# **EXHIBIT B**

HIGHLY CONFIDENTIAL

Page 336

1               UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
2

3      IN RE:  VALSARTAN, LOSARTAN AND  )
                                        )
4      IRBESARTAN PRODUCTS LIABILITY    )
                                        ) CASE NO:
5      LITIGATION                       ) 1:19-md-02875-RBKJS
                                        )
6                                       )
       THIS DOCUMENT RELATES TO:        )
7      In Re:  Valsartan, Losartan and  )
       Irbesartan Products Liability    )
8      Litigation.                      )
       _____

9

10

11                      (VOLUME II)
12     *HIGHLY CONFIDENTIAL REMOTE VIDEOTAPED DEPOSITION*
13              OF LAURA M. PLUNKETT, Ph.D.
14             FRIDAY, FEBRUARY 10, 2023
15                 9:04 CENTRAL TIME
16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 337

1
2          TRANSCRIPT of the stenographic notes of
3    the proceedings in the above-entitled matter, as
4    taken by and before LYDIA F. McDONNELL, a Certified
5    Shorthand Reporter and Notary Public of the State of
6    New Jersey, held remotely from Houston, Texas, on
7    Friday, February 10, 2023, commencing at 9:04 a.m.
8    Cental Time
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 338

1  A P P E A R A N C E S :
2  (All appearances remote via Zoom conference.)
3  HOLLIS LAW FIRM, P.A.
       BY:  C. BRETT VAUGHN, ESQ.
4  8101 College Boulevard, Suite 260
       Overland Park, Kansas 66210
5  913-385-5402
       brett@hollislawfirm.com
6  Attorneys for the Plaintiffs
7      - and -
8  LEVIN PAPANTONIO RAFFERTY PROCTOR BUCHANAN
       O'BRIEN BARR MOUGEY, P.A.
       BY:  DANIEL NIGH, ESQ.
9  316 S Baylen Street
10 Pensacola, Florida 32502
       805-435-7000
11 dnigh@levinlaw.com
       Attorneys for the Plaintiffs
12
       - and -
13
       RIVERO MESTRE LLP
14 BY:  JORGE MESTRE, ESQ.
       -and-
15     ZALMAN KASS, ESQ.
       2525 Ponce de Leon #1000
16 Miami, Florida 33134
       305-445-2500
17 jmestre@riveromestre.com
       zkass@riveromestre.com
18 Attorneys for the Plaintiffs
19     - and -
20 HARDING MAZOTTI, LLP
       BY:  ROSEMARIE RIDDLE BOGDAN, ESQ.
21 100 Park Avenue
       New York, New York 10017
22 917-540-9803
       Rosemarie.bogdan@1800law1010.com
23 Attorneys for the Plaintiffs
24
25

Page 339

1  A P P E A R A N C E S: (Continued)
2  (All appearances remote via Zoom conference.)
3  HINSHAW & CULBERTSON LLP
       BY:  GEOFFREY M. COAN, ESQ.
4  53 State Street, 27th Floor
       Boston, Massachusetts 02109
5  617-213-7000
       gcoan@hinshawlaw.com
6  Attorneys for the Defendant,
       Sciegen Pharmaceuticals, Inc.
7
8  HILL WALLACK LLP
       BY:  WILLIAM P. MURTHA, JR., ESQ.
9  21 Roszel Road
       Princeton, New Jersey 08540
10 609-924-0808
       wmurtha@hillwallack.com
11 Attorneys for the Defendant,
       Hetero Labs and Hetero Drugs
12
13 GREENBERG TRAURIG, LLP
       BY:  STEVEN M. HARKINS, ESQ.
14 Terminus 200
       3333 Piedmont Road NE, Suite 2500
15 Atlanta, Georgia 30305
       678-553-2312
16 sharkins@gtlaw.com
       Attorneys for the Defendant,
17 Teva Pharmaceutical USA, Inc.
18     -and-
19 WALSH PIZZI O'REILLY FALANGA, LLP
       BY:  CHRISTINE I. GANNON, ESQ.
20 Three Gateway Center
       100 Mulberry Street, 15th Floor
21 Newark, New Jersey 07102
       973-751-1017
22 cgannon@walsh.law
       Attorneys for the Defendant,
23 Teva Pharmaceutical USA, Inc.
24
25

Page 340

1  A P P E A R A N C E S: (Continue)
2  (All appearance remote via Zoom conference.)
3  SKADDEN, ARPS, SLATER, NEAGHER & FLOM, LLP
       BY:  JESSICA D. MILLER, ESQ.
4  One Manhattan West
       New York, New York 10001-8602
5  212-735-2588
       jessica.miller@skadden.com
6  Attorneys for the Defendant,
       ZHP
7
8  PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
       BY:  JASON M. REEFER, ESQ.
9      -and-
       FRANK H. STOY, ESQ.
10 301 Grant Street, 38th Floor
       Pittsburgh, Pennsylvania 15219
11 jmr@pietragallo.com
       fhs@pietragallo.com
12 Attorneys for the Defendant,
       Mylan N.V.
13
14 KIRKLAND & ELLIS, LLP
       BY:  BRITTNEY NAGEL, ESQ.
15 601 Lexington Avenue
       New York, New York 10022
16 212-309-4210
       brittney.nagel@kirkland.com
17 Attorneys for the Defendant,
       Torrent Pharmaceuticals
18
19 BUCHANAN INGERSOLL & ROONEY, P.C.
       BY:  CHRISTOPHER B. HENRY, ESQ.
20 Carillon Tower
       227 West Street, Suite 600
21 Charlotte, North Carolina 28202-2601
       704-444-3475
22 chirstiopher.henry@bipc.com
       Attorneys for the Defendant,
23 Albertson's LLC
24
       ALSO PRESENT:
25 Justin Bily - Videographer

2 (Pages 337 - 340)

Page 341

I N D E X

WITNESS: LAURA PLUNKETT, Ph.D.

DIRECT  CROSS  REDIRECT  RECROSS

MS. MILLER          342

MR. HARKINS                354

MS. NAGEL                  382

E X H I B I T S

NUMBER          DESCRIPTION          PAGE
Exhibit-12  21 CFR 314.420................... 368

SPECIAL REQUESTS

(No special requests)

Page 342

1  THE VIDEOGRAPHER: We are going on the
2  record at 9:04 Central Time on February 10th, 2023.
3  This is Media Unit No. 1 of the video-recorded
4  continuation deposition of Dr. Laura Plunkett
5  regarding the Valsartan litigation.
6      All counsel will be noted on the
7  stenographic record.
8      Would the court reporter please swear in
9  the witness, and then we can begin.
10 L A U R A   M.   P L U N K E T T, Ph.D., doing
11 business at 13923 Carriage Rock Lane, Houston, Texas,
12 77336, having been duly sworn by the Notary Public,
13 testified as follows:
14     MR. VAUGHN: Jessica, before we begin,
15 just on the record, we agreed we have a one-hour
16 limit between the three Defendants.
17     MS. MILLER: Correct.
18     MR. VAUGHN: Awesome. Thank you. Go
19 ahead.
20 CONTINUED REDIRECT EXAMINATION BY MS. MILLER:
21     Q.  Hi, Dr. Plunkett. Good to see you
22 again. I know it's been a while, but do you recall
23 saying at your last deposition when you were being
24 questioned by Plaintiff's counsel that if at any
25 point in time Valsartan contained NDMA, it would be

Page 343

1  de- -- or NDEA, it would be deemed adulterated?
2      A.  I don't remember the exact question, but
3  I certainly do have an opinion. I think it's
4  consistent with something that I have stated in my
5  report as well.
6      Q.  And right before I was cut off, I asked
7  you who you believed would deem Valsartan
8  adulterated, and you said -- and I'm quoting from
9  your -- from the transcript -- "I would deem it
10 adulterated consistent with the FDA's actions that
11 they took and a decision that they made in 2019 when
12 they sent the warning letter and made that
13 statement." Do you recall that?
14     A.  Again, not the exact language, but I
15 think that's true. I would -- I would stand by that
16 testimony, yes.
17     Q.  So -- so you --
18     A.  I wouldn't change that.
19     Q.  So you agree that adulteration is a
20 finding that's made by the FDA.
21         MR. VAUGHN: Object to form.
22     A.  In terms of an official regulatory
23 finding, yes. The FDA would make that finding;
24 however, like in this litigation, or any litigation
25 that I've served in, as an expert dealing with

Page 344

1  compliance with FDA regulations, it is certainly
2  something that I -- I have in the past, and have
3  formed an opinion on that, I believe consistent with
4  the regulation and consistent with FDA's own finding
5  that the product is -- would be deemed adulterated.
6      Q.  And the FDA made that finding with
7  respect to ZHP's API in the warning letter, correct?
8          MR. VAUGHN: Object to form.
9      A.  Yes. I -- well, I don't -- it may be in
10 other places, but certainly, it is in the warning
11 letter, yes.
12     Q.  Did you see any other places where the
13 FDA made a finding that ZHP's API -- scratch that.
14         Did you see any other document in which
15 the FDA used the term "adulterated" or "adulteration"
16 with respect to ZHP's API?
17         MR. VAUGHN: Object to form.
18     A.  I'd have to go and look to answer that
19 fully. I don't recall. It's possible that it is
20 discussed on some of the documents on the FDA website
21 that are -- that deal with issues related to the
22 recall, but I'd have to look. I don't recall.
23     Q.  Are you aware of any statement the FDA
24 said suggesting, or otherwise referencing
25 adulteration or adulterated with respect to ZHP's API

3 (Pages 341 - 344)

HIGHLY CONFIDENTIAL

Page 345

1 prior to the November 2018 warning letter?
2          MR. VAUGHN:  Object to form.
3     A.    Based on the evidence I've seen, I can't
4 answer that without looking, but I would be surprised
5 if they did because, again, when FDA put -- makes
6 that determination, it's regulatory finding that
7 would trigger a warning letter typically, or some
8 official action.  Adulteration is one of those
9 standards that would be triggered -- one of those
10 things that would trigger an actual -- either an
11 untitled letter, but most likely a warning letter,
12 being issued to the company.  So I -- I -- that's
13 where I would expect to see it when FDA makes that
14 statement.
15    Q.    Okay.  That was a long roundabout
16 answer.  I just want to make sure I understand.  You
17 are not aware of the FDA making any finding or
18 statement prior to the warning letter of November
19 2018 suggesting or stating that ZHP's API was
20 adulterated, correct?
21          MR. VAUGHN:  Object to form.
22    A.    And I'd answer the same way:  I can't
23 answer that fully without looking based on the fact
24 that you're giving it a specific date; however, as I
25 state- -- I -- I tried to point out to you that I

Page 346

1 would expect to find it in official documents, like a
2 warning letter, because that is typically where I see
3 such statements or decisions discussed.
4     Q.    Okay.  I'm a little confused by your
5 answer, because my question was are you aware of, not
6 was there.  And so I just want to clarify.  You are
7 not aware of any such finding, statement or
8 suggestion prior to November 2018, correct?
9          MR. VAUGHN:  Object to form.
10    A.    And I'd answer the same way:  I said I
11 can't answer that fully without looking, but I was
12 trying to explain to you that if -- if it did exist,
13 it would be in something like another warning letter.
14 I don't recall, and I'd have to go look in the files
15 to see if there's anything else.
16    Q.    Sitting here today, you're not aware of
17 such -- of any such statement or suggestion by the
18 FDA, correct?
19    A.    Without --
20          MR. VAUGHN:  Object to form.
21    A.    Without looking, that is correct.  I'd
22 have to go back and look at the documents; that's
23 correct.
24    Q.    And you're also not aware of any
25 statement issued by the FDA suggesting that ZHP

Page 347

1 failed to comply with CGMP prior to the November 2018
2 warning letter, correct?
3          MR. VAUGHN:  Object to form.
4     A.    I need to ask you to clarify.  Can I ask
5 for a clarification of that question?  Because I
6 think it's a little un- -- it's a little ambiguous.
7 Can -- you want me to explain what I'm -- why I'm
8 confused?
9     Q.    Sure.
10    A.    So are you saying that -- are you
11 limiting this to the fact that FDA never made a
12 determination that there was a lack of compliance
13 with GMP except in a letter that is dated in 2018
14 even though it may also reference things that
15 happened before 2018, or are you saying that -- are
16 you saying that -- are you doing something else?  If
17 that's what you're answering -- if that's what you're
18 asking, I think that's a little more clear, and I can
19 answer that question.
20    Q.    I am asking whether you are aware of any
21 statements made by the FDA before the warning letter
22 in November 2018 in which the FDA suggested or stated
23 that ZHP had failed to comply with CGMP?
24          MR. VAUGHN:  Object to form.
25    Q.    It's a very simple question.

