

**BARNES &
THORNBURG** LLP

2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904 U.S.A.
(310) 284-3880
Fax (310) 284-3894

Kristen L. Richer
(310) 284-3896
kristen.richer@btlaw.com

www.btlaw.com

May 10, 2023

**VIA ECF**

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
1500 Market Street, East Tower
18th Floor
Philadelphia, PA 19103

Re:     **In re Valsartan, Losartan, and Irbesartan Products Liability Litigation**
        **Case No. 1:19-md-02875-RBK**

Dear Special Master Vanaskie:

Pursuant to the Court's directive during the April 26, 2023 status conference that the
Pharmacy Defendants report back to Your Honor within 14 days, I write on behalf of the Pharmacy
Defendants regarding the status of our meet and confer discussions with Plaintiffs on the discovery
items in the Court's April 21, 2023 Order (Doc. 2343).  The Pharmacy Defendants and Plaintiffs
continue to meet and confer regarding the scope, form, and time of the proposed
production.  Because of these ongoing efforts, there are currently no disputes ripe for
adjudication.  The parties have committed to continue to discuss the best way to produce the
necessary data to Plaintiffs forthwith, though after the currently ordered deadline of May 30,
2023.  The Pharmacy Defendants and their counsel are continuing their ongoing efforts to
understand the data Plaintiffs seek, identify the knowledgeable people within each Pharmacy
Defendant's uniquely complex organization, and determine what data is available and in what form

Special Master the Honorable Thomas Vanaskie
Page 2

it can be produced.  These investigative steps are tedious, iterative, and time-consuming, but—as they have discussed with Plaintiffs' counsel—the Pharmacy Defendants believe they are making progress.  Thus, we suggest that the parties continue to meet and confer and submit an additional update to the Court in writing before the June 7, 2023 Case Management Conference.

## I.      Identification of Consumer Economic Loss Plaintiffs

The Pharmacy Defendants believe they have reached agreement with the Plaintiffs on most, if not all, of the issues associated with identification of the consumer economic loss Plaintiffs.  To ensure compliance with HIPAA before any production, the Pharmacy Defendants are preparing a proposed order governing the production of this data, which they will share with Plaintiffs and hope to submit to Your Honor in advance of next week's biweekly meeting.

## II.      Amounts Third-Party Payors Paid for VCDs

Judge Kugler ordered that the Pharmacy Defendants provide "amounts TPPs paid for valsartan" "relating to class certification claims" by the end of this month.  (ECF No. 2343.)  The Pharmacy Defendants have had several meet and confer discussions with Plaintiffs and are continuing to confer with Plaintiffs regarding (1) the timing of production, which all parties have agreed will occur after the initial deadline set by Judge Kugler, (2) the scope and form of the production, and (3) the format and verification of a written instrument that affords the Pharmacy Defendants to respond formally to this discovery, and to explain what, exactly, they are producing, including explanation of any limitations to the data.

On the scope and form of the production, Plaintiffs have explained their position as follows: because dispensing records produced by certain Pharmacy Defendants may show a data field Plaintiffs believe shows the "amounts TPPs paid for valsartan," the Pharmacy Defendants should

Special Master the Honorable Thomas Vanaskie
Page 3

produce that number *en masse* for every dispense of the VCDs.  But to this point, Plaintiffs' belief

about the data artificially simplifies it and ignores what we have consistently told them: it is our

general understanding at this time that while each Pharmacy does things differently, the fields are

only a data point, and not necessarily a final statement, of what Plaintiffs seek and what the Court

ordered to be produced: the "amounts TPPs paid for valsartan."  First, the fields are not necessarily

the "amounts TPPs paid."  Following adjudication of the prescription, payors may take/make

additional price adjustments to reflect things like rebates, bill-backs, or negotiated

discounts.  Second, the fields are not necessarily payments for valsartan.  The amount the payor

actually pays to the pharmacy may not necessarily be received or booked on a fill-by-fill or NDC-

specific basis, such that the payor may simply issue payments at predetermined intervals (*e.g.*,

monthly) for all covered fills during the relevant period.  Third, the fields do not necessarily show

TPP payments at all.  For some Pharmacies, the payor reflected in dispensing data is not the Third

Party Payor, but rather the Pharmacy Benefit Manager ("PBM") that provides prescription benefits

under the insurer's plan, and the "amount paid" may only reflect payment by a PBM that has

contracted with the TPP.

Given that the purpose of production of this data as it relates to Plaintiffs' actual claims

against the Pharmacy Defendants relates *only* to determination of the Pharmacy Defendants'

profits, production of "TPP amounts paid" on a granular, fill-by-fill basis seems unnecessary and

duplicative of the profit data that was also ordered to be produced.  Further, the contract payment

price and actual amounts paid by the payor per fill is a heavily negotiated and highly commercially

sensitive figure.  The Pharmacy Defendants have previously briefed the competitively sensitive

nature of this information for the Court, including by submitting declarations from each Pharmacy

Special Master the Honorable Thomas Vanaskie
Page 4

Defendant explaining the highly sensitive nature of this information.  (ECF No. 479)[1]  The Pharmacy Defendants have substantial concerns that production of this data at a granular or transactional level, across all consumers who filled during the seven-year relevant time period in this case, could cause them competitive harm, given that this information is being produced in a litigation that involves their competitors, suppliers, and the payors themselves.  That all being said, the Pharmacy Defendants are continuing to investigate proposals on *how* and in what form to produce the "TPP Amounts Paid"—or some form of reasonable proxy for that amount if it is not directly available—and are continuing to meet and confer with Plaintiffs on this front.

Finally, each Pharmacy Defendant would like to provide with its production company-specific objections it may have to the production of this data, explain what it is producing and, to the extent applicable, outline any limitations of this data.  The Pharmacy Defendants hope that the parties can reach an agreement on that issue will report back as soon as practical.

### III.    Costs and Profits for VCDs

As we understand Plaintiffs' request for "costs and profits," profits is simply revenues (from the above TPP production and the previously identified co-pays within the produced dispensing data), less costs.  Given that, production of the TPP payments seems entirely duplicative of the profit information sought by Plaintiffs, but the Pharmacy Defendants have conveyed to Plaintiffs that they are willing to continue to meet and confer regarding production of the requested information.

---

[1] Copies of this briefing and supporting declarations are attached hereto as an addendum for the Court's benefit.

BARNES & THORNBURG LLP

Special Master the Honorable Thomas Vanaskie
Page 5

"Costs" is difficult to define, as profits would certainly include both the costs of goods (the purchase price for valsartan) *and* overhead or selling, general, and administrative expenses. Regarding costs of goods, the Pharmacy Defendants have explained that production of this information is challenging, because post-invoice rebates, bill-backs and other discounts may affect the true net cost of these drugs, but may not be tracked on an NDC- or drug-specific basis.  The parties have discussed these issues on more than one occasion, and the Pharmacy Defendants are currently still investigating whether and how costs—factoring in these other cost-related elements—can be queried on an NDC-specific basis, and, even if so, in what form that production would take.  Additionally, some of this data also may be maintained by suppliers, not by the Pharmacy Defendants themselves.  Further, this information, like TPP payment information, is highly competitively sensitive, given the presence of each Pharmacy Defendant's competitors and suppliers in this litigation.[2]  Regarding other costs (*e.g.*, overhead), this information is also challenging to collect, in that it is not necessarily maintained on an NDC-specific basis, such that the Pharmacy Defendants are investigating their options and capabilities for producing this information, so that they can propose a method of production to the Plaintiffs.  Again, the Pharmacy Defendants suggest that the parties continue to meet and confer to work toward an agreement for the scope and form of this production, and Plaintiffs appear to be amenable to this request.

---

[2] *See* Addendum, ECF No. 479 (letter briefing and supporting affidavits of the Pharmacy Defendants explaining the competitively sensitive nature of cost information).

BARNES & THORNBURG LLP

Special Master the Honorable Thomas Vanaskie
Page 6

### IV.     Custodial Discovery

The Pharmacy Defendants require additional information to meaningfully evaluate Plaintiffs' proposal on custodial discovery, which is currently too general and broad to be helpful. That said, the parties will continue to meet and confer on this issue and be prepared to report to the Court at the June 7 Case Management Conference.

### V.   Conclusion

Given the complexities and sensitivity of these issues, the Pharmacy Defendants believe that they have made good progress in investigating these issues, and in working with Plaintiffs toward achieving reasonable and appropriate parameters for the timing, scope, and form of the ordered productions. We look forward to addressing these issues with you further at next week's biweekly meeting.

Respectfully submitted,

*/s/ Kristen L. Richer*

Kristen L. Richer

BARNES & THORNBURG LLP

# Addendum

# BARNES & THORNBURG LLP

Sarah E. Johnston
Partner
(310) 284-3798
sarah.johnston@btlaw.com

2029 Century Park East, Suite 300
Los Angeles, CA 90067
(310) 284-3880
Fax (310) 284-3894

www.btlaw.com

June 16, 2020

**VIA CM/ECF**
Honorable Joel Schneider
United States Magistrate Judge
U.S. District Court for the District of New Jersey

> Re: *In re Valsartan, Losartan, and Irbesartan Products Liability Litigation*
> No. 1:19-md-02875-RBK-JS (D.N.J.)

Dear Judge Schneider:

The Retailer and Pharmacy Defendants (collectively the "Retail Pharmacy Defendants") respectfully submit this letter brief addressing the "macro" discovery disputes as raised in Plaintiffs' April 13, 2020 letter brief (ECF 413), per the modified schedule approved by the Court on May 13, 2020 (ECF 432).

## I.     Introduction

Plaintiffs allege that the Manufacturer Defendants introduced a new solvent into the manufacturing process for generic valsartan, which Plaintiffs claim resulted in NDMA contamination of the finished drug. (*E.g.*, ECF 398 at ¶ 6.) The Retail Pharmacy Defendants are not alleged to have done anything but dispense finished dose prescription drugs manufactured by other Defendants pursuant to valid prescriptions. (*E.g., id.* at ¶¶ 407-410 (warranty allegations against retailers)). Indeed, in their case management proposal, Plaintiffs have even proposed a first trial <u>without</u> the Retail Pharmacy Defendants.[1] (ECF 420 at 4-5.) Although Plaintiffs dispute that the Retail Pharmacy Defendants are "unfairly swept up in this litigation," their <u>only</u> support for this statement is that these Defendants are large corporations with substantial market share. (ECF 413 at 1-2.) In other words, Plaintiffs offer <u>no</u> reason why these defendants are responsible for a prescription drug's alleged latent defect. This is not surprising, given the overwhelming case law holding that pharmacies do not have a duty to test and are not liable for latent defects in a prescription medication. *E.g.*, *Bichler v. Willing*, 58 A.D.2d 331, 333, 397 N.Y.S.2d 57, 58 (1977) ("Nor can plaintiffs recover in negligence on the hypothesis that appellant dispensed the drug without first inspecting or testing it for the purpose of discovering its latent dangers.").

Nonetheless, because the Court had previously indicated that it would not hear Rule 12 motions before discovery began, the Retail Pharmacy Defendants have engaged in extensive meet-

---

[1] Plaintiffs indicated that they wish to proceed with a class trial against ZHP and its affiliated entities, and potentially finished dose manufacturers, claiming that such a trial "would provide a tremendous amount of information and guidance across the litigation." (ECF 420 at 4-5.) While nothing in this letter should be interpreted as consenting to Plaintiffs' unprecedented approach to consolidated case management or class certification, and the Court has decided to withhold ruling on how any claims would be tried and against which parties until after the forthcoming Rule 12 and class certification motions, the Retail Pharmacy Defendants mention Plaintiffs' request because it highlights that even Plaintiffs do not think the Retail Pharmacy Defendants (and thus discovery from them) are necessary at this time.

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 2

and-confer negotiations with Plaintiffs, made substantial concessions during these sessions, and agreed to produce documents to Plaintiffs, including certain consumer-level purchase records and data concerning valsartan dispensed to consumers over a period of nearly a decade.[2] The Retail Pharmacy Defendants anticipate having to begin the burdensome process of collecting and producing these documents in the coming months, while simultaneously raising their Rule 12 defenses, including those demonstrating immunity provided to pharmacies.

Despite the Retail Pharmacy Defendants' agreement to produce such a significant amount of discovery, Plaintiffs seek more, including the production of highly sensitive, proprietary, and confidential pricing information that they claim is relevant to a calculation of retailers' purported "ill-gotten gains." More specifically, Plaintiffs seek the production of (1) upstream cost data (*i.e.* what the retailers paid for valsartan) and (2) downstream pricing data reflecting reimbursements from third-party payors ("TPPs") (*i.e.* what insurers paid to the pharmacies for valsartan). The Retail Pharmacy Defendants have refused to produce this data because, as discussed more fully below, it is irrelevant to the core allegations and theories of liability asserted against the Retail Pharmacy Defendants. Rather, such materials are relevant <u>only</u> to the extent Plaintiffs are able to plead and prove their entitlement to the disgorgement of retailer profits. (ECF 413 at 4 (referencing allegedly "ill-gotten gains").[3] But Plaintiffs have not come close to demonstrating that they may pursue a disgorgement remedy against the Retail Pharmacy Defendants, and any claimed relevance of this data is speculative at best. *See, e.g.*, *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982) (reversing judgment on unjust enrichment claim). Plaintiffs' requests for the discovery now at issue before the Court are wholly inconsistent with the claims alleged and the role of the Retail Pharmacy Defendants in this litigation.

Moreover, the documents requested are among the most commercially sensitive information in the possession of the Retail Pharmacy Defendants, as shown by the attached declarations. *See* Exhibits A through N (listed in addendum). Because Plaintiffs are not entitled to disgorgement as a remedy against these Defendants, and they have offered no basis for obtaining these most highly confidential, protected, nonpublic and commercially sensitive data, the information they seek is outside the scope of permissible discovery. *See* Fed. R. Civ. P. 26(b)(1) (the scope of discovery must be "relevant to any party's claim or defense and proportional to the

---

[2] Although the Retail Pharmacy Defendants agreed to produce documents, their production will <u>not</u> allow Plaintiffs to identify and trace the specific batch of valsartan a particular consumer received. Plaintiffs misleadingly and incorrectly claim that the Drug Supply Chain Security Act was intended to "track product from the manufacturer to the consumer." (ECF 413 at 9 at n.9.) That is simply not so. Direct sales to consumers are exempt from the product tracing requirements under the Act. 21 U.S.C. § 360eee(24)(B). Although the Act requires the retail pharmacy to provide transaction information to subsequent owners of prescription drugs, this requirement is <u>not</u> applicable to, among other things, dispensing to a patient. *Id.* In other words, the Act does not require transaction history be provided to patients at the point of sale.

[3] In one sentence, Plaintiffs claim that upstream cost data (what the Retail Pharmacy Defendants paid for valsartan from their suppliers) is "relevant to motive, intent, and notice," citing their prior and unrelated arguments to the Court about manufacturers and the cost of recycled solvents within the manufacturing process. ECF 413 at 4. Plaintiffs make no argument specific to the Retail Pharmacy Defendants, and surely must concede that any purported link between <u>retailer</u> product costs and purported "motive, intent, and notice" (which Plaintiffs do not attempt to identify) would be acutely more attenuated than direct manufacturing-process costs, even before considering the added complexity of the generic drug supply chain and pricing. *See, e.g.*, Declaration of Zachary Mikulak, attached as Exhibit A, at ¶ 6.

BARNES&THORNBURG LLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 3

needs to the needs of the case" considering many factors, including "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."). The information Plaintiffs now request is not relevant to any valid claim against the Retail Pharmacy Defendants, and thus is outside the scope of discovery on that basis alone. But even if it possessed marginal relevance, which the Retail Pharmacy Defendants deny, it is disproportional to the needs of the case as the burden and risk of producing the information far outweighs its negligible benefit. As demonstrated by the submitted declarations, the production of this information will have lasting, harmful effects in the acquisition and sale of prescription pharmaceuticals in the marketplace. The Retail Pharmacy Defendants therefore respectfully request that Plaintiffs' discovery demands be denied.

## II.    Relevant Procedural History and Remaining "Macro" Issues

Following a discovery conference on November 6, 2019, the Court ordered Plaintiffs to serve initial Rule 34 discovery on the downstream defendants on or before November 26, with the downstream defendants' objections to the requests due three weeks later, on December 17. On the November 26 due date, Plaintiffs served omnibus Distributor/Wholesaler/Pharmacy Requests for Production, comprising 65 individual document requests, with more than 150 discrete subparts, on 15 separate topics, and with responses contemplating substantial custodial and non-custodial document/ESI collection and production. Following an initial meet and confer about the impracticality and scope of the requests, Plaintiffs agreed to serve amended requests upon the Retail Pharmacy Defendants, and to revisit the discovery schedule, including the timing of objections, upon service of the amended discovery.

On December 10, 2019, Plaintiffs served amended requests. Unfortunately, however, the amendments did not address the Retail Pharmacy Defendants' concerns; the amended requests comprised 60 individual document requests, again with more than 150 discrete subparts, on 15 separate topics, and with responses contemplating substantial custodial and non-custodial collection and production. In many instances, the amended requests were broader than the initial requests and imposed greater discovery obligations upon the downstream defendants than on the manufacturers. Thus, in a December 18, 2019 email, the Court struck the entire set of discovery and asked Plaintiffs "to go back to the drawing board, sharpen their pencils and serve a new streamlined set of requests."

With those guideposts in mind, the Retail Pharmacy Defendants engaged in significant meet-and-confer negotiations in the first quarter of 2020. To facilitate discussions, counsel for the Retail Pharmacy Defendants provided Plaintiffs with a set of proposed discovery that, in their view, reflected the Court's guidance regarding the appropriate scope of "core" discovery, and that reflected the categories of information that the Retail Pharmacy Defendants could realistically produce. Plaintiffs responded with a different set of document requests, which the parties were able to work to narrow.

After several subsequent discovery conferences, the Retail Pharmacy Defendants and Plaintiffs agreed in principle on most issues, with the exception of the upstream cost data and TPP reimbursement rates and data. The Retail Pharmacy Defendants agreed to produce, where available (and availability often varies from retail pharmacy to retail pharmacy), centrally stored

BARNES&THORNBURGLLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 4

documents sufficient to identify, in brief: (1) the valsartan purchased by them from January 1, 2012 through the end of 2019; (2) as exemplar, the ordinary-course transactional documents accompanying valsartan purchased by them; (3) as exemplar, the type of manufacturer-included packaging or labeling information for valsartan dispensed by them; (4) the sale of valsartan to consumers; (5) the price paid by consumers for valsartan; (6) the information provided to them by the Manufacturer or Wholesaler Defendants from which they actually purchased valsartan; and (7) the identity of distribution centers that would have received or shipped valsartan. The Retail Pharmacy Defendants also agreed to produce several categories of documents relating to recalls and final written policies about a number of topics, including those relating to warranties, product tracing, and document retention. The Retail Pharmacy Defendants also agreed to produce in redacted form final written indemnification agreements with any supplier from whom they purchased the valsartan at issue in this litigation.

The only remaining issue for this "core" set of discovery relates to disgorgement of profits. Plaintiffs seek information about what the Retail Pharmacy Defendants paid for valsartan—their upstream cost data. Plaintiffs also seek information about what TPPs reimbursed the Retail Pharmacy Defendants for valsartan—the TPP pricing data.

