GT GreenbergTraurig

Victoria Davis Lockard
Tel 678.553.2100
Fax 678.553.2212
lockardv@gtlaw.com

May 15, 2023

**VIA ECF**

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
1500 Market Street, East Tower
18th Floor
Philadelphia, PA 19103

**Re: In re Valsartan, Losartan, and Irbesartan Products Liability Litigation**
**Case No. 1:19-md-02875-RBK-SAK**

Dear Special Master Vanaskie:

This letter is to provide Defendants' position with respect to the topics on the agenda for the Teleconference with Your Honor on May 17, 2023. The parties do not expect the need to discuss any confidential materials as part of these agenda items.

**1. Rule 702 Motion to Seal Briefing Schedule**

The parties have discussed and agreed on a proposed joint extension of the currently applicable deadlines related to documents designated confidential that were filed in redacted form on the public docket in connection with the Rule 702 briefing on case-specific liability experts completed on April 25, 2023. The parties propose that the deadline for filing any motions to seal be extended from May 25, 2023, to June 15, 2023, to allow the parties to meet and confer and brief only those issues which cannot be resolved by agreement, with the corresponding deadline for responding to any sealing motions being extended to July 10, 2023. If the Court approves, the parties can prepare a proposed order memorializing these new deadlines.



**2. Discovery Requests Relating to Plaintiffs' Proposed Class Notice Program**

The Manufacturer Defendants have served Plaintiffs with ten discovery requests relating to Plaintiffs' Motion for Approval of Form and Manner of Class Notice [Dkt. 2375] ("Class Notice Plan"), filed on May 10, 2023. According to the accompanying Declaration of Steven Weisbrot, Esq. [Dkt. 2375-4] ("Weisbrot Dec."), the Class Notice Plan contemplates notice to the Third-Party Payor ("TPP") Economic Loss Class by "direct notice via mail to approximately 28,500 mailing addresses on Angeion's proprietary third-party payor list," which "consists of drug stores, pharmacies, insurance companies, and health, welfare, and pension funds," plus such other TPPs via mail or email as Defendants may provide. (Weisbrot Dec. ¶ 16). The Class Notice Plan further contemplates notice to the Consumer Economic Loss Class and Medical Monitoring Class by Programmatic Display Advertising, including a variety of digital tactics, social media tactics, and paid search campaigns, all of which are described in general terms in Mr. Weisbrot's Declaration, together with unsubstantiated estimates of the anticipated reach and frequency of the proposed digital advertising campaign. (*Id.* ¶¶ 13-14, 23-24, 26, 29, 31-32, 34, 39-40).

It is Plaintiffs' burden to demonstrate that their Class Notice Plan provides "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Third Circuit is "stringent in enforcing the individual notice requirements." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 164 (3d Cir. 2015); *see also Larson v. AT&T Mobility LLC*, 687 F.3 109, 126 (3d Cir. 2012). The Manufacturer Defendants are unable to determine, from the face of the Class Notice Plan and supporting materials, whether and how it achieves the goals of "the best notice that is practicable" and "individual notice to all class members who can be identified through reasonable effort."



Notably, Plaintiffs' Class Notice Plan does not employ any of the methods identified by Plaintiffs' ascertainability expert, Laura R. Craft [Dkt. 1748-2 ("Craft Decl.")], submitted in support of Plaintiffs' Motion for Class Certification. Ms. Craft described methodologies she contended could be employed to "***identify*** consumer and TPP Class Members using electronic data common to the Proposed Classes." (Craft Decl. ¶ 8 (emphasis added); *see also id.* ¶¶ 9-72). The District Court's class certification opinion relied upon Ms. Craft's methodologies in finding Plaintiffs had satisfied Rule 23's implied ascertainability requirement. [*See* Dkt. 2261 at 24-29, 41-42, 66-67]. Yet Plaintiffs' Class Notice Plan does not propose to use any of Ms. Craft's methodologies to identify class members to receive individual notice under Rule 23(c)(2)(B). Instead, Plaintiffs have proposed to notify TPP Class members by use of a previously undisclosed and unevaluated "proprietary third-party payor list" that includes entities that are not part of the TPP Economic Loss Class—specifically, "drug stores" and "pharmacies." Plaintiffs have further proposed to notify potential Consumer Economic Loss and Medical Monitoring Class members through a digital media campaign that, evidently, does not contemplate any individual notices at all. The disconnect between Plaintiffs' ascertainability showing and their Class Notice Plan raises serious concerns as to whether the Class Notice Plan satisfies Rule 23(c)(2)(B)'s "best notice practicable" and "individual notice" requirements. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 305-06 (3d Cir. 2013) (noting that one of the purposes of the ascertainability requirement is to "protect[] absent class members by facilitating the bast notice practicable under Rule 23(c)(2) in a Rule 23(b)(3) action").

