# EXHIBIT D

```
1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
2

3  ━━━━━━━━━━━━━━━━━━━━━━━━        CIVIL ACTION NUMBER:

4  IN RE:  VALSARTAN PRODUCTS       19-md-02875
   LIABILITY LITIGATION
5                                   TELEPHONIC STATUS
   ━━━━━━━━━━━━━━━━━━━━━━━━         CONFERENCE
6
        Mitchell H. Cohen Building & U.S. Courthouse
7       4th & Cooper Streets
        Camden, New Jersey  08101
8       October 27, 2022
        Commencing at 10:00 a.m.
9
   B E F O R E:            THE HONORABLE ROBERT B. KUGLER
10                          UNITED STATES DISTRICT JUDGE
                           and
11                          THOMAS I. VANASKIE (RET.)
                           SPECIAL MASTER
12
   A P P E A R A N C E S:
13
        MAZIE SLATER KATZ & FREEMAN, LLC
14      BY:  ADAM M. SLATER, ESQUIRE
        103 Eisenhower Parkway
15      Roseland, New Jersey  07068
        For the Plaintiffs
16
        HONIK LLC
17      BY:  RUBEN HONIK, ESQUIRE
        1515 Market Street, Suite 1100
18      Philadelphia, Pennsylvania  191032
        For the Plaintiffs
19
        LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY PROCTOR, P.A.
20      BY:  DANIEL A. NIGH, ESQUIRE
        316 S. Baylen, Suite 600
21      Pensacola, Florida 32502
        For the Plaintiffs
22
            Ann Marie Mitchell, Official Court Reporter
23             AnnMarie_Mitchell@njd.uscourts.gov
                      (856) 576-7018
24
    Proceedings recorded by mechanical stenography; transcript
25         produced by computer-aided transcription.
```

```
 1    A P P E A R A N C E S (Continued):

 2        RIVERO MESTRE LLP
          BY:  ANDRES RIVERO, ESQUIRE
 3        2525 Ponce De Leon Boulevard, Suite 1000
          Miami, Florida 33134
 4        For the Plaintiffs

 5
          PARAFINCZUK WOLF, P.A.
 6        BY:  STEVEN D. RESNICK, ESQUIRE
          9050 Pines Boulevard, Suite 450-02
 7        Pembroke Pines, Florida 33024
          For the Plaintiffs
 8

 9        GREENBERG TRAURIG LLP
          BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
10        BY:  STEVEN M. HARKINS, ESQUIRE
          3333 Piedmont Road, NE, Suite 2500
11        Atlanta, Georgia  30305

12        BY:  GREGORY E. OSTFELD,  ESQUIRE
          77 West Wacker Drive, Suite 3100
13        Chicago, Illinois 60601
          For the Defendants, Teva Pharmaceutical Industries Ltd.,
14        Teva Pharmaceuticals USA, Inc., Actavis LLC,
          and Actavis Pharma, Inc.
15

16        MORGAN, LEWIS & BOCKIUS, LLP
          BY:  STEVEN N. HUNCHUCK, ESQUIRE
17        One Oxford Centre, 32nd Floor
          Pittsburgh, Pennsylvania 15219
18        For the Defendants, Aurolife Pharma LLC
          and Aurobindo Pharma USA, Inc.
19

20    ALSO PRESENT:

21        LORETTA SMITH, ESQUIRE
          Judicial Law Clerk to The Honorable Robert B. Kugler
22
          Larry MacStravic, Courtroom Deputy
23

24

25
```

*United States District Court*

```
 1              (PROCEEDINGS held telephonically before The Honorable

 2   ROBERT B. KUGLER and SPECIAL MASTER [!SPECIAL MASTER] at

 3   10:00 a.m.)

 4              SPECIAL MASTER VANASKIE:  Hello.

 5              RESPONSE:  Good morning.

 6              SPECIAL MASTER VANASKIE:  We'll give it a couple more

 7   minutes because people are still joining, but it is 10:00.

 8              (Pause in proceedings.)

 9              SPECIAL MASTER VANASKIE:  Maybe we'll get started

10   now.

11              Do we have a court reporter?

12              COURT REPORTER:  It's Ann Marie Mitchell, Your Honor.

13   Good morning.

14              SPECIAL MASTER VANASKIE:  Hi, Ann Marie.  Nice to

15   have you.  I hope all is well.

16              I wanted to clarify at the outset what it is you want

17   me to address before we bring in Judge Kugler.

18              I know I have this TPP trial defendants motion to

19   compel discovery.

20              Also asserted in the brief is a request to set a

21   schedule with respect to damage expert reports, Daubert

22   motions, et cetera.

23              It seems to me that part of this motion that's before

24   me is for Judge Kugler.

25              Who's the spokesperson for the plaintiffs, and what
```

```
 1   is your position?
 2          MR. HONIK:  Your Honor, good morning, this is Ruben
 3   Honik.
 4          Your Honor, we were advised of the defendants'
 5   interest and proposed schedule, I think it was either the day
 6   of or the day before we submitted these letters or agenda to
 7   the Court.
 8          And our position is that it's appropriate to arrive
 9   at a schedule.  And it's certainly been our understanding on
10   the plaintiffs' side that we would tackle that, as we have all
11   other scheduling matters, which is to say that we would meet
12   and confer, and to the extent the parties could agree upon a
13   schedule, we would jointly propose that to the Court.
14          And it is still our intention to do that, contrary to
15   what the submitted letter by the defendants to Your Honor for
16   today indicates.  We'd like the opportunity to confer with
17   them.  We think a schedule should be arrived at.  If we can do
18   that, all the better.  If we can't, we'll certainly submit it
19   to the Court.  And I believe you're correct that that's a
20   matter for Judge Kugler.
21          So we have a deadline between, I suppose, now and the
22   next -- we have an audience with the Judge.
23          SPECIAL MASTER VANASKIE:  All right.  Who is the
24   spokesperson for the defense?
25          MR. OSTFELD:  Your Honor, this is Greg Ostfeld.  I'll
```

```
 1    be the spokesperson for the defense on this issue.

 2            Respectfully, Your Honor, we have raised this issue

 3    at five separate meet and confers.  We raised it on October

 4    9th, October 12th, October 16th, October 18th and October

 5    25th.  And on each occasion we have asked plaintiffs to

 6    identify their proposed schedule for damages expert deadlines.

 7            And the first three times they demurred on that

 8    requested.  To the fourth time on October 18th, we were told

 9    that their position was no deadlines should be set until

10    there's been a ruling on class certification, a position with

11    which we vigorously disagree because we feel the Court has

12    made clear that a TPP trial is on a separate track from class

13    certification.  So we believed we were at an impasse.

14            We had previously discussed any number of ranges that

15    would be acceptable to the defendants, ranging from 30 to 60

16    days after the CMO 29 deadlines, when plaintiffs advised us

17    that their position was they were not willing to discuss

18    setting case management deadlines for damages experts until

19    there was a class certification ruling.

20            We said we planned to raise this in our brief with

21    the Court.  They requested our schedule, our specific schedule

22    that we would propose, which we also provided, and invited

23    further meet and confer.  And there still hasn't been a meet

24    and confer.

25            Our view is if their position is there should be no
```

1  deadlines until there's been a class certification ruling, we

2  are at an impasse, and this issue is ripe for determination.

3  And I would defer to Your Honor as to whether this is an issue

4  for Your Honor or for Judge Kugler.

5          If their position is no longer that this needs to

6  await a class certification ruling, we are happy to discuss

7  plaintiffs' schedule.  But we feel that that position, if it's

8  going to be their position, represents an impasse and that

9  this issue is ripe for a judicial determination.

10         MR. HONIK:  Your Honor, Ruben Honik.

11         May I address a couple of points?

12         SPECIAL MASTER VANASKIE:  Yes, you may, Mr. Honik.

13         MR. HONIK:  Your Honor, I can't tell you how strongly

14  I disagree with the characterization of our contact.

15         I can state to the Court on my oath that no

16  discussion with any of the co-leads has occurred regarding the

17  schedule, and we have never conveyed to Mr. Ostfeld or anyone

18  else from among the co-leads that we're unwilling to meet and

19  confer about a schedule.  On the contrary, it's as I stated,

20  we think a schedule is appropriate.

21         Now, we do think that it may be premature to set it

22  on the timeline proposed by the defendants.  And we do think

23  that whatever that timeline is should fall on the calendar at

24  a point time after the Court has weighed in on a certification

25  motion.  We think there's ample time to do that.

```
 1              If it turns out that Judge Kugler views it
 2    differently, that's fine.  But at the end of the day, inasmuch
 3    as this is an important matter for Judge Kugler to consider
 4    and determine and decide, we think there's ample time for the
 5    co-leads to confer with Mr. Ostfeld and anyone else on the
 6    defense executive committee between now and our next audience
 7    with Judge Kugler to see if we can arrive at something
 8    together.  And if as in many times in the past we're unable
 9    to, we'll present our respective positions, and the Judge will
10    weigh in on it.  I don't think it's much more complicated than
11    that.
12              SPECIAL MASTER VANASKIE:  Okay.  Anything else,
13    Mr. Ostfeld?
14              MR. OSTFELD:  Your Honor, I would only note the
15    co-leads were invited to each of these meet and confers, and
16    it was my understanding that MSPRC's counsel, who attended
17    each of the meet and confers, was in contact with the co-leads
18    on this issue.
19              It sounds like Mr. Honik's position is consistent
20    with what was conveyed to me by MSPRC's counsel, which is that
21    they believe this matter should be deferred until class
22    certification has been decided.  It is our understanding that
23    Judge Kugler would like to have the TPP trial proceeding
24    expeditiously towards trial, and we feel awaiting a ruling on
25    class certification and any appeal from that ruling is not
```

1    consistent with that objective.

2          I'm at the Court's pleasure in terms of whether you

3    would like us to confer further on this issue.  We feel

4    efficiency is best served by setting these deadlines.

5          SPECIAL MASTER VANASKIE:  I agree, Mr. Ostfeld, that

6    it appears appropriate that deadlines should be set, but I

7    also am of the view that this is a trial management matter

8    that is for Judge Kugler.  So I guess I'm punting on this

9    issue.  Judge Kugler will determine whether he should set

10   deadlines now or to require you to further meet and confer.

11         But I do think it would be appropriate to set

12   deadlines.  It's just a question of -- it's a trial management

13   order, and I think that should go to Judge Kugler; unless he

14   says to me, handle it, in which case I'd be happy to.  And I'd

15   ask you to meet and confer one more time, and then we'll issue

16   an order if you can't agree on a schedule.

17         All right.  Let's move then to the discovery motion

18   itself.

19         And I wanted to ask a question at the outset --

20         And Mr. Honik, will you be addressing this issue for

21   the plaintiffs?

22         MR. HONIK:  Your Honor, I perhaps will be addressing

23   certain elements of it, and folks, colleagues from Rivero

24   Mestre will be addressing others.

25         SPECIAL MASTER VANASKIE:  All right.  The first

```
 1  question I have is whether there is agreement that request 2,

 2  labeled subsidiary reimbursement and rebate data, will be

 3  answered, will be provided, the information will be provided?

 4          MR. RIVERO:  Your Honor, this is Andres Rivero from

 5  Rivero Mestre.  And Your Honor, there is no such agreement.

 6  And I'm glad to address it.

 7          SPECIAL MASTER VANASKIE:  Let's address it.  I think

 8  what I understood from the papers -- and I definitely could be

 9  wrong -- is that you offered to provide the documents under

10  that category as a compromise and then not have to provide the

11  documents under Category 3, CMS bids, and Category 4, internal

12  reporting.

13          Is my understanding correct?

14          MR. RIVERO:  Judge, it's more -- it is correct.  And

15  I don't want to -- by the way, we had very good discussions

16  with Mr. Ostfeld, and I want to respect, you know, the

17  settlement nature of those that attach.  But we absolutely

18  were willing to make compromise in that direction.

19          And, Judge, I have a proposal to make in terms of the

20  comments I'm going to make but not wholesale.

21          SPECIAL MASTER VANASKIE:  Okay.

22          MR. RIVERO:  I think -- I'll explain it.  But yes, in

23  other words, Judge, in the sense that we think there is some

24  basis for some production, yes, but not wholesale.

25          SPECIAL MASTER VANASKIE:  All right.  So let me turn
```

1    to plaintiffs then.

2        The defense agenda letter addressed this matter, this

3    motion.  It sounded like -- sort of like, almost like a reply

4    brief.

5        Do you want to respond at all to what has been said

6    in the agenda letter?

7        MR. RIVERO:  Judge, it would be part of my -- I'm

8    glad to address the entire -- if you mean the merits, yes, I'm

9    glad to address the merits, if I may.

10        SPECIAL MASTER VANASKIE:  I wanted to ask you, do you

11    to take that opportunity now?

12        MR. RIVERO:  I'm glad to, Judge.

13        So let me -- I think, Your Honor, indeed to get right

14    to the heart of it, there are two categories I think the

15    Court -- the Judge has -- you have understood, Your Honor,

16    that it's historical information, which is 1, and then

17    projections and estimates, which is 2, and 3, including bid

18    information and internal reporting.

19        SPECIAL MASTER VANASKIE:  Right.

20        MR. RIVERO:  So, Judge, first taking projections and

21    estimates.  And of course the burden is on the opposing party

22    to show that there's -- I'm sorry, to show that there's a --

23    I'm sorry, to the propounding party to show that there's

24    relevance to what they're asking for.  So talking about

25    projection and estimates, Your Honor, 2 and 3, they simply

1   don't make that initial showing.

2        What is it they actually say that 2 and 3 could do

3   for them, Judge?  This is critical to understand why they

4   don't make the showing.

5        They spent something like 40 pages, including a reply

6   sent two days ago.  And this is the closest they come to

7   explaining to you why an estimate or a projection would have

8   anything to do with their actual loss.

9        They say -- and this is page 12, Judge, of their --

10  of their initial brief, which was an even exchange.

11       They say that they want to learn, quote:  Actual loss

12  relative to their -- meaning the assignors' -- expectations,

13  which is the crux of disputed requests 3 and 4.

14       So Judge, it's not because I'm saying it.  It's not

15  my characterization.  They're saying 3 and 4 are

16  specifically -- the crux of what they're asking for is they

17  want to know expectations information in relation to actual

18  loss.

19       Now, Judge, that's in and of itself -- in common

20  sense, it doesn't make sense, because what's at issue is

21  actual loss.  All the case law that either side cites is the

22  damages category that we are seeking is actual damages, which

23  is an -- to say our actual losses.

24       So what they are saying is in 3 and 4, they want to

25  know our expectations in relation to what ends up being the

1  actual losses.

2         Now, let me very quickly take an example why this

3  makes no sense.  And I'll go further why they don't make this

4  showing.

5         Judge, let's assume I make a household budget of

6  $3,000 for car repairs.

7         And this happened to me, Judge.  I go to Shop 1 and I

8  spend $1,500 and they fix my bad alternator but in the process

9  they break my air conditioner.  I paid $1,500.  I'm unhappy

10  with Shop 1.

11        I go to Shop 2.  They charge me $1,500 to fix the air

12  conditioner.

13        Now, if you were to take the defendants' logic, I

14  didn't suffer a loss because my expectation was $3,000.

15        Judge, my expectation has nothing whatsoever to do.

16  Every lawyer on this call knows I'm out at least the $1,500

17  that they caused the damage to the air conditioner.  So what I

18  expected doesn't determine it.  Damages, Judge -- and I've

19  been doing this for 36 years, and I know there are lawyers,

20  including Your Honor, who have been doing this longer -- are

21  the actual amount I spent versus the actual amount perhaps I

22  received and other things about actual historical information.

23  That's Category 1.  What I expect has nothing to do with it.

24  And no economist will say so.

25        In fact, Judge, because I go back to whether they met

1    their burden to show that what they say is the purpose.  The

2    crux is expectations in relation to actual loss.

3           Your Honor, they presented experts, Stiroh and Kosty.

4    Neither Stiroh nor Kosty says anything of the sort, because no

5    economist worth their salt would say such a thing.  They

6    absolutely don't have it in their reports.  The only thing we

7    have is counsel saying in the future they may so opine.  But

8    we don't have it.

9           Now, number two, Judge, obviously our expert doesn't

10   say that.  Our expert says that our actual loss is our actual

11   spend.  And that's based on Judge Kugler's ruling in this case

12   that the amount that the -- that the drugs are economically

13   worthless at the point of sale by virtue of the dangerousness

14   caused by the contamination.  I'm reading from page 20 at 28

15   of the Judge's order.

16          We don't have to debate whether we're right or wrong,

17   but my expert is saying that was actually spent, historical

18   information is the damage.

19          That, by the way, we've already provided to the

20   defendants.  They've gotten our actual spend on valsartan and

21   they've gotten our spend on the cost of replacement, which is

22   a defense theory, Judge, which I don't take issue with it

23   being, you know, impossible economically.  We don't agree

24   that's the way to measure it.  But it's at least something

25   that one could explain.

1          Number three, Judge, they cite cases, but none of the

2    cases goes to this question at all.  The case they cite, the

3    principal case is an Ohio case called *JLJ* that says nothing

4    more than something that I heard in law school, expectation

5    damages equals actual damages.

6          So that's -- that is it.  That's what the law is,

7    Judge.  The law doesn't help them.

8          So at the end of the day they're saying the crux of

9    what they want is what were our expectations in relation to

10   our actual loss.  But there's nothing in logic or in their

11   experts or in our expert or in the case law that starts to

12   make a showing.  All they do is this conclusion.  We each get

13   expectations in relation to actual loss, but they never

14   explain how that has any bearing whatsoever.

15         As a gut check, Your Honor, I called my college

16   roommate, former chair of economics at Wesleyan University,

17   PhD from Harvard in economics, and I asked him, and he called

18   it economic nonsense.

19         Judge, there is no basis to establish the first

20   thing, which is relevance of expectations in relation to

21   actual loss data that they already have.

22         Now, Judge, turning briefly to 2.  And this is really

23   the question you asked me.  Historical information is a

24   different subject.  And it's not economic nonsense.  I'll

25   concede.  It's not economic nonsense.  There's a different

1   problem that we address.  And both sides talk about ad

2   nauseam, which is it's aggregated data, Your Honor.

3           SPECIAL MASTER VANASKIE:  Let me interrupt you just

4   for a minute here.

5           MR. RIVERO:  Sure.

6           SPECIAL MASTER VANASKIE:  Because I'd like to hear

7   from plaintiffs with respect the CMS bids and the internal

8   reporting before going back to the reimbursement and rebate

9   data.

10          Who is going to speak for defendants?

11          MR. OSTFELD:  Thank you, Your Honor.  This is Greg

12  Ostfeld.  I'll be addressing that for the defendants.

13          SPECIAL MASTER VANASKIE:  Okay, Mr. Ostfeld.

14          MR. OSTFELD:  So, Your Honor, I think common sense is

15  a good place to start here.

16          The plaintiffs' theory of injury in this case is that

17  because a series of valsartan-containing drugs were found in

18  some instances many years after they were reimbursed by the

19  TPPs to contain previously unknown nitrosamines, that the TPPs

20  have somehow been retroactively injured by that on the basis

21  of purchases or reimbursements that they made many years prior

22  to the discovery of this problem and the withdrawal of the

23  product from the market.

24          So that is an unusual and in our view a non-logical

25  theory of injury, that a TPP has been injured as a result of a

1    purchase that it already made on behalf of its beneficiaries,

2    that it's not really disputed delivered the clinical benefit

3    that was intended, and they're not claiming caused specific

4    physical injury to their beneficiaries, but nonetheless,

5    they're claiming they have suffered an economic loss as a

6    result of that.

7            The basic problem that plaintiff has is every single

8    claim that they are asserting is subjected to an actual

9    damages or actual losses limitation, every one of their

10   claims, either statutory or common law.  And we set forth the

11   citations on that at pages 11 and 12 of our brief.

12           So the challenge ahead of us is determining whether

13   in fact these TPPs, the MAO assignors on whose behalf MSPRC is

14   asserting claims, did in fact incur actual damages or actual

15   losses on purchases that they made many years ago, whether

16   their expectations were defeated with respect to those

17   purchases.  And the way that we probe that is by determining

18   what those expectations were versus what the costs were that

19   they actually incurred.

20           And with due respect to college roommates, this is

21   not economic nonsense.  This is basic economics.  Our experts,

22   Dr. Stiroh and Mr. Kosty, specifically criticize plaintiffs'

23   expert, Dr. Conti, for failing to account for functions like

24   government expenditures, discounts and rebates.

25           Mr. Kosty said that determining the costs borne by

1    the MAO assignors requires a significant amount of information

2    and is highly complex.

3            Dr. Stiroh said you need information on the actual

4    expenditures and the actual losses.

5            So what we're trying to get to here, Your Honor, is

6    actual losses.  And this kind of information we can only

7    obtain by determining what the MAOs expected to pay versus

8    what they actually paid.  Did the withdrawal of these

9    valsartan-containing drugs cause them to incur some economic

10   loss or economic --

11           (Court reporter clarification.)

