**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
_____

                             CIVIL ACTION NUMBER:
IN RE:  VALSARTAN PRODUCTS
LIABILITY LITIGATION          19-md-02875

                             CASE MANAGEMENT CONFERENCE
_____  Via Zoom Videoconference
```

```
        Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
        Camden, New Jersey  08101
        May 17, 2023
        Commencing at 4:00 p.m.
```

**B E F O R E:**        THE HONORABLE THOMAS I. VANASKIE (RET.)
                        UNITED STATES SPECIAL MASTER

**A P P E A R A N C E S:**

```
        MAZIE SLATER KATZ & FREEMAN, LLC
        BY:  ADAM M. SLATER, ESQUIRE
        BY:  CHRISTOPHER GEDDIS, ESQUIRE
        103 Eisenhower Parkway
        Roseland, New Jersey  07068
        For the Plaintiffs

        HONIK LLC
        BY:  RUBEN HONIK, ESQUIRE
        1515 Market Street, Suite 1100
        Philadelphia, Pennsylvania  191032
        For the Plaintiffs

        KANNER & WHITELEY, LLC
        BY:  CONLEE S. WHITELEY, ESQUIRE
        BY:  DAVID J. STANOCH, ESQUIRE
        BY:  LAYNE HILTON, ESQUIRE
        701 Camp Street
        New Orleans, Louisiana  70130
        For the Plaintiffs
```

Camille Pedano, Official Court Reporter
camillepedano@gmail.com
(609) 774-1494

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

```
 1   A P P E A R A N C E S (Continued):

 2        KIRTLAND & PACKARD LLP
          BY:  BEHRAM V. PAREKH, ESQUIRE
 3        1638 South Pacific Coast Highway
          Redondo Beach, California  90277
 4        For the Plaintiffs

 5        RIVERO MESTRE, LLP
          BY:  ZALMAN KASS, ESQUIRE
 6        2525 Ponce De Leon Boulevard
          Suite 1000
 7        Miami, Florida  33134
          For the Plaintiffs
 8
          GREENBERG TRAURIG LLP
 9        BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
          BY:  STEVEN M. HARKINS, ESQUIRE
10        3333 Piedmont Road, NE, Suite 2500
          Atlanta, Georgia  30305
11                 AND
          BY:  GREGORY E. OSTFELD,  ESQUIRE
12        77 West Wacker Drive, Suite 3100
          Chicago, Illinois 60601
13        For the Defendants, Teva Pharmaceutical Industries Ltd.,
          Teva Pharmaceuticals USA, Inc., Actavis LLC,
14        and Actavis Pharma, Inc.

15        ULMER & BERNE LLLP
          BY:  JEFFREY D. GEOPPINGER, ESQUIRE
16        600 Vine Street, Suite 2800
          Cincinnati, Ohio 445202
17        For the Wholesaler Defendants and AmerisourceBergen

18        BARNES & THORNBURG, LLP
          BY:  KRISTEN L. RICHER, ESQUIRE
19        2029 Century Park East, Suite 300
          Los Angeles, California  90067
20                 AND
          BY:  KARA KAPKE, ESQUIRE
21        11 S. Meridian Street
          Indianapolis, Indiana 46204
22        For the Retailer Defendants and CVS Pharmacy, Inc., and
          Rite Aid Corporation
23
          NORTON ROSE FULBRIGHT US LLP
24        BY:  D'LESLI DAVIS, ESQUIRE
          2200 Ross Avenue, Suite 3600
25        Dallas, Texas  75201-7932
          For the Wholesaler Defendant McKesson
```

*United States District Court*
*District of New Jersey*

1  **<u>ALSO PRESENT</u>**:

2       LORETTA SMITH, ESQUIRE
        Judicial Law Clerk to The Honorable Robert B. Kugler
3
        Larry MacStravic, Courtroom Deputy
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (PROCEEDINGS held via Zoom Videoconference before

2  The Honorable Thomas I. Vanaskie (Ret.), United States Special

3  Master, at 4:00 p.m.)

4             JUDGE VANASKIE:  Is everybody on that needs to be on?

5  I'm assuming so.

6             We are going to hear presentations with respect to

7  some matters that are in issue here.  I am going to follow the

8  agenda letter submitted by plaintiffs, the agenda letter of May

9  15th, and then we will switch to the letter of the same date,

10  and it's Document 2377 in the ECF system, from Victoria Lockard

11  on the defense side.

12             MR. SLATER:  Your Honor, one request, Your Honor.  I

13  don't have the letter in front of me and I don't know if it's

14  the first issue, the class notice issue, that had to be

15  discussed.  Behram Parekh, who's going to argue for us, I think

16  has another hearing in a little while so we were going to

17  request, because he only has about 25 or 30 minutes, if

18  convenient for Your Honor, we were hoping we could do that

19  issue first only because he's the one to argue it and he has

20  two hearings at the same time.

21             JUDGE VANASKIE:  It looks like he is standing outside

22  the courthouse right now.  So I think we should let him go

23  first.

24             MR. SLATER:  Thank you so much.

25             MR. PAREKH:  Thank you for accommodating me.

1          JUDGE VANASKIE:  All right.

2          MR. PAREKH:  I believe actually the issues raised are

3     by defendants and we responded to them.  So I don't know

4     whether you want to hear from them first or from us first.

5          JUDGE VANASKIE:  Who will be addressing this issue for

6     the defense?

7          MR. OSTFELD:  Your Honor, this is Greg Ostfeld.  I

8     will be addressing it for the defense.

9          JUDGE VANASKIE:  All right.  Do you want to go first,

10    Mr. Ostfeld?

11         MR. OSTFELD:  Certainly, Your Honor.  I'll be

12    addressing issues from the standpoint of the manufacturer

13    defendants.  I see Kara Kapke is on.  She's also raised some

14    issues on behalf of the pharmacy defendants, so she may also

15    want to chime in after I do.

16         JUDGE VANASKIE:  All right.

17         MR. OSTFELD:  So Your Honor, we're seeking some basic

18    discovery in connection with plaintiffs' Class Notice Program

19    which we believe is needed to evaluate whether the Class Notice

20    Program satisfies Rule 23(c)(2)(B)'s requirements of the best

21    notice practicable and individual notice to all class members

22    identifiable through reasonable effort.

23         We're also going to seek a short extension of the

24    opposition deadline to allow that discovery to proceed and to

25    allow us to properly evaluate this and to obtain some

1  additional materials the plaintiffs have agreed to provide but

2  that aren't ready yet that really should have been part of the

3  original notice plan.

4       So I would like to begin just by briefly explaining

5  why we need this discovery, which is to assess whether

6  plaintiffs have satisfied their burden of proof under 23(c),

7  that the Class Notice Plan provides adequate notice to the

8  absent class members.  As Your Honor likely knows, the Third

9  Circuit is stringent in enforcing 23(c)(2)(B)'s requirements

10 and, in particular, the individual notice requirement.

11      Plaintiffs' notice plan is notable in that it departs

12 from the methods to identify the class members that were

13 described by their ascertainability expert, Laura Craft.  Ms.

14 Craft had proposed using detailed transactional records from

15 pharmacies and from pharmacy benefit managers to identify the

16 TPP and consumer class members and if that had been done here,

17 we could then presumably proceed with individual notice to

18 those class members, but plaintiffs' notice plan doesn't use

19 those methods.

20      What they are proposing instead for the third-party

21 payor class, the TPP class, they're proposing individual notice

22 but they propose doing it using a proprietary mailing list from

23 a class administrator that they've hired; and then for the

24 consumer and medical monitoring classes, what they are

25 proposing is not individual notice at all but a digital

1     advertising campaign that targets hypertensive patients.

2          So deviating from the ascertainability evidence is not

3     necessarily fatal to plaintiffs' notice plan, but,

4     respectfully, it does raise serious questions because Third

5     Circuit precedent is clear that one purpose of the

6     ascertainability requirement is to protect absent class members

7     by facilitating the best notice practicable.

8          So because plaintiffs have proposed something

9     different from what they proposed at the class certification

10    stage, and what has already been explored through discovery, we

11    simply need a fair opportunity to take discovery on this new

12    and previously undisclosed methodology to give notice to class

13    members.

14         And what do we need here?  So we listed ten items in

15    our May 11th letter, which is Exhibit A to the defendants'

16    letter, but it really falls into three buckets.

17         The first bucket relates to the TPP notice plan, and

18    what we really need there -- we needed there was a copy of the

19    mailing list and the email list and plaintiffs have provided

20    that.  Now that we've seen it, it raises a number of questions

21    because it consists, as far as we can tell, largely of entities

22    that are not part of the class; pharmacies and drugstores and

23    employees of pharmacies and drugstores which are not part of

24    the class.  So we do think we need an opportunity to question

25    the administrator about this list.  We also, respectfully, need

1    to show this mailing list to our own experts.  The list was

2    produced "Attorneys' Eyes Only" and we're going to request

3    either plaintiffs' consent or leave of the Court to share this

4    list with our expert who has seen and who has signed onto the

5    protective order.  That's one of our buckets of discovery.

6           The second pertains to the individual advertising

7    campaign.  And what plaintiffs have done here is they've

8    provided a declaration from their class administrator, Steven

9    Weisbrot, who was not an expert during the class certification

10   stage.  We haven't had an opportunity to depose him previously.

11   His declaration is pretty technical regarding the digital

12   advertising campaign, but it's a little sparse on the details.

13   It lists tactics and tools but it doesn't describe in any

14   detail what they are, how they're used, how they would be

15   implemented.  Mr. Weisbrot provides reach and frequency

16   statistics that are intended to demonstrate adequacy, but he

17   doesn't explain how they're calculated.

18          And really, basically, this entire bucket of requests

19   can be satisfied -- and I'm referring here to Requests 3

20   through 8 and 10 from our letter -- we could satisfy all of

21   these by taking Mr. Weisbrot's deposition which plaintiffs are

22   not prepared to do.  They are willing to make him available for

23   an informal discussion, which we've scheduled for next Tuesday,

24   and we're certainly willing to have that discussion but,

25   respectfully, it's not sufficient.  We need more than an

1    informal discussion because a discussion isn't evidence.  It's

2    not testimony under oath, so we can't use it to present

3    concerns we have to Judge Kugler in our opposition brief.  This

4    is a very different scenario from the discussions referenced in

5    plaintiffs' letter regarding the use of technology-assisted

6    review and informal discussions with those experts, that was an

7    effort to reach compromise on document collection issues in

8    connection with eDiscovery.  Here, we have a part of the class

9    certification process, an important part.  We are dealing with

10   the phase of class notice which is governed by specific proofs

11   that are required by 23(c)(2)(B).  So it's a matter for

12   evidence and not just informal discussion.  Again, we're happy

13   to have that discussion, it could effectively narrow what we

14   need to cover at deposition, but we think we're also going to

15   need to have a deposition to learn and to develop evidence on

16   what this digital campaign does so that we can determine

17   whether or not it's sufficient to satisfy the individual notice

18   requirement of the Rule 23(c) even though it doesn't encompass

19   individual notice.

20        JUDGE VANASKIE:  Well, excuse me, let me ask you a

21   question:  Why not make that determination on the need for the

22   deposition of this expert, Mr. Weisbrot, to be made after you

23   have this sit-down and chat and see what you can reach

24   agreement on, and you can confer with your experts then based

25   upon information that he's provided?

1      MR. OSTFELD:  Under ordinary circumstances,

2    Your Honor, that's exactly what I would love to do and it's

3    what we proposed to plaintiffs.  We proposed that as well as

4    our third bucket of items, which is the contents of their

5    website and toll-free number.  The problem, Your Honor, is that

6    our opposition to the Class Notice Plan is due a week from

7    today.  We are not going to interview Mr. Weisbrot until the

8    day before it's due.  And what plaintiffs proposed -- what we

9    did, Your Honor, is we asked to go back to what was an agreed

10   schedule that we both proposed jointly to Judge Kugler, which

11   is that our opposition would be due June 7th and their reply

12   would be due June 28th.  Plaintiffs had also proposed a shorter

13   schedule, which is the one Judge Kugler adopted, which has our

14   opposition due May 24th.  We said to plaintiffs, look, there's

15   a lot going on here, there's a lot we need to know, why don't

16   we go back, why don't we propose to the Court that we go back

17   to the first schedule and they said no.  They said, we really

18   want to get this in front of Judge Kugler at the next case

19   management conference, which is on June 7th, so we're willing

20   to agree to two extra days, to extend it to May 26, but we're

21   not willing to agree to more than that.

22        So, Your Honor, respectfully, talking to Mr. Weisbrot

23   on Tuesday and then having a response due on Friday just

24   doesn't give us the time we need to do what Your Honor is

25   suggesting, which is to have a deposition -- or to decide on a

1    deposition after we've spoken with him.  If we can agree to the

2    extension, then I'm fine with that approach.  We can speak with

3    Mr. Weisbrot and then we can decide if there needs to be a

4    deposition.  We'd still like guidance from Your Honor as to

5    whether that deposition would go forward if we decide we need

6    it, because I don't think we'll be back in front of Your Honor

7    before our response deadline, even under the extended deadline,

8    but that would provide some breathing room to have those kinds

9    of discussions.

