

2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904 U.S.A.
(310) 284-3880
Fax (310) 284-3894

www.btlaw.com

Kristen L. Richer
(310) 284-3896
kristen.richer@btlaw.com

June 13, 2023

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
1500 Market Street, East Tower
18th Floor
Philadelphia, PA  19103

RE:   In re Valsartan, Losartan, and Irbesartan Products Liability Litigation
      Case No. 1:19-md-02875-RBK

Dear Special Master Vanaskie:

On behalf of Defendants Albertson's LLC, CVS Pharmacy, Inc., Express Scripts, Inc., Humana Pharmacy, Inc., Kroger Co., OptumRX, Rite Aid Corp., Walgreen Co., and Walmart Inc. (collectively, the "Pharmacy Defendants"), pursuant to Special Master Order No. 80 (ECF No. 2416),[1] please find enclosed our letter brief associated with the two outstanding discovery items subject to briefing at this time: (1) the form of production of "TPP Amounts Paid" and (2) production of information from the Pharmacy Defendants' loyalty or membership databases.[2]

I.   "TPP Amounts Paid"

As previously reported to the Court, this is the only issue under section 6.1 of CMO 32 on which the parties still have a dispute.  Specifically, the question is whether "TPP Amounts Paid"

---

[1] The parties informally reached out to chambers with a request to expedite the briefing schedule associated with Special Master Order No. 80 due to the Pharmacy Defendants' conflicts with an in-person July 6, 2023 hearing date.  The parties await the Court's guidance on that issue.

[2] The Pharmacy Defendants and Plaintiffs are working out a schedule for custodial discovery and depositions and plan to provide that schedule to the Court soon.

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 2

must be produced on a transaction-by-transaction basis, or whether it could be produced in the aggregate by both NDC and by month or quarter. The Plaintiffs have agreed that the Pharmacy Defendants will respond to interrogatories with their production; these draft interrogatories are attached as **Exhibit A**. Interrogatory No. 1 of the Pharmacy Defendants' proposal reads as follows, with the language in dispute in italics:

> For the Relevant Time Period, identify payments made to You by TPPs for VCDs dispensed by You during the relevant time period, as reflected in previously produced dispensing data. For purposes of this Interrogatory, each Retail Pharmacy Defendant *may, at its election, identify either:* (1) transactional amounts received from TPPs for each individual fill of VCDs; *or (2) transactional amounts for this data in an aggregated format, reflecting total amounts received from TPPs by NDC and by month or quarter (at the Retail Pharmacy Defendant's election).*

Plaintiffs would like this Interrogatory to read instead:

> For the Relevant Time Period, identify payments made to You by TPPs for VCDs dispensed by You during the relevant time period, as reflected in previously produced dispensing data. For purposes of this Interrogatory, each Retail Pharmacy Defendant shall identify transactional amounts received from TPPs for each individual fill of VCDs.

The proposed order attached as **Exhibit B** works regardless of the Court's ruling on this issue; the only dispute is which of the above versions of Interrogatory No. 1 to use within **Exhibit A**.

In short: Plaintiffs seek production of transaction-by-transaction information regarding the amount that patients' health insurance providers—or, in many instances, pharmacy benefit managers—paid for each of the millions of individual fills of at-issue valsartan during the relevant time period. The Pharmacy Defendants seek the option of producing this information in an aggregated fashion, and submit that this production format should be permitted given the purpose of producing this information and the Pharmacy Defendants' competitive concerns in producing this information in a more granular format. Plaintiffs still have not articulated why aggregated data will not suffice.

**BARNES & THORNBURG** LLP

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 3

As Your Honor will recall, Plaintiffs sought production of "TPP Amounts Paid" to provide them with data to support damages for their unjust enrichment claims against the Pharmacy Defendants. *See, e.g.*, April 10, 2023 Letter from R. Honik ("As discussed, Plaintiffs seek the "profit" data that Magistrate Judge Schneider earlier denied without prejudice (*see* 7/7/2020 Order, ECF No. 507), specifically, the prices paid by TPPs, as well as the gross and net prices paid by Retailers for VCDs."), available at ECF No. 2338-2. Plaintiffs have never articulated to the Pharmacy Defendants that they need production of "TPP Amounts Paid" for purposes of their upcoming trial against certain Manufacturers or as part of their claims relating to the TPPs themselves. Rather, the "TPP Amounts Paid" is just one component of a calculation of the "revenues" the Pharmacy Defendants received from their sale of at-issue valsartan.

