# MAZIE SLATER KATZ & FREEMAN, LLC

103 Eisenhower Parkway, Suite 207, Roseland, NJ  07068
Phone: (973) 228-9898 - Fax: (973) 228-0303
www.mazieslater.com

David A. Mazie*
Adam M. Slater*°
Eric D. Katz*°
David M. Freeman
Beth G. Baldinger
Matthew R. Mendelsohn*°
David M. Estes
Adam M. Epstein°

*Certified by the Supreme Court of
New Jersey as a Civil Trial Attorney

Karen G. Kelsen°
Cory J. Rothbort*°
Michael R. Griffith°
Christopher J. Geddis
Samuel G. Wildman
Julia S. Slater°
Trevor D. Dickson

°Member of N.J. & N.Y. Bars

June 19, 2023

*Via ECF & Email*                          *Contains Confidential Information*
                                            *Subject to Protective Order*

The Hon. Thomas I. Vanaskie, Special Master
Stevens & Lee, P.C.
1500 Market Street, East Tower, 18th Floor
Philadelphia, PA 19103

      Re:  *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
            No. 1:19-md-2875 (D.N.J.)

Dear Special Master Vanaskie:

Pursuant to Special Master Order No. 80 (ECF No. 2416) (and Special Master Order No. 80A, which Plaintiffs understand will be entered), this letter responds to the Retail Pharmacy Defendants' June 13 letter regarding Retailers' refusal to produce (i) the amounts paid by TPPs for VCDs on a transactional basis (versus in the aggregate), and (ii) consumer class members' contact information (specifically, emails) in available databases such as loyalty/member databases.

As previously reported by the parties, Plaintiffs reached compromises with Retailers on all of the remaining non-custodial data productions ordered by CMO No. 32 (ECF No. 2343), and continue to negotiate the custodial discovery ordered by CMO No.32.

    **I.**    **Amounts TPPs Paid**

CMO No. 32 ordered Retailers to produce the amounts TPPs paid for VCDs.  *See* ECF No. 2343, at ¶ 6.1.1.  There is no dispute about this.  Retailers correctly identify in their June 13 letter that the *only* issue here relates to the *format* of Retailers' forthcoming productions of the amounts TPPs paid for VCDs.  Retailers want the option to be able to produce the amounts TPPs paid either on a transaction-by-transaction **or** on an aggregate basis by TPP, NDC, and month or quarter.  Plaintiffs have requested the transaction-by-transaction data.

As a starting point, there is little question that the transactional sales information sought by the plaintiffs is relevant. Retailers do not dispute relevance. As such, Retailers bear the burden of resisting the production of discoverable, relevant data. *See, e.g.*, *Ramos v. Walmart, Inc.*, No. 21-cv-13827, 2023 WL 3477217, at *2 (D.N.J. May 16, 2023) (ordering Walmart, also defendant here, to produce "individualized data").

There also is no question that each Retailer possesses in its pharmacy dispensing data the amounts TPPs paid *on a transactional basis*. Plaintiffs previously submitted examples to Your Honor:

Here is an example from Defendant CVS's pharmacy records produced by class representative Jay Meader:



Here is an example from Defendant Walmart's pharmacy records produced by class representative Mary McLean:



Here is an example from Defendant Albertsons' pharmacy records produced by class representative Merilyn Andre:



The above examples further reveal that the amounts TPPs paid is no secret. Every single consumer class member's *own* pharmacy records show the precise dollar amount their TPPs paid towards VCD prescriptions.

Retailers have adopted the unreasonable position that the dollar amounts shown on the face of millions of consumer class members' own records—which, by Retailers' tacit admission under the agreed-upon HIPAA order, are *consumers'* own data to do with as they please, not Retailers' proprietary data—is so commercially sensitive and confidential that these transactional amounts are immune, even under an agreed-upon Protective Order. *See, e.g.*, Retailers' 6/13/2023 Ltr. (ECF No. 2427) at 3 (claiming amounts TPPs paid are commercially sensitive). Retailers do not elaborate on what purported "risk of competitive harm" exists in producing these data here, under the operative Protective Order. For one, nearly half of the Retailers are represented by the same counsel, so clearly they have some level of comfort about shared access to each other's data. Regardless, if Retailers truly are worried about sharing these data amongst themselves (*see id.* at 3), they are free to enter side agreements to limit their own access to or sharing of it. But Retailers' hypothetical concerns about unsubstantiated "competitive harm" are not enough to immunize relevant data from production.

