

2029 Century Park East, Suite 300
Los Angeles, CA 90067-2904 U.S.A.
(310) 284-3880
Fax (310) 284-3894

www.btlaw.com

Kristen L. Richer
(310) 284-3896
kristen.richer@btlaw.com

June 22, 2023

Special Master the Honorable Thomas Vanaskie
1500 Market Street, East Tower, 18th Floor
Philadelphia, PA  19103

RE:   **In re Valsartan, Losartan, and Irbesartan Products Liability Litigation**
      Case No. 1:19-md-02875-RBK

Dear Special Master Vanaskie:

Pursuant to Special Master Order No. 80A (ECF No. 2433), this letter serves as the reply to Plaintiffs' response (ECF No. 2432) to the Pharmacy Defendants' opening submission (ECF No. 2427) on the issues of aggregation of TPP payment amounts and loyalty database searches to attempt to find additional customer contact information not within the dispensing data.

I.   **TPP Payments**

Although the Pharmacy Defendants did not dispute relevance as to Plaintiffs' overarching need for TPP payments, they have disputed the need for and relevance of that data on an individualized, transaction-by-transaction basis. Plaintiffs still have not articulated *why* the individualized data is relevant, and have cited solely to the mere existence of the materials as the basis for the production.  Conversely, there is a substantial risk of competitive harm if *disaggregated data* regarding TPP payments is shared with competitors and most importantly, the TPPs themselves (Plaintiffs in this litigation), as doing so can give them an advantage in future negotiations regarding contract pricing and reimbursement rates. Finally, the Pharmacy Defendants criticized Plaintiffs' economist for "purporting to aggregate profits" using a formula that explicitly <u>excluded</u> the very data the Pharmacy Defendants are now producing; our criticisms focused on the formula itself, not the use of aggregated data.

II.  **Loyalty Databases**

Defendants' criticism of Plaintiffs' original class notice proposal was that it failed to use <u>any</u> method of direct notice to consumer class members, despite the fact that consumer contact information is readily available in the dispensing data that the Pharmacy Defendants will produce pursuant to the Amended HIPAA Order (ECF No. 2434).  Patients using the services of a pharmacy generally must provide an address and birth date to the pharmacy, and some provide a telephone number to the pharmacy.  Although some patients also provide an email address to the pharmacy if they want to be contacted about their prescriptions via email, many patients do not, likely reflecting discomfort with sensitive health information, such as prescription use, being transmitted

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 22, 2023
Page 2

via email. After Plaintiffs' original notice plan, the Pharmacy Defendants agreed to produce the requested patient contact information available in their dispensing databases.

Plaintiffs now want more, seeking additional customer information beyond what is in the dispensing data—and without even seeing what is in the dispensing data. This request creates issues for patient privacy and imposes a tremendous burden on the Pharmacy Defendants to search for and vet the additional data, despite the fact that those searches may yield little to no additional, reliable information, as the Court already recognized. *See* June 7, 2023 Hrg. Transcript at 28:16–23 (ECF No. 2428). There is nothing in Plaintiffs' responsive brief that should alter the Court's initial impressions.

The Pharmacy Defendants have committed to reasonable efforts to provide information to Plaintiffs for class notice purposes, as they will provide available dispensing data for all at-issue valsartan, including available names, mailing addresses, birth dates, telephone numbers, and email addresses. That is all that should be required. "A burdensome search through records that may prove not to contain any of the information sought clearly should not be required" for class notice. *Williams v. PillPack LLC*, No. 3:19-cv-5282, 2023 WL 2573356, at *3 (W.D. Wash. Mar. 20, 2023) (approving mixed email/mail class notice conducted through results of reverse look-up searches).

Undaunted by the irrelevance of the cases they initially cited, Plaintiffs have unleashed even more scattershot ones. Six involve the use of employee or former employee email addresses (not customer emails) in Fair Labor Standards Act class notice cases.[1] One case denied class certification of a claim that a furniture recall was carried out negligently when IKEA had the plaintiff's email address through its loyalty program but "could not identify her as a purchaser of recalled furniture and therefore did not contact her directly about the recall."[2] One case debated the type of "best notice practicable" in an airline antitrust case where the airline defendants had both mail and email addresses readily accessible.[3] Others discussed class notice proposals involving a combination of communication methods with no substantive discussion of email addresses beyond that they may be used if "easily ascertainable."[4] Finally, one case ordered Amazon to produce already-compiled contact information for customers who had purchased a

