**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

                                    CIVIL ACTION NUMBER:

IN RE:  VALSARTAN PRODUCTS
LIABILITY LITIGATION                    19-md-02875

_____            MOTIONS
                                   Via Zoom Videoconference

       Mitchell H. Cohen Building & U.S. Courthouse
       4th & Cooper Streets
       Camden, New Jersey  08101
       June 23, 2023
       Commencing at 11:00 a.m.

B E F O R E:          THE HONORABLE THOMAS I. VANASKIE (RET.)
                      UNITED STATES SPECIAL MASTER

A P P E A R A N C E S:

       MAZIE SLATER KATZ & FREEMAN, LLC
       BY:  ADAM M. SLATER, ESQUIRE
       103 Eisenhower Parkway
       Roseland, New Jersey  07068
       For the Plaintiffs

       HONIK LLC
       BY:  RUBEN HONIK, ESQUIRE
       1515 Market Street, Suite 1100
       Philadelphia, Pennsylvania  191032
       For the Plaintiffs

       KANNER & WHITELEY, LLC
       BY:  DAVID J. STANOCH, ESQUIRE
       701 Camp Street
       New Orleans, Louisiana  70130
       For the Plaintiffs


            Camille Pedano, Official Court Reporter
                 camillepedano@gmail.com
                      (609) 774-1494

    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1   **A P P E A R A N C E S (Continued):**

2       LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY PROCTOR, P.A.
        BY:  DANIEL A. NIGH, ESQUIRE
3       316 S. Baylen, Suite 600
        Pensacola, Florida 32502
4       For the Plaintiffs

5       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        BY:  ALLISON M. BROWN, ESQUIRE
6       1440 New York Avenue, N.W.
        Washington, DC 20005
7       For the Defendants, Prinston Pharmaceuticals,
        Solco Healthcare U.S. LLC, and  Zhejiang Huahai
8       Pharmaceuticals Ltd.

9       GREENBERG TRAURIG LLP
        BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
10      3333 Piedmont Road, NE, Suite 2500
        Atlanta, Georgia  30305
11              AND
        BY:  GREGORY E. OSTFELD,  ESQUIRE
12      77 West Wacker Drive, Suite 3100
        Chicago, Illinois 60601
13      For the Defendants, Teva Pharmaceutical Industries Ltd.,
        Teva Pharmaceuticals USA, Inc., Actavis LLC,
14      and Actavis Pharma, Inc.

15      WALSH PIZZI O'RIELLY FALANGA LLP
        BY:  CHRISTINE I. GANNON, ESQUIRE
16      Three gateway center
        100 Mulberry Street, 15th Floor
17      Neward, New Jersey  07102
        For the Defendants, Teva Pharmaceutical Industries Ltd.,
18      Teva Pharmaceuticals USA, Inc., Actavis LLC,
        and Actavis Pharma, Inc.
19
        PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
20      BY:  FRANK STOY, ESQUIRE
        One Oxford Centre, 38th Floor
21      Pittsburgh, Pennsylvania  15219
        For the Defendant, Mylan Pharmaceuticals, Inc.
22
        FALKENBERG IVES LLP
23      BY:  MEGAN A. ZMICK, ESQUIRE
        30 N. Lasalle Street, Suite 4020
24      Chicago, IL  60602
        For the Defendant, Humana Inc.
25

1    **A P P E A R A N C E S (Continued):**

2       ULMER & BERNE LLLP
        BY:  JEFFREY D. GEOPPINGER, ESQUIRE
3       600 Vine Street, Suite 2800
        Cincinnati, Ohio 445202
4       For the Wholesaler Defendants and AmerisourceBergen

5       BARNES & THORNBURG, LLP
        BY:  KRISTEN L. RICHER, ESQUIRE
6       2029 Century Park East, Suite 300
        Los Angeles, California  90067
7                AND
        BY:  KARA KAPKE, ESQUIRE
8       11 S. Meridian Street
        Indianapolis, Indiana 46204
9                AND
        BY:  PAUL QUINCY, ESQUIRE
10      555 12th Street NW, Suite 1200
        Washington, DC 20004
11      For the Retailer Defendants and CVS Pharmacy, Inc., and
        Rite Aid Corporation
12
        LEWIS BRISBOIS BEASGAARD & SMITH
13      BY:  ANDREW F. ALBERTO, ESQUIRE
        550 East Swedesboro Road, Suite 270
14      Wayne, Pennsylvania  19087
        For the Defendants, AvKARE and Camber
15

