1          UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW JERSEY
2

3  ────────────────────────────

                            CIVIL ACTION NUMBER:
4  IN RE:  VALSARTAN PRODUCTS
   LIABILITY LITIGATION              19-md-02875
5                                      MOTIONS
                                   VIA REMOTE ZOOM
6  ────────────────────────────   VIDEOCONFERENCE

7      Mitchell H. Cohen Building & U.S. Courthouse
       4th & Cooper Streets
8      Camden, New Jersey  08101
       July 6, 2023
9      Commencing at 11:00 a.m.

10 **B E F O R E:**       THE HONORABLE THOMAS I. VANASKIE (RET.)
                       UNITED STATES SPECIAL MASTER
11

12 **A P P E A R A N C E S**:

13     MAZIE SLATER KATZ & FREEMAN, LLC
       BY:  CHRISTOPHER GEDDIS, ESQUIRE
14     103 Eisenhower Parkway
       Roseland, New Jersey  07068
15     For the Plaintiffs

16     KANNER & WHITELEY, LLC
       BY:  CONLEE S. WHITELEY, ESQUIRE
17         DAVID J. STANOCH, ESQUIRE
       701 Camp Street
18     New Orleans, Louisiana  70130
       For the Plaintiffs

19     NIGH GOLDENBERG RASO & VAUGHN
       BY:  BRETT VAUGHN, ESQUIRE
20     14 Ridge Square NW, Third Floor
       Washington, D.C. 20016
21     For the Plaintiffs

22

23          Camille Pedano, Official Court Reporter
                camillepedano@gmail.com
                   (609) 774-1494
24

25    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1   **A P P E A R A N C E S (Continued):**

2       KIRTLAND & PACKARD LLP
        BY:  BEHRAM V. PAREKH, ESQUIRE
3       1638 South Pacific Coast Highway
        Redondo Beach, California  90277
4       For the Plaintiffs

5       FARR LAW FIRM
        BY:  GEORGE T. WILLIAMSON, ESQUIRE
6       99 Nesbit Street
        Punta Gorda, Florida 33950
7       For the Plaintiffs

8       RIVERO MESTRE, LLP
        BY:  ANDRÉS RIVERO, ESQUIRE
9            ZALMAN KASS, ESQUIRE
        2525 Ponce De Leon Boulevard
10      Suite 1000
        Miami, Florida  33134
11      For the Plaintiffs

12      PRETI FLAHERTY
        BY:  GREGORY P. HANSEL, ESQUIRE
13      One City Center
        Portland, Maine  04101
14      For the Plaintiff Maine Automobile Dealers Association,
        Inc., Insurance Trust
15
        LEVIN SEDRAN & BERMAN LLP
16      BY:  CHARLES E. SCHAFFER, ESQUIRE
        510 Walnut Street, Suite 500
17      Philadelphia, Pennsylvanian 19106
        For the Plaintiff Employers and Laborers Locals 100 and
18      397 Health and Welfare Fund

19      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        BY:  ALLISON M. BROWN, ESQUIRE
20      1440 New York Avenue, N.W.
        Washington, DC 20005
21      For the Defendants, Prinston Pharmaceuticals,
        Solco Healthcare U.S. LLC, and  Zhejiang Huahai
22      Pharmaceuticals Ltd.

23

24

25

```
 1   A P P E A R A N C E S (Continued):

 2        PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
          BY:  FRANK STOY, ESQUIRE
 3             JASON M. REEFER, ESQUIRE
          One Oxford Centre, 38th Floor
 4        Pittsburgh, Pennsylvania  15219
          For the Defendant, Mylan Pharmaceuticals, Inc.
 5
          GREENBERG TRAURIG LLP
 6        BY:  GREGORY COATES, ESQUIRE
          500 Campus Drive, Suite 400
 7        Florham Park, New Jersey 07932
          For the Defendants, Teva Pharmaceutical Industries Ltd.,
 8        Teva Pharmaceuticals USA, Inc., Actavis LLC,
          and Actavis Pharma, Inc.
 9
          HILL WALLACK, LLP
10        BY:  STEPHANIE-ROSE ORLANDO, ESQUIRE
          21 Roszel Road
11        Princeton, New Jersey 08540
          For the Defendants, Hetero Drugs and Hetero Labs
12
          ULMER & BERNE LLLP
13        BY:  JEFFREY D. GEOPPINGER, ESQUIRE
          600 Vine Street, Suite 2800
14        Cincinnati, Ohio 445202
          For the Wholesaler Defendants and AmerisourceBergen
15
          NORTON ROSE FULBRIGHT US LLP
16        BY:  D'LESLI M. DAVIS, ESQUIRE
               ELLIE K. NORRIS, ESQUIRE
17        2200 Ross Avenue, Suite 3600
          Dallas, Texas  75201-7932
18        For the Wholesaler Defendant McKesson

19        BARNES & THORNBURG, LLP
          BY:  BETH A. BEHRENS, ESQUIRE
20        2029 Century Park East, Suite 300
          Los Angeles, California  90067
21        For the Retailer Defendants and CVS Pharmacy, Inc., and
          Rite Aid Corporation
22
          CROWELL & MORING, LLP
23        BY:  DANIEL T. CAMPBELL, ESQUIRE
               MARIE S. DENNIS, ESQUIRE
24        1001 Pennsylvania Avenue, NW
          Washington, D.C.  20004
25        For Defendant Cardinal Health
```

1          (PROCEEDINGS held via remote Zoom videoconference

2     before The Honorable Thomas I. Vanaskie (Ret.), United States

3     Special Master, at 11:00 a.m.)

4          JUDGE VANASKIE:  Who will be arguing on behalf of the

5     wholesalers?

6          MS. DAVIS:  D'Lesli Davis for the wholesalers, Your

7     Honor.

8          JUDGE VANASKIE:  Thanks.

9          Who will be arguing on behalf of the plaintiffs or the

10    TPP plaintiffs?

11         MR. STANOCH:  Good morning, Your Honor.  David

12    Stanoch.  I will be initially arguing and then counsel for MSP

13    and MADA, who are also on, Gregory Hansel for MADA, Andrés

14    Rivero and Zalman Kass for MSP, will jump in as well.

15         JUDGE VANASKIE:  All right, very well.  Thank you, Mr.

16    Stanoch.

17         Will anybody else be arguing today?

18         (No response).

