Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 1 of 17 PageID: 87274

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

2018 WL 7488924
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia, Alexandria Division.

BROOKS SPORTS, INC., Plaintiff,
v.
ANTA (CHINA) CO., LTD., Defendant.

Civil Action No. 1:17-cv-1458 (LO/TCB)
|
Signed 11/30/2018

**Attorneys and Law Firms**

Noah Patrick Sullivan, Gibson Dunn & Crutcher LLP, Washington, DC, Craig Crandall Reilly, Law Office of Craig C. Reilly, Alexandria, VA, for Plaintiff.

Stephanie Grace Stella, Wolf Greenfield & Sacks PC, Boston, MA, John E. Coffey, Redmon, Peyton & Braswell, LLP, Alexandria, VA, for Defendant.

**REPORT AND RECOMMENDATION**

THERESA CARROLL BUCHANAN, UNITED STATES MAGISTRATE JUDGE

 *1  THIS MATTER comes before the Court on Plaintiff Brooks Sports, Inc's ("Brooks") Motion for Sanctions against Defendant Anta (China) Co., Ltd. ("Anta") (Dkt. 63). For the reasons stated below, the undersigned U.S. Magistrate Judge recommends that the Motion be GRANTED.

I. INTRODUCTION

Originally, Brooks moved for sanctions pursuant to Rule 37(b)(2). (Dkt. 63 at 1.) Brooks requested that Anta be precluded at trial from offering evidence of (1) any deductions from gross profits with respect to damages under the Lanham Act; (2) disputing the similarity of the goods or services that the Brooks and Anta marks identify; (3) disputing the similarities of the facilities used by Brooks and Anta; (4) disputing Anta's intent to associate itself with the Brooks trademark; and (5) disputing the similarity of advertising channels used by Brooks and Anta. Brooks also requested that the Court make a finding that Anta engaged in litigation misconduct, warranting an award of attorneys' fees under 15 U.S.C. § 1117(a); issue an adverse inference instruction to the jury at trial that the evidence that Anta has failed to produce would have been unfavorable to Anta; and impose monetary sanctions of no less than $250,000. However, as the sanctions litigation progressed and Brooks began to realize the full extent of Anta's wrongful conduct, Brooks then sought terminating sanctions against Anta.

II. PROCEDURAL AND FACTUAL HISTORY

**A. Factual Background**

Brooks filed a complaint on December 22, 2017, appealing a decision by the Trademark Trials and Appeals Board ("TTAB") (Dkt. 1). Brooks disagreed with the TTAB's rejection of, among other things, Brooks' likelihood of confusion and likelihood of dilution arguments. On March 22, 2018, Brooks filed an amended complaint, which added trademark infringement and trademark dilution claims against Anta (Dkt. 25).

**B. The Discovery Process**

Approximately one month after Brooks filed its amended complaint, the Court entered a scheduling order, which specified that discovery was to conclude by September 14, 2018 (Dkt. 27). On May 9, 2018, the parties filed their Joint Discovery Plan ("Plan") with the Court (Dkt. 28). On May 11, 2018, this Court approved the parties' Plan (Dkt. 30).

Brooks propounded its first set of Requests for Production ("RFPs") and Interrogatories on April 20, 2018. (Dkt. 53 at ¶ 3.) The first set included fifty-eight (58) RFPs and twelve (12) interrogatories. (Id., Exs. A-B.) Over the following three months, Brooks served an additional thirteen (13) RFPs and twelve (12) interrogatories. (Id.) [1] During the initial months of discovery, the parties did not seek any discovery-related relief from this Court.

On July 27, 2018, already several months into the discovery period, Brooks filed a variety of motions, including a Motion to Compel (Dkt. 49). Brooks' Motion alleged numerous discovery deficiencies on the part of Anta. For instance, Anta disclosed only one witness in its Rule 26(a)(1) initial disclosures: Dacheng Peng, a high-ranking corporate officer

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 2 of 17
PageID: 87275

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

of its multi-billion dollar company. (Dkt. 52 at 9; Dkt. 53 at ¶ 5.) Further, although Anta received seventy-one (71) separate requests for productions, Anta produced only 538 documents. (Dkt. 52 at 9-10, 17; Dkt. 53 at ¶ 4.) Anta failed to produce documents pertaining to (1) its business plans, strategic plans, and related documents on entering or conducting business in the United States market; (2) board and executive-level materials related to Anta's current and future business plans in the United States; (3) agreements with third-parties in the United States; (4) sales, revenue and income information for Anta in the United States; and (5) the Brooks and Anta Marks. (Dkt. 52 at 10, 19.)

**\*2** The Court held a hearing on Brooks' Motion to Compel on August 3, 2018. At the hearing, Anta's counsel assured the Court that Anta was conducting a "department-by-department, room-by-room, laptop-by-laptop, person-by-person search for documents." (Hr'g Tr. 13:1-2, Dkt. 62.) Counsel also attempted to explain away any alleged discovery deficiencies by arguing that a small number of documents were to be expected given the limited nature of the case and Anta's preliminary U.S. expansion plans. Anta's counsel informed the Court that "there is simply not the volume and breadth of documents that Brooks believes are out there." (Hr'g Tr. 14:11-12.) The undersigned disagreed and found that Anta had "clearly not complied with all of its discovery obligations," (Hr'g Tr. 15:9-10), and ordered Anta to come into full compliance with its discovery obligations by August 17, 2018 (Hr'g Tr. 17:1-8). As part of its ruling, the undersigned unambiguously instructed Anta's counsel that "this is it, this is [Anta's] only shot at coming into production. If they don't, they're going to start getting sanctioned." (Hr'g Tr. 19:6-8.)

### C. Motion for Sanctions

Upon Anta's failure to comply with the Court's August 3 Order, Brooks filed a Motion for Sanctions on August 24, 2018. Anta filed an opposition and the Court held a hearing on the Motion on August 31, 2018. At the August 31 hearing, the Court did not sanction Anta. Instead, the Court granted Anta another week to comply with its earlier order and directed the parties to appear before the undersigned on September 14, 2018 for a status conference (Dkt. 81). Two weeks later at the status conference, the Court announced it was taking the Motion for Sanctions under advisement and would be issuing a Report and Recommendation in the coming weeks. (Dkt. 104; Hr'g Tr. 61:20-62:6, Dkt. 107). The Court suspended all discovery deadlines while it considered the Motion for Sanctions (Dkt. 104).

The Court also invited the parties to meet-and-confer to narrow the outstanding issues and provide the Court with a supplemental status update. (Hr'g Tr. 63:12-16, Dkt. 107.) Brooks filed its Second Supplemental Status Report on October 10, 2018 (Dkt. 114). On October 18, 2018, Anta filed its Status Update and Response to Brooks' Second Supplemental Status Update (Dkt. 123).

Prior to receiving Anta's October 18 status update, the undersigned had prepared and nearly finalized this Report and Recommendation. But, after reviewing Anta's status update, the undersigned believed that the parties should be given one additional opportunity to clarify as well as summarize any remaining outstanding issues. As a result, the undersigned ordered the parties to appear before the Court for a final status conference. In preparation for the status conference, the Court allowed Brooks to file a response to Anta's status update and Anta to file a reply. Brooks filed its response to Anta's Status Update on November 5, 2018 (Dkt. 135) and Anta filed its reply on November 7, 2018 (Dkt. 142). The parties appeared before the Court on November 9, 2018 for the final status conference.

### III. STATEMENT OF FACTS

Brooks filed a motion to compel nearly three months after discovery began in this case. During those intervening months, Anta produced just 538 documents and named only one individual as part of its Rule 26(a)(1) initial disclosures. (Dkt. 53 at ¶¶ 4-5.) After this Court ordered Anta to come into compliance with its discovery obligations, Anta did provide Brooks with tens of thousands of additional documents. However, even though Anta's production greatly increased, Anta did not cure its discovery failures.

Gaps remain in nearly all of the categories of documents Brooks sought production of in its Motion to Compel. The gaps are especially troubling given this Court's multiple discovery orders. On August 3, the Court ordered that Anta "must fully comply with all discovery requests by Friday, August 17." (Dkt. 61; Hr'g Tr. 17:3-4, Dkt. 62.) On August 31, the Court ordered Anta to "produce everything that you haven't produced" by September 7 (Dkt. 81; Hr'g Tr. 52:5-6, 52:14-16, Dkt. 100), except for WeChat communications, which Anta had until September 12 to produce (Dkt. 81;

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 3 of 17
                                         PageID: 87276
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

Hr'g Tr. 53:18-20, Dkt. 100). Despite these Orders, Anta has not fully complied with Brooks' **discovery** requests for documents pertaining to Anta's U.S. Business Plans, Sales and Financial data, and Anta's internal deliberations regarding the Brooks' trademark, nor has it produced the majority of the requested **WeChat** communications.

