IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALSARTAN N-<br>NITROSODIMETHYLAMINE (NDMA)<br>PRODUCTS LIABILITY LITIGATION | Hon. Robert. B. Kugler |
| | Civ. No. 19-md-2875 (RBK/JS) |
| This Document Relates To:<br><br>*All Actions* | |

**DECLARATION OF BRANDON SCHWARTZ**
**REGARDING THE PROPOSED NOTICE PLAN AND ADMINISTRATION**

I, Brandon Schwartz, hereby declare:

1.  I am a Director of Legal Notice, and I am preparing this Declaration for the proposed Class Administrator, Postlethwaite & Netterville, APAC ("P&N")[1], a full-service administration firm providing legal administration services, including the design, development, and implementation of unbiased complex legal notification programs. We were asked by Counsel to develop and execute a proposed Notice Plan to provide notice in the above-referenced matter (the "Lawsuit"). The following statements are based on my personal knowledge as well as information provided by other experienced employees working under my supervision.

2.  We have undertaken the creation and execution of notice plans, along with the administration of diverse class action and mass action settlements. Our expertise extends across a wide array of subject matters, encompassing but not limited to privacy, products liability,

---

[1] As of May 21, 2023, the Directors & employees of Postlethwaite & Netterville (P&N), APAC joined EisnerAmper as EAG Gulf Coast, LLC. Where P&N is named or contracted, EAG Gulf Coast, LLC employees will service the work under those agreements. P&N's obligations to service work may be assigned by P&N to Eisner Advisory Group, LLC or EAG Gulf Coast, LLC, or one of Eisner Advisory Group, LLC's or EAG Gulf Coast, LLC's subsidiaries or affiliates.

consumer rights, mass tort, antitrust, insurance, and healthcare. The accomplished members of our team possess broad experience in the design and implementation of notice procedures involving various aspects of class certification and settlement programs.

## EXPERIENCE

3.  Drawing upon over 15 years of extensive expertise in class action, advertising, media, and marketing, I have designed and implemented comprehensive notice solutions encompassing all facets of class action certification and settlement notice programs. My proficiency includes an understanding of email and postal distribution methodologies, reach and frequency analysis, strategic media generation, meticulous demographic research, media plan design, effective media development and procurement, commercial and video production creation, and the adept application of best practices for effective social media outreach.

4.  I have designed, implemented, and managed notice campaigns for more than 100 cases. Some of my notice plans include: *Rivera v. Goggle* LLC, No. 2019-CH-009900 (Circuit Court of Cook County, IL); *Hezi v. Celsius Holdings, Inc.*, No. 1:21-cv-09892 (S.D.N.Y.); *Gilmore v. Monsanto*, No. 3:21-cv-8159 (N.D. Cal.); *Krommenhock v. Post Foods, LLC*, No. 3:16-cv-04958 (N.D. Cal.); *Hadley v. Kellogg Sales Company*, No. 5:16-cv-04955 (N.D. Cal.); *Jones v. Monsanto,* No. 4:19-cv-00102 (W.D. Mo.)*; In re: Sonic Corp. Customer Data Breach* Litigation, No. 1:17-md-02807 (N.D. Ohio); *In re: Interior Molded Doors Indirect Purchaser Antitrust Litigation*, No. 3:18-cv-00850 (E.D. Va.); *Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, No. 2:10-md-02179 (E.D. La.); and the *Indian Residential Schools Settlement*, No. 00-cv-192059 (Ont. Super. Ct.). A description of my experience is attached as **Exhibit A**.

