# Exhibit 125

**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

# FTC Policy Statement on Unfairness

**Tags:** Consumer Protection | Appliances | Alcohol | Automobiles | Clothing and Textiles | Finance | Franchises, Business Opportunities, and Investments | Funerals | Jewelry | Real Estate and Mortgages | Advertising and Marketing | Children | Endorsements, Influencers, and Reviews | Environmental Marketing | Health Claims | Online Advertising and Marketing | Telemarketing | Advertising and Marketing Basics

Give Feedback

**Date:** December 17, 1980

Appended to *International Harvester Co.*, 104 F.T.C. 949, 1070 (1984). *See* 15 U.S.C. § 45(n).

The Honorable Wendell H. Ford

Chairman, Consumer Subcommittee

Committee on Commerce, Science, and Transportation

Room 130 Russell Office Building

Washington, D.C. 20510

The Honorable John C. Danforth

Ranking Minority Member, Consumer Subcommittee

Committee on Commerce, Science, and Transportation

Room 130 Russell Office Building

Washington, D.C. 20510

Dear Senators Ford and Danforth:

This is in response to your letter of June 13, 1980, concerning one aspect of this agency's jurisdiction over "unfair or deceptive acts or practices." You informed us that the Subcommittee was planning to hold oversight hearings on the concept of "unfairness" as it has been applied to consumer transactions. You further informed us that the views of other interested parties were solicited and compiled in a Committee Print earlier this year. Your letter specifically requested the Commission's views on cases under Section 5 "not involving the content of advertising," and its views as to

"whether the Commission's authority should be limited to regulating false or deceptive comm advertising." Our response addresses these and other questions related to the concept of co unfairness.

We are pleased to have this opportunity to discuss the future work of the agency. The subject that you have selected appears to be particularly timely. We recognize that the concept of consumer unfairness is one whose precise meaning is not immediately obvious, and also recognize tha uncertainty has been honestly troublesome for some businesses and some members of  h profession. This result is understandable in light of the general nature of the statutory s the same time, though, we believe we can respond to legitimate concerns of business a attempting to delineate in this letter a concrete framework for future application of the unfairness authority. We are aided in this process by the cumulative decisions of this agen federal courts, which, in our opinion, have brought added clarity to the law. Although the administrative and judicial evolution of the consumer unfairness concept has still left some n flexibility in the statute, it is possible to provide a reasonable working sense of the conduct t covered.

In response to your inquiry we have therefore undertaken a review of the decided cases and have synthesized from them the most important principles of general app icability. Rather than merely reciting the law, we have attempted to provide the Committee with a concrete indication of the manner in which the Commission has enforced, and will continue to enforce, its unfairness m In so doing we intend to address the concerns that have been raised about the meaning of c unfairness, and thereby attempt to provide a greater sense of certainty about what the Com would regard as an unfair act or practice under Section 5.

This letter thus delineates the Commission's views of the boundaries of its consumer unfairn jurisdiction and is subscribed to by each Commissioner. In addition, we are enclosing a companion Commission statement that discusses the ways in which this body of law differs from, and supplements, the prohibition against consumer deception, and then considers and evaluates specific criticisms that have been made of our enforcement of the law.2 Since you have indicated a particular interest in the possible application of First Amendment principles to commercial ad the companion statement will include discussions relevant to that question. The companion s is designed to respond to the key questions raised about the unfairness doctrine. H  wever, individual Commissioners may not necessarily endorse particular arguments or particular examples of Commission's exercise of its unfairness authority contained in the companion statement.

Commission Statement of Policy on the Scope of the

Consumer Unfairness Jurisdiction

Section 5 of the FTC Act prohibits, in part, "unfair ... acts or practices in or affecting commer is commonly referred to as the Commission's consumer unfairness jurisdiction. The Commiss jurisdiction over "unfair methods of competition" is not discussed in this letter.4 Although we cannot give an exhaustive treatment of the law of consumer unfairness in this short statement, some relatively concrete conclusions ran nonetheless be drawn.

