```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2
 3  ─────────────────────────────        CIVIL ACTION NUMBER:

 4  IN RE:  VALSARTAN PRODUCTS           19-md-02875
    LIABILITY LITIGATION
 5                                       CASE MANAGEMENT CONFERENCE
                                         via Teams
 6  ─────────────────────────────

 7       Mitchell H. Cohen Building & U.S. Courthouse
         4th & Cooper Streets
 8       Camden, New Jersey  08101
         January 4, 2024
 9       Commencing at 1:15 p.m.

10  B E F O R E:          THE HONORABLE ROBERT B. KUGLER
                          UNITED STATES DISTRICT JUDGE
11                             and
                          THOMAS I. VANASKIE (RET.)
12                        SPECIAL MASTER

13  A P P E A R A N C E S:

14
         MAZIE SLATER KATZ & FREEMAN, LLC
15       BY:  ADAM M. SLATER, ESQUIRE
         103 Eisenhower Parkway
16       Roseland, New Jersey  07068
         For the Plaintiffs
17

18       HONIK LLC
         BY:  RUBEN HONIK, ESQUIRE
19       1515 Market Street, Suite 1100
         Philadelphia, Pennsylvania  191032
20       For the Plaintiffs

21

22          Ann Marie Mitchell, Official Court Reporter
                AnnMarie_Mitchell@njd.uscourts.gov
23                      (856) 576-7018

24   Proceedings recorded by mechanical stenography; transcript
              produced by computer-aided transcription.
25
```

1    **A P P E A R A N C E S (Continued):**

2

3        KANNER & WHITELEY, LLC
         BY:  LAYNE HILTON, ESQUIRE
4        701 Camp Street
         New Orleans, Louisiana  70130
         For the Plaintiffs
5

6        RIVERO MESTRE LLP
         BY:  ZALMAN KASS, ESQUIRE
7        2525 Ponce De Leon Boulevard, Suite 1000
         Miami, Florida 33134
8        For the Plaintiffs

9

10       GREENBERG TRAURIG LLP
         BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
         BY:  STEVEN M. HARKINS, ESQUIRE
11       3333 Piedmont Road, NE, Suite 2500
         Atlanta, Georgia  30305
12
         BY:  GREGORY E. OSTFELD,  ESQUIRE
13       77 West Wacker Drive, Suite 3100
         Chicago, Illinois 60601
14       For the Defendants, Teva Pharmaceutical Industries Ltd.,
         Teva Pharmaceuticals USA, Inc., Actavis LLC,
15       and Actavis Pharma, Inc.

16

17       ULMER & BERNE LLP
         BY:  JEFFREY D. GEOPPINGER, ESQUIRE
18       600 Vine Street, Suite 2800
         Cincinnati, Ohio 445202
19       For the Wholesaler Defendants and AmerisourceBergen

20

21   **ALSO PRESENT:**

22       LORETTA SMITH, ESQUIRE
         Judicial Law Clerk to The Honorable Robert B. Kugler
23
         Larry MacStravic, Courtroom Deputy
24

25

```
 1              (PROCEEDINGS held via Teams before The Honorable
 2   ROBERT B. KUGLER and SPECIAL MASTER THOMAS I. VANASKIE at
 3   1:15 p.m.)
 4              THE COURT:  Is Mr. Harkins on this call?
 5              MR. HARKINS:  Yes, Your Honor, I'm here.
 6              THE COURT:  Let's talk about your orders to show
 7   cause.
 8              All seven of them have been resolved apparently --
 9   well, not resolved.  Three, you have withdrawn the Pauline
10   Harris, Hines and Kaluhiokalani cases.  Correct?
11              MR. HARKINS:  Three can be withdrawn.
12              THE COURT:  Then you're going to carry the other
13   four; Alexandra Samocha; Benjamin Andrews; Haughton,
14   H-A-U-G-H-T-O-N; and Kennedy.  Correct?
15              MR. HARKINS:  That's correct.
16              THE COURT:  You have two orders to show cause you
17   want for next time, Davidson and Mantalis.
18              Any change on those?
19              MR. HARKINS:  No updates there, Your Honor.  The
20   defendants would request orders to show cause returnable at
21   the next case management conference in both of those two
22   cases.
23              THE COURT:  Anybody have any objection to listing
24   these for an order to show cause?
25              (No response.)
```

*United States District Court*

```
 1              THE COURT:  Okay.  Hearing none, they will be set for
 2     the next conference.
 3              And you did not have a chance to list any new first
 4     listings, you'll do that the next conference.  Correct?
 5              MR. HARKINS:  Correct, Your Honor.
 6              THE COURT:  Anything else you want to bring up?
 7              MR. HARKINS:  Nothing from the defense on those.
 8              THE COURT:  Okay.  Thank you.
 9              Now, you have -- go back to the letters from counsel.
10              The fact sheet, have you had any further -- as to the
11     fact sheet for the losartan/irbesartan cases?
12              MR. GEOPPINGER:  Good afternoon, Your Honor.  Jeff
13     Geoppinger on behalf of the defendants.
14              I'm sorry, I didn't quite hear your question with
15     respect to the fact sheet.
16              We are negotiating it.  We've made substantial
17     progress.  And we're just looking for the Court to provide us
18     a time to address with Judge Vanaskie any disputes that may
19     remain on the fact sheet within the next 30 days or so.
20              THE COURT:  Is Judge Vanaskie on this call somewhere?
21              SPECIAL MASTER VANASKIE:  Yes.  I'm on.  I'm on, Your
22     Honor.
23              THE COURT:  How are you doing, Tom?
24              SPECIAL MASTER VANASKIE:  Good.  How are you doing?
25              THE COURT:  Good.
```

*United States District Court*

```
1              Do you want to set a date you want to hear that?
2              SPECIAL MASTER VANASKIE:  Yeah.
3              How much time do counsel anticipate they need to
4    submit letter briefs, and do they want to go one side at a
5    time?  Mr. Geoppinger?
6              MR. GEOPPINGER:  I think that that would be fine,
7    Your Honor.  The defendants, I believe we can submit
8    initially, and then the plaintiffs submit a response.  And I
9    don't know, I think previously we've had a very short reply
10   provided for when we did this previously in the valsartan
11   case, so I would suggest we just follow that same model.
12             And with respect to timing, working backwards from
13   the defendants' perspective, I was looking at the week of the
14   22nd of this month for -- to hear the issues.  So if we can
15   find a date during that week, we can work backward on the
16   filing dates on the briefs, letter briefs.
17             SPECIAL MASTER VANASKIE:  All right.  Let me look at
18   my calendar.
19             How would the 24th of January be?  It's a Wednesday.
20             MR. GEOPPINGER:  That would work for the defendants,
21   Your Honor.
22             SPECIAL MASTER VANASKIE:  Who is addressing this
23   issue for the plaintiffs?
24             MR. KASS:  Your Honor, Zalman Kass on behalf of the
25   plaintiffs.
```

```
 1            If it were possible to do the following week, it

 2    would work a lot better, but I understand that there are other

 3    factors involved.  But if not, I will -- we'll make it work,

 4    the 24th.

 5            SPECIAL MASTER VANASKIE:  It's a little more

 6    problematic for me to --

 7            MR. KASS:  We'll make it work then.

 8            SPECIAL MASTER VANASKIE:  All right.  So we'll

 9    schedule hearing/argument for January 24th at 1:00 p.m., if

10    that's all right.

11            Larry, if we could impose upon you to do it by Teams,

12    let's do it with the Teams format.

13            All right.  So working backwards, can we have the

14    defense opening brief or opening submission by the 11th of

15    January?  Mr. Geoppinger?

16            MR. GEOPPINGER:  Would the Court -- would the Court

17    be -- I have another brief due that day on --

18            Would you be flexible, Your Honor, could we submit it

19    on -- and obviously with the plaintiffs' counsels' agreement

20    here -- on the 15th?

21            I know that's a court holiday.

22            Would the 16th be too late?

23            MR. KASS:  On the plaintiffs' side it would depend on

24    when our opposition would be due.  Right?  It doesn't give

25    much room.
```

*United States District Court*

1           SPECIAL MASTER VANASKIE:  Can we dispense with the

2   reply and have the 16th as the defense submission, the 23rd as

3   the plaintiffs' submission?

4           MR. GEOPPINGER:  That's fine by -- I'm all -- you

5   know, I will agree, that's fine with the defendants, Your

6   Honor.

7           SPECIAL MASTER VANASKIE:  I mean, you'll have an

8   opportunity to reply then when we hear it on the 24th.  All

9   right?

10          MR. KASS:  Okay.

11          SPECIAL MASTER VANASKIE:  So let's go with the 16th

12  for the defense submission, the 23rd for the plaintiffs'

13  submission, hearing/argument on the 24th at 1:00 p.m.

14          MR. GEOPPINGER:  Thank you, Your Honor.

15          MR. KASS:  Thank you.

16          SPECIAL MASTER VANASKIE:  Thank you.

17          Anything else on that?

18          LAW CLERK:  Judge, this is Loretta.

19          SPECIAL MASTER VANASKIE:  Yes.

20          LAW CLERK:  May I ask the parties that are going to

21  appear -- Teams is a little bit different, so to lessen

22  Larry's load, may we ask the parties who plan to appear

23  that -- for that hearing on the fact sheets to email him or

24  let the Court know who he needs to invite.

25          MR. GEOPPINGER:  Certainly.

*United States District Court*

```
 1            LAW CLERK:  Thank you.

 2            SPECIAL MASTER VANASKIE:  All right.  Thanks,

 3    Loretta.

 4            THE COURT:  All right.  You also -- this is Judge

 5    Kugler again.

 6            You're talking some about supplemental depositions of

 7    damages experts and you may ask Judge Vanaskie to decide

 8    something if you can't come to an agreement.

 9            Is that still correct?

10            MR. HONIK:  Good afternoon, Your Honor, Ruben Honik.

11            That is correct.  And regrettably, we haven't been

12    able to come to an agreement with the defendants and need to

13    place the matter before Judge Vanaskie.

14            THE COURT:  Okay.  Do you want to schedule for that?

15            MR. HONIK:  My own view is that this is a rather

16    simple and straightforward matter.  I will say that

17    Mr. Ostfeld for the defendants and I have made some progress,

18    modest as it may be.  My view is that we could probably

19    discuss it in the course of the next five or ten minutes and

20    knock it out.

21            That's just my view.

22            THE COURT:  Judge Vanaskie, do you want to tackle it

23    right now?

24            SPECIAL MASTER VANASKIE:  Yeah, let's tackle it right

25    now, if it can be done.
```

*United States District Court*

 1          Mr. Ostfeld, do you think we can do that?

 2          MR. HONIK:  You're muted, Greg.

 3          MR. OSTFELD:  Apologies, can everyone hear me?

 4          SPECIAL MASTER VANASKIE:  Yes.

 5          MR. HONIK:  Yes.

 6          MR. OSTFELD:  Yes.  I think we can cover it today.

 7  We came prepared to argue it today.

 8          SPECIAL MASTER VANASKIE:  Okay.  Very well.  Why

 9  don't we just get right into it then.

10          Is that all right, Judge Kugler?

11          MR. HONIK:  Yes, Judge, I'm happy to jump in and

12  perhaps provide a little bit of reminder context of what this

13  is all about.

14          So Dr. Conti, as I think everyone knows, is our

15  health economist expert.  She's provided to this point four

16  different reports.

17          The first couple related to our motion for class

18  certification.  The two more recent reports relate

19  specifically to third-party payor damages and even more

20  specifically MSP damages.  She prepared a report that

21  calculated the damages, the relevant damages, as it concerns

22  our upcoming trial sometime in February of last year.

23          In that regard, she underwent a nearly seven-hour

24  deposition in July of this past year, producing 269 pages of

25  testimony, and having gone -- undergone extensive examination

1    about the basis for her opinions.

2           Let me just say that the calculations that she

3    articulated in her report then were no different than the two

4    previous reports supporting our cert motion, which is to say

5    an analysis that says the damages occur at the point of sale

6    and that the formula to apply to ascertain damages is knowing

7    the number of pills sold and their price.

8           And what she did at our request more recently,

9    specifically on December 1st of this past year, so just a

10   month ago, she prepared a very limited supplemental report

11   based upon a new dataset that we got from the retailers fairly

12   recently.  In particular, we got claims data, that is, pricing

13   data, from Albertsons, CVS, Express Scripts, Humana, Kroger,

14   Optum, Rite Aid, Walgreens and Walmart.

15          And we thought it appropriate to ask her, applying

16   the identical methodology, the identical formula that she's

17   done on three prior occasions, to that new dataset so that the

18   fact-finder potentially has another snapshot of what the

19   damages are at the point of sale.

20          And so that's precisely what she did.  She prepared a

21   very brief report.  She talked about -- a little bit about

22   generic pricing at these large pharmacy chains, devoted maybe

23   two or three sentences to it.  But essentially took the same

24   formula, that is to say, number of pills at the point of sale,

25   and this time took the average pricing from this sample of

1    nine retailers or pharmacies, and, you know, produced values

2    or numbers so that the jury can now look at alternative

3    modeling but using the same methodology.

4          With that backdrop, Judge, and in view of the fact

5    that Dr. Conti has been deposed three times, most recently for

6    almost seven hours on this very narrow subject of damages, we

7    had proposed that the defense confine her examination to a

8    more limited number of hours rather than the seven permitted

9    by the rule and to confine the questioning to the scope of her

10   supplemental report.

11         And needless to say, we wanted to do that

12   reciprocally with the defense expert who has now seen these

13   datasets, has seen the report, and has himself authored a

14   report.  Whatever number of hours we would agree to, we would

15   agree, you know, mutually.

16         So we made some progress.  I don't want to speak for

17   Mr. Ostfeld, but I think he conceded that it's highly unlikely

18   to require seven hours of examination, but the only progress

19   we made was a suggestion that we try -- emphasis on try -- try

20   to confine the examination to four hours but not relinquishing

21   the right to go the full seven, could become necessary, and,

22   frankly, not wanting to confine it to the supplemental report

23   on the theoretical basis that there were some elements of it

24   that are related to the earlier reports.

25         And so in effect, it was a kind of hoped-for proposal

1    to keep it to four.  And we just thought that that was

2    unnecessary and inappropriate at this juncture.

3           What we would propose, Judge, in effect we're asking

4    for a ruling under 26 to limit the -- both time and scope.

5           We believe mutually that two hours is more than

6    sufficient time to examine Dr. Conti for the fourth time and

7    to confine it to the supplemental report, particularly

8    inasmuch as all she has done is taken the same methodology and

9    formula she's employed in each of her previous reports and

10   simply plug in new pricing from this sample dataset.

11          So with that, we would propose a limiting order to

12   two hours of examination, both for Mr. Gibson, the defense

13   expert, and Dr. Conti, our expert, and to confine the

14   questioning as closely as possible to the supplemental report

15   and only the supplemental report.

16          That's our position.

17          SPECIAL MASTER VANASKIE:  All right.  Thank you.

18          Mr. Ostfeld?

19          MR. OSTFELD:  Thank you, Your Honor.

20          I respectfully disagree a little bit with Mr. Honik's

21   description of the report in terms of it being narrow and

22   limited.  What we're talking about is a supplemental damages

23   report that asserts $550 million in damages for the upcoming

24   TPP trial.  That's based on not an analysis of one new

25   dataset, it's new pricing data derived from 169 separate

1    datasets from the nine pharmacy chains that Mr. Honik

2    mentioned as well as volume data from the IQVIA Xponent

3    dataset that purports to reflect almost a billion transactions

4    for 31 at-issue drugs in the TPP trial.

5         Notably, this is a pretty significant departure from

6    Dr. Conti's original damages report which calculated more than

7    $1.3 billion in damages for the TPP trial using different

8    pricing data and the same volume data.

9         It's our understanding that plaintiffs plan to

10   present both sets of opinions at the TPP trial.

11        Additionally, and not mentioned, was that 17 days

12   after the supplemental report was due and disclosed,

13   plaintiffs further disclosed 12 megabytes of putative

14   supplemental tables and logic files that purport to provide

15   state-specific calculations for all 50 states, DC and Puerto

16   Rico, 43 of which are at issue in the TPP trial, and none of

17   these state-specific calculations were provided in connection

18   with the prior report.

19        Respectfully, that's just a lot to digest for a

20   high-stakes trial that's just ten weeks away.  And what we're

21   seeking is a fair opportunity to question Dr. Conti about her

22   new opinions and how they relate to her old opinions.

23        I believe what plaintiffs proposed was two hours

24   strictly limited to the contents, the four corners of the

25   supplemental report.

1          Our counterproposal, we just sought two additional

2    hours, a total of four hours, which would be focused on the

3    supplemental report but with a fair opportunity to explore

4    other topics that we view as fair game outside the four

5    corners of the supplemental report.

6          And I'll address the proposed length restriction

7    first and then the topic restrictions.

8          So for length, of course, our starting point is the

9    seven hours that's provided under Rule 30(d)(1).

10          And when the defendants agreed with the plaintiffs

11    last month, the plaintiffs could provide a supplemental

12    damages report.  And when we further agreed to a supplemental

13    deposition schedule which we disclosed to the Court on

14    December 15th, to that point plaintiffs had said nothing about

15    either time limits or subject matter limits for the

16    deposition.  That was something that was raised four days

17    later, on December 19th.

18          And although we didn't think it was necessary to have

19    limits beyond those in Rule 30, we met and conferred, and then

20    we did propose to reduce our time from seven hours to four

21    hours, which we view as more than reasonable when you're

22    dealing with 170 data sources, $550 million in damages, an

23    almost $800 million discrepancy between two sets of damages

24    calculations that are going to be presented at trial, and 11

25    megabytes of late disclosed 50 state tables and logic files

1    with state-specific damages.

2            It's also I think relevant, Your Honor, though not

3    central, that Dr. Conti has historically been on the more

4    loquacious and detail-oriented side of witnesses.  I don't

5    mean that in any way pejoratively.  It's just the reality of

6    this witness.  It's fair to say that she provides somewhat

7    lengthier answers than average and often seeks clarification

8    of questions.

