Exhibit 2

```
 1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2                 CAMDEN VICINAGE
                     -   -   -
 3
 4  IN RE: VALSARTAN,      : MDL NO. 2875
    LOSARTAN, AND IRBESARTAN: CIVIL ACTION NO.
 5  PRODUCTS LIABILITY     : 19-2875
    LITIGATION             : (RBK/JS)
 6  _____
 7  THIS DOCUMENT APPLIES  : HONORABLE
    TO ALL CASES           : ROBERT B. KUGLER
 8
 9
                     -   -   -
10
              FEBRUARY 8, 2023
11
                     -   -   -
12
13           Remote Videotape Deposition,
14  taken via Zoom, of ALI AFNAN, Ph.D.,
15  commencing at 9:23 a.m., on the above
16  date, before Amanda Maslynsky-Miller,
17  Realtime Reporter and Certified Court
18  Reporter in and for the State of New
19  Jersey.
20
21                   -   -   -
22      GOLKOW LITIGATION SERVICES, INC.
        877.370.3377 ph| 917.591.5672 fax
23           deps@golkow.com
24
```

Art. Aman

Page 2

APPEARANCES:

MAZIE SLATER KATZ & FREEMAN LLC
BY: ADAM M. SLATER, ESQUIRE
BY: CHRISTOPHER J. GEDDIS, ESQUIRE
103 Eisenhower Parkway
2nd Floor
Roseland, New Jersey 07068
(973) 228-9898
aslater@mazieslater.com
cgeddis@mazieslater.com
Representing the Plaintiff

RIVERO MESTRE LLP
BY: JORGE A. MESTRE, ESQUIRE
BY: ZALMAN KASS, ESQUIRE
BY: AMANDA L. FERNANDEZ, ESQUIRE
2525 Ponce de Leon Boulevard
Suite 1000
Miami, Florida 33134
(305) 445-2500
jmestre@riveromestre.com
zkass@riveromestre.com
afernandez@riveromestre.com
Representing the Plaintiff

FARR FARR EMERICH HACKETT &
HOLMES, P.A.
BY: GEORGE T. WILLIAMSON, ESQUIRE
99 Nesbit Street
Punta Gorda, Florida 33950
(941) 639-1158
gwilliamson@farr.com
Representing the Plaintiff

Page 3

APPEARANCES: (Continued)

MEYER WILSON CO., LPA
BY: LAYNE HILTON, ESQUIRE
900 Camp Street
Suite 337
New Orleans, Louisiana 70130
(866) 827-6537
lhilton@meyerwilson.com
Representing the Plaintiff

HARDING MAZZOTTI, LLP
BY: ROSEMARIE RIDDELL BOGDAN, ESQUIRE
1 Wall Street
Albany, New York 12205
(518) 862-1200
rosemarie.bogdan@1800LAW1010.com
Representing the Plaintiff's
Steering Committee

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
BY: JESSICA D. DAVIDSON (MILLER), ESQUIRE
One Manhattan West
New York, New York 10001
(212) 735-3000
jessica.miller@skadden.com

- and -

BY: NINA R. ROSE, ESQUIRE
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000
nina.rose@skadden.com
Representing Zhejiang Huahai
Pharmaceutical Co., Ltd.

Page 4

APPEARANCES: (Continued)

WALSH PIZZI O'REILLY FALANGA LLP
BY: CHRISTINE I. GANNON, ESQUIRE
Three Gateway Center
100 Mulberry Street
15th Floor
Newark, New Jersey 07102
(973) 757-1100
cgannon@walsh.law
Representing Teva Pharmaceuticals
Industries Limited

GREENBERG TRAURIG LLP
BY: BRIAN RUBENSTEIN, ESQUIRE
1717 Arch Street
Suite 400
Philadelphia, Pennsylvania 19103
(215) 988-7800
rubensteinb@gtlaw.com
Representing Teva Pharmaceuticals
Industries Limited

BUCHANAN INGERSOLL & ROONEY PC
BY: CHRISTOPHER B. HENRY, ESQUIRE
Carillon Tower
227 West Trade Street
Suite 600
Charlotte, North Carolina 28202
(704) 444-3300
christopher.henry@bipc.com
Representing Albertson's LLC

Page 5

APPEARANCES: (Continued)

FALKENBERG IVES LLP
BY: MEGAN A. ZMICK, ESQUIRE
230 West Monroe
Suite 2220
Chicago, Illinois 60606
(312) 566-4801
maz@falkenbergives.com
Representing Humana Pharmacy, Inc.

HILL WALLACK LLP
BY: WILLIAM P. MURTHA JR., ESQUIRE
21 Roszel Road
Princeton, New Jersey 08540
(609) 924-0808
Wmurtha@hillwallack.com
Representing Hetero Drugs and
Hetero Labs

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: JASON M. REEFER, ESQUIRE
BY: MATTHEW D. SCHERBARTH, ESQUIRE
One Oxford Centre
301 Grant Street
38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-2000
jmr@pietragallo.com
mds@pietragallo.com
Representing Mylan Pharmaceuticals Inc.

Page 6

1  APPEARANCES: (Continued)
2
3        HINSHAW & CULBERTSON LLP
         BY: GEOFFREY M. COAN, ESQUIRE
4        53 State Street
         27th Floor
5        Boston, Massachusetts 02109
         (617) 213-7045
6        gcoan@hinshawlaw.com
         Representing Sciegen Pharmaceutical
7
8
9
10              - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1              - - -
2          I N D E X
3              - - -
4
5  Testimony of:  ALI AFNAN, Ph.D.
6    By Mr. Slater            12
     By Ms. Davidson          424
7
8
9          - - -
10     E X H I B I T S
11
           - - -
12  NO.        DESCRIPTION        PAGE
13  Afnan-1    No Bates
           Defendants' Responses and
14         Objections to Plaintiffs'
           Notice to Take Videotaped
15         Deposition (ECF NO. 2258)   17
16  Afnan-2    No Bates
           12/23/22 Expert Report of
17         Ali Afnan, Ph.D.        41
18  Afnan-3    No Bates
           1/11/23 Expert Report of
19         Ali Afnan, Ph.D.        43
20  Afnan-4    PRINSTON00077339-7344
           11/29/18 Letter,
21         Godwin to Du            54
22  Afnan-5    PRINSTON00075810-6099
           Deviation Investigation
23         Report              106
24

Page 8

1              - - -
2          E X H I B I T S
3              - - -
4
5  NO.        DESCRIPTION        PAGE
6  Afnan-6    No Bates
           Concise International
           Chemical Assessment
7          Document 31          121
8  Afnan-7    No Bates
           Dimethylformamide: Purification,
9          Tests for Purity and
           Physical Properties     129
10
11  Afnan-8    No Bates
           4/1/15 General Notices
12         and Requirements        181
13  Afnan-9    ZHP00190573-0574
           Notice on the Results of
14         the Report of the Preliminary
           Investigation on the Formation
15         of Unknown Impurities
           Resulting from the Sodium
16         Azide Quenching in Crude
17  Afnan-10   Irbesartan          221
           No Bates
           FDA Statement on the FDA's
18         Ongoing Investigation Into
           Valsartan and ARB Class
19         Impurities and the Agency's
           Steps to Address the Root
20         Causes of the Safety Issues 250
21  Afnan-11    No Bates
           Exhibit B-Materials Reviewed
22         and Considered (Amended and
           Supplemental)           269
23
24

Page 9

1              - - -
2          E X H I B I T S
3              - - -
4
5  NO.        DESCRIPTION        PAGE
6  Afnan-12   No Bates
           10/25/06 Impurities in
7          New Drug Substances
           Q3A(R2)             306
8  Afnan-13   No Bates
           Guidance for Industry
9          Genotoxic and Carcinogenic
           Impurities in Drug Substances
10         And Products: Recommended
           Approaches           325
11
12  Afnan-14   ZHP00662283-2309
           Investigation Regarding an
13         Unknown Impurity
           (Genotoxic Impurity)      374
14  Afnan-15   No Bates
           Guidance for Industry Q7A
15         Good Manufacturing Practice
           Guidance for Active
16         Pharmaceutical Ingredients  384
17  Afnan-16   ZHP01721348
           Genotoxicity Statement    419
18
19
20
21
22
23
24

Ali Afnan

Page 10

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
149    21

Request for Production of Documents
Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
11    1

Question Marked
Page Line    Page Line    Page Line
None

Page 12

deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.

Counsel's appearances will be noted on stenographic record. The court reporter, Amanda Miller, will now swear in the witness.

- - -

ALI AFNAN, Ph.D., after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. SLATER:

Q.   Good morning, Dr. Afnan.

A.   Good morning.

Q.   I'm Adam Slater, I'm going to take your deposition.  How are you?

A.   I'm good.  Thank you very

Page 11

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:  Good morning.  We are now on the record.  My name is Phillip Todd, I'm a videographer for Golkow Litigation Services.  Today's date is February 8th, 2023, and the time is 9:32 a.m.

This remote video deposition is being held in the matter of Valsartan, Losartan and Irbesartan Products Liability Litigation in the United States District Court, District of New Jersey.  The deponent is Dr. Ali Afnan.

All parties to this

Page 13

much.

Q.   Great.  Have you been deposed before?

A.   No.

Q.   You understand you must tell the truth in response to every question you're asked today?

A.   Yes.

Q.   If you're asked a question and you don't understand, for any reason, and you don't feel you can answer it truthfully or correctly, please tell the questioner and we'll refine the question so that you can understand it and that way you can then answer it, okay?

A.   Will do.

Q.   If counsel objects, let the counsel say whatever they need to say, and then you'll most likely be told to go ahead and answer.

But wait until the objection is stated, okay?

A.   Thank you.

Q.   When did you first become

1 aware that valsartan manufactured by ZHP
2 contained NDMA and NDEA?
3      A.   I think the very first time
4 I became aware of it when -- is when I
5 was approached to act as an expert
6 witness.
7      Q.   What was that date?
8      A.   Sometime early October.  I
9 don't have the exact date.
10     Q.   Before that date, you were
11 not aware of the fact that the valsartan
12 manufactured by ZHP contained NDMA and
13 NDEA?
14     A.   I -- no.
15     Q.   Were you aware of the recall
16 of valsartan before that time that you
17 were first approached for this case?
18     A.   No.
19     Q.   Had you ever heard of NDMA
20 before you were approached regarding this
21 case?
22     A.   I had heard of nitrosamines,
23 yes.
24     Q.   In what context?

1      A.   Discussions with
2 ex-colleagues about presence of NDMA in
3 certain products, but not specific to
4 which product.
5      Q.   When was that?  Are you
6 talking about before you were retained in
7 this case?
8      A.   It's before I was retained
9 in this case, yes.
10     Q.   And what was the context
11 where you spoke to colleagues about NDMA?
12     A.   It was just that, you know,
13 NDMA was present in certain products.
14 Again, not specifically mentioned, except
15 that it was in Metformin, because both of
16 us were taking Metformin at that time.
17     Q.   And who was this colleague
18 that you spoke to about this?
19     A.   It's -- it was actually at
20 lunch with a group of ex-colleagues who
21 are pharma executives or pharma employees
22 and FDA employees.
23     Q.   So you were at a lunch where
24 people from the FDA and people from

1 pharma were having lunch together?
2      A.   No.  As I said, it's
3 ex-colleagues.  It's a group of us who
4 have retired, who have left FDA.  We were
5 meeting -- we meet every now and then.
6      Q.   You said they were ex --
7 I'll rephrase.
8           You said they were pharmacy
9 executives.  Did they also work at the
10 FDA, those same people?
11     A.   No, no, no.  They were not
12 executives, they were employees of
13 pharma, who have retired from pharma, and
14 also ex-FDA employees; people that I used
15 to work with.
16     Q.   So that was just an informal
17 conversation at a lunch?
18     A.   That was purely an informal,
19 by the way, have you heard of, yes.
20     Q.   When did that occur?
21     A.   Maybe summer of last year.
22     Q.   Summer of 2022?
23     A.   No, I don't remember the
24 exact date.  I'm just saying maybe summer

1 of 2022.
2      Q.   You said summer of last
3 year, that's why I asked --
4      A.   Yes.
5      Q.   -- if it was 2022.
6      A.   Yes.
7      Q.   If I understand correctly,
8 in your work that you had done before you
9 were approached for this case, you never
10 specifically addressed nitrosamines, NDMA
11 or NDEA; is that correct?
12     A.   Correct.
13          MR. SLATER:  Let's mark as
14 Exhibit-1 the response to the
15 deposition notice.
16                -  -  -
17          (Whereupon, Exhibit Afnan-1,
18 No Bates, Defendants' Responses
19 and Objections to Plaintiffs'
20 Notice to Take Videotaped
21 Deposition (ECF NO. 2258), was
22 marked for identification.)
23                -  -  -
24          MR. SLATER:  We can put that

Page 18

1    on the screen.
2        MS. DAVIDSON:  So I just
3    want to make sure I understand.
4    Are we going to be having that for
5    everyone to see on the screen?
6        MR. SLATER:  That's why I
7    said put it on the screen.
8        MS. DAVIDSON:  Just the
9    other day you had a different
10   approach you wanted to take, so I
11   wanted to make sure I understood.
12   BY MR. SLATER:
13   Q.    Doctor, do you see the
14   exhibit -- the document we put up as
15   Exhibit-1 on the screen?
16   A.    Yes.
17   Q.    Have you seen this document
18   before?
19   A.    If you scroll down, I will
20   be able to tell you yes or no.  I see
21   only the top of the page.
22        Thank you.
23   Q.    You can see now the first
24   page.  It's titled, Defendants' Responses

Page 19

1    and Objections to Plaintiffs' Notice to
2    Take Videotape Deposition.
3    A.    Yes.
4    Q.    Have you seen this document
5    before?
6    A.    Yes.
7    Q.    Did you see the deposition
8    notice?
9    A.    I think so, yes.
10       MS. DAVIDSON:  I think Ali,
11   not being a lawyer, might not know
12   what a deposition notice is.  So
13   if you want to ask if he's seen
14   it, I suggest you show it to him.
15       MR. SLATER:  That's all
16   right.  He just said he saw it.
17       THE WITNESS:  No, I -- this
18   is what I have seen.
19   BY MR. SLATER:
20   Q.    Great.  The questions are
21   all on this, too.  So we're good.
22       Okay.  Did you go through
23   each of the requests and attempt to
24   provide the documents that were requested

Page 20

1    in the deposition notice to the lawyers
2    who hired you?
3    A.    Yes.
4        MS. DAVIDSON:  Dr. Afnan, I
5    wanted to object to that question,
6    and you did not give me time.  So
7    please make sure when Adam asks
8    you a question, I know Adam talks
9    very fast, and that encourages
10   everyone around him to talk very
11   fast, but it doesn't give -- I am
12   not fast.  It doesn't give me time
13   to object.
14       So I do object to that
15   question.
16       And please make sure that
17   you allow me time in this
18   deposition to object.
19       THE WITNESS:  Sure.  Sorry.
20   Will do.
21       MR. SLATER:  Chris, let's go
22   to the end, to Number 17, please.
23   Maybe we can make it a little
24   bigger.  Perfect.

Page 21

1    BY MR. SLATER:
2    Q.    Looking at Number 17, it
3    requested, Any cGMP guidance, rule,
4    protocol or procedure, drafted in whole
5    or in part by Dr. Afnan, related to the
6    development or manufacture of API or
7    finished dose and/or with regard to
8    genotoxic or other impurities in API or
9    finished dose.
10       Do you see that?
11   A.    Yes, I see that.
12   Q.    In response, we were told
13   that you were involved in the development
14   of FDA's process analytical technology
15   guidance in -- dated 2003, process
16   validation guidance 2011, and guidance
17   for industry, Q8 pharmaceutical
18   development, 2006, correct?
19       MS. DAVIDSON:  Adam, I don't
20   see that.  Is that --
21       MR. SLATER:  It's in the
22   response in the first paragraph of
23   the response that you guys wrote.
24       MS. DAVIDSON:  Oh, I see

Arun Kumar Khan

Page 22

¹ where you are. If you can point
² to where you're reading on the
³ page, it would be helpful.
⁴ BY MR. SLATER:
⁵     Q.   Do you see where I just
⁶ read, Doctor?
⁷     A.   What you -- yes, I do.
⁸     Q.   Did you ever draft, in whole
⁹ or in part, any other guidances, rules,
¹⁰ protocols or procedures related to the
¹¹ development or manufacture of API or
¹² finished dose and/or with regard to
¹³ genotoxic or other impurities in API or
¹⁴ finished dose?
¹⁵     MS. DAVIDSON:  Adam, if you
¹⁶     could possibly talk a little
¹⁷     slower.  I can't --
¹⁸     MR. SLATER:  I'm sorry,
¹⁹     I'm -- I'm doing the best I can.
²⁰ BY MR. SLATER:
²¹     Q.   Are there any others,
²² Doctor?
²³     A.   No.
²⁴     Q.   Do you agree that cGMP is an

Page 23

¹ obligation -- rephrase.
²     Do you agree that compliance
³ with cGMP is an obligation of a
⁴ pharmaceutical manufacturer like ZHP?
⁵     MS. DAVIDSON:  Objection.
⁶ BY MR. SLATER:
⁷     Q.   Yes or no?
⁸     MS. DAVIDSON:  I'm going to
⁹     object to that question.  If that
¹⁰     was a second question, I'm
¹¹     objecting again.  I think it's
¹²     vague.
¹³ BY MR. SLATER:
¹⁴     Q.   Can you answer the question,
¹⁵ please, Doctor?
¹⁶     A.   So --
¹⁷     MS. DAVIDSON:  Adam, give
¹⁸     him a minute.  Come on.
¹⁹     THE WITNESS:  So cGMPs are a
²⁰     minimal requirement for operation
²¹     which industry pharma companies
²²     are expected to be aware of and to
²³     apply to their processes and their
²⁴     practices.

Page 24

¹ BY MR. SLATER:
²     Q.   Do you agree with me that
³ ZHP was required to comply with cGMP at
⁴ all times -- at all times in the
⁵ development and manufacture of valsartan?
⁶     MS. DAVIDSON:  I'm going to
⁷     object again.  And, also, I
⁸     believe it was asked and answered.
⁹     THE WITNESS:  I did actually
¹⁰     answer it.
¹¹ BY MR. SLATER:
¹²     Q.   Yes or no, please.
¹³     MS. DAVIDSON:  Adam, you
¹⁴     know very well that he's not
¹⁵     required to give you yes or no.
¹⁶     He's allowed to answer the
¹⁷     question as he deems fit and to
¹⁸     provide whatever context he thinks
¹⁹     is necessary.
²⁰     If I understand this
²¹     question, I believe we've been
²²     down this road in this MDL
²³     proceeding.
²⁴ BY MR. SLATER:

Page 25

¹     Q.   Please answer the question,
² Doctor.
³     A.   GMPs specify what needs to
⁴ be done and not how the things are to be
⁵ done in a pharma company; and ZHP adhered
⁶ to the GMPs.
⁷     Q.   Now I'm going to ask the
⁸ question again.
⁹     I didn't ask you any of that
¹⁰ other things that you're talking about.
¹¹ So our deposition will go much more
¹² smoothly if I ask you a direct question
¹³ to just answer it directly and not talk
¹⁴ about other things.  So I would
¹⁵ appreciate it if you could try to do
¹⁶ that, please.
¹⁷     Was ZHP required to comply
¹⁸ with cGMPs at all times during the
¹⁹ development and manufacture of the
²⁰ valsartan that they manufactured and
²¹ sold?
²²     MS. DAVIDSON:  I'm going to
²³     object again.  At this point I
²⁴     think you're badgering the

Afy Afnan

Page 26

witness.

THE WITNESS: So I have answered the question. And I can't not give a dimension to my response.

However, if you say, were they required -- was ZHP required to apply it, the GMPs, my -- I have to make a lot of assessments to say -- to answer that question.

Again, I'll repeat, GMPs are a list of what-to-dos, not how-to-dos, and ZHP adhered to the GMPs.

BY MR. SLATER:

Q.   I didn't ask you if they adhered. I didn't ask you if it's a how-to. I didn't ask you any of those questions.

So I thought this would be the easiest question of the deposition. So I'm going to try it again.

Do you agree with me that ZHP was required to comply with cGMPs in

Page 27

the development and manufacture of the valsartan API that it manufactured?

MS. DAVIDSON: Objection again. Asked and answered. Vague. And at this point, badgering the witness.

BY MR. SLATER:

Q.   It's a yes-or-no question, Doctor.

MS. DAVIDSON: Again, I believe I stated this two minutes ago, but I'll state it again. He is not required to answer yes or no if he does not feel that yes or no is an adequate answer to the question. There's no thought control here.

I'm sorry, Dr. Afnan.

THE WITNESS: A yes or no does not actually address the question. I think the question is vague.

BY MR. SLATER:

Q.   You think it's a vague

Page 28

question to ask if ZHP was required to comply with cGMPs in the development and manufacture of valsartan; is that your testimony?

MS. DAVIDSON: I'm sorry. Objection.

BY MR. SLATER:

Q.   Please answer.

A.   So the --

MS. DAVIDSON: Hold on. You're mischaracterizing this testimony. And, also, every time I object you then ask a second question so that I have to object again.

So I suggest that after I object, Dr. Afnan knows that he's supposed to answer a question, unless I instruct him not to answer. So I don't think it's helpful to badger him after I object, pressuring him to answer the question. He knows there's a question pending.

Page 29

And then it's unclear to me, when you badger him again, whether I need to object again for the record.

Do you want the court reporter to read back the question, Dr. Afnan, since we distracted you with our back-and-forth?

THE WITNESS: Yes, please.

- - -

(Whereupon, the court reporter read the following part of the record:

"Question: You think it's a vague question to ask" --)

- - -

MR. SLATER: I'm just going to state for the record that I think that defense counsel is obstructing the deposition.

I'm going to now continue.

BY MR. SLATER:

Q.   Dr. Afnan, are you saying

Ari Attan

Page 30

¹ that my question is vague when I ask you
² if ZHP was required to comply with cGMPs
³ in the development and manufacture of
⁴ valsartan?
⁵         MS. DAVIDSON:  Wait a
⁶     minute.  Adam, are you taking back
⁷     the last question that I'm having
⁸     the court reporter read back?
⁹         MR. SLATER:  I'm not
¹⁰     going -- I'm not going to go
¹¹     back-and-forth with you.  You're
¹²     eating up my time already.  I'm
¹³     not doing this with you.
¹⁴         So I'm going to continue my
¹⁵     deposition.
¹⁶         MS. DAVIDSON:  So I assume
¹⁷     that question was stricken.
¹⁸ BY MR. SLATER:
¹⁹     Q.   Please answer.
²⁰     A.   The reason I believe your
²¹ answer is vague is -- your question is
²² vague is because this is not a simple yes
²³ or no.  It depends what the definition of
²⁴ cGMPs are, because, as I said, cGMPs are

Page 31

¹ a list of what-to-dos as stipulated by
² the Food and Drug Administration.
³         How those are effectively
⁴ put into practice is done through the
⁵ procedures of the firm.
⁶     Q.   And when the firm, then,
⁷ puts those principles into effect, those
⁸ standard operating procedures and
⁹ internal procedures become requirements
¹⁰ under cGMP, correct?
¹¹         MS. DAVIDSON:  Objection.
¹²         THE WITNESS:  That's a
¹³     circular argument.  They don't
¹⁴     become requirements under cGMP,
¹⁵     they become, effectively, the
¹⁶     practicing standards of the firm.
¹⁷     And the firm can change those as
¹⁸     well.  There is a procedure for
¹⁹     changing those.  They are not, you
²⁰     know, written once and for all.
²¹ BY MR. SLATER:
²²     Q.   How do you define cGMP?
²³     A.   It is the cGMPs are defined,
²⁴ for API drug manufacturers in Q7 -- ICH

Page 32

¹ guidance Q7.  For drug product
² manufacturers, it's defined in 210 and
³ 211 of the code of federal regulations.
⁴         Again, those are the
⁵ what-to-dos and not the how-to-dos.
⁶     Q.   The how-to-do is pursuant to
⁷ internal standard operating procedures
⁸ that are put into place by the firm; is
⁹ that what you're telling me?
¹⁰     A.   Yes.
¹¹     Q.   Are you saying that ZHP was
¹² only required to comply with its own
¹³ internal standard operating procedures
¹⁴ with regard to cGMP and was not required
¹⁵ to comply with ICH or other outside
¹⁶ sources of cGMP guidance?
¹⁷         MS. DAVIDSON:  Objection.
¹⁸     Mischaracterizes the witness's
¹⁹     testimony.
²⁰         THE WITNESS:  That's not
²¹     what I said.
²² BY MR. SLATER:
²³     Q.   At all times that --
²⁴ rephrase.

Page 33

¹         At all times that ZHP
² developed and manufactured valsartan, ZHP
³ was required to comply with both the
⁴ outside standards for cGMP that applied
⁵ to its manufacture and development of
⁶ valsartan, as well as the internal
⁷ protocols that had been implemented by
⁸ ZHP, pursuant to those outside sources;
⁹ would you agree with that statement?
¹⁰     A.   Can you --
¹¹         MS. DAVIDSON:  Objection.
¹²         THE WITNESS:  Can you tell
¹³     me which outside standards,
¹⁴     please?
¹⁵ BY MR. SLATER:
¹⁶     Q.   For example, ICH Q7.
¹⁷     A.   If you look at ICH Q7, on
¹⁸ the first page of the text of the
¹⁹ document, as well as every other
²⁰ guidance, FDA makes a statement that this
²¹ guidance is not binding and that it is a
²² recommendation and it's the current
²³ thinking of FDA regarding a topic.
²⁴     Q.   Please define for me which

Ari Afnan

Page 34

¹ cGMP standards applied to ZHP in the
² development and manufacture of valsartan.
³ Please list for me those sources of
⁴ objective authority, whether internal or
⁵ external to ZHP, which applied to them
⁶ and to which they had to comply.
⁷          MS. DAVIDSON:  That was two
⁸ questions.
⁹          MR. SLATER:  Great.
¹⁰ BY MR. SLATER:
¹¹     Q.   Please answer.
¹²          MS. DAVIDSON:  Which one,
¹³ the first or second?
¹⁴          MR. SLATER:  I'm not going
¹⁵ to -- I'm not going to banter with
¹⁶ you.
¹⁷ BY MR. SLATER:
¹⁸     Q.   Please answer the question.
¹⁹          MS. DAVIDSON:  I'm going to
²⁰ object.  That was a compound
²¹ question.
²²          I think that the rules of a
²³ deposition are you ask one
²⁴ question at a time, and there were

Page 35

¹     two in there.
² BY MR. SLATER:
³     Q.   Please answer the question.
⁴     A.   Can you ask the question
⁵ again, please?
⁶     Q.   Please list for me each
⁷ source of -- rephrase.
⁸          Please list for me each
⁹ standard that applied to ZHP's
¹⁰ development and manufacture of valsartan
¹¹ with regard to cGMP.
¹²          I want to know what --
¹³ the universe of what you believe applied
¹⁴ to them that they had to adhere to is.
¹⁵          MS. DAVIDSON:  I'm going to
¹⁶ object again.  I think it
¹⁷ actually, Adam, I think it's
¹⁸ important for this deposition to
¹⁹ understand, when you say ZHP, do
²⁰ you also mean its subs or are you
²¹ specifically referring to ZHP?
²²          MR. SLATER:  I don't even
²³ understand your question.  I'm not
²⁴ going to go back-and-forth.

Page 36

¹ BY MR. SLATER:
²     Q.   Please answer the question.
³     A.   I have here in front of me
⁴ ICH Q7.  Q7 is a guidance issued by
⁵ FDA -- ICH and adopted by FDA.  It's
⁶ title is, Good Manufacturing Practice
⁷ Guidance for Active Pharmaceutical
⁸ Ingredients, Guidance for Industry,
⁹ September 2016.
¹⁰          On the very Page Number 1,
¹¹ which is after Page Number 4, 4 as in IV,
¹² it states, Good manufacturing practice
¹³ guidance for active pharmaceutical
¹⁴ ingredients.  Guidance for industry.
¹⁵          And there is a black box
¹⁶ which says, This guidance represents the
¹⁷ current thinking of the Food and Drug
¹⁸ Administration on this topic.  It does
¹⁹ not establish any rights for any person
²⁰ and is not binding on FDA or the public.
²¹ You can use an alternative approach if it
²² satisfies the requirements of the
²³ applicable statutes and regulations.
²⁴          So --

Page 37

¹     Q.   Is that your complete answer
² to my question?
³     A.   You're asking me for --
⁴ again, you know, this goes back to the
⁵ very first question, one of the previous
⁶ questions, of you saying specify the
⁷ standards.
⁸          My point is, the GMPs are a
⁹ set of what-to-dos and not how-to-dos.
¹⁰ Industry needs to follow the how-to-dos
¹¹ and those how-to-dos are based on -- for
¹² API manufacturers, are based on Q7, which
¹³ ZHP followed and did.
¹⁴     Q.   I'd like you to list for
¹⁵ me -- rephrase.
¹⁶          Please list for me those
¹⁷ cGMP standards, whether they are external
¹⁸ to ZHP or internal to ZHP, such as
¹⁹ standard operating procedures that
²⁰ applied to ZHP in its development and
²¹ manufacture of valsartan.
²²          I need to know the list of
²³ what you believe they were required to
²⁴ comply with when they developed and

Ali Afnan

Page 38

¹ manufactured the valsartan.
²       Please answer the question.
³       MS. DAVIDSON:  Objection.
⁴ Compound.  Asked and answered.
⁵ Vague.
⁶ BY MR. SLATER:
⁷    Q.   I'm not asking you to read
⁸ the standards to me.  I'm asking for you
⁹ to list them for me, please.
¹⁰    A.   So -- so if I'm going to
¹¹ list them, Mr. Slater, I would go to
¹² ICH Q7, okay; and I would go to the table
¹³ of contents.
¹⁴       Would you like me to list
¹⁵ them for you?
¹⁶    Q.   I don't need you to list for
¹⁷ me the table of contents.
¹⁸       If you think that ICH Q7 was
¹⁹ something that ZHP needed to comply with,
²⁰ per my question, you can say ICH Q7.
²¹       I don't need you to read me
²² the table of contents.
²³    A.   The sections -- sorry.
²⁴       MS. DAVIDSON:  Dr. Afnan,

Page 39

¹ you've got to leave me time to
² object.
³       Because I object to that.  I
⁴ don't even think it was a
⁵ question.
⁶       THE WITNESS:  The current
⁷ standard in industry, and as
⁸ practiced by the regulators, is to
⁹ have a quality system which is
¹⁰ effectively defined through a
¹¹ guidance of FDA, which talks about
¹² quality systems.
¹³       And it's defined -- or it's
¹⁴ stipulated as what it needs to
¹⁵ have in Q7.  It requires,
¹⁶ effectively, the Quality 7, the
¹⁷ training of the personnel, the
¹⁸ buildings and facilities, the
¹⁹ process equipment, documentation
²⁰ and records, material management,
²¹ production and in-process
²² controls, packaging and
²³ identification labeling for APIs
²⁴ and intermediates, validating the

Page 40

¹ lab controls, validation, change
² control, rejection of materials,
³ complaints and recalls.
⁴       Now, about the internal
⁵ standards, that would be the list
⁶ of ZHP's SOPs, which I do not
⁷ have.  That was beyond the scope
⁸ of my agreement.
⁹ BY MR. SLATER:
¹⁰    Q.   When you say "beyond the
¹¹ scope" of your agreement, what do you
¹² mean?
¹³    A.   Not agreement, my agreement.
¹⁴ It was -- I was not tasked with assessing
¹⁵ all the GMPs of ZHP.
¹⁶    Q.   Got it.
¹⁷       MR. SLATER:  We can take
¹⁸ down the deposition notice.  Let's
¹⁹ put up as Exhibit --
²⁰ BY MR. SLATER:
²¹    Q.   Well, let me ask you,
²² Doctor, do you have your report in front
²³ of you?
²⁴    A.   I do.

Page 41

¹       MR. SLATER:  We have a
² December 23, 2022, report.  For
³ the record, we'll put it up on the
⁴ screen just so everybody can seen
⁵ it.  And it will be for the court
⁶ reporter to have it.  But that
⁷ will be Exhibit-2.
⁸       - - -
⁹       (Whereupon, Exhibit Afnan-2,
¹⁰ No Bates, 12/23/22 Expert Report
¹¹ of Ali Afnan, Ph.D., was marked
¹² for identification.)
¹³       - - -
¹⁴ BY MR. SLATER:
¹⁵    Q.   Doctor, subject to an e-mail
¹⁶ that we got that had some corrections of
¹⁷ a few things within the report, is this
¹⁸ the only report -- well, rephrase.  Let
¹⁹ me ask it differently.
²⁰       Is this the only report
²¹ you've written in this case?
²²    A.   I -- the amended report was,
²³ I think, submitted on January 11, 2023.
²⁴    Q.   Sorry.  I had a malfunction

Ali Afnan

Page 42

¹ here.
²        Let me ask the question
³ again.
⁴        The December 23, 2022,
⁵ report we have on the screen is the first
⁶ report you wrote in this case, correct?
⁷     A.   Yes.
⁸     Q.   Did that contain all the
⁹ opinions you had formed at the time that
¹⁰ you authored that report?
¹¹        MS. DAVIDSON:  Objection.
¹²        THE WITNESS:  Did it
¹³ contain -- can you -- can you
¹⁴ rephrase the question, please?
¹⁵ BY MR. SLATER:
¹⁶     Q.   On the screen we have your
¹⁷ December 23, 2022, report.
¹⁸     A.   Yes.
¹⁹     Q.   Did that report contain the
²⁰ opinions you had formed at the time that
²¹ you signed that report on December 23,
²² 2022?
²³     A.   Yes.
²⁴        MR. SLATER:  Let's take that

Page 43

¹ down and put up as Exhibit-3 the
² amended report now.
³        - - -
⁴        (Whereupon, Exhibit Afnan-3,
⁵ No Bates, 1/11/23 Expert Report of
⁶ Ali Afnan, Ph.D., was marked for
⁷ identification.)
⁸        - - -
⁹ BY MR. SLATER:
¹⁰     Q.   Exhibit-3 is the January 11,
¹¹ 2023, report.
¹²        Is that the second report
¹³ you wrote in this case?
¹⁴     A.   Yes.
¹⁵     Q.   Can you tell me what, if
¹⁶ anything, is different between the
¹⁷ January 11 report and the December 23,
¹⁸ 2022, report?
¹⁹        I don't need you to find
²⁰ page numbers.  If you can just tell me
²¹ generally what you did with the report
²² between those two dates.
²³        MS. DAVIDSON:  Objection.
²⁴ BY MR. SLATER:

Page 44

¹     Q.   Let me ask the question
² differently.
³        Why did you serve an amended
⁴ report on January 11, 2023?
⁵     A.   I discovered typographical
⁶ errors in it.  And then also I came
⁷ across a version of M7 which I had not
⁸ referred to in my December 23 report, it
⁹ was the earlier version of M7.
¹⁰     Q.   In your work outside of this
¹¹ case, did you ever apply M7 in any case,
¹² any situation?
¹³     A.   In my work I have -- during
¹⁴ the development phase of working with
¹⁵ some clients, I do look -- I have looked
¹⁶ at M7.
¹⁷     Q.   What was the context?
¹⁸        MS. DAVIDSON:  Adam, before
¹⁹ you go on.
²⁰        Dr. Afnan, as Adam has
²¹ cautioned his witnesses, I know
²² that some of your consulting work
²³ may be confidential.  And you're
²⁴ not obligated to violate

Page 45

¹ confidentiality of relationships
² or agreements with clients in
³ order to respond to this
⁴ deposition.
⁵        So please keep that in mind
⁶ when you're asked any questions
⁷ about your consulting work.
⁸        Thank you.
⁹        THE WITNESS:  Thank you.
¹⁰        As I said, it was during
¹¹ drug development processes.
¹² BY MR. SLATER:
¹³     Q.   Was that API drug
¹⁴ development process or finished dose drug
¹⁵ development process?
¹⁶     A.   In both cases, it was a new
¹⁷ drug, so it was both development of the
¹⁸ API and also, then, development of the
¹⁹ drug product.
²⁰     Q.   When did that occur?
²¹     A.   Over the last five years.  I
²² don't have the exact dates.
²³     Q.   Let's go back to Exhibit-2.
²⁴        Attached to Exhibit-2 is

Ari Afnan

Page 46

1 your C.V., curriculum vitae, correct?
2     A.   Yes.
3     Q.   You're currently the
4 president and founder of Step Change
5 Pharma, Inc.
6         What is that company?
7     A.   It's a consulting company.
8     Q.   What do you consult on?
9     A.   Various projects all related
10 to pharma; from drug development, which
11 is a much lesser extent of my work, to
12 GMP remediation, manufacturing
13 enhancements.
14     Q.   When you say drug
15 development is a lesser part of your
16 work, what do you mean by that?
17     A.   I have -- I have, maybe, two
18 or three clients who work in that area.
19     Q.   What does GMP remediation
20 mean?
21     A.   Firms who have gotten into
22 trouble with FDA or the European Agency
23 or any of the others and need to
24 effectively remediate.

Page 47

1     Q.   Did ZHP need to do GMP
2 remediation?
3     A.   They got 483 obligations,
4 which they addressed.  That's what I call
5 remediation.
6     Q.   Have any of your clients
7 received FDA warning letters for which
8 you had to perform GMP remediation?
9         MS. DAVIDSON:  Objection.
10 BY MR. SLATER:
11     Q.   You can answer, Doctor.
12     A.   Yes.
13     Q.   How many times?
14     A.   I don't recall.  Truthfully,
15 I don't recall.
16     Q.   Is it a good thing for a
17 pharmaceutical manufacturer to receive a
18 warning letter from the FDA?  Does the
19 manufacturer like getting warning
20 letters?  Is that something they like to
21 get?
22         MS. DAVIDSON:  Objection.
23 That was three questions.  Vague.
24 I think that's all.

Page 48

1         MR. SLATER:  I'll ask it
2 again.
3 BY MR. SLATER:
4     Q.   Do pharmaceutical
5 manufacturers hope to receive warning
6 letters from the FDA?
7         MS. DAVIDSON:  Objection.
8         THE WITNESS:  Pharma
9     manufacturers are in the business
10     of making a drug or drugs and
11     selling them, not receiving
12     warning letters.
13 BY MR. SLATER:
14     Q.   That's -- I didn't ask you
15 what business they're in.  I asked you a
16 simple question.
17         Is the answer yes or no?
18         MS. DAVIDSON:  Objection.
19 Maybe rephrase the question.
20         MR. SLATER:  I don't think I
21 need to.
22 BY MR. SLATER:
23     Q.   Can you answer, please?
24         MS. DAVIDSON:  Well, I'm

Page 49

1 objecting again.
2         THE WITNESS:  The answer is
3     no, because that's why they engage
4     third parties to do the work to
5     help them.
6 BY MR. SLATER:
7     Q.   What do you mean by that,
8 that's why they retain third parties to
9 do the work to help them?
10         I don't understand.  What's
11 that mean?
12     A.   They -- at times, firms work
13 with external parties like me, a GMP
14 remediation company, to assist them with
15 putting -- you know, correcting whatever
16 has been identified, partly -- yeah.
17     Q.   ZHP received a warning
18 letter in November 2018, correct?
19     A.   Yes.
20     Q.   That letter -- rephrase.
21         That warning letter
22 identified violations of cGMPs, correct?
23         MS. DAVIDSON:  Objection.
24 BY MR. SLATER:

Ari Afnan

Page 50

1  Q.  Can you answer the question,
2  please?
3       MS. DAVIDSON:  I believe the
4  witness was thinking.  And I do
5  want to state for the record --
6       MR. SLATER:  I think the
7  problem is, Jessica, when you're
8  objecting, he doesn't know if he's
9  allowed to answer the question.
10      MS. DAVIDSON:  No, I
11  explained at the beginning of the
12  deposition --
13      MR. SLATER:  I don't want to
14  argue with you.  I'm not going to
15  engage with you.
16      MS. DAVIDSON:  Okay.  I
17  don't want to engage with you
18  either, Adam.
19      But I want to point out that
20  you had many witnesses last week
21  who took up to five minutes to
22  answering questions.  We did not
23  badger them or interrupt the
24  deposition to address that.  Many

Page 51

1  of your witnesses took significant
2  periods of time.
3       If Dr. Afnan is thinking, I
4  don't think badgering him to
5  answer more quickly is fair or
6  appropriate deposition practice.
7       MR. SLATER:  I disagree with
8  everything you just said and I'm
9  going to wait for the answer.
10      THE WITNESS:  So a statement
11  on the warning letter is actually
12  boilerplate language which is on
13  every warning letter which FDA
14  issues.
15  BY MR. SLATER:
16      Q.  The warning letter states,
17  in part, This warning letter summarizes
18  significant deviations from current good
19  manufacturing practice, cGMP, for active
20  pharmaceutical ingredients, API.
21      The letter says that, right?
22      MS. DAVIDSON:  Objection.
23  If you're asking him to confirm
24  the reading of a document,

Page 52

1  obviously that document needs to
2  be in front of him.  I don't think
3  Dr. Afnan memorized the warning
4  letter or maybe he did.
5       MR. SLATER:  Do you want to
6  testify for him that he didn't
7  memorize the warning letter or do
8  you want to try to let him to
9  answer the question?
10      MS. DAVIDSON:  I don't know,
11  maybe he did memorize it.  My
12  point is, if you're asking --
13      MR. SLATER:  Why are you
14  trying to block him from answering
15  the question?
16      MS. DAVIDSON:  I am not
17  trying to block him from answering
18  the question, Adam.  As somebody
19  who repeatedly told his witness
20  last week to look at a document, I
21  think this is kind of an ironic
22  accusation.
23      If you want Dr. Afnan to
24  testify as to whether you read a

Page 53

1  document accurately, obviously he
2  needs the document in front of
3  him.
4  BY MR. SLATER:
5       Q.  Doctor, can you answer the
6  question, please?
7       A.  I would appreciate,
8  actually, if you could put it up.
9       Q.  Okay.  You said that the
10  letter contained boilerplate language
11  that's found in all warning letters.
12      Do you remember you said
13  that a few moments ago?
14      A.  Yes.
15      Q.  What's the boilerplate
16  language you were referring to?
17      A.  If you put it up, I'll show
18  you.
19      Q.  Let's put it up.
20      MR. SLATER:  This will be
21  exhibit, what, 3?  4, okay.
22  Exhibit-4 will be the warning
23  letter.
24                - - -

Ari Afnan

Page 54

(Whereupon, Exhibit Afnan-4,
PRINSTON00077339-7344, 11/29/18
Letter, Godwin to Du, was marked
for identification.)

            - - -

        THE WITNESS:  If you would
be kind enough to scroll down,
please.

        So the boilerplate language
is, This warning letter summarizes
significant deviations from
current good manufacturing
practice, cGMP 4.

        And then the rest of it
would be for whether it's testing,
whether it's APIs, or whether it's
for drug product.

        The next paragraph is also
boilerplate language.

BY MR. SLATER:

        Q.   Does every manufacturer of
pharmaceutical products receive a warning
letter that contains the boilerplate
language you just described every year?

Page 55

        A.   So if you can read the
question back to me, because that was an
interesting question.

        Q.   Well, I'll ask it -- I'll
ask it differently.  Well, actually, I'll
ask it again.

        Does every pharmaceutical
manufacturer, under the jurisdiction of
the FDA, receive a warning letter every
year with regard to all products that
they manufacture that contains the two
boilerplate sections you just pointed out
to me?

        MS. DAVIDSON:  Objection.

        THE WITNESS:  If a firm is
inspected, and it's very rare that
FDA inspects every year, if a firm
is inspected and observations are
given to it, the firm responds.

        FDA will then make a
determination, based on the
observations, the response and the
EIR whether to issue a warning
letter or not.

Page 56

        Every warning letter that is
issued has those two paragraphs in
it.

BY MR. SLATER:

        Q.   The warning letter sent by
the FDA to ZHP, dated November 29, 2018,
identified what they described in their
letter as significant deviations from
current good manufacturing practice for
active pharmaceutical ingredients.

        That's what the letter says,
correct?

        A.   That's what the letter says,
yes.

        Q.   The warning letter also
states, Because your methods, facilities
or controls for manufacturing,
processing, packing or holding do not
conform to cGMP, your API are adulterated
within the meaning of Section
501(a)(2)(B) of the Federal Food, Drug
and Cosmetic Act, correct?

        That's what it says in the
letter, correct?

Page 57

        A.   That's what it says in the
letter.

        MR. SLATER:  You can take
the letter down.

BY MR. SLATER:

        Q.   When you were at the FDA,
did you have any responsibility to
oversee API manufacturing of drugs?

        MS. DAVIDSON:  Objection.

        THE WITNESS:  In my years at
FDA, and the way FDA currently
works, there is no individual
person responsible for API
manufacturing.  It's effectively
managed through either the review
division or through ORA for
inspection, but primarily through
the review division.

        And, no, I was not solely
individually responsible for API
manufacturing.

BY MR. SLATER:

        Q.   When you were at the FDA,
did you have any responsibility in

Ari Arfman

[1] connection with any matters focused on
[2] API manufacturing of pharmaceutical drugs
[3] at any time?
[4]      MS. DAVIDSON:  Objection.
[5] BY MR. SLATER:
[6]      Q.   Let me ask the question
[7] differently.  I just want to make it
[8] cleaner.
[9]      A.   Yes.
[10]      Q.   At the FDA -- I'm going to
[11] ask it differently.
[12]      At the FDA, did you have
[13] responsibility in any way, or involvement
[14] in any way, with any matter involving the
[15] manufacture of API?
[16]      A.   So was I involved with the
[17] review of API applications or
[18] documentation?  The answer is yes.
[19]      But your question is vague
[20] in saying I was responsible solely for
[21] manufacture of API.
[22]      Q.   I never asked if you were
[23] solely responsible.  So the vague point
[24] that you're concerned about, I never

[1] actually asked that.
[2]      A.   My apologies.
[3]      Q.   You don't have to apologize.
[4]      What I'm asking, in a broad
[5] sense, is, what, if any, involvement you
[6] ever had with any matter involving API
[7] manufacture when you were at the FDA?
[8]      MS. DAVIDSON:  Objection.
[9]      THE WITNESS:  I believe I've
[10] answered that.
[11] BY MR. SLATER:
[12]      Q.   Just to be clear, would you
[13] please tell me what involvement you ever
[14] had with any matter involving API
[15] manufacturing?
[16]      A.   I have been involved with
[17] the review of API manufacturing
[18] processes.
[19]      Q.   In what context would you
[20] have reviewed the processes?  Would it
[21] have been where you went out and did an
[22] inspection?  Would it have been review of
[23] an application?  Would you have reviewed
[24] a document?  Would you have had a

[1] conversation with someone?
[2]      Can you explain to me what
[3] that involvement would have been?
[4]      A.   The review --
[5]      MS. DAVIDSON:  Whoa.  You
[6] got to give me a minute to object.
[7]      That was, like, seven
[8] questions.  So I'm not sure -- it
[9] was super compound.
[10]      If you know which one to
[11] answer, go ahead.
[12]      THE WITNESS:  Which one was
[13] I involved with?  The review
[14] process and approval process of
[15] APIs in FDA is very -- complex is
[16] the wrong word.
[17]      It's a team effort.  So
[18] there are multiple divisions,
[19] multiple groups, who actually get
[20] engaged in the review process.
[21]      The review process consists
[22] of, for APIs, depending whether
[23] it's a generic or whether it's a
[24] brand, whether it's existing or

[1] whether it's new, it will
[2] effectively be reviewed by
[3] different multidisciplinary
[4] groups.
[5]      And where I have been
[6] involved was to look at the
[7] manufacturing processes in
[8] relation to APIs.
[9]      It is then reviewed.  The
[10] agency, the FDA, asks for an
[11] inspection of the facility, if it
[12] doesn't have enough information
[13] about the GMP status of the
[14] facility.  And then it makes a
[15] collective decision.
[16] BY MR. SLATER:
[17]      Q.   I didn't ask you what the
[18] FDA does to oversee API.  I asked what
[19] involvement, if any, you've ever had when
[20] you were at the FDA with any matter
[21] involving API, what you did.
[22]      A.   I answered that.
[23]      Q.   I need you to tell me what
[24] you did.

Ari Afnan

Page 62

1    MS. DAVIDSON: Objection.
2    THE WITNESS: I answered
3 that. I said I was involved with
4 the review of the application to
5 FDA.
6 BY MR. SLATER:
7    Q. When you say "review of the
8 application to FDA," what specific
9 application is that? Is there a name for
10 that application?
11    A. That comes as part of either
12 ANDA, NDA or DMF.
13    Q. And in your role, what would
14 your responsibility have been in looking
15 at those applications? What were you
16 looking for? What were you doing?
17    A. My role was to look at,
18 effectively, the manufacturing process,
19 the controls, what FDA calls chemistry
20 manufacturing and controls of the
21 processes.
22    Q. What were you looking for
23 when you were looking at that material?
24    A. Whether the process was

Page 63

1 feasible or not, whether the critical
2 process parameters which have been
3 identified correlated to the critical
4 quality attributes and how those
5 attributes were controlled, and whether
6 they met USD requirements or if those
7 were in-house specifications.
8    Q. Do you hold yourself out as
9 an expert in organic chemistry?
10    A. No, not as an expert in
11 organic chemistry. No.
12    Q. Are you holding yourself out
13 as an expert in FDA regulation of API and
14 finished drug products?
15    A. I have extensively worked in
16 the API and drug product domain.
17    Q. Do you hold yourself out as
18 an expert with regard to the
19 identification of genotoxic impurities in
20 drug substances?
21    MS. DAVIDSON: Objection.
22    THE WITNESS: That's
23 actually two questions. And I am
24 not a toxicologist, so I'm not one

Page 64

1 to determine genotoxicity of a
2 chemical compound.
3 BY MR. SLATER:
4    Q. When you worked at
5 AstraZeneca, were you involved in the
6 development or manufacture of API?
7    A. Yes.
8    Q. What was your responsibility
9 in that context?
10    A. Process control.
11    Q. What does that mean, process
12 control?
13    A. Controlling the
14 manufacturing process to end up with the
15 result that was determined as desirable.
16    Q. When you say to end up with
17 the result that was desired, what does
18 that mean?
19    A. So that the API had the
20 right yield, the right specifications,
21 environmental conditions were met,
22 process went as planned.
23    Q. Was it a cGMP requirement
24 that the process control would result in

Page 65

1 an output of product as you just
2 described it?
3    A. Was it a cGMP requirement --
4 so I was involved in API manufacturing
5 for new products.
6    What is the GMP requirement?
7 Once it's approved, your controls need to
8 provide consistent quality, consistent --
9 you know, consistently meet
10 specifications; so the definition here is
11 based on meeting specifications.
12    Q. Is that required by GMP, the
13 manufacture of a drug product, whether
14 API or finished dose, that meets the
15 specifications?
16    A. So --
17    MS. DAVIDSON: Objection.
18    Please, Dr. Afnan, 30
19 seconds is all I ask.
20    THE WITNESS: Okay. Sorry.
21    Can you ask the question
22 again, please?
23 BY MR. SLATER:
24    Q. Sure.

Ari Aman

Page 66

1    You indicated that the
2 process control was intended to ensure
3 the output of drug product with
4 consistent quality, consistently meeting
5 the specifications.
6    I'm asking if that was
7 required by cGMP?
8    A.   The question requires a very
9 detailed answer; and the very detailed
10 answer you're going to object to.
11 Okay.  You say that is, it a
12 GMP requirement?  So, effectively, if you
13 develop a product and you say, for
14 example, its yield is between 80 percent
15 to 85 percent, one of the requirements
16 are that you have a -- develop a trend of
17 meeting that.
18    Now, once you develop, you
19 know, one batch produced at 90 percent
20 and another batch produced at 70 percent,
21 that's not a deviation from the GMPs.
22 You need to look at it.  But that's not a
23 deviation from the GMPs.
24    That's why I'm struggling

Page 67

1 with the question.
2    Q.   One of the things you said
3 that your process control was supposed to
4 ensure was consistent quality.
5    Is the output of API with
6 consistent quality a requirement of cGMP?
7    A.   So, again, you know,
8 consistent quality, it depends how -- how
9 the specs are -- specifications for the
10 API are determined.
11    So if the specifications,
12 which are approved by if regulator, you
13 know, should you meet those
14 specifications with every batch?  And the
15 answer is, that's the ideal goal.  Will
16 you meet those every single time?  And
17 the answer is, no, you will not.
18    So, again, it's not a
19 black-or-white response that I can give
20 you.
21    Q.   Does cGMP require that a
22 manufacturing process yield API that
23 meets the specifications for that API?
24    MS. DAVIDSON:  Objection.

Page 68

1    THE WITNESS:  I think I've
2 answered that.  But, again, I'll
3 try.
4    cGMPs allow you to fail in
5 manufacturing a batch.  So it's
6 not a case of, you know, the cGMPs
7 require that if I make 1,000
8 batches, they all need to be
9 identical.
10    cGMPs do allow batch
11 failures.  If a batch fails, that
12 means it doesn't meet its
13 specifications.  cGMPs allow that.
14 BY MR. SLATER:
15    Q.   Would I be correct that cGMP
16 allows for the possibility of a batch
17 failure, as you just described it, as
18 long as you detect and identify the batch
19 failure?
20    MS. DAVIDSON:  Objection.
21    THE WITNESS:  That's a
22 circular question.  If a batch
23 fails and it is rejected, then,
24 obviously, it doesn't reject

Page 69

1 itself.  It is assessed, analyzed
2 and, therefore, the quality unit
3 rejects it.
4    So if the quality unit
5 reject it, then -- that's what I
6 meant by your question is
7 circular.
8 BY MR. SLATER:
9    Q.   So if I understand
10 correctly, cGMP allows a batch failure,
11 but that's only if the batch failure is
12 identified by the quality unit and then
13 that batch failure is identified and that
14 batch is rejected?  Do I understand that
15 correctly?
16    MS. DAVIDSON:  Objection.
17 Mischaracterizes his testimony.
18    THE WITNESS:  Yes, it does
19 mischaracterize my testimony.
20 That's not what I said.
21 BY MR. SLATER:
22    Q.   All right.  So let me ask
23 you a different question, then.
24    Is it your testimony that

Ali Afnan

Page 70

¹ cGMP does not require that the API
² manufactured with a drug process --
³ rephrase.
⁴          Are you telling me that cGMP
⁵ does not require that the API
⁶ manufacturing process result in the
⁷ output of API that meets the approved
⁸ specifications for the drug?
⁹          MS. DAVIDSON:  Objection.
¹⁰     Again, mischaracterizes testimony.
¹¹          MR. SLATER:  I'm asking the
¹²     question.
¹³          MS. DAVIDSON:  You said, are
¹⁴     you saying, so I thought you were
¹⁵     characterizing his prior
¹⁶     testimony.  If not, great.
¹⁷          THE WITNESS:  Your approach
¹⁸     to cGMPs is that the cGMPs
¹⁹     determine -- define every activity
²⁰     of every day.  Again, I go back to
²¹     very early on when I was saying,
²²     you know, the GMPs define what to
²³     be done and not how to be done.
²⁴          So the cGMPs do not specify

Page 71

¹     that, you know what, the batch
²     needs to be rejected or approved.
³     The cGMPs create a system, and
⁴     that's the uniqueness of the U.S.
⁵     regulations, creates a system
⁶     within which a manufacturer
⁷     manufactures, tests and comes to a
⁸     disposition decision.
⁹          So cGMPs is a system within
¹⁰     a system.  It's like saying, here
¹¹     is a system for operating within
¹²     pharma, and then I have -- I have
¹³     a bad batch or I have a semi-bad
¹⁴     batch.  Again, not every result
¹⁵     of -- related to specifications of
¹⁶     a batch, you know, can result in a
¹⁷     rejection.
¹⁸ BY MR. SLATER:
¹⁹     Q.  What is the purpose of
²⁰ having specifications for a manufactured
²¹ API?
²²          MS. DAVIDSON:  Objection.
²³     Vague.
²⁴          THE WITNESS:  If -- I am not

Page 72

¹     sure I actually understand your
²     question clearly.
³ BY MR. SLATER:
⁴     Q.  Do you want me to explain
⁵ it?
⁶     A.  Please.
⁷     Q.  If you don't understand it
⁸ clearly, then I don't want you to answer
⁹ a question you don't understand clearly.
¹⁰     A.  Thank you.
¹¹     Q.  Do you know what
¹² specifications for API means?  In
¹³ general, do you understand what that
¹⁴ means?
¹⁵          MS. DAVIDSON:  Objection.
¹⁶          THE WITNESS:  You have a
¹⁷     definition for that, right?
¹⁸ BY MR. SLATER:
¹⁹     Q.  I'm asking you, you're the
²⁰ expert.  So tell me, what's the
²¹ definition of what the specifications for
²² API is?
²³          What are specifications?
²⁴ Why do they exist?

Page 73

¹     A.  They are --
²          MS. DAVIDSON:  Objection.
³     Ali, I don't want to yell at
⁴     you.  You got to give me time to
⁵     object.
⁶          THE WITNESS:  You know,
⁷     specifications are effectively
⁸     the -- the bandwidth that we
⁹     operate in, okay.  That's what the
¹⁰     specification is, it specifies a
¹¹     parameter and says, this
¹²     parameter, plus or minus a
¹³     variance, needs to be met or
¹⁴     should be met.
¹⁵          There are specifications and
¹⁶     there are limits.  So limits
¹⁷     are -- in the regulated
¹⁸     pharmaceutical world are internal
¹⁹     to the firm.  Specifications is
²⁰     what you agree with the regulator.
²¹ BY MR. SLATER:
²²     Q.  What is the purpose of
²³ establishing specifications for a
²⁴ manufactured API?

Afi Afnan

Page 74

1    A.   What's the purpose of
2  specifications for a manufactured API?
3  It's so that when we talk about that API,
4  we are talking about the same product,
5  regardless of who the manufacturer is.
6         However, there are
7  differences between those manufactured
8  products by different manufacturers.
9         MS. DAVIDSON:  We've been
10    going about an hour.  Is this a
11    good time for a break?
12         MR. SLATER:  I'm actually
13    ready to keep going for as long as
14    we possibly can.  I don't need a
15    break.
16         MS. DAVIDSON:  Dr. Afnan, do
17    you need a break?
18         THE WITNESS:  I would
19    appreciate a break.
20         MS. DAVIDSON:  Okay.  Let's
21    take ten minutes.
22         VIDEO TECHNICIAN:  We're off
23    the record at 10:37 a.m.
24              - - -

Page 75

1         (Whereupon, a brief recess
2    was taken.)
3              - - -
4         VIDEO TECHNICIAN:  We're
5    back on the record at 10:47 a.m.
6  BY MR. SLATER:
7    Q.   You said the purpose of
8  specifications for an API is so that when
9  we talk about the API it's the same
10  product, regardless of manufacturer,
11  correct?
12         MS. DAVIDSON:  Objection.
13         THE WITNESS:  Okay.  "Same"
14    is an interesting word to use.
15    And if I used same, it was -- it
16    has to be qualified.
17         So, effectively, when we
18    look at USP monographs, it defines
19    specifications for an API.  And
20    that has a range for purity,
21    impurity, unknown impurity, so on
22    and so forth.
23  BY MR. SLATER:
24    Q.   When you say there's a "a

Page 76

1  range," what do you mean?
2    A.   So, for example, it will say
3  98 percent to 102 percent purity.  It
4  says, you know, impurities or a specific
5  impurity below a certain limit.  It
6  states unknown impurities below .1
7  percent or 1 percent or .5 percent.  It
8  varies from product to product.
9    Q.   If there are unknown
10  impurities -- well, rephrase.
11         Are all -- rephrase.
12         Are all unknown impurities
13  evaluated in the same way in terms of
14  whether or not it's acceptable for them
15  to exist in an API?
16         MS. DAVIDSON:  Objection.
17         THE WITNESS:  If it's an
18    unknown impurity, how would one
19    assess it to see if it's supposed
20    to be there or not?  So could you
21    please rephrase your question?
22  BY MR. SLATER:
23    Q.   No.  Actually, I think I'll
24  ask a follow-up question.

Page 77

1         Unknown impurities need to
2  be assessed in order to identify what
3  they are because all impurities are not
4  treated the same, in terms of how much
5  can exist in an API or drug product,
6  correct?
7         MS. DAVIDSON:  Objection.
8         THE WITNESS:  ICH Q3A
9    specifically defines and allows
10    for unknown impurities to remain
11    in a product.  And an unknown
12    impurity is that, it's not known;
13    we don't know what it does.
14    You -- you know, all that is there
15    is what level and what the limit
16    is for it.
17  BY MR. SLATER:
18    Q.   If an unknown impurity is
19  below whatever threshold you are applying
20  as a manufacturer and the amount of that
21  impurity under that threshold is
22  sufficient to kill every single person
23  who takes the drug product, is that
24  acceptable?

Ari Afnan

1    MS. DAVIDSON: Objection.
2    THE WITNESS: If it's an
3  unknown impurity, how would a
4  manufacturer know of the effect of
5  an unknown impurity?
6  BY MR. SLATER:
7    Q.   In forming your opinions in
8  this case, is it your foundational
9  assumption that it's impossible for an
10  API manufacturer to identify the unknown
11  impurities created by a manufacturing
12  process?
13    MS. DAVIDSON: Objection.
14  BY MR. SLATER:
15    Q.   Let me ask the question
16  differently.
17    A.   Okay.
18    Q.   Is it your testimony that it
19  is impossible for an API manufacturer,
20  like ZHP, to identify the source of
21  impurities that are below the applicable
22  threshold but are not known?
23    Are you saying it's
24  impossible to figure out what they

1  actually are?
2    MS. DAVIDSON: Objection.
3    THE WITNESS: I didn't say
4  it's impossible. We need to go
5  back to ICH and see what ICH says,
6  even though it's a guidance and it
7  allows for unknown impurities
8  below a certain limit to be
9  present.
10    There is no requirement to
11  go and identify every single
12  unknown impurity and see
13  whether -- you know, what the
14  function of that impurity is.
15  BY MR. SLATER:
16    Q.   So that comes back to my
17  prior question.
18    If there's no requirement to
19  identify all unknown impurities, would it
20  be acceptable, under cGMP, if there was
21  an unknown impurity below the ICH Q3A
22  threshold that, if ingested by a human
23  being, would kill the person within one
24  day?

1  A.   Wow.
2    MS. DAVIDSON: I don't know
3  if that "wow" covers my objection.
4  You didn't give me a chance.
5    But I was intending to
6  object.
7    THE WITNESS: Well, that was
8  an objection from me.
9    MS. DAVIDSON: I don't think
10  you're allowed to do that,
11  Dr. Afnan.
12    THE WITNESS: Sorry.
13    MS. DAVIDSON: That's my
14  job.
15    THE WITNESS: Can you repeat
16  your question, please? Or I would
17  really prefer you to rephrase the
18  question.
19    MR. SLATER: Please read the
20  question back to him, please.
21     - - -
22    (Whereupon, the court
23  reporter read the following part
24  of the record:

1    "Question: So that comes
2  back to my prior question.
3    "If there's no requirement
4  to identify all unknown
5  impurities, would it be
6  acceptable, under cGMP, if there
7  was an unknown impurity below the
8  ICH Q3A threshold that, if
9  ingested by a human being, would
10  kill the person within one day?")
11     - - -
12    MS. DAVIDSON: Objection.
13    THE WITNESS: I don't even
14  know how to begin to answer that
15  question, because it is such a
16  far-fetched question that -- you
17  know, if it was below the
18  threshold limit?
19    If it's below the threshold
20  limit, the pharma manufacturer
21  doesn't know about it, because
22  it's unknown.
23    So the GMPs allow -- or,
24  more specifically, the

Ari Afnan

Page 82

1 specifications allow to have
2 unknown impurities.
3        Now, if it's a generic API,
4 then it's following the branded
5 API. If it's a brand API, then it
6 will have gone through multiple
7 different clinical studies where
8 the intent would have been to
9 identify a poisonous compound.
10 BY MR. SLATER:
11    Q.   Are all potential impurities
12 subject to the same threshold?
13    A.   So the threshold depends on
14 your analytical methodology. It's not
15 just the case of, you know, here I draw a
16 line and I call it a threshold and then
17 move on.
18        So I think your -- your
19 question needs exploring, it needs to be
20 changed.
21    Q.   Did you ever hear of the
22 cohort of concern?
23    A.   Yes.
24    Q.   When did you first hear of

Page 83

1 the cohort of concern?
2    A.   The cohorts of concern are
3 in M7, that's where I heard.
4    Q.   When? When did you first
5 learn of the cohort of concern?
6        MS. DAVIDSON: Objection.
7        THE WITNESS: As I have said
8    earlier, when I was working on --
9    when I was working on drug
10    development with -- outside of
11    this project, this case, I had
12    read M7.
13        So that goes back, you know,
14    before I started with this
15    project.
16 BY MR. SLATER:
17    Q.   What is the cohort of
18 concern?
19    A.   So M7 defines -- or lists
20 cohorts of concern, which effectively
21 lists a different set of types of
22 products or compounds and says, these are
23 of concern.
24        There is a, you know --

Page 84

1    Q.   What is the cohort of
2 concern? What substances comprise the
3 cohort of concern?
4        MS. DAVIDSON: Objection.
5 BY MR. SLATER:
6    Q.   Do you know?
7    A.   I would appreciate if you
8 could show me M7, and I will direct you
9 to it.
10    Q.   I don't have M7 at my
11 fingertips.
12    A.   I don't have the list
13 learned by heart either.
14    Q.   N-nitroso compounds are part
15 of the cohort of concern, correct?
16        MS. DAVIDSON: Objection.
17        THE WITNESS: Again, this is
18    not something I have learned by
19    heart. I would really appreciate
20    if we could look at M7.
21 BY MR. SLATER:
22    Q.   You don't know, as you sit
23 here right now without looking at M7,
24 whether N-nitroso compounds are part of

Page 85

1 the cohort of concern?
2        MS. DAVIDSON: Objection.
3    Badgering the witness.
4        THE WITNESS: I am --
5        MS. DAVIDSON: Please don't
6    interrupt me, Dr. Afnan.
7        If you would like to pull up
8    M7, that is permissible in this
9    deposition, as Adam told his own
10    witnesses.
11        THE WITNESS: Okay.
12 BY MR. SLATER:
13    Q.   Is the answer you can't
14 answer the question without seeing M7?
15        MS. DAVIDSON: Objection.
16    Mischaracterizes his testimony.
17    Badgering the witness.
18 BY MR. SLATER:
19    Q.   I need to know, Doctor.
20        Are you telling me that
21 without looking at M7 you can't tell me
22 if N-nitroso compounds are part of the
23 cohort of concern?
24        MS. DAVIDSON: Same

Ari Aman

Page 86

1  objections.
2      THE WITNESS:  So my response
3  is delayed or not given to you.
4      The reason I'm asking for M7
5  is because you're using a very
6  specific phrase, "N-nitroso
7  compounds."  I would like to see
8  if M7 says N-nitroso compounds.
9  BY MR. SLATER:
10     Q.   Do you -- do you know what
11 NDMA is?
12     A.   Yes.
13     Q.   What is NDMA?
14     A.   Nitrosodimethylamine.
15     Q.   Do you know -- do you know
16 what NDEA is?
17     MS. DAVIDSON:  I'm sorry.
18 Objection.  When you say what it
19 is, are you asking him what the
20 abbreviation stands for or what it
21 is?  I think the question is
22 vague.
23 BY MR. SLATER:
24     Q.   Do you know what NDEA is?

Page 87

1      MS. DAVIDSON:  So I'm going
2  to have to have the same objection
3  if you don't want to clarify the
4  question.
5      THE WITNESS:  It stands for
6  nitrosodiethylamine.
7  BY MR. SLATER:
8      Q.   Are NDMA and NDEA N-nitroso
9  compounds?
10     A.   Yes.
11     Q.   Does the threshold approach
12 to impurities apply to NDMA and NDEA?
13     MS. DAVIDSON:  Objection.
14 Are you asking -- can you repeat
15 the question, madam court
16 reporter?
17 BY MR. SLATER:
18     Q.   Sure.
19     Does the threshold approach
20 to impurities apply to NDMA and NDEA?
21     MS. DAVIDSON:  So you're
22 asking currently?  Is that a
23 present-tense question?
24     Q.   During the time --

Page 88

1      MS. DAVIDSON:  Otherwise I'm
2  going to object as vague.
3      MR. SLATER:  Okay.
4  BY MR. SLATER:
5      Q.   During the time that ZHP
6  developed and manufactured valsartan API,
7  did the threshold approach to impurities
8  apply to NDMA and NDEA?
9      A.   Your question is based on
10 today, looking back at 2000 -- you know,
11 prior to 2018.
12     So to actually look at
13 cohorts of concern, M7, I think, based on
14 my recollection, is that an assessment
15 needs to be done of the process to see
16 whether nitroso compounds would be
17 formed.  And if there is no -- if the
18 conclusion is that no mutagenic compounds
19 are formed, then the unknown impurities
20 will remain unknown.
21     ICH Q3A is also on the side
22 of -- you know, parallel to M7, not on
23 the side, parallel to M7.  And ICH Q3A,
24 at that time, and even today, says

Page 89

1  certain impurities can be below the
2  threshold limit, and below .1 percent you
3  can have unknown -- undefined,
4  uncharacterized impurities.
5      Q.   One of the things ZHP was
6  required to do was to assess its
7  manufacturing process for valsartan API,
8  correct?
9      A.   It was, yes.  And it did.
10     Q.   Why did you add the part
11 about "and it did"?
12     A.   Because -- because it did.
13     Q.   But did I ask you if they
14 did or not?
15     A.   No.
16     MS. DAVIDSON:  Objection.  I
17 don't know if that's actually a
18 question you're asking in a
19 deposition.  That's -- you're
20 obviously badgering the witness.
21     MR. SLATER:  I don't think I
22 am.  What I'm doing is trying
23 to -- I'm trying to determine the
24 witness's understanding of my

Afnan

Page 90

1 questions. And I'm trying to
2 understand why it is he said they
3 did, when I didn't ask the
4 question.
5 So I'm trying to understand
6 why he said it when I didn't ask
7 the question about whether they
8 did it or not.
9 MS. DAVIDSON: Okay. I
10 don't think you're really trying
11 to understand that. This is
12 Dr. Afnan's first deposition, as
13 he indicated at the beginning of
14 the deposition.
15 So I think let's just give
16 the man a break and move on with
17 actual questioning.
18 MR. SLATER: Right. We're
19 here to give ZHP and their expert
20 witness on GMP a break today.
21 MS. DAVIDSON: I don't know
22 what that means.
23 BY MR. SLATER:
24 Q. ZHP was required to

Page 91

1 assess -- rephrase.
2 When ZHP changed the
3 manufacturing process for valsartan, did
4 they need to understand the properties of
5 the chemicals and substances that they
6 were introducing to the process?
7 MS. DAVIDSON: Objection.
8 Vague.
9 THE WITNESS: Can you please
10 let me know what you mean by
11 "properties" of substances?
12 BY MR. SLATER:
13 Q. Their function, their
14 benefits to the process, potentially, and
15 their potential risks as being introduced
16 into the process as well.
17 Did they need to assess
18 those things?
19 A. Yes.
20 Q. One of the things that that
21 assessment needed to involve was the
22 potential risk of introduction of
23 impurities into the product, correct?
24 A. Can you read that question

Page 92

1 back to me, please?
2 Q. I'll ask it again. I'll try
3 to be even clearer.
4 A. Sure.
5 Q. In terms of assessing the
6 risks of introduction of a chemical or a
7 substance to the manufacturing process,
8 one of the risks that needed to be
9 assessed was whether that chemical or
10 substance would introduce impurities into
11 the process, correct?
12 A. Yes.
13 Q. And that assessment is
14 expected to be or required by cGMP to be
15 a scientific assessment, correct?
16 A. Can you tell me what you
17 mean by "scientific"?
18 Q. The assessment needs --
19 rephrase.
20 The assessment needed to be
21 based on scientific information that was
22 available to those people who were in
23 charge of this process, for example,
24 information that was available in the

Page 93

1 scientific literature, correct?
2 A. So the way they would be
3 expected and the way which is current
4 practice, and was practice at that time,
5 was for the firm to look at the process,
6 to look at the raw materials that it was
7 buying, making sure that those materials
8 met specifications; and then look at the
9 process and assess whether an undesired
10 side reaction will take place.
11 If those did not take place,
12 then there would not be a logical reason
13 for -- a scientific reason for going and
14 trolling through the scientific community
15 to see what else would happen.
16 So it is a -- it isn't a
17 black-and-white, you know what, they
18 should have -- they should have looked at
19 everything in the scientific community,
20 because that's not logical.
21 Q. Before ZHP introduced a new
22 substance into the manufacturing process,
23 it needed to understand -- well, let me
24 walk back, actually.

Ali Afnan

Page 94

1    One of the things you said
2  is that they must look at the raw
3  materials it was buying and make sure
4  they meet the specifications; is that one
5  of the things you said?
6    A.    They -- industry generally
7  requires to qualify its vendors.
8    Q.    What does it mean to qualify
9  a vendor?
10    A.    To look at a vendor, to make
11  sure that the vendor has acceptable GMPs,
12  and the substance which is coming in,
13  there are specifications, and those
14  specifications can be met.
15    Q.    In terms of understanding
16  the specifications for the substances
17  that are being purchased from vendors,
18  that would include, for example, if a
19  solvent was being purchased for use in a
20  manufacturing process, correct?
21    A.    Sorry, can you repeat the
22  question?
23    Q.    Sure.
24    When you talk about looking

Page 95

1  at the specifications for the substances
2  that are being purchased from vendors,
3  that would include, for example, if the
4  manufacturer purchased a solvent to be
5  used in the manufacturing process,
6  correct?
7    A.    So there is a qualification
8  to my response, which is defined in
9  ICH Q7.  ICH Q7 categorizes intermediates
10  and raw materials which are purchased for
11  use in an API process.
12    And that effectively depends
13  whether that solvent is expected to
14  remain in the process or whether it will
15  be removed from the process during
16  processing.
17    So as you get closer to that
18  solvent remaining in the process, they --
19  the regulatory requirement or the GMP
20  requirement goes up.
21    Q.    When you say if that solvent
22  remains in the process, you're not saying
23  it has to remain so long that it ends up
24  in the finished drug -- in the finished

Page 96

1  API product, are you?
2    MS. DAVIDSON:  Objection.
3  BY MR. SLATER:
4    Q.    Is that what you mean, that
5  staying in the process means it ends
6  up -- that that solvent is a part of the
7  finished API that comes out of the
8  process?
9    MR. SLATER:  I just want to
10  understand what the doctor is
11  saying.
12    MS. DAVIDSON:  Objection.
13  You asked a question and I
14  objected.  And then you asked a
15  new question, and now I don't know
16  which of the two questions is
17  pending.
18    If you changed your first
19  question to the second question, I
20  object to the second question.
21  BY MR. SLATER:
22    Q.    When you refer to the
23  process -- rephrase.
24    When you refer to the

Page 97

1  substance, in this case we're talking
2  about a solvent, remaining in the
3  process, are you saying remaining in the
4  process until the end so that the solvent
5  is actually in the API product that is
6  yielded by the process?
7    MS. DAVIDSON:  Objection.
8    THE WITNESS:  So the way the
9  regulations work, the way the GMPs
10  work, if you get a solvent which
11  is used in your processing, the
12  question that comes up that needs
13  to be taken into consideration by
14  the firm is whether the downstream
15  processing steps would effectively
16  remove that solvent from the
17  process.
18    However, in industrial
19  setting productions, it is
20  extremely rare for all the
21  solvents to be removed from the
22  process.  And for that reason,
23  most of the solvents which are
24  used in industry all have an

Ari Arman

Page 98

1    allowable limit in the API, in the
2    finished API.
3  BY MR. SLATER:
4      Q.   Does ICH Q7 require that
5  when ZHP purchased, for example, DMF from
6  a supplier, that it would either test the
7  DMF to see what it contained or rely on
8  the supplier's certificate of analysis
9  for that DMF to know what the DMF
10  contained?
11          MS. DAVIDSON:  Objection.
12          THE WITNESS:  So Q7 doesn't
13    address ZHP at all.  Q7 addresses
14    the what-to-do of pharma for APIs.
15          Again, if I look at Q7, Q7
16    would require the quality unit --
17    a part of Q7 would require that
18    the solvent supplier be qualified,
19    that the solvent supplier sell,
20    your example of DMF,
21    dimethylformamide, and that
22    dimethylformamide would have a
23    specification which is provided by
24    the firm.  And the C of A is

Page 99

1    provided with every batch.
2    According to current practice, or
3    good manufacturing practice, the
4    customer -- you know, a customer,
5    a manufacturer, an API
6    manufacturer, would qualify that
7    solvent, number one, and then it
8    would do IE testing of the batches
9    throughout the year.  And at least
10    one batch would be fully tested,
11    as per the C of A.  So if there
12    are five tests on the C of A,
13    those five tests would be run by
14    the API manufacturers.
15  BY MR. SLATER:
16      Q.   When you say they test per
17  the C of A, is that to compare what their
18  tests show versus what the certificate of
19  analysis shows should be within the
20  substance?
21      A.   Yes.
22      Q.   Do you know whether ZHP ever
23  looked at the certificate of analysis for
24  the DMF that it purchased and used in the

Page 100

1  zinc chloride process?
2          MS. DAVIDSON:  Objection.
3          THE WITNESS:  According to
4    FDA inspections of ZHP and, in
5    particular, the 2018 for-cause
6    inspection where the inspector
7    says there is a quality unit which
8    is well established, I would
9    conclude, based on that, that ZHP
10    would have been testing materials
11    coming in and would have had met
12    the regulatory requirements.
13          Because during the for-cause
14    inspection, the investigator says
15    their quality unit is
16    established it is operating well.
17    Previous inspections also found
18    that the quality unit was
19    functioning properly.
20  BY MR. SLATER:
21      Q.   So that I understand -- let
22  me just take a step back.
23          The reason I'm asking some
24  of these questions, so you know where I'm

Page 101

1  going is, you're coming in as an expert
2  to try to give opinions.  You didn't live
3  through this, so you have to have your
4  own understanding of the facts, based on
5  the materials provided to you.
6          You looked at a lot of
7  documents, you looked at testimony, you
8  looked at various things in order to
9  understand what you think the facts are,
10  right?
11          MS. DAVIDSON:  Objection.  I
12    don't know if that was actually a
13    question or --
14          MR. SLATER:  I'll ask
15    another question, because I don't
16    want to dismay you.
17  BY MR. SLATER:
18      Q.   Doctor, did you draw certain
19  factual assumptions in order to then form
20  opinions?
21          MS. DAVIDSON:  Objection.
22          THE WITNESS:  Can you
23    rephrase or repeat the question?
24  BY MR. SLATER:

Ari Afman

Page 102

1    Q.   Sure.
2         In order to form the
3    opinions you formed in this case, did you
4    rely on certain factual assumptions so
5    that you said to yourself, okay, the
6    facts are this, so based on these facts,
7    my opinion is this?
8         MS. DAVIDSON:  Objection.
9    BY MR. SLATER:
10   Q.   Did you do that as part of
11   your methodology here?
12        MS. DAVIDSON:  Objection.  I
13        think when you ask one question,
14        let's stop at that question, have
15        the objection, have an answer.
16        Because we have this pattern
17        where I object and then you have,
18        like, a follow-up question.  I
19        think it's creating a very unclear
20        record.
21        THE WITNESS:  So the scope
22        of my work was to assess whether
23        they followed the GMPs
24        specifically in relation to the

Page 103

1    issues here and specifically in
2    relation to plaintiffs' expert
3    reports, which have been
4    submitted.
5         None of the expert
6    reports -- the plaintiffs' expert
7    reports, question the C of A or
8    the solvent purchased by DMF.
9         So did I have certain
10   assumptions?  My point is, I am a
11   GMP assessor in this case, and I'm
12   looking to see whether ZHP adhered
13   to the GMPs or not.
14        And in the same way an
15   inspector would go on site and
16   make conclusions and draw
17   conclusions, I am relying on what
18   I call facts that the inspector
19   writes in her EIR and in her
20   observations.
21   BY MR. SLATER:
22   Q.   So one of the assumptions
23   that you drew in this case is that ZHP
24   looked at the certificates of analysis

Page 104

1    for the DMF it purchased for use in the
2    zinc chloride process; do I understand
3    you correctly?
4         A.   So, first of all, it's a
5    solvent that is added to the process and
6    then removed from the process, based on
7    the process description that ZHP gives.
8         That makes it a low-risk,
9    low-category ingredient going into the
10   process, number one.
11        Number two, did I draw any
12   conclusions that they must have looked at
13   the C of A?  And the answer is, if they
14   did not, if they had not released their
15   DMF, their solvents, they would have been
16   cited over and over and over.
17   Q.   Is it your understanding, in
18   forming your opinions, that ZHP looked at
19   the certificates of analysis for the DMF
20   it purchased for use in the zinc chloride
21   process; yes or no?
22        MS. DAVIDSON:  Objection.
23        THE WITNESS:  ZHP looked at
24        the C of As of the DMF it

Page 105

1    purchased.
2    BY MR. SLATER:
3    Q.   Did you ever look at any
4    certificate of analysis in connection
5    with the DMF that was purchased by ZHP
6    and used in the zinc chloride process?
7         I just want to know if you
8    ever saw any certificate of analysis for
9    that DMF.
10        COURT REPORTER:  Ms.
11        Davidson, you're on mute.
12        MS. DAVIDSON:  Sorry about
13        that.  I was objecting.
14        I'm glad you can read lips.
15        THE WITNESS:  So ZHP, in its
16        investigation that it sent to FDA,
17        lists the DMF suppliers and the
18        quality of those DMF supplies.
19        Now, did I look at the
20        specific C of A?  I honestly do
21        not recall.
22   BY MR. SLATER:
23   Q.   That's all I asked you.
24        I just asked you if you saw

Afi Afnan

Page 106

1  any certificate of analysis for the DMF.
2        MS. DAVIDSON:  Objection.  I
3     don't know if that's a question
4     or --
5  BY MR. SLATER:
6     Q.   So the point is, you don't
7  recall, correct?
8        MS. DAVIDSON:  Objection.
9     Asked and answered.
10       THE WITNESS:  I looked at
11    the data that was presented to
12    FDA, which FDA accepted.  That, I
13    do remember.
14       I do not remember
15    specifically looking at the C of A
16    of DMF.
17       MR. SLATER:  We're going to
18    put up an exhibit.  For purposes
19    of this deposition, I think this
20    is Exhibit 5 or 6.  This is
21    Exhibit-5.
22              - - -
23       (Whereupon, Exhibit Afnan-5,
24    PRINSTON00075810-6099, Deviation

Page 107

1     Investigation Report, was marked
2     for identification.)
3              - - -
4  BY MR. SLATER:
5     Q.   So to be clear, Exhibit-5 on
6  the screen is the deviation investigation
7  report, which was actually marked at a
8  prior deposition Peng Dong as ZHP 210.
9        Do you see that document on
10 the screen?
11    A.   I see it.  I would
12 appreciate it if it could also be put
13 into the share folder.
14    Q.   It's there.
15    A.   Okay.  Thank you.
16    Q.   Have you seen this document
17 before?
18    A.   That is the investigation I
19 was referring to.
20    Q.   Was this a document that was
21 significant to you in evaluating this
22 case and forming your opinions?
23       MS. DAVIDSON:  Objection.
24       THE WITNESS:  This was one

Page 108

1     of the documents that was of
2     significance to me.
3  BY MR. SLATER:
4     Q.   Let's go to Page 7 of 236 of
5  this document, please.  I'm looking at
6  the bottom part of the page.
7        This states, Based on the
8  investigation and the evaluation of the
9  current valsartan route of
10 synthesis (zinc chloride process), this
11 impurity is most likely formed during the
12 azide quenching by nitric acid of the API
13 manufacturing process.
14       Do you see where I'm reading
15 under Figure 3.1, which says, The
16 structure of NDMA?  Do you see where I'm
17 reading?
18    A.   Yes.
19    Q.   Continuing, it says,
20 Specifically, dimethylformamide (DMF) one
21 of the solvents used in Step 4 (Crude)
22 stage, may contain trace amount of
23 dimethylamine as an impurity.
24 Furthermore, during the tetrazole

Page 109

1  formation step, dimethylformamide may be
2  susceptible to low-level decomposition
3  under high temperature to produce trace
4  amount of dimethylamine, either by thermo
5  decomposition or hydrolysis.
6        Do you see where I just
7  read?
8     A.   Yes.
9     Q.   Did you read that language
10 as part of your evaluation of this case
11 in forming your opinions?
12    A.   Yes.
13    Q.   So when you formed your
14 opinions in this case, you were aware
15 that dimethylamine could be introduced --
16 rephrase.
17       So when you formed your
18 opinions in this case, you understood
19 that ZHP had determined that the DMF that
20 it was using in the zinc chloride process
21 may contain a trace amount of
22 dimethylamine as an impurity before it
23 even was added to the process; you had
24 read that language and understood it when

Ari Afnan

1  you formed your opinions, correct?
2          MS. DAVIDSON:  Objection.
3          THE WITNESS:  So what is
4  interesting is, what is the date
5  of this document?  Can you go to
6  the top or the bottom, or
7  wherever, and tell me what's the
8  date of that document?
9          MS. DAVIDSON:  I believe,
10  Dr. Afnan, if it was placed in
11  the --
12          MR. SLATER:  It's November
13  5, 2018.
14  BY MR. SLATER:
15      Q.   Please answer the question.
16          MS. DAVIDSON:  Adam, you
17  interrupted me.
18          Dr. Afnan, I believe if a
19  document has been placed in the
20  share drive, or whatever it's
21  called, as Adam noted, that you
22  can move up and down on it
23  yourself.
24          You can open it; is that

1  correct?
2          THE WITNESS:  Yes.
3          MS. DAVIDSON:  I just wanted
4  to clarify that.
5          THE WITNESS:  Thank you.
6          So this was an investigation
7  taking place -- in fact, this was
8  Version Number 2, as it says on
9  the screen.
10          This was an investigation
11  which was taking place where ZHP
12  was trying to find the root cause
13  and the method of formation of
14  NDMA in the process.
15          This is not a statement
16  about, you know what, this is what
17  we did.  They are testing every
18  single possible pathway to
19  formation of NDMA.  This document
20  is being written with a 20/20
21  hindsight that NDMA was present in
22  valsartan.  And as requested and
23  required by their system and FDA,
24  they're digging into where is this

1          NDMA coming from.
2  BY MR. SLATER:
3      Q.   My question was simply
4  whether you took that information that I
5  just read with you into consideration
6  when you formed your opinions.
7          It's a yes-or-no question.
8  I just want to know if you took it into
9  account when you formed your opinions.
10          MS. DAVIDSON:  Objection.
11  Again, I'm going to have to object
12  every time you say it's a
13  yes-or-no question.
14          THE WITNESS:  I actually do
15  not believe I can give you a
16  yes-or-no answer.
17          So if -- again, you know,
18  FDA said -- Dr. Gottlieb, on the
19  30th of August, 2018, says,
20  because it was not anticipated
21  that NDMA would occur at these
22  levels in the manufacture of the
23  valsartan API, manufacturers would
24  not have been testing for it.

1          That's what FDA said.
2  BY MR. SLATER:
3      Q.   Can you just answer my
4  question, please?
5      A.   I did.  I can't give you a
6  yes-or-no answer.
7          Would you like to rephrase
8  your question?
9      Q.   You told me a moment ago
10  that you read this language when you were
11  preparing your report, correct?
12      A.   Yes.
13      Q.   So you knew this information
14  when you wrote your report, correct?
15          MS. DAVIDSON:  Objection.
16          THE WITNESS:  I had to take
17  everything that I read in the
18  context of why, when, how, and why
19  am I reading it.
20          Again, this is a 20/20
21  hindsight in 2018, back end of
22  2018, where ZHP is making --
23  effectively trying to make NDMA.
24  And this is the report of them

Ari Aman

Page 114

1  trying, trying, to make NDMA.  So
2  they write this report when they
3  are trying to make NDMA.
4      So did I read this when I --
5  before writing my report?  Yes,
6  the answer is, I read this before
7  I wrote my report.
8  BY MR. SLATER:
9      Q.  Having read this, did you
10 consider the possibility that
11 dimethylamine was introduced to the zinc
12 chloride process as an impurity of DMF?
13     Did you consider that as one
14 of the pathways by which the NDMA got
15 into the process; yes or no?
16     MS. DAVIDSON:  Objection.  I
17 think that's --
18     THE WITNESS:  Again, the
19 scope of my work was to look at
20 the plaintiff experts reports and
21 assess that, as well as the GMP
22 assessment.  My scope was not to
23 dig into the chemistry of the
24 formation of NDMAs.

Page 115

1      And, again, I'll repeat,
2  this report is a look-back after
3  ZHP knew NDMA had been formed, and
4  they were now looking at the
5  pathways of formation of NDMA.
6      This is after -- this
7  report, this language, is after
8  the language by Scott Gottlieb,
9  FDA commissioner, which said it
10 was not anticipated that NDMA
11 would occur at these levels in the
12 manufacture of the valsartan APIs
13 and manufacturers were not testing
14 for it.
15 BY MR. SLATER:
16     Q.  In forming your opinions,
17 did you consider the possibility that the
18 dimethylamine was introduced to the zinc
19 chloride process as an impurity of DMF as
20 the DMF was purchased?
21     A.  So there is no monograph for
22 DMF that I have been able to find.  There
23 are specifications for levels of DMF in
24 finished APIs which effectively indicate,

Page 116

1  to me -- indicated, to me, that DMF,
2  which is a very common solvent, actually,
3  in the pharma industry, that if it's used
4  it would have followed certain -- certain
5  common practices, certain behaviors, you
6  know, certain practices that were
7  practiced across industry.
8      And, again, your question of
9  could this have come with DMF, the answer
10 goes back to, this text that you're
11 showing me is -- is a hypothesis of this
12 could have come -- it's a hypothesis that
13 this could have come.
14     As it says, it's most
15 likely formed during the azide quenching
16 by nitrous acid of the API.  One of the
17 solvents used and inspected for may
18 contain trace amounts of dimethylamine as
19 an impurity.
20     Q.  You just said that because
21 DMF was a very common solvent you would
22 expect that there would be certain
23 familiarity with DMF within the industry
24 and that certain common practices would

Page 117

1  be followed.
2      Can you tell me, first of
3  all -- well, let me rephrase the
4  question.
5      Do you have an opinion as to
6  what, as a matter of GMP, the people at
7  ZHP should have understood about the
8  potential impurities within DMF when they
9  decided to use that solvent in the zinc
10 chloride process?
11     MS. DAVIDSON:  Objection.
12     THE WITNESS:  Can you either
13 repeat or rephrase, please?
14 BY MR. SLATER:
15     Q.  Sure.  I'll rephrase it.
16 I'm actually going to ask it differently.
17     When you referred a moment
18 ago to certain practices in the industry,
19 what specific practices, with regard to
20 DMF, are you aware of that you would
21 expect ZHP followed?
22     A.  So industry --
23     Q.  I'm not asking -- by the
24 way, just to be clear, I'm not asking

Afran

1 generally. I'm asking with regard to
2 DMF.
3        MS. DAVIDSON: Why don't you
4    just rephrase it, then?
5    Because --
6        MR. SLATER: I don't think I
7    need to.
8        MS. DAVIDSON: We need clear
9    questions.
10       MR. SLATER: Thank you for
11   telling me my questions aren't
12   clear.
13 BY MR. SLATER:
14   Q.   Please answer, Doctor.
15       MS. DAVIDSON: I'm sorry,
16   but you added a caveat after your
17   question. At this point, I don't
18   even know what the standing
19   question is.
20       So I'm going to --
21       MR. SLATER: That's good
22   because you're not the one who I'm
23   actually deposing. So we're good.
24       MS. DAVIDSON: Adam, thank

1    you. I object to your question as
2    vague and --
3        MR. SLATER: I'll ask again,
4    because you're going to -- you're
5    going to have this conversation
6    with me, and it's not going to
7    really get us anywhere.
8        So I'll ask it again,
9    Doctor.
10 BY MR. SLATER:
11   Q.   What practices in the
12 industry would you expect that ZHP
13 followed with regard to the DMF that it
14 purchased and used in the zinc chloride
15 process?
16   A.   ZHP would have -- ZHP would
17 have effectively selected a supplier.
18 ZHP would have signed an agreement with
19 them. ZHP would have received a
20 specification from them. ZHP would have
21 then effectively developed the same
22 analytical methods or similar analytical
23 methods as them. ZHP would have
24 effectively looked for how this solvent

1    would remain in the process. And ZHP
2    would have, at the beginning, when they
3    were developing the process and
4    follow-on, they would have used USP
5    standards for residual solvents.
6    Q.   When you say the spec would
7    be received, is that the certificate of
8    analysis?
9    A.   The specification without
10 being listed on the C of A, maybe.
11       Normally, the informations
12 are communicated separate from the
13 C of A. And a C of A would have been
14 submitted as part of the specifications.
15   Q.   You said something a few
16 moments ago about whether there was a
17 monograph for DMF.
18       If there was a monograph for
19 DMF, would you expect that ZHP would have
20 looked at the monograph to get
21 information about the DMF?
22       MS. DAVIDSON: Objection.
23       THE WITNESS: I'm struggling
24    with ZHP getting information from

1    the monograph.
2        Could you please explain
3    your question -- that question to
4    me?
5 BY MR. SLATER:
6    Q.   Sure.
7    A.   I apologize.
8    Q.   Sure.
9        You said just a few moments
10 ago that you're not aware of a monograph
11 for DMF.
12       Did I understand you
13 correctly when you said that a few
14 minutes ago?
15   A.   Yes.
16   Q.   Okay. All right.
17       MR. SLATER: We're going to
18 put up a new exhibit, which is
19 going to be Exhibit-6.
20       - - -
21       (Whereupon, Exhibit Afnan-6,
22 No Bates, Concise International
23 Chemical Assessment Document 31,
24 was marked for identification.)

Ari Aman

1                - - -
2  BY MR. SLATER:
3      Q.   This is a World Health
4  Organization document from 2001.
5          And as you can see, it's
6  titled, N,N-dimethylformamide.
7          Do you see that on the
8  screen?
9      A.   Yes.
10     Q.   I assume you've not seen
11 this before, based on the answer you gave
12 me a couple of questions ago that you had
13 not seen a monograph about DMF; is that
14 correct?
15     A.   That's incorrect.  I have
16 seen this.  That's not a monograph.
17     Q.   Okay.  So let me -- let me
18 start over.
19         You've seen this document?
20     A.   Yes.
21     Q.   When did you see it?
22     A.   During the course of my
23 reviews before writing my report.
24     Q.   Let's go to Page 5.

1          Looking at the bottom right
2  corner, the first full paragraph under
3  Section 2, titled, Identity and
4  Physical/Chemical Properties.
5          Do you see where I am on the
6  bottom right?
7      A.   Yes.
8      Q.   The first paragraph under
9  that heading, the last sentence says, DMF
10 sold commercially contains trace amounts
11 of methanol, water, formic acid and
12 dimethylamine.
13         And then there's a citation
14 to a publication from 1994.
15         Do you see that?
16     A.   Yes.
17     Q.   Did you see that when you
18 wrote your report?
19     A.   As I said, I have seen the
20 report, yes.  I've seen this document.
21 Yes.
22     Q.   So you knew when you wrote
23 your report that according to a World
24 Health Organization publication about

1  DMF, dated in 2001, the impurities of DMF
2  sold commercially include dimethylamine?
3  You would have seen that and known that
4  when you wrote your report, correct?
5          MS. DAVIDSON:  Objection.
6  That's not what he said.
7          THE WITNESS:  Can you
8  rephrase, please, or repeat?
9  BY MR. SLATER:
10     Q.   When you wrote your
11 report --
12     A.   Yes.
13     Q.   -- you were aware that this
14 publication stated that DMF sold
15 commercially contains dimethylamine?  You
16 knew that when you wrote your report,
17 right?
18         MS. DAVIDSON:  Objection.
19         THE WITNESS:  So here is my
20 response, right.  This is a
21 general statement about DMF.  The
22 challenge is going to be
23 multiple-fold.
24         One is, was there a USP or

1  EP monograph for DMF?  And the
2  answer is still no.
3          Did, effectively, every
4  batch of product they manufactured
5  have dimethylamine because of this
6  statement?  That's a conclusion
7  that cannot be drawn.
8          Even if it is there, again,
9  if this is available to ZHP, then
10 why would the FDA say that neither
11 industry nor regulators knew about
12 the formation of NDMAs?
13 BY MR. SLATER:
14     Q.   If ZHP had looked at
15 scientific literature and read this
16 document and seen that commercially sold
17 DMF contains trace amounts of
18 dimethylamine, they would have been on
19 notice of the potential for dimethylamine
20 to be introduced to the zinc chloride
21 process as an impurity of the DMF they
22 were purchasing; they would have been
23 aware of that possibility, correct?
24         MS. DAVIDSON:  Objection.

Ari Afnan

Page 126

1    THE WITNESS: ZHP considered
2  their process, looked at their
3  materials, looked at what they
4  were doing and assessed the
5  process for unknown impurities
6  which would cause problems,
7  unknown impurities which would be
8  mutagenic. And they came to the
9  conclusion, based on the
10  information they had, that that
11  was not the case.
12    So saying because of this
13  document they should have known
14  about dimethylamine, I don't know
15  how that relates to assessment of
16  the -- risk assessment of the
17  manufacturing process. Because,
18  again, this is not a document that
19  one would go to if you are not
20  manufacturing for WHO regions.
21    MS. DAVIDSON: Is this a
22  good time for a break?
23    THE WITNESS: Yes.
24    MR. SLATER: It's not,

Page 127

1  actually, because I have to do
2  something at noon, so I'd rather
3  go another ten minutes and then
4  take a break at noon. I have to
5  speak to somebody for about ten
6  minutes.
7    MS. DAVIDSON: Noon is in 16
8  minutes, actually.
9    MR. SLATER: I realize. I
10  don't need to stop exactly at
11  noon, but thank you for correcting
12  my time count.
13    MS. DAVIDSON: Dr. Afnan,
14  would you like a break now or wait
15  until noon?
16    THE WITNESS: I would --
17    MR. SLATER: We can't go for
18  ten more minutes? I mean, come
19  on.
20    MS. DAVIDSON: I'm asking
21  the witness.
22    THE WITNESS: I would
23  appreciate it, because my mouth is
24  really dry and I need to drink

Page 128

1  something.
2    MS. DAVIDSON: Okay. Let's
3  go off the record.
4    MR. SLATER: You don't have
5  any water with you, Doctor?
6    THE WITNESS: I've run out.
7    MS. DAVIDSON: I'm sorry.
8  I'm sorry. No, we're not doing
9  this.
10    MR. SLATER: You don't need
11  to be so angry. It's not
12  necessary to be so angry.
13    MS. DAVIDSON: I'm not
14  angry, Adam. I think you're the
15  one who is angry.
16    Let's take a seven-minute
17  break, and then we can do a few
18  minutes before your noon call.
19    Let's go off the record.
20    VIDEO TECHNICIAN: We're off
21  the record at 11:45 a.m.
22      - - -
23    (Whereupon, a brief recess
24  was taken.)

Page 129

1      - - -
2    VIDEO TECHNICIAN: We're
3  back on the record at 11:54 a.m.
4  BY MR. SLATER:
5    Q.  In evaluating this case --
6  actually, let me -- let me withdraw that.
7    MR. SLATER: Do you have
8  that document ready? Let's go to
9  the next exhibit, which is
10  Exhibit-7.
11      - - -
12    (Whereupon, Exhibit Afnan-7,
13  No Bates, Dimethylformamide:
14  Purification,   Tests for Purity
15  and Physical Properties, was
16  marked for identification.)
17      - - -
18  BY MR. SLATER:
19    Q.  On the screen is Exhibit-7,
20  a publication of the International Union
21  of Pure and Applied Chemistry, titled,
22  Dimethylformamide: Purification, Tests
23  for Purity and Physical Properties.
24    Do you see that?

Ari Arman

Page 130

1    A.   Yes.
2    Q.   Have you ever seen this
3 document?
4    A.   I do not recall.  I don't
5 think so, but I don't recall.
6    Q.   Let's go to Page 887,
7 please, the middle of the page.
8        You see in the middle of the
9 page there's two formulas?  Just below
10 the first formula, do you see the word
11 "formic acid"?
12    A.   Yes.
13    Q.   Looking at the middle of the
14 page it says, Formic acid and
15 dimethylamine are thus predominant
16 impurities in DMF and determine the odor
17 of the impure solvent.
18        Do you see that?
19    A.   Yes.
20    Q.   So this would be another
21 publication, and just for the record,
22 this publication is from 1977, stating
23 that dimethylamine is a -- one of the
24 predominant impurities in DMF.

Page 131

1        That's what this says,
2 right?
3    A.   Those are the words on the
4 screen.
5    Q.   Based on the literature I've
6 shown you, would you agree with me that
7 ZHP should have been aware that the DMF
8 they were using in the zinc chloride
9 process could contain dimethylamine as an
10 impurity and could introduce the DMA to
11 the process as an impurity of the DMF?
12        Do you agree that ZHP should
13 have been aware of that possibility?
14        MS. DAVIDSON:  I object.
15    This is outside the scope of his
16    opinions.  He's not a chemist
17    here.
18        MR. SLATER:  I'm not asking
19    a chemistry question.
20 BY MR. SLATER:
21    Q.   I'm asking, from a GMP
22 perspective, should ZHP have been aware
23 of the potential introduction of the
24 dimethylamine to the zinc chloride

Page 132

1 process as an impurity of DMF?
2        MS. DAVIDSON:  Based on the
3    two lines you read?
4        MR. SLATER:  I'm not going
5    to go back-and-forth with you.
6 BY MR. SLATER:
7    Q.   Please answer the question.
8    A.   So ZHP investigated the
9 process with DMF and zinc chloride for
10 two years, okay?  This was reported to
11 FDA, as well, after doing their research.
12        So based on the work they
13 did, based on the data, and based on the
14 verification review by FDA, and their
15 drug product manufacturing clients, the
16 question of should they have known or
17 not, the question of did they know about
18 the formation of NDMA, and the answer is
19 they did not know.
20        FDA also states that they
21 did not know.  FDA says they do not know,
22 nor did industry, knew where these were
23 coming from.
24    Q.   As a matter of GMP, was ZHP

Page 133

1 to understand -- rephrase.
2        As a matter of current good
3 manufacturing practices during the
4 development and use of the zinc chloride
5 process, was ZHP obligated, as a matter
6 of cGMP, to be aware that one of the
7 known impurities of commercially sold DMF
8 was dimethylamine?
9        Were they -- were they
10 required to at least be aware of that
11 fact in performing their risk assessment;
12 yes or no?
13        MS. DAVIDSON:  Objection.
14    Lacks foundation.
15        THE WITNESS:  ZHP would not
16    be looking at the research based
17    on publications.  They would have
18    been looking at the research based
19    on what was happening in the
20    chemistry, in their -- in the
21    reactors, and the analytical
22    results they were getting, and
23    also based on the documentation
24    they were receiving from their

Ari Arnan

1    suppliers.  All of that was then
2    run by FDA.
3        So to say that here is a
4    statement and because of this they
5    should have taken that into
6    consideration, I think it's a --
7    it's an extrapolation of this to
8    something else that was not there.
9        ZHP looked at, effectively,
10   the process, they developed it.
11   They took two years.  They ran
12   multiple samples.  They did
13   extensive testing.  Then they
14   decided to change the process,
15   which was then submitted to both
16   FDA as well as EDQM, the European
17   authority.
18   BY MR. SLATER:
19       Q.   I just want to be clear.
20   It's your opinion that ZHP,
21   as part of its risk assessment, did not
22   need to consult scientific literature at
23   all with regard to potential risks of the
24   substances they were using in their

1    at its chemical manufacturing process of
2    zinc chloride and DMF as a catalyst and a
3    solvent.  ZHP took two years to develop
4    that process.  ZHP extensively tested
5    that process and the products from that
6    process.  ZHP used the methodology -- the
7    analytical methodology that was available
8    to it.  Documented it all, then submitted
9    it to FDA.
10       ZHP even made an engineering
11   batch of -- of valsartan with the new
12   process, submitted all of that to FDA.
13       So with that body of
14   evidence versus going and looking
15   specifically in the universe of published
16   literature for dimethylamine is not
17   logical.  So did they investigate?  They
18   did investigate.
19       Q.   And you agree with me, based
20   on the testimony you've read and the
21   stipulation you've read that was entered
22   in this case, ZHP did not do scientific
23   research in the literature with regard to
24   potential impurities or degradation of

1    manufacturing processes for valsartan?
2        MS. DAVIDSON:  I'm going to
3    object that that mischaracterizes
4    his testimony.  And it may be that
5    you're mischaracterizing his
6    testimony, because while he was
7    answering you were --
8        MR. SLATER:  I don't know
9    why you're giving a speech.  You
10   objected, I --
11       MS. DAVIDSON:  -- engaged in
12   another conversation and not
13   looking at the camera and
14   listening to his answer.
15       And that may be why you
16   misheard it.
17       MR. SLATER:  Counsel, please
18   don't make any more speaking
19   objections today.
20   BY MR. SLATER:
21       Q.   Can you answer the question,
22   please?
23       A.   So, again, to repeat my
24   answer -- to repeat my answer, ZHP looked

1    DMF, correct?
2        MS. DAVIDSON:  Objection.
3    BY MR. SLATER:
4        Q.   I understand you're saying
5    they didn't need to do it.
6        I'm just asking if you agree
7    they did not do it?
8        MS. DAVIDSON:  Objection.
9        THE WITNESS:  I didn't say
10   they didn't need to do it.  You're
11   mischaracterizing what I said.
12       My statement, again, is that
13   they did do sufficient risk
14   assessments, sufficient assessment
15   of the process, the zinc chloride
16   process, before compiling the data
17   and submitting it to the
18   regulator.
19       MR. SLATER:  Let's go off
20   the record.
21       VIDEO TECHNICIAN:  We're off
22   the record at 12:04 p.m.
23        - - -
24       (Whereupon, a luncheon

Ari Arthan

Page 138

1    recess was taken.)
2        - - -
3        VIDEO TECHNICIAN:  We're
4  back on the record at 12:44 p.m.
5  BY MR. SLATER:
6    Q.   You mentioned at one point
7  that you were retained to respond to the
8  plaintiff experts.
9        Do you remember you told me
10  that earlier?
11    A.   They -- the scope of my
12  assignment was to effectively opine on
13  the subjects which are -- or the topics
14  which are raised against ZHP, yes.
15    Q.   And did you understand your
16  role to be to, in essence, defend ZHP
17  against these accusations?
18        MS. DAVIDSON:  I'm sorry, I
19  was on mute.
20        I'm objecting to that
21  question.
22        Court reporter, can you read
23  that question back?
24        - - -

Page 139

1        (Whereupon, the court
2  reporter read the following part
3  of the record:
4        "Question:  And did you
5  understand your role to be to, in
6  essence, defend ZHP against these
7  accusations?")
8        - - -
9        MS. DAVIDSON:  Yeah, that's
10  a very objectionable question.  So
11  I'm doubling my objection.
12        MR. SLATER:  I'll ask the
13  question differently.
14  BY MR. SLATER:
15    Q.   Did you understand your role
16  to be to come up with arguments to defend
17  ZHP?
18        MS. DAVIDSON:  Same
19  objections.
20        THE WITNESS:  That was not
21  how I have approached this.
22        My approach to this is,
23  there are statements made by
24  plaintiff experts, assess them

Page 140

1    for -- for correctness.  And, at
2  the same time, look at the -- you
3  know, see what is being said and
4  whether there is -- whether that
5  is correct or not.  Yeah.
6  BY MR. SLATER:
7    Q.   Let's go back to the
8  document that we had up before.  We're
9  back in Exhibit-7 now.
10        Looking at Page 887, where
11  it says, Formic acid and dimethylamine
12  are, thus, predominant impurities in DMF
13  and determine the odor of the impure
14  solvent.
15        My question is, do you
16  understand what that means when this
17  document and this publication says that
18  dimethylamine is a predominant impurity
19  in DMF?  Do you understand what that
20  means?
21        MS. DAVIDSON:  Objection.
22        THE WITNESS:  How is
23  "predominant" qualified?
24  BY MR. SLATER:

Page 141

1    Q.   You see the words on the
2  page, I'm asking if you understand what
3  that means.
4    A.   Okay.  So I'm looking at the
5  word "predominant impurities," and I
6  would want to know what sort of a
7  percentage impurity that is.
8    Q.   Why does that matter?
9    A.   So there are no 100 percent
10  pure compounds in manufacturing grade
11  and, therefore, it is relevant because
12  it's a case of -- this is a -- this is a
13  scientific hypothetical statement, that
14  when you make this with this you have two
15  impurities or two of the degradation
16  products; the thermo degradation produces
17  this and this.
18        What is lacking in the
19  statement and, respectfully, in your
20  question, is there is no information about
21  what the thermal conditions are, nor
22  about what the percentages or what the
23  levels of those two degradation products
24  are.

Ari Afnan

1    Q.   Was ZHP required to assess
2 the potential risks of potential
3 impurities that could be introduced to
4 the manufacturing process by the
5 substances that ZHP was using?
6    A.   Can you repeat, please?
7    Q.   Was ZHP supposed to assess
8 the potential risks from the potential
9 impurities that could be introduced to
10 the valsartan manufacturing process?
11    We're talking about the zinc
12 chloride process here.  Let's talk about
13 that.
14    A.   So ZHP, as per practice and
15 regulations, would have been looking and
16 would have needed to demonstrate looking
17 for potential impurity formations.  And,
18 effectively, they would have needed to
19 validate it, which they did.
20    And then submit it to the
21 regulator, which they did.  And the
22 regulator agreed with their assessment at
23 the time.
24    So what they were supposed

1 to do they did do, and the regulator
2 agreed with that assessment.
3    Q.   So you agree that ZHP was
4 required, as part of its assessment, to
5 assess the potential risks from the
6 potential impurities that could be
7 introduced to the zinc chloride process
8 from the substances that were being used;
9 you agree with that, correct?
10    MS. DAVIDSON:  Objection.
11    THE WITNESS:  I responded to
12 that.  I don't know how to respond
13 again.
14 BY MR. SLATER:
15    Q.   Well, you did, Doctor, just
16 what I heard was you told me what they
17 did and what regulators did.  And I
18 literally did not ask you about what
19 anyone else did.  I asked what would they
20 do.  I asked what they were supposed to
21 do.
22    I just want to know if they
23 were supposed to look at that or not?
24    MS. DAVIDSON:  Okay.  So

1 first of all --
2    MR. SLATER:  I don't need a
3 lecture.  You can object to the
4 question.  You have an objection
5 to form.  He can answer.
6    You are not allowed to give
7 a speaking objection.  Please
8 don't.
9    MS. DAVIDSON:  Adam, you
10 have given speaking objections
11 endlessly in the last two weeks.
12    MR. SLATER:  I'm asking you
13 to not to do another speaking
14 objection.  Can you just please
15 let him answer the question?
16    MS. DAVIDSON:  No.  No.
17 Because, Adam --
18    MR. SLATER:  So don't let
19 him answer.  You're going to give
20 a speech.  Go ahead.  Give a
21 speech.
22    MS. DAVIDSON:  Adam, you
23 interrupted Dr. Afnan.  And as you
24 know, that is not appropriate

1 deposition behavior.  Then when I
2 tried to explain that you were
3 interrupting Dr. Afnan, you
4 proceeded to interrupt me.  So
5 you've now interrupted both of us
6 in the course of this.  I was not
7 appreciative of that.
8    Please allow the witness to
9 finish answering questions he's
10 asked.  Please do not interrupt
11 him.
12    I would object if there were
13 a question pending, but I don't
14 even know what question is pending
15 now.  Because, basically, the
16 witness started to answer the
17 question and you berated --
18 interrupted and berated him.
19    So why don't we have the
20 court reporter read back the
21 question, and why doesn't
22 Dr. Afnan provide a complete
23 answer?
24    MR. SLATER:  I'm not going

Ari Afnan

Page 146

1    to -- I'm going to ask the
2    question again myself.
3  BY MR. SLATER:
4      Q.   So, Dr. Afnan, do you agree
5  that ZHP was required to assess the
6  potential risks from the potential
7  impurities that could be introduced to
8  the zinc chloride process by the
9  substances that ZHP was using; yes or no?
10     A.   ZHP did do that.  So yes.
11  But they did do that.
12     Q.   I didn't ask if they did it.
13  I asked if they were supposed to do that.
14         Can you just answer that
15  question, please?
16     A.   I did answer.
17         MS. DAVIDSON:  Objection.
18     Objection.  Asked and answered.
19  BY MR. SLATER:
20     Q.   Doctor, I would
21  appreciate --
22         MS. DAVIDSON:  You cannot
23     control the way he answers a
24     question.  You can't, like, tell

Page 147

1      him to repeat his question and cut
2      off half the answer.  Come on.
3  BY MR. SLATER:
4      Q.   Doctor, I'm not asking you
5  what ZHP actually did.
6      I asked you if they were
7  supposed to evaluate the potential risks
8  from the potential impurities that could
9  be introduced to the zinc chloride
10  process by the substances that ZHP was
11  using.
12      I just want to know if
13  that's something they were supposed to
14  do.  I'm not asking if they did it or
15  not.
16         Can you please answer that
17  question?
18         MS. DAVIDSON:  Objection.
19     Compound.  And asked and answered.
20         THE WITNESS:  ZHP did what
21     it was supposed to do.
22  BY MR. SLATER:
23     Q.   I'm sorry.  Can you answer
24  my question, please?

Page 148

1      A.   I did.
2      Q.   I'm not asking you what ZHP
3  did.  So I'm not sure why you're
4  insisting on continually saying what ZHP
5  did.
6         I asked what they were
7  supposed to do.  I didn't ask if they did
8  it or not.
9         So can you please answer my
10  question?
11         MS. DAVIDSON:  I'm going to
12     object again.  Asked and answered.
13     Compound question.  Badgering the
14     witness.
15         THE WITNESS:  ZHP did what
16     it was supposed to do.
17  BY MR. SLATER:
18     Q.   Please answer my question.
19      I'm not asking what ZHP did.
20      Can you please answer my
21  question about what they were supposed to
22  do?
23         MS. DAVIDSON:  Objection.
24     We can stay on this all day if you

Page 149

1      want.  It's been asked and
2      answered multiple times.
3         THE WITNESS:  Yep.  Yep.
4  BY MR. SLATER:
5      Q.   I'm sorry, Doctor, that
6  doesn't substitute for your answer.  Just
7  because counsel keeps talking and saying
8  things.  You have to actually answer the
9  questions, under oath, yourself.
10     A.   I answered the question that
11  was asked, Mr. Slater.
12         My answer to you was ZHP
13  followed the regulations, followed the
14  GMPs, which sets the expectations, and
15  carried out those activities.
16     Q.   I keep telling you I'm not
17  asking what ZHP did.  I don't know why
18  you keep telling me what ZHP did.
19         Am I not communicating
20  clearly?
21         MS. DAVIDSON:  Objection.
22     I'm going to instruct you not to
23     answer that question.  That is
24     not -- that is a rhetorical

Ari Afnan

Page 150

1  question.  You're badgering the
2  witness.
3          Come on, Adam, just ask your
4  questions and that's that.  Don't
5  badger the witness.
6          MR. SLATER:  I don't really
7  want to talk directly with you at
8  this point about this.  I really
9  just want to explain to him, since
10  it's his first deposition, that
11  when I keep asking one question
12  and he keeps talking about
13  something I'm not asking, I find
14  it to be, you know, a little bit
15  frustrating.  I'm not yelling.
16  I'm talking in a normal tone of
17  voice.
18          And I don't understand why
19  he keeps telling me what they did
20  when I've said, like, six times in
21  a row, I'm not asking what they
22  did.  I'm asking what they're
23  supposed to do.
24          So I'm starting -- I'm

Page 151

1  feeling like he won't answer my
2  question deliberately, which
3  doesn't feel good.
4          So I'll give it one last
5  shot, and then we'll mark this
6  part of the transcript.
7  BY MR. SLATER:
8      Q.  Doctor, I'm not asking you
9  what ZHP did.  I'm asking if they were
10  supposed to do what I asked you.
11          Can you just answer that
12  question, please?
13          MS. DAVIDSON:  Objection.
14  Vague.  Asked and answered.
15  Mischaracterizes his testimony.
16          I think that's it.
17          THE WITNESS:  Can you read
18  back the question that you keep
19  asking me, which I believe I have
20  answered?
21  BY MR. SLATER:
22      Q.  Here is the question:  Was
23  ZHP required to evaluate and assess the
24  potential risks from potential impurities

Page 152

1  that could be introduced to the zinc
2  chloride process by the substances that
3  ZHP was using?
4          I want to know if they were
5  supposed to do that.  I'm not asking what
6  they did.  I'm asking if they were
7  supposed to do so.
8          Can you please answer that
9  question?
10          MS. DAVIDSON:  Objection.
11  Vague.  Asked and answered.
12          Dr. Afnan, do you want the
13  question read back by the court
14  reporter?
15          THE WITNESS:  Sure.
16          MR. SLATER:  You need the
17  question read back?
18          THE WITNESS:  Yes, please.
19  BY MR. SLATER:
20      Q.  Was ZHP required to assess
21  the potential risks that could be
22  introduced due to potential impurities
23  from the substances used in the zinc
24  chloride process; yes or no?

Page 153

1          MS. DAVIDSON:  Objection.
2  Vague.  Asked and answered.
3          THE WITNESS:  ZHP looked at
4  the potential risks due to the
5  potential impurities in the
6  process, referring to the zinc
7  chloride process, and came to a
8  conclusion, which was reported to
9  FDA.
10          ZHP did do what it was
11  supposed to do.
12  BY MR. SLATER:
13      Q.  Did I ask you what ZHP did
14  in that question?
15          MS. DAVIDSON:  Objection.
16  That's not a question to answer.
17          MR. SLATER:  It actually is
18  a question.
19  BY MR. SLATER:
20      Q.  Please answer.
21          MS. DAVIDSON:  No.
22  BY MR. SLATER:
23      Q.  Doctor, did I ask you what
24  ZHP did or did I ask you, as I have,

Ari Afman

Page 154

1  like, multiple times, asked you what they
2  were supposed to do?
3          MS. DAVIDSON:  Objection.
4  BY MR. SLATER:
5      Q.   I mean, is my question not
6  clear?  Are you not understanding my
7  question?  If you're not then I can, you
8  know, rephrase it.
9          MS. DAVIDSON:  Adam, every
10          time I object you just badger the
11          witness more.  And so I don't even
12          know what question is pending.
13          And I'm objecting to your
14          follow-on badgering of the witness
15          following the badgering of the
16          witness I already objected to.
17          THE WITNESS:  You want a
18          yes-or-no answer from me.  I am
19          not able to give you a yes-or-no
20          answer, because I think the
21          question has no merit of a
22          yes-or-no answer -- or the answer
23          has no merit if it's a yes-or-no
24          answer.

Page 155

1          I believe I have answered
2          the question multiple times in
3          exact same manner and have
4          addressed the question you have
5          asked me.
6  BY MR. SLATER:
7      Q.   Let's go now to Page 890 of
8  that document.  Same document we've been
9  in, which is Exhibit-7.  The very top.
10          At the top of Page 890, it
11  says, Tests for purity.  Owing to its
12  various modes of degradation, hydrolysis,
13  thermal and photochemical decomposition,
14  the principal impurities found in DMF
15  are:  dimethylamine, formic acid,
16  hydrogen cyanide, carbon dioxide and
17  carbon monoxide.
18          Do you see that?
19      A.   I see it, yes.
20      Q.   In forming your opinions in
21  this case, did you take into account the
22  fact that DMF could degrade through
23  hydrolysis and due to thermal impact,
24  meaning temperature?

Page 156

1          Did you take that into
2  account, that those were both pathways to
3  degradation that could yield
4  dimethylamine?
5          MS. DAVIDSON:  Objection.
6          THE WITNESS:  Dr. Xue, who
7          is a synthesis organic chemist, a
8          respected lecturer at University
9          of Maryland, addresses those
10          issues -- those points, in his
11          testimony.
12          The thermal decomposition
13          that you have asked me about and
14          is on the screen is effectively
15          based on reaching a particular
16          temperature which the process was
17          never at.
18          So if that temperature is
19          not reached and if hydrolysis is
20          not taking place, because it's
21          neither acidic or basic, then --
22          the question of did I take that
23          into account?  The answer is, yes,
24          I did take that into account.

Page 157

1  BY MR. SLATER:
2      Q.   Did you form your own
3  independent opinion about what you just
4  told me, or were you relying on Dr. Xue's
5  analysis of that subject matter?
6      A.   Dr. Xue refers to two
7  statements.  One is about the boiling
8  point of DMF, which I have referenced him
9  and verified by looking at, effectively,
10  the boiling point of DMF.  I've also
11  looked at the pH of the process, which,
12  again, he refers to, and, again, I have
13  verified.
14          So is it my opinion or is it
15  his opinion?  It's my opinion.
16      Q.   And you are not an expert in
17  the field of organic chemistry, right?
18      A.   I am --
19          MS. DAVIDSON:  Objection.
20          Objection.  You literally
21          objected, Adam, last week every
22          single time I asked somebody if
23          they were an expert in something.
24          MR. SLATER:  I'll ask the

Ari Afnan

Page 158

1    question differently.
2    BY MR. SLATER:
3       Q.   You told me before that you
4    are not holding yourself out as an expert
5    in organic chemistry.
6          Have you changed your mind
7    on that?
8       A.   I have a degree in
9    chemistry.  I have a Ph.D. in chemistry.
10         I am not a synthetic organic
11   chemist and up to date, but I do
12   understand sufficiently about chemistry
13   to opine on the subject.
14      Q.   In the materials you
15   reviewed, did you see whether ZHP tested,
16   at any time, to see if DMF could degrade
17   and yield dimethylamine under the
18   conditions used in the zinc chloride
19   process?
20         MS. DAVIDSON:  Objection.
21         THE WITNESS:  So if I go to
22   my report, I think the answer is
23   there.
24         Number 169, it says, and

Page 159

1    it's the third line, But as
2    Mr. Dong explains, this was
3    because both sodium azide and
4    sodium nitrate had been used
5    before the process changed, and
6    ZHP concluded, through the risk
7    assessment process, that the
8    increased amount of these
9    substances did not significantly
10   increase the potential risk of
11   sodium azide or sodium nitrate.
12   Moreover, even though ZHP had
13   concluded the potential risk was
14   low, it still conducted testing to
15   determine residual amounts of
16   those substances and performed a
17   further risk assessment based on
18   that testing.
19         So they did look at what was
20   going on.
21   BY MR. SLATER:
22      Q.   I just asked you whether
23   ZHP, to your knowledge, ever performed
24   any tests to determine whether DMF could

Page 160

1    degrade and give off dimethylamine under
2    the conditions of the zinc chloride
3    process.
4          Do you know whether they did
5    or not?  Did they perform any test on
6    that?
7          MS. DAVIDSON:  Objection.
8          THE WITNESS:  I don't recall
9    whether they did any tests or not.
10         However, the common practice
11   of industry would have been to
12   effectively look at known
13   solvents.  And this was a known
14   solvent.
15         The risk assessment would
16   have occurred -- the assessment
17   that you are asking would have
18   occurred during development phases
19   and not during commercial
20   manufacture.
21         The development phases were
22   done at a different site and they
23   were investigated and studied over
24   the course of more than two years.

Page 161

1    BY MR. SLATER:
2       Q.   Can you answer my question,
3    please?
4       A.   I answered your question,
5    which was, did they look at this test,
6    did they test for this?
7          And my answer is still, ZHP
8    looked at the new process, the zinc
9    chloride process with DMF, over a period
10   of longer than two years in the
11   development workshop at a different site.
12         And they concluded that the
13   process was not generating anything
14   undesirable, so.
15      Q.   Could you please answer my
16   question?
17         MS. DAVIDSON:  Objection.
18         THE WITNESS:  I answered the
19   question.
20         ZHP, over two years,
21   investigated the raw materials and
22   the process at their development
23   site and reported that data.
24   BY MR. SLATER:

Ari Afnan

Page 162

1    Q.  Can you answer my question,
2  please?
3        MS. DAVIDSON:  Objection.
4    You're badgering the witness.
5    He's answered your question to the
6    best of his ability.
7  BY MR. SLATER:
8    Q.  Please answer.
9        MS. DAVIDSON:  Objection.
10       THE WITNESS:  ZHP -- ZHP
11   tested all the raw materials and
12   the product from the process in
13   their development facility over a
14   period of greater -- longer than
15   two years.
16 BY MR. SLATER:
17   Q.  Did ZHP ever, to your
18 knowledge, ever do a test to determine
19 whether, under the conditions of the zinc
20 chloride process, DMF could degrade and
21 give off dimethylamine; yes or no?
22       Was that specific test ever
23 done by ZHP, to your knowledge?
24       MS. DAVIDSON:  Objection.

Page 163

1    Asked and answered.
2        THE WITNESS:  I have
3    answered the question twice or
4    three times.
5        So did ZHP ever do it?  As
6    I've said, they did it in their
7    development facility.  In a
8    commercial setting, it would be
9    against the GMPs to begin to do
10   tests on the site for whatever
11   reason, whatever purpose.
12 BY MR. SLATER:
13   Q.  Your testimony is that as
14 part of the risk assessment, ZHP
15 performed a specific test to determine
16 whether DMF could degrade and give off
17 dimethylamine under the conditions of the
18 zinc chloride process?
19       It's your understanding they
20 actually did that test as part of the
21 risk assessment; do I understand you
22 correctly?
23       MS. DAVIDSON:  Objection.
24   Asked and answered.

Page 164

1    Mischaracterizes testimony.
2    Badgering the witness.
3        THE WITNESS:  That's not
4    what I said.  What I said was,
5    they -- raw materials that were
6    being used in the process were
7    reviewed, were assessed, were risk
8    assessed, for ensuring that the
9    process was safe.
10       MR. SLATER:  Let's take that
11   exhibit down.  And let's go back
12   to the deviation investigation
13   report, please.  Page 170.
14       MS. DAVIDSON:  What exhibit
15   number was that again?  Could
16   someone remind me?
17       MR. SLATER:  I don't
18   remember.  It's either Exhibit-5
19   or 6.  Why don't we find out.
20   Exhibit-5.
21       Actually, let's start off --
22   yeah.  Okay.  That's good.
23 BY MR. SLATER:
24   Q.  Looking at page --

Page 165

1        MR. SLATER:  Actually, you
2    know what, Chris, let's go back.
3    Let's go to Page 9, actually.
4    Sorry about that.
5  BY MR. SLATER:
6    Q.  Okay.  We're looking now at
7  Page 9 of Exhibit-5, the deviation
8  investigation report.
9        And I'd like to look
10 starting in the middle of the page.  And
11 it says, For further confirmation, the
12 following lab scale trials were designed
13 and performed to verify the concluded
14 formation mechanism of NDMA.  The amount
15 of NDMA formed by quenching under
16 different temperatures is shown in the
17 table below.
18       Have you seen this page and
19 taken this into account in forming your
20 opinions in this case?
21   A.  Yes.
22   Q.  So you were aware that, as
23 part of their deviation investigation,
24 ZHP actually did lab tests where they had

Ari Arman

Page 166

1 DMF at the same temperature for the same
2 time period as under the zinc chloride
3 process and then, after that, combined
4 the sodium nitrate and they proved that
5 NDMA resulted; so you're aware of that,
6 correct?
7            MS. DAVIDSON:  Objection.
8            THE WITNESS:  This document
9     that you're looking at has some
10    differences from the commercial
11    scale batch.
12            If you are looking at Rows
13    Number 1 and 2, it's actually
14    saying the pH is adjusted to 1.
15    So the commercial process
16    was not operating at pH of 1,
17    number one.
18            Number two, this is a test
19    where they are driving to make
20    NDMA.  They are not trying to make
21    valsartan, they are trying to make
22    NDMA in the valsartan process.
23            Point three, this document
24    is after they have identified

Page 167

1     NDMA.  This document, this
2     deviation investigation, is
3     actually trying to find the root
4     cause of NDMA formation, and
5     they're trying various process
6     parameters to see what results
7     would come from that.  This is
8     then reported to FDA.
9 BY MR. SLATER:
10    Q.   All I asked you is if you
11 knew this information when you wrote your
12 report.
13           Is the answer yes or no?
14           MS. DAVIDSON:  Objection.
15           THE WITNESS:  Did I read the
16    investigation report, yes.
17 BY MR. SLATER:
18    Q.   And this showed that when
19 DMF was heated to 135 degrees Celsius for
20 20 hours, it created dimethylamine, which
21 then later combined with the sodium
22 nitrate and NDMA was formed, correct?
23 That's what this lab test shows, right?
24    A.   This lab test shows that if

Page 168

1 DMF, at 135 degrees, okay, 20 hours, then
2 add MTB, water, sodium nitrate and adjust
3 to 1 and then quench it as zero degrees
4 and quench it at 10 and quench it at 20
5 degrees.
6           So it's different settings
7 to generate or to create NDMA.  That's
8 what this document says.
9           I don't see any statement
10 about dimethylamine.
11    Q.   How would the NDMA have
12 formed if the DMF didn't introduce the
13 dimethylamine?
14    A.   That is --
15           MS. DAVIDSON:  Objection.
16 BY MR. SLATER:
17    Q.   You're the -- you said
18 you're a chemistry expert now, so tell
19 me -- let me ask the question
20 differently.
21           How did the NDMA --
22 rephrase.
23           You see the fourth column,
24 it says, NDMA in parts per million?  Do

Page 169

1 you see that?
2    A.   Yes.
3    Q.   How did that NDMA form?
4           MS. DAVIDSON:  Objection.
5    That's outside the scope of his
6    opinions.
7           MR. SLATER:  When you say
8    that, so I know how to take the
9    deposition, are you saying he's
10   not giving chemistry opinions?
11   Because he just said a few minutes
12   ago he is.  So I need to
13   understand what's in and what's
14   out.
15           MS. DAVIDSON:  I didn't hear
16   him say he's giving chemistry
17   opinions.  I think you're
18   mischaracterizing his testimony
19   now.
20           I will let the witness speak
21   for himself.
22           THE WITNESS:  I did not say
23   that I was giving chemistry
24   opinions.  I said I do have a

Ari Arman

Page 170

1   chemistry background.
2          My expertise in this is
3   GMPs.  And, again, to re-tread the
4   point, I look at that screen and
5   that tells me about the various
6   conditions ZHP created to see what
7   the -- you know, what levels of
8   NDMA are formed.
9   BY MR. SLATER:
10      Q.   Do you have any
11  understanding as to how that NDMA formed
12  in those lab tests, which you read about
13  before you authored your report?
14         MS. DAVIDSON:  Objection.
15  BY MR. SLATER:
16      Q.   It's a yes or no.  Either
17  you know or you don't.
18         MS. DAVIDSON:  Objection.  I
19  apologize for objecting in the
20  middle of your questions.  I
21  always think they're done and then
22  there's a postscript.
23         THE WITNESS:  My role, my
24  remit, was to look at the

Page 171

1   plaintiff experts and assess
2   GMP -- GMP statements.
3          I was not here, on this
4   project, to assess the chemistry.
5   For that, there was Professor Xue.
6   What I'm looking at and what
7   you asked me about this
8   is whether, you know,
9   dimethylamine is formed.  And I'm
10  saying, I don't see it on the
11  screen.
12  BY MR. SLATER:
13      Q.   Do you doubt the results of
14  these tests for any reason as they're
15  documented in this report from ZHP?
16      A.   I have no evidence to doubt
17  these results.  And these were the
18  results which were also submitted to FDA.
19         So, no, I don't doubt the
20  results.
21      Q.   Let's go to Page 170 of that
22  document, please.
23         Looking now at the middle of
24  the page, ZHP states in this report,

Page 172

1   According to the deviation investigation
2   report, DCE18001, in tetrazole formation
3   of crude step, DMF is used as solvent and
4   zinc chloride is used as catalyst.  Since
5   the temperature might reach 135, plus or
6   minus 5 degrees Celsius, and the reaction
7   time period last for 20, plus or minus
8   one hour, dimethylamine might be formed
9   by decomposition of DMF.
10         Do you see what I just read?
11      A.   Yes.
12      Q.   Do you disagree with that
13  conclusion that was drawn by ZHP in its
14  deviation investigation report that I
15  just read to you?
16      A.   This is not a conclusion,
17  because it's saying it's a probable root
18  cause.  It's using the word -- the
19  language, which says, and the reaction,
20  it might be formed.  That's not an, it is
21  formed.
22         This, as a deviation report,
23  if submitted, which says it might be
24  formed, my response would be, tell me

Page 173

1   whether it is or it isn't.
2          And, again, this document is
3   with hindsight.  This document is being
4   used to assess and to find the different
5   pathways.
6          Now, it also says, if the
7   temperature -- it says, the temperature
8   might reach 135, plus or minus 5 degrees.
9   That information would be available in
10  the batch report.
11      Q.   Did you evaluate that issue
12  at all, what temperatures were reached
13  and what impact that could have on the
14  DMF?
15      A.   Again, my remit here was not
16  chemistry.
17      Q.   As a GMP expert, one of your
18  rolls -- one of the things -- rephrase.
19         As a GMP expert, one of the
20  things you needed to consider was what
21  tests were performed by ZHP to determine
22  whether they performed tests that were
23  required by cGMP; that was within the
24  scope of what you were doing, right?

Page 174

1    MS. DAVIDSON:  Objection.
2    THE WITNESS:  So the tests
3    which are required to be performed
4    for release of material are
5    defined as per USP.  So those are
6    the tests which are there.
7  BY MR. SLATER:
8    Q.   Looking at the paragraph
9  that I was just reading in, it continues,
10  In subsequent step, when using sodium
11  nitrite to quench redundant azide,
12  valsartan was not separated.
13    Do you understand what that
14  sentence means?
15    MS. DAVIDSON:  Objection.
16    THE WITNESS:  So the
17    valsartan was not separated, as it
18    didn't settle out.
19  BY MR. SLATER:
20    Q.   The next sentence says --
21  rephrase.
22    Looking at the paragraph in
23  the middle of the page, after the first
24  couple of sentences about the formation

Page 175

1  of dimethylamine, it states, In
2  subsequent step when using sodium nitrite
3  to quench redundant azide, valsartan was
4  not separated.  Thus, trace amount of
5  NDMA is formed by reaction between
6  dimethylamine and nitrous acid.  To
7  verify this conclusion, Huahai conducted
8  simulation tests in the laboratory to
9  demonstrate the DMF degradation and the
10  generation of NDMA, the detail is in
11  Table 4-40 as follows.
12    Do you see what I just read?
13    A.   I see what you just read.
14    Q.   Did you read that when you
15  wrote your report?  Had you read that
16  information I just read to you?
17    A.   I have read this before I
18  wrote my report, yes.
19    Q.   Did you factor that into the
20  opinions you offered on GMP in this case;
21  yes or no?
22    MS. DAVIDSON:  I really -- I
23    guess if you're asking simply
24    about GMP, that's fine.  I really

Page 176

1  think you're delving into
2  chemistry at this point, which are
3  questions that are more
4  appropriately asked to Professor
5  Xue, who you already deposed.
6    But if you're just asking
7  about his GMP opinions, that's
8  fine.
9    THE WITNESS:  So can you ask
10  your question, please?
11  BY MR. SLATER:
12    Q.   When you formed your
13  opinions in this case regarding cGMP, did
14  you take this information into account
15  that I just read to you?
16    I just want to know if you
17  took it into account when you formed your
18  opinions; yes or no?
19    MS. DAVIDSON:  Objection.
20  BY MR. SLATER:
21    Q.   And, by the way, Doctor, I'm
22  not asking for what the analysis was.
23  I'm just asking if you took it into
24  account.

Page 177

1    MS. DAVIDSON:  I really
2    think we need to have one question
3    pending, one question answered,
4    because you just said six
5    different things.
6  BY MR. SLATER:
7    Q.   You can answer.
8    A.   The challenge that I have
9  answering your complex and multiple
10  questions is you say, did I take this
11  into account when making my GMP
12  decisions?
13    This is an investigation,
14  which is happening in a lab, in a lab
15  setting, as a result of a deviation which
16  has taken place before these activities
17  were taking place, before these -- this
18  data was being generated.
19    The reason the data was
20  generated was to actually push the
21  process to certain limits and see what
22  the impact is.  This is not happening in
23  a GMP setting, even though it's a
24  deviation investigation for a GMP

Ari Afnan

Page 178

¹ deviation.
²          These are happening in a
³ development setting to try and address,
⁴ to try and understand how NDMA is formed.
⁵          So when you ask me straight
⁶ questions expecting a yes-or-no answer, I
⁷ struggle.
⁸      Q.   When you formed your
⁹ opinions regarding whether or not ZHP
¹⁰ complied with cGMPs, was this information
¹¹ that I just read to you something that
¹² you factored into your opinion?
¹³          Either it's yes or no or you
¹⁴ can say something like, it was
¹⁵ irrelevant, I didn't have to consider it.
¹⁶          I don't know what your
¹⁷ answer is, but I'd just like to know if
¹⁸ it was something that you relied on, in
¹⁹ part, in forming your opinions.
²⁰          MS. DAVIDSON:  I'm going to
²¹ object.  Asked and answered.
²²          THE WITNESS:  I have
²³ answered this question.
²⁴          And when I'm reading this,

Page 179

¹          this is about an event which is
²      after GMP manufacturing has
³      stopped.  ZHP stopped manufacture
⁴      of valsartan in June.  This is
⁵      happening sometime later, much
⁶      later; and they're looking at it.
⁷          This is not what was
⁸      happening in their GMP area.  So
⁹      for me to look at this and look at
¹⁰      this data and to draw a conclusion
¹¹      based on what was going on
¹²      beforehand would actually not be
¹³      correct.
¹⁴ BY MR. SLATER:
¹⁵      Q.   You see in the Table 4-40 it
¹⁶ documents that, under these conditions
¹⁷ DMA was a degradation product of the DMF
¹⁸ under these conditions, correct?  That's
¹⁹ what's documented on the table, correct?
²⁰      A.   I see what the table says.
²¹      Q.   If ZHP had wanted to, they
²² could have run the same or similar lab
²³ tests as part of their risk assessment
²⁴ before they started manufacturing with

Page 180

¹ the zinc chloride process, right?
²      A.   This is happening with
³ hindsight, with effectively looking at --
⁴ it's looking at what is happening in back
⁵ end of 2018 and not what was happening
⁶ early on.
⁷          Early on, when they were
⁸ developing the process, ZHP had no reason
⁹ to vary the process parameters, as per
¹⁰ what's on the screen, and look for
¹¹ formation of NDMA.  Point one.
¹²          Point two, as testified --
¹³ or as stated by FDA, neither industry nor
¹⁴ the regulators knew about the chemical
¹⁵ pathways that would form NDMAs.
¹⁶          Point three, again, as is
¹⁷ stated by FDA, neither industry nor
¹⁸ regulators had the methods to detect
¹⁹ NDMA.  Dr. Gottlieb specifically says,
²⁰ NDMA is difficult to detect and to
²¹ isolate.
²²          So I look at this and this
²³ is all after the event.  This is with
²⁴ hindsight.  ZHP would not have known.

Page 181

¹          And, again, if ZHP -- the
² fact that ZHP did not know about the
³ formation of NDMAs is, again, stated by
⁴ the regulator.  The regulators didn't
⁵ know that these processes would result in
⁶ NDMA.
⁷          MR. SLATER:  We can take
⁸ that document down now and go to a
⁹ different document.
¹⁰          Is it 8 now, right?  Did you
¹¹ put it up?  You were waiting for
¹² me and I was waiting for you.
¹³          MS. DAVIDSON:  So we're
¹⁴ marking this as Exhibit-8?
¹⁵          MR. SLATER:  We are.
¹⁶          - - -
¹⁷          (Whereupon, Exhibit Afnan-8,
¹⁸ No Bates, 4/1/15 General Notices
¹⁹ and Requirements, was marked for
²⁰ identification.)
²¹          - - -
²²          MR. SLATER:  Can you reduce
²³ it just so the whole document is
²⁴ on the page?  Yeah.  Perfect.

Ari Aman

Page 182

BY MR. SLATER:

Q.   So what we have on the screen as Exhibit-8 is an April 1, 2015, bulletin from the United States Pharmacopeia convention titled, General Notices and Requirements.

Do you see that?

A.   Yes.

Q.   Do you know what USP is?

A.   Yes.

Q.   What is USP?

A.   USP is a not-for-profit independent organization that effectively writes two types of monographs.  One is a general chapter, which is binding.  And the other, which are not binding.  So they write the specifications.

Q.   When you say "they write the specifications," what specifications?

A.   APIs, drug products, some raw materials.

Q.   Let's go to Page 4, please.

And I'm looking now under Section 5.60, titled, Impurities and

Page 183

Foreign Substances.

Do you see that?

A.   Yes.

Q.   This says, Tests for the presence of impurities and foreign substances are provided in such substances to amounts that are unobjectionable under conditions in which the article is customarily employed.

Do you see what I just read?

A.   Yes.

Q.   Next this states, Non-monograph tests and acceptance criteria suitable for detecting and controlling impurities that may result from a change in the processing methods or that may be introduced from external sources should be employed in addition to the tests provided in the individual monograph where the presence of the impurity is inconsistent with applicable good manufacturing practices or good pharmaceutical practices.

Do you see what I just read?

Page 184

A.   Yes.

Q.   Did you know what I just read before I just read it to you?

MS. DAVIDSON:  Objection.

MR. SLATER:  I'm sorry, what's the objection?

MS. DAVIDSON:  Does he know what you read before you read it to him?  I don't even understand that question.

BY MR. SLATER:

Q.   Doctor, the information I just read to you from this official USP document, were you aware of that before I read it to you, or is this the first time you're seeing that?

A.   I was aware of that.

Q.   When they refer to a change in the processing methods, here, with the TEA and sodium nitrite quenching process and the zinc chloride process, ZHP changed the processing methods for valsartan, correct?

A.   Yes.

Page 185

Q.   When they refer to impurities that may be introduced from external sources, one way that impurity can be introduced from an external source would be, for example, with the DMF in the zinc chloride process if the DMF, as purchased, contained dimethylamine as an impurity, correct?

A.   It could, yes.

Q.   And this is saying that in those circumstances, non-monograph tests and acceptance criteria should be employed in addition to the tests provided in the individual monograph where the presence of the impurity is inconsistent with applicable good manufacturing practices or good pharmaceutical practices.

That's what it states, correct?

A.   That's what it states.

Q.   The presence of NDMA and NDEA in the valsartan manufactured by ZHP was unwanted, correct?

Ari Aman

Page 186

1    A.    Correct.
2    Q.    In fact, when it was
3  discovered that the NDMA and NDEA were in
4  the valsartan, that resulted in a recall
5  of the finished-dose pills that had been
6  manufactured with that API, correct?
7    A.    So the text you have read to
8  me relates to impurities and not unknown
9  impurities.
10    The problem with NDMA, as
11  stated by FDA, is that it's difficult to
12  detect.  The methods for its detection
13  were not there.  And that it was an
14  unknown below a .1 percent, where ICH
15  says you can have that impurity.
16    The method which is used for
17  effectively looking at the residual
18  solvents, as is stipulated by the USP, is
19  GC FID, that doesn't detect the NDMA.
20    So if you know what you're
21  looking for, then it is easy to go and
22  look for it.  But if one doesn't know
23  what it's looking for, then it's very
24  difficult to look for an unknown impurity

Page 187

1  that you're not aware of.
2    Q.    The point of this section is
3  instructing manufacturers that under
4  certain circumstances, which we just went
5  through, change in the processing methods
6  or impurities that may be introduced from
7  external sources, the manufacturer will
8  need to develop and utilize non-monograph
9  tests and acceptance criteria in order to
10  address those circumstances; that's what
11  this is saying, correct?
12    MS. DAVIDSON:  Objection.
13    THE WITNESS:  USP has no
14    authority to -- to dictate to
15    anyone what you have just read to
16    me.
17  BY MR. SLATER:
18    Q.    That's what the words on the
19  page say, correct?
20    A.    Your statement was, this
21  instruction.  And my response is, USP
22  cannot instruct industry what to do.
23    However, industry followed
24  Q3A, FDA adheres to Q3A, or follows that,

Page 188

1  and ZHP followed Q3A.
2    Q.    The words on the page
3  indicate that a manufacturer -- the word
4  used is "should," should employ
5  non-monograph tests and acceptance
6  criteria where there's a change in the
7  processing methods or impurities may be
8  introduced from external sources.
9    That's what the words on the
10  page say, that you're not limited just to
11  the tests and acceptance criteria listed
12  in the monograph; that's what the words
13  on the page say, correct?
14    MS. DAVIDSON:  Objection.
15    THE WITNESS:  So, again,
16    I'll repeat.
17    USP has no authority to say
18    what -- to say to a manufacturer
19    that you should do this.  The same
20    way that I have no authority when
21    I say, Mr. Slater, please do not
22    ask yes-or-no questions, okay.
23  BY MR. SLATER:
24    Q.    Did I read the language

Page 189

1  correctly?
2    A.    No, no, you didn't read the
3  language incorrectly.
4    What I'm saying is that it
5  says should.  That's advisory.  That's
6  not binding.  That's -- USP has no
7  authority to tell manufacturers what to
8  do.
9    Q3A is far more specific
10  about what should be followed and should
11  not be followed.
12    Q.    A manufacturer, such as ZHP,
13  would be expected, at least as of April
14  1, 2015, to understand that it would need
15  to consider utilizing non-monograph tests
16  and acceptance criteria as opposed to
17  being limited by the USP tests and
18  acceptance criteria in the monograph;
19  that you'll agree to, that's what this
20  provided -- that's what this information
21  instructed or advised -- I'll start over,
22  actually.  Because I don't want to fall
23  into the same back-and-forth with you.
24    You would agree with me that

Ari Afnan

Page 190

¹ current good manufacturing practices, at
² least as of April 1, 2015, required the
³ use of non-monograph tests and acceptance
⁴ criteria suitable for detecting and
⁵ controlling impurities that may result
⁶ from a change in the processing methods
⁷ or that may be introduced from external
⁸ sources?  That is something that
⁹ manufacturers would have needed to
¹⁰ understand, right?
¹¹      A.   As of January 2015, which is
¹² the date of this document, this document
¹³ does not have any authority to stipulate
¹⁴ to manufacturers that they need to use
¹⁵ compendial or non-compendial tests, one.
¹⁶           Two, this is referring to
¹⁷ known impurities.
¹⁸           Three, unknown impurities,
¹⁹ unknown impurities, which by nature, by
²⁰ their name, are unknown, which are not
²¹ expected to have an adverse -- to be --
²² to be carcinogenic, if one does not know
²³ of the presence of such impurities and
²⁴ the impurity is below .1 percent, as per

Page 191

¹ ICH 3A, one need not look for that.
²      Q.   Where does it say unknown
³ impurities there?  Where do you see
⁴ unknown?
⁵      A.   My point is --
⁶      MS. DAVIDSON:  Objection.
⁷      Hold on, Dr. Afnan.
⁸      I know I didn't object for,
⁹      like, three questions, you got out
¹⁰      of practice.
¹¹ BY MR. SLATER:
¹²      Q.   Where does the word
¹³ "unknown" describe the impurities?
¹⁴      A.   It says, Non-monograph tests
¹⁵ and acceptance criteria suitable for
¹⁶ detecting and controlling impurities.
¹⁷           If an impurity is unknown
¹⁸ and below .1 percent concentration and
¹⁹ not anticipated to be in a cohort of
²⁰ concern, then there is no requirement, as
²¹ per Q3, to look for it, to isolate it, to
²² identify it, and then to come up with
²³ non-compendial methods to detect it.
²⁴      Q.   How would you identify NDMA

Page 192

¹ in ZHP's valsartan without doing a test?
²      MS. DAVIDSON:  Objection.
³      THE WITNESS:  As per FDA and
⁴      USP, USP's monograph for valsartan
⁵      requires the use of GC FID.  It
⁶      required the use of GC FID then.
⁷      It requires use of GC FID today,
⁸      in 2023.
⁹           FDA also stated,
¹⁰      acknowledged, that neither
¹¹      industry nor regulators had the
¹²      test methods suitable for
¹³      detecting NDMA in valsartan.  And
¹⁴      for that reason, FDA developed
¹⁵      those methods and published those
¹⁶      methods.
¹⁷ BY MR. SLATER:
¹⁸      Q.   How would one have
¹⁹ identified NDMA in valsartan without
²⁰ doing a test to confirm that there was
²¹ NDMA in valsartan?
²²      A.   I've answered that question,
²³ and I'll answer again.
²⁴           The methods, which were

Page 193

¹ current up through June of 2018, in
² industry did not actually indicate
³ presence of NDMA.  As Dr. Gottlieb
⁴ stated, it's a very difficult substance
⁵ to detect.  It's -- the methods are not
⁶ there and -- the methods are not there
⁷ and, also, they -- the substance is
⁸ difficult to detect.  It's a residual
⁹ solvent, so it needs to be taken out of
¹⁰ solution into a gas and then tested.
¹¹      Q.   Is there any other way to
¹² confirm whether or not there's NDMA in
¹³ valsartan without running a test?
¹⁴           It's a yes-or-no question.
¹⁵ I just want to know, can you do it
¹⁶ without using a test?
¹⁷      MS. DAVIDSON:  Objection.
¹⁸      THE WITNESS:  If a firm
¹⁹      anticipated, and I'll use the word
²⁰      firm, FDA, if it's anticipated
²¹      that had the NDMA would occur,
²²      then they would look for it.
²³           But, again, if I go to the
²⁴      FDA's 30th of August 2019

Ali Arman

Page 194

1  statement, it says, Because it was
2  not anticipated that NDMA would
3  occur at these levels in the
4  manufacture of the valsartan API,
5  manufacturers would not have been
6  testing for it. They would not
7  have records that helped identify
8  the issue during the -- during an
9  inspection.
10      So this particular risk
11  would not have been identified on
12  an inspection. FDA agrees that
13  NDMA was not anticipated.
14  BY MR. SLATER:
15      Q.  It's your opinion that as a
16  matter of cGMP, ZHP did not have to run
17  any tests to determine if there was NDMA
18  or NDEA in its valsartan unless and until
19  it anticipated that there would be NDMA
20  or NDEA present in the valsartan?
21      MS. DAVIDSON:  Objection.
22      THE WITNESS:  Can you read
23  the question again?  Or can you
24  repeat the question?  One or the

Page 195

1  other.
2  BY MR. SLATER:
3      Q.  Is it your opinion that ZHP
4  did not have to test for NDMA or NDEA in
5  its valsartan until it actually
6  anticipated that there was NDMA or NDEA
7  present in the valsartan?
8      A.  So as per ICH guidances, if
9  presence of NDMA, or any other mutagenic
10  substance, is not anticipated, then there
11  is no test to be done for it.
12      Q.  That's your understanding of
13  ICH?
14      A.  Yes.
15      Q.  If ZHP had determined, based
16  on an analysis of the potential chemical
17  reactions and the potential presence of
18  secondary amines and nitrous acid in its
19  valsartan manufacturing processes, under
20  those circumstances, would GMP have
21  required ZHP to then run a test to see if
22  there actually was NDMA or NDEA in the
23  valsartan?
24      MS. DAVIDSON:  Objection.

Page 196

1      THE WITNESS:  So can you
2  please repeat?  I apologize,
3  sincerely apologize to you, but
4  can you repeat the question,
5  please?
6      MS. DAVIDSON:  It was a long
7  question.  You don't have to
8  apologize.
9  BY MR. SLATER:
10      Q.  If ZHP had actually
11  identified the potential formation of
12  NDMA or NDEA in its valsartan
13  manufacturing processes and knew that
14  that was a possible impurity that could
15  be created by those processes, under
16  those circumstances, would GMP have
17  required ZHP to run tests to see if there
18  was NDMA or NDEA in the valsartan?
19      A.  Yes.  But that's not the
20  case here.
21      Q.  We know from the documents I
22  showed you before that ZHP should have
23  anticipated at least the potential
24  presence of dimethylamine in the zinc

Page 197

1  chloride process, because we know that
2  that's a known impurity of commercial
3  DMF; we've established that, right?
4      MS. DAVIDSON:  Objection.
5      THE WITNESS:  No, we have
6  not.  I did not agree to that.
7  BY MR. SLATER:
8      Q.  You disagree or do you have
9  no opinion?
10      Tell me what your opinion is
11  on that.
12      MS. DAVIDSON:  Objection.
13  BY MR. SLATER:
14      Q.  Let me ask the question
15  clearly.
16      A.  Okay.
17      Q.  Are you saying that you
18  disagree that ZHP should have been on
19  notice of the potential for dimethylamine
20  to be an impurity of the DMF it was
21  purchasing?  Are you saying they didn't
22  have to be aware of that as a
23  possibility?
24      MS. DAVIDSON:  Objection.

Afnan

1  That was a compound question
2  again.  When you say "are you
3  saying," I think you're
4  characterizing testimony, in which
5  case it was mischaracterized.
6        I really think this would go
7  more smoothly if you stuck to one
8  question at a time.
9        MR. SLATER:  We're dealing
10 with a country lawyer who is
11 struggling through it.  I'm doing
12 the best I can.
13       MS. DAVIDSON:  From the
14 country of New Jersey?
15       All right.  Dr. Afnan, I'm
16 sorry for the side show.  Do you
17 understand the question you're
18 being asked right now or do you
19 need one question repeated to you?
20       THE WITNESS:  It's a very --
21 BY MR. SLATER:
22       Q.   You're obviously struggling
23 with it.
24       Let me do the best I can,

1  because I obviously am struggling here,
2  too.  Because I can't get an answer, so
3  it's obvious that my questions are no
4  good.
5        Do you have an opinion, one
6  way or the other, as to whether or not
7  ZHP should have been aware of the
8  potential for dimethylamine to be an
9  impurity of the DMF it was using in the
10 zinc chloride process?  I just want to
11 know right now if you have an opinion on
12 that.
13       A.   ZHP was not aware --
14       Q.   Do you have an opinion on
15 the question --
16       MS. DAVIDSON:  Whoa.  No.
17 He was in the middle of a
18 sentence, Adam.  Come on.
19       MR. SLATER:  So you're
20 encouraging your witness to
21 answer with a direct answer?
22 Okay.  Thank you.
23       MS. DAVIDSON:  What do you
24 mean?  He was in the middle of an

1  answer, and you stopped him and
2  interrupted him.  I don't know
3  what his answer was going to be.
4        MR. SLATER:  Counsel, all I
5  asked was if he has an opinion on
6  that.  I didn't ask what it was.
7        MS. DAVIDSON:  I understand.
8        MR. SLATER:  So I'm entitled
9  to the answer to the question.
10       MS. DAVIDSON:  That does not
11 entitle you to interrupt someone
12 mid question -- mid answer, Adam,
13 you know that.
14       And you wouldn't put up with
15 that if I were to do the same.
16       MR. SLATER:  Please stop
17 talking.  I'm just saying, you've
18 talked a lot and it's taking a lot
19 of time.
20 BY MR. SLATER:
21       Q.   Just answer the question,
22 Doctor.
23       MS. DAVIDSON:  What question
24 is pending?  Because I don't know.

1        MR. SLATER:  I'm sorry you
2  lost track, but you're not the
3  person I'm deposing.
4  BY MR. SLATER:
5        Q.   So please answer the
6  question.
7        MS. DAVIDSON:  I'm asking
8  the court reporter to repeat the
9  question so we know what the
10 question is.
11       MR. SLATER:  We're not going
12 to have the court reporter repeat
13 the question.
14 BY MR. SLATER:
15       Q.   Doctor, do you, yes or no,
16 have an opinion, I just want to know if
17 you have an opinion, I don't want to know
18 what it is, as to whether or not ZHP
19 should have been aware of the potential
20 for dimethylamine to be an impurity of
21 the DMF it was using in the zinc chloride
22 process; yes or no?  Do you have an
23 opinion?
24       MS. DAVIDSON:  Objection.

Ari Afnan

1    Objection.  To all three questions
2    that were just combined into one.
3        THE WITNESS:  I can't answer
4    that.  I genuinely cannot answer
5    that.
6        MS. DAVIDSON:  We've been
7    going a little more than an hour.
8    So, Adam, when you're at a
9    stopping point --
10       MR. SLATER:  I'm not there
11   yet.
12       MS. DAVIDSON:  What do you
13   mean?
14       MR. SLATER:  I'm not at a
15   stopping point right now.
16       MS. DAVIDSON:  Do you have
17   one or two questions on the same
18   topic --
19       MR. SLATER:  I'm not going
20   to be -- look, you can walk out of
21   the deposition and take a break
22   whenever you want.  But I'm in the
23   middle of a line of questioning.
24   There's no rule in the world that

1    says every hour we take a long
2    break.  I want to finish this line
3    of questioning.
4        I'm not agreeing to a break
5    right now.
6        MS. DAVIDSON:  First of
7    all --
8        MR. SLATER:  You know what,
9    I don't want to talk to you,
10   honestly, about this.  I'm not
11   ready to break.  I'm in the middle
12   of a line of questions, so it's
13   not a good stopping time.
14       I will now continue, unless
15   you stop the deposition and walk
16   out with your witness, and then
17   I'll have to wait for you to come
18   back.
19       MS. DAVIDSON:  So two
20   things.  Dr. Afnan, do you need a
21   break or do you want to go a few
22   more minutes?
23       MR. SLATER:  I'm in the
24   middle -- there's a question that

1    I'm in the middle of asking.
2    You're now trying to stop me from
3    continuing.  I don't think that's
4    kosher.
5        Can I please finish this
6    line of questioning?  You're
7    wasting my time.  And I don't
8    appreciate it.
9        MS. DAVIDSON:  Dr. Afnan --
10   BY MR. SLATER:
11       Q.   Doctor, do you know whether
12   or not ZHP knew that dimethylamine was a
13   potential impurity of the DMF it was
14   using in the zinc chloride process?  Do
15   you know whether they knew about that or
16   not?
17       MS. DAVIDSON:  Objection.
18       THE WITNESS:  I do not
19   recall, and I would need to look
20   at the documentation to say yeah
21   or nay.
22       And I would like a break.
23   BY MR. SLATER:
24       Q.   If ZHP knew --

1        MS. DAVIDSON:  Whoa.  He
2    just said he wants a break, so
3    let's take the break and follow up
4    afterwards.
5        MR. SLATER:  Off the record
6    at defense counsel's insistence.
7        VIDEO TECHNICIAN:  We're off
8    the record at 1:55 p.m.
9            -  -  -
10       (Whereupon, a brief recess
11   was taken.)
12           -  -  -
13       VIDEO TECHNICIAN:  We're
14   back on the record at 2:07 p.m.
15   BY MR. SLATER:
16       Q.   To be very clear, Dr. Afnan,
17   are you relying on Dr. Xue in order to
18   form any of your opinions?
19       Is there anything that
20   Dr. Xue has opined on where you would
21   say, I'm relying on that opinion in order
22   to form this other opinion?
23       MS. DAVIDSON:  Objection.
24       THE WITNESS:  So if I go to

Ari Afnan

Page 206

1    Statement Number 190 of my report,
2    okay, it's regarding the July 2017
3    e-mail, which the word "rely"
4    is -- I refer to his statement.
5        But, again, I have verified
6    it by studying the -- Ms. Jucai
7    Ge's testimony on the subject.
8    BY MR. SLATER:
9    Q.   So this is where you
10   referred to as detailed in the report of
11   Fengtian Xue, an expert chemist with
12   native fluency in Chinese, plaintiffs'
13   experts misread this highly technical
14   e-mail?
15   A.   Yes.
16   Q.   And am I understanding
17   correctly that one of the reasons you're
18   relying on Dr. Xue is because it's your
19   understanding that he is fluent in
20   Chinese?
21       MS. DAVIDSON:  Objection.
22       THE WITNESS:  As I said, I
23   verified by reading Jucai Ge's
24   testimony where she is questioned

Page 207

1    extensively about the e-mail.
2    BY MR. SLATER:
3    Q.   So you're not relying on
4    Dr. Xue at all?
5    A.   As I said --
6        MS. DAVIDSON:  Objection.
7        Hold on Dr. Afnan.
8        THE WITNESS:  For me to form
9    an opinion, okay, for me to form
10   an opinion on the subject, I've
11   looked at that e-mail, I've looked
12   at Jucai Ge's statement, I've
13   looked at -- sorry, deposition.  I
14   have looked at all of those.  And
15   I have also considered this.
16       If you ask me which is the
17   document that I am putting the
18   most weight on, that's Jucai Ge's
19   testimony -- or not testimony,
20   deposition.
21   BY MR. SLATER:
22   Q.   I notice that you spoke to
23   Jucai Ge Ge, according to your report.
24       Did I read that correctly?

Page 208

1    A.   Yes.
2    Q.   What day was that?
3    A.   I don't remember.  Maybe
4    November, maybe December.  It was before
5    my report.
6    Q.   How many times did you speak
7    to her?
8    A.   Once.
9    Q.   How long did you speak to
10   her for?
11   A.   I do not remember.
12   Q.   Did you record the
13   conversation?
14   A.   No.
15   Q.   Did you take notes of the
16   conversation?
17   A.   No.
18   Q.   Do you remember what she
19   told you?
20   A.   I remember what I asked and
21   what she told me.
22   Q.   What was that?
23   A.   I asked about customer
24   complaints or customer questions about

Page 209

1    unknown peaks.
2    Q.   When you say you gave the
3    most weight to Jucai Ge's deposition,
4    what in particular about her deposition
5    did you put weight on with regard to your
6    understanding of the July 27, 2017,
7    e-mail?
8    A.   As she said in her
9    deposition of April 2022, she had
10   actually done -- you know, she said, I
11   prepared for the deposition, I went back
12   and read the e-mail, I studied the
13   e-mail.  So she had actually done
14   background search regarding the e-mail.
15   Q.   You said you read the
16   e-mail.
17       Did you read the e-mail in
18   English or in Chinese?
19   A.   English.
20   Q.   Which version?
21   A.   The version that was in the
22   plaintiff experts' references as exhibits
23   to plaintiff experts.
24   Q.   Did you read the testimony

Ari Afnan

1  of Dr. Min Lee where he testified, on
2  behalf of ZHP, has to what the e-mail
3  said?
4      A.   I do recall some of the
5  depositions of Dr. Lee.
6      Q.   Was Dr. Lee's reading of the
7  e-mail of any significance to you in
8  forming your opinions about that e-mail?
9          MS. DAVIDSON:  Objection.
10         THE WITNESS:  So Dr. Lee's
11         deposition was -- his statements
12         were not as detailed or as
13         informed as Jucai Ge Ge's.
14  BY MR. SLATER:
15     Q.   Did you read John Du's
16  deposition and his testimony as to what
17  the e-mail said?
18     A.   I read that some time back.
19     Q.   Was John Du's testimony as
20  to what the e-mail said of significance
21  to you in forming your opinions about the
22  e-mail?
23         MS. DAVIDSON:  Objection.
24         THE WITNESS:  I read a lot

1      of material to form an opinion
2      about the e-mail and to then make
3      a statement.
4  BY MR. SLATER:
5      Q.   Was John Du's testimony in
6  regard to what the e-mail said
7  significant to you in forming your
8  opinion about the e-mail?
9          MS. DAVIDSON:  Objection.
10         THE WITNESS:  Would it be
11         possible for you to tell me what
12         you mean by "significance"?
13  BY MR. SLATER:
14     Q.   Something that you would say
15  that's part of the reason why I formed my
16  opinion is because based on what John Du
17  said; I'm relying on what John Du said as
18  part of the basis for my opinion.
19     A.   So based on that, I'll give
20  the answer that I've already given.
21         I looked at a lot of
22  depositions and materials regarding the
23  e-mail before I concluded my statement
24  which is in my report.

1      Q.   I understand you looked at a
2  lot of materials.
3          I'm asking if your reading
4  of John Du's testimony, as to what the
5  e-mail said, was significant to you in
6  forming your opinion?
7          MS. DAVIDSON:  Objection.
8          THE WITNESS:  I read a lot
9          of materials, including John Du's,
10         to then come to a conclusion.
11  BY MR. SLATER:
12     Q.   Did you read the translation
13  of the e-mail that was provided by ZHP to
14  us in the litigation?
15     A.   I read the translation that
16  was submitted as evidence of the
17  plaintiff experts.
18     Q.   You don't know what the
19  e-mail said yourself, you have to rely on
20  other people to tell you what it said,
21  right?
22         MS. DAVIDSON:  Objection.
23  BY MR. SLATER:
24     Q.   You can't read the e-mail in

1  Chinese -- new question.
2          Since you can't read the
3  e-mail, as it was written in Chinese, you
4  have to rely on the accuracy of
5  translations by other people and the
6  testimony of other people as to what it
7  said, correct?
8          MS. DAVIDSON:  Objection.
9          THE WITNESS:  So I don't
10         speak Chinese.  I read it in
11         English.  I read the testimony --
12         the deposition, not testimony, the
13         deposition of Jucai Ge, which is
14         quite detailed, and she provides
15         far more information than anybody
16         else about the e-mail.
17         I also looked at what
18         Dr. Xue says in his testimony,
19         which I have then referenced in my
20         statement.
21  BY MR. SLATER:
22     Q.   Since you can't read the
23  e-mail yourself, as it was written in
24  Chinese, you have to rely on other people

Ari Afnan

1  to tell you what it said, correct?
2        MS. DAVIDSON:  Objection.
3        THE WITNESS:  So there is a
4     translation.  I read the
5     translation and I looked at that
6     translation in English.
7        There is nobody pointing me
8     and saying, you know what, as you
9     read this, it means this, that or
10     the other.  And that's why I was
11     most interested in Jucai Ge's
12     deposition, because that's quite
13     detailed.
14  BY MR. SLATER:
15     Q.   Doctor, I'm honestly not
16  sure why it is that this question is
17  creating so much difficulty.  It's
18  literally a foundational question to move
19  forward.
20        You have to rely on the
21  translation of the e-mail and the
22  testimony of other people to understand
23  what the e-mail said, it's not something
24  you can read firsthand as written,

1  because you don't read Chinese, correct?
2        MS. DAVIDSON:  Objection.
3        THE WITNESS:  I do not read
4     Chinese.  And, again, as Jucai Ge
5     says, the e-mail is confusing, it
6     badly written, and she is reading
7     it in Chinese.
8        So, no, I'm not reading
9     Chinese.  I'm reading the
10     translation that was provided in
11     the plaintiff experts -- by the
12     plaintiff experts.
13  BY MR. SLATER:
14     Q.   Your only basis to say the
15  e-mail is confusing and badly written is
16  Jucai Ge saying that in testimony, right?
17  You have to rely on her for that, right?
18     A.   She says that, Dr. Xue says
19  that.  Jucai Ge talked to Dr. Lin, who
20  was the author, and the author says, no,
21  that's not what I said.
22     Q.   If I understand correctly,
23  your understanding of what the e-mail
24  says really comes from Jucai Ge's

1  deposition and Dr. Xue's report; that's
2  the basis for your understanding of what
3  it says, correct?
4     A.   And the text of the
5  translated text, as well as the
6  attachment that it refers to.
7     Q.   I want to understand if you
8  have a certain understanding of the
9  e-mail, okay?
10        So I'm just asking, do you
11  understand it to say a certain thing?
12  That's all my question is.  I'm not
13  asking for a speech.  I'm not asking
14  about anybody else on earth.
15        I know that you're smiling
16  and you're laughing, but I'm not asking
17  about anything else.  So please don't
18  tell me about anything else so we can
19  actually use my time efficiently, because
20  I want to finish your deposition today.
21        So please show me that
22  respect that you'll just answer my
23  question.
24        MS. DAVIDSON:  I'm going to

1     object to that colloquy.  I'm
2     objecting to that colloquy.
3     You're badgering.
4        MR. SLATER:  You can object.
5     I'm going to continue.
6        MS. DAVIDSON:  You're
7     interrupting me.  Please do not
8     badger the witness.  Please do not
9     speak to the witness that way.
10     You're asking the witness to show
11     you respect, so show respect to
12     the witness.
13        Thank you.
14        MR. SLATER:  Thank you very
15     much for those instructions.  I
16     appreciate it.
17  BY MR. SLATER:
18     Q.   Does your -- rephrase.
19        Do you understand the e-mail
20  to say, in part, that there is NDMA in
21  valsartan; yes or no?
22     A.   The e-mail, based on the
23  translation that I have seen, as well as
24  the patent which was accompanied with it,

Ali Afnan

Page 218

¹ alone without anything else, does not
² tell me there is NDMA in valsartan.
³        I have supporting evidence
⁴ from Jucai Ge and Dr. Xue, and others,
⁵ that effectively says that's not the
⁶ statement that the e-mail is making.
⁷        Q.    Who are the others?
⁸        A.    There are others who have
⁹ been deposed.
¹⁰        Q.    Who else said that it
¹¹ doesn't say that there's NDMA in
¹² valsartan?
¹³        A.    The two -- the two others
¹⁴ that I cannot recall right now that you
¹⁵ mentioned.
¹⁶        Q.    You think that Min Lee and
¹⁷ John Du said that the e-mail does not
¹⁸ indicate that there's NDMA in valsartan?
¹⁹ You think that's their testimony under
²⁰ oath?
²¹        MS. DAVIDSON:  Objection.
²²        THE WITNESS:  Yes.
²³ BY MR. SLATER:
²⁴        Q.    Is it your understanding

Page 219

¹ that the e-mail indicates that the NDMA
² in the valsartan was caused by the
³ quenching with sodium nitrite?
⁴        MS. DAVIDSON:  Objection.
⁵        THE WITNESS:  The e-mail is
⁶ talking about Impurity K, it's not
⁷ talking about NDMA. It's taking
⁸ about irbesartan process.  And
⁹ it's talking about, specifically,
¹⁰ formation of a nitroso compound
¹¹ which looks like a nitroso
¹² valsartan.  There is a chemical
¹³ formula given in that e-mail which
¹⁴ is different from that of
¹⁵ valsartan.
¹⁶ BY MR. SLATER:
¹⁷        Q.    Are you aware of the
¹⁸ language where it says that the NDMA is
¹⁹ produced by the quenching of the
²⁰ valsartan with sodium nitrite?  Are you
²¹ aware that the e-mail says that, or do
²² you dispute that the e-mail says that?
²³        MS. DAVIDSON:  Objection.
²⁴        Are you referring to a specific

Page 220

¹ translation of the e-mail?  Are
² you referring to the e-mail?
³        MR. SLATER:  I'm referring
⁴ to the e-mail.
⁵        MS. DAVIDSON:  The e-mail in
⁶ Chinese?
⁷        MR. SLATER:  Counsel, I'm
⁸ not going to go back-and-forth
⁹ with you.  Just -- you objected to
¹⁰ the form of the question.  Please
¹¹ answer.
¹²        I'm done with these
¹³ discussions with you.  I have
¹⁴ three more hours on the record.
¹⁵ I'm not going to spend it talking
¹⁶ to you.
¹⁷ BY MR. SLATER:
¹⁸        Q.    Please answer the question,
¹⁹ Doctor.
²⁰        A.    Can I please get the e-mail
²¹ on the screen?
²²        Q.    Sure.  One second.
²³        A.    Thank you.
²⁴        Q.    I'm going to get you the

Page 221

¹ e-mail, Doctor.
²        A.    Thank you.
³        And if -- Mr. Slater, if I
⁴ smile, I am not disrespecting you.
⁵        Q.    I don't mind smiling.
⁶ Smiling is great.  It's a healthy thing
⁷ to do.  It's good for endorphins.
⁸        MR. SLATER:  I think we're
⁹ up to Exhibit-9 now, right?
¹⁰        - - -
¹¹        (Whereupon, Exhibit Afnan-9,
¹² ZHP00190573-0574, Notice on the
¹³ Results of the Report of the
¹⁴ Preliminary Investigation on the
¹⁵ Formation of Unknown Impurities
¹⁶ Resulting from the Sodium Azide
¹⁷ Quenching in Crude Irbesartan, was
¹⁸ marked for identification.)
¹⁹        - - -
²⁰ BY MR. SLATER:
²¹        Q.    So on the screen is
²² Exhibit-9.
²³        A.    Yes.
²⁴        Q.    That's the e-mail

Ari Afrian] 

Page 222

1 translation that you saw?
2      A.   That is the e-mail
3 translation that I saw.
4      Q.   Let's go to the second page,
5 please.
6           Do you see at the very top
7 of the second page of the e-mail there's
8 some language up above some chemistry
9 formulas?  Do you see that?
10      A.   Yes.
11      Q.   And they're talking in the
12 first sentence about something that they
13 saw in irbesartan that they're working on
14 a manufacturing process for, they're
15 experimenting with a manufacturing
16 process, and they're talking about
17 irbesartan, right?
18      A.   Yes.
19      Q.   And it says, Through the
20 secondary mass spectrometry analysis, it
21 can be inferred that the extra NO
22 substituent is in the cyclic compound
23 fragment and it is very likely that it is
24 an N-NO compound.

Page 223

1           I'm going to stop there.
2           They're talking about what
3 they're seeing in the irbesartan, right?
4           MS. DAVIDSON:  Objection.
5           THE WITNESS:  Can I go to
6 Page 1 of this e-mail, please?
7 BY MR. SLATER:
8      Q.   Sure.  Do you need us to do
9 that for you?
10           MR. SLATER:  Go ahead.
11 We'll put on Page 1, let's go.
12           THE WITNESS:  I have it
13 open.
14           According to the results of
15 our telephone conversation with
16 the technology department of
17 Chuannan Plant 1 today, due to the
18 incomplete quenching of sodium
19 azide caused by the separate
20 treatment of irbesartan sodium
21 azide wastewater, there is a
22 frequent occurrence of muffled
23 explosion in the production
24 process.  So the technology

Page 224

1 department carried out the
2 technical improvement by which the
3 sodium azide quenching takes place
4 in the unstratified step in the
5 crude irbesartan process.
6           However, after the
7 improvement, there is an unknown
8 impurity of about .544 percent at
9 26 minutes in the crude
10 irbesartan, and it is the largest
11 impurity in the irbesartan crude
12 product.  We investigated, at 26
13 minutes, unknown impurity that
14 occurred in the crude irbesartan
15 after the improvement -- thank
16 you -- of the sodium azide
17 quenching process sent by the
18 technology department.
19           Based on the results of
20 these two days, currently it can
21 be confirmed that the impurity is
22 a nitroso derivative of irbesartan
23 and its precise molecular weight
24 of 458.2306, and the signal peak

Page 225

1 of M plus K plus 496.1865 can also
2 be observed.  The matching
3 molecular formula is C25H27N702.
4 Compared with the molecular
5 formula of irbesartan, it has an
6 extra NO but missing one hydrogen
7 atom.  The estimated possible
8 structural formula is shown as
9 follows.
10           Okay.  Now, he attached to
11 this e-mail, in Chinese, the
12 patent.  And the patent talks
13 about Impurity K, Impurity K being
14 present in that process, not in --
15 not a nitrosamine in valsartan.
16           So I've gone through this
17 e-mail several times.  And, again,
18 this is where Jucai Ge's testimony
19 or -- deposition, not testimony,
20 becomes very helpful.
21 BY MR. SLATER:
22      Q.   Great.  All I asked you is
23 if that first part of the sentence at the
24 top was referring to irbesartan up to the

Ari Afnan

Page 226

1 semi-colon.
2        Do you agree that's talking
3 about what they saw in the irbesartan?
4        MS. DAVIDSON:  Objection.
5        THE WITNESS:  So I would
6    have to guess.  I -- my assumption
7    is that the whole e-mail is about
8    irbesartan, from beginning to the
9    end.
10 BY MR. SLATER:
11    Q.   The first sentence at the
12 top of Page 2 says, Through the secondary
13 mass spectometry analysis, it can be
14 inferred that the extra NO substituent is
15 in the cyclic compound fragment and it is
16 very likely it is an N-NO compound.
17        Do you see what I just read?
18    A.   Yes.
19    Q.   And you just confirmed your
20 understanding is that has to do with what
21 they were seeing in irbesartan, right?
22        MS. DAVIDSON:  Objection.
23        THE WITNESS:  I did not.
24 BY MR. SLATER:

Page 227

1    Q.   You literally just said the
2 entire e-mail is about irbesartan.
3        Wouldn't that sentence be
4 included?
5    A.   Well, that is -- again, we
6 go back to, you know what, it's the
7 translation of the e-mail, so on and so
8 forth.
9        Potentially, yes, it's
10 referring to irbesartan.  Okay.
11    Q.   Now, after the semi-colon
12 Dr. Lin says, It is similar to the
13 N-nitroso dimethylamine that occurs in
14 valsartan when quenched with sodium
15 nitrite.
16        Do you see what I just read?
17    A.   Yes.
18    Q.   Forgetting about the e-mail
19 for a second, as a matter of fact in the
20 world, as of July 2017, there was NDMA in
21 valsartan and it was occurring when the
22 valsartan was quenched with sodium
23 nitrate.  That's when the NDMA was
24 forming.

Page 228

1        You know that for a fact,
2 correct?
3        MS. DAVIDSON:  Objection.
4        THE WITNESS:  I do not.
5    Again, going back to Jucai Ge, Dr.
6    Lin was situated -- was physically
7    placed at a different site,
8    different location.  He was
9    looking -- he was a development
10    department -- you know, technology
11    department.  He was looking at a
12    manufacturing process for
13    irbesartan.
14        And, actually, specifically
15    looking at the effluent coming
16    from the process and looking at
17    what could be formed and what
18    could not be formed.
19        So as he's doing this and he
20    goes on to say that, you know, you
21    find the patent, which he had
22    researched and, effectively, this
23    is a hypothetical e-mail, because
24    he's responding to the patent.

Page 229

1        And the patent talks about
2    Impurity K, which is a nitroso
3    valsartan compound.
4 BY MR. SLATER:
5    Q.   I'm not asking about the
6 e-mail right now, this question, okay.
7        Was there NDMA in the
8 valsartan manufactured with the zinc
9 chloride process?
10    A.   That was discovered in June
11 2018.
12    Q.   So the answer is yes, right?
13    A.   In June 2018, ZHP identified
14 NDMA in valsartan.
15    Q.   The NDMA was present at the
16 point when the sodium azide was quenched
17 with sodium nitrite; that's when the NDMA
18 formed, correct?
19    A.   According to FDA analysis,
20 NDMA was present in the -- NDMA was
21 present in their second process where
22 sodium nitrite was formed.  It was -- and
23 then into the zinc chloride process.
24 That was discovered in June 2018.

Ari Athan

Page 230

1   Q.   I'm sorry, Doctor, I have to
2  ask again, because I have no idea what
3  you just said.  I just didn't understand
4  it.
5          Doctor, the NDMA formed in
6  the zinc chloride process was formed when
7  the sodium azide was quenched with sodium
8  nitrite; that's when the formation
9  occurred, correct?
10         MS. DAVIDSON:  Objection.
11         THE WITNESS:  So as of yet,
12     there is no statement by FDA which
13     says it formed then.  The
14     investigation -- deviation
15     investigation, which we were
16     discussing earlier, specifically
17     is looking at multiple pathways of
18     formation of NDMA.
19 BY MR. SLATER:
20    Q.   Do you have an opinion as to
21 when the NDMA formed during the zinc
22 chloride process?  Was it during the
23 quenching with sodium nitrite or during
24 another part of the process, or do you

Page 231

1  have no opinion?
2          MS. DAVIDSON:  Objection.
3          THE WITNESS:  That I would
4      have to defer to a synthetic
5      organic chemist.  I would suggest
6      Dr. Xue.
7  BY MR. SLATER:
8      Q.   I would like you to assume
9  that this e-mail says that what they were
10 seeing in the irbesartan was similar to
11 the NDMA that occurs in valsartan when
12 quenched with sodium nitrite.  I'd like
13 you to assume that that's what the e-mail
14 says, okay?
15         Do you understand that I'm
16 asking you to assume that?
17     A.   So you want me to go into
18 hypothetical, okay.
19     Q.   I do.  You may not know
20 this, but we're allowed to ask
21 hypothetical questions of expert
22 witnesses.
23     A.   I appreciate that.
24     Q.   And I'd also like you to

Page 232

1  assume that there was NDMA in valsartan
2  manufactured with the zinc chloride
3  process and it occurred and formed when
4  the sodium azide was quenched with sodium
5  nitrite.  I'd also like you to assume
6  that, okay?
7      A.   Okay.
8      Q.   Would that change your
9  opinion as to when ZHP was aware there
10 was NDMA in its valsartan and how it
11 formed in July of 2017?
12         MS. DAVIDSON:  Objection.
13         THE WITNESS:  You have two
14     assumptions and then you would
15     like me to assume a third, based
16     on your two assumptions.
17         So, again, I would like to
18     go back to what FDA says, what my
19     testimony said, my report states
20     is that neither the FDA nor
21     industry knew how NDMA was formed,
22     neither FDA nor industry had
23     methods to test for them.
24         And so, therefore, if they

Page 233

1  didn't know how to test for it and
2  if they didn't know it was there,
3  then the question is that -- the
4  engagement between you and I is
5  purely theoretical, and not even
6  theoretical, it's hypothetical.
7          So, you know, at the time of
8  2017, ZHP did not know that NDMA
9  was present in its valsartan.
10 BY MR. SLATER:
11     Q.   Can you answer my question,
12 please?
13         MS. DAVIDSON:  Objection.
14         THE WITNESS:  Please ask it
15     again.
16         Hypothetical 1 was what,
17     that there is --
18 BY MR. SLATER:
19     Q.   I'll ask the question
20 differently for you.
21     A.   Thank you.
22     Q.   I already have your one
23 answer, so we have that for the record in
24 the transcript as your sworn testimony.

Ari Arman

Page 234

1    Now I'll ask a different
2  question in a different way.
3         If the e-mail says that
4  there was NDMA in valsartan and it occurs
5  when it's quenched with sodium nitrite,
6  that would be an accurate statement,
7  correct?
8         MS. DAVIDSON:  Objection.
9         THE WITNESS:  If the e-mail
10       said NDMA was present, yes, but
11       the e-mail does not say that.
12 BY MR. SLATER:
13    Q.    And if that was a correct
14 statement -- well, rephrase.
15       And if the e-mail says that
16 there was NDMA in valsartan and it
17 occurred when the valsartan was quenched
18 with sodium nitrite, not only would that
19 be a true statement, but it would also
20 prove that at least some people in ZHP
21 were aware of the presence of the NDMA
22 and how it was forming, right?
23       MS. DAVIDSON:  Objection.
24       THE WITNESS:  ZHP did not

Page 235

1  know -- again, you know, ZHP did
2  not know.
3       Dr. Lin says that's not what
4  he said in the e-mail.  Jucai Ge
5  says that's not what it says in
6  the e-mail.  So, you know, it's
7  purely hypothetical to go down
8  this path that if this happened
9  and that happened, then this other
10 thing would have happened.
11       As your statements, your
12 conclusion, based on your
13 theoretical statements, are
14 connected.  But that's not the
15 case here.  I really need to make
16 sure my testimony is accurate, as
17 accurate as it can be.
18 BY MR. SLATER:
19    Q.    If ZHP knew that there was
20 NDMA in valsartan and knew that it was
21 forming during the quenching of the
22 valsartan during the manufacturing
23 process with sodium nitrite, if they knew
24 that, good manufacturing practices

Page 236

1  required them to immediately notify their
2  customers and the FDA and cease
3  manufacture with that process until they
4  got further guidance, correct?
5         MS. DAVIDSON:  Objection.
6         THE WITNESS:  ZHP did
7         exactly that in June 2018.
8  BY MR. SLATER:
9     Q.    And if they knew that in
10 July of 2017, they would have been
11 required to do it in July of 2017 and not
12 wait until June of 2018, right?
13    A.    Whenever they would have
14 become aware of it, they would have had
15 to act.  But that was not the case, they
16 did not know in June 2017.
17    Q.    Well, you actually don't
18 know when they knew; you're just deciding
19 which witnesses to believe and which
20 translations of the document to believe,
21 but you don't know at all what happened,
22 right?
23        MS. DAVIDSON:  Objection.
24        THE WITNESS:  Respectfully,

Page 237

1  incorrect.  I -- you know, seven
2  years at FDA told me to look for
3  evidence, look for evidence, look
4  for evidence.
5       The evidence is there when
6  they received an e-mail, or a
7  communication, from Novartis
8  saying, what is that peak which is
9  there, send us data.  They did
10 send data.  They sent GC FID data.
11 They also sent GCMS data which was
12 not alluding, you know, the
13 unknown peak.
14 BY MR. SLATER:
15    Q.    Did you -- I'm sorry, I
16 didn't realize you were still talking.
17 Go ahead.
18    A.    So Novartis actually told
19 them that the chances are that using your
20 method, it will dilute at a different
21 time than ours.  FDA didn't know either.
22       So FDA, who had reviewed the
23 ANDAs related to this API, would have
24 known, would have actually assessed

Ali Arhan

1 whether NDMA would have been formed or
2 not.
3        So ZHP didn't know until
4 June 2018.
5    Q.   You just mentioned the FDA
6 review of the ANDAs.
7        You just referred to that,
8 right?
9    A.   Yes.
10    Q.   When the FDA did whatever
11 review it did of the ANDAs that were
12 filed, is it your testimony that the FDA
13 would, at that point, have done a
14 cGMP-compliant risk assessment of the
15 entire manufacturing process?
16        MS. DAVIDSON:  Objection.
17        THE WITNESS:  So there are
18        parallel activities for an
19        approval process going on.  One
20        activity is what's going on at the
21        API facility.  And that API
22        facility was also inspected in, I
23        think, 2011 and then in 2016 by
24        EDQM, who accepted the facility

1        and gave them a GMP certificate.
2        FDA had the DMF, which --
3        which the process, there's a
4        chlorine process had been filed
5        through as an amendment.  That was
6        also there.
7        The ANDA process would have
8        looked at, effectively, the tests
9        for the API.  It would have looked
10        for the process of making the drug
11        substance, and -- the process, as
12        well as the release criteria for
13        the raw substance.  And they would
14        have looked at whether the
15        chemistry recorded in the sections
16        of the Model 3 would be accurate,
17        correct or not.
18        And that would have then
19        been verified through either a GMP
20        inspection or a PAI inspection.
21 BY MR. SLATER:
22    Q.   Could you answer my
23 question, please?
24        MS. DAVIDSON:  Objection.

1 BY MR. SLATER:
2    Q.   Or I can ask it again.
3        Do you want me to ask you
4 again, Doctor?
5        Because I don't really
6 understand what you just said.  So I'm
7 going to try to ask a question that's
8 specific and hope that I can get a
9 specific answer.  That's my hope.
10        When the FDA reviewed the
11 ANDAs that were submitted with regard --
12 which then incorporated, by reference,
13 the DMFs for the TEA with sodium nitrite
14 quenching and the zinc chloride
15 processes, did the FDA perform a
16 cGMP-compliant risk assessment of each of
17 those manufacturing processes?
18    A.   I did respond.
19    Q.   It's a yes-or-no question.
20        Can you just tell me if the
21 review by the FDA is to the level of a
22 cGMP-compliant risk assessment?
23    A.   With all due respect, sir,
24 your question is wrong.

1        They review an ANDA
2 application.  It's not a GMP activity.
3 It's managed through other sections of
4 the CFR.  So FDA would have looked at the
5 sections of the common technical dossier
6 that would have been provided.  They
7 would have also looked at the GMP status
8 of the facility for approval of the ANDA.
9    Q.   Looking at the e-mail of
10 July 27, 2017, the second paragraph after
11 the chemistry diagrams says, If it is
12 confirmed as the above-speculated
13 structure, then its toxicity will be very
14 strong and there will be an extremely
15 high GMP risk.  This is a common problem
16 in the production and synthesis of sartan
17 APIs.  It is recommended to improve other
18 quenching processes (such as NACIO) along
19 with the optimization of the valsartan
20 sodium azide quenching process.
21        Do you see that?
22    A.   I see that.
23    Q.   So, first of all, where he
24 says, This is a common problem with the

Ari Aman

Page 242

¹ production and synthesis of sartan APIs,
² you understand that ZHP manufactured
³ other sartans, including irbesartan?
⁴     A.   Yes.
⁵     Q.   If ZHP was aware that the
⁶ quenching with sodium nitrite causing
⁷ nitrosamines was a common problem in the
⁸ production and synthesis of sartan APIs,
⁹ they would have been duty bound to notify
¹⁰ the FDA and their customers with regard
¹¹ to all of their sartans, correct?
¹²         If that's what they knew,
¹³ they would have been required to notify
¹⁴ the FDA and their customers, right?
¹⁵     A.   As the e-mail says, it says
¹⁶ if it is confirmed.  And by the way,
¹⁷ that's NACLO, sodium hydrochloride.
¹⁸         So it says, If it is
¹⁹ confirmed as the above speculated
²⁰ structure, then its toxicity will be
²¹ strong.  Okay.
²²     Q.   He then says, It is
²³ recommended to improve other quenching
²⁴ processes along with the optimization of

Page 243

¹ the valsartan sodium azide quenching
² process.
³         If that's correct, that he
⁴ was recommending, based on everything he
⁵ talked about, optimizing the valsartan
⁶ sodium azide quenching process, based on
⁷ having stated above that the NDMA was
⁸ formed during the sodium nitrite
⁹ quenching of the sodium azide, that would
¹⁰ be something that ZHP would have been
¹¹ required to notify the FDA and their
¹² customers of immediately, right?
¹³     A.   If that was the case, they
¹⁴ would have had to inform FDA and
¹⁵ customers immediately.  That was not the
¹⁶ case.
¹⁷         If I may be allowed to read
¹⁸ the next line of the next paragraph.  I
¹⁹ have also attached a patent of a 2013
²⁰ sodium azide sodium hyperchloride
²¹ quenching method by Zhejiang Second
²² Pharma Company Limited.  They proposed
²³ that the use of sodium azide quenching
²⁴ will result in the formation of N-NO

Page 244

¹ impurities.
²         Which, actually, as per the
³ attached, is a -- is a nitroso valsartan.
⁴ You know, the nitroso compounds are many
⁵ and plenty.  And, therefore, that
⁶ compound that he's referring to, if you
⁷ look at the patent, is actually Impurity
⁸ K.
⁹     Q.   Do you see where this says,
¹⁰ At the same time they -- meaning this
¹¹ other company, Zhejiang Second Pharma
¹² Company -- used ZHP's crude valsartan in
¹³ their LC-MS test and detected this
¹⁴ impurity.
¹⁵         And the impurity that was
¹⁶ referred to above in the valsartan was
¹⁷ NDMA, correct?
¹⁸     A.   Hold on.  I lost you.  Okay.
¹⁹ Allow me.
²⁰         So, okay.  What was your
²¹ question, please?
²²     Q.   This states that this other
²³ pharmaceutical company used ZHP's crude
²⁴ valsartan in their LC-MS test and

Page 245

¹ detected this impurity.
²         The impurity that was
³ identified up above in the valsartan was
⁴ listed as NDMA, correct?
⁵     A.   Can you point me to where it
⁶ says this is NDMA?
⁷     Q.   Sure.
⁸         MR. SLATER:  Scroll to the
⁹ top, please.
¹⁰         THE WITNESS:  Okay.  This is
¹¹ similar, similar, to
¹² N-nitrosamines.  This is similar.
¹³ BY MR. SLATER:
¹⁴     Q.   You don't have to read the
¹⁵ rest of the sentence, Doctor.  With all
¹⁶ due respect, it says that what they saw
¹⁷ in the irbesartan was similar to the NDMA
¹⁸ that occurs in valsartan when quenched
¹⁹ with sodium nitrite.
²⁰         That's what the document
²¹ says, right?
²²         MS. DAVIDSON:  Objection.
²³ That's what the translation says.
²⁴         THE WITNESS:  Which, again,

Ari Anan

1    if I follow what I said earlier,
2    if I look at both Professor Xue
3    and if I look at Jucai Ge, who
4    spoke to Dr. Lin in detail and
5    asked the questions, Dr. Lin says,
6    I never made that statement.  That
7    was not my intent.
8         So as we go through to the
9    second question, or the last
10   paragraph, yes, the statement
11   which says, At the same time they
12   used ZHP's crude valsartan.
13        So this e-mail was about
14   Impurity K.  This is about
15   Impurity K, which is a nitroso
16   valsartan.  It's a valsartan
17   molecule with an N-O attached to
18   it.
19   BY MR. SLATER:
20        Q.    Now you think the whole
21   e-mail is about Impurity K?  It's not
22   about irbesartan anymore?
23        MS. DAVIDSON:  Objection.
24   BY MR. SLATER:

1        Q.    I'm just asking.
2         Before you said the whole
3    e-mail was about irbesartan, now it's
4    about Impurity K?
5         MS. DAVIDSON:  Wait a
6    minute.  That's really
7    mischaracterizing his testimony
8    and --
9         MR. SLATER:  Without you
10   giving him what to say.  You
11   objected.  He can answer.
12        MS. DAVIDSON:  I'm not
13   telling --
14        MR. SLATER:  He doesn't need
15   to take signal from you.  The last
16   one he followed your objection and
17   followed it and said exactly what
18   you said.  Let's try not to do
19   that, please.
20        MS. DAVIDSON:  That is
21   literally the pot calling --
22        MR. SLATER:  I don't want to
23   argue with you.  I really don't.
24        MS. DAVIDSON:  I understand,

1    Adam.  But you're arguing with the
2    witness.  And my job today is to
3    make sure that this deposition
4    proceeds in an appropriate manner.
5         The way you're talking to
6    the witness is rude.  So I'm just
7    asking you not to.
8         MR. SLATER:  I don't think
9    I'm being rude at all.  There's an
10   audiotape of this transcript -- of
11   this deposition, the video has an
12   audio.  So anybody that needs to
13   look at it, I stand behind
14   everything I've done today.
15        I have one of the most
16   nonresponsive witnesses I've ever
17   deposed in my life.  I feel like
18   the deposition has been obstructed
19   to a great extent, and I'm doing
20   the best I can.
21        I'm not raising my voice.
22   And I'm not yelling.  And I think
23   that my request to not lead the
24   witness with speaking objections

1    is reasonable.
2         MS. DAVIDSON:  I did not
3    lead the witness in any way, and
4    you know that.  I was asking you
5    to please be polite, not badger
6    him, and just simply ask questions
7    and answers, which would make the
8    deposition go more quickly.
9         You're concerned about
10   eating up time, but you're eating
11   up time berating the witness.
12   BY MR. SLATER:
13        Q.    Show me where it says
14   Impurity K in the e-mail.  I just -- I
15   might have missed it.
16        A.    Impurity K is in the patent,
17   which was attached to the e-mail.
18        MR. SLATER:  We can take
19   that down.
20        I just need to know if you
21   guys are going to say you need a
22   break again, because I'm going to
23   go into something else.
24        If you need a break, you can

Afnan

Page 250

1 do it now. Otherwise I'd like to
2 start and not stop in three
3 minutes.
4        MS. DAVIDSON: I've been
5 trying to take a break about every
6 hour, and I believe we came back
7 at 2:05. So I was not going to
8 ask for another break for 15
9 minutes.
10        Unless Dr. Afnan needs one
11 now. He's the one who should be
12 the guide of it.
13        THE WITNESS: Let's go for
14 another ten minutes, please.
15        MR. SLATER: I'm just
16 putting up the next exhibit.
17              - - -
18        (Whereupon, Exhibit
19 Afnan-10, No Bates, FDA Statement
20 on the FDA's Ongoing Investigation
21 Into Valsartan and ARB Class
22 Impurities and the Agency's Steps
23 to Address the Root Causes of the
24 Safety Issues, was marked for

Page 251

1 identification.)
2              - - -
3 BY MR. SLATER:
4        Q.   On the screen is what we
5 have marked as Exhibit -- I think
6 we're -- on the screen is Exhibit-10,
7 which is an FDA statement dated January
8 25, 2019.
9        Do you see that?
10        A.   Yes.
11        Q.   Is this something you relied
12 on in forming your opinions in this case?
13        A.   It is quoted in my -- in my
14 testimony, so yes.
15        MR. SLATER: Let's go to the
16 second page, third paragraph.
17 Blow it up a little bit.
18        I'm just going to go -- the
19 paragraph that starts, Since then.
20 There we go.
21 BY MR. SLATER:
22        Q.   I'm looking at the -- let me
23 restart.
24        Looking now at the second

Page 252

1 page of this e-mail -- rephrase.
2        Looking now at the second
3 page of this statement, there's a
4 paragraph that starts, Since then, the
5 FDA and additional manufacturers of other
6 ARB medicines have identified more cases
7 of NDMA impurities as well as NDEA
8 impurities.
9        Do you see that?
10        A.   Yes.
11        Q.   Looking now at the paragraph
12 that starts with, Since then, the second
13 sentence says, We've placed a ZHP
14 facility on import alert to stop all of
15 its API and finished drugs made using
16 ZHP's API from legally entering the
17 United States. We also issued them a
18 warning letter outlining several
19 manufacturing violations, including
20 impurity control, change control and
21 cross-contamination from one
22 manufacturing process line to another.
23        Do you see what I just read?
24        A.   Yes.

Page 253

1        Q.   So in this FDA statement
2 that you relied on, the FDA makes clear
3 that they issued a warning letter to ZHP,
4 correct?
5        A.   Correct.
6        Q.   They made clear that the
7 warning letter outlined several
8 manufacturing violations, correct?
9        MS. DAVIDSON: Objection.
10 BY MR. SLATER:
11        Q.   Correct?
12        A.   That's what the warning
13 letter says.
14        Q.   And those violations are
15 cGMP violations identified in the warning
16 letter, correct?
17        A.   Okay. Yes.
18        Q.   They then list, in general
19 fashion, the nature of those cGMP
20 manufacturing violations as including
21 impurity control, change control and
22 cross-contamination from one
23 manufacturing process line to another.
24        That's what it says, right?

Ari Affan

Page 254

1    A.   Yes.
2    Q.   So in this statement that
3  you relied on, the FDA made clear, in
4  January of 2019, that they issued an
5  import alert against ZHP and issued them
6  a warning letter identifying several
7  manufacturing violations of cGMP.
8          That's in the letter, right?
9  That's in the statement, right?
10         MS. DAVIDSON:  Objection.
11  BY MR. SLATER:
12    Q.   Correct?
13    A.   That's what the letter says.
14    Q.   If you go to the last
15  sentence of this paragraph, it says,
16  Nonetheless, our inspections did reveal
17  systemic problems of supervision that
18  could have created the conditions for
19  quality issues to arise.
20         That's what the letter
21  says -- that's what the statement says,
22  again, with regard to their inspections
23  of ZHP, correct?
24    A.   That's what it says in the

Page 255

1  letter, yes.
2         MR. SLATER:  We can take
3      that one down.
4  BY MR. SLATER:
5    Q.   With regard to the import of
6  the warning letter, the warning letter is
7  a serious document, correct?
8         MS. DAVIDSON:  Objection.
9         THE WITNESS:  The warning
10      letter is informal and advisory.
11      That's what the FDA says.  FDA
12      doesn't consider warning letters
13      as final agency action.  That's
14      what the FDA says.
15  BY MR. SLATER:
16    Q.   The warning letters are
17  issued only for violations of regulatory
18  significance; that's the position of the
19  FDA, right?
20    A.   There is a sequence to the
21  issuance of warning letters.  The
22  sequence is that there is an inspection,
23  there is a response from the firm, then a
24  warning letter is issued if there is

Page 256

1  grounds to do this.
2         Now, in this particular
3  case, FDA is doing several things.
4         Number one, FDA is
5  effectively holding ZHP on the hook to
6  complete its investigation.  Their
7  warning letter is issued in November of
8  2018.  The inspection was from 27th of
9  July to 3rd of August.  They -- ZHP
10  informed FDA, in June, of presence of
11  NDMA and at the same time informed FDA
12  that it had stopped manufacture of
13  valsartan, it had stopped shipping
14  valsartan and it had informed its clients
15  to stop using the API.  They have done it
16  twice.
17         So, effectively, the warning
18  letter is coming pretty late in the day.
19  And that's because FDA is still waiting
20  for the investigation to complete and for
21  ZHP to give the information to them.
22         When -- the evidence of this
23  is, when ZHP responded, ZHP gave an
24  immediate response and then gave a

Page 257

1  detailed response, FDA came back with
2  some additional questions and very
3  friendly tone asking for, can you speed
4  up some of the questions?
5         So the warning letter is not
6  a, you know, this is the end of the day.
7  The warning letter is to engage in a
8  dialogue with the agency to get to the
9  root cause of the issue.  That's why
10  warning letters are issued.
11         And, again, the warning
12  letter, according to the regulatory
13  operations manual, is not -- is informal
14  and advisory, and it's not considered
15  warning letters -- you know, they aren't
16  considered to be final agency action.
17    Q.   The FDA never, ever came out
18  and said that the violations identified
19  in the warning letter did not exist and
20  did not occur?  The FDA never said that,
21  right?
22    A.   Well, FDA closed the warning
23  letter sometime later, which means it
24  accepted it.

Ari Aman

1    ZHP had already challenged
2 some of the observations, and ZHP
3 continued to engage the FDA in its
4 response to the warning letter, addressed
5 those issues.
6    Q.   What the FDA did is, they
7 said, now that we've identified these
8 serious systemic problems and we've given
9 you the warning letter, fix them; here is
10 the violations and now you have to fix it
11 and we're reserving the right to take
12 final enforcement action if we want to.
13    And then three years later,
14 or two years later, they finally said to
15 ZHP, okay, on a going-forward basis, you
16 finally fixed these problems, we're going
17 to finally remove you from the import
18 alert.
19    That's what actually
20 occurred, right?
21    A.   No.
22    MS. DAVIDSON:  Objection.
23    THE WITNESS:  So the import
24 alert is actually -- you know, the

1 import alert has a very specific
2 purpose.  And I'm looking for a
3 text out of my report which I will
4 come to.
5    The import alert is there to
6 prevent potentially violative
7 product getting into the market.
8 And it's also, according to FDA,
9 is to free up its resources so
10 that it can examine other
11 shipments.
12    Now, it also -- FDA also
13 wants a uniform coverage across
14 the United States, across the
15 country, and also to put the
16 responsibility back on the firm.
17    So the issue with this is
18 that the import alert, which was
19 initiated, I think, in September,
20 the import alert was put in place
21 on the same day FDA asked for a
22 list of clients of ZHP.
23    APIs, when they are sold,
24 there is no expiry date for API.

1    So when you sell a batch of APIs,
2 the API can be used continuously
3 until they run out.
4    What FDA wanted to do, very
5 specifically, was to make sure
6 that the drug product
7 manufacturers, who ZHP had no
8 control over, would not ship those
9 products to the U.S.
10    The fastest, the easiest and
11 the most convenient solution is an
12 import alert.
13 BY MR. SLATER:
14    Q.   When I read your report, I
15 thought you said something to the effect
16 of once the import alert was lifted, if
17 ZHP wanted to, it could start re -- it
18 could start selling its valsartan again,
19 the valsartan manufactured with the zinc
20 chloride process.
21    Did you mean to say that in
22 your report, or did I misread your
23 report?
24    MS. DAVIDSON:  Objection.

1    THE WITNESS:  So the DMF has
2 not been changed.  The DMF is
3 there and it's acting.  If --
4 BY MR. SLATER:
5    Q.   So in your opinion, they
6 can --
7    MS. DAVIDSON:  Whoa.  He was
8 in the middle of talking, Adam.
9    THE WITNESS:  So if I go
10 back and look at also on the
11 subject of, okay, so what happened
12 and what did they do, Point 98 in
13 my statement says, In the EIR --
14 this is the 2018 EIR which
15 resulted in a response and warning
16 letter and an import alert -- they
17 investigated, documented that he
18 reviewed the stability protocol
19 for valsartan implemented in 2012
20 and everything was good.
21    And he says, And noted that
22 all data reported within
23 specification, and results were
24 similar across the U.S. and

Ari Afnan

Page 262

non-U.S. market.

99. The EIR, the 2018 EIR, noted that ZHP has an established quality unit, consists of quality assurance department and quality control lab. It further noted that the firm has established written procedures for the quality unit covering supplier qualification, training, batch release validation, calibration, investigation, including deviation and product recalls, stability studies and complaints.

So they investigated, as documented, that the quality unit is functioning well.

100. The inspector observed employees' practices, reviewed documents and conducted personal -- personal interviews with various staff members to assess whether the firm's quality system is designed to achieve

Page 263

sufficient control over the facility and commercial manufacturing questions.

Through these activities, she observed the quality unit is involved in activities, including but not limited to, review of manufacturing documents and approval, product prior to release qualification and validation activities, deviations and change control activities.

A lot of what resulted in the warning letter, and a lot of what went on during the inspection, was ongoing investigation.

So looking at 98, 99 and 100, the quality unit of ZHP was on par. It was functioning according to the GMPs.

So the import alert and the warning letter have to be taken

Page 264

again in light of the events and in consideration of what was going on. ZHP informed FDA that it had NDMA in its valsartan. FDA came for an inspection, gave them a set of observations, and then an import alert, which effectively was to prevent material from all these drug product manufacturers coming into the U.S., as well as keeping them on hook.

Now, the DMF is still active. The DMF with zinc chloride is still active, because the quality system is functioning properly.

BY MR. SLATER:

Q. Is the import of you saying, after that answer at the end, that DMF, for the zinc chloride process, is still in effect, that if ZHP wants to, it can manufacture and sell valsartan manufactured with the zinc chloride process?

Page 265

MS. DAVIDSON: Objection.

BY MR. SLATER:

Q. Yes or no?

MS. DAVIDSON: Objection. Enough with the yes-or-no follow-ups to every question.

THE WITNESS: Sorry. I will not give you a yes-or-no answer. I'll tell you what is there.

ZHP stopped manufacturing using the process that was resulting in NDMA in June of 2018. They immediately stopped.

They started looking at their process. They put it right.

And as I said, the DMF is still active. Are they selling or not? I have no information about that. I know that the DMF is active.

BY MR. SLATER:

Q. Is ZHP permitted, if it wants to, today, to manufacture and sell in the United States valsartan

Ari Afnan

Page 266

1 manufactured with the zinc chloride
2 process; yes or no?
3          MS. DAVIDSON:  Objection.
4          THE WITNESS:  ZHP is allowed
5     to sell valsartan against the DMF
6     which is active.
7          MR. SLATER:  Thank you.  We
8     can take a break.  We can go off
9     the record.
10          THE WITNESS:  Thank you.
11          VIDEO TECHNICIAN:  We're off
12     the record at 3:10 p.m.
13               - - -
14          (Whereupon, a brief recess
15     was taken.)
16               - - -
17          VIDEO TECHNICIAN:  We're
18     back on the record at 3:36 p.m.
19 BY MR. SLATER:
20     Q.    I'm showing you what was
21 attached as Exhibit B to your initial
22 report of December 23, 2022, the list of
23 materials reviewed and considered.
24     A.    Yes.

Page 267

1     Q.    Did you read all those
2 documents?
3     A.    I -- if it's there, I read
4 it.
5     Q.    And it's your testimony if
6 it is there you read it cover to cover,
7 every one of the documents?
8     A.    So some cover to cover, some
9 several times, some I gleaned through.
10     Q.    Did you read all the
11 deposition transcripts listed there
12 completely?
13     A.    I read the deposition
14 transcripts starting when I started on
15 this project, yes.
16     Q.    You read every single one of
17 those deposition transcripts cover to
18 cover?
19          MS. DAVIDSON:  Objection.
20          THE WITNESS:  So I have read
21     those depositions, yes.
22 BY MR. SLATER:
23     Q.    One of the things I saw you
24 were provided was the expert report and

Page 268

1 deposition of David Chesney?
2     A.    Yes.
3     Q.    Did you read those
4 documents?
5     A.    Yes.
6     Q.    Do you know Mr. Chesney?
7     A.    I know of Mr. Chesney.  I
8 don't know him as an acquaintance or a
9 friend.
10     Q.    Did you take into account
11 the opinions that he offered during his
12 deposition?
13          MS. DAVIDSON:  Objection.
14          THE WITNESS:  Did I take
15     into account -- I read his
16     deposition.
17 BY MR. SLATER:
18     Q.    Were any of the things that
19 David Chesney said in his deposition of
20 any significance to you in forming your
21 opinions in this case?
22     A.    So were they of
23 significance?  Again, we've been there
24 before.  And I said, what do you mean by

Page 269

1 "significance," and you said, did I read
2 it?
3          So my answer is, based on
4 that definition, yes, I read it.  Did
5 he -- did I take it into account?  Yes, I
6 did.
7     Q.    Was there anything that
8 Mr. Chesney testified to where you looked
9 at it and said, you know, that's
10 something that's important, I'm going to
11 rely on that for my opinion?  Anything
12 you can think of?
13     A.    I don't recall.
14          MR. SLATER:  Let's put up
15     the supplemental list, please.  I
16     guess that would be a new exhibit,
17     12?
18               - - -
19          (Whereupon, Exhibit
20     Afnan-11, No Bates, Exhibit
21     B-Materials Reviewed and
22     Considered (Amended and
23     Supplemental), was marked for
24     identification.)

Ari Athan

Page 270

1           - - -
2   BY MR. SLATER:
3       Q.   So now we marked as
4   Exhibit-11 your amended and supplemental
5   list of materials reviewed and
6   considered.
7           Have you seen that document?
8       A.   Yes.
9       Q.   Does this list everything
10  that you have seen, as of now, relative
11  to this case?
12      A.   I believe so.
13      Q.   Unless I missed it, I don't
14  see the deposition -- hang on.
15          No, I take it back.  I see
16  on the first page that you saw some
17  deposition transcripts of our -- of the
18  plaintiffs' experts, Dr. Hecht, Dr. Bain,
19  Dr. Najafi and Dr. Plunkett.
20          You read those transcripts?
21      A.   Yes.
22      Q.   Did reading those
23  transcripts have any impact on your
24  opinions in this case?

Page 271

1       A.   Did they have any impact?
2   So, obviously, if I read a document, I
3   will have to consider what is being asked
4   and what is being said.  And if I
5   consider that in my deliberations, does
6   it have an impact?  Yes.  Does it have a
7   supreme impact, a perfect impact?  The
8   answer is -- is no.
9           So, again, I've read them.
10  I've read them.  I've looked at the
11  questions, and I've looked at the
12  answers.
13      Q.   I'd like you to assume for a
14  second that the information necessary for
15  ZHP to understand the potential formation
16  of NDMA and NDEA in its valsartan
17  manufacturing processes was available and
18  should have been found by the people that
19  were developing that process and then
20  overseeing that process.
21          In other words, I'd like you
22  to assume that Dr. Hecht and Dr. Najafi
23  are correct and that Dr. Xue is incorrect
24  on that point.

Page 272

1           Do you understand the
2   hypothetical I'm putting you in?
3           MS. DAVIDSON:  I'm sorry, my
4       computer froze, and I missed the
5       hypothetical.
6           Can you read it back?
7           MR. SLATER:  I'll do it.
8   BY MR. SLATER:
9       Q.   I want you to assume that
10  Dr. Hecht and Dr. Najafi are correct
11  about what ZHP could and should have
12  known about the potential formation of
13  NDMA and NDEA in the manufacturing
14  processes and that Dr. Xue is incorrect
15  as to what ZHP could and should have
16  known, based on what you read in the
17  reports and depositions, okay?
18      A.   Okay.
19      Q.   If that's the case, then ZHP
20  violated cGMP in failing to test for and
21  identify the presence of the NDMA and
22  NDEA, correct?
23          MS. DAVIDSON:  I'm going to
24      object.  That's an improper

Page 273

1   hypothetical.  Incomplete and
2   vague.
3       THE WITNESS:  So I'm looking
4   at the totality of the statements
5   by Dr. Hecht and Dr. Najafi.  And
6   there are statements that I simply
7   cannot subscribe to.  And yet you
8   ask me to hypothetically accept
9   those as correct.
10      If I assume those are
11  correct, then I don't even know
12  whether that would exclude
13  Dr. Xue's conclusions.
14      However, I cannot -- I
15  struggle to accept statements made
16  by Dr. Najafi and Dr. Hecht.
17  That's my struggle.
18  BY MR. SLATER:
19      Q.   If ZHP could have and should
20  have identified the potential formation
21  of NDMA and NDEA in the TEA with sodium
22  nitrite quenching and zinc chloride
23  processes and then did absolutely no
24  testing to try to identify whether there

Ari Arman

Page 274

1  was NDMA or NDEA, they would have
2  violated cGMPs, correct?
3        MS. DAVIDSON:  Objection.
4        THE WITNESS:  If they could
5    have and they should have, that
6    they -- the struggle that I have
7    is, again, as per FDA's statement,
8    nobody knew -- or, let's be
9    specific, neither industry nor the
10   regulators knew, and it's not only
11   FDA it's also the European
12   regulators, they did not know.
13       And, therefore, if you do
14   not know, since they didn't know,
15   they weren't looking for it.
16       So, you know, even based on
17   a hypothesis or a hypothetical --
18   not hypothesis, a hypothetical
19   that a firm knew, what about FDA?
20   Was FDA colluding with them?  No.
21   FDA didn't know either because the
22   knowledge of the process was not
23   known at that time.  And if it was
24   not known, then they would not

Page 275

1    have tested for it.
2        In fact, again, as stated by
3    the FDA, the test methods were not
4    there for detecting NDMA because
5    nobody expected that NDMA was
6    being formed in these processes.
7  BY MR. SLATER:
8    Q.   Is there any state of facts
9  that I can tell you as to what ZHP --
10 rephrase.
11       Is there any set of facts
12 that I can present to you as a
13 hypothetical as to ZHP's knowledge about
14 the manufacturing processes specific to
15 the formation of NDMA and NDEA where you
16 would say, well, if ZHP had known that,
17 then, yes, I agree they violated cGMP in
18 connection with those manufacturing
19 processes?
20       What would I have to show
21 you for you to say, yes, I can say they
22 violated cGMPs?
23       MS. DAVIDSON:  Objection.
24    Vague.

Page 276

1        THE WITNESS:  I'm -- I'm
2    stuck at the beginning of your
3    question, where you say any set of
4    facts as hypotheticals.  Facts are
5    not hypotheticals.  Facts are
6    facts.
7        So the question is, what
8    facts are there that you would
9    like to present to me and I will
10   respond to it?
11       My struggle is with
12   hypotheticals.  Yes, hypotheticals
13   can go whichever way they are
14   presented.  But the case here is
15   not based on hypotheticals.
16       If I'm in a deposition, my
17   goal, my objective, is for my
18   testimony to be accurate.
19 BY MR. SLATER:
20   Q.   Is it your opinion that even
21 if ZHP had known that NDMA and NDEA could
22 form in these manufacturing processes,
23 knew how the -- let me ask it
24 differently.

Page 277

1        If Ethicon -- Ethicon,
2  that's funny.
3        If ZHP knew that -- let me
4  start over.
5        If ZHP knew that the
6  substances they were using in the sodium
7  nitrite with quenching and zinc chloride
8  processes could have the reactions that
9  they ultimately were proven to have and
10 that NDMA and NDEA could potentially
11 form, as it ultimately did, if they had
12 identified that, if they had identified
13 those potential reactions, identified
14 that those chemicals and substances would
15 be in the process and knew that this
16 could happen, if they knew that and then
17 did not test to see if there was NDMA and
18 NDEA in those -- being produced by those
19 processes, under that hypothetical, would
20 you say that, well, if they knew those
21 things, yes, they violated cGMP by not
22 testing for NDMA and NDEA?
23       MS. DAVIDSON:  Objection.
24       THE WITNESS:  Again, that's

Ari Afnan

Page 278

1 a hypothetical. So I really need
2 to characterize my response
3 correctly.
4         If any firm knew of its
5 processes resulting in mutagenic
6 properties, I believe that firm
7 would inform the regulators and
8 would not continue production,
9 which is what ZHP did.
10 BY MR. SLATER:
11     Q.   Taking your response, if ZHP
12 knew that the NDMA and NDEA could
13 potentially be formed but they weren't
14 sure if it was or was not being formed
15 and the only way to know would be to
16 actually test the valsartan that was
17 being produced to see if there was NDMA
18 and NDEA but they never did the test,
19 under that circumstance, would they
20 violate cGMP?
21         MS. DAVIDSON: Objection.
22         THE WITNESS: So if a firm,
23     ZHP, knew that NDEA and NDMA were
24     being formed in one of the

Page 279

1     processes, then according to the
2     existing quality system
3     requirements of any firm, they
4     would have to raise a deviation,
5     they would have to stop it --
6     since it was NDMA and NDEA, they
7     would then effectively stop
8     manufacture and stop shipping.
9         This happened in June 2018
10     when they became aware. Prior to
11     that, they didn't know.
12 BY MR. SLATER:
13     Q.   If they understood that it
14 was possible for the NDMA and NDEA to
15 form, if they understood that and
16 understood the potential mechanism of
17 formation that ultimately was proven to
18 have occurred, would cGMPs, at that time,
19 have required ZHP to then do tests then
20 to see if there was NDMA and NDEA being
21 created?
22         MS. DAVIDSON: Objection. I
23     think this was asked and answered.
24     If it's different, I

Page 280

1 misunderstood.
2         THE WITNESS: So it's
3 worthwhile to look at the way the
4 pharmaceutical industry operates,
5 or is expected to operate.
6         A firm, ZHP included, would
7 develop a drug substance process
8 away from the manufacturing
9 facility, in an R&D setting. They
10 would investigate the process.
11 They would assess whether the
12 process is likely to produce,
13 specifically, NDMA and NDEA.
14         And if there is -- their
15 assessment is not effectively
16 looking -- if their assessment
17 says, the potential of forming
18 these impurities is not there, as
19 per GMP practices, there is no
20 obligation to go digging and
21 looking for those impurities.
22         All of that is documented in
23 ZHP. ZHP documented the process
24 of looking at the process, looking

Page 281

1 at potential impurities and
2 actually testing for what they
3 knew and coming up with a list of
4 them which was compliant to FDA
5 requirements.
6         They submitted that change
7 as a change to the DMF to FDA.
8 That was reviewed by FDA. FDA
9 accepted the change.
10         That process, then, got --
11 effectively, in 2018, the client,
12 a potential client -- not a
13 client, a potential client,
14 Novartis, told them that, hey,
15 what is this peak? Let's look at
16 it. They looked at it, they said
17 it's NDMA.
18         Immediately, they took
19 action of reporting to FDA,
20 stopping the process, stop
21 selling, did the recall, changed
22 the process, submitted the process
23 to the FDA.
24         That's why the DMF is still

Ari Arman

Page 282

1  active.  The DMF is active with a
2  change to the process.
3  BY MR. SLATER:
4       Q.   Can you answer my question,
5  please?
6            Doctor, can you please
7  answer my question?  I would really
8  appreciate it.
9       A.   So that I'm clear, can you
10 please repeat your question?  Because I
11 believe I've answered it.
12      Q.   If ZHP -- actually, you know
13 what, I'll ask the court reporter to read
14 it back to you so we'll get it exact.
15           And I really ask you, can
16 you just answer the question I actually
17 asked you?
18           COURT REPORTER:  I think
19      Jessica was kicked off.
20           THE WITNESS:  I would like
21      to wait until she's back, please.
22           MR. SLATER:  Go off the
23      record.
24           VIDEO TECHNICIAN:  We're off

Page 283

1  the record at 3:56 p.m.
2                - - -
3            (Whereupon, a brief recess
4      was taken.)
5                - - -
6            VIDEO TECHNICIAN:  We're
7      back on the record at 4:04 p.m.
8  BY MR. SLATER:
9       Q.   If ZHP understood the
10 possible formation of NDMA and NDEA with
11 its valsartan processes -- let me start
12 over.
13           If ZHP had understood that
14 the substances it was introducing into
15 the valsartan manufacturing processes,
16 specifically TEA with sodium nitrite
17 quenching and zinc chloride, could
18 potentially cause the formation of NDMA
19 and NDEA, were they required by cGMP to
20 test to see if NDMA and NDEA was formed?
21           MS. DAVIDSON:  Objection.
22           THE WITNESS:  So I did
23      respond to that question.
24           The response was that

Page 284

1  developing the process happens
2  away from the manufacturing
3  facility.
4            When ZHP was developing the
5  process away from the
6  manufacturing facility, they did
7  consider the formation of
8  impurities.  And at that time, as
9  per FDA's statement that neither
10 FDA nor industry understood the
11 pathway for formation of NDMAs,
12 these were not considered nor
13 detected.
14           So -- and, again, continuing
15 with what I said before,
16 development of a process is not a
17 GMP process, it's a non-GMP.  It's
18 not regulated.
19           Once it is approved by the
20 regulator and it's a process which
21 is validated, then it becomes a
22 GMP process and it's then in the
23 manufacturing markets -- markets
24 process.

Page 285

1            So your question asks --
2      your question has hypotheticals
3      that, you know, I would have to
4      conclude to do away with all facts
5      and work in the ether of
6      hypotheticals.
7  BY MR. SLATER:
8       Q.   When the process changes
9  took place, that's governed by GMP, it's
10 called change control, right?
11      A.   Yes.
12      Q.   If, as part of the process
13 changes, ZHP had realized that the
14 chemicals they were using and the
15 substances they were using could form
16 NDMA and NDEA under the conditions of
17 those processes, if they had realized
18 that, were they required, by cGMPs, to
19 test to see if there was NDMA or NDEA in
20 the valsartan?
21      A.   So giving you, again, almost
22 a repeat answer.
23           For ZHP to actually change
24 their process using a change control

Ari Afnan

1 procedure, they cannot do it in the
2 manufacturing facility.
3          What they have to do is
4 develop the process away from the
5 manufacturing facility, then validate the
6 process at scale in the manufacturing
7 facility and discard that batch.
8          Then submit that to the
9 agency, get approval from the agency and
10 EDQM, because that was also the customer,
11 and then proceed to manufacture for the
12 market.
13          So it's not a case of
14 suddenly one day they decide to implement
15 a change based on a change control.
16 There was two years of investigations and
17 studies carried out before that change
18 control was actually implemented, which
19 was after approval by the FDA.
20     Q.   I'll ask the question
21 differently.
22          If ZHP had realized, at any
23 point between 2011 and 2018, that their
24 manufacturing processes for the

1 manufacture of valsartan, the TEA with
2 sodium nitrite quenching and the zinc
3 chloride process, could potentially be
4 creating NDMA and NDEA, as soon as they
5 made that -- had that revelation that the
6 process could create those genotoxic
7 impurities, would they have been required
8 to test to see if there was NDMA and
9 NDEA?
10          MS. DAVIDSON:  Objection.
11          Same objections.
12          THE WITNESS:  So when
13          they -- when ZHP identified
14          presence of NDMA in its valsartan,
15          it actually stopped manufacture.
16          It informed the FDA.  It put a
17          stop at the process on hold.  It
18          put the stock on hold.  It
19          requested FDA for a recall
20          classification.  So they did all
21          of that.
22 BY MR. SLATER:
23     Q.   That's great.  That's not
24 what I asked you, though.  I didn't ask

1 you when they figured out that it was
2 there.
3          I said if they figured out
4 that it was possibly forming, did they
5 need to do the tests, at that point in
6 time when they first realized it could
7 possibly be forming, to see if there was
8 NDMA or NDEA in the drug substance; yes
9 or no?
10          MS. DAVIDSON:  I'm going to
11          object, because you interrupted
12          the witness and are asking the
13          same question again.  So it's
14          asked and answered.
15          But please don't interrupt
16          Dr. Afnan.
17          THE WITNESS:  You know, so
18          if I'd like to go to my report.  I
19          would like -- because I address
20          this in my report, and I think
21          that is probably -- if you go to
22          Number 80 in my report.
23          It says, ZHP performed
24          extensive research and testing for

1 more than two years before
2 submitting the drug master file
3 amendment containing zinc chloride
4 process.  On June 16th, 2011, ZHP
5 issued a summary of its test
6 production using the zinc chloride
7 process that noted overall the
8 crude isomer of the tri production
9 batches were maintained at 1 to 2
10 percent and there were no
11 individual impurities that were
12 difficult to remove by
13 crystallization and purification.
14 Therefore, the product quality
15 also met the expected
16 requirements.
17          Likewise, an internal change
18 request form, dated November 27,
19 2011, stated that the new process
20 solves the problem of production
21 stability and Valine methyl ester
22 condensation and pentanoy reaction
23 and the new reaction system of
24 zinc chloride and DMF for

Ari Arman

Page 290

1  tetrazole reaction is developed,
2  which greatly improves the
3  conversion rate of raw materials,
4  improves the yields, reduces --
5  reduces -- improves and -- it says
6  reduces the heat and reduces the
7  free waste.  In addition, by
8  optimizing the saponification
9  condition, the assay of isomer in
10 valsartan crude is reduced and the
11 quality of valsartan is improved.
12      Through a large number of
13 experimental results about
14 optimizing process and combined
15 with theoretical analysis, the
16 synthesis route of new process and
17 critical process parameters are
18 initially -- initially determined
19 by Huahai and the preliminary
20 analysis and evaluation of
21 impurities in the new process is
22 completed, confirming that the
23 quality product risk is
24 controlled.

Page 291

1      At the same time, the safety
2  risk brought by process changes
3  are also evaluated by Huahai
4  confirming that the new process is
5  safe and reliable, essentially.
6      According to the above
7  analysis, the zinc chloride
8  process is stable and reliable and
9  has the conditions for further
10 validation of production.  The
11 changes of original process are
12 applied and a new process
13 validation is organized.
14      And all of this was
15 submitted to FDA.
16 BY MR. SLATER:
17     Q.   Answer my question, please.
18      I'm going to ask you now --
19 I know your counsel is not going to tell
20 you that what you just did is completely
21 obstructive and not responsive.  I
22 realize that.  I'm just -- I'm just
23 telling you that this is not appropriate.
24      I asked you a question.

Page 292

1  Your counsel is making crazy faces.  I
2  don't know why.
3      I asked you a very
4  straightforward question and you went and
5  read me this whole section of your report
6  for five minutes.  I'm not really sure
7  why you think that's beneficial to your
8  position here.
9      So can you now answer my
10 question?  Which what you just read has
11 nothing to do with.
12      Can you please answer my
13 question?
14     A.   What was your question?
15     Q.   It's literally a yes-or-no
16 question, a very straightforward
17 hypothetical.
18      Can you just answer it,
19 please?
20      MS. DAVIDSON:  There's no
21 question pending.  He answered the
22 question you asked.
23      If you want to ask another
24 question, please go ahead.

Page 293

1  BY MR. SLATER:
2      Q.   I asked the question.
3      Doctor, please just answer
4  it.  Come on.
5      MS. DAVIDSON:  Objection.
6  If you want him to answer a
7  question --
8      MR. SLATER:  Don't tell me
9  to ask a question, please.  Don't
10 give me instructions.  I don't
11 need to be told what to do.
12      MS. DAVIDSON:  There's no
13 question pending.  You asked a
14 question.  He answered it.
15      MR. SLATER:  I don't want to
16 talk to you.  I don't want to
17 speak to you.  It's not helpful.
18 It's wasting more time.
19 BY MR. SLATER:
20     Q.   So, Doctor, answer my
21 question, please.
22      MS. DAVIDSON:
23 Unfortunately, I'm the person
24 defending this deposition.  You're

Afi Afnan

Page 294

1  interrupting me. You're being
2  rude.
3       Dr. Afnan answered your
4  question.
5       If you have another
6  question, ask another question.
7  But you can't just say, I don't
8  like your answer, give me another
9  one.
10      MR. SLATER: All right,
11  counsel. You stand behind that
12  being responsive. That's fine.
13 BY MR. SLATER:
14    Q.  Now, Doctor, answer my
15 question.
16      If ZHP, at any point between
17 2011 and 2018, realized that their
18 manufacturing processes for valsartan
19 could potentially be creating NDMA and
20 NDEA and they realized what the potential
21 mechanism of formation was, at that
22 point, were they required to test to see
23 if there was NDMA or NDEA in the
24 valsartan; yes or no?

Page 295

1       MS. DAVIDSON: Objection.
2       THE WITNESS: I'm afraid I
3  can't give you a yes-or-no answer.
4  So I'll give you an answer.
5       The answer is, based on the
6  hypotheticals that you have posed
7  and the assumptions that you have
8  made, the answer would be yes.
9       But this is not the case
10 here. I do not subscribe to the
11 hypotheticals. And I do not
12 subscribe to the assumptions.
13      And, again, this was not the
14 case here with ZHP prior to June
15 2018.
16 BY MR. SLATER:
17    Q.  There came a date when
18 Novartis advised ZHP that Novartis
19 thought there might be NDMA in the
20 valsartan, correct?
21    A.  Sorry. Can you ask the
22 first part? It just got cut out.
23    Q.  Novartis notified ZHP, in
24 2018, that it believed that there might

Page 296

1  be NDMA in ZHP's valsartan, correct?
2    A.  Novartis informed ZHP
3  that -- on 6th of June, informed ZHP that
4  they had asked -- to investigate an
5  unknown impurity. ZHP also, in parallel,
6  started an investigation of that same
7  issue.
8       So it was actually then that
9  they both came to the same conclusion.
10 And Novartis actually doesn't say here
11 NDMA, Novartis says this is potentially
12 NDMA.
13    Q.  Could ZHP have figured out
14 that there was NDMA in its valsartan
15 without Novartis's involvement? Would
16 that have been possible for ZHP to do
17 that all by itself?
18      MS. DAVIDSON: Objection.
19      THE WITNESS: This was a
20 manufacturing process which had
21 been approved by the Europeans and
22 FDA. The analytical method was
23 effectively GC FID that was not
24 detecting NDMAs.

Page 297

1       FDA says that. The methods
2  were not there. And nobody knew
3  about the formation of NDMAs in
4  valsartan, so.
5  BY MR. SLATER:
6    Q.  Is an important part of the
7  basis for your opinion what the FDA said
8  in the statements that it issued about
9  this situation, about what people knew
10 and what people didn't know, and
11 different methods and all the things that
12 the FDA has said? Is that an important
13 part of your opinion?
14    A.  Yes.
15    Q.  Could ZHP have figured out
16 that there was NDMA in the valsartan
17 without Novartis's assistance? Was that
18 possible, that they could have done it on
19 their own?
20      MS. DAVIDSON: Objection.
21      THE WITNESS: The question
22 is whether ZHP could have
23 identified it? And the answer is,
24 what was the justification to go

Ari Arman

Page 298

1  and look for it?
2       Novartis had a reason to
3  look for it, based on what has
4  been shared, which is, here is a
5  little peak which is coming up,
6  and unknown impurity after
7  targeting, and it was below the .1
8  percent and Novartis said, can we
9  look at that one?
10      Now, there were other
11  unknown peaks as well, which
12  Novartis did not look at.  But
13  Novartis decided to look at that.
14  BY MR. SLATER:
15      Q.   ZHP could have noticed that
16  peak and investigated that peak without
17  being told anything by Novartis; that was
18  possible, right?
19      A.   ZHP was operating according
20  to Q3A, which said you can have unknown
21  impurities below .1 percent.
22      So the answer is, they could
23  have.  But they had no reason, no
24  justification, no cause to look for that

Page 299

1  impurity and that peak.
2       Q.   If ZHP had been more careful
3  than it actually was and had decided to
4  investigate that NDMA peak, which it had
5  not identified yet, ZHP could have
6  figured out that it was NDMA, right?
7  That was something that was technically
8  feasible for it to do, correct?
9       MS. DAVIDSON:  Objection.
10      THE WITNESS:  So if you know
11  what you're looking for, it is
12  feasible to do it.  ZHP looked
13  with GCMS and actually -- so
14  that's how the conversation with
15  Novartis started.
16      Novartis asked for, can you
17  send the data, the spectra for
18  that peak?  Which they did and
19  they sent in.  And that
20  effectively was not NDMA; that was
21  the conclusion that they both came
22  to.
23  BY MR. SLATER:
24      Q.   Were the people at Novartis

Page 300

1  just a lot smarter than the people at
2  ZHP?
3       MS. DAVIDSON:  Objection.
4  BY MR. SLATER:
5       Q.   Is that why they figured it
6  out and ZHP didn't?
7       MS. DAVIDSON:  I'm sorry.  I
8  objected after the first question
9  because I thought there was just
10  one question.  And then there was
11  a second question.
12      I object to both.
13      THE WITNESS:  I cannot
14  comment whatsoever on that.
15  That's beyond the scope of my
16  work, to guess who is smarter.
17  BY MR. SLATER:
18      Q.   ZHP could have looked at the
19  unknown peaks and could have investigated
20  them and could have figured out that one
21  of those peaks represented NDMA if it had
22  chosen to do a thorough investigation
23  like Novartis did, correct?
24      MS. DAVIDSON:  Objection.

Page 301

1  BY MR. SLATER:
2       Q.   ZHP had the ability to do
3  that if it chose to go through that
4  process, correct?
5       MS. DAVIDSON:  Again, I keep
6  objecting after one question and
7  then a second question gets asked.
8  I'm objecting to both.
9       THE WITNESS:  ZHP had no
10  reason to investigate, because
11  they were adhering to the GMPs and
12  the requirements of FDA and EDQM.
13  They were following the GMPs.
14      And, therefore, what was
15  going on was that you were
16  allowed -- or ZHP was allowed to
17  have unknown impurities below .1
18  percent.  This is common practice
19  in industry.
20  BY MR. SLATER:
21      Q.   You keep explaining this to
22  me.  It's a very simple question.
23      Could ZHP have identified
24  the NDMA peak without Novartis's help if

Ari Afnan

1 ZHP had actually gone through the thought
2 process that Novartis did?  Was that
3 possible?
4         MS. DAVIDSON:  Objection.
5     Asked and answered.
6         THE WITNESS:  It's a simple
7     question, and you don't like my
8     answer.
9         Because my answer is, there
10    was no cause for ZHP to
11    investigate the unknown peaks.
12    There had been no cause from the
13    regulators to investigate those
14    unknown peaks, not -- two
15    regulators.
16 BY MR. SLATER:
17    Q.   Then why did Novartis
18 investigate the unknown peaks?
19    A.   Novartis was -- sorry.
20        THE WITNESS:  Jessica?
21        MR. SLATER:  Are you asking
22    for an objection, Doctor?  I
23    mean --
24        THE WITNESS:  If she wants

1     to.
2         MS. DAVIDSON:  He was
3     apologizing for the fact that I
4     had asked earlier to wait before
5     he answered questions.
6         I would have objected to the
7     question.  But go ahead.
8         MR. SLATER:  I have another
9     question.  I'm sure you would
10    have.
11 BY MR. SLATER:
12    Q.   Did Novartis do something
13 that was super human in the
14 pharmaceutical field --
15        MS. DAVIDSON:  Objection.
16 BY MR. SLATER:
17    Q.   -- that no other company
18 would have ever done, but we just --
19 everybody just lucked out that Novartis
20 happened to get involved?
21        MS. DAVIDSON:  Objection.
22 BY MR. SLATER:
23    Q.   Answer the question, please;
24 yes or no.

1    A.   I can't answer whether
2 Novartis was super human or not.
3    Q.   Okay.  Then you can't answer
4 the question.  That's fine.
5         Doctor, one of the very
6 important foundational assumptions in
7 your opinion is that Q3A allowed the NDMA
8 peak to go uninvestigated because it was
9 below .1 percent.
10        Do I understand that opinion
11 correctly?
12    A.   No, you do not understand
13 that correctly.  I have never said that
14 Q3A allows NDMA to be ignored.
15        If you see it in Q3A, I
16 would appreciate you showing it to me.
17    Q.   You've told -- you've told
18 me that the NDMA peak was so small and it
19 was below .1 percent, so ZHP was not
20 required to investigate what the cause of
21 that peak was; that's your opinion,
22 right?
23        MS. DAVIDSON:  Objection.
24    That completely mischaracterizes

1     his testimony.
2         THE WITNESS:  It does.  No,
3     that's not what I said.
4 BY MR. SLATER:
5    Q.   Okay.  So was ZHP required
6 to investigate what was behind that peak
7 that ultimately turned out to be NDMA
8 under cGMP; yes or no?
9    A.   I have responded to that
10 question.
11    Q.   Yes or no?
12        MS. DAVIDSON:  Objection.
13    Yes or no is not a question.
14        THE WITNESS:  Yeah, I cannot
15    give you a yes-or-no answer.  And
16    the response I've given you, you
17    don't like.
18 BY MR. SLATER:
19    Q.   That's fine.
20        MR. SLATER:  This is
21    Exhibit-12, right?  Just let me
22    know when you know.
23        MS. DAVIDSON:  Are you
24    talking to us?

Ari Afnan

1    MR. SLATER:  No, I'm not
2  talking to you.
3    MS. DAVIDSON:  Okay.
4    - - -
5    (Whereupon, Exhibit
6  Afnan-12, No Bates, 10/25/06
7  Impurities in New Drug Substances
8  Q3A(R2), was marked for
9  identification.)
10    - - -
11  BY MR. SLATER:
12    Q.   This is Exhibit-12.
13    A.   Yes.
14    Q.   We've put on the screen the
15  ICH Q3A.
16    Do you see that?
17    A.   Yes.
18    Q.   That's the Q3A that you've
19  been -- or the Q3 that you've been
20  referring to the whole deposition, right?
21    A.   Yes.
22    MS. DAVIDSON:  Objection.
23  Please, Dr. Afnan --
24    THE WITNESS:  Yes.

1    MS. DAVIDSON:  -- give me
2  time to object.
3  BY MR. SLATER:
4    Q.   Even though this says that
5  it's impurities in new drug substances,
6  you're aware that there's a guidance for
7  industry, from June 2009, that indicates
8  that this is also applicable to ANDAs,
9  right?
10    A.   Please tell me which
11  guidance.
12    Q.   Let me just ask you this
13  way:  You, as the expert on GMP, do you
14  know whether or not this guidance is also
15  applicable not only to new drug
16  substances but also to ANDAs?
17    A.   Q3A, right?
18    Q.   Yep.
19    A.   Yes, it is.
20    Q.   Okay.  This is an important
21  document that you're relying on in
22  forming your opinions, right?
23    A.   Yes.
24    Q.   Let's go to Page 2, Section

1  3.1.
2    Under Section 3, which is
3  titled, Rationale for the Reporting and
4  Control of Impurities, there's 3.1,
5  Organic Impurities.
6    Do you see that?
7    A.   Yes.
8    Q.   This says, The
9  application -- The applicant should --
10  rephrase.
11    3.1 says, The applicant
12  should summarize the actual and potential
13  impurities most likely to arise during
14  the synthesis, purification and storage
15  of the new drug substance.  This summary
16  should be based on sound scientific
17  appraisal of the chemical reactions
18  involved in the synthesis, impurities
19  associated with raw materials that could
20  contribute to the impurity profile of the
21  new drug substance, and possible
22  degradation products.
23    Do you see that?
24    A.   Yes.

1    Q.   So according to this
2  standard, among other things, ZHP was
3  required to make a sound scientific
4  appraisal of impurities associated with
5  the raw materials, correct?
6    A.   Yes.
7    Q.   And, for example, with DMF
8  that would include dimethylamine; that
9  would be an impurity associated with a
10  raw material, right?
11    MS. DAVIDSON:  Objection.
12  BY MR. SLATER:
13    Q.   Right, Doctor?
14    A.   Okay.  Yes.
15    Q.   Possible degradation
16  products, that's another thing that this
17  required ZHP to make a sound scientific
18  appraisal of, right?
19    MS. DAVIDSON:  Objection.
20    THE WITNESS:  They did.
21  BY MR. SLATER:
22    Q.   That's what this document
23  says they were required to do.
24    I didn't ask what they did,

Ari Afnan

1  Doctor. So let's now start answering my
2  questions, when I'm down to a few hours.
3      A.   Okay.
4          MS. DAVIDSON: Objection.
5  If that's a question.
6  BY MR. SLATER:
7      Q.   It says, They were also
8  required to make a sound scientific
9  appraisal of possible degradation
10 products, correct?
11         MS. DAVIDSON: Objection.
12 Misstates the document.
13 BY MR. SLATER:
14     Q.   That's what it says, right?
15         MS. DAVIDSON: Objection.
16         THE WITNESS: It says, The
17     summary should be based on sound
18     scientific appraisal of the
19     chemical reactions involved in the
20     synthesis, impurities associated
21     with the raw materials that could
22     contribute to the impurity profile
23     of the new drug substance, and
24     possible degradation products.

1  BY MR. SLATER:
2      Q.   Look down now two more
3  paragraphs.
4          There's a paragraph at the
5  bottom of this section that starts --
6          MR. SLATER: You've got to
7      scroll down a little bit, Chris.
8  BY MR. SLATER:
9      Q.   Looking now at the last
10 paragraph in Section 3.1, it says,
11 Identification of impurities present at
12 an apparent level of not more than, less
13 than or equal to, the identification
14 threshold is generally not considered
15 necessary.
16         Do you see that?
17     A.   Yes.
18     Q.   And that's one of the
19 important things that you've been relying
20 on throughout your testimony today as to
21 why you believe ZHP did not have to do
22 any tests to identify the peak that
23 turned out to be NDMA, correct?
24         MS. DAVIDSON: Objection.

1      That misstates his testimony
2  again.
3  BY MR. SLATER:
4      Q.   Correct?
5      A.   I do not rely only and
6  solely on this statement which you have
7  here.
8          I believe ZHP did do a
9  thorough job of looking at its processes.
10     Q.   Did ZHP ever, to your
11 knowledge, try to figure out what the
12 peak was, the one that was NDMA, that we
13 later learned was NDMA, did they ever try
14 to identify what that peak was before
15 Novartis got in touch with them; yes or
16 no?
17         It's a factual question, did
18 they or didn't they?
19         MS. DAVIDSON: Objection.
20         THE WITNESS: The answer is
21     right at the top of the page. If
22     you scroll to just below 3.1,
23     please.
24 BY MR. SLATER:

1      Q.   Doctor, I asked if they
2  tried to identify what that peak was.
3  This document doesn't talk about ZHP.
4          Did they try to identify
5  what that peak was or not; yes or no?
6          MS. DAVIDSON: You
7      interrupted the witness. And I'm
8      objecting.
9          MR. SLATER: How about you
10     ask your witness, please, to
11     answer the question directly, as
12     opposed to asking to talk about
13     this document where the answer is
14     not found.
15         THE WITNESS: You point me
16     to this document and you said,
17     based on this, they should have.
18     And I'm pointing --
19 BY MR. SLATER:
20     Q.   That's not what I asked you.
21 My question was very direct, Doctor.
22         I asked you is --
23     A.   You --
24     Q.   -- there anything that

Afi Afnan

1 you've seen indicating that ZHP ever
2 tried to identify what that NDMA peak was
3 before June of 2018?
4     A.   The applicant should
5 summarize the actual and potential
6 impurities most likely to arise during
7 the synthesis, purification and storage
8 of the new product.  This summary should
9 be based on sound scientific appraisal.
10         They did do that.
11         Based on that -- based on
12 that scientific appraisal by ZHP over two
13 years, as I have read to you a few
14 minutes ago, maybe ten minutes ago, as I
15 read that, this was done.
16     Q.   So you're saying that ZHP
17 actually evaluated the unknown peak that
18 later turned out to be NDMA --
19         MS. DAVIDSON:  Objection.
20 BY MR. SLATER:
21     Q.   -- to try to figure out what
22 it was before June of 2018?
23         MS. DAVIDSON:  Objection.
24         THE WITNESS:  That's not

1     what I said.
2 BY MR. SLATER:
3     Q.   Well, how about you just
4 give me a straight answer to the
5 question.  I don't understand why you
6 can't just say yes or no.
7         Did they or didn't they try
8 to identify that peak?
9         MS. DAVIDSON:  Objection.
10         THE WITNESS:  There was no
11 regulatory requirement, there was
12 no scientific obligation to
13 identify the peak.
14         The reason was because they
15 looked at the process, and based
16 on the process, which they looked
17 at, the prediction was that there
18 is no undesirable impurity present
19 in this process.  Therefore, the
20 unknowns would not be required to
21 be investigated.
22 BY MR. SLATER:
23     Q.   Did ZHP ever, to your
24 knowledge, try to identify what that peak

1 was that turned out to be NDMA before
2 Novartis got in touch with it?
3         As a matter of fact, yes or
4 no, did they actually focus on that peak
5 and try to identify what it was at any
6 point before Novartis raised an issue
7 about it; yes or no?
8         MS. DAVIDSON:  Objection.
9         THE WITNESS:  There were
10     customer requests about peaks --
11     unknown peaks which was -- this
12     was one of them that ZHP had
13     shared information with.
14         Even with this peak, which
15     is effectively a peak on top of
16     another one, was requested by
17     Novartis, and ZHP provided the
18     information to Novartis.
19         So did they try?  Yes.
20 BY MR. SLATER:
21     Q.   Did other customers identify
22 that peak and ask what it was, the NDMA
23 peak, at any point before Novartis did in
24 2018; yes or no?

1         MS. DAVIDSON:  Objection.
2         THE WITNESS:  If you had
3     allowed me to complete my
4     response, I would have told you
5     that this was not a question about
6     is it an NDMA or not.
7         The question was, can you
8     provide us with the data as to
9     what this peak is?  And ZHP
10     investigated, reported it to them,
11     and they accepted it.
12 BY MR. SLATER:
13     Q.   Who?
14     A.   The clients.
15     Q.   Which one?
16     A.   There were multiple
17 questions that came from different
18 clients, and that's what they did.
19     Q.   Multiple clients asked
20 questions about unknown peaks, including
21 that peak that turned out to be NDMA?
22         MS. DAVIDSON:  Objection.
23     Misstates his testimony.
24         Dr. Afnan, give me a minute.

Afzaan

1    MR. SLATER:  I'll withdraw
2  that question, actually.
3         MS. DAVIDSON:  Okay.
4         MR. SLATER:  We'll live with
5    the testimony.
6  BY MR. SLATER:
7    Q.   All right.  Let's go back to
8  the document.
9         Looking at the paragraph at
10  the end of 3.1, it says, Identification
11  of impurities present at an apparent
12  level of not more than, less than or
13  equal to the identification threshold is
14  generally not considered necessary.
15  However, analytical procedures should be
16  developed for those potential impurities
17  that are expected to be unusually potent,
18  producing toxic or pharmacological
19  effects at a level not more than, less
20  than or equal to the identification
21  threshold.  All impurities should be
22  qualified as described later in this
23  guideline.
24         Do you see what I just read?

1    A.   Yes.
2    Q.   The potential impurities
3  that are expected to be unusually potent
4  would include N-nitroso compounds,
5  correct?
6         MS. DAVIDSON:  Objection.
7         THE WITNESS:  N-nitroso
8    compounds are compounds of cohorts
9    of interest.
10  BY MR. SLATER:
11   Q.   Let's go to Page 4, Section
12  6.
13         Looking at Section 6,
14  Listing of Impurities and Specifications.
15  I want to go now to the second paragraph.
16         About halfway down that
17  paragraph, it says, For impurities known
18  to be unusually potent or to produce
19  toxic or unexpected pharmacological
20  effects, the quantitation/detection limit
21  of the analytical procedures should be
22  commensurate with the level at which the
23  impurities should be controlled.  For
24  unidentified impurities, the procedure

1  used and assumptions made in establishing
2  the level of the impurity should be
3  clearly stated.
4         Do you see that?
5    A.   Can you point me to where it
6  is in the second paragraph which begins
7  with, A rational?
8    Q.   Correct.  Seven lines down.
9    A.   For impurities known to
10  be -- okay.
11   Q.   That's what the document
12  says, correct?
13   A.   For impurities known to be
14  unusually potent or to produce toxic or
15  unexpected pharmacological effects, the
16  quantitation/detection limit of the
17  analytical procedure should be
18  commensurate with the level at which the
19  impurities should be controlled.
20         Yes, that's what it says.
21   Q.   Now, let's go to Page 10,
22  which is Attachment 3, the decision tree
23  for identification and qualification.
24         You cited this in your

1  report, right?
2    A.   Yes.
3    Q.   I'm just trying to find
4  where you cited this.
5         Do you know where this is in
6  your report?
7    A.   No.
8    Q.   All right.  Well, that's
9  fine.  I don't need to find it in your
10  report.
11         Do you see at the top --
12  rephrase.
13         Do you see at the top of the
14  decision tree, the first input says, Is
15  impurity greater than identification
16  threshold?
17   A.   Yes.
18   Q.   And it says, No.  And if you
19  go to no, No action.
20         And if, Yes, then you go
21  down to the next question of structure
22  identified.
23         Do you see that?
24   A.   Yes.

Page 322

1    Q.   Do you see the little C next
2  to the word "threshold" up at the top?
3    A.   Yes.
4    Q.   Yep.  And then on the next
5  page, let's go to the next page, Footnote
6  C says, Lower thresholds can be
7  appropriate if the impurity is unusually
8  toxic, correct?
9    A.   Correct.
10    Q.   So ZHP was required to know
11  that if it turned out that those peaks
12  that were below .1 percent represented
13  unusually toxic substances, like
14  N-nitroso compounds, that they couldn't
15  rely on the threshold of .1 percent; they
16  were required by cGMP to know that,
17  because that's what it said in the Q3A,
18  correct?
19        MS. DAVIDSON:  Objection.
20  Mischaracterizes the document.
21        THE WITNESS:  So if I go
22    back to the very first item that
23    you showed me in this set, in this
24    line of questioning, it says, For

Page 323

1  potential impurities that are
2  expected to be unusually potent,
3  for potential impurities that are
4  expected to be unusually potent.
5        If ZHP did not know that
6    that was a mutagenic impurity, how
7    would they conclude this is a
8    potent compound?
9        The same goes for the second
10    statement on Page 4, which says,
11    For impurities known to be
12    unusually potent or produce toxic
13    or unexpected effect.
14        Again, there is an
15    assumption in your questioning
16    that this unknown impurity was
17    potent.
18  BY MR. SLATER:
19    Q.   Is the standard objective,
20  meaning we're going to hold all
21  manufacturers to a high standard, or is
22  it subjective, meaning, well, if this
23  manufacturer was really diligent and
24  figured out that there was a potential

Page 324

1  issue, they're held to a higher standard
2  than an unusually less knowledgeable
3  manufacturer that doesn't figure it out
4  and doesn't realize, oh, there is this
5  potential impurity, they're held to a
6  lower standard?
7        Is that how it works?
8        MS. DAVIDSON:  Objection.
9  BY MR. SLATER:
10    Q.   It's a yes-or-no question.
11  I just want to know if the same standards
12  apply to everybody.
13        MS. DAVIDSON:  I don't know
14    if that's another question, but if
15    it is, I'm objecting to that one,
16    too.
17        THE WITNESS:  So, again, I
18    do not understand the basis of
19    your question or your assumption
20    of ZHP knew that these were potent
21    and toxic impurities.  ZHP did not
22    know that.
23        When ZHP found that, when
24    ZHP understood that they had NDMA,

Page 325

1  they took all the right actions.
2        FDA didn't know in -- prior
3  to June 2018, prior to ZHP writing
4  to them and saying, hey, we have
5  NDMA present.  FDA didn't know
6  that these unknown impurities in
7  valsartan which, according to FDA,
8  there were about 20 API
9  manufacturers, FDA didn't know
10  these were potent substances.
11        MR. SLATER:  Let's go to the
12  next exhibit, which is the FDA
13  guidance for industry, Genotoxic
14  and Carcinogenic Impurities in
15  Drug Substances and Products,
16  Recommended Approaches, December
17  2008.  Let's go to Exhibit-13.
18        - - -
19        (Whereupon, Exhibit
20  Afnan-13, No Bates, Guidance for
21  Industry Genotoxic and
22  Carcinogenic Impurities in Drug
23  Substances and Products:
24  Recommended Approaches, was marked

Ari Aman

Page 326

¹  for identification.)
²        - - -
³ BY MR. SLATER:
⁴    Q.   Have you ever seen this
⁵ document?
⁶    A.   It's a draft document.  It's
⁷ a draft which then eventually -- so, yes,
⁸ I have.
⁹    Q.   Are you aware that ZHP cited
¹⁰ to this document in its DMFs as being
¹¹ applicable to the manufacturing processes
¹² for valsartan?
¹³        MS. DAVIDSON:  Objection.
¹⁴        THE WITNESS:  No, I'm not
¹⁵    aware that ZHP referenced this in
¹⁶    their DMF applications.  I have
¹⁷    not come across that statement.
¹⁸ BY MR. SLATER:
¹⁹    Q.   Did you consider this
²⁰ guidance for industry and its contents in
²¹ forming your opinions in this case?
²²        MS. DAVIDSON:  Objection.
²³        THE WITNESS:  This is a
²⁴    draft guidance, which is dated

Page 327

¹    2008.  It's an ICH guidance which
²    FDA had started working on and,
³    therefore, it was in the various
⁴    stages.
⁵        This guidance later became a
⁶    final guidance.
⁷ BY MR. SLATER:
⁸    Q.   Did you consider this
⁹ guidance in forming your opinions, this
¹⁰ document; yes or no?
¹¹        MS. DAVIDSON:  Objection.
¹²        THE WITNESS:  I considered
¹³    --
¹⁴ BY MR. SLATER:
¹⁵    Q.   So you did not consider this
¹⁶ document, correct?
¹⁷    A.   This is a draft guidance
¹⁸ which is a precursor to M7.
¹⁹    Q.   So is the answer, no, I did
²⁰ not take this into account in forming my
²¹ opinions?
²²        MS. DAVIDSON:  Objection.
²³        THE WITNESS:  This is a
²⁴    draft guidance dating back to

Page 328

¹    2008.
²        In 2011, this was either
³    still a draft or not in process,
⁴    one.
⁵        As a draft guidance -- as a
⁶    fully approved guidance, if it was
⁷    an approved guidance, then it
⁸    would not be binding on FDA or
⁹    industry.  That's stated on the
¹⁰    second or third page of every
¹¹    guidance.
¹² BY MR. SLATER:
¹³    Q.   Let's go to the
¹⁴ introduction, Page 1.
¹⁵        It says, This guidance is
¹⁶ intended to inform pharmaceutical
¹⁷ manufacturers of the Food and Drug
¹⁸ Administration's current thinking
¹⁹ regarding genotoxic and carcinogenic
²⁰ impurities in drug substances and drug
²¹ products, including biologic products,
²² that are regulated by the Center For Drug
²³ Evaluation and Research.  This guidance
²⁴ provides recommendations on how to

Page 329

¹ evaluate the safety of these impurities
² during clinical development,
³ investigational new drug applications and
⁴ for marketing applications, new drug
⁵ applications, NDAs, biologics, license
⁶ applications, BLAs and abbreviated new
⁷ drug applications, ANDAs.
⁸        Do you see what I just read?
⁹    A.   Yes.
¹⁰    Q.   Do you know if ZHP was aware
¹¹ of this document and felt that it was
¹² obligated to comply with it?
¹³        MS. DAVIDSON:  Objection.
¹⁴ BY MR. SLATER:
¹⁵    Q.   Even though it said it's
¹⁶ non-binding, do you know what ZHP's
¹⁷ position on that was?
¹⁸        MS. DAVIDSON:  Objection.
¹⁹    When you say "this document," do
²⁰    you mean the draft or the final?
²¹        MR. SLATER:  Yes.  It's the
²²    only document on the screen.
²³ BY MR. SLATER:
²⁴    Q.   Do you know what ZHP's

Ari Afnan

Page 330

¹ position was about this in their
² depositions; yes or no?
³        A.   It says, This draft
⁴ guidance, when finalized.  It was not
⁵ final, one.
⁶        Two, taking into account the
⁷ same issue, if you look at the second
⁸ paragraph, it says, This guidance is
⁹ intended as an adjunct to the ICH
¹⁰ guidance for industry, Q3A.  I --
¹¹        Q.   Are you refusing to answer
¹² my question?
¹³        MS. DAVIDSON:  Please don't
¹⁴    interrupt him.
¹⁵        MR. SLATER:  You know what,
¹⁶    Ms. Miller, I have to tell you
¹⁷    something, you have an obligation,
¹⁸    as an officer of the court, to
¹⁹    know that your witness is not
²⁰    being responsive.  This has gone
²¹    on all day.
²²        I don't want to ask for more
²³    time, but he has sucked hours out
²⁴    of this deposition with these

Page 331

¹    nonresponsive answers, objectively
²    speaking.  And I think that it
³    would be in your interest as well,
⁴    to just say give him direct
⁵    answers to direct questions.
⁶    It would help all of us.
⁷ I'm not looking to come back
⁸    again.  I would really like to
⁹    finish today.
¹⁰        But if the witness refuses
¹¹    to answer simple questions, it's
¹²    very frustrating and it frustrates
¹³    the purpose of the deposition.
¹⁴ BY MR. SLATER:
¹⁵        Q.   Do you know what ZHP's
¹⁶ position is as to whether the FDA
¹⁷ guidance that's on the screen applied to
¹⁸ its development and manufacture of
¹⁹ valsartan; yes or no?
²⁰        A.   I have not looked at
²¹ development reports from ZHP, so I cannot
²² make any comments about that.
²³        This would have been
²⁴ applicable -- or the group that would

Page 332

¹ have looked at development would have
² looked at the development in a different
³ facility that I have not looked at,
⁴ number one.
⁵        Number two, whatever ZHP
⁶ developed was submitted both to EDQM and
⁷ to FDA.  And both --
⁸        Q.   Go to the top of Page 2.
⁹        MS. DAVIDSON:  I'm sorry,
¹⁰    Dr. Afnan, were you finished?
¹¹        THE WITNESS:  I said -- no,
¹²    I wasn't.
¹³        I said and both EDQ and FDA
¹⁴    accepted their application.
¹⁵ BY MR. SLATER:
¹⁶        Q.   Look at the top of Page 2,
¹⁷ it says, This guidance describes a
¹⁸ variety of ways to characterize and
¹⁹ reduce the potential lifetime cancer risk
²⁰ associated with patient exposure to
²¹ genotoxic and carcinogenic impurities,
²² both during clinical development and
²³ after approval.
²⁴        Do you see what I just read?

Page 333

¹        A.   Yes.
²        Q.   These approaches include,
³ first bullet point, changing the
⁴ synthetic and/or purification routes to
⁵ minimize the formation and/or maximize
⁶ the removal of the relevant impurity.
⁷        Do you see that?
⁸        A.   Yes.
⁹        Q.   Number -- the second bullet
¹⁰ point, Allowing a maximum daily exposure
¹¹ target of 1.5 micrograms per day for the
¹² relevant impurity as a general target for
¹³ marketed products, though higher levels
¹⁴ may be acceptable during clinical
¹⁵ development.  Certain impurities with
¹⁶ structural alerts, suggesting
¹⁷ particularly high genotoxic and
¹⁸ carcinogenic potential, would not be
¹⁹ appropriate for this general threshold
²⁰ approach and would need to be evaluated
²¹ on a case-by-case basis.
²²        Do you see what I just read?
²³        A.   Yes.
²⁴        Q.   N-nitroso compounds fall

Ari Afnan

Page 334

¹ within that category of impurities that
² would not be appropriate for the
³ threshold approach, according to this
⁴ document; you understand that, correct?
⁵        MS. DAVIDSON: Objection.
⁶        THE WITNESS: I do.
⁷        However, at that time, 2008,
⁸    ZHP had no clue that their process
⁹    was making NDMA.
¹⁰ BY MR. SLATER:
¹¹    Q.   Let's go to the bottom of
¹² the page where it says, Background.
¹³        The compounds that have been
¹⁴ demonstrated to induce genetic mutations,
¹⁵ chromosomal breaks and/or chromosomal
¹⁶ rearrangements are considered genotoxic
¹⁷ and have the potential to cause cancer in
¹⁸ humans. Exposures to even low levels of
¹⁹ these impurities may be of significant
²⁰ concern. Therefore, the identification
²¹ limits provided in ICH Q3A and ICH Q3B
²² may not be acceptable for genotoxic or
²³ carcinogenic impurities.
²⁴        Do you see what I just read?

Page 335

¹    A.   Yes.
²    Q.   Going a little further down,
³ about four lines further down, it says,
⁴ Although genotoxic and carcinogenic
⁵ properties can be acceptable for some
⁶ active pharmaceutical ingredients, APIs,
⁷ depending on clinical circumstances, for
⁸ example, cancer chemotherapies,
⁹ impurities in drug substances and drug
¹⁰ products generally do not have beneficial
¹¹ effects and may impose a risk without
¹² associated benefit. Therefore,
¹³ manufacturers should strive to achieve
¹⁴ the lowest levels of genotoxic or
¹⁵ carcinogenic impurities that are
¹⁶ technically feasible and/or levels that
¹⁷ convey no significant cancer risk.
¹⁸        Do you see what I just read?
¹⁹    A.   Yes.
²⁰    Q.   And, again, the types of
²¹ impurities we're talking about would
²² include N-nitroso compounds, and that's
²³ what they're talking about in this
²⁴ guidance in 2008, correct?

Page 336

¹        MS. DAVIDSON: Objection.
²        THE WITNESS: Yes.
³ BY MR. SLATER:
⁴    Q.   Let's go to Page 6.
⁵        Section 3 is titled,
⁶ Recommended Approaches for Initial
⁷ Assessment of Genotoxic Potential of
⁸ Impurities.
⁹        Do you see that?
¹⁰    A.   I do.
¹¹    Q.   The third paragraph under
¹² that says, If an impurity that is present
¹³ at levels below the ICH qualification
¹⁴ thresholds is identified, the impurity
¹⁵ should be evaluated for genotoxicity and
¹⁶ carcinogenicity based on structural
¹⁷ activity relationship assessments, i.e.,
¹⁸ whether there is a structural alert.
¹⁹ This evaluation can be conducted via
²⁰ review of the available literature or
²¹ through a computational toxicology
²² assessment. Commonly used software
²³ includes -- and they give examples of the
²⁴ software.

Page 337

¹        Do you see what I just read?
²    A.   Yes.
³    Q.   And, again, if the impurity,
⁴ in this case NDMA from the zinc chloride
⁵ process, had been evaluated, it would
⁶ have been identified as NDMA and then ZHP
⁷ would have been duty bound to take action
⁸ to eliminate it from the valsartan and
⁹ not sell the valsartan with the NDMA,
¹⁰ correct?
¹¹        MS. DAVIDSON: Objection.
¹² BY MR. SLATER:
¹³    Q.   I don't know what's so
¹⁴ funny, Doctor.
¹⁵        Can you just answer that
¹⁶ with a yes or no, please?
¹⁷    A.   No, I can't answer with a
¹⁸ yes or no.
¹⁹        MS. DAVIDSON: Objection.
²⁰ BY MR. SLATER:
²¹    Q.   Fine. You can't answer with
²² a yes or no, I'll move to the next
²³ question.
²⁴        Let's go to Page 7.

Ari Arman

Page 338

1       Section 4 is titled,
2  Recommended Approaches for Handling
3  Genotoxic and Carcinogenic Impurities.
4       And then Section A under
5  that is titled, Prevention of Genotoxic
6  and Carcinogenic Impurity Formation.
7       Do you see that?
8    A.   Yes.
9    Q.   Prevention of genotoxic and
10 carcinogenic impurity formation is
11 important in drug manufacturing, correct?
12   A.   Yes.
13   Q.   You always want to prevent
14 the formation of genotoxic and
15 carcinogenic impurities when you're
16 manufacturing drug substances, correct?
17      MS. DAVIDSON:  Objection.
18      THE WITNESS:  So, again,
19   this guidance -- this draft
20   guidance, which was published in
21   2008, ZHP's process in 2007 was
22   actually the TIN process.
23      ZHP's process was
24   investigated when they changed to

Page 339

1  the TEA and also when they changed
2  to the zinc chloride process.
3       And they looked, they
4  assessed whether genotoxic
5  impurities would be formed and
6  they concluded that they're not
7  present.
8       They were going from an
9  existing process, which was the
10 TIN process, to the TEA process
11 and then to the zinc chloride
12 process.  So what you're reading
13 to me out of this draft guidance
14 dated 2008 has an assumption that
15 if a manufacturer knew that it
16 has, effectively, carcinogenic
17 substances in it, would they have
18 an obligation to do what you say
19 here?  The answer is yes.
20      However, ZHP investigated,
21 assessed and decided that it
22 didn't know.  FDA vouches for that
23 when FDA says, FDA nor industry
24 knew about the formation, about

Page 340

1  the presence of these mutagenic
2  substances.
3  BY MR. SLATER:
4    Q.   Look now --
5       MS. DAVIDSON:  Can we --
6       MR. SLATER:  I'm right in
7   the middle of this document.  I'm
8   not breaking while I'm going
9   through this document.  I'm sorry.
10 BY MR. SLATER:
11   Q.   Looking now at Section A, it
12 says, under the heading of, Prevention of
13 Genotoxic and Carcinogenic Impurity
14 Formation, Since drug-related impurities
15 presumably provide limited, if any,
16 therapeutic benefits and because of their
17 potential to cause cancer in humans,
18 every feasible technical effort should be
19 made to prevent the formation of
20 genotoxic or carcinogenic compounds
21 during drug substance synthesis or drug
22 product manufacturing.
23      Do you see that?
24   A.   Yes.

Page 341

1    Q.   Do you see what I just read?
2    A.   I do.
3    Q.   And you agree that ZHP
4  needed to make every feasible technical
5  effort to prevent the formation of
6  genotoxic or carcinogenic compounds
7  during the synthesis and manufacture of
8  the valsartan it manufactured, correct?
9       MS. DAVIDSON:  Objection.
10      THE WITNESS:  If ZHP knew of
11   the formation of genotoxic
12   compounds, yes.
13      This is not the case here.
14   ZHP did not know about the
15   formation of NDMA or NDEA in its
16   valsartan process.
17 BY MR. SLATER:
18   Q.   Let's flip over to the next
19 page.
20      MR. SLATER:  Actually, no,
21   no.  Let's scroll down.  Scroll
22   down.
23 BY MR. SLATER:
24   Q.   Do you see at the bottom of

Ari Afnan

1 the page it says, under B1, the title is,
2 Acceptable Levels to Support Marketing
3 Applications.
4        Do you see that?
5    A.   Yes.
6    Q.   And that's the thresholds
7 that you've been talking about during the
8 deposition, right?
9    A.   The threshold --
10       MS. DAVIDSON: Objection.
11       THE WITNESS: No. The
12 threshold is based on, actually --
13 this is the threshold for -- in
14 this guidance, for very specific
15 substances. The threshold is what
16 is effectively detectable.
17       So we're looking at two
18 different things.
19       You are making an assumption
20 that every impurity is genotoxic
21 in ZHP process and in ZHP product.
22 That's not the case.
23       ZHP assessed the process.
24 ZHP shared that assessment with

1    the regulators, that I do not have
2    any mutagenic substances. ZHP
3    received approval from the
4    regulators that there were no
5    mutagenic substances. FDA bears
6    testimony, publicly, by saying
7    neither the regulator nor the
8    manufacturers knew about the
9    formation of NDMAs nor about -- it
10   calls them unexpected impurities.
11 BY MR. SLATER:
12   Q.   And they issued a warning
13 letter to ZHP -- and when they made all
14 those statements that you just told me,
15 in the statement from the FDA, they
16 pointed out that they issued a warning
17 letter to ZHP for its GMP violations that
18 allowed these substances to exist in its
19 valsartan; that's also what the FDA did,
20 correct?
21       MS. DAVIDSON: Objection.
22 Misstates many, many things.
23       THE WITNESS: No. FDA
24 didn't do that.

1 BY MR. SLATER:
2    Q.   Fine.
3    A.   FDA --
4    Q.   You said they didn't do it.
5 Doctor, you answered my question.
6       MS. DAVIDSON: No, no, Adam.
7 If he has something to finish, you
8 know that -- when you've had
9 witnesses, you have them finish
10 their answers, including
11 Dr. Plunkett, who had very long
12 answers.
13       Dr. Afnan, complete your
14 answer.
15       THE WITNESS: FDA --
16       MR. SLATER: Again, let me
17 say for the record, you're telling
18 your witness to ramble on
19 non-responsively to keep sucking
20 time out of the deposition, as an
21 officer of the court.
22       MS. DAVIDSON: No, that's
23 not what I'm telling the witness.
24 He's not my witness, first of all.

1    He's an expert witness.
2       MR. SLATER: Let him answer.
3 Do you want --
4       MS. DAVIDSON: He's in the
5 middle of answering a question.
6 You can't just cut him off, Adam,
7 you know that. You know better
8 than that.
9       MR. SLATER: Thank you. I
10 know better? You stand behind
11 what's going on in this
12 deposition? I find that hard to
13 imagine, but I guess you do.
14 BY MR. SLATER:
15   Q.   Do you have something else
16 you want to say, Doctor, in response to
17 my last question?
18   A.   Yes, I do.
19       MS. DAVIDSON: He was in the
20 middle of the answer.
21       THE WITNESS: Yes, I do.
22       MS. DAVIDSON: Do you even
23 recall what you were talking
24 about? Because I don't.

Ari Afnan

Page 346

```
1        MR. SLATER:  Why are you
2   saying that to him?  Why would you
3   suggest to him to say he doesn't
4   remember?  Why would you do that?
5   It's inappropriate.
6        MS. DAVIDSON:  I'm asking if
7   he wants the question read back,
8   Adam, because --
9        MR. SLATER:  He doesn't
10  need --
11       MS. DAVIDSON:  -- all of
12  your explosions make it impossible
13  for me to even know where we were.
14  Because you rudely interrupted
15  him, then attacked me and then
16  attacked the witness.
17       If he can -- if he
18  remembers, great.  I don't.
19       Go ahead, Dr. Afnan.
20       THE WITNESS:  ZHP was issued
21  a warning letter.  The warning
22  letter which effectively, as I
23  have said, is informal and
24  advisory, as per FDA.  And that
```

Page 347

```
1   was issued because FDA needed more
2   information on the conclusion of
3   the investigation.
4        If you look at the
5   communications after the warning
6   letter between FDA and ZHP, FDA is
7   as interested in the outcome of
8   the warning letter -- of the
9   investigation into the formation
10  of NDMAs as is ZHP.
11       By that time, if -- you
12  know, there is no product being
13  manufactured, the process is
14  changed -- or the process
15  had stopped and the process was
16  changed later.
17       So the warning letter is
18  there as an informal iterative
19  action by FDA to actually move the
20  firm to come up with a conclusion
21  of what the pathway for formation
22  of these substances are.
23       FDA, at no point, states in
24  the warning letter that ZHP has
```

Page 348

```
1   been making NDMA in its process
2   since 2007 or '10 or '11 or
3   whatever.  It's not there.
4        MS. DAVIDSON:  All right.
5   Are we ready for a break?  I think
6   everybody needs a break.
7        MR. SLATER:  No, I'm not
8   done with this document, and I'm
9   not breaking.
10       MS. DAVIDSON:  I'm not
11  familiar with the rule that you
12  can go on with a document forever
13  to prevent people from taking a
14  break and going to the bathroom.
15       THE WITNESS:  I am ready for
16  a break.
17       MR. SLATER:  You guys, if
18  you want to stop, even though I'm
19  asking you not to stop, I can't
20  physically stop you.
21       So you tell me what you want
22  to do.  I'd like to continue.  If
23  you want to make me stop --
24       MS. DAVIDSON:  Do you -- I
```

Page 349

```
1   would like to be cooperative.
2        Do you have more than five
3   minutes left on this document?
4        MR. SLATER:  I don't know,
5   because every question I ask, I
6   get a long, rambling nonresponsive
7   speech.  So I would say, yes, less
8   than five minutes if I get
9   responsive answers to questions.
10       MS. DAVIDSON:  Adam, that's
11  not necessary.  If you have more
12  than five --
13       MR. SLATER:  Yes, it is.
14       MS. DAVIDSON:  If you have
15  more than five minutes on the
16  document, I think we should take a
17  break.
18       MR. SLATER:  I don't.  I
19  don't have more than five minutes.
20       You just asked me.  I don't
21  have more than five minutes on the
22  document.  You can ask the expert
23  that you hired whether or not he
24  could answer questions with a
```

Ari Athan

Page 350

1  direct answer.  You're wasting my
2  time on this video.
3      MS. DAVIDSON:  You're
4  wasting it.  So let's --
5      MR. SLATER:  What do you
6  want to do, break or not break?
7  Make a decision, please.
8      MS. DAVIDSON:  I would like
9  to have a break and go to the
10  ladies room.
11      THE WITNESS:  Yes, please.
12      MR. SLATER:  Off the record.
13      VIDEO TECHNICIAN:  We're off
14  the record at 5:02 p.m.
15          - - -
16      (Whereupon, a brief recess
17  was taken.)
18          - - -
19      VIDEO TECHNICIAN:  We're
20  back on the record at 5:07 p.m.
21  BY MR. SLATER:
22      Q.   Looking at --
23      MR. SLATER:  Where is the
24  document?

Page 351

1  BY MR. SLATER:
2      Q.   Looking at Section B1,
3  titled, Acceptable Levels to Support
4  Marketing Applications.  Let's go to the
5  carryover of that paragraph on the top of
6  Page 8.
7          And after they talk about
8  various threshold levels, they state, at
9  the end of that paragraph, at the top of
10  the page, However, there are some
11  compounds containing certain structural
12  groups, aflatoxin-like, N-nitroso and
13  azoxy structures, that have extremely
14  high carcinogenic potency and are
15  excluded from the threshold approach.
16          Do you see that?
17      A.   Yes.
18      Q.   That includes NDMA and NDEA,
19  correct?
20      A.   Yes.
21      Q.   So if FDA, in its guidance
22  in 2008, said NDMA and NDEA are excluded
23  from the threshold approach; that's what
24  that means, correct?

Page 352

1      A.   Yes.
2      Q.   Let's go to Page 13.
3          Appendix A to this document
4  is the decision tree flow diagram.
5          Do you see that?
6      A.   Yes.
7      Q.   At the very top it says,
8  Identify impurity.
9          Do you see that?
10      A.   Yes.
11      Q.   That's the first thing the
12  manufacturer is supposed to do, is
13  actually make every feasible technical
14  effort, as I read that language from
15  earlier in the document, to identify the
16  impurity, right?
17      MS. DAVIDSON:  Objection.
18      THE WITNESS:  Only if the
19  expectation is for the impurity to
20  be genotoxic.
21  BY MR. SLATER:
22      Q.   It says, Once you identify
23  the impurity, observed level exceeds --
24  let me go back, actually, to what you

Page 353

1  just said.
2          You're saying that you have
3  to know that you have a genotoxic
4  impurity before you have to look for the
5  impurity and identify it?
6          Isn't that a little
7  circular, Doctor?
8      MS. DAVIDSON:  Objection.
9      THE WITNESS:  I don't think
10  it is.  I think what the
11  requirements are, there has to be
12  an expectation of genotoxic
13  impurities; an expectation of
14  genotoxic impurities.
15  BY MR. SLATER:
16      Q.   What if you have an
17  understanding of potential formation of
18  genotoxic impurities, you don't expect it
19  to be formed, but you know it might form
20  from the process that you -- that you're
21  using, are you able to say, well, we
22  don't expect it, so we're not going to
23  investigate why it's there, whether it's
24  there or not?  Is that acceptable?

Ari Arnan

Page 354

1    MS. DAVIDSON:  Objection.
2    MR. SLATER:  Let me ask it
3  again.
4  BY MR. SLATER:
5    Q.    You say if it's expected.
6    What if it's known to be
7  possible, based on an understanding of
8  the chemical process at issue?  In that
9  case, are you allowed to ignore
10  identification of the impurity because
11  you don't know for sure that it's been
12  formed, or do you have to actually
13  investigate to see if it's there?
14    MS. DAVIDSON:  Same
15  objections.
16    THE WITNESS:  The answer is,
17  if you expect it to be there, you
18  need to identify it.
19    In this case, ZHP did not
20  know that it was potentially there
21  or it could potentially be formed.
22  BY MR. SLATER:
23    Q.    If ZHP knew that it could
24  potentially form, they would have been

Page 355

1  required to test for the NDMA and NDEA,
2  correct?
3    A.    If they expected it to be
4  there, yes.  But they did not know.  This
5  is not the case here.
6    Q.    Why do you keep changing my
7  question?  I did not ask about if they
8  expected it.
9    In fact, you didn't answer
10  my prior question, Doctor, you evaded it.
11    What you said -- I asked you
12  a question, and I'll try it again.
13    A.    Okay.
14    Q.    If ZHP didn't expect NDMA to
15  form but knew that it was potentially
16  going to form based on an understanding
17  of the chemical reactions, did ZHP have
18  to test to see if NDMA was forming?
19    A.    It didn't expect it but
20  potentially knew it would be there?  To
21  me, both those two are the same.
22    If you expect it to be there
23  or if you believe, potentially, it is
24  going to be there, you will test for it.

Page 356

1    And, again, that's not what
2  the case is here.  ZHP didn't expect it
3  nor did it know potentially it would be
4  there.
5    Q.    Looking at the decision
6  tree, this says, once you identify the
7  impurity, you go to the next question,
8  Whether the observed level exceeds the
9  relevant ICH qualification threshold or
10  is less than ICH qualification threshold
11  but displays a structural alert.
12    Do you see that?
13    A.    Yes.
14    Q.    So that's telling you, if
15  you identified NDMA or NDEA, even if it
16  was in a quantity less than the ICH
17  qualification threshold, you would then
18  have to go down where it says, yes, and
19  determine, Are you able to prevent the
20  formation of the impurity, correct?
21    A.    Yes.  And, again, not the
22  case here.
23    Q.    It's not the case here
24  because ZHP did not evaluate the

Page 357

1  potential formation -- well, rephrase.
2    It's not the case here
3  because ZHP did not identify the
4  potential for the formation of
5  nitrosamines in its manufacturing
6  process, correct?  That's your opinion,
7  right?
8    A.    Yes.  ZHP looked at the
9  process and did not predict or estimate
10  or come up with a reason, justification
11  for formation of mutagenic substances.
12    Q.    And the basis of your
13  opinion that ZHP was not expected to
14  identify the potential formation of NDMA
15  or NDEA in these processes is your
16  reliance on Dr. Xue for that point,
17  correct?
18    A.    No, no, no.
19    MS. DAVIDSON:  Objection.
20  BY MR. SLATER:
21    Q.    So you're now an organic
22  chemistry expert again?
23    A.    No, no.  I haven't answered
24  yet.

Ari Arman

Page 358

1    MS. DAVIDSON:  And I haven't
2 even had a chance to -- to object,
3 because everybody is talking over
4 each other.
5    I object to that question.
6 It mischaracterizes his testimony.
7    Also, he started answering,
8 you did not let him finish.  And
9 you, again, made a sarcastic
10 retort.  Let him answer the
11 question.
12    THE WITNESS:  I am not an
13 organic chemist.  I am not
14 responding as an organic chemist,
15 I am not relying solely on
16 Dr. Xue's expertise in this case.
17    I am looking at what was
18 developed in the early phases in
19 2010, 2012, 2013, and submitted to
20 the regulators for their review
21 and approval.  They did not
22 identify mutagenic substances
23 prior to 2018.
24 BY MR. SLATER:

Page 359

1    Q.   For your opinion that the
2 organic chemists at ZHP were not expected
3 to figure out that there was a potential
4 for the formation of NDMA or NDEA, do you
5 rely on Dr. Xue's opinion that it would
6 not be expected for a chemist to have
7 known or figured that out, or do you have
8 the opinion that the organic chemist did
9 not need to figure that out?
10    I'm trying to figure out
11 where your basis is to give this organic
12 chemistry opinion.
13    MS. DAVIDSON:  Objection.
14 If that's a question.
15    THE WITNESS:  I'm not --
16 BY MR. SLATER:
17    Q.   I'll ask it differently,
18 Doctor.
19    A.   No, I --
20    Q.   The question of whether --
21 the question of whether ZHP's chemists
22 were expected to identify the potential
23 formation of nitrosamines in these
24 manufacturing processes is a question of

Page 360

1 organic chemistry, in terms of an
2 understanding of the literature and what
3 was available out there and what could
4 have been found and identified by organic
5 chemists, correct?
6    A.   Your question had the word
7 "expected to."  My response has been and
8 continues to be that ZHP looked at the
9 process and they came to the conclusion
10 that there are no mutagenic substances
11 formed in the process.
12    Furthermore, this was a
13 change to the TIN process, which went
14 from TIN to TEA and then it went to zinc
15 chloride.  The time difference between
16 the TIN and the zinc chloride process was
17 three years.
18    There was a lot of studies
19 done during that time period, as well as
20 when they changed to TEA.  So they did
21 investigate.  They didn't see, they
22 didn't predict -- they didn't predict,
23 they didn't estimate, they did not come
24 up with that expectation of, oh, NDMA

Page 361

1 will be formed here.
2    FDA also looked at the same
3 data, the same information, and the same
4 chemistry, and did not come up with a
5 conclusion of mutagenic substances are
6 formed in this process.
7    Q.   Is that the basis for your
8 opinion that ZHP was not expected to
9 identify the potential formation of
10 nitrosamines?
11    What you just went through,
12 is that -- I'm just asking you, is that
13 the basis for the opinion?
14    MS. DAVIDSON:  Objection.
15 BY MR. SLATER:
16    Q.   I don't need you to repeat
17 it.
18    I just need to know, is that
19 the basis for the opinion?
20    A.   That was not the opinion I
21 expressed.
22    Q.   One of the reasons why you
23 say ZHP was not expected to identify the
24 potential formation of nitrosamines is

Ali Afnan

Page 362

1 because ZHP did not identify the
2 potential formation of the nitrosamines
3 based on their risk assessment; is that
4 one of the reasons why you give that
5 opinion, because they didn't figure it
6 out?
7        A.   It's based on the risk
8 assessment, as well as the research they
9 have done.
10       Q.   Another basis for your
11 opinion is that the FDA didn't identify
12 that risk of formation of nitrosamines.
13 That's another reason why you say ZHP was
14 not expected to identify that potential
15 risk.
16        Do I understand that
17 correctly?
18       A.   I'm not using the FDA
19 statement as a reason of saying that's
20 because they didn't find it.
21        I'm saying, the FDA's
22 statement verifies that they did not find
23 it, they did not have an expectation of
24 doing so.

Page 363

1        I'm not saying that ZHP
2 based their decision on what the FDA had
3 said, because the FDA said this in 2018.
4 I'm saying the statements, two of, in
5 2018 and 2019, were effectively verifying
6 that ZHP had not looked at the process
7 and said, you know, we expect NDMAs.  FDA
8 says, it was not expected to be there.
9        Q.   In terms of your
10 understanding that ZHP was not expected
11 to have been able to identify the
12 potential formation of nitrosamines, is
13 there anything else that you're relying
14 on besides what you just told me, those
15 two points, for that opinion?
16       A.   It's the investigation,
17 which they had done, the assessments that
18 they had done, the reports that they had
19 issued, which effectively said, we've
20 looked at the process and we do not
21 expect any carcinogenic impurities.
22        The process -- this was a
23 process revision, this was a process
24 update -- or a process change.

Page 364

1        The original process was
2 developed in 2007.  Then, as they changed
3 each step, they looked at the potentials
4 of, you know, formation of undesired
5 impurities, and their conclusion was that
6 there is nothing there.
7        The analytical data
8 supported that they were not finding
9 anything or that there was no NDMA
10 present.
11       Q.   In forming the opinion --
12 well, rephrase.
13        I don't need to go over it
14 again.
15        MR. SLATER:  Let's take this
16 document down.  And let's go to --
17 back to the warning letter, okay.
18        I'm going to go back to the
19 FDA warning letter.  I think we
20 used it.  Yeah.  We used it very
21 early on.
22        THE WITNESS:  Yes, we did.
23        MR. SLATER:  It was
24 Exhibit-2 or 3 or something?

Page 365

1        MS. DAVIDSON:  Yeah, let's
2 just make sure for the record we
3 identify what the exhibit number
4 is.
5        MR. SLATER:  Exhibit-4.
6        MS. DAVIDSON:  Thanks.
7 BY MR. SLATER:
8        Q.   Let's go, in the warning
9 letter, to Page 4.
10        This is what the FDA said in
11 Section 2, the heading is, Failure to
12 Evaluate the Potential Effect That
13 Changes in the Manufacturing Process May
14 Have on the Quality of Your API.
15        Do you see that heading?
16       A.   Yes.
17       Q.   The FDA states, In November
18 2011, you approved the valsartan API
19 process change that included the use of
20 the solvent DMF.  Your intention was to
21 improve the manufacturing process,
22 increase product yield and lower
23 production costs.  However, you failed to
24 adequately assess the potential formation

Ari Afman

Page 366

¹ of mutagenic impurities when you
² implemented the new process.
³ Specifically, you did not consider the
⁴ potential for mutagenic or other toxic
⁵ impurities to form from DMF degradants,
⁶ including the primary DMF degradant
⁷ dimethylamine.  According to your ongoing
⁸ investigation, dimethylamine is required
⁹ for the probable human carcinogen NDMA to
¹⁰ form during the valsartan API
¹¹ manufacturing process.  NDMA was
¹² identified in valsartan API manufactured
¹³ at your facility.
¹⁴        Do you see what I just read?
¹⁵    A.   Yes.
¹⁶    Q.   So you agree the FDA found a
¹⁷ violation of cGMP based on the failure to
¹⁸ adequately assess the potential formation
¹⁹ of mutagenic impurities when they
²⁰ implemented the new process.
²¹        That's what it says on the
²² document, correct?
²³    A.   That's what it says on the
²⁴ document, which is written and issued

Page 367

¹ with the benefit of hindsight.
²    Q.   The next paragraph says, You
³ also failed to evaluate the need for
⁴ additional analytical methods to ensure
⁵ that unanticipated impurities were
⁶ appropriately detected and controlled in
⁷ your valsartan API before you approved
⁸ the process change.  You are responsible
⁹ for developing and using suitable methods
¹⁰ to detect impurities when developing and
¹¹ making change to your manufacturing
¹² processes.  If new or higher levels of
¹³ impurities are detected, you should fully
¹⁴ evaluate the impurities and take action
¹⁵ to ensure the drug is safe for patients.
¹⁶        Do you see what I just read?
¹⁷    A.   Yes.
¹⁸    Q.   So the FDA found, again, a
¹⁹ violation of cGMP because ZHP failed to
²⁰ apply analytical methods sufficient to
²¹ identify these new impurities, and
²² specifically NDMA -- NDMA and NDEA in
²³ their valsartan.
²⁴        That's what the words on the

Page 368

¹ page say, correct?
²        MS. DAVIDSON:  Objection.
³    Mischaracterizes the document.
⁴ BY MR. SLATER:
⁵    Q.   It's what it says, right,
⁶ Doctor?
⁷    A.   It says, You failed to
⁸ evaluate the need for analytical -- for
⁹ additional analytical methods.
¹⁰        Again, it's important to
¹¹ look at the warning letter in the light
¹² of events that took place.  When ZHP
¹³ identified presence of NDMA, ZHP took
¹⁴ action.  They stopped manufacturing.
¹⁵ They started investigating.  They
¹⁶ informed the FDA.  They did a recall.
¹⁷ They did all of those.
¹⁸        So this, which is issued in
¹⁹ November of 2018, is actually there to
²⁰ make sure that ZHP is going to keep its
²¹ end of the bargain and continue its
²² investigation.
²³        Otherwise, ZHP had stopped
²⁴ production, had stopped shipping, even

Page 369

¹ before the import letter was put in
² place.
³    Q.   Going now to the third
⁴ paragraph, the FDA states, Your response
⁵ states that predicting NDMA formation
⁶ during the valsartan manufacturing
⁷ process required an extra dimension over
⁸ current industry practice and that your
⁹ process development study was adequate.
¹⁰ We disagree.  We remind you that common
¹¹ industry practice may not always be
¹² consistent with cGMP requirements and
¹³ that you are responsible for the quality
¹⁴ of drugs you produce.
¹⁵        Do you see what I just read?
¹⁶    A.   Yes.
¹⁷    Q.   Did you read that when you
¹⁸ wrote your opinion in your report?
¹⁹        MS. DAVIDSON:  Objection.
²⁰        THE WITNESS:  Yes.
²¹ BY MR. SLATER:
²²    Q.   You keep saying to me, for
²³ the last however many hours we've been in
²⁴ this deposition, well, the FDA didn't

Ari Afnan

1  find it, so there was no obligation for
2  ZHP to find it.
3        This warning letter from the
4  FDA tells ZHP that it was their
5  responsibility to identify the NDMA and
6  they failed to do so.
7        That's what the words on the
8  page say, correct?
9      A.   Again, those are the words
10 on the page.  But it has to be taken in
11 the context of what's going on.  FDA had
12 received, had shared every document that
13 ZHP did.  Every process that ZHP
14 developed was shared with FDA.  It was
15 shared through the amendments to the DMF.
16 It was also informed to FDA when the
17 ANDAs were filed with FDA.
18        So all of those were shared
19 with FDA.  This is in the -- with 20/20
20 hindsight, in November of 2018, after FDA
21 has been to site multiple times, has not
22 found any issues with the quality system.
23 Then a for-cause inspection, which
24 results in this warning letter.

1        So it has to be taken in the
2  light of where it is, you know.  It's --
3  it's suddenly ZHP goes from being
4  compliant to noncompliant on 29th of
5  November 2018.
6      Q.   One of the things you've
7  said to me multiple times is, well, this
8  is with the benefit of hindsight, this is
9  looking back with hindsight.
10        You'd said that a few times
11 to me, right?
12     A.   Yes.
13     Q.   Does the FDA have a warning
14 letter that they also will issue in a
15 different circumstance where they look
16 into their crystal ball and see what
17 someone is going to do in the future and
18 give them a warning letter for future
19 conduct that hasn't happened yet?  Is
20 there the crystal ball warning letter
21 also?
22        MS. DAVIDSON:  Objection.
23        THE WITNESS:  Warning
24 letters are issued after an

1  inspection and after review of
2  their response to the inspection.
3  BY MR. SLATER:
4      Q.   Is it your -- rephrase.
5        In forming your opinions,
6  did you discount the significance of the
7  retrospective analysis of what occurred,
8  including that performed by ZHP and that
9  performed by the FDA, because it was
10 being done in hindsight?
11     A.   Sorry.  Could you either
12 rephrase or explain that question to me
13 again?
14     Q.   Sure.
15        In forming your opinions as
16 to whether or not ZHP complied with
17 cGMPs --
18     A.   Yes.
19     Q.   -- did you discount the
20 significance of the FDA's findings in
21 this warning letter and discount the
22 significance of the findings by ZHP in
23 its own deviation investigation reports
24 because they were hindsight analyses

1  looking back on what happened?
2        MS. DAVIDSON:  Objection.
3  BY MR. SLATER:
4      Q.   I just want to know, yes or
5  no, did you do that?
6        MS. DAVIDSON:  Okay. Again,
7  every single time you ask a
8  question I object and then you
9  have your little colloquy.
10        I'm objecting to the
11 question, and if that follow up is
12 a question, to that as well.
13        THE WITNESS:  So, again, you
14 know, in June of 2018, when ZHP
15 informed FDA about presence of
16 NDMA, FDA did not issue,
17 immediately, a warning letter and
18 say, you know what, you're done,
19 this is it, go back.
20        FDA's warning letter is
21 issued after the response.  FDA
22 issues this warning letter because
23 the response was not as expected,
24 the response to the 483.

Ari Afnan

Page 374

1    MR. SLATER:  We're now going
2  to put up on the screen
3  Exhibit-14.
4         - - -
5    (Whereupon, Exhibit
6  Afnan-14, ZHP00662283-2309,
7  Investigation Regarding an Unknown
8  Impurity (Genotoxic Impurity), was
9  marked for identification.)
10        - - -
11 BY MR. SLATER:
12   Q.   This is a draft of the
13 deviation investigation report, draft of
14 Version 1.
15   Do you see this on the
16 screen?  Have you seen this document
17 before?
18   A.   I have seen the final
19 version, yes.
20   Q.   All right.  Well, let me go
21 to -- let's go to -- the Bates number is
22 308 at the bottom right.
23   A.   308.
24   Q.   Under Section 5.2, it says,

Page 375

1  Control strategy.  And the paragraph
2  starts, Due to insufficient extent and
3  depth of process research at the early
4  stage, as well as insufficient study and
5  understanding of potential genotoxic
6  impurities, only side reaction product
7  and degradation products were studied and
8  was unaware of the further reaction
9  between degradation products and raw
10 material.
11   Do you see what I just read?
12   A.   Yes.
13   Q.   Have you ever seen that
14 before right now?
15   A.   As I said, this is the
16 draft.  I've seen the final version.
17   Q.   So you've never seen the
18 language I just read to you, correct?
19   A.   I do not recall reading that
20 language in the final version.  But it
21 may --
22   Q.   Now having seen that there
23 were people at ZHP that wrote into a
24 deviation investigation report that they

Page 376

1  had an insufficient extent and depth of
2  process research and insufficient study
3  and understanding of potential genotoxic
4  impurities, and as a result, they failed
5  to investigate and assess all of the
6  reactions, now having seen that, that's
7  an important fact that you need to take
8  into consideration and reassess your
9  opinions as to whether or not they did an
10 adequate assessment of the risks of
11 formation of nitrosamines, correct?
12   MS. DAVIDSON:  Objection.
13   THE WITNESS:  So this is a
14 draft document.  The purpose of a
15 draft document is document in
16 progress.  It's being developed.
17   So if you look at the final
18 version, we will see what was
19 there.
20   A draft is something which
21 is being written by people to be
22 considered as a -- as a group, and
23 an investigation.  In pharma it's
24 usually effectively reviewed

Page 377

1  collectively and it's also
2  developed collectively.
3   So because it was in the
4  draft, it doesn't mean it's in the
5  final version.  It doesn't mean
6  it's correct.
7   I don't know who wrote that.
8  I don't know whether the quality
9  organization of the site agreed
10 with that statement.
11 BY MR. SLATER:
12   Q.   You agree with that
13 statement, that that's what occurred?
14   MS. DAVIDSON:  Objection.
15   THE WITNESS:  This is a
16 draft.  Let's pull up the final
17 version and look --
18 BY MR. SLATER:
19   Q.   Let's answer my question.
20 You just said I agree with
21 that statement.  You're saying you agree
22 with the statement I just read to you,
23 correct?
24   MS. DAVIDSON:  Objection.

Ari Afnan

Page 378

1    That mischaracterizes his
2    testimony.
3        MR. SLATER:  Why are you
4    testifying?  Please don't.
5        MS. DAVIDSON:  He didn't say
6    that.
7        THE WITNESS:  No, no.
8        MS. DAVIDSON:  You're
9    misquoting him, Adam.
10       MR. SLATER:  Okay.  Then
11   I'll ask you the next question.
12   BY MR. SLATER:
13       Q.   You did not say that.
14           You know, one possibility is
15   that that is true, that's what actually
16   happened and someone at ZHP said, wait a
17   second, we can't admit in this document,
18   which we're submitting to the FDA, what
19   this says, because it's an admission that
20   we did insufficient research and an
21   insufficient risk assessment, so we need
22   to remove that.  That's one possible
23   reason why that language was removed.
24           You'll -- as an objective

Page 379

1    expert, you would agree that's one
2    possible explanation, right?
3        MS. DAVIDSON:  Objection.
4        THE WITNESS:  That's -- that
5        would be against the GMPs of
6        falsifying records.  ZHP was not
7        cited for data integrity and for
8        falsifying records.
9    BY MR. SLATER:
10       Q.   Did the FDA ever see this
11   document that I'm showing you right now,
12   this draft?
13       MS. DAVIDSON:  Objection.
14       THE WITNESS:  I have no
15       idea.  My point is not whether FDA
16       saw this draft or not.
17           FDA, if they had been
18       presented with a draft, if the
19       investigator would have normally
20       said, give me the final version,
21       not the draft.
22   BY MR. SLATER:
23       Q.   If what's written there is
24   actually true, ZHP violated cGMPs,

Page 380

1    correct?
2            If what I just read to you
3    is actually the truth, they violated
4    cGMPs, correct?
5        A.   If what is written here --
6    again, I go back, and you're not going to
7    like my answer, that, effectively, that
8    development work -- you know, assuming
9    that's a correct statement, the depth of
10   process of research at the early stages,
11   as well as insufficient study and
12   undertaking, would occur at the
13   development location where GMPs do not
14   apply.
15           So, effectively, development
16   is parceled -- is run at a different
17   location to the -- to the manufacturing
18   facility.  That's why development has no
19   GMPs, no -- no rules and regulations
20   covering it.  It's effectively best
21   practices.
22       Q.   Pharmaceutical best
23   practices?
24           You said "best practices,"

Page 381

1    do you mean pharmaceutical best
2    practices?
3        A.   It's the common practice
4    that development is not regulated by any
5    regulator.
6        Q.   The risk assessment --
7    rephrase.
8            If the statement I just read
9    is a true statement in characterizing the
10   level of research and understanding
11   during the risk assessment phase of the
12   change control process, which was
13   governed by cGMP, then they violated
14   cGMP, correct?
15       A.   If the level of research was
16   insufficient, it is not contrary to GMPs,
17   it is just a badly developed process.
18           There are badly developed
19   processes in pharma, in industry, which
20   are there.
21           Now, specifically if they
22   are looking at, okay, we didn't do the
23   research, or if the statement is a firm
24   did not do their research to then find

Afnan

Page 382

¹ the formation of degradants and
² degradation products and so on and so
³ forth, and informed the regulator that I
⁴ have done the work and everything is fine
⁵ and it's not there, that would be -- in
⁶ fact, not even GMPs, that would be lying
⁷ to the regulator.
⁸       Q.   The guidances we went
⁹ through earlier talked about the need to
¹⁰ take every feasible technical effort to
¹¹ avoid genotoxic impurities.
¹²       Remember we talked about
¹³ that?
¹⁴       A.   Yes.
¹⁵       Q.   Part of taking every
¹⁶ feasible technical effort would be making
¹⁷ sure that you have sufficient extent and
¹⁸ depth of process research and sufficient
¹⁹ study and understanding of the potential
²⁰ genotoxic impurities so that you could
²¹ understand the potential reactions and
²² avoid those reactions and avoid the
²³ impurity, correct?
²⁴       A.   Yes.  On the provision that

Page 383

¹ you expect to form undesirable
² impurities.
³       MR. SLATER:  We can take
⁴    that down.
⁵       Let's go -- can you get to
⁶    Q7A by any chance?  I'm sorry, I
⁷    didn't give you a heads up, Chris.
⁸       Got it?  Forget it?  Here.
⁹    You take it and when you find it
¹⁰    let me know.
¹¹       MS. DAVIDSON:  Adam, do you
¹²    want to go off the record while
¹³    you figure this out?
¹⁴       MR. SLATER:  Nope.  I want
¹⁵    to keep moving, one way or the
¹⁶    other.
¹⁷       Hey, Chris, can you go to --
¹⁸    put up the EMEA?
¹⁹       All right.  Go off the
²⁰    record for a second.  I got Chris
²¹    all screwed up with this.
²²       MS. DAVIDSON:  No problem.
²³       VIDEO TECHNICIAN:  Hang on a
²⁴    second.  We're off the record at

Page 384

¹    5:42 p.m.
²       - - -
³       (Whereupon, a brief recess
⁴    was taken.)
⁵       - - -
⁶       VIDEO TECHNICIAN:  We're
⁷    back on the record at 5:42 p.m.
⁸       MR. SLATER: Let's put up
⁹    Q7A.  We're up to Exhibit-15 now.
¹⁰       - - -
¹¹       (Whereupon, Exhibit
¹²    Afnan-15, No Bates, Guidance for
¹³    Industry Q7A Good Manufacturing
¹⁴    Practice Guidance for Active
¹⁵    Pharmaceutical Ingredients, was
¹⁶    marked for identification.)
¹⁷       - - -
¹⁸ BY MR. SLATER:
¹⁹       Q.   Looking at the Q7A, dated
²⁰ August 2001, that's a document you're
²¹ familiar with, correct?
²²       A.   Yes.
²³       Q.   This applied, in your
²⁴ opinion, to ZHP's manufacture of

Page 385

¹ valsartan?
²       A.   Yes.
³       Q.   Let's go to Page 1.
⁴       Under the introduction, the
⁵ second paragraph, the third line, it
⁶ says, In this guidance, the term "should"
⁷ identifies recommendations that, when
⁸ followed, will ensure compliance with
⁹ cGMPs.  An alternative approach may be
¹⁰ used if such approach satisfies the
¹¹ requirements of the applicable statutes.
¹²       Do you see what I just read?
¹³       A.   Yes.
¹⁴       Can I ask a question?  Is
¹⁵ there a reason why you're using this
¹⁶ version?
¹⁷       Q.   Is there a different version
¹⁸ you think I should be using?
¹⁹       A.   I'm just asking because
²⁰ there is another one which was finalized
²¹ in 2016.
²²       Q.   I thought I would use the
²³ one that was in effect the entire time.
²⁴       A.   Sure.  Thank you.

Ari Aman

Page 386

1    Q.   Let's go to Page 28.
2         Under the heading of,
3  Laboratory Controls, if we go down to the
4  third paragraph, it says, All
5  specifications, sampling plans and test
6  procedures should be scientifically sound
7  and appropriate to ensure that raw
8  materials, intermediates, APIs and labels
9  and packaging materials conform to
10 established standards of quality and/or
11 purity.
12        Do you see that?
13   A.   Yes.
14   Q.   And ZHP was required to
15 ensure that all of its specifications,
16 sampling plans and test procedures were
17 scientifically sound, right?
18   A.   Yes.
19   Q.   That was a cGMP obligation,
20 right?
21   A.   It is, yes.
22        The reason I hesitate is
23 because, actually, since this is a
24 generic drug or generic API, there is a

Page 387

1  USP monograph of valsartan which would
2  actually be the specifications for
3  valsartan.
4    Q.   We went through, before,
5  that the USP had explained that you must
6  develop additional tests and analytical
7  methods if you change the process and
8  you're going to introduce external
9  sources that could bring impurities into
10 the process.
11        Remember we went through
12 that before?
13   A.   I do remember.  That's not
14 the one I'm referring to.
15        There is a monograph for
16 valsartan API.
17   Q.   I realize that.
18        But the monograph for
19 valsartan API is not the exhaustive list
20 of tests and acceptance criteria
21 applicable once ZHP developed its new
22 processing methods and was introducing
23 external sources that could bring
24 impurities in, like DMF and

Page 388

1  triethylamine, right?
2         MS. DAVIDSON:  Objection.
3  BY MR. SLATER:
4    Q.   Correct?
5    A.   If --
6         MS. DAVIDSON:  Objection.
7         THE WITNESS:  If ZHP wanted
8  to sell its product to United
9  States, it would have to meet the
10 requirements of the USP monograph
11 for valsartan.
12 BY MR. SLATER:
13   Q.   And this language I just
14 read, because, remember, we said should,
15 we read that from the beginning, means if
16 you do this, you're going to comply with
17 cGMP.
18        And they're saying here, you
19 need to ensure that the raw materials,
20 intermediates, APIs, et cetera, conform
21 to established standards of quality
22 and/or purity, right?
23        MS. DAVIDSON:  Objection.
24        THE WITNESS:  It says all

Page 389

1         specifications, sampling plans,
2         test procedures should be
3         scientifically sound and
4         appropriate to ensure that raw
5         materials, intermediates, APIs and
6         labels and packaging materials
7         conform to standards.
8         I'm not disputing that.
9  BY MR. SLATER:
10   Q.   And in this case, it turned
11 out that the -- that the valsartan
12 contained NDMA, and, by definition, the
13 established standards of quality and
14 purity did not approve and allow for NDMA
15 to be in valsartan, correct?
16        MS. DAVIDSON:  Objection.
17        THE WITNESS:  So, again, I
18 would like to say that you're --
19 so the monograph on valsartan does
20 not have NDMA.  You're correct, it
21 doesn't have it in there.
22        But it also stipulates what
23 test methods should be used for --
24 for assessing the specification,

Al-Nihan

Page 390

¹ the quality of valsartan.
² BY MR. SLATER:
³      Q.   We literally just went
⁴ through this, that non-monograph tests
⁵ and acceptance criteria are required
⁶ where you change the processing methods
⁷ or introduce external sources that could
⁸ bring impurities to them, then you have
⁹ to develop other testing and acceptance
¹⁰ criteria to address those circumstances.
¹¹      That's literally what the
¹² USP says, right?
¹³      MS. DAVIDSON:  Objection.
¹⁴      THE WITNESS:  No.  That's
¹⁵ not what the USP says.
¹⁶      It's if you believe that
¹⁷ there are undesirable impurities
¹⁸ present.  Q3A allows you to have
¹⁹ less than .1 percent.
²⁰      This document, which says
²¹ that it should be scientifically
²² sound, Q7, does not address about
²³ bringing in new test methods or
²⁴ whatever.  Is --

Page 391

¹ BY MR. SLATER:
²      Q.   I --
³      MS. DAVIDSON:  Are you
⁴ interrupting him?  Are you done?
⁵      THE WITNESS:  No, I'm not
⁶ done.
⁷      MS. DAVIDSON:  You're both
⁸ talking over each other.
⁹      THE WITNESS:  I'm not done.
¹⁰ So Q7 specifically says,
¹¹ here are the specifications, ding,
¹² ding, ding, ding, specifications,
¹³ sampling plans, test procedures
¹⁴ should be scientifically sound and
¹⁵ appropriate.
¹⁶      And what I have said is the
¹⁷ test procedures are defined by USP
¹⁸ monograph of valsartan.
¹⁹ BY MR. SLATER:
²⁰      Q.   You're not testifying that
²¹ the USP allows -- rephrase.
²²      You're not testifying the
²³ USP permitted the valsartan sold by ZHP
²⁴ to have NDMA or NDEA in it?  That's not

Page 392

¹ what you're saying, is it?
²      A.   That's not what I'm saying,
³ no.
⁴      Q.   Okay.  And you would agree
⁵ with me the USP did not permit NDMA or
⁶ NDEA to be in the valsartan, correct?
⁷      A.   USP does not say in its
⁸ monograph NDMA should be absent.
⁹      Q.   It's understood that there
¹⁰ should be no NDMA or NDEA in valsartan in
¹¹ order to comply with USP, correct?
¹²      A.   It's understood and accepted
¹³ that nitrosamines should not be present
¹⁴ in drug product or drug substance at
¹⁵ levels which cause concern.
¹⁶      Q.   Let's go to the next page,
¹⁷ Page 29.
¹⁸      Section B is, Testing of
¹⁹ Intermediates and APIs.  And the second
²⁰ paragraph says, An impurity profile
²¹ describing the identified and
²² unidentified impurities present in a
²³ typical batch produced by a specific
²⁴ controlled production process should

Page 393

¹ normally be established for each API.
² The impurity profile should include the
³ identity or some qualitative analytical
⁴ designation, for example, retention time,
⁵ the range of each impurity observed, and
⁶ classification of each identified
⁷ impurity, for example, inorganic,
⁸ organic, solvent.
⁹      Do you see that?
¹⁰      A.   Yes.
¹¹      Q.   And that requirement applied
¹² to ZHP and required that they identify,
¹³ in some manner as described here, every
¹⁴ one of the impurities that were showing
¹⁵ up on their testing, even if they hadn't
¹⁶ identified exactly what the impurities
¹⁷ are, correct?
¹⁸      A.   As per text, it says, An
¹⁹ impurity profile describing the
²⁰ identified and unidentified impurities
²¹ present in a typical batch produced by
²² specific controls should normally be
²³ established for each API.
²⁴      So there should be a purity

Ali Aflhan

Page 394

1 and an impurity profile effectively
2 created for each product.  And this was
3 done by ZHP.
4       Q.   Where did ZHP develop an
5 impurity profile that identified the NDMA
6 and the NDEA in its valsartan in
7 accordance with this?  Tell me where they
8 were identified -- and I'm going to use
9 the language, either identified by name
10 or some qualitative analytical
11 designation.
12       Tell me where that was done.
13 What document did that?
14       MS. DAVIDSON:  Objection.
15       THE WITNESS:  So if they had
16 identified NDMA, which they had
17 not, then it would not be listed
18 as an unknown -- unidentified
19 impurity.  ZHP had no cause to
20 predict or estimate presence of
21 NDMAs prior to June 2018.
22       ZHP did develop an impurity
23 profile and -- impurity profile in
24 2007, which was with the TIN

Page 395

1 process.  Then as they did each
2 change, this question was raised,
3 addressed and verified that the
4 impurity profile has not
5 drastically changed, drastically
6 changed meaning some -- you know,
7 effectively, impurity A
8 concentration had gone down as
9 they improved the process.  The
10 impurity profile, it stated, did
11 not change.
12       So both the impurity profile
13 and the purity profile remained
14 unchanged as they went from the
15 TEA process to the zinc chloride
16 process.
17 BY MR. SLATER:
18       Q.   ZHP specifically said that
19 the impurity profile had not changed and
20 they said that in the DMF for both of the
21 new processes, right?
22       A.   Correct.
23       MS. DAVIDSON:  Objection.
24       THE WITNESS:  Sorry.

Page 396

1 BY MR. SLATER:
2       Q.   In fact, the NDMA and NDEA
3 were new impurities that were never
4 identified either by name or by some
5 qualitative analytical designation
6 anywhere in any document.
7       They never did that, right?
8       MS. DAVIDSON:  Objection.
9       THE WITNESS:  So ZHP, not
10 knowing that NDMA or NDEA is
11 present in the product, looked at
12 the impurity profile, and the
13 impurity profile effectively says
14 what do you have?
15       Again, going back to 3A,
16 Q3A, it says, you need to list
17 your known impurity profile, which
18 are listed in the USP monograph,
19 and then look at your impurity
20 profile and the collective sum of
21 those cannot go above a certain
22 limit.
23       So they looked at it; it was
24 not there.  They didn't see it.

Page 397

1       They did not know about NDMA or
2       NDEA.
3 BY MR. SLATER:
4       Q.   The peaks -- we'll talk
5 about NDMA.
6       The peak for NDMA was there,
7 they just didn't identify what it was.
8       We've agreed to that before,
9 right?  You've told me it was too small,
10 whatever.  But -- let me rephrase.
11       The NDMA peak was there, it
12 just wasn't identified, and it wasn't
13 identified by name, and it wasn't
14 identified by qualitative analytical
15 designation as described in this ICH
16 guidance; it was never identified,
17 correct?
18       MS. DAVIDSON:  Objection.
19 BY MR. SLATER:
20       Q.   Either by name or by
21 location or anything else?
22       MS. DAVIDSON:  Objection.
23       That was a lot of questions.
24 BY MR. SLATER:

Ali Khan

Page 398

1    Q.   I'll ask it again, because I
2  know you got a great objection there.
3        Let's go back to my original
4  question.
5        Where did ZHP identify the
6  NDMA and NDEA, either by identity or
7  qualitative analytical designation, as
8  required in what I just read?
9    A.   ZHP --
10   Q.   I've never seen the
11 document.  Is there a document where that
12 happened?
13       MS. DAVIDSON:  Adam,
14    literally, he started talking and
15    you asked another question.
16       What are you doing?
17       MR. SLATER:  I'm trying to
18    get him to actually answer my
19    question.
20 BY MR. SLATER:
21   Q.   I'm asking if there's a
22 document.
23       MR. SLATER:  Why don't you
24    please ask your witness to just

Page 399

1    tell me, yes or no, is there a
2    document where he's seen that.
3    It's the only question I'm asking.
4       THE WITNESS:  There was --
5       MS. DAVIDSON:  I'm objecting
6    to this colloquy.
7       Ali, if you know what
8    question is pending, go ahead and
9    answer.
10      THE WITNESS:  There are
11    three or four questions there.
12 BY MR. SLATER:
13   Q.   I'll ask it again, because
14 you're confused, you think there's three
15 or four questions.
16       Is there a document you can
17 point me to where ZHP identified, either
18 by name or by qualitative analytical
19 designation, the NDEA and the NDMA; yes
20 or no?
21   A.   ZHP was not aware of NDMA or
22 NDEA until June 2018.  Prior to June
23 2018, ZHP had looked at the impurity
24 profile and the peaks coming, alluding,

Page 400

1  after it had been investigated.
2        They did not report it to
3  clients unless the clients asked.  And
4  when they did their assessment, which was
5  based on GC FID and GCMS pointed to a
6  solvent or solvents that they were using
7  in the process, not DMF, not any of the
8  DMF degradants.  There are other
9  processes.
10       And that is in the
11 communications which went between the
12 clients and ZHP saying, what was that
13 impurity?
14       That was also the subject of
15 my call with Jucai Ge.
16   Q.   Nowhere in any impurity
17 profile have you seen where ZHP
18 specifically identified each impurity
19 observed and classified each identified
20 impurity as required here?  That did not
21 happen, right?
22       MS. DAVIDSON:  Objection.
23       THE WITNESS:  I've answered
24    the question.  And I'll answer

Page 401

1    again.
2        ZHP did not know about NDMA
3    or NDEA until June 2018.  ZHP had
4    looked at the impurity profile,
5    and the impurity profile, which
6    would have been filed with the DMF
7    changes, would have said what was
8    there and the fact that the
9    profile was whatever it was.
10 BY MR. SLATER:
11   Q.   And we both know from
12 reading the DMF that that impurity
13 profile did not mention NDMA or NDEA or
14 identify either of those impurities in a
15 qualitative or quantitative way.
16       They were not mentioned at
17 all, correct?
18   A.   I'll give a repeat.
19       MS. DAVIDSON:  Objection.
20       THE WITNESS:  ZHP didn't
21    know about NDMA or NDEA in its
22    valsartan process until June 2018.
23    So if it didn't know about the
24    presence of NDMA or NDEA there was

Ali Rhman

1  no way for it to actually list
2  them as saying, here is NDMA or
3  NDEA.
4       It was not expected, it was
5  not detected, the methods that
6  were there were not sufficient to
7  detect them.  FDA also agrees with
8  that statement.
9       MR. SLATER:  You can take
10  that document down.
11 BY MR. SLATER:
12  Q.   You talked about
13 bioequivalence a lot in your report.
14       Do you know what that means?
15  A.   I hope so.
16  Q.   What does bioequivalence
17 mean?
18  A.   It means it will have the
19 same response biologically as the
20 reference listed drug.
21  Q.   So, for example, with
22 valsartan, in simple terms, it will still
23 have the desired effect on the body to
24 control blood pressure?

1  A.   The same desired effect as
2 its reference listed drug, yes.
3  Q.   Therapeutic equivalent is a
4 different term with a different meaning,
5 correct?
6  A.   Yes.
7  Q.   That means that the drug has
8 the same quality, identity, and purity as
9 the reference listed drug, correct?
10       MS. DAVIDSON:  Did I freeze
11  or did Adam freeze?
12       THE WITNESS:  No, you're not
13  frozen.
14 BY MR. SLATER:
15  Q.   Correct?
16       MS. DAVIDSON:  I'm sorry,
17  I'm not sure what happened.
18       Did you say something after
19  the word "identity"?
20       MR. SLATER:  I'll just ask
21  the question again.
22       MS. DAVIDSON:  Okay.  I'm
23  sorry.  I didn't force my Internet
24  to stop.

1       MR. SLATER:  Can I just
2  talk, please?
3       MS. DAVIDSON:  Sure.
4 BY MR. SLATER:
5  Q.   Therapeutic equivalent means
6 the drug has the same quality, identity
7 and purity as the reference listed drug,
8 correct?
9  A.   Yes.
10  Q.   And you understand that our
11 claim in this case is not that there was
12 a lack of bioequivalence, you understand
13 that the claim is that there was a lack
14 of therapeutic equivalence?
15       You understand that, right?
16       MS. DAVIDSON:  Objection.
17 BY MR. SLATER:
18  Q.   Or do you not understand
19 that?
20       MS. DAVIDSON:  Objection.
21       THE WITNESS:  That's -- I
22 understand what therapeutic
23 equivalence is.  I think the
24 question of same quality -- the

1  quality, as I said earlier,
2  according to USP, is defined to be
3  98 to 102 percent purity for
4  valsartan.
5       So that's what it means to
6  me, 98 to 102 percent.
7 BY MR. SLATER:
8  Q.   With all due respect, all
9 I'm asking you is this:  You used the
10 term "bioequivalence," and you said the
11 plaintiffs' experts are criticizing the
12 lack of bioequivalence.  You said that
13 many times in your report.
14       Do you understand that the
15 claim is not a lack of bioequivalence but
16 actually is a claim of a lack of
17 therapeutic equivalence?
18       I'm just asking if you
19 understand that.
20       MS. DAVIDSON:  Objection.
21       THE WITNESS:  So your -- the
22 plaintiff experts referred to
23 bioequivalence.  That's what I
24 have addressed.

Ali Rahman

Page 406

1      You're muted.
2      MR. SLATER:  Can I have the
3  court reporter read back the
4  answer, please?  I lost the feed
5  for a second.
6           -  -  -
7      (Whereupon, the court
8  reporter read the following part
9  of the record:
10     "Answer:  The plaintiff
11  experts referred to
12  bioequivalence.  That's what I
13  have addressed.")
14           -  -  -
15 BY MR. SLATER:
16     Q.   You talked in your report
17 about Valisure and testing of Diovan,
18 right?
19     A.   I did, yes.
20     Q.   Are you relying on
21 Valisure's testing of Diovan as a basis
22 for your opinions in this case?
23     A.   Could you just repeat the
24 first part?  Am I --

Page 407

1      Q.   Are you relying on
2  Valisure's purported findings on testing
3  of Diovan as a basis for your opinions in
4  this case?
5      A.   So Diovan -- Valisure tested
6  a Novartis product.  Novartis in United
7  States.  That product was the only -- the
8  only valsartan which is approved by --
9  approved for Novartis is an NDA drug,
10 which is listed as a reference standard
11 and as the ROD.
12     Valisure tested Novartis
13 product.  There is no expectation for
14 this to be a generic sample which it
15 brought to the U.S. and to be tested.
16 Valisure tested it, and the plaintiff
17 expert lab, Emory, Dr. Najafi, he also
18 verified those tests.
19     Now, I believe -- I am not
20 certain, but I believe that that Diovan
21 was -- or those samples were Diovan.
22 I've asked Skadden counsel for the NDC
23 number, which has been requested but not
24 yet provided.

Page 408

1      If we have the NDC number,
2  that would directly pinpoint to whether
3  it's Diovan or not.
4      Q.   I'll let you assume, for
5  purposes of these next questions, that
6  what Valisure tested was Diovan, okay?
7      A.   Okay.
8      Q.   If that's the case, are you
9  relying on Valisure's testing of Diovan
10 purportedly finding NDMA as a basis for
11 your opinions?  Is it something you're
12 relying on as one of the bases for your
13 opinions?
14     MS. DAVIDSON:  Objection.
15     THE WITNESS:  Which opinion?
16 BY MR. SLATER:
17     Q.   Any of your opinions.
18     MS. DAVIDSON:  The first
19 question --
20 BY MR. SLATER:
21     Q.   This is really not that
22 complicated.  I'm not asking for an
23 explanation or which opinions.  It's a
24 very simple question.

Page 409

1      Are you relying on
2  Valisure's testing of Diovan and
3  purported finding of NDMA in Diovan as
4  one of the bases for your opinions in
5  this case; yes or no?
6      MS. DAVIDSON:  Well, first
7  you said assume something.  Is the
8  assumption still part of your
9  question?
10     MR. SLATER:  Yes.  That they
11 tested Diovan.
12     THE WITNESS:  So there are
13 212 opinions that I have put in.
14 I really would need to be very
15 careful of saying this applies
16 across the board, because, you
17 know, some of them have nothing to
18 do with Valisure testing.  My --
19 BY MR. SLATER:
20     Q.   I'll ask you a different
21 question.
22     MS. DAVIDSON:  Wait.  He was
23 in the middle of talking.
24     MR. SLATER:  Are you just --

Page 410

1    I'm trying to use time wisely
2    here, and you're just wanting to
3    just keep talking on something
4    like this.  I mean, what's the
5    point?
6        MS. DAVIDSON:  You can't
7    interrupt a witness.  It's, like,
8    Rule 101.
9        MR. SLATER:  Maybe you
10   should interrupt him.
11   BY MR. SLATER:
12   Q.   Keep going, Doctor.
13   A.   So my point is that
14   Valisure -- you know, the plaintiff
15   experts make the statement saying this
16   drug is not equivalent to Diovan.
17       The point is, if Diovan has
18   NDMA in it, then what are we talking
19   about?  Because -- because even Diovan,
20   if it had NDMA in it, then you don't --
21   that's a discovery which is made late in
22   the day.
23   Q.   Did you read Dr. Xue's
24   deposition?

Page 411

1    A.   I did read Dr. Xue's
2    deposition.
3    Q.   Do you agree with me --
4    well, rephrase.
5        Do you agree with Dr. Xue
6    that the chemical -- rephrase.
7        Do you agree with Dr. Xue
8    that the manufacturing process and the
9    chemical reactions in the TIN process
10   which is used to make Diovan is not
11   capable of forming NDMA?
12       MS. DAVIDSON:  Objection.
13       THE WITNESS:  Can I see that
14   statement from Dr. Xue, please?
15   BY MR. SLATER:
16   Q.   No, I don't have time to
17   start showing you things.  So let me ask
18   the question differently.
19       Do you assume, in forming --
20   rephrase.
21       If the -- rephrase.
22       If Valisure tested Diovan,
23   and if Valisure reported that they found
24   NDMA based on that testing, you're saying

Page 412

1    that's significant to you because if
2    Diovan had NDMA in it, you said, what are
3    we talking about?  Do I understand you
4    correctly?
5    A.   No.  My point --
6    Q.   Fine.  That's fine.  I don't
7    understand you.  Next question.
8        Do you have any
9    understanding or assumption that the
10   testing that was performed by Valisure
11   was reliable?
12   A.   It was verified by the
13   plaintiff expert's lab.
14   Q.   You're assuming that
15   Dr. Najafi's lab actually verified the
16   testing of the Diovan that's referred to
17   by Valisure; yes or no?
18   A.   Dr. Najafi tested the same
19   samples, and according to his deposition,
20   he said that -- first he said, yes, they
21   were the same, and then he said they were
22   in the same ballpark.
23       So, no he didn't test for
24   Valisure.  The results issued or reported

Page 413

1    on Valisure are not necessarily done by
2    Emory Labs.  But Emory Labs tested and
3    agreed with those, according to
4    Dr. Najafi.
5    Q.   Are you aware that the
6    samples that were provided to Dr. Najafi,
7    that the results he reported, don't match
8    up to the results for the Diovan that was
9    tested by Valisure, which shows that he
10   actually tested different blind
11   specimens?
12       Did you ever look at that
13   and match that up?
14       MS. DAVIDSON:  Objection.
15   BY MR. SLATER:
16   Q.   I'm just asking, did you
17   ever look at the results to see that they
18   are different?
19   A.   His deposition said that
20   Valisure told him he is in the right
21   ballpark.
22   Q.   Did you ever see the letter
23   from FDA to Valisure dated December 5,
24   2022?

Ali Rahman

Page 414

¹   A.   Yes.
²   Q.   Did you see all of the
³ different problems that the FDA
⁴ identified with Valisure's testing,
⁵ including their testing for nitrosamine
⁶ impurities in valsartan?
⁷   A.   I do -- I prefer -- I would
⁸ appreciate if you could show it to me.
⁹   Q.   I'm just asking, do you
¹⁰ remember seeing that the FDA criticized
¹¹ Valisure's testing for nitrosamine
¹² impurities in valsartan?
¹³      MS. DAVIDSON:  Objection.
¹⁴      THE WITNESS:  I really would
¹⁵   like to see the document before I
¹⁶   agree to you.
¹⁷ BY MR. SLATER:
¹⁸   Q.   Do you have an opinion that
¹⁹ Valisure's testing was reliable and that
²⁰ you're relying on what they say about
²¹ what they found in Diovan?
²²      Just yes or no, I just want
²³ to know.
²⁴      MS. DAVIDSON:  Objection.

Page 415

¹   He responded multiple times.  He
² said he wanted to see the letter.
³ You're badgering him and
⁴ pressuring him.
⁵      MR. SLATER:  No.  What I'm
⁶ doing is not getting all my time
⁷ sucked up to show him something
⁸ that he already knows.
⁹      THE WITNESS:  I have not
¹⁰ looked at Valisure's document --
¹¹ BY MR. SLATER:
¹²   Q.   Okay.  I'll --
¹³   A.   No, no, no.
¹⁴      I have not looked at
¹⁵ Valisure's GMP systems to make a decision
¹⁶ whether it's reliable or not.
¹⁷   Q.   Okay.
¹⁸   A.   Sorry.
¹⁹      MS. DAVIDSON:  If you want
²⁰ him to look at the letter --
²¹      MR. SLATER:  No, I really
²² don't.  I'm going to ask my next
²³ question.
²⁴      MS. DAVIDSON:  -- off the

Page 416

¹ record.  Please don't interrupt
² me.
³      I was saying if you want --
⁴ I was trying to be gracious.
⁵      MR. SLATER:  It's okay.
⁶ We're way past gracious, I'm
⁷ sorry.  I just need to ask my next
⁸ question.
⁹      I don't know why you're
¹⁰ making a face.  I just want --
¹¹      MS. DAVIDSON:  I just think
¹² it's incredibly rude, Adam, how
¹³ you talk over me.  Incredibly rude
¹⁴ and shocking.
¹⁵      MR. SLATER:  I'm sorry, I
¹⁶ don't have a lot of time.
¹⁷      MS. DAVIDSON:  While I was
¹⁸ offering to go off so that you
¹⁹ wouldn't use your time in looking
²⁰ at the document.
²¹      MR. SLATER:  I don't need to
²² look at the document.
²³ BY MR. SLATER:
²⁴   Q.   Doctor, does the approved

Page 417

¹ formulation of Diovan include NDMA in it?
²   A.   Approved formulation?  Can
³ you be very specific?
⁴      Do you mean what FDA
⁵ approved or do you mean what is being
⁶ sold in the market?
⁷   Q.   What FDA approved.
⁸   A.   So what FDA approved should
⁹ not have -- actually, I have no idea,
¹⁰ because now it's hindsight.  We are
¹¹ looking back.
¹²      At the time FDA approved,
¹³ FDA assumed there was no NDMA.  At the
¹⁴ time FDA approved ZHP process, there was
¹⁵ an understanding that there was no NDMA.
¹⁶   Q.   If there would be NDMA in a
¹⁷ Diovan pill, that would be due to a cGMP
¹⁸ violation in the manufacturing process,
¹⁹ correct?
²⁰      MS. DAVIDSON:  Objection.
²¹ Calls for speculation.
²²      THE WITNESS:  I can't make
²³ that statement.  You know, you
²⁴ want a yes-or-no answer, and I'm

Al 4. Afnan

Page 418

1    sorry, I can't give you a
2    yes-or-no answer.
3    BY MR. SLATER:
4        Q.   Are you aware that the
5    manufacturing process and chemical
6    reactions for Diovan are incapable of
7    forming NDMA as an impurity?
8            MS. DAVIDSON:  Objection.
9            THE WITNESS:  I have not
10    looked at the NDMA process.  I am
11    looking at Valisure.  I am looking
12    at, effectively, Dr. Najafi saying
13    that, yes, he found it and it's in
14    the -- ballpark agrees with
15    Valisure's data.
16    BY MR. SLATER:
17        Q.   If I'm correct and Dr. Xue
18    is correct that the manufacturing process
19    for Diovan was not capable of creating
20    NDMA, then the only way for NDMA to get
21    into the pills would be due to a cGMP
22    violation, correct?
23        A.   I cannot --
24            MS. DAVIDSON:  Same

Page 419

1    objections.
2            THE WITNESS:  I cannot
3    comment on Novartis's
4    manufacturing process because I
5    have not looked at it.  I don't
6    know what they do.
7            You obviously have knowledge
8    of the process.  I don't.
9            MR. SLATER:  Let's go off
10    the record.
11            VIDEO TECHNICIAN:  We're off
12    the record at 6:14 p.m.
13            - - -
14            (Whereupon, a brief recess
15    was taken.)
16            - - -
17            VIDEO TECHNICIAN:  We're
18    back on the record at 6:22 p.m.
19            - - -
20            (Whereupon, Exhibit
21    Afnan-16, ZHP01721348,
22    Genotoxicity Statement, was marked
23    for identification.)
24            - - -

Page 420

1    BY MR. SLATER:
2        Q.   We've put on the screen
3    Exhibit-16, a genotoxicity statement,
4    dated July 14, 2015, signed by Lucy Liu,
5    manager of regulatory affairs at ZHP.
6            Have you seen this document?
7        A.   I think I have.
8        Q.   And you can see on July 14,
9    2015, ZHP represented that its valsartan
10    was, to the best of its knowledge, in
11    accordance with the guideline, the
12    EMEA/CHMP/QWP/251344/2006 and ICH M7.
13            Do you see that?
14        A.   Yes.
15        Q.   Do you know what the first
16    guideline is that they listed there?
17        A.   It's the quality working
18    party of EMEA.
19        Q.   What's the significance of
20    that guideline?
21        A.   That --
22            MS. DAVIDSON:  Objection.
23            THE WITNESS:  Yes.
24            So can we pull it up,

Page 421

1    please?
2    BY MR. SLATER:
3        Q.   I don't have that.  I've
4    never seen it.  I don't even know what it
5    is.
6        A.   Okay.  So this is EMEA.
7    This is very old, because they are no
8    longer called EMEA.
9            And what they did was they
10    actually, I think, and I'm not sure, so
11    I'm speculating here, that that was the
12    precursor to M7.
13        Q.   They say that this is --
14    rephrase.
15            They say that the valsartan
16    is in accordance with ICH M7.
17            Do you see that?
18        A.   Yes.
19        Q.   So based on this document,
20    ZHP was applying ICH M7 as of July 14,
21    2015, correct?
22            MS. DAVIDSON:  Objection.
23            THE WITNESS:  I'm sorry, but
24    it doesn't say that.

Ali Afnan

Page 422

BY MR. SLATER:
2    Q.   They're making a
3 genotoxicity statement and they're
4 representing that the valsartan complies
5 with ICH M7.
6        That's what the document
7 says, right?
8    A.   It says that the drug
9 substance valsartan manufactured by this
10 is, to the best of our knowledge, in
11 accordance with M7, yes.
12    Q.   They then say, The reagents,
13 intermediates and impurities susceptible
14 of generating genotoxic impurities have
15 been taken into account.  No genotoxic
16 impurities are present in the substance.
17        Do you see that?
18    A.   Yes.
19    Q.   In retrospect, that
20 statement was incorrect, because we know
21 that there were genotoxic impurities in
22 the valsartan, correct?
23        MS. DAVIDSON:  Objection.
24        THE WITNESS:  In 2023 and in

Page 423

1 post June 2018, yes, we know.
2        Pre June 2018, ZHP didn't
3 know.
4        MR. SLATER:  All right.  I'm
5 not going to ask any other
6 questions at this point.
7        I'm reserving whatever
8 minutes I have left.  And
9 depending on how many questions
10 counsel asks, I will intend to
11 continue to ask reasonable
12 follow-up questions.
13        And I'm reserving all my
14 rights regarding whether or not I
15 need to ask for more time in the
16 future.
17        So I'm handing it off to
18 defense counsel.
19        MS. DAVIDSON:  Thank you,
20 Adam.  I will just have very few
21 questions.  I need five minutes
22 first.
23        VIDEO TECHNICIAN:  Would you
24 like to go off the record?

Page 424

1        MS. DAVIDSON:  Let's go off
2 the record.
3        VIDEO TECHNICIAN:  We're off
4 the record at 6:25 p.m.
5        - - -
6        (Whereupon, a brief recess
7 was taken.)
8        - - -
9        VIDEO TECHNICIAN:  We're
10 back on the record at 6:34 p.m.
11        MS. DAVIDSON:  Great.
12        - - -
13        EXAMINATION
14        - - -
15 BY MS. DAVIDSON:
16    Q.   Dr. Afnan, it's late in the
17 evening.  I just have a few very quick
18 questions for you.
19        My first question is,
20 earlier today there was some discussion
21 of the DMF --
22    A.   You froze.
23    Q.   -- is that correct?
24    A.   Sorry.  You cut out.

Page 425

1        Can you repeat?
2        MS. DAVIDSON:  I went back
3 upstairs.  Okay.  It's clearly an
4 upstairs/downstairs thing.  Can
5 you guys hear me now?
6 BY MS. DAVIDSON:
7    Q.   So I said that earlier today
8 I believe there was some discussion of
9 the DMF for the zinc chloride process,
10 and you testified that the DMF is still
11 active; is that correct?
12    A.   The drug master file is
13 still active, yes.
14    Q.   Do you know whether there
15 have been any changes to that drug master
16 file over time?
17    A.   Yes.
18    Q.   And when I say do you know
19 if there have been, maybe that wasn't a
20 great question.
21        Have there been --
22    A.   Yes.
23    Q.   -- changes in the drug
24 master file over time?

Ali Afnan

Page 426

¹  A.   Yes, there have been changes
²  to the DMF.
³  Q.   Okay.  My other question for
⁴  you was, earlier today we talked about a
⁵  WHO document.
⁶  MS. DAVIDSON:  And can we
⁷  bring that document back on the
⁸  screen?  Unfortunately, I don't
⁹  remember what exhibit number it
¹⁰  was.
¹¹  We can either reintroduce it
¹²  or -- Chris, do you know what
¹³  document that was?  The WHO
¹⁴  document, Chris Geddis, master of
¹⁵  the documents?
¹⁶  MR. SLATER:  He sort of
¹⁷  checked out on this thing.  He was
¹⁸  working on other stuff.
¹⁹  MS. DAVIDSON:  He's not
²⁰  here?
²¹  MR. SLATER:  He's here, but
²²  he moved on to some other work.
²³  Exhibit-6.
²⁴  MS. DAVIDSON:  Okay.

Page 427

¹  BY MS. DAVIDSON:
²  Q.   Dr. Afnan, if you could -- I
³  believe you have Exhibit-6 in your files.
⁴  I just want to make sure you know which
⁵  document we're talking about.
⁶  A.   Yes.  It's the -- it's the
⁷  WHO document 2001.
⁸  Q.   I just wanted to clarify, do
⁹  you -- looking at this document, do you
¹⁰  know when you first saw it?
¹¹  A.   Actually, I made a mistake,
¹²  I think, because it looks familiar.
¹³  This was presented in -- I
¹⁴  saw this after my report.  This was
¹⁵  present in Dr. Bain's testimony as one of
¹⁶  the exhibits of her testimony.  So I have
¹⁷  not seen it prior to writing my report.
¹⁸  MS. DAVIDSON:  Those are my
¹⁹  only questions.
²⁰  THE WITNESS:  I apologize.
²¹  MR. SLATER:  No other
²²  questions.
²³  MS. DAVIDSON:  Enjoy your
²⁴  dinner, Adam.  Have a good night

Page 428

¹  everybody.
²  VIDEO TECHNICIAN:  If
³  there's nothing further, the time
⁴  is now 6:37 p.m., this concludes
⁵  today's testimony from Dr. Ali
⁶  Afnan.  We are now off the record.
⁷  - - -
⁸  (Whereupon, the deposition
⁹  concluded at 6:37 p.m.)
¹⁰  - - -

Page 429

¹  CERTIFICATE
²
³  I, Amanda Maslynsky-Miller, Certified
⁴  Realtime Reporter, do hereby certify that
   prior to the commencement of the examination,
⁵  ALI AFNAN, Ph.D., was remotely sworn by me to
   testify to the truth, the whole truth and
⁶  nothing but the truth.
⁷
⁸  I DO FURTHER CERTIFY that the foregoing is a
   verbatim transcript of the testimony as taken
⁹  stenographically by me at the time, place and
   on the date hereinbefore set forth, to the
¹⁰  best of my ability.
¹¹  I DO FURTHER CERTIFY that I am neither a
   relative nor employee nor attorney nor
¹²  counsel of any of the parties to this action,
   and that I am neither a relative nor employee
¹³  of such attorney or counsel, and that I am
   not financially interested in the action.
¹⁴
¹⁵
¹⁶  _____
¹⁷  Amanda Miller
   Certified Realtime Reporter
¹⁸  Dated: February 10, 2023
¹⁹
²⁰  (The foregoing certification of this
   transcript does not apply to any reproduction
²¹  of the same by any means, unless under the
   direct control and/or supervision of the
²²  certifying reporter.)
²³
²⁴

Page 430

## INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 432

## ACKNOWLEDGMENT OF DEPONENT

1
2
3      I,_____, do
   hereby certify that I have read the
   foregoing pages,  1 - 428, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   ALI AFNAN, Ph.D.          DATE
9
10
   Subscribed and sworn
11 to before me this
   _____ day of _____, 20_____.
12
   My commission expires:_____
13
14 _____
   Notary Public
15
16
17
18
19
20
21
22
23
24

Page 431

1
      - - - - - -
      E R R A T A
2
      - - - - - -
3  PAGE  LINE  CHANGE
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

Page 433

1
      LAWYER'S NOTES
2  PAGE  LINE
3  _____ _____ _____
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____

A13-Athan

**WORD INDEX**

9:6   306:6
**10:37**   74:23
**10:47**   75:5
**100**   4:4
141:9
262:18
263:20
**1000**   2:12
**10001**   3:16
**101**   410:8
**102**   76:3
405:3, 6
**103**   2:4
**106**   7:23
**11**   10:17
41:23
43:10, 17
44:4   348:2
**11/29/18**
7:20   54:2
**11:45**
128:21
**11:54**   129:3
**12**   7:6
269:17
**12/23/22**
7:16   41:10
**12:04**
137:22
**12:44**   138:4
**121**   8:7
**12205**   3:10
**129**   8:9
**13**   352:2
**135**   167:19
168:1
172:5   173:8
**14**   420:4, 8
421:20
**1440**   3:20
**149**   10:7
**15**   250:8
**15219**   5:18

**< 0 >**
**02109**   6:5
**07068**   2:5
**07102**   4:5
**08540**   5:10

**< 1 >**
**1**   3:10
10:17
36:10   76:6,
7   89:2
166:13, 14,
16   168:3
182:3
186:14
189:14
190:2, 24
191:18
223:6, 11, 17
233:16
289:9
298:7, 21
301:17
304:9, 19
322:12, 15
328:14
374:14
385:3
390:19
432:3
**1,000**   68:7
**1.5**   333:11
**1/11/23**
7:18   43:5
**1:55**   205:8
**10**   168:4
320:21
348:2
429:17
**10/25/06**

**15th**   4:5
**16**   127:7
**169**   158:24
**16th**   289:4
**17**   7:15
20:22   21:2
**170**   164:13
171:21
**1717**   4:11
**181**   8:11
**190**   206:1
**19103**   4:12
**19-2875**   1:5
**1977**   130:22
**1994**   123:14

**< 2 >**
**2**   111:8
123:3
166:13
226:12
289:9
307:24
332:8, 16
365:11
**2:05**   250:7
**2:07**   205:14
**20**   167:20
168:1, 4
172:7
325:8
432:11
**20/20**
111:20
113:20
370:19
**2000**   88:10
**20005**   3:20
**2001**   122:4
124:1
384:20
427:7
**2003**   21:15
**2006**   21:18

**2007**   338:21
348:2
364:2
394:24
**2008**   325:17
327:1
328:1
334:7
335:24
338:21
339:14
351:22
**2009**   307:7
**2010**   358:19
**2011**   21:16
238:23
286:23
289:4, 19
294:17
328:2
365:18
**2012**   261:19
358:19
**2013**   243:19
358:19
**2015**   182:3
189:14
190:2, 11
420:4, 9
421:21
**2016**   36:9
238:23
385:21
**2017**   206:2
209:6
227:20
232:11
233:8
236:10, 11,
16   241:10
**2018**   49:18
56:6   88:11
100:5
110:13

112:19
113:21, 22
180:5
193:1
229:11, 13,
24   236:7, 12
238:4
256:8
261:14
262:2
265:12
279:9
281:11
286:23
294:17
295:15, 24
314:3, 22
316:24
325:3
358:23
363:3, 5
368:19
370:20
371:5
373:14
394:21
399:22, 23
401:3, 22
423:1, 2
**2019**   193:24
251:8
254:4   363:5
**202**   3:21
**2022**   16:22
17:1, 5
41:2   42:4,
17, 22   43:18
209:9
266:22
413:24
**2023**   1:7
11:15
41:23
43:11   44:4

192:8
422:24
429:17
**21** 5:10
10:7
**210** 32:2
107:8
**211** 32:3
**212** 3:17
409:13
**213-7045**
6:5
**215** 4:12
**221** 8:16
**2220** 5:4
**2258** 7:15
17:21
**227** 4:18
**228-9898**
2:6
**23** 41:2
42:4, 17, 21
43:17 44:8
266:22
**230** 5:4
**236** 108:4
**25** 251:8
**250** 8:20
**2525** 2:12
**26** 224:9, 12
**263-2000**
5:19
**269** 8:22
**27** 209:6
241:10
289:18
**27th** 6:4
256:8
**28** 386:1
**28202** 4:19
**2875** 1:4
**29** 56:6
392:17

**29th** 371:4
**2nd** 2:5

< 3 >
**3** 53:21
239:16
308:2
320:22
336:5
364:24
**3.1** 108:15
308:1, 4, 11
311:10
312:22
318:10
**3:10** 266:12
**3:36** 266:18
**3:56** 283:1
**30** 65:18
430:16
**301** 5:17
**305** 2:13
**306** 9:7
**308** 374:22, 23
**30th** 112:19
193:24
**31** 8:7
121:23
**312** 5:5
**325** 9:10
**33134** 2:13
**337** 3:4
**33950** 2:20
**371-7000**
3:21
**374** 9:13
**384** 9:16
**38th** 5:18
**3A** 191:1
396:15
**3rd** 256:9

< 4 >

**4** 36:11
53:21
54:13
108:21
182:22
319:11
323:10
338:1 365:9
**4/1/15** 8:11
181:18
**4:04** 283:7
**400** 4:11
**41** 7:17
**412** 5:19
**419** 9:17
**424** 7:6
**428** 432:3
**43** 7:19
**4-40** 175:11
179:15
**444-3300**
4:20
**445-2500**
2:13
**458.2306**
224:24
**483** 47:3
373:24
**496.1865**
225:1

< 5 >
**5** 76:7
106:20
110:13
122:24
172:6
173:8
413:23
**5.2** 374:24
**5.60** 182:24
**5:02** 350:14
**5:07** 350:20

**5:42** 384:1, 7
**501(a)(2)(B**
56:21
**518** 3:11
**53** 6:4
**54** 7:21
**544** 224:8
**566-4801**
5:5

< 6 >
**6** 106:20
164:19
319:12, 13
336:4
**6:14** 419:12
**6:22** 419:18
**6:25** 424:4
**6:34** 424:10
**6:37** 428:4, 9
**600** 4:19
**60606** 5:5
**609** 5:11
**617** 6:5
**639-1158**
2:21
**6th** 296:3

< 7 >
**7** 39:16
108:4
337:24
**70** 66:20
**70130** 3:5
**704** 4:20
**735-3000**
3:17
**757-1100**
4:6

< 8 >

**8** 1:7
181:10
351:6
**80** 66:14
288:22
**827-6537**
3:5
**85** 66:15
**862-1200**
3:11
**866** 3:5
**877.370.3377**
1:22
**887** 130:6
140:10
**890** 155:7, 10
**8th** 11:15

< 9 >
**9** 165:3, 7
**9:23** 1:15
**9:32** 11:16
**90** 66:19
**900** 3:4
**917.591.5672**
1:22
**924-0808**
5:11
**941** 2:21
**973** 2:6 4:6
**98** 76:3
261:12
263:19
405:3, 6
**988-7800**
4:12
**99** 2:20
262:2
263:19

< A >
**a.m** 1:15
11:16

Al-Othman

74:*23*  75:*5*
128:*21*
129:*3*
**abbreviated**
329:*6*
**abbreviation**
86:*20*
**ability**
162:*6*
301:*2*  429:*9*
**able**  18:*20*
115:*22*
154:*19*
353:*21*
356:*19*
363:*11*
**above-**
**speculated**
241:*12*
**absent**
392:*8*
**absolutely**
273:*23*
**accept**
273:*8, 15*
**acceptable**
76:*14*
77:*24*
79:*20*  81:*6*
94:*11*
333:*14*
334:*22*
335:*5*
342:*2*
351:*3*
353:*24*
**acceptance**
183:*13*
185:*12*
187:*9*
188:*5, 11*
189:*16, 18*
190:*3*
191:*15*

387:*20*
390:*5, 9*
**accepted**
106:*12*
238:*24*
257:*24*
281:*9*
317:*11*
332:*14*
392:*12*

**accompanied**
217:*24*
**account**
112:*9*
155:*21*
156:*2, 23, 24*
165:*19*
176:*14, 17,*
*24*  177:*11*
268:*10, 15*
269:*5*
327:*20*
330:*6*
422:*15*
**accuracy**
213:*4*
**accurate**
234:*6*
235:*16, 17*
239:*16*
276:*18*
430:*20*
**accurately**
53:*1*
**accusation**
52:*22*
**accusations**
138:*17*
139:*7*
**achieve**
262:*24*
335:*13*

**acid**  108:*12*
116:*16*
123:*11*
130:*11, 14*
140:*11*
155:*15*
175:*6*
195:*18*
**acidic**
156:*21*
**acknowledge**
**d**  192:*10*
**ACKNOWL**
**EDGMENT**
432:*1*

**acquaintance**
268:*8*
**act**  14:*5*
56:*22*
236:*15*
**acting**  261:*3*
**ACTION**
1:*4*  255:*13*
257:*16*
258:*12*
281:*19*
321:*19*
337:*7*
347:*19*
367:*14*
368:*14*
429:*12, 13*
**actions**
325:*1*
**Active**  9:*15*
36:*7, 13*
51:*19*
56:*10*
264:*13, 14*
265:*17, 20*
266:*6*
282:*1*
335:*6*

384:*14*
425:*11, 13*
**activities**
149:*15*
177:*16*
238:*18*
263:*4, 6, 11,*
*13*
**activity**
70:*19*
238:*20*
241:*2*
336:*17*
**actual**
90:*17*
308:*12*
314:*5*
**ADAM**  2:*3*
12:*22*  20:*7,*
*8*  21:*19*
22:*15*
23:*17*
24:*13*  30:*6*
35:*17*
44:*18, 20*
50:*18*
52:*18*  85:*9*
110:*16, 21*
118:*24*
128:*14*
144:*9, 17, 22*
150:*3*
154:*9*
157:*21*
199:*18*
200:*12*
202:*8*
248:*1*
261:*8*
344:*6*
345:*6*
346:*8*
349:*10*
378:*9*

383:*11*
398:*13*
403:*11*
416:*12*
423:*20*
427:*24*
**add**  89:*10*
168:*2*
**added**
104:*5*
109:*23*
118:*16*
**addition**
183:*18*
185:*13*
290:*7*
**additional**
252:*5*
257:*2*
367:*4*
368:*9*  387:*6*
**Address**
8:*19*  27:*20*
50:*24*
98:*13*
178:*3*
187:*10*
250:*23*
288:*19*
390:*10, 22*
**addressed**
17:*10*  47:*4*
155:*4*
258:*4*
395:*3*
405:*24*
406:*13*
**addresses**
98:*13*  156:*9*
**adequate**
27:*15*
369:*9*
376:*10*

adequately
365:24
366:18
adhere
35:14
adhered
25:5  26:13,
17  103:12
adheres
187:24
adhering
301:11
adjunct
330:9
adjust  168:2
adjusted
166:14
Administrati
on  31:2
36:18
Administrati
on's  328:18
admission
378:19
admit
378:17
adopted
36:5
adulterated
56:19
adverse
190:21
advised
189:21
295:18
advisory
189:5
255:10
257:14
346:24
afernandez@
riveromestre.
com  2:15

affairs
420:5
aflatoxin-
like  351:12
AFNAN
1:14  7:3,
17, 19  11:23
12:13, 20
20:4  21:5
27:18
28:17  29:7,
24  38:24
41:11  43:6
44:20  51:3
52:3, 23
65:18
74:16
80:11  85:6
110:10, 18
127:13
144:23
145:3, 22
146:4
152:12
191:7
198:15
203:20
204:9
205:16
207:7
250:10
288:16
294:3
306:23
317:24
332:10
344:13
346:19
424:16
427:2
428:6
429:5  432:8
Afnan-1
7:13  17:17

Afnan-10
8:17  250:19
Afnan-11
8:21  269:20
Afnan-12
9:3  306:6
Afnan-13
9:8  325:20
Afnan-14
9:10  374:6
Afnan-15
9:14  384:12
Afnan-16
9:17  419:21
Afnan-2
7:16  41:9
Afnan-3
7:18  43:4
Afnan-4
7:20  54:1
Afnan-5
7:22  106:23
Afnan-6  8:3
121:21
Afnan-7  8:8
129:12
Afnan-8  8:9
181:17
Afnan-9
8:11  221:11
Afnan's
90:12
afraid  295:2
Agency
8:19  46:22
61:10
250:22
255:13
257:8, 16
286:9
ago  27:12
53:13
113:9
117:18

120:16
121:10, 14
122:12
169:12
314:14
agree  22:24
23:2  24:2
26:23  33:9
73:20
131:6, 12
136:19
137:6
143:3, 9
146:4
189:19, 24
197:6
226:2
275:17
341:3
366:16
377:12, 20,
21  379:1
392:4
411:3, 5, 7
414:16
agreed  11:3
12:2
142:22
143:2
377:9
397:8  413:3
agreeing
203:4
agreement
40:8, 11, 13
119:18
agreements
45:2
agrees
194:12
402:7
418:14
ahead
13:20

60:11
144:20
223:10
237:17
292:24
303:7
346:19
399:8
Albany  3:10
Albertson's
4:21
alert  252:14
254:5
258:18, 24
259:1, 5, 18,
20  260:12,
16  261:16
263:23
264:7
336:18
356:11
alerts
333:16
ALFANO
5:15
ALI  1:14
7:3, 17, 19
11:23
12:13
19:10
41:11  43:6
73:3  399:7
428:5
429:5  432:8
allow  20:17
68:4, 10, 13
81:23  82:1
145:8
244:19
389:14
allowable
98:1
allowed
24:16  50:9

Alex Oman

80:*10*
144:*6*
231:*20*
243:*17*
266:*4*
301:*16*
304:*7*
317:*3*
343:*18*
354:*9*
**Allowing**
333:*10*
**allows**
68:*16*
69:*10*  77:*9*
79:*7*
304:*14*
390:*18*
391:*21*
**alluding**
237:*12*
399:*24*
**alternative**
36:*21*  385:*9*
**Amanda**
1:*16*  2:*11*
12:*10*
429:*1, 16*
**Amended**
8:*22*  41:*22*
43:*2*  44:*3*
269:*22*
270:*4*
**amendment**
239:*5*  289:*3*
**amendments**
370:*15*
**amines**
195:*18*
**amount**
77:*20*
108:*22*
109:*4, 21*
159:*8*

165:*14*
175:*4*
**amounts**
116:*18*
123:*10*
125:*17*
159:*15*
183:*7*
**analyses**
372:*24*
**analysis**
98:*8*  99:*19,
23*  103:*24*
104:*19*
105:*4, 8*
106:*1*
120:*8*
157:*5*
176:*22*
195:*16*
222:*20*
226:*13*
229:*19*
290:*15, 20*
291:*7*  372:*7*
**analytical**
21:*14*
82:*14*
119:*22*
133:*21*
136:*7*
296:*22*
318:*15*
319:*21*
320:*17*
364:*7*
367:*4, 20*
368:*8, 9*
387:*6*
393:*3*
394:*10*
396:*5*
397:*14*

398:*7*
399:*18*
**analyzed**
69:*1*
**and/or**  21:*7*
22:*12*
333:*4, 5*
334:*15*
335:*16*
386:*10*
388:*22*
429:*21*
**ANDA**
62:*12*
239:*7*
241:*1, 8*
**ANDAs**
237:*23*
238:*6, 11*
240:*11*
307:*8, 16*
329:*7*
370:*17*
**angry**
128:*11, 12,
14, 15*
**Answer**
10:*5*  13:*11,
15, 20*  23:*14*
24:*10, 16*
25:*1, 13*
26:*10*
27:*13, 15*
28:*8, 18, 20,
22*  30:*19, 21*
34:*11, 18*
35:*3*  36:*2*
37:*1*  38:*2*
47:*11*
48:*17, 23*
49:*2*  50:*1,
9*  51:*5, 9*
52:*9*  53:*5*
58:*18*

60:*11*  66:*9,
10*  67:*15, 17*
72:*8*  81:*14*
85:*13, 14*
102:*15*
104:*13*
110:*15*
112:*16*
113:*3, 6*
114:*6*
116:*9*
118:*14*
122:*11*
125:*2*
132:*7, 18*
135:*14, 21,
24*  144:*5, 15,
19*  145:*16,
23*  146:*14,
16*  147:*2, 16,
23*  148:*9, 18,
20*  149:*6, 8,
12, 23*  151:*1,
11*  152:*8*
153:*16, 20*
154:*18, 20,
22, 24*
156:*23*
158:*22*
161:*2, 7, 15*
162:*1, 8*
167:*13*
177:*7*
178:*6, 17*
192:*23*
199:*2, 21*
200:*1, 3, 9,
12, 21*  201:*5*
202:*3, 4*
211:*20*
216:*22*
220:*11, 18*
229:*12*
233:*11, 23*

239:*22*
240:*9*
247:*11*
264:*19*
265:*8*
269:*3*
271:*8*
282:*4, 7, 16*
285:*22*
291:*17*
292:*9, 12, 18*
293:*3, 6, 20*
294:*8, 14*
295:*3, 4, 5, 8*
297:*23*
298:*22*
302:*8, 9*
303:*23*
304:*1, 3*
305:*15*
312:*20*
313:*11, 13*
315:*4*
327:*19*
330:*11*
331:*11*
337:*15, 17,
21*  339:*19*
344:*14*
345:*2, 20*
349:*24*
350:*1*
354:*16*
355:*9*
358:*10*
377:*19*
380:*7*
398:*18*
399:*9*
400:*24*
406:*4, 10*
417:*24*
418:*2*

Al-Afnan

**answered**
24:8  26:3
27:4  38:4
59:10
61:22  62:2
68:2  106:9
146:18
147:19
148:12
149:2, 10
151:14, 20
152:11
153:2
155:1
161:4, 18
162:5
163:1, 3, 24
177:3
178:21, 23
192:22
279:23
282:11
288:14
292:21
293:14
294:3
302:5
303:5
344:5
357:23
400:23
**answering**
50:22
52:14, 17
135:7
145:9
177:9
310:1
345:5  358:7
**answers**
146:23
249:7
271:12
331:1, 5

344:10, 12
349:9  432:4
**anticipated**
112:20
115:10
191:19
193:19, 20
194:2, 13, 19
195:6, 10
196:23
**anybody**
213:15
216:14
248:12
**anymore**
246:22
**API**  21:6, 8
22:11, 13
27:2  31:24
37:12
45:13, 18
51:20
56:19  57:8,
13, 20  58:2,
15, 17, 21
59:6, 14, 17
61:18, 21
63:13, 16
64:6, 19
65:4, 14
67:5, 10, 22,
23  70:1, 5, 7
71:21
72:12, 22
73:24  74:2,
3  75:8, 9, 19
76:15  77:5
78:10, 19
82:3, 5
88:6  89:7
95:11  96:1,
7  97:5
98:1, 2
99:5, 14

108:12
112:23
116:16
186:6
194:4
237:23
238:21
239:9
252:15, 16
256:15
259:24
260:2
325:8
365:14, 18
366:10, 12
367:7
386:24
387:16, 19
393:1, 23
**APIs**  39:23
54:16
60:15, 22
61:8  98:14
115:12, 24
182:20
241:17
242:1, 8
259:23
260:1
335:6
386:8
388:20
389:5
392:19
**apologies**
59:2
**apologize**
59:3  121:7
170:19
196:2, 3, 8
427:20
**apologizing**
303:3

**apparent**
311:12
318:11
**APPEARAN
CES**  2:1
3:1  4:1
5:1  6:1
12:8
**appearing**
12:1
**Appendix**
352:3
**applicable**
36:23
78:21
183:21
185:16
307:8, 15
326:11
331:24
385:11
387:21
**applicant**
308:9, 11
314:4
**application**
59:23  62:4,
8, 9, 10
241:2
308:9
332:14
**applications**
58:17
62:15
326:16
329:3, 4, 5, 6,
7  342:3
351:4
**applied**
33:4  34:1,
5  35:9, 13
37:20
129:21
291:12

331:17
384:23
393:11
**APPLIES**
1:7  409:15
**apply**  23:23
26:8  44:11
87:12, 20
88:8
324:12
367:20
380:14
429:20
**applying**
77:19
421:20
**appraisal**
308:17
309:4, 18
310:9, 18
314:9, 12
**appreciate**
25:15  53:7
74:19  84:7,
19  107:12
127:23
146:21
204:8
217:16
231:23
282:8
304:16
414:8
**appreciative**
145:7
**approach**
18:10
36:21
70:17
87:11, 19
88:7
139:22
333:20
334:3

351:*15, 23*
385:*9, 10*
**approached**
14:*5, 17, 20*
17:*9* 139:*21*
**Approaches**
9:*10*
325:*16, 24*
333:2
336:6 338:2
**appropriate**
51:6
144:*24*
248:*4*
291:*23*
322:7
333:*19*
334:2
386:7
389:*4*
391:*15*
430:6
**appropriatel
y** 176:*4*
367:6
**approval**
60:*14*
238:*19*
241:8
263:9
286:*9, 19*
332:*23*
343:*3*
358:*21*
**approve**
389:*14*
**approved**
65:7 67:*12*
70:7 71:2
284:*19*
296:*21*
328:6, 7
365:*18*
367:7

407:*8, 9*
416:*24*
417:2, *5, 7, 8,*
*12, 14*
**April** 182:*3*
189:*13*
190:2 209:*9*
**ARB** 8:*18*
250:*21*
252:6
**Arch** 4:*11*
**area** 46:*18*
179:8
**argue** 50:*14*
247:*23*
**arguing**
248:*1*
**argument**
31:*13*
**arguments**
139:*16*
**ARPS** 3:*12*
**article** 183:*9*
**asked** 13:7,
*9* 17:*3*
24:8 27:*4*
38:4 45:6
48:*15*
58:22 59:*1*
61:*18*
96:*13, 14*
105:*23, 24*
106:9
143:*19, 20*
145:*10*
146:*13, 18*
147:6, *19*
148:6, *12*
149:*1, 11*
151:*10, 14*
152:*11*
153:2
154:*1*
155:5

156:*13*
157:22
159:22
163:*1, 24*
167:*10*
171:7
176:*4*
178:*21*
198:*18*
200:5
208:*20, 23*
225:22
246:5
259:*21*
271:3
279:*23*
282:*17*
287:*24*
288:*14*
291:*24*
292:*3, 22*
293:*2, 13*
296:*4*
299:*16*
301:7
302:5
303:*4*
313:*1, 20, 22*
317:*19*
349:*20*
355:*11*
398:*15*
400:*3*
407:22
**asking** 37:*3*
38:7, 8
51:*23*
52:*12* 59:*4*
66:6 70:*11*
72:19 86:*4,*
*19* 87:*14, 22*
89:*18*
100:*23*
117:*23, 24*

118:*1*
127:*20*
131:*18, 21*
137:6
141:2
144:*12*
147:*4, 14*
148:2, *19*
149:*17*
150:*11, 13,*
*21, 22* 151:*8,*
*9, 19* 152:*5,*
*6* 160:*17*
175:*23*
176:6, *22, 23*
201:7
204:*1*
212:3
216:*10, 13,*
*16* 217:*10*
229:5
231:*16*
247:*1*
248:7
249:*4*
257:*3*
288:*12*
302:*21*
313:*12*
346:6
348:*19*
361:*12*
385:*19*
398:*21*
399:*3*
405:*9, 18*
408:*22*
413:*16*
414:*9*
**asks** 20:*7*
61:*10*
285:*1*
423:*10*

aslater@maz
ieslater.com
2:6
**assay** 290:*9*
**assess** 76:*19*
89:6 91:*1,*
*17* 93:*9*
102:22
114:*21*
139:24
142:*1, 7*
143:5
146:5
151:*23*
152:20
171:*1, 4*
173:*4*
262:*23*
280:*11*
365:*24*
366:*18*
376:5
**assessed**
69:*1* 77:2
92:9 126:*4*
164:7, *8*
237:*24*
339:*4, 21*
342:*23*
**assessing**
40:*14* 92:5
389:*24*
**Assessment**
8:6 88:*14*
91:21
92:*13, 15, 18,*
*20* 114:22
121:*23*
126:*15, 16*
133:*11*
134:*21*
137:*14*
142:22
143:2, *4*

A. J. Athan

159:7, *17*
160:*15, 16*
163:*14, 21*
179:*23*
238:*14*
240:*16, 22*
280:*15, 16*
336:7, 22
342:*24*
362:*3, 8*
376:*10*
378:*21*
381:6, *11*
400:*4*
**assessments**
26:9
137:*14*
336:*17*
363:*17*
**assessor**
103:*11*
**assignment**
138:*12*
**assist** 49:*14*
**assistance**
297:*17*
**associated**
308:*19*
309:*4, 9*
310:*20*
332:*20*
335:*12*
**assume**
30:*16*
122:*10*
231:*8, 13, 16*
232:*1, 5, 15*
271:*13, 22*
272:9
273:*10*
408:*4*
409:7
411:*19*

**assumed**
417:*13*
**assuming**
380:8
412:*14*
**assumption**
78:9 226:6
323:*15*
324:*19*
339:*14*
342:*19*
409:8 412:9
**assumptions**
101:*19*
102:*4*
103:*10, 22*
232:*14, 16*
295:7, *12*
304:6 320:*1*
**assurance**
262:5
**AstraZeneca**
64:5
**atom** 225:7
**Attached**
45:*24*
225:*10*
243:*19*
244:*3*
246:*17*
249:*17*
266:*21*
430:*12*
432:6
**attachment**
216:6
320:*22*
**attacked**
346:*15, 16*
**attempt**
19:*23*
**attorney**
429:*11, 13*
430:*16*

**attributes**
63:*4, 5*
**audio**
248:*12*
**audiotape**
248:*10*
**August**
112:*19*
193:*24*
256:9
384:*20*
**author**
215:*20*
**authored**
42:*10*
170:*13*
**authority**
34:*4*
134:*17*
187:*14*
188:*17, 20*
189:7
190:*13*
**available**
92:*22, 24*
125:9
136:7
173:9
271:*17*
336:*20*
360:*3*
**Avenue** 3:*20*
**avoid**
382:*11, 22*
**aware** 14:*1,
4, 11, 15*
23:*22*
109:*14*
117:*20*
121:*10*
124:*13*
125:*23*
131:7, *13, 22*
133:6, *10*

165:*22*
166:5
184:*14, 17*
187:*1*
197:*22*
199:7, *13*
201:*19*
219:*17, 21*
232:9
234:*21*
236:*14*
242:5
279:*10*
307:6
326:9, *15*
329:*10*
399:*21*
413:5 418:*4*
**Azide** 8:*15*
108:*12*
116:*15*
159:*3, 11*
174:*11*
175:*3*
221:*16*
223:*19, 21*
224:*3, 16*
229:*16*
230:7
232:*4*
241:*20*
243:*1, 6, 9,
20, 23*
**azoxy**
351:*13*

**< B >**
**B1** 342:*1*
351:2
**back** 29:6
30:6, 8
37:*4* 45:*23*
55:2 70:*20*
75:5 79:5,

*16* 80:*20*
81:2 83:*13*
88:*10* 92:*1*
93:*24*
100:*22*
113:*21*
116:*10*
129:*3*
138:*4, 23*
140:7, *9*
145:*20*
151:*18*
152:*13, 17*
164:*11*
165:2
180:*4*
203:*18*
205:*14*
209:*11*
210:*18*
227:6
228:5
232:*18*
250:6
257:*1*
259:*16*
261:*10*
266:*18*
270:*15*
272:6
282:*14, 21*
283:7
318:7
322:22
327:*24*
331:7
346:7
350:*20*
352:*24*
364:*17, 18*
371:9
373:*1, 19*
380:6
384:7

396:*15*
398:*3*
406:*3*
417:*11*
419:*18*
424:*10*
425:*2*  426:*7*
**back-and-**
**forth**  29:*9*
30:*11*
35:*24*
132:*5*
189:*23*
220:*8*
**background**
170:*1*
209:*14*
334:*12*
**bad**  71:*13*
**badger**
28:*21*  29:2
50:*23*
150:*5*
154:*10*  249:*5*
**badgering**
25:*24*  27:6
51:*4*  85:*3*,
17  89:*20*
148:*13*
150:*1*
154:*14, 15*
162:*4*
164:2
217:*3*  415:*3*
**badly**  215:*6*,
*15*  381:*17*,
*18*
**Bain**  270:*18*
**Bain's**
427:*15*
**ball**  371:*16*,
20

**ballpark**
412:*22*
413:*21*
418:*14*
**bandwidth**
73:*8*
**banter**
34:*15*
**bargain**
368:*21*
**based**  37:*11*,
*12*  55:*21*
65:*11*  88:*9*,
*13*  92:*21*
100:*9*
101:*4*
102:*6*
104:*6*
108:*7*
122:*11*
126:9
131:*5*
132:2, *12, 13*
133:*16, 18,*
*23*  136:*19*
156:*15*
159:*17*
179:*11*
195:*15*
211:*16, 19*
217:*22*
224:*19*
232:*15*
235:*12*
243:*4, 6*
269:*3*
272:*16*
274:*16*
276:*15*
286:*15*
295:*5*
298:*3*
308:*16*
310:*17*

313:*17*
314:*9, 11*
315:*15*
336:*16*
342:*12*
354:7
355:*16*
362:*3, 7*
363:2
366:*17*
400:*5*
411:*24*
421:*19*
**bases**
408:*12*
409:*4*
**basic**  156:*21*
**basically**
145:*15*
**basis**
211:*18*
215:*14*
216:2
258:*15*
297:7
324:*18*
333:*21*
357:*12*
359:*11*
361:*7, 13, 19*
362:*10*
406:*21*
407:*3*
408:*10*
**batch**  66:*19*,
20  67:*14*
68:*5, 10, 11,*
*16, 18, 22*
69:*10, 11, 13,*
*14, 16*  99:*1,*
*10*  125:*4*
136:*11*
166:*11*

173:*10*
260:*1*
262:*10*
286:7
392:*23*
393:*21*
**batches**
68:*8*  99:*8*
289:*9*
**Bates**  7:*13,*
*16, 18*  8:*3, 8,*
*9, 17, 21*  9:*3,*
*8, 14*  17:*18*
41:*10*  43:5
121:*22*
129:*13*
181:*18*
250:*19*
269:*20*
306:6
325:*20*
374:*21*
384:*12*
**bathroom**
348:*14*
**bears**  343:*5*
**beginning**
50:*11*
90:*13*
120:2
226:*8*
276:2
388:*15*
**begins**  320:6
**behalf**  210:2
**behavior**
145:*1*
**behaviors**
116:*5*
**believe**  24:*8,*
*21*  27:*11*
30:*20*
35:*13*
37:*23*  50:*3*

59:*9*  110:*9,*
*18*  112:*15*
151:*19*
155:*1*
236:*19, 20*
250:*6*
270:*12*
278:*6*
282:*11*
311:*21*
312:*8*
355:*23*
390:*16*
407:*19, 20*
425:*8*  427:*3*
**believed**
295:*24*
**beneficial**
292:7
335:*10*
**benefit**
335:*12*
367:*1*  371:*8*
**benefits**
91:*14*
340:*16*
**berated**
145:*17, 18*
**berating**
249:*11*
**best**  22:*19*
162:*6*
198:*12, 24*
248:*20*
380:*20, 22,*
*24*  381:*1*
420:*10*
422:*10*
429:*9*
**better**
345:*7, 10*
**beyond**
40:*7, 10*

300:*15*
bigger  20:*24*
binding
  33:*21*
  36:*20*
  182:*15, 16*
  189:*6*  328:*8*
bioequivalen
ce 402:*13,*
*16*  404:*12*
  405:*10, 12,*
*15, 23*
  406:*12*
biologic
  328:*21*
biologically
  402:*19*
biologics
  329:*5*
bit  150:*14*
  251:*17*
  311:*7*
black  36:*15*
black-and-
white  93:*17*
black-or-
white  67:*19*
BLAs  329:*6*
blind  413:*10*
block  52:*14,*
*17*
blood
  402:*24*
Blow  251:*17*
B-Materials
  8:*21*  269:*21*
board
  409:*16*
body
  136:*13*
  402:*23*
BOGDAN
  3:*9*

boilerplate
  51:*12*
  53:*10, 15*
  54:*9, 19, 23*
  55:*12*
boiling
  157:*7, 10*
BOSICK
  5:*15*
Boston  6:*5*
bottom
  108:*6*
  110:*6*
  123:*1, 6*
  311:*5*
  334:*11*
  341:*24*
  374:*22*
Boulevard
  2:*12*
bound
  242:*9*  337:*7*
box  36:*15*
brand
  60:*24*  82:*5*
branded
  82:*4*
break  74:*11,*
*15, 17, 19*
  90:*16, 20*
  126:*22*
  127:*4, 14*
  128:*17*
  202:*21*
  203:*2, 4, 11,*
*21*  204:*22*
  205:*2, 3*
  249:*22, 24*
  250:*5, 8*
  266:*8*
  348:*5, 6, 14,*
*16*  349:*17*
  350:*6, 9*

breaking
  340:*8*  348:*9*
breaks
  334:*15*
BRIAN  4:*10*
brief  75:*1*
  128:*23*
  205:*10*
  266:*14*
  283:*3*
  350:*16*
  384:*3*
  419:*14*
  424:*6*
briefly  12:*5*
bring  387:*9,*
*23*  390:*8*
  426:*7*
bringing
  390:*23*
broad  59:*4*
brought
  291:*2*
  407:*15*

BUCHANAN
  4:*17*
buildings
  39:*18*
bullet  333:*3,*
*9*
bulletin
  182:*4*
business
  48:*9, 15*
buying  93:*7*
  94:*3*

< C >
C.V  46:*1*

C25H27N702
  225:*3*

calibration
  262:*11*
call  47:*4*
  82:*16*
  103:*18*
  128:*18*
  400:*15*
called
  110:*21*
  285:*10*
  421:*8*
calling
  247:*21*
calls  62:*19*
  343:*10*
  417:*21*
CAMDEN
  1:*2*
camera
  135:*13*
Camp  3:*4*
cancer
  332:*19*
  334:*17*
  335:*8, 17*
  340:*17*
capable
  411:*11*
  418:*19*
carbon
  155:*16, 17*
carcinogen
  366:*9*

Carcinogenic
  9:*9*  190:*22*
  325:*14, 22*
  328:*19*
  332:*21*
  333:*18*
  334:*23*
  335:*4, 15*
  338:*3, 6, 10,*
*15*  339:*16*

340:*13, 20*
  341:*6*
  351:*14*
  363:*21*
carcinogenici
ty  336:*16*
careful
  299:*2*
  409:*15*
carefully
  430:*4*
Carillon
  4:*18*
Carolina
  4:*19*
carried
  149:*15*
  224:*1*
  286:*17*
carryover
  351:*5*
case  14:*17,*
*21*  15:*7, 9*
  17:*9*  41:*21*
  42:*6*  43:*13*
  44:*11*  68:*6*
  78:*8*  82:*15*
  83:*11*  97:*1*
  102:*3*
  103:*11, 23*
  107:*22*
  109:*10, 14,*
*18*  126:*11*
  129:*5*
  136:*22*
  141:*12*
  155:*21*
  165:*20*
  175:*20*
  176:*13*
  196:*20*
  198:*5*
  235:*15*
  236:*15*

243:*13, 16*
251:*12*
256:*3*
268:*21*
270:*11, 24*
272:*19*
276:*14*
286:*13*
295:*9, 14*
326:*21*
337:*4*
341:*13*
342:*22*
354:*9, 19*
355:*5*
356:*2, 22, 23*
357:*2*
358:*16*
389:*10*
404:*11*
406:*22*
407:*4*
408:*8*  409:*5*
**case-by-case**
333:*21*
**CASES**  1:*7*
45:*16*  252:*6*
**catalyst**
136:*2*  172:*4*
**categorizes**
95:*9*
**category**
334:*1*
**cause**
111:*12*
126:*6*
167:*4*
172:*18*
257:*9*
283:*18*
298:*24*
302:*10, 12*
304:*20*
334:*17*

340:*17*
392:*15*
394:*19*
**caused**
219:*2*
223:*19*
**Causes**  8:*20*
250:*23*
**causing**
242:*6*
**cautioned**
44:*21*
**caveat**
118:*16*
**cease**  236:*2*
**Celsius**
167:*19*
172:*6*
**Center**  4:*4*
328:*22*
**Centre**  5:*17*
**certain**  15:*3,
13*  76:*5*
79:*8*  89:*1*
101:*18*
102:*4*
103:*9*
116:*4, 5, 6,
22, 24*
117:*18*
177:*21*
187:*4*
216:*8, 11*
333:*15*
351:*11*
396:*21*
407:*20*
**certificate**
98:*8*  99:*18,
23*  105:*4, 8*
106:*1*
120:*7*
239:*1*  429:*1*

**certificates**
103:*24*
104:*19*
**certification**
11:*4*  429:*17*
**Certified**
1:*17*  429:*1,
17*
**certify**
429:*4, 6, 11*
432:*3*
**certifying**
429:*21*
**cetera**
388:*20*
**CFR**  241:*4*
**cgannon@wa
lsh.law**  4:*6*
**cgeddis@ma
zieslater.com
2:*7*
**cGMP**  21:*3*
22:*24*  23:*3*
24:*3*  31:*10,
14, 22*  32:*14,
16*  33:*4*
34:*1*  35:*11*
37:*17*
51:*19*
54:*13*
56:*19*
64:*23*  65:*3*
66:*7*  67:*6,
21*  68:*15*
69:*10*  70:*1,
4*  79:*20*
81:*6*  92:*14*
133:*6*
173:*23*
176:*13*
194:*16*
253:*15, 19*
254:*7*

272:*20*
275:*17*
277:*21*
278:*20*
283:*19*
305:*8*
322:*16*
366:*17*
367:*19*
369:*12*
381:*13, 14*
386:*19*
388:*17*
417:*17*
418:*21*
**cGMP-
compliant**
238:*14*
240:*16, 22*
**cGMPs**
23:*19*
25:*18*
26:*24*  28:*2*
30:*2, 24*
31:*23*
49:*22*  68:*4,
6, 10, 13*
70:*18, 24*
71:*3, 9*
178:*10*
274:*2*
275:*22*
279:*18*
285:*18*
372:*17*
379:*24*
380:*4*  385:*9*
**challenge**
124:*22*
177:*8*
**challenged**
258:*1*
**chance**  80:*4*
358:*2*  383:*6*

**chances**
237:*19*
**change**
31:*17*  40:*1*
46:*4*
134:*14*
183:*16*
184:*18*
187:*5*
188:*6*
190:*6*
232:*8*
252:*20*
253:*21*
263:*12*
281:*6, 7, 9*
282:*2*
285:*10, 23,
24*  286:*15,
17*  289:*17*
360:*13*
363:*24*
365:*19*
367:*8, 11*
381:*12*
387:*7*
390:*6*
395:*2, 11*
431:*3*
**changed**
82:*20*  91:*2*
96:*18*
158:*6*
159:*5*
184:*22*
261:*2*
281:*21*
338:*24*
339:*1*
347:*14, 16*
360:*20*
364:*2*
395:*5, 6, 19*

changes
285:*8, 13*
291:*2, 11*
365:*13*
401:*7*
425:*15, 23*
426:*1*
430:*11*
432:*5*
changing
31:*19*
333:*3*  355:*6*
chapter
182:*15*
characterize
278:*2*
332:*18*
characterizin
g  70:*15*
198:*4*  381:*9*
charge
92:*23*
Charlotte
4:*19*
checked
426:*17*
Chemical
8:*6*  64:*2*
92:*6, 9*
121:*23*
136:*1*
180:*14*
195:*16*
219:*12*
308:*17*
310:*19*
354:*8*
355:*17*
411:*6, 9*
418:*5*
chemicals
91:*5*
277:*14*
285:*14*

chemist
131:*16*
156:*7*
158:*11*
206:*11*
231:*5*
358:*13, 14*
359:*6, 8*
chemistry
62:*19*  63:*9,*
*11*  114:*23*
129:*21*
131:*19*
133:*20*
157:*17*
158:*5, 9, 12*
168:*18*
169:*10, 16,*
*23*  170:*1*
171:*4*
173:*16*
176:*2*
222:*8*
239:*15*
241:*11*
357:*22*
359:*12*
360:*1*  361:*4*
chemists
359:*2, 21*
360:*5*
chemotherap
ies  335:*8*
Chesney
268:*1, 6, 7,*
*19*  269:*8*
Chicago  5:*5*
Chinese
206:*12, 20*
209:*18*
213:*1, 3, 10,*
*24*  215:*1, 4,*
*7, 9*  220:*6*
225:*11*

chloride
100:*1*
104:*2, 20*
105:*6*
108:*10*
109:*20*
114:*12*
115:*19*
117:*10*
119:*14*
125:*20*
131:*8, 24*
132:*9*
133:*4*
136:*2*
137:*15*
142:*12*
143:*7*
146:*8*
147:*9*
152:*2, 24*
153:*7*
158:*18*
160:*2*
161:*9*
162:*20*
163:*18*
166:*2*
172:*4*
180:*1*
184:*21*
185:*6*
197:*1*
199:*10*
201:*21*
204:*14*
229:*9, 23*
230:*6, 22*
232:*2*
240:*14*
260:*20*
264:*14, 20,*
*23*  266:*1*
273:*22*

277:*7*
283:*17*
287:*3*
289:*3, 6, 24*
291:*7*
337:*4*
339:*2, 11*
360:*15, 16*
395:*15*
425:*9*
chlorine
239:*4*
chose  301:*3*
chosen
300:*22*
Chris  20:*21*
165:*2*
311:*7*
383:*7, 17, 20*
426:*12, 14*

CHRISTINE
4:*3*
CHRISTOP
HER  2:*4*
4:*17*
christopher.h
enry@bipc.c
om  4:*20*

chromosomal
334:*15*
Chuannan
223:*17*
circular
31:*13*
68:*22*  69:*7*
353:*7*

circumstance
278:*19*
371:*15*
circumstance
s  185:*11*

187:*4, 10*
195:*20*
196:*16*
335:*7*
390:*10*
citation
123:*13*
cited
104:*16*
320:*24*
321:*4*
326:*9*  379:*7*
CIVIL  1:*4*
claim
404:*11, 13*
405:*15, 16*
clarify  87:*3*
111:*4*  427:*8*
Class  8:*18*
250:*21*
classification
287:*20*
393:*6*
classified
400:*19*
cleaner  58:*8*
clear  59:*12*
107:*5*
117:*24*
118:*8, 12*
134:*19*
154:*6*
205:*16*
253:*2, 6*
254:*3*  282:*9*
clearer  92:*3*
clearly  72:*2,*
*8, 9*  149:*20*
197:*15*
320:*3*  425:*3*
client
281:*11, 12,*
*13*

Al-Ghanham

clients
44:*15*  45:2
46:*18*  47:6
132:*15*
256:*14*
259:22
317:*14, 18,
19*  400:*3, 12*
clinical
82:7  329:2
332:22
333:*14*
335:7
closed
257:22
closer  95:*17*
clue  334:*8*
COAN  6:*3*
code  32:*3*
cohort
82:22  83:*1,
5, 17*  84:*1, 3,
15*  85:*1, 23*
191:*19*
cohorts
83:2, *20*
88:*13*  319:*8*
colleague
15:*17*
colleagues
15:*11*
collective
61:*15*
396:*20*
collectively
377:*1, 2*
colloquy
217:*1, 2*
373:9  399:6
colluding
274:*20*
column
168:*23*

combined
166:*3*
167:*21*
202:2
290:*14*
Come  23:*18*
116:*9, 12, 13*
127:*18*
139:*16*
147:2
150:*3*
167:7
191:22
199:*18*
203:*17*
212:*10*
259:*4*
293:*4*
326:*17*
331:7
347:*20*
357:*10*
360:*23*
361:*4*
comes
62:*11*  71:7
79:*16*  81:*1*
96:7  97:*12*
215:*24*
coming
94:*12*
100:*11*
101:*1*
112:*1*
132:*23*
228:*15*
256:*18*
264:*10*
281:*3*
298:*5*
399:*24*
commencement  429:*4*

commencing
1:*15*
commensurate  319:*22*
320:*18*
comment
300:*14*
419:*3*
comments
331:22
commercial
160:*19*
163:8
166:*10, 15*
197:2  263:2

commercially
123:*10*
124:*2, 15*
125:*16*
133:7
commission
432:*11*
commissioner  115:9
Committee
3:*12*
common
116:*2, 5, 21,
24*  160:*10*
241:*5, 15, 24*
242:7
301:*18*
369:*10*
381:*3*
Commonly
336:22
communicated  120:*12*
communicating  149:*19*
communication  237:7

communications  347:5
400:*11*
community
93:*14, 19*
companies
23:*21*
company
25:5  46:*6,
7*  49:*14*
243:22
244:*11, 12,
23*  303:*17*
compare
99:*17*
Compared
225:*4*
compendial
190:*15*
compiling
137:*16*
complaints
40:*3*
208:*24*
262:*14*
complete
37:*1*
145:22
256:*6, 20*
317:*3*
344:*13*
completed
290:22
completely
12:7
267:*12*
291:*20*
304:*24*
complex
60:*15*  177:9
compliance
23:2  385:8
compliant
281:*4*  371:*4*

complicated
408:22
complied
178:*10*
372:*16*
complies
422:*4*
comply
24:*3*  25:*17*
26:*24*  28:2
30:2  32:*12,
15*  33:*3*
34:6  37:*24*
38:*19*
329:*12*
388:*16*
392:*11*
compound
34:*20*  38:*4*
60:9  64:2
82:9
147:*19*
148:*13*
198:*1*
219:*10*
222:22, *24*
226:*15, 16*
229:*3*
244:6  323:8
compounds
83:22
84:*14, 24*
85:22  86:*7,
8*  87:9
88:*16, 18*
141:*10*
244:*4*
319:*4, 8*
322:*14*
333:*24*
334:*13*
335:22
340:*20*

Al-Ghanhan

341:*6, 12*
351:*11*
**comprise**
84:*2*
**computation
al** 336:*21*
**computer**
272:*4*
**concentratio
n** 191:*18*
395:*8*
**concern**
82:22 83:*1,
2, 5, 18, 20,
23* 84:2, *3,
15* 85:*1, 23*
88:*13*
191:*20*
334:*20*
392:*15*
**concerned**
58:*24* 249:*9*
**Concise** 8:*6*
121:*22*
**conclude**
100:*9*
285:*4* 323:*7*
**concluded**
159:*6, 13*
161:*12*
165:*13*
211:*23*
339:*6* 428:*9*
**concludes**
428:*4*
**conclusion**
88:*18*
125:*6*
126:*9*
153:*8*
172:*13, 16*
175:*7*
179:*10*
212:*10*

235:*12*
296:*9*
299:*21*
347:2, *20*
360:*9*
361:*5* 364:*5*
**conclusions**
103:*16, 17*
104:*12*
273:*13*

**condensation**
289:*22*
**condition**
290:*9*
**conditions**
64:*21*
141:*21*
158:*18*
160:*2*
162:*19*
163:*17*
170:*6*
179:*16, 18*
183:*8*
254:*18*
285:*16*
291:*9*
**conduct**
371:*19*
**conducted**
159:*14*
175:*7*
262:*20*
336:*19*
**confidential**
44:*23*
**confidentialit
y** 45:*1*
**confirm**
51:*23*
192:*20*
193:*12*

**confirmation**
165:*11*
**confirmed**
224:*21*
226:*19*
241:*12*
242:*16, 19*
**confirming**
290:*22*
291:*4*
**conform**
56:*19*
386:*9*
388:*20*
389:*7*
**confused**
399:*14*
**confusing**
215:*5, 15*
**connected**
235:*14*
**connection**
58:*1* 105:*4*
275:*18*
**consider**
114:*10, 13*
115:*17*
173:*20*
178:*15*
189:*15*
255:*12*
271:*3, 5*
284:*7*
326:*19*
327:*8, 15*
366:*3*

**consideration**
97:*13*
112:*5*
134:*6*
264:2 376:*8*

**Considered**
8:22 126:*1*
207:*15*
257:*14, 16*
266:*23*
269:*22*
270:*6*
284:*12*
311:*14*
318:*14*
327:*12*
334:*16*
376:*22*
**consistent**
65:8 66:*4*
67:*4, 6, 8*
369:*12*
**consistently**
65:*9* 66:*4*
**consists**
60:*21* 262:*4*
**consult**
46:8 134:*22*
**consulting**
44:22 45:*7*
46:*7*
**contain**
42:*8, 13, 19*
108:*22*
109:*21*
116:*18*
131:*9*
**contained**
14:2, *12*
53:*10* 98:*7,
10* 185:*7*
389:*12*
**containing**
289:*3*
351:*11*
**contains**
54:*23*
55:*11*
123:*10*

124:*15*
125:*17*
**contents**
38:*13, 17, 22*
326:*20*
**context**
14:*24*
15:*10*
24:*18*
44:*17*
59:19 64:*9*
113:*18*
370:*11*
**continually**
148:*4*
**continue**
29:*22*
30:*14*
203:*14*
217:*5*
278:*8*
348:*22*
368:*21*
423:*11*
**Continued**
3:*1* 4:*1*
5:*1* 6:*1*
258:*3*
**continues**
174:9 360:*8*
**Continuing**
108:*19*
204:*3*
284:*14*
**continuously**
260:*2*
**contrary**
381:*16*
**contribute**
308:*20*
310:*22*
**control**
27:17 40:*2*
64:*10, 12, 24*

66:2  67:3
146:23
252:20
253:21
260:8
262:6
263:1, 12
285:10, 24
286:15, 18
308:4
375:1
381:12
402:24
429:21
**controlled**
63:5
290:24
319:23
320:19
367:6
392:24
**Controlling**
64:13
183:15
190:5
191:16
**controls**
39:22  40:1
56:17
62:19, 20
65:7  386:3
393:22
**convenient**
260:11
**convention**
182:5
**conversation**
16:17  60:1
119:5
135:12
208:13, 16
223:15
299:14

**conversion**
290:3
**convey**
335:17
**cooperative**
349:1
**corner**
123:2
**correct**
17:11, 12
21:18
31:10  42:6
46:1  49:18,
22  56:12, 22,
24  68:15
75:11  77:6
84:15  89:8
91:23
92:11, 15
93:1  94:20
95:6  106:7
110:1
111:1
113:11, 14
122:14
124:4
125:23
137:1
140:5
143:9
166:6
167:22
179:13, 18,
19  184:23
185:8, 20, 24
186:1, 6
187:11, 19
188:13
213:7
214:1
215:1
216:3
228:2
229:18

230:9
234:7, 13
236:4
239:17
242:11
243:3
244:17
245:4
253:4, 5, 8,
11, 16
254:12, 23
255:7
271:23
272:10, 22
273:9, 11
274:2
295:20
296:1
299:8
300:23
301:4
309:5
310:10
311:23
312:4
319:5
320:8, 12
322:8, 9, 18
327:16
334:4
335:24
337:10
338:11, 16
341:8
343:20
351:19, 24
355:2
356:20
357:6, 17
360:5
366:22
368:1
370:8
375:18

376:11
377:6, 23
380:1, 4, 9
381:14
382:23
384:21
388:4
389:15, 20
392:6, 11
393:17
395:22
397:17
401:17
403:5, 9, 15
404:8
417:19
418:17, 18,
22  421:21
422:22
424:23
425:11
432:4
**correcting**
49:15
127:11
**corrections**
41:16
430:5, 7
432:5
**correctly**
13:12  17:7
69:10, 15
104:3
121:13
163:22
189:1
206:17
207:24
215:22
278:3
304:11, 13
362:17
412:4

**correctness**
140:1
**correlated**
63:3
**Cosmetic**
56:22
**costs**  365:23
**counsel**
11:3  13:17,
18  29:20
135:17
149:7
200:4
220:7
291:19
292:1
294:11
407:22
423:10, 18
429:12, 13
**Counsel's**
12:8  205:6
**count**
127:12
**country**
198:10, 14
259:15
**couple**
122:12
174:24
**course**
122:22
145:6
160:24
**COURT**
1:1, 17
11:21
12:10  29:5,
12  30:8
41:5  80:22
87:15
105:10
138:22
139:1

A13-Athan

145:*20*
152:*13*
201:*8, 12*
282:*13, 18*
330:*18*
344:*21*
406:*3, 7*
430:*20*
**cover** 267:*6,*
*8, 17, 18*
**coverage**
259:*13*
**covering**
262:*9*
380:*20*
**covers** 80:*3*
**crazy** 292:*1*
**create** 71:*3*
168:7 287:*6*
**created**
78:*11*
167:*20*
170:6
196:*15*
254:*18*
279:*21*
394:*2*
**creates** 71:*5*
**creating**
102:*19*
214:*17*
287:*4*
294:*19*
418:*19*
**criteria**
183:*14*
185:*12*
187:*9*
188:*6, 11*
189:*16, 18*
190:*4*
191:*15*
239:*12*

387:*20*
390:*5, 10*
**critical** 63:*1,*
*3* 290:*17*
**criticized**
414:*10*
**criticizing**
405:*11*
**cross-**
**contaminatio**
**n** 252:*21*
253:*22*
**Crude** 8:*15*
108:*21*
172:*3*
221:*17*
224:*5, 9, 11,*
*14* 244:*12,*
*23* 246:*12*
289:*8*
290:*10*
**crystal**
371:*16, 20*
**crystallizatio**
**n** 289:*13*
**CULBERTS**
**ON** 6:*3*
**current**
33:*22*
36:*17* 39:*6*
51:*18*
54:*12* 56:*9*
93:*3* 99:*2*
108:*9*
133:*2*
190:*1*
193:*1*
328:*18*
369:*8*
**currently**
46:*3* 57:*11*
87:*22*
224:*20*

**curriculum**
46:*1*
**customarily**
183:*9*
**customer**
99:*4*
208:*23, 24*
286:*10*
316:*10*
**customers**
236:*2*
242:*10, 14*
243:*12, 15*
316:*21*
**cut** 147:*1*
295:*22*
345:*6*
424:*24*
**cyanide**
155:*16*
**cyclic**
222:*22*
226:*15*

**< D >**
**D.C** 3:*20*
**daily** 333:*10*
**data** 106:*11*
132:*13*
137:*16*
161:*23*
177:*18, 19*
179:*10*
237:*9, 10, 11*
261:*22*
299:*17*
317:*8*
361:*3*
364:*7*
379:*7*
418:*15*
**date** 1:*16*
11:*14* 14:*7,*
*9, 10* 16:*24*

110:*4, 8*
158:*11*
190:*12*
259:*24*
295:*17*
429:*9*
430:*9* 432:*8*
**dated** 21:*15*
56:*6* 124:*1*
251:*7*
289:*18*
326:*24*
339:*14*
384:*19*
413:*23*
420:*4*
429:*17*
**dates** 43:*22*
45:*22*
**dating**
327:*24*
**David**
268:*1, 19*
**DAVIDSON**
3:*15* 7:*6*
18:*2, 8*
19:*10* 20:*4*
21:*19, 24*
22:*15* 23:*5,*
*8, 17* 24:*6,*
*13* 25:*22*
27:*3, 10*
28:*5, 10*
30:*5, 16*
31:*11*
32:*17*
33:*11* 34:*7,*
*12, 19* 35:*15*
38:*3, 24*
42:*11*
43:*23*
44:*18* 47:*9,*
*22* 48:*7, 18,*
*24* 49:*23*

50:*3, 10, 16*
51:*22*
52:*10, 16*
55:*14* 57:*9*
58:*4* 59:*8*
60:*5* 62:*1*
63:*21*
65:*17*
67:*24*
68:*20*
69:*16* 70:*9,*
*13* 71:*22*
72:*15* 73:*2*
74:*9, 16, 20*
75:*12*
76:*16* 77:*7*
78:*1, 13*
79:*2* 80:*2,*
*9, 13* 81:*12*
83:*6* 84:*4,*
*16* 85:*2, 5,*
*15, 24* 86:*17*
87:*1, 13, 21*
88:*1* 89:*16*
90:*9, 21*
91:*7* 96:*2,*
*12* 97:*7*
98:*11*
100:*2*
101:*11, 21*
102:*8, 12*
104:*22*
105:*11, 12*
106:*2, 8*
107:*23*
110:*2, 9, 16*
111:*3*
112:*10*
113:*15*
114:*16*
117:*11*
118:*3, 8, 15,*
*24* 120:*22*
124:*5, 18*

Alka Athan

| | | | | |
|---|---|---|---|---|
| 125:*24* | 191:*6* | 253:*9* | 322:*19* | 396:*8* |
| 126:*21* | 192:*2* | 254:*10* | 324:*8, 13* | 397:*18, 22* |
| 127:*7, 13, 20* | 193:*17* | 255:*8* | 326:*13, 22* | 398:*13* |
| 128:*2, 7, 13* | 194:*21* | 258:*22* | 327:*11, 22* | 399:*5* |
| 131:*14* | 195:*24* | 260:*24* | 329:*13, 18* | 400:*22* |
| 132:*2* | 196:*6* | 261:*7* | 330:*13* | 401:*19* |
| 133:*13* | 197:*4, 12, 24* | 265:*1, 4* | 332:*9* | 403:*10, 16,* |
| 135:*2, 11* | 198:*13* | 266:*3* | 334:*5* | *22*  404:*3, 16,* |
| 137:*2, 8* | 199:*16, 23* | 267:*19* | 336:*1* | *20*  405:*20* |
| 138:*18* | 200:*7, 10, 23* | 268:*13* | 337:*11, 19* | 408:*14, 18* |
| 139:*9, 18* | 201:*7, 24* | 272:*3, 23* | 338:*17* | 409:*6, 22* |
| 140:*21* | 202:*6, 12, 16* | 274:*3* | 340:*5* | 410:*6* |
| 143:*10, 24* | 203:*6, 19* | 275:*23* | 341:*9* | 411:*12* |
| 144:*9, 16, 22* | 204:*9, 17* | 277:*23* | 342:*10* | 413:*14* |
| 146:*17, 22* | 205:*1, 23* | 278:*21* | 343:*21* | 414:*13, 24* |
| 147:*18* | 206:*21* | 279:*22* | 344:*6, 22* | 415:*19, 24* |
| 148:*11, 23* | 207:*6* | 283:*21* | 345:*4, 19, 22* | 416:*11, 17* |
| 149:*21* | 210:*9, 23* | 287:*10* | 346:*6, 11* | 417:*20* |
| 151:*13* | 211:*9* | 288:*10* | 348:*4, 10, 24* | 418:*8, 24* |
| 152:*10* | 212:*7, 22* | 292:*20* | 349:*10, 14* | 420:*22* |
| 153:*1, 15, 21* | 213:*8* | 293:*5, 12, 22* | 350:*3, 8* | 421:*22* |
| 154:*3, 9* | 214:*2* | 295:*1* | 352:*17* | 422:*23* |
| 156:*5* | 215:*2* | 296:*18* | 353:*8* | 423:*19* |
| 157:*19* | 216:*24* | 297:*20* | 354:*1, 14* | 424:*1, 11, 15* |
| 158:*20* | 217:*6* | 299:*9* | 357:*19* | 425:*2, 6* |
| 160:*7* | 218:*21* | 300:*3, 7, 24* | 358:*1* | 426:*6, 19, 24* |
| 161:*17* | 219:*4, 23* | 301:*5* | 359:*13* | 427:*1, 18, 23* |
| 162:*3, 9, 24* | 220:*5* | 302:*4* | 361:*14* | **day**  18:*9* |
| 163:*23* | 223:*4* | 303:*2, 15, 21* | 365:*1, 6* | 70:*20* |
| 164:*14* | 226:*4, 22* | 304:*23* | 368:*2* | 79:*24* |
| 166:*7* | 228:*3* | 305:*12, 23* | 369:*19* | 81:*10* |
| 167:*14* | 230:*10* | 306:*3, 22* | 371:*22* | 148:*24* |
| 168:*15* | 231:*2* | 307:*1* | 373:*2, 6* | 208:*2* |
| 169:*4, 15* | 232:*12* | 309:*11, 19* | 376:*12* | 256:*18* |
| 170:*14, 18* | 233:*13* | 310:*4, 11, 15* | 377:*14, 24* | 257:*6* |
| 174:*1, 15* | 234:*8, 23* | 311:*24* | 378:*5, 8* | 259:*21* |
| 175:*22* | 236:*5, 23* | 312:*19* | 379:*3, 13* | 286:*14* |
| 176:*19* | 238:*16* | 313:*6* | 383:*11, 22* | 330:*21* |
| 177:*1* | 239:*24* | 314:*19, 23* | 388:*2, 6, 23* | 333:*11* |
| 178:*20* | 245:*22* | 315:*9* | 389:*16* | 410:*22* |
| 181:*13* | 246:*23* | 316:*8* | 390:*13* | 432:*11* |
| 184:*4, 7* | 247:*5, 12, 20,* | 317:*1, 22* | 391:*3, 7* | **days**  224:*20* |
| 187:*12* | *24*  249:*2* | 318:*3* | 394:*14* | 430:*16* |
| 188:*14* | 250:*4* | 319:*6* | 395:*23* | |

Ali - Athan

**DCE18001**
172:2
**de** 2:12
**dealing**
198:9
**December**
41:2  42:4,
17, 21  43:17
44:8  208:4
266:22
325:16
413:23
**decide**
286:14
**decided**
117:9
134:14
298:13
299:3
339:21
**deciding**
236:18
**decision**
61:15  71:8
320:22
321:14
350:7
352:4
356:5
363:2
415:15
**decisions**
177:12
**decompositio
n** 109:2, 5
155:13
156:12
172:9
**deemed**
430:19
**deems** 24:17
**defend**
138:16
139:6, 16

**Defendants**
7:13  17:18
18:24
**defending**
293:24
**defense**
29:20
205:6
423:18
**defer** 231:4
**define**
31:22
33:24
70:19, 22
**defined**
31:23  32:2
39:10, 13
95:8  174:5
391:17
405:2
**defines**
75:18  77:9
83:19
**definition**
30:23
65:10
72:17, 21
269:4
389:12
**degradant**
366:6
**degradants**
366:5
382:1  400:8
**degradation**
136:24
141:15, 16,
23  155:12
156:3
175:9
179:17
308:22
309:15
310:9, 24

375:7, 9
382:2
**degrade**
155:22
158:16
160:1
162:20
163:16
**degree**
158:8
**degrees**
167:19
168:1, 3, 5
172:6  173:8
**delayed**
86:3
**deliberately**
151:2
**deliberations**
271:5
**delving**
176:1
**demonstrate**
142:16
175:9
**demonstrate
d** 334:14
**department**
223:16
224:1, 18
228:10, 11
262:5
**depending**
60:22
335:7  423:9
**depends**
30:23  67:8
82:13  95:12
**deponent**
11:23  432:1
**deposed**
13:3  176:5

218:9
248:17
**deposing**
118:23
201:3
430:16
**Deposition**
1:13  7:15
10:2  11:17
12:1, 23
17:15, 21
19:2, 7, 12
20:1, 18
25:11
26:21
29:21
30:15
34:23
35:18
40:18  45:4
50:12, 24
51:6  85:9
89:19
90:12, 14
106:19
107:8
145:1
150:10
169:9
202:21
203:15
207:13, 20
209:3, 4, 9,
11  210:11,
16  213:12,
13  214:12
216:1, 20
225:19
248:3, 11, 18
249:8
267:11, 13,
17  268:1, 12,
16, 19
270:14, 17

276:16
293:24
306:20
330:24
331:13
342:8
344:20
345:12
369:24
410:24
411:2
412:19
413:19
428:8
430:3, 13, 17,
19
**depositions**
210:5
211:22
267:21
272:17
330:2
**deps@golko
w.com** 1:23
**depth** 375:3
376:1
380:9
382:18
**derivative**
224:22
**describe**
191:13
**described**
54:24  56:7
65:2  68:17
318:22
393:13
397:15
**describes**
332:17
**describing**
392:21
393:19

Al Rahman

**DESCRIPTION** 7:*12*
8:*3*  9:*3*
104:*7*
**designation**
393:*4*
394:*11*
396:*5*
397:*15*
398:*7*
399:*19*
**designed**
165:*12*
262:*24*
**desirable**
64:*15*
**desired**
64:*17*
402:*23*
403:*1*
**detail**
175:*10*
246:*4*
**detailed**
66:*9*
206:*10*
210:*12*
213:*14*
214:*13*
257:*1*
**detect**
68:*18*
180:*18, 20*
186:*12, 19*
191:*23*
193:*5, 8*
367:*10*
402:*7*
**detectable**
342:*16*
**detected**
244:*13*
245:*1*
284:*13*

367:*6, 13*
402:*5*
**detecting**
183:*14*
190:*4*
191:*16*
192:*13*
275:*4*
296:*24*
**detection**
186:*12*
**determination** 55:*21*
**determine**
64:*1*  70:*19*
89:*23*
130:*16*
140:*13*
159:*15, 24*
162:*18*
163:*15*
173:*21*
194:*17*
356:*19*
**determined**
64:*15*
67:*10*
109:*19*
195:*15*
290:*18*
**develop**
66:*13, 16, 18*
136:*3*
187:*8*
280:*7*
286:*4*
387:*6*
390:*9*
394:*4, 22*
**developed**
33:*2*  37:*24*
88:*6*
119:*21*
134:*10*

192:*14*
290:*1*
318:*16*
332:*6*
358:*18*
364:*2*
370:*14*
376:*16*
377:*2*
381:*17, 18*
387:*21*
**developing**
120:*3*
180:*8*
271:*19*
284:*1, 4*
367:*9, 10*
**development**
21:*6, 13, 18*
22:*11*  24:*5*
25:*19*  27:*1*
28:*2*  30:*3*
33:*5*  34:*2*
35:*10*
37:*20*
44:*14*
45:*11, 14, 15,*
*17, 18*  46:*10,*
*15*  64:*6*
83:*10*
133:*4*
160:*18, 21*
161:*11, 22*
162:*13*
163:*7*
178:*3*
228:*9*
284:*16*
329:*2*
331:*18, 21*
332:*1, 2, 22*
333:*15*
369:*9*

380:*8, 13, 15,*
*18*  381:*4*
**Deviation**
7:*22*  66:*21,*
*23*  106:*24*
107:*6*
164:*12*
165:*7, 23*
167:*2*
172:*1, 14, 22*
177:*15, 24*
178:*1*
230:*14*
262:*12*
279:*4*
372:*23*
374:*13*
375:*24*
**deviations**
51:*18*
54:*11*  56:*8*
263:*11*
**diagram**
352:*4*
**diagrams**
241:*11*
**dialogue**
257:*8*
**dictate**
187:*14*
**difference**
360:*15*
**differences**
74:*7*  166:*10*
**different**
18:*9*  43:*16*
61:*3*  69:*23*
74:*8*  82:*7*
83:*21*
160:*22*
161:*11*
165:*16*
168:*6*
173:*4*

177:*5*
181:*9*
219:*14*
228:*7, 8*
234:*1, 2*
237:*20*
279:*24*
297:*11*
317:*17*
332:*2*
342:*18*
371:*15*
380:*16*
385:*17*
403:*4*
409:*20*
413:*10, 18*
414:*3*
**differently**
41:*19*  44:*2*
55:*5*  58:*7,*
*11*  78:*16*
117:*16*
139:*13*
158:*1*
168:*20*
233:*20*
276:*24*
286:*21*
359:*17*
411:*18*
**difficult**
180:*20*
186:*11, 24*
193:*4, 8*
289:*12*
**difficulty**
214:*17*
**dig**  114:*23*
**digging**
111:*24*
280:*20*
**diligent**
323:*23*

**dilute**
237:*20*
**dimension**
26:*4*  369:*7*
**dimethylami**
**ne**  108:*23*
109:*4, 15, 22*
114:*11*
115:*18*
116:*18*
123:*12*
124:*2, 15*
125:*5, 18, 19*
126:*14*
130:*15, 23*
131:*9, 24*
133:*8*
136:*16*
140:*11, 18*
155:*15*
156:*4*
158:*17*
160:*1*
162:*21*
163:*17*
167:*20*
168:*10, 13*
171:*9*
172:*8*
175:*1, 6*
185:*7*
196:*24*
197:*19*
199:*8*
201:*20*
204:*12*
227:*13*
309:*8*
366:*7, 8*
**Dimethylfor**
**mamide**  8:*8*
98:*21, 22*
108:*20*

109:*1*
129:*13, 22*
**ding**  391:*11,*
*12*
**dinner**
427:*24*
**Diovan**
406:*17, 21*
407:*3, 5, 20,*
*21*  408:*3, 6,*
*9*  409:*2, 3,*
*11*  410:*16,*
*17, 19*
411:*10, 22*
412:*2, 16*
413:*8*
414:*21*
417:*1, 17*
418:*6, 19*
**dioxide**
155:*16*
**direct**  25:*12*
84:*8*
199:*21*
313:*21*
331:*4, 5*
350:*1*
429:*21*
**Direction**
10:*5*
**directly**
25:*13*
150:*7*
313:*11*
408:*2*
**disagree**
51:*7*
172:*12*
197:*8, 18*
369:*10*
**discard**
286:*7*
**discount**
372:*6, 19, 21*

**discovered**
44:*5*  186:*3*
229:*10, 24*
**discovery**
410:*21*
**discussing**
230:*16*
**discussion**
424:*20*
425:*8*
**Discussions**
15:*1*  220:*13*
**dismay**
101:*16*
**displays**
356:*11*
**disposition**
71:*8*
**dispute**
219:*22*
**disputing**
389:*8*

**disrespecting**
221:*4*
**distracted**
29:*8*
**DISTRICT**
1:*1*  11:*21,*
*22*
**division**
57:*16, 18*
**divisions**
60:*18*
**DMA**
131:*10*
179:*17*
**DMF**  62:*12*
98:*5, 7, 9, 20*
99:*24*
103:*8*
104:*1, 15, 19,*
*24*  105:*5, 9,*
*17, 18*  106:*1,*

*16*  108:*20*
109:*19*
114:*12*
115:*19, 20,*
*22, 23*  116:*1,*
*9, 21, 23*
117:*8, 20*
118:*2*
119:*13*
120:*17, 19,*
*21*  121:*11*
122:*13*
123:*9*
124:*1, 14, 21*
125:*1, 17, 21*
130:*16, 24*
131:*7, 11*
132:*1, 9*
133:*7*
136:*2*
137:*1*
140:*12, 19*
155:*14, 22*
157:*8, 10*
158:*16*
159:*24*
161:*9*
162:*20*
163:*16*
166:*1*
167:*19*
168:*1, 12*
172:*3, 9*
173:*14*
175:*9*
179:*17*
185:*5, 6*
197:*3, 20*
199:*9*
201:*21*
204:*13*
239:*2*
261:*1, 2*
264:*12, 13,*

*19*  265:*16,*
*19*  266:*5*
281:*7, 24*
282:*1*
289:*24*
309:*7*
326:*16*
365:*20*
366:*5, 6*
370:*15*
387:*24*
395:*20*
400:*7, 8*
401:*6, 12*
424:*21*
425:*9, 10*
426:*2*
**DMFs**
240:*13*
326:*10*
**Doctor**
18:*13*  22:*6,*
*22*  23:*15*
25:*2*  27:*9*
40:*22*
41:*15*
47:*11*  53:*5*
85:*19*
96:*10*
101:*18*
118:*14*
119:*9*
128:*5*
143:*15*
146:*20*
147:*4*
149:*5*
151:*8*
153:*23*
176:*21*
184:*12*
200:*22*
201:*15*
204:*11*

A42-Athan

214:*15*
220:*19*
221:*1*
230:*1, 5*
240:*4*
245:*15*
282:*6*
293:*3, 20*
294:*14*
302:22
304:*5*
309:*13*
310:*1*
313:*1, 21*
337:*14*
344:*5*
345:*16*
353:7
355:*10*
359:*18*
368:*6*
410:*12*
416:*24*
**DOCUMEN
T** 1:*7* 8:*7*
18:*14, 17*
19:*4* 33:*19*
51:*24* 52:*1,
20* 53:*1, 2*
59:*24*
107:*9, 16, 20*
108:*5*
110:*5, 8, 19*
111:*19*
121:*23*
122:*4, 19*
123:*20*
125:*16*
126:*13, 18*
129:*8*
130:*3*
140:*8, 17*
155:*8*
166:*8, 23*

167:*1*
168:*8*
171:22
173:*2, 3*
181:*8, 9, 23*
184:*14*
190:*12*
207:*17*
236:*20*
245:*20*
255:7
270:7
271:*2*
307:*21*
309:22
310:*12*
313:*3, 13, 16*
318:*8*
320:*11*
322:*20*
326:*5, 6, 10*
327:*10, 16*
329:*11, 19,
22* 334:*4*
340:*7, 9*
348:*8, 12*
349:*3, 16, 22*
350:*24*
352:*3, 15*
364:*16*
366:*22, 24*
368:*3*
370:*12*
374:*16*
376:*14, 15*
378:*17*
379:*11*
384:*20*
390:*20*
394:*13*
396:*6*
398:*11, 22*
399:*2, 16*
402:*10*

414:*15*
415:*10*
416:*20, 22*
420:*6*
421:*19*
422:*6*
426:*5, 7, 13,
14* 427:*5, 7,
9*
**documentati
on** 39:*19*
58:*18*
133:*23*
204:*20*
**Documented**
136:*8*
171:*15*
179:*19*
261:*17*
262:*16*
280:*22, 23*
**Documents**
10:*10*
19:*24*
101:*7*
108:*1*
179:*16*
196:*21*
262:*20*
263:*8*
267:*2, 7*
268:*4*
426:*15*
**doing** 22:*19*
30:*13*
62:*16*
89:22
126:*4*
128:*8*
132:*11*
173:*24*
192:*1, 20*
198:*11*
228:*19*

248:*19*
256:*3*
362:*24*
398:*16*
415:*6* 430:*8*
**domain**
63:*16*
**Dong** 107:*8*
159:*2*
**dose** 21:*7, 9*
22:*12, 14*
45:*14* 65:*14*
**dossier**
241:*5*
**doubling**
139:*11*
**doubt**
171:*13, 16,
19*
**downstream**
97:*14*
**Dr** 11:*23*
12:*20* 20:*4*
21:*5* 27:*18*
28:*17* 29:*7,
24* 38:*24*
44:*20* 51:*3*
52:*3, 23*
65:*18*
74:*16*
80:*11* 85:*6*
90:*12*
110:*10, 18*
112:*18*
127:*13*
144:*23*
145:*3, 22*
146:*4*
152:*12*
156:*6*
157:*4, 6*
180:*19*
191:*7*
193:*3*

198:*15*
203:*20*
204:*9*
205:*16, 17,
20* 206:*18*
207:*4, 7*
210:*1, 5, 6,
10* 213:*18*
215:*18, 19*
216:*1*
218:*4*
227:*12*
228:*5*
231:*6*
235:*3*
246:*4, 5*
250:*10*
270:*18, 19*
271:*22, 23*
272:*10, 14*
273:*5, 13, 16*
288:*16*
294:*3*
306:*23*
317:*24*
332:*10*
344:*11, 13*
346:*19*
357:*16*
358:*16*
359:*5*
407:*17*
410:*23*
411:*1, 5, 7,
14* 412:*15,
18* 413:*4, 6*
418:*12, 17*
424:*16*
427:*2, 15*
428:*5*
**draft** 22:*8*
326:*6, 7, 24*
327:*17, 24*
328:*3, 5*

329:*20*
330:*3*
338:*19*
339:*13*
374:*12, 13*
375:*16*
376:*14, 15,*
*20* 377:*4, 16*
379:*12, 16,*
*18, 21*
**drafted** 21:*4*
**drastically**
395:*5*
**draw** 82:*15*
101:*18*
103:*16*
104:*11*
179:*10*
**drawn**
125:*7*
172:*13*
**drew** 103:*23*
**drink**
127:*24*
**drive** 110:*20*
**driving**
166:*19*
**Drug** 9:*6, 9*
31:*2, 24*
32:*1* 36:*17*
45:*11, 13, 14,*
*17, 19* 46:*10,*
*14* 48:*10*
54:*17*
56:*21*
63:*14, 16, 20*
65:*13* 66:*3*
70:*2, 8*
77:*5, 23*
83:*9* 95:*24*
132:*15*
182:*20*
239:*10*
260:*6*

264:*9*
280:*7*
288:*8*
289:*2*
306:*7*
307:*5, 15*
308:*15, 21*
310:*23*
325:*15, 22*
328:*17, 20,*
*22* 329:*3, 4,*
*7* 335:*9*
338:*11, 16*
340:*21*
367:*15*
386:*24*
392:*14*
402:*20*
403:*2, 7, 9*
404:*6, 7*
407:*9*
410:*16*
422:*8*
425:*12, 15,*
*23*
**drug-related**
340:*14*
**Drugs** 5:*12*
48:*10* 57:*8*
58:*2*
252:*15*
369:*14*
**dry** 127:*24*
**Du** 7:*21*
54:*3*
211:*16, 17*
218:*17*
**Due** 12:*4*
152:*22*
153:*4*
155:*23*
223:*17*
240:*23*
245:*16*

375:*2*
405:*8*
417:*17*
418:*21*
**duly** 12:*14*
**Du's** 210:*15,*
*19* 211:*5*
212:*4, 9*
**duty** 242:*9*
337:*7*

**< E >**
**earlier** 44:*9*
83:*8*
138:*10*
230:*16*
246:*1*
303:*4*
352:*15*
382:*9*
405:*1*
424:*20*
425:*7* 426:*4*
**early** 14:*8*
70:*21*
180:*6, 7*
358:*18*
364:*21*
375:*3*
380:*10*
**earth**
216:*14*
**easiest**
26:*21*
260:*10*
**easy** 186:*21*
**eating**
30:*12*
249:*10*
**ECF** 7:*15*
17:*21*
**EDQ** 332:*13*
**EDQM**
134:*16*

238:*24*
286:*10*
301:*12*
332:*6*
**effect** 31:*7*
78:*4*
260:*15*
264:*21*
323:*13*
365:*12*
385:*23*
402:*23*
403:*1*
**effectively**
31:*3, 15*
39:*10, 16*
46:*24*
57:*14* 61:*2*
62:*18*
66:*12* 73:*7*
75:*17*
83:*20*
95:*12*
97:*15*
113:*23*
115:*24*
119:*17, 21,*
*24* 125:*3*
134:*9*
138:*12*
142:*18*
156:*14*
157:*9*
160:*12*
180:*3*
182:*13*
186:*17*
218:*5*
228:*22*
239:*8*
256:*5, 17*
264:*7*
279:*7*
280:*15*

281:*11*
296:*23*
299:*20*
316:*15*
339:*16*
342:*16*
346:*22*
363:*5, 19*
376:*24*
380:*7, 15, 20*
394:*1*
395:*7*
396:*13*
418:*12*
**effects**
318:*19*
319:*20*
320:*15*
335:*11*
**efficiently**
216:*19*
**effluent**
228:*15*
**effort** 60:*17*
340:*18*
341:*5*
352:*14*
382:*10, 16*
**EIR** 55:*23*
103:*19*
261:*13, 14*
262:*2*
**Eisenhower**
2:*4*
**either** 50:*18*
57:*15*
62:*11*
84:*13* 98:*6*
109:*4*
117:*12*
164:*18*
170:*16*
178:*13*
237:*21*

Ali Fahim

239:*19*
274:*21*
328:2
372:*11*
394:*9*
396:*4*
397:*20*
398:6
399:*17*
401:*14*
426:*11*
**eliminate**
337:8
**e-mail**
41:*15*
206:*3, 14*
207:*1, 11*
209:*7, 12, 13,
14, 16, 17*
210:2, *7, 8,
17, 20, 22*
211:*2, 6, 8,
23*  212:*5, 13,
19, 24*  213:*3,
16, 23*
214:*21, 23*
215:*5, 15, 23*
216:9
217:*19, 22*
218:*6, 17*
219:*1, 5, 13,
21, 22*  220:*1,
2, 4, 5, 20*
221:*1, 24*
222:2, *7*
223:6
225:*11, 17*
226:7
227:2, *7, 18*
228:*23*
229:6
231:*9, 13*
234:*3, 9, 11,
15*  235:*4, 6*

237:6
241:9
242:*15*
246:*13, 21*
247:*3*
249:*14, 17*
252:*1*
**EMEA**
383:*18*
420:*18*
421:*6, 8*
**EMEA/CHM
P/QWP/2513
44/2006**
420:*12*
**EMERICH**
2:*15*
**Emory**
407:*17*
413:2
**employ**
188:*4*
**employed**
183:*9, 18*
185:*13*
**employee**
429:*11, 12*
**employees**
15:*21, 22*
16:*12, 14*
262:*19*
**encourages**
20:*9*
**encouraging**
199:*20*
**endlessly**
144:*11*
**endorphins**
221:7
**ends**  95:*23*
96:*5*
**enforcement**
258:*12*

**engage**  49:*3*
50:*15, 17*
257:7  258:*3*
**engaged**
60:*20*
135:*11*
**engagement**
233:*4*
**engineering**
136:*10*
**English**
209:*18, 19*
213:*11*
214:6
**enhancement
s**  46:*13*
**Enjoy**
427:*23*
**ensure**  12:6
66:2  67:*4*
367:*4, 15*
385:8
386:*7, 15*
388:*19*
389:*4*
**ensuring**
164:8
**entered**
136:*21*
**entering**
252:*16*
**entire**  227:2
238:*15*
385:*23*
**entitle**
200:*11*
**entitled**
200:8
**environment
al**  64:*21*
**EP**  125:*1*
**equal**
311:*13*
318:*13, 20*

**equipment**
39:*19*
**equivalence**
404:*14, 23*
405:*17*
**equivalent**
403:*3*
404:*5*
410:*16*
**errata**
430:6, *9, 12,
15*  432:6
**errors**  44:6
**ESQUIRE**
2:*3, 4, 10, 11,
19*  3:*3, 9, 15,
17*  4:*3, 10,
17*  5:*3, 9, 16*
6:*3*
**essence**
138:*16*
139:6
**essentially**
291:*5*
**establish**
36:*19*
**established**
100:8, *16*
197:*3*
262:*3, 7*
386:*10*
388:*21*
389:*13*
393:*1, 23*
**establishing**
73:*23*  320:*1*
**ester**  289:*21*
**estimate**
357:*9*
360:*23*
394:*20*
**estimated**
225:7

**et**  388:*20*
**ether**  285:5
**Ethicon**
277:*1*
**European**
46:*22*
134:*16*
274:*11*
**Europeans**
296:*21*
**evaded**
355:*10*
**evaluate**
147:7
151:*23*
173:*11*
329:*1*
356:24
365:*12*
367:*3, 14*
368:8
**evaluated**
76:*13*
291:*3*
314:*17*
333:*20*
336:*15*
337:*5*
**evaluating**
107:*21*
129:*5*
**evaluation**
108:8
109:*10*
290:*20*
328:*23*
336:*19*
**evening**
424:*17*
**event**  179:*1*
180:*23*
**events**
264:*1*
368:*12*

eventually
326:7
everybody
41:4
303:19
324:12
348:6
358:3 428:1
evidence
136:14
171:16
212:16
218:3
237:3, 4, 5
256:22
ex 16:6
exact 14:9
16:24
45:22
155:3
282:14
exactly
127:10
236:7
247:17
393:16
EXAMINAT
ION 12:17
424:13
429:4
examine
259:10
examined
12:15
example
33:16
66:14 76:2
92:23
94:18 95:3
98:5, 20
185:5
309:7
335:8

393:4, 7
402:21
examples
336:23
exceeds
352:23
356:8
exclude
273:12
excluded
351:15, 22
ex-
colleagues
15:2, 20
16:3
executives
15:21 16:9,
12
ex-FDA
16:14
exhaustive
387:19
Exhibit
8:21 17:17
18:14
40:19 41:9
43:4 53:21
54:1
106:18, 20,
23 121:18,
21 129:9, 12
164:11, 14
181:17
221:11
250:16, 18
251:5
266:21
269:16, 19,
20 306:5
325:12, 19
365:3
374:5
384:11

419:20
426:9
Exhibit-1
17:14 18:15
Exhibit-10
251:6
Exhibit-11
270:4
Exhibit-12
305:21
306:12
Exhibit-13
325:17
Exhibit-14
374:3
Exhibit-15
384:9
Exhibit-16
420:3
Exhibit-2
41:7 45:23,
24 364:24
Exhibit-3
43:1, 10
Exhibit-4
53:22 365:5
Exhibit-5
106:21
107:5
164:18, 20
165:7
Exhibit-6
121:19
426:23
427:3
Exhibit-7
129:10, 19
140:9 155:9
Exhibit-8
181:14
182:3
Exhibit-9
221:9, 22

exhibits
209:22
427:16
exist 72:24
76:15 77:5
257:19
343:18
existing
60:24
279:2 339:9
expect
116:22
117:21
119:12
120:19
353:18, 22
354:17
355:14, 19,
22 356:2
363:7, 21
383:1
expectation
352:19
353:12, 13
360:24
362:23
407:13
expectations
149:14
expected
23:22
92:14 93:3
95:13
189:13
190:21
275:5
280:5
289:15
318:17
319:3
323:2, 4
354:5
355:3, 8
357:13

359:2, 6, 22
360:7
361:8, 23
362:14
363:8, 10
373:23
402:4
expecting
178:6

experimental
290:13
experimentin
g 222:15
Expert 7:16,
18 14:5
41:10 43:5
63:9, 10, 13,
18 72:20
90:19
101:1
103:2, 5, 6
157:16, 23
158:4
168:18
173:17, 19
206:11
231:21
267:24
307:13
345:1
349:22
357:22
379:1
407:17
expertise
170:2
358:16
experts
114:20
138:8
139:24
171:1
206:13

Al J. Athan

209:22, 23
212:17
215:11, 12
270:18
405:11, 22
406:11
410:15
**expert's**
412:13
**expires**
432:11
**expiry**
259:24
**explain**
60:2  72:4
121:2
145:2
150:9
372:12
**explained**
50:11  387:5
**explaining**
301:21
**explains**
159:2
**explanation**
379:2
408:23
**exploring**
82:19
**explosion**
223:23
**explosions**
346:12
**exposure**
332:20
333:10
**Exposures**
334:18
**expressed**
361:21
**extensive**
134:13
288:24

**extensively**
63:15
136:4  207:1
**extent**
46:11
248:19
375:2
376:1
382:17
**external**
34:5  37:17
49:13
183:17
185:3, 4
187:7
188:8
190:7
387:8, 23
390:7
**extra**
222:21
225:6
226:14
369:7

**extrapolation**
134:7
**extremely**
97:20
241:14
351:13

< F >
**face**  416:10
**faces**  292:1
**facilities**
39:18  56:16
**facility**
61:11, 14
162:13
163:7
238:21, 22,
24  241:8
252:14

263:2
280:9
284:3, 6
286:2, 5, 7
332:3
366:13
380:18
**fact**  14:11
111:7
133:11
155:22
181:2
186:2
227:19
228:1
275:2
303:3
316:3
355:9
376:7
382:6
396:2  401:8
**factor**
175:19
**factored**
178:12
**facts**  101:4,
9  102:6
103:18
275:8, 11
276:4, 5, 6, 8
285:4
**factual**
101:19
102:4
312:17
**fail**  68:4
430:18
**failed**
365:23
367:3, 19
368:7
370:6  376:4

**failing**
272:20
**fails**  68:11,
23
**failure**
68:17, 19
69:10, 11, 13
365:11
366:17
**failures**
68:11
**fair**  51:5
**FALANGA**
4:3
**FALKENBE**
**RG**  5:3
**fall**  189:22
333:24
**falsifying**
379:6, 8
**familiar**
348:11
384:21
427:12
**familiarity**
116:23
**far**  189:9
213:15
**far-fetched**
81:16
**FARR**  2:15
**fashion**
253:19
**fast**  20:9,
11, 12
**fastest**
260:10
**fax**  1:22
**FDA**  8:17
15:22, 24
16:4, 10
33:20, 23
36:5, 20
39:11

46:22  47:7,
18  48:6
51:13  55:9,
17, 20  56:6
57:6, 11, 23
58:10, 12
59:7  60:15
61:10, 18, 20
62:5, 8, 19
63:13
100:4
105:16
106:12
111:23
112:18
113:1
115:9
125:10
132:11, 14,
20, 21  134:2,
16  136:9, 12
153:9
167:8
171:18
180:13, 17
186:11
187:24
192:3, 9, 14
193:20
194:12
229:19
230:12
232:18, 20,
22  236:2
237:2, 21, 22
238:5, 10, 12
239:2
240:10, 15,
21  241:4
242:10, 14
243:11, 14
250:19, 20
251:7
252:5

A. Athan

253:1, 2
254:3
255:11, 14, 19  256:3, 4, 10, 11, 19
257:1, 17, 20, 22  258:3, 6
259:8, 12, 21
260:4
264:3, 4
274:11, 19, 20, 21  275:3
281:4, 7, 8, 19, 23
284:10
286:19
287:16, 19
291:15
296:22
297:1, 7, 12
301:12
325:2, 5, 7, 9, 12  327:2
328:8
331:16
332:7, 13
339:22, 23
343:5, 15, 19, 23  344:3, 15
346:24
347:1, 6, 19, 23  351:21
361:2
362:11, 18
363:2, 3, 7
364:19
365:10, 17
366:16
367:18
368:16
369:4, 24
370:4, 11, 14, 16, 17, 19, 20
371:13

372:9
373:15, 16, 21  378:18
379:10, 15, 17  402:7
413:23
414:3, 10
417:4, 7, 8, 12, 13, 14
**FDA's**
21:14
193:24
274:7
284:9
362:21
372:20
373:20
**feasible**
63:1  299:8, 12  335:16
340:18
341:4
352:13
382:10, 16

**FEBRUARY**
1:7  11:15
429:17
**federal**  32:3
56:21
**feed**  406:4
**feel**  13:11
27:14
151:3
248:17
**feeling**
151:1
**felt**  329:11
**Fengtian**
206:11
**FERNANDE Z**  2:11
**FID**  186:19
192:5, 6, 7

237:10
296:23
400:5
**field**  157:17
303:14
**figure**
78:24
108:15
312:11
314:21
324:3
359:3, 9, 10
362:5
383:13
**figured**
288:1, 3
296:13
297:15
299:6
300:5, 20
323:24
359:7
**file**  289:2
425:12, 16, 24
**filed**  238:12
239:4
370:17
401:6
**files**  427:3
**filing**  11:4
**final**  255:13
257:16
258:12
327:6
329:20
330:5
374:18
375:16, 20
376:17
377:5, 16
379:20

**finalized**
330:4
385:20
**finally**
258:14, 16, 17
**financially**
429:13
**find**  43:19
111:12
115:22
150:13
164:19
167:3
173:4
228:21
321:3, 9
345:12
362:20, 22
370:1, 2
381:24
383:9
**finding**
364:8
408:10
409:3
**findings**
372:20, 22
407:2
**fine**  175:24
176:8
294:12
304:4
305:19
321:9
337:21
344:2
382:4  412:6
**fingertips**
84:11
**finish**  145:9
203:2
204:5
216:20

331:9
344:7, 9
358:8
**finished**
21:7, 9
22:12, 14
45:14
63:14
65:14
95:24  96:7
98:2
115:24
252:15
332:10
**finished-dose**  186:5
**firm**  31:5, 6, 16, 17  32:8
55:15, 17, 19
73:19  93:5
97:14
98:24
193:18, 20
255:23
259:16
262:7
274:19
278:4, 6, 22
279:3
280:6
347:20
381:23
**Firms**
46:21  49:12
**firm's**
262:23
**first**  13:24
14:3, 17
18:23
21:22
33:18
34:13  37:5
42:5  82:24
83:4  90:12

Ali-Athar

96:*18*
104:*4*
117:2
123:2, *8*
130:*10*
144:*1*
150:*10*
174:*23*
184:*15*
203:6
222:*12*
225:*23*
226:*11*
241:*23*
270:*16*
288:6
295:*22*
300:*8*
321:*14*
322:*22*
333:*3*
344:*24*
352:*11*
406:*24*
408:*18*
409:6
412:*20*
420:*15*
423:*22*
424:*19*
427:*10*
**firsthand**
214:*24*
**fit**  24:*17*
**five**  45:*21*
50:*21*
99:*12, 13*
292:6
349:2, *8, 12,*
*15, 19, 21*
423:*21*
**fix**  258:*9, 10*
**fixed**  258:*16*

**flip**  341:*18*
**FLOM**  3:*15*
**Floor**  2:*5*
4:*5*  5:*18*
6:*4*
**Florida**
2:*13, 20*
**flow**  352:*4*
**fluency**
206:*12*
**fluent**
206:*19*
**focus**  316:*4*
**focused**  58:*1*
**folder**
107:*13*
**follow**
37:*10*
205:*3*
246:*1*
373:*11*
**followed**
37:*13*
102:*23*
116:*4*
117:*1, 21*
119:*13*
149:*13*
187:*23*
188:*1*
189:*10, 11*
247:*16, 17*
385:*8*
**following**
29:*13*
80:*23*  82:*4*
139:2
154:*15*
165:*12*
301:*13*
406:*8*
**follow-on**
120:*4*
154:*14*

**follows**
12:*15*
175:*11*
187:*24*
225:9
**follow-up**
76:*24*
102:*18*
423:*12*
**follow-ups**
265:6
**Food**  31:2
36:*17*
56:*21*
328:*17*
**Footnote**
322:*5*
**for-cause**
100:*5, 13*
370:*23*
**force**  403:*23*
**foregoing**
429:*6, 17*
432:*3*
**Foreign**
183:*1, 5*
**forever**
348:*12*
**Forget**
383:*8*
**Forgetting**
227:*18*
**form**  11:*6*
101:*19*
102:2
144:*5*
157:2
169:*3*
180:*15*
205:*18, 22*
207:*8, 9*
211:*1*
220:*10*
276:22

277:*11*
279:*15*
285:*15*
289:*18*
353:*19*
354:*24*
355:*15, 16*
366:*5, 10*
383:*1*  432:*5*
**Formation**
8:*14*  109:*1*
111:*13, 19*
114:*24*
115:*5*
125:*12*
132:*18*
165:*14*
167:*4*
172:2
174:*24*
180:*11*
181:*3*
196:*11*
219:*10*
221:*15*
230:*8, 18*
243:*24*
271:*15*
272:*12*
273:*20*
275:*15*
279:*17*
283:*10, 18*
284:*7, 11*
294:*21*
297:*3*
333:*5*
338:*6, 10, 14*
339:*24*
340:*14, 19*
341:*5, 11, 15*
343:*9*
347:*9, 21*
353:*17*

356:*20*
357:*1, 4, 11,*
*14*  359:*4, 23*
361:*9, 24*
362:2, *12*
363:*12*
364:*4*
365:*24*
366:*18*
369:*5*
376:*11*
382:*1*
**formations**
142:*17*
**formed**
42:*9, 20*
88:*17, 19*
102:*3*
108:*11*
109:*13, 17*
110:*1*
112:*6, 9*
115:*3*
116:*15*
165:*15*
167:22
168:*12*
170:*8, 11*
171:*9*
172:8, *20, 21,*
*24*  175:*5*
176:*12, 17*
178:*4, 8*
211:*15*
228:*17, 18*
229:*15, 18,*
*22*  230:*5, 6,*
*13, 21*  232:*3,*
*11, 21*  238:*1*
243:*8*
275:6
278:*13, 14,*
*24*  283:*20*
339:*5*

353:*19*
354:*12, 21*
360:*11*
361:*1, 6*
**formic**
123:*11*
130:*11, 14*
140:*11*
155:*15*
**forming**
78:7
104:*18*
107:*22*
109:*11*
115:*16*
155:*20*
165:*19*
178:*19*
210:*8, 21*
211:7
212:6
227:*24*
234:*22*
235:*21*
251:*12*
268:*20*
280:*17*
288:*4, 7*
307:*22*
326:*21*
327:*9, 20*
355:*18*
364:*11*
372:*5, 15*
411:*11, 19*
418:7
**formula**
130:*10*
219:*13*
225:*3, 5, 8*
**formulas**
130:*9* 222:*9*
**formulation**
417:*1, 2*

**forth** 75:*22*
227:8
382:*3* 429:*9*
**forward**
214:*19*
**found** 53:*11*
100:*17*
155:*14*
271:*18*
313:*14*
324:*23*
360:*4*
366:*16*
367:*18*
370:22
411:*23*
414:*21*
418:*13*
**foundation**
133:*14*
**foundational**
78:8
214:*18*
304:6
**founder**
46:*4*
**four** 335:*3*
399:*11, 15*
**fourth**
168:*23*
**fragment**
222:*23*
226:*15*
**free** 259:*9*
290:7
**FREEMAN**
2:*3*
**freeze**
403:*10, 11*
**frequent**
223:*22*
**friend** 268:*9*
**friendly**
257:*3*

**front** 36:*3*
40:*22* 52:*2*
53:*2*
**froze** 272:*4*
424:*22*
**frozen**
403:*13*
**frustrates**
331:*12*
**frustrating**
150:*15*
331:*12*
**full** 123:*2*
**fully** 99:*10*
328:6
367:*13*
**function**
79:*14* 91:*13*
**functioning**
100:*19*
262:*17*
263:*21*
264:*15*
**funny** 277:*2*
337:*14*
**further**
159:*17*
165:*11*
236:*4*
262:6
291:9
335:*2, 3*
375:8
428:*3*
429:*6, 11*

**Furthermore**
108:*24*
360:*12*
**future**
371:*17, 18*
423:*16*

**< G >**

**GANNON**
4:*3*
**gas** 193:*10*
**Gateway**
4:*4*
**GC** 186:*19*
192:*5, 6, 7*
237:*10*
296:*23*
400:*5*
**GCMS**
237:*11*
299:*13*
400:*5*
**gcoan@hinsh**
**awlaw.com**
6:*6*
**Ge** 207:*23*
210:*13*
213:*13*
215:*4, 16, 19*
218:*4*
228:*5*
235:*4*
246:*3*
400:*15*
**GEDDIS**
2:*4* 426:*14*
**General**
8:*11* 72:*13*
124:*21*
181:*18*
182:*5, 15*
253:*18*
333:*12, 19*
**generally**
43:*21* 94:6
118:*1*
311:*14*
318:*14*
335:*10*
**generate**
168:7

**generated**
177:*18, 20*
**generating**
161:*13*
422:*14*
**generation**
175:*10*
**generic**
60:*23* 82:*3*
386:*24*
407:*14*
**genetic**
334:*14*
**Genotoxic**
9:9, *13*
21:*8* 22:*13*
63:*19*
287:6
325:*13, 21*
328:*19*
332:*21*
333:*17*
334:*16, 22*
335:*4, 14*
336:7
338:*3, 5, 9,*
*14* 339:*4*
340:*13, 20*
341:6, *11*
342:*20*
352:*20*
353:*3, 12, 14,*
*18* 374:*8*
375:*5*
376:*3*
382:*11, 20*
422:*14, 15,*
*21*
**Genotoxicity**
9:*17* 64:*1*
336:*15*
419:*22*
420:*3* 422:*3*

genuinely
202:4

**GEOFFREY**
6:3
**GEORGE**
2:19
**Ge's** 206:7,
23 207:12,
18 209:3
210:13
214:11
215:24
225:18
**getting**
47:19
120:24
133:22
259:7 415:6
**give** 20:6,
11, 12 23:17
24:15 26:4
60:6 67:19
73:4 80:4
90:15, 19
101:2
112:15
113:5
144:6, 19, 20
151:4
154:19
160:1
162:21
163:16
211:19
256:21
265:8
293:10
294:8
295:3, 4
305:15
307:1
315:4
317:24

331:4
336:23
359:11
362:4
371:18
379:20
383:7
401:18
418:1
**given** 55:19
86:3
144:10
211:20
219:13
258:8
305:16
432:4
**gives** 104:7
**giving**
135:9
169:10, 16,
23 247:10
285:21
**glad** 105:14
**gleaned**
267:9
**GMP** 46:12,
19 47:1, 8
49:13
61:13 65:6,
12 66:12
90:20
95:19
103:11
114:21
117:6
131:21
132:24
171:2
173:17, 19
175:20, 24
176:7
177:11, 23,
24 179:2, 8

195:20
196:16
239:1, 19
241:2, 7, 15
280:19
284:17, 22
285:9
307:13
343:17
415:15
**GMPs** 25:3,
6 26:8, 11,
14 37:8
40:15
66:21, 23
70:22
81:23
94:11 97:9
102:23
103:13
149:14
163:9
170:3
263:22
301:11, 13
379:5
380:13, 19
381:16
382:6
**go** 13:19
19:22
20:21
25:11
30:10
35:24
38:11, 12
44:19
45:23
60:11
70:20 79:4,
11 103:15
108:4
110:5
122:24

126:19
127:3, 17
128:3, 19
129:8
130:6
132:5
137:19
140:7
144:20
155:7
158:21
164:11
165:2, 3
171:21
181:8
182:22
186:21
193:23
198:6
203:21
205:24
220:8
222:4
223:5, 10, 11
227:6
231:17
232:18
235:7
237:17
246:8
249:8, 23
250:13
251:15, 18,
20 254:14
261:9
266:8
276:13
280:20
282:22
288:18, 21
292:24
297:24
301:3
303:7

304:8
307:24
318:7
319:11, 15
320:21
321:19, 20
322:5, 21
325:11, 17
328:13
332:8
334:11
336:4
337:24
346:19
348:12
350:9
351:4
352:2, 24
356:7, 18
364:13, 16,
18 365:8
373:19
374:20, 21
380:6
383:5, 12, 17,
19 385:3
386:1, 3
392:16
396:21
398:3
399:8
416:18
419:9
423:24
424:1
**goal** 67:15
276:17
**Godwin**
7:21 54:3
**goes** 37:4
83:13
95:20
116:10

228:20
323:9  371:3
**going**  12:22
18:4  23:8
24:6  25:7,
22  26:22
29:18, 22
30:10, 14
34:14, 15, 19
35:15, 24
38:10
50:14  51:9
58:10
66:10
74:10, 13
87:1  88:2
93:13
101:1
104:9
106:17
112:11
117:16
118:20
119:4, 5, 6
121:17, 19
124:22
132:4
135:2
136:14
144:19
145:24
146:1
148:11
149:22
159:20
178:20
179:11
200:3
201:11
202:7, 19
216:24
217:5
220:8, 15, 24
223:1

228:5
238:19, 20
240:7
249:21, 22
250:7
251:18
258:16
264:2
269:10
272:23
288:10
291:18, 19
301:15
323:20
335:2
339:8
340:8
345:11
348:14
353:22
355:16, 24
364:18
368:20
369:3
370:11
371:17
374:1
380:6
387:8
388:16
394:8
396:15
410:12
415:22
423:5
**going-
forward**
258:15
**GOLKOW**
1:22  11:13
**Good**  9:15
11:10
12:20, 21, 24
19:21  36:6,

12  47:16
51:18
54:12  56:9
74:11  99:3
118:21, 23
126:22
133:2
151:3
164:22
183:22
185:16, 17
190:1
199:4
203:13
221:7
235:24
261:20
384:13
427:24
**Gorda**  2:20
**GORDON**
5:15
**gotten**  46:21
**Gottlieb**
112:18
115:8
180:19
193:3
**governed**
285:9
381:13
**gracious**
416:4, 6
**grade**
141:10
**Grant**  5:17
**Great**  13:2
19:20  34:9
70:16
221:6
225:22
248:19
287:23
346:18

398:2
424:11
425:20
**greater**
162:14
321:15
**greatly**
290:2
**GREENBER
G**  4:10
**grounds**
256:1
**group**
15:20  16:3
331:24
376:22
**groups**
60:19  61:4
351:12
**guess**
175:23
226:6
269:16
300:16
345:13
**Guidance**
9:8, 14, 15
21:3, 15, 16
32:1, 16
33:20, 21
36:4, 7, 8, 13,
14, 16  39:11
79:6  236:4
307:6, 11, 14
325:13, 20
326:20, 24
327:1, 5, 6, 9,
17, 24  328:5,
6, 7, 11, 15,
23  330:4, 8,
10  331:17
332:17
335:24
338:19, 20

339:13
342:14
351:21
384:12, 14
385:6
397:16
**guidances**
22:9  195:8
382:8
**guide**
250:12
**guideline**
318:23
420:11, 16,
20
**guys**  21:23
249:21
348:17
425:5
**gwilliamson
@farr.com**
2:21

**< H >**
**HACKETT**
2:15
**half**  147:2
**halfway**
319:16
**handing**
423:17
**Handling**
338:2
**hang**
270:14
383:23
**happen**
93:15
277:16
400:21
**happened**
235:8, 9, 10
236:21
261:11

279:*9*
303:*20*
371:*19*
373:*1*
378:*16*
398:*12*
403:*17*
**happening**
133:*19*
177:*14*, *22*
178:*2*
179:*5*, *8*
180:*2*, *4*, *5*
**happens**
284:*1*
**hard**   345:*12*
**HARDING**
3:*9*
**heading**
123:*9*
340:*12*
365:*11*, *15*
386:*2*
**heads**   383:*7*
**Health**
122:*3*
123:*24*
**healthy**
221:*6*
**hear**   82:*21*,
*24*   169:*15*
425:*5*
**heard**   12:*7*
14:*19*, *22*
16:*19*   83:*3*
143:*16*
**heart**   84:*13*,
*19*
**heat**   290:*6*
**heated**
167:*19*
**Hecht**
270:*18*
271:*22*

272:*10*
273:*5*, *16*
**held**   11:*18*
324:*1*, *5*
**help**   49:*5*, *9*
301:*24*
331:*6*
**helped**
194:*7*
**helpful**   22:*3*
28:*21*
225:*20*
293:*17*
**HENRY**
4:*17*
**hereinbefore**
429:*9*
**hesitate**
386:*22*
**Hetero**   5:*12*
**hey**   281:*14*
325:*4*
383:*17*
**high**   109:*3*
241:*15*
323:*21*
333:*17*
351:*14*
**higher**
324:*1*
333:*13*
367:*12*
**highly**
206:*13*
**HILL**   5:*9*
**HILTON**
3:*3*
**hindsight**
111:*21*
113:*21*
173:*3*
180:*3*, *24*
367:*1*
370:*20*

371:*8*, *9*
372:*10*, *24*
417:*10*
**HINSHAW**
6:*3*
**hired**   20:*2*
349:*23*
**Hold**   28:*10*
63:*8*, *17*
191:*7*
207:*7*
244:*18*
287:*17*, *18*
323:*20*
**holding**
56:*18*
63:*12*
158:*4*   256:*5*
**HOLMES**
2:*19*
**honestly**
105:*20*
203:*10*
214:*15*
**HONORAB
LE**   1:*7*
**hook**   256:*5*
264:*11*
**hope**   48:*5*
240:*8*, *9*
402:*15*
**hour**   74:*10*
172:*8*
202:*7*
203:*1*   250:*6*
**hours**
167:*20*
168:*1*
220:*14*
310:*2*
330:*23*
369:*23*
**how-to**
26:*18*

**how-to-do**
32:*6*
**how-to-dos**
26:*13*   32:*5*
37:*9*, *10*, *11*
**Huahai**
3:*22*   175:*7*
290:*19*
291:*3*
**human**
79:*22*   81:*9*
303:*13*
304:*2*   366:*9*
**Humana**   5:*6*
**humans**
334:*18*
340:*17*
**hydrochlorid
e**   242:*17*
**hydrogen**
155:*16*
225:*6*
**hydrolysis**
109:*5*
155:*12*, *23*
156:*19*
**hyperchlorid
e**   243:*20*
**hypothesis**
116:*11*, *12*
274:*17*, *18*
**hypothetical**
141:*13*
228:*23*
231:*18*, *21*
233:*6*, *16*
235:*7*
272:*2*, *5*
273:*1*
274:*17*, *18*
275:*13*
277:*19*
278:*1*
292:*17*

**hypotheticall
y**   273:*8*

**hypotheticals**
276:*4*, *5*, *12*,
*15*   285:*2*, *6*
295:*6*, *11*

**< I >**
**i.e**   336:*17*
**ICH**   31:*24*
32:*15*
33:*16*, *17*
36:*4*, *5*
38:*12*, *18*, *20*
77:*8*   79:*5*,
*21*   81:*8*
88:*21*, *23*
95:*9*   98:*4*
186:*14*
191:*1*
195:*8*, *13*
306:*15*
327:*1*
330:*9*
334:*21*
336:*13*
356:*9*, *10*, *16*
397:*15*
420:*12*
421:*16*, *20*
422:*5*
**idea**   230:*2*
379:*15*
417:*9*
**ideal**   67:*15*
**identical**
68:*9*

**identification**
17:*22*
39:*23*
41:*12*   43:*7*
54:*4*   63:*19*

Ali Rahman

| | | | | |
|---|---|---|---|---|
| 107:2 | 368:13 | **identifying** | *20* 260:12, | 78:11, 21 |
| 121:24 | 392:21 | 254:6 | 16 261:16 | 79:7, 19 |
| 129:16 | 393:6, 16, 20 | **Identity** | 263:23 | 81:5 82:2, |
| 181:20 | 394:5, 8, 9, | 123:3 | 264:7, 18 | 11 87:12, 20 |
| 221:18 | 16 396:4 | 393:3 | 369:1 | 88:7, 19 |
| 251:1 | 397:12, 13, | 398:6 | **important** | 89:1, 4 |
| 269:24 | 14, 16 | 403:8, 19 | 35:18 | 91:23 |
| 306:9 | 399:17 | 404:6 | 269:10 | 92:10 |
| 311:11, 13 | 400:18, 19 | **ignore** 354:9 | 297:6, 12 | 117:8 |
| 318:10, 13, | 414:4 | **ignored** | 304:6 | 124:1 |
| 20 320:23 | **identifies** | 304:14 | 307:20 | 126:5, 7 |
| 321:15 | 385:7 | **Illilnois** 5:5 | 311:19 | 130:16, 24 |
| 326:1 | **identify** | **imagine** | 338:11 | 133:7 |
| 334:20 | 68:18 77:2 | 345:13 | 368:10 | 136:24 |
| 354:10 | 78:10, 20 | **immediate** | 376:7 | 140:12 |
| 374:9 | 79:11, 19 | 256:24 | **impose** | 141:5, 15 |
| 384:16 | 81:4 82:9 | **immediately** | 335:11 | 142:3, 9 |
| 419:23 | 191:22, 24 | 236:1 | **impossible** | 143:6 |
| **identified** | 194:7 | 243:12, 15 | 78:9, 19, 24 | 146:7 |
| 49:16, 22 | 272:21 | 265:13 | 79:4 346:12 | 147:8 |
| 56:7 63:3 | 273:24 | 281:18 | **improper** | 151:24 |
| 69:12, 13 | 311:22 | 373:17 | 272:24 | 152:22 |
| 166:24 | 312:14 | **impact** | **improve** | 153:5 |
| 192:19 | 313:2, 4 | 155:23 | 241:17 | 155:14 |
| 194:11 | 314:2 | 173:13 | 242:23 | 182:24 |
| 196:11 | 315:8, 13, 24 | 177:22 | 365:21 | 183:5, 15 |
| 229:13 | 316:5, 21 | 270:23 | **improved** | 185:2 |
| 245:3 | 352:8, 15, 22 | 271:1, 6, 7 | 290:11 | 186:8, 9 |
| 252:6 | 353:5 | **imperative** | 395:9 | 187:6 |
| 253:15 | 354:18 | 430:14 | | 188:7 |
| 257:18 | 356:6 | **implement** | **improvement** | 190:5, 17, 18, |
| 258:7 | 357:3, 14 | 286:14 | 224:2, 7, 15 | 19, 23 191:3, |
| 273:20 | 358:22 | | **improves** | 13, 16 |
| 277:12, 13 | 359:22 | **implemented** | 290:2, 4, 5 | 221:15 |
| 287:13 | 361:9, 23 | 33:7 | **impure** | 244:1 |
| 297:23 | 362:1, 11, 14 | 261:19 | 130:17 | 250:22 |
| 299:5 | 363:11 | 286:18 | 140:13 | 252:7, 8 |
| 301:23 | 365:3 | 366:2, 20 | **Impurities** | 280:18, 21 |
| 321:22 | 367:21 | **import** | 8:14, 19 | 281:1 |
| 336:14 | 370:5 | 252:14 | 9:6, 9 21:8 | 284:8 |
| 337:6 | 393:12 | 254:5 | 22:13 | 287:7 |
| 356:15 | 397:7 | 255:5 | 63:19 76:4, | 289:11 |
| 360:4 | 398:5 | 258:17, 23 | 6, 10, 12 | 290:21 |
| 366:12 | 401:14 | 259:1, 5, 18, | 77:1, 3, 10 | 298:21 |

Ali Afnan

301:*17*
306:*7*
307:*5*
308:*4, 5, 13, 18*   309:*4*
310:*20*
311:*11*
314:*6*
318:*11, 16, 21*   319:*2, 14, 17, 23, 24*
320:*9, 13, 19*
323:*1, 3, 11*
324:*21*
325:*6, 14, 22*
328:*20*
329:*1*
332:*21*
333:*15*
334:*1, 19, 23*
335:*9, 15, 21*
336:*8*
338:*3, 15*
339:*5*
340:*14*
343:*10*
353:*13, 14, 18*   363:*21*
364:*5*
366:*1, 5, 19*
367:*5, 10, 13, 14, 21*   375:*6*
376:*4*
382:*11, 20*
383:*2*
387:*9, 24*
390:*8, 17*
392:*22*
393:*14, 16, 20*   396:*3*
401:*14*
414:*6, 12*
422:*13, 14, 16, 21*

**Impurity**
9:*12, 13*
75:*21*   76:*5, 18*   77:*12, 18, 21*   78:*3, 5*
79:*12, 14, 21*
81:*7*
108:*11, 23*
109:*22*
114:*12*
115:*19*
116:*19*
125:*21*
131:*10, 11*
132:*1*
140:*18*
141:*7*
142:*17*
183:*21*
185:*3, 8, 15*
186:*15, 24*
190:*24*
191:*17*
196:*14*
197:*2, 20*
199:*9*
201:*20*
204:*13*
219:*6*
224:*8, 11, 13, 21*   225:*13*
229:*2*
244:*7, 14, 15*
245:*1, 2*
246:*14, 15, 21*   247:*4*
249:*14, 16*
252:*20*
253:*21*
296:*5*
298:*6*
299:*1*
308:*20*
309:*9*

310:*22*
315:*18*
320:*2*
321:*15*
322:*7*
323:*6, 16*
324:*5*
333:*6, 12*
336:*12, 14*
337:*3*
338:*6, 10*
340:*13*
342:*20*
352:*8, 16, 19, 23*   353:*4, 5*
354:*10*
356:*7, 20*
374:*8*
382:*23*
392:*20*
393:*2, 5, 7, 19*   394:*1, 5, 19, 22, 23*
395:*4, 7, 10, 12, 19*
396:*12, 13, 17, 19*
399:*23*
400:*13, 16, 18, 20*   401:*4, 5, 12*   418:*7*
**inappropriat e** 346:*5*
**incapable**
418:*6*
**include**
94:*18*   95:*3*
124:*2*
309:*8*
319:*4*
333:*2*
335:*22*
393:*2*   417:*1*

**included**
227:*4*
280:*6*
365:*19*
**includes**
336:*23*
351:*18*
**including**
212:*9*
242:*3*
252:*19*
253:*20*
262:*12*
263:*6*
317:*20*
328:*21*
344:*10*
366:*6*
372:*8*   414:*5*
**incomplete**
223:*18*
273:*1*
**inconsistent**
183:*21*
185:*16*

**incorporated**
240:*12*
**incorrect**
122:*15*
237:*1*
271:*23*
272:*14*
422:*20*
**incorrectly**
189:*3*
**increase**
159:*10*
365:*22*
**increased**
159:*8*
**incredibly**
416:*12, 13*

**independent**
157:*3*
182:*13*
**INDEX**   10:*2*
**indicate**
115:*24*
188:*3*
193:*2*
218:*18*
**indicated**
66:*1*   90:*13*
116:*1*
**indicates**
219:*1*   307:*7*
**indicating**
314:*1*
**individual**
57:*12*
183:*19*
185:*14*
289:*11*
**individually**
57:*20*
**induce**
334:*14*
**industrial**
97:*18*
**Industries**
4:*7, 14*
**Industry**
9:*8, 14*
21:*17*
23:*21*   36:*8, 14*   37:*10*
39:*7*   94:*6*
97:*24*
116:*3, 7, 23*
117:*18, 22*
119:*12*
125:*11*
132:*22*
160:*11*
180:*13, 17*
187:*22, 23*

192:*11*
193:*2*
232:*21, 22*
274:*9*
280:*4*
284:*10*
301:*19*
307:*7*
325:*13, 21*
326:*20*
328:*9*
330:*10*
339:*23*
369:*8, 11*
381:*19*
384:*13*
**inferred**
222:*21*
226:*14*
**inform**
243:*14*
278:*7*
328:*16*
**informal**
16:*16, 18*
255:*10*
257:*13*
346:*23*
347:*18*
**information**
61:*12*
92:*21, 24*
112:*4*
113:*13*
120:*21, 24*
126:*10*
141:*20*
167:*11*
173:*9*
175:*16*
176:*14*
178:*10*
184:*12*
189:*20*

213:*15*
256:*21*
265:*18*
271:*14*
316:*13, 18*
347:*2*   361:*3*
**informations**
120:*11*
**informed**
210:*13*
256:*10, 11,*
*14*   264:*3*
287:*16*
296:*2, 3*
368:*16*
370:*16*
373:*15*
382:*3*
**INGERSOL
L**   4:*17*
**ingested**
79:*22*   81:*9*
**ingredient**
104:*9*
**Ingredients**
9:*16*   36:*8,*
*14*   51:*20*
56:*10*
335:*6*
384:*15*
**in-house**
63:*7*
**initial**
266:*21*
336:*6*
**initially**
290:*18*
**initiated**
259:*19*
**inorganic**
393:*7*
**in-process**
39:*21*

**input**
321:*14*
**insistence**
205:*6*
**insisting**
148:*4*
**inspected**
55:*16, 18*
116:*17*
238:*22*
**inspection**
57:*17*
59:*22*
61:*11*
100:*6, 14*
194:*9, 12*
239:*20*
255:*22*
256:*8*
263:*17*
264:*5*
370:*23*
372:*1, 2*
**inspections**
100:*4, 17*
254:*16, 22*
**inspector**
100:*6*
103:*15, 18*
262:*18*
**inspects**
55:*17*
**instruct**
28:*19*
149:*22*
187:*22*
**instructed**
189:*21*
**instructing**
187:*3*
**instruction**
187:*21*
**instructions**
217:*15*

293:*10*
430:*1*
**insufficient**
375:*2, 4*
376:*1, 2*
378:*20, 21*
380:*11*
381:*16*
**integrity**
379:*7*
**intend**
423:*10*
**intended**
66:*2*
328:*16*
330:*9*
**intending**
80:*5*
**intent**   82:*8*
246:*7*
**intention**
365:*20*
**interest**
319:*9*   331:*3*
**interested**
214:*11*
347:*7*
429:*13*
**interesting**
55:*3*   75:*14*
110:*4*
**intermediate
s**   39:*24*
95:*9*   386:*8*
388:*20*
389:*5*
392:*19*
422:*13*
**internal**
31:*9*   32:*7,*
*13*   33:*6*
34:*4*   37:*18*
40:*4*   73:*18*
289:*17*

**International**
8:*6*   121:*22*
129:*20*
**Internet**
403:*23*
**interrupt**
50:*23*   85:*6*
145:*4, 10*
200:*11*
288:*15*
330:*14*
410:*7, 10*
416:*1*
**interrupted**
110:*17*
144:*23*
145:*5, 18*
200:*2*
288:*11*
313:*7*
346:*14*
**interrupting**
145:*3*
217:*7*
294:*1*   391:*4*
**interviews**
262:*21*
**introduce**
92:*10*
131:*10*
168:*12*
387:*8*   390:*7*
**introduced**
91:*15*
93:*21*
109:*15*
114:*11*
115:*18*
125:*20*
142:*3, 9*
143:*7*
146:*7*
147:*9*

A. Athan

152:*1, 22*
183:*17*
185:*2, 4*
187:*6*
188:*8*  190:*7*
**introducing**
91:*6*
283:*14*
387:*22*
**introduction**
91:*22*  92:*6*
131:*23*
328:*14*
385:*4*
**investigate**
136:*17, 18*
280:*10*
296:*4*
299:*4*
301:*10*
302:*11, 13,
18*  304:*20*
305:*6*
353:*23*
354:*13*
360:*21*
376:*5*
**investigated**
132:*8*
160:*23*
161:*21*
224:*12*
261:*17*
262:*15*
298:*16*
300:*19*
315:*21*
317:*10*
338:*24*
339:*20*
400:*1*
**investigating**
368:*15*

**Investigation**
7:*22*  8:*14,
18*  9:*12*
105:*16*
107:*1, 6, 18*
108:*8*
111:*6, 10*
164:*12*
165:*8, 23*
167:*2, 16*
172:*1, 14*
177:*13, 24*
221:*14*
230:*14, 15*
250:*20*
256:*6, 20*
262:*12*
263:*12, 18*
296:*6*
300:*22*
347:*3, 9*
363:*16*
366:*8*
368:*22*
372:*23*
374:*7, 13*
375:*24*
376:*23*
**investigation
al**  329:*3*
**investigation
s**  286:*16*
**investigator**
100:*14*
379:*19*
**involve**
91:*21*
**involved**
21:*13*
58:*16*
59:*16*
60:*13*  61:*6*
62:*3*  64:*5*

65:*4*  263:*6*
303:*20*
308:*18*
310:*19*
**involvement**
58:*13*  59:*5,
13*  60:*3*
61:*19*
296:*15*
**involving**
58:*14*  59:*6,
14*  61:*21*
**IRBESART
AN**  1:*4*
8:*16*  11:*19*
219:*8*
221:*17*
222:*13, 17*
223:*3, 20*
224:*5, 10, 11,
14, 22*  225:*5,
24*  226:*3, 8,
21*  227:*2, 10*
228:*13*
231:*10*
242:*3*
245:*17*
246:*22*
247:*3*
**ironic**  52:*21*
**irrelevant**
178:*15*
**isolate**
180:*21*
191:*21*
**isomer**
289:*8*  290:*9*
**issuance**
255:*21*
**issue**  55:*23*
173:*11*
194:*8*
257:*9*
259:*17*

296:*7*
316:*6*
324:*1*
330:*7*
354:*8*
371:*14*
373:*16*
**issued**  36:*4*
56:*2*
252:*17*
253:*3*
254:*4, 5*
255:*17, 24*
256:*7*
257:*10*
289:*5*
297:*8*
343:*12, 16*
346:*20*
347:*1*
363:*19*
366:*24*
368:*18*
371:*24*
373:*21*
412:*24*
**Issues**  8:*20*
51:*14*
103:*1*
156:*10*
250:*24*
254:*19*
258:*5*
370:*22*
373:*22*
**item**  322:*22*
**iterative**
347:*18*
**its**  32:*12*
33:*5*  35:*20*
37:*20*
66:*14*
68:*12*  89:*6*
94:*7*

105:*15*
134:*21*
136:*1*
143:*4*
155:*11*
172:*13*
186:*12*
194:*18*
195:*5, 18*
196:*12*
224:*23*
232:*10*
233:*9*
241:*13*
242:*20*
252:*15*
256:*6, 14*
258:*3*
259:*9*
260:*18*
264:*4*
271:*16*
278:*4*
283:*11*
287:*14*
289:*5*
296:*14*
312:*9*
326:*10, 20*
331:*18*
341:*15*
343:*17, 18*
348:*1*
351:*21*
357:*5*
368:*20, 21*
372:*23*
386:*15*
387:*21*
388:*8*
392:*7*
394:*6*
401:*21*

A1 - Athan

403:2
420:9, 10
**IV** 36:11
**IVES** 5:3

**< J >**
**January**
41:23
43:10, 17
44:4
190:11
251:7 254:4
**JASON**
5:16
**JERSEY**
1:1, 19 2:5
4:5 5:10
11:22
198:14
**JESSICA**
3:15 50:7
282:19
302:20
**jessica.miller**
**@skadden.co**
**m** 3:17
**jmestre@riv**
**eromestre.co**
**m** 2:14
**jmr@pietrag**
**allo.com**
5:19
**job** 80:14
248:2 312:9
**John**
210:15, 19
211:5, 16, 17
212:4, 9
218:17
**JORGE**
2:10
**JR** 5:9
**Jucai** 206:6,
23 207:12,

18, 23 209:3
210:13
213:13
214:11
215:4, 16, 19,
24 218:4
225:18
228:5
235:4
246:3
400:15
**July** 206:2
209:6
227:20
232:11
236:10, 11
241:10
256:9
420:4, 8
421:20
**June** 179:4
193:1
229:10, 13,
24 236:7, 12,
16 238:4
256:10
265:12
279:9
289:4
295:14
296:3
307:7
314:3, 22
325:3
373:14
394:21
399:22
401:3, 22
423:1, 2
**jurisdiction**
55:8
**justification**
297:24

298:24
357:10

**< K >**
**KASS** 2:11
**KATZ** 2:3
**keep** 45:5
74:13
149:16, 18
150:11
151:18
301:5, 21
344:19
355:6
368:20
369:22
383:15
410:3, 12
**keeping**
264:11
**keeps** 149:7
150:12, 19
**kicked**
282:19
**kill** 77:22
79:23 81:10
**kind** 52:21
54:7
**knew**
113:13
115:3
123:22
124:16
125:11
132:22
167:11
180:14
196:13
204:12, 15,
24 232:21
235:19, 20,
23 236:9, 18
242:12
274:8, 10, 19

276:23
277:3, 5, 15,
16, 20 278:4,
12, 23 281:3
297:2, 9
324:20
339:15, 24
341:10
343:8
354:23
355:15, 20
**know** 15:12
19:11 20:8
24:14
31:20
35:12 37:4,
22 44:21
49:15 50:8
52:10
60:10 65:9
66:19 67:7,
13 68:6
70:22 71:1,
16 72:11
73:6 76:4
77:13, 14
78:4 79:13
80:2 81:14,
17, 21 82:15
83:13, 24
84:6, 22
85:19
86:10, 15, 24
88:10, 22
89:17
90:21
91:10
93:17
96:15 98:9
99:4, 22
100:24
101:12
105:7
106:3

111:16
112:8, 17
116:6
118:18
126:14
132:17, 19,
21 135:8
140:3
141:6
143:12, 22
144:24
145:14
147:12
149:17
150:14
152:4
154:8, 12
160:4
165:2
169:8
170:7, 17
171:8
176:16
178:16, 17
181:2, 5
182:9
184:2, 7
186:20, 22
190:22
191:8
193:15
196:21
197:1
199:11
200:2, 13, 24
201:9, 16, 17
203:8
204:11, 15
209:10
212:18
214:8
216:15
227:6
228:1, 10, 20

231:*19*
233:*1, 2, 7, 8*
235:*1, 2, 6*
236:*16, 18, 21* 237:*1, 12, 21* 238:*3*
244:*4*
249:*4, 20*
257:*6, 15*
258:*24*
265:*19*
268:*6, 7, 8*
269:*9*
273:*11*
274:*12, 14, 16, 21*
278:*15*
279:*11*
282:*12*
285:*3*
288:*17*
291:*19*
292:*2*
297:*10*
299:*10*
305:*22*
307:*14*
321:*5*
322:*10, 16*
323:*5*
324:*11, 13, 22* 325:*2, 5, 9* 329:*10, 16, 24* 330:*15, 19* 331:*15*
337:*13*
339:*22*
341:*14*
344:*8*
345:*7, 10*
346:*13*
347:*12*
349:*4*
353:*3, 19*

354:*11, 20*
355:*4*
356:*3*
361:*18*
363:*7*
364:*4*
371:*2*
373:*4, 14, 18*
377:*7, 8*
378:*14*
380:*8*
383:*10*
395:*6*
397:*1*
398:*2*
399:*7*
401:*2, 11, 21, 23* 402:*14*
409:*17*
410:*14*
414:*23*
416:*9*
417:*23*
419:*6*
420:*15*
421:*4*
422:*20*
423:*1, 3*
425:*14, 18*
426:*12*
427:*4, 10*
**knowing**
396:*10*
**knowledge**
159:*23*
162:*18, 23*
274:*22*
275:*13*
312:*11*
315:*24*
419:*7*
420:*10*
422:*10*

**knowledgeab
le** 324:*2*
**known**
77:*12*
78:*22*
124:*3*
126:*13*
132:*16*
133:*7*
160:*12, 13*
180:*24*
190:*17*
197:*2*
237:*24*
272:*12, 16*
274:*23, 24*
275:*16*
276:*21*
319:*17*
320:*9, 13*
323:*11*
354:*6*
359:*7*
396:*17*
**knows**
28:*17, 23*
415:*8*
**kosher**
204:*4*
**KUGLER**
1:*7*

**< L >**
**lab** 40:*1*
165:*12, 24*
167:*23, 24*
170:*12*
177:*14*
179:*22*
262:*6*
407:*17*
412:*13, 15*
**labeling**
39:*23*

**labels** 386:*8*
389:*6*
**laboratory**
175:*8* 386:*3*
**Labs** 5:*12*
413:*2*
**lack** 404:*12, 13* 405:*12, 15, 16*
**lacking**
141:*18*
**Lacks**
133:*14*
**ladies**
350:*10*
**language**
51:*12*
53:*10, 16*
54:*9, 19, 24*
109:*9, 24*
113:*10*
115:*7, 8*
172:*19*
188:*24*
189:*3*
219:*18*
222:*8*
352:*14*
375:*18, 20*
378:*23*
388:*13*
394:*9*
**large** 290:*12*
**largest**
224:*10*
**late** 256:*18*
410:*21*
424:*16*
**laughing**
216:*16*
**lawyer**
19:*11*
198:*10*

**lawyers**
20:*1*
**LAWYER'S**
433:*1*
**LAYNE** 3:*3*
**LC-MS**
244:*13, 24*
**lead** 248:*23*
249:*3*
**learn** 83:*5*
**learned**
84:*13, 18*
312:*13*
**leave** 39:*1*
**lecture**
144:*3*
**lecturer**
156:*8*
**Lee** 210:*1, 5* 218:*16*
**Lee's** 210:*6, 10*
**left** 16:*4*
349:*3* 423:*8*
**legally**
252:*16*
**Leon** 2:*12*
**lesser** 46:*11, 15*
**Letter** 7:*20*
47:*18*
49:*18, 20, 21*
51:*11, 13, 16, 17, 21* 52:*4, 7* 53:*10, 23*
54:*3, 10, 23*
55:*9, 24*
56:*1, 5, 8, 11, 13, 15, 24*
57:*2, 4*
252:*18*
253:*3, 7, 13, 16* 254:*6, 8, 13, 20* 255:*1,*

Ali - Athan

6, 10, 24
256:7, 18
257:5, 7, 12,
19, 23 258:4,
9 261:16
263:15, 24
343:13, 17
346:21, 22
347:6, 8, 17,
24 364:17,
19 365:9
368:11
369:1
370:3, 24
371:14, 18,
20 372:21
373:17, 20,
22 413:22
415:2, 20
**letters** 47:7,
20 48:6, 12
53:11
255:12, 16,
21 257:10,
15 371:24
**level** 77:15
240:21
311:12
318:12, 19
319:22
320:2, 18
352:23
356:8
381:10, 15
**levels**
112:22
115:11, 23
141:23
170:7
194:3
333:13
334:18
335:14, 16
336:13

342:2
351:3, 8
367:12
392:15
**lhilton@mey**

**erwilson.com**
3:6
**LIABILITY**
1:5 11:20
**license**
329:5
**life** 248:17
**lifetime**
332:19
**lifted** 260:16
**light** 264:1
368:11
371:2
**Likewise**
289:17
**limit** 76:5
77:15 79:8
81:18, 20
89:2 98:1
183:6
319:20
320:16
396:22
**Limited** 4:7,
14 188:10
189:17
243:22
263:7
340:15
**limits** 73:16
177:21
334:21
**Lin** 215:19
227:12
228:6
235:3
246:4, 5

**Line** 10:6,
11, 16, 21
82:16
159:1
202:23
203:2, 12
204:6
243:18
252:22
253:23
322:24
385:5
431:3 433:2
**lines** 132:3
320:8 335:3
**lips** 105:14
**list** 26:12
31:1 34:3
35:6, 8
37:14, 16, 22
38:9, 11, 14,
16 40:5
84:12
253:18
259:22
266:22
269:15
270:5, 9
281:3
387:19
396:16
402:1
**listed**
120:10
188:11
245:4
267:11
394:17
396:18
402:20
403:2, 9
404:7
407:10
420:16

**listening**
135:14
**Listing**
319:14
**lists** 83:19,
21 105:17
**literally**
143:18
157:20
214:18
227:1
247:21
292:15
390:3, 11
398:14
**literature**
93:1
125:15
131:5
134:22
136:16, 23
336:20
360:2
**LITIGATIO
N** 1:5, 22
11:14, 20
212:14
**little** 20:23
22:16
150:14
202:7
251:17
298:5
311:7
322:1
335:2
353:6 373:9
**Liu** 420:4
**live** 101:2
318:4
**LLC** 2:3
4:21
**LLP** 2:10
3:9, 15 4:3,

**listening** — *(see above)*
**location**
228:8
380:13, 17
397:21
**logical**
93:12, 20
136:17
**long** 68:18
74:13
95:23
196:6
203:1
208:9
344:11
349:6
**longer**
161:10
162:14
421:8
**look** 33:17
44:15
52:20 61:6
62:17
66:22
75:18
84:20
88:12 93:5,
6, 8 94:2, 10
98:15
105:3, 19
114:19
140:2
143:23
159:19
160:12
161:5
165:9
170:4, 24
179:9
180:10, 22
186:22, 24
191:1, 21

**10** 5:3, 9, 15
6:3

A143 Athan

193:*22*
202:*20*
204:*19*
237:*2, 3*
244:*7*
246:*2, 3*
248:*13*
261:*10*
280:*3*
281:*15*
298:*1, 3, 9, 12, 13, 24*
311:*2*
330:*7*
332:*16*
340:*4*
347:*4*
353:*4*
368:*11*
371:*15*
376:*17*
377:*17*
396:*19*
413:*12, 17*
415:*20*
416:*22*
**look-back**
115:*2*
**looked**
44:*15*
93:*18*
99:*23*
101:*6, 7, 8*
103:*24*
104:*12, 18, 23*  106:*10*
119:*24*
120:*20*
125:*14*
126:*2, 3*
134:*9*
135:*24*
153:*3*
157:*11*

161:*8*
207:*11, 13, 14*  211:*21*
212:*1*
213:*17*
214:*5*
239:*8, 9, 14*
241:*4, 7*
269:*8*
271:*10, 11*
281:*16*
299:*12*
300:*18*
315:*15, 16*
331:*20*
332:*1, 2, 3*
339:*3*
357:*8*
360:*8*
361:*2*
363:*6, 20*
364:*3*
396:*11, 23*
399:*23*
401:*4*
415:*10, 14*
418:*10*
419:*5*
**Looking**
21:*2*  62:*14, 16, 22, 23*
84:*23*
85:*21*
88:*10*
94:*24*
103:*12*
106:*15*
108:*5*
115:*4*
123:*1*
130:*13*
133:*16, 18*
135:*13*
136:*14*

140:*10*
141:*4*
142:*15, 16*
157:*9*
164:*24*
165:*6*
166:*9, 12*
171:*6, 23*
174:*8, 22*
179:*6*
180:*3, 4*
182:*23*
186:*17, 21, 23*  228:*9, 11, 15, 16*
230:*17*
241:*9*
251:*22, 24*
252:*2, 11*
259:*2*
263:*19*
265:*14*
273:*3*
274:*15*
280:*16, 21, 24*  299:*11*
311:*9*
312:*9*
318:*9*
319:*13*
331:*7*
340:*11*
342:*17*
350:*22*
351:*2*
356:*5*
358:*17*
371:*9*
373:*1*
381:*22*
384:*19*
416:*19*
417:*11*

418:*11*
427:*9*
**looks**
219:*11*
427:*12*

**LOSARTAN**
1:*4*  11:*19*
**lost**  201:*2*
244:*18*
406:*4*
**lot**  26:*9*
101:*6*
200:*18*
210:*24*
211:*21*
212:*2, 8*
263:*14, 15*
300:*1*
360:*18*
397:*23*
402:*13*
416:*16*
**Louisiana**
3:*5*
**low**  159:*14*
334:*18*
**low-category**
104:*9*
**Lower**
322:*6*
324:*6*
365:*22*
**lowest**
335:*14*
**low-level**
109:*2*
**low-risk**
104:*8*
**LPA**  3:*3*
**lucked**
303:*19*
**Lucy**  420:*4*

**lunch**  15:*20, 23*  16:*1, 17*
**luncheon**
137:*24*
**lying**  382:*6*

**< M >**
**M7**  44:*7, 9, 11, 16*  83:*3, 12, 19*  84:*8, 10, 20, 23*
85:*8, 14, 21*
86:*4, 8*
88:*13, 22, 23*
327:*18*
420:*12*
421:*12, 16, 20*  422:*5, 11*
**madam**
87:*15*
**maintained**
289:*9*
**making**
48:*10*  93:*7*
113:*22*
177:*11*
218:*6*
239:*10*
292:*1*
334:*9*
342:*19*
348:*1*
367:*11*
382:*16*
416:*10*
422:*2*
**malfunction**
41:*24*
**man**  90:*16*
**managed**
57:*15*  241:*3*
**management**
39:*20*

Ali - Afshan

**manager**
420:*5*
**Manhattan**
3:*16*
**manner**
155:*3*
248:*4*
393:*13*
**manual**
257:*13*
**manufacture**
21:6  22:*11*
24:5  25:*19*
27:1  28:*3*
30:3  33:5
34:2  35:*10*
37:*21*
55:*11*
58:*15, 21*
59:7  64:*6*
65:*13*
112:22
115:*12*
160:*20*
179:*3*
194:*4*
236:*3*
256:*12*
264:22
265:*23*
279:8
286:*11*
287:*1, 15*
331:*18*
341:7
384:*24*
**manufacture
d**  14:*1, 12*
25:*20*  27:2
33:2  38:*1*
70:2  71:*20*
73:24  74:2,
7  88:*6*
125:*4*

185:*23*
186:6
229:8
232:2
242:2
260:*19*
264:*23*
266:*1*
341:8
347:*13*
366:*12*
422:9
**manufacture
r**  23:*4*
47:*17, 19*
54:21  55:*8*
71:6  74:*5*
75:*10*
77:20  78:*4,
10, 19*  81:*20*
95:4  99:*5,
6*  187:*7*
188:*3, 18*
189:*12*
323:*23*
324:*3*
339:*15*
352:*12*
**manufacture
rs**  31:*24*
32:2  37:*12*
48:*5, 9*
74:8  99:*14*
112:23
115:*13*
187:*3*
189:7
190:*9, 14*
194:5
252:5
260:7
264:9
323:*21*
325:9

328:*17*
335:*13*
343:8
**manufacture
s**  71:7
**Manufacturi
ng**  9:*15*
36:6, *12*
46:*12*
51:*19*
54:*12*  56:*9,
17*  57:*8, 14,
21*  58:2
59:*15, 17*
61:7  62:*18,
20*  64:*14*
65:4  67:22
68:5  70:6
78:*11*  89:7
91:*3*  92:7
93:22
94:*20*  95:5
99:*3*
108:*13*
126:*17, 20*
132:*15*
133:*3*
135:*1*
136:*1*
141:*10*
142:*4, 10*
179:*2, 24*
183:22
185:*17*
190:*1*
195:*19*
196:*13*
222:*14, 15*
228:*12*
235:*22, 24*
238:*15*
240:*17*
252:*19, 22*
253:*8, 20, 23*

254:7
263:*3, 8*
265:*10*
271:*17*
272:*13*
275:*14, 18*
276:22
280:8
283:*15*
284:*2, 6, 23*
286:*2, 5, 6,
24*  294:*18*
296:*20*
326:*11*
338:*11, 16*
340:22
357:5
359:*24*
365:*13, 21*
366:*11*
367:*11*
368:*14*
369:6
380:*17*
384:*13*
411:8
417:*18*
418:*5, 18*
419:*4*
**mark**  17:*13*
151:5
**Marked**
10:*20*
17:22
41:*11*  43:*6*
54:*3*  107:*1,
7*  121:*24*
129:*16*
181:*19*
221:*18*
250:*24*
251:5
269:*23*
270:*3*

306:*8*
325:*24*
374:*9*
384:*16*
419:22
**market**
259:7
262:*1*
286:*12*
417:*6*
**marketed**
333:*13*
**marketing**
329:*4*
342:2  351:*4*
**markets**
284:*23*
**marking**
181:*14*
**Maryland**
156:*9*
**Maslynsky-
Miller**  1:*16*
429:*1*
**mass**
222:*20*
226:*13*
**Massachusett
s**  6:*5*
**master**
289:2
425:*12, 15,
24*  426:*14*
**match**
413:*7, 13*
**matching**
225:2
**material**
39:*20*
62:*23*
174:*4*
211:*1*
264:8

309:*10*
375:*10*
**materials**
40:*2*  93:*6,*
*7*  94:*3*
95:*10*
100:*10*
101:*5*
126:*3*
158:*14*
161:*21*
162:*11*
164:*5*
182:*21*
211:*22*
212:*2, 9*
266:*23*
270:*5*
290:*3*
308:*19*
309:*5*
310:*21*
386:*8, 9*
388:*19*
389:*5, 6*
**matter**
11:*18*
58:*14*  59:*6,*
*14*  61:*20*
117:*6*
132:*24*
133:*2, 5*
141:*8*
157:*5*
194:*16*
227:*19*
316:*3*
**matters**
58:*1*
**MATTHEW**
5:*16*
**maximize**
333:*5*

**maximum**
333:*10*
**maz@falken**

**bergives.com**
5:*6*
**MAZIE**  2:*3*
**MAZZOTTI**
3:*9*
**MDL**  1:*4*
24:*22*
**mds@pietrag**
**allo.com**
5:*20*
**MEAGHER**
3:*12*
**mean**  35:*20*
40:*12*
46:*16, 20*
49:*7, 11*
64:*11, 18*
76:*1*  91:*10*
92:*17*  94:*8*
96:*4*
127:*18*
154:*5*
199:*24*
202:*13*
211:*12*
260:*21*
268:*24*
302:*23*
329:*20*
377:*4, 5*
381:*1*
402:*17*
410:*4*
417:*4, 5*
**meaning**
56:*20*
155:*24*
244:*10*
323:*20, 22*
395:*6*  403:*4*

**means**
68:*12*
72:*12, 14*
90:*22*  96:*5*
140:*16, 20*
141:*3*
174:*14*
214:*9*
257:*23*
351:*24*
388:*15*
402:*14, 18*
403:*7*
404:*5*
405:*5*
429:*20*
**meant**  69:*6*
**mechanism**
165:*14*
279:*16*
294:*21*
**medicines**
252:*6*
**meet**  16:*5*
65:*9*  67:*13,*
*16*  68:*12*
94:*4*  388:*9*
**meeting**
16:*5*  65:*11*
66:*4, 17*
**meets**  65:*14*
67:*23*  70:*7*
**MEGAN**
5:*3*
**members**
262:*22*
**memorize**
52:*7, 11*
**memorized**
52:*3*
**mention**
401:*13*
**mentioned**
15:*14*

138:*6*
218:*15*
238:*5*
401:*16*
**merit**
154:*21, 23*
**MESTRE**
2:*10*
**met**  63:*6*
64:*21*
73:*13, 14*
93:*8*  94:*14*
100:*11*
289:*15*
**Metformin**
15:*15, 16*
**methanol**
123:*11*
**method**
111:*13*
186:*16*
237:*20*
243:*21*
296:*22*
**methodology**
82:*14*
102:*11*
136:*6, 7*
**methods**
56:*16*
119:*22, 23*
180:*18*
183:*16*
184:*19, 22*
186:*12*
187:*5*
188:*7*
190:*6*
191:*23*
192:*12, 15,*
*16, 24*  193:*5,*
*6*  232:*23*
275:*3*
297:*1, 11*

367:*4, 9, 20*
368:*9*
387:*7, 22*
389:*23*
390:*6, 23*
402:*5*
**methyl**
289:*21*
**MEYER**  3:*3*
**Miami**  2:*13*
**micrograms**
333:*11*
**mid**  200:*12*
**middle**
130:*7, 8, 13*
165:*10*
170:*20*
171:*23*
174:*23*
199:*17, 24*
202:*23*
203:*11, 24*
204:*1*
261:*8*
340:*7*
345:*5, 20*
409:*23*
**MILLER**
3:*15*  12:*10*
330:*16*
429:*16*
**million**
168:*24*
**Min**  210:*1*
218:*16*
**mind**  45:*5*
158:*6*  221:*5*
**minimal**
23:*20*
**minimize**
333:*5*
**minus**
73:*12*

172:*6, 7*
173:*8*
**minute**
23:*18*  30:*6*
60:*6*  247:*6*
317:*24*
**minutes**
27:*11*
50:*21*
74:*21*
121:*14*
127:*3, 6, 8,*
*18*  128:*18*
169:*11*
203:22
224:*9, 13*
250:*3, 9, 14*
292:*6*
314:*14*
349:*3, 8, 15,*
*19, 21*  423:*8,*
*21*
**mischaracteriz**
**ize**  69:*19*
**mischaracteri**
**zed**  198:*5*
**Mischaracteriz**
**izes**  32:*18*
69:*17*
70:*10*
85:*16*
135:*3*
151:*15*
164:*1*
304:*24*
322:*20*
358:*6*
368:*3*  378:*1*
**mischaracteriz**
**izing**  28:*11*
135:*5*
137:*11*
169:*18*
247:*7*

**misheard**
135:*16*
**misquoting**
378:*9*
**misread**
206:*13*
260:*22*
**missed**
249:*15*
270:*13*
272:*4*
**missing**
225:*6*
**Misstates**
310:*12*
312:*1*
317:*23*
343:*22*
**mistake**
427:*11*
**misunderstoo**
**d**  280:*1*
**Model**
239:*16*
**modes**
155:*12*
**molecular**
224:*23*
225:*3, 4*
**molecule**
246:*17*
**moment**
113:*9*
117:*17*
**moments**
53:*13*
120:*16*
121:*9*
**monograph**
115:*21*
120:*17, 18,*
*20*  121:*1, 10*
122:*13, 16*
125:*1*

183:*20*
185:*14*
188:*12*
189:*18*
192:*4*
387:*1, 15, 18*
388:*10*
389:*19*
391:*18*
392:*8*
396:*18*
**monographs**
75:*18*
182:*14*
**monoxide**
155:*17*
**Monroe**  5:*4*
**morning**
11:*11*
12:*20, 21*
**mouth**
127:*23*
**move**  82:*17*
90:*16*
110:*22*
214:*18*
337:*22*
347:*19*
**moved**
426:*22*
**moving**
383:*15*
**MTB**  168:*2*
**muffled**
223:*22*
**Mulberry**
4:*4*
**multidiscipli**
**nary**  61:*3*
**multiple**
60:*18, 19*
82:*6*
134:*12*
149:*2*

154:*1*
155:2
177:*9*
230:*17*
317:*16, 19*
370:*21*
371:7  415:*1*
**multiple-**
**fold**  124:*23*
**MURTHA**
5:*9*
**mutagenic**
88:*18*
126:*8*
195:*9*
278:*5*
323:*6*
340:*1*
343:*2, 5*
357:*11*
358:*22*
360:*10*
361:*5*
366:*1, 4, 19*
**mutations**
334:*14*
**mute**
105:*11*
138:*19*
**muted**  406:*1*
**Mylan**  5:*20*

**< N >**
**N,N-**
**dimethylfor**
**mamide**
122:*6*
**N.W**  3:*20*
**NACIO**
241:*18*
**NACLO**
242:*17*
**Najafi**
270:*19*

271:22
272:*10*
273:5, *16*
407:*17*
412:*18*
413:*4, 6*
418:*12*
**Najafi's**
412:*15*
**name**  11:*12*
62:*9*
190:*20*
394:*9*
396:*4*
397:*13, 20*
399:*18*
**native**
206:*12*
**nature**  12:*4*
190:*19*
253:*19*
**nay**  204:*21*
**NDA**  62:*12*
407:*9*
**NDAs**  329:*5*
**NDC**
407:*22*
408:*1*
**NDEA**  14:*2,*
*13*  17:*11*
86:*16, 24*
87:*8, 12, 20*
88:*8*
185:*23*
186:*3*
194:*18, 20*
195:*4, 6, 22*
196:*12, 18*
252:*7*
271:*16*
272:*13, 22*
273:*21*
274:*1*
275:*15*

276:*21*
277:*10, 18,*
22  278:*12,*
*18, 23*  279:*6,*
*14, 20*
280:*13*
283:*10, 19,*
20  285:*16,*
*19*  287:*4, 9*
288:*8*
294:*20, 23*
341:*15*
351:*18, 22*
355:*1*
356:*15*
357:*15*
359:*4*
367:*22*
391:*24*
392:*6, 10*
394:*6*
396:*2, 10*
397:*2*
398:*6*
399:*19, 22*
401:*3, 13, 21,*
24  402:*3*

**NDMA**
14:*2, 12, 19*
15:*2, 11, 13*
17:*10*
86:*11, 13*
87:*8, 12, 20*
88:*8*
108:*16*
111:*14, 19,*
21  112:*1, 21*
113:*23*
114:*1, 3, 14*
115:*3, 5, 10*
132:*18*
165:*14, 15*
166:*5, 20, 22*
167:*1, 4, 22*

168:*7, 11, 21,*
24  169:*3*
170:*8, 11*
175:*5, 10*
178:*4*
180:*11, 19,*
20  181:*6*
185:22
186:*3, 10, 19*
191:24
192:*13, 19,*
21  193:*3, 12,*
21  194:*2, 13,*
*17, 19*  195:*4,*
*6, 9, 22*
196:*12, 18*
217:*20*
218:*2, 11, 18*
219:*1, 7, 18*
227:*20, 23*
229:*7, 14, 15,*
*17, 20*  230:*5,*
*18, 21*
231:*11*
232:*1, 10, 21*
233:*8*
234:*4, 10, 16,*
21  235:*20*
238:*1*
243:*7*
244:*17*
245:*4, 6, 17*
252:*7*
256:*11*
264:*4*
265:*12*
271:*16*
272:*13, 21*
273:*21*
274:*1*
275:*4, 5, 15*
276:*21*
277:*10, 17,*
22  278:*12,*

*17, 23*  279:*6,*
*14, 20*
280:*13*
281:*17*
283:*10, 18,*
20  285:*16,*
*19*  287:*4, 8,*
*14*  288:*8*
294:*19, 23*
295:*19*
296:*1, 11, 12,*
*14*  297:*16*
299:*4, 6, 20*
300:*21*
301:*24*
304:*7, 14, 18*
305:*7*
311:*23*
312:*12, 13*
314:*2, 18*
316:*1, 22*
317:*6, 21*
324:*24*
325:*5*
334:*9*
337:*4, 6, 9*
341:*15*
348:*1*
351:*18, 22*
355:*1, 14, 18*
356:*15*
357:*14*
359:*4*
360:*24*
364:*9*
366:*9, 11*
367:*22*
368:*13*
369:*5*
370:*5*
373:*16*
389:*12, 14,*
20  391:*24*
392:*5, 8, 10*

394:*5, 16*
396:*2, 10*
397:*1, 5, 6,*
*11*  398:*6*
399:*19, 21*
401:*2, 13, 21,*
24  402:*2*
408:*10*
409:*3*
410:*18, 20*
411:*11, 24*
412:*2*
417:*1, 13, 15,*
*16*  418:*7, 10,*
20

**NDMAs**
114:*24*
125:*12*
180:*15*
181:*3*
284:*11*
296:*24*
297:*3*
343:*9*
347:*10*
363:*7*
394:*21*

**necessarily**
413:*1*

**necessary**
24:*19*
128:*12*
271:*14*
311:*15*
318:*14*
349:*11*
430:*4*

**need**  13:*18*
29:*3*  37:*22*
38:*16, 21*
43:*19*
46:*23*  47:*1*
48:*21*
61:*23*  65:*7*

66:22  68:*8*
74:*14, 17*
77:*1*  79:*4*
85:*19*  91:*4,*
*17*  118:*7, 8*
127:*10, 24*
128:*10*
134:22
137:*5, 10*
144:*2*
152:*16*
169:*12*
177:*2*
187:*8*
189:*14*
190:*14*
191:*1*
198:*19*
203:*20*
204:*19*
223:*8*
235:*15*
247:*14*
249:*20, 21,*
24  278:*1*
288:*5*
293:*11*
321:*9*
333:*20*
346:*10*
354:*18*
359:*9*
361:*16, 18*
364:*13*
367:*3*
368:*8*
376:*7*
378:*21*
382:*9*
388:*19*
396:*16*
409:*14*
416:*7, 21*
423:*15, 21*

needed
38:*19*
91:*21*  92:*8,*
*20*  93:*23*
142:*16, 18*
173:*20*
190:*9*
341:*4*  347:*1*
needs  25:*3*
37:*10*
39:*14*  52:*1*
53:2  71:2
73:*13*
82:*19*
88:*15*
92:*18*
97:*12*
193:*9*
248:*12*
250:*10*
348:6
neither
125:*10*
156:*21*
180:*13, 17*
192:*10*
232:*20, 22*
274:*9*
284:*9*
343:7
429:*11, 12*
Nesbit  2:*20*
never  17:*9*
58:22, *24*
156:*17*
246:6
257:*17, 20*
278:*18*
304:*13*
375:*17*
396:*3, 7*
397:*16*
398:*10*
421:*4*

NEW  1:*1,*
*18*  2:*5*  3:*5,*
*10, 16, 20*
4:*5*  5:*10*
9:*6*  11:22
45:*16*  61:*1*
65:*5*  93:*21*
96:*15*
121:*18*
136:*11*
161:*8*
198:*14*
213:*1*
269:*16*
289:*19, 23*
290:*16, 21*
291:*4, 12*
306:*7*
307:*5, 15*
308:*15, 21*
310:*23*
314:*8*
329:*3, 4, 6*
366:2, *20*
367:*12, 21*
387:*21*
390:*23*
395:*21*
396:*3*
Newark  4:*5*
night  427:*24*
NINA  3:*17*
nina.rose@sk
adden.com
3:*21*
nitrate
159:*4, 11*
166:*4*
167:22
168:2
227:*23*
nitric
108:*12*

nitrite
174:*11*
175:2
184:*20*
219:*3, 20*
227:*15*
229:*17, 22*
230:*8, 23*
231:*12*
232:5
234:*5, 18*
235:*23*
240:*13*
242:6
243:8
245:*19*
273:22
277:7
283:*16*
287:2
nitrosamine
225:*15*
414:*5, 11*
nitrosamines
14:22
17:*10*
242:7
357:5
359:*23*
361:*10, 24*
362:2, *12*
363:*12*
376:*11*
392:*13*
nitroso
88:*16*
219:*10, 11*
224:22
229:2
244:*3, 4*
246:*15*
nitrosodiethy
lamine  87:*6*

Nitrosodimet
hylamine
86:*14*
nitrous
116:*16*
175:6
195:*18*
N-
nitrosamines
245:*12*
N-nitroso
84:*14, 24*
85:22  86:*6,*
*8*  87:*8*
227:*13*
319:*4, 7*
322:*14*
333:*24*
335:22
351:*12*
N-NO
222:*24*
226:*16*
243:*24*
N-O  246:*17*
non-binding
329:*16*
non-
compendial
190:*15*
191:*23*
noncomplian
t  371:*4*
non-GMP
284:*17*
Non-
monograph
183:*13*
185:*11*
187:8
188:5
189:*15*
190:*3*

191:*14*
390:*4*
nonresponsiv
e  248:*16*
331:*1*  349:6
non-
responsively
344:*19*
non-U.S
262:*1*
noon  127:*2,*
*4, 7, 11, 15*
128:*18*
Nope  383:*14*
normal
150:*16*
Normally
120:*11*
379:*19*
393:*1, 22*
North  4:*19*
Notary
432:*14*
noted  12:*9*
110:*21*
261:*21*
262:*3, 6*
289:7
430:*11*
432:6
notes
208:*15*
433:*1*
not-for-
profit
182:*12*
Notice  7:*14*
8:*13*  17:*15,*
*20*  19:*1, 8,*
*12*  20:*1*
40:*18*
125:*19*
197:*19*

A-42 Afhan

207:22
221:*12*
**noticed**
298:*15*
**Notices**
8:*11*
181:*18*
182:*6*
**notified**
295:*23*
**notify** 236:*1*
242:*9, 13*
243:*11*
**Novartis**
237:*7, 18*
281:*14*
295:*18, 23*
296:*2, 10, 11*
298:*2, 8, 12,*
*13, 17*
299:*15, 16,*
*24* 300:*23*
302:*2, 17, 19*
303:*12, 19*
304:*2*
312:*15*
316:*2, 6, 17,*
*18, 23* 407:*6,*
*9, 12*
**Novartis's**
296:*15*
297:*17*
301:*24*
419:*3*
**November**
49:*18* 56:*6*
110:*12*
208:*4*
256:*7*
289:*18*
365:*17*
368:*19*
370:*20*
371:*5*

**Number**
20:*22* 21:*2*
36:*10, 11*
99:*7*
104:*10, 11*
111:*8*
158:*24*
164:*15*
166:*13, 17,*
*18* 206:*1*
256:*4*
288:*22*
290:*12*
332:*4, 5*
333:*9*
365:*3*
374:*21*
407:*23*
408:*1* 426:*9*
**numbers**
43:*20*

**< O >**
**oath** 149:*9*
218:*20*
**object** 20:*5,*
*13, 14, 18*
23:*9* 24:*7*
25:*23*
28:*13, 14, 17,*
*22* 29:*3*
34:*20*
35:*16* 39:*2,*
*3* 60:*6*
66:*10* 73:*5*
80:*6* 88:*2*
96:*20*
102:*17*
112:*11*
119:*1*
131:*14*
135:*3*
144:*3*
145:*12*

148:*12*
154:*10*
178:*21*
191:*8*
217:*1, 4*
272:*24*
288:*11*
300:*12*
307:*2*
358:*2, 5*
373:*8*
**objected**
96:*14*
135:*10*
154:*16*
157:*21*
220:*9*
247:*11*
300:*8* 303:*6*
**objecting**
23:*11* 49:*1*
50:*8*
105:*13*
138:*20*
154:*13*
170:*19*
217:*2*
301:*6, 8*
313:*8*
324:*15*
373:*10*
399:*5*
**objection**
13:*21* 23:*5*
27:*3* 28:*6*
31:*11*
32:*17*
33:*11* 38:*3*
42:*11*
43:*23* 47:*9,*
*22* 48:*7, 18*
49:*23*
51:*22*
55:*14* 57:*9*

58:*4* 59:*8*
62:*1* 63:*21*
65:*17*
67:*24*
68:*20*
69:*16* 70:*9*
71:*22*
72:*15* 73:*2*
75:*12*
76:*16* 77:*7*
78:*1, 13*
79:*2* 80:*3,*
*8* 81:*12*
83:*6* 84:*4,*
*16* 85:*2, 15*
86:*18* 87:*2,*
*13* 89:*16*
91:*7* 96:*2,*
*12* 97:*7*
98:*11*
100:*2*
101:*11, 21*
102:*8, 12, 15*
104:*22*
106:*2, 8*
107:*23*
110:*2*
112:*10*
113:*15*
114:*16*
117:*11*
120:*22*
124:*5, 18*
125:*24*
133:*13*
137:*2, 8*
139:*11*
140:*21*
143:*10*
144:*4, 7, 14*
146:*17, 18*
147:*18*
148:*23*
149:*21*

151:*13*
152:*10*
153:*1, 15*
154:*3*
156:*5*
157:*19, 20*
158:*20*
160:*7*
161:*17*
162:*3, 9, 24*
163:*23*
166:*7*
167:*14*
168:*15*
169:*4*
170:*14, 18*
174:*1, 15*
176:*19*
184:*4, 6*
187:*12*
188:*14*
191:*6*
192:*2*
193:*17*
194:*21*
195:*24*
197:*4, 12, 24*
201:*24*
202:*1*
204:*17*
205:*23*
206:*21*
207:*6*
210:*9, 23*
211:*9*
212:*7, 22*
213:*8*
214:*2*
215:*2*
218:*21*
219:*4, 23*
223:*4*
226:*4, 22*
228:*3*

230:*10*
231:*2*
232:*12*
233:*13*
234:*8, 23*
236:*5, 23*
238:*16*
239:*24*
245:*22*
246:*23*
247:*16*
253:*9*
254:*10*
255:*8*
258:*22*
260:*24*
265:*1, 4*
266:*3*
267:*19*
268:*13*
274:*3*
275:*23*
277:*23*
278:*21*
279:*22*
283:*21*
287:*10*
293:*5*
295:*1*
296:*18*
297:*20*
299:*9*
300:*3, 24*
302:*4, 22*
303:*15, 21*
304:*23*
305:*12*
306:*22*
309:*11, 19*
310:*4, 11, 15*
311:*24*
312:*19*
314:*19, 23*
315:*9*

316:*8*
317:*1, 22*
319:*6*
322:*19*
324:*8*
326:*13, 22*
327:*11, 22*
329:*13, 18*
334:*5*
336:*1*
337:*11, 19*
338:*17*
341:*9*
342:*10*
343:*21*
352:*17*
353:*8*
354:*1*
357:*19*
359:*13*
361:*14*
368:2
369:*19*
371:22
373:2
376:*12*
377:*14, 24*
379:*3, 13*
388:*2, 6, 23*
389:*16*
390:*13*
394:*14*
395:*23*
396:8
397:*18, 22*
398:2
400:*22*
401:*19*
404:*16, 20*
405:*20*
408:*14*
411:*12*
413:*14*
414:*13, 24*

417:*20*
418:*8*
420:*22*
421:*22*
422:*23*

**objectionable**
139:*10*
**Objections**
7:*14*   11:6
17:*19*   19:*1*
86:*1*
135:*19*
139:*19*
144:*10*
248:*24*
287:*11*
354:*15*
419:*1*
**objective**
34:*4*
276:*17*
323:*19*
378:*24*
**objectively**
331:*1*
**objects**
13:*17*
**obligated**
44:*24*
133:*5*
329:*12*
**obligation**
23:*1, 3*
280:*20*
315:*12*
330:*17*
339:*18*
370:*1*
386:*19*
**obligations**
47:*3*
**observations**
55:*18, 22*

103:*20*
258:2   264:*6*
**observed**
225:*2*
262:*18*
263:*5*
352:*23*
356:*8*
393:*5*
400:*19*
**obstructed**
248:*18*
**obstructing**
29:*21*
**obstructive**
291:*21*
**obvious**
199:*3*
**obviously**
52:*1*   53:*1*
68:*24*
89:*20*
198:*22*
199:*1*
271:2   419:7
**occur**   16:*20*
45:*20*
112:*21*
115:*11*
193:*21*
194:*3*
257:*20*
380:*12*
**occurred**
160:*16, 18*
224:*14*
230:*9*
232:*3*
234:*17*
258:*20*
279:*18*
372:7
377:*13*

**occurrence**
223:*22*
**occurring**
227:*21*
**occurs**
227:*13*
231:*11*
234:*4*
245:*18*
**October**
14:*8*
**odor**   130:*16*
140:*13*
**offered**
175:*20*
268:*11*
**offering**
416:*18*
**officer**
330:*18*
344:*21*
**official**
184:*13*
**Oh**   21:*24*
324:*4*
360:*24*
**okay**   13:*15,*
*22*   19:22
38:*12*
50:*16*   53:*9,*
*21*   65:*20*
66:*11*   73:9
74:*20*
75:*13*
85:*11*   88:*3*
90:*9*   102:*5*
107:*15*
121:*16*
122:*17*
128:*2*
132:*10*
141:*4*
143:*24*

164:22
165:6
168:1
188:22
197:16
199:22
206:2
207:9
216:9
225:10
227:10
229:6
231:14, 18
232:6, 7
242:21
244:18, 20
245:10
253:17
258:15
261:11
272:17, 18
304:3
305:5
306:3
307:20
309:14
310:3
318:3
320:10
355:13
364:17
373:6
378:10
381:22
392:4
403:22
408:6, 7
415:12, 17
416:5
421:6
425:3
426:3, 24
**old** 421:7

**once** 31:20
65:7  66:18
208:8
260:16
284:19
352:22
356:6
387:21
**Ongoing**
8:18
250:20
263:17
366:7
**open**
110:24
223:13
**operate**
73:9  280:5
**operates**
280:4
**operating**
31:8  32:7,
13  37:19
71:11
100:16
166:16
298:19
**operation**
23:20
**operations**
257:13
**opine**
138:12
158:13
**opined**
205:20
**opinion**
102:7
117:5
134:20
157:3, 14, 15
178:12
194:15
195:3

197:9, 10
199:5, 11, 14
200:5
201:16, 17,
23  205:21,
22  207:9, 10
211:1, 8, 16,
18  212:6
230:20
231:1
232:9
261:5
269:11
276:20
297:7, 13
304:7, 10, 21
357:6, 13
359:1, 5, 8,
12  361:8, 13,
19, 20  362:5,
11  363:15
364:11
369:18
384:24
408:15
414:18
**opinions**
42:9, 20
78:7  101:2,
20  102:3
104:18
107:22
109:11, 14,
18  110:1
112:6, 9
115:16
131:16
155:20
165:20
169:6, 10, 17,
24  175:20
176:7, 13, 18
178:9, 19
205:18

210:8, 21
251:12
268:11, 21
270:24
307:22
326:21
327:9, 21
372:5, 15
376:9
406:22
407:3
408:11, 13,
17, 23  409:4,
13
**opposed**
189:16
313:12
**optimization**
241:19
242:24
**optimizing**
243:5
290:8, 14
**ORA**  57:16
**order**  45:3
77:2  101:8,
19  102:2
187:9
205:17, 21
392:11
**organic**
63:9, 11
156:7
157:17
158:5, 10
231:5
308:5
357:21
358:13, 14
359:2, 8, 11
360:1, 4
393:8
**Organization**

122:4
123:24
182:13
377:9
**organized**
291:13
**original**
291:11
364:1
398:3
430:15
**Orleans**  3:5
**outcome**
347:7
**outlined**
253:7
**outlining**
252:18
**output**  65:1
66:3  67:5
70:7
**outside**
32:15  33:4,
8, 13  44:10
83:10
131:15
169:5
**overall**
289:7
**oversee**
57:8  61:18
**overseeing**
271:20
**Owing**
155:11
**Oxford**  5:17

**< P >**
**P.A**  2:19
**p.m**  137:22
138:4
205:8, 14
266:12, 18
283:1, 7

350:*14*, *20*
384:*1*, *7*
419:*12*, *18*
424:*4*, *10*
428:*4*, 9
**packaging**
39:22
386:9  389:6
**packing**
56:*18*
**PAGE**  7:*12*
8:*3*  9:*3*
10:*6*, *11*, *16*,
*21*  18:*21*, *24*
22:*3*  33:*18*
36:*10*, *11*
43:*20*
108:*4*, *6*
122:*24*
130:*6*, *7*, *9*,
*14*  140:*10*
141:*2*
155:*7*, *10*
164:*13*, *24*
165:*3*, *7*, *10*,
*18*  171:*21*,
*24*  174:*23*
181:*24*
182:*22*
187:*19*
188:*2*, *10*, *13*
222:*4*, *7*
223:*6*, *11*
226:*12*
251:*16*
252:*1*, *3*
270:*16*
307:*24*
312:*21*
319:*11*
320:*21*
322:*5*
323:*10*
328:*10*, *14*

332:*8*, *16*
334:*12*
336:*4*
337:*24*
341:*19*
342:*1*
351:*6*, *10*
352:*2*
365:*9*
368:*1*
370:*8*, *10*
385:*3*
386:*1*
392:*16*, *17*
431:*3*  433:*2*
**pages**  432:*3*
**PAI**  239:*20*
**par**  263:*21*
**paragraph**
21:*22*
54:*18*
123:*2*, *8*
174:*8*, *22*
241:*10*
243:*18*
246:*10*
251:*16*, *19*
252:*4*, *11*
254:*15*
311:*4*, *10*
318:*9*
319:*15*, *17*
320:*6*
330:*8*
336:*11*
351:*5*, *9*
367:*2*
369:*4*
375:*1*
385:*5*
386:*4*
392:*20*
**paragraphs**
56:*2*  311:*3*

**parallel**
88:*22*, *23*
238:*18*
296:*5*
**parameter**
73:*11*, *12*
**parameters**
63:*2*  167:*6*
180:*9*
290:*17*
**parceled**
380:*16*
**Parkway**
2:*4*
**part**  21:*5*
22:*9*  29:*13*
46:*15*
51:*17*
62:*11*
80:*23*
84:*14*, *24*
85:*22*
89:*10*  96:*6*
98:*17*
102:*10*
108:*6*
109:*10*
120:*14*
134:*21*
139:*2*
143:*4*
151:*6*
163:*14*, *20*
165:*23*
178:*19*
179:*23*
211:*15*, *18*
217:*20*
225:*23*
230:*24*
285:*12*
295:*22*
297:*6*, *13*
382:*15*

406:*8*, *24*
409:*8*
**particular**
100:*5*
156:*15*
194:*10*
209:*4*  256:*2*
**particularly**
333:*17*
**parties**
11:*24*  12:*7*
49:*4*, *8*, *13*
429:*12*
**partly**  49:*16*
**parts**  168:*24*
**party**
420:*18*
**patent**
217:*24*
225:*12*
228:*21*, *24*
229:*1*
243:*19*
244:*7*
249:*16*
**path**  235:*8*
**pathway**
111:*18*
284:*11*
347:*21*
**pathways**
114:*14*
115:*5*
156:*2*
173:*5*
180:*15*
230:*17*
**patient**
332:*20*
**patients**
367:*15*
**pattern**
102:*16*

**pause**  12:*5*
**PC**  4:*17*
**peak**
224:*24*
237:*8*, *13*
281:*15*
298:*5*, *16*
299:*1*, *4*, *18*
301:*24*
304:*8*, *18*, *21*
305:*6*
311:22
312:*12*, *14*
313:*2*, *5*
314:*2*, *17*
315:*8*, *13*, *24*
316:*4*, *14*, *15*,
*22*, *23*  317:*9*,
*21*  397:*6*, *11*
**peaks**  209:*1*
298:*11*
300:*19*, *21*
302:*11*, *14*,
*18*  316:*10*,
*11*  317:*20*
322:*11*
397:*4*
399:*24*
**pending**
28:*24*
96:*17*
145:*13*, *14*
154:*12*
177:*3*
200:*24*
292:*21*
293:*13*
399:*8*
**Peng**  107:*8*

**Pennsylvania**
4:*12*  5:*18*
**pentanoy**
289:*22*

Ali Afnan

people
15:*24*
16:*10, 14*
92:*22*
117:*6*
212:*20*
213:*5, 6, 24*
214:*22*
234:*20*
271:*18*
297:*9, 10*
299:*24*
300:*1*
348:*13*
375:*23*
376:*21*
percent
66:*14, 15, 19, 20*  76:*3, 7*
89:*2*  141:*9*
186:*14*
190:*24*
191:*18*
224:*8*
289:*10*
298:*8, 21*
301:*18*
304:*9, 19*
322:*12, 15*
390:*19*
405:*3, 6*
percentage
141:*7*
percentages
141:*22*
Perfect
20:*24*
181:*24*
271:*7*
perform
47:*8*  160:*5*
240:*15*
performed
159:*16, 23*

163:*15*
165:*13*
173:*21, 22*
174:*3*
288:*23*
372:*8, 9*
412:*10*
performing
133:*11*
period
161:*9*
162:*14*
166:*2*
172:*7*
360:*19*
periods  51:*2*
permissible
85:*8*
permit
392:*5*
permitted
265:*22*
391:*23*
person
36:*19*
57:*13*
77:*22*
79:*23*
81:*10*
201:*3*
293:*23*
personal
262:*21*
personnel
39:*17*
perspective
131:*22*
ph  1:*22*
157:*11*
166:*14, 16*
Ph.D  1:*14*
7:*3, 17, 19*
12:*13*
41:*11*  43:*6*

158:*9*
429:*5*  432:*8*
pharma
15:*21*  16:*1, 13*  23:*21*
25:*5*  46:*5, 10*  48:*8*
71:*12*
81:*20*
98:*14*
116:*3*
243:*22*
244:*11*
376:*23*
381:*19*
Pharmaceuti cal  3:*22*
6:*6*  9:*16*
21:*17*  23:*4*
36:*7, 13*
47:*17*  48:*4*
51:*20*
54:*22*  55:*7*
56:*10*  58:*2*
73:*18*
183:*23*
185:*18*
244:*23*
280:*4*
303:*14*
328:*16*
335:*6*
380:*22*
381:*1*
384:*15*
Pharmaceuti cals  4:*7, 13*
5:*20*
pharmacolog ical  318:*18*
319:*19*
320:*15*
Pharmacopei a  182:*5*

Pharmacy
5:*6*  16:*8*
phase  44:*14*
381:*11*
phases
160:*18, 21*
358:*18*
Philadelphia
4:*12*
Phillip
11:*12*
photochemic al  155:*13*
phrase  86:*6*
Physical
8:*9*  129:*15, 23*
Physical/Che mical  123:*4*
physically
228:*6*
348:*20*
PIETRAGA LLO  5:*15*
pill  417:*17*
pills  186:*5*
418:*21*
pinpoint
408:*2*
Pittsburgh
5:*18*
PIZZI  4:*3*
place  32:*8*
93:*10, 11*
111:*7, 11*
156:*20*
177:*16, 17*
224:*3*
259:*20*
285:*9*
368:*12*
369:*2*  429:*8*
placed
110:*10, 19*

228:*7*
252:*13*
Plaintiff  2:*7, 15, 22*  3:*6*
114:*20*
138:*8*
139:*24*
171:*1*
209:*22, 23*
212:*17*
215:*11, 12*
405:*22*
406:*10*
407:*16*
410:*14*
412:*13*
Plaintiffs
7:*14*  17:*19*
19:*1*  103:*2, 6*  206:*12*
270:*18*
405:*11*
Plaintiff's
3:*12*
planned
64:*22*
plans  386:*5, 16*  389:*1*
391:*13*
Plant
223:*17*
please  12:*5*
13:*12*  20:*7, 16, 22*  23:*15*
24:*12*  25:*1, 16*  28:*8*
29:*10*
30:*19*
33:*14, 24*
34:*3, 11, 18*
35:*3, 5, 6, 8*
36:*2*  37:*16*
38:*2, 9*
42:*14*  45:*5*

Al-MAthan

| | | | | |
|---|---|---|---|---|
| 48:*23*  50:2 | 244:*21* | 157:*8, 10* | 329:*17* | 324:*20* |
| 53:6  54:*8* | 245:*9* | 166:*23* | 330:*1* | 325:*10* |
| 59:*13* | 247:*19* | 170:*4* | 331:*16* | **potential** |
| 65:*18*, 22 | 249:*5* | 176:2 | **possibility** | 82:*11* |
| 72:6  76:*21* | 250:*14* | 180:*11, 12,* | 68:*16* | 91:*15*, 22 |
| 80:*16, 19, 20* | 269:*15* | *16*  187:2 | 114:*10* | 117:8 |
| 85:5  91:*9* | 282:*5, 6, 10,* | 191:*5* | 115:*17* | 125:*19* |
| 92:*1*  108:*5* | *21*  288:*15* | 202:*9, 15* | 125:*23* | 131:*23* |
| 110:*15* | 291:*17* | 229:*16* | 131:*13* | 134:*23* |
| 113:*4* | 292:*12, 19,* | 238:*13* | 197:*23* | 136:*24* |
| 117:*13* | *24*  293:*3, 9,* | 245:*5* | 378:*14* | 142:2, *8, 17* |
| 118:*14* | *21*  303:*23* | 261:*12* | **possible** | 143:*5, 6* |
| 121:2 | 306:*23* | 271:*24* | 111:*18* | 146:6 |
| 124:8 | 307:*10* | 286:*23* | 196:*14* | 147:*7, 8* |
| 130:7 | 312:*23* | 288:5 | 211:*11* | 151:*24* |
| 132:7 | 313:*10* | 294:*16, 22* | 225:7 | 152:*21, 22* |
| 135:*17, 22* | 330:*13* | 313:*15* | 279:*14* | 153:*4, 5* |
| 142:6 | 337:*16* | 316:*6, 23* | 283:*10* | 159:*10, 13* |
| 144:*7, 14* | 350:*7, 11* | 320:*5* | 296:*16* | 195:*16, 17* |
| 145:*8, 10* | 378:*4* | 333:*3, 10* | 297:*18* | 196:*11, 23* |
| 146:*15* | 398:*24* | 347:*23* | 298:*18* | 197:*19* |
| 147:*16, 24* | 404:2 | 357:*16* | 302:*3* | 199:8 |
| 148:*9, 18, 20* | 406:*4* | 379:*15* | 308:*21* | 201:*19* |
| 151:*12* | 411:*14* | 399:*17* | 309:*15* | 204:*13* |
| 152:*8, 18* | 416:*1* | 410:*5, 13, 17* | 310:*9, 24* | 271:*15* |
| 153:*20* | 421:*1* | 412:*5*  423:*6* | 354:7 | 272:*12* |
| 161:*3, 15* | 430:*3, 8* | **pointed** | 378:*22* | 273:*20* |
| 162:2, *8* | **plenty**  244:*5* | 55:*12* | 379:*2* | 277:*13* |
| 164:*13* | **Plunkett** | 343:*16* | **possibly** | 279:*16* |
| 171:*22* | 270:*19* | 400:*5* | 22:*16* | 280:*17* |
| 176:*10* | 344:*11* | **pointing** | 74:*14* | 281:*1, 12, 13* |
| 182:*22* | **plus**  73:*12* | 214:7 | 288:*4, 7* | 294:*20* |
| 188:*21* | 172:*5, 7* | 313:*18* | **post**  423:*1* | 308:*12* |
| 196:2, *5* | 173:*8*  225:*1* | **points** | **postscript** | 314:*5* |
| 200:*16* | **point**  22:*1* | 156:*10* | 170:*22* | 318:*16* |
| 201:*5* | 25:*23*  27:*5* | 363:*15* | **pot**  247:*21* | 319:2 |
| 204:*5* | 37:*8*  50:*19* | **poisonous** | **potency** | 323:*1, 3, 24* |
| 216:*17, 21* | 52:*12* | 82:*9* | 351:*14* | 324:*5* |
| 217:*7, 8* | 58:*23* | **polite**  249:*5* | **potent** | 332:*19* |
| 220:*10, 18,* | 103:*10* | **Ponce**  2:*12* | 318:*17* | 333:*18* |
| *20*  222:*5* | 106:6 | **posed**  295:*6* | 319:*3, 18* | 334:*17* |
| 223:6 | 118:*17* | **position** | 320:*14* | 336:7 |
| 233:*12, 14* | 138:6 | 255:*18* | 323:2, *4, 8,* | 340:*17* |
| 239:*23* | 150:8 | 292:8 | *12, 17* | 353:*17* |

Ali - Athan

357:*1, 4, 14*
359:*3, 22*
361:*9, 24*
362:*2, 14*
363:*12*
365:*12, 24*
366:*4, 18*
375:*5*
376:*3*
382:*19, 21*
**potentially**
91:*14*
227:*9*
259:*6*
277:*10*
278:*13*
283:*18*
287:*3*
294:*19*
296:*11*
354:*20, 21,*
*24*  355:*15,*
*20, 23*  356:*3*
**potentials**
364:*3*
**Practice**
9:*15*  31:*4*
36:*6, 12*
51:*6, 19*
54:*13*  56:*9*
93:*4*  99:*2,*
*3*  142:*14*
160:*10*
191:*10*
301:*18*
369:*8, 11*
381:*3*
384:*14*
**practiced**
39:*8*  116:*7*
**practices**
23:*24*
116:*5, 6, 24*
117:*18, 19*

119:*11*
133:*3*
183:*22, 23*
185:*17, 18*
190:*1*
235:*24*
262:*19*
280:*19*
380:*21, 23,*
*24*  381:*2*
**practicing**
31:*16*
**Pre**  423:*2*
**precise**
224:*23*
**precursor**
327:*18*
421:*12*
**predict**
357:*9*
360:*22*
394:*20*
**predicting**
369:*5*
**prediction**
315:*17*

**predominant**
130:*15, 24*
140:*12, 18,*
*23*  141:*5*
**prefer**
80:*17*  414:*7*
**Preliminary**
8:*13*
221:*14*
290:*19*
**prepared**
209:*11*
**preparing**
113:*11*
**presence**
15:*2*  183:*5,*
*20*  185:*15,*

*22*  190:*23*
193:*3*
195:*9, 17*
196:*24*
234:*21*
256:*10*
272:*21*
287:*14*
340:*1*
368:*13*
373:*15*
394:*20*
401:*24*
**present**
15:*13*  79:*9*
111:*21*
194:*20*
195:*7*
225:*14*
229:*20, 21*
233:*9*
234:*10*
275:*12*
276:*9*
311:*11*
315:*18*
318:*11*
325:*5*
336:*12*
339:*7*
364:*10*
390:*18*
392:*13, 22*
393:*21*
396:*11*
422:*16*
427:*15*
**presented**
106:*11*
276:*14*
379:*18*
427:*13*
**present-**
**tense**  87:*23*

**president**
46:*4*
**pressure**
402:*24*
**pressuring**
28:*22*  415:*4*
**presumably**
340:*15*
**pretty**
256:*18*
**prevent**
259:*6*
264:*8*
338:*13*
340:*19*
341:*5*
348:*13*
356:*19*
**Prevention**
338:*5, 9*
340:*12*
**previous**
37:*5*  100:*17*
**primarily**
57:*17*
**primary**
366:*6*
**Princeton**
5:*10*
**principal**
155:*14*
**principles**
31:*7*
**PRINSTON0**
**0075810-**
**6099**  7:*22*
106:*24*
**PRINSTON0**
**0077339-**
**7344**  7:*20*
54:*2*
**prior**  70:*15*
79:*17*  81:*2*
88:*11*

107:*8*
263:*9*
279:*10*
295:*14*
325:*2, 3*
355:*10*
358:*23*
394:*21*
399:*22*
427:*17*
429:*4*
**probable**
172:*17*
366:*9*
**probably**
288:*21*
**problem**
50:*7*
186:*10*
241:*15, 24*
242:*7*
289:*20*
383:*22*
**problems**
126:*6*
254:*17*
258:*8, 16*
414:*3*
**procedure**
21:*4*  31:*18*
286:*1*
319:*24*
320:*17*
**procedures**
22:*10*  31:*5,*
*8, 9*  32:*7, 13*
37:*19*
262:*8*
318:*15*
319:*21*
386:*6, 16*
389:*2*
391:*13, 17*

Ali - Athan

proceed
286:*11*
proceeded
145:*4*
proceeding
24:*23*
proceeds
248:*4*
process
21:*14, 15*
39:*19*
45:*14, 15*
60:*14, 20, 21*
62:*18, 24*
63:*2*  64:*10,*
*11, 14, 22, 24*
66:*2*  67:*3,*
*22*  70:*2, 6*
78:*12*
88:*15*  89:*7*
91:*3, 6, 14,*
*16*  92:*7, 11,*
*23*  93:*5, 9,*
*22*  94:*20*
95:*5, 11, 14,*
*15, 18, 22*
96:*5, 8, 23*
97:*3, 4, 6, 17,*
*22*  100:*1*
104:*2, 5, 6, 7,*
*10, 21*  105:*6*
108:*10, 13*
109:*20, 23*
111:*14*
114:*12, 15*
115:*19*
117:*10*
119:*15*
120:*1, 3*
125:*21*
126:*2, 5, 17*
131:*9, 11*
132:*1, 9*
133:*5*

134:*10, 14*
136:*1, 4, 5, 6,*
*12*  137:*15,*
*16*  142:*4, 10,*
*12*  143:*7*
146:*8*
147:*10*
152:*2, 24*
153:*6, 7*
156:*16*
157:*11*
158:*19*
159:*5, 7*
160:*3*
161:*8, 9, 13,*
*22*  162:*12,*
*20*  163:*18*
164:*6, 9*
166:*3, 15, 22*
167:*5*
177:*21*
180:*1, 8, 9*
184:*20, 21*
185:*6*
197:*1*
199:*10*
201:*22*
204:*14*
219:*8*
222:*14, 16*
223:*24*
224:*5, 17*
225:*14*
228:*12, 16*
229:*9, 21, 23*
230:*6, 22, 24*
232:*3*
235:*23*
236:*3*
238:*15, 19*
239:*3, 4, 7,*
*10, 11*
241:*20*
243:*2, 6*

252:*22*
253:*23*
260:*20*
264:*20, 24*
265:*11, 15*
266:*2*
271:*19, 20*
274:*22*
277:*15*
280:*7, 10, 12,*
*23, 24*
281:*10, 20,*
*22*  282:*2*
284:*1, 5, 16,*
*17, 20, 22, 24*
285:*8, 12, 24*
286:*4, 6*
287:*3, 6, 17*
289:*4, 7, 19*
290:*14, 16,*
*17, 21*  291:*2,*
*4, 8, 11, 12*
296:*20*
301:*4*
302:*2*
315:*15, 16,*
*19*  328:*3*
334:*8*
337:*5*
338:*21, 22,*
*23*  339:*2, 9,*
*10, 12*
341:*16*
342:*21, 23*
347:*13, 14,*
*15*  348:*1*
353:*20*
354:*8*
357:*6, 9*
360:*9, 11, 13,*
*16*  361:*6*
363:*6, 20, 22,*
*23, 24*  364:*1*
365:*13, 19,*

*21*  366:*2, 11,*
*20*  367:*8*
369:*7, 9*
370:*13*
375:*3*
376:*2*
380:*10*
381:*12, 17*
382:*18*
387:*7, 10*
392:*24*
395:*1, 9, 15,*
*16*  400:*7*
401:*22*
411:*8, 9*
417:*14, 18*
418:*5, 10, 18*
419:*4, 8*
425:*9*
processes
23:*23*
45:*11*
59:*18, 20*
61:*7*  62:*21*
135:*1*
181:*5*
195:*19*
196:*13, 15*
240:*15, 17*
241:*18*
242:*24*
271:*17*
272:*14*
273:*23*
275:*6, 14, 19*
276:*22*
277:*8, 19*
278:*5*
279:*1*
283:*11, 15*
285:*17*
286:*24*
294:*18*
312:*9*

326:*11*
357:*15*
359:*24*
367:*12*
381:*19*
395:*21*
400:*9*
processing
56:*18*
95:*16*
97:*11, 15*
183:*16*
184:*19, 22*
187:*5*
188:*7*
190:*6*
387:*22*
390:*6*
produce
109:*3*
280:*12*
319:*18*
320:*14*
323:*12*
369:*14*
produced
66:*19, 20*
219:*19*
277:*18*
278:*17*
392:*23*
393:*21*
produces
141:*16*
producing
318:*18*
product
15:*4*  32:*1*
45:*19*
54:*17*
63:*16*  65:*1,*
*13*  66:*3, 13*
74:*4*  75:*10*
76:*8*  77:*5,*

Al-Afghan

11, 23  91:23
96:1  97:5
125:4
132:15
162:12
179:17
224:12
259:7
260:6
262:13
263:9
264:9
289:14
290:23
314:8
340:22
342:21
347:12
365:22
375:6
388:8
392:14
394:2
396:11
407:6, 7, 13
**Production**
10:10
39:21
223:23
241:16
242:1, 8
278:8
289:6, 8, 20
291:10
365:23
368:24
392:24
**productions**
97:19
**PRODUCTS**
1:5  9:10
11:20  15:3,
13  54:22
55:10

63:14  65:5
74:8  83:22
136:5
141:16, 23
182:20
260:9
308:22
309:16
310:10, 24
325:15, 23
328:21
333:13
335:10
375:7, 9
382:2
**Professor**
171:5
176:4  246:2
**profile**
308:20
310:22
392:20
393:2, 19
394:1, 5, 23
395:4, 10, 12,
13, 19
396:12, 13,
17, 20
399:24
400:17
401:4, 5, 9,
13
**progress**
376:16
**project**
83:11, 15
171:4
267:15
**projects**
46:9
**properly**
100:19
264:16

**Properties**
8:9  91:4,
11  123:4
129:15, 23
278:6  335:5
**proposed**
243:22
**propounded**
432:5
**protocol**
21:4  261:18
**protocols**
22:10  33:7
**prove**
234:20
**proved**
166:4
**proven**
277:9
279:17
**provide**
19:24
24:18  65:8
145:22
317:8
340:15
**provided**
98:23  99:1
101:5
183:6, 19
185:14
189:20
212:13
215:10
241:6
267:24
316:17
334:21
407:24
413:6
**provides**
213:14
328:24

**provision**
382:24
**public**
36:20
432:14
**publication**
123:14, 24
124:14
129:20
130:21, 22
140:17
**publications**
133:17
**publicly**
343:6
**published**
136:15
192:15
338:20
**pull**  85:7
377:16
420:24
**Punta**  2:20
**purchased**
94:17, 19
95:2, 4, 10
98:5  99:24
103:8
104:1, 20
105:1, 5
115:20
119:14
185:7
**purchasing**
125:22
197:21
**Pure**
129:21
141:10
**purely**
16:18
233:5  235:7
**Purification**
8:8  129:14,

22  289:13
308:14
314:7  333:4
**Purity**  8:9
75:20  76:3
129:14, 23
155:11
386:11
388:22
389:14
393:24
395:13
403:8
404:7  405:3
**purported**
407:2  409:3
**purportedly**
408:10
**purpose**
71:19
73:22  74:1
75:7
163:11
259:2
331:13
376:14
**purposes**
106:18
408:5
**pursuant**
32:6  33:8
**push**  177:20
**put**  17:24
18:7, 14
31:4  32:8
40:19  41:3
43:1  53:8,
17, 19
106:18
107:12
121:18
181:11
200:14
209:5

223:*11*
259:*15, 20*
265:*15*
269:*14*
287:*16, 18*
306:*14*
369:*1*
374:2
383:*18*
384:8
409:*13*
420:2
**puts** 31:7
**putting**
49:*15*
207:*17*
250:*16*
272:2

**< Q >**
**Q3** 191:*21*
306:*19*
**Q3A** 77:8
79:*21* 81:8
88:*21, 23*
187:*24*
188:*1*
189:9
298:*20*
304:7, *14, 15*
306:*15, 18*
307:*17*
322:*17*
330:*10*
334:*21*
390:*18*
396:*16*
**Q3A(R2**
9:7 306:8
**Q3B** 334:*21*
**Q7** 31:*24*
32:*1* 33:*16,*
*17* 36:4
37:*12*

38:*12, 18, 20*
39:*15* 95:9
98:*4, 12, 13,*
*15, 17*
390:22
391:*10*
**Q7A** 9:*14*
383:6
384:*9, 13, 19*
**Q8** 21:*17*
**qualification**
95:7
262:*10*
263:*10*
320:23
336:*13*
356:*9, 10, 17*
**qualified**
75:*16*
98:*18*
140:*23*
318:22
**qualify** 94:7,
*8* 99:6
**qualitative**
393:*3*
394:*10*
396:5
397:*14*
398:7
399:*18*
401:*15*
**quality** 39:*9,*
*12, 16* 63:4
65:8 66:4
67:4, *6, 8*
69:2, *4, 12*
98:*16*
100:7, *15, 18*
105:*18*
254:*19*
262:4, *5, 8,*
*16, 23* 263:5,
*20* 264:*15*

279:2
289:*14*
290:*11, 23*
365:*14*
369:*13*
370:22
377:8
386:*10*
388:21
389:*13*
390:*1*
403:8
404:6, *24*
405:*1*
420:*17*
**quantitation/**
**detection**
319:*20*
320:*16*
**quantitative**
401:*15*
**quantity**
356:*16*
**quench**
168:3, *4*
174:*11*
175:3
**quenched**
227:*14, 22*
229:*16*
230:7
231:*12*
232:4
234:5, *17*
245:*18*
**Quenching**
8:*15*
108:*12*
116:*15*
165:*15*
184:*20*
219:3, *19*
221:*17*
223:*18*

224:3, *17*
230:*23*
235:*21*
240:*14*
241:*18, 20*
242:6, *23*
243:*1, 6, 9,*
*21, 23*
273:22
277:7
283:*17*
287:2
**Question**
10:*20* 11:7
13:*6, 9, 13*
20:5, *8, 15*
23:9, *10, 14*
24:*17, 21*
25:*1, 8, 12*
26:3, *10, 21*
27:8, *16, 21*
28:*1, 14, 18,*
*23, 24* 29:7,
*15, 16* 30:*1,*
*7, 17, 21*
34:*18, 21, 24*
35:3, *4, 23*
36:2 37:2,
*5* 38:2, *20*
39:5 42:2,
*14* 44:*1*
48:*16, 19*
50:*1, 9*
52:9, *15, 18*
53:6 55:2,
*3* 58:6, *19*
65:*21* 66:8
67:*1* 68:22
69:*6, 23*
70:*12* 72:2,
*9* 76:*21, 24*
78:*15*
79:*17*
80:*16, 18, 20*

81:*1, 2, 15,*
*16* 82:*19*
85:*14*
86:*21* 87:4,
*15, 23* 88:9
89:*18* 90:*4,*
*7* 91:*24*
94:22
96:*13, 15, 19,*
*20* 97:*12*
101:*13, 15,*
*23* 102:*13,*
*14, 18* 103:7
106:3
110:*15*
112:3, *7, 13*
113:4, *8*
116:8
117:4
118:*17, 19*
119:*1*
121:3
131:*19*
132:7, *16, 17*
135:*21*
138:*21, 23*
139:*4, 10, 13*
140:*15*
141:*20*
144:4, *15*
145:*13, 14,*
*17, 21* 146:2,
*15, 24* 147:*1,*
*17, 24*
148:*10, 13,*
*18, 21*
149:*10, 23*
150:*1, 11*
151:2, *12, 18,*
*22* 152:9, *13,*
*17* 153:*14,*
*16, 18* 154:5,
*7, 12, 21*
155:2, *4*

156:22
158:1
161:2, 4, 16,
19  162:1, 5
163:3
168:19
176:10
177:2, 3
178:23
184:10
192:22
193:14
194:23, 24
196:4, 7
197:14
198:1, 8, 17,
19  199:15
200:9, 12, 21,
23  201:6, 9,
10, 13
203:24
213:1
214:16, 18
216:12, 23
220:10, 18
229:6
233:3, 11, 19
234:2
239:23
240:7, 19, 24
244:21
246:9
265:6
276:3, 7
282:4, 7, 10,
16  283:23
285:1, 2
286:20
288:13
291:17, 24
292:4, 10, 13,
14, 16, 21, 22,
24  293:2, 7,
9, 13, 14, 21

294:4, 6, 15
297:21
300:8, 10, 11
301:6, 7, 22
302:7
303:7, 9, 23
304:4
305:10, 13
310:5
312:17
313:11, 21
315:5
317:5, 7
318:2
321:21
324:10, 14,
19  330:12
337:23
344:5
345:5, 17
346:7
349:5
355:7, 10, 12
356:7
358:5, 11
359:14, 20,
21, 24  360:6
372:12
373:8, 11, 12
377:19
378:11
385:14
395:2
398:4, 15, 19
399:3, 8
400:24
403:21
404:24
408:19, 24
409:9, 21
411:18
412:7
415:23
416:8

424:19
425:20
426:3
**questioned**
206:24
**questioner**
13:13
**questioning**
90:17
202:23
203:3
204:6
322:24
323:15
**questions**
19:20
26:19  34:8
37:6  45:6
47:23
50:22  60:8
63:23  90:1
96:16
100:24
118:9, 11
122:12
145:9
149:9
150:4
170:20
176:3
177:10
178:6
188:22
191:9
199:3
202:1, 17
203:12
208:24
231:21
246:5
249:6
257:2, 4
263:3
271:11

303:5
310:2
317:17, 20
331:5, 11
349:9, 24
397:23
399:11, 15
408:5
423:6, 9, 12,
21  424:18
427:19, 22
432:4
**quick**
424:17
**quickly**
51:5  249:8
**quite**
213:14
214:12
**quoted**
251:13

< R >
**R&D** 280:9
**raise**  279:4
**raised**
138:14
316:6  395:2
**raising**
248:21
**ramble**
344:18
**rambling**
349:6
**ran**  134:11
**range**  75:20
76:1  393:5
**rare**  55:16
97:20
**RASPANTI**
5:15
**rate**  290:3
**rational**
320:7

**Rationale**
308:3
**raw**  93:6
94:2  95:10
161:21
162:11
164:5
182:21
239:13
290:3
308:19
309:5, 10
310:21
375:9
386:7
388:19
389:4
**RBK/JS**  1:5
**reach**  172:5
173:8
**reached**
156:19
173:12
**reaching**
156:15
**reaction**
93:10
172:6, 19
175:5
289:22, 23
290:1
375:6, 8
**reactions**
195:17
277:8, 13
308:17
310:19
355:17
376:6
382:21, 22
411:9  418:6
**reactors**
133:21

**read**  22:6
29:6, 13
30:8  38:7,
21  52:24
55:1  80:19,
23  83:12
91:24
105:14
109:7, 9, 24
112:5
113:10, 17
114:4, 6, 9
125:15
132:3
136:20, 21
138:22
139:2
145:20
151:17
152:13, 17
167:15
170:12
172:10, 15
175:12, 13,
14, 15, 16, 17
176:15
178:11
183:10, 24
184:3, 8, 13,
15  186:7
187:15
188:24
189:2
194:22
207:24
209:12, 15,
17, 24
210:15, 18,
24  212:8, 12,
15, 24  213:2,
10, 11, 22
214:4, 9, 24
215:1, 3
226:17

227:16
243:17
245:14
252:23
260:14
267:1, 3, 6,
10, 13, 16, 20
268:3, 15
269:1, 4
270:20
271:2, 9, 10
272:6, 16
282:13
292:5, 10
314:13, 15
318:24
329:8
332:24
333:22
334:24
335:18
337:1
341:1
346:7
352:14
366:14
367:16
369:15, 17
375:11, 18
377:22
380:2
381:8
385:12
388:14, 15
398:8
406:3, 8
410:23
411:1
430:3  432:3
**reading**
22:2  51:24
108:14, 17
113:19
174:9

178:24
206:23
210:6
212:3
215:6, 8, 9
270:22
339:12
375:19
401:12
**ready**  74:13
129:8
203:11
348:5, 15
**reagents**
422:12
**realize**
127:9
237:16
291:22
324:4
387:17
**realized**
285:13, 17
286:22
288:6
294:17, 20
**really**  80:17
84:19
90:10
119:7
127:24
150:6, 8
175:22, 24
177:1
198:6
215:24
235:15
240:5
247:6, 23
278:1
282:7, 15
292:6
323:23
331:8

408:21
409:14
414:14
415:21
**Realtime**
1:17  429:4,
17
**rearrangeme
nts**  334:16
**reason**
13:10
30:20  86:4
93:12, 13
97:22
100:23
163:11
171:14
177:19
180:8
192:14
211:15
298:2, 23
301:10
315:14
357:10
362:13, 19
378:23
385:15
386:22
430:5
**reasonable**
249:1
423:11
**reasons**
206:17
361:22
362:4
**reassess**
376:8
**recall**  14:15
47:14, 15
105:21
106:7
130:4, 5

160:8
186:4
204:19
210:4
218:14
269:13
281:21
287:19
345:23
368:16
375:19
**recalls**  40:3
262:13
**receipt**
430:17
**receive**
47:17  48:5
54:22  55:9
**received**
47:7  49:17
119:19
120:7
237:6
343:3
370:12
**receiving**
48:11
133:24
**recess**  75:1
128:23
138:1
205:10
266:14
283:3
350:16
384:3
419:14
424:6
**recollection**
88:14
**recommenda
tion**  33:22
**recommenda
tions**

Ali Afhlan

| | | | | |
|---|---|---|---|---|
| 328:*24* | **records** | 153:*6* | **regardless** | 257:*12* |
| 385:*7* | 39:*20* | 190:*16* | 74:*5* 75:*10* | 315:*11* |
| **Recommende** | 194:*7* | 219:*24* | **regions** | 420:*5* |
| **d** 9:*10* | 379:*6, 8* | 220:*2, 3* | 126:*20* | **REILLY** |
| 241:*17* | **reduce** | 225:*24* | **regulated** | 4:*3* |
| 242:*23* | 181:*22* | 227:*10* | 73:*17* | **reintroduce** |
| 325:*16, 24* | 332:*19* | 244:*6* | 284:*18* | 426:*11* |
| 336:*6* 338:*2* | **reduced** | 306:*20* | 328:22 | **reject** 68:*24* |
| **recommendi** | 290:*10* | 387:*14* | 381:*4* | 69:*5* |
| **ng** 243:*4* | **reduces** | **refers** 157:*6,* | **regulation** | **rejected** |
| **record** | 290:*4, 5, 6* | *12* 216:*6* | 63:*13* | 68:*23* |
| 11:*12* 12:*9* | **redundant** | **refine** 13:*13* | **regulations** | 69:*14* 71:*2* |
| 29:*4, 14, 19* | 174:*11* | **refuses** | 32:*3* 36:*23* | **rejection** |
| 41:*3* 50:*5* | 175:*3* | 331:*10* | 71:*5* 97:*9* | 40:*2* 71:*17* |
| 74:*23* 75:*5* | **REEFER** | **refusing** | 142:*15* | **rejects** 69:*3* |
| 80:*24* | 5:*16* | 330:*11* | 149:*13* | **related** 21:*5* |
| 102:*20* | **refer** 96:*22,* | **regard** 21:*7* | 380:*19* | 22:*10* 46:*9* |
| 128:*3, 19, 21* | *24* 184:*18* | 22:*12* | **regulator** | 71:*15* |
| 129:*3* | 185:*1* 206:*4* | 32:*14* | 67:*12* | 237:*23* |
| 130:*21* | **reference** | 35:*11* | 73:*20* | **relates** |
| 137:*20, 22* | 240:*12* | 55:*10* | 137:*18* | 126:*15* |
| 138:*4* | 402:*20* | 63:*18* | 142:*21, 22* | 186:*8* |
| 139:*3* | 403:*2, 9* | 117:*19* | 143:*1* | **relation** |
| 205:*5, 8, 14* | 404:*7* | 118:*1* | 181:*4* | 61:*8* |
| 208:*12* | 407:*10* | 119:*13* | 284:*20* | 102:*24* |
| 220:*14* | **referenced** | 134:*23* | 343:*7* | 103:*2* |
| 233:*23* | 157:*8* | 136:*23* | 381:*5* | **relationship** |
| 266:*9, 12, 18* | 213:*19* | 209:*5* | 382:*3, 7* | 336:*17* |
| 282:*23* | 326:*15* | 211:*6* | **regulators** | **relationships** |
| 283:*1, 7* | **references** | 240:*11* | 39:*8* | 45:*1* |
| 344:*17* | 209:*22* | 242:*10* | 125:*11* | **relative** |
| 350:*12, 14,* | **referred** | 254:*22* | 143:*17* | 270:*10* |
| *20* 365:*2* | 44:*8* | 255:*5* | 180:*14, 18* | 429:*11, 12* |
| 383:*12, 20,* | 117:*17* | **Regarding** | 181:*4* | **release** |
| *24* 384:*7* | 206:*10* | 9:*12* 14:*20* | 192:*11* | 174:*4* |
| 406:*9* | 238:*7* | 33:*23* | 274:*10, 12* | 239:*12* |
| 416:*1* | 244:*16* | 176:*13* | 278:*7* | 262:*11* |
| 419:*10, 12,* | 405:*22* | 178:*9* | 302:*13, 15* | 263:*9* |
| *18* 423:*24* | 406:*11* | 206:*2* | 343:*1, 4* | **released** |
| 424:*2, 4, 10* | 412:*16* | 209:*14* | 358:*20* | 104:*14* |
| 428:*6* | **referring** | 211:*22* | **regulatory** | **relevant** |
| **recorded** | 35:*21* | 328:*19* | 95:*19* | 141:*11* |
| 239:*15* | 53:*16* | 374:*7* | 100:*12* | 333:*6, 12* |
| | 107:*19* | 423:*14* | 255:*17* | 356:*9* |

Ali - Athan

**reliable**
291:*5, 8*
412:*11*
414:*19*
415:*16*
**reliance**
357:*16*
**relied**
178:*18*
251:*11*
253:2  254:*3*
**rely**  98:*7*
102:*4*
206:*3*
212:*19*
213:*4, 24*
214:*20*
215:*17*
269:*11*
312:*5*
322:*15*
359:*5*
**relying**
103:*17*
157:*4*
205:*17, 21*
206:*18*
207:*3*
211:*17*
307:*21*
311:*19*
358:*15*
363:*13*
406:*20*
407:*1*
408:*9, 12*
409:*1*
414:*20*
**remain**
77:*10*
88:*20*
95:*14, 23*
120:*1*

**remained**
395:*13*
**remaining**
95:*18*  97:*2,
3*
**remains**
95:*22*
**remediate**
46:*24*
**remediation**
46:*12, 19*
47:*2, 5, 8*
49:*14*
**remember**
16:*23*
53:*12*
106:*13, 14*
138:*9*
164:*18*
208:*3, 11, 18,
20*  346:*4*
382:*12*
387:*11, 13*
388:*14*
414:*10*
426:*9*
**remembers**
346:*18*
**remind**
164:*16*
369:*10*
**remit**
170:*24*
173:*15*
**Remote**
1:*13*  11:*17*
12:*4*
**remotely**
12:*1, 3*
429:*5*
**removal**
333:*6*
**remove**
97:*16*

258:*17*
289:*12*
378:*22*
**removed**
95:*15*
97:*21*
104:*6*
378:*23*
**repeat**
26:*11*
80:*15*
87:*14*
94:*21*
101:*23*
115:*1*
117:*13*
124:*8*
135:*23, 24*
142:*6*
147:*1*
188:*16*
194:*24*
196:2, *4*
201:*8, 12*
282:*10*
285:*22*
361:*16*
401:*18*
406:*23*
425:*1*
**repeated**
198:*19*
**repeatedly**
52:*19*
**rephrase**
16:7  23:*1*
32:*24*  35:*7*
37:*15*
41:*18*
42:*14*
48:*19*
49:20  70:*3*
76:*10, 11, 21*
80:*17*  91:*1*

92:*19*
96:*23*
101:*23*
109:*16*
113:*7*
117:*3, 13, 15*
118:*4*
124:*8*
133:*1*
154:*8*
168:*22*
173:*18*
174:*21*
217:*18*
234:*14*
252:*1*
275:*10*
308:*10*
321:*12*
357:*1*
364:*12*
372:*4, 12*
381:*7*
391:*21*
397:*10*
411:*4, 6, 20,
21*  421:*14*
**Report**  7:*16,
18, 23*  8:*13*
40:22  41:*2,
10, 17, 18, 20,
22*  42:*5, 6,
10, 17, 19, 21
12, 17, 18, 21*
44:*4, 8*
107:*1, 7*
113:*11, 14,
24*  114:*2, 5,
7*  115:*2, 7*
122:*23*
123:*18, 20,
23*  124:*4, 11,
16*  158:*22*

164:*13*
165:*8*
167:*12, 16*
170:*13*
171:*15, 24*
172:2, *14, 22*
173:*10*
175:*15, 18*
206:*1, 10*
207:*23*
208:*5*
211:*24*
216:*1*
221:*13*
232:*19*
259:*3*
260:*14, 22,
23*  266:*22*
267:*24*
288:*18, 20,
22*  292:*5*
321:*1, 6, 10*
369:*18*
374:*13*
375:*24*
400:*2*
402:*13*
405:*13*
406:*16*
427:*14, 17*
**reported**
132:*10*
153:*8*
161:*23*
167:*8*
261:*22*
317:*10*
411:*23*
412:*24*
413:*7*
**Reporter**
1:*17, 18*
12:*10*  29:*6,
13*  30:*8*

Ali-Afham

41:6  80:23
87:16
105:10
138:22
139:2
145:20
152:14
201:8, 12
282:13, 18
406:3, 8
429:4, 17, 21
**reporting**
12:5
281:19
308:3
**reports**
103:3, 6, 7
114:20
272:17
331:21
363:18
372:23
**represented**
300:21
322:12
420:9

**Representing**
2:7, 15, 22
3:6, 12, 22
4:7, 13, 21
5:6, 12, 20
6:6  422:4
**represents**
36:16

**reproduction**
429:20
**Request**
10:10
248:23
289:18
**requested**
19:24  21:3

111:22
287:19
316:16
407:23
**requests**
19:23
316:10
**require**
67:21  68:7
70:1, 5
98:4, 16, 17
**required**
24:3, 15
25:17  26:7,
24  27:13
28:1  30:2
32:12, 14
33:3  37:23
65:12  66:7
89:6  90:24
92:14
111:23
133:10
142:1
143:4
146:5
151:23
152:20
173:23
174:3
190:2
192:6
195:21
196:17
236:1, 11
242:13
243:11
279:19
283:19
285:18
287:7
294:22
304:20
305:5

309:3, 17, 23
310:8
315:20
322:10, 16
355:1
366:8
369:7
386:14
390:5
393:12
398:8
400:20
**requirement**
23:20
64:23  65:3,
6  66:12
67:6  79:10,
18  81:3
95:19, 20
191:20
315:11
393:11
**Requirement
s**  8:11  31:9,
14  36:22
63:6  66:15
100:12
181:19
182:6
279:3
281:5
289:16
301:12
353:11
369:12
385:11
388:10
**requires**
39:15  66:8
94:7  192:5,
7
**research**
132:11
133:16, 18

136:23
288:24
328:23
362:8
375:3
376:2
378:20
380:10
381:10, 15,
23, 24
382:18
**researched**
228:22
**reserved**
11:7
**reserving**
258:11
423:7, 13
**residual**
120:5
159:15
186:17
193:8
**resources**
259:9
**respect**
216:22
217:11
240:23
245:16
405:8
**respected**
156:8
**respectfully**
141:19
236:24
**respond**
45:3  138:7
143:12
240:18
276:10
283:23
**responded**
143:11

256:23
305:9  415:1
**responding**
228:24
358:14
**responds**
55:19
**response**
13:6  17:14
21:12, 22, 23
26:5  55:22
67:19  86:2
95:8
124:20
172:24
187:21
255:23
256:24
257:1
258:4
261:15
278:2, 11
283:24
305:16
317:4
345:16
360:7
369:4
372:2
373:21, 23,
24  402:19
**Responses**
7:13  17:18
18:24

**responsibility**
57:7, 24
58:13
62:14  64:8
259:16
370:5
**responsible**
57:13, 20
58:20, 23

A.J. Athan

367:8
369:13
**responsive**
291:21
294:12
330:20
349:9
**rest** 54:14
245:15
**restart**
251:23
**result** 64:15,
17, 24 70:6
71:14, 16
177:15
181:5
183:15
190:5
243:24
376:4
**resulted**
166:5
186:4
261:15
263:14
**Resulting**
8:15
221:16
265:12
278:5
**Results**
8:13
133:22
167:6
171:13, 17,
18, 20
221:13
223:14
224:19
261:23
290:13
370:24
412:24

413:7, 8, 17
**retain** 49:8
**retained**
15:6, 8
138:7
**retention**
393:4
**retired** 16:4,
13
**retort**
358:10
**re-tread**
170:3
**retrospect**
422:19

**retrospective**
372:7
**return**
430:15
**reveal**
254:16
**revelation**
287:5
**review**
57:15, 18
58:17
59:17, 22
60:4, 13, 20,
21 62:4, 7
132:14
238:6, 11
240:21
241:1
263:7
336:20
358:20
372:1
**Reviewed**
8:21 59:20,
23 61:2, 9
158:15
164:7
237:22

240:10
261:18
262:19
266:23
269:21
270:5
281:8
376:24
**reviews**
122:23
**revision**
363:23
**rhetorical**
149:24
**RIDDELL**
3:9
**right** 19:16
51:21
64:20
69:22
72:17
84:23
90:18
101:10
121:16
123:1, 6
124:17, 20
131:2
157:17
167:23
173:24
180:1
181:10
190:10
197:3
198:15, 18
199:11
202:15
203:5
212:21
215:16, 17
218:14
221:9
222:17

223:3
226:21
229:6, 12
234:22
236:12, 22
238:8
242:14
243:12
245:21
253:24
254:8, 9
255:19
257:21
258:11, 20
265:15
285:10
294:10
298:18
299:6
304:22
305:21
306:20
307:9, 17, 22
309:10, 13,
18 310:14
312:21
318:7
321:1, 8
325:1
340:6
342:8
348:4
352:16
357:7
368:5
371:11
374:20, 22
375:14
379:2, 11
383:19
386:17, 20
388:1, 22
390:12
395:21

396:7
397:9
400:21
404:15
406:18
413:20
422:7 423:4
**rights** 36:19
423:14
**risk** 91:22
126:16
133:11
134:21
137:13
159:6, 10, 13,
17 160:15
163:14, 21
164:7
179:23
194:10
238:14
240:16, 22
241:15
290:23
291:2
332:19
335:11, 17
362:3, 7, 12,
15 378:21
381:6, 11
**risks** 91:15
92:6, 8
134:23
142:2, 8
143:5
146:6
147:7
151:24
152:21
153:4
376:10
**RIVERO**
2:10

A143 Nathan

Road  5:10 24:22

ROBERT 1:7

ROD  407:11

role  62:13, 17  138:16 139:5, 15 170:23

rolls  173:18

room 350:10

ROONEY 4:17

Root  8:19 111:12 167:3 172:17 250:23 257:9

ROSE  3:17

Roseland 2:5

ROSEMARIE  3:9

rosemarie.bogdan@1800LAW1010.com 3:11

Roszel  5:10

route  108:9 290:16

routes  333:4

row  150:21

Rows 166:12

RUBENSTEIN  4:10

rubensteinb@gtlaw.com 4:13

rude  248:6, 9  294:2 416:12, 13

rudely 346:14

rule  21:3 202:24 348:11 410:8

rules  22:9 34:22 380:19

run  99:13 128:6 134:2 179:22 194:16 195:21 196:17 260:3 380:16

running 193:13

< S >

safe  164:9 291:5 367:15

Safety  8:20 250:24 291:1  329:1

sample 407:14

samples 134:12 407:21 412:19 413:6

sampling 386:5, 16 389:1 391:13

saponification  290:8

sarcastic 358:9

sartan 241:16 242:1, 8

sartans 242:3, 11

satisfies 36:22 385:10

saw  19:16 105:8, 24 222:1, 3, 13 226:3 245:16 267:23 270:16 379:16 427:10, 14

saying 16:24 29:24 32:11  37:6 58:20 70:14, 21 71:10 78:23 95:22 96:11  97:3 126:12 137:4 148:4 149:7 166:14 169:9 171:10 172:17 185:10 187:11 189:4 197:17, 21 198:3 200:17 214:8

215:16 237:8 264:18 314:16 325:4 343:6 346:2 353:2 362:19, 21 363:1, 4 369:22 377:21 388:18 392:1, 2 400:12 402:2 409:15 410:15 411:24 416:3 418:12

says  36:16 51:21 56:11, 13, 23 57:1  73:11 76:4  79:5 83:22  86:8 88:24 100:7, 14 108:15, 19 111:8 112:19 116:14 123:9 130:14 131:1 132:21 140:11, 17 155:11 158:24 165:11 168:8, 24 172:19, 23 173:6, 7

174:20 179:20 180:19 183:4 186:15 189:5 191:14 194:1 203:1 213:18 215:5, 18, 20, 24  216:3 218:5 219:18, 21, 22  222:19 226:12 227:12 230:13 231:9, 14 232:18 234:3, 15 235:3, 5 241:11, 24 242:15, 18, 22  244:9 245:6, 16, 21, 23  246:5, 11 249:13 252:13 253:13, 24 254:13, 15, 21, 24 255:11, 14 261:13, 21 280:17 288:23 290:5 296:11 297:1 307:4 308:8, 11 309:23 310:7, 14, 16 311:10

318:*10*
319:*17*
320:*12, 20*
321:*14, 18*
322:6, *24*
323:*10*
328:*15*
330:*3, 8*
332:*17*
334:*12*
335:*3*
336:*12*
339:*23*
340:*12*
342:*1*
352:7, *22*
356:6, *18*
363:*8*
366:*21, 23*
367:*2*
368:*5, 7*
374:*24*
378:*19*
385:*6*
386:*4*
388:*24*
390:*12, 15,
20* 391:*10*
392:*20*
393:*18*
396:*13, 16*
422:7, *8*
**scale**
165:*12*
166:*11*
286:*6*
**SCHERBAR
TH** 5:*16*
**Sciegen** 6:*6*
**scientific**
92:*15, 17, 21*
93:*1, 13, 14,
19* 125:*15*
134:*22*

136:*22*
141:*13*
308:*16*
309:*3, 17*
310:*8, 18*
314:*9, 12*
315:*12*
**scientifically**
386:6, *17*
389:*3*
390:*21*
391:*14*
**scope** 40:7,
*11* 102:*21*
114:*19, 22*
131:*15*
138:*11*
169:*5*
173:*24*
300:*15*
**Scott** 115:*8*
**screen** 18:*1,
5, 7, 15* 41:*4*
42:*5, 16*
107:6, *10*
111:*9*
122:*8*
129:*19*
131:*4*
156:*14*
170:*4*
171:*11*
180:*10*
182:*3*
220:*21*
221:*21*
251:*4, 6*
306:*14*
329:*22*
331:*17*
374:2, *16*
420:2 426:*8*
**screwed**
383:*21*

**scroll** 18:*19*
54:7 245:*8*
311:*7*
312:*22*
341:*21*
**sealing** 11:*4*
**search**
209:*14*
**second**
23:*10*
28:*13*
34:*13*
43:*12*
96:*19, 20*
220:*22*
222:*4, 7*
227:*19*
229:*21*
241:*10*
243:*21*
244:*11*
246:*9*
251:*16, 24*
252:2, *12*
271:*14*
300:*11*
301:*7*
319:*15*
320:*6*
323:*9*
328:*10*
330:*7*
333:*9*
378:*17*
383:*20, 24*
385:*5*
392:*19*
406:*5*
**secondary**
195:*18*
222:*20*
226:*12*
**seconds**
65:*19*

**Section**
56:*20*
123:*3*
182:*24*
187:*2*
292:*5*
307:*24*
308:*2*
311:*5, 10*
319:*11, 13*
336:*5*
338:*1, 4*
340:*11*
351:*2*
365:*11*
374:*24*
392:*18*
**sections**
38:*23*
55:*12*
239:*15*
241:*3, 5*
**see** 18:*5, 13,
20, 23* 19:*7*
21:*10, 11, 20,
24* 22:*5*
76:*19* 79:*5,
12* 86:*7*
88:*15*
93:*15* 98:*7*
103:*12*
107:*9, 11*
108:*14, 16*
109:*6*
122:*5, 7, 21*
123:*5, 15, 17*
129:*24*
130:*8, 10, 18*
140:*3*
141:*1*
155:*18, 19*
158:*15, 16*
167:*6*
168:*9, 23*

169:*1*
170:*6*
171:*10*
172:*10*
175:*12, 13*
177:*21*
179:*15, 20*
182:*7*
183:*2, 10, 24*
191:*3*
195:*21*
196:*17*
222:*6, 9*
226:*17*
227:*16*
241:*21, 22*
244:*9*
251:*9*
252:*9, 23*
270:*14, 15*
277:*17*
278:*17*
279:*20*
283:*20*
285:*19*
287:*8*
288:*7*
294:*22*
304:*15*
306:*16*
308:*6, 23*
311:*16*
318:*24*
320:*4*
321:*11, 13,
23* 322:*1*
329:*8*
332:*24*
333:*7, 22*
334:*24*
335:*18*
336:*9*
337:*1*
338:*7*

340:*23*
341:*1*, *24*
342:*4*
351:*16*
352:*5, 9*
354:*13*
355:*18*
356:*12*
360:*21*
365:*15*
366:*14*
367:*16*
369:*15*
371:*16*
374:*15*
375:*11*
376:*18*
379:*10*
385:*12*
386:*12*
393:*9*
396:*24*
411:*13*
413:*17, 22*
414:*2, 15*
415:*2*
420:*8, 13*
421:*17*
422:*17*
**seeing**
85:*14*
184:*16*
223:*3*
226:*21*
231:*10*
414:*10*
**seen** 18:*17*
19:*4, 13, 18*
41:*4*
107:*16*
122:*10, 13,*
*16, 19*
123:*19, 20*
124:*3*

125:*16*
130:*2*
165:*18*
217:*23*
270:*7, 10*
314:*1*
326:*4*
374:*16, 18*
375:*13, 16,*
*17, 22*   376:*6*
398:*10*
399:*2*
400:*17*
420:*6*
421:*4*
427:*17*
**selected**
119:*17*
**sell** 98:*19*
260:*1*
264:*22*
265:*23*
266:*5*
337:*9*  388:*8*
**selling**
48:*11*
260:*18*
265:*17*
281:*21*
**semi-bad**
71:*13*
**semi-colon**
226:*1*
227:*11*
**send** 237:*9,*
*10*  299:*17*
**sense** 59:*5*
**sent** 56:*5*
105:*16*
224:*17*
237:*10, 11*
299:*19*
**sentence**
123:*9*

174:*14, 20*
199:*18*
222:*12*
225:*23*
226:*11*
227:*3*
245:*15*
252:*13*
254:*15*
**sentences**
174:*24*
**separate**
120:*12*
223:*19*
**separated**
174:*12, 17*
175:*4*
**September**
36:*9*  259:*19*
**sequence**
255:*20, 22*
**serious**
255:*7*  258:*8*
**serve**  44:*3*
**SERVICES**
1:*22*  11:*14*
**set** 37:*9*
83:*21*
264:*5*
275:*11*
276:*3*
322:*23*
429:*9*
**sets** 149:*14*
**setting**
97:*19*
163:*8*
177:*15, 23*
178:*3*  280:*9*
**settings**
168:*6*
**settle**  174:*18*
**seven**  60:*7*
237:*1*  320:*8*

**seven-**
**minute**
128:*16*
**share**
107:*13*
110:*20*
**shared**
298:*4*
316:*13*
342:*24*
370:*12, 14,*
*15, 18*
**sheet**  430:*7,*
*9, 12, 15*
432:*6*
**ship**  260:*8*
**shipments**
259:*11*
**shipping**
256:*13*
279:*8*
368:*24*
**shocking**
416:*14*
**shot**  151:*5*
**show**  19:*14*
53:*17*  84:*8*
99:*18*
198:*16*
216:*21*
217:*10, 11*
249:*13*
275:*20*
414:*8*  415:*7*
**showed**
167:*18*
196:*22*
322:*23*
**showing**
116:*11*
266:*20*
304:*16*
379:*11*

393:*14*
411:*17*
**shown**
131:*6*
165:*16*
225:*8*
**shows**
99:*19*
167:*23, 24*
413:*9*
**side**  88:*21,*
*23*  93:*10*
198:*16*
375:*6*
**sign**  430:*8*
**signal**
224:*24*
247:*15*
**signed**
42:*21*
119:*18*
420:*4*
**significance**
108:*2*
210:*7, 20*
211:*12*
255:*18*
268:*20, 23*
269:*1*
372:*6, 20, 22*
420:*19*
**significant**
51:*1, 18*
54:*11*  56:*8*
107:*21*
211:*7*
212:*5*
334:*19*
335:*17*
412:*1*
**significantly**
159:*9*
**signing**
430:*10*

**similar**
119:*22*
179:*22*
227:*12*
231:*10*
245:*11, 12,*
*17*  261:*24*
**simple**
30:*22*
48:*16*
301:*22*
302:*6*
331:*11*
402:*22*
408:*24*
**simply**
112:*3*
175:*23*
249:*6*  273:*6*
**simulation**
175:*8*
**sincerely**
196:*3*
**single**  67:*16*
77:*22*
79:*11*
111:*18*
157:*22*
267:*16*
373:*7*
**sir**  240:*23*
**sit**  84:*22*
**site**  103:*15*
160:*22*
161:*11, 23*
163:*10*
228:*7*
370:*21*
377:*9*
**situated**
228:*6*
**situation**
44:*12*  297:*9*

**six**  150:*20*
177:*4*
**SKADDEN**
3:*12*  407:*22*
**SLATE**
3:*12*
**SLATER**
2:*3*  7:*6*
12:*19, 22*
17:*13, 24*
18:*6, 12*
19:*15, 19*
20:*21*  21:*1,*
*21*  22:*4, 18,*
*20*  23:*6, 13*
24:*1, 11, 24*
26:*15*  27:*7,*
*23*  28:*7*
29:*18, 23*
30:*9, 18*
31:*21*
32:*22*
33:*15*  34:*9,*
*10, 14, 17*
35:*2, 22*
36:*1*  38:*6,*
*11*  40:*9, 17,*
*20*  41:*1, 14*
42:*15, 24*
43:*9, 24*
45:*12*
47:*10*  48:*1,*
*3, 13, 20, 22*
49:*6, 24*
50:*6, 13*
51:*7, 15*
52:*5, 13*
53:*4, 20*
54:*20*  56:*4*
57:*3, 5, 22*
58:*5*  59:*11*
61:*16*  62:*6*
64:*3*  65:*23*
68:*14*  69:*8,*

*21*  70:*11*
71:*18*  72:*3,*
*18*  73:*21*
74:*12*  75:*6,*
*23*  76:*22*
77:*17*  78:*6,*
*14*  79:*15*
80:*19*
82:*10*
83:*16*  84:*5,*
*21*  85:*12, 18*
86:*9, 23*
87:*7, 17*
88:*3, 4*
89:*21*
90:*18, 23*
91:*12*  96:*3,*
*9, 21*  98:*3*
99:*15*
100:*20*
101:*14, 17,*
*24*  102:*9*
103:*21*
105:*2, 22*
106:*5, 17*
107:*4*
108:*3*
110:*12, 14*
112:*2*
113:*2*
114:*8*
115:*15*
117:*14*
118:*6, 10, 13,*
*21*  119:*3, 10*
121:*5, 17*
122:*2*
124:*9*
125:*13*
126:*24*
127:*9, 17*
128:*4, 10*
129:*4, 7, 18*
131:*18, 20*

132:*4, 6*
134:*18*
135:*8, 17, 20*
137:*3, 19*
138:*5*
139:*12, 14*
140:*6, 24*
143:*14*
144:*2, 12, 18*
145:*24*
146:*3, 19*
147:*3, 22*
148:*17*
149:*4, 11*
150:*6*
151:*7, 21*
152:*16, 19*
153:*12, 17,*
*19, 22*  154:*4*
155:*6*
157:*1, 24*
158:*2*
159:*21*
161:*1, 24*
162:*7, 16*
163:*12*
164:*10, 17,*
*23*  165:*1, 5*
167:*9, 17*
168:*16*
169:*7*
170:*9, 15*
171:*12*
174:*7, 19*
176:*11, 20*
177:*6*
179:*14*
181:*7, 15, 22*
182:*1*
184:*5, 11*
187:*17*
188:*21, 23*
191:*11*
192:*17*

194:*14*
195:*2*
196:*9*
197:*7, 13*
198:*9, 21*
199:*19*
200:*4, 8, 16,*
*20*  201:*1, 4,*
*11, 14*
202:*10, 14,*
*19*  203:*8, 23*
204:*10, 23*
205:*5, 15*
206:*8*
207:*2, 21*
210:*14*
211:*4, 13*
212:*11, 23*
213:*21*
214:*14*
215:*13*
217:*4, 14, 17*
218:*23*
219:*16*
220:*3, 7, 17*
221:*3, 8, 20*
223:*7, 10*
225:*21*
226:*10, 24*
229:*4*
230:*19*
231:*7*
233:*10, 18*
234:*12*
235:*18*
236:*8*
237:*14*
239:*21*
240:*1*
245:*8, 13*
246:*19, 24*
247:*9, 14, 22*
248:*8*
249:*12, 18*

| | | | | |
|---|---|---|---|---|
| 250:*15* | 315:*2, 22* | 379:*9, 22* | **smiling** | **solely**  57:*19* |
| 251:*3, 15, 21* | 316:*20* | 383:*3, 14* | 216:*15* | 58:*20, 23* |
| 253:*10* | 317:*12* | 384:*8, 18* | 221:*5, 6* | 312:*6* |
| 254:*11* | 318:*1, 4, 6* | 388:*3, 12* | **smoothly** | 358:*15* |
| 255:*2, 4, 15* | 319:*10* | 389:*9* | 25:*12*  198:*7* | **solution** |
| 260:*13* | 323:*18* | 390:*2* | **Sodium** | 193:*10* |
| 261:*4* | 324:*9* | 391:*1, 19* | 8:*15*  159:*3,* | 260:*11* |
| 264:*17* | 325:*11* | 395:*17* | *4, 11*  166:*4* | **solvent** |
| 265:*2, 21* | 326:*3, 18* | 396:*1* | 167:*21* | 94:*19*  95:*4,* |
| 266:*7, 19* | 327:*7, 14* | 397:*3, 19, 24* | 168:*2* | *13, 18, 21* |
| 267:*22* | 328:*12* | 398:*17, 20,* | 174:*10* | 96:*6*  97:*2,* |
| 268:*17* | 329:*14, 21,* | *23*  399:*12* | 175:*2* | *4, 10, 16* |
| 269:*14* | *23*  330:*15* | 401:*10* | 184:*20* | 98:*18, 19* |
| 270:*2* | 331:*14* | 402:*9, 11* | 219:*3, 20* | 99:*7*  103:*8* |
| 272:*7, 8* | 332:*15* | 403:*14, 20* | 221:*16* | 104:*5* |
| 273:*18* | 334:*10* | 404:*1, 4, 17* | 223:*18, 20* | 116:*2, 21* |
| 275:*7* | 336:*3* | 405:*7* | 224:*3, 16* | 117:*9* |
| 276:*19* | 337:*12, 20* | 406:*2, 15* | 227:*14, 22* | 119:*24* |
| 278:*10* | 340:*3, 6, 10* | 408:*16, 20* | 229:*16, 17,* | 130:*17* |
| 279:*12* | 341:*17, 20,* | 409:*10, 19,* | *22*  230:*7, 23* | 136:*3* |
| 282:*3, 22* | *23*  343:*11* | *24*  410:*9, 11* | 231:*12* | 140:*14* |
| 283:*8* | 344:*1, 16* | 411:*15* | 232:*4* | 160:*14* |
| 285:*7* | 345:*2, 9, 14* | 413:*15* | 234:*5, 18* | 172:*3* |
| 287:*22* | 346:*1, 9* | 414:*17* | 235:*23* | 193:*9* |
| 291:*16* | 348:*7, 17* | 415:*5, 11, 21* | 240:*13* | 365:*20* |
| 293:*1, 8, 15,* | 349:*4, 13, 18* | 416:*5, 15, 21,* | 241:*20* | 393:*8*  400:*6* |
| *19*  294:*10,* | 350:*5, 12, 21,* | *23*  418:*3, 16* | 242:*6, 17* | **solvents** |
| *13*  295:*16* | *23*  351:*1* | 419:*9* | 243:*1, 6, 8, 9,* | 97:*21, 23* |
| 297:*5* | 352:*21* | 420:*1* | *20, 23* | 104:*15* |
| 298:*14* | 353:*15* | 421:*2* | 245:*19* | 108:*21* |
| 299:*23* | 354:*2, 4, 22* | 422:*1* | 273:*21* | 116:*17* |
| 300:*4, 17* | 357:*20* | 423:*4* | 277:*6* | 120:*5* |
| 301:*1, 20* | 358:*24* | 426:*16, 21* | 283:*16* | 160:*13* |
| 302:*16, 21* | 359:*16* | 427:*21* | 287:*2* | 186:*18* |
| 303:*8, 11, 16,* | 361:*15* | **slower** | **software** | 400:*6* |
| *22*  305:*4, 18,* | 364:*15, 23* | 22:*17* | 336:*22, 24* | **solves** |
| *20*  306:*1, 11* | 365:*5, 7* | **small** | **sold**  25:*21* | 289:*20* |
| 307:*3* | 368:*4* | 304:*18* | 123:*10* | **somebody** |
| 309:*12, 21* | 369:*21* | 397:*9* | 124:*2, 14* | 52:*18* |
| 310:*6, 13* | 372:*3* | **smarter** | 125:*16* | 127:*5* |
| 311:*1, 6, 8* | 373:*3* | 300:*1, 16* | 133:*7* | 157:*22* |
| 312:*3, 24* | 374:*1, 11* | **smile**  221:*4* | 259:*23* | **soon**  287:*4* |
| 313:*9, 19* | 377:*11, 18* | | 391:*23* | **SOPs**  40:*6* |
| 314:*20* | 378:*3, 10, 12* | | 417:*6* | |

Alan Aman

**Sorry** 20:*19*
22:*18*
27:*18*  28:*5*
38:*23*
41:*24*
65:*20*
80:*12*
86:*17*
94:*21*
105:*12*
118:*15*
128:*7, 8*
138:*18*
147:*23*
149:*5*
165:*4*
184:*5*
198:*16*
201:*1*
207:*13*
230:*1*
237:*15*
265:*7*
272:*3*
295:*21*
300:*7*
302:*19*
332:*9*
340:*9*
372:*11*
383:*6*
395:*24*
403:*16, 23*
415:*18*
416:*7, 15*
418:*1*
421:*23*
424:*24*
**sort**  141:*6*
426:*16*
**sound**
308:*16*
309:*3, 17*
310:*8, 17*

314:*9*
386:*6, 17*
389:*3*
390:*22*
391:*14*
**source**  35:*7*
78:*20*  185:*4*
**sources**
32:*16*  33:*8*
34:*3*
183:*18*
185:*3*
187:*7*
188:*8*
190:*8*
387:*9, 23*
390:*7*
**space**  430:*6*
**speak**  127:*5*
169:*20*
208:*6, 9*
213:*10*
217:*9*
293:*17*
**speaking**
12:*6*
135:*18*
144:*7, 10, 13*
248:*24*
331:*2*
**spec**  120:*6*
**specific**
15:*3*  62:*8*
76:*4*  86:*6*
105:*20*
117:*19*
162:*22*
163:*15*
189:*9*
219:*24*
240:*8, 9*
259:*1*
274:*9*
275:*14*

342:*14*
392:*23*
393:*22*
417:*3*
**specifically**
15:*14*
17:*10*
35:*21*  77:*9*
81:*24*
102:*24*
103:*1*
106:*15*
108:*20*
136:*15*
180:*19*
219:*9*
228:*14*
230:*16*
260:*5*
280:*13*
283:*16*
366:*3*
367:*22*
381:*21*
391:*10*
395:*18*
400:*18*
**specification**
73:*10*
98:*23*
119:*20*
120:*9*
261:*23*
389:*24*

**specifications**
63:*7*  64:*20*
65:*10, 11, 15*
66:*5*  67:*9,*
*11, 14, 23*
68:*13*  70:*8*
71:*15, 20*
72:*12, 21, 23*
73:*7, 15, 19,*

*23*  74:*2*
75:*8, 19*
82:*1*  93:*8*
94:*4, 13, 14,*
*16*  95:*1*
115:*23*
120:*14*
182:*17, 19*
319:*14*
386:*5, 15*
387:*2*
389:*1*
391:*11, 12*
**specifies**
73:*10*
**specify**  25:*3*
37:*6*  70:*24*
**specimens**
413:*11*
**specs**  67:*9*
**spectometry**
226:*13*
**spectra**
299:*17*

**spectrometry**
222:*20*
**speculated**
242:*19*
**speculating**
421:*11*
**speculation**
417:*21*
**speech**
135:*9*
144:*20, 21*
216:*13*
349:*7*
**speed**  257:*3*
**spend**
220:*15*
**spoke**  15:*11,*
*18*  207:*22*
246:*4*

**stability**
261:*18*
262:*13*
289:*21*
**stable**  291:*8*
**staff**  262:22
**stage**
108:22
375:*4*
**stages**
327:*4*
380:*10*
**stand**
248:*13*
294:*11*
345:*10*
**standard**
31:*8*  32:*7,*
*13*  35:*9*
37:*19*  39:*7*
309:*2*
323:*19, 21*
324:*1, 6*
407:*10*
**standards**
31:*16*  33:*4,*
*13*  34:*1*
37:*7, 17*
38:*8*  40:*5*
120:*5*
324:*11*
386:*10*
388:*21*
389:*7, 13*
**standing**
118:*18*
**stands**
86:*20*  87:*5*
**start**  122:*18*
164:*21*
189:*21*
250:*2*
260:*17, 18*
277:*4*

Al Jafarhan

283:*11*
310:*1*
411:*17*
**started**
83:*14*
145:*16*
179:*24*
265:*14*
267:*14*
296:6
299:*15*
327:2
358:7
368:*15*
398:*14*
**starting**
150:*24*
165:*10*
267:*14*
**starts**
251:*19*
252:*4, 12*
311:*5*  375:*2*
**State**  1:*18*
6:*4*  27:*12*
29:*19*  50:*5*
275:*8*
351:8  430:*5*
**stated**
13:*22*
27:*11*
124:*14*
180:*13, 17*
181:*3*
186:*11*
192:*9*
193:*4*
243:7
275:*2*
289:*19*
320:*3*
328:*9*
395:*10*

**Statement**
8:*17*  9:*17*
33:*9, 20*
51:*10*
111:*15*
124:*21*
125:6
134:*4*
137:*12*
141:*13, 19*
168:9
187:*20*
194:*1*
206:*1, 4*
207:*12*
211:*3, 23*
213:*20*
218:6
230:*12*
234:*6, 14, 19*
246:*6, 10*
250:*19*
251:7
252:*3*
253:*1*
254:2, *9, 21*
261:*13*
274:7
284:*9*
312:6
323:*10*
326:*17*
343:*15*
362:*19, 22*
377:*10, 13,
21, 22*  380:*9*
381:*8, 9, 23*
402:*8*
410:*15*
411:*14*
417:*23*
419:*22*
420:*3*
422:*3, 20*

**statements**
139:*23*
157:7
171:*2*
210:*11*
235:*11, 13*
273:*4, 6, 15*
297:*8*
343:*14*
363:*4*
**STATES**
1:*1*  11:*21*
36:*12*
51:*16*
56:*16*  76:*6*
108:7
132:*20*
171:*24*
175:*1*
182:*4*
183:*12*
185:*19, 21*
232:*19*
244:*22*
252:*17*
259:*14*
265:*24*
347:*23*
365:*17*
369:*4, 5*
388:*9*  407:7
**stating**
130:*22*
**status**  61:*13*
241:7
**statutes**
36:*23*
385:*11*
**stay**  148:*24*
**staying**  96:*5*
**Steering**
3:*12*
**stenographic**
12:*9*

**stenographic
ally**  429:*8*
**Step**  46:*4*
100:*22*
108:*21*
109:*1*
172:*3*
174:*10*
175:*2*
224:*4*  364:*3*
**Steps**  8:*19*
97:*15*
250:*22*
**stipulate**
190:*13*
**stipulated**
11:*2*  31:*1*
39:*14*
186:*18*
**stipulates**
389:*22*
**stipulation**
136:*21*
**Stipulations**
10:*15*
**stock**  287:*18*
**stop**  102:*14*
127:*10*
200:*16*
203:*15*
204:*2*
223:*1*
250:*2*
252:*14*
256:*15*
279:*5, 7, 8*
281:*20*
287:*17*
348:*18, 19,
20, 23*
403:*24*
**stopped**
179:*3*
200:*1*

256:*12, 13*
265:*10, 13*
287:*15*
347:*15*
368:*14, 23,
24*
**stopping**
202:*9, 15*
203:*13*
281:*20*
**storage**
308:*14*
314:7
**straight**
178:*5*  315:*4*
**straightforw
ard**  292:*4,
16*
**strategy**
375:*1*
**Street**  2:*20*
3:*4, 10*  4:*4,
11, 18*  5:*17*
6:*4*
**stricken**
30:*17*
**strive**
335:*13*
**strong**
241:*14*
242:*21*
**structural**
225:*8*
333:*16*
336:*16, 18*
351:*11*
356:*11*
**structure**
108:*16*
241:*13*
242:*20*
321:*21*
**structures**
351:*13*

struggle
178:7
273:15, 17
274:6
276:11
**struggling**
66:24
120:23
198:11, 22
199:1
**stuck** 198:7
276:2
**studied**
160:23
209:12
375:7
**studies** 82:7
262:14
286:17
360:18
**study** 369:9
375:4
376:2
380:11
382:19
**studying**
206:6
**stuff** 426:18
**subject**
41:15
82:12
157:5
158:13
206:7
207:10
261:11
400:14
430:10
**subjective**
323:22
**subjects**
138:13

**submit**
142:20
286:8
**submitted**
41:23
103:4
120:14
134:15
136:8, 12
171:18
172:23
212:16
240:11
281:6, 22
291:15
332:6
358:19
**submitting**
137:17
289:2
378:18
**subs** 35:20
**subscribe**
273:7
295:10, 12
**Subscribed**
432:8
**subsequent**
174:10
175:2
**substance**
92:7, 10
93:22
94:12 97:1
99:20
193:4, 7
195:10
239:11, 13
280:7
288:8
308:15, 21
310:23
340:21
392:14

422:9, 16
432:6
**Substances**
9:6, 9
63:20 84:2
91:5, 11
94:16 95:1
134:24
142:5
143:8
146:9
147:10
152:2, 23
159:9, 16
183:1, 6, 7
277:6, 14
283:14
285:15
306:7
307:5, 16
322:13
325:10, 15,
23 328:20
335:9
338:16
339:17
340:2
342:15
343:2, 5, 18
347:22
357:11
358:22
360:10
361:5
**substituent**
222:22
226:14
**substitute**
149:6
**sucked**
330:23
415:7
**sucking**
344:19

**suddenly**
286:14
371:3
**sufficient**
77:22
137:13, 14
263:1
367:20
382:17, 18
402:6
**sufficiently**
158:12
**suggest**
19:14
28:16
231:5 346:3
**suggesting**
333:16
**suitable**
183:14
190:4
191:15
192:12
367:9
**Suite** 2:12
3:4 4:11,
19 5:4
**sum** 396:20
**summarize**
308:12
314:5
**summarizes**
51:17 54:10
**summary**
289:5
308:15
310:17
314:8
**summer**
16:21, 22, 24
17:2
**super** 60:9
303:13
304:2

**supervision**
254:17
429:21
**Supplementa
l** 8:22
269:15, 23
270:4
**supplier**
98:6, 18, 19
119:17
262:9
**suppliers**
105:17
134:1
**supplier's**
98:8
**supplies**
105:18
**SUPPORT**
10:2 342:2
351:3
**supported**
364:8
**supporting**
218:3
**supposed**
28:18 67:3
76:19
142:7, 24
143:20, 23
146:13
147:7, 13, 21
148:7, 16, 21
150:23
151:10
152:5, 7
153:11
154:2
352:12
**supreme**
271:7
**sure** 18:3,
11 20:7, 16,
19 60:8

Ali A. Athan

65:24  72:1
87:18  92:4
93:7  94:3,
11, 23  102:1
117:15
121:6, 8
148:3
152:15
214:16
220:22
223:8
235:16
245:7
248:3
260:5
278:14
292:6
303:9
354:11
365:2
368:20
372:14
382:17
385:24
403:17
404:3
421:10
427:4
**susceptible**
109:2
422:13
**swear**  12:11
**sworn**  12:3,
14  233:24
429:5  432:8
**synthesis**
108:10
156:7
241:16
242:1, 8
290:16
308:14, 18
310:20
314:7

340:21
341:7
**synthetic**
158:10
231:4  333:4
**system**  39:9
71:3, 5, 9, 10,
11  111:23
262:24
264:15
279:2
289:23
370:22
**systemic**
254:17
258:8
**systems**
39:12
415:15

**< T >**
**table**  38:12,
17, 22
165:17
175:11
179:15, 19,
20
**Take**  7:14
12:23
17:20
18:10  19:2
40:17
42:24  57:3
74:21
93:10, 11
100:22
113:16
127:4
128:16
155:21
156:1, 22, 24
164:10
169:8
176:14

177:10
181:7
202:21
203:1
205:3
208:15
247:15
249:18
250:5
255:2
258:11
266:8
268:10, 14
269:5
270:15
327:20
337:7
349:16
364:15
367:14
376:7
382:10
383:3, 9
402:9
**taken**  1:14
75:2  97:13
128:24
134:5
138:1
165:19
177:16
193:9
205:11
263:24
266:15
283:4
350:17
370:10
371:1
384:4
419:15
422:15
424:7  429:8

**takes**  77:23
224:3
**talk**  20:10
22:16
25:13  74:3
75:9  94:24
142:12
150:7
203:9
293:16
313:3, 12
351:7
397:4
404:2
416:13
**talked**
200:18
215:19
243:5
382:9, 12
402:12
406:16
426:4
**talking**  15:6
25:10  74:4
97:1
142:11
149:7
150:12, 16
200:17
219:6, 7, 9
220:15
222:11, 16
223:2
226:2
237:16
248:5
261:8
305:24
306:2
335:21, 23
342:7
345:23
358:3

391:8
398:14
409:23
410:3, 18
412:3  427:5
**talks**  20:8
39:11
225:12
229:1
**target**
333:11, 12
**targeting**
298:7
**tasked**
40:14
**TEA**
184:20
240:13
273:21
283:16
287:1
339:1, 10
360:14, 20
395:15
**team**  60:17
**technical**
206:13
224:2
241:5
340:18
341:4
352:13
382:10, 16
**technically**
299:7
335:16
**TECHNICIA
N**  11:10
74:22  75:4
128:20
129:2
137:21
138:3
205:7, 13

266:*11, 17*
282:*24*
283:*6*
350:*13, 19*
383:*23*
384:*6*
419:*11, 17*
423:*23*
424:*3, 9*
428:*2*
**technology**
21:*14*
223:*16, 24*
224:*18*
228:*10*
**telephone**
223:*15*
**tell**  13:*5, 12*
18:*20*
33:*12*
43:*15, 20*
59:*13*
61:*23*
72:*20*
85:*21*
92:*16*
110:*7*
117:*2*
146:*24*
168:*18*
172:*24*
189:*7*
197:*10*
211:*11*
212:*20*
214:*1*
216:*18*
218:*2*
240:*20*
265:*9*
275:*9*
291:*19*
293:*8*
307:*10*

330:*16*
348:*21*
394:7, *12*
399:*1*
**telling**  32:*9*
70:*4*  85:*20*
118:*11*
149:*16, 18*
150:*19*
247:*13*
291:*23*
344:*17, 23*
356:*14*
**tells**  170:*5*
370:*4*
**temperature**
109:*3*
155:*24*
156:*16, 18*
166:*1*
172:5  173:7

**temperatures**
165:*16*
173:*12*
**ten**  74:*21*
127:*3, 5, 18*
250:*14*
314:*14*
**term**  385:6
403:*4*
405:*10*
**terms**  76:*13*
77:4  92:5
94:*15*
360:*1*
363:9
402:22
**test**  98:6
99:*16*
160:5
161:*5, 6*
162:*18, 22*
163:*15, 20*

166:*18*
167:*23, 24*
192:*1, 12, 20*
193:*13, 16*
195:*4, 11, 21*
232:23
233:*1*
244:*13, 24*
272:*20*
275:*3*
277:*17*
278:*16, 18*
283:*20*
285:*19*
287:*8*
289:*5*
294:*22*
355:*1, 18, 24*
386:*5, 16*
389:*2, 23*
390:*23*
391:*13, 17*
412:*23*
**tested**  99:*10*
136:*4*
158:*15*
162:*11*
193:*10*
275:*1*
407:*5, 12, 15, 16*  408:6
409:*11*
411:22
412:*18*
413:*2, 9, 10*
**testified**
12:*15*
180:*12*
210:*1*
269:8
425:*10*
**testify**  52:*6, 24*  429:*5*

**testifying**
378:*4*
391:*20, 22*
**Testimony**
7:*3*  28:*4, 12*  32:*19*
69:*17, 19, 24*
70:*10, 16*
78:*18*
85:*16*
101:7
135:*4, 6*
136:*20*
151:*15*
156:*11*
163:*13*
164:*1*
169:*18*
198:*4*
206:7, *24*
207:*19*
209:*24*
210:*16, 19*
211:*5*
212:*4*
213:*6, 11, 12, 18*  214:22
215:*16*
218:*19*
225:*18, 19*
232:*19*
233:*24*
235:*16*
238:*12*
247:7
251:*14*
267:*5*
276:*18*
305:*1*
311:*20*
312:*1*
317:*23*
318:*5*
343:*6*

358:*6*
378:*2*
427:*15, 16*
428:5  429:8
**testing**
54:*15*  99:*8*
100:*10*
111:*17*
112:*24*
115:*13*
134:*13*
159:*14, 18*
194:6
273:*24*
277:22
281:*2*
288:*24*
390:9
392:*18*
393:*15*
406:*17, 21*
407:*2*
408:9
409:*2, 18*
411:24
412:*10, 16*
414:*4, 5, 11, 19*
**Tests**  8:9
71:7  99:*12, 13, 18*
129:*14, 22*
155:*11*
159:*24*
160:9
163:*10*
165:*24*
170:*12*
171:*14*
173:*21, 22*
174:2, *6*
175:8
179:*23*
183:*4, 13, 19*

185:*11, 13*
187:*9*
188:*5, 11*
189:*15, 17*
190:*3, 15*
191:*14*
194:*17*
196:*17*
239:*8*
279:*19*
288:*5*
311:*22*
387:*6, 20*
390:*4*
407:*18*
**tetrazole**
108:*24*
172:2  290:*1*
**Teva**  4:*7, 13*
**text**  33:*18*
116:*10*
186:7
216:*4, 5*
259:*3*
393:*18*
**Thank**
12:*24*
13:*23*
18:*22*  45:*8,*
*9*  72:*10*
107:*15*
111:*5*
118:*10, 24*
127:*11*
199:22
217:*13, 14*
220:*23*
221:*2*
224:*15*
233:*21*
266:*7, 10*
345:*9*
385:*24*
423:*19*

**Thanks**
365:*6*
**theoretical**
233:*5, 6*
235:*13*
290:*15*
**therapeutic**
340:*16*
403:*3*
404:*5, 14, 22*
405:*17*
**thermal**
141:*21*
155:*13, 23*
156:*12*
**thermo**
109:*4*
141:*16*
**thing**  47:*16*
216:*11*
221:6
235:*10*
309:*16*
352:*11*
425:*4*
426:*17*
**things**  25:*4,*
*10, 14*  41:*17*
67:2  89:*5*
91:*18, 20*
94:*1, 5*
101:*8*
149:*8*
173:*18, 20*
177:*5*
203:*20*
256:*3*
267:*23*
268:*18*
277:*21*
297:*11*
309:*2*
311:*19*
342:*18*

343:*22*
371:*6*
411:*17*
**think**  14:*3*
19:*9, 10*
23:*11*
25:*24*
27:*21, 24*
28:*20*
29:*15, 20*
34:*22*
35:*16, 17*
38:*18*  39:*4*
41:*23*
47:*24*
48:*20*  50:*6*
51:*4*  52:*2,*
*21*  68:*1*
76:*23*  80:*9*
82:*18*
86:*21*
88:*13*
89:*21*
90:*10, 15*
101:*9*
102:*13, 19*
106:*19*
114:*17*
118:*6*
128:*14*
130:*5*
134:*6*
151:*16*
154:*20*
158:22
169:*17*
170:*21*
176:*1*
177:*2*
198:*3, 6*
204:*3*
218:*16, 19*
221:*8*
238:*23*

246:*20*
248:*8, 22*
251:*5*
259:*19*
269:*12*
279:*23*
282:*18*
288:*20*
292:*7*
331:*2*
348:*5*
349:*16*
353:*9, 10*
364:*19*
385:*18*
399:*14*
404:*23*
416:*11*
420:*7*
421:*10*
427:*12*
**thinking**
33:*23*
36:*17*  50:*4*
51:*3*  328:*18*
**thinks**  24:*18*
**third**  49:*4,*
*8*  159:*1*
232:*15*
251:*16*
328:*10*
336:*11*
369:*3*
385:*5*  386:*4*
**thirty**
430:*16*
**thorough**
300:*22*
312:*9*
**thought**
26:*20*
27:*16*
70:*14*
260:*15*

295:*19*
300:*9*
302:*1*
385:22
**Three**  4:*4*
46:*18*
47:*23*
163:*4*
166:*23*
180:*16*
190:*18*
191:*9*
202:*1*
220:*14*
250:2
258:*13*
360:*17*
399:*11, 14*
**threshold**
77:*19, 21*
78:22
79:*22*  81:*8,*
*18, 19*  82:*12,*
*13, 16*  87:*11,*
*19*  88:*7*
89:*2*
311:*14*
318:*13, 21*
321:*16*
322:*2, 15*
333:*19*
334:*3*
342:*9, 12, 13,*
*15*  351:*8, 15,*
*23*  356:*9, 10,*
*17*
**thresholds**
322:*6*
336:*14*
342:*6*
**time**  11:*8,*
*16*  14:*3, 16*
15:*16*  20:*6,*
*12, 17*  28:*12*

Ali Rahman

30:*12*
34:*24*  39:*1*
42:9, 20
51:2  58:*3*
67:*16*  73:*4*
74:*11*
87:*24*  88:*5, 24*  93:*4*
112:*12*
126:22
127:*12*
140:2
142:*23*
154:*10*
157:22
158:*16*
166:2
172:7
184:*15*
198:8
200:*19*
203:*13*
204:7
210:*18*
216:*19*
233:7
237:*21*
244:*10*
246:*11*
249:*10, 11*
256:*11*
274:*23*
279:*18*
284:8
288:6
291:*1*
293:*18*
307:2
330:*23*
334:7
344:*20*
347:*11*
350:2
360:*15, 19*

373:7
385:*23*
393:4
410:*1*
411:*16*
415:6
416:*16, 19*
417:*12, 14*
423:*15*
425:*16, 24*
428:*3*  429:*8*
**times**  24:*4*
25:*18*
32:*23*  33:*1*
47:*13*
49:*12*
149:2
150:*20*
154:*1*
155:2
163:*4*
208:6
225:*17*
267:9
370:*21*
371:*7, 10*
405:*13*
415:*1*
**TIN**  338:*22*
339:*10*
360:*13, 14, 16*  394:*24*
411:*9*
**title**  36:6
342:*1*
**titled**  18:*24*
122:6
123:*3*
129:*21*
182:*5, 24*
308:*3*
336:5
338:*1, 5*
351:*3*

**today**  13:7
88:*10, 24*
90:20
135:*19*
192:7
216:20
223:*17*
248:2, *14*
265:23
311:20
331:9
424:20
425:7  426:4
**Today's**
11:*14*  428:5
**Todd**  11:*12*
**told**  13:*19*
21:*12*
52:*19*  85:9
113:9
138:9
143:*16*
157:4
158:3
208:*19, 21*
237:2, *18*
281:*14*
293:*11*
298:*17*
304:*17*
317:4
343:*14*
363:*14*
397:9
413:20
**tone**  150:*16*
257:3
**top**  18:*21*
110:6
155:9, *10*
222:6
225:*24*
226:*12*
245:9

312:*21*
316:*15*
321:*11, 13*
322:2
332:8, *16*
351:*5, 9*
352:7
**topic**  33:*23*
36:*18*
202:*18*
**topics**
138:*13*
**totality**
273:4
**touch**
312:*15*
316:2
**Tower**  4:*18*
**toxic**
318:*18*
319:*19*
320:*14*
322:8, *13*
323:*12*
324:*21*
366:4
**toxicity**
241:*13*
242:20
**toxicologist**
63:*24*
**toxicology**
336:*21*
**trace**
108:22
109:*3, 21*
116:*18*
123:*10*
125:*17*
175:4
**track**  201:2
**Trade**  4:*18*

**training**
39:*17*
262:*10*
**transcript**
151:6
233:*24*
248:*10*
429:8, *20*
430:*17, 19*

**transcription**
432:4
**transcripts**
267:*11, 14, 17*  270:*17, 20, 23*
**translated**
216:5
**translation**
212:*12, 15*
214:*4, 5, 6, 21*  215:*10*
217:*23*
220:*1*
222:*1, 3*
227:7
245:*23*
**translations**
213:5
236:20
**TRAURIG**
4:*10*
**treated**  77:*4*
**treatment**
223:20
**tree**  320:*22*
321:*14*
352:4  356:6
**trend**  66:*16*
**tri**  289:8
**trial**  11:8
**trials**  165:*12*
**tried**  145:2
313:2  314:2

triethylamine
388:*1*
trolling
93:*14*
trouble
46:*22*
true  234:*19*
378:*15*
379:*24*
381:*9*
truth  13:*6*
380:*3*
429:*5, 6*
truthfully
13:*12*  47:*14*
try  25:*15*
26:*22*  52:*8*
68:*3*  92:*2*
101:*2*
178:*3, 4*
240:*7*
247:*18*
273:*24*
312:*11, 13*
313:*4*
314:*21*
315:*7, 24*
316:*5, 19*
355:*12*
trying
52:*14, 17*
89:*22, 23*
90:*1, 5, 10*
111:*12*
113:*23*
114:*1, 3*
166:*20, 21*
167:*3, 5*
204:*2*
250:*5*
321:*3*
359:*10*

398:*17*
410:*1*  416:*4*
turned
305:*7*
311:*23*
314:*18*
316:*1*
317:*21*
322:*11*
389:*10*
twice  163:*3*
256:*16*
two  27:*11*
34:*7*  35:*1*
43:*22*
46:*17*
55:*11*  56:*2*
63:*23*
96:*16*
104:*11*
130:*9*
132:*3, 10*
134:*11*
136:*3*
141:*14, 15,*
*23*  144:*11*
157:*6*
160:*24*
161:*10, 20*
162:*15*
166:*18*
180:*12*
182:*14*
190:*16*
202:*17*
203:*19*
218:*13*
224:*20*
232:*13, 16*
258:*14*
286:*16*
289:*1*
302:*14*
311:*2*

314:*12*
330:*6*
332:*5*
342:*17*
355:*21*
363:*4, 15*
types  83:*21*
182:*14*
335:*20*
typical
392:*23*
393:*21*
typographica
l  44:*5*

< U >
U.S  71:*4*
260:*9*
261:*24*
264:*10*
407:*15*
ultimately
277:*9, 11*
279:*17*
305:*7*
unanticipate
d  367:*5*
unaware
375:*8*
unchanged
395:*14*
uncharacteri
zed  89:*4*
unclear
29:*1*  102:*19*
undefined
89:*3*
understand
13:*5, 10, 14*
17:*7*  18:*3*
24:*20*
35:*19, 23*
49:*10*  69:*9,*
*14*  72:*1, 7, 9,*

13  90:*2, 5,*
11  91:*4*
93:*23*
96:*10*
100:*21*
101:*9*
104:*2*
121:*12*
133:*1*
137:*4*
138:*15*
139:*5, 15*
140:*16, 19*
141:*2*
150:*18*
158:*12*
163:*21*
169:*13*
174:*13*
178:*4*
184:*9*
189:*14*
190:*10*
198:*17*
200:*7*
212:*1*
214:*22*
215:*22*
216:*7, 11*
217:*19*
230:*3*
231:*15*
240:*6*
242:*2*
247:*24*
271:*15*
272:*1*
304:*10, 12*
315:*5*
324:*18*
334:*4*
362:*16*
382:*21*
404:*10, 12,*

15, *18, 22*
405:*14, 19*
412:*3, 7*
understandin
g  89:*24*
94:*15*
101:*4*
104:*17*
154:*6*
163:*19*
170:*11*
195:*12*
206:*16, 19*
209:*6*
215:*23*
216:*2, 8*
218:*24*
226:*20*
353:*17*
354:*7*
355:*16*
360:*2*
363:*10*
375:*5*
376:*3*
381:*10*
382:*19*
412:*9*
417:*15*
understood
18:*11*
109:*18, 24*
117:*7*
279:*13, 15,*
16  283:*9, 13*
284:*10*
324:*24*
392:*9, 12*
undertaking
380:*12*
undesirable
161:*14*
315:*18*

383:*1*
390:*17*
**undesired**
93:*9*  364:*4*
**unexpected**
319:*19*
320:*15*
323:*13*
343:*10*
**Unfortunatel**
**y**  293:*23*
426:*8*
**unidentified**
319:*24*
392:*22*
393:*20*
394:*18*
**uniform**
259:*13*
**uninvestigate**
**d**  304:*8*
**Union**
129:*20*
**uniqueness**
71:*4*
**unit**  69:*2, 4,*
*12*  98:*16*
100:*7, 18*
262:*4, 9, 16*
263:*5, 20*
**UNITED**
1:*1*  11:*21*
182:*4*
252:*17*
259:*14*
265:*24*
388:*8*  407:*6*
**universe**
35:*13*
136:*15*
**University**
156:*8*
**Unknown**
8:*14*  9:*12*

75:*21*  76:*6,*
*9, 12, 18*
77:*1, 10, 11,*
*18*  78:*3, 5,*
*10*  79:*7, 12,*
*19, 21*  81:*4,*
*7, 22*  82:*2*
88:*19, 20*
89:*3*  126:*5,*
*7*  186:*8, 14,*
*24*  190:*18,*
*19, 20*  191:*2,*
*4, 13, 17*
209:*1*
221:*15*
224:*7, 13*
237:*13*
296:*5*
298:*6, 11, 20*
300:*19*
301:*17*
302:*11, 14,*
*18*  314:*17*
316:*11*
317:*20*
323:*16*
325:*6*
374:*7*
394:*18*
**unknowns**
315:*20*
**unobjectiona**
**ble**  183:*8*
**unstratified**
224:*4*
**unusually**
318:*17*
319:*3, 18*
320:*14*
322:*7, 13*
323:*2, 4, 12*
324:*2*
**unwanted**
185:*24*

**update**
363:*24*
**upstairs**
425:*3*
**upstairs/dow**
**nstairs**
425:*4*
**USD**  63:*6*
**use**  36:*21*
75:*14*
94:*19*
95:*11*
104:*1, 20*
117:*9*
133:*4*
190:*3, 14*
192:*5, 6, 7*
193:*19*
216:*19*
243:*23*
365:*19*
385:*22*
394:*8*
410:*1*
416:*19*
**USP**  75:*18*
120:*4*
124:*24*
174:*5*
182:*9, 11, 12*
184:*13*
186:*18*
187:*13, 21*
188:*17*
189:*6, 17*
192:*4*
387:*1, 5*
388:*10*
390:*12, 15*
391:*17, 21,*
*23*  392:*5, 7,*
*11*  396:*18*
405:*2*
**USP's**  192:*4*

**usually**
376:*24*
**utilize**  187:*8*
**utilizing**
189:*15*

**< V >**
**vague**  23:*12*
27:*5, 22, 24*
29:*16*  30:*1,*
*21, 22*  38:*5*
47:*23*
58:*19, 23*
71:*23*
86:*22*  88:*2*
91:*8*  119:*2*
151:*14*
152:*11*
153:*2*
273:*2*
275:*24*
**validate**
142:*19*
286:*5*
**validated**
284:*21*
**validating**
39:*24*
**validation**
21:*16*  40:*1*
262:*11*
263:*10*
291:*10, 13*
**Valine**
289:*21*
**Valisure**
406:*17*
407:*5, 12, 16*
408:*6*
409:*18*
410:*14*
411:*22, 23*
412:*10, 17,*
*24*  413:*1, 9,*

*20, 23*
418:*11*
**Valisure's**
406:*21*
407:*2*
408:*9*
409:*2*
414:*4, 11, 19*
415:*10, 15*
418:*15*
**VALSARTA**
**N**  1:*4*  8:*18*
11:*19*  14:*1,*
*11, 16*  24:*5*
25:*20*  27:*2*
28:*3*  30:*4*
33:*2, 6*
34:*2*  35:*10*
37:*21*  38:*1*
88:*6*  89:*7*
91:*3*  108:*9*
111:*22*
112:*23*
115:*12*
135:*1*
136:*11*
142:*10*
166:*21, 22*
174:*12, 17*
175:*3*
179:*4*
184:*23*
185:*23*
186:*4*
192:*1, 4, 13,*
*19, 21*
193:*13*
194:*4, 18, 20*
195:*5, 7, 19,*
*23*  196:*12,*
*18*  217:*21*
218:*2, 12, 18*
219:*2, 12, 15,*
*20*  225:*15*

227:*14, 21,
22*  229:*3, 8,
14*  231:*11*
232:*1, 10*
233:*9*
234:*4, 16, 17*
235:*20, 22*
241:*19*
243:*1, 5*
244:*3, 12, 16,
24*  245:*3, 18*
246:*12, 16*
250:*21*
256:*13, 14*
260:*18, 19*
261:*19*
264:*4, 22*
265:*24*
266:*5*
271:*16*
278:*16*
283:*11, 15*
285:*20*
287:*1, 14*
290:*10, 11*
294:*18, 24*
295:*20*
296:*1, 14*
297:*4, 16*
325:*7*
326:*12*
331:*19*
337:*8, 9*
341:*8, 16*
343:*19*
365:*18*
366:*10, 12*
367:*7, 23*
369:*6*
385:*1*
387:*1, 3, 16,
19*  388:*11*
389:*11, 15,
19*  390:*1*

391:*18, 23*
392:*6, 10*
394:*6*
401:*22*
402:*22*
405:*4*
407:*8*
414:*6, 12*
420:*9*
421:*15*
422:*4, 9, 22*
**variance**
73:*13*
**varies**  76:*8*
**variety**
332:*18*
**Various**
46:*9*  101:*8*
155:*12*
167:*5*
170:*5*
262:*22*
327:*3*  351:*8*
**vary**  180:*9*
**vendor**  94:*9,
10, 11*
**vendors**
94:*7, 17*
95:*2*
**verbatim**
429:*8*
**verification**
132:*14*
**verified**
157:*9, 13*
206:*5, 23*
239:*19*
395:*3*
407:*18*
412:*12, 15*
**verifies**
362:*22*

**verify**
165:*13*
175:*7*
**verifying**
363:*5*
**version**
44:*7, 9*
111:*8*
209:*20, 21*
374:*14, 19*
375:*16, 20*
376:*18*
377:*5, 17*
379:*20*
385:*16, 17*
**versus**
99:*18*
136:*14*
**VICINAGE**
1:*2*
**VIDEO**
11:*10, 17*
74:*22*  75:*4*
128:*20*
129:*2*
137:*21*
138:*3*
205:*7, 13*
248:*11*
266:*11, 17*
282:*24*
283:*6*
350:*2, 13, 19*
383:*23*
384:*6*
419:*11, 17*
423:*23*
424:*3, 9*
428:*2*

**videographer**
11:*13*
**Videotape**
1:*13*  19:*2*

**Videotaped**
7:*14*  17:*20*
**violate**
44:*24*
278:*20*
**violated**
272:*20*
274:*2*
275:*17, 22*
277:*21*
379:*24*
380:*3*
381:*13*
**violation**
366:*17*
367:*19*
417:*18*
418:*22*
**violations**
49:*22*
252:*19*
253:*8, 14, 15,
20*  254:*7*
255:*17*
257:*18*
258:*10*
343:*17*
**violative**
259:*6*
**vitae**  46:*1*
**voice**
150:*17*
248:*21*
**vouches**
339:*22*

**< W >**
**wait**  13:*21*
30:*5*  51:*9*
127:*14*
203:*17*
236:*12*
247:*5*
282:*21*

**Videotaped**
303:*4*
378:*16*
409:*22*
**waiting**
181:*11, 12*
256:*19*
**waived**  11:*5*
**walk**  93:*24*
202:*20*
203:*15*
**Wall**  3:*10*
**WALLACK**
5:*9*
**WALSH**  4:*3*
**want**  18:*3*
19:*13*  29:*5*
35:*12*  50:*5,
13, 17, 19*
52:*5, 8, 23*
58:*7*  72:*4,
8*  73:*3*
87:*3*  96:*9*
101:*16*
105:*7*
112:*8*
134:*19*
141:*6*
143:*22*
147:*12*
149:*1*
150:*7, 9*
152:*4, 12*
154:*17*
176:*16*
189:*22*
193:*15*
199:*10*
201:*16, 17*
202:*22*
203:*2, 9, 21*
216:*7, 20*
231:*17*
240:*3*
247:*22*

258:*12*
272:*9*
292:*23*
293:*6, 15, 16*
319:*15*
324:*11*
330:*22*
338:*13*
345:*3, 16*
348:*18, 21,*
*23*  350:*6*
373:*4*
383:*12, 14*
414:*22*
415:*19*
416:*3, 10*
417:*24*
427:*4*
**wanted**
18:*10, 11*
20:*5*  111:*3*
179:*21*
260:*4, 17*
388:*7*
415:*2*  427:*8*
**wanting**
410:*2*
**wants**  205:*2*
259:*13*
264:*21*
265:*23*
302:*24*
346:*7*
**warning**
47:*7, 18, 19*
48:*5, 12*
49:*17, 21*
51:*11, 13, 16,*
*17*  52:*3, 7*
53:*11, 22*
54:*10, 22*
55:*9, 23*
56:*1, 5, 15*
252:*18*

253:*3, 7, 12,*
*15*  254:*6*
255:*6, 9, 12,*
*16, 21, 24*
256:*7, 17*
257:*5, 7, 10,*
*11, 15, 19, 22*
258:*4, 9*
261:*15*
263:*15, 24*
343:*12, 16*
346:*21*
347:*5, 8, 17,*
*24*  364:*17,*
*19*  365:*8*
368:*11*
370:*3, 24*
371:*13, 18,*
*20, 23*
372:*21*
373:*17, 20,*
*22*
**Washington**
3:*20*
**waste**  290:*7*
**wastewater**
223:*21*
**wasting**
204:*7*
293:*18*
350:*1, 4*
**water**
123:*11*
128:*5*  168:*2*
**way**  13:*15*
16:*19*
57:*11*
58:*13, 14*
76:*13*  93:*2,*
*3*  97:*8, 9*
103:*14*
117:*24*
146:*23*
176:*21*

185:*3*
188:*20*
193:*11*
199:*6*
217:*9*
234:*2*
242:*16*
248:*5*
249:*3*
276:*13*
278:*15*
280:*3*
307:*13*
383:*15*
401:*15*
402:*1*
416:*6*
418:*20*
**ways**  332:*18*
**week**  50:*20*
52:*20*
157:*21*
**weeks**
144:*11*
**weight**
207:*18*
209:*3, 5*
224:*23*
**well**  24:*14*
31:*18*  33:*6,*
*19*  40:*21*
41:*18*
48:*24*  55:*4,*
*5*  76:*10*
80:*7*  91:*16*
93:*23*
100:*8, 16*
114:*21*
117:*3*
132:*11*
134:*16*
143:*15*
216:*5*
217:*23*

227:*5*
234:*14*
236:*17*
239:*12*
252:*7*
257:*22*
262:*17*
264:*10*
275:*16*
277:*20*
298:*11*
315:*3*
321:*8*
323:*22*
331:*3*
353:*21*
357:*1*
360:*19*
362:*8*
364:*12*
369:*24*
371:*7*
373:*12*
374:*20*
375:*4*
380:*11*
409:*6*  411:*4*
**went**  59:*21*
64:*22*
187:*4*
209:*11*
263:*16*
292:*4*
360:*13, 14*
361:*11*
382:*8*
387:*4, 11*
390:*3*
395:*14*
400:*11*
425:*2*
**we're**  19:*21*
74:*22*  75:*4*
90:*18*  97:*1*

106:*17*
118:*23*
121:*17*
128:*8, 20*
129:*2*
137:*21*
138:*3*
140:*8*
142:*11*
165:*6*
181:*13*
198:*9*
201:*11*
205:*7, 13*
221:*8*
231:*20*
251:*6*
258:*11, 16*
266:*11, 17*
282:*24*
283:*6*
323:*20*
335:*21*
342:*17*
350:*13, 19*
353:*22*
374:*1*
378:*18*
383:*24*
384:*6, 9*
416:*6*
419:*11, 17*
424:*3, 9*
427:*5*
**West**  3:*16*
4:*18*  5:*4*
**we've**  24:*21*
74:*9*  155:*8*
197:*3*
202:*6*
252:*13*
258:*7, 8*
268:*23*
306:*14*

363:*19*
369:*23*
397:*8*  420:*2*
**whatsoever**
300:*14*
**what-to-do**
98:*14*
**what-to-dos**
26:*12*  31:*1*
32:*5*  37:*9*
**whichever**
276:*13*
**Whoa**  60:*5*
199:*16*
205:*1*  261:*7*
**WILLIAM**
5:*9*
**WILLIAMS**
**ON**  2:*19*
**WILSON**
3:*3*
**wisely**  410:*1*
**withdraw**
129:*6*  318:*1*
**Witness**
10:*5*  12:2,
*11*  14:*6*
19:*17*
20:*19*
23:*19*  24:*9*
26:*1, 2*
27:*6, 19*
29:*10*
31:*12*
32:*20*
33:*12*  39:*6*
42:*12*  45:*9*
48:*8*  49:*2*
50:*4*  51:*10*
52:*19*  54:*6*
55:*15*
57:*10*  59:*9*
60:*12*  62:*2*
63:*22*

65:*20*  68:*1,*
*21*  69:*18*
70:*17*
71:*24*
72:*16*  73:*6*
74:*18*
75:*13*
76:*17*  77:*8*
78:*2*  79:*3*
80:7, *12, 15*
81:*13*  83:*7*
84:*17*  85:*3,*
*4, 11, 17*
86:*2*  87:*5*
89:*20*
90:*20*  91:*9*
97:*8*  98:*12*
100:*3*
101:*22*
102:*21*
104:*23*
105:*15*
106:*10*
107:*24*
110:*3*
111:2, *5*
112:*14*
113:*16*
114:*18*
117:*12*
120:*23*
124:7, *19*
126:*1, 23*
127:*16, 21,*
*22*  128:*6*
133:*15*
137:*9*
139:*20*
140:*22*
143:*11*
145:8, *16*
147:*20*
148:*14, 15*
149:*3*

150:*2, 5*
151:*17*
152:*15, 18*
153:*3*
154:*11, 14,*
*16, 17*  156:*6*
158:*21*
160:*8*
161:*18*
162:*4, 10*
163:*2*
164:*2, 3*
166:*8*
167:*15*
169:*20, 22*
170:*23*
174:*2, 16*
176:*9*
178:*22*
187:*13*
188:*15*
192:*3*
193:*18*
194:*22*
196:*1*
197:*5*
198:*20*
199:*20*
202:*3*
203:*16*
204:*18*
205:*24*
206:*22*
207:*8*
210:*10, 24*
211:*10*
212:*8*
213:*9*
214:*3*
215:*3*
217:*8, 9, 10,*
*12*  218:*22*
219:*5*
223:5, *12*

226:*5, 23*
228:*4*
230:*11*
231:*3*
232:*13*
233:*14*
234:9, *24*
236:*6, 24*
238:*17*
245:*10, 24*
248:*2, 6, 24*
249:*3, 11*
250:*13*
255:*9*
258:*23*
261:*1, 9*
265:*7*
266:*4, 10*
267:*20*
268:*14*
273:*3*
274:*4*
276:*1*
277:*24*
278:*22*
280:*2*
282:*20*
283:*22*
287:*12*
288:*12, 17*
295:*2*
296:*19*
297:*21*
299:*10*
300:*13*
301:*9*
302:6, *20, 24*
305:2, *14*
306:*24*
309:*20*
310:*16*
312:*20*
313:7, *10, 15*
314:*24*

315:*10*
316:*9*
317:*2*
319:*7*
322:*21*
324:*17*
326:*14, 23*
327:*12, 23*
330:*19*
331:*10*
332:*11*
334:*6*
336:*2*
338:*18*
341:*10*
342:*11*
343:*23*
344:*15, 18,*
*23, 24*  345:*1,*
*21*  346:*16,*
*20*  348:*15*
350:*11*
352:*18*
353:*9*
354:*16*
358:*12*
359:*15*
364:*22*
369:*20*
371:*23*
373:*13*
376:*13*
377:*15*
378:*7*
379:*4, 14*
388:*7, 24*
389:*17*
390:*14*
391:5, *9*
394:*15*
395:*24*
396:*9*
398:*24*
399:*4, 10*

400:*23*
401:*20*
403:*12*
404:*21*
405:*21*
408:*15*
409:*12*
410:*7*
411:*13*
414:*14*
415:*9*
417:*22*
418:*9*
419:*2*
420:*23*
421:*23*
422:*24*
427:*20*
430:*1*
**witnesses**
44:*21*
50:*20*  51:*1*
85:*10*
231:*22*
236:*19*
248:*16*
344:*9*
**witness's**
32:*18*  89:*24*
**Wmurtha@h**
**illwallack.co**
**m**  5:*11*
**word**  60:*16*
75:*14*
130:*10*
141:*5*
172:*18*
188:*3*
191:*12*
193:*19*
206:*3*
322:*2*
360:*6*
403:*19*

**words**
131:*3*
141:*1*
187:*18*
188:*2, 9, 12*
271:*21*
367:*24*
370:*7, 9*
**work**  16:*9,*
*15*  17:*8*
44:*10, 13, 22*
45:*7*  46:*11,*
*16, 18*  49:*4,*
*9, 12*  97:*9,*
*10*  102:*22*
114:*19*
132:*12*
285:*5*
300:*16*
380:*8*
382:*4*
426:*22*
**worked**
63:*15*  64:*4*
**working**
44:*14*  83:*8,*
*9*  222:*13*
327:*2*
420:*17*
426:*18*
**works**
57:*12*  324:*7*
**workshop**
161:*11*
**world**  73:*18*
122:*3*
123:*23*
202:*24*
227:*20*
**worthwhile**
280:*3*
**Wow**  80:*1, 3*
**write**  114:*2*
182:*17, 18*

**writes**
103:*19*
182:*14*
**writing**
114:*5*
122:*23*
325:*3*
427:*17*
**written**
31:*20*
41:*21*
111:*20*
213:*3, 23*
214:*24*
215:*6, 15*
262:*8*
366:*24*
376:*21*
379:*23*
380:*5*
**wrong**
60:*16*
240:*24*
**wrote**  21:*23*
42:*6*  43:*13*
113:*14*
114:*7*
123:*18, 22*
124:*4, 10, 16*
167:*11*
175:*15, 18*
369:*18*
375:*23*
377:*7*

**< X >**
**Xue**  156:*6*
157:*6*
171:*5*
176:*5*
205:*17, 20*
206:*11, 18*
207:*4*
213:*18*

215:*18*
218:*4*
231:*6*
246:2
271:*23*
272:*14*
357:*16*
411:*5, 7, 14*
418:*17*
**Xue's**  157:*4*
216:*1*
273:*13*
358:*16*
359:*5*
410:*23*
411:*1*

**< Y >**
**yeah**  49:*16*
139:*9*
140:*5*
164:*22*
181:*24*
204:*20*
305:*14*
364:*20*
365:*1*
**year**  16:*21*
17:*3*  54:*24*
55:*10, 17*
99:*9*
**years**  45:*21*
57:*10*
132:*10*
134:*11*
136:*3*
160:*24*
161:*10, 20*
162:*15*
237:*2*
258:*13, 14*
286:*16*
289:*1*

314:*13*
360:*17*
**yell**  73:*3*
**yelling**
150:*15*
248:22
**Yep**  149:*3*
307:*18*
322:*4*
**yes-or-no**
27:*8*  112:*7,*
*13, 16*  113:*6*
154:*18, 19,*
*22, 23*  178:*6*
188:*22*
193:*14*
240:*19*
265:*5, 8*
292:*15*
295:*3*
305:*15*
324:*10*
417:*24*
418:*2*
**yield**  64:*20*
66:*14*
67:*22*
156:*3*
158:*17*
365:*22*
**yielded**  97:*6*
**yields**  290:*4*
**York**  3:*10,*
*16, 20*

**< Z >**
**ZALMAN**
2:*11*
**zero**  168:*3*
**Zhejiang**
3:*22*
243:*21*
244:*11*

Alzafhan

**ZHP**  14:*1,*
*12*  23:*4*
24:*3*  25:*5,*
*17*  26:*7, 13,*
*24*  28:*1*
30:2  32:*11*
33:*1, 2, 8*
34:*1, 5*
35:*19, 21*
37:*13, 18, 20*
38:*19*
40:*15*  47:*1*
49:*17*  56:6
78:20  88:*5*
89:5  90:*19,*
*24*  91:2
93:*21*  98:*5,*
*13*  99:22
100:*4, 9*
103:*12, 23*
104:*7, 18, 23*
105:*5, 15*
107:8
109:*19*
111:*11*
113:22
115:*3*
117:7, *21*
119:*12, 16,*
*18, 19, 20, 23*
120:*1, 19, 24*
125:9, *14*
126:*1*
131:7, *12, 22*
132:*8, 24*
133:*5, 15*
134:9, *20*
135:24
136:*3, 4, 6,*
*10, 22*
138:*14, 16*
139:6, *17*
142:*1, 5, 7,*
*14*  143:3

146:5, *9, 10*
147:5, *10, 20*
148:2, *4, 15,*
*19*  149:*12,*
*17, 18*  151:9,
*23*  152:*3, 20*
153:*3, 10, 13,*
*24*  158:15
159:*6, 12, 23*
161:7, *20*
162:*10, 17,*
*23*  163:5, *14*
165:24
170:6
171:*15, 24*
172:*13*
173:*21*
178:9
179:*3, 21*
180:*8, 24*
181:*1, 2*
184:*21*
185:23
188:*1*
189:*12*
194:*16*
195:*3, 15, 21*
196:*10, 17,*
*22*  197:*18*
199:*7, 13*
201:*18*
204:*12, 24*
210:2
212:*13*
229:*13*
232:9
233:8
234:*20, 24*
235:*1, 19*
236:6
238:*3*
242:*2, 5*
243:*10*
252:*13*

253:*3*
254:*5, 23*
256:*5, 9, 21,*
*23*  258:*1, 2,*
*15*  259:22
260:*7, 17*
262:*3*
263:*20*
264:*3, 21*
265:*10, 22*
266:*4*
271:*15*
272:*11, 15,*
*19*  273:*19*
275:9, *16*
276:*21*
277:*3, 5*
278:*9, 11, 23*
279:*19*
280:*6, 23*
282:*12*
283:*9, 13*
284:*4*
285:*13, 23*
286:22
287:*13*
288:*23*
289:*4*
294:*16*
295:*14, 18,*
*23*  296:*2, 3,*
*5, 13, 16*
297:*15, 22*
298:*15, 19*
299:*2, 5, 12*
300:*2, 6, 18*
301:*2, 9, 16,*
*23*  302:*1, 10*
304:*19*
305:5
309:*2, 17*
311:*21*
312:*8, 10*
313:*3*

314:*1, 12, 16*
315:23
316:*12, 17*
317:9
322:*10*
323:5
324:*20, 21,*
*23, 24*  325:*3*
326:*9, 15*
329:*10*
331:*21*
332:*5*
334:8
337:6
339:*20*
341:*3, 10, 14*
342:*21, 23,*
*24*  343:*2, 13,*
*17*  346:*20*
347:*6, 10, 24*
354:*19, 23*
355:*14, 17*
356:*2, 24*
357:*3, 8, 13*
359:*2*
360:*8*
361:*8, 23*
362:*1, 13*
363:*1, 6, 10*
367:*19*
368:*12, 13,*
*20, 23*  370:*2,*
*4, 13*  371:*3*
372:*8, 16, 22*
373:*14*
375:*23*
378:*16*
379:*6, 24*
386:*14*
387:*21*
388:7
391:*23*
393:*12*
394:*3, 4, 19,*

22  395:*18*
396:9
398:*5, 9*
399:*17, 21,*
*23*  400:*12,*
*17*  401:*2, 3,*
*20*  417:*14*
420:*5, 9*
421:*20*
423:2
**ZHP0019057**
**3-0574**  8:*11*
221:*12*
**ZHP0066228**
**3-2309**  9:*10*
374:6
**ZHP0172134**
**8**  9:*17*
419:*21*
**ZHP's**  35:*9*
40:6  192:*1*
244:*12, 23*
246:*12*
252:*16*
275:*13*
296:*1*
329:*16, 24*
331:*15*
338:*21, 23*
359:*21*
384:24
**zinc**  100:*1*
104:*2, 20*
105:6
108:*10*
109:*20*
114:*11*
115:*18*
117:9
119:*14*
125:*20*
131:*8, 24*
132:9
133:*4*

A - Nathan

| | | | | |
|---|---|---|---|---|
| 136:2 | **ZMICK** 5:3 | | | |
| 137:15 | **Zoom** 1:14 | | | |
| 142:11 | | | | |
| 143:7 | | | | |
| 146:8 | | | | |
| 147:9 | | | | |
| 152:1, 23 | | | | |
| 153:6 | | | | |
| 158:18 | | | | |
| 160:2 | | | | |
| 161:8 | | | | |
| 162:19 | | | | |
| 163:18 | | | | |
| 166:2 | | | | |
| 172:4 | | | | |
| 180:1 | | | | |
| 184:21 | | | | |
| 185:6 | | | | |
| 196:24 | | | | |
| 199:10 | | | | |
| 201:21 | | | | |
| 204:14 | | | | |
| 229:8, 23 | | | | |
| 230:6, 21 | | | | |
| 232:2 | | | | |
| 240:14 | | | | |
| 260:19 | | | | |
| 264:13, 20, 23  266:1 | | | | |
| 273:22 | | | | |
| 277:7 | | | | |
| 283:17 | | | | |
| 287:2 | | | | |
| 289:3, 6, 24 | | | | |
| 291:7 | | | | |
| 337:4 | | | | |
| 339:2, 11 | | | | |
| 360:14, 16 | | | | |
| 395:15 | | | | |
| 425:9 | | | | |
| **zkass@river omestre.com** 2:14 | | | | |