# Exhibit 11

Confidential Information - Subject to Protective Order

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
2                   CAMDEN VICINAGE

3

    ****************************
4   IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
    AND IRBESARTAN PRODUCTS
5   LIABILITY LITIGATION          Civil No.
                                  19-2875
6   ****************************  (RBK/JS)

    THIS DOCUMENT APPLIES TO ALL
7   CASES                         HON ROBERT B.
                                  KUGLER
8   ****************************
9           - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER
10

11

12          Remote Videotaped via Zoom
13  Deposition of JUCAI GE, held at the location
14  of the deponent, commencing at 7:04 a.m.
15  China Standard Time, on the 26th of May,
16  2022, before Maureen O'Connor Pollard,
17  Registered Diplomate Reporter, Realtime
18  Systems Administrator, Certified Shorthand
19  Reporter.
20

21                    - - -
22

          GOLKOW LITIGATION SERVICES
23              877.370.DEPS
             deps@golkow.com
24

Page 2

REMOTE APPEARANCES:

MAZIE SLATER KATZ & FREEMAN, LLC
BY: ADAM M. SLATER, ESQ.
BY: CHRISTOPHER J. GEDDIS, ESQ.
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-228-9898
aslater@mazieslater.com
cgeddis@mazieslater.com
Representing the Plaintiffs

MEYER WILSON CO., LPA
BY: LAYNE HILTON, ESQ.
900 Camp Street, Suite 337
New Orleans, Louisiana 70130
614-255-2697
lhilton@meyerwilson.com
Representing the Plaintiffs

HOLLIS LAW FIRM
BY: IRIS SIMPSON, ESQ.
8101 College Blvd., Suite 260
Overland Park, Kansas 66210
800-701-3672
iris@hollislawfirm.com
Representing the Plaintiffs

FARR LAW FIRM
BY: GEORGE T. WILLIAMSON, ESQ.
99 Nesbit Street
Punta Gorda, Florida 33950
941-639-1158
gwilliamson@farr.com
Representing the Plaintiffs

Page 3

REMOTE APPEARANCES (Continued):

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
BY: RICHARD T. BERNARDO, ESQ.
BY: ALLISON M. BROWN, ESQ.
One Manhattan West
New York, New York 10001-8602
212-735-3453
richard.bernardo@skadden.com
allison.brown@skadden.com
Representing the Defendants Zhejiang
Huahai Pharmaceutical Co., Ltd.,
Prinston Pharmaceutical Inc., Huahai
U.S., Inc., and Solco Healthcare US,
LLC

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
BY: CATHERINE I. MULLALEY, ESQ.
500 Boylston Street
Boston, Massachusetts 02116
617-573-4851
kate.mullaley@skadden.com
Representing the Defendants Zhejiang
Huahai Pharmaceutical Co., Ltd.,
Prinston Pharmaceutical Inc., Huahai
U.S., Inc., and Solco Healthcare US,
LLC

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: FRANK H. STOY, ESQ.
One Oxford Centre
Pittsburgh, Pennsylvania 15219
412-263-1840
fhs@pietragallo.com
Representing the Defendant, Mylan
Pharmaceuticals, Inc.

Page 4

REMOTE APPEARANCES (Continued):

BARNES & THORNBURG, LLP
BY: KARA KAPKE, ESQ.
11 S. Meridian Street
Indianapolis, Indiana 46204
317-231-6491
kara.kapke@btlaw.com
Representing the Defendants CVS
Pharmacy, Inc., and Rite Aid
Corporation

GREENBERG TRAURIG, LLP
BY: STEVEN M. HARKINS, ESQ.
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
678-553-2100
harkinss@gtlaw.com
Representing the Defendants Teva
Pharmaceutical Industries, Ltd., Teva
Pharmaceuticals SA, Inc., Actavis LLC,
and Actavis Pharma, Inc.

Interpreter: Dr. Yang Shao
Check Interpreter: Phil Hughes

Also Present:

Stephanie Martin, Legal Assistant, Skadden

Paget Houston, Summer Associate, Skadden
Klara Bieniasz, Summer Associate, Skadden

Videographer: Judy Diaz

Page 5

INDEX

EXAMINATION                    PAGE
JUCAI GE
BY MR. SLATER                   9

E X H I B I T S
NO.        DESCRIPTION         PAGE
ZHP-456A    Second Amended Notice to
            Take Videotaped Oral
            Deposition................  10
ZHP-456B    Chinese version of Second
            Amended Notice to Take
            Videotaped Oral
            Deposition.................  10

ZHP-295     Previously marked.
            Chinese version of
            ZHP-296...................  78

ZHP-296     Previously marked.
            Notice on the Results of
            the Report of the
            Preliminary Investigation
            on the Formation of
            Unknown Impurities
            Resulting from the Sodium
            Azide Quenching in Crude
            Irbesartan, Batches
            ZHP00190573 and 190574.....  78
ZHP-431     Previously marked.
            Chinese version of
            PowerPoint................  73

Page 6

ZHP-432    Previously marked.
     PowerPoint, Advanced
     analytical Technology
     Center (CEmat)
     Introduction...............    73

ZHP-213A    Previously marked.
     November 29, 2018 FDA
     warning letter.............    26

ZHP-213B    Previously marked.
     Chinese version of FDA
     warning letter.............    26

ZHP-458A    Binder of documents........    17

ZHP- 458B   Chinese version of Binder
     of Documents...............    17

Page 7

- - -

### DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE  LINE

   19    22

Request for Production of Documents
PAGE  LINE
None.

Stipulations
PAGE  LINE
None.

Questions Marked Highly Confidential
PAGE  LINE
None.

Page 8

PROCEEDINGS

THE VIDEOGRAPHER:  We are now on the record.

My name is Judy Diaz.  I'm the legal videographer for Golkow Litigation Services.

Today's date is May 26, 2022, and the time is 7:04 a.m.

This remote video deposition is being held in the matter of Valsartan, Losartan, and Irbesartan Products Liability Litigation MDL, for the United States District Court, District of New Jersey.

The deponent is Jucai Ge.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

All counsel will be noted on the stenographic record.

The court reporter is Maureen Pollard, and will now swear in the

Page 9

interpreter and the witness.

_ _ _

YANG SHAO, Interpreter, having been duly remotely sworn to translate the questions and answers to the best of his ability, translated as follows:

_ _ _

JUCAI GE, having been duly remotely identified and sworn, was examined and testified as follows through the interpreter:

EXAMINATION

BY MR. SLATER:

Q.    Good evening.

A.    Good evening.

Q.    I guess it's good morning for you.

A.    That's correct.  It is morning here.

Q.    We're going to take your deposition now.  You know that, right?

A.    I understand that.

Also, I'd like to express my appreciation to Adam for postponing this

Confidential Information - Subject to Protective Order

Page 10

1  deposition by a month.  Originally I was
2  supposed to be quarantined for a month.  So
3  thank you for your understanding.
4      Q.    You're welcome.  I've never
5  been thanked by a witness before.  This is
6  the best night of my life.
7      A.    Thank you.
8      Q.    I hope that you'll thank me at
9  the end also.
10      A.    I hope so, too.  I will do my
11  best to work with you.
12      Q.    You understand as you just --
13  rephrase.
14          You just took an oath to tell
15  the truth.  You understand you must be
16  truthful in answering all questions in this
17  deposition, correct?
18      A.    That is correct.  That is for
19  sure.
20          MR. SLATER:  Chris, let's put
21      up the deposition notice, please.
22          (Whereupon, ZHP Exhibit Numbers
23      456A and 456B were marked for
24      identification.)

Page 11

1  BY MR. SLATER:
2      Q.    This is the deposition notice
3  for today's deposition.
4          Have you seen this document?
5      A.    Yes, I've seen it before.
6          MR. SLATER:  Let's go to
7      Exhibit Number 2, the response to the
8      deposition notice.
9  BY MR. SLATER:
10      Q.    Have you seen this document,
11  the response to the deposition notice?
12      A.    I've also seen this before.
13          MR. SLATER:  We can take that
14      down.
15          MR. GEDDIS:  Adam, just for the
16      record, it's -- Exhibit 456A is the
17      English dep notice; 456B is the
18      Chinese translation, and then
19      obviously so on for the next document.
20          MR. SLATER:  Okay.  So the
21      second exhibit is 457A and 457B?
22          MR. GEDDIS:  Yes.
23          MR. BERNARDO:  Oh, I'm sorry.
24      So the system is that each English

Page 12

1  version is the A and each Chinese
2  version is the B, and they get the
3  same number?
4          MR. GEDDIS:  Yeah, that's what
5      we've been doing in the past.
6          MR. BERNARDO:  Thank you.
7  BY MR. SLATER:
8      Q.    Did you prepare to testify in
9  this deposition?
10      A.    That is correct.  I've done a
11  lot of work in preparation for today's
12  deposition in order to answer the related
13  questions.
14      Q.    Can you estimate how much time
15  you spent preparing?
16      A.    It was sometime in March that I
17  received the deposition notice that I would
18  testify as the representative of the company
19  on certain topics, so I spent a lot of time
20  to be familiar with all those topics.
21          And also I would communicate
22  with people and review related documents.
23  Every day I would spend from six to ten hours
24  doing that, except for the two days I spent

Page 13

1  on my way here.
2          Therefore, every day I have
3  been spending six to ten hours a day to be
4  familiar with the topics and to communicate
5  with people.
6      Q.    And that is since March, when
7  you first were told about the deposition?
8      A.    Essentially, yes.
9      Q.    Do you know what day in March
10  that was, approximately or exactly?
11      A.    I do not recall the exact date.
12  All I can recall is that it was sometime
13  before the Chinese Memorial Day.  After that,
14  I've been very busy reviewing the documents
15  and communicating with people.
16      Q.    What day is Chinese Memorial
17  Day?
18      A.    April 5th.
19      Q.    We were advised that you
20  interviewed a number of people to help you
21  prepare, is that correct?
22      A.    I don't quite get your
23  question.  However, once I was notified that
24  I would represent the company to attend this

Page 14

1  deposition, I first approached my attorney or
2  attorneys to have a better understanding of
3  the topics.  Then I approached related people
4  and communicated with them, and I also
5  reviewed the related documents.
6      Q.    As part of your preparation,
7  did you speak with Min Li?  Yes or no.
8      A.    Yes, I did.
9      Q.    As part of your preparation,
10 did you speak with Jinsheng Lin?
11     A.    Yes, I did.
12     Q.    As part of your preparation,
13 did you speak with Peng Dong?
14     A.    Yes, I did.
15     Q.    As part of your preparation,
16 did you speak with Linda Lin?
17     A.    Yes, I did.
18     Q.    As part of your preparation,
19 did you speak with Hai Wang?
20     A.    Yes, I did.
21     Q.    As part of your preparation,
22 did you speak with Lewis Chodosh?
23     A.    Yes, I did.
24     Q.    Did you speak with anybody else

Page 15

1  to help you prepare for this deposition?
2          MR. BERNARDO:  Object to the
3      form of the question.
4          THE WITNESS:  Are you referring
5      to the preparation for this deposition
6      in general without being specific for
7      any topic?
8  BY MR. SLATER:
9      Q.    I don't understand your
10 question.
11     A.    As for the people you just
12 mentioned, I mainly communicate with them.
13     Q.    Is there anybody else that you
14 spoke with to help you prepare to testify in
15 this deposition?
16     A.    When it comes to issues like
17 English, I did communicate with people from
18 the QA department.
19         I also communicated with people
20 such as Wei Cheng, spelled as W-E-I, last
21 name C-H-E-N-G, on topics like responses.
22     Q.    When you say you spoke with
23 people in the QA department regarding
24 English, what do you mean by that?

Page 16

1      A.    Because I'm poor in English,
2  and many documents, on the other hand, are in
3  English.  So I approached the people in the
4  QA department and asked them to help me
5  translate.  They had to help me find related
6  documents and then do the translation.  That
7  is because, indeed, my English is really
8  poor.
9      Q.    When did you speak to Lewis
10 Chodosh?
11         Let me reask the question.
12 When did you speak with Lewis Chodosh?
13     A.    I don't recall the exact time.
14 However, since he is based in the US, we were
15 scheduled to have a meeting on a certain
16 evening.
17     Q.    Why did you speak to Lewis
18 Chodosh?
19     A.    That was because I read a
20 report of the impact of NDMA or NDEA on
21 health written by Dr. Chodosh, so I wanted to
22 communicate with him regarding that report.
23         MR. SLATER:  Chris, let's mark
24     the -- put up the binder, and you can

Page 17

1  let us know what exhibit number it is.
2          MR. GEDDIS:  It's Exhibit 458.
3  I'll open it in one second.
4          (Whereupon, Exhibit Numbers
5      ZHP-458A and ZHP- 458B were marked for
6      identification.)
7          MR. GEDDIS:  Do you want it in
8  Chinese or English on the screen?
9          MR. SLATER:  You know, I just
10 really want the first page, just so we
11 can identify it.  The English is fine.
12 BY MR. SLATER:
13     Q.    This is Exhibit 458A, and it's
14 the table of contents for a binder we were
15 provided.
16         Is that a binder that you
17 reviewed?
18     A.    Not only did I review all the
19 documents listed here; I also reviewed other
20 documents, simply because these documents are
21 quite related to this case.  I list those
22 documents here.
23     Q.    Did you compile the binder
24 yourself?

