# EXHIBIT 1

'Red flags on top of red flags': Problems mount for UM athletics booster John Ruiz

**NewsRoom**

7/30/23 Miami Herald 3041

Miami Herald (FL)
Copyright (c) 2023 McClatchy-Tribune Information Services. All Rights Reserved.

July 30, 2023

'Red flags on top of red flags': Problems mount for UM athletics booster John Ruiz

By Ben Wieder and Jay Weaver, Miami Herald

Even by Miami standards, John H. Ruiz has been living large.

He doesn't buy just one waterfront mansion. He buys seven.

He doesn't just buy a 20-seat private plane. He buys a private Boeing passenger jet.

And he doesn't stop at buying fancy speed boats. He buys the companies that make them.

The brash attorney and entrepreneur has also become known as the sugar daddy of the University of Miami athletic program, making headlines for his company's sponsorship of star players and bold proposals to build the university a new football stadium.

But the high living might soon be coming to an end.

The Miami Herald has learned that Ruiz and his health insurance claims company LifeWallet — previously known as MSP Recovery — are the target of federal civil and criminal investigations. The ongoing federal probes mark an unprecedented level of trouble for the one-time TV host whose business practices and out-sized lifestyle evoke comparisons to Donald Trump.

His teetering enterprise is built on a Coral Gables company that seeks to recover money paid by Medicare-affiliated insurance companies that should have been paid by a different insurance carrier.

LifeWallet was once valued at more than $32 billion, but the company is now worth a small fraction of that. Its stock, which was worth more than $10 a share right before the company went public through a special purpose acquisition company, or SPAC, merger last year now trades for less than a quarter.

Ruiz and the company are also facing several lawsuits claiming that they owe millions of dollars to the sellers of businesses they acquired.

Ruiz has weathered trouble before — he was given a public reprimand by the Florida Bar in 2011 over a legal dispute — and his Coral Gables home, an office building he owned and even his boat were all the subject of foreclosure actions a decade ago.

But his current problems are more serious.

'Red flags on top of red flags': Problems mount for UM athletics booster John Ruiz

Ruiz and LifeWallet are the target of investigations by the U.S. Securities and Exchange Commission and the U.S. Attorney's Office for the Southern District of Florida.

The SEC declined to officially comment on whether it is investigating Ruiz's company. But the regulatory agency indicated that MSP Recovery, doing business as LifeWallet, is currently under federal investigation in response to a Freedom of Information Act request from the Miami Herald. The SEC said it could not turn over records requested by the Herald because they had been "compiled for law enforcement purposes" and could "reasonably be expected to interfere with enforcement activities." Sources familiar with the probe say SEC investigators are looking at what Ruiz's company represented to investors about its value and other possible securities violations.

The Herald has also learned that multiple witnesses have been interviewed about Ruiz and his company by the U.S. Attorney's Office in Miami. The investigation, led by FBI and IRS agents, is looking at financial representations made to investors and spending practices, according to sources. All three agencies declined to comment.

'Potentially massive financial problems'

The events mark a stunning decline for Ruiz and the company that put him on Forbes Magazine's annual list of billionaires last year after MSP Recovery went public in May of 2022, and later rebranded itself as LifeWallet.

The company's stock price nosedived soon after it was listed on the NASDAQ stock exchange and it has never recovered. It had already dropped by more than two-thirds by the time Ruiz rang the NASDAQ opening bell two days after the company went public and the price would never reach that height again.

MSP Recovery Opening bell.pngJohn Ruiz rings the bell to celebrate his company being listed on the NASDAQ stock exchange.

To keep the company afloat, Ruiz and Chief Legal Officer Frank Quesada loaned LifeWallet more than $100 million less than a month after it went public; meanwhile, the company has had to renegotiate with creditors for more time to pay off its debts.

Even more telling, LifeWallet's recent financial filings with the SEC constitute "red flags on top of red flags," said Richard Hong, a seasoned litigator who worked more than 25 years for the U.S. Attorney's Office in Miami and the Justice Department in Washington, D.C., as well as the SEC.

LifeWallet was months late in filing its 2022 annual report, and only filed it on Thursday, July 27, after the Herald sent the firm a detailed list of questions, including why it hadn't yet been filed.

The company had admitted in April that its earlier quarterly financial filings covering part of last year weren't reliable.

The newly filed annual report showed that LifeWallet took in $23.4 million last year from its primary business of recovering incorrectly paid insurance claims, falling far short of the $992 million in 2022 revenue the company had projected it would earn before going public.

And the company said its assets were worth $3.4 billion at the end of 2022, a far cry from the $6.5 billion it said LifeWallet's assets were worth in September, before it told the SEC it had to revise the numbers.

The company has not yet filed its financial report for the first quarter of 2023, which was due in May, but said it intends to file by August 7.

Case 1:19-md-02875-RMB-SAK    Document 2637-4    Filed 02/13/24    Page 4 of 367
PageID: 94854
'Red flags on top of red flags': Problems mount for UM athletics booster John Ruiz

LifeWallet acknowledged in the just-filed annual report that its financial reporting issues "adversely affected" the business by impacting the "confidence of investors, employees, and customers" and exposed the company to "greater risks associated with litigation, regulatory proceedings and government enforcement actions."

Earlier, the company said in a June SEC filing that its chief financial officer, Calvin Hamstra, had resigned after holding the position for roughly a year. He was replaced on an interim basis by LifeWallet's chief operating officer, Ricardo Rivera, who now holds both titles. The company has also admitted in filings to the SEC that it is at risk of being delisted on the NASDAQ exchange, which would make it much more difficult to trade the company's stock.

Hong, the former prosecutor, said LifeWallet's recently filed annual report, known as a 10-K, doesn't ease concerns about the company.

"It is difficult for me to fathom how a reasonable investor could draw any positive takeaways about the company's financial condition after reviewing this 10-K," said Hong, a partner with the Morrison Cohen law firm in New York. "They have all the telltale signs of a company with potentially massive financial problems."

Ruiz and LifeWallet declined to answer questions about the company's delay in filing its financial reports, the departure of Hamstra or the federal investigations into Ruiz and the company, referring the Herald to the company's filings with the SEC.

The negative publicity over LifeWallet's SEC disclosures has already cost the company business. In late April, LifeWallet was compelled to step aside from its role handling potential claims in the 4.4-million-person class-action lawsuit against Florida Power & Light over the utility company's "storm charges," which were imposed before Hurricane Irma inflicted potentially billions of dollars in property damages to customers in 2017.

LifeWallet "does not appear to be in good financial shape and may not survive the duration of this lawsuit," a lawyer for the utility asserted, according to a court document.

While Ruiz called the accusation "unequivocally false" in a court filing and wrote that FPL's statements "were made intentionally and recklessly and filed in bad faith," he eventually agreed to have a judge handling the case appoint another claims administrator to move the case along. His law firm is still involved as one of the legal representatives of the certified class members.

Staking their claims

The idea behind the company — created in 2014 as MSP Recovery, with the MSP standing for Medicare Secondary Payer — was to recover insurance money that Medicare-affiliated healthcare plans paid initially that should have been paid by a different insurer.

For example, if someone covered by a Medicare plan was injured in a car accident, his or her health insurance might have paid a hospital tab that should have actually been paid by a car insurance firm. In this example, Ruiz's company would collect payment from the car insurance company and then split the proceeds with the health insurer.

In some cases, Ruiz's company would negotiate with the health insurer for the right to buy the full value of the claim at a discount. For insurers, it meant money in their pockets immediately on a claim that might never pan out.

When the company went public, MSP Recovery said its portfolio included $1.5 trillion in billed insurance claims.

Ruiz's company developed algorithms that it said would comb through health claims records to identify potential cases and it partnered with the big-data company Palantir Technologies to help power its analysis.

'Red flags on top of red flags': Problems mount for UM athletics booster John Ruiz

MIA_104JohnRuizUM00NEWPPPEntrepreneur, businessman, and attorney, John H. Ruiz, at his house in Coral Gables on Wednesday, Dec. 08, 2021.

In recent years the company added other divisions, including one focused on making personal health data more accessible to consumers.

The company's growth wasn't always smooth. In 2016, for example, it required that all executives take a steep pay cut after the company didn't land the full $37.5 million it had been hoping for from a legal investment firm, according to court records.

But fortunes improved the following year after a $410 million investment from a Houston-based litigation lender.

Spending spree

While Ruiz was still years away from being anointed a billionaire by Forbes, he began to spend money like one, according to public records.

Between 2018 and 2022, Ruiz and companies tied to him bought more than $150 million worth of properties, including seven in the ultra-luxe Gable Estates, according to Miami-Dade property records. One of them was a couple doors down from the $30 million mansion owned by music producer Pharrell Williams.

The centerpiece of the buying spree was a 30,000-square-foot, nine-bedroom, 14-bathroom house in Gables Estates, sitting on more than two acres of waterfront property, that Ruiz bought for $46 million in 2020.

Ruiz properties map

Ruiz subsequently sold several of the properties, fetching nearly 30% more overall than he had paid for them, including one of the Gables Estates mansions that he sold to Rivera, the company's chief operating officer and interim chief financial officer, six months after Ruiz purchased it. He and his companies still own three Gables Estates mansions.

Ruiz made headlines for his unsolicited proposals to build a new stadium for the University of Miami football team, which would be called, naturally, LifeWallet Stadium.

He and his family announced big donations to the schools where his sons Johnny and Alex had played baseball — $10 million for athletic facilities at Westminster Christian School and $2 million to upgrade the weight room at the University of Miami baseball stadium. And Ruiz told the Herald in late 2021 that he planned to donate "north of $50 million" to the University of Miami.

RuizUM's Johnny Ruiz celebrates his ninth-inning home run Saturday, April 8, 2017, in Coral Gables, Fla.

Ruiz also donated $1 million in July 2021 to support families of the victims of the Surfside building collapse.

His family's giving didn't always attract positive attention.

The family became caught up in the political firestorm surrounding disgraced New York Congressman George Santos after revelations that Ruiz's ex-wife, Mayra, and two of his children had written more than $17,000 in checks in 2022 to support the Republican's campaign and hired Santos to broker a yacht deal.

Ruiz was quick to distance himself from that.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    4

AP23130698055486.jpgU.S. Rep. George Santos leaves the federal courthouse in Central Islip, N.Y., Wednesday, May 10, 2023. (AP Photo/Seth Wenig)

"I have been separated from my wife for over four years," Ruiz said in January 2023. "Mayra and my kids each have their own financial independence."

Cash concerns

It can sometimes be hard to distinguish spending by Ruiz and his health-claims company.

Take the example of private jets.

A month before LifeWallet went public in 2022, Ruiz invited Miami reporters to tour his new private jet, a Boeing 767 that had once ferried passengers for the Australian airline Qantas.

The refurbished interior now included a theater, bedroom and shower, conference room, dining room and two lounges with couches that converted to beds, according to the Miami New Times.

john ruiz plane interior joshua ceballos miami new times.pngJohn H. Ruiz, left, with Ben Shirazi, right, and Diana Diaz, middle right, in the theater of Ruiz's Boeing 767.

A company called MSP Recovery Aviation, LLC registered the plane with the Federal Aviation Administration a month before MSP Recovery announced that it would go public the following year. But Ruiz said that he is, in fact, the owner of the planes. LifeWallet pays Ruiz's company for use of the planes, according to the company's financial filings.

MSP Recovery Aviation, LLC first brought two private jets in 2018 and currently owns three planes, including the Boeing jet, and a helicopter. Ruiz said that his company is currently trying to sell the Boeing plane and the helicopter.

Ruiz's spending spree in recent years has been all the more striking given his financial condition not long ago.

He had been facing foreclosure on a Coral Gables home and his boat and lost an office building. He and his then-wife Mayra were subject to a 2014 tax lien from the Internal Revenue Services for nearly $30,000 in unpaid federal taxes from 2011 and 2013. And his ill-fated attempt to turn an old baseball stadium in Homestead into a youth sports mecca failed publicly. Ruiz's company wound up being evicted from the stadium, on the losing end of a lawsuit against the city and the subject of embarrassing stories about the shoddy living conditions of Venezuelan teenagers who had been living in the stadium through a baseball training program leasing space from Ruiz's company.

homestead stadium la ley AD_01.JPG.JPGThe Homestead baseball complex on April 25, 2012.

Even as his spending surged, Ruiz seemed to regularly find himself in need of more cash.

While he and his connected companies appeared to pay for most of the properties up-front with cash, he subsequently wound up using many of the properties as collateral for more than $80 million in loans taken out in 2021 and 2022, according to Miami-Dade property records. The most recent homes he sold in the Gables Estates went for millions less than he had initially asked for them — with one selling for two-thirds the original asking price. Ruiz told the Herald he "often acquires real estate through all- cash purchases and occasionally uses the equity in one property to obtain financing for the purchase of other properties."

In the wake of LifeWallet's decline, numerous business owners have come forward saying they are owed millions by the company and Ruiz.

Ruiz agreed to buy Titusville, Florida boat manufacturer Vectorworks for $35 million in cash in late 2021, but to date has paid only $15 million, according to a lawsuit that is ongoing. Ruiz said he was persuaded to buy the company under "materially false pretenses."

And Norberto Menendez, the founder of the company that gave Ruiz's health-claims company its name, LifeWallet, said in a lawsuit that he is owed $12.5 million.

In text messages from August 2022 produced in the suit, Ruiz indicates that the amount was to be paid in a pre-set amount of company stock that was worth less at that point and is practically worthless now.

"The market is down but will adjust at some point," Ruiz wrote in August 2022, arguing that Menendez should accept shares as payment. "Again the only reason we are discussing this is bc the stock market is down."

Menendez insists it was to be cash or a cash-equivalent. Ruiz denies all the allegations in the lawsuit and the case is ongoing.

Canes connections

If Ruiz or his company is charged by federal authorities, it could have major ripple effects across Miami.

Among those who could be impacted are the University of Miami and many of its star athletes.

Ruiz has been front and center in the extensive sponsorship of University of Miami athletes through newly legal Name, Image and Likeness deals, known as NIL, which allow college athletes to collect endorsements and have been a major boon to Miami's athletic program.

Ruiz celebrated on the court after the men's basketball team defeated the University of Texas to advance to the Final Four in last year's NCAA basketball tournament and he regularly touts new deals on social media. He's been referred to by ESPN and other sports outlets as Miami's "NIL King."

LifeWallet has signed deals with Miami quarterback Tyler Van Dyke, All-American safety Kam Kinchens and defensive tackle Leonard Taylor, among many other members of the football team. Guard Isaiah Wong, last year's Atlantic Coast Conference men's basketball player of the year, signed a six-figure deal with LifeWallet, and his teammate Nijel Pack turned heads when he signed a two-year, $800,000 deal with LifeWallet that included a car when he transferred from Kansas State in 2022.

MiamiHouston_20230324_nw_002Miami guard Nijel Pack (24) launches a three-point shot against Houston during a Sweet 16 college basketball game in the Midwest Regional of the NCAA Tournament Friday, March 24, 2023, in Kansas City.

The university did not respond to multiple requests for comment about its relationship with Ruiz but its athletic director, Dan Radakovich, acknowledged to the Herald in May that NIL support from Ruiz and LifeWallet "have been really important." He added that the university was trying to expand its base of financial support to "supplement those dollars that John has put in with other sources of revenue."

The financial and legal threats faced by Ruiz and his company could accelerate the university's need to do so.

Major supporters of the program have had legal problems before. The school's former top booster, Nevin Shapiro, was sentenced in 2011 to 20 years in prison for fraud. That was before the existence of NIL benefits. Shapiro admitted he used millions of dollars gained illegally from a $930 million Ponzi scheme to write checks to the university and provide impermissible benefits

to star athletes, including, he later claimed, spending on strip clubs, cars, trips and an abortion. The NCAA stripped the football and men's basketball teams of numerous scholarships and put the athletic program on probation for three years.

While the NIL deals LifeWallet has struck with Miami athletes are legal under NCAA rules, Ruiz's sponsorship activity has already gotten Miami's athletic program in hot water.

The Miami's women's basketball team was sanctioned earlier this year after the NCAA found that Ruiz had provided an impermissible meal to twin sisters Haley and Hanna Cavinder before they had officially committed to transfer to Miami from Fresno State. Ruiz, and the sisters, escaped penalties. Ruiz said the sanctions have had no impact on his relationship with the university.

---- Index References ----

Company: U.S. SECURITIES AND EXCHANGE COMMISSION; Federal Bureau of Investigation; Internal Revenue Service; FLORIDA POWER & LIGHT COMPANY; Federal Aviation Administration; PALANTIR TECHNOLOGIES INC.; The Florida Bar; MORRISON COHEN LLP; ESPN, INC.; Msp Recovery Aviation, LLC

News Subject: (Crime (1CR87); Criminal Law (1CR79); Financial Fraud (1FI18); Fraud (1FR30); Government Litigation (1GO18); Legal (1LE33); Social Issues (1SO05); Sports Law (1SP70))

Industry: (Entertainment (1EN08); Sports (1SP75))

Region: (Americas (1AM92); Florida (1FL79); Kansas (1KA13); New York (1NE72); North America (1NO39); Texas (1TE14); U.S. Mid-Atlantic Region (1MI18); U.S. Midwest Region (1MI19); U.S. Southeast Region (1SO88); U.S. Southwest Region (1SO89); USA (1US73))

Language: EN

Other Indexing: (University of Miami football team; SPAC; U.S. Attorney's Office for the Southern District of Florida; Justice Department; Miami-Dade; University of Texas; U.S. Securities and Exchange Commission; FBI; Internal Revenue Services; Florida Power & Light; Federal Aviation Administration; Palantir Technologies; Florida Bar; Morrison Cohen; ESPN; MSP Recovery Aviation, LLC) (John Ruiz)

Word Count: 3128

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**NewsRoom**

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re Novartis and Par Antitrust Litigation** | **1:18-cv-04361-AKH** |
| **This Document Relates To:**<br><br>**All Actions** | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. RENA CONTI

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

I.      INTRODUCTION ................................................................................1

II.     BACKGROUND ..................................................................................1

III.    ARGUMENT ........................................................................................3

        A.      Dr. Conti's Methodology For Identifying Members of the Putative
                Class Is Unreliable ....................................................................4

        B.      Dr. Conti's Methodology For Calculating Overcharges to the
                Putative Class Is Unreliable ......................................................6

IV.     CONCLUSION ....................................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)...................................................................................3, 5

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..............................................................................................5

*Pacific Life Ins. Co. v. Bank of New York Mellon*,
    2021 WL 5299193 (S.D.N.Y. Nov. 15, 2021)...........................................................6

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010)....................................................................8

*Weiner v. Snapple Beverage Corp.*,
    No. 07 CIV. 8742 DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010).......................8

**Statutes & Rules**

Fed. R. Evid. 702 ..................................................................................................3, 8

Case 1:Case 1:18-cv-4361-AKH Document 2697-4 Filed 08/02/23 Page 4 of 23
Case 1:18-cv-4361-AKH Document 4697 Filed 08/02/23 Page 13 of 367
PageID: 94863

## I.    INTRODUCTION

Plaintiffs seek to rely on expert testimony from economist Dr. Rena Conti, who opines on the purported injury to the putative end-payor ("EPP") class.  Dr. Conti's methodology, however, suffers from two critical flaws, each of which provides an independent basis for exclusion.  First, Dr. Conti's analysis fails to accurately identify the consumers and third-party payors ("TPPs") that paid for brand or generic Exforge prescriptions in the specific jurisdictions that are included within the putative EPP class, while accounting for those jurisdictions that are excluded from the putative EPP class.  Second, Dr. Conti's analysis fails to reliably determine how much TPPs (such as insurance companies) paid for the prescriptions at issue, a necessary predicate to calculating an accurate overcharge estimate.

## II.    BACKGROUND

The putative EPP class is comprised of two types of indirect purchasers: (i) consumers, who are individual purchasers of brand or generic Exforge, and (ii) TPPs, which include entities such as health plans and insurers that reimbursed some or all of the prescription price on behalf of their members or insureds.  Ex. A, Conti Rpt. ¶ 14.[1]  The putative EPP class is limited to those consumers or TPPs who made their brand or generic Exforge purchases in one of 22 jurisdictions.[2]  *Id.*  As the Court may recall, while the EPPs' complaint initially sought to include 48 jurisdictions within the putative class,

---

[1] Exhibits filed herewith are attached to the Declaration of Rachel G. Skaistis.

[2] These 22 jurisdictions are: the District of Columbia, Arizona, California, Florida, Hawaii, Iowa, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Utah, Vermont, West Virginia, and Wisconsin.  *Id.*

that number was reduced to 22 in the Court's rulings on the motion to dismiss. *See* Opinion and Order Granting Defs. Partial Mot. to Dismiss, ECF No. 193, at 17-19. Since that time, EPPs have not contested that the jurisdictions within their putative class are limited to those 22. As such, calculating a reliable damages estimate requires accurately identifying the operative jurisdiction for purposes of each prescription during the relevant period, as well as assessing the extent to which the indirect purchasers of those prescriptions were allegedly injured—*i.e.*, whether and how much less they would have paid absent the challenged conduct.

Dr. Conti seeks to make both determinations using a dataset her consulting firm purchased from a third party, IQVIA; the dataset is called Xponent, and it attempts to capture retail sales information for about 92 percent of all prescriptions in the country. Ex. A, Conti Rpt. ¶ 91; Ex. D, Craft Rpt. ¶ 42. The Xponent data include a "STATE" field, which Dr. Conti uses to determine which jurisdiction was the operative jurisdiction for each prescription. Ex. C, Conti Dep. Tr. at 188:2-20. The data also list an amount of monthly pharmacy reimbursement by medication, which Dr. Conti uses to determine an average, monthly per-prescription price to calculate her overcharge estimate. Ex. A, Conti Rpt. ¶ 93. For purposes of her opinions, Dr. Conti was instructed by Plaintiffs' counsel that "antitrust injury occurs at the moment of purchase", *id.* ¶ 116, and interpreted the Xponent data as providing information relevant to that moment for assessing injury to both consumers and TPPs in the putative EPP class.[3] After applying

---

[3] *See* Ex. C, Conti Dep. Tr. at 188:2-20 ("Q: What is the operative location for assessing which reimbursements are in the putative class? . . . A: Injury occurs at the point of sale, and therefore it's the point -- it's the place where the consumer receives the dispensed prescription. Q: And to make the determination of where the consumer received the dispensed prescription, you used the state field in the Xponent data; right?

this methodology, Dr. Conti concluded that antitrust injury can be shown using common proof, that overcharges can be reliably calculated on a class-wide basis, and that overcharges to the putative EPP class are between $94 and $130 million.  Ex. A, Conti Rpt. ¶ 4.

Notably, on January 3, 2022—nearly a month after her deposition and following the close of expert discovery—Dr. Conti submitted a so-called "Second Errata," in which she admitted, for the first time, that her understanding of the "STATE" field in the Xponent data had been incorrect.  Ex. B, Conti Second Errata ¶¶ 5-6.  Specifically, Dr. Conti explained that on December 9, 2021—three days after her deposition—she learned that the "STATE" field "reflects the *prescriber's* location the vast majority of times," not the moment of purchase.  *Id.* ¶ 5 (emphasis added).  Notwithstanding this fundamental misunderstanding of the data, Dr. Conti went on to state that her "conclusions and opinions remain the same."  *Id.* ¶¶ 5-6.

## III.    ARGUMENT

Dr. Conti's analyses rely on a flawed understanding of the Xponent data and result in an unreliable definition of the putative EPP class and overcharge estimate.  Her opinions should therefore be excluded.  Fed. R. Evid. 702(c) (expert testimony is only admissible if "the testimony is the product of reliable principles and methods"); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (expert testimony must be reliable at every step: "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible").

---

A: Yes, which reflects the -- for retail pharmacies, it reflects the location of the pharmacy, as I understand it.").

### A. Dr. Conti's Methodology For Identifying Members of the Putative Class is Unreliable

In her expert report, and throughout her deposition, Dr. Conti asserted, without reason or explanation, that antitrust injury occurs at the "point of sale," which she assumes is the location of the pharmacy (for retail purchases) or the consumer's residence (for mail order purchases). *See, e.g.*, Ex. A, Conti Rpt. ¶ 116; Ex. C, Conti Dep. Tr. at 188:11-20.[4]  She further testified that she relied upon the "STATE" field in the Xponent data to identify this geographical point of sale for purposes of her opinions.  Ex. C, Conti Dep. Tr. at 192:16-23.  Setting aside whether the pharmacy location or consumer's home address provide the correct metric for determining point of sale (particularly for the purpose of assessing antitrust injury for a TPP who may be hundreds or thousands of miles away from the pharmacy and consumer), the IQVIA data on which Dr. Conti relies does not provide that information.  Instead, as Dr. Conti now admits, the "STATE" field in the dataset on which she relied reports on the location of the *prescribing physician*. *See* Ex. B, Conti Second Errata ¶ 5.  This error calls into question all of Dr. Conti's opinions because it undermines her application of the IQVIA data.

First, there is no logical basis for suggesting that the point in time at which a consumer or TPP is allegedly injured occurs when a doctor writes a prescription for branded or generic Exforge.  Neither money nor medication changes hands at that moment.  Moreover, many prescriptions that are written are never filled.

---

[4] *See also* Ex. C, Conti Dep. Tr. at 201:13-19 ("A: Okay. Just common sense for a second, please. If I'm a consumer, I walk into a pharmacy and I am given a prescription drug from the pharmacist, that is the point of sale. It is exactly that definition of the point of sale that I am applying in assessing injury and damages in this calculation.").

Second, using the prescribing physician's location for determining class membership would be improper in instances, for example, where a consumer visited a physician in a jurisdiction other than where he or she filled a prescription, or where a TPP paid a pharmacy for a prescription in a jurisdiction other than where the medication was prescribed.  For instance, Dr. Conti's approach would count as an EPP class member a consumer who visited a physician in the District of Columbia (included in the putative class definition) but filled that prescription in Maryland or Virginia (both excluded from the putative class definition).  It would also count as an EPP class member an insurer based in Washington (excluded from the putative class definition) who paid for all or part of a prescription that was written in New York (included in the putative class definition), even if the insurer's payment for that prescription was made to a pharmacy in New Jersey or Connecticut (both excluded from the putative class definition).

Thus, the data Dr. Conti relies upon is insufficient to support her analysis.  *See Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony"); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (expert opinion should be excluded when "there is simply too great an analytical gap between the data and the opinion proffered" (internal quotation marks omitted)).

Dr. Conti now attempts to rehabilitate her testimony—after her deposition and the conclusion of expert discovery—by stating that her error has no impact on the conclusions and opinions set forth in her report.  Ex. B, Conti Second Errata ¶ 6.  This untimely opinion lacks foundation and should also be excluded.  Indeed, Dr. Conti's

revised opinion is based solely on conclusory statements that "people seek medical care within a short distance of their residence," and "prescriber state, pharmacy state, and the patient state are highly concordant." *Id.* ¶ 6. Dr. Conti—who does not claim any expertise in such matters—has not put forward any methodology, much less a reliable one, to make those determinations. They should be excluded as a result. *Pacific Life Ins. Co. v. Bank of New York Mellon*, 2021 WL 5299193, at *3 (S.D.N.Y. Nov. 15, 2021) ("Rule 702 requires that expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation." (internal quotation marks omitted)).

### B. Dr. Conti's Methodology For Calculating Overcharges to the Putative Class Is Unreliable

Dr. Conti's opinions should also be excluded because her methodology cannot reliably capture amounts paid for Exforge and its generic equivalents by the TPP members of the putative class. The Xponent data Dr. Conti uses to calculate overcharges attempt to capture the amounts paid to pharmacies for Exforge prescriptions.[5] Dr. Conti acknowledges, however, that many TPPs use pharmacy benefit managers ("PBMs")— who were intentionally excluded from the definition of the putative EPP class[6]—to execute their pharmaceutical purchasing, and so they reimburse the PBMs, not the pharmacies, for their members' prescriptions. *See* Ex. A, Conti Rpt. ¶¶ 171-173. ███

███████████████████████████████████

███████████████████████████████████

---

[5] *See, e.g.*, Ex. C, Conti Dep. Tr. at 175:5-10 ("Q: You mentioned that the Xponent data that you used for your analysis is -- reflects the payment to the pharmacy for the pharmaceutical product; right? A: Correct. It is the point of sale purchase price.").

[6] End-Payor Plaintiffs' Consolidated Amended Complaint, ECF No. 25, ¶ 174(i).

████████████████████████████████████

████████████████████████████████████

████████████████████████ *See, e.g.,* Ex. F, UFCW LOCAL 1500-EXFG-000536–66 at -43.

Dr. Conti conceded at her deposition that in instances where it is a PBM that pays the pharmacies for Exforge prescriptions—rather than TPPs themselves—the "reimbursement" by the TPP to the PBM for a given prescription (which the TPP seeks to recover as alleged damages in this case) could be different than what is received by the pharmacy and ultimately reflected in the Xponent data for that sale. Ex. C, Conti Dep. Tr. at 166:22-167:3. This disparity could be, for example, a function of "spread pricing," whereby a TPP agrees to pay the PBM more for prescriptions than the PBM pays the pharmacy. Ex. A, Conti Rpt. ¶ 173. Or the disparity could be, for example, the result of the PBM failing to meet contracted rebate or pricing guarantees to the TPP that require the PBM to take a loss on a given prescription.[7] In either case, there is no basis to assume that the amount received by the pharmacy, as reflected in the Xponent data, is the proper metric to determine overcharges—that could allocate "damages" to TPPs that suffered no harm at all, or whose alleged harm is considerably overstated.

Dr. Conti has not investigated the extent to which there may be differences between the amounts TPPs in the putative class paid PBMs for Exforge and generic

---

[7] Ex. E, Rogers Dep. Tr. at 76:20 – 77:5 ("[Q:] We talked earlier about the possibility that there could be instances in which the rebates paid out to a client under rebate guarantees exceed the rebates received by Optum from the manufacturer on specific prescriptions right? A: That is a possibility, yes. Q: In those instances, does Optum take a net loss on that particular prescription? . . . .[A:] In the – in the aggregate, we could calculate a loss.").

Exforge prescriptions and the pharmacy reimbursements for those prescriptions included in the Xponent data on which she relies.[8]  Dr. Conti also has not assessed, and has no basis to assume, whether any such payments by TPPs to PBMs were made in the same jurisdiction as the prescribers of the Exforge and generic Exforge prescriptions to which they are tied, which is the only geographical information Dr. Conti can draw from the Xponent data to determine which TPPs should be included in the putative class.  *See* Ex. B, Conti Second Errata ¶ 5.  This incomplete analysis is insufficient to meet the demanding reliability requirements of Rule 702.  *See Weiner v. Snapple Beverage Corp.*, No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010) (excluding expert report that provided "no details concerning the significant conceptual, implementation, or data issues that would be encountered if his [approach] were adopted"); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 274 (S.D.N.Y. 2010) ("The minimal data that [the experts] relied upon . . . provide ample reason to exclude their testimony on damages.")

## IV.  CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court exclude the testimony of Dr. Rena Conti in its entirety.

---

[8] Ex. C, Conti Dep. Tr. at 175:11-176:5 ("Q: So in instances where there's a difference between the payment to the pharmacy and the payment from the third-party payer to the PBM for a given transaction, the Xponent data does not take into account that difference; correct? [A:] . . . . There might be these additional adjudications, but I think that they're out of my calculation, certainly.").

Dated: January 11, 2022

Respectfully submitted,

/s/ Rachel G. Skaistis

Evan Chesler
Rachel G. Skaistis
Helam Gebremariam

Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000
echesler@cravath.com
rskaistis@cravath.com
hgebremariam@cravath.com

*Attorneys for Defendants Novartis*
*Pharmaceuticals Corporation and Novartis AG*

/s/ Benjamin M. Greenblum

Benjamin M. Greenblum
Andrew W. Rudge
Elise M. Baumgarten
Thomas W. Ryan
R. Chet Otis
Adam Pan
**WILLIAMS & CONNOLLY LLP**
650 Fifth Avenue, Suite 1500
New York, NY 10019
Tel: (646) 949-2800
Fax: (646) 949-2801
bgreenblum@wc.com
arudge@wc.com
ebaumgarten@wc.com
tryan@wc.com
rcotis@wc.com
apan@wc.com

*Attorneys for Defendant Par*
*Pharmaceutical, Inc.*

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 17-22539-CV-WILLIAMS**

MSPA CLAIMS 1, LLC, *et al.*,

     Plaintiffs,

v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

     Defendant.

_____/

## ORDER

    **THIS MATTER** is before the Court on Chief Magistrate Judge Edwin G. Torres'
Report and Recommendation (DE 220) ("***Report***") on Defendant's Motion for Summary
Judgment (DE 200) ("***Motion***"). In the Report, Chief Magistrate Judge Torres
recommends that the Court grant Defendant's Motion for Summary Judgment. (DE 220
at 1.) Specifically, the Report finds that "the claims alleged in this case are meritless and
unsupported by the record on the motion." (*Id.*) Plaintiff filed Objections to the Report (DE
238) and Defendant filed a Response (DE 240).[1] The Court conducted a *de novo* review
of the portions of the Report to which Plaintiff objected and a review of the remainder of
the Report for clear error.

    Having carefully reviewed the Report, the Objections, and having considered the
extensive record and the applicable law, it is **ORDERED AND ADJUDGED** that:

_____

[1] Plaintiff filed an additional Reply (DE 241) without prior leave of Court. Accordingly,
the Reply is not considered in this Order.

1. The Report and Recommendation (DE 220) is **AFFIRMED AND ADOPTED**.

2. Defendant's Motion for Summary Judgment (DE 200) is **GRANTED**.

3. All deadlines and hearings are **CANCELLED**. All pending motions are **DENIED AS MOOT**.[2]

4. Judgement in favor of Defendant will be entered by way of a separate Order.

    **DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>12th</u> day of February, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

[2] The Court has reviewed Plaintiff's Motion for Partial Summary Judgment (DE 222) and finds the arguments unpersuasive.

# EXHIBIT 7

Case 1:18-md-02875-RMB-SAK   Document 2637-4   Filed 02/13/24   Page 26 of 367
PageID: 94876

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2017-022854-CA-01
SECTION: CA21
JUDGE: David C. Miller

**Heydi Velez et al**

Plaintiff(s)

vs.

**Florida Power & Light Company et al**

Defendant(s)

_____/

### AGREED COURT ORDER RESOLVING PLAINTIFFS' MOTIONS TO STRIKE

A special set hearing for this matter was held at 9:00 a.m. on Thursday, April 27, 2023.
[D.E. 320]  This Order memorializes the Court's rulings on:

   i. Plaintiffs' April 17, 2023 Emergency Motion to Strike Certain Statements and Order to Show Cause Why Defendant Florida Power & Light Company and its Counsel Should Not Be Sanctioned Under the Court's Inherent Contempt Powers ("**Initial Motion to Strike**") [D.E. 317];

   ii. Plaintiffs' April 24, 2023 Amended Emergency Motion to Strike Certain Statements and Order to Show Cause ("**Amended Motion to Strike**") [D.E. 332];

   iii. Defendant, Florida Power & Light Company's ("**FPL**"), April 26, 2023 Opposition to Plaintiffs' Emergency Motions to Strike ("**FPL's Opposition**") [D.E. 338]; and

   iv. FPL's April 26, 2023 Notice of Filing Exhibits to Florida Power & Light Company's Opposition to Plaintiffs' Emergency Motions to Strike ("**NOF Exhibits to FPL's Opposition**") [D.E. 339]

(collectively, the "**Motion to Strike Filings**").

This Court, having reviewed the Motion to Strike Filings; having reviewed the court file; having heard argument from counsel for the Plaintiffs and from FPL; having been informed of the agreement of the parties; and having been otherwise duly advised in the premises; it is, thereupon,

**ORDERED AND ADJUDGED** that:

1. By agreement of the respective parties, the filers of the following court documents hereby withdraw those court documents (or expressly stated portions thereof):

   a. the Motion to Strike Filings;

   b. the 10 subpoenas issued on April 20, 2023 by Plaintiffs that were directed to FPL's counsel of record [D.E. 321-330];

   c. Plaintiffs' April 20, 2023 Notice to Appear at the Evidentiary Hearing Scheduled for April 27, 2023 [D.E. 331];

   d. FPL's April 25, 2023 Omnibus Notice of Objection to Ten Subpoenas Duces Tecum to Non-Party Attorneys, and FPL's Served Attorneys' Notice of Joinder in Objections and April 26, 2023 *Joinder* [D.E. 333 and 337];

   e. FPL's Omnibus Motion for Protective Order As to Ten Non-Party Attorneys Subpoenas and FPL Notice to Testify, or in the Alternative, Motion to Quash the Subpoenas and Notice [D.E. 341];

   f. Plaintiffs' April 26, 2023 Response in Opposition to Defendant's Omnibus Notice of Objection to Ten Subpoenas Duces Tecum Directed to Non-Party Attorneys [D.E. 342];

   g. Plaintiffs' and FPL's requests for judicial notice [D.E. 343, 344]; and

   h. section (E) on pages 9-10 of FPL's Motion for Court Approval of its Proposed Class Notice [D.E. 318].

(collectively, the "**LifeWallet Filings**").

2. The parties and their respective counsel also agree to conclude for all time, all issues concerning the motions to strike by agreeing:

  a. MSP Recovery, LLC d/b/a LifeWallet shall be replaced by Epiq as class administrator, effective immediately (the mechanics of which will be detailed further in a separate order);

  b. to seal the withdrawn LifeWallet Filings, or aforementioned parts thereof, and portions of the transcript of the April 27, 2023 hearing should it later be filed with this Court (the mechanics of which will be detailed further in a separate order);

  c. not to proceed to hearing, evidentiary or otherwise, on the Motion to Strike Filings;

  d. there shall be no adverse implication or inference as a result of either party, or their respective counsels', entry into this agreement and/or withdrawing any motion or part thereof;

  e. there shall be no adverse implication or inference as a result of either party, or their respective counsels', withdrawal of any of the LifeWallet Filings; and

  f. MSP Recovery, LLC d/b/a LifeWallet, and their respective parents, subsidiaries, and related entities as well as all owners, officers, directors, and counsel for same (collectively, "**MSP**") and Plaintiffs all hereby unequivocally release FPL and their respective counsel of record (including the law firms of Heise Suarez Melville, P.A.; Boies Schiller Flexner LLP; and Squire Patton Boggs LLP), from any and all claims, if any exist, stemming from any of the LifeWallet Filings; and

  g. FPL as well as its owners, officers, directors, and counsel for same hereby unequivocally release Plaintiffs and MSP from any and all claims, if any exist, stemming from any of the LifeWallet Filings.

3. As a result of the parties' aforementioned agreement, the Motion to Strike Filings is **MOOT**.

4. The Court hearing set for October 2023 on the Motion to Strike Filings is cancelled.

**IT IS SO ORDERED.**

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 28th day of April, 2023.

2017-022854-CA-01 04-28-2023 1:02 PM
Hon. David C. Miller

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Alexis Fernandez, afernandez@msprecoverylawfirm.com
Alexis Fernandez, serve@msprecoverylawfirm.com
Alexis Fernandez, afernandez@msprecoverylawfirm.com
Alvin Bruce Davis, alvin.davis@squirepb.com
Alvin Bruce Davis, patricia.sullivan@squirepb.com
Alvin Bruce Davis, FLA_DCKT@squirepb.com
Amanda Elizabeth Preston, amanda.preston@squirepb.com
Amanda Elizabeth Preston, patricia.sullivan@squirepb.com
Amanda Elizabeth Preston, FLA_DCKT@squirepb.com
Carla C Benedi, cbenedi@hsmpa.com
Charles L Schlumberger, charles.schlumberger@fpl.com
Charles L Schlumberger, jacqueline.bussey@fpl.com
Digna B. French, Digna.french@squirepb.com
Digna B. French, doreen.dougherty@squirepb.com
Digna B. French, FLA_DCKT@squirepb.com
Digna French, Digna.french@squirepb.com
Dorian N Daggs, ddaggs@hsmpa.com
Dorian N Daggs, filings@hsmpa.com

Eduardo E. Bertran, ebertran@armaslaw.com
Eduardo E. Bertran, malmeida@armaslaw.com
Francesco A. Zincone, fzincone@armaslaw.com
Frank C. Quesada, fquesada@msprecovery.com
Frank C. Quesada, frank@quesadalaw.net
Frank C. Quesada, anna@quesadalaw.net
Gabrielle Christina Craft, gcraft@hsmpa.com
Gonzalo R Dorta, grd@dortalaw.com
Gonzalo R Dorta, jgonzalez@dortalaw.com
JOHN H RUIZ, serve@msprecovery.com
JOHN H RUIZ, afernandez@msprecovery.com
JOHN H RUIZ, aalvarez@msprecovery.com
Jacqueline Bussey, Jacqueline.Bussey@fpl.com
Jeannie Pupo, jpupo@msprecoverylawfirm.com
John H. Ruiz, jruiz@msprecoverylawfirm.com
John Henslee, john.henslee@squirepb.com
Jose Alfredo Armas, Alfred@armaslaw.com
Jose Alfredo Armas, malmeida@armaslaw.com
Joseph Ianno Jr., Joseph.Iannojr@fpl.com
Joseph Ianno Jr., Billijoel.Lupton@fpl.com
Julio C Acosta a, eservice@acostalaw.org
Julio C Acosta a, cpla@acostalaw.org
Lourdes Rodriguez, lrodriguez@msprecoverylawfirm.com
Luis Eduardo Suarez, lsuarez@hsmpa.com
Luis Eduardo Suarez, filings@hsmpa.com
Luis Eduardo Suarez, bvelazquez@hsmpa.com
MSP Recovery Law Firm, serve@msprecoverylawfirm.com
Mark J Heise, mheise@hsmpa.com
Mark J Heise, filings@hsmpa.com
Matias R. Dorta, mrd@dortalaw.com
Matias R. Dorta, bcabrera@dortalaw.com
Natalia Marrero, nmarrero@armaslaw.com
Nicole Varela, nvarela@dortalaw.com
Pascual A. Oliu, poliu@bsfllp.com
Pascual A. Oliu, ftleserve@bsfllp.com
Pascual A. Oliu, jbalda@bsfllp.com
Pascual Oliu, poliu@bsfllp.com
Patricia Melville, pmelville@hsmpa.com
Patricia Melville, filings@hsmpa.com
Sashi Bach, sbach@bsfllp.com
Sashi C. Bach, sbach@bsfllp.com
Sashi C. Bach, ftleserve@bsfllp.com
Sashi C. Bach, mhernandez@bsfllp.com
Stuart H. Singer, ssinger@bsfllp.com
Stuart H. Singer, aanderson@bsfllp.com
Stuart H. Singer, ftleserve@bsfllp.com
Susanne Herman, sherman@bsfllp.com

Thomas S. Ward, tward@hsmpa.com
Thomas S. Ward, filings@hsmpa.com
Thomas S. Ward, cbenedi@hsmpa.com
Zaima Olivares, zolivares@msprecoverylawfirm.com


**Physically Served:**

# EXHIBIT 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE TRANSITION PERIOD FROM                TO**

**Commission File Number: 001-39445**

# MSP Recovery, Inc.
**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **84-4117825** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2710 Le Jeune Road Floor 10** | |
| **Coral Gables, Florida** | **33134** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (305) 614-2222**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Class A common stock, $0.0001 par value per share** | **LIFW** | **The Nasdaq Global Market** |
| **Redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $11.50 per share** | **LIFWW** | **The Nasdaq Global Market** |
| **Redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $0.0001 per share** | **LIFWZ** | **The Nasdaq Global Market** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.  Yes ☐ No ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☐ No ☒

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).  Yes ☐ No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.  ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☒

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant based on the closing price of $0.328 for the shares of common stock on the Nasdaq Stock Market on June 30, 2023, was $43,005,879.

The number of shares of Registrant's Common Stock outstanding as of July 19, 2023 was 331,235,848 shares of Class A common stock, $0.0001 par value per share, and 3,106,616,119 shares of Class V common stock, $0.0001 par value per share, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

**Explanatory Note**

As described in our Current Report on Form 8-K filed with the SEC on April 14, 2023, we identified errors in the accounting for the indemnification asset, various intangible assets and rights to cash flows, and consolidation of an entity in connection with our business combination. As a result of these errors, management and the audit committee of our board of directors concluded that our previously issued unaudited condensed consolidated financial statements for the periods ended June 30, 2022 and September 30, 2022 were materially misstated. Accordingly, our unaudited condensed consolidated financial statements for the foregoing periods require restatement and should no longer be relied upon. The financial information that was previously filed or otherwise reported as of and for the periods ended June 30, 2022 and September 30, 2022 is superseded by the information in this Annual Report on Form 10-K. See Note 18 to our consolidated financial statements in this Annual Report on Form 10-K for additional information on the restatement and the related financial information impacts.

In addition, on April 16, 2023, the board of directors of the Company established a special committee to review matters related to the preparation and filing of this Annual Report on Form 10-K, and to address any related issues. At that time, it was decided to postpone the filing of this Annual Report on Form 10-K pending the special committee's review. On June 13, 2023, the special committee finalized its review. The findings and recommendations of the special committee are set forth in "Part II, Item 9A Controls and Procedures" of this Annual Report on Form 10-K.

**Table of Contents**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 15 |
| Item 1B. | Unresolved Staff Comments | 49 |
| Item 2. | Properties | 49 |
| Item 3. | Legal Proceedings | 49 |
| Item 4. | Mine Safety Disclosures | 49 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 50 |
| Item 6. | [Reserved] | 50 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 64 |
| Item 8. | Financial Statements and Supplementary Data | 64 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 97 |
| Item 9A. | Controls and Procedures | 97 |
| Item 9B. | Other Information | 100 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 100 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 101 |
| Item 11. | Executive Compensation | 105 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 107 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 110 |
| Item 14. | Principal Accounting Fees and Services | 111 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 112 |
| Item 16 | Form 10-K Summary | 114 |

i

**DEFINITIONS**

Unless otherwise stated or unless the context otherwise requires, the terms "we," "us," "our," the "Company," and "LifeWallet" refer to MSP Recovery, Inc. d/b/a LifeWallet. As used in this annual report on Form 10-K, unless otherwise noted or the context otherwise requires, the terms below are defined as follows:

"Algorithm" The term algorithm generally refers to a set of instructions that perform a particular action. Our team of data scientists and medical professionals create proprietary instruction sets, or "Algorithms," to identify recovery opportunities within our Assignors' Claims data sets. The Algorithms incorporate various data points within our Assignors' data, which may include, but are not limited to, medical coding classification systems such as diagnosis codes (e.g., ICD-8/ICD-9/ICD-10 codes), procedure codes (e.g., CPT codes), and drug codes (e.g., NDC codes); non-medical data such as demographics and date ranges; and data from public sources such as crash reports, offense incident reports, and other reports that provide details as to an occurrence. These Algorithms are then applied to our Assignors' aggregated Claims data, filtering through the billions of lines of data from our Assignors to identify recoverable opportunities consistent with a given Algorithm's criteria. Identified potential recoveries are then further quality reviewed by our medical team.

"Amended and Restated Bylaws" means the proposed Amended and Restated Bylaws of the Company;

"Billed Amount" (a/k/a the charged amount or retail price) is the full commercial value of services billed by the provider, or the full charge that the provider would ordinarily bill for the service provided. The Billed Amount for a specific procedure code is based on the provider and varies from location to location. The Company uses historical data from claims submitted by providers to determine the Billed Amount when a Billed Amount is not provided in the data received from the Assignor.

"Board of Directors" or "Board" means the board of directors of the Company;

"Business Combination" means the business combination pursuant to that certain Membership Interest Purchase Agreement, dated as of July 11, 2021, as described in more detail in Note 1 of this Form 10-K;

"Claim" means the right, title to, and/or interest in, any and all claims or potential claims, including all related reimbursement and recovery rights, which the Company has, may have had, or may have in the future assigned to it (whether or not asserted), including all rights to causes of action and remedies against any third-party, whether a primary payer or responsible party, at law or in equity. The term "Claim" includes but is not limited to: (i) claims arising under consumer protection statutes and laws; (ii) claims arising under the Medicare and Medicare Advantage secondary payer statutes, whether based in contract, tort, statutory right, or otherwise, in connection with the payment to provide healthcare services or supplies; (iii) claims arising under any state statutes and common laws irrespective of the rights that are conferred to MSP through assignment or otherwise; and (iv) all right, title, and interest to any recovery rights that may exist for any potential cause of action where a responsible party or primary payer is liable, even where it has not been established because liability is not yet proven as of the date that the Claim is identified or discovered, together with all receivables, general intangibles, payment intangibles, and other rights to payment now existing or hereafter arising and all products and proceeds of the foregoing;

"Class A Common Stock" means the shares of the Company's Class A common stock, par value $0.0001 per share, as described in more detail in Note 3 of this Form 10-K;

"Class B Common Stock" means the shares of the Company's Class B common stock, par value $0.0001 per share, as described in more detail in Note 1 of this Form 10-K;

"Class V Common Stock" means the shares of the Company's Class V common stock, par value $0.0001 per share, as described in more detail in Note 1 of this Form 10-K;

"Class B Unit" means the non-voting economic Class B Units of the Company, as described in more detail in Note 1 of this Form 10-K;

"Closing" means the closing of the Business Combination, as described in more detail in Note 3 of this Form 10-K;

"DGCL" means the Delaware General Corporation Law, as may be amended from time to time;

"Exchange Act" means the Securities Exchange Act of 1934, as amended;

"Existing Warrant Agreement" means the Warrant Agreement dated as of August 13, 2020, by and between the Company and Continental Stock Transfer & Trust Company;

"Founder Shares" means the shares of the Class B Common Stock and the shares of Class A Common Stock issued upon the automatic conversion of the Class B Common Stock at the time of the Business Combination as provided in the Existing Charter;

"GAAP" means generally accepted accounting principles in the United States, as applied on a consistent basis;

"IPO" means the initial public offering by the Company;

"Incentive Plan" means the MSP Recovery Omnibus Incentive Plan effective May 18, 2022, a copy of which is filed as an Exhibit 10.16 to our Form S-1 Registration Statement filed on November 30, 2022;

"LCAP Board" means the board of directors of the Company prior to the Closing;

"LLC Agreement" means the first amended and restated limited liability company agreement of Opco;

"Members' Representative" means John H. Ruiz, solely in his capacity as the representative of the Members;

"MIPA" means the Membership Interest Purchase Agreement, dated as of July 11, 2021, as described in more detail in Note 1 of this Form 10-K;

"MSP Recovery" means MSP Recovery, LLC;

"New Warrants" means 1,029,000,000 warrants, each to purchase one share of Class A Common Stock issued as a dividend to the holders of record of Class A Common Stock as of the close of business on the date of Closing;

"Nomura" means Nomura Securities International, Inc.;

"Opco" means Lionheart II Holdings, LLC, a wholly owned subsidiary of the Company;

"Paid Amount," (a/k/a Medicare Paid Rate or wholesale price) means the amount paid to the provider from the health plan or insurer. This amount varies based on the party making payment. For example, Medicare typically pays a lower fee for service rate than commercial insurers. The Paid Amount is derived from the Claims data we receive from our Assignors. In the limited instances where the data received lacks a paid value, our team calculates the Paid Amount with a formula. The formula used provides rates for outpatient services and is derived from the customary rate at the 95th percentile as it appears from standard industry commercial rates or, where that data is unavailable, the billed amount if present in the data. These amounts are then adjusted to account for the customary Medicare adjustment to arrive at the calculated Paid Amount. Management believes that this formula provides a conservative estimate for the Medicare paid amount rate, based on industry studies which show the range of differences between private insurers and Medicare rates for outpatient services.

We periodically update this formula to enhance the calculated paid amount where that information is not provided in the Assignor data. Management believes this measure provides a useful baseline for potential recoveries, but it is not a measure of the total amount that may be recovered in respect of potentially recoverable Claims, which in turn may be influenced by any applicable potential statutory recoveries such as double damages or fines, as described below. This calculation accounts for an approximate 7% increase in the total Paid Amount. Where we have to extrapolate a Paid Amount to establish damages, the calculated amount may be contested by opposing parties.

"Private Warrants" means warrants which is exercisable for one share of Class A Common Stock, in accordance with its terms;

"Public Units" means units comprised of one share of Class A Common Stock and one-half of one Public Warrant issued in the IPO;

"Public Warrants" means warrants included in the Public Units issued in the IPO, each of which is exercisable for one share of Class A Common Stock, in accordance with its terms, as described in more detail in Note 3;

"PVPRC" means the cumulative Paid Amount value of potentially recoverable Claims. We analyze our Claims portfolio and identify potentially recoverable Claims using Algorithms that comb through historical paid Claims data and search for potential recoveries. The PVPRC is a measure of the Paid Amount in respect of those potentially recoverable Claims. In the limited instances where the data received from our Assignors lacks a paid value, the adjustment formula described in the definition of Paid Amount is applied and increases PVPRC by approximately 6.5%.

"SEC" means the U.S. Securities and Exchange Commission;

"Securities Act" means the Securities Act of 1933, as amended;

"Series MRCS" means Series MRCS, a series of MDA, Series LLC, a Delaware series limited liability company;

"Sponsor" means Lionheart Equities, LLC, a Delaware limited liability company;

"Trust Account" means the trust account established by the Company for the benefit of its stockholders with Continental Stock Transfer & Trust Company;

"Up-C Unit" means each pair consisting of one share of Class V Common Stock and one Class B Unit, as described in more detail in Note 1 of this Form 10-K.

"Virage" means Virage Capital Management LP, a Delaware limited partnership;

"Voting Rights Threshold Date" means the date on which the voting power of John H. Ruiz and his affiliates represent less than fifty percent (50%) of the voting power of all of the then outstanding shares of the Company generally entitled to vote;

"VRM" means Virage Recovery Master LP, a Delaware limited partnership and affiliate of Virage; and

"VRM MSP" means VRM MSP Recovery Partners LLC, a Delaware limited liability company and joint investment vehicle of VRM and Series MRCS.

3

---

## Item 1. Business.

### Industry Overview

The market for healthcare data solutions and healthcare Claims recovery solutions is large and growing. In 2020, the U.S. national health care expenditure was an estimated $4.1 trillion and accounted for 19.7% of the U.S. gross domestic product ("GDP"). The Office of the Actuary of the Center for Medicare & Medicaid Services ("CMS") estimates that the U.S. national health care expenditure will amount to $6.2 trillion, accounting for 19.7% of the GDP in 2028. National health care expenditures are projected to grow 1.1% faster than the GDP between 2019 and 2028.

CMS estimated that $1.6 trillion would be spent on Medicare and Medicaid in 2021. This $1.6 trillion includes $684 billion on Medicaid expenditures and $923 billion on Medicare expenditures. We estimate the serviceable addressable market for Medicare was $102 billion and $75 billion for Medicaid for 2021.

Further, CMS estimates that they review less than 0.2% of the over one billion Claims that Medicare processes every year, which leads to a potentially high frequency or number of improper payments of Claims submitted.

### The Company's Business Overview

We are a leading data analytics company specializing in healthcare Claims recovery. Our Assignors are healthcare providers and payers (the "Assignors") that have irrevocably assigned to us their recovery rights associated with certain healthcare Claims. We obtain Claims data from the Assignors and leverage our data analytics capabilities using our Claims recovery platform to identify payments that were improperly paid by our Assignors. We then seek the full recoverable amount from those parties who, under applicable law or contract, were responsible for payment (or reimbursement). Our Assignors fall into three general categories:

o   **Medicare Advantage.** Medicare Advantage organizations ("MAOs") contract with CMS to administer Medicare benefits to Medicare beneficiaries pursuant to Medicare Advantage plans; and MAOs, in turn, contract with Medicare first-tier, downstream, and related entities to assist the MAOs in administering those Medicare benefits.

o   **Medicaid.** Health coverage provided to eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities.

o   **Commercial Insurance.** Employer-sponsored or individual purchased health insurance coverage.

In January 2022, the Company announced the launch of LifeWallet. LifeWallet is a data ecosystem that is in continuous development to provide innovative data solutions for a variety of industries, including, but not limited to, sports, education, legal, and healthcare. LifeWallet is being developed to employ sophisticated data analytics to enable informed decision-making and improved patient outcomes.

Our assets are generally comprised of recovery rights assigned by our Assignors relating to the improper payment of medical expenses. As opposed to service-based contracts, the entirety of these recovery rights have been irrevocably assigned to us, and because we own these rights, our recovery rights for Claims being pursued cannot be revoked.

Although our Assignors are primarily MAOs, Management Services Organizations ("MSO") and Independent Practitioner Associations ("IPA"), we also can (and in certain cases do) provide our Claims recovery services to other entities such as:

•   Health Maintenance Organizations ("HMOs")

•   Accountable Care Organization ("ACOs")

•   Physicians

•   Home Healthcare Facilities

•   Self-Funded Plans

•   States and Municipalities

•   Skilled Nursing Facilities

•   Hospitals/Health Systems

Our data recovery system operates across a Health Insurance Portability and Accountability Act of 1996 ("HIPAA") compliant IT platform incorporating the latest in business intelligence and data technology. Due to the sensitive nature of the data we receive from our Assignors, we ensure that our data systems comply with the security and privacy mandates by federal law. In April 2022, Marcum LLP ("Marcum"), a HITRUST authorized External Assessor Organization, completed an independent assessment of MSP

4

Recovery's system and service commitments, concluding that our system met the requirements to satisfy the applicable trust services criteria and HITRUST CSF criteria. This independent assessment verifies that we met the healthcare industry's highest standards in protecting healthcare information and mitigating this risk, including compliance with HIPAA rules and regulations. On March 2, 2023, Marcum provided MSP Recovery a report demonstrating that our data recovery system's commitments and system requirements meet or exceed the stringent SOC 2 Type II applicable trust services criteria. For our cloud computing services, we currently use the HITRUST certified Amazon Web Services ("AWS").

### The Company's History

In April 2014, MSP Recovery's predecessor, La Ley Recovery Systems, entered into its first assignment agreement. Later that year, MSP Recovery, LLC was founded to provide data driven solutions, and La Ley Recovery Systems filed its first lawsuit against a primary payer—Allstate Insurance Company. In late 2014, we entered into assignment agreements with our second and third Assignors. To date, we have over 160 Assignors.

Since 2014, we have had significant legal victories, including several significant federal appellate court wins. In these opinions, the courts agreed with us on a variety of key issues, holding that:

- downstream entities, such as MSOs and IPAs have standing to sue primary plans under the Medicare Secondary Payer Act ("MSP Act") and associated federal regulations (collectively, the "MSP Laws"); and

- a settlement agreement with a Medicare beneficiary is evidence of constructive knowledge that the primary payer had reimbursement obligations.

### <u>Claims Recovery Model</u>

**Identifying Opportunity.** Our primary focus is on the Medicare and Medicaid markets. Medicare is the second largest government program, with approximately 65 million enrollees and estimated annual expenditures of approximately $930 billion during 2022. Medicaid is a state-based program with approximately 85 million enrollees and estimated annual expenditures of approximately $864 billion during 2022. Under the MSP Laws, Medicare is the secondary payer in those instances where a primary payer is obligated to provide coverage to an insured. When Medicare (or an MAO) makes a payment for medical services that are the responsibility of a primary payer under the MSP Act, those payments are subject to recovery where, and to the extent that, one of the statutorily enumerated sources of primary coverage was contractually obligated to pay. Subsequent MSP Act legislation authorizes private parties to recover unreimbursed payments in cases where a primary plan fails to provide payment (or appropriate reimbursement) in accordance with MSP Laws.

We believe our access to large volumes of data, sophisticated data analytics, and a leading technology platform provide a unique ability to discover and recover Claims. Using Algorithms, we identify fraud, waste, and abuse in the Medicare, Medicaid, and commercial insurance segments. Our Algorithms have identified what we estimate to be significant value in potentially recoverable Claims. Of the amount spent yearly by Medicare on medical expenses for its beneficiaries, we estimate that at least 10% are improper payments by private Medicare Advantage plans where a primary payer was responsible to make the payment. We seek recoveries of the Billed Amount from responsible primary payers, and in some instances, double damages and statutory interest pursuant to the MSP Laws.

**Pursuit of Recoveries.** After potentially recoverable Claims are identified using our Algorithms, and vetted by our team of professionals, we formally retain counsel, including La Ley con John H. Ruiz P.A., d/b/a MSP Recovery Law Firm (the "Law Firm"), described in more detail below under "Fee Sharing Arrangement," and other law firms, to pursue recoveries using a variety of methods, including, but not limited to, demand letters, litigation, private lien resolution programs, and the submission of Claims to mass tort or antitrust settlement coordinators.

### Medicare and the MSP Law
*The Medicare Secondary Payer Act*

The MSP Act states that, under certain conditions, Medicare is the secondary payer rather than the primary payer for its insureds. When Medicare (or an MAO) makes a payment for medical services that are the responsibility of a primary plan under the MSP Act, those payments are conditional. Conditional payments are made by Medicare (or an MAO) as an accommodation for its beneficiaries but are secondary and subject to reimbursement in all situations where one of the statutorily enumerated sources of primary coverage was obligated to pay instead.

Subsequent to the initial passage of the MSP Laws, Congress provided a private cause of action, authorizing private parties to recover unreimbursed payments in cases where a primary plan fails to pay or provide appropriate reimbursement in accordance with MSP Laws. We use the current MSP Laws, among others, including the double damages provision, to hold primary payers accountable. The U.S. Senate and the U.S. House of Representatives is currently contemplating the Repair Abuses of MSP Payments Act, re-introduced in May 2023, which seeks to limit the application of the private cause of action under the Medicare Secondary Payer Act and related double damages provisions.

5

*Medicare Advantage Plans*

In 1997, Congress enacted the Medicare Part C program to allow Medicare beneficiaries to receive Medicare Part A and B benefits through privately-run managed care plans. Under the Medicare Advantage program, a private insurance company contracts with CMS to provide Medicare Parts A and B benefits on behalf of Medicare beneficiaries enrolled in a Medicare Advantage Plan ("MA Plan"). Under such a contract, the MAO receives a fixed amount per enrollee (the "Capitation") and must provide at least the same level of benefits that enrollees would receive under the fee-for-service option. The Capitation structure incentivizes MAOs to provide Medicare benefits more efficiently than under the fee-for-service model due to the competition among MAOs for enrollees as well as the savings recovered from primary payers resulting in additional benefits to enrollees.

An MAO's payment obligation under Part C is coextensive with that of the Secretary under Parts A and B. Part C includes a reference to the MSP Act and renders an MAO a "secondary payer" under the Act. In addition, the CMS regulations provide that an MAO will exercise the same rights to recovery from a primary plan, entity or individual that the HHS Secretary exercises under the MSP regulations. The U.S. Court of Appeals for the Eleventh Circuit has accordingly recognized parity between MAOs and Medicare, as "Congress empowered (and perhaps obligated) MAOs to make secondary payments under the same circumstances as the Secretary." MAOs, however, are merely the first layer of the Medicare Advantage program. Due to the customary practices within the MAO industry, the financial injury caused by a primary plan's failure to reimburse conditional payments is often felt primarily by First Tier and Downstream Entities.

*First-Tier and Downstream Entities*

Federal regulations recognize Medicare first-tier and downstream entities as active participants in the provision of benefits under Medicare Part C. 42 C.F.R. § 422.2 defines a "First-Tier Entity" as "any party that enters into an acceptable written arrangement with an MA organization or contract applicant to provide administrative services or health care services for a Medicare eligible individual." A "Downstream Entity" is an entity that enters into a similar written arrangement at a level below that of a First-Tier Entity. Such written arrangements continue down to the level of the ultimate provider of both health and administrative services. These contracts are both encouraged and regulated by CMS, which requires First-Tier and Downstream Entities to furnish healthcare services in a manner consistent with the dictates of the Medicare program and a MA plan's obligations thereunder. In this way, First-Tier and Downstream Entities are the parties responsible for managing and providing healthcare services to Medicare beneficiaries under the Medicare Advantage program.

First-Tier entities include MSOs and IPAs. An IPA is a business entity organized and owned by a network of independent physician practices for the purpose of reducing overhead and optimizing efficiency and effectiveness in the delivery of health care to Medicare beneficiaries. Put simply, IPAs are healthcare providers who often bear the full financial risk of managing their patients' care. An MSO is a group that owns or manages multiple physician practices for the same purpose. The core business of IPAs and MSOs within the Medicare Part C infrastructure is to manage the care of patients, leverage their delivery systems, and focus on preventive health in order to create value and cost savings.

Because of an MSO and IPA's role as a point of service provider and manager of a beneficiary's care, MAOs customarily pass their risk of loss onto MSOs and IPAs. Under these arrangements, an MAO deducts a percentage of the CMS capitation rate for its administrative costs and pays the balance to the IPA or MSO. In exchange, the provider (IPA or MSO) assumes the full financial risk for the care of the MAO's enrollee. As such, "at-risk" IPAs and MSOs are charged with producing competition, innovation, progress, and savings in the Medicare Part C environment. In accepting the full financial risk of a Medicare beneficiary's health care, an IPA or MSO assumes the MAO's position within the Medicare Part C framework.

When a Medicare Advantage enrollee is injured in an accident, an IPA or MSO can meet its obligation to that enrollee in one of two ways. First, it can render the requisite care to the enrollee directly through its network of physicians, providers, or medical centers. Under this scenario, the MSO or IPA suffers the full cost of providing items and services to the Medicare beneficiary.

Alternatively, if the enrollee is treated in an emergency room or other facility outside of the MSO or IPA's provider system, then the MSO or IPA may make a conditional payment for the cost of that treatment because it is financially responsible for the enrollee's care. Under this second scenario, the contracting MAO pays the outside provider (i.e., the emergency room) and then charges the full amount of that payment to the MSO or IPA who bears the risk of loss. In other words, the MSO or IPA must reimburse the MAO for the full amount of its payment to the outside provider (or that payment is applied as a set-off against capitated funds that the MSO or IPA would otherwise receive).

If an MAO makes a secondary payment which is later appropriately reimbursed by a primary payer, then the MAO will not charge and collect that same amount from the MSO or IPA responsible for that particular enrollee. On the other hand, if the primary payer violates the MSP Act, it is First-Tier and Downstream Entities that are damaged as a result. When an MSO or IPA is damaged by a primary payer, that entity may likewise turn to the MSP Act's broadly worded private cause of action against the primary payer.

**Double Damages.** Under existing statutory and case law, the private cause of action under the MSP Act permits an award of double damages when a primary plan fails to provide for primary payment or appropriate reimbursement. We are entitled to pursue medical expenses paid by our Assignors that should have been paid by Primary Plans. Under the MSP Act, we are entitled to pursue double the amount that a provider charged. The private cause of action under 42 U.S.C. § 1395y(b)(3)(A), works in concert with 42

U.S.C. § 1395w-22(a)(4), which expressly provides MAOs with the right to "charge or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy, described in such section the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services…" Moreover, the MSP regulations in Part 411 also support the fact that a provider may bill its full charges for services to primary payers. The statute provides the Company the ability to seek double the charged or otherwise Billed Amounts from primary plans. The payment disparity between the Paid Amount and the Billed Amount creates a free rider scenario where the primary payer is in a better financial position if it does not comply with the law. In other words, if a primary payer's liability is capped at double the Paid Amount (an amount less than what the primary payer would have paid) then the entire purpose of the MSP Act—to make Medicare secondary—is defeated. That is why Congress set the damage amount at the amount billed by the provider; to incentivize compliance with the MSP Act. However, the Repair Abuses of MSP Payments Act (S.1607/H.R.3388) (the "RAMP Act") introduced by Senators Tim Scott (R-SC) and Maggie Hassan (D-NH) and Representatives Brad Schneider (D-IL) and Gus Bilirakis (R-FL) in the U.S. Senate and the U.S. House of Representatives, respectively, could limit potential double damage recoveries to group health plans only, as defined in paragraph 42 U.S.C. § 1395y(b)(1)(A)(v)). This legislation, if enacted as proposed, would not apply retroactively, and would not affect our existing portfolio of Claims or lawsuits filed prior to its potential enactment.

**Interest Multiple.** In addition to the Billed Amount, the Company is entitled to pursue interest pursuant to Section 1862(b)(2)(B)(i) of the Social Security Act and 42 C.F.R. § 411.24(m), which provides express authority to assess interest on Medicare Secondary Payer debts. Therefore, when recovery is pursued through litigation, we seek to recover double the amount owed for our Assignor's accident-related medical expenses, plus accrued statutory interest due pursuant to the MSP Laws.

Pursuant to federal and state laws, we believe the Company has an established basis for future recoveries, often in excess of the Paid Amount. By discovering, quantifying, and settling the gap between Paid Amount and Billed Amount on a large scale, we believe we are positioned to generate meaningful profit margins. Pursuant to the "right-to-charge" provision in the MSP Laws, an MAO may charge, or authorize providers to charge, insurance carriers for usual, customary, and reasonable charges permitted by the law, plan, or policy, such as the Billed Amount. As such laws, plans, and policies provide for payment of the providers' actual charges (the Billed Amount), rather than the reduced Medicare payments, we pursue recovery of the Billed Amount and in certain cases, as provided by law, double the Billed Amount for medical services and treatments. The below graphic demonstrates the difference between the Paid Amount, the Billed Amount, and the potential for double damages. For additional information, see "Development of Medicare and the MSP Law" below.



**Illustrative Recovery Potential**

**Mandatory Reporting**

**The Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA"):** MMSEA added mandatory reporting requirements with respect to Medicare beneficiaries who have coverage under group health plan arrangements as well as for Medicare beneficiaries who receive settlements, judgments, awards, or other payment from liability insurance (including self-insurance), no-fault insurance, or workers' compensation. Failure to comply with MMSEA may result in a civil money penalty of $1,000 for each day of noncompliance for each individual for which the information should have been submitted. This civil money penalty is in addition to any other penalties prescribed by law and in addition to any Medicare secondary payer Claim under this title with respect to an individual. Although we are not entitled to pursue MMSEA penalties on our own behalf, we have filed a qui tam lawsuits on behalf of the federal government to enforce this federal law.

**Recent Updates - Corporate Rebranding**

In January 2023, we rebranded to LifeWallet. The core strategy and business of the Company remains the same—secondary payer reimbursement recoveries. However, utilizing the name LifeWallet reflects the diverse recovery opportunities presented by the Company's growing technological innovations and consolidates current and future lines of business under one name, while positioning the Company for future revenues streams.

**The LifeWallet Ecosystem**

We are developing LifeWallet—a versatile, scalable, and expandable ecosystem, where tokenized data is stored in a secure, user friendly platform with multiple applications. LifeWallet is expected to provide real-time analytics at the point of care, helping identify the primary insurer, assisting providers in receiving reasonable and customary rates for accident-related treatment, shortening the company's collection time frame, and increasing revenue visibility and predictability. The platform aims to avoid the improper documenting of medical Claims that lead to improper billing, thereby preventing fraud, waste, and abuse, and is also expected to provide an application programming interface that allows patients to gain immediate access to all of their medical records when seeking medical treatments. LifeWallet incorporates extensive privacy and security standards and is HIPAA compliant.

8

A number of applications that will be powered by LifeWallet are currently in development, including:

- **LifeWallet Sports.** LifeWallet Sports empowers student-athletes to maximize their Name, Image, and Likeness ("NIL") rights by connecting them with brands and businesses. The platform assists athletes in deal negotiation and rule compliance and enables brands and businesses to identify talent, schedule events, monitor campaigns, and much more.

- **Chase to Pay Services.** Over time we intend to shift our core business to the Chase to Pay service platform powered by LifeWallet ("Chase to Pay"). Chase to Pay is being developed to locate and organize users' medical records to facilitate efficient access and enable informed decision-making and improved patient care. A real-time, analytics driven platform that identifies the proper primary payer at the point of care, Chase to Pay is intended to plug into the real-time medical utilization platforms used by providers at the point of care.

- **LifeWallet Health.** LifeWallet Health is being developed to give patients the ultimate control over their healthcare data by providing easy access to their medical history, providing healthcare notifications, and utilizing a wide variety of data points to improve overall patient care.

- **LifeChain.** LifeChain is being developed to tokenize healthcare Claims and patient records using blockchain technology, to enable adjudication of Claims upfront, in real-time, with complete transparency. LifeChain aims to reduce costs, maximize provider revenue, improve patient care, and eliminate fraud, while maintaining patient privacy using decentralized biometric authentication.

- **LifeWallet 911.** LifeWallet 911 is being developed for utilization by emergency service organizations to improve the facilitation of emergency services by providing 911 operators, dispatchers, and emergency medical providers with immediate access to vital information to reduce response times and improve patient outcomes.

- **LifeWallet Legal.** LifeWallet Legal is being developed to bring together clients and attorneys through a trusted, verified data platform to facilitate the efficient processing of Claims for improved legal outcomes.

- **LifeWallet EDU.** LifeWallet EDU is being developed to provide an intelligent infrastructure and security solutions for educational institutions, utilizing biometric technology to prevent safety breaches in real-time, thus providing unparalleled security for students, faculty, and staff.

## Competitive Strengths

*Irrevocable Assignments*

We differ from competitors as we receive irrevocable assignments of recovery rights associated with certain healthcare related Claims. When we are assigned these rights, we obtain ownership in those rights that our competitors do not. Rather than provide services under third-party vendor services contracts, we receive the rights to our Assignors' Claims, and therefore step into the Assignor's shoes. As assignees, we are the plaintiff in any action filed in connection with such Claims, we maintain control over the direction of the litigation, and we can pursue additional recoveries under numerous legal theories that our competitors cannot.

*Scale of Current Portfolio*

Our current portfolio has scaled significantly. As of December 31, 2022, we have been assigned recovery rights on Claims valued at approximately $1,574 billion in Billed Amount (and approximately $375 billion in Paid Amount), of which approximately $89.6 billion is PVPRC.

We are typically entitled to 100% of recoveries pursuant to our Claims cost recovery agreements ("CCRA"). From those recoveries, we are typically contractually obligated to pay 50% of recoveries to the Assignor, plus attorneys' fees and costs associated with pursuit of the recoveries. In certain cases, we have purchased the Assignor's rights to recovery proceeds in advance of a collection; therefore, entitling the Company to retain 100% of the recovery proceeds, net of attorneys' fees and costs. As of December 31, 2022, we were entitled to up to approximately 54% in the aggregate of the approximately $89.6 billion in PVPRC. Our recoveries would constitute a portion of the approximately $89.6 billion in PVPRC that may be recovered, after giving effect to our expenses, including any contingent fee payment payable to the Law Firm. See "Risk Factors—Risks Related to the Company's Business and Industry." This approximately $89.6 billion in PVPRC was identified using our Algorithms which comb through historical paid Claims data and to identify potential recoveries. As of December 31, 2022, the approximately $89.6 billion in PVPRC and approximately $375 billion in Paid Amount included approximately $5.5 billion and approximately $24.4 billion in capitated payments, respectively. Such capitated amounts are typically based on a fixed amount per enrollee in a plan rather than amounts paid on a fee-for-service basis and, in calculating the equivalent of Paid Amount for purposes of measuring potential recoveries, in cases where payments were based on capitated amounts, MSP Recovery reviews capitated encounter data typically found in Medicare Part B payments. The Company has successfully recovered full amounts on these capitated payments in prior settlements.

The typical timeline for Claims being identified as potentially recoverable Claims to actual Claims recovery revenue can vary greatly depending on the complexity of the recovery strategy and litigation, as well as the status of each Claim in the recovery process. The Company monitors the penetration status of the Claims portfolio, which categories the status of cases based on their status in the

recovery process in the following categories: in development, recovery process initiated, data collected and matched, resolution discussions in process and other cases. Potentially recoverable Claims can take years to reach resolution based on a variety of factors.



### LIFEWALLET'S RECOVERY PORTFOLIO OVER TIME ($ BILLIONS)

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| Billed Amount | $63 | $147 | $174 | $219 | $242 | $1,527 | $1,574 |
| Paid Amount | $8 | $28 | $37 | $49 | $58 | $364 | $375 |

*Our Proprietary Data Analytics System*

We believe our access to large volumes of data, sophisticated data analytics, and leading technology platforms provide a unique opportunity to discover and recover Claims. Our Algorithms comb through historical paid Claims data to identify potential recovery opportunities. As of December 31, 2022, we estimate a PVPRC of $89.6 billion. Through data mining, we continue to identify new recovery opportunities.

*Our Founders and Broad Team with Extensive Legal Experience*

Experienced management gives us a competitive advantage. Our founder, John H. Ruiz, is recognized as one of America's pre-eminent trial lawyers, named "2019's DBR Florida Trailblazer" for groundbreaking work in integrating data analytics into the practice of law and for the impact it is having on healthcare recoveries. Over the course of a distinguished 30-year legal career, Mr. Ruiz has gained national recognition in class action, mass tort litigation, multi-district litigation ("MDL") consolidated cases, medical malpractice, products liability, personal injury, real estate, and aviation disaster cases. Our Chief Legal Officer, Frank C. Quesada, has extensive experience in healthcare litigation, including numerous legal wins in state and federal court, at the trial and appellate levels.

Due to our team's extensive knowledge of the MSP Laws, and decades of experience in data analytics within the medical industry, we believe we are well positioned to recover monies owed to our Assignors under the MSP Laws, as well as other state and federal laws. We use our proprietary software and a highly trained staff including IT personnel, accountants, statisticians, physicians, data analysts and attorneys to maximize the recovery of Claims already paid.

**Growth Strategy**

*Expansion of Assignor Claims.* CMS has projected that health spending will continue to grow at an average rate of 5.4% a year between 2019 and 2028. We anticipate that this trend will be reflected in our own growth. We plan to expand our Assignor base by implementing new strategies to secure new Assignors and continue receiving assignments of Claims from our existing Assignors. These strategies will include a platform to educate potential Assignors about our company, making strategic business partnerships, potential mergers, acquisitions of personnel, as well as other marketing strategies.

*Further Development of our Chase to Pay Services.* The Company is currently developing the Chase to Pay model. This model will allow payers and providers to identify the proper primary payer in real time, at the point of care. Our plan is to develop these services to form a source of revenue that does not require the acquisition costs and recovery sharing associated with our Claims recovery business.

*Continued Development of our Data Analytics System.* We will also continue to develop our proprietary system and anticipate shifting to AI and machine learning to better enhance our recovery potential. The development of our system will allow us to be more efficient in the services we provide our Assignors, as well as being able to attract more Assignors.

*Monetizing Existing Software Applications.* We intend to offer certain of our software applications, including our Claims to Med application as separate products. The Claims to Med application translates the codified component of procedural codes ("CPT codes") from medical Claims data and medical bills into medical records that are consistent with Claims records. This allows patients, providers, attorneys, corporations, and the general public to better understand their medical history.

## Our Services

### Claims Recovery

As part of our Claims recovery business, we pursue a number of types of recoveries, including:

*Contractual Cases*

When Medicare or an MAO, as a secondary payer, makes a payment on behalf of a beneficiary for injuries related to the use, maintenance, or operation of a vehicle, that payment may be recoverable from a no-fault insurer, as a primary payer. No-fault coverage does not require an assessment of liability, and thus, when a covered medical expense is incurred, the insurer must accept primary payer responsibility. The no-fault insurer's failure to pay or reimburse Medicare and MAOs constitutes a breach of the beneficiary's no-fault coverage, and a violation of the MSP Laws.

*Settlement Cases*

The MSP Act allows Medicare beneficiaries, providers and MAOs to seek reimbursement from any entity or person that has settled a dispute and failed to pay or reimburse Medicare and MAOs for an enrollee's medical expenses related to that dispute. We review our Assignor's Claims data and compare these records with the CMS database and court dockets to determine if any of our Assignor's enrollees have been involved in a dispute that resulted in a settlement.

*Product Liability*

Defective or dangerous products cause thousands of injuries every year. Many product liability cases arise from instances in which an implantable medical device causes an adverse reaction due to a design or manufacturing defect. These adverse reactions may range from minor rashes to cancer and subsequent death. Where Medicare or an MAO has paid an enrollee's medical expenses for these injuries, we can pursue recoveries.

*Antitrust-Pharmaceutical*

Antitrust laws, including the Sherman Antitrust Act of 1890 (the "Sherman Act") and the Clayton Antitrust Act of 1914 (the "Clayton Act") and analogous state unfair competition laws prohibit business practices that unreasonably deprive consumers of the benefits of competition, resulting in higher prices for products and services. The Sherman Act also outlaws all contracts, combinations, and conspiracies that unreasonably restrain interstate and foreign trade.

Our antitrust cases typically derive from one of the two following scenarios: (1) either a group of manufacturers who make similar products decide to raise product prices collectively irrespective of market fluctuations; or (2) a manufacturer of a branded pharmaceutical enters into a "pay for delay" agreement with a generic drug manufacturer so that the generic drug manufacturer delays the market launch of a cheaper competing drug. We bring antitrust Claims on behalf of our Assignors under both scenarios pursuant to the Sherman Act, the Clayton Act and state unfair competition laws.

*False Claims Act*

The False Claims Act (the "FCA") is widely regarded as an effective tool in combating waste, fraud and abuse against the federal government. The FCA prohibits the submission of false or fraudulent Claims for payment from the government. The FCA, which imposes civil penalties, fees, and treble damages for fraudulent claims, permits private individuals to file qui tam suits on behalf of the federal government.

*Mass Tort and Private Lien Resolution Programs*

When a defendant in an MDL settles its cases with the plaintiffs, the issues can be resolved through a Master Settlement Agreement ("MSA"), which settles all pending lawsuits and provides that the defendant(s) agrees to set aside funds to settle the MDL related cases involving various conditions.

MSAs govern the terms of the settlement and provide for the resolution of all liens against the settlement proceeds. A lien resolution administrator assists in resolving all liens that are asserted by government payers or private payers against settlement funds and ensures that all such liens are resolved prior to settlement payments being disbursed to the settling claimants.

An MSA typically provides for a Private Lien Resolution Agreement (the "PLRP Agreement") whereby the lien resolution administrator and our entities (the "MSP Group") establish an efficient procedure to resolve MSP Group's Claims and liens accordingly.

Upon payment of MSP Group's liens as provided in the PLRP Agreement, MSP Group's reimbursement Claims against recoveries by claimants as defined in the MSA are resolved, and all potential liabilities related to such liens in favor of MSP Group are

released. The only liens subject to resolution are those liens that qualify for a settlement payment pursuant to the MSA. No other Claims owned or otherwise held by the MSP Group are encompassed in the PLRP Agreement.

MSP Group conducts an analysis of the claimants in the MDL settlement and identifies liens belonging to MSP Group arising from medical care and treatment provided to claimants for which MSP Group has a legal right of recovery. A lien administrator provides the list of claimants to MSP Group. MSP Group then provides the claims data supporting MSP Group's liens to the lien administrator, which includes the specific Billed and Paid Amount of MSP Group's liens. The lien administrator reviews and verifies MSP Group's data and confirms that the Claims included in the liens are reimbursable.

**Our Claims Portfolio**

As of December 31, 2022, we have received assignments to recovery rights for more than 160 Assignors in the Medicare, Medicaid, and commercial Insurance segments, associated with approximately $1.573 trillion in Billed Amount of health care Claims. We have been assigned Claims from all 50 states, as well as Puerto Rico. Each dot in the following graphic represents a ZIP code for which the Company maintains data.

We typically acquire recovery rights by entering into a CCRA with an Assignor, pursuant to which the Assignor assigns all right, title, and interest in and to its Claims recovery and reimbursement rights to the Company, or to an affiliated entity, partner, or investor, in exchange for (a) deferred compensation, typically structured as 50% of any net recovery earned by and paid to us, or (b) an upfront lump sum payment. Some of these CCRAs are "limited recovery" agreements, meaning that they are limited in time or scope as to what is assigned to us. For example, certain of our CCRAs relate specifically to claims against manufacturers, distributors, and producers of Actos, pioglitazone, metformin, glimepiride, or Duetact. Additionally, certain other CCRAs relate specifically to healthcare services rendered and paid for during a specified timeframe. In general, our CCRAs allow the Company to recover historical Claims. Under some of the CCRAs, the Company has been assigned historical Claims and the Assignor has agreed to continue assigning Claims data. The Company currently expects to generate a substantial portion of total revenue from current CCRAs through recoveries on historical Claims under our Recovery Model. The Company believes as it builds out the Chase to Pay platform and recovery model, a significant portion of the Company's revenue from these CCRAs will be derived through the Chase to Pay model by recovering on Claims as they occur.

In the cases where we acquire recovery rights for an upfront lump sum payment, instead of a CCRA, we typically enter into a Claims Purchase and Assignment Agreement ("CPAA"). Under a typical CPAA, an entity assigns all right, title, and interest in and to its Claims recovery and reimbursement rights to us (or our affiliated entity, partner or investor) in exchange for an upfront lump sum payment. In these arrangements, we (or our affiliated entity, partner or investor) would typically own 100% of all future net recoveries from those purchased Claims. Often times the CPAA includes a provision to continue acquiring future Claims from the Assignor.

**MSP Lien Resolver**

We intend to further develop and expand the offering for our MSP Lien Resolver. MSP Lien Resolver is a disruptive new product that helps identify, quantify, and resolve outstanding liens. Key areas of functionality for MSP Lien Resolver include modules for related lien notices, Claims history, Claims dispute and negotiation, and case settlement and payment. MSP Lien Resolver benefits us because the additional proprietary data enhances overall data quality and efficacy. This product also deepens relationships with attorneys and outside information providers.



**Sales and Marketing**

Our sales force is comprised of internal and external sales professionals. Our sales force identifies potential Assignors and manages relationships with existing Assignors. The sales force is incentivized via a recovery-based strategy. Once we have received recoveries for Claims related to an Assignor, the applicable sales professional is compensated. This mechanism ensures low fixed costs while offering a potentially generous commission model.

Among other things, our marketing strategies generate new Assignor leads, by educating investors and Assignors about our Company.

**Licensing and Regulation**

We are subject to federal and state laws and regulations governing privacy, security and breaches of patient information and the conduct of certain electronic health care transactions, including, HIPAA and other health information privacy and security requirements. Some of our Assignors with which we have or may establish business relationships, are "Covered Entities" that are regulated under HIPAA. We also are a "Business Associate" of our Assignors; as such, we must comply with HIPAA regulations. To provide our Covered Entity Assignors with services that involve the use or disclosure of protected health information, HIPAA requires us to enter into Business Associate agreements with our Assignors.

In addition to HIPAA, we may be subject to other U.S. federal and state laws relating to the collection, dissemination, use of and access to, personal information. While we believe that we are in material compliance with such laws and regulations, failure to comply with these laws could expose us to lawsuits, data security incidents, regulatory enforcement or fines.

**Intellectual Property and R&D**

We rely on trade secret laws. We use a combination of confidential agreements and licenses with our Assignors, employees, vendors, and other parties. We also rely on other security measures to control the access to our confidential information, software, and other intellectual property.

Our research and development team uses proprietary software and a highly trained staff including I.T. personnel, accountants, statisticians, physicians, data analysts and attorneys to search through numerous data sources. We will continue the investment of resources into our proprietary systems.

Our intellectual property licensing agreements grant, during the term of the agreement, a non-exclusive, non-transferable, non-assignable, irrevocable, worldwide, fully paid-up license under our software and technology to use, perform, import, export, and all other rights pursuant to our software and technology solely in connection with the parties' assigned Claims and the transactions contemplated in the agreements between the parties. Nothing in these agreements affect our ownership or control in our software and technology. Except for the license, all of our other rights with respect to our software and technology are reserved.

**Competition**

We believe we do not have any direct competitors. Other entities in the industry act as vendors and pursue reactive recoveries, while we aggressively pursue recoveries on our own behalf, using various state and federal laws. Although somewhat different in approach, we compete with in-house recovery departments, collection and financial services companies and other companies. Some of these entities are Cotiviti Holdings, Inc., MultiPlan Corporation, Encore Capital Group, Inovalon Holdings, Inc., Optum, Inc., Verisk Health, Inc., McKesson Corporation, Change Healthcare Corporation, HMS Holdings Corp., The Rawlings Group, Equian, LLC, Trover Solutions, Inc. and other, smaller companies.

**Human Capital**

Our employees and culture are critical components to our success and growth as a company. As of December 31, 2022, we had approximately 100 employees. None of our employees are covered by collective bargaining agreements or represented by a labor union. We believe that the relationships we have with our employees are positive.

In addition, we employ specialized contract or part-time employees on a temporary basis, which include highly trained IT personnel, accountants, statisticians, physicians, data analysts and attorneys to maximize the recovery of Claims. We have historically been able to transition many of these top performers from contract or part-time to full time employment.

We strive to attract, develop, and retain the best talent by providing competitive pay and benefits, continuous growth and development, and a diverse and inclusive workplace. Our human capital resource objectives include not only acquiring the best talent but also motivating those that drive our business forward. We aim to achieve these objectives using generous compensation programs and offering a one-of-a-kind employee experience.

To better develop and incentivize our employees, we regularly provide employee feedback and recognition. We have an annual bonus program, and we utilize spot bonuses in order to continue to drive our employees to find opportunities and innovate our business.

13

**Fee Sharing Arrangements**

We engage with each Assignor independently. As stated above, typically our Assignors irrevocably assign to us broad recovery rights to the Claims assigned. Generally, the assignment agreements provide for the Assignor to receive 50% of the Net Proceeds of any recoveries from the Claims assigned. The "Net Proceeds" of any assigned Claim is defined as the gross amount recovered on an assigned Claim, minus any costs directly traceable to such assigned Claim(s) for which recovery was made. In some instances, we may purchase outright an Assignor's recovery rights; in this instance, we are entitled to the entire recovery.

We enter into legal services agreements with the Law Firm and the various entities that hold Claims. In this relationship, the Company (and other Claims holding entities) is the plaintiff and the Law Firm serves as its counsel. The Law Firm is engaged to act as exclusive lead counsel to represent MSP Recovery and each of its subsidiaries and affiliates (or other applicable entity) as it pertains to the Assigned Claims, on a contingency basis. The Law Firm engages outside litigation counsel from around the nation as co-counsel and these arrangements are made directly between the Law Firm and other counsel. For the services provided, the Law Firm is typically entitled 40% of our 50% portion of the Gross Proceeds (i.e., 20% of the total Gross Proceeds). This contingency fee can change in the future. The Law Firm is also entitled to attorneys' fees that are awarded pursuant to any fee shifting statute, by agreement, or court award.

The below is an illustration of how the recovery proceeds arrangement typically works when co-counsel is (and is not) involved:



*Seasonality*

Seasonality does not have a material impact on our business.

### Other Information about MSP Recovery, Inc. d/b/a LifeWallet

We make available free of charge through our website, www.msprecovery.com, our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the SEC. In addition, our website includes other items related to corporate governance matters, including, among other things, our corporate governance principles, charters of various committees of the Board of Directors, and our code of conduct applicable to all employees, officers and directors. We intend to disclose on our internet website any amendments to or waivers from our code of business conduct and ethics as well as any amendments to its corporate governance principles or the charters of various committees of the Board of Directors. Copies of these documents may be obtained, free of charge, from our website. The SEC also maintains an internet site that contains reports, proxy and information statements and other information regarding issuers that file periodic and other reports electronically with the SEC. The address of that site is www.sec.gov. The information available on or through our website is not a part of this Annual Report and should not be relied upon.

14

**Forward-Looking Statements**

Certain of the statements contained in this Annual Report on Form 10-K (this "Annual Report") are forward-looking and constitute forward-looking statements within the meaning of Section 27A of the Securities Act, and Section 21E of the Exchange Act. Forward-looking statements may generally be identified by the use of words such as "anticipate," "believe," "could," "expect," "intend," "plan," "predict," "may," "should," and "will" or, in each case, their negative, or other variations or comparable terminology. These forward-looking statements include all matters that are not historical facts, including, for example, guidance for 2023 portfolio recovery and revenue. By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future. As a result, these statements are not guarantees of future performance or results and actual events may differ materially from those expressed in or suggested by the forward-looking statements. Although we believe that our expectations are based on reasonable assumptions within the bounds of our knowledge of our industry, business and operations, we cannot guarantee that actual results will not differ materially from our expectations. In evaluating such forward-looking statements, you should specifically consider various factors, including the risks outlined under "Risk Factors." Any forward-looking statement made by LifeWallet herein speaks only as of the date made. The discussion of risks and uncertainties set forth in this Annual Report is not necessarily a complete or exhaustive list of all risks facing the Company at any particular point in time. New risks and uncertainties come up from time to time, and it is not possible for management to predictor identify all such events or to assess either the impact of all such risk factors on our business or the extent to which any individual risk factor, combination of factors, or new or altered factors, may cause results to differ materially from those contained in any forward-looking statement. LifeWallet has no obligation, and does not intend, to update any forward-looking statements after the date hereof for any reason, even if new information becomes available in the future, except as required by federal securities laws. Factors that could cause these differences include, but are not limited to, LifeWallet's ability to capitalize on its assignment agreements and recover monies that were paid by the assignors; the inherent uncertainty surrounding settlement negotiations and/or litigation, including with respect to both the amount and timing of any such results; the validity of the assignments of Claims to LifeWallet; the ability to successfully expand the scope of our Claims or obtain new data and Claims from LifeWallet's existing assignor base or otherwise; LifeWallet's ability to innovate and develop new solutions, and whether those solutions will be adopted by LifeWallet's existing and potential assignors; negative publicity concerning healthcare data analytics and payment accuracy; compliance with the listing standards of The Nasdaq Capital Market; and those other factors listed under "Risk Factors" below and elsewhere in this Annual Report and other reports filed by the Company with the SEC. Unless the context requires otherwise or unless otherwise noted, all references in this Annual Report to "LifeWallet," "MSP Recovery," "MSP," "the Company," "we," "us," or "our" are to MSP Recovery, Inc., d/b/a LifeWallet, a Delaware corporation.

**Item 1A. Risk Factors.**

*An investment in our securities involves a high degree of risk. You should carefully consider the following risk factors, together with all of the other information included in this Form 10-K before making an investment decision. The occurrence of one or more of the events or circumstances described in these risk factors, alone or in combination with other events or circumstances may have an adverse effect on our business, cash flows, financial condition, and results of operations. You should also carefully consider the following risk factors in addition to the other information included in this Form 10-K, including matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements." We may face additional risks and uncertainties that are not presently known to us or that we currently deem immaterial, which may also impair our business or financial condition. The following discussion should be read in conjunction with the financial statements and notes to the financial statements included herein.*

**Risk Factors Summary**

The following is a summary of some of the Company's most important risks and uncertainties that could materially adversely affect our business, financial condition, and results of operations. You should read this summary together with the more detailed description of each risk factor. Additional discussion of the risks summarized in this Risk Factors Summary, and other risks that we face, can be found below under the heading "Risk Factors" and should be carefully considered, together with other information in this Form 10-K and our other filings with the SEC, before making an investment in our securities.

**Risks Related to the Company's Business and Industry:**

- We have a history of net losses and no substantial revenue to date, and we may not achieve recoveries, generate significant revenue or achieve profitability.

- We have a limited history of actual recoveries to date, and there are risks associated with estimating the amount of revenue that we recognize from the recovery.

- Litigation outcomes are inherently risky, and we depend upon the due care of lawyers and the court system. Unfavorable court rulings, delays, damages limitations, and our ability to collect on judgments in our favor could adversely affect our business.

15

- Counterparties in our lawsuits employ dilatory tactics that delay the resolution of litigation or settlement negotiations, which increases the costs associated with recoveries and substantially delays the outcome of our cases and any associated revenue recognition.

- Our fee sharing arrangement with the Law Firm materially reduces our recoveries.

- Assignors may pursue recovery on Claims directly or may use recovery agents other than us in connection with the Assignor's efforts to recover on Claims.

- Our business and future growth depend on our ability to successfully expand the volume of our healthcare Claims and obtain data from new Assignors and healthcare Claims from our existing Assignor base.

- The positions we will typically acquire in connection with our acquisition of Claims are unsecured and may be effectively subordinated to other obligations and are at risk to fraud on the part of the Assignor of the Claim.

- Healthcare spending fluctuations, simplification of the healthcare delivery and reimbursement system, programmatic changes to the scope of benefits and limitations to payment integrity initiatives could reduce the need for our data-driven solutions.

- If our existing Assignors prematurely terminate their agreement with us or if either party materially breaches an agreement, and we can no longer receive future assignments of healthcare Claims recoveries, it could have a material adverse effect on our business, financial condition, and results of operations.

- We have long sales and implementation cycles for many of our data-driven solutions and may fail to close sales after expending time and resources, or experience delays in implementing the solutions.

- If our Assignors' risk agreements change, it can have a material adverse effect on our business, financial condition, and results of operations.

- Our use and disclosure of individually identifiable information, including health information, is subject to federal and state privacy and security regulations, and our failure to comply with those regulations or adequately secure the information we hold could result in significant liability or reputational harm.

- If we fail to innovate and develop new solutions, or if these new solutions are not adopted by existing and potential Assignors or other users, it could have a material adverse effect on our business, financial condition and results of operations.

- Changes in the United States healthcare environment, or in laws relating to healthcare programs and policies, and steps we take in anticipation of such changes, particularly as they relate to the Affordable Care Act and Medicare and Medicaid programs, could have a material adverse effect on our business, financial condition and results of operations.

- A significant portion of our Claims comes from a limited number of Assignors who have relationships with key existing payers, and the loss of one or more of these Assignors or disruptions in Assignor-payer relationships, could have a material adverse effect on our business, financial condition and results of operations.

- The data healthcare analytics and healthcare payment market are relatively new and unpenetrated, and may not develop, develop more slowly than we expect, or sustain negative publicity which may adversely affect our business.

- We face significant competition, and we expect competition to increase.

- Failure to adequately protect the confidentiality of our trade secrets, know-how, proprietary applications, business processes other proprietary information and trademarks could adversely affect the value of our technology and products.

- Our qui tam litigation may be subject to government intervention and dismissal pursuant to 31 U.S.C. § 3730(2)(A).

- We are subject to extensive government regulation. Any violation of the laws and regulations applicable to us or a negative audit or investigation finding could have a material adverse effect on our business.

- Our business depends on effective information processing systems that are compliant with current HIPAA transaction and code set standards and the integrity of the data in, and operations of, our information systems, as well as those of other entities that provide us with data or receive data from us.

- In the event we fail to maintain our Security Organization Control 2, HITRUST, or other certifications, we could be in breach of our obligations under our contracts, fines and other penalties could result and we may suffer reputational harm and damage to our business.

- We may make acquisitions of businesses or Claim recovery interests that prove unsuccessful, and any mergers, acquisitions, dispositions or joint venture activities may change our business and financial results and introduce new risks.

16

- We have a substantial amount of indebtedness and payment obligations, and together with any future indebtedness or payment obligations, could adversely affect our ability to operate our business.

- Failure to obtain or maintain ongoing financing to fund operations could negatively impact our business.

- Adverse judgments or settlements in litigation, regulatory or other dispute resolution proceedings could have a material adverse effect on our business, financial condition and results of operations.

- If we fail to accurately calculate the Paid Amount and Paid Value of Potential Recoverable Claims, it can have a material adverse effect on our business, results of operations, financial condition, and cash flows.

- Failure of our software vendors, utility providers and network providers to perform as expected, changes in our relationships with them, or losing access to data sources may adversely affect our business.

- We may be sued by third parties for alleged infringement of their proprietary rights.

- Changes in, or interpretations of, tax rules and regulations may adversely affect our effective tax rates.

- We will be required to pay the Tax Receivable Agreement ("TRA") Parties (as defined in the TRA) for most of the benefits relating to, among other things, an increase in tax attributes as a result of the Company's direct and indirect allocable share of existing tax basis acquired in the Business Combination, and the Company's increase in its allocable share of existing tax basis and anticipated tax basis adjustments we receive in connection with sales or exchanges of Up-C Units after the Business Combination.

- Our success is dependent upon the efforts of our key personnel. The loss of key personnel could negatively impact the operations and profitability of the Company and its financial condition could suffer as a result.

- We might be unable to successfully recruit and retain qualified employees.

- General economic, political and market forces and dislocations beyond our control could reduce demand for our solutions and our overall business may suffer from an economic downturn.

- COVID-19 or another pandemic, epidemic, or outbreak of an infectious disease may have an adverse effect on our business, the nature and extent of which are highly uncertain and unpredictable.

- We are concentrated in certain geographic regions, which makes us sensitive to regulatory, economic, environmental, and competitive conditions in those regions.

### Risks Related to Our Securities:

- We are controlled by the Members, including John H. Ruiz and Frank C. Quesada, whose interests may conflict with our interests and the interests of other stockholders. Further, our status as a "controlled company" on Nasdaq removes certain corporate governance protections.

- Our stockholders will experience substantial dilution as a consequence of, among other transactions, any further issuance of common stock.

- We may not be able to comply with Nasdaq's continued listing standards, which could cause de-listing and reduce liquidity.

- Our common stock may be delisted from The Nasdaq Capital Market if we fail to comply with continued listing standards.

- We may be required to take write-downs or write-offs, restructuring, and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.

- We may be unable to obtain additional financing to fund the operations and growth of the Company.

- Anti-takeover provisions contained in our Charter and bylaws, as well as provisions of Delaware law, could impair a takeover attempt.

- The Charter contains a provision renouncing our interest and expectancy in certain corporate opportunities.

### Risks Related to Ownership of our Common Stock:

- The market price of our common stock may be significantly volatile.

- We may redeem unexpired Public Warrants and New Warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making such warrants worthless.

17

- Our stockholders may experience significant dilution as a result of future equity offerings or issuances and exercise of outstanding options and warrants.

- Warrants have become exercisable for our Class A Common Stock, which has increase the number of shares eligible for future resale in the public market and may result in dilution to our stockholders.

- The Company's management has limited experience in operating a public company.

- Failure to establish and maintain effective internal controls could have a material adverse effect on the accuracy and timing of our financial reporting in future periods.

**Risks Related to the Company's Business and Industry**

*In this section "we," "us," "our," and other similar terms refer to MSP Recovery, Inc. d/b/a LifeWallet and its subsidiaries prior to the Business Combination and to the Company following the Business Combination.*

***We have a history of net losses and no substantial revenue to date, and we may not achieve recoveries, generate significant revenue, or achieve profitability. Our relatively limited operating history makes it difficult to evaluate our current business and future prospects and increases the risk of your investment.***

Our relatively limited operating history makes it difficult to evaluate our current business and plan for our future growth. The Company started in 2014 with its very first assignment from a health plan in Miami, Florida. To date, we have achieved no substantial revenue and limited actual recoveries from our assigned Claims, and there is no guarantee that we will achieve recoveries, revenue, or profitability as we have projected. We have encountered and will continue to encounter significant risks and uncertainties frequently experienced by new and growing companies in rapidly changing industries, such as determining appropriate investments for our limited resources, competition from other data analytics companies, acquiring and retaining Assignors, hiring, integrating, training and retaining skilled personnel, unforeseen expenses, challenges in forecasting accuracy and successfully integrating new strategies. If we are unable to achieve actual recoveries, increase our Assignor base, successfully manage our recovery efforts from third-party payers or successfully expand, our revenue and our ability to achieve and sustain profitability would be impaired. If our assumptions regarding these and other similar risks and uncertainties, which we use to plan our business, are incorrect or change as we gain more experience operating our business or due to changes in our industry, or if we do not address these challenges successfully, our operating and financial results could differ materially from our expectations and our business could suffer.

***We have a limited history of actual recoveries to date, and there are risks associated with estimating the amount of revenue that we recognize from the recovery. If our estimates of revenue are materially inaccurate, it would impact the timing and the amount of our revenue recognition and have a material adverse effect on our business, results of operations, financial condition and cash flows.***

We have a limited track record of generating actual recoveries and related revenue from the Claims we have purchased or otherwise been assigned. There are risks associated with estimating the value of future recoveries and revenues that we may achieve under our assigned Claims. Our estimates and projections depend on significant assumptions and involve significant risks which could cause our actual results to vary materially.

Examples of material assumptions we make include, but are not limited to:

- Our assessment that the assigned Claims are potentially recoverable Claims;

- The achievement of multiples above the PVPRC; and

- The length (and cost) of litigation required to achieve recoveries.

Any of these assumptions may prove over time to be materially inaccurate. If our estimates of revenues are materially inaccurate, it could impact the timing and the amount of our revenue recognition and have a material adverse impact on our business, results of operations, financial condition and cash flows.

***Under most of our agreements with Assignors, we assume the risk of failure to recover on the assigned Claims, and if we fail to make recoveries with respect to the assigned Claims receivables and therefore, are unable to generate recovery proceeds greater than or equal to the amounts paid by us to purchase the assigned Claims, it can adversely affect our business.***

In many instances, we pay our Assignors an upfront purchase price for assignment of their healthcare Claims recoveries. Accordingly, there is a risk that we may not successfully recapture the upfront purchase price if we fail to make recoveries with respect to the assigned Claims. Further, our ability to identify and recover on future Claims includes risks such as:

- underperformance relative to our expectations and the price paid for the Claims;

- unanticipated demands on our management and operational resources;

- failure to successfully recover on legal Claims;

18

- difficulty in integrating personnel, operations, and systems;

- maintaining current customers and securing future customers of the combined businesses;

- assumption of liabilities; and

- litigation-related charges.

Finally, our potential ability to achieve recovery revenues are based largely on the Paid Value of Potentially Recoverable Claims of our portfolio and our ability to discover, quantify, and settle the gap between Billed Amount and Paid Amount on a large scale. If we fail to accurately calculate the Paid Amount or the Paid Value of Potential Recoverable Claims, the Recovery Multiple or our recovery rights are not appropriately perfected, these factors may have a material adverse effect on our business, results of operations, financial condition, and cash flows.

***Litigation outcomes are inherently risky; unfavorable court rulings, delays, damages calculations, or other limitations can adversely affect our recovery efforts, our potential to generate revenue, and our overall business.***

It is difficult to predict litigation outcomes, particularly complex litigation of the type that forms the basis of our business. If we do not succeed in the litigation, if the damages awarded in our favor are less than what we expected, or if it is not possible to successfully enforce a favorable judgment, we could suffer a variety of adverse consequences, including the complete loss of potential revenue expected from that matter and, in some jurisdictions, liability for the adverse costs of the successful party to the litigation. Unfavorable litigation outcomes could, individually or in the aggregate, have a material adverse effect on our business, revenue, results of operations, and financial condition.

Typically, we must file actions in court to recover monies related to those paid by our Assignors and a substantial amount of our recoveries are dependent on the courts. Because we rely on the courts to adjudicate recoveries, we can be subject to adverse court rulings, significant delays, damages calculations or other limitations, each of which can negatively impact our recovery efforts, potential to generate revenue, and financial condition of our business.

For example, from time to time, the courts dismiss our cases, or Claims pursued in our cases, with or without prejudice. When dismissal is without prejudice, we can refile the action. Accordingly, we retain the ability to bring those Claims in a recovery action. When dismissal is with prejudice, we cannot refile the action. Accordingly, we lose the ability to pursue such Claims. We cannot guarantee that we will not receive adverse rulings in court. Historically, we have received adverse rulings such as:

- Dismissal for failure to file within the applicable statute of limitations. For example, on August 10, 2022, the United States Court of Appeals, Eleventh Circuit held that four-year statute of limitations period for civil actions arising under an Act of Congress enacted after December 1, 1990 applies to certain claims brought under the Medicare Secondary Payer private cause of action, and that the limitations period begins to run on the date that the cause of action accrued. This opinion may render certain Claims held by the Company unrecoverable and may substantially reduce PVPRC and BVPRC as calculated. As our cases were filed at different times and in various jurisdictions, and prior to data matching with a defendant we are not able to accurately calculate the entirety of damages specific to a given defendant, we cannot calculate with certainty the impact of this ruling at this time. Although this opinion is binding only on courts in the Eleventh Circuit, if the application of this statute of limitations as determined by the Eleventh Circuit was applied to all Claims assigned to us, we estimate that the effect would be a reduction of PVPRC by approximately $8.86 billion. As set forth in our Risk Factors, PVPRC is based on a variety of factors. As such, this estimate is subject to change based on the variety of legal claims being litigated and statute of limitations tolling theories that apply.

- Dismissal because an assignment did not include the Claim that was brought in court (or such assignment was found to be invalid).

- Dismissal for lack of standing to assert Claims.

- Dismissal for lack of personal jurisdiction.

- Dismissal for pleading deficiencies.

Additionally, in certain of our cases, our recoveries may be limited as a function of courts' damages calculations. Adverse court rulings could also occur from:

- Our assignment agreements with Assignors being deemed invalid by courts. We receive assignments of healthcare Claims from our Assignors via irrevocable assignments, which allow use to pursue those Claims that our Assignors originally owned. Enforceability of our assignment agreements is often challenged by defendants and if a court determines an assignment agreement is invalid (due to a technical deficiency or regulatory prohibition or otherwise) we will lose the ability to pursue those Claims.

19

- Our damages calculations include medical expenses paid by our Assignors that courts may deem unreasonable, unrelated, or unnecessary, and could lead to lower than anticipated recoveries.

- Our Claims may be subject to different interpretations of the applicable statutes of limitations.

For example, in certain antitrust matters, recoveries may be limited to the difference between the price that a drug manufacturer charged for the drug and the price of the drug absent the relevant anticompetitive action. The list above is not exhaustive of unfavorable rulings, damages calculations or other limitations which we may or have encountered.

We generate, and expect to generate, a significant portion of our revenue by collecting on settlements and/or judgments that are granted by courts in lawsuits filed against insurers, tortfeasors, and other liable parties. A decrease in the willingness of courts to grant these judgments, a change in the requirements for filing these cases or obtaining these judgments, or a decrease in our ability to collect on these judgments could have an adverse effect on our revenue, operating results, and the financial condition of our business. As we increase our use of the legal channels for collections, our short-term margins may decrease as a result of an increase in upfront court costs and costs related to counterclaims. We may not be able to collect on certain aged Claims because of applicable statutes of limitations, and we may be subject to adverse effects of regulatory changes.

Our recoveries may also be delayed due to inconsistent rulings on different cases which creates delays in our recovery efforts, or court and administrative closing resulting from the COVID-19 pandemic. We can be subject to many other unfavorable rulings, damages calculations or limitations which are not listed above. Such unfavorable rulings, damages calculations or other limitations can negatively affect our business and our recovery efforts.

***Our litigation often involves complex, novel legal theories with little or no precedent on which courts can rely, which may adversely affect our ability to generate revenue and negatively impact our business.***

The lawsuits we file in pursuit of recoveries often involve causes of action that are entirely novel, or novel as applied to the facts alleged in our complaints. For example, while the MSP Law was enacted in 1980, its use by an assignee to pursue recoveries on its own behalf is novel. As such, courts deciding litigated issues in our cases often have limited binding precedent on which to base an opinion, and often review our cases as a first impression. As a result, our cases may be delayed as courts require more time to analyze the legal issues, and outcomes are difficult to accurately predict.

We may employ rarely used causes of action, such as Florida's equitable pure bill of recovery. LifeWallet has brought numerous pure bill of discovery cases against medical device and drug manufacturers and insurance companies, seeking to identify the proper party defendant or the appropriate theory on which to base relief. As these cases do not seek money damages, success in these cases may lead to information that can used to further pursue recoveries, but not money damages that can be recognized as revenue. These cases, in and of themselves, are an expense to LifeWallet, and may negatively impact our business if, for any reason, they fail to yield actionable results.

Our counterparties likewise often assert defenses that require complex, jurisdiction specific analysis. Litigation of these issues is often time consuming, delaying potential recoveries, and costly. The success of these defenses is difficult to predict and could result in partial or the entire dismissal of a given case, reducing or eliminating potential recoveries, and any associated recognition of revenue.

***Our lawsuits are brought in a diverse range of judicial venues across many jurisdictions, which may result in different outcomes on similar issues, adversely affect our recovery efforts, and limit our ability to generate revenue.***

Favorable opinions from state and federal appellate courts are binding only in the jurisdiction where the opinion was published. Accordingly, appellate opinions upholding our legal position may be relied on within the issuing jurisdiction but are, at most, persuasive to other courts. Appellate courts can disagree, and we may obtain an unfavorable opinion on similar issues where another appellate court ruled in our favor. As we may expend substantial resources pursuing appeals to establish the validity of a legal basis for recovery, which may prove unsuccessful, thus limiting our ability to generate revenue and negatively impact our business.

***Counterparties in our lawsuits employ dilatory tactics that delay the resolution of litigation or settlement negotiations, which increases the costs associated with recoveries and substantially delays the outcome of our cases and any associated revenue recognition.***

Our counterparties employ strategies to delay proceedings and the ultimate resolution of our cases. Dilatory tactics include, but are not limited to, frivolous court filings, extended and improper discovery objections and disputes, delayed negotiations for data matching protocols, and protracted settlement negotiations that may or may not yield a settlement. While these delays do not adversely affect the value of the underlying assets, and in some case statutory interest continues to accrue, the costs associated with recoveries increase substantially, and our ability to successfully resolve our cases may be limited. As a result, our ability to recognize revenue is delayed and our ultimate recovery may be diminished as a result.

***Our fee sharing arrangement with the Law Firm materially reduces our recoveries.***

We enter into legal services agreements with the Law Firm and the various entities that hold Claims. The Law Firm is engaged to act as counsel to represent MSP Recovery and each of its subsidiaries and affiliates (or other applicable entity) on a contingency basis as it pertains to the assigned Claims. The Law Firm engages outside litigation counsel from around the U.S. as co-counsel and

these arrangements are made directly between the Law Firm and other counsel. For the services provided, the Law Firm typically collects a fee equal to 40% of our 50% portion of the Net Proceeds (i.e., 20% of the total Net Proceeds), which is paid from our portion of the Net Proceeds. Co-counsel is paid from the Law Firm's portion of the Net Proceeds. The Law Firm is also entitled to attorney's fees that are awarded to the Law Firm pursuant to any fee shifting statute, by agreement, or court award. Any increase in attorneys' fees and costs would reduce our potential net recoveries. For more information about our fee sharing arrangement, see "Business —Scale of Current Portfolio" and " —Fee Sharing Arrangements."

***Assignors may pursue recovery on Claims directly or may use recovery agents other than us in connection with the Assignor's efforts to recover on Claims.***

With respect to the Assignors of the assigned Claims, some of our agreements exclude from the assignment of Claims those Claims that are assigned to or being pursued by other recovery vendors of the Assignor at the time of the assignment. We have identified instances where the Assignor did not filter its data provided to us to account for such exclusions. This resulted in some Claims being identified by us for purposes of our recovery estimates. This also has resulted in other recovery agents of the Assignor making collections on Claims that we previously believed were assigned to us. Although we endeavor to seek appropriate clarification from Assignors to properly identify Claims that are being pursued by other recovery vendors, due to the nature and volume of data, it may not be possible to identify with precision all such Claims. While we do not believe that there is any overlap with other recovery vendors with respect to assigned Claims to be material, there can be no assurance as to the ultimate impact on our recoveries or our business.

***If lawyers who we rely on to litigate Claims and defenses do not exercise due skill and care, or the interests of their clients do not align with the interests of our Assignors, there may be a material adverse effect on the value of our assets.***

We are particularly reliant on lawyers to litigate Claims and defenses with due skill and care. If they are unable or unwilling to do this for any reason, it is likely to have a material adverse effect on the value of our assets. We may have limited experience or no prior dealings with such lawyers and there can be no guarantee that the outcome of a case will be in line with our or the lawyers' assessment of the case or that such lawyers will perform with the expected skill and care.

***Our business and future growth depend on our ability to successfully expand the volume of our healthcare Claims and obtain data from new Assignors and healthcare Claims from our existing Assignor base.***

We expect a significant portion of our future revenue growth to come from expanding the volume of Claims we are assigned; this includes obtaining Claims and data from new Assignors as well as our existing Assignors. Our efforts to do so may not be successful. If we are unable to successfully expand the scope of healthcare Claims assigned from potential and existing Assignors, it could have a material adverse effect on our growth and on our business, financial condition, and results of operations.

***The positions we will typically acquire in connection with our acquisition of Claims are unsecured and may be effectively subordinated to other obligations and are at risk to fraud on the part of the Assignor of the Claim.***

The types of Claims we invest in are typically unsecured, and therefore will be subordinated to existing or future secured obligations and may be subordinated to other unsecured obligations of the parties against which we seek recoveries. The repayment of these Claims and rights is subject to significant uncertainties. The holders of other obligations may have priority over us to collect amounts due to them and therefore would be entitled to be paid in full before assets would be available for distribution to us.

Further, the possibility of material misrepresentations or omissions on the part of an Assignor, underlying beneficiary or other counterparty (e.g., some Assignors may set out to defraud investors like us). For example, an Assignor may misrepresent the quality, validity or existence of a Claim or other information provided to us. There is no assurance we will detect such fraud and any inaccuracy or incompleteness, if undetected, may adversely affect the valuation of one or more Claims and adversely affect our business and performance. Under certain circumstances, recoveries may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance.

***Internal improvements to healthcare Claims and retail billing processes by our Assignors could reduce the need for, and revenue generated by, our solutions, which could have a material adverse effect on our business, financial condition and results of operations.***

We offer solutions that help our Assignors enhance payment accuracy in an increasingly complex environment, including through our Chase to Pay platform. Over time, our work may increase compliance amongst third-party payers. If such processes continue to improve, demand for our solutions could be reduced. With enough time and investment, many of our Assignors may be able to reduce or resolve recurring payment process complexities and resulting payment inaccuracies. As the skills, experience and resources of such technology, systems and personnel improve, they may be able to identify payment inaccuracies before using our services, which would reduce the payment inaccuracies identified by our solutions and our ability to generate revenue, which could have a material adverse effect on our business, financial condition and results of operations.

21

*Healthcare spending fluctuations, simplification of the healthcare delivery and reimbursement system, programmatic changes to the scope of benefits and limitations to payment integrity initiatives could reduce the need for our data-driven solutions, which could have a material adverse effect on our business, financial condition and results of operations.*

Our solutions improve our Assignors' ability to accurately pay healthcare Claims and prevent or recover inaccurate payments, which often are a result of complexities in the healthcare Claims payment system. Although the healthcare benefit and payment systems continue to grow in complexity due to factors such as increased regulation and increased healthcare enrollment, the need for and user adoption of our solutions and/or the scope and profitability of the solutions that we provide to our Assignors could be negatively affected by, among other things:

- simplification of the U.S. healthcare delivery and reimbursement systems, either through shifts in the commercial healthcare marketplace or through legislative or regulatory changes at the federal or state level;

- reductions in the scope of private sector or government healthcare benefits (for example, decisions to eliminate coverage of certain services);

- the transition of healthcare beneficiaries from fee-for-service plans to value-based plans;

- the adoption of healthcare plans with significantly higher deductibles;

- limits placed on payment integrity initiatives, including the Medicare RAC program; and

- lower than projected growth in private health insurance or the various Medicare and Medicaid programs, including Medicare Advantage.

Any of these developments could have a material adverse effect on our business, financial condition and results of operations.

*If our existing Assignors prematurely terminate their agreement with us or if either party materially breaches an agreement, and we can no longer receive future assignments of healthcare Claims recoveries, it could have a material adverse effect on our business, financial condition, and results of operations.*

We expect in the future to derive a significant portion of our revenue from our existing Assignors and, accordingly, we are reliant on ongoing transfer and usage of data, and associated assignments, of Claims from existing Assignors. As a result, maintaining these relationships is critical to our future growth and our business, financial condition and results of operations. We may experience significantly more difficulty than we anticipate in maintaining our existing Assignor agreements. Factors that may affect our ability to continue providing our services under such agreements for our services and our ability to sell additional solutions include:

- the price, performance, and functionality of our solutions;

- the availability, price, performance, and functionality of competing solutions;

- our Assignors' perceived ability to review Claims accurately using their internal resources;

- our ability to develop complementary solutions;

- our continued ability to access the data necessary to enable us to effectively develop and deliver new solutions to Assignors;

- the stability and security of our platform;

- changes in healthcare laws, regulations, or trends; and

- the business environment of our Assignors.

Pursuant to the Claims recovery and assignment agreements with our Assignors, the Assignors may choose to discontinue one or more services under an existing contract, may exercise flexibilities within their contracts to adjust service volumes, and may breach or terminate the contract prior to its agreed upon completion date. A material breach by either party to the agreement may also result in the termination of receiving future Claims. Any such occurrences could reduce our revenue from these Assignors. Although a cancellation or termination of a contract does not revoke the original assignment from our Assignors in many instances because such assignment was irrevocable, termination still affects future transfers of data and future assignment of Claims. Accordingly, such cancellations or terminations can constrain our growth and result in a decrease in revenue, which could have a material adverse effect on our business, financial condition and results of operations.

*If an Assignor prematurely terminates its agreement with us, we may be precluded from accessing that Assignor's data and/or be forced to destroy data in our position from that Assignor, which may substantially impair our ability to recover on that Assignor's Claims.*

We enter into Claims Cost Recovery Agreements ("CCRA") and Business Associate Agreements ("BAA") with our Assignors. Pursuant to the CCRAs with our Assignors, our Assignors typically agree to provide the Company with historical claims data as well

22

as the most updated claims data that the Assignor's systems can provide and provide ongoing data transfers and agreed upon intervals. If, for any reason, our CCRA with an Assignor is terminated, our BAA with that Assignor requires us to return and/or destroy all Protected Health Information, which may substantially impair our ability to recover on that Assignor's Claims.

***If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition, and results of operations.***

As part of our strategy, we seek to develop new Assignor relationships, principally among healthcare payers and providers. Our ability to develop new relationships depends on a variety of factors, including the quality and performance of our solutions, as well as the ability to market and sell our solutions effectively and differentiate ourselves from our competitors. We may not be successful in developing new Assignor relationships. If we are unable to develop new Assignor relationships, it could have a material adverse effect on our business, financial condition, and results of operations.

***In some events, we may act as a servicing agent for another party. If one of these parties terminates their agreement with us or if either party materially breaches an agreement, it could have a material adverse effect on our business, financial condition and results of operations.***

Sometimes, we may provide our services as a servicing agent to third parties. These services include, but are not limited to, identifying, processing, prosecuting and recovering monies related to recoverable Claims. As a servicing agent, we will act as an independent contractor on behalf of a contracting party who owns the rights to certain recoverable Claims. If a party terminates such servicing agreement with us, or if either party is in default of any servicing agreement, it could have a material adverse effect on our business, financial condition and results of operations.

***We have long sales and implementation cycles for many of our data-driven solutions and may fail to close sales after expending time and resources, or experience delays in implementing the solutions, which could have a material adverse effect on our business, financial condition and results of operations.***

Potential customers generally perform a thorough evaluation of available payment accuracy solutions and require us to expend time, effort, and money educating them as to the value of our solutions prior to entering into a contract with them. We may expend significant funds and management resources during the sales cycle and ultimately fail to close the sale. Our sales cycle may be extended due to our potential customer's budgetary constraints or for other reasons. In addition, following a successful sale, the implementation of our systems frequently involves a lengthy process, as we onboard the new customer's healthcare data into our proprietary systems. If we are unsuccessful in closing sales after expending funds and management resources or if we experience delays in such sales or in implementing our solutions, it could have a material adverse effect on our business, financial condition and results of operations.

***If our Assignors' risk agreements change, it can have a material adverse effect on our business, financial condition, and results of operations.***

Many of our Assignors are First-Tier entities, as defined in 42 CFR § 422.2. A First-Tier entity is a party that enters into a written arrangement, acceptable to CMS, with an MAO or applicant to provide administrative services or healthcare services for a Medicare eligible individual under the Medicare Advantage program. These entities enter into risk agreements with Downstream Entities, as defined under 42 CFR § 422.2. If these agreements change or include any restrictions on the assignability of Claims, it can have a material adverse effect on our recoveries, business, financial condition, and results of operations.

***Our use and disclosure of individually identifiable information, including health information, is subject to federal and state privacy and security regulations, and our failure to comply with those regulations or adequately secure the information we hold could result in significant liability or reputational harm.***

State and federal laws and regulations, including HIPAA, govern the collection, dissemination, use, disclosure, creation, receipt, maintenance, transmission, privacy, confidentiality, security, availability and integrity of individually identifiable information, including protected health information ("PHI"). HIPAA establishes basic national privacy and security standards for protection of PHI by covered entities such as our Assignors, and the business associates with whom such entities contract for services, including us. As a business associate, we are also directly liable for compliance with HIPAA. In addition to HIPAA, we must adhere to state patient confidentiality and other laws that are not preempted by HIPAA, including those that are more stringent than HIPAA.

In the event of a breach of our obligations under HIPAA or other state laws, we could be subject to enforcement actions by the U.S. Department for Health and Human Services Office for Civil Rights and state regulators and lawsuits, including class action lawsuits, by private plaintiffs. Mandatory penalties for HIPAA violations can be significant and OCR and state regulators may require businesses to enter into settlement or resolution agreements and corrective action plans that impose ongoing compliance requirements. If a person knowingly or intentionally obtains or discloses PHI in violation of HIPAA requirements, criminal penalties may also be imposed. In addition, state Attorneys General are authorized to bring civil actions under HIPAA or relevant state laws. Courts can award damages, costs and attorneys' fees related to violations of HIPAA or state laws in such cases. While we maintain safeguards that we believe are reasonable and appropriate to protect the privacy and security of PHI and other personally identifiable information consistent with applicable law and our contractual obligations, we cannot provide assurance regarding how these laws, regulations,

and contracts will be interpreted, enforced or applied to our operations; our systems may be vulnerable to physical break-ins, viruses, hackers, and other potential sources of security breaches or incidents. In addition, we may not be able to prevent incidents of inappropriate use or disclosure or unauthorized access to or acquisition.

***We obtain and process a large amount of sensitive data. Our systems and networks may be subject to cyber-security breaches and other disruptions that could compromise our information. Any real or perceived improper use of, disclosure of, or access to such data could harm our reputation as a trusted brand, as well as have a material adverse effect on our business, financial condition and results of operations.***

We rely on information technology networks and systems to process and store electronic information. We collect and store sensitive data, including personally identifiable information of our consumers, on our information technology networks. Despite the implementation of security measures, our information technology networks and systems have been, and in the future may be, vulnerable to disruptions and shutdowns due to attacks by hackers or breaches due to malfeasance by contractors, employees and others who have access to our networks and systems. The occurrence of any of these cyber security events could compromise our networks and the information stored on our networks could be accessed. Any such access could disrupt our operations, adversely affect the willingness of sellers to sell to us or result in legal Claims, liability, reputational damage or regulatory penalties under laws protecting the privacy of personal information, any of which could adversely affect our business, financial condition and operating results.

In addition, our operations are spread across the United States and Puerto Rico and we rely heavily on technology to communicate internally and efficiently perform our services. We have implemented measures that are designed to mitigate the potential adverse effects of a disruption, relocation or change in operating environment; however, we cannot provide assurance that the situations we plan for and the amount of insurance coverage that we maintain will be adequate in any particular case. In addition, despite system redundancy and security measures, our systems and operations are vulnerable to damage or interruption from, among other sources:

- power loss, transmission cable cuts and telecommunications failures;

- damage or interruption caused by fire, earthquakes and other natural disasters;

- attacks by hackers or nefarious actors;

- human error;

- computer viruses and other malware or software defects; and

- physical break-ins, sabotage, intentional acts of vandalism, terrorist attacks and other events beyond our control.

If we encounter a business interruption, if we fail to effectively maintain our information systems, if it takes longer than we anticipate to complete required upgrades, enhancements or integrations or if our business continuity plans and business interruption insurance do not effectively compensate on a timely basis, we could suffer operational disruptions, disputes with Assignors, civil or criminal penalties, regulatory problems, increases in administrative expenses, loss of our ability to produce timely and accurate financial and other reports or other adverse consequences, any of which could have a material adverse effect on our business, financial condition and results of operations.

Because of the large amount of data that we collect and manage, it is possible that hardware failures or errors in our systems could result in data loss or corruption or cause the information that we collect to be incomplete or contain inaccuracies that our partners regard as significant. If our data were found to be inaccurate or unreliable due to fraud or other error, or if we, or any of the third-party service providers we engage, were to fail to maintain information systems and data integrity effectively, we could experience operational disruptions that may hinder our ability to provide services, establish appropriate pricing for services, retain and attract Assignors, establish reserves, report financial results timely and accurately and maintain regulatory compliance, among other things. Additionally, as Assignors maintain their own supporting documentation, data and records, it is possible that they may provide us with erroneous or inaccurate data. The occurrence of any of these events could cause our solutions to be perceived as vulnerable, cause our Assignors to lose confidence in our solutions, negatively affect our ability to attract new Assignors and cause existing Assignors to terminate or not renew our solutions. If the information is lost, improperly disclosed or threatened to be disclosed, we could incur significant liability and be subject to regulatory scrutiny and penalties. Furthermore, we could be forced to expend significant resources in response to a security breach, including investigating the cause of the breach, repairing system damage, increasing cyber-security protection costs by deploying additional personnel and protection technologies, notifying and providing credit monitoring to affected individuals, paying regulatory fines and litigating and resolving legal Claims and regulatory actions, all of which could increase our expenses and divert the attention of our management and key personnel away from our business operations.

In addition, if our own confidential business information were improperly disclosed, our business could be materially adversely affected. A core aspect of our business is the reliability and security of our technology platform. Any perceived or actual breach of security could have a significant impact on our reputation as a trusted brand, cause us to lose existing Assignors, prevent us from

24

obtaining new Assignors, require us to expend significant funds to remedy problems caused by breaches and to implement measures to prevent further breaches and expose us to legal risk and potential liability. Any security breach at a third-party vendor providing services to us could have similar effects. Any breach or disruption of any systems or networks on which we rely could have a material adverse effect on our business, financial condition and results of operations.

Our information technology strategy and execution are critical to our continued success. We expect to continue to invest in long-term solutions that will enable us to continue being a differentiator in the market and to protect against cybersecurity risks and threats. Our success is dependent, in large part, on maintaining the effectiveness of existing technology systems and continuing to deliver and enhance technology systems that support our business processes in a cost-efficient and resource-efficient manner. Increasing regulatory and legislative changes will place additional demands on our information technology infrastructure that could have a direct impact on resources available for other projects tied to our strategic initiatives. In addition, recent trends toward greater patient engagement in health care require new and enhanced technologies, including more sophisticated applications for mobile devices. Connectivity among technologies is becoming increasingly important. We must also develop new systems to meet current market standards and keep pace with continuing changes in information processing technology, evolving industry and regulatory standards and patient needs. Failure to do so may present compliance challenges and impede our ability to deliver services in a competitive manner. Further, because system development projects are long-term in nature, they may be more costly than expected to complete and may not deliver the expected benefits upon completion. Our failure to effectively invest in, implement improvements to and properly maintain the uninterrupted operation and data integrity of our information technology and other business systems could adversely affect our results of operations, financial position and cash flow.

***If we fail to innovate and develop new solutions, or if these new solutions are not adopted by existing and potential Assignors or other users, it could have a material adverse effect on our business, financial condition and results of operations.***

Our results of operations and continued growth will depend on our ability to successfully develop and market new solutions that our existing and potential Assignors or other users are willing to adopt. For example, as part of our "Chase to Pay" model, we launched LifeWallet in January 2022, a platform designed to organize and facilitate access to users' medical records. We cannot provide assurance that our new or modified solutions will be responsive to Assignor or users preferences or industry changes, or that the product and service development initiatives we prioritize will yield the gains that we anticipate, if any.

If we are unable to predict market preferences or if our industry changes, or if we are unable to modify our solutions on a timely basis, we may lose Assignors or fail to attract new ones. If existing Assignors are not willing to adopt new solutions, or if potential Assignors or other users do not value such new solutions, it could have a material adverse effect on our business, financial condition and results of operations.

We expect to make substantial investments in and changes to our operational platforms, systems and applications to compete effectively and keep up with technological advances. We may also face difficulties in integrating any upgraded platforms into our current technology infrastructure. In addition, significant technological changes could render our existing solutions obsolete. Although we have invested, and will continue to invest, significant resources in developing and enhancing our solutions and platforms, any failure to keep up with technological advances or to integrate upgraded operational platforms and solutions into our existing technology infrastructure could have a material adverse effect on our business, financial condition and results of operations.

***Certain of our activities present the potential for identity theft or similar illegal behavior by our employees or contractors with respect to third parties, which could have a material adverse effect on our business, financial condition and results of operations.***

Our solutions involve the use and disclosure of personal information that in some cases could be used to impersonate third parties or otherwise improperly gain access to their data or funds.

If any of our employees or contractors take, convert, or misuse such information, or we experience a data breach creating a risk of identity theft, we could be liable for damages and our business reputation could be damaged. In addition, we could be perceived to have facilitated or participated in illegal misappropriation of documents or data and, therefore, be subject to civil or criminal liability. In addition, federal and state regulators may take the position that a data breach or misdirection of data constitutes an unfair or deceptive act or trade practice. We also may be required to notify individuals affected by any data breaches. Further, a data breach or similar incident could impact the ability of our Assignors that are creditors to comply with the federal "red flags" rules, which require the implementation of identity theft prevention programs to detect, prevent and mitigate identity theft in connection with Assignor accounts, which could be costly. If data utilized in our solutions are misappropriated for the purposes of identity theft or similar illegal behavior, it could have a material adverse effect on our reputation, business, financial condition and results of operations.

***If we fail to comply with applicable privacy, security and data laws, regulations and standards, including with respect to third-party service providers that utilize sensitive personal information on our behalf, it could have a material adverse effect on our reputation, business, financial condition and results of operations.***

We have Assignors throughout the United States and our solutions may contain healthcare information of patients located across all 50 states and Puerto Rico. Therefore, we may be subject to the privacy laws of each such jurisdiction, which may vary and, in some cases, can impose more restrictive requirements than federal law. Where state laws are more protective, we have to comply with the

stricter provisions. In addition to fines and penalties imposed upon violators, some of these state laws also afford private rights of action to individuals who believe their personal information has been misused. California's patient privacy laws, for example, provide for penalties of up to $250,000 and permit injured parties to sue for damages. The interplay of federal and state laws may be subject to varying interpretations by courts and government agencies, creating complex compliance issues for us and our Assignors and potentially exposing us to additional expense, adverse publicity and liability. Further, as regulatory focus on privacy issues continues to increase and laws and regulations concerning the protection of personal information expand and become more complex, these potential risks to our business could intensify. Changes in laws or regulations associated with the enhanced protection of certain types of sensitive data, such as PHI or PII, along with increased customer demands for enhanced data security infrastructure, could greatly increase our cost of providing our services, decrease demand for our services, reduce our revenue and/or subject us to additional liabilities.

The following legal and regulatory developments also could have a material adverse effect on our business, financial condition and results of operations:

- amendment, enactment, or interpretation of laws and regulations that restrict the access and use of personal information and reduce the supply of data available to Assignors;

- changes in cultural and consumer attitudes to favor further restrictions on information collection and sharing, which may lead to regulations that prevent full utilization of our solutions;

- failure of our solutions to comply with current laws and regulations; and

- failure of our solutions to adapt to changes in the regulatory environment in an efficient, cost-effective manner.

***Changes in the United States healthcare environment, or in laws relating to healthcare programs and policies, and steps we take in anticipation of such changes or a failure to comply with such laws, particularly as they relate to the Affordable Care Act and Medicare and Medicaid programs, could have a material adverse effect on our business, financial condition, and results of operations.***

Approximately 93% of our expected recoveries arise from Claims being brought under the Medicare Secondary Payer Act private cause of action (Section 1862(b)(3)(A) of the Social Security Act (42 U.S.C. § 1395y(b)(3)(A)). This law allows us to pursue recoveries against primary payers for reimbursement of medical expenses that our Assignors paid for when primary payers (i.e., liability insurers) were responsible for payment. While we believe we have been successful at both the federal and state level in establishing a legal basis for our recoveries, changes to the laws on which we base our recoveries, particularly the Medicare Secondary Payer Act, can adversely affect our business.

For example, on May 16, 2023, Senators Tim Scott (R-SC) and Maggie Hassan (D-NH) and Representatives Brad Schneider (D-IL) and Gus Bilirakis (R-FL) introduced the Repair Abuses of MSP Payments Act (S.1607/H.R.3388) (the "RAMP Act") in the U.S. Senate and the U.S. House of Representatives, respectively, seeking to amend the private cause of action under the Medicare Secondary Payer Act, by striking "primary plan" and inserting "group health plan" (as defined in paragraph 42 U.S.C. § 1395y(b)(1)(A)(v)).

The Medicare Secondary Payer Act's private cause of action—a fundamental component of how the Company is able to calculate damages—incentivizes private parties, such as MSP Recovery, to pursue reimbursement of conditional payments by rewarding them with double damages. If the Medicare Secondary Payer Act is changed, or if the RAMP Act were enacted to apply retroactively, it could significantly reduce the Company's potential recoveries and have a material adverse effect on its business, financial condition, and results of operations.

The healthcare industry in the United States is subject to a multitude of changing political, economic and regulatory influences that affect every aspect of our healthcare system. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Affordability Reconciliation Act (the "Affordable Care Act"), made major changes in how healthcare is delivered and reimbursed, and generally increased access to health insurance benefits to the uninsured and underinsured population of the United States. Among other things, the Affordable Care Act increased the number of individuals with Medicaid and private insurance coverage, implemented reimbursement policies that tie payment to quality, facilitated the creation of accountable care organizations that may use capitation and other alternative payment methodologies, strengthened enforcement of fraud and abuse laws and encouraged the use of information technology. However, many of these changes require implementing regulations that have not yet been drafted or have been released only as proposed rules. In addition, there have been and continue to be a number of legislative and regulatory initiatives to contain healthcare costs, reduce federal and state government spending on healthcare products and services and limit or restrict the scope of the Medicare RAC program and other program integrity initiatives.

Future changes to the Affordable Care Act and to the Medicare and Medicaid programs and other federal or state healthcare reform measures may lower reimbursement rates, establish new payment models, increase or decrease government involvement in healthcare, decrease the Medicare RAC program and otherwise change the operating environment for us and our Assignors. If efforts to waive, modify or otherwise change the Affordable Care Act, in whole or in part, are successful, if we are unable to adapt our solutions to meet changing requirements or expand service delivery into new areas, or the demand for our solutions is reduced as a

26

result of healthcare organizations' reactions to changed circumstances and financial pressures, it could have a material adverse effect on our business, financial condition and results of operations.

Healthcare organizations may react to such changed circumstances and financial pressures, including those surrounding the implementation of the Affordable Care Act, by taking actions such as curtailing or deferring their retention of service providers, which could reduce the demand for our data driven solutions and, in turn, have a material adverse effect on our business, financial condition and results of operations.

*A significant portion of our Claims comes from a limited number of Assignors who have relationships with key existing payers, and the loss of one or more of these Assignors or disruptions in Assignor-payer relationships could have a material adverse effect on our business, financial condition and results of operations.*

We have acquired a significant portion of our Claims from and entered into agreements for new services with a limited number of large Assignors. These Assignors assign these Claims with an irrevocable assignment from the Assignor to us each with different and/or staggered terms. In addition, we also rely on our reputation and recommendations from key Assignors to promote our solutions to potential new Assignors.

Further, our ability to pursue a significant portion of our Claims depends on our arrangements pursuant to which we are granted access to health care data, which may be terminated upon the occurrence of certain events. See "- We use various data sources in our business and if we lose access to those data sources it could have a material adverse effect on our business, financial condition, and results of operations." Accordingly, if any of these Assignors fail to renew or terminate their existing agreements with us, it could have a material adverse effect on our business, financial condition and results of operations.

*Our revenues and operations are dependent upon a limited number of key existing payers and our Assignors' continued relationship with those payers, and disruptions in those relationships (including renegotiation, non-renewal or termination of capitation agreements) or the inability of such payers to maintain their contracts with the Centers for Medicare and Medicaid Services, or CMS, could adversely affect our business.*

Our operations are dependent on a concentrated number of payers with whom our Assignors contract to provide services. The loss of these contracts for our Assignors could have a material adverse effect on our business, results of operations, financial condition and cash flows. The sudden loss of any of our Assignors' payer partners or the renegotiation of any of our Assignors' payer contracts could adversely affect our operating results.

Moreover, our inability to maintain agreements with our Assignors with respect to their health care Claims recovery rights and data or to negotiate favorable terms for those agreements in the future could result in the loss of revenue and could have a material adverse effect on our profitability and business.

*The data healthcare analytics and healthcare payment markets are relatively new and unpenetrated, and may not develop, develop more slowly than we expect, or sustain negative publicity which may adversely affect our business.*

The data healthcare analytics and healthcare payment accuracy markets are relatively new and the overall market opportunity remains relatively unpenetrated. It is uncertain whether this market will achieve and sustain high levels of demand, client acceptance and market adoption. Our success will depend to a substantial extent on the willingness of our Assignors to use, and to increase the frequency and extent of their utilization of our solutions, as well as on our ability to demonstrate the value of data-driven solutions and payment accuracy solutions to healthcare payers and government agencies. If our Assignors or other potential customers do not perceive the benefits of our data-driven solutions, then our market may not continue to develop, or it may develop more slowly than we expect. If any of these events occurs, it could have a material adverse effect on our business, financial condition and results of operations.

*Negative publicity concerning the data healthcare analytics and healthcare payment accuracy industry or patient confidentiality and privacy could limit the future growth of the healthcare payment accuracy market.*

Our data-driven solutions help prevent and recover improper payments made to healthcare providers. As a result, healthcare providers, insurers, third-party payers and others have criticized the healthcare payment accuracy industry and have hired lobbyists to discredit the reported success that payment accuracy solutions have had in improving the accuracy of payments. Further, negative publicity regarding patient confidentiality and privacy could limit market acceptance of our healthcare solutions. Many consumer advocates, privacy advocates and government regulators believe that the existing laws and regulations do not adequately protect privacy. They have become increasingly concerned with the use of personal information. As a result, they are lobbying for further restrictions on the dissemination or commercial use of personal information to the public and private sectors. If healthcare providers, privacy advocates and others are successful in creating negative publicity for the healthcare payment accuracy industry, government and private healthcare payers could hesitate to contract with payment accuracy providers, such as us, which could have a material adverse effect on our reputation, business, financial condition and results of operations.

27

*We face significant competition, and we expect competition to increase.*

Competition among providers of healthcare payment accuracy solutions to U.S. healthcare insurance companies is strong and we may encounter additional competition as new competitors enter this area.

Our current healthcare solutions competitors include:

- other payment accuracy vendors, including vendors focused on discrete aspects of the healthcare payment accuracy process;

- fraud, waste, and abuse Claim edit and predictive analysis companies;

- primary Claims processors;

- numerous regional utilization management companies;

- in-house payment accuracy capabilities;

- Medicare RACs; and

- Healthcare consulting firms and other third-party liability service providers.

We may not be able to compete successfully against existing or new competitors. In addition, we may be forced to increase the consideration we provide for assigned Claims or lower our pricing, or the demand for our data-driven solutions may decrease as a result of increased competition. Further, a failure to be responsive to our existing and potential Assignors' needs could hinder our ability to maintain or expand our Assignor base, hire and retain new employees, pursue new business opportunities, complete future acquisitions and operate our business effectively. Any inability to compete effectively could have a material adverse effect on our business, financial condition and results of operations.

*If we are unable to protect our proprietary technology, information, processes and know-how, the value of our solutions may be diminished, which could have a material adverse effect on our business, financial condition and results of operations.*

We rely significantly on proprietary technology, information, processes and know-how that are not subject to patent or copyright protection. We seek to protect this information through trade secret or confidentiality agreements with our employees, consultants, subcontractors or other parties, as well as through other security measures. These agreements and security measures may be inadequate to deter misappropriation of intellectual property and may be insufficient to protect our proprietary information. Misappropriation of our intellectual property by third parties, or any disclosure or dissemination of our business intelligence, queries, Algorithms and other similar information by any means, could undermine competitive advantages we currently derive or may derive therefrom. Any of these situations could result in our expending significant time and incurring expense to enforce our intellectual property rights. Although we have taken measures to protect our proprietary rights, others may compete with our business by offering solutions or services that are substantially similar to ours. If the protection of our proprietary rights is inadequate to prevent unauthorized use or appropriation by third parties or our employees, the value of our solutions, brand and other intangible assets may be diminished and competitors may be able to more effectively offer solutions that have the same or similar functionality as our solutions, which could have a material adverse effect on our business, financial condition and results of operations.

*Our success depends on our ability to protect our intellectual property rights.*

Our success depends in part on our ability to protect our proprietary software, confidential information and know-how, technology and other intellectual property and intellectual property rights. To do so, we rely generally on copyright, trademark and trade secret laws, confidentiality and invention assignment agreements with employees and third parties, and license and other agreements with consultants, vendors and Assignors. There can be no assurance that employees, consultants, vendors and Assignors have executed such agreements or have not breached or will not breach their agreements with us, that we will have adequate remedies for any breach, or that our trade secrets will not otherwise become known or independently developed by competitors. Additionally, we monitor our use of open-source software to avoid uses that would require us to disclose our proprietary source code or violate applicable open source licenses, but if we engaged in such uses inadvertently, we could be required to take remedial action or release certain of our proprietary source code. These scenarios could have a material adverse effect on our business, financial condition and results of operations. In addition, despite the protections we place on our intellectual property, a third party could, without authorization, copy or otherwise obtain and use our products or technology, or develop similar technology. In addition, agreement terms that address non-competition are difficult to enforce in many jurisdictions and might not be enforceable in certain cases.

As we begin to pursue patents, we might not be able to obtain meaningful patent protection for our technology. In addition, if any patents are issued in the future, they might not provide us with any competitive advantages or might be successfully challenged by third parties.

We rely on unpatented proprietary technology. It is possible that others will independently develop the same or similar technology or otherwise obtain access to our unpatented technology. To protect our trade secrets and other proprietary information, we require employees, consultants, advisors and collaborators to enter into confidentiality agreements. We cannot assure you that these

agreements will provide meaningful protection for our trade secrets, know-how, or other proprietary information in the event of any unauthorized use, misappropriation, or disclosure of such trade secrets, know-how, or other proprietary information. Further, the theft or unauthorized use or publication of our trade secrets and other confidential business information could reduce the differentiation of our services and harm our business, and the value of our investment in development or business acquisitions could be reduced and third parties might make claims against us related to losses of their confidential or proprietary information.

We rely on our trademarks, service marks, trade names and brand names to distinguish our services from the services of our competitors and have registered or applied to register many of these trademarks. We cannot assure you that our trademark applications will be approved. Third parties may also oppose our trademark applications or otherwise challenge our use of the trademarks. In the event that our trademarks are successfully challenged, we could be forced to rebrand our services, which could result in loss of brand recognition and could require us to devote resources advertising and marketing new brands. Further, we cannot assure you that competitors will not infringe our trademarks or that we will have adequate resources to enforce our trademarks. Additionally, if we expand our focus to the international payment accuracy market, there is no guarantee that our trademarks, service marks, trade names and brand names will be adequately protected.

***Our ability to obtain, protect, and enforce our intellectual property rights is subject to uncertainty as to the scope of protection, registrability, patentability, validity and enforceability of our intellectual property rights in each applicable jurisdiction, as well as the risk of general litigation or third-party oppositions.***

Existing U.S. federal and state intellectual property laws offer only limited protection. Moreover, if we expand our business into markets outside of the United States, our intellectual property rights may not receive the same degree of protection as they would in the United States because of the differences in foreign trademark and other laws concerning proprietary rights. Governments may adopt regulations, and government agencies or courts may render decisions, requiring compulsory licensing of intellectual property rights. When we seek to enforce our intellectual property rights, we may be subject to claims that the intellectual property rights are invalid or unenforceable. Litigation may be necessary in the future to enforce our intellectual property rights and to protect our trade secrets. Litigation brought to protect and enforce our intellectual property rights could be costly, time consuming and distracting to management and could result in the impairment or loss of portions of our intellectual property rights. Furthermore, our efforts to enforce our intellectual property rights may be met with defenses, counterclaims and countersuits attacking the validity and enforceability of our intellectual property rights. Our inability to protect our proprietary technology against unauthorized copying or use, as well as any costly litigation or diversion of our management's attention and resources, could delay further sales or the implementation of our solutions, impair the functionality of our solutions, delay introductions of new solutions, result in our substituting inferior or more costly technologies into our solutions, or have a material adverse effect on our business, financial condition and results of operations.

***Our qui tam litigation may be subject to Government Intervention and Dismissal pursuant to 31 U.S.C. § 3730(c)(2)(A).***

We file qui tam ("whistleblower") actions on behalf of the United States government ("Federal Government") under the False Claims Act, 31 U.S.C. § 3729 et seq. These actions give the Federal Government the opportunity to intervene and participate in the action. The False Claims Act authorizes the Attorney General to dismiss a qui tam action over the relator's objection. The action can be dismissed if the Federal Government determines their best interests are not served with the litigation. This can be the case if the litigation does not advance their interests, preserve their limited resources or avoid adverse precedent.

The Federal Government may dismiss an action notwithstanding the objections of the relator if the relator has received notice from the Federal Government and the person is afforded an opportunity to be heard on the Federal Government's motion to dismiss. Courts have stated that the Federal Government has an "unfettered" right to dismiss a qui tam action. Swift v. United States, 318 F.3d 250, 252 (D.C. Cir. 2003). Federal Government intervention as well as dismissal pursuant to 31 U.S.C. § 3730(c)(2)(A), can negatively affect our business and our recovery efforts.

***We are subject to extensive government regulation. Any violation of the laws and regulations applicable to us or a negative audit or investigation finding could have a material adverse effect on our business.***

Much of our business is regulated by the Federal Government and the states in which we operate. The laws and regulations governing our operations generally are intended to benefit and protect individual citizens, including government program beneficiaries, health plan members and providers, rather than stockholders. The government agencies administering these laws and regulations have broad latitude to enforce them. These laws and regulations regulate how we do business, what services we offer and how we interact with our Assignors, providers, other healthcare payers and the public. Increased involvement by us in analytic or audit work that can have an impact on the eligibility of individuals for medical coverage or specific benefits could increase the likelihood and incidence of us being subjected to scrutiny or legal actions by parties other than our Assignors, based on alleged mistakes or deficiencies in our work, with significant resulting costs and strain on our resources.

In addition, because we may receive payments from federal and state governmental agencies, we may become subject to various laws, including the Federal False Claims Act and similar state statutes, which permit government law enforcement agencies to institute suits against us for violations and, in some cases, to seek double or treble damages, penalties and assessments. In addition, private

29

citizens, acting as whistleblowers, can sue on behalf of the Federal Government under the "qui tam" provisions of the Federal False Claims Act and similar statutory provisions in many states.

The expansion of our operations into new products and services may further expose us to requirements and potential liabilities under additional statutes and legislative schemes that previously have not been relevant to our business, such as banking statutes, that may both increase demands on our resources for compliance activities and subject us to potential penalties for noncompliance with statutory and regulatory standards.

If the government discovers improper or illegal activities in the course of audits or investigations, we may be subject to various civil and criminal penalties and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions and debarment from doing business with the government. Such risks, particularly under the Federal False Claims Act and similar state fraud statutes, have increased in recent years due to legislative changes that have (among other amendments) expanded the definition of a false claim to include, potentially, any unreimbursed overpayment received from, or other monetary debt owed to, a government agency. If we are found to be in violation of any applicable law or regulation, or if we receive an adverse review, audit or investigation, any resulting negative publicity, penalties or sanctions could have an adverse effect on our reputation in the industry, impair our ability to compete for new contracts and have a material adverse effect on our business, financial condition and results of operations.

We are also subject to laws, regulations and rules enacted by national, regional and local governments and Nasdaq. In particular, we are required to comply with certain SEC, Nasdaq and other legal or regulatory requirements. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time-consuming and costly. Those laws, regulations or rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations or rules, as interpreted and applied, could have a material adverse effect on our business and results of operations.

***Our business depends on effective information processing systems that are compliant with current HIPAA transaction and code set standards and the integrity of the data in, and operations of, our information systems, as well as those of other entities that provide us with data or receive data from us.***

Our ability to conduct our operations and accurately report our financial results depends on the integrity of the data in our information systems and the integrity of the processes performed by those systems. These information systems and applications require continual maintenance, upgrading and enhancement to meet our operational needs, satisfy Assignor requests and handle and enable our expansion and growth. Despite our testing and quality control measures, we cannot be certain that errors or system deficiencies will not be found, and that remediation can be done in a timeframe that is acceptable to our Assignors or that Assignor relationships will not be impaired by the occurrence of errors or the need for remediation. In addition, implementation of upgrades and enhancements may cost more, take longer or require more testing than originally expected. Given the large amount of data we collect and manage, it is possible that hardware failures, errors or technical deficiencies in our systems could result in data loss or corruption or cause the information that we collect, utilize or disseminate to be incomplete or contain inaccuracies that our Assignors regard as significant.

Moreover, because we submit high volumes of monetary Claims to third parties, the efficiency and effectiveness of our own operations are to some degree dependent on the Claims processing systems of these third parties and their compliance with any new transaction and code set standards. Since October 1, 2015, health plans, commercial payers and healthcare providers have been required to transition to the new ICD-10 coding system, which greatly expands the number and detail of diagnosis codes used for inpatient, outpatient and physician Claims. The transition to the new transaction and code set standard is expensive, time-consuming and may initially result in disruptions or delays as we and other stakeholders make necessary system adjustments to be fully compliant and capable of exchanging data.

In addition, we may experience delays in processing Claims and therefore earning our fees if the third parties with whom we work are not in full compliance with these new standards in the required timeframe. Claims processing systems failures, incapacities or deficiencies internal to these third parties could significantly delay or obstruct our ability to recover money, and thereby interfere with our performance and our ability to generate revenue in the timeframe we anticipate, which in turn could have a material adverse effect on our business, financial condition and results of operations.

***In the event we fail to maintain our Security Organization Control 2, HITRUST or other certifications, we could be in breach of our obligations under our contracts; fines and other penalties could result, we may suffer reputational harm, and our business could be damaged, limiting our ability to generate revenue.***

In addition to government regulations and securities laws, we are subject to self-regulatory standards and industry certifications that may legally or contractually apply to us. These include Security Organization Control 2 ("SOC 2"), with which we are currently compliant. In the event we fail to maintain our SOC 2 compliance or fail to receive recertification from HITRUST, we could be in breach of our obligations under Assignor and other contracts, fines, and other penalties could result, and we may suffer reputational harm and damage to our business. Further, our Assignors may expect us to comply with more stringent privacy and data security

30

requirements than those imposed by laws, regulations, or self-regulatory requirements, and we may be obligated contractually to comply with additional or different standards relating to our handling or protection of data.

Any failure or perceived failure by us to comply with federal or state laws or regulations, industry standards or other legal obligations, or any actual or suspected privacy or security incident, whether or not resulting in unauthorized access to, or acquisition, release or transfer of personally identifiable information ("PII") or other data, may result in governmental enforcement actions and prosecutions, private litigation, fines and penalties or adverse publicity and could cause our Assignors to lose trust in us, which could have an adverse effect on our reputation and business. We may be unable to make such changes and modifications in a commercially reasonable manner or at all, and our ability to pursue recoveries could be limited. Any of these developments could harm our business, financial condition and results of operations. Privacy and data security concerns, whether valid or invalid, may inhibit retention of our systems by existing Assignors or onboarding onto or, in the case of our Chase to Pay services, adoption of our systems by new Assignors. For more information on Chase to Pay services, please see the section entitled "Business - Chase to Pay."

***Costs associated with, and our ability to obtain and maintain adequate insurance, could adversely affect our profitability and financial condition.***

We hold a number of insurance policies, including directors' and officers' liability insurance, business interruption insurance, property insurance and workers' compensation insurance. If the costs of maintaining adequate insurance coverage should increase significantly in the future, our operating results could be materially adversely affected. Likewise, if any of our current insurance coverage should become unavailable to us or become economically impractical, we would be required to operate our business without indemnity from commercial insurance providers. Similarly, if we exhaust our current insurance coverage for any given policy period, we would be required to operate our business without indemnity from commercial insurance providers for any Claims made that are attributable to that policy period.

***Our services could become subject to new, revised or enhanced regulatory requirements in the future, which could result in increased costs, could delay or prevent our introduction of new solutions, or could impair the function or value of our existing solutions, which could have a material adverse effect on our business, financial condition and results of operations.***

The healthcare industry is highly regulated at the federal, state and local levels, and is subject to changing legislative, regulatory, political and other influences. As has been the trend in recent years, it is reasonable to assume that there will continue to be increased government oversight and regulation of the healthcare industry in the future. Changes to existing laws and regulations, or the enactment of new federal and state laws and regulations affecting the healthcare industry, could create unexpected liabilities for us, could cause us or our Assignors to incur additional costs and could restrict our or our Assignors' operations. Many healthcare laws are complex, subject to frequent change and dependent on interpretation and enforcement decisions from government agencies with broad discretion. We cannot assure our stockholders as to the ultimate content, timing or effect of any new healthcare legislation or regulations, nor is it possible at this time to estimate the impact of potential new legislation or regulations on our business. In addition, federal and state legislatures periodically have considered programs to reform or amend the U.S. healthcare system at both the federal and state level, such as the enactment of the Affordable Care Act. It is possible that the changes to the Medicare, Medicaid or other governmental healthcare program reimbursements may serve as precedent to possible changes in other payers' reimbursement policies in a manner adverse to us. Similarly, changes in private payer reimbursements could lead to adverse changes in Medicare, Medicaid and other governmental healthcare programs, which could have a material adverse effect on our business, financial condition and results of operations. Our failure to anticipate accurately the application of these laws and similar or future laws and regulations, or our failure to comply with them, could create liability for us, result in adverse publicity and have a material adverse effect on our business, financial condition and results of operations.

While we believe that we have structured our agreements and operations in material compliance with applicable healthcare laws and regulations, there can be no assurance that we will be able to successfully address changes in the current regulatory environment. We believe that our business operations materially comply with applicable healthcare laws and regulations. However, some of the healthcare laws and regulations applicable to us are subject to limited or evolving interpretations, and a review of our business or operations by a court, law enforcement, or a regulatory authority might result in a determination that could have a material adverse effect on us. Furthermore, the healthcare laws and regulations applicable to us may be amended or interpreted in a manner that could have a material adverse effect on our business, prospects, results of operations and financial condition.

Our services may become subject to new or enhanced regulatory requirements and we may be required to change or adapt our services in order to comply with these regulations. If we fail to successfully implement a new regulatory framework, it could adversely affect our ability to offer services deemed critical by our Assignors, which could have a material adverse effect on our business, financial condition and results of operations. New or enhanced regulatory requirements may render our solutions obsolete or prevent us from performing certain services. Further, new or enhanced regulatory requirements could impose additional costs on us, thereby making existing solutions unprofitable, and could make the introduction of new solutions more costly or time consuming than we anticipate, which could have a material adverse effect on our business, financial condition and results of operations.

31

*Failing to accurately estimate our contract pricing may have a material adverse effect on our business.*

Our Assignor contracts are generally recovery-based. We receive a fee for such contracts based on the monies identified and ultimately recovered. Our ability to earn a profit on a performance-based agreement requires that we accurately estimate the costs involved and outcomes likely to be achieved and assess the probability of completing multiple tasks and transactions within the contracted time period.

We derive a relatively small portion of our revenue on a "fee-for-service" basis whereby billing is based upon a flat fee or a fee per hour. To earn a profit on these contracts, we must accurately estimate costs involved and assess the probability of achieving certain milestones within the contracted time period. If we do not accurately estimate the costs and timing for completing projects, or if we encounter increased or unexpected costs, delays, failures, liabilities, or risks, including those outside of our control, our contracts could prove unprofitable for us or yield lower profit margins than anticipated. Although we believe that we have recorded adequate provisions in our financial statements for losses on our fee-for-service contracts where applicable, as required under GAAP, we cannot provide assurance that our contract provisions will be adequate to cover all actual future losses. The inability to accurately estimate the factors upon which we base our contract pricing could have a material adverse effect on business, financial condition and results of operations.

*If we fail to cost-effectively develop widespread brand awareness and maintain our reputation, or if we fail to achieve and maintain market acceptance, our business could suffer.*

We believe that maintaining and enhancing our reputation and brand recognition is critical to our relationships with our Assignors and ability to attract new Assignors. The promotion of our brand may require us to make substantial investments and we anticipate that, as our market becomes increasingly competitive, these marketing initiatives may become increasingly difficult and expensive. Our marketing activities may not be successful or yield increased revenue and to the extent that these activities yield increased revenue, the increased revenue may not offset the expenses we incur and our results of operations could be harmed. In addition, any factor that diminishes our reputation or that of our management, including failing to meet expectations, or any adverse publicity or litigation involving or surrounding us, could make it substantially more difficult for us to attract new Assignors. In addition, negative publicity resulting from any adverse government audit could injure our reputation. If we do not successfully maintain and enhance our reputation and brand recognition, our business may not grow and we could lose our relationships with Assignors, which would harm our business, results of operations and financial condition.

The registered or unregistered trademarks or trade names that we own or license may be challenged, infringed, circumvented, declared generic, lapsed or determined to be infringing on or dilutive of other marks. We may not be able to protect our rights in these trademarks and trade names, which we need in order to build name recognition with Assignors, payers and other partners. In addition, third parties may in the future file for registration of trademarks similar or identical to our trademarks. If they succeed in registering or developing common law rights in such trademarks, and if we are not successful in challenging such third-party rights, we may not be able to use these trademarks to promote our business in certain relevant jurisdictions. If we are unable to establish name recognition based on our trademarks and trade names, we may not be able to compete effectively and our brand recognition, reputation and results of operations may be adversely affected.

*Our ability to execute on business plans, maintain high levels of service, or adequately address competitive challenges will be negatively impacted if we fail to properly manage our growth, which could have a material adverse effect on our business, financial condition and results of operations.*

In recent years, our size and the scope of our business operations have expanded rapidly, and we expect that we will continue to grow and expand into new areas within the healthcare industry; however, such growth and expansion has resulted in nominal revenue to date and carries costs and risks that, if not properly managed, could have a material adverse effect on our business, financial condition and results of operations. To effectively manage our business plans, we must continue to improve our operations, while remaining competitive. We must also be flexible and responsive to our Assignors' needs and to changes in the political, economic and regulatory environment in which we operate. The greater size and complexity of our expanding business puts additional strain on our administrative, operational and financial resources and makes the determination of optimal resource allocation more difficult. A failure to anticipate or properly address the demands that our growth and diversification may have on our resources and existing infrastructure may result in unanticipated costs and inefficiencies and could adversely impact our ability to execute on our business plans and growth goals, which could have a material adverse effect on our business, financial condition and results of operations.

We may require significant capital expenditures and the allocation of valuable management resources to grow and change in these areas. We must effectively increase our headcount and continue to effectively train and manage our employees. We will need to continue to hire, train and manage additional qualified information technology, operations and marketing staff, and improve and maintain our technology and information systems to properly manage our growth. If our new hires perform poorly, or if we are unsuccessful in hiring, training, managing and integrating these new employees, or if we are not successful in retaining our existing employees, our business may be adversely affected. We will be unable to manage our business effectively if we are unable to alleviate the strain on resources caused by growth in a timely and successful manner. If we fail to effectively manage our anticipated growth and change, the quality of our services may suffer, which could negatively affect our brand and reputation and harm our ability to attract and retain Assignors and employees.

We have encountered and will continue to encounter risks and difficulties frequently experienced by growing companies in rapidly changing industries, including increasing expenses as we continue to grow our business. We expect our operating expenses to increase significantly over the next several years as we continue to hire additional personnel, expand our operations and infrastructure, and continue to expand to reach more Assignors. In addition to the expected costs to grow our business, we also expect to incur additional legal, accounting, investor relations and other expenses as a newly public company. These investments may be more costly than we expect, and if we do not achieve the benefits anticipated from these investments, or if the realization of these benefits is delayed, they may not result in increased revenue or growth in our business. If our growth rate were to decline significantly or become negative, it could adversely affect our financial condition and results of operations. If we are not able to achieve or maintain positive cash flow in the long term, we may require additional financing, which may not be available on favorable terms or at all and/or which could be dilutive to our stockholders. Our failure to achieve or maintain profitability could negatively impact the value of our common stock.

We may require additional financing to fund our operations or growth. The failure to secure additional financing on acceptable terms and conditions or at all could have a material adverse effect on our continued development or growth. Our access to, and the availability of, financing will be impacted by many factors, including, but not limited to, our financial performance, our credit ratings, our then current level of indebtedness, the liquidity of the overall capital markets and the state of the U.S. and global economy. None of our officers, directors or stockholders will be obligated to provide any financing to us.

***We may not be able to obtain additional capital to continue the development of our business.***

There can be no assurance that our future proposed operations and Claims recovery will be implemented successfully or that we will ever have profits. If we are unable to successfully recover on Claims and continue pursuing recoveries, holders of our common stock may lose their entire investment. We face all of the risks inherent in a new business and a new public company, including the expenses, difficulties, complications and delays frequently encountered in connection with conducting operations, including the need for significant additional capital requirements and management's potential underestimation of initial and ongoing costs. In evaluating our business and future prospects, these difficulties should be considered. If we are not effective in addressing these risks, we would not be able to implement our business strategy and our results of operations would be adversely affected. To date, the Company's sources of liquidity to fund working capital have been through funds from servicing agreements, member contributions and investments from other third parties. Our ability to obtain necessary financing may be impaired by factors such as the health of and access to capital markets, our limited track record, or a future doubt about our ability to continue as a going concern.

***Failure to properly manage our growth or obtain additional financing to fund growth could negatively impact our business.***

In order to implement our business plan and achieve and favorable results, we expect to expand our business operations and hire additional sales and support personnel. We may not have sufficient resources to do so. If we hire additional personnel and invest in additional infrastructure, we may not be effective in expanding our operations and our systems, procedures or controls may not be adequate to support any such expansion. Failure to properly manage our growth could have a material adverse effect on our business and our operating results. Failure to obtain financing, or obtain financing on favorable terms, could have a material adverse effect on future operating prospects, could require us to significantly reduce operations, and could result in a decrease in our stock price.

***We may make acquisitions of businesses or Claim recovery interests that prove unsuccessful, and any mergers, acquisitions, dispositions or joint venture activities may change our business and financial results and introduce new risks.***

From time to time, we may make acquisitions of, or otherwise invest in, other companies that could complement our business, including the acquisition of entities in diverse geographic regions and entities offering greater access to businesses and markets that we do not currently serve. The acquisitions we make may be unprofitable or may take some time to achieve profitability. In addition, we may not successfully operate the businesses that we acquire, or may not successfully integrate these businesses with our own, which may result in our inability to maintain our goals, objectives, standards, controls, policies, culture, or profitability. Through acquisitions, we may enter markets in which we have limited or no experience. Any acquisition may result in a potentially dilutive issuance of equity securities, and the incurrence of additional debt which could reduce our profitability. We also pursue dispositions and joint ventures from time to time. Any such transactions could change our business lines, geographic reach, financial results or capital structure. Our company could be larger or smaller after any such transactions and may have a different investment profile.

We may also invest in certain Claim recovery interests, as well as assignor interests in Claims with the intent to expand our portfolio of recoverable Claims and add to our potential revenue streams by selling these Claims at a higher rate than that paid by the Company. These purchases may prove unprofitable or may take some time to achieve profitability. These purchases may also adversely affect our liquidity and cash positions if we use our cash in order to purchase new Claims, or if we finance such purchase with debt that we are ultimately not able to repay. If we do not realize the anticipated benefits of any such acquisition, it would have a material effect on our business, financial condition and results of operations.

33

***We have a substantial amount of indebtedness and payment obligations, and together with any future indebtedness or payment obligations, could adversely affect our ability to operate our business.***

We have substantial amounts of indebtedness and payment obligations and we may incur substantial additional indebtedness or payment obligations in order to finance acquisitions of additional Claims assets or otherwise in connection with financing our operations, and such increased leverage could adversely affect our business.

For example, on March 29, 2023, we entered into a membership interest purchase agreement with Hazel Holdings I LLC (together with its affiliates, "Hazel"), which was funded partially by a purchase money loan between Hazel, as lender, and the Company, as borrower, in the amount of $250 million, which has increased our indebtedness and obligation to pay interest, and an Amended and Restated Credit Agreement with affiliates of Hazel with respect to an aggregate $80 million loan credit facility, which has also increased our indebtedness and obligations to pay interest. In addition, pursuant to the Master Transaction Agreement, dated March 9, 2022 (as amended, the "Virage MTA"), we have payment obligations to Virage in the amount of $825.0 million as of March 31, 2023.

The terms of any of our existing or future indebtedness or payment obligations may restrict or otherwise negatively impact our ability to grow and manage our business. In addition, we may not have the ability to refinance or pay such amounts when due if we do not begin generating revenue. The amount of our indebtedness and payment obligations could limit our ability to obtain further financing and limit our ability to pursue our operational and strategic goals and opportunities, and adversely affect our liquidity position if the Claims we purchase do not generate proceeds at the rate we expect, if at all. The increased leverage, potential lack of access to financing and increased expenses could have a material adverse effect on our financial condition, results of operations and cash flows.

***Failure to obtain or maintain ongoing financing to fund operations would negatively impact our business.***

On March 29, 2023, the Company entered into an Amended and Restated Credit Agreement with affiliates of Hazel, as the lender and administrative agent with respect to an aggregate $80 million term loan credit facility consisting of a Term Loan A commitment to fund up to $30 million (in multiple installments) in proceeds and a Term Loan B commitment to fund up to $18 million (in multiple installments) in proceeds, in each case, after taking into account an original issue discount (collectively, the "Working Capital Credit Facility"). This Working Capital Credit Facility, our continued source of funding for operations, is contingent on compliance with certain covenants, which we may not meet. If we fail to meet comply with these covenants, continued funding may cease, substantially impairing our ability to continue our operations, including the pursuit of recoveries. On May 11, 2023 and June 13, 2023, Hazel notified us that it would not disburse additional funds under the Working Capital Credit Facility until the Company satisfies certain funding conditions, including the filing of this Annual Report on Form 10-K. The parties subsequently agreed that $5.5 million will be funded under Term Loan A in accordance with the terms of the Working Capital Credit Facility subsequent to the filing of this 2022 Form 10-K and receipt of funding notices, deeming funding conditions satisfied or waived. Following such funding, the Term Loan A commitment would be terminated, with total funding of $20.5 million. In addition, the parties agreed to increase the Term Loan B commitment from $18 million to $27.5 million, which will be funded in multiple installments and in accordance with the terms of the Working Capital Credit Facility. A failure to obtain or maintain financing to fund operations would require us to significantly reduce operations and would have a material adverse effect on future operating prospects.

***Adverse judgments or settlements in litigation, regulatory or other dispute resolution proceedings could have a material adverse effect on our business, financial condition and results of operations.***

We are currently party to, and may in the future become party to, lawsuits and other claims against us that arise from time to time in the ordinary course of our business. These may include lawsuits and claims related to, for example, contracts, subcontracts, protection of confidential information or trade secrets, wage and benefits, employment of our workforce or compliance with any of a wide array of state and federal statutes, rules and regulations that pertain to different aspects of our business. We also may be required to initiate expensive litigation or other proceedings to protect our business interests. In addition, because of the payments we may receive from potential future government Assignors, we may become subject to unexpected inquiries, investigations, legal actions or enforcement proceedings pursuant to the False Claims Act, healthcare fraud, waste and abuse laws or similar legislation. Any investigations, settlements or adverse judgments stemming from such legal disputes or other claims may result in significant monetary damages or injunctive relief against us, as well as reputational injury that could adversely affect us. In addition, litigation and other legal claims are subject to inherent uncertainties and management's view of currently pending legal matters may change in the future. Those uncertainties include, but are not limited to, costs of litigation, unpredictable judicial or jury decisions and the differing laws and judicial proclivities regarding damage awards among the states in which we operate. Unexpected outcomes in such legal proceedings, or changes in management's evaluation or predictions of the likely outcomes of such proceedings (possibly resulting in changes in established reserves) could have a material adverse effect on our business, financial condition and results of operations.

34

***If we are unable to successfully identify and recover on future Claims, our results of operations could be adversely affected.***

As a part of our business plan, we have acquired the right to pursue recoveries and we intend to continue to pursue acquiring additional Claims to support our business strategy. These recoveries can involve a number of risks and challenges, any of which could cause significant operating inefficiencies and adversely affect our growth and profitability. Such risks and challenges include:

- underperformance relative to our expectations and the price paid for the Claims;

- unanticipated demands on our management and operational resources;

- failure to successfully recover on legal Claims;

- difficulty in integrating personnel, operations, and systems;

- maintaining current customers and securing future customers of the combined businesses;

- assumption of liabilities; and

- litigation-related charges.

The profits of Claims may take considerable time to recover and certain recoveries may fall short of expected returns. If our recoveries are not successful, we may record impairment charges. Our ability to grow our capital will depend upon our success at identifying and recovering legal Claims, which requires substantial judgment in assessing their values, strengths, weaknesses, liabilities, and potential profitability, as well as the availability of capital.

***If we fail to accurately calculate the Paid Amount and Paid Value of Potential Recoverable Claims, it can have a material adverse effect on our business, results of operations, financial condition, and cash flows.***

Typically, we identify recoverable Claims using our proprietary Algorithms which comb through historical paid Claims data and search for potential recoveries. Our potential ability to achieve recovery revenues are based largely on the Paid Value of Potentially Recoverable Claims of our portfolio and our ability to discover, quantify and settle the gap between Billed Amount and Paid Amount on a large scale. If we fail to accurately calculate the Paid Amount or the Paid Value of Potential Recoverable Claims, the Recovery Multiple or the recovery rights we are entitled to may not be appropriately captured, which may have a material adverse effect on our business, results of operations, financial condition and cash flows.

***Failure of our software vendors, utility providers and network providers to perform as expected, changes in our relationships with them, or losing access to data sources may adversely affect our business.***

Our ability to service our Assignors and deliver and implement solutions requires that we work with certain third-party providers, including software vendors, utility providers and network providers, and depends on such third parties meeting our expectations in both timeliness and quality. We might incur significant additional liabilities if the services provided by these third parties do not meet our expectations, if they terminate or refuse to renew their relationships with us or if they were to offer their services to us on less advantageous terms, which could have a material adverse effect on our business, financial condition and results of operations. In addition, while there are backup systems in many of our operating facilities, an extended outage of utility or network services supplied by these vendors or providers could impair our ability to deliver our solutions, which could have a material adverse effect on our business, financial condition and results of operations.

Our ability to service our Assignors and deliver and implement solutions requires that we use several data sources when identifying recoveries. If we were to lose access to those data sources, including as a result of any termination of our data access arrangements, it could have a material adverse effect on our business, financial condition and results of operations.

***We may be sued by third parties for alleged infringement of their proprietary rights.***

Our success depends also in part on us not infringing the intellectual property rights of others. Our competitors, as well as a number of other entities and individuals, may own or claim to own intellectual property relating to our industry. In the future, such third parties may claim that we are infringing their intellectual property rights, and we may be found to be infringing such rights. Any claims or litigation could cause us to incur significant expenses and, if successfully asserted against us, could require that we pay substantial damages or ongoing royalty payments, prevent us from offering our services, or require that we comply with other unfavorable terms. Even if we were to prevail in such a dispute, any litigation could be costly and time-consuming and divert the attention of our management and key personnel from our business operations.

***Changes in, or interpretations of, tax rules and regulations may adversely affect our effective tax rates.***

We have operations throughout the United States and in Puerto Rico. Accordingly, we are subject to taxation in many jurisdictions with increasingly complex tax laws, the application of which can be uncertain.

Unanticipated changes in our tax rates could affect our future financial condition and results of operations. Our future effective tax rates could be unfavorably affected by changes in the tax rates in jurisdictions where our income is earned and taxed, by changes in, or our interpretation of, tax rules and regulations in the jurisdictions in which we do business, by increases in expenses not

deductible for tax purposes including impairments of goodwill, by changes in GAAP or other applicable accounting standards or by changes in the valuation of our deferred tax assets and liabilities.

In addition, we are subject to the continual examination of our income tax returns by the U.S. Internal Revenue Service ("IRS") and other domestic and international tax authorities. Tax authorities in various jurisdictions may disagree with and subsequently challenge the amount of profits taxed in their state or country, which may result in increased tax liability, including accrued interest and penalties, which would cause our tax expense to increase. There can be no assurance that the final determination of any of these examinations will not have a material adverse effect on our financial condition and results of operations.

***We will be required to pay the Tax Receivable Agreement ("TRA") Parties (as defined in the TRA) for most of the benefits relating to, among other things, an increase in tax attributes as a result of the Company's direct and indirect allocable share of existing tax basis acquired in the Business Combination, and the Company's increase in its allocable share of existing tax basis and anticipated tax basis adjustments we receive in connection with sales or exchanges of Up-C Units after the Business Combination.***

In connection with the Business Combination, we entered into a TRA with the TRA Parties (as defined in the TRA) that provides for the payment by the Company to such TRA Parties of 85% of the benefits, if any, that the Company is deemed to realize (calculated using certain assumptions) as a result of: (i) the Company's direct and indirect allocable share of existing tax basis acquired in the Business Combination, (ii) increases in the Company's allocable share of existing tax basis and tax basis adjustments that will increase the tax basis of the tangible and intangible assets of Opco as a result of the Business Combination and as a result of sales or exchanges of Up-C Units for cash or shares of the Company's Class A common stock, and (iii) certain other tax benefits related to entering into the TRA, including tax benefits attributable to payments under the TRA. These increases in existing tax basis and tax basis adjustments generated over time may reduce the amount of tax that the Company would otherwise be required to pay in the future, although the IRS may challenge all or part of the validity of that tax basis, and a court could sustain such a challenge. Actual tax benefits realized by the Company may differ from tax benefits calculated under the TRA as a result of the use of certain assumptions in the TRA, including the use of an assumed weighted-average state and local income tax rate to calculate tax benefits. The payment obligation under the TRA is an obligation of the Company and not of Opco. While the amount of existing tax basis, the anticipated tax basis adjustments and the actual amount and utilization of tax attributes, as well as the amount and timing of any payments under the TRA, will vary depending upon a number of factors, including the timing of exchanges of Up-C Units for shares of the Company common stock, the applicable tax rate, the price of shares of the Company's Class A common stock at the time of exchanges, the extent to which such exchanges are taxable and the amount and timing of our income, we expect that as a result of the size of the transfers and increases in the tax basis of the tangible and intangible assets of Opco and our possible utilization of tax attributes, including existing tax basis acquired at the time of the Business Combination, the payments that the Company may make under the TRA will be substantial. The payments under the TRA are not conditioned on the exchanging holders of Opco Units or other TRA Parties continuing to hold ownership interests in us. To the extent payments are due to the TRA Parties under the TRA, the payments are generally required to be made within five business days after the tax benefit schedule (which sets forth the Company's realized tax benefits covered by the TRA for the relevant taxable year) is finalized. The Company is required to deliver such a tax benefit schedule to the TRA Parties' Representative (as defined in the TRA), for its review, within ninety calendar days after the due date (including extensions) of the Company's federal corporate income tax return for the relevant taxable year.

***Payments under the TRA may be accelerated and/or significantly exceed the actual tax benefits the Company realizes under the TRA and such accelerations may impair our ability to consummate change of control transactions.***

The Company's payment obligations under the TRA will be accelerated in the event of certain changes of control or its election to terminate the TRA early. The accelerated payments will relate to all relevant tax attributes then allocable to the Company in the case of an acceleration upon a change of control and to all relevant tax attributes allocable or that would be allocable to the Company (in the case of an election by the Company to terminate the TRA early, assuming all Up-C Units were then exchanged). The accelerated payments required in such circumstances will be calculated by reference to the present value (at a specified discount rate determined by reference to LIBOR) of all future payments that holders of Up-C Units or other recipients would have been entitled to receive under the TRA, and such accelerated payments and any other future payments under the TRA will utilize certain valuation assumptions, including that the Company will have sufficient taxable income to fully utilize the deductions arising from the increased tax basis and tax basis and other benefits related to entering into the TRA. In addition, recipients of payments under the TRA will not reimburse us for any payments previously made under the TRA if such tax basis and the Company's utilization of certain tax attributes is successfully challenged by the IRS (although any such detriment would be taken into account in future payments under the TRA). The Company's ability to achieve benefits from any existing tax basis, tax basis adjustments or other tax attributes, and the payments to be made under the TRA, will depend upon a number of factors, including the timing and amount of our future income. As a result, even in the absence of a change of control or an election to terminate the TRA, payments under the TRA could be in excess of 85% of the Company's actual cash tax benefits.

Accordingly, it is possible that the actual cash tax benefits realized by the Company may be significantly less than the corresponding TRA payments or that payments under the TRA may be made years in advance of the actual realization, if any, of the anticipated future tax benefits. There may be a material negative effect on our liquidity if the payments under the TRA exceed the actual cash tax benefits that the Company realizes in respect of the tax attributes subject to the TRA and/or distributions to the Company by Opco are not sufficient to permit the Company to make payments under the TRA after it has paid taxes and other

expenses. We may need to incur additional indebtedness to finance payments under the TRA to the extent our cash resources are insufficient to meet our obligations under the TRA as a result of timing discrepancies or otherwise, and these obligations could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combinations or other changes of control.

***The acceleration of payments under the Tax Receivable Agreement in the case of certain changes of control may impair our ability to consummate change of control transactions or negatively impact the value of our Company common stock.***

In the case of a "Change of Control" under the TRA (which is defined to include, among other things, a 50% change in control of the Company, the approval of a complete plan of liquidation or dissolution of the Company, or the disposition of all or substantially all of the Company's direct or indirect assets), payments under the TRA will be accelerated and may significantly exceed the actual benefits the Company realizes in respect of the tax attributes subject to the TRA. We expect that the payments that we may make under the TRA (the calculation of which is described in the immediately preceding risk factor) in the event of a change of control will be substantial. As a result, our accelerated payment obligations and/or the assumptions adopted under the TRA in the case of a change of control may impair our ability to consummate change of control transactions or negatively impact the value received by owners of our Company common stock in a change of control transaction.

***Our success is dependent upon the efforts of our key personnel. The loss of key personnel could negatively impact the operations and profitability of the Company and its financial condition could suffer as a result.***

It is possible that we will lose some key personnel, the loss of which could negatively impact the operations and profitability of the Company. We anticipate that some or all of the management of the Company will remain in place.

The Company's success depends to a significant degree upon the continued contributions of senior management, certain of whom would be difficult to replace. Departure by certain of the Company's officers could have a material adverse effect on the Company's business, financial condition or operating results. The Company does not maintain key-man life insurance on any of its officers. The services of such personnel may not continue to be available to the Company.

***Our business is dependent on our ability to attract and retain qualified employees.***

Our ability to operate our business and provide our solutions is dependent on our ability to recruit, employ, train and retain the skilled personnel who have relevant experience in the healthcare and data analytics industries as well as information technology professionals who can design, implement, operate and maintain complex information technology systems. For example, certain of our employees in our company must either have or rapidly develop a significant amount of technical knowledge with regard to medical insurance coding and procedures. In addition, certain of our retrospective data-driven solutions rely on a team of trained registered nurses or medical coding professionals to review medical information and provide feedback with respect to the medical appropriateness of care provided. Innovative, experienced and technologically proficient professionals, qualified nurses and experienced medical coding professionals are in great demand and are likely to remain a limited resource. Our ability to recruit and retain such individuals depends on a number of factors, including the competitive demands for employees having, or able to rapidly develop, the specialized skills we need and the level and structure of compensation required to hire and retain such employees. We may not be able to recruit or retain the personnel necessary to efficiently operate and support our business. Even if our recruitment and retention strategies are successful, our labor costs may increase significantly. In addition, our internal training programs may not be successful in providing inexperienced personnel with the specialized skills required to perform their duties. If we are unable to hire, train and retain sufficient personnel with the requisite skills without significantly increasing our labor costs, it could have a material adverse effect on our business, financial condition and results of operations.

***General economic, political and market forces and dislocations beyond our control could reduce demand for our solutions and our overall business, may suffer from an economic downturn.***

The demand for our data-driven solutions may be impacted by factors that are beyond our control, including macroeconomic, political and market conditions, the availability of short-term and long-term funding and capital, the level and volatility of interest rates, currency exchange rates and inflation. The United States economy recently experienced periods of contraction and both the future domestic and global economic environments may continue to be less favorable than those of prior years. Any one or more of these factors may contribute to reduced activity and prices in the securities markets generally and could result in a reduction in demand for our solutions, which could have a material adverse effect on our business, results of operations and financial condition.

***COVID-19 or another pandemic, epidemic, or outbreak of an infectious disease may have an adverse effect on our business, the nature and extent of which are highly uncertain and unpredictable.***

The severity, magnitude and duration of the ongoing COVID-19 pandemic is uncertain and rapidly changing. As of the date of this Form 10-K, the extent to which the COVID-19 pandemic may impact our business, results of operations and financial condition remains uncertain. Furthermore, because of our business model, the full impact of the COVID-19 pandemic may not be fully reflected in our results of operations and overall financial condition until future periods.

*We are concentrated in certain geographic regions, which makes us sensitive to regulatory, economic, environmental and competitive conditions in those regions.*

Due to the concentration of our operations in Florida, our business may be adversely affected by economic conditions that disproportionately affect Florida as compared to other states. In addition, our exposure to many of the risks described herein are not mitigated by a diversification of geographic focus.

Moreover, regions in and around the southeastern United States commonly experience hurricanes and other extreme weather conditions. As a result, our offices, especially those in Florida and Puerto Rico, are susceptible to physical damage and business interruption from an active hurricane season or a single severe storm. Moreover, global climate change could increase the intensity of individual hurricanes or the number of hurricanes that occur each year. Even if our facilities are not directly damaged, we may experience considerable disruptions in our operations due to property damage or electrical outages experienced in storm-affected areas by our employees. Additionally, long-term adverse weather conditions, whether caused by global climate change or otherwise, could cause an outmigration of people from the communities where our offices are located. If any of the circumstances described above occurred, there could be a harmful effect on our business and our results of operations could be adversely affected.

*We depend on our senior management team and other key employees, and the loss of one or more of these employees or an inability to attract and retain other highly skilled employees could harm our business.*

Our success depends largely upon the continued services of our senior management team and other key employees. We rely on our leadership team in the areas of operations, information technology and security, marketing, compliance and general and administrative functions. From time to time, there may be changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business. The loss (including as a result of a COVID-19 infection) of one or more of the members of our senior management team, or other key employees, could harm our business. In particular, the loss of the services of our founder and Chief Executive Officer, John H. Ruiz, could significantly delay or prevent the achievement of our strategic objectives. Changes in our executive management team may also cause disruptions in, and harm to, our business.

*Our overall business results may suffer from an economic downturn.*

During periods of high unemployment, governmental entities often experience budget deficits as a result of increased costs and lower than expected tax collections. These budget deficits affect federal, state and local government entities and may result in reductions in spending for health and human service programs, including Medicare, Medicaid and similar programs, which represent significant payer sources for our Assignors.

**Risks Related to Our Securities**

*In this section, "we," "us," "our," and other similar terms refer to MSP Recovery, Inc. d/b/a LifeWallet and its subsidiaries prior to the Business Combination and to the Company following the Business Combination.*

*We are controlled by the Members, including John H. Ruiz and Frank C. Quesada, whose interests may conflict with our interests and the interests of other stockholders. Further, our status as a "controlled company" on Nasdaq removes certain corporate governance protections.*

The Members (or their designees) hold all of our issued and outstanding Class V Common Stock, which control approximately 97.7% of the combined voting power of our common stock, and John H. Ruiz and Frank C. Quesada, as a group, control approximately 97.8% of the combined voting power of our common stock. They effectively have the ability to determine all corporate actions requiring stockholder approval, including the election and removal of directors, any amendment to our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets. This could have the effect of delaying or preventing a change in control or otherwise discouraging a potential acquirer from attempting to obtain control of the Company, which could cause the market price of our Class A Common Stock to decline or prevent stockholders from realizing a premium over the market price for Class A Common Stock. The Members' interests may conflict with our interests as a company or the interests of our other stockholders.

*Our stockholders will experience substantial dilution as a consequence of, among other transactions, any future issuances of common stock.*

The Company currently has an aggregate of 3,084,305 Public Warrants outstanding and no Private Warrants outstanding, which have become exercisable as of 10 days after closing of the Business Combination, on a cashless basis with an exercise price of $0.0001.

In addition, there are outstanding or designated Up-C Units that may be exchanged for 3,106,616,119 shares of Common Stock.

In addition, the Company will have the ability to issue up to 98,736,750 shares of Class A Common Stock pursuant to awards under the Incentive Plan. The shares of Class A Common Stock reserved for future issuance under the Incentive Plan will become eligible for sale in the public market once those shares are issued, subject to provisions relating to various vesting agreements, lock-up agreements and, in some cases, limitations on volume and manner of sale applicable to affiliates under Rule 144, as applicable. The aggregate number of shares that may be issued pursuant to awards under the Incentive Plan will be subject to an annual increase on

January 1 of each calendar year (commencing with January 1, 2023 and ending on and including January 1, 2031) equal to the lesser of (i) a number of shares equal to 3% of the total number of shares actually issued and outstanding on the last day of the preceding fiscal year or (ii) a number of shares as determined by the Board. The Company filed one or more registration statements on Form S-8 under the Securities Act to register shares of Class A Common Stock or securities convertible into or exchangeable for shares of Class A Common Stock issued pursuant to the Incentive Plan. Any such Form S-8 registration statements will automatically become effective upon filing. Accordingly, shares registered under such registration statements will be available for sale in the open market.

Depending upon market liquidity at the time, sales of shares of our Class A Common Stock under the Yorkville Purchase Agreement may cause the trading price of our Class A Common Stock to decline. After Yorkville has acquired shares under the Yorkville Purchase Agreement, it may sell all, some or none of those shares. Sales to Yorkville by us pursuant to the Yorkville Purchase Agreement may result in substantial dilution to the interests of other holders of our Class A Common Stock. The sale of a substantial number of shares of our Class A Common Stock to Yorkville, or anticipation of such sales, could make it more difficult for us to sell equity or equity-related securities in the future at a time and at a price that we might otherwise wish to effect sales. However, we have the right to control the timing and amount of any sales of our shares to Yorkville, and the Yorkville Purchase Agreement may be terminated by us at any time at our discretion without penalty.

The sale of substantial amounts of shares of our Common Stock or warrants, or the perception that such sales could occur, could cause the prevailing market price of shares of our Common Stock and warrants to decline significantly. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate. We believe the likelihood that warrant holders will exercise their warrants is dependent upon the market price of our Common Stock.

***We qualify as a "controlled company" within the meaning of the Nasdaq listing standards and, as a result, our stockholders may not have certain corporate governance protections that are available to stockholders of companies that are not controlled companies.***

So long as more than 50% of the voting power for the election of directors is held by an individual, a group or another company, we will qualify as a "controlled company" under the Nasdaq listing requirements. Mr. Ruiz controls more than a majority of the voting power of our outstanding capital stock. As a result, we qualify as a "controlled company" under the Nasdaq listing standards and will not be subject to the requirements that would otherwise require us to have: (i) a majority of "independent directors," as defined under the listing standards of Nasdaq; (ii) a nominating and corporate governance committee comprised solely of independent directors; and (iii) a compensation committee comprised solely of independent directors. In addition, the Members, including John H. Ruiz and Frank C. Quesada have the ability to control matters requiring stockholder approval, including the election and removal of directors, any amendment to our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets. See "We are controlled by the Members, including John H. Ruiz and Frank C. Quesada, whose interests may conflict with our interests and the interests of other stockholders."

The Members, including John H. Ruiz and Frank C. Quesada (together, the "MSP Principals"), may have their interest in us diluted due to future equity issuances, repurchases under the LLC Agreement from the MSP Principals in connection with the exercise of New Warrants or Members or their designees selling shares of Class A Common Stock, in each case, which could result in a loss of the "controlled company" exemption under the Nasdaq listing rules. We would then be required to comply with those provisions of the Nasdaq listing requirements.

***There can be no assurance that we will be able to comply with the continued listing standards of Nasdaq.***

Our Class A Common Stock, Public Warrants and New Warrants are currently listed on Nasdaq. If Nasdaq delists our Class A Common Stock, Public Warrants or New Warrants from trading on its exchange for failure to meet the listing standards, we and our stockholders could face significant material adverse consequences including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that the Class A Common Stock is a "penny stock" which will require brokers trading in the Class A Common Stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." To the extent our Class A Common Stock, Public Warrants and New Warrants are listed on Nasdaq, they are covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case.

***Failure to meet the continued listing requirements of Nasdaq could result in the delisting of our common stock, thus negatively impacting the price value of our common stock and negatively impacting our ability to raise additional capital.***

On April 18, 2023, we received a notification letter from the Listing Qualifications Department of the Nasdaq Stock Market LLC ("Nasdaq") stating the Company was not in compliance with the requirements of Nasdaq Listing Rule 5250(c)(1) (the "Reporting Rule") as a result of not having timely filed this Annual Report on Form 10-K (the "2022 Form 10-K") with the SEC. In addition, on May 18, 2023, we received a written notice from Nasdaq stating that the Company was not in compliance with Nasdaq's continued listing requirements under the Reporting Rule as a result our failure to file our Quarterly Report on Form 10-Q for the quarter ended March 31, 2023 in a timely manner (the "First Quarter Form 10-Q"). Under the Nasdaq rules, the Company had 60 calendar days, or until June 20, 2023, to file the 2022 Form 10-K and First Quarter Form 10-Q or to submit to Nasdaq a plan to regain compliance with the Nasdaq Listing Rules.

On April 24, 2023, we received notice from Nasdaq that the closing bid price for our common stock had been below $1.00 per share for the previous 30 consecutive business days, and that we are therefore not in compliance with the minimum bid price requirement for continued inclusion on Nasdaq under Nasdaq Listing Rule 5450(a)(1) (the "Minimum Bid Requirement"). The notice indicates that we will have 180 calendar days, or until October 23, 2023, to regain compliance with this requirement. We can regain compliance with the $1.00 minimum bid listing requirement if the closing bid price of our common stock is at least $1.00 per share for a minimum of 10 consecutive business days during the 180-day compliance period. If we do not regain compliance during such 180-day compliance period, the Company may be eligible for an additional 180 calendar days, provided that the Company meets the continued listing requirement for market value of publicly held shares and all other applicable initial listing standards for Nasdaq, and provides a written notice of its intention to cure this deficiency during the second compliance period, including by effecting a reverse stock split, if necessary.

On June 20, 2023, the Company submitted a plan of compliance to achieve and sustain compliance with all Nasdaq Capital Market listing requirements, including the Reporting Rule and Minimum Bid Requirement. On July 7, Nasdaq notified the Company that it was granting an extension to file the 2022 Form 10-K and the First Quarter Form 10-K on or before August 7, 2023. The Company intends file its First Quarter Form 10-Q on or before such date, and to actively monitor its bid price.

If we fail to achieve our plan of compliance or in the future we fail to comply with Nasdaq's continued listing requirements, including the Reporting Rule and Minimum Bid Requirement, our common stock will be subject to delisting. In the event we receive notice that our common stock is being delisted, Nasdaq rules permit us to appeal any delisting determination by the Nasdaq staff to a Hearings Panel. If our common stock were to be delisted by Nasdaq, our common stock would be subject to rules that impose additional sales practice requirements on broker-dealers who sell our securities. The additional burdens imposed upon broker-dealers by these requirements could discourage broker-dealers from effecting transactions in our common stock. This would adversely affect the ability of investors to trade our common stock and would adversely affect the value of our common stock. These factors could contribute to lower prices and larger spreads in the bid and ask prices for our common stock. The delisting of our common stock from Nasdaq would also adversely affect our ability to complete future financings.

***If our shares are delisted from Nasdaq and become subject to the penny stock rules, it would become more difficult to trade our shares.***

The SEC has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. Penny stocks are generally equity securities with a price of less than $5.00, other than securities registered on certain national securities exchanges or authorized for quotation on certain automated quotation systems, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system. If we do retain a listing on Nasdaq and if the price of our common stock is less than $5.00, our Common Stock will be deemed a penny stock. The penny stock rules require a broker-dealer, before a transaction in a penny stock not otherwise exempt from those rules, to deliver a standardized risk disclosure document containing specified information. In addition, the penny stock rules require that before effecting any transaction in a penny stock not otherwise exempt from those rules, a broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive: (i) the purchaser's written acknowledgement of the receipt of a risk disclosure statement; (ii) a written agreement to transactions involving penny stocks; and (iii) a signed and dated copy of a written suitability statement. These disclosure requirements may have the effect of reducing the trading activity in the secondary market for our common stock, and therefore stockholders may have difficulty selling their shares.

***We may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.***

Although due diligence was conducted on MSP prior to the Business Combination, we cannot assure you that this diligence surfaced all material issues that may be present in MSP's business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of MSP's business and outside of our and MSP's control will not later arise. As a result of these factors, we may be forced to write down or write off assets, restructure operations, or incur impairment or other charges that could result in losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may

be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about the Company or its securities. Accordingly, any of our stockholders could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.***

We will be subject to federal and state income taxes in the United States and potentially in other jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- changes in tax laws, regulations, or interpretations thereof; or

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

In addition, we may be subject to audits of our income, sales and other transaction taxes by taxing authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations.

***We may be unable to obtain additional financing to fund the operations and growth of the Company.***

We may require additional financing to fund the operations or growth of the Company. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the Company. None of our officers, directors or stockholders is required to provide any financing to us.

***In some jurisdictions, our recoveries may be limited due to legal restrictions, which may have negative consequences for the value or enforcement of our contractual agreements with our counterparties, for our ability to do business in certain jurisdictions or for our cost of doing business.***

There exist in various jurisdictions prohibitions or restrictions in connection with purchasing Claims from plaintiffs (known as maintenance, and a form of maintenance, called champerty), assignment of certain kinds of Claims, and/or participating in a lawyer's contingent fee interests. Such prohibitions and restrictions, to the extent they exist, are governed by the rules and regulations of each state and jurisdiction in the United States and vary in degrees of strength and enforcement in different states and federal jurisdictions. Some jurisdictions in the U.S. and other jurisdictions may not, for legal and professional ethics reasons, permit us to pursue certain recoveries, or the law and regulations in those jurisdictions may be uncertain, and accordingly we may not have the ability or the desire to pursue recoveries in these jurisdictions, thereby limiting the size of the potential market. If we, our counterparties or the lawyers handling the underlying matters were to be found to have violated the relevant prohibitions or restrictions in connection with certain matters, there could be a materially adverse effect on the value of the affected assets, our ability to enforce the relevant contractual agreements with our counterparties and the amounts we would be able to recover with respect to such matters, or our costs for such matters.

***Anti-takeover provisions contained in our Charter and bylaws, as well as provisions of Delaware law, could impair a takeover attempt.***

Our Second Amended and Restated Certificate of Incorporation (our "Charter") contains provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together, these provisions may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities. These provisions include:

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect candidates to serve as a director of the Board;

- a classified board of directors with three-year staggered terms, which could delay the ability of stockholders to change the membership of a majority of the Board;

- the requirement that, at any time from and after the date on which the voting power of John H. Ruiz and his affiliates represent less than 50% of the voting power of all of the then outstanding shares entitled to vote ("Voting Rights Threshold Date"), directors elected by the stockholders generally entitled to vote may be removed from the Board solely for cause and only by affirmative vote of the holders of at least 66 2/3% of the voting power of the then outstanding shares entitled to vote, voting together as a single class;

41

- the exclusive right of the Board to fill newly created directorships and vacancies with respect to directors elected by the stockholders generally entitled to vote, which prevents stockholders from being able to fill vacancies on the Board;

- the prohibition on stockholder action by written consent from and after the Voting Rights Threshold Date, which forces stockholder action from and after the Voting Rights Threshold Date to be taken at an annual or special meeting of stockholders;

- the requirement that special meetings of stockholders may only be called by the Chairperson of the Board, the Chief Executive Officer of the Company or the Board, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors;

- the requirement that, from and after the Voting Rights Threshold Date, amendments to certain provisions of the Charter and amendments to the Amended and Restated Bylaws must be approved by the affirmative vote of the holders of at least 66 2/3% in voting power of the then outstanding shares of the Company generally entitled to vote;

- our authorized but unissued shares of common stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans; the existence of authorized but unissued and unreserved shares of common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise;

- advance notice procedures set forth in the Amended and Restated Bylaws that stockholders must comply with in order to nominate candidates to the Board or to propose other matters to be acted upon at a meeting of stockholders, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of the Company;

- an exclusive forum provision which provides that, unless the Company consents in writing to the selection of an alternative forum, (i) any derivative action brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, or employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim; and

- arising pursuant to any provision of the DGCL, the Charter or the Amended and Restated Bylaws, or (iv) any action asserting a claim governed by the internal affairs doctrine of the State of Delaware, in each case, will be required to be filed in the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware lacks jurisdiction over any such action or proceeding, then a state court located within the State of Delaware or the federal district court for the District of Delaware).

***The Charter contains a provision renouncing our interest and expectancy in certain corporate opportunities.***

The Charter provides that the Company will have no interests or expectancy in, or being offered an opportunity to participate in any corporate opportunity, to the fullest extent permitted by applicable law, with respect to any lines of business or business activity or business venture conducted by any holder of common stock, any affiliate of such holder or any director, officer or stockholder of such holder or any affiliate thereof ("Relevant Persons") as of the date of the filing of the Charter with the Secretary of State of the State of Delaware or received by, presented to or originated by the Relevant Persons after the date of the filing of the Charter with the Secretary of State of the State of Delaware in such person's capacity as a Relevant Person (and not in his, her or its capacity as a director, officer or employee of the Company). These provisions of the Charter create the possibility that a corporate opportunity of ours may be used for the benefit of the Relevant Persons.

### Risks Related to Ownership of Our Common Stock

*In this section, unless otherwise noted or the context otherwise requires, "we," "us," and "our" refer to the Company.*
***The market price of our common stock may be significantly volatile.***
The market price for our common stock may be significantly volatile and subject to wide fluctuations in response to factors including the following:

- actual or anticipated fluctuations in our quarterly or annual operating results;

- changes in financial or operational estimates or projections;

- conditions in markets generally;

- changes in legislation that may affect our business;

- changes in the economic performance or market valuations of companies similar to ours; and

- general economic or political conditions in the United States or elsewhere.

In addition, if we fail to reach an important recovery milestone or result by a publicly expected deadline, even if by only a small margin, there could be significant impact on the market price of our common stock. Additionally, as we approach the announcement of anticipated significant information and as we announce such information, we expect the price of our common stock to be particularly volatile, and negative results would have a substantial negative impact on the price of our common stock.

In some cases, following periods of volatility in the market price of a company's securities, stockholders have often instituted class action securities litigation against those companies. Such litigation, if instituted, could result in substantial costs and diversion of management attention and resources, which could significantly harm our business operations and reputation.

***A market for our securities may not continue, which would adversely affect the liquidity and price of our securities.***

The price of our securities may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active trading market for our securities may never develop or, if developed, it may not be sustained. In addition, the price of our securities can vary due to general economic conditions and forecasts, our general business condition and the release of our financial reports. Additionally, if our securities are not listed on, or become delisted from, Nasdaq for any reason, and are quoted on the OTC Bulletin Board, an inter-dealer automated quotation system for equity securities that is not a national securities exchange, the liquidity and price of our securities may be more limited than if we were quoted or listed on Nasdaq or another national securities exchange. You may be unable to sell your securities unless a market can be established or sustained.

***If the Business Combination's benefits do not meet the expectations of investors, stockholders, or financial analysts, the market price of our securities may decline.***

If the benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of the Company's securities may decline.

The trading price of our common stock is highly volatile and is subject to wide fluctuations in response to various factors, some of which are beyond our control, including limited trading volume. In addition to the factors discussed in this "Risk Factors" section and elsewhere in this annual report, these factors include:

- the valuation ascribed to MSP and the Company's Class A Common Stock in the Business Combination may not be indicative of the price of the Company that will prevail in the current trading market,

- research and reports that industry or securities analysts may publish about us, our business, our market, or our competitors,

- our dual class structure could make us ineligible for inclusion in certain indices, and as a result, mutual funds, exchange-traded funds and other investment vehicles that attempt to passively track those indices will not be investing in our stock,

- our status as an "emerging growth company" allows us exemptions from certain reporting requirements including: (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"); (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements; (iii) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements; and (iv) delayed adoption of certain accounting standards. The attractiveness of our Class A Common Stock as a result of these exemptions cannot be predicted.

In such circumstances, the trading price of our securities may not recover and may experience a further decline.

***If securities analysts publish negative evaluations of our stock or stop publishing research or reports about our business, the price of our stock could decline.***

The trading market for our common stock relies in part on the research and reports that industry or financial analysts publish about us or our business. We currently have limited research coverage by financial analysts. Securities analysts may discontinue coverage or downgrade their evaluation of our stock. If any of the analysts who continue to cover or cover us in the future downgrade their evaluation of our common stock or publishes inaccurate or unfavorable research about our business, our common stock price may decline. If additional analysts cease to cover our stock, we could lose visibility in the market for our stock, which in turn could cause our stock price to decline.

***We cannot predict the impact our dual class capital structure may have on the market price of the shares of Class A Common Stock.***

We cannot predict whether our dual class structure, combined with the concentrated control of the Company, will result in a lower or more volatile market price of the Class A Common Stock or in adverse publicity or other adverse consequences. For example, certain index providers have announced restrictions on including companies with multiple-class share structures in certain of their indices. Under any such announced policies or future policies, our dual class capital structure could make us ineligible for inclusion in certain indices, and as a result, mutual funds, exchange-traded funds and other investment vehicles that attempt to passively track those indices will not be investing in our stock. It is unclear what effect, if any, these policies will have on the

43

valuations of publicly traded companies excluded from such indices, but it is possible that they may depress valuations as compared to similar companies that are included. As a result, the market price of shares of Class A Common Stock could be adversely affected.

***We may amend the terms of the Public Warrants in a manner that may be adverse to holders with the approval by the holders of at least 50% of the then-outstanding Public Warrants. As a result, the exercise price of a holder's Public Warrants could be increased, the exercise period could be shortened and the number of shares of our Common Stock purchasable upon exercise of a Public Warrant could be decreased, all without the approval of that warrant holder.***

Our Public Warrants were issued in registered form under the Existing Warrant Agreement. The Existing Warrant Agreement provides that the terms of the Public Warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision or provide for the delivery of Alternative Issuance (as defined in the Existing Warrant Agreement) but requires the approval by the holders of at least 65% of the then-outstanding Public Warrants to make any other change, including any change that adversely affects the interests of the registered holders. Accordingly, we may amend the terms of the Public Warrants in a manner adverse to a holder if holders of at least 65% of the then-outstanding Public Warrants approve of such amendment. Although our ability to amend the terms of the Public Warrants with the consent of at least 65% of the then-outstanding Public Warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the Public Warrants, shorten the exercise period or decrease the number of shares of Class A Common Stock purchasable upon exercise of a Public Warrant.

***We may redeem unexpired Public Warrants and New Warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making such warrants worthless.***

We have the ability to redeem outstanding Public Warrants and New Warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant; provided that the last reported sales price of our Class A Common Stock equals or exceeds $18.00 per share (or as otherwise adjusted pursuant to the Existing Warrant Agreement or New Warrant Agreement, as applicable) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give proper notice of such redemption to the warrant holders and provided certain other conditions are met. During the most recent 60-day trading period, the price of our Class A Common Stock has remained below the threshold that would allow us to redeem the Public Warrants and New Warrants. If and when the Public Warrants and New Warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding Public Warrants and New Warrants could force the warrant holders: (i) to exercise their Public Warrants or New Warrants and pay the exercise price therefor at a time when it may be disadvantageous for them to do so; (ii) to sell their Public Warrants or New Warrants at the then-current market price when they might otherwise wish to hold their Public Warrants or New Warrants; or (iii) to accept the nominal redemption price which, at the time the outstanding New Warrants are called for redemption, is likely to be substantially less than the market value of their New Warrants. None of the Private Warrants will be redeemable by us so long as they are held by their initial purchasers or such initial purchasers' permitted transferees. Pursuant to the terms of the Existing Warrant Agreement, the exercise price of the Public Warrants and Private Warrants has decreased to $0.0001 after giving effect to the issuance of the New Warrants. None of the Private Warrants will be redeemable by us so long as they are held by the Sponsor or its permitted transferees.

The Company has no obligation to notify holders of the Public Warrants or the New Warrants that they have become eligible for redemption. However, in the event the Company determined to redeem the Public Warrants or the New Warrants, holders of the Public Warrants and the New Warrants, as applicable, would be notified of such redemption as described in the Existing Warrant Agreement and the New Warrant Agreement, as applicable. Specifically, in the event that the Company elects to redeem all of the redeemable warrants as described above, the Company shall fix a date for the redemption (the "Redemption Date"). Notice of redemption shall be mailed by first class mail, postage prepaid, by the Company not less than 30 days prior to the Redemption Date to the registered holders of the redeemable warrants to be redeemed at their last addresses as they appear on the registration books. Any notice mailed in the manner provided in the Existing Warrant Agreement and the New Warrant Agreement shall be conclusively presumed to have been duly given whether or not the registered holder received such notice. In addition, beneficial owners of the redeemable warrants will be notified of such redemption via the Company's posting of the redemption notice to DTC.

***Our stockholders may experience significant dilution as a result of future equity offerings or issuances and exercise of outstanding options and warrants.***

In order to raise additional capital or pursue strategic transactions, we may in the future offer, issue or sell additional shares of our common stock or other securities convertible into or exchangeable for our common stock, including the issuance of common stock in relation to our Incentive Plan. Our stockholders may experience significant dilution as a result of future equity offerings, issuances, or the exercising of warrants. Investors purchasing shares or other securities in the future could have rights superior to existing stockholders. As of December 31, 2022, we have the following number of securities convertible into, or allowing the purchase of, our common stock, including 3,319,304 Public Warrants outstanding, outstanding Up-C units exchangeable for 3,147,979,494 shares of our Common Stock, and 98,736,750 shares of Class A Common Stock reserved for future issuance under our stock incentive plan.

44

*Warrants have become exercisable for our Class A Common Stock, which has increased the number of shares eligible for future resale in the public market and may result in dilution to our stockholders.*

We issued Public Warrants to purchase 11,500,000 shares of Class A Common Stock as part of our IPO and, on the IPO closing date, we issued Private Warrants to the Sponsor and Nomura to purchase in the aggregate 325,000 shares of our Class A Common Stock. In addition, the Company issued an aggregate of 1,028,046,326 New Warrants to the holders of the Company's Class A Common Stock as of the close of business on the Closing Date. Pursuant to the terms of the Existing Warrant Agreement, the exercise price of the Public Warrants and Private Warrants decreased to $0.0001 per share after giving effect to the issuance of the New Warrants. Pursuant to the terms of the LLC Agreement, at least twice a month, to the extent any New Warrants have been exercised in accordance with their terms, the Company is required to purchase from the MSP Principals, proportionately, the number of Up-C Units or shares of Class A Common Stock owned by such MSP Principal equal to the Aggregate Exercise Price divided by the Warrant Exercise Price in exchange for the Aggregate Exercise Price. Notwithstanding the foregoing, the shares of Class A Common Stock issuable upon exercise of our warrants will result in dilution to the then existing holders of Class A Common Stock of the Company and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our Class A Common Stock.

The Private Warrants are identical to the Public Warrants sold as part of the Public Units issued in our IPO except that, so long as they are held by the Sponsor, Nomura or their permitted transferees: (i) they will not be redeemable by us; (ii) they (including the Class A Common Stock issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold by the Sponsor until 30 days after the completion of an initial business combination; (iii) they may be exercised by the holders on a net share (cashless) basis; and (iv) are subject to registration rights. The New Warrants will be issued in registered form under the New Warrant Agreement between the Company and Continental Stock Transfer & Trust Company. The New Warrant Agreement is filed as an exhibit to the registration statement and incorporated by reference herein.

*The Company's management has limited experience in operating a public company.*

The Company's executive officers have limited experience in the management of a publicly traded company. The Company's management team may not successfully or effectively manage its transition to a public company that will be subject to significant regulatory oversight and reporting obligations under federal securities laws. Their limited experience in dealing with the increasingly complex laws pertaining to public companies could be a significant disadvantage in that it is likely that an increasing amount of their time may be devoted to these activities which will result in less time being devoted to the management and growth of the Company. The Company may not have adequate personnel with the appropriate level of knowledge, experience, and training in the accounting policies, practices or internal controls over financial reporting required of publicly traded companies. The development and implementation of the standards and controls necessary for the Company to achieve the level of accounting standards required of a publicly traded company may require costs greater than expected. It is possible that the Company will be required to expand its employee base and hire additional employees to support its operations as a public company, which will increase its operating costs in future periods.

*The provision of our Charter requiring exclusive forum in the courts in the State of Delaware for certain types of lawsuits may have the effect of discouraging lawsuits against our directors and officers.*

The Charter requires that, unless the Company consents in writing to the selection of an alternative forum, (i) any derivative action brought on behalf of the Company; (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, or employee of the Company to the Company or the Company's stockholders; (iii) any action asserting a claim arising pursuant to any provision of the DGCL, the Charter or Amended and Restated Bylaws; or (iv) any action asserting a claim governed by the internal affairs doctrine of the State of Delaware, in each case, is to be filed in the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware lacks jurisdiction over any such action or proceeding, then a state court located within the State of Delaware or the federal district court for the District of Delaware). The exclusive forum provision described above does not apply to actions arising under the Securities Act or the Exchange Act. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder, and Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder. The Charter provides that the federal district courts of the United States of America will, to the fullest extent permitted by law, be the sole and exclusive forum for resolving any complaint asserting a cause of action arising under the federal securities laws, including the Securities Act and the rules and regulations thereunder. Our decision to adopt such a federal forum provision followed a decision by the Supreme Court of the State of Delaware holding that such provisions are facially valid under Delaware law. While there can be no assurance that federal or state courts will follow the holding of the Delaware Supreme Court or determine that our federal forum provision should be enforced in a particular case, application of our federal forum provision means that suits brought by our stockholders to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder must be brought in federal court and cannot be brought in state court. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all claims brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. Accordingly, actions by our stockholders to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder must be brought in federal court. Our stockholders will not be deemed to have waived our compliance with the federal securities laws and the regulations promulgated thereunder.

Although we believe that these exclusive forum provisions benefit us by providing greater consistency in the application of Delaware law, the exclusive forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable in disputes with us or any of our directors, officers or stockholders, which may discourage lawsuits with respect to such claims. Further, in the event a court finds the exclusive forum provision contained in the Charter to be unenforceable or inapplicable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

***The JOBS Act permits "emerging growth companies" like us to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies.***

We currently qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 ("JOBS Act"). As such, we take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies for as long as we continue to be an emerging growth company, including: (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"); (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements; and (iii) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements. As a result, our stockholders may not have access to certain information they deem important. We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year: (a) following August 18, 2025, the fifth anniversary of our IPO; (b) in which we have total annual gross revenue of at least $1.07 billion; or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A Common Stock that is held by non-affiliates exceeds $700 million as of the last business day of our prior second fiscal quarter, and the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period.

In addition, Section 107 of the JOBS Act provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as it is an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. We have elected to avail ourselves of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company that is neither an emerging growth company nor an emerging growth company that has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

We cannot predict if investors will find our Class A Common Stock less attractive because we rely on these exemptions. If some investors find our Class A Common Stock less attractive as a result, there may be a less active trading market for our Class A Common Stock and our stock price may be more volatile.

***Failure to establish and maintain effective internal controls could have a material adverse effect on the accuracy and timing of our financial reporting in future periods.***

As a publicly traded company, we are subject to the Exchange Act and the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act" or "SOX"). The Sarbanes-Oxley Act requires that we maintain effective disclosure controls and procedures and internal control over financial reporting. The standards required for a public company under Section 404 of SOX are significantly more stringent than those required of MSP as a privately held company. Further, as an emerging growth company, our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal controls over financial reporting pursuant to Section 404 of SOX until the date we are no longer an emerging growth company. Our independent registered public accounting firm may issue a report that is adverse in the event that it is not satisfied with the level at which the controls of the Company are documented, designed or operating.

As noted within "Part II, Item 9A Controls and Procedures" of this Annual Report on Form 10-K, we reported material weaknesses in internal control related to the following items:

- We did not have sufficient controls related to the accounting for complex transactions.

- We did not have sufficient controls over the human resources and payroll processes. Specifically:

  o Insufficient design of controls as the outsourced system used for payroll did not have appropriate audit and we did not have appropriate compensating controls or documented segregation of duties over the system used for payroll;

  o Insufficient implementation of controls resulting in a lack of an effective control environment over payroll entries;

46

o    Insufficient design and implementation of controls within our human resources business process; and,

o    Insufficient implementation of controls resulting in a lack of proper documentation over approval of bonus payments.

- Insufficient design of controls as we did not have appropriate segregation of duties and review controls over disbursements.

On April 16, 2023, a special committee of the Board of Directors was formed to review matters related to the preparation and filing of this Annual Report on Form 10-K. On June 13, 2023, the special committee finalized its review. The findings and recommendations of the special committee are set forth in "Part II, Item 9A Controls and Procedures" of this Annual Report on Form 10-K. The special committee identified deficiencies in our internal controls which we consider material weaknesses. The material weaknesses relate to failures to develop or maintain an effective system of internal disclosure controls for the timely disclosure of material communications from external sources to the Company's management and Board of Directors for review and evaluation.

A special committee of the board of directors made unanimous recommendations to enhance and improve the public company reporting capabilities of the Company, including but not limited to:

- The implementation of certain management training,

- The hiring of a director of internal audit, and

- Enhancements to the Company's internal communication process, as well as increased reporting to the Audit Committee of Board of Directors.

We consider these recommendations to be indicative of material weaknesses related to a failure to develop or maintain an effective system of internal disclosure controls for the timely disclosure of material communications from external sources to the Company's management and Board of Directors for review and evaluation. Specifically, the material weaknesses we identified were as follows:

- We did not have sufficient controls related to training personnel to understand their respective roles and responsibilities.

- We did not have sufficient monitoring activities, including a director of internal audit.

- We did not have sufficient lines of communication internally and to the Board of Directors, and therefore did not maintain a sufficient control environment with respect to oversight of the Board of Directors.

Any failure to maintain effective internal controls, including the recommendations of the special committee, could adversely impact our ability to report our financial results on a timely and accurate basis, or may result in a restatement of our financial statements for prior periods. Any such failures could have a material adverse effect on our financial results and investor confidence and the market for our common stock. For a discussion of our internal controls over financial reporting and a description of management's plan for remediation of the material weaknesses, see "Part II, Item 9A Controls and Procedures" of this Annual Report on Form 10-K. Completion of the remediation plan does not provide assurance that our remediation or other controls will continue to operate properly.

***Our internal control over financial reporting may not be effective and our independent registered public accounting firm may not be able to certify as to their effectiveness, which could have a significant and adverse effect on our business and reputation.***

As a public company, we are required to comply with the SEC's rules implementing Sections 302 and 404 of SOX, which require management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of internal control over financial reporting. To comply with the requirements of being a public company, the Company may be required to provide the management report on internal controls commencing with the annual report for fiscal year ended December 31, 2023, and we may need to undertake various actions, such as implementing additional internal controls and procedures and hiring additional accounting or internal audit staff. The standards required for a public company under Section 404 of SOX are significantly more stringent than those required as a privately held company. Further, as an emerging growth company, our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal controls over financial reporting pursuant to Section 404 of SOX until the date we are no longer an emerging growth company. Our independent registered public accounting firm may issue a report that is adverse in the event that it is not satisfied with the level at which the controls of the Company are documented, designed or operating.

Testing and maintaining these controls can divert our management's attention from other matters that are important to the operation of our business. If we identify material weaknesses in the internal control over financial reporting of the Company or are unable to comply with the requirements of Section 404 of SOX or assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal controls over financial reporting when we no longer qualify as an emerging growth company, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock could be negatively affected and we could become subject to investigations by the SEC or other regulatory authorities, which could require additional financial and management resources.

***The restatement of our prior quarterly financial statements may affect investor confidence and raise reputational issues and may subject us to additional risks and uncertainties, including increased professional costs and the increased possibility of legal proceedings and regulatory inquiries.***

As discussed in the Explanatory Note preceding Part I, Item I above and in Note 18 to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K, we determined to restate our unaudited condensed consolidated financial statements as of and for the periods ended June 30, 2022 and September 30, 2022 after we identified errors in the accounting for the indemnification asset, various intangible assets, and rights to cash flows and consolidation of an entity in connection with the our business combination. As a result of this error and the resulting restatement of our unaudited condensed consolidated financial statements for the impacted periods, we have incurred, and may continue to incur, unanticipated costs for accounting and legal fees in connection with or related to the restatement and have become subject to a number of additional risks and uncertainties, including the increased possibility of litigation and regulatory inquiries. Any of the foregoing may affect investor confidence in the accuracy of our financial disclosures and may raise reputational risks for our business, both of which could harm our business and financial results.

***Matters relating to or arising from the special committee of the Board of Directors' investigation, including governmental investigations, regulatory proceedings, litigation matters, and potential additional expenses, may adversely affect our business and results of operations.***

On April 16, 2023, a special committee of the Board of Directors was formed to review matters related to the preparation and filing of this Annual Report on Form 10-K. On June 13, 2023, the special committee finalized its review. The findings and recommendations of the special committee are set forth in "Part II, Item 9A Controls and Procedures" of this Annual Report on Form 10-K.

We have incurred significant expenses related to legal, accounting, and other professional services in connection with the special committee review and related matters. The expenses incurred, and expected to be incurred, have adversely affected, and could continue to adversely affect, our business, financial condition, and results of operations or cash flows.

In addition, the resulting impact of our delayed filing of periodic reports on the confidence of investors, employees, and customers, and the diversion of the attention of the management team that has occurred, and is expected to continue, has adversely affected, and could continue to adversely affect, our business, financial condition and results of operations or cash flows.

As a result of the matters reported above, we are exposed to greater risks associated with litigation, regulatory proceedings and government enforcement actions. Any future investigations or additional lawsuits may adversely affect our business, financial condition, results of operations and cash flows.

***The Company's stockholders may be held liable for claims by third parties against the Company to the extent of distributions received by them.***

If the Company is forced to file a bankruptcy case or an involuntary bankruptcy case is filed against the Company which is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by the Company's stockholders. Furthermore, because the Company distributed the proceeds held in the Public Shares to the Company's Public Stockholders in connection with the Closing, this may be viewed or interpreted as giving preference to the Company's Public Stockholders over any potential creditors with respect to access to or distributions from the Company's assets. Furthermore, the LCAP Board may be viewed as having breached their fiduciary duties to the Company's creditors and/or may have acted in bad faith, and thereby exposing itself and the Company to claims of punitive damages, by paying Public Stockholders from the Trust Account prior to addressing the claims of creditors. The Company cannot assure you that claims will not be brought against it for these reasons.

### Risks Related to the Yorkville Purchase Agreement

*In this section "we," "us," "our," and other similar terms refer to MSP Recovery, Inc. d/b/a LifeWallet and its subsidiaries prior to the Business Combination and to the Company following the Business Combination.*

On January 6, 2023, we entered into the Yorkville Purchase Agreement with YA II PN, Ltd., a Cayman Island exempted company ("Yorkville"), pursuant to which Yorkville committed to purchase up to $1 billion in shares of Common Stock, subject to certain limitations and conditions set forth in the Yorkville Purchase Agreement. Our shares of Common Stock that may be issued under the Yorkville Purchase Agreement may be sold by us to Yorkville at our discretion from time to time over the 36-month period commencing on the date the registration statement became effective. No registration statement for the Yorkville Purchase Agreement is currently effective and no sales may be made under the Purchase Agreement until it becomes effective.

We generally have the right to control the timing and amount of any sales of our shares of Common Stock to Yorkville under the Yorkville Purchase Agreement. Sales of our shares of Common Stock, if any, to Yorkville under the Yorkville Purchase Agreement will depend upon market conditions and other factors to be determined by us. We may ultimately decide to sell to Yorkville all, some or none of the shares of Common Stock that may be available for us to sell to Yorkville pursuant to the Yorkville Purchase Agreement.

Because the purchase price per share to be paid by Yorkville for the shares of Common Stock that we may elect to sell to Yorkville under the Yorkville Purchase Agreement, if any, will fluctuate based on the market prices of our shares of Common Stock at the time we elect to sell shares to Yorkville pursuant to the Yorkville Purchase Agreement, if any, it is not possible for us to predict, as of the date of this Form 10-K and prior to any such sales, the number of shares of Common Stock that we will sell to Yorkville under the Yorkville Purchase Agreement, the purchase price per share that Yorkville will pay for shares purchased from us under the Yorkville Purchase Agreement, or the aggregate gross proceeds that we will receive from those purchases by Yorkville under the Yorkville Purchase Agreement.

Although the Yorkville Purchase Agreement provides that, during the term of the agreement and subject to issuance and effective registration of the shares, we may, in our discretion, from time to time direct Yorkville to purchase our shares of Common Stock from us in one or more purchases under the agreement, for a maximum aggregate purchase price of up to $1,000,000,000, the Yorkville Purchase Agreement is subject to a cap of 650,000,000 shares of Common Stock. Assuming all of the 120,000,000 shares remaining to be sold to Yorkville were sold, per the terms of the Yorkville Purchase Agreement, at a 2.0% discount to the last closing sale price of our shares of Common Stock as reported on NASDAQ on December 30, 2022, or $1.60 per share (inclusive of such discount), we would not receive aggregate gross proceeds from the sale of such shares to Yorkville equal to Yorkville's $1,000,000,000 total aggregate purchase commitment under the Yorkville Purchase Agreement. However, because the market prices of our shares of Common Stock may fluctuate from time to time and, as a result, the actual purchase prices to be paid by Yorkville for our shares of Common Stock that we direct it to purchase under the Yorkville Purchase Agreement, if any, also may fluctuate because they will be based on such fluctuating market prices of our shares of Common Stock, it is possible that we would need to issue and sell more than 650,000,000 shares of Common Stock to Yorkville under the Yorkville Purchase Agreement in order to receive aggregate gross proceeds equal to Yorkville's $1,000,000,000 total aggregate purchase commitment under the Yorkville Purchase Agreement.

The number of our shares of Common Stock ultimately offered for sale by Yorkville is dependent upon the number of shares of Common Stock, if any, we ultimately elect to sell to Yorkville under the Yorkville Purchase Agreement.

***Investors who buy shares at different times will likely pay different prices.***

Pursuant to the Yorkville Purchase Agreement, we will have discretion, subject to market demand, to vary the timing, prices, and numbers of shares sold to Yorkville. If and when we do elect to sell our shares of Common Stock to Yorkville pursuant to the Yorkville Purchase Agreement, after Yorkville has acquired such shares, Yorkville may resell all, some or none of such shares at any time or from time to time in its discretion and at different prices. As a result, investors who purchase shares from Yorkville at different times will likely pay different prices for those shares, and so may experience different levels of dilution and in some cases substantial dilution and different outcomes in their investment results. Investors may experience a decline in the value of the shares they purchase from Yorkville as a result of future sales made by us to Yorkville at prices lower than the prices such investors paid for their shares. In addition, if we sell a substantial number of shares to Yorkville under the Yorkville Purchase Agreement, or if investors expect that we will do so, the actual sales of shares or the mere existence of our arrangement with Yorkville may make it more difficult for us to sell equity or equity-related securities in the future at a time and at a price that we might otherwise wish to affect such sales.

## Item 1B. Unresolved Staff Comments.

Not applicable.

## Item 2. Properties.

We lease our corporate headquarters and maintain our executive offices in an office building in Miami, Florida, which is located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, FL 33134. We also lease office space in Puerto Rico. We believe that our existing facilities are adequate for our current and planned levels of operation.

## Item 3. Legal Proceedings.

From time to time, we may become involved in legal proceedings or be subject to claims arising in the ordinary course of our business. We are not currently party to any material legal proceedings. Regardless of outcome, such proceedings or claims can have an adverse impact on us because of defense and settlement costs, diversion of resources and other factors and there can be no assurances that favorable outcomes will be obtained.

## Item 4. Mine Safety Disclosures.

Not applicable.

49

PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

<u>Market for our Common Stock and Warrants</u>

Our common stock and warrants are traded on The Nasdaq Stock Market under the symbols "LIFW", "LIFWW" and "LIFWZ," respectively.

<u>Record Holders</u>

As of June 30, 2023, there were approximately 42 stockholders of record of our common stock, 8 stockholders of record of our redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $11.50 per share and 1 stockholder of record of our redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $0.0001 per share. The actual number of stockholders may be greater than this number of record stockholders and includes stockholders who are beneficial owners but whose shares are held in street name by brokers and other nominees. This number of stockholders of record also does not include stockholders whose shares may be held in trust by other entities.

<u>Dividend Policy</u>

We have never declared or paid any cash dividends on our common stock. We currently anticipate that we will retain all of our future earnings for use in the operation of our business and to fund future growth and do not anticipate paying any cash dividends in the foreseeable future. Any future determination to declare cash dividends will be made at the discretion of our Board of Directors, subject to applicable law, and will depend on our financial condition, results of operations, capital requirements, general business conditions and other factors that our Board of Directors may deem relevant.

<u>Unregistered Sales of Equity Securities</u>

None.

<u>Issuer Purchases of Equity Securities</u>

None.

**Item 6. [Reserved]**

50

2/7/24, 12:49 AM    10-K

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

### MSP RECOVERY INC.'S d/b/a LIFEWALLET'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis provides information that LifeWallet's management believes is relevant to an assessment and understanding of LifeWallet's consolidated results of operations and financial condition. The discussion should be read together with "Selected Historical Combined and Consolidated Financial and Operating Data of MSP" and the historical audited annual combined and consolidated financial statements as of and for the years ended December 31, 2021 and 2020 included in the S-1 Registration Statement filed on January 20, 2023 with the SEC, and our consolidated financial statements and the related notes and other information included elsewhere in this Annual Report on Form 10-K (the "Form 10-K"). Unless the context otherwise requires, all references in this subsection to "We," "the Company" or "MSP" refers to the business of the MSP Companies prior to the consummation of the Business Combination, which will be the business of the Company and its subsidiaries following the consummation of the Business Combination. This discussion may contain forward-looking statements based upon LifeWallet's current expectations, estimates and projections that involve risks and uncertainties. Actual results could differ materially from those anticipated in these forward-looking statements due to, among other considerations, the matters discussed under "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."*

**Our Business**

We are a leading healthcare recoveries and data analytics company. Our business model includes two principal lines of business, Claims Recovery and LifeWallet. We focus on the Medicare, Medicaid and commercial insurance spaces. We are disrupting the antiquated healthcare reimbursement system, using data and analytics to identify and recover improper payments made by Medicare, Medicaid, and Commercial Health Insurers.

Medicare and Medicaid are payers of last resort. Too often, they end up being the first and only payers, because the responsible payer is not identified or billed. Because Medicare and Medicaid pay a far lower rate than what other insurers are often billed, this costs the healthcare system (and the supporting taxpayers) tens of billions of dollars a year in improper billing and lost recoveries. By discovering, quantifying and settling the billed-to-paid gap on a large-scale basis, MSP is positioned to generate meaningful annual recovery revenue at high profit margins.

Our access to large volumes of data, sophisticated data analytics and a leading technology platform provide a unique opportunity to discover and recover Claims. We have developed Algorithms to identify waste, fraud and abuse in the Medicare, Medicaid, and Commercial Health Insurance segments. Our deep team of data scientists and medical professionals analyze historical medical Claims data to identify recoverable opportunities. Once these potential recoveries are reviewed by our team, they are aggregated and pursued. Through federal statutory law and a series of legal cases and precedents, we believe we have an established basis for future recoveries.

We differ from our competitors because we receive our recovery rights through irrevocable assignments of Claims. When we are assigned these rights, we take on a risk that our competitors do not. Rather than provide services under a third-party vendor services contract, we receive the rights to certain recovery proceeds from our Assignors' Claims (and, in many cases, actually take assignment of the Claims themselves, which allow us to step into the Assignors' shoes). In the instances where we take Claims by assignment, we have total control over the direction of the litigation. We, or our affiliated entities, are the plaintiff in any action filed and have total control over the direction of the lawsuit. By receiving Claims through assignment, we can pursue additional recoveries under numerous legal theories that our competitors cannot. In the cases where we take Claims by assignment, we typically agree that 50% of the recoveries generated by those Claims is paid to the applicable Assignor. In the cases where we do not take Claims by assignment, we typically would still be entitled to receive 50% of the recoveries generated by those Claims, subject to certain expenses. Although we typically own assigned Claims, for a significant portion of assigned Claims our ability to pursue recoveries depends on our ongoing access to data through data access rights granted to us. In these cases, termination of such health care data access would substantially impair our ability to generate recoveries on those Claims.

Our current Claims portfolio has scaled significantly. We are entitled to a portion of any recovery rights associated with approximately $1,574 billion in Billed Amount (and approximately $375 billion in Paid Amount), which contains approximately $89.6 billion in Paid Value of Potentially Recoverable Claims, as of December 31, 2022. We are typically entitled to 50% of recovery rights pursuant to our CCRAs but in certain cases we have also purchased from our Assignors, from time to time, rights to 100% of the recovery. We believe it would take any competitor a long time to amass the portfolio of Claims rights currently owned by us due to, among things, the volume of our Claims data retained and strength of our data analytics, which we believe are key to attracting counterparties willing to assign Claims to us.

**Our Business Model**

*Recovery Model*

In our current business model, we receive irrevocable assignments of health Claims recovery rights through Claims Cost Recovery Agreements ("CCRA") from a variety of sources including, but not limited to, MAOs, MSOs, HMOs, Hospitals, and other at risk

51

entities. Prior to executing a CCRA, we utilize our proprietary internal data analytics platform to review the set of Claims and identify Claims with probable recovery paths.

Once Claims have been assigned, our data analysts run proprietary Algorithms to identify potential recoveries. Results are then quality checked by our internal Medical Team. We contract with the Law Firm and various other law firms across the country to pursue our recoveries through the legal system. Where appropriate, Law Firm reaches out to the liable parties to demand payment of amounts that are owed. Prior to litigation, there may be an incentive for the primary insurer to settle. If legal action is required for recovery from primary insurers, claimholders are entitled to pursue "double damages" under the Medicare Secondary Payer Act.

We engage with each Assignor independently. Typically, our Assignors irrevocably assign to us broad recovery rights to the Claims assigned. Generally, the assignment agreements provide for the Assignor to receive 50% of the Net Proceeds of any recoveries from the Claims assigned. The "Net Proceeds" of any assigned Claim is defined as the gross amount recovered on an assigned Claim, minus any costs directly traceable to such assigned Claim(s) for which recovery was made. In some instances, we may purchase outright an Assignor's recovery rights; in this instance, we are entitled to the entire recovery. In some cases, we have entered into arrangements to transfer CCRAs or rights to proceeds from CCRAs to other parties. Such sales include variable consideration in the form of payments that will be made only upon achievement of certain recoveries or based on a percentage of actual recoveries.

We have yet to generate substantial revenue from the Recovery Model. To date, the majority of our revenue has been generated by Claims recovery services which are either performance-based or fee for service arrangements as described below.

### Chase to Pay

Over time, we plan to pivot the business to the "Chase to Pay" model. Chase to Pay is a real-time analytics driven platform that identifies the proper primary insurer at the point of care. Chase to Pay is intended to plug into the real-time medical utilization platforms used by providers at the points of care. Rather than allow an MAO to make a wrongful payment whereby we need to chase down the primary payer and collect a reimbursement for the MAO, Chase to Pay is intended to prevent the MAO from making a wrongful payment and ensures that the correct payer pays in the first instance. Furthermore, the primary payer typically will make payments at a higher multiple than the MAO would have paid, and MSP will be entitled to receive its portion of the recovery proceeds on the amounts paid by the primary payer.

As Chase to Pay works at the point of care, it is expected to decrease legal costs of recovery. As a result, Chase to Pay would improve the net recovery margin as the recovery multiple grows and variable legal costs to recover decline.

We have yet to generate revenue from this model, nor have we executed any agreements with customers to date. We are currently in the process of determining the pricing and form of these arrangements. As part of our "Chase to Pay" model, we launched LifeWallet in January 2022, a platform powered by our sophisticated data analytics, designed to locate and organize users' medical records, facilitating efficient access to enable informed decision-making and improved patient care.

### Claims Recovery Services

We also recognize Claims recovery service revenue from our services to customers to assist those entities with the pursuit of Claims recovery rights. We provide services to other parties in identifying recoverable Claims as well as provide data matching and legal services. Under our Claims recovery services model, we do not own the rights to Claims but provide our services for a fee based on budgeted expenses for the month with an adjustment for the variance between budget and actual expense from the prior month.

We were a party to that certain Recovery Services Agreement (the "MSP RH Series 01 Recovery Services Agreement"), dated as of October 23, 2020, by and between MSP Recovery Holdings Series 01, LLC ("MSP RH Series 01") and MSP Recovery, LLC, pursuant to which MSP Recovery will provide services including identifying, processing, prosecuting, and recovering money for certain Claims of MSP RH Series 01. In return for these services, MSP RH Series 01 paid a one-time fee of approximately $7.2 million and has agreed to pay annual service fees of approximately $3.0 million commencing January 1, 2021, subject to adjustment based on the aggregate value of Claims of MSP RH Series 01 that is subject to the MSP RH Series 01 Recovery Services Agreement. Subsequent to December 31, 2022, this service fee agreement was terminated in connection with the loan facility executed with Hazel Partners Holdings LLC. See Note 19 to the financial statements, *Subsequent Events* for details.

The fees received pursuant to this agreement are related to expenses incurred and are not tied to the Billed Amount or potential recovery amounts. Although we believe our future business to be highly tied to the Recovery Model and Chase to Pay, we will continue to enter into these contracts as the market dictates.

### Recent Updates

#### Hazel Transactions

On March 29, 2023, the Company entered into a membership interest purchase agreement with Hazel, whereby in exchange for a purchase price of $390 million, the Company acquired from Hazel membership interests in entities that own certain Claims recovery and reimbursement rights (the "Claims Purchase"). The purchase price for the Claims Purchase was funded by (i) the proceeds from the Claims Sale (as defined below), and (ii) a purchase money loan between Hazel, as lender, and the Company, as borrower, in the amount of $250 million (the "Purchase Money Loan").

In a separate transaction on March 29, 2023, the Company entered into a membership interest purchase agreement with Hazel, whereby in exchange for a purchase price of $150 million, Hazel acquired from the Company the membership interests in entities that own certain other Claims recovery and reimbursement rights, provided that the Company and Hazel will share in the recovery proceeds therefrom in accordance with an agreed waterfall (the "Claims Sale," and together with the Claims Purchase, the "Claims Transactions").

In addition, on March 29, 2023, the Company entered into an Amended and Restated Credit Agreement with affiliates of Hazel, as the lender and administrative agent with respect to an aggregate $80 million term loan credit facility consisting of a Term Loan A commitment to fund up to $30 million (in multiple installments) in proceeds and a Term Loan B commitment to fund up to $18 million (in multiple installments) in proceeds, in each case, after taking into account an original issue discount (collectively, the "Working Capital Credit Facility"). As previously reported, an initial $10 million in proceeds was drawn under the Term Loan A on March 6, 2023. At closing, on March 29, 2023, an additional $5 million was disbursed to the Company under the Term Loan A. On May 11, 2023 and June 13, 2023, Hazel notified us that it would not disburse additional funds under the Working Capital Credit Facility until the Company satisfies certain funding conditions, including the filing of this Annual Report on Form 10-K. The parties subsequently agreed that $5.5 million will be funded under Term Loan A in accordance with the terms of the Working Capital Credit Facility subsequent to the filing of this 2022 Form 10-K and receipt of funding notices, deeming funding conditions satisfied or waived. Following such funding, the Term Loan A commitment would be terminated, with total funding of $20.5 million. In addition, the parties agreed to increase the Term Loan B commitment from $18 million to $27.5 million, which will be funded in multiple installments and in accordance with the terms of the Working Capital Credit Facility.

Loans under the Working Capital Credit Facility accrue interest at a Term Secured Overnight Financing Rate for 12-month interest period, plus an applicable margin of 10% per annum. Accrued interest on the Working Capital Credit Facility is payable in kind and will be capitalized. The Working Capital Credit Facility has a stated maturity date of March 31, 2026, and Hazel may extend for up to one year in its sole discretion. The Purchase Money Loan accrues interest at a rate of 20% per annum, payable in kind or in cash at the Company's discretion. The Purchase Money Loan has a maturity date of March 31, 2026, extendable up to one year in Hazel's sole discretion.

The Company is permitted to prepay the loans under the Working Capital Credit Facility from time to time without prepayment premium. Prepayment of the Purchase Money Loan will be permitted after the prepayment or repayment of loans under the Working Capital Loans, and such prepayment of the Purchase Money Loan may be subject to prepayment penalty, as applicable.

The Purchase Money Loan and the Working Capital Credit Facility contains certain representations, warranties and covenants of the Company and its subsidiaries, including restrictions on debt incurrence, liens, investments, affiliate transactions, distributions and dividends, fundamental changes, certain debt prepayments and Claim settlement.

Amounts borrowed and obligations under the Purchase Money Loan and the Working Capital Credit Facility are secured by a pledge of proceeds from certain Claims in the Company's Claims portfolio, with the lien securing the Purchase Money Loan being subordinated and junior to the lien securing the Working Capital Credit Facility. Pursuant to the Purchase Money Loan and the Working Capital Credit Facility, the Company entered into a collateral administrative agreement between the Company and Hazel, which sets forth certain arrangements between the Company and Hazel in relation to the management of the litigation of certain Claims owned by the Company, the proceeds of which were pledged to Hazel to secure the Purchase Money Loan and the Working Capital Credit Facility.

*Virage Amendment*

On April 12, 2023, we entered into an amendment (the "Virage MTA Amendment") to the Virage MTA and the Guaranty Agreement made as of March 9, 2022 (as amended, the "Virage Guaranty") pursuant to which the payment date was extended from May 23, 2023 until September 30, 2024, subject to acceleration upon certain triggering events. Under the Virage MTA Amendment, Virage will receive a first priority lien on all sources of revenue of the Company not otherwise encumbered as of the date of the Virage MTA Amendment, to the extent in excess of the amount of revenues necessary to establish and maintain an operating reserve of $70 million for overhead expenses and applicable taxes. In addition, pursuant to the Master Transaction Agreement, dated March 9, 2022 (as amended, the "Virage MTA"), we have payment obligations to Virage in the amount of $825.0 million as of March 31, 2023.

On January 1, 2024, if the Virage Guaranty is not paid, the Company will be required to make a one-time, lump sum payment to Virage for the period starting May 24, 2023 and ending December 31, 2023, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock for the five day period prior to the issuance. If paid in warrants, such warrants will expire on January 1, 2026.

Further, for each calendar month beginning with January 31, 2024 until the obligations to Virage are paid in full, the Company has agreed to pay to Virage an amount monthly, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-

end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common

53

stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock. If paid in warrants, such warrants will expire two years from the date of issuance.

The warrants will contain customary provisions for a transaction of this type, including that each warrant will be exercisable in whole or in part at any time prior to the expiration date, be freely transferable, subject only to applicable securities laws, and be subject to customary anti-dilution protection regarding the exercise price and number of shares of Class A Common Stock to be issued upon the exercise of each warrant.

*Nomura Promissory Note*

On April 12, 2023, the Company amended the promissory note to Nomura originally issued on May 27, 2022, which amendment increased the principal amount to approximately $26.2 million and extended the maturity date of the promissory note to September 30, 2024. The amended note carries an interest rate of 16% per annum and is payable in kind or in cash, at the Company's discretion, every 30 calendar days after April 12, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the promissory note together with all accrued and unpaid interest thereon.

**Key Factors Affecting Our Results**

***Our Claims Portfolio***

We differ from some of our competitors because we receive our recovery rights through irrevocable assignments. When we are assigned these rights, we take on the risk that such Claims may not be recoverable. We are entitled to pursue a portion of any recovery rights associated with approximately $1,574 billion in Billed Amount (and approximately $375 billion in Paid Amount), which contained approximately $89.6 billion in Paid Value of Potentially Recoverable Claims, as of December 31, 2022. We are typically entitled to 100% of recovery rights pursuant to our CCRAs, but contractually obligated to pay 50% of gross recoveries to the Assignor. In certain cases, we have purchased from our Assignors the rights to 100% of the recovery. By discovering, quantifying, and settling the gap between Billed Amount and Paid Amount on a large scale, we believe we are positioned to generate substantial annual recovery revenue at high profit margins for our assigned Claims. In litigation, we have a competitive advantage by our experienced management and legal teams. While our model of being assigned the Claim rights allows us the flexibility to direct the litigation and potentially generate higher margins, we have, on an opportunistic basis, paid the Assignor an upfront purchase price for these rights.

To date, we have not generated substantial revenue from our Claims portfolio, and our business model is dependent of achieving revenue from this model in the future. If we are unable to recover the upfront purchase price from the assigned Claims or the investments we have made in pursuing recoveries, it would have an adverse effect on our profitability and business.

Our potential Claims recovery revenue in a given period will be impacted by the amount of Claims we review and ultimately pursue. The number of Claims that we review is driven by the Claims we receive through assignment. As we are assigned more Claims, we can review the Claims and identify additional recoveries. To expand our Assignor base and obtain more Claims, we plan to implement new strategies to secure new Assignors. These strategies will include a platform to educate potential Assignors about our company, making strategic business partnerships, potential mergers, acquisitions of personnel, as well as other marketing strategies. Our Assignors have grown from 32 in 2015, to 105 in 2018, to 123 in 2019, to 134 in 2020 and over 160 Assignors to date. If we are unable to continue to attract new Assignors to our platform, this could adversely affect future profitability.

In addition to obtaining new Claims, our ability to collect on identified Claims on our estimated multiples is key to our future profitability. Per the Medicare Secondary Payer Act, we are entitled to pursue reasonable and customary rates. Under existing statutory and case law, the private cause of action under the Medicare Secondary Payer Act permits an award of double damages when a primary plan fails to provide for primary payment or appropriate reimbursement. In addition to double damages, MSP may pursue statutory interest from primary payers on any amounts owed. Federal law also provides express authority to assess interest on Medicare Secondary Payer debts.

As a result, we may pursue double damages and statutory interest in our Medicare Secondary Payer Act-related recoveries. We can recover these amounts under either the Recovery Model or the Chase to Pay Model. Federal law also expressly provides MAOs with the right to charge providers for the Billed Amount when auto insurer liability exists. Per the terms of various legal services agreements that MSP has with the Law Firm, for legal services provided, the Law Firm would receive a percentage of the total Claim recovery which would include double damages and additional penalties. Our ability to pursue double damages may be impacted by the RAMP Act as disclosed in *Note 13, Commitments and Contingencies.*

Our Claims recovery revenue is typically recognized upon reaching a binding settlement or arbitration with the counterparty or when the legal proceedings, including any appellate process, are resolved. A decrease in the willingness of courts to grant these judgments, a change in the requirements for filing these cases or obtaining these judgments, or a decrease in our ability to collect on these judgments could have an adverse effect on our business, financial condition and operating results. Of the Claims identified as potentially recoverable, relating to our accident-related cases as of December 31, 2022, approximately 86% are already in the recovery process; either the recovery process has been initiated, data has been collected and matched, or resolution discussions are in process.

*Key Performance Indicators*

To evaluate our business, key trends, risks and opportunities, prepare projections, make strategic decisions and measure our performance, we track several key performance indicators ("KPIs"). As our company has yet to achieve significant revenues and the drivers of expected revenues require significant lead time before revenue can be generated, MSP's management utilizes KPIs to assist in tracking progress and believes such KPIs are useful in evaluating the performance of our business, in addition to our financial results prepared in accordance with GAAP. The KPIs are Total Paid Amount, Paid Value of Potentially Recoverable Claims, Billed Value of Potentially Recoverable Claims, Recovery Multiple and Penetration Status of Portfolio.

**Total Paid Amount:** Total Paid Amount represents the total within the Claims portfolio of the amount actually paid to the provider from the health plan, including incorporation of capitated amounts. As we continue to expand, we anticipate our revenue growth will be greatly dependent on our ability to increase the Total Paid Amount and, correspondingly, the Paid Value of Potentially Recoverable Claims, in our portfolio. Management believes this metric is a useful measure to investors and is useful in managing or monitoring company performance because we view an increase in Paid Amount as a positive indicator as it should provide the Company with the ability to increase the Paid Value of Potentially Recoverable Claims. Conversely, a decrease would produce a diminishing expectation of the Paid Value of Potentially Recoverable Claims.

**Paid Value of Potentially Recoverable Claims:** The Paid Value of Potentially Recoverable Claims ("PVPRC") represents the cumulative Paid Amount of potentially recoverable Claims. We analyze our Claims portfolio and identify potentially recoverable Claims using our Algorithms to comb through historical paid Claims data and search for potential recoveries. The PVPRC is a measure of the actual Paid Amount that has been paid to providers in respect of those potentially recoverable Claims. Management believes this measure provides a useful baseline for potential recoveries, but it is not a measure of the total amount that may be recovered in respect of potentially recoverable Claims, which in turn may be influenced by any applicable potential statutory recoveries such as double damages or fines, as described below. We believe our ability to generate future Claims recovery income is largely dependent on our ability to accurately identify potentially recoverable Claims through our data analytics and ultimately recover on these Claims. Management believes this metric is a useful measure to investors and in managing or monitoring company performance because we view an increase in PVPRC as a positive indicator as it should provide the Company with the ability to increase Claims recovery income and otherwise shows growth.

**Billed Value of Potentially Recoverable Claims:** Billed Value of Potentially Recoverable Claims ("BVPRC") represents the cumulative Billed Amount of potentially recoverable Claims. We analyze our Claims portfolio and identify potentially recoverable Claims using our Algorithms to comb through historical paid Claims data and search for potential recoveries. For a majority of our Claims, the Company believes it has the ability to recover in excess of the Paid Amount by collecting the Billed Amount plus interest plus double damages under applicable law. Under existing statutory and case law, the private cause of action under the Medicare Secondary Payer Act permits an award of double damages when a primary plan fails to provide for primary payment or appropriate reimbursement. Federal law expressly provides MAOs with the right to charge, or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or primary plan policy. We believe our ability to generate future Claim recovery income is largely dependent on our ability to accurately identify potentially recoverable Claims through our data analytics and ultimately recover on these Claims. Management believes this metric is a useful measure to investors and in managing or monitoring company performance because we view an increase in BVPRC as a positive indicator as it should provide the Company with the ability to increase Claims recovery income and otherwise shows growth.

**Recovery Multiple:** The Recovery Multiple is the amount of income of any generated Claims recovery income obtained by the Company in respect of any Claims as compared to the Paid Amount of those Claims (e.g., on a $600 recovery, if the paid amount for said Claim was $100, the Recovery Multiple is 6x). For these purposes, we record values under the Recovery Multiple only once we have recorded Claims recovery income either through the receipt of cash or recognition of accounts receivable on the Claims. Management believes this metric is useful to investors and is useful in managing or monitoring company performance because the Recovery Multiple provides a measure of the Company's ability to recover on its Claims recovery rights. A Recovery Multiple above 1x would illustrate the Company's ability to collect in excess of the Paid Amount. To date, because actual recoveries have been limited, this measure has had limited utility in historical periods. However, management believes this measure will become more meaningful during the next 12 months and beyond to the extent the Company begins to report actual increases in recoveries during those periods. As of December 31, 2022, the Company has obtained settlements with two counterparties where the Recovery Multiple was or would be in excess of the Paid Amount. However, these settlements do not provide a large enough sample to be statistically significant, and are therefore not shown in the table. As the Recovery Multiple is based on actual recoveries, this measure is not based on the Penetration Status of Portfolio, as described below.

**Penetration Status of Portfolio:** Penetration Status of Portfolio provides a measure of the Company's recovery efforts by taking into account the current stages of recovery of Claims in the portfolio and tying it in with the estimated market share of the related primary payers. The total percentage represents the estimated aggregate market share for the respective primary payers in which the Company is in some stage of recovery. As the Company initiates additional recovery efforts against additional primary payers, the Company expects this number to increase. These stages of recovery include where (1) the recovery process has been initiated, (2) data has been collected and matched, or (3) potential resolution discussions are in process. The Company uses third-party sources to estimate the aggregate market share of those primary payers in the property and casualty auto insurance market with whom the Company is engaged

in one of these stages of recovery. Management believes this metric is useful to investors and in managing or monitoring company performance because it provides insight as to the estimated share of the market that is covered by existing recovery efforts. We estimate that cases that are in the potential resolution discussions and/or data matching are closer to generating potential future Claims recovery income.

| | | | As of and for the, | | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, 2022 | Nine Months Ended September 30, 2022 | Six Months Ended June 30, 2022 | Three Months Ended March 31, 2022 | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
| *$ in billions* | | | | | | |
| Paid Amount | $ 374.8 | $ 373.3 | $ 370.2 | $ 366.9 | $ 364.4 | $ 58.4 |
| Paid Value of Potentially Recoverable Claims | 89.6 | 89.2 | 88.3 | 87.3 | 86.6 | 14.7 |
| Billed Value of Potentially Recoverable Claims | 377.8 | 376.1 | 371.3 | 367.8 | 363.2 | 52.3 |
| Recovery Multiple | N/A[1] | N/A[1] | N/A[1] | N/A[1] | N/A[1] | N/A[1] |
| Penetration Status of Portfolio | 85.8% | 85.8% | 76.3% | 76.3% | 75.6% | N/A |

(1)    During the year ended December 31, 2022, the Company has received total recoveries of $4.9 million with a recovery multiple of 3.8x. However, the settlement amounts do not provide a large enough sample to be statistically significant, and are therefore not shown in the table.

(2)    On August 10, 2022, the United States Court of Appeals, Eleventh Circuit held that four-year statute of limitations period for civil actions arising under an Act of Congress enacted after December 1, 1990 applies to certain claims brought under the Medicare Secondary Payer private cause of action, and that the limitations period begins to run on the date that the cause of action accrued. This opinion may render certain Claims held by the Company unrecoverable and may substantially reduce PVPRC and BVPRC as calculated. As our cases were filed at different times and in various jurisdictions, and prior to data matching with a defendant we are not able to accurately calculate the entirety of damages specific to a given defendant, we cannot calculate with certainty the impact of this ruling at this time. Although this opinion is binding only on courts in the Eleventh Circuit, if the application of this statute of limitations as determined by the Eleventh Circuit was applied to all Claims assigned to us, we estimate that the effect would be a reduction of PVPRC by approximately $8.86 billion. As set forth in our Risk Factors, PVPRC is based on a variety of factors. As such, this estimate is subject to change based on the variety of legal claims being litigated and statute of limitations tolling theories that apply.

### Healthcare Industry

Our business is directly related to the healthcare industry and is affected by healthcare spending and complexity in the healthcare industry. We estimate that our total addressable market is over $150 billion annually. Our primary focus is on the Medicare and Medicaid market segments. Medicare is the second largest government program, with estimated annual expenditures during 2021 of approximately $923 billion and approximately 63.5 million enrollees. Medicaid has a combined estimated annual expenditure during 2021 of approximately $684 billion with approximately 76.5 million enrollees. Of the billions spent yearly by Medicare on medical expenses for its beneficiaries, we estimate that at least 10% of this was improperly paid by private Medicare plans.

Our addressable market, and therefore revenue potential, is impacted by the expansion or contraction of healthcare coverage and spending, which directly affects the number of Claims available. The Centers for Medicare & Medicaid Services ("CMS") has projected that health spending will continue to grow at an average rate of 5.4% a year between 2019 and 2028. We also believe reimbursement models may become more complex as healthcare payers accommodate new markets and lines of business and as advancements in medical care increase the number of testing and treatment options available. As reimbursement models grow more complex and healthcare coverage increases, the complexity and number of Claims may also increase, which could impact the demand for our solutions. Such changes could have a further impact on our results of operations.

As of December 31, 2022, approximately 93% of our expected recoveries arise from Claims being brought under the Medicare Secondary Payer Act. While we believe the MSP Act has bipartisan support, changes to the laws on which we base our recoveries, particularly the MSP Act, can adversely affect our business. Our ability to generate future revenue is therefore significantly dependent on factors outside our control.

### Key Components of Sales and Expenses

The following represent the components of our results of operations.

### Claims Recovery Income

Our primary income-producing activities are associated with the pursuit and recovery of proceeds related to Claims recovery rights that the Company obtains through CCRAs, in which we become the owner of those rights. As such, this income is not generated from the transfer of control of goods or services to customers, but through the proceeds realized from perfection of Claims recoveries from rights we hold outright. We recognize Claims recovery income based on a gain contingency model that is, when the amounts are reasonably certain of collection. This typically occurs upon reaching a binding settlement or arbitration with the counterparty or when the legal proceedings, including any appellate process, are resolved.

In some cases, we would owe an additional payment to the original assignor in connection with the realized value of the recovery right. Claims recovery income is recognized on a gross basis, as we are entitled to the full value of recovery proceeds and make payment

to the original assignor similar to a royalty arrangement. Such payments to prior owners are recognized as cost of Claims recovery in the same period the Claims recovery income is recognized.

### Claims Recovery Service Income

We also recognize Claims recovery service income for our services to a related party and a third party to assist those entities with pursuit of Claims recovery rights. We have determined we have a single performance obligation for the series of daily activities that comprise Claims recovery services, which are recognized over time using a time-based progress measure. We enter into Claims recovery service contracts with third parties. Amounts payable for services to third parties are typically based on budgeted expenses for the current month with an adjustment for the variance between budget and actual expenses from the prior month.

### Costs of Recoveries

Costs of recoveries consist of all directly attributable costs specifically associated with Claims processing activities, including contingent payments payable to assignors (i.e., settlement expenses).

### Claims Amortization Expense

Claims Amortization Expense consists of the amortization of CCRA intangible assets for those CCRAs in which we made upfront payments or commitments in order to acquire Claims recovery rights.

### Operating Expenses

### General and Administrative Expenses

General and administrative expenses consist primarily of personnel-related expenses for employees involved in general corporate, sales and marketing functions, including executive management and administration, legal, human resources, accounting, finance, tax, and information technology. Personnel-related expenses primarily include wages and bonuses. General and administrative expenses also consist of rent, IT costs, insurance, and other office expenses.

As we continue to grow as a company and build out our team, we expect that our sales, general and administrative costs will increase. We also expect to incur additional expenses as a result of operating as a public company, including expenses necessary to comply with the rules and regulations applicable to companies listed on a national securities exchange and related to compliance and reporting obligations pursuant to the rules and regulations of the SEC, as well as higher expenses for general and director and officer insurance, investor relations, and professional services.

### Professional Fees

Professional Fees consist of consulting, accounting, and other professional services from third party providers.

### Professional Fees - Legal

Professional Fees - Legal consist of payments for the expenses of the Law Firm covered by the Legal Services Agreement and other legal professional services from third party providers including payments to co-counsel.

### Depreciation and Amortization

Depreciation and amortization expense consist of depreciation and amortization of property and equipment related to our investments in leasehold improvements, office and computer equipment, and internally generated capitalized software development costs. We provide for depreciation and amortization using the straight-line method to allocate the cost of depreciable assets over their estimated useful lives.

### Interest Expense

In some cases, we have entered into arrangements to transfer CCRAs or rights to proceeds from CCRAs to other parties. When such transfers are considered to be sales of future revenue that are debt-like in nature as defined in Accounting Standards Codification ("ASC") 470, these arrangements are recognized as debt based on the proceeds received and are imputed an interest rate based on the expected timing and amount of payments to achieve contractual hurdles. Our interest expense consists of the imputed interest on these payments. We anticipate that as we recognize Claims recoveries related to CCRAs in these arrangements, the interest expense on these arrangements will decrease.

Interest income consists primarily of interest on short term investments.

### Other Income (expense)

Other income consists of equity investment earnings and some affiliate related income. Other expenses consist of bank service charges, airing fees, tax penalties, settlement expense, political contributions and donations, and some affiliate related expenses.

57

*Changes in Fair Value of Warrant and Derivative Liabilities*

Changes in fair value of warrants and derivative liabilities consists of the mark to market of warrant liabilities and derivatives as part of the OTC Equity Prepaid Forward Transaction noted in Note 17, *Derivative Liability* in the notes to consolidated financial statements.

*Net (income) loss attributable to non-controlling members*

Net (income) loss attributable to non-controlling members consists of income or loss of attributable to Class V shareholders.

*Income Tax Benefit*

As a result of the Business Combination, the Company became the sole managing member of MSP Recovery, LLC, which is treated as a partnership for U.S. federal, state and local income tax purposes. As a partnership, MSP Recovery, LLC is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by MSP Recovery, LLC is passed through to and included in the taxable income or loss of its partners, including MSP Recovery, Inc. The Company is subject to U.S. federal income taxes, in addition to state and local income taxes, with respect to the Company's allocable share of income of MSP Recovery, LLC. The Company's deferred tax balances reflect the impact of temporary differences between the carrying amount of assets and liabilities and the Company's tax basis. The balances are stated at the tax rates in effect when the temporary differences are expected to be recovered or settled. The Company reviewed the anticipated future realization of the tax benefit of the Company's existing deferred tax assets and concluded that it is more likely than not that all of the deferred tax assets will not be realized in the future.

**Results of Operations**

*Year ended December 31, 2022 versus year ended December 31, 2021*

The following table sets forth a summary of our consolidated results of operations for the year ended December 31, 2022 and 2021.

| *(in thousands except for percentages)* | | 2022 | | 2021 | | $ Change | | % Change | |
|---|---|---|---|---|---|---|---|---|---|
| Claims recovery income | $ | 4,878 | $ | 126 | $ | 4,752 | | 3,771 | % |
| Claims recovery service income | | 18,542 | | 14,500 | | 4,042 | | 28 | % |
| **Total Claims Recovery** | $ | **23,420** | $ | **14,626** | $ | **8,794** | | **60** | **%** |
| **Operating expenses** | | | | | | | | | |
| Cost of claims recoveries | $ | 2,054 | $ | 26 | $ | 2,028 | | 7,800 | % |
| Claims amortization expense | | 266,929 | | 164 | | 266,765 | | 162,662 | % |
| General and administrative | | 23,959 | | 12,633 | | 11,326 | | 90 | % |
| Professional fees | | 18,497 | | 8,502 | | 9,995 | | 118 | % |
| Professional fees - legal | | 43,035 | | 128 | | 42,907 | | 33,521 | % |
| Depreciation and amortization | | 424 | | 343 | | 81 | | 24 | % |
| **Total operating expenses** | $ | **354,898** | $ | **21,796** | $ | **333,102** | | **1,528** | **%** |
| **Operating Income/ (Loss)** | $ | **(331,478)** | $ | **(7,170)** | $ | **(324,308)** | | **4,523** | **%** |
| Interest expense | $ | (121,011) | $ | (27,046) | $ | (93,965) | | 347 | % |
| Other income (expense), net | | 63,067 | | 1,139 | | 61,928 | | 5,437 | % |
| Change in fair value of warrant and derivative liabilities | | (12,483) | | - | | (12,483) | | (100) | % |
| **Net loss before provision for income taxes** | $ | **(401,905)** | $ | **(33,077)** | $ | **(368,828)** | | **1,115** | **%** |
| Provision for income tax benefit (expense) | $ | - | $ | - | $ | - | | (100) | % |
| **Net loss** | $ | **(401,905)** | $ | **(33,077)** | $ | **(368,828)** | | **1,115** | **%** |
| Less: Net (income) loss attributable to non-controlling members | $ | 394,488 | $ | (16) | $ | 394,504 | | (2465650) | % |
| **Net loss attributable to controlling members** | $ | **(7,417)** | $ | **(33,093)** | $ | **25,676** | | **(78)** | **%** |

*Claims recovery income.* Claims recovery income increased by $4.8 million for the year ended December 31, 2022 driven by an increase in settlements during the period.

*Claims recovery service income.* Claims recoveries service income increased by $4.0 million, or 28%, to $18.5 million for the year ended December 31, 2022 from $14.5 million for the year ended December 31, 2021, primarily driven by a $5.0 million servicing contract completed during the year ended December 31, 2022.

*Cost of Claims recoveries.* Cost of Claims recoveries increased by $2.0 million, to $2.1 million for the year ended December 31, 2022 from $26 thousand for the year ended December 31, 2021, primarily driven by payments due to assignors and the Law Firm on Claims recoveries during the period.

*Claims amortization expense.* Claims amortization expense increased by $266.8 million, to $266.9 million for the year ended December 31, 2022 from $164 thousand for the year ended December 31, 2021, primarily driven by increased amortization due to the acquisition of CCRAs obtained as part of the business combination. In addition, the Company purchased additional CCRAs during the

58

year ended December 31, 2022, included in Intangible assets, net, which further contributed to the increase in Claims amortization expense.

*General and administrative.* General and administrative increased by $11.3 million, or 90%, to $24.0 million for the year ended December 31, 2022 from $12.6 million for the year ended December 31, 2021, primarily driven by increase in wages of $5.0 million and advertising expenses of $3.8 million.

*Professional fees.* Professional fees increased by $10.0 million, or 118%, to $18.5 million for the year ended December 31, 2022 from $8.5 million for the year ended December 31, 2021, primarily driven by an increase in accounting and consulting fees due to the Business Combination.

*Professional fees - legal.* Professional fees - legal increased by $42.9 million for the year ended December 31, 2022, primarily driven by a one-time share-based payment expense of $20.1 million, payments to the Law Firm of $9.6 million to cover expenses through the prepaid and $13.2 million fees to outsourced law firms.

*Interest expense.* Interest expense increased by $94.0 million, or 347%, to $121.0 million for the year ended December 31, 2022 from $27.0 million for the year ended December 31, 2021, primarily driven by an increase due to the guarantee obligation as well as due to increases in the basis for which interest is incurred on our Claims Financing Obligations, additional interest on commitments incurred at the end of 2021 and accrued interest on the related party loan obtained in June 2022.

*Other income, net.* Other income increased by $61.9 million, to $63.1 million for the year ended December 31, 2022 from $1.1 million for the year ended December 31, 2021 driven by a gain associated with the settlement of the Brickell Key Investment debt extinguishment.

*Change in fair value of warrant and derivative liabilities.* For the year ended December 31, 2022, $12.5 million of loss was recorded related to mark to market adjustments for the fair value of warrants for $2.9 million and for the fair value of derivative liabilities related to the Committed Equity facility for $9.6 million.

## Non-GAAP Financial Measures

In addition to the financial measures prepared in accordance with GAAP, this Form 10-K also contains non-GAAP financial measures. We consider "adjusted net loss" and "adjusted operating loss" as non-GAAP financial measures and important indicators of performance and useful metrics for management and investors to evaluate our business's ongoing operating performance on a consistent basis across reporting periods. Adjusted net loss represents Net loss adjusted for certain non-cash and non-recurring expenses and adjusted operating loss items represents Operating loss adjusted for certain non-cash and non-recurring expenses. These measures provide useful information to investors, and a reconciliation of these measures to the most directly comparable GAAP measures and other information relating to these non-GAAP measures is included in Note 2 to our consolidated financial statements appearing elsewhere in this Form 10-K. A reconciliation of these non-GAAP measures is included below:

| (In thousands) | | December 31, 2022 |
|---|---|---|
| **GAAP Operating Loss** | $ | (331,478) |
| Share based compensation | | 20,055 |
| Claims amortization expense | | 266,929 |
| **Adjusted operating loss** | $ | (44,494) |
| | | |
| **GAAP Net Loss** | $ | (401,905) |
| Share based compensation | | 20,055 |
| Claims amortization expense | | 266,929 |
| Gain on debt extinguishment | | (63,367) |
| Paid-in-kind Interest | | 121,011 |
| Change in fair value of warrant and derivative liabilities | | 12,483 |
| **Adjusted net loss** | $ | (44,794) |

## Liquidity and Capital Resources

### Sources of Liquidity

Since inception, we have financed our operations primarily from partnership contributions and investor financing. As of December 31, 2022, we had $3.7 million in cash and cash equivalents. As of December 31, 2022, we had loan payables of $198.5 million consisting of our Claims Financing Obligations and notes payable. We had $2.8 million in interest payable related to our Claims Financing Obligations. In addition, we had a loan from related parties with a balance of $125.8 million. This loan bears interest at an annual rate of 4%, payable in kind, and will mature on the four-year anniversary of the issuance and the terms were more favorable than we could have obtained from another party.

As an early-stage growth company, the Company has incurred substantial net losses since inception. As of December 31, 2022, the Company had unrestricted cash and cash equivalents totaling $3.7 million. The Company has incurred recurring losses and negative cash flows since inception and has an accumulated deficit of $29.2 million as of December 31, 2022. For the year ended December 31, 2022, the Company used approximately $80.6 million of cash in operations. The Company's liquidity will depend on the ability to generate substantial Claims recovery income and Claims recovery services income in the near future, the timing of which is uncertain, as well as its ability to secure funding from capital sources. The Company's principal liquidity needs have been capital expenditures, working capital, debt service and Claims financing obligations.

The Company anticipates sources of liquidity to include the Hazel Working Capital Facility as disclosed in Note 19, Subsequent Events. The Company anticipates having funding through this source and has taken several actions to address liquidity concerns, including:

1. On April 12, 2023, the Company entered into the Virage MTA Amendment, which extended the due date for the payment obligations to Virage to September 30, 2024. See summary in Note 19, *Subsequent Events*.

2. On April 12, 2023, the Company entered into an amended and restated promissory note with Nomura, which extended the due date to September 30, 2024. See summary in Note 19, *Subsequent Events*.

3. On March 29, 2023, the Company entered into the Working Capital Credit Agreement consisting of commitments to fund up to $48 million in proceeds. See summary in Note 19, *Subsequent Events*.

4. Given the uncertainty with regard to the timing and amount of claims recovery income, management implemented a reduction of operating costs in 2023 through the reduction or elimination of certain controllable expenses particularly within the budgeted costs to expand and develop new solutions through LifeWallet platform, advertising expenses and non-contingent legal fees. The Company anticipates that the reductions would contribute approximately $21.5M in savings to operating expenses over the next twelve months.

The Company has concluded that such actions alleviate the substantial doubt about the Company's ability to continue as a going concern beyond one year from the date these financial statements are issued.

### Hazel Working Capital Credit Facility

On March 29, 2023, the Company entered into the Working Capital Credit Facility, which provides for up to $80 million (with a 40% original issue discount), consisting of a Term Loan A commitment to fund up to $30 million (in multiple installments) in proceeds and a Term Loan B Commitment to fund up to $18 million (in multiple installments) in proceeds. An initial $10 million in proceeds was drawn under the Term Loan A on March 6, 2023. On March 29, 2023, an additional $5 million was disbursed to the Company under the Term Loan A. Loans under the Working Capital Credit Facility accrue interest at a Term Secured Overnight Financing Rate for 12-month interest period, plus an applicable margin of 10% per annum. Accrued interest is payable in kind and will be capitalized quarterly. The Working Capital Credit Facility has a stated maturity date of March 31, 2026, and Hazel may extend for up to one year in its sole discretion.

On May 11, 2023 and June 13, 2013, Hazel notified us that it would not disburse additional funds under the Working Capital Credit Facility until the Company satisfies certain milestone funding conditions, including certain servicing obligations as well as filing this Annual Report on Form 10-K. The parties subsequently agreed that $5.5 million will be funded under Term Loan A in accordance with the terms of the Working Capital Credit Facility subsequent to the filing of this 2022 Form 10-K and receipt of funding notices, deeming funding conditions satisfied or waived. Following such funding, the Term Loan A commitment would be terminated, with total funding of $20.5 million. In addition, the parties agreed to increase the Term Loan B commitment from $18 million to $27.5 million, which will be funded in multiple installments and in accordance with the terms of the Working Capital Credit Facility.

### MSP Principals Promissory Note

On June 16, 2022, the MSP Principals provided cash to the Company to finance operations in an aggregate amount of $112.8 million. The Company issued the MSP Principals Promissory Note to the MSP Principals in an aggregate principal amount of $112.8 million that has an annual interest rate of 4%, payable in kind, and matures on the day that is the four-year anniversary of the issuance. On the maturity date, the Company is required to pay the MSP Principals an amount in cash equal to the outstanding principal amount, plus accrued and unpaid interest. The promissory note is prepayable by the Company at any time, without prepayment penalties, fees or other expenses. A portion of the proceeds under the MSP Principals Promissory Note in an amount equal to $36.5 million was advanced to the Law Firm for certain operating expenses as contemplated by the Legal Services Agreement. The MSP Principals Promissory Note contains customary events of default that would allow the MSP Principals to declare the MSP Principals Promissory Note immediately due and payable or the MSP Principals Promissory Note will immediately and automatically become due and payable without notice, presentment, demand, protest or other request of any kind. In addition, the MSP Principals Promissory Note may be accelerated by the MSP Principals if the Board of Directors of the Company (excluding the MSP Principals) terminates the Legal Services Agreement.

*Nomura Promissory Note*

On May 27, 2022, the Company issued an unsecured promissory note to Nomura in a principal amount of approximately $24.5 million related to advisory fees and deferred underwriting fees and expenses that became due and payable by the Company to Nomura, in connection with the consummation of the Business Combination (as defined herein).

On April 12, 2023, the Company amended the promissory note, increasing the principal amount to approximately $26.2 million and extending the maturity date of the promissory note to September 30, 2024. The amended note carries an interest rate of 16% per annum and is payable in cash every 30 calendar days after April 12, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the promissory note together with all accrued and unpaid interest thereon.

*Yorkville Purchase Agreement*

On January 6, 2023, the Company entered into a Company Common Stock Purchase Agreement (the "Yorkville Purchase Agreement") with YA II PN, Ltd., a Cayman Island exempted company ("Yorkville"). Pursuant to the Yorkville Purchase Agreement, after the closing of the Business Combination, the Company will have the right to sell to Yorkville from time to time at its option up to $1 billion in Class A common stock shares, subject to the terms, conditions and limitations set forth in the Yorkville Purchase Agreement. This Purchase Agreement will not be operational until a Registration Statement is effective.

Sales of the shares of the Company's common stock to Yorkville under the Yorkville Purchase Agreement, and the timing of any such sales, will be determined by the Company from time to time in its sole discretion and will depend on a variety of factors, including, among other things, market conditions, the trading price of the common stock, as well as determinations by the Company about the use of proceeds of such common stock sales. The net proceeds from any such sales under the Yorkville Purchase Agreement will depend on the frequency with, and the price at, which the shares of common stock are sold to Yorkville.

Upon the initial satisfaction of the conditions to Yorkville's obligation to purchase shares of common stock set forth under the Yorkville Purchase Agreement, the Company will have the right, but not the obligation, from time to time, at its sole discretion and on the terms and subject to the limitations contained in the Yorkville Purchase Agreement, until no later than the first day of the month following the 36 month anniversary of the date that the registration statement of the shares is declared effective, to direct Yorkville to purchase up to a specified maximum amount of common stock as set forth in the Yorkville Purchase Agreement by delivering written notice to Yorkville prior to the commencement of trading on any trading day. The purchase price of the common stock that the Company elects to sell to Yorkville pursuant to the Yorkville Purchase Agreement will be 98% of the VWAP of the common stock during the applicable purchase date on which the Company has timely delivered a written notice to Yorkville, directing it to purchase common stock under the Yorkville Purchase Agreement.

The previous purchase agreement that the Company entered into on May 17, 2022 with Cantor Fitzgerald & Co. has been terminated.

*Assignment and Sale of Proceeds Agreement*

On June 30, 2022, the Company entered into an Assignment and Sale of Proceeds Agreement (the "Assignment Agreement") and a Recovery Services Agreement (the "Services Agreement" and collectively, the "Agreements") with the Prudent Group ("Prudent") in order to monetize up to $250 million of the value of the Company's net recovery interest in Claim demand letters that the Company has commenced sending to insurers who admitted they had primary payer responsibility for the underlying accidents to the federal government ("Net Recovery Proceeds"). Pursuant to the Agreements, at the Company's sole and absolute discretion, the Company has the right to direct Prudent to acquire, on a non-recourse basis, a percentage of Net Recovery Proceeds, up to an aggregate of $250 million, at a purchase price of 90% of Net Recovery Proceeds of such Claim.

Under the Services Agreement, the Company will service and recover on the demand letters and will retain any revenues generated in excess of the amount received from Prudent, plus up to an 18% annual return on the amount Prudent paid for Net Recovery Proceeds. Prudent may terminate the Services Agreement upon sixty (60) days prior written notice to the Company. The Company plans to utilize the Assignment Agreement as funding is needed. To date, the Company has not exercised its rights pursuant to the Services Agreement and does not anticipate doing so in the foreseeable future.

Actual results, including sources and uses of cash, may differ from our current estimates due to the inherent uncertainty involved in making those estimates and any such differences may impact the Company's ability to continue as a going concern in the future. The expenditures associated with the development and launch of our additional recovery services and the anticipated increase in Claims recovery capacity are subject to significant risks and uncertainties, many of which are beyond our control, which may affect the timing and magnitude of these anticipated expenditures. These risk and uncertainties are described in more detail in the section entitled "Risk Factors."

**PPP Loan**

During 2020, we obtained funds under the Paycheck Protection Program (the "PPP Loans") in the amount of $1.1 million. As of December 31, 2021, all of the PPP Loans have been forgiven.

*Claims Financing Obligations*

On February 20, 2015, the Company entered into a Claims Proceeds Investment Agreement ("CPIA") with a third-party investor to invest directly and indirectly in Claims, disputes, and litigation and arbitration Claims. For such investment, the Company assigned to the investor a portion of the future proceeds of certain Claims, albeit the Company remained the sole owner and assignee of rights to Claims because the investor was only acquiring rights to a portion of the proceeds of the Claims. The investor return was based on its investment ($23 million between the original and amended agreements) and an internal rate of return of 30% calculated from the Closing Date.

During the year ended December 31, 2022, the Company finalized an Amendment to the CPIA and a Warrant Agreement with the third-party, pursuant to which the parties have agreed to amend the original CPIA and required payment terms. See Note 11 to our consolidated financial statements for a description of the Claims financing obligations and details on the amendment.

*Tax Receivable Agreement*

Under the terms of the TRA, we generally will be required to pay to the Members, and to each other person from time to time that becomes a "TRA Party" under the TRA, 85% of the tax savings, if any, that we are deemed to realize in certain circumstances as a result of certain tax attributes that exist following the Business Combination and that are created thereafter, including as a result of payments made under the TRA. The term of the TRA will continue until all such tax benefits have been utilized or expired unless we exercise our right to terminate the TRA for an amount representing the present value of anticipated future tax benefits under the TRA or certain other acceleration events occur. Any payments made by us under the TRA will generally reduce the amount of overall cash flow that might have otherwise been available to us, and, to the extent that we are unable to make payments under the TRA for any reason, the unpaid amounts generally will be deferred and will accrue interest until paid by us.

*Cash Flows*

The following table summarizes our cash flows for the periods indicated:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| (in thousands) | | 2022 | | 2021 |
| Net cash used in operating activities | $ | (80,635) | $ | 2,249 |
| Net cash used in investing activities | | (5,684) | | (2,007) |
| Net cash provided by (used in) financing activities | | 99,735 | | (10,457) |
| Net increase (decrease) in cash and cash equivalents and restricted cash | | 13,416 | | (10,215) |
| Cash and cash equivalents and restricted cash at beginning of period | | 1,664 | | 11,879 |
| Cash and cash equivalents and restricted cash at end of period | $ | 15,080 | $ | 1,664 |

*Cash Flows Used in Operating Activities*

Net cash used in operating activities increased by $82.9 million to $80.6 million for the year ended December 31, 2022 compared to net cash provided of $2.2 million for the year ended December 31, 2021. During the year ended December 31, 2022, net cash used in operating activities was impacted primarily by our net loss, an increase in Prepaid and other assets of $27.6 million and decrease in affiliate payable of $25.4 million. This was partially offset by a $23.4 million increase in accounts payable and accrued liabilities. Net cash used in operating activities was further impacted by non-cash charges including a $63.4 gain on debt extinguishment partially offset by Claims amortization expense of $266.9 million, paid in kind interest of $120.0 million, share-based compensation of $20.1 million and change in fair value of derivatives of $9.6 million and change in fair value of warrant liabilities of $2.2 million.

*Cash Flows Used in Investing Activities*

Net cash used in investing activities increased by $3.7 million to $5.7 million for the year ended December 31, 2022 compared to $2.0 million for the year ended December 31, 2021. During the year ended December 31, 2022, our cash used in investing activities was primarily due to acquisition of additional CCRAs included in Intangible assets, net, of which $3.0 million was paid for in cash and $3.0 million of additions to property, plant and equipment.

*Cash Flows Provided by (Used in) Financing Activities*

Net cash provided by in financing activities increased to $99.7 million for the year ended December 31, 2022 compared to $10.5 million net cash used in financing activities for the year ended December 31, 2021. This is primarily due to proceeds from the related party loan of $125.8 million, proceeds from the Business Combination of $12.0 million, and $9.8 million from the issuance of common stock. These were partially offset by $50.2 million of transaction costs incurred in connection with the Business Combination.

**Off-Balance Sheet Commitments and Arrangements**

As of the balance sheet dates of December 31, 2022 and December 31, 2021, we have not engaged in any off-balance sheet arrangements, as defined in the rules and regulations of the SEC.

https://www.sec.gov/Archives/edgar/data/1802450/000095017023034839/mspr-20221231.htm

**Contractual Obligations, Commitments and Contingencies**

The following table and the information that follows summarizes our contractual obligations as of December 31, 2022.

The future minimum lease payments under non-cancelable operating leases as of December 31, 2022 are as follows:

| (In thousands) | Lease Payments |
|---|---|
| **Year Ending December 31,** | |
| 2023 [(1)] | $ 217 |
| **Total** | **$ 217** |

(1) Operating lease expires before or during the year ending December 31, 2023

Based on Claims financing obligations and notes payable agreements, as of December 31, 2022 and December 31, 2021, the present value of amounts owed under these obligations were $201.3 million and $201.4 million, respectively, including unpaid interest to date of $2.8 million and $94.5 million, respectively. The weighted average interest rate is 6.3% based on the current book value of $201.3 million with rates that range from 2% to 11.04%. The Company is expected to repay these obligations from cash flows from Claim recovery income.

As of December 31, 2022, the minimum required payments on these agreements are $354.9 million. Certain of these agreements have priority of payment regarding any proceeds until full payment of the balance due is satisfied. The maturity of the commitments range from the date sufficient Claims recoveries are received to cover the required return or in some cases by 2031.

**Critical Accounting Policies**

Our consolidated financial statements and the related notes thereto included elsewhere in this Form 10-K are prepared in accordance with GAAP. The preparation of our consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts and related disclosures in our financial statements and accompanying notes. We base our estimates on historical experience and on various other factors that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions due to the inherent uncertainty involved in making those estimates and any such differences may be material.

We believe that the following accounting policies involve a high degree of judgment and complexity. Accordingly, these are the policies we believe are the most critical to aid in fully understanding and evaluating our consolidated financial condition and results of our operations. See Note 2, *Basis of Presentation and Summary of Significant Accounting Policies* to our consolidated financial statements appearing elsewhere in this Form 10-K for a description of our other significant accounting policies.

*Revenue Recognition*

*Claims Recovery Income*

We recognize revenue based on a gain contingency model when the amounts are reasonably certain of collection, typically upon reaching a binding settlement or arbitration with the counterparty or when the legal proceedings, including any appellate process, are resolved. Claims recovery income is recognized on a gross basis, as the Company is entitled to the full value of recovery proceeds and makes a payment to the original assignor similar to a royalty arrangement. Such payments to prior owners are recognized as cost of Claims recovery in the same period the Claims recovery income is recognized.

*Claims Recovery Service Income*

We recognize Claims recovery service income for our services to third parties for our services to assist those entities with pursuit of Claims recovery rights. We have determined that we have a single performance obligation for the series of daily activities that comprise Claims recovery services, which are recognized over time using a time-based progress measure. Amounts owed under existing arrangements or as a result of actual settlements or resolved litigation are recognized as accounts receivable. Amounts estimated and recognized, but not yet fully settled or resolved as part of litigation are recognized as contract assets. We enter into Claims recovery service contracts with third parties. Amounts for services to third parties are typically based on budgeted expenses for the current month with an adjustment for the variance between budget and actual expenses from the prior month.

*Impairment of Intangible Assets*

We evaluate long-lived assets, such as property and equipment, and finite-lived intangibles, such as Claims recovery rights and capitalized software costs, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset or asset group may not be recoverable. If the estimated future cash flows (undiscounted and without interest charges) from the use of an asset group are less than the carrying value, a write-down would be recorded to reduce the related asset group to its estimated fair value. There were no impairment indicators or charges in the year ended December 31, 2022 and 2021.

For the CCRA intangibles, we will also assess the intangible assets recognized for CCRAs for impairment in accordance with ASC 350-30-35-14, whereby an impairment loss shall be recognized if the carrying amount of the intangible asset is not recoverable

and its carrying amount exceeds its fair value based on the model for long-lived assets to be held and used under ASC 360-10. ASC 360-10

63

requires entities to evaluate long-lived assets (including finite-lived intangible assets) when indicators are present. Impairment indicators would result only when the potential recoveries under the Claim paths of all remaining Claims suggests the unamortized carrying value is not recoverable. As upfront payments for CCRAs are typically a fraction of the potential recoveries, it would typically take a substantial negative event (such as an unfavorable court ruling upheld on appeal or a change in law/statute with retroactive effect) to suggest an impairment may be triggered. There were no impairment indicators or charges in the year ended December 31, 2022 and 2021.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk.**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information otherwise required under this item.

**Item 8. Financial Statements and Supplementary Data.**

64

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 34) | 66 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | 67 |
| Consolidated Statements of Operations for the Years ended December 31, 2022 and 2021, and 2020 | 68 |
| Consolidated Statements of Stockholders' Equity for the Years ended December 31, 2022, 2021 and 2020 | 69 |
| Consolidated Statements of Cash Flows for the Years ended December 31, 2022 and 2021, and 2020 | 71 |
| Notes to Consolidated Financial Statements | 72 |

65

**Report of Independent Registered Public Accounting Firm**

To the shareholders and the Board of Directors of
MSP Recovery, Inc. and Subsidiaries

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of MSP Recovery, Inc. and Subsidiaries (the "Company") as of December 31, 2022 and 2021, the related consolidated statements of operations, changes in equity, and cash flows, for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

*/s/ Deloitte & Touche LLP*

Miami, Florida

July 26, 2023

We have served as the Company's auditor since 2021.

66

**MSP RECOVERY, INC. and Subsidiaries**
**Consolidated Balance Sheets**

| (In thousands except per share amounts) | | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 3,661 | $ | 1,664 |
| Restricted cash | | 11,420 | | - |
| Accounts receivable | | 6,195 | | - |
| Affiliate receivable (1) | | 2,425 | | 4,070 |
| Prepaid expenses and other current assets (1) | | 27,656 | | 13,304 |
| **Total current assets** | | **51,357** | | **19,038** |
| Property, plant and equipment, net | | 3,432 | | 750 |
| Intangible assets, net (2) | | 3,363,156 | | 84,218 |
| **Total assets** | $ | **3,417,945** | $ | **104,006** |
| | | | | |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 8,422 | $ | 4,609 |
| Affiliate payable (1) | | 19,822 | | 45,252 |
| Commission payable | | 545 | | 465 |
| Deferred service fee income | | - | | 249 |
| Derivative liability | | 9,613 | | - |
| Warrant liability | | 5,311 | | - |
| Other current liabilities | | 72,002 | | 3,489 |
| **Total current liabilities** | | **115,715** | | **54,064** |
| Guaranty obligation (1) | | 787,945 | | |
| Claims financing obligation and notes payable (1) | | 198,489 | | 106,805 |
| Loan from related parties (1) | | 125,759 | | - |
| Interest payable (1) | | 2,765 | | 94,545 |
| **Total liabilities** | $ | **1,230,673** | $ | **255,414** |
| **Commitments and contingencies (Note 13)** | | | | |
| | | | | |
| Class A common stock subject to possible redemption, 1,129,589 shares at redemption value as of December 31, 2022. | | 1,807 | | - |
| | | | | |
| **Stockholders' Equity (Deficit):** | | | | |
| Class A common stock, $0.0001 par value; 5,500,000,000 shares authorized; 74,605,284 issued and outstanding as of December 31, 2022 | $ | 7 | $ | - |
| Class V common stock, $0.0001 par value; 3,250,000,000 shares authorized; 3,147,979,494 issued and outstanding as of December 31, 2022 | | 315 | | - |
| Additional paid-in capital | | 136,760 | | - |
| Members' equity | | - | | (155,756) |
| Accumulated deficit | | (29,203) | | - |
| **Total Stockholders' Equity (Deficit)** | $ | **107,879** | $ | **(155,756)** |
| Non-controlling interest | | 2,077,586 | | 4,348 |
| **Total equity** | $ | **2,185,465** | $ | **(151,408)** |
| **Total liabilities and equity** | $ | **3,417,945** | $ | **104,006** |

1. As of December 31, 2022 and 2021, the total affiliate receivable, affiliate payable, guaranty obligation and loan from related parties balances are with related parties. In addition, the prepaid expenses and other current assets, Claims financing obligation and notes payable and interest payable includes balances with related parties. See *Note 14, Related Party,* for further details.
2. As of December 31, 2022, intangible assets, net included $2.3 billion related to a consolidated VIE. See *Note 10, Variable Interest Entities,* for further details.

*The accompanying notes are an integral part of these consolidated financial statements.*

**MSP RECOVERY, INC. and Subsidiaries**
**Consolidated Statements of Operations**

|  | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (In thousands except per share amounts) | | 2022 | | 2021 | | 2020 |
| Claims recovery income | $ | 4,878 | $ | 126 | $ | 255 |
| Claims recovery service income (1) | | 18,542 | | 14,500 | | 13,632 |
| **Total Claims Recovery** | $ | **23,420** | $ | **14,626** | $ | **13,887** |
| Operating expenses | | | | | | |
| Cost of claim recoveries (2) | | 2,054 | | 26 | | 47 |
| Claims amortization expense | | 266,929 | | 164 | | 125 |
| General and administrative (3) | | 23,959 | | 12,633 | | 14,130 |
| Professional fees | | 18,497 | | 8,502 | | 2,211 |
| Professional fees - legal (4) | | 43,035 | | 128 | | 468 |
| Depreciation and amortization | | 424 | | 343 | | 235 |
| Total operating expenses | | 354,898 | | 21,796 | | 17,216 |
| **Operating Loss** | $ | **(331,478)** | $ | **(7,170)** | $ | **(3,329)** |
| Interest expense | | (121,011) | | (27,046) | | (20,886) |
| Other income (expense), net | | 63,067 | | 1,139 | | (51) |
| Change in fair value of warrant and derivative liabilities | | (12,483) | | — | | — |
| **Net loss before provision for income taxes** | $ | **(401,905)** | $ | **(33,077)** | $ | **(24,266)** |
| Provision for income tax expense | | — | | — | | — |
| **Net loss** | $ | **(401,905)** | $ | **(33,077)** | $ | **(24,266)** |
| Less: Net (income) loss attributable to non-controlling members | | 394,488 | | (16) | | 18 |
| **Net loss attributable to controlling members** | $ | **(7,417)** | $ | **(33,093)** | $ | **(24,248)** |
| | | | | | | |
| Basic and diluted weighted average shares outstanding, Class A Common Stock (5) | | 61,825,105 | | N/A | | N/A |
| **Basic and diluted net income per share, Class A Common Stock (5)** | $ | **(0.12)** | | N/A | | N/A |

1. For the years ended December 31, 2022, 2021 and 2020, Claims recovery service income included $10.6 million, $11.5 million, and $13.1 million, respectively, of Claims recovery service income from VRM MSP. See *Note 14, Related Party,* for further details.
2. For the year ended December 31, 2022, cost of Claim recoveries included $405 thousand of related party expenses. This relates to contingent legal expenses earned from Claims recovery income pursuant to legal service agreements with the La Ley con John H. Ruiz P.A., d/b/a MSP Recovery Law Firm (the "Law Firm"). See *Note 14, Related Party,* for further details. For the years ended December 31, 2021 and 2020, the expenses related to contingent legal expenses were de minimis.
3. For the year ended December 31, 2022, general and administrative expenses included $400 thousand of related party expenses. For the years ended December 31, 2021 and 2020, the amounts were de minimis. See *Note 14, Related Party,* for further details.
4. For the year ended December 31, 2022, professional fees - legal included $29.7 million of related party expenses related to the Law Firm. For the year ended December 31, 2021 and 2020, the amounts were de minimis, respectively, of related party expenses related to the Law Firm. See *Note 14, Related Party,* for further details.
5. Earnings per share information has not been presented for periods prior to the Business Combination (as defined in Note 1, *Description of Business*), as it resulted in values that would not be meaningful to the users of these consolidated financial statements. Refer to *Note 16, Net Loss Per Common Share* for further information.

*The accompanying notes are an integral part of these consolidated financial statements.*

68

**MSP RECOVERY, INC. and Subsidiaries**
**Consolidated Statements of Changes in Equity**

### Year Ended December 31, 2022

| (In thousands except shares) | Class A Common Stock | | Class V Stock | | Additional Paid-in Capital | Members' Deficit | Accumulated Deficit | Non-Controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| **Balance at December 31, 2021** | — | $  — | — | $ — | $  — | $ (155,756) | $  — | $   4,348 | $ (151,408) |
| Contributions prior to recapitalization transaction | — | — | — | — | — | 15 | — | — | 15 |
| Distributions prior to recapitalization transaction | — | — | — | — | — | (147) | — | — | (147) |
| Net loss prior to recapitalization transaction | — | — | — | — | — | (28,640) | — | — | (28,640) |
| Cumulative effect of recapitalization transaction | 7,582,668 | — | 3,154,473,292 | 315 | 41,277 | 184,528 | — | 2,490,751 | 2,716,871 |
| Opening net assets of Lionheart II Holdings, LLC acquired | — | — | — | — | — | — | (21,786) | — | (21,786) |
| Adjustment for value of derivative on temporary equity | — | — | — | — | 9,613 | — | — | — | 9,613 |
| Conversion of Warrants | 8,505,557 | 1 | — | — | 16,702 | — | — | (6,611) | 10,092 |
| Class A Issuances | 58,517,059 | 6 | (6,493,798) | — | 69,168 | — | — | (45,054) | 24,120 |
| Net loss | — | — | — | — | — | — | (7,417) | (365,848) | (373,265) |
| **Balance at December 31, 2022** | 74,605,284 | $   7 | 3,147,979,494 | $ 5 | $ 136,760 | $  — | $ (29,203) | 2,077,586 | $ 2,185,465 |

### Year Ended December 31, 2021

| (In thousands) | Members' Deficit | Non-Controlling Interests | Total Equity |
|---|---|---|---|
| **Balance at December 31, 2020** | $     (120,179) | $   4,332 | $    (115,847) |
| Contributions | 227 | — | 227 |
| Distributions | (2,711) | — | (2,711) |
| Net loss | (33,093) | 16 | (33,077) |
| **Balance at December 31, 2021** | $     (155,756) | $   4,348 | $    (151,408) |

*The accompanying notes are an integral part of these consolidated financial statements.*

69

https://www.sec.gov/Archives/edgar/data/1802450/000095017023034839/mspr-20221231.htm 110/185

**MSP RECOVERY, INC. and Subsidiaries**
**Consolidated Statements of Changes in Equity**

**Year Ended December 31, 2020**

| *(In thousands)* | Members' Deficit | | Non-Controlling Interests | | Total Equity | |
|---|---|---|---|---|---|---|
| **Balance at December 31, 2019** | $ | (104,455 ) | $ | 4,350 | $ | (100,105 ) |
| Contributions | | 8,524 | | — | | 8,524 |
| Distributions | | — | | — | | — |
| Net loss | | (24,248 ) | | (18 ) | | (24,266 ) |
| **Balance at December 31, 2020** | $ | (120,179 ) | $ | 4,332 | $ | (115,847 ) |

*The accompanying notes are an integral part of these consolidated financial statements.*

70

**MSP RECOVERY, INC. and Subsidiaries**
**Consolidated Statements of Cash Flows**

| (In thousands) | Year ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| **Cash flows from operating activities:** | | | |
| Net loss (1) | $ (401,905 ) | $ (33,077 ) | $ (24,266 ) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | | |
| Depreciation and amortization | 424 | 343 | 235 |
| Claims amortization expense | 266,929 | 164 | 125 |
| Paid in kind interest | 145,321 | 27,023 | 20,843 |
| Change in fair value of derivatives | 9,613 | — | — |
| Deferred income taxes | (531 ) | — | — |
| Share based compensation | 20,055 | — | — |
| Change in fair value of warrant liability | 2,870 | — | — |
| PPP loan forgiveness | — | (1,043 ) | (44 ) |
| Realized gain on equity securities | — | (201 ) | (18 ) |
| Unrealized losses on investments - short position | — | — | 279 |
| Gain on debt extinguishment | (63,367 ) | — | — |
| **Change in operating assets and liabilities:** | | | |
| Accounts receivable | (6,195 ) | — | — |
| Affiliate receivable (1) | 1,645 | 801 | (3,346 ) |
| Affiliate payable (1) | (25,430 ) | 6,225 | 5,670 |
| Prepaid expenses and other assets | (27,604 ) | 1 | (9 ) |
| Commission payable | 80 | — | — |
| Accounts payable and accrued liabilities | (2,291 ) | 2,013 | 268 |
| Deferred service fee income | (249 ) | — | 249 |
| **Net cash (used in) provided by operating activities** | **(80,635 )** | **2,249** | **(14 )** |
| **Cash flows from investing activities:** | | | |
| Additions to property, plant, and equipment | (2,984 ) | (481 ) | (330 ) |
| Additions to intangible assets | (2,700 ) | (150 ) | — |
| Proceeds from short sale of short positions | — | — | 1,298 |
| Proceeds from sale of equity securities | — | 4,450 | 1,273 |
| Purchases of equity securities | — | (4,056 ) | (1,255 ) |
| Purchase of securities to cover short position | — | (1,770 ) | — |
| **Net cash (used in) provided by investing activities** | **(5,684 )** | **(2,007 )** | **986** |
| **Cash flows from financing activities:** | | | |
| Proceeds from Business Combination | 12,009 | — | — |
| Transaction costs incurred for the Business Combination | (49,638 ) | (7,973 ) | — |
| Proceeds from related party loan (1) | 125,759 | — | — |
| Issuance of common stock | 9,188 | — | — |
| Issuance of temporary equity | 2,417 | — | — |
| Contribution from members | — | 227 | 8,524 |
| Distributions to members | — | (2,711 ) | — |
| Proceeds from debt financing | — | — | 1,086 |
| **Net cash provided by (used in) financing activities** | **99,735** | **(10,457 )** | **9,610** |
| Increase (decrease) in cash and cash equivalents and restricted cash | 13,416 | (10,215 ) | 10,582 |
| Cash and cash equivalents and restricted cash at beginning of year | 1,664 | 11,879 | 1,297 |
| **Cash and cash equivalents and restricted cash at end of period** | **$ 15,080** | **$ 1,664** | **$ 11,879** |

**Supplemental cash flow information:**

**Supplemental disclosure of non-cash investing and financing activities:**

| | | | |
|---|---|---|---|
| Purchase of intangible asset financed by note payable | $ — | $ 83,805 | $ — |
| Purchase of intangible asset through issuance of Class A common stock | 10,963 | — | — |
| Purchase of intangible asset in accrued expenses | 51,167 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Payment of professional fees through issuance of Class A common stock | | | 1,618 | | — | |
| Transaction costs incurred included in accounts payable | | | 29,681 | | — | |
| **Cash paid during the period for:** | | | | | | |
| Interest | $ | — | $ | 23 | $ | 43 |

1.  Balances include related party transactions. See *Note 14, Related Party*, for further details.

*The accompanying notes are an integral part of these consolidated financial statements.*

71

Table of Contents

**Note 1. DESCRIPTION OF BUSINESS**

On May 23, 2022 (the "Closing Date"), MSP Recovery, Inc. d/b/a LifeWallet, a Delaware corporation (formerly known as Lionheart Acquisition Corporation II ("LCAP") consummated the previously announced business combination pursuant to that certain Membership Interest Purchase Agreement, dated as of July 11, 2021 (as amended, the "MIPA"), by and among the Company, Lionheart II Holdings, LLC, a wholly owned subsidiary of the Company, MSP Recovery, LLC and combined and consolidated subsidiaries ("Legacy MSP"), the members of Legacy MSP (the "Members"), and John H. Ruiz, in his capacity as the representative of the Members (the "Members' Representative"). Pursuant to the MIPA, the Members sold and assigned all of their membership interests in Legacy MSP to the Company in exchange for non-economic voting shares of Class V common stock, par value $0.0001, of the Company ("Class V Common Stock") and non-voting economic Class B Units of the Company ("Class B Units," and each pair consisting of one share of Class V Common Stock and one Class B Unit, an "Up-C Unit") (such transaction, the "Business Combination"). The Up-C Units are convertible into Class A Common Stock of the Company at the discretion of holder of the Up-C Unit. See *Note 3, Business Combination* for details. Subsequent to the Closing Date, the Company's sole asset is its equity interest in MSP Recovery, LLC. The Company is the managing member and therefore consolidates Legacy MSP.

Legacy MSP was organized in 2014 as a Medicaid and Medicare Secondary Pay Act recovery specialist. The Company utilizes its proprietary internal data analytics platform to review health Claims assigned by secondary payers such as Health Plans, Management Service Organizations ("MSO"), providers of medical services and Independent Physicians Associations. This platform allows the Company to identify Claims cost recovery rights with potential recovery paths where Claims either should not have been paid by the secondary payers or should have been reimbursed by third-party entities.

MSP seeks the assignment of recovery rights from secondary payers by acquiring the recovery rights to Claims from secondary payers via Claims Cost Recovery Agreements ("CCRAs"). Prior to executing a CCRA, the Company utilizes its proprietary internal data analytics platform to review the set of Claims and identify Claims with probable recovery paths. MSP's assets are these irrevocable assignments of health Claims recovery rights that are automatic, all-encompassing and superior to other interests supported by Federal and State laws and regulations. MSP's operations are primarily conducted in the U.S. and Puerto Rico.

**Investment Capacity Agreement**

On September 27, 2021, the Company entered into an Investment Capacity Agreement (the "ICA") providing for potential future transactions regarding select healthcare Claims recovery interests with its investment partner, Virage, which transactions may include the sale of Claims by MSP. The ICA provides that the maximum value of such Claims will be $3 billion.

When the Company takes an assignment, the Company takes an assignment of the entire recovery but often has a contractual obligation to pay the assignor 50% of any recoveries. This 50% interest typically is retained by the assignor (the "Retained Interest"), although in some cases, the Company has acquired all of the recoveries, and the applicable assignor has not kept any Retained Interest. The Retained Interest is not an asset of the Company, but an obligation to pay these assignors, with the Company keeping the other 50% interest of any recoveries. Virage's funding in connection with future transactions generally will be used to purchase Retained Interests from existing assignors or new MSP assignors, although its funds can also be used to buy 50% of the recoveries from the Company, in the event the applicable assignor did not retain any Retained Interest. In connection with transactions consummated under the ICA, the Company may receive certain fees, including a finder's fee for identifying the recoveries and a servicing fee for servicing the Claims.

Pursuant to the ICA, the Company will assist Virage in acquiring these Retained Interests for a cash price. Virage will be paid the recovery generated from the purchased Retained Interests when received through litigation or settlements. The ICA is separate and distinct from the equity investment in the Company by VRM MSP (an affiliate of Virage). While the ICA is still in effect as of the date of this annual report, it is uncertain if or when the Company would transact on the ICA. To date, there have been no transactions in connection with this ICA, and the Company does not anticipate any in the foreseeable future.

**LifeWallet**

On January 10, 2022, the Company announced the launch of LifeWallet, LLC ("LifeWallet"). As of December 31, 2022, the Company's investment related to LifeWallet included in the consolidated balance sheets was limited to activity and expenses incurred during the year ended December 31, 2022. Through the date the financial statements were issued, LifeWallet has executed agreements for advertising costs within the next 12 months of approximately $5.5 million. A portion of these contracts are cancellable with a 30-day notice period. For the aforementioned agreements that do not have a 30-day cancellation at will provision, the parties have mutually agreed to terminate said agreements prior to the filing of this Annual Report on Form 10-K.

**Committed Equity Facility**

On May 17, 2022, the Company entered into a Company Common Stock Purchase Agreement (the "Purchase Agreement") with an affiliate of Cantor Fitzgerald ("CF"). Pursuant to the Purchase Agreement, after the closing of the Business Combination, the Company will have the right to sell to CF from time to time at its option up to $1 billion in Class A common stock shares, subject to the terms, conditions and limitations set forth in the Purchase Agreement.

Table of Contents

On January 6, 2023, the Company entered into a Company Common Stock Purchase Agreement (the "Yorkville Purchase Agreement") with YA II PN, Ltd., a Cayman Island exempted company ("Yorkville"), which replaced the Purchase Agreement with CF noted above. Pursuant to the Yorkville Purchase Agreement, the Company has the right to sell to Yorkville from time to time at its option up to $1 billion in shares of the Company's Common Stock, subject to the terms, conditions and limitations set forth in the Yorkville Purchase Agreement. Sales of the shares of the Common Stock to Yorkville under the Yorkville Purchase Agreement, and the timing of any such sales, will be determined by the Company from time to time in its sole discretion and will depend on a variety of factors, including, among other things, market conditions, the trading price of the common stock, as well as determinations by the Company about the use of proceeds of such Common Stock sales. The net proceeds from any such sales under the Yorkville Purchase Agreement will depend on the frequency with, and the price at, which the shares of Common Stock are sold to Yorkville. Upon the initial satisfaction of the conditions to Yorkville's obligation to purchase shares of Common Stock set forth under the Yorkville Purchase Agreement (the "Commencement"), including that a registration statement registering the resale by Yorkville of the shares of Common Stock under the Securities Act, purchased pursuant to the Yorkville Purchase Agreement (the "Resale Registration Statement") is declared effective by the SEC and a final prospectus relating thereto is filed with the SEC, the Company will have the right, but not the obligation, from time to time, at its sole discretion and on the terms and subject to the limitations contained in the Yorkville Purchase Agreement, until no later than the first day of the month following the 36 month anniversary of the date that the Resale Registration Statement is declared effective, to direct Yorkville to purchase up to a specified maximum amount of Common Stock as set forth in the Yorkville Purchase Agreement by delivering written notice to Yorkville prior to the commencement of trading on any trading day. The purchase price of the common stock that the Company elects to sell to Yorkville pursuant to the Yorkville Purchase Agreement will be 98% of the volume-weighted average price ("VWAP") of the Common Stock during the applicable purchase date on which the Company has timely delivered a written notice to Yorkville, directing it to purchase common stock under the Yorkville Purchase Agreement. The purchase agreement that the Company entered into on May 17, 2022 with CF has been terminated.

### Assignment and Sale of Proceeds Agreement

On June 30, 2022, the Company entered into an Assignment and Sale of Proceeds Agreement (the "Assignment Agreement") and a Recovery Services Agreement (the "Services Agreement" and collectively, the "Agreements") with the Prudent Group ("Prudent") in order to monetize up to $250 million of the value of the Company's net recovery interest in Claim demand letters that the Company has commenced sending to insurers who admitted they had primary payer responsibility for the underlying accidents to the federal government ("Net Recovery Proceeds").

Pursuant to the Agreements, at the Company's sole and absolute discretion, the Company has the right to direct Prudent to acquire, on a non-recourse basis, a percentage of the Company's Net Recovery Proceeds, up to an aggregate of $250 million, at a purchase price of 90% of the Net Recovery Proceeds of such Claim.

Under the Services Agreement, the Company will service and recover on the demand letters and will retain any revenues generated in excess of the amount received from Prudent, plus up to an 18% annual return on the amount Prudent paid for the Net Recovery Proceeds. Prudent may terminate the Services Agreement upon sixty (60) days prior written notice to the Company.

The Company may utilize the Assignment Agreement as funding if needed. While the Prudent Agreements are still in effect as of the date of these financial statements, it is uncertain if or when the Company would transact on the agreements.

### Warrant Agreement with Brickell Key Investments, LP

On October 12, 2022, MSP Recovery, Inc., a Delaware corporation (the "Company"), finalized an Amendment to the Claim Proceeds Investment Agreement (the "Amendment") and a Warrant Agreement (the "Warrant Agreement") with Brickell Key Investments LP (the "Holder"), pursuant to which the parties have agreed to amend the original Claims Proceeds Investment Agreement ("CPIA") and required payment terms. The Amendment and Warrant Agreement were agreed effective September 30, 2022.

Pursuant to the agreements, the Company grants to the Holder the right to purchase Class A common shares in the Company (the "Class A Shares") in accordance with the terms and conditions of the Agreement. The maximum amount of Class A shares that the holder may purchase from the Company is 66,666,666 (the "Amount") for a purchase price equal to $6,666.67 ($0.0001 per Class A Share) (the "Exercise Price") and is payable in cash. This Warrant (the "Warrant") will expire at 5:00 p.m. (Eastern Time), on September 30, 2027 and may be exercised in whole or in part by Holder at any time prior to such date. The Holder can only sell a maximum of 15% per month of the Class A Shares obtained through the Warrant.

In exchange for the Company issuing the Warrant, the amounts owed to the Holder pursuant to CPIA are reduced from approximately $143 million to equal $80 million (the "Reduced Obligation"), and no further interest will accrue. The Holder has the right to receive the $80 million owed through (1) proceeds as outlined in the CPIA, (2) cash paid by the Company or (3) monetization of the Warrant (through the sale of the Warrant or sale of the underlying Class A Shares). If the Holder monetizes the Warrant, the amount owed will be reduced at a measure of $1.20 per Class A Share (five-day volume weighted average price as of September 30, 2022).

Table of Contents

**Liquidity**

As an early-stage growth company, the Company has incurred substantial net losses since inception. As of December 31, 2022, the Company had unrestricted cash and cash equivalents totaling $3.7 million. The Company has incurred recurring losses and negative cash flows since inception and has an accumulated deficit of $29.2 million as of December 31, 2022. For the year ended December 31, 2022, the Company used approximately $80.6 million of cash in operations. The Company's liquidity will depend on the ability to generate substantial Claims recovery income and Claims recovery services income in the near future, the timing of which is uncertain, as well as its ability to secure funding from capital sources. The Company's principal liquidity needs have been capital expenditures, working capital, debt service and Claims financing obligations.

The Company anticipates sources of liquidity to include the Hazel Working Capital Facility as disclosed in Note 19, *Subsequent Events*. The Company anticipates having funding through this source and has taken several actions to address liquidity concerns, including:

1. On April 12, 2023, the Company entered into the Virage MTA Amendment, which extended the due date for the payment obligations to Virage to September 30, 2024. See summary in Note 19, *Subsequent Events*.

2. On April 12, 2023, the Company entered into an amended and restated promissory note with Nomura, which extended the due date to September 30, 2024. See summary in Note 19, *Subsequent Events*.

3. On March 29, 2023, the Company entered into the Working Capital Credit Agreement consisting of commitments to fund up to $48 million in proceeds. See summary in Note 19, *Subsequent Events*.

4. Given the uncertainty with regard to the timing and amount of claims recovery income, management implemented a reduction of operating costs in 2023 through the reduction or elimination of certain controllable expenses particularly within the budgeted costs to expand and develop new solutions through LifeWallet platform, advertising expenses and non-contingent legal fees. The Company anticipates that the reductions would contribute approximately $21.5M in savings to operating expenses over the next twelve months.

The Company has concluded that such actions alleviate the substantial doubt about the Company's ability to continue as a going concern beyond one year from the date these financial statements are issued.

## Note 2. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation and Principles of Consolidation**

*Basis of presentation*

These statements have been prepared pursuant to the rules and regulations of the SEC and in accordance with GAAP. In the opinion of management, the consolidated financial statements (the "Financial Statements") reflect all adjustments, which consist only of normal recurring adjustments, necessary to state fairly the results of operations, financial condition and cash flows for the periods presented herein. Prior to the Business Combination, the consolidated interim financial statements reflect Legacy MSP. All intercompany transactions and balances are eliminated from the consolidated financial statements.

*Principles of consolidation*

The Company consolidates all entities that it controls through a majority voting interest or otherwise and the accompanying consolidated financial statements include the accounts of the Company's wholly owned subsidiaries and these entities for which the Company has a controlling interest in. The Company also consolidates all entities that it controls as the primary beneficiary of a variable interest entity ("VIE"). Under the VIE model, management first assesses whether the Company has a variable interest in an entity, which would include an equity interest. If the Company has a variable interest in an entity, management further assesses whether that entity is a VIE, and if so, whether the Company is the primary beneficiary under the VIE model. Generally, entities that are organized similar to a limited partnership, in which a general partner (or managing member) make the most relevant decisions that affect the entity's economic performance, are considered to be VIEs which would require consolidation, unless the limited partners have substantive kickout or participating rights. Entities that do not qualify as VIEs are assessed for consolidation under the voting interest model.

Under the VIE model, an entity is deemed to be the primary beneficiary of a VIE if it holds a controlling financial interest. A controlling financial interest is defined as (a) the power to direct the activities of a VIE that most significantly affect the entity's economic performance and (b) the obligation to absorb losses of the entity or the right to receive benefits from the entity that could potentially be significant to the VIE. Management determines whether the Company is the primary beneficiary of a VIE at the time it

becomes involved with a VIE and reconsiders that conclusion at each reporting date. This analysis includes an evaluation of the Company's control rights, as well as the economic interests that the Company holds in the VIE, including indirectly through related parties. As a result of the Business Combination, the Company consolidates MSP Recovery, LLC under the VIE model.

**Estimates and Assumptions**

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and reported amounts of revenues and expenses during the reporting periods. Actual results could differ from the Company's estimates. Estimates are periodically reviewed considering changes in circumstances, facts and experience. Changes in estimates are recorded in the period in which they become known. Significant estimates and assumptions reflected in these consolidated financial statements include but are not limited to Claims recovery income and Claims recovery service income recognition, recoverability of long-lived assets and cost of Claims recoveries.

**Segments**

Operating segments are defined as components of an entity for which separate financial information is available and regularly reviewed by the chief operating decision maker ("CODM"). The Company manages its operations as a single segment for the purposes of assessing performance and making decisions. The Company's CODM is its Chief Executive Officer. The Company has determined that it operates in one operating segment and one reportable segment, as the CODM reviews financial information presented on a consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. In addition, all of the Company's revenues and long-lived assets are attributable primarily to operations in the United States and Puerto Rico for all periods presented.

**Concentration of credit risk and Off-Balance Sheet Risk**

Cash and cash equivalents and affiliate receivable are financial instruments that are potentially subject to concentrations of credit risk. See *Note 14, Related Party*, for disclosure of affiliate receivables. The Company's cash and cash equivalents and restricted cash are deposited in accounts at large financial institutions, and amounts may exceed federally insured limits. The Company believes it is not exposed to significant credit risk due to the financial strength of the depository institutions in which the cash and cash equivalents are held. The Company has no other financial instruments with off-balance-sheet risk of loss.

**Cash and Cash Equivalents and Restricted Cash**

The Company considers all highly liquid investments purchased with original maturities of three months or less to be cash equivalents.

Restricted Cash consists of cash held in escrow related to the Prepaid Forward Agreement with CF. See *Note 17, Derivative Liability*, for more information on the Prepaid Forward Agreement.

**Fair Value Measurements**

The Company applies the provisions of Accounting Standards Codification ("ASC") 820, *Fair Value Measurements*, for fair value measurements of financial assets and financial liabilities and for fair value measurements of non-financial items that are recognized or disclosed at fair value in the financial statements on a recurring basis. The Company also applied the provisions of the subtopic to fair value measurements of non-financial assets and non-financial liabilities that are recognized or disclosed at fair value in the financial statements on a non-recurring basis. The subtopic defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The subtopic also establishes a framework for measuring fair value and expands disclosures about fair value measurements. The fair value framework requires the Company to categorize certain assets and liabilities into three levels, based upon the assumptions used to price those assets or liabilities. The three levels are defined as follows:

Level 1: Quoted prices in active markets for identical assets or liabilities.

Level 2: Quoted prices for similar assets and liabilities in active markets or inputs that are observable.

Level 3: Unobservable inputs reflecting management's own assumptions about the inputs used in pricing the asset or liability.

The Company has determined the estimated fair value of its financial instruments based on appropriate valuation methodologies; however, for Level 2 and Level 3 inputs considerable judgment is required to develop these estimates. Accordingly, these estimated fair values are not necessarily indicative of the amounts the Company could realize in a current market exchange. The estimated fair values can be materially affected by using different assumptions or methodologies. The methods and assumptions used in estimating the fair values of financial instruments are based on carrying values and future cash flows. As of December 31, 2022 and December 31, 2021, the Company did not hold any Level 2 or Level 3 assets or liabilities.

75

Cash and cash equivalents and restricted cash are stated at cost, which approximates their fair value. The carrying amounts reported in the balance sheets for affiliate receivable, accounts payable, affiliate payable and accrued liabilities approximate fair value, due to their short-term maturities.

Outstanding borrowings that qualify as financial instruments are carried at cost, which approximates their fair value as of December 31, 2022 and December 31, 2021.

## Equity Method Investments

Equity investments that are not consolidated, but over which the Company exercises significant influence, are accounted for in accordance with ASC 323, "Investments—Equity Method and Joint Ventures" ("ASC 323"). Whether or not the Company exercises significant influence with respect to an investee company depends on an evaluation of several factors including, among others, representation on the investee company's board of directors and ownership level. An entity is presumptively assumed to have significant influence in a corporation when it holds 20% or more of the voting stock of the investee company, or at a lower level (e.g., 3% to 5%) for entities that track separate members capital accounts.

Under the equity method of accounting, an investee company's accounts are not reflected within the Company's consolidated balance sheets and statements of operations; however, the Company's share of the earnings or losses of the investee company is reflected in the caption "Other income" in the consolidated statements of operations. The Company's carrying value in equity method investee companies is not reflected in the Company's consolidated balance sheets as of December 31, 2022 or December 31, 2021 as the carrying value is zero. When the Company's carrying value in an equity method investee company is reduced to zero, no further losses are recorded in the Company's consolidated financial statements unless the Company has guaranteed obligations of the investee company or has committed additional funding. When the investee company subsequently reports income, the Company will not record its share of such income until it equals the amount of its share of losses not previously recognized.

## Property, Plant and Equipment

Property and equipment are stated at historical cost less accumulated depreciation and accumulated impairment losses, if any. Major expenditures for property and equipment and those that substantially increase useful lives are capitalized. When assets are sold or otherwise disposed of, costs and related accumulated depreciation are removed from the financial statements and any resulting gains or losses are included in general and administrative expenses within our consolidated statements of operations.

The Company provides for depreciation and amortization on property and equipment using the straight-line method to allocate the cost of depreciable assets over their estimated lives as follows:

| | |
|---|---|
| Office and Computer Equipment | 3 years |
| Furniture and Fixtures | 3 years |
| Leasehold Improvements | Lesser of lease term or estimated life |

## Internal Use Software

Internal-use software development costs incurred in the preliminary project stage are expensed as incurred; costs incurred in the application and development stage, which meet the capitalization criteria, are capitalized and amortized on a straight-line basis over the estimated useful life of the asset and costs incurred in the post-implementation/operations stage are expensed as incurred. The estimated useful life for development costs capitalized as of December 31, 2022 and 2021 is five years. Further, internal and external costs incurred in connection with upgrades or enhancements are also evaluated for capitalization. If the software upgrade results in an additional functionality, costs are capitalized; if the upgrade only extends the useful life, it is expensed as occurred.

## Intangible assets

In certain of its CCRAs, the Company makes upfront payments to acquire Claims recovery rights from secondary payers, such as health plans, managed service organizations, providers or medical services and independent physicians' associations. The Company recognizes intangible assets for costs incurred up front to acquire Claims recovery rights from various assignors.

The Company amortizes capitalized costs associated with CCRAs over 8 years, based on the typical expected timing to pursue recovery through litigation, including through potential appeals.

As part of the Business Combination, the Company acquired rights to Claims recovery cash flows. As a result of this purchase and the guarantee obligation as noted in Note 10, *Variable Interest Entities*, the Company consolidated the entity which holds these Claim rights. Upon consolidation, these Claims rights were accounted for under ASC 350 similar to other CCRAs the Company holds. As such these assets are held at cost, net of amortization.

The Company evaluates these assets for impairment whenever events or changes in circumstances indicate that the carrying value of the asset may not be recoverable. If the estimated future cash flows (undiscounted and without interest charges) from the use of an asset group are less than the carrying value, a write-down would be recorded to reduce the related asset group to its estimated fair value. There were no impairment indicators in the years ended December 31, 2022, 2021 and 2020.

Table of Contents

## Leases

Leases entered into by the Company, in which substantially all the benefits and risk of ownership are transferred to the Company, are recorded as obligations under leases. Leases that meet one of the finance lease criteria are classified as finance leases, while all others are classified as operating leases. The Company determines if an arrangement is a lease at inception and has made an accounting policy election not to recognize right of use assets and lease liabilities that arise from short term lease as defined as leases with initial terms not in excess of 12 months. As of December 31, 2022, the Company did not have any leases in excess of 12 months. See Note 8, *Short Term Leases*, for more information.

## Non-controlling Interests

As part of the Business Combination and described in *Note 1, Description of Business*, the Company became the managing member of MSP Recovery, LLC, which is consolidated as the Company controls the operating decisions of MSP Recovery, LLC. The non-controlling interest relates to the Up-C Units that are convertible into Class A Common Stock of the Company at the discretion of the holder of the Up-C Unit. The Up-C Unit holders retained approximately 99.76% of the economic ownership percentage of the Company as of the Closing Date. The non-controlling interest is classified as permanent equity within the consolidated balance sheet of the Company. As of December 31, 2022, based on the Class A common stock issuances during the period, the non-controlling interest of Class V shareholders was 97.70%.

Changes in the Company's ownership interest in MSP Recovery, LLC, due to Class V shareholders converting their shares to Class A, are accounted for as equity transactions. Each issuance of the Company's Class A Common Stock requires a corresponding issuance of MSP Recovery, LLC units to the Company. The issuance would result in a change in ownership and would reduce the balance of non-controlling interest and increase the balance of additional paid-in capital.

## Impairment of Long-Lived Assets

The Company evaluates long-lived assets, such as property and equipment, including capitalized software costs, and finite-lived intangibles such as Claims recovery rights, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset or asset group may not be recoverable. If the estimated future cash flows (undiscounted and without interest charges) from the use of an asset group are less than the carrying value, a write-down would be recorded to reduce the related asset group to its estimated fair value. There were no impairment indicators in the year ended December 31, 2022, 2021 and 2020.

## Claims Recovery

The Company's primary income-producing activities are associated with the pursuit and recovery of proceeds related to Claims recovery rights that the Company obtains through CCRAs, in which it becomes the owner of those rights. As a result, such income is not generated from the transfer of control of goods or services to customers, but from the proceeds realized from perfection of Claims recoveries from rights the Company holds outright. The Company also generates revenue by providing Claims recovery services to other entities outside of the Company.

*Claims recovery income*

The Company recognizes Claims recovery income based on a gain contingency model – that is, when the amounts are reasonably certain of collection. This typically occurs upon reaching a binding settlement or arbitration with the counterparty or when the legal proceedings, including any appellate process, are resolved.

In some cases, the Company owes an additional payment to the original assignor in connection with the realized value of the recovery right. Claims recovery income is recognized on a gross basis, as the Company is entitled to the full value of recovery proceeds, and makes a payment to the original assignor similar to a royalty arrangement. Such payments to prior owners are recognized as cost of Claims recovery in the same period the Claims recovery income is recognized.

When the Company becomes entitled to recovery proceeds from the settlement of a Claim recovery pursuit or proceeding, it recognizes the amount in accounts receivable.

*Claims recovery service income, ASC 606, Revenue from Contracts with Customers*

The guidance under ASC 606, Revenue from Contracts with Customers, provides that an entity should apply the following steps: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations in the contract; and (5) recognize revenue when, or as, the entity satisfies a performance obligation.

The Company derives revenues from contracts with customers primarily from Claims recovery services arrangements ("Claims recovery services"). Claims recovery services include services to related parties or third parties to assist those entities with pursuit of Claims recovery rights. The Company has determined it has a single performance obligation for the series of daily activities that comprise Claims recovery services, which are recognized over time using a time-based progress measure and are typically based on (1) budgeted expenses for the current month with an adjustment for the variance between budget and actual expenses from the prior month or (2) on

a contingent basis dependent on actual settlements or resolved litigation. Amounts estimated and recognized, but not yet fully settled or resolved as part of litigation are recognized as contract assets. There were no contract assets on December 31, 2022 or December 31, 2021, as amounts associated with unresolved litigation were fully constrained.

Claims recovery services are generally paid in advance on a monthly basis. The Company did not recognize any material revenue for the year ended December 31, 2022 and 2021 for performance obligations that were fully satisfied in previous periods.

For the year ended December 31, 2022 and 2021, the majority of the Company's Claims recovery service income was related to a servicing agreement with VRM MSP, which was entered into on March 27, 2018. As part of the Business Combination, the Company acquired rights to cash flows in the assets, after certain required returns to VRM MSP, that had been part of the servicing agreement. As part of this acquisition, the Company no longer receives service income from this agreement and consolidates the entity in which the Company acquired rights to cash flow in the assets as outlined in Note 4, *Asset Acquisitions*. For the year ended December 31, 2022, the Company also recognized $5.0 million of servicing income related to a specific contract where the performance obligations were completed during the year.

The Company does not have material unfulfilled performance obligation balances for contracts with an original length greater than one year in any years presented. Additionally, the Company does not have material costs related to obtaining a Claims recovery service contract with amortization periods greater than one year for any period presented.

The Company applies ASC 606 utilizing the following allowable exemptions or practical expedients:

- Exemption to not disclose the unfulfilled performance obligation balance for contracts with an original length of one year or less.

- Practical expedient to recognize the incremental costs of obtaining a contract as an expense when incurred if the amortization period of the asset that the entity otherwise would have recognized is one year or less.

- Election to present revenue net of sales taxes and other similar taxes, if any.

- Practical expedient not requiring the entity to adjust the promised amount of consideration for the effects of a significant financing component if the entity expects, at contract inception, that the period between when the entity transfers a promised good or service to a customer and when the customer pays for that good or service will be one year or less.

**Transfers of Claims Cost Recovery Rights to Others**

In some cases, the Company has entered into arrangements to transfer CCRAs or rights to proceeds from CCRAs to other parties. The Company evaluates whether such transfers are sales of nonfinancial assets, sales of future revenues treated as debt, in-kind contributions to equity method investees, or other types of arrangements.

When they are treated as sales of nonfinancial assets, the Company recognizes a gain on the sale when control transfers to the counterparty based on the difference between the fair value of consideration (including cash) received and the recognized carrying value of the CCRAs. In some cases, such sales include variable consideration in the form of payments that will be made only upon achievement of certain recoveries or based on a percentage of actual recoveries. The Company estimates and constrains the amounts that will ultimately be realized based on these variable payment terms and includes those amounts in the determination of gain or loss; the gain or loss is subsequently updated based on changes in those estimates.

In other cases, such transfers are considered to be sales of future revenue that are debt-like in nature. These arrangements are recognized as debt based on the proceeds received, and are imputed an interest rate based on the expected timing and amount of payments to achieve contractual hurdles. These are subject to revisions of estimates of that timing and amount based on the contractual provisions and the Company's assumptions from changes in facts and circumstances. Such changes are reflected through revision of the imputed interest rate on a cumulative catch-up basis.

**Cost of Claims Recoveries**

Costs of Claims recoveries consist of all directly attributable costs specifically associated with Claims processing activities, including contingent payments to assignors (i.e., settlement expenses).

**Claims amortization expense**

Claims amortization expense includes amortization of CCRAs acquired as part of the business combination, shown as Intangibles, net in the consolidated balance sheets, and CCRA intangible assets for which the Company made upfront payments for Claims recovery rights. For further details on CCRAs see *Note 7, Intangible Assets, Net*.

**Income Taxes**

Our income tax expense, deferred tax assets and liabilities, and reserves for unrecognized tax benefits reflect management's best assessment of estimated current and future taxes to be paid. As a result of the Business Combination, the Company became the sole

Table of Contents

managing member of MSP Recovery, LLC, which is treated as a partnership for U.S. federal, state and local income tax purposes. As a partnership, MSP Recovery, LLC is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by MSP Recovery, LLC is passed through to and included in the taxable income or loss of its partners, including MSP Recovery, Inc. The Company is subject to U.S. federal income taxes, in addition to state and local income taxes, with respect to the Company's allocable share of income of MSP Recovery, LLC.

The Company's deferred tax balances reflect the impact of temporary differences between the carrying amount of assets and liabilities and the Company's tax basis. The balances are stated at the tax rates in effect when the temporary differences are expected to be recovered or settled. The Company reviewed the anticipated future realization of the tax benefit of the Company's existing deferred tax assets and concluded that it is more likely than not that all of the deferred tax assets will not be realized in the future.

### Comprehensive Income (Loss)

The Company has no components of other comprehensive income (loss). As such, net loss equates to comprehensive income (loss) for all periods presented in this report.

### Recent Accounting Pronouncements

### New Accounting Pronouncements Recently Adopted

In February 2016, the FASB issued ASU 2016-02, *Leases*, to increase transparency and comparability among organizations by recognizing right of use assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. In July 2018, ASU 2018-10, *Codification Improvements to ASC 2016-02, Leases*, was issued to provide more detailed guidance and additional clarification for implementing ASU 2016-02. Furthermore, in July 2018, the FASB issued ASU 2018-11, *Leases: Targeted Improvements*, which provides an optional transition method in addition to the existing modified retrospective transition method by allowing a cumulative effect adjustment to the opening balance of retained earnings in the period of adoption. Furthermore, in March 2020, ASU 2020-03, *Codification Improvements to Financial Instruments, Leases*, was issued to provide more detailed guidance and additional clarification for implementing ASU 2016-02. Additionally, on June 3, 2020, the FASB deferred by one year the effective date of the new leases standard for private companies, private not-for-profits and public not-for-profits that have not yet issued (or made available for issuance) financial statements reflecting the new standard. Furthermore, in June 2020, ASU 2020-05, *Revenue from Contracts with Customers and Leases*, was issued to defer effective dates of adoption of the new leasing standard for fiscal years beginning after December 15, 2021, and interim periods within those fiscal years beginning after December 15, 2022. The Company adopted this guidance utilizing the cumulative catch-up method with an effective date of January 1, 2022 and it had no material impact on our consolidated financial statements. The Company has made an accounting policy election to not to recognize right of use assets and lease liabilities that arise from short term lease as defined as leases with initial terms not in excess of 12 months. As of December 31, 2022, the Company did not have any leases in excess of 12 months. See Note 8, *Short Term Leases*, for more information.

ASU 2019-12, *Simplifying the Accounting for Income Taxes (Topic 740)*. In December 2019, the FASB issued ASU 2019-12, *Simplifying the Accounting for Income Taxes (Topic 740)*. This standard simplifies the accounting for income taxes by eliminating certain exceptions to the guidance in ASC 740 related to the approach for intra-period tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. The standard also simplifies aspects of the accounting for franchise taxes and enacted changes in tax laws or rates and clarifies the accounting for transactions that result in a step-up in the tax basis of goodwill. The standard is effective for public companies for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2021. The Company adopted this guidance on January 1, 2022 and it had no material impact on our consolidated financial statements.

ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting*. In March 2020, the FASB issued ASU 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting*. The amendments in this Update provide optional guidance for a limited period of time to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. This standard is effective for all entities as of March 12, 2020 through December 31, 2022. Early adoption is permitted. The Company adopted this guidance on January 1, 2022 and it had no material impact on our consolidated financial statements.

ASU 2020-06, *Debt — Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging — Contracts in Entity's Own Equity (Subtopic 815- 40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity*. On August 5, 2020, the FASB issued ASU 2020-06, *Debt — Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging — Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity*. The amendments simplify the accounting for certain financial instruments with characteristics of liabilities and equity, including convertible instruments and contracts on an entity's own equity. The standard is effective for public companies for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2021. Early adoption is permitted. The Company adopted this guidance on January 1, 2022 and it had no material impact on our consolidated financial statements.

ASU 2022-03, *Fair Value Measurement (Topic 820) - Fair Value Measurement of Equity Securities Subject to Contractual Sale Restrictions*. On June 30, 2022, the FASB issued ASU 2022-03, *Fair Value Measurement (Topic 820) - Fair Value Measurement of*

Table of Contents

*Equity Securities Subject to Contractual Sale Restrictions*. The amendment clarifies that contractual sale restrictions should not be considered when measuring the equity security's fair value and prohibits an entity from recognizing a contractual sale restriction as a separate unit of account. The standard is effective for public companies for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2024. Early adoption is permitted. The Company adopted this guidance in June 2022, which resulted in the Company recognizing the assets acquired as part of the Business Combination at values that were not discounted for contractual sale restrictions, which had a material impact on the Company's consolidated financial statements in relation to the asset acquisitions as noted in Note 4, *Asset Acquisitions*.

**New Accounting Pronouncements Issued but Not Yet Adopted**

ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses*. In 2016 and subsequently, the FASB issued ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments including subsequent amendments to the initial guidance*: ASU 2019-04, *Codification Improvements to Topic 326, Financial Instruments-Credit Losses, Topic 815, Derivatives and Hedging, and Topic 825. Financial Instruments, ASU 2019-05, Financial Instruments - Credit Losses (Topic 326): Targeted Transition Relief, ASU 2019-11, Codification Improvements to Topic 326, Financial Instruments - Credit Losses*. ASU 326, and ASU 2022-02, *Financial Instruments - Credit Losses (Topic 326): Troubled Debt Restructurings and Vintage Disclosures* and related amendments require credit losses on financial instruments measured at amortized cost basis to be presented at the net amount expected to be collected, replacing the current incurred loss approach with an expected loss methodology that is referred to as CECL. This ASU is effective for fiscal years beginning after December 15, 2022, and interim periods within those fiscal years. While the Company does not anticipate the implementation would have a material effect on the Company's consolidated operating results, cash flows, financial condition and related disclosures, the Company is currently evaluating the effect that implementation of this standard will have.

**Note 3. BUSINESS COMBINATION**

On May 23, 2022, MSP Recovery, Inc. consummated the Business Combination pursuant to the MIPA as noted in Note 1.

As a result of the closing of the Business Combination (the "Closing"), the Company is organized in an "Up-C" structure in which all of the business of Legacy MSP and its subsidiaries is held directly or indirectly by the Company, the Company is the managing member, consolidates Legacy MSP and the Company owns all of the voting economic Class A Units and the Members and their designees own all of the non-voting economic Class B Units in accordance with the terms of the first amended and restated limited liability company agreement of the Company. Each Up-C Unit may be exchanged for either, at the Company's option, (a) cash or (b) one share of Class A common stock, par value $0.0001, of the Company ("Class A Common Stock"), subject to the provisions set forth in the LLC Agreement. The aggregate consideration paid to the Members (or their designees) at the Closing consisted of (i) 3,250,000,000 Units and (ii) rights to receive payments under the Tax Receivable Agreement ("TRA"). Of the 3,250,000,000 Units, 3,154,473,292 Units were issued in connection with the Closing and 95,526,708 Units were designated to the Company and Opco for cancellation ("Canceled Units"). Since the Closing, the Company has issued 50,022,000 Up-C Units to certain designated persons and intends to further issue shares of Class A Common Stock in respect of transaction-related bonuses or certain other designated persons, which together with the 50,022,000 Up-C Units would be equivalent in number to the Canceled Units.

In connection with the Closing, the Company changed its name from "Lionheart Acquisition Corporation II" to "MSP Recovery, Inc." The Business Combination is accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, the Company is treated as the acquirer for financial statement reporting purposes. The reverse recapitalization was treated as the equivalent of Legacy MSP issuing stock for the net assets of LCAP, accompanied by a recapitalization. The net assets of LCAP are stated at historical cost, with no goodwill or other intangible assets recorded.

The Company received net proceeds in the business combination transaction of approximately $23.4 million, which includes the restricted cash received as part of FEF shares as defined in *Note 17, Derivative Liability*. The Company incurred direct and incremental costs of approximately $79.2 million related to the Business Combination, which consisted primarily of investment banking, legal, accounting and other professional fees. These transaction-related costs were recorded as a reduction of additional paid-in capital in the consolidated balance sheets.

*Warrants*

As part of the business combination transaction, the Company assumed the liability related to the LCAP public warrants ("Public Warrants") of $12.5 million. Pursuant to the terms of the Existing Warrant Agreement, and after giving effect to the issuance of the New Warrants, as defined below, the exercise price of the Public Warrants decreased to $0.0001 per share of Class A Common Stock. During the period from the Closing Date to December 31, 2022, approximately 8.5 million warrants of the original 11.8 million warrants had been exercised. For the year ended December 31, 2022, the fair value of the warrants increased resulting in other expense of $2.9 million. Following anti-dilution adjustments made in connection with the Business Combination, the Public Warrants have an exercise price of $0.0001 per share, which have become exercisable as of 10 days after closing of the Business Combination, on a cashless basis.

Table of Contents

Additionally, in connection with the Business Combination, the Company declared the New Warrant Dividend comprising approximately 1,028 million New Warrants payable to the holders of record of the Class A Common Stock as of the close of business on the Closing Date, after giving effect to the waiver of the right, title and interest in, to or under, participation in any such dividend by the Members, on behalf of themselves and any of their designees. The New Warrants will be exercisable 30 days following the Closing Date until their expiration date, which will be the fifth anniversary of the Closing Date or earlier redemption. The record date for the determination of the holders of record of the outstanding shares of Class A Common Stock entitled to receive the New Warrant Dividend was the close of business on the Closing Date. Pursuant to the terms of the LLC Agreement, at least twice a month, to the extent any New Warrants have been exercised in accordance with their terms, the Company is required to purchase from the MSP Principals, proportionately, the number of Up-C Units or shares of Class A Common Stock owned by such MSP Principal equal to the Aggregate Exercise Price divided by the Warrant Exercise Price in exchange for the Aggregate Exercise Price. The Company determined that the New Warrants instruments meet the equity scope exception in ASC 815 to be classified in stockholders' equity, and as the repurchase right noted above has a mirrored value designed to offset the New Warrants, if exercised would be an equity only transaction. The New Warrants are each exercisable for one share of Class A Common Stock at an exercise price of $11.50 per share and will be subject to certain anti-dilution adjustments and become exercisable 30 days following the Closing, expiring five years from the date of Closing.

Public Warrants and New Warrants are currently listed on Nasdaq under the symbols "LIFWZ" and "LIFWW", respectively.

*Tax Receivable Agreement*

In connection with the Business Combination, the Company also entered into a TRA. Pursuant to the TRA, the Company is required to pay the sellers 85% of the amount of tax benefits that the Company actually realizes as a result of (i) the Company's direct and indirect allocable share of existing tax basis acquired in the Business Combination, (ii) increases in the Company's allocable share of existing tax basis and tax basis adjustments that will increase the tax basis of the tangible and intangible assets of the Company as a result of the Business Combination and as a result of sales or exchanges of Up-C Units for cash or shares of Class A Common Stock, and (iii) certain other tax benefits related to entering into the TRA, including tax benefits attributable to payments under the TRA.

During the year ended December 31, 2022, the Company's TRA liability associated with the allocable share of existing tax basis acquired in the Business Combination would give rise to a TRA liability of $2.5 million. Furthermore, during the year ended December 31, 2022, 6,493,798 of Class V units were exchanged for Class A common stock of the Company, which will result in an increase in its share of the tax basis in the net assets of MSP Recovery, LLC; these exchanges will not give rise to a TRA liability due to the Company not receiving a tax basis adjustment that increased the tax basis of the tangible and intangible assets as a result of a limitation on the partnership tax allocations of built-in gains and losses.

The Company has assessed the realizability of the net deferred tax assets and, in that analysis, has considered the relevant positive and negative evidence available to determine whether it is more likely than not that some portion or all of the deferred tax assets will be realized. The Company has recorded a full valuation allowance against the deferred tax assets as of December 31, 2022, which will be maintained until there is sufficient evidence to support the reversal of all or some portion of these allowances. As the tax benefits associated with the TRA have not be recognized, based on estimates of future taxable income, the Company has concluded it is not probable to recognize any tax receivable agreement liability. If the valuation allowance recorded against the deferred tax assets is released in a future period, the Tax Receivable Agreement liability may be considered probable at that time and recorded within earnings.

*Non-Controlling interest*

As a result of the Business Combination, the Company reflects non-controlling interests due to the Up-C structure. The Company holds all of the voting Class A Units of Opco, whereas the Members (or their designees) hold all of the non-voting economic Class B Units of Opco (these Class B Units represent the non-controlling interest in the Company). The ownership percentage of Class V Common Stock held in the Company by the Members (or their designees) will be equivalent to the number of Class B Units held in the Company, and as such, reflects non-controlling interest in the Company, which is equivalent to the Class V Common Stock ownership percentage. See *Note 12, Noncontrolling Interest*, for more information on ownership interests in the Company.

*Nomura Promissory Note*

On May 27, 2022, the Company issued an unsecured promissory note to Nomura in a principal amount of approximately $24.5 million related to advisory fees and deferred underwriting fees and expenses that became due and payable by the Company to Nomura, in connection with the consummation of the Business Combination. On April 12, 2023, the Company amended the promissory note, increasing the principal amount to approximately $26.2 million and extending the maturity date of the promissory note to September 30, 2024. The amended note carries an interest rate of 16% per annum and is payable in kind or in cash, at the Company's discretion, every 30 calendar days after April 12, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the promissory note together with all accrued and unpaid interest thereon. The balance of the unsecured promissory note and related interest are included within Claims financing obligations and notes payable in the consolidated balance sheet.

Table of Contents

**Note 4. ASSET ACQUISITIONS**

On May 23, 2022 as part of the closing of the Business Combination, the Company acquired assets through the issuance of Up-C units. In exchange for approximately 196.6 million Up-C units, the Company acquired CCRAs previously held by Series MRCS, an affiliate of MSP. The CCRAs are included as Intangible Assets, net in the consolidated balance sheet.

The CCRAs are held at cost, which was determined using the opening market price of the Company's Class A shares as of the day subsequent to the Closing Date discounted by 4.5% for lack of marketability due to timing before shares are sellable. The Company determined the appropriate measurement date was the opening of the first trading day of the Class A shares after the Closing Date as this reflects the equivalent value of the Up-C units provided to the sellers. The Up-C units provided to the sellers did not include New Warrants and as such the Class A shares value excluding the New Warrants was reflected at the Close of the first trading day after the Closing Date. The CCRAs are treated as finite life intangible assets similar to other CCRAs that the Company has acquired and have a useful life of 8 years. For further details on this CCRA acquisition, see *Note 7, Intangible Assets, Net*.

On May 23, 2022 as part of the closing of the Business Combination, the Company acquired assets through the issuance of Up-C units. In exchange for approximately 356.8 million Up-C units, the Company acquired the rights to receive the distributable net proceeds (the "Proceeds") of a portfolio of Claims owned by VRM MSP, a Delaware limited liability company and joint investment vehicle of VRM and Series MRCS. Under this asset acquisition structure, the Company determined that the arrangements to acquire the rights to proceeds from certain Claims recovery rights along with the guarantee of the VRM Full Return (noted and defined below) result in the Company consolidating the Series. Upon consolidation, the Company included the value of the Up-C units provided and the value of the guarantee as Intangible Assets, net in the consolidated balance sheet. These are held at cost and treated as finite life intangible assets similar to other CCRAs that the Company has acquired and have a useful life of 8 years.

In connection with such transaction the Company agreed to pay Virage an amount equal to the contributions by Virage to VRM MSP plus an annual rate of return of 20% (the "VRM Full Return"). Pursuant to the terms of the agreement with Virage, such amount is payable exclusively by any of the following means (or any combination thereof): (a) the Proceeds, (b) a sale of certain reserved shares of Messrs. John Ruiz and Frank Quesada, and the delivery of the resulting net cash proceeds thereof to VRM, or (c) a sale of shares by the Company and delivery of the net cash proceeds thereof to VRM. The amount of the VRM Full Return was $787.9 million as of December 31, 2022. Upon payment of the VRM Full Return, VRM and Series MRCS would assign and transfer to the Company their respective rights to receive all Proceeds. As the Company incurred debt related to the VRM Full Return as included in the guarantee obligation within the consolidated balance sheet, this value was included in the purchase price and is included in Intangible Assets, net, in the consolidated balance sheet for the full value of the VRM Full Return at the acquisition date. Any subsequent interest accrual is reflected within interest expense in the consolidated statement of operations. Separately, the VRM Full Return was guaranteed by Messrs. John Ruiz and Frank Quesada for any remaining required payment of the VRM Full Return as of May 23, 2023.

On April 12, 2023, the Company entered into an amendment (the "Virage MTA Amendment") to the agreement with Virage pursuant to which the payment date for the VRM Full Return was extended from May 23, 2023 until September 30, 2024, subject to acceleration upon certain triggering events. See *Note 19, Subsequent Events*.

**Note 5. INVESTMENT IN EQUITY METHOD INVESTEES**

The Company holds three investments which are accounted for using the equity method: MAO-MSO Recovery II LLC Series PMPI ("Series PMPI"), MAO-MSO Recovery LLC and MAO-MSO Recovery II LLC (both collectively the "MAO-MSO entities").

Series PMPI is a series of MAO-MSO Recovery II LLC. The Company exercises significant influence over the operating and financial activities of Series PMPI, but does not exercise control of the entity. In accordance with Series PMPI's operating agreement, the controlling member is entitled to a preferred return of 20% per annum (the "Preferred Return"). Once the Preferred Return has been met, the controlling member is entitled to 50% of Claims recoveries by PMPI. The noncontrolling member is allocated 100% of the costs of PMPI. Since the Preferred Return exceeds the total members' equity of PMPI as of both December 31, 2022 and December 31, 2021, the value of the equity method investment in the consolidated balance sheet is $0.

The MAO-MSO entities are Delaware limited liability companies formed as master series entities whose central operations are to form other series legal entities that will hold and pursue Claims recovery rights. The MAO-MSO entities are not designed to hold or pursue Claims recoveries themselves. The Company holds a 50% economic interest in both entities, and has significant influence through its equity investment, but does not control either entity. As equity method investments, the Company recognizes its proportionate share of net earnings or losses as equity earnings in Other income. The activity of these entities has been insignificant for the years ended December 31, 2022, 2021 and 2020. Since the Company did not make a contribution to the MAO-MSO entities and the entities have recorded losses, the value of the equity method investment in the consolidated balance sheets is $0 as of both December 31, 2022 and December 31, 2021.

82

Table of Contents

Summary financial information for equity accounted investees, not adjusted for the percentage ownership of the Company is as follows:

| Series PMPI (in thousands) | December 31, 2022 | For the year ended, December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Revenue | 22 | 1 | 34 |
| Amortization | 2,000 | 2,000 | 2,000 |
| Other expenses | 8 | - | 20 |
| Profit (Loss) | (1,986) | (1,999) | (1,986) |

| Series PMPI (in thousands) | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Total Assets | $ 3,341 | 5,390 |
| Total Liabilities | $ 274 | 266 |

## Note 6. PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net consist of the following:

| (In thousands) | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Office and computer equipment | $ 430 | $ 356 |
| Leasehold improvements | 113 | 113 |
| Internally developed software | 4,050 | 1,020 |
| Other software | 68 | 66 |
| **Property, plant and equipment, gross** | $ 4,661 | $ 1,555 |
| Less: accumulated depreciation and amortization of software | (1,229) | (805) |
| **Property, plant and equipment, net** | $ 3,432 | $ 750 |

For the years ended December 31, 2022, 2021 and 2020, depreciation expense and amortization expense was $424 thousand, $343 thousand and $235 thousand, respectively.

## Note 7. INTANGIBLE ASSETS, NET

During the year ended December 31, 2022, the Company acquired CCRAs held by Series MRCS and consolidated CCRAs held by the Series. The assets were acquired through the issuance of equity as part of the Business Combination. The assets are held at cost and treated as a finite intangible asset with a useful life of 8 years.

Intangible assets, net consists of the following:

| (in thousands) | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Intangible assets, gross | $ 3,630,823 | $ 84,955 |
| Accumulated amortization | (267,667) | (737) |
| **Net** | $ 3,363,156 | $ 84,218 |

During the year ended December 31, 2022, in addition to the CCRAs acquired as part of the Business Combination the Company purchased $64.8 million of CCRAs included in Intangible assets, net, of which $2.7 million was paid in cash, $11.0 million was paid through Class A Common Stock issuance and $51.2 million is recorded within Other Current Liabilities in the consolidated balance sheet as of December 31, 2022 and will be paid through the issuance of Class A Common Stock. The payment is due in the second quarter of 2023. For the CCRAs acquired through equity issuance, the Company is required to provide additional shares or cash if the value of the shares provided is not equal to $10.0 million or greater within 1 year of issuance. As such, the Company recorded a liability of $8.7 million within Other current liabilities in the consolidate balance sheet for the difference between $10.0 million and the fair value of the shares as of December 31, 2022.

For the years ended December 31, 2022, 2021 and 2020, Claims amortization expense was $266.9 million, $164 thousand, and $125 thousand, respectively.

Future amortization for CCRAs is expected to be as follows:

| (in thousands) | CCRAs Amortization |
|---|---|
| 2023 | $ 453,853 |
| 2024 | 453,853 |
| 2025 | 453,780 |

| | | |
|---|---|---|
| 2026 | | 453,728 |
| 2027 | | 453,728 |
| Thereafter | | 1,094,214 |
| **Total** | $ | **3,363,156** |

83

Table of Contents

## Note 8. SHORT TERM LEASES

The Company leases office space under a non-cancellable operating lease expiring November 2023. In addition, the Company rents an office space from the Law Firm, which is on a month-to-month basis and therefore is not included in the future minimum lease payments below. Rent expense for the years ended December 31, 2022, 2021 and 2020 was $0.8 million, $0.8 million and $1.5 million, respectively. With the adoption of ASC 842 as noted in Note 2, *Basis of Presentation and Summary of Significant Accounting Policies*, the Company has made an accounting policy election to capitalize leases with initial terms in excess of 12 months. As of December 31, 2022, the Company did not have any leases in excess of 12 months.

The future minimum lease payments under non-cancellable operating leases as of December 31, 2022 for the next five years and thereafter are as follows:

| (In thousands) | Lease Payments | |
|---|---|---|
| **Year Ending December 31,** | | |
| 2023 [(1)] | $ | 217 |
| **Total** | **$** | **217** |

[(1)] Operating lease expires before or during the year ending December 31, 2023.

## Note 9. INCOME TAX

The Company holds an economic interest in MSP Recovery, LLC and consolidates its financial position and results. The remaining ownership of MSP Recovery, LLC not held by the Company is considered a noncontrolling interest. MSP Recovery, LLC is treated as a partnership for income tax reporting and its members, including the Company, are liable for federal, state, and local income taxes based on their share of the LLC's taxable income.

There was no provision for income tax for the years ended December 31, 2022, 2021, and 2020.

A reconciliation of the United States statutory income tax rate to the Company's effective tax rate for the year ended December 31, 2022, 2021, and 2020 is as follows for the years indicated:

| | December 31, 2022 | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Federal Statutory rate | 21.00% | 21% | 21% |
| Noncontrolling interests/effect of pass-through entities | -20.70% | -21% | -21% |
| Valuation allowance | -0.40% | 0% | 0% |
| Other | 0.10% | 0% | 0% |
| Effective Income tax rate | 0.00% | 0% | 0% |

Details of the Company's deferred tax assets and liabilities at December 31, 2022 and 2021 are as follows for the years indicated:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Deferred tax assets** | | |
| Net operating loss carryforward | $ 423 | 53 |
| Investment in MSP Recovery, LLC | 38,263 | - |
| Start-up Costs | 917 | 804 |
| Transaction Costs | 3,224 | - |
| Total deferred tax assets | 42,827 | 857 |
| Valuation Allowance | -42,827 | -857 |
| Total Deferred tax assets (liability) | $ - | - |

The Company has a deferred tax asset for the difference between the financial reporting and the tax basis of its investment in MSP Recovery, LLC. The deferred tax asset above does not consider the iterative impact of the TRA liability as the entire liability has not been recorded as of December 31, 2022.

As of December 31, 2022 and 2021, the Company had $3,854,829 and $446,481 of U.S. gross federal and state net operating loss carryovers available to offset future taxable income, respectively.

In assessing the realization of the deferred tax assets, management considers whether it is more likely than not that some portion of all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which temporary differences representing net future deductible amounts become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income and tax planning strategies in making this assessment. After consideration of all of the information available, management believes that significant uncertainty exists with respect to future realization of the deferred tax assets and has therefore established a full valuation allowance.

As of December 31, 2022 and 2021, the Company has not recorded any unrecognized tax benefits. The Company files income tax returns in the U.S. federal jurisdiction and Florida which remain open and subject to examination by the various taxing authorities. As of December 31, 2022, the Company's federal and state and local income tax years 2019 through 2022 remain open and are subject to examination.

84

Table of Contents

## Note 10. VARIABLE INTEREST ENTITIES

### Investments in consolidated Variable Interest Entities

The Company evaluates its ownership, contractual, and other interests in entities to determine if they are VIEs, if the Company has a variable interest in those entities, and the nature and extent of those interests. These evaluations are highly complex and involve management judgment and the use of estimates and assumptions based on available historical information, among other factors. Based on its evaluations, if the Company determines it is the primary beneficiary of such VIEs, it consolidates such entities into its financial statements. VIEs information below is presented on aggregate basis based on similar risk and reward characteristics and MSP's involvement with the VIEs.

The Company includes a number of entities that are determined to be VIEs and for which the common control group can direct the use of the entities' assets and resources for other purposes. The Company consolidates VIEs in which one of the combined entities is the primary beneficiary.

The assets of the consolidated VIEs may only be used to settle obligations of these VIEs and to settle any investors' ownership liquidation requests. There is no recourse to MSP for the consolidated VIEs' liabilities. The assets of the consolidated VIEs are not available to MSP's creditors.

Total assets and liabilities included in its consolidated balance sheets for these VIEs were $2.3 billion and $0.4 million, respectively, at December 31, 2022 and $9.7 million and $122.7 million, respectively, at December 31, 2021. The assets at December 31, 2022 include the Intangible Assets, net included in the Series of $2.3 billion.

### Investments in unconsolidated Variable Interest Entities

The Company is involved with VIEs in which it has investments in equity but does not consolidate because it does not have the power to direct the activities that most significantly impact their economic performance and thus is not considered the primary beneficiary of the entities. Those VIEs are reflected as equity method investments.

Total assets and liabilities for these VIEs were $3.4 million and $0.3 million, respectively, at December 31, 2022 and $5.4 million and $0.3 million, respectively, at December 31, 2021.

Generally, MSP's exposure is limited to its investment in those VIEs (see *Note 5, Investment in Equity Method Investees*). For MAO-MSO Recovery II, LLC and Series PMPI, MSP may be exposed to providing additional recovery services at its own cost if recovery proceeds allocated to it are insufficient to recover the costs of those services. MSP does not have any other exposures or any obligation to provide additional funding.

## Note 11. CLAIMS FINANCING OBLIGATIONS AND NOTES PAYABLE

During the year ended December 31, 2022, the Company finalized an Amendment to Claim Proceeds Investment Agreement and a Warrant Agreement with Brickell Key Investments LP (the "Holder"), pursuant to which the parties have agreed to amend the original Claims Proceeds Investment Agreement ("CPIA") and required payment terms. The Amendment and Warrant Agreement were executed effective September 30, 2022. Pursuant to the agreements, the Company grants to the Holder the right to purchase Class A common shares in the Company (the "Class A Shares") in accordance with the terms and conditions of the Agreement. The maximum amount of Class A Shares that the Holder may purchase from the Company is 66,666,666 (the "Amount") for a purchase price equal to $6,666.67 ($0.0001 per Class A Share) and is payable in cash. This Warrant (the "Warrant") will expire at 5:00 p.m. (Eastern Time), on September 30, 2027 and may be exercised in whole or in part by Holder at any time prior to such date. The Holder can only sell a maximum of 15% per month of the Class A Shares obtained through the Warrant. In exchange for the Company issuing the Warrant, the amounts owed to the Holder pursuant to CPIA are amended to equal $80 million. The Holder has the right to receive the $80 million owed through proceeds as outlined in the CPIA, cash paid by the Company or monetization of the Warrant (through the sale of the Warrant or sale of the underlying Class A Shares). If the Holder monetizes the Warrant, the amount owed will be reduced at a measure of $1.20 per Class A Share. In connection with the Amendment and Warrant Agreement, the Holder also executed a Stock Pledge Agreement (the "Pledge Agreement") with MSP Founders, John H. Ruiz and Frank Quesada (the "Founders"). As part of the agreement, the Founders agreed to pledge 50 million shares to secure payment of the original principal amount of the CPIA. If the Holder were to receive amounts in excess of $80 million, the Founders would receive interest of 10% on the original principal amount of the CPIA. In addition, the Pledge Agreement provides the right to repurchase the Warrant from the Holder on or before June 30, 2023. The Founders entered into an agreement with the Company where this repurchase right has been assigned to the Company (the "Side Agreement"). The Pledge Agreement and Side Agreement were executed effective September 30, 2022. As the Company has, at its option, the ability to pay its obligation through cash proceeds or through monetization of the Warrants, the amount owed as of December 31, 2022 was included as Claims financing obligation and notes payable on the consolidated balance sheet. Also, the liability related to the remaining amounts due was recorded as $80 million as of December 31, 2022 as the Company, at its option, has the ability to repurchase the Warrants for $80 million on or before June 30, 2023. The resulting gain on debt extinguishment from the amendment was $63.4 million and was recorded in Other income (expense), net within the consolidated statement of operations for the year ended December 31, 2022.

Based on Claims financing obligations and notes payable agreements, as of December 31, 2022 and December 31, 2021, the present value of amounts owed under these obligations were $201.3 million and $201.4 million, respectively, including unpaid interest to date of $2.8 million and $94.5 million, respectively. The weighted average interest rate is 6.3% based on the current book value of $201.3 million with rates that range from 2% to 11.04%. The Company is expected to repay these obligations from cash flows from Claim recovery income or potentially through class A common stock issuances.

As of December 31, 2022, the minimum required payments on these agreements are $354.9 million. Certain of these agreements have priority of payment regarding any proceeds until full payment of the balance due is satisfied. The maturity of the commitments range from the date sufficient Claims recoveries are received to cover the required return or in some cases by 2031.

Also, during 2020, the Company obtained funds under the Paycheck Protection Program (the "PPP Loan") in the amount of $1.1 million. Since the amount must be repaid unless forgiven in accordance with the Paycheck Protection Program, the Company accounted for the funds as debt under ASC 470. As of December 31, 2022 and December 31, 2021, the total amount of the PPP Loans have been forgiven.

## Note 12. NONCONTROLLING INTEREST

The non-controlling interest balance primarily represents the Up-C Units of the Company held by the Members. The following table summarizes the ownership of Units in the Company as of December 31, 2022:

|  | Common Units | Ownership Percentage |
|---|---|---|
| Ownership of Class A Common Units | 74,605,284 | 2.3% |
| Ownership of Class V Common Units | 3,147,979,494 | 97.7% |
| Balance at end of period | 3,222,584,778 | 100.0% |

The non-controlling interest holders have the right to exchange Up-C Units, at the Company's option, for (i) cash or (ii) one share of Class A Common Stock, subject to the provisions set forth in the LLC Agreement. As such, future exchanges of Up-C Units by non-controlling interest holders will result in a change in ownership and reduce or increase the amount recorded as non-controlling interest and increase or decrease additional paid-in-capital or retained earnings when the Company has positive or negative net assets, respectively. As of December 31, 2022, 6.5 million Up-C Units have exchanged into Class A shares.

In addition to the non-controlling interest related to Up-C Units, the Company also has non-controlling interests related to the Series as noted in Note 10, Variable Interest Entities, and MAO-MSO Recovery LLC Series FHCP ("FHCP"), which is a non-wholly owned subsidiary of MSP Recovery, LLC. In accordance with FHCP's operating agreement, the noncontrolling member is entitled to a preferred return of 20% per annum (the "Preferred Return"). Once the Preferred Return has been met, the noncontrolling member is entitled to 80% of Claims recovery by FHCP. The controlling member is allocated 100% of the costs of FHCP. Since the Preferred Return exceeds the total members' equity of FHCP as of December 31, 2022 and December 31, 2021, the non-controlling interest also includes $4.3 million representing the entire members' equity of FHCP.

## Note 13. COMMITMENTS AND CONTINGENCIES

The Company is subject to certain legal proceedings, Claims, investigations, and administrative proceedings in the ordinary course of its business. The Company records a provision for a liability when it is both probable that the liability has been incurred and the amount of the liability can be reasonably estimated. These provisions, if any, are reviewed and adjusted to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other information and events pertaining to a particular case. Depending on the nature and timing of any such proceedings that may arise, an unfavorable resolution of a matter could materially affect the Company's future consolidated results of operations, cash flows or financial position in a particular period. As of December 31, 2022, there was no material pending or threatened litigation against us.

The Company pursues Claims recoveries through settlement, arbitration and legal proceedings. The accounting policy for these activities is discussed under Claims recovery income in Note 2, *Basis of presentation and summary of significant accounting policies.*

Approximately 93% of the Company's expected recoveries arise from Claims being brought under the Medicare Secondary Payer Act private cause of action (Section 1862(b)(3)(A) of the Social Security Act (42 U.S.C. § 1395y(b)(3)(A)). This law allows the Company to pursue recoveries against primary payers for reimbursement of medical expenses that the Company's assignors paid for when primary payers (i.e., liability insurers) were responsible for payment. On May 16, 2023, Senators Tim Scott (R-SC) and Maggie Hassan (D-NH) and Representatives Brad Schneider (D-IL) and Gus Bilirakis (R-FL) introduced the Repair Abuses of MSP Payments Act (S.1607/H.R.3388) (the "RAMP Act") in the U.S. Senate and the U.S. House of Representatives, respectively, seeking to amend the private cause of action under the Medicare Secondary Payer Act, by striking "primary plan" and inserting "group health plan" (as defined in paragraph 42 U.S.C. § 1395y(b)(1)(A)(v)).

The Medicare Secondary Payer Act's private cause of action—a fundamental component of how the Company is able to calculate damages—incentivizes private parties, such as MSP Recovery, to pursue reimbursement of conditional payments by rewarding them with double damages. If the Medicare Secondary Payer Act is changed, or if the RAMP Act were enacted to apply retroactively, it could

Table of Contents

significantly reduce the Company's potential recoveries and have a material adverse effect on its business, financial condition, and results of operations.

## Note 14. RELATED PARTY

*Loan from related parties*

During the year ended December 31, 2022, the Company issued an unsecured promissory note in an aggregate principal amount of $112.8 million (the "Promissory Note") to John H. Ruiz and Frank C. Quesada, the Company's Chief Executive Officer and director and Chief Legal Officer and director, respectively (collectively, the "MSP Principals"), to provide cash to pay transaction costs related to the Merger, pay down affiliate payable balances and provide operating cash to the Company. In addition to the amounts in the Promissory Note, at the merger date with LCAP, the MSP Principals contributed $13.0 million through funds that had been loaned to VRM MSP to cover related service fees. The Promissory Note as well as the amount contributed at the merger date bears interest at an annual rate of 4%, payable in kind, and will mature on the four-year anniversary of the issuance. The Promissory Note is payable by the Company at any time, without prepayment penalties, fees, or other expenses. During the year ended December 31, 2022, the Company recorded $2.7 million on interest expense related to the Promissory Note.

A portion of the proceeds under the Promissory Note in an amount equal to $36.5 million was advanced to the Law Firm, an affiliate of certain Members, for certain operating expenses as contemplated by the Legal Services Agreement. This amount is reflected in prepaid expenses and other current assets within the consolidated balance sheets and had a balance of $26.9 million as of December 31, 2022. The payments of Law Firm expenses are reflected in Professional fees - legal within the consolidated statement of operations. The payments are expense as incurred as the Company doesn't have recourse to these amounts, but if the Law Firm earns fees under the legal service agreements (the "Existing LSAs") noted below, the Company would not be obligated to pay these costs until the amount of fees earned were in excess of the payments of Law Firm expenses and payments the Company has made to co-counsels. As of as December 31, 2022, the Company has paid Law Firm expenses and co-counsel fees equal to $21.9 million in excess of the fees earned under the Existing LSAs. Therefore, the Company would not be required to pay or incur expenses through cost of Claims recoveries until the amount of fees earned were in excess of the amounts already paid. As of December 31, 2022, this represents prepayments that would cover recoveries of $109.5 million assuming the 40% fees on the half owned by the Company as fees are not incurred on the half owned by the assignors.

*Legal Services – MSP Recovery Law Firm*

Certain Company entities have previously entered into the Existing LSAs with the Law Firm, an affiliate of certain Members, for the recovery of Claims. Pursuant to the terms of the Existing LSAs, the Law Firm provides the Company with investigation, case management, research and legal services in the pursuit of recovery of Claims in exchange for a portion of the recovered proceeds relating to such Claims. The Existing LSAs also provide that the Law Firm serves as exclusive lead counsel for any litigation relating to such Claims. As of December 31, 2022 there was no amount due as amounts paid through the prepaid noted above had covered amounts of existing LSAs due to the Law Firm for Claim recoveries. As of December 31, 2021, $5.5 million was due to the Law Firm and included in the consolidated balance sheets in Affiliate Payable. For the year ended December 31, 2022, $29.7 million was included in Professional fees - Legal for expenses related to the Law Firm in the consolidated statements of operations. The amounts were largely due to share base compensation as noted below and the payment of Law Firm expenses per the related party loan as noted above. For the years ended December 31, 2021 and 2020, the amounts were de minimis. For the year ended December 31, 2022, $405 thousand were included in cost of Claims recoveries for expenses related to the Law Firm in the consolidated statements of operations. For the years ended December 31, 2021 and 2020, no amounts were included cost of Claims recoveries for expenses related to the Law Firm in the consolidated statements of operations.

The Law Firm may also collect and/or hold cash on behalf of the Company in the ordinary course of business. As of December 31, 2022 and December 31, 2021, $2.1 million and $3.4 million, respectively, was due from the Law Firm and included in the consolidated balance sheets in Affiliate Receivable. In addition, the Company rents office space from the Law Firm as discussed in *Note 8, Short Term Leases*.

For the year ended December 31, 2022, the Company issued 8,022,000 Class A common stock shares to the Law Firm employees, which was deemed to be share based compensation. As such $20.1 million of expense was included within Professional fees - Legal for expenses related to the Law Firm in the consolidated statements of operations for the year ended December 31, 2022.

*MSP Recovery Aviation, LLC*

The Company may make payments related to operational expenses on behalf of its affiliate, MSP Recovery Aviation, LLC ("MSP Aviation"). MSP Aviation was created to provide aircraft rental to third party customers and the Company. The Company has made payments in the periods of the financial statements only related to specifically billed flights and these rates are at or below the market rate for such services. As of both December 31, 2022 and December 31, 2021, $153 thousand was due from MSP Aviation and included in the consolidated balance sheets in Affiliate Receivable. For the year ended December 31, 2022, $400 thousand was included in

Table of Contents

General and Administrative expenses related to MSP Aviation in the consolidated statements of operations. For the year ended December 31, 2021 and 2020, the amounts were de minimis.

*Funds held for other entities*

The Company may collect and/or hold cash on behalf of its affiliates in the ordinary course of business. As of December 31, 2022 and December 31, 2021, $19.8 million and $39.7 million was due to affiliates of the Company and included in the consolidated balance sheets in Affiliate Payable. These amounts were primarily due to Series MRCS, and will be repaid either through excess cash flows from operations or other financing. During the year ended December 31, 2021, the Company also entered into a note payable with Series MRCS as outlined in *Note 7, Intangible Assets, Net*. As of December 31, 2022 and December 31, 2021, the balance of the note payable was $0.5 million and included in the consolidated balance sheets in Claims financing obligation and notes payable.

As of December 31, 2022 and December 31, 2021, there were additional receivables from other affiliates of $148 thousand and $92 thousand, respectively. As of December 31, 2021, $0.4 million was due to MSP National, LLC from Series MRCS. These were included in the consolidated balance sheets in Affiliate Receivable.

*VRM*

Historically, MSP Recovery, LLC has received Claims recovery service income for services provided to VRM MSP. The Company concluded that VRM MSP is a related party due to ownership interests in the entity held by Series MRCS LLC. During the years ended December 31, 2022, 2021 and 2020, $10.6 million, $11.5 million and $13.1 million, respectively, of Claims recovery service income was received from VRM MSP as part of the servicing agreement and was included in the consolidated statements of operations. As of the merger date, the VRM MSP servicing agreement was terminated.

## Note 15. INVESTMENTS IN EQUITY SECURITIES AND OBLIGATIONS TO DELIVER SECURITIES

The Company had an outstanding obligation to provide equity securities (a "short position") as of December 31, 2020. The short position was classified as a liability, marked-to-market and was evaluated at Level 1 for fair value. During the year ended December 31, 2021, the Company covered its short position by acquiring 100,000 equity shares of a publicly traded U.S. company for $1.8 million, recognizing a realized loss of $193 thousand in Other income, net in the consolidated statements of operations. As of December 31, 2022 and December 31, 2021, the Company had no investments in equity securities.

## Note 16. NET LOSS PER COMMON SHARE

Basic earnings per share of Class A common stock is computed by dividing net income attributable to common shareholders by the weighted-average number of shares of Class A common stock outstanding during the period. Diluted earnings per share of Class A common stock is computed by dividing net income attributable to common shareholders adjusted for the assumed exchange of all potentially dilutive securities, by the weighted-average number of shares of Class A common stock outstanding adjusted to give effect to potentially dilutive elements. Diluted loss per share for all period presented is the same as basic loss per share as the inclusion of the potentially issuable shares would be anti-dilutive.

Prior to the Business Combination, the equity structure of MSP Recovery, LLC included units which shared in the profits and losses of MSP Recovery, LLC. In reviewing the calculation of earnings per unit for periods prior to the Business Combination, the Company concluded that it resulted in values that would not be meaningful to the users of the consolidated financial statements. As such, earnings per share information for the year ended December 31, 2021 and 2020 has not been presented. The basic and diluted earnings per share for the year ended December 31, 2022 represent loss from only the period from the Closing Date to December 31, 2022 for the Company.

The following table sets forth the computation of basic and diluted earnings per share of Class A common stock:

| (In thousands except shares and per share amounts) | | Year ended December 31, 2022 |
|---|---|---|
| **Numerator - basic and diluted:** | | |
| Net loss | $ | (401,905) |
| Less: Net loss attributable to MSP Recovery, LLC pre Business Combination | | 28,640 |
| Less: Net loss attributable to the noncontrolling interest post Business Combination | | 365,848 |
| Net loss attributable to common shareholders | $ | (7,417) |
| **Denominator - basic and diluted:** | | |
| Weighted-average shares of Class A common stock outstanding - basic | | 61,825,105 |
| Effect of dilutive securities: | | |
| Weighted-average shares of Class A common stock outstanding - dilutive | | 61,825,105 |
| Earnings per share of Class A common stock - basic | $ | (0.12) |
| Earnings per share of Class A common stock - diluted | $ | (0.12) |

Shares of the Company's Class V common stock do not participate in the earnings or losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted earnings per share of Class V common stock under the two-class method has not been presented.

88

Table of Contents

In the calculation for earnings per share for the year ended December 31, 2022, the Company excluded from the calculation of diluted earnings per share 3,147,979,494 shares of Class V common stock, 3,319,304 Public Warrants outstanding, 66,666,666 CPIA Warrants and 1,028,046,326 shares of New Warrants outstanding because their effect would have been anti-dilutive.

## Note 17. DERIVATIVE LIABILITY

The Company and CF entered into an agreement for an OTC Equity Prepaid Forward Transaction (the "Transaction"). Pursuant to the terms of the Transaction, CF agreed to (a) transfer to the Company for cancellation any warrants to purchase shares received as a result of being the stockholder of record of a share as of the close of business on the closing date of the Business Combination, pursuant to the previously announced and declared LCAP dividend and (b) waive any redemption right that would require the redemption of the Subject Shares (as defined below) in exchange for a pro rata amount of the funds held in LCAP's trust account.

At closing of the Business Combination, the Company transferred from the trust account to an escrow account an amount equal to (a) the aggregate number of such Subject Shares (approximately 1.1 million shares), multiplied by (b) the per share redemption price for shares out of the trust account, as a prepayment to CF of the amount to be paid to CF in settlement of the Transaction for the number of shares owned by CF at the closing of the Business Combination (the "FEF Shares"). CF may sell the Subject Shares at its sole discretion in one or more transactions, publicly or privately. Any such sale shall constitute an optional early termination of the Transaction upon which (a) CF will receive from the escrow account an amount equal to the positive excess, if any, of (x) the product of the redemption price and the aggregate number of shares over (y) an amount equal to the proceeds received by CF in connection with sales of the shares, and (b) the Company will receive from the escrow account the amount set forth in (y) above.

The Company concluded that the instrument includes an embedded derivative for the change in value of the Company's Class A common stock and as such, at the end of each period the Company will mark to market the shares through booking a derivative liability/asset. The calculation of the derivative liability/asset would be the difference between the restricted cash and current fair value of the outstanding FEF shares (number of FEF shares multiplied by market price of the Company's Class A common stock as of period end). As of December 31, 2022, CF had not sold any FEF shares. The aggregate purchase price of $11.4 million is reflected in restricted cash with the fair value of the shares of $1.8 million included as Class A common stock subject to possible redemption within temporary equity and the derivative liability of $9.6 million reflected in current liabilities in the consolidated balance sheets.

## Note 18. QUARTERLY FINANCIAL DATA (UNAUDITED) RESTATEMENT OF PREVIOUSLY ISSUED FINANCIAL STATEMENTS

*Description of Restatement of Financial Information*

Subsequent to the issuance of the interim financial information as of and for the periods ended June 30, 2022 and September 30, 2022, management identified material errors in such financial information. As disclosed within Note 4, Asset Acquisitions, the Company acquired various intangible assets in connection with the Business Combination. The Company identified an error in the accounting for these acquisitions, in that the Class A market price as of the Closing Date utilized in the valuation included the value of the New Warrants, whereas the Up-C Units provided in the acquisition did not have rights to New Warrants. Therefore, the Class A market price didn't equate to the value of the Up-C Units until the opening of the day after the Closing Date when the New Warrants became detached from the Class A shares. This error impacts the intangible assets value that was acquired as of the Closing Date and the resulting amortization of those assets.

In addition, the Company also determined, based on analysis of the rights to cash flows from the Series and the related guaranty obligation, that the Company is the primary beneficiary of the Series, and therefore should consolidate as of the transaction date. This error impacts the intangible assets and indemnification asset value that was acquired as the balance is now reflected in Intangible Assets, net and is therefore amortized rather than recorded as a financial asset; as a result of this change, the indemnification asset is no longer recorded and the Virage Guaranty is accreted through interest expense. The Company's financial statements should also include the activity of the Series from the date of acquisition as it is now consolidated.

As a result of these errors, the Company determined that the valuation of the asset acquisitions and impacts of consolidating the Series were misstated in the Company's financial statements for the periods ending June 30 and September 30, 2022. In the following tables, the Company has presented a reconciliation of its unaudited condensed consolidated financial information as originally reported, to the as restated amounts as of and for the three and six months ended June 30, 2022, and the three and nine months ended September 30, 2022. The restatements will be reflected in the comparative financial statements included in our future filings of our 2023 unaudited condensed consolidated financial statements within our Quarterly Reports on Form 10-Q.

89

The table below sets forth the unaudited condensed consolidated balance sheet information, including the balances as reported, adjustments and the balances as restated:

| *(In thousands except per share amounts)* | For the reporting period June 30, 2022 | | |
| --- | --- | --- | --- |
| | As previously reported | Restatement Adjustments | As Restated |
| **ASSETS** | | | |
| Current assets: | | | |
| Accounts receivable | $ 901 | 17 | $ 918 |
| Indemnification asset | 719,413 | (719,413 ) | - |
| **Total current assets** | **795,780** | **(719,396 )** | **76,384** |
| Deferred tax asset | 857 | (857 ) | - |
| Intangible assets, net | 2,095,735 | 1,441,475 | 3,537,210 |
| Investment in rights to claim recovery cash flows | 3,673,610 | (3,673,610 ) | - |
| **Total assets** | **$ 6,566,932** | **$ (2,952,388 )** | **$ 3,614,544** |
| | | | |
| **Stockholders' Equity (Deficit):** | | | |
| Additional paid-in capital | $ 187,269 | (60,479 ) | $ 126,790 |
| Accumulated deficit | (23,074 ) | (592 ) | (23,666 ) |
| **Total Stockholders' Equity (Deficit)** | **$ 164,517** | **$ (61,071 )** | **$ 103,446** |
| Non-controlling interest | 5,251,837 | (2,891,317 ) | 2,360,520 |
| **Total equity** | **$ 5,416,354** | **$ (2,952,388 )** | **$ 2,463,966** |
| **Total liabilities and equity** | **$ 6,566,932** | **$ (2,952,388 )** | **$ 3,614,544** |

| *(In thousands except per share amounts)* | For the reporting period September 30, 2022 | | |
| --- | --- | --- | --- |
| | As previously reported | Restatement Adjustments | As Restated |
| **ASSETS** | | | |
| Current assets: | | | |
| Accounts receivable | $ 7,525 | 138 | $ 7,663 |
| Indemnification asset | 752,510 | (752,510 ) | - |
| **Total current assets** | **820,157** | **(752,372 )** | **67,785** |
| Deferred tax asset | 857 | (857 ) | - |
| Intangible assets, net | 2,077,571 | 1,395,955 | 3,473,526 |
| Investment in rights to claim recovery cash flows | 3,673,610 | (3,673,610 ) | - |
| **Total assets** | **$ 6,574,675** | **$ (3,030,884 )** | **3,543,791** |
| | | | |
| **Stockholders' Equity (Deficit):** | | | |
| Additional paid-in capital | $ 201,656 | (66,689 ) | $ 134,967 |
| Accumulated deficit | (23,537 ) | (2,201 ) | (25,738 ) |
| **Total Stockholders' Equity (Deficit)** | **$ 178,441** | **$ (68,890 )** | **109,551** |
| Non-controlling interest | 5,213,812 | (2,961,994 ) | 2,251,818 |
| **Total equity** | **$ 5,392,253** | **$ (3,030,884 )** | **2,361,369** |
| **Total liabilities and equity** | **$ 6,574,675** | **$ (3,030,884 )** | **3,543,791** |

90

Table of Contents

The tables below set forth the unaudited condensed consolidated statements of operations, including the balances as reported, adjustments and the as restated balances:

| | For the three months ended June 30, 2022 | | | For the six months ended June 30, 2022 | | |
|---|---|---|---|---|---|---|
| *(In thousands except per share amounts)* | As Reported | Restatement Adjustments | As Restated | As Reported | Restatement Adjustments | As Restated |
| Claims recovery income | $ 1,319 | 38 | $ 1,357 | $ 1,428 | 38 | $ 1,466 |
| Claims recovery service income | 3,971 | - | 3,971 | 12,047 | - | 12,047 |
| **Total Claims Recovery** | $ 5,290 | $ 38 | $ 5,328 | $ 13,475 | $ 38 | $ 13,513 |
| Operating expenses | | | | | | |
| Cost of claim recoveries | 694 | 8 | 702 | 701 | 8 | 709 |
| Claims amortization expense | 23,818 | 15,173 | 38,991 | 26,535 | 15,173 | 41,708 |
| Professional fees | 3,118 | 13 | 3,131 | 5,056 | 13 | 5,069 |
| Total operating expenses | 57,449 | 15,194 | 72,643 | 69,108 | 15,194 | 84,302 |
| **Operating Loss** | $ (52,159) | $ (15,156) | $ (67,315) | $ (55,633) | $ (15,156) | $ (70,789) |
| Interest expense | (10,977) | (13,375) | (24,352) | (21,392) | (13,375) | (34,767) |
| Net loss before provision for income taxes | $ (77,450) | $ (28,531) | $ (105,981) | $ (91,341) | $ (28,531) | $ (119,872) |
| Provision for income tax benefit (expense) | 326 | (326) | - | 326 | (326) | - |
| Net loss | $ (77,124) | $ (28,857) | $ (105,981) | $ (91,015) | $ (28,857) | $ (119,872) |
| Less: Net (income) loss attributable to non-controlling members | 75,836 | 28,265 | 104,101 | 89,727 | 28,265 | 117,992 |
| Net loss attributable to controlling members | $ (1,288) | $ (592) | $ (1,880) | $ (1,288) | $ (592) | $ (1,880) |
| | | | | | | |
| Basic and diluted weighted average shares outstanding, Class A Common Stock | 13,607,255 | N/A | 13,607,255 | 13,607,255 | N/A | 13,607,255 |
| Basic and diluted net income per share, Class A Common Stock | $ (0.09) | N/A | $ (0.14) | $ (0.09) | N/A | $ (0.14) |

| | For the three months ended September 30, 2022 | | | For the nine months ended September 30, 2022 | | |
|---|---|---|---|---|---|---|
| *(In thousands except per share amounts)* | As Reported | Restatement Adjustments | As Restated | As Reported | Restatement Adjustments | As Restated |
| Claims recovery income | $ 2,571 | 188 | $ 2,759 | $ 3,999 | 226 | $ 4,225 |
| **Total Claims Recovery** | $ 8,319 | $ 188 | $ 8,507 | $ 21,794 | $ 226 | $ 22,020 |
| Operating expenses | | | | | | |
| Cost of claim recoveries | 1,160 | 38 | 1,198 | 1,861 | 45 | 1,906 |
| Claims amortization expense | 66,331 | 45,520 | 111,851 | 92,866 | 60,694 | 153,560 |
| Professional fees | 5,875 | 29 | 5,904 | 10,931 | 42 | 10,973 |
| Total operating expenses | 88,104 | 45,587 | 133,691 | 157,212 | 60,781 | 217,993 |
| **Operating Loss** | $ (79,785) | $ (45,399) | $ (125,184) | $ (135,418) | $ (60,555) | $ (195,973) |
| Interest expense | (13,083) | (33,097) | (46,180) | (34,475) | (46,472) | (80,947) |
| Net loss before provision for income taxes | $ (27,060) | $ (78,496) | $ (105,556) | $ (118,401) | $ (107,027) | $ (225,428) |
| Provision for income tax benefit (expense) | - | - | - | 326 | (326) | - |
| Net loss | $ (27,060) | $ (78,496) | $ (105,556) | $ (118,075) | $ (107,353) | $ (225,428) |
| Less: Net (income) loss attributable to non-controlling members | 26,597 | 76,887 | 103,484 | 116,324 | 105,152 | 221,476 |
| Net loss attributable to controlling members | $ (463) | $ (1,609) | $ (2,072) | $ (1,751) | $ (2,201) | $ (3,952) |

| | | | | | |
|---|---|---|---|---|---|
| Basic and diluted weighted average shares outstanding, Class A Common Stock | 69,036,899 | — | 69,036,899 | 53,138,474 | — | 53,138,474 |
| Basic and diluted net income per share, Class A Common Stock | $ (0.01) | $ (0.02) | $ (0.03) | $ (0.03) | $ (0.04) | $ (0.07) |

91

Table of Contents

The table below sets forth the unaudited condensed consolidated statements of cash flows, including balances as reported, adjustments and balances as restated amounts. Note that only amounts that have changed have been disclosed:

| (In thousands) | As Previously Reported | For the six months ended June 30, Restatement Adjustments | As Restated |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net loss | $ (91,015) | $ (28,857) | $ (119,872) |
| Claims amortization expense | 26,535 | 15,173 | 41,708 |
| Paid in kind interest | 21,369 | 13,375 | 34,744 |
| Deferred income taxes | (857) | 326 | (531) |
| **Change in operating assets and liabilities:** | | | |
| Accounts receivable | (901) | (17) | (918) |
| **Net cash used in operating activities** | **(60,912)** | **—** | **(60,912)** |
| **Net cash used in investing activities** | **(3,015)** | **—** | **(3,015)** |
| **Net cash provided by (used in) financing activities** | **98,728** | **—** | **98,728** |

| (In thousands) | As Previously Reported | For the nine months ended September 30, 2022 Restatement Adjustments | As Restated |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net loss | $ (118,075) | $ (107,353) | $ (225,428) |
| Claims amortization expense | 92,866 | 60,694 | $ 153,560 |
| Paid in kind interest | 34,475 | 46,472 | $ 80,947 |
| Deferred income taxes | (857) | 326 | $ (531) |
| Accounts receivable | (7,525) | (139) | $ (7,664) |
| **Net cash used in operating activities** | **(70,764)** | **—** | **(70,764)** |
| **Net cash used in investing activities** | **(4,563)** | **—** | **(4,563)** |
| **Net cash provided by (used in) financing activities** | **99,351** | **—** | **99,351** |

92

The table below sets forth the unaudited condensed consolidated statements of changes in equity, including balances as reported, adjustments and balances as restated amounts. Note that only amounts that have changed have been disclosed:

| | For the reporting period June 30, 2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | | | | Restatement Adjustments | | | | As Restated | | | |
| *(In thousands except shares)* | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity |
| **Balance at December 31, 2021** | $ — | $ — | $ 4,348 | $ (151,408) | | | | | $ — | $ — | $ 4,348 | $ (151,408) |
| Contributions prior to recapitalization transaction | — | — | — | 15 | | | | | — | — | — | 15 |
| Distributions prior to recapitalization transaction | — | — | — | (147) | | | | | — | — | — | (147) |
| Net loss prior to recapitalization transaction | — | — | — | (28,640) | | | | | — | — | — | (28,640) |
| Cumulative effect of recapitalization transaction | 48,773 | — | 5,406,736 | 5,640,353 | (7,496) | | (2,915,985) | (2,923,481) | 41,277 | — | 2,490,751 | 2,716,872 |
| Opening net assets of Lionheart II Holdings, LLC acquired | — | (21,786) | — | (21,786) | | | | | — | (21,786) | — | (21,786) |
| Adjustment for value of derivative on temporary equity | 9,003 | — | — | 9,003 | | | | | 9,003 | — | — | 9,003 |
| Conversion of Warrants | 20,462 | — | (12,287) | 8,177 | (6,627) | | | (6,627) | 13,835 | — | (12,287) | 1,550 |
| Class A Issuances | 109,031 | — | (85,872) | 23,164 | (46,356) | | | (46,356) | 62,675 | — | (85,872) | (23,192) |
| Net loss | — | (1,288) | (61,088) | (62,376) | | (592) | 24,668 | 24,075 | — | (1,880) | (36,420) | (38,301) |
| **Balance at June 30, 2022** | $ 187,269 | $ (23,074) | $ 5,251,837 | $ 5,416,354 | $ (60,479) | $ (592) | $ (2,891,317) | $ (2,952,388) | $ 126,790 | $ (23,666) | $ 2,360,520 | $ 2,463,966 |

93

https://www.sec.gov/Archives/edgar/data/1802450/0000095017023034839/mspr-20221231.htm

151/185

Table of Contents

| (In thousands except shares) | As Previously Reported | | | | Restatement Adjustments | | | | As Restated | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity |
| Balance at December 31, 2021 | $ — | $ — | $ 4,348 | $ (151,408) | | | | | $ — | $ — | $ 4,348 | $ (151,408) |
| Contributions prior to recapitalization transaction | — | — | — | 15 | | | | | — | — | — | 15 |
| Distributions prior to recapitalization transaction | — | — | — | (147) | | | | | — | — | — | (147) |
| Net loss prior to recapitalization transaction | — | — | — | (28,640) | | | | | — | — | — | (28,640) |
| Cumulative effect of recapitalization transaction | 48,773 | — | 5,406,736 | 5,640,352 | (7,496) | | (2,915,985) | (2,923,481) | 41,277 | — | 2,490,751 | 2,716,871 |
| Opening net assets of Lionheart II Holdings, LLC acquired | — | (21,786) | — | (21,786) | | | | | — | (21,786) | — | (21,786) |
| Adjustment for value of derivative on temporary equity | 10,065 | — | — | 10,065 | | | | | 10,065 | — | — | 10,065 |
| Conversion of Warrants | 22,895 | — | (13,444) | 9,452 | (7,255) | | | (7,255) | 15,640 | — | (13,444) | 2,197 |
| Class A Issuances | 119,923 | — | (96,144) | 23,785 | (51,938) | | | (51,938) | 67,985 | — | (96,144) | (28,153) |
| Net loss | — | (1,751) | (87,684) | (89,435) | | (2,201) | (46,009) | (48,210) | — | (3,952) | (133,693) | (137,645) |
| Balance at September 30, 2022 | $ 201,656 | $ (23,537) | $ 5,213,812 | $ 5,392,253 | $ (66,689) | $ (2,201) | $ (2,961,994) | $ (3,030,884) | $ 134,967 | $ (25,738) | $ 2,251,818 | $ 2,361,369 |

*For the reporting period September 30, 2022*

## Note 19. SUBSEQUENT EVENTS

### Hazel Transactions

On March 29, 2023 (and amended on July 17, 2023), the Company entered into a membership interest purchase agreement with Hazel, whereby in exchange for a stated purchase price of $390 million, the Company acquired from Hazel interests in certain Claims recovery and reimbursement rights (the "Claims Purchase"). The purchase price for the Claims Purchase was funded by (i) the proceeds from the Claims Sale (as defined below), and (ii) a purchase money loan between Hazel, as lender, and the Company, as borrower, in the amount of $250 million (the "Purchase Money Loan").

On March 29, 2023, the Company entered into a membership interest purchase agreement with Hazel, whereby in exchange for a purchase price of $150 million, Hazel acquired from the Company the membership interests in entities that own certain other Claims recovery and reimbursement rights, provided that the Company and Hazel will share in the recovery proceeds therefrom in accordance with an agreed waterfall (the "Claims Sale," and together with the Claims Purchase, the "Claims Transactions").

In addition, on March 29, 2023, the Company entered into an Amended and Restated Credit Agreement (the "Working Capital Credit Facility") with affiliates of Hazel, as the lender and administrative agent, which provides for up to $80 million (with a 40% original issue discount), consisting of a Term Loan A commitment to fund up to $30 million (in multiple installments) in proceeds, and a Term Loan B Commitment to fund up to $18 million (in multiple installments) in proceeds, the funding of each conditioned on certain milestones. An initial $10 million in proceeds was drawn under the Term Loan A on March 6, 2023. On March 29, 2023, an additional $5 million was disbursed to the Company under the Term Loan A. On May 11, 2023 and June 13, 2023, Hazel notified us that it would

94

Table of Contents

not disburse additional funds under the Working Capital Credit Facility until the Company satisfies certain funding conditions, including the filing of this Annual Report on Form 10-K. The parties subsequently agreed that $5.5 million will be funded under Term Loan A in accordance with the terms of the Working Capital Credit Facility subsequent to the filing of this 2022 Form 10-K and receipt of funding notices, deeming funding conditions satisfied or waived. Following such funding, the Term Loan A commitment would be terminated, with total funding of $20.5 million. In addition, the parties agreed to increase the Term Loan B commitment from $18 million to $27.5 million, which will be funded in multiple installments and in accordance with the terms of the Working Capital Credit Facility.

Loans under the Working Capital Credit Facility accrue interest at a Term Secured Overnight Financing Rate for 12-month interest period, plus an applicable margin of 10% per annum. Accrued interest on the Working Capital Credit Facility is payable in kind and will be capitalized. The Working Capital Credit Facility has a stated maturity date of March 31, 2026, and Hazel may extend for up to one year in its sole discretion. The Purchase Money Loan accrues interest at a rate of 20% per annum, payable in kind or in cash at the Company's discretion. The Purchase Money Loan has a maturity date of March 31, 2026, extendable up to one year in Hazel's sole discretion.

The Company is permitted to prepay the loans under the Working Capital Credit Facility from time to time without prepayment premium. Prepayment of the Purchase Money Loans will be permitted after the prepayment or repayment of loans under the Working Capital Loans, and such prepayment of the Purchase Money Loans may be subject to prepayment penalty, as applicable.

The Purchase Money Loan and the Working Capital Credit Agreement contains certain representations, warranties and covenants of the Company and its subsidiaries, including restrictions on debt incurrence, liens, investments, affiliate transactions, distributions and dividends, fundamental changes, certain debt prepayments and Claim settlement.

Amounts borrowed and obligations under the Purchase Money Loan and the Working Capital Credit Facility are secured by a pledge of proceeds from certain Claims in the Company's Claims portfolio, with the lien securing the Purchase Money Loan being subordinated and junior to the lien securing the Working Capital Credit Facility. Pursuant to the Purchase Money Loan and the Working Capital Credit Facility, the Company entered into a collateral administrative agreement between the Company and Hazel, which sets forth certain arrangements between the Company and Hazel in relation to the management of the litigation of certain Claims owned by the Company, the proceeds of which were pledged to Hazel to secure the Purchase Money Loan and the Working Capital Credit Facility.

**Yorkville Facility**

Refer to Note 1 - *Description of the Business* of this Form 10-K.

**Virage Amendment**

On April 12, 2023, we entered into an amendment (the "Virage MTA Amendment") to the Virage MTA and Virage Guaranty pursuant to which the payment date was extended from May 23, 2023 until September 30, 2024, subject to acceleration upon certain triggering events. The guaranty obligation will become current at September 30, 2023, and the Company does not currently have available liquidity to satisfy such obligations. Under the Virage MTA Amendment, Virage will receive a first priority lien on all sources of revenue of the company not otherwise encumbered as of the date of the Virage MTA Amendment, to the extent in excess of the amount of revenues necessary to establish and maintain an operating reserve of $70 million for overhead expenses and applicable taxes.

On January 1, 2024, if the Virage Guaranty is not paid, the Company will be required to make a one-time, lump sum payment to Virage for the period starting May 24, 2023 and ending December 31, 2023, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock for the five day period prior to the issuance. If paid in warrants, such warrants will expire on January 1, 2026.

Further, for each calendar month beginning with January 31, 2024 until the obligations to Virage are paid in full, the Company has agreed to pay to Virage an amount monthly, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock. If paid in warrants, such warrants will expire two years from the date of issuance.

Table of Contents

The warrants will contain customary provisions for a transaction of this type, including that each warrant will be exercisable in whole or in part at any time prior to the expiration date, be freely transferable, subject only to applicable securities laws, and be subject to customary anti-dilution protection regarding the exercise price and number of shares of Class A Common Stock to be issued upon the exercise of each warrant.

**Amended and Restated Nomura Promissory Note**

On April 12, 2023, the Company amended the promissory note to Nomura originally issued on May 27, 2022, which amendment increased the principal amount to approximately $26.3 million and extended the maturity date of the promissory note to September 30, 2024. The note will become current at September 30, 2023, and the Company does not currently have available liquidity to satisfy said obligation. The amended note carries an interest rate of 16% per annum and is payable in kind or in cash, at the Company's discretion, every 30 calendar days after April 12, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the promissory note together with all accrued and unpaid interest thereon.

**Cano Health Share Issuance**

On July 7, 2023, the Company issued 199,000,001 shares of Class A common stock to Cano Health, LLC ("Cano") as payment for $61,677,419.35 million dollars in deferred compensation related to the following agreements, which the Company had the option to pay in cash or in stock and has elected to pay in stock, of which (i) 80,645,162 shares of Common Stock were issued as a deferred consideration for the assignment of certain claims pursuant to that certain Purchase Agreement, effective as of September 30, 2022, as amended to date, by and between the Company and Cano, and (ii) 118,354,839 shares of Common Stock were issued as deferred consideration for the assignment of certain claims pursuant to that certain Amended and Restated Claims Recovery and Assignment Agreement effective as of December 31, 2021, as amended to date, by and between the Company and Cano.

96

Table of Contents

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

Not applicable.

## Item 9A. Controls and Procedures.

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

### *Evaluation of Disclosure Controls and Procedures*

Management, including our Chief Executive Officer and Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Management is likewise required, on a quarterly basis, to evaluate the effectiveness of its internal controls and to disclose any changes and material weaknesses identified through such evaluation of those internal controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis. Effective internal controls are necessary for us to provide reliable financial reports and prevent fraud. As required by Rules 13a-15 and 15d-15 under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2022. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were not effective, due to the material weaknesses related to the items noted below. To address these material weaknesses, we performed additional analysis as deemed necessary to ensure that our financial statements were prepared in accordance with U.S. GAAP. Based on such analysis and notwithstanding the identified material weaknesses, management, including our Chief Executive Officer and Chief Financial Officer, believe the consolidated financial statements included in this Annual Report fairly represent in all material respects our financial condition, results of operations and cash flows at and for the periods presented in accordance with U.S. GAAP.

### *Management's Report on Internal Control over Financial Reporting*

This Annual Report on Form 10-K does not include a report of management's assessment regarding internal control over financial reporting as allowed by the SEC for newly public companies. We completed the Business Combination on May 23, 2022 pursuant to which we acquired MSP Recovery, LLC. Prior to the Business Combination, we were a special purpose acquisition company (formerly known as Lionheart Acquisition Corporation II), which was formed for the purpose of effecting a merger, recapitalization, reorganization or similar business combination with one or more businesses. The existing internal controls prior to the Business Combination are no longer applicable as of the assessment date as our operations prior to the Business Combination were insignificant compared to those of the post combination consolidated entity. Additionally, as we are an "emerging growth company" as defined under the JOBS Act, we are subject to reduced public company reporting requirements. The JOBS Act provides that an emerging growth company is not required to have the effectiveness of such company's internal control over financial reporting audited by its external auditors for as long as such company is deemed to be an emerging growth company.

### *Material Weaknesses*

As of December 31, 2021 and 2020, we identified the following material weaknesses in our internal controls over financial reporting. The material weaknesses we identified were as follows:

- We did not have sufficient accounting and financial reporting resources to address our financial reporting requirements. Specifically:

    o We did not have sufficient resources with an appropriate level of knowledge and GAAP expertise to identify, evaluate and account for transactions; and

    o We did not have an adequate segregation of duties or appropriate level of review that is needed to comply with financial reporting requirements.

Table of Contents

- We did not design, implement or maintain an effective control environment over our financial reporting requirements. Specifically:

  o We did not have effective controls over the period end financial reporting process and preparation of financial statements due to:

    ▪ A lack of a sufficient level of formal accounting policies and procedures that define how transactions should be initiated, recorded, processed and reported; and

    ▪ A lack of an effective control environment over period end close procedures.

  o We did not have appropriate controls or documented segregation of duties over information technology systems used to create or maintain financial reporting records;

  o We did not design or maintain the appropriate controls related to the separation of accounting records for each entity included within our combined and consolidated financial statements.

As of December 31, 2022, we identified material weaknesses in our internal control over financial reporting. The material weaknesses we identified were as follows:

- We did not have sufficient controls related to the accounting for complex transactions.

- We did not have sufficient controls over the human resources and payroll processes. Specifically:

  o Insufficient design of controls as the outsourced system used for payroll did not have appropriate service organization report and we did not have appropriate compensating controls or documented segregation of duties over the system used for payroll;

  o Insufficient design of controls resulting in a lack of an effective control environment over payroll entries;

  o Insufficient design of controls within our human resources business process.

  o Insufficient design of controls resulting in a lack of proper documentation over approval of bonus payments.

- Insufficient design of controls as we did not have appropriate segregation of duties and review controls over cash disbursements.

A special committee of the board of directors made unanimous recommendations to enhance and improve the public company reporting capabilities of the Company, including but not limited to:

- The implementation of certain management training,

- The hiring of a director of internal audit, and

- Enhancements to the Company's internal communication process, as well as increased reporting to the Audit Committee of Board of Directors.

We consider these recommendations to be indicative of material weaknesses related to a failure to develop or maintain an effective system of internal disclosure controls for the timely disclosure of material communications from external sources to the Company's management and Board of Directors for review and evaluation. Specifically, the material weaknesses we identified were as follows:

- We did not have sufficient controls related to training personnel to understand their respective roles and responsibilities.

- We did not have sufficient monitoring activities, including a director of internal audit.

- We did not have sufficient lines of communication internally and to the Board of Directors, and therefore did not maintain a sufficient control environment with respect to oversight of the Board of Directors.

These control deficiencies resulted in a misstatement in our accounts or disclosures that resulted in a material misstatement to the previously filed interim unaudited financial statements. Accordingly, we determined that these control deficiencies constitute material weaknesses.

98

*Remediation Plan*

As of December 31, 2022, we have implemented measures, which addressed certain material weaknesses noted as of December 31, 2021. The following items were implemented and operated effectively as of December 31, 2022:

- To address lack of appropriate accounting and financial reporting resources and segregation of duties:

  o We hired key accounting personnel with appropriate levels of U.S. generally accepted accounting principles expertise and financial reporting knowledge and experience.

  o We completed a segregation of duty review over financial reporting and implemented changes to address any deficiencies.

- To address lack of effective control environment over our financial reporting requirements:

  o We developed formal accounting policies and procedures.

  o We designed a control environment over how transactions are initiated, recorded, processed and reported, and implemented period end close procedures.

  o We have implemented certain accounting and information technology systems to automate manual processes, to help implement segregation of duties and to assist in consolidation and period end close.

While we have implemented these measures and these have remediated the material weaknesses noted as of December 31, 2021, except for those material weaknesses noted as of December 31, 2022, there is no assurance that we have identified all material weaknesses or that there will not be additional material weaknesses or deficiencies that are identified. We are in the process of implementing measures designed to remediate the control deficiencies that led to the material weaknesses as of December 31, 2022. During 2023, we have:

- To address the material weaknesses in internal controls related to the accounting for complex financial instruments:

  o We are in process of implementing further controls over the review of complex financial instruments, which may include engaging outside advisors with specialist knowledge of GAAP and valuation.

- Within the human resources and payroll processes:

  o We have identified potential human resource outsourced vendors and have begun designing and implementing payroll and human resource related controls.

  o We have also identified third party payroll service providers with sufficient service organization reports that we expect will allow us to rely on the system once we implement appropriate complimentary user controls.

- To address segregation of duties over cash disbursement:

  o We have begun designing and implementing appropriate segregation of duties over disbursements during the current year and added controls to review cash disbursements made prior to this implementation.

In order to address the material weaknesses identified by the special committee, the special committee made recommendations to enhance and improve the public company reporting capabilities of the Company, including but not limited to:

- Enhancing development of the control environment with the implementation of certain management training,

- The hiring of a director of internal audit to improve the monitoring and effectiveness of internal controls, and

- Enhancements to the Company's internal communication process to support controls and increase reporting to the Audit Committee of Board of Directors to allow for more effective exercise of oversight responsibilities.

We intend to implement such recommendations to remediate the weaknesses identified by the special committee.

Neither our Company, nor our independent registered public accounting firm, were required to perform an evaluation of the Company's internal control over financial reporting as of December 31, 2022 in accordance with the provisions of the Sarbanes-Oxley Act and, as such, there is no assurance that we have identified all material weaknesses or that there will not be additional material weaknesses or deficiencies that are identified. While our independent registered public accounting firm is not required to audit the effectiveness of our internal control over financial reporting until after we are no longer an "emerging growth company" as defined in the JOBS Act, a failure to design, implement or maintain effective internal control over financial reporting could adversely affect the results of annual independent registered public accounting firm audit reports regarding the effectiveness of the Company's internal control over financial reporting that we will eventually be required to include in reports that will be filed with the SEC. If the continued existence of one or more material weaknesses in the Company's internal control over financial reporting persist, this could have a

material and adverse effect on our business, results of operations and financial condition, and it could cause a decline in the trading price of the Company's Class A common stock.

*Changes in Internal Control Over Financial Reporting*

Outside of the material weaknesses noted above, there were no changes in our internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. Other Information.

Not applicable.

### Item 9C. Disclosure Regarding Foreign Jurisdiction that Prevent Inspections.

Not applicable.

100

Table of Contents

## PART III

### Item 10. Directors, Executive Officers and Corporate Governance.

**Management and Board of Directors**

The following sets forth certain information, as of June 30, 2023, concerning the persons who serve as executive officers and members of the Board following.

| Name | Age | Position |
|------|-----|----------|
| *Directors* | | |
| John H. Ruiz | 56 | Class III Director |
| Frank C. Quesada | 43 | Class III Director |
| Ophir Sternberg | 53 | Class III Director |
| Beatriz Assapimonwait | 61 | Class I Director |
| Michael F. Arrigo | 64 | Class II Director |
| Thomas W. Hawkins | 62 | Class II Director |
| Roger Meltzer | 72 | Class I Director |
| | | |
| *Executive Officers* | | |
| John H. Ruiz | 56 | Chief Executive Officer |
| Frank C. Quesada | 43 | Chief Legal Officer |
| Ricardo Rivera | 51 | Chief Operating Officer & Interim Chief Financial Officer |
| Alexandra Plasencia | 38 | General Counsel |

**Information about Executive Officers and Directors**
*Directors*

**John H. Ruiz**. John Ruiz is a founder of LifeWallet and has served as Chief Executive Officer since the Company's inception (in 2014 as MSP Recovery). Mr. Ruiz was named one of Lawyers of Distinction's "2023 Power Lawyers," for his accomplishments in healthcare law. He was also named "2019's DBR Florida Trailblazer," for his work in integrating data analytics into the practice of law, and for its positive impact on healthcare recoveries across the mainland U.S. and Puerto Rico. Over the course of his 30-year legal career, Mr. Ruiz has gained national recognition in class action, mass tort litigation, MDL consolidated cases, medical malpractice, products liability, personal injury, real estate, and aviation disaster cases. Recently, Mr. Ruiz led the legal strategy in the landmark victory handed down by the U.S. Court of Appeals for the Eleventh Circuit, in MSP Recovery Claims Series v. Ace American (11th Cir.). In addition, he has certified more than 100 class actions and led MSP's participation in Humana v. Western Heritage (11th Cir.), MSP Recovery v. Allstate (11th Cir.), and MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co. (11th Cir.). Mr. Ruiz has been involved as counsel in cases that have totaled more than $20 billion in settlements. These class actions resulted in some of the largest awards in Florida against major insurance companies. In total, Mr. Ruiz has certified class actions against major car insurers in the State of Florida, resulting in the current and potential redistribution of billions of dollars in improperly paid claims spanning a period of more than 10 years. Starting as early as 1996, Mr. Ruiz filed class-action lawsuits on behalf of more than 30,000 Miami-Dade County residents against the Florida Department of Agriculture for trespassing onto the private properties of homeowners and chopping down their citrus trees without any compensation. The case was ultimately certified, and the Department of Agriculture directly compensated all members of the aggrieved class. In 2001, Mr. Ruiz represented consumers in a class action lawsuit against Firestone that resulted in dozens of fatalities and thousands of serious blowouts. Mr. Ruiz was also hired as local counsel by numerous out of state law firms that had pending cases in Florida courts. The cases in aggregate settled for more than $30 million. Mr. Ruiz also represented the families of crash victims in a wrongful death suit against Chalk's International Ocean Airway. Mr. Ruiz was the first lawyer to file a limited fund class action. The case settled for a confidential agreed amount. Mr. Ruiz is licensed to practice before the Court of Appeals for the Fourth Circuit, the US Court of Appeals for the Second Circuit, the US Court of Appeals for the Third Circuit, and the Florida Supreme Court.

**Frank C. Quesada**. Frank C. Quesada is a founding member of LifeWallet and has served as Chief Legal Officer since its inception. Mr. Quesada is also a Partner at MSP Recovery Law Firm. With over 16 years of healthcare and complex commercial litigation experience, Mr. Quesada oversees LifeWallet's in-house attorneys and several nationally recognized law firms that assist MSP Recovery Law Firm in their recovery efforts. Additionally, he develops LifeWallet's legal strategies and spearheads execution. Notably, Mr. Quesada led the execution of federal appellate strategies in MSP Recovery cases resulting in landmark legal victories and new Medicare Secondary Payer Act precedent benefitting Medicare entities across the country. These legal victories include MSP Recovery v. Allstate (11th Cir.), MSPA Claims 1 v. Tenet (11th Cir.), MSPA Claims 1 v. Kingsway Amigo (11th Cir.), and MSP

Table of Contents

Recovery Claims Series v. Ace American (11th Cir.). Mr. Quesada currently serves on the Board of Directors of USA Water Polo, Inc.

**Ophir Sternberg**. Ophir Sternberg is a Board Member of the Company, and was previously the Chairman, President and Chief Executive Officer of Lionheart Acquisition Corporation II, the SPAC through which LifeWallet became a publicly traded company. Mr. Sternberg has over 30 years of experience acquiring, developing, repositioning, and investing in all segments of the real estate industry, including office, retail, ultra-luxury residential condominiums, hospitality, industrial, and land acquisitions. Mr. Sternberg is the Founder and Chief Executive Officer of Miami/Fort Lauderdale based Lionheart Capital, founded in 2010. Mr. Sternberg began his career assembling, acquiring, and developing properties in emerging neighborhoods in New York City, which established his reputation for identifying assets with unrealized potential and combining innovative partnerships with efficient financing structures to realize above average returns. Mr. Sternberg came to the United States in 1993 after completing three years of military service within an elite combat unit for the Israeli Defense Forces. Under Mr. Sternberg's leadership, Lionheart Capital executed numerous prominent real estate transactions and repositions, including The Ritz-Carlton Residences in Miami Beach, which resulted in a total sell-out value in excess of $550 million, as well as purchase of the development's site, the former Miami Heart Institute. Additionally, Mr. Sternberg led the $120 million sale of The Seagull Hotel, making it the highest grossing hotel sale of 2020 in Miami Beach. Mr. Sternberg and Lionheart Capital are currently in development on a number of other projects, including retail properties in Miami's fashion and culture epicenter, The Design District and a pre-war building located in the Gold Coast of Greenwich Village and built in 1928. In addition to The Ritz-Carlton Residences, Miami Beach, Lionheart Capital also partnered with Ritz-Carlton to brand The Ritz-Carlton Residences Singer Island, Palm Beach, cementing a reputation for bringing to market high-end luxury branded properties. In 2017, Mr. Sternberg founded Out of the Box Ventures, LLC, a Lionheart Capital subsidiary, to acquire and reposition distressed retail properties throughout the United States. With 13 properties in 10 states, Out of the Box Ventures currently controls over 3 million square feet of big box stores, shopping centers, and enclosed regional mall properties with plans to improve and expand upon these acquisitions. Mr. Sternberg and Lionheart Capital are dedicated to working with best-in-class operators and partners such as Marriott International. Lionheart Capital has been able to execute numerous, marquee transactions due largely to Mr. Sternberg's extensive industry relationships particularly with key institutional investors. In March 2020, Mr. Sternberg became Chairman of Nasdaq-listed OPES, and on June 30, 2020, announced the SPAC's initial business combination with BurgerFi, a fast-casual "better burger" concept that consists of approximately 120 restaurants nationally and internationally. The OPES-BurgerFi business combination closed on December 16, 2020 and Mr. Sternberg is the Executive Chairman of the post-combination Nasdaq-listed company, BurgerFi International, Inc. (NASDAQ: BFI). The OPES team, led by Mr. Sternberg, evaluated over 50 potential targets and negotiated business combination terms with multiple candidates in a span of a few months and acquired BurgerFi at what it believed was an attractive multiple relative to its peers. On October 11, 2021, BurgerFi, led by Ophir Sternberg as Executive Chairman, announced the acquisition of Anthony's Coal Fired Pizza & Wings, creating a multi-brand platform of premium casual restaurant concepts. With the acquisition of Anthony's, BurgerFi now has 180 systemwide restaurant locations across the country through its two premium casual dining brands, with 61 Anthony's locations and 119 BurgerFi locations. In May 2021, Lionheart Capital acquired the legendary and iconic American speed boat racing brand, Cigarette Racing Team, synonymous with custom-made, handcrafted, high-powered luxury performance powerboats. The Cigarette brand has grown in sophistication, becoming a product excellence company which focuses on impeccable engineering and beautiful design. Cigarette now builds the finest powerboats for the most loyal and discriminating performance boaters, using only the best in materials, technology, and workmanship. Mr. Sternberg is also the Chairman, President, and Chief Executive Officer of Lionheart III Corp, a SPAC that was originally formed for a $100 million raise, but on November 8, 2021, closed on its initial public offering at an upsized $125 million. Lionheart III Corp, under the ticker symbol LION, was welcomed into the Nasdaq family. On July 26, 2022, Lionheart III announced its business combination agreement with Security Matters Limited ("SMX") (ASX:SMX), a publicly traded company on the Australian Securities Exchange, bringing the expected combined entity value to $360M. SMX creates a sustainable system within the current supply chain, designed for the 21st century economy. The SMX business combination closed on March 8, 2023.

**Beatriz Assapimonwait**. Beatriz (Betty) Assapimonwait has over 40 years of experience in the managed health care industry. Ms. Assapimonwait was, up until August 2021, Regional President for the South Florida region at Humana Inc. (NYSE:HUM) ("Humana"), one of the largest private insurance health insurers in the U.S. with a focus on administering Medicare Advantage plans. In her role at Humana, Ms. Assapimonwait was responsible for developing market strategies and leading all market operations for all Medicare lines of business, including HMOs and PPOs for the South Florida region. Prior to her role at Humana, she served as CEO of Family Physicians of Winter Park, Inc., until its acquisition by Humana, where from December 2016 to July 2019, she led the strategic and operational efforts of a global risk MSO with 22 primary clinics in the Central Florida Region. Additionally, she served as the Vice President of Medicare Advantage Prescription Drug Plans at Aetna, Inc. from November 2014 to November 2016; Chief Operations Officer at Innovacare Health, from January 2014 to October 2014; Founder and President of Seven Stars Quality Healthcare, from July 2013 to December 2013; and Regional President for the North Florida region at Humana, from January 2009 to June 2013. Ms. Assapimonwait was appointed to serve on the board of directors of CareMax Inc. (Nasdaq:CMAX) in September 2021 and also serves as the Chair of the Strategy and Operations Committee since September 2021. She earned her Bachelor of Arts degree from Florida International University in 1983, and is certified in Healthcare Compliance by the Health Care Compliance Association and in HIPAA Compliance from Kennesaw State University. She has won several awards and commendations, including being a

Table of Contents

Stevie Award Finalist of the American Business Awards for Best Customer Service Organization in 2004 and appointed Preceptor and Clinical Adjunct Faculty for the Healthcare Administration Program in 1997 at the University of Houston-Clear Lake.

**Michael F. Arrigo**. Michael F. Arrigo is a co-founder and the chief executive officer of No World Borders, Inc., a healthcare data, regulations, and economics firm with clients in the pharmaceutical, medical device, hospital, surgical center, physician group, diagnostic imaging, laboratory and genetic testing, health information technology, and health insurance markets. In his role at No World Borders, Inc., Mr. Arrigo advises MAOs who provide health insurance under Part C of the Medicare Act and serves as an expert witness regarding medical coding and medical billing, fraud damages, HIPAA privacy, and Electronic Health Record software. Prior to his current role, Mr. Arrigo served as Vice President at First American Financial (NYSE: FAF) from October 2002 to February 2007, overseeing eCommerce and regulatory compliance technology initiatives for top mortgage banks; Vice President of Fidelity National Financial (NYSE: FNF) from 2002 to 2003; chief executive officer of one of the first cloud-based billing software companies, Erogo, from 2000 to 2002; Vice President of Marketing for an email encryption and security software company until its acquisition by a company that merged into Axway Software SA (Euronext: AXW.PA) from 1999 to 2000; CEO of LeadersOnline, an online recruiting venture of Heidrick & Struggles from 1997 to 1999; management consultant to Hewlett Packard, Oracle, and Symantec from 1994 to 1997; Vice President of Marketing for a software company acquired by a company that merged into Cincom Systems from 1992 to 1994; Product Manager at Ashton-Tate from 1987 to 1992 responsible for database software products including Microsoft/Sybase SQL Server. Mr. Arrigo earned his Bachelor of Science in Business Administration from the University of Southern California in 1981. His post-graduate studies include biomedical ethics at Harvard Medical School, biomedical informatics at Stanford Medical School, blockchain and crypto-economics at the Massachusetts Institute of Technology, and training as a Certified Professional Medical Auditor (CPMA).

**Thomas W. Hawkins.** Thomas Hawkins previously served as a Management Consultant for MEDNAX, Inc. from February 2014 to December 2017, after serving as General Counsel and Board Secretary from April 2003 to August 2012. Prior to that, Mr. Hawkins worked for New River Capital Partners as a Partner from January 2000 to March 2003; AutoNation, Inc. as Senior Vice President of Corporate Development from May 1996 to December 1999; Viacom, Inc. as Executive Vice President from September 1994 to May 1996; and Blockbuster Entertainment Corporation as Senior Vice President, General Counsel, and Secretary from October 1989 to September 1994. Mr. Hawkins has been a board member of MSP Recovery, Inc. since May 2022, and currently serves on the board of directors of SMX (Security Matters) Public Limited Company (from March 2023 to present), Jumptuit Inc., a data analytics technology company (from November 2019 to present), and the Alumni Association of the University of Michigan (from October 2019 to present). Mr. Hawkins received his Juris Doctor from Northwestern University in 1986 and his A.B. in Political Science from the University of Michigan in 1983.

**Roger Meltzer**. Mr. Meltzer practiced law at DLA Piper LLP from 2007 and held various roles: Global Co-Chairman (2015 through 2020), and currently as Chairman Emeritus; Americas Co-Chairman (2013 through 2020); Member, Office of the Chair (2011 through 2020); Member, Global Board (2008 through 2020); Co-Chairman, U.S. Executive Committee (2013 through 2020); Member, U.S. Executive Committee (2007 through 2020); and Global Co-Chairman, Corporate Finance Practice (2007 through 2015). Prior to joining DLA Piper LLP, Mr. Meltzer practiced law at Cahill Gordon & Reindel LLP from 1977 to 2007 where he was a member of the Executive Committee from 1987 through 2007, Co-Administrative Partner and Hiring Partner from 1987 through 1999, and Partner from 1984 through 2007. Mr. Meltzer currently serves on the Advisory Board of Harvard Law School Center on the Legal Profession (May 2015—Present); and the Board of Trustees, New York University Law School (September 2011—Present); and previously served on the Corporate Advisory Board, John Hopkins, Carey Business School (January 2009—December 2012). He has previously served on the board of directors of: Lionheart II Corp (March 2021 to May 2022), Lionheart III Corp (March 2021 to August 2022), Haymaker Acquisition Corp. III (February 2021 to July 2022), certain subsidiaries of Nordic Aviation Capital (December 2021 to April 2022), The Legal Aid Society (November 2013 to January 2020), Hain Celestial Group, Inc. (December 2000 to February 2020), American Lawyer Media (January 2010 to July 2014) and The Coinmach Service Corporation (December 2009 to June 2013). Mr. Meltzer has also received several awards and honors and has been actively involved in philanthropic activity throughout his career. Mr. Meltzer received Juris Doctor degree in law from New York University School of Law and an A.B. from Harvard College. In February 2021, Mr. Meltzer joined the board of directors of Haymaker Acquisition Corp. 4, a special purpose acquisition company focused on identifying and implementing value creation initiatives within the consumer and consumer-related products and services industries. In February 2021, Mr. Meltzer joined the board of directors of Ubicquia LLC, a smart solutions infrastructure company. In May 2022, Mr. Meltzer joined the board of directors of MSP Recovery, Inc. following its business combination with Lionheart Acquisition Corp. II. In June 2022, Mr. Meltzer joined the board of directors of Aearo Holding LLC and affiliated entities. In August 2022, Mr. Meltzer joined the board of directors of Empatan Public Limited Company ("SMX") following its business combination with Lionheart III Corp, Security Matters Limited and Aryeh Merger Sub Inc. In January 2023, Mr. Meltzer joined the board of directors of AID Holdings II ("Enlivant"), a senior living facility provider and portfolio company of TPG Capital L.P. In February 2023, Mr. Meltzer joined the board of directors of Klein Hersh, an executive recruitment firm that spans the life sciences continuum and healthcare industry. In April 2023, Mr. Meltzer joined the board of directors of Cyxtera Technologies, Inc., a company specializing in colocation and interconnection services, with a footprint of more than 60 data centers in over 30 markets. In

103

May 2023, Mr. Meltzer joined the board of directors of John C. Heath, Attorney at Law PC d/b/a/ Lexington Law, an industry leader specializing in credit repair services.

### Executive Officers

**John H. Ruiz** - See "-*Management and Board of Directors*."

**Frank C. Quesada** - See "-*Management and Board of Directors*."

**Alexandra Plasencia**. Alexandra Plasencia currently serves as the General Counsel of MSP Recovery, Inc. Prior to becoming General Counsel, Ms. Plasencia served as the Company's Chief Compliance Officer and Corporate Counsel. Ms. Plasencia is a corporate and healthcare attorney who focuses her practice on complex business transactions, contracting, and healthcare and organizational compliance. Ms. Plasencia utilizes her comprehensive healthcare background to advise the Company on a full spectrum of legal and regulatory business issues. Prior to her role at the Company, Alexandra was General Counsel and Corporate Secretary for Conviva Care Solutions, a management services organization overseeing 300,000 patients, throughout 300 practices and 800 clinicians throughout Florida and Texas. In that role, Ms. Plasencia worked closely with and advised the board of directors, developed the organization's legal strategy and oversaw legal affairs, including acquisitions, regulatory compliance & oversight, corporate governance, litigation oversight, and provider, payor, and physician contracting. Ms. Plasencia has extensive experience in managed care and full-risk arrangements. Prior to her role with Conviva, Ms. Plasencia was the General Counsel for MCCI Medical Group where she developed a legal team and oversaw the company's legal and organizational strategy. During her tenure, Ms. Plasencia handled various multi-million-dollar acquisitions, corporate financing, and successfully integrated various physician practices into MCCI. Most notably, Ms. Plasencia represented MCCI in its sale to Humana and played a pivotal role in the structure, development and creation of Conviva Care Solutions and Conviva Physician Group. Ms. Plasencia earned her Juris Doctor and MBA in 2011 from the University of Miami, where she also received her BBA from the School of Business. Ms. Plasencia has supported and contributed her time to Kristi House, the Leadership Learning Center, Amigos for Kids, and the Friends of St. Jude.

**Ricardo Rivera**. Ricardo Rivera currently serves as Chief Operating Officer and has served as the interim Chief Financial Officer of MSP Recovery, Inc. since June 29, 2023. Mr. Rivera joined the Company in September 2019, and from September 2019 until July 2021, Mr. Rivera served as the Chief of Staff. Over the past 25 years Mr. Rivera has held positions as COO & CFO at various private corporations in the US and internationally. Before joining the Company, Mr. Rivera was COO & CFO of Transatlantic Power Fund Management, LLC, a subsidiary of Transatlantic Power Holdings LLC. Mr. Rivera has a Master's in Professional Accounting and a BBA in Accounting from the University of Miami.

### Family Relationships
There are no family relationships between any of our directors or executive officers.

### Involvement in Certain Legal Proceedings
During the past 10 years, none of our current directors, nominees for directors or current executive officers has been involved in any legal proceeding identified in Item 401(f) of Regulation S-K that would be material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the Company.

### DELINQUENT SECTION 16(a) REPORTS
Section 16(a) of the Securities Exchange Act of 1934, as amended, requires the Company's officers and directors, and greater than 10% shareholders, to file reports of ownership and changes in ownership of the Company's securities with the SEC. Copies of the reports are required by SEC regulation to be furnished to the Company. We believe that, during 2022, our directors, executive officers, and 10% stockholders complied with all Section 16(a) filing requirements, except for: (i) a late Form 4 filing by Frank C. Quesada dated June 8, 2022 to report the purchase warrants by the reporting person; (ii) a late Form 4/A filing by Frank C. Quesada dated June 14, 2022 to report the purchase warrants by the reporting person; (iii) a late Form 4 filing by Michael F. Arrigo dated June 3, 2022 to report the purchase of Class A common shares by the reporting person; and (iv) a late Form 4 filing by John H. Ruiz dated November 23, 2022 to report to report the purchase of Class A common shares by the reporting person.

### Corporate Governance Principles and Code of Ethics
Our Board is committed to sound corporate governance principles and practices. In order to clearly set forth our commitment to conduct our operations in accordance with our high standards of business ethics and applicable laws and regulations, our Board adopted Corporate Governance Guidelines applicable to our directors, executive officers and employees that complies with the rules and regulations of Nasdaq. A copy of our Corporate Governance Guidelines is available on our corporate website at https://investor.lifewallet.com, in the "Documents & Charters" section in the "Corporate Governance" tab. The information on our website shall not be deemed incorporated by reference in this Form 10-K. You also may obtain without charge a printed copy of the

104

Table of Contents

Corporate Governance Guidelines by sending a written request to: LifeWallet General Counsel, 2701 South Le Jeune Road, Floor 10, Coral Gables, Florida 33134.

**Board of Directors**

The business and affairs of the Company are managed by or under the direction of the Board. The Board is currently composed of seven members.

The Board held eight meetings and acted by written consent without a meeting on one occasion during the year ended December 31, 2021. In 2022, each person serving as a director attended at least 75% of the total number of meetings of our Board and any Board committee on which he or she served.

**Board Committees**

Pursuant to our bylaws, our Board may establish one or more committees of the Board however designated, and delegate to any such committee the full power of the Board, to the fullest extent permitted by law.

The standing committees of our Board currently include an Audit Committee, a Compensation Committee, and a Nominating and Corporate Governance Committee. Each of the committees reports to the Board as such committee deems appropriate and as the Board may request. The composition, duties, and responsibilities of these committees are as follows:

*Audit Committee*

Mr. Hawkins, Mr. Meltzer, and Mr. Arrigo serve on the Audit Committee. Mr. Hawkins qualifies as the Audit Committee financial expert as defined in Item 407(d)(5) of Regulation S-K promulgated under the Securities Act, and serves as Chairperson of the Audit Committee. The Audit Committee operates under a written charter adopted by the Board of Directors. According to its charter, the Audit Committee shall consist of at least three members, each of whom shall be a non-employee director who has been determined by the Board to meet the independence requirements of Nasdaq, and also Rule 10A-3(b)(1) of the SEC, subject to the exemptions provided in Rule 10A-3(c). The charter contains a detailed description of the scope of the Audit Committee's responsibilities and how they will be carried out. The Audit Committee's charter is available on our website at https://investor.lifewallet.com, in the "Documents & Charters" section in the "Corporate Governance" tab. The information on our website shall not be deemed incorporated by reference in this Form 10-K. The Audit Committee held two meetings during the year ended December 31, 2022.

**Item 11. Executive Compensation.**

**Summary Compensation Table**

The following table presents information regarding the total compensation awarded to, earned by, and paid to the named executive officers of LifeWallet for services rendered to LifeWallet in all capacities for the years indicated.

**Summary Compensation Table[5]**

| Name and Principal Position | Year | Salary ($)[1] | Bonus ($) | All Other Compensation ($)[2] | Total ($) |
|---|---|---|---|---|---|
| John H. Ruiz[3] | 2022 | $964,507 | — | $427,382 | $1,391,889 |
| Chief Executive Officer | 2021 | — | | $739,832 | $739,832 |
| Frank C. Quesada[4] | 2022 | $318,339 | — | $190,365 | |
| Chief Legal Officer | 2021 | — | | $355,750 | $355,750 |
| Ricardo Rivera | 2022 | $506,130 | — | — | $506,130 |
| Chief Operating Officer | 2021 | $400,000 | $75,000 | — | $475,000 |

1.    The salary amounts represent the actual amounts paid during the fiscal year.

2.    Amounts reported in the "All Other Compensation" column reflect amounts paid to our named executive officers by the Law Firm for their services to the Company. The relationship between the Company and the Law Firm, which is an entity that is not part of the Business Combination, is fully described in "Certain Relationships and Related Party Transactions— Certain Relationships and Related Party Transactions-The Company—Legal Services-MSP Recovery Law Firm." Except as detailed below, in 2022 and 2021, the total amount of perquisites and personal benefits for each of the NEOs was less than $10,000.

2/7/24, 12:49 PM                                                    10-K

3.   All Other Compensation includes: In 2022: $89,832 paid by the Law Firm for life insurance premium and $48,000 for personal security paid by Law Firm to a limited liability company.

4.   All Other Compensation includes: In 2021: $350,000 paid by the Law Firm to a limited liability company, which is owned by Mr. Quesada.

5.   During the years 2022 and 2021, the NEOs did not receive Stock Awards, Option Awards, Nonequity incentive plan compensation nor Nonqualified deferred compensation earnings.

**Narrative Disclosure to Summary Compensation Table**

For 2022, the principal elements of compensation provided to the named executive officers were base salaries, bonuses, and broad-based employee benefits.

**Base Salary**

During 2022, each of our named executive officers received an annual base salary from the Company as a fixed component of compensation. See the "Summary Compensation Table." Base salaries were either determined when the named executive officers entered into their employment agreements or were determined by the Compensation Committee, and are intended to attract and retain individuals with superior talent commensurate with their relative expertise and experience. Considerations in determining base salary amounts include the executive's performance, level of responsibility, experience, and comparative salaries in the marketplace.

**Cash Bonus Compensation**

The Company did not pay cash bonuses to any of the named executive officers during the fiscal year ended December 31, 2022.

**Equity Compensation**

The Company did not issue any equity compensation in fiscal year ended December 31, 2022. The Company intends to issue equity awards under the Incentive Plan, a copy of which is filed as an Exhibit 10.16 to our Form S-1 Registration Statement filed on November 30, 2022.

**Outstanding Equity Awards at Fiscal Year-End**

As of December 31, 2022, the named executive officers did not have any outstanding equity awards.

**Fiscal Year 2022 Director Compensation Table**

The following table provides information regarding the total compensation that was earned by or paid to each of our non-employee directors during the fiscal year ended December 31, 2022. Other than as set forth in the table and described below, we did not pay any compensation, make any equity awards or non-equity awards to, or pay any other compensation to any of the non-employee members of our Board of Directors during 2022. John H. Ruiz, our Chief Executive Officer, did not receive any compensation for his service as a member of our Board of Directors during 2022. Frank C. Quesada, our Chief Legal Officer, did not receive any compensation for his service as a member of our Board of Directors during 2022. To the extent applicable, we reimburse non-employee directors for travel expenses incurred in attending meetings of our Board of Directors or any committee thereof.

**2022 Non-Employee Director Compensation Table**

| Name | Fees earned or paid in cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| Michael Arrigo | $73,525 | $100,725 | $174,250 |
| Beatriz Assapimonwait | $54,704 | $100,725 | $155,429 |
| Thomas Hawkins | $64,418 | $100,725 | $165,143 |
| Roger Meltzer | $58,346 | $100,725 | $159,071 |
| Ophir Sternberg | $43,168 | $100,725 | $143,893 |

106

Table of Contents

**Narrative Disclosure to Director Compensation Table**

During the fiscal year ended December 31, 2022, the Compensation Committee and the Board determined that each non-employee director was entitled to receive a $143,893 retainer per year regardless of committee services, paid in 30% cash and 70% equity. In addition to the $143,893 retainer for each non-employee director, some directors received additional payment as follows:

- $21,250 cash retainer per year for the chairman of the audit committee or $15,179 cash retainer per year for each other member of the audit committee; and

- $15,179 cash retainer per year for the chairman of the compensation committee or $11,536 cash retainer per year for each other member of the compensation committee.

Compensation for our non-employee directors is not limited to the payments determined by our compensation policies. Our non-employee directors remain eligible to receive equity awards and cash or other compensation as may be provided from time to time at the discretion of our Board. No such awards or payments were made in 2022.

**Company Executive Officer and Director Compensation**

The following disclosures concern employment agreements with the Company's executive officers:

*Employment Agreements.* We have entered into Employment Agreements with John H. Ruiz and Frank C. Quesada.

*Employment Agreement with John H. Ruiz*

Mr. Ruiz serves as our Chief Executive Officer. Under the terms of his employment agreement, he will earn a base salary of not less than $1,800,000, subject to annual review for potential increase (but not decrease) by the Board. In addition, Mr. Ruiz is eligible to receive an annual cash performance bonus of up to 100% of his base salary, based upon the achievement of individual and Company performance objectives and subject to Board approval. In addition, Mr. Ruiz is entitled to: (i) participate in and be granted awards under the MSP Recovery Omnibus Incentive Plan effective as of May 18, 2022 at the discretion of the Board, (ii) participate in the employee benefit plans, including pension, medical, disability and life insurance offered by the Company, and (iii) reimbursement for all reasonable and necessary out-of-pocket business, entertainment and travel expenses.

During the term of Mr. Ruiz's employment agreement, he will be bound by non-competition and non-solicitation obligations. Upon a termination of Mr. Ruiz's employment without Cause (as defined in his employment agreement) or the resignation by Mr. Ruiz for Good Reason (as defined in his employment agreement), Mr. Ruiz will be entitled to receive all accrued, determined and unpaid compensation, a pro-rata bonus payment for the fiscal year of termination based on actual performance results for the full annual performance period and a severance payment of Mr. Ruiz' base salary for a period of six months after the date of termination.

*Employment Agreement with Frank C. Quesada*

Mr. Quesada serves as our Chief Legal Officer. Under the terms of his employment agreement, he will earn a base salary of not less than $600,000, subject to annual review for potential increase (but not decrease) by the Board. In addition, Mr. Quesada is eligible to receive an annual cash performance bonus of up to 100% of his base salary, based upon the achievement of individual and Company performance objectives and subject to Board approval. In addition, Mr. Quesada is entitled to: (i) participate in and be granted awards under the MSP Recovery Omnibus Incentive Plan effective as of May 18, 2022 at the discretion of the Board, (ii) participate in the employee benefit plans, including pension, medical, disability and life insurance offered by the Company, and (iii) reimbursement for all reasonable and necessary out-of-pocket business, entertainment and travel expenses.

During the term of Mr. Quesada's employment agreement, he will be bound by non-competition and non-solicitation obligations. Upon a termination of Mr. Quesada's employment without Cause (as defined in his employment agreement) or the resignation by Mr. Quesada for Good Reason (as defined in his employment agreement), Mr. Quesada will be entitled to receive all accrued, determined and unpaid compensation, a pro-rata bonus payment for the fiscal year of termination based on actual performance results for the full annual performance period and a severance payment of Mr. Quesada's base salary for a period of six months after the date of termination.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The following table sets forth information known by us regarding the beneficial ownership of the Common Stock as of June 30, 2023, by:

- each person who is known by us to be the beneficial owner of more than 5% of the outstanding shares of Common Stock;

Table of Contents

• each of our current Named Executive Officers and directors; and

• all of our current executive officers and directors as a group.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days.

The percentage of beneficial ownership is based on 132,235,874 shares of Class A Common Stock issued and outstanding as of June 30, 2023, and 3,106,616,119 shares of Class V Common Stock issued and outstanding as of June 30, 2023, as applicable, the only outstanding classes of the Company's common stock. At the Closing, the Class B Common Stock was automatically converted into shares of Class A Common Stock on a one-for-one basis. Unless otherwise indicated, the address for each of the persons listed in the table is c/o MSP Recovery, Inc. 2701 Le Jeune Road, Floor 10 Coral Gables, Florida 33134.

| Beneficial Owner Name | Class A Common Stock (1) | | Class V Common Stock (2) | |
|---|---|---|---|---|
| | Number of Shares | % | Number of Shares | % |
| **Named Executive Officers & Directors** | | | | |
| John H. Ruiz(3)(4) | 2,085,176,055 | 94.11% | 2,084,157,566 | 67.09 |
| Frank C. Quesada(5)(6) | 901,928,778 | 87.32% | 901,390,330 | 29.02 |
| Ricardo Rivera(7) | 46,691 | * | — | |
| Alexandra Plasencia(8) | 35,825 | * | — | |
| Michael F. Arrigo | 6,355 | * | — | |
| Beatriz Assapimonwait | — | — | — | |
| Roger Meltzer(9)(10)(11) | 1,190,000 | 0.90% | — | |
| Thomas W. Hawkins(9)(12)(13) | 2,380,000 | 1.78% | — | |
| Ophir Sternberg(14) | 601,367,495 | 82.67% | — | |
| All directors and officers as a group (9 individuals) | 3,592,131,199 | 96.62% | 2,985,547,896 | |
| | | | | |
| **5% Stockholders** | | | | |
| Virage Recovery Master LP(15) | 96,552,851 | 42.41% | | |
| Oliver SPV Holdings LLC(9)(16) | 59,540,075 | 31.32% | | |
| Alex Ruiz(17) | 42,000,000 | 32.04% | | |
| Paul Rapisarda | 21,675,732 | 14.34% | | |
| JLS Equities LLC(18) | 11,912,499 | 8.34% | | |
| Jessica Wasserstrom(9)(19) | 9,440,000 | 6.72% | | |
| Leviathan Group LLC | 8,260,000 | 5.93% | | |
| John H. Ruiz, II(20) | 7,420,004 | 5.36% | 7,420,004 | * |
| Virage Recovery Participation LP(21) | 17,095,368 | 11.54% | 17,095,368 | * |
| Series MRCS(22) | 413,478,000 | 75.93% | 413,478,000 | 13.11% |
| Brickell Key Investments LP(23) | 66,666,666 | 47.01% | | |

\*    Less than one percent (1%)

1. Includes shares of Class A Common Stock issuable pursuant to derivatives (including Up-C Units and warrants) exercisable within 60 days of June 30, 2023.

2. Includes shares of Class V Common Stock, which are non-economic voting shares of the Company.

3. Includes 172,489 shares of Class A Common Stock and 846,000 warrants directly held by Mr. Ruiz. In addition to securities directly held by Mr. Ruiz in his individual capacity, includes shares held by the following entities Jocral Family LLLP, Ruiz Group Holdings Limited, LLC and Series MRCS, a series of MDA, Series LLC, a Delaware series limited liability company ("Series MRCS"), including shares held by Series MRCS for the benefit of Jocral Holdings LLC. Reported figures do not include securities held by John Ruiz II, Mr. Ruiz's son, in his capacity as a Member, or by Alex Ruiz, Mr. Ruiz's son, of which Mr. Ruiz disclaims beneficial ownership.

4.Reported figures do not include any attributed ownership based on Mr. Ruiz's investment in VRM, which have been transferred to affiliated trusts of Mr. Ruiz and of which Mr. Ruiz disclaims beneficial ownership. Messrs. Ruiz and Quesada together invested in VRM, which investment represented a 1.14% ownership interest in VRM. Mr. Ruiz is entitled to 70% of such investment,

108

and Mr. Quesada is entitled to 30% of such investment. As a result, the indirect beneficial ownership attributable to such affiliated trusts would be 0.8% of VRM.

5.Includes 138,909 shares of Class A Common Stock and 399,539 warrants directly held by Mr. Quesada. In addition to securities directly held by Mr. Quesada in his individual capacity, includes shares held by Quesada Group Holdings LLC and Series MRCS.

6.Reported figures do not include any attributed ownership based on Mr. Quesada's investment in VRM, which have been transferred to affiliated trusts of Mr. Quesada and of which Mr. Quesada disclaims beneficial ownership. Messrs. Ruiz and Quesada together invested in VRM, which investment represented a 1.14% ownership interest in VRM. Mr. Ruiz is entitled to 70% of such investment, and Mr. Quesada is entitled to 30% of such investment. As a result, the indirect beneficial ownership attributable to such affiliated trusts would be 0.3% of VRM.

7.Includes 46,691 shares of Class A Common Stock.

8.Consists of 35,825 shares of Class A Common Stock held by the spouse of Alexandra Plasencia.

9.The business address for each of these individuals is c/o, Lionheart Equities LLC, 4218 NE 2nd Avenue, Miami FL 33137.

10.Roger Meltzer has been a member of the Board since 2021.

11.Beneficial ownership includes 10,000 shares Star Class A Common Stock and 1,180,000 shares of Class A Common Stock underlying New Warrants.

12.Thomas Hawkins has been a member of the Board since 2021. Beneficial ownership includes (i) 50,000 shares of Class A Common Stock and 2,360,000 shares of Class A Common Stock underlying New Warrants held in an individual capacity and (ii) 10,000 shares of Class A Common Stock and 1,180,000 shares of Class A Common Stock underlying New Warrants held by the Estate of Steven R. Berrard. Thomas Hawkins holds sole voting and investment control over the shares held by the Estate of Steven R. Berrard as the personal representative.

13.Beneficial ownership includes 50,000 shares of Class A Common Stock and 2,360,000 shares of Class A Common Stock underlying New Warrants.

14.Beneficial ownership includes 114,945,825 shares of Class A Common Stock issuable upon exchange of the Up-C Units.

15.Includes (i) 832,498 shares of Class A Common Stock and 87,320,000 shares of Class A Common Stock underlying New Warrants owned by Lionheart Investments, LLC; (ii) 1,000,000 shares of Class A Common Stock and 118,000,000 shares of Class A Common Stock underlying New Warrants owned by Star Mountain Equities, LLC; (iii) 2,435,060 shares of Class A Common Stock and 273,029,937 shares of Class A Common Stock underlying New Warrants owned by Sponsor; and (iv) 1,000,000 shares of Class A Common Stock and 118,000,000 shares of Class A Common Stock underlying New Warrants owned by the 2022 OS Irrevocable Trust. Mr. Sternberg holds sole voting and investment control over the shares held by each of Lionheart Investments, LLC, Star Mountain Equities, LLC, and Sponsor as the sole manager. Mr. Sternberg's spouse holds sole voting and investment control over the shares owned by the 2022 OS Irrevocable Trust as its trustee and as a result, Mr. Sternberg may be deemed to have beneficial ownership of the shares owned by the 2022 OS Irrevocable Trust.

16.Beneficial ownership includes 58,990,077 shares of Class A Common Stock underlying New Warrants. Alan Rubenstein holds sole voting and investment control over the shares held by Oliver SPV Holdings, LLC as its manager. The address for Mr. Rubenstein and Oliver SPV Holdings, LLC is 822 Oliver St, Woodmere, NY 11598.

17.Alex Ruiz is the son of John H. Ruiz, the Company's Chief Executive Officer.

18.Beneficial ownership includes 112,499 shares of Class A Common Stock and 11,800,000 shares of Class A Common Stock underlying New Warrants. Jacob Sod holds sole voting and investment control over the shares held by JLS Equities LLC as its manager. The address for Jacob Sod and JLS Equities LLC is 58 Larch Hill Rd, Lawrence, NY 11559.

19.Beneficial ownership includes 87,499 shares of Class A Common Stock and 9,440,000 shares of Class A Common Stock underlying New Warrants.

20.John H. Ruiz, II is the son of John H. Ruiz, the Company's Chief Executive Officer. Beneficial ownership includes 7,420,004 shares of Class A Common Stock issuable upon exchange of the Up-C Units held in an individual capacity.

21.Beneficial ownership includes 5,065,769 shares of Class A Common Stock issuable upon exchange of the Up-C Units.

22.Includes 124,043,400 Up-C Units held by Series MRCS that are beneficially owned by Frank C. Quesada and 289,434,600 shares beneficially owned by John H. Ruiz (including through his affiliate, Jocral Holdings, LLC).

23.Includes 66,666,666 shares of Class A Common Stock issuable upon exercise of the CPIA Warrant pursuant to the Amendment and the Warrant Agreement with the Holder.

Table of Contents

## Item 13. Certain Relationships and Related Transactions, and Director Independence.

### Advances and Promissory Notes

Pursuant to a loan agreement dated May 20, 2022, John H. Ruiz and Frank C. Quesada provided a cash loan to the Company in the amount of $13,272,176.64 in order to satisfy the Service Fee Account condition as described in the Membership Interest Purchase Agreement dated July 11, 2021 (the "Closing Loan"). The Closing Loan has an annual interest rate of 4% and was set to mature on November 23, 2022; however, the maturity date of the Closing Loan may be extended, at the option of the Company, for up to three successive six-month periods (for a total of 24 months). The Company exercised this right and extended the maturity date of the Closing Loan. This loan agreement was ratified by the Audit Committee on June 15, 2022.

Pursuant to a loan agreement dated June 16, 2022, La Ley con John H. Ruiz d/b/a MSP Recovery Law Firm and MSP Law Firm, PLLC (collectively, "Law Firm") made a cash loan to the Company in the amount of approximately $112,000,000 (the "New Loan") in order to: (i) to fund the obligations to pay costs and expenses incurred in connection with the SPAC transaction undertaken by Lionheart II Holdings, LLC, and (ii) to fund operating expenses and other obligations of MSP Recovery, Inc., including repayment of certain funds that had been previously advanced to the Company by John H. Ruiz and Frank C. Quesada of approximately $24,000,000. The New Loan has an annual interest rate of 4%, paid in kind, and will mature four years from the effective date of the New Loan, with no prepayment penalty. This loan agreement was approved by the Audit Committee on June 15, 2022.

In addition to the New Loan, John H. Ruiz and Frank C. Quesada advanced an additional $4.95 million to the Company to cover certain expenses (the "Bridge Loan"). The Bridge Loan does not accrue interest on the unpaid balance and becomes due and payable upon funding of a credit facility that was being negotiated, but had not closed, at the end of fiscal year 2022, as set forth in Note 18 - Subsequent Events of the 2022 Form 10-K. Company can repay the Bridge Loan at any time, without prepayment penalties, fees, or other expenses.

### Legal Services Agreement

At the closing of the business combination between the Company and Lionheart Acquisition Corporation II, the Company entered into a Legal Services Agreement ("LSA") with La Ley con John H. Ruiz, P.A. d/b/a MSP Recovery Law Firm and MSP Law Firm, PLLC (collectively, the "Law Firm"), dated May 23, 2022. Pursuant to the LSA, the Company engaged the Law Firm to act as its exclusive lead counsel to represent the Company, and each of its subsidiaries, as it pertains to certain assigned Claims, causes of actions, proceeds, products, and distribution. Under the LSA, the Company will pay the Law Firm all of the Law Firm's documented costs related to representation of the Company or its subsidiaries approved in accordance with an agreed budget. For the services described in the LSA, the Law Firm will be entitled to: (i) any attorneys' fees that are awarded to the Law Firm pursuant to a fee shifting statute by agreement or court award in such case, and (ii) an amount, if greater than zero, equal to the difference between 40% of the recovery proceeds due to the Company or its subsidiaries for recovered Claims, less any amount due to the Law Firm under the foregoing clauses ((i) and (ii) together, the "Compensation").

The LSA also contains an advance provision, whereby the Company will advance to the Law Firm a monthly amount equal to: (x) $1,000,000 of the Compensation due to the Law Firm to fund certain resources necessary to provide services by the Law Firm, plus (y) overhead costs (i.e., salaries rent, utilities, and similar expenses; provided that any compensation paid to John Ruiz or Frank Quesada by the Law Firm shall not be included in such overhead costs) to operate the Law Firm in an amount necessary to pay such overhead costs reasonably anticipated by the Law Firm to become due in such month. This Advance shall be offset from the Compensation, and in the event that the Legal Services Agreement is terminated, certain additional fees may become payable to the Law Firm pursuant to the terms of the Legal Services Agreement. The LSA was ratified by the Audit Committee on June 15, 2022.

### Air Transportation Services Agreement

Historically, MSP has been provided with aviation services pursuant to an Air Transportation Services Agreement, dated June 3, 2019, by and between MSP Recovery Aviation, LLC ("MSP Aviation") and Series MRCS, a designated series of MDA Series, LLC, pursuant to which MSP Aviation agreed to provide Series MRCS and its affiliates with air transportation services via its private, non-commercial plane. In exchange for such services, Series MRCS agreed to reimburse MSP Aviation for aircraft rental and flight time along with related fees, expenses, and taxes in accordance with a lease agreement for each flight. MSP Aviation is owned by John H. Ruiz.

As of both December 31, 2022 and 2021, $153 thousand was due from MSP Aviation and included in the condensed consolidated balance sheets in Affiliate Receivable. For the year ended December 31, 2022, $400 thousand was included in General and Administrative expenses related to MSP Aviation in the condensed consolidated statements of operations. For the year ended December 31, 2021, the amounts were de minimis. Management of MSP intends to continue its relationship with MSP Aviation under an informal arrangement that provides MSP and its representatives with economic terms that are at least no less favorable than the terms it would receive if it were to engage an unrelated third party to provide substantially similar services. This agreement was approved by the Audit Committee on June 15, 2022.

110

Table of Contents

*Registration Rights*

The Company has entered into the Registration Rights Agreement August 13, 2020 with the Holders (as defined therein). Pursuant to the terms of the Amended and Restated Registration Rights Agreement, (i) the Founder Shares and the shares of Class A common stock issued or issuable upon the conversion of any Founder Shares, (ii) the Units (as defined therein), (iii) the shares of Class A common stock included in such Units, (iv) the Original Warrants included in such Units (including any shares of Class A common stock issued or issuable upon the exercise of any such Original Warrants), (v) the New Warrants (including any shares of Class A common stock issued or issuable upon the exercise of any such New Warrants), (vi) the equity securities that Nomura purchased from the Company pursuant to that certain Forward Purchase Agreement described in the section entitled "Business – Company History." (the "Forward Purchase Shares"), (vii) any outstanding share of the Class A common stock or any other equity security (including the shares of Class A common stock issued or issuable upon the exercise or conversion of any other equity security) of the Company held by a Holder as of the date of the Registration Rights Agreement, (viii) any shares of the Company issued or to be issued to any Additional Holders (as defined in the Registration Rights Agreement) in connection with the Business Combination and (ix) any other equity security of the Company issued or issuable with respect to any of the securities described in the foregoing clauses (i) - (ix) by way of a stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or reorganization will be entitled to certain registration rights, subject to the terms and conditions set forth in the Registration Rights Agreement.

The foregoing summary of the Registration Rights Agreement is not complete and is qualified in its entirety by reference to the complete text of the Registration Rights Agreement as set forth in an exhibit to the registration statement.

*Director Independence*

Our Board has determined that five of our directors, Michael F. Arrigo, Beatriz Assapimonwait, Thomas Hawkins, Ophir Sternberg, and Roger Meltzer, qualify as "independent" directors within the meaning of the independent director guidelines of Nasdaq and applicable SEC rules. The Nasdaq independence definition includes a series of objective tests regarding a director's independence and requires that the Board make an affirmative determination that a director has no relationship with us that would interfere with such director's exercise of independent judgment in carrying out the responsibilities of a director. As part of the Board's determination, among other factors, the Board considered certain relationships of directors, including employment by LifeWallet.

## Item 14. Principal Accounting Fees and Services.

The following is a summary of the fees billed to us by Deloitte & Touche LLP ("Deloitte") for professional services rendered for the fiscal year ending December 31, 2022 and 2021.

| Accounting Fees and Services | | |
| --- | --- | --- |
| Fee Category | 2022 | 2021 |
| Audit Fees | $1,444,002 | $557,796 |
| Audit-Related Fees | $895,821 | — |
| Tax Fees | — | — |
| All Other Fees | — | — |
| Total Fees | $2,339,823 | $557,796 |

*Audit Fees.* The aggregate audit fees (inclusive of out-of-pocket expenses) billed by Deloitte were for professional services rendered for the audit of our annual financial statements and review of financial statements included in our Annual Report on Form 10-K filed with the SEC, and for services that are normally provided by the independent registered certified public accountants in connection with such filings, including amendments, or engagements for the fiscal year ended December 31.

*Audit Related Fees.* This category consists of assurance and related services by the independent registered public accounting firm that are reasonably related to the performance of the audit or review of our financial statements and are not reported above under "Audit Fees." The services for the fees that would normally be disclosed under this category include consultation regarding our correspondence with the SEC and other accounting consulting.

*Tax Fees.* This category consists of professional services rendered by our independent registered public accounting firm for tax compliance, tax advice and tax planning. The services for the fees that would normally be disclosed under this category include tax return preparation and technical tax advice.

*All Other Fees.* This consists of fees billed for products and services other than those described above.

111

Table of Contents

PART IV

**Item 15. Exhibits, Financial Statement Schedules.**

### 1. FINANCIAL STATEMENTS

The following is a list of the consolidated financial statements of MSP Recovery, Inc. filed with this Annual Report, together with the reports of our independent registered public accountants and Management's Report on Internal Control over Financial Reporting:

**Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID No 34). | 66 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | 67 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022, 2021 and 2020 | 68 |
| Consolidated Statements of Equity for the Years Ended December 31, 2022, 2021 and 2020 | 69 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021 and 2020 | 71 |
| Notes to Consolidated Financial Statements | 72 |

### 2. FINANCIAL STATEMENT SCHEDULES

All financial statement schedules are omitted because the information is inapplicable or presented in the notes to the consolidated Financial Statements.

### 3. EXHIBITS

The following documents are included as exhibits to this report:

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date |
| 2.1+ | Membership Interest Purchase Agreement | 8-K | 001-39445 | 2.1 | May 27, 2022 |
| 2.2+ | Amendment No. 1 to Membership Interest Purchase Agreement | 8-K | 001-39445 | 2.2 | May 27, 2022 |
| 2.3+ | Amendment No. 2 to Membership Interest Purchase Agreement | 8-K | 001-39445 | 2.3 | May 27, 2022 |
| 2.4+ | Amendment No. 3 to Membership Interest Purchase Agreement | 8-K | 001-39445 | 2.4 | May 27, 2022 |
| 2.5+ | Amendment No. 4 to Membership Interest Purchase Agreement | 8-K | 001-39445 | 2.5 | May 27, 2022 |
| 3.1+ | Second Amended and Restated Certificate of Incorporation of the Company | 8-K | 001-39445 | 3.1 | May 27, 2022 |
| 3.2+ | Amended and Restated Bylaws of the Company | 8-K | 001-39445 | 3.2 | May 27, 2022 |
| 4.1+ | Specimen Unit Certificate of the Registrant | 8-K | 001-39445 | 4.1 | May 27, 2022 |
| 4.2+ | Specimen Class A Common Stock Certificate of the Registrant | 8-K | 001-39445 | 4.2 | May 27, 2022 |
| 4.3+ | Specimen Warrant Certificate of the Registrant | 8-K | 001-39445 | 4.3 | May 27, 2022 |
| 4.4+ | Warrant Agreement, dated August 13, 2020, by and between the Registrant and Continental Stock Transfer & Trust Company, LLC | 8-K | 001-39445 | 4.4 | May 27, 2022 |
| 4.5+ | New Warrant Agreement | 8-K | 001-39445 | 4.5 | May 27, 2022 |
| 4.6+ | Form of New Warrant Certificate | 8-K | 001-39445 | 4.6 | May 27, 2022 |
| 4.7+ | CPIA Warrant Agreement | 10-Q | 001-39445 | 10.1 | November 10, 2022 |
| 10.1+ | Letter Agreement, dated August 13, 2020, by and among the Registrant and its officers, directors, Nomura and the Sponsor | S-4 | 6770 | 10.1 | April 29, 2022 |
| 10.2+ | Investment Management Trust Agreement, dated August 13, 2020, by and between the Registrant and Continental Stock Transfer & Trust Company, LLC | S-4 | 6770 | 10.2 | April 29, 2022 |
| 10.3+ | Registration Rights Agreement, dated August 13, 2020, by and among the Registrant and certain security holders | S-4 | 001-39445 | 10.3 | April 29, 2022 |
| 10.4+ | Securities Purchase Agreement, dated July 27, 2020, by and between the Sponsor and Nomura | S-4 | 001-39445 | 10.4 | April 29, 2022 |

| 10.5+ | Private Placement Unit Subscription Agreement, dated August 13, 2020, by and between the Registrant and the Sponsor | S-4 | 6770 | 10.5 | April 29, 2022 |

112

[Table of Contents](#)

| 10.6+ | [Private Placement Unit Subscription Agreement, dated August 13, 2020, by and between the Registrant and Nomura](#) | S-4 | 6770 | 10.6 | April 29, 2022 |
|---|---|---|---|---|---|
| 10.7+ | [Indemnification Agreement](#) | 8-K | 001-39445 | 10.7 | May 27, 2022 |
| 10.8+ | [Administrative Support Agreement, dated August 13, 2020, by and between the Registrant and the Sponsor](#) | S-4 | 6770 | 10.8 | April 29, 2022 |
| 10.9+ | [Forward Purchase Agreement, dated August 13, 2020, by and between the Company and Nomura](#) | S-4 | 6770 | 10.9 | April 29, 2022 |
| 10.10+ | [Form of Limited Liability Agreement of Opco](#) | S-4 | 6770 | 10.10 | April 29, 2022 |
| 10.11+ | [Amended and Restated Registration Rights Agreement](#) | 8-K | 001-39445 | 10.11 | May 27, 2022 |
| 10.12+ | [Tax Receivable Agreement](#) | 8-K | 001-39445 | 10.12 | May 27, 2022 |
| 10.13+ | [Sponsor Agreement](#) | S-4 | 6770 | 10.13 | April 29, 2022 |
| 10.14+ | [Employment Agreement, entered into as of May 23, 2022 by and between John H. Ruiz and Lionheart II Holdings, LLC](#) | 8-K | 001-39445 | 10.5 | May 27, 2022 |
| 10.14+ | [Employment Agreement, entered into as of May 23, 2022 by and between Frank C. Quesada and Lionheart II Holdings, LLC](#) | 8-K | 001-39445 | 10.6 | May 27, 2022 |
| 10.15+ | [Escrow Agreement](#) | 8-K | 001-39445 | 10.7 | May 27, 2022 |
| 10.16+ | [2022 Omnibus Incentive Plan](#) | 8-K | 001-39445 | 10.8 | May 27, 2022 |
| 10.17+ | [Lock-Up Agreement](#) | 8-K | 001-39445 | 10.9 | May 27, 2022 |
| 10.18+ | [Legal Services Agreement](#) | 8-K | 001-39445 | 10.10 | May 27, 2022 |
| 10.19+ | [Side Letter Agreement](#) | 8-K | 001-39445 | 10.11 | May 27, 2022 |
| 10.20+ | [Virage Side Letter Agreement](#) | 8-K | 001-39445 | 10.12 | May 27, 2022 |
| 10.21+ | [VRM Full Return Guaranty Agreement](#) | S-4 | 6770 | 10.21 | April 29, 2022 |
| 10.22+ | [Asset and Interest Transfer Agreement in relation to the Series MRCS Asset Acquisition](#) | S-4 | 6770 | 10.22 | April 29, 2022 |
| 10.23+ | [Transfer Agreement in relation to the VRM MSP Asset Acquisition](#) | S-4 | 6770 | 10.23 | April 29, 2022 |
| 10.24+ | [Master Transaction Agreement in relation to the VRM MSP Asset Acquisition](#) | S-4 | 6770 | 10.24 | April 29, 2022 |
| 10.25+ | [Common Stock Purchase Agreement, dated January 6, 2023, between MSP Recovery, Inc. and YA II PN, Ltd.](#) | 8-K | 001-39445 | 10.1 | January 12, 2023 |
| 10.26+ | [Registration Rights Agreement, dated January 6, 2023, between MSP Recovery, Inc. and YA II PN, Ltd.](#) | 8-K | 001-39445 | 10.2 | January 12, 2023 |
| 10.27+ | [Second Amended and Restated Claims Proceeds Investment Agreement, dated January 24, 2019, between MSPA Claims 1, LLC and Brickell Key Investments LP](#) | S-1/A | 333-268616 | 10.27 | January 20, 2023 |
| 10.28+ | [Amendment to Claim Proceeds Investment Agreement, dated September 30, 2022, between MSP Recovery, Inc. and Brickell Key Investments LP](#) | S-1/A | 333-268616 | 10.28 | January 20, 2023 |
| 10.29+ | [MTA Amendment and Binding Term Sheet, by and between Virage Recovery Master LP, Series MRCS, a series of MDA, Series LLC, John H. Ruiz, Frank C. Quesada, Virage Capital Management LP, MSP Recovery, LLC, La Ley con John H. Ruiz, MSP Recovery, Inc. and Lionheart II Holdings, LLC, dated April 12, 2023](#) | 8-K | 001-39445 | 10.1 | April 17, 2023 |
| 10.30+ | [Amended and Restated Secured Promissory Note, dated April 12, 2023 by and between the Company and Nomura Securities International, Inc.](#) | 8-K | 001-39445 | 10.2 | April 17, 2023 |
| 10.31* | [Membership Interest Purchase Agreement, dated March 29, 2023, by and among MSP Recovery LLC, MSP Recovery Claims, Series, LLC and Hazel Holdings I LLC](#) | | | | |
| 10.32* | [Membership Interest Purchase Agreement, dated March 29, 2023 by and among MSP Recovery, LLC, MSP Recovery Claims Series 44, LLC, MSP Recovery Holding Series 01, LLC and Hazel Holdings I LLC](#) | | | | |
| 10.33* | [Credit Agreement, dated March 29, 2023 by and between Subrogation Holdings LLC, MSP Recovery, LLC, MSP Recovery](#) | | | | |

2/7/24, 12:49 AM

Case 1:19-md-02875-RMB-SAK    Document 2637-4    Filed 02/13/24    Page 214 of 367
PageID: 95064

Claims, Series LLC - Series 15-09-321 and Hazel Holdings I LLC

10-K

113

Table of Contents

| 10.34* | Amended and Restated Credit Agreement, dated March 29, 2023 by and between Subrogation Holdings LLC, MSP Recovery, LLC, MSP Recovery Claims, Series LLC - Series 15-09-321 and Hazel Holdings I LLC |
|---|---|
| 10.35* | Amended and Restated Collateral Administration Agreement, dated March 29, 2023, by and between Hazel Partners Holdings LLC, Subrogation Holdings, LLC and MSP Recovery LLC |
| 23.1* | Consent of Deloitte & Touche LLP |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1# | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2# | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |
| 104* | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

| * | Filed herewith. |
|---|---|
| # | Furnished herewith. |
| + | Previously filed. |

**Item 16. Form 10-K Summary**

Not applicable.

114

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

MSP Recovery, Inc.

| July 26, 2023 | By: | /s/ John H. Ruiz |
| | | **John H. Ruiz** |
| | | **Chief Executive Officer** |

| July 26, 2023 | By | /s/ Ricardo Rivera |
| | | **Ricardo Rivera** |
| | | **Interim Chief Financial Officer** |

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ John H. Ruiz<br>**John H. Ruiz** | Chief Executive Officer/Director<br>(Principal Executive Officer) | July 26, 2023 |
| /s/ Ricardo Rivera<br>**Ricardo Rivera** | Chief Operating Officer and Interim Chief Financial Officer<br>(Principal Financial Officer and Principal Accounting Officer) | July 26, 2023 |
| /s/ Frank C. Quesada<br>**Frank C. Quesada** | Chief Legal Officer/Director | July 26, 2023 |
| /s/ Alexandra Plasencia<br>**Alexandra Plasencia** | General Counsel | July 26, 2023 |
| /s/ Ophir Sternberg<br>**Ophir Sternberg** | Director | July 26, 2023 |
| /s/ Beatriz Assapimonwait<br>**Beatriz Assapimonwait** | Director | July 26, 2023 |
| /s/ Michael Arrigo<br>**Michael Arrigo** | Director | July 26, 2023 |
| /s/ Thomas W. Hawkins<br>**Thomas W. Hawkins** | Director | July 26, 2023 |
| /s/ Roger Meltzer<br>**Roger Meltzer** | Director | July 26, 2023 |

115

# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

## FORM 10-Q

#### (Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2023**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission File Number: 001-39445**

# MSP Recovery, Inc.
### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **84-4117825** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2710 Le Jeune Road** | |
| **Floor 10** | |
| **Coral Gables, Florida** | **33134** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (305) 614-2222**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A common stock, $0.0001 par value per share | LIFW | The Nasdaq Global Market |
| Redeemable warrants, each lot of 25 warrants is exercisable for one share of Class A common stock at an exercise price of $287.50 per share | LIFWW | The Nasdaq Global Market |
| Redeemable warrants, each lot of 25 warrants is exercisable for one share of Class A common stock at an exercise price of $0.0025 per share | LIFWZ | The Nasdaq Global Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of November 13, 2023, the registrant had 14,323,764 shares of Class A common stock, $0.0001 par value per share, and 124,253,176 shares of Class V common stock, $0.0001 par value per share, outstanding.

### Explanatory Note

As previously reported, MSP Recovery, Inc., d/b/a LifeWallet, identified errors in the accounting for the indemnification asset, various intangible assets and rights to cash flows, and consolidation of an entity in connection with our business combination. As a result of these errors, management and the audit committee of our board of directors concluded that our previously issued unaudited condensed consolidated financial statements for the periods ended June 30, 2022, and September 30, 2022, were materially misstated. Accordingly, our unaudited condensed consolidated financial statements for the foregoing periods require restatement and should no longer be relied upon. The financial information that was previously filed or otherwise reported as of and for the periods ended June 30, 2022 and September 30, 2022 was superseded by the information in our Annual Report on Form 10-K filed with the SEC on July 27, 2023 and this Quarterly Report on Form 10-Q. See Note 2, *Basis of Presentation And Summary of Significant Accounting Policies*, to our condensed consolidated financial statements in this Quarterly Report on Form 10-Q for additional information on the restatement and the related financial information impacts.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| **PART I.** | FINANCIAL INFORMATION | | 4 |
| Item 1. | Financial Statements (Unaudited) | | 4 |
|  | Condensed Consolidated Balance Sheets as of September 30, 2023 and December 31, 2022 | | 4 |
|  | Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2022 (as restated) | | 5 |
|  | Condensed Consolidated Statements of Changes in Equity for the three and nine months ended September 30, 2023 and 2022 (as restated) | | 6 |
|  | Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2023 and 2022 (as restated) | | 8 |
|  | Notes to Unaudited Condensed Consolidated Financial Statements | | 9 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 31 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | | 46 |
| Item 4. | Controls and Procedures | | 46 |
| **PART II.** | OTHER INFORMATION | | 49 |
| Item 1. | Legal Proceedings | | 49 |
| Item 1A. | Risk Factors | | 49 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 49 |
| Item 3. | Defaults Upon Senior Securities | | 50 |
| Item 4. | Mine Safety Disclosures | | 50 |
| Item 5. | Other Information | | 50 |
| Item 6. | Exhibits | | 51 |
| Signatures | | | 52 |

## DEFINITIONS

Unless otherwise stated or unless the context otherwise requires, the terms "we," "us," "our," the "Company," and "LifeWallet" refer to MSP Recovery, Inc. d/b/a LifeWallet. As used in this Quarterly Report on Form 10-Q, unless otherwise noted or the context otherwise requires, the terms below are defined as follows:

"2022 Form 10-K" means the Company's Annual Report on Form 10-K for the year ended December 31, 2022, which was filed by the Company on July 27, 2023;

"Algorithm" refers to a set of instructions that perform a particular action. Our team of data scientists and medical professionals create proprietary instruction sets, or "Algorithms," to identify recovery opportunities within the data sets of our Assignors' Claims. Our proprietary algorithms incorporate various data points within the data sets of our Assignors' Claims, which may include, but are not limited to, medical coding classification systems such as diagnosis codes (e.g., ICD-8/ICD-9/ICD-10 codes), procedure codes (e.g., CPT codes), and drug codes (e.g., NDC codes); non-medical data such as demographics and date ranges; and data from public sources such as crash reports, offense incident reports, and other reports that provide details as to an occurrence. These Algorithms are then applied to our Assignors' aggregated Claims data, filtering through the billions of lines of data from our Assignors to identify recoverable opportunities consistent with a given Algorithm's criteria. Identified potential recoveries are then further quality reviewed by our medical team;

"Billed Amount" (a/k/a the charged amount or retail price) is the full commercial value of services billed by the provider, or the full charge that the provider would ordinarily bill for the service provided. The Billed Amount for a specific procedure code is based on the provider and may vary from location to location. Where a Billed Amount is not provided in the data received from the Assignor, the Company may use paid amount or paid adjusted values, where available, to extrapolate a Billed Amount value. Where we have to extrapolate a Billed Amount to establish damages, the calculated amount may be contested by opposing parties;

"Board of Directors" or "Board" means the board of directors of the Company;

"Business Combination" means the business combination pursuant to the MIPA, as defined herein;

"CCRA" mean Claims Cost Recovery Agreement;

"CF" means Cantor Fitzgerald, L.P., a New York based investment bank;

"Claim" means the right, title to, and/or interest in, any and all claims or potential claims, including all related reimbursement and recovery rights, which the Company has, may have had, or may have in the future assigned to it (whether or not asserted), including all rights to causes of action and remedies against any third-party, whether a primary payer or responsible party, at law or in equity. The term "Claim" includes but is not limited to: (i) claims arising under consumer protection statutes and laws; (ii) claims arising under the Medicare and Medicare Advantage secondary payer statutes, whether based in contract, tort, statutory right, or otherwise, in connection with the payment to provide healthcare services or supplies; (iii) claims arising under any state statutes and common laws irrespective of the rights that are conferred to MSP through assignment or otherwise; and (iv) all right, title, and interest to any recovery rights that may exist for any potential cause of action where a responsible party or primary payer is liable, even where it has not been established because liability is not yet proven as of the date that the Claim is identified or discovered, together with all receivables, general intangibles, payment intangibles, and other rights to payment now existing or hereafter arising and all products and proceeds of the foregoing;

"Class A Common Stock" means the Company's Class A common stock, par value $0.0001 per share;

"Class V Common Stock" means the Company's Class V common stock, par value $0.0001 per share;

"Class B Unit" means the non-voting economic Class B Units of Opco, as described in more detail in Note 3, *Business Combination*, of this Form 10-Q;

"Closing" means the closing of the Business Combination, as described in more detail in Note 3, *Business Combination*, of this Form 10-Q;

"Company" means the registrant, MSP Recovery, Inc. d/b/a LifeWallet, a Delaware corporation;

"Exchange Act" means the Securities Exchange Act of 1934, as amended;

"Existing Warrant Agreement" means the Warrant Agreement dated as of August 13, 2020, by and between the Company and Continental Stock Transfer & Trust Company;

"GAAP" means generally accepted accounting principles in the United States of America, as applied on a consistent basis;

"Hazel" means Hazel Holdings I LLC, a Delaware limited liability company, together with its affiliates;

"HPH" means Hazel Partners Holdings LLC, a Delaware limited liability company;

"HMO" means health maintenance organization;

"IPO" means the August 14, 2020 initial public offering of Lionheart Acquisition Corporation II.

"Law Firm" means La Ley con John H. Ruiz P.A. d/b/a MSP Recovery Law Firm;

"Legacy MSP" means MSP Recovery as it was organized in 2014 as a Medicaid and Medicare Secondary Pay Act recovery specialist;

"LLC Agreement" means the first amended and restated limited liability company agreement of Opco;

"MAO" means Medicare Advantage organization;

"Members' Representative" means John H. Ruiz, solely in his capacity as the representative of the Members;

"MIPA" means the Membership Interest Purchase Agreement, dated as of July 11, 2021, as amended, and as described in more detail in Note 3, *Business Combination*, of this Form 10-Q;

"MSO" means management service organization;

"MSP Recovery" means MSP Recovery, LLC, a Florida limited liability company;

"MSP RH Series 01" means MSP Recovery Holdings Series 01, LLC, a Delaware limited liability company;

"MSP RH Series 01 Recovery Services Agreement" means the Recovery Services Agreement dated as of October 23, 2020 by and between MSP RH Series 01 and MSP Recovery;

"New Warrants" means 1,029,000,000 warrants, each exercisable to purchase 1/25 of one share, post Reverse Stock Split, of Class A Common Stock (but only exercisable in lots of 25 to purchase whole shares), which were issued as a dividend to the holders of record of Class A Common Stock as of the close of business on the date of Closing;

"Nomura" means Nomura Securities International, Inc.;

"Opco" means Lionheart II Holdings, LLC, a wholly owned subsidiary of the Company;

"OTC Equity Prepaid Forward Transaction" means an agreement between the Company and CF in which CF agreed to (a) transfer to the Company for cancellation any warrants to purchase shares received as a result of being the stockholder of record of a share as of the close of business on the closing date of the Business Combination, pursuant to the previously announced and declared LCAP dividend and (b) waive any redemption right that would require the redemption of the Subject Shares (as defined below) in exchange for a pro rata amount of the funds held in LCAP's trust account;

"Paid Amount" (a/k/a Medicare Paid Rate or wholesale price) means the amount paid to a provider by a health plan or insurer. This amount varies based on the party making payment. For example, Medicare typically pays a lower fee for service rate than commercial insurers. The Paid Amount is derived from the Claims data we receive from our Assignors. In the limited instances where the data received lacks a paid amount value, our team calculates the Paid Amount with a formula. The formula used provides rates for outpatient services and is derived from the customary rate at the 95th percentile as it appears from standard industry commercial rates or, where that data is unavailable, the billed amount if present in the data. These amounts are then adjusted to account for the customary Medicare adjustment to arrive at the calculated Paid Amount. Management believes that this formula provides a conservative estimate for the

Medicare paid amount rate, based on industry studies which show the range of differences between private insurers and Medicare rates for outpatient services;

We periodically update this formula to enhance the calculated paid amount where that information is not provided in the Assignor data. Management believes this measure provides a useful baseline for potential recoveries, but it is not a measure of the total amount that may be recovered in respect of potentially recoverable Claims, which in turn may be influenced by any applicable potential statutory recoveries such as double damages or fines, as described below. This calculation accounts for an approximate 7% increase in the total Paid Amount. Where we have to extrapolate a Paid Amount to establish damages, the calculated amount may be contested by opposing parties;

"Public Units" means units comprised of one share of Class A Common Stock and one-half of one Public Warrant issued at the IPO;

"Public Warrants" means warrants included in the Public Units issued in the IPO, each exercisable to purchase 1/25 of one share, post Reverse Stock Split, of Class A Common Stock (but only exercisable in lots of 25 to purchase whole shares), in accordance with its terms, as described in more detail in Note 3, *Business Combination*, of this Form 10-Q;

"PVPRC" means the cumulative Paid Amount value of potentially recoverable Claims. We use Algorithms to comb through historical paid Claims data and search for potential recoveries. The PVPRC is a measure of the Paid Amount in respect of those potentially recoverable Claims. In the limited instances where the data received from our Assignors lacks a paid value, the adjustment formula described in the definition of Paid Amount is applied and increases PVPRC by approximately 7%. As non-compliance with Section 111 reporting requirements is commonplace, responsible reporting entities (RRE) routinely fail to report their responsibility to make primary payments; for this reason, data matching is often required to determine which reporting entity is responsible to reimburse a given potentially recoverable Claim;

"Recovery Proceeds" means, with respect to any Claim, any and all gross proceeds recovered, including compensation, interest, penalties, and fees which may be paid or payable with respect to such Claim (including any and all cash, securities, instruments or other property which may be paid or issued by defendants or third parties in litigation proceedings in satisfaction of such Claim);

"SEC" means the U.S. Securities and Exchange Commission;

"Series" means Delaware series limited liability companies, formed pursuant to the Delaware law, that are used by the Company to own and segregate assets, including CCRAs;

"Securities Act" means the Securities Act of 1933, as amended;

"Series MRCS" means Series MRCS, a series of MDA, Series LLC, a Delaware series limited liability company;

"Trust Account" means the trust account established by the Company for the benefit of its stockholders with Continental Stock Transfer & Trust Company;

"Up-C Unit" means each pair consisting of one share of Class V Common Stock and one Class B Unit, as described in more detail in Note 3, *Business Combination*, of this Form 10-Q;

"Virage" means Virage Capital Management LP, a Delaware limited partnership;

"VRM" means Virage Recovery Master LP, a Delaware limited partnership and affiliate of Virage; and

"VRM MSP" means VRM MSP Recovery Partners LLC, a Delaware limited liability company and joint investment vehicle of VRM and Series MRCS;

"Working Capital Credit Facility" means the credit agreement as described in more detail in Note 10, *Claims Financing Obligations and Notes Payable*, of this Form 10-Q.

iii

Table of Contents
Part I – Financial Information
Item 1. Financial Statements

**MSP RECOVERY, INC. and Subsidiaries**
**Condensed Consolidated Balance Sheets**
**(Unaudited)**

| *(In thousands except per share amounts)* | September 30, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 6,659 | $ | 3,661 |
| Restricted cash | | — | | 11,420 |
| Accounts receivable | | 706 | | 6,195 |
| Affiliate receivable (1) | | 831 | | 2,425 |
| Prepaid expenses and other current assets (1) | | 14,874 | | 27,656 |
| **Total current assets** | | **23,070** | | **51,357** |
| Property, plant and equipment, net | | 4,890 | | 3,432 |
| Intangible assets, net (2) | | 3,253,707 | | 3,363,156 |
| Right-of-use assets | | 368 | | — |
| **Total assets** | $ | **3,282,035** | $ | **3,417,945** |
| | | | | |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 6,643 | $ | 8,422 |
| Affiliate payable (1) | | 19,822 | | 19,822 |
| Commission payable | | 829 | | 545 |
| Derivative liability | | — | | 9,613 |
| Warrant liability | | 662 | | 5,311 |
| Other current liabilities | | 14,588 | | 72,002 |
| **Total current liabilities** | | **42,544** | | **115,715** |
| Guaranty obligation (1) | | 900,455 | | 787,945 |
| Claims financing obligation and notes payable (1) | | 513,450 | | 198,489 |
| Lease liabilities | | 264 | | — |
| Loan from related parties (1) | | 130,709 | | 125,759 |
| Interest payable (1) | | 50,951 | | 2,765 |
| **Total liabilities** | $ | **1,638,373** | $ | **1,230,673** |
| Commitments and contingencies (Note 12) | | | | |
| Class A common stock subject to possible redemption, 45,183 shares at redemption value as of December 31, 2022 (None as of September 30, 2023) | $ | — | $ | 1,807 |
| **Stockholders' Equity (Deficit):** | | | | |
| Class A common stock, $0.0001 par value; 5,500,000,000 shares authorized; 13,799,230 and 2,984,212 issued and outstanding as of September 30, 2023 and December 31, 2022, respectively | $ | 1 | $ | — |
| Class V common stock, $0.0001 par value; 130,000,000 shares authorized; 124,264,645 and 125,919,180 issued and outstanding as of September 30, 2023 and December 31, 2022, respectively | | 12 | | 13 |
| Additional paid-in capital | | 347,376 | | 137,069 |
| Accumulated deficit | | (62,094 ) | | (29,203 ) |
| **Total Stockholders' Equity (Deficit)** | | **285,295** | | **107,879** |
| Non-controlling interest | | 1,358,367 | | 2,077,586 |
| **Total equity** | $ | **1,643,662** | $ | **2,185,465** |
| **Total liabilities and equity** | $ | **3,282,035** | $ | **3,417,945** |

(1)  As of September 30, 2023 and December 31, 2022, the total affiliate receivable, affiliate payable, guaranty obligation and loan from related parties balances are with related parties. In addition, the prepaid expenses and other current assets, claims financing obligation and notes payable,

and interest payable includes balances with related parties. See Note 15, *Related Party Transactions*, for further details.

(2)  As of September 30, 2023 and December 31, 2022, intangible assets, net included $2.3 billion and $2.3 billion, respectively, related to a consolidated VIE. See Note 9, *Variable Interest Entities*, for further details.

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

4

**MSP RECOVERY, INC. and Subsidiaries**
**Condensed Consolidated Statements of Operations (As Restated)**
**(Unaudited)**

| (In thousands except per share amounts) | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 As Restated | 2023 | 2022 As Restated |
| Claims recovery income | $ 440 | $ 2,759 | $ 6,479 | $ 4,225 |
| Claims recovery service income (1) | — | 5,748 | 498 | 17,795 |
| **Total Claims Recovery** | **$ 440** | **$ 8,507** | **$ 6,977** | **$ 22,020** |
| Operating expenses | | | | |
| Cost of claim recoveries (2) | 574 | 1,198 | 1,972 | 1,906 |
| Claims amortization expense | 121,008 | 111,851 | 355,481 | 153,560 |
| General and administrative (3) | 6,130 | 6,621 | 20,691 | 17,049 |
| Professional fees | 2,466 | 5,904 | 15,611 | 10,973 |
| Professional fees – legal (4) | 6,871 | 8,014 | 25,889 | 34,251 |
| Allowance for credit losses | — | — | 5,000 | — |
| Depreciation and amortization | 85 | 103 | 182 | 254 |
| Total operating expenses | 137,134 | 133,691 | 424,826 | 217,993 |
| **Operating Loss** | **$ (136,694)** | **$ (125,184)** | **$ (417,849)** | **$ (195,973)** |
| Interest expense (5) | (88,279) | (46,180) | (204,287) | (80,947) |
| Other income, net | 408 | 63,138 | 8,697 | 63,175 |
| Change in fair value of warrant and derivative liabilities | 348 | 2,670 | 4,247 | (11,683) |
| **Net loss before provision for income taxes** | **$ (224,217)** | **$ (105,556)** | **$ (609,192)** | **$ (225,428)** |
| Provision for income tax expense | — | — | — | — |
| **Net loss** | **$ (224,217)** | **$ (105,556)** | **$ (609,192)** | **$ (225,428)** |
| Less: Net loss attributable to non-controlling members | 204,462 | 103,484 | 576,301 | 221,476 |
| **Net loss attributable to controlling members** | **$ (19,755)** | **$ (2,072)** | **$ (32,891)** | **$ (3,952)** |
| | | | | |
| Basic and diluted weighted average shares outstanding, Class A Common Stock | 12,703,472 | 2,761,476 | 7,097,032 | 2,125,539 |
| **Basic and diluted net loss per share, Class A Common Stock** | **$ (1.56)** | **$ (0.75)** | **$ (4.63)** | **$ (1.86)** |

(1) For the three and nine months ended September 30, 2022, claims recovery service income included $0.0 million and $10.6 million, respectively, of claims recovery service income from VRM MSP. There are no claims recovery service income from VRM MSP for the three and nine months ended September 30, 2023. See Note 13, *Related Party Transactions*, for further details.

(2) For both the three and nine months ended September 30, 2023, cost of claim recoveries included $0.3 million of related party expenses. For both the three and nine months ended September 30, 2022, cost of claim recoveries included $0.3 million of related party expenses. This relates to contingent legal expenses earned from claims recovery income pursuant to legal service agreements with the Law Firm. See Note 13, *Related Party Transactions*, for further details.

(3) For the three and nine months ended September 30, 2022, general and administrative expenses included $0.2 million and $0.4 million of related party expenses. See Note 13, *Related Party Transactions*, for further details. No such related party expenses were present for the three and nine months ended September 30, 2023.

(4) For the three and nine months ended September 30, 2023 and 2022, Professional Fees—legal included $4.6 million and $13.5 million, and $4.6 million and $5.0 million, respectively, of related party expenses related to the Law Firm. See Note 13, *Related Party Transactions*, for further details.

(5) For three and nine months ended September 30, 2023, interest expense included $67.8 million and $159.2 million, respectively, related to interest expense due to VRM. For the three and nine months ended September 30, 2022, interest expense included $33.1 million and $46.5 million, respectively, related to interest expense due to VRM. See Note 13, *Related Party Transactions*, for further details.

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
**Condensed Consolidated Statements of Changes in Equity (As Restated)**
**(Unaudited)**

### Three Months Ended September 30, 2023

| (In thousands except shares) | Class A Common Stock | | Class V Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at June 30, 2023 | 5,289,434 | $ — | 124,264,645 | $ 12 | $ 176,643 | $ (42,339) | $ 1,669,169 | $ 1,803,485 |
| Conversion of Warrants | 125 | — | — | — | 2 | — | 1 | 3 |
| Class A Issuances | 8,509,671 | 1 | — | — | 170,731 | — | (106,341) | 64,391 |
| Net loss | — | — | — | — | — | (19,755) | (204,462) | (224,217) |
| Balance at September 30, 2023 | 13,799,230 | $ 1 | 124,264,645 | $ 12 | $ 347,376 | $ (62,094) | $ 1,358,367 | $ 1,643,662 |

### Three Months Ended September 30, 2022 (As Restated)

| (In thousands) | Class A Common Stock | | Class V Stock | | Additional Paid-in Capital (As Restated) | Member's Deficit | Accumulated Deficit (As Restated) | Non-Controlling Interests (As Restated) | Total Equity (As Restated) |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance at June 30, 2022 | 2,642,042 | $ — | 126,178,932 | $ 13 | $ 127,099 | $ — | $ (23,666) | $ 2,360,520 | $ 2,463,966 |
| Contributions prior to recapitalization transaction | — | — | — | — | — | — | — | — | — |
| Distributions prior to recapitalization transaction | — | — | — | — | — | — | — | — | — |
| Net loss prior to recapitalization transaction | — | — | — | — | — | — | — | — | — |
| Cumulative effect of recapitalization transaction | — | — | — | — | — | — | — | — | — |
| Opening net assets of Lionheart II Holdings, LLC acquired | — | — | — | — | — | — | — | — | — |
| Adjustment for value of derivative on temporary equity | — | — | — | — | 1,062 | — | — | — | 1,062 |
| Conversion of Warrants | 28,247 | — | — | — | 1,805 | — | — | (1,157) | 648 |
| Class A Issuances | 246,096 | — | (230,123) | — | 5,310 | — | — | (10,272) | (4,962) |
| Net loss | — | — | — | — | — | — | (2,072) | (97,273) | (99,345) |
| Balance at September 30, 2022 | 2,916,385 | $ — | 125,948,809 | $ 13 | $ 135,276 | $ — | $ (25,738) | $ 2,251,818 | $ 2,361,369 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

6

**MSP RECOVERY, INC. and Subsidiaries**
**Condensed Consolidated Statements of Changes in Equity (As Restated)**
**(Unaudited)**

**Nine Months Ended September 30, 2023**

| (In thousands except shares) | Class A Common Stock | | Class V Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance at December 31, 2022** | 2,984,212 | $ — | 125,919,180 | $ 13 | $ 137,069 | $ (29,203 ) | $ 2,077,586 | $ 2,185,465 |
| Conversion of Warrants | 9,523 | — | — | — | 388 | — | (169 ) | 219 |
| Class A Issuances | 10,805,495 | 1 | (1,654,535 ) | (1 ) | 209,919 | — | (142,749 ) | 67,170 |
| Net loss | — | — | — | — | — | (32,891 ) | (576,301 ) | (609,192 ) |
| **Balance at September 30, 2023** | 13,799,230 | $ 1 | 124,264,645 | $ 12 | $ 347,376 | $ (62,094 ) | $ 1,358,367 | $ 1,643,662 |

**Nine Months Ended September 30, 2022 (As Restated)**

| (In thousands) | Class A Common Stock | | Class V Stock | | Additional Paid-in Capital (As Restated) | Member's Deficit (As Restated) | Accumulated Deficit (As Restated) | Non-Controlling Interests (As Restated) | Total Equity (As Restated) |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| **Balance at December 31, 2021** | — | $ — | — | $ — | $ — | $ (155,756 ) | $ — | $ 4,348 | $ (151,408 ) |
| Contributions prior to recapitalization transaction | — | — | — | — | — | 15 | — | — | 15 |
| Distributions prior to recapitalization transaction | — | — | — | — | — | (147 ) | — | — | (147 ) |
| Net loss prior to recapitalization transaction | — | — | — | — | — | (28,640 ) | — | — | (28,640 ) |
| Cumulative effect of recapitalization transaction | 303,307 | — | 126,178,932 | 13 | 41,579 | 184,528 | — | 2,490,751 | 2,716,871 |
| Opening net assets of Lionheart II Holdings, LLC acquired | — | — | — | — | — | — | (21,786 ) | — | (21,786 ) |
| Adjustment for value of derivative on temporary equity | — | — | — | — | 10,065 | — | — | — | 10,065 |
| Conversion of Warrants | 316,328 | — | — | — | 15,641 | — | — | (13,444 ) | 2,197 |
| Class A Issuances | 2,296,750 | — | (230,123 ) | — | 67,991 | — | — | (96,144 ) | (28,153 ) |
| Net loss | — | — | — | — | — | — | (3,952 ) | (133,693 ) | (137,645 ) |
| **Balance at September 30, 2022** | 2,916,385 | $ — | 125,948,809 | $ 13 | $ 135,276 | $ — | $ (25,738 ) | $ 2,251,818 | $ 2,361,369 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

7

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows (As Restated)**
**(Unaudited)**

| | | Nine months ended September 30, | | |
|---|---|---|---|---|
| *(In thousands)* | | 2023 | | 2022 |
| | | | | (As Restated) |
| **Cash flows from operating activities:** | | | | |
| Net loss (1) | $ | (609,192) | $ | (225,428) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | | 182 | | 254 |
| Claims amortization expense | | 355,481 | | 153,560 |
| Paid in kind interest (1) | | 204,263 | | 80,947 |
| Change in fair value of derivatives | | 158 | | 10,065 |
| Change in fair value of warrant liability | | (4,406) | | 1,619 |
| Mark to Market Gain on liability payable in stock | | (3,937) | | — |
| Share based compensation | | 1,875 | | 20,055 |
| Non-cash lease expense | | 1 | | — |
| Deferred income taxes | | — | | (531) |
| Allowance for credit losses | | 5,000 | | — |
| Gain on debt extinguishment | | — | | (63,367) |
| Gain on sale of intangibles | | (4,599) | | — |
| Change in operating assets and liabilities: | | | | |
| Accounts receivable | | 53 | | (7,664) |
| Affiliate receivable (1) | | 1,594 | | 2,296 |
| Affiliate payable (1) | | — | | (25,430) |
| Prepaid expenses and other assets (1) | | 13,032 | | (32,609) |
| Commission payable | | 284 | | 75 |
| Accounts payable and other current liabilities | | 8,678 | | 15,394 |
| **Net cash used in operating activities** | | **(31,533)** | | **(70,764)** |
| **Cash flows from investing activities:** | | | | |
| Additions to property, plant, and equipment | | (1,641) | | (1,863) |
| Purchases of intangible assets | | (600) | | (2,700) |
| Proceeds from sale of intangible assets | | 10,000 | | — |
| **Net cash provided by (used in) investing activities** | | **7,759** | | **(4,563)** |
| **Cash flows from financing activities:** | | | | |
| Proceeds from debt financing | | 25,000 | | — |
| Deferred financing costs | | (250) | | — |
| Debt issuance costs | | (683) | | |
| Proceeds from related party loan (1) | | 4,950 | | 125,759 |
| Release of temporary equity | | (11,420) | | — |
| Repayment of the Claims financing obligation | | (2,488) | | — |
| Proceeds from Business Combination | | — | | 12,009 |
| Transaction costs incurred for the Business Combination | | — | | (49,638) |
| Issuance of common stock | | — | | 8,804 |
| Issuance of temporary equity | | — | | 2,417 |
| Warrant conversions | | 243 | | |
| **Net cash provided by financing activities** | | **15,352** | | **99,351** |
| (Decrease) increase in cash and cash equivalents and restricted cash | | (8,422) | | 24,024 |
| Cash and cash equivalents and restricted cash at beginning of year | | 15,081 | | 1,664 |
| **Cash and cash equivalents and restricted cash at end of period** | $ | **6,659** | $ | **25,688** |
| | | | | |
| **Supplemental disclosure of non-cash investing and financing activities:** | | | | |
| Sale of intangible assets | $ | 30,987 | $ | — |
| Purchase of intangible asset financed by note payable | | 250,000 | | — |
| Release of temporary equity | | 1,807 | | — |

| | | |
|---|---|---|
| Original issue discount | 16,667 | — |
| Purchase of intangible asset through issuance of Class A common stock | — | 10,000 |
| Purchase of intangible asset in accrued expenses | — | 48,167 |
| Payment of professional fees through issuance of Class A common stock | 2,049 | 1,326 |
| Transaction costs incurred included in accounts payable and accrued liabilities | — | 29,692 |
| Non-cash lease liabilities arising from obtaining right-of-use assets | 426 | — |
| Payment of Cano Health payment in shares | 61,690 | |

(1)    Balances include related party transactions. See Note 13, *Related Party Transactions*, for further details.

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

8

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## Note 1. DESCRIPTION OF BUSINESS

On May 23, 2022 (the "Closing Date"), MSP Recovery, Inc. d/b/a LifeWallet, a Delaware corporation (formerly known as Lionheart Acquisition Corporation II ("LCAP")) consummated the previously announced business combination pursuant to that certain Membership Interest Purchase Agreement, dated as of July 11, 2021, as amended (the "MIPA"), by and among the Company, Lionheart II Holdings, LLC, a wholly owned subsidiary of the Company, MSP Recovery, LLC and combined and consolidated subsidiaries ("Legacy MSP"), the members of Legacy MSP (the "Members"), and John H. Ruiz, in his capacity as the representative of the Members (the "Members' Representative"). Pursuant to the MIPA, the Members sold and assigned all of their membership interests in Legacy MSP to the Company in exchange for non-economic voting shares of Class V common stock, par value $0.0001, of the Company ("Class V Common Stock") and non-voting economic Class B Units of Opco ("Class B Units," and each pair consisting of one share of Class V Common Stock and one Class B Unit, an "Up-C Unit") (such transaction, the "Business Combination"). The Up-C Units are convertible into Class A Common Stock of the Company at the discretion of the holder of the Up-C Unit. See Note 3, *Business Combination*, for details. Subsequent to the Closing Date, the Company's sole asset is its equity interest in MSP Recovery, LLC. The Company is the managing member and therefore consolidates Legacy MSP.

Legacy MSP was organized in 2014 as a Medicaid and Medicare Secondary Payer Act recovery specialist. The Company utilizes its proprietary internal data analytics platform to review health Claims assigned by secondary payers such as health plans, MSOs, providers of medical services, and independent physicians associations. This platform allows the Company to identify Claims cost recovery rights with potential recovery paths where Claims either should not have been paid by the secondary payers or should have been reimbursed by third-party entities.

MSP Recovery is assigned recovery rights to Claims by secondary payers via CCRAs. Prior to executing a CCRA, MSP Recovery utilizes its proprietary internal data analytics platform to review the set of Claims of a prospective assignor to identify Claims with probable recovery paths. MSP Recovery's assets are these irrevocable broad assignments of health Claims recovery rights that are supported by federal and state laws and regulations. MSP Recovery's operations are primarily conducted in the U.S. and Puerto Rico.

### 2023 Reverse Stock Split

Effective at 11:59 PM EDT on October 12, 2023, the Company amended its Second Amended and Restated Certificate of Incorporation filed with the Secretary of State of the State of Delaware to effect a 1-for-25 reverse stock split of the Company's common stock (the "Reverse Split"). The Company's Class A Common Stock began trading post split on October 13, 2023 under the same symbol, LIFW. As a result of the Reverse Split, every 25 shares of the Company's old common stock were converted into one share of the Company's new common stock. Fractional shares resulting from the Reverse Split were rounded up to the nearest whole number. The Reverse Split automatically and proportionately adjusted, based on the 1-for-25 split ratio, all issued and outstanding shares of the Company's common stock, as well as the terms of warrants and other derivative securities outstanding at the time of the effectiveness of the Reverse Split. Proportionate adjustments were made to the per share exercise price and the number of shares issuable upon the exercise of all outstanding stock options and warrants to purchase shares of common stock. Share and per share data (except par value) for the periods presented reflect the effects of the Reverse Split. References to numbers of shares of common stock and per share data in the accompanying financial statements and notes thereto for periods ended prior to October 13, 2023 have been adjusted to reflect the Reverse Split on a retroactive basis. Unless otherwise noted, the share and per share information in this Quarterly Report have been adjusted to give effect to the one-for-twenty-five (1-for-25) Reverse Split.

### LifeWallet

As of September 30, 2023, the Company's investment related to LifeWallet included in the condensed consolidated statement of operations was limited to activity and expenses incurred during the nine months ended September 30, 2023, which amounted to $3.7 million.

### Committed Equity Facility

On May 17, 2022, the Company entered into a Company Common Stock Purchase Agreement (the "CF Agreement") with an affiliate of Cantor Fitzgerald ("CF"). Pursuant to the CF Agreement, after the closing of the Business Combination, the Company will have the right to sell to CF, from time to time at its option, up to $1 billion in Class A Common Stock shares, subject to the terms, conditions and limitations set forth in the CF Agreement.

On January 6, 2023, the Company entered into a Company Common Stock Purchase Agreement (the "Yorkville Purchase Agreement") with YA II PN, Ltd., a Cayman Island exempted company ("Yorkville"), which replaced the CF Agreement noted above. Pursuant to the Yorkville Purchase Agreement, the Company has the right to sell to Yorkville from time to time at its option up to $1 billion in shares of the Company's Class A Common Stock, subject to the terms, conditions and limitations set forth in the Yorkville Purchase Agreement.

In connection with the Yorkville Purchase Agreement, the ELOC Agreement has been terminated.

9

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

Subsequent to September 30, 2023, the Company entered into the Standby Equity Purchase Agreement ("Yorkville SEPA") with Yorkville, which replaced the Yorkville Purchase Agreement described above. Pursuant to the Yorkville SEPA, the Company has the right to sell to Yorkville up to $250 million of its shares of common stock, subject to certain limitations and conditions set forth in the Yorkville SEPA, from time to time during the term of the Yorkville SEPA. Sales of the shares of common stock to Yorkville under the Yorkville SEPA, and the timing of any such sales, are at the Company's option, and the Company is under no obligation to sell any shares of common stock to Yorkville under the Yorkville SEPA except in connection with notices that may be submitted by Yorkville, in certain circumstances as described below.

Upon the satisfaction of the conditions to Yorkville's purchase obligation set forth in the Yorkville SEPA, including having a registration statement registering the resale of the shares of common stock issuable under the Yorkville SEPA declared effective by the SEC, the Company will have the right, but not the obligation, from time to time at its discretion until the Yorkville SEPA is terminated to direct Yorkville to purchase a specified number of shares of common stock ("Advance") by delivering written notice to Yorkville ("Advance Notice"). While there is no mandatory minimum amount for any Advance, it may not exceed an amount equal to 100% of the average of the daily traded amount during the five consecutive trading days immediately preceding an Advance Notice.

The shares of common stock purchased pursuant to an Advance delivered by the Company will be purchased at a price equal to (i) 98% of the VWAP of the shares of common stock on the applicable date of delivery of the Advance Notice during regular trading hours on such date or (ii) 97% of the lowest daily VWAP of the shares of common stock during the three consecutive trading days commencing on the date of the delivery of the Advance Notice, other than the daily VWAP on a day in which the daily VWAP is less than a minimum acceptable price as stated by the Company in the Advance Notice or there is no VWAP on the subject trading day. The Company may establish a minimum acceptable price in each Advance Notice below which the Company will not be obligated to make any sales to Yorkville. "VWAP" is defined as the daily volume weighted average price of the shares of common stock for such trading day on the Nasdaq Stock Market during regular trading hours as reported by Bloomberg L.P.

In connection with the Yorkville SEPA, and subject to the condition set forth therein, Yorkville has agreed to advance to the Company in the form of convertible promissory notes (the "Convertible Notes") an aggregate principal amount of $15.0 million (the "Pre-Paid Advance"). The Pre-Paid Advance was disbursed on November 14, 2023 with respect to $5.0 million and the remaining balance of the Pre-Paid Advance will be disbursed in the amount of (i) $5.0 million on the second trading day after the first amendment to the registration statement registering the resale of the shares of common stock issuable under the Yorkville SEPA being filed and (ii) $5.0 million upon the registration statement registering the resale of the shares of common stock issuable under the Yorkville SEPA being declared effective. The purchase price for the Pre-Paid Advance is 95.0% of the principal amount of the Pre-Paid Advance. If required pursuant to the amended and restated promissory note issued by the Company to Nomura, Yorkville shall pay the aggregate purchase price for the shares of common stock will be offset against an amount outstanding under a promissory note (first towards accrued and unpaid interest, if any, then towards principal equal to 50% of such aggregate purchase price and payment of the remaining 50% of such aggregate purchase price to the Company). Interest shall accrue on the outstanding balance of any Pre-Paid Advance at an annual rate equal to 5.0%, subject to an increase to 18% upon an event of default as described in the Convertible Notes. Yorkville may convert the Convertible Notes into shares of the Company's common stock at a conversion price equal to the lower of 120% of VWAP the day prior to the date of the closing of each tranche (the "Fixed Price") or 95% of the lowest daily VWAP during the five consecutive trading days immediately preceding the conversion (the "Conversion Price"), which in no event may the Conversion Price be lower than 20% of the closing price the trading day immediately prior to the signing of the definitive documents (the "Floor Price"). In addition, upon the occurrence and during the continuation of an event of default, the Convertible Notes shall become immediately due and payable and the Company shall pay to Yorkville the principal and interest due thereunder. In no event shall Yorkville be allowed to effect a conversion if such conversion, along with all other shares of common stock beneficially owned by Yorkville and its affiliates would exceed 9.99% of the outstanding shares of the common stock of the Company. If any time on or after November 14, 2023 (i) the daily VWAP is less than the Floor Price for ten consecutive trading days ("Floor Price Trigger"), (ii) the Company has issued substantially all of the shares available under the Exchange Cap (as defined below) ("Exchange Cap Trigger") or (iii) the Parent is in material breach of the Registration Rights Agreement, dated as of the date hereof, by and between Yorkville and the Company (the "Registration Rights Agreement") and such breach remains uncured for a period of twenty trading days, or the occurrence of an "Event" (as defined in the Registration Rights Agreement) ("Registration Event Trigger" and collectively with the Floor Price Trigger and the Exchange Cap Trigger, the "Trigger"), then the Company shall make monthly payments to Yorkville beginning on the seventh trading day after the Trigger and continuing monthly in the amount of $1,500,000 plus an 5.0% premium and accrued and unpaid interest. The Exchange Cap Trigger will not apply in the event the Company has obtained the approval from its stockholders in accordance with the rules of Nasdaq Stock Market for the issuance of shares of common stock pursuant to the transactions contemplated in the Convertible Note and the Yorkville SEPA in excess of 19.99% of the aggregate number of shares of common stock issued and outstanding as of the effective date of the Yorkville SEPA (the "Exchange Cap").

Yorkville, in its sole discretion and providing that there is a balance remaining outstanding under the Convertible Notes, may deliver a notice under the Yorkville SEPA requiring the issuance and sale of shares of common stock to Yorkville at the Conversion

Price in consideration of an offset of the Convertible Notes ("Yorkville Advance"). Yorkville, in its sole discretion, may select the amount of any Yorkville Advance, provided that the number of shares issued does not cause Yorkville to exceed the 9.99% ownership

10

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

limitation, does not exceed the Exchange Cap or the amount of shares of common stock that are registered. As a result of a Yorkville Advance, the amounts payable under the Convertible Notes will be offset by such amount subject to each Yorkville Advance.

The Company will control the timing and amount of any sales of shares of common stock to Yorkville, except with respect to Yorkville Advances. Actual sales of shares of common stock to Yorkville as an Advance under the Yorkville SEPA will depend on a variety of factors to be determined by the Company from time to time, which may include, among other things, market conditions, the trading price of the Company's common stock and determinations by the Company as to the appropriate sources of funding for our business and operations.

The Yorkville SEPA will automatically terminate on the earliest to occur of (i) the first day of the month following the 36-month anniversary of the date of the Yorkville SEPA or (ii) the date on which Yorkville shall have made payment of Advances pursuant to the Yorkville SEPA for shares of common stock equal to $250,000,000. The Company has the right to terminate the Yorkville SEPA at no cost or penalty upon five (5) trading days' prior written notice to Yorkville, provided that there are no outstanding Advance Notices for which shares of common stock need to be issued and the Company has paid all amounts owed to Yorkville pursuant to the Convertible Notes. The Company and Yorkville may also agree to terminate the Yorkville SEPA by mutual written consent. Neither the Company nor Yorkville may assign or transfer the Company's respective rights and obligations under the Yorkville SEPA, and no provision of the Yorkville SEPA may be modified or waived by the Company or Yorkville other than by an instrument in writing signed by both parties.

The Yorkville SEPA contains customary representations, warranties, conditions and indemnification obligations of the parties. The representations, warranties and covenants contained in such agreements were made only for purposes of such agreements and as of specific dates, were solely for the benefit of the parties to such agreements and may be subject to limitations agreed upon by the contracting parties.

The net proceeds under the Yorkville SEPA to the Company will depend on the frequency and prices at which the Company sells its shares of common stock to Yorkville. The Company expects that any proceeds received from such sales to Yorkville will be used for working capital and general corporate purposes.

## Cano Health

On July 7, 2023, the Company issued 7,960,001 unregistered shares of Class A Common Stock (after giving effect to the Reverse Split) to Cano Health, LLC ("Cano") as payment for $61.7 million in deferred compensation related to the following agreements, which the Company had the option to pay in cash or in stock and has elected to pay in stock, of which (i) 3,225,807 shares of Common Stock were issued as a deferred consideration for the assignment of certain claims pursuant to that certain Purchase Agreement, effective as of September 30, 2022, as amended to date, by and between MSP Recovery and Cano, and (ii) 4,734,194 shares of Common Stock were issued as deferred consideration for the assignment of certain claims pursuant to that certain Amended and Restated Claims Recovery and Assignment Agreement effective as of December 31, 2021, as amended to date, by and between MSP Recovery and Cano. See summary in "*Cano Health*" in Note 12, *Commitments and Contingencies*.

## Liquidity

As an early-stage growth company, the Company has incurred substantial net losses since inception. As of September 30, 2023, the Company had unrestricted cash and cash equivalents totaling $6.7 million. The Company has incurred recurring losses and negative cash flows since inception and has an accumulated deficit of $62.1 million as of September 30, 2023. For the nine months ended September 30, 2023, the Company used approximately $31.5 million of cash in operations. The Company's liquidity will depend on the ability to generate substantial Claims recovery income and Claims recovery services income in the near future, the timing of which is uncertain, as well as its ability to secure funding from capital sources. The Company's principal liquidity needs have been capital expenditures, working capital, debt service and Claims financing obligations.

The Company anticipates sources of liquidity to include the Working Capital Credit Facility as disclosed in Note 10, *Claims Financing Obligations and Notes Payable*. The Company anticipates having funding through the Working Capital Credit Facility and has taken several actions to address liquidity concerns, including:

11

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

1. On March 29, 2023, the Company's subsidiary, Subrogation Holdings, LLC and its parent, MSP Recovery LLP, entered into the Working Capital Credit Facility consisting of commitments to fund up to $48 million in proceeds. See summary in "*Hazel Transactions*" in Note 10, *Claims Financing Obligations and Notes Payable*.

2. On November 13, 2023, the Company entered into the MTA Amendment No. 2 and Amendment to the Amended and Restated Security Agreement ("Second Virage MTA Amendment"), which extended the due date for the payment obligations to Virage to December 31, 2024. See summary in Note 4, *Asset Acquisitions*. This payment obligation will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy such obligations.

3. On November 13, 2023, the Company entered into the Amended and Restated Nomura Promissory Note, which extended the due date to December 31, 2024. See summary in Note 10, *Claims Financing Obligations and Notes Payable*. Amended and Restated Nomura Promissory Note will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy said obligation.

4. On November 14, 2023, the Company entered into the Yorkville SEPA, which included a pre-advancement in the amount of up to $15.0 million in connection with the purchase of the Company's common stock. See summary above in "*Committed Equity Facility*" within Note 1, *Description of the Business*.

5. Given the uncertainty with regard to the timing and amount of claims recovery income, management implemented a reduction of operating costs in 2023 through the reduction or elimination of certain controllable expenses particularly within the budgeted costs to expand and develop new solutions through LifeWallet platform, advertising expenses and non-contingent legal fees.

The Company has concluded that such actions alleviate the substantial doubt about the Company's ability to continue as a going concern beyond one year from the date these financial statements are issued.

**Notice of Non-Compliance with Nasdaq Listing Requirements**

On April 24, 2023, the Company was notified by Nasdaq Listing Qualifications staff (the "Staff") that the Company was non-compliant with Nasdaq Listing Rule 5250(c)(1) as a result of not having timely filed its 2022 Form 10-K. The Company was also deemed non-compliant with Nasdaq's Bid Price Requirement as the closing bid price for the Company's Class A Common Stock had fallen below $1.00 per share for 30 consecutive business days (March 13, 2023 through April 23, 2023). Pursuant to Nasdaq Marketplace Rule 5810(c)(3)(A), the Company was provided with a compliance cure period of 180 calendar days, or until October 23, 2023, to regain compliance with the Bid Price Requirement. On July 27, 2023, the Company filed its 2022 Form 10-K.

On May 24, 2023, the Company was notified by Nasdaq that it was not in compliance with the requirements of Nasdaq Listing Rule 5250(c) as a result of not having timely filed its Form 10-Q for the period ended March 31, 2023 with the SEC. On August 7, 2023, Nasdaq granted the Company an extension until August 30, 2023 to file its Quarterly Reports on Form 10-Q for the quarters ending March 31, 2023 and June 30, 2023. On August 16, 2023, the Company was notified by Nasdaq that it was not in compliance with the requirement of Nasdaq Listing Rule 5250(c)(1) as a result of not having timely filed its Form 10-Q for the period ended June 30, 2023 with the SEC. On August 17, 2023, the Company filed its Quarterly Report on Form 10-Q for the period ending March 31, 2023. The Company has regained compliance with such rule as a result of the filing of the Quarterly Report on Form 10-Q for the period ended June 30, 2023 on August 30, 2023. On August 31, 2023, the Company was notified by Nasdaq that it regained compliance with Nasdaq Listing Rule 5250(c)(1) after having filed its 2022 Form 10-K, and Quarterly Reports on Form 10-Q for the quarters ended March 31, 2023 and June 30, 2023.

On September 5, 2023, the Company received a determination from the Staff that the Company's Class A Common Stock had a closing bid price of $0.10 or less for 10 consecutive trading days during a compliance period and so, pursuant to Listing Rule 5810(3) (A)(iii), the Staff determined to delist the Company's securities from The Nasdaq Capital Market (the "Delisting Determination"). Pursuant to the procedures set out in the Nasdaq Listing Rules, the Company appealed the Delisting Determination to a hearing panel (the "Hearing"), which suspended the Delisting Determination until the Hearing, which was scheduled for November 2, 2023. The Company effected the Reverse Stock Split on October 13, 2023, which caused the price of its Class A Common Stock to trade at a level sufficient to regain compliance with Listing Rule 5810(3)(A)(iii), and Listing Rule 5450(a)(1). On October 27, 2023, the Company was notified by the Staff that it had regained compliance with all applicable listing standards, the Hearing was canceled, and that the Company's stock will continue to be listed and traded on the Nasdaq Stock Market.

12

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## Note 2. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation and Principles of Consolidation

*Basis of presentation*

These statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and, in accordance with those rules and regulations, do not include all information and footnote disclosures normally included in annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). In the opinion of management, the unaudited condensed consolidated interim financial statements (the "Financial Statements") reflect all adjustments, which consist only of normal recurring adjustments, necessary to state fairly the results of operations, financial condition and cash flows for the interim periods presented herein. Prior to the Business Combination, the Financial Statements reflect Legacy MSP.

These Financial Statements should be read in conjunction with the consolidated financial statements and notes thereto included in the 2022 Form 10-K. The year-end condensed consolidated balance sheet data was derived from the audited financial statements but does not include all disclosures required by GAAP. The results of operations for any interim period are not necessarily indicative of the results of operations to be expected for the full year.

All intercompany transactions and balances are eliminated from the Financial Statements.

*Principles of consolidation*

The Company consolidates all entities that it controls through a majority voting interest or otherwise and the accompanying Financial Statements include the accounts of the Company's wholly owned subsidiaries and these entities for which the Company has a controlling interest in. The Company also consolidates all entities that it controls as the primary beneficiary of a variable interest entity ("VIE"). Under the VIE model, management first assesses whether the Company has a variable interest in an entity, which would include an equity interest. If the Company has a variable interest in an entity, management further assesses whether that entity is a VIE, and if so, whether the Company is the primary beneficiary under the VIE model. Generally, entities that are organized similar to a limited partnership, in which a general partner (or managing member) make the most relevant decisions that affect the entity's economic performance, are considered to be VIEs which would require consolidation, unless the limited partners have substantive kickout or participating rights. Entities that do not qualify as VIEs are assessed for consolidation under the voting interest model.

Under the VIE model, an entity is deemed to be the primary beneficiary of a VIE if it holds a controlling financial interest. A controlling financial interest is defined as (a) the power to direct the activities of a VIE that most significantly affect the entity's economic performance and (b) the obligation to absorb losses of the entity or the right to receive benefits from the entity that could potentially be significant to the VIE. Management determines whether the Company is the primary beneficiary of a VIE at the time it becomes involved with a VIE and reconsiders that conclusion at each reporting date. This analysis includes an evaluation of the Company's control rights, as well as the economic interests that the Company holds in the VIE, including indirectly through related parties. As a result of the Business Combination, the Company consolidates MSP Recovery under the VIE model.

### Correction of Previously Reported Interim Condensed Consolidated Quarterly Financial Statement

The interim condensed consolidated financial statements include corrections to the three and nine months ended September 30, 2022, respectively, which were presented in Note 18 to the audited consolidated financial statements and notes thereto for the fiscal year ended December 31, 2022, in the Company's fiscal year 2022 Form 10-K filed on July 27, 2023. This restatement corrected errors in the accounting for the indemnification asset, various intangible assets and rights to cash flows, and consolidation of an entity in connection with our business combination.

*Description of Restatement of Financial Information*

Subsequent to the issuance of the interim financial information as of and for the periods ended June 30, 2022 and September 30, 2022, management identified material errors in such financial information. As disclosed within Note 4, *Asset Acquisitions*, the Company acquired various intangible assets in connection with the Business Combination. The Company identified an error in the accounting for these acquisitions, in that the Class A market price as of the Closing Date utilized in the valuation included the value of the New Warrants, whereas the Up-C Units provided in the acquisition did not have rights to New Warrants. Therefore, the Class A market price did not equate to the value of the Up-C Units until the opening of the day after the Closing Date when the New Warrants became detached from the Class A shares. This error impacts the intangible assets value that were acquired as of the Closing Date and the resulting amortization of those assets.

In addition, the Company also determined, based on analysis of the rights to cash flows from the Series and the related guaranty obligation, that the Company is the primary beneficiary of the Series, and therefore should consolidate as of the transaction date. This

error impacts the intangible assets and indemnification asset value that was acquired as the balance is now reflected in Intangible Assets, net and is therefore amortized rather than recorded as a financial asset; as a result of this change, the indemnification asset is no longer recorded and the Virage Guaranty is accreted through interest expense. The Company's financial statements should also include the activity of the Series from the date of acquisition as it is now consolidated.

13

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

As a result of these errors, the Company determined that the valuation of the asset acquisitions and impacts of consolidating the Series were misstated in the Company's financial statements for the periods ending June 30 and September 30, 2022. In the following tables, the Company has presented a reconciliation of its unaudited condensed consolidated financial information as originally reported, to the as restated amounts as of and for the three and nine months ended September 30, 2022.

The table below sets forth the unaudited condensed consolidated balance sheet information, including the balances as reported, adjustments and the balances as restated. Note that only amounts that have changed have been disclosed:

| | For the reporting period | | |
| | September 30, 2022 | | |
| (In thousands except per share amounts) | As previously reported | Restatement Adjustments | As Restated |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets:** | | | |
| Accounts receivable | $ 7,525 | $ 138 | $ 7,663 |
| Indemnification asset | 752,510 | (752,510 ) | — |
| **Total current assets** | **820,157** | **(752,372 )** | **67,785** |
| Deferred tax asset | 857 | (857 ) | — |
| Intangible assets, net | 2,077,571 | 1,395,955 | 3,473,526 |
| Investment in rights to claim recovery cash flows | 3,673,610 | (3,673,610 ) | — |
| **Total assets** | **$ 6,574,675** | **$ (3,030,884 )** | **$ 3,543,791** |
| | | | |
| **Stockholders' Equity (Deficit):** | | | |
| Additional paid-in capital | $ 201,965 | $ (66,689 ) | $ 135,276 |
| Accumulated deficit | (23,537 ) | (2,201 ) | (25,738 ) |
| **Total Stockholders' Equity (Deficit)** | **$ 178,441** | **$ (68,890 )** | **$ 109,551** |
| Non-controlling interest | 5,213,812 | (2,961,994 ) | 2,251,818 |
| **Total equity** | **$ 5,392,253** | **$ (3,030,884 )** | **$ 2,361,369** |
| **Total liabilities and equity** | **$ 6,574,675** | **$ (3,030,884 )** | **$ 3,543,791** |

The table below sets forth the unaudited condensed consolidated statements of operations, including the balances as reported, adjustments and the as restated balances. Note that only amounts that have changed have been disclosed:

| | For the three months ended September 30, 2022 | | | For the nine months ended September 30, 2022 | | |
| (In thousands except per share amounts) | As Reported | Restatement Adjustments | As Restated | As Reported | Restatement Adjustments | As Restated |
|---|---|---|---|---|---|---|
| Claims recovery income | $ 2,571 | 188 | $ 2,759 | $ 3,999 | $ 226 | $ 4,225 |
| **Total Claims Recovery** | **$ 8,319** | **$ 188** | **$ 8,507** | **$ 21,794** | **$ 226** | **$ 22,020** |
| Operating expenses | | | | | | |
| Cost of claim recoveries | 1,160 | 38 | 1,198 | 1,861 | 45 | 1,906 |
| Claims amortization expense | 66,331 | 45,520 | 111,851 | 92,866 | 60,694 | 153,560 |
| Professional fees | 5,875 | 29 | 5,904 | 10,931 | 42 | 10,973 |
| Total operating expenses | 88,104 | 45,587 | 133,691 | 157,212 | 60,781 | 217,993 |
| **Operating Loss** | **$ (79,78 5)** | **$ (45,39 9)** | **$ (125,184 )** | **$ (135,4 18)** | **$ (60,555 )** | **$ (195,9 73)** |
| Interest expense | (13,08 3) | (33,09 7) | (46,180 ) | (34,47 5) | (46,472 ) | (80,94 7) |
| Net loss before provision for income taxes | **$ (27,06 0)** | **$ (78,49 6)** | **$ (105,556 )** | **$ (118,4 01)** | **$ (107,027 )** | **$ (225,4 28)** |
| Provision for income tax benefit (expense) | - | - | - | 326 | (326 ) | - |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net loss | $ | (27,060) | $ | (78,496) | $ | (105,556) | $ | (118,075) | $ | (107,353) | $ | (225,428) |
| Less: Net (income) loss attributable to non-controlling members | | 26,597 | | 76,887 | | 103,484 | | 116,324 | | 105,152 | | 221,476 |
| Net loss attributable to controlling members | $ | (463) | $ | (1,609) | $ | (2,072) | $ | (1,751) | $ | (2,201) | $ | (3,952) |
| | | | | | | | | | | | | |
| Basic and diluted weighted average shares outstanding, Class A Common Stock | | 2,761,476 | | N/A | | 2,761,476 | | 2,125,539 | | N/A | | 2,125,539 |
| Basic and diluted net income per share, Class A Common Stock | $ | (0.17) | | N/A | $ | (0.75) | $ | (0.82) | | N/A | $ | (1.86) |

14

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

The table below sets forth the unaudited condensed consolidated statements of cash flows, including balances as reported, adjustments and balances as restated amounts. Note that only amounts that have changed have been disclosed:

| (In thousands) | As Previously Reported | | Restatement Adjustments | | As Restated | |
|---|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | | |
| Net loss | $ | (118,075) | $ | (107,353) | $ | (225,428) |
| Claims amortization expense | | 92,866 | | 60,694 | | 153,560 |
| Paid in kind interest | | 34,475 | | 46,472 | | 80,947 |
| Deferred income taxes | | (857) | | 326 | | (531) |
| Accounts receivable | | (7,525) | | (139) | | (7,664) |
| **Net cash used in operating activities** | $ | (70,764) | $ | — | $ | (70,764) |
| **Net cash used in investing activities** | $ | (4,563) | $ | — | $ | (4,563) |
| **Net cash provided by financing activities** | $ | 99,351 | $ | — | $ | 99,351 |

The table below sets forth the unaudited condensed consolidated statements of changes in equity, including balances as reported, adjustments and balances as restated amounts. Note that only amounts that have changed have been disclosed:

| | As Previously Reported | | | | Restatement Adjustments | | | | As Restated | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (In thousands except shares) | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity | Additional Paid-in Capital | Accumulated Deficit | Non-Controlling Interests | Total Equity |
| **Balance at December 31, 2021** | $ — | $ — | $ 4,348 | $ (151,408) | | | | | $ — | $ — | $ 4,348 | $ (151,408) |
| Contributions prior to recapitalization transaction | — | — | — | 15 | | | | | — | — | — | 15 |
| Distributions prior to recapitalization transaction | — | — | — | (147) | | | | | — | — | — | (147) |
| Net loss prior to recapitalization transaction | — | — | — | (28,640) | | | | | — | — | — | (28,640) |
| Cumulative effect of recapitalization transaction | 49,075 | — | 5,406,736 | 5,640,352 | (7,496) | — | (2,915,985) | (2,923,481) | 41,579 | — | 2,490,751 | 2,716,871 |
| Opening net assets of Lionheart II Holdings, LLC acquired | — | (21,786) | — | (21,786) | | | | | — | (21,786) | — | (21,786) |
| Adjustment for value of derivative on temporary equity | 10,065 | — | — | 10,065 | | | | | 10,065 | — | — | 10,065 |
| Conversion of Warrants | 22,896 | — | (13,444) | 9,452 | (7,255) | — | | (7,255) | 15,641 | — | (13,444) | 2,197 |
| Class A Issuances | 119,929 | — | (96,144) | 23,785 | (51,938) | — | | (51,938) | 67,991 | — | (96,144) | (28,153) |
| Net loss | — | (1,751) | (87,684) | (89,435) | | (2,201) | (46,009) | (48,210) | — | (3,952) | (133,693) | (137,645) |
| **Balance at September 30, 2022** | $ 201,965 | $ (23,537) | $ 5,213,812 | $ 5,392,253 | $ (66,689) | $ (2,201) | $ (2,961,994) | $ (3,030,884) | $ 135,276 | $ (25,738) | $ 2,251,818 | $ 2,361,369 |

15

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## Estimates and Assumptions

The preparation of Financial Statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and reported amounts of revenues and expenses during the reporting periods. Actual results could differ from the Company's estimates. Estimates are periodically reviewed considering changes in circumstances, facts, and experience. Changes in estimates are recorded in the period in which they become known. Significant estimates and assumptions reflected in these Financial Statements include, but are not limited to, Claims recovery income and Claims recovery service income recognition, recoverability of long-lived assets, and cost of Claims recoveries.

## Concentration of credit risk and Off-Balance Sheet Risk

Cash and cash equivalents and affiliate receivable are financial instruments that are potentially subject to concentrations of credit risk. See Note 13, *Related Party Transactions*, for disclosure of affiliate receivables. The Company's cash and cash equivalents and restricted cash are deposited in accounts at large financial institutions, which at times may exceed federally insured limits. The Company has not incurred any losses on these accounts. The Company believes it is not exposed to significant credit risk due to the financial strength of the depository institutions in which the cash and cash equivalents are held. The Company has no other financial instruments with off-balance-sheet risk of loss.

## Non-controlling Interests

As part of the Business Combination and described in Note 3, *Business Combination*, the Company became the managing member of MSP Recovery, which is consolidated as the Company controls the operating decisions of MSP Recovery. The non-controlling interest relates to the Up-C Units that are convertible into Class A Common Stock of the Company at the discretion of the holder of the Up-C Unit. The Up-C Unit holders retained approximately 99.76% of the economic ownership percentage of the Company as of the Closing Date. The non-controlling interest is classified as permanent equity within the condensed consolidated balance sheet of the Company. As of September 30, 2023, based on the Class A Common Stock issuances during the period, the non-controlling interest of Class V Common Stock shareholders was 90.01%.

Changes in the Company's ownership interest in MSP Recovery, due to Class V Common Stock shareholders converting their shares to Class A Common Stock, are accounted for as equity transactions. Each issuance of the Company's Class A Common Stock requires a corresponding issuance of MSP Recovery units to the Company. The issuance would result in a change in ownership and would reduce the balance of non-controlling interest and increase the balance of additional paid-in capital.

## Claims Recovery Service Income

For the three and nine months ended September 30, 2023 and 2022, the majority of the Company's Claims recovery service income was related to a servicing agreements with VRM MSP and MSP RH Series 01. As part of the Business Combination, the Company acquired rights to cash flows in the assets, after certain required returns to VRM MSP, that had been part of the servicing agreement. As part of this acquisition, the Company no longer receives service income from this agreement and consolidates the entity in which the Company acquired rights to cash flow in the assets as outlined in Note 4, *Asset Acquisitions*.

In connection with the Hazel transactions discussed in Note 4, *Asset Acquisitions,* the Company terminated its service agreement with MSP Recovery RH Series 01, an affiliate of Hazel.

## Recent Accounting Pronouncements

### New Accounting Pronouncements Recently Adopted

ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses*. In 2016 and subsequently, the FASB issued ASU 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments including subsequent amendments to the initial guidance*: ASU 2019-04, *Codification Improvements to Topic 326, Financial Instruments – Credit Losses, Topic 815, Derivatives and Hedging, and Topic 825. Financial Instruments, ASU 2019-05, Financial Instruments – Credit Losses (Topic 326): Targeted Transition Relief,* ASU 2019-11, *Codification Improvements to Topic 326, Financial Instruments – Credit Losses*. ASU 326, and ASU 2022-02, *Financial Instruments – Credit Losses (Topic 326): Troubled Debt Restructurings and Vintage Disclosures* and related amendments require credit losses on financial instruments measured at amortized cost basis to be presented at the net amount expected to be collected, replacing the current incurred loss approach with an expected loss methodology that is referred to as CECL. This ASU is effective for fiscal years beginning after December 15, 2022, and interim periods within those fiscal years. The Company adopted this guidance on January 1, 2023 and it had no material impact on our Financial Statements.

16

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

**Note 3. BUSINESS COMBINATION**

On May 23, 2022, MSP Recovery, Inc. consummated the Business Combination pursuant to that certain Membership Interest Purchase Agreement, dated as of July 11, 2021, as amended (the "MIPA"), by and among the Company, Lionheart II Holdings, LLC, a wholly owned subsidiary of the Company, MSP Recovery, LLC and combined and consolidated subsidiaries ("Legacy MSP"), the members of Legacy MSP (the "Members"), and John H. Ruiz, in his capacity as the representative of the Members (the "Members' Representative"). Pursuant to the MIPA, the Members sold and assigned all of their membership interests in Legacy MSP to the Company in exchange for non-economic voting shares of Class V common stock, par value $0.0001, of the Company ("Class V Common Stock") and non-voting economic Class B Units of Opco ("Class B Units," and each pair consisting of one share of Class V Common Stock and one Class B Unit, an "Up-C Unit") (such transaction, the "Business Combination"). Subsequent to the Closing Date, the Company's sole asset is its equity interest in MSP Recovery.

As a result of the closing of the Business Combination (the "Closing"), the Company is organized in an "Up-C" structure in which all of the business of Legacy MSP and its subsidiaries is held directly or indirectly by the Company, the Company is the managing member and consolidates Legacy MSP. The Company owns all of the voting economic Class A Units and the Members and their designees own all of the non-voting economic Class B Units in accordance with the terms of the first amended and restated limited liability company agreement of the Company. Each Up-C Unit may be exchanged for either, at the Company's option, (a) cash or (b) one share of Class A Common Stock, subject to the provisions set forth in the LLC Agreement. The aggregate consideration paid to the Members (or their designees) at the Closing consisted of (i) 130,000,000 Up-C Units and (ii) rights to receive payments under the Tax Receivable Agreement, discussed in detail above. Of the 130,000,000 Up-C Units, 126,178,932 Up-C Units were issued in connection with the Closing and 3,821,069 Units were designated to the Company and Opco for cancellation ("Canceled Units"). Since the Closing, the Company has issued 2,000,880 Up-C Units to certain designated persons and intends to further issue shares of Class A Common Stock in respect of transaction-related bonuses or certain other designated persons, which together with the 2,000,880 Up-C Units, would be equivalent in number to the Canceled Units.

In connection with the Closing, the Company changed its name from "Lionheart Acquisition Corporation II" to "MSP Recovery, Inc." The Business Combination is accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, the Company is treated as the acquired for financial statement reporting purposes. The reverse recapitalization was treated as the equivalent of Legacy MSP issuing stock for the net assets of LCAP, accompanied by a recapitalization. The net assets of LCAP are stated at historical cost, with no goodwill or other intangible assets recorded.

The Company received net proceeds in the business combination transaction of approximately $23.4 million, which includes the restricted cash received as part of FEF shares as defined in Note 15, *Derivative Liability*. The Company incurred direct and incremental costs of approximately $79.2 million related to the Business Combination, which consisted primarily of investment banking, legal, accounting, and other professional fees. These transaction-related costs were recorded as a reduction of additional paid-in capital in the condensed consolidated balance sheets. During the nine months ended September 30, 2023, the Company and CF agreed to terminate their OTC Equity Prepaid Forward Transaction. As a result of this termination, the restricted cash received as part of FEF shares amounting to $11.4 million was released and paid to Cantor.

*Warrants*

As part of the Business Combination transaction, the Company assumed the liability related to the LCAP public warrants ("Public Warrants") of $12.5 million. Pursuant to the terms of the Existing Warrant Agreement, and after giving effect to the issuance of the New Warrants, as defined below, the exercise price of the Public Warrants decreased to a Reverse Split adjusted $0.0025 per share of Class A Common Stock. During the period from the Closing Date to September 30, 2023, approximately 8.7 million warrants of the original 11.8 million warrants have been exercised and the fair value of the remaining warrants decreased resulting in other income for the three and nine months ended September 30, 2023 and 2022. Following anti-dilution adjustments made in connection with the Business Combination, and adjusted for the Reverse Split, the Public Warrants have an exercise price of $0.0025 per share, which have become exercisable as of 10 days after closing of the Business Combination, on a cashless basis.

Additionally, in connection with the Business Combination, the Company declared the New Warrant dividend comprising approximately 1,028 million New Warrants payable to the holders of record of the Class A Common Stock as of the close of business on the Closing Date, after giving effect to the waiver of the right, title, and interest in, to or under, participation in any such dividend by the Members, on behalf of themselves and any of their designees. The New Warrants will be exercisable 30 days following the Closing Date until their expiration date, which will be the fifth anniversary of the Closing Date or earlier redemption. The record date for the determination of the holders of record of the outstanding shares of Class A Common Stock entitled to receive the New Warrant dividend was the close of business on the Closing Date. Pursuant to the terms of the LLC Agreement, at least twice a month, to the extent any New Warrants have been exercised in accordance with their terms, the Company is required to purchase from the MSP Principals, proportionately, the number of Up-C Units or shares of Class A Common Stock owned by such MSP Principal equal to the

aggregate exercise price divided by the warrant exercise price in exchange for the aggregate exercise price. The Company determined that the New Warrants instruments meet the equity scope exception in ASC 815 to be classified in stockholders' equity, and as the repurchase right

17

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

noted above has a mirrored value designed to offset the New Warrants, if exercised would be an equity only transaction. The New Warrants are each exercisable for 1/25th of one share of Class A Common Stock at a Reverse Split adjusted exercise price of $287.50 per whole share. The New Warrants must be exercised in lots of 25, as no fractional shares will be issued as a result of their exercise. The New Warrants are subject to certain anti-dilution adjustments.

Public Warrants and New Warrants are currently listed on Nasdaq under the symbols "LIFWZ" and "LIFWW," respectively.

*Tax Receivable Agreement*

In connection with the Business Combination, the Company also entered into a Tax Receivable Agreement (the "TRA"). Pursuant to the TRA, the Company is required to pay the sellers 85% of the amount of tax benefits that the Company actually realizes as a result of (i) the Company's direct and indirect allocable share of existing tax basis acquired in the Business Combination, (ii) increases in the Company's allocable share of existing tax basis and tax basis adjustments that will increase the tax basis of the tangible and intangible assets of the Company as a result of the Business Combination and as a result of sales or exchanges of Up-C Units for cash or shares of Class A Common Stock, and (iii) certain other tax benefits related to entering into the Tax Receivable Agreement, including tax benefits attributable to payments under the Tax Receivable Agreement. During the three and nine months ended September 30, 2023, 0.0 million and 1.7 million, respectively, of Class V units were exchanged for Class A Common Stock of the Company. The Company receives an increase in its share of the tax basis in the net assets of MSP Recovery, LLC due to the interests being redeemed. The Company has assessed the realizability of the net deferred tax assets and in that analysis has considered the relevant positive and negative evidence available to determine whether it is more likely than not that some portion or all of the deferred tax assets will be realized. The Company has recorded a full valuation allowance against the deferred tax assets as of September 30, 2023, which will be maintained until there is sufficient evidence to support the reversal of all or some portion of these allowances. As the tax benefits associated with the TRA have not been recognized, based on estimates of future taxable income, the Company has concluded it is not probable to recognize any tax receivable agreement liability. If the valuation allowance recorded against the deferred tax assets is released in a future period, the TRA liability may be considered probable at that time and recorded within earnings.

*Non-Controlling interest*

As a result of the Business Combination, the Company reflects non-controlling interests as a result of the Up-C structure. The Company holds all of the voting Class A Units of Opco, whereas the Members (or their designees) hold all of the non-voting economic Class B Units of Opco (these Class B Units represent the non-controlling interest in the Company). The ownership percentage of Class V Common Stock held in the post-combination Company by the Members (or their designees) will be equivalent to the number of Class B Units of Opco, and as such, reflects the non-controlling interest in the Company, which is equivalent to the Class V Common Stock ownership percentage. See Note 11, *Noncontrolling Interest*, for more information on ownership interests in the Company.

*Amended and Restated Nomura Promissory Note*

On May 27, 2022, the Company issued an unsecured promissory note to Nomura in a principal amount of approximately $24.5 million related to advisory fees and deferred underwriting fees and expenses that became due and payable by the Company to Nomura, in connection with the consummation of the Business Combination. On April 12, 2023, the Company amended the promissory note, increasing the principal amount to approximately $26.3 million and extending the maturity date of the promissory note to September 30, 2024. On November 13, 2023, the Company entered into the Amended and Restated Nomura Promissory Note to (a) increase the principal amount to approximately $28.9 million, (b) extend the maturity date to December 31, 2024 and (c) permit the Company to use the proceeds from an at-the-market offering to repay indebtedness incurred by the Company for which the proceeds are used for operating expenses, subject to certain enumerated restrictions. The Amended and Restated Nomura Promissory Note carries an interest rate of 16% per annum and is payable in kind or in cash, at the Company's discretion, every 30 calendar days after November 13, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the Amended and Restated Nomura Promissory Note together with all accrued and unpaid interest thereon. The balance of the unsecured Amended and Restated Nomura Promissory Note and related interest are included within Claims financing obligations and notes payable in the condensed consolidated balance sheet. Refer to Note 10, *Claims Financing Obligations and Notes Payable*.

**Note 4. ASSET ACQUISITIONS**

*VRM*

On May 23, 2022 as part of the Closing of the Business Combination, the Company acquired assets through the issuance of Up-C Units. In exchange for approximately 7.9 million Up-C Units (after giving effect to the Reverse Split), the Company acquired Claims previously held by Series MRCS, an affiliate of the Company. The Claims are included as Intangible Assets, net in the condensed consolidated balance sheet.

The Claims are held at cost, which was determined using the opening market price of the Company's Class A Common Stock as of the day subsequent to the Closing Date discounted by 4.5% or lack of marketability due to timing before shares are sellable. The Company determined the appropriate measurement date was the opening of the first trading day of the Class A Common Stock after the

18

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

Closing Date as this reflects the equivalent value of the Up-C Units provided to the sellers. The Up-C Units provided to the sellers did not include New Warrants, and as such, the Class A Common Stock value excluding the New Warrants was reflected at the Close of the first trading day after the Closing Date. The Claims are treated as finite life intangible assets similar to other Claims that the Company has acquired and have a useful life of eight years. For further details on this Claims acquisition, see Note 7, *Intangible Assets, Net*.

On May 23, 2022 as part of the Closing of the Business Combination, the Company acquired assets through the issuance of Up-C Units. In exchange for approximately 14.3 million Up-C Units (after giving effect to the Reverse Split), the Company acquired the rights to receive the distributable net proceeds (the "Proceeds") of a portfolio of Claims owned by VRM MSP, a Delaware limited liability company and joint investment vehicle of VRM and Series MRCS. Under this asset acquisition structure, the Company determined that the arrangements to acquire the rights to proceeds from certain Claims recovery rights along with the guarantee of the VRM Full Return (noted and defined below) result in the Company consolidating the Series. Upon consolidation, the Company included the value of the Up-C Units provided and the value of the guarantee as Intangible Assets, net in the condensed consolidated balance sheet. These are held at cost and treated as finite life intangible assets similar to other CCRAs that the Company has acquired, and have a useful life of eight years.

In connection with such transaction the Company agreed to pay Virage an amount equal to the contributions by Virage to VRM MSP plus an annual rate of return of 20% (the "VRM Full Return"). Pursuant to the terms of the agreement with Virage, such amount is payable exclusively by any of the following means (or any combination thereof): (a) the Proceeds, (b) a sale of certain reserved shares of Messrs. John Ruiz and Frank Quesada, and the delivery of the resulting net cash proceeds thereof to VRM, or (c) a sale of shares by the Company and delivery of the net cash proceeds thereof to VRM. The amount of the VRM Full Return was $900.5 million as of September 30, 2023.

As the Company incurred debt related to the VRM Full Return as included in the guarantee obligation within the condensed consolidated balance sheet, this value was included in the purchase price and is included in Intangible Assets, net, in the condensed consolidated balance sheet for the full value of the VRM Full Return at the acquisition date. Any subsequent interest accrual is reflected within interest expense in the condensed consolidated statement of operations.

On April 12, 2023, the Company and Messrs. Quesada and Ruiz entered into an amendment (the "Virage MTA Amendment") to the agreement with Virage and the related Guaranty pursuant to which the payment date for the VRM Full Return was extended from May 23, 2023 until September 30, 2024, subject to acceleration upon certain triggering events. Subsequent to September 30, 2023, the maturity date was extended to December 31, 2024. In addition, the Virage MTA Amendment changed the payment methods to Virage to exclusively be, in the following order of priority: (a) the Proceeds and any other sources of revenue or liquidity of the Company (and its subsidiaries) that are not encumbered by a lien of a party other than Virage and to the extent such revenues and liquidity exceed the amount of net of revenues necessary to establish and maintain an operating reserve of $70.0 million (reduced to $47.5 million on July 24, 2023) for certain Company expenses, (b) a sale of certain reserved shares of Messrs. John Ruiz and Frank Quesada, and the delivery of the resulting net cash proceeds thereof to VRM, (c) Parent's sale of additional shares and delivery of proceeds to Virage, subject to certain anti-dilution provisions, (d) if not satisfied by the foregoing, a sale of other shares of the Company by Messrs. John Ruiz and Frank Quesada, and the delivery of the resulting net cash proceeds thereof to VRM; provided that if the VRM Full Return is not fully paid by September 30, 2024 the VRM Full Return shall be payable by any of such payment methods in any order of priority.

As a part of the Virage MTA Amendment, on January 1, 2024, the Company will be required to make a one-time, lump sum payment to Virage for the period starting May 24, 2023 and ending December 31, 2023, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock for the five day period prior to the issuance. If paid in warrants, such warrants will expire on January 1, 2026.

Further, for each calendar month beginning with January 31, 2024 until the obligations to Virage are paid in full, the Company has agreed to pay to Virage an amount monthly, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock. If paid in warrants, such warrants will expire two years from the date of issuance.

19

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

The warrants will contain customary provisions for a transaction of this type, including that each warrant will be exercisable in whole or in part at any time prior to the expiration date, be freely transferable, subject only to applicable securities laws, and be subject to customary anti-dilution protection regarding the exercise price and number of shares of Class A Common Stock to be issued upon the exercise of each warrant.

The Virage warrant, if issued will be recorded at fair value on or after January 1, 2024. The Company recorded interest expense related to Virage MTA Amendment as of September 30, 2023 of $43.7 million. The accrued interest expense related to the Virage MTA Amendment is reflected in Interest Payable on the condensed consolidated Balance Sheet as of September 30, 2023.

On November 13, 2023, the Company entered into the Second Virage MTA Amendment that extended the final payment date of the VRM Full Return to December 31, 2024, subject to acceleration upon certain triggering events. In addition, the Second Virage MTA Amendment (a) changed the minimum operating reserve from $47.5 million to the budget of the Company (plus applicable taxes) plus 10% and (b) requires Virage and the Company negotiate and agree on a form of initial warrant and monthly warrant by no later than December 1, 2023. The payment obligations will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy said obligation.

*VRM Swap*

On July 28, 2023, VRM exercised its option to exchange Claims with service dates prior to January 1, 2014 for more recent Claims. To do so, the VRM MSP agreement was amended to reflect that: (a) rights to recovery proceeds arising from Claims held by VRM MSP, with dates of service before January 1, 2014, were transferred to MSP Recovery; (b) MSP Recovery contributed to VRM MSP in the form of in-kind ownership interests to certain Series entities holding Claims; and (c) as a result of such capital contributions, MSP Recovery was admitted as a member of VRM MSP.

The contribution of certain Series (holding certain CCRAs) by MSP Recovery into VRM MSP is considered a common control transaction, given that the Company consolidates Series before and after such transfers. In addition, the Company analyzed being admitted as a member of VRM MSP and concluded to apply Investments in Equity Method guidance under ASC 323. The Company initially measured and recorded its equity method investment in VRM MSP using a cost accumulation model; however, in consolidation, the investment in VRM MSP is eliminated, with the CCRA intangible assets remaining on the balance sheet under the "Intangible assets" line item. The investment in VRM MSP will reflect a zero balance. In addition, given VRM MSP's primary assets are the CCRAs, VRM MSP's ability to generate any earnings (not already reported via MSP Recovery consolidation of Series), is negligible; therefore, MSP Recovery does not expect any significant earnings from VRM MSP.

*Hazel Transactions*

<u>Claims Transactions and Purchase Money Loan</u>

On March 29, 2023, the Company acquired a controlling interest in nine legal entities, whose sole assets are CCRAs, from Hazel Holdings I LLC (together with its affiliates, "Hazel"). This is referred to as the "Claims Purchase." The purchase price for the Claims Purchase was funded by (i) a purchase money loan between Hazel, as a lender, and the Company, as a borrower, in the amount of $250 million (the "Purchase Money Loan") and (ii) proceeds from the sale of certain, separate CCRAs in the Claims Sale (as defined below).

Also, on March 29, 2023, the Company sold a controlling interest in three legal entities whose sole assets are CCRAs to Hazel. The agreement provided that the Company and Hazel would share in the recovery proceeds therefrom, in accordance with an agreed waterfall after Hazel had realized the first $150 million in claims recoveries. This transaction is referred to as the "Claims Sale," and together with the Claims Purchase, the "Claims Transactions."

As the Claims Transactions were negotiated together in contemplation of one another, they have been combined for accounting purposes. The Company analyzed the Claims Sale and determined that this transaction would be treated as the sale of in-substance nonfinancial assets, in exchange for noncash consideration in the form of the CCRAs from the Claims Purchase measured at fair value. The variable consideration related to future recoveries is fully constrained, because, at this time, it is not probable that any amounts will be owed above the $150 million recovery threshold that would trigger additional payments. The Company analyzed the Claims Purchase and determined it results in the initial consolidation of variable interest entities that are not businesses. The acquired CCRAs held by those entities are recognized at fair value.

The fair value of the assets sold in the Claims Sale was determined to be $45.5 million. The Company's carrying value of those CCRAs surrendered was $40.9 million. Because there are no other observable prices for such transactions, the Company determined the fair value by reference to the purchase price for those CCRAs in a recent transaction. The fair value of the acquired CCRAs was determined to be $285.5 million, and the Company recognized the Purchase Money Loan recognized at $250 million, as any implicit discount or premium to current market rates at the time of issuance were insignificant.

This resulted in a gain on the Claims Transactions of $34.6 million, which largely corresponds to the previously recognized amortization of the CCRAs that were sold in the Claims Sale.

20

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

Amounts borrowed and obligations under the Purchase Money Loan and the Working Capital Credit Facility (See Note 10, *Claims Financing Obligation and Note Payable*) are secured by a pledge of proceeds from specific Claims in the Company's Claims portfolio, with the lien securing the Purchase Money Loan being subordinated and junior to the lien securing the Working Capital Credit Facility. Pursuant to the Purchase Money Loan and the Working Capital Credit Facility, the Company entered into a collateral administrative agreement between the Company and Hazel, which sets forth certain arrangements between the Company and Hazel in relation to Claims owned by the Company, the proceeds of which are due to the Company were pledged to Hazel to secure the Purchase Money Loan and the Working Capital Credit Facility.

## Note 5. INVESTMENT IN EQUITY METHOD INVESTEES

The Company holds three investments which are accounted for using the equity method: MAO-MSO Recovery II LLC Series PMPI ("Series PMPI"), MAO-MSO Recovery LLC, and MAO-MSO Recovery II LLC (collectively, the "MAO-MSO entities").

Series PMPI is a series of MAO-MSO Recovery II LLC. The Company exercises significant influence over the operating and financial activities of Series PMPI, but does not exercise control of the entity. In accordance with Series PMPI's operating agreement, the controlling member is entitled to a preferred return of 20% per annum (the "Preferred Return"). Once the Preferred Return has been met, the controlling member is entitled to 50% of claims recoveries by PMPI. The noncontrolling member is allocated 100% of the costs of PMPI. Since the Preferred Return exceeds the total members' equity of PMPI as of both September 30, 2023 and December 31, 2022, the value of the equity method investment in the condensed consolidated balance sheet is $0.

The MAO-MSO entities are Delaware limited liability companies formed as master series entities whose central operations are to form other series legal entities that will hold and pursue claims recovery rights. The MAO-MSO entities are not designed to hold or pursue claims recoveries themselves. The Company holds a 50% economic interest in both entities and has significant influence through its equity investment, but does not control either entity. As equity method investments, the Company recognizes its proportionate share of net earnings or losses as equity earnings in Other income. The activity of these entities has been insignificant for the three and nine months ended September 30, 2023 and 2022. Since the Company did not make a contribution to the MAO-MSO entities, and the entities have recorded losses, the value of the equity method investment in the condensed consolidated balance sheets is $0 as of both September 30, 2023 and December 31, 2022.

Summary financial information for equity accounted investees, not adjusted for the percentage ownership of the Company is as follows:

| Series PMPI *(in thousands)* | For the three months ended September 30, | | | | For the nine months ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023 | | 2022 | |
| Revenue | $ | 8 | $ | 16 | $ | 8 | $ | 16 |
| Amortization | | 500 | | 500 | | 1,500 | | 1,500 |
| Other expenses | | — | | 8 | | — | | 8 |
| Loss | | (492) | | (492) | | (1,492) | | (1,492) |

| Series PMPI *(in thousands)* | September 30, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| Total Assets | $ | 1,874 | | 3,341 |
| Total Liabilities | $ | 309 | | 274 |

## Note 6. PROPERTY, PLANT AND EQUIPMENT, NET

Property, plant and equipment, net consist of the following:

| *(In thousands)* | September 30, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| Office and computer equipment | $ | 434 | $ | 430 |
| Leasehold improvements | | 113 | | 113 |
| Internally developed software | | 5,687 | | 4,050 |
| Other software | | 67 | | 68 |
| **Property, plant and equipment, gross** | $ | 6,301 | $ | 4,661 |
| Less: accumulated depreciation and amortization of software | | (1,411) | | (1,229) |
| **Property, plant and equipment, net** | $ | 4,890 | $ | 3,432 |

For the three and nine months ended September 30, 2023 and 2022, depreciation expense and amortization expense was $0.1 million and $0.2 million, respectively, and $0.1 million and $0.3 million, respectively.

21

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## Note 7. INTANGIBLE ASSETS, NET

The Company holds CCRAs held by Series MRCS, which were acquired through the issuance of equity as part of the Business Combination in 2022 and additional acquisitions of additional CCRAs throughout 2022 and 2023. These assets are held at cost and treated as a finite intangible asset with a useful life of eight years.

Intangible assets, net consists of the following:

| (in thousands) | September 30, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| Intangible assets, gross | $ | 3,872,256 | $ | 3,630,823 |
|    Accumulated amortization | | (618,549 ) | | (267,667 ) |
| **Net** | **$** | **3,253,707** | **$** | **3,363,156** |

During the nine months ended September 30, 2023, the Company purchased $286.9 million of CCRAs included in Intangible Assets, net, of which $285.5 million was through the Hazel transaction (See Note 4, *Asset Acquisitions*), $0.8 million was through a Class A Common Stock issuance in July 2023 and $0.6 million was paid in cash.

For the three and nine months ended September 30, 2023 and 2022, claims amortization expense was $121.0 million and $355.5 million, respectively, and $111.9 million and $153.6 million, respectively.

Future amortization for CCRAs, for the remainder of 2023 and thereafter is expected to be as follows:

| (in thousands) | CCRAs Amortization |
|---|---|
| 2023 | 121,008 |
| 2024 | 483,959 |
| 2025 | 483,907 |
| 2026 | 483,907 |
| 2027 | 483,907 |
| Thereafter | 1,197,019 |
|    **Total** | **$   3,253,707** |

There were no impairment indicators in the nine months ended September 30, 2023 and 2022 related to the intangible assets. The Company monitors intangible assets for potential impairment indicators, including, but not limited to, assumptions regarding the amount and timing of future collections derived from its CCRAs. The Company continues to pursue recoveries from various parties under rights held through its CCRAs; however, extended delays may result in future impairment of the Company's intangible assets.

The following table presents the changes in the Company's intangibles assets for nine months ended September 30, 2023:

| (in thousands) | Intangible Assets |
|---|---|
| Balance as of December 31, 2022 | $   3,363,156 |
| Acquisitions of CCRAs | 286,929 |
| Amortization expense | (355,481 ) |
| Sale of CCRAs | (40,897 ) |
| **Total** | **$   3,253,707** |

## Note 8. LEASES

The Company leases office space under a non-cancellable operating lease which commenced in September 2023 and expires August 2026. Prior to this lease, the Company held a short-term lease, therefore the Company recorded an initial ROU asset and lease liability upon signing the new lease agreement. Lease expense for both three and nine months ended September 30, 2023 amounted to $13.2 thousand.

In addition, the Company rents an office space from the Law Firm, which is on a month-to-month basis and therefore is not included within the ROU Asset and Lease liability nor in the future minimum lease payments below. Short-term rent expense for the three and nine months ended September 30, 2023 and 2022 was $0.3 million and $0.9 million, respectively, and $0.2 million and $0.6 million, respectively.

The presentation of right-of-use assets and lease liabilities in the condensed consolidated balance sheet is as follows:

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

| *(In thousands)* | Classification | September 30, 2023 |
|---|---|---|
| **Assets** | | |
| Right-of-use asset | Right-of-use assets | $ 368 |
| **Total Leased Assets** | | $ 368 |
| | | |
| **Liabilities** | | |
| Current | | |
| Operating lease liability | Other current liabilities | $ (104) |
| Non-current | | |
| Operating lease liability | Lease liabilities | $ (264) |
| **Total Lease Liability** | | $ (368) |

The future minimum lease payments under non-cancellable operating leases as of September 30, 2023 for the next five years and thereafter are as follows:

| *(in thousands)* | |
|---|---|
| Remainder of 2023 | $ 38 |
| 2024 | 153 |
| 2025 | 157 |
| 2026 | 107 |
| 2027 | — |
| Thereafter | — |
| Total minimum payments required | 455 |
| Less: implied interest | (87) |
| Present value of lease liabilities | $ 368 |

## Note 9. VARIABLE INTEREST ENTITIES

### *Investments in Consolidated Variable Interest Entities*

The Company evaluates its ownership, contractual, and other interests in entities to determine if they are VIEs, if the Company has a variable interest in those entities, and the nature and extent of those interests. These evaluations are highly complex and involve management judgment and the use of estimates and assumptions based on available historical information, among other factors. Based on its evaluations, if the Company determines it is the primary beneficiary of such VIEs, it consolidates such entities into its financial statements. The VIEs information below is presented on an aggregate basis based on similar risk and reward characteristics and MSP Recovery's involvement with the VIEs.

The Company includes a number of entities that are determined to be VIEs and for which the common control group can direct the use of the entities' assets and resources for other purposes. The Company consolidates VIEs in which one of the combined entities is the primary beneficiary.

The assets of the consolidated VIEs may only be used to settle obligations of these VIEs and to settle any investors' ownership liquidation requests. There is no recourse to MSP Recovery for the consolidated VIEs' liabilities. The assets of the consolidated VIEs are not available to MSP Recovery's creditors.

Total assets and liabilities included in its condensed consolidated balance sheets for these VIEs were $2.3 billion and $0.4 million, respectively, as of September 30, 2023 and $2.3 billion and $0.4 million, respectively, as of December 31, 2022. The assets at September 30, 2023 and December 31, 2022 include the Intangible Assets, net included in the Series of $2.0 billion and $2.3 billion, respectively.

### *Investments in Unconsolidated Variable Interest Entities*

The Company is involved with VIEs in which it has investments in equity but does not consolidate because it does not have the power to direct the activities that most significantly impact their economic performance and thus is not considered the primary beneficiary of the entities. Those VIEs are reflected as equity method investments.

Total assets and liabilities for these VIEs were $1.9 million and $1.9 million, respectively, at September 30, 2023 and $3.4 million and $0.3 million, respectively, at December 31, 2022.

23

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

Generally, MSP Recovery's exposure is limited to its investment in those VIEs (see Note 5, *Investment in Equity Method Investees*). For MAO-MSO Recovery II, LLC and Series PMPI, MSP Recovery may be exposed to providing additional recovery services at its own cost if recovery proceeds allocated to it are insufficient to recover the costs of those services. MSP Recovery does not have any other exposures or any obligation to provide additional funding.

*VRM MSP*

As discussed in Note 4, *Asset Acquisitions*, the Company became a member of VRM MSP through the contribution of certain Series (holding certain CCRAs) by MSP Recovery into VRM MSP, which was considered a common control transaction. The Company determined, based on analysis of the rights to cash flows from the Series and the related guaranty obligation, that the Company is the primary beneficiary of the Series entities, and therefore should consolidate as of the transaction date. The Company consolidates the Series held within VRM MSP, however does not consolidate VRM MSP itself.

Refer to Note 4, *Asset Acquisitions*, for additional information on this VRM MSP transaction.

**Note 10. CLAIMS FINANCING OBLIGATIONS AND NOTES PAYABLE**

Based on claims financing obligations and notes payable agreements, as of September 30, 2023 and December 31, 2022, the present value of amounts owed under these obligations were $529.2 million and $198.5 million, respectively, including capitalized interest. The weighted average interest rate is 14.5% based on the current book value of $529.2 million with rates that range from 2% to 20%. The Company is expected to repay these obligations from cash flows from claim recovery income or potentially for the renegotiated debt through class A common stock issuances.

As of September 30, 2023, the minimum required payments on these agreements are $678.1 million. Certain of these agreements have priority of payment regarding any proceeds until full payment of the balance due is satisfied. The maturity of the commitments range from the date sufficient claims recoveries are received to cover the required return or in some cases by 2031.

Brickell Key Investment Amendment

In 2015, the Company entered into a Claims Proceeds Investment Agreement ("CPIA"), as amended, with Brickell Key Investments LP (the "Holder"). Pursuant to the CPIA, as amended, the Company grants to the Holder the right to purchase Class A common shares in the Company (the "Class A Shares") up to a maximum amount of 2,666,667 (the "Amount") for a purchase price equal to $6,666.67 ($0.0025 per Class A Share), and is payable in cash. This Warrant (the "Warrant") will expire at 5:00 p.m. (Eastern Time), on September 30, 2027 and may be exercised in whole or in part by Holder at any time prior to such date. In exchange for the Company issuing the Warrant, the amounts owed to the Holder pursuant to CPIA are amended to equal $80 million. The Holder has the right to receive the $80 million owed through proceeds as outlined in the CPIA, cash paid by the Company or monetization of the Warrant (through the sale of the Warrant or sale of the underlying Class A Shares). If the Holder monetizes the Warrant, the amount owed will be reduced at a measure of $30.00 per Class A Share. In connection with the Amendment and Warrant Agreement, the Holder also executed a Stock Pledge Agreement (the "Pledge Agreement") with Legacy MSP founders, John H. Ruiz and Frank C. Quesada (the "Founders"). As part of the Pledge Agreement, the Founders agreed to pledge 50 million shares to secure payment of the original principal amount of the CPIA. In addition, the Pledge Agreement provides the right to repurchase the Warrant from the Holder on or before June 30, 2023. The Founders entered into an agreement with the Company where this repurchase right has been assigned to the Company (the "Side Agreement"). As the Company has, at its option, the ability to pay its obligation through cash proceeds or through monetization of the Warrants, the $80.0 million of amounts owed as of September 30, 2023 was included as Claims financing obligation and notes payable on the condensed consolidated balance sheet.

The Founders did not exercise the option to repurchase the Warrants on or before June 30, 2023. The Company recognized the Warrants at fair value which, considering the price of the Company's common stock was below $30.00 as of September 30, 2023, it was determined to be zero.

Hazel Working Capital Credit Facility and Hazel Purchase Money Loan

On March 29, 2023, the Company's subsidiary, Subrogation Holdings, LLC, entered into an Amended and Restated Credit Agreement (the "Working Capital Credit Facility") with Hazel Partners Holdings LLC ("HPH"), an affiliate of Hazel, as the lender and administrative agent, which provides for up to $80 million (with a 40% original issue discount), consisting of a Term Loan A commitment to fund up to $30 million in proceeds (in multiple installments), and a Term Loan B Commitment to fund up to $18 million in proceeds (in multiple installments), the funding of each conditioned on certain milestones. An initial $10 million in proceeds was drawn under the Term Loan A on March 6, 2023. On March 29, 2023, an additional $5 million was disbursed to the Company under the Term Loan A. On May 11, 2023 and June 13, 2023, HPH notified the Company's subsidiary, Subrogation Holdings, LLC, that it would not disburse additional funds under the Working Capital Credit Facility until the Company satisfied certain funding

conditions, including the filing of Annual Report on Form 10-K for the year ending December 31, 2022, which was filed on July 27, 2023.

24

---

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

The parties subsequently agreed that $5.5 million would be funded under Term Loan A in accordance with the terms of the Working Capital Credit Facility subsequent to the filing of the 2022 Form 10-K and receipt of funding notices, deeming funding conditions satisfied or waived. Following such funding, the Term Loan A commitment would be terminated, with total funding of $20.5 million. In addition, the parties agreed to increase the Term Loan B commitment from $18 million to $27.5 million, after giving effect to the original issue discount on the Working Capital Credit Facility, which will be funded in multiple installments and in accordance with the terms of the Working Capital Credit Facility. Funding will be at a rate of $2.25 million per month until December 2023, and thereafter at $1.75 million per month, subject to potential further reductions in the case of certain agreed cost savings and funds availability. The amended terms to the Working Capital Credit Facility were memorialized in the Second Amended and Restated First Lien Credit Agreement dated November 10, 2023.

During both the three and nine months ended September 30, 2023, the Company's subsidiary, Subrogation Holdings, LLC, received funding from HPH amounting to $5.5 million from Term Loan A and $4.5 million in two installments under Term Loan B. Subsequent to September 30, 2023, the Company's subsidiary, Subrogation Holdings, LLC, received an additional $4.5 million under Term Loan B.

Pursuant to the Second Amended and Restated First Lien Credit Agreement, and in order to secure those additional advances of Term Loan B beginning in January 2024, the Company agreed to provide, as additional collateral, the following: (i) a pledge of proceeds from certain Claims in the Company's Claims portfolio, up to $14 million; (ii) a pledge of the equity interests in an Affiliate of Messrs. John Ruiz and Frank Quesada; and (iii) a personal guaranty by Messrs. John Ruiz and Frank Quesada, as primary obligors, guaranteeing those additional advances of Term Loan B beginning in January 2024.

In addition, as discussed in Note 4, *Asset Acquisitions*, on March 29, 2023 the Company entered into the Purchase Money Loan with Hazel in the amount of $250.0 million.

Loans under the Working Capital Credit Facility accrue interest at a Term Secured Overnight Financing Rate for 12-month interest period, plus an applicable margin of 10% per annum. Accrued interest on the Working Capital Credit Facility is payable in kind and will be capitalized. The Working Capital Credit Facility has a stated maturity date of March 31, 2026, and HPH may extend for up to one year in its sole discretion. The Purchase Money Loan accrues interest at a rate of 20% per annum, payable in kind or in cash at the Company's discretion. The Purchase Money Loan has a maturity date of March 31, 2026, extendable up to one year in Hazel's sole discretion.

The Company is permitted to prepay the loans under the Working Capital Credit Facility from time to time without prepayment premium. Prepayment of the Purchase Money Loan will be permitted after the prepayment or repayment of loans under the Working Capital Credit Facility, and such prepayment of the Purchase Money Loan may be subject to prepayment penalty, as applicable.

The Purchase Money Loan and the Working Capital Credit Facility contain certain representations, warranties, and covenants of the Company and its subsidiaries, including restrictions on debt incurrence, liens, investments, affiliate transactions, distributions and dividends, fundamental changes, certain debt prepayments, and Claim settlement.

As discussed in Note 4, *Asset Acquisitions*, amounts borrowed and obligations under the Purchase Money Loan and the Working Capital Credit Facility are secured by a pledge of proceeds from certain Claims in the Company's Claims portfolio, with the lien securing the Purchase Money Loan being subordinated and junior to the lien securing the Working Capital Credit Facility. Pursuant to the Purchase Money Loan and the Working Capital Credit Facility, the Company entered into a collateral administrative agreement between the Company and HPH, which sets forth certain arrangements between the Company and HPH in relation to the management of the litigation of certain Claims owned by the Company, the proceeds of which are due to the Company, and were pledged to Hazel and HPH to secure the Purchase Money Loan and the Working Capital Credit Facility, respectively.

<u>Amended and Restated Nomura Promissory Note</u>

On April 12, 2023, the Company amended the promissory note to Nomura originally issued on May 27, 2022, which increased the principal amount to approximately $26.3 million and extended the maturity date of the promissory note to September 30, 2024. Pursuant to the Amended and Restated Promissory Note dated November 13, 2023, the Company amended the promissory note to Nomura to (a) increase the principal amount to approximately $28.9 million, (b) extend the maturity date to December 31, 2024 and (c) permit the Company to use the proceeds of an at-the-market offering to repay indebtedness incurred by the Company for which the proceeds are used for operating expenses, subject to certain enumerated restrictions. The Amended and Restated Promissory Note will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy said obligation. The Amended and Restated Nomura Promissory Note carries an interest rate of 16% per annum and is payable in kind or in cash, at the Company's discretion, every 30 calendar days after November 13, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the Amended and Restated Nomura Promissory Note together with all accrued and unpaid interest thereon.

25

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## Note 11. NONCONTROLLING INTEREST

The non-controlling interest balance primarily represents the Up-C Units of the Company held by the Members. The following table summarizes the stock ownership in the Company as of September 30, 2023:

|  | Shares of Common Stock | Ownership Percentage |
|---|---|---|
| Ownership of Class A Common Stock | 13,799,230 | 9.99 % |
| Ownership of Class V Common Stock | 124,264,645 | 90.01 % |
| Balance at end of period | 138,063,875 | 100.00 % |

The non-controlling interest holders have the right to exchange Up-C Units, at the Company's option, for (i) cash or (ii) one share of Class A Common Stock, subject to the provisions set forth in the LLC Agreement. As such, future exchanges of Up-C Units by non-controlling interest holders will result in a change in ownership and reduce or increase the amount recorded as non-controlling interest and increase or decrease additional paid-in-capital or retained earnings when the Company has positive or negative net assets, respectively. As of September 30, 2023, 2.5 million Up-C Units have been exchanged into shares of Class A Common Stock. In addition, 0.5 million new Up-C Units were issued during the nine months ended September 30, 2023.

In addition to the non-controlling interest related to Up-C Units, the Company also has non-controlling interests related to MAO-MSO Recovery LLC Series FHCP ("FHCP"), which is a non-wholly owned subsidiary of MSP Recovery. In accordance with FHCP's operating agreement, the noncontrolling member is entitled to a preferred return of 20% per annum (the "Preferred Return"). Once the Preferred Return has been met, the noncontrolling member is entitled to 80% of claims recoveries by FHCP. The controlling member is allocated 100% of the costs of FHCP. Since the Preferred Return exceeds the total members' equity of FHCP as of both September 30, 2023 and December 31, 2022, the non-controlling interest also includes $4.3 million representing the entire members' equity of FHCP.

## Note 12. COMMITMENTS AND CONTINGENCIES

The Company is subject to certain legal proceedings, claims, investigations, and administrative proceedings in the ordinary course of its business. The Company records a provision for a liability when it is both probable that liability has been incurred and the amount of the liability can be reasonably estimated. These provisions, if any, are reviewed and adjusted to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other information and events pertaining to a particular case. Depending on the nature and timing of any such proceedings that may arise, an unfavorable resolution of a matter could materially affect the Company's future results of operations, cash flows or financial position in a particular period.

The Company pursues claims recoveries through settlement, arbitration and legal proceedings. The accounting policy for these activities is discussed under Claims recovery income in Note 2, *Basis of Presentation And Summary of Significant Accounting Policies*, in our Annual Report on Form 10-K for the year ended December 31, 2022.

A significant majority of the Company's expected recoveries arise from Claims brought pursuant to the private cause of action under the Medicare Secondary Payer Act ("MSP Act"). This law allows the Company to pursue recoveries against primary payers for reimbursement of medical expenses that the Company's assignors paid for when primary payers (i.e., liability insurers) were responsible for payment. On May 16, 2023, the Repair Abuses of MSP Payments Act (the "RAMP Act") was introduced in the U.S. Senate and the U.S. House of Representatives, respectively, seeking to amend the private cause of action under the Medicare Secondary Payer Act, by striking "primary plan" and inserting "group health plan" into the existing text. As there is no indication that the RAMP Act is intended to be enacted retroactively, it should not have any effect on the recoverability of historical claims. To the extent that the Company has recovery rights in claims that have not yet been sought, or to the extent that the Company is assigned additional claims that may otherwise have been entitled to recoveries under the MSP Act, the passing of the RAMP Act could impact the Company's ability to pursue recoveries on those prospective claims.

### *Investigations*

As previously disclosed on Form 8-K, on August 11, 2022, the Securities and Exchange Commission (the "SEC") initiated an investigation of the Company, and requested documents relating to, among other matters, the business combination transaction with Lionheart Acquisition Corporation II consummated on May 23, 2022 and related matters. The Company received a subpoena dated March 1, 2023 from the SEC regarding the aforementioned subject matter, and subsequently received a subpoena on May 10, 2023 requesting documents in connection with the Company's financial statements for the periods ended June 30, 2022 and September 30, 2022 that required restatements as disclosed in the Company's Form 8-K filed with the SEC on April 14, 2023. On August 16, 2023, the Company received an additional subpoena from the SEC regarding certain funding sources of the Company prior to the Business

Combination, as well as various statements and disclosures by the Company in connection with and following the Business Combination. The Company intends to fully cooperate with the SEC in responding to the subpoenas.

26

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

In addition, on March 10, 2023, the Company received a subpoena from the U.S. Attorney's Office in connection with a grand jury investigation in the U.S. District Court for the Southern District of Florida requesting certain information concerning the Company. To the best of the Company's knowledge, the Department of Justice has not issued any target letters to anyone associated with the Company as a result of this investigation. (The United States Attorney's Manual states that a "target" is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant.)

The Company has cooperated, and will continue to cooperate, fully with these inquiries. In connection with its review of the matters related to the preparation and filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, a special committee of the Company's board of directors, along with external advisors retained thereby, also reviewed the subject matter of information requests related to the foregoing subpoenas. Based on this review, the Company believes that these investigations will be resolved without any material developments; however, there can be no assurance as to the outcome or future direction thereof.

*Cano Health*

On August 10, 2023, the Company sued Cano Health, LLC ("Cano") in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida for declaratory relief and anticipatory breach of the CCRA, Purchase Agreement, and a Services Agreement (collectively, the "Cano Agreements") between the parties. On the same day, Cano sued the Company in the same court, alleging fraud in the inducement, breach of contract, tortious interference, and unjust enrichment relating to the Cano Agreements. While it is inherently difficult to predict the eventual outcomes of pending actions, the Company denies all liability alleged by Cano and intends to defend the litigation vigorously.

The Company has outstanding a $5.0 million receivable from Cano; however, due to Cano's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2023, which included a substantial doubt about its ability to continue as a going concern, the Company established a reserve for the balance due under such receivable during the nine months ended September 30, 2023.

## Note 13. RELATED PARTY TRANSACTIONS

*Loans from related parties*

During the year ended December 31, 2022, the Company issued an unsecured promissory note in an aggregate principal amount of $112.8 million (the "Promissory Note") to John H. Ruiz and Frank C. Quesada, the Company's Chief Executive Officer and director and Chief Legal Officer and director, respectively (collectively, the "MSP Principals"), in exchange for the MSP Principals agreeing to provide cash to pay transaction costs related to the Merger, pay down affiliate payable balances, and provide operating cash to the Company. In addition to the amounts in the Promissory Note, at the merger date with LCAP, the MSP Principals contributed $13.0 million through funds that had been loaned to VRM MSP to cover related service fees. The Promissory Note as well as the amount contributed at the merger date bears interest at an annual rate of 4%, payable in kind, and will mature on the four-year anniversary of the issuance. The Promissory Note is payable by the Company at any time, without prepayment penalties, fees, or other expenses. During the three and nine months ended September 30, 2023, the Company recorded $1.3 million and $3.9 million, respectively, on interest expense related to the Promissory Note.

A portion of the proceeds under the Promissory Note in an amount equal to $36.5 million was advanced to the Law Firm, an affiliate of certain Members, for certain operating expenses pursuant to a legal services agreement. This amount is reflected in prepaid expenses and other current assets within the condensed consolidated balance sheets and had a balance of $13.4 million as of September 30, 2023. The advances of Law Firm expenses are reflected in Professional fees - legal within the condensed consolidated statement of operations. The advances are expensed as incurred, as the Company does not have recourse to any amounts incurred should Law Firm fail to secure recoveries, although it does have recourse to any amounts advanced that have not been incurred as an expense.

Under the legal services agreement, Company shall advance certain of Law Firm's monthly expenses, including payroll and overhead; however, should Law Firm earn fees under the legal service agreements (the "Existing LSAs") noted below, net of pre-existing obligations including payments to co-counsel sufficient to cover its monthly expenses, Company is entitled to reimbursement of the advance of said monthly expenses. Further, to the extent that Law Firm earns a surplus of fees in excess of its monthly expenses, said surplus shall be used to reimburse past amounts of Law Firm's monthly expenses that Company advanced. For the nine months ended September 30, 2023, approximately $13.5 million of the $36.5 million advanced by the Company to the Law Firm has been incurred for expenses pursuant to the legal services agreement.

*Legal Services – Law Firm*

Certain Company entities have previously entered into the Existing LSAs with the Law Firm, an affiliate of certain Members, for the recovery of Claims. Pursuant to the terms of the Existing LSAs, the Law Firm provides the Company with investigation, case

management, research and legal services in the pursuit of recovery of Claims in exchange for a portion of the recovered proceeds relating to such Claims. The Existing LSAs also provide that the Law Firm serves as lead counsel or co-lead counsel for any litigation relating

27

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

to such Claims. As of September 30, 2023 and December 31, 2022 there was no amount due, as amounts paid through the prepaid noted above had covered amounts of existing LSAs due to the Law Firm for Claim recoveries. For the three and nine months ended September 30, 2023, $4.6 million and $13.5 million, respectively, was included in Professional fees – legal, for expenses related to the Law Firm in the condensed consolidated statements of operations. The amounts were largely due to the payment of Law Firm expenses per the related party loan as noted above. For the three and nine months ended September 30, 2022, $4.6 million and $24.7 million, respectively was included in Professional fees – legal for expenses related to the Law Firm in the condensed consolidated statements of operations. The amounts were largely due to share base compensation as noted below and the payment of Law Firm expenses per the related party loan as noted above. For the three and nine months ended September 30, 2023 and 2022, no amounts were included for cost of claims recoveries for expenses related to the Law Firm in the condensed consolidated statements of operations.

During the nine months ended September 30, 2023, the Company received a $4.95 million loan from the Law Firm, evidenced by an unsecured promissory note, to provide general operational funding. The aggregate unpaid principal amount of this promissory note is due 24 months from the date of the last advance from the Purchase Money Loan is made. This promissory note is payable by the Company at any time, without prepayment penalties, fees, or other expenses. The note does not carry any interest and can be repaid at any time or from time to time without a prepayment penalty.

The Law Firm may also collect and/or hold cash on behalf of the Company in the ordinary course of business. As of September 30, 2023 and December 31, 2022, $0.5 million and $2.1 million, respectively, was due from the Law Firm and included in the condensed consolidated balance sheets in Affiliate Receivable. In addition, the Company rents office space from the Law Firm as discussed in Note 8, *Leases*.

*MSP Recovery Aviation, LLC*

The Company may make payments related to operational expenses on behalf of its affiliate, MSP Recovery Aviation, LLC ("MSP Aviation"). The Company has made payments in the periods of the financial statements only related to specifically billed flights. As of both September 30, 2023 and December 31, 2022, $0.2 million was due from MSP Aviation and included in the condensed consolidated balance sheets in Affiliate Receivable. For the three and nine months ended September 30, 2023 $0.0 and $0.2 million was included in General and Administrative expenses related to MSP Aviation in the condensed consolidated statements of operations. For the three and nine months ended September 30, 2022, $0.2 million and $0.4 million, was included in General and Administrative expenses related to MSP Aviation in the condensed consolidated statements of operations.

*Funds held for other entities*

The Company may collect and/or hold cash on behalf of its affiliates in the ordinary course of business. As of both September 30, 2023 and December 31, 2022, $19.8 million and $19.8 million was due to affiliates of the Company and included in the condensed consolidated balance sheets in Affiliate Payable. These amounts were primarily due to Series MRCS, and will be repaid either through excess cash flows from operations or other financing. During the year ended December 31, 2022, the Company also entered into a note payable with Series MRCS as outlined in Note 7, *Intangible Assets, Net*. As of September 30, 2023 and December 31, 2022, the balance of the note payable was $0.5 million and included in the condensed consolidated balance sheets in Claims financing obligation and notes payable.

As of September 30, 2023 and December 31, 2022, there were additional receivables from other affiliates of $0.2 million and $0.1 million, respectively. These were included in the condensed consolidated balance sheets in Affiliate Receivable.

*VRM*

Historically, MSP Recovery has received Claims recovery service income for services provided to VRM MSP. The Company concluded that VRM MSP is a related party due to ownership interests in the entity held by Series MRCS LLC. During the three and nine months ended September 30, 2022, $0.0 and $10.6 million, respectively, of claims recovery service income was received from VRM MSP as part of the servicing agreement and was included in the condensed consolidated statements of operations. There was no Claims recovery service income for services provided to VRM MSP for the three and nine months ended September 30, 2023.

For the three and nine months ended September 30, 2023, the Company recorded $67.8 million and $159.2 million, respectively, for interest expense related to the VRM Full Return and Virage MTA Amendment. For the three and nine months ended September 30, 2022, the Company recorded $33.1 million and $46.5 million for interest expense related to the VRM Full Return. Prior the Business Combination, the Company had not guaranteed the VRM Full Return therefore no amount of interest was recorded by prior to Business Combination.

*Working Capital Credit Facility Collateral*

Pursuant to the Second Amended and Restated First Lien Credit Agreement, and in order to secure those additional advances of Term Loan B beginning in January 2024, the Company approved for Messrs. John Ruiz and Frank Quesada to provide, as additional

collateral, the following: (i) a pledge of the equity interests in an Affiliate of Messrs. John Ruiz and Frank Quesada; and (ii) a personal

28

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

guaranty by Messrs. John Ruiz and Frank Quesada, as primary obligors, guaranteeing those additional advances of Term Loan B beginning in January 2024.

## Note 14. NET LOSS PER COMMON SHARE

Basic earnings per share of Class A Common Stock is computed by dividing net income attributable to common shareholders by the weighted-average number of shares of Class A Common Stock outstanding during the period. Diluted earnings per share of Class A Common Stock is computed by dividing net income attributable to common shareholders adjusted for the assumed exchange of all potentially dilutive securities, by the weighted-average number of shares of Class A Common Stock outstanding adjusted to give effect to potentially dilutive elements. Diluted loss per share for all period presented is the same as basic loss per share as the inclusion of the potentially issuable shares would be anti-dilutive.

The following table sets forth the computation of basic and diluted earnings per share of Class A Common Stock:

| (In thousands except shares and per share amounts) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | | (As Restated) | | (As Restated) |
| **Numerator – basic and diluted:** | | | | |
| Net loss | $ (224,217) | $ (105,556) | $ (609,192) | $ (225,428) |
| Less: Net loss attributable to MSP Recovery, LLC pre Business Combination | — | — | — | — |
| Less: Net loss attributable to the noncontrolling interest post Business Combination | 204,462 | $ 103,484 | 576,301 | $ 221,476 |
| Net loss attributable to common shareholders | $ (19,755) | $ (2,072) | $ (32,891) | $ (3,952) |
| **Denominator – basic and diluted:** | | | | |
| Weighted-average shares of Class A common stock outstanding – basic | 12,703,472 | 2,761,476 | 7,097,032 | 2,125,539 |
| Effect of dilutive securities: | | | | |
| Weighted-average shares of Class A common stock outstanding – dilutive | 12,703,472 | 2,761,476 | 7,097,032 | 2,125,539 |
| Earnings per share of Class A common stock – basic | $ (1.56) | $ (0.75) | $ (4.63) | $ (1.86) |
| Earnings per share of Class A common stock – diluted | $ (1.56) | $ (0.75) | $ (4.63) | $ (1.86) |

Shares of the Company's Class V Common Stock do not participate in the earnings or losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted earnings per share of Class V Common Stock under the two-class method has not been presented.

In the calculation for earnings per share for the three and nine months ended September 30, 2023, the Company excluded from the calculation of diluted earnings per share 124,264,645 shares of Class V Common Stock, 3,084,703 Public Warrants outstanding, 2,666,667 shares issuable upon the exercise of the CPIA Warrant, and 1,028,046,326 of New Warrants outstanding because their effect would have been anti-dilutive. As discussed in Note 1, *Description of the Business*, the Reverse Split did not affect the number of outstanding warrants; it had effect on the exercise terms of the warrants.

## Note 15. DERIVATIVE LIABILITY

The Company and CF had previously entered into an agreement for an OTC Equity Prepaid Forward Transaction, pursuant to which CF agreed to (a) transfer to the Company for cancellation any warrants to purchase shares received as a result of being the stockholder of record of a share as of the close of business on the closing date of the Business Combination, pursuant to the previously announced and declared LCAP dividend and (b) waive any redemption right that would require the redemption of the Subject Shares (as defined below) in exchange for a pro rata amount of the funds held in LCAP's Trust account.

At the Closing of the Business Combination, the Company transferred from the Trust Account to an escrow account an amount equal to (a) the aggregate number of such Subject Shares (approximately 44,000 shares), multiplied by (b) the per share redemption price for shares out of the Trust Account, as a prepayment to CF of the amount to be paid to CF in settlement of the OTC Equity Prepaid Forward Transaction for the number of shares owned by CF at the closing of the Business Combination (the "FEF Shares"). CF

may sell the Subject Shares at its sole discretion in one or more transactions, publicly or privately. Any such sale shall constitute an optional early termination of the OTC Equity Prepaid Forward Transaction upon which (a) CF will receive from the escrow account an amount equal to the positive excess, if any, of (x) the product of the redemption price and the aggregate number of shares over (y) an amount

29

Table of Contents

**MSP RECOVERY, INC. and Subsidiaries**
Notes to Condensed Consolidated Financial Statements
(Unaudited)

equal to the proceeds received by CF in connection with sales of the shares, and (b) the Company will receive from the escrow account the amount set forth in (y) above.

The Company concluded that the instrument includes an embedded derivative for the change in value of the Company's Class A Common Stock, and as such, at the end of each period the Company will mark to market the shares through booking a derivative liability/asset. The calculation of the derivative liability/asset would be the difference between the restricted cash and current fair value of the outstanding FEF shares (number of FEF shares multiplied by market price of the Company's Class A Common Stock as of period end).

On January 6, 2023, the Company and CF entered into an Omnibus Fee Amendment Agreement ("Fee Amendment Agreement"). Pursuant to the terms of the Fee Amendment Agreement, in satisfaction of the deferred underwriting commissions under a previous agreement, the Company and CF agreed to release from escrow the $11.4 million of restricted cash and release the FEF shares previously held as Class A Common Stock subject to possible redemption within temporary equity. Prior to the Fee Amendment Agreement, CF had not sold any FEF shares.

As a result of the Fee Amendment Agreement and termination of the OTC Forward Transaction, as of September 30, 2023, the Company no longer has any restricted cash, Class A Common Stock subject to possible redemption, or derivative liability in the condensed consolidated balance sheets.

### Note 16. SUBSEQUENT EVENTS

*Notice of Compliance with Nasdaq Listing Requirements*

On October 27, 2023, the Company received a letter from the Staff at Nasdaq that the bid price deficiency has been cured, that the Company is in compliance with all applicable listing standards, and that the Company's stock will continue to be listed and traded on the Nasdaq Stock Market.

30

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

**MSP RECOVERY INC.'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Unless the context requires otherwise or unless otherwise noted, all references in this Form 10-Q to "LifeWallet," "the Company," "we," "us," or "our" are to MSP Recovery, Inc., d/b/a LifeWallet, a Delaware corporation. The following discussion and analysis provides information that the Company's management believes is relevant to an assessment and understanding of the Company's condensed consolidated results of operations and financial condition. The discussion should be read together with our 2022 Form 10-K for the year-ended December 31, 2022 and our condensed consolidated financial statements and the related notes and other information included elsewhere in this Quarterly Report on Form 10-Q (the "Q3-2023" or "Form 10-Q"). This discussion may contain forward-looking statements based upon the Company's current expectations, estimates, and projections that involve risks and uncertainties. Actual results could differ materially from those anticipated in these forward-looking statements due to, among other considerations, the matters discussed under "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."*

**Cautionary Note Regarding Forward-Looking Statements**

Certain of the statements contained in this Quarterly Report on Form 10-Q are forward-looking and constitute forward-looking statements within the meaning of Section 27A of the Securities Act, and Section 21E of the Exchange Act. Forward-looking statements may generally be identified by the use of words such as "anticipate," "believe," "could," "expect," "intend," "plan," "predict," "may," "should," and "will" or, in each case, their negative, or other variations or comparable terminology. These forward-looking statements include all matters that are not historical facts, including, for example, guidance for 2023 portfolio recovery and revenue. By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future. As a result, these statements are not guarantees of future performance or results and actual events may differ materially from those expressed in or suggested by the forward-looking statements. Although we believe that our expectations are based on reasonable assumptions within the bounds of our knowledge of our industry, business, and operations, we cannot guarantee that actual results will not differ materially from our expectations. In evaluating such forward-looking statements, you should specifically consider various factors, including the risks outlined under "Risk Factors." Any forward-looking statement made by the Company herein speaks only as of the date made. The discussion of risks and uncertainties set forth in this Form 10-Q is not necessarily a complete or exhaustive list of all risks facing the Company at any particular point in time. New risks and uncertainties come up from time to time, and it is not possible for management to predict or identify all such events or to assess either the impact of all such risk factors on our business or the extent to which any individual risk factor, combination of factors, or new or altered factors, may cause results to differ materially from those contained in any forward-looking statement. The Company has no obligation, and does not intend, to update any forward-looking statements after the date hereof for any reason, even if new information becomes available in the future, except as required by federal securities laws. Factors that could cause these differences include, but are not limited to, the Company's ability to capitalize on its assignment agreements and recover monies that were paid by the assignors; the inherent uncertainty surrounding settlement negotiations and/or litigation, including with respect to both the amount and timing of any such results; the validity of the assignments of Claims to the Company; the ability to successfully expand the scope of our Claims or obtain new data and Claims from the Company's existing assignor base or otherwise; the Company's ability to innovate and develop new solutions, and whether those solutions will be adopted by the Company's existing and potential assignors; negative publicity concerning healthcare data analytics and payment accuracy; compliance with the listing standards of The Nasdaq Capital Market; and those other factors listed under "Risk Factors" below and elsewhere in this Form 10-Q and other reports filed by the Company with the SEC.

**Our Business**

We are a leading healthcare recovery and data analytics company. We focus on the Medicare, Medicaid, and commercial insurance spaces. We are disrupting the antiquated healthcare reimbursement system, using data and analytics to identify and recover improper payments made by Medicare, Medicaid, and commercial health insurers.

Medicare and Medicaid are payers of last resort. Too often, they end up being the first and only payers, because the responsible payer is not identified or billed. As Medicare and Medicaid pay a far lower rate than what other insurers are often billed, this costs the healthcare system (and the supporting taxpayers) tens of billions of dollars a year in improper billing and lost recoveries. By discovering, quantifying, and settling the billed-to-paid gap on a large-scale basis, the Company is positioned to generate meaningful annual recovery revenue at high profit margins.

Our access to large volumes of data, sophisticated data analytics, and a leading technology platform provide a unique opportunity to discover and recover on Claims. We have developed Algorithms to identify waste, fraud, and abuse in the Medicare, Medicaid, and commercial health insurance segments. Our team of experienced data scientists and medical professionals analyze historical medical Claims data to identify recoverable opportunities. Once potential recoveries are reviewed by our team, they are aggregated and pursued. Through statutory law and case law, we believe we have an established basis for future recoveries.

We differ from our competitors as we receive our recovery rights through irrevocable assignments of Claims. Rather than provide services under a third-party vendor services contract, we receive the rights to certain recovery proceeds from our Assignors. As assignees, we have control over the direction of the litigation and take on a risk that our competitors do not. We, or our affiliated entities, are the plaintiff in any action filed and have control over the direction of the lawsuit. By receiving Claims through assignment, we can pursue additional recoveries under numerous legal theories that our competitors cannot. Although we typically own assigned Claims, for a significant portion of assigned Claims, our ability to pursue recoveries depends on our ongoing access to data through data access rights granted to us. In these cases, termination of such data access would substantially impair our ability to generate recoveries on those Claims.

Our current Claims portfolio has scaled significantly. We are entitled to a portion of any recovery rights associated with approximately $1,603 billion in Billed Amount (and approximately $381 billion in Paid Amount), which contains approximately $92 billion in Paid Value of Potentially Recoverable Claims, as of September 30, 2023. We believe it would take any competitor a long time to amass the portfolio of Claims rights currently owned by us due to, among things, the volume of our Claims data retained and strength of our data analytics, which we believe are key to attracting new clients that are willing to assign Claims to us.

## Our Business Model

### Recovery Model

In our current business model, we receive irrevocable assignments of health Claim recovery rights through CCRAs from a variety of sources including, but not limited to, MAOs, MSOs, HMOs, hospitals, and other at-risk entities. Prior to executing a CCRA, we utilize our proprietary internal data analytics platform to review the set of Claims and identify Claims with probable recovery paths.

Once recovery rights have been assigned, our data analysts use our proprietary Algorithms to identify potential recoveries. Results are then equally checked by our internal medical team. We contract with the Law Firm and various other law firms across the country to pursue recoveries through the legal system. Where appropriate, Law Firm reaches out to the liable parties to demand payment of amounts that are owed. Prior to litigation, there may be an incentive for the primary insurer to settle. If legal action is required to pursue recovery from primary insurers, claimholders are entitled to pursue "double damages" under the Medicare Secondary Payer Act.

We engage with each Assignor independently. We are typically entitled to 100% of recoveries pursuant to our CCRA. From those recoveries, we are typically contractually obligated to pay 50% of Net Proceeds to the Assignor. In certain cases, we have purchased the Assignor's rights to recovery proceeds in advance of any collection; therefore, entitling the Company to retain 100% of the Net Proceeds. The "Net Proceeds" of any assigned Claim is defined as the gross amount recovered on an assigned Claim, minus any costs directly traceable to such assigned Claim(s) for which recovery was made. In some instances, we may purchase outright an Assignor's recovery rights; in this instance, we are entitled to the entire recovery. In some cases, we have entered into arrangements to transfer CCRAs or rights to proceeds from CCRAs to other parties. Such sales include variable consideration in the form of payments that will be made only upon achievement of certain recoveries or based on a percentage of actual recoveries.

We have yet to generate substantial revenue from the recovery model. To date, the majority of our revenue has been generated by Claims recovery services which are either performance-based or fee for service arrangements as described below.

### Chase to Pay

Over time, we plan to pivot the business to the "Chase to Pay" model. Chase to Pay is a real-time analytics driven platform that identifies the proper primary insurer at the point of care. Chase to Pay is intended to plug into the real-time medical utilization platforms used by providers at the points of care. Rather than allow an MAO to make a wrongful payment whereby we need to chase down the primary payer and collect a reimbursement for the MAO, Chase to Pay is intended to prevent the MAO from making a wrongful payment; instead redirecting payment obligations to the correct payer in the first instance. Furthermore, the primary payer typically will make payments at a higher multiple than the MAO would have paid, and MSP will be entitled to receive its portion of the recovery proceeds on the amounts paid by the primary payer.

As Chase to Pay works at the point of care, it is expected to decrease legal costs of recovery. As a result, when implemented, Chase to Pay is expected to improve the net recovery margin as the recovery multiple grows and variable legal costs to recover decline.

We have yet to generate revenue from this model, nor have we executed any agreements with customers to date. We are currently in the process of determining the pricing and form of these arrangements. As part of our "Chase to Pay" model, we launched LifeWallet in January 2022, a platform powered by our sophisticated data analytics, designed to locate and organize users' medical records, facilitating efficient access to enable informed decision-making and improved patient care.

### Claims Recovery Services

We also recognize Claims recovery service revenue from our services to customers to assist those entities with the pursuit of Claims recovery rights. We provide services to other parties to identify recoverable Claims and provide data matching and legal services. Under our Claims recovery services model, we do not own the rights to Claims but provide our services for a fee based on budgeted expenses for the month with an adjustment for the variance between budget and actual expense from the prior month.

We were a party to that certain Recovery Services Agreement (the "MSP RH Series 01 Recovery Services Agreement"), dated as of October 23, 2020, by and between MSP Recovery Holdings Series 01, LLC ("MSP RH Series 01") and MSP Recovery, pursuant to which MSP Recovery will provide services including identifying, processing, prosecuting, and recovering money for certain Claims of MSP RH Series 01. In return for these services, MSP RH Series 01 paid a one-time fee of approximately $7.2 million, and has agreed to pay annual service fees of approximately $3.0 million commencing January 1, 2021, subject to adjustment based on the aggregate value of Claims of MSP RH Series 01 that is subject to the MSP RH Series 01 Recovery Services Agreement. Subsequent to December 31, 2022, this service fee agreement is terminated in connection with the loan facility executed with HPH (as defined below). See Note 4, *Asset Acquisitions*, to the condensed consolidated financial statements for additional detail.

The fees received pursuant to this agreement are related to expenses incurred and are not tied to the Billed Amount or potential recovery amounts. Although we believe our future business to be highly tied to the recovery model and Chase to Pay, we will continue to enter into these contracts as the market dictates.

### Recent Updates

*2023 Reverse Stock Split*

The Company filed a Certificate of Amendment to its Second Amended and Restated Certificate of Incorporation filed with the Secretary of State of the State of Delaware that became effective at 11:59 PM EDT on October 12, 2023 to effect a 1-for-25 reverse stock split of the Company's common stock (the "Reverse Split"). The stock began trading post split on October 13, 2023 under the same symbol, LIFW. As a result of the Reverse Split, every 25 shares of the Company's old common stock were converted into one share of the Company's new common stock. Fractional shares resulting from the Reverse Split were rounded up to the nearest whole number. The Reverse Split automatically and proportionately adjusted, based on the 1-for-25 split ratio, all issued and outstanding shares of the Company's common stock, as well as the terms of warrants and other derivative securities outstanding at the time of the effectiveness of the Reverse Split. Proportionate adjustments were made to the per share exercise price and the number of shares issuable upon the exercise of all outstanding stock options and warrants to purchase shares of common stock. Share and per share data (except par value) for the periods presented reflect the effects of the Reverse Split. References to numbers of shares of common stock and per share data in the accompanying financial statements and notes thereto for periods ended prior to October 13, 2023 have been adjusted to reflect the Reverse Split on a retroactive basis. Unless otherwise noted, the share and per share information in this Quarterly Report have been adjusted to give effect to the one-for-twenty-five (1-for-25) Reverse Split.

*Notice of Non-Compliance with Nasdaq Listing Requirements*

On April 24, 2023, the Company was notified by Nasdaq Listing Qualifications staff (the "Staff") that the Company was non-compliant with Nasdaq Listing Rule 5250(c)(1) as a result of not having timely filed its 2022 Form 10-K. The Company was also deemed non-compliant with Nasdaq's Bid Price Requirement as the closing bid price for the Company's Class A Common Stock had fallen below $1.00 per share for 30 consecutive business days (March 13, 2023 through April 23, 2023). Pursuant to Nasdaq Marketplace Rule 5810(c)(3)(A), the Company was provided with a compliance cure period of 180 calendar days, or until October 23, 2023, to regain compliance with the Bid Price Requirement. On July 27, 2023, the Company filed its 2022 Form 10-K.

On May 24, 2023, the Company was notified by Nasdaq that it was not in compliance with the requirements of Nasdaq Listing Rule 5250(c) as a result of not having timely filed its Form 10-Q for the period ended March 31, 2023 with the SEC. On August 7, 2023, Nasdaq granted the Company an extension until August 30, 2023 to file its Quarterly Reports on Form 10-Q for the quarters ending March 31, 2023 and June 30, 2023. On August 16, 2023, the Company was notified by Nasdaq that it was not in compliance with the requirement of Nasdaq Listing Rule 5250(c)(1) as a result of not having timely filed its Form 10-Q for the period ended June 30, 2023 with the SEC. On August 17, 2023, the Company filed its Quarterly Report on Form 10-Q for the period ending March 31, 2023. The Company has regained compliance with such rule as a result of the filing of the Quarterly Report on Form 10-Q for the period ended June 30, 2023 on August 30, 2023. On August 31, 2023, the Company was notified by Nasdaq that it regained compliance with Nasdaq Listing Rule 5250(c)(1) after having filed its 2022 Form 10-K, and Quarterly Reports on Form 10-Q for the quarters ended March 31, 2023 and June 30, 2023.

On September 5, 2023, the Company received a determination from the Staff that the Company's Class A Common Stock had a closing bid price of $0.10 or less for 10 consecutive trading days during a compliance period and so, pursuant to Listing Rule 5810(3) (A)(iii), the Staff determined to delist the Company's securities from The Nasdaq Capital Market (the "Delisting Determination"). Pursuant to the procedures set out in the Nasdaq Listing Rules, the Company appealed the Delisting Determination to a hearing panel (the "Hearing"), which suspended the Delisting Determination until the Hearing, which was scheduled for November 2, 2023. The Company effected the Reverse Stock Split on October 13, 2023, which caused the price of its Class A Common Stock to trade at a level sufficient to regain compliance with Listing Rule 5810(3)(A)(iii), and Listing Rule 5450(a)(1). On October 27, 2023, the Company was notified by the Staff that it had regained compliance with all applicable listing standards, and that the Company's stock will continue to be listed and traded on the Nasdaq Stock Market.

33

*Hazel Transactions*

On August 4, 2023, the Company's subsidiary, Subrogation Holdings, LLC, received funding amounting to $5.5 million from Term Loan A and $2.3 million installment under Term Loan B, both pursuant to the Amended and Restated Credit Agreement (the "Working Capital Credit Facility") with Hazel Partners Holdings LLC ("HPH"). Subsequent to September 30, 2023, the Company's subsidiary, Subrogation Holdings, LLC, received an additional $4.5 million under Term Loan B.

Amounts borrowed and obligations under the Working Capital Credit Facility are secured by a pledge of proceeds from certain Claims in the Company's Claims portfolio, with the lien securing the Purchase Money Loan being subordinated and junior to the lien securing the Working Capital Credit Facility.

*Virage Amendment*

On April 12, 2023, we entered into an amendment (the "Virage MTA Amendment") to the Virage MTA and Virage Guaranty pursuant to which the payment date was extended from May 23, 2023 until September 30, 2024, subject to acceleration upon certain triggering events. Subsequent to September 30, 2024, the maturity date was extended to December 31, 2024. The payment obligation will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy such obligations. Under the Virage MTA Amendment, Virage received a first priority lien on all sources of revenue of the company not otherwise encumbered as of the date of the Virage MTA Amendment, to the extent in excess of the amount of revenues necessary to establish and maintain an operating reserve of $70 million for overhead expenses and applicable taxes. On July 24, 2023, the operating reserve was adjusted to $47.5 million and MSP Recovery agreed not to increase its 2023 operating budget without Virage's consent.

On January 1, 2024, the Company will be required to make a one-time, lump sum payment to Virage for the period starting May 24, 2023 and ending December 31, 2023, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock for the five day period prior to the issuance. If paid in warrants, such warrants will expire on January 1, 2026.

Further, for each calendar month beginning with January 31, 2024 until the obligations to Virage are paid in full, the Company has agreed to pay to Virage an amount monthly, in one or a combination of: (a) cash, in an amount equal to 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and/or (b) warrants to purchase Class A common stock at $0.0001 per share, in an amount equal to the quotient of 1.0% of each calendar month-end balance (which month-end balance shall be increased daily up to 20% per annum based on a formula set forth in the Virage MTA Amendment) of the amount owing to Virage as of each preceding calendar month end and the volume weighted average price of a share of our Class A common stock. If paid in warrants, such warrants will expire two years from the date of issuance.

The warrants will contain customary provisions for a transaction of this type, including that each warrant will be exercisable in whole or in part at any time prior to the expiration date, be freely transferable, subject only to applicable securities laws, and be subject to customary anti-dilution protection regarding the exercise price and number of shares of Class A Common Stock to be issued upon the exercise of each warrant.

In addition, the Virage MTA Amendment changed the payment methods to Virage to exclusively be, in the following order of priority: (a) the Proceeds and any other sources of revenue or liquidity of the Company (and its subsidiaries) that are not encumbered by a lien of a party other than Virage and to the extent such revenues and liquidity exceed the amount of net of revenues necessary to establish and maintain an operating reserve of $70 million (reduced to $47.5 million on July 24, 2023) for certain Company expenses, (b) a sale of certain reserved shares of Messrs. John H. Ruiz and Frank C. Quesada, and the delivery of the resulting net cash proceeds thereof to VRM, (c) Parent's sale of additional shares and delivery of proceeds to Virage, subject to certain anti-dilution provisions, (d) if not satisfied by the foregoing, a sale by Messrs. Ruiz and Quesada other shares of Messrs. Ruiz and Quesada, and the delivery of the resulting net cash proceeds thereof to VRM; provided that if the VRM Full Return is not fully paid by September 30, 2024 the VRM Full Return shall be payable by any of such payment methods in any order of priority. In addition, in connection therewith, Messrs. Quesada and Ruiz agreed to certain transfer restrictions applicable to their common stock, and agreed to effectuate sales of Company common stock in certain circumstances.

On November 13, 2023, the Company entered into the Second Virage MTA Amendment that extended the final payment date of the VRM Full Return to December 31, 2024, subject to acceleration upon certain triggering events. In addition, the Second Virage MTA Amendment (a) changed the minimum operating reserve from $47.5 million to the budget of the Company (plus applicable taxes) plus 10%, and (b) requires Virage and the Company negotiate and agree on a form of initial warrant and monthly warrant by no later than December 1, 2023.

34

*Amended and Restated Nomura Promissory Note*

On April 12, 2023, the Company amended the promissory note to Nomura originally issued on May 27, 2022, which amendment increased the principal amount to approximately $26.3 million and extended the maturity date of the promissory note to September 30, 2024. Subsequent to September 30, 2023, the Company entered into the Amended and Restated Nomura Promissory Note to (a) increase the principal amount to approximately $28.9 million, (b) extend the maturity date was extended to December 31, 2024. and (c) permit the Company to use the proceeds of an at-the-market offering to repay indebtedness incurred by the Company for which the proceeds are used for operating expenses, subject to certain enumerated restrictions. The Amended and Restated Nomura Promissory Note will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy said obligation. The Amended and Restated Nomura Promissory Note carries an interest rate of 16% per annum and is payable in kind or in cash, at the Company's discretion, every 30 calendar days after November 13, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the Amended and Restated Nomura Promissory Note together with all accrued and unpaid interest thereon.

*Cano Health*

On July 7, 2023, the Company issued 4,760,001 unregistered shares (after giving effect to the Reverse Split) of Class A Common Stock to Cano Health, LLC ("Cano") as payment for $61.6 million in deferred compensation related to the following agreements, which the Company had the option to pay in cash or in stock and has elected to pay in stock, of which (i) 3,225,807 shares of Common Stock were issued as a deferred consideration for the assignment of certain claims pursuant to that certain Purchase Agreement, effective as of September 30, 2022, as amended to date, by and between MSP Recovery and Cano, and (ii) 4,734,194 shares of Common Stock were issued as deferred consideration for the assignment of certain claims pursuant to that certain Amended and Restated Claims Recovery and Assignment Agreement effective as of December 31, 2021, as amended to date, by and between MSP Recovery and Cano.

On August 10, 2023, the MSP Recovery sued Cano in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida for declaratory relief and anticipatory breach of the CCRA, Purchase Agreement, and a Service Agreement (collectively, the "Cano Agreements") between the parties. On the same day, Cano sued the Company in the same court, alleging fraud in the inducement, breach of contract, tortious interference, and unjust enrichment relating to the Cano Agreements. The Company has outstanding a $5.0 million receivable from Cano; however, due to Cano's Quarterly Report on Form 10-Q for the June 30, 2023 period, which includes a substantial doubt about its ability to continue as a going concern, the Company established a reserve for the balance due under such receivable during the nine months ended September 30, 2023.

*Virage Swap*

On July 28, 2023, VRM exercised its option to exchange Claims with service dates prior to January 1, 2014 for more recent Claims. To do so, the VRM MSP agreement was amended to reflect that: (a) rights to recovery proceeds arising from Claims held by VRM MSP, with dates of service before January 1, 2014, were transferred to MSP Recovery; (b) MSP Recovery contributed capital to VRM MSP in the form of in-kind ownership interests to certain series entities holding Claims; however, recovery proceeds associated with said entities with service dates prior to January 1, 2014 and after March 31, 2023 were retained by MSP Recovery; and (c) as a result of such capital contributions, MSP Recovery was admitted as a member of VRM MSP.

**Key Factors Affecting Our Results**

***Our Claims Portfolio***

We differ from some of our competitors because we obtain our recovery rights through irrevocable assignments. When we are assigned these rights, we take on the risk that such Claims may not be recoverable. We are entitled to pursue a portion of any recovery rights associated with approximately $1,603 billion in Billed Amount (and approximately $381 billion in Paid Amount), which contained approximately $92 billion in Paid Value of Potentially Recoverable Claims, as of September 30, 2023. We are typically entitled to 100% of recovery rights pursuant to our CCRAs, but contractually obligated to pay 50% of gross recoveries to the Assignor. In certain cases, we have purchased from our Assignors the rights to 100% of the recovery. By discovering, quantifying, and settling the gap between Billed Amount and Paid Amount on a large scale, we believe we are positioned to generate substantial annual recovery revenue at high profit margins for our assigned Claims. In litigation, our experienced management and legal teams provide us with a competitive advantage. While our model of being assigned the Claim rights allows us the flexibility to direct the litigation and potentially generate higher margins, we have, on an opportunistic basis, paid the Assignor an upfront purchase price for these rights.

To date, we have not generated substantial revenue from our Claims portfolio, and our business model is dependent of achieving revenue from this model in the future. If we are unable to recover the upfront purchase price from the assigned Claims or the investments we have made in pursuing recoveries, it would have an adverse effect on our profitability and business.

Our potential Claims recovery income in a given period will be impacted by the amount of Claims we review and ultimately pursue. The number of Claims that we review is driven by the Claims we receive through assignment. As we are assigned more Claims, we can review the Claims and identify additional recoveries. To expand our Assignor base and obtain more Claims, we plan to implement new strategies to secure new Assignors. These strategies will include a platform to educate potential Assignors about our

company, making strategic business partnerships, potential mergers, as well as other marketing strategies. Our Assignors have grown from 32 in 2015, to

35

105 in 2018, to 123 in 2019, to 134 in 2020 and over 160 Assignors to date. If we are unable to continue to attract new Assignors to our platform, this could adversely affect future profitability.

In addition to obtaining new Claims, our ability to collect on identified Claims at our estimated multiples is key to our future profitability. Pursuant to the Medicare Secondary Payer Act, we believe we are entitled to pursue reasonable and customary rates. Under existing statutory and case law, the private cause of action under the Medicare Secondary Payer Act permits the pursuit of double damages when a primary plan fails to provide for primary payment or appropriate reimbursement. In addition to double damages, federal law provides express authority to pursue statutory interest from primary payers on any amounts owed.

As a result, we may pursue double damages and statutory interest in our Medicare Secondary Payer Act-related recoveries. We seek to recover these amounts under either the recovery model or the Chase to Pay model. Federal law also expressly provides MAOs with the right to charge providers for the Billed Amount when accident related liability exists. Per the terms of various legal services agreements that MSP Recovery has with the Law Firm, for legal services provided, the Law Firm would receive a percentage of the total Claim recovery which would include double damages and additional penalties. Our ability to pursue double damages may be impacted by the RAMP Act as disclosed in Note 12, *Commitments and Contingencies*.

Our Claims recovery revenue is typically recognized upon reaching a binding settlement or arbitration with a counterparty or when the legal proceedings, including any appellate process, are resolved. A decrease in the willingness of courts to grant these judgments, a change in the requirements for filing these cases or obtaining these judgments, or a decrease in our ability to collect on these judgments could have an adverse effect on our business, financial condition, and operating results. Of the Claims identified as potentially recoverable, relating to our accident-related cases as of September 30, 2023, approximately 86.8% of claims are already in the recovery process, which are claims where either the recovery process has been initiated, data has been collected and matched, or resolution discussions are in process.

### Key Performance Indicators

To evaluate our business, key trends, risks and opportunities, prepare projections, make strategic decisions, and measure our performance, we track several key performance indicators ("KPIs"). As our company has yet to achieve significant revenues and the drivers of expected revenues require significant lead time before revenue can be generated, management utilizes KPIs to assist in tracking progress, and believes such KPIs are useful in evaluating the performance of our business, in addition to our financial results prepared in accordance with GAAP. The KPIs are total Paid Amount, Paid Value of Potentially Recoverable Claims, Billed Value of Potentially Recoverable Claims, Recovery Multiple, and Penetration Status of Portfolio.

**Total Paid Amount**: The term Paid Amount is defined in the Definitions section above. As we continue to expand, we anticipate our revenue growth will be greatly dependent on our ability to increase the total Paid Amount and, correspondingly, the Paid Value of Potentially Recoverable Claims, in our portfolio. Management believes this metric is a useful measure to investors and is useful in managing or monitoring company performance because we view an increase in Paid Amount as a positive indicator as it should provide the Company with the ability to increase the Paid Value of Potentially Recoverable Claims. Conversely, a decrease would produce a diminishing appreciation of the Paid Value of Potentially Recoverable Claims.

**Paid Value of Potentially Recoverable Claims (PVPRC)**: The term PVPRC is defined in the Definitions section above. We analyze our Claims portfolio and identify potentially recoverable Claims using our Algorithms to comb through historical paid Claims data and search for potential recoveries. PVPRC is a measure of the Paid Amount that has been paid to providers in respect of those potentially recoverable Claims. Management believes this measure provides a useful metric for potential recoveries, but it is not a measure of the actual amount that may be recovered with respect to potentially recoverable Claims, which in turn may be higher or lower based on a variety of factors. As non-compliance with Section 111 reporting requirements is commonplace, responsible reporting entities (RRE) routinely fail to report their responsibility to make primary payments; for this reason, data matching is often required to determine which reporting entity is responsible to reimburse a given potentially recoverable Claim. Our ability to generate future Claims recovery income is largely dependent on our ability to accurately identify potentially recoverable Claims through our data analytics and ultimately recover on these Claims. Management believes this metric is a useful measure to investors and in managing or monitoring company performance because we view an increase in PVPRC as a positive indicator as it should provide the Company with the ability to increase Claims recovery income and otherwise shows growth.

**Billed Value of Potentially Recoverable Claims (BVPRC)**: Billed Value of Potentially Recoverable Claims ("BVPRC") represents the cumulative Billed Amount of potentially recoverable Claims. We analyze our Claims portfolio and identify potentially recoverable Claims using Algorithms to comb through historical paid Claims data and search for potential recoveries. For a majority of our Claims, the Company believes it has the ability to recover in excess of the Paid Amount by pursuing the Billed Amount plus interest plus double damages under applicable law. Under existing statutory and case law, the private cause of action under the Medicare Secondary Payer Act permits an award of double damages when a primary plan fails to provide for primary payment or appropriate reimbursement. We believe federal law expressly provides MAOs with the right to charge, or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or primary plan policy. We believe our ability to generate future Claim recovery income is largely dependent on our ability to accurately identify potentially recoverable Claims through our data

analytics and ultimately recover on these Claims. Management believes this metric is a useful measure to investors and in managing or monitoring

36

company performance because we view an increase in BVPRC as a positive indicator as it should provide the Company with the ability to increase Claims recovery income and otherwise shows growth.

**Recovery Multiple**: The vast majority of our recoveries are sought pursuant to the MSP Act and associated regulations (the "MSP Laws"); however, some recoveries are sought under product liability, antitrust, and other various causes of action. For recoveries sought pursuant to the MSP Laws, we generally pursue amounts in excess of the Paid Amount; in other cases, the cause of action will dictate the amount pursued. The Recovery Multiple is the amount of any generated Claims recovery income obtained by the Company in respect to any Claims as compared to the Paid Amount of those Claims (e.g., if a given Claim had a Paid Amount of $100, a $600 recovery would represent a Recovery Multiple of 6x). For these purposes, we record values under the Recovery Multiple once we have recorded Claims recovery income, either through the receipt of cash or recognition of accounts receivable on the Claims. Management believes this metric is useful to investors to manage or monitor the Company's performance because the Recovery Multiple provides a measure of our ability to recover on Claims recovery rights. A Recovery Multiple above 1x would illustrate the Company's ability to recover amounts in excess of the Paid Amount. As actual recoveries have been limited to date, this measure has limited utility for historical periods. However, management believes this measure will become more meaningful during the next 12 months and beyond to the extent the Company begins to report actual increases in recoveries during those periods. As of September 30, 2023, the Company has obtained settlements where the Recovery Multiple was or would be in excess of the Paid Amount, and settlements at or below the paid amount. However, these settlements do not provide a large enough sample to be statistically significant and are therefore not shown in the table. As the Recovery Multiple is based on actual recoveries, this measure is not based on the Penetration Status of Portfolio, as described below.

**Penetration Status of Portfolio**: Penetration Status of Portfolio provides a measure of the Company's recovery efforts by taking into account the current stages of recovery of Claims in the portfolio and tying it in with the estimated market share of the related primary payers. The total percentage represents the estimated aggregate market share for the respective primary payers in which the Company is in some stage of recovery. As the Company initiates additional recovery efforts against additional primary payers, the Company expects this number to increase. These stages of recovery include where (1) the recovery process has been initiated, (2) data has been collected and matched, or (3) potential resolution discussions are in process. The Company uses third-party sources to estimate the aggregate market share of those primary payers in the property and casualty auto insurance market with whom the Company is engaged in one of these stages of recovery. Management believes this metric is useful to investors and in managing or monitoring company performance because it provides insight as to the estimated share of the market that is covered by existing recovery efforts. We estimate that cases that are in the potential resolution discussions and/or data matching are closer to generating potential future Claims recovery income.

| | Nine months ended September 30, 2023 | Year Ended December 31, 2022 | Year Ended December 31, 2021 | Year Ended December 31, 2020 |
|---|---|---|---|---|
| *$ in billions* | | | | |
| Paid Amount | $ 381.1 | $ 374.8 | $ 364.4 | $ 58.4 |
| Paid Value of Potentially Recoverable Claims | 91.5 | 89.6 | 86.6 | 14.7 |
| Billed Value of Potentially Recoverable Claims | 387.1 | 377.8 | 363.2 | 52.3 |
| Recovery Multiple | N/A[(1)] | N/A[(1)] | N/A[(1)] | N/A[(1)] |
| Penetration Status of Portfolio | 86.8% | 85.8% | 75.6% | N/A |

(1)  During the nine months ended September 30, 2023, the Company has received total recoveries of $6.1 million with a recovery multiple of 1.53x. However, the settlement amounts do not provide a large enough sample to be statistically significant, and are therefore not shown in the table.

(2)  On August 10, 2022, the United States Court of Appeals, Eleventh Circuit held that a four-year statute of limitations period applies to certain claims brought under the Medicare Secondary Payer Act's private cause of action, and that the limitations period begins to run on the date that the cause of action accrued. This opinion may render certain Claims held by the Company unrecoverable and may substantially reduce PVPRC and BVPRC as calculated. As our cases were filed at different times and in various jurisdictions, and prior to data matching with a defendant we are not able to accurately calculate the entirety of damages specific to a given defendant, we cannot calculate with certainty the impact of this ruling at this time. However, the Company has deployed several legal strategies (including but not limited to seeking to amend existing lawsuits in a manner that could allow claims to relate back to the filing date as well as asserting tolling arguments based on theories of fraudulent concealment) that would apply to tolling the applicable limitations period and minimizing any material effect on the overall collectability of its claim rights. In addition, the Eleventh Circuit decision applies only to district courts in the Eleventh Circuit. Many courts in other jurisdictions have applied other statutes of limitations to the private cause of action, including borrowing the three-year statute of limitations applicable to the government's cause of action; and borrowing from the False Claims Act's six-year period. The most recent decision on the issue from the District Court of Massachusetts, for example, applies the same statute of limitations as Eleventh Circuit, but expressly disagrees with the Eleventh Circuit's application of the "accrual" rule and instead adopted the notice-based trigger that the company has always argued should apply. This would mean that the limitations period for unreported claims has not even begun to accrue. This is a complex legal issue that will continue to evolve in jurisdictions across the country. Nevertheless, if the application of the statute of limitations as determined by the Eleventh Circuit was applied to all Claims assigned to us, we estimate that the effect would be a reduction of PVPRC by approximately $8.9 billion. As set forth in our Risk Factors, PVPRC is based on a variety of factors. As such, this estimate is subject to change based on the variety of legal claims being litigated and statute of limitations tolling theories that apply.

## Healthcare Industry

Our business is directly related to the healthcare industry and is affected by healthcare spending and complexity in the healthcare industry. We estimate that our total addressable market is over $150 billion annually. Our primary focus is on the Medicare and

Medicaid market segments. Medicare is the second largest government program, with estimated annual expenditures during 2021 of approximately

37

$923 billion for approximately 63.5 million enrollees. Medicaid has a combined estimated annual expenditure during 2021 of approximately $684 billion for approximately 76.5 million enrollees. Of the billions spent yearly by Medicare on medical expenses for its beneficiaries, we estimate that at least 10% of this was improperly paid by private Medicare plans.

Our addressable market, and therefore revenue potential, is impacted by the expansion or contraction of healthcare coverage and spending, which directly affects the number of Claims available. The Centers for Medicare & Medicaid Services ("CMS") has projected that health spending will continue to grow at an average rate of 5.4% a year between 2019 and 2028. We also believe reimbursement models may become more complex as healthcare payers accommodate new markets and lines of business and as advancements in medical care increase the number of testing and treatment options available. As reimbursement models grow more complex and healthcare coverage increases, the complexity and number of Claims may also increase, which could impact the demand for our solutions. Such changes could have a further impact on our results of operations.

As of September 30, 2023, approximately 92.6% of our expected recoveries arise from Claims being brought under the Medicare Secondary Payer Act. While we believe the MSP Act has bipartisan support, changes to the laws on which we base our recoveries, particularly the MSP Act, can adversely affect our business. Our ability to generate future revenue is therefore significantly dependent on factors outside our control.

**Key Components of Sales and Expenses**

The following represent the components of our results of operations.

**Revenue**

*Claims Recovery Income*

Our primary income-producing activities are associated with the pursuit and recovery of proceeds related to Claims recovery rights that the Company obtains through CCRAs, which are irrevocably assigned to us. As such, this income is not generated from the transfer of control of goods or services to customers, but through the proceeds realized from perfection of Claims recoveries from rights we own. We recognize Claims recovery income based on a gain contingency model; that is, when the amounts are reasonably certain of collection. This typically occurs upon reaching a binding settlement or arbitration with the counterparty or when the legal proceedings, including any appellate process, are resolved.

In some cases, we would owe an additional payment to the original assignor in connection with the realized value of the recovery right. Claims recovery income is recognized on a gross basis, as we are entitled to the full value of recovery proceeds and make payment to the original assignor similar to a royalty arrangement. Such payments to our Assignors are recognized as cost of Claims recovery in the same period the Claims recovery income is recognized.

*Claims Recovery Service Income*

We also recognize Claims recovery service income for our services to a related party and a third party to assist those entities with pursuit of Claims recovery rights. We have determined we have a single performance obligation for the series of daily activities that comprise Claims recovery services, which are recognized over time using a time-based progress measure. We enter into Claims recovery service contracts with third parties. Amounts payable for services to third parties are typically based on budgeted expenses for the current month with an adjustment for the variance between budget and actual expenses from the prior month.

The Company does not anticipate significant claims recovery service income during 2023.

**Operating Expenses**

*Costs of Claim Recoveries*

Costs of recoveries consist of all directly attributable costs specifically associated with Claims processing activities, including contingent payments payable to assignors (i.e., settlement expenses).

*Claims Amortization Expense*

Claims Amortization Expense consists of the amortization of CCRA intangible assets for those CCRAs in which we made upfront payments or commitments in order to acquire Claims recovery rights.

*General and Administrative Expenses*

General and administrative expenses consist primarily of personnel-related expenses for employees involved in general corporate, sales, and marketing functions, including executive management and administration, legal, human resources, accounting, finance, tax, and information technology. Personnel-related expenses primarily include wages and bonuses. General and administrative expenses also consist of rent, IT costs, insurance, and other office expenses.

As we continue to grow as a company and build our team, we expect that our sales, general and administrative costs will increase. We also expect to incur additional expenses as a result of operating as a public company, including expenses necessary to comply with the rules and regulations applicable to companies listed on a national securities exchange and related to compliance and reporting

obligations pursuant to the rules and regulations of the SEC, as well as higher expenses for general and director and officer insurance, investor relations, and professional services.

*Allowance for credit losses*

Allowance for credit losses consists of a specific reserve for a receivable amount due from Cano. Due to its material nature, it is included separately in the condensed consolidated statement of operations.

*Professional Fees*

Professional Fees consist of consulting, accounting, and other professional fees that are charged for services provided by third-party vendors.

*Professional fees – legal*

Professional fees – legal consist of payments for the expenses of the Law Firm covered by a certain Legal Services Agreement and other legal professional services from third-party providers, including payments to co-counsel.

*Depreciation and Amortization*

Depreciation and amortization expense consist of depreciation and amortization of property and equipment related to our investments in leasehold improvements, office and computer equipment, and internally generated capitalized software development costs. We provide for depreciation and amortization using the straight-line method to allocate the cost of depreciable assets over their estimated useful lives.

**Interest Expense**

In some cases, we have entered into arrangements to transfer CCRAs or rights to proceeds from CCRAs to other parties. When such transfers are considered to be sales of future revenue that are debt-like in nature as defined in Accounting Standards Codification ("ASC") 470, these arrangements are recognized as debt based on the proceeds received and are imputed an interest rate based on the expected timing and amount of payments to achieve contractual hurdles. Our interest expense consists of the imputed interest on these payments. We anticipate that as we recognize Claims recoveries related to CCRAs in these arrangements, the interest expense on these arrangements will decrease. In addition, interest expense includes interest paid on the Nomura Promissory Note, Working Capital Credit Facility, Purchase Money Loan, Virage transactions (See Note 4, *Assets Acquisitions*) and Loans from related parties.

**Other Income (Expense)**

Other income consists of equity investment earnings, some affiliate related income, mark to market gain (loss) for payments due in stock. Other expenses consist of bank service charges, airing fees, tax penalties, settlement expense, political contributions and donations, and some affiliate related expenses.

**Changes in Fair Value of Warrant and Derivative Liabilities**

Changes in fair value of warrants and derivative liabilities consists of the mark to market of warrant liabilities and derivatives as part of the OTC Equity Prepaid Forward Transaction noted in Note 15, *Derivative Liability*, and warrant liabilities due to Public Warrants as noted in Note 3, *Business Combination*, in the notes to condensed consolidated financial statements.

**Net (Income) Loss Attributable to Non-Controlling Members**

Net (income) loss attributable to non-controlling members consists of income or loss attributable to Class V Common Stock shareholders.

**Income Tax Benefit**

As a result of the Business Combination, the Company became the sole managing member of MSP Recovery, which is treated as a partnership for U.S. federal, state, and local income tax purposes. As a partnership, MSP Recovery is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by MSP Recovery is passed through to and included in the taxable income or loss of its partners, including MSP Recovery, Inc. The Company is subject to U.S. federal income taxes, in addition to state and local income taxes, with respect to the Company's allocable share of income of MSP Recovery. The Company's deferred tax balances reflect the impact of temporary differences between the carrying amount of assets and liabilities and the Company's tax basis. The balances are stated at the tax rates in effect when the temporary differences are expected to be recovered or settled. The Company reviewed the anticipated future realization of the tax benefit of the Company's existing deferred tax assets and concluded that it is more likely than not that all of the deferred tax assets will not be realized in the future.

39

**Results of Operations**

*Three months ended September 30, 2023 versus three months ended September 30, 2022*

The following table sets forth a summary of our condensed consolidated results of operations for the three months ended September 30, 2023 to three months ended September 30, 2022 indicated.

| (in thousands except for percentages) | Three Months Ended September 30, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2023 | | 2022 (As Restated) | | $ Change | | % Change | |
| Claims recovery income | $ | 440 | $ | 2,759 | $ | (2,319) | | (84) | % |
| Claims recovery service income | | — | | 5,748 | | (5,748) | | (100) | % |
| **Total Claims Recovery** | **$** | **440** | **$** | **8,507** | **$** | **(8,067)** | | **(95)** | **%** |
| **Operating expenses** | | | | | | | | | |
| Cost of claims recoveries | $ | 574 | $ | 1,198 | $ | (624) | | (52) | % |
| Claims amortization expense | | 121,008 | | 111,851 | | 9,157 | | 8 | % |
| General and administrative | | 6,130 | | 6,621 | | (491) | | (7) | % |
| Professional fees | | 2,466 | | 5,904 | | (3,438) | | (58) | % |
| Professional fees – legal | | 6,871 | | 8,014 | | (1,143) | | (14) | % |
| Depreciation and amortization | | 85 | | 103 | | (18) | | (17) | % |
| **Total operating expenses** | **$** | **137,134** | **$** | **133,691** | **$** | **3,443** | | **3** | **%** |
| **Operating Income/ (Loss)** | **$** | **(136,694)** | **$** | **(125,184)** | **$** | **(11,510)** | | **9** | **%** |
| Interest expense | $ | (88,279) | $ | (46,180) | $ | (42,099) | | 91 | % |
| Other income (expense), net | | 408 | | 63,138 | | (62,730) | | (99) | % |
| Change in fair value of warrant and derivative liabilities | | 348 | | 2,670 | | (2,322) | | (87) | % |
| **Net loss before provision for income taxes** | **$** | **(224,217)** | **$** | **(105,556)** | **$** | **(118,661)** | | **112** | **%** |
| Provision for income tax benefit (expense) | $ | — | $ | — | $ | — | | (100) | % |
| **Net loss** | **$** | **(224,217)** | **$** | **(105,556)** | **$** | **(118,661)** | | **112** | **%** |
| Less: Net (income) loss attributable to non-controlling members | $ | 204,462 | $ | 103,484 | $ | 100,978 | | 98 | % |
| **Net loss attributable to controlling members** | **$** | **(19,755)** | **$** | **(2,072)** | **$** | **(17,683)** | | **853** | **%** |

*Claims recovery income.* Claims recovery income decreased by $2.3 million to $0.4 million for the three months ended September 30, 2023 compared to the same period in the prior year, driven by decreased settlements during the period.

*Claims recovery service income.* Claims recovery service income decreased by $5.7 million to $0.0 million for the three months ended September 30, 2023 compared to the same period in the prior year, primarily driven by a decrease in third party service fees. The Company does not anticipate significant claims recovery service income during 2023.

*Cost of claims recoveries.* Cost of claims recoveries decreased by $0.6 million to $0.6 million, for the three months ended September 30, 2023 compared to the same period in the prior year, driven by assignor and law firm costs, which are directly correlated to the decrease in claims recovery income.

*Claims amortization expense.* Claims amortization expense increased by $9.2 million to $121.0 million compared to the same period in the prior year, primarily driven by increased amortization due to the acquisition of CCRAs purchased during the nine months ended September 30, 2023, included in Intangible assets.

*General and administrative.* General and administrative decreased by $0.5 million to $6.1 million for the three months ended September 30, 2023 compared to the same period in the prior year, primarily driven by a decrease in salaries and benefits of $0.4 million, marketing and promotions of $0.3 million, payroll expenses and payroll taxes of $0.2 million, offset by an increase in non-executive board compensation $0.3 million, among others.

*Professional fees.* Professional fees decreased by $3.4 million to $2.5 million for the three months ended September 30, 2023 compared to the same period in the prior year, primarily driven by decrease in professional fees of $0.5 million and services fees of $3.0 million.

*Professional fees – legal.* Professional fees – legal decreased by $1.1 million to $6.9 million for the three months ended September 30, 2023 compared to the same period in the prior year, primarily due to a $1.1 million decrease in fees to outsourced law firms.

*Interest expense.* Interest expense increased by $42.1 million to $88.3 million in the three months ended September 30, 2023 compared to the same period in the prior year, primarily driven by an increase due to the guarantee obligation as well as due to increases in the basis for which interest is incurred on our Claims financing obligations and accrued interest on the related party loan obtained in June 2022.

*Other income (expense), net.* Other income, net decreased by $62.7 million for the three months ended September 30, 2023 compared to the same period in the prior year, driven almost entirely by a gain associated with the settlement of the Brickell Key Investment debt extinguishment for the three months ended September 30, 2022, which did not reoccur in 2023.

40

*Change in fair value of warrant and derivative liabilities.* The change in fair value of warrant and derivative liabilities decreased $2.3 million to $0.3 million for the three months ended September 30, 2023 compared to the same period in the prior year. For the three months ended September 30, 2023, the $0.3 million gain related to a mark to market adjustment to the fair value of Public Warrants. For the three months ended September 30, 2022, $2.7 million of gain was recorded related to mark to market adjustments for the fair value of warrants for $3.7 million and a loss for the fair value of derivative liabilities related to the Committed Equity facility for $1.0 million.

<u>Nine months ended September 30, 2023 versus Nine months ended September 30, 2022</u>

The following table sets forth a summary of our condensed consolidated results of operations for the nine months ended September 30, 2023 to the nine months ended September 30, 2022 indicated.

| | | Nine Months Ended September 30, | | | | | |
|---|---|---|---|---|---|---|---|
| (in thousands except for percentages) | | 2023 | | 2022 (As Restated) | $ Change | | % Change |
| Claims recovery income | $ | 6,479 | $ | 4,225 | $ 2,254 | 53 | % |
| Claims recovery service income | | 498 | | 17,795 | (17,297) | (97) | % |
| **Total Claims Recovery** | $ | 6,977 | $ | 22,020 | $ (15,043) | (68) | % |
| **Operating expenses** | | | | | | | |
| Cost of claims recoveries | $ | 1,972 | $ | 1,906 | $ 66 | 3 | % |
| Claims amortization expense | | 355,481 | | 153,560 | 201,921 | 131 | % |
| General and administrative | | 20,691 | | 17,049 | 3,642 | 21 | % |
| Professional fees | | 15,611 | | 10,973 | 4,638 | 42 | % |
| Professional fees – legal | | 25,889 | | 34,251 | (8,362) | (24) | % |
| Allowance for credit losses | | 5,000 | | — | 5,000 | 100 | % |
| Depreciation and amortization | | 182 | | 254 | (72) | (28) | % |
| **Total operating expenses** | $ | 424,826 | $ | 217,993 | $ 206,833 | 95 | % |
| **Operating Income/ (Loss)** | $ | (417,849) | $ | (195,973) | $ (221,876) | 113 | % |
| Interest expense | $ | (204,287) | $ | (80,947) | $ (123,340) | 152 | % |
| Other income (expense), net | | 8,697 | | 63,175 | (54,478) | (86) | % |
| Change in fair value of warrant and derivative liabilities | | 4,247 | | (11,683) | 15,930 | (136) | % |
| **Net loss before provision for income taxes** | $ | (609,192) | $ | (225,428) | $ (383,764) | 170 | % |
| Provision for income tax benefit (expense) | $ | — | $ | — | $ — | (100) | % |
| **Net loss** | $ | (609,192) | $ | (225,428) | $ (383,764) | 170 | % |
| Less: Net (income) loss attributable to non-controlling members | $ | 576,301 | $ | 221,476 | $ 354,825 | 160 | % |
| **Net loss attributable to controlling members** | $ | (32,891) | $ | (3,952) | $ (28,939) | 732 | % |

*Claims recovery income.* Claims recovery income increased by $2.3 million for the nine months ended September 30, 2023 compared to the nine months ended September 30, 2022, driven by increased settlements during the year to date period.

*Claims recovery service income.* Claims recovery service income decreased by $17.3 million, for the nine months ended September 30, 2023 from $17.8 million for the nine months ended September 30, 2022, primarily driven by a decrease in third party service fees. The Company does not anticipate significant claims recovery service income during 2023.

*Cost of claims recoveries.* Cost of claims recoveries remained consistent with a slightly increase of $66 thousand in comparison to the same period in prior year.

*Claims amortization expense.* Claims amortization expense increased by $201.9 million for nine months ended September 30, 2023 compared to the nine months ended September 30, 2022, primarily driven by increased amortization due to the acquisition of CCRAs obtained as part of the business combination completed in the second quarter of 2022 and additional CCRA purchases during the nine months ended September 30, 2023.

*General and administrative.* General and administrative increased by $3.6 million in nine months ended September 30, 2023 from the nine months ended September 30, 2022, primarily driven by increases costs in salaries and benefits of $0.9 million, increase in non-executive board compensation of $0.9 million, marketing and promotions of $0.8 million, and insurance of $0.5 million, among others, as compared to the nine months ended September 30, 2022.

*Professional fees.* Professional fees increased by $4.6 million for the nine months ended September 30, 2023 compared to the nine months ended September 30, 2022, primarily driven by additional costs incurred by being a public company, including $5.7 million advisory fees, as well as $0.9 million of other external consultants, offset by a decrease of $2.0 million in various professional fees.

*Professional fees - legal.* Professional fees – legal decreased by $8.4 million when compared to the same period in 2022, primarily driven by a $20.0 million reduction in shared based compensation, offset by $2.8 million increase in fees to outsourced law firms and Law Firm expenses of $8.8 million for the nine months ended September 30, 2023.

41

*Allowance for credit losses*. Allowance for credit losses for the nine months ended September 30, 2023 was $5.0 million, entirely related to an amount due from Cano which has been reserved considering their recent filing which includes a substantial doubt about Cano's ability to continue as a going concern. No such reserves existed for the nine months ended September 30, 2022.

*Interest expense*. Interest expense increased by $123.3 million to $204.3 million in nine months ended September 30, 2023 from $80.9 million for the nine months ended September 30, 2022, primarily driven by an increase due to the guarantee obligation, as well as due to increases in the basis for which interest is incurred on our Claims financing obligations and accrued interest on the related party loan obtained in June 2022.

*Other income (expense), net*. Other income, net decreased by $54.5 million for nine months ended September 30, 2023 driven by a $63.4 million gain associated with the settlement of the Brickell Key Investment debt extinguishment in 2022. Other income for the nine months ended September 30, 2023 consists primarily of a $4.6 million of gain on the sale of CCRAs and $3.9 million of gain on fair value of liability payable in stock.

*Change in fair value of warrant and derivative liabilities*. For the nine months ended September 30, 2023, increased $15.9 million in comparison to the nine months ended September 30, 2022. For the nine months ended September 30, 2023, $4.4 million gain in 2023 related to a mark to market adjustment to the fair value of Public Warrants. For the nine months ended September 30, 2022, $11.7 million of loss was recorded related to mark to market adjustments for the fair value of warrants for $1.6 million and for the fair value of derivative liabilities related to the Committed Equity facility for $10.1 million.

**Non-GAAP Financial Measures**

In addition to the financial measures prepared in accordance with GAAP, this Form 10-Q also contains non-GAAP financial measures. We consider "adjusted net loss" and "adjusted operating loss" as non-GAAP financial measures and important indicators of performance and useful metrics for management and investors to evaluate our business's ongoing operating performance on a consistent basis across reporting periods. We believe these measures provide useful information to investors. Adjusted net loss represents net loss adjusted for certain non-cash and non-recurring expenses and adjusted operating loss items represents Operating loss adjusted for certain non-cash and non-recurring expenses. A reconciliation of these non-GAAP measures to their most relevant GAAP measure is included below:

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| (In thousands) | 2023 | | 2022 | | 2023 | | 2022 | |
| **GAAP Operating Loss** | $ | (136,694 ) | $ | (125,184 ) | $ | (417,849 ) | $ | (195,973 ) |
| Share-based compensation | | 1,875 | | — | | 1,875 | | 20,055 |
| Claims amortization expense | | 121,008 | | 111,851 | | 355,481 | | 153,560 |
| Allowance for credit losses | | — | | — | | 5,000 | | — |
| **Adjusted operating loss** | $ | (13,811 ) | $ | (13,333 ) | $ | (55,493 ) | $ | (22,358 ) |
| | | | | | | | | |
| **GAAP Net Loss** | $ | (224,217 ) | $ | (105,556 ) | $ | (609,192 ) | $ | (225,428 ) |
| Share-based compensation | | 1,875 | | — | | 1,875 | | 20,055 |
| Gain on debt extinguishment | | — | | (63,367 ) | | — | | (63,367 ) |
| Claims amortization expense | | 121,008 | | 111,851 | | 355,481 | | 153,560 |
| Allowance for credit losses | | — | | — | | 5,000 | | — |
| Paid-in-kind Interest | | 88,279 | | 46,180 | | 204,287 | | 80,947 |
| Change in fair value of warrant and derivative liabilities | | (348 ) | | (2,670 ) | | (4,247 ) | | 11,683 |
| **Adjusted net loss** | $ | (13,403 ) | $ | (13,562 ) | $ | (46,796 ) | $ | (22,550 ) |

**Liquidity and Capital Resources**

*Sources of Liquidity*

As an early-stage growth company, the Company has incurred substantial net losses since inception. As of September 30, 2023, the Company had unrestricted cash and cash equivalents totaling $6.7 million. The Company has incurred recurring losses and negative cash flows since inception and has an accumulated deficit of $62.1 million as of September 30, 2023. For the nine months ended September 30, 2023, the Company used approximately $31.5 million of cash in operations. The Company's liquidity will depend on the ability to generate substantial Claims recovery income and Claims recovery services income in the near future, the timing of which is uncertain, as well as its ability to secure funding from capital sources. The Company's principal liquidity needs have been capital expenditures, working capital, debt service and Claims financing obligations.

The Company anticipates sources of liquidity to include the Working Capital Credit Facility as disclosed in Note 10, *Claims Financing Obligations and Notes Payable*. The Company anticipates having funding through the Working Capital Credit Facility and

has taken several actions to address liquidity concerns, including:

42

1. On March 29, 2023, the Company's subsidiary, Subrogation Holdings, LLC and its parent, MSP Recovery LLP, entered into the Working Capital Credit Facility consisting of commitments to fund up to $48 million in proceeds. See summary in "*Hazel Transactions*" in Note 10, *Claims Financing Obligations and Notes Payable*.

2. On November 13, 2023, the Company entered into the MTA Amendment No. 2 and Amendment to the Amended and Restated Security Agreement ("Second Virage MTA Amendment"), which extended the due date for the payment obligations to Virage to December 31, 2024. See summary in Note 4, *Asset Acquisitions*. This payment obligation will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy such obligations.

3. On November 13, 2023, the Company entered into the Amended and Restated Nomura Promissory Note, which extended the due date to December 31, 2024. See summary in Note 10, *Claims Financing Obligations and Notes Payable*. Amended and Restated Nomura Promissory Note will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy said obligation.

4. On November 14, 2023, the Company entered into the Yorkville SEPA, which included a pre-advancement in the amount of $15.0 million in connection with the purchase of the Company's common stock. See summary above in "*Committed Equity Facility*" within Note 1, *Description of the Business*.

5. Given the uncertainty with regard to the timing and amount of claims recovery income, management implemented a reduction of operating costs in 2023 through the reduction or elimination of certain controllable expenses particularly within the budgeted costs to expand and develop new solutions through LifeWallet platform, advertising expenses and non-contingent legal fees.

*Working Capital Credit Facility*

On March 29, 2023, the Company's subsidiary, Subrogation Holdings, LLC, entered into the Working Capital Credit Facility, which provides for up to $80 million (with a 40% original issue discount), consisting of a Term Loan A commitment to fund up to $30 million (in multiple installments) in proceeds and a Term Loan B commitment to fund up to $18 million (in multiple installments) in proceeds. An initial $10 million in proceeds was drawn under the Term Loan A on March 6, 2023. On March 29, 2023, an additional $5 million was disbursed to the Company's subsidiary, Subrogation Holdings, LLC, under the Term Loan A. Loans under the Working Capital Credit Facility accrue interest at a Term Secured Overnight Financing Rate for 12-month interest period, plus an applicable margin of 10% per annum. Accrued interest is payable in kind and will be capitalized quarterly. The Working Capital Credit Facility has a stated maturity date of March 31, 2026, and HPH may extend for up to one year in its sole discretion.

On May 11, 2023 and June 13, 2023, HPH notified us that it would not disburse additional funds under the Working Capital Credit Facility until the Company satisfied certain milestone funding conditions, including certain servicing obligations as well as filing the 2022 Form 10-K. The parties subsequently agreed that $5.5 million will be funded under Term Loan A in accordance with the terms of the Working Capital Credit Facility subsequent to the filing of the 2022 Form 10-K and receipt of funding notices, deeming funding conditions satisfied or waived. Following such funding, the Term Loan A commitment would be terminated, with total funding of $20.5 million. In addition, the parties agreed to increase the Term Loan B commitment from $18 million to $27.5 million, after giving effect to the original issue discount on the Working Capital Credit Facility and which will be funded in multiple installments and in accordance with the terms of the Working Capital Credit Facility. Funding will be at a rate of $2.25 million per month until December 2023, and thereafter at $1.75 million per month, subject to potential further reductions in the case of certain agreed cost savings and funds availability.

On August 4, 2023, after the filing of the Annual Report on Form 10-K, the Company's subsidiary, Subrogation Holdings, LLC, received from HPH funding amounting to $5.5 million from Term Loan A and $2.3 million installment under Term Loan B. On August 30, 2023, the Company's subsidiary, Subrogation Holdings, LLC, received an additional $2.3 million installment under Term Loan B. On November 13, 2023, the Company's subsidiary, Subrogation Holdings, LLC, received an additional $4.5 million under Term Loan B.

*MSP Principals Promissory Note*

On June 16, 2022, the MSP Principals provided cash to the Company to finance operations in an aggregate amount of $112.8 million. The Company issued the MSP Principals Promissory Note to the MSP Principals in an aggregate principal amount of $112.8 million that has an annual interest rate of 4%, payable in kind, and matures on the day that is the four-year anniversary of the issuance. On the maturity date, the Company is required to pay the MSP Principals an amount in cash equal to the outstanding principal amount, plus accrued and unpaid interest. The promissory note is pre-payable by the Company at any time, without prepayment penalties, fees or other expenses. A portion of the proceeds under the MSP Principals Promissory Note in an amount equal to $36.5 million was advanced to the Law Firm for certain operating expenses as contemplated by the Legal Services Agreement. The MSP Principals Promissory Note contains customary events of default that would allow the MSP Principals to declare the MSP Principals Promissory Note immediately due and payable or the MSP Principals Promissory Note will immediately and automatically become due and

payable without notice, presentment, demand, protest or other request of any kind. In addition, the MSP Principals Promissory Note may be

43

accelerated by the MSP Principals if the Board of Directors of the Company (excluding the MSP Principals) terminates the Legal Services Agreement.

During the nine months ended September 30, 2023, the Company received a $4.95 million loan from the Law Firm, evidenced by an unsecured promissory note, to provide general operational funding. The aggregate unpaid principal amount of this promissory note is due 24 months from the date of the last advance from the Purchase Money Loan is made. This promissory note is payable by the Company at any time, without prepayment penalties, fees, or other expenses. The note does not carry any interest and can be repaid at any time or from time to time without a prepayment penalty.

*Amended and Restated Nomura Promissory Note*

On May 27, 2022, the Company issued an unsecured promissory note to Nomura in a principal amount of approximately $24.5 million related to advisory fees and deferred underwriting fees and expenses that became due and payable by the Company to Nomura, in connection with the consummation of the Business Combination (as defined herein).

On April 12, 2023, the Company amended the promissory note, increasing the principal amount to approximately $26.2 million and extending the maturity date of the promissory note to September 30, 2024. Subsequent to September 30, 2023, the Company entered into the Amended and Restated Nomura Promissory Note to (a) increase the principal amount to approximately $28.9 million, (b) extend the maturity date to December 31, 2024 and (c) permit the Company to use the proceeds of an at-the-market offering to repay indebtedness incurred by the Company for which the proceeds are used for operating expenses, subject to certain enumerated restrictions. The Amended and Restated Nomura Promissory Note will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy said obligation. The amended note carries an interest rate of 16% per annum and is payable in kind or in cash, at the Company's discretion, every 30 calendar days after November 13, 2023. Upon two days prior written notice to Nomura, the Company may prepay all or any portion of the then outstanding principal amount under the Amended and Restated Nomura Promissory Note together with all accrued and unpaid interest thereon.

*Yorkville Purchase Agreement*

On January 6, 2023, the Company entered into Yorkville Purchase Agreement with Yorkville. Pursuant to the Yorkville Purchase Agreement, after the closing of the Business Combination, the Company will have the right to sell to Yorkville from time to time at its option up to $1 billion in Class A common stock shares, subject to the terms, conditions and limitations set forth in the Yorkville Purchase Agreement. This Purchase Agreement will not be operational until a Registration Statement is effective.

The previous purchase agreement that the Company entered into on May 17, 2022 with Cantor Fitzgerald & Co. has been terminated.

Subsequent to September 30, 2023, the Company entered into the Yorkville SEPA with Yorkville, which replaced the Yorkville Purchase Agreement described above. Pursuant to the Yorkville SEPA, the Company has the right to sell to Yorkville up to $250 million of its shares of common stock, subject to certain limitations and conditions set forth in the Yorkville SEPA, from time to time during the term of the Yorkville SEPA. Sales of the shares of common stock to Yorkville under the Yorkville SEPA, and the timing of any such sales, are at the Company's option, and the Company is under no obligation to sell any shares of common stock to Yorkville under the Yorkville SEPA except in connection with notices that may be submitted by Yorkville, in certain circumstances as described above.

Refer to *Committed Equity Facility* within Note 1, *Description of the Business*, for additional information on the Yorkville SEPA.

*Assignment and Sale of Proceeds Agreement*

On June 30, 2022, the Company entered into an Assignment and Sale of Proceeds Agreement (the "Assignment Agreement") and a Recovery Services Agreement (the "Services Agreement" and collectively, the "Agreements") with the Prudent Group ("Prudent") in order to monetize up to $250 million of the value of the Company's net recovery interest in Claim demand letters that the Company has commenced sending to insurers who admitted they had primary payer responsibility for the underlying accidents to the federal government ("Net Recovery Proceeds"). Pursuant to the Agreements, at the Company's sole and absolute discretion, the Company has the right to direct Prudent to acquire, on a non-recourse basis, a percentage of Net Recovery Proceeds, up to an aggregate of $250 million, at a purchase price of 90% of Net Recovery Proceeds of such Claim.

Under the Services Agreement, the Company will service and recover on the demand letters and will retain any revenues generated in excess of the amount received from Prudent, plus up to an 18% annual return on the amount Prudent paid for Net Recovery Proceeds. Prudent may terminate the Services Agreement upon 60 days prior written notice to the Company. The Company plans to utilize the Assignment Agreement as funding is needed. To date, the Company has not exercised its rights pursuant to the Services Agreement and does not anticipate doing so in the foreseeable future.

*Tax Receivable Agreement*

Under the terms of the TRA, we generally will be required to pay to the Members, and to each other person from time to time that becomes a "TRA Party" under the TRA, 85% of the tax savings, if any, that we are deemed to realize in certain circumstances as a result of certain tax attributes that exist following the Business Combination and that are created thereafter, including as a result of

payments made under the TRA. The term of the TRA will continue until all such tax benefits have been utilized or expired unless we exercise our right to terminate the TRA for an amount representing the present value of anticipated future tax benefits under the TRA or certain other

44

acceleration events occur. Any payments made by us under the TRA will generally reduce the amount of overall cash flow that might have otherwise been available to us, and, to the extent that we are unable to make payments under the TRA for any reason, the unpaid amounts generally will be deferred and will accrue interest until paid by us.

*Cash Flows*

The following table summarizes our cash flows for the periods indicated:

| (in thousands) | Nine Months Ended September 30, | |
| | 2023 | 2022 |
| --- | --- | --- |
| Net cash used in operating activities | $ (31,533) | $ (70,764) |
| Net cash provided by (used in) investing activities | 7,759 | (4,563) |
| Net cash provided by financing activities | 15,352 | 99,351 |
| (Decrease) increase in cash and cash equivalents and restricted cash | (8,422) | 24,024 |
| Cash and cash equivalents and restricted cash at beginning of year | 15,081 | 1,664 |
| Cash and cash equivalents and restricted cash at end of period | $ 6,659 | $ 25,688 |

*Cash Flows Used In Operating Activities*

Net cash used in operating activities decreased by $39.2 million to $31.5 million for the nine months ended September 30, 2023 compared to net cash used in of $70.8 million for the nine months ended September 30, 2022. During the nine months ended September 30, 2023, net cash used in operating activities was impacted primarily by our net loss, $355.5 million of claims amortization expense, $204.3 million of paid-in-kind interest, change in fair value of warrant liability of $4.4 million, gain on sale of intangible $4.6 million, allowance for credit losses $5.0 million, mark to market gain on liability payable in stock of $3.9 million, and an increase of $26.2 million of changes in working capital.

*Cash Flows Provided by (Used in) Investing Activities*

Net cash provided by investing activities increased by $12.3 million to $7.8 million for the nine months ended September 30, 2023 compared to net cash used of $4.6 million for the nine months ended September 30, 2022. During the nine months ended September 30, 2023, our cash provided by investing activities was primarily $10.0 million proceeds from the sale of CCRAs, which are included in Intangible assets, offset by cash used in investing activities related to the acquisition of additional CCRAs amounting to $0.6 million and $1.6 million of additions to property, plant, and equipment.

*Cash Flows Provided by Financing Activities*

Net cash provided by financing activities decreased to $15.4 million for the nine months ended September 30, 2023 compared to $99.4 million net cash provided by financing activities for the nine months ended September 30, 2022. This is primarily due to borrowings from the New Money Loan of $25.0 million and proceeds from the related party loan of $4.95 million, which are offset by $11.4 million restricted cash payment related to the FEF shares to CF, $2.5 million repayments of the claims financing obligation and $0.7 million of debt issuance costs and $0.3 million payment of deferred financing costs.

**Contractual Obligations, Commitments and Contingencies**

Based on claims financing obligations and notes payable agreements, as of September 30, 2023, the present value of amounts owed under these obligations were $529.2 million, including capitalized interest to date. The weighted average interest rate is 14.5% based on the current book value of $529.2 million with rates that range from 2.0% to 20.0%. The Company is expected to repay these obligations from cash flows from claim recovery income.

As of September 30, 2023, the Company has $900.5 million of guaranty obligations. On April 12, 2023, we entered into the Virage MTA Amendment pursuant to which the payment date was extended from May 23, 2023 until September 30, 2024, subject to acceleration upon certain triggering events. Subsequent to September 30, 2023, the maturity date was extended to December 31, 2024. The guaranty obligation will become a current liability after December 31, 2023, and the Company does not currently have available liquidity to satisfy such obligations. Under the Virage MTA Amendment, Virage will receive a first priority lien on all sources of revenue of the company not otherwise encumbered as of the date of the Virage MTA Amendment, to the extent in excess of the amount of revenues necessary to establish and maintain an operating reserve of $70 million for overhead expenses and applicable taxes. On July 24, 2023, the operating reserve was adjusted to $47.5 million and MSP Recovery agreed not to increase its 2023 operating budget without Virage's consent.

As of September 30, 2023, the minimum required payments on these agreements are $678.1 million. Certain of these agreements have priority of payment regarding any proceeds until full payment of the balance due is satisfied. The maturity of the commitments range from the date sufficient claims recoveries are received to cover the required return or in some cases by 2031.

45

**Critical Accounting Policies**

Our condensed consolidated financial statements and the related notes thereto included elsewhere in this Form 10-Q are prepared in accordance with GAAP. The preparation of our condensed consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts and related disclosures in our financial statements and accompanying notes. We base our estimates on historical experience and on various other factors that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions due to the inherent uncertainty involved in making those estimates and any such differences may be material.

An accounting policy is considered to be critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time the estimate is made, and if different estimates that reasonably could have been used, or changes in the accounting estimate that are reasonably likely to occur, could materially impact the condensed consolidated financial statements. Our Critical Accounting Policies and Estimates disclosed in "*Management's Discussion and Analysis of Financial Condition and Results of Operations - Critical Accounting Policies*" in our 2022 Form 10-K, for which there were no material changes during the three months ended June 30, 2023, included the following:

- **Revenue Recognition**
    o   Claims Recovery Income
    o   Claims Recovery Service Income

- **Impairment of Intangible Assets**

**Item 3. Quantitative and Qualitative Disclosures About Market Risk.**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information otherwise required under this item.

**Item 4. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

Management, including our Chief Executive Officer and Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Management is likewise required, on a quarterly basis, to evaluate the effectiveness of its internal controls and to disclose any changes and material weaknesses identified through such evaluation of those internal controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis. Effective internal controls are necessary for us to provide reliable financial reports and prevent fraud. As required by Rules 13a-15 and 15d-15 under the Exchange Act, our Chief Executive Officer and Chief Financial Officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of September 30, 2023. Based upon their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) were not effective, due to the material weaknesses related to the items noted below. To address these material weaknesses, we performed additional analysis as deemed necessary to ensure that our financial statements were prepared in accordance with U.S. GAAP. Based on such analysis and notwithstanding the identified material weaknesses, management, including our Chief Executive Officer and Chief Financial Officer, believe the condensed consolidated financial statements included in this Quarterly Annual Report fairly represent in all material respects our financial condition, results of operations and cash flows at and for the periods presented in accordance with U.S. GAAP.

46

*Material Weaknesses*

As of December 31, 2022, we identified material weaknesses in our internal control over financial reporting. The material weaknesses we identified were as follows:

- We did not have sufficient controls related to the accounting for complex transactions.

- We did not have sufficient controls over the human resources and payroll processes. Specifically:

  o Insufficient design of controls as the outsourced system used for payroll did not have appropriate service organization report and we did not have appropriate compensating controls or documented segregation of duties over the system used for payroll;

  o Insufficient design of controls resulting in a lack of an effective control environment over payroll entries;

  o Insufficient design of controls within our human resources business process.

  o Insufficient design of controls resulting in a lack of proper documentation over approval of bonus payments.

- Insufficient design of controls as we did not have appropriate segregation of duties and review controls over cash disbursements.

A special committee of the Board of Directors made unanimous recommendations to enhance and improve the public company reporting capabilities of the Company, including but not limited to:

- The implementation of certain management training,

- The hiring of a director of internal audit, and

- Enhancements to the Company's internal communication process, as well as increased reporting to the Audit Committee of the Board of Directors.

We consider these recommendations to be indicative of material weaknesses related to a failure to develop or maintain an effective system of internal disclosure controls for the timely disclosure of material communications from external sources to the Company's management and Board of Directors for review and evaluation. Specifically, the material weaknesses we identified were as follows:

- We did not have sufficient controls related to training personnel to understand their respective roles and responsibilities.

- We did not have sufficient monitoring activities, including a director of internal audit.

- We did not have sufficient lines of communication internally and to the Board of Directors, and therefore did not maintain a sufficient control environment with respect to oversight of the Board of Directors.

These control deficiencies resulted in a misstatement in our accounts or disclosures that resulted in a material misstatement to the previously filed interim unaudited financial statements. Accordingly, we determined that these control deficiencies constitute material weaknesses.

*Remediation Plan*

We are in the process of implementing measures designed to remediate the control deficiencies that led to the material weaknesses as of December 31, 2022. During 2023, we have:

- To address the material weaknesses in internal controls related to the accounting for complex financial instruments:

  o We are in the process of implementing further controls over the review of complex financial instruments, which may include engaging outside advisors with specialist knowledge of GAAP and valuation.

- Within the human resources and payroll processes:

  o We have identified potential human resource outsourced vendors and have begun designing and implementing payroll and human resource related controls.

  o We have also identified third party payroll service providers with sufficient service organization reports that we expect will allow us to rely on the system once we implement appropriate complimentary user controls.

- To address segregation of duties over cash disbursement:

  o We have begun designing and implementing appropriate segregation of duties over disbursements during the current year and added controls to review cash disbursements made prior to this implementation.

47

In order to address the material weaknesses identified by the special committee, the special committee made recommendations to enhance and improve the public company reporting capabilities of the Company, including but not limited to:

- Enhancing development of the control environment with the implementation of certain management training,

- The hiring of a director of internal audit to improve the monitoring and effectiveness of internal controls, and

- Enhancements to the Company's internal communication process to support controls and increase reporting to the Audit Committee of the Board of Directors to allow for more effective exercise of oversight responsibilities.

We intend to implement such recommendations to remediate the weaknesses identified by the special committee.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

48

---

# PART II—OTHER INFORMATION

**Item 1. Legal Proceedings.**

From time to time, we may become involved in legal proceedings or be subject to claims arising in the ordinary course of our business. Except as set forth below, we are not currently party to any material legal proceedings. Regardless of outcome, such proceedings or claims can have an adverse impact on us because of defense and settlement costs, diversion of resources and other factors and there can be no assurances that favorable outcomes will be obtained.

*Investigations*

As previously disclosed on Form 8-K, on August 11, 2022, the Securities and Exchange Commission (the "SEC") initiated an investigation of the Company, and requested documents relating to, among other matters, the business combination transaction with Lionheart Acquisition Corporation II consummated on May 23, 2022 and related matters. The Company received a subpoena dated March 1, 2023 from the SEC regarding the aforementioned subject matter, and subsequently received a subpoena on May 10, 2023 requesting documents in connection with the Company's financial statements for the periods ended June 30, 2022 and September 30, 2022 that required restatements as disclosed in the Company's Form 8-K filed with the SEC on April 14, 2023. On August 16, 2023, the Company received an additional subpoena from the SEC regarding certain funding sources of the Company prior to the Business Combination, as well as various statements and disclosures by the Company in connection with and following the Business Combination. The Company intends to fully cooperate with the SEC in responding to the subpoena.

In addition, on March 10, 2023, the Company received a subpoena from the U.S. Attorney's Office in connection with a grand jury investigation in the U.S. District Court for the Southern District of Florida requesting certain information concerning the Company. To the best of the Company's knowledge, the Department of Justice has not issued any target letters to anyone associated with the Company as a result of this investigation. (The United States Attorney's Manual states that a "target" is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant.)

The Company has cooperated, and will continue to cooperate, fully with these inquiries. In connection with its review of the matters related to the preparation and filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, a special committee of the Company's board of directors, along with external advisors retained thereby, also reviewed the subject matter of information requests related to the foregoing subpoenas. Based on this review, the Company believes that these investigations will be resolved without any material developments; however, there can be no assurance as to the outcome or future direction thereof.

*Cano Health*

On August 10, 2023, MSP Recovery sued Cano Health, LLC ("Cano") in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida for declaratory relief and anticipatory breach of the CCRA, Purchase Agreement, and a Services Agreement (collectively, the "Cano Agreements") between the parties. On the same day, Cano sued the Company in the same court, alleging fraud in the inducement, breach of contract, tortious interference, and unjust enrichment relating to the Cano Agreements. While it is inherently difficult to predict the eventual outcomes of pending actions, the Company denies all liability alleged by Cano and management intends to litigate vigorously on behalf of the Company.

**Item 1A. Risk Factors.**

There have been no material changes to our principal risks that we believe are material to our business, results of operations, and financial condition, from the risk factors previously disclosed in the Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K"). Prospective investors are encouraged to consider the risks described in our 2022 Form 10-K, our Management's Discussion and Analysis of Financial Condition and Results of Operations contained in this Form 10-Q and in our 2022 Form 10-K, and other information publicly disclosed or contained in documents we file with the Securities and Exchange Commission before purchasing our securities.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

**Recent Sales of Unregistered Securities**

*Palantir Technologies, Inc. ("Palantir")*

Over the course of the quarterly period ended September 30, 2023, the Company has issued 274,947 unregistered shares of Class A Common Stock (after giving effect to the Reverse Split) to Palantir, in exchange for services provided in reliance on Section 4(a)(2) of the U.S. Securities Act of 1933.

49

*John H. Ruiz*

Pursuant to a purchase agreement dated October 25, 2023, and as disclosed on his Form 4 dated October 26, 2023, on October 26, 2023, the Company issued 467,290 unregistered shares of Class A Common Stock to Virage in satisfaction of certain obligations of the Company, which shares were subsequently purchased from Virage by Mr. Ruiz.

*Frank C. Quesada*

Pursuant to a purchase agreement dated September 25, 2023, and as disclosed on his Form 4 dated October 2, 2023, on September 29, 2023, the Company issued 274,726 unregistered shares (after giving effect to the Reverse Split) of Class A Common Stock to Virage in satisfaction of certain obligations of the Company, which shares were subsequently purchased from Virage by Mr. Quesada.

*Cano Health, LLC ("Cano")*

Pursuant to the Second Amendment to Amended and Restated Claims Recovery and Assignment Agreement and the First Amendment to the Purchase Agreement by and among the Company and Cano, on July 7, 2023, the Company issued 7,960,001 unregistered shares (after giving effect to the Reverse Split) of Class A Common Stock to Cano.

**Item 3. Defaults Upon Senior Securities.**

None

**Item 4. Mine Safety Disclosures.**

Not applicable

**Item 5. Other Information.**

None

50

**Item 6. Exhibits.**

The following exhibits are filed as part of, or incorporated by reference into, this Quarterly Report on Form 10-Q.

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date |
| 3.1+ | Second Amended and Restated Certificate of Incorporation of the Company | 8-K | 001-39445 | 3.1 | May 27, 2022 |
| 3.2+ | Amended and Restated Bylaws of the Company | 8-K | 001-39445 | 3.2 | May 27, 2022 |
| 3.3+ | Certificate of Amendment to Second Amended and Restated Certificate of Incorporation | 8-K | 001-39445 | 3.1 | October 16, 2023 |
| 10.1+ | MTA Amendment and Binding Term Sheet, by and between Virage Recovery Master LP, Series MRCS, a series of MDA, Series LLC, John H. Ruiz, Frank C. Quesada, Virage Capital Management LP, MSP Recovery, LLC, La Ley con John H. Ruiz, MSP Recovery, Inc. and Lionheart II Holdings, LLC, dated April 12, 2023 | 8-K | 001-39445 | 10.1 | April 17, 2023 |
| 10.2+ | Amended and Restated Secured Promissory Note, dated April 12, 2023 by and between the Company and Nomura Securities International, Inc. | 8-K | 001-39445 | 10.2 | April 17, 2023 |
| 10.3+ | Membership Interest Purchase Agreement, dated March 29, 2023, by and among MSP Recovery LLC, MSP Recovery Claims, Series, LLC and Hazel Holdings I LLC | 10-K | 001-39445 | 10.31 | July 27, 2023 |
| 10.4+ | Membership Interest Purchase Agreement, dated March 29, 2023 by and among MSP Recovery, LLC, MSP Recovery Claims Series 44, LLC, MSP Recovery Holding Series 01, LLC and Hazel Holdings I LLC | 10-K | 001-39445 | 10.32 | July 27, 2023 |
| 10.5+ | Credit Agreement, dated March 29, 2023 by and between Subrogation Holdings LLC, MSP Recovery, LLC, MSP Recovery Claims, Series LLC - Series 15-09-321 and Hazel Holdings I LLC | 10-K | 001-39445 | 10.33 | July 27, 2023 |
| 10.6+ | Amended and Restated Credit Agreement, dated March 29, 2023 by and between Subrogation Holdings LLC, MSP Recovery, LLC, MSP Recovery Claims, Series LLC - Series 15-09-321 and Hazel Holdings I LLC | 10-K | 001-39445 | 10.34 | July 27, 2023 |
| 10.7* | Amended and Restated Promissory Note, dated November 13, 2023 by and between the Company and Nomura Securities International, Inc. | | | | |
| 10.8* | MTA Amendment No. 2 and Amendment to the Amended and Restated Security Agreement dated November 13, 2023 by and between Virage Recovery Master LP, Series MRCS, John H. Ruiz, Frank C. Quesada, Virage Capital Management LP, MSP Recovery, LLC, La Ley con John H. Ruiz, MSP Recovery, Inc. and Lionheart II Holdings, LLC | | | | |
| 10.9* | Second Amended and Restated Credit Agreement, dated November 10, 2023 by and between Subrogation Holdings LLC, MSP Recovery, LLC, JRFQ Holdings, LLC, 4601 Coral Gables Property, LLC, Hazel Partners Holdings LLC and MSP Recovery Claims, Series LLC - Series 15-09-321 | | | | |
| 10.10* | Standby Equity Purchase Agreement dated November 14, 2023 by and between YA II PN, LTD. and MSP Recovery, Inc. | | | | |
| 10.11* | Registration Rights Agreement dated November 14, 2023 by and between YA II PN, LTD. and MSP Recovery, Inc. | | | | |
| 10.12* | Form of Promissory Note | | | | |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | |
| 32.1# | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | |
| 32.2# | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | |
| 101.INS* | XBRL Instance Document | | | | |

| | |
|---|---|
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |
| 104* | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

_____

\* Filed herewith.
\+ Previously filed
\# Furnished herewith.

51

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**MSP Recovery, Inc.**

Date: November 14, 2023

By: _____
/s/ Francisco Rivas-Vásquez

**Francisco Rivas-Vásquez**
**Chief Financial Officer**
(Principal Financial Officer and Principal Accounting Officer)

52

# EXHIBIT 10

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CANO HEALTH, LLC,

               Plaintiff,

v.

MSP RECOVERY, INC. D/B/A
LIFEWALLET, MSP RECOVERY LLC,
MSP RECOVERY CLAIMS, SERIES LLC,
SERIES 17-03-569, a Designated Series of
MSP Recovery Claims, Series LLC, CLAIMS
RR, LLC, and JOHN RUIZ,

               Defendants

                                    /

**CASE NO.** _____

**COMPLEX BUSINESS**
**LITIGATION SECTION**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Cano Health, LLC ("Cano Health"), by and through its undersigned counsel, hereby files this Complaint, against Defendants MSP Recovery, Inc., d/b/a LifeWallet, MSP Recovery LLC,[1] MSP Recovery Claims, Series LLC, Series 17-03-569, a designated series of MSP Recovery Claims, Series LLC, and John Ruiz (collectively, the "Defendants").

## INTRODUCTION

Plaintiff Cano Health is a healthcare provider that operates primary care centers and supports affiliated healthcare services in in Florida, Texas, Nevada, and Puerto Rico. Cano Health's specialty is providing value-based care to senior citizens, encompassing not just access to primary care physicians, but also wellness activities, pharmacy services, home visits, and

---

[1]    MSP Recovery LLC combined with MSP Recovery, Inc. in May 2022, and no longer exists as a separate entity, but out of an abundance of caution and to preserve all rights, is being named as a separate defendant here.

telehealth services. As with any healthcare provider, Cano Health is dependent upon the reimbursement it receives for the services it provides in order to continue providing those lifesaving and life-improving services.

Defendant MSP Recovery, Inc. is a company that acquires claims against insurance companies or other responsible parties from market participants like Cano Health, and which boastfully claims to be "disrupting the antiquated healthcare reimbursement system with data-driven solutions to secure recoveries from responsible parties." In truth, as has been recently disclosed by much-belated SEC filings and investigative reporting, MSP Recovery is a sham. MSP Recovery has never been able to secure any meaningful revenue from the claims it has aggregated. Instead, it used the face value of those claims to prop up an absurdly over-inflated valuation, and then leveraged that false valuation to (i) fraudulently induce business partners to give up valuable assets in return for worthless shares and rights to future shares in MSP Recovery, and (ii) support windfall salaries and perks for its executive officers, including many self-interested transactions with its own founder and CEO, Defendant John Ruiz.

Between 2021 and 2022, before this fraud came to light, Defendants fraudulently induced Cano Health to assign to them claims with a face value of as much as several ***billion*** dollars. Cano Health did so in reliance upon fraudulent, unrealized promises by Defendants that they would pay Cano Health consideration of at least $66.75 million in the form of either cash or an issuance of securities. Defendants specifically represented that if they used securities to pay their debts to Cano Health—which of course they did because, unbeknownst to Cano Health, Defendants' business was generating no income—then they would take all necessary steps to ***ensure*** those securities were registered within ten business days of issuance, and furthermore to make "true up"

payments in cash or additional shares to Cano Health if those securities failed to maintain their market value.

But the deadlines for payment and registration have come and gone, and Defendants have materially breached their obligations to Cano Health by either (i) failing to attempt payment *at all*, or otherwise (ii) failing to register the securities issued to Cano Health, meaning Cano Health has given up a fortune in potential claims and received nothing in return but worthless, unsellable shares in a sham company.  Unsurprisingly, recent news reporting has disclosed that Defendants are the subject of criminal and civil investigations by (i) the U.S. Attorney's Office for the Southern District of Florida, (ii) the Federal Bureau of Investigation, (iii) the Securities and Exchange Commission, and (iv) the Internal Revenue Service, and Defendants are also the defendants in numerous private lawsuits seeking to recover for unpaid debts and other misconduct.

It is readily apparent that Defendants can never deliver what they promised in the contracts they fraudulently induced Cano Health to enter, and they knew this before those contracts were executed.  Accordingly, Cano Health brings this action seeking recission of those agreements, so that Cano Health can take back the claims that were stolen from it and pursue its own recoveries.

## **PARTIES**

1.      Plaintiff Cano Health is a Florida limited liability company, with its principal place of business in the city of Miami, Miami-Dade County, Florida.

2.      Defendant MSP Recovery, Inc. (d/b/a "LifeWallet") is a Florida corporation, with its principal place of business in the city of Coral Gables, Miami-Date County, Florida.

3.      Defendant MSP Recovery LLC was a Florida limited liability company, with its principal place of business in the city of Coral Gables, Miami-Date County, Florida, which in May 2022 combined with MSP Recovery, Inc.  Defendant MSP Recovery LLC no longer exists as a

separate entity, but it is being named separately in this Complaint out of an abundance of caution, to ensure Cano Health preserves all possible rights.

4.      Defendant MSP Recovery Claims, Series LLC is a Delaware Series LLC with its principal place of business in the city of Coral Gables, Miami-Date County, Florida.

5.      Defendant Series 17-03-569 is a designated series of MSP Recovery Claims, Series LLC, which has a principal place of business in the city of Coral Gables, Miami-Date County, Florida.

6.      Defendant Claims RR, LLC is a Florida limited liability company with its principal place of business in the city of Miami, Miami-Date County, Florida.

7.      Defendant John Ruiz is the founder and Chief Executive Officer of Defendant MSP Recovery, Inc. and is a resident of the city of Coral Gables, Miami-Dade County, Florida.

## JURISDICTION AND VENUE

8.      This action concerns business transactions and the amount in controversy is well over $750,000, and it is therefore subject to mandatory assignment to the Court's Complex Business Litigation Division pursuant to Eleventh Judicial Circuit Administrative Order 16-12, Section 3.

9.      All the parties to this action are subject to personal jurisdiction in this Court because all parties reside or maintain their principal places of business in Miami-Dade County, Florida, and this action arises from (i) representations that were made and received in Miami-Dade County, Florida, and (ii) contracts that were executed in and call for performance in Miami-Date County, Florida.

10.     In addition to the above, one of the contracts at issue in this action contains a mandatory venue provision stating that "[a]ny action, whether in law or in equity must be commenced and maintained in federal or state court within Miami-Dade County, Florida."

## FACTUAL ALLEGATIONS

11.     Plaintiff Cano Health is a healthcare provider that operates primary care centers and supports affiliated healthcare services in in Florida, Texas, Nevada, and Puerto Rico.

12.     Cano Health's specialty is providing value-based care to senior citizens, encompassing not just access to primary care physicians, but also wellness activities, pharmacy services, home visits, and telehealth services.

13.     Cano Health is dependent upon the reimbursement it receives for the services it provides in order to continue providing those lifesaving and life-improving services.

14.     Defendant MSP Recovery LLC was a Florida limited liability company founded by Defendant John Ruiz in 2014.

15.     In May 2022, MSP Recovery LLC was combined with MSP Recovery, Inc. pursuant to a Special Purpose Acquisition Company ("SPAC") transaction, so that Defendant John Ruiz could take the business public.

16.     In light of the business combination, the term "MSP Recovery" will be used herein to refer to both MSP Recovery LLC and its successor by way of combination, MSP Recovery, Inc.

17.     MSP Recovery's business model relies upon acquiring claims against insurance companies or other responsible parties from participants in the healthcare marketplace, *e.g.* Cano Health, and then seeking to recover on those obligations.  MSP Recovery claims to be "disrupting the antiquated healthcare reimbursement system with data-driven solutions to secure recoveries from responsible parties."  *See* MSP Recovery, *On a Mission to Recover Improperly Paid Healthcare Dollars*, https://www.msprecovery.com/health/ (last accessed August 4, 2023).

18.     The truth—only recently revealed in SEC filings and by investigative reporting—is that MSP Recovery is a sham, and effectively a Ponzi scheme.  For all its boastful claims of "disrupting the antiquated healthcare reimbursement system," what MSP Recovery has actually

done is accumulate a massive trove of claims to recover the cost of medical treatment that it has not monetized and is incapable of monetizing, and then used the face value of those claims to prop up an absurdly overinflated valuation.[2]

19.     MSP Recovery has used that overinflated valuation to (i) induce unwitting business partners to agree to accept worthless MSP Recovery shares in lieu of cash, and (ii) justify windfall salaries and perks for its own executives.  For example, MSP Recovery has reimbursed an aviation company owned by its CEO, Defendant John Ruiz, hundreds of thousands of dollars each year for "allowing" Mr. Ruiz to use his own personally customized Boeing 767 jet.

20.     MSP Recovery's fraud came to light in July 2023, when it filed its first (and much delayed) Form 10-K, and (i) admitted that the quarterly financial statements it had filed before this date had been materially misleading, (ii) revealed that it had generated "no substantial revenue to date," (iii) exposed its dire financial condition, with operating expenses *100 times greater* than its cash on hand, and (iv) disclosed the indulgent self-dealing of Defendant John Ruiz.  A copy of MSP Recovery's Form 10-K for the year 2022, untimely filed with the SEC on July 27, 2023, is attached hereto as Exhibit 1.

21.     Unsurprisingly, MSP Recovery and Defendant John Ruiz are currently the subject of criminal and civil investigations by (i) the U.S. Attorney's Office for the Southern District of Florida, (ii) the Federal Bureau of Investigation, (iii) the Securities and Exchange Commission,

---

[2]     MSP Recovery going public was "the second biggest SPAC merger" ever at the time it was announced, with the company claiming to have "an enterprise value of $32.6 billion."  *MSP Recovery to go public via nearly $33 bln mega SPAC deal*, Reuters, https://www.reuters.com/article/msp-recovery-ipo-idCNL4N2OO194 (last accessed August 4, 2023).  This meant that Defendant John Ruiz could claim, on paper, to have a personal net worth of more than $20 billion.  *Shares in second-largest SPAC target sink by half in trading debut*, Financial Times, https://www.ft.com/content/23108acb-96db-4d54-8560-b31373c7c56a (last accessed August 4, 2023).

and (iv) the Internal Revenue Service.  Those investigations concern potential criminal and civil liability arising from the false representations they have made to investors, and their indefensible spending practices.  Two news articles from the Miami Herald, published on July 31, 2023 and August 2, 2023, describing the investigations into Defendants, are attached hereto as Exhibits 2 and 3.

22.    As set forth below, between 2021 and 2022 (*i.e.*, prior to the revelation that MSP Recovery was a complete sham), Cano Health assigned potentially billions of dollars' worth of claims to MSP Recovery, its affiliates, and its subsidiaries, based on false representations that Cano Health would receive valuable consideration for those claims, and that MSP Recovery and its subsidiaries and affiliates comprised a legitimate business enterprise capable of delivering on their contractual obligations.  As would be revealed, all of that was a lie.

### a.  *The Claims Agreement*

23.    Cano Health entered into a Claims Recovery and Assignment Agreement with a shell entity controlled by MSP Recovery (Defendant Series 17-03-569) on January 19, 2021, which was then amended and restated in an agreement dated December 31, 2021 (the "Claims Agreement").  A copy of the Claims Agreement will be filed under seal as Exhibit 4.

24.    The Claims Agreement was amended by agreement of the parties on September 30, 2022.  A copy of that first amendment (the "First Claims Amendment") will be filed under seal as Exhibit 5.

25.    The Claims Agreement was further amended by agreement of the parties on September 30, 2022.  A copy of that second amendment (the "Second Claims Amendment") will be filed under seal as Exhibit 6.

26.     Pursuant to the Claims Agreement, as amended, Cano Health assigned away claims against third parties with a face value of several billion dollars.  In return, Cano Health was guaranteed upfront consideration of $41.75 million, plus a portion of any amounts MSP Recovery was able to actually recover on those claims.  *See* Claims Agreement (UNDER SEAL) §§ 3.1-3.3; First Claims Amendment (UNDER SEAL) § 1; Second Claims Amendment (UNDER SEAL) § 1.

27.     The claims that Cano Health assigned to MSP Recovery's shell affiliate pursuant to the Claims Agreement were subdivided into four categories, with separate upfront consideration for each:  (i) Assigned Past Claims, for which the upfront consideration was $10 million; (ii) Future Claims, for which the upfront consideration was $10 million; (iii) OC/ACH Acquired Claims, for which the upfront consideration was $17 million; and (iv) 2023 Assigned Claims, for which the upfront consideration was $4.75 million.[3]  *See* Claims Agreement (UNDER SEAL) §§ 3.1-3.3; First Claims Amendment (UNDER SEAL) § 1; Second Claims Amendment (UNDER SEAL) § 1.

28.     The Claims Agreement provided that the upfront consideration owed to Cano Health could be paid either in cash or "by causing [MSP Recovery] to issue Class A Common LIFW Shares to [Cano Health]."[4]  If payment was to be made in shares, then the assignee agreed that it "shall ensure that [MSP Recovery] makes all appropriate filings to register the LIFW Shares issued pursuant to this section [by June 30, 2023 as to the Assigned Past Claims and within ten business days of issuance as to all others], and uses commercially reasonable best efforts to cause such filings to become effective, and the shares to become fully registered, unrestricted and freely

---

[3]     The $4.75 million for the 2023 Assigned Claims was to be paid in four, equal, quarterly installments, commencing on January 1, 2023, with each payment due within 30 days of the quarter's end.  As set forth herein, MSP Recovery has not made ***any*** quarterly installment payment.

[4]     LIFW is the NASDAQ stock symbol for MSP Recovery, Inc.

tradeable, as soon as possible." *See* Claims Agreement (UNDER SEAL) §§ 3.1-3.3; First Claims Amendment (UNDER SEAL) § 1; Second Claims Amendment (UNDER SEAL) § 1.

29.     The assignee further agreed that—with regard to the Assigned Past Claims and the 2023 Assigned Claims—to the extent the shares lost value between when they were issued and when they became freely tradeable, Cano Health would be entitled to a "True-Up" of either additional shares or cash in order to ensure that it received the full upfront consideration to which it was entitled under the Claims Agreement. *See* First Claims Amendment (UNDER SEAL) §§ 1.e, 1.g; Second Claims Amendment (UNDER SEAL) § 1.a.

30.     Cano Health was induced to enter the Claims Agreement based upon representations by Defendants that (i) MSP Recovery had special expertise in securing recoveries on claims like the ones held by Cano Health, which was of material significance to Cano Health because a portion of its consideration would consist of a percentage of any proceeds actually recovered by MSP Recovery; and (ii) MSP Recovery was a legitimate, successful business enterprise that either had access to $41.75 million in cash or was capable of issuing registered, freely tradeable securities with a fair valuation of $41.75 million.

31.     Cano Health would have never entered the Claims Agreement—and certainly not assigned away its valuable claims prior to receiving its bargained-for consideration—had it known these representations were false.

### b.   The Services Agreement

32.     Cano Health entered into a services agreement with MSP Recovery on August 1, 2022 (the "Services Agreement"). A copy of the Services Agreement is attached hereto as Exhibit 7.

33.     Pursuant to the Services Agreement, MSP Recovery was to provide certain data processing and claims analysis services to Cano Health, and in return, Cano Health was to pay MSP Recovery $5 million.  *See* Services Agreement §§ 1, 2.

34.     Cano Health was induced to enter the Services Agreement based upon representations by Defendants that MSP Recovery was a legitimate business enterprise with expertise in processing and analyzing claims to recover the cost of healthcare services, which MSP Recovery was supposedly leveraging to great commercial success.  *See* Services Agreement § 1.

35.     These representations were of material significance to Cano Health because it would have not entrusted the processing of its data or analysis of its claims to a sham business enterprise that—far from having any special expertise or insights in this area—was in fact completely incapable of generating any meaningful revenue from claims such as these.  Cano Health certainly would not agree to pay such a company millions of dollars for its unreliable and untrustworthy services.

36.     Although MSP Recovery represented in the Services Agreement that it would perform (or had already performed) certain data processing and analysis tasks, those services were either not performed, performed in a materially inadequate fashion, or cannot be relied upon in light of the recent revelation that MSP Recovery is not a legitimate business with expertise in this field, but a sham.

### c.  The Purchase Agreement

37.     Cano Health entered into a Purchase Agreement with MSP Recovery on September 30, 2022 (the "Purchase Agreement").  A copy of the Purchase Agreement is attached hereto as Exhibit 8.

38.    The Purchase Agreement was amended by agreement of the parties on March 31, 2023 (the "First Purchase Amendment").  A copy of that amendment is attached hereto as Exhibit 9.

39.    Pursuant to the Purchase Agreement, Cano Health agreed to assign valuable claims against insurers and other third parties to an affiliate of MSP Recovery, in return for upfront consideration of $25 million and a share in the proceeds of any future recovery on those claims. *See* Purchase Agreement §§ 1.1-1.4; First Purchase Amendment § 1.

40.    Thereafter, in satisfaction of its obligations under the Purchase Agreement, Cano Health entered into a related Claims Assignment Agreement with Defendant Claims RR, LLC, a "claims vehicle" affiliate of MSP Recovery, on May 11, 2023 (the "Assignment Agreement").  A copy of the Assignment Agreement is attached hereto as Exhibit 10.

41.    Collectively, the Claims Agreement, Services Agreement, Purchase Agreement, and Assignment Agreement are referred to herein as the "Agreements."

42.    The Purchase Agreement, as amended, again provided that the $25 million in upfront consideration owed to Cano Health could be paid either in cash or "by causing [MSP Recovery] to issue Class A Common Stock of LifeWallet (the "LIFW Shares")."  *See* Purchase Agreement §§ 1.1-1.4; First Purchase Amendment § 1.

43.    Again, the Purchase Agreement provided that if payment was to be made in shares, then "MSP [Recovery] shall ensure that [MSP Recovery] makes all appropriate filings to register the LIFW Shares issued pursuant to this section within ten business days of the issuance of such shares, and uses commercially reasonable best efforts to cause such filings to become effective, and the shares to become fully registered, unrestricted, and freely tradeable, as soon as possible." *See* Purchase Agreement §§ 1.1a; First Purchase Amendment § 1.

44.    Cano Health was induced to enter the Purchase Agreement based upon representations by Defendants that (i) MSP Recovery had special expertise in securing recoveries on claims such as the ones held by Cano Health, which was of material significance to Cano Health because a portion of its consideration would consist of a percentage of any proceeds actually recovered by MSP Recovery; and (ii) MSP Recovery was a legitimate, successful business enterprise that either had access to $25 million in cash or was capable of issuing registered, freely tradeable securities with a fair valuation of $25 million.

45.    Cano Health would have never entered the Purchase Agreement—and certainly not assigned away its valuable claims prior to receiving its bargained-for consideration—had it known these representations were false.

### d. Defendants' Material Breaches

46.    With regard to the 2023 Assigned Claims, the Claims Agreement provided that payment was to be made in a series of quarterly instalments.  *See* First Claims Amendment (UNDER SEAL) § 1.g.  The deadline for payment of the first three such instalments (totaling $3.56 million) have all come and gone without Defendants paying (even *attempting* payment by any means), which is clearly a material breach of the Claims Agreement.  *See id.*  With regard to the remaining categories of claims and their respective payment obligations, Defendants' material breaches are described below.

47.    MSP Recovery became a publicly traded company on May 20, 2022.  Its first Form 10-K annual report as a public company was due to be filed on March 31, 2023.

48.    Instead of filing its Form 10-K on March 31, 2023, MSP Recovery instead filed a notice with the SEC that it would be taking advantage of the 15-day grace period for late filings

afforded by 17 CFR § 240.12b-25.  A copy of the notice filed by MSP Recovery is attached hereto as Exhibit 11.

49.    But MSP Recovery did not file a Form 10-K within the next 15 days.  MSP Recovery did not file its Form 10-K until *months later*, after being contacted by investigative journalists with questions about—among other things—the reasons why MSP Recovery was not complying with its mandatory financial reporting requirements.  *See* Exhibits 2, 3 (Miami Herald Articles).

50.    On June 29, 2023, and July 7, 2023, MSP Recovery issued a combined 200,000,001 shares of stock to Cano Health, as the first of several steps necessary to satisfy its payment obligations under the Claims Agreement and Purchase Agreement.  A public filing memorializing these issuances of shares is attached hereto as Exhibit 12.

51.    Under the relevant terms of the Claims Agreement and Purchase Agreement, Defendants were then required to ***"ensure that [MSP Recovery] makes all appropriate filings to register the LIFW Shares" by no later than <u>June 30, 2023</u>, as to the shares issued for the Assigned Past Claims, and <u>July 21, 2023</u>, as to all others.***  *See* Claims Agreement (UNDER SEAL) §§ 3.1-3.3; First Claims Amendment (UNDER SEAL) § 1; Second Claims Amendment (UNDER SEAL) § 1; Purchase Agreement §§ 1.1a; First Purchase Amendment § 1.

52.    But MSP Recovery did not register the shares issued to Cano Health by those deadlines.  Instead, MSP Recovery sent a letter to Cano Health on July 21, 2023, explaining that because MSP Recovery still had not filed its Form 10-K for the year 2022, nor other periodic reports that were overdue, it was unable to register the shares.  A copy of this letter is attached hereto as Exhibit 13.

53.     MSP Recovery therefore admitted that Defendants had materially breached their contractual obligations to "ensure that [MSP Recovery] makes all appropriate filings to register the LIFW Shares" by no later than June 30, 2023, and July 21, 2023.

54.     MSP Recovery's failure to make timely filings with the SEC also constituted a material breach of Defendants' contractual obligations to use "commercially reasonable best efforts to cause [the necessary] filings to become effective, and the shares to become fully registered, unrestricted, and freely tradeable, *as soon as possible*."  To state the obvious, a commercially reasonable entity would file its mandatory periodic reports with the SEC—especially its *first ever* annual report—in a timely fashion, and certainly not miss the deadline to do so by more than three months.

55.     On July 27, 2023, when Defendants were already in material breach of their obligations to Cano Health, and after being hounded with questions from investigative reporters about why MSP Recovery had failed to make its mandatory public financial disclosures, MSP Recovery finally filed its much-belated Form 10-K.

56.     It immediately became apparent why MSP Recovery had resisted making its mandatory public financial disclosures.  Those disclosures revealed a business that was a complete sham, and existed for the sole purpose of enriching its executives and insiders at the expense of its business partners and the investing public.

57.     Among other damning revelations, MSP Recovery's Form 10-K (i) admitted that the quarterly financial statements it had filed before this date had been materially misleading, (ii) revealed that it had generated "no substantial revenue to date," (iii) exposed its dire financial condition, with operating expenses *100 times greater* than its cash on hand, and (iv) disclosed the indulgent self-dealing of Defendant John Ruiz.  *See* Exhibit 1 (Form 10-K).  These revelations

confirmed that Defendants' breaches were not just material but incurable; MSP Recovery is not a legitimate business and is incapable of fulfilling its obligations to Cano Health.

58.    Defendants obviously knew all of these facts when they entered into the Agreements with Cano Health:  they knew that MSP Recovery was a sham; they knew that it was incapable of generating any significant amount of revenue from the claims it acquired; they knew that it did not have any significant cash on hand with which to pay its obligations; they knew that any securities issued by MSP Recovery would be fundamentally worthless; and they knew all of this would come to light the moment MSP Recovery was compelled to make **accurate** public financial disclosures.

59.    Defendants knew all of this and they concealed it from Cano Health because they knew Cano Health would never have entered into any of the Agreements but for the false representations that:  (i) MSP Recovery and its affiliates and subsidiaries had special expertise in securing recoveries on claims such as the ones held by Cano Health, and (ii) MSP Recovery was a legitimate, successful business enterprise that either had access to $66.75 million in cash or was capable of issuing registered, freely tradeable securities with a fair valuation of $66.75 million.

60.    Cano Health was defrauded into entering the Agreements, and Defendants knew from inception that MSP Recovery would never be capable of delivering what was promised in those Agreements.  Accordingly, Cano Health is entitled to have the Agreements rescinded so that it can take back the valuable claims it has given up for absolutely no consideration, and the parties can return to the *status quo* that existed before Defendants committed their fraud against Cano Health.

## FIRST CAUSE OF ACTION

**(Against MSP Recovery, MSP Recovery Claims, Series LLC,
Series 17-03-569, a designated series of MSP Recovery Claims, Series LLC, and John Ruiz)
(Fraud in the Inducement, Claims Agreement)**

61.     Cano Health repeats and realleges the allegations set forth in paragraphs 1 through 60, as though fully set forth herein.

62.     The above-named Defendants made material misrepresentations to Cano Health in connection with the negotiation of the Claims Agreement, including but not limited to that: (i) they were capable of delivering on the commitments they would be binding themselves to by executing the Claims Agreement; (ii) MSP Recovery had special expertise in securing recoveries from third parties for the cost of healthcare services; and (iii) MSP Recovery was a legitimate, successful business enterprise that either had access to $41.75 million in cash or was capable of issuing registered, freely tradeable securities with a fair valuation of $41.75 million.

63.     Defendants, given their insight into MSP Recovery's actual business operations and financial condition, and the fact that it was a sham enterprise, knew these material misrepresentations were false at the time they were made.

64.     Defendants made their material misrepresentations with the purpose of inducing Cano Health to enter into the Claims Agreement, and they were successful in that goal. Cano Health would not have entered into the Claims Agreement but for Defendants' material misrepresentations.

65.     As a result of Defendants' material misrepresentations, Cano Health gave up its rights to valuable claims against third parties, with a face value of several billion dollars, and in return received only worthless unregistered securities issued by a sham company, and no valuable consideration whatsoever.

## SECOND CAUSE OF ACTION
### (Against MSP Recovery, MSP Recovery Claims, Series LLC, and
### Series 17-03-569, a designated series of MSP Recovery Claims)
### (Breach of Contract, Claims Agreement)

66.    Cano Health repeats and realleges the allegations set forth in paragraphs 1 through

60, as though fully set forth herein.

67.    To the extent the Claims Agreement is not deemed void and/or rescindable by this

Court, the Claims Agreement represents a valid contract to which Cano Health is a party, and

which has been materially breached by the above-named Defendants.

68.    Defendants materially breached the Claims Agreement by all of the following:

a.    Failing to make quarterly payments for the 2023 Assigned Claims, a

material breach of the Claims Agreement, as amended by Section 1.g of the

First Claims Amendment;

b.    Failing to cause the issuance and registration of shares in MSP Recovery as

upfront consideration for the Assigned Past Claims by June 30, 2023, a

material breach of Section 3.1(a) of the Claims Agreement, as amended by

Section 1 of the First Claims Amendment and Section 1 of the Second

Claims Amendment.

c.    Failing to cause MSP Recovery to make all necessary filings to ensure the

shares issued as upfront consideration for the remaining categories of claims

were registered by no later than July 21, 2023, a material breach of the

Claims Agreement, as amended by Section 1 of the First Claims

Amendment and Section 1 of the Second Claims Amendment; and

d.    Otherwise failing to use commercially reasonable best efforts to cause the

necessary filings to become effective, and the shares to become fully

17

registered, unrestricted, and freely tradeable, as soon as possible, including
but not limited to failing to cause MSP Recovery to file a timely Form 10-
K for the year 2022, a material breach of the Claims Agreement, as amended
by Section 1 of the First Claims Amendment and Section 1 of the Second
Claims Amendment.

69.    Cano Health has been damaged as a result of these material breaches because it is
entitled to a minimum of $41.75 million in upfront consideration under the terms of the Claims
Agreement but has instead received nothing but worthless, unregistered securities issued by a sham
company.

## THIRD CAUSE OF ACTION
**(MSP Recovery, MSP Recovery Claims, Series LLC, and John Ruiz)**
**(Tortious Interference, Claims Agreement)**

70.    Cano Health repeats and realleges the allegations set forth in paragraphs 1 through
60, as though fully set forth herein.

71.    To the extent any of the above-named Defendants is found not to be a party or
beneficiary to the Claims Agreement, each such Defendant was a participant in acts that tortiously
interfered with the performance of the Claims Agreement and caused its material breach.

72.    Defendants knew that Cano Health had entered into the Claims Agreement, having
been involved in its negotiation and execution.

73.    Defendants undertook actions that caused MSP Recovery not to register securities
issued to Cano Health by the deadlines, including but not limited to causing MSP Recovery not to
file a timely Form 10-K for the year 2022.

74.    Defendants therefore undertook actions that caused the material breach of the
Claims Agreement, inflicting damages on Cano Health by depriving it of the at least $41.75 million
in upfront consideration it is entitled to under the Claims Agreement.

## FOURTH CAUSE OF ACTION
### (Against MSP Recovery and John Ruiz)
### (Fraud in the Inducement, Services Agreement)

75.    Cano Health repeats and realleges the allegations set forth in paragraphs 1 through 60, as though fully set forth herein.

76.    The above-named Defendants made material misrepresentations to Cano Health in connection with the negotiation of the Services Agreement, including but not limited to that: (i) MSP Recovery was capable of delivering on the commitments it would be binding itself to by executing the Services Agreement; and (ii) MSP Recovery was a legitimate business enterprise with expertise in processing and analyzing claims to recover the cost of healthcare services, which MSP Recovery was leveraging to great commercial success.

77.    Defendants, given their insight into MSP Recovery's actual business operations and financial condition, and the fact that it was a sham enterprise, knew these material misrepresentations were false at the time they were made.

78.    Defendants made their material misrepresentations with the purpose of inducing Cano Health to enter into the Services Agreement, and they were successful in that goal.  Cano Health would not have entered into the Services Agreement but for Defendants' material misrepresentations.

79.    Cano Health did not receive the value of any of the services that MSP Recovery had agreed to provide under the Services Agreement.

80.    As a result of Defendants' material misrepresentations, Cano Health agreed to pay $5 million for inadequate services by an unreliable and untrustworthy sham business, which it never would have done but for Defendants' material misrepresentations.

**FIFTH CAUSE OF ACTION**
**(Against MSP Recovery)**
**(Breach of Contract, Services Agreement)**

81.     Cano Health repeats and realleges the allegations set forth in paragraphs 1 through 60, as though fully set forth herein.

82.     To the extent the Services Agreement is not deemed void and/or rescindable by this Court, the Services Agreement represents a valid and enforceable contract to which Cano Health is a party and that has been materially breached by MSP Recovery.

83.     MSP Recovery materially breached the Services Agreement because—although it represented that it would perform (or had already performed) certain data processing and analysis tasks—those services were either not performed, performed in a materially inadequate fashion, or cannot be relied upon in light of the recent revelation that MSP Recovery is not a legitimate business with expertise in this field but a sham.  This was a material breach of Section 1 of the Services Agreement.

**SIXTH CAUSE OF ACTION**
**(Against MSP Recovery, Claims RR, LLC, and John Ruiz)**
**(Fraud in the Inducement, Purchase Agreement and Assignment Agreement)**

84.     Cano Health repeats and realleges the allegations set forth in paragraphs 1 through 60, as though fully set forth herein.

85.     The above-named Defendants made material misrepresentations to Cano Health in connection with the negotiation of the Purchase Agreement and related Assignment Agreement, including but not limited to that:  (i) they were capable of delivering on the commitments they would be binding themselves to by executing the Purchase Agreement and related Assignment Agreement; (ii) MSP Recovery had special expertise in securing recoveries from third parties for the cost of healthcare services; and (iii) MSP Recovery was a legitimate, successful business

20

enterprise that either had access to $25 million in cash or was capable of issuing registered, freely

tradeable securities with a fair valuation of $25 million.

86.    Defendants, given their insight into MSP Recovery's actual business operations and

financial condition, and the fact that it was a sham enterprise, knew these material

misrepresentations were false at the time they were made.

87.    Defendants made their material misrepresentations with the purpose of inducing

Cano Health to enter into the Purchase Agreement and related Assignment Agreement, and they

were successful in that goal.  Cano Health would not have entered into the Purchase Agreement

and related Assignment Agreement but for Defendants' material misrepresentations.

88.    Notwithstanding Defendants' failure to pay the agreed upon consideration to Cano

Health for the claims assigned pursuant to the Purchase Agreement and related Assignment

Agreement, Defendants filed a complaint concerning those claims, for their personal benefit, in

the Circuit Court of the 11th Judicial Circuit, Miami Dade-County, on May 16, 2023.  *See Claims*

*RR, LLC v Simply Health Plans, Inc.*, No. 2023-016877 CA 44.

89.    As a result of Defendants' material misrepresentations, Cano Health gave up its

rights to valuable claims against third parties, and in return received only worthless unregistered

securities issued by a sham company, and no valuable consideration whatsoever.

### SEVENTH CAUSE OF ACTION
**(Against MSP Recovery and Claims RR, LLC)**
**(Breach of Contract, Purchase Agreement and Assignment Agreement)**

90.    Cano Health repeats and realleges the allegations set forth in paragraphs 1 through

60, as though fully set forth herein.

91.     To the extent the Purchase Agreement and related Assignment Agreement are not deemed void and/or rescindable by this Court, those agreements represent a valid contract to which Cano Health is a party and that has been materially breached by the above-named Defendants.

92.     Defendants materially breached the Purchase Agreement and related Assignment Agreement by all of the following:

     a.     Failing to cause MSP Recovery to make all necessary filings to ensure the shares issued as upfront consideration were registered by no later than July 21, 2023, a material breach of Section 1.1a of the Purchase Agreement and Section 1 of the First Purchase Amendment; and

     b.     Otherwise failing to use commercially reasonable best efforts to cause the necessary filings to become effective, and the shares to become fully registered, unrestricted, and freely tradeable, as soon as possible, including but not limited to failing to cause MSP Recovery to file a timely Form 10-K for the year 2022, a material breach of Section 1.1a of the Purchase Agreement and Section 1 of the First Purchase Amendment.

93.     Cano Health has been damaged as a result of these material breaches because it is entitled to a minimum of $25 million in upfront consideration under the terms of the Purchase Agreement and related Assignment Agreement but has instead received nothing but worthless, unregistered securities issued by a sham company.

**<u>EIGHTH CAUSE OF ACTION</u>**
**(Against All Defendants)**
**(Unjust Enrichment)**

94.     Cano Health repeats and realleges the allegations set forth in paragraphs 1 through 60, as though fully set forth herein.

95.    Cano Health has conferred a benefit on all Defendants, having assigned to them claims against third parties with a face value of several billion dollars, and having been fraudulently solicited to pay an additional $5 million for unreliable services that were either not performed or inadequately performed.

96.    Defendants are obviously aware of these benefits conferred, either being the direct beneficiaries themselves or having been involved in the wrongful enterprise by which their affiliates, subsidiaries, or associated companies acquired the benefits.

97.    Defendants have retained the benefits despite knowing that they were wrongfully obtained and despite Cano Health's entreaties that the parties should rescind their Agreements and restore the *status quo*.

98.    Under these circumstances, it would be inequitable to permit Defendants to retain the valuable claims Cano Health assigned to them, or to be permitted to try and extract further benefits from Cano Health.

## **PRAYER FOR RELIEF**

WHEREFORE, Cano Health prays for relief as follows:

1.    An order rescinding all of the Agreements or, in the alternative, for an award of no less than $66.75 million, plus pre- and post-judgment interest;

2.    For Cano Health's costs of suit and attorneys' fees;

3.    For an award of punitive damages; and

4.    For such other and further relief as the Court may deem just and appropriate.

## **JURY TRIAL DEMAND**

Cano Health demands a jury trial in this action on all issues so triable.

Dated this 10th day of August, 2023.

_/s/ Clay M. Carlton_
Clay M. Carlton
Florida Bar No. 85767
Email: clay.carlton@morganlewis.com
Robert M. Brochin
Florida Bar No. 319661
bobby.brochin@morganlewis.com
Morgan, Lewis & Bockius LLP
600 Brickell Avenue, Suite 1600
Miami, FL  33131-3075
Telephone:  305.415.3000

_Counsel for Plaintiff Cano Health, LLC_

# EXHIBIT 11

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

#### Date of Report (Date of earliest event reported): August 01, 2023

---

# MSP Recovery, Inc.

###### (Exact name of Registrant as Specified in Its Charter)

---

| **Delaware** | **001-39445** | **84-4117825** |
|:---:|:---:|:---:|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2701 Le Jeune Road**
**Floor 10**
**Coral Gables, Florida**                                    **33134**
(Address of Principal Executive Offices)                     (Zip Code)

### Registrant's Telephone Number, Including Area Code: (305) 614-2222

---

###### (Former Name or Former Address, if Changed Since Last Report)

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

#### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Class A common stock, par value $0.0001 per share | LIFW | The Nasdaq Global Market |
| Redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $11.50 per share | LIFWW | The Nasdaq Global Market |

| Redeemable warrants, each whole warrant exercisable for one share of Class A common stock at an exercise price of $0.0001 per share | The Nasdaq Global Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01 Other Events.**

On August 11, 2022, the Securities and Exchange Commission (the "SEC") initiated an investigation of the Company, and requested documents relating to, among other matters, the business combination transaction with Lionheart Acquisition Corporation II consummated on May 23, 2022 and related matters. The Company received a subpoena dated March 1, 2023 from the SEC regarding the aforementioned subject matter, and subsequently received a subpoena on May 10, 2023 requesting documents in connection with the Company's financial statements for the periods ended June 30, 2022 and September 30, 2022 that required restatements as disclosed in the Company's Form 8-K filed with the SEC on April 14, 2023.

In addition, on March 10, 2023, the Company received a subpoena from the U.S. Attorney's Office in connection with a grand jury investigation in the U.S. District Court for the Southern District of Florida requesting certain information concerning the Company. To the best of the Company's knowledge, the Department of Justice has not issued any target letters to anyone associated with the Company as a result of this investigation. (The United States Attorney's Manual states that a "target" is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant.)

The Company has cooperated, and will continue to cooperate, fully with these inquiries. In connection with its review of the matters related to the preparation and filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, a special committee of the Company's board of directors, along with external advisors retained thereby, also reviewed the subject matter of information requests related to the foregoing subpoenas. Based on this review, the Company believes that these investigations will be resolved without any material developments; however, there can be no assurance as to the outcome or future direction thereof.

---

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MSP Recovery, Inc.**

Date: August 1, 2023

By: /s/ Alexandra Plasencia

Name: Alexandra Plasencia
Title: General Counsel

# EXHIBIT 12

Case 1:18-md-02875-RMBSAK Document 2637 Filed 06/14/22 Page 2 of 18
Case 1:22-cv-00825 Document 1-763 Filed 02/13/24 Page 341 of 367
PageID: 95191

## RECOVERY AGREEMENT

THIS RECOVERY AGREEMENT ("Agreement") is made this 12th day of May, 2017, ("**Effective Date**") by and between SummaCare, Inc., an Ohio Corporation ("**Client**") and MSP Recovery, LLC, a Florida Limited Liability Company and/or its assigns ("**MSP Recovery**").

WHEREAS, Client is a Health Maintenance Organization, Maintenance Service Organization, Independent Practice Association, Medical Center, and/or other health care organization and/or provider and is duly authorized by state or federal law, and/or other administrative or licensing agencies to provide or arrange for the provision of medical and health care services and/or supplies including medications, treatment or other procedures ("health care services") to persons, including but not limited to those who are covered under government healthcare programs such as Medicare, Medicare Advantage or Medicaid; and

WHEREAS, Client has certain legal rights to recover payments for the provision of health care services arising from contractual agreements, such as participation and network agreements with applicable capitation and risk sharing arrangements, and state and federal laws that provide for the reimbursement of conditional payments made by the Client, including the right to recover claims for health care services that are billed on a fee for service basis (the "**General Claims**"); and

WHEREAS, MSP Recovery has expertise in analyzing claims, identifying primary payers and recovering costs or claims for health care services paid by or on behalf of Client for which Client was not or should not have been the primary payer (the amounts of such payments by Client being the "**Client Paid Amount**"); and

WHEREAS, MSP Recovery is in the business of identifying and analyzing Parts A, B and D of Client's Medicare, Medicare Advantage and/or Medicaid claims (the "**Medicare/Medicaid Claims**, and together with the General Claims, the "**Claims**") and pursuing the recovery of Claims; and

WHEREAS, Client wishes to assign to MSP Recovery all right, title, interest in and ownership of the Claims, including all underlying documents relating to the Claims.

NOW THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to as follows:

### ARTICLE I

1.1    Recovery of the Claims.

In order for MSP Recovery to provide its analysis, identification and claims recovery services (the "**Services**") and pursue recovery of the Assigned Claims (as hereinafter defined), Client shall provide MSP Recovery with historical claims data as well as the most updated claims data that Client's current systems can provide, as of the date hereof. Client shall provide ongoing data transfers at intervals of no less than 30 days. The transfer and delivery of Client's claims data shall be in compliance with HIPAA and shall be *via* a secure file transfer protocol site in accordance with Client's data security requirements. It is the intent of the Parties that such data will be analyzed using MSP Recovery's platform, which will allow MSP Recovery to identify claims that should be paid by a primary payer, including those that should have been paid within the "clean claims time period" as required by state and/or federal laws as it pertains to the processing of claims by a Medicare Advantage Organization and/or under any of the requirements of any state agency that governs any Medicaid beneficiary payment requirements for medical services and/or supplies.

Recovery Agreement        MSP        Client        Page 1 of 17

Case 1:19-md-02875-RMB-SAK    Document 2637-4 Filed 06/14/2023    Page 3 of 18
Case 1:19-cv-09625-RMB-SAK    Document 2637-4 Filed 06/14/2023    Page 342 of 367
PageID: 95192

Upon receipt of Client's claims data, MSP Recovery shall conduct a review and analysis of the data and use its best efforts to identify the Assigned Claims for which Client has a legal right of recovery and reimbursement. In accordance with Article I, all claims that have been or can be identified by MSP Recovery as being recoverable pursuant to any contractual, statutory, equitable or legal basis, whether state or federal (including the Medicare Secondary Payer Act) and whether arising as a Part A, B or D claim(s) shall be deemed Assigned Claims. As part of its services and recovery efforts, MSP Recovery will determine the available primary insurance coverage and/or other responsible parties for secured[1] and unsecured[2] claims and pursue those claims against the appropriate parties.

MSP Recovery shall initiate and pursue the recovery of the Assigned Claims and, for each potentially recoverable Assigned Claim, MSP Recovery shall use commercially reasonable efforts to recover the value of such Assigned Claim. MSP Recovery shall pursue the recovery and reimbursement of the Assigned Claims in its own name or in the name of an affiliated entity. Accordingly, MSP Recovery may assign this Agreement to any affiliated entity. MSP Recovery may, in its discretion, contract with law firms and attorneys, experts, investigators and/or claims specialists to assist it in pursuing recoveries. MSP Recovery will use its best efforts in pursuing recovery for the Assigned Claims and makes no express or implied promises regarding the existence or amounts of potential recoveries, given that the results of its analysis are case-specific and will vary. Client acknowledges that no guarantees or promises have been made regarding the amount or results of potential recoveries.

MSP Recovery's services focus on the analysis, identification and recovery of conditional payments that have already been made by the Client. MSP Recovery does not perform or provide any of the following services: claims related or enrollee/member-facing functions; healthcare services; administrative services; the processing of claims for health care services; connecting potential beneficiaries to health plans; providing customer service to beneficiaries, enrollees or members; sales or marketing services; utilization management; member application, enrollment or membership functions; claims administration, processing or coverage functions; credentialing; provider network management. MSP Recovery's services do not negatively impact enrollees or Medicare Advantage members or otherwise put them at any financial risk. Accordingly, MSP Recovery is neither a first tier nor downstream entity and/or provider. Client has taken all steps to ensure that this contract is acceptable to CMS and is in full compliance with CMS (as hereinafter defined) contracting requirements and guidelines.

## ARTICLE II

2.1.    Compensation of MSP Recovery.

In full consideration of providing the services to Client, Client shall assign the Assigned Claims to MSP Recovery or its affiliates as provided for in Article IV. Client will have no other obligation to compensate MSP Recovery for any costs incurred by MSP Recovery in undertaking the services hereunder or in relation to recovery of any Assigned Claims. As between the parties, all costs and expenses for the services and pursuit of the Assigned Claims shall be for the account of MSP Recovery. Client shall have no liability to MSP Recovery for the value of any Assigned Claim or the failure of MSP Recovery to recover

---

[1] A secured claim is one in which a payment is required pursuant to an insurance agreement whereby either the terms of the policy and/or by statutory requirement, the insurer is required to pay for medical services before any other available sources of payment.

[2] An unsecured claim is one whereby there is either no contractual obligation to be a Primary Payer or where the Primary Payer has paid the limits of its contractual obligation.

on any Assigned Claim, and MSP Recovery shall have no liability to Client for the value of any Assigned Claim or the failure of MSP Recovery to recover on any Assigned Claim.

2.2     Client's Contingent Payment.

MSP will pay to Client, out of the proceeds of any recovery made on the Claims, a contingent deferred purchase price as consideration for the Assigned Claims as follows:

Client will receive 50% of the Net Proceeds of any Assigned Claims.

1.                       Example:     ▪   MSP Recovery recovers $12,000 and incurs $500 in costs.
                                      ▪   Net Proceeds are $11,500
                                      ▪   Client receives 50% of $11,500 − $5,750
                                      ▪   MSP Recovery receives 50% of $11,500 = $5,750

For purposes of this Agreement, "Net Proceeds" of any Assigned Claim is defined as the gross proceeds recovered in respect of such Assigned Claim, minus any Costs (as hereinafter defined) (whether in litigation or otherwise) that is directly traceable to such Assigned Claim(s) for which recovery was made. Attorneys' fees are not included in the Net Proceeds definition and any attorneys' fees that are recovered pursuant to a fee shifting statute by settlement or otherwise shall not affect the computation of the Net Proceeds amount. To the extent that any attorneys' fees are awarded pursuant to a multi-district litigation and/or a class action or any other mass tort or litigation procedure wherein a court awards attorneys' fees from the total settlement award and/or the defendant agrees to a negotiated fee award, such attorneys' fees shall not affect the computation of the Net Proceeds amount. For purposes of this Agreement, "proceeds of any recovery" shall also include the sale by Client of all or a portion of its 50% recovery rights in one lump sum or in divisible amounts.

The breakdown and percentages described above shall also apply irrespective of payment under any Medicaid, commercial insurance, and medical plans. Any health plan(s) of the Client are encompassed within the Agreement.

2.3     Costs.

All costs incurred by MSP Recovery in pursuing the Assigned Claims ("Costs") shall be deducted from gross proceeds in determining Net Proceeds. "Costs" include, but are not limited to filing fees, witness fees, consultant fees, deposition fees, court reporter fees, photocopy charges, and expenses reasonably related and necessary for the investigation, pursuit and recovery of the Assigned Claims. MSP Recovery shall pay all Costs upfront for each Assigned Claim, however, in the event of a settlement and/or recovery of a judgment amount, MSP Recovery shall seek court approval to recover said Costs from third parties. To the extent that costs are recovered from a third party, such recovered Costs shall not be deducted in determining Net Proceeds with respect to such Assigned Claim.

**ARTICLE III**

3.1.    Recoveries; Settlements.

Any and all amounts recovered by MSP Recovery in connection with the Assigned Claims will be reported to Client on a monthly basis *via* automatic electronic reports. Client shall designate an electronic email address to obtain such information. All payments received by MSP Recovery shall be segregated into a segregated lockbox account entitled MSP Recovery - _____". Client shall receive payments

Recovery Agreement         MSP ✓              Client PMX              Page 3 of 17

Case 1:18-md-02875-RMB-SAK Document 2637 Filed 06/14/22 Page 5 of 18
Case 1:22-cv-00828-AK Document 1-26 Filed 06/14/22/13/24 Page 344 of 367
PageID: 95194

by the 10th of each month for the prior month's activity of all cleared funds, minus any costs incurred for any claims and/or expenses during the prior month.

3.2. Closing Statement.

Upon a recovery and the conclusion of a particular representation with regard to an Assigned Claim, MSP Recovery shall provide Client a closing statement reflecting an itemization of all costs and expenses, together with the total amount of recovery. MSP Recovery shall retain a copy of this Agreement and any closing statements for six (6) years after execution of the closing statement. During such period, Client may inspect these documents at reasonable times and upon reasonable notice.

## ARTICLE IV

4.1 Assignment of Claims.

Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims", excluding those claims previously identified by other vendors currently under contract with Client. The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

4.2 Continuing Assignment.

Client acknowledges that Claims that arise after the Effective Date of this Agreement ("Prospective Claims") shall also be assigned to MSP Recovery as the Client's data is transferred to MSP Recovery for Claims' analysis and to pursue possible recovery on the Assigned Claims, excluding those claims previously identified by other vendors currently under contract with Client. In order to convey to MSP Recovery the assignment of the Prospective Claims, Client shall execute the addendum in the form attached as Exhibit A to this Agreement (the "Assignment Addendum").

## ARTICLE V

5.1. Proprietary Information.

Recognizing the parties' proprietary interests in their respective business operations, MSP Recovery and Client each acknowledge the confidential nature of their relationship, and any information or data relating to the business operations, systems, components, customers, prices, methods, plans, programs or results exchanged by the parties shall remain confidential and collectively be referred to as "Trade Secrets". The parties shall not disclose any information, including protected health information, pertaining to Client's members, patients, and/or methods of recovery, and Trade Secrets.

Recovery Agreement          MSP          Client          Page 4 of 17

Case 1:19-md-02875-RMBSAK Document 2637 Filed 06/14/22 Page 6 of 18
Case 1:19-md-02875-RMB-SAK Document 2637-1 Filed 02/13/24 Page 345 of 367
PageID: 95195

## ARTICLE VI

6.1.   Representations, Warranties, and Covenants.

(a)   General Warranties of Both Parties. Each party's execution, delivery and performance of this Agreement has been duly authorized by all appropriate corporate action and this Agreement constitutes a valid, binding and enforceable obligation as to each party.

(b)   Client's Representations, Warranties, and Covenants.

i.   Neither the execution, delivery, nor performance of this Agreement will conflict with or violate any other agreement, license, contract, instrument or other commitment or arrangement to which Client is bound.

ii.   Client has all right, title, interest in and ownership of the Claims being assigned subject to this Agreement, free and clear of all liens and encumbrances.

iii.   Client will cooperate with MSP Recovery and deliver to MSP Recovery all information relating to the Assigned Claims, including all Assigned Documents, to enable MSP Recovery to perform the Services and recover the Assigned Claims.

## ARTICLE VII

7.1.   Successors and Assigns.

This Agreement shall be binding upon the successors, legal representatives or assigns of the parties hereto.

7.2.   Indemnification.

Client shall indemnify MSP Recovery in connection with any recoveries that may be owed and/or are claimed by any of Client's first tier and/or downstream providers. This includes, but is not limited to, Maintenance Service Organizations, Independent Physicians Associations and/or any other entity. However, this does not include any claims previously identified by other vendors currently under agreement with Client

7.3.   Governing Law and Venue.

The interpretation, construction and enforcement of this Agreement shall be in accordance with the laws of the State of Ohio, without regard to any conflict of laws principles that would apply any laws other than those of the State of Ohio and any action, whether in law or in equity must be commenced and maintained in federal or state court within Summit County, Ohio.

7.4.   Severability.

Should any term(s) of this Agreement be deemed unenforceable, all other terms shall survive and remain in full force and effect. This includes any and all financial terms, rulings and/or other findings of the Centers for Medicare and Medicaid Services ("CMS"), Agency for Health Care Administration, or of a court of competent jurisdiction.

7.5.   Entire Agreement.

Recovery Agreement          MSP          Client          Page 5 of 17

This Agreement sets forth the entire agreement of the Parties. The parties agree that this Agreement has been drafted by both parties and shall not be construed against or in favor of one party or the other.

7.6. Attorneys' Fees.

In the event of any controversy arising under or relating to the interpretation or implementation of this Agreement or any breach thereof, the prevailing party shall be entitled to payment for all costs and reasonable attorney's fees (both trial and appellate) incurred in connection therewith. The terms of this Section shall survive any termination of this Agreement.

7.7. Waiver.

A waiver by any party of any of the terms of this Agreement shall not be construed as a general waiver by the party and the party is free to reinstate any such term or condition, with or without notice to the other.

7.8 Notice.

All notice and other communications required or permitted hereunder or convenient in connection herewith shall be in writing and shall be deemed to have been given when mailed via certified mail, return receipt requested or sent via electronic delivery as follows:

If to:  MSP Recovery                          If to:   Client
        5000 SW 75 Ave, Suite 400                    _____
        Miami, FL 33155                              _____
        Attn: Mr. Frank C. Quesada
        Chief Legal Officer                   Attn: _____
        Phone: 305-614-2222                   Phone: _____
        Email:FQuesada@msprecovery.com        Email: _____

or to such other names and addresses as Company or Client shall designate by notice to the other Party hereto in the manner specified in this Section.

7.9 Amendment.

This Agreement may be amended, in whole or in part, at any time by mutual written agreement of the parties, subject to any regulatory approvals as may be required by law.

7.10 Assignment.

This Agreement may not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, either party may assign this Agreement, in whole or in part, to any corporate successor or any corporation that is its sole corporate member, without the consent of the other party.

7.11 Term.

This Agreement shall be effective as of the Effective Date set forth herein and shall have an initial term of one (1) year, unless terminated earlier pursuant to the provisions of this Agreement. This Agreement shall automatically renew for successive terms of one (1) year unless terminated as set forth below.

Recovery Agreement          MSP ____          Client ____          Page 6 of 17

Case 1:18-md-02875-RMG-SAK Document 2637-4 Filed 06/14/22 Page 8 of 18
Case 1:22-cv-00828-AK Document 26-3 Filed 02/13/24 Page 347 of 367
PageID: 95197

7.12    Termination With Cause.

In the event either party breaches this agreement, the non-breaching party may terminate this Agreement for cause upon thirty (30) days written notice to the breaching party. The breaching party shall have thirty (30) days to cure the breach. In the event the breach is not cured within the thirty (30) days, the termination shall be effective pursuant to the terms of this notice. Failure by MSP Recovery to make timely payments constitutes a breach of this Agreement.

7.13    Termination Without Cause.

Either party with sixty (60) days advance written notice to the other party, may terminate this Agreement without cause.

7.14    Disputes.

Any dispute which arises out of or relates to this Agreement or a breach of this Agreement shall be referred first to the Management Dispute Resolution Process. The "Management Dispute Resolution Process" shall mean the efforts by management and senior management of all parties involved in the dispute to appropriately research and investigate the facts and circumstances surrounding the dispute, and to resolve the dispute by good faith negotiation and cooperation among the parties.

In the event that (a) the Management Dispute Resolution Process does not resolve a dispute in the reasonable opinion of the parties involved, or (b) 60 days have passed since a dispute was referred to the Management Dispute Resolution Process, then the parties mutually agree to settle the dispute by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, in which the Arbitrator(s) may assess compensatory damages only, and in no event shall the arbitrator assess consequential or punitive damages.   The compensation and expenses of the Arbitrator and any administrative fees or costs associated with the arbitration proceedings shall be borne equally by the parties. In addition, each party shall pay its own fees and expenses incurred in connection with any arbitration proceeding, including but not limited to attorneys' fees and expenses, expenses incurred preparing for arbitration, witness fees and expenses, copying expenses, and other similar fees and expenses. Arbitration shall take place in a reasonable location selected by the respondent.

7.15    Independent Contractor.

None of the provisions of this Agreement are intended to create, nor shall be deemed or construed to create any relationship between the parties other than that of independent entities contracting with one another solely for the purposes of effecting the provisions of this Agreement. Neither of the parties hereto, nor any of their respective officers, directors, employees or agents shall have authority to bind the other or shall be deemed or construed to be the agent, employee or representative of the other except as may be specifically provided herein. Neither party, nor any employees or agents thereof, shall have any claim under this Agreement nor otherwise against the other party for social security benefits, workman's compensation, disability benefits, unemployment insurance, vacation, sick pay or any other employee benefits of any kind.

7.16    Protected Health Information.

The Parties agree that Protected Health Information, as defined in 45 CFR 160.103, may be exchanged by the Parties and the Parties will comply with the Business Associate Agreement, set forth in **Exhibit B**, attached hereto and incorporated.

Recovery Agreement          MSP          Client          Page 7 of 17

Case 1:19-md-02875-RMBSAK Document 2637 Filed 06/14/22 Page 9 of 18
Case 1:22-cv-10928-AK Document 1-7 Filed 02/13/24 Page 348 of 367
PageID: 95198

IN WITNESS WHEREOF, the parties have hereunto set their hands effective the date first written above.

SummaCare, Inc.

Sign: _____

Print: STEPHEN ADAMSON

Title: Chief Operating Officer

MSP Recovery, LLC

Sign: _____

Print: Jorge A Lopez

Title: Asst. Gen Council.

Case 1:19-md-02875-RMB-SAK Document 2657 Filed 06/14/23 Page 10 of 18
Case 1:22-cv-20948-AK Document 265-10 Filed 02/13/24 Page 349 of 367
PageID: 95199

## EXHIBIT A

### Assignment Addendum

### FORM OF ASSIGNMENT ADDENDUM

This Assignment Addendum ("Agreement") is made this _12_ day of May, 2017, ("Effective Date") by and between SummaCare, Inc, an Ohio Corporation ("Client") and MSP Recovery, LLC, a Florida Limited Liability Company and/or its assigns ("MSP Recovery").

WHEREAS, on _May 12_____, 2017 (the "Effective Date") Client and MSP Recovery entered into the Recovery Agreement; and

WHEREAS, pursuant to the Recovery Agreement, Client has irrevocably assigned to MSP Recovery all right, title, interest, and ownership of the Assigned Claims; and

WHEREAS, Client wishes to assign to MSP Recovery all right, title, interest in and ownership of the Claims arising between the date hereof and the Effective Date.

NOW THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to as follows:

### ARTICLE I

#### 1.1    Assignment of Claims

Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims". The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all documents relating to the Assigned Claims (the "Assigned Documents"). The Documents include, but are not limited to, those documents listed on Schedule A to the attached.

### ARTICLE II

#### 2.1    Successors and Assigns

This Addendum shall be binding upon the successors, legal representatives or permitted assigns of the parties hereto.

Recovery Agreement          MSP          Client          Page 9 of 17

Case 1:19-md-02875-RMBH-SAK Document 2637-11 Filed 06/14/23 Page 11 of 18
Case 1:22-cv-01048-RMB Document 26-7 Filed 02/13/24 Page 350 of 367
PageID: 95200

2.2   Incorporation of Recovery Agreement

All terms, representations, warranties and covenants in the Recovery Agreement are incorporated herein and are applicable to the parties to this Assignment Addendum.

IN WITNESS WHEREOF, the parties have hereunto set their hands effective the date first written above.

SummaCare, Inc

Sign: _____

Print: *STEPHEN ADAMSON*

Title: *Chief Operations Officer*

MSP Recovery, LLC

Sign: _____

Print: *Jorge A. Lopez*

Title: *Asst Gen Counsel*

Case 1:19-md-02875-RMB-SAK Document 2637 Filed 06/14/23 Page 12 of 18
Case 1:22-cv-30928-AK Document 26-7 Filed 02/13/24 Page 351 of 367
PageID: 95201

## SCHEDULE A

1)     Documentation of services rendered and any payments made for those services

2)     Any documentation required to establish liability of third-party payer, including related medical records [3]

---

[3] Subject to HIPAA compliance regulations and confidentiality requirements

## EXHIBIT B

### Business Associate Agreement

This Business Associate Agreement, effective May 4, 2017 ("Effective Date"), is entered into by and between SummaCare, Inc. and Summa Insurance Company, Inc. (collectively "Health Plan" or "Covered Entity"), both located at 10 N. Main St., Akron, Ohio, 44308 and MSP Recovery, LLC ("Business Associate") located at 5000 SW 75 Ave, Suite 400, Miami, Florida 33155.

WHEREAS Health Plan is a Health Insurance Corporation and Insurer engaged in works with providers, patients and employers to provide a comprehensive community focused health plan;

WHEREAS in order to effectively carry out its operations, it is necessary for Health Plan to contract with entities who provide additional services;

WHEREAS Health Plan has engaged Business Associate to carry out such identified services, which includes the use and disclosure of Protected Health Information;

NOW THEREFORE, for and in consideration of the mutual promises and covenants contained herein and in order to assure compliance with 45 C.F.R. Parts 160 and 164 on privacy and confidentiality and security, the parties agree as follows:

### SECTION I. DUTIES OF BUSINESS ASSOCIATE

Business Associate shall use Protected Health Information for the purpose described below in Section II.

### SECTION II. PROTECTED HEALTH INFORMATION

For purposes of this Agreement, "Protected Health Information," as defined at 45 C.F.R. §160.103, and as may be periodically revised or amended by the U.S. Department of Health and Human Services, the U.S. Congress or other federal agency, means information that is received from, or created or received on behalf of, Health Plan and is information about an individual which relates to the past, present or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual. Protected Health Information (PHI) also either identifies the individual or there is a reasonable basis to believe the information can be used to identify the individual. Protected Health Information pertains to both living and deceased individuals. Electronic Protected Health Information ("EPHI") means individually identifiable health information that is transmitted by or maintained in electronic media.

- A. Business Associate's use and/or disclosure of PHI shall be limited to only those purposes below that are necessary to perform its obligations under this Agreement:
  - 1. Business Associate shall use PHI only for the following purposes: to identify potential recovery and reimbursement rights related to health care claims paid for by the Health Plan/Covered Entity for which a primary payer was responsible.
  - 2. Business Associate shall not disclose the Protected Health Information unless otherwise expressly approved by Health Plan.

B. Unless otherwise limited by this Agreement, Business Associate may also:
   1. Use the PHI in its possession for the proper management and administration of Business Associate or to carry out its legal responsibilities.
   2. Disclose the PHI in its possession for the proper management and administration of Business Associate or to carry out its legal responsibilities, if such disclosure is required by law or is addressed in this Agreement.

C. Business Associate may not use or disclose Protected Health Information in any manner that would constitute a violation of 45 C.F.R. Parts 160 and 164 if used or disclosed by Health Plan.

D. Business Associate agrees to not use or further disclose Protected Health Information other than as authorized by this Agreement or as required by law.

E. Business Associate shall use appropriate safeguards to prevent uses or disclosures of Protected Health Information other than as provided for by this Agreement.

F. Business Associate shall comply with the Security Provisions of 45 CFR §§164.308, 164.310, 164.312 and 164.316 in the same manner as these regulations apply to Health Plan or Covered Entities.

G. Business Associate shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of EPHI that Business Associate creates, receives, maintains, or transmits on behalf of Health Plan.

H. If Business Associate becomes aware of any use or disclosure of Protected Health Information not provided for by this Agreement, it shall report such use or disclosure to Health Plan within three business days of gaining such knowledge.

I. Business Associate shall report to Health Plan any security incident within three business days of becoming aware of such incident. For the purposes of this paragraph, "security incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with systems operations in an information system.

J. Business Associate shall require that its agents, including subcontractors, to whom it provides Protected Health Information under this Agreement, agree to the same restrictions and conditions that apply to Business Associates with respect to such information.

K. Business Associate shall ensure that any agent to whom it provides EPHI, including a subcontractor, agrees to implement reasonable and appropriate administrative, physical and technical safeguards to protect the confidentiality, integrity, and availability of such EPHI.

L. Within fifteen business days of a request by Health Plan, Business Associate agrees to comply with Health Plan's request to accommodate an individual's access to his/her Protected Health Information. In the event an individual contacts Business Associate directly about access to Protected Health Information, Business Associate will not provide access to the individual but shall forward such request to Health Plan within three business days of such contact.

M. Within fifteen business days of a request by Health Plan, Business Associate agrees to comply with Health Plan's request to make amendments to Protected Health Information. Business Associate shall promptly incorporate any such amendments into the Protected Health Information. In the event an individual contacts Business Associate directly about making amendments to Protected Health Information, Business Associate will not make any amendments to the individual's Protected Health Information but shall forward such request to Health Plan within three business days of such contact.

N. Business Associate shall keep a record of disclosures of Protected Health Information and agrees to make information regarding disclosures of Protected Health Information available to Health Plan within fifteen days of a request by Health Plan. Business Associate shall provide, at a minimum, the following information: (i) the date of disclosure; (ii) the name of the entity or person who received the Protected Health Information, and the address of such entity or person, if known; (iii) a brief description of the Protected Health Information disclosed; (iv) a brief statement regarding the purpose and explanation of the basis of such disclosure and (v) the names of all individuals whose protected health information was disclosed.

Recovery Agreement          MSP          Client          Page 13 of 17

Case 1:19-md-02875-RMB-SAK Document 2637 Filed 06/14/23 Page 15 of 18
Case 1:22-cv-30428 Document 26 Filed 06/14/22/13/24 Page 354 of 367
PageID: 95204

O. Business Associate agrees to comply with any other restrictions on the use or disclosure of Protected Health Information that Health Plan may from time to time request.

P. Business Associate shall make its internal practices, books and records relating to uses and disclosures of Protected Health Information available to Health Plan, or to the Secretary of the U.S. Department of Health and Human Services or designee, for purposes of determining Health Plan and Business Associate compliance with 45 C.F.R. Parts 160 and 164.

Q. Upon the termination of this Agreement, Business Associate shall return or destroy all Protected Health Information and will retain no copies of such information. If such return or destruction of Protected Health Information is not feasible as approved by Health Plan, Business Associate agrees that the provisions of this Agreement are extended beyond termination to the Protected Health Information, and Business Associate shall limit all further uses and disclosures to those purposes that make the return or destruction of the Protected Health Information infeasible.

## SECTION III. HITECH

A. Business Associate will implement administrative, physical and technical safeguards consistent with 45 CFR §§164.308, 164.310 and 164.312 to protect the confidentiality, integrity and availability of the EPHI that it receives, creates, transmits or maintains on behalf of Health Plan in the same manner as these regulations apply to Health Plan.

Business Associate will adopt, maintain and update written policies and procedures consistent with requirements of 45 CFR §164.316 with respect to its administrative, physical and technical safeguards.

B. Business Associate may use and disclose PHI only if such use or disclosure is in compliance with each applicable requirement of 45 CFR §164.504(e) and this Agreement. The additional requirements of Subtitle D of the American Recovery and Reinvestment Act of 2009 (ARRA) (ARRA §§13400-13424) that relate to privacy and that are made applicable with respect to covered entities are also applicable to Business Associate and are hereby incorporated into this Agreement.

C. Business Associate will refrain from marketing practices prohibited by Section 13406 of HITECH.

D. Effective as of the effective date of regulations promulgated by the Department of Health and Human Services under Section 13405(d) of HITECH, Business Associate will not receive or provide direct or indirect remuneration in exchange for any PHI in a manner that would violate Section 13405(d) of HITECH.

E. Business Associate will:

- have in place policies and procedures that are designed to detect the inappropriate acquisition, access, use or disclosure of PHI. Business Associate's workforce and its agents have received the training on such policies and procedures that Business Associate deems appropriate.

- notify the Covered Entity as soon as practicable and (except in the event of a law enforcement delay as provided in 45 CFR §164.412) in no case later than 10 business days after the discovery of an acquisition, access, use or disclosure in a manner not permitted by the HIPAA privacy regulations of PHI that Business Associate accesses, maintains, retains, modifies, records, stores, destroys or otherwise holds, uses or discloses on behalf of the Covered Entity.

Recovery Agreement         MSP          Client          Page 14 of 17

At the time of such notice or as soon as reasonably possible thereafter (and in no case later than 30 calendar days), Business Associate will provide the identification of each individual whose unsecured PHI has been, or is reasonably believed by Business Associate to have been, acquired, accessed, used or disclosed during such breach.

- assist the Covered Entity in assessing whether the impermissible acquisition, access, use or disclosure of PHI poses a significant risk of financial, reputational or other harm to the individuals whose information is involved.

- will provide notification at its own expense in a form acceptable to the Covered Entity without unreasonable delay and in compliance with applicable law if the Covered Entity determines that individuals whose data is affected by the impermissible acquisition, access, use or disclosure of PHI must be notified pursuant to 45 CFR Part 164 Subpart D.

F.  Business Associate shall determine the amount minimally necessary consistent with the requirements in Section 13405(b) of HITECH, or as otherwise specified in regulations promulgated by the Secretary of the Department of Health and Human Services.

## SECTION IV. TERM AND TERMINATION

This Agreement shall terminate upon the completion of the underlying Agreement or if Covered Entity or knows of a pattern of activity or practice of the Business Associate that constitutes a material violation of the Business Associate's obligations under 45 CFR Part 164 Subpart E. Covered Entity will notify the Business Associate and provide a reasonable period for the Business Associate to cure or end the violation. If the Business Associate does not cure or end the violation within ten days of notice, Covered Entity will, if feasible, terminate its service agreement with the Business Associate. If termination of the service agreement is not feasible, Health Plan shall report the violation to the Department of Health and Human Services.

## SECTION V. INDEMNIFICATION

Business Associate agrees to indemnify, defend and hold Health Plan and its officers, directors, and employees harmless from any alleged claim or penalty against Health Plan or its officers, directors or employees arising from any allegation of uses and/or disclosures of PHI or EPHI in violation of 45 C.F.R. Parts 160 and 164 arising from an alleged use or disclosure of PHI or EPHI by Business Associate or its agents or subcontractors, including any penalties attributed to the failure of Business Associate to notify Health Plan within the timeframes set forth in section III above.

## SECTION VI. BOOKS AND RECORDS

To the extent Section 952 of the Omnibus Reconciliation Act of 1980 (Public Law 96-499) is found applicable to this Agreement, until the expiration of six (6) years after the furnishing of service pursuant to this Agreement, Business Associate agrees to make available upon written request to the Secretary of Health and Human Services, or upon request to the Comptroller General, or to any of their duly authorized representatives, this Agreement, and books, documents and records of the Business Associate that are necessary to certify the extent of any costs of Health Plan arising from this Agreement. Further, if Business Associate carries out any of its duties arising from this Agreement through a subcontractor, with a value or cost of Ten Thousand Dollars ($10,000) or more over a 12-month period, with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing

Recovery Agreement          MSP          Client          Page 15 of 17

Case 1:19-md-02875-RMB-SAK Document 2637 Filed 06/14/22 Page 17 of 18
Case 1:22-cv-10928-AK Document 1-263 Filed 06/14/22 Page 356 of 367
PageID: 95206

of such services pursuant to such subcontract, the related organization shall make available, upon written request to the Secretary of Health and Human Services, or upon request to the Comptroller General, or any of their duly authorized representatives, the subcontract, books, documents, and records of such organization that are necessary to verify the nature or extent of such costs.

## SECTION VII. AMENDMENT

A. To the extent that any provision of this Agreement is in conflict with any law, regulation, rule, or administrative policy of any governmental entity, this Agreement will have been deemed to have been amended in order to bring it into conformity with these provisions.

B. Except as stated in paragraph A of this Section, this Agreement may be amended only in a written agreement signed by both parties.

## SECTION VIII. GOVERNING LAW

This Agreement will be executed, delivered, integrated, construed and enforced pursuant to and in accordance with the laws of the State of Ohio.

## SECTION IX. ASSIGNMENT

This Agreement may not be assigned by either party without the prior written consent of the other party. Except for the prohibition on assignment contained in the preceding sentence, this Agreement shall be binding upon and inure to the benefits of the heirs, successors, and assigns of the parties hereto.

## SECTION X. WAIVER OF BREACH

The waiver by either party of a breach or a violation of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of same or other provision hereof. No waiver shall be effective against any party hereto unless in a writing signed by that party.

## SECTION XI. NOTICES

All notices, requests, demands, approvals, and other communications required or permitted by this Agreement shall be in writing and sent by certified mail or by personal delivery. Such notice shall be deemed given on any date of delivery by the United States Postal Service. Any notice shall be sent to the following address:

If to Health Plan:
SummaCare, Inc.
10 N. Main St.
Akron, OH 44308
ATTN: President
CC: Privacy Officer

If to Business Associate:
| | |
|---|---|
| Name: | MSP Recovery, LLC |
| Address: | 5000 SW 75 Avenue, Suite 400 |
| City: | Miami |
| State: | Florida |
| Zip: | 33155 |
| ATTN: | Mr. Frank C. Quesada, Chief Legal Officer |

Recovery Agreement          MSP _____          Client _____          Page 16 of 17

Case 1:19-md-02875-RMBSAK Document 2657led 06/14/22 Page 18 of 18
Case 1:22-cv-10493 Document 263 Filed 02/13/24 Page 357 of 367
PageID: 95207

## SECTION XII. SEVERABILITY

If any provision of this Agreement is held invalid, the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefits of the remaining provisions of this Agreement.

## SECTION XIII. SURVIVAL

The responsibilities of Business Associate under the provisions of Section IV of this Agreement shall survive termination of this Agreement indefinitely.

**IN WITNESS WHEREOF**, each of the undersigned has caused this Agreement to be duly executed in its name and on its behalf as of the Effective Date.

MSP Recovery, LLC

SummaCare, Inc.

**Business Associate**

_Signature_

_Signature_

Stephen Adamson

Jorge A. Lopez

_Printed Name_

_Printed Name_

Chief Operations Officer

Asst Gen. Counsel

_Title_

_Title_

5/16/2017

5/12/2017

_Date_

_Date_



SummaCare
1200 E Market St, Suite 400
Akron, OH 44305-4018
summacare.com

September 5, 2018

MSP Recovery, LLC
5000 SW 75 Ave, Suite 400
Miami, FL 33155

Re:  Recovery Agreement

This letter is in reference to that certain Recovery Agreement dated May 12,
2017 by and between SummaCare, Inc. and MSP Recovery, LLC. (the "Recovery
Agreement"). This will confirm, pursuant to the Recovery Agreement, that
Summacare, Inc. has consented to, approved and ratified the assignment of the
Recovery Agreement executed on June 12, 2017 by MSP Recovery, LLC, and all
rights contained therein, including all claims and reimbursement rights, to and in
favor of MSP Recovery Claims Series, LLC or any of its designated series,
including but not limited to, Series 16-11-509.


Summacare, Inc.,
an Ohio corporation


_____
Signature

*Stephen Adamson*
Print Name

*Chief Operative Officer*
Title

*9/7/2018*
Date

# EXHIBIT 13

## ASSIGNMENT AGREEMENT

THIS CONFIDENTIAL PURCHASE AGREEMENT ("Agreement") is made as of the date when this Agreement is fully executed ("**Effective Date**"), by, between and among the (a) assignors EmblemHealth Services Company, LLC and Group Health Incorporated, a New York corporation and Medicare Advantage Organization, and Health Insurance Plan of Greater New York, a New York corporation and Medicare Advantage Organization (collectively referred to as "**Assignor**"), on the one hand, and (b) the assignees Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company, and its affiliated entity MSP Recovery, LLC, a Florida Limited Liability Company, on the other hand (collectively referred to as "**Assignee**"). Assignor and Assignee herein are each referred to as a "**Party**" and collectively as the "**Parties**.".

### PREAMBLE

**WHEREAS,** Assignor is a Health Maintenance Organization, and Preferred Provider Organization, and/or other health insurance provider, and is duly authorized by state or federal law, or other administrative or licensing agencies to engage in health insurance business, which includes issuing health insurance plans that provides payment for certain covered medical and health care services and/or supplies including medications, treatment or other procedures ("**Health Care Services**") rendered to persons enrolled in Medicare and Medicare Advantage programs (jointly referred to herein as "**Medicare**"); and

**WHEREAS,** Assignor has certain legal and equitable rights to seek reimbursement and/or recover payments from primary payers and any other party or entity that may be responsible to Assignor directly or through rights conferred on the Assignor pursuant to state and/or federal law pertaining to beneficiaries, for Health Care Services provided to Assignor's Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by the Assignor for such Medicare services, whether under Parts A, B and D of the Medicare Act, including pursuant to a Medicare Advantage Plan, including the right to recover claims for Medicare Health Care Services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights, legal or equitable, in favor of Assignor, including in any litigation, such as but not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the forgoing defined as the "**Medicare Recovery Claims;**" and

**WHEREAS,** Assignee has expertise in analyzing Medicare claims, identifying primary payers and recovering costs or claims for Medicare Health Care Services paid by or on behalf of Assignor for which Assignor was not or should not have been the primary payer; and

**WHEREAS,** Assignor wishes to assign to Assignee all right, title, interest in and ownership of Medicare Recovery Claims – excluding Medicare Recovery Claims that can be asserted against Assignor's members, enrollees and/or contracted providers, and excluding Medicare Recovery Claims that, as of the Effective Date, have been assigned to and/or are being pursued by other recovery vendors, including, but not limited to, The Rawlings Group – related to Medicare Health Care Services that were rendered and paid for by Assignor during the six (6) year period beginning September 29, 2011 and ending September 29, 2017 (hereinafter, such Medicare Recovery Claims shall be referred to as the "**Assigned Medicare Recovery Claims**") (this provision shall not preclude future transactions as to Medicare Recovery Claims involving Assignor's members, enrollees and/or contracted providers); and

**WHEREAS,** the assignment of the Assigned Medicare Recovery Claims shall include Assignor granting Assignee access claims data, information and documentation directly relating to the Assigned

Exh. C to Emblem Purchase Agreement



Case 1:19-md-02875-RMBBSAWZ Document 2637 Filed 05/25/22 Page 3 of 9
Case 1:22-cv-02875-RMB-SAK Document 2637 Filed 02/13/24 Page 361 of 367
PageID: 95211

Medicare Recovery Claims (hereinafter to all minimum necessary, such data and documentation shall be referred to as the "**Assigned Medicare Benefit Material**"), for the sole and limited purpose(s) of this Agreement and in accordance with Business Associate Agreement entered into between Assignor and MSP Recovery, LLC, effective as of January 25, 2017 (hereinafter, "**Business Associate Agreement**," incorporated herein, by reference, in its entirety), and the Nondisclosure Agreement entered into between Assignor and MSP Recovery, LLC, effective as of January 25, 2017 (hereinafter, "**Nondisclosure Agreement**," incorporated herein, by reference, in its entirety), which Business Associate Agreement and Nondisclosure Agreement all Parties agree herein to be bound by; and

**WHEREAS**, Assignee acknowledges and agrees that it will not change and/or delete the HIPAA Protected Health Information contained in the Assigned Medicare Benefit Material; namely, personal information including, but not limited to names, Social Security numbers as well as health information; and

**WHEREAS**, it is acknowledged and agreed to by the Parties that the assignment of the Assigned Medicare Recovery Claims includes the right on the part of Assignee to pursue recovery with respect to the Assigned Medicare Recovery Claims and to retain any and all amounts recovered on the Assigned Medicare Recovery Claims, in accordance with the terms set forth herein; and

**NOW, THEREFORE**, in consideration of the execution and delivery of this Agreement and the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to as follows:

1.　　**Incorporation of Recitals.** Each of the foregoing recitals and the representations reflected therein are incorporated herein and expressly made a part of this Agreement.

2.　　**Assignment of Assigned Medicare Recovery Claims.**

a.　　The definition of Assigned Medicare Recovery Claims set forth in the Preamble is reiterated and incorporated herein, and the following exclusions are restated for emphasis: Consistent with the definition of Assigned Medicare Recovery Claims set forth in the Preamble, the Assigned Medicare Recovery Claims do not include claims that Assignor may have against its members, enrollees, and/or contracted providers, regardless of the nature of the claims, or claims that are currently being pursued by other vendors pursuant to a contract with Assignor (such excluded claims being defined as "Assignor Retained Claims").

b.　　Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable. It is expressly acknowledged and agreed by Assignee that this Agreement does not contemplate nor constitute an assignment by Assignor to Assignee of Assignor Retained Claims. The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

Exh. C to Emblem Purchase Agreement　　　　2



3.  **Purpose of Assignment.** Assignor makes and Assignee accepts this assignment of the Assigned Medicare Recovery Claims in order to facilitate Assignee's ability to initiate and pursue the recovery of the Assigned Medicare Recovery Claims, including in any litigation, such as but not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility. For each potentially recoverable Assigned Medicare Recovery Claim, Assignee shall use commercially reasonable efforts to recover the value of such Assigned Medicare Recovery Claims. Assignee shall pursue the recovery and reimbursement of the Assigned Medicare Recovery Claims in its own name or in the name of an affiliated entity controlled in whole or in part by Assignee. Accordingly, upon thirty (30) days prior written notice given by Assignee to Assignor explaining the purpose of a proposed assignment, and prior written approval by Assignor, which may not be unreasonably withheld, Assignee may assign this Agreement and corresponding Business Associate Agreement to any entity controlled in whole or in part by Assignee, which entity shall enter into a written agreement with Assignor to be bound by the terms of this Agreement, and corresponding Business Associate Agreement and Nondisclosure Agreement. Such assignment, however, shall not relieve Assignee of its obligations and responsibilities set forth in, and/or related to, this Agreement, and corresponding Business Associate Agreement and Nondisclosure Agreement. Assignee is prohibited from assigning this Agreement to any entity which is not controlled in whole or in part by Assignee. Assignee may, in its discretion, contract with law firms and attorneys, experts, investigators and/or claims specialists to assist it in pursuing recoveries consistent with the Business Associate Agreement. Assignee will use its best efforts in pursuing recovery for the Assigned Medicare Recovery Claims and makes no express or implied promises regarding the existence or amounts of potential recoveries, given that the results of its analysis are case-specific and will vary. Assignor acknowledges that no guarantees or promises have been made regarding the amount or results of potential recoveries.

3.  **Consideration.** Assignor acknowledges that Assignor has received good and valuable consideration for entering into this Agreement, the sufficiency of which is hereby acknowledged by the Parties. The amount of consideration provided to Assignor shall be deferred contingent compensation in the amount of 50% of the value of the recoveries of the Assigned Medicare Recovery claims affected by Assignee. Such consideration may be accelerated pursuant to an agreement between the Parties, which agreement shall supersede this Agreement. In addition, other than the acknowledged consideration, Assignor will have no other obligation to compensate Assignee for any costs incurred by Assignee in undertaking in relation to recovery of any Assigned Medicare Recovery Claims. As between the Parties, all costs and expenses for the services and pursuit of recovery with respect to the Assigned Medicare Recovery Claims shall be for the account of Assignee. Assignor shall have no liability to Assignee for the value of any Assigned Medicare Recovery Claim or the failure of Assignee to recover on any Assigned Medicare Recovery Claim, and Assignee shall have no liability to Assignor for the value of any Assigned Medicare Recovery Claim or the failure of Assignee to recover on any Assigned Medicare Recovery Claim.

4.  **Confidential Information and Protected Health Information.** The rights, responsibilities and obligations with respect to Assignee's access to Confidential and Protected Health Information, which are set forth in the Business Associate Agreement entered into by the Parties, effective as of January 25, 2017, and the Nondisclosure Agreement entered into by the Parties, effective as of January 25, 2017, are incorporated herein by reference, and are binding upon the Parties. The Parties acknowledge and agree that the Assigned Medicare Benefit Material is Protected Health Information as protected by the Business Associate Agreement.

5.  **General Representations and Warranties of Both Parties.** Each Party represents and warrants as follows:

Exh. C to Emblem Purchase Agreement

3



     a.    The representations and warranties of each of the Parties are true and correct in all respects as of the date of execution of this Agreement;

     b.    Each Party is duly organized and existing and is in good standing in its state of domicile;

     c.    Each Party is duly qualified to do business and is in good standing under the laws of any jurisdiction where the conduct of its business require it to be so qualified;

     d.    Each Party possesses any and all licenses and/or governmental approvals required to perform its respective business;

     e.    Each Party's execution, delivery and performance of this Agreement and the performance of all obligations thereunder have been duly authorized by all appropriate corporate action;

     f.    This Agreement has been duly executed and delivered by duly authorized officers of each Party and therefore constitutes valid, binding and enforceable obligations as to each Party enforceable one as against each other;

     g.    Each Party shall at all times comply with all applicable laws and regulations in the performance of this Agreement; and

     h.    No agent, broker, finder, financial advisor or any other entity will be entitled to any fee, commission or other compensation in connection with the assignment contemplated herein, or of any other right or obligation arising under this Agreement;

     i.    These general representations and warranties of both Parties, as well as the Assignee's and Assignor's representations and warranties, shall survive and be in full force and effect after the execution of this Agreement.

    6.    **Assignee's Representations and Warranties.** Assignee understands and acknowledges that Assignor, in entering into this Agreement, is relying upon the Assignee's representation that it is experienced with, and it possesses expertise regarding, the assignment of Medicare Recovery Claims and related data, information and documentation, and matters related to recovery on Medicare Recovery Claims. Moreover, it is understood by Assignor that Assignee, upon assignment of the Assigned Medicare Recovery Claims, intends to initiate and pursue recovery of the Assigned Medicare Recovery Claims, and may, consistent with the Business Associate Agreement, contract with law firms and attorneys, experts, investigators and/or claims specialists to assist it in pursuing recovery. Assignee, therefore, represents warrants and/or agrees as follows, and acknowledges that Assignee's representations, warranties and agreements, as set forth in this Agreement, including in the Preamble, are a material inducement for Assignor entering into this Agreement:

     a.    Assignee has not encountered and is unaware of any legal impediment to the Parties entering into this Agreement.

     b.    Assignee has not encountered and is unaware of any challenges to agreements like this Agreement based upon alleged violation of CMS contracting requirements and guidelines, or alleged failure to obtain approval from any governmental or regulatory authority.

     c.    Assignee, understands the difference between recovery from payers, and recovery from Medicare and Medicare Advantage plan members, enrollees and contracted providers, and, therefore, represents, warrants and agrees that it shall not pursue recovery with respect to the Assigned



Case 1:19-md-02875-RMBSAW/Z Document 2697-5 Filed 05/25/23 Page 6 of 9
Case 1:19-md-02875-RMBSAW/Z Document 2697-5 Filed 02/13/24 Page 364 of 367
PageID: 95214

Medicare Recovery Claims from any of Assignor's members, enrollees or contracted providers under this Agreement and pursuant to the specific transaction the Agreement documents. This provision does not preclude subsequent transactions between the Parties which may involve other recoveries from any of Assignor's members, enrollees or contracted providers.

        d.      Under this Agreement and pursuant to the specific transaction, Assignee shall initiate and pursue the recovery of the Assigned Medicare Recovery Claims from payers other than Assignor's members, enrollees and/or contracted providers, and, for each potentially recoverable Assigned Medicare Recovery Claim, Assignee shall use commercially reasonable efforts to recover the value of such Assigned Medicare Recovery Claim from payers other than Assignor's members, enrollees and/or contracted providers. Assignee shall pursue the recovery and reimbursement of the Assigned Medicare Recovery Claims in its own name. Upon thirty (30) days prior written notice given by Assignee to Assignor explaining the purpose of a proposed assignment, and prior written approval by Assignor, which may not be unreasonably withheld, Assignee may assign this Agreement, and corresponding Business Associate Agreement and Nondisclosure Agreement, to any entity controlled in whole or in part by Assignee, which entity shall enter into a written agreement with Assignor to be bound by the terms of this Agreement, and corresponding Business Associate Agreement and Nondisclosure Agreement. In such case, Assignee shall pursue the recovery and reimbursement of the Assigned Medicare Recovery Claims in the name of its affiliated entity. Such assignment, however, shall not relieve Assignee of its obligations and responsibilities set forth in, and/or related to, this Agreement. Assignee is prohibited from assigning this Agreement to any entity that is not controlled in whole or in part by Assignee. Assignee may, in its discretion, and at no cost or expense to Assignor, contract with law firms and attorneys, experts, investigators and/or claims specialists to assist it in pursuing recoveries, consistent with the Business Associate Agreement.

        7.      **Assignor's Representations and Warranties.** Assignor understands and acknowledges that in order for Assignee to pursue the recovery of the Assigned Medicare Recovery Claims that it contemplates upon conclusion of the assignment contemplated herein, and to obtain the full benefit of this Agreement, Assignor must have full sole legal right, title, standing and interest in the Assigned Medicare Recovery Claims that are the subject of this Agreement and are being assigned. Assignor hereby represents and warrants that, as of the date of this Agreement's execution, Assignor possesses full legal right, title, standing and interest in the Assigned Medicare Recovery Claims being assigned. Further, Assignor represents and warrants as follows, and acknowledges that Assignor's representations and warranties are a material inducement for Assignee entering into this Agreement:

        a.      None of the execution, delivery, nor performance of this Agreement will conflict with or violate the governing corporate documents of Assignor or conflict with or violate any other agreement, license, contract, instrument or other commitment or arrangement to which Assignor is bound;

        b.      Assignor holds and possesses all rights, authorizations, title, interest in and ownership of the Assigned Medicare Recovery Claims being assigned subject to this Agreement, free and clear of all liens and encumbrances;

        c.      No lawsuit, judicial or administrative action, suit, investigation or proceeding of any kind is pending or, to Assignor's knowledge, threatened, in any court or before any governmental or regulatory authority, (i) which would prevent the carrying out of this Agreement or the assignment of Assigned Medicare Recovery Claims contemplated hereby or (ii) which would declare this Agreement or the assignment of Assigned Medicare Recovery Claims contemplated hereby to be unlawful or (iii) which would cause the rescission of this Agreement or (iv) which would have a material adverse effect upon this Agreement or the assignment of Assigned Medicare Recovery Claims contemplated hereby;

Exh. C to Emblem Purchase Agreement         5



      d.     Assignor, a Health Plan, has made the claims payments with respect to the Assigned Medicare Recovery Claims for and on behalf of the enrollee members that are the subject of the Assigned Medicare Recovery Claims being assigned; and

      e.     Consistent with the terms of this Agreement and the Business Associate Agreement, Assignor hereby grants Assignee access to all Assigned Medicare Benefit Material.

### 8.   Indemnification of Assignee.

    (a)   Third Party Demands.

Assignor shall indemnify, defend and hold harmless Assignee and its affiliates, and its and their respective successors and assigns (and its and their respective officers, directors, employees and agents) from and against any third party demands, claims, lawsuits, judicial or administrative actions, investigations or proceeding based upon any allegation that (i) Assignor, as of the Effective Date, did not hold and possess all rights, authorizations, standing, title, and interest in and ownership to any Assigned Medicare Recovery Claim(s) or portion thereof, being assigned pursuant to this Agreement and; (ii) any allegation that any Claim(s), or portion thereof, being assigned pursuant to this Agreement, infringes, misappropriates or violates any right of any person or entity, including any assertion or claim that any recoveries are or may be owed to any of Assignor's first tier and/or downstream providers, such as Maintenance Service Organizations, Independent Physicians' Associations, subrogation or recovery audit contractors, and/or any other entity with whom Assignor may have an Agreement.

    (b)   Assignor's Breach of Representations and/or Warranties.

Assignor shall indemnify, defend and hold harmless Assignee and its affiliates, and its and their respective successors and assigns (and its and their respective officers, directors, employees and agents) for any losses or damages arising from (i) any knowing and willful breach of any of the representations and warranties set forth in Article III of this Agreement; (ii) any failure of the Assignor to perform in accordance with any covenant or other term of this Agreement; and/ or (iii) any assertion of the right to brokerage or finder's fees or commissions or similar payments by persons or entities other than the Parties.

### 9.   Indemnification of Assignor.

    (a)   Third Party Demands.

In addition to the indemnification provided for in the Business Associate Agreement, and without the intent to limit such indemnification, Assignee shall indemnify, defend and hold harmless Assignor and its affiliates, and its and their respective successors and assigns (and its and their respective officers, directors, employees and agents) for and against any demands, claims, lawsuits, judicial or administrative actions, investigations or proceeding by any third party (including any governmental agency) arising out of or related to illegal conduct undertaken by Assignee with respect to effecting recoveries with respect to the Assigned Medicare Recovery Claims pursuant to this Agreement, , and/or challenges to the lawfulness of the assignment of the Assigned Medicare Recovery Claims and of the provision of access to the Assigned Medicare Benefit Material.

    (b)   Assignee's Breach of Representations and/or Warranties.

Assignee shall indemnify, defend and hold harmless Assignor and its affiliates, and its and their respective successors and assigns (and its and their respective officers, directors, employees and agents)



Case 1:19-md-02875-RMB-SAK Document 2637 Filed 02/25/22 Page 8 of 9
Case 1:19-md-02875-RMB-SAK Document 2637 Filed 02/13/24 Page 366 of 367
PageID: 95216

for and against any losses or damages arising from (i) any knowing and willful breach by Assignee of any of its representations and warranties set forth in this Agreement; and/or (ii) any failure of the Assignee to perform in accordance with any covenant or other term of this Agreement.

10.     **Successors and Assigns.** This Agreement shall be binding upon the successors, legal representatives or permitted assigns of the Parties hereto.

11.     **Governing Law and Venue.** The interpretation, construction and enforcement of this Agreement shall be in accordance with the laws of the State of New York, without regard to any conflict of laws principles that would apply any laws other than those of the State of New York and any action, whether in law or in equity must be commenced and maintained in federal or state court within New York County, New York.

12.     **Severability.** Should any term(s) of this Agreement be deemed unenforceable, all other terms shall survive and remain in full force and effect. This includes any and all financial terms, rulings and/or other findings of the Centers for Medicare and Medicaid Services ("CMS"), Agency for Health Care Administration, or of a court of competent jurisdiction.

13.     **Waiver.** A waiver by any party of any of the terms of this Agreement shall not be construed as a general waiver by the Party and the Party is free to reinstate any such term or condition, with or without notice to the other.

14.     **Notice.** All notice and other communications required or permitted hereunder or convenient in connection herewith shall be in writing and shall be deemed to have been given when mailed via certified mail, return receipt requested or sent via electronic delivery as follows:

If to:  **Assignee**                                      If to:  **Assignor**

MSP Recovery, LLC                                   EmblemHealth, Inc.
5000 SW 75 Ave., Suite 400                          55 Water Street, 13th Floor
Miami, FL 33155                                     New York, NY 10041
Attn: Frank Quesada                                 Attn: Michael Palmateer
Phone: 305-614-2222                                 Phone: 646-447-6170
Email: FQuesada@msprecovery.com                     Email:
                                                    mpalmateer@emblemhealth.com

                                                    With copy to:

                                                    EmblemHealth, Inc.
                                                    Legal Department
                                                    55 Water Street, 13th Floor
                                                    New York, NY 10041
                                                    Attn: Carlos G. Manalansan
                                                    Phone: 646-447-7837
                                                    Email:
                                                    cmanalansan@emblemhealth.com

or to such other names and addresses as Assignee or Assignor shall designate by notice to the other Party hereto in the manner specified in this Section.

Exh. C to Emblem Purchase Agreement                                                     7



15.     **Execution and Counterparts.** This Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument. Signatures on this Agreement or any counterpart of this Agreement, transmitted by facsimile machine or electronic mail in .pdf format shall have the same force and effect as original signatures.

IN WITNESS WHEREOF, the Parties have hereunto set their hands on the dates set forth below.

ASSIGNOR

EmblemHealth Services Company, LLC

Sign: _____
Print: Michael Palmateer
Title: Chief Administrative Officer

Date: 3/20/18

Group Health Incorporated

Sign: _____
Print: Michael Palmateer
Title: Chief Administrative Officer

Date: 3/20/18

Health Insurance Plan of Greater New York

Sign: _____
Print: Michael Palmateer
Title: Chief Administrative Officer

Date: 3/20/18

ASSIGNEE

Series 16-08-483 a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company

Sign: _____
Print: John H. Ruiz
Title: Authorized Officer

Date: 3/20/2018

MSP Recovery, LLC

Sign: _____
Print: John H. Ruiz
Title: Authorized Officer

Date: 3/20/2018

Exh. C to Emblem Purchase Agreement

8

