Exhibit 5

Confidential Information - Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2                  CAMDEN VICINAGE
3
    *****************************
4
    IN RE:  VALSARTAN, LOSARTAN,   MDL No. 2875
5   AND IRBESARTAN PRODUCTS
    LIABILITY LITIGATION           Civil No.
6                                  19-2875
    ***************************   (RBK/JS)
7
    THIS DOCUMENT APPLIES TO ALL   HON ROBERT B.
8   CASES                          KUGLER
9   ***************************
10            - CONFIDENTIAL INFORMATION -
              SUBJECT TO PROTECTIVE ORDER
11
12
13            Continued Remote Videotaped via
14   Zoom Deposition of MIN LI, Ph.D., commencing at
15   7:05 a.m. China Standard Time, on the 21st of
16   April, 2021, before Maureen O'Connor Pollard,
17   Registered Diplomate Reporter, Realtime
18   Systems Administrator, Certified Shorthand
19   Reporter.
20
21                     - - -
22
           GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24

Confidential Information - Subject to Protective Order

Page 288

```
 1  APPEARANCES:  ALL PARTIES APPEARED REMOTELY
 2
    MAZIE SLATER KATZ & FREEMAN, LLC
 3  BY:  ADAM SLATER, ESQ.
    BY:  CHERYLL A. CALDERON, ESQ.
 4  BY:  CHRISTOPHER GEDDIS, ESQ.
       103 Eisenhower Parkway
 5     Roseland, New Jersey 07068
       973-228-9898
 6     aslater@mazieslater.com
       ccalderon@mazieslater.com
 7     cgeddis@mazieslater.com
       Representing the Plaintiffs
 8
 9  HOLLIS LAW FIRM
       BY:  IRIS SIMPSON, ESQ.
10  BY:  C. BRETT VAUGHN, ESQ.
       8101 College Boulevard, Suite 260
11     Overland Park, Kansas 66210
       800-701-3672
12     iris@hollislawfirm.com
       Representing the Plaintiffs
13
14  MORGAN & MORGAN
       BY:  STEPHANIE JACKSON, ESQ.
15  BY:  HANNAH FUJIMAKI, ESQ.
       20 North Orange Avenue, Suite 1600
16     Orlando, Florida 32801
       sjackson@forthepeople.com
17     hfujimaki@forthepeople.com
       Representing the Plaintiffs
18
19  FLEMING NOLAN JEZ, LLP
       BY:  DAVID HOBBS, ESQ.
20     2800 Post Oak Boulevard
       Houston, Texas 77056
21     713-621-7944
       david_hobbs@fleming-law.com
22     Representing the Plaintiffs
23
24
```

Page 290

```
 1  APPEARANCES (Continued):
 2
    DUANE MORRIS, LLP
 3  BY:  FREDERICK R. BALL, ESQ.
       100 High Street
 4     Boston, Massachusetts 02110
       857-488-4229
 5     frball@duanemorris.com
       Representing the Defendants Zhejiang
 6     Huahai Pharmaceutical Co., Ltd.,
       Prinston Pharmaceutical Inc., Huahai
 7     U.S., Inc., and Solco Healthcare US,
       LLC
 8
 9  CIPRIANI & WERNER, P.C.
       BY:  JULIA H. FERTEL, ESQ.
10     450 Sentry Parkway
       Blue Bell, Pennsylvania 19422
11     610-567-0700
       jfertel@c-wlaw.com
12     Representing the Defendant Aurobindo
       Pharmaceuticals
13
14  PIETRAGALLO GORDON ALFANO BOSICK &
    RASPANTI, LLP
15  BY:  FRANK STOY, ESQ.
       One Oxford Centre
16     Pittsburgh, Pennsylvania 15219
       412-263-1840
17     fhs@pietragallo.com
       Representing the Defendant Mylan
18     Pharmaceuticals, Inc.
19
20  Also Present:  Phil Hughes
21
22  Videographer: Judy Diaz
23
24
```

Page 289

```
 1
 2
 3  APPEARANCES (Continued):
    GREENBERG TRAURIG LLP
 4  BY:  KATE M. WITTLAKE, ESQ.
       4 Embarcadero Center, Suite 3000
 5     San Francisco, California 94111
       415-655-1285
 6     wittlakek@gtlaw.com
       Representing the Defendants Teva
 7     Pharmaceutical Industries, Ltd., Teva
       Pharmaceuticals SA, Inc., Actavis LLC,
 8     and Actavis Pharma, Inc.:
 9  DUANE MORRIS, LLP
       BY:  NATHAN B. REEDER, ESQ.
10     30 South 17th Street
       Philadelphia, Pennsylvania 19103
11     215-979-1164
       nbreeder@duanemorris.com
12     Representing the Defendants Zhejiang
       Huahai Pharmaceutical Co., Ltd.,
13     Prinston Pharmaceutical Inc., Huahai
       U.S., Inc., and Solco Healthcare US,
14     LLC
15
16  DUANE MORRIS, LLP
    BY:  PATRICK C. GALLAGHER, ESQ.
17     1875 NW Corporate Boulevard
       Boca Raton, Florida 33431
18     561-962-2131
       pcgallagher@duanemorris.com
19     Representing the Defendants Zhejiang
       Huahai Pharmaceutical Co., Ltd.,
20     Prinston Pharmaceutical Inc., Huahai
       U.S., Inc., and Solco Healthcare US,
21     LLC
22
23
24
```

Page 291

```
 1            INDEX
 2  EXAMINATION                    PAGE
    MIN LI, Ph.D.
 3
 4  BY MR. SLATER                  296
 5
 6
 7       E X H I B I T S
 8  NO.     DESCRIPTION            PAGE
 9  ZHP-42    Previously marked.
             Response to DMF Information
10           Request Letter, Bates
             ZHP00079913 through 9945.....  472
11
12  ZHP-197   Previously marked.
             Article,
13           N,N-Dimethylformamide: much
             more than a solvent..........  411
14  ZHP-205   Previously marked.
             Document titled Valsartan,
15           USP (Process II), Bates
             HUAHAI-US00007752 through
16           7923......................  488
17  ZHP-206   Previously marked.
             Guideline on the Limits of
18           Genotoxic Impurities.........  321
19  ............................
20  ZHP-208   Previously Marked.
             Guidance for Industry,
21           Genotoxic and Carcinogenic
             Impurities in Drug
22           Substances and Products:
             Recommended Approaches.......  296
23
24  ZHP-209   Previously marked.
             IARC Monographs.............  458
```

Confidential Information - Subject to Protective Order

Page 292

1
2    ZHP-211    Previously marked.
        Sun, et al article,
3        Theoretical Investigation
        of N-Nitrosodimethylamine
4        Formation from Nitrosation
        of Trimethylamine, Bates
5        ZHP01807298 through 7308.....   413
6    ZHP-213    Previously marked.
        November 29, 2018 FDA
7        Warning Letter, Bates
        ZHP01544159 through 4164.....   425
8
9
            NEW EXHIBITS
10
11
12    ZHP-306    9/25/18 e-mail, Bates
        ZHP01390339.................   345
13    ZHP-307    List of deficiency letters,
        Bates ZHP00457705 through
14        7707.......................   349
15    ZHP-308    Letter from FDA to Huahai
        US Inc., Bates
16        PRINSTON00285416 through
        5422.......................   365
17
18    ZHP-309    Wang, et al paper titled
        Development of Liquid
19        Chromatography Electrospray
        Ionization Tandem Mass
20        Spectrometry Methods for
        Analysis of DNA Adducts of
21        Formaldehyde and Their
        Application to Rats Treated
22        with N-Nitrosodimethylamine
        or
23        4-(Methylnitrosamino)-1-(3-
        pyridyl)-1-butanone, Bates
24        ZHP00387118 through 7125.....   370

Page 293

1
2    ZHP-310    Draft Consensus Guideline,
        Assessment and Control of
3        DNA Reactive (Mutagenic)
        Impurities ini
4        Pharmaceuticals to Limit
        Potential Carcinogenic
5        Risk, M7...................   379
6    ZHP-311    Textbook, Purification of
        Laboratory Chemicals........   391
7    ZHP-312    Establishment Inspection
        Report, Bates
8        PRINSTON00162349 through
        2406.......................   436
9
10    ZHP-313    E-mail chain, Bates
        ZHP00388607................   494
11    ZHP-314    Document titled Health
        effects of amines and
12        derivatives associated with
        CO2 capture: Nitrosamines
13        and nitramines.............   496
14    ZHP-306-t  English translation of
        ZHP-306....................   346
15
16    ZHP-307-t  English translation of
        ZHP-307....................   349
17
18
19
20
21
22
23
24

Page 294

1                - - -
2        DEPOSITION SUPPORT INDEX
            - - -
3
    Direction to Witness Not to Answer
4    PAGE  LINE
    None.
5
6
7
8    Request for Production of Documents
    PAGE  LINE
9    None.
10
11
    Stipulations
12    PAGE  LINE
    None.
13
14
    Questions Marked Highly Confidential
15    PAGE  LINE
    None.
16
17
18
19
20
21
22
23
24

Page 295

1        P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  We're now on
4    the record.
5        My name is Judy Diaz.  I am the
6    legal videographer for Golkow
7    Litigation Services.
8        Today's date is April 21, 2021,
9    and the time is 7:05 a.m.
10        This remote video deposition is
11    being held in the matter of Valsartan,
12    Losartan, and Irbesartan Products
13    Liability Litigation MDL.
14        This is the continuation of the
15    deponent Min Li, Ph.D.
16        All parties to this deposition
17    are appearing remotely and have agreed
18    to the witness being sworn in
19    remotely.
20        All counsel will be noted on
21    the stenographic record.
22        And the court reporter is
23    Maureen Pollard.
24        ///

Confidential Information Subject to Protective Order

Page 296

1    MIN LI, Ph.D.,
2 having been previously duly remotely sworn,
3 was examined and testified further as
4 follows:
5    FURTHER EXAMINATION
6 BY MR. SLATER:
7    Q.    Good evening, or good morning.
8    A.    Good evening.
9    Q.    Dr. Li, did you review any
10 documents since last night's deposition?
11    A.    No.
12    MR. SLATER:  Cheryll, let's put
13 up Exhibit 208, please.
14    MR. BALL:  I think it would be
15 308.
16    MR. SLATER:  It's an old
17 exhibit.
18    MR. BALL:  Sorry.  Sorry.
19    MR. SLATER:  That's okay.  It's
20 probably the first time I was right
21 about any exhibit number.
22 BY MR. SLATER:
23    Q.    On the screen is Exhibit 208,
24 which is titled "Guidance for Industry,

Page 297

1 Genotoxic and Carcinogenic Impurities in Drug
2 Substances and Products:  Recommended
3 Approaches," and it's dated December 2008.
4    Do you see the document in
5 front of you?
6    A.    Yes.
7    Q.    And that's a document you're
8 familiar with, correct?
9    A.    I, you know, read it before.
10    MR. SLATER:  Cheryll, let's
11 turn, if we could, to page 7, please.
12 Great.
13    Q.    Looking under heading IV,
14 Section A is titled "Prevention of Genotoxic
15 and Carcinogenic Impurity Formation."
16    And it says, "Since
17 drug-related impurities presumably provide
18 limited, if any, therapeutic benefits and
19 because of their potential to cause cancer in
20 humans, every feasible technical effort
21 should be made to prevent the formation of
22 genotoxic or carcinogenic compounds during
23 drug substance synthesis or drug product
24 manufacturing."

Page 298

1    And my question first is, NDMA
2 and NDEA were drug-related impurities with
3 regard to valsartan, correct?
4    A.    Yes.
5    Q.    And -- rephrase.
6    Neither NDMA or NDEA provided
7 any therapeutic benefits to patients who took
8 valsartan, correct?
9    A.    I'm sorry, say that again?
10    Q.    Sure.
11    There was no therapeutic
12 benefits, there was nothing positive for the
13 patient about having NDMA and NDEA in the
14 valsartan they were taking, correct?
15    MR. BALL:  Objection.  Calls
16 for expert testimony.
17    A.    That I don't know.  I mean,
18 that up to toxicologists, you know, medical
19 doctor.  I mean, at this point it's probably
20 known, but...
21 BY MR. SLATER:
22    Q.    Are you saying you think there
23 may have been some benefit to patients?
24    A.    I don't know.  I mean, as I

Page 299

1 said, it's best to be answered by
2 toxicologists.
3    Q.    Well, one of the topics here is
4 "ZHP's evaluation and knowledge of the health
5 risks of the nitrosamines, including NDMA and
6 NDEA, including but not limited to as a
7 contaminant of ZHP's valsartan API and ZHP's
8 valsartan finished dose."
9    You do understand that's one of
10 the topics, correct?
11    A.    Mm-hmm.
12    Q.    In that context, I'm asking
13 you, are you saying there was some health
14 benefit to having NDMA and NDEA in --
15    A.    No, I'm not saying that.
16    Q.    -- the valsartan?
17    A.    I'm not saying that.  As I
18 said, you know, based upon up-to-date
19 knowledge, it probably does not have, okay.
20 But the ultimate answer is best to be
21 answered by, you know, toxicologists.
22    Q.    As you sit here now, there's no
23 benefit at all that you can point to of NDMA
24 or NDEA being in ZHP's valsartan, right?

1    A.    As I already said, you know, up
2  to this point, it does not have any
3  information to show that, as far as I know.
4    Q.    You have no information --
5    A.    I'm not the best person, you
6  know, you know, to provide a professional
7  answer to that.
8    Q.    Well, you're the only person
9  allowed to talk tonight about this, so
10  I'll -- I just want to confirm.
11        There's no benefit whatsoever
12  that you can think of now to having NDMA or
13  NDEA in ZHP's valsartan, correct?
14        MR. BALL:  Objection.  Calls
15    for expert testimony.
16        And I also think it's outside
17    the scope.  It's the health risks of
18    the nitrosamines, not any benefits of
19    the nitrosamines, Adam.
20    A.    I would agree with Rick.  I
21  mean, what we talk about here is really its
22  potential risk.
23  BY MR. SLATER:
24    Q.    I'll ask it differently then.

1        The presence of NDMA and NDEA
2  in ZHP's valsartan created a risk; it created
3  no benefit, correct?
4        MR. BALL:  Objection.
5    Compound.
6    A.    It's a potential risk.
7  BY MR. SLATER:
8    Q.    Certainly having NDMA or NDEA
9  in ZHP's valsartan increased the risk for a
10  person taking those pills to develop cancer.
11  That's why it's called a probable carcinogen,
12  correct?
13        MR. BALL:  Objection.  Calls
14    for expert testimony, compound.
15    A.    Again, I'm not the best person,
16  you know, to ask this question.  A
17  toxicologist would be much more appropriate.
18  BY MR. SLATER:
19    Q.    Based on your preparation for
20  the deposition, your review of all the
21  materials you reviewed, you would agree with
22  me that the presence of the NDMA and NDEA in
23  the valsartan created some level of increased
24  risk for cancer for people who took those

1  pills, correct?
2    A.    Again --
3        MR. BALL:  Objection.  Calls
4    for expert testimony.  Go ahead -- and
5    compound.
6        Go ahead, Dr. Li.
7    A.    If you look at some of the
8  FDA's, you know, issue statement, so their
9  assessment at this point is that overall, you
10  know, the overall risk remains to be very
11  small.  So that's all that I can understand.
12        You know, in terms how much,
13  you know, probability, as I said, again, it's
14  not really for me, you know, to speculate.
15  BY MR. SLATER:
16    Q.    With regard to the NDMA,
17  without us trying to quantify how much risk
18  there was, you would agree with me that the
19  NDMA in the valsartan increased the risk to
20  some level for the people who took those
21  pills to develop cancer?
22        MR. BALL:  Objection.  Calls
23    for expert testimony.
24    A.    You know, basically, I think

1  that's the same question that you already
2  asked, you know, quite a few times.
3  BY MR. SLATER:
4    Q.    Is the answer yes, that to some
5  extent there's an increased risk of cancer?
6    A.    As I told you, I'm not the best
7  person to give an answer on that.
8    Q.    Well, that is one of the topics
9  that you were designated to testify on.
10        And with due respect to my
11  esteemed colleague Mr. Ball, I don't think
12  it's expert testimony, because it's a
13  Court-ordered designation topic for a
14  corporate representative to answer questions
15  on this.  So that's why I'm trying to ask the
16  question.
17        MR. BALL:  Hold on for a
18    second.
19        We can stay on the record and
20    discuss this, or we can go off the
21    record and discuss it.  Which would
22    you prefer to do?
23        MR. SLATER:  I don't need to
24    discuss it.  I just wanted to -- I'm

Confidential Information - Subject to Protective Order

Page 304

1    happy to --
2         MR. BALL:  Then I'm going to
3    continue my objections, and he can
4    answer to the degree he can.
5         MR. SLATER:  Well, I will --
6         MR. BALL:  You can ask him if
7    there were evaluation and knowledge
8    related to --
9         MR. SLATER:  I'm not going to
10   have --
11        MR. BALL:  You mean -- I
12   offered to go off the record, Adam.
13        MR. SLATER:  You don't know
14   what I'm going to say.
15        MR. BALL:  You said you didn't
16   want to.
17        MR. SLATER:  Rick, relax, you
18   don't know what I'm going to say.
19        I'm going to give you a
20   standing objection to every time I ask
21   a question under this topic that
22   you're going to say calls for expert
23   testimony, I have my position, but
24   that way we don't have to argue about

Page 305

1    it.
2         MR. BALL:  I'm not every time
3    you ask a question on this topic.  I'm
4    going to ask the ones that actually
5    call for expert testimony as opposed
6    to ZHP's evaluation and knowledge of
7    the health risks of nitrosamines.
8         If you want to ask questions
9    about that as opposed to trying to put
10   words in his mouth, that's fine, but
11   that's not what you're doing.
12   BY MR. SLATER:
13        Q.    The presence of the NDMA in the
14   valsartan created a health risk, correct?
15        A.    I think anyway, you know, I
16   already answered this question, you know,
17   because according to today's knowledge or
18   whatever the information given by, for
19   example, like FDA's, right, it's not any
20   level, you know, of the presence will give
21   the potential risk.  It -- there is a
22   threshold as of today, okay.
23        As I said yesterday, you know,
24   the daily allowable intake defined by FDA is

Page 306

1    96 nanogram per day.
2         Q.    The NDMA levels in ZHP's
3    valsartan were higher in every single batch
4    that was tested than 96 nanograms, correct?
5         MR. BALL:  Objection.
6    Foundation.
7         A.    As I indicated, you know, this
8    is not correct because you really have to
9    differentiate, you know, the valsartan
10   product from which processes.  Okay.  From
11   the TEA processes, as far as I know, the vast
12   majority of them, you know, the tested were
13   below the 96 nanogram per day.
14   BY MR. SLATER:
15        Q.    Let's talk about the zinc
16   chloride process for a moment.  Every single
17   batch manufactured with the zinc chloride
18   process exceeded the FDA limit of
19   96 nanograms, correct?
20        MR. BALL:  Objection.
21   Foundation.
22        A.    Yeah, based upon, yeah, the
23   results, yeah, that we tested, yes.
24             ///

Page 307

1    BY MR. SLATER:
2         Q.    And for every single one of
3    those valsartan pills that was made with that
4    API with the zinc chloride process, there was
5    a health risk for those patients that used
6    those pills, correct?
7         MR. BALL:  Objection.
8    Foundation.  Asks for -- calls for
9    expert testimony.
10        A.    Well, I think the correct
11   answer or the statement or description would
12   be potential risk.
13   BY MR. SLATER:
14        Q.    The -- you used the word last
15   night "consensus."  The scientific consensus,
16   the majority of scientists who know -- who
17   are looking at this issue would agree that
18   there was an increased risk for those
19   patients who used the zinc chloride valsartan
20   manufactured by ZHP, they -- rephrase.  Let
21   me ask it again.
22        The consensus is that using the
23   valsartan that was manufactured with the zinc
24   chloride process increased those patients'

Case 1:19-md-02875-RMB-SAK   Document 2648-6   Filed 02/16/24   Page 8 of 57
confidential information — subject to protective order
PageID: 96420

1  risk to develop cancer.  We don't have to
2  argue about how much of an increase it is,
3  but you'd agree there was some increase as a
4  result of taking those pills, correct?
5          MR. BALL:  Objection.
6      Speculative, vague, and calls for
7      expert testimony.
8      A.    Again, the risk is potential
9  risk.
10         MR. SLATER:  Please go,
11     Cheryll, to page 8, if you could.  The
12     top of the page.  Perfect.
13  BY MR. SLATER:
14     Q.    At the top of page 8 there's
15  discussion about the threshold approach, and
16  it says in the last sentence, "However, there
17  are some compounds containing certain
18  structural groups (aflatoxin-like,
19  N-nitroso-, and azoxy-structures) that have
20  extremely high carcinogenic potency and are
21  excluded from the threshold approach."
22         You understand that, correct?
23     A.    Yes.
24     Q.    And N-nitroso compounds

1  includes NDMA and NDEA, correct?
2      A.    Yes.
3      Q.    And the reason that they're
4  excluded from the threshold approach is
5  because they're considered to be so dangerous
6  that they have to be evaluated on an
7  item-by-item basis, correct?
8          MR. BALL:  Objection.  Calls
9      for expert testimony, vague.
10     A.    I need to point out that here,
11  you know, the wording here, high carcinogen,
12  carcinogenic, you know, potency is really
13  referring to animal studies.
14  BY MR. SLATER:
15     Q.    Whatever studies it may be
16  based on, the consensus is that NDMA, for
17  example, has extremely high carcinogenic
18  potency and increases the risk of the patient
19  using a pill contaminated with NDMA of
20  developing cancer, correct?
21         MR. BALL:  Objection.  Vague,
22     calls for speculation, expert
23     testimony.
24     A.    Again, this is a potential

1  risk.
2  BY MR. SLATER:
3      Q.    It's a potential risk that no
4  patient would knowingly ever accept if they
5  had a choice of any other pill to control
6  their blood pressure, you would agree with
7  that, right?
8          MR. BALL:  Objection.
9      Speculative.
10     A.    Whatever medicine a patient
11  need to take, they need to ask or consult
12  with their doctors.
13  BY MR. SLATER:
14     Q.    Well, ZHP understands that the
15  reason that the worldwide regulatory
16  authorities required ZHP to stop selling its
17  valsartan was because the risk to patients of
18  developing cancer due to the nitrosamine
19  contamination was considered to be too great.
20  You understand that, right?
21         MR. BALL:  Objection.
22     Speculative.
23     A.    I think yesterday, yes, sir, I
24  indicated we voluntarily pull recall.  Okay.