Page 348

1     A.    It's really not so simple because they
2 can be in a warning letter where they made a
3 statement re: referencing actions or activities that
4 predate --
5     Q.    I didn't ask that.
6     A.    -- a statement, but certainly --
7     Q.    I'm asking about the date of a
8 statement.  Are you aware of any statement made by
9 FDA before November 2018?  That's the question I'm
10 asking.  You can answer --
11          MR. VAUGHN:  Object to form.
12    Q.    -- another question to Brett.
13          MR. VAUGHN:  Argumentative.
14    Q.    My question is, are you aware of a
15 statement made by FDA before November 2018 in which
16 FDA suggested or stated that ZHP had been in
17 violation of CGMP?
18          MR. VAUGHN:  Object to form.
19 Argumentative.  Asked and answered.
20    A.    So I -- I can't answer that question
21 without looking as well, because now I'm -- I'm
22 thinking as I listen to your question, are you only
23 limiting it to Valsartan and that API?  Then that's a
24 little easier question to answer.
25          Again, there's -- there's multiple times

4 (Pages 345 - 348)

HIGHLY CONFIDENTIAL

Page 349

1 that FDA has interacted with the -- ZHP, but if
2 you're talking about specific to the issue of
3 Valsartan and the CGMPs for Valsartan, is that what
4 you're asking?
5    Q.    That is what I'm asking.
6    A.    I'd have to go look. I can't answer
7 that to say for sure, but certainly, they did do that
8 in 2018; that is correct.
9    Q.    Sitting here today, can you point to any
10 statement or suggestion made by the FDA before
11 November 2018 regarding ZHP's compliance with CGMP
12 with respect to Valsartan?
13        MR. VAUGHN: Object to form.
14    A.    So I'd answer the same way: I'd have to
15 go look. I can't answer that without looking to see
16 if there is another document, but certainly, they do
17 do that in the 2018 document.
18    Q.    But you can't point right now without
19 looking to any other document. Is that correct?
20        MR. VAUGHN: Object to form.
21 Argumentative.
22    A.    Not without looking, I -- I cannot name
23 you another document; that is true. But again, I --
24 I can't say that there is not such a document.
25    Q.    Do you ever recall seeing such a

Page 350

1 document?
2        MR. VAUGHN: Object to form.
3    A.    I have -- I don't recall ever asking the
4 question of the doc- -- I don't recall ever assessing
5 the documents the way you're asking the question, so
6 that's why I'm -- I'm -- I'm stating it the way I am.
7 It's not that I went about review of the documents to
8 look for a statement specific -- as specific as you
9 are asking it.
10        I'm not the -- I'm not the only one
11 dealing with the issues related to GMP, so it's very
12 possible there are other letters that are in the
13 documents that I've looked at that I just don't
14 remember, because they're not ones that I state to --
15 I don't cite to in my report, for example, in terms
16 of the description of my opinion.
17    Q.    Do you consider yourself to be offering
18 a CGMP opinion in this litigation?
19    A.    I'm not the CGMP expert in terms of all
20 of the details of the CGMP inspections compliance,
21 that is, I believe, Dr. Bain in the litigation, but I
22 certainly have expertise around the issues of the
23 importance of CGMP as described in my report to
24 complying fully and as it relates to the issue of
25 adulteration.

Page 351

1    Q.    Are you or are you --
2    A.    How important the CGMP standard is to
3 that.
4    Q.    Are you or are you not offering an
5 opinion about ZHP's compliance with CGMP?
6    A.    From the aspect as stated in my report,
7 I am giving you an opinion as it relates to the issue
8 of how CGMP ties to the adulteration standard, yes,
9 but I did not do the full analysis on my own of all
10 of the documents related to the GMP issues. Again,
11 that's in the scope of Dr. Bain, so I'd suggest that
12 that's where you would go to ask a lot of the
13 questions you may have about the documents in that
14 area.
15    Q.    So you're offering an opinion about
16 CGMP, but you don't know whether FDA ever addressed
17 ZHP's compliance with CGMP with respect to Valsartan
18 before the November 2018 warning letter.
19        MR. VAUGHN: Object to form. Compound.
20 Argumentative.
21    A.    So I'm saying I'd have to go back and
22 look at the documents. I don't recall. That's all
23 I'm stating for you. Because in my report, if you
24 look at what I address as it relates to the
25 statement, I point to the 2018 letter.

Page 352

1    Q.    Do you point to anything else?
2    A.    In my report as stated, no. But what
3 I'm telling you, I did have access to a variety of
4 other documents. And as you're asking the question,
5 I'd have to go back and look to see whether or not
6 any of the other documents that I have seen or that
7 have been attached as exhibits to depositions that I
8 have reviewed indeed address your point.
9    Q.    If the FDA had addressed adulteration or
10 CGMP violations with respect to Valsartan before
11 November '18, wouldn't you have included that in your
12 report?
13        MR. VAUGHN: Object to form.
14    A.    It depends.
15    Q.    What does it depends on?
16    A.    It depends upon the -- how the evidence
17 related in terms of the opinions -- the -- the way
18 that -- the information I've reviewed, the opinions
19 that I've expressed. I don't recall that document,
20 but as I always do in my deposition, if you have one,
21 show it to me. I don't recall it, but I can't say
22 for sure that I have ruled out that there's nothing
23 there because that was beyond the scope of what I
24 did. Looking for and reviewing and having at the tip
25 of my memory everything that I -- that I have

5 (Pages 349 - 352)

HIGHLY CONFIDENTIAL

Page 353

1  reviewed, there are other documents there. They
2  looked and did other GMP inspections in the past.
3  Where the GM- -- where the Valsartan line was,
4  indeed, operating at ZHP. I don't recall a document,
5  that's what I think I've told you already. But I
6  can't -- in order to fully answer and say absolutely,
7  there is no such document, I'd have to go look.
8      I don't know how else to -- to answer
9  the question for you in order to be accurate in terms
10 of what my memory is and what the -- the breadth of
11 the information that is available to me.
12     Q.   Are you offering an opinion on whether
13 the FDA made any statements regarding adulteration or
14 CGMP violations with respect to ZHP's Valsartan API
15 before November 2018?
16     A.   About their statement? No. Because
17 I -- that is not in my report. What I cite to in my
18 report is the 2018 statement.
19     Q.   So you do not have an opinion as to
20 whether or not that was the first time the FDA
21 offered a statement or suggestion regarding
22 adulteration or CGMP with respect to API -- ZHP? You
23 don't have --
24         MR. VAUGHN: Object to form.
25     A.   I have not formed that opinion as you're

Page 354

1  asking it, no. And in order to verify one way or the
2  other for you, I'd have to go and look.
3      Q.   And you don't recall that. Sitting here
4  today, you don't recall whether that's the first time
5  or not.
6          MR. VAUGHN: Object to form.
7      A.   I can't tell you without looking
8  accurately, whether that is, indeed, the first time.
9  I -- I certainly am aware that -- that that is a time
10 that's highly relevant in this case, and I have
11 discussed it and described it in my report.
12         MS. MILLER: Steve, she's all yours.
13 RECROSS-EXAMINATION BY MR. HARKINS:
14     Q.   Good morning, Dr. Plunkett. How are you
15 doing?
16     A.   Fine. Thank you.
17     Q.   I would like to follow up on a few
18 things from the end of your deposition.
19         As a reminder in case you've forgotten,
20 I represent the Teva Defendants, one of the
21 finished-dose manufacturers in this case. You're
22 aware of that, right?
23     A.   Yes.
24     Q.   You just testified a little bit about
25 the warning letter that was directed to ZHP with

Page 355

1  Ms. Miller, correct?
2      A.   Yes.
3      Q.   You're aware that the FDA has never sent
4  a warning letter to Teva related to their Valsartan
5  finished-dose drug product?
6      A.   So I can't verify that by the research
7  that I have done. In other words, I haven't looked
8  at all of the warning letters that have come in, for
9  example, what might have happened after the warning
10 letter from 2018, but I can't -- I certainly have not
11 referred to one, and I have not formed an opinion
12 about any warning letters to Teva after 2018 'cause I
13 don't cite to them in my report. Does that answer
14 your question?
15     Q.   You're -- you're not aware of any
16 warning letter like the one that was sent to ZHP that
17 was sent to Teva related to their finished-dose
18 Valsartan drug product. Is that correct?
19     A.   I have not seen such a warning letter;
20 that is true.
21     Q.   Are you aware of any public statement by
22 FDA or finding related to Teva's finished-dose drug
23 product being adulterated?
24         MR. VAUGHN: Object to form.
25     A.   Are you being broad as far as public

Page 356

1  statements? And the reason I ask that is so, for
2  example, at the FDA website where they discuss the
3  recall, they're listed as a product that's been
4  recalled, and it's listed as being recalled because
5  of the presence of the NDMA. And we know that the
6  presence of the NDMA is what triggered the
7  adulteration finding by the government, by -- by FDA,
8  so that evidence exists. But maybe you're meaning
9  something more specific, so....
10     Q.   I -- I -- I think I am. Let me try and
11 help.
12         I understand your opinion with regard to
13 adulteration. I am asking if you are aware -- and I
14 am being broader than just a warning letter -- of any
15 public statement by the FDA specifically that Teva's
16 finished-dose drug product was adulterated.
17         MR. VAUGHN: Object to form.
18     A.   Okay. So do you -- you -- are you
19 asking me do they use the -- a specific set of words
20 or.... because I do think in the -- I'd have to go
21 pull them. I have some of them printed out here like
22 I had at the first deposition. I'd have to go back
23 and look at the statements from the FDA website over
24 time because they mention API from Teva, from
25 Torrent. From a variety of different manufacturers.

6 (Pages 353 - 356)

HIGHLY CONFIDENTIAL

Page 357

1 Not API --
2     Q.    I am being --
3     A.    -- finished dose.  Finished-dose
4 product.
5     Q.    I am being specific to Teva's
6 finished-dose drug product and the actual term
7 "adulteration" as set forth in the Food, Drug and
8 Cosmetics Act, if you are aware of any public
9 statement, including on those statements that you are
10 referencing, declaring that Teva's finished-dose
11 Valsartan drug product was adulterated.
12     A.    I'd have to go look to see the exact
13 terms they use, but I would argue -- not argue.  I
14 would point out to you that the fact that the product
15 was "recall" was evidence of, and linkage to that
16 finding of adulteration.  That's what led to the
17 recall.  And their product, indeed, is stated in the
18 doc- -- in different public documents to have been
19 subject to the recall.
20        But if you are looking for a specific
21 sentence that says FDA sent a warning letter saying
22 that Teva had an adulterated product or FDA found
23 Teva's product to be adulterated, those specific
24 words, I'd have to go look.  I don't know.  But
25 basically, to me, as a regulatory expert, the issue

Page 358

1 is they were recalled.  It is stated they were part
2 of the recall, and -- and the evidence shows and the
3 facts of the case show, that that recall was linked
4 to the finding of adulteration in the API.
5     Q.    Dr. Plunkett, you're not aware, as you
6 sit here today, without reviewing additional
7 material, of any such statement.  Is that fair?
8        MR. VAUGHN:  Object to form.
9     A.    I'm not aware of those specific words as
10 you're asking, but I'm trying to point out to you
11 that regardless of whether those words are used, the
12 fact that the public documents describe Teva's
13 product as part of the recall, that there is
14 essentially linking those to the issue of
15 adulteration.  That was the reason for the recall, so
16 I don't think you can walk away from that.  Their
17 product would be -- because of the recall, their
18 product is also adulterated because of the fact that
19 it contains the -- the ZHP API.
20     Q.    Dr. Plunkett, I'm not asking or -- or --
21 or requesting that you change your opinion that I
22 understand as to whether you believe the product was
23 adulterated; I'm just trying to confirm, are you
24 aware, as you sit here today, of any public statement
25 that specifically indicates Teva's Valsartan

Page 359

1 finished-dose product was adulterated?
2        MR. VAUGHN:  Object to form.
3     A.    And I'd have to answer it the exact same
4 way:  The way you're asking -- if -- if you're asking
5 me that specific phrase, I'd have to go look in
6 the public statements, but how -- what I'm pointing
7 out to you is regardless of whether those specific
8 words are there is -- the product is what it is.
9 It's an adulterated product that was included in the
10 recall.
11     Q.    And Dr. Plunkett, I am not asking you to
12 speculate on documents that you haven't seen.
13 Without going and reviewing additional documents, as
14 you sit here today, you are not aware of that
15 specific statement with respect to Teva's Valsartan
16 finished-dose drug product, correct?
17        MR. VAUGHN:  Object to form.
18     A.    I am not aware of those specific words;
19 that is correct.  But again, I think that there's
20 context here that is important to understand, and
21 that's all I'm trying to point out to you.  Is that
22 the con- -- the -- the use of those words is -- is --
23 is one thing, but there's also the understanding of
24 what the recall was based on, which we know there are
25 many -- there's a variety of public statements from

Page 360

1 Teva themselves about them recalling their product.
2     Q.    Understood.  Dr. Plunkett, is, in your
3 opinion, that every product that is recalled is
4 adulterated under the FD&C Act?
5     A.    No.  There's different reasons for
6 recall, if that's what you're asking me.
7 Adulteration -- adulterated products are often
8 subject to recall, but there's -- you know, I -- I
9 wouldn't say it's at 100 percent all the time that
10 they would be recalled.  It would depend whether
11 there's anything to recall, No. 1.  And then there's
12 other reasons to recall besides adulteration.
13        Misbranding, for example, is a reason to
14 potentially recall if the FDA makes the decision that
15 the issues related to the misbranding are serious
16 enough to raise a safety concern for the public.
17        Illegally -- illegally selling a product
18 that is a -- another example would be illegally
19 selling a product that is making drug claims, which
20 isn't regulated as a drug could be subject to a
21 potential recall as well.  There's a variety of
22 different ways.
23     Q.    And just to confirm, there -- there are
24 other different ways.  Those aren't specifically the
25 things that are at issue in this case, correct?

7 (Pages 357 - 360)

HIGHLY CONFIDENTIAL

Page 361

1          MR. VAUGHN: Object to form.
2      A.   That is -- based on the recall that is
3  at issue in this case; that is true. It is around an
4  adulteration issue.
5      Q.   Now, in -- in addition to issuing a
6  warning letter, the FDA has any number of other
7  enforcement mechanisms that it can take when it deems
8  a product to be adulterated or otherwise
9  inappropriately present on the market. Is the right?
10         MR. VAUGHN: Object to form.
11     A.   If you're asking me generally about
12 their --
13     Q.   Generally, yeah.
14     A.   -- mobilities, yes. Generally they have
15 a variety of enforceabilities; that is true.
16     Q.   They could seize adulterated product in
17 coordination with DOJ. Is that right?
18     A.   If it got raised to that level, yes. It
19 typically doesn't happen unless the company refuses
20 first to cooperate.
21     Q.   They can issue consent decrees. They
22 can do import alerts. Those type of things?
23     A.   Import alerts, absolutely. Those are a
24 very -- that happens all the time. That's actually a
25 pretty easy thing to do. But the -- the issues

Page 362

1  related to seizures, those kinds of things, those are
2  things that typically don't happen unless there's
3  been some -- in my experience, there's been some lack
4  of cooperation for the -- on a -- by a company to
5  cooperate in terms of taking care of the issue.
6      Q.   And they can take a number of actions
7  after an FDA inspection. They could take a --
8  something like an Official Action Indicated if they
9  find problems at the facility?
10         MR. VAUGHN: Object to form.
11     A.   Are you asking is that possible for FDA
12 to do? If that's what you're asking, yes, that --
13 there are different things that FDA can do.
14     Q.   Yes, no. That's -- that's what I'm
15 asking generally. They could also take a Voluntary
16 Action Indicated after inspection of a facility as
17 well generally.
18         MR. VAUGHN: Object to form.
19     A.   By "they" do you mean the company, or by
20 "they" do you mean --
21     Q.   I mean FDA.
22     A.   Oh, FDA. They can ask for vol-- oh,
23 sure. They can ask a company or they can inquire or
24 write to a company and ask for voluntary action. Is
25 that what you're asking?