## III.    Argument

Plaintiffs' discovery requests for upstream cost (supplier pricing information) and production of data concerning TPP payments to the Retail Pharmacy Defendants should be denied. The discovery at issue relates only to a disgorgement of profits remedy, which is not available to Plaintiffs, and is not proportional to the needs of the litigation, especially in light of the exceptionally sensitive nature of the data requested. Indeed, Plaintiffs' stated intention not to try a case against the Retailer Defendants anytime soon (ECF 420 at 4-5) proves that their demand for the requested documents is not proportional to the current needs of the case.

### A.  Disgorgement of profits is not an available remedy to Plaintiffs.

Plaintiffs seek gross and net upstream cost data and TPP reimbursement rates to support a "disgorgement of profits" damages theory. But the equitable remedy of disgorgement is not available given Plaintiffs' ample remedies at law, and the Economic Loss Master Complaint fails to plead any circumstances that would make disgorgement appropriate in any event.

Plaintiffs argue that they are entitled to documents showing gross and net upstream cost data and TPP reimbursements because they "plead a variety of claims that permit disgorgement of ill-gotten gains (e.g., unjust enrichment)." (ECF 13 at 4.) (emphasis added). Plaintiffs misrepresent the case they brought. Of the nine causes of action pled against the Retail Pharmacy Defendants in the Consolidated Second Amended Economic Loss Class Action Complaint, Plaintiffs only seek disgorgement of any alleged "ill-gotten gains" as to one—Count 13 for unjust enrichment. Compare ECF No. 398 at ¶ 560 (seeking disgorgement), with id. at ¶¶ 435-445, 455-465, 475-482, 491-503, 517-529, 543-548, 567-576, 587-594 (the remaining eight claims against the Retail Pharmacy Defendants, none of which seeks disgorgement).

In fact, Plaintiffs' other claims against the Retail Pharmacy Defendants—including multiple warranty claims based on the alleged contract formed between Plaintiffs and the Retail

BARNES&THORNBURGLLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 5

Pharmacy Defendants at the time of sale—prohibit Plaintiffs from pursuing a claim for unjust enrichment or disgorgement of profits. *See, e.g.*, *id.* at ¶ 437 (alleging contract). Because these other claims provide Plaintiffs with adequate remedies at law, Plaintiffs' claim for equitable relief fails as a matter of law in <u>all</u> eighteen states for which there is a named class representative in the Second Amended Economic Loss Class Action Complaint.[4] Simply put, since Plaintiffs have alleged the existence of a valid contract between themselves and the Retail Pharmacy Defendants, they have pled themselves out of court on their unjust enrichment claim.

Even if Plaintiffs were found to have pled unjust enrichment in the alternative (which they have not), Plaintiffs' request for disgorgement also fails because Plaintiffs do not adequately plead a basis for such relief. As an equitable claim, unjust enrichment is only appropriate in circumstances where it would be "unjust" for the tortfeasor to retain the benefits received. *See Goldsmith v. Camden Cty. Surrogate's Office*, 975 A.2d 459, 462 (N.J. Super. Ct. App. Div. 2009) ("The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another"); *see also Cty. of Essex v. First Union Nat. Bank*, 891 A.2d 600, 605-06 (N.J. 2006). Furthermore, disgorgement of profits is only available where the "conscious wrongdoing" is such that it "tips the scale" in favor of awarding such a unique form of relief. *See* Restatement (Third) of Restitution and Unjust Enrichment § 3 cmt. a ("Liability to disgorge profits is ordinarily limited to cases of … 'conscious wrongdoing,' because the disincentives that are the object of a disgorgement remedy are not required in dealing with … inadvertent tortfeasors.").[5] For example, disgorgement of profits has been found

---

[4] *See Resnick v. Hyundai Motor Am. Inc.*, 2017 WL 1531192, at *22 (C.D. Cal. Apr. 13, 2017) (noting that, in California, quasi-contractual claims like unjust enrichment cannot lie where there is an express contract as a result of a warranty, and citing cases standing for that proposition under the laws of Florida, Georgia, Louisiana, Massachusetts, North Carolina, South Carolina, and Texas); *Richard Parks Corrosion Tech., Inc. v. Plas-Pak Indus., Inc.*, 2015 WL 5708539, at *4 (D. Conn. Sept. 29, 2015) (under Connecticut law, "[l]ack of a remedy under contract is a precondition for recovery based upon unjust enrichment."); *Blue Frog Movil NV Inc. v. Navicomm LLC*, 2007 WL 3334793, at *2 (S.D. Ind. Nov. 8, 2007) (under Indiana law, "the existence of a contract precludes the pursuit of an equitable remedy" by party to that contract); *Ice Corp. v. Hamilton Sundstrand, Inc.*, 444 F. Supp. 2d 1165, 1170 (D. Kan. 2006) ("Kansas law is clear that … unjust enrichment" is not appropriate "when an enforceable express contract regulates the relations of the parties with respect to the disputed issue."); *Multiplan, Inc. v. Holland*, 2016 WL 3983669, at *3 (S.D. Miss. July 25, 2016) ("unjust enrichment only applies to situations where … there is no legal contract" under Mississippi law); *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 310 (3d Cir. 1982) ("recovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties" under New Jersey law); *Steadfast Ins. Co. v. Legacy Safety & Consulting, LLC*, 2015 WL 12803775, at *4 (D.N.M. June 25, 2015) ("New Mexico law strongly disfavors unjust enrichment claims when remedies exist under contract law."); *Downey v. Adloox Inc.*, 238 F. Supp. 3d 514, 526 (S.D.N.Y. 2017) ("It is one of the well-settled principles of New York law that the existence" of a "contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir. 2009) ("Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment … when an express contract covers the same subject."); *Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, 2008 WL 2758029, at *4 (E.D. Pa. July 15, 2008) ("Pennsylvania law prohibits unjust enrichment claims where a contract governs the relationship of the parties"); *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190 (Va. 2018) (under Virginia law, "t]he existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment").

[5] It therefore makes sense that the proper remedy for strict liability torts is restitution, not disgorgement. *Compare id.* at § 3 cmt. a, *with id.* at § 51 cmt. a ("Strict liability in tort creates the possibility of actionable wrongdoing without culpability: the unjust enrichment of tortfeasors without fault … is accordingly measured [through restitution]").

BARNES&THORNBURGLLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 6

appropriate in cases that involve a breach of fiduciary duty, profits derived from the diversion of business that otherwise would have gone to the plaintiff, or securities fraud.[6]

Here, Plaintiffs have not pled any facts that would warrant the Retail Pharmacy Defendants being required to disgorge their profits to Plaintiffs. Indeed, Plaintiffs have not alleged that the Retail Pharmacy Defendants acted in bad faith, that their profits are rightly owed to Plaintiffs because they resulted from the diversion of Plaintiffs' business, or even that Plaintiffs did not receive the therapeutic value of the valsartan medication they paid for, as FDA recommended patients keep taking recalled valsartan until they could obtain a substitute, given its health benefits. *See, e.g., District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 532-33 (D.N.J. 2011) (holding that "alleged overpayment" could not sustain unjust enrichment claim where drug was not inferior, not inadequate, and did not cause personal injuries).

Further, contrary to Plaintiffs' assertions, pharmacies do not have a duty to test prescriptions for latent defects. *E.g. Ramirez v. Richardson-Merrell, Inc.*, 628 F. Supp. 85, 87 (E.D. Pa. 1986) (rejecting a duty to test on the part of a pharmacist). Indeed, pharmacies are often immune from liability—whether warranty-based or tort-based—for dispensing a prescription with a latent defect. *E.g., In re Rezulin Prod. Liab. Litig.*, 133 F. Supp. 2d 272, 292 (S.D.N.Y. 2001) ("[A]lmost every state that has considered the issue has declined to find pharmacists liable for breach of either implied or express warranty with respect to properties of prescription drugs."). Here, Plaintiffs merely allege that the Retail Pharmacy Defendants dispensed valsartan that, <u>unbeknownst to the Retail Pharmacy Defendants</u>, may have included an impurity created during the manufacturing process for which these Defendants had no obligation to test. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413 (S.D.N.Y. 2015) (rejecting "disgorgement of ill-gotten gains" class damages model because it did not match plaintiff's legal theory that the product was worthless and plaintiffs were therefore entitled to their money back). In doing so, Plaintiffs concede—and the law recognizes—that the Retail Pharmacy Defendants are not "conscious wrongdoers," and therefore that disgorgement of profits is not an appropriate remedy.

> **B. TPPs did not bring suit against the Retail Pharmacy Defendants and Consumer Plaintiffs do not have standing to pursue disgorgement relating to payments made by the TPPs.**

The Consumer Plaintiffs seek production of documents showing how much the TPPs paid or reimbursed the pharmacies whenever a plan member purchased valsartan. Plaintiffs claim that production of these highly confidential reimbursement rates is to "establish individual and aggregate damages, . . . especially . . . to calculate Retail Pharmacy Defendants' ill-gotten gains." (ECF 413 at 4.) As discussed above, Plaintiffs are not entitled to disgorgement as a remedy. Even

---

[6] *See, e.g., Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 497-98 (D.N.J. 2012) (breach of fiduciary duty); *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1221-23 (8th Cir. 1976) (disgorgement awarded when the defendant used pictures of a competitor's trailer in its ads and copied the trailer's distinctive external design); *S.E.C. v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996) (unlike restitution, disgorgement "does not seek to compensate the victims of the wrongful act," but is meant to "prevent the wrongdoer from enriching himself by his wrongs"). Some states require bad faith for disgorgement of profits. LA Civ. Code Art. 2303 ("A person who <u>in bad faith</u> received a payment or a thing not owed to him is bound to restore it with its fruits and products.") (emphasis added). Plaintiffs have not alleged that the Retail Pharmacy Defendants acted in bad faith, so the Louisiana plaintiff's claim for disgorgement fails under Louisiana law.

BARNES&THORNBURG LLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 7

so, while the Retail Pharmacy Defendants are named as defendants in the Economic Loss Class Master Complaint, it is only as to the claims asserted by the Consumer Plaintiffs—not the TPP Plaintiffs. (ECF 398, even-numbered counts.) The Consumer Plaintiffs are certainly not entitled to recover damages for what TPPs—themselves plaintiffs—paid for valsartan, when the TPPs have separate claims for those damages and <u>have chosen not to name the Retail Pharmacies as defendants</u>.

Put another way, to the extent the Consumer Plaintiffs have suffered no actual harm (because, for instance, they had no co-pay for valsartan), they have no standing to bring any type of economic loss claim. Without a direct financial loss, they have no injury in the economic loss actions. *See, e.g.*, *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 538-39 (3d Cir. 1994) (plaintiff did not have standing to pursue claims from automobile insurer's denial of her claim where "Medicare paid the medical expenses for which she seeks a recovery" because she was not herself injured); *Barows v. Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347, 367–68 (D.N.J. 2006) (even though plaintiff claimed that the defendants misrepresented the sums they attempted to collect, "the fact that she did not actually pay those fees is fatal to her standing to bring such a claim"); *Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016) (without out-of-pocket loss, no injury-in-fact to plaintiff).

Here, the Consumer Plaintiffs seek to bootstrap their economic loss damages claims by latching on to alleged damages belonging to the TPPs. Such bootstrapping is not permitted, especially when <u>the TPPs have not sued the Retail Pharmacy Defendants</u>. A Consumer Plaintiff is not entitled to recover a TPP's economic loss; he is only entitled to recover his direct economic loss. For example, if a Consumer Plaintiff pays the same, flat co-payment for any type of prescription drug, branded or generic, he suffers no economic loss associated with purchasing one over the other. *E.g.*, *In re K-Dur Antitrust Litig.*, 2008 WL 2660776, at *11 (D.N.J. Feb. 21, 2008) (consumer who had a flat Medicaid co-pay throughout prospective class damages period suffered no injury; any economic injury was borne exclusively by Medicaid). This is why consumer class actions for economic loss relating to pharmaceutical drug pricing or generic delay invariably exclude consumers "whose out-of-pocket expenditures do not vary with the cost of their prescription drugs"—because those consumers have suffered no economic injury. *E.g.*, *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 347 (E.D. Mich. 2001); *see also, e.g.*, *In re Pharmaceutical Average Wholesale Price Litig.*, 230 F.R.D. 61, 66-67, 69 (D. Mass. 2005) (excluding from class those with flat co-pays and those whose co-pay was reimbursed by an insurer or other third party).

The Consumer Plaintiffs claim to need data on TPP reimbursement rates to use those damages to support their own economic loss claims. But whatever the TPPs reimbursed pharmacies for valsartan—something the TPPs themselves know—that information is an alleged damage belonging to the TPPs, not the end consumers. Discovery into TPP reimbursement rates should be denied.

BARNES&THORNBURGLLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 8

### C. Production of highly confidential upstream cost and TPP reimbursement data is not proportional to the needs of the litigation, particularly now.

Because Plaintiffs are not entitled to a disgorgement remedy and further are not entitled to claim as damages disgorgement relating to TPPs, they have presented no legitimate reason whatsoever for the discovery they seek. Given the significant burden and harm to the Retail Pharmacy Defendants from disclosure of this data, the needs of this litigation simply do not call for production of upstream cost data or TPP reimbursement rates. *See, e.g., Harrington v. Bergen County*, 2017 WL 4387373 (D.N.J. Oct. 3, 2017) (speculative and burdensome discovery request failed proportionality requirements of Rule 26).

The Retail Pharmacy Defendants have submitted 14 declarations demonstrating the significant burden and concomitant harms associated with the production of upstream pricing data and TPP reimbursement rates. The harms associated with revealing this type of data are extreme, and these Defendants vigilantly protect this information at all levels of their respective organizations. *E.g.*, Declaration of John Holderman, Ex. B, at ¶ 10; Declaration of Grace Allen, Ex. C, at ¶ 11; Declaration of Danny Tsai, Ex. D, at ¶ 12.

The Retail Pharmacy Defendants compete with each other, both to obtain generic drugs at the lowest possible cost and to receive reimbursement from TPPs for those drugs at the highest possible rate. Beyond competition among the retailers, numerous suppliers—drug manufacturers, wholesalers, and distributors—are defendants in this litigation. If a drug supplier learned what retailers paid other suppliers for a drug, that supplier could use that information to achieve a lower sticker price. Likewise, significant competitive harm would result if TPP reimbursement rates were disclosed. The production of this data has the potential to cause the Retail Pharmacy Defendants irreparable injury and to upend the entire structure of the generic drug business model. It would adversely affect the cost of generic pharmaceuticals, making them more expensive to individual consumers, including the Plaintiffs themselves.[7] A sample of the declarations shows how imperative it is for the requested information to remain secret:

- "The critical nature of this secrecy cannot be overstated. Indeed, the very integrity of the generic pricing market requires that pricing information be absolutely protected and walled off from other market entities—including the manufacturers, wholesalers, or pharmacies that are defendants in this case—to maximize competitive balance between the various players in this environment, and to ensure access of generic drugs to consumers who require them." Declaration of Matt Perlberg, Ex. E, at ¶ 9.

---

[7] Beyond the attached declarations, commentators also have argued that disclosure of the sensitive financial data requested here would lead to higher prescription drug prices for the public. *E.g.*, J. Shepherd, *Is more information always better?*, 99 Cornell L. Rev. Online 1, 19 (2013) ("[T]he disclosure of sensitive financial information will undercut the most efficient pharmacy network contracts, leading to higher prescription drug prices."); Federal Trade Commission, April 17, 2007 Letter, https://www.ftc.gov/sites/default/files/documents/advocacy_documents/ftc-staff-comment-hon.nelie-pou-concerning-new-jersey.b.310-regulate-contractual-relationships-between-pharmacy-benefit-managers-and-health-benefit-plans/v060019.pdf, at 10-12 (explaining why mandated disclosure of certain pricing information within the pharmacy supply chain may raise drug prices).

BARNES&THORNBURGLLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 9

- "The viability of [defendant's] generic drug business therefore demands that the confidentiality of pricing information be fully protected and carefully maintained because of the significant competitive and economic impact if a [defendant] competitor or wholesaler learned what it was paying for a particular drug at a particular time in the drug supply marketplace." Declaration of Dick Derks, Ex. F, at ¶ 8.

- "If PBMs had access to these costs they could effectively lower our reimbursement decreasing our ability to generate margin on the vast majority of our business. Exposing the pricing could also eliminate our ability to negotiate with pharmaceutical manufacturers and wholesalers as they would be able to offer less competitive bids." Declaration of Owen P. McMahon, Ex. G, at ¶ 8.

- Disclosure "would alter the competitive balance that allows the generic drug market to function efficiently. It could also limit [defendant's] ability to negotiate future sales and sourcing contracts." Declaration of Britt Turner, Ex. H, at ¶ 11.

- "If [the requested] information ended up in the hands of a competitor or of suppliers/wholesalers generally, it would be impossible to undo the damage to [defendant's] ability to obtain the most favorable pricing of generic drugs and to pass these costs savings on to [its] customers." Declaration of Zachary Mikulak, Ex. A, at ¶ 11.

In addition, generic drug pricing and reimbursement is often negotiated in the aggregate, rather than on a drug-by-drug basis. *See* Declaration of Erin K. McCoy, Ex. I, at ¶ 7; Declaration of Megan Mistarz, Ex. J, at ¶ 5. Thus, "[c]apturing meaningful drug transaction-level data would be extremely burdensome over any period of time and also would be very difficult, if not impossible, to interpret on a per prescription basis." Declaration of Michael Viirre, Ex. K, at ¶ 9. Therefore, Plaintiffs' request for the gross and net price paid by TPPs for all valsartan dispensed by the Retail Pharmacy Defendants not only is irrelevant and involves incredibly sensitive information, it may also be impossible as a practical matter to be produced as Plaintiffs request.

A confidentiality provision in a protective order is inadequate to address this concern. Although the protective order in this case (ECF 139) restricts disclosure of "restricted confidential information" only to the Court (filed under seal) and the parties' external counsel (ECF 139 at 7, 19), Plaintiffs' explicit purpose in requesting the information is to use it to establish a damages model of disgorgement, which would require disclosure to experts and use in depositions. Regardless of confidentiality protections, individuals outside the Retailer Pharmacy Defendants will have newfound access to the upstream cost and downstream TPP reimbursement documents, which is simply too great a risk for the Retail Pharmacy Defendants to bear. *See, e.g.*, Declaration of Tony Braun, Ex. L, at ¶ 13.

Confidentiality concerns—particularly regarding the sensitive pricing information here—provide a basis for denying discovery when relevancy is low. *E.g.*, *Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, 2017 WL 4310221 (M.D. Pa. Sept. 28, 2017) (quashing subpoena for relevant documents because of the confidentiality within them: "Courts have routinely found that a protective order is insufficient protection against unnecessary disclosure of confidential

BARNES&THORNBURGLLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 10

information to the requesting party."); *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 2015 WL 13650055 (D.N.M. Nov. 23, 2015) ("While the Protective Order reduces the risk of an unprotected disclosure, it certainly does not eliminate it. Given the severe and irreversible economic damages which would occur if improper disclosure occurred, the Court considers the harm of disclosure relatively high.").