To address these concerns and to evaluate the sufficiency of Plaintiffs' Class Notice Plan, the Manufacturer Defendants sent a letter to the Plaintiffs' Executive Committee ("PEC") on May

Special Master the Honorable Thomas Vanaskie
Page 4

11, 2023, containing ten discovery requests. *See* Letter from G. Ostfeld dated May 11, 2023, attached hereto as **Exhibit A**. The ten discovery requests seek to explore, *inter alia*: the contents of the mailing list proposed to be used for notice to the TPP Economic Loss Class; a more complete description and details of the proposed Programmatic Display Advertising campaign, digital tactics, social media tactics, and paid search campaign to be used for notice to the Consumer Economic Loss and Medical Monitoring Classes; the bases and calculation of Mr. Weisbrot's rate and frequency estimates; the performance metrics and reports to be used as part of the digital campaign; the contents of the proposed dedicated web-site and scripts for the toll-free telephone support number; and the deposition of Mr. Weisbrot. The Manufacturer Defendants believe all of these requests are directly relevant to the requirements of Rule 23(c)(2).

Counsel for Plaintiffs and the Manufacturer Defendants held an initial meet-and-confer call on Friday, May 12, 2023, and made some progress on the requests, with many open questions remaining. Although the Manufacturer Defendants intend to continue their discussions with Plaintiffs' counsel and hope many of the discovery requests can be resolved by agreement, any issues that remain unresolved by the time of the May 17, 2023 biweekly meeting may require the Special Master's attention, as Defendants' response to the Class Notice Plan is currently due on May 24, 2023, pursuant to Case Management Order 32 [Dkt. 2343] ("CMO 32"), entered by the District Court on April 21, 2023. *See* CMO 32 § 2.0 (ordering a response to the Class Notice Plan by May 24, 2023).

Due to the many unresolved discovery requests and uncertainties concerning the scope and effect of Plaintiffs' Class Notice Plan, the Manufacturer Defendants also request that the Court extend the deadline for Defendants' response to the Class Notice Plan. The parties had originally

GREENBERG TRAURIG, LLP ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM
Terminus 200 Building, 3333 Piedmont Road NE, 25th Floor ■ Atlanta, Georgia 30305 ■ Tel 678.553.2100 ■ Fax 78.553.2212



agreed and proposed that Defendants submit their responses and objections to Plaintiffs' Class Notice Plan by June 7, 2023, with Plaintiffs' reply due June 28, 2023, with Plaintiffs stating they were also "willing" to enter a shorter schedule. *See* Plaintiffs' Letter to Judge Kugler dated April 12, 2023 [Dkt. 2338] at 3; Defendants' Letter to Judge Kugler dated April 12, 2023 [Dkt. 2339] at 2. The District Court adopted the shorter schedule in CMO 32, setting a response deadline of May 24, 2023 and a reply deadline of June 7, 2023. Given the complexity of Plaintiffs' Class Notice Plan, the submission of an expert declaration in support of the plan, the necessity of discovery to understand the details of the plan, and the fact that certain important aspects of the Class Notice Plan (*e.g.* the contents of the web site and scripts for the toll-free telephone support number) are not yet ready, the Manufacturer Defendants respectfully submit the original briefing scheduled agreed by the parties is more appropriate to enable discovery to be completed and to facilitate a full and meaningful evaluation of the Class Notice Plan in accordance with the rigorous requirements of Rule 23(c)(2).

**3. MSPRC Discovery Deficiencies**

The TPP Defendants intend to move for an order to show cause why Plaintiff MSP Recovery Claims, Series LLC ("MSPRC") should not be sanctioned under Fed. R. Civ. P. 37(b), for its failure to comply with Special Master Order No. 73 [Dkt. 2249] ("SMO 73"), entered by the Special Master on January 24, 2023, and CMO 32. SMO 73 ordered MSPRC to produce "the documents reflecting the subsidies, reimbursements, and rebates it received from CMS during the time period for which it is seeking damages." SMO 73 at 4. CMO 32 ordered MSPRC to complete its rolling productions by May 3, 2023. CMO 32 § 3.0. Notwithstanding these two orders, MSPRC failed to produce the substantial majority of documents responsive to SMO 73 by May 3, 2023.