12           MR. OSTFELD:  So Your Honor, the data that we are

13   seeking, both the CMS bid data and the internal reports,

14   contain lots of information on the MAO's expected versus

15   actual drug payments, which will be useful to assess whether

16   in fact this withdrawal caused actual damages.

17           For example, Your Honor, the CMS bids contain what's

18   called the Rx bid workbook, the prescription drug bid

19   workbook, which has seven worksheets with highly relevant

20   information on projected and actual prescription drug spend.

21   Worksheet 2 of that workbook, for example, has data on the

22   utilization and cost of covered drugs by type of script and

23   anticipated revenue.

24           So this isn't like the car repair analogy where

25   you're just making a projection and then comparing actual

1    spend against what was projected without looking at the

2    categories of how it was spent, you're looking at utilization

3    as well.  So you've got projections, you've got utilization,

4    and you're able to assess from that information the complex

5    question of whether there was a utilization that was not in

6    line with expectations.

7         We believe what this will show is that the

8    utilization during the years prior to the discovery of the

9    nitrosamine issue was in line with expectations,

10   or if it was not, that that was not caused by any

11   nitrosamine-related issues.

12        The question we want to assess is whether as a result

13   of the withdrawal, there were additional prescription drug

14   costs that were incurred.  Those would constitute actual

15   losses or actual injury to the MAOs.  If it could be shown

16   that as a result of the withdrawal they incurred additional

17   prescription drug costs that they did not expect to incur on

18   utilization of drugs that they otherwise would not have spent

19   for, that's information that's helpful from an actual damages

20   and actual loss perspective.

21        We don't know whether or not that's going to show up

22   even for the year of the withdrawal.  For prior years we

23   expect that these CMS bid workbooks and internal documents are

24   going to show us utilization and spend in line with

25   expectations, and expectation damages are the classic measure

1    of breach of warranty damages.

2         So for that reason, Your Honor, we think we have met

3    our threshold showing of relevance.

4         MR. RIVERO:  Your Honor, may I respond very briefly?

5         Judge, I don't know if you can hear me.

6         SPECIAL MASTER VANASKIE:  Yes.  I'm sorry.  I muted

7    mine.

8         MR. RIVERO:  No problem.

9         SPECIAL MASTER VANASKIE:  I wanted the court reporter

10   to be able to hear.

11        But yes.  Go ahead, please.

12        MR. RIVERO:  Yes, Judge.  And by the way, in any

13   remark I make, I want to say that I have a lot of respect for

14   Mr. Ostfeld and have had very positive discussions with him.

15   So I mean no disrespect, but, Judge, he didn't answer your

16   question.

17        That answer conflates historical data and actual

18   losses all over the place with the question of what the

19   estimates have to do with them.  And there's no -- and by the

20   way, the last part, legally, again, no offense, but if you

21   look at the two cases they cite, there's an Ohio -- two Ohio

22   cases.  All those cases say about expectation damages is an

23   old term is that -- to clarify, the courts say, expectation

24   damages in a contract setting are actual damages.  It's an

25   old -- it's just a statement of something that we all

1    understand.

2          I'm not saying anything unusual.  And that's why

3    historical information is not an economic nonsense request.

4    But respectfully, he's waved his hands a lot, but he didn't

5    tell you why if the assignor made an estimate that they were

6    going to spend $3,000 on -- by the way, these are

7    aggregated -- this is aggregated.  They're not talking about

8    specific -- there's no specific projection of valsartan.  But

9    they made it -- I'm just using the 3,000 for reasons that you

10   know from my example.

11         And somebody caused them -- they really would have

12   spent $1,500 but somebody caused them a damage, to spend

13   $3,000, that they weren't out anything.  The two are

14   unrelated, and he hasn't explained in any way in economic

15   sense that they are.

16         Again, I'm sorry, not to belabor it, but all

17   calculation of damages is what I spent versus what I got back,

18   and then there are legal questions about whether I should have

19   had to spend it in the first place.  But there are actual

20   spend, actual receipt numbers, which is Category 2, not

21   projections and estimates.

22         Your Honor, they just -- they simply fail under our

23   rules.  The modern discovery rules, there's a proportionality

24   test.  And the first test is does it have some bearing of

25   relevance.  And this question of estimates and projections has

1   absolutely no bearing of relevance, and they just -- you don't

2   get to the second question.  It simply shouldn't be, Judge.

3           Glad to address historical information if you want me

4   to.

5           MR. HONIK:  Your Honor, this is Ruben Honik.

6           May I add a very brief bit of context for this?

7   Because I think there's something being lost here.

8           SPECIAL MASTER VANASKIE:  Go ahead, Mr. Honik.

9           MR. HONIK:  Very briefly, Judge.  As I listened to

10  Mr. Ostfeld not only today but during the course of a number

11  of meetings on this very topic, it strikes me very powerfully

12  that this is simply a rehash of an argument that all the

13  defendants made at this point nearly two years ago, that the

14  insurance companies involved here and the consumers have no

15  injury.  Right?  Either because their expectations were met

16  with reality or the insurance company would have had to pay

17  for a substitute drug for any number of other reasons, all of

18  which were asserted in extensive briefing to Judge Kugler.

19          And what Mr. Ostfeld did today on the record is to

20  mischaracterize our claim.  Our claim for warranty is not

21  based on the lookback that he's talking about.  What the Judge

22  has ruled in this case as a matter of pleading -- and we

23  understand that we have to prove the elements of it -- is that

24  this injury was completed at point of sale.  When the drugs

25  are handed to patients, consumers, at the point of sale, they,

1    as well as the insurance companies, have completed an economic

2    transaction.  They've paid for this drug.

3         And what the theory of this case is and what our

4    damage experts have modeled and outlined, which we do in

5    innumerable pharmaceutical cases, there's nothing novel about

6    this, is to say that these drugs were illegal, should not have

7    been in the marketplace and therefore have zero value.

8         And the Court in its motion to dismiss ruling

9    embraced that, for better or worse.  And Mr. Ostfeld is simply

10   trying to reargue that.

11        And I mention this, because it's important to

12   understand the theory under which this is proceeding on the

13   relevance question.

14        If the injury and damage is complete at the point of

15   sale, the only question really is what was paid and what was

16   reimbursed.  Those are the historical numbers that Mr. Rivero

17   is referring to.  And we have both provided and will

18   supplement historical data so that they understand what the

19   actual dollars are.

20        It is wholly irrelevant to understand what the

21   parties thought they may have to put out.  And it's even more

22   attenuated, Judge, because the numbers here -- we've used the

23   word "in the aggregate" frequently, but let's break down what

24   that means.

25        That means that the expectation is for all drugs, all

```
 1   medical devices, all hospital treatment.  It's an all-in

 2   number.  And because I was the one that deposed their experts,

 3   Stiroh and Kosty, I asked them specifically -- because they

 4   were barking up this tree at the beginning -- I said, how are

 5   you going to do it, what's the formula, what's the

 6   methodology, if you're going to take this aggregated number

 7   and tell us how much is associated with valsartan?  And Judge,

 8   they were unable to do that.

 9         And so this is relevant, because if they confessed or

10   stated under oath that there was no method by which you could

11   take an aggregate number reflecting a bid or an expectation

12   or, for that matter, the actual aggregated number once paid or

13   exchanged and then extrapolate from that something specific

14   that is de minimis for valsartan, that should not be a basis

15   for them to have a fishing expedition now.

16         That's what this is.  They're fishing for numbers to

17   conjure up a formula that their experts have already conceded

18   under oath cannot be done.

19         That's the essence of the relevance argument.

20         MR. OSTFELD:  Your Honor, this is Greg Ostfeld.

21         May I be heard on these issues?

22         SPECIAL MASTER VANASKIE:  You certainly may,

23   Mr. Ostfeld.

24         MR. OSTFELD:  Thank you, Your Honor.

25         I like to begin with Mr. Honik's point regarding
```

1    Judge Kugler's ruling on the motion to dismiss.

2         I think it's important to understand, as Mr. Honik

3    acknowledged, that this was a ruling that was made at the

4    motion to dismiss stage.  And as Judge Kugler put it, the TPP

5    plaintiffs had alleged sufficient injury and the lack of

6    functionality at the motion to dismiss stage.

7         All that means is that we are at issue on plaintiffs'

8    alleged worthlessness theory.  They are allowed to try to

9    prove that theory, and we are allowed to attempt to refute it.

10   So the fact that we intend to challenge that theory I think

11   should not be surprising to anyone.  And the idea that we

12   would want to take discovery to demonstrate and substantiate

13   our challenge to that theory also should not surprise anybody.

14        It is our intention to show not only that the

15   products were not worthless at the point of sale but also that

16   the TPP plaintiffs incurred no injury because they incurred no

17   economic losses or actual injury.

18        At most what Mr. Honik has described might be a

19   theory of injury on the consumer side that they did not

20   consume what they believed they were consuming.  We disagree

21   with that theory.

22        But certainly on the TPP side the idea that a

23   third-party payor whose only role was to reimburse a drug that

24   was purchased suffered an injury where they incurred no

25   additional cost or injury is something that we are allowed to

1  vigorously challenge through our experts.

2         I also respectfully disagree with Mr. Honik's

3  description of the admissions he believes he got out of our

4  experts at deposition.

5         The plaintiffs have now had an opportunity to brief

6  the issue, and those quotes which Mr. Honik also described at

7  the last case management conference certainly did not emerge

8  in their papers.  And in fact, we put in the relevant quotes

9  into our papers.  And what Mr. Kosty said was not that it was

10  impossible to disaggregate but it requires a significant

11  amount of information and is complex.  What Dr. Stiroh said is

12  that information is needed on the actual expenditure.  So

13  these were indications that what is needed to perform the type

14  of exercise that Mr. Honik describes is more information.

15         I also respectfully -- as Mr. Rivero said, we had

16  many good conversations, we had many good meet and confers, we

17  didn't reach resolution.  I respect him as well.  I even

18  respect his roommate whose deposition I would like to take

19  based on the representations that have been placed on the

20  record today.

21         But I think the key point, Your Honor, is you have to

22  look at not just -- it's not just a matter of the projections.

23  It's not just a matter of the expectations.  We're not seeking

24  that in the abstract.  What these papers tell us by looking at

25  utilization and spend, in addition to expectations, is how the

1    actual spend tracked the expectations.  That's the key

2    difference from his car repair analogy.  We're not just

3    getting the budget at the beginning of the year of I expect to

4    spend $3,000 on car repair and then calling that a lack of

5    injury.  We then get to actually see how the money was

6    utilized and how the spend lined up with the budget.

7         So what we would get to see in the example of his

8    analogy is the repair that was made, the damage, the

9    additional repair that was made, in that instance comparing

10   the projection against the spend shows the injury.  It's not

11   just zeroing out the balance at the end.  It's looking to see

12   utilization.  And that's why we think the CMS bids are

13   relevant and why the internal documents are relevant.

14        SPECIAL MASTER VANASKIE:  Why would it be appropriate

15   to provide them for a -- for the past ten years, the time

16   frame of the request?

17        MR. OSTFELD:  Your Honor, that is a fair question.

18   It is most important for the year of the withdrawal.  We think

19   that year is clearly relevant.

20        To the extent that the plaintiffs -- the TPPs are

21   asserting that they suffered economic loss retroactively from

22   prior spend, the projections in the previous years would be

23   less relevant.  For the years other than the year of the

24   withdrawal, we may not need the projection data, but the

25   actual utilization and actual spend data from the Rx

1    worksheets would still be relevant, because that still enables

2    us to assess their theory of actual injury.

3              SPECIAL MASTER VANASKIE:  And by the year of

4    withdrawal you mean 2018?

5              MR. OSTFELD:  For the NDMA drugs, yes, I believe

6    that's correct, Your Honor.

7              I apologize.  I've always been bad at dates.  I'm

8    sure somebody will pipe up if I've gotten the date wrong, but

9    I believe it is 2018.

10             SPECIAL MASTER VANASKIE:  Okay.  Go ahead.

11             Is that Mr. Honik or --

12             MR. RIVERO:  No.  It's Andres Rivero, Judge.

13             SPECIAL MASTER VANASKIE:  Mr. Rivero.

14             MR. RIVERO:  Your Honor, yeah, I didn't get to

15    address the historical information, and I don't know --

16             SPECIAL MASTER VANASKIE:  I do want to get back to

17    that.  I want to finish up on this.

18             MR. RIVERO:  Okay.  Yep.

19             SPECIAL MASTER VANASKIE:  The other point that's been

20    raised -- I shouldn't say the other.  But another point that

21    has been raised concerns the proprietary and confidential

22    nature of this information.

23             MR. RIVERO:  Yes, Judge.

24             SPECIAL MASTER VANASKIE:  It seems to me that can all

25    be covered by the existing protective orders.

*United States District Court*

1          Why wouldn't be the protective orders be sufficient?

2          MR. RIVERO:  Your Honor, that's on the second prong

3    of this analysis as to both categories.

4          But again, there is simply no showing -- I don't know

5    what Mr. Ostfeld is saying when he says utilization.  There's

6    absolutely no showing that a projection -- and I understand

7    what he's saying is that a report may have both historical

8    information and a projection.  But we're saying as to the

9    historical information, let's have that discussion about what

10   that means.  But the part of it that's an estimate has no

11   bearing on what you actually spent.

12         If the Court on any aspect of this were to find that

13   production should be made -- Judge, I understand what the

14   Court is saying.  It's extraordinarily sensitive.  In the

15   SummaCare situation we have the testimony of the affiant from

16   SummaCare who says they're in the most competitive

17   jurisdiction in the United States for these bids and that, in

18   fact, Judge, one of the defendants that we can identify, we

19   don't know how many, are direct competitors.  So we would want

20   this applied in the most rigorous way.

21         But I understand what the Court is saying.  If you

22   were to order any kind of production, there is an order.  We'd

23   want -- we would want to discuss what the right protections

24   were, especially in relation to competitors; but just they

25   simply don't meet the first prong on projections and

1    estimates.

2          I'm glad to answer any questions on that or address

3    historical information.

4          SPECIAL MASTER VANASKIE:  No.  That's all the

5    questions I had thus far.

6          Let's go to the historical information.

7          MR. RIVERO:  Your Honor, obviously I make a

8    distinction whereas they make no showing whatsoever that an

9    estimate could bear on the actual spend and what's actually

10   received back by the assignors.  I understand that doesn't

11   apply.  And I'm not making that argument on historical

12   information.  It could apply.

13         Here's the problem that exists for their making the

14   showing, though, that what we have is relevant to their claim.

15   All -- and this again is in our affiant's declarations.  And

16   this is simply a fact.  We produced already the particularized

17   historical information on total valsartan spend, and we

18   produced historical information on what we spent on

19   replacements.  That we already gave to the defendants.  They

20   have that.  So on the spend side as to this drug that's in

21   controversy, they have it.

22         What they now want on the spend side is they want --

23   what we have is the aggregate of all pharmaceutical spends.

24         Now, Judge, number one, again, I don't know why

25   that's relevant.  We totally -- what we spent in total, I

1   don't know how it goes to our damage on this.  But I can at

2   least see the possibility, perhaps in relation to the next

3   part of what they ask, which is what did we receive from

4   Medicare.  And I'm not saying it's economic nonsense.  That

5   would be -- that would be -- that would be wrong.  There's a

6   way it could be.

7          The problem is, Judge, they don't make -- they don't

8   make any showing that they have anyone who would be able to

9   create an economic model to disaggregate -- I think they call

10  it tease out.  I think they use that -- somebody uses that.

11  It might be -- I don't know if it's counsel or one of their

12  experts.  To tease out in the aggregate what the assignors got

13  from Medicare and how it did or did not relate to valsartan.

14  For the aggregate information to be relevant, they have to

15  have a means to disaggregate.

16         Rena Conti, our expert, says that cannot be done.

17  Now, I understand that one of their experts say it can be

18  done.  I get that.  But they haven't presented somebody who

19  says that.

20         But more important, Judge, there is one case exactly

21  that they cite on the entire subject matter, and that's in

22  *Namenda* out of New York.  And I think nobody has really looked

23  at what *Namenda* means.

24         *Namenda*, Your Honor, was a motion in limine by the

25  defense to strike the plaintiffs' expert who testifies on

1    actual loss.  And that plaintiffs' expert says that there are

2    Medicare payments but that it is not possible to disaggregate

3    the Medicare payments, exactly what I'm telling the Court.

4    That's what the court reports in its decision in *Namenda*, if

5    you look at it.

6        The defense expert, a fellow named Grabowski, says

7    the plaintiffs' expert is wrong.  There may be a way to tease

8    it out, and therefore, the expert opinion is -- the

9    plaintiffs' expert opinion is misguided and should be

10   excluded.

11       But Grabowski, the opinion doesn't say -- because

12   Grabowski doesn't do it.  Grabowski doesn't give a model about

13   how you would be able to do it.  He just says, it may be

14   possible to do it.

15       Here's the ultimate point, Judge, to get to the

16   common sense and practical concerns.  I understand it's

17   possible.  Grabowski says it's possible.  Defense counsel say

18   it's possible.  They haven't offered an actual example or

19   model that we could look at and say, okay, yeah, we understand

20   and we can negotiate into that.

21       Here is what I would suggest very specifically,

22   Judge, is -- and I would certainly -- this would be a -- the

23   nature of a compromise is there are different categories.

24   There's the regular Part D per capita, per head reimbursement.

25   I'm glad to talk with the Court about why that's not

1   disaggregated and why it can't be disaggregated, which is a

2   reimbursement per person for pharmaceuticals.

3           But Judge, I think they -- honestly, I believe

4   they'll never -- no expert is going to really be able to do

5   that.  Or Conti says they can't do it.  Judge, given them the

6   year of recall.  Give them the year of recall.  And if they

7   can come up -- if an expert can come back and use the year of

8   recall and put together a model and persuade you they can do

9   it, let them come back and say, we're entitled to more.

10          But, Judge, on -- I think to be fair, on both

11  catastrophic and low income, those are two categories, give

12  them two years, Judge, for the same purpose, because I

13  believe, and in fact the plaintiffs' expert in *Namenda* says

14  it.  So it's not because I tell you; it's because -- he says,

15  there -- he says, well, there could be some possibility on

16  catastrophic, which is a kind of Medicare payment to these

17  assignors, and in the low income -- by the way, the

18  plaintiffs' expert in *Namenda* doesn't mention low income, but

19  I'm telling the Court and the defense we believe that somebody

20  might say and it might be the area where they could find

21  something and make some model.  So I'm being as -- you know,

22  I'm trying to be as fair on this as possible.

23          Give them two years, Judge.  If they can come back --

24  because Rena Conti says, and I think she is the leading pharma

25  medical economist in the country, that it can't be

1  disaggregated or teased out, there's no reason they should get

2  ten years.  It doesn't make sense.  But I think that that

3  would be a fair result on this, Judge.

4        So to just -- and part of it -- the reason I say one

5  to two years, it is extraordinarily sensitive.  This is the

6  heart of our assignors' business.  In the MAO business, the

7  entire thing is the bids.  And it's the secret sauce of, you

8  know, their estimates about medical inflation, their estimates

9  about how much, you know, the change -- the actuarial change

10  and the age of their pool population.  And they're all

11  competing on these extremely specific things.  It's the

12  sources and methods.

13        So that's why I would say, Judge, it would be in my

14  view a fair way to split the baby to say, okay, take these

15  samples, test them, and if you can come back with something

16  and show the Court -- you know, obviously we're going to look

17  at it very carefully, Judge.  So that's what I would suggest

18  to the Court.

19        But again, the real legal analysis, Your Honor -- I'm

20  sorry, I don't want to belabor it -- is they don't meet the

21  burden right now.  They do not meet the burden that they have

22  a means to disaggregate that would actually make it work.  So

23  frankly, in a technical -- technically, I think they're not

24  entitled to it.

25        But I did tell the Court that I had a non-wholesale

1   approach to this that I think is fair, that gives them a

2   chance to do what they're saying, which the expert, Grabowski,

3   for the defense in *Namenda* said was possible but didn't do.

4   And then we could know whether they're actually able to do it.

5   That would be --

6           Your Honor, may I have just one moment?

7           SPECIAL MASTER VANASKIE:  Yes, you may.

8           MR. RIVERO:  And not -- and Judge, I do not want to

9   abuse your time, but while I recognize --

10          I think somebody is speaking.  I want to make sure

11  the court reporter can hear.

12          Judge, it's not economic nonsense to talk about

13  historical info.  There is simply no logical defense for

14  projections and estimates in any way when we are talking about

15  what was actually spent, which we've already given them, the

16  actual spend on replacement costs, which we've already given

17  them for valsartan, and what I'm telling the Court where --

18  you know, we are prepared to accept an order to prepare -- to

19  present actual receipts in aggregate, that's all we have, on

20  recall year as to generalized Part D premiums and maybe two

21  years as to -- as to -- as to allow them to test a real

22  economic theory.  It's economic nonsense to talk about what

23  was estimated beforehand as having anything to do with what

24  was actually paid or was actually received.