10           The third thing we need, Your Honor, are the contents

11   of the website and the scripts of the toll-free number.  And

12   that's basic stuff.  That should have been part of the original

13   Class Notice Plan.  What is going to be told to the class

14   members is an essential part of the Class Notice Plan.  We need

15   to know what's going to be said, in what language, both on the

16   website and on the toll-free number.  They've also proposed

17   they're going to use the website to collect data from class

18   members.  We need to know what data are going to be collected

19   and how and what the process looks like and where it goes and

20   what's done with it.  These are all part of the process.  And

21   that's basic information that can, should and must be provided

22   to us.  I think plaintiffs acknowledge that.  They say they are

23   going to give it to us; the problem is it's not ready yet.  And

24   that's fine but again, it goes to the timeliness issue.  They

25   can't even commit that it will be ready before our deadline,

1    our current deadline of May 24th, which means we may not have a

2    chance to evaluate it at all before we have to file our

3    opposition papers.  So it's all fine, I'm not suggesting that

4    their Class Notice Plan needs to be stricken but it's not

5    complete until they provide that information.

6           So what needs to happen is they need to be given a

7    date certain to do that.  We then need to have an extended

8    deadline that accommodates the fact that they needed more time

9    to prepare the elements of their Class Notice Plan.  And then

10   we can have a reasonable, rational approach to develop the

11   class notice briefing and to put it in front of Judge Kugler in

12   the ordinary course, not on a rushed basis.  There's millions

13   of class members here in a lawsuit where plaintiffs' own

14   damages expert has calculated a multibillion dollar price tag.

15   These claims belong to the class members.  They're entitled to

16   proper notice, they're entitled to an opportunity to opt out,

17   they need to have a good notice plan for that to happen and

18   because this notice plan doesn't follow their ascertainability

19   methods, there really needs to be a full and fair opportunity

20   to explore it.  That's all we're seeking.

21           JUDGE VANASKIE:  All right.  Mr. Parekh.

22           MR. PAREKH:  Sure, Your Honor.

23           We have provided Mr. Ostfeld with some of the data

24   that he's requesting.  We've also committed to provide him in

25   the next day or two with a mockup of the website, and we did

1   provide, with the original notice, the long-form notice, which

2   contained virtually all of the information that the website

3   would have, the website would just be more detailed and

4   presented in a different manner.  So it's more of a manner

5   rather than a content issue.

6        In terms of the questions that Mr. Ostfeld has, a lot

7   of his questions are basic questions of what does this

8   marketing term mean rather than a question of -- you know, a

9   substantive question as to where or how adequate this notice

10  is.  And if Mr. Ostfeld doesn't know the meaning of the

11  marketing term, that's not really our issue.  I mean, you could

12  Google those marketing terms, they have meanings, they are sort

13  of industry standard meanings; but we also have offered and

14  they have accepted to interview Mr. Weisbrot and be able to

15  answer those questions for him informally.  This is exactly the

16  same type of situation that we had when we were dealing with

17  the 30(b)(6) notices regarding ESI and sources of the ESI.  We

18  certainly could have insisted on a 30(b)(6) depo and then said,

19  you know, we need to be able to use that in order to make our

20  discovery motions.  We didn't.  We accepted the informal offer

21  and it works out.

22        In terms of the scheduling, this is the schedule that

23  Judge Kugler ordered and we think that, you know, it's a

24  reasonable schedule.  It's ultimately Judge Kugler's decision,

25  not defendant's position, as to whether or not notice is

1   adequate, and we think putting all of this in front of Judge

2   Kugler before the June 7th CMC would allow him to -- whether or

3   not he makes a decision on that day -- at least let us know

4   what additional information he may want or what his concerns

5   are and then we can address those concerns.  It's a Court

6   determination.  And really in terms of notice from defendants'

7   standpoint, you know, they don't really have a -- it's not

8   really a standing issue but the question of notice really comes

9   down to is the Court meeting due process, not whether or not

10  plaintiff or defendant is really in the right.

11          In terms of the other issues that Mr. Ostfeld has

12  covered, we did provide the TPP information to him already and

13  what we said was, if you believe that the TPP information is

14  underrepresented or wrong in any way, please come back and tell

15  us and we are happy to include anybody that you in your, in

16  defendants' knowledge should be noticed and we'll include those

17  people in the notice.  And we've asked for that information and

18  they're welcome to provide it and we'll provide individual

19  notice to those people.  We're not saying we won't.

20          The issue with delaying everything, one, it really is

21  Judge Kugler's decision in terms of whether or not he wants to

22  change the schedule; but the other issue is that if we delay it

23  past the June 7th CMC, then we're basically 30 days out before

24  we get to see Judge Kugler again.  And we think that all of

25  that is then pushing the trial date further and further out,

1    and Judge Kugler certainly doesn't want to do that.

2         We believe that the information we provided in the

3    original motion and declaration is sufficient.  We understand

4    the defendants want more information, we're providing it to

5    them, but we don't see why notice is particularly a complicated

6    issue here and we think that they should be able to brief it by

7    next Friday.

8         JUDGE VANASKIE:  All right.  Mr. Ostfeld.

9         MR. OSTFELD:  Just a few quick points, Your Honor.

10        I certainly agree that Judge Kugler ultimately will

11   make the decision whether or not the schedule will be changed.

12   I think Judge Kugler greatly respects Your Honor's input on

13   these issues and if Your Honor says that there are discovery

14   issues and there needs to be additional time, I think Judge

15   Kugler is likely to give attention to Your Honor's

16   recommendations on that, and I would even go so far as to say I

17   think he's likely to accept your recommendations.  So I do

18   think the recommendation would be appropriate here.

19        With respect to the sufficiency of the information, it

20   comes back to the same problem.  Rule 23(c)(2)(B) is quite

21   clear:  Individual notice must be given where the individuals

22   can reasonably be identified.  The plaintiffs themselves

23   submitted an ascertainability expert who identified how they

24   believed the individuals could be ascertained and identified

25   and individually notified.  They have now come out with a

1    notice plan that doesn't do that.  It is our obligation -- it

2    is incumbent on both sides and, frankly, it is independently

3    incumbent upon the Court to make sure the due process rights of

4    the class members are protected.  That requires careful

5    evaluation of a plan that deviates from the ascertainability

6    plan and it requires very careful evaluation of a plan that

7    proposes to use entirely technological means to purportedly

8    reach members of the class, not even members of the class,

9    members of a hypertensive population that may or may not mirror

10   the requirements of the class.  This is not something that has

11   ever been proposed before; we had no knowledge that there was

12   going to be an effort at a digital advertising campaign until

13   we saw the Class Notice Plan.  That was the first we heard that

14   there wouldn't be an attempt at individual notice to the

15   identified class members.  It requires evaluation.  The Court

16   owes these class members their due process.  And if it requires

17   pushing back consideration of the Class Notice Plan by a month,

18   I do not think that is too high a price to pay for due process.

19   Due process does not come with a stopwatch.  There needs to be

20   a full and fair opportunity to vet this plan, which there has

21   not been.

22          JUDGE VANASKIE:  All right.

23          MR. PAREKH:  Your Honor, what Mr. Ostfeld just said

24   are basically their arguments opposing our plan.  He just laid

25   out for you why they think our plan is inadequate.  I don't see

 1   why that can't be briefed by next Friday, given the fact that

 2   he laid all those things out for you today.  And if Judge

 3   Kugler agrees with him, then we will go back to the drawing

 4   board and redo our plan.  If Judge Kugler disagrees with him,

 5   and thinks that our plan and the information we provided is

 6   adequate, then we go forward that way.  But what he's saying is

 7   we think your information is inadequate, we want more

 8   information, but we don't want to actually brief that issue

 9   until we get all of this additional information and then we're

10   going to still say your plan is inadequate.

11           JUDGE VANASKIE:  All right.

12           MR. OSTFELD:  What I'm saying, Your Honor, is we are

13   entitled to explore the adequacy of this plan before we have to

14   brief it.  There are certainly elements of this plan that I

15   find troubling but we have had no discovery into this plan yet

16   and we are entitled to take that.  We have the sketchy details

17   of a plan; we don't have the contents of the website.  There's

18   a lot that has to happen here in order for Judge Kugler to make

19   an informed decision about the adequacy of class notice.  It is

20   incumbent upon us to take the discovery to identify those

21   issues and put them in front of the judge.  That is why we have

22   an adversarial process.

23           JUDGE VANASKIE:  What are the ground rules,

24   Mr. Parekh, for the interview of Mr. Weisbrot?

25           MR. PAREKH:  We've provided Mr. Weisbrot -- we haven't

1  set any ground rules.  They are welcome to ask him whatever

2  questions they want.  He is available for I think three and a

3  half hours is what we've set aside.  And, you know, if we think

4  that there is something that they are delving into that is

5  completely inappropriate, maybe we will raise that issue but we

6  haven't set any preconditions or ground rules.

7          JUDGE VANASKIE:  All right.  Does anyone else want to

8  be heard on this issue?

9          (No response).

10          JUDGE VANASKIE:  All right.  I am not going to suggest

11  to Judge Kugler that the schedule be adjusted to enable you to

12  pursue discovery on the questions that you've raised.  You will

13  have, I think, a fair opportunity to interview Mr. Weisbrot;

14  you can raise your questions then.  Attorneys are very good at

15  submitting declarations, so you can submit a declaration with

16  respect to what you learn during that interview.  And if you

17  feel that you have not had an adequate exploration of the

18  issues surrounding notice, then you can raise that in your

19  papers that you file with Judge Kugler and oppose the notice

20  that's suggested by plaintiffs at that time.  But I am not

21  going to adjust the schedule to allow for additional formal

22  discovery.

23          All right.

24          MR. OSTFELD:  Understood, Your Honor.  May we share

25  the mailing list with our experts?

1          MR. PAREKH:  We don't have an objection to that as

2     long as you identify the expert.

3          MR. OSTFELD:  Understood.

4          JUDGE VANASKIE:  All right.  So you identify the

5     expert, you can certainly share the mailing list with your

6     expert.

7          MR. PAREKH:  What I meant is, we need to be able to

8     know who that expert is in order to determine whether or not

9     there's a conflict before that list is shared.  I apologize if

10    I wasn't clear.

11         JUDGE VANASKIE:  Oh, for purposes of making a conflict

12    determination?

13         MR. PAREKH:  Correct, Your Honor, because it's a

14    proprietary mailing list by a particular notice expert and if

15    it's another notice expert that he believes, you know, is

16    competing against him in the same field, there may be an issue.

17    We hope not but we do at least want to have the ability to run

18    that by.  And if there is an issue, you know, may we just come

19    back to Your Honor through an informal phone call or something?

20         JUDGE VANASKIE:  Yes.  I wanted to mention that.  You

21    know, you don't have to wait until the next scheduled discovery

22    conference to raise an issue with me.  I think we set that

23    precedent a long time ago that if something comes up that

24    requires a decision on a discovery matter, raise it with me by

25    way of a letter and I'll promptly schedule a conference call

1    and so you don't have to wait until the next discovery

2    conference.

3        But yes, Mr. Ostfeld, please provide the name of your

4    expert or names of your experts and you can certainly disclose

5    the mailing list to your expert upon confirmation that there is

6    no conflict and no objection from plaintiffs.  All right?

7        MR. OSTFELD:  All right.  And then, Your Honor, for my

8    own planning purposes, is my response deadline the CMO 32

9    deadline of May 24 or the May 26 deadline that plaintiffs

10   indicated they were providing along with the interview of Mr.

11   Weisbrot?

12       JUDGE VANASKIE:  You'll have until May 26th, two

13   additional days.  If we need to put an order on the record,

14   please submit the proposed order to me and we will promptly see

15   that it gets docketed.  Okay?

16       MR. OSTFELD:  Thank you, Your Honor.

17       JUDGE VANASKIE:  All right.

18       MR. PAREKH:  Thank you, Your Honor.  I need to get off

19   the phone, so I apologize.

20       JUDGE VANASKIE:  Understood.  Thank you.

21       All right.  So we will move back now to the

22   plaintiffs' letter.

23       I did want to address one question, one matter on the

24   first page of that submission, the May 15th submission, and

25   that is the redactions with respect to Exhibit CC, ECF 1189,

1    that's the report that was done in Europe with respect to this

2    matter.  And you're entitled to a decision on that.  You know,

3    I issued rulings from the bench and memorialized them in an

4    order that went out some time ago and I would propose in this

5    instance, unless there's objection, because I have written

6    quite a lot on this issue of confidentiality and the access to

7    court records, I would simply issue an order that identifies

8    those parts of Exhibit CC I believe should remain redacted and

9    those parts that should not.  And I am kind of jumping around

10   here but the point is that we held argument and I gave the

11   defense the opportunity to again submit another round of

12   redactions to Exhibit CC, which they did.  I had reviewed the

13   initial round.  I haven't given you my ruling on this new

14   round, even though it's somewhat old now, this old new round,

15   but I would propose simply to issue an order that identifies

16   those parts that should remain redacted, those parts that

17   should not, without saying much more than that.  And if I do it

18   that way, I will have something out this week to you on that.