To date, despite several rounds of meet and confers and the Pharmacy Defendants' best efforts to reach middle ground on this issue, Plaintiffs have failed to offer any reason at all—let alone any compelling reason—why they need line-by-line transactional data on TPP payment amounts. Aggregate amounts paid by TPPs, which Pharmacy Defendants have already agreed to provide, will support efforts to identify the Pharmacy Defendants' profits from the sale of the at-issue product. Transaction-level data does not provide additional benefits, and its production carries with it the potential to impose significant competitive harm.

As previously discussed in the Pharmacy Defendants' letter briefs to Your Honor, and in prior, earlier discovery briefing to Magistrate Judge Schneider in 2020, information concerning TPP payment amounts is of critical competitive concern to the Pharmacy Defendants, given (1) the presence of their competitor pharmacies in this litigation, and (2) the fact that this data is being produced to plaintiffs' counsel, who actually represent third-party payors in these cases. Indeed, the Pharmacy Defendants have already produced affidavits and briefed the competitively sensitive

**BARNES & THORNBURG** LLP

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 4

nature of this information for the Court (ECF No. 479).  Statements from those declarations include the following, which are just examples outlining the competitive harm that could befall production of transaction-by-transaction information:

- "The result of these negotiations is that the health plan, through its PBM, has constructed a network of pharmacies to be included with clients' benefit plans, and has negotiated a complex pricing structure for each retail pharmacy within the network. . . . Reimbursements are generally made in the aggregate, such that the actual reimbursement amount for a specific prescription fill varies by day, by network and by patient, depending on a number of factors . . . .  Retail pharmacies compete with each other to provide services to plans and to be considered "in network" for those plans. . . . Because of the competitive nature of the retail pharmacy business in the U.S., the reimbursement amount that CVS receives for each prescription is a closely guarded trade secret."  *See* Decl. of E.K. McCoy, ECF No. 479-9, at ¶¶ 6-8.

- "[A]ll retail pharmacies (including those that are defendants in this case) want to negotiate the best possible pricing for themselves and their customers. That involves (a) providing services to TPPs, (b) being considered "in network" for those TPPs, and (c) receiving fair reimbursement from TPPs. Other retail pharmacy defendants could gain a significant competitive and economic advantage over Walgreens if they learned this confidential information, and especially what each TPP reimburses Walgreens for dispensing generic drugs to the TPP's beneficiaries and members."  *See* Decl. of M. Mistarz, ECF No. 479-10, at ¶ 10.

Although production in an aggregated fashion does not wholly resolve the Pharmacy Defendants' competitive concerns, here, it does help mitigate them, because it makes it hard for the viewer to make direct, apples-to-apples comparisons of different TPPs reimbursement rates for fills of each drug.

To date, Plaintiffs have refused the Pharmacy Defendants' attempt at compromise and insisted on granular production, arguing without reason simply that because the transaction-level payment information is sometimes shown on a given patient's own, individual pharmacy record, it should be produced for all fills, for all NDCs, and for all TPPs to Plaintiffs at that same, granular level.  But that disregards the concern.  Although true that an individual patient may have access to some information about his or her own health insurance information—including reimbursement

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 5

rates—by reviewing his or her own pharmacy record, it is the production of this information *en masse*, and in the context of this specific litigation, that presents real risk of competitive harm to the Pharmacy Defendants.

Because Plaintiffs have not offered a compelling reason for needing this data in granular format to tally Pharmacy Defendants' profits, and because production in that format raises serious competitive concerns for some of the Pharmacy Defendants, the Pharmacy Defendants respectfully submit that production of aggregated TPP payment information more than satisfies the production requirement of CMO 32, and that the Court should approve the Pharmacy Defendants' proposed language for Interrogatory No. 1.