Furthermore, the transaction-by-transaction amounts paid by TPPs exist in *the exact same pharmacy dispensing databases* from which each Retailer (i) earlier produced the NDCs, quantities dispensed, dates of sale, and amounts paid by consumers (e.g., co-pays), *see* 7/9/2020 Order (ECF No. 509) at Ex. A (ordering the foregoing), and (ii) will be producing consumer class members' names, addresses, dates of birth, telephone numbers, email addresses, and identities of TPPs reimbursing for any part of the VCDs dispensed, *see* 5/30/2023 Order (ECF No. 2413).

Given this, there is no burden posed by producing the amounts TPPs paid on a transactional basis, because Retailers already are producing the consumer identifiers from these exact same databases, for the exact same transactions, *including* the names (or codes for) TPPs that issued payment for every VCD transaction. Thus, Retailers need only query and pull one additional field value—the amounts paid by the TPPs, in addition to the TPPs' identities that they are pulling already—at the same time. Moreover, that at least some Retailers intend to produce the amounts TPPs paid on a transaction-by-transaction basis highlights it is neither impossible nor unduly burdensome to do so—especially when each of them already will be re-querying these exact same databases for the consumer identifiers. *See, e.g.*, *In re Novartis & Par Antitrust Litig.*, No. 19-md-00149, 2019 WL

5722055, at *6 (E.D. Pa. Nov. 5, 2019) (a request for "sales data, projected and actual gross profits and revenue . . . is neither extraordinary or burdensome").[1]

That leaves Retailers' contention that Plaintiffs might not need transaction-level data on amounts TPPs paid. Retailers, however, said just the opposite at class certification. Then, Retailers criticized Plaintiffs for "purporting to aggregate profits." Defs.' Class Cert. Opp'n (ECF No. 2008) at 57. Plaintiffs cannot be put in the same position they were put in at class certification—i.e., Retailers' withholding discoverable information (e.g., before class certification, Retailers withheld costs and profits data), but then they criticize Plaintiffs for lacking the very data Retailers withheld. And again, the production of transaction-by-transaction data is not novel. *See, e.g.*, *Fusion Elite All Stars v. Rebel Athletic Inc.*, No. 21-mc-00028, 2002 WL 1274965 (W.D. Tenn. Apr. 28, 2022) (ordering production of transaction-level sales data); *Direct Purchaser Class Plaintiffs v. Apotex Corp.*, No. 16-62492, 2017 WL 4230124 (S.D. Fla. May 15, 2017) (same).

## II. Customer/Loyalty Databases

All Defendants, including Retailers, criticized Plaintiffs' original class notice proposal because it "does not give individual notice to all TPP **and consumer class members identifiable through reasonable effort.**" Defs.' Mem. (ECF No. 2412) at 2 (emphasis added). So, Plaintiffs asked Retailers, who are party defendants here, to produce additional contact information for consumer class members in Retailers' customer/loyalty databases. These are live, reasonably accessible databases which each Retailer maintains in the ordinary course of business. Retailers and all Defendants for that matter cannot insist on direct notice while at the same time claiming that the data to provide direct notice is too burdensome to produce.

The principal motivator here is that Retailers have represented that their pharmacy dispensing databases likely do not capture many consumer class members' emails. Therefore, Plaintiffs principally seek class members' emails from Retailers' databases beyond the dispensing databases, such as customer/loyalty databases, to reduce the exorbitant cost of postage that would be incurred in lieu of emails (or telephone numbers); costs which even under the most conservative estimates will reduce the class's recovery by millions of dollars. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64, 71-72 (D.D.C. 2018) (finding email notice superior to mail notice because many class members use the internet in modern times and email notice costs are "meager" as compared to "disproportionately higher cost of providing notification by direct mail").

Retailers now balk at producing the exact information they earlier chastised Plaintiffs for not incorporating into the proposed class notice program (i.e., additional ways to effectuate direct notice). Retailers cannot have it both ways. Their strawman arguments against producing consumer class member information from customer/loyalty databases do not hold water.