---

[1] *James v. Boyd Gaming Corp.*, 522 F. Supp. 3d 892 (D. Kan. 2021); *Ott v. Publix Super Markets, Inc.*, 298 F.R.D. 550 (M.D. Tenn. 2014); *Haro v. Walmart, Inc.*, No. 21-cv-00239, 2023 WL 2239333 (E.D. Cal. Feb. 27, 2023); *Amaraut v. Sprint/United Mgmt. Co.*, No. 19-cv-1411, 2020 WL 8024170 (S.D. Cal. Jan. 14, 2020); *Woods v. Caremark PHC, LLC*, No. 14-cv-583, 2016 WL 5417445 (W.D. Mo. Aug. 2, 2016); *Syed v. M-I, LLC*, No. 12-cv-1718, 2014 WL 6685966 (E.D. Cal. Nov. 26, 2014).

[2] *Dukich v. IKEA US Retail LLC*, 343 F.R.D. 296, 303, 310 (E.D. Pa. 2022).

[3] *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64, 68–69 (D.D.C. 2018).

[4] *Horosny v. Burlington Coat Factory of California, LLC*, No. 15-cv-5005, 2016 WL 10586285, at *10 (C.D. Cal. Oct. 27, 2016); *see also In re AT&T Mobility Wireless Data Services Litigation*, 270 F.R.D. 330, 352 (N.D. Ill. 2010) (discussing "former customers for whom AT & T has an email address").

BARNES & THORNBURG LLP

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 22, 2023
Page 3

computer graphics card,[5] essentially what the Pharmacy Defendants are already doing in this case. But Plaintiffs have not, and cannot, point to any case in which a company produced customer contact information from the database at issue yet was then ordered to review an unrelated database in the hopes of finding further contact information.

Moreover, instead of substantively addressing what the Pharmacy Defendants said about the initial six cases Plaintiffs cited, Plaintiffs simply re-cited them with no discussion. (ECF No. 2432 at 6). This is particularly puzzling given their citation to *Corcoran v. CVS Health*, No. 3:15-cv-3504, 2019 WL 6250972 (N.D. Cal. Nov. 22, 2019), wherein the very same Notice Administrator Plaintiffs propose to use in this case testified that he is able to take contact information of the type the Pharmacy Defendants are already providing from their dispensing databases and run an email "append" to locate email addresses associated with the class member information. By contrast, Plaintiffs here propose to haphazardly attempt to "match-up and fill in missing emails" using unreliable and unverified emails from loyalty databases. (ECF No. 2432 at 5).

Setting aside the lack of legal authority supporting Plaintiffs' position on this issue, the technical challenges and privacy concerns in Plaintiffs' request make it untenable from a practical standpoint. It bears reiterating that whether and how loyalty card data can be searched varies among the Pharmacy Defendants. The Pharmacy Defendants Express Scripts, OptumRx, and Humana do not have pharmacy customer loyalty databases that could be queried. Accordingly, as used in this letter brief, "Retailer" refers to the other Pharmacy Defendants, all of whom had some type of front-of-store (*i.e.*, non-pharmacy) loyalty or membership program: Albertsons, CVS, Kroger, Rite Aid, Walgreens, and Walmart (through its membership warehouse subsidiary Sam's Club). Consistent with the Plaintiffs' so-called "implicit concession" in footnote 3 of their response, the Pharmacy Defendants do not understand Plaintiffs to be seeking information from customer databases wholly untethered to valsartan transactions. Plaintiffs' suggestion—or, perhaps, thinly veiled threat—in footnote 3 of their response that they may ask the Pharmacy Defendants to *also* search other sources, such as credit card receipts, point-of-sale systems, or other undefined sources, in the future essentially boils down to a request that the Pharmacy Defendants act as some sort of "phone book" or search engine, query any source that may have any consumer information in it—regardless of feasibility, verifiability, or privacy concerns—and just dump the data on a third party administrator retained by Plaintiffs, trusting that it will handle the data with care, and narrow its results appropriately to address the Retailers' significant privacy concerns. Plaintiffs' comment exemplifies the burdensome and unproductive approach that Plaintiffs are asking the Pharmacy Defendants to take here, and the scope of any such ask is unwieldy and unprecedented, and should be rejected out of hand.