16

17

18

19

20

21

22

23

24

25

 1              (PROCEEDINGS held via Zoom Videoconference before

 2     The Honorable Thomas I. Vanaskie (Ret.), United States Special

 3     Master, at 11:00 a.m.)

 4              JUDGE VANASKIE:  We are here to entertain argument on

 5     two discovery issues, two fairly well-identified issues and

 6     well-briefed issues; one dealing with the form of production of

 7     information dealing with the sale of VCDs, valsartan-containing

 8     drugs, and amounts paid to third-party payors; and then another

 9     issue dealing with whether production from royalty card

10     databases should be required.

11              So, Ms. Kapke, are you ready to proceed?

12              MS. KAPKE:  Yes, Your Honor.

13              JUDGE VANASKIE:  All right.

14              MS. KAPKE:  I think --

15              JUDGE VANASKIE:  And then we will hear from Mr.

16     Stanoch.

17              MS. KAPKE:  I think the first issue is pretty well

18     teed up in the briefs.  We have not yet seen any articulation

19     from plaintiffs why they need this data in the individualized

20     form and we do have significant concerns about presenting it

21     en masse to the TPPs themselves.  That can cause significant

22     competitive harm.  And the only explanation for why plaintiffs

23     want this data is, well, it exists so you have to give it to

24     us.  So we think we proposed a very reasonable solution that

25     says, look, we will give it to you but we will aggregate it.

1  And plaintiffs haven't really articulated to us why they want

2  it on that individualized patient-by-patient basis.

3        So I think that summarizes the issue pretty concisely

4  for us.

5        JUDGE VANASKIE:  Have you provided an evidentiary

6  foundation for the competitive concerns you articulate in your

7  papers?

8        MS. KAPKE:  Yes, we have.  Those were in the initial

9  declarations that we submitted and they -- we didn't submit

10 them with the reply but we did submit them in -- I'll give you

11 the exact link.

12       JUDGE VANASKIE:  Perfect.

13       MS. KAPKE:  So it's 479- and then there's a series of

14 affidavits.  So I'll just read from the declaration of E.K.

15 McCoy.

16       "Retail pharmacies compete with each other to provide

17 services to plans and be considered in network for those plans.

18 Because of the competitive nature of the retail pharmacy

19 business in the US, the reimbursement amount that CVS receives

20 for each prescription is a closely guarded trade secret."

21       And then one from M. Mistarz that we quoted in our

22 brief at 479-10:  "Other retail pharmacy defendants could gain

23 a significant competitive and economic advantage over

24 Walgreen's if they learned this confidential information and

25 especially what each TPP reimburses Walgreen's for dispensing

1    generic drugs to the TPP's beneficiaries and members."  And

2    those are just two samples.

3        At ECF 479 we have affidavits from I think every

4    single pharmacy defendant in this case indicating the

5    significant harm here.

6        JUDGE VANASKIE:  All right.  Let's hear from Mr.

7    Stanoch then on this issue.

8        Why do you need the transaction-by-transaction,

9    prescription-by-prescription data?

10        MR. STANOCH:  Good morning, Your Honor.  David

11    Stanoch --

12        JUDGE VANASKIE:  Good morning.

13        MR. STANOCH:  -- for the plaintiffs.

14        We need it for damages, Your Honor, plain and simple.

15    We know this disaggregated data exists, they admit it exists,

16    there's no dispute that it's relevant, and Your Honor heard

17    defendants, through Mr. Ostfeld, argue for the last six months

18    about how important it was for them to get disaggregated data

19    from MSP regarding certain subsidies and reimbursements and

20    other issues so that they can have a more accurate damages

21    model.  It's the same issue we're looking at here, Your Honor.