19         JUDGE VANASKIE:  Hearing no one else, we'll proceed to

20    hear argument on this extensive motion that has been well

21    briefed.

22         Ms. Davis, are you ready to proceed?

23         MS. DAVIS:  Thank you, Your Honor, yes.  May it please

24    the Court.

25         I thought what I would do is take a step back and talk

1  high level about the facts of where we're at and the law, and I

2  think if we do that, number one, it will make the

3  excruciatingly painful process of going through the individual

4  requests a little bit easier, number one; and number two, I

5  think I can wind into this discussion sort of our counterpoints

6  to some of the things that the plaintiff TPPs have raised in

7  their 18-page letter response.

8          Is that all right with the Court?

9          JUDGE VANASKIE:  That's all right with me.

10         I should let you all know that I have another call at

11 noon so I only have -- sometimes these can go on quite some

12 time but I will have to have a hard stop at about 11:55.

13         MS. DAVIS:  I'll try to pick up the pace then,

14 Your Honor.  Thanks.

15         In this case, with regard to unjust enrichment,

16 Your Honor, the TPP plaintiffs are claiming that wholesalers

17 were unjustly enriched literally thousands of times in a manner

18 that should prohibit them from keeping their profits.  And what

19 they're specifically saying is that every time a TPP plaintiff

20 covered a prescription for VCD, somehow, somewhere a wholesaler

21 was tangentially enriched by that in a way that allowing them

22 to keep their profits would be inequitable and unconscionable.

23         Fundamentally, then, for this unjust enrichment theory

24 to fly, the plaintiffs have to be able to show that a specific

25 wholesaler sold a specific VCD that was covered on a particular

1    date by a specific third-party payor; and to date, the

2    wholesalers have seen zero, not a shred of evidence on that

3    front.

4          Now, what's happened over the past year is that the

5    wholesalers and the plaintiffs have been engaged in core

6    discovery or macro discovery and through that process, the

7    wholesalers have repeatedly come to the Court and said the

8    plaintiffs -- TPP plaintiffs' claims, particularly unjust

9    enrichment, but all of them, should be dismissed because there

10   is no evidence of the essential elements and they have not even

11   pled facts that would show that.  And at each step in this

12   process, the plaintiffs have come to the Court and said, whoa,

13   whoa, whoa, we're in discovery, we're still trying to find all

14   this stuff out, they've begged off.  They said, don't put us to

15   our proof yet, let us stay alive for another day, and on each

16   occasion the Court has allowed that to happen.

17         Even in your ruling, Your Honor, on the motion for

18   leave to amend the complaint, the plaintiffs came in and said,

19   we're going to be able to trace this stuff to the wholesalers,

20   we're going to look at these VCD numbers, and the Court, on

21   Page 12 of that ruling, Footnote 9, said that -- and I believe

22   it's Docket Number 1614 -- said, you know, the plaintiffs make

23   a persuasive case here.  Discovery is ongoing, they need these

24   VCD numbers, and then they're going to be able to link this to

25   particular wholesalers.

1    So the plaintiffs were supposed to take those VCD

2    numbers and go back to their files and tell us which

3    transactions they can say or which transactions they cannot say

4    a specific wholesaler was involved in.  But, of course, after

5    they survived the motion for leave to amend the complaint,

6    that's the last, you know, that we heard of that.

7    Now, where we are with this motion is wholesalers are

8    looking to close the loop.  We are now at the stage where the

9    unjust enrichment claim has been certified, we are presumably

10    headed towards a trial, and so the plaintiffs, with these very

11    tailored requests that are directed only to the unjust

12    enrichment claim, are trying to find out once and for all what

13    evidence do you have that's favorable for you, what evidence do

14    you have that's favorable for the wholesalers, and what

15    evidence must you admit you simply do not have.  And despite

16    having begged for more time through the entirety of this whole

17    case, in response what the plaintiffs say is, too late,

18    Wholesalers, you missed some imaginary window to find out our

19    evidence.  And that just didn't make any sense.

20    Now, the wholesalers are moving forward, getting more

21    specific, going from macro to micro, trying to find the detail

22    that would support these claims that are apparently headed

23    towards trial.

24    The plaintiffs, the TPP plaintiffs, are going in the

25    other direction.  We are literally being asked right now for

1    discovery that relates to not the certified unjust enrichment

2    claim but claims that are stragglers for individual class reps

3    that are now just an individual plaintiff on things that

4    survived the motion to dismiss.

5              So there can be no question that the parties are

6    engaged in discovery; there can be no question that the TPP

7    plaintiffs have the burden of proof on unjust enrichment; and

8    there can be no question that after all of these years, the

9    wholesalers are entitled to the information they request to

10   defend themselves at a trial of the case.

11             Now, real quickly, because I think we're all in

12   agreement on this, but the elements of the unjust enrichment

13   claim are set forth by Judge Kugler in Docket Number --

14             JUDGE VANASKIE:  They have been fully set forth.

15             Plaintiffs, as I understand it, the TPPs have agreed

16   to produce -- respond to certain requests, have rephrased the

17   requests, you sent me the red-lined version.  Why isn't that

18   sufficient?

19             MS. DAVIS:  Let me tackle that.

20             So you saw the red-lined version and if you can read

21   through that, what they are saying is, we will produce the

22   documents we intend to rely on, not all documents we have that

23   relate to these things but the documents we intend to rely on,

24   and they only really talk about producing things related to

25   some claims data, contracts with the wholesalers, and documents

1  regarding wholesaler wrongdoing.

2          That is so compressed, Your Honor, as to have been a

3  nonstarter.

4          That having been said, with regard to what they put

5  into their letter brief, here is where I think we are, my

6  reading of what they said.  I'm sure they will disabuse me of

7  this notion if I'm incorrect.