### A. Anta's U.S. Business Plans

**\*3** Brooks' RFPs to Anta made numerous requests for United States related documents.[2] Yet, when Brooks filed its Motion to Compel, Anta had not produced any "business plans, strategic plans, and related documents on entering or conducting business in the U.S. Market." (Dkt. 52 at 19.) Specifically, Anta failed to produce documents related to its agreements with third parties in the United States. (Id.) Further, Anta's initial productions did not include "Board meeting minutes, presentations, executive reports, market analysis, or other documents" that addressed Anta's business in the United States, including any expansion plans. (Id. at 20.) After the August 3 hearing, Anta did make supplemental productions. However, those were similarly incomplete and inadequate.

When Brooks filed its Motion for Sanctions three weeks later, Anta still had not produced responsive documents regarding its U.S. business plans.

1. *Agreements with U.S. Third Parties*

One major gap is Anta's failure to disclose agreements with third parties in the United States. In its Motion for Sanctions and status reports, Brooks noted multiple examples of U.S. partners that Anta did not disclose until late in production. (Dkt. 74 at 7-8.) For example, Anta did not disclose its relationship with Fishermen Labs, a Los Angeles-based e-commerce company, until nearly two weeks after the Court's August 17 deadline. (Dkt. 73 at 7.) In fact, Anta only made that disclosure after Brooks discovered a reference to Fishermen Labs in Anta's production and then questioned Anta about the relationship at a meet-and-confer on August 23. (Hr'g Tr. 26:24-27:12, Dkt. 100.) Anta did not officially disclose that relationship until August 29 and had yet to produce any documents pertaining to Fishermen Labs by the August 31 hearing. (Id.; Dkt. 73 at 5, 7-8) At that hearing, Anta's counsel admitted that Fishermen Labs "was not a search term we applied throughout all the documents," (Hr'g Tr. 44:8-9, Dkt. 100), and could not represent what Fishermen Labs documents Anta had in its possession because counsel had "not [yet] done a search for Fishermen Labs in [its] production to see what is there" (Hr'g Tr. 44:18-20). At the September 14 status conference, Anta's counsel attempted to minimize the significance of that disclosure failure, stating that "you know, they keep raising up companies of being this big deal of withholding documents. Fishermen Labs is – designed the AntaAmerica Website, that's what they did. That's all they did. The head of the U.S. design center, David Bond, didn't even know they existed or who they were. They didn't contract with Anta. They contracted with C21." (Hr'g Tr. 44:17-23, Dkt. 107.)

Brooks' subsequent filings in support of its Motion for Sanctions raise similar concerns regarding other agreements with U.S. third-parties. Nearly three-and-half weeks after the Court-imposed deadline for Anta to come into full compliance with its **discovery** obligations, Brooks found additional references to U.S. companies with whom Anta had some form of a business relationship buried in emails. (Dkt. 89 at 7-8.) These newly-identified parties included Tether and Times 10, both U.S.-based companies that are or were assisting Anta with its U.S. business plans. (Id. at 7.) Tether had been working with Anta for nearly a year-and-half and was vigorously pursing business related to "the Anta launch in the U.S." (Id., Ex. H.) Times 10 was chosen by Anta, after an active search, to run its Anta America online business as part of Anta's "brand strategy to enter the US market and build[ ] the Anta brand." (Id., Exs. H, T.)[3] As with Fishermen Labs, Anta did not disclose these parties, nor did it produce documents received or sent to these parties. (Id. at 8.) Thus, Brooks only learned of their existence by reviewing produced emails. (Hr'g Tr. 12:25-13:8, Dkt. 107.)

**\*4** In its October 18 filing, Anta strongly criticized Brooks for insinuating that Tether was assisting with Anta's U.S. plans. Anta informed the Court that Tether worked primarily on Chinese, not U.S., related matters and that Brooks was "misconstruing the documents" so as to "fit Tether into the narrative" that Anta's U.S. business plans are developed and imminent. (Dkt. 123 at 16.)

However, third-party **discovery** received from Tether clearly establishes that Anta did retain Tether to work on Anta's U.S. launch. David Bond, on behalf of Anta, entered into a contract with Tether on May 30, 2018. (Dkt. 136 at 12, Ex. P.) The contract, prepared (not executed) in March 2018, clearly states that Tether is to assist Anta in [redacted] (Id., Ex. P at 3 (emphasis added) ); see also (Id., Ex. N at 2 (March 25, 2018

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 4 of 17
                                              PageID: 87277
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

email from Anta to Tether stating [redacted] ) Tether's work included [redacted] (Dkt. 136, Ex. P at 3.) The contract also provided for Tether to develop a "final go-to-market plan" for the upcoming Anta U.S. launch, (Id., Ex. P at 4), which Tether did create and present a draft plan of to Anta on August 7, 2018. (Id., Ex. Q).

When asked to explain this clear misrepresentation at the November 9 status conference, Anta's counsel stated that David Bond did not originally believe the work Tether was performing for Anta was relevant to the present litigation. (Hr'g Tr. 36:6-15, Dkt. 149.) Counsel further clarified that David Bond "did not remember the fact that he had signed the contract in May of this year." (Hr'g Tr. 36:16-17.)

2. *Documents Related to Investment Banks or Financial Institutions*

Relatedly, at the time Brooks filed its Motion for Sanctions, Anta had not produced any documents or communications involving its contact with investment banks or financial institutions related to its U.S. expansion plans, (Dkt. 65 at 6, 16), even though Anta previously investigated buying Brooks as well as several other companies (Dkt. 89, Ex. E (email from Dennis Tao to Chris Hsieh of Goldman Sachs discussing M&A opportunities, including Brooks) ). By the September 14 status conference, Anta did produce some documents related to U.S. investment banks. (Id.) Brooks also received a limited number of additional Goldman Sachs related documents, including a pitch book that did not mention Brooks, but no other investment bank or financial institution documents were produced. (Hr'g Tr. 8:23-9:6, Dkt. 107.) When asked at the status conference why Anta had not produced any pitchbooks or more substantial presentations, Anta's counsel stated that the documents in question likely did not exist. (Hr'g Tr. 42:16-19.) First, counsel stated he reviewed the emails at issue and could not locate any evidence of a pitchbook or more substantial presentation. (Hr'g Tr. 42:8-15.) Even if pitchbooks were created, according to Anta's counsel, they were never forwarded in any of the emails. (Hr'g Tr. 42:25-43:1.) Second, counsel stated that pitchbooks, if in existence, would not necessarily have to be produced in response to Brooks' RFPs as Anta has "moved on and they didn't make any of those purchases. All these pitchbooks and all this correspondence to Goldman Sachs ... happened back in 2014, four years ago. I don't even know what relevance it has to what Anta is going to be doing today." (Hr'g Tr. 43:12-14, 43:16-18.)

By its October 2018 filing, Anta claimed to have produce any and all documents referencing the three financial institutions Anta previously discussed entrance into the U.S. market with. (Dkt. 123 at 10-12.) Anta also reaffirmed that besides searching e-mails, it searched all locations "where any such additional documents, if they existed, would be found." (Id. at 12.) However, Anta has not still not produced any pitchbooks mentioning Brooks. (Dkt. 135 at 15.)

3. *Anta Board Meeting Minutes and Materials*

**\*5** Anta's supplemental productions only included minutes from one Board meeting where the Board discussed the U.S. market. (Dkt. 65 at 6, 15-16.) Anta produced two additional board documents prior to the September 14 status conference. (Dkt. 89 at 9.) Other Board documents produced by Anta included "pictures of NBA players and Anta personnel, single page images of Board members' signatures ..." (Dkt. 73 at 6.) However, those documents do not address Anta's current or future U.S. business plans. (Id.) Brooks rightly asserts that this is a surprising result given the fact that the United States represents [redacted] and Board minutes that were produced showed the Board discussing investments for "as little as \$2 million." (Hr'g Tr.7:8-17, Dkt. No. 107; Dkt. 73 at 6.)

At the September 14 status conference, Anta's counsel attempted to explain away the small number of produced board documents by resorting to an oft-repeated explanation in this case: the documents were not produced because they "just don't exist." (Hr'g Tr. 31:4, Dkt. No. 107.) Counsel, though not having reviewed all the Board minutes and related documents himself, supported the assertion that no more responsive documents existed by walking the Court through the steps KPMG, an auditing firm retained by Anta, took to search Anta's board minutes. (Hr'g Tr. 31:12-25.) When asked why counsel did not personally review all the Board minutes, as there were only twenty-four (24) relevant meeting minutes at issue, counsel explained that the meeting minutes and related documents constituted "several gigabytes" of data, thus necessitating the use of broad search terms. (Hr'g Tr. 30:15-31:3.)