5.  The courts have consistently acknowledged both the credibility of our team (curriculum vitae attached hereto as **Exhibit B**) and the effectiveness of our class action notice plans. Illustrative court opinions affirming the sufficiency of our notice plans include:

a. On April 5, 2023, in the Order Granting Plaintiffs' Motions for Final Approval of Class action Settlement in *Hezi v. Celsius Holdings, Inc.*, No. 1:21-cv-09892 (S.D.N.Y.), Judge Jennifer H. Rearden wrote:

> The Court finds and determines that the notice procedure carried out by Claims Administrator Postlethwaite & Netterville, APAC ("P&N") afforded adequate protections to Class Members and provides the basis for the Court to make an informed decision regarding approval of the Settlement based on the responses of Class Members. The Court finds and determines that the Notice was the best notice practicable and has satisfied the requirements of law and due process.

b. In the matter *Gilmore et al. v. Monsanto Company, et al.*, No. 3:21-CV-8159 (N.D. Cal.), Judge Vince Chhabria ruled on March 31, 2023:

> The Court finds that Class Notice has been disseminated to the Class in compliance with the Court's Preliminary Approval Order and the Notice Plan. The Court further finds that this provided the best notice to the Class practicable under the circumstances, fully satisfied due process, met the requirements of Rule 23 of the Federal Rules of Civil Procedure, and complied with all other applicable law.

c. In the matter *Rivera, et al. v. Google LLC,* No. 2019-CH-00990 (Ill. Cir. Ct. Cook Cnty.), Judge Anna M. Loftus ruled on September 28, 2022:

> Pursuant to this Court's Order granting preliminary approval of the Settlement, Postlethwaite & Netterville, APAC ("P&N") served as Settlement Administrator. This Court finds that the Settlement Administrator performed all duties thus far required as set forth in the Settlement Agreement.
>
> The Court finds that the Settlement Administrator has complied with the approved notice process as confirmed by its Declaration filed with the Court. The Court further finds that the Notice plan set forth in the Settlement as executed by the Settlement Administrator satisfied the requirements of Due Process and 735 ILCS 5/2-803. The Notice plan was reasonably calculated and constituted the best notice practicable to apprise Settlement Class Members of the nature of this litigation, the scope of the Settlement Class, the terms of the Settlement, the right of Settlement Class Members to object to the Settlement or exclude themselves from the Settlement Class and the process for doing so, and of the Final Approval Hearing. Accordingly, the Court finds and concludes that the Settlement Class Members have

   been provided the best notice practicable under the circumstances, and that the Notice plan was clearly designed to advise the Settlement Class Members of their rights.

 d. In the matter *Hadley, et al. v. Kellogg Sales Company*, No. 16-cv-04955 (N.D. Cal.), Judge Lucy H. Koh ruled on November 23, 2021:

   The Class Notice and claims submission procedures set forth in Sections 4 and 6 of the Settlement Agreement, and the Notice Plan filed on March 10, 2021, fully satisfy Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, were the best notice practicable under the circumstances, provided individual notice to all Settlement Class Members who could be identified through reasonable effort, and support the Court's exercise of jurisdiction over the Settlement Classes as contemplated in the Settlement Agreement and this Order. See Fed. R. Civ. P. 23(e)(2)(C)(ii).In the matter Hadley, et al. v. Kellogg Sales Co., No. 16-cv-04955 (N.D. Cal.), Judge Lucy H. Koh ruled on November 23, 2021.

 e. Additionally, on April 19, 2021, in the Order Granting Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement in *Siddle, et al. v. The Duracell Company, et al.*, No. 4:19-cv-00568 (N.D. Cal.), Judge James Donato ruled:

   The Court finds that the Class Notice and Claims Administration procedures set forth in the Agreement fully satisfy Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, were the best notice practicable under the circumstances, provided due and sufficient individual notice to all persons in the Settlement Class who could be identified through reasonable effort, and support the Court's exercise of jurisdiction over the Settlement Class as contemplated in the Agreement and this Final Approval Order.

## **OVERVIEW**

6. Concurrent with the Motion, Plaintiffs have submitted revised Class and Subclass definitions to the Court, copies of which are attached hereto as **Exhibits C, D,** and **E** (collectively, the "Classes"). Based on the revised Class and Subclass definitions, Plaintiffs estimate the potential class size to be approximately 5,000,000 unique potential members (persons and entities) across all Classes, most of whom are unique potential individual members of the

Consumer Economic Loss and Medical Monitoring Classes.