The present understanding of the unfairness standard is the result of an evolutionary pr statute was deliberately framed in general terms since Congress recognized the imposs drafting a complete list of unfair trade practices that would not quickly become outdate loopholes for easy evasion.5 The task of identifying unfair trade practices was therefore assi the Commission, subject to judicial review,6 in the expectation that the underlying criteria would evolve and develop over time. As the Supreme Court observed as early as 1931, the ban on u "belongs to that class of phrases which do not admit of precise definition, but the meaning a application of which must be arrived at by what this court elsewhere has called 'the gradual of judicial inclusion and exclusion.'"7

By 1964 enough cases had been decided to enable the Commission to identify three factors considered when applying the prohibition against consumer unfairness. These were: (1) whe practice injures consumers; (2) whether it violates established public policy; (3) whether it is or unscrupulous.8 These factors were later quoted with apparent approval by the Supreme C the 1972 case of *Sperry & Hutchinson*.9 Since then the Commission has continued to refine the standard of unfairness in its cases and rules, and it has now reached a more detailed sense o the definition and the limits of these criteria.10

# Consumer injury

Unjustified consumer injury is the primary focus of the FTC Act, and the most important of th *S&H* criteria. By itself it can be sufficient to warrant a finding of unfairness. The Commission's to rely on an independent criterion of consumer injury is consistent with the intent of the sta which was to "[make] the consumer who may be injured by an unfair trade practice of equal before the law with the merchant injured by the unfair methods of a dishonest competitor."11

The independent nature of the consumer injury criterion does not mean that every consumer      legally "unfair," however. To justify a finding of unfairness the injury must satisfy three tests. It m    substantial; it must not be outweighed by any countervailing benefits to consumers or compe    that the practice produces; and it must be an injury that consumers themselves could not rea    have avoided.

First of all, the injury must be substantial. The Commission is not concerned with trivial or me    speculative harms.12 In most cases a substantial injury involves monetary harm, as whe      l    coerce consumers into purchasing unwanted goods or servicesl3 or when consumers b    goods or services on credit but are unable to assert against the creditor claims or defen    from the transaction. 14 Unwarranted health and safety risks may also support a finding    unfairness.15 Emotional impact and other more subjective types of harm, on the other h    ordinarily make a practice unfair. Thus, for example, the Commission will not seek to ban an    advertisement merely because it offends the tastes or social beliefs of some viewers, as has    suggested in some of the comments.16

Second, the injury must not be outweighed by any offsetting consumer or competitive benef    the sales practice also produces. Most business practices entail a mixture of economic and o    costs and benefits for purchasers. A seller's failure to present complex technical data on his    may lessen a consumer's ability to choose, for example, but may also reduce the initial price    pay for the article. The Commission is aware of these tradeoffs and will not find that a practi    unfairly injures consumers unless it is injurious in its net effects.17 The Commission also take    of the various costs that a remedy would entail. These include not only the costs to the parti    directly before the agency, but also the burdens on society in general in the form of increased    paperwork, increased regulatory burdens on the flow of information, reduced incentives to in    and capital formation, and similar matters.18 Finally, the injury must be one which consumers could    not reasonably have avoided.19 Normally we expect the marketplace to be self-correcting, and we    rely on consumer choice-the ability of individual consumers to make their own private purcha    decisions without regulatory intervention--to govern the market. We anticipate that consume    survey the available alternatives, choose those that are most desirable, and avoid those that    inadequate or unsatisfactory. However, it has long been recognized that certain types of sales    techniques may prevent consumers from effectively making their own decisions, and that co    action may then become necessary. Most of the Commission's unfairness matters are brought un    these circumstances. They are brought, not to second-guess the wisdom of particular consu

decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking.20

Sellers may adopt a number of practices that unjustifiably hinder such free market decisions may withhold or fail to generate critical price or performance data, for example, leaving buye insufficient information for informed comparisons.21 Some may engage in overt coercion, as dismantling a home appliance for "inspection" and refusing to reassemble it until a service co signed.22 And some may exercise undue influence over highly susceptible classes of p by promoting fraudulent "cures" to seriously ill cancer patients.23 Each of these practic an essential precondition to a free and informed consumer transaction, and, in turn, to a functioning market. Each of them is therefore properly banned as an unfair practice und Act.24

# Violation of public policy

The second *S&H* standard asks whether the conduct violates public policy as it has been estab by statute, common law, industry practice, or otherwise. This criterion may be applied in two di ways. It may be used to test the validity and strength of the evidence of consumer injury, or, less often, it may be cited for a dispositive legislative or judicial determination that such injury is p