9            And that's all fine.  Witnesses aren't required to be

10   concise, and it's our job as the attorneys to adapt to the

11   witness's style.  But when you have a witness that tends to be

12   a little bit more vocal, it does mean you need a little more

13   time to question her.  And that was another concern about the

14   two-hour limit.

15           So that's why we seek four hours, Your Honor.  We may

16   not need the full four hours, but we feel like as an outer

17   boundary, four hours is appropriate.

18           I also do want to correct, we weren't saying four

19   hours as kind of an aspirational goal, but we could take the

20   full seven hours.

21           I think what we proposed was if there was still a

22   topic being concluded when we got to four hours, that there

23   would be a fair opportunity to conclude the topic.  And that's

24   just because in the past, when we've hit time limits, there's

25   been some dispute over whether the questioning must be cut off

1    at the exact moment where the time limit expires.  We just

2    want to make sure if there's a topic ongoing, that we have a

3    fair opportunity to finish that topic.

4            Now, with respect to the subject matter, Your Honor,

5    we've made clear, we're not looking to have needless

6    repetition or to go through prior lines of questioning that

7    were covered in prior depositions.  Nobody needs that.

8            The supplemental depositions will be properly focused

9    on the contents of the supplemental reports.  Our only

10   opposition is to a strict confinement of the deposition to the

11   four corners of the report.  We think, respectfully, that we

12   need a fair opportunity to ask about certain other topics that

13   we think are fair game.  And I have a few illustrative

14   examples.

15           For one, Dr. Conti's new report in the first

16   paragraph incorporates by reference her three prior reports.

17   And she also expressly relies upon volume data from the IQVIA

18   Xponent dataset that she analyzed in more detail in her prior

19   damages report.  We think we should be permitted to question

20   her regarding her reliance on prior reports and prior datasets

21   in the new report.

22           Second, Your Honor, Dr. Conti's 50 state tables that

23   we got 17 days after her supplemental report aren't within the

24   four corners of the report, but, respectfully, if they're

25   going to be presented at trial, we need a fair opportunity to

1    question her about the 50 state calculations.  That's

2    something that hasn't been previously disclosed and was not

3    part of her prior damages report.  This would be our first

4    opportunity to question her on state-specific calculations.

5              And third, because plaintiffs have advised, at least

6    we understand that Dr. Conti's new report is an alternative

7    calculation to her original, we think we need a fair

8    opportunity to question her regarding the relationship between

9    the two reports, the comparison of the two reports, and how

10   the new report impacts her opinions in the old report.

11             When you're dealing with an $800 million -- almost

12   $800 million delta in damages, that raises a lot of questions

13   about how these two reports interact with one another.

14             So respectfully, Your Honor, we think these topics

15   are all properly raised, even though they're outside the

16   precise four corners of the supplemental report, and we don't

17   think there should be an artificial or arbitrary exclusion of

18   topics like this, given Dr. Conti's reliance on prior

19   materials and the interaction between the old opinions and the

20   new opinions.

21             So we're not looking to repeat questioning, but we

22   do -- we don't want to be prevented from asking about these

23   topics or appropriate follow-up questions to any testimony

24   that Dr. Conti provides when she's explaining and describing

25   her supplemental opinions.

```
 1              Another option, of course, Your Honor, is if you're
 2    available, you're also welcome to attend these depositions and
 3    preside over them.  And that may shorten the questioning, and
 4    it may also enable us to resolve disputes as they come up,
 5    which, you know, could maybe enable us to do this more
 6    efficiently.
 7              We have no objection to that if Your Honor is
 8    available.  We also aren't -- don't think it's necessary.
 9    We've always been able to work out these issues in the past.
10    But if Your Honor wishes to attend, you're certainly welcome
11    to attend these depositions.
12              With that, I think that's defendants' position, and
13    we would welcome your ruling.
14              SPECIAL MASTER VANASKIE:  Go ahead, Mr. Honik.
15              MR. HONIK:  Your Honor, you know, it's amusing to
16    me -- and I'm very fond of Greg, but you talk about
17    loquacious.  There's no better example of why we want to limit
18    this to something substantially less than seven.
19              Look, at any point in a case of this magnitude, one
20    can look at the number of pills sold and the data that
21    captures it and say, oh, my god, it's so enormous, the roof is
22    falling in.
23              I have now attended three of her depositions, each of
24    which lasted seven hours, and not once did anybody dive in at
25    the depth that Mr. Ostfeld suggests may occur here to the
```

*United States District Court*

1    dataset.  Nobody is looking at the billions of captured pill

2    amounts at all.

3          And let me just say that their own expert was able to

4    digest everything that he just described in a couple of weeks

5    and turned around a very succinct report, who basically says

6    the data is the data.  And all that Dr. Conti did was to input

7    this new pricing.

8          The only -- literally the only difference in the

9    reports is that from these nine retailers, we have some

10   pricing.  And it's not the entire universe of pricing, which

11   is what IQVIA captures, it's a subset.

12         So I don't -- I don't foreclose the idea that yes,

13   there is some interrelationship between her prior opinions and

14   the ones reflected here.  And Mr. Ostfeld should have an

15   opportunity to explore them within the confines of these new

16   values.  And I think two hours is ample to do that.

17         And, Judge, you've been down this road a million

18   times.  They think it's four hours, we think it's two, so, you

19   know, somewhere between our perception of what it is and their

20   perception is probably where this thing should fall.  That's

21   number one.

22         Number two, I think it's semantically incorrect to

23   say that we want some strict adherence to the issues within

24   the four corners of the Complaint.  We've all been doing this

25   long enough to know that there is relatedness to some of her

1  other opinions.  And I'm confident that we can manage

2  ourselves within the confines of that pathway once we go to

3  examine her.  And I don't want an order that says it shall be

4  strictly confined to the issues.  I think an order that says

5  it shall be reasonably confined to the issues raised in the

6  supplemental report is adequate.  And I think we can police

7  ourselves.

8       But I think the key thing is to bring this under some

9  reasonable control and not have another seven-hour deposition

10  and, frankly, not have another four-hour deposition.  We can

11  do Dr. -- Mr. Gibson in two hours, they can absolutely do

12  Dr. Conti in two.

13       And I'll say this as well.  If we're nearing the

14  clock on two hours and Greg says to me, Ruben, I've got

15  another 15 or 20 minutes because she's loquacious, you can

16  rest assured that we'll give him the 15 or 20 minutes.

17       But parties need restraints.  Fences and borders are

18  good things to have in litigation like this.  And I would urge

19  Your Honor to limit us to a reasonable amount of time knowing

20  that reasonable lawyers can expand a little bit as needed in

21  real time.

22       Two hours is the right number.

23       SPECIAL MASTER VANASKIE:  All right.  I always hated

24  resolving things of this nature.

25       I'm going to -- and we'll issue an order -- grant

1   Mr. Ostfeld's request that he have four hours of deposition to

2   conclude.  I hope he doesn't have to use four hours, but --

3   you're both exceptional lawyers, and you make reasonable

4   estimates of the amount of time you're going to require.

5           I was pleased Mr. Ostfeld didn't argue for seven

6   hours.  And four hours, I hope it doesn't require four hours,

7   but we'll give him those four hours.

8           And I expect, Mr. Honik, that when you get to those

9   four hours and if he has another 10, 15 minutes, you'll be

10  accommodating, as long as he's reasonable.  And let's proceed

11  on that basis.

12          In terms of my sitting in on the deposition, I've

13  done that before.  I'm not a fan.  I don't think it's

14  necessary.  I think, especially with lawyers of your quality

15  and experience, that it is unnecessary.  If you both agree

16  otherwise, and tell me the date, I'll see if I'm available;

17  but otherwise, I don't intend to sit through a deposition and

18  rule on objections.  All right?

19          Any questions?

20          MR. HONIK:  No, Your Honor.  Thank you.

21          MR. OSTFELD:  No questions, Your Honor.  Thank you.

22          SPECIAL MASTER VANASKIE:  All right.  We'll issue an

23  order that limits the resumed deposition to four hours.

24          And in terms of its topics, we won't say anything

25  other than they have to be reasonably related to the

1   supplemental report.

2           I understand there will be a need to go back and

3   forth in terms of questioning how this supplemental report

4   relates to the original report.  All right?

5           MR. OSTFELD:  Your Honor, the only request I would

6   make on that is if it could also encompass the 50 state tables

7   that were received after the supplemental report.

8           THE COURT:  It can include the 50 state tables issued

9   after the supplemental report.  And we'll make that clear as

10  well.  All right?

11          MR. HONIK:  Thank you, Judge.

12          SPECIAL MASTER VANASKIE:  Anything else?

13          MR. HONIK:  Not on this.

14          MR. OSTFELD:  No, Your Honor.

15          SPECIAL MASTER VANASKIE:  Okay.

16          THE COURT:  This is Judge Kugler again.

17          We still have -- you raised the issues of the

18  pretrial order, in limine motions and the jury questionnaire.

19          Let's start with the jury questionnaire.

20          Are there any disputes as to what's going into this

21  jury questionnaire?

22          MS. LOCKARD:  Your Honor, it's Victoria Lockard for

23  the defendants.

24          We have been working on a proposed jury questionnaire

25  that we have indicated we would turn over to plaintiffs for

1   their review and comment.

2          And we have -- Mr. Ostfeld has put together a

3   proposed schedule that incorporates many of the timelines and

4   internal deadlines that we were contemplating.  But my

5   estimation is that we should be able to get that questionnaire

6   draft over to plaintiffs within about ten days to two weeks,

7   get their input, and then be able to submit that to you

8   sometime before February or in early February.

9          THE COURT:  Well, if there's an agreement on it, I

10  really don't need it till just before trial.  But if

11  there's -- obviously, if there's some disputes, then I'll need

12  it before that so we can resolve the disputes.  Okay?

13         The pretrial order, what questions do you have about

14  the pretrial order?

15         We have a form of order that we use in New Jersey.

16  It essentially involves the plaintiff going first, completing

17  its portion of the pretrial order; submitting it to defense

18  counsel, who then complete their portion of it, send it back

19  to plaintiffs' counsel; then everybody signs and files it.

20         We expect you to spend a lot of time on the pretrial

21  order.  It's very difficult to introduce any evidence in the

22  trial if it's not in the pretrial order.  Let's leave it at

23  that.

24         And we expect -- there will be a section where you

25  can list your witnesses that you contemplate might testify at

1   trial.  And you also have to list what you think they're going

2   to testify to.  You will need to spend some time on that,

3   because to say that they're going to testify as to the facts

4   and circumstances of the case is not going to make it.

5            But anyway, again, I don't expect there should be any

6   disputes about what goes in it, because you pretty much have

7   carte blanche on both sides as to what you want to put in this

8   thing.

9            But obviously we need to get that filed before we

10  start the trial, so what are your proposals about that?

11           MR. OSTFELD:  Thank you, Your Honor.  This is Greg

12  Ostfeld.

13           And we've -- obviously, we've spent a lot of time

14  looking at the Court's form final pretrial order for the

15  Camden division.  And we've been regularly meeting and

16  conferring with plaintiffs.  And we've sent them a fairly

17  detailed proposal for the back and forth exchange of the

18  various components of the final pretrial order.

19           I think the most important question we all have is

20  when Your Honor wants the final pretrial order.  The form

21  doesn't necessarily have a specific deadline for that.  It

22  covers a few elements of it, like the trial briefs and the

23  jury questions seven days before trial.

24           We wanted to know if that seven-day deadline applies

25  to the full final pretrial order or if you want pieces of it

1    or portions of it more than seven days before trial?

2            THE COURT:  Well, first of all, don't worry about the

3    voir dire questions, because that's going to be covered in

4    your jury questionnaire.

5            Anyway, seven days before trial is fine, completed

6    and signed by all the attorneys who are going to be appearing

7    in the case.  Okay?

8            MR. OSTFELD:  All right.  Thank you, Your Honor.

9            THE COURT:  Now, in limine motions, what are we doing

10   about that?

11           MR. OSTFELD:  Your Honor, as part of our proposal to

12   plaintiffs' counsel, we also included a proposed schedule on

13   the in limine motions.

14           I just got this to them essentially a few days before

15   the holidays.  I don't think they've had an opportunity to

16   digest it and respond yet, so it may be that setting a

17   schedule on in limine motions would be premature until we've

18   had a chance to meet and confer on that issue.

19           If Your Honor has a sense of when you'd like the in

20   limine motions, that would certainly provide us with some

21   guidance; but otherwise, we can meet and confer on that issue

22   and make a recommendation to the Court.

23           THE COURT:  Well, it depends entirely on what the

24   motions are as to when I want to see it.

25           I mean, based on the practice so far, I expect

```
 1   thousands of pages.  That's not something we can turn around
 2   in a week.
 3          All kidding aside, please don't make the mistake of
 4   disguising dispositive motions as in limine motions, because
 5   I'll just deny them out of hand.  I see that all too often
 6   with lawyers, and I don't expect to see it from you.
 7          But again, I have no idea what in limine motions
 8   you're contemplating, so I don't know how much time I'll need
 9   to go through them.
10          But perhaps when we speak next month, we can have a
11   better idea about this.  Okay?
12          MR. OSTFELD:  That seems fair, Your Honor.
13          THE COURT:  Anybody else want to be heard on these
14   issues, about the in limine motions, the pretrial order,
15   things of that nature?
16          MR. SLATER:  I don't think so for plaintiffs, Your
17   Honor.  I think your guidance helps us to reengage with the
18   defendants.
19          THE COURT:  Anything else you want to talk about
20   today?
21          I promise I will get this Teams thing mastered before
22   the next hearing.
23          I don't know.  This worked great for Zoom.  But for
24   some reason, the federal government, despite spending $6
25   trillion a year, can't find the money to fund Zoom accounts
```

1  anymore.  I don't get it, but I don't make those decisions.

2  This is my editorial for the day.

3          Anything else you want to talk about?

4          SPECIAL MASTER VANASKIE:  I think -- I think I'm

5  going to hear argument on the motion to seal exhibits filed in

6  connection with the class certification motion if counsel is

7  prepared to discuss that today.

8          But, Judge Kugler, that's the only thing I have.

9          THE COURT:  Well, why don't we schedule the next

10 meeting.

11         How about February 1st?  Can we do that?  It's a

12 Thursday --

13         MR. SLATER:  Yes.

14         THE COURT:  -- four weeks from today.

15         1:00?

16         MR. SLATER:  That sounds good, Judge.

17         THE COURT:  All right.  We'll do it again at 1:00.

18         And, Judge Vanaskie, do you want to hear argument?

19         SPECIAL MASTER VANASKIE:  Yes, on the motion to seal

20 exhibits that were filed in connection with one of the class

21 certification motions.  It's been pending for some time now,

22 but I think we can resolve it.

23         And I guess I'd ask who would be presenting argument

24 for the defense, since it's their request, and who will be

25 presenting argument for the plaintiffs.

```
 1            MR. HARKINS:  This is Steve Harkins with Greenberg
 2    Traurig.  I'll be presenting for the Teva defendants.
 3            MS. HILTON:  And Your Honor, this is Layne Hilton,
 4    and I'll be presenting for the plaintiffs.
 5            SPECIAL MASTER VANASKIE:  Very well.  All right.
 6            Mr. Harkins, I think you have a tough road to hoe
 7    here with respect to sealing these exhibits in lieu of the
 8    fact that they were presented in connection with an
 9    adjudicatory proceeding.
10            There is a presumption of public access, and you have
11    to show clearly defined and serious injury if the information
12    is disclosed.
13            And I've read each of -- there's only six documents
14    at issue.  I've read each of the six documents.  And I'm
15    really struggling with how Teva would be harmed by having
16    these documents in the public domain.
17            So having said that, I'll turn it you.
18            MR. HARKINS:  Your Honor, in deciding to continue to
19    maintain confidentiality and seeking to seal these six
20    documents, we looked at your prior order in Special Master
21    Order Number 47 that evaluated the confidentiality of certain
22    documents.  And that order did note that because those
23    documents had not yet been submitted as part of the public
24    record, that presumption did not apply.
25            It has been a long time since we went through this
```

1    exercise with plaintiffs.

2            SPECIAL MASTER VANASKIE:  It has.

3            MR. HARKINS:  But as correctly referenced in

4    plaintiffs' brief, the initial body of documents that were

5    potentially going to be subject to the motion to seal was

6    very, very large.  And we were able to identify both from your

7    guidance in prior orders on confidentiality and keeping in

8    mind the presumption that you referenced of public access in

9    narrowing it down to just these six documents.

10            And I am happy to go through them one by one, if the

11    Court thinks that would be necessary or helpful, but at a high

12    level, the basis for seeking to seal these particular

13    documents we believe is set forth in the affidavit presented

14    by Mr. Binsol as well as the content of the documents

15    themselves.

16            Each of these documents provides a roadmap to Teva's

17    internal processes, which, while they are not formulations,

18    are formula that Teva considers proprietary.  It explains how

19    they handle a certain number of very poor functions with

20    regard to specifically their API suppliers, API suppliers who

21    are either negotiating directly in business with Teva or are

22    competing with Teva as API suppliers to other companies.

23            In all of the instances of these documents, there is

24    information that an API supplier, either negotiating directly

25    with Teva or working with one of Teva's competitors, could use

1    to determine Teva's internal policies, evaluate how those

2    policies are implemented specifically by Teva, in material

3    that is not shared publicly.

4         To the extent these types of documents are ever

5    communicated outside of the company, they are held as strictly

6    confidential and communicated only to the parties who are also

7    involved in that relationship.

8         As set forth in Mr. Binsol's declaration submitted

9    here, we have a description of each of the documents.  And I

10   think it goes without saying that these are not ordinarily

11   disclosed to the public.

12        He describes the particular policies and procedures

13   that are at issue, some in more detailed reports and some in

14   the extensive email communications that surround production of

15   those reports.  And the competitive harm, though slightly

16   different in each instance here, is it enables Teva's API

17   suppliers to have proprietary information that would enable

18   them to competitively disadvantage Teva either in direct

19   negotiations or, as said, in negotiations with other API

20   suppliers.