Confidential Information Subject to Protective Order

Page 18

1    A.    I compiled the Chinese version
2  of the documents, and I got help for the
3  translation for the English version, because
4  I did not do the translation myself.  I only
5  compiled the Chinese version of the
6  documents.
7    Q.    Item 3 is the Chodosh report
8  and supplement.  Did you have that in your
9  possession, or did somebody give that to you?
10   A.    I don't quite understand your
11 question.  Can you be more specific?
12   Q.    Who gave you the Chodosh report
13 and supplement?
14   A.    Oh, now I understand your
15 question.
16          That was during the discussion
17 of the topics.  My attorney or attorneys
18 mentioned the evaluation report by
19 Dr. Chodosh; therefore, I asked my attorney
20 or attorneys to arrange for the delivery of
21 such report to me.
22   Q.    Item 4 is the Bottorff report.
23 Why did you read that?
24   A.    Likewise, during the

Page 19

1  discussion, the attorneys not only mentioned
2  the report by Dr. Chodosh, but also this
3  report.  I, therefore, wanted to find out
4  what is in such a report.  Therefore, I asked
5  the attorneys to have that report delivered
6  to me.
7    Q.    Item 5 is the Wang report.  Why
8  did you read that?
9    A.    The reason why I reviewed the
10 Wang report was because during my
11 communication with Min Li, spelled as M-I-N,
12 last name L-I, he mentioned that Dr. Wang at
13 the early stage did a preliminary
14 investigation and generated a report.
15          I also wanted to find out the
16 content of this report.  Likewise, I asked my
17 attorneys to have that report delivered to
18 me.
19   Q.    Were you told anything about a
20 toxicologist named Janice Britt?
21          MR. BERNARDO:  Object to the
22    form of the question, and direct the
23    witness not to answer to the extent
24    that she was told anything by counsel.

Page 20

1    But otherwise you can answer.
2          MR. SLATER:  Let me ask it
3    differently.  New question.
4  BY MR. SLATER:
5    Q.    In your preparation, did you
6  learn of the existence of a toxicologist
7  named Janice Britt?
8    A.    No, I didn't.
9    Q.    During your preparation, were
10 you made aware of someone named Dipak
11 Panigrahy?
12          MR. BERNARDO:  Object to the
13    form of the question.  Same objection.
14    Adam, you refer to last name
15    with the rephraseology.
16 BY MR. SLATER:
17   Q.    As part of your preparation,
18 did you learn of the existence of a doctor
19 named Dipak, D-I-P-A-K, Panigrahy,
20 P-A-N-I-G-R-A-H-Y?
21   A.    I don't know of this person.
22   Q.    During your preparation, did
23 you become aware of the existence of
24 Dr. Stephen Lagana?

Page 21

1    A.    Not for this person.  I don't
2  know of this person.
3    Q.    During your preparation, did
4  you become aware of the existence of
5  Dr. Steven Hecht?
6    A.    No, I never saw this name
7  before.
8    Q.    During your preparation, did
9  you become aware of the existence of
10 Dr. Etminan?
11   A.    I don't believe I know this
12 person.
13          As for all the people you just
14 mentioned, since they all bear the English
15 names, even had I seen those names in my
16 review of the documents, I would have skipped
17 those names; therefore, I would not have any
18 recollection of those names.  I don't know
19 any of them.
20   Q.    During your preparation, did
21 you become aware of the existence of
22 Dr. Madigan?
23   A.    Seems like I don't have any
24 impression.

Confidential Information - Subject to Protective Order

Page 22

1    Q.    As part of your preparation,
2  did you read the transcripts of the
3  depositions of Min Li, Peng Dong, Linda Lin,
4  or Hai Wang?
5    A.    Only excerpts.  Only a very
6  short excerpt.  I didn't read much.
7    Q.    Did you ever read your own
8  deposition transcript?
9    A.    Yes, I did.
10    Q.    Did you take notes when you
11  prepared for this deposition?
12    A.    No, I didn't take any notes.
13    Q.    Do you know what excerpts you
14  looked at from the depositions of Min Li,
15  Peng Dong, Linda Lin, and Hai Wang?
16    A.    I don't recall, because the
17  excerpt was quite short and didn't say much.
18  And I took a quick look and didn't find any
19  issue, so I do not recall what it said.
20    Q.    Did you select the excerpts to
21  review, or did somebody else select the
22  excerpts for you?
23    A.    Likewise, it was during the
24  discussion on the topics, the attorneys

Page 23

1  mentioned those transcripts that might be
2  relating to those topics, so I asked the
3  attorneys to provide some excerpts for me to
4  review.
5    However, since those excerpts
6  are in English, and I don't read English, the
7  workload to translate those excerpts was too
8  high, so I only read a small portion of those
9  excerpts, maybe a part of Peng Dong's
10  deposition transcript, and I didn't find that
11  very useful.
12    Instead, I found that oral
13  communication with those people would be more
14  helpful and would give me more information;
15  therefore, I didn't read much of those
16  excerpts.
17    Q.    Did somebody translate the
18  excerpts that you did read?
19    A.    That is correct.
20    Q.    Who?
21    A.    For some of those, as I just
22  stated in my prior testimony, I asked a
23  person called Wei Cheng, W-E-I, last name
24  C-H-E-N-G, from the QA department to help me.

Page 24

1    Q.    Item 6 on this list is 1978
2  IARC monograph excerpts.  Is that 1978 IARC
3  monograph found in the files of ZHP?
4    A.    I don't quite get your
5  question.  However, likewise, I received this
6  document through my attorneys, and I also got
7  help for the Chinese translation.
8    The original monograph was a
9  thick book in English, so I only had the
10  excerpt, the comment part, translated into
11  Chinese for me to review.
12    Q.    Item 8 is Gomm, G-O-M-M, et al.
13  It's a medical article.
14    Did you read that?
15    A.    Yes, I did.
16    Q.    Why?
17    A.    That was because this article
18  also commented on the impact of NDMA in
19  valsartan on health.  That's why I asked them
20  to provide this document to me for review.
21    Q.    When you say it commented on
22  the impact of NDMA on health, did that
23  include the statistically significant finding
24  of a causal relationship between the NDMA in

Page 25

1  the valsartan pills and liver cancer?
2    MR. BERNARDO:  Object to the
3  form of the question.
4    THE WITNESS:  I did review the
5  content, and also reviewed the
6  conclusion.
7    As for the specifics, you had
8  better just show it to me so that we
9  can have a better discussion.
10    However, I do have some
11  recollection, even though the
12  recollection is not quite clear.
13    I did remember that in
14  conclusion, the risk that NDMA caused
15  to human health was not existing.
16    At the end of the article, it
17  did mention and list certain issues
18  and listed out some factors of
19  uncertainty, but as the conclusion,
20  the article did say that NDMA did not
21  cause any risk to human health.
22    If you want to have a detailed
23  discussion regarding the content, we'd
24  better just take a look at this

1  article.
2  BY MR. SLATER:
3      Q.    That was your understanding of
4  the conclusion of the article, what you just
5  told me?
6      A.    Well, that is correct.
7      Q.    You're not a toxicologist,
8  right?
9      A.    That is correct.  I am not.
10     MR. SLATER:  All right.  Chris,
11  let's put up the FDA warning letter
12  previously marked as Exhibit 213.
13         (Whereupon, Exhibit Number
14  ZHP-213A and ZHP-213B were previously
15  marked for identification.)
16         THE WITNESS:  I see it.
17  BY MR. SLATER:
18     Q.    Halfway down the first page is
19  a paragraph that says -- rephrase.  I'm going
20  to start over.
21         The third paragraph of the FDA
22  warning letter says -- rephrase.  I'm going
23  to ask it again.
24         The third paragraph states,

1  "Because your methods, facilities, or
2  controls for manufacturing, processing,
3  packing, or holding do not conform to CGMP,
4  your API are adulterated within the meaning
5  of section 501(a)(2)(B) of the Federal Food,
6  Drug, and Cosmetic Act, 21 U.S.C.,
7  351(a)(2)(B)."
8         Do you understand what
9  "adulterated" means?
10         MR. BERNARDO:  Object to the.
11         THE WITNESS:  Dr. Shao, I quite
12  understand -- I don't quite get the
13  Chinese translation of this paragraph.
14         INTERPRETER SHAO:  The
15  interpreter would like to repeat the
16  rendition.
17         MR. SLATER:  Okay.
18         THE WITNESS:  Maybe something
19  is lost in the Chinese translation, so
20  I still don't quite get the
21  translation of this paragraph.
22         However, with this paragraph, I
23  still have the recollection of FDA's
24  conclusion, and I also understand what

1  "adulterated" means.
2  BY MR. SLATER:
3      Q.    What does "adulterated" mean?
4      A.    In terms of the meaning of
5  being adulterated with the aforementioned
6  501(a)(2)(B), there was a definition for the
7  meaning.
8      Q.    You said you understand what
9  "adulterated" means.  Tell me your
10  understanding of the definition.
11     A.    As for the understanding of the
12  word "adulterated," I understand its meaning.
13  It's actually a terminology only used by FDA.
14  Typically we as enterprises do not use this
15  term.
16         If you want an exact definition
17  of this term, then you have to resort to
18  Section 501(a)(2)(B).
19         But I understand what it means.
20  That means that in our manufacturing process,
21  our methods, facilities, and controls did not
22  conform to the cGMP.  That's what it means.
23         However, this term also has a
24  time limit, and only FDA defines this term.

1         I'm sorry, Dr. Shao.  Maybe I
2  didn't make myself very clear.  What I said
3  was, only FDA would use this term in their
4  conclusion, and they also use such terms for
5  their FDA approvals.
6      Q.    You don't work in the
7  regulatory department, do you?
8      A.    That is correct, I do not work
9  in the regulatory department.  Instead, I
10  work in the QA department.
11     Q.    Who told you what "adulterated"
12  means?
13     A.    First of all, this term
14  "adulterate" has something to do with GMP,
15  and I would engage GMP in my daily work.
16         Secondly, for this term, I also
17  consulted with Linda from the RA department
18  and had a discussion with her about the
19  meaning.
20     Q.    And you under- -- rephrase.
21         And you understand that when
22  the FDA made its finding of adulteration, its
23  finding was based on violations of cGMP by
24  ZHP in the manufacturing process for the

Page 30

1 valsartan, correct?
2          MR. BERNARDO:  Object to the
3     form of the question.
4          THE WITNESS:  I don't quite get
5     your question.  Can the interpreter
6     repeat the rendition?
7 BY MR. SLATER:
8     Q.    Sure.
9     A.    I'm sorry.  Something must have
10 lost in the translation, so I don't quite get
11 your question.  However, I will do my best to
12 respond to it.
13          As I stated in my prior
14 statement, "adulteration" is a term that FDA
15 would use.  In their finding, they found
16 there was some deviation there, that we
17 actually did not conform to GMP.
18          Of course, it was within the
19 scope of FDA's authority to make such a
20 finding.  However, from our company's point
21 of view, we have always been conformed to GMP
22 or in compliance with GMP.  That position has
23 been reflected in our response to FDA's
24 warning letter, as well as the communications

Page 31

1 with FDA over a long period of time.
2          I'm not sure whether your
3 question is answered.
4     Q.    So you're telling me ZHP has
5 never taken responsibility for its violations
6 of cGMP?
7          MR. BERNARDO:  Object to the
8     form of the question.
9          THE WITNESS:  I don't know
10     whether it's because I'm from a
11     different profession, I couldn't
12     understand your question.  After all,
13     I'm not a lawyer.  However, I will do
14     my best to answer your question as
15     follows.
16          First, after their discovery,
17     FDA did gave us the warning letter
18     stating that ZHP failed to conform to
19     cGMP.  However, from the company's
20     point of view, we have been in
21     compliance with the cGMP, which was
22     also reflected in our response to the
23     warning letter.
24          Even though the company has

Page 32

1 been in compliance with the cGMP, in
2 order to work with FDA and the
3 response to this finding, we did a lot
4 of work for improvement seriously and
5 diligently.
6          Secondly, our company is a
7 responsible company.  Ever since we
8 received this warning letter, we
9 stopped the sales in the US.
10          I don't know whether I got the
11 key point of your question and
12 answered your question, but I will try
13 my best to answer this question.
14 BY MR. SLATER:
15     Q.    In the FDA warning letter, the
16 FDA says on the first page, "During our
17 inspection, our investigators observed
18 specific deviations including, but not
19 limited to, the following.
20          "Number 1.  Failure of your
21 quality unit to ensure that quality-related
22 complaints are investigated and resolved."
23          Later in the letter, "Number 2.
24 Failure to evaluate the potential effect that