1  And also as I mentioned yesterday, you know,
2  once we have complete our very intense, you
3  know, investigation, like it was in like two,
4  three weeks, you know, once we have, you
5  know, a -- you know, good numbers of, you
6  know, of the value of the NDMA, we
7  immediately contact FDA as well as, you know,
8  other regulatory agencies.  Okay.  We ask FDA
9  for, you know, guidance, right.  We ask them
10  whether we should immediately do the recall.
11         And as I mentioned yesterday,
12  the answer, or at least the initial answer
13  from the FDA, they ask us to hold on upon
14  further notifications.  Okay, so this is
15  exactly what happened.
16  BY MR. SLATER:
17     Q.    Let's go through a few of the
18  things you just said.
19         Number one, you're saying ZHP
20  made the decision to voluntarily recall the
21  valsartan contaminated with nitrosamines.
22  Did I understand you correctly?
23     A.    As I said, we contacted -- once
24  we, you know, have the results or the initial

1 results, we contacted FDA, okay, asking
2 whether we just should go ahead with the
3 recall.
4    Q.    You understood that a recall
5 was likely the appropriate next step after
6 you confirmed the nitrosamine contamination
7 of your valsartan, and that's why you asked
8 that question of the FDA, is that what you're
9 saying?
10         MR. BALL:  Objection.  Outside
11    the scope.
12         Go ahead and answer, Dr. Li.
13    A.    Because there was a potential
14 risk, right, so as a responsible company, you
15 know, once you confirm the initial results,
16 you know, have reliable results, you know, to
17 your best knowledge, you know, this is a
18 response the company should do, so that's
19 what ZHP did.
20 BY MR. SLATER:
21    Q.    As soon as ZHP knew that its
22 valsartan was contaminated with NDMA, the
23 responsible thing to do, as you just said,
24 was to contact the FDA and take steps to

1 recall the pills, correct?
2         MR. BALL:  Objection.
3    Compound, and mischaracterizes his
4    testimony.
5    A.    Yeah, that's basically what I
6 said.  Yeah.
7 BY MR. SLATER:
8    Q.    ZHP did not do that as of July
9 2017, correct?
10    A.    That I need to go to, I think,
11 one of the documents.  We have the timetable
12 of, you know, chronology of all the events.
13 I don't remember all the details.
14         But basically the thing is, as
15 I said, once we complete our initial
16 investigations, okay, and we just, you know,
17 quickly contact FDA.  And I think between the
18 initial contact and the FDA's next, you know,
19 actions, there -- the time was at least about
20 a week or maybe even longer, okay.
21    Q.    I think maybe you misheard my
22 question.  I'll ask it again.
23         As of July 27, 2017 --
24    A.    Oh, I'm sorry.  2000 -- well,

1 as I said, as a company as a whole, you know,
2 we didn't know that.
3    Q.    People within your company knew
4 this, correct?
5         MR. BALL:  Objection.  Vague,
6    speculative.
7 BY MR. SLATER:
8    Q.    All right.  I'll ask the
9 question again.  Stop for a second, Dr. Li,
10 I'll ask the question again.
11         As of July 27, 2017, there were
12 people in your company who were on notice,
13 including you, that the valsartan
14 manufactured with the zinc chloride process
15 was contaminated with NDMA, correct?
16    A.    No, that's not true.  As I
17 indicated yesterday, you know, based upon,
18 you know, the content, you know, of that
19 particular exhibit, you know, it looks like
20 he was making his speculations.
21    Q.    Whatever you want to call it,
22 speculations, he was correct and that was
23 confirmed for the worldwide regulatory
24 authorities, including the FDA, right, that

1 NDMA was in the valsartan that your company
2 was selling, right?
3         MR. BALL:  Objection.  Vague
4    and compound.
5    A.    That was after, you know, the
6 company become aware, after, you know, the
7 June 6, 2018.
8 BY MR. SLATER:
9    Q.    Well, it was after ZHP realized
10 that if it didn't tell the FDA about the
11 contamination with NDMA, that Novartis was
12 probably going to do so, so ZHP had no choice
13 at that point, right?
14         MR. BALL:  Objection.
15    Speculative and compound.
16    A.    That's your speculation.
17 That's not, you know, what I felt.
18 BY MR. SLATER:
19    Q.    Let's go back to my original
20 question.
21         In July of 2017, ZHP did not
22 notify the FDA that there was NDMA in the
23 zinc chloride process manufactured valsartan,
24 correct?

Confidential Information - Subject to Protective Order

1    A.   As I told you, you know, the
2  company did not know at the time.
3    Q.   I'm not -- well, my question is
4  whether or not the company notified the FDA
5  at that time.
6        MR. BALL: Dr. Li, that's a
7        yes-or-no question.  To the degree you
8        can answer yes or no, please answer
9        yes or no.
10   A.   Well, because the company did
11 not know, so the answer is no.
12 BY MR. SLATER:
13   Q.   You said earlier that the FDA
14 told ZHP not to recall the valsartan
15 immediately, or something to that effect,
16 correct?
17   A.   Something like that, yes.
18   Q.   And that was because the FDA
19 first needed to ensure that there was
20 adequate supply of blood pressure pills
21 before these pills would be pulled off the
22 market, because as bad as it was to have an
23 increased risk of cancer over time, it could
24 be worse for people to start having strokes

1  and heart attacks because they don't have the
2  blood pressure pills over the next week.
3        You understood that's what the
4  FDA was evaluating, right?
5        MR. BALL: Objection.
6        Speculation, calls for expert
7        testimony, compound, and I think every
8        other objection to form I could think.
9    A.   Yeah, I don't know exactly what
10 FDA was thinking at the time.
11 BY MR. SLATER:
12   Q.   Well, you're talking about what
13 the FDA -- you affirmatively -- rephrase.
14       You're the one who brought up
15 what the FDA told you or didn't tell you, so
16 that's why I'm asking what those discussions
17 were.
18       You apparently know about them,
19 right?
20   A.   They didn't tell us the reason.
21 They just said hold on.
22   Q.   Shortly after ZHP notified the
23 FDA about the NDMA in ZHP's valsartan, ZHP
24 stopped selling the valsartan and recalled

1  it, correct?
2        MR. BALL: Objection.
3        Compound.
4    A.   I'm sorry.  Say that again,
5  please?
6  BY MR. SLATER:
7    Q.   Sure.
8        Shortly after ZHP notified the
9  FDA that there was NDMA in the valsartan,
10 within a short period of time after that, ZHP
11 stopped selling that valsartan and recalled
12 it in the United States and worldwide,
13 correct?
14       MR. BALL: Objection.  Vague,
15       compound.
16   A.   I think I would really need to,
17 you know, take a look at that particular
18 timetable, you know, describing, you know,
19 like which events happened.
20       You know, it might -- we might
21 already, you know, like have stopped the
22 production, you know, or it may, you know,
23 happen almost at the same time.
24       But as I said, we have that

1  document.  So I think the best way is just,
2  you know, you know, you can upload that
3  document.  I mean, let's take a look, you
4  know, what exactly, you know, going to happen
5  every step.
6  BY MR. SLATER:
7    Q.   The reason that ZHP, as you
8  said, made the decision to recall and stop
9  selling its contaminated valsartan was
10 because ZHP deemed the health risk to
11 patients to be unacceptable, correct?
12       MR. BALL: Objection.  Vague
13       and compound.
14   A.   Again, I said it's a potential
15 risk.
16 BY MR. SLATER:
17   Q.   And it's a potential risk
18 that's unacceptable -- rephrase.
19       And it was a potential risk
20 that was unacceptable for patients, correct?
21       MR. BALL: Objection.  Vague,
22       and calls for expert testimony.
23   A.   Again, it's a potential risk to
24 patient.

Confidential Information Subject to Protective Order

Page 320

BY MR. SLATER:

Q. An unacceptable potential risk.
That's why ZHP stopped selling valsartan and
recalled it, correct?

MR. BALL: Objection. Vague,
mischaracterizes his prior testimony,
and foundation.

A. So according -- you know,
basically once we knew, you know, the
presence of NDMA, and, you know, once we knew
potentially, okay, to the patient, we -- you
know, as I said, after we confirmed the
results, okay, you know, we stopped the
production and distribution, and also
contact, you know, regulatory agencies.

BY MR. SLATER:

Q. And that's because ZHP knew
that the potential risk to patients of taking
those pills was an unacceptable health risk,
correct?

MR. BALL: Objection. Vague,
calls for expert testimony, and
mischaracterizes his earlier
testimony.

Page 321

A. Again, you know, as I said, you
know, you know, the best answer would be by a
toxicologist in terms of what level, you
know, is acceptable, what level is not
acceptable.

BY MR. SLATER:

Q. I am asking you the questions
because you were designated by ZHP to testify
on this topic, so you're the person I have to
ask the questions.

MR. BALL: That's not what
you're asking him, Adam. You're
asking him things that are outside
the -- you're asking for expert
testimony, you're not asking for
factual testimony, and you're putting
words in his mouth.

So feel free to ask him
questions which were within the topic.
I'm happy to have you do that.

MR. SLATER: Cheryll, let's go
now to a new exhibit. Let's go to
Exhibit 206, please. Thank you.

///

Page 322

BY MR. SLATER:

Q. On the screen is Exhibit 206,
which is the June 28, 2006 European Medicines
Agency Guidelines on the Limits of Genotoxic
Impurities, which was valid from January 1,
2007 to January 31, 2018.

Do you see that?

A. Mm-hmm.

MR. SLATER: Cheryll, let's go,
if we could, to page 4 of 8 at the
top, the section titled "Toxicological
Background," please.

THE WITNESS: Could you make it
a little bigger, please? Yes. Thank
you.

BY MR. SLATER:

Q. Section 4 of this document from
the European Medicines Agency is titled
"Toxicological Background," and it states,
"According to current regulatory practice it
is assumed that (in vivo) genotoxic compounds
have the potential to damage DNA at any level
of exposure and that such damage may
lead/contribute to tumour development. Thus

Page 323

for genotoxic carcinogens it is prudent to
assume that there is no discernible threshold
and that any level of exposure carries a
risk."

Do you see that?

A. Yes.

Q. NDMA is a genotoxic compound as
discussed here, correct?

A. Yes.

Q. NDEA is a genotoxic compound as
discussed here, correct?

MR. BALL: Objection. Vague.

A. Yes.

BY MR. SLATER:

Q. And when they talk about the
potential to damage DNA at any level of
exposure, they're talking about these being
mutagenic genotoxic compounds, correct?

MR. BALL: Objection.
Speculative and vague, calls for
expert testimony.

Go ahead and answer.

A. To the animals. These results
all derived from animal studies.

Confidential Information - Subject to Protective Order

Page 324

1 BY MR. SLATER:
2    Q.    Your understanding is that this
3 standard was written to determine whether or
4 to what extent genotoxic compounds would be
5 given to animals?
6        MR. BALL:  Objection to form.
7        Dr. Li, please let me get my
8    objection in.
9        Mischaracterizes his earlier
10    testimony.
11    A.    Well, basically all of those
12 results, okay, based upon, you know, you
13 know, documents like this, they all derived
14 from animal studies at very high dosage.
15 BY MR. SLATER:
16    Q.    Okay.  Coming back to the
17 question I asked you, when this refers to the
18 potential to damage DNA at any level of
19 exposure, that's talking about it being a
20 mutagenic, genotoxic compound, correct?
21        MR. BALL:  Objection.
22    Speculative.
23    A.    As I said, that the potential
24 risk here or understanding of whatever the

Page 325

1 description here, it was derived from animal
2 studies.  And also, I'm not sure, you know,
3 you know, the current, you know, M7, whatever
4 the exactly same, you know, opinion, you
5 know, you know, on this.  I think in M7 it
6 probably has an acceptable levels.  So maybe
7 that's why the reason, you know, you know,
8 this document become obsolete.
9 BY MR. SLATER:
10    Q.    I'll try it again.
11        When this refers to geno- --
12 rephrase.
13        When this refers to genotoxic
14 compounds have the potential to damage DNA at
15 any level of exposure, that's talking about
16 these genotoxic compounds being mutagenic,
17 that's what that means, correct?
18    A.    What I understand --
19        MR. BALL:  Objection --
20        THE WITNESS:  Go ahead.
21        MR. BALL:  Objection.
22    Speculative, calls for expert
23    testimony.
24        To the degree you can answer

Page 326

1 under your understanding, go ahead,
2    Doctor.
3    A.    Right.  Yeah.  So based upon
4 what I understand, all of these data are
5 results from animal studies, and it was very
6 high, you know, doses.
7 BY MR. SLATER:
8    Q.    Did I ask you what the basis
9 for this statement was in this EMA guidance
10 document in terms of what type of studies
11 this was based on?
12    A.    From some of the other
13 documents, I don't, you know, remember, like,
14 you know, either like M7 or some other --
15 FDA's document or EMA's document, or if you
16 can go to the literature, you know, all of
17 those data with nitrosamine, they were
18 derived from animal studies, as far as I
19 know.
20    Q.    The reference to genotoxic
21 compounds have the potential to damage DNA at
22 any level of exposure is a reference to
23 mutagenic/genotoxic compounds.  That's what
24 mutagenic means, right?

Page 327

1        MR. BALL:  Objection.
2    Compound, calls for expert testimony,
3    speculative, and foundation.
4    A.    Again, as I said, you know,
5 basically this statement, based upon my
6 understanding, okay, this statement was based
7 upon animal studies, okay, with very high
8 doses.
9        MR. BALL:  Adam, he's clearly
10    not understanding the question.  Maybe
11    if you ask it in a different way.
12        MR. SLATER:  This is a Ph.D
13    from Johns Hopkins.
14        MR. BALL:  Okay.  Adam, would
15    you like me to ask him a question?
16        MR. SLATER:  No.
17        MR. BALL:  I want to -- okay.
18 I'm just trying to help you out,
19 buddy.  I -- you know, I'm saying if
20 you're going to say that he's a Ph.D,
21 I'm just suggesting he's clearly not
22 understanding the question, because I
23 kind of understand the question, but
24 he is not.

Page 328

1   MR. SLATER: That's okay. I'll
2  do -- I'm doing the best I can.
3   MR. BALL: That's okay.
4   MR. SLATER: But I would prefer
5  that you not ask the questions.
6   MR. BALL: That's fine. I
7  won't, then.
8   MR. SLATER: Thank you.
9  BY MR. SLATER:
10   Q.   What does the term "mutagenic"
11  mean?
12   A.   Mutagenic, which means it cause
13  mutation in genes.
14   Q.   Damage to someone's DNA,
15  correct?
16   MR. BALL: Objection. Vague.
17   A.   As I said here, you know,
18  referring to this very statement here, okay,
19  it's based upon animal study, okay. Animal
20  study at the very high doses, okay, it shows
21  mutagenic to animals.
22  BY MR. SLATER:
23   Q.   A mutagenic/genotoxic impurity
24  by definition is one which can damage DNA,

Page 329

1  correct?
2   A.   Yeah, at very high doses.
3   Q.   This document from the European
4  Medicines Agency states in the sentence we
5  just went over, "Thus for genotoxic
6  carcinogens it is prudent to assume that
7  there is no discernible threshold and that
8  any level of exposure carries a risk."
9   That's a true statement,
10  correct? ZHP agrees with that statement,
11  right?
12   A.   That is a statement in that
13  document, yes, 2008.
14   MR. SLATER: Let's go to
15  page 6, please, Cheryll. Thank you.
16  Scroll up a little bit. A little
17  more. Wonderful. Thank you.
18   Q.   Looking at the center of the
19  page, the first full paragraph, this EMA
20  document states, "Some structural groups were
21  identified to be of such high potency that
22  intakes even below the threshold of
23  toxicological concern would be associated
24  with a high probability of a significant

Page 330

1  carcinogenic risk," and then there's
2  citations to two articles, one from 1999 and
3  one from 2004.
4   Do you see that?
5   A.   Yes.
6   Q.   A significant carcinogenic risk
7  would be a significant risk of developing
8  cancer. That's what that phrase means,
9  correct?
10   MR. BALL: Objection.
11  Foundation.
12   A.   It says a high probability.
13  And again, although I haven't gone through
14  these two papers, but based upon everything,
15  you know, that I know, these results most
16  likely derived from animal studies.
17  BY MR. SLATER:
18   Q.   When this phrase -- rephrase.
19   When this refers to a
20  significant carcinogenic risk, that means by
21  definition a significant risk of developing
22  cancer, correct? That's what those words
23  mean, right?
24   MR. BALL: Objection. Vague,

Page 331

1  foundation.
2   A.   It says, "a high probability of
3  a significant carcinogenic risk." It's still
4  a probability, although it's a high
5  probability.
6   Again, you know, this is from
7  animal studies.
8  BY MR. SLATER:
9   Q.   A significant carcinogenic risk
10  is a significant risk of developing cancer,
11  correct?
12   MR. BALL: Objection. Vague,
13  foundation.
14   A.   No matter what, you know, it's
15  still a probability.
16  BY MR. SLATER:
17   Q.   A carcinogenic risk is a risk
18  of developing cancer, correct?
19   MR. BALL: Objection. Vague,
20  foundation, and calls for expert
21  testimony.
22   A.   Well, based upon this wording,
23  right, this specific wording, carcinogenic
24  risk, you're right, it is, you know,

Confidential Information - Subject to Protective Order

Page 332

1  developing the risk for developing cancer.
2  But as I said here, if you look at the whole
3  sentence, okay, it says, "a high probability
4  of a significant carcinogenic risk."  So it's
5  still a risk.
6           And again, you know, as I said,
7  these study most likely, you know, based upon
8  animal studies.
9  BY MR. SLATER:
10      Q.    Does ZHP think it is a good
11  idea to sell pills contaminated with a
12  substance that carry with them a high
13  probability of a significant carcinogenic
14  risk?
15           MR. BALL:  Objection.
16      Argumentative, foundation.
17      A.    As I told you, you know, as a
18  company we didn't know until June 6, 2018.
19  So, you know, the company will not knowingly,
20  you know, you know, to distribute the
21  product.  So that's why, as I say, once we
22  knew, you know, at the company level and once
23  we determined, you know, the levels, okay, so
24  we did everything we can and contact agency

Page 333

1  and, you know, initiate the recall, you know,
2  everything.
3           MR. SLATER:  Cheryll, you
4      switched the page for some reason.
5           Can you scroll up a little bit
6      again just to get that paragraph a
7      little higher up on the page?  Thank
8      you.  That's good.
9  BY MR. SLATER:
10      Q.    It was not acceptable to sell
11  valsartan with NDMA contamination because of
12  the high probability of a significant
13  carcinogenic risk, correct?
14           MR. BALL:  Objection.
15      Mischaracterizes his earlier
16      testimony, calls for expert testimony.
17      A.    You know, as I told you, you
18  know, once, you know, once we knew, you know,
19  in June 2018 and once we determined, you
20  know, the levels, we immediately, you know,
21  contacted regulatory agencies and take
22  actions.
23  BY MR. SLATER:
24      Q.    Are you aware of studies that

Page 334

1  have been done concluding that it is probable
2  that NDMA will cause cancer in humans?
3      A.    I don't know, you know, what --
4  which is specific like a paper or study, you
5  know, that you are referring to, I mean.
6      Q.    Are you saying you're not
7  familiar with anything in the scientific
8  literature at all that says that it's
9  probable that NDMA will cause cancer in
10  humans?
11           MR. BALL:  Objection.
12      Mischaracterizes his testimony.
13      A.    As I said, that, you know,
14  basically as I said, you know, people making
15  those hypothesis or whatever, based upon
16  animal studies, okay.
17  BY MR. SLATER:
18      Q.    In preparing yourself to talk
19  about ZHP's evaluation and knowledge of the
20  health risks of nitrosamines, including NDMA
21  and NDEA, including but not limited to as a
22  contaminant of ZHP's valsartan API and ZHP's
23  valsartan finished dose, did you review any
24  studies addressing risk to humans of

Page 335

1  developing cancer due to exposure to NDMA?
2      A.    Yes, I did review some papers,
3  okay.  There is one particular, you know,
4  paper, you know, they came out after
5  ranitidine, you know, NDMA issue was, you
6  know, was discovered, okay.
7           That paper from my own
8  perspective, right, from a scientific design,
9  I think, you know, this is a very good study,
10  okay?  This study was published by a group of
11  Korean, you know, medical doctors.  Okay.
12           In this particular, you know,
13  retrospective review, right, they compared
14  40,000 patients, or maybe 40-plus thousand,
15  okay, patients taking ranitidine, okay.
16           Ranitidine by now, you know,
17  people know it will -- you know, ranitidine
18  will decompose, and also -- it will also, you
19  know, you know, metabolize within human body,
20  okay, to very high level of NDMA.
21           I think yesterday I may have
22  mentioned, I think, an average level, you
23  know, you know, with a single person taking
24  150 milligram of ranitidine, was 47 microgram

Confidential Information - Subject to Protective Order

Page 336

1  per day, okay?
2          And they compared, you know,
3  this group of patient with another group of
4  patient, 10,000-plus patient, taking
5  another -- you know, same class, like an
6  antacid, you know, drug which is called
7  famotidine, okay.
8          Famotidine, it is known by now
9  it will not, you know, decompose to give
10 NDMA, or it will not, you know, be
11 metabolized to give NDMA, right?
12         So they compared these two
13 group of people retrospectively.  And the
14 conclusion from this, you know, very well,
15 you know, controlled study, I think
16 the conclusion says there is no -- basically
17 there's no difference in terms of the cancer
18 risk between the two groups.
19    Q.    Is that the only study you're
20 aware of that's addressed this issue?
21    A.    That's the study that I just
22 came across most recently.  The vast
23 majority, you know, of the other paper, as
24 far as I, you know, came across, you know,

Page 337

1  they seem to be all -- you know, all, like,
2  related to animal.
3          There may be like, you know,
4  another one.  They may be doing a similar
5  study, you know.  But to me, you know, the
6  study design, you know, may not be very well,
7  you know, controlled.
8          I mean, because whenever you do
9  those things you -- from a scientific basis,
10 you know, you need to well control, you know,
11 you know, your patient population.  And also
12 your patient population need to be large
13 enough to be statistically meaningful, right?
14         So in this case, 40-plus
15 thousand versus 10,000, you know, 10,000-plus
16 control group, you know, to me it's a very
17 well-controlled study.
18    Q.    So you mentioned a study done
19 out of Korea.  Are you aware of any other
20 studies addressing the risk of cancer to
21 humans due to nitrosamines?
22    A.    There may be some, but I
23 haven't -- you know, due to my limited time,
24 I haven't, you know, had a chance to go

Page 338

1  through them, you know.
2          But as I said, you know, over
3  the course, you know, since June 2018, it
4  seems to me, you know, the vast majority of
5  the studies were based upon the animals.
6    Q.    Does ZHP have a collection of
7  literature regarding the risk to humans of
8  nitrosamine ingestion?
9    A.    I don't know that there is like
10 a -- like a complete, like a compilation,
11 but -- you know, but for myself during the
12 course of this preparation, I downloaded some
13 papers.
14    Q.    You've told us about a study
15 out of Korea.  Is there any other study known
16 to you or ZHP as you sit here now addressing
17 the risk to humans due to ingestion of
18 nitrosamines?
19    A.    There may be some others, but
20 as I said, you know, I haven't had a time,
21 you know, you know, to go through them.  So I
22 don't know the specifics, you know, the other
23 ones.  Maybe the other ones, you know, as I
24 said, I just came across.