Page 363

1      Q.   Yes.
2      A.   Yeah, that's correct. It can be a
3  voluntary. And -- and typically, most recalls are
4  voluntary, again, because most companies will
5  cooperate when an issue is identified and brought to
6  their attention.
7      Q.   And as we know from this case, they can
8  send a warning letter to a company, right?
9          MR. VAUGHN: Object to form. Vague. As
10 too vague.
11     A.   Well, it depends.
12     Q.   Sorry. If the FDA sends a warning
13 letter. Let me correct the question, Dr. Plunkett.
14         MR. VAUGHN: I was trying to help.
15     Q.   If FDA --
16         MR. HARKINS: Sorry. I understood the
17 objection. Withdrawn.
18     Q.   FDA can obviously send a warning letter
19 to a company, correct?
20     A.   A company that it regulates as it
21 relates to a product; yes, that's correct. If it --
22 if it has -- if FDA is -- if a company has a product
23 under the purview of FDA, yes, FDA can send a warning
24 letter.
25     Q.   And as you sit here today, you're not

Page 364

1  aware of FDA taking a single one of these enforcement
2  steps with respect to Teva and their Valsartan
3  finished-dose drug product, are you?
4          MR. VAUGHN: Object to form.
5      A.   Well, certainly, recall they did. Is
6  that what you're asking me? There was a recall that
7  was asked for. But are you asking me about seizures
8  and junctions, import alerts? What are you asking?
9      Q.   Other than the voluntary recall that
10 Teva initiated in coordination with FDA, are you
11 aware of any other official action like any of those
12 we just described taken by FDA with respect to Teva's
13 Valsartan finished-dose drug product?
14         MR. VAUGHN: Object to form.
15     A.   I -- off the top of my head, I am not
16 aware -- or I couldn't name one for you. But again,
17 I can't -- I can't -- I can't with 100 percent surety
18 say that such doesn't exist somewhere. I just -- I'm
19 not aware of it. That's the best way I can answer it
20 for you.
21     Q.   Understood. At the end of your
22 deposition last time, you discussed the finished-drug
23 manufacturer obtaining access to the closed portion
24 of the DMF for API referenced in its ANDA. Do you
25 recall that testimony?

8 (Pages 361 - 364)

HIGHLY CONFIDENTIAL

Page 365

1    A.    In general terms we did; yes, that's
2 correct.
3    Q.    You cannot identify any section of the
4 Code of Federal Regulations that requires a
5 finished-dose manufacturer to obtain access to the
6 DMF for API referenced in its ANDA?
7         MR. VAUGHN: Object to form.
8    A.    Off the -- no. But again, the -- the
9 FDA regulations as they exist are a -- a floor, a
10 ceiling, a minimum set. I am aware of the fact
11 'cause I've worked with companies before that go to
12 someone when they're going to be considering them as
13 a supplier and asking for an NDA or a confidentiality
14 agreement to review in detail files that relate to a
15 process, so it can be done.
16    Q.    Again, I --
17    A.    But that -- but I would agree with you.
18 I don't -- I don't believe there -- any of the
19 regulations address that specifically.
20    Q.    And similarly, you cannot identify any
21 CGMP that requires a finished-dose manufacturer to
22 obtain access to the DMF for API referenced in its
23 ANDA, correct?
24         MR. VAUGHN: Object to form.
25    A.    Well, the CGMP regulations are more

Page 366

1 broad than that. That would be a pretty prescriptive
2 step to be asking that someone to do -- or asking to
3 be in the regulations, but I would argue that -- or
4 not -- I don't want to argue. I would point out that
5 the CGMP regulations require that a finished-dose
6 manufacturer have processes in place, a good quality
7 system, management system in place to ensure that
8 their product is being manufactured and produced
9 consistent with GMPs. That's part of that as we
10 talked about in some detail, I believe. I don't
11 think it may have been with you. It may have been
12 with Ms. Miller back -- back in January on the first
13 day.
14         Those quality system requirements or
15 those quality systems include the -- the fact that
16 the finished-dose manufacturer has to have
17 appropriate processes in place to ensure that their
18 drug, indeed, is being produced consistent with GMP.
19    Q.    And -- and I think you may have answered
20 my question at the beginning, but just to confirm. I
21 am not asking about broader quality system issues; I
22 am just trying to confirm that there is no specific
23 prescription under CGMPs requiring a finished-drug
24 manufacturer to obtain access to the DMF in order to
25 reference API in its ANDA, correct?

Page 367

1    A.    Yes. I answered that, and I said yes,
2 that I -- I am not aware of that. And the reason is,
3 first off, the regulations are not that prescriptive;
4 however, there is guidance around this issue and the
5 guidance that FDA has -- has produced indicates that.
6 That's what I'm referring to, is the idea that
7 there's an expectation, and actually a -- the -- the
8 regulations broadly require that a finished-dose
9 manufacturer take all steps necessary to ensure that
10 the product they're selling is consistent and in
11 compliance with CGMP.
12    Q.    Dr. Plunkett, I'm gonna go ahead and
13 just Screen Share a section of the CFR here. We can
14 introduce this as an exhibit as well. Are you
15 familiar with this regulation?
16    A.    Yes. If you want to talk about a
17 specific section, I'll -- I'll -- we'll need to
18 review it.
19    Q.    Understood. And this is cited in your
20 Reliance list. I think generally under 21 CFR DMF.
21 Is -- is this what you're referring to there?
22    A.    Yes. This is part of it. This is just
23 one page of it. But yes, that's correct.
24    Q.    Understood. And I'm happy to upload
25 this and let you have any time to review it if you

Page 368

1 need, but looking just down under the first part here
2 on subsection A. Do you see that?
3    A.    I see section -- yes. I see that
4 section, yes.
5         MR. VAUGHN: Steve, do you mind
6 uploading it just so I can review the full document
7 as well.
8         MR. HARKINS: Yeah. And this has been
9 into the -- popped in the Dropbox.
10         Is the videographer on to add this to an
11 exhibit? I think we're on the Novak Trial Services
12 platform today.
13         MR. VAUGHN: That's the one I'm on.
14         THE VIDEOGRAPHER: Yes. It -- it should
15 be in there now.
16         MR. HARKINS: I'm up- -- re-uploading it
17 now. Give me one second.
18         (Exhibit-12, 21 CFR 314.420, marked for
19 identification.)
20         THE WITNESS: Can I ask a question?
21 This will be Exhibit -- a new exhibit that -- you're
22 gonna make this Exhibit-12. Is that correct?
23         MR. HARKINS: Yes. It will be a new
24 exhibit.
25         THE WITNESS: Okay.

9 (Pages 365 - 368)

HIGHLY CONFIDENTIAL

Page 369

1     MR. HARKINS:  And do you have access to
2 the Dropbox, Dr. Plunkett?
3     THE WITNESS:  I -- well, I don't think I
4 need it for this document.  It's two pages.  I'm
5 generally familiar with what's here.  Ask your
6 question.  I may need you to go to page 2.  But if
7 you're on Part A, I can see it, so go ahead -- right
8 ahead and ask your question.
9     MR. VAUGHN:  I'm good to go, Steve.  And
10 I've got it pulled up now.
11     MR. HARKINS:  Great.
12   Q.   All right.  And Dr. Plunkett, if you
13 need any time or questions about the document, just
14 let me know.
15   Looking under subpart A, and I'm asking
16 to start with the -- it is the phrase after the colon
17 "purposes."  If you're able to see it here.
18   A.   Yes, I see it.  "To permit the holder."
19   Q.   And go ahead and just read that sentence
20 into the record.
21   A.   "To permit the holder to incorporate the
22 information by reference when the holder submits an
23 investigational new drug application under part 312
24 or submits an application or an abbreviated
25 application or an amendment or supplement to them

Page 370

1 under this part, or to permit the holder to authorize
2 other persons to rely on the information to support a
3 submission to FDA without the holder having to
4 disclose the information to the person."
5   Q.   And -- and I'm happy to -- if you want
6 to qualify this:  Generally speaking, this is the
7 description in the CFR of the purpose of Drug Master
8 Files?
9   A.   Yes, that's correct.
10   Q.   And in that language that you just read,
11 the holder in this case would be the DMF holder or
12 the API manufacturer.  Is that correct?
13     MR. VAUGHN:  Object to form.
14   A.   It would be -- this is the DMF holder,
15 and obviously the DMF holder could be more than an
16 API manufacturer.  But yes, an API manufacturer in
17 this case was the Drug Master File holder; that is
18 true.
19   Q.   And when it says "other persons to rely
20 on the information," those other persons would be
21 finished-dose manufacturers from, for example,
22 another company, correct?
23     MR. VAUGHN:  Object to form.
24   A.   Well, I think they're pretty broad, but
25 that generally would be who I would be expecting that

Page 371

1 other person to be, yes.
2   Q.   And understanding it might be broader,
3 but in this case, for example, that would be Teva and
4 Torrent as the finished-dose manufacturers
5 referencing ZHP's Valsartan API DMF.  Is that right?
6   A.   Yes.  But I'm a- -- I'm aware of the
7 fact that they did; that is correct.  And that --
8 that relationship is true based upon the way you've
9 described it.
10   Q.   And just to return to one of your
11 statements about the regulation, are you aware of any
12 FDA guidance, and again, that requires a
13 finished-dose manufacturer to obtain access to the
14 DMF for API referenced in its ANDA?
15     MR. VAUGHN:  Object to form.
16   A.   State the first part of your sentence
17 again?
18   Q.   I -- I believe you've indicated --
19 'cause I had asked some questions about whether there
20 was anything in the CFR or in GMPs as to whether
21 there was anything that specifically required a
22 finished-dose manufacturer to either seek or obtain
23 access to API -- sorry -- to the DMF for its API.  My
24 question is, can you identify any FDA guidance that
25 requires a finished-dose manufacturer to obtain

Page 372

1 access to the DMF for API referenced in its ANDA?
2   A.   So I think -- I -- I think you're asking
3 something other than the way I'm hearing it, 'cause I
4 would say to you, this regulation specifically is
5 requiring them to reference it obviously.  If they're
6 going -- if they're gonna be permitted to -- if
7 they're -- if they're gonna be permitted to reference
8 it, this is the way they would do it, I guess is what
9 I'm saying, but I think you're asking something else.
10   I -- I think what you're -- maybe I'm
11 wrong, but I think where you're going -- maybe you
12 need to reask the question 'cause I'm not really sure
13 what you're trying to ask in terms of the -- because
14 this particular -- this particular part of the
15 language would, indeed, state what the holder should
16 be doing in terms of referencing the DMF.
17   Q.   And -- and just to be clear -- and maybe
18 this is two questions.  First, Dr. Plunkett, this
19 regulation does not require an ANDA applicant to
20 obtain access to the closed portion of the DMF,
21 correct?
22   A.   Oh.  That's a different -- okay.  I
23 didn't hear "closed portion" in your other question.
24 That's why I was confused.
25   Okay.  So yes; that is correct.  It does

10 (Pages 369 - 372)

HIGHLY CONFIDENTIAL

Page 373

1 not require them to access the closed portion; that
2 is true. This is not there.
3    Q.    And --
4    A.    But again, there's other -- there's
5 other regulations or other guidance that I was
6 talking about when I was referencing that issue.
7    Q.    And that is my question. Are you aware
8 of any guidance from FDA that requires an ANDA
9 applicant to obtain access to the closed portion of a
10 DMF?
11        MR. VAUGHN: Object to form.
12    A.    I think I answered that for you earlier.
13 I said I don't recall -- I don't -- I don't think
14 there's a specific language to the regulation to
15 require it in the way you're stating it; however,
16 they do require compliance of GMPs. And if the only
17 way to ensure compliance, in my view, for example, in
18 this case, is to understand the details on whether or
19 not the company making the API has -- is complying
20 with those GMPs having done the full risk assessment
21 and all those things, I don't know how you do that
22 without getting into some of the closed portion of
23 the -- of the Drug Master File.
24        But I -- that's -- that's -- I don't
25 think that's what you're asking me, so I tried to

Page 374

1 answer it first. I don't believe there's specific
2 language the way you are stating it, but that doesn't
3 mean the finished-dose manufacturer doesn't have an
4 obligation under the law, the regulations and also as
5 set forth in the guidance to take steps to ensure
6 that their drug that they're selling, their finished
7 dose is, indeed, in compliance with GMP.
8    Q.    Well, maybe -- let me try and break that
9 down a little bit.
10        You don't cite to any document in your
11 report which identifies a requirement for a
12 finished-dose drug manufacturer to obtain access to
13 the closed portion of a DMF, do you?
14    A.    I don't state an -- an opinion that way.
15 No, I don't. If that's what you're asking me. I
16 don't have a statement that proactively states
17 exactly what you did; however, I have opinions that
18 are relevant to answering that question.
19    Q.    Understood. And I just want to be
20 clear. You don't identify any document on your
21 Reliance list which requires a finished-dose
22 manufacturer to obtain access to the closed portion
23 of a DMF, do you?
24    A.    There's not, no. But again, it --
25 what -- what is the step there, as I discuss in my

Page 375

1 report, is the regulations for the finished-dose
2 manufacturer that are applicable which would require
3 them to take the steps they need to take to ensure
4 that their product is being manufactured consistent
5 with GMPs which, in my view, could include access to
6 the closed portion. And in my experience working
7 with companies, that's what companies have done.
8    Q.    So I just want to clarify. Is it your
9 opinion that any finished-dose manufacturer who does
10 not obtain access to the closed portion of the DMF
11 violation of CGMPs?
12    A.    No. I'm not implying that. That's a
13 broader statement than I think I -- I have stated.
14 Do you want me to explain?
15    Q.    Maybe I can clarify. I understand it is
16 your opinion in this case that the finished-dose
17 manufacturers should have done that. Is it your
18 opinion that any finished-dose manufacturer who does
19 not also manufacture the API needs to obtain access
20 to the closed portion of the DMF in order to comply
21 with CGMP?
22        MR. VAUGHN: Object to form.
23    A.    I think that is not an opinion --
24 opinion that I have formed at this time, no.
25 However, I would couch that by saying that it's