Here, the harm of disclosing this confidential financial information towers over any alleged benefit of its production.  There is no benefit to producing information about profits period, but that is particularly true now.  As noted above, Plaintiffs represented to the Court that their requested first trial would not involve downstream defendants.  (ECF 420 at 4-5.)  Further, the Court has allowed Defendants to brief Rule 12 motions, which will include separate Retail Pharmacy Defendant-specific arguments, including the innocent seller defense, which will address in greater detail and foreclose any argument regarding the so-called "ill-gotten gains" underlying Plaintiffs' requests here.  (ECF 432.)  While the parties are briefing Rule 12 motions, the Retail Pharmacy Defendants have agreed to begin producing documents requested by Plaintiffs, outside of the upstream cost data and downstream reimbursement rates at issue here.  There simply is no need for the Court to order production of these highly confidential documents at this time, and without the benefit of considering these Defendants' full defenses in their Rule 12 briefing.

## IV.  Conclusion

In light of the Retail Pharmacy Defendants' role in this case and the very real risks associated with disclosure of the pricing information at issue, the Retail Pharmacy Defendants appreciate the Court's attention to these matters, and to the full understanding of the business model Plaintiffs seek to upend for this entire group of defendants, particularly on such a flimsy proffer of necessity.  We therefore request that the Court deny Plaintiffs' requests in full.

Respectfully submitted,

Sarah E. Johnston

BARNES&THORNBURGLLP

Honorable Joel Schneider
United States Magistrate Judge
June 16, 2020
Page 11

## Addendum: List of Exhibits

Exhibit A – Declaration of Zachary Mikulak (Walgreens Boots Alliance, Inc.)

Exhibit B – Declaration of John Holderman (CVS Pharmacy, Inc.)

Exhibit C – Declaration of Grace Allen (Express Scripts, Inc.)

Exhibit D – Declaration of Danny Tsai (Humana Pharmacy, Inc.)

Exhibit E – Declaration of Matt Perlberg (Express Scripts, Inc.)

Exhibit F – Declaration of Dick Derks (Walmart Inc.)

Exhibit G – Declaration of Owen P. McMahon (Rite Aid)

Exhibit H – Declaration of Britt Turner (The Kroger Co.)

Exhibit I – Declaration of Erin K. McCoy (CVS Pharmacy, Inc.)

Exhibit J – Declaration of Megan Mistarz (Walgreens Boots Alliance, Inc.)

Exhibit K – Declaration of Michael Viirre (Walmart Inc.)

Exhibit L – Declaration of Tony Braun (Humana, Inc.)

Exhibit M – Declaration of Britt Turner (The Kroger Co.)

Exhibit N – Declaration of Alison Farrell (Rite Aid)

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| | Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF ZACHARY MIKULAK

I, Zachary Mikulak, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of Walgreens Boots Alliance, Inc. ("Walgreens"), a Defendant in the above-captioned proceeding.

2.      I have worked at Walgreens for fourteen (14) years and am employed as Senior Director, Generic Purchasing and Analytics.  In that role, I oversee two teams: (1) category managers, who are responsible for Walgreens' interaction with the more than one hundred (100) generic manufacturers from whom Walgreens sources generic drugs; and (2) the analytics team, which is responsible for data reporting and analytics.

3.      In my capacity as Senior Director, Generic Purchasing and Analytics, I am familiar with the competitive and commercial sensitivities associated with generic drug sourcing. Likewise, in that capacity, I have personal knowledge regarding the steps Walgreens takes to protect the confidential and proprietary financial data and information relating to sourcing pharmaceutical products.

4.     Walgreens is a national pharmacy.  I understand that it is one of several retail pharmacy defendants in this multi-district litigation.  Although the precise methods of sourcing generic drugs undoubtedly vary across retail pharmacies, in my capacity as Senior Director, Generic Purchasing and Analytics, my experience has shown me that the complexity of these transactions is not unique to Walgreens.

5.     Because of the complexity of sourcing generic drugs within a highly competitive environment, and for the reasons explained in this Declaration, the production of non-public cost information creates a significant burden upon and concern to Walgreens.

6.     The sourcing of generic drugs is more complicated than that of name-brand drugs.  With a name-brand drug, there is typically only one manufacturer.  In contrast, the FDA may approve multiple entities to manufacture and sell a particular generic drug in multiple different formulations.  From a procurement standpoint, negotiating the cost of generic drugs is more complicated than for name brand drugs.  The baseline cost for a name brand drug is generally the wholesale acquisition price, which is published and well known.  For generic drugs, however, the cost depends on a multitude of factors, including, among others, the number of manufacturers in the market, the volume the pharmacy is purchasing, and the length of the contract.  Pharmacies may and often do source generic drugs from multiple entities with varying contracts, negotiations, and pricing structures.

7.     Walgreens considers non-public information regarding the sourcing of generic drugs it sells to be one of its most—if not its most—commercially sensitive, highly confidential, and proprietary trade secrets.  Generic drugs are dispensed in far greater proportion than name-brand drugs and therefore account for a substantial portion of prescription drug sales for

pharmacies.  This results in a highly competitive environment among retail pharmacy chains and across the various entities selling and sourcing generic drugs to those retail pharmacy chains.

8.      Retail pharmacies compete with each other to source generic drugs, including to negotiate the most competitive pricing for these drugs with wholesalers and suppliers.  The viability of Walgreens's generic drug business, therefore, demands that the confidentiality of pricing information be carefully maintained, in light of the real risk of the significant competitive and economic advantage that would be gained if competitors of Walgreens learned what Walgreens was paying for a particular drug.

9.      Walgreens has undertaken extensive steps to maintain the confidentiality of its financial data, including non-public cost information.  For example, within Walgreens, such information is housed within a password protected system, and access to it is restricted to certain authorized employees within particular groups and divisions.  To access the information, an employee needs a specific user ID and password, which is tracked on an audit log, so that Walgreens can monitor who accesses the information, and when.  External to Walgreens, any email sent containing such information is encrypted before leaving the company.  Walgreens' contracts with each manufacturer contain strict non-disclosure provisions, prohibiting the disclosure of confidential cost information outside of those two entities, even to the applicable intermediary wholesaler.  For example, Walgreens' wholesalers are aware of the indirect cost to Walgreens, but are not privy to any agreements Walgreens has with the manufacturers that may allow for chargebacks and similar reductions that lessen Walgreens' ultimate cost.

10.      Walgreens has taken great care to ensure that competitors do not obtain access to or learn of its confidential financial data and cost information. Disclosure of sensitive and confidential financial data and cost information to the public and/or to other defendants who are

to function efficiently. It could also limit and restrict Walgreen's ability to negotiate future sourcing contracts.

11. Given the tremendous commercial sensitivity of Walgreens' sourcing and financial data and the effort Walgreens has put into protecting it, Walgreens is highly concerned that a litigation protective order would be insufficient to protect it from inadvertent disclosure. Considering that many other defendants in this litigation are competitors of Walgreens (e.g., the other pharmacies) or are wholesaler/manufacturers that are not privy to the details of Walgreens' sourcing of its generic drugs, any improper disclosure of Walgreens' sourcing/cost information would have adverse financial consequences to Walgreens. If such information ended up in the hands of a competitor or of suppliers/wholesalers generally, it would be impossible to undo the damage to Walgreens' ability to obtain the most favorable pricing of generic drugs and to pass those cost savings on to Walgreens' customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May 12 , 2020 at Kenosha, Wisconsin.

Zachary Mikulak

# EXHIBIT B

Case 1:19-md-02875-RBK-SAK Document 478-2 Filed 05/10/20 Page 25 of 111 PageID: 8172

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF JOHN HOLDERMAN

I, John Holderman, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.     I am authorized to provide this declaration on behalf of CVS Pharmacy, Inc. ("CVS"), a Defendant in the above-captioned proceeding.

2.     I have worked at CVS for nearly six years, and currently am employed as a Senior Director of Pharmacy Merchandising.   In my current role, I manage the CVS team responsible for administering CVS's generic medication sourcing contracts.

3.     In my capacity as a Senior Director of Pharmacy Merchandising,  I am familiar with the competitive and commercial sensitivities associated with generic drug pricing. Likewise, in that capacity, I have personal knowledge regarding the steps CVS takes to safeguard confidential and proprietary financial data and information relating to sourcing, pricing and distributing pharmaceutical products.

4.     I understand that the plaintiffs in this litigation have asked CVS to produce information regarding its sourcing and purchase of generic Valsartan from its suppliers, including the price it paid to each of its suppliers for this generic drug.  Because of the

1

complexity of sourcing and selling generic drugs within a highly competitive retail pharmacy environment, production of this information imposes a significant burden on CVS for the reasons explained in this Declaration.

5.     CVS is a national pharmacy that purchases and distributes both branded and generic drugs to its customers. Although the process of sourcing both branded and generic medications is incredibly complex, the pricing and selling of generic drugs is significantly more complicated than that of name-brand drugs. With a name-brand drug, there is typically only one manufacturer and, as a result, only one entity with whom CVS must negotiate the purchase price of the drug. Each of CVS's competitors also must purchase from the same name-brand manufacturer, such that there is less variability in the pricing of a given drug amongst entities and purchasers in the supply chain.

6.     In contrast, for generic drugs, CVS has the option of purchasing from numerous companies authorized to manufacture and sell generic drugs. Because of the many options for sourcing a given generic drug, and to ensure that its supply needs are met, CVS often sources generic drugs from multiple entities. It purchases some generic drugs directly from a manufacturer and purchases others indirectly through a wholesaler. Because of the competing suppliers in the generic drug market, and because CVS's own competitors are also simultaneously attempting to buy product from and negotiating the pricing of generic drugs with the same suppliers, the market for purchasing generic drugs is very complex, and pricing and supply options vary greatly.

7.     CVS therefore considers non-public information regarding the sourcing and pricing of generic drugs it sells to be one of its most—if not the most—commercially sensitive, highly confidential, and proprietary trade secrets. Generic drugs account for a significant portion

of CVS's prescription drug sales such that any disclosure of non-public pricing information could significantly affect the overall market for generic drugs and how CVS operates within that competitive market.

8.      CVS competes with other retailers to source and sell generic drugs, including to obtain the most competitive pricing for these drugs with wholesalers and manufacturers. If CVS's pricing agreements with its suppliers were disclosed publicly, or were to become known to CVS's competitors and other suppliers, such disclosure could affect the entire supply chain by reducing competition in the generic market place, which could lead to increased prices and a reduction in the availability of certain medications. CVS, specifically, could be hampered in its ability to negotiate and purchase crucial generic drugs at competitive prices.

9.      The profitability and function of CVS's generic drug business therefore demands that the confidentiality of pricing information be carefully maintained, in light of the real risk of the significant competitive and economic advantage competitors would gain if they learned what CVS was paying for a particular drug.

10.      Given the significant concerns raised by the confidential nature of this information, CVS has undertaken extensive steps to maintain the confidentiality of its financial data, including non-public pricing information. For example, though CVS employs approximately 300,000 people, it restricts access to its pricing agreements to a small group of employees on a need-to-know basis to ensure that confidential pricing information is not shared outside or within the company. Pricing agreements and confidential pricing information are stored in protected folders, or are otherwise protected by password restrictions, to help maintain the confidentiality of the data. Moreover, to the extent CVS's supply and pricing agreements must be shared with an individual outside of CVS, pricing information is carefully redacted from

the document to avoid disclosure. CVS also negotiates contractual protections with its suppliers to ensure the confidentiality of this information.

11. CVS has taken great care to ensure that its competitors and competing suppliers do not obtain access to or learn of its confidential financial data and pricing information. Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would threaten to alter the competitive balance that allows the generic drug market to function. It could also limit CVS's ability to negotiate future sales and sourcing contracts.

12. Given the significant effort CVS has put into protecting its sensitive financial and pricing data, CVS is very concerned that a litigation protective order would be insufficient to protect all parties involved from inadvertent disclosure of that data. If this information were to fall into the hands of any of CVS's competitors, or the numerous supply chain entities from which it purchases generic drugs, CVS's generic drug business could be irreparably harmed. Executed June _12_, 2020 at _Charlestown, Rhode Island_.

_____
John Holderman

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| | Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF GRACE ALLEN

I, Grace Allen, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of Express Scripts, Inc. ("Express Scripts"), a Defendant in the above-captioned proceeding.

2.      I am currently the Vice President of Client Pricing and Underwriting for Express Scripts.

3.      In that capacity, I am familiar with the competitive and commercial sensitivities associated with generic drug reimbursement rates to pharmacies, as well as pricing guarantees negotiated with Express Scripts' Clients for valsartan-containing drugs ("VCDs").  Likewise, in that capacity, I have personal knowledge regarding the steps Express Scripts and its affiliated mail-order pharmacy entities take to safeguard confidential and proprietary financial data and information relating to pharmacy reimbursement rates and Client pricing for pharmaceutical products, including VCDs.

1

4.      Express Scripts is a pharmacy benefits manager ("PBM"). As a PBM, Express Scripts contracts with employers and other third-party payors ("TPPs"), to safely, consistently, and affordably facilitate the dispensation of prescription drugs to members of the sponsors.

5.      Express Scripts does not dispense prescription drugs. Instead, Express Scripts maintains a "network" of third-party retail pharmacies that meet Express Scripts' standards and requirements and from which its Clients' members may be able to obtain prescription drugs, depending on the particular Client's agreement and plan design. In addition, Express Scripts' affiliated mail-order pharmacy entities may dispense certain types of prescription drugs. Often, plan members pay some portion of the cost of a particular drug and TPPs agree to pay or reimburse the remainder of that cost, pursuant to heavily negotiated and highly confidential agreements and plan designs.

6.      I understand that Plaintiffs in this multidistrict litigation are seeking production of information concerning the amounts paid by TPPs for VCDs dispensed by Express Scripts' affiliated mail-order entities to Express Scripts members.

7.      I also understand that many named defendants in this litigation are pharmaceutical drug manufacturers or wholesalers, which may source pharmaceutical products for Express Scripts' affiliated mail-order pharmacies. I also understand that many named defendants are pharmacies that participate in Express Scripts' retail pharmacy network. Some of these pharmacy defendants are affiliated with PBMs that compete with Express Scripts in the market for PBM services.

8.      The rates negotiated between Express Scripts and TPPs for generic drugs like VCDs, which I understand is included among the data Plaintiffs in this litigation have requested by seeking the amounts paid or reimbursed by TPPs for VCDs dispensed by Express Scripts'

affiliated mail-order entities, are a highly sensitive and closely guarded trade secret, the secrecy of which Express Scripts considers one of its central value propositions. This pricing is subject to heavily negotiated agreements with TPPs, which have strongly worded confidentiality provisions that restrict and forbid public disclosure of pricing and rates.

9. If Express Scripts' PBM competitors or network pharmacies, or the entities that source prescription drugs for Express Scripts' affiliated mail-order pharmacies, were to obtain data or documents regarding the rates offered to TPPs, those entities could use it to their advantage in negotiating sourcing or network agreements with Express Scripts, among other competitive injuries.

10. This sensitivity applies both to current pricing information and historical pricing information, as negotiated prices often build from rates provided in prior years.

11. Express Scripts and its affiliated pharmacy entities have accordingly undertaken extensive steps to maintain the confidentiality of the types of data and information requested by Plaintiffs in this litigation. These efforts include inserting confidentiality protections into its agreements with TPPs, expending substantial time, capital, and effort to abide by and enforce such provisions, employing restrictions and clearances to limit access to this information—and data and information concerning dispensation by Express Scripts' affiliated mail-order entities— to employees that have a need to know it.

12. Indeed, certain of Express Scripts' PBM Services Agreements would potentially permit a TPP Client to seek relief in the event that financial data or information is disclosed to third parties.

13. Disclosure of such sensitive and confidential financial data and information to the public and/or to other defendants who are parties to this litigation, even at a condensed or

3

aggregate level, would fundamentally alter the competitive balance that allows the generic drug market to function efficiently and hinder Express Scripts' or its affiliated pharmacy entities' abilities to negotiate in the marketplace.

14.     Accordingly, even a litigation protective order would be insufficient to protect all parties involved from inadvertent disclosure of this highly sensitive information. Many of the defendants either compete in the marketplace or are contracted with each other through heavily negotiated agreements.  As such, any  disclosure would cause irreparable harm. It would be impossible to undo the damage of such a disclosure.

Executed on this 2nd day of ~~May~~ June, 2020

_Grace E Allen_
_____

Grace Allen

HB: 4840-8600-8767.1

# EXHIBIT D

UNITED STATES DISTRICT COURT DISTRICT
OF NEW JERSEY

| | |
|---|---|
| **IN RE: VALSARTAN**<br><br>**PRODUCTS LIABILITY LITIGATION**<br><br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Robert B.<br>Kugler, District Judge<br><br><br>Honorable Joel<br>Schneider,<br>Magistrate<br>Judge |

## DECLARATION OF DANNY TSAI

I, Danny Tsai, hereby declare pursuant to 28 U.S.C. 1746 as follows:

1. I understand that Humana Pharmacy, Inc. ("Humana Pharmacy") is currently named as a defendant in litigation regarding generic valsartan, losartan, and irbesartan products. I further understand that the plaintiffs are seeking to discover information regarding Humana Pharmacy's contracts with pharmacy benefit managers (PBMs), including the amounts reimbursed by PBMs for the products at issue. I submit this declaration in order to explain why this information is extremely sensitive. Humana Pharmacy would suffer significant competitive harm if this information were to be disclosed.

2. I currently support Humana Pharmacy, Inc. as an Associate Vice President of Financial Planning & Analysis. In that role, I am responsible for the financial operations of Humana Pharmacy, Inc. including accounting, budgeting, forecasting, and billing/collections.

3. I have served in this role since 2019. Prior to that, I served as a Director of Financial Planning & Analysis.

4. As a result of my experience, I am familiar with the competitive and commercial sensitivities of the pharmacy business and pharmacy-PBM contracting.

5. By way of example, I am familiar with the following issues:

    a. Most of the prescription drugs that Humana Pharmacy dispenses are covered by an insurance plan. Humana Pharmacy very rarely dispenses to uninsured individuals. All of the drugs at issue in this litigation require a prescription.

    b. Humana Pharmacy enters into contracts with multiple PBMs. Each PBM represents a different insurance plan or plans. By entering into contracts with PBMs, Humana Pharmacy is able to accept different insurance plans as an "in-network" pharmacy.

    c. If Humana Pharmacy has a contractual agreement with a PBM to accept a particular insurance plan, Humana Pharmacy is an "in-network" pharmacy for patients covered by that plan. If Humana Pharmacy has no such agreement, it is an "out-of-network" pharmacy for patients covered by that plan.

    d. Humana Pharmacy is an "in-network" pharmacy for the vast majority of drugs it dispenses. Although Humana Pharmacy could dispense drugs to a patient as an "out-of-network" pharmacy, it rarely does so. It is almost always more cost-effective for a patient to fill a prescription at an "in-network" pharmacy.

    e. The amount that insured patients pay for drugs at an "in-network" pharmacy is governed by the terms of their insurance plan. The amount that Humana Pharmacy receives for such drugs is governed by the terms of Humana Pharmacy's contracts with PBMs.

    f. The PBM contracts specify how much the insurance plan will reimburse Humana Pharmacy for the drug.