The TPP Defendants wrote to MSPRC's counsel and the PEC on May 9, 2023, demanding production of the missing documents by Friday, May 12, 2023. *See* Letter from G. Ostfeld dated May 9, 2023, attached hereto as **Exhibit B**. MSPRC responded on May 12, 2023, refusing to producing any additional documents. *See* Letter from J. Mestre dated May 12, 2023, attached hereto as **Exhibit C**.

The parties have set a meet-and-confer for Tuesday, May 17, 2023. If that meet-and-confer does not result in MSPRC's full compliance with SMO 73 and CMO 32, the TPP Defendants intend to proceed with their motion for an order to show cause. Because production of the missing documents is necessary for the TPP Defendants to complete their damages expert reports, which are due on June 7, 2023, the TPP Defendants include this issue in their position statement so that the Special Master may address it at the May 17, 2023 biweekly meeting, ahead of that deadline. The TPP Defendants further propose that the June 7, 2023 deadline should be extended until 35 days after Plaintiffs comply in full with SMO 73, in order to preserve the timeline contemplated by CMO 32 and 32A that the TPP Defendants' damages expert reports would be due 35 days after MSPRC completed its rolling production of documents directed by SMO 73.

### A. SMO 73 Ordered MSPRC to Produce Responsive Subsidy, Reimbursement, and Rebate Documents and Data, Which Include 14 Categories of Standard Reports and Datasets

SMO 73 granted in part the TPP Defendants' Joint Motion to Compel Production of Documents and Data Relevant to Plaintiff's Alleged Damages [Dkt. 2178] ("Motion to Compel"). Specifically, the Special Master granted the Motion to Compel with respect to Request No. 2:

> Request 2. **Subsidy, Reimbursement, and Rebate Data**: Data [in Excel format] and reports reflecting subsidies, reimbursements, and rebates that You received from CMS [Center for Medicare and Medicaid Services], including but not limited to prescription drug



> event ("PDE") reports and all PDE payment records reflecting reimbursements and payments for valsartan-containing drugs, ***and other standard reports and data available through CMS which reflect payments made or received by You for any prescription drugs for Insureds enrolled in Your Plans during the Relevant Time Period, such as Monthly Membership Summary Reports, Plan Payment Reports, [and] Payment/Interim Plan Payment Records Reports***.

[Dkt. 2178-1 at 2 (emphasis added)]. The TPP Defendants identified with specificity in their supporting brief a list of the fourteen responsive reports and datasets encompassed by Request No. 2 (the "14 Reports and Datasets"):

- Monthly Membership Reports (MMR)
- Monthly Membership Summary Data Reports (MMSR)
- Monthly Membership Summary Data Files (MMSD)
- Plan Payment Reports (PPR)
- Plan Payment Report/Interim Payment Data Files (IPPR)
- Payment Records Reports
- Payment Reconciliation System (PRS) annual reports detailing the annual reconciliation based on PDE records
- Risk Adjustment System (RAS) Prescription Drug Hierarchical Condition Category (RxHCC) Model Output Data Files
- RAS RxHCC Model Output Reports
- Medicare Advantage Organization (MAO) 004 Reports – Encounter Data Diagnosis Eligible for Risk Adjustment
- Prescription Drug Event (PDE) Submittal File
- Prescription Drug Event (PDE) PDFS Response Data File
- Prescription Drug Event (PDE) DBC Cumulative Beneficiary Summary Report
- COB-OHI files and COB-OHI Supplement Records, which include National Drug Codes (NDCs) submitted by Patient Assistance Programs (PAPs).

[*Id*. at 7-8]. MSPRC opposed this request and filed a brief in opposition. [Dkt. 2181].