25          Thank you, Judge.

1          SPECIAL MASTER VANASKIE:  Thank you.

2          MR. OSTFELD:  Your Honor, this is Greg Ostfeld.

3          SPECIAL MASTER VANASKIE:  Yes, Mr. Ostfeld.

4          MR. OSTFELD:  I think there have been two rather

5    remarkable propositions that have just been put forward by

6    MSPRC's counsel.

7          One is a reversal of the burden of proof, the

8    suggestion that it is somehow defendants' obligation to

9    disprove damages rather than plaintiffs' burden to prove

10   damages.

11         And the second is that demonstrating how data would

12   be used at trial precedes the discoverability of that data at

13   the discovery stage.

14         And I respectfully disagree with both of those.

15         The starting point of this analysis is plaintiffs'

16   burden to prove damages and the limitation on every single one

17   of MSPRC's claims that they are limited to actual damages or

18   actual losses.

19         There are -- there's a very important implication to

20   that.  Government payments, subsidies, reimbursements and

21   rebates are not actual damages.  They must be subtracted from

22   damages or set off.  As the *In re:  Namenda* court found, it is

23   not even a close question.  And it is our position that it is

24   plaintiffs' burden to disaggregate the data and to subtract or

25   set off the government payments.  And to the extent that they

1   fail to do so, they are subject to criticism for failing to do

2   so.

3        And that is what is -- exactly what is at issue in *In*

4   *re: Namenda*, and I think Mr. Rivero's description of that

5   case demonstrates exactly why these data are relevant.

6        What we may very well end up with at the trial stage

7   are an expert from plaintiff who has not accounted at all for

8   government expenditures in their calculation of MSPRC's

9   damages and an expert for the defense who is criticizing

10  plaintiffs' expert for failing to account for, subtract and

11  set off damages and seeks to use the discovery materials to

12  demonstrate that those data existed and plaintiffs simply

13  failed to do it.

14       We don't necessarily have to undertake the exercise

15  that plaintiffs apparently plan not to undertake.  We don't

16  have to go year by year, calculate the government expenditures

17  and subtract them.  We just simply need to demonstrate that

18  there is a basis to criticize plaintiffs' expert to do that.

19       Now, we also may go through that year-by-year

20  exercise, but we certainly don't have to demonstrate how we're

21  going to do that, give them a preview of who our expert is and

22  what our expert's opinions are going to be at the liberal

23  discovery stage.

24       I think what we have demonstrated is these data are

25  relevant.  The opportunity to look at government expenditures,

1    the opportunity to determine whether those can be

2    disaggregated, whether those can be subtracted from

3    plaintiffs' asserted damages calculation, is clearly relevant,

4    is directly relevant to what is at issue in this case.  And I

5    haven't heard anything from plaintiffs to suggest that we

6    haven't met our burden on that or that *In re:  Namenda* is

7    wrong in its demonstration that government payments should be

8    subtracted from actual damages.

9          So this simply becomes an issue of a complex

10   calculation, which is what our experts said, a calculation

11   that requires a lot of information and something that needs to

12   be evaluated closely by the damages experts for both sides in

13   order to determine how to subtract, how to set off this very

14   important, potentially -- as our expert, Mr. Kosty, said, it's

15   about -- it's -- approximately 75 percent of the total spend

16   on prescription drugs comes from the government.  So we're

17   talking about a very important component of damages here.

18         And this is the classic reason why you take

19   discovery, why you have broad and liberal discovery at the

20   discovery phases, to enable the experts, the people who know

21   this space, the people who understand these data, to dig in,

22   to look at the aggregate data, to propose how it could be

23   disaggregated, and who criticize each other.  This is what the

24   trier of fact is ultimately going to be asked to look at is

25   each expert's criticisms of the others and who wins.  And

1  having the data is an important first step for our experts to

2  undertake that analysis.

3        SPECIAL MASTER VANASKIE:  Why --

4        MR. RIVERO:  Your Honor --

5        SPECIAL MASTER VANASKIE:  Let me ask this question,

6  please.  And I'll ask this of Mr. Ostfeld.

7        Why wouldn't it be satisfactory at this time to limit

8  the production of the subsidy, reimbursement and rebate data

9  to the year of withdrawal or a two-year period and have your

10 experts determine what they can do with that information and

11 make your case for requiring more?

12       MR. OSTFELD:  Well, Your Honor, I have two points

13 that I would make on that.

14       The first is that they're not seeking damages just

15 for a two-year lookback period, that they are seeking damages

16 going back for -- I believe six, seven, eight, ten years,

17 whatever the relevant time period is.  They are seeking

18 damages going back quite far in time.  And it is inefficient

19 for our experts to evaluate data on a piecemeal basis.

20       The second point, Your Honor, is, I don't believe

21 we've heard any explanation from the plaintiffs as to why it

22 would be unduly burdensome for them to produce these data for

23 the relevant years.  We've listed on pages 7 and 8 of our

24 brief the specific reports and the specific datasets that we

25 believe are responsive to request number 2.

1          These are pre-baked.  These are things that exist in

2     a finished form.  They're all accessible from the same

3     databases.  They're all accessible from the same websites.

4     You know, it's not like retrieving -- retrieving eight years

5     or seven years or six years is significantly more burdensome

6     than retrieving one year or two years.  Plaintiffs have

7     certainly made no showing on that basis.

8          So rather than have some form of iterative process

9     where we're going back and forth between discovery and

10    demonstration and discovery and demonstration and having to

11    preview our experts' opinions, which I also think is

12    prejudicial and unfair to the defense when plaintiffs are not

13    previewing their experts' opinions and where they're opposing

14    having a case management schedule as to damages experts, I

15    don't think they should get a peek at what our experts'

16    methodology is going to be.

17         They haven't demonstrated burden.  They haven't

18    demonstrated that this is irrelevant.  Produce the data.  Let

19    our experts undertake their analysis.  They'll see the results

20    at the same time that we do, at the same time the Court does,

21    and then we proceed the way we always proceed in a trial, to

22    have the trier of fact decide who's right.

23         MR. RIVERO:  Judge, if I may, Andres Rivero.

24         Judge, I think -- I want to make sure it's really

25    clear what I'm saying.

```
1        We're at the discovery phase.  They have to show the

2   relevance.  The problem that they have right now, and

3   unfortunately nobody can do this, they need to show you now

4   that the aggregated data now would be relevant.  All they're

5   saying is maybe.  And in fact, I got to tell you, it's worse.

6   Because Mr. Ostfeld says -- says, you know, maybe I can do it.

7   But the problem he has is that his expert, Mr. Kosty,

8   testified -- I have it in my brief at page 4 in a footnote:

9   The payments provided from the federal government to plan

10  sponsors -- that's the assignments -- are independent of

11  spending on a specific drug.  Judge, that's a quote.

12        Mr. Kosty also says -- that's on the Part D, Judge.

13  That's the premium, which I'm telling you should be limited to

14  a year.  And honestly, they don't meet their burden, they

15  shouldn't get the year, Judge, technically based on the law

16  and based on what Mr. --  their own experts said.

17        On what's called the Medicare risk corridor, which is

18  the catastrophic, which I referred to, which I said to be

19  fair, because we think it's a little bit more possible on a

20  risk -- on the risk corridor/catastrophic or on the low income

21  that somebody might be able to do something.

22        Kosty doesn't think so.  Their expert doesn't think

23  so.  Let me quote him.  Quote:  Medicare risk corridor

24  payments are made in aggregate at the end of the benefit

25  period and are not directly attributable to specific products,
```

1    classes of products or individual claims.

2            Judge, that's not our expert.  That's their expert.

3            The problem they have -- and I'll go back to *Namenda*

4    for a second because I don't know if he's crystal clear.  They

5    have a very serious problem.  Right now in discovery we're

6    telling them and their expert is saying, the receipts for

7    Medicare are aggregated.  They are not traceable back to

8    valsartan.  That's what Kosty says.  I just read it to you.

9    How in the world can aggregate be relevant?

10           And here's what the proposal is, which I'm agreeing

11   is not economic nonsense.  It could be possible.  It's

12   conceivable.  Some expert might come in and create a model.

13   But the problem is they don't show us anything.  Their experts

14   don't talk about it.  So it's a guess.  It's a speculation.

15   They haven't shown that it would be -- that it can be done.

16           And the expert that the defense put forward in

17   *Namenda*, a Dr. Grabowski, but -- and I noticed that the

18   defense doesn't want to do any specifics.  They don't want to

19   talk specifically about their cases.  They don't want to talk

20   specifically about their experts.  They don't want to talk

21   specifically about anything that's been produced to them.

22   They want to talk in generalities.

23           Grabowski in *Namenda*, the order appears to suggest

24   Grabowski got no discovery.  All Grabowski does is criticize

25   the plaintiff.  So discovery from the best I can tell in

*Namenda* was not permitted for exactly what they're asking

here.

So Judge, it's a speculation.  They don't meet the

burden.

But I think I'm being very reasonable in proposing

let me them have a year and see if they can do what nobody has

yet done.  So I feel like it's Star Trek, to go where no one

has gone before.  Maybe they're going to be able to do it.

And then give them the two years on the other categories,

because, again, I'm being ultra fair.  We do believe there

might be some more possibility there.  Let them try.

If they meet their burden in the first place, it

doesn't solve my proportionality problem.  My proportionality

problem, my -- the sensitivity, but I conceded to the Court

that there is a confidentiality in place.

This is the entire competitive advantage of each of

these MAOs.  Judge, if this leaks in here, it does really

serious economic harm.  And I'm -- frankly, I propose

attorneys' eyes only with their experts, because this is super

sensitive, but I do say since it's not economic nonsense, let

them have a sample to see if they can meet the relevance

burden.

It is their burden.  I'm not burden shifting.

They're failing to meet their burden, and I'm making a

concession I don't think I have to, Judge.  That's my

 1    proposal.

 2            MR. HONIK:  Your Honor, Ruben Honik.  There's another

 3    very compelling reason not to grant this discovery, Judge, and

 4    that's internal consistency.

 5            The relevant case to look at is not *Namenda*.  And

 6    I'll tell you why in a moment for another reason.  It's our

 7    case.

 8            Plaintiffs sought in this very litigation the

 9    production of cost data from downstream defendants,

10    wholesalers and retailers within the first year of this

11    litigation.  It was extensively briefed and argued to Judge

12    Schneider.  The downstream defendants said that it's

13    aggregated data that you cannot segregate.  They argued that

14    it is highly sensitive to their business modeling.  And we

15    were denied an opportunity to get that aggregated data.

16            There is precedent in this case where this Court has

17    denied a requesting party the very kind of data that we're

18    talking about here.  And to now, frankly, consider any

19    positive by producing this or at least producing it without

20    some real showing that experts can do anything with this

21    disaggregate -- or with this aggregate data I think would be

22    inconsistent, respectfully, with the prior ruling of this

23    Court.

24            And finally, let me just point out something that's

25    extremely important that we haven't talked about.  The *Namenda*

1    case in New York that the defendants so strongly rely upon was

2    an antitrust case.

3         Why is that important to consider?  That was a pay

4    for delivery generic case, meaning an antitrust violation for

5    the unlawful delay of a generic drug into the marketplace.

6         So what do economists have to do in that case to

7    arrive at damages?  Well, they have to compare a but for world

8    where they're envisioning what the economic impact of generic

9    entry would have been had it occurred at an earlier point in

10   time.

11        In order to get at that, *Namenda* only stands for the

12   proposition that you have to look at a very different

13   landscape of what the economic factors were.  In other words,

14   it's a temporal evaluation economically over a period of time.

15        That's not what this warranty case is.  This warranty

16   case -- and no experts disagree.  The defendants don't

17   disagree.  Our experts don't disagree.  This is a single

18   event, if you will, when the drug is sold and it's paid for.

19   This isn't a comparison temporally over time in a created but

20   for world.

21        The fact that *Namenda* was decided in the context of a

22   antitrust case is -- makes it wholly different.  And for no

23   other reason than that Judge Schneider denied the very type of

24   discovery that defendants now seek from us, that at least as

25   confidential and proprietary to the insurers as they are to

1   the downstream defendants, I don't think the outcome should be

2   any different, Judge.

3          MR. OSTFELD:  Your Honor, this is Greg Ostfeld.  I

4   don't want to exhaust the Court's patience, but I've had two

5   counsel make opposing arguments, if I could just briefly be

6   heard.

7          SPECIAL MASTER VANASKIE:  You certainly may.

8          And I want to ask you too, what about taking what I

9   would view as -- not a sampling of data but limited data and

10  then coming back if you can make the case for more of the

11  data.

12         Go ahead, you respond, because you're right, you had

13  two lawyers making arguments, and you've got -- certainly have

14  to have an opportunity to respond.

15         MR. OSTFELD:  Thank you, Judge.

16         And we're seeking limited data.  We're seeking 14

17  specific data reports and 14 specific datasets over a limited

18  period of time.  And frankly, producing that over the full

19  period of time versus producing it over a year or two, you're

20  talking about essentially the same amount of effort.  So it is

21  a limited amount of data, but it will enable our experts to

22  undertake a comprehensive analysis.

23         Now Mr. Rivero made a point about what Mr. Kosty said

24  at deposition regarding the fact that the data are reported

25  for Medicare in the aggregate.  That is certainly true, but

1   Mr. Kosty never said that it was possible to disaggregate the

2   data.  What he said in his report at paragraphs 83 and 85 is

3   that it requires a significant amount of information on the

4   subsidies paid by the government entities and it's highly

5   complex.  That is why we need more data, not less.

6          I also respectfully continue to disagree with

7   Mr. Rivero that the burden is upon us to demonstrate to

8   plaintiffs how they are supposed to go about disaggregating

9   the data, subtracting the government expenditures or setting

10  off the government expenditures.

11         The law is clear government expenditures are not

12  injury.  The burden is upon the plaintiffs to perform that.

13  It is sufficient for our experts to have the data they need to

14  criticize plaintiffs' experts.  And that is exactly the

15  dynamic that came out in *Namenda*.

16         Also, I have to specifically respectfully disagree

17  with Mr. Rivero that the conclusion to be drawn from the

18  motion in limine ruling in *Namenda* is the discovery was

19  disallowed.  There's nothing to suggest that Dr. Grabowski in

20  *Namenda* didn't have access to data and wasn't using the data

21  available to criticize the damages methodology.  There's

22  simply nothing in the record to suggest that.

23         So what we're dealing with here, Your Honor, is a

24  forthcoming classic battle of the experts, where plaintiffs'

25  experts are going to be arguing that they cannot disaggregate

1    the government data and are going to be seeking the full

2    amount that was spent at the point of sale as their damages.

3           Our experts are going to be criticizing plaintiffs'

4    experts for failing to disaggregate the data, not over a one-

5    or two-year period but over the entire time period.  Whether

6    or not our experts then make the next step and actually

7    calculate what should have been subtracted out, that's our

8    strategic decision to make.  That's our tactical decision to

9    make.  We should be allowed to make that decision in

10    conference with our experts, not get a discrete piece of data

11    and then have to make some kind of showing beyond our burden

12    of proof, which is not ours, it's plaintiffs' burden of proof.

13    We should not be required to do that.  We should simply be

14    given the datasets and data to which we are entitled to enable

15    our experts to formulate their criticism of plaintiffs'

16    damages calculation.

17           Lastly, Your Honor, with respect to Mr. Honik's point

18    regarding *Namenda* being an antitrust case.  It certainly is an

19    antitrust case, and that comes with some differences.

20           But on this issue, it is perfectly clear what

21    happened.  The uniform antitrust statute at issue in *Namenda*

22    contains a statutory restriction to actual damages.  We showed

23    on pages 11 and 12 of our brief that every claim presented by

24    MSPRC likewise has an actual damages restriction.  The New

25    York consumer protection statutory claims in fact have

1    language that very closely parallels the statutory language in

2    *Namenda*.

3            So in all instances we are dealing with an actual

4    damages to actual damages comparator.  And the important point

5    from the *Namenda* decision is that government expenditures,

6    reimbursements, et cetera, are not damages.  They have to come

7    out.  It's not even a close question.

8            If it's not even a close question for trial, it's

9    even less of a close question at the discovery stage.

10           MR. HONIK:  Judge, you may be muted.

11           SPECIAL MASTER VANASKIE:  Last question I think for

12   Mr. Ostfeld.

13           And that is, production of data on attorneys' eyes

14   only basis, what's your position?

15           MR. OSTFELD:  Your Honor, I think that's captured by

16   the restricted confidential category in the existing

17   protective order.

18           If plaintiffs are making the argument that restricted

19   confidential is no longer sufficient protection -- and I would

20   note the defendants have produced some really, really

21   sensitive documents under the restricted confidential

22   category.  If they think they need something even more for

23   this to protect their secret sauce, I certainly would be fine

24   entertaining that, as long as counsel get to look at it and

25   our experts get to look at it in accordance with the

 1    restricted confidential category.

 2          If there's some category of disclosure within that

 3    section that goes beyond that that they want to talk about,

 4    that's fine.  We don't want -- we're not looking to expose

 5    their secret sauce to the world.  We're looking to show it to

 6    our experts and to be able to confer amongst counsel on it.

 7          And that's for the TPP defendants.  We're not

 8    suggesting that CVS or the other downstream defendants or

 9    pharmacies need to be brought into this.

10          SPECIAL MASTER VANASKIE:  All right.  Thank you.

11          Anything else from the plaintiffs?

12          MR. RIVERO:  No, Judge, not from me.

13          SPECIAL MASTER VANASKIE:  All right.  Well argued.

14    We'll try to get a decision out promptly on this.  I'm sure

15    I'll get the transcript -- this argument has been very

16    helpful.  I'm sure I'll get the transcript promptly and make a

17    decision.

18          Is there any other matter you need to cover with me

19    before we get Judge Kugler on the line?

20          (No response.)

21          SPECIAL MASTER VANASKIE:  Hearing nothing, what I'm

22    going to do then is drop off the call.

23          Excuse me?  Go ahead.

24          MR. HUNCHUCK:  I was on mute myself, Your Honor.

25          This is Steven Hunchuck from Morgan Lewis & Bockius

 1    on behalf of defendants.

 2             I just -- if I may, just give a quick update on the

 3    losartan/irbesartan plaintiff fact sheet.

 4             SPECIAL MASTER VANASKIE:  Okay.  Thank you.

 5             MR. HUNCHUCK:  I'll be short, Your Honor, because

 6    this really is just a status update for the Court.

 7             But in light of the recent productions of core

 8    discovery from both parties in part, the defendants have

 9    reached out to plaintiffs and discussed proposed plaintiff

10    fact sheets related to those products.  We sent them drafts

11    on -- to plaintiffs' counsel on Friday.

12             So while this issue isn't ripe for today, other than

13    to inform the Court that the parties have begun the conferral

14    process and defendants hope to present any disagreements at

15    the next biweekly conference call.

16             SPECIAL MASTER VANASKIE:  Great.  Anything else?

17             MS. LOCKARD:  Judge Vanaskie, good morning, it's

18    Victoria Lockard.

19             SPECIAL MASTER VANASKIE:  Yes.

20             MS. LOCKARD:  Just briefly, the only other issue I

21    believe we had proposed that is appropriate for you is the

22    parties had jointly proposed a briefing schedule on the motion

23    to seal, which we included in our submission, for opening

24    briefs on December 2nd and response briefs on December 19th.

25             So we'd like to get the Court's endorsement of that,

 1   if you're inclined, and proceed accordingly, or as otherwise

 2   instructed.

 3           SPECIAL MASTER VANASKIE:  Ms. Lockard, I thought you

 4   were interrupting to congratulate the Phillies on beating the

 5   Braves during the playoffs, but --

 6           MS. LOCKARD:  Ooh.  I didn't expect it from you,

 7   Judge Vanaskie.  I expected it from Judge Kugler, but okay.

 8   We'll take --

 9           SPECIAL MASTER VANASKIE:  We're both Phillies fans.

10           Yeah.  But we'll issue an order on that.

11           I just want to double check with Judge Kugler,

12   because, again, it was one of those motions, it wasn't clear

13   if that should be mine or I should let Judge Kugler handle it.

14   But I don't see that as a problem.

15           Anything else?

16           (No response.)

17           SPECIAL MASTER VANASKIE:  All right.  I'm going to

18   drop off the call, get Judge Kugler on the line and rejoin you

19   all.

20           Thank you all very much.

21           (Pause in proceedings.)