19           Any objection to proceeding that way.  On behalf of

20   the plaintiffs, I'm sure not.  But on behalf of the defense?

21           (No response).

22           JUDGE VANASKIE:  You can always raise the objection

23   after the order comes out but this way we'll expedite it.  All

24   right?

25           Now, Mr. Slater, you raised the issue with respect to

```
 1  briefing schedule on sealing.  This was all part of that issue.
 2          MR. SLATER:  Yes, Your Honor.  I think that's going to
 3  be handled by Mr. Geddis for the plaintiffs.
 4          JUDGE VANASKIE:  All right.  Is there anything really
 5  in dispute here, Mr. Geddis?
 6          MR. GEDDIS:  Are we talking about the deadline for the
 7  briefing?
 8          JUDGE VANASKIE:  Yes.
 9          MR. GEDDIS:  No, Your Honor.  I think defense just
10  wanted until June 15th and then we wanted until July 10th.
11          JUDGE VANASKIE:  Right.  If there is no objection, we
12  will issue an order that sets those deadlines.  All right?
13          MR. GEDDIS:  Thank you, Your Honor.
14          MR. HARKINS:  Thank you, Your Honor.
15          JUDGE VANASKIE:  Okay, thanks.
16          I am not sure how much we can cover on this today but
17  the next issue on the plaintiffs' agenda letter is the
18  propriety of MSP's discovery responses.  And a lot has been
19  said on this.  And who's addressing this issue for the
20  plaintiffs?
21          MR. SLATER:  I think that myself and Mr. Kass will be
22  addressing this, depending on how the argument goes.
23          JUDGE VANASKIE:  All right.
24          MR. OSTFELD:  Your Honor, Greg Ostfeld.  I will be
25  addressing it for the defendants.  I think this is another
```

1  situation where we've raised the issue.

2          JUDGE VANASKIE:  Yes.

3          MR. OSTFELD:  If you would like --

4          JUDGE VANASKIE:  Well, the question I had for you, Mr.

5  Ostfeld, is, is this ready for any kind of determination or are

6  you proposing additional briefing or where does it stand?

7          MR. OSTFELD:  So I think the discovery issue, the

8  underlying discovery issue can probably be presented today.  I

9  think the question raised by the motion for order to show cause

10  is probably not properly before Your Honor today.  I imagine

11  plaintiffs will want an opportunity to brief that.  But I

12  certainly think the discovery issues can be raised today and

13  are somewhat time sensitive because, again, they relate to a

14  pending deadline, which is our June 7th deadline for damages

15  expert reports.

16          JUDGE VANASKIE:  All right.  Well, let's hear then

17  your position with respect to the underlying discovery issue.

18          MR. SLATER:  I will defer to Mr. Kass on this.  I was

19  prepared to handle the part about the motion that got filed

20  yesterday, which I want do to address, but we might as well hit

21  the part that's in the letter first, the substantive discovery

22  issue, and that's for Mr. Kass.

23          MR. OSTFELD:  Your Honor, from defense perspective,

24  what we're asking you to do is simply to enforce what

25  Your Honor already ordered in Special Master Order 73, which we

1    respectfully submit MSPRC has violated by failing to produce

2    most of the records and datasets in its possession, custody, or

3    control reflecting the subsidies, reimbursements, and rebates

4    its assignors received from CMS, the Center for Medicare and

5    Medicaid Services, during the time period for which MSPRC is

6    seeking damages.  We're also seeking a corresponding extension

7    of our damages expert disclosure deadline to offset the

8    prejudice caused by the withholding of those documents.

9           To refresh your memory on why this is relevant, you

10   probably remember vividly the lengthy argument on October 27th

11   where we addressed this issue, and, specifically, the TPP

12   defendants' Request Number 2 which sought subsidy reimbursement

13   and rebate data.  We tried to be really transparent about what

14   we were seeking when we filed that motion to compel and argued

15   it before Your Honor on October 27th.  We listed 14 specific

16   reports and datasets that are submitted to CMS and that pertain

17   to the reimbursement, subsidy, and rebate data that we need.

18   And there's no mystery where this list came from, Your Honor.

19   These reports and datasets are the ones that our damages

20   experts said they needed in order to evaluate plaintiffs'

21   damages theory as pertains to Medicare Advantage organizations

22   and Part B plans.  And specifically, the analysis to be

23   undertaken was whether plaintiffs were improperly including

24   amounts that were paid by the government as part of their

25   damages, which the *In Re Namenda* case, as Your Honor may

1    recall, says should not be included.  That requires accounting

2    for a variety of different government subsidies and

3    reimbursements.  Some of these are addressed by data that the

4    plaintiffs have already produced and some of them are not.

5         For example, a third-party payor's drug payment

6    obligation may be lower or it may be zero during certain phases

7    of Medicare coverage, like the catastrophic phase or the

8    coverage gap phase, and you can identify those situations from

9    the prescription drug event data, which to some degree MSPRC

10   has produced.  So there's some missing PDE data but they've

11   produced some.

12        Likewise, the government pays a subsidy called the

13   low-income subsidy for drug purchases for low-income

14   beneficiaries.  Those are also reflected in the PDE data.  But

15   there are other subsidies as well which are not reflected in

16   the PDE data, and that's really what's at issue today.

17        For example, there is the CMS direct subsidy, which is

18   a beneficiary-specific subsidy paid to offset the cost of drug

19   treatments for specific conditions, like, relevant to this

20   case, hypertension or primary pulmonary hypertension.  And to

21   disaggregate that subsidy and to allocate it to a specific drug

22   purchase, you need the other reports that we're asking for.

23   Those reports are the only reports that show the

24   beneficiary-level data needed to disaggregate.  They show the

25   healthcare condition codes for these beneficiaries, the

1    diagnosis codes, the specific prescriptions.  Using these data,

2    our experts can determine what direct subsidy payments a TPP

3    received to cover a given patient's individual drug costs and

4    can even allocate them to be offset against specific valsartan

5    costs.  This is what plaintiffs argued at the October 27th

6    hearing needed to be done to make the data useful and what they

7    argued couldn't be done.  Our experts disagree.  They say it

8    can be done, it just requires a lot of data, which is why nine

9    of the requested reports and datasets on our list that haven't

10   been produced provide the elements of these data.

11        Another example is the direct and indirect

12   remuneration paid by CMS which includes all rebates, subsidies,

13   and price concessions from any source that decreases the costs

14   incurred by the Part D sponsor.  The other two missing

15   requested reports and datasets provide these elements of data.

16   And if Your Honor wants, I can go through these reports one by

17   one and discuss them, but I figure it's more helpful to provide

18   you with a general description of what we need and what we

19   haven't been given.

20        That's why we asked for these reports and datasets.

21   It's not just the PDE data, which MSPRC has provided in part,

22   and it's not just the aggregate totals, which are what are in

23   the Excel spreadsheets they provided.  Those aggregate totals

24   don't tell us much unless we have the accompanying data needed

25   to disaggregate.

1        And again, Your Honor, we were very transparent about

2   needing these 14 reports and datasets in our motion to compel.

3   We highlighted them repeatedly at oral argument.  Your Honor

4   was very patient with us.  You gave us all every opportunity to

5   say everything we wanted to say at that argument.  MSPRC never

6   contested the relevance of any of these reports or datasets,

7   they never disputed they have them or could get them from their

8   assignors, they never argued it would be burdensome to produce

9   them.  Their only arguments were that the subsidies aren't

10  relevant and you can't disaggregate them.  Your Honor rejected

11  those argument and ordered the documents produced.  You ordered

12  them to produce the documents reflecting the subsidies,

13  reimbursements, and rebates received from CMS during the time

14  period for which MSPRC is seeking damages.

15        Essentially, plaintiffs' position seems to be that

16  because you didn't cut and paste our list of the 14 specific

17  reports and datasets, they only had to produce what they

18  decided was relevant, which they thought was the PDE data and

19  the aggregate spreadsheet.  I don't think that's a reasonable

20  interpretation of what Your Honor did.  The 14 reports and

21  datasets were perfectly clear in the motion, they were

22  perfectly clear at argument.  Your Honor could reasonably

23  anticipate that the parties would act in good faith when you

24  ordered the production of the documents reflecting subsidies,

25  reimbursements, and rebates to include the 14 reports and

1    datasets that essentially everybody agreed were the ones at

2    issue.

3         CMO 32 ordered MSPRC to complete its rolling

4    production by May 3rd.  And although MSPRC produced documents

5    through the last day of that deadline, with respect to

6    Your Honor's order, all they ever produced was a portion of the

7    PDE data and the Excel spreadsheets that they've referenced in

8    their letter.

9         So there's really three things we need here:

10        First, we need the 11 sets of reports and datasets

11   that they have not produced at all for the entire time period.

12        Second, with respect to the PDE data, they have not

13   produced the ConnectiCare PDE data, which is one of the

14   assignors of MSPRC.  And what they've said about that is that's

15   not one of the two assignors at issue in the upcoming TPP

16   trial, but that's not accurate.  To be clear, Your Honor,

17   ConnectiCare is a subsidiary of EmblemHealth.  Plaintiffs'

18   damages expert folded the ConnectiCare claims data into the

19   EmblemHealth data and included it in her damages calculation.

20   You can't have it both ways.  If you're including ConnectiCare

21   in your damages, you have to include the ConnectiCare reports

22   and datasets in your production, and they haven't done that.

23        The third issue is they haven't produced the

24   EmblemHealth data for 2014.  What plaintiffs say about that is

25   they don't have it.  And it's possible -- we have discussed a

1    possible resolution of this one.  We've asked for a

2    certification and an explanation of why they don't have it when

3    they had 2013 and 2015 to 2017.  Plaintiffs are considering

4    that.  So we may have resolution of that one.  I think it's

5    fair to say we're at loggerheads on the other ones.

6         That's what we're asking you to order them to produce:

7    The 11 missing reports and datasets for the full time period

8    and the ConnectiCare data and to do something about the

9    EmblemHealth data for 2014, either a certification and

10   explanation or identifying and locating and giving us the data.

11        We also, respectfully, Your Honor, need more time.

12   The reason we need more time --

13        JUDGE VANASKIE:  All right.

14        MR. OSTFELD:  I'm sorry?

15        JUDGE VANASKIE:  Let me hear from Mr. Kass first with

16   respect to the question of the documents that you're

17   requesting, these 11 reports plus ConnectiCare.

18        MR. SLATER:  Your Honor, it's Adam Slater.  Now that I

19   realize what we are talking about, I'm actually going to start

20   the argument.  Mr. Kass may need to supplement, but I'm going

21   to begin.  Okay?

22        The context is important because this basically

23   duplicates the unauthorized motion that was just filed for

24   sanctions, which I got the sense the defense was trying to

25   create some sort of an impression that there was some sense of

1   urgency with this and there was something new or different.

2   The motion, and I think it's part and parcel of this, that

3   motion should be stricken.  There was never a request for

4   permission to file it.

5        The idea that a motion for sanctions under Rule 37 was

6   filed over this issue is of great concern to us.

7        Getting into the substance of it, which we can come

8   back to what I just said, the order was complied with.  The

9   initial request, the actual request, was for the plaintiffs to

10  produce the data reflecting the subsidies, reimbursements, and

11  rebates.  Your Honor, we went back through the argument, we

12  went back through your order, which was very, very specific and

13  understandable, where Your Honor found that two categories of

14  what was requested were not relevant and you didn't actually

15  reach the burden and confidentiality issues.  Your order was

16  specific to produce the requested subsidy, reimbursement, and

17  rebate data.  That's what the order said; that's what was done.

18       What defense is now pointing to is in their motion

19  they attempted to expand the discovery request and listed a

20  whole bunch of other types of reports and now they're --

21       JUDGE VANASKIE:  Hold on.

22       MR. SLATER:  Loretta, you went off of mute, Loretta.

23       (Brief interruption.)

24       JUDGE VANASKIE:  All right.

25       MR. SLATER:  So, what happened was in their motion,

1    the defendants listed these other categories of reports.  What

2    counsel's not telling you is those reports that they are asking

3    for, they include things like data as to the medical conditions

4    of patients which Your Honor did not order to be produced and,

5    in fact, Your Honor, again, your rationale for how you weighed

6    the different arguments of the two sides, Your Honor said

7    there's a potential relevance to what the TPP's paid and

8    whether they got reimbursements.  I can tell you certainly the

9    plaintiffs, as you know, don't agree that that should be

10   admissible, the reimbursements, and we don't believe that can

11   be shown to a reasonable degree of certainty at trial, but

12   Your Honor ordered it.  You said, that's what I'm looking at,

13   how are the damages going to be calculated.  The defense has

14   the right to the damages data in order to balance all this.