II.     **Plaintiffs' Request for Customer Information from "Loyalty/Similar Databases"**

Plaintiffs seek to compel Pharmacy Defendants to produce contact information for potential class members through loyalty or similar databases, speculating that Pharmacy Defendants can supplement pharmacy-side customer records with front-of-store (non-pharmacy) customer records such as loyalty rewards data. *See* June 5, 2023 A. Slater Ltr. to J. Kugler, ECF No. 2417 at 7. As the Court stated during the June 7 hearing, concerning these "other database" requests:

> **I can certainly understand the burden that would be imposed to provide this information. Perfect notice or notice system designed for perfection is impossible.** So it seems to me that maybe it's a bit of an overreaction on the part of the plaintiffs, the objections to the original notice plan to now be seeking all this information, but why don't you submit it in letter briefs and we'll get it resolved as promptly as possible.

June 7, 2023 Hrg. Transcript at 28:16–23 (emphasis added), attached as **Exhibit C**. Pharmacy Defendants agree with the Court's assessment, and nothing in Plaintiffs' promised case citations

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 6

changes the reasoning. This proposal creates a slew of delays and major burdens, all in pursuit of largely redundant information for class notice, and the Court should reject it.

> **A.  Plaintiffs' proposal to search "loyalty/similar databases" will cause major burden and delay with little to no benefit.**

Plaintiffs' proposal for last-minute collection of loyalty rewards data poses significant burdens that will delay the class notice process. As explained during the June 7 hearing, the Pharmacy Defendants just received this request from Plaintiffs and will submit burden affidavits in reply if necessary. The Pharmacy Defendants already plan to provide available data within the dispensing data for patients' names, mailing addresses, birth dates, and telephone numbers. The data contained in the dispensing records for the VCDs is generally the true source for the contact information Plaintiffs seek. Plaintiffs would have Pharmacy Defendants use patient information from the dispensing data to query separate loyalty and membership databases—for those Pharmacy Defendants who have such databases, and not all of them do—in search of different or additional contact information. This imposes unnecessary burden and delay without any reasonable likelihood of receiving information that will better equip Plaintiffs to comply with the due process requirements inherent in providing notice to putative class members.

As the Pharmacy Defendants explained to the Court at the June 7 conference, defense counsel's initial investigation of the feasibility of Plaintiffs' request that the Pharmacy Defendants search their loyalty- or membership-related data for patient contact information (as opposed to querying the information contained in their pharmacy patient dispensing data, which they are already producing) may be difficult, unreliable, and time consuming, if feasible at all, given the nature of the query and the volume of patients to search. This is true for a number of reasons.

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 7

First, the Pharmacy Defendants with loyalty programs note that a patient's loyalty account generally is not linked to or incorporated in his or her patient profile, such that the patient's loyalty information (including contact information) cannot be incorporated into or identified in a query of the dispensing data that the Pharmacy Defendants are already pulling pursuant to the HIPAA order. Some of the Pharmacy Defendants do not have a "loyalty" program, and for those that do, loyalty records may exist in a different database than the pharmacy dispensing records. Within the pharmacy dispensing records, there may not be a field for a loyalty or membership identification number whatsoever, and even if such a field exists, that field may not be populated, because for most Pharmacy Defendants, customers are not required to and often do not need to enter it in filling their prescriptions.

Second, because the loyalty records are not the true source for pharmacy-fill information, a patient's fills of prescription drugs often are not—or in some cases, never are—reflected in the loyalty records at all, and, even if reflected, are not able to be queried in a way that allows the Pharmacy Defendant to search, for example, for all fills of a given NDC at issue in this litigation.[3] Thus, to search the loyalty records, the pharmacies generally must search by patient—not by

---

[3] In a recent meet and confer on June 9, Plaintiffs' counsel suggested that the Pharmacy Defendants instead search for all patients with a fill of "valsartan" noted in their loyalty records during the time period at issue in this litigation. Although the Pharmacy Defendants are still investigating whether it is possible to do so, based on counsel's current understanding, many do not have the ability to search on a drug-name basis in their loyalty records, which do not generally capture prescription-specific details regarding the name of the drug filled, even assuming the customer used his or her loyalty information at the point of sale when picking up his or her prescription. Moreover, Plaintiffs' proposal raises breadth concerns, because it risks sweeping in loyalty information for customers who did not purchase prescriptions filled with the specific NDCs at issue in this case, and therefore who are not members of the class or subclasses certified by the Court. The Pharmacy Defendants should not be required to disclose information for individuals outside the class, and to meaningfully police that boundary and verify that each person identified is, in fact, a class member would require a herculean effort and take a tremendous amount of time, all of which is unnecessary given that the Pharmacy Defendants are already producing the contact information for class members available in their dispensing data.