---

[1] Retailers' disappointment that they have to re-query their pharmacy dispensing databases again, after they produced limited information from these databases earlier, is a 'burden' of their own making. Plaintiffs sought *all* of the relevant pharmacy dispensing data in 2020. Retailers balked then at producing everything at that time. Had they simply produced that which Plaintiffs requested years ago, they would not be in their present position.

First, they vaguely argue burden.  But that in itself is no reason to deny this discovery for class notice purposes, when Retailers admit they likely have more email addresses in their customer/loyalty databases than they do in their pharmacy dispensing databases.  *See, e.g.*, *Larson v. AT&T Mobility LLC*, 687 F.3d 109 (3d Cir. 2012) (rejecting assertion that it would take time, effort, and money for defendant to query its own data for class member contact information); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 345 (1978) (requiring defendant to "sort manually through a considerable volume of paper records, keypunch between 150,000 and 300,000 computer cards, and create eight new computer programs for use with records kept on computer tapes that either [were] in existence or would have to be created from the paper records"); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974) (identifying individuals "[b]y comparing the records and tapes of the odd-lot firms with the wire firm tapes which contain the name and address of each customer").

Relatedly, Retailers argue the data in their own customer/loyalty databases might be inaccurate, outdated, or over-inclusive. But as Retailers themselves point out, *see* Retailers' 6/13/2023 Ltr. (ECF No. 2427) at 5, perfection is not required here.  Plaintiffs have already suggested that Retailers simply query by product (i.e., valsartan) to identify names, address, dates of birth, and emails associated with valsartan purchases, and then Plaintiffs themselves or the Notice Administrator can cross-reference those results against the pharmacy dispensing data to match-up and fill-in missing emails that exist in the customer/loyalty data but not in the pharmacy dispensing data.[2]

As to Retailers' fox-guarding-the-henhouse concern about potentially delaying the issuance of class notice to afford them sufficient time to pull data from their customer/loyalty databases, *see* Retailers' 6/13/2023 Ltr. (ECF No. 2427) at 9, that is no reason to deny this discovery.  Class notice is important.  Plaintiffs, and presumably Defendants, want to get it right.  If reasonable efforts will result in additional consumer class members receiving more cost-effective direct notice via email, than taking a little more time to pull the customer/loyalty data is not only preferable, but arguably required.  *See, e.g.*, *Larson*, 687 F.3d at 128.

Finally, Retailers strain to thread too fine a needle to distinguish the wide body of applicable caselaw.  They essentially argue that a retail *pharmacy* has never been ordered to produce data from their customer/loyalty databases *specifically*, in a *published* case, involving a *multi-defendant MDL*, that relates to a *generic drug* product, and following a *certified* merits class.  But no goldilocks citation is necessary for the unremarkable proposition that retail companies, including Retailers, often produce the exact type of consumer contact information for class notice purposes that Plaintiffs seek here, whether or not it is from a specific database identified by name.  Here are some examples.  Many more exist:

---

[2] Matching-up data across Retailers' databases will allay any concerns of over-inclusive notice, although it must be noted that "[n]otice to a broader group than the class definition is acceptable as long as there is some link or connection between the method of class notice and the class definition." *Victorino v. FCA US LLC*, No. 16-cv-1617, 2020 WL 5064295 (S.D. Cal. Aug. 27, 2020).

5

- *Hasemann v. CVS Pharmacy Inc.*, No. 19-mc-2518, 2023 WL 1785545 (E.D.N.Y. Feb. 6, 2023) (CVS, a non-party, ordered to produce class member names, addresses, and email addresses for customers that made purchases "with a credit **or under a rewards program**") (emphasis added)

- *Hasemann v. Gerber Products Co.*, No. 15-cv-2995, 2023 WL 2499131 (E.D.N.Y. Mar. 14, 2023 (noting that four non-defendant retailers, including Walmart and CVS, produced names, addresses, and emails for consumers identified **in their rewards or other databases**)

- *Corcoran v. CVS Health*, No. 15-cv-03504, 2019 WL 6250972 (N.D. Cal. Nov. 22, 2019) (ordering CVS to produce names, addresses, and emails of class members)