Regarding the loyalty data itself, as the Retailers have already explained to Plaintiffs, most Retailers do not have the ability to search by National Drug Code or even drug name within their loyalty database. Decl. of A. Tian of Walgreens ("Tian Decl.") at ¶ 7, attached as **Exhibit A**; Decl. of K. Gannamani of CVS ("Gannamani Decl.") at ¶ 8, attached as **Exhibit B.** There is no feasible

---

[5] *Ostrowski v. Amazon.com, Inc.*, No. 16-cv-1378, 2016 WL 4992051 (W.D. Wash. Sept. 16, 2016).

way, as Plaintiffs suggest, for those Retailers to "simply query by product." In these cases, the only information within the loyalty card database about a transaction involving a prescription is that the transaction involved a prescription pickup; there will be no associated information about the drug involved. For those Retailers, the only way to provide additional contact information from the loyalty database would be to create a process—one that does not presently exist—whereby individual patient identifiers found in the separate dispensing database essentially function as the search terms for bulk querying the loyalty database. These type of multi-pronged searches take time, manpower, computing power, and significant quality control review. Ex. A, Tian Decl. ¶ 9; Ex. B, Gannamani Decl. ¶¶ 9, 12; Decl. of M. Paulk of Rite Aid ("Paulk Decl.") at ¶ 9, attached as **Exhibit C**; Decl. of M. Holt of Sam's Club ("Holt Decl.") at ¶ 8, attached as **Exhibit D;** Decl. of M. Rando of Albertsons ("Rando Decl.") at ¶¶ 6, 8, attached as **Exhibit E**. Other Retailers may undertake a different process to link point-of-sale transactions associated with a loyalty or membership identification number to a valsartan dispense, but creating that initial link only begins the process of potentially producing information to Plaintiff.

Regardless of the process used, if compelled to undertake this search, it would be imperative for the Retailers to cross reference multiple identifiers within the dispensing database and within the loyalty data to attempt to minimize (though not eliminate) the risk of improper disclosures, including disclosure of one person's health information (*i.e.*, that the person has high blood pressure), to someone other than the patient and to avoid sending notice emails to customers who never took at-issue valsartan. That process of cross-referencing would be time consuming and fraught with potential error. Ex. A, Tian Decl. ¶¶ 10–11; Ex. B, Gannamani Decl. ¶¶ 11–12; Ex. C, Paulk Decl. ¶ 11; Ex. D, Holt Decl. ¶ 8; Ex. E, Rando Decl. ¶¶ 7-8.

Plaintiffs suggest that they or the Notice Administrator could "match-up and fill in missing emails" (ECF No. 2432 at 5). It is unclear *how* the Notice Administrator would do that, especially if individual patient identifiers are themselves the search terms used. Regardless, Retailers cannot simply turn over a pile of email addresses untethered to actual purchases of valsartan. Doing so would be inconsistent with their privacy obligations and practices. Indeed, Plaintiffs' recent disclosure of a potential "cybersecurity incident" at one of their vendors underscores this point. *See* June 8, 2023 Email from Dave Stanoch, attached as **Exhibit F**.

This case is not about movie rentals, baby food, or even an over-the-counter drug. This case involves prescription medication, and the inadvertent disclosure of class members' protected health information (*i.e.*, that the person has high blood pressure) to someone other than the patient—even a spouse or a neighbor—carries the risk of real harm. The fact that a patient was prescribed this prescription medication is protected health information, disclosure of which the patient should control. It is one thing for a pharmacy to disclose contact information provided to that pharmacy and provided by the patient himself in connection with his prescriptions. The Pharmacy Defendants have already agreed to do that. It is a far different thing for the pharmacy to disclose contact information found in a loyalty database (*i.e.*, a marketing database) that is tenuously linked—if at all—to a patient who also appears in the dispensing records. If a patient wanted her email to receive communications about her prescriptions or pharmacy services, she could have provided her email to the pharmacy. If she did, those email addresses will be produced

■■■■■ BARNES & THORNBURG LLP

<u>from the dispensing data.</u>  But there is no need for the Retailers to go on an extensive and likely unproductive hunt for additional contact information that a patient may never have wanted associated with his prescriptions or that may belong to someone else altogether.