22    The data exists in the exact same pharmacy databases they are

23    pulling the name, address, birth date, and telephone number,

24    they've already pulled the co-pay, we got that already, and

25    it's right there in the records and this would be information

1    that's highly relevant to us to having the most accurate,

2    robust damages model we can.

3            JUDGE VANASKIE:  How do we address the competitive

4    concerns that have been raised?

5            MR. STANOCH:  I'd say a couple things to that,

6    Your Honor.  Number one, we have a protective order obviously

7    in this case for years.  Your Honor allowed MSP to produce what

8    it vehemently argued was hypersensitive, hyper-commercially

9    sensitive information as well, and Your Honor found the

10   protective order sufficient for purposes of that disclosure.

11   We've had a number of other data points produced by all manner

12   of entities and persons here, and the protective order has been

13   adequate in every instance in terms of businesses' competitive

14   information and pricing, in terms of the cost of API in

15   prescription drugs, in terms of individual plaintiff's very

16   sensitive psychiatric records, even though this is a personal

17   injury case not involving a psychiatric drug.  In all instances

18   that's come before Your Honor or Magistrate Judge Schneider or

19   Judge Kugler it's been found that the protective order is

20   sufficient.

21           The only competitive concerns I heard this morning,

22   Your Honor, was about retailers themselves gaining some sort of

23   advantage.  They can make any agreement they want not to look

24   at each other's data, Your Honor.  I imagine they're not.

25   Under the protective order, I think only outside counsel would

1   be looking at it anyway.  So I don't really see the issue there

2   in terms of competitive harm.

3        Their letter makes reference to competitive harm with

4   consumers but, Your Honor, I mean, every one of us can get our

5   pharmacy records, and we put the examples in, consumers can

6   clearly see the amounts their own TPPs paid in their own

7   pharmacy records.

8        And in terms of TPP competitive advantage, the only

9   parties here, named parties, are MSP and Mata, and, again,

10  under the protective order already, only the outside counsel

11  can see it so there's no risk of Mata, which is a nonprofit

12  that's using an administrator anthem anyway, and MSP, which is

13  not the underlying assignors anyway, seeing the data and

14  gaining some advantage, I think that's speculative at best.

15       JUDGE VANASKIE:  Ms. Kapke, why isn't the "for outside

16  counsel's eyes only" protective order sufficient?

17       MS. KAPKE:  I think there's a risk of disclosure even

18  beyond the protective order terms, even inadvertent, has our

19  clients concerned.

20       JUDGE VANASKIE:  But that's a speculative basis for me

21  to withhold -- to say you can aggregate the information as

22  opposed to providing it.

23       MS. KAPKE:  Well, I think it's a matter of balancing

24  plaintiffs' need.  And I still haven't heard plaintiffs

25  articulate a need.  They're saying we need this but they're

1  getting -- they would be getting, under our proposal,

2  aggregated data by month, four quarters, on payments, and

3  that's what they need for damages.  I don't see why they need

4  that individualized and our clients have concern about the

5  protective order.  I understand Mr. Stanoch's point about the

6  protective order giving some, some assurances; but our clients

7  view this as very, very confidential information and they're

8  concerned that the protective order just isn't enough.

9          JUDGE VANASKIE:  Mr. Stanoch, why do you need the

10  information on a transaction-by-transaction basis as opposed to

11  aggregated data?

12          MR. STANOCH:  We need it for, as I said earlier, for

13  our damages modeling, Your Honor.  Our experts are entitled --

14          JUDGE VANASKIE:  Can you be more specific on that?

15          MR. STANOCH:  Well, as Mr. Ostfeld has argued to this

16  Court before over the last six months as to MSP's data, the

17  disaggregated data provides the most accurate picture of the

18  underlying transactions.  At one point I think in October he

19  said that it was actually plaintiffs' MSP's burden to

20  disaggregate the data.  It's not even a close question.  It's

21  his favorite case, *In Re Namenda*, talks about coming up with

22  the most accurate damages modeling numbers available and to do

23  that, you get disaggregated data.

24          Same position here, Your Honor.  The data exists.  We

25  want to make sure our damages model is robust with the most

1  accurate disaggregated data possible.