8          They have said they will answer Requests 1, 2, 5A

9  through P, in their entirety, as written, and will state that

10 they do not have responsive documents if they do not have them.

11 And we're okay with that as long as plaintiffs are willing to

12 explain certain data fields if we need help on those, given

13 that some of the stuff is in an Excel spreadsheet with cryptic

14 notations.

15         We, as a result of that, are willing to table Requests

16 3, 4, the remainder of 5, Q and things that we have tabled

17 before, and Request Number 6.

18         So that leaves us with Requests 7 through 28 on what

19 is really a small number of topics:  Elements of unjust

20 enrichment, value of the VCDs to the TPPs, damages to the TPPs,

21 interactions between wholesalers and TPPs, and then the

22 communications leading up to the MSP assignments.

23         Now, Judge, if I may, since I -- I'm going to jump

24 over the core elements of unjust enrichment because we are all

25 on the same page, but I would note that the damages for unjust

1  enrichment can be reimbursement, restitution, disgorgement of

2  profits.

3        Now, the TPPs are not seeking restitution or

4  reimbursement and there's a reason for that:  They know that

5  they're not out any money.  They're not in the red on this,

6  they're in the black on this, and we think we're entitled to

7  prove it.

8        What the plaintiffs say is, oh, no, no, no.  The value

9  of the product, the VCDs, to us and through our insureds, is

10 irrelevant to this proceeding because we are only pleading

11 disgorgement of profits.  And disgorgement of profits is based

12 on what you, Wholesalers, got, not what we lost.  And we agree

13 with that with regard to damages.  But here's where the TPPs

14 are confused.

15       The unjust enrichment claim requires an assessment of

16 the equities between the parties, the context of the

17 communications and the transactions made the basis of the

18 claim, and an assessment of what the wholesalers got and

19 whether or not the TPPs were harmed.  That's for liability.

20 You do not get to worry about your election of remedies for

21 disgorgement of profits or otherwise until you prove that there

22 is liability for unjust enrichment, and without some form of

23 unjustness or inequity, you're not there on liability.

24       So the vast majority of those topics that I just

25 listed, Your Honor, are requests that are directed to these

1    issues of liability.

2           And, you know, their objections, undue burdensomeness

3    and disproportionality, they filed no affidavits in support of

4    this, and as Your Honor is aware, this Court has always

5    required some sort of factual sworn testimony to support those

6    objections.

7           They complain that the requests seek sensitive and

8    proprietary information.  There is a protective order that they

9    have told us from the start of this case is sufficient to

10   protect sensitive and proprietary information.

11          And, of course, they never are able to address

12   relevance because each of these requests are specifically

13   relevant.

14          And, Your Honor, with that, I'm happy to turn to the

15   actual categories of requests but I want to stop there --

16          JUDGE VANASKIE:  All right.  Let's turn to the actual

17   categories of requests.

18          MS. DAVIS:  So Requests 11 through 16, elements of

19   unjust enrichment, so we've got, tell us if you have any

20   documents reflecting the specific benefit that the wholesalers

21   got, Number 12, and what portion of that you believe is unjust

22   for the wholesalers to retain.  Fundamental unjust enrichment.

23   Fundamentally, something that's not been disclosed in this case

24   by the plaintiffs over the life of the case.

25          13, misleading actions by the wholesalers.  I do

1    believe at one point the plaintiffs were willing to produce

2    that information, at least on which they intended to rely.  We,

3    of course, are entitled to any of that information, whether

4    it's helpful to them and whether they want to rely on it or

5    not.

6            14, whether they expected remuneration or payment from

7    wholesalers.  It's our belief, Your Honor, that there has never

8    been any interaction between the TPPs and the wholesalers,

9    there are never any contracts between the TPPs and the

10   wholesalers, and that on every one of these underlying

11   transactions the TPPs have no idea not only which wholesaler

12   was involved but whether a wholesaler was involved.  And if

13   they don't have that information, we're entitled to a statement

14   of that fact in response to appropriate discovery.

15           15 is wrongdoing or unjust/improper conduct.

16           16 is any wholesaler action causing damage.

17           Those are just from the core elements of unjust

18   enrichment.

19           Now, that's Requests 11 through 16.

20           Requests 22 through 28 is -- yes, Your Honor.

21           JUDGE VANASKIE:  It may be helpful for me, Ms. Davis,

22   if I ask Mr. Stanoch to respond at this time with respect to

23   those particular requests.

24           MR. STANOCH:  Yes, Your Honor, David Stanoch for the

25   plaintiffs, and my colleagues for MSP and MADA can feel free to

1    jump in.

2            I'm loathed to do it but just to note two things I

3    heard very early on:  This is not a referendum or

4    reconsideration of Judge Kugler's motion to dismiss rulings.

5    This is not a referendum and reconsideration of Your Honor's

6    ruling and Judge Kugler's affirmance of your ruling on the

7    motions for leave to amend the complaints.  This is not a

8    referendum or reconsideration on the class certification

9    decision, the very long and detailed and yearlong-briefed

10   motion and order that Judge Kugler entered.  So the talk about

11   what plaintiffs will prove and how they will do it and the

12   veracity of their claims, we've been through this multiple

13   times for years and we have substantive rulings at every step

14   of the way on the veracity of our claims.

15           Number two, I keep hearing reference that the TPPs, in

16   their files, may not, may not have reference to specific

17   transactions with wholesalers touching a specific pill.  We

18   have been through this before as well, Your Honor, that we can

19   establish elements through defendants' own files, which we have

20   been working on, as Your Honor knows from prior years of

21   discovery of wholesalers, regarding which defendants touched

22   which product.  There's no requirement in the law that I, as a

23   plaintiff, must have my own record to prove an element of my

24   claim exclusively.

25           On Requests Number 11 to 16, specifically, Your Honor,

1    we're not even sure what else would be produced.  I'm not even

2    sure -- first of all, we stand on all of our arguments in our

3    letter, of course, Your Honor, in terms of the --

4            JUDGE VANASKIE:  Of course you do.

5            MR. STANOCH:  -- timing, et cetera.  I will not

6    belabor all that.