During the intervening period between the September and November status conferences, Anta produced all of the board meeting minutes dating back to mid-2007, none of which involved a discussion of the U.S. market. (Dkt. 123 at 9.) Although Anta produced all the board meeting minutes, it did not produce many of the corresponding documents the Board reviewed and approved during those meetings. (Dkt. 136 at 16-17.) A significant number of the meeting minutes and

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 5 of 17
                                 PageID: 87278
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

resolutions produced merely state that the Board "reviewed and approved this certain document." (Hr'g Tr. 32:15, Dkt. 149.) When asked why Anta did not produce the underlying documents, Anta's counsel argued that "there is no evidence whatsoever that these actual attachments have anything to do with the launch in the United States." (Hr'g Tr. 36:13-15.)

However, given the potential volume of US business that Anta is seeking (set forth below), it seems unlikely that Anta's US expansion plans could not be discussed at board meetings, and Anta's obvious refusal to produce attachments to board minutes which they approved, must be looked at with some skepticism. Further, it is impossible for Brooks to prove that the attachments concern US expansion plans without actually seeing them.

    4. *Evidence of Anta's U.S. Plans*

For all the aforementioned sub-categories, Anta's counsel repeatedly explained that the documents likely did not exist because Anta did not possess any concrete, imminent plans to significantly expand their business in the United States. (Hr'g Tr. 13:19-14:9, Dkt. 62.) From the outset of the present sanctions dispute, Anta informed the Court that "[b]ecause Anta's plans for the U.S. are, at best, in their infancy, the kinds of documents Brooks demands simply do not exist." (Dkt. 68 at 3.) Anta pointed to its 2018 profile for a U.S. general manager, created by the large recruiting firm Korn Ferry, as proof that its U.S. plans were only preliminary. (Id.) At the hearings, Anta's counsel again expressed confidence that Anta does not "have a big, master plan right now of what they're going to be doing in the United States," (Hr'g Tr. 45:21-23, Dkt. 107), and that "there is just not this treasure trove" of documents of Anta "trying to plan and figure out how [they are] going to get into the [U.S.] market" (Hr'g Tr. 18:23-25, Dkt. 100). In its Second Supplemental Status Report, Anta did not retreat from this position, but instead represented that "Brooks' claims of missing documents and information are *baseless*." (Dkt. 123 at 8 (emphasis added).)

**\*6** However, Anta's own productions as well as productions Brooks received from its third-party subpoenas directly contradict Anta's prior representations about its U.S. plans. For example, productions received from Tether, a U.S. third-party, as well as David Bond's WeChats establish that Anta's U.S. business plans are far from being only half-baked, preliminary matters.

WeChats from David Bond illuminate Anta's concrete U.S. expansion plans. On August 11, 2018, David Bond discussed Anta's pending U.S. expansion plans. Mr. Bond informed several individuals via a WeChat group message that:

  [redacted]

(Dkt. 115, Ex. Q at 5-6.) [redacted] (Id., Ex. Q at 7.) In a separate WeChat message, Mr. Bond also mentioned that he was "making progress on the US plan" and that the "audience for this plan is the *Anta board of directors* (mostly finance people), *Anta management* (mostly operations people) ...." (Id., Ex. O at 10 (emphasis added).) Additionally, his WeChats again confirm that Anta utilized U.S third-Parties, like Tether, to develop their U.S. expansion plan, (Id.), and that those expansion plans involve developing and selling running shoes. (Id. at 16). Moreover, [redacted] (Id., Ex. Nat 7-12, 20.)

Also, an email brought to the attention of the Court at the November 9 status conference, similarly confirms Anta seriously contemplated expanding its share of the U.S. market. The email, from March 2018, between David Bond and Mr. Zheng states that [redacted] (Hr'g Tr. 61:6-11, Dkt. 149.) Another email from March 2018, presumably from James Zheng, states that David Bond is "working closely with me on Anta's U.S. expansion project. He suggests that we need to run serious market study in U.S. and recommends Tether." (Hr'g Tr. 61:14-16.)

Furthermore, Mr. Bond serves in a higher role than previously represented to the Court. At the August 31 hearing, Anta informed the Court that Anta did not want David Bond to be the U.S. general manager as they wanted an executive with more business experience. (Hr'g Tr. 16:18-23, Dkt. 100.) Instead, David Bond was to remain as the head of the U.S. design center, (Hr'g Tr. 16:8-9), and spend, at most, "2.5 percent of his time ... on trying to come up with ... what [Anta is] going to do in the United States market." (Hr'g Tr. 51:8-10, Dkt. 107). Approximately seven weeks later, Anta finally informed the Court, albeit buried deep in an attached exhibit, that David Bond had in fact been offered the General Manager position in *August.* (Dkt. 125, Ex. A at 17.) Emails suggest that the decision to offer David Bond the general manager position was made as early as July. (Dkt. 136 at 8, Ex. H at 3.)

Finally, Anta repeatedly claimed that the U.S. Design Center ("USDC") "is at this time almost exclusively dedicated to designing products for sale outside the United States." (Dkt. 123 at 34); see also (Hr'g Tr. 49:14-24, Dkt. 107 ("Your honor ... I think Brooks has, and I apologize, I think you have

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 6 of 17 PageID: 87279

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

[a fundamental misunderstanding] about the way that Anta is operating their U.S. design center....[Anta has] a design center in the United States, hiring people from the United States that don't want to relocate to China, to design shoes for China.") ). Yet again, third-party discovery establishes that this is not quite true. A July 2018 email shows David Bond discussing design ideas for the U.S. market with members of the USDC. (Dkt. 136, Ex. I.) [redacted] (Id.) Attached to the email is a sketch of a running shoe. (Id.) Per David Bond's WeChats, the design team responsible for working on helping Anta succeed in the U.S. is not a small, insignificant team. In fact, this design team is "[w]orld class" and consists on nine (9) designers, seven (7) of which are based in California. (Dkt. 115, Ex. Q at 5-6.)

### B. Sales and Financial Data

**\*7** In its REPs, Brooks requested that Anta produce documents related to its calculation of profits and costs.[4] However, when Brooks moved for sanctions, Anta had only produced one document in response: a sales spreadsheet. (Dkt. 65 at 14.) In its objection to Brooks' Motion for Sanctions, Anta explained that it "produced a comprehensive sales spreadsheet detailing its revenues, costs, and profits and including over a thousand unique sales entries." (Dkt. 68 at 16.) Further, Anta claimed it should not be required to produce any additional documents as they had met their burden of producing documents "sufficient to show" Anta's costs and profits, (Id.) The Court, at the August 31 hearing, ruled that Anta "must produce the backup financial documents and sales documents that would support the spreadsheet.... So you have to produce everything that would back it up." (Hr'g Tr. 50:16-24, Dkt. 100.)

Per the Court's ruling, Anta began producing additional financial documents to support the data in the spreadsheet they provided. (Dkt. 89 at 10-11.) However, Anta "failed to produce financial statements for large periods of time, including, but not limited to, 2012 to 2014 and the majority of 2018, and only provided summaries of U.S. sales data for the period between 2016 and late 2017." (Id.) Additionally, "Anta also did not provide geographic breakdowns of sales or general ledgers for any years other than 2017." (Id.) During the September 14 status conference, Brooks' counsel further clarified that there were two main categories of missing documents as well as three categories where production remained incomplete or deficient. (Hr'g Tr. 4:12-17, Dkt. 107.) In terms of the missing categories of documents, Anta had not produced any relevant general ledger entries or documents providing the geographic breakdown of sales. (Hr'g Tr. 4:19-5:21.) The categories of documents where production remained incomplete were balance sheets for the U.S. joint venture with Concept 21, profits and loss statements, and cash balance statements. (Hr'g Tr. 5:23-6:8.) Additionally, the documents Anta did produce to back up its spreadsheet were inconsistent with the data provided in the spreadsheet. (Hr'g Tr. 6:9-23.) As Brooks' counsel explained, "there are two problems. One, to the extent we can correlate anything with what they've produced, it appears to be inconsistent and inaccurate. [Two,] the lack of backup documentation for entire periods of time and by geography, mak[es] it impossible for us to make any sense of the spreadsheet or the documents themselves." (Hr'g Tr. 6:17-23.)

In response, Anta's counsel stated he believed Anta had produced "everything that backs up the summary spreadsheets that we produced regarding U.S. sales." (Hr'g Tr. 17:6-8.) Regarding geographic breakdown of sales, Counsel explained that Anta "as a normal course of business" does not "run reports on a geography basis because their sales are so dominant in China that all the other regions, they don't – it doesn't matter to them – They're blips." (Hr'g Tr. 17:18-24.) Further, Anta already exported their entire SAP system to Plaintiff, (Hr'g Tr. 17:14-15), which serves as Anta's only geographic breakdown of sales (Hr'g Tr. 18:3-8). But when asked by the Court if Anta produced the documents Brooks claimed were missing, counsel could not represent to the Court that all of the requested documents had been produced. (Hr'g Tr. 21:15-18.) Anta's counsel, though able to review some of the produced financial documents with a translator and a financial expert, had not yet reviewed the entirety of the financial production. (Hr'g Tr. 21:9-10.) Instead, Anta itself reviewed and produced the requested documents after Anta's counsel provided them with a list identifying documents needed to back up the spreadsheet. (Hr'g Tr. 21:4-9.)