7. The proposed Notice Plan described herein has been curated to deliver the most feasible and effective notice to the Classes through a mixed channel approach. Consequently, it is my opinion to a reasonable degree of certainty based on my qualifications and experience outlined above and the methodology detailed in this Declaration that the Notice Plan would successfully meet due process standards, comport with Fed. R. Civ. P. 23, and align with the recommendations provided in the *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*[2].

## DETAILS OF THE NOTICE PLAN

### Consumer Economic Loss Class and Medical Monitoring Class

**Overview of Methodology**

8. We determined the most reasonable and practicable way to reach and communicate with potential members of the Consumer Economic Loss and Medical Monitoring Classes is through a multifaceted approach, utilizing a combination of: (1) email notice; (2) text message notice; (3) mailed notice; (4) digital banner notice; (5) social media notice; and (6) search advertising.

9. A reach and frequency analysis of a program employing multiple notice channels, including media notice, requires demographic considerations and media consumption habits of a target audience. We utilize the nationally syndicated research bureau MRI-Simmons (formerly GfK Mediamark Research, Inc.) ("MRI")[3] and comScore[4], among others, to establish a qualitative

---

[2] https://www.fjc.gov/content/301350/illustrative-forms-class-action-notices-notice-checklist-and-plain-language-guide

[3] MRI-Simmons is a nationally-syndicated research tool. It is the leading supplier of multi-media audience research, and provides comprehensive reports on demographic, lifestyle, product usage and media exposure. MRI-Simmons conducts more than 30,000 personal interviews annually to gather their information and is used by more than 450 advertising agencies as the basis for the majority of media and marketing campaigns.

[4] comScore is a global internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and internet usage data. comScore maintains a proprietary database of more than 2 million consumers who have given comScore permission to monitor their browsing and transaction behavior, including online and offline purchasing. comScore panelists also participate in survey research that captures and integrates their attitudes.

5

target audience (inclusive of Class Members) of " Adults 35 years old and older that have, or had, a prescription medication for hypertension or heart disease/heart attack" (the "Target Audience"). Excerpts of the Target Audience demographics include:[5]

- 51% are female / 49% are male;
- 10% are aged 35-44 years old, 17% are aged 45-54 years old, 27% are aged 55-64 years old, and 46% are 65 years old or older;
- Compared to adults aged 18 years or older in the United States, those in the 55–64 age group are 46 times more likely, and adults aged 65 and above are 90 times more likely, to have taken or currently be taking prescription medication for conditions related to hypertension, heart disease, or heart attacks;
- 22% have a child living at home;
- 15% identify as Black or African American;
- 10% speak Spanish at home most often;
- 79% own a home, with a median home value of $271,741;
- 40% have a household income under $59,999 and 41% have a household income between $60,000 and $149,999.

10.  Notice experts use socioeconomic data, audience characteristics and media consumption habits to guide the creation of unbiased notice plans that adhere to court-approved methodologies and align with standard practices prevalent in the advertising industry. Objective data points such as these help guide the delivery of messaging to the Target Audience and shape the vehicles used to place a notice before a Class Member.

**Direct Notice**

11.  Class Counsel has provided approximately 167 files which contain, among other data points, potential contact information for potential members of the Consumer Economic Loss and Medical Monitoring Classes ("Notice List"). To date we have identified that the files contain

---

[5] 2023 MRI-Simmons Spring Doublebase USA.

6

over 38,000,00 records. Individuals may appear in multiple records due to multiple prescriptions filled during the class period and, after identifying unique individuals within each data set, and then identifying duplicates across data sets and deduplicating the records, we have identified 4,427,411 unique potential class members ("Class Members"), which will facilitate the implementation of direct notice. We have been performing, and will continue to perform, a comprehensive review, analysis, and deduplication process of the records to ensure that the data is accurately formatted for direct notice distribution.

12. Specifically, to identify contact information for the Notice List, we first reviewed pharmacy dispensing data containing reasonably available consumer contact information, including mailing addresses, email addresses, and phone numbers. For consumers for whom a valid email addresses was not available in the pharmacy dispensing data, we collaborated with a third-party data provider specializing in aggregating consumer data and identity verification to append email addresses, where available, to the Notice List. The Notice Plan proposes to distribute individual notice to all on the Notice List for whom the data includes a facially valid email address ("Email Notice"), mobile phone number ("Text Notice"), or mailing address ("Postcard Notice"), in that order of preference.