Although public policy was listed by the *S&H* Court as a separate consideration, it is used most frequently by the Commission as a means of providing additional evidence on the degree of injury caused by specific practices. To be sure, most Commissi6n actions are brought to redr relatively clear-cut injuries, and those determinations are based, in large part, on objective eco analysis. As we have indicated before, the Commission believes that considerable attention s devoted to the analysis of whether substantial net harm has occurred, not only because that the unfairness test, but also because the focus on injury is the best way to ensure that the Commission acts responsibly and uses its resources wisely. Nonetheless, the Commission wishes t emphasize the importance of examining outside statutory policies and established judicial pr for assistance in helping the agency ascertain whether a particular form of conduct does in f to harm consumers. Thus the agency has referred to First Amendment decisions upholding consumers' rights to receive information, for example, to confirm that restrictions on advertis unfairly to hinder the informed exercise of consumer choice.25

Conversely, statutes or other sources of public policy may affirmatively allow for a practice th
Commission tentatively views as unfair. The existence of such policies will then give the agency
reason to reconsider its assessment of whether the practice is actually injurious in its net eff
other situations there may be no clearly established public policies, or the policies may even
conflict. While that does not necessarily preclude the Commission from taking action if there
evidence of net consumer injury, it does underscore the desirability of carefully examining public
policies in all instances.27 In any event, whenever objective evidence of consumer injury is d
obtain, the need to identify and assess all relevant public policies assumes increased im

Sometimes public policy will independently support a Commission action. This occurs w
is so clear that it will entirely determine the question of consumer injury, so there is little need fo
separate analysis by the Commission. In these cases the legislature or court, in announ
has already determined that such injury does exist and thus it need not be expressly proved
instance. An example of this approach arose in a case involving a mail-order firm.28 There th
Commission was persuaded by an analogy to the due-process clause that it was unfair for th
bring collection suits in a forum that was unreasonably difficult for the defendants to reach. I
similar case the Commission applied the statutory policies of the Uniform Commercial Code
that various automobile manufacturers and their distributors refund to their customers any s
money that was realized after they repossessed and resold their customer's cars.29 The Com
acts on such a basis only where the public policy is suitable for administrative enforcement b
agency, however. Thus it turned down a petition for a rule to require fuller disclosure of aeroso
propellants, reasoning that the subject of fluorocarbon safety was currently under study by o
scientific and legislative bodies with more appropriate expertise or jurisdiction over the subje

To the extent that the Commission relies heavily on public policy to support a finding of unfa
the policy should be clear and well-established. In other words, the policy should be declare
embodied in formal sources such as statutes, judicial decisions, or the Constitution as interp
the courts, rather than being ascertained from the general sense of the national values. The
should likewise be one that is widely shared, and not the isolated decision of a single state o
court. If these two tests are not met the policy cannot be considered as an "established" pub
for purposes of the S&H criterion. The Commission would then act only on the basis of convi
independent evidence that the practice was distorting the operation of the market and there
causing unjustified consumer injury.

## Unethical or unscrupulous conduct

Finally, the third *S&H* standard asks whether the conduct was immoral, unethical, oppressive, o unscrupulous. This test was presumably included in order to be sure of reaching all the purpo the underlying statute, which forbids "unfair" acts or practices. It would therefore allow the Commission to reach conduct that violates generally recognized standards of business ethic test has proven, however, to be largely duplicative. Conduct that is truly unethical or unscrupulo almost always injure consumers or violate public policy as well. The Commission has the relied on the third element of *S&H* as an independent basis for a finding of unfairness, and i the future only on the basis of the first two.

We hope this letter has given you the information that you require. Please do not hesita can be of any further assistance. With best regards,

/s/Michael Pertschuk Chairman

/s/Paul Rand Dixon Commissioner

/s/David A. Clanton Commissioner

/s/Robert Pitofsky Commissioner

/s/Patricia P. Bailey Commissioner

———

1Unfairness: Views on Unfair Acts and Practices in Violation of the Federal Trade Commission (1980) (hereinafter referred to as "Committee Print").

2Neither this letter nor the companion statement addresses ongoing proceedings, but the Commission is prepared to discuss those matters separately at an appropriate time.

3The operative sentence of Section 5 reads in full as follows: "Unfair methods of competition affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are unlawful." 15 U.S.C. 45(a)(1).

4In fulfilling its competition or antitrust mission the Commission looks to the purposes, polici spirit of the other antitrust laws and the FTC Act to determine whether a practice affecting

competition or competitors is unfair. *See, e.g., FTC v. Brown Shoe Co.,* 384 U.S. 316 (1966). In making this determination the Commission is guided by the extensive legislative histories of those st and a considerable body of antitrust case law. The agency's jurisdiction over "deceptive acts or practices" is likewise not discussed in this letter.