21        I'm happy to go into more granular detail on that,

22   but on that basis --

23        SPECIAL MASTER VANASKIE:  I think you're going to

24   have to go into --

25        MR. HARKINS:  Sorry.

 1          SPECIAL MASTER VANASKIE:  I think you're going to

 2   have to go into more granular detail, because I'm looking --

 3   you know, what you say in a broad sense, that would deserve

 4   protection.  But when I read the documents themselves, I'm not

 5   seeing that.

 6          MR. HARKINS:  Sure.  So, Your Honor, if you'd like to

 7   take a look, and I'm happy to go by a specific document, for

 8   example, the one ending in Bates 49024.

 9          SPECIAL MASTER VANASKIE:  What exhibit number is

10   that?  I have them by exhibit number.

11          MR. HARKINS:  That is Exhibit Number -- apologies.

12   My cover sheet doesn't have it.

13          That is Exhibit Number 16 and 17 to Defense

14   Exhibit --

15          SPECIAL MASTER VANASKIE:  16 and 67?

16          MR. HARKINS:  16 and 67, yes.

17          SPECIAL MASTER VANASKIE:  Yes.  I have that in front

18   of me.

19          MR. HARKINS:  So, Your Honor, what this represents is

20   an investigation report.  And the investigation report

21   specifically here is looking into the nitrosamine issue.

22          But what this report demonstrates is not just a

23   single Teva policy but a number of Teva internal policies and

24   how those policies are implemented when performing this type

25   of investigation.

1          So it goes beyond simply disclosing a Teva policy or

2     a policy that might be mandated by CGMPs and illustrates for

3     any one of Teva's competitors how these sensitive internal

4     investigations, which are not ordinarily shared outside the

5     company at all, are conducted.

6          SPECIAL MASTER VANASKIE:  Well, what -- can you point

7     to specific language that shows that?  As I said, I've read

8     the exhibit, and I'm having trouble finding that.

9          MR. HARKINS:  So, for example, Your Honor, on the

10    second page under heading number 2, this lays out Teva's

11    internal policy of issuing a global notification to

12    management.  It provides a timeline of when Teva sent

13    notifications to regulatory authorities.  It describes Teva's

14    performance of a toxicological assessment.  It describes

15    additional testing that Teva performed.  And it describes what

16    they did as a result of the testing that was performed.

17          And while individually all of these may seem like

18    simple responses to CGMP requirements or something that might

19    be ordinarily done, the entire content of the document is to

20    provide a roadmap that anyone looking at it would have a very

21    clear understanding of Teva's processes and procedures for

22    performing this type of investigation.

23          MS. HILTON:  Your Honor, if I may.

24          THE COURT:  Go ahead, Ms. Hilton.

25          MS. HILTON:  I would have to say that I -- that the

1    document references specific policy numbers is immaterial to

2    the fact that everything that Teva was doing in this

3    document -- which, by the way, was authored, you know, more

4    than six years ago -- was something that was rooted from their

5    obligations under good manufacturing practices.  And those

6    obligations under good manufacturing practices are an

7    industrywide roadmap.

8         So to the extent -- you know, I would understand if

9    this document referenced particular suppliers that weren't

10   just otherwise disclosed or particular routes of syntheses in

11   these -- you know, the manufacturing of their drugs that

12   wasn't disclosed.  But I don't think anyone in the industry

13   reading this wouldn't -- wouldn't agree that this was how or

14   that these were the sorts of activities that might be

15   undertaken.  I don't think there's anything proprietary or

16   confidential about it.

17        And I think that as we set forth in our brief, the

18   fact that Teva's own employees issued public press releases,

19   they did industrywide talks about how they handled this

20   particular crisis that, again, was now as we're looking back

21   more than six years ago, would demonstrate that this isn't

22   information that they keep within themselves, this is

23   information that is across the industry and well known.

24        SPECIAL MASTER VANASKIE:  Mr. Harkins, I'm looking at

25   the document.

*United States District Court*

1          So under heading number 2 or paragraph 2, Teva's

2     immediate actions on 6 November 2018, a global notification to

3     management issued, all products containing Mylan valsartan API

4     were placed on temporary hold.

5          What's confidential about that?

6          MR. HARKINS:  The individual facts that are

7     referenced in this document are, as, you know, admittedly

8     plaintiffs point out mostly either a matter of public record

9     or something that has been communicated outside and externally

10    by Teva whether to the public at large or to regulators.

11         We are not seeking to keep these documents under seal

12    because they contain a reference to an individual action that

13    Teva took at one time.  And the public interest in having

14    access to that information is not curtailed by keeping this

15    material under seal.  Those documents are -- I'm sorry, those

16    facts are, generally speaking, already a matter of public

17    record.

18         What this document does is it provides detailed

19    analysis internal to Teva about how they evaluate and

20    implement their own processes in response to these facts.  The

21    information here is really only applicable or interesting to

22    someone like an API supplier who might want to know how Teva

23    is going to evaluate issues that arise in the course of their

24    business relationship, how they're going to conduct

25    investigations.

1          This material when compiled in this fashion as an

2     internal report is different than the type of external

3     reporting and presentations that Teva makes to the public and

4     to regulators.

5          The map here is the problem.  It's the confluence of

6     all of these facts in a very particular way that provides a

7     competitor insight into Teva's practices in a way that is

8     really only useful to a competitor and not the public.

9          MS. HILTON:  I mean, respectfully, Your Honor, I

10    simply would disagree.  I don't think that this document

11    provides a roadmap at all, and I think the fact that Teva

12    would concede that the underlying facts in this document are

13    public is probably fatal to their argument that they should

14    somehow overcome the presumption of public access here for

15    these court documents.

16         MR. HARKINS:  And, Your Honor, just to clarify, I'm

17    not conceding that all of the facts contained in this document

18    are a matter of public record, but, for example, the fact that

19    Mylan valsartan API were placed on a temporary hold in and of

20    itself is not the type of document that we are seeking to

21    seal.  And there are any number --

22         (Technological interruption.)

23         MR. HARKINS:  Apologies.

24         And there are any number of documents that reflect

25    individual facts like that, that in determining what material

1    we were going to move and seek to keep under seal, we

2    excluded, where it contains an isolated fact, something that

3    is either a matter of public record or not by itself

4    competitively sensitive information.

5         It is when all this information is compiled to

6    demonstrate how Teva's internal processes and thought-making

7    and decisionmaking play out that it becomes something that we

8    feel is competitively sensitive, sufficient to overcome the

9    burden of public access.

10        SPECIAL MASTER VANASKIE:  Let me move to another

11   document.

12        MR. HARKINS:  The next document, Your Honor, and I

13   believe this is the global quality report that was referenced,

14   actually, in a prior exhibit.  And it is --

15        SPECIAL MASTER VANASKIE:  Exhibit 66.

16        MR. HARKINS:  Yes.

17        And this report contains similar information and I

18   think is appropriately categorized in a similar way.

19        This reflects any number of Teva policies that are

20   specifically being implemented here in their evaluation of a

21   supplier, commentary on that supplier.  And again, while the

22   individual facts referenced may in any number of instances be

23   elsewhere a matter of public record, it will be something that

24   Teva has provided to a regulator or to the public at large.

25        When the information is compiled in this way, it

1  provides a roadmap into how Teva conducts its own internal

2  policies, investigations and evaluations of its suppliers.

3  That information, again, would very likely only be relevant or

4  useful to an API supplier either seeking to contract directly

5  with Teva or working with one of Teva's competitors.

6          MS. HILTON:  Your Honor --

7          THE COURT:  So -- go ahead, Ms. Hilton.

8          MS. HILTON:  I would just point out, I think that

9  this document that Mr. Harkins references, this is another one

10  where, you know, I can't recall, this was so long ago, I

11  believe I may have even agreed to redact out some of the names

12  of the people and the entities from whom Teva supplies

13  valsartan API except for from Mylan.  But aside from that,

14  there is nothing in here that isn't otherwise referenced in

15  the public.

16          And I don't -- this idea that -- you know, that any

17  such report could lay -- set forth a roadmap, I mean, I think

18  that's such an amorphous harm, it's not the sort of clear and

19  concrete harm that *Avandia* requires.

20          And so it's almost difficult to argue about why this

21  isn't or shouldn't be sealed, because it's -- there's so much

22  in here that's in the public that it's almost anathema to

23  argue it.

24          So I think that the argument that these documents

25  provide some sort of roadmap, I don't believe that that really

*United States District Court*

1    meets the harm requirement that *Avandia* requires.

2         SPECIAL MASTER VANASKIE:  Any reply, Mr. Harkins?

3         MR. HARKINS:  Your Honor, again, without taking each

4    of these specific facts separately, some of these may be in

5    the public record elsewhere.  To the extent they are, the

6    interest in the public of having that information available

7    from these specific documents is minimal to nonexistent.

8         What these documents do, the same way that having

9    Teva produce its own corporate policies in the public record,

10   is provides competitors with the ability to copy into it based

11   on how those policies are implemented to strategize against

12   Teva.  That's what's set forth in Mr. Binsol's declaration.

13        This is material that Teva internally views as

14   competitively sensitive and proprietary in the same way that

15   the formulation information for their drugs is viewed as

16   competitively sensitive and proprietary.

17        And we think that providing this type of information

18   in this format -- and we are not saying that every document

19   that references any of these individual facts that may be in

20   the public record needs to be sealed, which is why we've

21   selected this very narrow subset of material to try and

22   maintain under seal rather than keep all of the attendant

23   facts separate.

24        And just one other point to the idea of redacting out

25   individual names here.  That sort of gets the entire issue

1    from a proprietary and competitive standpoint backwards.

2         The problem with allowing these documents into the

3    public record is not that it states that ZHP did something on

4    a certain date.  The problem is that it provides insight for

5    anyone else competing with Teva into how Teva is going to in

6    the future implement its own policies and try and evaluate a

7    supplier in any sort of similar situation where these types of

8    investigations are being undertaken or where similar internal

9    policies are being implemented.

10        That's the basis, again, for our seeking -- and I

11   apologize for the frog in my throat -- seeking to seal this

12   narrow set of documents and specifically these first two

13   reports.

14        SPECIAL MASTER VANASKIE:  Let me read from the

15   conclusion on page 3 of this Exhibit 66, the global quality

16   report, and then ask you, Mr. Harkins, how that disclosure of

17   that information would provide this roadmap to Teva's

18   competitors or those who want to deal with Teva, you know, API

19   providers.

20        So the conclusion says:  Based on the executed Teva

21   toxicology assessment and the health hazard assessment, Teva

22   will continue to develop product quality data before it

23   executes a worldwide recall of all valsartan single and

24   combination products containing API manufactured by Zhejhang

25   Huahai Pharmaceutical Company Limited.  In the meantime, any

1    authority request recall initiated will extend to pharmacy

2    level unless otherwise instructed by a regulatory authority.

3    All other valsartan finished products using the API from

4    alternate manufacturers shall remain on the market unless

5    further notification is received to recall.  The temporary and

6    precautionary hold status placed on all API and finished

7    products manufactured using non-ZHP material shall be lifted.

8          How does that provide a roadmap to how Teva does

9    business?

10          MR. HARKINS:  Your Honor, the way that that would

11    allow someone to understand Teva's processes is to look back

12    at the rest of the document which shows how Teva arrived at

13    that conclusion.  And if someone was in a relationship with

14    Teva where they had to report this type of issue, this

15    document would demonstrate what type of internal assessment of

16    the supplier Teva would perform, what type of Teva

17    toxicological assessment would be performed, how Teva would

18    undertake a clinical safety assessment and arrive at that

19    conclusion, how they would perform their quality assessment,

20    and to the extent there are any steps that were not taken by

21    Teva, the supplier would also be aware that other analyses

22    which a different company might perform or request are, in

23    general, at least according to this roadmap, not going to be

24    undertaken by Teva in the course of investigating this type of

25    impurity.

1          So someone who is faced with a similar issue of

2     having to report something or having to raise an issue about

3     an impurity with Teva would have, from this document, a

4     step-by-step guide to the type of material that Teva is

5     looking to prepare to arrive at that conclusion that you

6     referenced on page 3.

7          MS. HILTON:  Your Honor, if I may?

8          SPECIAL MASTER VANASKIE:  You may.

9          MS. HILTON:  If it is Teva's position that the

10    competitive harm that would befall them if these documents

11    came out is that a supplier or another pharmaceutical company

12    might not do business with them because they believe Teva does

13    not meet its obligations under CGMP or shortcuts its

14    investigations, then Mr. Binsol should have said that in the

15    declaration.  He should have said the harm will be that

16    companies will not do business with us if they know how

17    lackadaisical our CGMP practices are.  But instead, we have

18    these sort of broad and sweeping conclusions that don't really

19    identify or articulate that harm.

20         And furthermore, the paragraph that you read, and

21    what Teva did in the wake of the NDMA, you know, valsartan

22    recall is what every defendant in this litigation did.  This

23    is -- you know, other documents that are very similar to this

24    in nature from the other manufacturers, they did not contest

25    that those documents should remain under seal.  It is only

1  Teva --

2          You know, I tried to be very, very -- I tried to take

3  a very, you know, nice edge with this and tried to make sure

4  that we weren't bringing documents to you that -- you know,

5  that were on the margins.  And other defendants did concede

6  that these sorts of investigation documents precisely such as

7  this one from Teva was -- you know, didn't contain the sort of

8  proprietary trade secret or information that would require

9  continued sealing of a public record.

10          SPECIAL MASTER VANASKIE:  Thank you.

11          MR. HARKINS:  Your Honor --

12          SPECIAL MASTER VANASKIE:  Mr. Harkins?

13          MR. HARKINS:  Apologies.

14          Just to make one point, the steps outlined in this

15  report and in the prior investigation do not simply meet some

16  minimum requirement as mandated by CGMPs.  These are

17  implementations of Teva's internal policies, many of which,

18  including policies and steps undertaken and referenced in both

19  of these documents, go above and beyond normal minimum CGMP

20  requirements.  This does not simply reflect the baseline

21  investigation or steps that any manufacturer was required to

22  undertake.

23          We believe that this material is proprietary.  It is

24  sensitive to Teva.  We believe that there is a proprietary

25  interest in maintaining its confidentiality, as Your Honor

1    agreed in connection with our initial ruling that was not,

2    admittedly, in connection with material being presented on the

3    public record.

4            Based on what we have presented in the affidavit of

5    Mr. Binsol, argument today and discussion of the individual

6    documents themselves, we feel that this proprietary internal

7    information is still sensitive enough and the competitive harm

8    to Teva specifically in allowing API suppliers to understand

9    how Teva is going to implement their own internal policies is

10   sufficient to overcome the presumption of public access.

11           We acknowledge that burden is different here.

12           And I'm happy to discuss the other documents more

13   broadly, though I think that the first two probably fall

14   pretty neatly into their own category as sort of the full

15   reports.

16           SPECIAL MASTER VANASKIE:  The other documents are

17   email exchanges, as I recollect.  And so, again, I'm having --

18   I really am.

19           What you say, Mr. Harkins, if the documents indicated

20   what you say, yeah, they'd be protected, but I'm not sure the

21   documents do that.

22           MR. HARKINS:  Your Honor, with respect --

23           SPECIAL MASTER VANASKIE:  That's my problem.

24           MR. HARKINS:  My apologies.

25           And I understand Your Honor's comments.  And with

 1   respect to the emails, these do not provide as detailed of a

 2   roadmap.  And I believe the reason that we feel and submitted

 3   the affidavit in support of their competitively sensitive

 4   nature is that even more so than the reports, there are

 5   internal discussions, thought processes among high-level

 6   employees at Teva evaluating sort of two categories, two

 7   emails that relate to the preparation of toxicological

 8   assessments and then two emails related to Teva's internal

 9   audit procedures.

10          Both of these documents -- or I'm sorry, both of

11   these categories of documents also contain analysis and

12   criticisms of Teva's suppliers, that demonstrates Teva's own

13   internal evaluation, again, of those relationships.

14          It is not as detailed a roadmap, but the specific

15   material discussed in there we do feel is still competitively

16   sensitive.  It reveals Teva's own internal thought processes.

17   It reveals the way in which Teva implements their internal

18   policies in certain situations that would be relevant and

19   potentially competitively sensitive if they were disclosed to

20   broader the industry but more specifically API suppliers who

21   are negotiating with Teva.

22          MS. HILTON:  Your Honor, if I may, just to sort of

23   center us in these documents, you know, with respect to Teva's

24   oversight of their API suppliers, that is at the core of this

25   case.  That is -- that is not an ancillary issue here.  That

1    is not a fringe issue.  How Teva oversees its API suppliers is

2    the fundamental basis for this case and why Teva is in this

3    litigation to begin with.

4           And so keeping that in mind, when you understand that

5    that is the crux of this case and then reading these

6    documents, it's really almost incomprehensible to understand

7    what about this document, what about these email exchanges is

8    in any way the sort of material that would overcome the

9    presumption of public access.

10          SPECIAL MASTER VANASKIE:  All right.  Anything else,

11   Mr. Harkins?

12          MR. HARKINS:  Your Honor, and I'm happy to talk in

13   more detail about the specific items, but just to say, our

14   client clearly views this material as confidential,

15   proprietary and sensitive.  We understand the standard that

16   we're arguing against, and we've tried to be as narrow as

17   possible in submitting only these documents that we think

18   reflect things which are directly reflective of Teva's

19   internal policies and decisionmaking.  But we understand the

20   Court's comments, particularly on the email exchanges as well.

21          THE COURT:  Thank you for that.

22          I mean, I -- you know, I think it's commendable what

23   you did in terms of narrowing the dispute to six documents,

24   but I still have to analyze each document in the context of

25   *Avandia*.  And that's what I'm struggling with.

 1          I'll refer to Exhibit 72 and the specific page -- the

 2   Bates number ends in 523, an email to Cory Sawyer and Edward

 3   Coller (ph), death from -- I apologize for my pronunciation

 4   problems -- Siauliai.  And hi, Cory, thanks for the

 5   information.  The API manufacturer provided toxicology data

 6   review and their calculation of potential exposure of NDMA.  I

 7   will forward this information to our nonclinical tox for their

 8   review and agreement on the conclusion.  It is difficult to

 9   assess the potential risks of carcinogenic impurity using

10   postmarketing spontaneous reports.