Page 33

1 changes in the manufacturing process may have
2 on the quality of your API."
3          You're aware that the FDA found
4 both of those deviations and put them in the
5 warning letter, correct?
6          MR. BERNARDO:  Object to the
7     form of the question.
8          THE WITNESS:  I believe it
9     should be put in this way.  In the
10     warning letter, FDA did put two
11     deviations that they thought were
12     deviations in the letter.
13          First, the investigation of --
14     on the complaints were not sufficient.
15          Secondly, the deviation
16     regarding the evaluation of the
17     potential effect from the changes.
18          Indeed, they put those two
19     deviations in the warning letter.
20 BY MR. SLATER:
21     Q.    The FDA also rejected ZHP's
22 explanation and argument that it had not
23 committed these deviations, correct?
24          MR. BERNARDO:  Object to the

Page 34

1 form of the question.
2      THE WITNESS:  I wonder where I
3 can find such statement that you just
4 made or referred to in this warning
5 letter.  I failed to find such
6 statements in the letter.
7 BY MR. SLATER:
8      Q.   Let's go to page 4.  The third
9 paragraph under -- I'm sorry.
10      On page 4, the third paragraph
11 under number 2 says, "Your response states
12 that predicting NDMA formation during the
13 valsartan manufacturing process required an
14 extra dimension over current industry
15 practice, and that your process development
16 study was adequate.  We disagree.  We remind
17 you that common industry practice may not
18 always be consistent with CGMP requirements
19 and that you are responsible for the quality
20 of drugs you produce."
21      Does that refresh you on what
22 the FDA said in rejecting ZHP's response to
23 the findings of deviations?
24      MR. BERNARDO:  Object to the

Page 35

1 form of the question.
2      THE WITNESS:  Now I see this
3 paragraph.
4      Indeed, FDA wrote this
5 paragraph regarding the response we
6 filed for the inspection.
7      And with regards to the
8 evaluation of the investigation, FDA
9 did write -- did write such a
10 paragraph when we tried to respond to
11 the finding of that deviation, the
12 second one.
13 BY MR. SLATER:
14      Q.   Let's go to page 2.
15 In the second-to-last
16 paragraph, the FDA stated to ZHP, "Your
17 response states that NDMA was difficult to
18 detect.  However, if you had investigated
19 further, you may have found indicators in
20 your residual solvent chromatograms alerting
21 you to the presence of NDMA.  For example,
22 you told our investigators you were aware of
23 a peak that eluted after the toluene peak in
24 valsartan API residual solvent chromatograms

Page 36

1 where the presence of NDMA was suspected to
2 elute.  At the time of testing, you
3 considered this unidentified peak to be noise
4 and investigated no further.  Additionally,
5 residual solvent chromatograms for valsartan
6 API validation batches manufactured using
7 your zinc chloride process, with DMF in 2012
8 (C5355-12-001, C5355-12-002, and
9 C5355-12-003) show at least one unidentified
10 peak eluting after the toluene peak in the
11 area where the presence of NDMA was suspected
12 to elute."
13      Does that refresh your memory
14 that the FDA also disagreed with ZHP's
15 explanation regarding the difficulty in
16 detecting NDMA?
17      MR. BERNARDO:  Object to the
18 form of the question.
19      THE WITNESS:  I disagree with
20 this paragraph.  My disagreement was
21 also reflected in our response to what
22 was written by FDA in this paragraph.
23      That was because,
24 retrospectively, nobody at that time

Page 37

1 was aware of the existence of NDMA in
2 valsartan.  Now, of course, everything
3 is very clear.  But, retrospectively,
4 had we known the existence of the
5 NDMA, we would have found that was
6 also in our response to FDA.
7      I also listed FDA's statement
8 in the list of documents, and I also
9 believed that typically if we are
10 aware of one impurity, we would
11 develop the analytical method
12 accompanying.
13      At that time with regard to
14 NDMA, nobody was aware of that, so we
15 developed the analytical method
16 according to the common industry
17 practice as well as the FDA's
18 requirement.
19      But at that time nobody knew
20 what NDMA was.  So, as I said, had we
21 known the method, the impurity, we
22 would have developed the method
23 accordingly.  Since we didn't have the
24 method, we were not aware of such an

Page 38

1    impurity in the existence.
2  BY MR. SLATER:
3    Q.   Looking now at the last full
4  paragraph on page 2 of the warning letter,
5  the FDA states, "Your response also states
6  that you were not the only firm to identify
7  NDMA in valsartan API.  In your case, FDA
8  analyses of samples identified amounts of
9  NDMA in valsartan API manufactured at your
10 firm that were significantly higher than the
11 NDMA levels in valsartan API manufactured by
12 other firms.  FDA has grave concerns about
13 the potential presence of mutagenic
14 impurities in all intermediates and API
15 manufactured at your facility, both because
16 of the data indicating the presence of
17 impurities in API manufactured by multiple
18 processes, and because of the significant
19 inadequacies in your investigation."
20     Does that refresh your memory
21 that the FDA also disagreed with ZHP's
22 explanations?  Does that help you to remember
23 that?
24     MR. BERNARDO:  Object to the

Page 39

1  form of the question.
2     THE WITNESS:  I found
3  discrepancy between the translation
4  given by the interpreter just now and
5  the Chinese version of the warning
6  letter.  I don't know what caused the
7  discrepancy in translation.
8     However, based on the Chinese
9  translation provided by my colleagues
10 for this FDA warning letter, after
11 their investigation, FDA did provide
12 such a view based on their awareness
13 of NDMA; therefore, their conclusion
14 was a respective conclusion, because
15 at that time everyone would know the
16 existence of NDMA.
17     That was the base where FDA
18 thought our investigation was not
19 sufficient.  However, back at that
20 time nobody was aware of NDMA.
21     In our response to FDA, we
22 stated that ZHP was not the only firm
23 that identified NDMA.  That was
24 because we reviewed the public

Page 40

1  announcement made by FDA and was made
2  aware of that.  Such a position was
3  also reflected in our response to FDA.
4  We were very clear about the whole
5  process.
6  BY MR. SLATER:
7    Q.   The findings by the FDA
8  constituted violations of cGMP and thus met
9  the definition of "adulteration" as you
10 understand the definition of "adulteration,"
11 correct?
12     MR. BERNARDO:  Object to the
13 form of the question.
14 BY MR. SLATER:
15   Q.   I'll ask it differently.  Let
16 me withdraw the question and start over.
17     The deviations found by the FDA
18 met the definition for "adulteration,"
19 correct?
20     MR. BERNARDO:  Object to the
21 form of the question.
22     THE WITNESS:  I don't quite get
23 your question.  I am sorry, I don't
24 know what you're asking about.

Page 41

1  BY MR. SLATER:
2    Q.   The deviations discussed by the
3  FDA in their warning letter constituted
4  adulteration of the valsartan, correct?
5     MR. BERNARDO:  Object to the
6  form of the question.
7  BY MR. SLATER:
8    Q.   Let me ask the question again.
9  Let me withdraw it and ask it again.
10     Based on the deviations from
11 cGMP found by the FDA, the valsartan was
12 adulterated, correct?
13     MR. BERNARDO:  Object to the
14 form of the question.
15     THE WITNESS:  Maybe I already
16 spoke in my prior statement, the term
17 "adultration" -- "adulteration,"
18 rather, is a term that FDA would use.
19 That's okay.  That's within the scope
20 of their authority.
21     Due to what they thought was a
22 deviation from the cGMP, FDA issued in
23 their warning letter in November 2018
24 that that was adulteration.  However,

Confidential Information - Subject to Protective Order

Page 42

1  that doesn't mean that valsartan
2  itself was adulterated.
3        MR. BERNARDO:  Adam, I've been
4  trying to let you finish this line,
5  but we've been going for almost an
6  hour and a half, if there's a good
7  time to take a break.
8        MR. SLATER:  I'd like to go
9  another five minutes or so and just
10 try to finish this question off.
11       MR. BERNARDO:  Sure.  I've been
12 trying not to interrupt, but we've
13 been going an hour and a half, and I
14 just want to make sure --
15       MR. SLATER:  I'm fine going as
16 long.  I mean, if the witness doesn't
17 need a break and I don't need a break,
18 I don't know that we need to stop.
19       But let me go for a couple more
20 minutes, and if you want to have a
21 break, I can't stop you.  That's why I
22 load up the food on my desk.
23       MR. BERNARDO:  I need the
24 opposite of that.

Page 43

1  BY MR. SLATER:
2        Q.    Based on your understanding of
3  the definition of "adulteration," because of
4  the deviations from cGMP found by the FDA,
5  the valsartan manufactured with the zinc
6  chloride process was adulterated, correct?
7        MR. BERNARDO:  Object to the
8  form of the question.
9        THE WITNESS:  That is not
10 correct.  I totally disagree.  It was
11 in November 2018 that FDA issued this
12 warning letter.
13       However, before November 2018,
14 ZHP already terminated the
15 manufacturing of valsartan using zinc
16 chloride process in June of 2018.
17       Therefore, I do not agree with
18 the statement that the products made
19 by ZHP was adulterated, according to
20 FDA's warning letter.
21 BY MR. SLATER:
22       Q.    You understand the FDA was
23 talking about the valsartan API manufactured
24 with the zinc chloride process, correct?

Page 44

1        A.    I don't get the translation.
2  Could the interpreter repeat the rendition?
3        I wonder what time frame are
4  you referring to, or what specific time point
5  are you referring to?
6        In terms of the time frame in
7  my response to you, actually, when we found
8  out the existence of NDMA in valsartan in
9  June 2018, we terminated the manufacturing.
10 Prior to that time, we did manufacture
11 valsartan using zinc chloride process.
12       MR. SLATER:  If you want to
13 take a break, we can take a break now.
14       MR. BERNARDO:  Thank you, Adam.
15 Appreciate it.
16       THE VIDEOGRAPHER:  The time
17 right now is 8:35 a.m.  We're off the
18 record.
19       (Whereupon, a recess was
20 taken.)
21       THE VIDEOGRAPHER:  The time
22 right now is 8:49 a.m.  We're back on
23 the record.
24            ///

Page 45

1  BY MR. SLATER:
2        Q.    During your preparation for
3  this deposition, did you become aware of the
4  existence of David Chesney?
5        A.    No.
6        Q.    Are you aware that there's a
7  person named David Chesney that was hired to
8  be the cGMP expert witness on behalf of ZHP
9  in this litigation?
10       A.    I'm not aware of that.
11       Q.    Were you aware that
12 Mr. Chesney, when he had his deposition
13 taken, testified that ZHP violated cGMP in
14 its risk assessment in connection with the
15 manufacturing process for the zinc chloride
16 manufacturing process?
17       MR. BERNARDO:  Object to the
18 form of the question.
19 BY MR. SLATER:
20       Q.    Let me reask the question.  I
21 think I double-spoke at the end, so I think
22 it needs to be asked again.
23       During your preparation for
24 this deposition, did you become aware that

Page 46

1 David Chesney, ZHP's cGMP expert, testified
2 that ZHP violated cGMP in connection with the
3 manufacture and manufacturing process for the
4 valsartan manufactured with the zinc chloride
5 process?
6            MR. BERNARDO:  Object to the
7       form of the question.
8            THE WITNESS:  I'm not aware of
9       that.
10 BY MR. SLATER:
11       Q.    You were given certain expert
12 reports as part of your preparation for this
13 deposition.  Wouldn't you have liked to have
14 seen the expert deposition of the cGMP expert
15 for ZHP?
16            MR. BERNARDO:  Object to the
17       form of the question.
18            THE WITNESS:  I did review some
19       of the expert reports, especially the
20       health risks.  As I told you before, I
21       read the report by Dr. Chodosh and I
22       communicated with him.
23            So my first point is on the
24       topic of adulteration, that is related

Page 47

1       to GMP.  As the person in charge of
2       QA, I engage in GMP activities, so I
3       don't know what you mean.
4            As for FDA's warning letter,
5       requests, or questions, we always try
6       to respond seriously by organizing
7       human resources for such responses.
8       So I don't know what you mean.
9 BY MR. SLATER:
10       Q.    You were given the reports of
11 certain defense experts.  Would you have
12 liked to have seen Mr. Chesney's deposition,
13 since he was ZHP's expert on GMP and
14 testified that ZHP violated cGMP in the zinc
15 chloride manufacturing process?
16            MR. BERNARDO:  Object to the
17       form of the question.
18            THE WITNESS:  When I was trying
19       to get familiar with the topics, I was
20       not made aware of that.  That is why I
21       did not have any communication with
22       him or had the chance to review his
23       report.  That's number one.
24            Number two, our company's

Page 48

1       position in our response is that we
2       never violated any cGMP requirements.
3       We were always in compliance with
4       cGMP.
5 BY MR. SLATER:
6       Q.    Earlier you said that ZHP did a
7 lot of work to improve its processes.  The
8 reason that ZHP had to improve its processes
9 is because they violated cGMP, right?
10            MR. BERNARDO:  Object to the
11       form of the question.
12            THE WITNESS:  In response to
13       your question, our company has been in
14       compliance with cGMP from beginning to
15       end.
16            In order to work with FDA, in
17       our response to FDA we made it very
18       clear that we have been in compliance
19       with cGMP.
20            However, in order to work with
21       them, we did a lot of work in a
22       proactive and responsible way to make
23       some improvements and enhancements.
24            It has always been our