Page 339

1          But this particular one,
2  because of, as I said, well designed, you
3  know, studies with large significant, you
4  know, you know, patient populations.
5    Q.    Coming back to the EMA
6  standard, this indicates in the paragraph
7  we've been reading on page 6, in the second
8  sentence, "This group of high potency
9  genotoxic carcinogens comprises
10 aflatoxin-like, N-nitroso-, and
11 azoxy-compounds that have to be excluded from
12 the threshold of toxicological concern
13 approach.  Risk assessment of members of such
14 groups require compound-specific toxicity
15 data."
16         Do you see what I just read?
17    A.    Yes.
18    Q.    And, again, when they --
19 rephrase.
20         When the EMA standards --
21 rephrase.
22         When this EMA guidance document
23 refers to N-nitroso-, they're talking about
24 nitrosamines including NDMA, correct?

Confidential Information - Subject to Protective Order

---

Page 340

1    A.    NDMA is one member of this
2  class compound.
3    Q.    And another -- rephrase.
4       Another nitroso compound is
5  NDEA, correct?
6    A.    Yes.
7    Q.    And the European Regulatory --
8  rephrase.
9       The European Medicines --
10  rephrase.
11       The European Medicines Agency
12  referred to NDMA and NDEA as "high potency
13  genotoxic carcinogens." That's how they're
14  referenced in this guidance document,
15  correct?
16    A.    As a group, they are
17  potentially high -- you know, high potency,
18  right. Here it says, yeah, you need to have
19  a, you know, compound, you know, you know,
20  specific.
21       But also, you know, like I
22  indicated yesterday, not all nitrosamine
23  compound they have the same, you know,
24  potential risk, okay? For example, as I

---

Page 341

1  mentioned, you know, impurity K of valsartan,
2  it has been treated as a regular impurity by
3  the original innovator, Novartis.
4    Q.    In terms of the nitrosamines
5  that are high potency genotoxic
6  carcinogenics, one of those is NDMA, right?
7    A.    As I said, the NDMA or NDEA,
8  they have potentially high risk -- potential
9  high risk, based upon animal studies.
10    Q.    That potential high risk is
11  considered to be unacceptable in valsartan,
12  correct?
13       MR. BALL: Objection.
14    Foundation, calls for expert
15    testimony.
16    A.    I think I answered, you know,
17  this question before. You know, with regard
18  to, you know, acceptable level in patient, I
19  think it's best answered by a toxicologist.
20  BY MR. SLATER:
21    Q.    In terms of what actually
22  happened in June of 2018, the consensus among
23  those scientists responsible for this issue
24  in the United States was that this risk was

---

Page 342

1  unacceptable for patients, correct?
2       MR. BALL: Objection. Vague,
3    calls for expert testimony, and
4    speculative.
5    A.    I think this is the same
6  question you just asked before.
7  BY MR. SLATER:
8    Q.    Is the answer yes?
9       MR. BALL: Go ahead and answer
10    if you can, Dr. Li.
11    A.    I already told you, you know,
12  this would be best answered, you know, by a
13  toxicologist.
14  BY MR. SLATER:
15    Q.    Well, I'm just asking,
16  factually the answer is yes, correct? That's
17  why you stopped selling valsartan, correct?
18       MR. BALL: Objection.
19    Mischaracterizes earlier testimony,
20    vague and speculative, and lacks
21    foundation.
22    A.    Again, you know, as I answered
23  it before, you know, the reason we, you know,
24  stop after, you know, we did our, you know,

---

Page 343

1  thorough investigation is based upon the
2  potential risk.
3  BY MR. SLATER:
4    Q.    All risks are potential,
5  correct?
6       MR. BALL: Objection. Vague.
7  BY MR. SLATER:
8    Q.    That's why they're called
9  risks.
10       MR. BALL: Objection.
11    Compound.
12    A.    I don't -- certain -- well,
13  it's all how you define it. There's certain
14  risk is confirmed, okay? It really, I guess,
15  depends upon the context when you discuss
16  risk.
17       I mean, I'm not an expert, you
18  know, you know, you know, like, you know, you
19  know, to discuss that exactly definition, you
20  know, you know, of risk, but I know, you
21  know, people use potential risks.
22       And also, you know, sometimes,
23  you know, they just use, you know, like seems
24  to be like a -- you know, a confirmed risk.

---

Confidential Information Subject to Protective Order

---

Page 344

BY MR. SLATER:

Q.   The scientific consensus is that ingesting NDMA as a contaminant of valsartan poses a health risk to those people that take the pills, correct?

MR. BALL: Objection. Objection. Foundation, calls for expert testimony, and speculative.

A.   I think you already asked several times. You know, essentially this is the same question you asked before. I think I already answered that.

BY MR. SLATER:

Q.   Well, is the answer to that question yes? The answer is yes, right?

MR. BALL: Objection. Mischaracterizes his earlier testimony.

A.   As I said, you know, our decision was based upon potential risk to humans.

MR. SLATER: Cheryll, we can take that one down. Give me one second to get organized, I will tell

---

Page 345

you what we're going to next, or ask you to take us to where we're going next.

Okay. Let's go to ZHP01390339, please.

(Whereupon, Exhibit Number ZHP-306 was marked for identification.)

MR. BALL: Hey, Adam, do you guys have a translated version of this that I can look at?

MR. SLATER: I think so. Cheryll can confirm. If we don't we'll make one for you, but I think we do.

MS. CALDERON: Give me one second, I'll put it in the --

MR. SLATER: No problem. Take your time.

(Pause.)

MR. SLATER: Are we good?

MR. BALL: I still don't have it. Hold on, maybe I need to refresh, sorry. No, I still -- I only have the

---

Page 346

305. Do you have like a 305A or a 306?

MS. CALDERON: I'm trying to load it now. Just give me one second.

MR. BALL: Okay.

MR. SLATER: Just let me know.

MS. CALDERON: All right. I was on mute.

Do you see it?

MR. BALL: Let me refresh. Is it 306?

MS. CALDERON: I did 306-t.

MR. BALL: Yep, got it. Thank you. I'm trying to open it now.

(Whereupon, Exhibit Number ZHP-306-t was marked for identification.)

MR. BALL: Cheryll, that's not showing me any -- there we go, okay. Sorry. It opened.

MS. CALDERON: Okay.

MR. BALL: It just look a long time to open, sorry.

///

---

Page 347

BY MR. SLATER:

Q.   Okay. On the screen we have Exhibit -- gosh, I don't know what number we're up to. I lost track.

MS. CALDERON: 306.

MR. SLATER: 306.

Q.   On the screen we have Exhibit 306, which is an e-mail that was sent to you on September 25, 2018. Who sent that e-mail to you?

A.   It's Mr. Lin.

Q.   Jinsheng Lin?

A.   Yes, Jinsheng Lin. Yes.

Q.   And just to refresh our recollection again, as of 2018 what was his position in your department?

A.   I think he should be like associate technical director.

Q.   Mr. Lin wrote to you, and since the e-mail is short, maybe you could tell us what it says, please.

A.   Sure. Yeah, basically, you know, it's the same thing, you know, for the title of the attachment. Yeah, essentially

---

Confidential Information - Subject to Protective Order

Page 348

1  it's the list of the potential organic
2  impurity of valsartan basically.  Yeah,
3  that's what it is.
4      Q.   It says that there's a list of
5  potential organic purities for valsartan and
6  points out that impurity K is not listed,
7  correct?
8      A.   Oh, yes, mm-hmm, it says, yes.
9      Q.   And why did he point out that
10 impurity K was not listed in this list of
11 potential organic purities for valsartan?
12        MR. BALL:  Objection.
13        I think you mean impurities,
14     Adam, not purities.
15        MR. SLATER:  Did I say
16     purities?
17        MR. BALL:  You said purities.
18 BY MR. SLATER:
19     Q.   Oh.  I'll ask it again.
20     Why did Mr. Lin point out to
21 you that impurity K was not listed in this
22 list of potential organic impurities for
23 valsartan?
24     A.   I don't know.  I don't know why

Page 349

1  he did that.  Maybe that's already confirmed,
2  you know.  So because here it says list of
3  potential, so impurity K, you know, because
4  as I said, you know, from the very beginning
5  it has been controlled as a regular impurity,
6  and it's sort of -- you know, at this point,
7  you know, it's quite well-known.
8      Q.   If I understand what you've
9  been saying is it's your testimony that
10 impurity K was controlled as a regular
11 impurity, not as a nitrosamine impurity, is
12 that what you're telling me?
13     A.   Yes.
14        MR. BALL:  Objection.
15     Mischaracterizes his testimony.  But
16     go ahead.  Sorry.
17     A.   Yeah, the answer is yes.
18        MR. SLATER:  Let's go now to a
19     new document, ZHP00457705, which we
20     will mark as Exhibit 307.
21        (Whereupon, Exhibit Numbers
22     ZHP-307 and ZHP-307-t were marked for
23     identification.)
24        ///

Page 350

1        MR. SLATER:  And hopefully
2  we'll turn it.
3        MR. BALL:  Yeah, can we upload
4  an English version for me?  Thank you.
5        THE WITNESS:  Could you
6  increase the scale?  It's --
7        MR. SLATER:  Cheryll, download
8  the -- upload the English version
9  first, let's get that to Rick first,
10 and then we'll worry about this
11 document.
12        MS. CALDERON:  I am having an
13 issue uploading to the link, I just
14 have to restart it.  If you just give
15 me a minute.
16        MR. SLATER:  No problem.
17        Can we go off?  I just got a
18 message from Cheryll, she's lost her
19 feed.
20        MR. BALL:  Okay.  That's fine.
21        Do you want to take a break now
22 then, Adam?  We've got about an hour
23 ten.
24        MR. SLATER:  That's fine.

Page 351

1  That's probably a good idea.
2        MR. BALL:  Okay.  Go ahead.
3        MR. SLATER:  Let's go off the
4  record, Judy.
5        MR. BALL:  Yeah, go off the
6  record.
7        THE VIDEOGRAPHER:  The time
8  right now is 8:14 a.m.  We're off the
9  record.
10        (Whereupon, a recess was
11 taken.)
12        THE VIDEOGRAPHER:  The time
13 right now is 8:29 a.m.  We're back on
14 the record.
15 BY MR. SLATER:
16     Q.   On the screen is a document
17 we've marked as Exhibit 307.  Do you see
18 that?
19     A.   Mm-hmm.
20     Q.   And what's the title of that
21 document?  What does it say at the top?
22     A.   It says "Drug Substance Product
23 Deficiency Letter Progress," and then it
24 looks like a date, 2020, March 19th.

Page 352

```
1      Q.    So this is a list of deficiency
2  letters having to do with the drug substances
3  and their progress in being responded to?
4      A.    Yes.
5      Q.    Looking at the --
6      MR. SLATER:  If you could
7  scroll up a little bit, Cheryll, so we
8  get all of Box 5.  Great.  You've got
9  to scroll down a little bit, actually.
10     MR. BALL:  Adam, can I say one
11  thing?
12     MR. SLATER:  What?
13     MR. BALL:  The English
14  translation of this, it makes no sense
15  at all, none.  I'm sure Cheryll could
16  read it to you and let you know that
17  it makes no sense.
18     We'll go ahead with the
19  deposition, and if I have questions
20  regarding what Dr. Li is reading, we
21  can -- we can address that, but --
22     MR. SLATER:  Do you want to --
23  do you want to take a moment, we'll go
24  off and you can have it translated?
```

Page 353

```
1      MR. BALL:  No, I'd like you to
2  provide a translation that's actually
3  understandable.  For example, I can
4  read you some of what it says --
5      MR. SLATER:  No, I don't need
6  you to.  I'm saying -- let's go off
7  the record for a second if we're going
8  to discuss this.
9      MR. BALL:  Okay.
10     THE VIDEOGRAPHER:  The time
11  right now is 8:30 a.m.  We're off the
12  record.
13         (Off the record discussion.)
14     THE VIDEOGRAPHER:  The time
15  right now is 8:32 a.m.  We're back on
16  the record.
17  BY MR. SLATER:
18     Q.    Looking at Box Number 5 --
19  actually let's start at the top with the
20  headings.
21         The left-hand column the
22  heading is "Number," so we can understand
23  that.  That's just a listing of each of the
24  deficiency letters?
```

Page 354

```
1      A.    Mm-hmm.
2      Q.    The next column next to Number,
3  what does that heading say?
4      A.    That's the product name.
5      Q.    What's the third column
6  heading?
7      A.    It's the market.
8      Q.    When you say "the market,"
9  meaning the country where it's sold?
10     A.    Right.
11     Q.    What's the fourth column
12  heading?
13     A.    The fourth column, you mean in
14  terms of market, right?
15     Q.    The first column was number,
16  the second column was the product name, the
17  third was the market.  What's the fourth
18  column heading?
19     A.    Oh, I'm sorry.  Basically it's
20  the summary of the main issue.  Yeah.
21     Q.    What is the fifth column
22  heading?
23     A.    The fifth column heading -- you
24  mean you want me to go through, you know, the
```

Page 355

```
1  summary of the main deficiency or the main
2  issue?
3      Q.    No.  What I'm asking you is,
4  we've been going across the top row where the
5  headings -- where the titles of each of the
6  columns is set forth.
7         So the left-hand column, the
8  first column was number.
9      A.    Uh-huh.
10     Q.    The second column was product
11  name.
12     A.    Right.
13     Q.    The third column was the
14  market.
15     A.    Right.
16     Q.    The fourth column was the
17  summary of the main issue.
18         I'm asking you what the heading
19  on the fifth column is now.
20     A.    Oh, I'm sorry.  Okay.  That's
21  the progress.  Yeah, current status and the
22  progress.
23     Q.    Okay.  And what's the last
24  column, the sixth column?
```

Confidential Information – Subject to Protective Order

Page 356

1    A.   That's the expected submission,
2  you know, to the regulatory agencies.
3    Q.   When you say "the expected
4  submission," is that a date or --
5    A.   Or day or, yeah, or month,
6  whatever, yeah.
7    Q.   Now, applying those headings,
8  we'll be able to walk through the fifth row,
9  number 5.
10         Do you see number 5 down there?
11   A.   Mm-hmm, yep.
12   Q.   What is the product name for
13  row 5?
14   A.   Valsartan.
15   Q.   What is the market?
16   A.   US market.
17   Q.   Then in the summary of the main
18  issue, tell me if I understand this
19  correctly.  The first line has to do with
20  reprocessing plan for the NDMA and the NDEA
21  for the old process?
22         MR. BALL:  Adam, I'm going to
23     object.  You clearly have an English
24     translation of this that you have

Page 357

1  refused to share with us.  So you may
2  proceed if you want, but --
3         MR. SLATER:  What I said is I
4     don't have a translation of the entire
5     document.  That's why I asked Dr. Li
6     to translate.
7         But why don't we go off the
8     record.  Hang on.  Let's go off the
9     record.
10        THE VIDEOGRAPHER:  The time
11     right now is 8:36 a.m.  We're off the
12     record.
13         (Off the record discussion.)
14        THE VIDEOGRAPHER:  The time
15     right now is 8:36 a.m.  We're back on
16     the record.
17  BY MR. SLATER:
18   Q.   Looking at line number 2 in the
19  fourth column, can you tell me what that
20  says, please?
21   A.   You mean the number 1 in the
22  first column, right?
23   Q.   Well, we just went through
24  number 1, right?

Page 358

1    A.   Okay.  Yeah, okay, yeah.
2    Q.   Let me ask the question.
3         In the fourth column, which is
4  the heading you said was summary of the main
5  issue --
6    A.   Right.
7    Q.   -- what does number 2 say?
8    A.   It says, impurity K and
9  impurity L, it said required to be controlled
10  as nitrosamine impurity.
11   Q.   And that would have been the
12  requirement from the FDA in the United
13  States, correct?
14         MR. BALL:  Objection.  Calls
15     for expert -- calls for a legal
16     conclusion.
17   A.   Let me provide a more complete
18  background, okay?
19         So, as I mentioned, you know,
20  since the very beginning, you know,
21  impurity K and -- you know, has been
22  controlled as a regular impurity, okay, at
23  1,000 ppm.
24         And impurity L is a, you know,

Page 359

1  closed structure analog of impurity K.  So
2  essentially it's like the impurity of the
3  impurity, okay.
4         And based upon the
5  quantitative, you know, structure-activity
6  relationship, okay, impurity L, you know, can
7  be also treated as a regular impurity, okay.
8         And so with regard to this
9  particular request or the deficiency letter
10  from the FDA, right, during -- well, this is
11  because we filed an amendment, okay, as far
12  as I understand, okay, to the FDA submitting
13  our, you know, optimized or -- you know, with
14  a separate quenching valsartan, you know,
15  improved process, okay?
16         So in that submission we
17  were -- you know, we were referring to, you
18  know, the control of, you know, impurity K as
19  a regular impurity by pointing or referencing
20  European, you know, you know, you know,
21  regulatory documents, okay.
22         And then FDA responded, right?
23  I think that was like about, you know, more
24  than one year ago, okay.  FDA basically says,

1  okay, if I, you know, remember, you know,
2  correctly, I think it basically says for
3  impurity K, although it said your statement
4  saying, you know, impurity K is Ames
5  negative, right?
6        And however, okay, at that
7  point, okay, FDA says we still need you guys
8  to, you know -- you have some like -- you
9  know, like two or three options, okay, to go
10  ahead.
11        First, we require you to do,
12  you know, in vivo animal studies, right, so
13  that's number one.
14        Number two, if you, you know,
15  was not able to do the animal study, then you
16  need to control as, you know, as a
17  nitrosamine or treated as a nitrosamine
18  impurity.  Okay.  So that's where, you
19  know -- you know, how the issue basically,
20  you know, came out.
21        So for this specific request,
22  right, and from our regulatory, you know, you
23  know, affairs department, I think, you know,
24  they probably, you know, requires, you know,

1  you know, CEMAT to develop a -- like a
2  quantitative method to give a more accurate,
3  you know, you know, method to control, you
4  know, you know, to see either, you know, you
5  know, impurity K or L can be controlled as a
6  nitrosamine impurity, which means, you know,
7  a specification of like 26.5 nanogram per
8  day, okay?
9        So I think, yeah, this is, you
10  know, you know, you know, is -- basically,
11  again, if my memory, you know, you know, you
12  know, is correct, so this is basically how,
13  you know, this came out, right?
14        I think in the end, based upon
15  our study, impurity K could not be, you know,
16  controlled at such a low level, okay, due to
17  the nature of the process chemistry.  Okay?
18        So then after that, we revert
19  to another, you know, like option 1, right,
20  because FDA say, you know, you need to do the
21  in vivo animal study.  And if the animal
22  study results is negative, then, you know,
23  you communicate that to us and then we'll --
24  you know, basically, you know, they will

1  decide whether, you know, it can be qualified
2  as a regular impurity.
3        So in the end we, you know,
4  contracted an external, you know, CRO, okay,
5  to do a particular in vivo animal study; it's
6  called a comet assay.
7        This particular comet assay is
8  also mentioned in the M7, okay, as part of
9  the in vivo, you know, test, you know,
10  evaluating the, you know, the -- ultimately
11  the, you know, the potential, you know,
12  carcinogenic, you know, potential.  Okay.
13        So -- yeah.  So afterwards, you
14  know, because from the process, as I said,
15  based upon the nature of the process, you
16  know, you just cannot control at such a low
17  level.  So we -- as I said, we revert to
18  option one, okay.
19        So we have to prepare enough
20  quantity and then, you know, send out for
21  this comet assay.  And the results of the
22  comet assay cannot be negative.  Okay.
23        And then I think in the
24  beginning of this year we submitted, you

1  know, this result to the FDA, okay?  So this
2  exactly, you know, how everything evolved or
3  happened.
4  BY MR. SLATER:
5     Q.    Coming back to my question, was
6  it the FDA that directed ZHP to control
7  impurities K and L as nitrosamine impurities?
8     A.    I think I already explained it
9  quite clearly.  They gave us two options.
10        One option is to do in vivo
11  animal studies.  Okay.  So basically what
12  that means is if in vivo animal study cannot
13  be negative, you know, they may, you know,
14  accept our, you know, you know, argument
15  that, you know, impurity K can be treated as
16  a regular impurity, which is already or still
17  being done, you know, based upon the policy
18  from European regulatory agencies.  Okay.
19        So the option two is if we, you
20  know, is not able, like it was not able to do
21  that, for whatever the reason, right, lack of
22  resources or no CRO, for example, you know,
23  you know, in China would do that kind of
24  study, then we need to control impurity K and

Confidential Information - Subject to Protective Order

Page 364

1  L as, you know, nitrosamine, like a default,
2  you know, specification, which, as I
3  mentioned, 26.5 nanogram per day.
4       Q.    You said that number 2
5  indicated that impurity K and impurity L were
6  required to be controlled in accordance with
7  nitrosamine impurities.  I'm simply asking
8  was it the FDA that was requiring that.
9            MR. BALL:  Objection.  Asked
10      and answered, and it mischaracterizes
11      his earlier testimony.
12      A.    Again, you know, this statement
13  is taking, you know, you know, out of the
14  context.  Okay.  In this particular case,
15  probably in every cases, okay, you cannot
16  taking, you know, your question out of the
17  context.  Okay.  So I already repeated it
18  twice, right?
19            So there's two options, okay.
20  Only if we are not able to do the option one,
21  then, you know, we will need to do the option
22  two, which is to control that as nitrosamine
23  default values.  Okay.  So, you know, so
24  otherwise, you know, you are basically, you

Page 365

1  know, not saying, you know, you know, you
2  know -- I mean, it would be very much
3  misleading, okay?
4  BY MR. SLATER:
5       Q.    The deficiency letter that's
6  being addressed in row 5 was a deficiency
7  letter from the FDA, correct?
8       A.    It is for FDA, based upon our,
9  you know, the amendment to submit our, you
10  know, newly improved, you know, valsartan
11  process.
12            And by the way, you know, by
13  the way, this process has already been
14  accepted by the European regulatory agencies.
15  We already resume the supply of valsartan
16  drug substances to the European market as
17  well as to the Chinese market.
18            MR. SLATER:  Let's take that
19      document down, and the next document
20      we'll go to which will be Exhibit 308,
21      it will be PRINSTON00285416.
22            (Whereupon, Exhibit Number
23      ZHP-308 was marked for
24      identification.)