Page 376

1 probably most important. I might have that -- that
2 opinion if you added the clause, in cases where the
3 API manufacturer is using a process that is -- that
4 is different than the process that was part of the
5 listing of the monograph for the referenced listed
6 drug.
7    Q.    Okay. So with that qualification, then,
8 is it your opinion that any finished-dose
9 manufacturer who does not obtain access to the DMF
10 violation of CGMP or that DMF, does not use the same
11 manufacturing process as the referenced listed drug?
12        MR. VAUGHN: Object the form.
13    A.    I would -- I would -- I would say that
14 that -- it -- that could be an issue, yes; that's
15 correct. I mean, I think I would couch that with, it
16 could. Because I -- it would really depend on the
17 circumstances and the conditions.
18        Certainly, the regulations do not put
19 out the requirement the way -- I think I've agreed
20 with you on that. I -- the regulations don't make it
21 an absolute requirement for the company to take that
22 step, but as I've tried to explain, that the issue in
23 this case is different. The issue in this case --
24 and I -- I think I have formed the opinion, and I
25 don't want to go back over that again, but

11 (Pages 373 - 376)

HIGHLY CONFIDENTIAL

Page 377

1 essentially you know what my opinion is. I do
2 believe, in this case, they should have done that.
3    Q.    And I'm gonna go ahead and take that
4 down. And if for any reason you need to see that
5 again, Dr. Plunkett, let me know.
6        Dr. Plunkett, at the end of your
7 deposition last time, you also testified that the
8 finished-dose manufacturers, including Teva, should
9 have done what Novartis did to identify the NDMA
10 impurity. Do you recall that testimony?
11    A.    I don't know exactly how I stated it,
12 but I certainly do -- do believe that -- that as --
13 as -- I think what I stated was we know that a
14 finished-dose manufacturer did do it, so it could
15 have been done. And certainly, that would have been
16 something that would have made sense for these
17 companies to do. They didn't do it. But certainly,
18 they could have, and I believe they should have.
19    Q.    Have you reviewed documents to determine
20 how Novartis identified, and then structurally
21 characterized, the NDMA in Valsartan API?
22        MR. VAUGHN: Object to form.
23 Foundation.
24    A.    I have re- -- I have reviewed deposition
25 testimony that talks about some of the internal

Page 378

1 documents that have gone back and forth on this
2 issue. I'm -- surely -- I'm sure I have not seen
3 every document, because I don't believe Novartis
4 discovery is available in this case, so I haven't
5 seen a bunch of Novartis files. But certainly, I am
6 aware of some documents and some discussion, and --
7 and those that I have seen indicated, generally, the
8 steps that Novartis took.
9    Q.    So -- and hearing your counsel's
10 objection on foundation, I understand if you don't
11 know the answers to these questions. And if that's
12 the case, please let me know.
13        Novartis did not identify the potential
14 for NDMA formation based on analysis of the Valsartan
15 API chemical route of synthesis as documented in the
16 DMF, did they?
17        MR. VAUGHN: Object to form.
18    A.    I can't answer that, actually, without
19 looking. I can't answer that. I don't know.
20    Q.    And Novartis did not identify the
21 potential for NDMA formation as part of a risk
22 assessment it prepared on the Valsartan API, did
23 they?
24        MR. VAUGHN: Object to form.
25 Foundation.

Page 379

1    A.    I can't answer that either without
2 looking. I don't know. I don't know whether that's
3 addressed in the documents I have seen.
4    Q.    And sitting here, you don't know either
5 way, do you?
6    A.    Without --
7        MR. VAUGHN: Object to form.
8    A.    Without looking at the documents that I
9 know describe it, I don't recall that discussion of
10 why it was done. It's my understanding they were
11 looking for new -- here's what I do know. I -- it
12 was my understanding that Novartis was looking to
13 qualify as a new supplier. I don't know for what
14 purpose generally. I don't know whether, you know,
15 they had an ANDA at issue. I don't know those
16 details because I don't have a lot of discovery
17 documents from Novartis that describes their
18 motivation.
19    Q.    And again, one way or another, do you
20 know whether Novartis identified, and then
21 structurally characterized, NDMA using a theoretical
22 analysis of the route of synthesis?
23        MR. VAUGHN: Object to form.
24    A.    So that's beyond the scope of what I
25 looked at, although I do believe that that is

Page 380

1 described in other experts' reports. Maybe the
2 chemist's --
3    Q.    And --
4    A.    -- report. I'm not sure.
5    Q.    And -- and just to say, Dr. Plunkett,
6 you don't know specifically how or why Novartis
7 eventually identified the NDMA in Valsartan API, do
8 you?
9        MR. VAUGHN: Object to form.
10    A.    Well, I -- I can't -- I don't know -- if
11 you're asking why, I'm not in Novartis's head, so I
12 can't answer that. As far as what, I'm -- there's a
13 description of what they did, but I -- again, that
14 was beyond the scope of, I think, my -- of what I did
15 in terms of the opinions I formed because, to me,
16 that's more of an issue of -- maybe for the chemist
17 to describe what -- what they did in terms of the
18 methods they used, things like that.
19    Q.    And I -- I think I understand. How
20 Novartis eventually identified and structurally
21 characterized NDMA is not part of the opinions that
22 you're offering in this case, correct?
23    A.    That is true, that is not. I believe
24 that -- that may be someone else, but that's not me.
25    Q.    And therefore, your opinion that the

12 (Pages 377 - 380)

HIGHLY CONFIDENTIAL

Page 381

1 finished-dose manufacturers, including Teva, should
2 have done the same thing that Novartis did is only
3 based on the fact that you understand Novartis
4 eventually structurally characterized NDMA. Is that
5 fair?
6        MR. VAUGHN: Object to form.
7    A.    I don't think I can answer that yes or
8 no. Can I explain or -- or can I ask you to clarify?
9    Q.    Let me try and ask a better question.
10       I -- I understand it's your opinion that
11 Teva and Torrent should have identified it based on
12 the fact that Novartis did. Is that fair?
13   A.    Novartis could, that's right, and they
14 did; yes, that's correct.
15   Q.    But you don't know how Novartis actually
16 structurally characterized and identified NDMA.
17   A.    Without going to look, I can tell you,
18 some of that is described. It talks about the
19 methods they used. That's in some of the documents,
20 but that was beyond the scope of, I think, what I was
21 asked to do in this case.
22       I was asked to, for example,
23 determine whether or not the chemical methods that
24 Novartis used were better or worse or -- you know,
25 I -- I mean, that -- that is all -- I think that's

Page 382

1 sort of where -- where that goes, and so that's why
2 I'm hesitant to say anything more than what I've
3 already said. I think it is beyond the scope of what
4 I did. But I do know that there are documents that I
5 have reviewed that describe some of the -- the
6 details on how they did it.
7    Q.    And the specifics of that are beyond the
8 scope of your opinions in your report, correct?
9    A.    In terms of the opinions I had formed;
10 yes, that's correct. It wasn't -- it was not in --
11 it was not something that I -- that I covered because
12 it's my -- in my view, that would be an issue for a
13 chemist to cover, for example, or someone else may
14 have been asked to do that, but that wasn't something
15 I was asked to do.
16       MR. HARKINS: Thank you, Dr. Plunkett.
17 Those are all the questions that I have for you
18 today. I believe counsel for Torrent is gonna have
19 some follow-up as well.
20       MR. VAUGHN: Thanks, Steven.
21 RECROSS-EXAMINATION BY MS. NAGEL:
22   Q.    Good morning, Dr. Plunkett. Do you
23 remember we spoke a few weeks ago during the first
24 part of your deposition?
25   A.    Yeah. I think you just asked a couple

Page 383

1 of questions. You were very short, but yes, I do
2 recall.
3    Q.    I did not have much time. And you --
4 you recall I represent the Torrent Defendants,
5 correct?
6    A.    Yes.
7    Q.    Dr. Plunkett, in your Materials Relied
8 Upon list, you list just shy of 30 documents that
9 were produced by Torrent, and one transcript from a
10 Torrent employee, correct?
11   A.    I don't know the exact number, but
12 that's probably true, yes. I think there's only one
13 transcript, that's for sure. I don't know if -- if
14 30 is accurate. But yes, there's certainly many,
15 many more documents with a ZHP Bates number on
16 there -- or Bates identifier on there.
17   Q.    Okay. And as part of that small set of
18 documents that you reviewed for Torrent, you reviewed
19 the -- some of the technical and quality agreements
20 between Torrent and ZHP, correct?
21       MR. VAUGHN: Object to form.
22   A.    Certainly, some of those documents that
23 I have reviewed and relied upon are quality
24 agreements, yes. There's a paragraph in my report
25 where I think I cite to those.

Page 384

1    Q.    And the quality agreement establishes
2 what parts of the DMF are gonna be shared with
3 Torrent, correct?
4       MR. VAUGHN: Object to form.
5    A.    I don't know if that's addressed. I --
6 I believe the quality agreement -- the part that I
7 talk about talks about who's respons- -- who's
8 responsible for what, but if you want me to pull it
9 up.... I can't answer that without looking.
10   Q.    Dr. Plunkett, you didn't actually review
11 the parts of the DMF that were shared with Torrent,
12 did you?
13       MR. VAUGHN: Object to form.
14 Argumentative.
15   A.    I did not review the entire Drug Master
16 File; that is correct. And I -- and I can't tell you
17 which parts were shared, so -- without -- so I don't
18 think I have information to answer that. I don't
19 think I can answer that.
20   Q.    Okay. And Dr. Plunkett, what documents
21 did you rely on in forming -- or what Torrent
22 documents did you rely on in forming your opinion
23 that Torrent should have obtained full access to
24 ZHP's DMF?
25   A.    Well, I don't think I'm necessarily

13 (Pages 381 - 384)

HIGHLY CONFIDENTIAL

Page 385

1 relying on Tor- -- well, I'm relying on the --
2 documents that -- that show that Torrent and ZHP had
3 an agreement to -- to exchange -- to set -- they
4 had an -- they had an agreement to buy product from
5 ZHP. So that part of the -- agreement ties them
6 together as -- as the supplier for the finished-dose
7 manufacturer.
8         Beyond that, my opinions that I have
9 expressed are based upon the regulatory requirements
10 for -- as a finished-dose manufacturer to ensure that
11 their product is compliant with GMP, the -- and my
12 experience and training.
13         And then I think, as I have said, as I
14 just discussed with Mr. Harkins as it relates to
15 Teva, those -- those same opinions would hold. It's
16 the idea that what regulations put the onus on the
17 finished-dose manufacturer for the product they sell.
18 The guidance describes, in fact, that the
19 finished-dose manufacturer is supposed to take steps
20 to validate the -- the product that comes from their
21 supplier routinely. It's not something that only is
22 done once. It has to be done continually over time
23 to -- to make sure -- to ensure that the product
24 remain as it did the first day they moved -- shipped
25 the batch that they initial- -- they initially may

Page 386

1 have used for their initial validation exercise, so
2 they have other responsibilities.
3         So I think the majority of my opinions
4 would -- the majority of the information that I have
5 relied upon to form that opinion would be based upon
6 the general regulation, my experience and training,
7 as well as them -- the agreement that shows that the
8 two parties were, indeed, engaged in a relationship
9 of an API being bought from ZHP and that Torrent was
10 the finished-dose manufacturer and the holder of the
11 ANDA.
12     Q.    So to confirm, you're not relying on any
13 documents -- any Torrent documents that establish
14 what information Torrent had from the DMF in forming
15 that opinion, correct?
16         MR. VAUGHN: Object to form.
17     A.    I don't know. I mean, I'd have to go
18 back and look if any of the documents that I have
19 discuss that. That's why I think I started -- when
20 you asked the question before this one, I think I
21 said I have to -- I don't know. I'd have to look
22 whether or not the quality agreement addresses that
23 specific issue. I can't answer that without looking.
24     Q.    And Dr. Plunkett, I believe you
25 testified a few minutes ago that you did not review

Page 387

1 ZHP's DMF or what parts were made available to
2 Torrent. Is that right?
3     A.    I said I -- I think I -- I think what I
4 said was I did not review the entire DMF. I did not.
5 And I'm not -- and also, right as I sit here, I'm not
6 aware of any document that tells me exactly what they
7 were made -- what was made available to them. But
8 certainly, that is -- I have seen discussions of
9 their ability to be able to reference the DMF. So
10 again, I can't answer your question fully without
11 looking at the Torrent documents I have. I don't
12 recall one, though.
13         MS. NAGEL: Okay. Mr. Vaughn, can I
14 have like five minutes?
15         MR. VAUGHN: For a break?
16         MS. NAGEL: Yes, please.
17         MR. VAUGHN: Yeah, Of course.
18         THE VIDEOGRAPHER: The time is 9:55.
19 We're going off the record.
20         (Break: 9:55 a.m. Central Time.)
21         (Resume: 10:01 a.m. Central Time.)
22         THE VIDEOGRAPHER: The time is 10:01.
23 We're back on the record.
24         MS. NAGEL: So Dr. Plunkett, that is all
25 the questions I have for you, and I think Defendants

Page 388

1 are just going to reserve the remainder of their time
2 for any recross.
3         MR. VAUGHN: I have no questions, so I
4 think we're done.
5         THE VIDEOGRAPHER: Great. The time is
6 10:01. This ends today's deposition.
7         (Proceedings concluded at 10:01 a.m.
8 Central Time.)
9         - - - - - - - -
10         J U R A T
11
12         I, LAURA M. PLUNKETT, Ph.D. DO HEREBY
13 CERTIFY that I have read the foregoing transcript of
14 my deposition testimony.
15
16 _____
17 LAURA M. PLUNKETT, Ph.D.
18
19
20 SWORN TO AND SUBSCRIBED
21 BEFORE ME THIS _____
22 DAY OF_____
23 2023
24 _____
25 Notary Public

14 (Pages 385 - 388)