6. It is important for Humana Pharmacy to protect information about its PBM contracting and PBM pricing from PBMs.

  a. Humana Pharmacy's PBM contracts include strict privacy and confidentiality terms. To disclose this information would be in breach of the PBM contracts.

  b. Similarly, Humana Pharmacy often communicates to PBMs that it will not share this information, even if no contract results. To disclose this information would damage Humana Pharmacy's standing in the commercial community, and it would damage the trust relationships that Humana Pharmacy has built with PBMs.

  c. PBMs that know the terms of Humana Pharmacy's other PBM contracts may refuse to contract with Humana Pharmacy for anything more than the lowest reimbursement rate.

  d. If any of Humana Pharmacy's PBM contracts were to dissolve, Humana Pharmacy would likely lose the customers that are insured by the plans represented by the PBM.

7. Based on these considerations, I believe Humana Pharmacy would suffer considerable harm to its competitive position if its reimbursement rates and PBM contract information were disclosed to PBMs.

8. It is also important for Humana Pharmacy to protect information about drug reimbursement from competing pharmacies, including those also named as defendants in this lawsuit.

  a. Competitors may leverage this information to engage in predatory pricing. For instance, the competitor may agree to accept reimbursement at a lower rate that the competitor knows Humana Pharmacy cannot match.

9. Based on these considerations, I believe Humana Pharmacy would suffer considerable harm to its competitive position if its reimbursement rates were disclosed to competing pharmacies.

10. I understand that several other large national pharmacy chains are also named as defendants in this litigation, such as Wal-Mart, Walgreens, Kroger, Albertsons, Rite-Aid, Express Scripts, and CVS. These companies are direct competitors of Humana Pharmacy. Based on my experience in the industry, I believe these companies likely regard their drug reimbursement information and PBM contracts the same way Humana Pharmacy regards its own information. That is to say, I believe they consider their information to be highly confidential. I believe they would not want Humana Pharmacy to learn their information.

11. These competing pharmacies have their own relationships with PBMs. In addition, some of them—such as Express Scripts and CVS—are affiliated with PBMs. Therefore, if Humana Pharmacy's information is disclosed to these competing pharmacies, there is a risk that PBMs would obtain the information, as well.

12. Humana Pharmacy goes to great lengths to protect information about its PBM contracts and reimbursement rates. For instance, Humana Pharmacy:

    a. maintains the confidential contracts and reimbursement rates on a private electronic drive that is accessible only with valid login credentials for Humana employees directly involved in the rate negotiation and contracting;

    b. limits the distribution of the contract and rate information to solely the key finance, analytics, and operational leadership teams on a "need to know" basis;

    c. maintains strict privacy rules and regulations governing employee access and protocols;

   d. maintains stringent cybersecurity systems to ensure that the above protocols are followed.

13. I understand that courts sometimes enter protective orders that require counsel to protect the confidentiality of information. I do not believe that such an order would be sufficient in this case.

   a. I assume that the partners, associates, and support staff at the various law firms would make good-faith efforts to protect the confidentiality of Humana Pharmacy's information. Nevertheless, inadvertent disclosures happen.

   b. I understand that more than 100 attorneys have appeared in this case. If Humana Pharmacy's information is produced, presumably all of these many attorneys and their law firms would have access to it. At each firm, numerous individuals (partners, associates, support staff) would have access to Humana Pharmacy's information. The more individuals have access to the information, the greater risk of an inadvertent disclosure. For instance, a third party might overhear plaintiffs' counsel discussing the information. A third party might see one of Humana Pharmacy's documents over counsel's shoulder. Or one of Humana Pharmacy's documents (or a memo or email that references Humana Pharmacy's information) may simply be dropped in public.

   c. Setting aside disclosure concerns, there is a risk that any lawyer who views Humana Pharmacy's information will retain that information in his or her mind. I assume that counsel will comply with a court order to destroy the information upon conclusion of the litigation. But it is extremely difficult to "unring the bell" once Humana Pharmacy's information is viewed. Of course, Humana expects its own

counsel to guard vigilantly against any use of this information that might disadvantage Humana Pharmacy. But counsel who represent other parties do not have the same duties to Humana Pharmacy, and they cannot be expected to have the same care. Again, these concerns are exacerbated by the sheer number of individuals that would gain access to Humana Pharmacy's information.

d.  Even if Humana Pharmacy's information is produced on an "Attorneys' Eyes Only" basis, or even if Humana Pharmacy's information is produced only to Plaintiffs, PBMs and competing pharmacies may discover the information if it is filed with the court or referenced in a court hearing.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true.

Dated: _____5/20/20_____          Signed: _____

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| | Honorable Joel Schneider, Magistrate Judge |

### DECLARATION OF MATT PERLBERG

I, Matt Perlberg, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.  I am authorized to provide this declaration on behalf of Express Scripts, Inc. ("Express Scripts"), a Defendant in the above-captioned proceeding.

2.  I am currently the Vice President of Supply Chain Sourcing and Product for Express Scripts.

3.  In that capacity, I am familiar with the competitive and commercial sensitivities associated with generic drug pricing, including the processes by which generic pharmaceutical drugs such as valsartan-containing drugs ("VCDs") are sourced for Express Scripts' affiliated mail-order pharmacies. Likewise, in that capacity, I have personal knowledge regarding the steps Express Scripts and its affiliated entities take to protect the confidential and proprietary financial data and information related thereto.

4.  Express Scripts is a pharmacy benefits manager ("PBM"). As a PBM, Express Scripts contracts with employers and other third-party payors (health plan sponsors), to safely, consistently, and affordably facilitate the dispensation of prescription drugs to plan members.

5.      Express Scripts does not acquire or dispense prescription drugs.  Instead, Express Scripts maintains a "network" of third-party retail pharmacies from which plan members may obtain prescription drugs.  In addition, prescription drugs may be sourced for and dispensed by Express Scripts' affiliated mail-order pharmacy entities.

6.      I am aware that the defendants in this litigation include a number of pharmaceutical manufacturers and a number of drug wholesalers, many of which source generic pharmaceutical products for Express Scripts' affiliated mail-order pharmacies.  I am also aware that many of the defendants in this action are retail pharmacies.

7.      I am aware that plaintiffs in this litigation have requested non-public information regarding the sourcing and pricing of VCDs from manufacturers and/or wholesalers.  This information is commercially sensitive, highly confidential, and constitutes proprietary trade secrets.

8.      Pharmacy sourcing of generic drugs, including VCDs, takes place in an extremely complex environment.  A foundational aspect of these negotiations is that  pricing and purchase quantities for these generic drugs remains confidential.

9.      The critical nature of this secrecy cannot be overstated.  Indeed, the very integrity of the generic pricing market requires that pricing information be absolutely protected and walled off from other market entities—including the manufacturers, wholesalers, or pharmacies that are defendants in this case—to maximize competitive balance between the various players in this environment, and to ensure access of generic drugs to consumers who require them.

10.      Express Scripts and its affiliates that negotiate pricing have spent years expending significant efforts to wall off and protect this information.  This includes extensive measures to maintain the confidentiality of its non-public pricing information and related financial data.

2

These efforts include strict confidentiality protections into sourcing contracts over many years with suppliers and wholesalers, expending substantial time, capital, and effort to abide by and enforce such provisions, and employing restrictions and clearances to limit access to this information to individuals within the company that have a need to know it.

11.     In addition, certain of these sourcing agreements would potentially permit a manufacturer to seek relief in the event that costs information is disclosed.

12.     If years of protective efforts are undone through the present litigation, and manufacturers or wholesalers obtain any pricing data, those manufacturers and wholesalers could use this information to prejudice Express Scripts (or its affiliated entities) in pricing negotiations. Similarly, if the defendant pharmacies obtained financial data related to the procurement costs associated with drugs dispensed by Express Scripts' affiliated mail-order pharmacies, either from Express Scripts directly or from manufacturers or wholesalers, the defendant pharmacies could gain an unfair advantage in the market.

13.     Disclosing such information, even at a condensed or aggregate level, to the parties in this litigation would result in the destruction of the integrity of the process for negotiating generic pricing.

14.     Accordingly, even a litigation protective order is insufficient to protect all parties involved from inadvertent disclosure of this highly sensitive information.  Many of the Defendants either compete in the marketplace or are contracted with each other through heavily negotiated agreements.  As such, any disclosure would cause irreparable harm. It would be impossible to undo the damage of such a disclosure.

[Remainder of page intentionally blank]

Executed on this <u>5</u> day of June, 2020

*Matt Perlberg*
Matt Perlberg (Jun 5, 2020 17:26 CDT)
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Matt Perlberg

# Matt Perlberg Declaration (for signature 6.5.2020)

Final Audit Report                                              2020-06-05

| | |
|---|---|
| Created: | 2020-06-05 |
| By: | James Spung (James.Spung@huschblackwell.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAIXzy1H7I8Hqu3VTUzNM3qWVU0L6W-hR4 |

## "Matt Perlberg Declaration (for signature 6.5.2020)" History

📄 Document created by James Spung (James.Spung@huschblackwell.com)
2020-06-05 - 4:01:49 PM GMT- IP address: 75.130.220.18

📧 Document emailed to Matt Perlberg (mperlberg@express-scripts.com) for signature
2020-06-05 - 4:02:38 PM GMT

📄 Email viewed by Matt Perlberg (mperlberg@express-scripts.com)
2020-06-05 - 10:25:23 PM GMT- IP address: 167.18.104.10

✍️ Document e-signed by Matt Perlberg (mperlberg@express-scripts.com)
Signature Date: 2020-06-05 - 10:26:59 PM GMT - Time Source: server- IP address: 167.18.104.10

✅ Signed document emailed to arothe@express-scripts.com, Matt Perlberg (mperlberg@express-scripts.com) and
James Spung (James.Spung@huschblackwell.com)
2020-06-05 - 10:26:59 PM GMT

Adobe Sign

# EXHIBIT F

Case 1:19-md-02875-RBK-JS Document 2278-6 Filed 05/10/22 Page 48 of 111 PageID: 85195

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## <u>DECLARATION OF DICK DERKS</u>

I, Dick Derks, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of Walmart Inc. (Walmart), a Defendant in the above-captioned proceeding.

2.      I have worked at Walmart for six (6) years and am employed as Director of Generic Rx, Pharmacy Merchandising.  In that role, I am responsible for sourcing generic drugs for Walmart's retail network.

3.      In my capacity as Director of Generic Rx, Pharmacy Merchandising, I am familiar with the competitive and commercial sensitivities associated with generic drug pricing.

4.      Walmart is, among other things, a national pharmacy.  While the precise methods of sourcing and selling generic drugs undoubtedly vary across retail pharmacies, in my capacity as Walmart's Director of Generic Rx, Pharmacy Merchandising, I understand that the complexity of these transactions is not unique to Walmart.

DocuSign Envelope ID: 60517382-7145-4982-844A-F1681BB9CE7A

Case 1:19-md-02875-RBK-JS Document 2278-6 Filed 05/10/22 Page 49 of 111 PageID: 35196
Case 1:19-md-02875-RBK-JS Document 473-6 Filed 06/16/20 Page 3 of 5 PageID: 7659

5.      Because of the complexity of sourcing and selling generic drugs within a highly
competitive environment, production of non-public pricing information imposes a significant
confidentiality risk upon Walmart for the reasons explained in this Declaration.

6.      The pricing and selling of generic drugs is very complicated.  While with a name-
brand drug there is typically only one manufacturer, for generic drugs the FDA may approve
multiple entities to manufacture and sell a particular generic drug in different formulations.  That
means that pharmacies may and do source generic drugs from different entities with varying
contracts, negotiations, and pricing structures.  Some generic drugs are purchased directly from a
manufacturer; others are purchased indirectly through a wholesaler.

7.      Walmart considers non-public information regarding the sourcing and pricing of
the generic drugs it sells to be one of its most commercially sensitive, highly confidential, and
proprietary trade secrets.  Generic drugs are dispensed in far greater proportion than name-brand
drugs, and therefore account for a substantial portion of prescription drug sales for pharmacies.
There is a highly competitive environment among retail pharmacy chains and across the various
entities selling and sourcing generic drugs to those retail pharmacy chains, with all participants –
pharmacies and distributors – seeking to obtain the best pricing terms.

8.      Retail pharmacies compete with each other to source and sell generic drugs,
including to negotiate the most competitive pricing for these drugs with wholesalers and
suppliers.  A large percentage of Walmart's prescriptions dispensed and a significant portion of
Walmart's prescription drug sales come from generic drugs, so protecting the confidential
sourcing and pricing of those generic drugs is of paramount importance.  If, for example, a
competitor or a wholesaler learned the prices Walmart pays to source one of its generic drugs,
that competitor or wholesaler could leverage that information to get its own better prices, putting

DocuSign Envelope ID: 60517383-7145-4982-844A-F1681BB9CE7A

Walmart at a competitive disadvantage. The viability of Walmart's generic drug business

therefore demands that the confidentiality of pricing information be fully protected and carefully

maintained because of the significant competitive and economic impact if a Walmart competitor

or wholesaler learned what it was paying for a particular drug at a particular time in the drug

supply marketplace.

9.      Walmart has made significant efforts to maintain the confidentiality of its

sourcing data, including non-public pricing information. For example, contracts relating to drug

sourcing and pricing are maintained in a password protected system to which only key Walmart

employees are allowed access. Furthermore, the financial details of Walmart drug supplier

contracts, including negotiations related to those contracts, are maintained within a specific

department and are not shared with other departments at Walmart.

10.      Walmart has taken great care to ensure that its competitors, and drug wholesalers

other than those with whom it transacts business, do not obtain access to or learn of its

confidential financial data and pricing information. The disclosure of such sensitive information

to the public and/or to other defendants in this litigation who are competitors of Walmart, or to

wholesalers other than those with whom Walmart contracts, would alter the important and

delicate competitive balance that allows the generic drug market to function efficiently and,

ultimately, to benefit consumers. It would also limit Walmart's ability to negotiate future sales

and sourcing contracts. Walmart's contracts with its suppliers include confidentiality provisions,

so disclosure of this information, even if pursuant to a protective order, would result in adverse

consequences to Walmart's ability to negotiate and contract with its suppliers in the future.

11.      Given the sensitivity of such financial and pricing data, Walmart is highly

concerned that a protective order is insufficient to prevent an inadvertent disclosure of the

DocuSign Envelope ID: 60517382-7145-4982-844A-F1681BB9CE7A

foregoing information. Considering that many other defendants in this litigation are direct competitors of Walmart or are suppliers with whom Walmart does or may contract for the purchase of generic drugs, any inadvertent disclosure of upstream pricing information would have adverse financial consequences to Walmart. If Walmart's confidential financial and pricing data ends up in the hands of a competitor or of suppliers generally, it would cause irreparable harm. In the event of such a disclosure, it would be impossible to undo the damage to Walmart's ability to obtain the most favorable pricing of generic drugs dispensed to its customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May __, 2020 at Bentonville, Arkansas.
5/12/2020 | 08:40 CDT

*Dick Derks*
_____
Dick Derks

# EXHIBIT G

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| | Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF RITE AID

I, \_\_Owen P. McMahon\_\_\_\_\_, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.     I am authorized to provide this declaration on behalf of Rite Aid, a Defendant in the above-captioned proceeding.

2.     I have worked at Rite Aid for over twenty (20) years and I have been employed as Vice President ("VP") of Pharmaceutical Purchasing since 2015. A brief overview of my duties as VP of Pharmaceutical Purchasing include, but is not limited to, the following: develop short and long term strategic procurement practices to increase sales and gross profit margins; review, analyze, and negotiate strategic purchasing agreements for pharmaceutical products; oversee, manage, and coordinate activities of pharmacy pricing associates; serve as an internal expert in the area of pharmaceutical product purchasing and distribution for all functional areas of the business; and participate in the development and execution of financial control processes to ensure the accurate accounting of purchases and associated revenue.

3.     In my capacity as VP of Pharmaceutical Purchasing, I am familiar with the competitive and commercial sensitivities associated with generic drug pricing. Likewise, in that

1

capacity, I have personal knowledge regarding the steps Rite Aid takes to protect the confidential and proprietary financial data and information relating to sourcing, pricing and distributing pharmaceutical products.

4.      Rite Aid is a national pharmacy.  It is one of several retail pharmacy defendants in this multi-district litigation.  Although the precise methods of sourcing and selling generic drugs undoubtedly vary across retail pharmacies, in my capacity as VP of Pharmaceutical Purchasing. I understand that the complexity of these transactions is not unique to Rite Aid.

5.      Because of the complexity of sourcing and selling generic drugs within a highly competitive environment, production of non-public pricing information imposes a significant burden on Rite Aid, for the reasons explained in this Declaration.

6.      The pricing and selling of generic drugs is more complicated than that of name-brand drugs.  With a name-brand drug, there is typically only one manufacturer.  In contrast, FDA may approve dozens of entities to manufacture and sell a particular generic drug in multiple different formulations.  Pharmacies may source generic drugs from multiple entities with varying contracts, negotiations, and pricing structures.  Some generic drugs are purchased directly from a manufacturer; others are purchased indirectly through a wholesaler.

7.      Rite Aid considers non-public information regarding the sourcing and pricing of generic drugs it sells to be one of its most—if not its most—commercially sensitive, highly confidential, and proprietary trade secrets.  Generic drugs are dispensed in far greater proportion than name-brand drugs and therefore account for a substantial portion of prescription drug sales for pharmacies; this results in a highly competitive environment among retail pharmacy chains and across the various entities selling and sourcing generic drugs to those retail pharmacy chains.

8. Retail pharmacies compete with each other to source and sell generic drugs, including to negotiate the most competitive pricing for these drugs with wholesalers and suppliers. The cost of generic pharmaceuticals are the basis for how Rite Aid makes money as a business, exposing the cost would undermine our ability to conduct business with payers and PBMs. The vast majority of our business is dispensing medications and the majority of products dispensed are generics, providing pricing would provide details to the market that could be used against us when negotiating contracts with PBMs. We make the margin between the price that a PBM will reimburse us for a product and the cost we can buy the product at. If PBMs had access to these costs they could effectively lower our reimbursement decreasing our ability to generate margin on the vast majority of our business. Exposing the pricing could also eliminate our ability to negotiate with pharmaceutical manufacturers and wholesalers as they would be able to offer less competitive bids. The viability of Rite Aid's generic drug business therefore demands that the confidentiality of pricing information be carefully maintained, in light of the real risk of the significant competitive and economic advantage that would be gained if competitors of Rite Aid learned what Rite Aid was paying for a particular drug.

9. Rite Aid has undertaken extensive steps to maintain the confidentiality of its financial data, including non-public pricing information. For example, the wholesale, distributor and generic manufacturer agreements are in a repository only accessible to a select few people due to the sensitivity of this information. Those agreements are the basis for how generics are priced and the structure of rebates associated with our purchases.

10. Additionally, to ensure that sensitive financial data and other information regarding pricing and costs are only disclosed to third parties under adequate confidentiality provisions, Rite Aid also requires that its employees follow clear guidelines to ensure confidentiality of sensitive

3

financial information is maintained. All Rite Aid employees must comply with these requirements in requesting disclosure of any financial information outside the company. These requirements apply not only to pricing data, but to all financial information Rite Aid considers commercially sensitive and a trade secret.