The Special Master heard extensive argument from the parties at the October 27, 2022 Case Management Conference. The arguments made during that hearing meaningfully inform the present dispute, and specifically the recognition of all parties and the Special Master that Request No. 2 was inclusive of the 14 Reports and Datasets. *See* Transcript of Oct. 27, 2022, Case Management Conference ("Oct. 27 Tr."), attached hereto as **Exhibit D**. Plaintiffs' counsel first

acknowledged that it was relevant to the damages calculation under their own "point of sale" measure of damages to identify "what was paid and what was reimbursed," which requires the production of "the historical numbers" and "historical data so that [TPP Defendants] understand what the actual dollars are." Oct. 27 Tr. at 22:14-19. Yet Plaintiffs' counsel also questioned the ability of the TPP Defendants' experts to "disaggregate" the Medicare subsidy, reimbursement, and rebate data and "[t]o tease out in the aggregate what the assignors got from Medicare and how it did or did not relate to valsartan," which Plaintiffs' counsel insisted was necessary "[f]or the aggregate information to be relevant, they have to have a means to disaggregate." *Id*. at 30:7-15. Plaintiffs then proposed in the "nature of a compromise" that MSPRC produce ***all*** of the requested reports and data only for "the year of the recall," as well as reports (*i.e.* the PDE reports) relating to subsidies during the "catastrophic and low income" phases of Medicare coverage for two years, and then allow TPP Defendants to "come back" and seek more. *Id*. at 31-21-33:3.

The TPP Defendants opposed the proposed "compromise," arguing that the Medicare reports and data were demonstrably relevant, and "[t]he opportunity to look at government expenditures, the opportunity to determine whether those can be disaggregated, whether those can be subtracted from plaintiffs' assessed damages calculation … is directly relevant to what is at issue in this case." *Id*. at 36:24-38:2. The TPP Defendants expressly referenced the 14 Reports and Datasets as "the specific reports and specific datasets we believe are responsive to request number 2" listed in the TPP Defendants' motion, and noted that these 14 Reports and Datasets are all "pre-baked" and accessible and Plaintiffs had made no showing that it would be burdensome to produce them. *Id*. at 38:20-39:22. Plaintiffs' counsel then spoke for several more minutes reiterating their arguments regarding the disaggregation of data, but never disputed that MSPRC could produce all

of the 14 Reports and Datasets, never argued that it would be burdensome to do so, and repeated the proposed compromise to produce all of the materials requested for one year and certain categories for two years. *Id*. at 39:23-43:1.

The Special Master then asked the TPP Defendants' counsel to further address Plaintiffs' proposal to produce "limited data," and the TPP Defendants' counsel again noted that the request was seeking "14 specific data reports and 14 specific datasets over a limited period of time," and producing those 14 Reports and Datasets "over the full period of time versus producing it over a year or two, you're talking about essentially the same amount of efforts. So it is a limited amount of data, but it will enable our experts to undertake a comprehensive analysis." *Id*. at 45:16-22.

Following briefing and argument, the Special Master entered SMO 73 granting the TPP Defendants' Motion to Compel with respect to Request No. 2. The Special Master found, "The extent to which such payments [by TPPs for at-issue valsartan drugs] were offset by subsidies, reimbursements or rebates from CMS appears clearly relevant to the determination of actual damages sustained by the alleged contamination of the VCDs." SMO 73 at 3-4 (citing *In re Namenda Indirect Purchaser Antitrust Litig*., 115CV6549CMRWL, 2022 WL 3362429, at *11 (S.D.N.Y. Aug. 15, 2022)). The Special Master also specifically rejected MSPRC's argument that "aggregate" data are not relevant, holding: "The fact that the data are aggregated, and not produced on a per product basis, does not defeat the relevance of such data. Indeed, such data may be important in contesting damage calculations made by Plaintiff's experts." *Id*. at 4. Thus, the Special Master concluded: "Accordingly, MSPRC will be directed to produce ***the documents reflecting the subsidies, reimbursements, and rebates*** it received from CMS during the time period for which it is seeking damages." *Id*. (emphasis added).



**B. MSPRC Has Violated SMO 73 and CMO 32 by Failing to Produce the Responsive Subsidy, Reimbursement, and Rebate Documents and Data It Was Ordered to Produce**

MSPRC has failed and refused to comply with SMO 73. Although productions were temporarily suspended following entry of the Court's class certification order, the District Court resumed discovery with the entry of CMO 32. Among other provisions, CMO 32 directed MSPRC to complete its rolling production by May 3, 2023. *See* CMO 32 § 3.0.