22           THE COURT:  It's a great day to be a fan of the

23   Philadelphia Phillies and the Eagles.

24           Hey, Mr. Slater, I was really disappointed in your

25   Yankees.  I don't know what happened, but I think their team

```
 1   is better than that.  But what are you going to do?
 2            MR. SLATER:  Judge, as a Yankee fan, I thought they
 3   exceeded expectations.
 4            THE COURT:  No.
 5            MR. SLATER:  Don't you like a Yankee fan with a glass
 6   half full attitude, though?
 7            THE COURT:  Well, they have some decisions to make
 8   now, that's for sure.  We'll see how they do.
 9            But anyway --
10            MR. SLATER:  But congratulations to the Phillies.
11            THE COURT:  Huh?
12            MR. SLATER:  I said, congratulations to the Phillies.
13            THE COURT:  Thank you.  They exceeded all my
14   expectations.  Back in September, I didn't think they were
15   going to make it to the playoffs, bit boy, it sure has been
16   exciting to be a Phillies fan right now.  Houston is a great
17   team, but, you know, hope springs eternal among Philadelphia
18   people, so we will see.
19            How about we get right to the dismissals.
20            Mr. Harkins, are you going to handle this?
21            MR. HARKINS:  Yes, Your Honor.  This is Steve Harkins
22   with Greenberg Traurig for the Teva defendants and Joint
23   Defense Group.
24            THE COURT:  You wrote about Richard Allen Williams.
25            Is Mr. Pittman on the call for Mr. Williams?
```

1          MR. HARKINS:  Your Honor, this is Mr. Harkins.  I'm

2    not hearing anything from counsel for plaintiffs or the Court.

3    But I just want to confirm that I'm not missing somebody on

4    mute.

5          THE COURT:  Mr. Harkins, this is Judge Kugler again.

6    I got disconnected.  I guess I haven't paid my AT&T bill

7    lately, so --

8          Anyway, I started to ask if Mr. Pittman was on the

9    line for the plaintiff.  Is he on the line?

10          Is anybody on the line for the plaintiff Richard

11    Allen Williams?

12          I don't know, Mr. Harkins.  Have you heard back from

13    them since you got the letter?

14          MR. HARKINS:  Your Honor, we have not.  Other than

15    that submission, we have not seen anything from counsel.  They

16    have not attended any of the meet and confers.

17          I also note that effectively the extension that was

18    requested has really been granted by plaintiffs' counsel.

19          I can confirm that as of right now there is still no

20    plaintiff fact sheet filed with regard to this case, so we

21    think it's appropriate to finalize dismissal at this time.

22          THE COURT:  All right.  I'm going to grant your

23    motion to dismiss.  This has been going on for quite some

24    time, and I don't know what's going on, but the plaintiff

25    needs to make a decision, hasn't made a decision knowing what

 1   the consequences were, so I'm going to grant the application

 2   to dismiss that.

 3          All right.  You wrote that the King and Collins

 4   matters have been resolved.

 5          How about the other four?

 6          MR. HARKINS:  One update there, Your Honor.

 7          The Elie Greene v. Aurobindo matter has also been

 8   resolved, and that order to show cause can be withdrawn.

 9          The defendants therefore are only requesting

10   dismissals in three matters, the Smith, Thompson and Bernhardt

11   cases, and defendants would move for dismissal of those three

12   actions at this time.

13          THE COURT:  Okay.  Benita King, Carrie Collins and

14   Elie Greene, that order to show cause will be dismissed.

15          Anybody want to speak on Jim Smith, Eric Thompson or

16   Estate of Bernhardt?

17          MR. RESNICK:  Your Honor, good morning.  This is

18   Steven Resnick from Parafinczuk Wolf on behalf of the Estate

19   of Charles Bernhardt.  I'd like to address the issue if I may,

20   Judge.

21          THE COURT:  Sure.

22          MR. RESNICK:  So our firm was retained by

23   Mr. Bernhardt in 2019.  He subsequently passed away in 2021.

24          The surviving spouse, Osha Bernhardt, she's in her

25   80s, and we've had some difficulty contacting her.  We've made

1   a number of calls.  We've sent several letters.  We tried to

2   locate other family members without much success in terms of a

3   response.

4           We recently engaged a company called Peoplehunter.com

5   which specializes in locating individuals for attorneys.  And

6   that outfit helped us locate one of the children, a daughter

7   name Vicki Brown.

8           As it turns out, Judge, Mrs. Bernhardt happened to be

9   staying with the daughter at the time.  And we're now in touch

10  with Mrs. Bernhardt, and we have her cooperation.

11          She certainly understands her obligations.  She's

12  completed a fact sheet which we literally received yesterday

13  and which we submitted yesterday.  There may be a missing

14  authorization which we've resent to the plaintiff.  But we're

15  now in communication with her, and we have a good method of

16  reaching her.

17          Given her age, she does need a bit more hand-holding,

18  but I think it would reasonable to allow her at least one more

19  opportunity to participate in this litigation.

20          So we would request an order to show cause be denied

21  or at a minimum that the returnable date on the rule to show

22  cause be extended at least to the next case management

23  conference.

24          THE COURT:  All right.  We'll extend it another 30

25  days to the next management conference to see how it works

```
 1  out.  Okay?
 2          MR. RESNICK:  Okay.  Thank you, Your Honor.
 3          THE COURT:  All right.  So the Jim Smith and Eric
 4  Thompson matters will be dismissed since no one has spoken on
 5  their behalf.
 6          Mr. Harkins, you have -- let's see -- ten you want to
 7  list for order to show cause.
 8          Any changes on those?
 9          MR. HARKINS:  One update there, Your Honor.
10          Number 4 on our list, Gracie Ellis, that case can be
11  withdrawn, so we would request orders to show cause returnable
12  at the next case management conference in the other nine
13  matters.
14          THE COURT:  Anybody want to speak on behalf of any of
15  these plaintiffs at this time?
16          MR. NIGH:  Your Honor, it's Daniel Nigh on behalf of
17  Carl Mirabile.  And I would just reiterate what we said in the
18  past, that we don't believe that billing records are a core
19  deficiency.  However, as we've done in the past, we've been
20  able to usually work these out over the next 30 days so we
21  don't have an issue at the next case management conference.
22          THE COURT:  Okay.  You've got another 30 days to see
23  if we can get it worked out.
24          Anybody else?
25          MR. RESNICK:  Your Honor, this is Steven Resnick
```

1    again from Parafinczuk Wolf.  I can speak to Chikhi, Baker and

2    Engel.

3        We're still working to cure the deficiencies in those

4    cases and hope to be able to do so by the next case management

5    conference.  Just wanted to let you know.

6        THE COURT:  Okay.  Thank you.

7        All right.  Estate of Rita Chikhi, C-H-I-K-H-I;

8    Yvonne Baker; Carl Mirabile, M-I-R-A-B-I-L-E; Gracie Ellis;

9    Rose McCarty; Bobby Yount.

10        I'm sorry, Gracie Ellis, no.  That's not going to be

11    listed.

12        Rose McCarty; Bobby Yount; Robert Parker; Howard

13    Engel; Genita, G-E-N-I-T-A, Johnson; and Anthony Long will all

14    be listed as an order to show cause why they shouldn't be

15    dismissed at the next management conference.

16        Then we have 20 more, Mr. Harkins, you want to list

17    again.  Correct?

18        MR. HARKINS:  Yes, Your Honor.  No updates on the

19    remainder of that list, although turning just back briefly to

20    the prior request orders to show cause in the nine cases, I'll

21    just note, because this comment has been made several times

22    now on our recent most case management conference calls, the

23    specific issue of whether medical expenses were a core

24    deficiency was argued to Judge Schneider on the May 27, 2020

25    case management conference.

1          Judge Schneider ruled that the failure to provide

2    medical expenses or records documenting medical expenses was a

3    core deficiency, that being a deficiency that standing alone

4    was sufficient to justify placement on this list and a request

5    for an order to show cause leading to eventual dismissal.

6          We've been proceeding under that for more than two

7    years now, so we are going to continue to list these as a core

8    deficiency in accordance with Judge Schneider's ruling.  If

9    the Court would like us to revisit that, we certainly can.

10          And again, I believe as Mr. Nigh has acknowledged,

11    this has not led to the actual dismissal of cases, but it has

12    been very helpful in enabling us to actually obtain these

13    records from plaintiffs.

14          So with that note, though, no other updates to the

15    requests for defendants to relist those 20 matters for the

16    next case management conference.

17          THE COURT:  We are not going to revisit that ruling.

18    It has been efficient.  Everybody understands it.

19          But I understand how Mr. Nigh makes the point he

20    makes, and that's okay.  But we will continue to dismiss cases

21    if they fail to supply billing records.

22          All right.  So we have Clifford Conley; Harold

23    Mabry -- I'm having some problems here today with the

24    internet -- Dennis Macabuhay, M-A-C-A-B-U-H-A-Y; Estate of

25    Daniel Kwoka, K-W-O-K-A; Estate of Eloise Allen; Carrie

```
 1   Collins; Maritza Hernandez; Zola Owens; Willie Quarles,
 2   Q-U-A-R-L-E-S; Larry Bass; Ina Roddey, R-O-D-D-E-Y; Estate of
 3   Candace King; Robert Bailey; Thomas Amoia, A-M-O-I-A; Robert
 4   Lewis; Brian Thompson; Renne, R-E-N-N-E, Bishop; Mona Clark;
 5   Estate of Charlotte Orrino, O-R-R-I-N-O; and Estate of Gale,
 6   G-A-L-E, Barber will all be listed next time for a second
 7   listing.
 8            Mr. Harkins, does that cover everything?
 9            MR. HARKINS:  That does.  Thank you, Your Honor.
10            THE COURT:  All right.  I understand that you're
11   still trying to work out this timing for the motion to seal,
12   but apparently you've made a proposal.  And if that's
13   agreeable to both sides, we'll enter that order.
14            The damages expert, I'm a little unclear as to where
15   you are in the timelines for that.  I think there ought to be
16   timelines for the damages experts as requested by defendants.
17   If you can't work out the dates, I'll just impose them on you.
18            So do you want to -- plaintiffs and defendants want
19   to try to talk to each other about the dates for that and then
20   submit an order or proposal?
21            MR. HONIK:  Yes, Your Honor.  Ruben Honik for
22   plaintiffs.
23            We would like that opportunity.
24            THE COURT:  Okay.  Let's get that done within the
25   next seven days, please.
```

1          MR. HONIK:  Yes, sir.

2          THE COURT:  All right.  Anything else?

3          (No response.)

4          THE COURT:  Hearing nothing, thank you very much.

5   And Happy Halloween, everybody.  We'll see you next month.

6          RESPONSE:  Thank you, Your Honor.

7          (Proceedings concluded at 11:25 a.m.)

8                            -  -  -

9          I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  */S/ Ann Marie Mitchell, CCR, CRR, RDR, RMR*
    *Court Reporter/Transcriber*

13

14  *30th day of October, 2022*
         *Date*

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,500** [5] - 12:8, 12:9, 12:11, 12:16, 20:12
**$3,000** [2] - 12:6, 12:14, 20:6, 20:13, 26:4

## /

**/S** [1] - 60:12

## 0

**07068** [1] - 1:15
**08101** [1] - 1:7

## 1

**1** [4] - 10:16, 12:7, 12:10, 12:23
**1000** [1] - 2:3
**103** [1] - 1:14
**10:00** [3] - 1:8, 3:3, 3:7
**11** [2] - 16:11, 47:23
**1100** [1] - 1:17
**11:25** [1] - 60:7
**12** [3] - 11:9, 16:11, 47:23
**12th** [1] - 5:4
**14** [2] - 45:16, 45:17
**1515** [1] - 1:17
**15219** [1] - 2:17
**16th** [1] - 5:4
**18th** [2] - 5:4, 5:8
**19-md-02875** [1] - 1:4
**191032** [1] - 1:18
**19th** [1] - 50:24

## 2

**2** [9] - 9:1, 10:17, 10:25, 11:2, 12:11, 14:22, 17:21, 20:20, 38:25
**20** [3] - 13:14, 57:16, 58:15
**2018** [2] - 27:4, 27:9
**2019** [1] - 54:23
**2020** [1] - 57:24
**2021** [1] - 54:23
**2022** [2] - 1:8, 60:14
**2500** [1] - 2:10
**2525** [1] - 2:3
**25th** [1] - 5:5
**27** [2] - 1:8, 57:24
**28** [1] - 13:14
**29** [1] - 5:16
**2nd** [1] - 50:24

## 3

**3** [7] - 9:11, 10:17, 10:25, 11:2, 11:13, 11:15, 11:24
**3,000** [1] - 20:9
**30** [4] - 5:15, 55:24, 56:20, 56:22
**30305** [1] - 2:11
**30th** [1] - 60:14
**3100** [1] - 2:12
**316** [1] - 1:20
**32502** [1] - 1:21
**32nd** [1] - 2:17
**33024** [1] - 2:7
**33134** [1] - 2:3
**3333** [1] - 2:10
**36** [1] - 12:19

## 4

**4** [6] - 9:11, 11:13, 11:15, 11:24, 40:8, 56:10
**40** [1] - 11:5
**450-02** [1] - 2:6
**4th** [1] - 1:7

## 5

**576-7018** [1] - 1:23

## 6

**60** [1] - 5:15
**600** [1] - 1:20
**60601** [1] - 2:13

## 7

**7** [1] - 38:23
**75** [1] - 37:15
**77** [1] - 2:12

## 8

**8** [1] - 38:23
**80s** [1] - 54:25
**83** [1] - 46:2
**85** [1] - 46:2
**856** [1] - 1:23

## 9

**9050** [1] - 2:6
**9th** [1] - 5:4

## A

**a.m** [3] - 1:8, 3:3, 60:7
**able** [11] - 18:4, 19:10, 30:8, 31:13, 32:4, 34:4, 40:21, 42:8,
49:6, 56:20, 57:4
**above-entitled** [1] - 60:10
**absolutely** [4] - 9:17, 13:6, 21:1, 28:6
**abstract** [1] - 25:24
**abuse** [1] - 34:9
**accept** [1] - 34:18
**acceptable** [1] - 5:15
**access** [1] - 46:20
**accessible** [2] - 39:2, 39:3
**accordance** [1] - 48:25, 58:8
**accordingly** [1] - 51:1
**account** [2] - 16:23, 36:10
**accounted** [1] - 36:7
**acknowledged** [2] - 24:3, 58:10
**Actavis** [2] - 2:14, 2:14
**ACTION** [1] - 1:3
**actions** [1] - 54:12
**actual** [59] - 11:8, 11:11, 11:17, 11:21, 11:22, 11:23, 12:1, 12:21, 12:22, 13:2, 13:10, 13:20, 14:5, 14:10, 14:13, 14:21, 16:8, 16:9, 16:14, 17:3, 17:4, 17:6, 17:15, 17:16, 17:20, 17:25, 18:14, 18:15, 18:19, 18:20, 19:17, 19:24, 20:19, 20:20, 22:19, 23:12, 24:17, 25:12, 26:1, 26:25, 27:2, 29:9, 31:1, 31:18, 34:16, 34:19, 35:17, 35:18, 35:21, 37:8, 47:22, 47:24, 48:3, 48:4, 58:11
**actuarial** [1] - 33:9
**ad** [1] - 15:1
**ADAM** [1] - 1:14
**add** [1] - 21:6
**addition** [1] - 25:25
**additional** [4] - 18:13, 18:16, 24:25, 26:9
**address** [11] - 3:17, 6:11, 9:6, 9:7, 10:8, 10:9, 15:1, 21:3, 27:15, 29:2, 54:19
**addressed** [1] - 10:2
**addressing** [4] - 8:20, 8:22, 8:24, 15:12
**admissions** [1] - 25:3
**advantage** [1] - 42:16
**advised** [2] - 4:4, 5:16

**affiant** [1] - 28:15
**affiant's** [1] - 29:15
**age** [2] - 33:10, 55:17
**agenda** [3] - 4:6, 10:2, 10:6
**aggregate** [1] - 22:23, 23:11, 29:23, 30:12, 30:14, 34:19, 37:22, 40:24, 41:9, 43:21, 45:25
**aggregated** [9] - 15:2, 20:7, 23:6, 23:12, 40:4, 41:7, 43:13, 43:15
**ago** [3] - 11:6, 16:15, 21:13
**agree** [4] - 4:12, 8:5, 8:16, 13:23
**agreeable** [1] - 59:13
**agreeing** [1] - 41:10
**agreement** [2] - 9:1, 9:5
**ahead** [6] - 16:12, 19:11, 21:8, 27:10, 45:12, 49:23
**aided** [1] - 1:25
**air** [3] - 12:9, 12:11, 12:17
**all-in** [1] - 23:1
**alleged** [2] - 24:5, 24:8
**Allen** [3] - 52:24, 53:11, 58:25
**allow** [2] - 34:21, 55:18
**allowed** [4] - 24:8, 24:9, 24:25, 47:9
**almost** [1] - 10:3
**alone** [1] - 58:3
**ALSO** [1] - 2:20
**alternator** [1] - 12:8
**Amoia** [1] - 59:3
**AMOIA** [1] - 59:3
**amount** [9] - 12:21, 13:12, 17:1, 25:11, 45:20, 45:21, 46:3, 47:2
**ample** [2] - 6:25, 7:4
**analogy** [3] - 17:24, 26:2, 26:8
**analysis** [6] - 28:3, 33:19, 35:15, 38:2, 39:19, 45:22
**Andres** [3] - 9:4, 27:12, 39:23
**ANDRES** [1] - 2:2
**Ann** [3] - 3:12, 3:14, 60:12
**ann** [1] - 1:22
**AnnMarie_Mitchell@ njd.uscourts.gov** [1]

**-** 1:23
**answer** [3] - 19:15, 19:17, 29:2
**answered** [1] - 9:3
**Anthony** [1] - 57:13
**anticipated** [1] - 17:23
**antitrust** [6] - 44:2, 44:4, 44:22, 47:18, 47:19, 47:21
**anyway** [2] - 52:9, 53:8
**apologize** [1] - 27:7
**appeal** [1] - 7:25
**application** [1] - 54:1
**applied** [1] - 28:20
**apply** [2] - 29:11, 29:12
**approach** [1] - 34:1
**appropriate** [7] - 4:8, 6:20, 8:6, 8:11, 26:14, 50:21, 53:21
**area** [1] - 32:20
**argued** [4] - 43:11, 43:13, 49:13, 57:24
**arguing** [1] - 46:25
**argument** [5] - 21:12, 23:19, 29:11, 48:18, 49:15
**arguments** [2] - 45:5, 45:13
**arrive** [3] - 4:8, 7:7, 44:7
**arrived** [1] - 4:17
**aspect** [1] - 28:12
**asserted** [3] - 3:20, 21:18, 37:3
**asserting** [3] - 16:8, 16:14, 26:21
**assess** [4] - 17:15, 18:4, 18:12, 27:2
**assignments** [1] - 40:10
**assignor** [1] - 20:5
**assignors** [5] - 16:13, 17:1, 29:10, 30:12, 32:17
**assignors'** [2] - 11:12, 33:6
**associated** [1] - 23:7
**assume** [1] - 12:5
**AT&T** [1] - 53:6
**Atlanta** [1] - 2:11
**attach** [1] - 9:17
**attempt** [1] - 24:9
**attended** [2] - 7:16, 53:16
**attenuated** [1] - 22:22
**attitude** [1] - 52:6
**attorneys** [1] - 55:5
**attorneys'** [2] - 42:19,

48:13
**attributable** [1] -
40:25
**audience** [2] - 4:22,
7:6
**Aurobindo** [2] - 2:18,
54:7
**Aurolife** [1] - 2:18
**authorization** [1] -
55:14
**available** [1] - 46:21
**await** [1] - 6:6
**awaiting** [1] - 7:24

## B

**baby** [1] - 33:14
**bad** [2] - 12:8, 27:7
**Bailey** [1] - 59:3
**baked** [1] - 39:1
**Baker** [2] - 57:1, 57:8
**balance** [1] - 26:11
**Barber** [1] - 59:6
**barking** [1] - 23:4
**based** [3] - 13:11,
21:21, 25:19, 40:15,
40:16
**basic** [2] - 16:7, 16:21
**basis** [8] - 9:24, 14:19,
15:20, 23:14, 36:18,
38:19, 39:7, 48:14
**Bass** [1] - 59:2
**battle** [1] - 46:24
**Baylen** [1] - 1:20
**bear** [1] - 29:9
**bearing** [4] - 14:14,
20:24, 21:1, 28:11
**beating** [1] - 51:4
**becomes** [1] - 37:9
**beforehand** [1] -
34:23
**begin** [1] - 23:25
**beginning** [2] - 23:4,
26:3
**begun** [1] - 50:13
**behalf** [7] - 16:1,
16:13, 50:1, 54:18,
56:5, 56:14, 56:16
**belabor** [2] - 20:16,
33:20
**believes** [1] - 25:3
**beneficiaries** [2] -
16:1, 16:4
**benefit** [2] - 16:2,
40:24
**Benita** [1] - 54:13
**Bernhardt** [7] - 54:10,
54:16, 54:19, 54:23,
54:24, 55:8, 55:10
**best** [2] - 8:4, 41:25