15   And that was the subsidy, reimbursement, and rebate data.

16   Again, that was produced.

17         So at the very first swipe, what the defense is doing

18   is trying to enforce something that they dumped into their

19   motion as additional requests beyond the original request which

20   Your Honor did not order.  Your Honor was specific, we produced

21   what needed to be produced, and now, in essence, they're trying

22   to bootstrap that into an argument, well, this was supposed to

23   be produced before but, in essence, this is a new motion on

24   issues that have never been in a formal discovery request and

25   our major concern is that this is tied into an ultimate request

1  to delay everything because what you'll hear is their expert

2  needs it, their expert needs to be able to put this in, they

3  can't meet the deadlines, all the deadlines should be put out,

4  and what MSP told Mr. Ostfeld is if there's something in

5  particular you want to show us, we'd look at it, but there's

6  nothing new.

7        As far as the points that Mr. Ostfeld listed, the 11

8  sets of reports and datasets, I've addressed that.  That wasn't

9  part of your order and that wasn't something that was directed,

10  that was something that was dumped into the motion but was not

11  requested and Your Honor again was very specific on what to

12  produce.

13        Number two, the ConnectiCare PDE data, they are

14  correct that our expert referenced it and I believe in the meet

15  and confer Mr. Ostfeld was asked, are you seeking to expand the

16  trial to ConnectiCare, he said, no, I'm not.  So the fact that

17  our expert put it into the report, counsel can discuss this

18  offline as to whether that could be addressed by simply a

19  supplemental report or some other way to address it, but if the

20  data is all going to be produced, you're essentially expanding

21  the case into ConnectiCare also, which is not one of the

22  assignors for trial.

23        The Emblem data, counsel is talking to the client to

24  obtain a certification to address the 2014 data and that's

25  being addressed.

1          So maybe the last two issues raise something that has

2   to be discussed.  All these other reports, that should be

3   denied out of hand because the order was complied with.  And I

4   will leave Mr. Kass if there's something important that I left

5   out.

6          MR. KASS:  I think that's it for now.

7          JUDGE VANASKIE:  All right, very well.

8          Mr. Ostfeld, how do I determine -- I guess your

9   position is that the order that required the subsidy,

10  reimbursement, rebate data to be produced necessarily

11  incorporated the reports that were referenced in your motion.

12         MR. OSTFELD:  That's exactly correct, Your Honor.  And

13  it's not something that we shoehorned into our motion or

14  something we tried to slide in.  I think we were really, really

15  loud and explicit about this.  What we requested was subsidy,

16  reimbursement, and rebate data.  In our report, we tried to be

17  as specific as possible because in our multiple meets and

18  confers with plaintiffs, what we kept hearing was, we don't

19  know what you're asking for.  So we got really specific:  Here

20  are the 14 reports and datasets that constitute the subsidy

21  reimbursement, and rebate data.  We put it in our motion.  We

22  argued it.  It was one of the spotlights at the October 27th

23  argument.  We kept talking about those 14.  We called them

24  pre-baked reports.  We talked about how it wasn't burdensome

25  because these were pre-baked reports that went to CMS.

1          The arguments that Mr. Slater just made, if they

2    really felt that way, could have been made at the October 27th

3    hearing when Your Honor allowed all the argument we wanted.

4          When he refers to this data referring to the medical

5    conditions of the patients, Your Honor, as I explained, that's

6    what's needed to disaggregate the data, the subsidies are

7    tied -- it's not -- these aren't like medical records of the

8    patients; they're HCC codes, they're healthcare condition

9    codes, they're diagnosis codes, they're prescription codes.

10   They show what the beneficiaries were coded with and what was

11   paid on behalf of the beneficiaries as a result of that.  So if

12   you want to disaggregate the CMS-direct subsidy, what you have

13   to do is cross-reference the subsidy against the HCC codes, the

14   diagnose codes, the prescription codes, then you can identify

15   what was paid for each beneficiary for each of their medical

16   conditions and that's how you disaggregate the data to

17   determine what was paid that is attributable to the

18   valsartan-containing drugs, what are the government payments

19   that have to be offset against damages.

20         So I think that absolutely must be done, it's why this

21   was in the original list of 14 reports.  And we never heard a

22   peep of disagreement about the reports or datasets until

23   Your Honor granted the motion, then they decided to go back and

24   decide for themselves what they were going to produce

25   notwithstanding that Your Honor had the full benefit of our

1    description of what was to be produced when we argued this

2    motion before.  This is going back and rearguing the merits and

3    it's why we contend and why we contend vigorously that they are

4    in violation of this order and it's why we brought the motion.

5          The other point that I want to bring up, Your Honor,

6    is ConnectiCare.  What Mr. Slater said is that it was

7    referenced in their expert's report.  It wasn't referenced.  It

8    was incorporated into the damages calculation as part of the

9    EmblemHealth damages claim.

10          We had proposed, with respect to the expert reports,

11   that what should be done, now that we have a trial set, is

12   plaintiffs should submit a new damages report that is

13   particularized to the TPP trial.  Plaintiffs oppose that.  They

14   said, you have a damages report that you can respond to, you

15   should respond to it.  Judge Kugler agreed with plaintiffs.

16   That's fine.  That's the report we have, that's the report we

17   have to respond to, that means we have to respond to the

18   EmblemHealth data and to the ConnectiCare data that is folded

19   into the EmblemHealth data, which means plaintiffs need to

20   produce it.

21          Lastly, Your Honor, on the timing point, this is

22   really straightforward.  Judge Kugler ordered MSPRC to produce

23   its data and complete its rolling production by May 3rd.  They

24   have not produced everything Your Honor ordered produced and

25   absolutely we need time to review the data.  This isn't a

```
 1    delayed tactic.  This is a remedy for the fact --
 2            JUDGE VANASKIE:  Hold on.  We are getting some
 3    interference.
 4            MR. SLATER:  Somebody's unmuted who is watching with a
 5    phone number, I think.
 6            (Brief interruption.)
 7            JUDGE VANASKIE:  Thanks.
 8            MR. OSTFELD:  So just finishing up that point,
 9    Your Honor, what I have just described, the process of
10    disaggregation, requires analyzing some voluminous reports
11    going through a lot of data.  The report -- the CMO 32
12    contemplated five weeks for us, from May 3rd to June 7th, to
13    review the data and to prepare our report.  MSPRC has not
14    produced the data; our experts have not had an opportunity to
15    review it.  We're simply seeking what's fair, which is adhering
16    to the original timeframe contemplated by CMO 32 by giving us
17    the 35 days after MSPRC completes its production for us to
18    prepare our damages expert responses.
19            MR. SLATER:  Your Honor, I could suggest that on the
20    ConnectiCare issue what I think should happen is that we should
21    be ordered to meet and confer on an expedited basis and get
22    back to Your Honor within a couple of days.  I would think this
23    is something that can be worked out.
24            As far as the Emblem data, I told you we're working on
25    getting the certification.
```

1          To come back to the merits, the defense request that

2     they moved on asked for the data on the subsidies,

3     reimbursements, and rebates in Excel format.  That's what the

4     request was.  They got a lot more than that but that's what the

5     request was.

6          The other requests that they "baked" into their -- to

7     take Mr. Ostfeld's word -- into their motion were never

8     requested.  Your Honor never contemplated production of medical

9     conditions and medical records.  It was purely the numbers,

10    what was paid and what was paid back.

11         And I have to come back to the motion again.  That

12    motion was filed without the Court's permission in violation of

13    Local Rule 37.1.  It came out of left field for them to file it

14    without discussing it first and Your Honor authorizing it.  It

15    never should have been a motion for sanctions anyway.  Even if

16    the defense believes they're entitled to something, it should

17    have been a motion to compel additional documents or discovery,

18    not a motion for sanctions.  So we ask that that motion be

19    stricken as well.

20         Thank you.

21         JUDGE VANASKIE:  Mr. Ostfeld, do you want to address

22    the point made by Mr. Slater concerning the filing of the

23    motion without authorization?

24         MR. OSTFELD:  Your Honor, if we violated a local rule,

25    then we can certainly go back and revisit that.  What we filed

1    was not a motion for sanctions, it was a motion for order to

2    show cause.  We think it's an appropriate motion for order to

3    show cause because we believe that they are in violation of

4    Your Honor's order and we think that that is entirely clear

5    that they are in violation of Your Honor's order.  This isn't

6    the motion to compel additional data; this is a motion to

7    compel production of the data that Your Honor contemplated when

8    you entered your order.

9           JUDGE VANASKIE:  Can you read to me, or it might take

10   me a minute or two to find, the actual request for production

11   that I ordered production of?  That didn't make much sense.

12   But the actual --

13          MR. HONIK:  Your Honor, it may be --

14          JUDGE VANASKIE:  -- request for production.

15          MR. HONIK:  Your Honor, this is Rubin Honik.

16          It may be enlightening for the Court to know, because

17   I think there is -- I don't want to say something

18   inappropriate, but the request the defense made of us is

19   contained at docket entry 2167-1, which was a letter from the

20   defense group asking us to put the reimbursement data on an

21   Excel spreadsheet.  That's what was the subject of argument

22   before the Court, and we've complied with that completely.

23   It's a fiction that these additional reports were somehow the

24   specific subject of that initial request or even argument.

25   This is, regrettably, an attempt on the defense's part to

1    enlargen the schedule and there's simply no basis to do that

2    because MSP has complied completely by producing that rebate

3    and reimbursement data in exactly the format they requested

4    which can be found at docket entry 2167-1.

5              MR. OSTFELD:  Your Honor, I'm going to read to you

6    Request Number 2 as it was expressed in our motion to compel,

7    which is what you ruled on.

8              JUDGE VANASKIE:  All right.

9              MR. OSTFELD:  "Request Number 2, Subsidy,

10   Reimbursement, and Rebate Data:  Data in Excel format and

11   reports reflecting subsidies, reimbursements, and rebates that

12   you received from CMS, Center for Medicare and Medicaid

13   Services, including but not limited to prescription drug event

14   reports and all PDE payment records reflecting reimbursements

15   and payments for valsartan-containing drugs and other standard

16   reports and data available through CMS which reflect payments

17   made or received by you for any prescription drugs for insureds

18   enrolled in your plans during the relevant time period, such as

19   monthly membership summary reports, plan payment reports, and

20   payment/interim plan payment records/reports."

21             That is the request that was in front of Your Honor.

22             What plaintiffs are referring to is there were earlier

23   iterations of this request in letters that did not have the

24   same level of detail.  Through our meet-and-confer process with

25   plaintiffs, they sought additional detail which we provided and

1  we moved on the request as I just read it to you.

2          MR. KASS:  Your Honor --

3          MR. SLATER:  Your Honor, it's Adam Slater.  I think

4  I'm going to read what Mr. Kass has.

5          What you were just read is what's in the motion.  Your

6  question was, what did the request actually say in September

7  2022.  It requested the first half of what was read, a subsidy,

8  reimbursement, and rebate data.  "TPP plaintiffs shall produce,

9  in Excel format, data reflecting all subsidies, reimbursements,

10  and rebates received by TPP plaintiffs from Center for Medicare

11  and Medicaid Services ("CMS"), including but not limited to all

12  prescription drug event (PDE) reports and all PDE payment

13  records reflecting reimbursement requests and payments for

14  valsartan drugs during the time period for which TPP plaintiff

15  is seeking damages, the relevant time period."

16          What Mr. Ostfeld just read to you from the motion

17  added on the language stating "and other standard reports and

18  data available through CMS which reflect payments made or

19  received by you for any prescription drugs for insureds

20  enrolled in your plans during the relevant time period, such as

21  monthly membership summary reports, planned payment reports,

22  and payment/interim plan payment records/reports."

23          So, again, all that add-on was not in the request.

24  It's not appropriate in your motion to expand your requests and

25  then ask for something that was not in the original request.

1    And, frankly, Your Honor, you addressed this, as you said, as

2    we all said, in detail, it was argued, and your order was very

3    clear to produce what was requested.  That's what we produced.

4         And we can answer more questions about what else they

5    are asking for, but we don't agree that any of these other

6    reports would provide any meaningful or substantial additional

7    information anyway, and it would start to get into problems

8    that you didn't address, like burden and redaction for

9    confidentiality because some of these reports, for example,

10   have bid information and that type of data can be elicited and

11   also the medical information, which, again, Your Honor never

12   addressed because it was never raised.  So the focus was on

13   what was paid and what may have been reimbursed.  What they did

14   was expand it in the motion, Your Honor didn't order it, and

15   now they're trying to expand it again.

16        MR. KASS:  Your Honor, if I could just mention one

17   little thing just to kind of help complete the picture is that

18   Mr. Slater mentioned what Your Honor had ordered, and if you

19   look at Your Honor's order at docket entry 2249, it clearly

20   states what are the discovery issues at issue, what are the

21   disputes, what are the categories, and it starts here on the

22   first page "the subsidy, reimbursement data."  That is a direct

23   quote from the original request, the letter that defendants

24   submitted to the Court at 2167.  So that additional part that

25   defendants tacked on on their motion to compel, that was never

1    ordered by the Court.  The Court stuck with the original

2    request and MSP has produced the data that defendants requested

3    in their original request.

4        MR. OSTFELD:  Your Honor, you've heard from three

5    plaintiffs' counsel.  May I be heard on this issue?