**BARNES & THORNBURG** LLP

product—for prescription medications. This is different from some pharmacies' ability to query loyalty records for all members' purchases of a given front-of-store product, by SKU number or Universal Product Codes.

Third, the process of searching using patient identifying information is complicated, prone to error, and requires an extensive amount of quality control such that doing so in bulk is burdensome, slow and costly. Querying on a patient-specific basis requires confirmation by two to three personal identifiers, to confirm that the right patient's information is being released. Here, because loyalty numbers are not widely available in most Pharmacy Defendants' records, the Pharmacy Defendants anticipate needing to attempt searches using some combination of name, address, date of birth, and phone number to verify identity. But past experience teaches that even with these data points—which need to be pulled from the Pharmacy Defendants' dispensing records—verification of customers' identities for purposes of producing loyalty information can be very challenging. In most instances, full name, date of birth, and address are not required. Moreover, no one verifies this information at the time that a customer opens a loyalty account, such that customers may use false names or birth dates, inaccurate addresses, or abbreviations when entering information for a loyalty card. And some customers may have multiple loyalty accounts with different information entered. Indeed, some of the Pharmacy Defendants' recent experiences in the *Zantac* MDL underscore that, even where *plaintiffs themselves* provide the personal identifiers to query the loyalty data (in that case, for front-of-store ranitidine purchases), searches often yielded mis-hits or other confusing or inaccurate results that required both company- and outside-counsel time to quality control. Doing so in the context of this litigation, for millions of consumers, would be incredibly challenging, costly, and prone to error and mis-identification.

BARNES & THORNBURG LLP

Fourth, given the number of class members in this case, estimated in the millions, there are open questions amongst the Pharmacy Defendants as to whether it is even feasible to run searches for that volume of patients as requested by Plaintiffs. Certain Pharmacy Defendants currently can only search their loyalty records on a customer-by-customer basis, when querying with patient information. For the others there is some concern that, although batch searches are possible, searching this volume of patients may cause errors in or otherwise impede the data pulls because their systems are not designed for such massive, bulk queries. Finally, setting aside these significant concerns regarding burden and feasibility, requiring the Pharmacy Defendants to develop a process for searching for loyalty or membership data based on identifiers contained in their dispensing records, test that method, perform quality control on that method, pull the data, and perform quality control checks on that data pulled for millions of consumers would add many months of delay to the parties' ongoing efforts to provide Plaintiffs with the data they need to propose and administer a notice program. This is because the Pharmacy Defendants would first need to gather and produce their dispensing data, due 60 days from entry of the Amended HIPAA order, and then, *only after the dispensing data has already been produced*, use the information contained in the dispensing data productions to attempt to formulate a script and query for searching their loyalty data for the same consumers. That process, including efforts to develop it, test it, and resolve any technological issues that result, could easily take several months after the production of the dispensing data, which seems counter to the Court's directive at the June 7 conference that the Court would like the parties to resolve class notice issues as expeditiously as possible so that they do not trail into the fall. This delay is unnecessary and unproductive, particularly given the extensive amount of dispensing data consumer identifying information and

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 10

contact information anticipated to be produced to Plaintiffs pursuant to the Amended HIPAA Order.

### B. Plaintiffs' referenced case law is wholly inapplicable here.

The Court agreed to withhold decision on loyalty rewards data discovery from the June 7 case management conference because "Plaintiffs' referenced [they have] plenty of case law that says this data is routinely provided in these type of matters." **Exhibit C,** June 7, 2023 Hrg. Transcript at 28:9–14. As Plaintiffs' counsel stated, "we can cite case after case from Brooklyn to Washington to Kansas to Arkansas and everywhere in between where we're finding that this information is being provided for purposes of notice specifically from retailers such as Wal-Mart, CVS, Target, . . . and others." *Id.* at 26:4–9. Not a single case delivers what Plaintiffs promised.[4]

Plaintiffs provided citations to six cases, all of which are irrelevant to whether the Pharmacy Defendants should be required to search loyalty or similar databases for additional contact information *beyond* what is in the dispensing records.