- *In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL No. 2924, 2020 WL 1640021, at *6 (S.D. Fla. Apr. 2, 2020) "(In addition, the vendors [including many of Retailers who are parties here] will be directed to seek certain documents evidencing proof of usage of Zantac and/or ranitidine products potentially including, but not limited to, prescription records, **pharmacy loyalty rewards program records** and other records of usage, as agreed upon by the parties.") (emphasis added)

- *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, No. 09-md-2023, 2012 WL 13059198 (E.D.N.Y. Aug. 17, 2012) (ordering retailer non-party Safeway, an entity now affiliated with Albertsons, a Retailer defendant here, to produce contact information for consumer class members)

- *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) (approving email notice based on emails provided by defense in antitrust class action against Walmart and Netflix)

- *Horosny v. Burlington Coat Factory of California, LLC*, No. 15-05005, 2016 WL 10586285 (C.D. Cal. Oct. 27, 2016) (retailer-defendant produced class member names, addresses, and emails)

- *Kolinek v. Walgreen Co.*, 311 F.R.D. 483 (N.D. Ill. 2015) (approving class notice plan that approved emailing and texting class members, based on emails and telephone numbers provided by Walgreens)

- *Haro v. Walmart, Inc.*, No. 21-cv-00239, 2023 WL 2239333 (E.D. Cal. Feb. 27, 2023) (Walmart produced names, addresses, and emails)

- *Woods v. Caremark PHC, L.L.C.*, No. 14-cv-583, 2016 WL 5417445 (W.D. Mo. Aug. 2, 2016) (approving the mailing and emailing of class notice to class members in suit against Caremark, an entity affiliated with Retailer CVS)

- *Ostroski v. Amazon.com, Inc.*, No. C16-1378, 2016 WL 4992051 (W.D. Wash. Sept. 16, 2016) (non-party Amazon ordered to produce names, addresses, and emails of class members)

- *Dukich v. IKEA US Retail LLC*, 343 F.R.D. 296, 303 (E.D. Pa. 2022) (retailer-defendant produced email addresses for consumers who were members "of [IKEA's] loyalty program")

- *Ott v. Publix Super Markets, Inc.*, 298 F.R.D. 550 (M.D. Tenn. 2014) (granting motion to compel retailer to produce names, addresses, emails, and telephone numbers)

- *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) (approving notice plan using emails for class members provided by defendant)

- *Amaraut v. Sprint/United Mgmt. Co.*, No. 19-cv-1411, 2020 WL 8024170 (S.D. Cal. Jan. 14, 2020) (ordering defendant to produce class members' names, addresses, telephone numbers, and emails)

- *James v. Boyd Gaming Corp.*, 522 F. Supp. 3d 892, 928 (D. Kan. 2021) (ordering defendant to produce class members' names, addresses, telephone numbers, and emails)

- *Syed v. M-I, L.L.C.*, No. 12-cv-1718, 2014 WL 6685966 (E.D. Cal. Nov. 26, 2014) (ordering defendant to produce names, addresses, emails, telephone numbers, and social security numbers for class members)

- *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64 (D.D.C. 2018) (directing production of class members' email addresses for class notice given the potential cost of postage)

The bottom-line is Retailers suggest their pharmacy dispensing databases will not have as many email addresses for consumer class members as their other databases. Those other databases are reasonably accessible, and are used countless times every day by consumer class members in the ordinary course of Retailers' businesses. Plaintiffs have said they or the Notice Administrator will do the heavy-lifting to match-up emails in the customer/loyalty databases to VCD prescriptions in the pharmacy dispensing databases. Plaintiffs also have suggested ways to streamline the electronic querying and extraction of the data. Courts across the country recognize that emails provide a ready, cost-effective means to provide direct notice to class members. The data from Retailers' member/loyalty databases[3] should be produced here so it can be incorporated into Plaintiffs' notice plan.

---

[3] Note Plaintiffs already made an implicit concession to Retailers by not seeking Retailers' production of consumer class members' contact information that might exist in Retailers' other databases, such as online order or credit card purchase databases, at this time. That attempt to

Respectfully,

ADAM M. SLATER

cc:   DEC Counsel (via email for unredacted version) (via ECF for redacted version)

---

streamline this process may need to be modified based on Retailers' unexpected resistance to what should be a straightforward production by Retailers.