Moreover, it is unclear if this significant and burdensome effort will actually result in useable, non-duplicative email addresses.  When creating loyalty cards, customers have near complete control over how much or how little information they disclose.  Retailers do not generally verify what is provided or require an email address at signup.  Ex. A, Tian Decl. ¶ 6; Ex. B, Gannamani Decl. ¶¶ 10–11; Ex. C, Paulk Decl. ¶ 7; Ex. E, Rando Decl. ¶¶ 6-7; Decl. of M. Wright of Sam's Club ("Wright Decl.") at ¶ 5, attached as **Exhibit G**.  When signing up, customers may make up fake names, fake dates of birth, and, yes, fake email addresses.

The Retailers' concerns about the quality or veracity of what may come back in email searches, whether it is usable at all, and whether it presents significant privacy concerns are not merely hypothetical.  To test the feasibility and usefulness of Plaintiffs' request, counsel asked a Retailer with the capability of querying its loyalty database by National Drug Code to pull records from both the dispensing database (including patient identifiers) and the loyalty database for a randomly selected NDC and month.

- The dispensing data sample included 107 fills, all of which had an associated name and mailing address.  The dispensing database had a phone number for nearly half of the fills, and an email address for ten of them.

- In contrast, the loyalty database only showed 41 fills with any type of contact information (whether it be mailing address, email address, or telephone number) for that same sample NDC and month.  Of those 41 hits, only 25 had associated email addresses, and two of those email addresses were already in the dispensing data.

- Of the 23 possible new email addresses, a manual review showed that <u>only five</u> involved a match to first name, last name, and one other form of contact information in both the dispensing and rewards databases.  The other records involved a mismatch of some kind between the dispensing and loyalty data, including one that appeared to be completely unrelated to a person who is now deceased; one that appeared to belong to neighbors; and many that appeared to belong to household or family members, several of whom had different addresses.  Even with a name match between the loyalty data and dispensing data, some of the loyalty email addresses appeared to belong to a different person entirely: that is, the email address in the loyalty database appeared to include all or part of a <u>different</u> person's name, such as John.Brown@provider.com, even though the name in the dispensing and loyalty databases was Mary Smith.  Other email addresses in the loyalty database appeared to be the work emails of a household member, not the patient.

In short, of this sample of 107 fills, ten emails were <u>already</u> in the dispensing data, along with mailing addresses for everyone and phone numbers for nearly half the sample; supplementing the

Special Master the Honorable Thomas Vanaskie
Stevens & Lee
June 22, 2023
Page 6

dispensing data with loyalty card information would result in adding only five additional email addresses to Plaintiffs' list of contact information, and even those five email addresses were unverified.

Further, customers often share loyalty cards or memberships, thinking of them as a "household" card as opposed to an individual one. Ex. A, Tian Decl. ¶ 10; Ex. B, Gananmani Decl. ¶ 11; Ex. C, Paulk Decl. ¶ 10; Ex. E, Rando Decl. ¶ 6. Sending class notice to one spouse's email about the other's grocery purchase may be appropriate, but family members sharing a loyalty card may wish to keep their private medical information just that—private. And even beyond the "household" problem, some loyalty or membership cards are shared among or used by friends, ex-partners, or businesses. For example, a small business may purchase "add-on" Sam's Club memberships for its employees, each of whom may have a unique membership number. Ex. F, Wright Decl. ¶ 4. However, the primary member may be the only person who enters contact information for each such add-on member and may use the same email address for each add-on member. *See id.* at ¶ 5. Again, it is one thing for a company email address to receive information about renewals or member purchases of a front-of-store product, but an entirely different proposition for that same company email address to receive protected health information about a member's pharmacy dispenses, particularly when the pharmacy database will be already be queried to provide whatever contact information the member provided to the pharmacy.

Rule 23 directs class notice be the "best notice practicable under circumstances" and that it entail "reasonable efforts." Pharmacy Defendants are certainly cooperating with Plaintiffs in their efforts to provide such notice, and will produce the requested available contact information found within their pharmacy dispensing databases for putative class members. What Plaintiffs demand goes far beyond that, pushing for Pharmacy Defendants to undertake onerous and time-consuming searches of non-pharmacy loyalty databases in the speculation that it will yield further email addresses. The pay-off they seek is of dubious, marginal value. This is not what Rule 23 contemplates or prescribes, and the Court should reject Plaintiffs' proposal for burdensome, additional searches.

Respectfully submitted,

*/s/ Kristen L. Richer*
Kristen L. Richer

BARNES & THORNBURG LLP