2       And honestly, Your Honor, I don't need to disclose an

3  expert damages model in more detail or preview it to Ms. Kapke.

4  I don't expect the same from her.  They already have our

5  models, they've already criticized it for the aggregated data

6  we used, and now we're trying to seek the disaggregated data to

7  make it even more robust, even though Judge Kugler found it

8  reliable anyway.

9       JUDGE VANASKIE:  Anything else, Ms. Kapke?

10       MS. KAPKE:  No, Your Honor.

11       JUDGE VANASKIE:  Let's move to the next issue and that

12  deals with the royalty program records.

13       Why, Mr. Stanoch, aren't the dispensing data

14  sufficient?

15       MR. STANOCH:  Well, again, Your Honor -- and it is

16  Stanoch, you were right the first time.

17       JUDGE VANASKIE:  I go back and forth on that.

18       MR. STANOCH:  That's how we say it.  I don't know why,

19  Your Honor.  I know it looks like Stanoch.

20       JUDGE VANASKIE:  All right, Mr. Stanoch.

21       MR. STANOCH:  Your instincts were right on that.

22       So to the question, Your Honor, again, this goes to

23  ensuring a robust Class Notice Program.  All defendants took

24  issue with the original version of the notice program,

25  criticizing the strength of the proposed direct notice program.

1   So we're now looking for additional means, consistent with the

2   23 case law, to ensure that we have direct notice to as many

3   class members as possible.  We have been told on multiple

4   occasions by retailers that the pharmacy dispensing data

5   probably won't have many emails.  It's really I think beyond

6   dispute that emails are a much more effective -- cost effective

7   and efficient way to effectuate a direct notice plan.

8   Otherwise, we'll be looking at additional millions of dollars

9   in postage for direct notice to consumer class members.  And we

10  know that emails exist in certain of these retailer defendants'

11  databases.  I saw for the first time in their letter last night

12  that three of the retailers don't have such databases, the

13  other six do.  And we think that obviously it's relevant to

14  effectuate notice, that there's no real confidentiality

15  concerns similar to the issues we've already discussed

16  regarding the protective order, we're class counsel, we're

17  trying to make sure we comply with due process, et cetera.

18          In terms of burden, they submitted some declarations

19  last night.  They're very, I'd suggest, vague in terms of

20  suggesting this may take a lot of work and it may take a little

21  time for us to query it.  We think under the applicable Third

22  Circuit case law, specifically also the *Larson v. AT&T Mobility*

23  case from the Third Circuit, that that's insufficient, a

24  generalized statement of burden.  There's no concrete

25  description of the costs that are involved and the efforts.

```
 1   Simply saying something is hard, Larson, the Third Circuit said
 2   that's not good enough.  And we don't want any of us to be in a
 3   position, the Court, plaintiffs, class counsel, defendants, in
 4   a situation down the road where we run into a problem with
 5   Larson.  And I'm always loath to suggest to the Court, any
 6   court, to look at a case, but if Your Honor looks at any case
 7   after this, I'd commend to you the Larson case to see some of
 8   the general atmospherics that we're trying to address here and
 9   to nip something down the road now by seeking to get these
10   email addresses.
11           And in terms of the parade of horribles, if you will,
12   in terms of their letter briefs and declarations of, oh, some
13   of the data might be inaccurate or it may be stale or someone
14   could have made up a fake email address, not only is that very
15   speculative, Your Honor, but, again, perfection for Rule 23
16   class notice purposes is not required.  And even if when we go
17   -- go to sign up, you know, any of us today sign up for a
18   loyalty program with these companies, the very first thing when
19   I go on the website says enter your email address.  So we know
20   it's there to some extent.  And there's no citation in their
21   letter of last night to which retailer tried to pull which
22   example from pages 5 and 6 of Ms. Richer's letter, and I didn't
23   do all of the arithmetic because I was only able to look at it
24   this morning, but the bottom line is they say in their example,
25   come up with five other additional emails.  Well, if you have
```

1  millions of consumer class members, Your Honor, if you do the

2  math, that's going to be a lot of other direct notice contacted

3  people getting the notice.