7            In terms of what they are, they're talking about the

8    value and the benefit you allege wholesalers received and the

9    wrongdoing, all of that has been produced, Your Honor.  We

10   produced in response to Request Number 7 that all of these

11   defendants, three years ago almost, including wholesalers, all

12   documents not previously produced that reflect, relate, or

13   refer to any amount for which you seek reimbursement on,

14   including the amounts sought, the amounts of alleged diminution

15   in value of the VCDs as warranted, and as received and/or

16   covered by you or each assignor or its agent and/or any alleged

17   loss of benefit of any alleged bargain you claim herein

18   specified by specific VCD product.  Right?  This was something

19   negotiated a long time ago.  We've produced damages reports,

20   Judge.  We're not starting from the beginning in this case.

21           JUDGE VANASKIE:  Right.

22           MR. STANOCH:  They have our expert report which

23   specifies the benefit alleged that the wholesalers received.

24   Their profits, we've been talking about that for a very long

25   time, the specific benefits and what was unjust, the profits on

 1    the VCDs at issue that were merchanted in this case, and Judge

 2    Kugler affirmed our damages expert's damages methodology as

 3    sufficiently reliable to go forward.

 4              So in terms of all this information, aside from all of

 5    our other objections to it, they have everything that we would

 6    use to show benefit and our damages report; and if there's

 7    additional information that they have yet to produce to us

 8    under CMO 32, of course we can cite that back to them if we

 9    ever get to the point where we need to supplement our expert

10    report.  But as of now, they have all of this and I am not sure

11    what, if anything, else there would be.

12              JUDGE VANASKIE:  Mr. Stanoch, where do things stand

13    with respect to the compliance with CMO 32?

14              MR. STANOCH:  In terms of CMO 32, and to remind

15    Your Honor, CMO 32 spoke exclusively of ordering downstream

16    defendants, retailers, and wholesalers to produce information.

17              JUDGE VANASKIE:  Right.

18              MR. STANOCH:  Nothing talked about plaintiffs to

19    produce anything additionally because they never asked at that

20    point because they had all these opportunities years ago.

21              With the wholesalers specifically, they have produced

22    data responsive to one of the subcategories ordered by CMO 32.

23    They are -- that's the amounts paid and the amounts charged for

24    VCDs, I believe.

25              JUDGE VANASKIE:  Go ahead.

1      MR. STANOCH:  They are still working on their own on

2  the profits issue.  We had a call I believe before the July 4th

3  holiday.

4      And then custodial discovery, we're still trying to

5  meet and confer with them on that but that's really gone

6  nowhere at this point and we are much more progressed with the

7  retailers, for example, where, Your Honor, we presented a joint

8  schedule on RFPs, search terms, deadlines for custodians,

9  30(b)(6)'s.  We're nowhere close to that with the wholesalers.

10      JUDGE VANASKIE:  All right, thank you.

11      Anything else on Requests 11 through 16?

12      MR. STANOCH:  I don't think so.  Unless one of my

13  colleagues has something else to add, Your Honor, I think

14  Your Honor appreciates the issues.

15      MS. DAVIS:  Your Honor, if I may, I think what they're

16  saying is that they don't have any responsive documents to 11

17  through 16 in their own files, that they're going to do some

18  work with the documents produced by the other defendants, but,

19  Your Honor, I would suggest we're entitled to that statement in

20  response to formal discovery.  If they don't have it, they need

21  to say it; and the reason they don't want to say it is because

22  they realize how devastating it is to their claim.  But this

23  dodge about pointing everywhere else and playing with times and

24  the shell game of timing is inappropriate.  These are core

25  fundamental requests and why they can't say that they don't

1   have any documents that show that there was a specific benefit

2   generated by them to the wholesalers is beyond me.

3           MR. STANOCH:  That's not what -- I'm sorry.  May I

4   respond?

5           JUDGE VANASKIE:  You may respond, Mr. Stanoch.

6           MR. STANOCH:  Ms. Davis's statements are very, I

7   believe, not tethered to the requests we're really focused at

8   issue.  This is not asking for things in our files or it's not

9   asking for documents that the wholesalers have.  They're not

10  reflected in the actual wording of 11 through 16.  Plus,

11  there's no shell game on the timing.  The chronology speaks for

12  itself.  And this idea that if we don't have documents we are

13  not saying something, we have agreement I heard on all of the

14  burdensome data requests which we've agreed to, notwithstanding

15  our objections, where we've said we will respond and produce

16  data or state that there's no additional data for the various

17  subparts.

18          So we're not trying to hide anything.  We've said

19  exactly what she's asking for, for the requests which we think

20  are appropriate at this period.

21          JUDGE VANASKIE:  Thank you.

22          MS. DAVIS:  Your Honor, I'm ready to move on to

23  Requests 22 through 28 if it's --

24          JUDGE VANASKIE:  Let's do so.

25          MS. DAVIS:  These are the requests that relate to the

 1  value of the VCDs to the TPPs or their insureds.  A lot of

 2  acronyms there.  I apologize.

 3          22 is the value provided to the insureds by the VCD,

 4  23 is the value provided to you, the TPP, and they go through a

 5  number of documents culminating in Number 28, which is

 6  essentially the profits to the TPPs.

 7          Now, as we discussed, in trying to determine whether

 8  it is unjust for McKesson to retain, as an example, and a

 9  wholesaler, whatever payment it tangentially received through

10  its supply chain provision of a particular VCD, say, to a

11  pharmacy, it is appropriate to look at the juxtaposition and

12  the situation and the equities between the parties.  And the

13  plaintiffs keep talking about this idea that the VCDs were

14  worthless to them.  They invoke Judge Kugler's warranty motion

15  to dismiss order, which talks about worthlessness, and they

16  pretend to say that Judge Kugler somehow has ruled on the

17  merits, as a matter of law, that there's liability for the

18  wholesalers, and that's not what happens in a motion to

19  dismiss, clearly; but also he was talking about contractual

20  claims, benefits of the bargain, meeting of the minds.  We are

21  in the equitable world.  And so if we were to find that the

22  plaintiffs got the product and actually made money off each of

23  these transactions, that would be very relevant to the equities

24  between the parties and whether McKesson was running away with

25  some ill-gotten gain.