**\*8** For a significant period of time between the September 14 status conference and the issuance of this Report & Recommendation, Anta could not confirm that it provided all necessary financial documents to back up its spreadsheet. (Dkt. 114 at 2.) Anta, though promising to "identify the specific financial documents [it] produced responsive to Brooks' requests," had been unable to confirm due to "the volume of financial information produced," and an interruption caused by a Chinese holiday. (Id., Exs. K, EE.) However, in its October 18 filing, Anta declared it had "produced all information reasonably necessary to identify its

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 7 of 17 PageID: 87280

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

U.S. sales and to support its defenses." (Dkt. 123 at 18.) Anta explained that any problems with its financial information production rested solely with Brooks: "Many of Brooks' complaints are due to the fact that Brooks does not understand Anta's documents." (Id. at 19.) According to Anta, all the information Brooks required was contained in documents already produced and any additional documentation or information sought by Brooks would be too burdensome to produce. (Id. at 19-23.)

Brooks continues to dispute Anta's assessment of its financial data production, stating that the spreadsheet "omits key data and suffers from significant material inaccuracies." (Dkt. 135 at 18.) As an example of Anta's insufficient production, Brooks cites the lack of data pertaining to unauthorized third-party resellers of Anta products in the United States despite the fact that Anta has knowledge of those resellers. (Dkt. 136 at 19, Exs. X, Z; Dkt. 137, Ex. AA at 8.) Other problems include incomplete or contradictory sales data, lack of data to justify Anta's claims of deductible costs from its gross profits, and incomplete or inaccurate data on marketing expenses. (Id. at 20.) Although Anta produced additional international sales data and a supplemental expert report, Brooks could not conduct a sufficient review before its status report response was due. (Id. at 18.)

At the November 9 status conference, Anta's counsel admitted that Anta did possess native data to backup the costs for all eighty-seven (87) of the accused products, but only produced the native data for three (3) of the products. (Hr'g Tr. 42:1-43:10, Dkt. 149.) Counsel explained that it did not produce the data for the remaining products due to "time pressures." (Hr'g Tr. 43:10-15.) Counsel for Anta admitted that Anta could, in fact, produce the data that Brooks repeatedly requested, but simply chose not to. During that same status conference, counsel clarified that Anta had in fact produced the profit and loss statements, but had not produced a general ledger. (Hr'g Tr. 40:23-41:12.)

### C. Internal Deliberations Related to Brooks Trademark

In its initial RFPs, Brooks requested any documents pertaining to Anta's internal deliberations regarding the Brooks' trademark.[5] When Brooks moved for sanctions several months later, Anta's production of responsive documents remained at zero. (Dkt. 65 at 4, 13-14.) The lack of production appeared particularly troubling as the parties' history stretches back approximately ten years. (Id. at 13.) Key flash points between Anta and Brooks include the parties' interactions in 2010 related to Anta's interest in entering the U.S. market, including Anta's attempt to register its mark in the U.S. in 2009; Anta's potential acquisition of Brooks in 2014; and Anta's suit against Brooks in China for trademark infringement in 2017. (Id.) Despite the parties' past, Anta's production did not include any internal discussions or deliberations regarding the Brooks trademark. The only responsive documents produced by Anta involved publicly available annual reports and litigation files from China. (Hr'g Tr. 39:10-40:13, Dkt. 100.)

**\*9** At the August 31 hearing, Anta informed the Court that internal discussions involving the 2017 Chinese litigation already had been, or soon would be, produced. (Hr'g Tr. 48:2-5, Dkt. 100.) Anta's counsel advised the Court that Anta, Chairman Ding in particular, does not "keep a lot of documents" and therefore production of internal deliberation documents would be limited. (Hr'g Tr. 48:6-12.)

In its October 2018 status report, Anta again clarified to the Court that it had in fact produced documents responsive to Brooks' requests as Anta had turned over "thousands of documents containing the word 'Brooks.' " (Dkt. 123 at 23.) Anta stated that Brooks' complaints pertain to lack of emails, not responsive documents, and those concerns are more properly addressed by adhering to the Joint Discovery Plan's email provision. (Id. at 23-24.) Anta cited multiple examples of documents it produced involving internal deliberations relating to (1) Anta's U.S. trademark application and Brooks' opposition to that application, (2) the Brooks Mark and Chinese trademark dispute, and (3) Anta's efforts to acquire Brooks and other U.S. companies. (Id. at 24-26.)

Brooks maintains its assertion that Anta has failed to produce responsive documents in its possession. As an example of Anta's failure, Brooks references a 2017 brand study prepared by Tether. (Dkt. 136 at 10, 21.) The study [redacted] (Id., Ex. K at 6-8), [redacted] (Id., Ex. K at 2). However, Anta did not produce the 2017 study. (Id. at 10, 21.) Brooks only learned of the study through productions made by Tether in response to a third-party subpoena. (Id.)

### D. WeChat Communications

While litigating its Motion for Sanctions, Brooks expressed concern regarding Anta's employees use of WeChat, a popular Chinese communication platform, to conduct

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 8 of 17
                                 PageID: 87281
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

substantive business. (Dkt. 65 at 18-19.) At the time Brooks moved for Sanctions, Anta had not yet produced any WeChat communications, which serves as a "primary means of communicating for Anta." (Id. at 5.) Anta disputed this characterization in its opposition, representing that though "Anta employees sometimes use WeChat messaging to arrange for meetings and use WeChat 'groups' to hold conference calls" they "do not use WeChat to exchange messages or files regarding substantive business deals or business strategies. These matters are handled using emails, face-to-face meetings, or phone calls." (Dkt. 68 at 5.)

As part of its opposition, Anta included a declaration from Executive Director and Anta Brand President Jie "James" Zheng. Mr. Zheng reaffirmed this point in his declaration. Mr. Zheng declared under penalty of perjury that "Anta's executives and other employees do not use WeChat to exchange text messages or files regarding substantive business matters." (Dkt. 70 at ¶ 7.) Anta also included a Declaration from Manager of the Basketball Affairs Shuo "Shawn" Liu. Mr. Liu declared under penalty of perjury that "[a]ll of my substantive written communications with NBA players and their representatives are done via email" and that while he does "have a WeChat account, [he] would rarely if ever use it for written substantive business communications. If [he] wanted to send a file or a written message to an NBA player representative, [he] would do so via email instead." (Dkt. 71 at ¶¶ 6-7.) Anta later informed the Court that Anta in fact prohibits its employees from using WeChat to conduct confidential company business. (Hr'g Tr. 46:20-47:2, Dkt. 100.) Recognizing the possibility that employees may nonetheless have used WeChat for business purposes, this Court ordered Anta to search WeChat and produce "all of the WeChat results" by September 12. (Hr'g Tr. 51:2-8; 53:18-19.)

**\*10** By the September 12 deadline, Anta had produced WeChat communications from only one employee, David Bond, who works at Anta's California office. (Dkt. 93 at 11.) None of the other fourteen (14) custodians selected by Brooks would provide their written consent for Anta to collect and search their WeChat messages. (Id.) Anta claimed it could not demand consent from these custodians as that would violate Chinese privacy laws. (Id.) The custodians chosen by Brooks included co-founder Chairman Ding as well as other senior executives. (Dkt. 96 at 2; Dkt. 94 at ¶ 6.) When asked by the Court why Chairman Ding refused to give consent for his WeChat messages to be searched, Anta's counsel could not provide an explanation. (Hr'g Tr. 32:3-11, Dkt. 107.)

The WeChat custodians' refusal to provide consent coincided with Brooks discovering several instances of Anta employees, including Chairman Ding, conducting substantive business on WeChat. For instance, in one email, an Anta employee clearly responded to a colleague's business-related inquiry sent earlier via WeChat. (Dkt. 89, Ex. N at 2-3.) Other examples of WeChat references in Anta's production include U.S. third parties sending business proposals through WeChat, (Id. Ex. H at 2.), and a plan to use what appear to be official, internal Anta WeChat accounts. (Dkt. 97, Ex. A at 3.) Also, Chairman Ding himself uses WeChat extensively. Per a magazine article provided and translated by Brooks, Chairman Ding used WeChat to "message his subordinates at four in the morning, demanding an explanation as to why Anta's advertising was played less frequently than Li Ning's" during the 2012 London Olympics. (Dkt. 96-3 at ¶ 6.)

During the September 14 status conference, this Court asked Anta's counsel how it could reconcile the aforementioned documents with Anta's earlier representation that it did not use WeChat for substantive business purposes. (Hr'g Tr. 32:19-25, Dkt. 107.) Counsel explained that Mr. Zheng's memory might be to blame for the conflicting statements. (Hr'g Tr. 33:1-7.)