13. **Email Notice**: The short form notice has been formatted (attached as **Exhibit F**) for email distribution to all Class Members for whom a facially valid email address has been provided in the Notice List and/or through the email append process. The Email Notice will be created using embedded html text format, presenting a user-friendly and easily readable layout that avoids the inclusion of tables, graphs, or any other elements that may increase the likelihood of the email landing in SPAM folders and/or being blocked by Internet Service Providers ("ISP" or "ISPs"). Furthermore, we are committed to adhering to email industry best practices, incorporating essential elements such as 'unsubscribe' links, readily available Class Administrator contact information, and the utilization of multiple IP addresses with established

7

sender reputations.[6]

14.   To safeguard the integrity and optimize the deliverability of the Email Notice, all emails would undergo a hygiene and verification process. This process entails deduplication, syntax validation, detection and correction of misspelled domains, domain validation, and risk validation. We would monitor and report all email delivery attempts. For instances where an email is returned as undeliverable, commonly known as a 'bounce,' the specific reason for the bounce will be documented. If an email address is determined to be non-existent when attempted to send, this would be categorized as a 'hard bounce,' and no further delivery attempts would be made to that address. Instances where the inbox is full, initial blocking or deferral by the ISP, or any other factors impeding delivery are categorized as 'soft bounces.' To mitigate the number of undelivered emails resulting from soft bounces, we will make additional email attempts to addresses experiencing a soft bounce for a period of 72-hours. If an email remains undeliverable after this 72-hour period, it will be deemed undeliverable, and no additional delivery attempts would be pursued for that particular email address.

15.   **Text Notice**: Where a phone number exists in the Notice List for any Class Member for whom the Email Notice was undeliverable or no email address was available, we will send a text message notification (proposed Text Notice attached as **Exhibit G**). Prior to sending the Text Notice, phone numbers will undergo a validation process to determine their association with a mobile device. When initiating text message notifications, we follow guidelines endorsed by U.S. Chamber of Commerce and expert marketing agencies specializing in text message notifications, ensuring adherence to best practice procedures when communicating with class members via text message. This includes an opt-out option and sending text messages within normal operating hours, among others. The Text Notice will also clearly identify itself as being

---

[6] ISP's assign scores, or sender reputation, to domains and IP addresses which tells email inbox providers if the email should be delivered to the recipient's inbox or directed to the spam folder. The sender reputation is determined by multiple factors such as: the timing and number of emails sent from the IP/domain; number of recipients that have marked incoming mail from the sender as spam; number of emails that are delivered directly to spam boxes; number of emails that bounce back; number of recipients that interact with the email (e.g. open, reply, forward or delete); quality of the content within the email (e.g. typos); the number of users that unsubscribe; and many other factors.

sent on behalf of a U.S. Federal Court.

16.     **Postcard Notice**: For any Class Member unreachable by email or text, but where a mailing address exists, we will mail a Postcard Notice (attached as **Exhibit H**) via United States Postal Service ("USPS") First Class Mail. Prior to mailing, all mailing addresses would be checked against the National Change of Address ("NCOA")[7] database to ensure the accuracy and currency of Class Member address information for proper formatting and mail delivery. Additionally, the addresses will be validated through the Coding Accuracy Support System to uphold zip code precision, while Delivery Point Validation would be employed to verify mailing address accuracy. In the event that NCOA provides a more current mailing address for a Class Member, we would update the address accordingly. In instances where a Postcard Notice is returned with forwarding mailing address information, we would re-send to the newly provided mailing address. For any Postcard Notices that are returned as undeliverable, we would utilize standard skip-tracing techniques to obtain forwarding mailing address information. If skip-tracing yields an alternative forwarding mailing address, we would re-mail the notice to the mailing address identified through the skip-tracing process.