5 *See* H.R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., at 19 (1914) (If Congress "were to adopt t method of definition, it would undertake an endless task"). In 1914 the statute was phrased o terms of "unfair methods of competition," and the reference to "unfair acts or practices" added until the Wheeler-Lee Amendment in 1938. The initial language was still understood reaching most of the conduct now characterized as consumer unfairness, however, and so the original legislative history remains relevant to the construction of that part of the statut

6 The Supreme Court has stated on many occasions that the definition of "unfairness" is ultim one for judicial determination. *See, e.g., FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 249 (1972); *FTC v. R..F. Keppel & Bro.,* 291 U.S. 304, 314 (1934).

7 *FTC v. Raladam Co.,* 283 U.S. 643, 648 (1931). *See also FTC v. R.F. Keppel & Bro.,* 291 U.S. 304, 310 (1934) ("Neither the language nor the history of the Act suggests that Congress intended to the forbidden methods to fixed and unyielding categories").

8 The Commission's actual statement of the criteria was as follows:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common- law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Statement of Basis and Purpose, Unfair or Deceptive Advertising and Labeling of Cigarettes Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (1964).

Give Feedback

9*FTC v. Sperry & Hutchinson C..,* 405 U.S. 223, 244-45 n.5 (1972). The Circuit Courts have concl that this quotation reflected the Supreme Court's own views. *See Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 n.8 (7th Cir. 1976); *Heater v. FTC,* 503 F.2d 321, 323 (9th Cir. 1974). The application of these factors to antitrust matters is beyond the scope of this letter.

10These standards for unfairness are generally applicable to both advertising and non-adver cases.

1183 Cong. Rec. 3255 (1938) (remarks of Senator Wheeler).

12An injury may be sufficiently substantial, however, if it does a small harm to a large number people, or if it raises a significant risk of concrete harm.

13*See, e.g., Holland Furnace Co. v. FTC*, 295 F.2d 302 (7th Cir. 1961) (seller's servicemen dismantle home furnaces and then refused to reassemble them until the consumers had agreed to buy or replacement parts).

14Statement of Basis and Purpose, Preservation of Consumers' Claims and Defenses, 40 Fed 53,506, 53522-23 (1975).

15For an example *see Philip Morris, Inc.*, 82 F.T.C. 16 (1973) (respondent had distributed free-sam razor blades in such a way that they could come into the hands of small children) (consent agreement). Of course, if matters involving health and safety are within the primary jurisdicti some other agency, Commission action might not be appropriate.

16*See, e.g.,* comments of Association of National Advertisers, Committee Print at 120. In an ex case, however, where tangible injury could be clearly demonstrated, emotional effects might p be considered as the basis for a finding of unfairness. *Cf.* 15 U.S.C. 1692 *et seq.* (Fair Debt Collection Practices Act) (banning, eg., harassing late-night telephone calls).

17*See Pftzer, Inc.*, 81 F.T.C. 23, 62-63 n. 13 (1972); Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, Reg. 59614, 59636 n.95 (1978).

When making this determination the Commission may refer to existing public policies for help ascertaining the existence of consumer injury and the relative weights that should be assign

various costs and benefits. The role of public policy in unfairness determinations will be discu more generally below.

18For example, when the Commission promulgated the Holder Rule it anticipated an overall l of economic costs to society because the rule gave creditors the incentive to police sellers, increasing the likelihood that those selling defective goods or services would either improve practices or leave the marketplace when they could not obtain financing. These benefits, in Commission's judgment, outweighed any costs to creditors and sellers occasioned by th Statement of Basis and Purpose, Preservation of Consumers' Claims and Defenses, 40 53506, 53522-23 (1975).

19In some senses any injury can be avoided--for example, by hiring independent exper products in advance, or by private legal actions for damages-but these courses may be too to be practicable for individual consumers to pursue.

20This emphasis on informed consumer choice has commonly been adopted in other statute *See, e.g.,* Declaration of Policy, Fair Packaging and Labeling Act, 15 U.S.C. 1451 ("Informed consume are essential to the fair and efficient functioning of a free market economy".)