11          The conclusion will be likely based on nonclinical

12   tox assessment on the exposure.  However, I will conduct a

13   search in our postmarketing safety database and safety signal

14   detection system.  Since the product has been distributed to

15   many countries, I will search all cases except US.  I do not

16   see US in the distribution list.

17          Please provide me the earliest market release date

18   that will start the date for data burst -- I'm sorry, for

19   database search.

20          And finally, I will try to find any epidemiology

21   studies in public domain on the effects of NDMA.

22          Now, how does that cause irreparable -- not

23   irreparable but serious competitive harm to Teva?

24          MR. HARKINS:  That specific email essentially lays

25   out Teva's internal process for following their policy of

1    performing this type of toxicology review.  It's more general

2    than if the policy itself were attached and distributed for

3    Teva's competitors to review, but that three lines of

4    information provides a very general roadmap to exactly what

5    Teva is going to do in performing this toxicology assessment,

6    what databases they are going to search, the steps that they

7    are going to take and in what order.  And in combination with

8    the rest of the email chain, which provides similar back and

9    forth describing target dates, internal dates that Teva has

10   set for performing certain actions, it gives a reasonably

11   accurate picture of not only how Teva chose to handle this

12   particular situation but how Teva would handle another

13   situation or performing a toxicology assessment.

14           And in the same way that we would view the internal

15   policy that reflects how those assessments are performed as

16   proprietary and confidential, we would view this email that

17   provides a high-level discussion and information walking

18   through the steps of how that is performed, we view that as

19   similarly proprietary.

20           SPECIAL MASTER VANASKIE:  Now, plaintiffs have

21   presented evidence that Teva presented webinars dealing with

22   how it responded to the alleged contamination.

23           How does that differ from this information that's

24   been provided in these emails?

25           MR. HARKINS:  Your Honor, the information that's

1  provided in these emails represents Teva's internal policies

2  which are certainly more detailed than the public-facing

3  descriptions and sort of general information that has been

4  provided to the public, particularly in the material that

5  plaintiffs cite to.

6        The general information that Teva shared with the

7  public about their response is not what is contained in these

8  documents.  It's not what we are seeking to keep under seal.

9  We are seeking to keep under seal Teva's internal

10  communications that reflect their own analysis, discussion,

11  and steps in that process which are not a matter of public

12  record.

13        The fact of when Teva initiated a recall, the fact of

14  when Teva identified the presence of an impurity, that is not

15  the type of information that we are seeking to keep under

16  seal.  It is the internal policies that lead to that decision

17  and the internal discussion that reflects how those policies

18  are implemented.

19        THE COURT:  Ms. Hilton, anything else?

20        MS. HILTON:  Your Honor, I would simply state that I

21  disagree that what we actually see within the four corners of

22  the documents is as clear a roadmap about policies and

23  processes and procedures as Mr. Harkins and Mr. Binsol state.

24        And just to your point, this -- you know, this

25  paragraph about the toxicological review, it seems to me that

1   this process is the same sort of process as baking a cake.

2   There are certain steps you of course take first, second,

3   third and fourth.

4           We sort of can't extend -- I think that because the

5   idea -- you know, because *Avandia* requires such a concrete

6   harm, I would simply argue that any sort of, you know -- the

7   idea that a roadmap is somehow sufficient to meet that

8   concrete harm that *Avandia* requires, I just don't think it

9   passes muster, quite frankly, because it's really quite

10  amorphous and it's almost difficult to argue against, because

11  taken at large, any -- any document, any document that a

12  company prepares in the course of its ordinary course of

13  business could potentially provide such a roadmap.

14          SPECIAL MASTER VANASKIE:  Thank you.

15          Mr. Harkins, I'll give you the final word if there's

16  anything else you'd like to say.

17          MR. HARKINS:  Well -- and, Your Honor, not to --

18  another frivolous analogy, but to the extent that this is

19  simply a recipe for baking a cake, Teva's internal recipe for

20  putting together a product or conducting an investigation or

21  implementing its own policies is Teva's recipe.  It is

22  sensitive to us.  We believe that it would cause competitive

23  harm to allow that specific recipe that Teva employs to be

24  disclosed.

25          Having said that, we understand Your Honor's

```
 1   thoughts.

 2          SPECIAL MASTER VANASKIE:  Okay.  Thank you all very

 3   much.

 4          If there's nothing else, we'll conclude for the day.

 5          Is there anything else from anybody?

 6          MR. HARKINS:  Not from the defendants.

 7          MS. HILTON:  Not from me, Your Honor.

 8          SPECIAL MASTER VANASKIE:  All right.  Thank you all

 9   very much.  Take care.

10          THE COURT:  Thanks everybody.  Happy New Year.

11          RESPONSE:  Happy New Year.

12          (Proceedings concluded at 2:22 p.m.)

13                              -  -  -

14          I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   /s/ Ann Marie Mitchell          5th day of January, 2024

18   Court Reporter/Transcriber      Date

19

20

21

22

23

24

25
```

*United States District Court*

| $ |
| --- |

**$550** [2] - 12:23, 14:22
**$800** [3] - 14:23, 17:11, 17:12

| / |
| --- |

**/s** [1] - 50:17

| 0 |
| --- |

**07068** [1] - 1:16
**08101** [1] - 1:8

| 1 |
| --- |

**1.3** [1] - 13:7
**10** [1] - 21:9
**1000** [1] - 2:7
**103** [1] - 1:15
**11** [1] - 14:24
**1100** [1] - 1:19
**11th** [1] - 6:14
**12** [1] - 13:13
**15** [3] - 20:15, 20:16, 21:9
**1515** [1] - 1:19
**15th** [2] - 6:20, 14:14
**16** [3] - 31:13, 31:15, 31:16
**169** [1] - 12:25
**16th** [3] - 6:22, 7:2, 7:11
**17** [3] - 13:11, 16:23, 31:13
**170** [1] - 14:22
**19-md-02875** [1] - 1:4
**191032** [1] - 1:19
**19th** [1] - 14:17
**1:00** [4] - 6:9, 7:13, 27:15, 27:17
**1:15** [2] - 1:9, 3:3
**1st** [2] - 10:9, 27:11

| 2 |
| --- |

**2** [3] - 32:10, 34:1
**20** [2] - 20:15, 20:16
**2018** [1] - 34:2
**2024** [2] - 1:8, 50:17
**22nd** [1] - 5:14
**23rd** [2] - 7:2, 7:12
**24th** [5] - 5:19, 6:4, 6:9, 7:8, 7:13
**2500** [1] - 2:11
**2525** [1] - 2:7
**26** [1] - 12:4
**269** [1] - 9:24
**2800** [1] - 2:17
**2:22** [1] - 50:12

| 3 |
| --- |

**3** [2] - 39:15, 41:6
**30** [2] - 4:19, 14:19
**30(d)(1)** [1] - 14:9
**30305** [1] - 2:11
**31** [1] - 13:4
**3100** [1] - 2:13
**33134** [1] - 2:7
**3333** [1] - 2:11

| 4 |
| --- |

**4** [1] - 1:8
**43** [1] - 13:16
**445202** [1] - 2:18
**47** [1] - 28:21
**49024** [1] - 31:8
**4th** [1] - 1:7

| 5 |
| --- |

**50** [6] - 13:15, 14:25, 16:22, 17:1, 22:6, 22:8
**523** [1] - 46:2
**576-7018** [1] - 1:23
**5th** [1] - 50:17

| 6 |
| --- |

**6** [2] - 26:24, 34:2
**600** [1] - 2:17
**60601** [1] - 2:13
**66** [2] - 36:15, 39:15
**67** [2] - 31:15, 31:16

| 7 |
| --- |

**701** [1] - 2:3
**70130** [1] - 2:4
**72** [1] - 46:1
**77** [1] - 2:13

| 8 |
| --- |

**856** [1] - 1:23

| A |
| --- |

**ability** [1] - 38:10
**able** [6] - 8:12, 18:9, 19:3, 23:5, 23:7, 29:6
**above-entitled** [1] - 50:15
**absolutely** [1] - 20:11
**access** [7] - 28:10, 29:8, 34:14, 35:14, 36:9, 43:10, 45:9
**accommodating** [1] - 21:10
**according** [1] - 40:23

**accounts** [1] - 26:25
**accurate** [1] - 47:11
**acknowledge** [1] - 43:11
**Actavis** [2] - 2:14, 2:15
**action** [1] - 34:12
**ACTION** [1] - 1:3
**actions** [1] - 34:2, 47:10
**activities** [1] - 33:14
**ADAM** [1] - 1:15
**adapt** [1] - 15:10
**additional** [2] - 14:1, 32:15
**additionally** [1] - 13:11
**address** [2] - 4:18, 14:6
**addressing** [1] - 5:22
**adequate** [1] - 20:6
**adherence** [1] - 19:23
**adjudicatory** [1] - 28:9
**admittedly** [2] - 34:7, 43:2
**advised** [1] - 17:5
**affidavit** [3] - 29:13, 43:4, 44:3
**afternoon** [2] - 4:12, 8:10
**ago** [4] - 10:10, 33:4, 33:21, 37:10
**agree** [5] - 7:5, 11:14, 11:15, 21:15, 33:13
**agreed** [4] - 14:10, 14:12, 37:11, 43:1
**agreement** [5] - 6:19, 8:8, 8:12, 23:9, 46:8
**ahead** [3] - 18:14, 32:24, 37:7
**Aid** [1] - 10:14
**aided** [1] - 1:24
**Albertsons** [1] - 10:13
**Alexandra** [1] - 3:13
**alleged** [1] - 47:22
**allow** [2] - 40:11, 49:23
**allowing** [2] - 39:2, 43:8
**almost** [8] - 11:6, 13:3, 14:23, 17:11, 37:20, 37:22, 45:6, 49:10
**ALSO** [1] - 2:21
**alternate** [1] - 40:4
**alternative** [2] - 11:2, 17:6
**AmerisourceBergen** [2] - 2:18
**amorphous** [2] -

37:18, 49:10
**amount** [2] - 20:19, 21:4
**amounts** [1] - 19:2
**ample** [1] - 19:16
**amusing** [1] - 18:15
**analogy** [1] - 49:18
**analyses** [1] - 40:21
**analysis** [5] - 10:5, 12:24, 34:19, 44:11, 48:10
**analyze** [1] - 45:24
**analyzed** [1] - 16:18
**anathema** [1] - 37:22
**ancillary** [1] - 44:25
**Andrews** [1] - 3:13
**ann** [1] - 1:22
**Ann** [1] - 50:17
**AnnMarie_Mitchell@njd.uscourts.gov** [1] - 1:22
**answers** [1] - 15:7
**anticipate** [1] - 5:3
**anyway** [2] - 24:5, 25:5
**API** [20] - 29:20, 29:22, 29:24, 30:16, 30:19, 34:3, 34:22, 35:19, 37:4, 37:13, 39:18, 39:24, 40:3, 40:6, 43:8, 44:20, 44:24, 45:1, 46:5
**apologies** [5] - 9:3, 31:11, 35:23, 42:13, 43:24
**apologize** [2] - 39:11, 46:3
**appear** [2] - 7:21, 7:22
**appearing** [1] - 25:6
**applicable** [1] - 34:21
**applies** [1] - 24:24
**apply** [2] - 10:6, 28:24
**applying** [1] - 40:15
**appropriate** [3] - 10:15, 15:17, 17:23
**appropriately** [1] - 36:18
**arbitrary** [1] - 17:17
**argue** [6] - 9:7, 21:5, 37:20, 37:23, 49:6, 49:10
**arguing** [1] - 45:16
**argument** [7] - 27:5, 27:18, 27:23, 27:25, 35:13, 37:24, 43:5
**arise** [1] - 34:23
**arrive** [2] - 40:18, 41:5
**arrived** [1] - 40:12
**articulate** [1] - 41:19
**articulated** [1] - 10:3

**artificial** [1] - 17:17
**ascertain** [1] - 10:6
**aside** [2] - 26:3, 37:13
**aspirational** [1] - 15:19
**asserts** [1] - 12:23
**assess** [1] - 46:9
**assessment** [10] - 32:14, 39:21, 40:15, 40:17, 40:18, 40:19, 46:12, 47:5, 47:13
**assessments** [2] - 44:8, 47:15
**assured** [1] - 20:16
**at-issue** [1] - 13:4
**Atlanta** [1] - 2:11
**attached** [1] - 47:2
**attend** [3] - 18:2, 18:10, 18:11
**attendant** [1] - 38:22
**attended** [1] - 18:23
**attorneys** [2] - 15:10, 25:6
**audit** [1] - 44:9
**authored** [2] - 11:13, 33:3
**authorities** [1] - 32:13
**authority** [2] - 40:1, 40:2
**available** [4] - 18:2, 18:8, 21:16, 38:6
**Avandia** [5] - 37:19, 38:1, 45:25, 49:5, 49:8
**average** [2] - 10:25, 15:7
**aware** [1] - 40:21

| B |
| --- |

**backdrop** [1] - 11:4
**backward** [1] - 5:15
**backwards** [3] - 5:12, 6:13, 39:1
**baking** [2] - 49:1, 49:19
**based** [7] - 10:11, 12:24, 25:25, 38:10, 39:20, 43:4, 46:11
**baseline** [1] - 42:20
**basis** [7] - 10:1, 11:23, 21:11, 29:12, 30:22, 39:10, 45:2
**Bates** [2] - 31:8, 46:2
**become** [1] - 11:21
**becomes** [1] - 36:7
**befall** [1] - 41:10
**begin** [1] - 45:3
**behalf** [2] - 4:13, 5:24
**Benjamin** [1] - 3:13
**BERNE** [1] - 2:16

**better** [3] - 6:2, 18:17, 26:11
**between** [5] - 14:23, 17:8, 17:19, 19:13, 19:19
**beyond** [3] - 14:19, 32:1, 42:19
**billion** [2] - 13:3, 13:7
**billions** [1] - 19:1
**Binsol** [4] - 29:14, 41:14, 43:5, 48:23
**Binsol's** [2] - 30:8, 38:12
**bit** [6] - 7:21, 9:12, 10:21, 12:20, 15:12, 20:20
**blanche** [1] - 24:7
**body** [1] - 29:4
**borders** [1] - 20:17
**Boulevard** [1] - 2:7
**boundary** [1] - 15:17
**brief** [5] - 6:14, 6:17, 10:21, 29:4, 33:17
**briefs** [4] - 5:4, 5:16, 24:22
**bring** [2] - 4:6, 20:8
**bringing** [1] - 42:4
**broad** [2] - 31:3, 41:18
**broader** [1] - 44:20
**broadly** [1] - 43:13
**Building** [1] - 1:7
**burden** [2] - 36:9, 43:11
**burst** [1] - 46:18
**business** [6] - 29:21, 34:24, 40:9, 41:12, 41:16, 49:13

### C

**cake** [2] - 49:1, 49:19
**calculated** [2] - 9:21, 13:6
**calculation** [2] - 17:7, 46:6
**calculations** [6] - 10:2, 13:15, 13:17, 14:24, 17:1, 17:4
**calendar** [1] - 5:18
**Camden** [2] - 1:8, 24:15
**Camp** [1] - 2:3
**captured** [1] - 19:1
**captures** [2] - 18:21, 19:11
**carcinogenic** [1] - 46:9
**care** [1] - 50:9
**carry** [1] - 3:12
**carte** [1] - 24:7
**CASE** [1] - 1:5

**case** [8] - 3:21, 5:11, 18:19, 24:4, 25:7, 44:25, 45:2, 45:5
**cases** [4] - 3:10, 3:22, 4:11, 46:15
**categories** [2] - 44:6, 44:11
**categorized** [1] - 36:18
**category** [1] - 43:14
**center** [1] - 44:24
**central** [1] - 15:3
**cert** [1] - 10:4
**certain** [7] - 16:12, 28:21, 29:19, 39:4, 44:18, 47:10, 49:2
**certainly** [4] - 7:25, 18:10, 25:20, 48:2
**certification** [3] - 9:18, 27:6, 27:21
**certify** [1] - 50:14
**CGMP** [4] - 32:18, 41:13, 41:17, 42:19
**CGMPs** [2] - 32:2, 42:16
**chain** [1] - 47:8
**chains** [2] - 10:22, 13:1
**chance** [2] - 4:3, 25:18
**change** [1] - 3:18
**Chicago** [1] - 2:13
**chose** [1] - 47:11
**Cincinnati** [1] - 2:18
**circumstances** [1] - 24:4
**cite** [1] - 48:5
**CIVIL** [1] - 1:3
**claims** [1] - 10:12
**clarification** [1] - 15:7
**clarify** [1] - 35:16
**class** [3] - 9:17, 27:6, 27:20
**clear** [5] - 16:5, 22:9, 32:21, 37:18, 48:22
**clearly** [2] - 28:11, 45:14
**Clerk** [1] - 2:22
**CLERK** [3] - 7:18, 7:20, 8:1
**client** [1] - 45:14
**clinical** [1] - 40:18
**clock** [1] - 20:14
**closely** [1] - 12:14
**Cohen** [1] - 1:7
**Coller** [1] - 46:3
**combination** [2] - 39:24, 47:7
**Commencing** [1] - 1:9
**commendable** [1] - 45:22

**comment** [1] - 23:1
**commentary** [1] - 36:21
**comments** [2] - 43:25, 45:20
**communicated** [3] - 30:5, 30:6, 34:9
**communications** [2] - 30:14, 48:10
**companies** [2] - 29:22, 41:16
**Company** [1] - 39:25
**company** [5] - 30:5, 32:5, 40:22, 41:11, 49:12
**comparison** [1] - 17:9
**competing** [2] - 29:22, 39:5
**competitive** [6] - 30:15, 39:1, 41:10, 43:7, 46:23, 49:22
**competitively** [8] - 30:18, 36:4, 36:8, 38:14, 38:16, 44:3, 44:15, 44:19
**competitor** [2] - 35:7, 35:8
**competitors** [6] - 29:25, 32:3, 37:5, 38:10, 39:18, 47:3
**compiled** [3] - 35:1, 36:5, 36:25
**Complaint** [1] - 19:24
**complete** [1] - 23:18
**completed** [1] - 25:5
**completing** [1] - 23:16
**components** [1] - 24:18
**computer** [1] - 1:24
**computer-aided** [1] - 1:24
**concede** [2] - 35:12, 42:5
**conceded** [1] - 11:17
**conceding** [1] - 35:17
**concern** [1] - 15:13
**concerns** [1] - 9:21
**concise** [1] - 15:10
**conclude** [3] - 15:23, 21:2, 50:4
**concluded** [2] - 15:22, 50:12
**conclusion** [7] - 39:15, 39:20, 40:13, 40:19, 41:5, 46:8, 46:11
**conclusions** [1] - 41:18
**concrete** [3] - 37:19, 49:5, 49:8