Page 49

1       company's position that we've been in
2       compliance with cGMP.  The reason we
3       did a lot of work for improvement and
4       enhancement was to work with FDA, not
5       because we violated cGMP.
6            So we have always been very
7       clear in our response to reflect the
8       company's position.  That is also
9       eventually recognized by FDA in their
10       approval.
11 BY MR. SLATER:
12       Q.    You said that your company was
13 always proactive and responsible in the steps
14 it took, but let's look at page 4 of the
15 warning letter again and address what the FDA
16 had to say about that.
17            Let's look at the
18 second-to-last paragraph.  The second-to-last
19 paragraph says, "Your response does not
20 describe sufficient corrective actions to
21 ensure that your firm has adequate change
22 management procedures in place:  (1) to
23 thoroughly evaluate your API manufacturing
24 process, including changes to those

Case 1:19-md-02875-RMB-SAK   Document 2626-11   Filed 02/06/24   Page 15 of 34
confidential information - subject to protective order
PageID: 94242

Page 50

1  processes; and (2) to detect any unsafe
2  impurities, including potentially mutagenic
3  impurities.  For FDA's current thinking on
4  control of potentially mutagenic impurities,
5  see FDA's guidance document M7(R1) Assessment
6  and Control of DNA Reactive (Mutagenic)
7  Impurities in Pharmaceuticals To Limit
8  Potential Carcinogenic Risk for approaches
9  that FDA considers appropriate for evaluating
10  mutagenic impurities, at," and then there's a
11  link there.
12      So, in fact, does that refresh
13  your memory that the FDA was not satisfied
14  with ZHP's proposed corrective actions and
15  forced ZHP to do more?
16      MR. BERNARDO:  Object to the
17  form of the question.
18      THE WITNESS:  Indeed, in this
19  warning letter FDA made such writings
20  in response to our prior response and
21  made such requests.  Indeed, it was
22  written here.  However, it doesn't
23  mean that we violated GMP.  I do not
24  agree with such interpretation.

Page 51

1      FDA, over here, indeed wrote
2  down what they thought would be a
3  better corrective action as a
4  regulatory authority.
5      (Zoom technical issue.)
6      MR. SLATER:  I'm back.  I guess
7  I disappeared for a second, and I
8  think I lost --
9      MR. BERNARDO:  You disappeared
10  again, in an interesting pose.
11      THE VIDEOGRAPHER:  Should I go
12  off the record?
13      MR. BERNARDO:  Sure.
14      THE VIDEOGRAPHER:  The time
15  right now is 9:06 a.m.  We're off the
16  record.
17      (Off the record for technical
18  issue.)
19      THE VIDEOGRAPHER:  The time
20  right now is 9:09 a.m.  We're back on
21  the record.
22      MR. SLATER:  Okay.  Let's go to
23  page 6, Chris.  Great.
24      ///

Page 52

1  BY MR. SLATER:
2      Q.   Looking at the first full
3  sentence om -- rephrase.
4      Looking at the first full
5  paragraph, which is only a sentence, on
6  page 6 of the FDA warning letter, the FDA
7  informs ZHP, "FDA placed your firm on Import
8  Alert 66-40 on September 28, 2018."
9      And you understand that ZHP was
10  placed on Import Alert because of the cGMP
11  violations found in connection with the zinc
12  chloride manufacturing process, right?
13      MR. BERNARDO:  Object to the
14  form of the question.
15      THE WITNESS:  Judging from the
16  content of this letter, I do not see
17  any causal effect relationship between
18  the two.  I'm aware that FDA did put
19  us on such an Import Alert.
20      MR. SLATER:  Hello?  Can you
21  guys hear me?
22      MR. BERNARDO:  Yes.  You did
23  seem to freeze for a minute, but...
24      MR. SLATER:  So where are we?

Page 53

1  I think you were reading the question
2  to the witness, Dr. Shao?
3      MR. BERNARDO:  No, I thought
4  she answered and you had her answer.
5      MR. SLATER:  You know what, I
6  didn't hear the answer.  Can I have
7  the answer read to me, please?  I must
8  have missed it when I was stage left
9  again.
10      (Whereupon, the reporter read
11  back the answer:
12      "ANSWER:  Judging from the
13  content of this letter, I do not see
14  any causal effect relationship between
15  the two.  I'm aware that FDA did put
16  us on such an Import Alert.")
17  BY MR. SLATER:
18      Q.   The next paragraph says --
19  rephrase.
20      The next paragraph of the
21  warning letter states, "Until you correct all
22  deviations completely and we confirm your
23  compliance with CGMP, FDA may withhold
24  approval of any new applications or

Page 54

1  supplements listing your firm as a drug
2  manufacturer."
3       So you understood that FDA was
4  taking this action because of the deviations
5  from cGMP, correct?
6       MR. BERNARDO:  Object to the
7  form of the question.
8       THE WITNESS:  That
9  interpretation is incorrect.  I
10  disagree with such a view.
11      In FDA's warning letter, they
12  did state such procedure that until
13  the corrections were completely made,
14  all the applications submitted by our
15  company, as well as the supplements,
16  will be upheld.  That's their
17  procedure.
18      We're aware of that, but that
19  doesn't mean that we violated the
20  cGMP.
21  BY MR. SLATER:
22      Q.   The corrections that the FDA
23  was referring to were corrections of the cGMP
24  violations listed in this letter, correct?

Page 55

1       MR. BERNARDO:  Object to the
2  form of the question.
3       INTERPRETER SHAO:  The
4  interpreter was asked to repeat the
5  rendition.
6       THE WITNESS:  The corrections
7  that FDA was referring to were the
8  corrections for the deviations from
9  the cGMP listed in this warning
10  letter, as we discussed before.
11  BY MR. SLATER:
12      Q.   And, therefore, you agree that
13  ZHP had violated cGMP and needed to correct
14  those violations, correct?
15      MR. BERNARDO:  Object to the
16  form of the question.
17      THE WITNESS:  That is
18  incorrect.  Why we took some actions
19  for improvement was to work with FDA.
20  That was very clear with FDA in our
21  response letter.  That has always been
22  our position, that we did not violate
23  any cGMP.
24           ///

Page 56

1  BY MR. SLATER:
2       Q.   Am I correct that no matter
3  what evidence the jury hears at the trial of
4  this case, your answer on behalf of ZHP will
5  be that ZHP did nothing in violation of cGMP
6  and acted appropriately in all things?
7       MR. BERNARDO:  Object to the
8  form of the question.
9       THE WITNESS:  I don't
10  understand what you're referring to by
11  evidence of violation of cGMP that the
12  jury would hear in the trial of this
13  case.
14      I did mention in my prior
15  statement that in our response to this
16  warning letter, we made it very clear
17  that it has always been the position
18  of our company that we're being in
19  compliance with cGMP.
20      That was so in our response
21  letter.  That was also the same in our
22  communication with FDA afterwards.  We
23  have always been making that very
24  clear.

Page 57

1  BY MR. SLATER:
2       Q.   It will always be ZHP's
3  position that it did nothing wrong and never
4  violated cGMP in the manufacture of
5  valsartan, no matter what evidence is shown,
6  no matter what documents are seen, and no
7  matter what testimony is provided by
8  witnesses, correct?
9       MR. BERNARDO:  Object to the
10  form of the question.
11      THE WITNESS:  I disagree
12  with -- I disagree with your
13  statement.  That is incorrect.
14      Our manufacturing of valsartan
15  in ZHP could trace as back as in 2011
16  or maybe 2010.  During the whole
17  period of time, we have conducted a
18  series of work before we started to
19  manufacture valsartan in compliance
20  with GMP.
21      We met the requirement of FDA.
22  We did not start in the manufacturing
23  of valsartan until the regulatory
24  procedure and approval was complete.

Page 58

1       During the process, FDA
2   conducted many inspections and came up
3   with the conclusion that we were in
4   the -- in compliance with GMP, except
5   for this inspection.  That was because
6   the inspection was made after the
7   discovery of NDMA.  Therefore, they
8   issued this warning letter.
9       In this warning letter, they
10  listed those findings which our
11  company made a response.  Based on the
12  above points, actually in addition to
13  that, we were audited many times by
14  EU, by Japanese, and Korean official
15  authorities, and their conclusion was
16  always that we were in compliance with
17  cGMP.
18      So it's not like no matter what
19  evidence was produced, that our
20  company's position would be the same,
21  that we were in compliance with cGMP.
22  That's why I disagree with your
23  statement.
24          ///

Page 59

1   BY MR. SLATER:
2       Q.    As you just said, once the FDA
3   found out about the NDMA in the valsartan, it
4   investigated, it found cGMP violations, it
5   issued a warning letter, and it put ZHP on
6   the Import Alert, correct?
7       MR. BERNARDO:  Object to the
8   form of the question.
9       THE WITNESS:  I don't see any
10  causal effect relationship between the
11  two.  The warning letter issued by FDA
12  made it very clear the reason why they
13  issued such a letter was because they
14  believed that we failed to meet their
15  requirement by two deviations, and
16  that is not because we violated cGMP
17  simply by manufacturing valsartan.
18      We have already discussed about
19  that, and I've already stated in my
20  prior statement that when we were
21  manufacturing valsartan in June 2018,
22  we found NDMA and we reported that
23  discovery to FDA.  Afterwards, FDA
24  organized this inspection.

Page 60

1       I was just wondering why you
2   would come up with such a conclusion.
3   You know, as discussed before, after
4   we made response to FDA, FDA
5   eventually gave the approval by
6   issuing this IEA report.  Actually,
7   EIA report.
8       Actually, in 2012, we already
9   received this EIA report from FDA.
10      Do you mean that we have been
11  violating the cGMP all the time?  What
12  do you mean by saying that?
13  BY MR. SLATER:
14      Q.    It was never acceptable for
15  there to be NDMA in the valsartan that ZHP
16  was selling, correct?
17      A.    I don't quite understand your
18  question.  As I said in my prior statement,
19  the reason why we were selling valsartan in
20  the US and we were manufacturing valsartan
21  was because of the approval by the FDA.  We
22  met their requirement.
23      Q.    It's your testimony that the
24  FDA approved the sale of valsartan containing

Page 61

1   NDMA?
2       A.    That is not my testimony.  I
3   think you misunderstood me.
4       Before June 2018, we didn't
5   know about NDMA, and I believe FDA was not
6   aware of NDMA.  That's why we were given the
7   approval to manufacture valsartan.
8       However, in June 2018, after we
9   discovered NDMA, we conducted investigations,
10  suspended manufacturing, and took
11  corresponding actions.
12      Q.    The FDA would never have
13  approved the sale of ZHP's valsartan if it
14  knew that there was NDMA in it.
15      You agree with that, right?
16      MR. BERNARDO:  Object to the
17  form of the question.
18      THE WITNESS:  First, I don't
19  think your hypothesis is legitimate.
20  That is because when we were applying
21  for approval for manufacturing ND- --
22  manufacturing valsartan, we were not
23  aware of NDMA.  Neither were they.
24      Even if your hypothesis were

Page 62

1  legitimate, FDA would have asked our
2  company to take actions in quality
3  control to limit the content of NDMA
4  had they been aware of the existence
5  of NDMA, and would have asked us to
6  take corresponding actions.
7       In other words, I believe our
8  company would have done our best to
9  meet the requirement of FDA.
10 BY MR. SLATER:
11      Q.   One of the requirements the FDA
12 expected ZHP to meet would have been
13 compliance with ICH M7 at all times that ZHP
14 sold the valsartan, correct?
15      A.   I'm not sure of the scope of
16 sale that you're referring to.
17      Q.   At all times, the FDA expected
18 ZHP to comply with ICH M7 in its assessment
19 and control of DNA-reactive mutagenic
20 impurities, correct?
21      MR. BERNARDO:  Object to the
22 form of the question.
23      THE WITNESS:  I don't quite
24 understand your question, but I'll

Page 63

1  give it a try.
2       First point I would like to
3  make is that ZHP as a drug
4  manufacturer has been expected by FDA
5  to meet the requirement of M7.
6       My second point is, our company
7  has always been in compliance with M7.
8  BY MR. SLATER:
9       Q.   So you think that ZHP was in
10 compliance with ICH M7 when it was selling
11 valsartan that contained the
12 mutagenic/genotoxic impurity NDMA in the
13 United States?
14      MR. BERNARDO:  Object to the
15 form of the question.
16      THE WITNESS:  I don't agree
17 with your statement because I think
18 the causal effect relationship should
19 be the opposite; therefore, I believe
20 that your statement is completely
21 incorrect.
22      Our company has always been in
23 compliance with ICH M7 in controlling
24 impurities.  However, we were not

Page 64

1  aware of NDMA until June 2018, nor was
2  FDA.  Therefore, for something you
3  don't know, you really cannot do
4  anything about it.
5       Prior to that, because of the
6  unawareness of NDMA, you cannot accuse
7  us of violating ICH M7.  Actually, our
8  company has always been in compliance
9  with ICH M7.
10      Therefore, I do not agree with
11 your statement that our company was
12 selling NDMA containing valsartan
13 knowingly, or on purpose, or
14 deliberately.
15      I would like to also add
16 something else.  My first point is
17 that we were expected to be in
18 compliance with ICH M7 when we were
19 going through the regulatory process.
20 Otherwise, FDA would not have approved
21 our application.
22      It was FDA's observation that
23 we were in compliance with ICH M7, and
24 they also confirmed so through

Page 65

1  multiple inspections.  Otherwise, they
2  wouldn't have brought it up in their
3  previous inspections.
4       My second point is, had we
5  known the existence of NDMA prior to
6  2018, why did we delay the recall and
7  other work until then?  What was the
8  reason we would do that?
9  BY MR. SLATER:
10      Q.   There would never be an
11 acceptable reason to do that, right?
12      A.   To do what?  Are you referring
13 to the sales of valsartan?
14      Q.   I'll ask the question
15 differently.
16      You just said if you had known
17 of the presence of NDMA, why did you delay
18 the recall until 2018.
19      My question to you is, you
20 agree that it never would have been
21 acceptable under any circumstances to delay
22 disclosure to the FDA and to your customers
23 once you found out that there was NDMA in the
24 valsartan, correct?