Page 366

1  BY MR. SLATER:
2       Q.    On the screen we have
3  Exhibit 307, which looks like it was -- has a
4  fax date at the top of March 18, 2020.
5            MS. CALDERON:  Adam, it's 308.
6      I'm sorry to interrupt.
7            MR. SLATER:  The exhibit number
8      is 308?
9  BY MR. SLATER:
10      Q.    Exhibit 308, which has a March
11  2020 fax stamp at the top, is a letter from
12  the FDA to Huahai US as US agent for ZHP.
13            Do you see that?
14      A.    Yes, I see that.
15      Q.    And it --
16            MR. SLATER:  Scroll down,
17      please, Cheryll.
18      Q.    This indicates, "Dear Sir:
19  This communication is in reference to your
20  Type II Drug Master File for Valsartan USP
21  (Process II)."
22            And I want to stop there.  What
23  is Valsartan Process II?
24      A.    Process II, I think it is -- by

Page 367

1  this time it should have been the zinc
2  chloride process.
3            MR. SLATER:  Let's go to the
4      second page, please, paragraph
5      number 5.
6       Q.    This states, "In the
7  January 21, 2020 amendment you stated in
8  3.2.S.2.2 that impurities K and L were
9  negative in the Ames assay and that these
10  could be controlled as 'any single impurity'
11  at NMT 0.10 percent in the drug substance.
12  Please note that our clinical group has
13  stated that Ames assays may not fully
14  characterize the mutagenicity of N-nitroso
15  compounds due to species-specific differences
16  in metabolic activation of potential
17  mutagens."
18            Do you see what I just read?
19      A.    Yeah, mm-hmm.
20      Q.    The letter continues, "These
21  N-nitroso compounds are identified as part of
22  the 'cohort of concern' for potent
23  carcinogenic effects, therefore additional
24  caution and a more robust characterization of

Page 368

1 their mutagenic potential is warranted. We
2 recommend the following regarding the nitroso
3 valsartan and nitroso valsartan methyl ester
4 impurities in valsartan drug substance," and
5 then there's two --
6     A.    Two options.
7     Q.    -- two options indicated.
8         Do you see that?
9     A.    Oh yeah.  Yeah.  That's exactly
10 what I said, two options.
11     Q.    Number one says, "Reduce
12 Impurities K and L in your drug substance to
13 levels that are below the reporting threshold
14 of 0.03 parts per million."
15         Do you see that?
16     A.    Mm-hmm.
17     Q.    And the second option is to
18 "characterize each impurity in an in vivo
19 gene mutation assay," and then it describes
20 that.
21         Do you see that?
22     A.    Oh, yeah, sure.
23     Q.    At no time did the FDA or any
24 regulatory agency tell ZHP that it could

Page 369

1 treat NDMA or NDEA as -- I need to rephrase
2 the question.
3         At no time did the FDA permit
4 ZHP to treat NDMA as anything other than a
5 nitrosamine impurity once the FDA became
6 aware of it, correct?
7     A.    We're talking about here, you
8 know, impurity K and L.  I mean, now you're
9 switch, you're talking about NDMA.
10     Q.    Okay.  I asked -- do you want
11 me to reask my question?
12     A.    Sure.
13     Q.    At any time did the FDA tell
14 ZHP that it did not have to control NDMA as a
15 nitrosamine impurity?
16     A.    No.
17     Q.    At any time did the FDA tell
18 ZHP that it did not have to control NDEA as a
19 nitrosamine impurity?
20     A.    No.
21     Q.    The impurity that led to the
22 recall of the zinc chloride process valsartan
23 was NDMA, correct?
24     A.    Yes.

Page 370

1     Q.    The impurities that led to
2 the -- well, withdrawn.
3         MR. SLATER:  Okay.  I think we
4 finished that document.  We'll take
5 that down.
6         Cheryll, let's now go to
7 ZHP00387118, please.
8         (Whereupon, Exhibit Number
9 ZHP-309 was marked for
10 identification.)
11 BY MR. SLATER:
12     Q.    On the screen we have what
13 we've now marked as Exhibit -- gosh, I should
14 know what I'm talking about before I start
15 talking about the exhibit.
16         On the exhibit -- rephrase.
17         On the screen is Exhibit 309,
18 which is a scientific literature article.
19         Do you see that?
20     A.    Yeah, mm-hmm.
21     Q.    And it's titled, excuse my
22 pronunciations, "Development of Liquid
23 Chromatography Electrospray Ionization Tandem
24 Mass Spectrometry Methods for Analysis of DNA

Page 371

1 Adducts of Formaldehyde and Their Application
2 to Rats Treated with NDMA or
3 4-(Methylnitrosamino)-1-(3-pyridyl)-1-
4 butanone," and it says that it was a 2007
5 publication.
6         Do you see that?
7     A.    Yes.
8     Q.    And this article, I believe --
9 well, rephrase.
10         This is an article that you've
11 read, correct?
12     A.    I have not gone through this
13 particular article.
14     Q.    Are you sure about that?
15     A.    Yeah, I'm pretty sure.  I may
16 have -- I don't know, I may have downloaded
17 it, but I can tell you I just haven't gone
18 through, you know, this particular article in
19 details.
20     Q.    Let's go through -- I actually
21 didn't complete introducing the article so
22 let me just make sure for the record I
23 address it -- rephrase.
24         This article was written by --

Page 372

1 it looks like there's a handful of authors,
2 just for the record their names are Mingyao
3 Wang, Guang Cheng, Peter Villalta, and
4 Stephen S. Hecht, and it looks like from the
5 University of Minnesota Cancer Center.
6        Do you see that in front of
7 you?
8     A.   Oh, yeah, yeah.  Yeah, could
9 you maybe, you know, increase, you know, just
10 a little bit?  Yeah.  Yeah, that's better.
11 Thank you.
12        MR. SLATER:  Let's go, if we
13     could, Cheryll, to the second page of
14     the article.  I want to talk about a
15     particular part of it.
16        I'm only going to use the
17     left-hand column, so if it needs to be
18     larger it's fine.
19        That's good.  And you can just
20     scroll up now.  Perfect.
21     Q.   Looking at the left-hand column
22 at the top it says, "NDMA and NNK are
23 representative N-nitroso methyl carcinogens.
24 Beginning with the landmark studies of Magee,

Page 373

1 Dutton, Heath, and Druckrey nearly 50 years
2 ago, well-established pathways of metabolic
3 activation of nitrosamines involving
4 cytochrome P450-mediated a-methyl
5 hydroxylation have been described in the
6 literature."
7        Do you see what I'm reading?
8     A.   Mm-hmm.
9     Q.   It says further, "As shown in
10 Scheme 1, methyl hydroxylation of NDMA and
11 NNK yields intermediates 5 and 9, which
12 spontaneously release reactive
13 diazohydroxides 6 and 10.  These
14 diazohydroxides or the corresponding
15 diazonium ions react with DNA, producing
16 adducts such as 06-methyl-dGuo from NDMA and
17 06-pyridyloxobutyl-dGuo (06-POB-dGuo) from
18 NNK."
19        I want to stop there.  This is
20 talking about these nitrosamines reacting
21 with and causing changes to DNA, correct?
22     A.   Could we just scroll up a
23 little bit?  I just want to take a look at
24 the, you know, the reaction scheme.

Page 374

1     Q.   Yes.
2     A.   Okay.  So what is the question?
3 I'm sorry.
4     Q.   They're talking about these
5 nitrosamines having an impact and reacting
6 with and changing DNA, correct?
7     A.   Yes.  But it looks like, you
8 know, as I said, this whole research was
9 based upon animal studies.  Yeah, so from the
10 animal study at very high doses, looks like,
11 you know, they isolated these DNA or -- yeah,
12 you know, adducts.  Yeah, that's what it
13 says, it looks like.
14        MR. SLATER:  Cheryll, please
15     scroll back down to where we were so
16     we can get to the -- perfect.  Thank
17     you.
18     Q.   The article continues, "The
19 roles" -- I just read that.  Rephrase.
20        Actually, I didn't get there.
21 Let me continue.  New question.
22        Continuing now, it says, "The
23 roles in carcinogenesis of these and related
24 methyl- and pyridyloxobutyl DNA adducts of

Page 375

1 NDMA, NNK, and other N-nitroso compounds have
2 been extensively studied," and I want to stop
3 there.
4        And you would agree with me
5 that there are a lot of studies talking about
6 the fact that NDMA and NNK and other
7 nitrosamine are carcinogenic, correct?
8        MR. BALL:  Objection.  Vague.
9     A.   Based upon the statement here,
10 it looks like, yeah, that's the case.  But
11 again, you know, based upon, you know, my
12 knowledge, you know, as I said, of these
13 studies, you know, they were based upon
14 animal studies.
15 BY MR. SLATER:
16     Q.   The last sentence of this
17 section says, "In this paper, we present the
18 first evidence that formaldehyde DNA adducts
19 are formed in the lung and liver of rats
20 treated with NDMA and NNK."
21        Do you see that?
22     A.   Yes.
23     Q.   So when they -- rephrase.
24        When they discuss treating rats

Confidential - Subject to Protective Order

Page 376

1 with NDMA, they're talking about giving NDMA
2 to these rats in order to intentionally cause
3 them to develop cancer, correct?
4         MR. BALL:  Objection.  Vague,
5     and mischaracterizes the document.
6     A.    Looks like this is what it
7 says.
8 BY MR. SLATER:
9     Q.    And you know that NDMA has been
10 used for many years, and it's well understood
11 to give cancer to laboratory animals so they
12 can then be studied, because it's so
13 efficient at causing cancer, correct?
14         MR. BALL:  Objection.  Calls
15     for expert testimony, foundation,
16     vague.
17     A.    As I indicated, or as I
18 answered before, animal study, you know, at a
19 very high dose, you know, it issues
20 carcinogenic to the animals.
21 BY MR. SLATER:
22     Q.    It's accepted in the scientific
23 community that NDMA very efficiently causes
24 cancer in laboratory animals when scientists

Page 377

1 want to study the cancer in those laboratory
2 animals, correct?
3         MR. BALL:  Objection.  Calls
4     for expert testimony, testimony
5     foundation, vague.
6     A.    Based upon the description in
7 this particular paragraph, or in particular
8 the last sentences, it didn't say that, you
9 know.  It just said the first evidence
10 formaldehyde NDMA -- I'm sorry
11 formaldehyde DNA adducts are formed in the
12 livers of rats treated with NDMA and NNK.  So
13 it didn't say anything else.
14         MR. SLATER:  Let's go now to
15     the page where the Bates number is
16     123, the last three digits, please.
17     It's the "Discussion" left-hand column
18     on that page.  I just want to bring up
19     the discussion there.  Perfect.  Thank
20     you.
21 BY MR. SLATER:
22     Q.    Here now in the "Discussion"
23 part of this article, which was provided to
24 us by ZHP from ZHP's own files, it states

Page 378

1 that first "The results of this study provide
2 the first evidence for the presence of
3 formaldehyde DNA adducts in laboratory
4 animals."
5         Do you see that?
6     A.    Uh-huh, sure.
7     Q.    If we go down a little further
8 in that paragraph, about halfway down it
9 says, "The method was applied to rats treated
10 with the carcinogenic nitrosamines NDMA and
11 NNK, and the results demonstrate for the
12 first time that formaldehyde DNA adducts are
13 produced from these carcinogens, in addition
14 to the well-characterized adducts, which
15 result from diazohydroxides formed in
16 nitrosamine metabolism."
17         Do you see that?
18     A.    Yes.  Let me read it through
19 again.
20         (Witness reviewing document.)
21     A.    Okay, yeah.
22     Q.    When this refers to NDMA as a
23 carcinogenic nitrosamine, that means from a
24 scientific perspective that it's a

Page 379

1 nitrosamine that causes cancer, correct?
2         MR. BALL:  Objection.  Vague,
3     calls for expert testimony,
4     mischaracterizes the document.
5     A.    I mean, again, as I, you know,
6 answered previously, it's carcinogenic to
7 animal -- you know, laboratory animals, and
8 it's, you know, it's a probable carcinogenic
9 to humans.
10 BY MR. SLATER:
11     Q.    You said "it's a probable
12 carcinogenic to humans"?  That's the last
13 part you said?
14     A.    Yes.
15         MR. SLATER:  Okay.  We can take
16     this document down now.  Just give me
17     a second.  I'll find the next one
18     hopefully.  There it is.
19         Cheryll, let's go now to the
20     2013 ICH Consensus Guideline, please.
21     Thank you.
22         (Whereupon, Exhibit Number
23     ZHP-310 was marked for
24     identification.)

Confidential Information - Subject to Protective Order

Page 380

1    MR. SLATER:  Sorry, I'm having
2 trouble with my binder clip here.  I
3 feel like I have to get my binder
4 clips in place before I can move to
5 the next thing.
6    MR. BALL:  I have the same
7 problem from time to time.  I hate
8 when they flip off of everything and
9 go all over my office.
10    MR. SLATER:  Yep, they squeeze
11 off and they fly all over.
12    MR. BALL:  Yep, exactly.
13 BY MR. SLATER:
14    Q.    Looking now at this exhibit,
15 which is --
16    MR. SLATER:  Is this 310?
17 Gosh, am I ever right about the
18 exhibit number?
19    MS. CALDERON:  No.  But it's
20 310, yes.
21    MR. SLATER:  That's a suspect
22 response.
23    MS. CALDERON:  You were right
24 this time.

Page 381

1    Q.    Do you see Exhibit 310 in front
2 of you?
3    A.    Yes, I do.
4    Q.    And you've mentioned the ICH
5 guidelines during the course of the
6 deposition, and this is the one --
7    MR. SLATER:  If you could
8 scroll up a little, Cheryll.
9    Q.    It will show that it was dated
10 February 6, 2013.
11    Do you see that?
12    A.    Mm-hmm.
13    Q.    The title of this document is
14 "Assessment and Control of DNA Reactive
15 (Mutagenic) Impurities in Pharmaceuticals to
16 Limit Potential Carcinogenic Risk."  And it
17 says then "M7."
18    Do you see that?
19    A.    Mm-hmm.
20    Q.    Just to be clear on the title
21 and the purpose of this document is to
22 prevent human beings from developing cancers
23 as a result of pharmaceutical drugs, correct?
24    MR. BALL:  Objection.

Page 382

1 Foundation.
2    A.    It's already, you know, stated
3 very clear, right?  It's for the purpose to
4 limit the potential carcinogenic risk.
5 BY MR. SLATER:
6    Q.    It's to limit the potential
7 carcinogenic risk for human beings ingesting
8 pharmaceutical products, correct?
9    A.    Yes.
10    Q.    More specifically, it's seeking
11 to limit that potential carcinogenic risk as
12 a result of DNA reactive or mutagenic
13 impurities in those pharmaceutical products,
14 correct?
15    MR. BALL:  Objection.
16 Foundation.
17    A.    Based upon this title, yes.
18    MR. SLATER:  Let's go, if we
19 could, Cheryll, to page 2, please.
20 There's a heading number 3 that says
21 "General Principles."  You just --
22 there you go.
23 BY MR. SLATER:
24    Q.    Looking at heading 3 titled

Page 383

1 "General Principles," the first sentence
2 says, "The focus of this guideline is on DNA
3 reactive substances that have a potential to
4 directly cause DNA damage when present at low
5 levels leading to mutations and therefore,
6 potentially causing cancer."
7    So that's giving some overview
8 of what the purpose of this standard is,
9 correct?
10    A.    Mm-hmm.
11    Q.    Going to the second paragraph,
12 it starts out, "A Threshold of Toxicological
13 Concern (TTC) concept was developed to define
14 an acceptable intake for any unstudied
15 chemical that will not pose a risk of
16 carcinogenicity or other toxic effects."
17    Do you see that?
18    A.    Mm-hmm.
19    Q.    So the threshold of
20 toxicological concern is, according to this
21 document, applicable to a certain class of
22 pharmaceutical products, correct?
23    A.    Looks like.
24    MR. SLATER:  Cheryll, could you

Confidential Information - Subject to Protective Order

Page 384

1    scroll down a little bit so we can get
2    that -- perfect.  Thank you.
3        Q.    At the end of that paragraph it
4    says, "Some structural groups were identified
5    to be of such high potency that intakes even
6    below the TTC would theoretically be
7    associated with a potential for a significant
8    carcinogenic risk.  This group of high
9    potency mutagenic carcinogens ('cohort of
10   concern') comprises aflatoxin-like,
11   N-nitroso-, and azoxy-compounds."  Correct?
12       A.    Yes.
13       Q.    And the N-nitroso compounds
14   include NDMA, correct?
15       A.    Yes.
16       Q.    And N-nitroso compounds include
17   NDEA, correct?
18       A.    Yes.
19           MR. SLATER:  Cheryll, could you
20       go to page 5, please?  Thank you.  You
21       can scroll up a little bit more.  No,
22       the other way.  That should do it.
23       Q.    Section 5.2 is titled
24   "Degradants," or Degradants.  How would you

Page 385

1    pronounce that?
2        A.    Usually pronounce it degradant.
3        Q.    Okay.  I'll go with your
4    pronunciation.
5            Section 5.2 is titled
6    "Degradants."  And if we go down to the
7    second to last paragraph in that section it
8    says, "Knowledge of relevant degradation
9    pathways can be used to help guide decisions
10   on the selection of potential degradation
11   products to be evaluated for mutagenicity,
12   e.g., from degradation chemistry principles,
13   relevant stress testing studies, and
14   development stability studies."
15           I want to stop there and first
16   ask you what is -- what is a degradation
17   pathway?  What does that mean?
18       A.    Well, basically how a drug --
19   you know, a drug substance will decompose,
20   you know, to form, you know, maybe sometimes,
21   you know, first through an intermediate and
22   then to its final product.  So basically it's
23   just a pathway, you know, or sometimes you
24   may call it a mechanism, a degradation

Page 386

1    mechanism.
2        Q.    A degradation pathway can also
3    include decomposition of an ingredient in a
4    manufacturing process -- well, rephrase.
5            A degradation pathway can
6    also -- well, rephrase.
7            Degradation can also refer to
8    decomposition yielding impurity, correct?
9        A.    To be precise --
10           MR. BALL:  Objection.  Asked
11       and answered.
12       A.    Sorry, yeah.
13           To be precise, the degradants
14   that we discuss here or the document discuss
15   here is typically related to after the making
16   of a drug substance, okay.  So once you have,
17   you know, the final isolated pure drug
18   substances that have met the -- your
19   registered specifications, right, so from
20   that point, okay, you will perform the
21   stability study, okay.
22           So based upon that, you know,
23   you will examine whether that particular drug
24   substance will decompose to give a number of,

Page 387

1    you know, degradation products.
2            Or the same thing is true, you
3    know, once you formulate that already made,
4    you know, that drug substance into a finished
5    product, right, and so you're making a
6    finished or dosage form.  So the degradants
7    or the degradation product, you know,
8    examination start from that point once you
9    make that product.
10           So during the process something
11   will decompose, but, you know, it's -- it's
12   basically outside the scope of, you know, of
13   what this document is talking about.  I would
14   believe, you know, when we're talking about,
15   you know, drug degradation is, you know, is
16   the -- these two scenarios that I just, you
17   know, described.
18   BY MR. SLATER:
19       Q.    Looking at the paragraph --
20   rephrase.
21           Looking at the first paragraph
22   under the heading "5.2.  Degradants," the
23   second sentence says, "Actual drug product
24   degradation products include those observed

Confidential Information - Subject to Protective Order

1  above the ICH Q3B reporting threshold during
2  storage of the drug product in the proposed
3  long-term storage conditions and primary and
4  secondary packaging."
5        That's what you were just
6  talking about, right?
7    A.   Yes.
8    Q.   That's after the product has
9  been manufactured and is now going to be
10 stored and then it's going to be, I would
11 assume, shipped and packaged, etcetera,
12 right?
13   A.   Exactly.
14   Q.   This says that the actual drug
15 product degradation products also include
16 those impurities that arise during the
17 manufacture of the drug product, correct?
18   A.   Let's see.  Well, right here,
19 yeah, that's what it says.
20   Q.   And coming back now to the
21 paragraph second from the bottom of this
22 section, when it talks about "Knowledge of
23 relevant degradation pathways can be used to
24 help guide decisions on the selection of

1  potential degradation products to be
2  evaluated for mutagenicity," that's talking
3  about an assessment that's made to evaluate
4  potential risks, so you want to look for
5  those potential products of the degradation
6  process, correct?
7        MR. BALL:  Objection.
8    A.   Yes.
9        Sorry.
10 BY MR. SLATER:
11   Q.   And that's something that's
12 evaluated when a risk assessment is performed
13 on a manufacturing process, correct?
14   A.   Right.
15   Q.   And it talks about, in
16 performing that assessment, looking at
17 degradation chemistry principles, and that
18 would be looking at the science, right,
19 looking at the actual science of how these
20 substances may degrade, correct?
21   A.   Yes, look at the science and
22 also the knowledge, yeah, knowledge being,
23 yeah, derived from science and, you know,
24 known to, you know, a specific group of the

1  communities like the process chemists.
2    Q.   For example, in the manufacture
3  of pharmaceutical drug substances such as
4  valsartan, process chemists are part of that
5  process to risk assess and evaluate based on
6  science what are the potential degradation
7  products of that manufacturing process,
8  right?
9    A.   Yes.
10   Q.   And it's required that that
11 risk assessment be thorough and
12 scientifically based, for example, in
13 scientific literature, correct?
14       MR. BALL:  Objection.
15 Foundation, calls for a legal
16 conclusion.
17   A.   To the scope, to the scope, you
18 know, because to the best knowledge of the
19 process science, you know, chemists, you
20 know, at that time.
21 BY MR. SLATER:
22   Q.   All right.  We're going to come
23 back to this, but I want to go through a
24 couple things first.

1        MR. SLATER:  So the next thing
2  I'd like to do, Cheryll, is go to the
3  next document, which I guess is
4  Exhibit 311, which is the 1996
5  textbook Purification of Laboratory
6  Chemicals, please.
7        (Whereupon, Exhibit Number
8  ZHP-311 was marked for
9  identification.)
10       MR. SLATER:  And this will be
11 Exhibit 311.  Thank you.
12 BY MR. SLATER:
13   Q.   Looking at Exhibit 311, this is
14 a textbook titled Purification of Laboratory
15 Chemicals.
16       Do you see that?
17   A.   Mm-hmm.
18   Q.   And on the next page we can see
19 that the date of publication was 1996.
20       Do you see that?
21   A.   Mm-hmm.
22   Q.   And then it says it was
23 reprinted multiple times, 1997, 1998, 1999,
24 and 2000, correct?

Confidential Information - Subject to Protective Order

---

Page 392

1    A.    Mm-hmm.
2         MR. SLATER:  Cheryll, let's now
3    scroll down to page 192, please.  Down
4    to the bottom of the page, the last
5    paragraph, please.  Perfect.
6    Q.    I'm looking now at page 192,
7    you can see that there's an entry for
8    "N,N-dimethylformamide," and then in
9    parentheses "DMF."
10        Do you see that?
11   A.    Mm-hmm.
12   Q.    And DMF was one of the solvents
13   used as part of the zinc chloride process,
14   correct?
15   A.    Yes.
16   Q.    And this indicates in this
17   textbook that DMF "Decomposes slightly at its
18   normal boiling point to give small amounts of
19   dimethylamine and carbon monoxide."
20        Do you see that?
21   A.    Okay.
22   Q.    And it says, "The decomposition
23   is catalyzed by acidic or basic materials, so
24   that even at room temperature DMF is

---

Page 393

1    appreciably decomposed if allowed to stand
2    for several hours with solid KOH, NaOH or
3    CaH2."
4         Do you see that?
5    A.    Mm-hmm.
6    Q.    And you would agree with me
7    that from the perspective of the chemistry
8    community, the potential decomposition of DMF
9    was something that was known and was known by
10   mainstream chemists, correct?
11        MR. BALL:  Objection.  Calls
12   for speculation, expert testimony.
13   A.    You know, this description did
14   not give specifics, okay.  It's kind of a --
15   and also, you know, here it says, you know,
16   if it's allowed, you know, to be in contact
17   with solid, you know, KOH, sodium chloride,
18   you know, you know, calcium hydride, these
19   are all very strong, you know, you know,
20   base.
21   BY MR. SLATER:
22   Q.    It was understood, and this --
23   we saw the dates before, that this was in
24   print between 1996 and 2000, this textbook,

---

Page 394

1    at least this version as of the time that
2    this -- rephrase.
3    A.    Mm-hmm.
4    Q.    This textbook documents
5    scientific knowledge as of the late 1990s and
6    2000 that DMF decomposes slightly at its
7    normal boiling point to give small amounts of
8    dimethylamine and carbon monoxide.  That's
9    what's stated in that first sentence,
10   correct?
11   A.    Mm-hmm.
12        MR. BALL:  Objection.
13   Objection.  Mischaracterizes the
14   document, calls for expert testimony,
15   and vague.
16        MR. SLATER:  One second, I just
17   want to get that down.
18        MR. BALL:  And calls for
19   speculation.
20        MR. SLATER:  You said
21   mischaracterizes the document, vague,
22   speculation.
23        MR. BALL:  And expert
24   testimony.