HIGHLY CONFIDENTIAL

Page 389

1  ATTACH TO DEPOSITION OF:  IN RE:  VALSARTAN, LOSARTAN
2  AND IRBESARTAN PRODUCTS LIABILITY LITIGATION
3
4  DATE TAKEN:  Friday, February 10, 2023
5
6        E R R A T A  S H E E T
7
8        INSTRUCTIONS:   After reading the
   transcript of testimony, please note any change,
9  addition or deletion on this sheet.  DO NOT make any
   marks or notations on the transcript itself.
10        Please sign and date this errata sheet
   and return it to the court reporter whose name is
11  shown below.
12
   PAGE  LINE    CHANGE
13  ___  ___   _____
14  ___  ___   _____
15  ___  ___   _____
16  ___  ___   _____
17  ___  ___   _____
18  ___  ___   _____
19  ___  ___   _____
20  ___  ___   _____
21  ___  ___   _____
22  ___  ___   _____
23  ___  ___   _____
24  ___  ___   _____
25

Page 390

1        C E R T I F I C A T E
2
3        I, LYDIA F. McDONNELL, a Certified
4  Shorthand Reporter and Notary Public of the State of
5  New Jersey, do hereby certify that prior to the
6  commencement of the examination, LAURA M. PLUNKETT,
7  Ph.D. was duly sworn by me to testify the truth, the
8  whole truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place, and on the date hereinbefore set forth.
13        I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither
16  a relative nor employee of such attorney or counsel,
17  and that I am not financially interested in the
18  action.
19
20
   _____
21  Notary Public of the State of New Jersey
22  License No. 30XI00155900
23  My Commission expires June 30, 2024
24  Dated:  February 16, 2023
25

**[& - absolutely]**                                                    Page 1

| & | 2 | 301   340:10 | 7 |
|---|---|---|---|
| **&**   339:3 340:3 340:8,14,19 | **2**   369:6 | **30305**   339:15 | **704-444-3475**   340:21 |
| **0** | **200**   339:14 | **305-445-2500**   338:16 | **77336**   342:12 |
| **02109**   339:4 | **2018**   345:1,19 346:8 347:1,13 347:15,22 348:9,15 349:8 349:11,17 351:18,25 353:15,18 355:10,12 | **30xi00155900**   390:22 | **8** |

**&**   339:3 340:3
340:8,14,19

**0**

**02109**   339:4
**02875**   336:5
**07102**   339:21
**08540**   339:9

**1**

**1**   342:3 360:11
**10**   336:14
337:7 389:4
**100**   338:21
339:20 360:9
364:17
**1000**   338:15
**10001-8602**
340:4
**10017**   338:21
**10022**   340:15
**10:01**   387:21
387:22 388:6,7
**10th**   342:2
**12**   341:12
368:18,22
**13923**   342:11
**15219**   340:10
**15th**   339:20
**16**   390:24
**18**   352:11
**1800law1010...**
338:22
**1:19**   336:5

**2**

**2**   369:6
**200**   339:14
**2018**   345:1,19
346:8 347:1,13
347:15,22
348:9,15 349:8
349:11,17
351:18,25
353:15,18
355:10,12
**2019**   343:11
**2023**   336:14
337:7 342:2
388:23 389:4
390:24
**2024**   390:23
**21**   339:9
341:12 367:20
368:18
**212-309-4210**
340:16
**212-735-2588**
340:5
**227**   340:20
**2500**   339:14
**2525**   338:15
**260**   338:4
**27th**   339:4
**28202-2601**
340:21

**3**

**30**   383:8,14
390:23

**301**   340:10
**30305**   339:15
**305-445-2500**
338:16
**30xi00155900**
390:22
**312**   369:23
**314.420**   368:18
**314.420...........**
341:12
**316**   338:9
**32502**   338:10
**33134**   338:16
**3333**   339:14
**342**   341:5
**354**   341:6
**368**   341:12
**382**   341:7
**38th**   340:10

**5**

**53**   339:4

**6**

**600**   340:20
**601**   340:15
**609-924-0808**
339:10
**617-213-7000**
339:5
**66210**   338:4
**678-553-2312**
339:15

**7**

**704-444-3475**
340:21
**77336**   342:12

**8**

**805-435-7000**
338:10
**8101**   338:4

**9**

**913-385-5402**
338:5
**917-540-9803**
338:22
**9441**   390:20
**973-751-1017**
339:21
**9:04**   336:15
337:7 342:2
**9:55**   387:18,20

**a**

**a.m.**   337:7
387:20,21
388:7
**abbreviated**
369:24
**ability**   387:9
**able**   369:17
387:9
**above**   337:3
**absolute**
376:21
**absolutely**
353:6 361:23

| | | | |
|---|---|---|---|
| **access** 352:3 | **addressed** | **agreements** | **answered** |
| 364:23 365:5 | 351:16 352:9 | 383:19,24 | 348:19 366:19 |
| 365:22 366:24 | 379:3 384:5 | **ahead** 342:19 | 367:1 373:12 |
| 369:1 371:13 | **addresses** | 367:12 369:7,8 | **answering** |
| 371:23 372:1 | 386:22 | 369:19 377:3 | 347:17 374:18 |
| 372:20 373:1,9 | **adulterated** | **albertson's** | **answers** 378:11 |
| 374:12,22 | 343:1,8,10 | 340:23 | **api** 344:7,13,16 |
| 375:5,10,19 | 344:5,15,25 | **alerts** 361:22 | 344:25 345:19 |
| 376:9 384:23 | 345:20 355:23 | 361:23 364:8 | 348:23 353:14 |
| **accurate** 353:9 | 356:16 357:11 | **alfano** 340:8 | 353:22 356:24 |
| 383:14 390:10 | 357:22,23 | **ambiguous** | 357:1 358:4,19 |
| **accurately** | 358:18,23 | 347:6 | 364:24 365:6 |
| 354:8 | 359:1,9 360:4 | **amendment** | 365:22 366:25 |
| **act** 357:8 360:4 | 360:7 361:8,16 | 369:25 | 370:12,16,16 |
| **action** 345:8 | **adulteration** | **analysis** 351:9 | 371:5,14,23,23 |
| 362:8,16,24 | 343:19 344:15 | 378:14 379:22 | 372:1 373:19 |
| 364:11 390:15 | 344:25 345:8 | **anda** 364:24 | 375:19 376:3 |
| 390:18 | 350:25 351:8 | 365:6,23 | 377:21 378:15 |
| **actions** 343:10 | 352:9 353:13 | 366:25 371:14 | 378:22 380:7 |
| 348:3 362:6 | 353:22 356:7 | 372:1,19 373:8 | 386:9 |
| **activities** 348:3 | 356:13 357:7 | 379:15 386:11 | **appearance** |
| **actual** 345:10 | 357:16 358:4 | **answer** 344:18 | 340:2 |
| 357:6 | 358:15 360:7 | 345:4,16,22,23 | **appearances** |
| **actually** 361:24 | 360:12 361:4 | 346:5,10,11 | 338:2 339:2 |
| 367:7 378:18 | **ago** 382:23 | 347:19 348:10 | **applicable** |
| 381:15 384:10 | 386:25 | 348:20,24 | 375:2 |
| **add** 368:10 | **agree** 343:19 | 349:6,14,15 | **applicant** |
| **added** 376:2 | 365:17 | 353:6,8 355:13 | 372:19 373:9 |
| **addition** 361:5 | **agreed** 342:15 | 359:3 364:19 | **application** |
| 389:9 | 376:19 | 374:1 378:18 | 369:23,24,25 |
| **additional** | **agreement** | 378:19 379:1 | **appropriate** |
| 358:6 359:13 | 365:14 384:1,6 | 380:12 381:7 | 366:17 |
| **address** 351:24 | 385:3,4,5 | 384:9,18,19 | **area** 351:14 |
| 352:8 365:19 | 386:7,22 | 386:23 387:10 | **argue** 357:13 |
| | | | 357:13 366:3,4 |

HIGHLY CONFIDENTIAL

**[argumentative - c]**                                          Page 3

| | | | |
|---|---|---|---|
| **argumentative** 348:13,19 349:21 351:20 384:14 | **attention** 363:6 **attorney** 390:14,16 | 366:12 376:25 378:1 386:18 387:23 | **bipc.com** 340:22 |
| **arps** 340:3 | **attorneys** 338:6 338:11,18,23 339:6,11,16,22 340:6,12,17,22 | **bain** 350:21 351:11 | **bit** 354:24 374:9 |
| **asked** 343:6 348:19 364:7 371:19 381:21 381:22 382:14 382:15,25 386:20 | | **barr** 338:8 **based** 345:3,23 359:24 361:2 371:8 378:14 381:3,11 385:9 386:5 | **bogdan** 338:20 **bosick** 340:8 **boston** 339:4 **bought** 386:9 **boulevard** 338:4 |
| **asking** 347:18 347:20 348:7 348:10 349:4,5 350:3,5,9 352:4 354:1 356:13,19 358:10,20 359:4,4,11 360:6 361:11 362:11,12,15 362:25 364:6,7 364:8 365:13 366:2,2,21 369:15 372:2,9 373:25 374:15 380:11 | **authorize** 370:1 **available** 353:11 378:4 387:1,7 **avenue** 338:21 340:15 **aware** 344:23 345:17 346:5,7 346:16,24 347:20 348:8 348:14 354:9 354:22 355:3 355:15,21 356:13 357:8 358:5,9,24 359:14,18 364:1,11,16,19 365:10 367:2 371:6,11 373:7 378:6 387:6 | **basically** 357:25 **batch** 385:25 **bates** 383:15,16 **baylen** 338:9 **beginning** 366:20 **believe** 344:3 350:21 358:22 365:18 366:10 371:18 374:1 377:2,12,18 378:3 379:25 380:23 382:18 384:6 386:24 **believed** 343:7 **best** 364:19 **better** 381:9,24 **beyond** 352:23 379:24 380:14 381:20 382:3,7 385:8 | **breadth** 353:10 **break** 374:8 387:15,20 **brett** 338:3,5 348:12 **brittney** 340:14 **brittney.nagel** 340:16 **broad** 355:25 366:1 370:24 **broader** 356:14 366:21 371:2 375:13 **broadly** 367:8 **brought** 363:5 **buchanan** 338:8 340:19 **bunch** 378:5 **business** 342:11 **buy** 385:4 |
| **aspect** 351:6 **assessing** 350:4 **assessment** 373:20 378:22 **atlanta** 339:15 **attach** 389:1 **attached** 352:7 | **awesome** 342:18 | **bily** 340:25 | |

| | b | |
|---|---|---|
| | **b** 340:19 341:9 **back** 346:22 351:21 352:5 356:22 366:12 | |

| | c | |
|---|---|---|
| | **c** 338:1,3 339:1 340:1 390:1,1 | |

[care - conference]                                                                      Page 4

| | | | |
|---|---|---|---|
| **care** 362:5 | **certified** 337:4 | **chemist's** 380:2 | **commencing** |
| **carillon** 340:20 | 390:3 | **chirstiopher....** | 337:7 |
| **carolina** 340:21 | **certify** 388:13 | 340:22 | **commission** |
| **carriage** | 390:5,9,13 | **christine** | 390:23 |
| 342:11 | **cfr** 341:12 | 339:19 | **companies** |
| **case** 336:4 | 367:13,20 | **christopher** | 363:4 365:11 |
| 354:10,19,21 | 368:18 370:7 | 340:19 | 375:7,7 377:17 |
| 358:3 360:25 | 371:20 | **circumstances** | **company** |
| 361:3 363:7 | **cgannon** | 376:17 | 345:12 361:19 |
| 370:11,17 | 339:22 | **cite** 350:15 | 362:4,19,23,24 |
| 371:3 373:18 | **cgmp** 347:1,23 | 353:17 355:13 | 363:8,19,20,22 |
| 375:16 376:23 | 348:17 349:11 | 374:10 383:25 | 370:22 373:19 |
| 376:23 377:2 | 350:18,19,20 | **cited** 367:19 | 376:21 |
| 378:4,12 | 350:23 351:2,5 | **claims** 360:19 | **compliance** |
| 380:22 381:21 | 351:8,16,17 | **clarification** | 344:1 347:12 |
| **cases** 376:2 | 352:10 353:14 | 347:5 | 349:11 350:20 |
| **cause** 355:12 | 353:22 365:21 | **clarify** 346:6 | 351:5,17 |
| 365:11 371:19 | 365:25 366:5 | 347:4 375:8,15 | 367:11 373:16 |
| 372:3,12 | 367:11 375:21 | 381:8 | 373:17 374:7 |
| **ceiling** 365:10 | 376:10 | **clause** 376:2 | **compliant** |
| **cental** 337:8 | **cgmps** 349:3 | **clear** 347:18 | 385:11 |
| **center** 339:20 | 366:23 375:11 | 372:17 374:20 | **comply** 347:1 |
| **central** 336:15 | **change** 343:18 | **closed** 364:23 | 347:23 375:20 |
| 342:2 387:20 | 358:21 389:8 | 372:20,23 | **complying** |
| 387:21 388:8 | 389:12 | 373:1,9,22 | 350:24 373:19 |
| **certainly** 343:3 | **characterized** | 374:13,22 | **compound** |
| 344:1,10 348:6 | 377:21 379:21 | 375:6,10,20 | 351:19 |
| 349:7,16 | 380:21 381:4 | **coan** 339:3 | **con** 359:22 |
| 350:22 354:9 | 381:16 | **code** 365:4 | **concern** 360:16 |
| 355:10 364:5 | **charlotte** | **college** 338:4 | **concluded** |
| 376:18 377:12 | 340:21 | **colon** 369:16 | 388:7 |
| 377:15,17 | **chemical** | **come** 355:8 | **conditions** |
| 378:5 383:14 | 378:15 381:23 | **comes** 385:20 | 376:17 |
| 383:22 387:8 | **chemist** 380:16 | **commencem...** | **conference** |
| | 382:13 | 390:6 | 338:2 339:2 |

[conference - details]                                                    Page 5

340:2
**confidential**
  336:12
**confidentiality**
  365:13
**confirm**  358:23
  360:23 366:20
  366:22 386:12
**confused**  346:4
  347:8 372:24
**consent**  361:21
**consider**
  350:17
**considering**
  365:12
**consistent**
  343:4,10 344:3
  344:4 366:9,18
  367:10 375:4
**contained**
  342:25
**contains**
  358:19
**context**  359:20
**continually**
  385:22
**continuation**
  342:4
**continue**  340:1
**continued**
  339:1 342:20
**cooperate**
  361:20 362:5
  363:5