11.     Rite Aid has taken great care to ensure that competitors do not obtain access to or learn of its confidential financial data and pricing information. Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would alter the competitive balance that allows the generic drug market to function efficiently. It could also limit Rite Aid's ability to negotiate future sales and sourcing contracts.

12.     Given the tremendous effort Rite Aid has put into protecting its sensitive financial and pricing data, Rite Aid is highly concerned that a litigation protective order would be insufficient to protect all parties involved from inadvertent disclosure of the same. Considering nearly every defendant is a competitor in some way, any improper disclosure is likely to end up in the hands of a third party which would cause irreparable harm. In the event of such an occurrence, it would be impossible to undo the damage of such a disclosure.

Date: June , 8            , 2020            By: _____
                                             Owen McMahon
                                             Vice President of Pharmaceutical
                                             Purchasing for Rite Aid

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF BRITT TURNER

I, Britt Turner, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of The Kroger Co., a Defendant in the above-captioned proceeding.

2.      I have worked at The Kroger Co. for 34 years and am employed as the Director of Pharmacy Procurement.

3.      In my capacity as Director of Pharmacy Procurement, I am familiar with the competitive and commercial sensitivities associated with generic drug pricing. Likewise, in that capacity, I have personal knowledge regarding the steps Kroger Pharmacy takes to protect the confidential and proprietary financial data and information relating to sourcing, pricing and distributing pharmaceutical products.

4.      Kroger Pharmacy  is a national pharmacy.  It is one of several retail pharmacy defendants in this multi-district litigation.  Although the precise methods of sourcing and selling generic drugs undoubtedly vary across retail pharmacies, in my capacity as Director of Pharmacy Procurement, I understand that the complexity of these transactions is not unique to Kroger.

5.    Because of the complexity of sourcing and selling generic drugs within a highly competitive environment, production of non-public pricing information imposes a significant burden on Kroger, for the reasons explained in this Declaration.

6.    The pricing and selling of generic drugs is more complicated than that of name-brand drugs.  With a name-brand drug, there is typically only one manufacturer.  In contrast, FDA may approve dozens of entities to manufacture and sell a particular generic drug in multiple different formulations.  Pharmacies may source generic drugs from multiple entities with varying contracts, negotiations, and pricing structures.  Some generic drugs are purchased directly from a manufacturer; others are purchased indirectly through a wholesaler.

7.    Kroger considers non-public information regarding the sourcing and pricing of generic drugs it sells to be one of its most—if not its most—commercially sensitive, highly confidential, and proprietary trade secrets.  Generic drugs are dispensed in far greater proportion than name-brand drugs and therefore account for a substantial portion of prescription drug sales for pharmacies; this results in a highly competitive environment among retail pharmacy chains and across the various entities selling and sourcing generic drugs to those retail pharmacy chains.

8.    Retail pharmacies compete with each other to source and sell generic drugs, including to negotiate the most competitive pricing for these drugs with wholesalers and suppliers. The viability of Kroger's generic drug business therefore demands that the confidentiality of pricing information be carefully maintained, in light of the real risk of the significant competitive and economic advantage that would be gained if competitors of Kroger learned what Kroger was paying for a particular drug.

9.      Kroger has undertaken extensive steps to maintain the confidentiality of its financial data, including non-public pricing information.  For example, this data is stored on the Kroger network where only few people on my team have access to it.

10.      Additionally, to ensure that sensitive financial data and other information regarding pricing and costs are only disclosed to third parties under adequate confidentiality provisions, Kroger also requires that its employees follow a process designed to confirm that a non-disclosure agreement, protective order or other confidentiality protections are in place before distribution of sensitive financial information.  All Kroger employees must comply with these requirements in requesting disclosure of any financial information outside the company.  These requirements apply not only to pricing data, but to all financial information Kroger considers commercially sensitive and a trade secret.

11.      Kroger has taken great care to ensure that competitors do not obtain access to or learn of its confidential financial data and pricing information. Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would alter the competitive balance that allows the generic drug market to function efficiently.  It could also limit Kroger's ability to negotiate future sales and sourcing contracts.

12.      Given the tremendous effort Kroger has put into protecting its sensitive financial and pricing data, Kroger is highly concerned that a litigation protective order would be insufficient to protect all parties involved from inadvertent disclosure of the same. Considering nearly every defendant is a competitor in some way, any improper disclosure is likely to end up in the hands of a third party which would cause irreparable harm. In the event of such an occurrence, it would be impossible to undo the damage of such a disclosure.

4815-4579-6030.1                              Page **3** of **4**

6/3/20
Date

Britt Turner
Britt Turner

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| In re: Valsartan Products Liability Litigation | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| | Honorable Joel Schneider, Magistrate Judge |

## DECLARATION OF ERIN McCOY

I, Erin McCoy, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of CVS Pharmacy, Inc. ("CVS"), a Defendant in the above-captioned proceeding.

2.      I have worked at CVS for 6 years and currently am employed as the Senior Director of Payer Relations. In my current role, I am responsible for coordinating CVS's negotiation of contract provisions for prescription drug reimbursements and pricing.

3.      In my capacity as Senior Director of Payer Relations, I am familiar with the competitive and commercial sensitivities associated with generic drug reimbursement and pricing. I also have personal knowledge regarding the steps CVS takes to safeguard confidential and proprietary financial data and information relating to the pricing of pharmaceutical products, including the generic versions of Valsartan at issue in this litigation.

4.      I understand that Plaintiffs in this litigation are seeking production of information concerning the price that various entities paid or reimbursed CVS for generic Valsartan dispensed to customers. Because of the complex and highly competitive nature of the retail

1

pharmacy business, generally, and the retail pharmacy market for generic drugs, specifically, production of this information imposes a significant burden on CVS and risks significant harm to CVS's retail pharmacy business.

5.     Generic drugs account for a substantial portion of CVS's prescription drug sales. CVS's pricing and selling of generic prescription drugs is the result of an incredibly complex process, which is affected both by the rates that CVS is able to negotiate in purchasing medications, and by the price CVS ultimately charges consumers or their health insurance plans for the prescriptions it dispenses.  CVS considers non-public information regarding the sourcing and pricing of generic drugs it sells to be among its most commercially sensitive, highly confidential, and proprietary trade secrets.

6.     The price that a pharmacy customer pays for a prescription fill is influenced by a number of factors, including whether that customer has health insurance.  Rather than contract with retail pharmacies directly, many health insurance or prescription benefit plans rely on Pharmacy Benefit Managers (PBMs) to negotiate their reimbursement rates and structures. CVS negotiates with PBMs to determine the amount it is reimbursed for the cost of all or a portion of a customer's prescription fill.  With the exception of certain specialty medications, which Valsartan is not, CVS does not negotiate reimbursement rates for drugs on a drug-by-drug basis. Rather, it negotiates the rate of reimbursement for all generic drugs—or all branded drugs— covered by a plan, as a whole.  The result of these negotiations is that the health plan, through its PBM, has constructed a network of pharmacies to be included with clients' benefit plans, and has negotiated a complex pricing structure for each retail pharmacy within the network.

7.     With respect to the reimbursements themselves, in general, it is the PBM, acting on behalf of the plan, that reimburses CVS for the cost of all or a portion of a customer's

2

prescription fill. Reimbursements generally are made in the aggregate, such that the actual reimbursement amount for a specific prescription fill varies by day, by network and by patient, depending on a number of factors that have nothing to do with the particular drug dispensed, other than whether the drug is generic or branded.

8.      Retail pharmacies compete with each other to provide services to plans and to be considered "in network" for those plans. CVS does not necessarily receive the same reimbursement rate as other pharmacies in the same network. It negotiates its rates individually, and commits substantial effort to obtaining the most competitive rate available. Because of the competitive nature of the retail pharmacy business in the U.S., the reimbursement amount that CVS receives for each prescription is a closely guarded trade secret. Further, although reimbursement rates may change over time, rate structures often build off discussions from year to year, such that CVS considers both current and prior rate information to be highly confidential.

9.      CVS has significant concerns that, if ordered to produce this highly confidential information regarding the amounts reimbursed for Valsartan, the other retail pharmacies named in this litigation could gain a significant competitive advantage over CVS. This would cause substantial harm to CVS, and could undermine its competitive position vis-à-vis the other pharmacies that also compete for reimbursement from the same entities.

10.      Production of this information also risks substantial harm to CVS's ability to negotiate with the PBMs acting on behalf of health plans or insurers. CVS's retail pharmacy business depends on being able to negotiate competitive agreements for the dispensing of important prescription medications to consumers.

11.     In light of the significant concerns raised by the confidential nature of this information, CVS has undertaken extensive steps to maintain the confidentiality of its financial data, including prescription drug reimbursement information.

12.     For example, CVS limits access to this information to a small team of people with a need to know how much CVS is reimbursed for prescription drugs that it dispenses. Although CVS employs approximately 300,000 individuals, fewer than 50 employees have access to the folders and databases containing sensitive information regarding CVS's agreements regarding reimbursements for patient prescriptions. Access to the actual contracts that set forth the pricing components of these agreements is even more limited to ensure that these documents and the sensitive business information in them remains confidential. Moreover, the content of these agreements is subject to internal policies to limit verbal disclosure of the terms of these agreements within different departments of the company. CVS also negotiates contractual protections with all PBMs to ensure the confidentiality of this information outside CVS. The PBMs also view this information as highly confidential, and also insist that CVS to agree to strict confidentiality provisions that prohibit disclosure to third parties.

13.     Given the significant effort CVS puts into protecting its sensitive reimbursement data, CVS is very concerned that a litigation protective order is insufficient to protect CVS from the inadvertent disclosure of this data. If this information were to fall into the hands of any of CVS's competitors, or even into the hands of the Third Party Payor plaintiffs in this litigation, CVS's business could be irreparably harmed.

Executed June 15, 2020 at   Granville, Ohio          .

Erin McCoy

4

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875 |
| | Honorable Robert B. Kugler, District Court Judge |
| | Honorable Joel Schneider, Magistrate Judge |

<u>**DECLARATION OF MEGAN MISTARZ**</u>

I, Megan Mistarz, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of Walgreens Boots Alliance, Inc. ("Walgreens"), a Defendant in the above-captioned proceeding.

2.      I have worked at Walgreens for nearly thirteen (13) years and am employed as Senior Director, Payor & Provider Solutions.  In that role, I manage the team that provides analytic and operational support to Walgreens' managed care sales and contracting teams.

3.      In my capacity as Senior Director, Payor & Provider Solutions, I am familiar with the competitive and commercial sensitivities associated with generic drug reimbursement and pricing.  Likewise, in that capacity, I have personal knowledge regarding the steps Walgreens takes to safeguard confidential and proprietary financial data and information relating to pricing of, and reimbursement for, pharmaceutical products, including the generic versions of Valsartan at issue in this litigation.

4.      I understand that Plaintiffs in this litigation are seeking production of information concerning the price that Third-Party Payors ("TPPs") paid or reimbursed Walgreens for

1

Valsartan dispensed to customers.  The term Third-Party Payor refers generally to any entity
(other than the patient) that reimburses a pharmacy for the cost of all or a portion of the cost of a
patient's prescription.

5.      The process by which pharmacies are reimbursed for prescriptions is complicated.
For Walgreens, the process is generally as follows:  First, the patient provides his or her
prescription and insurance card to the pharmacy.  Second, Walgreens submits the claim for the
prescription to the TPP or its claims processor ("Processor").  Third, the Processor returns to
Walgreens the amount owed by the patient for the prescription and the amount owed by the TPP
for the prescription.  The returned amounts, i.e., the adjudicated amounts, are the total payment
expected by the pharmacy for the dispensed prescription; however, this amount may not be the
final amount paid by the TPP.  At certain agreed-upon time periods (e.g., quarterly, annually,
etc.) depending on the contract between Walgreens and each TPP, Walgreens and the TPP will
undergo a reconciliation process for all prescriptions dispensed in that time period.  For example,
if a TPP has agreed to reimburse Walgreens for all generic prescriptions at a certain
reimbursement rate, but on aggregate for all generic prescriptions dispensed during that period
the TPP has underpaid the pharmacy compared to the contracted reimbursement rate, then the
difference between the overall adjudicated amount and contracted amount is negotiated by the
parties.  The negotiated amount is agreed to as an aggregate amount and is not allocated among
individual drugs, let alone individual consumer transactions.

6.      There are different types of TPPs.  Some TPPs are employers or health insurance
plans.  Other TPPs are Pharmacy Benefit Managers ("PBMs").  Rather than contract directly
with pharmacies, some employers/health care plans use PBMs to negotiate on their behalf.  In
these cases, the employer/health care plan is referred to as the "Client" of the PBM.  On behalf of

the Client, the PBM constructs a network of pharmacies to be included within the Client's benefit plans and negotiates pricing with those pharmacies.

7.     When a PBM constructs a network of pharmacies to be included in a particular Client's plan, it is driven by the Client's needs and preferences.  For example, some Clients elect to include a narrow range of pharmacies, which excludes certain pharmacy providers, because the PBM has contracted with other pharmacies at more aggressive pricing in exchange for the potential of those pharmacies acquiring a higher share of prescriptions.  Other Clients prefer to include a wider range of pharmacies, while still trying to reduce their costs and those of their beneficiaries/members.

8.     Because of the complexity of dispensing and reimbursement for generic drugs within this highly competitive environment, the dissemination of non-public reimbursement information imposes a significant risk on Walgreens.  Non-public information regarding the pricing of generic drugs is among the most commercially sensitive of Walgreens' trade secrets, given the highly competitive environment not only among retail pharmacy chains, but also the various entities selling and sourcing generic drugs to those retail pharmacy chains.

9.     The amount TPPs reimburse Walgreens for each prescription is a guarded trade secret.  The contracts that Walgreens has with various TPPs contain highly sensitive and confidential information, and those contracts contain confidentiality provisions prohibiting the disclosure of that information.  Further, even prior contracts remain highly confidential because although contracts and reimbursement rates may change over time, rate structures often build off discussions from year to year, so disclosure of "old" rates or contracts are likely to strongly suggest what current contracts contain.

10.     For example, all retail pharmacies (including those that are defendants in this case) want to negotiate the best possible pricing for themselves and their customers.  That involves (a) providing services to TPPs, (b) being considered "in network" for those TPPs, and (c) receiving fair reimbursement from TPPs.  Other retail pharmacy defendants could gain a significant competitive and economic advantage over Walgreens if they learned this confidential information, and especially what each TPP reimburses Walgreens for dispensing generic drugs to the TPP's beneficiaries and members.

11.     Further, because TPPs may negotiate different reimbursement rates for different pharmacies or different Clients, disclosure of a TPPs reimbursement rate or the reimbursement rate contracted between the TPP and its Client could fundamentally alter the way the retail pharmacy industry operates.

12.     Walgreens has made great efforts to maintain the confidentiality of its financial data, including non-public pricing information.  For example, access to this information is highly curtailed even within Walgreens.  Very few key employees have access to this information.  These employees sit on a locked floor within the building.  Even on that locked floor, paper copies of confidential documents such as contracts must be kept in locked drawers.  In terms of electronic files, confidential financial data is located on a particular shared drive that only certain employees have access to, which is maintained by virtue of authenticator IDs linked to Walgreens' electronic file structure.  Further, employees with access to confidential financial information are required to sign a non-disclosure agreement.  These requirements apply not only to pricing data, but to financial information Walgreens considers commercially sensitive and a trade secret.

13.     Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would fundamentally alter the competitive balance that allows the generic drug market to function efficiently and hinder Walgreens' ability to negotiate future contracts with TPPs.

14.     Given the extreme commercial sensitivity of pricing/reimbursement information and the great lengths Walgreens has gone to protect its sensitive financial and pricing data, Walgreens is concerned that a protective order would be insufficient to protect against the inadvertent disclosure of this information.  Considering that every retail pharmacy defendant is a competitor of Walgreens, any improper disclosure could be crippling to the entire industry, and would be impossible to undo.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed May 18, 2020 at Highland Park, Illinois.

*Megan M. Mistarz*
Megan Mistarz

# EXHIBIT K

DocuSign Envelope ID: ABF3A495-5419-486B-8460-344BC36C8FEE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875 <br><br> Honorable Robert B. Kugler, District Court Judge <br><br> Honorable Joel Schneider, Magistrate Judge |

## <u>DECLARATION OF MICHAEL VIIRRE</u>

I, Michael Viirre, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of Walmart Inc. (Walmart), a Defendant in the above-captioned proceeding.

2.      I have worked at Walmart for seven (7) months and am employed as Senior Director of Specialty Pharmacy. My responsibilities include, but are not limited to, payer account management of specialty pharmacy networks and building out and managing Walmart's specialty prescriber relations sales team.

3.      In my capacity as Senior Director of Specialty Pharmacy, I am familiar with the competitive and commercial sensitivities associated with drug pricing and reimbursement. Likewise, in that capacity, I have personal knowledge regarding the steps Walmart takes to safeguard confidential and proprietary financial data and information relating to the pricing of pharmaceutical products dispensed through its retail pharmacies, including the generic versions of Valsartan at issue in this litigation.

DocuSign Envelope ID: ABF3A495-5413-486B-8460-344BG36C8EFE

Case 1:19-md-02875-RBK-JS   Document 4473-11   Filed 06/26/20   Page 3 of 6   PageID: 765
Case 1:19-md-02875-RBK-JS   Document 2073-1   Filed 05/10/22   Page 75 of 111   PageID: 85322

4. I understand that Plaintiffs in this litigation are seeking the production of information concerning the amount that Third-Party Payors (TPPs) and their clients paid or reimbursed Walmart for Valsartan dispensed to Walmart's pharmacy customers. TPPs include Pharmacy Benefit Managers (PBMs), Pharmacy Benefit Administrators (PBAs), and Direct To Employers (DTEs). When a customer has a TPP, the TPP reimburses the pharmacy directly for the cost of all or a portion of the cost of the prescription medication. The TPP is contractually obligated to do business with Walmart in a way that maintains the confidentially of pricing information, and such information is customarily safeguarded from disclosure to third parties by confidentiality provisions in those contracts.

5. There are many factors that contribute to how much a customer pays for medication. Some scenarios include: 1) the customer may pay cash for the medication (without insurance), in which case the price of the medication is driven by the pharmacy, 2) the customer may have pharmacy insurance, in which case the pharmacy has agreed to pricing with the TPP and the TPP is responsible for managing such pricing, including the customer's plan benefit design, 3) the TPP may utilize another TPP's relationship and pricing with the pharmacy, 4) the pricing arrangement between the TPP and the pharmacy may be an aggregate guarantee where the price of all drugs are constantly changing and the reimbursement between the pharmacy and the TPP is trued up over a period of time, 5) certain lines of business may have other pricing components taken at the point of sale or after the point of sale that would impact the price of a single drug (e.g., Direct Indirect Remuneration or performance-based networks), 6) the pharmacy network design (a number of pharmacies allowed to participate and provide prescription drug services) impacts pricing, and 7) the pricing mechanism agreed to by the pharmacy and the TPP (e.g., average wholesale price (AWP), wholesale acquisition cost (WAC),

DocuSign Envelope ID: ABE3A495-E419-495B-8460-344BC36C8EEE

Cost Plus, National Average Drug Acquisition Cost (NADAC), etc.) impacts the pricing of the drug.