The May 3 deadline has passed and MSPRC has not produced the substantial majority of the 14 Reports and Datasets. As of May 3, MSPRC had produced only a portion of its PDE data, omitting PDE claims data for EmblemHealth for date of service year 2014, omitting all PDE data for ConnectiCare claims, and omitting all of the other 14 Reports and Datasets encompassed by Request No. 2. Thus, the following data and reports (the "Missing Production Materials") remain outstanding:

- Prescription Drug Event (PDE) data files for EmblemHealth for date of service year 2014
- PDE data files for ConnectiCare
- Monthly Membership Reports (MMR)
- Monthly Membership Summary Data Reports (MMSR)
- Monthly Membership Summary Data Files (MMSD)
- Plan Payment Reports (PPR)
- Plan Payment Report/Interim Payment Data Files (IPPR)
- Payment Records Reports
- Payment Reconciliation System (PRS) annual reports detailing the annual reconciliation based on PDE records
- Risk Adjustment System (RAS) Prescription Drug Hierarchical Condition Category (RxHCC) Model Output Data Files
- RAS RxHCC Model Output Reports
- Medicare Advantage Organization (MAO) 004 Reports – Encounter Data Diagnosis Eligible for Risk Adjustment
- COB-OHI files and COB-OHI Supplement Records, which include National Drug Codes (NDCs) submitted by Patient Assistance Programs (PAPs).

MSPRC has never disputed that the 14 Reports and Datasets, including all of the Missing Production Materials, are documents "reflecting the subsidies, reimbursements, and rebates" its assignors "received from CMS during the time period for which it is seeking damages." SMO 73 at 4. Thus, the Missing Production Materials fall within the plain language of SMO 73's mandate. MSPRC's failure and refusal to produce the Missing Production Materials are consequently a direct and clear violation of SMO 73 and CMO 32.

The TPP Defendants sent a deficiency letter to MSPRC's counsel and the PEC on May 9, 2023, demanding compliance by May 12. *See* Ex. B. Prompt compliance is essential, because the TPP Defendants' damages expert reports are due on June 7, 2023, and the defense experts need time to analyze the Missing Production Materials. Doing so is likely to require multiple weeks, as reflected by the 35-day period between the completion of MSPRC's rolling production (May 3) and the deadline for the TPP Defendants' damages expert reports (June 7). MSPRC's delinquent production is thus directly impeding expert discovery and progress towards the depositions of damages experts as ordered by CMO 32. The TPP Defendants also offered to meet-and-confer, and provided dates and times from May 10-12.

MSPRC responded on May 12, 2023. *See* Ex. C. It refused to produce any of the Missing Production Materials. Disregarding the plain language of SMO 73, as well as Request No. 2, the parties' briefs, and the arguments made by Plaintiffs' counsel at oral argument, MSPRC now asserts it has complied with SMO 73, insists it is not required to produce data "in the format that Defendants would have liked or the precise form to which Defendants believe they are entitled," and states that SMO 73 "didn't order the data to be produced on a specific form[.]" Ex. C at 1-2.



These contentions are simply false. SMO 73 is not ambiguous. It directs MSPRC to produce "the documents reflecting the subsidies, reimbursements, and rebates" its assignors received from CMS during the relevant time period. SMO 73 at 4. The Missing Production Materials indisputably fit this description. Nor was there ever any question as to their inclusion in Request No. 2. The request itself specifically sought all data and reports "reflecting subsidies, reimbursements, and rebates" received from CMS, including "standard reports and data available through CMS … such as ***Monthly Membership Summary Reports, Plan Payment Reports, [and] Payment/Interim Plan Payment Records Reports***." [Dkt. 2178-1 at 2 (emphasis added)]. More than that, the TPP Defendants specifically listed the 14 Reports and Datasets in their Motion to Compel as the list of "standard reports and data" responsive to Request No. 2. [*Id*. at 7-8]. Further, the TPP Defendants repeatedly referenced these 14 Reports and Datasets as responsive at oral argument, without contradiction by MSPRC when it proposed its rejected "compromise" of one year of responsive reports and data. Rule 34 requires MSPRC to produce the responsive materials in its "possession, custody, or control," not the cherry-picked items it deems sufficient after being ordered to comply with Request No. 2. Fed. R. Civ. P. 34(a)(1). This is not a matter of failing to produce responsive documents or data in the format the TPP Defendants "would have liked," but rather a direct violation of the clear and unambiguous mandate of SMO 73.

MSPRC's excuses for its violations of SMO 73 have no merit. First, MSPRC points to certain "excel sheets" it produced, which it claims "show[] all the payments that it received from CMS that could relate to the claims at issue." Ex. C at 2. MSPRC further asserts that the TPP Defendants "fail to identify what additional data they hope to glean from the fourteen specific forms that they identify in their letter" or "how that data would be any different from the data that

MSPRC has already produced[.]" Ex. C at 2. The TPP Defendants are not required, of course, to make yet another showing that the 14 Reports and Datasets are relevant; SMO 73 already decided that issue and ordered them produced.