**better** [3] - 4:18, 22:9,
52:1
**between** [3] - 4:21,
7:6, 39:9
**beyond** [2] - 47:11,
49:3
**bid** [6] - 10:17, 17:13,
17:18, 18:23, 23:11
**bids** [9] - 9:11, 15:7,
17:17, 26:12, 28:17,
33:7
**bill** [1] - 53:6
**billing** [2] - 56:18,
58:21
**Bishop** [1] - 59:4
**bit** [4] - 21:6, 40:19,
52:15, 55:17
**biweekly** [1] - 50:15
**Bobby** [2] - 57:9,
57:12
**BOCKIUS** [1] - 2:16
**Bockius** [1] - 49:25
**borne** [1] - 16:25
**Boulevard** [2] - 2:3,
2:6
**boy** [1] - 52:15
**Braves** [1] - 51:5
**breach** [1] - 19:1
**break** [2] - 12:9, 22:23
**Brian** [1] - 59:4
**brief** [10] - 3:20, 5:20,
10:4, 11:10, 16:11,
21:6, 25:5, 38:24,
40:8, 47:23
**briefed** [1] - 43:11
**briefing** [2] - 21:18,
50:22
**briefly** [6] - 14:22,
19:4, 21:9, 45:5,
50:20, 57:19
**briefs** [2] - 50:24
**bring** [1] - 3:17
**broad** [1] - 37:19
**brought** [1] - 49:9
**Brown** [1] - 55:7
**budget** [3] - 12:5,
26:3, 26:6
**Building** [1] - 1:6
**burden** [21] - 10:21,
13:1, 33:21, 35:7,
35:9, 35:16, 35:24,
37:6, 39:17, 40:14,
42:4, 42:12, 42:22,
42:23, 42:24, 46:7,
46:12, 47:11, 47:12
**burdensome** [2] -
38:22, 39:5
**business** [3] - 33:6,
43:14

## C

**calculate** [2] - 36:16,
47:7
**calculation** [6] -
20:17, 36:8, 37:3,
37:10, 47:16
**calendar** [1] - 6:23
**Camden** [1] - 1:7
**Candace** [1] - 59:3
**cannot** [4] - 23:18,
30:16, 43:13, 46:25
**capita** [1] - 31:24
**captured** [1] - 48:15
**car** [4] - 12:6, 17:24,
26:2, 26:4
**carefully** [1] - 33:17
**Carl** [2] - 56:17, 57:8
**Carrie** [2] - 54:13,
58:25
**case** [39] - 5:18, 8:14,
11:21, 13:11, 14:2,
14:3, 14:11, 15:16,
21:22, 22:3, 25:7,
30:20, 36:5, 37:4,
38:11, 39:14, 43:5,
43:7, 43:16, 44:1,
44:2, 44:4, 44:6,
44:15, 44:16, 44:22,
45:10, 47:18, 47:19,
53:20, 55:22, 56:10,
56:12, 56:21, 57:4,
57:22, 57:25, 58:16
**cases** [12] - 14:1, 14:2,
19:21, 19:22, 22:5,
41:19, 54:11, 57:4,
57:20, 58:11, 58:20
**catastrophic** [3] -
32:11, 32:16, 40:18
**categories** [6] - 10:14,
18:2, 28:3, 31:23,
32:11, 42:9
**category** [6] - 9:10,
11:22, 48:16, 48:22,
49:1, 49:2
**Category** [4] - 9:11,
12:23, 20:20
**caused** [7] - 12:17,
13:14, 16:3, 17:16,
18:10, 20:11, 20:12
**CCR** [1] - 60:12
**Centre** [1] - 2:17
**certain** [1] - 8:23
**certainly** [15] - 4:9,
4:18, 23:22, 24:22,
25:7, 31:22, 36:20,
39:7, 45:7, 45:13,
45:25, 47:18, 48:23,
55:11, 58:9
**certification** [8] - 5:10,

5:13, 5:19, 6:1, 6:6,
6:24, 7:22, 7:25
**certify** [1] - 60:9
**cetera** [2] - 3:22, 48:6
**chair** [1] - 14:16
**challenge** [4] - 16:12,
24:10, 24:13, 25:1
**chance** [1] - 34:2
**change** [2] - 33:9
**changes** [1] - 56:8
**characterization** [2] -
6:14, 11:15
**charge** [1] - 12:11
**Charles** [1] - 54:19
**Charlotte** [1] - 59:5
**check** [2] - 14:15,
51:11
**Chicago** [1] - 2:13
**Chikhi** [2] - 57:1, 57:7
**CHIKHI** [1] - 57:7
**children** [1] - 55:6
**citations** [1] - 16:11
**cite** [4] - 14:1, 14:2,
19:21, 30:21
**cites** [1] - 11:21
**CIVIL** [1] - 1:3
**claim** [5] - 16:8, 21:20,
29:14, 47:23
**claiming** [2] - 16:3,
16:5
**claims** [5] - 16:10,
16:14, 35:17, 41:1,
47:25
**clarification** [1] -
17:11
**clarify** [2] - 3:16, 19:23
**Clark** [1] - 59:4
**class** [7] - 5:10, 5:12,
5:19, 6:1, 6:6, 7:21,
7:25
**classes** [1] - 41:1
**classic** [3] - 18:25,
37:18, 46:24
**clear** [6] - 5:12, 39:25,
41:4, 46:11, 47:20,
51:12
**clearly** [2] - 26:19,
37:3
**Clerk** [1] - 2:21
**Clifford** [1] - 58:22
**clinical** [1] - 16:2
**close** [4] - 35:23, 48:7,
48:8, 48:9
**closely** [2] - 37:12,
48:1
**closest** [1] - 11:6
**CMO** [1] - 5:16
**CMS** [6] - 9:11, 15:7,
17:13, 17:17, 18:23,
26:12

**co** [5] - 6:16, 6:18, 7:5,
7:15, 7:17
**co-leads** [5] - 6:16,
6:18, 7:5, 7:15, 7:17
**Cohen** [1] - 1:6
**colleagues** [1] - 8:23
**college** [2] - 14:15,
16:20
**Collins** [3] - 54:3,
54:13, 59:1
**coming** [1] - 45:10
**Commencing** [1] - 1:8
**comment** [1] - 57:21
**comments** [1] - 9:20
**committee** [1] - 7:6
**common** [4] - 14:19,
15:14, 16:10, 31:16
**communication** [1] -
55:15
**companies** [2] -
21:14, 22:1
**company** [2] - 21:16,
55:4
**comparator** [1] - 48:4
**compare** [1] - 44:7
**comparing** [2] - 17:25,
26:9
**comparison** [1] -
44:19
**compel** [1] - 3:19
**compelling** [1] - 43:3
**competing** [1] - 33:11
**competitive** [2] -
28:16, 42:16
**competitors** [2] -
28:19, 28:24
**complete** [1] - 22:14
**completed** [3] - 21:24,
22:1, 55:12
**complex** [5] - 17:2,
18:4, 25:11, 37:9,
46:5
**complicated** [1] - 7:10
**component** [1] - 37:17
**comprehensive** [1] -
45:22
**compromise** [3] -
9:10, 9:18, 31:23
**computer** [1] - 1:25
**computer-aided** [1] -
1:25
**concede** [1] - 14:25
**conceded** [2] - 23:17,
42:14
**conceivable** [1] -
41:12
**concerns** [2] - 27:21,
31:16
**concession** [1] -
42:25

concluded [1] - 60:7
conclusion [2] -
14:12, 46:17
conditioner [3] - 12:9,
12:12, 12:17
confer [10] - 4:12,
4:16, 5:23, 5:24,
6:19, 7:5, 8:3, 8:10,
8:15, 49:6
conference [12] -
25:7, 47:10, 50:15,
55:23, 55:25, 56:12,
56:21, 57:5, 57:15,
57:22, 57:25, 58:16
CONFERENCE [1] -
1:5
conferral [1] - 50:13
confers [5] - 5:3, 7:15,
7:17, 25:16, 53:16
confessed [1] - 23:9
confidential [6] -
27:21, 44:25, 48:16,
48:19, 48:21, 49:1
confidentiality [1] -
42:15
confirm [2] - 53:3,
53:19
conflates [1] - 19:17
congratulate [1] -
51:4
congratulations [2] -
52:10, 52:12
conjure [2] - 23:17
Conley [1] - 58:22
consequences [1] -
54:1
consider [3] - 7:3,
43:18, 44:3
consistency [1] - 43:4
consistent [2] - 7:19,
8:1
constitute [1] - 18:14
consume [1] - 24:20
consumer [2] - 24:19,
47:25
consumers [2] -
21:14, 21:25
consuming [1] - 24:20
contact [2] - 6:14,
7:17
contacting [1] - 54:25
contain [3] - 15:19,
17:14, 17:17
containing [2] - 15:17,
17:9
contains [1] - 47:22
contamination [1] -
13:14
context [2] - 21:6,
44:21

Conti [4] - 16:23,
30:16, 32:5, 32:24
continue [3] - 46:6,
58:7, 58:20
Continued [1] - 2:1
contract [1] - 19:24
contrary [2] - 4:14,
6:19
controversy [1] -
29:21
conversations [1] -
25:16
conveyed [2] - 6:17,
7:20
Cooper [1] - 1:7
cooperation [1] -
55:10
core [5] - 50:7, 56:18,
57:23, 58:3, 58:7
correct [6] - 4:19,
9:13, 9:14, 27:6,
57:17, 60:9
corridor [2] - 40:17,
40:23
corridor/
catastrophic [1] -
40:20
cost [4] - 13:21, 17:22,
24:25, 43:9
costs [5] - 16:18,
16:25, 18:14, 18:17,
34:16
counsel [13] - 7:16,
7:20, 13:7, 30:11,
31:17, 35:6, 45:5,
48:24, 49:6, 50:11,
53:2, 53:15, 53:18
country [1] - 32:25
couple [2] - 3:6, 6:11
course [2] - 10:21,
21:10
court [2] - 3:11, 35:22
COURT [2] - 1:1, 3:12
Court [5] - 1:22,
17:11, 43:16, 43:23,
60:12
Court's [3] - 8:2, 45:4,
50:25
Courthouse [1] - 1:6
Courtroom [1] - 2:22
courts [1] - 19:23
cover [2] - 49:18, 59:8
covered [2] - 17:22,
27:25
create [2] - 30:9, 41:12
created [1] - 44:19
critical [1] - 11:3
criticism [2] - 36:1,
47:15
criticisms [1] - 37:25

criticize [6] - 16:22,
36:18, 37:23, 41:24,
46:14, 46:21
criticizing [2] - 36:9,
47:3
CRR [1] - 60:12
crux [4] - 11:13,
11:16, 13:2, 14:8
crystal [1] - 41:4
cure [1] - 57:3
CVS [1] - 49:8

# D

damage [8] - 3:21,
12:17, 13:18, 20:12,
22:4, 22:14, 26:8,
30:1
damages [44] - 5:6,
5:18, 11:22, 12:18,
14:5, 16:9, 16:14,
17:16, 18:19, 18:25,
19:1, 19:22, 19:24,
20:17, 35:9, 35:10,
35:16, 35:17, 35:21,
35:22, 36:9, 36:11,
37:3, 37:8, 37:12,
37:17, 38:14, 38:15,
38:18, 39:14, 44:7,
46:21, 47:2, 47:16,
47:22, 47:24, 48:4,
48:6, 59:14, 59:16
dangerousness [1] -
13:13
DANIEL [1] - 1:20
Daniel [2] - 56:16,
58:25
data [48] - 9:2, 14:21,
15:2, 15:9, 17:12,
17:13, 17:21, 19:17,
22:18, 26:24, 26:25,
35:11, 35:12, 35:24,
36:5, 36:12, 36:24,
37:21, 37:22, 38:1,
38:8, 38:19, 38:22,
39:18, 40:4, 43:9,
43:13, 43:15, 43:17,
43:21, 45:9, 45:11,
45:16, 45:17, 45:21,
45:24, 46:2, 46:5,
46:9, 46:13, 46:20,
47:1, 47:4, 47:10,
47:14, 48:13
databases [1] - 39:3
datasets [3] - 38:24,
45:17, 47:14
Date [1] - 60:14
date [2] - 27:8, 55:21
dates [3] - 27:7, 59:17,
59:19
Daubert [1] - 3:21

daughter [2] - 55:6,
55:9
DAVIS [1] - 2:9
days [6] - 5:16, 11:6,
55:25, 56:20, 56:22,
59:25
De [1] - 2:3
de [1] - 23:14
deadline [1] - 4:21
deadlines [9] - 5:6,
5:9, 5:16, 5:18, 6:1,
8:4, 8:6, 8:10, 8:12
dealing [2] - 46:23,
48:3
debate [1] - 13:16
December [2] - 50:24
decide [2] - 7:4, 39:22
decided [2] - 7:22,
44:21
decision [9] - 31:4,
47:8, 47:9, 48:5,
49:14, 49:17, 53:25
decisions [1] - 52:7
declarations [1] -
29:15
defeated [1] - 16:16
Defendants [2] - 2:13,
2:18
defendants [28] -
3:18, 4:15, 5:15,
6:22, 13:20, 15:10,
15:12, 21:13, 28:18,
29:19, 43:9, 43:12,
44:1, 44:16, 44:24,
45:1, 48:20, 49:7,
49:8, 50:1, 50:8,
50:14, 52:22, 54:9,
54:11, 58:15, 59:16,
59:18
defendants' [3] - 4:4,
12:13, 35:8
defense [15] - 4:24,
5:1, 7:6, 10:2, 13:22,
30:25, 31:6, 31:17,
32:19, 34:3, 34:13,
36:9, 39:12, 41:16,
41:18
Defense [1] - 52:23
defer [1] - 6:3
deferred [1] - 7:21
deficiencies [1] - 57:3
deficiency [5] - 56:19,
57:24, 58:3, 58:8
definitely [1] - 9:8
delay [1] - 44:5
delivered [1] - 16:2
delivery [1] - 44:4
demonstrate [5] -
24:12, 36:12, 36:17,
36:20, 46:7

demonstrated [3] -
36:24, 39:17, 39:18
demonstrates [1] -
36:5
demonstrating [1] -
35:11
demonstration [3] -
37:7, 39:10
demurred [1] - 5:7
denied [4] - 43:15,
43:17, 44:23, 55:20
Dennis [1] - 58:24
deposed [1] - 23:2
deposition [3] - 25:4,
25:18, 45:24
Deputy [1] - 2:22
described [2] - 24:18,
25:6
describes [1] - 25:14
description [2] - 25:3,
36:4
determination [2] -
6:2, 6:9
determine [6] - 7:4,
8:9, 12:18, 37:1,
37:13, 38:10
determining [4] -
16:12, 16:17, 16:25,
17:7
devices [1] - 23:1
difference [1] - 26:2
differences [1] - 47:19
different [6] - 14:24,
14:25, 31:23, 44:12,
44:22, 45:2
differently [1] - 7:2
difficulty [1] - 54:25
dig [1] - 37:21
direct [1] - 28:19
direction [1] - 9:18
directly [2] - 37:4,
40:25
disaggregate [10] -
25:10, 30:9, 30:15,
31:2, 33:22, 35:24,
43:21, 46:1, 46:25,
47:4
disaggregated [5] -
32:1, 33:1, 37:2,
37:23
disaggregating [1] -
46:8
disagree [10] - 5:11,
6:14, 24:20, 25:2,
35:14, 44:16, 44:17,
46:6, 46:16
disagreements [1] -
50:14
disallowed [1] - 46:19
disappointed [1] -

51:24
**disclosure** [1] - 49:2
**disconnected** [1] -
53:6
**discounts** [1] - 16:24
**discoverability** [1] -
35:12
**discovery** [23] - 3:19,
8:17, 15:22, 18:8,
20:23, 24:12, 35:13,
36:11, 36:23, 37:19,
37:20, 39:9, 39:10,
40:1, 41:5, 41:24,
41:25, 43:3, 44:24,
46:18, 48:9, 50:8
**discrete** [1] - 47:10
**discuss** [3] - 5:17, 6:6,
28:23
**discussed** [2] - 5:14,
50:9
**discussion** [2] - 6:16,
28:9
**discussions** [2] -
9:15, 19:14
**dismiss** [7] - 22:8,
24:1, 24:4, 24:6,
53:23, 54:2, 58:20
**dismissal** [4] - 53:21,
54:11, 58:5, 58:11
**dismissals** [2] - 52:19,
54:10
**dismissed** [3] - 54:14,
56:4, 57:15
**disprove** [1] - 35:9
**disputed** [2] - 11:13,
16:2
**disrespect** [1] - 19:15
**distinction** [1] - 29:8
**DISTRICT** [3] - 1:1,
1:1, 1:10
**documenting** [1] -
58:2
**documents** [5] - 9:9,
9:11, 18:23, 26:13,
48:21
**dollars** [1] - 22:19
**done** [7] - 23:18,
30:16, 30:18, 41:15,
42:7, 56:19, 59:24
**double** [1] - 51:11
**down** [1] - 22:23
**downstream** [4] -
43:9, 43:12, 45:1,
49:8
**Dr** [6] - 16:22, 16:23,
17:3, 25:11, 41:17,
46:19
**drafts** [1] - 50:10
**drawn** [1] - 46:17
**Drive** [1] - 2:12

**drop** [2] - 49:22, 51:18
**drug** [12] - 17:15,
17:18, 17:20, 18:13,
18:17, 21:17, 22:2,
24:23, 29:20, 40:11,
44:5, 44:18
**drugs** [10] - 13:12,
15:17, 17:9, 17:22,
18:18, 21:24, 22:6,
22:25, 27:5, 37:16
**due** [1] - 16:20
**during** [3] - 18:8,
21:10, 51:5
**dynamic** [1] - 46:15

**E**

**Eagles** [1] - 51:23
**economic** [22] - 14:18,
14:24, 14:25, 16:5,
16:21, 17:9, 17:10,
20:3, 20:14, 22:1,
24:17, 26:21, 30:4,
30:9, 34:12, 34:22,
41:11, 42:18, 42:20,
44:8, 44:13
**economically** [3] -
13:12, 13:23, 44:14
**economics** [3] -
14:16, 14:17, 16:21
**economist** [3] - 12:24,
13:5, 32:25
**economists** [1] - 44:6
**effectively** [1] - 53:17
**efficiency** [1] - 8:4
**efficient** [1] - 58:18
**effort** [1] - 45:20
**eight** [2] - 38:16, 39:4
**Eisenhower** [1] - 1:14
**either** [4] - 4:5, 11:21,
16:10, 21:15
**elements** [2] - 8:23,
21:23
**Elie** [2] - 54:7, 54:14
**Ellis** [3] - 56:10, 57:8,
57:10
**Eloise** [1] - 58:25
**embraced** [1] - 22:9
**emerge** [1] - 25:7
**enable** [3] - 37:20,
45:21, 47:14
**enables** [1] - 27:1
**enabling** [1] - 58:12
**end** [5] - 7:2, 14:8,
26:11, 36:6, 40:24
**endorsement** [1] -
50:25
**ends** [1] - 11:25
**engaged** [1] - 55:4
**Engel** [2] - 57:2, 57:13

**enter** [1] - 59:13
**entertaining** [1] -
48:24
**entire** [5] - 10:8,
30:21, 33:7, 42:16,
47:5
**entities** [1] - 46:4
**entitled** [4] - 32:9,
33:24, 47:14, 60:10
**entry** [1] - 44:9
**envisioning** [1] - 44:8
**equals** [1] - 14:5
**Eric** [2] - 54:15, 56:3
**especially** [1] - 28:24
**ESQUIRE** [10] - 1:14,
1:17, 1:20, 2:2, 2:6,
2:9, 2:10, 2:12, 2:16,
2:21
**essence** [1] - 23:19
**essentially** [1] - 45:20
**establish** [1] - 14:19
**estate** [1] - 57:7
**Estate** [4] - 54:16,
54:18, 58:24, 58:25,
59:2, 59:5
**estimate** [4] - 11:7,
20:5, 28:10, 29:9
**estimated** [1] - 34:23
**estimates** [10] - 10:17,
10:21, 10:25, 19:19,
20:21, 20:25, 29:1,
33:8, 34:14
**et** [2] - 3:22, 48:6
**eternal** [1] - 52:17
**evaluate** [1] - 38:19
**evaluated** [1] - 37:12
**evaluation** [1] - 44:14
**event** [1] - 44:18
**eventual** [1] - 58:5
**exactly** [6] - 30:20,
31:3, 36:3, 36:5,
42:1, 46:14
**example** [6] - 12:2,
17:17, 17:21, 20:10,
26:7, 31:18
**exceeded** [2] - 52:3,
52:13
**exchange** [1] - 11:10
**exchanged** [1] - 23:13
**exciting** [1] - 52:16
**excluded** [1] - 31:10
**excuse** [1] - 49:23
**executive** [1] - 7:6
**exercise** [3] - 25:14,
36:14, 36:20
**exhaust** [1] - 45:4
**exist** [1] - 39:1
**existed** [1] - 36:12
**existing** [2] - 27:25,
48:16