6        JUDGE VANASKIE:  You certainly may.

7        Mr. Ostfeld.

8        MR. OSTFELD:  Thank you, Your Honor.

9        Your Honor, our view is it doesn't matter which

10   iteration of the request you're looking at.  When you're

11   talking about subsidies, reimbursements, and rebates, you're

12   talking about the 14 reports and datasets.

13       What happened, and what plaintiffs are leaving out, is

14   there was a meet-and-confer process where they sought further

15   clarification which we provided.  Going back to the original

16   letter and the original letter request and ignoring the

17   subsequent revisions is not appropriate.

18       We placed in front of Your Honor the request that was

19   at issue but it doesn't matter, you could strike the last half

20   of that and simply keep the original language and we're still

21   talking about the same reports and the same data.

22       And, again, Your Honor, there was perfect transparency

23   on this.  All of this was in our motion, all of this was

24   referenced multiple times at the October 27th argument.  There

25   is no credible argument that there was confusion on plaintiffs'

1    part as to the documents we were seeking, the documents we were

2    moving on, and what Your Honor meant when you ordered

3    production of the documents reflecting subsidies,

4    reimbursements, and rebates.  It's these 14 reports and data.

5         I would like to hear an explanation from them as to

6    how they propose we disaggregate the CMS-direct subsidy without

7    the nine missing reports pertaining to that or how we

8    disaggregate the direct and indirect remuneration number

9    without the two missing reports on that.  That is why all of

10   these reports and datasets reflect subsidies, reimbursements,

11   and rebates.  They are all what are needed to perform the

12   disaggregation that plaintiffs vociferously argued at the

13   October 27th hearing is the only way to make this historical

14   data meaningful.

15        MR. SLATER:  You know, it's ironic, Judge, because

16   it's literally in your order and it was addressed that we

17   explained that what they were seeking was the aggregated data,

18   and we explained that we didn't know what they could do with it

19   on a substantial basis or what they would be able to do with it

20   through their experts.  And Your Honor said, you know what?  I

21   hear what you're saying.  The defendants want the aggregated

22   data so you ordered it, and we understood and we produced it

23   because that's what was at issue, that's what was -- that was

24   what was requested, and that's what was produced.

25        Now, the defense is looking again saying now we want

1  these other things which were not ordered.  Again, I don't know

2  why Mr. Ostfeld is laughing at me, I'm sorry if I am that

3  funny, but the order literally says, "MSPRC shall produce the

4  requested subsidy, rebate, and reimbursement data for the

5  relevant time period."

6        I keep coming back to the fact that a number of these

7  reports talk about the patients' medical conditions.  That was

8  not contemplated.  I don't know where they come up with the

9  idea that this is something Your Honor considered or discussed

10  because it wasn't.  It wasn't something that Your Honor ordered

11  or was contemplating because you were focused on what was paid

12  and what may have come back and -- and I'm going to leave it at

13  that.  If anyone wants to add to it, but that's really what's

14  at issue here.

15        JUDGE VANASKIE:  All right.  Go ahead, I will give you

16  the last word, Mr. Ostfeld.

17        MR. OSTFELD:  Just for the record, Your Honor, I

18  wasn't laughing at Mr. Slater.  The phrase now I'm asking for

19  hit me funny because we asked for it clearly in our motion.

20        JUDGE VANASKIE:  Understood.  Understood.

21        I think what I'm realizing is there was ambiguity in

22  the order that required production.  The order didn't reference

23  14 separate reports or sets of reports that would be the

24  universe of documents to show subsidy, reimbursement, and

25  rebate data, and the proposed order that accompanied their

1    original motion to compel, Document Number 2178, simply refers

2    to the documents being sought as subsidy, reimbursement, and

3    rebate data.

4         It would have been helpful, I suppose, and we wouldn't

5    be having this argument now, if it was clear that this was what

6    had to be produced, these 14 sets of records.  It may be that

7    they need to be produced but I am going to have a hard time

8    concluding that they were clearly incorporated in the order

9    that required production of that type of data.

10        You can continue to pursue your motion.  I'm not sure

11   where we stand on that right now.  I don't know if it's a

12   motion for sanctions or a motion to issue a rule to show cause

13   why sanctions should not be ordered.  I will listen to this

14   argument.  I don't want to foreclose anybody, and this is

15   obviously an important point, and it may be that you're

16   entitled to those 14 reports, but I have a hard time

17   concluding, based upon the arguments that have been presented

18   to me and the fairly lengthy letter briefs that were submitted

19   in connection with this conference today, that plaintiffs would

20   be on notice that they had to produce those 14 reports.

21        It certainly would have been preferable to have

22   specified what needed to be produced.  Mr. Ostfeld, you can

23   feel very strongly, and you do, and that's okay, that they had

24   to know that that's what you were looking for, but I can't read

25   the order or the documents as saying, from my perspective, that

1    they had to know and they disregarded the order.

2         Now, where does that leave us?  I think you can get

3    the documents, Mr. Ostfeld.

4         MR. OSTFELD:  I care much more about the documents

5    than the sanctions, Your Honor.  If the documents are ordered

6    produced, I will happily withdraw the motion for an order to

7    show cause.

8         MR. SLATER:  I think where it leaves us, Judge, is the

9    motion is a request -- they can call it whatever they want --

10   it says they are requesting sanctions under Rule 37, they filed

11   it without authorization, it should be withdrawn.  It's

12   something that shouldn't have been done.

13        What I would suggest is this:  If we're going to start

14   to talk about those reports, and we're now going to go down

15   that road, the issues Your Honor said you did not need to

16   address of burden and confidentiality are now going to become

17   very important issues, and it's now -- which is another reason

18   why we believe what we did was appropriate, but we're now going

19   to have to enter into a meet and confer on it, it's going to

20   have to be presented to Your Honor at a conference, because

21   it's not just a simple matter of just spitting those reports

22   out, and it also contains, as we've talked about, medical

23   information about subscribers, so there's a whole level of

24   argument on that too.  So it's going to have to be handled in

25   an orderly way.

1          We believe the whole thing should be denied.  If they

2    want to talk to us, we'll certainly -- that would be

3    Your Honor's expectation, if someone wants to talk, you talk to

4    them.  If we can reach a point where we say, okay, based on our

5    discussion we can agree to give you the following in this

6    format, in order to address our burden and confidentiality

7    concerns and our relevance concerns, then maybe it can get

8    worked out and we would be willing to try to get them some more

9    information, but we're certainly not taking the position or

10   accepting that we're going to be obligated to, if it becomes a

11   disputed issue with Your Honor, because I think we have good

12   arguments about why this shouldn't be produced, but we're

13   willing to talk.  We should talk on an expedited basis about

14   this, we should talk through the documents, and then come back

15   to Your Honor, I think, so that Your Honor can have a clear

16   record, we can narrow the disputes, hopefully, and then

17   whatever remains, Your Honor can then be presented with an

18   orderly record in order to make a decision.  I don't know any

19   other reasonable way to approach this.

20          MR. OSTFELD:  Your Honor, if I may, I don't fault Mr.

21   Slater for not knowing this because he hasn't been part of

22   these meet and confers, but Mr. Kass and I have conferred on

23   this list specifically yesterday but on these requests I would

24   guess about a dozen times.  We've had a lot of meet and confers

25   on this, we've discussed a lot of different compromised

1  proposals before Your Honor's order came down.  I would

2  respectfully submit, even if Your Honor feels that your

3  previous order wasn't clear in ordering the production of the

4  14 reports and datasets, the 14 reports and datasets were at

5  issue when we were before Your Honor last time, and you can

6  certainly clarify your order and order the production of the 14

7  reports and datasets now.

8          Based on the meet and confer yesterday, Mr. Kass and I

9  are at odds on this.  We are at an impasse.  We have not been

10  able to resolve this issue.

11          The appropriate path forward is for Your Honor to

12  order the production of the reports and datasets that are the

13  subsidies, reimbursements, and rebates data for the reasons

14  that I've described and they should be produced.

15          JUDGE VANASKIE:  Mr. Kass.

16          MR. SLATER:  Your Honor --

17          JUDGE VANASKIE:  Let me hear from Mr. Kass.

18          MR. KASS:  Your Honor, at a minimum, I'm going to

19  speak towards the meet and confer and I'll have Mr. Slater

20  handle the rest.

21          MR. SLATER:  Slow down.

22          MR. KASS:  Yeah, yeah.  I will speak with respect to

23  the meet and confer and I'll let Mr. Slater handle the rest.

24          Your Honor, we did have a meet-and-confer call

25  yesterday.  Unfortunately, it wasn't very productive because

1  defendants' position was, we get all these documents, the Court

2  said we get all these documents, I will never accept anything

3  other than all these documents.  Right?  So that's a different

4  state than where we are now, where we have clarity from the

5  Court that the Court didn't specifically order these documents;

6  and with that clarity, it's possible that a subsequent

7  meet-and-confer call would result in different results.

8         MR. SLATER:  What I was going to say, Your Honor, is,

9  I understand Mr. Ostfeld asking to just order it.  That's

10  great.  I've probably said that many times also at some of

11  these conferences, but the fact is, it implicates issues that

12  Your Honor specifically said you were not addressing of burden,

13  confidentiality, and you made specific relevancy findings in

14  your order about what's relevant.  In that *Namenda* case, you

15  actually contrasted it in one context to another and found

16  something is relevant in this context and not relevant in that

17  context.  So it's not so simple, and if they want to go down

18  this road, we have to have the opportunity to go through the

19  reports one at a time, we need to present our arguments, and

20  what I'm saying is, we're probably in a position to produce

21  more of this data, if we need to, if Your Honor wants us to,

22  but it's something that has to be discussed and we need a

23  global agreement on what we're going to produce and what we're

24  not and what's in dispute.  If we can't reach an agreement,

25  then we'll come back before Your Honor but with an opportunity

1    to explain to you the burden and confidentiality and relevancy

2    issues as to those 14 reports because, again, it's not --

3    they're significant issues and Your Honor would need to

4    consider those as opposed to just saying produce it all.

5            MR. OSTFELD:  Your Honor, respectfully --

6            JUDGE VANASKIE:  Yes, Mr. Ostfeld.

7            MR. OSTFELD:  -- plaintiffs are trying to run out the

8    clock here.  We have a damages report due on June 7th.  The

9    process that Mr. Slater is describing will drag on for weeks.

10   I know this because our previous processes have dragged on for

11   weeks and in the meantime, our deadline will come and expire

12   and our experts will have to disclose their reports without the

13   data that we need and, respectfully, that I believe was within

14   the scope of our prior motion to compel.

15           Your Honor's order did not cut and paste our listed 14

16   reports and datasets.  I certainly understand Your Honor's view

17   that you do not feel that plaintiffs could discern from that

18   that they were required to produce the 14 reports and datasets,

19   but Your Honor did require production of the subsidies,

20   reimbursements, and rebates data.

21           All of the arguments and concerns plaintiffs had

22   regarding these reports and datasets, they had this in their

23   hands in October of last year.  They've had months to raise

24   these issues and they haven't.

25           These reports should be produced so that our experts

1    can complete their work.

2         JUDGE VANASKIE:  Mr. Ostfeld, I looked at the proposed

3    order that accompanied the original motion to compel, which is

4    at ECF Document 2178-5, and it wasn't specific as to 14 reports

5    that would be the universe of documents.  So there's some

6    ambiguity here.

7         I am going to direct that you meet and confer on an

8    expedited basis to see which of these reports will be produced

9    by the plaintiffs.  The plaintiffs will have an opportunity to

10   address the burden and confidentiality issues that they have

11   raised.  I would like a letter report back from you all by

12   Monday of next week, so that's May 22nd, and I'd like to

13   schedule another conference call for later in the week -- I

14   have to look at my calendar -- a conference call to try to get

15   this resolved.  It's not a very complicated issue, after all.

16   But I do have to say that I don't think the order, with all due

17   respect -- and I know you feel strongly about this.  If the

18   order had been presented to me and had cut and paste 14 issues,

19   we wouldn't be here arguing.  There's ambiguity, ambiguity in

20   my order, and that's what happens when there's ambiguity.  All

21   right?

22         So I'll direct that you meet and confer, file a status

23   report by close of business or end of the day, midnight, on --

24   it's no longer midnight in the Third Circuit, by the way, you

25   got to know that -- so that I get it by Monday, midnight, and

1   I'll look at my calendar and schedule a conference call for

2   next week.  All right?

3          MR. SLATER:  Thank you, Judge.

4          And I just want to know, and I'm hoping Mr. Ostfeld

5   can answer the question and avoid Your Honor having to rule on

6   this, whether we have to move to strike their motion or whether

7   they're going to voluntarily withdraw the motion at this point,

8   since Your Honor is now addressing this issue.  I would really

9   much prefer not to have to take that procedural step of filing

10  a motion to strike the sanctions motion.  We are not

11  comfortable with that sitting on the docket, I'm sure you can

12  understand.

13         MR. OSTFELD:  Your Honor, I'll just need to be able to

14  confer with my colleagues.  But we're going to have an

15  expedited meet and confer.  I would imagine by then I'll have

16  an answer on that question.