The first case cited, *Corcoran v. CVS Health*, No. 3:15-cv-3504, 2019 WL 6250972 (N.D. Cal. Nov. 22, 2019), attached as **Exhibit E,** does involve notice to pharmacy patients, but does not address the defendant's searches of loyalty or "other databases" in any way. Rather, in that case, the plaintiffs proposed to email the short-form notice to email address either (a) provided by defendants or (b) located by the Angeion Group LLC (Plaintiffs' proposed notice provider in this case), and send via postal mail the short-form notice to all class members for whom there were no email addresses or for whom an email address resulted in a bounce-back message. *Id.* at *9.

---

[4] Following the June 7 hearing, Pharmacy Defendants requested that Plaintiffs provide citations to the referenced cases. In response, Plaintiffs identified the six opinions discussed herein. *See* June 8, 2023 Email from Dave Stanoch, attached as **Exhibit D**.

**BARNES & THORNBURG** LLP

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 11

Briefing in that case shows that CVS provided information *only* from its Pharmacy Data Warehouse—exactly the type of dispensing data CVS has already agreed provide to Plaintiffs. *See* Decl. of G. Lewandowski at ¶ 3, *Corcoran v. CVS Pharmacy, Inc.*, No. 15-cv-3504 (N.D. Cal. Oct 7, 2019), ECF No. 390-2, attached as **Exhibit F.** There is no mention of searching front-of-store purchases or loyalty card data in *Corcoran*. But that case *is* instructive for another reason: the notice administrator in that case, Angeion and its principal Steven Weisbrot (who happens to be the proposed notice administrator in this case and submitted a declaration in this case as well, *see* ECF No. 2375-4), described the process he would take for locating email addresses for patients for whom emails were not available from the defendant's production (which, as noted above, was through Pharmacy Data Warehouse):

> While CVS does not maintain a robust list of class member addresses, Angeion is able to accurately garner class member email addresses by utilizing the data points that CVS does maintain. This process is typically referred to as an email "append" and is routinely utilized by corporate marketing departments, brand advertisers, and class action notification specialists, in order to reach their customers, consumers or class members. . . . The append will attempt to locate email addresses associated with the Class Member information provided to Angeion by utilizing a network of data partners (FN) to aggregate a combination of first- and third-party consumer data to source, update, and verify email addresses. Specifically, the append matches email addresses to certain other data points as a validity check, such as the individual's name, U.S. postal address and cellular or home phone number. In my professional experience, and based on the availability of the data points described above, I believe we will be able to garner email addresses for approximately 65% of the class, or more.
>
> (FN) Our data partners typically include Acxiom, Dun & Bradstreet, Google, Nielsen, Oracle and Facebook

Decl. of S. Weisbrot of Angeion Group, LLC at ¶¶ 12, 14, *Corcoran v. CVS Pharmacy, Inc.*, No. 15-cv-3504 (N.D. Cal. Sept. 16, 2019), ECF No. 377-2, attached as **Exhibit G**; *see also* Reply Decl. of S. Weisbrot of Angeion Group, LLC, *Corcoran v. CVS Pharmacy, Inc.*, No. 15-cv-3504 (N.D. Cal. Oct. 21, 2019), ECF No. 393-1, attached as **Exhibit H** (further describing Angeion's

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 12

email location process).[5]  In other words, *Corcoran* demonstrates that the robust information already being provided by Pharmacy Defendants such as CVS in this case can be readily utilized by Plaintiffs' own notice provider to search for patient email addresses where they do not already otherwise exist in the dispensing data.  Loyalty searches are not necessary.

Plaintiffs cite one additional case involving pharmacy customers: *Kolinek v. Walgreen Co.*, No. 1:13-cv-04806 (N.D. Ill. Apr. 3, 2015), ECF No. 97, attached as **Exhibit I**.  In that case, plaintiffs alleged Walgreens' calls to customers about prescription refills were unlawful under the TCPA.  As stated in the preliminary approval order that Plaintiffs cited here, class notice went out through email and traditional mail. The cited opinion does not specify the source of these email addresses, much less whether they came from loyalty rewards data.  The declaration attached to the motion seeking final approval of this settlement indicates that Walgreens did *not* have or produce email addresses for approximately 90% of the records.  However, as in *Corcoran*, the class administrator used a reverse email lookup to obtain email addresses for approximately half of the class; the other half of the class received notice via postcard.  *See* Decl. of L. Racines Re: Notice Procedures at ¶¶ 8–11, *Kolinek v. Walgreen Co.*, No. 13-cv-4806 (N.D. Ill. July 29, 2015), ECF No. 137-1 at 90–94, attached as **Exhibit J**.  Far from showing that the burdensome searches and cumbersome process of matching loyalty card data to individual prescription records is required, these cases show the opposite.  Contact information within the dispensing data is the one

---

[5] Note that in *Corcoran*, following oral argument where the Court indicated its hesitation with notice via text message, the parties there withdrew their inclusion of text message notification in their proposed notice plan. *See* 2019 WL 6250972, at *10.