4       So we think it's appropriate at this time for them to

5  pull the information which we know it exists, which they have

6  not articulated precisely the burden, so we can ensure that the

7  notice program is robust and is efficient as possible.

8       JUDGE VANASKIE:  All right.  Ms. Kapke?

9       MS. KAPKE:  A lot to say in response there.

10       First of all, I will tell you, I have been on the

11  phone with a lot of these declarants over the last week, week

12  and a half, and the burden is very real.  I'll tell you the

13  first thing that we put up was the declaration from Walgreen's

14  and they talked about the huge amount of computing power that

15  this would take.  They're not exactly sure how to run this

16  search so it would take a process of them even figuring out how

17  to do it because they cannot query by NDC or by drug name.  So

18  they've got to come up with this unique script and to do that,

19  they've got to save all of the dispensing data and then try to

20  match it up.  That will take time away from the daily processes

21  that they do.  You know, they have to submit things to the

22  prescription drug monitoring databases, PDMD, for purposes of

23  controlled substances dispensing.  They're very concerned that

24  this is going to affect that process.

25       The second declaration, CVS, talked about how it would

1  take several weeks to write this script.  This script does not

2  exist.

3         The third declaration we submitted was from Rite Aid,

4  that Rite Aid was the example, they're the only company that --

5  declaration that one of my clients submitted that hand-query by

6  NDC.  They have very strict limitations on who can do that.

7  They don't do it but I asked them to specifically so that I

8  could see if this was even possible.  And what I found so

9  interesting about this was of those 23 email addresses, most of

10  them, 18 of them, had a mismatch to the person's dispensing

11  data.

12         And I think Mr. Stanoch's concerns -- dismissiveness

13  of our concerns about privacy really need to -- we really need

14  to take a hard look at that.  Regulators have been very

15  concerned about keeping marketing databases separate from

16  pharmacy dispensing databases, separate from vaccine records,

17  and we want to make sure that we are only providing the

18  patient's information.

19         Another declaration that we submitted related to Sam's

20  Club.  Sam's is the only loyalty program at issue for defendant

21  Walmart here, and they have a membership model.  And this is

22  not hypothetical either.  We couldn't pull a sample but Sam's

23  has a very business-focused approach to gaining and signing up

24  members.  A lot of small businesses will go and they'll have,

25  for instance, someone sign up and have 16 -- up to 16

1   additional members that they pay for, but because they're

2   paying for it, the email address associated with that

3   membership number may be -- or that membership signup may be

4   something like, you know, purchasing@acme.com.  Now, each

5   individual member is going to have a card that they can then

6   use at the pharmacy and provide the pharmacy with their email

7   address, but the membership card, the membership database, may

8   have purchasing@acme.com.

9        If I am a consumer, I do not want my information going

10  to my employer.  I don't give my email address to the pharmacy

11  that I fill at because my secretary reads my emails.  I do give

12  a lot of these people email addresses because I don't care if

13  my secretary sees coupons that I get from CVS and Walgreen's

14  and all these other companies.  But we're talking about

15  protected health information.  And these are not hypothetical

16  concerns.  They're very real concerns about this mismatch.  And

17  I think when you are talking about millions and millions of

18  prescriptions at issue, the burden is very real to try and

19  manually match up membership data or loyalty card data and do

20  the quality control on that.

21       Your Honor had it right when we were talking about

22  this initially.  It's very speculative to think that we're

23  going to get a lot of additional stuff, if any at all.  And

24  there is a huge burden and notice need not be perfect.  We're

25  going -- if you, as a consumer, went to the pharmacy and gave

1    the pharmacy a piece of contact information, we will produce

2    that.  It's the extra step that we have a real problem with,

3    Your Honor.

4         JUDGE VANASKIE:  All right.  Where do things stand

5    right now with respect to production of contact information

6    from the dispensing database?