1          And I would also point out that each of these relate

2    to the unclean hands defense as well.  And the unclean hands

3    defense here, Your Honor, is that the TPPs are saying that the

4    wholesalers, without any knowledge, came into possession of

5    VCDs that were tainted, turned around and sold them without

6    knowledge, and somehow profited off that.  Well -- and then

7    they say they didn't do that, they didn't profit off a sale of

8    a VCD, but they profited off their purchases of VCDs.  As they

9    made those purchases, they fulfilled their contractual

10   insurance arrangements, they were collecting co-pays, they were

11   having insureds be satisfied because they were getting their

12   prescriptions covered, and we believe there's actually a

13   specific cost associated with a lot of these transactions by

14   the health insurance company TPPs on which they were literally

15   profiting from the processing and the passing of the VCDs on

16   further through the system.

17          So each of these value issues relate to whether the

18   plaintiffs come into court with unclean hands.  And, of course,

19   that's the haggling --

20          JUDGE VANASKIE:  How would you value an insured's

21   satisfaction?

22          MS. DAVIS:  Well, I think we have to get experts to do

23   that once we see what their own presentations say at the end of

24   the year.  Hey, we've had a great year, we fulfilled all of

25   this, this is what we made on individual transactions, this is

1   how many repeat signups we have, this is how much we've been

2   able to increase the premiums for a good service the year

3   before.  I mean, I think it's all within the business records

4   of those companies how they valued their ability to fulfill

5   these services, what value they placed on meeting their

6   contractual obligations; and then, of course, Judge, you just

7   can't skip over it, right, the therapeutic value to the

8   insured.

9         So the insured is taking a blood pressure medication

10  and they make it through the year without a heart attack or a

11  stroke, how do you value that?  I think we would have to have

12  expert testimony.  But what do the medical records in the TPPs'

13  own files say about that?  Are they collecting that, yes, we

14  see that Valsartan has been a good drug for this patient; we

15  will continue to keep it on this formulary; we will continue to

16  approve that prescription.  We'll cover it.  It's good.

17        All of those things are value, all those things relate

18  to the equities between the parties and the unclean hands.

19  Right?  So it's liability as well as the affirmative defense.

20        And in a gutsy move, right, the plaintiffs' response

21  to this is, oh, this discovery is not -- on unclean hands is

22  not too late, it's premature.  So, you know, I thought we were

23  headed to trial, I thought we were trying to get the core

24  documents.  I thought the plaintiffs needed to be held to

25  answer whether they do or do not have relevant evidence,

1  whether it helps them or hurts them, not what they intend to

2  rely on but what they have in their files, and very clearly

3  these requests relate to what these TPPs have in their files.

4      So, with that, we believe that on both liability and

5  unclean hands affirmative defense, each of 22 through 28 are

6  required for production or for a statement we don't have it.

7      JUDGE VANASKIE:  All right.  Do you want to reply, Mr.

8  Stanoch?

9      MR. STANOCH:  I will, Your Honor.  And it's

10 breathtaking to hear argument again at this stage, years into

11 the case, about value and therapeutic value of the VCDs.  We

12 put in our letter, and, again, I won't belabor this either,

13 Judge, this has been discussed and argued between three

14 different jurists, yourself, Judge Kugler, Magistrate Judge

15 Schneider, ad nauseam for years, we've crossed this bridge, it

16 was a flashpoint of discovery for years.  On class

17 certification, Judge Kugler rightly said that the therapeutic

18 value does not -- is not disabling to our damages expert's

19 report.  And just like in the *BCBS v. GlaxoSmithKline* case,

20 where Dr. Conti was an expert there, any value and failure

21 allegedly to discount for therapeutic value of a drug is a

22 credibility determination to be made.

23     In terms of the profits that the TPP plaintiffs made,

24 as a matter of law, Your Honor, unjust enrichment, it focused

25 on defendants' gains, not plaintiffs' conduct and losses.  I

1  don't think we need to argue that any more.  I think the case

2  law is very clear.

3        These entities, too, MSP's assignors and MADA, they're

4  not in the supply chain.  They keep saying, oh, you're equally

5  culpable, maybe you did something too, even if unclean hands,

6  which we've never had an answer in this case so, of course,

7  it's that we haven't been able to deal with this and test an

8  unclean hands defense legally because they haven't been ordered

9  to file an answer, they don't touch the product.  They're a

10  different type of entity.  They are not taking it and then

11  selling it at a markup to a consumer themselves in which case

12  maybe, oh, well, you know, you did the same thing as

13  wholesalers, you made a profit too, that should be part of the

14  damages calculation and offset somehow equitably.  That's not

15  the case here; that's not the reality.

16        MSP's assignors and MADA are just passive entities

17  who, at the point of sale, are contributing reimbursement money

18  to the drug.  They're never merchanting in the product, they're

19  not profiting on the product, even if that was relevant.

20        A number of these documents, too, Your Honor --

21  obviously, all of the objections that are in our letter we

22  stand on.  A number of these documents Ms. Davis talks about,

23  oh, things they considered or value or things of that nature,

24  these requests talk about things that were already produced.

25  Formularies, Pharmaceutical and Therapeutic Committee meeting

1   minutes.  Those are the meetings, right, of the subgroups

2   deciding which drugs will be covered and if they're covered,

3   does it have a value or not, and the tier placement, all of

4   that's there.  All of the data, all of the data on all of the

5   transactions that these claims and all of the reimbursement

6   data that Your Honor has dealt with over the last eight months,

7   MSP has now produced supplementally, they have all that.

8        So I don't believe, given the nature of the claim and

9   the reason, which is unjust enrichment, right, which focuses on

10  the defendants, and the long history of discovery in this case,

11  that there's anything else that MSP and MADA, at this juncture,

12  nearly four, five years in the case, should have to respond to.