After the status conference, Brooks brought Mr. Bond's WeChats to the attention of this Court. (Dkt. 115 at 8-10.) Mr. Bond's WeChat communications unmistakably confirm that Anta employees use WeChat to conduct Anta-related business. In fact, Mr. Bond used WeChat to discuss a variety of business matters, including inventory levels, amount of merchandise sold in the U.S., future U.S. expansion plans, sponsored athlete complaints, and potential copyright infringement issues. (Id., Exs. M, N, O, Q, R, S, T.)

Productions from third-parties also establish that Anta employees use WeChat to conduct substantive business. For example, Shuo "Shawn" Liu discussed various business-related topics with NBA superstar Klay Thompson's agent (Greg Lawrence) and business manager (Joe McLean). (Dkt. 137, Ex. DD.) Those topics include Anta's current lawsuit with Brooks, Klay Thompson's royalty payments, Anta's U.S. plans, and control of Anta's social media and e-commerce site. (Id.)

IV. LEGAL STANDARD

Case 1:19-md-02875-RMB-SAK    Document 2490-11    Filed 09/15/23    Page 9 of 17
                                       PageID: 87282
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

District courts can exercise "nearly unfettered discretion to control the timing and scope of **discovery** and impose sanctions for failure to comply with its **discovery** orders." Hinkle v. City of Clarksburg, W.Va., 81 F.3d 416, 426 (4th Cir. 1996); see also Vir2us, Inc. v. Invincea, Inc., 235 F. Supp. 3d 766, 779 (E.D. Va. 2017) ("District Courts enjoy broad discretion to select an appropriate [sanction] in light of the totality of the circumstances." (citations omitted) ).

In determining whether **discovery** sanctions are appropriate, courts should apply a three-step analysis of "(1) whether a party violated a **discovery** order or Federal Rule of Civil Procedure; (2) whether the violation was 'harmless' or 'substantially justified;' and (3) which sanction is appropriate for the violation." Vir2us, 235 F. Supp. 3d at 772 (citing Samsung Elecs. Co., Ltd. v. Nvidia Corp., 314 F.R.D. 190, 195-96 (E.D. Va. 2016) ).

**\*11** Federal Rule of Civil Procedure 37(b) authorizes a court to issue sanctions for failure to obey a **discovery** order. [6] Fed. R. Civ. P. 37(b)(2)(A) ("If a party... fails to obey an order to provide or permit **discovery**... the court where the action is pending may issue further just orders."). These sanctions include directing that certain facts be taken as established for the purposes of the underlying action; prohibiting the disobedient party from supporting or opposing certain claims or defenses; striking pleadings in whole or in part; rendering a default judgment against the disobedient party; or dismissing the action or proceeding in whole or in part. FED. R. CIV. P. 37(b)(2)(A).

Courts also possess inherent authority to impose sanctions for "any conduct utterly inconsistent with the orderly administration of justice." Projects Mgmt. Co. v. Dyncorp Int'l, LLC, 734 F.3d 366, 375 (4th Cir. 2013) (quotations and citations omitted). A court's inherent power to issue sanctions "is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers." United States v. Shaffer Equip. Co., 11 F.3d 450, 461 (4th Cir. 1993). "Courts have 'considerable discretion' in choosing the appropriate sanction under this inherent authority and may, for example, dismiss claims, enter default judgment, and award attorneys' fees and costs." Glynn v. EDO Corp., No. JFM-07-1660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010) (citing Shaffer, 11 F.3d at 461-62); see also Shepherd v. ABC, Inc., 62 F.3d 1469, 1475 (D.C. Cir. 1995) ("The inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment.")

The burden of proof in sanctions cases remains unsettled in this Circuit. See Jenkins v. Woody, No. 3:15-cv-355, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017); Glynn, 2010 WL 3294347, at *2 ("Whether it is sought under the Federal Rules of Civil Procedure or pursuant to this Court's inherent power, the precise burden of proof in a motion for sanctions is unclear in the Fourth Circuit.") However, when determining whether to impose severe sanctions, such as dismissal or default judgment, courts often apply a "clear and convincing" standard of evidence. See Suntrust Mortg., Inc. v. AIG United Guar. Corp, No. 3:09-cv-529, 2011 WL 1225989, at *20 (E.D. Va. Mar. 29, 2011) (collecting cases); Glynn, 2010 3294347, at *2 (same).

### V. ANALYSIS

Over the span of nearly three-and-half months, the parties filed hundreds of pages worth of briefing with the Court and appeared before the undersigned for four separate hearings. During that time, the degree and severity of Anta's **discovery** disobedience has only grown. With every update provided by Brooks and shifting explanation given by Anta, the undersigned grew increasingly concerned about Anta's willingness to participate in these proceedings in good faith. Anta did not merely fail to obey the Court's **discovery** orders; Anta disobeyed **discovery** orders while blatantly lying to the Court.

**\*12** Accordingly, the undersigned finds that sanctions are appropriate under Rule 37(b)(2) as well as its inherent authority. Anta violated Rule 37(b)(2) by failing to comply with the undersigned's **discovery** orders and engaged in conduct wholly inconsistent with the orderly administration of justice. The undersigned believes that only default judgment in favor of Brooks may cure the harm, as Anta's deceitful, obfuscatory actions have infected the entirety of these proceedings; thereby eliminating any hope of a "fair trial." Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 505 (4th Cir. 1977).

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 10 of 17
                                 PageID: 87283
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

### A. Anta Violated Rule 37(b)(2)

Despite multiple Court orders to fully comply with Brooks' discovery requests, Anta failed to do so. As the undersigned has already explained, a party does not get "months and months to produce." (Hr'g Tr. 15:8, Dkt. 62.) Instead, they must produce by the deadlines imposed by the court or else face sanctions. (Hr'g Tr. 15:4-8.) Here, the Court imposed a deadline of August 17 for Anta to completely respond to all of Brooks' discovery requests. Anta clearly did not do so. The Court then, with the exception of WeChat communications, extended its deadline to September 7. Still, Anta failed to comply.

One of Anta's most egregious violations involves its refusal to produce documents regarding Tether. After being ordered by the Court to produce all documents responsive to Brooks' RFPs, which included documents related to Anta's U.S. plans, Anta did not produce documents pertaining to Tether let alone disclose their partnership. Instead, Brooks only discovered the existence of a potential relationship between Anta and Tether through its review of Anta's produced emails. When confronted by Brooks about Tether's absence from the document production and disclosures, Anta did not accept responsibility for the oversight or attempt to immediately rectify the error. Rather, Anta, up until at least October 18, 2018, resolutely denied retaining Tether to perform any significant work related to the United States. Anta represented that Tether worked almost exclusively on the Chinese market and attacked Brooks for insinuating that Tether worked on U.S. matters. Not until November 7, 2018, after Brooks confronted Anta with its third-party subpoena returns from Tether, did Anta finally admit to this Court that Tether had been retained since at least May 30, 2018, to work on Anta's U.S. expansion plans.

Relatedly, Anta did not produce pitchbooks or presentations from financial institutions, such as Goldman Sachs, regarding its proposed U.S. plans nor did it produce additional Board materials where the U.S. market was discussed. While Anta has produced documents related to financial institutions, it still has not produced pitchbooks or other substantive presentations from those entities. With regard to Board materials, Anta has produced board minutes dating back to 2007, but did not produce the attachments to those minutes. Additionally, Anta failed to produce documents involving internal deliberations about the Brooks mark even though the parties' nearly decade-long history is littered with lawsuits as well as potential acquisitions and partnerships. For instance, Anta did not produce a 2017 study that discussed [redacted] Clearly, this study was responsive to Brooks' RFPs and indicates that Anta recently focused on and discussed the Brooks mark.

Anta also violated this Court's order by declining to produce all the sales and financial data to back up its spreadsheets. Originally, Anta claimed to satisfy its discovery obligations after producing just a spreadsheet with no corresponding backup data. Then, after the Court's orders, Anta did produce some backup data. However, that data proved to be inconsistent or inaccurate with the spreadsheets or publicly-available data as well as insufficient. For example, Anta only produced the costs backup data for three (3) of the eighty-seven (87) accused products. Although Anta could have provided backup data for the remaining eighty-four (84) products, it chose not to, and only cited time and burden constraints at the last hearing on November 9. Those arguments are unavailing. Anta has had nearly seven weeks to produce the costs backup data and concerns that it would be too burdensome to produce are untimely raised.[7]

\*13 Furthermore, Anta's inability to comply with the Court's order to search and produce its employees' WeChat communications raises serious concerns. Initially, Anta emphatically claimed that its employees do not use WeChat for substantive business purposes. However, David Bond's WeChats, third-party discovery, and emails show that this is clearly not the case. Then Anta stated that it could not produce the WeChat communications of fourteen of Brooks' requested custodians as they had invoked their privacy rights under Chinese law. The undersigned will not delve into an analysis of the applicable Chinese law and will assume the custodians lawfully invoked their rights. However, the Court remains very troubled that high-level executives, including Anta's co-founder and Dacheng Peng—the person who was initially identified in Anta's Rule 26(a) disclosures as the only person having information related to this litigation—refused to allow the company to search their WeChats. Their refusal is even more concerning given the evidence before the Court that WeChat is used extensively by Anta employees to conduct business.