**Digital Advertising Notice**

17.     According to MRI research, 97% of the Target Audience has used the internet in the last 30 days, 53% are medium-to-heavy users of the internet, and 82% use a cellular or smartphone device to access the internet.[8] Additionally, 96% of adults over 65 years old use the internet and 75% use their cellular or smartphone device to access the internet.[9]

18.     Accordingly, we will run banner notices on desktop and mobile devices on select websites where Class Members may visit regularly and utilize audience networks based on its cost efficiency, timing, and their contribution to reaching the Target Audience as well as social

---

[7] The NCOA database is maintained by the USPS and consists of approximately 160 million permanent change-of-address ("COA") records consisting of names and addresses of individuals, families, and businesses who have filed a COA with the USPS. The address information is maintained on the database for 48 months.
[8] 2023 MRI-Simmons Spring Doublebase USA.
[9] *Id*.

9

media advertising on Facebook and Instagram.

19. Additionally, MRI reveals that 9% of the Target Audience are of Spanish, Hispanic or Latino origin descent and 10% speak Spanish most often at home.[10] Therefore, where appropriate, digital notices will appear in Spanish and English.

20. We follow advertising industry best practices when designing and implementing digital notice programs. Further, we incorporate a programmatic approach to developing and implementing our notice programs which brings multiple consumer data points into a single platform allowing us to monitor the placement of notices on websites that Class Members may be visiting and take active, real-time measures to improve efficiencies. Additionally, we develop a unique mix of segment targeting that are based on the demography and metrics of the Target Audience.

21. Here, we would include a mix of segments such as:

- *Demographics* – target users based on age, income, etc.;
- *Behavioral* – individuals who previously viewed or searched for information related hypertension, heart disease, heart attacks, Valsartan and other prescription medication related to the treatment of hypertension, heart disease, and heart attacks;
- *Contextual* – individuals that visit a web page that has key terms such as Valsartan, hypertension, heart disease, heart attacks, heart health, and more, as well as words related to the Defendant(s);
- *Interest-based & Engagement* – individuals that have interacted, liked, followed, shared, or commented on content related to heart health, hypertension, heart disease, heart attacks and other related social media accounts;
- *Language* – individuals that choose Spanish as their preferred browser language and/or Spanish language appropriate websites;
- *Cultural Affinity* – targeting individuals that identify as Black/African American, etc.;

---

[10] *Id.*

10

- *Device* – individuals on both desktop and mobile devices;
- *Select Placement* – high traffic premier websites in the shopping, sports, weather, entertainment, and local sites. Sites such as AARP.com, WebMD.com, ReadersDigest.com, Weather.com, CNN.com, FoxNews.com, USAToday.com are a few of the premier sites that will be utilized; and
- *Look-alike* (if approved by the Parties) – target users that share similar characteristics to the Notice List.

22. The banner notices will have the opportunity to run on thousands of websites through the Google Display Network and Basis (formerly known as Centro) programmatic demand-side platform allowing the notices to appear on websites that are relevant to the user. These sites will provide an opportunity for a Class Member to see the banner notice while they are viewing content relevant to them.

23. In addition to the digital notices described above, banner notifications will run on the top-visited social media sites Facebook and Instagram. These sites represent the leading group of social network sites with over 250 million users in the United States.[11] Social media emphasizes user-driven content sharing, thereby facilitating the organic dissemination of notices through trusted channels utilized by Class Members in their regular communication. Notices on Facebook and Instagram will appear in a user's feed.

24. The banner notices will utilize standard Interactive Advertising Bureau ad sizes (350x250, 728x90, 970x250, 300x600) and custom ads sizes according to Facebook and Instagram advertising guidelines. Proposed banner notices are attached hereto as **Exhibit I**.

25. Combined, we estimate that the digital advertising notice program will generate more than 91 million impressions.

**Search Advertising**

26. Search-based advertising places a notice in front of users that are actively

---

[11] "Number of Facebook users in United States from 2018 to 2027" (Statista; July 2023) and "Number of Instagram users in the United States from 2018 to 2027" (Statista; July 2023).

11

researching a topic. Utilizing Google Ads, a select list of keywords will be developed that are relevant to the litigation. When a user enters those keywords into the Google search bar, a short descriptive notice may appear above the results that would direct users to the Case Website.