21*See, e.g.,* Statement of Basis and Purpose, Labeling and Advertising of Home Insulation, 44 Reg. 50218, 5022 -23 (1979); Statement of Basis and Purpose, Posting of Minimum Octane Nu on Gasoline Dispensing Pumps, 36 Fed. Reg. 23871,23882 (1971). *See also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* Inc., 425 U.S. 748 (1976).

22*See Holland Furnace Co. v. ETC,* 295 F.2d 302 (7th Cir. 1961); *cf Arthur Murray Studio, Inc. v.* EW, 458 F.2d 622 (5th Cir. 1972) (emotional high-pressure sales tactics, using teams of salesmen wh refused to let the customer leave the room until a contract was signed). *See also* Statement of Basis and Purpose, Cooling-Off Period for Door-to-Door Sales, 37 Fed. Reg. 22934, 22937-38 (1972).

23*See, e.g., Travel King,* Inc., 86 F.T.C. 715, 774 (1975). The practices in this rase primarily involv deception, but the Commission noted the special susceptibilities of such patients as one rea banning the ads entirely rather than relying on the remedy of fuller disclosure. The Commiss recognizes that "undue influence" in advertising and promotion is difficult to define, and ther exercises its authority here only with respect to substantial coercive-like practices and signif consumer injury.

24These few examples are not exhaustive, but the general direction they illustrate is clear. As the Commission stated in promulgating its Eyeglasses Rule, the inquiry should begin, at least, by "whether the acts or practices at issue inhibit the functioning of the competitive market and consumers are harmed thereby." Statement of Basis and Purpose, Advertising of 0phthalmic Go and Services, 43 Fed. Reg. 23992,24001 (1978).

25See Statement of Basis and Purpose, Advertising of ophthalmic Goods and Services, 43 Fe 23992,24001 (1978), citing Virginia State Board of Pharmacy v. Virginia Citizens Consumer Co      i' 425 U.S. 748 (1976).

26Cf. Statement of Basis and Purpose, Advertising of ophthalmic Goods and Services, supra; see n.17 supra.

27The analysis of external public policies is extremely valuable but not always definitive. The legislative history of Section 5 recognizes that new forms of unfair business practices may a which, at the time of the Commission's involvement, have not yet been generally proscribed. page 4, supra. Thus a review of public policies established independently of Commission actio not be conclusive in determining whether the challenged practices should be prohibited or o restricted. At the same time, however, we emphasize the importance of examining public policies since a thorough analysis can serve as an important check on the overall reasonableness of Commission's actions.

28Spiegel, Inc. v. FTC, 540 F.2d 287 (7th Cir. 1976). In this case the Commission did inquire into th extent of the resulting consumer injury, but under the rationale involved it presumably need not h done so. See also FTC v. R.F. Keppel & Bro., 291 U.S. 304 (1934) (firm had gained a marketing advantage by selling goods through a lottery technique that violated state gambling policies    cf. Simeon Management Corp., 87 F.T.C. 1184, 1231 (1976), aff'd, 579 F.2d 1137 (9th Cir. 1978) (firm advertised weight-loss program that used a drug which could not itself be advertised under FD regulations) (alternative ground). Since these public-policy cases are based on legislative determinations, rather than on a judgment within the Commission's area of special economic expertise, it is appropriate that they can reach a relatively wider range of consumer injuries t those associated with impaired consumer choice.

29A surplus occurs when a repossessed car is resold for more than the amount owed by the plus the expenses of repossession and resale. The law of 49 states requires that creditors re

surpluses when they occur, but if creditors systematically refuse to honor this obligation, consu have no practical way to discover that they have been deprived of money to which they are e *See Ford Motor Co.,* 94 F.T.C. 564, 618 (1979) *appeal pending,* Nos. 79-7649 and 79-7654 (9th Cir.); *Ford Motor Co.,*93 F.T.C. 402 (1979) (consent decree); *General Motors Corp.,* D. 9074 (Feb., 1980) (consent decree). By these latter two consent agreements the Commission, because of its un jurisdiction, has been able to secure more than $2 million for consumers allegedly deprived o surpluses to which they were entitled.

30See Letter from John F. Dugan, Acting Secretary, to Action on Smoking and Health (Januar 1977). *See* also letter from Charles A. Tobin, Secretary, to Prof. Page and Mr. Young (September 17,1973) (denying petition to exercise § 6(b) subpoena powers to obtain consumer complaint information from cosmetic fu-ms and then to transmit the data to FDA for that agency's purposes).

Give Feedback