**conduct** [2] - 34:24, 46:12
**conducted** [1] - 32:5
**conducting** [1] - 49:20
**conducts** [1] - 37:1
**confer** [2] - 25:18, 25:21
**CONFERENCE** [1] - 1:5
**conference** [3] - 3:21, 4:2, 4:4
**conferred** [1] - 14:19
**conferring** [1] - 24:16
**confident** [1] - 20:1
**confidential** [5] - 30:6, 33:16, 34:5, 45:14, 47:16
**confidentiality** [4] - 28:19, 28:21, 29:7, 42:25
**confine** [6] - 11:7, 11:9, 11:20, 11:22, 12:7, 12:13
**confined** [2] - 20:4, 20:5
**confinement** [1] - 16:10
**confines** [2] - 19:15, 20:2
**confluence** [1] - 35:5
**connection** [6] - 13:17, 27:6, 27:20, 28:8, 43:1, 43:2
**considers** [1] - 29:18
**contain** [3] - 34:12, 42:7, 44:11
**contained** [2] - 35:17, 48:7
**containing** [2] - 34:3, 39:24
**contains** [2] - 36:2, 36:17
**contamination** [1] - 47:22
**contemplate** [1] - 23:25
**contemplating** [2] - 23:4, 26:8
**content** [2] - 29:14, 32:19
**contents** [2] - 13:24, 16:9
**contest** [1] - 41:24
**context** [2] - 9:12, 45:24
**Conti** [9] - 9:14, 11:5, 12:6, 12:13, 13:21, 15:3, 17:24, 19:6, 20:12
**Conti's** [5] - 13:6,

16:15, 16:22, 17:6, 17:18
**continue** [2] - 28:18, 39:22
**Continued** [1] - 2:1
**continued** [1] - 42:9
**contract** [1] - 37:4
**control** [1] - 20:9
**Cooper** [1] - 1:7
**copy** [1] - 38:10
**core** [1] - 44:24
**corners** [7] - 13:24, 14:5, 16:11, 16:24, 17:16, 19:24, 48:21
**corporate** [1] - 38:9
**correct** [9] - 3:10, 3:14, 3:15, 4:4, 4:5, 8:9, 8:11, 15:18, 50:14
**correctly** [1] - 29:3
**Cory** [2] - 46:2, 46:4
**counsel** [6] - 4:9, 5:3, 23:18, 23:19, 25:12, 27:6
**counsels'** [1] - 6:19
**counterproposal** [1] - 14:1
**countries** [1] - 46:15
**couple** [2] - 9:17, 19:4
**course** [8] - 8:19, 14:8, 18:1, 34:23, 40:24, 49:2, 49:12
**COURT** [1] - 1:1
**court** [2] - 6:21, 35:15
**Court** [2] - 1:22, 50:18
**Court's** [2] - 24:14, 45:20
**Courthouse** [1] - 1:7
**Courtroom** [1] - 2:23
**cover** [2] - 9:6, 31:12
**covered** [1] - 16:7, 25:3
**covers** [1] - 24:22
**crisis** [1] - 33:20
**criticisms** [1] - 44:12
**crux** [1] - 45:5
**curtailed** [1] - 34:14
**cut** [1] - 15:25
**CVS** [1] - 10:13

### D

**damages** [20] - 8:7, 9:19, 9:20, 9:21, 10:5, 10:6, 10:19, 11:6, 12:22, 12:23, 13:6, 13:7, 14:12, 14:22, 14:23, 15:1, 16:19, 17:3, 17:12
**data** [14] - 10:12, 10:13, 12:25, 13:2,

13:8, 14:22, 16:17, 18:20, 19:6, 39:22, 46:5, 46:18
**database** [2] - 46:13, 46:19
**databases** [1] - 47:6
**dataset** [7] - 10:11, 10:17, 12:10, 12:25, 13:3, 16:18, 19:1
**datasets** [3] - 11:13, 13:1, 16:20
**Date** [1] - 50:18
**date** [6] - 5:1, 5:15, 21:16, 39:4, 46:17, 46:18
**dates** [3] - 5:16, 47:9
**Davidson** [1] - 3:17
**DAVIS** [1] - 2:10
**days** [9] - 4:19, 13:11, 14:16, 16:23, 23:6, 24:23, 25:1, 25:5, 25:14
**DC** [1] - 13:15
**De** [1] - 2:7
**deadline** [2] - 24:21, 24:24
**deadlines** [1] - 23:4
**deal** [1] - 39:18
**dealing** [3] - 14:22, 17:11, 47:21
**death** [1] - 46:3
**December** [3] - 10:9, 14:14, 14:17
**decide** [1] - 8:7
**deciding** [1] - 28:18
**decision** [1] - 48:16
**decisionmaking** [2] - 36:7, 45:19
**decisions** [1] - 27:1
**declaration** [3] - 30:8, 38:12, 41:15
**defendant** [1] - 41:22
**Defendants** [2] - 2:14, 2:18
**defendants** [13] - 3:20, 4:13, 5:7, 5:20, 7:5, 8:12, 8:17, 14:10, 22:23, 26:18, 28:2, 42:5, 50:6
**defendants'** [2] - 5:13, 18:12
**Defense** [1] - 31:13
**defense** [9] - 4:7, 6:14, 7:2, 7:12, 11:7, 11:12, 12:12, 23:17, 27:24
**defined** [1] - 28:11
**delta** [1] - 17:12
**demonstrate** [3] - 33:21, 36:6, 40:15

**demonstrates** [2] - 31:22, 44:12
**deny** [1] - 26:5
**departure** [1] - 13:5
**deposed** [1] - 11:5
**deposition** [10] - 9:24, 14:13, 14:16, 16:10, 20:9, 20:10, 21:1, 21:12, 21:17, 21:23
**depositions** [6] - 8:6, 16:7, 16:8, 18:2, 18:11, 18:23
**depth** [1] - 18:25
**Deputy** [1] - 2:23
**derived** [1] - 12:25
**described** [1] - 19:4
**describes** [4] - 30:12, 32:13, 32:14, 32:15
**describing** [2] - 17:24, 47:9
**description** [2] - 12:21, 30:9
**descriptions** [1] - 48:3
**deserve** [1] - 31:3
**despite** [1] - 26:24
**detail** [5] - 15:4, 16:18, 30:21, 31:2, 45:13
**detail-oriented** [1] - 15:4
**detailed** [6] - 24:17, 30:13, 34:18, 44:1, 44:14, 48:2
**detection** [1] - 46:14
**determine** [1] - 30:1
**determining** [1] - 35:25
**develop** [1] - 39:22
**devoted** [1] - 10:22
**differ** [1] - 47:23
**difference** [1] - 19:8
**different** [8] - 7:21, 9:16, 10:3, 13:7, 30:16, 35:2, 40:22, 43:11
**difficult** [4] - 23:21, 37:20, 46:8, 49:10
**digest** [3] - 13:19, 19:4, 25:16
**dire** [1] - 25:3
**direct** [1] - 30:18
**directly** [4] - 29:21, 29:24, 37:4, 45:18
**disadvantage** [1] - 30:18
**disagree** [3] - 12:20, 35:10, 48:21
**disclosed** [11] - 13:12, 13:13, 14:13, 14:25, 17:2, 28:12, 30:11, 33:10, 33:12, 44:19,

49:24
**disclosing** [1] - 32:1
**disclosure** [1] - 39:16
**discrepancy** [1] - 14:23
**discuss** [3] - 8:19, 27:7, 43:12
**discussed** [1] - 44:15
**discussion** [4] - 43:5, 47:17, 48:10, 48:17
**discussions** [1] - 44:5
**disguising** [1] - 26:4
**dispense** [1] - 7:1
**dispositive** [1] - 26:4
**dispute** [2] - 15:25, 45:23
**disputes** [6] - 4:18, 18:4, 22:20, 23:11, 23:12, 24:6
**distributed** [2] - 46:14, 47:2
**distribution** [1] - 46:16
**DISTRICT** [3] - 1:1, 1:1, 1:10
**dive** [1] - 18:24
**division** [1] - 24:15
**document** [23] - 31:7, 32:19, 33:1, 33:3, 33:9, 33:25, 34:7, 34:18, 35:10, 35:12, 35:17, 35:20, 36:11, 36:12, 37:9, 38:18, 40:12, 40:15, 41:3, 45:7, 45:24, 49:11
**documents** [43] - 28:13, 28:14, 28:16, 28:20, 28:22, 28:23, 29:4, 29:9, 29:13, 29:14, 29:16, 29:23, 30:4, 30:9, 31:4, 34:11, 34:15, 35:15, 35:24, 37:24, 38:7, 38:8, 39:2, 39:12, 41:10, 41:23, 41:25, 42:4, 42:6, 42:19, 43:6, 43:12, 43:16, 43:19, 43:21, 44:10, 44:11, 44:23, 45:6, 45:17, 45:23, 48:8, 48:22
**domain** [2] - 28:16, 46:21
**done** [5] - 8:25, 10:17, 12:8, 21:13, 32:19
**down** [2] - 19:17, 29:9
**Dr** [15] - 9:14, 11:5, 12:6, 12:13, 13:6, 13:21, 15:3, 16:15, 16:22, 17:6, 17:18,

17:24, 19:6, 20:11, 20:12
**draft** [1] - 23:6
**Drive** [1] - 2:13
**drugs** [3] - 13:4, 33:11, 38:15
**due** [3] - 6:17, 6:24, 13:12
**during** [1] - 5:15

**E**

**earliest** [1] - 46:17
**early** [1] - 23:8
**economist** [1] - 9:15
**edge** [1] - 42:3
**editorial** [1] - 27:2
**Edward** [1] - 46:2
**effect** [2] - 11:25, 12:3
**effects** [1] - 46:21
**efficiently** [1] - 18:6
**Eisenhower** [1] - 1:15
**either** [4] - 14:15, 29:21, 29:24, 30:18, 34:8, 36:3, 37:4
**elements** [2] - 11:23, 24:22
**elsewhere** [2] - 36:23, 38:5
**email** [9] - 7:23, 30:14, 43:17, 45:7, 45:20, 46:2, 46:24, 47:8, 47:16
**emails** [5] - 44:1, 44:7, 44:8, 47:24, 48:1
**emphasis** [1] - 11:19
**employed** [1] - 12:9
**employees** [2] - 33:18, 44:6
**employs** [1] - 49:23
**enable** [3] - 18:4, 18:5, 30:17
**enables** [1] - 30:16
**encompass** [1] - 22:6
**ending** [1] - 31:8
**ends** [1] - 46:2
**enormous** [1] - 18:21
**entire** [3] - 19:10, 32:19, 38:25
**entirely** [1] - 25:23
**entities** [1] - 37:12
**entitled** [1] - 50:15
**epidemiology** [1] - 46:20
**especially** [1] - 21:14
**ESQUIRE** [9] - 1:15, 1:18, 2:3, 2:6, 2:10, 2:10, 2:12, 2:17, 2:22
**essentially** [4] - 10:23, 23:16, 25:14, 46:24

**estimates** [1] - 21:4
**estimation** [1] - 23:5
**evaluate** [4] - 30:1, 34:19, 34:23, 39:6
**evaluated** [1] - 28:21
**evaluating** [1] - 44:4
**evaluation** [2] - 36:20, 44:13
**evaluations** [1] - 37:2
**evidence** [2] - 23:21, 47:21
**exact** [1] - 16:1
**exactly** [1] - 47:4
**examination** [5] - 9:25, 11:7, 11:18, 11:20, 12:12
**examine** [2] - 12:6, 20:3
**example** [4] - 18:17, 31:8, 32:9, 35:18
**examples** [1] - 16:14
**except** [2] - 37:13, 46:15
**exceptional** [1] - 21:3
**exchange** [1] - 24:17
**exchanges** [3] - 43:17, 45:7, 45:20
**excluded** [1] - 36:2
**exclusion** [1] - 17:17
**executed** [1] - 39:20
**executes** [1] - 39:23
**exercise** [1] - 29:1
**exhibit** [4] - 31:9, 31:10, 32:8, 36:14
**Exhibit** [6] - 31:11, 31:13, 31:14, 36:15, 39:15, 46:1
**exhibits** [3] - 27:5, 27:20, 28:7
**expand** [1] - 20:20
**expect** [6] - 21:8, 23:20, 23:24, 24:5, 25:25, 26:6
**experience** [1] - 21:15
**expert** [5] - 9:15, 11:12, 12:13, 19:3
**experts** [1] - 8:7
**expires** [1] - 16:1
**explaining** [1] - 17:24
**explains** [2] - 29:18
**explore** [2] - 14:3, 19:15
**exposure** [2] - 46:6, 46:12
**Express** [1] - 10:13
**expressly** [1] - 16:17
**extend** [2] - 40:1, 49:4
**extensive** [2] - 9:25, 30:14
**extent** [5] - 30:4, 33:8,

38:5, 40:20, 49:18
**external** [1] - 35:2
**externally** [1] - 34:9

## F

**faced** [1] - 41:1
**facing** [1] - 48:2
**fact** [15] - 4:10, 4:11, 4:15, 4:19, 7:23, 10:18, 11:4, 28:8, 33:2, 33:18, 35:11, 35:18, 36:2, 48:13
**fact-finder** [1] - 10:18
**factors** [1] - 6:3
**facts** [12] - 24:3, 34:6, 34:16, 34:20, 35:6, 35:12, 35:17, 35:25, 36:22, 38:4, 38:19, 38:23
**fair** [11] - 13:21, 14:3, 14:4, 15:6, 15:23, 16:3, 16:12, 16:13, 16:25, 17:7, 26:12
**fairly** [2] - 10:11, 24:16
**fall** [2] - 19:20, 43:13
**falling** [1] - 18:22
**fan** [1] - 21:13
**far** [1] - 25:25
**fashion** [1] - 35:1
**fatal** [1] - 35:13
**February** [4] - 9:22, 23:8, 27:11
**federal** [1] - 26:24
**fences** [1] - 20:17
**few** [3] - 16:13, 24:22, 25:14
**filed** [3] - 24:9, 27:5, 27:20
**files** [3] - 13:14, 14:25, 23:19
**filing** [1] - 5:16
**final** [5] - 24:14, 24:18, 24:20, 24:25, 49:15
**finally** [1] - 46:20
**finder** [1] - 10:18
**fine** [5] - 5:6, 7:4, 7:5, 15:9, 25:5
**finish** [1] - 16:3
**finished** [2] - 40:3, 40:6
**first** [10] - 4:3, 9:17, 14:7, 16:15, 17:3, 23:16, 25:2, 39:12, 43:13, 49:2
**five** [1] - 8:19
**flexible** [1] - 6:18
**Florida** [1] - 2:7
**focused** [2] - 14:2, 16:8

**follow** [2] - 5:11, 17:23
**follow-up** [1] - 17:23
**following** [2] - 6:1, 46:25
**fond** [1] - 18:16
**foreclose** [1] - 19:12
**foregoing** [1] - 50:14
**form** [3] - 23:15, 24:14, 24:20
**format** [2] - 6:12, 38:18
**formula** [5] - 10:6, 10:16, 10:24, 12:9, 29:18
**formulation** [1] - 38:15
**formulations** [1] - 29:17
**forth** [8] - 22:3, 24:17, 29:13, 30:8, 33:17, 37:17, 38:12, 47:9
**forward** [1] - 46:7
**four** [29] - 3:13, 9:15, 11:20, 12:1, 13:24, 14:2, 14:4, 14:16, 14:20, 15:15, 15:16, 15:17, 15:18, 15:22, 16:11, 16:24, 17:16, 19:18, 19:24, 20:10, 21:1, 21:2, 21:6, 21:7, 21:9, 21:23, 27:14, 48:21
**four-hour** [1] - 20:10
**fourth** [2] - 12:6, 49:3
**frankly** [3] - 11:22, 20:10, 49:9
**FREEMAN** [1] - 1:14
**fringe** [1] - 45:1
**frivolous** [1] - 49:18
**frog** [1] - 39:11
**front** [1] - 31:17
**full** [5] - 11:21, 15:16, 15:20, 24:25, 43:14
**functions** [1] - 29:19
**fund** [1] - 26:25
**fundamental** [1] - 45:2
**furthermore** [1] - 41:20
**future** [1] - 39:6

## G

**game** [2] - 14:4, 16:13
**general** [5] - 40:23, 47:1, 47:4, 48:3, 48:6
**generally** [1] - 34:16
**generic** [1] - 10:22
**GEOPPINGER** [8] - 2:17, 4:12, 5:6, 5:20, 6:16, 7:4, 7:14, 7:25

**Geoppinger** [3] - 4:13, 5:5, 6:15
**Georgia** [1] - 2:11
**Gibson** [2] - 12:12, 20:11
**given** [1] - 17:18
**global** [4] - 32:11, 34:2, 36:13, 39:15
**goal** [1] - 15:19
**god** [1] - 18:21
**government** [1] - 26:24
**grant** [1] - 20:25
**granular** [2] - 30:21, 31:2
**great** [1] - 26:23
**Greenberg** [1] - 28:1
**GREENBERG** [1] - 1:10
**Greg** [4] - 9:2, 18:16, 20:14, 24:11
**GREGORY** [1] - 2:12
**guess** [1] - 27:23
**guidance** [3] - 25:21, 26:17, 29:7
**guide** [1] - 41:4