Page 66

1    A.    With regard to your
2  hypothetical question, I have to say that
3  indeed in June 2018, once we found out about
4  the existence of NDMA, we disclosed to FDA
5  right away, and we did our best to develop
6  analytical methods.
7    Q.    Can you answer my question,
8  please?
9    A.    I think I already gave you a
10  direct answer.
11        Had we known the existence of
12  NDMA prior to June 2018, we would have done
13  the same as we did in June 2018, which was
14  that we made an immediate disclosure to the
15  FDA, and we immediately started communication
16  with FDA and did our best to develop
17  analytical methods.
18    Q.    You were required to take the
19  steps that you took in 2018 as soon as you
20  knew that there was NDMA in the valsartan,
21  correct?
22    A.    We took also many actions at
23  that time, such as suspension of the
24  manufacturing and suspension of the sales and

Page 67

1  locking up all the manufactured goods in the
2  warehouse.  Those actions were taken
3  spontaneously.  Nobody required us to do so.
4    Q.    ZHP needed to take those steps
5  as soon as ZHP became aware that there was
6  NDMA in its valsartan, correct?
7    A.    That was the decision we made
8  after the company conducted the deviation
9  investigation.
10    Q.    My question that I'm asking you
11  to answer with a simple yes or no, please, as
12  soon as ZHP knew that there was NDMA in its
13  valsartan, it was required to disclose this
14  to the FDA and to its customers and to stop
15  selling the valsartan with the NDMA in it,
16  correct?
17        MR. BERNARDO:  Object to the
18    form of the question.
19  BY MR. SLATER:
20    Q.    Let me rephrase the question.
21  Let me withdraw it and ask it differently.
22        The steps that ZHP took in
23  June 2018, you would agree with me ZHP would
24  have needed to take the same steps if it had

Page 68

1  learned that there was NDMA in the valsartan
2  at an earlier time, correct?
3    A.    That is correct.
4    Q.    In fact, as of at least
5  July 27, 2017, you and others in your company
6  knew that when valsartan was quenched with
7  sodium nitrite, it was forming NDMA, correct?
8    A.    That is incorrect.
9        MR. BERNARDO:  Adam, we've been
10    going over an hour.  If you're going
11    to turn to that topic and we could
12    take a break, that would be good.
13        MR. SLATER:  Sure.  Sure.
14        MR. BERNARDO:  Thank you.
15        MR. SLATER:  Go off the record.
16        THE VIDEOGRAPHER:  The time
17    right now is 9:52 a.m.  We're off the
18    record.
19        (Whereupon, a recess was
20    taken.)
21        THE VIDEOGRAPHER:  The time
22    right now is 10:08 a.m.  We're back on
23    the record.
24        ///

Page 69

1  BY MR. SLATER:
2    Q.    A few moments ago you asked the
3  question why would ZHP not have disclosed the
4  presence of the NDMA in its valsartan as soon
5  as it knew.
6        And I guess in response to you
7  asking that question, I would pose the
8  possibility that ZHP was making so much
9  money, and in the words of Jun Du to the FDA
10  investigator, "dominating the world market
11  for valsartan," that that was the incentive
12  that unfortunately ZHP was swayed by and
13  didn't take action to stop selling the
14  NDMA-contaminated valsartan earlier.
15        That's certainly something that
16  could have happened here, right?
17    A.    This is incorrect.  This is
18  completely incorrect.  I'm not aware of the
19  statement made by Jun Du.  However, I don't
20  believe your statement is correct.
21    Q.    If ZHP failed to disclose the
22  presence of the NDMA earlier because ZHP
23  wanted to continue to profit from that
24  valsartan, that would have been completely

Confidential Information - Subject to Protective Order

Page 70

¹ improper, correct?

² A. I found your statement sounds
³ incredible. ZHP is a manufacturer of
⁴ valsartan.

⁵ I don't quite understand your
⁶ statement, actually. Could Dr. Shao repeat a
⁷ rendition?

⁸ Well, if the company wants to
⁹ make more profits, then it could have taken
¹⁰ better approaches, such as removal of the
¹¹ impurities. By doing that, the company could
¹² have made more profits.

¹³ Q. ZHP only disclosed the presence
¹⁴ of the NDMA in the valsartan after Novartis
¹⁵ forced ZHP to do so, right?

¹⁶ A. That is incorrect.

¹⁷ Q. Have you read the e-mails
¹⁸ between ZHP and Novartis that led to the
¹⁹ disclosure of the NDMA in the valsartan?

²⁰ A. While I was organizing the
²¹ deviation investigation, I already read that
²² e-mail.

²³ In that e-mail, Novartis was
²⁴ only stating that they were suspecting that

Page 71

¹ the impurity might be NDMA.

² Q. And then ZHP confirmed it was
³ NDMA, and ZHP was not moving quickly enough,
⁴ and Novartis had to threaten ZHP to force ZHP
⁵ to disclose the NDMA, correct?

⁶ A. I don't know where you came up
⁷ with that narrative. That's not what I'm
⁸ aware of.

⁹ Q. Let's go back to the July 27,
¹⁰ 2017 e-mail that Jinsheng Lin sent to you and
¹¹ copied several people.

¹² You have that e-mail in your
¹³ binder, right?

¹⁴ A. That is correct.

¹⁵ Q. It's item number 11 in your
¹⁶ binder, correct?

¹⁷ A. Let me check. That is correct.
¹⁸ Item number 11 is that e-mail, while item
¹⁹ number 12 is the attachment to that e-mail.

²⁰ Q. Jinsheng Lin is a Ph.D.
²¹ organic chemist, correct?

²² A. Since we worked in different
²³ departments, I was never familiar with his
²⁴ qualifications, so I don't know about that.

Page 72

¹ All I know is that he works in
² CEMAT, and he is someone that would conduct
³ analysis on impurities.

⁴ Q. He was in charge of the lab for
⁵ process and degradation impurity research at
⁶ CEMAT, correct?

⁷ A. He was not the person in
⁸ charge. I believe Min Li is actually the
⁹ person in charge.

¹⁰ Q. Min Li was in charge of all of
¹¹ CEMAT. Jinsheng Lin was in charge of the lab
¹² for process and degradation impurity
¹³ research, correct?

¹⁴ A. Are you referring to now or
¹⁵ back in 2017?

¹⁶ Q. 2017.

¹⁷ A. If you're referring to the time
¹⁸ in 2017, if my memory serves me right, he was
¹⁹ just a regular analytical personnel at CEMAT.
²⁰ Because recently I noticed there was some
²¹ promotions, if my memory serves me right.

²² MR. SLATER: Chris, let's put
²³ up Exhibit 431, please.

²⁴ ///

Page 73

¹ (Whereupon, Exhibit Number
² ZHP-431 was previously marked for
³ identification.)

⁴ BY MR. SLATER:

⁵ Q. Actually, you know what, you
⁶ can actually give -- Exhibit 431 is the
⁷ version in Chinese and Exhibit 432 is the
⁸ English translation of the PowerPoint. Let's
⁹ work with 432 on the screen, but you can
¹⁰ certainly -- I'd like to give the witness 431
¹¹ so she can see that as well.

¹² (Whereupon, Exhibit Number
¹³ ZHP-432 was previously marked for
¹⁴ identification.)

¹⁵ BY MR. SLATER:

¹⁶ Q. Let's go to the third page.

¹⁷ This is a PowerPoint that we've
¹⁸ been provided that my understanding is dated
¹⁹ November 2017 regarding CEMAT.

²⁰ Do you see that?

²¹ A. I don't know. I've never seen
²² this document before.

²³ Q. So in your work that you did to
²⁴ prepare for this deposition, you didn't see

Page 74

1  this PowerPoint, which has been used in other
2  depositions, in order to give you background
3  about Jinsheng Lin's role at the company in
4  2017, correct?
5          MR. BERNARDO:  Object to the
6  form of the question.
7          THE WITNESS:  That's not
8  correct.  As I said before, in order
9  to prepare for this deposition, I
10  worked very hard to get familiar with
11  the topics with regard to the three
12  topics that I have to speak on.  I did
13  a lot of work in preparation.
14          But this document was certainly
15  not on the list of the documents that
16  I needed to review.  Had you told me
17  that I had to review this document, I
18  would have reviewed this document.
19          Anyway, with that, I have to
20  say even though I already reviewed a
21  lot of documents, that doesn't mean
22  that I reviewed all the documents.
23  BY MR. SLATER:
24      Q.    Looking now at the third page

Page 75

1  of this PowerPoint, you can see that it is
2  titled that it's -- rephrase.
3          Looking now at the third page
4  of this PowerPoint, it refers to the lab or
5  laboratory for process and degradation
6  impurity research and says that the
7  responsible person for that laboratory was
8  Jinsheng Lin, correct?
9          MR. BERNARDO:  Objection to the
10  form of the question.
11          THE WITNESS:  As I mentioned
12  earlier, my English is poor.  If
13  possible, could someone translate this
14  page for me since I do not understand
15  what it says in English here?
16          MR. SLATER:  The version in
17  Chinese or Mandarin is Exhibit 431.
18  Chris, if you could put that
19  up.
20          THE WITNESS:  Can you show me
21  the cover of this document so that I
22  can figure out who prepared this
23  document?
24          MR. SLATER:  You can do that,

Page 76

1  Chris.  You can show her the cover.
2          THE WITNESS:  Can you scroll
3  down to second page?
4          Now I see.  It was Wen Quan Zhu
5  that prepared this document.  Wen Quan
6  Zhu's named is spelled W-E-N, Q-U-A-N,
7  last name Z-H-U.  But the document
8  didn't say when it was prepared.
9  BY MR. SLATER:
10      Q.    I'm representing to you that
11  the information we have says November 2017.
12      A.    Is that so?
13          Oh, now I know that since CEMAT
14  is located at the corporate headquarters in
15  the Xunqiao site of Linhai County, Xunqiao
16  spelled as X-U-N-Q-I-A-O, while I work at the
17  Chuannan site, also in Linhai County, in the
18  Chemical Engineering Industrial Park.  So
19  we're looking at different sites and
20  different departments.
21          I was never familiar with the
22  title and job description of Jinsheng Lin,
23  and I didn't make any effort to gather
24  information regarding that during my

Page 77

1  preparation.
2          In the past, I did not get to
3  interact with CEMAT.  Only once there was an
4  issue and we needed their support to resolve
5  the issues, we would approach.
6          MR. SLATER:  Let's go back to
7  the third page.
8  BY MR. SLATER:
9      Q.    This page -- rephrase.
10          The third page of this
11  PowerPoint shows that Jinsheng Lin was the
12  responsible person in this laboratory for
13  process and degradation impurity research,
14  correct?  That's what it says on the page,
15  correct?
16          MR. BERNARDO:  Object to the
17  form of the question.
18          THE WITNESS:  That's what it
19  says on this page.
20  BY MR. SLATER:
21      Q.    Looking now at the e-mail of
22  July 27, 2017, that Jinsheng Lin addressed to
23  you.  Do you see that in front of you?
24          MR. SLATER:  You can take this

Page 78

1    document down, Chris.
2         THE WITNESS:  I see it.
3         MR. SLATER:  And we'll put up
4    on the screen 296, which is the
5    English version, but the witness can
6    refer to the Exhibit 295, which is the
7    original Mandarin.
8         That's not the exhibit.
9         (Whereupon, Exhibit Numbers
10   ZHP-295 and ZHP-296 were previously
11   marked for identification.)
12   BY MR. SLATER:
13        Q.    This e-mail was written to you
14   and copied to multiple people, correct?
15        A.    That is correct.
16        Q.    Let's look at the second page.
17        At the top, one of the things
18   that Jinsheng Lin wrote in this e-mail is
19   that nitrosodimethylamine occurs in valsartan
20   when it's quenched with sodium nitrite.
21        And, in fact, you can confirm
22   to me that's a true statement; that was the
23   root cause for the NDMA in the zinc chloride
24   process valsartan, correct?