---

Page 395

1         MR. SLATER:  Expert testimony.
2    BY MR. SLATER:
3    Q.    That's what that sentence says,
4    correct?
5    A.    That's what sentence says, yes.
6    Q.    And in terms of scientific
7    knowledge, as of the late 1990s and 2000s, it
8    was known that DMF could decompose to give
9    off small amounts of dimethylamine, correct?
10        MR. BALL:  Objection.  Calls
11   for expert testimony, and speculation.
12   A.    So there is, yeah, this
13   description here, I mean, obviously.  But,
14   you know, based upon my understanding, you
15   know, at the time of 2011 and 2012, you know,
16   there is no, like, patterns or specific
17   literatures indicating, you know, you know,
18   you know, valsartan process chemistry
19   utilizing DMF or, you know, slight amount of
20   the impurity of DMF would -- you know, would
21   cause an issue.
22        So the bottom line is, you
23   know, there was a knowledge gap, you know,
24   you know, at the time, and so...

---

Confidential Information - Subject to Protective Order

Page 396

1    Another thing is that
2  basically, you know, everything, you know,
3  can decompose to certain, you know, degree,
4  right, particularly, you know, under some --
5  you know, by in contact with very strong
6  base, you know, like, for example, here.
7    So when it's encountered with
8  this, you know, you know, you know, strong
9  base, you know, this would not be, you know,
10 relevant with the zinc chloride process.
11   So that process during that
12 tetrazole formation, you know, you know, you
13 know, particular step during the reaction, it
14 did not use such a strong acid -- I'm sorry,
15 base, you know, KOH or, you know, sodium
16 hydride or whatever.
17 BY MR. SLATER:
18   Q.   You said something -- well,
19 rephrase.
20   As part of the risk assessment,
21 the scientific analysis of the process
22 required that the potential decomposition of
23 DMF would be taken into account in the risk
24 assessment for the zinc chloride process,

Page 397

1  correct?
2    A.   Well, what I'm just saying is
3  that at the time of this process development,
4  it appears, you know, this minor
5  decomposition did not fall into the knowledge
6  base, you know, during that particular time
7  period.
8    Q.   When you say "didn't fall into
9  the knowledge base," you mean didn't fall
10 into the knowledge base of the people at ZHP
11 performing the risk assessment, correct?
12   A.   It's not only the ZHP, you
13 know, because I believe that, you know, you
14 know, this particular process is also
15 utilized, you know, by other, you know,
16 companies.
17   And also I would utilize -- you
18 know, I would like to point out, you know,
19 some other companies, they use, you know, the
20 same zinc chloride process, but instead of
21 utilizing, you know, DMF, you know, they use
22 another nitrogen-containing solvent, which is
23 NMP, you know, I guess we have discussed NMP
24 yesterday, you know, as like, you know, an

Page 398

1  alternative sample diluent for the test base
2  GMS.
3    So for that process, similar
4  things happen, right, I mean retrospectively.
5  And so for the similar process, if you
6  utilize NMP, then, you know, retrospectively
7  now we know that NMP would also -- you know,
8  during that process will decompose slightly,
9  and then during the quenching it would form,
10 you know, the other N-nitroso, you know,
11 compound.  I think it's called an NMBA.
12   So, you know, basically, you
13 know, you know, it -- you know, now
14 retrospectively, you know, looking at the --
15 you know, this issue and certainly these
16 minor decomposition of the solvent, you know,
17 did not fall into the knowledge base, you
18 know, of all of these process chemists.
19   Q.   When you said this information
20 about DMF decomposition to give off
21 dimethylamine was not within the knowledge
22 base specific to valsartan manufactured by
23 ZHP with the zinc chloride process, you were
24 referring to the knowledge base of ZHP,

Page 399

1  correct?
2    A.   What I'm saying is it's not
3  only ZHP.  You know, anyone utilizing, you
4  know, the same or similar process, you know,
5  they had the same issue, now looking back.
6    And also, you know, you know,
7  you know, in our process as well as, you
8  know, other, you know, you know, companies'
9  process, they have all been submitted, you
10 know, numerous times, you know, to the
11 regulatory agencies, you know, you know,
12 different countries.
13   So prior to, you know,
14 June 2018, you know, all of those, you know,
15 process chemists, you know, after, you know,
16 their regulatory review, they all get
17 approved, you know, during that period.
18   So basically, you know, I would
19 say, you know, it's fair to say, like, you
20 know, from FDA's, you know, you know, some of
21 the document says, you know, during that time
22 period the industry as well as regulators,
23 you know, had a knowledge gap.
24   Q.   Certainly in the chemistry

Confidential Information - Subject to Protective Order

Page 400

1 community it was known that DMF could
2 decompose, give off small amounts of
3 dimethylamine, and that this could happen
4 either in acidic or basic environments,
5 correct?
6          That's what it says right
7 there, right?
8          MR. BALL:  Hold on.  Objection.
9     Vague, calls for speculation, and
10     calls for expert testimony.
11     A.    You know, basically, again, you
12 know, as I said, here it says, you know, in
13 context with a, you know, strong base, it
14 will -- you know, it will decompose.
15          A lot of things, you know, a
16 lot of organic solvents, you know, if you
17 treat it with strong base, you know, it would
18 decompose.  And, you know, it's all based
19 upon, you know, the context.
20 BY MR. SLATER:
21     Q.    This says that the
22 decomposition of DMF is catalyzed by acidic
23 or basic materials, and you agree with me it
24 can happen due to acidic or basic materials,

Page 401

1 correct?
2          MR. BALL:  Objection.
3     Mischaracterizes his earlier
4     testimony, and mischaracterizes the
5     document.
6     A.    The sentence just says quite,
7 you know, vaguely, just said, you know, by
8 acidic or basic, right.
9          So it gives examples, specific
10 examples of base, but here it didn't give
11 specific examples of acids, right?  I don't
12 see any acids being mentioned here.
13 BY MR. SLATER:
14     Q.    Our jumping-off point to this
15 was the requirement under the ICH standard to
16 apply degradation chemistry principles in
17 order to perform a risk assessment.  And
18 since ZHP was going to use DMF in the zinc
19 chloride process, they needed to do that
20 analysis with regard to DMF, correct?
21     A.    You know, at the time of the
22 process development, okay, DMF was considered
23 to be a very stable solvent, okay?  And as a
24 matter of fact, you know, DMF is still, you

Page 402

1 know, from a process chemistry perspective in
2 general, is still a very stable solvent.  It
3 all depends upon, you know, a particular
4 combination of -- you know, of different
5 facts, right?
6          So with regard to the zinc
7 chloride, you know, you know, process, either
8 utilizing the DMF or like other company
9 utilizing, you know, NMP, only when you, you
10 know, in that specific, you know, you know,
11 particular combination, now we know
12 retrospectively, you know, that very tiny or
13 low amount of decomposition would cause, you
14 know, this problem.  But otherwise, you know,
15 it still would be fine.
16          I mean, like our, you know,
17 newly, you know, improved process, right?
18 Once we, you know, found the root cause and
19 then we do the separate quenching, so we
20 still using DMF right now.
21          And, you know, as I indicated,
22 you know, yesterday, our valsartan now have,
23 you know, undetectable, you know, level of
24 NDMA.  You know, the detection limit is only

Page 403

1 5 ppb, which is, you know, 60 times lower
2 than the current FDA's requirement, which is
3 300 ppb.
4     Q.    What is CaH2?
5     A.    Oh, that's calcium hydride.
6     Q.    Is that an acid?
7     A.    No, that's a base.  That's a
8 very strong base.
9     Q.    What is NaOH?
10     A.    Sodium hydrochloride.  Yeah,
11 that's a very basic, you know, you know, you
12 know, base.  Yeah.
13          I mean, I guess if somebody --
14 I mean, like when I first learned chemistry,
15 sodium, you know, hydrochloride is probably
16 the first base that I learned.
17     Q.    Coming back to my question,
18 in -- rephrase.
19          In performing its risk
20 assessment, ZHP was required to evaluate by
21 applying degradation chemistry principles to
22 the potential degradation of DMF since it was
23 going to be used in the zinc chloride
24 process, correct?

Confidential Information - Subject to Protective Order

1    MR. BALL: Objection. Vague,
2  and asked and answered.
3    A.    Based upon -- you know, based
4  upon what I know, okay, the original, you
5  know, you know, process chemist, okay, they
6  considered or they utilized this
7  degradation -- you know, you know, you know,
8  considering the degradation chemistry.
9         But the minor degradation of
10  DMF, it was just not falling to, you know,
11  the knowledge base. Not only with ZHP, as I
12  indicated; also with other companies utilize
13  the same or similar process.
14         So what that's supposed to mean
15  is that during that particular time period,
16  you know, within the process chemist, you
17  know, you know, circle, this was not a
18  concern, or this knowledge, you know, was not
19  there.
20         So that's what I meant, you
21  know. There was a knowledge gap, you know,
22  as indicated by, you know, some of those
23  FDA's training material.
24  BY MR. SLATER:

1    Q.    There was no knowledge gap
2  regarding the potential decomposition of DMF
3  to give off dimethylamine. That was
4  something that was known, and I'm showing you
5  a mainstream textbook that says it. That was
6  no secret, right?
7    MR. BALL: Objection.
8  Argumentative, speculative, and
9  mischaracterizes his testimony.
10    A.    Look, chemistry as well as all
11  of the other sciences, I mean, it's -- you
12  know, it has enormous details in terms of the
13  knowledge, okay. And now, you know, we
14  looking back, you know, the critical thing is
15  that, you know, someone, or a group of people
16  or regulators, you know, you know, need to
17  connecting those dots, they scattered, you
18  know, you know, here and there. Otherwise,
19  you know, yeah, I mean these piece of
20  knowledge, you know, could be here and there,
21  right.
22         I mean, when we, you know, come
23  up with a solution or finding, you know,
24  people, you know, very often can go back and

1  then now realize, you know, oh, yeah, if you
2  were to connecting these dots, you know,
3  together at the time, you know, you may, you
4  know, you know, avoid, you know, that issue.
5         But, you know, but that's also,
6  you know, part of the, you know, knowledge
7  base, right. Not only we talking about the
8  individual pieces knowledge here and there,
9  you know, also you need to, you know,
10  making -- you know, you know, connecting the
11  dots.
12         So that's another level, you
13  know, of the knowledge. And, you know, so
14  that's what I, you know, meant, you know,
15  specifically with regard to this issue, you
16  know. It is -- nobody, you know, throughout
17  industry as well as the regulator, you know,
18  at the time, you know, were able to
19  connecting all the dots.
20  BY MR. SLATER:
21    Q.    And my questions are specific
22  to the people who worked at ZHP when the zinc
23  chloride process was being developed. Those
24  people who were in charge of that process

1  needed to perform a risk assessment that
2  included evaluating the potential
3  decomposition of DMF as part of that process,
4  it's something that had to be considered,
5  correct?
6    A.    As I told you, you know, also
7  if you look at some of the FDA's, you know,
8  you know, released documents, you need to
9  have that knowledge, or you need to have the
10  knowledge, you know, to connecting, you know,
11  those dots, you know, otherwise, you know,
12  you would have a knowledge gap.
13         Once you had that knowledge
14  gap, you -- you know, it will not lead you to
15  that direction. But as I said, in general
16  during the, you know, process development,
17  ZHP's, you know, process chemists look at
18  the, you know, the degradation issues.
19         But as I said, you know, due to
20  the knowledge gap, it just didn't lead them,
21  you know, to this particular issue.
22    Q.    Did you just say that ZHP's
23  process chemists looked at the degradation
24  issues as part of the process change?

1    A.    Well, based upon, you know, you
2  know, you know, maybe some of the documents,
3  it's probably there.  But although I, you
4  know, didn't have time, you know, you know,
5  you know, to go through them in very -- you
6  know, in full details.
7    Q.    You have no idea if that was
8  looked at, right?
9    A.    I had some idea, but I said
10  I -- you know, I'm not a process chemist, you
11  know, so it's better to be answered by a
12  process chemist.
13    Q.    Well, with regard to the root
14  cause investigation which would have included
15  evaluating how this happened, did you see
16  anything indicating that anybody at ZHP
17  considered the potential decomposition of the
18  DMF to yield dimethylamine as part of the
19  process?  Did you see anything indicating
20  that anybody thought about that at all at
21  ZHP?
22    A.    Basically as I already said,
23  you know, due to the knowledge gap this
24  particular issue was not considered.

1    Q.    And that knowledge gap would
2  include a lack of research in either
3  textbooks or published literature, in the
4  scientific literature, to evaluate potential
5  decomposition of DMF?  It wasn't researched
6  at all, correct?
7      MR. BALL:  Objection.
8  Foundation, speculation.
9      Go ahead and answer if you can.
10    A.    Yeah, I think that's -- that's
11  a speculation.  You know, that process was
12  developed very early on, you know.  I was not
13  there, I am not a process chemist, so I
14  cannot speculate.
15  BY MR. SLATER:
16    Q.    You've seen nothing indicating
17  that anybody at ZHP made any effort to look
18  at any scientific literature or publications
19  at all to evaluate potential decomposition of
20  DMF, you've seen nothing indicating anyone
21  looked at that, correct?
22      MR. BALL:  Objection.
23  Compound.
24      Go ahead and answer if you can.

1    A.    As I said, I cannot answer that
2  question, because I was not there, you know,
3  I'm not a process chemist.
4  BY MR. SLATER:
5    Q.    In your role as a 30(b)(6) --
6      MR. BALL:  Hold on, hold on.
7  Either you've seen it or you haven't
8  seen it.
9    A.    I haven't seen it, yeah.
10      MR. BALL:  Yeah, that's fine.
11  BY MR. SLATER:
12    Q.    And coming back to the ICH
13  guideline, evaluation of the degradation
14  chemistry principles would have required an
15  evaluation of scientific literature or
16  publications to try to answer that question,
17  right?
18      MR. BALL:  Objection.
19  Mischaracterizes the guideline.
20    A.    Yeah, the guideline has that
21  information.  Yeah.
22      MR. SLATER:  Let's take this
23  exhibit down and go to Exhibit 197.
24      MR. BALL:  Why don't we take --

1  we've gone about an hour 15 since our
2  last break --
3      MR. SLATER:  We can take this
4  down and take a break now.
5      MR. BALL:  Okay.
6      MR. SLATER:  Take this down,
7  and let's go off the record.
8      MR. BALL:  Okay.  Great.
9  Thanks.
10      THE VIDEOGRAPHER:  The time
11  right now is 9:46 a.m.  We're now off
12  the record.
13      (Whereupon, a recess was
14  taken.)
15      THE VIDEOGRAPHER:  The time
16  right now is 10:04 a.m.  We're back on
17  the record.
18  BY MR. SLATER:
19    Q.    On the screen we have
20  Exhibit 197, which is an article that was
21  published in scientific literature in 2009
22  titled "N,N-Dimethylformamide: much more than
23  a solvent."
24      Do you see that?

Confidential Information - Subject to Protective Order

Page 412

1    A.    Mm-hmm.
2         MR. SLATER:  Let's go, if we
3    could, to page 8315, the right-hand
4    column, 3.  Excellent.
5    Q.    Heading Number 3 says, "Source
6    of carbon monoxide," and then it says, "DMF
7    decomposes slightly at its boiling point to
8    afford dimethylamine and carbon monoxide,
9    this reaction occurring even at room
10   temperature in the presence of some acidic or
11   basic materials.  This observation has led to
12   the use of DMF as a carbonylating agent."
13        Do you see that?
14   A.    Yes.
15   Q.    So this is another example of
16   an article in the published literature
17   setting forth that DMF could potentially
18   decompose and yield dimethylamine, correct?
19   A.    This looks like exactly the
20   same wording, I mean the first one that I'm
21   seeing, right, in that first reference.
22        So may I take a look at the
23   reference 32?  I just want to make sure what
24   this reference is.

Page 413

1    Q.    Sure.  I think you're probably
2    right, actually.
3    A.    32.  Yeah, Purification of
4    Laboratory Chemicals, 19 -- well, it's 1966.
5    Okay, yeah, that's -- looks like that's the
6    same one, yes.
7         MR. SLATER:  Let's stay on that
8    page, Cheryll.
9    Q.    So reference 32 is to the
10   textbook that we were talking about a moment
11   ago, Exhibit 311, except this is a citation
12   to the version of that textbook published in
13   1966, correct?
14   A.    Looks like, yes, mm-hmm.  It
15   looks like the first version, right?
16   Q.    I don't know.
17   A.    Probably, yeah.
18   Q.    So this article is showing that
19   a textbook actually talked about the
20   decomposition of DMF to yield dimethylamine
21   going back as far as 1966, correct?
22   A.    Yes.
23        MR. SLATER:  Let's take that
24   down now, and then go to Exhibit 211.

Page 414

1    Q.    Exhibit 2 -- rephrase.
2         Exhibit 211 is an article that
3    was published in 2010 in the Journal of
4    Physical Chemistry, and the title is
5    "Theoretical Investigation of
6    N-Nitrosodimethylamine Formation from
7    Nitrosation of Triethylamine."
8         Do you see that?
9    A.    Mm-hmm.
10   Q.    And it looks like this was
11   submitted in 2009 and published in 2010,
12   correct?
13   A.    Yes.
14   Q.    And the people who published
15   this article, it looks like Zhi Sun, Yong
16   Dong Liu, and Ru Gang Zhong from the College
17   of Life Science & Bioengineering, Beijing
18   University of Technology in Beijing, correct?
19   A.    Yes.
20   Q.    So this article was actually
21   published by some people in China, correct?
22   A.    Mm-hmm, looks like, yes.
23   Q.    Let's go down now a little bit
24   in the Introduction, and looking at the

Page 415

1    second paragraph it says -- please, yeah.
2         Looking at the second paragraph
3    under the Introduction, it says in part,
4    "Because dialkylnitrosamines are of great
5    interest in carcinogenesis, much attention
6    has been focused on their formation
7    mechanism, especially from secondary amines."
8         Do you see that?
9    A.    Mm-hmm.
10   Q.    Is dimethylamine a secondary
11   amine?
12   A.    Yes.
13   Q.    "Consequently, NDMA is
14   generally believed to be formed from the
15   reactions of dimethylamine (DMA) and
16   nitrosating agents, such as N2O3, N204, and
17   ONCl."
18        Then it begins, "In addition to
19   secondary amines, however, a wide variety of
20   tertiary amines have also been demonstrated
21   to react with nitrous acid to produce
22   N-nitrosamines in aqueous solution."
23   A.    Okay.
24   Q.    This is talking about the

Confidential Information - Subject to Protective Order

Page 416

1  process whereby a nitrosating agent such as,
2  for example, nitrous acid would be a
3  nitrosating agent, correct?
4      A.    Yes.
5      Q.    Can react with diethylamine to
6  create NDMA, correct?
7      A.    Mm-hmm.
8      Q.    And that's actually what
9  happened with the zinc chloride process to
10  create the NDMA, correct?
11      A.    Yeah, retrospectively we know
12  that's the case.
13      Q.    Certainly you would agree with
14  me that in performing the risk assessment at
15  the outset with the zinc chloride process,
16  the process chemists at ZHP would have known
17  through degradation chemistry principles and
18  the principles here in this article that NDMA
19  could form if they had gone through
20  literature, as we just did, correct?
21          MR. BALL:  Objection.
22      Speculative.
23      A.    I mean, this is basically, you
24  know, the same kind of question, I mean, you

Page 417

1  already asked before.
2          You know, so my answer, you
3  know, I already, you know, gave to you is
4  that, you know, due to, you know, the
5  knowledge gap, you know, at the time, right?
6          And also I indicate the
7  knowledge gap is not only, you know, piece
8  of, you know, a particular knowledge, also a
9  lot of times you have to connecting, you
10  know, the thoughts together.
11          So, you know, like, as I said,
12  again, like FDA's -- you know, some of those
13  training materials, you know, they indicate
14  at the time industry and also regulator, you
15  know, had that knowledge gap.
16  BY MR. SLATER:
17      Q.    This article, as we just went
18  through a moment ago, was actually written by
19  and submitted by people in China in 2009,
20  correct?
21      A.    Yeah, looks like.  Yeah,
22  mm-hmm.
23      Q.    There was nothing -- well,
24  rephrase.