**cooperation**
  362:4
**coordination**
  361:17 364:10
**correct**  342:17
  344:7 345:20
  346:8,18,21,23
  347:2 349:8,19
  355:1,18
  359:16,19
  360:25 363:2
  363:13,19,21
  365:2,23
  366:25 367:23
  368:22 370:9
  370:12,22
  371:7 372:21
  372:25 376:15
  380:22 381:14
  382:8,10 383:5
  383:10,20
  384:3,16
  386:15
**cosmetics**  357:8
**couch**  375:25
  376:15
**counsel**  342:6
  342:24 382:18
  390:14,16
**counsel's**  378:9
**couple**  382:25
**course**  387:17
**court**  336:1
  342:8 389:10

**cover**  382:13
**covered**  382:11
**cross**  341:4
**culbertson**
  339:3
**cut**  343:6

**d**

**d**  340:3 341:1
**daniel**  338:9
**date**  345:24
  348:7 389:4,10
  390:12
**dated**  347:13
  390:24
**day**  366:13
  385:24 388:22
**de**  338:15
  343:1
**deal**  344:21
**dealing**  343:25
  350:11
**decision**  343:11
  360:14
**decisions**  346:3
**declaring**
  357:10
**decrees**  361:21
**deem**  343:7,9
**deemed**  343:1
  344:5
**deems**  361:7
**defendant**
  339:6,11,16,22
  340:6,12,17,22

**defendants**
  342:16 354:20
  383:4 387:25
**deletion**  389:9
**depend**  360:10
  376:16
**depends**  352:14
  352:15,16
  363:11
**deposition**
  336:12 342:4
  342:23 352:20
  354:18 356:22
  364:22 377:7
  377:24 382:24
  388:6,14 389:1
**depositions**
  352:7
**describe**
  358:12 379:9
  380:17 382:5
**described**
  350:23 354:11
  364:12 371:9
  380:1 381:18
**describes**
  379:17 385:18
**description**
  341:11 350:16
  370:7 380:13
**detail**  365:14
  366:10
**details**  350:20
  373:18 379:16
  382:6

**[determination - ensure]**                                                   Page 6

**determination**
345:6 347:12
**determine**
377:19 381:23
**different**
356:25 357:18
360:5,22,24
362:13 372:22
376:4,23
**direct**  341:4
**directed**  354:25
**disclose**  370:4
**discovery**
378:4 379:16
**discuss**  356:2
374:25 386:19
**discussed**
344:20 346:3
354:11 364:22
385:14
**discussion**
378:6 379:9
**discussions**
387:8
**district**  336:1,1
**dmf**  364:24
365:6,22
366:24 367:20
370:11,14,15
371:5,14,23
372:1,16,20
373:10 374:13
374:23 375:10
375:20 376:9
376:10 378:16

384:2,11,24
386:14 387:1,4
387:9
**dnigh**  338:11
**doc**  350:4
357:18
**document**
336:6 344:14
349:16,17,19
349:23,24
350:1 352:19
353:4,7 368:6
369:4,13
374:10,20
378:3 387:6
**documented**
378:15
**documents**
344:20 346:1
346:22 350:5,7
350:13 351:10
351:13,22
352:4,6 353:1
357:18 358:12
359:12,13
377:19 378:1,6
379:3,8,17
381:19 382:4
383:8,15,18,22
384:20,22
385:2 386:13
386:13,18
387:11
**doing**  342:10
347:16 354:15

372:16
**doj**  361:17
**dose**  354:21
355:5,17,22
356:16 357:3,3
357:6,10 359:1
359:16 364:3
364:13 365:5
365:21 366:5
366:16 367:8
370:21 371:4
371:13,22,25
374:3,7,12,21
375:1,9,16,18
376:8 377:8,14
381:1 385:6,10
385:17,19
386:10
**dr**  342:4,21
350:21 351:11
354:14 358:5
358:20 359:11
360:2 363:13
367:12 369:2
369:12 372:18
377:5,6 380:5
382:16,22
383:7 384:10
384:20 386:24
387:24
**dropbox**  368:9
369:2
**drug**  355:5,18
355:22 356:16
357:6,7,11

359:16 360:19
360:20 364:3
364:13,22
366:18,23
369:23 370:7
370:17 373:23
374:6,12 376:6
376:11 384:15
**drugs**  339:11
**duly**  342:12
390:7

**e**

**e**  338:1,1 339:1
339:1 340:1,1
341:1,9 342:10
389:6,6,6
390:1,1
**earlier**  373:12
**easier**  348:24
**easy**  361:25
**either**  345:10
371:22 379:1,4
**ellis**  340:14
**employee**
383:10 390:14
390:16
**ends**  388:6
**enforceabilities**
361:15
**enforcement**
361:7 364:1
**engaged**  386:8
**ensure**  366:7
366:17 367:9
373:17 374:5

375:3 385:10
385:23
**entire**  384:15
387:4
**entitled**  337:3
**errata**  389:10
**esq**  338:3,9,14
338:15,20
339:3,8,13,19
340:3,8,9,14,19
**essentially**
358:14 377:1
**establish**
386:13
**establishes**
384:1
**eventually**
380:7,20 381:4
**evidence**  345:3
352:16 356:8
357:15 358:2
**exact**  343:2,14
357:12 359:3
383:11
**exactly**  374:17
377:11 387:6
**examination**
342:20 354:13
382:21 390:6
**example**
350:15 355:9
356:2 360:13
360:18 370:21
371:3 373:17
381:22 382:13

**except**  347:13
**exchange**  385:3
**exercise**  386:1
**exhibit**  341:12
367:14 368:11
368:18,21,21
368:22,24
**exhibits**  352:7
**exist**  346:12
364:18 365:9
**exists**  356:8
**expect**  345:13
346:1
**expectation**
367:7
**expecting**
370:25
**experience**
362:3 375:6
385:12 386:6
**expert**  343:25
350:19 357:25
**expertise**
350:22
**experts**  380:1
**expires**  390:23
**explain**  346:12
347:7 375:14
376:22 381:8
**expressed**
352:19 385:9

**f**

**f**  337:4 390:1,3
**facility**  362:9
362:16

**fact**  345:23
347:11 357:14
358:12,18
365:10 366:15
371:7 381:3,12
385:18
**facts**  358:3
**failed**  347:1,23
**fair**  358:7
381:5,12
**falanga**  339:19
**familiar**  367:15
369:5
**far**  355:25
380:12
**fd&c**  360:4
**fda**  343:20,23
344:1,6,13,15
344:20,23
345:5,13,17
346:18,25
347:11,21,22
348:9,15,16
349:1,10
351:16 352:9
353:13,20
355:3,22 356:2
356:7,15,23
357:21,22
360:14 361:6
362:7,11,13,21
362:22 363:12
363:15,18,22
363:23,23
364:1,10,12

365:9 367:5
370:3 371:12
371:24 373:8
**fda's**  343:10
344:4
**february**
336:14 337:7
342:2 389:4
390:24
**federal**  365:4
**fhs**  340:11
**file**  370:17
373:23 384:16
**files**  346:14
365:14 370:8
378:5
**financially**
390:17
**find**  346:1
362:9
**finding**  343:20
343:23,23
344:4,6,13
345:6,17 346:7
355:22 356:7
357:16 358:4
**fine**  354:16
**finished**  354:21
355:5,17,22
356:16 357:3,3
357:6,10 359:1
359:16 364:3
364:13,22
365:5,21 366:5
366:16,23

[finished - great]                                              Page 8

367:8 370:21
371:4,13,22,25
374:3,6,12,21
375:1,9,16,18
376:8 377:8,14
381:1 385:6,10
385:17,19
386:10
**firm** 338:3
**first** 353:20
354:4,8 356:22
361:20 366:12
367:3 368:1
371:16 372:18
374:1 382:23
385:24
**five** 387:14
**flom** 340:3
**floor** 339:4,20
340:10 365:9
**florida** 338:10
338:16
**follow** 354:17
382:19
**follows** 342:13
**food** 357:7
**foregoing**
388:13 390:9
**forgotten**
354:19
**form** 343:21
344:8,17 345:2
345:21 346:9
346:20 347:3
347:24 348:11

348:18 349:13
349:20 350:2
351:19 352:13
353:24 354:6
355:24 356:17
358:8 359:2,17
361:1,10
362:10,18
363:9 364:4,14
365:7,24
370:13,23
371:15 373:11
375:22 376:12
377:22 378:17
378:24 379:7
379:23 380:9
381:6 383:21
384:4,13 386:5
386:16
**formation**
378:14,21
**formed** 344:3
353:25 355:11
375:24 376:24
380:15 382:9
**forming** 384:21
384:22 386:14
**forth** 357:7
374:5 378:1
390:12
**found** 357:22
**foundation**
377:23 378:10
378:25

**frank** 340:9
**friday** 336:14
337:7 389:4
**full** 351:9 368:6
373:20 384:23
**fully** 344:19
345:23 346:11
350:24 353:6
387:10
**further** 390:9
390:13

**g**

**gannon** 339:19
**gateway** 339:20
**gcoan** 339:5
**general** 365:1
386:6
**generally**
361:11,13,14
362:15,17
367:20 369:5
370:6,25 378:7
379:14
**geoffrey** 339:3
**georgia** 339:15
**getting** 373:22
**give** 368:17
**giving** 345:24
351:7
**gm** 353:3
**gmp** 347:13
350:11 351:10
353:2 366:18
374:7 385:11

**gmps** 366:9
371:20 373:16
373:20 375:5
**go** 342:18
344:18 346:14
346:22 349:6
349:15 351:12
351:21 352:5
353:7 354:2
356:20,22
357:12,24
359:5 365:11
367:12 369:6,7
369:9,19
376:25 377:3
386:17
**goes** 382:1
**going** 342:1
359:13 365:12
372:6,11
381:17 387:19
388:1
**gonna** 367:12
368:22 372:6,7
377:3 382:18
384:2
**good** 342:21
354:14 366:6
369:9 382:22
**gordon** 340:8
**government**
356:7
**grant** 340:10
**great** 369:11
388:5

**[greenberg - irbesartan]**                                          Page 9

| | | | |
|---|---|---|---|
| **greenberg** 339:13 | **henry** 340:19 | 380:20 381:11 381:16 | **indicated** 362:8 362:16 371:18 378:7 |

**greenberg**
  339:13
**gtlaw.com**
  339:16
**guess** 372:8
**guidance** 367:4
  367:5 371:12
  371:24 373:5,8
  374:5 385:18

**h**

**h** 340:9 341:9
  389:6
**happen** 361:19
  362:2
**happened**
  347:15 355:9
**happens**
  361:24
**happy** 367:24
  370:5
**harding** 338:20
**harkins** 339:13
  341:6 354:13
  363:16 368:8
  368:16,23
  369:1,11
  382:16 385:14
**head** 364:15
  380:11
**hear** 372:23
**hearing** 372:3
  378:9
**held** 337:6
**help** 356:11
  363:14

**henry** 340:19
**hereinbefore**
  390:12
**hesitant** 382:2
**hetero** 339:11
  339:11
**hi** 342:21
**highly** 336:12
  354:10
**hill** 339:8
**hillwallack.c...**
  339:10
**hinshaw** 339:3
**hinshawlaw.c...**
  339:5
**hold** 385:15
**holder** 369:18
  369:21,22
  370:1,3,11,11
  370:14,15,17
  372:15 386:10
**hollis** 338:3
**hollislawfirm...**
  338:5
**hour** 342:15
**houston** 337:6
  342:11

**i**

**idea** 367:6
  385:16
**identification**
  368:19
**identified**
  363:5 377:20
  379:20 380:7

380:20 381:11
381:16
**identifier**
  383:16
**identifies**
  374:11
**identify** 365:3
  365:20 371:24
  374:20 377:9
  378:13,20
**ii** 336:11
**illegally** 360:17
  360:17,18
**implying**
  375:12
**import** 361:22
  361:23 364:8
**importance**
  350:23
**important**
  351:2 359:20
  376:1
**impurity**
  377:10
**inappropriately**
  361:9
**include** 366:15
  375:5
**included**
  352:11 359:9
**including** 357:9
  377:8 381:1
**incorporate**
  369:21

**indicated** 362:8
  362:16 371:18
  378:7
**indicates**
  358:25 367:5
**information**
  352:18 353:11
  369:22 370:2,4
  370:20 384:18
  386:4,14
**ingersoll**
  340:19
**initial** 385:25
  386:1
**initially** 385:25
**initiated**
  364:10
**inquire** 362:23
**inspection**
  362:7,16
**inspections**
  350:20 353:2
**instructions**
  389:8
**interacted**
  349:1
**interested**
  390:17
**internal** 377:25
**introduce**
  367:14
**investigational**
  369:23
**irbesartan**
  336:4,7 389:2

[issue - look]                                                                 Page 10

**issue**  349:2
  350:24 351:7
  357:25 358:14
  360:25 361:3,4
  361:21 362:5
  363:5 367:4
  373:6 376:14
  376:22,23
  378:2 379:15
  380:16 382:12
  386:23
**issued**  345:12
  346:25
**issues**  344:21
  350:11,22
  351:10 360:15
  361:25 366:21
**issuing**  361:5

**j**

**j**  388:10
**january**  366:12
**jason**  340:8
**jersey**  336:1
  337:6 339:9,21
  390:5,21
**jessica**  340:3
  342:14
**jessica.miller**
  340:5
**jmestre**  338:17
**jmr**  340:11
**jorge**  338:14
**jr**  339:8
**junctions**  364:8

**june**  390:23
**justin**  340:25

**k**

**k**  342:10
**kansas**  338:4
**kass**  338:15
**kinds**  362:1
**kirkland**
  340:14
**kirkland.com**
  340:16
**know**  342:22
  351:16 353:8
  356:5 357:24
  359:24 360:8
  363:7 369:14
  373:21 377:1,5
  377:11,13
  378:11,12,19
  379:2,2,4,9,11
  379:13,14,14
  379:15,20
  380:6,10
  381:15,24
  382:4 383:11
  383:13 384:5
  386:17,21