6.      In all the cases described above, the pricing for a dispensed medication which the pharmacy and the TPP negotiate and maintain is both complicated and extremely confidential. As I have noted above, Walmart's contracts with TPPs prevent the sharing of such confidential information.

7.      Pricing must not be shared across competitors or with TPP plan sponsors.  If either were to receive the confidential pricing details of their competitors, they would have a competitive advantage in the market and, potentially, could use that information to control the outcome of plan sponsor requests for proposals (RFPs), contract pricing negotiations, and future Walmart-TPP relationships.  For example, PBMs construct networks of providers (pharmacies). If Walmart is in a network and another pharmacy learned of Walmart's pricing within that network, the competitor pharmacy could try to undercut Walmart's pricing, and ultimately cut Walmart out of the network.  In this situation, the market would compress and the customers would not benefit, since their contribution to the cost of a drug is only a portion of its total cost.

8.      Because of the complexity of pricing drugs within this highly competitive environment, the disclosure of non-public reimbursement information imposes a significant confidentiality risk on Walmart for the reasons explained in this Declaration.

9.      Pharmacy reimbursement rates change constantly with each TPP and Walmart contracts with hundreds of TPPs for the drugs it dispenses to customers.  Capturing meaningful drug transaction-level data would be extremely burdensome over any period of time and also would be very difficult, if not impossible, to interpret on a per prescription basis.  Drug pricing

DocuSign Envelope ID: ABF3A495-E419-405B-8460-344BC36C8FEE

as between Walmart and its TPPs is most often evaluated and proceeds on an aggregate basis as opposed to a drug-specific or transaction-specific basis.

10.     Walmart has made significant efforts to maintain the confidentiality of its pricing data, including non-public pricing information.  For example, contracts relating to drug pricing are maintained in a password protected system to which only key Walmart employees are allowed access.  Furthermore, the financial details of Walmart drug supplier contracts, as well as contracts and negotiations, including price, with PBMs, DTEs and other TPPs are maintained within a specific department and are not shared with other departments at Walmart.

11.     Disclosure of extremely sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would fundamentally alter the competitive balance that allows the generic drug market to function efficiently and offer customers the lowest prices available for generic medicines.  For the reasons set forth above, the disclosure of such information would also impair Walmart's ability to negotiate future pharmacy provider agreements and sourcing contracts to obtain the lowest competitive cost for its prescription medications dispensed to its customers.

12.     Given the great lengths, and associated expense, that Walmart has implemented to protect its sensitive financial and drug pricing data, Walmart is concerned that a protective order would be insufficient to protect against the inadvertent disclosure of this information. Considering every retailer defendant is a competitor of Walmart, any improper disclosure would cause irreparable harm; a harm that would be impossible to adequately remedy.

DocuSign Envelope ID: ABF3A495-E413-485B-8460-344BC36C8EFE

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed May __, 2020 at Bentonville, Arkansas.

5/13/2020 | 09:21 CDT

_____

Michael Viirre

# EXHIBIT L

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALSARTAN<br><br>PRODUCTS LIABILITY LITIGATION<br><br><br>This Document Relates to All Actions | MDL No. 2875<br><br><br>Honorable Robert B. Kugler,<br>District Judge<br><br><br>Honorable Joel Schneider,<br>Magistrate Judge |

## DECLARATION OF TONY BRAUN

I, Tony Braun, hereby declare pursuant to 28 U.S.C. 1746 as follows:

1.  I understand that Humana is currently named as a defendant in litigation regarding generic valsartan, losartan, and irbesartan products.  I further understand that the plaintiffs are seeking to discover information regarding Humana's relationships with its suppliers of those products, including the prices paid for these products from 2012 to the present.  I submit this declaration in order to explain why this information is extremely sensitive.  Humana would suffer significant competitive harm if this information were to be disclosed.

2.  I am currently employed as the Vice President of Pharmaceutical Contracting & Supply Chain at Humana Inc.  In that role, I am responsible for the strategy development and management of Humana's growing multi-billion pharmaceutical contracting, purchasing, inventory planning and supply chain efforts supporting Humana's mail order, specialty and staff model pharmacies.  I am responsible for both the generic and branded pharmaceutical supply chains.

3.  I have served in this role since October 2017.  Prior to that, I served for over 13 years as Humana's Director of Pharmaceutical Contracting & Purchasing.  Therefore, I have over

15 years' experience in Humana's pharmaceutical purchasing efforts, including both generic pharmaceuticals and branded pharmaceuticals.

4. As a result of my experience, I am familiar with the competitive and commercial sensitivities of the pharmacy business. I am also familiar with the specific commercial sensitivities particular to generic drug pricing.

5. By way of example, I am familiar with the following issues:

   a. The generic drug market is much more competitive than the branded drug market. If a company develops a branded drug, and no generic versions exist, then the brand has a monopoly. Humana does not have a choice among competing manufacturers. By contrast, once multiple generic versions enter the market, Humana has several alternatives from which to choose. Physicians may permit Humana to substitute any FDA-approved generic for a prescribed branded drug. (The practice of generic substitution is governed by state law, and thus the particular rules can vary from state to state.)

   b. Humana and other pharmacies sometimes purchase drugs directly from manufacturers, and sometimes purchase drugs from distributors. Indeed, Humana has a choice regarding whether to purchase the same drug from the manufacturer or from one of several distributors.

6. It is important for Humana to protect information about drug pricing from drug distributors, competitors, and other suppliers. This includes both the present pricing, as well as pricing that was in effect in past years. Drug purchases are Humana Pharmacy, Inc.'s primary expense, making the pricing information of utmost importance to the company from a competitive standpoint.

a. Humana's supply contracts include express privacy and confidentiality terms.  To disclose this information may be a breach of Humana's supply contracts.

b. Similarly, Humana often communicates to potential suppliers that it will not share this information, even if no contract results.  To disclose this information would damage Humana's standing in the commercial community, and it would damage the trust relationships that Humana has built with its suppliers.

c. A supplier that learns a different supplier's pricing may manipulate the "total cost of ownership" in order to undercut the original supplier on price or inflate the price to a higher level than the supplier would have originally offered.  As a result, Humana could be misled.  The "total cost of ownership" refers to the end-to-end cost throughout the total product lifecycle.  The risk is that a competing supplier may move more of the "total cost of ownership" to hidden areas in order to achieve a lower "sticker price."

d. Suppliers who know Humana's pricing may seek to sell to competing pharmacies at higher prices.  Over the longer term, these suppliers may emerge as direct competitors themselves.

e. Humana's suppliers are likely also suppliers to Humana's competitors, including those who are co-defendants in this lawsuit.  Therefore, any disclosure to a supplier creates a risk that information will be disclosed to competitors.

f. With respect to past pricing, Humana's contracts with suppliers often build on one another from year-to-year, making the past pricing information as commercially sensitive as the present day's information.

7. Based on these considerations, I believe Humana would suffer considerable harm to its competitive position if its supply chain and pricing information were disclosed to its suppliers and potential suppliers. This includes distributors such as McKesson, AmeriSourceBergen, and Cardinal Health. It also includes manufacturers such as Aurobindo, Teva, and Mylan. Further, I understand that these suppliers are defendants in this litigation.

8. It is also important for Humana to protect information about drug pricing from competing pharmacies, including those also named as defendants in this lawsuit.

    a. Competitors may leverage this information to engage in predatory pricing. For instance, the competitor may offer pharmacy services at a lower cost that they know Humana cannot match.

9. Based on these considerations, I believe Humana would suffer considerable harm to its competitive position of its supply chain and pricing information were disclosed to competing pharmacies.

10. I understand that several other large national pharmacy chains are also named as defendants in this litigation, such as Wal-Mart, Walgreens, Kroger, Albertsons, Rite-Aid, Express Scripts, and CVS. These companies are direct competitors of Humana Pharmacy. Based on my experience in the industry, I believe these companies likely regard their supply and pricing information the same way Humana regards its own information. That is to say, I believe they consider their information to be highly confidential. I believe they would not want Humana to learn their information.

11. Humana goes to great lengths to protect information about the pricing of its supply chain, including its generic drugs. For instance, Humana:

    a.   maintains the confidential pricing information on a private electronic drive that is accessible only with valid login credentials for Humana employees directly involved in the pricing negotiation and contracting;

    b.   limits the distribution of this pricing information to solely the Finance and Inventory Planning teams on a "need to know" basis;

    c.   maintains strict privacy rules and regulations governing employee access and protocols;

    d.   maintains stringent cybersecurity systems to ensure that the above protocols are followed.

12. I understand that courts sometimes enter protective orders that require counsel to protect the confidentiality of information. I do not believe that such an order would be sufficient in this case.

    a.   I assume that the partners, associates, and support staff at the various law firms would make good-faith efforts to protect the confidentiality of Humana's information. Nevertheless, inadvertent disclosures happen.

    b.   I understand that more than 100 attorneys have appeared in this case. If Humana's information is produced, presumably all of these many attorneys and their law firms would have access to it. At each firm, numerous individuals (partners, associates, support staff) would have access to Humana's information. The more individuals have access to the information, the greater risk of an inadvertent disclosure. For instance, a third party might overhear plaintiffs' counsel discussing the information. A third party might see one of Humana's documents over counsel's shoulder. Or

one of Humana's documents (or a memo or email that references Humana's information) may simply be dropped in public.

c. Setting aside disclosure concerns, there is a risk that any lawyer who views Humana's information will retain that information in his or her mind. I assume that counsel will comply with a court order to destroy the information upon conclusion of the litigation. But it is extremely difficult to "unring the bell" once Humana's information is viewed. Of course, Humana expects its own counsel to guard vigilantly against any use of this information that might disadvantage Humana. But counsel who represent other parties do not have the same duties to Humana, and they cannot be expected to have the same care. Again, these concerns are exacerbated by the sheer number of individuals that would gain access to Humana's information.

d. Even if Humana's information is produced on an "Attorneys' Eyes Only" basis, or even if Humana's information is produced only to Plaintiffs, Humana's suppliers and competitors may discover the information if it is filed with the court or referenced in a court hearing.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true.

Dated: May 8, 2020                    Signed: *Tony A. Braun*

# EXHIBIT M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| In re: Valsartan Products Liability Litigation | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge<br><br>Honorable Joel Schneider, Magistrate Judge |

### DECLARATION OF BRITT TURNER

I, Britt Turner, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1.      I am authorized to provide this declaration on behalf of The Kroger Co., a Defendant in the above-captioned proceeding.

2.      I have worked at Kroger for 34 years and am employed as Director of Pharmacy Procurement.

3.      In my capacity as Director of Pharmacy Procurement, I am familiar with the competitive and commercial sensitivities associated with generic drug reimbursement and pricing. Likewise, in that capacity, I have personal knowledge regarding the steps Kroger takes to safeguard confidential and proprietary financial data and information relating to sourcing, pricing and distributing pharmaceutical products, including the generic versions of Valsartan at issue in this litigation.

4.      I understand that Plaintiffs in this litigation are seeking production of information concerning the price that Third-Party Payors (TPPs) paid or reimbursed Kroger for Valsartan dispensed to customers.

Page **1** of **4**

5.      The pricing and selling of drugs is complicated by the process by which the ultimate consumer pays for a prescription.  Many consumers have health insurance plans or TPPs who reimburse a pharmacy directly for the cost of all or a portion of the cost of the prescription.

6.      Rather than contract with suppliers directly to negotiate prescription costs, many TPPs use a pharmacy benefit manager, or PBM.  The PBM negotiates with pharmaceutical manufacturers to obtain rebates for the cost of prescription drugs covered by the TPP's benefit plan, constructing a network of pharmacies to be included with clients' benefit plans, and negotiating pricing with retail pharmacies within the TPP's network.

7.      When a PBM sets up a network of pharmacies to be included in a particular TPP's plan, it is driven by the TPP's needs and preferences.  For example, some TPPs elect to include a narrow range of pharmacies, which may include chain, independent or mail pharmacies, because the PBM has contracted with those pharmacies to offer lower prices in exchange for filling a higher share of prescriptions.  Other TPPs prefer to include a wider range of pharmacies, while still trying to reduce costs for TPPs and their beneficiaries/members.

8.      Although several entities have both retail pharmacy operations and PBM operations, typically those entities will erect a strong firewall between the PBM arm and the retail pharmacy arm.  This firewall prevents PBM employees from accessing the prices that retail pharmacies negotiate with other PBMs and prevents retail pharmacies from accessing the prices a PBM negotiates with other retail pharmacies.   Because PBMs operate through a network of pharmacies across the United States, the retail pharmacy side of the business will represent only a small portion of the pharmacies in the PBM's network.

9.      Because of the complexity of sourcing and selling generic drugs within a highly competitive environment, production of non-public reimbursement information imposes a significant burden on Kroger.

10.     Although contracts and reimbursement rates may change over time, rate structures often build off discussions from year to year, so prior rate information remains highly confidential.

11.     First, how much Kroger paid a wholesaler or manufacturer for a particular drug is highly confidential.  There are several competitor retail pharmacies, some of which operate as PBMs, in this litigation.  If a PBM knew how much Kroger paid for a particular drug, that competitor could gain an economic and competitive advantage over Kroger when negotiating reimbursement rates with the PBM or even when determining whether beneficiaries of a particular TPP may fill a prescription at Kroger and be considered in network.

12.     Non-public information regarding the sourcing and pricing of generic drugs is among the most commercially sensitive of Kroger's trade secrets, given the highly competitive environment not only among retail pharmacy chains, but also the various entities selling and sourcing generic drugs to those retail pharmacy chains.

13.     Second, how much a TPP reimburses Kroger for each prescription is another guarded trade secret.  The contracts that Kroger has with various PBMs for various TPPs contain highly sensitive and confidential material.

14.     For example, the retail pharmacy defendants compete with each other to provide services to TPPs, be considered "in network" for those TPPs, and receive the highest possible reimbursement rates from TPPs.  Other retail pharmacy defendants could gain a significant competitive and economic advantage over Kroger if they learned what each TPP reimburses Kroger for dispensing a given drug.

15.     Further, because PBMs may negotiate different reimbursement rates for different pharmacies or different TPPs, disclosure of a TPP's reimbursement rate could fundamentally alter the way the PBMs operate.

16.     Kroger has made great efforts to maintain the confidentiality of its financial data, including non-public pricing information.  For example, this data is stored on the Kroger network where only the few people on my team have access to it.

17.     Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would fundamentally alter the competitive balance that allows the generic drug market to function efficiently and hinder Kroger's ability to negotiate future sales and sourcing contracts.

18.     Given the great lengths, and great expenses, that Kroger has gone to protect its sensitive financial and pricing data, Kroger is concerned that a protective order would be insufficient to protect all parties involved from inadvertent disclosure of the same. Considering nearly every defendant is a competitor in some way, any improper disclosure is likely to end up in the hands of a third party which would cause irreparable harm. In the event of such an occurrence, it would be impossible to undo the damage of such a disclosure.

_____6|3|20_____                          _Britt Turner_____
Date                                      Britt Turner

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | |
|---|---|
| **In re: Valsartan Products Liability Litigation** | MDL No. 2875<br><br>Honorable Robert B. Kugler,<br>District Court Judge<br><br>Honorable Joel Schneider,<br>Magistrate Judge |

## DECLARATION OF RITE AID

I, Alison Farrell, being competent and over the age of twenty-one (21), state that I have personal knowledge of the following facts and hereby declare under penalty of perjury:

1. I am authorized to provide this declaration on behalf of Rite Aid, a Defendant in the above-captioned proceeding.

2. I have worked at Rite Aid for since July 6, 2015, and am employed as the Vice President ("VP") of Managed Care at Rite Aid Headquarters Corporation. A brief overview of my duties as VP of Managed Care include, but is not limited to, the following: control and management of all managed care contracting and negotiating rates with insurance plans and PBMs.

3. In my capacity as VP of Managed Care, I am familiar with the competitive and commercial sensitivities associated with generic drug reimbursement and pricing. Likewise, in that capacity, I have personal knowledge regarding the steps Rite Aid takes to safeguard confidential and proprietary financial data and information relating to sourcing and pricing,, including the generic versions of Valsartan at issue in this litigation.

4. I understand that Plaintiffs in this litigation are seeking production of information concerning the price that Third-Party Payors (TPPs) paid or reimbursed Rite Aid for Valsartan dispensed to customers.

1

5.      The pricing and selling of drugs is complicated by the process by which the ultimate consumer pays for a prescription.  Many consumers have health insurance plans or TPPs who use a pharmacy benefit manager, or PBM to construct a network of Pharmacies to be included with clients' benefit plans and negotiate pricing with retail pharmacies within the TPP's network. TPPs through the PBM reimburse a pharmacy directly for the cost of all or a portion of the cost of the prescription.

6.      In addition the PBM negotiates with pharmaceutical manufacturers to obtain rebates for the cost of prescription drugs covered by the TPP's benefit plan. When a PBM sets up a network of pharmacies to be included in a particular TPP's network, it is driven by the TPP's needs and preferences.  For example, some TPPs elect to include a narrow range of pharmacies, which may include chain, independent or mail pharmacies, because the PBM has contracted with those pharmacies to offer lower prices in exchange for filling a higher share of prescriptions.  Other TPPs prefer to include a wider range of pharmacies, while still trying to reduce costs for TPPs and their beneficiaries/members.

7.      Although several entities have both retail pharmacy operations and PBM operations, typically those entities will erect a strong firewall between the PBM arm and the retail pharmacy arm.  This firewall prevents PBM employees from accessing the prices that retail pharmacies negotiate with other PBMs and prevents retail pharmacies from accessing the prices a PBM negotiates with other retail pharmacies.   Because PBMs operate through a network of pharmacies across the United States, the retail pharmacy side of the business will represent only a small portion of the pharmacies in the PBM's network.

8.     Because of the complexity of sourcing and selling generic drugs within a highly competitive environment, production of non-public reimbursement information imposes a significant burden on Rite Aid.

9.     Although contracts and reimbursement rates may change over time, rate structures often build off of agreements from year to year, so prior rate information remains highly confidential.

10.    First, how much Rite Aid paid a wholesaler or manufacturer for a particular drug is highly confidential.  There are several competitor retail pharmacies, some of which operate as PBMs, in this litigation.  If a PBM knew how much Rite Aid paid for a particular drug, that competitor could gain an economic and competitive advantage over Rite Aid when negotiating reimbursement rates with the PBM or even when determining whether beneficiaries of a particular TPP may fill a prescription at Rite Aid and be considered in network.

11.    Non-public information regarding the sourcing and pricing of generic drugs is among the most commercially sensitive of Rite Aid's trade secrets, given the highly competitive environment not only among retail pharmacy chains, but also the various entities selling and sourcing generic drugs to those retail pharmacy chains.

12.    Second, how much a TPP reimburses Rite Aid for each prescription is another guarded trade secret.  The contracts that Rite Aid has with various PBMs for various TPPs contain highly sensitive and confidential material.

13.    For example, the retail pharmacy defendants compete with each other to provide services to TPPs, be considered "in network" for those TPPs, while still receiving the highest possible reimbursement rates from TPPs.  Other retail pharmacy defendants could gain a

significant competitive and economic advantage over Rite Aid if they learned what each TPP reimburses Rite Aid for dispensing a given drug.