Regardless, MSPRC's position is deeply disingenuous. As MSPRC is well aware, its "excel sheets" contain nowhere close to the same level of detail available in the 14 Reports and Datasets. The excel sheets (which are designated confidential and therefore are not attached to this letter, but will be made available to the Special Master on request), present data at the highest and least useful level of abstraction. They contain only contract-level summaries of direct subsidies and certain other amounts at the broadest level of aggregation. They contain ***no*** beneficiary-level detail at all, such as hierarchical condition categories ("HCCs"), diagnosis codes, or beneficiary-specific direct subsidy payment amounts. These are the essential details necessary to perform the "disaggregation" that Plaintiffs themselves argued must be undertaken in order to render the subsidy, reimbursement, and rebate data relevant to damages. Oct. 27 Tr. at 30:7-15.

Plaintiffs' motives for violating SMO 73 are clear: they seek to protect their damages expert from criticism by depriving the TPP Defendants' damages experts of the very beneficiary-level data and detail necessary to demonstrate the relevance of the Medicare subsidies, reimbursements, and rebates to Plaintiffs' damages calculations, and the errors of Plaintiffs' damages expert in failing to account for them. That is invalid. MSPRC's obligation is to produce the responsive documents "in the responding party's possession, custody, or control," not just the least useful and least informative iteration of responsive data that MSPRC is able to identify and is willing to supply in defiance of a court order. Fed. R. Civ. P. 34(a)(1).



Second, MSPRC asserts that "many" of the Missing Production Materials "would include data that the Court expressly held that MSPRC did not have to produce, such as highly confidential information related to the assignors' bids." Ex. C at 2. MSPRC never previously objected to producing any of the 14 Reports and Datasets on this basis and offers no explanation for it now. It is non-sensical. What SMO 73 held MSPRC did not have to produce was "CMS bids," comprised of all materials "submitted in connection with … bid submissions to CMS" for each contract year. SMO 73 at 2, 5. The Special Master specifically distinguished bid submissions, which deal with "*estimated* receipts and expenditures," from "what actually occurred, as opposed to what was estimated or projected to happen." *Id*. at 5-6 (emphasis in original). None of the Missing Production Materials deal with "estimated" or "projected" receipts or expenditures; they are all historical reports of "what actually occurred." The Missing Production Materials are the very records of "what was paid and what was reimbursed" that Plaintiffs' counsel has acknowledged to be relevant as "historical numbers" and "historical data." Oct. 27 Tr. at 22:14-19.

Third, MSPRC acknowledges it has not produced EmblemHealth PDE data for 2014, but asserts only that EmblemHealth "has provided all the PDE data that it possesses for the claims at issue," and states "MSPRC cannot produce what does not exist." Ex. C at 1. Although that is undoubtedly true, it raises significant concerns as to why EmblemHealth retained and produced PDE data for 2013 and 2015 to 2017, but not 2014. EmblemHealth's failure to retain and produce relevant data requires more explanation to the TPP Defendants and the Special Master than a bare denial that the data and records exist.

Fourth, MSPRC misleadingly asserts that it is not required to produce PDE data for ConnectiCare, because SMO 73 relates to the claims "assigned to MSPRC" by two TPPs,



EmblemHealth and Summacare. What MSPRC omits is the fact that ConnectiCare is a subsidiary of EmblemHealth, and Plaintiffs' own damages expert has ***included*** ConnectiCare's claims data and a calculation for ConnectiCare's damages as part of her damages calculation for the claims assigned to MSPRC by EmblemHealth. Plaintiffs cannot have it both ways. If ConnectiCare's claims are part of EmblemHealth's claims for purposes of calculating MSPRC's damages, then ConnectiCare's reports and data must be produced as part of EmblemHealth's production for purposes of evaluating EmblemHealth's damages calculation.