**exists** [1] - 29:13
**expect** [5] - 12:23,
18:17, 18:23, 26:3,
51:6
**expectation** [8] -
12:14, 12:15, 14:4,
18:25, 19:22, 19:23,
22:25, 23:11
**expectations** [18] -
11:12, 11:17, 11:25,
13:2, 14:9, 14:13,
14:20, 16:16, 16:18,
18:6, 18:9, 18:25,
21:15, 25:23, 25:25,
26:1, 52:3, 52:14
**expected** [4] - 12:18,
17:7, 17:14, 51:7
**expedition** [1] - 23:15
**expeditiously** [1] -
7:24
**expenditure** [1] -
25:12
**expenditures** [9] -
16:24, 17:4, 36:8,
36:16, 36:25, 46:9,
46:10, 46:11, 48:5
**expenses** [3] - 57:23,
58:2
**expert** [33] - 3:21, 5:6,
13:9, 13:10, 13:17,
14:11, 16:23, 30:16,
30:25, 31:1, 31:6,
31:7, 31:8, 31:9,
32:4, 32:7, 32:13,
32:18, 34:2, 36:7,
36:9, 36:10, 36:18,
36:21, 37:14, 40:7,
40:22, 41:2, 41:6,
41:12, 41:16, 59:14
**expert's** [2] - 36:22,
37:25
**experts** [39] - 5:18,
13:3, 14:11, 16:21,
22:4, 23:2, 23:17,
25:1, 25:4, 30:12,
30:17, 37:10, 37:12,
37:20, 38:1, 38:10,
38:19, 39:14, 39:19,
40:16, 41:13, 41:20,
42:19, 43:20, 44:16,
44:17, 45:21, 46:13,
46:14, 46:24, 46:25,
47:3, 47:4, 47:6,
47:10, 47:15, 48:25,
49:6, 59:16
**experts'** [3] - 39:11,
39:13, 39:15
**explain** [3] - 9:22,
13:25, 14:14
**explained** [1] - 20:14

**explaining** [1] - 11:7
**explanation** [1] -
38:21
**expose** [1] - 49:4
**extend** [1] - 55:24
**extended** [1] - 55:22
**extension** [1] - 53:17
**extensive** [1] - 21:18
**extensively** [1] - 43:11
**extent** [3] - 4:12,
26:20, 35:25
**extraordinarily** [2] -
28:14, 33:5
**extrapolate** [1] - 23:13
**extremely** [2] - 33:11,
43:25
**eyes** [2] - 42:19, 48:13

**F**

**fact** [19] - 12:25,
16:13, 16:14, 17:16,
24:10, 25:8, 28:18,
29:16, 32:13, 37:24,
39:22, 40:5, 44:21,
45:24, 47:25, 50:3,
50:10, 53:20, 55:12
**factors** [1] - 44:13
**fail** [3] - 20:22, 36:1,
58:21
**failed** [1] - 36:13
**failing** [5] - 16:23,
36:1, 36:10, 42:24,
47:4
**failure** [1] - 58:1
**fair** [8] - 26:17, 32:10,
32:22, 33:3, 33:14,
34:1, 40:19, 42:10
**fall** [1] - 6:23
**family** [1] - 55:2
**fan** [4] - 51:22, 52:2,
52:5, 52:16
**fans** [1] - 51:9
**far** [2] - 29:5, 38:18
**federal** [1] - 40:9
**fellow** [1] - 31:6
**filed** [1] - 53:20
**finalize** [1] - 53:21
**finally** [1] - 43:24
**fine** [3] - 7:2, 48:23,
49:4
**finish** [1] - 27:17
**finished** [1] - 39:2
**firm** [1] - 54:22
**first** [11] - 5:7, 8:25,
10:20, 14:19, 20:19,
20:24, 28:25, 38:1,
38:14, 42:12, 43:10
**fishing** [2] - 23:15,
23:16

**five** [1] - 5:3
**fix** [2] - 12:8, 12:11
**Floor** [1] - 2:17
**Florida** [3] - 1:21, 2:3, 2:7
**folks** [1] - 8:23
**footnote** [1] - 40:8
**foregoing** [1] - 60:9
**form** [2] - 39:2, 39:8
**former** [1] - 14:16
**formula** [2] - 23:5, 23:17
**formulate** [1] - 47:15
**forth** [2] - 16:10, 39:9
**forthcoming** [1] - 46:24
**forward** [2] - 35:5, 41:16
**four** [1] - 54:5
**fourth** [1] - 5:8
**frame** [1] - 26:16
**frankly** [4] - 33:23, 42:18, 43:18, 45:18
**FREEMAN** [1] - 1:13
**frequently** [1] - 22:23
**Friday** [1] - 50:11
**full** [3] - 45:18, 47:1, 52:6
**functionality** [1] - 24:6
**functions** [1] - 16:23
**future** [1] - 13:7

**G**

**Gale** [1] - 59:5
**GALE** [1] - 59:6
**generalities** [1] - 41:22
**generalized** [1] - 34:20
**generic** [3] - 44:4, 44:5, 44:8
**Genita** [1] - 57:13
**GENITA** [1] - 57:13
**Georgia** [1] - 2:11
**given** [5] - 32:5, 34:15, 34:16, 47:14, 55:17
**glad** [7] - 9:6, 10:8, 10:9, 10:12, 21:3, 29:2, 31:25
**glass** [1] - 52:5
**government** [15] - 16:24, 35:20, 35:25, 36:8, 36:16, 36:25, 37:7, 37:16, 40:9, 46:4, 46:9, 46:10, 46:11, 47:1, 48:5
**Grabowski** [11] - 31:6, 31:11, 31:12, 31:17, 34:2, 41:17, 41:23,

**41:24, 46:19**
**Gracie** [3] - 56:10, 57:8, 57:10
**grant** [3] - 43:3, 53:22, 54:1
**granted** [1] - 53:18
**great** [3] - 50:16, 51:22, 52:16
**Greenberg** [1] - 52:22
**GREENBERG** [1] - 2:9
**Greene** [2] - 54:7, 54:14
**Greg** [5] - 4:25, 15:11, 23:20, 35:2, 45:3
**GREGORY** [1] - 2:12
**Group** [1] - 52:23
**guess** [3] - 8:8, 41:14, 53:6
**gut** [1] - 14:15

**H**

**half** [1] - 52:6
**Halloween** [1] - 60:5
**hand** [1] - 55:17
**hand-holding** [1] - 55:17
**handed** [1] - 21:25
**handle** [3] - 8:14, 51:13, 52:20
**hands** [1] - 20:4
**Happy** [1] - 60:5
**happy** [2] - 6:6, 8:14
**HARKINS** [8] - 2:10, 52:21, 53:1, 53:14, 54:6, 56:9, 57:18, 59:9
**Harkins** [8] - 52:20, 52:21, 53:1, 53:5, 53:12, 56:6, 57:16, 59:8
**harm** [1] - 42:18
**Harold** [1] - 58:22
**Harvard** [1] - 14:17
**head** [1] - 31:24
**hear** [4] - 15:6, 19:5, 19:10, 34:11
**heard** [6] - 14:4, 23:21, 37:5, 38:21, 45:6, 53:12
**hearing** [3] - 49:21, 53:2, 60:4
**heart** [2] - 10:14, 33:6
**held** [1] - 3:1
**hello** [1] - 3:4
**help** [1] - 14:7
**helped** [1] - 55:6
**helpful** [3] - 18:19, 49:16, 58:12
**Hernandez** [1] - 59:1

**Hi** [1] - 3:14
**highly** [4] - 17:2, 17:19, 43:14, 46:4
**historical** [18] - 10:16, 12:22, 13:17, 14:23, 19:17, 20:3, 21:3, 22:16, 22:18, 27:15, 28:7, 28:9, 29:3, 29:6, 29:11, 29:17, 29:18, 34:13
**holding** [1] - 55:17
**honestly** [2] - 32:3, 40:14
**HONIK** [12] - 1:16, 1:17, 4:2, 6:10, 6:13, 8:22, 21:5, 21:9, 43:2, 48:10, 59:21, 60:1
**Honik** [13] - 4:3, 6:10, 6:12, 8:20, 21:5, 21:8, 24:2, 24:18, 25:6, 25:14, 27:11, 43:2, 59:21
**Honik's** [4] - 7:19, 23:25, 25:2, 47:17
**Honor** [65] - 3:12, 4:2, 4:4, 4:15, 4:25, 5:2, 6:3, 6:4, 6:10, 6:13, 7:14, 8:22, 9:4, 9:5, 10:13, 10:15, 10:25, 12:20, 13:3, 14:15, 15:2, 15:11, 15:14, 17:5, 17:12, 17:17, 19:2, 19:4, 20:22, 21:5, 23:20, 23:24, 25:21, 26:17, 27:6, 27:14, 28:2, 29:7, 30:24, 33:19, 34:6, 35:2, 38:4, 38:12, 38:20, 43:2, 45:3, 46:23, 47:17, 48:15, 49:24, 50:5, 52:21, 53:1, 53:14, 54:6, 54:17, 56:2, 56:9, 56:16, 56:25, 57:18, 59:9, 59:21, 60:6
**HONORABLE** [1] - 1:9
**Honorable** [2] - 2:21, 3:1
**hope** [4] - 3:15, 50:14, 52:17, 57:4
**hospital** [1] - 23:1
**household** [1] - 12:5
**Houston** [1] - 52:16
**Howard** [1] - 57:12
**Hunchuck** [1] - 49:25
**HUNCHUCK** [3] - 2:16, 49:24, 50:5

**I**

**idea** [2] - 24:11, 24:22
**identify** [2] - 5:6, 28:18
**illegal** [1] - 22:6
**Illinois** [1] - 2:13
**impact** [1] - 44:8
**impasse** [3] - 5:13, 6:2, 6:8
**implication** [1] - 35:19
**important** [12] - 7:3, 22:11, 24:2, 26:18, 30:20, 35:19, 37:14, 37:17, 38:1, 43:25, 44:3, 48:4
**impose** [1] - 59:17
**impossible** [2] - 13:23, 25:10
**Ina** [1] - 59:2
**inasmuch** [1] - 7:2
**Inc** [3] - 2:14, 2:14, 2:18
**inclined** [1] - 51:1
**included** [1] - 50:23
**including** [3] - 10:17, 11:5, 12:20
**income** [4] - 32:11, 32:17, 32:18, 40:20
**inconsistent** [1] - 43:22
**incur** [3] - 16:14, 17:9, 18:17
**incurred** [6] - 16:19, 18:14, 18:16, 24:16, 24:24
**indeed** [1] - 10:13
**independent** [1] - 40:10
**indicates** [1] - 4:16
**indications** [1] - 25:13
**individual** [1] - 41:1
**individuals** [1] - 55:5
**Industries** [1] - 2:13
**inefficient** [1] - 38:18
**inflation** [1] - 33:8
**info** [1] - 34:13
**inform** [1] - 50:13
**information** [32] - 9:3, 10:16, 10:18, 11:17, 12:22, 13:18, 14:23, 17:1, 17:3, 17:6, 17:14, 17:20, 18:4, 18:19, 20:3, 21:3, 25:11, 25:12, 25:14, 27:15, 27:22, 28:8, 28:9, 29:3, 29:6, 29:12, 29:17, 29:18, 30:14, 37:11, 38:10, 46:3

**initial** [2] - 11:1, 11:10
**injured** [2] - 15:20, 15:25
**injury** [17] - 15:16, 15:25, 16:4, 18:15, 21:15, 21:24, 22:14, 24:5, 24:16, 24:17, 24:19, 24:24, 24:25, 26:5, 26:10, 27:2, 46:12
**innumerable** [1] - 22:5
**instance** [1] - 26:9
**instances** [2] - 15:18, 48:3
**instructed** [1] - 51:2
**insurance** [3] - 21:14, 21:16, 22:1
**insurers** [1] - 44:25
**intend** [1] - 24:10
**intended** [1] - 16:3
**intention** [2] - 4:14, 24:14
**interest** [1] - 4:5
**internal** [7] - 9:11, 10:18, 15:7, 17:13, 18:23, 26:13, 43:4
**internet** [1] - 58:24
**interrupt** [1] - 15:3
**interrupting** [1] - 51:4
**invited** [2] - 5:22, 7:15
**involved** [1] - 21:14
**irrelevant** [2] - 22:20, 39:18
**issue** [26] - 5:1, 5:2, 6:2, 6:3, 6:9, 7:18, 8:3, 8:9, 8:15, 8:20, 11:20, 13:22, 18:9, 24:7, 25:6, 36:3, 37:4, 37:9, 47:20, 47:21, 50:12, 50:20, 51:10, 54:19, 56:21, 57:23
**issues** [2] - 18:11, 23:21
**iterative** [1] - 39:8
**itself** [2] - 8:18, 11:19

**J**

**JERSEY** [1] - 1:1
**Jersey** [2] - 1:7, 1:15
**Jim** [2] - 54:15, 56:3
**JLJ** [1] - 14:3
**Johnson** [1] - 57:13
**joining** [1] - 3:7
**Joint** [1] - 52:22
**jointly** [2] - 4:13, 50:22
**JUDGE** [1] - 1:10
**judge** [1] - 42:17

**Judge** [96] - 3:17,
3:24, 4:20, 4:22, 6:4,
7:1, 7:3, 7:7, 7:9,
7:23, 8:8, 8:9, 8:13,
9:14, 9:19, 9:23,
10:7, 10:12, 10:15,
10:20, 11:3, 11:9,
11:14, 11:19, 12:5,
12:7, 12:15, 12:18,
12:25, 13:9, 13:11,
13:22, 14:1, 14:7,
14:19, 14:22, 19:5,
19:12, 19:15, 21:2,
21:9, 21:18, 21:21,
22:22, 23:7, 24:1,
24:4, 27:12, 27:23,
28:13, 28:18, 29:24,
30:7, 30:20, 31:15,
31:22, 32:3, 32:5,
32:10, 32:12, 32:23,
33:3, 33:13, 33:17,
34:8, 34:12, 34:25,
39:23, 39:24, 40:11,
40:12, 40:15, 41:2,
42:3, 42:25, 43:3,
43:11, 44:23, 45:2,
45:15, 48:10, 49:12,
49:19, 50:17, 51:7,
51:11, 51:13, 51:18,
52:2, 53:5, 54:20,
55:8, 57:24, 58:1,
58:8
**Judge's** [1] - 13:15
**Judicial** [1] - 2:21
**judicial** [1] - 6:9
**jurisdiction** [1] - 28:17
**justify** [1] - 58:4

## K

**KATZ** [1] - 1:13
**key** [2] - 25:21, 26:1
**kind** [5] - 17:6, 28:22,
32:16, 43:17, 47:11
**King** [3] - 54:3, 54:13,
59:3
**knowing** [1] - 53:25
**knows** [1] - 12:16
**Kosty** [13] - 13:6, 13:4,
16:22, 16:25, 23:3,
25:9, 37:14, 40:7,
40:12, 40:22, 41:8,
45:23, 46:1
**Kugler** [20] - 2:21,
3:17, 3:24, 4:20, 6:4,
7:1, 7:3, 7:7, 7:23,
8:8, 8:9, 8:13, 21:18,
24:4, 49:19, 51:7,
51:11, 51:13, 51:18,
53:5
**KUGLER** [2] - 1:9, 3:2

**Kugler's** [2] - 13:11,
24:1
**Kwoka** [1] - 58:25
**KWOKA** [1] - 58:25

## L

**labeled** [1] - 9:2
**lack** [2] - 24:5, 26:4
**landscape** [1] - 44:13
**language** [2] - 48:1
**larry** [1] - 2:22
**Larry** [1] - 59:2
**last** [3] - 19:20, 25:7,
48:11
**lastly** [1] - 47:17
**lately** [1] - 53:7
**law** [8] - 11:21, 14:4,
14:6, 14:7, 14:11,
16:10, 40:15, 46:11
**Law** [1] - 2:21
**lawyer** [1] - 12:16
**lawyers** [2] - 12:19,
45:13
**leading** [2] - 32:24,
58:5
**leads** [5] - 6:16, 6:18,
7:5, 7:15, 7:17
**leaks** [1] - 42:17
**learn** [1] - 11:11
**least** [7] - 12:16,
13:24, 30:2, 43:19,
44:24, 55:18, 55:22
**led** [1] - 58:11
**legal** [2] - 20:18, 33:19
**legally** [1] - 19:20
**Leon** [1] - 2:3
**less** [3] - 26:23, 46:5,
48:9
**letter** [4] - 4:15, 10:2,
10:6, 53:13
**letters** [2] - 4:6, 55:1
**LEVIN** [1] - 1:19
**Lewis** [2] - 49:25, 59:4
**LEWIS** [1] - 2:16
**LIABILITY** [1] - 1:4
**liberal** [2] - 36:22,
37:19
**light** [1] - 50:7
**likewise** [1] - 47:24
**limine** [2] - 30:24,
46:18
**limit** [1] - 38:7
**limitation** [2] - 16:9,
35:16
**limited** [6] - 35:17,
40:13, 45:9, 45:16,
46:17, 45:21
**line** [8] - 18:6, 18:9,
18:24, 49:19, 51:18,

53:9, 53:10
**lined** [1] - 26:6
**list** [6] - 56:7, 56:10,
57:16, 57:19, 58:4,
58:7
**listed** [4] - 38:23,
57:11, 57:14, 59:6
**listened** [1] - 21:9
**listing** [1] - 59:7
**literally** [1] - 55:12
**litigation** [3] - 43:8,
43:11, 55:19
**LITIGATION** [1] - 1:4
**LLC** [4] - 1:13, 1:16,
2:14, 2:18
**LLP** [3] - 2:2, 2:9, 2:16
**locate** [2] - 55:2, 55:6
**locating** [1] - 55:5
**Lockard** [2] - 50:18,
51:3
**LOCKARD** [4] - 2:9,
50:17, 50:20, 51:6
**logic** [2] - 12:13, 14:10
**logical** [2] - 15:24,
34:13
**look** [12] - 19:21,
25:22, 31:5, 31:19,
33:16, 36:25, 37:22,
37:24, 43:5, 44:12,
48:24, 48:25
**lookback** [2] - 21:21,
38:15
**looked** [1] - 30:22
**looking** [6] - 18:1,
18:2, 25:24, 26:11,
49:4, 49:5
**LORETTA** [1] - 2:21
**losartan/irbesartan**
[1] - 50:3
**loss** [15] - 11:8, 11:11,
11:18, 11:21, 12:14,
13:2, 13:10, 14:10,
14:13, 14:21, 16:5,
17:10, 18:20, 26:21,
31:1
**losses** [10] - 11:23,
12:1, 16:9, 16:15,
17:4, 17:6, 18:15,
19:18, 24:17, 35:18
**lost** [1] - 21:7
**low** [4] - 32:11, 32:17,
32:18, 40:20
**Ltd** [1] - 2:13

## M

**Mabry** [1] - 58:23
**Macabuhay** [1] - 58:24
**MACABUHAY** [1] -
58:24

**MacStravic** [1] - 2:22
**management** [14] -
5:18, 8:7, 8:12, 25:7,
39:14, 55:22, 55:25,
56:12, 56:21, 57:4,
57:15, 57:22, 57:25,
58:16
**MAO** [3] - 16:13, 17:1,
33:6
**MAO's** [1] - 17:14
**MAOs** [3] - 17:7,
18:15, 42:17
**Marie** [4] - 1:22, 3:12,
3:14, 60:12
**Maritza** [1] - 59:1
**market** [1] - 15:23
**Market** [1] - 1:17
**marketplace** [2] -
22:7, 44:5
**MASTER** [48] - 1:11,
3:2, 3:4, 3:6, 3:9,
3:14, 4:23, 6:12,
7:12, 8:5, 8:25, 9:7,
9:21, 9:25, 10:10,
10:19, 15:3, 15:6,
15:13, 19:6, 19:9,
21:8, 23:22, 26:14,
27:3, 27:10, 27:13,
27:16, 27:19, 27:24,
29:4, 34:7, 35:1,
35:3, 38:3, 38:5,
45:7, 48:11, 49:10,
49:13, 49:21, 50:4,
50:16, 50:19, 51:3,
51:9, 51:17
**materials** [1] - 36:11
**matter** [13] - 4:20, 7:3,
7:21, 8:7, 10:2,
21:22, 23:12, 25:22,
25:23, 30:21, 49:18,
54:7, 60:10
**matters** [6] - 4:11,
54:4, 54:10, 56:4,
56:13, 58:15
**MAZIE** [1] - 1:13
**McCarty** [2] - 57:9,
57:12
**mean** [3] - 10:8, 19:15,
27:4
**meaning** [2] - 11:12,
44:4
**means** [7] - 22:24,
22:25, 24:7, 28:10,
30:15, 30:23, 33:22
**measure** [2] - 13:24,
18:25
**mechanical** [1] - 1:24
**medical** [6] - 23:1,
32:25, 33:8, 57:23,
58:2