17         JUDGE VANASKIE:  That's fine.

18         MR. SLATER:  That's acceptable to us, Your Honor.

19  Thank you.

20         JUDGE VANASKIE:  All right.  All right.  Well, that

21  exhausted Item Number 3 of the agenda letter from plaintiffs.

22         Item Number 4 is Retailer Discovery.  Is there

23  anything that's ripe for me on retailer discovery?

24         MR. STANOCH:  Good afternoon, Your Honor.  David

25  Stanoch for the plaintiffs.  I'll address these issues.

1          Before I begin, I wasn't sure if you or the court
2    reporter would want just a very brief break.  That was a very
3    long colloquy we just had.
4          JUDGE VANASKIE:  That's a very nice suggestion.  Let's
5    give five minutes for Camille to stretch her fingers some more.
6          MR. STANOCH:  Very good, Your Honor.
7          JUDGE VANASKIE:  Five minutes.
8          (Brief recess taken from 5:14 p.m. until 5:20 p.m.)
9          MR. STANOCH:  Yes, Your Honor, addressing the retailer
10   discovery issues first.  I think it may be correct that there's
11   technically nothing specifically at issue for Your Honor to
12   decide today, but as noted in our letter of May 15th, as well
13   as our separate update letter to Your Honor of May 10th, we do
14   have some timing concerns that appear to be arising.
15         CMO 32, it was very clear, specified four things that
16   retail pharmacy defendants are supposed to produce.  And all
17   the parties have outlined that; there's no disagreement about
18   the general categories.
19         Retailers' letter to Your Honor of May 10th suggests
20   the parties continue to meet and confer and provide a "further
21   update" on June 7th; and then their letter of the 15th with
22   respect to only one category of the information ordered
23   suggested another 60, 90-day deadline for them to produce it.
24   We have some timing concerns with that.
25         CMO 32 is very clear that the three categories of data

1    were to be produced by May 30th and custodial discovery and

2    deposition plan submitted May 31st, and we don't think that

3    there's reason to delay, let alone to further confer, given the

4    clarity of the items that are addressed and the parties'

5    discussions to date, especially when the requests for

6    additional time, which it's not even clear how much time

7    they're asking for, what intermediate dates, if any, they're

8    asking about and if it would apply to some or all of the

9    categories, what's really the ask to Your Honor.

10            So we would just suggest that we stay the course with

11    CMO Number 32, as Judge Kugler ordered, given those deadlines

12    that were set and the clarity of the information ordered.

13            JUDGE VANASKIE:  All right.  Who's addressing this for

14    the pharmacy defendants?

15            MS. KAPKE:  Your Honor, Kara Kapke for the pharmacy

16    defendants.

17            To hear this from Mr. Stanoch is disappointing, to say

18    the least.  I think their May 15th letter contains

19    misrepresentations that have to be corrected.

20            The letter states that we did not address the ability

21    to meet that May 30th deadline to provide the information

22    necessary to effectuate notice, and that's just not true.

23    Timing issues were in our April 24th letter, before the last

24    status conference where we said that meeting a May 30th

25    deadline was impossible and untenable.  I stated in open court

1    before Judge Kugler multiple times saying there are logistical

2    challenges with producing this data and I requested more time

3    to comply with the May 30th deadline.  I specifically stated in

4    open court that we needed more time to gather and compile this

5    data, and that includes identifiers for purposes of notice.

6         To quote Mr. Slater, it's not just a simple matter of

7    spitting these reports out.  It's very complicated to produce

8    this, and we can't do it by May 30th.  We can't.  And it's not

9    clear what we've actually been ordered to produce.  I think the

10   prior discussion is very illuminating because the four

11   categories are not clear.  We don't know what we're supposed to

12   produce.  We had told plaintiffs' counsel repeatedly in meet

13   and confers, and even in our letter on May 10th, where we

14   stated our production would be after the May 30th deadline.  In

15   all of our meet and confers, plaintiff has never objected to

16   giving us the necessary time for production.  So reading the

17   letter stating that we did not address the ability to meet that

18   May 30th deadline was, honestly, a bit shocking and very

19   frustrating.

20        I want to start with the identifiers issue, though,

21   because I feel like our letters talked past each other.  And my

22   colleague, Kristen Richer, can talk about some of the other

23   issues but I want to provide an explanation of why this takes

24   time.

25        CMO 32 ordered the pharmacy defendants to "unredact"

1  the previously produced dispensing data, but that's a bit of a

2  misnomer because some of the pharmacy defendants simply cannot

3  do what CMO 32 ordered, which is un-redact the dispensing data

4  because many pharmacy defendants did not actually redact

5  anything from the dispensing data.

6       There were multiple options for producing the

7  dispensing data in the negotiated RFPs and redacting personal

8  identifiers was just one of them.  Some defendants anonymized

9  the data, some defendants did not pull identifiers, such as

10  mailing or email addresses.  So in many cases the dispensing

11  data with actual names, addresses and/or emails will need to be

12  re-pulled.  That takes time and we're certainly willing to

13  produce it when it's ready but it logistically cannot be done

14  in a matter of a few weeks.

15       But beyond the time of production, there's the issue

16  of HIPAA.  We have respectfully requested, and we've done this

17  through every meet and confer and every letter to the Court,

18  we've requested a HIPAA-compliant order when the Court

19  specifically finds that this production of protected health

20  information is necessary for purposes of the litigation.  We

21  sent a proposed order to plaintiff last Thursday, along with a

22  request to meet and confer, and have not heard back from them

23  at all in response to that email.  So it's very frustrating for

24  them to say in letters to you that everything must be done by

25  May 30th and then let six days pass without responding to an

1   email from us where we proposed an order and where we requested

2   a meet and confer.

3          But, in any event, HIPAA specifically requires that

4   pharmacies, as covered entities under HIPAA, make reasonable

5   efforts to limit protected health information to the minimum

6   necessary to accomplish the intended purpose of the use

7   disclosure request.  That's 45 CFR 164.502(B).  I don't think

8   that's really in dispute here.

9          We certainly understand that plaintiffs may need to

10  match the dispensing data to individuals for purposes of class

11  administration to determine whether a person paid for

12  valsartan, how much valsartan a person was dispensed, and other

13  matters, and we have never contemplated not producing, in some

14  form or fashion, identifiers with the dispensing data that we

15  did produce.  But now we have a problem with HIPAA because

16  we're being told that the addresses are necessary for class

17  notice.  That's what's been in every request, every submission

18  to the Court, but the Class Notice Plan doesn't include it in

19  any way.  There's no actual use of those addresses, email

20  addresses or mailing addresses, in the Class Notice Plan.  It

21  relies exclusively on advertising or a media campaign.

22          So what are we supposed to do?  Why do we need to

23  produce addresses to the plaintiffs if they're not going to use

24  them?  And how is that compliant with HIPAA's mandate that we

25  only produce the minimum necessary information to accomplish

1    the intended purpose of the disclosure?

2            At bottom, Your Honor, we understand we will need to

3    produce identifiers and that will include protected health

4    information.  We're willing to do that but it's certainly very

5    reasonable for us to have an understanding of exactly what

6    we're being ordered to produce and only produce identifiers

7    once.  We don't want to have to go back to our clients a second

8    time, a third time, to produce additional identifiers if

9    plaintiffs need something different than addresses, and they

10   don't need addresses, as I understand it right now, because

11   they are not using addresses in any way.  We don't want to

12   produce addresses, which are protected health information and

13   may include, for example, service member military addresses

14   that are highly confidential, unless those addresses are the

15   minimum necessary for the purposes of the litigation.

16           We understand there will be identifiers needed.  It

17   could be name and date of birth, we don't know though, but it

18   does need to meet HIPAA.

19           And so we're seeking three things on the identifiers:

20   Clarity from plaintiffs on what identifiers they actually need

21   and plan to use and for what purpose, because what they have

22   told us and represented to the Court that the addresses are

23   needed for notice purposes is not at all reflected in their

24   notice plan.

25           We need an order that contains the magic language

1  under HIPAA so that we ensure we are following the law and that

2  our disclosure is the minimum necessary.

3       And then third, we need more time to actually pull the

4  requested data once we know exactly what we're pulling and

5  there's a HIPAA order in place.

6       So the thing that is specifically ripe today is that

7  May 30th deadline can't -- we can't comply with that.  We've

8  said that for a month.  And right now I don't know what I would

9  go to my clients and request because I can't un-redact data.

10 So I don't know what I would be requesting in response to CMO

11 32's order.

12      So we need those three things:  Clarity on what we're

13 supposed to produce; an order that contains the magic HIPAA

14 language; and then more time and relief from the May 30th

15 deadline.

16      And my colleague Kristen Richer can talk about the

17 other issues, but I wanted to start with the identifier.

18      JUDGE VANASKIE:  Thank you.

19      MS. RICHER:  Your Honor, would you like me to pause

20 there so that you can deal with that --

21      JUDGE VANASKIE:  Yes, let me go back to Mr. Stanoch

22 and ask, first, is there any issue with respect to the HIPAA

23 language that needs to be in the order?

24      MR. STANOCH:  No, Your Honor.  We'll figure it out.

25 We've figured this type of thing out in this case before.  It

 1    will be a vanilla order.  I'm sorry Ms. Kapke is frustrated.

 2    I'm frustrated that I have to provide clarity about what

 3    identifiers I need for notice plans when we've told her in her

 4    letters.  So luckily we can say that that issue is moot both

 5    ways.  We've told her before, we can tell her the exact fields

 6    we want, that we need it for notice and claims administration.

 7    We will double-check her order and let her know this week,

 8    that's fine.

 9           I'm sorry, I argued before the New Mexico State

10    Supreme Court today, I'm sorry I didn't get back to Ms. Kapke's

11    email fast enough for her.

12           And what we need it for -- she's right, their Class

13    Notice Program did not expressly reference the data, of course

14    not.  CMO 32 ordered us to file last week.  They say they don't

15    even have the data yet and don't know how quick they'll get it.

16    How can we put in our notice plan last week what we're going to

17    do with data we don't have yet.  So I'm not faulting anyone,

18    Judge.  We're moving on parallel tracks under CMO 32.  This is

19    simply basic information for notice and claims administration

20    verification for the economic loss class members.  By the end

21    of the week I'm happy to tell her again which identifiers and

22    if we have it tweaked to her order, if not say it's acceptable

23    and we can jointly submit it.

24           JUDGE VANASKIE:  I know it's a little bit difficult

25    given the uncertainty of exactly what is being requested, but

1    do you have an estimate of how much time you would need to

2    produce the information?

3            MS. KAPKE:  So I think there are some pharmacy

4    defendants who can do it more quickly.  In our proposed order,

5    we put 90 days.  I think we've asked all of the client pharmacy

6    defendants if they could live with 60 and the response we got

7    was "probably," but we'd like a little bit of a caveat that we

8    could come back to the Court for more than that.

9            I certainly think that if we have it ready, we're not

10   going to hold it back.  As soon as it's ready, we can produce

11   it.

12           I think there are some pharmacy defendants who can get

13   it out somewhat quickly but others, it's going to be an

14   entirely new pull once we know exactly what we're pulling.

15   Others, it might be a crosswalk where we provide the anonymized

16   number and then provide the information that goes with that

17   anonymized number.  That, actually, I think is going to be an

18   easier pull than re-pulling all of the dispensing data.  And so

19   it really just depends on how the client's data is set up and

20   also what data we're talking about.  If we don't need mailing

21   addresses and we're going to use date of birth or something

22   like that, that's a different pull because a lot of the data

23   didn't have mailing addresses in it on the first go.

24           So I think we could probably live with 60 days but we

25   requested 90 because we didn't want to have to come back to the

1    Court if we ran into a problem.

2          This data often requires quality control checking, it

3    often requires multiple pulls where you run -- it's not just

4    spitting out a report.  You have to write scripts to pull the

5    data.  It's pretty complicated.

6          JUDGE VANASKIE:  Judge Kugler's order required

7    production I guess by May 30th, and you say that cannot be

8    accomplished.

9          What I would like to do is confer with Judge Kugler on

10   what the deadlines should be.  I will recommend that it be

11   extended.

12         MS. KAPKE:  Thank you, Your Honor.

13         MS. RICHER:  Thank you, Your Honor.

14         Your Honor, I just want to highlight because I think

15   part of the confusion and the timing under Judge Kugler's order

16   is, like Ms. Kapke said, Judge Kugler seemed to contemplate

17   that the plaintiffs already had all of this data, that some of

18   it had just been redacted, but that's not the case with the way

19   that the data was produced to them in the discovery.  And so

20   it's not simply a matter of removing redactions that are on

21   spreadsheets.  It's a matter of re-pulling what is, you know,

22   millions and millions of fills of prescriptions for, you know,

23   230 NDCs over about a ten-year period.  It's a lot of data and

24   to pull that is quite a tricky endeavor, for all the reasons

25   Ms. Kapke noted.

1            JUDGE VANASKIE:  Thank you.

2            MR. STANOCH:  Your Honor, if I may, just because this

3    dovetails with the Class Notice Plan and the argument

4    Your Honor heard about an hour or so ago.

5            JUDGE VANASKIE:  Go ahead.

6            MR. STANOCH:  It may be that some of this could be

7    reduced for the retailers if the defendants are not going to

8    oppose a publication aspect of Class Notice Plan, in which case

9    potentially, I'm saying that with a very big "P," potentially

10   direct notice to the economic loss consumer class members are

11   not necessary, but we can't be in a position where their side,

12   not Ms. Richer or Ms. Kapke, but their side say, ah-ha, you say

13   publication notice only, that's not the best form of notice,

14   well, then, that's why we need this objective information on

15   the consumers from the retailers because they know who got the

16   actual scripts, who are the actual consumer class members.