Here, the Pharmacy Defendants preserve all rights to object to the notice proposal Plaintiffs eventually submit to the Court, in form, scope, and content.  Moreover, the Pharmacy Defendants' citation of Weisbrot's declaration in the *Corcoran* case does not constitute an endorsement of the methods used therein.

**BARNES & THORNBURG** LLP

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 13

true source of contact information that the Pharmacy Defendants can provide, and they should not be ordered to look for anything beyond that dispensing data.

The remaining cases cited by Plaintiffs do not involve prescriptions or pharmacy products. Two involve alleged deceptive advertising for infant formula, a front-of-store product. *See Hasemann v. CVS Pharmacy, Inc.*, 2023 WL 1785545 (E.D.N.Y. Feb. 6, 2023) and *Hasemann v. Gerber Products Co.*, 2023 WL 2499131 (E.D.N.Y. Mar. 14, 2023), attached as **Exhibits K and L**. Another is a one-page decision in which the court ordered production of sales data for aspirin (a front-of-store product) based on the parties' "fail[ure] to provide any explanation or support for its contention" of undue burden. *In re Bayer Corp. Combination Aspirin Products Marketing and Sales Practices Litigation*, No. 09-md-2023, 2012 WL 13059198 (E.D.N.Y. Aug. 17, 2012), attached as **Exhibit M**. As noted above, identifying persons who used a loyalty card to purchase a front-of-store product is an entirely different proposition than using loyalty card data to identify prescription purchases, because front-of-store purchases generally can be queried by product using SKU or Universal Product Codes (depending on the retailer's system) and because the more robust dispensing data does not exist for front-of-store non-prescription purchases. Plaintiffs' cited cases do not consider a scenario involving pharmacy contact information, much less support the contention that dispensing data should be supplemented with front-of-store data.

Finally, Plaintiffs cite an antitrust case concerning notice to Netflix subscribers, *In re Online DVD Rental Antitrust Litigation*, 779 F.3d 934 (9th Cir. 2015). There, the Ninth Circuit approved the district court's approval of a settlement between a class of Netflix subscribers and Walmart relating to an agreement where Netflix stopped selling DVDs and Walmart wound down its online rental service. The case provides no indication whatsoever that Walmart provided *any* information whatsoever to identify the putative members of the class—which consisted only of

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 13, 2023
Page 14

Netflix subscribers. In fact, notice in that case was given using *Netflix's* subscription records—not using data provided by Walmart or any other retailer. *See* Decl. of S. McLendon at ¶¶ 2–4, *In re Online DVD Rental Antitrust Litigation*, No. 4:09-md-2029 (N.D. Cal. Jan. 30, 2012), ECF No. 566-3 (detailing execution of class notice plan), attached as **Exhibit N**.

In sum, Plaintiffs' cited cases add nothing to the discussion and oral argument the Court has already heard, and Plaintiffs' request for supplemental information from loyalty or similar databases, *outside the dispensing data the Pharmacy Defendants have already agreed to produce*, should be denied. In the event the Court agrees following receipt of Plaintiffs' opposition, and given the compressed briefing schedule on this issue, the Pharmacy Defendants respectfully request that the Special Master deny Plaintiffs' request for searches of loyalty or membership databases following receipt of Plaintiffs' response brief, rather than requiring the Pharmacy Defendants to produce affidavits further supporting their position on this issue.

### III.   Conclusion

With respect to the only two items to be argued in this submission, the Pharmacy Defendants respectfully request that the Court (1) allow the Pharmacy Defendants to produce aggregated "TPP Amounts Paid" and (2) deny Plaintiffs' request that the Pharmacy Defendants search loyalty or membership databases for supplemental contact information.

Respectfully submitted,

*/s/ Kristen L. Richer*

Kristen L. Richer

**BARNES & THORNBURG** LLP