7         MS. KAPKE:  We have 60 days from the amended HIPAA

8    order, which was entered this week, and so we are getting those

9    pulls as soon as we can.  We're not going to sit and wait on it

10   but as soon as we get them done and ready, we'll get them out

11   the door.  You know, this is a lot of data and our clients are

12   -- it takes some time, you know.  It takes computing power, it

13   takes time, but we will get it out the door as soon as we can,

14   Your Honor.

15        JUDGE VANASKIE:  Mr. Stanoch, should we wait for the

16   dispensing data to be produced so you have a sense and your

17   administrator has a sense of how many email addresses you

18   receive, how accurate is the contact information that you

19   receive, before we require production of data from a loyalty

20   card program database?

21        MR. STANOCH:  I appreciate that thought, Your Honor,

22   but I know that we're under a lot of other countervailing

23   scheduling pressure.  And I'm not pointing the finger at any

24   particular party of that, it's just the nature of the way the

25   schedule has come down.  And while I understand the allure of

 1   that suggestion, Your Honor, on a personal level, I'm not sure

 2   plaintiffs are in a position to agree to that now.

 3         JUDGE VANASKIE:  Understood.

 4         MR. STANOCH:  That's all.

 5         MS. KAPKE:  I think one other important thing to

 6   mention, as a consumer, I have a real concern on a privacy

 7   front about email addresses being used to discuss my

 8   prescriptions.  But that being said, what I thought was so

 9   interesting about plaintiffs' submission is they reference the

10   *Corcoran* case, and a couple other cases, but in the *Corcoran*

11   case, plaintiffs' own class administrator that they're

12   proposing to use in this case used what's called an email

13   append and they used data like the type of data that we're

14   producing from the pharmacy and dispensing data, mailing

15   address in particular, maybe a phone number, maybe an email

16   address, but they used that data and then other sources to come

17   up with email addresses.  I don't know that that's going to be

18   reliable but it's certainly going to be more reliable and less

19   burdensome than trying to manually match up loyalty cards,

20   which are household cards, they are not individualized cards.

21   And I think before we go down this route of creating new

22   searches that have never been used before, doing those manual

23   comparisons, plaintiffs ought to look at their own notice

24   administrator for a program that they have proposed in other

25   cases.

1        JUDGE VANASKIE:  All right, Mr. Stanoch, what's your

2    position on that?  Let me hear that.

3        MR. STANOCH:  Sure.  Number one, we were not counsel

4    in that other case.  We are not aware of any effort to try to

5    get additional -- the email addresses from the loyalty

6    databases that we're trying to get now.  So I think it's really

7    an apple-to-orange comparison, what happened there, number one.

8        Number two, we're at a certified litigation merits

9    class in this situation, right, and the defendants and CVS and

10    the other retailers, they've challenged the adequacy of the

11    notice program already.  It's not an agreed-upon or

12    non-objected-to situation as may be in other cases.  Again, not

13    faulting anyone but that's the world we're living in.

14        So any sort of arrangements or non-opposition that may

15    have happened in other cases, that's not this case.

16        I don't need to go tit for tat with Ms. Kapke about

17    her own subjective views as a consumer.  I don't need to

18    speculate myself about whether a hypothetical consumer might

19    put in a fake email address in their CVS loyalty card setup.

20    That's a risk.  It could happen with any database anywhere for

21    anything.  So I'm not sure how much hay to make of that.

22        I'd just note again with the *Larson* case, Your Honor,

23    the defendant put in a declaration, said it's going to take

24    four or five months and a hundred thousand dollars for us to

25    pull this data, the Court said don't worry about it, it was

 1   reversed.

 2          So just from a very broad perspective, I just want to

 3   underscore yet again to Your Honor just so you understand where

 4   we're coming from to make sure all T's are crossed at this

 5   point in terms of our efforts to obtain enough information to

 6   effectuate that direct notice available through reasonable

 7   efforts.

 8          JUDGE VANASKIE:  Right.

 9          MS. KAPKE:  I just have to make two quick points.

10          The *Larson* case did not have any indication that there

11   were other databases at issue, and here we have the pharmacy

12   database.  Plaintiffs are going to get contact information.