13  Even if they don't have it, right, I think that itself is

14  disproportional and unduly burdensome.

15       And I'll note that all of the discovery of the

16  wholesalers to this point, right, was non-custodial and very

17  narrowly focused, and Magistrate Judge Schneider wanted us to

18  do that, he emailed us in 2019 to do that.  The requests we had

19  to enter as to wholesalers specifically say it's non-custodial.

20       So for them to turn around now and say, oh, we need

21  everything from their custodians about value and medical

22  records and things of that nature, we think it's completely

23  disproportionate and unduly burdensome and completely

24  untethered to the actual claim, unjust enrichment, that they

25  say they need it for, which they knew about for the last four

1    years.

2           MS. HANSEL:  May it please the Court, Your Honor, Greg

3    Hansel for MADA.

4           MADA, by statute, is a nonprofit multi-employer

5    welfare arrangement under Maine statute.  We do not make a

6    profit.  Even if we did, the measure of damages in an unjust

7    enrichment claim is the benefit retained by the defendant, not

8    the plaintiff's loss or profit.  So it's irrelevant.

9           I'm baffled by some of Ms. Davis's arguments.  She

10   argued that the wholesalers have a tangential role.  Their role

11   is not tangential.  They are directly a crucial part of the

12   supply chain between manufacturers and pharmacies.

13          She also said, if, if wholesalers somehow profited,

14   well, I thought their business model was to buy drugs from

15   manufacturers, mark them up and resell them to pharmacies.  So

16   if they weren't making a profit, maybe they wouldn't be, you

17   know, some of the largest businesses in this country and most

18   profitable.

19          The wholesalers also do not explain why it matters

20   that this is an unjust enrichment claim where Judge Kugler

21   ruled on the motion to dismiss that the drugs were worthless.

22   Why is unjust enrichment damages different where the Court has

23   stated the drugs were worthless in the context of warranty?  So

24   it's a distinction without a difference.

25          Your Honor, we believe the requests should be denied.

1    Thank you.

2        JUDGE VANASKIE:  Thank you, Mr. Hansel.

3        MS. DAVIS:  Your Honor, that's just not the law.  They

4    keep talking about damages and the choice of their damages, but

5    the justness issue is relevant.  And I won't read it to you but

6    I would point you to two cases cited by the plaintiffs in their

7    letter, *Cohan v. Minicozzi*, that is 2016 WL 5798900, Superior

8    Court of Connecticut.  The Court says, the defendant was

9    benefited by plaintiff's work, he failed to pay for that work,

10    and plaintiff has been financially harmed as a result.  They

11    are looking at whether the plaintiff has been harmed.

12        The other case is *Swan Media Group v. Staub.*  In New

13    York, to prevail on a claim of unjust enrichment -- this is the

14    liability piece, not damages -- the plaintiff must establish

15    the defendant benefited at the plaintiff's expense and then the

16    equity and good conscience.  Where is the good conscience

17    coming from?  It's coming from a look at the totality of the

18    circumstances.  Equity and good conscience then require a

19    remedy for that.

20        So the plaintiffs' own mandates in their cited law

21    says that when you're looking at the liability here, we have to

22    factor in the justness.

23        I do want to mention tangential.  The reason

24    tangential is important is wholesalers are completely

25    tangential when it comes to TPPs.  They are over here on a

1    supply chain, manufacturer to wholesaler to pharmacy.  There is

2    a complex insurance system that almost nobody can figure out

3    between the TPPs, their administrators, how they cover a claim,

4    what they pay, when.  Never the twain shall meet, Your Honor.

5    And it is that fact that plays, again, into the justness, the

6    directness of the relationship, and other elements of

7    liability.

8         And the last thing I would say on this point, because

9    Mr. Stanoch says it about a lot of things, he said they have

10   all that, that all is out there, that.  What is where,

11   Your Honor?  We ask specific requests and if that has been

12   produced, great, cite it to us.  If you don't have it, great,

13   we will move on.  But this is a search for relevant element

14   evidence that the plaintiffs have been saying for years they

15   will get to and they haven't, and as we head in the

16   homestretch, the wholesalers are entitled to it.

17        Your Honor, I think the next two categories, damages

18   to the TPPs, communications and contracts with the wholesaler

19   defendants, are very fundamental types of requests for

20   production.  I am going to jump over those for that reason and

21   go to the last category.

22        JUDGE VANASKIE:  All right.

23        MS. DAVIS:  Request Number 10 is communications

24   culminating in the assignment.  So this is directed to MSP and

25   its assignors.  This is not Mr. Hansel who's MADA over there.

1  These are the assignments made by the various TPPs to MSP,

2  which has repeatedly been called a debt collector, a litigation

3  vehicle in the reported opinions about MSP.  And if MSP is

4  going to be a class rep, if this litigation vehicle is, as it

5  is now a confirmed class reps, then defendants are entitled to

6  understand how those assignments work, how they were

7  negotiated, what the intention of those assignments was, and

8  what the scope of those assignments as informed by these other

9  documents is.

10        And we've cited two cases, *MAO-MSO v. Mercury*, that's

11  2023 WL 1793469 at 2 from the Ninth Circuit; and then *MAO-MSO*

12  *Recovery v. Farmers Insurance*, 2022 WL 1690150 at 7 through 9.

13  And what the Ninth Circuit says is, look, we started looking

14  into all this information in the assignments and when you look

15  at extrinsic documents, hey, we found that the particular

16  assignors in issue had already assigned these claims to another

17  entity; therefore, this assignment is invalid.

18        The *Farmers* case, similar.  The discovery after

19  looking at these negotiations and the documents related to the

20  assignment list, MSP didn't own the claims at all.

21        So this is a test.  There's a request to get the

22  documents that would test the scope, the validity, the limits,

23  and the nature of the claims that were intended to be included

24  in the assignments.  We do have the assignments.  There is a

25  need to go beyond that particularly, as these courts have

1    found, but we're talking about a really quirky, ginned-up

2    vehicle to try to pursue claims on behalf of other entities

3    that are not technically before the Court.