While Anta argues it did nothing wrong, the undersigned disagrees and finds Anta's various explanations for missing documents and untimely productions unpersuasive. Anta attempts to explain away its discovery deficiencies by arguing that documents are only missing because they do

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK    Document 2490-11    Filed 09/15/23    Page 11 of 17
PageID: 87284

not exist. According to Anta, the absence of documents should be unsurprising, as the United States is only a "test market," representing a far-flung hope that one day, in the distant future, it may be able to make some inroads in the United States. To put it simply, Anta's representations are not credible. Anta's contract with Tether as well as David Bond's WeChats reveal an active, concerted effort on the part of Anta to expand its U.S. business. Anta also contacted or worked with various other U.S. third-parties, such as Goldman Sachs, Fishermen Labs, and Times 10, regarding the U.S. market. Additionally, produced documents establish that Anta plans to [redacted] Moreover, it appears incongruous that a 'test market' would warrant Jie "James" Zheng and Chairman Ding [8] from continually "taking control" of U.S.-related matters. (Dkt. 89, Ex. T at 2.)

As an alternative explanation, Anta argues that blame for the lack of responsive documents rests squarely with Brooks. Specifically, Anta contends Brooks is at fault for devising a poor email search term strategy. (Dkt. 124 at 14; Dkt. 143 at 5.) This argument also misses the mark. Anta had a duty, separate and apart from the discovery plan's email provision, to search for responsive documents. Anta knew that it contracted with Tether, Fishermen Labs, and other U.S. third parties as well as communicated with various financial institutions. Therefore, it needed to take affirmative actions besides merely searching emails to locate those responsive documents.

Further, the Court's determination that Anta committed discovery violations is not solely limited to surmising whether the documents at issue exist or not. Many of Anta's violations occurred in plain sight. First and foremost, Anta lied about its relationship with Tether and maintained that lie until November when confronted with documents produced by Tether. Anta also did not produce any documents related to Tether despite being directly responsive to Brooks' RFPs. Anta also did not disclose nor produce documents from other U.S. third parties, such as Fishermen Labs, until well after the August 17 deadline and only after Brooks raised the issue. Third, Anta still refuses to produce the necessary financial data to backup the spreadsheets it provided to Brooks. Finally, Anta did not produce the 2017 study on the Anta and Brooks mark. As a result, the Court is confident in finding that Anta did not comply with the Court's discovery orders.

Finally, regarding the WeChat communications, Anta claims that it should not be penalized for the argued legitimate refusal under Chinese law by its employees to allow searches of their WeChat accounts. The Court disagrees. Anta may not avoid penalties for their claimed inability to produce those communications. Anta clearly knowingly allowed its employees to use WeChat for substantive business communications through only their personal accounts and devices. In fact, the sole person identified in Anta's initial disclosures as having knowledge of the facts of the case, Dacheng Peng, refused to allow his WeChat to be search, which the Court finds particularly troubling. Anta should not be able to conveniently use Chinese law to shield production of communications responsive to discovery requests when it could have set up Anta-controlled WeChat accounts for its employees' use which would not have the same issues regarding Chinese privacy laws.

*14 In reaching its conclusion, the Court is mindful of Anta's contention that it "engaged in a comprehensive and systematic process to identify all responsive documents in its possession, custody and control." (Dkt. 93 at 1). In support, Anta offers the Declarations of Jie Lian and John Strand. Those Declarations establish that Anta's outside counsel logged hundreds of hours interviewing Anta employees, collecting data, and reviewing documents. (Dkt. 69 at ¶¶ 10-35; Dkt. 72 at ¶¶ 8-22.) However, while not doubting the veracity of those Declarations, they do not allay the Court's concerns.

As an initial matter, counsel's declarations do not fix the damage caused by Anta's multiple lies to the Court. [9] One of Anta's most disastrous decisions was to submit to this Court perjurious declarations from Executive Director and Anta Brand President Jie "James" Zheng and Anta's Manager of Basketball Affairs Shuo "Shawn" Liu. Messrs. Zheng and Liu assured the Court, under penalty of perjury, that Anta employees never used WeChat to discuss or send documents regarding substantive business. David Bond's WeChats and discovery produced as the result of third-party subpoenas unequivocally establish that those Declarations were false; they were lies. Anta also lied about David Bond's role in the United States. In August, Anta claimed that David Bond was only a designer, lacking the necessary business expertise with which to run the USDC. But, before making that representation to the Court, Anta had already offered David Bond the general manager position and emails suggest that David Bond was being actively considered for the position at least as early as July. However, Anta did not correct its representation for nearly seven weeks. Relatedly, Anta also stated that the USDC would work almost exclusively on products for the Chinese market. Yet again, that is demonstrably false. Similarly, Anta, as late as November,

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 12 of 17 PageID: 87285

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

continued to assert that Tether's work for Anta related almost exclusively to the Chinese market. Once again, this was clearly not true.

Putting aside Anta's egregious conduct, counsel's declarations still do not provide great comfort to the Court that Anta took its **discovery** obligations seriously. First, notwithstanding the time and energy exerted by Anta's outside counsel, they still have served in a more limited capacity regarding **discovery**. For example, Anta's in-house counsel has shouldered most of the responsibility of reviewing documents for privilege and responsiveness. (Dkt. 93 at 5-6; Hr'g Tr. 22:21-24:12, Dkt. 107.) As a result, Anta's outside counsel could not, at times, affirmatively represent or address a **discovery** issue because they had not yet reviewed all the documents at issue. (Hr'g Tr. 21:15-18.) Second, the Court is skeptical of Anta's "even more extensive plan" developed in response to the August 3 Order. (Dkt. 69 at ¶ 21.) Mr. Lian's Declaration states that in an effort to comply with the August 3 Order, he spent a week (August 5-12) at Anta's headquarters (approximately 125 hours in total), conducting a "drawer-to-drawer, computer-to-computer, and office-to-office search" for responsive documents. (Id.) But Anta's counsel, at the August 3 hearing, assured that Court that Anta was *already conducting* such an extensive, sophisticated search: "What Anta is doing is doing a department-by-department, room-by-room, laptop-by-laptop, person-by-person search for documents." (Hr'g Tr. 12:25-13:2, Dkt. 62.) Assuming that this was in fact the case, it is unclear to the Court why Anta's "extensive plan" should provide any reassurance when its first extensive search resulted in only a small number of documents actually being produced. Finally, per Mr. Lian's Declaration, it appears Anta did not begin to take its **discovery** obligations seriously until late July. Mr. Lian's first week-long visit to Anta did not occur until July 24, just three days before Brooks filed its Motion to Compel. (Dkt. 69 at ¶ 10.) As a result, the Court remains concerned that Anta did not even begin to approach its **discovery** obligations seriously until it was threatened with Court intervention.

**\*15**  In summation, the Court recognizes that "a party cannot disobey a **discovery** order by failing to produce documents that do not exist." Moulton Bane v. Moulton, No. 14-cv-265-JD, 2015 WL 12990224, at \*2 (D.N.H. Nov. 10, 2015); see also Bizprolink, LLC v. Am. Online, 140 F. App'x 459, 462-63 (4th Cir. 2005). However, Anta's refusal to produce documents related to U.S. third parties, such as Tether, the 2017 brand study, and adequate financial documents to back up its spreadsheet as well as Anta's unconscionable misrepresentations and flat-out lies already constitute **discovery** violations or otherwise sanctionable actions. See Vir2us, 235 F. Supp. 3d at 773-76 (finding multiple **discovery** violations where Defendant produced responsive documents after previously stating they did not exist and providing shifting justifications for the documents' absence); see also 🚩Shaffer, 11 F.3d at 462 (recognizing a court's inherent power to sanction a party who "deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process"). Consequently, Anta's prior wrongful conduct, when viewed in light of Plaintiff's supplemental filings, convinces the undersigned that Anta disobeyed this Court's clear, direct **discovery** orders.

**B. Anta's Violations Were Unjustified and Harmful**

Brooks propounded its first set of RFPs and interrogatories on April 20, 2018. The Rule 16(b) Scheduling Order was entered on May 11, 2018. Brooks did not file its first Motion to Compel until July 27, 2018. This Court then issued two separate **discovery** orders on August 3, 2018 and August 31, 2018, directing Anta to come into compliance with its **discovery** obligations. The Court did not take Brooks' Motion for Sanctions under advisement until September 14, 2018. Anta has offered no reasonable explanation or justification for why, after having nearly five months to appropriately respond to Brooks' requests as well as multiple reprieves from this Court, it failed to fulfill its **discovery** obligations and obey this Court's **discovery** orders.