**Hardcopy Publication Notice**

27. We evaluated whether notice by publication in a periodical of general circulation, such as *USA Today* or *People*, would materially improve the reach and frequency of the Consumer Economic Loss Class and Medical Monitoring Class notice plan, and concluded that publication notice would not materially improve the reach and frequency of the notice plan. Accordingly, this notice plan does not incorporate a publication notice element.

**Third-Party Payor ("TPP") Class**

28. The Notice Plan provides direct notice to the TPP Class through email and direct mail to more than 44,000 contacts on our proprietary third-party payor list ("TPP List"). The TPP List consists of health and medical insurance organizations, associations, and claims processors; trade, labor, and union welfare benefits and health funds; labor and employee organizations and associations; self-insured entities (Form 5500 filing); and other related entities and organizations. Further, in our analysis of the data provided to us to date, we have identified TPPs that have been included in the Notice List which will be cross-referenced with our TPP List and updated as needed. Attached as **Exhibit J** is the proposed short form Notice to TPPs.

**Media Outreach to Third-Party Payor Class**

29. In addition to the direct notice efforts to the third-party payor list described above, the Notice Plan provides issuing notice through four to six relevant industry publications and websites. In instances where a publication schedule is not conducive to the notice schedule or the notice is rejected by the publications legal review department, we will suggest an alternate publication or increase frequency in other publications.

30. We will coordinate with the following industry publications and websites:

- *National Association of Benefits and Insurance Professionals (NABIP)*: "NABIP represents more than 100,000 licensed health insurance agents, brokers, general

12

agents, consultants and benefit professionals through more than 200 chapters across America. NABIP members service the health insurance needs of large and small employers as well as people seeking individual health insurance coverage."[12]

- o NABIP.org homepage banner advertisement
- o NABIP eNewsletter
- o ½ page *America's Benefit Specialist Magazine*: The official publication for NABIP members with a readership of more than 36,000.

- *Society for Human Resource Management (SHRM)*: With nearly 319,000 members worldwide[13], SHRM represents and engages with executive leaders, HR specialist and HR generalists from small and large companies. SHRM.org website averages more than 3.9 million users and 12 million page views monthly.[14]
    - o SHRM.org banner advertisement

- *America's Health Insurance Plans Association (AHIP)*: AHIP is the national association whose members provide health care coverage, services, and solutions to hundreds of millions of Americans.
    - o *AHIP Smart Briefs* eNewsletter: With over 70,000 subscribers, AHIP Solutions SmartBrief is a subscription-only news service dedicated to informing health plan executives and leaders of the news shaping their industry.

### EARNED MEDIA – PRESS RELEASE

31. A press release will be distributed over PRNewswire's US1 and Hispanic Newslines in substantially the same form as the Short Form Notice. The press release will be issued broadly to media outlets, including newspapers, magazines, wire services, television, radio, and online media nationally. Combined, the Newslines distributes to more than 20,000 media

---

[12] NABIP Media Kit: https://mediakit.theygsgroup.com/nabip/#slide=about-nabip.
[13] 2022 SHRM Annual Report: https://www.shrm.org/about-shrm/pages/2022-shrm-annual-report.aspx.
[14] 2023 SHRM Media Kit.

13

outlets in the United States.

## CASE WEBSITE

32. We will establish and maintain a dedicated website, www.ValsartanMedicationLawsuit.com, designed to inform Class Members in all Classes of their legal rights and options. The website address will be included in the Notices and all digital banners will link directly to the Case Website. Important case related documents such as the Notices, Motions, Court Orders, and other relevant documents, will be accessible on the Case Website, allowing all Class Members to review and download these documents at their convenience. The Notices to TPPs will include a web address to a sub-site of the Case Website tailored to TPP-specific information. The sub-site will feature essential information related to the TPP Class. This sub-site can also be accessed from the homepage of the website.

33. The Case Website will also contain long form notices tailored to the Consumer Economic Loss and Medical Monitoring Classes, attached as **Exhibit K**, and the TPP Class, attached as **Exhibit L**.