## H

**hand** [1] - 26:5
**handle** [3] - 29:19, 47:11, 47:12
**handled** [1] - 33:19
**Happy** [1] - 50:10
**happy** [7] - 9:11, 29:10, 30:21, 31:7, 43:12, 45:12, 50:11
**HARKINS** [32] - 2:10, 3:5, 3:11, 3:15, 3:19, 4:5, 4:7, 28:1, 28:18, 29:3, 30:25, 31:6, 31:11, 31:16, 31:19, 32:9, 34:6, 35:16, 35:23, 36:12, 36:16, 38:3, 40:10, 42:11, 42:13, 43:22, 43:24, 45:12, 46:24, 47:25, 49:17, 50:6
**Harkins** [12] - 3:4, 28:1, 28:6, 33:24, 37:9, 38:2, 39:16, 42:12, 43:19, 45:11, 48:23, 49:15
**harm** [12] - 30:15, 37:18, 37:19, 38:1, 41:10, 41:15, 41:19, 43:7, 46:23, 49:6, 49:8, 49:23
**harmed** [1] - 28:15
**Harris** [1] - 3:10
**hated** [1] - 20:23
**Haughton** [1] - 3:13

**HAUGHTON** [1] - 3:14
**hazard** [1] - 39:21
**heading** [2] - 32:10, 34:1
**health** [2] - 9:15, 39:21
**hear** [7] - 4:14, 5:1, 5:14, 7:8, 9:3, 27:5, 27:18
**heard** [1] - 26:13
**hearing** [3] - 4:1, 7:23, 26:22
**hearing/argument** [1] - 6:9, 7:13
**held** [2] - 3:1, 30:5
**helpful** [1] - 29:11
**helps** [1] - 26:17
**hi** [1] - 46:4
**high** [4] - 13:20, 29:11, 44:5, 47:17
**high-level** [2] - 44:5, 47:17
**high-stakes** [1] - 13:20
**highly** [1] - 11:17
**Hilton** [3] - 28:3, 32:24, 37:7, 48:19
**HILTON** [12] - 2:3, 28:3, 32:23, 32:25, 35:9, 37:6, 37:8, 41:7, 41:9, 44:22, 48:20, 50:7
**himself** [1] - 11:13
**Hines** [1] - 3:10
**historically** [1] - 15:3
**hit** [1] - 15:24
**hoe** [1] - 28:6
**hold** [3] - 34:4, 35:19, 40:6
**holiday** [1] - 6:21
**holidays** [1] - 25:15
**Honik** [4] - 8:10, 13:1, 18:14, 21:8
**HONIK** [11] - 1:18, 1:18, 8:10, 8:15, 9:2, 9:5, 9:11, 18:15, 21:20, 22:11, 22:13
**Honik's** [1] - 12:20
**Honor** [57] - 3:5, 3:19, 4:5, 4:12, 4:22, 5:7, 5:21, 5:24, 6:18, 7:6, 7:14, 8:10, 12:19, 15:2, 15:15, 16:4, 16:22, 17:14, 18:1, 18:7, 18:10, 18:15, 20:19, 21:20, 21:21, 22:5, 22:14, 22:22, 24:11, 24:20, 25:8, 25:11, 25:19, 26:12, 26:17, 28:3, 28:18,

31:6, 31:19, 32:9, 32:23, 35:9, 35:16, 36:12, 37:6, 38:3, 40:10, 41:7, 42:11, 42:25, 43:22, 44:22, 45:12, 47:25, 48:20, 49:17, 50:7
**Honor's** [2] - 43:25, 49:25
**HONORABLE** [1] - 1:10
**Honorable** [2] - 2:22, 3:1
**hope** [2] - 21:2, 21:6
**hoped** [1] - 11:25
**hoped-for** [1] - 11:25
**hour** [4] - 9:23, 15:14, 20:9, 20:10
**hours** [33] - 11:6, 11:8, 11:14, 11:18, 11:20, 12:5, 12:12, 13:23, 14:2, 14:9, 14:20, 14:21, 15:15, 15:16, 15:17, 15:19, 15:20, 15:22, 18:24, 19:16, 19:18, 20:11, 20:14, 20:22, 21:1, 21:2, 21:6, 21:7, 21:9, 21:23
**Huahai** [1] - 39:25
**Humana** [1] - 10:13

## I

**idea** [7] - 19:12, 26:7, 26:11, 37:16, 38:24, 49:5, 49:7
**identical** [2] - 10:16
**identified** [1] - 48:14
**identify** [2] - 29:6, 41:19
**Illinois** [1] - 2:13
**illustrates** [1] - 32:2
**illustrative** [1] - 16:13
**immaterial** [1] - 33:1
**immediate** [1] - 34:2
**impacts** [1] - 17:10
**implement** [3] - 34:20, 39:6, 43:9
**implementations** [1] - 42:17
**implemented** [6] - 30:2, 31:24, 36:20, 38:11, 39:9, 48:18
**implementing** [1] - 49:21
**implements** [1] - 44:17
**important** [1] - 24:19
**impose** [1] - 6:11
**impurity** [4] - 40:25,

41:3, 46:9, 48:14
**inappropriate** [1] - 12:2
**inasmuch** [1] - 12:8
**Inc** [2] - 2:14, 2:15
**include** [1] - 22:8
**included** [1] - 25:12
**including** [1] - 42:18
**incomprehensible** [1] - 45:6
**incorporates** [2] - 16:16, 23:3
**incorrect** [1] - 19:22
**indicated** [2] - 22:25, 43:19
**individual** [7] - 34:6, 34:12, 35:25, 36:22, 38:19, 38:25, 43:5
**individually** [1] - 32:17
**Industries** [1] - 2:14
**industry** [3] - 33:12, 33:23, 44:20
**industrywide** [2] - 33:7, 33:19
**information** [27] - 28:11, 29:24, 30:17, 33:22, 33:23, 34:14, 34:21, 36:4, 36:5, 36:17, 36:25, 37:3, 38:6, 38:15, 38:17, 39:17, 42:8, 43:7, 46:5, 46:7, 47:4, 47:17, 47:23, 47:25, 48:3, 48:6, 48:15
**initial** [1] - 29:4, 43:1
**initiated** [2] - 40:1, 48:13
**injury** [1] - 28:11
**input** [2] - 19:6, 23:7
**insight** [2] - 35:7, 39:4
**instance** [1] - 30:16
**instances** [2] - 29:23, 36:22
**instead** [1] - 41:17
**instructed** [1] - 40:2
**intend** [1] - 21:17
**interact** [1] - 17:13
**interaction** [1] - 17:19
**interest** [3] - 34:13, 38:6, 42:25
**interesting** [1] - 34:21
**internal** [29] - 23:4, 29:17, 30:1, 31:23, 32:3, 32:11, 34:19, 35:2, 36:6, 37:1, 39:8, 40:15, 42:17, 43:6, 43:9, 44:5, 44:8, 44:13, 44:16, 44:17, 45:19, 46:25,

47:9, 47:14, 48:1, 48:9, 48:16, 48:17, 49:19
**internally** [1] - 38:13
**interrelationship** [1] - 19:13
**interruption** [1] - 35:22
**introduce** [1] - 23:21
**investigating** [1] - 40:24
**investigation** [8] - 31:20, 31:25, 32:22, 42:6, 42:15, 42:21, 49:20
**investigations** [5] - 32:4, 34:25, 37:2, 39:8, 41:14
**invite** [1] - 7:24
**involved** [2] - 6:3, 30:7
**involves** [1] - 23:16
**IQVIA** [3] - 13:2, 16:17, 19:11
**irreparable** [2] - 46:22, 46:23
**isolated** [1] - 36:2
**issue** [16] - 5:23, 13:4, 13:16, 20:25, 21:22, 25:18, 25:21, 28:14, 30:13, 31:21, 38:25, 40:14, 41:1, 41:2, 44:25, 45:1
**issued** [3] - 22:8, 33:18, 34:3
**issues** [8] - 5:14, 18:9, 19:23, 20:4, 20:5, 22:17, 26:14, 34:23
**issuing** [1] - 32:11
**items** [1] - 45:13
**itself** [3] - 35:20, 36:3, 47:2

## J

**January** [5] - 1:8, 5:19, 6:9, 6:15, 50:17
**Jeff** [1] - 4:12
**JEFFREY** [1] - 2:17
**JERSEY** [1] - 1:1
**Jersey** [3] - 1:8, 1:16, 23:15
**job** [1] - 15:10
**Judge** [4] - 4:18, 4:20, 7:18, 8:4, 8:7, 8:13, 8:22, 9:10, 9:11, 11:4, 12:3, 19:17, 22:11, 22:16, 27:8, 27:16, 27:18
**JUDGE** [1] - 1:10

**Judicial** [1] - 2:22
**July** [1] - 9:24
**jump** [1] - 9:11
**juncture** [1] - 12:2
**jury** [7] - 11:2, 22:18, 22:19, 22:21, 22:24, 24:23, 25:4

## K

**Kaluhiokalani** [1] - 3:10
**KANNER** [1] - 2:2
**Kass** [1] - 5:24
**KASS** [6] - 2:6, 5:24, 6:7, 6:23, 7:10, 7:15
**KATZ** [1] - 1:14
**keep** [8] - 12:1, 33:22, 34:11, 36:1, 38:22, 48:8, 48:9, 48:15
**keeping** [3] - 29:7, 34:14, 45:4
**Kennedy** [1] - 3:14
**key** [1] - 20:8
**kidding** [1] - 26:3
**kind** [2] - 11:25, 15:19
**knock** [1] - 8:20
**knowing** [2] - 10:6, 20:19
**known** [1] - 33:23
**knows** [1] - 9:14
**Kroger** [1] - 10:13
**Kugler** [5] - 2:22, 8:5, 9:10, 22:16, 27:8
**KUGLER** [2] - 1:10, 3:2

## L

**lackadaisical** [1] - 41:17
**language** [1] - 32:7
**large** [5] - 10:22, 29:6, 34:10, 36:24, 49:11
**Larry** [1] - 6:11
**larry** [1] - 2:23
**Larry's** [1] - 7:22
**last** [2] - 9:22, 14:11
**lasted** [1] - 18:24
**late** [2] - 6:22, 14:25
**LAW** [3] - 7:18, 7:20, 8:1
**Law** [1] - 2:22
**lawyers** [4] - 20:20, 21:3, 21:14, 26:6
**lay** [1] - 37:17
**Layne** [1] - 28:3
**LAYNE** [1] - 2:3
**lays** [2] - 32:10, 46:24
**lead** [1] - 48:16
**least** [2] - 17:5, 40:23

**leave** [1] - 23:22
**length** [2] - 14:6, 14:8
**lengthier** [1] - 15:7
**Leon** [1] - 2:7
**less** [1] - 18:18
**lessen** [1] - 7:21
**letter** [2] - 5:4, 5:16
**letters** [1] - 4:9
**level** [4] - 29:12, 40:2, 44:5, 47:17
**LIABILITY** [1] - 1:4
**lieu** [1] - 28:7
**lifted** [1] - 40:7
**likely** [2] - 37:3, 46:11
**limine** [8] - 22:18, 25:9, 25:13, 25:17, 25:20, 26:4, 26:7, 26:14
**limit** [5] - 12:4, 15:14, 16:1, 18:17, 20:19
**Limited** [1] - 39:25
**limited** [4] - 10:10, 11:8, 12:22, 13:24
**limiting** [1] - 12:11
**limits** [5] - 14:15, 14:19, 15:24, 21:23
**lines** [2] - 16:6, 47:3
**list** [4] - 4:3, 23:25, 24:1, 46:16
**listing** [1] - 3:23
**listings** [1] - 4:4
**literally** [1] - 19:8
**LITIGATION** [1] - 1:4
**litigation** [3] - 20:18, 41:22, 45:3
**LLC** [4] - 1:14, 1:18, 2:2, 2:14
**LLP** [3] - 2:6, 2:9, 2:16
**load** [1] - 7:22
**LOCKARD** [2] - 2:10, 22:22
**Lockard** [1] - 22:22
**logic** [2] - 13:14, 14:25
**look** [6] - 5:17, 11:2, 18:19, 18:20, 31:7, 40:11
**looked** [1] - 28:20
**looking** [4] - 4:17, 5:13, 16:5, 17:21, 19:1, 24:14, 31:2, 31:21, 32:20, 33:20, 33:24, 41:5
**loquacious** [2] - 15:4, 18:17, 20:15
**Loretta** [2] - 7:18, 8:3
**LORETTA** [1] - 2:22
**losartan/irbesartan** [1] - 4:11
**Louisiana** [1] - 2:4
**Ltd** [1] - 2:14

## M

**MacStravic** [1] - 2:23
**magnitude** [1] - 18:19
**maintain** [2] - 28:19, 38:22
**maintaining** [1] - 42:25
**manage** [1] - 20:1
**MANAGEMENT** [1] - 1:5
**management** [3] - 3:21, 32:12, 34:3
**mandated** [2] - 32:2, 42:16
**Mantalis** [1] - 3:17
**manufactured** [2] - 39:24, 40:7
**manufacturer** [2] - 42:21, 46:5
**manufacturers** [2] - 40:4, 41:24
**manufacturing** [3] - 33:5, 33:6, 33:11
**map** [1] - 35:5
**margins** [1] - 42:5
**Marie** [2] - 1:22, 50:17
**Market** [1] - 1:19
**market** [2] - 40:4, 46:17
**Master** [1] - 28:20
**MASTER** [49] - 1:12, 3:2, 4:21, 4:24, 5:2, 5:17, 5:22, 6:5, 6:8, 7:1, 7:7, 7:11, 7:16, 7:19, 8:2, 8:24, 9:4, 9:8, 12:17, 18:14, 20:23, 21:22, 22:12, 22:15, 27:4, 27:19, 28:5, 29:2, 30:23, 31:1, 31:9, 31:15, 31:17, 32:6, 33:24, 36:10, 36:15, 38:2, 39:14, 41:8, 42:10, 42:12, 43:16, 43:23, 45:10, 47:20, 49:14, 50:2, 50:8
**mastered** [1] - 26:21
**material** [14] - 30:2, 34:15, 35:1, 35:25, 38:13, 38:21, 40:7, 41:4, 42:23, 43:2, 44:15, 45:8, 45:14, 48:4
**materials** [1] - 17:19
**matter** [11] - 8:13, 8:16, 14:15, 16:4, 34:8, 34:16, 35:18, 36:3, 36:23, 48:11, 50:15
**MAZIE** [1] - 1:14

**mean** [7] - 7:7, 15:5, 15:12, 25:25, 35:9, 37:17, 45:22
**meantime** [1] - 39:25
**mechanical** [1] - 1:24
**meet** [5] - 25:18, 25:21, 41:13, 42:15, 49:7
**meeting** [2] - 24:15, 27:10
**meets** [1] - 38:1
**megabytes** [2] - 13:13, 14:25
**mentioned** [2] - 13:2, 13:11
**MESTRE** [1] - 2:6
**met** [1] - 14:19
**methodology** [3] - 10:16, 11:3, 12:8
**Miami** [1] - 2:7
**might** [7] - 23:25, 32:2, 32:18, 33:14, 34:22, 40:22, 41:12
**million** [6] - 12:23, 14:22, 14:23, 17:11, 17:12, 19:17
**mind** [2] - 29:8, 45:4
**minimal** [1] - 38:7
**minimum** [2] - 42:16, 42:19
**minutes** [4] - 8:19, 20:15, 20:16, 21:9
**mistake** [1] - 26:3
**Mitchell** [3] - 1:7, 1:22, 50:17
**model** [1] - 5:11
**modeling** [1] - 11:3
**modest** [1] - 8:18
**moment** [1] - 16:1
**money** [1] - 26:25
**month** [4] - 5:14, 10:10, 14:11, 26:10
**most** [2] - 11:5, 24:19
**mostly** [1] - 34:8
**motion** [6] - 9:17, 10:4, 27:5, 27:6, 27:19, 29:5
**motions** [11] - 22:18, 25:9, 25:13, 25:17, 25:20, 25:24, 26:4, 26:7, 26:14, 27:21
**move** [2] - 36:1, 36:10
**MR** [65] - 3:5, 3:11, 3:15, 3:19, 4:5, 4:7, 4:12, 5:6, 5:20, 5:24, 6:7, 6:16, 6:23, 7:4, 7:10, 7:14, 7:15, 7:25, 8:10, 8:15, 9:2, 9:3, 9:5, 9:6, 9:11, 12:19, 18:15, 21:20,

21:21, 22:5, 22:11, 22:13, 22:14, 24:11, 25:8, 25:11, 26:12, 26:16, 27:13, 27:16, 28:1, 28:18, 29:3, 30:25, 31:6, 31:11, 31:16, 31:19, 32:9, 34:6, 35:16, 35:23, 36:12, 36:16, 38:3, 40:10, 42:11, 42:13, 43:22, 43:24, 45:12, 46:24, 47:25, 49:17, 50:6
**MS** [12] - 22:22, 28:3, 32:23, 32:25, 35:9, 37:6, 37:8, 41:7, 41:9, 44:22, 48:20, 50:7
**MSP** [1] - 9:20
**must** [1] - 15:25
**muster** [1] - 49:9
**muted** [1] - 9:2
**mutually** [2] - 11:15, 12:5
**Mylan** [3] - 34:3, 35:19, 37:13

## N

**names** [2] - 37:11, 38:25
**narrow** [5] - 11:6, 12:21, 38:21, 39:12, 45:16
**narrowing** [2] - 29:9, 45:23
**nature** [4] - 20:24, 26:15, 41:24, 44:4
**NDMA** [3] - 41:21, 46:6, 46:21
**NE** [1] - 2:11
**nearing** [1] - 20:13
**nearly** [1] - 9:23
**neatly** [1] - 43:14
**necessarily** [1] - 24:21
**necessary** [5] - 11:21, 14:18, 18:8, 21:14, 29:11
**need** [14] - 5:3, 8:12, 15:12, 15:16, 16:12, 16:25, 17:7, 20:17, 22:2, 23:10, 23:11, 24:2, 24:9, 26:8
**needed** [1] - 20:20
**needless** [2] - 11:11, 16:5
**needs** [3] - 7:24, 16:7, 38:20
**negotiating** [4] - 4:16, 29:21, 29:24, 44:21
**negotiations** [2] -