Page 79

1         MR. BERNARDO:  Object to the
2    form of the question.
3         THE WITNESS:  That is
4    incorrect.  Actually, your
5    interpretation did not reflect the
6    intent of this sentence.
7         I have to admit that this
8    e-mail is poorly written and
9    ambiguous, to be the least.  However,
10   your interpretation is oversimplified.
11   You could not just take this sentence
12   out of the context and come up with
13   this interpretation, which did not
14   reflect the true intention of Dr. Lin,
15   which was confirmed through my
16   communication with him.
17   BY MR. SLATER:
18        Q.    You realize you've already
19   testified under oath in your prior deposition
20   that the e-mail says in part that there was
21   nitrosodimethylamine in valsartan and that it
22   occurred when the valsartan was quenched with
23   sodium nitrite.
24        You know you testified to that

Page 80

1    under oath already, right?
2         MR. BERNARDO:  Object to the
3    form of the question.
4         THE WITNESS:  I don't quite get
5    your question.  Indeed, I recall this
6    e-mail was asked about in my prior
7    deposition.  However, you can resort
8    to the relevant evidence for my
9    response.
10   BY MR. SLATER:
11        Q.    It's a true statement that in
12   July 2017 there was NDMA in the valsartan
13   that your company was manufacturing, correct?
14        MR. BERNARDO:  Object to the
15   form of the question.
16        THE WITNESS:  I don't know how
17   to respond to this question.
18        Well, let me put it in this
19   way.  I believe the right way to put
20   it is that not until June 2018 did we
21   become aware of the existence of NDMA
22   in valsartan that we manufactured
23   prior to that date.
24        ///

Page 81

1    BY MR. SLATER:
2         Q.    Please answer my question with
3    a yes or a no.
4         In July of 2017, there was NDMA
5    in the valsartan manufactured by ZHP with the
6    zinc chloride process, correct?
7         A.    A point of clarification.  A
8    point of clarification.  Are you asking
9    whether we were already aware that there was
10   NDMA in the valsartan we manufactured with
11   the zinc chloride process in July 2017?
12        Is that what your question is
13   about?
14        Q.    No.  My question is, there was
15   NDMA in the valsartan manufactured by ZHP
16   with the zinc chloride process in July 2017,
17   correct?
18        MR. BERNARDO:  Object to the
19   form of the question.
20        THE WITNESS:  I don't know
21   whether it is because of the
22   difference between English and
23   Chinese, I am still puzzled by your
24   question.  I will do my best to

Page 82

¹ respond to your question.
²       Not until June 2018 did we
³ become aware that there was NDMA in
⁴ the valsartan that we manufactured in
⁵ 2017 using the zinc chloride process.
⁶       Prior to June 2018, we were not
⁷ aware of the existence of NDMA that we
⁸ manufactured using the zinc chloride
⁹ process; the existence of the NDMA in
¹⁰ the valsartan that we manufactured
¹¹ using the zinc chloride process, that
¹² is.
¹³ BY MR. SLATER:
¹⁴     Q.   I have tables -- rephrase.
¹⁵       I have tables of NDMA test
¹⁶ results from testing of batches going back to
¹⁷ the first validation batches that were
¹⁸ manufactured in 2011 and then in 2014 and
¹⁹ forward.  Every single one of those batches
²⁰ of valsartan manufactured with the zinc
²¹ chloride process contained NDMA, correct?
²²       MR. BERNARDO:  Object to the
²³    form of the question.
²⁴       THE WITNESS:  That is correct.

Page 83

¹    However, that was the result of
² retrospective testing of all those
³ batches after we learned about the
⁴ existence of NDMA in valsartan in
⁵ June 2018.
⁶ BY MR. SLATER:
⁷     Q.   When Jinsheng Lin said in his
⁸ July 27, 2017 e-mail that there was NDMA that
⁹ occurs in valsartan when quenched with sodium
¹⁰ nitrite, that was an accurate statement,
¹¹ correct?
¹²     A.   That's incorrect.  I don't
¹³ think your interpretation was a correct
¹⁴ reflection of the intention of the author.
¹⁵     Q.   That's what the words on the
¹⁶ page say, correct?
¹⁷     A.   That's incorrect.  That -- as I
¹⁸ stated in my prior testimony, this e-mail was
¹⁹ poorly written and complicated, as you could
²⁰ see here, even though that was the words that
²¹ said so on this page.  But the whole e-mail
²² is about the impurity found in the technical
²³ improvement for irbesartan.
²⁴       I communicated with Peng Dong

Page 84

¹ and Jinsheng Lin and eventually figured out,
² after reading this e-mail again and again,
³ that this e-mail was trying to make a
⁴ comparison with NDMA when it was talking
⁵ about the toxicology of this impurity from
⁶ being the technical improvement of
⁷ irbesartan.
⁸     Q.   And in making the comparison to
⁹ the NDMA in valsartan, Dr. Lin also pointed
¹⁰ out that the NDMA was forming when it was --
¹¹ when the valsartan was quenched with sodium
¹² nitrite during the manufacturing process,
¹³ correct?  That's what the words on the page
¹⁴ say.
¹⁵     A.   That's incorrect.  In order to
¹⁶ correctly interpret this e-mail, you have not
¹⁷ only to read through this e-mail, but also
¹⁸ the attachment.
¹⁹       In order to truthfully
²⁰ understand the meaning of this e-mail, I did
²¹ a large amount of work, including
²² communicating with Jinsheng Lin himself.
²³ Until then I fully understood the intention
²⁴ of this e-mail by reading the e-mail from top

Page 85

¹ to bottom.
²     Q.   The statement that the NDMA
³ occurred in valsartan when it was quenched
⁴ with sodium nitrite, that's a true statement,
⁵ and that's actually the root cause for the
⁶ NDMA in valsartan, correct?
⁷       MR. BERNARDO:  Object to the
⁸    form of the question.
⁹       THE WITNESS:  That's incorrect.
¹⁰ That's incorrect.  That's completely
¹¹ incorrect.
¹²       As I mentioned before,
¹³ Dr. Jinsheng Lin at that time was only
¹⁴ someone that would conduct analysis of
¹⁵ impurities at CEMAT.
¹⁶       Through communication with him,
¹⁷ I learned at that time he had very
¹⁸ limited knowledge of the process of
¹⁹ manufacturing valsartan.  That
²⁰ limitation was only to the attached
²¹ patent, from which he would try to
²² come up with this comparison of
²³ Impurity K, nitroso compound, and
²⁴ NDMA.

Page 86

1        According to him, NDMA was a
2   quite common impurity.  That's why he
3   wanted to use NDMA to have a
4   comparison with the impurity he found
5   in the technical improvement of
6   irbesartan.
7        Through communication with
8   Jinsheng Lin, he actually was not
9   aware of the NDMA in valsartan at all
10  at that time.
11  BY MR. SLATER:
12       Q.    Let's go further down in the
13  e-mail to the second-to-last paragraph.
14       He says, "This is a common
15  problem in the production and synthesis of
16  sartan APIs.  It is recommended to improve
17  other quenching processes (such as NaClO)
18  along with the optimization of the valsartan
19  sodium azide quenching process."
20       And I want to focus on the last
21  part.  Do you see where it says that he was
22  recommending "the optimization of the
23  valsartan sodium azide quenching process"?
24       A.    I see that paragraph.  I see

Page 87

1   the paragraph you just referred to.
2        Q.    Are you aware that in the
3   deviation investigation report DC-18003,
4   there's a section that refers to valsartan
5   zinc chloride process optimization, and that
6   optimization which Dr. Lin had recommended in
7   2017 is exactly what your company did to try
8   to remove the NDMA from the valsartan?
9        Are you aware of that?
10       MR. BERNARDO:  Object to the
11  form of the question.
12       THE WITNESS:  I believe you
13  completely misunderstood what's
14  written here, as well as what's
15  written in DC-18003.  I believe you
16  have a complete misunderstanding
17  regarding the two documents.
18  BY MR. SLATER:
19       Q.    You know that NDMA is different
20  from Impurity K as that term is used in the
21  patent, right?  Right?
22       A.    Indeed, those two impurities
23  are different.  They are both nitroso
24  compounds.

Page 88

1        Q.    So it's your testimony that
2   Jinsheng Lin accidentally correctly guessed
3   that there was NDMA in valsartan in July of
4   2017?  That's your explanation?
5        MR. BERNARDO:  Object to the
6   form of the question.
7        THE WITNESS:  I completely
8   disagree with you.
9   BY MR. SLATER:
10       Q.    So it's your testimony that
11  when Jinsheng Lin said there was NDMA in
12  valsartan, he really meant to say there's an
13  unknown nitrosamine in valsartan?
14       Do I understand you correctly?
15       MR. BERNARDO:  Object to the
16  form of the question.
17       THE WITNESS:  I don't
18  understand your question.  Can the
19  interpreter repeat the rendition?
20       I don't agree with you.  It is
21  incorrect.  As I said before, Jinsheng
22  Lin was at that time only someone who
23  would conduct analysis in CEMAT, as
24  shown in the PowerPoint file.  He was

Page 89

1   actually doing the impurity analysis
2   or impurity degradation analysis and
3   the structure confirmation.
4        CEMAT is located at the company
5   headquarters in Xunqiao, while
6   valsartan at that time was
7   manufactured at the Chuannan site.
8        I already communicated with
9   Jinsheng Lin.  At that time we were
10  working in different sites, so his
11  understanding regarding the impurity
12  in valsartan was only limited to
13  Impurity K mentioned in that happened.
14       He at that time was not aware
15  of the existence of NDMA in valsartan.
16  That was because of the limitation of
17  the analytical method.
18       A good analytical method is
19  capable of testing out the targeting
20  impurities.  At that time, the
21  analytical method failed to detect
22  that impurity, so Jinsheng Lin or we
23  did not have any awareness of the NDMA
24  in valsartan at that time.

Page 90

BY MR. SLATER:

Q.    So it's your testimony that Jinsheng Lin didn't know there was NDMA in valsartan, yet in his e-mail he said there was NDMA in valsartan.

MR. BERNARDO:  Object to the form of the question.

BY MR. SLATER:

Q.    Do I understand what you're saying?

A.    That is why I was confused when I was reading his e-mail in the first place, the same confusion you are having right now.

Needless to say, this e-mail was poorly written, and it was hard to understand.

Even when it was written in Chinese, I could not get what is said until I communicated with the author himself and read through not only the body of the e-mail, but also the attachment.  Not until then did I figure out what it was saying.

So it is understandable that when it is translated into English, you're

Page 91

having a hard time understanding the content. Even when it was written in Chinese, I had the same problem, too.

Q.    Well, you actually aren't having trouble reading the e-mail, because we agree it says that there is NDMA in valsartan.  We've already agreed on that, right?  That's what the e-mail says, the words on the page.  You've already told me that, right?

A.    Even though that sentence in the e-mail says so, you would not get the correct understanding until you look into the context.

I failed to get what the e-mail said in the beginning until I had communication with the author, Jinsheng Lin. He told me at the time he was -- of the existence of NDMA in valsartan.

He also -- I also told you at that time that was because there was no capable analytical method that would test out such impurity; therefore, nobody could test and confirm the existence of NDMA in

Page 92

valsartan.

In addition, he was not a technician of valsartan.  He was not in charge of this product.  His understanding regarding valsartan was only limited to the Impurity K mentioned in the attached patent, not NDMA.

So if you look into the context of this e-mail, you can tell that at that time he was trying to make a comparison between NDMA and Impurity K and the impurity found in the technical improvement of irbesartan, since they were all nitroso compounds, and he was merely trying to make a toxicology comparison.

Q.    And to be very clear, the words on the page not only say that there was NDMA in valsartan; they also say that the NDMA occurred in the valsartan when it was quenched with sodium nitrite.

Those words were accurate and true at the time the e-mail was written, correct?

A.    That's incorrect.

Page 93

Q.    Okay.  Tell me what's incorrect.  In July 2017, you've already agreed there was NDMA in valsartan, right? So that's correct?

Let me ask it again.

MR. SLATER:  Dr. Shao, let me ask it again.

Q.    In July 2017, there was NDMA in valsartan manufactured with the zinc chloride process.  That was a correct statement, right?

MR. BERNARDO:  I'm sorry, Adam. Can you repeat?

BY MR. SLATER:

Q.    Let me ask it differently.  Let me ask it differently.

In July of 2017, there was NDMA in the valsartan manufactured by ZHP.  That's a correct statement, right?