Page 418

1          The idea that dimethylamine and
2  nitrous acid could react to form NDMA, that
3  was something that a process chemist working
4  at a pharmaceutical company would be expected
5  to know as of 2011, correct?
6          MR. BALL:  Objection.
7      Speculative, and calls for expert
8      testimony.
9      A.    As I said, it's only, you know,
10  when somebody connecting the dots together,
11  you know, linking those two things together.
12          First of all, you know, the
13  minor decomposition of DMF would give small
14  amount of dimethylamine.
15          Second of all, you know, you
16  have to also link, you know, its reaction
17  with the nitrous acid.  So it's basically,
18  you know, you know, you need, or someone at
19  the time, you know, need to connecting the
20  dots, right?
21          I mean, a lot of things, you
22  know, looking retrospectively it may become,
23  you know, much more obvious.  But at the
24  time, as I indicated before, you know, the

Page 419

1  minor decomposition of DMF, it was just not,
2  you know, you know, falling into the
3  knowledge base.
4  BY MR. SLATER:
5      Q.    If ZHP's process team --
6  rephrase.
7          If the people at ZHP had
8  performed a proper risk assessment and
9  actually looked at the scientific literature,
10  this article was there to be found in 2011,
11  correct?
12      A.    Again, as I indicated, you
13  know, chemistry is a vast, you know, you
14  know, you know -- as a science contains vast,
15  you know, you know, knowledge base.
16          And as I indicated also, you
17  know, a lot of things looking back, you know,
18  you know, people would then start to
19  connecting all the dots.  So the knowledge
20  base is not only, you know, you know, the
21  individual pieces, you know.  Also somebody
22  at some time or at the right time need to
23  connecting those dots.
24          So another thing is, as I

Confidential Information - Subject to Protective Order

Page 420

1  indicated before, you know, not only, you
2  know, ZHP, but also other company utilizing,
3  you know, the same or similar, you know, you
4  know, a certain process, a similar case
5  being -- you know, utilizing NMP as the
6  reaction solvent.
7          You know, those processes, they
8  were all commercialized.  They were all
9  previously submitted to various regulatory
10  agencies, including European agencies, you
11  know, the FDAs.
12          And so at the time, you know,
13  again, you know, at these agencies, you know,
14  there are, you know, great numbers of
15  capable, you know, scientists.
16          So, you know, it appears now
17  retrospectively it also did not -- you know,
18  you know, I mean, they obviously also, you
19  know, seem to have, you know, the knowledge
20  gap particularly, you know, connecting the
21  dots.
22     Q.    When you refer to "connecting
23  the dots" -- rephrase.
24          A risk assessment requires a

Page 421

1  scientific analysis to connect the dots.
2  That's the point of a risk assessment, to do
3  a thorough scientific analysis and connect
4  the dots, correct?
5     A.    The thorough scientific
6  evaluation will be limited at any given
7  time, okay, to a particular, you know, set of
8  knowledge.
9          I mean, you know, you basically
10  just, you know, cannot, you know, you know,
11  go through, you know, every single details.
12  I mean, it's just not practical, you know.
13          Unless -- unless, like, if
14  something happened, you know, for example
15  like these particular events, right?  Now
16  everybody, you know, you know, start to
17  connecting the dots, and then, you know,
18  regulatory agencies, you know, also require
19  every company to do, you know, you know, you
20  know, you know, the risk assessment,
21  particularly with regard to the nitrosamine,
22  you know, you know, potential risk, right.
23          And then, you know, now we see
24  more and more, you know, you know, different

Page 422

1  commercialized drugs, you know, you know, you
2  know, being -- having the issue of NDMA,
3  right.
4          As I mentioned yesterday, we
5  have seen issues for NDMA in, you know,
6  ranitidine, you know, and as I said that, you
7  know, ranitidine has become a commercialized
8  product, I think as early as 1981.
9          And, you know, you know, these
10  companies, you know, you know, know, this
11  particular product, you know, it was
12  developed by, you know, this very well-known,
13  you know, GlaxoSmithKline in the company.
14          And also during the course of
15  this very long history, we also see other
16  companies, you know, including Sanofi, you
17  know, which is, you know, also another very
18  famous, you know, France-based multinational
19  pharmaceutical company, right, they also
20  manufacture, you know, you know, you know,
21  ranitidine for quite a few years.
22          You know, I'm sure, you know,
23  their scientists as well as, you know, the
24  early, you know, you know, GSK or, you know,

Page 423

1  French, you know, SmithKline at the time,
2  they all did a, you know, risk assessment
3  based on the best knowledge at that time.
4          But still, you know, this issue
5  remained, you know, unknown until, you know,
6  these particular events become known, you
7  know, to, you know, everybody.
8     Q.    Am I correct that the only
9  company that was selling ZHP valsartan API --
10  rephrase.
11          Am I -- rephrase.
12          ZHP was selling its zinc
13  chloride process valsartan -- rephrase.
14          ZHP developed the zinc chloride
15  process in order to sell zinc chloride
16  process valsartan for profit by ZHP.  That
17  was the purpose of that, correct?
18          MR. BALL:  Objection.  Outside
19     the scope.
20     A.    Again, you know, first of all,
21  you know, I'm not a process chemist, okay,
22  but if you want to ask, you know, my
23  personal, you know, you know, perspective,
24  you know, I might give you one, okay?

Page 424

1    Every -- first of all, every
2 commercial process, you know, you need to
3 consider costs, right?  Result in effective
4 costs, you know, we would have had a lot of
5 issues, right?
6    And the reason, you know, you
7 know -- I mean, the United States has the
8 best, you know, generic drug company or
9 industry, you know, you know, in the world,
10 you know.  That has bring down, you know, you
11 know, the cost to the patients, you know,
12 tremendously.
13    So, you know, controlling
14 costs, you know, you know, is something every
15 company, you know, whether, you know, it's a
16 generic drug company or a multinational
17 pharmaceutical company, you know, everybody,
18 you know, you know, doing that, right.
19    And also by controlling costs a
20 company would also, you know, share, you
21 know, those savings, you know, with patients,
22 right?
23    So -- and another thing is, you
24 know, the fundamental, you know, criteria is

Page 425

1 that you need to, you know, you know, at the
2 same time you're controlling the costs, you
3 need to also develop a product, right, which
4 is comparable -- you know, like during the
5 process change, you know, which is comparable
6 to the previous, you know, product.  So based
7 upon my limited knowledge, you know, at the
8 time of the process development during that
9 evaluation.
10    So the overall quality, you
11 know, of this zinc chloride process was
12 comparable, you know, to the previous ones.
13    MR. SLATER:  Cheryll, let's go
14 to Exhibit 213, please.  213.
15    MR. BALL:  Adam, can we go off
16 for just one second while I go ask the
17 people out in the hall to be a little
18 bit more quiet?
19    MR. SLATER:  Sure.
20    MR. BALL:  Thank you.  I'll be
21 right back.
22    MR. SLATER:  Let's go off the
23 record.
24    THE VIDEOGRAPHER:  The time

Page 426

1 right now is 10:23 a.m.  We're now off
2 the record.
3    (Pause.)
4    THE VIDEOGRAPHER:  The time
5 right now is 10:23 a.m.  We're back on
6 the record.
7 BY MR. SLATER:
8    Q.    We're back in Exhibit 213, the
9 November 29, 2018 warning letter from the
10 FDA.
11    MR. SLATER:  Cheryll, would you
12 go to page 4 of that document, please?
13 Middle of the page, please, a little
14 further down.  Okay.
15    Q.    This is the FDA's commentary on
16 this subject we've been discussing, and it
17 says, "You also failed to evaluate the need
18 for additional analytical methods to ensure
19 that unanticipated impurities were
20 appropriately detected and controlled in your
21 valsartan API before you approved the process
22 change."
23    So I'm going to stop there.
24 They're talking about the risk assessment

Page 427

1 process, correct?
2    A.    Let me see.
3    MR. BALL:  Objection.  Calls
4 for speculation.
5    A.    It looks like so, mm-hmm.
6 BY MR. SLATER:
7    Q.    Then the FDA says, "You are
8 responsible for developing and using suitable
9 methods to detect impurities when developing,
10 and making changes, to your manufacturing
11 processes.  If new or higher levels of
12 impurities are detected, you should fully
13 evaluate the impurities and take action to
14 ensure the drug is safe for patients."
15    You agree with what the FDA
16 said in terms of what the obligations of ZHP
17 were?  That's an accurate statement, correct?
18    MR. BALL:  Objection.  Calls
19 for a legal conclusion.
20    A.    The last sentence -- sorry,
21 yeah.
22    The last sentence said, "If new
23 or higher level of impurity are detected."
24 But this was not the case with NDMA, because

Confidential Information - Subject to Protective Order

Page 428

1  as I indicated, you know, the residual
2  solvent method is not capable to detect NDMA.
3  BY MR. SLATER:
4      Q.   GC-MS was capable of detecting
5  and identifying NDMA if you thought about it
6  and looked for it, right?
7      A.   The GC --
8          MR. BALL:  Hold on, hold on.
9          Objection.  Calls for expert
10  testimony, argumentative, and
11  mischaracterizes his testimony.
12          Go ahead.
13      A.   I think I, you know, answered
14  it yesterday.  The GC-MS method are based
15  upon the ZHP's GC-FID method, okay, is still
16  not, you know, you know, as -- is -- it's
17  still not adequately to detect NDMA as -- you
18  know, as a suitable, you know, analytical
19  control method.
20  BY MR. SLATER:
21      Q.   If ZHP had been looking for
22  NDMA or any nitrosamines with GC-MS -- well,
23  I'll withdraw that.
24          The problem ultimate -- well,

Page 429

1  actually I want to withdraw that and actually
2  go back to my question.
3          You agree with me that ZHP was
4  responsible during the process change to
5  develop and use suitable methods to detect
6  impurities when developing and making changes
7  to the manufacturing process, correct?
8          MR. BALL:  Objection.
9  Mischaracterizes his earlier
10  testimony.
11      A.   You know, as I -- as I said, I
12  already answered this question before, you
13  know, because there is, you know, like FDA,
14  you know, you know, the statement says, you
15  know, it said if new or higher level of
16  impurity are detected.
17          But as I said, you know, the
18  GC-FID method, which is the residual solvent
19  method and also is a registered, you know,
20  method, okay, it just not capable, you know,
21  detecting NDMA.
22          As far as, you know, you know,
23  go back to the, you know, the very same, you
24  know, point, you know, right, basically, you

Page 430

1  know, I said during the time of the process
2  change, you know, no one, you know, the
3  industry, also the regulatory agencies, you
4  know, you know, had that knowledge gap.
5          You know, if at the time, you
6  know, people already knew, like today, yeah,
7  everybody will go that extra mile and -- to,
8  you know, look for it.  But, you know, that
9  was just not the case during that time.
10  BY MR. SLATER:
11      Q.   Looking now at the third full
12  paragraph on page 4 of this FDA warning
13  letter of November 29, 2018, the FDA stated,
14  "Your response states that predicting NDMA
15  formation during the valsartan manufacturing
16  process required an extra dimension over
17  current industry practice, and that your
18  process development study was adequate.  We
19  disagree.  We remind you that common industry
20  practice may not always be consistent with
21  cGMP requirements and that you are
22  responsible for the quality of drugs you
23  produce."
24          Do you see that?

Page 431

1      A.   Yeah, I see that, mm-hmm.
2      Q.   And you understand that ZHP at
3  all times was required to comply with cGMP
4  requirements with regard to its process for
5  manufacturing its valsartan that it was going
6  to sell.  You agree with that, correct?
7          MR. BALL:  Objection.  Calls
8  for a legal conclusion.
9      A.   To me it's very obvious, you
10  know, this whole paragraph is a
11  retrospective, you know, statement.  So going
12  back to that, you know, period, you know,
13  we -- as I said, you know, we did all what we
14  can do, and we filed to the various
15  regulatory agencies like everybody else.  And
16  this process, you know, was approved by
17  multiple, you know, regulatory agencies,
18  including the FDA.
19          And also, as I said, you know,
20  I indicated that, you know, in some of the
21  most recently released FDA training material,
22  you know, FDA, you know, basically
23  acknowledged, you know, the knowledge gap
24  during the previous time by both industry as

Confidential Information - Subject to Protective Order

Page 432

1  well as regulators.
2  BY MR. SLATER:
3      Q.    So is it ZHP's position that
4  other companies or regulatory agencies are at
5  fault for letting ZHP manufacture valsartan
6  with the zinc chloride process and not
7  adequately evaluate and realize that NDMA
8  could be produced?  Are you saying it's
9  someone else's fault and it's not ZHP's
10 responsibility?
11         MR. BALL:  Objection.
12     Foundation, mischaracterizes his
13     earlier testimony.
14     A.    It's clearly not what I said
15 before.  Okay.  What I'm saying or what I
16 have been saying is during that particular
17 time the industry as well as the regulatory
18 agency had that knowledge gap.  Okay.  And
19 also, you know, science, you know, is making
20 progress all the time.
21 BY MR. SLATER:
22     Q.    Are you -- rephrase.
23         Speaking for ZHP right now, is
24 ZHP saying ZHP is not responsible for its

Page 433

1  failure to adequately assess the risks, but
2  somebody else is responsible for ZHP's
3  failures?
4      A.    Again --
5         MR. BALL:  Objection.
6     Mischaracterizes his testimony.
7      A.    Again, you know, this is not
8  what I'm saying, okay.
9  BY MR. SLATER:
10     Q.    Well, who's responsible for the
11 inadequate risk assessment?  Is it ZHP, or is
12 it someone else?
13         MR. BALL:  Objection.
14     Foundation and compound.
15     A.    When FDA says, you know, there
16 was a knowledge gap at the time for both
17 industry as well as for the regulatory
18 agencies, you tell me who would be
19 responsible.
20 BY MR. SLATER:
21     Q.    If you look at this letter from
22 the FDA in November of 2018, the last part of
23 that paragraph we've been talking about says,
24 "You are responsible for the quality of drugs

Page 434

1  you produce."
2         You agree with that statement,
3  correct?
4         MR. BALL:  Objection.  Calls
5     for a legal conclusion.
6         Go ahead.
7      A.    Yes.  Everybody, or every
8  manufacturer will be responsible to the
9  extent, you know, you know, with their best
10 efforts at the time.
11 BY MR. SLATER:
12     Q.    And ZHP is -- rephrase.
13         ZHP is also responsible for its
14 failure to disclose to the FDA in 2017 when
15 it knew at the latest -- rephrase.  Let me --
16 let me reask the question.
17         And ZHP as of July 2017 at the
18 latest, when it knew that NDMA had been
19 produced as part of the zinc chloride process
20 and was an impurity in its valsartan, at that
21 point ZHP had a responsibility to tell the
22 FDA, right?
23         MR. BALL:  Objection.
24     Foundation, calls for a legal

Page 435

1  conclusion.
2      A.    I think I -- you know, as I
3  told you before, at the time it was, you
4  know, it was a guess, you know, by a single,
5  you know, chemist.
6  BY MR. SLATER:
7      Q.    That single chemist was
8  Jinsheng Lin who worked for you, right?
9      A.    He was in my department, yes.
10     Q.    He's still in your department,
11 right?
12     A.    He still is, yes.
13     Q.    Did Jinsheng Lin tell you --
14 rephrase.
15         Did -- rephrase.
16         Did Jinsheng Lin show you the
17 chromatograms that he used to identify the
18 NDMA in the valsartan?
19         MR. BALL:  Objection.
20     Foundation.
21     A.    As I told you, you know, in
22 that e-mail clearly, you know, he's just
23 making a -- you know, a guess or, you know, a
24 projection, you know.

Confidential Information - Subject to Protective Order

Page 436

BY MR. SLATER:
   Q.   Well, actually, what he said in that e-mail was that NDMA occurs in valsartan when it's quenched with sodium nitrite, which was an accurate statement.  It was scientifically accurate, correct?
        MR. BALL:  Objection.  Vague, and mischaracterizes the document.
   A.   As I said, again, you know, this was his projection.
        MR. SLATER:  Cheryll, let's go, if we could, to that other document you started to pull up.  I don't remember what it was previously marked as, if you could tell us.  The establishment inspection report.
        MS. CALDERON:  I don't think it was previously marked.
        MR. SLATER:  Oh, really?  Well, we can mark it again.  What are we up to?  I'm not the guy to know that answer.
        (Whereupon, Exhibit Number ZHP-312 was marked for

Page 437

identification.)
BY MR. SLATER:
   Q.   Looking at Exhibit 312, this is the July 23, 2018 Establishment Inspection Report.
        You're familiar with this document, right?
   A.   I probably at least read through this, yeah.
        MR. SLATER:  Let's go, if we could, to page 25, Cheryll, 25 of 58.  The Bates number, the last two digits are 73.  Perfect.
   Q.   You mentioned earlier that the process change to zinc chloride took into account cost.  Remember you were telling me that earlier?
        MR. BALL:  Objection.  Mischaracterizes his earlier testimony.
   A.   You mean, you know, why, you know, a new process like zinc chloride process was developed, right?
        ///

Page 438

BY MR. SLATER:
   Q.   Didn't you tell me earlier that one of the benefits -- well, rephrase.
        Didn't you tell me earlier you have to take into account the cost?
   A.   Oh, yeah, yeah.  Yeah, every process, you know, development, yeah, cost, you know, is a factor to be, you know, to be considered.
        But also that I mentioned, you know, very clearly, you know, that the fundamental, you know, you know, you know, factor that need to be considered is, you know, the product produced by the new process need to be comparable with regard to the registered specifications.
   Q.   Well, let's look at -- rephrase.
        Looking at the middle paragraph on this page, there is a statement in the middle after the second line -- rephrase.
        Looking at the center -- rephrase.
        Looking at the paragraph in the

Page 439

middle of the page, the second sentence says, "Mr. Jun Du, Executive Vice President, apologized and stated the change control should have stated the purpose of the change was to save money."
   A.   I'm sorry.  Where it is?
   Q.   Sure.
        Let's do this.  Looking at the carryover paragraph at the top of the page, you can see that it's discussing, about four lines from the bottom, the "Valsartan Process II Zinc Chloride Process Change Summary."
        Do you see that?
   A.   Wait a second.
        So basically it's the first paragraph, right?
   Q.   Right.  Four lines from the bottom of that paragraph.
   A.   Four lines from the bottom.  One, two... Four lines.  One, two, three... I don't see "Mr. Jun Du" here.
   Q.   No.  Now I'm on a different paragraph.  I'm leading into it now.  So let

Confidential Information - Subject to Protective Order

Page 440

1  me as you this.
2       If you look at the first
3  paragraph --
4       A.   Oh.  Oh, actually, I'm sorry.
5  Actually I see in the second paragraph, okay.
6  Second paragraph, yeah, "Mr. Jun Du,
7  Executive Vice President, apologized and
8  stated that the change control should have
9  stated the purpose" of change -- "should have
10 stated the purpose was to save money."
11      I don't know -- I don't know,
12 you know, you know, what that's supposed to
13 mean.  Maybe --
14      MR. BALL:  He hasn't asked you
15 a question yet.
16      Go ahead, Adam.
17 BY MR. SLATER:
18      Q.   In this Establishment
19 Inspection Report, you can see at the first
20 paragraph it's discussing the zinc chloride
21 process change.
22      Do you see that?
23      A.   You mean the very first
24 paragraph, right?

Page 441

1       Q.   Right.  The first paragraph,
2  four lines from the bottom of the first
3  paragraph, it's discussing the zinc chloride
4  process change.
5       Do you see that?
6       A.   Hold on.  So four line from the
7  bottom of the first paragraph.
8       And also, yeah, going above,
9  like, Mr. Dong pointed out a table
10 describing, right, manufacturing process for
11 valsartan API.
12      "Mr. Dong pointed to a table
13 describing manufacturing operating ranges in
14 Valsartan Process II Zinc Chloride Process
15 Change Summary."
16      And then, "The table does not
17 include an acceptance criteria.  I asked
18 Mr. Dong if the firm established specific
19 parameters with acceptance criteria which the
20 firm used to evaluate if the isomer
21 conversion was reduced and the yield
22 increased...again pointed to the same table."
23      Okay.  Yeah, so there's some,
24 yeah, discussion with Mr. Peng Dong, yes.

Page 442

1  Okay.
2       Q.   In the first paragraph, we can
3  see the process change to the zinc chloride
4  process is being discussed, correct?
5       A.   You're basically again talking
6  about the first paragraph?
7       Q.   Right.  It's discussing the
8  zinc chloride process change, correct?
9       A.   Yes.  So far the very first
10 line of the first paragraph, right, okay?  It
11 says, okay, "Change Request...did not
12 identify specific parameters the firm would
13 use to evaluate the effectiveness of the
14 requested change and the impact of the
15 requested change on intermediates and/or the
16 final valsartan API prior to implementing
17 change..."
18      So it's talk about particularly
19 change request here.
20      Q.   And then in the second
21 paragraph on this page, in the second line it
22 says that "Mr. Jun Du, Executive Vice
23 President, apologized and stated the change
24 control should have stated the purpose of the

Page 443

1  change was to save money.  Mr. Du further
2  stated the cost reduction was so significant
3  it is what made it possible for the firm to
4  dominate the world market share."
5       Do you see what I just read?
6       A.   I don't know what -- you know,
7  you know, what he actually said --
8       MR. BALL:  That's a yes-or-no
9  question, did you see what he read.
10      A.   Well, what is -- yeah, what is
11 showing here, yeah, it is.  But, you know, as
12 far as whether Mr. Du, you know, actually
13 said that or, I don't know, maybe that's a
14 translational error.  I really cannot tell.
15 I mean, you know, it would be best, you know,
16 to verify with Mr. Jun Du.
17 BY MR. SLATER:
18      Q.   Do you see what I just read?
19      A.   Yeah, I saw what you read,
20 yeah.
21      Q.   And with regard to the subject
22 of cost and the cost in connection with the
23 process change, in fact, as stated by Mr. Du,
24 who is one of the top executives in the

Confidential Information - Subject to Protective Order

1  company, this cost reduction from the zinc
2  chloride process allowed ZHP to dominate the
3  world market share for valsartan.  That's
4  what, according to this document from the
5  FDA, is what he told the FDA, correct?
6       MR. BALL:  Objection.  Hearsay,
7       outside the scope.
8       A.    Yeah, I think it's outside my
9  scope.  I mean, this is, you know, purely --
10 you know, I'm a technical person, so, you
11 know, best again, you know, check with him
12 and make sure, you know, or whether he really
13 said that or really he meant that, you know.
14 It could have been, you know, there's some
15 misunderstanding.
16 BY MR. SLATER:
17      Q.    And, in fact, the reason why
18 you and the others who received that e-mail
19 in July 2017 from Jinsheng Lin did nothing in
20 response to that, knowing that NDMA was
21 developing in the valsartan, was because the
22 valsartan was doing so well in the market
23 that you didn't want to disrupt that,
24 correct?

1       MR. BALL:  Objection.
2       Foundation, mischaracterizes his
3       earlier testimony, and outside the
4       scope.
5       A.    I would say that's your
6  speculation.
7  BY MR. SLATER:
8       Q.    And then in April 2018, when
9  you directed your team not to complete the
10 report that had been written since July of
11 2017 because of the sensitive impurity, that
12 was because you understood that that would
13 disrupt the marketing of the product which
14 was very profitable to ZHP, and you didn't
15 want to get in the way of that by disclosing
16 the NDMA impurity, correct?
17      MR. BALL:  Objection.
18      Foundation, mischaracterizes his
19      earlier testimony.
20      A.    What you said really, you know,
21 twisted, you know, you know, the fact, okay.
22 Like I said yesterday, that particular
23 impurity is not NDMA, okay.  That particular
24 impurity, you know, was the N-nitroso

1  derivative of irbesartan.
2       And also, again, that impurity
3  was only present, you know, during the, you
4  know, process, you know, you know, you know,
5  trial tried to overcome some of the safety,
6  you know, you know, concern, right.
7       So as I indicated before, you
8  know, that impurity was not a real impurity
9  in a, you know, real commercial batch, and
10 so -- and also I indicated to you, you know,
11 you know, the work has been done at the time,
12 you know, the report was already there, you
13 know.  I didn't say, you know, you know --
14 you know, I mean, you can see, you know, you
15 know, from such a long period of time, you
16 know, you know, that work has been, you know,
17 you know, has been ongoing.
18      You know, as I explained
19 yesterday, you know, the reason, you know, I
20 advised him not to issue is try to avoid
21 confusion, you know.
22 BY MR. SLATER:
23      Q.    Your testimony is now that you
24 told Mr. Lin not to issue that report was to

1  avoid confusion, when last night you told me
2  that you didn't even remember it ever
3  happening.  Have you suddenly remembered?
4       A.    Well, I --
5       MR. BALL:  Objection.
6       Mischaracterizes his earlier
7       testimony, and argumentative.
8       A.    Yeah, I mean, I think what I
9  said yesterday is, first of all, I just said,
10 you know, you know, I don't remember, you
11 know, you know, you know, whether, you know,
12 you know, I don't remember the details of
13 that conversation, okay?
14      Second -- second point is I
15 said retrospectively, you know, you know, if
16 I want to give you a reasonable explanation,
17 you know, that's -- you know, that could be,
18 you know, the most likely reason, okay.
19 BY MR. SLATER:
20      Q.    So do you remember the Jinsheng
21 Lin e-mail and then directing your team not
22 to issue the report?
23      A.    I don't remember --
24      MR. BALL:  Hold on.