**l**

**l**  342:10,10
**labs**  339:11
**lack**  347:12
  362:3
**lane**  342:11

**language**
  343:14 370:10
  372:15 373:14
  374:2
**laura**  336:13
  341:3 342:4
  388:12,17
  390:6
**law**  338:3
  374:4
**led**  357:16
**leon**  338:15
**letter**  343:12
  344:7,11 345:1
  345:7,11,11,18
  346:2,13 347:2
  347:13,21
  348:2 351:18
  351:25 354:25
  355:4,10,16,19
  356:14 357:21
  361:6 363:8,13
  363:18,24
**letters**  350:12
  355:8,12
**level**  361:18
**levin**  338:8
**levinlaw.com**
  338:11
**lexington**
  340:15
**liability**  336:4
  336:7 389:2
**license**  390:22

**likely**  345:11
**limit**  342:16
**limiting**  347:11
  348:23
**line**  353:3
  389:12
**linkage**  357:15
**linked**  358:3
**linking**  358:14
**list**  367:20
  374:21 383:8,8
**listed**  356:3,4
  376:5,11
**listen**  348:22
**listing**  376:5
**litigation**  336:5
  336:8 342:5
  343:24,24
  350:18,21
  389:2
**little**  346:4
  347:6,6,18
  348:24 354:24
  374:9
**llc**  340:23
**llp**  338:13,20
  339:3,8,13,19
  340:3,8,14
**long**  345:15
**look**  344:18,22
  346:14,22
  349:6,15 350:8
  351:22,24
  352:5 353:7
  354:2 356:23

HIGHLY CONFIDENTIAL

**[look - nagel]**                                        Page 11

357:12,24
359:5 381:17
386:18,21
**looked**  350:13
353:2 355:7
379:25
**looking**  345:4
345:23 346:11
346:21 348:21
349:15,19,22
352:24 354:7
357:20 368:1
369:15 378:19
379:2,8,11,12
384:9 386:23
387:11
**losartan**  336:3
336:7 389:1
**lot**  351:12
379:16
**lydia**  337:4
390:3

**m**

**m**  336:13 339:3
339:13 340:8
342:10 388:12
388:17 390:6
**made**  343:11
343:12,20
344:6,13
347:11,21
348:2,8,15
349:10 353:13
377:16 387:1,7
387:7

**majority**  386:3
386:4
**make**  343:23
345:16 368:22
376:20 385:23
389:9
**makes**  345:5,13
360:14
**making**  345:17
360:19 373:19
**management**
366:7
**manhattan**
340:4
**manufacture**
375:19
**manufactured**
366:8 375:4
**manufacturer**
364:23 365:5
365:21 366:6
366:16,24
367:9 370:12
370:16,16
371:13,22,25
374:3,12,22
375:2,9,18
376:3,9 377:14
385:7,10,17,19
386:10
**manufacturers**
354:21 356:25
370:21 371:4
375:17 377:8
381:1

**manufacturing**
376:11
**marked**  368:18
**market**  361:9
**marks**  389:9
**massachusetts**
339:4
**master**  370:7
370:17 373:23
384:15
**material**  358:7
**materials**  383:7
**matter**  337:3
**mazotti**  338:20
**mcdonnell**
337:4 390:3
**md**  336:5
**mean**  362:19
362:20,21
374:3 376:15
381:25 386:17
**meaning**  356:8
**mechanisms**
361:7
**media**  342:3
**memory**  352:25
353:10
**mention**  356:24
**mestre**  338:13
338:14
**methods**
380:18 381:19
381:23
**miami**  338:16

**miller**  340:3
341:5 342:17
342:20 354:12
355:1 366:12
**mind**  368:5
**minimum**
365:10
**minutes**  386:25
387:14
**misbranding**
360:13,15
**mobilities**
361:14
**monograph**
376:5
**morning**
354:14 382:22
**motivation**
379:18
**mougey**  338:8
**moved**  385:24
**mulberry**
339:20
**multiple**
348:25
**murtha**  339:8
**mylan**  340:12

**n**

**n**  338:1 339:1
340:1 341:1
342:10
**n.v.**  340:12
**nagel**  340:14
341:7 382:21
387:13,16,24

HIGHLY CONFIDENTIAL

**[name - opinion]**                                                              Page 12

| | | | |
|---|---|---|---|
| **name**  349:22 | **newark**  339:21 | 346:20 347:3 | **obtaining** |
| 364:16 389:10 | **nigh**  338:9 | 347:24 348:11 | 364:23 |
| **nda**  365:13 | **north**  340:21 | 348:18 349:13 | **obviously** |
| **ndea**  343:1 | **notary**  337:5 | 349:20 350:2 | 363:18 370:15 |
| **ndma**  342:25 | 342:12 388:25 | 351:19 352:13 | 372:5 |
| 356:5,6 377:9 | 390:4,21 | 353:24 354:6 | **offered**  353:21 |
| 377:21 378:14 | **notations**  389:9 | 355:24 356:17 | **offering**  350:17 |
| 378:21 379:21 | **note**  389:8 | 358:8 359:2,17 | 351:4,15 |
| 380:7,21 381:4 | **noted**  342:6 | 361:1,10 | 353:12 380:22 |
| 381:16 | **notes**  337:2 | 362:10,18 | **official**  343:22 |
| **ne**  339:14 | **novak**  368:11 | 363:9 364:4,14 | 345:8 346:1 |
| **neagher**  340:3 | **novartis**  377:9 | 365:7,24 | 362:8 364:11 |
| **necessarily** | 377:20 378:3,5 | 370:13,23 | **oh**  362:22,22 |
| 384:25 | 378:8,13,20 | 371:15 373:11 | 372:22 |
| **necessary** | 379:12,17,20 | 375:22 376:12 | **okay**  345:15 |
| 367:9 | 380:6,20 381:2 | 377:22 378:17 | 346:4 356:18 |
| **need**  347:4 | 381:3,12,13,15 | 378:24 379:7 | 368:25 372:22 |
| 367:17 368:1 | 381:24 | 379:23 380:9 | 372:25 376:7 |
| 369:4,6,13 | **novartis's** | 381:6 383:21 | 383:17 384:20 |
| 372:12 375:3 | 380:11 | 384:4,13 | 387:13 |
| 377:4 | **november** | 386:16 | **once**  385:22 |
| **needs**  375:19 | 345:1,18 346:8 | **objection** | **ones**  350:14 |
| **neither**  390:13 | 347:1,22 348:9 | 363:17 378:10 | **onus**  385:16 |
| 390:15 | 348:15 349:11 | **obligation** | **operating** |
| **never**  347:11 | 351:18 352:11 | 374:4 | 353:4 |
| 355:3 | 353:15 | **obtain**  365:5,22 | **opinion**  343:3 |
| **new**  336:1 | **number**  341:11 | 366:24 371:13 | 344:3 350:16 |
| 337:6 338:21 | 361:6 362:6 | 371:22,25 | 350:18 351:5,7 |
| 338:21 339:9 | 383:11,15 | 372:20 373:9 | 351:15 353:12 |
| 339:21 340:4,4 | | 374:12,22 | 353:19,25 |
| 340:15,15 | **o** | 375:10,19 | 355:11 356:12 |
| 368:21,23 | | 376:9 | 358:21 360:3 |
| 369:23 379:11 | **o'brien**  338:8 | **obtained** | 374:14 375:9 |
| 379:13 390:5 | **o'reilly**  339:19 | 384:23 | 375:16,18,23 |
| 390:21 | **object**  343:21 | | 375:24 376:2,8 |
| | 344:8,17 345:2 | | |
| | 345:21 346:9 | | |

**[opinion - pretty]**                                                      Page 13

376:24 377:1
380:25 381:10
384:22 386:5
386:15
**opinions**
352:17,18
374:17 380:15
380:21 382:8,9
385:8,15 386:3
**order**   353:6,9
354:1 366:24
375:20
**overland**   338:4
**own**   344:4
351:9

**p**

**p**   338:1,1 339:1
339:1,8 340:1
340:1 342:10
**p.a.**   338:3,8
**p.c.**   340:19
**page**   341:11
367:23 369:6
389:12
**pages**   369:4
**papantonio**
338:8
**paragraph**
383:24
**park**   338:4,21
**part**   358:1,13
366:9 367:22
368:1 369:7,23
370:1 371:16
372:14 376:4

378:21 380:21
382:24 383:17
384:6 385:5
**particular**
372:14,14
**parties**   386:8
390:15
**parts**   384:2,11
384:17 387:1
**past**   344:2
353:2
**pennsylvania**
340:10
**pensacola**
338:10
**percent**   360:9
364:17
**permit**   369:18
369:21 370:1
**permitted**
372:6,7
**person**   370:4
371:1
**persons**   370:2
370:19,20
**ph.d.**   336:13
341:3 342:10
388:12,17
390:7
**pharmaceutical**
339:17,23
**pharmaceutic...**
339:6 340:17
**phrase**   359:5
369:16

**piedmont**
339:14
**pietragallo**
340:8
**pietragallo.co...**
340:11,11
**pittsburgh**
340:10
**pizzi**   339:19
**place**   366:6,7
366:17 390:12
**places**   344:10
344:12
**plaintiff's**
342:24
**plaintiffs**   338:6
338:11,18,23
**platform**
368:12
**please**   342:8
378:12 387:16
389:8,10
**plunkett**
336:13 341:3
342:4,21
354:14 358:5
358:20 359:11
360:2 363:13
367:12 369:2
369:12 372:18
377:5,6 380:5
382:16,22
383:7 384:10
384:20 386:24
387:24 388:12

388:17 390:6
**point**   342:25
345:25 349:9
349:18 351:25
352:1,8 357:14
358:10 359:21
366:4
**pointing**   359:6
**ponce**   338:15
**popped**   368:9
**portion**   364:23
372:20,23
373:1,9,22
374:13,22
375:6,10,20
**possible**   344:19
350:12 362:11
**potential**
360:21 378:13
378:21
**potentially**
360:14
**predate**   348:4
**prepared**
378:22
**prescription**
366:23
**prescriptive**
366:1 367:3
**presence**   356:5
356:6
**present**   340:24
361:9
**pretty**   361:25
366:1 370:24

**[princeton - recross]**                                         Page 14

**princeton**
339:9
**printed** 356:21
**prior** 345:1,18
346:8 347:1
390:5
**proactively**
374:16
**probably** 376:1
383:12
**problems** 362:9
**proceedings**
337:3 388:7
**process** 365:15
376:3,4,11
**processes** 366:6
366:17
**proctor** 338:8
**produced**
366:8,18 367:5
383:9
**product** 344:5
355:5,18,23
356:3,16 357:4
357:6,11,14,17
357:22,23
358:13,17,18
358:22 359:1,8
359:9,16 360:1
360:3,17,19
361:8,16
363:21,22
364:3,13 366:8
367:10 375:4
385:4,11,17,20

385:23
**products** 336:4
336:7 360:7
389:2
**public** 337:5
342:12 355:21
355:25 356:15
357:8,18
358:12,24
359:6,25
360:16 388:25
390:4,21
**pull** 356:21
384:8
**pulled** 369:10
**purpose** 370:7
379:14
**purposes**
369:17
**purview** 363:23
**put** 345:5
376:18 385:16

**q**

**qualification**
376:7
**qualify** 370:6
379:13
**quality** 366:6
366:14,15,21
383:19,23
384:1,6 386:22
**question** 343:2
346:5 347:5,19
347:25 348:9
348:12,14,20

348:22,24
350:4,5 352:4
353:9 355:14
363:13 366:20
368:20 369:6,8
371:24 372:12
372:23 373:7
374:18 381:9
386:20 387:10
**questioned**
342:24
**questions**
351:13 369:13
371:19 372:18
378:11 382:17
383:1 387:25
388:3
**quoting** 343:8

**r**

**r** 338:1 339:1
340:1 342:10
388:10 389:6,6
390:1
**rafferty** 338:8
**raise** 360:16
**raised** 361:18
**raspanti** 340:8
**rbkjs** 336:5
**read** 369:19
370:10 388:13
**reading** 389:8
**really** 348:1
372:12 376:16
**reask** 372:12

**reason** 356:1
358:15 360:13
367:2 377:4
**reasons** 360:5
360:12
**recall** 342:22
343:13 344:19
344:22,22
346:14 349:25
350:3,4 351:22
352:19,21
353:4 354:3,4
356:3 357:15
357:17,19
358:2,3,13,15
358:17 359:10
359:24 360:6,8
360:11,12,14
360:21 361:2
364:5,6,9,25
373:13 377:10
379:9 383:2,4
387:12
**recalled** 356:4
356:4 358:1
360:3,10
**recalling** 360:1
**recalls** 363:3
**record** 342:2,7
342:15 369:20
387:19,23
**recorded** 342:3
**recross** 341:4
354:13 382:21
388:2

HIGHLY CONFIDENTIAL

**[redirect - review]**                                                       Page 15

**redirect** 341:4
342:20
**reefer** 340:8
**reference**
347:14 366:25
369:22 372:5,7
387:9
**referenced**
364:24 365:6
365:22 371:14
372:1 376:5,11
**referencing**
344:24 348:3
357:10 371:5
372:16 373:6
**referred** 355:11
**referring** 367:6
367:21
**refuses** 361:19
**regard** 356:12
**regarding**
342:5 349:11
353:13,21
**regardless**
358:11 359:7
**regulated**
360:20
**regulates**
363:20
**regulation**
344:4 367:15
371:11 372:4
372:19 373:14
386:6

**regulations**
344:1 365:4,9
365:19,25
366:3,5 367:3
367:8 373:5
374:4 375:1
376:18,20
385:16
**regulatory**
343:22 345:6
357:25 385:9
**relate** 365:14
**related** 344:21
350:11 351:10
352:17 355:4
355:17,22
360:15 362:1
**relates** 336:6
350:24 351:7
351:24 363:21
385:14
**relationship**
371:8 386:8
**relative** 390:14
390:16
**relevant** 354:10
374:18
**reliance** 367:20
374:21
**relied** 383:7,23
386:5
**rely** 370:2,19
384:21,22
**relying** 385:1,1
386:12