14. Further, because PBMs may negotiate different reimbursement rates for different pharmacies or different TPPs, disclosure of a TPP's reimbursement rate could fundamentally alter the way the PBMs operate.

15. Rite Aid has made great efforts to maintain the confidentiality of its financial data, including non-public pricing information. For example, all managed care contracts are governed by the confidentiality provisions in the agreements. All physical copies of managed care contracts are stored in a secure location with limited access and all electronic copies are stored on Rite Aid's secure server with access limited to those Rite Aid employees that require access to these contracts for the performance of their daily functions.

16. Additionally, to ensure that sensitive financial data and other information regarding pricing and costs are only disclosed to third parties under adequate confidentiality provisions, Rite Aid also requires that its employees follow clear guidelines to ensure confidentiality of sensitive financial information is maintained. All Rite Aid employees must comply with these requirements in requesting disclosure of any financial information outside the company. These requirements apply not only to pricing data, but to all financial information Rite Aid considers commercially sensitive and a trade secret.

17. Disclosure of sensitive and confidential financial data and pricing information to the public and/or to other defendants who are parties to this litigation would fundamentally alter the competitive balance that allows the generic drug market to function efficiently and hinder Rite Aid's ability to negotiate future sales and sourcing contracts.

4

18.     Given the great lengths, and great expenses, that Rite Aid has gone to protect its
sensitive financial and pricing data, Rite Aid is concerned that a protective order would be
insufficient to protect all parties involved from inadvertent disclosure of the same. Considering
nearly every defendant is a competitor in some way, any improper disclosure is likely to end up in
the hands of a third party which would cause irreparable harm. In the event of such an occurrence,
it would be impossible to undo the damage of such a disclosure.

Date: ___June 10___, 2020            By: _____

                                         Alison Farrell
                                         Vice President of Managed Care
                                         for Rite Aid

**Other Documents**

1:19-md-02875-RBK-JS VALSARTAN LOSARTAN AND IRBESARTAN PRODUCTS LIABILITY LITIGATION

MDL2875

## U.S. District Court

### District of New Jersey [LIVE]

**Notice of Electronic Filing**

The following transaction was entered by JOHNSTON, SARAH on 6/16/2020 at 9:39 PM EDT and filed on 6/16/2020

**Case Name:**     VALSARTAN LOSARTAN AND IRBESARTAN PRODUCTS LIABILITY LITIGATION
**Case Number:**    1:19-md-02875-RBK-JS
**Filer:**
**Document Number:** 479

**Docket Text:**
**Letter from Retail/Pharmacy Defendants re Macro Discovery Issues. (Attachments: # (1) Exhibit A - Decl. of Zachary Mikulak, # (2) Exhibit B - Decl. of John Holderman, # (3) Exhibit C - Decl. of Grace Allen, # (4) Exhibit D - Decl. of Danny Tsai, # (5) Exhibit E - Decl. of Matt Perlberg, # (6) Exhibit F - Decl. of Dick Derks, # (7) Exhibit G - Decl. of Owen P. McMahon, # (8) Exhibit H - Decl. of Britt Turner, # (9) Exhibit I - Decl. of Erin McCoy, # (10) Exhibit J - Decl. of Megan Mistarz, # (11) Exhibit K - Decl. of Michael Viirre, # (12) Exhibit L - Decl. of Tony Braun, # (13) Exhibit M - Decl. of Britt Turner, # (14) Exhibit N - Decl. of Alison Farrell)(JOHNSTON, SARAH)**

**1:19-md-02875-RBK-JS Notice has been electronically mailed to:**

AARON VAN NOSTRAND     vannostranda@gtlaw.com, cohenl@gtlaw.com, harkinss@gtlaw.com, lockardv@gtlaw.com, NJLitDock@gtlaw.com, rodriguezme@gtlaw.com, rubensteinb@gtlaw.com

ABRAHAM JAMES SPUNG     james.spung@huschblackwell.com, christine.herrmann@huschblackwell.com, james-spung-8886@ecf.pacerpro.com

ADAM M. SLATER     aslater@mskf.net, ccalderon@mskf.net, cgeddis@mazieslater.com, kkelsen@mskf.net, ltreat@mskf.net

ADAM R. CREDEUR     adam@kwdejean.com, natalie@kwdejean.com

ALAN KLEIN     aklein@duanemorris.com, pgkopania@duanemorris.com

ALEX C. DAVIS     alex@jonesward.com, milan@jonesward.com, sean@jonesward.com

ALEXIA BRANCATO     alexia.brancato@kirkland.com, kenymanagingclerk@kirkland.com

ALLAN KANNER     a.kanner@kanner-law.com, a.tennis@kanner-law.com, c.whiteley@kanner-law.com, k.crowell@kanner-law.com, l.hilton@kanner-law.com

ALYSON LOUISE OLIVER     notifications@oliverlawgroup.com

ANDRES RIVERO    arivero@riveromestre.com, arolnick@riveromestre.com, cwhorton@riveromestre.com, ddaponte@riveromestre.com, jmestre@riveromestre.com, npuentes@riveromestre.com, palvarez@riveromestre.com, receptionist@riveromestre.com, rsanchez@riveromestre.com

ANDREW DAVID KAPLAN    akaplan@crowell.com

ANDREW JOSEPH OBERGFELL    aobergfell@bursor.com, aleslie@bursor.com, rrichter@bursor.com

ANDREW LANE REISSAUS    areissaus@hollingsworthllp.com, andrew-reissaus-5488@ecf.pacerpro.com, losartan-5194@ecf.pacerpro.com, prevacid-7950@ecf.pacerpro.com

ANNA BLIZZARD GREENBERG    agreenberg@blizzardlaw.com, jpiper@blizzardlaw.com

ANNESLEY HODGES DEGARIS    adegaris@degarislaw.com, asapone@degarislaw.com

ANTHONY MICHAEL CHRISTINA    achristina@lowey.com, 3918436420@filings.docketbird.com, aoc5144@gmail.com

ASHLEIGH ELIZABETH RASO    araso@meshbesher.com, mfrenz@meshbesher.com

ASHTON R. SMITH    ashton@moorelawgroup.com

BEHRAM V. PAREKH    bvp@kirtlandpackard.com, fr@kirtlandpackard.com, gs@kirtlandpackard.com, kcb@kirtlandpackard.com, mfc@kirtlandpackard.com, rr@kirtlandpackard.com

BETH S. ROSE    brose@sillscummis.com, edocket@sillscummis.com, mdelgiudice@sillscummis.com, vlodato@sillscummis.com

BISMA MUHAMMED    bmuhammed@sillscummis.com

BRIAN A. GOLDSTEIN    brian.goldstein@cellinoandbarnes.com, alex.greco@cellinoandbarnes.com, michael.williams@cellinoandbarnes.com

BRIAN H. RUBENSTEIN    rubensteinb@gtlaw.com

BRIAN LUCAS SPADORA    bspadora@sillscummis.com, mdelgiudice@sillscummis.com

BRIAN T. KU    brian@kumussman.com, reyna@kumussman.com

BRITTON LAURENCE ST.ONGE    bstonge@polsinelli.com, rthompson@polsinelli.com, STLDocketing@polsinelli.com, tnelsonburris@polsinelli.com

BRUCE ANTHONY MCMULLEN    bmcmullen@bakerdonelson.com, kbnewman@bakerdonelson.com

BRYAN SCHEFMAN    bryan@schefmanlaw.com, jessica.hs@schefmanlaw.com, ksorensen@schefmanlaw.com

Brittney Nagle    bee.nagle@kirkland.com, kenymanagingclerk@kirkland.com

CALLE M. MENDENHALL    cmendenhall@frplegal.com, cisbell@frplegal.com

CAMERON E. GRANT    cgrant@sakg.com

CARLOS FRANCISCO ORTIZ    carlos.ortiz@nortonrosefulbright.com, calendaring-nortonrose-9955@ecf.pacerpro.com, nymcocalendaring@nortonrosefulbright.com

CHARLES J. FALLETTA    cfalletta@sillscummis.com, cfalletta@gmail.com, edocket@sillscummis.com, mdelgiudice@sillscummis.com

CHRISTOPHER BRETT VAUGHN    brett@hollislawfirm.com

CHRISTOPHER J. DALTON    christopher.dalton@bipc.com

CHRISTOPHER LUKE COFFIN    ccoffin@pbclawfirm.com, sdupont@pbclawfirm.com

CHRISTOPHER T. HELLUMS    chrish@pittmandutton.com, jills@pittmandutton.com, PDH-efiling@pittmandutton.com

CLEM C. TRISCHLER    cct@pietragallo.com, jmr@pietragallo.com, ren@pietragallo.com, trg@pietragallo.com

CURTIS BRADLEY MINER    curt@colson.com, claudiav@colson.com, michelle@colson.com

DAMON J. BALDONE    damon@baldonelaw.com, thomas@baldonelaw.com

DANIEL A. NIGH    dnigh@levinlaw.com, lmassey@levinlaw.com, mpendley@levinlaw.com

DANIEL AARON RIHN    arihn@peircelaw.com, mrossi@peircelaw.com

DANIEL C. FLEMING    dfleming@wongfleming.com, jmarrazo@wongfleming.com, sshalloo@wongfleming.com

DANIEL CALEB LEVIN    dlevin@lfsblaw.com, jlascio@lfsblaw.com

DANIEL V KOHLS    dkohls@hansenkohls.com, rkytonen@hansenkohls.com, sschiele@hansenkohls.com

DANIEL WILLIAM ROBERTSON    drobertson@hansenkohls.com, rkytonen@hansenkohls.com, sschiele@hansenkohls.com

DAVID E. SELLINGER    sellingerd@gtlaw.com, brunoma@gtlaw.com, mc, NJLitDock@gtlaw.com, whitmana@gtlaw.com

DAVID I. CATES    dcates@cateslaw.com, rmcmanus@cateslaw.com

DAVID JOHN STANOCH    dstanoch@golombhonik.com, cbarnes@golombhonik.com

DAVID LEE HOBBS    david_hobbs@fleming-law.com, ssalvide@fleming-law.com

DAVID MALCOLM MCMULLAN , JR    dmcmullan@barrettlawgroup.com, bhamilton@barrettlawgroup.com, ntmaddux@barrettlawgroup.com

DAWNN ELAYNE BRIDDELL    dbriddell@duanemorris.com, khajna@duanemorris.com

DENNIS M. GEIER    dgeier@cprlaw.com, cmcnelis@cprlaw.com, emorgera@cprlaw.com, klawson@cprlaw.com

DEVORA WHITMAN ALLON    devora.allon@kirkland.com, ecf-b6317641dae4@ecf.pacerpro.com, kenymanagingclerk@kirkland.com

DONALD PATRICK MCKENNA , JR    don@hwnn.com, lynne@hwnn.com

DONALD R. MCMINN    dmcminn@hollingsworthllp.com, don-mcminn-3840@ecf.pacerpro.com, ecfsartan@hollingsworthllp.com, losartan-5194@ecf.pacerpro.com, ngarder@hollingsworthllp.com

EDWIN EARL WALLIS    ewallis@gwtclaw.com, achapman@gwtclaw.com

EIZABETH FLETCHER QUINBY    equinby@preti.com, jcronan@preti.com

ELIZABETH NORRIS    ellie.norris@nortonrosefulbright.com, rodger.penton@nortonrosefulbright.com

EMILY JEFFCOTT    ejeffcott@forthepeople.com

ERIC I. ABRAHAM    eabraham@hillwallack.com, dstipo@hillwallack.com, nshah@hillwallack.com, rfiebig@wileyrein.com

ERNEST F. KOSCHINEG , III    ekoschineg@c-wlaw.com, mwilliams@c-wlaw.com

FRANK SPANO    fspano@polsinelli.com

FRANKLIN GADDY    frank@hickslawoffices.com

GEOFFREY MARVIN COAN    gcoan@hinshawlaw.com, lgrimard@hinshawlaw.com

GEORGE ALLEN BARTON    gab@georgebartonlaw.com

GEORGE T. WILLIAMSON    gwilliamson@farr.com, akibler@farr.com, jbradsher@farr.com

GRANT CAMERON WRIGHT    gwright@hillwallack.com, mverdadero@HillWallack.com

GREGORY PAUL HANSEL    ghansel@preti.com, BClark@preti.com, kwoodman@preti.com, mzschokke@preti.com

HEATHER ANN PIGMAN    hpigman@hollingsworthllp.com, rduncan@hollingsworthllp.com

HENRY SCHWARTZ , I    henry_schwartz@msn.com

HILARY ELIZABETH JOHNSON    hjohnson@crowell.com

HOWARD B. MANKOFF    hmankoff@mdwcg.com

HUNTER J. SHKOLNIK    hunter@napolilaw.com, 1505475420@filings.docketbird.com

IRENE M. MCLAFFERTY    irene@messalaw.com, chill@messalaw.com, dfeltman@messalaw.com

JAMES ALEX WATKINS    jaw@capitelliandwicker.com, michelle@capitelliandwicker.com, scordes@capitelliandwicker.com

JAMES C. SHAH    jshah@sfmslaw.com, nfinkelman@sfmslaw.com, pleadings@sfmslaw.com, smoss@sfmslaw.com

JAMES M. SIMPSON , JR    simpson@fridayfirm.com, enesdahl@fridayfirm.com, jasmith@fridayfirm.com

JAMES R. REEVES , JR    jrr@rmlawcall.com, beh@rmlawcall.com

JANET LYNN POLETTO     jpoletto@hkmpp.com, rblanton@hkmpp.com

JASON CHARLES CHAMBERS     jason@hollislawfirm.com

JASON MICHAEL REEFER     jmr@pietragallo.com, bill.rodgers@mylan.com, bradley.matta@mylan.com, brian.cuthbertson@mylan.com, douglas.miner@mylan.com, dsm@pietragallo.com, elana.williams@mylan.com, trg@pietragallo.com

JASON R. PARISH     jason.parish@bipc.com, alison.sharp@bipc.com, jacqueline.thomas@bipc.com

JASON S. RATHOD     jrathod@classlawdc.com, info@classlawdc.com

JASON TRAVIS BROWN     jtb@jtblawgroup.com, administration@jtblawgroup.com, cocozguan@jtblawgroup.com, nicholasconlon@jtblawgroup.com, patalmonrode@jtblawgroup.com, tonyteng@jtblawgroup.com

JAY PHILIP LEFKOWITZ     lefkowitz@kirkland.com, jay-lefkowitz-2474@ecf.pacerpro.com, kenymanagingclerk@kirkland.com

JEFFREY A. KENNARD     jkennard@sakg.com

JEFFREY DANIEL GEOPPINGER     jgeoppinger@ulmer.com, jsuggs@ulmer.com

JENNIFER A. MOORE     jennifer@moorelawgroup.com, kara@moorelawgroup.com, mary@moorelawgroup.com

JESSICA ANN PRISELAC     jpriselac@duanemorris.com, AWaleko@duanemorris.com, emedina@duanemorris.com

JESSICA MARGARET HEINZ     jheinz@c-wlaw.com, mwilliams@c-wlaw.com

JOHN SAWIN     jsawin@sawinlawyers.com

JOHN D. SILEO     jack@johnsileolaw.com, amanda@johnsileolaw.com, casey@johnsileolaw.com, noele@johnsileolaw.com

JOHN JOSEPH CRONAN , III     jcronan@preti.com

JOHN RANDOLPH DAVIS     jdavis@slackdavis.com, bquestad@slackdavis.com, lstrickland@slackdavis.com

JONATHAN D. JANOW     jonathan.janow@bipc.com, alison.sharp@bipc.com, jacqueline.thomas@bipc.com

JONATHAN S MANN     jonm@pittmandutton.com, jills@pittmandutton.com, PDH-efiling@pittmandutton.com

JOSE D. ROMAN     jroman@lawppl.com, frontdesk@lawppl.com

JOSEPH D. LANE     jlane@cochranfirm.com, EOrtega@CochranFirm.com, joelane@cochranfirm.com, lzander@cochranfirm.com

JOSEPH I. MARCHESE     jmarchese@bursor.com, scott@bursor.com

JOSEPH STEVE PIACUN     jpiacun@gprlawyers.com, ebrune@gprlawyers.com

JOSEPH T. WAECHTER     jwaechter@forthepeople.com, gubiles@forthepeople.com, hcullen@forthepeople.com

JULIA KOESTNER WITTMAN    julia.wittman@quarles.com, debra.hitchens@quarles.com

Justin R. Parafinczuk    jparafinczuk@pwslawfirm.com

KARA KAPKE    kara.kapke@btlaw.com, jperkins@btlaw.com, jsmethers@btlaw.com

KAY L. VAN WEY    courtfilings@vanweylaw.com, jeanne@vanweylaw.com

KELLY A. WATERS    kwaters@wshblaw.com, afioretti@wshblaw.com, kcepuchowicz@wshblaw.com, scoston@wshblaw.com

KENNETH G. GILMAN    kgilman@gilmanpastor.com, rdambrosio@gilmanpastor.com

KENNETH W DEJEAN    kwdejean@kwdejean.com, adam@kwdejean.com, jessicap@kwdejean.com, natalie@kwdejean.com

KIRSTIN B. IVES    kbi@falkenbergives.com, ag@falkenbergives.com

KRISTEN LEE RICHER    kristen.richer@btlaw.com, jerod.williams@btlaw.com

LANNY H. DARR    darr@darrfirm.com, amy@darrfirm.com, kimberly@darrfirm.com

LARACLAY PARKER    lparker@goldenlawoffice.com, jennifer@goldenlawoffice.com

LAUREN ELLIOTT STINE    lauren.stine@quarles.com, DocketAZ@quarles.com, maria.marotta@quarles.com

LEVI M. PLESSET    lplesset@mjfwlaw.com, abrazel@mjfwlaw.com, mfox@mjfwlaw.com

LINDA WONG    lwong@wongfleming.com, Anavarro@wongfleming.com, obrennan@wongfleming.com, sshalloo@wongfleming.com

LLOYD WEAVERR GATHINGS , II    lgathings@gathingslaw.com

LORI G. COHEN    cohenl@gtlaw.com, cruzo@gtlaw.com

LOUIS FRANCIS TUMOLO    louis.tumolo@beasleyfirm.com, lt1@beasleyfirm.com

Luke Bresnahan    lbresnahan@crowell.com

MARK R. MUELLER    mark@muellerlaw.com, aeddy@muellerlaw.com, receptionist@muellerlaw.com, sfaries@muellerlaw.com

MARLENE J GOLDENBERG    mjgoldenberg@goldenberglaw.com, LMainguy@goldenberglaw.com, rarchambeau@goldenberglaw.com, scherif@goldenberglaw.com

MARTIN DANIEL CRUMP    martin.crump@daviscrump.com, latrisha@daviscrump.com, robert.cain@daviscrump.com, susan.gavagnie@daviscrump.com, taylor.hardenstein@daviscrump.com

MATIAS JOSE ADROGUE    service@mjalawyer.com, mja@mjalawyer.com

MATTHEW D. KNEPPER    matt.knepper@huschblackwell.com

MATTHEW PALMER LAMBERT    plambert@gainsben.com, cberg@gainsben.com, lstevens@gainsben.com,