**C. MSPRC's Violations Warrant an Order to Show Cause Why MSPRC Should Not Be Subject to Sanctions and Other Relief**

MSPRC's violations of SMO 73 and CMO 32 support sanctions under Rule 37(b)(2)(A), which authorizes the Court to impose sanctions if a party "fails to obey an order to provide or permit discovery[.]" Fed. R. Civ. P. 37(b)(2)(A). Here, SMO 73 ordered MSPRC to provide discovery and CMO 32 set a deadline for MSPRC to do so. MSPRC violated both orders. Sanctions at the Court's disposal include, but are not limited to, "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," "striking pleadings in whole or in part," "staying further proceedings until the order is obeyed," "dismissing the action or proceeding in whole or in part," or "treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination." *Id*. Instead of or in addition to the foregoing sanctions, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).



Rule 37 sanctions "are available to the district court 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent[.]'" *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006) (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)). The Court "has broad discretion regarding the type and degree of sanctions it can impose," so long as the sanctions are "just and related to the claims at issue." *Id.* (citing *Estate of Spear v. Comm'r of Internal Revenue Serv.*, 41 F.3d 103, 109 (3d Cir. 1994)). *See also Harris v. City of Philadelphia*, 47 F.3d 1311, 1330 (3d Cir. 1995).

Appropriate sanctions for MSPRC's violations of SMO 73 and CMO 32 include: (1) striking Plaintiffs' damages report and prohibiting Plaintiffs from presenting a damages calculation in reliance upon that report; (2) disqualifying MSPRC from serving as a class representative; (3) staying proceedings until MSPRC complies with SMO 73; (4) holding MSPRC in contempt for its failure to comply with SMO 73 and CMO 32; and (5) ordering MSPRC to pay the reasonable expenses, including attorney's fees, caused by its failure to comply with SMO 73 and CMO 32. Any or all of these sanctions are just and related to the claims at issue, insofar as MSPRC's failure to comply with SMO 73 has substantially prejudiced the TPP Defendants' ability to evaluate Plaintiffs' damages report, to prepare their responsive expert damages reports, and to comply with the deadlines set forth in CMO 32 for expert disclosures and depositions. In the first instance, however, MSPRC should be ordered to show cause why it should not be sanctioned for its violations of SMO 73 and CMO 32, the TPP Defendants can reply, and the Special Master may then take the issue up for resolution or for recommendation to the District Court, as appropriate.



**D. The June 7, 2023 Deadline for the TPP Defendants' Damages Expert Reports and Schedule for Deposing Damages Experts Should Be Extended Until 35 Days After MSPRC Complies with SMO 73**

MSPRC's violations of SMO 73 and CMO 32 also directly impact the schedule set out by the District Court in CMO 32. Under CMO 32, as modified by CMO 32A on April 27, 2023 [Dkt 2368], the TPP Defendants are required to "submit their response to the report of plaintiffs' damages expert Dr. Rena Conti" by June 7, 2023. CMO 32A § 8.1. The parties are also to "submit a schedule for deposing the damages experts" by June 7, 2023. *Id*. § 8.2.

For the reasons described above, MSPRC's failure to produce the Missing Production Materials has directly impacted the ability of the TPP Defendants' damages experts to complete their responses to Dr. Conti's damages report. In particular, the TPP Defendants' experts cannot complete their analysis regarding the impact of Medicare subsidies, reimbursements, and rebates upon Dr. Conti's damages calculations, because MSPRC's violation of SMO 73 and CMO 32 has deprived them of timely access to the reports and datasets necessary to this analysis.

If MSPRC had timely produced the Missing Production Materials by May 3, 2023, as directed by CMO 32, the TPP Defendants' experts would have had 35 days to analyze the materials and to incorporate them into their expert reports. Accordingly, to mitigate the prejudice created by MSPRC's violations, the TPP Defendants' deadline of June 7 to submit their responsive reports and to submit a schedule for deposing the damages experts should be extended until 35 days after MSPRC complies in full with SMO 73.

**4. Pharmacy Discovery**

The Pharmacy Defendants submitted their status update letter to Your Honor on May 10, 2023. [Dkt. 2373]. On the morning of Thursday, May 11, 2023, the Pharmacy Defendants emailed

counsel for Plaintiffs a proposed Order to Plaintiffs regarding HIPAA compliance of protected health information (the "Proposed Order") and a request to meet and confer further regarding that Proposed Order and other outstanding discovery issues. *See* K. Kapke Email & Attachment thereto, attached hereto as **Exhibit E**. As of the time of this Letter, Plaintiffs have not responded to that request for an additional meet and confer or provided comments on the Proposed Order.