**Medicare** [9] - 30:4,
30:13, 31:2, 31:3,
32:16, 40:17, 40:23,
41:7, 45:25
**meet** [19] - 4:11, 5:3,
5:23, 6:18, 7:15,
7:17, 8:10, 8:15,
25:16, 28:25, 33:20,
33:21, 40:14, 42:3,
42:12, 42:21, 42:24,
53:16
**meetings** [1] - 21:11
**members** [1] - 55:2
**mention** [2] - 22:11,
32:18
**merits** [2] - 10:8, 10:9
**Mestre** [2] - 8:24, 9:5
**MESTRE** [1] - 2:2
**met** [4] - 12:25, 19:2,
21:15, 37:6
**method** [2] - 23:10,
55:15
**methodology** [3] -
23:6, 39:16, 46:21
**methods** [1] - 33:12
**Miami** [1] - 2:3
**might** [7] - 24:18,
30:11, 32:20, 40:21,
41:12, 42:11
**mine** [2] - 19:7, 51:13
**minimis** [1] - 23:14
**minimum** [1] - 55:21
**minute** [1] - 15:4
**minutes** [1] - 3:7
**Mirabile** [2] - 56:17,
57:8
**MIRABILE** [1] - 57:8
**mischaracterize** [1] -
21:20
**misguided** [1] - 31:9
**missing** [2] - 53:3,
55:13
**MITCHELL** [1] - 1:19
**Mitchell** [4] - 1:6, 1:22,
3:12, 60:12
**model** [6] - 30:9,
31:12, 31:19, 32:8,
32:21, 41:12
**modeled** [1] - 22:4
**modeling** [1] - 43:14
**modern** [1] - 20:23
**moment** [2] - 34:6,
43:6
**Mona** [1] - 59:4
**money** [1] - 26:5
**month** [1] - 60:5
**MORGAN** [1] - 2:16
**Morgan** [1] - 49:25
**morning** [5] - 3:5,
3:13, 4:2, 50:17,

54:17
**most** [5] - 24:18,
26:18, 28:16, 28:20,
57:22
**motion** [14] - 3:18,
3:23, 6:25, 8:17,
10:3, 22:8, 24:1,
24:4, 24:6, 30:24,
46:18, 50:22, 53:23,
59:11
**motions** [2] - 3:22,
51:12
**move** [2] - 8:17, 54:11
**MR** [63] - 4:2, 4:25,
6:10, 6:13, 7:14,
8:22, 9:4, 9:14, 9:22,
10:7, 10:12, 10:20,
15:5, 15:11, 15:14,
17:12, 19:4, 19:8,
19:12, 21:5, 21:9,
23:20, 23:24, 26:17,
27:5, 27:12, 27:14,
27:18, 27:23, 28:2,
29:7, 34:8, 35:2,
35:4, 38:4, 38:12,
39:23, 43:2, 45:3,
45:15, 48:10, 48:15,
49:12, 49:24, 50:5,
52:2, 52:5, 52:10,
52:12, 52:21, 53:1,
53:14, 54:6, 54:17,
54:22, 56:2, 56:9,
56:16, 56:25, 57:18,
59:9, 59:21, 60:1
**MS** [3] - 50:17, 50:20,
51:6
**MSPRC** [2] - 16:13,
47:24
**MSPRC's** [5] - 7:16,
7:20, 35:6, 35:17,
36:8
**must** [1] - 35:21
**mute** [2] - 49:24, 53:4
**muted** [2] - 19:6,
48:10

**N**

**name** [1] - 55:7
**named** [1] - 31:6
**Namenda** [25] - 30:22,
30:23, 30:24, 31:4,
32:13, 32:18, 34:3,
35:22, 36:4, 37:6,
41:3, 41:17, 41:23,
42:1, 43:5, 43:25,
44:11, 44:21, 46:15,
46:18, 46:20, 47:18,
47:21, 48:2, 48:5
**nature** [3] - 9:17,
27:22, 31:23

**nauseam** [1] - 15:2
**NDMA** [1] - 27:5
**NE** [1] - 2:10
**nearly** [1] - 21:13
**necessarily** [1] - 36:14
**need** [10] - 17:3,
26:24, 36:17, 40:3,
46:5, 46:13, 48:22,
49:9, 49:18, 55:17
**needed** [2] - 25:12,
25:13
**needs** [3] - 6:5, 37:11,
53:25
**negotiate** [1] - 31:20
**never** [4] - 6:17, 14:13,
32:4, 46:1
**NEW** [1] - 1:1
**New** [5] - 1:7, 1:15,
30:22, 44:1, 47:24
**next** [16] - 4:22, 7:6,
30:2, 47:6, 50:15,
55:22, 55:25, 56:12,
56:20, 56:21, 57:4,
57:15, 58:16, 59:6,
59:25, 60:5
**Nice** [1] - 3:14
**NIGH** [2] - 1:20, 56:16
**nigh** [2] - 58:10, 58:19
**Nigh** [1] - 56:16
**nine** [2] - 56:12, 57:20
**nitrosamine** [2] - 18:9,
18:11
**nitrosamine-related**
[1] - 18:11
**nitrosamines** [1] -
15:19
**nobody** [3] - 30:22,
40:3, 42:6
**non** [2] - 15:24, 33:25
**non-logical** [1] - 15:24
**non-wholesale** [1] -
33:25
**none** [1] - 14:1
**nonetheless** [1] - 16:4
**nonsense** [10] - 14:18,
14:24, 14:25, 16:21,
20:3, 30:4, 34:12,
34:22, 41:11, 42:20
**note** [5] - 7:14, 48:20,
53:17, 57:21, 58:14
**nothing** [9] - 12:15,
12:23, 14:3, 14:10,
22:5, 46:19, 46:22,
49:21, 60:4
**noticed** [1] - 41:17
**novel** [1] - 22:5
**NUMBER** [1] - 1:3
**number** [9] - 5:14,
13:9, 14:1, 21:10,
21:17, 23:2, 23:6,

23:11, 23:12, 29:24,
38:25, 55:1, 56:10
**numbers** [4] - 20:20,
22:16, 22:22, 23:16

**O**

**oath** [3] - 6:15, 23:10,
23:18
**objective** [1] - 8:1
**obligation** [1] - 35:8
**obligations** [1] - 55:11
**obtain** [2] - 17:7,
58:12
**obviously** [3] - 13:9,
29:7, 33:16
**occasion** [1] - 5:5
**occurred** [2] - 6:16,
44:9
**October** [8] - 1:8, 5:3,
5:4, 5:8, 60:14
**offense** [1] - 19:20
**offered** [2] - 9:9, 31:18
**Official** [1] - 1:22
**Ohio** [3] - 14:3, 19:21
**old** [2] - 19:23, 19:25
**once** [1] - 23:12
**one** [22] - 8:15, 13:25,
16:9, 23:2, 28:18,
29:24, 30:11, 30:17,
30:20, 33:4, 34:6,
35:7, 35:16, 39:6,
42:7, 47:4, 51:12,
54:6, 55:6, 55:18,
56:4, 56:9
**One** [1] - 2:17
**ooh** [1] - 51:6
**opening** [1] - 50:23
**opine** [1] - 13:7
**opinion** [3] - 31:8,
31:9, 31:11
**opinions** [3] - 36:22,
39:11, 39:13
**opportunity** [9] - 4:16,
10:11, 25:5, 36:25,
37:1, 43:15, 45:14,
55:19, 59:23
**opposing** [3] - 10:21,
39:13, 45:5
**order** [19] - 8:13, 8:16,
13:15, 28:22, 34:18,
37:13, 41:23, 44:11,
48:17, 51:10, 54:8,
54:14, 55:20, 56:7,
57:14, 58:5, 59:13,
59:20
**orders** [4] - 27:25,
28:1, 56:11, 57:20
**Orrino** [1] - 59:5
**ORRINO** [1] - 59:5

**Osha** [1] - 54:24
**OSTFELD** [16] - 2:12,
4:25, 7:14, 15:11,
15:14, 17:12, 23:20,
23:24, 26:17, 27:5,
35:2, 35:4, 38:12,
45:3, 45:15, 48:15
**Ostfeld** [21] - 4:25,
6:17, 7:5, 7:13, 8:5,
9:16, 15:12, 15:13,
19:14, 21:10, 21:19,
22:9, 23:20, 23:23,
28:5, 35:2, 35:3,
38:6, 40:6, 45:3,
48:12
**otherwise** [2] - 18:18,
51:1
**ought** [1] - 59:15
**outcome** [1] - 45:1
**outfit** [1] - 55:6
**outlined** [1] - 22:4
**outset** [2] - 3:16, 8:19
**Owens** [1] - 59:1
**own** [1] - 40:16
**Oxford** [1] - 2:17

**P**

**P.A** [2] - 1:19, 2:5
**page** [3] - 11:9, 13:14,
40:8
**pages** [4] - 11:5,
16:11, 38:23, 47:23
**paid** [9] - 12:9, 17:8,
22:2, 22:15, 23:12,
34:24, 44:18, 46:4,
53:6
**PAPANTONIO** [1] -
1:19
**papers** [4] - 9:8, 25:8,
25:9, 25:24
**Parafinczuk** [2] -
54:18, 57:1
**PARAFINCZUK** [1] -
2:5
**paragraphs** [1] - 46:2
**parallels** [1] - 48:1
**Parker** [1] - 57:12
**Parkway** [1] - 1:14
**part** [7] - 3:23, 10:7,
19:20, 28:10, 30:3,
33:4, 50:8
**Part** [3] - 31:24, 34:20,
40:12
**participate** [1] - 55:19
**particularized** [1] -
29:16
**parties** [5] - 4:12,
22:21, 50:8, 50:13,
50:22

**party** [4] - 10:21,
10:23, 24:23, 43:17
**passed** [1] - 54:23
**past** [4] - 7:8, 26:15,
56:18, 56:19
**patience** [1] - 45:4
**patients** [1] - 21:25
**Pause** [2] - 3:8, 51:21
**pay** [3] - 17:7, 21:16,
44:3
**payment** [1] - 32:16
**payments** [8] - 17:15,
31:2, 31:3, 35:20,
35:25, 37:7, 40:9,
40:24
**payor** [1] - 24:23
**peek** [1] - 39:15
**Pembroke** [1] - 2:7
**Pennsylvania** [2] -
1:18, 2:17
**Pensacola** [1] - 1:21
**people** [4] - 3:7,
37:20, 37:21, 52:18
**Peoplehunter.com** [1]
- 55:4
**per** [3] - 31:24, 32:2
**percent** [1] - 37:15
**perfectly** [1] - 47:20
**perform** [2] - 25:13,
46:12
**perhaps** [3] - 8:22,
12:21, 30:2
**period** [9] - 38:9,
38:15, 38:17, 40:25,
44:14, 45:18, 45:19,
47:5
**permitted** [1] - 42:1
**person** [1] - 32:2
**perspective** [1] -
18:20
**persuade** [1] - 32:8
**Pharma** [3] - 2:14,
2:18, 2:18
**pharma** [1] - 32:24
**pharmaceutical** [2] -
22:5, 29:23
**Pharmaceutical** [1] -
2:13
**pharmaceuticals** [1] -
32:2
**Pharmaceuticals** [1] -
2:14
**pharmacies** [1] - 49:9
**phase** [1] - 40:1
**phases** [1] - 37:20
**PhD** [1] - 14:17
**Philadelphia** [3] -
1:18, 51:23, 52:17
**Phillies** [6] - 51:4,
51:9, 51:23, 52:10,

52:12, 52:16
**physical** [1] - 16:4
**piece** [1] - 47:10
**piecemeal** [1] - 38:19
**Piedmont** [1] - 2:10
**Pines** [2] - 2:6, 2:7
**pipe** [1] - 27:8
**Pittman** [2] - 52:25, 53:8
**Pittsburgh** [1] - 2:17
**place** [5] - 15:15, 19:18, 20:19, 42:12, 42:15
**placed** [1] - 25:19
**placement** [1] - 58:4
**plaintiff** [10] - 16:7, 36:7, 41:25, 50:3, 50:9, 53:9, 53:10, 53:20, 53:24, 55:14
**plaintiffs** [27] - 3:25, 5:5, 5:16, 8:21, 10:1, 15:7, 24:5, 24:16, 25:5, 26:20, 36:12, 36:15, 37:5, 38:21, 39:6, 39:12, 43:8, 46:8, 46:12, 48:18, 49:11, 50:9, 53:2, 56:15, 58:13, 59:18, 59:22
**Plaintiffs** [5] - 1:15, 1:18, 1:21, 2:4, 2:7
**plaintiffs'** [24] - 4:10, 6:7, 15:16, 16:22, 24:7, 30:25, 31:1, 31:7, 31:9, 32:13, 32:18, 35:9, 35:15, 35:24, 36:10, 36:18, 37:3, 46:14, 46:24, 47:3, 47:12, 47:15, 50:11, 53:18
**plan** [2] - 36:15, 40:9
**planned** [1] - 5:20
**playoffs** [2] - 51:5, 52:15
**pleading** [1] - 21:22
**pleasure** [1] - 8:2
**point** [21] - 6:24, 13:13, 21:13, 21:24, 21:25, 22:14, 23:25, 24:15, 25:21, 27:19, 27:20, 31:15, 35:15, 38:20, 43:24, 44:9, 45:23, 47:2, 47:17, 48:4, 58:19
**points** [2] - 6:11, 38:12
**Ponce** [1] - 2:3
**pool** [1] - 33:10
**population** [1] - 33:10
**position** [12] - 4:1,

4:8, 5:9, 5:10, 5:17, 5:25, 6:5, 6:7, 6:8, 7:19, 35:23, 48:14
**positions** [1] - 7:9
**positive** [2] - 19:14, 43:19
**possibility** [3] - 30:2, 32:15, 42:11
**possible** [10] - 31:2, 31:14, 31:17, 31:18, 32:22, 34:3, 40:19, 41:11, 46:1
**potentially** [1] - 37:14
**powerfully** [1] - 21:11
**practical** [1] - 31:16
**pre** [1] - 39:1
**pre-baked** [1] - 39:1
**precedent** [1] - 43:16
**precedes** [1] - 35:12
**prejudicial** [1] - 39:12
**premature** [1] - 6:21
**premium** [1] - 40:13
**premiums** [1] - 34:20
**prepare** [1] - 34:18
**prepared** [1] - 34:18
**prescription** [5] - 17:18, 17:20, 18:13, 18:17, 37:16
**present** [3] - 7:9, 34:19, 50:14
**PRESENT** [1] - 2:20
**presented** [2] - 13:3, 30:18, 47:23
**preview** [2] - 36:21, 39:11
**previewing** [1] - 39:13
**previous** [1] - 26:22
**previously** [2] - 5:14, 15:19
**principal** [1] - 14:3
**probe** [1] - 16:17
**problem** [14] - 15:1, 15:22, 16:7, 19:8, 29:13, 30:7, 40:2, 40:7, 41:3, 41:5, 41:13, 42:13, 42:14, 51:14
**problems** [1] - 58:23
**proceed** [3] - 39:21, 51:1
**proceeding** [3] - 7:23, 22:12, 58:6
**proceedings** [3] - 3:8, 51:21, 60:10
**Proceedings** [2] - 1:24, 60:7
**PROCEEDINGS** [1] - 3:1
**process** [3] - 12:8, 39:8, 50:14

**PROCTOR** [1] - 1:19
**produce** [2] - 38:22, 39:18
**produced** [5] - 1:25, 29:16, 29:18, 41:21, 48:20
**producing** [4] - 43:19, 45:18, 45:19
**product** [1] - 15:23
**production** [6] - 9:24, 28:13, 28:22, 38:8, 43:9, 48:13
**productions** [1] - 50:7
**products** [4] - 24:15, 40:25, 41:1, 50:10
**PRODUCTS** [1] - 1:4
**projected** [2] - 17:20, 18:1
**projection** [8] - 10:25, 11:7, 17:25, 20:8, 26:10, 26:24, 28:6, 28:8
**projections** [9] - 10:17, 10:20, 18:3, 20:21, 20:25, 25:22, 26:22, 28:25, 34:14
**promptly** [2] - 49:14, 49:16
**prong** [2] - 28:2, 28:25
**proof** [3] - 35:7, 47:12
**proportionality** [3] - 20:23, 42:13
**proposal** [5] - 9:19, 41:10, 43:1, 59:12, 59:20
**propose** [4] - 4:13, 5:22, 37:22, 42:18
**proposed** [6] - 4:5, 5:6, 6:22, 50:9, 50:21, 50:22
**proposing** [1] - 42:5
**proposition** [1] - 44:12
**propositions** [1] - 35:5
**propounding** [1] - 10:23
**proprietary** [2] - 27:21, 44:25
**protect** [1] - 48:23
**protection** [2] - 47:25, 48:19
**protections** [1] - 28:23
**protective** [3] - 27:25, 28:1, 48:17
**prove** [4] - 21:23, 24:9, 35:9, 35:16
**provide** [4] - 9:9, 9:10, 26:15, 58:1

**provided** [6] - 5:22, 9:3, 13:19, 22:17, 40:9
**punting** [1] - 8:8
**purchase** [1] - 16:1
**purchased** [1] - 24:24
**purchases** [3] - 15:21, 16:15, 16:17
**purpose** [2] - 13:1, 32:12
**put** [6] - 22:21, 24:4, 25:8, 32:8, 35:5, 41:16

## Q

**Quarles** [1] - 59:1
**QUARLES** [1] - 59:2
**questions** [3] - 20:18, 29:2, 29:5
**quick** [1] - 50:2
**quickly** [1] - 12:2
**quite** [2] - 38:18, 53:23
**quote** [4] - 11:1, 40:11, 40:23
**quotes** [2] - 25:6, 25:8

## R

**RAFFERTY** [1] - 1:19
**raise** [1] - 5:20
**raised** [4] - 5:2, 5:3, 27:20, 27:21
**ranges** [1] - 5:14
**ranging** [1] - 5:15
**rather** [3] - 35:4, 35:9, 39:8
**RDR** [1] - 60:12
**RE** [1] - 1:4
**re** [3] - 35:22, 36:4, 37:6
**reach** [1] - 25:17
**reached** [1] - 50:9
**reaching** [1] - 55:16
**read** [1] - 41:8
**reading** [1] - 13:14
**real** [3] - 33:19, 34:21, 43:20
**reality** [1] - 21:16
**really** [13] - 14:22, 16:2, 20:11, 22:15, 30:22, 32:4, 39:24, 42:17, 48:20, 50:6, 51:24, 53:18
**reargue** [1] - 22:10
**reason** [7] - 19:2, 33:1, 33:4, 37:18, 43:3, 43:6, 44:23
**reasonable** [2] - 42:5, 55:18

**reasons** [2] - 20:9, 21:17
**rebate** [3] - 9:2, 15:8, 38:8
**rebates** [2] - 16:24, 35:21
**receipt** [1] - 20:20
**receipts** [2] - 34:19, 41:6
**receive** [1] - 30:3
**received** [4] - 12:22, 29:10, 34:24, 55:12
**recent** [2] - 50:7, 57:22
**recently** [1] - 55:4
**recognize** [1] - 34:9
**record** [4] - 21:19, 25:20, 46:22, 60:10
**recorded** [1] - 1:24
**records** [4] - 56:18, 58:2, 58:13, 58:21
**referred** [1] - 40:18
**referring** [1] - 22:17
**reflecting** [1] - 23:11
**refute** [1] - 24:9
**regard** [1] - 53:20
**regarding** [4] - 6:16, 23:25, 45:24, 47:18
**regular** [1] - 31:24
**rehash** [1] - 21:12
**reimburse** [1] - 24:23
**reimbursed** [2] - 15:18, 22:16
**reimbursement** [5] - 9:2, 15:8, 31:24, 32:2, 38:8
**reimbursements** [3] - 15:21, 35:20, 48:6
**reiterate** [1] - 56:17
**rejoin** [1] - 51:18
**relate** [1] - 30:13
**related** [2] - 18:11, 50:10
**relation** [8] - 11:17, 11:25, 13:2, 14:9, 14:13, 14:20, 28:24, 30:2
**relative** [1] - 11:12
**relevance** [9] - 10:24, 14:20, 19:3, 20:25, 21:1, 22:13, 23:19, 40:2, 42:21
**relevant** [20] - 17:19, 23:9, 25:8, 26:13, 26:19, 26:23, 27:1, 29:14, 29:25, 30:14, 36:5, 36:25, 37:3, 37:4, 38:17, 38:23, 40:4, 41:9, 43:5
**relist** [1] - 58:15

**rely** [1] - 44:1
**remainder** [1] - 57:19
**remark** [1] - 19:13
**remarkable** [1] - 35:5
**Rena** [2] - 30:16, 32:24
**Renne** [1] - 59:4
**RENNE** [1] - 59:4
**repair** [5] - 17:24, 26:2, 26:4, 26:8, 26:9
**repairs** [1] - 12:6
**replacement** [2] - 13:21, 34:16
**replacements** [1] - 29:19
**reply** [2] - 10:3, 11:5
**report** [2] - 28:7, 46:2
**reported** [1] - 45:24
**reporter** [4] - 3:11, 17:11, 19:9, 34:11
**Reporter** [1] - 1:22
**REPORTER** [1] - 3:12
**Reporter/ Transcriber** [1] - 60:12
**reporting** [3] - 9:12, 10:18, 15:8
**reports** [6] - 3:21, 13:6, 17:13, 31:4, 38:24, 45:17
**representations** [1] - 25:19
**represents** [1] - 6:8
**request** [9] - 3:20, 9:1, 20:3, 26:16, 38:25, 55:20, 56:11, 57:20, 58:4
**requested** [4] - 5:8, 5:21, 53:18, 59:16
**requesting** [2] - 43:17, 54:9
**requests** [2] - 11:13, 58:15
**require** [1] - 8:10
**required** [1] - 47:13
**requires** [4] - 17:1, 25:10, 37:11, 46:3
**requiring** [1] - 38:11
**resent** [1] - 55:14
**RESNICK** [5] - 2:6, 54:17, 54:22, 56:2, 56:25
**Resnick** [2] - 54:18, 56:25
**resolution** [1] - 25:17
**resolved** [2] - 54:4, 54:8
**respect** [9] - 3:21, 9:16, 15:7, 16:16,