17           JUDGE VANASKIE:  Understood.  Anything else on this

18   issue?  Anything else with respect to discovery from the

19   retailer side?

20           MS. RICHER:  Yes, Your Honor.  I did just want to

21   clarify, you know, plaintiffs' letter raised timing concerns

22   with respect to the other categories of information that the

23   Court had ordered us to produce and then the last end-of-month

24   conference Judge Kugler ordered us to meet and confer with

25   plaintiffs on.  You know, we are again a little bit frustrated

1  with plaintiffs' comments that it's not clear whether we can

2  produce this discovery by the end of the month.  I think we've

3  tried to be very clear with plaintiffs that we can't and that

4  we're trying to meet and confer with them on this because for

5  the reasons outlined in our letter submitted on the 10th and

6  then previewed in our letter submitted on the 15th, these data

7  points, again, are not static data points that are easy to

8  pull, they are complicated to pull.  I don't think those issues

9  are ripe before the Court right now, Your Honor.

10         To address Mr. Stanoch's concerns about moving things

11  along, you know, we've being been trying very hard to meet and

12  confer with our clients and with each other and with plaintiffs

13  to try and figure out what can be produced and in what format.

14  I will tell the Court that we are working on a proposal right

15  now to try to send to plaintiffs in the next few days.  I think

16  from our perspective what makes the most sense is for us to

17  send that over, for us to meet and confer with plaintiffs, try

18  to reach agreement on some of this stuff.  I'm really hopeful

19  that we can.  Mr. Stanoch and I have a good record of

20  navigating these issues when they're complex.  If we can't, we

21  can submit letter briefing to the Court, we proposed at the end

22  of the month because that's the next time we'll be before

23  Your Honor, and coming out of the Court's ruling on any

24  disputes, if there are any, we'll have clear marching orders.

25         I think, there again, we'll probably need about 60

1    days to gather this data.  A lot of it overlaps with the data

2    that we're talking about with regard to the economic loss

3    identifiers.  You know, for example, Your Honor, what was paid

4    to us for prescriptions, some of that ties to dispensing data

5    to some extent.

6         So I think what makes sense is for us to present this

7    stuff to you at the end of the month for you to tell us what to

8    do on any disputes, and then we'd probably need about 60 days

9    from the Court's ruling to pull the data and produce it to

10   plaintiffs.

11        I think that's real progress, Your Honor.  I don't

12   think it meaningfully slows anything down that's on calendar in

13   the immediate future in this case.  And I think -- you know,

14   I'm hopeful that we can get to a place where we negotiate this

15   with plaintiffs, we get them the data they need, we can address

16   some of our concerns about confidentiality and sensitive nature

17   of this data, and we will get this stuff pulled and moving.

18        So that's what I would say about, you know, the cost

19   and profit data and the TPP data.

20        And then on custodial discovery and depositions, I

21   read in plaintiffs' letter for the first time that they're not

22   okay with our proposal for the end of the year to target

23   completing custodial discovery and depositions.  You know, we

24   thought that was a reasonable timeframe, factoring in where we

25   are with this stuff, we don't have requests against us pending,

1    so negotiating custodian and producing documents in response to

2    requests that haven't been served is a little bit tricky but we

3    have a proposal for Mr. Stanoch that I'd like to float by him

4    to address that as well.  You know, I think we're due to come

5    back to the Court at the end of the month on that issue with a

6    proposed schedule or to have Judge Kugler tell us what he wants

7    the schedule to be.  So I am not sure that that's ripe, but I

8    do think there is room to meet and confer on those issues

9    further.

10             JUDGE VANASKIE:  Mr. Stanoch?

11             MR. STANOCH:  Your Honor, I'm happy to continue to

12   meet and confer with Ms. Richer and her colleagues.  We're

13   happy to review her proposal.  I think she's probably right

14   that there is nothing ripe for Your Honor to do right now

15   anymore other than for me to just note we're 13 days away from

16   the CMO deadline for the production of all these other

17   categories of data and you're hearing and I'm hearing they are

18   going to give me a proposal later this week.  So, they have

19   certainly reached out to meet and confer and there is no issue

20   with that; but it's just alarming to my side, generally, where

21   we are, given the deadlines, but perhaps that's how we have to

22   deal with it right now.

23             MR. SLATER:  Can I add one thing, please?

24             MS. RICHER:  Candidly, Your Honor, I -- Adam, I'd like

25   to respond first.

1          MR. SLATER:  Sure, of course.

2          MS. RICHER:  So, you know, candidly, Your Honor, like

3   Ms. Kapke said earlier, we've been very transparent I think

4   with the Court and with plaintiffs that those deadlines were

5   not workable for the pharmacy defendants.  We've tried to be

6   very -- you know, I think I've said now in multiple meet and

7   confers with Mr. Stanoch when we decide what it is that we're

8   pulling, we probably need about 60 days to produce it.  So I

9   don't think it should be a surprise to plaintiffs.  We were

10  surprised to read in the letter that they thought that the May

11  30th deadline was the production date for these materials

12  because, frankly, Your Honor, we thought we were past that.

13  And we understood Judge Kugler, when he told us at the end of

14  the last case management conference to meet and confer with

15  plaintiffs about these issues and to come back to you,

16  Your Honor, mid-month, to say that he understood that as well.

17  You know, this is not us delaying for delay's sake.  These are

18  very complicated things that plaintiffs are asking us to pull.

19  They are not necessarily static data points that exist the way

20  that plaintiffs assumed, and we're talking about a lot of data

21  in some of these cases.  So I don't think it's unreasonable for

22  us to need more time.  I don't think we're really holding up

23  anything else in the case by trying to have conversations with

24  plaintiffs and trying to get this right in the first for

25  instance.  But it is the case that that end-of-month deadline

1    is not a workable deadline to us and we have tried to be as

2    transparent about that as possible.

3            JUDGE VANASKIE:  As I said, I will confer with Judge

4    Kugler about that deadline.

5            Mr. Slater?

6            MR. SLATER:  Thank you, Judge.

7            Admittedly, I haven't been in these meet and confers

8    but I just wanted to throw out something because I would like

9    to believe that the retailers are already collecting the

10   databases, collecting the data.  When I heard, after the order

11   then we'll get to work on it, then we'll need 60 days, I would

12   think that there may be certain categories or columns in

13   spreadsheets or sections of data that may be an issue and they

14   may not ultimately have to produce but I think that they should

15   be collecting, pulling this together because they know there

16   are certain things they're agreeing to produce to us, so I

17   would think that that process should start and maybe that can

18   have a significant impact on we need 60 days from the order.

19   So I just wanted to put that out there.

20           And I'll ask my second question, so I don't have to

21   ask them both, Mr. Stanoch raised a question, do the defendants

22   believe that we don't need to provide direct notice with this

23   Class Certification Notice Program, because that would make a

24   big difference.  We're obviously going to need this information

25   later if we reach any resolutions because that's a different

1    level of notice if there's a settlement, but the question is

2    whether or not the defendants take the position you don't need

3    to give direct notice now, we're in agreement that publication

4    notice is adequate.  It gives them more breathing room on this

5    information and it gives us a little bit of comfort in

6    negotiating what we need to do because, obviously, if we do

7    need to give direct notice, this issue has to be really, really

8    focused on and we have to do everything we can to get this

9    information as soon as possible because all we're doing with

10   all these time frames we're pushing out is pushing out the

11   potential trial date.

12          So I just wanted to make those points and ask for

13   those answers.

14          JUDGE VANASKIE:  I am concerned about that.

15          Anything else?

16          MS. WHITELEY:  Yes, Your Honor, this is Conlee

17   Whiteley on behalf of plaintiffs.

18          So to go with Mr. Slater's point just a little bit

19   further, Ms. Richer said that we're not holding up anything

20   else in the case, and I see that Mr. Ostfeld came on for a

21   minute and I'll anticipate that he's going to say, yes, we are

22   because he is at an unfair advantage as we may be in a reply as

23   to how to brief the point he made earlier as to the best notice

24   practicable.  So the practicable considerations have to do with

25   whether they are going to be able to get us this information,

1    how complete it will be, and when, to make that analysis.  And

2    so the sooner we can get to the bottom of those issues, even if

3    we don't have the actual data but when we'll get it and what it

4    will consist of, then we will be able to address those issues

5    more squarely before the Court.

6            JUDGE VANASKIE:  Mr. Ostfeld?

7            MR. OSTFELD:  Your Honor, obviously, I don't take a

8    position on the request with respect to the pharmacies.

9            With respect to class notice, I don't think it's a

10   matter of defendants agreeing or not agreeing as to whether

11   individual notice is required.  Rule 23(c)(2)(B) requires

12   individual notice where the class members can reasonably be

13   identified.  So the question comes down to reasonable

14   identification, and discovery issues are obviously part of when

15   a class member can be reasonably identified.  But even if we

16   were to give that agreement, which I certainly can't do either

17   for my own client or on behalf of the defense group, the Court

18   has an independent obligation to ensure class notice to the

19   class representatives and to the class members, excuse me.

20   It's their due process right.  So we can't simply waive away

21   individual notice where it is reasonably practicable.  It has

22   to be done.

23           MS. RICHER:  And just to clarify, Your Honor, with

24   regard to the consumer economic loss, plaintiffs'

25   identification and their addresses and their email addresses,

1    we're not refusing to produce that data and, in fact, we sent

2    them a proposed order that contemplated the production of it

3    and we've said we think we need about 60 to 90 days to produce

4    this data.  It's a lot of data to pull.

5        What then happened after we sent the notice over is we

6    got their notice plan which didn't contemplate using that

7    information at all.  And so in this weird loop here where one

8    hand isn't talking to the other, if plaintiffs think they want

9    to send direct notice and they need this information to do it,

10   we've said we would produce it.  We have concern under HIPAA

11   about producing it to them if they aren't using it for those

12   purposes.  That's the loop we're trying to close now.

13       On timely, I think, Ms. Whiteley, you know, I've said

14   to Mr. Stanoch repeatedly, I think we would need 60 to 90 days

15   to re-pull all of this data and produce it to you.  It's a

16   tremendous amount of data and it can be tricky to pull.

17       And to Mr. Slater's point, it is not the sort of thing

18   where we can go collect names now and go back and collect

19   dispensing dates later and go back and collect addresses after

20   that.  We're going to have to sweep archived information to

21   pull this data, and doing that in pieces introduces a level of

22   error that, one, is not particularly efficient; but two, could

23   really affect whether the data comes back in a way that's

24   problematic.  So no, we're not collecting it piecemeal right

25   now.  We really need to know what the data pull looks like so

1    that we can instruct our clients and they can write the scripts

2    and do what they need to do to go get the data.  But we're

3    happy to start that process as soon as we have clarity on this

4    issue.  We're really trying to get there.

5              JUDGE VANASKIE:  All right.  Thank you.

6              MS. RICHER:  Thank you, Your Honor.

7              JUDGE VANASKIE:  The last category is wholesaler

8    discovery.

9              MR. STANOCH:  Yes, Your Honor, David Stanoch again for

10   the plaintiffs.

11             Again, I don't think there is really anything

12   specifically ripe, Your Honor.  I think, again, as with the

13   retailers, CMO 32 was quite clear as to what was being ordered

14   produced or due from the wholesaler defendants.  Those are the

15   same deadlines of May 30 and 31 that we just discussed with the

16   retailers.

17             One aspect of one bullet of that data wholesalers have

18   committed to producing by May 30th.  We flag in our letter some

19   concerns we have about that data but, you know, we may have to

20   just wait to get it before we see what happens next.  But

21   beyond that, I think it's simply a timing issue again in terms

22   of we appreciate this involves work.  I think both sides talked

23   about that in person in Camden last month, but we've yet to

24   hear a concrete proposal in terms of what are we going to be

25   getting and when.

1          And further, some other just concerns we note

2     generally in the wholesalers saying they need to have their

3     retained experts do analysis of profits and costs, that gives

4     us pause, Judge, because even if they don't have the data

5     specific for the profit and costs for valsartan like we talked

6     about last month, our position of course is we're entitled to

7     the ordinary course documents and data next best, not what a

8     litigation-hired expert comes up with.  They can certainly

9     present that later maybe and make the argument to say, based on

10    our data, you say it's X, we say it's Y, that's fine, that's a

11    merits issue down the road; we're talking about getting the

12    information.  And even if it's not the exact number, as we

13    talked about before, I won't belabor it, there will certainly

14    be something close enough that we can use to a reasonable

15    certainty with our experts.