13   They're going to get addresses.  Plaintiffs -- I mean this is

14   all about money is what it is.  Plaintiffs could send email --

15   or could send mailing notice to nearly every single consumer

16   that's part of the class.  Obviously, the consumers that

17   purchased at non-pharmacy defendants, they can't; but for every

18   pharmacy defendant, they're going to get an address.  Some may

19   be undeliverable but that's just the nature of this program.

20   But there is a meaningful difference between what is in

21   dispensing data and loyalty data.

22          Pharmacy data is verified data.  People can't use fake

23   names, people can't use the wrong date of birth, or they won't

24   get their prescription.  These are doctors' ordered

25   prescriptions.  It is very real that households share loyalty

1  databases; people put in -- you know, the example we were

2  joking around with was bugsbunny@yahoo.com, but people don't

3  provide real email addresses when they sign up.  In fact, some

4  of the -- in the declarations we talked about the fact that,

5  you know, before 2015, for instance, you could just -- at CVS,

6  you could just walk in the store and get a card.  So many of

7  the loyalty card swipes aren't even going to have information

8  with them.  Walgreen's said that only 25 percent of loyalty

9  members have ever provided an email and that email address has

10  never been verified.  But in contrast, you are going to have a

11  name and address in nearly every case of the verified

12  prescription database.

13          Plaintiffs have not cited a single case, we have

14  looked, we have not found a single case where one database with

15  the true source of that data was insufficient and that some

16  newly created, almost phonebook search was required.  We're

17  giving plaintiffs what the script -- the information associated

18  with the prescription that's in our dispensing databases.

19  That's the true source of this.  That is exactly what

20  plaintiffs need to effectuate direct notice, and they didn't

21  propose any form of direct notice in the initial class notice

22  proposal.  There was not a single form of consumer direct

23  notice.  It was all advertising.  So it is an overreaction, as

24  Your Honor indicated when we first talked about this.

25          JUDGE VANASKIE:  All right.  Anything else, Mr.

1    Stanoch?

2           MR. STANOCH:  I think enough has been said and

3    Your Honor appreciates the issues.

4           JUDGE VANASKIE:  I think both sides have argued this

5    persuasively.  I am going to take it under advisement and will

6    issue a decision promptly because I know we have to move this

7    matter along.  Thank you very much for both the briefing and

8    your oral arguments today.

9           And unless there's any other business, we'll be

10   adjourned.

11          Go ahead, Mr. Stanoch.

12          MR. STANOCH:  Yes, Your Honor, one unrelated

13   housekeeping matter for next week, just because it was brought

14   to my attention -- in two weeks.  There is a July 6th hearing

15   on the wholesaler issues, Your Honor may recall.

16          JUDGE VANASKIE:  Yes.

17          MR. STANOCH:  That call was originally scheduled to be

18   via Zoom.  Then this call was scheduled for the same day and

19   then a docket entry said this call with the retailers would be

20   live on July 6th.  Nothing ever said with the wholesalers.  So

21   right now I think both sides, the wholesalers and plaintiffs,

22   think July 6th is still on Zoom, which we're fine either way,

23   we just want to make sure that's true because it was odd that

24   the retailer one was rescheduled to live but the wholesalers

25   wasn't.  We just want to make sure we're on the same page.

```
 1          JUDGE VANASKIE:  We will leave that July 6 argument
 2   session via Zoom.
 3          MR. STANOCH:  Excellent.
 4          JUDGE VANASKIE:  It's just a lot easier for everyone.
 5   It's good to see everybody in person but this is easier.  So
 6   that will stay by Zoom and I'll probably see you all on the 6th
 7   of July and see you then.
 8          Enjoy the Independence Day weekend.
 9          MR. STANOCH:  Thank you.  You as well, Your Honor, and
10   everyone else.
11          MS. KAPKE:  Thank you.
12          (The proceedings concluded at 11:31 a.m.)
13          -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -
14          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE
15           -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -
16
17          I certify that the foregoing is a correct transcript
18   from the record of proceedings in the above-entitled matter.
19
20   /S/ Camille Pedano, CCR, RMR, CRR, CRC, RPR     June 23, 2023
21   Court Reporter/Transcriber                      Date
22
23
24
25
```

*United States District Court*
*District of New Jersey*