4              JUDGE VANASKIE:  But why would not the assignments

5    themselves answer the question?

6              MS. DAVIS:  Just as in those two cases, if we look at

7    the relevant documents and we see that, oh, this assignor had

8    already assigned these claims or the underlying document here

9    says we will not assign you these claims, despite the existence

10    of this assignment, we may find that MSP, as in these other

11    cases, do not have the claims that they purport to have in the

12    assignments they produced in the litigation.  It is testing the

13    validity of those assignments and there is certainly enough

14    question about this litigation vehicle, how they do business,

15    and what the negotiations are that that testing seems warranted

16    and we shouldn't have to take MSP's word at the face of the

17    assignment that all is good and clean here, particularly in

18    light of past findings that that's not been the case.

19              JUDGE VANASKIE:  All right.  Who will be responding on

20    that?

21              MR. RIVERO:  Judge, I would like to --

22              JUDGE VANASKIE:  Mr. Rivero?

23              MR. RIVERO:  Yes, Your Honor, Andrés Rivero, but just

24    briefly, and Mr. Kass will go into the details.

25              Judge, I just want to note, this case is many years

1    old.  I was involved in the negotiation of the plaintiffs fact

2    sheets at the very beginning of the case where one of the

3    central issues was the production of these assignment

4    contracts.  They were produced years and years ago, discovery's

5    been ongoing for years, and this is very, very late in the game

6    -- by the way, Ms. Davis's characterization of the case is

7    that's about the ultimate claim, not about the assignments.

8    This is way, way late in the game when they've had knowledge

9    about these assignment agreements, have had the assignment

10   agreements, Judge, I don't want to exaggerate, but I'm

11   remembering four or five years.

12          So I'll defer to Mr. Kass on the details.

13          MR. KASS:  Your Honor, just to build off of that, this

14   entire hearing, you know, Ms. Davis started off saying we need

15   information about the unjust enrichment claims.  What these

16   arguments are simply saying are -- they are attacking the

17   validity of the assignments.  It has nothing to do with the

18   unjust enrichment.  We haven't heard any explanation why this

19   hasn't come up in the past four years.

20          Your Honor, what hasn't been mentioned is that

21   defendants had the opportunity and, in fact, did depose MSP's

22   corporate representatives who signed and who negotiated these

23   assignment agreements.  They have deposed the assignors.

24   Your Honor, if they had any questions about the scope of the

25   assignments that cannot be answered from the face of the

1  assignment, which would be quite surprising, Your Honor,

2  because the assignments say exactly what is being transferred

3  over, if they had any additional questions, they had

4  opportunities at a deposition to ask the assignors.  So it's

5  unclear now what they want.

6      Your Honor, if you read what they're asking for in the

7  actual requests, okay, is, okay, so for each claim that you

8  obtain through an assignment, any and all communications

9  between you and that party making the assignment reflecting the

10  negotiation of that assignment.

11      Your Honor, that is extremely broad, asking for any

12  email, any detail, and they haven't even said specifically what

13  they're looking for other than maybe we'll find something that

14  maybe will show that maybe you don't have these claims.

15  Your Honor, that's a purist fishing expedition.  They haven't

16  shown any valid basis for it here; they haven't explained why

17  they haven't asked for it before.

18      Your Honor, at this point in time our position is it's

19  too late, it's unduly burdensome, and, Your Honor, frankly,

20  there's no real need for it.

21      So unless Mr. Andrés or anybody else has anything else

22  to add.

23      MR. STANOCH:  I hate, Your Honor, to triple-team Ms.

24  Davis but I know she can handle all three of us.

25      Just procedurally, as Mr. Rivero noted, there was

1    extensive negotiation for the fact sheet, the TPP fact sheet,

2    that MSP had to respond and the assignments were a very hot

3    issue there.

4         There was another set of RFPs which wholesalers

5    signed, right, years ago, any agreements or contracts which

6    reflect, refer and/or relate to any agreement between you and

7    an assignor, and it goes on.

8         So the idea that maybe there's some other side

9    agreement that Ms. Davis is implying may exist, it would have

10   already been produced, if any, right, under these requests,

11   separate from the fact sheets as well.  And then as Mr. Kass

12   mentioned, both MSP and the assignors were all deposed, they

13   were all asked about it, nothing else came up there.  And then

14   I'd be remiss if I did not add that Judge Kugler already found

15   that MSP is an adequate class representative on behalf of the

16   assignors at issue in this case, and it would be an attack and

17   a reconsideration of that order and ruling to start coming in

18   now to say they lack standing or the assignments are not valid

19   or they're inadequate when that issue was directly bearing on

20   the adequacy as a representative and it was found to be met by

21   the Court.

22        JUDGE VANASKIE:  Thank you.

23        Ms. Davis.

24        MS. DAVIS:  Yes, I think I can wrap up.  I know we are

25   at three-quarters after the hour and you've got a hard stop.

1     At core, these requests for production are directed at

2  searching out relevant evidence for the one claim that the TPPs

3  have moved for class cert on and that it is anticipated that

4  there could be a trial on it.  Aware then that there's a trial,

5  that has crystallized the need for the marshalling of the

6  evidence that exists on these claims and that has not been

7  clearly delineated by the TPPs to date, despite their repeated

8  promises to the Court that we're going to get there, we're

9  going to link these things to wholesalers, we're going to show

10  how wholesalers fit in all this, we're going to show you

11  traceability, we're going to show you that there was an unjust

12  portion of what the wholesalers got, we'll let you know what

13  that is.  It's never happened and we're on a track here.

14     We are narrowing issues and, in all candor,

15  Your Honor, it would be nearly impossible for the wholesalers

16  to have a full and fair defense presented to the jury without

17  this information.  Judge Kugler has said he would never send a

18  party to trial without the basic discovery that they need, and

19  as this case has proceeded from macro discovery to class

20  certification issues to decisions about what can be in the

21  pleadings, always was a later date to talk about specific

22  claims and specific evidence related to those claims once we're

23  in the trial.