Anta's violations were far from benign. In the six weeks prior to the close of **discovery**, Brooks continually struggled to obtain documents central to its case. For instance, as part of its trademark infringement claim, Brooks must establish that "products bearing the Anta Marks will be injected into the same streams of commerce as Brooks products and marketed in a manner likely to create confusion." (Dkt. 65 at 24.) However, Anta repeatedly failed to produce documents regarding its plans for the U.S. market, including agreements with U.S. third parties responsible for promoting and selling the Anta brand in the U.S. Additionally, Brooks has the burden to prove Anta's gross profits, and then the burden shifts to Anta to show every element of deduction. 15 U.S.C. § 1117(a). But Anta has yet to provide documents which completely backup its spreadsheet, thereby severely hampering Brooks' ability to prepare for trial. Relatedly,

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 13 of 17
                                        PageID: 87286
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

Brooks' expert was forced to prepare an expert report and rebuttal report "without the benefit of complete and accurate financial data from Anta." (Dkt. 73 at 12.) Further, Anta disputes that it is attempting to associate, or rather align itself, with the Brooks mark. However, Anta's productions of internal deliberations regarding to Brooks mark remains wholly inadequate. Finally, Anta insists that WeChat is not used for substantive business purposes, yet the co-founder of the company will not even allow the company he owns to search his apparently non-responsive WeChats. Mr. Ding's refusal is especially alarming given the wealth of information contained in Mr. Bond's recently produced WeChat communications. As a result, the Court is left to conclude that Brooks is harmed by Anta's refusal to search and produce WeChat communications.

Anta's violation of this Court's discovery orders leaves Brooks in a precarious position. Brooks cannot adequately prepare for upcoming depositions. Brooks cannot sufficiently develop its trial strategy as key pieces of information are missing. Brooks cannot fully evaluate the strengths of its claims for settlement negotiations. Thus, Anta's unjustified actions are clearly harmful to Brooks.

 *16  Anta argues that should the Court find Anta violated its discovery orders, awarding sanctions would not be appropriate as Brooks is unharmed. Specifically, Anta asserts that depositions of David Bond and other executives would address many of Brooks' complaints. (Dkt. 142 at 6, 8, 18.) Presumably, during their depositions, Mr. Bond would be able to clarify Tether's work for Anta, Mr. Zheng could offer a more detailed explanation for why Anta did not produce more documents related to the Brooks mark, and another executive could explain any questions Brooks had related to Anta's sales and financial data. Despite Anta's insistence, depositions will not cure the lack of produced documents. First, without documents produced by third parties that should have been produced by Anta, Brooks would not even be able to fully question David Bond about Tether or another Anta executive about the 2017 brand study. Second, most of the misrepresentations and lies at issue here came directly from those very same executives Anta is claiming need to be deposed.

Additionally, Brooks argues (for seemingly the first time) that it is not contesting several elements of Brooks' claims, (Id. at 3.), and thus claims that failing to produce documents related to its U.S. plans could not possibly cause any prejudice to Brooks. This argument, too, is unpersuasive. The harm in this case is not only the lack of production, but also Anta's numerous misrepresentations and lies. It is now impossible for the Court or Brooks to believe Anta is being truthful about any of its representations.

### C. Sanctions Are Appropriate

In determining what sanctions are appropriate under Rule 37(b), the Fourth Circuit instructs district courts to consider "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." Anderson v. Found. for Advancement. Educ. and Emp't of Am. Indians, 155 F.3d 500, 504 (4th Cir. 1998) ).

1. *Bad Faith*

The undersigned finds Anta acted in bad faith by ignoring the Court's August 3, 2018 and August 31, 2018 discovery orders as well as the Court's direct admonishment that Anta would face sanctions unless it came into compliance with its discovery obligations. In the Fourth Circuit, "bad faith includes willful conduct, where the party 'clearly should have understood his duty to the court' but nonetheless 'deliberately disregarded' it." Axiom Res. Mgmt., Inc. v. Alfotech Sols., LLC, No. 1:10-cv-1011, 2011 WL 2560096, at *7 (E.D. Va. June 3, 2011) (quoting Rabb v. Amatex Corp., 769 F.2d 996, 1000 (4th Cir. 1985) ). Here, despite being directly instructed to comply with its discovery obligations on numerous occasions, Anta failed to do so. Anta knew the consequences of its actions. Furthermore, and even more shocking, Anta submitted declarations from two of its top executives falsely declaring under oath that WeChat was not used for substantive business purposes as well as maintained a host of other lies for months. Such willful disregard of the Court's orders and blatant deception amounts to bad faith.

2. *Prejudice to the Plaintiff*

As addressed above, the undersigned finds that Anta's deliberate non-compliance has severely prejudiced Brooks. Brooks cannot adequately prepare for upcoming depositions and trial due to Anta's failure to turn over responsive documents. Anta's failures include its refusal to completely and expeditiously disclose and produce documents related to its U.S. plans, its insufficient production of financial data,

Case 1:19-md-02875-RMB-SAK Document 2490-11 Filed 09/15/23 Page 14 of 17 PageID: 87287

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

and withholding documents regarding internal deliberations related to the Brooks trademark. Brooks has the burden of proof in this case and, because of Anta's actions, Brooks is unable to adequately evaluate its case and properly prepare for trial. Cf. United States v. One Tract of Real Property, 107 F.3d 868, 1997 WL 71719, at *3 (4th Cir. 1997) (per curiam) ("[Plaintiff's] repeated refusals to comply with ... legitimate **discovery** requests, despite court orders to the contrary .... was prejudicial to [Defendant] (because it could not defend against claims, facts, and witnesses that [Plaintiff] refused to provide) and hampered the district court's efforts to advance and resolve the litigation.")

**\*17** Additionally, Brooks expended considerable time and incurred significant monetary expenses due to Anta's failures to comply with its **discovery** obligations, which required Brooks to file multiple motions, appear in Court on four separate occasions, and file hundreds pages worth of briefs. See Hosch v. BAE Sys. Info. Sols., Inc., No. 1:13-cv-00825 (AJT/TCB), 2014 WL 1681694, at *6 (E.D. Va. Apr. 24, 2014). Therefore, Anta's unwillingness to completely engage in **discovery** in good faith has materially prejudiced Brooks.

3. *Need for Deterrence*

The undersigned finds that the need for deterrence weighs in favor of serious, severe sanctions. Courts must have the ability to effectively manage their cases, and parties are expected to take the Court's orders, instructions, and timelines seriously. "Continued contumacious behavior and abuse through non-compliance with [a Court's] orders cannot be tolerated. And with **discovery's** important role in modern litigation, *deterrence is greatly needed.*" Flame S.A. v. Industrial Carriers, Inc., 39 F. Supp. 3d 752, 765 (E.D. Va. 2014) (emphasis added). Anta is a sophisticated party with sophisticated counsel. Refusal to comply with this Court's orders can only be interpreted as an unabashed flouting of the Court's authority and role in overseeing **discovery**. The Court cannot countenance complete disregard for its **discovery** orders and must fashion sanctions with an appropriate amount of deterrent effect.

4. *Effectiveness of Less Drastic Sanctions*

Finally, the undersigned determines imposing any sanctions less than default judgment would not be appropriate. In making this conclusion, the undersigned understands and takes into consideration the Fourth Circuit's instruction that since terminating sanctions "are the most severe, such orders must be entered with the greatest caution." Shaffer, 11 F.3d at 462. However, the undersigned also recognizes "the need to preserve the integrity of the judicial process in order to retain confidence that *the process works to uncover the truth*" Projects Mgmt., 734 F.3d at 376 (quoting Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001)). Presently, Brooks is significantly disadvantaged due to Anta's non-compliance. As the state of **discovery** stands now, Brooks lacks sufficient information with which to prosecute its case as well as rebut Anta's defenses. Preclusion and monetary sanctions as well as an adverse inference instruction will not cure this. See Mutual Fed. Sav. & Loan Ass'n v. Richards & Assocs., 872 F.2d 88, 93 (4th Cir. 1989) (affirming default judgment where district court rejected imposing "other sanctions such as partial summary judgment or preclusion of certain defenses because without the essential **discovery** materials, the case could be more difficult to try")

Further, the Court must be mindful that the sanctions imposed should deter future parties with Anta-like resources from disobeying this Court's **discovery** orders. Anta is a multi-billion-dollar company. Consequently, large monetary sanctions likely would not possess the same deterrent effect as it would with parties of considerably smaller resources. An Anta-sized party in the future cannot be allowed to merely factor in flagrant **discovery** violations as a cost of doing business. Severe sanctions are sometimes necessary to send "an unmistakable message to ... others that the judicial system will not tolerate repeated misconduct never wholly remedied in the future." Id. at 94 (recognizing that failure to impose severe sanctions would send the "opposite message that the court may be pushed, ignored and defied to the outermost limits").