34. The Case Website will also provide the ability for Class Members to determine their eligibility for the various Classes and Subclasses. Additionally, as set forth in the long form notices, it will provide relevant dates, address frequently asked questions, outline instructions for opting out of the Lawsuit, contact information for the Class Administrator, and furnish other case-related information. Visitors to the Case Website will also be able to register for updates to receive updates regarding the Lawsuit.

## DEDICATED TOLL-FREE HOTLINE

35. A dedicated toll-free informational hotline will be available 24 hours per day, seven days per week. The hotline will utilize an interactive voice response system where Class Members can obtain essential information regarding the Lawsuit and be provided responses to frequently asked questions. Class Members will also have the option to leave a voicemail and receive a call back from the Class Administrator.

**REQUESTS FOR EXCLUSION**

36. Class Members that want to exclude themselves, or opt out, from the Class may submit a request for exclusion by mail to a dedicated Post Office Box or email to a dedicated email address that we would maintain. We will monitor all mail delivered to that Post Office Box or email address and track all exclusion requests received, which would be provided to Counsel.

**DATA SECURITY**

37. Our firm routinely manages a broad range of confidential and highly sensitive information. To ensure privacy and data protection, we maintain industry-leading practices and follow industry accepted standards as endorsed by the National Institute of Standards and Technology (NIST), HITRUST, CIS Critical Security Controls (CIS Controls). Moreover, our certified data centers, meet stringent compliance regulations – PCI, HIPAA, FINRA, Sarbanes-Oxley, and Gramm-Leach-Bliley – and undergo annual SSAE16 SOCII audits.

38. Our data encryption protection encompasses email encryption for confidential transmissions as well as laptop hard drive encryption. These encryption mechanisms adhere to industry standards, providing a minimum of 128-bit encryption strength. Complex password requirements and two-factor authentication further bolsters access to our proprietary claims management database and other system-related services. For data transmission, we establish a secure password protected web portal ensuring the protected exchange of sensitive information. Employee security protocols are enforced through annual security awareness training, specializing in the handling of protected information such as PII and identifying the mechanisms of phishing and social engineering, among others.

39. In addition to these measures, we maintain comprehensive insurance coverage, including network security insurance, providing protection in the event of any breach. Furthermore, consumer data is strictly confined to the agreed-upon purpose of administering the Lawsuit. These policies underscore our commitment to safeguarding sensitive information and distinguishes us within the legal notice and settlement administration field. Detailed information regarding our information security policies is attached hereto as **Exhibit M**.

## TIMING OF NOTICE

40. We understand the Parties have agreed to an opt-out period of at least 45 days from commencement of the Notice Plan, the date on which publication and direct notice is initially transmitted. We estimate that the Notice Plan can be commenced as of December 4, 2023, or 14 days following approval of Notice, whichever is later, and direct notice will be substantially complete by December 18, 2023. All undeliverable direct notice attempts will be promptly addressed.

## CONCLUSION

41. In 2010, the Federal Judicial Center ("FJC") issued the *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide.* The guide states that, "the lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%." This Notice Plan is designed to deliver an estimated reach to at least 80% of the Target Audience with an estimated average frequency of 1.53. The measurable reach of the Notice Plan is driven by direct notice to an overwhelming majority of Class Members identified in the Notice List and bolstered by digital publication notice but does not include the direct notice to TPPs, press release, paid search, dedicated website, and toll-free hotline, as these vehicles are difficult to calculate. They, however, will meaningfully strengthen the reach and frequency of the Notice Plan.

42. This method of focused notice dissemination is a measured and targeted approach to provide effective notice in this case, follows the guidance set forth in the *Manual for Complex Litigation (4th ed.)* and FJC guidance, and exceeds the requirements of due process, including its "desire to actually inform" requirement.[15]

I declare under penalty of perjury that the foregoing is true and correct to the best of my

---

[15] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 US 306, 315, 70 S Ct 653, 94 L Ed 865 (1950)

knowledge and belief.

Executed this 13th day of November, 2023 in Portland, Oregon.

_____
Brandon Schwartz