30:19
**NEW** [1] - 1:1
**new** [14] - 4:3, 10:11, 10:17, 12:10, 12:24, 12:25, 13:22, 16:15, 16:21, 17:6, 17:10, 17:20, 19:7, 19:15
**New** [6] - 1:8, 1:16, 2:4, 23:15, 50:10, 50:11
**next** [10] - 3:17, 3:21, 4:2, 4:4, 4:19, 8:19, 26:10, 26:22, 27:9, 36:12
**nice** [1] - 42:3
**nine** [3] - 11:1, 13:1, 19:9
**nitrosamine** [1] - 31:21
**nobody** [2] - 16:7, 19:1
**non** [1] - 40:7
**non-ZHP** [1] - 40:7
**nonclinical** [2] - 46:7, 46:11
**none** [2] - 4:1, 13:16
**nonexistent** [1] - 38:7
**normal** [1] - 42:19
**notably** [1] - 13:5
**note** [1] - 28:22
**nothing** [4] - 4:7, 14:14, 37:14, 50:4
**notification** [3] - 32:11, 34:2, 40:5
**notifications** [1] - 32:13
**November** [1] - 34:2
**number** [19] - 10:7, 10:24, 11:8, 11:14, 18:20, 19:21, 19:22, 20:22, 29:19, 31:9, 31:10, 31:23, 32:10, 34:1, 35:21, 35:24, 36:19, 36:22, 46:2
**Number** [3] - 28:21, 31:11, 31:13
**NUMBER** [1] - 1:3
**numbers** [2] - 11:2, 33:1

## O

**objection** [2] - 3:23, 18:7
**objections** [1] - 21:18
**obligations** [3] - 33:5, 33:6, 41:13
**obviously** [4] - 6:19, 23:11, 24:9, 24:13
**occasions** [1] - 10:17
**occur** [2] - 10:5, 18:25

**Official** [1] - 1:22
**often** [2] - 15:7, 26:5
**Ohio** [1] - 2:18
**old** [3] - 13:22, 17:10, 17:19
**once** [2] - 18:24, 20:2
**one** [18] - 5:4, 12:24, 16:15, 17:13, 18:19, 19:21, 27:20, 29:10, 29:25, 31:8, 32:3, 34:13, 37:5, 37:9, 38:24, 42:7, 42:14
**ones** [1] - 19:14
**ongoing** [1] - 16:2
**opening** [2] - 6:14
**opinions** [10] - 10:1, 13:10, 13:22, 17:10, 17:19, 17:20, 17:25, 19:13, 20:1
**opportunity** [11] - 7:8, 13:21, 14:3, 15:23, 16:3, 16:12, 16:25, 17:4, 17:8, 19:15, 25:15
**opposition** [2] - 6:24, 16:10
**option** [1] - 18:1
**Optum** [1] - 10:14
**order** [21] - 3:24, 12:11, 20:3, 20:4, 20:25, 21:23, 22:18, 23:13, 23:14, 23:15, 23:17, 23:21, 23:22, 24:14, 24:18, 24:20, 24:25, 26:14, 28:20, 28:22, 47:7
**Order** [1] - 28:21
**orders** [4] - 3:6, 3:16, 3:20, 29:7
**ordinarily** [3] - 30:10, 32:4, 32:19
**ordinary** [1] - 49:12
**oriented** [1] - 15:4
**original** [3] - 13:6, 17:7, 22:4
**Orleans** [1] - 2:4
**OSTFELD** [11] - 2:12, 9:3, 9:6, 12:19, 21:21, 22:5, 22:14, 24:11, 25:8, 25:11, 26:12
**Ostfeld** [9] - 8:17, 9:1, 11:17, 12:18, 18:25, 19:14, 21:5, 23:2, 24:12
**Ostfeld's** [1] - 21:1
**otherwise** [6] - 21:16, 21:17, 25:21, 33:10, 37:14, 40:2
**ourselves** [2] - 20:2,

20:7
**outer** [1] - 15:16
**outlined** [1] - 42:14
**outside** [5] - 14:4, 17:15, 30:5, 32:4, 34:9
**overcome** [4] - 35:14, 36:8, 43:10, 45:8
**oversees** [1] - 45:1
**oversight** [1] - 44:24
**own** [13] - 8:15, 19:3, 33:18, 34:20, 37:1, 38:9, 39:6, 43:9, 43:14, 44:12, 44:16, 48:10, 49:21

## P

**p.m** [5] - 1:9, 3:3, 6:9, 7:13, 50:12
**page** [4] - 32:10, 39:15, 41:6, 46:1
**pages** [2] - 9:24, 26:1
**paragraph** [4] - 16:16, 34:1, 41:20, 48:25
**Parkway** [1] - 1:15
**part** [3] - 17:3, 25:11, 28:23
**particular** [8] - 10:12, 29:12, 30:12, 33:9, 33:10, 33:20, 35:6, 47:12
**particularly** [3] - 12:7, 45:20, 48:4
**parties** [4] - 7:20, 7:22, 20:17, 30:6
**party** [1] - 9:19
**passes** [1] - 49:9
**past** [4] - 9:24, 10:9, 15:24, 18:9
**pathway** [1] - 20:2
**Pauline** [1] - 3:9
**payor** [1] - 9:19
**pejoratively** [1] - 15:5
**pending** [1] - 27:21
**Pennsylvania** [1] - 1:19
**people** [1] - 37:12
**perception** [2] - 19:19, 19:20
**perform** [3] - 40:16, 40:19, 40:22
**performance** [1] - 32:14
**performed** [5] - 32:15, 32:16, 40:17, 47:15, 47:18
**performing** [6] - 31:24, 32:22, 47:1, 47:5, 47:10, 47:13
**perhaps** [2] - 9:12,

26:10
**permitted** [2] - 11:8, 16:19
**perspective** [1] - 5:13
**ph** [1] - 46:3
**Pharma** [1] - 2:15
**pharmaceutical** [1] - 41:11
**Pharmaceutical** [2] - 2:14, 39:25
**Pharmaceuticals** [1] - 2:14
**pharmacies** [1] - 11:1
**pharmacy** [3] - 10:22, 13:1, 40:1
**Philadelphia** [1] - 1:19
**picture** [1] - 47:11
**pieces** [1] - 24:25
**Piedmont** [1] - 2:11
**pill** [1] - 19:1
**pills** [3] - 10:7, 10:24, 18:20
**place** [1] - 8:13
**placed** [3] - 34:4, 35:19, 40:6
**plaintiff** [1] - 23:16
**plaintiffs** [20] - 5:8, 5:23, 5:25, 13:9, 13:13, 13:23, 14:10, 14:11, 14:14, 17:5, 22:25, 23:6, 24:16, 26:16, 27:25, 28:4, 29:1, 34:8, 47:20, 48:5
**Plaintiffs** [4] - 1:16, 1:20, 2:4, 2:8
**plaintiffs'** [7] - 6:19, 6:23, 7:3, 7:12, 23:19, 25:12, 29:4
**plan** [2] - 7:22, 13:9
**play** [1] - 36:7
**pleased** [1] - 21:5
**plug** [1] - 12:10
**point** [13] - 9:15, 10:5, 10:19, 10:24, 14:8, 14:14, 18:19, 32:6, 34:8, 37:8, 38:24, 42:14, 48:24
**police** [1] - 20:6
**policies** [21] - 30:1, 30:2, 30:12, 31:23, 31:24, 36:19, 37:2, 38:9, 38:11, 39:6, 39:9, 42:17, 42:18, 43:9, 44:18, 45:19, 48:1, 48:16, 48:17, 48:22, 49:21
**policy** [8] - 31:23, 32:1, 32:2, 32:11, 33:1, 46:25, 47:2,

47:15
**Ponce** [1] - 2:7
**poor** [1] - 29:19
**portion** [2] - 23:17, 23:18
**portions** [1] - 25:1
**position** [3] - 12:16, 18:12, 41:9
**possible** [3] - 6:1, 12:14, 45:17
**postmarketing** [2] - 46:10, 46:13
**potential** [2] - 46:6, 46:9
**potentially** [4] - 10:18, 29:5, 44:19, 49:13
**practice** [1] - 25:25
**practices** [4] - 33:5, 33:6, 35:7, 41:17
**precautionary** [1] - 40:6
**precise** [1] - 17:16
**precisely** [2] - 10:20, 42:6
**premature** [1] - 25:17
**preparation** [1] - 44:7
**prepare** [1] - 41:5
**prepared** [5] - 9:7, 9:20, 10:10, 10:20, 27:7
**prepares** [1] - 49:12
**presence** [1] - 48:14
**present** [1] - 13:10
**PRESENT** [1] - 2:21
**presentations** [1] - 35:3
**presented** [8] - 14:24, 16:25, 28:8, 29:13, 43:2, 43:4, 47:21
**presenting** [4] - 27:23, 27:25, 28:2, 28:4
**preside** [1] - 18:3
**press** [1] - 33:18
**presumption** [6] - 28:10, 28:24, 29:8, 35:14, 43:10, 45:9
**pretrial** [11] - 22:18, 23:13, 23:14, 23:17, 23:20, 23:22, 24:14, 24:18, 24:20, 24:25, 26:14
**pretty** [3] - 13:5, 24:6, 43:14
**prevented** [1] - 17:22
**previous** [2] - 10:4, 12:9
**previously** [3] - 5:9, 5:10, 17:2
**price** [1] - 10:7
**pricing** [9] - 10:12,

10:22, 10:25, 12:10, 12:25, 13:8, 19:7, 19:10
**problem** [4] - 35:5, 39:2, 39:4, 43:23
**problematic** [1] - 6:6
**problems** [1] - 46:4
**procedures** [4] - 30:12, 32:21, 44:9, 48:23
**proceed** [1] - 21:10
**proceeding** [1] - 28:9
**proceedings** [1] - 50:15
**Proceedings** [2] - 1:24, 50:12
**PROCEEDINGS** [1] - 3:1
**process** [4] - 46:25, 48:11, 49:1
**processes** [8] - 29:17, 32:21, 34:20, 36:6, 40:11, 44:5, 44:16, 48:23
**produce** [1] - 38:9
**produced** [2] - 1:24, 11:1
**producing** [1] - 9:24
**product** [3] - 39:22, 46:14, 49:20
**production** [1] - 30:14
**products** [4] - 34:3, 39:24, 40:3, 40:7
**PRODUCTS** [1] - 1:4
**progress** [4] - 4:17, 8:17, 11:16, 11:18
**promise** [1] - 26:21
**pronunciation** [1] - 46:3
**properly** [2] - 16:8, 17:15
**proposal** [3] - 11:25, 24:17, 25:11
**proposals** [1] - 24:10
**propose** [3] - 12:3, 12:11, 14:20
**proposed** [7] - 11:7, 13:23, 14:6, 15:21, 22:24, 23:3, 25:12
**proprietary** [13] - 29:18, 30:17, 33:15, 38:14, 38:16, 39:1, 42:8, 42:23, 42:24, 43:6, 45:15, 47:16, 47:19
**protected** [1] - 43:20
**protection** [1] - 31:4
**provide** [12] - 4:17, 9:12, 13:14, 14:11, 25:20, 32:20, 37:25,

39:17, 40:8, 44:1, 46:17, 49:13
**provided** [9] - 5:10, 9:15, 13:17, 14:9, 36:24, 46:5, 47:24, 48:1, 48:4
**providers** [1] - 39:19
**provides** [13] - 15:6, 17:24, 29:16, 32:12, 34:18, 35:6, 35:11, 37:1, 38:10, 39:4, 47:4, 47:8, 47:17
**providing** [1] - 38:17
**public** [35] - 28:10, 28:16, 28:23, 29:8, 30:11, 33:18, 34:8, 34:10, 34:13, 34:16, 35:3, 35:8, 35:13, 35:14, 35:18, 36:3, 36:9, 36:23, 36:24, 37:15, 37:22, 38:5, 38:6, 38:9, 38:20, 39:3, 42:9, 43:3, 43:10, 45:9, 46:21, 48:2, 48:4, 48:7, 48:11
**public-facing** [1] - 48:2
**publicly** [1] - 30:3
**Puerto** [1] - 13:15
**purport** [1] - 13:14
**purports** [1] - 13:3
**put** [2] - 23:2, 24:7
**putative** [1] - 13:13
**putting** [1] - 49:20

## Q

**quality** [5] - 21:14, 36:13, 39:15, 39:22, 40:19
**questioning** [7] - 11:9, 12:14, 15:25, 16:6, 17:21, 18:3, 22:3
**questionnaire** [6] - 22:18, 22:19, 22:21, 22:24, 23:5, 25:4
**questions** [8] - 15:8, 17:12, 17:23, 21:19, 21:21, 23:13, 24:23, 25:3
**quite** [3] - 4:14, 49:9

## R

**raise** [1] - 41:2
**raised** [4] - 14:16, 17:15, 20:5, 22:17
**raises** [1] - 17:12
**rather** [3] - 8:15, 11:8, 38:22

**RE** [1] - 1:4
**read** [6] - 28:13, 28:14, 31:4, 32:7, 39:14, 41:20
**reading** [2] - 33:13, 45:5
**real** [1] - 20:21
**reality** [1] - 15:5
**really** [9] - 23:10, 28:15, 34:21, 35:8, 37:25, 41:18, 43:18, 45:6, 49:9
**reason** [2] - 26:24, 44:2
**reasonable** [6] - 14:21, 20:9, 20:19, 20:20, 21:3, 21:10
**reasonably** [3] - 20:5, 21:25, 47:10
**received** [2] - 22:7, 40:5
**recent** [1] - 9:18
**recently** [3] - 10:8, 10:12, 11:5
**recipe** [4] - 49:19, 49:21, 49:23
**reciprocally** [1] - 11:12
**recollect** [1] - 43:17
**recommendation** [1] - 25:22
**record** [14] - 28:24, 34:8, 34:17, 35:18, 36:3, 36:23, 38:5, 38:9, 38:20, 39:3, 42:9, 43:3, 48:12, 50:15
**recorded** [1] - 1:24
**redact** [1] - 37:11
**redacting** [1] - 38:24
**reduce** [1] - 14:20
**reengage** [1] - 26:17
**refer** [1] - 46:1
**reference** [2] - 16:16, 34:12
**referenced** [9] - 29:3, 29:8, 33:9, 34:7, 36:13, 36:22, 37:14, 41:6, 42:18
**references** [3] - 33:1, 37:9, 38:19
**reflect** [5] - 13:3, 35:24, 42:20, 45:18, 48:10
**reflected** [1] - 19:14
**reflective** [1] - 45:18
**reflects** [3] - 36:19, 47:15, 48:17
**regard** [2] - 9:23, 29:20

**regarding** [2] - 16:20, 17:8
**regrettably** [1] - 8:11
**regularly** [1] - 24:15
**regulator** [1] - 36:24
**regulators** [2] - 34:10, 35:4
**regulatory** [2] - 32:13, 40:2
**relate** [3] - 9:18, 13:22, 44:7
**related** [4] - 9:17, 11:24, 21:25, 44:8
**relatedness** [1] - 19:25
**relates** [1] - 22:4
**relationship** [4] - 17:8, 30:7, 34:24, 40:13
**relationships** [1] - 44:13
**release** [1] - 46:17
**releases** [1] - 33:18
**relevant** [4] - 9:21, 15:2, 37:3, 44:18
**reliance** [1] - 16:20, 17:18
**relies** [1] - 16:17
**relinquishing** [1] - 11:20
**remain** [3] - 4:19, 40:4, 41:25
**reminder** [1] - 9:12
**repeat** [1] - 17:21
**repetition** [1] - 16:6
**reply** [4] - 5:9, 7:2, 7:8, 38:2
**report** [49] - 9:20, 10:3, 10:10, 10:21, 11:10, 11:13, 11:14, 11:22, 12:7, 12:14, 12:15, 12:21, 12:23, 13:6, 13:12, 13:18, 13:25, 14:3, 14:5, 14:12, 16:11, 16:15, 16:19, 16:21, 16:23, 16:24, 17:3, 17:6, 17:10, 17:16, 19:5, 20:6, 22:1, 22:3, 22:4, 22:7, 22:9, 31:20, 31:22, 35:2, 36:13, 36:17, 37:17, 39:16, 40:14, 41:2, 42:15
**Reporter** [1] - 1:22
**Reporter/ Transcriber** [1] - 50:18
**reporting** [1] - 35:3
**reports** [18] - 9:16, 9:18, 10:4, 11:24,

12:9, 16:9, 16:16, 16:20, 17:9, 17:13, 19:9, 30:13, 30:15, 39:13, 43:15, 44:4, 46:10
**represents** [2] - 31:19, 48:1
**request** [7] - 3:20, 10:8, 21:1, 22:5, 27:24, 40:1, 40:22
**require** [4] - 11:18, 21:4, 21:6, 42:8
**required** [2] - 15:9, 42:21
**requirement** [2] - 38:1, 42:16
**requirements** [2] - 32:18, 42:20
**requires** [4] - 37:19, 38:1, 49:5, 49:8
**resolve** [3] - 18:4, 23:12, 27:22
**resolved** [3] - 3:8, 3:9
**resolving** [1] - 20:24
**respect** [4] - 4:15, 5:12, 16:4, 28:7, 43:22, 44:1, 44:23
**respectfully** [6] - 12:20, 13:19, 16:11, 16:24, 17:14, 35:9
**respond** [1] - 25:16
**responded** [1] - 47:22
**RESPONSE** [1] - 50:11
**response** [4] - 3:25, 5:8, 34:20, 48:7
**responses** [1] - 32:18
**rest** [3] - 20:16, 40:12, 47:8
**restraints** [1] - 20:17
**restriction** [1] - 14:6
**restrictions** [1] - 14:7
**result** [1] - 32:16
**resumed** [1] - 21:23
**RET** [1] - 1:11
**retailers** [3] - 10:11, 11:1, 19:9
**returnable** [1] - 3:20
**reveals** [2] - 44:16, 44:17
**review** [6] - 23:1, 46:6, 46:8, 47:1, 47:3, 48:25
**Rico** [1] - 13:16
**risks** [1] - 46:9
**Rite** [1] - 10:14
**RIVERO** [1] - 2:6
**road** [2] - 19:17, 28:6
**Road** [1] - 2:11
**roadmap** [16] - 29:16,