A.    To the best of my recollection, I have already responded to that question just now.

Q.    In July of 2017, it was true that the NDMA in the valsartan was occurring

Page 94

1  when the valsartan was quenched with sodium
2  nitrite during the manufacturing process.
3  That's a true, correct statement, right?
4      A.    You cannot put it that way.  I
5  don't think it is a correct statement.
6      Q.    Well, how was the NDMA being
7  formed in the valsartan if it wasn't being
8  formed when the product was being quenched
9  with sodium nitrite?  How was it happening if
10 that wasn't the way it was occurring?  Please
11 tell me.
12     A.    Let me go back to your previous
13 question.  Maybe that was due to the
14 difference between Chinese and English, and
15 something must have lost -- might have been
16 lost in the translation.
17        I agree that there was NDMA in
18 the valsartan that we manufactured using the
19 zinc chloride-sodium nitrite manufacturing
20 process in 2017.
21        In fact, there was NDMA in
22 valsartan that was manufactured using the
23 same manufacturing process in 2011.  That was
24 the result of our discovery in 2018.

Page 95

1      Q.    And the true and correct fact
2  that there was NDMA in valsartan and it was
3  occurring when the valsartan was quenched
4  with sodium nitrite during the manufacturing
5  process, those true and correct facts were
6  made known to you and everybody that received
7  this e-mail in July of 2017, including but
8  not limited to Peng Dong, Linda Lin, and
9  Min Li, and yourself, correct?
10        MR. BERNARDO:  Object to the
11     form of the question.
12        THE WITNESS:  That is
13     incorrect.  Actually, in July 2017,
14     people, including Jinsheng Lin and
15     others, including the people that I
16     just mentioned, such as Peng Dong,
17     Linda Lin, Min Li, and I, none of us
18     was aware of the existence of NDMA in
19     valsartan, while the reason being in
20     2017 we did not have the corresponding
21     analytical methods to test out NDMA;
22     therefore, nobody was aware of its
23     existence.
24            ///

Page 96

1  BY MR. SLATER:
2      Q.    Let's look at the e-mail.
3  Right underneath the little pictures there's
4  a paragraph that says, "In order to further
5  verify the structure of the impurity and its
6  formation mechanism, we plan to simulate the
7  quenching conditions and use the finished
8  Irbesartan product to react with NaNO2" --
9  which is sodium nitrite -- "and HCl to
10 monitor the impurity produced by the
11 reaction, and then separate it for NMR for
12 final structural verification, while
13 simultaneously carrying out the confirmation
14 of the impurity by multi-stage MS," which
15 means mass spectrometry, correct?
16        And that's the method that's
17 used to identify NDMA in valsartan, correct?
18        MR. BERNARDO:  Object to the
19     form.
20 BY MR. SLATER:
21     Q.    Mass spectrometry, correct?
22        MR. BERNARDO:  Object to the
23     form of the question.
24        THE WITNESS:  That is

Page 97

1  completely incorrect.
2  BY MR. SLATER:
3      Q.    Okay.  So you don't use mass
4  spectrometry to identify NDMA in valsartan?
5  That's not how it was done?
6        MR. BERNARDO:  Object to the
7     form of the question.
8        THE WITNESS:  As I mentioned
9     earlier, in order to identify an
10    impurity, we have to find out the
11    identity of the impurity first, and
12    then develop analytical methods.
13        Over here the impurity was
14    referring to the impurity found during
15    the technical improvement of
16    irbesartan on page 1; therefore, the
17    followup work was referring to that
18    impurity, and the confirmation of the
19    structure of that impurity would be
20    done through mass spectrometry.
21        Once again, the impurity here
22    is regarding the one that was
23    discovered during the technical
24    improvement of irbesartan.  He didn't

Page 98

1 say anything about the confirmation of
2 the existence of NDMA. That is my
3 first point.
4     My second point is that at that
5 time we did not have the right
6 analytical method to identify NDMA in
7 valsartan; therefore, at that time
8 none of us was aware of the existence
9 of NDMA in valsartan.
10 BY MR. SLATER:
11     Q.    As you said, the first thing
12 you need to do is figure out what impurity
13 you're looking for, and we know that it says
14 right in this e-mail there was NDMA in the
15 valsartan that occurred when it was quenched
16 with sodium nitrite.
17     So isn't the point that your
18 company already had mass spectrometry
19 available and had already figured out there
20 was NDMA in the valsartan before this e-mail
21 was ever written about this irbesartan
22 project? That's the point, isn't it?
23     MR. BERNARDO:  Object to the
24 form of the question.

Page 99

1     THE WITNESS:  Of course that
2 was not the point. If you look at the
3 whole body of this e-mail, I have to
4 say sure enough, this e-mail was so
5 poorly written, and you could not
6 simplify the e-mail by looking at only
7 one sentence. Even the paragraphs
8 written here were very confusing.
9     At that time, not only Jinsheng
10 Lin himself, even us, did not know
11 anything about the existence of NDMA
12 in valsartan. That was because there
13 was no analytical method would
14 identify NDMA in valsartan. That was
15 my first point.
16     My second point is that had we
17 known there was NDMA in valsartan at
18 that time, we would have taken the
19 same actions that we took in
20 June 2018.
21     MR. BERNARDO:  Adam, when
22 you're at a point to take a break,
23 we've been going for about an hour and
24 20 minutes, and it's late.

Page 100

1     MR. SLATER:  We can take a
2 break.
3     MR. BERNARDO:  Okay. Let's do
4 that.
5     THE VIDEOGRAPHER:  The time
6 right now is 11:26 a.m. We're off the
7 record.
8     (Whereupon, a recess was
9 taken.)
10     THE VIDEOGRAPHER:  The time
11 right now is 11:44 a.m. We're back on
12 the record.
13     MR. BERNARDO:  I just want to
14 point out that Mr. Slater and I were
15 just discussing the scheduling, and
16 it's ZHP's position that we've already
17 reduced the number of topics through
18 stipulations that we've provided by
19 two, so we're only remaining with
20 three topics. So surely we should be
21 able to get this done stopping at
22 midnight, which is reasonable tonight,
23 and doing the same thing tomorrow.
24     Both Ms. Brown and I, and I

Page 101

1 know Mr. Slater as well, are just
2 getting over COVID, and I really --
3 while I normally would be willing to
4 go later, I really don't want to
5 overdo it, and I would suggest we go
6 until midnight.
7     I'm not going to stop you in
8 the middle of a question; if it goes
9 like ten minutes or something over,
10 that's fine.
11     But we're just not comfortable,
12 for the reasons I just said, going
13 further. And we'll obviously work
14 with you to make sure we can get
15 through this deposition, but I don't
16 see why we can't complete it in
17 tonight and tomorrow night in the time
18 we just discussed.
19     MR. SLATER:  All right. I'm
20 not going to -- probably -- probably
21 not too much benefit for us debating
22 too much over this, but my position is
23 we have a certain amount of time to
24 take this deposition. I'm not going

Confidential Information - Subject to Protective Order

Page 102

1  to start recasting the time that we
2  had.
3       There was never any discussion
4  when we reached -- when you agreed to
5  admit to certain facts, there was no
6  discussion of limiting the time in a
7  deposition, nor would I ever have
8  agreed to that, nor was it ever
9  raised.  So I think that that's a
10 little bit artificial.
11      Let's hope that we can do well
12 tonight and tomorrow, but we have over
13 12 hours of time by order.  I argued
14 the issue, and the whole point was so
15 we wouldn't be put in a situation
16 where we would be running out of time
17 and start getting into double-time.
18      So I'm just saying we've only
19 been on the record for three hours and
20 49 minutes.  I'm willing to keep
21 going, and maybe we should start
22 earlier tomorrow night.
23      MR. BERNARDO:  Well, when we're
24 done, let's ask the witness, because

Page 103

1  it's obviously 7:00 a.m. her time.
2       MR. SLATER:  She looks like an
3  early riser.
4       MR. BERNARDO:  Sorry, I didn't
5  hear.
6       MR. SLATER:  She looks like an
7  early riser.
8       MR. BERNARDO:  We'll talk
9  afterwards.
10      MR. SLATER:  Okay.
11      Are we back on?
12      THE VIDEOGRAPHER:  We are on.
13      MR. SLATER:  Okay.
14 BY MR. SLATER:
15      Q.   Looking at the e-mail from
16 Jinsheng Lin, where he says there's NDMA in
17 the valsartan that occurs when it's quenched
18 with sodium nitrite, he doesn't refer to the
19 patent at all when he says that.  The patent
20 comes later, at the end of the e-mail, in a
21 different context, correct?
22      A.   That's incorrect.  Actually, as
23 we have discussed in our prior testimony --
24 in my prior testimony, this e-mail was very

Page 104

1  confusing and it was actually quite messy,
2  and it was very hard to understand what it
3  tried to say.
4       For this e-mail, the -- it
5  didn't say that it was aware of the valsartan
6  impurity at that time.  So that's the first
7  thing I wanted to express.
8       My second point is that at that
9  time Dr. Lin did not become aware of the
10 existence of NDMA in valsartan.  That's the
11 feedback he gave me through our
12 communication.
13      At that time, he was not
14 familiar with any impurity in valsartan.  He
15 was not in charge of this product, so his
16 understanding of the impurity in valsartan
17 was only limited to this patent.
18      As to NDMA as an impurity in
19 valsartan, as in my prior statement, at that
20 time we needed a proper analytical method to
21 identify NDMA in valsartan.  However, we
22 didn't have such analytical method;
23 therefore, neither did Jinsheng Lin or we had
24 any knowledge of the existence of NDMA in

Page 105

1  valsartan.
2       Once again, this e-mail was
3  written in such a messy way, and that's the
4  reason why it was very confusing.
5       Q.   Let's look at a few things that
6  are stated in this e-mail.
7       One of the things in the last
8  paragraph -- rephrase.
9       The last paragraph states in
10 part that the patent pointed out that the use
11 of sodium nitrite quenching will result in
12 the formation of N-nitroso impurities.
13      That's one of the things that
14 is stated, correct?
15      A.   That is correct.  That's what
16 the patent said.  He was basically
17 summarizing what the patent said.
18      Q.   He also says with regard to
19 the patent that this other company "used ZHP's
20 crude Valsartan in their LC-MS test and
21 detected this impurity," which was an
22 N-nitroso impurity, correct?
23      A.   That's what the e-mail says.
24 However, through communication with Dr. Lin,

Page 106

1 he told me that he heard that from a friend
2 of his. However, the other party did not
3 provide any chromatogram as well as data, so
4 he only recited or mentioned that he heard.
5      Q.    He then says in this paragraph
6 that "This indicates" -- meaning what is
7 written in the patent -- "that other
8 companies have paid attention to the quality
9 problem very early on."
10      So he's referring to this
11 formation of N-nitroso impurities due to
12 sodium nitrite quenching as a quality
13 problem. That's what it says on the
14 document, correct?
15      A.    Your statement is incorrect.
16 In the e-mail, he did refer to the 2013
17 patent. He also mentioned what he heard from
18 a friend of his regarding Impurity K.
19      But the e-mail also told us
20 that if, indeed, this Impurity K is a nitroso
21 compound, as it said, then it would become a
22 quality issue. And I agree with that.
23      Q.    Who is this friend that
24 Jinsheng Lin spoke to? What's that person's

Page 107

1 name?
2      A.    He didn't disclose that
3 friend's name in our communication. After
4 all, it's part of the trade secret, you know,
5 in business, and I was shy of prying for such
6 information.
7      Nevertheless, even after our
8 company heard what he heard from the friend,
9 we paid attention to this issue.
10      Q.    Dr. Lin referred to the use of
11 sodium nitrite quenching resulting from the
12 formation of N-nitroso impurities as a
13 quality problem, correct?
14      A.    I don't quite get your
15 question. However, I'll try to respond.
16      In this e-mail, he did mention
17 the Impurity K referred to in the patent. If
18 this Impurity K is indeed a nitroso compound,
19 then we have to control this impurity.
20 That's from the perspective of FDA as well as
21 the perspective of GMP. We have to control
22 this impurity.
23      If, after confirmation, we have
24 confirmed or identified this Impurity K in

Page 108

1 our product, then indeed this would be
2 regarded as a quality issue, a quality
3 problem.
4      Q.    If you had detected NDMA in
5 valsartan, that would be a quality problem,
6 too, right?
7      A.    Definitely. At that time we
8 didn't have the analytical method to detect
9 the NDMA in valsartan. Otherwise, we
10 wouldn't have been sitting here for this
11 deposition, right?
12      Q.    He finishes that paragraph at
13 the end of this e-mail and says, "So leaders
14 please pay attention to this issue." Right?
15 That's what he said?
16      A.    That is correct.
17      Q.    So let's be clear. In this
18 e-mail, Jinsheng Lin said in an e-mail that
19 went to you, who -- you were the head of
20 quality at the time, is that correct?
21      A.    I was the QA head at Chuannan
22 site, yes.
23      Q.    It went to you; it went to
24 Min Li, who was the head of CEMAT; it went to