Confidential Information - Subject to Protective Order

---

Page 448

1    Objection.  Vague, compound,
2  foundation.
3    Go ahead.
4    A.    I don't remember, you know, you
5  know, that particular e-mail, as I said,
6  because, you know, you know, I receive, you
7  know, a lot of e-mail every day, and, you
8  know -- so I, you know, basically completely
9  slipped through.
10    But with regard to that
11  conversation, you know, you know, I already
12  provide you, you know, the explanation.
13  BY MR. SLATER:
14    Q.    Well, is your explanation based
15  on what you remember, or is your explanation
16  something that you're just coming up with now
17  because you don't remember?
18    MR. BALL:  Objection.
19    Argumentative.  And compound.
20    A.    I think, you know, I, you know,
21  I've been quite clear, you know, yesterday
22  and also just moments ago.  You know, as I
23  said, first of all, with regard to that
24  conversation, I do not remember the details

---

Page 449

1  of the conversation, okay, and then I'm
2  trying to provide a reasonable explanations.
3  BY MR. SLATER:
4    Q.    When you say you tried to
5  provide reasonable explanations, are you
6  making up these explanations, or are these
7  actually the facts of what you recall
8  happened?
9    MR. BALL:  Objection.
10    Argumentative, and compound, and
11  mischaracterizes his testimony.
12    A.    So, you know, basically, you
13  know, as I said, you know, I just try to, you
14  know, because I do not remember the details,
15  so as I said this would be a likely, you
16  know, reason, okay?
17  BY MR. SLATER:
18    Q.    We talked last night about the
19  fact that we can't find that report.  Can you
20  tell me any more than you told me last night
21  about where we might find that report that
22  you told your team not to issue in April of
23  2018?  Because we'd really like to read it.
24    MR. BALL:  Objection.

---

Page 450

1  Mischaracterizes his testimony.
2    Go ahead and answer if you can.
3    A.    The report should be somewhere,
4  but I don't know exactly, you know, or at
5  least, you know, at that time, but I don't
6  know what would have happened, you know, to
7  it now.
8  BY MR. SLATER:
9    Q.    Well, it should be in your
10  custodial file because it was provided to you
11  to read and decide what you wanted to do with
12  it, and after you reviewed it you said not to
13  issue it.  So actually we should have gotten
14  it from your custodial file, right?
15    MR. BALL:  Objection.
16    Speculative, and foundation.
17    A.    I really don't know whether it
18  should be there or not.  I mean --
19  BY MR. SLATER:
20    Q.    Well, when somebody sends you a
21  completed report to approve, you then have it
22  in your e-mails and you have it on your
23  computer, it should be there if somebody
24  produces everything that's on there that's

---

Page 451

1  relevant, right?
2    MR. BALL:  Objection.
3    Speculative.
4    A.    I mean, at a certain point, you
5  know, it's possible, you know, yeah, he sent
6  that, you know, he might e-mail me, it's
7  possible.  And also it's possible, you know,
8  he might just bring a hard copy.
9    But as I said, you know, I just
10  have no memory, you know, on the detail, what
11  exactly happened.
12  BY MR. SLATER:
13    Q.    Did you speak to anybody today
14  other than your lawyers --
15    A.    No.
16    Q.    Let me just ask you.
17    Did you speak to anybody today
18  other than your lawyers --
19    A.    Today --
20    Q.    You've got to let me finish the
21  question.
22    MR. BALL:  Min, let him finish,
23    okay?
24    THE WITNESS:  Okay.  Sure.

---

Page 452

1    Mm-hmm.
2  BY MR. SLATER:
3    Q.    Did you speak to anybody today
4  other than your lawyers about this deposition
5  or anything that you testified to or were
6  asked about yesterday?
7    A.    No.
8    Q.    When your computer was --
9  rephase.
10    I just want to be very clear.
11  Do you recall your computer actually being
12  collected so that information on the computer
13  could be taken down and provided to us as
14  part of this litigation?  Do you recall that
15  actually happening?
16    A.    Oh, yeah, mm-hmm.
17    Q.    Do you have hard copy documents
18  in your office?
19    A.    No.
20    MR. BALL:  Objection.  Vague.
21  BY MR. SLATER:
22    Q.    Well, you just told me that
23  Mr. Lin might have brought you the report as
24  a hard copy, so I assume from that that

Page 453

1  sometimes people provided you hard copy
2  documents.  Did I misunderstand?
3    MR. BALL:  Objection.
4    Mischaracterizes his testimony.
5    A.    But I don't keep that, you
6  know, hard copy.  He might -- okay.  He
7  may -- he might or he might not.  But, you
8  know, hypothetically, you know, if he, you
9  know, bring a hard copy for discussion
10  usually, you know, I don't keep them.
11  Otherwise, you know, I'll be, you know, you
12  know, overwhelmed, you know.  I don't like to
13  have too many, you know, you know, hard copy,
14  you know, because it's also waste of
15  resources.
16  BY MR. SLATER:
17    Q.    You have some paper documents
18  in your office; you're not saying you have
19  none, are you?
20    A.    I have some, yeah, like
21  company, you know, you know, policies, you
22  know, for some of the company policy.  For
23  example, like travel policies, you know, it's
24  just for easy references.

Page 454

1    Q.    As part of the root cause
2  investigation conducted by ZHP, did ZHP
3  review the July 27, 2017 e-mail that we
4  talked about and we've been discussing for
5  Mr. Lin?  Did -- was that looked at as part
6  of ZHP's root cause investigation?
7    A.    You mean was that, or was his
8  e-mail being looked at it?
9    Q.    Right.  Was that looked at as
10  part of the root cause investigation
11  conducted by ZHP?
12    A.    I mean, as I told you, you
13  know, yesterday, you know, you know, it
14  basically -- you know, that e-mail didn't,
15  you know, you know, generate any resonance.
16    MR. BALL:  Min, that's a yes or
17    no question.  Did you -- was it -- did
18    anybody look at it as part of the root
19    cause analysis?
20    A.    No.
21  BY MR. SLATER:
22    Q.    Did anybody speak to Mr. Lin as
23  part of the root cause analysis -- root --
24  let me rephrase it.

Page 455

1    Did anybody speak to Jinsheng
2  Lin as part of the root cause investigation?
3    A.    I have no idea.
4    Q.    Certainly Mr. Lin should have
5  that report on his computer, right?
6    MR. BALL:  Objection.
7    Speculation.
8    A.    He may, you know, right now,
9  may or may not.  I really don't know.
10  BY MR. SLATER:
11    Q.    Somebody should have that
12  report on their computer, right?
13    MR. BALL:  Objection.
14    Speculation.
15  BY MR. SLATER:
16    Q.    It should exist somewhere
17  within -- it should -- rephrase.
18    That report should exist
19  somewhere within ZHP, right?
20    MR. BALL:  Objection.
21    Speculation and argumentative and
22    compound.
23    A.    A more accurate statement would
24  be, you know, it most likely this document

Page 456

1  may be present in the computer, you know, at
2  a certain point of time.  But as far as its
3  current status, I really, you know, have
4  no -- I do not have that knowledge.
5  BY MR. SLATER:
6     Q.   Well, does ZHP have that
7  knowledge?
8        MR. BALL:  Objection.
9     Speculation.
10 BY MR. SLATER:
11    Q.   Remember, you're speaking for
12 ZHP, so I'm asking --
13       MR. BALL:  No, I understand,
14    Adam, I didn't tell him not to answer.
15       MR. SLATER:  No, no.  I was
16    going to rephrase the question to make
17    it clearer.
18 BY MR. SLATER:
19    Q.   Speaking for ZHP, that report
20 should exist somewhere, right --
21       MR. BALL:  Objection.
22 BY MR. SLATER:
23    Q.   -- in the company, and be able
24 to be produced to us, right?

Page 457

1        MR. BALL:  Objection.
2     Speculation.
3     A.   You know, as I said, you know,
4  at this point, you know, I just cannot answer
5  that question.
6  BY MR. SLATER:
7     Q.   Why can't you answer that
8  question?
9     A.   Because, you know, anything can
10 happen between then and now.
11    Q.   What do you mean by that,
12 "anything can happen"?
13    A.   You know, it just could be
14 deleted or, you know, you know, for whatever
15 the reason, if it's, you know, saved
16 somewhere at some point.
17       MR. SLATER:  Cheryll, let's go
18    to Exhibit 209, please.
19       MR. BALL:  Adam, did we lose
20    Cheryll?  There we go.  Okay.
21       MR. SLATER:  I don't think we
22    would lose her.  She would just say,
23    You know what?  It's late enough, I've
24    had it with you people, and I'm moving

Page 458

1  on.  Wouldn't be the first time she's
2  done that to me.
3        MS. CALDERON:  Won't be the
4     last.
5        MR. SLATER:  Excellent.  I hope
6     you got that on the record.
7        MR. BALL:  Yeah, we're still on
8     the record.
9        MR. SLATER:  Good, good.
10 BY MR. SLATER:
11    Q.   Looking now at ZHP-209 --
12 rephrase.
13       Looking now at Exhibit 209,
14 this is an "IARC Monograph on the Evaluation
15 of the Carcinogenic Risk of Chemicals to
16 Humans."
17       MR. SLATER:  And if you could
18    scroll up a little more, Cheryll,
19    please.
20    Q.   It's addressing some N-nitroso
21 compounds.
22       Do you see that?
23    A.   Mm-hmm.
24       MR. SLATER:  And just to --

Page 459

1  scroll up again to be sure that we're
2  clear on timing.  I just want to get
3  to the very bottom of the page to get
4  to the date.
5     Q.   And the date on this document
6  is May 1978.
7        Do you see that?
8     A.   Mm-hmm.
9     Q.   You know what IARC is, right?
10    A.   Oh, yes.
11    Q.   It's the International Agency
12 for Research on Cancer, a respected
13 organization, correct?
14    A.   Oh, yes.
15       MR. BALL:  Objection.
16    Speculation.
17 BY MR. SLATER:
18    Q.   Speaking for ZHP with regard
19 to -- rephrase.
20       Speaking for ZHP, the IARC is
21 certainly a respected organization, correct?
22    A.   Yes.
23       MR. SLATER:  Let's look now at
24    page 36, and I want to look at the

Confidential Information - Subject to Protective Order

Page 460

1    third paragraph.
2        Q.   The third -- rephrase.
3            The third paragraph on page 36
4    starts out, "It has been known since 1865
5    that the reaction of dimethylamine
6    hydrochloride with sodium nitrite at an
7    acidic pH yields" N-nitro sodium
8    methylene" -- I'm going to start over.
9            The third paragraph on page 36
10   starts out stating, "It has been known since
11   1865 that the reaction of dimethylamine
12   hydrochloride with sodium nitrite at an
13   acidic pH yields NDMA."
14           Do you see that?
15       A.   Yes.
16       Q.   And, again, that's describing
17   what happened in the zinc chloride process,
18   correct?
19           MR. BALL:  Objection.
20   Foundation.
21       A.   This -- you know, I think the
22   correct way to say is, you know, the zinc
23   chloride, you know, retrospectively again,
24   the zinc chloride process for the formation

Page 461

1    of NDMA, you know, was also under the acidic,
2    you know, pH.
3            So, yes, so from that
4    perspective, yeah, they are consistent.
5    BY MR. SLATER:
6        Q.   And this is an IARC monograph
7    from 1978.  It's certainly something that
8    scientists would be aware of and have
9    available to them if they wanted to consult
10   it, correct?
11       A.   Yes.
12           MR. BALL:  Objection.
13   Speculative, and calls for expert
14   testimony.
15   BY MR. SLATER:
16       Q.   And it would have been
17   available to be reviewed in 2011 certainly,
18   right, since it's dated in 1978, correct?
19       A.   I'm sorry, what?
20           MR. BALL:  Go ahead, answer.
21           THE WITNESS:  Okay.
22           Yeah, basically, you know, if
23   there is a particular, you know, you
24   know, reason, you know, at the time,

Page 462

1    yeah, someone will, you know, you
2    know, going and trying to find this
3    document.
4            MR. SLATER:  Let's go, Cheryll,
5    to page 40, please.  Thank you.
6    BY MR. SLATER:
7        Q.   Looking at page 40, the first
8    full paragraph, the second sentence starts
9    out, "The principal techniques employed for
10   the analysis of volatile N-nitrosamines have
11   been described in a recent publication," and
12   it gives a citation from 1978.
13           Do you see that?
14       A.   Right.
15           MR. BALL:  Hold on.  Adam, I
16   don't see it.  Where are you?
17           MR. SLATER:  I'm in the
18   paragraph --
19           MR. BALL:  Oh, I see it.  I'm
20   sorry.  I'm sorry.  I was looking
21   farther down.
22           MR. SLATER:  No problem.
23   BY MR. SLATER:
24       Q.   The paragraph continues, "The

Page 463

1    relative merits of high- and low-resolution
2    mass spectrometry are discussed, since use of
3    mass spectrometry as a confirmatory technique
4    is particularly important."
5            Do you see what I just read?
6        A.   Yes.
7        Q.   And certainly it was
8    well-known, at least as of 1978 when this
9    IARC monograph was published, that mass
10   spectrometry was an important confirmatory
11   technique to identify nitrosamines such as
12   NDMA, correct?
13           MR. BALL:  Objection.
14   Speculative, and calls for expert
15   testimony.
16       A.   This description itself is very
17   vague, okay.  Between, you know, that time
18   and now, you know, mass spectrometry has made
19   quite, you know, a significant progress.
20           So without knowing, you know,
21   the detail what this particular, you know,
22   you know, sentence is referring, you know,
23   it's very difficult, you know, you know, to
24   assess, you know.

Confidential Information - Subject to Protective Order

Page 464

1    I mean, one thing I would say,
2  you know, based upon, you know, such a low
3  level, right, now these, you know, you know,
4  like 30 ppb, you know, or sometimes even
5  lower, I would say that the technology or the
6  mass spectrometry, you know, during that time
7  would not be adequate to analyze or detect at
8  such a low level, you know, as we see or need
9  to, you know, test today.
10    Q.    You would agree with me that at
11  least as of 1978 when this IARC monograph was
12  published, it was known that mass
13  spectrometry was an important confirmatory
14  technique to identify nitrosamines such as
15  NDMA, correct?
16    MR. BALL:  Objection.  Calls
17  for expert testimony.
18    A.    Here it just said, yeah, the
19  principal technique, yeah, for the analysis
20  of volatile N-nitrosamine.
21    (Cross-talking.)
22  BY MR. SLATER.
23    Q.    That would include NDMA,
24  correct?

Page 465

1    MR. BALL:  You both were
2  talking at the same time.  I didn't
3  hear the question.  I'm sorry.
4    A.    So, Adam, could you repeat
5  the -- you know, the question, right, Rick
6  wanted to hear, right?
7  BY MR. SLATER:
8    Q.    When this talks about volatile
9  N-nitrosamines, that would include NDMA,
10  correct?
11    A.    Yes.
12    MR. SLATER:  All right.  Let's
13  take this document down, and we're
14  going to switch to another document.
15  So I don't know -- I lost track
16  of time, so you tell me.
17    MR. BALL:  We're at three hours
18  and 26 minutes, so we can -- it's
19  really up to you, Adam.  We've got
20  about an hour six since the last
21  break.
22    MR. SLATER:  All right.  Let's
23  keep going.  I'm fine --
24    MR. BALL:  Do you think you can

Page 466

1  finish your next document in like the
2  last -- the next 15 minutes, or do we
3  want to take a break now, or --
4    MR. SLATER:  I don't think I'm
5  going to finish this in the next
6  15 minutes.  I've got a lot of
7  interaction documents here.
8    MR. BALL:  Okay.  So why don't
9  we take a break, you can get yourself
10  set up and then, you know, if we need
11  to take another break we can, if we
12  don't we won't, okay?
13    MR. SLATER:  That sounds good.
14  All right.  So let's take ten.
15    THE VIDEOGRAPHER:  The time
16  right now is 11:07 a.m.  We're now off
17  the record.
18    (Whereupon, a recess was
19  taken.)
20    THE VIDEOGRAPHER:  The time
21  right now is 11:22 a.m.  We're back on
22  the record.
23  BY MR. SLATER:
24    Q.    Looking now at -- rephrase.

Page 467

1    Going back to the ICH
2  Guideline, M7 from 2013, we're now looking at
3  Section 7.2.1 titled "Mutagenic Impurities
4  With Positive Carcinogenicity Data (Class 1
5  in Table 1)."  And for these -- rephrase, I'm
6  going to start over.
7    MR. SLATER:  Let me just check
8  something.  I might want to go to a
9  different page.
10    You know what, let's go to
11  page 10, to the top of the page.
12  Great.  I'll start over.
13    Q.    We're back -- rephrase.
14    Looking at the ICH guideline
15  from 2013, we're now on page 10.  At the top
16  of page 10 it states, "A disproportionately
17  high number of members of some structural
18  classes of mutagens, i.e. aflatoxin-like-,
19  N-nitroso-, and azoxy structures, of which
20  some may occur as impurities in
21  pharmaceuticals, display extremely high
22  carcinogenic potency.  Acceptable intakes for
23  these high-potency carcinogens would likely
24  be significantly lower than the acceptable

Confidential Information - Subject to Protective Order

1  intakes defined in this guideline."
2        Do you see what I just read?
3     A.    Yes.
4     Q.    And first of all, they're
5  talking about these structures displaying
6  extremely high carcinogenic potency.  That
7  would relate to the tendency to be able to
8  increase your risk for or cause cancer,
9  correct?
10        MR. BALL:  Objection.  Vague.
11     A.    Specifically with regard to
12  nitrosamine, so I think in previous, you
13  know, you know, conversations, you know, I
14  think I indicated the carcinogenicity, it is
15  being discussed here, is referring to you,
16  know, the result, or the data derived from
17  animal studies.
18  BY MR. SLATER:
19     Q.    When this refers to extremely
20  high carcinogenic potency, that's talking
21  about the ability to cause or increase the
22  risk for cancer, correct?
23        MR. BALL:  Objection.  Vague.
24     A.    Again, the risk, you know, to

1  cancer with regard to N-nitrosamine, you
2  know, is really related to or referring to,
3  you know, you know, the -- in animals.
4  BY MR. SLATER:
5     Q.    This standard is talking about
6  impurities in pharmaceuticals.  Those would
7  be pharmaceuticals that would be taken by
8  human beings, correct?
9     A.    Yes.
10     Q.    And with regard to humans
11  taking pharmaceuticals, this is talking about
12  certain impurities that display extremely
13  high carcinogenic potency.  That's the
14  context, correct?
15        MR. BALL:  Objection.  Vague,
16        calls for expert testimony.
17     A.    With regard to that, you know,
18  specific, you know, the three classes, yes.
19  BY MR. SLATER:
20     Q.    And then when it says,
21  "Acceptable intakes for these high-potency
22  carcinogens would likely be significantly
23  lower than the acceptable intakes defined in
24  this guideline," this is talking about the

1  need to evaluate the specific impurities and
2  determine what would be the acceptable level
3  for that impurity as opposed to using the
4  threshold approach, correct?
5        MR. BALL:  Objection.
6  Foundation.
7     A.    Yeah.  I'm sorry.  Yes.
8  BY MR. SLATER:
9     Q.    And in this case, in 2018 the
10  FDA actually established certain limits when
11  this became known to them that there was NDMA
12  in the valsartan, correct?
13        MR. BALL:  Objection.
14  Foundation.
15     A.    Yeah, that was issued by FDA,
16  yeah, in 2018.
17  BY MR. SLATER:
18     Q.    And those limits for NDMA were
19  96 nanograms, which would equate to 0.3 parts
20  per million, correct?
21     A.    There was no such limit at that
22  time.  That limit was established only after,
23  you know, the events of June 2018.
24     Q.    In 2018, after the FDA was made

1  aware that there was NDMA in the valsartan,
2  the FDA established certain limits, correct?
3     A.    Yes.  And also I indicated
4  yesterday at different time point, you know,
5  you know, the limits also, you know, changes
6  with time.  From the very beginning of it
7  should be absent, meaning for NDMA would be 5
8  ppb in terms of the limit of detection to the
9  current, you know, 96-nanogram, which is
10  equivalent to 300 ppb.  So -- so you can see
11  there is a 60 times of increase in terms of
12  the allowable intake.
13     Q.    The FDA established limits of
14  96 nanograms, which equates to 0.3 parts per
15  million, correct?
16     A.    Yes, for valsartan.
17     Q.    For NDMA in valsartan, correct?
18     A.    Versus its maximum dose, yes.
19     Q.    And for NDEA, actually
20  established limits of 26.5 nanograms or
21  .083 parts per million, correct?
22        MR. BALL:  Objection.
23  Foundation.
24     A.    Yeah, it looks like, yes.

Page 472

BY MR. SLATER:

1 BY MR. SLATER:
2      Q.    And these limits were set as --
3 rephrase.
4           These limits were set in order
5 to protect patient safety, correct?
6           MR. BALL:  Objection.
7 Speculation.
8      A.    As the title of --
9           MR. BALL:  Calls for expert
10 testimony.
11           Go ahead.
12      A.    As the title of this M7
13 implies, you know, the purpose is limit of
14 potential carcinogenic risk.
15           MR. SLATER:  Cheryll, what I'd
16 like to do now is pull up, if we
17 could, Exhibit 42.
18 BY MR. SLATER:
19      Q.    Page 42 is a document dated
20 September 1st, 2018 titled "Response to DMF
21 Information Request Letter."
22           Do you see that there?
23      A.    Mm-hmm.  Yep.
24      Q.    What I'd like to now do is turn

Page 473

1 to page 8, if we could, please.
2           MR. SLATER:  If you could,
3 Cheryll, just scroll up a little bit
4 more so we capture the top part of the
5 page, and then we'll scroll down once
6 we read the top.  Thank you.
7      Q.    Looking now on page 8 of this
8 document, there was a request, you can see at
9 the top, little letter "b.", "Provide a
10 summary of the data for all lots tested to
11 date for NDMA manufactured using the
12 post-change process ('zinc chloride
13 process').  Provide the corresponding GC
14 chromatograms."
15           And the Response is that, "The
16 summary of the data for all lots tested to
17 date for NDMA manufactured using the
18 post-change process (the zinc chloride
19 process) are provided in Table 1."
20           Do you see that?
21      A.    Mm-hmm, yes.
22      Q.    And we just talked a little bit
23 about the limits.
24           MR. SLATER:  You can scroll up

Page 474

1 a little, Cheryll, so that we just
2 show the table at this point.  A
3 little more.  Thank you.
4      Q.    We talked a few moments ago
5 about the limits the FDA set, and for NDMA it
6 was 0.3 parts per million.  We talked about
7 that, right?
8      A.    Mm-hmm.
9      Q.    And -- rephrase.
10           Looking now at Batch Number 1,
11 which was manufactured on December 28, 2011,
12 which was one of the validation batches, the
13 NDMA result was 76 parts per million,
14 correct?
15           MR. BALL:  Objection.
16 Foundation.
17      A.    I'm sorry.  Yes.
18 BY MR. SLATER:
19      Q.    And I just did some simple math
20 and divided 76 by .3 to try to figure out how
21 many times the FDA limit that was, and I came
22 to 253 times the FDA limit.
23           Does that sound right to you?
24      A.    Probably, yeah.