**remain** 385:24
**remainder**
388:1
**remember**
343:2 350:14
382:23
**reminder**
354:19
**remote** 336:12
338:2 339:2
340:2
**remotely** 337:6
**report** 343:5
350:15,23
351:6,23 352:2
352:12 353:17
353:18 354:11
355:13 374:11
375:1 380:4
382:8 383:24
**reporter** 337:5
342:8 389:10
390:4
**reports** 380:1
**represent**
354:20 383:4
**requesting**
358:21
**requests**
341:13,14
**require** 366:5
367:8 372:19
373:1,15,16
375:2

**required**
371:21
**requirement**
374:11 376:19
376:21
**requirements**
366:14 385:9
**requires** 365:4
365:21 371:12
371:25 373:8
374:21
**requiring**
366:23 372:5
**research** 355:6
**reserve** 388:1
**respect** 344:7
344:16,25
349:12 351:17
352:10 353:14
353:22 359:15
364:2,12
**respons** 384:7
**responsibilities**
386:2
**responsible**
384:8
**resume** 387:21
**return** 371:10
389:10
**review** 350:7
365:14 367:18
367:25 368:6
384:10,15
386:25 387:4

[reviewed - specific]                                                        Page 16

| reviewed 352:8 | **s** | 378:7 379:3 | shorthand |
|---|---|---|---|

**reviewed** 352:8
352:18 353:1
377:19,24
382:5 383:18
383:18,23
**reviewing**
352:24 358:6
359:13
**riddle** 338:20
**right** 343:6
349:18 354:22
361:9,17 363:8
369:7,12 371:5
381:13 387:2,5
**risk** 373:20
378:21
**rivero** 338:13
**riveromestre....**
338:17,17
**road** 339:9,14
**rock** 342:11
**rooney** 340:19
**rosemarie**
338:20
**rosemarie.bo...**
338:22
**roszel** 339:9
**roundabout**
345:15
**route** 378:15
379:22
**routinely**
385:21
**ruled** 352:22

**s**

**s** 338:1,9 339:1
340:1 341:9
389:6
**safety** 360:16
**saying** 342:23
347:10,15,16
351:21 357:21
372:9 375:25
**says** 357:21
370:19
**sciegen** 339:6
**scope** 351:11
352:23 379:24
380:14 381:20
382:3,8
**scratch** 344:13
**screen** 367:13
**second** 368:17
**section** 365:3
367:13,17
368:3,4
**see** 342:21
344:12,14
345:13 346:2
346:15 349:15
352:5 357:12
368:2,3,3
369:7,17,18
377:4
**seeing** 349:25
**seek** 371:22
**seen** 345:3
352:6 355:19
359:12 378:2,5

378:7 379:3
387:8
**seize** 361:16
**seizures** 362:1
364:7
**sell** 385:17
**selling** 360:17
360:19 367:10
374:6
**send** 363:8,18
363:23
**sends** 363:12
**sense** 377:16
**sent** 343:12
355:3,16,17
357:21
**sentence** 
357:21 369:19
371:16
**serious** 360:15
**served** 343:25
**services** 368:11
**set** 356:19
357:7 365:10
374:5 383:17
385:3 390:12
**share** 367:13
**shared** 384:2
384:11,17
**sharkins**
339:16
**sheet** 389:9,10
**shipped** 385:24
**short** 383:1

**shorthand**
337:5 390:4
**show** 352:21
358:3 385:2
**shown** 389:11
**shows** 358:2
386:7
**shy** 383:8
**sign** 389:10
**signature**
390:20
**similarly**
365:20
**simple** 347:25
348:1
**single** 364:1
**sit** 358:6,24
359:14 363:25
387:5
**sitting** 346:16
349:9 354:3
379:4
**skadden** 340:3
**skadden.com**
340:5
**slater** 340:3
**small** 383:17
**sorry** 363:12,16
371:23
**sort** 382:1
**speaking** 370:6
**special** 341:13
341:14
**specific** 345:24
349:2 350:8,8

**[specific - take]**                                                      Page 17

356:9,19 357:5
357:20,23
358:9 359:5,7
359:15,18
366:22 367:17
373:14 374:1
386:23
**specifically**
356:15 358:25
360:24 365:19
371:21 372:4
380:6
**specifics** 382:7
**speculate**
359:12
**spoke** 382:23
**stand** 343:15
**standard** 351:2
351:8
**standards**
345:9
**start** 369:16
**started** 386:19
**state** 337:5
339:4 345:25
350:14 371:16
372:15 374:14
390:4,21
**stated** 343:4
347:22 348:16
351:6 352:2
357:17 358:1
375:13 377:11
377:13

**statement**
343:13 344:23
345:14,18
346:7,17,25
348:3,6,8,8,15
349:10 350:8
351:25 353:16
353:18,21
355:21 356:15
357:9 358:7,24
359:15 374:16
375:13
**statements**
346:3 347:21
353:13 356:1
356:23 357:9
359:6,25
371:11
**states** 336:1
374:16
**stating** 345:19
350:6 351:23
373:15 374:2
**stenographic**
337:2 342:7
**stenographic...**
390:11
**step** 366:2
374:25 376:22
**steps** 364:2
367:9 374:5
375:3 378:8
385:19
**steve** 354:12
368:5 369:9

**steven** 339:13
382:20
**stoy** 340:9
**street** 338:9
339:4,20
340:10,20
**structurally**
377:20 379:21
380:20 381:4
381:16
**subject** 357:19
360:8,20
**submission**
370:3
**submits** 369:22
369:24
**subpart** 369:15
**subscribed**
388:20
**subsection**
368:2
**suggest** 351:11
**suggested**
347:22 348:16
**suggesting**
344:24 345:19
346:25
**suggestion**
346:8,17
349:10 353:21
**suite** 338:4
339:14 340:20
**supplement**
369:25

**supplier** 365:13
379:13 385:6
385:21
**support** 370:2
**supposed**
385:19
**sure** 345:16
347:9 349:7
352:22 362:23
372:12 378:2
380:4 383:13
385:23
**surely** 378:2
**surety** 364:17
**surprised**
345:4
**swear** 342:8
**sworn** 342:12
388:20 390:7
**synthesis**
378:15 379:22
**system** 366:7,7
366:14,21
**systems** 366:15

**t**

**t** 341:9 342:10
342:10 388:10
389:6,6 390:1
390:1
**take** 361:7
362:6,7,15
367:9 374:5
375:3,3 376:21
377:3 385:19

**[taken - triggered]**                                    Page 18

| | | | |
|---|---|---|---|
| **taken**  337:4 | 390:10 | 372:2,2,9,10,11 | 358:6,24 |
| 364:12 389:4 | **teva**  339:17,23 | 373:12,13,25 | 359:14 363:25 |
| 390:11 | 354:20 355:4 | 375:13,23 | 368:12 382:18 |
| **talk**  367:16 | 355:12,17 | 376:15,19,24 | **today's**  388:6 |
| 384:7 | 356:24 357:22 | 377:13 380:14 | **together**  385:6 |
| **talked**  366:10 | 360:1 364:2,10 | 380:19 381:7 | **told**  353:5 |
| **talking**  349:2 | 371:3 377:8 | 381:20,25 | **took**  343:11 |
| 373:6 | 381:1,11 | 382:3,25 | 378:8 |
| **talks**  377:25 | 385:15 | 383:12,25 | **top**  364:15 |
| 381:18 384:7 | **teva's**  355:22 | 384:18,19,25 | **tor**  385:1 |
| **technical** | 356:15 357:5 | 385:13 386:3 | **torrent**  340:17 |
| 383:19 | 357:10,23 | 386:19,20 | 356:25 371:4 |
| **tell**  354:7 | 358:12,25 | 387:3,3,25 | 381:11 382:18 |
| 381:17 384:16 | 359:15 364:12 | 388:4 | 383:4,9,10,18 |
| **telling**  352:3 | **texas**  337:6 | **thinking** | 383:20 384:3 |
| **tells**  387:6 | 342:11 | 348:22 | 384:11,21,23 |
| **term**  344:15 | **thank**  342:18 | **three**  339:20 | 385:2 386:9,13 |
| 357:6 | 354:16 382:16 | 342:16 | 386:14 387:2 |
| **terminus** | **thanks**  382:20 | **ties**  351:8 385:5 | 387:11 |
| 339:14 | **theoretical** | **time**  336:15 | **tower**  340:20 |
| **terms**  343:22 | 379:21 | 337:8 342:2,25 | **training**  385:12 |
| 350:15,19 | **thing**  359:23 | 353:20 354:4,8 | 386:6 |
| 352:17 353:9 | 361:25 381:2 | 354:9 356:24 | **transcript** |
| 357:13 362:5 | **things**  345:10 | 360:9 361:24 | 337:2 343:9 |
| 365:1 372:13 | 347:14 354:18 | 364:22 367:25 | 383:9,13 |
| 372:16 380:15 | 360:25 361:22 | 369:13 375:24 | 388:13 389:8,9 |
| 380:17 382:9 | 362:1,2,13 | 377:7 383:3 | 390:10 |
| **testified**  342:13 | 373:21 380:18 | 385:22 387:18 | **traurig**  339:13 |
| 354:24 377:7 | **think**  343:3,15 | 387:20,21,22 | **trial**  368:11 |
| 386:25 | 347:6,18 353:5 | 388:1,5,8 | **tried**  345:25 |
| **testify**  390:7 | 356:10,20 | 390:11 | 373:25 376:22 |
| **testimony** | 358:16 359:19 | **times**  348:25 | **trigger**  345:7 |
| 343:16 364:25 | 366:11,19 | **tip**  352:24 | 345:10 |
| 377:10,25 | 367:20 368:11 | **today**  346:16 | **triggered**  345:9 |
| 388:14 389:8 | 369:3 370:24 | 349:9 354:4 | 356:6 |

HIGHLY CONFIDENTIAL

**[true - want]**                                                                    Page 19

**true**  343:15
  349:23 355:20
  361:3,15
  370:18 371:8
  373:2 380:23
  383:12 390:10
**truth**  390:7,8,8
**try**  356:10
  374:8 381:9
**trying**  346:12
  358:10,23
  359:21 363:14
  366:22 372:13
**two**  369:4
  372:18 386:8
**type**  361:22
**typically**  345:7
  346:2 361:19
  362:2 363:3

**u**

**u**  342:10,10
  388:10
**un**  347:6
**under**  360:4
  363:23 366:23
  367:20 368:1
  369:15,23
  370:1 374:4
**understand**
  345:16 356:12
  358:22 359:20
  373:18 375:15
  378:10 380:19
  381:3,10

**understanding**
  359:23 371:2
  379:10,12
**understood**
  360:2 363:16
  364:21 367:19
  367:24 374:19
**unit**  342:3
**united**  336:1
**untitled**  345:11
**upload**  367:24
**uploading**
  368:6,16
**usa**  339:17,23
**use**  356:19
  357:13 359:22
  376:10
**used**  344:15
  358:11 380:18
  381:19,24
  386:1
**using**  376:3
  379:21

**v**

**vague**  363:9,10
**validate**  385:20
**validation**
  386:1
**valsartan**  336:3
  336:7 342:5,25
  343:7 348:23
  349:3,3,12
  351:17 352:10
  353:3,14 355:4
  355:18 357:11

**understanding** 358:25 359:15
  364:2,13 371:5
  377:21 378:14
  378:22 380:7
  389:1
**variety**  352:3
  356:25 359:25
  360:21 361:15
**vaughn**  338:3
  342:14,18
  343:21 344:8
  344:17 345:2
  345:21 346:9
  346:20 347:3
  347:24 348:11
  348:13,18
  349:13,20
  350:2 351:19
  352:13 353:24
  354:6 355:24
  356:17 358:8
  359:2,17 361:1
  361:10 362:10
  362:18 363:9
  363:14 364:4
  364:14 365:7
  365:24 368:5
  368:13 369:9
  370:13,23
  371:15 373:11
  375:22 376:12
  377:22 378:17
  378:24 379:7
  379:23 380:9
  381:6 382:20

**understanding** 383:21 384:4
  384:13 386:16
  387:13,15,17
  388:3
**verify**  354:1
  355:6
**video**  342:3
**videographer**
  340:25 342:1
  368:10,14
  387:18,22
  388:5
**videotaped**
  336:12
**view**  373:17
  375:5 382:12
**violation**
  348:17 375:11
  376:10
**violations**
  352:10 353:14
**vol**  362:22
**volume**  336:11
**voluntary**
  362:15,24
  363:3,4 364:9

**w**

**walk**  358:16
**wallack**  339:8
**walsh**  339:19
**walsh.law**
  339:22
**want**  345:16
  346:6 347:7
  366:4 367:16

HIGHLY CONFIDENTIAL

**[want - zoom]**                                                        Page 20

370:5 374:19
375:8,14
376:25 384:8
**warning**
343:12 344:7
344:10 345:1,7
345:11,18
346:2,13 347:2
347:21 348:2
351:18 354:25
355:4,8,9,12,16
355:19 356:14
357:21 361:6
363:8,12,18,23
**way** 345:22
346:10 349:14
350:5,6 352:17
354:1 359:4,4
364:19 371:8
372:3,8 373:15
373:17 374:2
374:14 376:19
379:5,19
**ways** 360:22,24
**website** 344:20
356:2,23
**weeks** 382:23
**went** 350:7
**west** 340:4,20
**william** 339:8
**withdrawn**
363:17
**witness** 341:3
342:9 368:20
368:25 369:3

**wmurtha**
339:10
**words** 355:7
356:19 357:24
358:9,11 359:8
359:18,22
**worked** 365:11
**working** 375:6
**worse** 381:24
**write** 362:24
**wrong** 372:11

| **x** |
| **x** 341:1,9 |

| **y** |
| **yeah** 361:13 |

363:2 368:8
382:25 387:17
**york** 338:21,21
340:4,4,15,15

| **z** |

**zalman** 338:15
**zhp** 340:6
346:25 347:23
348:16 349:1
353:4,22
354:25 355:16
358:19 383:15
383:20 385:2,5
386:9
**zhp's** 344:7,13
344:16,25
345:19 349:11
351:5,17
353:14 371:5

384:24 387:1
**zkass** 338:17
**zoom** 338:2
339:2 340:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.