6/16/2020
Case 1:19-md-02875-RBK-SAK   Document 2373   Filed 05/10/23   Page 103 of 111 PageID:
CMECF LIVE - U.S. District Court for the District of New Jersey
85250

mennis@gainsben.com

MEGAN A. ZMICK     maz@falkenbergives.com, ag@falkenbergives.com

MEGAN E. GROSSMAN     Megan.Grossman@lewisbrisbois.com, Claire.Reeves@lewisbrisbois.com,
Myra.Lewis@lewisbrisbois.com

MELISSA S. GELLER     msgeller@duanemorris.com, AutoDocketNWK@duanemorris.com,
CAllagoa@duanemorris.com, DCismowski@duanemorris.com

MICHAEL A. LONDON     mlondon@douglasandlondon.com, adileo@douglasandlondon.com,
gdouglas@douglasandlondon.com, kpadden@douglasandlondon.com, lferrante@douglasandlondon.com,
lgreenberg@douglasandlondon.com, lmaldonado@douglasandlondon.com, lsay@douglasandlondon.com,
rnewman@douglasandlondon.com, vanello@douglasandlondon.com

MICHAEL C. SALVO     michael.salvo@admlaw.com, kaitlyn.Fraser@admlaw.com, msalvo@verizon.net

MICHAEL CARROLL SCHAFLE     mschafle@greenlegalteam.com, dcarney@greenlegalteam.com

MICHAEL CHARLES ZOGBY     michael.zogby@faegredrinker.com, tina.tucci@faegredrinker.com

MICHAEL J. OGBORN     mike.ogborn@omtrial.com

MICHAEL JOSEPH MODL     mmodl@axley.com, lniebuhr@axley.com

MICHAEL L. KELLY     mlk@kirtlandpackard.com, mfc@kirtlandpackard.com

MICHAEL P. MCGARTLAND     mike@mcgartland.com, Stefani@mcgartland.com

MICHAEL S. CATLETT     Michael.Catlett@azag.gov, ACL@azag.gov

MOLLY E. FLYNN     molly.flynn@faegredrinker.com

MORRIS S. DWECK     dweck.morris@gmail.com, cbeboe@bernlieb.com, dburke@bernlieb.com,
dweck@bernlieb.com, ebrown@bernlieb.com, ECalderon@bernlieb.com, gboss@bernlieb.com,
LEidelman@bernlieb.com, mnunez@bernlieb.com, ndube@bernlieb.com, sross@bernlieb.com

MYLES MCGUIRE     mmcguire@mcgpc.com

NAKUL Y. SHAH     nshah@hillwallack.com

NATALIE M. DEJEAN     natalie@kwdejean.com, adam@kwdejean.com, jessica@kwdejean.com

NICHOLAS A. MIGLIACCIO     nmigliaccio@classlawdc.com, info@classlawdc.com

NICHOLAS RYAN ROCKFORTE     nrockforte@pbclawfirm.com

NICHOLAS S. CLEVENGER     nsc@petersonlawfirm.com, csc@petersonlawfirm.com

NICOLE D. GALLI     ndgalli@ndgallilaw.com

PAIGE NICOLE BOLDT     pboldt@wattsguerra.com, amorales2@wattsguerra.com, rcarmony@wattsguerra.com

PAMELA A. BORGESS     pborgess@borgesslaw.com, ebrogan@borgesslaw.com

PATRICK SHANAN MONTOYA    patrick@colson.com, Claudiav@colson.com, yilianne@colson.com

PAUL A. HIGDON    seho@higdonlawyers.com, staff@higdonlawyers.com

PAUL T. GESKE    pgeske@mcgpc.com

PAULINE F. TUTELO    pftutelo@mdwcg.com

PETER D. ST. PHILLIP , JR    pstphillip@lowey.com, 5680211420@filings.docketbird.com

PETER JOSEPH JOHNSEN    peter.johnsen@beasleyfirm.com, lt1@beasleyfirm.com, pj1@beasleyfirm.com

PETER LAWRENCE KAUFMAN    kaufman@psblaw.com, aranda@psblaw.com, lam@psblaw.com

PIUS AKAMDI OBIOHA    pius@obiohalaw.com, pakamdi@aol.com

Patricia L. McGrail    pmcgrail@mcgrailassociates.com

QUENTIN F. URQUHART , JR    qurquhart@irwinllc.com, mries@irwinllc.com

RACHEL GEMAN    rgeman@lchb.com, hselhorst@lchb.com

REBECCA EILEEN BAZAN    rebazan@duanemorris.com

RICHARD LEE ROOT    rroot@morrisbart.com, bbarnes@morrisbart.com, jpalacios@morrisbart.com, lgodshall@morrisbart.com, mreed@morrisbart.com

ROBBIE FREYDA ROGART    rrogart@crowell.com, robbie.rogart@gmail.com

ROBERT ELMORE BLANTON , JR    rblanton@hkmpp.com, asilva@hkmpp.com, jpoletto@hkmpp.com

ROBERT L SACHS , JR    rsachs@shragerlaw.com

ROBIN P LOURIE    robin@lourielaw.net

RODNEY VERIL TAYLOR    rodtaylor@abatelegal.com

ROSALEE B.C. THOMAS    rbcthomas@finkelsteinthompson.com

ROSEMARIE RIDDELL BOGDAN    rrbvalsartan@1800law1010.com, dolores.desalvo@1800law1010.com, kristen.winner@1800law1010.com

RUBEN HONIK    rhonik@golombhonik.com, emalloy@golombhonik.com

SARAH ELIZABETH JOHNSTON    sarah.johnston@btlaw.com, constance.lewis@btlaw.com, docket-la@btlaw.com, jennifer.fukai@btlaw.com

SCOTT A. BURSOR    scott@bursor.com, cpatruno@bursor.com

SCOTT ALLEN BENKIE    sabenkie@aol.com, bclaw@benkiecrawford.com

SEAN PATRICK STEINMAN    ssteinman@ronaustinlaw.com

SEJAL K. BRAHMBHATT    sbrahmbhatt@whlaw.com, nrvera@whlaw.com, rglinski@whlaw.com, scoleman@whlaw.com

SETH A. GOLDBERG    sagoldberg@duanemorris.com, baschwartz@duanemorris.com, CWHill@duanemorris.com, rapone@duanemorris.com

SHEVON D.B. ROCKETT    rockett.shevon@dorsey.com

SIGMUND DAVID SCHUTZ    sschutz@preti.com, jcharron@preti.com

SINDHU SUSAN DANIEL    sdaniel@baronbudd.com, bclark@baronbudd.com, chguerra@baronbudd.com, hwerkema@baronbudd.com, khewlett@baronbudd.com, schakrabarty@baronbudd.com

STACY ANN BURROWS    stacy@georgebartonlaw.com, gab@georgebartonlaw.com

STEFANIE LYNN COLELLA-WALSH    scolella-walsh@stark-stark.com, ccarlson@stark-stark.com, kcalandra@stark-stark.com, rpettiford@stark-stark.com

STEPHEN SKINNER    sskinner@skinnerfirm.com, 6371733420@filings.docketbird.com, craze@skinnerfirm.com

STEVE FARIES    sfaries@muellerlaw.com, aeddy@muellerlaw.com, receptionist@muellerlaw.com

STEVEN C. BABIN , JR    steven.babin@babinlaws.com, 4580358420@filings.docketbird.com, aaron.porterfield@babinlaws.com, elizabeth.robertson@babinlaws.com, emilee.casey@babinlaws.com, kemmily.kwok@babinlaws.com

STEVEN M. HARKINS    harkinss@gtlaw.com, cruzo@gtlaw.com

TERENCE J. SWEENEY    SweeneyLawFirm@optonline.net

THOMAS P. GIUFFRA    slevin@rheingoldlaw.com, mdweck@rheingoldlaw.com

TIMOTHY PATRICK KINGSBURY    tkingsbury@mcgpc.com

TYLER G. JOHANNES    tgj@falkenbergives.com, ag@falkenbergives.com

URIEL RABINOVITZ    urabinovitz@lowey.com, 7845857420@filings.docketbird.com

VICTORIA DAVIS LOCKARD    lockardv@gtlaw.com, cruzo@gtlaw.com

VINITA GANDHI    vinita@yourattorney.com

WALTER H. SWAYZE , III    pete.swayze@lewisbrisbois.com, kelly.liebers@lewisbrisbois.com, megan.grossman@lewisbrisbois.com

WESLEY CHADWICK COOK    chad.cook@beasleyallen.com, crystal.jacks@beasleyallen.com, david.dearing@beasleyallen.com, ellen.royal@beasleyallen.com, tabitha.dean@beasleyallen.com

WYATT JOHN BERKOVER    wberkover@vogelzanglaw.com

Weston P. Pesillo    wpesillo@mcgrailassociates.com

William Morris Bristol    wmb@garyfrankelaw.com

**1:19-md-02875-RBK-JS Notice has been sent by regular U.S. Mail:**

MCGARTLAND


Alan H. Rolnick
COUNSEL NOT ADMITTED TO USDC NJ BAR
Rivero Mestre LLP
2525 Ponce de Leon Blvd.
Suite 1000
Coral Gables, FL 33134

Ali R Yousefi
Law Offices Of Ali Yousefi, P.C.
75 Broadway Street Suite 202
San Francisco, CA 94111

Andrea T McKellar
COUNSEL NOT ADMITTED TO USDC NJ BAR
McKellar Hyde PLC
4235 Hillsboro Pike
Suite 300
Nashville, TN 37215

DREW T DORNER
NOT A MEMBER OF THE USDC NJ BAR
Duane Morris, LLP
505 9th Street, N.W., Suite 1000
Washington, DC 20004

Daniel Chike Obioha
COUNSEL NOT ADMITTED USDC NJ BAR
Law Offices of Pius Obioha and Associates, LLC
1550 North Broad St.
New Orleans, LA 70119

David V. McLendon
COUNSEL NOT ADMITTED TO USDC NJ BAR
Watts Guerra LLP (San Antonio)
4 Dominion Dr.
Bldg. 3
Suite 100
San Antonio, TX 78257

Donecia Banks Miley
COUNSEL NOT ADMITTED TO USDC NJ BAR
Dean Morris, LLC
1505 N. 19th Street
Monroe, LA 71201

ELINOR HART MURAROVA
NOT A MEMBER USDC NJ BAR
Duane Morris LLP

190 S. LaSalle Street
Suite 3700
Chicago, IL 60603

Elizabeth Azadeh Zareh
Zareh and Associates
One Embarcadero
Suite 1020
San Francisco, CA 94111

Evan J. Godofsky
COUNSEL NOT ADMITTED USDC NJ BAR
Larzelere, Picou, Wells, Simpson, Lonero, LLC
Two Lakeway Center
3850 N. Causeway Blvd.
Suite 500
Metairie, LA 70002

Graham Caughman Talley
COUNSEL NOT ADMITTED TO USDC NJ BAR
Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
425 West Capitol Avenue
Suite 1800
Little Rock, AR 72201

Henry R. Schwartz , I
COUNSEL NOT ADMITTED TO USDC NJ BAR
32 Court Street
Ste 908
New York, NY 11201

JESSICA A. PEREZ
COUNSEL NOT ADMITTED TO USDC NJ BAR
PENDLEY BAUDIN & COFFIN LLP
1100 POYDRAS STREET
NEW ORLEANS, LA 70163

Jason Ruskin Reese
COUNSEL NOT ADMTTED TO USDC NJ BAR
WAGNER REESE & CROSSEN, LLP
11939 North Meridian Street
Carmel, IN 46032

KARTIK MADIRAJU
COUNSEL NOT ADMITTED TO USDC-NJ BAR
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
250 HUDSON STREET
8TH FLOOR
NEW YORK, NY 10013

KEVIN F HORMUTH
COUNSEL NOT ADMITTED TO USDC-NJ BAR
GREENSFELDER & HEMKER
EQUITABLE BUILDING

10 SOUTH BROADWAY
SUITE 2000
ST LOUIS, MO 63102

Kathleen M. O'Donnell
COUNSEL NOT ADMITTED TO USDC NJ BAR
ODonnell Law Firm
327 Gorham Street
Lowell, MA 01852

Kelly T. Currie
COUNSEL NOT ADMITTED TO USDC NJ BAR
Crowell & Moring, LLP
590 Madison Avenue
20th Flr
New York, NY 10022

L Clayton Burgess
COUNSEL NOT ADMITTED USDC NJ BAR
Law Office of L Clayton Burgess
605 W Congress St
Lafayette, LA 70501

MARY WU TULLIS
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ PC
165 MADISON AVENUE
SUITE 200
MEMPHIS, TN 38103

MEREDITH PROCTOR GRANT
NOT A MEMBER OF USDC NJ BAR
Duane Morris, LLP
750 B Street
Suite 2900
San Diego, CA 92101
United Sta

MICHAEL L. SLACK
NOT A MEMBER OF USDC NJ BAR
Slack Davis Sanger, LLP
2705 Bee Cave Road
Suite 200
Austin, TX 78746

MICHELLE NICOLE MICHAEL
MARSHALL DENNEHEY WARNER COLEMAN AND GOGGIN
425 EAGLE ROCK AVE.
ROSELAND, NJ 07068

Michael Brandon Smith
COUNSEL NOT A MEMBER OF USDC NJ BAR
Childers, Schlueter & Smith, LLC
Suite 100
1932 North Druid Hills Road

Atlanta, GA 30319

Morgan J. Wells , Jr
COUNSEL NOT ADMITTED USDC NJ BAR
Larzelere, Picou, Wells, Simpson, Lonero, LLC
Two Lakeway Center
3850 N. Causeway Blvd.
Suite 500
Metairie, LA 70002

PAUL EVANS CHRONIS
NOT A MEMBER OF USDC NJ BAR
Duane Morris LLP
190 South LaSalle Street
Suite 3700
Chicago, IL 60603

PAUL G. JOYCE
NOT A MEMBER OF USDC NJ BAR
Colucci & Gallaher, P.C.
2000 Liberty Building
424 Main Street
Buffalo, NY 14202-3695

PAUL STUART ROTHSTEIN
PAUL S ROTHSTEIN PA - GAINESVILLE FL
626 NE 1ST ST
GAINESVILLE, FL 32601

Peter J. Ainsworth
COUNSEL NOT ADMITTED USDC NJ BAR
Meehan, Boyle, Black & Bogdanow, P.C.
Two Center Plaza
Suite 600
Boston, MA 02108-1922

ROBERT A COX
NOT A MEMBER OF USDCNJ BAR
Glassman, Wyatt, Tuttle & Cox, P.C.
26 North Second Street
Memphis, TN 38103

ROBERT K ERLANGER
220 FIFTH AVENUE
SUITE 1702
NEW YORK, NY 10001

SCOTT ANTHONY MORGAN
NOT MEMBER OF USDC NJ BAR
Morgan Law Firm, Ltd.
55 W. Wacker Drive
Suite 900
Chicago, IL 60601

Stanley Paul Baudin
COUNSEL NOT ADMITTED USDC NJ BAR
Pendley, Baudin & Coffin, LLP (Plaquemine)
P. O. Drawer 71
24110 Eden St.
Plaquemine, LA 70765-0071

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-0] [5d79ba1286bd5e0b9b8ff1e6e8a98670b87513b2f004919706276b2afd955c0bd2d07056283f594a58082e7c248ed1aa4c29ae4703528ac982f6d91509fbc4c7]]
**Document description:**Exhibit A - Decl. of Zachary Mikulak
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-1] [1cf74c6742dcffe9901038a0865e537fbd8b38f2ccc183614b504819a1b7cc7eb8a7e56b0f4ac913e03df7f471a5e52418f8087ac2608924c2f8e0ea4452640a]]
**Document description:**Exhibit B - Decl. of John Holderman
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-2] [a4b3f5b03329794f7ea9f6cb8a7900e3581cff63756b1f515e95c135cb5913b648262c6bc110f14e4800696bb4c2516230006db05f2f7f772cdace2aa2fef4ce]]
**Document description:**Exhibit C - Decl. of Grace Allen
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-3] [b07652d7c613997c304904095cec61e553a9ccb40150d544716484e03568db0867e9ecf61b588f411a344dbe63fb34cfbbe196066e7480dec8e9afa2c0784ebf]]
**Document description:**Exhibit D - Decl. of Danny Tsai
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-4] [12b6428116ed85773be60460fae3258c34752bd0e226802ac5345eb9ae57f9fe3078365c7f223ccba8450f4985c26d64a47fa6078a46be3a7e6a8a569304714f]]
**Document description:**Exhibit E - Decl. of Matt Perlberg
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-5] [05520dd0b9e7f07d07aa8175c092ee80fd10a09ccf9593e15265c613dfc2dad76459cfbeccd9acf873c034751c7ebf4d0c4976d709711e81c8bb7025eff0752d]]
**Document description:**Exhibit F - Decl. of Dick Derks
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-6] [40bf7c6168bf88177b36077396599bef84d988fa2b2622a9e0d208bd68b10c8dede2db9e2ecc1dd76511dfac760ff2d29f119a1e4369dbefea0e2e2e97d302d1]]
**Document description:**Exhibit G - Decl. of Owen P. McMahon
**Original filename:**n/a
**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-7] [4b5523f73da4a02a18cc8798aaf32ba57c61172233e6772b5d167f0ff73f6bcfb0 dc6cd0502656d79d8425b062c25032773c69e7f2e2ec359acb860e4f6e0693]]

**Document description:**Exhibit H - Decl. of Britt Turner
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-8] [2ace0d31cd95f3c01fd730bb0334179640d562dff12f1267c71bb3c2da0dcf8ab1 0ba1ba2088c5d69ba06c6bfb031ac912574f62993b42a996d4c0583f7237c5]]

**Document description:**Exhibit I - Decl. of Erin McCoy
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-9] [519c29a8c5358e23ecb131c66abdb049aed8e8433b81140e06d5c153bd954e4148 f4a49066ef4baaa13935fef232e5078da772ba89668df190adaf39ba53eda3]]

**Document description:**Exhibit J - Decl. of Megan Mistarz
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-10] [a4af0f0368117c3feca67400e26d3c316cb57411a924735bb619549b257d08713 901f919f77cee6dfd 7c1a5114590dc750a6bae1daaca3f8d305abee72d123c5]]

**Document description:**Exhibit K - Decl. of Michael Viirre
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-11] [669fa2aac7e030bca62ab3422408ee813657359f23d92cfa6a2ca2101b51a223d 206329cbe08072f4b1f918a4fc1ce49d132ab37fc79d508c3b779137a149535]]

**Document description:**Exhibit L - Decl. of Tony Braun
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-12] [8950e14b024a1f8ce95ffc75de863151572ddc13d4717e8b1420c8a06f583739e 4f02369d0297da5300cb0b265c46ba4d738deb39ca072c23f91694610338d0c]]

**Document description:**Exhibit M - Decl. of Britt Turner
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-13] [b23031d1e6c394c3d228109f73b32086e3f86e6df70a4b0eb5526268096fa8817 50f3ed0937b1baff595f6ad351ca3de5c64558b9ce98352a61ad9aa5ec106ab]]

**Document description:**Exhibit N - Decl. of Alison Farrell
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1046708974 [Date=6/16/2020] [FileNumber=13794246-14] [131617c24759341f9262225f3b639ced9c993ac1ddddb454e3390a4ca7c78b798 6fdfa4dff941fb6815c52da1754ec59fc04a4cbf0d31cfc0766efb55f315daf]]

☐☐☐☐