On the afternoon of Thursday, May 11, 2023, after reviewing Plaintiffs' Motion for Approval of Form and Manner of Class Notice [Dkt. 2375] and the accompanying exhibits, the Pharmacy Defendants sent Plaintiffs' counsel additional correspondence seeking clarification on whether Plaintiffs intended to use the requested protected health information for class notice purposes. *See* Letter from K. Richer, attached hereto as **Exhibit F**. The Pharmacy Defendants had prepared the Proposed Order consistent with Plaintiffs' repeated references that they sought to use the protected health information for class notice purposes. [*See*, e.g., Letter from R. Honik, Dkt. 2338, requesting information "to facilitate the class notice process"].

The Pharmacy Defendants participated in a meet and confer with Plaintiffs on Friday, May 12, 2023. During that call, Plaintiffs' counsel indicated that their exclusion of direct-to-consumer notice in the Notice Plan was intentional at this point because they were unclear on what data they would receive from the Pharmacy Defendants. To the extent that Plaintiffs suggested that their exclusion of direct-to-consumer notice within the Class Notice Plan was in any way because of improper delay on behalf of the Pharmacy Defendants, we strongly reject—and are frankly puzzled by—that suggestion.



Special Master the Honorable Thomas Vanaskie
Page 19

The Pharmacy Defendants initially produced dispensing data without individual patient identifiers pursuant to the parties' negotiated agreement, memorialized in the Request for Production, that this information would be produced in redacted or anonymized format due to HIPAA and privacy concerns. [*See* RFP Nos. 4 & 5 in Plaintiffs' Second Amended Set, Dkt. 509-1 ("You also may redact protected patient information to address any privacy or HIPAA concerns raised by the production of this data, as appropriate.")]. When the Pharmacy Defendants timely produced documents/dispensing data in response to RFP No. 4, they appropriately redacted, withheld, or anonymized protected patient information at that point, although counsel for Pharmacy Defendants represented to Plaintiffs' counsel that they could likely produce protected health information within 60 or 90 days of a HIPAA-compliant order that directed the Pharmacy Defendants to do so. That remains true today, but the first time that the Pharmacy Defendants were aware that Plaintiffs sought that production on the same timeline as other discovery requests associated with the TPP trial was in Ruben Honik's April 10, 2023 letter. [*See* Dkt. 2338-2 ("Finally, Plaintiffs seek sufficient information to identify individual class members (e.g., names, addresses, etc.) for purposes of effectuating class notice.")]. In response, the Pharmacy Defendants did not take issue with the idea of that production, but rather simply raised concern about *other* proposals for *general* discovery of the Pharmacy Defendants. [*See* Dkt. 2338-3].

Again, the Pharmacy Defendants do not object to producing certain, necessary personal health information within the dispensing data previously produced, provided that the disclosure complies with HIPAA, but the Pharmacy Defendants do need (1) additional time to produce the requested information, because it is not as simple as "unredacting" a series of prior redactions; and (2) assuming Plaintiffs can articulate the necessity of their request for PHI, a Court Order

GREENBERG TRAURIG, LLP ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM
Terminus 200 Building, 3333 Piedmont Road NE, 25th Floor ■ Atlanta, Georgia 30305 ■ Tel 678.553.2100 ■ Fax 78.553.2212

substantially similar to the one that Pharmacy Defendants have proposed to Plaintiffs but have not received a response about yet. Under these conditions, as already discussed with Plaintiffs, the Pharmacy Defendants are willing to produce that data within 90 days of entry of a HIPAA-compliant order, like the one attached to Ms. Kapke's May 11 Email (*see* **Ex. E**).

**5. Wholesaler Discovery**

In accordance with the Court's directive at the April 26, 2023, status conference, Wholesaler Defendants met and conferred with Plaintiffs' counsel on multiple occasions and submitted their status update letter to Your Honor on May 10, 2023. [Dkt. 2372]. Counsel for Wholesaler Defendants will be prepared to address the issues outlined in that letter, as well as in Plaintiffs' corresponding letter [Dkt. 2374], at the status conference on May 17, 2023.

Respectfully submitted,

*/s/ Victoria Davis Lockard*

Victoria Davis Lockard

cc: Adam Slater, Esq. (*via email, for distribution to Plaintiffs' Counsel*)
Jessica D. Miller, Esq. (*via email, for distribution to Defendants' Counsel*)
Lori G. Cohen, Esq. (*via email*)
Clem C. Trischler, Esq. (*via email*)
Sarah E. Johnston, Esq. (*via email*)
Jeffrey D. Geoppinger, Esq. (*via email*)