**respectfully** [8] - 5:2, 20:4, 25:2, 25:15, 35:14, 43:22, 46:6, 46:16
**respective** [1] - 7:9
**respond** [4] - 10:5, 19:4, 45:12, 45:14
**RESPONSE** [2] - 3:5, 60:6
**response** [5] - 49:20, 50:24, 51:16, 55:3, 60:3
**responsive** [1] - 38:25
**restricted** [4] - 48:16, 48:18, 48:21, 49:1
**restriction** [2] - 47:22, 47:24
**result** [5] - 15:25, 16:6, 18:12, 18:16, 33:3
**results** [1] - 39:19
**RET** [1] - 1:11
**retailers** [1] - 43:10
**retained** [1] - 54:22
**retrieving** [3] - 39:4, 39:6
**retroactively** [2] - 15:20, 26:21
**returnable** [2] - 55:21, 56:11
**revenue** [1] - 17:23
**reversal** [1] - 35:7
**revisit** [2] - 58:9, 58:17
**Richard** [2] - 52:24, 53:10
**rigorous** [1] - 28:20
**ripe** [3] - 6:2, 6:9, 50:12
**risk** [4] - 40:17, 40:20, 40:23
**Rita** [1] - 57:7
**Rivero** [11] - 8:23, 9:4, 9:5, 22:16, 25:15, 27:12, 27:13, 39:23, 45:23, 46:7, 46:17
**RIVERO** [22] - 2:2, 2:2, 9:4, 9:14, 9:22, 10:7, 10:12, 10:20, 15:5, 19:4, 19:8, 19:12, 27:12, 27:14, 27:18, 27:23, 28:2, 29:7, 34:8, 38:4, 39:23, 49:12
**Rivero's** [1] - 36:4
**RMR** [1] - 60:12
**Road** [1] - 2:10
**ROBERT** [2] - 1:9, 3:2
**Robert** [4] - 2:21,

57:12, 59:3
**Roddey** [1] - 59:2
**RODDEY** [1] - 59:2
**role** [1] - 24:23
**roommate** [2] - 14:16, 25:18
**roommates** [1] - 16:20
**Rose** [1] - 57:9
**rose** [1] - 57:12
**Roseland** [1] - 1:15
**Ruben** [5] - 4:2, 6:10, 21:5, 43:2, 59:21
**RUBEN** [1] - 1:17
**rule** [1] - 55:21
**ruled** [2] - 21:22, 58:1
**rules** [2] - 20:23
**ruling** [14] - 5:10, 5:19, 6:1, 6:6, 7:24, 7:25, 13:11, 22:8, 24:1, 24:3, 43:22, 46:18, 58:8, 58:17
**Rx** [2] - 17:18, 26:25

## S

**sale** [6] - 13:13, 21:24, 21:25, 22:15, 24:15, 47:2
**salt** [1] - 13:5
**sample** [1] - 42:21
**samples** [1] - 33:15
**sampling** [1] - 45:9
**satisfactory** [1] - 38:7
**sauce** [3] - 33:7, 48:23, 49:5
**schedule** [15] - 3:21, 4:5, 4:9, 4:13, 4:17, 5:6, 5:21, 6:7, 6:17, 6:19, 6:20, 8:16, 39:14, 50:22
**scheduling** [1] - 4:11
**Schneider** [4] - 43:12, 44:23, 57:24, 58:1
**Schneider's** [1] - 58:8
**school** [1] - 14:4
**script** [1] - 17:22
**seal** [2] - 50:23, 59:11
**second** [6] - 21:2, 28:2, 35:11, 38:20, 41:4, 59:6
**secret** [3] - 33:7, 48:23, 49:5
**section** [1] - 49:3
**see** [15] - 7:7, 26:5, 26:7, 26:11, 30:2, 39:19, 42:6, 42:21, 51:14, 52:8, 52:18, 55:25, 56:6, 56:22, 60:5
**seek** [1] - 44:24

**seeking** [9] - 11:22, 17:13, 25:23, 38:14, 38:15, 38:17, 45:16, 47:1
**seeks** [1] - 36:11
**segregate** [1] - 43:13
**sense** [8] - 9:23, 11:20, 12:3, 15:14, 20:15, 31:16, 33:2
**sensitive** [5] - 28:14, 33:5, 42:20, 43:14, 48:21
**sensitivity** [1] - 42:14
**sent** [3] - 11:6, 50:10, 55:1
**separate** [2] - 5:3, 5:12
**September** [1] - 52:14
**series** [1] - 15:17
**serious** [2] - 41:5, 42:18
**served** [1] - 8:4
**set** [11] - 3:20, 5:9, 6:21, 8:6, 8:9, 8:11, 16:10, 35:22, 35:25, 36:11, 37:13
**setting** [4] - 5:18, 8:4, 19:24, 46:9
**settlement** [1] - 9:17
**seven** [4] - 17:19, 38:16, 39:5, 59:25
**several** [2] - 55:1, 57:21
**sheet** [3] - 50:3, 53:20, 55:12
**sheets** [1] - 50:10
**shifting** [1] - 42:23
**Shop** [3] - 12:7, 12:10, 12:11
**short** [1] - 50:5
**show** [22] - 10:22, 10:23, 13:1, 18:7, 18:21, 18:24, 24:14, 33:16, 40:1, 40:3, 41:13, 49:5, 54:8, 54:14, 55:20, 55:21, 56:7, 56:11, 57:14, 57:20, 58:5
**showed** [1] - 47:22
**showing** [13] - 11:1, 11:4, 12:4, 14:12, 19:3, 28:4, 28:6, 29:8, 29:14, 30:8, 39:7, 43:20, 47:11
**shown** [2] - 18:15, 41:15
**shows** [1] - 26:10
**side** [6] - 4:10, 11:21, 24:19, 24:22, 29:20, 29:22

**sides** [3] - 15:1, 37:12, 59:13
**significant** [3] - 17:1, 25:10, 46:3
**significantly** [1] - 39:5
**simply** [14] - 10:25, 20:22, 21:2, 21:12, 22:9, 28:4, 28:25, 29:16, 34:13, 36:12, 36:17, 37:9, 46:22, 47:13
**single** [3] - 16:7, 35:16, 44:17
**situation** [1] - 28:15
**six** [2] - 38:16, 39:5
**SLATER** [6] - 1:13, 1:14, 52:2, 52:5, 52:10, 52:12
**Slater** [1] - 51:24
**SMITH** [1] - 2:21
**Smith** [3] - 54:10, 54:15, 56:3
**sold** [1] - 44:18
**solve** [1] - 42:13
**sorry** [6] - 10:22, 10:23, 19:6, 20:16, 33:20, 57:10
**sort** [2] - 10:3, 13:4
**sought** [1] - 43:8
**sounded** [1] - 10:3
**sounds** [1] - 7:19
**sources** [1] - 33:12
**space** [1] - 37:21
**speaking** [1] - 34:10
**SPECIAL** [48] - 1:11, 3:2, 3:4, 3:6, 3:9, 3:14, 4:23, 6:12, 7:12, 8:5, 8:25, 9:7, 9:21, 9:25, 10:10, 10:19, 15:3, 15:6, 15:13, 19:6, 19:9, 21:8, 23:22, 26:14, 27:3, 27:10, 27:13, 27:16, 27:19, 27:24, 29:4, 34:7, 35:1, 35:3, 38:3, 38:5, 45:7, 48:11, 49:10, 49:13, 49:21, 50:4, 50:16, 50:19, 51:3, 51:9, 51:17
**specializes** [1] - 55:5
**specific** [13] - 5:21, 16:3, 20:8, 23:13, 33:11, 38:24, 40:11, 40:25, 45:17, 57:23
**specifically** [8] - 11:16, 16:22, 23:3, 31:21, 41:19, 41:20, 41:21, 46:16
**specifics** [1] - 41:18

**speculation** [2] - 41:14, 42:3
**spend** [24] - 12:8, 13:11, 13:20, 13:21, 17:20, 18:1, 18:24, 20:6, 20:12, 20:19, 20:20, 25:25, 26:1, 26:4, 26:6, 26:10, 26:22, 26:25, 29:9, 29:17, 29:20, 29:22, 34:16, 37:15
**spending** [1] - 40:11
**spends** [1] - 29:23
**spent** [12] - 11:5, 12:21, 13:17, 18:2, 18:18, 20:12, 20:17, 28:11, 29:18, 29:25, 34:15, 47:2
**split** [1] - 33:14
**spoken** [1] - 56:4
**spokesperson** [3] - 3:25, 4:24, 5:1
**sponsors** [1] - 40:10
**spouse** [1] - 54:24
**springs** [1] - 52:17
**stage** [6] - 24:4, 24:6, 35:13, 36:6, 36:23, 48:9
**standing** [1] - 58:3
**stands** [1] - 44:11
**Star** [1] - 42:7
**start** [1] - 15:15
**started** [2] - 3:9, 53:8
**starting** [1] - 35:15
**starts** [1] - 14:11
**state** [1] - 6:15
**statement** [1] - 19:25
**States** [1] - 28:17
**STATES** [2] - 1:1, 1:10
**status** [1] - 50:6
**STATUS** [1] - 1:5
**statute** [1] - 47:21
**statutory** [4] - 16:10, 47:22, 47:25, 48:1
**staying** [1] - 55:9
**stenography** [1] - 1:24
**Steve** [1] - 52:21
**Steven** [3] - 49:25, 54:18, 56:25
**STEVEN** [3] - 2:6, 2:10, 2:16
**still** [8] - 3:7, 4:14, 5:23, 27:1, 53:19, 57:3, 59:11
**Stiroh** [6] - 13:3, 13:4, 16:22, 17:3, 23:3, 25:11
**strategic** [1] - 47:8
**Street** [1] - 1:17

**Streets** [1] - 1:7
**strike** [1] - 30:25
**strikes** [1] - 21:11
**strongly** [2] - 6:13, 44:1
**subject** [3] - 14:24, 30:21, 36:1
**subjected** [1] - 16:8
**submission** [2] - 50:23, 53:15
**submit** [2] - 4:18, 59:20
**submitted** [3] - 4:6, 4:15, 55:13
**subsequently** [1] - 54:23
**subsidiary** [1] - 9:2
**subsidies** [2] - 35:20, 46:4
**subsidy** [1] - 38:8
**substantiate** [1] - 24:12
**substitute** [1] - 21:17
**subtract** [4] - 35:24, 36:10, 36:17, 37:13
**subtracted** [4] - 35:21, 37:2, 37:8, 47:7
**subtracting** [1] - 46:9
**success** [1] - 55:2
**suffer** [1] - 12:14
**suffered** [3] - 16:5, 24:24, 26:21
**sufficient** [5] - 24:5, 28:1, 46:13, 48:19, 58:4
**suggest** [6] - 31:21, 33:17, 37:5, 41:23, 46:19, 46:22
**suggesting** [1] - 49:8
**suggestion** [1] - 35:8
**Suite** [6] - 1:17, 1:20, 2:3, 2:6, 2:10, 2:12
**SummaCare** [2] - 28:15, 28:16
**super** [1] - 42:19
**supplement** [1] - 22:18
**supply** [1] - 58:21
**suppose** [1] - 4:21
**supposed** [1] - 46:8
**surprise** [1] - 24:13
**surprising** [1] - 24:11
**surviving** [1] - 54:24

**T**

**tackle** [1] - 4:10
**tactical** [1] - 47:8
**team** [2] - 51:25, 52:17
**tease** [3] - 30:10,

30:12, 31:7
**teased** [1] - 33:1
**technical** [1] - 33:23
**technically** [2] - 33:23, 40:15
**TELEPHONIC** [1] - 1:5
**telephonically** [1] - 3:1
**temporal** [1] - 44:14
**temporally** [1] - 44:19
**ten** [4] - 26:15, 33:2, 38:16, 56:6
**term** [1] - 19:23
**terms** [3] - 8:2, 9:19, 55:2
**test** [4] - 20:24, 33:15, 34:21
**testified** [1] - 40:8
**testifies** [1] - 30:25
**testimony** [1] - 28:15
**Teva** [3] - 2:13, 2:14, 52:22
**the court** [48] - 4:7, 4:13, 4:19, 5:11, 5:21, 6:15, 6:24, 10:14, 19:9, 22:8, 28:12, 28:13, 28:21, 31:3, 31:4, 31:25, 32:19, 33:16, 33:18, 33:25, 34:11, 34:17, 39:20, 42:14, 50:6, 50:13, 51:22, 52:4, 52:7, 52:11, 52:13, 52:24, 53:2, 53:5, 53:22, 54:13, 54:21, 55:24, 56:3, 56:14, 56:22, 57:6, 58:9, 58:17, 59:10, 59:24, 60:2, 60:4
**theory** [13] - 13:22, 15:16, 15:25, 22:3, 22:12, 24:8, 24:9, 24:10, 24:13, 24:19, 24:21, 27:2, 34:22
**therefore** [3] - 22:7, 31:8, 54:9
**they've** [3] - 13:20, 13:21, 22:2
**third** [1] - 24:23
**third-party** [1] - 24:23
**Thomas** [1] - 59:3
**THOMAS** [2] - 1:11, 1:19
**Thompson** [4] - 54:10, 54:15, 56:4, 59:4
**three** [3] - 5:7, 14:1, 54:10, 54:11
**threshold** [1] - 19:3
**timeline** [2] - 6:22, 6:23

**timelines** [2] - 59:15, 59:16
**timing** [1] - 59:11
**today** [6] - 4:16, 21:10, 21:19, 25:20, 50:12, 58:23
**together** [2] - 7:8, 32:8
**topic** [1] - 21:11
**total** [3] - 29:17, 29:25, 37:15
**totally** [1] - 29:25
**touch** [1] - 55:9
**towards** [1] - 7:24
**TPP** [8] - 3:18, 5:12, 7:23, 15:25, 24:4, 24:16, 24:22, 49:7
**TPPs** [4] - 15:19, 16:13, 26:20
**traceable** [1] - 41:7
**track** [1] - 5:12
**tracked** [1] - 26:1
**transaction** [1] - 22:2
**transcript** [4] - 1:24, 49:15, 49:16, 60:9
**transcription** [1] - 1:25
**Traurig** [1] - 52:22
**TRAURIG** [1] - 2:9
**treatment** [1] - 23:1
**tree** [1] - 23:4
**Trek** [1] - 42:7
**trial** [10] - 3:18, 5:12, 7:23, 7:24, 8:7, 8:12, 35:12, 36:6, 39:21, 48:8
**tried** [1] - 55:1
**trier** [2] - 37:24, 39:22
**true** [1] - 45:25
**try** [4] - 24:8, 42:11, 49:14, 59:19
**trying** [4] - 17:5, 22:10, 32:22, 59:11
**turn** [1] - 9:25
**turning** [2] - 14:22, 57:19
**turns** [2] - 7:1, 55:8
**two** [23] - 10:14, 11:6, 13:9, 19:21, 20:13, 21:13, 32:11, 32:12, 32:23, 33:5, 34:20, 35:4, 38:9, 38:12, 38:15, 39:6, 42:9, 45:4, 45:13, 45:19, 47:5, 58:6
**two-year** [3] - 38:9, 38:15, 47:5
**type** [3] - 17:22, 25:13, 44:23

**U**

**U.S** [1] - 1:6
**ultimate** [1] - 31:15
**ultimately** [1] - 37:24
**ultra** [1] - 42:10
**unable** [2] - 7:8, 23:8
**unclear** [1] - 59:14
**under** [8] - 9:9, 9:11, 20:22, 22:12, 23:10, 23:18, 48:21, 58:6
**understood** [2] - 9:8, 10:15
**undertake** [5] - 36:14, 36:15, 38:2, 39:19, 45:22
**unduly** [1] - 38:22
**unfair** [1] - 39:12
**unfortunately** [1] - 40:3
**unhappy** [1] - 12:9
**uniform** [1] - 47:21
**UNITED** [2] - 1:1, 1:10
**United** [1] - 28:17
**University** [1] - 14:16
**unknown** [1] - 15:19
**unlawful** [1] - 44:5
**unless** [1] - 8:13
**unrelated** [1] - 20:14
**unusual** [2] - 15:24, 20:2
**unwilling** [1] - 6:18
**up** [9] - 11:25, 18:21, 23:4, 23:17, 26:6, 27:8, 27:17, 32:7, 36:6
**update** [4] - 50:2, 50:6, 54:6, 56:9
**updates** [2] - 57:18, 58:14
**USA** [2] - 2:14, 2:18
**useful** [1] - 17:15
**uses** [1] - 30:10
**utilization** [11] - 17:22, 18:2, 18:3, 18:5, 18:8, 18:18, 18:24, 25:25, 26:12, 26:25, 28:5
**utilized** [1] - 26:6

**V**

**VALSARTAN** [1] - 1:4
**valsartan** [10] - 13:20, 15:17, 17:9, 20:8, 23:7, 23:14, 29:17, 30:13, 34:17, 41:8
**valsartan-containing** [2] - 15:17, 17:9
**value** [1] - 22:7

**Vanaskie** [2] - 50:17, 51:7
**VANASKIE** [46] - 1:11, 3:4, 3:6, 3:9, 3:14, 4:23, 6:12, 7:12, 8:5, 8:25, 9:7, 9:21, 9:25, 10:10, 10:19, 15:3, 15:6, 15:13, 19:6, 19:9, 21:8, 23:22, 26:14, 27:3, 27:10, 27:13, 27:16, 27:19, 27:24, 29:4, 34:7, 35:1, 35:3, 38:3, 38:5, 45:7, 48:11, 49:10, 49:13, 49:21, 50:4, 50:16, 50:19, 51:3, 51:9, 51:17
**versus** [6] - 12:21, 16:18, 17:7, 17:14, 20:17, 45:19
**Vicki** [1] - 55:7
**VICTORIA** [1] - 2:9
**Victoria** [1] - 50:18
**view** [5] - 5:25, 8:7, 15:24, 33:14, 45:9
**views** [1] - 7:1
**vigorously** [2] - 5:11, 25:1
**violation** [1] - 44:4
**virtue** [1] - 13:13

**W**

**Wacker** [1] - 2:12
**warranty** [4] - 19:1, 21:20, 44:15
**waved** [1] - 20:4
**websites** [1] - 39:3
**weigh** [1] - 7:10
**weighed** [1] - 6:24
**Wesleyan** [1] - 14:16
**West** [1] - 2:12
**whatsoever** [3] - 12:15, 14:14, 29:8
**whereas** [1] - 29:8
**wholesale** [3] - 9:20, 9:24, 33:25
**wholesalers** [1] - 43:10
**wholly** [2] - 22:20, 44:22
**Williams** [3] - 52:24, 52:25, 53:11
**Willie** [1] - 59:1
**willing** [2] - 5:17, 9:18
**wins** [1] - 37:25
**withdrawal** [10] - 15:22, 17:8, 17:16, 18:13, 18:16, 18:22, 26:18, 26:24, 27:4, 38:9
**withdrawn** [2] - 54:8, 56:11
**WOLF** [1] - 2:5
**Wolf** [2] - 54:18, 57:1
**word** [1] - 22:23
**words** [2] - 9:23, 44:13
**workbook** [3] - 17:18, 17:19, 17:21
**workbooks** [1] - 18:23
**works** [1] - 55:25
**worksheet** [1] - 17:21
**worksheets** [2] - 17:19, 27:1
**world** [4] - 41:9, 44:7, 44:20, 49:5
**worse** [2] - 22:9, 40:5
**worth** [1] - 13:5
**worthless** [2] - 13:13, 24:15
**worthlessness** [1] - 24:8
**wrote** [2] - 52:24, 54:3

**Y**

**Yankee** [2] - 52:2, 52:5
**Yankees** [1] - 51:25
**year** [24] - 18:22, 26:3, 26:18, 26:19, 26:23, 27:3, 32:6, 32:7, 34:20, 36:16, 36:19, 38:9, 38:15, 39:6, 40:14, 40:15, 42:6, 43:10, 45:19, 47:5
**year-by-year** [1] - 36:19
**years** [23] - 12:19, 15:18, 15:21, 16:15, 18:8, 18:22, 21:13, 26:15, 26:22, 26:23, 32:12, 32:23, 33:2, 33:5, 34:21, 38:16, 38:23, 39:4, 39:5, 39:6, 42:9, 58:7
**yesterday** [2] - 55:12, 55:13
**York** [3] - 30:22, 44:1, 47:25
**Yount** [2] - 57:9, 57:12
**Yvonne** [1] - 57:8

**Z**

**zero** [1] - 22:7
**zeroing** [1] - 26:11
**Zola** [1] - 59:1