16         And then the only other issue, the wholesalers are

17    still pushing for supplemental discovery requests to be served

18    on MSP and MADA.  They say they've been pared down.  I'll just

19    say we can agree to disagree with that.  They're still

20    requesting medical records, still requesting -- now it's called

21    unclean hands -- for TPP profits.  But these aren't companies

22    that take possession and resell the product.  There is no

23    unclean hands defense.  It's all the same issues we talked

24    about last month.  Rather than get into requests that are still

25    being arguably negotiated and which were not ordered by CMO 32,

1    let's defer what wholesalers might want to serve on the named

2    TPP plaintiffs, let's get to the bottom and complete what CMO

3    32 actually ordered the wholesalers to produce, and then we can

4    revisit the issue.

5        JUDGE VANASKIE:  All right.  Who's addressing

6    questions raised here on the behalf of the wholesaler

7    defendants?

8        MR. GEOPPINGER:  Good afternoon, Your Honor.  Jeff

9    Geoppinger on behalf of the wholesaler defendants, and my

10   colleagues on with me will chime in I'm sure if needed.

11       Your Honor, I'll take the -- I guess I'll start with

12   the first point Mr. Stanoch addressed, which is CMO 32.

13   There's three bullet points on three things that the Court

14   ordered us to produce under 7.1.  I think as we discussed last

15   on April 26, we're going to produce documents which I believe

16   respond to 7.1.2 and 7.1.3 by the end of the month.  If there's

17   any issue, we'll raise it.  But we're working towards that and

18   expect to have that done, I should say data on those points.

19       7.1.1 is the profits issue.  Again, I discussed it --

20   Mr. Stanoch and I discussed with Judge Kugler.  This is

21   information that the wholesalers do not keep in the ordinary

22   course of their business.  This is not something that's new

23   information for anybody in this litigation.  In 2020 we

24   submitted I think eight briefs on the issue.  We had an hour

25   and a half argument with Judge Schneider on the issue.  Judge

1   Schneider issued an order that addressed some requests for

2   production on this issue.  He actually denied those requests

3   for production.  He also, in his order, raised issues about the

4   scope of those requests and also the relevance of them, which

5   we anticipated would have been addressed later on at some point

6   with the Court, if and when the requests were served.  That did

7   not happen.  Instead, we got CMO 32 and we're working to deal

8   with it, Your Honor.

9        We've met and conferred with Mr. Stanoch.  We talked

10  about a proxy, a term he mentioned at this conference, and that

11  we, you know, are attempting to embrace and figure out how can

12  we go about coming up with a proxy.  It is a process,

13  Your Honor.  We are not dragging our feet, I assure you.  It is

14  going to take time.  It is going to be difficult.  It's going

15  to require hard work and if there's any question about that,

16  the declarations submitted in 2020 with our briefing lay all of

17  that out.

18       So we're looking for something, we're looking for an

19  answer.  We've asked and I thought, maybe Mr. Stanoch can tell

20  me we agree, that we're on the same page at least that we're

21  going to work towards that and we're going to try to figure

22  this out, and we're going to try to come up with one by I guess

23  a date certain at some point.  It's not going to be May 31st.

24  We cannot get this complicated issue done by May 31st.  And,

25  yes, it will probably include experts looking at the

1    information and trying to find out a way to find out or proxy

2    profits for VCDs as the order requires.  But we've met and

3    conferred and we're going to continue to do so and we'll

4    continue to keep the Court up to date with where we are at on

5    that issue.  As to the profits for VCDs, as I explained on

6    April 26, that is not ordinary course data that we have.

7            On the discovery issue, Your Honor, we submitted a

8    letter on May 10th and the letter on May 10th, Your Honor, I

9    would submit, lays out the core relevance of what it is that we

10   are looking for.  It's very simple, Your Honor.  We are looking

11   for discovery of the TPPs on the elements of their claim of

12   unjust enrichment.  That's what we need.  The elements are the

13   plaintiffs' burden to prove, not ours, and we don't think the

14   TPPs at this point should be able to ask for a bunch of

15   discovery from us and say, but let's just hold off on doing any

16   discovery with respect to the elements of the claims as to the

17   TPPs.

18           So we proposed discovery to Mr. Stanoch.  We've had

19   meet and confers about it.  We tried to pare it back.  We can

20   agree to disagree whether our efforts were successful in that

21   regard.  But, in any event, I think, Your Honor, the path

22   forward on that discovery is to do what we did before with

23   respect to the discovery that we dealt with early on in the

24   case, which is to set a schedule for the parties to basically

25   take the time to meet and confer and then submit briefing on

1    whatever they can't agree to for you to decide what is and what

2    is not permissible in that respect.

3            JUDGE VANASKIE:  Are you at the point now where you

4    can identify the issues that need to be briefed so we can set a

5    briefing schedule or do we have to give you some more time to

6    meet and confer before doing that?

7            MS. DAVIS:  Your Honor, D'Lesli Davis for Defendant

8    Wholesaler McKesson.

9            In conjunction with the meet and confers related to

10   CMO 32 -- and, by the way, we had briefed to the Court in one

11   of the letters that we needed to do this basic core discovery

12   on the unjust enrichment elements, and that kind of just got

13   skipped over when addressed in CMO 32.  But in our

14   communications and our back and forth on that, we have, from

15   the state, raised the discovery that we need from the

16   plaintiffs and what we've heard, as you heard in open court,

17   was that it's the most harassing discovery that Mr. Slater has

18   ever seen and it should be stricken immediately.  We have heard

19   that it is too voluminous, it is enormously burdensome, and it

20   is designed to harass.  And so we carved it back and added

21   categories that were in the May 10th letter to Your Honor to

22   describe the relevance of the categories of documents being

23   sought and the topics of discovery being sought, and what we've

24   gotten every time is just no.  And even the objections are

25   conclusory.  There's been no point at which the plaintiffs have

1    just said, you're wrong about relevance; you're wrong about

2    thinking this is an element; you're wrong about whether we have

3    a burden on this.  Your Honor, I would suggest that there is a

4    reason for the no, no, no, and the histrionics.  I think the

5    plaintiffs don't have this information and I think that the

6    plaintiffs don't want to be forced to admit that they don't

7    have it because they know they have the burden on these issues.

8    But at core, the defendant wholesalers have got to be able to

9    know what the plaintiffs have or do not have, and I'll give you

10   an example, that links a particular wholesaler as the seller of

11   a VCD on a particular transaction.  If McKesson didn't sell the

12   drug on this particular claim, and I mean the claim that's

13   being covered by the insurance company or the TPP, then

14   McKesson could not be unjustly enriched by this.

15        The plaintiffs have promised at the motion to dismiss

16   stage, at the motion for leave to amend their pleading stage,

17   that this is all something that they're going to get to in

18   discovery, it's not time yet to talk about proximate cause of

19   their burdens.

20        So I would suggest, Your Honor -- I know you just

21   asked about scheduling -- I would suggest that unless the

22   plaintiffs represent that they're willing to talk about this

23   substantively, which we're happy to do, we're at the stage

24   where we just need to enter a scheduling order on briefing.

25        JUDGE VANASKIE:  All right.

1        MR. STANOCH:  Your Honor, if the wholesalers only

2   wanted the one thing or two things, perhaps that would be a

3   room for compromise.  We attached to our letter the

4   "pared-down" requests.  It speaks for itself.  They want

5   everything about TPP's profits, they want medical records for

6   insureds, they want every communication about MSP's assignments

7   from its -- every communication.  The assignments were

8   produced.  They want every communication about the assignments

9   and I can go on and on.

10       I think Your Honor's right.  Give us one more chance

11  to talk and then we can have a schedule perhaps and then go

12  from there.

13       MS. DAVIS:  That's agreeable, Your Honor.

14       JUDGE VANASKIE:  All right.  Well, what I will direct

15  then is that -- how soon can you complete your meet and confer?

16  I'm not very optimistic but maybe you will at least narrow the

17  issues a bit.  How much time do you need?

18       MS. DAVIS:  Mr. Stanoch, do you believe we can get it

19  done in a week?

20       MR. STANOCH:  Potentially a week or two.  I know folks

21  were asking -- not you, Ms. Davis, but other folks on your

22  side -- about the upcoming Memorial holiday.  So however --

23       MS. DAVIS:  Let's shoot for a week and we will give a

24  report to Your Honor about where we are at at the week if we

25  need additional time.

1          JUDGE VANASKIE:  Okay.  You have a week from today.

2     So you have until the 24th.  Then I will receive that report

3     and I will issue a briefing schedule so that we can get the

4     matters that remain in dispute on an agenda to be resolved --

5     on a schedule to be resolved.  All right?

6          MR. STANOCH:  Thank you, Your Honor.

7          MR. GEOPPINGER:  Thank you, Your Honor.

8          JUDGE VANASKIE:  All right.  Is there anything else?

9          MR. SLATER:  Yes, Your Honor.  One issue that is --

10          JUDGE VANASKIE:  I shouldn't have asked that question,

11     Mr. Slater.

12          MR. SLATER:  You are going to like this issue.  We

13     just need your blessing.  We asked the defense for an extension

14     to serve our irbesartan and losartan discovery from today to

15     Monday.  They've agreed.  So we just wanted to ask the Court if

16     that's acceptable, and if you want us to send an order in, we

17     can certainly do that, or a letter to so order, however you

18     want to handle it.

19          JUDGE VANASKIE:  That is acceptable and that is an

20     easy one.  I will ask you to send a proposed order to me.

21          MR. SLATER:  Will do.  You will have it tomorrow,

22     Judge.

23          JUDGE VANASKIE:  Thank you.

24          MR. OSTFELD:  Your Honor, I just had one

25     clarification.  I think I said earlier that our informal

1    interview with the class administrator was next Tuesday.  It's

2    actually next Monday.  My apologies for misidentifying the

3    date.

4              JUDGE VANASKIE:  Okay.  Thank you.

5              MR. HONIK:  Your Honor, in an abundance of caution,

6    and I hate to tax anyone's time here, I don't think this point

7    is lost on the Court, and I mention it only now for emphasis or

8    clarity because I know Your Honor will be speaking to Judge

9    Kugler.

10             Judge Kugler is poised to evaluate our notice plan,

11   and that notice plan has a lot of moving parts.  There's the

12   economic loss or consumer part, there's the TPP part, which is

13   implicated by a trial that's on the schedule, and one of the

14   things that needs to be briefed and addressed to the Court is

15   the practicability of notice and whether it needs to be down to

16   the consumer level.  And we have an unfortunate chicken-and-egg

17   proposition here in that the defendants are unwilling to

18   concede that publication notice may be adequate, we will put

19   that aside substantively, but at the same time, we don't have

20   retailer data, we don't know what it's going to look like or

21   when we're going to have it, to be able to inform the Court

22   whether that's the most practicable way to provide notice to

23   the consumer class.

24             So there needs to be some thought -- there is a way

25   out of this, but as Your Honor speaks to Judge Kugler about the

1  schedule and its implications here, I just want to make the

2  record clear and sensitize Your Honor to the fact that it is a

3  chicken-and-egg proposition here.

4        JUDGE VANASKIE:  All right.  I know how important that

5  issue is, and certainly we are all sensitive to the command of

6  due process that you use the method that is most likely, given

7  the complexities, to provide information to class members.  I

8  understand the dilemma you are in where you've got to address

9  the question of what kind of notice should be provided when you

10  don't have all the information.  But this is a very complicated

11  matter and the class size is huge.

12        And so I will certainly keep that in mind when I have

13  a discussion with Judge Kugler and we will try to keep this

14  matter moving.  I know what he wants to do is keep it moving,

15  moving, moving.

16        MR. HONIK:  Yes, Judge.  And we may be able to adhere

17  to that by staggering this.  We may be able to separate out the

18  TPP-related notice from the consumer notice.  I just --

19        JUDGE VANASKIE:  Right.

20        MR. HONIK:  I put that out there for your

21  consideration.

22        JUDGE VANASKIE:  Okay.  Thank you.  All right.  Now,

23  at the risk of --

24        MR. SLATER:  Don't do it, Judge.  Don't do it.

25        JUDGE VANASKIE:  Is there anything else?

1          MR. SLATER:  Nothing for plaintiffs.

2          JUDGE VANASKIE:  Camille, thank you so much.  You are

3    an iron woman to stay this long and get this done.

4          Thank you all very much and we'll be talking to you.

5          MR. HONIK:  Thank you, Judge.  Thank you, Camille.

6          MR. SLATER:  Thank you, Your Honor.

7          MS. KAPKE:  Thank you, Your Honor.

8          MS. WHITELEY:  Thank you, Your Honor.

9          JUDGE VANASKIE:  Thanks.

10         (The proceedings concluded at 6:03 p.m.)

11         - - - - - - - - - - - - - - - - -

12         FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

13          - - - - - - - - - - - - - - - - -

14

15         I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18    */S/ Camille Pedano, CCR, RMR, CRR, CRC, RPR      5/18/2023*
      *Court Reporter/Transcriber                       Date*

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*