24     It's appropriate for the wholesalers to get to serve

25  these here.  And I think what we've heard, Judge, honestly, is

1    that most of this stuff does not exist in the TPPs' files.  And

2    so any burden argument is unlikely.

3         I do not believe that the parties have -- I do not

4    believe that the TPP parties have this information and it's

5    fair to require them to say so.

6         Thank you, Your Honor.

7         JUDGE VANASKIE:  All right.  Anything else?

8         MR. STANOCH:  Your Honor, David Stanoch.

9         There's many things I would say in response to that.

10   I will just leave it that we all disagree with the

11   characterization, and issues about unjust enrichment damages

12   and a potential trial has absolutely nothing to do with

13   wholesalers belated attempt to get all documents about these

14   assignments at issue.

15        And she references, which I think is an inappropriate

16   reference, to Judge Kugler's statement.  That was about

17   supplemental expert reports that focused on the first subclass

18   trial against ZHP, Teva, and Torrent.  It had nothing to do

19   with new fact discovery.

20        Also, she says she has a right to get the discovery.

21   She did.  She had years.  Our chronology speaks for itself.

22   All the defendants were there every step of the way.  This very

23   issue of assignments and everything else in their letter, this

24   was all part of what they wanted, no one was denied anything.

25   That's different than the plaintiffs who tried to get things

1  specifically and were told deferred and wait.  That's what CMO

2  32 ordered us to get.  That's why CMO 32 didn't order TPPs to

3  produce anything else.  The wholesalers had their shot

4  repeatedly.

5          MS. DAVIS:  I would just note for the record,

6  Your Honor, the wholesalers, before the entry of CMO 32,

7  briefed that they wanted discovery.  While all this discussion

8  was going on about discovery, the TPPs raised and requested

9  discovery -- I'm sorry, the wholesalers raised and requested

10  discovery from the TPPs.  It simply was omitted.  Nobody talked

11  about it in the order.  I don't think it was even an

12  intentional denial.  I think it was a complete oversight.

13          So pretending that just because CMO 32 doesn't have

14  discovery directed at the TPPs is not a fair representation.

15          MR. STANOCH:  The chronology speaks for itself, Judge.

16          JUDGE VANASKIE:  Thank you, Mr. Stanoch.

17          Mr. Hansel, Mr. Rivero, Mr. Kass, anything else?

18          MR. RIVERO:  Nothing further from MSP, Your Honor.

19          MS. HANSEL:  Nothing further from MADA.  Thank you,

20  Your Honor.

21          JUDGE VANASKIE:  All right.  I'm sorry we had a hard

22  stop but I think we are getting close enough to it now that we

23  will adjourn for the day.

24          You've given me a lot to chew on here and I will try

25  to get a decision out as soon as I can.  Unfortunately, I will

 1    be in Pittsburgh next week so I don't think you will get

 2    anything from me before the end of next week on this issue.  So

 3    I beg for your indulgence and patience, and I will get

 4    something out promptly, as prompt as I can.

 5            Anything else?

 6            MS. DAVIS:  Thank you.

 7            MR. STANOCH:  Your Honor, I just think in Ms. Davis's

 8    rendition of the different requests, I think she might have

 9    overlooked the one about contracts with wholesalers, or did we

10    reach agreement then today, Ms. Davis?

11            MS. DAVIS:  No.  I think I skipped over them because I

12    thought they were sort of self-explanatory and well-briefed by

13    both sides.  If you want to slug it out, we can, but I was

14    trying to pick up the pace and not talk about things we

15    considered fundamental and that I think the parties have joined

16    issue on.

17            MR. STANOCH:  One thing.

18            JUDGE VANASKIE:  Mr. Stanoch, yes.

19            MR. STANOCH:  Very briefly, Your Honor.

20            These requests about any contracts with wholesalers

21    and documents relating to same, the fact is, again, all of our

22    objections are in the letter, this isn't give us any contract

23    you, MADA or MSP assignors, have with a wholesaler defendant

24    relating to VCDs.  It's give us any contract or agreement you

25    may have with a wholesaler for any reason; and on top of that,

1    give us any documents relating to or discussing or concerning

2    any such agreements.  Right?  And our proposal was very

3    rational, based on all the court-ordered discovery in other

4    instances earlier where if there is any agreements or contracts

5    with wholesalers and the at-issue entities regarding VCDs, they

6    be produced or would say none exist.  Everything else

7    collateral that's something that's not about VCDs and doesn't

8    touch on it or documents about those VCD agreements, if any,

9    well beyond the scope of what wholesalers have had to do or

10   retailers or any other party.  So we just wanted to underscore

11   that.

12           MS. DAVIS:  Your Honor, briefly on that.

13           I mean, we seek contracts or agreements between the

14   wholesalers and the TPP class reps.  That is so fundamental as

15   to be, you know, elementary.  Then we seek any communications

16   between the two regarding the actual claims in the case or

17   regarding the VCDs at issue in the case.  And they say, oh,

18   we'll give you some contracts; we're not going to talk to you

19   about these communications with regard to the claims or the

20   VCDs.

21           So that's another nonstarter, Your Honor.  I mean, the

22   communications between the parties with regard to the specifics

23   of the case, fundamentally relevant, fundamentally have not

24   seen in this case, have not been produced in this case by the

25   TPPs.

1          MR. STANOCH:  Neither have the defendants.

2          MS. DAVIS:  There are none.  We don't have any.

3          JUDGE VANASKIE:  All right.  I think that will be it

4    for today, then.  I will issue a decision.

5          Camille, thanks for your patience and we will look

6    forward to getting the transcript from you and we will move

7    forward.

8          Thank you all very much.

9          MR. STANOCH:  Thank you, Judge.

10         MS. DAVIS:  Thank you, Your Honor.

11         (The proceedings concluded at 11:53 a.m.)

12         - - - - - - - - - - - - - - - - - -

13         FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

14          - - - - - - - - - - - - - - - - -

15

16         I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   /S/ Camille Pedano, CCR, RMR, CRR, CRC, RPR    July 8, 2023
     Court Reporter/Transcriber                        Date
20

21

22

23

24

25