### D. Inherent Authority

**\*18** In imposing sanctions under its inherent authority, courts must apply a similar multi-factor test. A court must consider the following factors when deciding whether to issue terminating sanctions:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney,

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 15 of 17
                                    PageID: 87288
Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

Shaffer, 11 F.3d at 462-63. In this case, those factors weigh in favor of granting terminating actions against Anta.

As Anta's wrongful conduct has already been discussed in great detail, it is unnecessary for the undersigned to provide another exhaustive analysis. Nonetheless, the undersigned will address each of the factors in turn.

Here, Anta is completely at fault for all **discovery** violations, misrepresentations, and lies in this case. Anta is a multi-billion dollar company, represented by experienced counsel. They knew or should have known the consequences of obfuscating and lying to the court. Moreover, the undersigned issued an unequivocal warning that failure to completely participate in **discovery** would result in sanctions. Factor two is also satisfied because, as noted earlier, the undersigned believes the client, not counsel, is completely at fault for the wrongful conduct.

Further, this proceeding and Brooks have been greatly prejudiced by Anta's lies and misrepresentations. Brooks cannot adequately prepare for trial nor can it have any confidence that Anta will not lie again at depositions or at trial. Further, as the undersigned previously stated, it is nigh impossible to "separate out the infection that Anta has created and spread through the course of this **discovery**." (Hr'g Tr. 66:3-4, Dkt. 149). It would be extremely difficult to allow this case to proceed when neither Brooks or the Court could trust anything Anta represented, even if those representations occurred under oath.

Finally, as addressed above, lesser sanctions would not achieve the requisite level of deterrence nor would it cure Brooks' harm. Additionally, there certainly is a public interest in safeguarding the integrity of the judicial process and not allowing litigants to enjoy the privilege of the courthouse after openly refusing to obey the Court's rules and orders.

## VI. RECOMMENDATION

For the reasons set forth above, the undersigned Magistrate Judge RECOMMENDS that Plaintiff's Motion for Sanctions be GRANTED. Specifically, the undersigned RECOMMENDS that Default Judgment be granted in favor of Brooks. Should the district judge adopt the undersigned's recommendation, the undersigned is prepared to issue a separate default judgment Report and Recommendation.

Alternatively, should the district judge decline to impose default judgment, the undersigned recommends that, with the exception of the $250,000 monetary sanction, the Court grant all sanctions requested by Brooks in its Motion (Dkt. 63).

**\*19** Furthermore, the undersigned will separately consider an award of attorneys' fees and costs related to Brooks' Motion to Compel and Motion for Sanctions.

## VI. NOTICE

The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service. [10] Failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

The Clerk is directed to forward of this Report and Recommendation to counsel of record.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 7488924

**Brooks Sports, Inc. v. Anta (China) Co., Ltd.,** Not Reported in Fed. Supp. (2018)

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 16 of 17
PageID: 87289

**Footnotes**

| | |
|---|---|
| 1 | In early July 2018, Brooks changed its lead counsel (Dkts. 44-45). Of the supplemental RFPs and interrogatories, Brooks' new counsel is responsible for serving nine (9) RFPs and seven (7) interrogatories. (Dkt. 53 at ¶ 3.) |
| 2 | Those requests include the production of all documents concerning "[Anta's] United States marketing, branding, or product strategies or plans" (RFP 20); "any studies, surveys or market research about the use of the Anta Mark in the United States" (RFP 37); "any competitive analyses or market analyses relating to the Accused Products in the United States, including without limitation, any documents concerning the identification of [Anta's] competitors" (RFP 41); "any plan [Anta has] (or have had) to expand the type of goods or services [Anta] currently offer[s] for sale in the United States in connection with the Anta Mark" (RFP 51); "Anta's product plans, marketing plans and/or business plans for the Accused Products in the United States" (RFP 52). (Dkt. 53, Ex. A.) |
| 3 | Brooks issued third-party **discovery** to Times 10, but Times 10 has refused to comply with the subpoena or to obtain counsel. Brooks initiated enforcement proceedings in the United States District Court for the Central District of California; however, Brooks does not expect a resolution until at least December 4, 2018. (Dkt. 136 at 35.) |
| 4 | Those requests include the production of "all purchase orders, invoices and other records of the Accused Products by you to any person in the United States, including without limitation any distributors, resellers, or consumers" (RFP 4); "documents sufficient to show Anta's monthly U.S. sales of the Accused Products (in units and dollars) from inception through 2018" (RFP 24); "documents sufficient to show the profit Anta has received from the sale of the Accused products in the United States from inception through 2018" (RFP 28); "documents sufficient to show Anta's costs of producing and selling the Accused Products in the United States from inception through 2018" (RFP 43); "Anta's annual income, profit and loss and other financial statements for each year from 2014 through 2018" (RFP 44); "documents sufficient to show Anta's advertising, marketing and promotional expenses for all Accused Products for each year from 2014 through 2018" (RFP 46). (Dkt. 53, Ex. A.) |
| 5 | Those requests included all documents concerning "the preparation, filing and/or prosecution of any or all applications for registration, state or federal, of the Anta Mark in the United States" (RFP 6); "Anta's views as to the similarity or lack of similarity of the Anta Mark to any of the Brooks Marks" (RFP 8); "any communication or notice to you about the possibility that your use of the Anta Mark might or might not result in confusion or mistake in the trade or among the public, including without limitation with respect to Brooks or the Brooks Marks" (RFP 13); "the decision to use and apply to register the Anta Mark in the United States" (RFP 34); "[Anta's] first notice of Brooks' use of the Brooks Marks" (RFP 49). (Dkt. 53, Ex. A.) |
| 6 | Although Brooks' requested sanctions pursuant to Rule 37(b)(2), it did not cite to nor provide a discussion of Rule 37(b)(2) in its Memorandum in Support. (Dkt. 63 at 1.) Instead, it cited to Rule 37(c)(1) and supporting case law. (Dkt. 65 at 20.) Regardless, Rule 37(b) is the more appropriate standard for the type of sanctions requested by Brooks. See Vir2us, 235 F. Supp. 3d at 779 ("The sanction options contained in Rule 37(b), unlike preclusion, impose penalties 'when a party fails to disclose evidence helpful to an opposing party.' " (quoting S. States Rack & Fixture. Inc. v. Sherwin-Williams Co., 318 F.3d 592, 592 n.2 (4th Cir. 2003) ) ); see also FED R. CIV. P. 37(c) advisory committee note to 1993 amendment ("Preclusion of evidence is not an effective incentive to compel disclosure of information that, being supporting of the position of the opposing party, might advantageously be concealed by the disclosing party."). Therefore, the Court will analyze the appropriateness of Brooks' requested sanctions under Rule 37(b). |

Case 1:19-md-02875-RMB-SAK   Document 2490-11   Filed 09/15/23   Page 17 of 17 PageID: 87290

Brooks Sports, Inc. v. Anta (China) Co., Ltd., Not Reported in Fed. Supp. (2018)

| | |
|---|---|
| 7 | Brooks also raised concerns over discrepancies with Anta's profits data. [redacted] Reputable industry reports list Anta's annual revenue for U.S. sales at approximately $16 million. (Dkt. 136, Ex. E at 24) Brooks contends that the difference between these two amounts might well be accounted for in the sales made by the unauthorized third-party resellers. Although Anta claims it cannot obtain documentation or data from these resellers, it has been less than forthcoming about its relationship with at least some of these resellers. |
| 8 | The undersigned assumes, based on the context of the email, that Mr. David Bond is referring to James Zheng and Chairman Ding when he writes: [redacted] |
| 9 | It is important to note that the undersigned does not believe that Anta's counsel knowingly lied to the Court or knew that these statements by Anta were lies. The undersigned believes that Anta lied to counsel, thereby causing counsel to repeat those lies to the Court. |
| 10 | On November 19, 2018, the undersigned filed this same Report & Recommendation ("R&R") under seal (Dkt. 153). The Clerk provided the parties with copies of the sealed R&R that same day via email. In a separate order, the undersigned informed the parties that it anticipated filing a redacted version of the R&R by Wednesday, November 28, 2018, and instructed the parties to inform the Court, *ex parte*, "of any redactions they believe [were] necessary by Tuesday, November 27, 2018, at 5:00 p.m." (Dkt. 154). The parties did contact the Court before the deadline and requested various redactions. The Court accepted and incorporated all requested redactions into this public version of the R&R. No other changes have been made to the R&R. Therefore, **the deadline to object to this R&R remains fourteen (14) days from the date of service of the sealed R&R** (Dkt. 153). Deadline to object is 12/7/18 Per Dkt. 166. |

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.