32:20, 33:7, 35:11, 37:1, 37:17, 37:25, 39:17, 40:8, 40:23, 44:2, 44:14, 47:4, 48:22, 49:7, 49:13
**ROBERT** [2] - 1:10, 3:2
**Robert** [1] - 2:22
**roof** [1] - 18:21
**room** [1] - 6:25
**rooted** [1] - 33:4
**Roseland** [1] - 1:16
**routes** [1] - 33:10
**Ruben** [2] - 8:10, 20:14
**RUBEN** [1] - 1:18
**rule** [2] - 11:9, 21:18
**Rule** [2] - 14:9, 14:19
**ruling** [3] - 12:4, 18:13, 43:1

### S

**safety** [3] - 40:18, 46:13
**sale** [3] - 10:5, 10:19, 10:24
**Samocha** [1] - 3:13
**sample** [2] - 10:25, 12:10
**Sawyer** [1] - 46:2
**schedule** [7] - 6:9, 8:14, 14:13, 23:3, 25:12, 25:17, 27:9
**scope** [2] - 11:9, 12:4
**Scripts** [1] - 10:13
**seal** [15] - 27:5, 27:19, 28:19, 29:5, 29:12, 34:11, 34:15, 35:21, 36:1, 38:22, 39:11, 41:25, 48:8, 48:9, 48:16
**sealed** [2] - 37:21, 38:20
**sealing** [2] - 28:7, 42:9
**search** [4] - 46:13, 46:15, 46:19, 47:6
**second** [3] - 16:22, 32:10, 49:2
**secret** [1] - 42:8
**section** [1] - 23:24
**see** [6] - 21:16, 25:24, 26:5, 26:6, 46:16, 48:21
**seeing** [1] - 31:5
**seek** [2] - 15:15, 36:1
**seeking** [11] - 13:21, 28:19, 29:12, 34:11, 35:20, 37:4, 39:10, 39:11, 48:8, 48:9, 48:15

**seeks** [1] - 15:7
**seem** [1] - 32:17
**selected** [1] - 38:21
**semantically** [1] - 19:22
**send** [1] - 23:18
**sense** [2] - 25:19, 31:3
**sensitive** [12] - 32:3, 36:4, 36:8, 38:14, 38:16, 42:24, 43:7, 44:3, 44:16, 44:19, 45:15, 49:22
**sent** [2] - 24:16, 32:12
**sentences** [1] - 10:23
**separate** [2] - 12:25, 38:23
**separately** [1] - 38:4
**serious** [2] - 28:11, 46:23
**set** [9] - 4:1, 5:1, 29:13, 30:8, 33:17, 37:17, 38:12, 39:12, 47:10
**sets** [2] - 13:10, 14:23
**setting** [1] - 25:16
**seven** [17] - 3:8, 9:23, 11:6, 11:8, 11:18, 11:21, 14:9, 14:20, 15:20, 18:18, 18:24, 20:9, 21:5, 24:23, 24:24, 25:1, 25:5
**seven-day** [1] - 24:24
**seven-hour** [2] - 9:23, 20:9
**shall** [4] - 20:3, 20:5, 40:4, 40:7
**shared** [3] - 30:3, 32:4, 48:6
**sheet** [5] - 4:10, 4:11, 4:15, 4:19, 31:12
**sheets** [1] - 7:23
**short** [1] - 5:9
**shortcuts** [1] - 41:13
**shorten** [1] - 18:3
**show** [5] - 3:6, 3:16, 3:20, 3:24, 28:11
**shows** [2] - 32:7, 40:12
**Siauliai** [1] - 46:4
**side** [3] - 5:4, 6:23, 15:4
**sides** [1] - 24:7
**signal** [1] - 46:13
**signed** [1] - 25:6
**significant** [1] - 13:5
**signs** [1] - 23:19
**similar** [7] - 36:17, 36:18, 39:7, 39:8, 41:1, 41:23, 47:8
**similarly** [1] - 47:19

**simple** [2] - 8:16, 32:18
**simply** [8] - 12:10, 32:1, 35:10, 42:15, 42:20, 48:20, 49:6, 49:19
**single** [2] - 31:23, 39:23
**sit** [1] - 21:17
**sitting** [1] - 21:12
**situation** [3] - 39:7, 47:12, 47:13
**situations** [1] - 44:18
**six** [7] - 28:13, 28:14, 28:19, 29:9, 33:4, 33:21, 45:23
**SLATER** [5] - 1:14, 1:15, 26:16, 27:13, 27:16
**slightly** [1] - 30:15
**SMITH** [1] - 2:22
**snapshot** [1] - 10:18
**sold** [2] - 10:7, 18:20
**someone** [4] - 34:22, 40:11, 40:13, 41:1
**sometime** [2] - 9:22, 23:8
**somewhat** [1] - 15:6
**somewhere** [2] - 4:20, 19:19
**sorry** [5] - 4:14, 30:25, 34:15, 44:10, 46:18
**sort** [14] - 37:18, 37:25, 38:25, 39:7, 41:18, 42:7, 43:14, 44:6, 44:22, 45:8, 48:3, 49:1, 49:4, 49:6
**sorts** [2] - 33:14, 42:6
**sought** [1] - 14:1
**sounds** [1] - 27:16
**sources** [1] - 14:22
**speaking** [1] - 34:16
**SPECIAL** [49] - 1:12, 3:2, 4:21, 4:24, 5:2, 5:17, 5:22, 6:5, 6:8, 7:1, 7:7, 7:11, 7:16, 7:19, 8:2, 8:24, 9:4, 9:8, 12:17, 18:14, 20:23, 21:22, 22:12, 22:15, 27:4, 27:19, 28:5, 29:2, 30:23, 31:1, 31:9, 31:15, 31:17, 32:6, 33:24, 36:10, 36:15, 38:2, 39:14, 41:8, 42:10, 42:12, 43:16, 43:23, 45:10, 47:20, 49:14, 50:2, 50:8
**Special** [1] - 28:20

**specific** [15] - 13:15, 13:17, 15:1, 17:4, 24:21, 31:7, 32:7, 33:1, 38:4, 38:7, 44:14, 45:13, 46:1, 46:24, 49:23
**specifically** [10] - 9:19, 9:20, 10:9, 29:20, 30:2, 31:21, 36:20, 39:12, 43:8, 44:20
**spend** [2] - 23:20, 24:2
**spending** [1] - 26:24
**spent** [1] - 24:13
**spontaneous** [1] - 46:10
**stakes** [1] - 13:20
**standard** [1] - 45:15
**standpoint** [1] - 39:1
**start** [3] - 22:19, 24:10, 46:18
**starting** [1] - 14:8
**state** [11] - 13:15, 13:17, 14:25, 15:1, 16:22, 17:1, 17:4, 22:6, 22:8, 48:20, 48:23
**state-specific** [4] - 13:15, 13:17, 15:1, 17:4
**STATES** [2] - 1:1, 1:10
**states** [2] - 13:15, 39:3
**status** [1] - 40:6
**stenography** [1] - 1:24
**step** [2] - 41:4
**step-by-step** [1] - 41:4
**steps** [8] - 40:20, 42:14, 42:18, 42:21, 47:6, 47:18, 48:11, 49:2
**Steve** [1] - 28:1
**STEVEN** [1] - 2:10
**still** [6] - 8:9, 15:21, 22:17, 43:7, 44:15, 45:24
**straightforward** [1] - 8:16
**strategize** [1] - 38:11
**Street** [3] - 1:19, 2:3, 2:17
**Streets** [1] - 1:7
**strict** [2] - 16:10, 19:23
**strictly** [3] - 13:24, 20:4, 30:5
**struggling** [2] - 28:15, 45:25
**studies** [1] - 46:21

**style** [1] - 15:11
**subject** [4] - 11:6, 14:15, 16:4, 29:5
**submission** [5] - 6:14, 7:2, 7:3, 7:12, 7:13
**submit** [5] - 5:4, 5:7, 5:8, 6:18, 23:7
**submitted** [3] - 28:23, 30:8, 44:2
**submitting** [2] - 23:17, 45:17
**subset** [2] - 19:11, 38:21
**substantial** [1] - 4:16
**substantially** [1] - 18:18
**succinct** [1] - 19:5
**sufficient** [4] - 12:6, 36:8, 43:10, 49:7
**suggest** [1] - 5:11
**suggestion** [1] - 11:19
**suggests** [1] - 18:25
**Suite** [5] - 1:19, 2:7, 2:11, 2:13, 2:17
**supplemental** [25] - 8:6, 10:10, 11:10, 11:22, 12:7, 12:14, 12:15, 12:22, 13:12, 13:14, 13:25, 14:3, 14:5, 14:11, 14:12, 16:8, 16:9, 16:23, 17:16, 17:25, 20:6, 22:1, 22:3, 22:7, 22:9
**supplier** [9] - 29:24, 34:22, 36:21, 37:4, 39:7, 40:16, 40:21, 41:11
**suppliers** [12] - 29:20, 29:22, 30:17, 30:20, 33:9, 37:2, 43:8, 44:12, 44:20, 44:24, 45:1
**supplies** [1] - 37:12
**support** [1] - 44:3
**supporting** [1] - 10:4
**surround** [1] - 30:14
**sweeping** [1] - 41:18
**syntheses** [1] - 33:10
**system** [1] - 46:14

**T**

**tables** [5] - 13:14, 14:25, 16:22, 22:6, 22:8
**tackle** [2] - 8:22, 8:24
**talks** [1] - 33:19
**target** [1] - 47:9
**Teams** [6] - 1:5, 3:1, 6:11, 6:12, 7:21,

26:21
**Technological** [1] - 35:22
**temporary** [3] - 34:4, 35:19, 40:5
**ten** [3] - 8:19, 13:20, 23:6
**tends** [1] - 15:11
**terms** [5] - 12:21, 21:12, 21:24, 22:3, 45:23
**testify** [3] - 23:25, 24:2, 24:3
**testimony** [2] - 9:25, 17:23
**testing** [2] - 32:15, 32:16
**Teva** [67] - 2:14, 2:14, 28:2, 28:15, 29:18, 29:21, 29:22, 29:25, 30:2, 30:18, 31:23, 32:1, 32:12, 32:15, 33:2, 34:10, 34:13, 34:19, 34:22, 35:3, 35:11, 36:19, 36:24, 37:1, 37:5, 37:12, 38:9, 38:12, 38:13, 39:5, 39:18, 39:20, 39:21, 40:8, 40:12, 40:14, 40:16, 40:17, 40:21, 40:24, 41:3, 41:4, 41:12, 41:21, 42:1, 42:7, 42:24, 43:8, 43:9, 44:6, 44:17, 44:21, 45:1, 45:2, 46:23, 47:5, 47:9, 47:11, 47:12, 47:21, 48:6, 48:13, 48:14, 49:23
**Teva's** [29] - 29:16, 29:25, 30:1, 30:16, 32:3, 32:10, 32:13, 32:21, 33:18, 34:1, 35:7, 36:6, 37:5, 39:17, 40:11, 41:9, 42:17, 44:8, 44:12, 44:16, 44:23, 45:18, 46:25, 47:3, 48:1, 48:9, 49:19, 49:21
**The Court** [37] - 3:4, 3:6, 3:12, 3:16, 3:23, 4:1, 4:6, 4:8, 4:17, 4:20, 4:23, 4:25, 6:16, 7:24, 8:4, 8:14, 8:22, 14:13, 22:8, 22:16, 23:9, 25:2, 25:9, 25:22, 25:23, 26:13, 26:19, 27:9, 27:14, 27:17, 29:10, 32:24, 37:7, 45:21,

48:19, 50:10
**themselves** [4] - 29:15, 31:4, 33:22, 43:6
**theoretical** [1] - 11:23
**they've** [1] - 25:15
**thinks** [1] - 29:11
**third** [3] - 9:19, 17:5, 49:3
**third-party** [1] - 9:19
**THOMAS** [2] - 1:11, 3:2
**thought-making** [1] - 36:6
**thoughts** [1] - 50:1
**thousands** [1] - 26:1
**three** [8] - 3:9, 3:11, 10:17, 10:23, 11:5, 16:16, 18:23, 47:3
**throat** [1] - 39:11
**Thursday** [1] - 27:12
**timeline** [1] - 32:12
**timelines** [1] - 23:3
**timing** [1] - 5:12
**today** [6] - 9:6, 9:7, 26:20, 27:7, 27:14, 43:5
**together** [2] - 23:2, 49:20
**Tom** [1] - 4:23
**took** [3] - 10:23, 10:25, 34:13
**topic** [5] - 14:7, 15:22, 15:23, 16:2, 16:3
**topics** [6] - 14:4, 16:12, 17:14, 17:18, 17:23, 21:24
**total** [1] - 14:2
**tough** [1] - 28:6
**tox** [2] - 46:7, 46:12
**toxicological** [4] - 32:14, 40:17, 44:7, 48:25
**toxicology** [5] - 39:21, 46:5, 47:1, 47:5, 47:13
**TPP** [5] - 12:24, 13:4, 13:7, 13:10, 13:16
**trade** [1] - 42:8
**transactions** [1] - 13:3
**transcript** [2] - 1:24, 50:14
**transcription** [1] - 1:24
**Traurig** [1] - 28:2
**TRAURIG** [1] - 2:9
**trial** [17] - 9:22, 12:24, 13:4, 13:7, 13:10, 13:16, 13:20, 14:24, 16:25, 23:10, 23:22,

24:1, 24:10, 24:22, 24:23, 25:1, 25:5
**tried** [4] - 42:2, 42:3, 45:16
**trillion** [1] - 26:25
**trouble** [1] - 32:8
**try** [6] - 11:19, 38:21, 39:6, 46:20
**turn** [2] - 22:25, 26:1, 28:17
**turned** [1] - 19:5
**two** [27] - 3:16, 3:21, 9:18, 10:3, 10:23, 12:5, 12:12, 13:23, 14:1, 14:23, 15:14, 17:9, 17:13, 19:16, 19:18, 19:22, 20:11, 20:12, 20:14, 20:22, 23:6, 39:12, 43:13, 44:6, 44:8
**two-hour** [1] - 15:14
**type** [12] - 31:24, 32:22, 35:2, 35:20, 38:17, 40:14, 40:15, 40:16, 40:24, 41:4, 47:1, 48:15
**types** [2] - 30:4, 39:7

**U**

**U.S** [1] - 1:7
**ULMER** [1] - 2:16
**under** [16] - 12:4, 14:9, 20:8, 32:10, 33:5, 33:6, 34:1, 34:11, 34:15, 36:1, 38:22, 41:13, 41:25, 48:8, 48:9, 48:15
**undergone** [1] - 9:25
**underlying** [1] - 35:12
**undertake** [2] - 40:18, 42:22
**undertaken** [4] - 33:15, 39:8, 40:24, 42:18
**underwent** [1] - 9:23
**UNITED** [2] - 1:1, 1:10
**universe** [1] - 19:10
**unless** [2] - 40:2, 40:4
**unlikely** [1] - 11:17
**unnecessary** [2] - 12:2, 21:15
**up** [3] - 4:6, 17:23, 18:4
**upcoming** [2] - 9:22, 12:23
**updates** [1] - 3:19
**urge** [1] - 20:18
**US** [2] - 46:15, 46:16
**USA** [1] - 2:14
**useful** [2] - 35:8, 37:4

## V

**VALSARTAN** *[1] - 1:4*
**valsartan** *[7] - 5:10, 34:3, 35:19, 37:13, 39:23, 40:3, 41:21*
**values** *[2] - 11:1, 19:16*
**Vanaskie** *[6] - 4:18, 4:20, 8:7, 8:13, 8:22, 27:18*
**VANASKIE** *[49] - 1:11, 3:2, 4:21, 4:24, 5:2, 5:17, 5:22, 6:5, 6:8, 7:1, 7:7, 7:11, 7:16, 7:19, 8:2, 8:24, 9:4, 9:8, 12:17, 18:14, 20:23, 21:22, 22:12, 22:15, 27:4, 27:19, 28:5, 29:2, 30:23, 31:1, 31:9, 31:15, 31:17, 32:6, 33:24, 36:10, 36:15, 38:2, 39:14, 41:8, 42:10, 42:12, 43:16, 43:23, 45:10, 47:20, 49:14, 50:2, 50:8*
**various** *[1] - 24:18*
**via** *[2] - 1:5, 3:1*
**VICTORIA** *[1] - 2:10*
**Victoria** *[1] - 22:22*
**view** *[9] - 8:15, 8:18, 8:21, 11:4, 14:4, 14:21, 47:14, 47:16, 47:18*
**viewed** *[1] - 38:15*
**views** *[2] - 38:13, 45:14*
**Vine** *[1] - 2:17*
**vocal** *[1] - 15:12*
**voir** *[1] - 25:3*
**volume** *[3] - 13:2, 13:8, 16:17*

## W

**Wacker** *[1] - 2:13*
**wake** *[1] - 41:21*
**Walgreens** *[1] - 10:14*
**walking** *[1] - 47:17*
**Walmart** *[1] - 10:14*
**wants** *[1] - 24:20*
**webinars** *[1] - 47:21*
**Wednesday** *[1] - 5:19*
**week** *[4] - 5:13, 5:15, 6:1, 26:2*
**weeks** *[4] - 13:20, 19:4, 23:6, 27:14*
**welcome** *[3] - 18:2, 18:10, 18:13*
**West** *[1] - 2:13*

**WHITELEY** *[1] - 2:2*
**Wholesaler** *[1] - 2:18*
**wishes** *[1] - 18:10*
**withdrawn** *[2] - 3:9, 3:11*
**witness** *[2] - 15:6, 15:11*
**witness's** *[1] - 15:11*
**witnesses** *[3] - 15:4, 15:9, 23:25*
**word** *[1] - 49:15*
**worldwide** *[1] - 39:23*
**worry** *[1] - 25:2*

## X

**Xponent** *[2] - 13:2, 16:18*

## Y

**Year** *[2] - 50:10, 50:11*
**year** *[4] - 9:22, 9:24, 10:9, 26:25*
**years** *[2] - 33:4, 33:21*

## Z

**Zalman** *[1] - 5:24*
**ZALMAN** *[1] - 2:6*
**Zhejhang** *[1] - 39:24*
**ZHP** *[2] - 39:3, 40:7*
**Zoom** *[2] - 26:23, 26:25*

*United States District Court*