Page 109

1 Peng Dong; it went to Linda Lin, the head of
2 regulatory, and some other people.
3      And in this e-mail, he said
4 that there was NDMA in valsartan that
5 occurred when it was quenched with sodium
6 nitrite.
7      He talked about a patent that
8 he read that said that the use of sodium
9 nitrite quenching will result in the
10 formation of N-nitroso impurities.
11      He pointed out that this would
12 be a quality problem, and he also said the
13 way to detect this impurity would be with
14 liquid chromatography-mass spectrometry, and
15 told the leaders to pay attention to this
16 issue. So all that information was there.
17      You and everyone on that e-mail
18 knew that you were quenching the valsartan
19 with sodium nitrite, yet it's your testimony
20 that nobody in response to this e-mail
21 actually said, Let's use the liquid
22 chromatography-mass spectrometry machine at
23 CEMAT -- which was an Agilent, A-G-I-L-E-N-T,
24 6100 single quad LC-MS machine -- and let's

Case 1:19-md-02875-RMB-SAK    Document 2626-11    Filed 02/06/24    Page 30 of 34
confidential information - subject to Protective Order
PageID: 94257

Page 110

1  try to identify whether there's nitrosamines
2  in our valsartan.
3        Do I have that correct?
4        MR. BERNARDO:  Object to the
5  form of the question.
6        THE WITNESS:  That's completely
7  incorrect.  Look at the title of this
8  e-mail.  It was about the impurity
9  that generated from the sodium azide
10  quenching in the technical improvement
11  of irbesartan.
12       For this impurity, this e-mail
13  was actually the investigation report.
14  It is all about irbesartan.
15       So while he was searching for
16  this nitroso impurity, he found this
17  patent regarding valsartan, which
18  mentioned Impurity K.  And he was
19  trying to make a comparison between
20  that impurity from irbesartan and
21  Impurity K as well as NDMA in
22  toxicology.
23       In the end of the e-mail, he
24  did mention that could be a quality

Page 111

1  issue, because for valsartan that
2  could be Impurity K, which was already
3  found by an analysis done by other
4  companies.  So he asked all the
5  leaders to pay attention, which we
6  did.
7        I don't know why you interpret
8  the e-mail this way.  As in the large
9  volume of discussion we had before, in
10  2017 Jinsheng Lin, Min Li, or any of
11  us did not know the existence of NDMA
12  in valsartan.
13       There are so many reasons why
14  we were not aware of that, one of them
15  being that we did not have the
16  analytical method to identify and
17  detect the NDMA in valsartan.  We were
18  not aware of such thing, so how could
19  we come up with the analytical method
20  such as LC-MS for any unknown
21  impurity?  How could we make up any
22  analytical method for that?
23       So we didn't know what to do.
24  We didn't know what method to develop

Page 112

1  for that impurity, simply because we
2  were not aware of that impurity, not
3  until June 2018 when Novartis made the
4  complaint.  And the company was paying
5  full attention to that.
6        Not only did we develop the
7  analytical method to detect that
8  impurity; we also reported that to
9  FDA, among many other actions we took.
10       Had we known the existence of
11  NDMA in valsartan in 2017, we would
12  have done the same thing that we did
13  in 2018.
14       So as you can see here, this
15  report is about the investigation of
16  an impurity in this small-scale
17  technical improvement of irbesartan.
18  And how could we then expand that to
19  an already commercialized product,
20  valsartan, for the suspicion that
21  there might be NDMA in it?
22       So out of common sense, this
23  doesn't sound reasonable.  Once again,
24  at that time we were not aware of the

Page 113

1  existence of NDMA in valsartan.
2  BY MR. SLATER:
3        Q.    The e-mail says that the use of
4  sodium nitrite quenching in valsartan will
5  result in the formation of N-nitroso
6  impurities.
7        So even accepting everything
8  you said about what ZHP didn't know, as of
9  the date of this e-mail, your company was on
10  notice that the sodium nitrite quenching of
11  any of its sartans needed to be investigated
12  and testing needed to be done to see if
13  nitrosamines were being formed, right?
14       Nothing was done, correct?
15  According to you, nothing was done?
16       MR. BERNARDO:  Objection.  Let
17  her answer the first question before
18  you ask the second, please.
19       THE WITNESS:  What's the first
20  question?  Your question was super
21  long.
22  BY MR. SLATER:
23       Q.    I'm not asking the question
24  again.  You heard the question; you can

Page 114

1  answer it.
2        Do you want me to ask a new
3  question?  I'll ask a new question.  It was
4  objected to; I'm happy to.
5        So here's the first thing.
6  After this e-mail was sent, no testing was
7  done of any of your sartans to determine
8  whether N-nitroso compounds were being formed
9  due to the sodium nitrite quenching, is that
10 your testimony?
11        MR. BERNARDO:  Object to the
12 form of the question.
13        THE WITNESS:  It's not correct.
14 You cannot put it in that way.
15 Over here we talked about the
16 Impurity K, because the patent
17 mentioned Impurity K.  And also other
18 companies found Impurity K in the
19 analysis of our crude products.
20 We actually care about the
21 impurity in our finished products;
22 therefore, after communication I found
23 that not only Jinsheng Lin, but also
24 Peng Dong, did analysis of Impurity K

Page 115

1  and couldn't find any Impurity K.
2        So we did pay attention to this
3        issue and took actions.  You cannot
4        say we never conducted any testing.
5  BY MR. SLATER:
6     Q.    You're saying that Jinsheng Lin
7  and Peng Dong in 2017 tested valsartan to see
8  if there was Impurity K in it?
9     A.    It went like this.  During the
10 communication with Jinsheng Lin, he told me
11 he did conduct analysis of Impurity K in
12 2017.
13        Likewise, I also communicated
14 with Peng Dong, and he also conducted an
15 analysis regarding Impurity K in our product.
16 And he also received the feedback from CEMAT
17 that CEMAT did not find any Impurity K in our
18 product.
19    Q.    What CEMAT did find was NDMA in
20 the valsartan, and that's why Jinsheng Lin
21 said it in his e-mail, that there's NDMA in
22 the valsartan that's caused when it's
23 quenched with sodium nitrite.
24        That is what was found, right?

Page 116

1        MR. BERNARDO:  Object to the
2  form of the question.
3  Characterization of the prior
4  testimony.
5        THE WITNESS:  That's completely
6  incorrect.
7        As I stated in my prior
8  testimony, Jinsheng Lin or any of the
9  other people on this e-mail was not
10 aware of the existence of NDMA in
11 valsartan, because at that time there
12 was no such analytical method to
13 identify NDMA in valsartan.  So your
14 statement is completely incorrect.
15 BY MR. SLATER:
16    Q.    You're -- rephrase.
17        So you're testifying that when
18 Jinsheng Lin said there was NDMA in
19 valsartan, he said that for no reason, and it
20 was just a complete coincidence and lucky
21 guess?
22        Is that your testimony?
23        MR. BERNARDO:  Object to the
24 form of the question.

Page 117

1        THE WITNESS:  Your statement is
2  completely incorrect, as I stated in
3  my prior testimony.
4        At that time Jinsheng Lin was
5  not aware of the existence of NDMA in
6  valsartan.  His understanding of NDMA
7  in valsartan was only limited to that
8  patent.
9        I also stated that this e-mail,
10 in terms of what it tried to state,
11 was written in such a messy and
12 ambiguous way.
13        And in this e-mail, he was
14 trying to make a comparison between
15 NDMA and that impurity he found in
16 toxicology.  So the e-mail did not
17 acknowledge that he already had the
18 awareness of NDMA in valsartan.  And
19 none of us did, the reason being there
20 was no analytical method to identify
21 such an impurity.
22        Without such an analytical
23 method to identify the impurity in the
24 testing, how can we come up with such

Confidential Information Subject to Protective Order

Page 118

1  knowledge?  Therefore, I believe your
2  statement is completely incorrect.
3       In order to fully understand
4  this e-mail, I also mentioned before
5  that you need to read the context of
6  the e-mail or the entirety of this
7  e-mail, as well as the attachment to
8  it.
9  BY MR. SLATER:
10      Q.    The patent does not mention
11  NDMA, correct?
12      A.    That is correct.  The patent
13  did not mention NDMA in its entirety.
14      Q.    Jinsheng Lin did reference NDMA
15  in valsartan in his e-mail, correct?
16      A.    I already mentioned that in
17  terms of the reference of NDMA, at the time
18  he was only trying to make a comparison in
19  toxicology between NDMA and the impurity he
20  found regarding the irbesartan.
21      The patent did not mention
22  NDMA.  However, the patent mentioned that
23  when valsartan was quenched with sodium
24  nitrite, there was an -- an impurity came.

Page 119

1      That is the evidence that at
2  that time the whole industry, ZHP, or
3  Jinsheng Lin did not have the awareness of
4  NDMA in valsartan.  Otherwise, the patent
5  would have mentioned NDMA instead of
6  Impurity K.
7      Q.    When you say that there was not
8  an analytical method to identify NDMA in the
9  valsartan, you're not saying that it wasn't
10  technologically feasible to do it, right?
11  You're not claiming that there was no such
12  method in the world to do that, are you?
13      A.    As I mentioned before, when you
14  try to develop an analytical method for a
15  specific impurity, you have to do that
16  development regarding that impurity.
17      I listed two FDA announcements
18  or documents.  Judging from the content of
19  such documents, you could tell that first you
20  have to be aware of such an impurity.  Then
21  you would develop an analytical method
22  targeting that impurity.
23      Q.    And that was technologically
24  feasible in 2011 through 2018, right?

Page 120

1       MR. BERNARDO:  Object to the
2  form of the question.
3       THE WITNESS:  I don't know what
4  you mean by "technologically
5  feasible."  Can you be more specific?
6  BY MR. SLATER:
7       Q.    The technology and the
8  scientific knowledge existed so that if one
9  at ZHP wanted to develop a method to try to
10  identify NDMA in valsartan, that could be
11  done, correct?
12      MR. BERNARDO:  Object to the
13  form of the question.
14      THE WITNESS:  Had we known
15  prior to June 2018 that there was an
16  impurity called NDMA, I believe my
17  company would have been capable of
18  developing such an analytical method
19  for this impurity, just like what we
20  did when we became aware of such an
21  impurity in June 2018.
22      MR. BERNARDO:  Adam, I'm trying
23  to be cooperative.  We went a
24  half-hour longer than we had

Page 121

1  anticipated.  And if we can end it
2  here, I'm happy to go off the record
3  and ask Ms. Ge if she's willing to
4  start early tomorrow as well.  But I'd
5  like to stop here.
6       MR. SLATER:  Well, I'm going to
7  be a gentleman and I'm not going to
8  argue with you.  I've already told you
9  how I feel about it.  I'm prepared to
10  keep going, but I understand your
11  position, and I'm going to try to be
12  optimistic that despite my
13  disappointment in not getting to go
14  into the deep of night, that we'll be
15  able to finish this deposition
16  tomorrow night and not ruin
17  everybody's Friday night before
18  Memorial Day.
19      MR. BERNARDO:  I would point
20  out we are in the deep of the night,
21  but other than that, I appreciate
22  that.
23      Why don't we go off the record
24  and see if Ms. Ge is willing to start

Page 122

1  earlier tomorrow.
2      THE VIDEOGRAPHER:  The time
3  right now is 12:32 p.m.  We're off the
4  record.
5      (Whereupon, the deposition was
6  adjourned.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 124

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.  It will be
10  attached to your deposition.
11      It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24

Page 123

1      CERTIFICATE
2
3      I, MAUREEN O'CONNOR
POLLARD, Registered Diplomate
Reporter, Realtime Systems
4  Administrator, and Certified Shorthand
Reporter, do hereby certify that prior
5  to the commencement of the
examination, JUCAI GE, was remotely
6  duly identified and sworn by me to
testify to the truth, the whole truth,
7  and nothing but the truth.
8      I DO FURTHER CERTIFY that
the foregoing is a verbatim transcript
9  of the testimony as taken
stenographically by and before me at
10  the time, place, and on the date
hereinbefore set forth, to the best of
11  my ability.
12      I DO FURTHER CERTIFY that
I am neither a relative nor employee
13  nor attorney nor counsel of any of the
parties to this action, and that I am
14  neither a relative nor employee of
such attorney or counsel; and that I
15  am not financially interested in the
action.
16
17
18  _____
19  MAUREEN O'CONNOR POLLARD
NCRA Registered Diplomate Reporter
20  Realtime Systems Administrator
Certified Shorthand Reporter
21  Notary Public
22  Dated: June 2, 2022
23
24

Page 125

1      - - - - - -
       E R R A T A
2      - - - - - -
3  PAGE LINE CHANGE
4  ___ ___ _____
5    REASON: _____
6  ___ ___ _____
7    REASON: _____
8  ___ ___ _____
9    REASON: _____
10  ___ ___ _____
11    REASON: _____
12  ___ ___ _____
13    REASON: _____
14  ___ ___ _____
15    REASON: _____
16  ___ ___ _____
17    REASON: _____
18  ___ ___ _____
19    REASON: _____
20  ___ ___ _____
21    REASON: _____
22  ___ ___ _____
23
24

Page 126

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4      I, _____, do
   Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9

10  _____
    WITNESS NAME          DATE
11
12
13
14
15
16

    Subscribed and sworn
17  To before me this
    _____ day of _____, 20____.
18
    My commission expires: _____
19
20  _____
    Notary Public
21
22
23
24

Page 127

1          LAWYER'S NOTES
2  PAGE  LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____