Page 475

1      Q.    And just randomly looking at
2 this, going on the right-hand column,
3 Batch 409 at 99.6, that's 332 times the FDA
4 limit.
5           Do you see that?
6           MR. BALL:  Adam, I don't see
7 batch 409.
8           MR. SLATER:  It's in the second
9 column.
10      A.    Right here, yeah.
11           MR. BALL:  Oh, number 409, not
12 batch 409.  The batch number is --
13 okay.  I misunderstood what you were
14 pointing to, Adam.
15           MR. SLATER:  No problem, no
16 problem.
17           Cheryll, could you scroll down
18 a little bit, please?  Let's scroll a
19 few pages down to page 11 of 33, to
20 the top of that chart.  You'll see
21 it's -- you're going to see number 125
22 in the left and 517 in the middle.
23 There you are.
24      Q.    Looking now at the batch

Page 476

1 numbered 518, we have 188.1 parts per
2 million, which if you divide that by .3,
3 that's 627 times the limit set by the FDA,
4 correct?
5      A.    Yes.
6      Q.    And we can go through this. My
7 point being, this actually was through --
8 rephrase.
9           MR. SLATER: Cheryll, can you
10     scroll to the end on page 16, just so
11     we can establish the number of batches
12     that were tested? Perfect.
13     Q.    783 batches. We can agree that
14 all of these batches tested at numbers many,
15 many times more than the limit the FDA ended
16 up setting, correct?
17          MR. BALL: Objection. Vague.
18     A.    They're all higher, yeah, than
19 0.3.
20 BY MR. SLATER:
21     Q.    And in terms of the health and
22 safety component, those levels certainly
23 are -- rephrase.
24          In terms of health and safety

Page 477

1 for patients, those levels of NDMA are not
2 acceptable from a health standpoint, correct?
3           MR. BALL: Objection. Calls
4      for expert testimony.
5      A.    As I indicated yesterday, in
6 terms of the health risks, you know, it would
7 be better suited, you know, to be answered by
8 a toxicologist.
9 BY MR. SLATER:
10     Q.    Well, speaking for ZHP, those
11 levels are certainly not acceptable for sale,
12 correct?
13          MR. BALL: Objection. Vague.
14     A.    At the time of the -- you know,
15 of the registration, you know, you know,
16 prior to these events, you know, this
17 particular specification was not there, you
18 know, so all product met all the, you know,
19 regulatory filed specifications. So this is
20 really a retrospective analysis.
21 BY MR. SLATER:
22     Q.    Well, let's talk
23 retrospectively.
24          Retrospectively looking at

Page 478

1 these levels, it was never acceptable to be
2 selling valsartan with these levels of NDMA,
3 correct? From a health perspective from
4 ZHP's view of the health risk?
5           MR. BALL: Objection.
6      Speculative and compound, and calls
7      for expert testimony.
8 BY MR. SLATER:
9      Q.    I'll ask the question again.
10 One second.
11          From ZHP's perspective, the
12 health risk posed by these levels of NDMA was
13 never acceptable, correct?
14          MR. BALL: Objection. Vague.
15     A.    You know, again, you know, with
16 potential risk to, you know, patients, again,
17 this would be best answered by a
18 toxicologist.
19 BY MR. SLATER:
20     Q.    Well, I'm asking you, who is
21 testifying for ZHP in this deposition on this
22 topic, and you would agree with me on behalf
23 of ZHP these levels would never have been and
24 never were acceptable from a health

Page 479

1 perspective for the patients using
2 medication, correct?
3           MR. BALL: Objection. Calls
4      for expert testimony, vague.
5      A.    Again, you know, it's not
6 for -- you know, for me, you know, to, you
7 know, give that evaluations.
8 BY MR. SLATER:
9      Q.    Well, the FDA certainly has
10 toxicologists on their staff, right?
11     A.    Oh, yeah.
12     Q.    And they determined these
13 levels would not be acceptable from a health
14 standpoint, correct?
15          MR. BALL: Objection.
16     Speculative.
17     A.    Retrospectively, based on the
18 current knowledge, this is the case.
19 Retrospectively, again.
20 BY MR. SLATER:
21     Q.    And that unacceptable health
22 risk is an unacceptable risk that somebody
23 could develop cancer as a result of using
24 this medication contaminated with NDMA at

Confidential - Subject to Protective Order

Page 480

1  these levels, correct?
2          MR. BALL:  Objection.  Calls
3      for expert testimony, compound,
4      foundation.
5      A.   As I indicated yesterday, you
6  know, NDMA, you know, to human is a probable
7  or potential carcinogenic.  So whether, you
8  know, these levels will cause cancer in
9  humans is not confirmed.
10 BY MR. SLATER:
11     Q.   Well, when you -- rephrase.
12         NDMA is considered a probable
13 carcinogen, which means more likely than not
14 it will cause or contribute to somebody at
15 least having an increased risk to develop
16 cancer.  Can we agree to that without having
17 to quantify the level of increased risk?
18         Can we agree to that statement?
19         MR. BALL:  Objection.  Calls
20     for expert testimony.
21     A.   There is no evidence, you know,
22 you know, at this point, or there's no, you
23 know, confirmed link, okay, between these
24 levels, you know, of NDMA to the potential

Page 481

1  risk or to -- you know, to -- essentially,
2  you know, it's a potential risk, okay.  So a
3  potential risk is not a confirmed link.
4  BY MR. SLATER:
5      Q.   You would agree with me that
6  the people who took the valsartan
7  contaminated with NDMA have a higher risk to
8  develop cancer than if they had not taken the
9  valsartan contaminated with NDMA.
10         You would agree with that
11 statement, correct?
12         MR. BALL:  Objection.  Outside
13     the scope, and calls for expert
14     testimony, and foundation.
15     A.   Again, it's best to be answered
16 by a toxicologist.
17 BY MR. SLATER:
18     Q.   This is Topic 36.  This is what
19 you're designated to testify on.  It's not
20 expert testimony, it's not beyond the scope.
21 It's ZHP's evaluation and knowledge of the
22 health risks of this contamination with NDMA.
23         MR. BALL:  Adam, I didn't
24     instruct him not to answer.

Page 482

1          MR. SLATER:  No, I understand,
2  but what I'm --
3          MR. BALL:  Adam, I've made my
4  objection.
5          MR. SLATER:  The problem is
6  your witness continues to say he won't
7  answer the question when he's
8  designated to answer the question.
9          MR. BALL:  No, no.  I don't
10 think it is that.  I think it actually
11 is outside the scope.  But if you want
12 to continue to ask him, feel free.
13 BY MR. SLATER:
14     Q.   Based on ZHP's evaluation and
15 knowledge of the health risks of the NDMA
16 contamination of the valsartan, those people
17 who took those pills have a higher risk to
18 develop cancer than if they had not taken
19 those pills.
20         You can agree to that, right?
21         MR. BALL:  Objection.
22 Mischaracterizes his testimony,
23 foundation, and calls for expert
24 testimony.

Page 483

1      A.   This is what, you know, you
2  said, okay?  I didn't say that, okay.  And
3  from, you know, ZHP's perspective in terms of
4  the health risk, right, all I can tell you
5  based on my expertise, based on my
6  understanding, is this is a potential risk to
7  human, okay.  Anything beyond that, you know,
8  it's really not appropriate for me, you know,
9  to comment.
10 BY MR. SLATER:
11     Q.   Well, you're the only person
12 designated on this topic, so you're the
13 person I have to ask these questions of.
14         MR. BALL:  Objection.
15 Argumentative.
16     A.   Yeah, you know, I give you
17 answer, you know, you know.  You know, my
18 answer, you know, or, you know, by
19 representing ZHP is at this point our, you
20 know, you know, risk assessment, you know,
21 based upon, you know, you know, you know, you
22 know, the potential risk, you know, to human.
23 You know, everything, you know, is out there,
24 you know, as I said.

Confidential Information - Subject to Protective Order

Page 484

1    At this point it's still a
2    potential risk, okay.  There is no
3    established link, okay?
4          And also yesterday, you know, I
5    gave you an example, right, a 40,000-plus,
6    you know, patient taking ranitidine, you
7    know, which is known now, you know, to give
8    huge amount.  You know, the level of NDMA
9    actually, if you look at the paper, actually
10   are much higher, you know, than these.  And
11   versus a group of control, you know, a group
12   like more than 10,000, you know, patient
13   taking famotidine, which is the same class of
14   the medication, but would not decompose to
15   give NDMA.
16         So, as I indicated, you know,
17   this is from my, you know, limited, you know,
18   understanding, you know, in this particular,
19   you know, like a clinical side, right, you
20   know.
21         To me this is very
22   well-controlled, with large enough population
23   to have a significant, you know, you know,
24   meaningful, you know, results.

Page 485

1          You know, I -- and again, you
2    know, this result, you know, indicated that
3    there is no increased, you know, cancer risk
4    to patients taking ranitidine versus, you
5    know, the patient taking, you know,
6    famotidine.
7    Q.    You told me earlier that ZHP
8    made the decision to stop selling its
9    valsartan because of the levels of NDMA in
10   the valsartan.  That was for the benefit of
11   patients, right?
12         MR. BALL:  Objection.
13   Mischaracterizes his earlier
14   testimony.
15   A.    Yeah, I think I already give
16   the answer, you know, previously.
17   BY MR. SLATER:
18   Q.    Well, let me ask you now.
19         When ZHP decided to stop
20   selling -- rephrase.
21         As you said that -- rephrase.
22         When ZHP, as you said, decided
23   to stop selling the valsartan contaminated
24   with NDMA, that decision was made based on

Page 486

1    the health risk to patients, right?
2          MR. BALL:  Objection.
3    Mischaracterizes his earlier
4    testimony.
5    A.    I said based upon the potential
6    risk to human, yeah, or to patient.
7    BY MR. SLATER:
8    Q.    When you say due to the
9    potential risk to patients, it was determined
10   by ZHP that it was unacceptably dangerous for
11   patients to take the pills contaminated with
12   the NDMA, correct?
13         MR. BALL:  Objection.
14   Mischaracterizes his earlier
15   testimony.
16   A.    Again, this is what you're
17   saying.  Okay.  This is not what I said.  So
18   I think I have answered numerous times, you
19   know, yesterday as well as today.
20   BY MR. SLATER:
21   Q.    Well, when you say that it was
22   a potential risk, what you're saying is that
23   it was too dangerous, otherwise you would
24   have kept selling it, correct?

Page 487

1          MR. BALL:  Objection.
2    Mischaracterizes his testimony, and
3    argumentative.
4    A.    I think any -- anyone with a,
5    you know, a reasonable, you know,
6    understanding will not equal a potential
7    risk, you know, to, like you said, a very
8    dangerous.  These -- these two are clearly,
9    you know, you know, they are -- mean
10   different things.
11   BY MR. SLATER:
12   Q.    When you say a potential risk,
13   it was an unacceptable risk in ZHP's
14   viewpoint, and that's why ZHP stopped selling
15   the valsartan, correct?
16         MR. BALL:  Objection.
17   Mischaracterizes his testimony.
18   A.    Again, our decision was based
19   upon the potential risk, you know, to
20   patients.
21   BY MR. SLATER:
22   Q.    And the decision that that
23   potential risk was unacceptable, correct?
24         MR. BALL:  Objection.

Confidential Information - Subject to Protective Order

Page 488

1    Mischaracterizes his testimony, asked
2    and answered.
3    A.    I mean, I -- you know, if you
4    want to keep asking the same question, you
5    know, you know, I can give you the same
6    answer.
7        You know, basically as I said,
8    the decision was made based upon the
9    potential risks to patients and which, you
10   know, that potential risk is based upon, you
11   know, the available scientific, you know, you
12   know, documents available, you know, as of
13   today.
14       MR. SLATER:  Take this document
15   down.  And Cheryll, let's go to
16   Exhibit 205, please.
17   BY MR. SLATER:
18   Q.    This is the DMF amendment that
19   was filed -- it's dated November 10, 2013 --
20   was filed in December of 2013.
21       Do you see that?
22   A.    Yes.
23   Q.    And this section 3.2.S.3.2
24   lists impurities, and there's a table of

Page 490

1    you know, the presence of impurity K or
2    whatever.  So I think that this is a
3    regulatory filing document, so I think my
4    colleague from the regulatory affair, you
5    know, will have a much better, you know, you
6    know, answer to you.
7        Q.    Well, the regulatory affairs
8    people aren't the ones determining what
9    impurities are in the substance, they seek
10   that advice from people like yourself, right?
11       MR. BALL:  Objection.  Vague.
12   A.    Well, basically, you know, they
13   will, you know, get -- you know, confirm the
14   results from R&D people, including, you know,
15   my organizations.
16       But here, yeah, I clearly don't
17   see impurity K.  You know, the very reason at
18   this point why it's not in there, you know, I
19   just cannot tell you the details, because I
20   don't know, you know, those details.
21       Only thing that I know is
22   during the course, you know, at a certain
23   point, you know, we became to know.
24       ///

Page 489

1    Potential Impurities in Valsartan.
2        Do you see that?
3    A.    Oh, yeah, mm-hmm, sure.
4        MR. SLATER:  And, Cheryll, if
5    you could scroll down through that
6    list of impurities, let's go through
7    the lettered ones.  Go to the last
8    lettered one that we can get to.  I
9    think it's probably going to be J.
10   There we go.
11   Q.    In the list of impurities in
12   this DMF, it goes up to impurity J.
13   Impurity K, which we've discussed previously,
14   was not listed, correct?
15   A.    Based upon this table, it was
16   not listed in there.
17   Q.    And -- rephrase.  And please --
18   well, rephrase.
19       And I think you've told us
20   already that by this time ZHP knew that there
21   was impurity K in the valsartan?  Do I
22   understand that correctly?
23   A.    I have not saying, you know,
24   specifically like by 2013, you know, we knew,

Page 491

1    BY MR. SLATER:
2    Q.    You don't know when that was?
3    A.    I would say it's -- looks like,
4    you know, it's probably, you know, maybe
5    after this one, you know.
6    Q.    Do you have any idea when it
7    was discovered or who discovered it?
8        MR. BALL:  Objection.  Vague.
9        MR. SLATER:  All right.  I'll
10   ask it again.
11   BY MR. SLATER:
12   Q.    Do you have any idea who
13   identified impurity K, and when that occurred
14   in the valsartan manufactured by ZHP?
15   A.    I told you yesterday
16   retrospectively that we knew it was, you
17   know, it was, you know, discovered by the
18   original innovator, you know, Novartis.
19       MR. SLATER:  Let's scroll
20   through, slowly through the end of the
21   list of impurities, please.
22   Q.    And please look at this because
23   I'm going to ask you at the end --
24       MR. SLATER:  Stop for one

Confidential Information - Subject to Protective Order

---

Page 492

1    second, Cheryll.
2        Q.    Tell me if you see any
3    nitrosamines listed as potential impurities.
4        MR. SLATER:  And you can
5    continue scrolling.
6        Q.    You would agree with me that no
7    nitrosamines were listed as potential
8    impurities for the zinc chloride process
9    valsartan, correct?
10        A.    Yes, in this file, yes.
11        MR. SLATER:  Let's go, if we
12    could, Cheryll, to page 364.
13        Q.    Okay.  Now we have -- rephrase.
14        Looking at page 364, there's a
15    listing that says, "All the potential organic
16    impurities are demonstrated in valsartan
17    listed as follows."  And you can see there's
18    no impurity K and there's no nitrosamines,
19    correct?
20        A.    Yeah, looks like.
21        MR. SLATER:  Cheryll, please
22    scroll down now to the bottom part of
23    this page.
24        Q.    Okay.  Looking now at the text

---

Page 493

1    underneath that table, it says, "Regarding
2    the impurity D-J and hydrolysis product,
3    there is not any high potency genotoxic
4    group, such as, aflatoxin-like-, N-nitroso-,
5    and azoxy-compound has been included in these
6    impurities."
7        I want to stop there.
8        We know certainly in retrospect
9    that, in fact, there was NDMA in the
10    valsartan, correct?
11        A.    Yes, retrospective.
12        Q.    So this DMF was inaccurate when
13    it said there were no N-nitroso compounds,
14    correct?
15        A.    It was based upon the knowledge
16    at the time.
17        Q.    It was incorrect at the time,
18    correct?
19        A.    As I said, retrospectively it
20    turned out to be not accurate.
21        MR. SLATER:  I think we can
22    take that down.  And the next document
23    that we're going to go to is
24    ZHP01567728.  And I think you can put

---

Page 494

1    the English translation into the --
2    the link or whatever it is, Cheryll,
3    if you could do that as well, please.
4        And then once it's there you
5    all can let me know and I'll continue.
6        MS. CALDERON:  Can I take --
7    can we take just a minute off the
8    record?  I just want to locate the
9    English translation.
10        MR. SLATER:  Sure.
11        THE VIDEOGRAPHER:  Off the
12    record, or timer?
13        MR. BALL:  No, it's fine, we
14    can go off the record.
15        THE VIDEOGRAPHER:  Time right
16    now is 11:54 a.m.  We're now off the
17    record.
18        (Pause.)
19        (Whereupon, Exhibit Number
20    ZHP-313 was marked for
21    identification.)
22        THE VIDEOGRAPHER:  The time
23    right now is 11:57 a.m.  We're back on
24    the record.

---

Page 495

1        MR. SLATER:  Great.  Thank you.
2        You know, Cheryll, scroll down
3    a little bit just so we can see the
4    whole bottom e-mail.  Perfect.  A
5    little more actually.  See if you can
6    get -- no, too much.  There you go.
7    BY MR. SLATER:
8        Q.    Looking at Exhibit 313, it's an
9    e-mail exchange in June 2018, June 16th.
10        Do you see that?
11        A.    Yeah, mm-hmm.
12        Q.    It looks like someone named
13    Minfa Wang wrote to you on June 16, 2018.
14        Who is Minfa Wang?
15        A.    She is the analytical head at
16    Prinston Pharmaceuticals, which is a
17    subsidiary of Huahai.
18        Q.    And she wrote to you and said,
19    "Attached paper is from web below."  And then
20    she quotes a link, and says, "It looks the
21    potent is different between" -- and I assume
22    that means potency -- "is different between
23    nitrosamines and nitramines.  Nitramine is
24    less potent than that nitrosamine.  Have been

---

Confidential Information - Subject to Protective Order

Page 496

1  confirmed as nitrosamine?"
2      That's what she asked you,
3  correct?
4      A.    Yes.
5      Q.    And you then -- let's scroll up
6  now to your response.
7      And you confirmed -- "It is
8  confirmed the impurity is NDMA," correct?
9      A.    Yes.
10     MR. SLATER:  Can we -- as
11     Exhibit 314, let's put up the next
12     document, which was the document that
13     that link will take you to.
14     THE WITNESS:  Right.
15     (Whereupon, Exhibit Number
16     ZHP-314 was marked for
17     identification.)
18 BY MR. SLATER:
19     Q.    It's titled "Health effects of
20 amines and derivatives associated with CO2
21 capture:  Nitrosamines and nitramines."
22     And it looks like it was an
23 analysis or study that was carried out by the
24 Norwegian Institute of Public Health,

Page 497

1  correct?
2      A.    I don't remember, you know, you
3  know, at the time, you know, when I probably
4  clicked the link, and so I don't remember
5  exactly who published it.  But if you say,
6  you know, that's Norwegian -- oh yeah.
7  Here's the Norwegian.  Yeah, I saw that.
8  Okay, yeah.
9      MR. SLATER:  Let's go now to
10     the next page, please, to Section 2,
11     paragraph 2.  Perfect.
12     Q.    Looking now at paragraph 2,
13 titled "Evaluation of cancer risk from
14 exposure to nitrosamines."
15     Do you see that?
16     A.    Oh, yeah, mm-hmm.
17     Q.    And this says, "Nitrosamines
18 represent a large and diverse family of
19 synthetic and naturally occurring compounds.
20 Approximately 90 percent of the 300
21 nitrosamines tested have shown carcinogenic
22 effects in bioassays and laboratory animals.
23 Among these, NDMA has been most thoroughly
24 studied.  NDMA has been shown to be a potent

Page 498

1  mutagen and carcinogen."  And it cites an
2  NIPH report from 2009, which would be the
3  same organization, Norwegian Institute of
4  Public Health.
5      It then says, "Due to their
6  potent carcinogenicity, other health outcomes
7  of these compounds have been given less
8  emphasis and are therefore less well
9  documented."
10     So that would have been some
11 information that would have been available to
12 you when Minfa Wang wrote to you in
13 June 2018?
14     A.    Yeah.
15     MR. SLATER:  Let me just check
16     something.
17     Okay.  We're done with that
18     document.
19     At this point I'm going to wrap
20     up for the night.
21     MR. BALL:  Okay.  Adam, we've
22     gone like four hours tonight.  I
23     just -- I want to make sure you
24     understand we're not going to add time

Page 499

1  on to the last day.
2      MR. SLATER:  You know what, I
3  don't want to argue with you, but it's
4  fine.
5      THE VIDEOGRAPHER:  Do you want
6  that off the record?
7      MR. BALL:  Yeah, yeah.
8      MR. SLATER:  It's fine if it's
9  on the record or off the record.
10     THE VIDEOGRAPHER:  The time
11 right now is 12:02 p.m.  We're now off
12 the record.
13     (Whereupon, the deposition was
14 adjourned.)

Page 500

CERTIFICATE

I, MAUREEN O'CONNOR POLLARD, Registered Diplomate Reporter, Realtime Systems Administrator, and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, MIN LI, PhD, was remotely duly identified and sworn by me to testify to the truth, the whole truth, and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
MAUREEN O'CONNOR POLLARD
NCRA Registered Diplomate Reporter
Realtime Systems Administrator
Certified Shorthand Reporter
Notary Public

Dated:  April 23, 2021

Page 501

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 502

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

REASON: _____

___  ___  _____

Page 503

ACKNOWLEDGMENT OF DEPONENT

I, _____, do Hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Min Li, Ph.D.            Date

Subscribed and sworn
To before me this
_____ day of _____, 20____.

My commission expires: _____

_____
Notary Public

Confidential Information Subject to Protective Order

Page 504

1       LAWYER'S NOTES

2  PAGE  LINE

3  ____  ____  _____

4  ____  ____  _____

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10 ____  ____  _____

11 ____  ____  _____

12 ____  ____  _____

13 ____  ____  _____

14 ____  ____  _____

15 ____  ____  _____

16 ____  ____  _____

17 ____  ____  _____

18 ____  ____  _____

19 ____  ____  _____

20 ____  ____  _____

21 ____  ____  _____

22 ____  ____  _____

23 ____  ____  _____

24 ____  ____  _____