Exhibit 51

Confidential Information - Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
2                    CAMDEN VICINAGE

3
       *****************************
4
       IN RE:  VALSARTAN, LOSARTAN,   MDL No. 2875
5      AND IRBESARTAN PRODUCTS
       LIABILITY LITIGATION           Civil No.
6                                     19-2875
       ****************************   (RBK/JS)
7
       THIS DOCUMENT APPLIES TO ALL   HON ROBERT B.
8      CASES                          KUGLER
9      ****************************
10              - CONFIDENTIAL INFORMATION -
                SUBJECT TO PROTECTIVE ORDER
11

12

13             Continued Remote Videotaped via
14     Zoom Deposition of MIN LI, Ph.D., commencing at
15     7:08 a.m. China Standard Time, on the 22nd of
16     April, 2021, before Maureen O'Connor Pollard,
17     Registered Diplomate Reporter, Realtime
18     Systems Administrator, Certified Shorthand
19     Reporter.
20
21                    - - -
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24

Page 506

1   APPEARANCES:  ALL PARTIES APPEARED REMOTELY
2
    MAZIE SLATER KATZ & FREEMAN, LLC
3   BY:  ADAM SLATER, ESQ.
    BY:  CHERYLL A. CALDERON, ESQ.
4   BY:  JULIA S. SLATER, ESQ.
    BY:  CHRISTOPHER GEDDIS, ESQ.
5       103 Eisenhower Parkway
        Roseland, New Jersey 07068
6       973-228-9898
        aslater@mazieslater.com
7       ccalderon@mazieslater.com
        cgeddis@mazieslater.com
8       Representing the Plaintiffs
9
    HOLLIS LAW FIRM
10  BY:  IRIS SIMPSON, ESQ.
    BY:  C. BRETT VAUGHN, ESQ.
11      8101 College Boulevard, Suite 260
        Overland Park, Kansas 66210
12      800-701-3672
        iris@hollislawfirm.com
13      Representing the Plaintiffs
14
    MORGAN & MORGAN
15  BY:  STEPHANIE JACKSON, ESQ.
    BY:  HANNAH FUJIMAKI, ESQ.
16      20 North Orange Avenue, Suite 1600
        Orlando, Florida 32801
17      sjackson@forthepeople.com
        hfujimaki@forthepeople.com
18      Representing the Plaintiffs
19
    FLEMING NOLAN JEZ, LLP
20  BY:  DAVID HOBBS, ESQ.
        2800 Post Oak Boulevard
21      Houston, Texas 77056
        713-621-7944
22      david_hobbs@fleming-law.com
        Representing the Plaintiffs
23
24

Page 507

1   APPEARANCES (Continued):
2
    FARR LAW FIRM
3   BY:  GEORGE T. WILLIAMSON, ESQ.
        99 Nesbit Street
4       Punta Gorda, Florida 33950
        941-639-1158
5       gwilliamson@farr.com
        Representing the Plaintiffs
6
7
    GREENBERG TRAURIG LLP
8   BY:  KATE M. WITTLAKE, ESQ.
        4 Embarcadero Center, Suite 3000
9       San Francisco, California 94111
        415-655-1285
10      wittlakek@gtlaw.com
        Representing the Defendants Teva
11      Pharmaceutical Industries, Ltd., Teva
        Pharmaceuticals SA, Inc., Actavis LLC,
12      and Actavis Pharma, Inc.:
13
14  DUANE MORRIS, LLP
15  BY:  NATHAN B. REEDER, ESQ.
        30 South 17th Street
16      Philadelphia, Pennsylvania 19103
        215-979-1164
17      nbreeder@duanemorris.com
        Representing the Defendants Zhejiang
18      Huahai Pharmaceutical Co., Ltd.,
        Prinston Pharmaceutical Inc., Huahai
19      U.S., Inc., and Solco Healthcare US,
        LLC
20
21
22
23
24

Page 508

1   APPEARANCES (Continued):
2
    DUANE MORRIS, LLP
3   BY:  PATRICK C. GALLAGHER, ESQ.
        1875 NW Corporate Boulevard
4       Boca Raton, Florida 33431
        561-962-2131
5       pcgallagher@duanemorris.com
        Representing the Defendants Zhejiang
6       Huahai Pharmaceutical Co., Ltd.,
        Prinston Pharmaceutical Inc., Huahai
7       U.S., Inc., and Solco Healthcare US,
        LLC
8
9
    DUANE MORRIS, LLP
10  BY:  FREDERICK R. BALL, ESQ.
        100 High Street
11      Boston, Massachusetts 02110
        857-488-4229
12      frball@duanemorris.com
        Representing the Defendants Zhejiang
13      Huahai Pharmaceutical Co., Ltd.,
        Prinston Pharmaceutical Inc., Huahai
14      U.S., Inc., and Solco Healthcare US,
        LLC
15
16
    CIPRIANI & WERNER, P.C.
17  BY:  JULIA H. FERTEL, ESQ.
        450 Sentry Parkway
18      Blue Bell, Pennsylvania 19422
        610-567-0700
19      jfertel@c-wlaw.com
        Representing the Defendant Aurobindo
20      Pharmaceuticals
21
22
23
24

Page 509

1   APPEARANCES (Continued):
2
    PIETRAGALLO GORDON ALFANO BOSICK &
3   RASPANTI, LLP
    BY:  JOHN B. ZAPPONE, ESQ.
4       One Oxford Centre
        Pittsburgh, Pennsylvania 15219
5       412-263-1840
        jbz@pietragallo.com
6       Representing the Defendant Mylan
        Pharmaceuticals, Inc.
7
8
    Also Present:  Phil Hughes
9               Andrew Huang, Esq.
10
    Videographer: Judy Diaz
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 510

```
 1            INDEX
 2  EXAMINATION                    PAGE
 3  MIN LI, Ph.D.
 4  BY MR. SLATER                  514
 5
 6
 7       E X H I B I T S
 8  NO.      DESCRIPTION           PAGE
 9  ZHP-210    Previously marked.
            Deviation Investigation
10          Report....................  657
11  ZHP-212    Previously marked.
            Investigation regarding an
12          unknown impurity, Bates
            ZHP00662283 through 2309....  528
13
14
15          NEW EXHIBITS
16
17  ZHP-315    7/22/18 e-mail, Bates
            SYNCORES00028075............  514
18  ZHP-316    E-mail chain, Bates
            CHARLESWANG000239 through
19          291.........................  537
20  ZHP-317    Safety Data Sheet, Bates
            CHARLESWANG000310 through
21          317.........................  567
22  ZHP-318    6/22/18 e-mail, Bates
            CHARLESWANG000430...........  571
23
24  ZHP-319    E-mail chain, Bates
            CHARLESWANG000447 through
```

Page 511

```
 1
 2  ZHP-320    Nonclinical Safety
            Assessment of
 3          N-nitrosodimethylamine
            (NMDA) and Recommended
 4          Limit in Drug Product,
            Bates CHARLESWANG000164
 5          through 182.................  649
 6  ZHP-321    Concise International
            Chemical Assessment
 7          Document 38 regarding NDMA..  664
 8  ZHP-315-t  English translation of
            ZHP-315.....................  514
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 512

```
 1            - - -
    DEPOSITION SUPPORT INDEX
 2            - - -
 3
    Direction to Witness Not to Answer
 4  PAGE LINE
    None.
 5
 6
 7
 8  Request for Production of Documents
    PAGE LINE
 9  None.
10
11
    Stipulations
12  PAGE LINE
    None.
13
14
    Questions Marked Highly Confidential
15  PAGE LINE
    None.
16
17
18
19
20
21
22
23
24
```

Page 513

```
 1       P R O C E E D I N G S
 2
 3       THE VIDEOGRAPHER:  We're now on
 4  the record.
 5       My name is Judy Diaz.  I am a
 6  legal videographer for Golkow
 7  Litigation Services.
 8       Today's date is April 22, 2021,
 9  and the time is 7:08 a.m.
10       This remote video deposition is
11  being held in the matter of Valsartan,
12  Losartan, and Irbesartan Products
13  Liability Litigation MDL.
14       This is the continuation of the
15  deponent Min Li Ph.D.
16       All parties to this deposition
17  are appearing remotely and have agreed
18  to the witness being sworn in
19  remotely.
20       All counsel will be noted on
21  the stenographic record.
22       The court reporter is Maureen
23  Pollard.
24       ///
```

Confidential Information - Subject to Protective Order

Page 514

MIN LI, Ph.D.,
having been previously duly remotely sworn,
was examined and testified further as
follows:

MR. SLATER:  Cheryll, I think
we can put up Exhibit 315, the next
exhibit, and I think there's an
English translation you can put in the
box for counsel.
(Whereupon, Exhibit Numbers
ZHP-315 and ZHP-315-t were marked for
identification.)
MR. SLATER:  Is it possible to
make that a little smaller?  Let's get
that so we can see it.
FURTHER EXAMINATION
BY MR. SLATER:
Q.    In front of us we have
Exhibit 315, which is a July 22, 2018,
e-mail.
And if we could, let's look,
first of all, just at who it's written from
and to.  Can you just let us know what that

Page 515

says, please, in terms of who it's written
from and to?
A.    I don't know this person
X.W. Guo.  But I certainly know they're
recipients, Chinese name Huang Luning, he is
the vice president at SynCores.
Q.    I missed who you said.  Who was
the person who received it?
A.    Huang Luning.
Q.    And he's the head of SynCores?
A.    No, he is the vice president of
SynCores.
Q.    The vice president of SynCores.
So this e-mail was sent from
the vice president of Shanghai SynCores --
A.    No, I'm sorry.  I don't know
who the sender is, okay.  That's, you know,
you know, you know, like Guo, I don't know
who this person.  But the recipient I know.
I personally know him, yes.
Q.    So the recipient is the vice
president of SynCores.
A.    Yes.
Q.    And it was written, according

Page 516

to the e-mail, by somebody who also worked at
SynCores, correct?
A.    Yes, looks like, yeah.
Q.    And tell us, let's start with
the introduction part, what that says.
A.    He said, "Dr. Huang, updated
the data as shown below."  It said, starting
from the number 6, like big points, or he
said that, you know, you can look from the
number 6, which is the major, you know,
points, like they have like, you know, one,
two, three, you know, like a big points,
right.  So number 6.
Q.    Before you read 6, I just
wanted to establish, so -- rephrase.
So this e-mail was written to
Mr. Huang, and it says that an updated table
is shown, and he's starting from heading
number 6, it looks like, right?
A.    Yes, exactly, yep.
Q.    Let's look at -- first, it says
in the first one, I see a 111.4 ppm.  What is
that referring to?
A.    Just basic, you know, you know,

Page 517

what is written here, right.  So first, you
know, three characters is basically the
Chinese name for valsartan.  We call it
(Chinese pronunciation valsartan), right?
So there's a parentheses, 111.4
ppm, and the next thing he said, you know,
genotoxic, probably, you know, means NDMA.
Okay.
So my guess is, okay, just
based upon, you know, you know, what I can
look at here, he probably referred to a
particular valsartan batch which has NDMA,
you know, in terms of its contents, like an
111.4 ppm.
Q.    I wanted to see if we could go
through and just understand how we calculate
something.  And maybe you can help me.  I
want to try to convert ppm to nanograms.
So if we have 111.4 ppm, my
understanding is that we would then need to
know the milligrams of the pill as part of
the calculation, is that correct?
A.    Yeah, you can certainly
calculate based upon 111.4, yeah.

1    Q.    So it was a 320-milligram
2  valsartan pill and it was 111.4 ppm, would we
3  just multiply 111.4 times 320 to find the
4  nanograms?
5    A.    This would be in the unit also
6  of the milligram, right?  So, 320
7  times 111.4, you will get -- you have to
8  divide it by 1 million, right, divide it by 1
9  million, and then the number you got should
10  be in the unit of milligram.
11    Q.    Well, it's my understanding
12  there's 1 million nanograms in a milligram,
13  is that correct?
14    A.    Well, ppm basically means 1
15  particle per million.  It doesn't matter,
16  like, yeah, what the -- you know, you know,
17  it's a ratio.
18    Q.    So if it's -- rephrase.
19       If it's measured in parts per
20  million --
21    A.    Right.  So, yeah, basically if
22  you wanted to know, you know, equivalent to
23  320 milligram a tablet, right, made from
24  dispatch, so I think the calculation would be

1  320 times 111.4 divided by 1 million.
2       And then you've got, you know,
3  like, whatever the XYZ number, right, but the
4  unit will be milligram, because you're
5  starting from 320 milligram.
6    Q.    Well, I'm trying to calculate
7  in nanograms.
8    A.    Nanograms, then you will be --
9  let's see.  You will be nanograms, so
10  milligram, micro- -- yeah, so there you will
11  be -- let me see.  You will be -- I think
12  then you will be times 1 million again,
13  right?  So --
14    Q.    So it would just be --
15    A.    Yeah.  Yeah.  Yeah.  So
16  basically they just cancel out, then, right.
17    Q.    So to find out how many
18  nanograms this would be if it was a
19  320-milligram pill, we would multiply 111.4
20  times 320 to find out how many nanograms,
21  correct?
22       MR. GALLAGHER:  I'm going to
23       object to this line of questioning
24       because it's calling for expert

1  testimony.
2       Look, it's not a math test.  If
3       you want to ask about facts and stuff,
4       but asking him how to calculate
5       stuff --
6       You can answer, Dr. Li.  You
7       should answer, to the extent you know
8       and can.
9  BY MR. SLATER:
10    Q.    Dr. Li, just because this way
11  we'll have a basis when we ask questions
12  later and we'll know our vocabulary, if I
13  multiply 111.4 ppm times 320 milligram,
14  assuming it was a 320-milligram pill, I come
15  up with 35,648 nanograms.
16       That would be a correct
17  calculation, correct?
18    A.    I'm sorry, what is the number
19  again that you calculated?
20    Q.    Sure.
21       111.4 parts per million times
22  320 milligrams comes to 35,648 nanograms.
23       MR. GALLAGHER:  Again, I'm
24       going to object to this as calling for

1  expert testimony.  It's not a math
2  test.
3       MR. SLATER:  I think Dr. Li has
4       a grasp on the calculation, so I'm not
5       really sure what the objection is.
6       And this falls -- it helps us
7       to answer some of the questions and
8       the topics as we go forward.
9    A.    It looks like so, yeah, mm-hmm.
10  BY MR. SLATER:
11    Q.    Okay.  So just to have a clean
12  question and answer, the reference --
13  rephrase.
14       The reference to 111.4 ppm, if
15  we were to assume that was in a 320-milligram
16  valsartan pill, we would multiply 111.4 times
17  320 to find out how many nanograms, and here
18  that would be 35,648, correct?
19       MR. GALLAGHER:  Same objection.
20    A.    Yeah, looks like so, mm-hmm.
21       MR. SLATER:  Okay.  Let's
22       scroll down now, Cheryll, to the next
23       part.  Perfect.
24  BY MR. SLATER:

Confidential Information Subject to Protective Order

Page 522

1    Q.    Looking now at Section 7, let's
2  walk through that.  It's my understanding it
3  refers to a DMF blank experiment.
4        What does that mean, "a DMF
5  blank experiment"?
6    A.    I don't know.  I mean, this is
7  SynCores experiment.  So let me read through.
8  I will try to see whether I can have some
9  understanding.  DMF...
10        (Witness reviewing document.)
11    A.    Okay.  So I think, yeah, it
12  looks like they just treated the DMF with
13  sodium nitrite, and also like in the presence
14  either acid or base, it looks like.  Yeah,
15  that's what -- you know, they're trying to
16  understand how NDMA would be formed from, you
17  know, DMF.  Yeah, basically it's sort of like
18  a part of a mechanistic study, yeah.
19    Q.    If I understand correctly --
20  rephrase.
21        If I understand correctly,
22  SynCores was studying the origin of how the
23  NDMA was formed as part of a root cause
24  investigation, correct?

Page 523

1    A.    Looks like, yes.
2        MR. GALLAGHER:  Objection.
3  Lacks foundation.
4  BY MR. SLATER:
5    Q.    If I understand this correctly,
6  they indicated that as long as sodium nitrite
7  is added, genotoxic impurities will be
8  generated, is that correct?
9    A.    The statement says so.  And I
10  think, you know, the genotoxic impurity here
11  looks like, you know, from the context
12  specific, was specifically referring to NDMA.
13    Q.    And I think they then said --
14  rephrase.
15        And it then refers to
16  generating this NDMA is extremely obvious in
17  an acidic environment, is that correct?
18    A.    Let me -- let me double-check.
19        Yes, looks like so.  Acidic,
20  yes, it's quite obvious, yes, was a ppm.
21    Q.    They refer to the fact that
22  this is caused by the additional reaction of
23  dimethylamine.  That is a degradant of DMF,
24  correct?

Page 524

1    A.    Yeah, the next sentence it said
2  it should be DMF decomposition becoming
3  dimethylamine and then reacted with sodium
4  nitrite under condition, yes.
5    Q.    And I think they conclude that
6  the purpose of the experiment had been
7  achieved, and that they can't explain that
8  NDMA is only derived from dimethylamine in
9  DMF because you need the sodium nitrite as
10  stated above to create the NDMA.
11        Do I understand that correctly?
12        MR. GALLAGHER:  Objection.
13  Vague, and lacks foundation.
14        You can answer, Dr. Li.
15    A.    Okay.  I think -- I think the
16  conclusion says NDMA formation, it will not
17  only originate from the methylamine that's
18  originally present in DMF.  So based -- based
19  upon, you know, what it says, right, from
20  everything written here, it -- so my
21  understanding is like under the acidic
22  condition DMF, you know, would form -- I'm
23  sorry, DMF would decompose to give
24  dimethylamine.

Page 525

1        So at least, you know, from
2  this experiment it seems like, you know,
3  there -- NDMA would from, you know, two
4  sources, right, or from two parts of the
5  dimethylamine.
6        So one part of the
7  dimethylamine would be originally present,
8  and the other part of the dimethylamine would
9  be, you know, decomposition product under the
10  acidic condition, you know, or under that
11  particular experimental condition they was
12  performing.
13  BY MR. SLATER:
14    Q.    And I think they had said --
15  rephrase.
16        They had stated above that the
17  NDMA will be created as long as sodium
18  nitrite is added.
19        Do I understand that correctly?
20    A.    The first, the very -- after
21  the column, right, yeah, the first sentence
22  says, yeah, like as long as you adding sodium
23  nitrite, yeah, it will generate NDMA.
24        And then the next sentence

Page 526

1 says, under acidic condition it will be much
2 more obvious, yeah, like a breakdown with
3 ppm.
4          And then the next one says it
5 should be DMF, you know, decomposition.
6          So for everything here, it
7 looks like, you know, the majority of the
8 NDMA, all the dimethylamine, you know, to be
9 converted into, you know, NDMA would be from
10 the decomposition of DMF.
11     Q.    Combined with the sodium
12 nitrite?
13     A.    Combined with sodium nitrite,
14 yeah, under acidic conditions.
15     Q.    And you talked yesterday about
16 the concept of connecting the dots.  This
17 would be an example of people connecting the
18 dots.  Is that fair?
19     A.    It is fair, but this is
20 after --
21          MR. GALLAGHER:  Objection.
22     A.    Sorry.  But this is, you know,
23 after, you know, this event came out and they
24 tried to understand, yeah, exactly what would

Page 527

1 happen.
2 BY MR. SLATER:
3     Q.    And as part of the analysis
4 that ZHP performed in looking back as to why
5 this happened, it was understood that this
6 was not recognized when the process was being
7 created to use zinc chloride due to
8 insufficient study and insufficient research,
9 correct?
10          MR. GALLAGHER:  Objection.
11     Vague, calls for speculation.
12 BY MR. SLATER:
13     Q.    I'll ask it again.  Let me ask
14 a new question, because counsel said that I
15 asked a question that was vague and called
16 for speculation so I want to try to fix it.
17          ZHP in 2018, in looking back,
18 concluded that the reason this was not
19 figured out and these dots were not connected
20 back in 2011 was because of insufficient
21 research and insufficient study, correct?
22          MR. GALLAGHER:  Objection.
23     Vague.
24     A.    As I already answered, you

Page 528

1 know, previously, you know, the whole
2 industry as well as, you know, the regulator,
3 you know, all, you know, had this knowledge
4 gap, obviously including ZHP.
5          MR. SLATER:  Let's take that
6 document down and go to Exhibit 212,
7 please.  If we could, Cheryll, let's
8 go to page -- the Bates number 1308 in
9 the bottom right, the last three
10 digits.
11          Actually let's stop for a
12 second.  Don't go anywhere.  I'll just
13 identify the document first.
14     Q.    We have on the screen
15 Exhibit 212, which is a report, and the topic
16 title is "Investigation regarding an unknown
17 impurity," and then in parentheses "Genotoxic
18 Impurity" with regard to valsartan.
19          Do you see that?
20     A.    Mm-hmm.
21     Q.    Okay.
22          MR. SLATER:  Let's go now to
23 page -- the page that has the 308 as
24 the last three digits, please.

Page 529

1     A.    One thing, you know, but just
2 by looking at this document it looks like
3 this is only a draft.  We have -- I think
4 have a final, finalized, you know, signed
5 document.  So I don't know, should we look at
6 the final document?
7     Q.    No, we'll look at this
8 document.
9          MR. SLATER:  Scroll down a
10 little further, Cheryll, so we get the
11 bottom half of the page, please.
12 Perfect.
13     Q.    Section 5.2 is titled "Control
14 strategy."
15          Do you see that?
16     A.    Mm-hmm.
17     Q.    Under the heading of 5.2,
18 "Control strategy," it says, "Due to
19 insufficient extent and depth of process
20 research at the early stage, as well as
21 insufficient study and understanding of
22 potential genotoxic impurities, only side
23 reaction product and degradation products
24 were studied, and was unaware of the further

Page 530

1  reaction between degradation products and raw
2  material."
3         Do you see what I just read?
4     A.   Mm-hmm.
5     Q.   So certainly as of the time
6  this document was drafted, the conclusion at
7  that time was that there was insufficient
8  extent and depth of process research as well
9  as insufficient study and understanding of
10 potential genotoxic impurities.  That's what
11 the document states, correct?
12        MR. GALLAGHER:  Object to the
13    questions on this document to the
14    extent the witness said this is not a
15    final version and asked to see the
16    final version.
17        But, Dr. Li, you should answer,
18    if you can answer.
19    A.   I mean, yeah, based upon this
20 version, you know, this is what it says.  But
21 as I said, you know, this statement is still
22 consistent, you know, with the fact, you
23 know, that I already said that, you know, the
24 whole industry as well as, you know, ZHP and

Page 531

1  also the regulators, you know, everybody had
2  the same knowledge gap at the time.
3         MR. SLATER:  Take that document
4     down, please.
5  BY MR. SLATER:
6     Q.   Who is Charles Wang?
7     A.   Charles Wang, who is a
8  toxicologist, you know, who is the consultant
9  of Huahai or ZHP.
10    Q.   Was he somebody that was an
11 independent consultant, had his own company?
12    A.   Sort of, yeah.
13    Q.   What do you mean "sort of"?
14    A.   He was doing, you know, that --
15 you know, he is a long-time friend, and so,
16 you know, you know, he is a trained
17 toxicologist, so when we had a -- you know,
18 you know, this issue, you know, when this
19 issue came out we came to him, you know, for
20 help.
21    Q.   I asked you if he had an
22 independent consulting company.  Did he have
23 an independent consulting company?
24    A.   That I don't know.  I mean, you

Page 532

1  know, whether he set up -- you know, I don't
2  know.  I had no details about this.
3     Q.   You said he was a long-time
4  friend.  Who was he a long-time friend of?
5     A.   Myself.
6     Q.   How did you know him?
7     A.   We know him because, you know,
8  he and I, we both have been the member of a
9  professional, you know, association, it's
10 called Sino-American Pharmaceutical
11 Association, and he and I, you know, were
12 both, you know, like a member, like long-time
13 members.  This is a nonprofit, you know,
14 professional organizations started in New
15 Jersey, I think around time of 1993.
16    Q.   Did you ever work together?
17    A.   No, we never worked together.
18    Q.   And by the way, I think I
19 forgot to ask you the other day, there's
20 someone at ZHP named Eric, and if I don't
21 pronounce his name correctly, let me -- Eric
22 Tsai, T-S-A-I?
23    A.   Eric Tsai, yeah.
24    Q.   Did you work with him in the

Page 533

1  past before you came to ZHP?
2     A.   We actually worked in the same
3  company, but we were not in the same
4  department.  Yeah.
5     Q.   What company did you work at
6  with Eric Tsai?
7     A.   Merck & Company.  When I first
8  joined Merck & Company in 1998, Eric Tsai, he
9  was already there.  Yeah.  And I left Merck
10 the first time in 2005, as far as I remember,
11 he still was, you know, with Merck.  Yeah.
12    Q.   Was it just a coincidence that
13 the two of you ended up at ZHP, or was there
14 some connection there?
15    A.   Perfectly coincidental.
16    Q.   Coming back to Charles Wang,
17 you said he was a long-time friend.  When did
18 you meet him?
19        MR. GALLAGHER:  Adam, are we
20    moving on from the 30(b)(6) to
21    individual?
22        MR. SLATER:  No, we're not.
23        MR. GALLAGHER:  I'm going to
24    object to all this as outside the

Page 534

scope of the 30(b)(6).

MR. SLATER: I'm confident that it's within the scope. I'm confident that I'm allowed to ask who he was, because you know who he is, so I don't think you should have an issue with me asking the questions.

MR. GALLAGHER: I don't have a problem with you asking the questions. It's just that it's outside the scope of the 30(b)(6).

MR. SLATER: We disagree. So I'm going to continue now, okay?

MR. GALLAGHER: Absolutely. It's outside the scope of the 30(b)(6), but Dr. Li should answer to the extent he knows personally.

BY MR. SLATER:

Q.    So I'll ask the question again, Doctor.

A.    It's such a long time, you know.

Q.    Let me ask the question again.

Page 535

I don't mean to interrupt you, but let me just ask the question.

A.    Okay. Sure.

Q.    How long -- well, rephrase. When did you meet Charles Wang?

MR. GALLAGHER: Objection. Outside the scope.

A.    You know, there's such a long time, so I don't remember exactly which year. I would say somewhere, you know, like -- probably I would say in late, you know, '90s, or maybe early 2000. You know, like late 1990s, somewhere around that period.

BY MR. SLATER:

Q.    When you said he was a long-time friend, I might have misheard. I thought maybe that you said "of us," or in plural. So was it with somebody else at ZHP?

MR. GALLAGHER: Objection. Outside the scope.

You can answer.

THE WITNESS: Yeah, sorry. I don't know, you know, who else, you know, you know, he himself

Page 536

considered to be a long-time friend. I really don't know. I cannot speak for him, okay.

BY MR. SLATER:

Q.    Did he know anyone else at ZHP, to your knowledge?

A.    Oh, yes.

MR. GALLAGHER: Objection. Outside the scope.

THE WITNESS: Sorry.

BY MR. SLATER:

Q.    Who?

MR. GALLAGHER: Objection. Outside the scope.

BY MR. SLATER:

Q.    Who else did he know at ZHP, to your knowledge?

MR. GALLAGHER: Objection. Outside the scope.

A.    I mean, based upon my personal knowledge, you know, he knows Mr. Jun Du.

BY MR. SLATER:

Q.    Do you have any idea how they knew each other?

Page 537

MR. GALLAGHER: Objection. Outside the scope.

A.    As far as I understand, they probably -- okay, that's just my guess. They probably, you know, essentially, you know, you know, came to know each other. Also through the same organization, you know, because, you know, this organization, you know, that I just mentioned, it's scientific, you know, you know, oriented. And so every year, you know, this organization will be, you know, you know, holding like conferences, scientific conferences, you know, you know, career, like a workshop, you know, things like that.

And Huahai US, you know, at least for a period of time, you know, was the -- you know, the sponsor of some of the meeting events.

MR. SLATER: Let's put up our next exhibit. We'll call it Number 316. It's CHARLESWANG000289.

(Whereupon, Exhibit Number ZHP-316 was marked for

Page 538

1   identification.)
2        MR. SLATER:  Let's go to the
3   beginning of the e-mail chain on the
4   second page, please.
5        I want to get the e-mail --
6   yeah.  Can you, Cheryll, possibly
7   scroll up so we can get the -- no, the
8   other way.  There you go.  Stop.
9   Perfect.
10  BY MR. SLATER:
11       Q.    Looking now at the second page
12  of this e-mail chain where the Bates number
13  is CHARLESWANG000290.
14       Do you see that?
15       A.   000290.  Where is the --
16       Q.   It's probably behind the
17  pictures of people.
18       A.    Oh, let me see.  Sorry.  Okay.
19  Oh, yeah, mm-hmm.
20       Q.    Looking at this e-mail chain,
21  starting with the first e-mail in the chain,
22  which starts at the bottom of the second
23  page, it's an e-mail from yourself, Min Li,
24  to Charles Wang, June 6, 2018.

Page 539

1        And you say you're
2   forwarding -- or subject says "Forward:  WHO
3   Report," and you say, "Please see the
4   report."
5        A.    Can I see that?  I'm sorry.
6   Can I see that word?
7        Q.    I'm just asking, do you see
8   what I just read, the June 6, 2018 date?
9        A.    Yeah, I see the date, but I
10  don't see any content.
11       Q.    That's the e-mail that we were
12  provided, so I'll ask the next question.
13       June 6, 2018 is the day after
14  Novartis confirmed to your company that they
15  had identified the NDMA in the valsartan we
16  were testing through the outside lab,
17  Solvias.
18       We went through that yesterday,
19  right?
20       A.    That was -- as I said, we
21  received the e-mail, you know, you know, they
22  indicated they suspect, you know, that that
23  was the NDMA.
24       Q.    And this is the -- rephrase.

Page 540

1        This is the next day, June 6th,
2   correct?
3        A.    Yes.
4        Q.    You say in this e-mail, "Please
5   see the report."  I assume you had spoken
6   with Charles Wang before you sent this
7   e-mail.
8        Do you recall?
9        A.    I do not recall.
10       Could I just see, you know, you
11  know, that particular content that you just,
12  you know, reading twice already?
13       Q.    I'm reading literally what's
14  right in front of you, sir.
15       A.    Oh, "Please see the report."
16  Yeah.  Yeah.
17       Q.    It looks like you had written
18  to Charles Wang from Yahoo Mail on Android.
19       Do you see that?
20       A.    Yes, mm-hmm.
21       Q.    What's an Android?
22       A.    What's Android?  That was my,
23  you know, US, you know, cell phone, you know,
24  you know, at that time, it looks like.

Page 541

1        Q.    Do you know who the
2   manufacturer is of the Android?
3        A.    I don't remember.  It could
4   be -- let's see.  It could be a Samsung, you
5   know, smartphone, but I really don't remember
6   exactly.
7        Q.    Was that phone turned in to be
8   checked to produce documents to us as part of
9   the production obligations in this
10  litigation?
11       A.    That phone has been dead, I
12  think.  Yeah, that phone -- so I think I, you
13  know, changed to my current phone.  That
14  phone has been -- yeah.
15       Q.    That phone is dead?
16       A.    Yeah.
17       Q.    Is it buried?  Is it buried, or
18  is it still available?
19       A.    No, it's no longer available.
20  It has been disposed, you know, because it's
21  no longer usable, totally unusable.
22       Q.    We know it was working on
23  June 6, because we see the e-mail that you
24  sent from your Android, right?

Page 542

1    A.    Yes.
2    Q.    June 6, 2018 it was working,
3  right?
4    A.    Oh, yeah, uh-huh.
5    Q.    When did it stop working?
6    A.    When did it stop working.
7  Sometime after -- I don't -- see, I don't
8  remember exactly.  It -- let me see.  I just
9  don't remember, you know, you know, all of
10  these details.
11    Q.    Did that phone die in 2018 or
12  2019?
13    A.    I just --
14         MR. GALLAGHER:  Objection.
15         THE WITNESS:  Sorry, go ahead.
16         MR. GALLAGHER:  Objection.
17    Asked and answered.
18         You can answer, Dr. Li.
19    A.    Yeah.  I just don't remember
20  right now.  I mean...
21  BY MR. SLATER:
22    Q.    Did you pay for that phone, or
23  did your company pay for it?
24    A.    I paid for that phone myself.

Page 543

1    Q.    When you replaced that phone,
2  did you do that yourself, or did the company
3  have any part of you replacing the phone?
4    A.    Everything, you know, I did
5  myself, like I paid for myself.
6    Q.    The phone that you replaced
7  this Android with is what, what type of
8  phone?
9    A.    It should be, you know, this
10  new Samsung phone that I'm using right now.
11    Q.    Do you know what type of phone
12  it is?
13    A.    What type of this phone.  At
14  the time that I bought it should be kind of
15  like a top of the line, you know, you know,
16  Samsung phone, but I don't remember exactly,
17  you know, the model.
18    Q.    Is it in the room with you
19  right now?
20    A.    Yeah, it is in this room, yeah.
21  I can take a look if you want.
22    Q.    Can you take a look right now
23  and tell me what kind of phone it is?
24    A.    Sure.

Page 544

1         Oh, let me see, it's probably
2  from the setting, right, looking about the
3  phone.  Okay.  It's model number SM-N950U.
4    Q.    Is it an Android, is it a
5  model -- is that the model?
6    A.    Yeah, it should be Android
7  operating, yeah.  Everybody else, yeah, I
8  think other than -- other than the, like,
9  Apple, right.
10    Q.    When you bought this new phone,
11  did you get some sort of a warranty or some
12  sort of protection plan where if something
13  happened to it you could use that to help fix
14  it?
15    A.    No.
16         MR. GALLAGHER:  I'm going to
17    object to this line as outside the
18    scope as well.
19         But please go ahead.
20    A.    Yeah, I think we usually don't
21  buy those protection plans.
22  BY MR. SLATER:
23    Q.    What would you need to do to
24  tell me the day that you got the new phone so

Page 545

1  we'd know when you replaced the old phone?
2         MR. GALLAGHER:  Objection.
3    Asked and answered.
4    A.    I really need to, you know, dig
5  into some of the detail if I, you know, if I,
6  you know, you know, have to tell you exactly
7  the -- I need to -- I need to do some
8  research.
9  BY MR. SLATER:
10    Q.    Sometimes the Samsung phones
11  have the name on the back of the phone.  Can
12  you look at the back of your phone and see
13  what type you have now?
14    A.    The name of the phone.  On the
15  back cover of my phone?  Let me see.  I need
16  to remove the protection.  Hold.  Galaxy
17  Note 8, yeah.
18    Q.    You said Galaxy Note 8?
19    A.    Yes.
20    Q.    Was your Galaxy Note 8 phone
21  provided to your company for documents and
22  information to be provided to us as part of
23  this litigation?
24    A.    No.  Because, you know, once I

Page 546

¹ got this Galaxy phone, you know, it's -- I
² don't think it's been used with this
³ communication.
⁴     Q.    Where did you get the phone?
⁵ Did you buy it at a store?
⁶     A.    Yeah, I buy it in the store,
⁷ yes.
⁸     Q.    What store did you buy it at?
⁹         MR. GALLAGHER:  I'm going to
¹⁰ object to this entire line as outside
¹¹ the scope and, you know, bearing
¹² into --
¹³         MR. SLATER:  Well, I'll ask you
¹⁴ a question, Counsel, maybe it will
¹⁵ move things along.
¹⁶         Can you represent right now
¹⁷ that Dr. Li's phones were both
¹⁸ properly collected and reviewed to
¹⁹ make productions of documents and
²⁰ information to us pursuant to the
²¹ discovery obligations in this
²² litigation?
²³         MR. GALLAGHER:  I can represent
²⁴ that we collected from all the devices

Page 547

¹ that we needed to collect from to get
² the documents to meet our discovery
³ obligations.
⁴         MR. SLATER:  Does that include
⁵ the phone he was using on -- rephrase.
⁶         Does that include the phone
⁷ that was being used on June 6, 2018?
⁸         MR. GALLAGHER:  I think he told
⁹ you that phone is -- no longer exists.
¹⁰         MR. SLATER:  Well, I'm asking
¹¹ you because we're asking these
¹² questions so we can match up the dates
¹³ and find out when the phone "died" and
¹⁴ we're going to track that phone.
¹⁵         MR. GALLAGHER:  If you want
¹⁶ to -- if you want to continue, I'm
¹⁷ just objecting as outside the scope
¹⁸ and, you know, veering in wildly
¹⁹ irrelevant.
²⁰         If you want to, you know,
²¹ submit a request in writing for us to
²² look at something, we're happy to do
²³ that.  But you're welcome to do your
²⁴ deposition as you'd like.  I'm just

Page 548

¹     objecting outside the cope and veering
²     into wildly irrelevant.
³ BY MR. SLATER:
⁴     Q.    While we're on it, I had asked
⁵ you on the first night of the deposition when
⁶ you were first told about the deposition, and
⁷ you said it was by an e-mail about six months
⁸ ago, and I asked if you would check that
⁹ date.  Did you do so?
¹⁰     A.    I'm sorry, check what?
¹¹     Q.    The date of the e-mail that you
¹² received the first time you were told you
¹³ were going to be deposed in this litigation.
¹⁴         MR. GALLAGHER:  Object as
¹⁵         calling for speculation, and to the
¹⁶         extent it calls for attorney/client
¹⁷         privileged information.
¹⁸         And to the extent you know and
¹⁹         can answer without disclosing
²⁰         information regarding communications
²¹         with your attorneys, you can.  But to
²²         the extent it would disclose
²³         information communicated from
²⁴         attorneys for ZHP, I instruct you not

Page 549

¹ to answer.
²     A.    So -- so I -- you know, well,
³ first of all, I haven't had a chance, you
⁴ know, you know, you know, to do that.  But I
⁵ guess after, you know, after this deposition,
⁶ you know, I can take some effort, you know,
⁷ to look it up.
⁸         But, you know, these past few
⁹ days, you know, I have been very exhausted,
¹⁰ and I also need to, you know, read through
¹¹ some of the, you know, documentation, you
¹² know, right, to -- for continuous prepare,
¹³ you know, for this deposition, so I really
¹⁴ haven't done, you know, this information
¹⁵ search.
¹⁶ BY MR. SLATER:
¹⁷     Q.    You told me on -- rephrase.
¹⁸         You told me that it would have
¹⁹ been an e-mail from Maggie Kong, so you could
²⁰ just search your e-mails for her name and
²¹ see --
²²     A.    No, I said that --
²³         MR. GALLAGHER:  Let me -- slow
²⁴ down.  Sorry.

Confidential Information - Subject to Protective Order

Page 550

1    Again, I'm going to object to
2  the extent you're asking him to
3  speculate, and to the extent it calls
4  for attorney/client privileged
5  information.
6    Adam, if you want to send us a
7  request we can -- in writing, we can
8  go back and look, and to the extent
9  that it doesn't involve
10 attorney/client information we can
11 share that.
12   A.    I think, yeah, I think, I think
13 my counsel will provide an accurate, you
14 know, dates, yeah.
15 BY MR. SLATER:
16   Q.    We also talked the other day
17 about when your Lenovo ThinkPad broke and you
18 replaced it.  Did you look into what the date
19 was when that happened?
20   A.    That --
21   MR. GALLAGHER:  Same objection.
22 BY MR. SLATER:
23   Q.    Lenovo ThinkPad, I'm sorry.
24   A.    That, as I said, that probably,

Page 551

1  let's see, I think it's -- it's probably
2  somewhere around May 2018.
3    But again, you know, you know,
4  I need to go back, you know, to talk to, you
5  know, my IT people, you know, to see what
6  exactly date, you know, they provided, you
7  know, this current one, you know, to me.
8    MR. GALLAGHER:  And, again,
9  Adam, same objections.  And if you
10 want to send us a request in writing,
11 we can take that under advisement.
12 BY MR. SLATER:
13   Q.    Why did you contact Charles
14 Wang -- well, rephrase.  Let me ask you this.
15 Did you contact Charles Wang as
16 a result of Novartis notifying your company
17 of the identification of NDMA on June 5,
18 2018?  Is that why you contacted him?
19   MR. GALLAGHER:  Objection.
20 Vague, and lacks foundation.
21   A.    The reason -- first of all,
22 obviously, you know, because we received a
23 notice and we, you know, need to have an
24 expertise, you know, to evaluate from the,

Page 552

1  you know, toxicological perspective.
2    And also, as I said, because he
3  is a long-time friend of mine, and I know he
4  is a toxicologist, so that's how, you know, I
5  naturally, you know, thought of him and
6  turned to him for help.
7  BY MR. SLATER:
8    Q.    Did you see him as an expert in
9  toxicology?
10   A.    Oh, yeah, yeah.
11   Q.    Did you consider him somebody
12 who would provide you reliable information?
13   A.    Yes.
14   Q.    Was he somebody that you
15 trusted?
16   A.    Oh, yes.
17   MR. SLATER:  Let's scroll up,
18 Cheryll, to the next e-mail in the
19 chain on the second page.  Perfect.
20   Q.    Now, looking at the June 10,
21 2018 e-mail sent at 11:49 a.m. from Charles
22 Wang to yourself, do you see that?
23   A.    Mm-hmm.
24   Q.    I have another question.

Page 553

1  Rephrase.
2    Why is it that you and Charles
3  Wang were communicating on your Yahoo
4  accounts rather than on business accounts?
5    A.    I think the main reason is, you
6  know, he is a long-time friend of mine, and,
7  you know, we've been using, you know, Yahoo
8  e-mail or personal e-mail, you know, for
9  quite long.
10   So during that time, you know,
11 because this events was so urgent, right, so
12 I, you know, did it, you know, just
13 naturally, you know.
14   And because, you know, his
15 Yahoo e-mail is also like sort of like stored
16 on my, you know, Yahoo, right?  So once I
17 type, you know, like "Charles," that e-mail
18 naturally will appear.
19   So, yeah, it's urgent, it's for
20 convenient.  Yeah, that's how it happened.
21   Q.    Did you or anybody else from
22 ZHP, to your knowledge, contact any other
23 toxicologists or experts regarding the health
24 or safety issues with NDMA in June 2018?

Confidential Information - Subject to Protective Order

Page 554

1    A.    I don't recall.  I mean, for me
2  I only contacted the Charles Wang.  But
3  anyone else, you know, from ZHP contact
4  anybody else, I just don't know.
5      Q.    Was Charles Wang the only
6  outside toxicologist your company consulted
7  in connection with the NDMA in the valsartan?
8      A.    I cannot -- you know, I do not
9  have this knowledge like somebody else did.
10     Q.    Is there any other toxicologist
11 other than Charles Wang that anybody at ZHP
12 consulted with or spoke to regarding the NDMA
13 in valsartan?
14         MR. GALLAGHER:  Objection.
15     Vague.
16     A.    You know, as I said, you know,
17 from my perspective, I only contact or
18 consulted with Charles Wang.
19 BY MR. SLATER:
20     Q.    As part of your preparation to
21 testify for your company, did you ask others
22 if they had contacted any other
23 toxicologists?
24     A.    I haven't asked.

Page 555

1      Q.    Looking now at the June 10,
2  2018 e-mail, Charles Wang wrote to you and
3  said, "Hi Min, The attached is draft report
4  for NDMA."
5      A.    Mm-hmm.
6      Q.    "I can take out the limit of
7  0.011 parts per million if you are unable to
8  achieve it."
9          Do you see that?
10     A.    Mm-hmm.
11     Q.    So in this report that he
12 wrote, he put in a maximum acceptable limit
13 of 0.011 parts per million for on a
14 going-forward basis, correct?
15     A.    Yes.
16     Q.    And he asked you if you --
17 he -- rephrase.
18         And he's asking you here, do
19 you want me to change it if ZHP can't get to
20 that level; that's what he's asking you,
21 correct?
22     A.    Mm-hmm, yes.
23     Q.    Is that what a good scientist
24 does in providing scientific advice, provide

Page 556

1  their opinion and their advice, but then say,
2  well, I'll change it if for commercial
3  purposes you need me to?
4          MR. GALLAGHER:  Objection.
5      Vague.
6      A.    I think your statement is
7  twisted, you know, the fact.  Okay.
8          At that time, okay, nobody had
9  any idea like what limit should be set, okay.
10 So very naturally there would be a
11 discussion, what would be a reasonable, you
12 know, you know, limit to set, okay.
13         So I think that, you know,
14 based upon the context, you know, everything
15 is written here, it looks like, you know, the
16 0.011 ppm was a number, if I remember
17 correctly, you know, proposed by a Novartis,
18 you know, toxicologist, okay.
19         And that person, you know, you
20 know, derived this number from, I think, an
21 animal study.  It's not based upon rodent,
22 okay.  I think it's based upon, you know, a
23 primate, maybe monkey or something.
24         So that, you know, from that

Page 557

1  PD50, you know, that person derived a limit
2  of 0.011 ppm.  Okay.
3          So later, you know, I think if
4  you look at the European regulatory, you
5  know, you know, document, you know, they
6  spent, you know, quite a -- you know, you
7  know, quite a few, like maybe one page or
8  whatever, discussing what the value should be
9  used.
10         So I think the conclusion or
11 the eventual consensus is that for those, you
12 know, animal carcinogenic study, it would
13 have been more reliable to use, you know, you
14 know, data from rodent.
15         The very reason is because
16 primate -- you know, the lifespan of primate,
17 you know, is too long, right?  You know, so
18 you would have -- you know, quite a lot of
19 other factors would impact, you know, how a
20 tumor would be produced.
21         So I think, you know, if you
22 ask somebody, you know, you know, who are
23 familiar or some, you know, like a
24 toxicologist who are familiar, you know, with

Confidential Information - Subject to Protective Order

Page 558

these issues, you know, or everything that I,
you know, you know, you know, are talking
about here, you know, people would agree, you
know.

So that's how the 0.3 ppm,
right? It's from a rodent, you know, study.
Okay.

So yeah, at the very beginning,
you know, as I said, even FDA or European
regulatory agency, you know, you know, didn't
know, you know, how to set, and -- yeah, so
it's very -- you know, everything, you know,
was progressing, and actually is still, you
know, progressing.

BY MR. SLATER:

Q.    Reading along in the e-mail,
Charles Wang said, "I can take out the limit
of 0.011 ppm if you are unable to achieve it.
See if your client accept the limit
recommended based on the maximum intake of
NDMA via food or exposure of indoor air.  The
limit of 0.011 ppm is calculated based on the
EPA recommended limit for underground water,
which won't cause the risk to exceeding the

Page 559

tumorigenesis rate of 10e-6 in lifespan of
human being.  Let me know if you any comments
or questions."

That's what he wrote to you,
right?

A.    Okay.  Oh, yeah.  So -- yeah,
okay.  So based upon -- I'm sorry.  Yeah,
based upon, you know, you know, this whole
e-mail, yes.

So I take it back, you know,
you know, referring the 0.011 ppm, you know.

But between Novartis and the
ZHP, we did have that communications, you
know, in terms of what limit, you know, you
know, should be set.

So, as I said, the data from,
you know, you know, you know, from that
primate, it would be lower than 0.3.

So, I mean, this 0.011 could be
from, you know, the primate, okay, because
they are -- you know, both are lower than the
0.3.

But, you know, in the end, as I
said, you know, after, you know, all of the,

Page 560

you know, you know, discussion progressing,
so now regulatory agencies, particularly
like, you know, FDA, right, now is setting a
limit of 0.3, which is based upon, you know,
the rodent carcinogenic study.

MR. SLATER:  Cheryll, if you
could scroll up to the next page so we
can get to the beginning of the next
e-mail, which starts on the next page,
please.  Perfect.

Q.    Later that day now on June 10,
2018 at 9:09 p.m., where the prior e-mail had
been at 11:49 a.m., Charles Wang writes to
you again.

Do you see that?

A.    Mm-hmm.

Q.    He writes to you to provide you
a statement in the ICH M7 guideline.

Do you see that?

A.    Yeah, "TTC-based Acceptable
Intakes."  Okay.  Mm-hmm.

Q.    And it has some threshold of
toxicological concern-based acceptable
intakes, and it has some information on that.

Page 561

Do you see that?

A.    Yeah, let me read through.
TTC-based...

(Witness reviewing document.)

THE WITNESS:  So that's the
first paragraph, 7.2, "Based on
Compound Specific Risk Assessment."

Okay.  "Mutagenic Impurities
with Positive Carcinogenicity Data
(Class 1 in Table 1).
Compound-specific risk assessments to
derive acceptable intakes should be
applied instead of the TTC-based
acceptable intake where sufficient
carcinogenicity data exist.  For a
known mutagenic carcinogen, a
compound-specific acceptable intake
can be calculated" -- "and
linear extrapolation as a default" --
okay.  Yeah.

MR. GALLAGHER:  Doctor, when
you read out loud, the court reporter
has to take everything down that
you're saying.  So just when you're

Page 562

1 reviewing the document, for ease of
2 everyone, the document says what it
3 says.
4         THE WITNESS:  Okay.  I'm sorry.
5 Yeah.
6         Yeah, I finished reading, yes.
7         MR. SLATER:  Counsel, I would
8 appreciate it if you would not
9 instruct your witness not to say
10 things out loud.
11         MR. GALLAGHER:  I'm not
12 instructing him not to say things.  I
13 think he didn't realize.
14         THE WITNESS:  Well, yeah, I
15 just read through the e-mail.
16         MR. GALLAGHER:  If you feel
17 it's necessary for you to read it out
18 loud, you should read it out loud.
19 I'm not sure if that's what you were
20 intending to do, so...
21         Please proceed.
22         THE WITNESS:  Okay.
23 BY MR. SLATER:
24     Q.    You can see that after --

Page 563

1 rephrase.
2         You can see that in this e-mail
3 Charles Wang says.  "Hi Min, See statement in
4 ICH M7 regarding" -- and then you see that's
5 what it says, right?
6     A.    Mm-hmm.
7     Q.    And then he has some
8 information about acceptable intake levels
9 and it depends on what class somebody is
10 placed in.
11         Do you see that?
12     A.    Yes.
13         MR. SLATER:  Cheryll, if you
14 could scroll down to the top half of
15 the following page, we'll go to the
16 carryover, and there's a table.
17     Q.    And you remember, that table is
18 in the ICH M7 guideline, correct?
19     A.    Yes.
20     Q.    And we see it says Table 1 --
21         MR. SLATER:  Scroll up a
22 millimeter more so we can get the
23 bottom of the e-mail, please.  Just a
24 little -- that's it.  Perfect.

Page 564

1     Q.    We see the table, and then you
2 can see underneath that it says, "NDMA should
3 be Class 1 compound" giving its" -- "given
4 its well known mutagenicity nature of this
5 compound.  Charles."
6         Do you see that?
7     A.    Yes.
8     Q.    So he's saying that it should
9 fall into Class 1 under the ICH guidelines,
10 which is defined as a known mutagenic
11 carcinogen, correct?
12         MR. GALLAGHER:  Objection.
13 Vague, and calls for speculation.
14     A.    It's a known mutagenic
15 carcinogenic to animal.
16 BY MR. SLATER:
17     Q.    A Class 1 impurity is defined
18 on this table as a known mutagenic
19 carcinogen, and he's saying NDMA should fall
20 into that class, correct?
21         MR. GALLAGHER:  Objection.
22 Vague, calls for speculation, and to
23 the extent it calls for expert
24 testimony.

Page 565

1     A.    That's what he said.
2         But I should emphasize, in this
3 particular case NDMA is a known mutagenic
4 carcinogen to animal.
5 BY MR. SLATER:
6     Q.    Let's go up now to the
7 beginning of the e-mail.  Rephrase.
8         Let's go to the beginning of
9 the whole -- rephrase.
10         Let's go to the top now, to the
11 last e-mail in the chain, please.
12         MR. SLATER:  Thank you,
13 Cheryll.
14     Q.    Looking now at the next e-mail
15 in the chain, June 12, 2018, Charles Wang
16 wrote to you at 3:18, it looks like.
17         Do you see that?
18     A.    Yes.
19     Q.    And he says -- rephrase.
20         In this e-mail Charles Wang
21 says, "Hi Min, Looks like IARC does consider
22 NDMA as a Class 2A agent.  However, according
23 to the definition of Class 2 in ICH M7(R1)
24 guideline, the Class 2 compound should be a

Page 566

1  "Known mutagens with unknown carcinogenic
2  potential (bacterial mutagenicity positive*,
3  no rodent carcinogenicity data)."
4      Do you see that?
5      A.   Yes.
6      Q.   And he actually highlighted the
7  "no rodent carcinogenicity data."
8      Do you see that?
9      A.   Let's see.  No rodent -- yeah,
10  highlighted, yes.
11      Q.   The e-mail continues, "There
12  are plenty rodent carcinogenicity data for
13  NDMA (see revised report in the attached,
14  page 4).  In Fisher MSDS, NDMA has been
15  classified as Class 1B for carcinogenicity
16  (attached)."
17      Do you see that?
18      A.   Yes.
19      Q.   He then says, "Guess you can
20  argue with your client and see if they accept
21  IARC's classification and agree to control
22  the level at threshold of toxicological
23  concern (1.5" -- is that micrograms or
24  milligrams per day?

Page 567

1      A.   Microgram.
2      Q.   And we went over yesterday, and
3  I can pull it out if we need to, that the ICH
4  M7 guideline actually said that's
5  inapplicable to those compounds that are
6  considered to be in the cohort of concern
7  like nitrosamine compounds.  Remember we went
8  through that yesterday?
9          MR. GALLAGHER:  Objection to
10  the extent it mischaracterizes his
11  testimony.
12      A.   Yes, we did went through.
13          MR. SLATER:  In fact, Cheryll,
14  let's pull up now as Exhibit 317 the
15  material safety data sheet referred to
16  here by Charles Wang.
17      (Whereupon, Exhibit Number
18  ZHP-317 was marked for
19  identification.)
20  BY MR. SLATER:
21      Q.   You know what a material safety
22  data sheet is, correct?
23      A.   Yes.
24      Q.   What is a material safety data

Page 568

1  sheet?
2      A.   Well, based upon my
3  understanding, it is a document that
4  typically utilized in the storage and
5  transportation of a chemical.
6      Q.   It also provides hazard and
7  risk information about the chemical, correct?
8      A.   Right.  Being one of the
9  section or two, you know, some of the
10  sections, they talk about -- yeah, that's
11  why, you know, just to help people, you know,
12  to be properly handling, you know, the
13  chemical during the transportation or
14  storage.
15      Q.   Looking now at the
16  Classification section, under
17  "Carcinogenicity" it says "Category 1B,"
18  correct?
19      A.   I'm sorry, where?
20          MR. SLATER:  You've got to
21  scroll up, Cheryll, just to get that
22  box that has the categories in it.
23  Perfect.  That's good.  Yeah.  I don't
24  want to go to the next page.  No, I

Page 569

1  don't want to go to the next page.
2      Q.   Looking at the classification
3  category, I'm just looking to identify what
4  Charles Wang was referring to, he said that
5  it refers to NDMA as a Class 1B.
6      Do you see that?
7      A.   Mm-hmm.  Yes.
8          MR. GALLAGHER:  Objection.
9          MR. SLATER:  Okay.  We can take
10  that down.
11      A.   But I don't know how, you know,
12  this MS --
13          MR. SLATER:  Cheryll, you can
14  take that down.  We're going to the
15  next document.
16          MR. GALLAGHER:  You can
17  complete your answer.  And if you need
18  to see the document, we can --
19  BY MR. SLATER:
20      Q.   I'll put it back up.  I --
21      A.   You know, I --
22      Q.   If you want to see the document
23  again, I'll go through the whole thing --
24      A.   That's fine.  But I just need

Page 570

1  to point out, you know, it looks to me, you
2  know, I don't know -- first of all, I don't
3  know what this Class 1B, you know, in this
4  particular MSDS, you know, they are referring
5  to.
6         Okay.  If they are referring to
7  the same, you know, you know, IARC
8  categorization, you know, then it is just not
9  correct, because if they look at the, you
10  know, IARC classification, you know, even as
11  of today, you know, NDMA is classified as 2A,
12  okay.
13     Q.    We literally just went through
14  in Exhibit 316 where Charles Wang, who you
15  told us earlier is an expert, someone who is
16  reliable and who you trust, told you that he
17  disagrees with the Class 2A classification.
18  That is what the e-mail said.
19         Is that a correct statement
20  that I just made?  Yes or no.
21     A.    He --
22         MR. GALLAGHER:  Objection.
23     Calls for speculation, to the extent
24     it mischaracterizes the document and

Page 571

1  the testimony.
2     A.    You know, you know, from the
3  e-mail he just referring to this MSDS, okay.
4  He didn't, you know, you know, you know, go
5  further commenting, you know, on how this
6  Class 1B, you know, was assigned or whether
7  it's -- it may be misleading or this may be
8  incorrect.  You know, this is just a -- you
9  know, based upon everything, you know, that I
10  know.
11         MR. SLATER:  Okay.  Cheryll,
12     I'm going to skip ahead two exhibits
13     in our list to CHARLESWANG000430,
14     please, and we'll make that
15     Exhibit 318.
16         (Whereupon, Exhibit Number
17     ZHP-318 was marked for
18     identification.)
19  BY MR. SLATER:
20     Q.    On the screen is Exhibit 318, a
21  June 22, 2018 e-mail from Charles Wang to
22  yourself, correct?
23     A.    Yes.
24     Q.    Now, in this e-mail he's still

Page 572

1  on his Yahoo account, but you're on your work
2  account.  Do you know why that is?
3     A.    You know, again, I don't
4  remember exactly, you know, you know, you
5  know, you know, that I talked to him or
6  whatever.  So I would say a reasonable
7  explanation is, you know, as I explained, you
8  know, right, you know, in the -- during the
9  very early phase, you know, it was quite
10  urgent so I just sent him through my personal
11  e-mail, right.
12         And but then, you know, a few
13  days or, you know, after this event, you
14  know, I probably communicated or talked with
15  him, you know, over the phone or whatever,
16  you know, just I -- I just told him, you
17  know, probably, you know, he should utilize
18  my company e-mail.
19     Q.    Looking now at this e-mail,
20  Exhibit 318, Charles Wang writes to you, and
21  in the first paragraph he's providing you
22  some information about some -- a paper and
23  some sort of a reply to a paper.
24         Do you see that?

Page 573

1     A.    I'm sorry, what?
2     Q.    Rephrase.  Withdraw it.
3         MR. SLATER:  Could you scroll
4     up, please, Cheryll, a little more so
5     we can capture the -- that's it.
6     Perfect.
7     Q.    Looking now at the June 22,
8  2018 e-mail, which we've marked as
9  Exhibit 318, to you, and I want to look, if
10  we could, at the second paragraph of that
11  e-mail, okay?
12     A.    Mm-hmm.
13     Q.    Charles Wang says, "Hi Min,"
14  and then in the second paragraph says, "I
15  suggest Huahai to hire a carcinogenicity
16  expert consultant to perform the analysis,
17  who knows risk assessment of carcinogen and
18  kept updated in regulatory guideline and
19  standards in this field.  If needed, I can
20  recommend a couple to you for consideration.
21         "Best, Charles."
22         Do you see that?
23     A.    Yes.
24     Q.    So he's basically telling you,

Confidential Information - Subject to Protective Order

Page 574

1  I think we need to get somebody in who is a
2  real high-level expert in this field to help
3  us out with this project, and he's willing to
4  reach out to people he knows to try to get
5  you such an expert, correct?
6        MR. GALLAGHER:  Objection.
7  Mischaracterizes the document.
8        A.    Yeah, he said he can recommend
9  a couple, yes.
10       MR. SLATER:  Let's take that
11  down now.  And we're going to go to
12  Exhibit 319, which is going to be
13  CHARLESWANG000447.
14       (Whereupon, Exhibit Number
15  ZHP-319 was marked for
16  identification.)
17       MR. SLATER:  If we could, let's
18  go to the first e-mail in the chain,
19  which starts at the very bottom of the
20  second page, please.  Perfect.
21 BY MR. SLATER:
22       Q.    The first e-mail in the chain
23 starting at the bottom of the second page is
24 dated July 5, 2018 at 1:50 p.m.

Page 575

1        Do you see that?
2        A.    Mm-hmm.  Yep.
3        Q.    The e-mail reads, "Hi Jim, Long
4  time no see.  Hope everything is going well."
5        MR. SLATER:  Let's scroll down
6  to see the rest of the e-mail.
7        Q.    "Friend of mine is looking
8  forward a consultant in United States to help
9  them define their product at FDA.  Give me a
10 call if you are interested.  My cell number
11 is" -- and then the cell number is redacted.
12       Do you see that?
13       A.    Yes.
14       Q.    Then he says -- rephrase.
15 Then Charles Wang says, "For
16 your information, I have moved back to US and
17 still working for GSK" -- that would be
18 GlaxoSmithKline, correct?
19       A.    Yeah, looks like, uh-huh.
20       Q.    -- "still working for
21 GlaxoSmithKline in their safety assessment
22 group in Upper Merion, Pennsylvania.  Hope to
23 meet you again sometimes for catch up.
24       "Talk to you later and enjoy

Page 576

1  your summer.
2        "Best regards, Charles."
3        Do you see that?
4        A.    Mm-hmm.
5        Q.    And are you aware that, in
6  fact, Charles Wang at that time was the
7  director of safety assessment for
8  GlaxoSmithKline?
9        A.    I don't know -- I don't
10 remember his title, but, yeah, it looks --
11 yeah, he was working, yeah, for GSK.
12       Q.    Did GSK know that in June and
13 July of 2018 Charles Wang was consulting for
14 ZHP regarding the NDMA contamination in
15 valsartan?
16       MR. GALLAGHER:  Objection.
17 Vague, and calls for speculation.
18       A.    I have no knowledge of that.
19 BY MR. SLATER:
20       Q.    Did Charles Wang ever say to
21 you anything to the effect of, I'll do this
22 for you, but we can't tell my employer, or we
23 can't let my employer know that I'm
24 consulting on the side for another

Page 577

1  pharmaceutical company?
2        MR. GALLAGHER:  Objection.
3  Argumentative, and foundation.
4        A.    I don't think this kind of
5  conversation ever occurred.
6  BY MR. SLATER:
7        Q.    Why did you consult with
8  Charles Wang, who was employed another
9  company, rather than hiring an independent
10 toxicological consultant?
11       MR. GALLAGHER:  Objection.
12 Lacks foundation.
13       A.    As I told you, he has been a
14 long-time friend of mine, okay, and we didn't
15 know anybody, you know, else in terms of the,
16 you know, professional toxicologist, right?
17 And due to the urgency, you know, you know,
18 of this nature, we had to, you know, invoke
19 him, right?
20       I don't know if you understand,
21 you know, the procedure if you want to hire
22 somebody, right, from a company.  Like, you
23 know, there's a lot of red tape you have to
24 go through.

Confidential Information - Subject to Protective Order

Page 578

1    So due to the very urgent
2  nature, you know, we tried to solve this
3  problem as soon as possible.  So I naturally,
4  you know, you know, think of him and, you
5  know, just contact him.
6  BY MR. SLATER:
7    Q.    When you say "there's a lot of
8  red tape," red tape at ZHP to hire a
9  professional consultant who is independent?
10    MR. GALLAGHER:  Objection.
11  Foundation.
12    Go ahead.
13    A.    From a company perspective, no
14  matter, you know, who you hire, okay, you
15  have to go through certain procedures, right?
16  Like, you know, a contract for service, you
17  know, like a confidential, you know,
18  agreement, whatever.  You know, this will
19  take at least a few days.
20    But here, you know, because the
21  urgency, you know, of the nature, right, we
22  don't want to waste any single day.
23  BY MR. SLATER:
24    Q.    So you didn't pay Charles Wang

Page 579

1  for any of the consulting he did for ZHP?
2    A.    That I have no idea.
3    Q.    You don't know if Charles Wang
4  was paid for the work he did for ZHP?
5    A.    I have no knowledge of that,
6  okay, because this is -- you know, this has
7  been outside of my -- you know, yeah, because
8  I'm -- as I said, I'm a technical person.  I
9  just reach out to him, you know, you know,
10  for his help.
11    Q.    Did you ever discuss with
12  Charles Wang the subject of him being
13  compensated for consulting for ZHP while he
14  was employed by GlaxoSmithKline as their
15  director of safety assessment?
16    MR. GALLAGHER:  Objection.
17  Lacks foundation.
18    A.    As I said, you know, for this
19  matter I don't know.  I have no idea.
20  BY MR. SLATER:
21    Q.    You have no idea if you ever --
22  well, let me ask the question.  I want to
23  make sure I'm clear.
24    Did you ever ask any --

Page 580

1  rephrase.
2    Did anybody ever tell you that
3  Charles Wang was paid anything for consulting
4  for ZHP with regard to the NDMA contamination
5  of ZHP's valsartan?
6    A.    I don't remember.
7    MR. GALLAGHER:  Objection.
8  Foundation.
9  BY MR. SLATER:
10    Q.    That would be pretty easy to
11  find out, right?  If we requested that from
12  you, your company should have a record if
13  they paid him, right?
14    MR. GALLAGHER:  Objection.
15  Lacks foundation.
16    A.    You can -- I would say you can
17  make, you know, a request, right, just like
18  Patrick said.  You can make a request, you
19  know, through all counsel.  They can find out
20  for you.
21  BY MR. SLATER:
22    Q.    Would Jun Du know if Charles
23  Wang was paid for the work he did for ZHP?
24    MR. GALLAGHER:  Objection.

Page 581

1  Calls for speculation.
2    A.    You can ask him, okay?
3  BY MR. SLATER:
4    Q.    Did you ever speak to the
5  chairman of your company, Mr. Chen, regarding
6  any of your interactions with Charles Wang
7  and what he was telling you?
8    A.    No.
9    Q.    Did you ever speak to Baohua
10  Chen at all about the nitrosamine
11  contamination of valsartan sold by ZHP?  Did
12  you ever discuss that with him?
13    A.    We discussed the matter, you
14  know, in meetings.
15    Q.    Meetings in person?
16    A.    No, not in person.
17    Q.    How were those meetings held?
18    A.    I mean, like, you know, when
19  this event basically occurred, you know, you
20  know, it become the top priority of the
21  company.
22    So as the CEO of the company,
23  you know, you know, he organized, you know,
24  quite a few meetings, basically just to

Confidential Information - Subject to Protective Order

Page 582

1 ensure, you know, the investigation being
2 conducted, you know, as soon as possible,
3 and, you know, basically just ask us, you
4 know, what kind of resources that we need,
5 basically.
6      Q.    Were those meetings that you
7 talked about held in person?  Well, rephrase.
8          You said the meetings were not
9 held in person.  So how were they held?
10     A.    You know, with a group, like,
11 you know, with a group of peoples.
12     Q.    Was it over the telephone?  Was
13 it by videoconference?  How did you
14 communicate with one another in those
15 meetings?
16     A.    Sir, as I said, there are
17 different meetings, okay?  Some meetings, I
18 don't -- you know, I don't remember, you
19 know, you know, all the details.  But some
20 meetings, you know, all the participants, you
21 know, were attending in person, some meetings
22 probably, you know, involving some
23 telecommunications.
24     Q.    So you did have meetings in

Page 583

1 person with Mr. Chen about the nitrosamine
2 contamination of the valsartan?
3      A.    Well, in person, okay, I
4 thought you mean like, like, just, you know,
5 like one-on-one meeting, you know.  But,
6 yeah, like a -- when -- a group of meeting,
7 yeah, both Mr. Chen and I as well as other
8 members of the management, yeah.  Yeah, at
9 least, you know, yeah, we were attending some
10 of the meeting, you know, when both Mr. Chen
11 and myself were physically, you know,
12 attending the meetings.
13     Q.    So you said meetings took place
14 in person, right?
15     A.    Some meeting, yeah, some
16 meeting, yeah, were attended in person, yes.
17     Q.    Were some of the meetings by
18 videoconference?
19     A.    Yeah, uh-huh.  Not
20 videoconference.  I don't think you -- you
21 know, you -- we don't have videoconference,
22 usually just teleconference.
23     Q.    You said usually
24 teleconference.  Did at least one of the

Page 584

1 meetings involving Mr. Chen regarding the
2 nitrosamine contamination of the valsartan
3 take place over videoconference?
4      A.    I don't remember that ever
5 happened.
6          MR. GALLAGHER:  Adam, we've --
7      you can finish -- we've been going
8      about an hour and 20 minutes.  When
9      you get to a natural --
10 BY MR. SLATER:
11     Q.    Did any of the meetings take
12 place by telephone?
13     A.    As I said, some of the meeting
14 may, you know, may be held, you know, with
15 some attendants, okay, joining by
16 teleconference.
17     Q.    Teleconference means by
18 telephone?
19     A.    Yeah, by telephone, yes.
20     Q.    Did you attend every meeting
21 that Mr. Chen organized and attended
22 regarding the nitrosamine contamination of
23 ZHP's valsartan?
24     A.    I don't think so, like did I

Page 585

1 attended every meeting, because there's a
2 different, you know, you know, you know,
3 aspects dealing with this issue, right.
4          And, for example, the issue
5 regarding like recall, you know, because I --
6 you know, as I said, I'm a technical person,
7 those meetings, you know, I never attended,
8 you know, those kind of meetings because it's
9 outside of my scope, outside of my
10 responsibility.
11     Q.    You said --
12     A.    Yeah.
13     Q.    You said that Mr. Chen
14 organized meetings because he was the CEO.
15 So you don't know how many meetings took
16 place or who attended all those meetings?
17         MR. GALLAGHER:  Objection.
18     Calls for speculation.
19         Go ahead.
20     A.    As I said, you know, I -- those
21 information I'm not, you know, within my
22 responsibility, okay.
23 BY MR. SLATER:
24     Q.    Well, I'm not asking for your

Page 586

1 responsibility. I'm asking if you know how
2 many meetings took place and who attended
3 each of them.
4    A.   I don't --
5         MR. GALLAGHER:  Objection.
6 Calls for speculation.
7    A.   I don't remember.
8 BY MR. SLATER:
9    Q.   How many meetings did you
10 attend with Mr. Chen regarding the
11 nitrosamine contamination of ZHP's valsartan?
12    A.   Again, I don't have accurate
13 numbers.
14    Q.   Was it 10 meetings, was it 20
15 meetings? Can you estimate, please?
16    A.   I just cannot.
17    Q.   You have no idea how many
18 meetings you attended with Mr. Chen?
19    A.   I don't keep, you know, you
20 know, you know, those things.
21    Q.   I'm just asking if you can
22 recall how many meetings. You said this was
23 top priority of the company at the time. I
24 would think you could recall roughly how many

Page 587

1 meetings you attended with the chairman of
2 the company about this crisis.
3         MR. GALLAGHER:  Objection.
4 Argumentative, and asked and answered.
5 BY MR. SLATER:
6    Q.   Can you recall?
7    A.   No, I cannot recall the
8 accurate number.
9    Q.   Can you give me an estimate?
10        MR. GALLAGHER:  Objection.
11 Asked and answered.
12    A.   As I said, you know, I don't
13 want to provide -- you know, you know,
14 because I don't have this memory, so I don't
15 want to, you know, provide any specific
16 number, okay?
17 BY MR. SLATER:
18    Q.   Well, can you tell me your best
19 estimate, please, or are you unwilling to do
20 so?
21        MR. GALLAGHER:  Objection.
22 Argumentative, and asked and answered.
23    A.   So if you want to say, you
24 know, the best estimate by now, you know, you

Page 588

1 know, at this time I would say probably, you
2 know, maybe single digit or maybe up single
3 digit.
4 BY MR. SLATER:
5    Q.   What does that mean, "single
6 digit or maybe up single digit"?
7    A.   Like, you know, anywhere like
8 maybe between five or nine or something like
9 that.
10    Q.   Do you recall what was
11 discussed in those meetings?
12    A.   As I said, I don't, you know,
13 recall all the exact, you know, you know, you
14 know, contents. Basically, you know, you
15 know, the instruction was, you know, we need
16 to, you know, put all the efforts -- you
17 know, the company will support utilizing all
18 the resources, you know, to push this forward
19 as soon as possible.
20    Q.   Using all the resources -- I'm
21 sorry.
22        When you say using all the
23 resources, did that include making sure that
24 there wouldn't be any "red tape" like you

Page 589

1 said before if you needed to hire an expert
2 consultant to advise the company, for
3 example, on toxicology?
4         MR. GALLAGHER:  Objection.
5 Lack of foundation.
6    A.   This topic was not discussed,
7 okay. So in terms of the resources, from my
8 perspective, okay, it was, you know, you
9 know, we need to -- we need to purchase
10 additional, you know, high-end instrument,
11 okay, particularly like a mass spectrometry,
12 a GC-MS, GC-MS/MS, you know, stuff like that.
13 So he indicated he will give the full
14 support, like, you know, as long as, you
15 know, yeah, like how many, whatever, you
16 know, whenever that I, you know, propose he
17 will, you know, approve the purchase of these
18 instrument.
19 BY MR. SLATER:
20    Q.   Were notes or minutes taken of
21 these meetings with Mr. Chen?
22    A.   I don't remember.
23    Q.   Did you take notes of these
24 meetings?

Confidential Information - Subject to Protective Order

Page 590

1    A.    No.
2    Q.    Did you see anybody else taking
3 notes during these meetings?
4    A.    I didn't pay attention to that.
5    Q.    So you would go to meetings
6 with the chairman of the company about a
7 situation that was the top priority of the
8 company, and you wouldn't take any notes
9 during those meetings at all?
10         MR. GALLAGHER:  Objection.
11 Argumentative.
12         And we're getting close to --
13         towards an hour and a half, if you get
14         close to a breaking point.
15    A.    I didn't take note.
16 BY MR. SLATER:
17    Q.    Is that your typical practice,
18 you go to important meetings and you take no
19 notes at all?
20         MR. GALLAGHER:  Objection.
21 Vague, and argumentative.
22    A.    Because those meetings, you
23 know, you know, from my perspective, as I
24 said, you know, it's very specific, okay.

Page 591

1 Because for me, I just need to have the
2 funding to purchase these instrument, so, you
3 know, for these simple things I don't think
4 it's necessary, you know, for me to take
5 note.  You know, he just, yes, you know, then
6 go ahead.
7 BY MR. SLATER:
8    Q.    Are you saying that you had
9 five to nine meetings, which is your
10 estimate, and at every one you discussed
11 buying equipment to do testing, and that was
12 the whole meeting every time?  You're not
13 saying that, are you?
14    A.    No, I'm not saying that.
15         MR. GALLAGHER:  Objection.
16 BY MR. SLATER:
17    Q.    Do you remember what else was
18 discussed in those meetings with Mr. Chen,
19 the chairman of the company?
20    A.    Look, you know, as I said, I
21 don't remember, you know, exactly, you know,
22 you know, all the other things, okay.
23         The most obvious things is, or
24 the most clear thing is that Mr. Chen was

Page 592

1 fully support, okay, in terms of, you know,
2 allocating funding, you know, for the
3 instrument, you know, that I need.
4         The other meeting, it's most
5 likely he was asking, you know, for our
6 progress, for example, how the method
7 development was ongoing, you know, stuff like
8 that.
9    Q.    Okay.  Did Mr. Chen say any --
10 well, rephrase.
11         Did Mr. Chen ever tell you or
12 the people in your meetings -- rephrase.
13         During the meetings you
14 attended with Mr. Chen, did he take notes?
15 Did you ever see him taking notes?
16    A.    No.
17    Q.    Did anybody take notes in these
18 meetings that you ever observed?
19    A.    I just pay attention mostly to
20 Mr. Chen when I spoke, you know, to him.
21    Q.    When you were in these
22 meetings, did you ever notice anybody in the
23 meetings taking notes?
24    A.    I don't re --

Page 593

1         MR. GALLAGHER:  Objection.
2         Go ahead.
3    A.    I don't recall, okay?
4 BY MR. SLATER:
5    Q.    So a roomful of people meeting
6 with the chairman of the company about a
7 situation that's the top priority of the
8 company multiple times, in all those meetings
9 you never took notes, Mr. Chen never took
10 notes, and you never saw anyone else take
11 notes.
12         That's your best recollection,
13 is that what you're testifying?
14         MR. GALLAGHER:  Objection.
15 Argumentative, asked and answered,
16 vague, and compound.
17    A.    That's not what exactly what I
18 told you.  Okay.  What I can tell you is
19 Mr. Chen, he didn't take notes, okay?  And I
20 didn't take note.  Who else, I don't
21 remember, okay?
22 BY MR. SLATER:
23    Q.    Were there ever agendas
24 circulated for these meetings; for example,

Page 594

1  by e-mail?
2      A.   I don't know.  I don't
3  remember.
4      Q.    When these meetings were
5  scheduled, were e-mails sent out or any sort
6  of calendar sent out so everybody would know
7  the date and time and place of the meetings?
8      A.    I don't remember.  I mean, but
9  one thing is, you know, usually, okay, I can
10  tell you my -- you know, like for Mr. -- you
11  know, for meetings with Mr. Chen, usually,
12  you know, his, you know, secretary, you know,
13  would make phone calls.
14         And one of the reason probably
15  was he was quite busy, so we just -- you
16  know, a lot of times we just stand by.  And
17  so once he had time, his secretary would
18  call, call us, you know, to go to meeting
19  rooms, you know, with him.
20      Q.    Who was his secretary?  What's
21  her name?
22      A.    There is a --
23      Q.    Who is Mr. Chen's secretary?
24      A.    There are a group, you know, of

Page 595

1  people, okay.  I don't know exactly, you
2  know, who would be designated.
3         I think the best, you know,
4  answer, if you can, you know, maybe you can
5  also go through my counsel, you know, making
6  a formal request, they can provide it, you
7  know, from the staff of Mr. Chen.  You know,
8  they probably can give you, you know, a much
9  more accurate, you know, because I don't want
10  to, you know, you know, guess.
11      Q.    You know who works for
12  Mr. Chen.  Tell us the names of the people
13  that work for him as his secretaries and
14  assistants.
15         MR. GALLAGHER:  Objection.
16      Asked and answered.
17         And, Adam, we've been going
18      over an hour and a half now.
19         MR. SLATER:  I'm in the middle
20      of a line of questioning.  I don't
21      want to break this deposition now.  I
22      don't think it would be appropriate.
23         MR. GALLAGHER:  I'm not sure
24      where you're going, but okay.

Page 596

1      A.    His chief of staff, okay, is
2  Ms. Maggie Kong, as I mentioned the other
3  day.
4  BY MR. SLATER:
5      Q.    Is she the person who would
6  call you to tell you meetings were being
7  scheduled?
8      A.    Sometimes she called me;
9  sometimes, you know, her staff.
10      Q.    Who are the staff members that
11  worked for her who would contact you?
12      A.    You know, there would be
13  different, you know, people, okay, so I don't
14  remember, you know, you know, very
15  specifically for, you know, exactly, you
16  know, who under her, you know, called me,
17  okay?
18      Q.    Can you remember anybody else's
19  name that contacted you, other than Maggie
20  Kong?
21      A.    I mean, you know, this is for
22  so long, so I couldn't, you know, give you an
23  accurate.  You know, I don't want to provide,
24  you know, you know, you know, anything, you

Page 597

1  know, inaccurate, okay.
2         So only thing for sure, you
3  know, yeah, it would be somebody -- you know,
4  yeah, sometimes could be her; sometimes, you
5  know, could be someone, you know, you know,
6  of her staff.
7      Q.    After these meetings would take
8  place, what would Mr. Chen do in terms of
9  taking action based on the meetings?
10         MR. GALLAGHER:  Objection.
11      Lack of foundation, and calls for
12      speculation.
13      A.    I don't pay attention to, you
14  know, other things, as I said, you know,
15  because my, you know, main function or my
16  main responsibility was to ensure the
17  technical investigation, you know, move
18  forward as soon as possible.
19  BY MR. SLATER:
20      Q.    Did Mr. Chen give any
21  instructions at these meetings?  Other than
22  you said he said, okay, you can buy that
23  machine that you were asking about, did he
24  ever give any other instructions?

Page 598

1    A.    As I said, I don't --
2         MR. GALLAGHER:  Objection.
3    Lacks foundation.
4    A.    As I said, you know, my only
5    focus, you know, was, you know, you know, for
6    the part of the responsibility, you know,
7    from my perspective.
8    BY MR. SLATER:
9    Q.    Was Mr. Chen aware that at
10   least as of July 27, 2017 there were people
11   in your company that knew that NDMA was in
12   valsartan that your company was selling?
13   A.    He had no idea.
14        MR. GALLAGHER:  Objection.  No
15   foundation.
16   BY MR. SLATER:
17   Q.    How do you know he had no idea?
18   A.    Because I told you, you know,
19   as I told you before already, okay.
20   Q.    Did anybody who either sent or
21   received that e-mail ever tell Mr. Chen or
22   tell someone else who told Mr. Chen about
23   that?
24        MR. GALLAGHER:  Objection.

Page 599

1    BY MR. SLATER:
2    Q.    Do you know?
3         MR. GALLAGHER:  Objection.
4    Vague, and lacks foundation.
5    A.    As I said, I -- you know, I
6    don't remember, or I don't know, you know,
7    who else on that e-mail list, you know, what
8    they did afterwards.
9    BY MR. SLATER:
10   Q.    You don't know if Mr. Chen was
11   aware that your company knew about the NDMA
12   in the valsartan as of July 2017?
13        MR. GALLAGHER:  Objection.
14   Vague, lacks foundation, and
15   mischaracterizes the documents and
16   testimony.
17   A.    I'm pretty sure he -- you know,
18   he didn't know.  Otherwise, you know, he
19   probably, you know, will talk to me.
20   BY MR. SLATER:
21   Q.    Why do you say that?
22   A.    Well, because, you know, if
23   it's really, you know, you know, you know,
24   you know, a big issue, you know, yeah,

Page 600

1    he will.  You know, particularly, you know,
2    this is, you know, right, related to an
3    investigation of an impurity, right?
4         Mr. Chen, you know, you know,
5    he is just at the very top.  He wouldn't, you
6    know, have those details, information,
7    unless, you know, you know, you know, I
8    became aware, and then I, you know, will
9    report that to him, or somebody like from QA
10   or whatever.
11        But as I said, you know, if
12   people on that list, you know, they -- you
13   know, they feel or whatever, you know, this
14   is an issue, or they may not.  As I said, you
15   know, they may -- they may not, you know, or
16   they think, you know, Mr. Lin's claim may be,
17   you know, way exaggerated.
18   Q.    Well, his claim wasn't
19   exaggerated.  He was 100 percent accurate
20   about valsartan containing NDMA, correct?
21        MR. GALLAGHER:  Objection.
22   Wait, Min.
23        THE WITNESS:  Sorry.
24        MR. GALLAGHER:  Objection.

Page 601

1    Vague, lacks foundation, calls for
2    speculation, and mischaracterizes
3    documents and testimony.
4    A.    I think I answered this
5    question, you know, several times, okay.
6    BY MR. SLATER:
7    Q.    Did you tell Mr. Chen that in
8    April of 2018 you told Mr. Lin, who worked
9    for you, not to complete or not to issue --
10   rephrase.
11        Did you tell Mr. Chen at any
12   time that in April 2018 you told Mr. --
13   rephrase.
14        Did you tell Mr. Chen at any
15   time that in April 2018 you directed that a
16   report that had been written regarding
17   concern about nitrosamines in irbesartan, and
18   you had instructed that that report not be
19   issued because of the fact that the impurity
20   was sensitive?
21        Did you tell Mr. Chen that?
22   A.    No.
23        MR. GALLAGHER:  Objection.
24        THE WITNESS:  Sorry.

Case 1:19-md-02875-RMB-SAK    Document 2648-29    Filed 02/16/24    Page 27 of 53
confidential information - subject to protective order
PageID: 97004

Page 602

1    MR. GALLAGHER:  Objection.
2    Outside the scope, vague, compound,
3    and lacks foundation.
4    A.    The answer is no.
5    BY MR. SLATER:
6    Q.    You said that Mr. Chen was
7    organizing these meetings.  Based on your
8    understanding and what you observed, was he
9    very actively interested in what was
10   happening with the contamination of valsartan
11   with nitrosamines?
12   A.    As I've said, that he is on top
13   of the progress, okay?  He didn't know, you
14   know, all those technical details.  It's not
15   his job.
16        I just want to make sure --
17   yeah.
18   Q.    I'm sorry.
19        How do you know he didn't know
20   the technical details?
21        MR. GALLAGHER:  Objection.
22        Vague, and calls for speculation.
23   A.    He is the CEO of the company.
24   So if you talk to head -- like a CEO of

Page 603

1    Novartis, you know, he would -- would that
2    person know the technical details of NDMA?
3    BY MR. SLATER:
4    Q.    I don't know if -- I don't
5    know, if it turned out that NDMA was
6    contaminating one of their drug substances
7    and that substance -- and the NDMA was
8    carcinogenic, yeah, I would think the
9    Novartis CEO would want to know everything
10   about it, if you're asking me.
11        MR. GALLAGHER:  Objection.
12        Wait.  Wait, Min.
13        Objection.  Vague,
14        hypothetical, calls for speculation.
15   BY MR. SLATER:
16   Q.    Do you know that --
17        MR. GALLAGHER:  Just for the
18   record, we've been going for an hour and
19   40 minutes now, and I'm sure the court
20   reporter would love a break, but --
21   BY MR. SLATER:
22   Q.    Do you know that Mr. Chen --
23        MR. GALLAGHER:  -- your
24        deposition.

Page 604

1    BY MR. SLATER:
2    Q.    Do you know that Mr. Chen has a
3    master's in chemical engineering?
4    A.    That I --
5        MR. GALLAGHER:  Objection.
6    A.    Sorry.
7    BY MR. SLATER:
8    Q.    Do you know that Mr. Chen has a
9    background in chemistry or chemical
10   engineering?  Are you aware of that?
11        MR. GALLAGHER:  Objection.
12   Outside the scope.
13   A.    I know he at least had a
14   college degree, okay, but everything else I
15   really didn't pay attention.
16        MR. SLATER:  You can take a
17   break now.  Go off the record.
18        THE VIDEOGRAPHER:  The time
19   right now is 8:47 a.m.  We're now off
20   the record.
21        (Whereupon, a recess was taken)
22        THE VIDEOGRAPHER:  The time
23   right now is 9:05 a.m.  We're back on
24   the record.

Page 605

1    BY MR. SLATER:
2    Q.    Do you know -- well, wait a
3    second.
4        Do you know whether any record
5    was made of Mr. Chen's interactions with
6    other people in the company about the
7    valsartan contamination?
8    A.    I have no idea.
9        MR. GALLAGHER:  Objection.
10   Calls for speculation, and
11   foundation -- lack of foundation.
12   BY MR. SLATER:
13   Q.    Can you recall, other than
14   discussing the equipment that you needed,
15   anything else that you told Mr. Chen
16   connected to the valsartan contamination with
17   nitrosamines?
18   A.    I'm sorry, say that again?
19   Q.    Sure.
20        Do you remember anything you
21   told Mr. Chen regarding the nitrosamine
22   contamination of valsartan?
23        Earlier you told us you
24   discussed some equipment you needed.

Page 606

1  Anything else?
2      A.    As far as I can remember, you
3  know, those are the items that I -- was
4  the -- you know, was the main topic.
5  Everything else I really, you know, do not
6  recall.
7          But instrument, you know, was
8  really an urgent needs because we need to,
9  you know, have those instruments to be in
10 place.
11     Q.    What instrument --
12     A.    Sorry --
13     Q.    What instrument or instruments
14 did you discuss the need for?
15     A.    GC-MS, and also GC-MS/MS in
16 particular, at least initially.  And then
17 later on there's also -- I think, you know,
18 we discussed like some LC-MS equipment.
19     Q.    Didn't you already have a GC-MS
20 machine?
21     A.    That --
22         MR. GALLAGHER:  Objection.
23     A.    Sorry, go ahead.  I'm sorry.
24         You know, we were facing with

Page 607

1  thousands, you know, batches of valsartan
2  need to be tested, okay, so a single, you
3  know, GC-MS, you know, would not be
4  sufficient, right.
5          And also that, you know,
6  particular GC-MS also was needed, you know,
7  to develop and optimize, you know, analytical
8  methods.  So we need to place the GC-MS also
9  in the QC.  Because in QC, in Chuannan CC
10 there had been no GC-MS instrument, so we
11 need to put these, you know, instrument into
12 Chuannan QC site, right.
13         So eventually, you know,
14 Chuannan QC site became the, you know, the
15 main testing site for those, you know,
16 thousands batches of commercial, you know,
17 batches of the valsartan.
18 BY MR. SLATER:
19     Q.    Was Mr. Chen told during these
20 meetings that multiple customers of ZHP had
21 since 2014 been complaining that there was
22 unknown peaks and interference on
23 chromatograms, and they were concerned about
24 what impurities might be there, and that they

Page 608

1  kept asking for an answer from ZHP and
2  couldn't get an answer?
3          MR. GALLAGHER:  Objection.
4      Lacks foundation, and mischaracterizes
5      documents and testimony.
6      A.    Such detail, you know, such
7  technical details were never discussed, you
8  know, at, you know, Mr. Chen's level.
9  BY MR. SLATER:
10     Q.    Was there discussion about how
11 your company should -- rephrase.
12         In these meetings with
13 Mr. Chen, was there discussion about how your
14 company should interact with the FDA?
15         MR. GALLAGHER:  Objection.
16     Outside the scope.
17         THE WITNESS:  Pardon.  Go
18     ahead.
19         MR. GALLAGHER:  Objection.
20     Outside the scope.
21         To the extent you know
22     personally, Mr. Li, you should answer.
23     A.    Anything as far as I know,
24 anything, you know, relating to interacting

Page 609

1  with regulatory agencies was taken care of by
2  the RA department.  Mr. Chen would not have,
3  you know, such detailed knowledge, you know,
4  how to interact.
5  BY MR. SLATER:
6      Q.    How do you know that?  Do
7  you -- did you attend the meetings with the
8  regulatory people that he attended?
9      A.    I don't remember.  But as I
10 said, based upon my, you know, my
11 observation, okay, he just would not be
12 involved in too much, you know, operational
13 details, okay.  He's only pay attention to
14 high levels, okay, like every --
15     Q.    One of your very profitable
16 drugs was contaminated with something that
17 caused cancer.  That's about as high level as
18 it gets, right?
19         MR. GALLAGHER:  Objection.
20     Argumentative.
21     A.    I don't want to comment on
22 that, okay.
23 BY MR. SLATER:
24     Q.    Do you know whether or not

1  Mr. Chen ever discussed with anybody how your
2  company should interact with the FDA?
3      A.   I don't remember -- sorry.
4          MR. GALLAGHER:  Objection.
5      Outside the scope, and asked and
6      answered.
7      A.   I don't remember.
8  BY MR. SLATER:
9      Q.   At any of these meetings that
10 you attended, did Mr. Chen ever ask you, how
11 did this happen, and ask for an explanation
12 for how this could happen?
13         MR. GALLAGHER:  Objection.
14     Vague.
15 BY MR. SLATER:
16     Q.   Time out.  I'm going to ask the
17 question again because counsel said it's
18 vague, so in case, in case, you know, that
19 objection will be sustained I'm going to ask
20 the question again.
21         Did Mr. Chen ever ask you, how
22 was it that our valsartan could be
23 contaminated with a nitrosamine and we didn't
24 know about it?  Did he ever ask that

1  question?
2      A.   I don't remember specifically,
3  okay, he -- like he specifically asked that
4  question, okay.  But I can tell you at least
5  in one of those meetings like, like I
6  explained to everyone, you know, you know,
7  the root cause analysis as we put into this
8  deviation report.
9      Q.   When you say the deviation
10 report, you mean the deviation investigation
11 reports that were provided to the FDA?
12     A.   Yes.
13         MR. GALLAGHER:  Objection.
14     Lacks foundation.
15     A.   The deviation report actually,
16 you know, you and I, we just went through,
17 you know, an early draft version.  Yeah, I
18 think that -- that's the deviation, you know,
19 investigation report.
20         But what you presented, you
21 know, was only -- you know, looks like an
22 early version.  It's not the final, finalized
23 version.
24         ///

1  BY MR. SLATER:
2      Q.   Did you tell Mr. Chen that in
3  multiple drafts the deviation investigation
4  report stated that your company had
5  insufficiently researched and studied the
6  chemical processes, and then somebody made
7  the decision to take that language out of the
8  report before the report was finalized?  Did
9  you or anyone tell them that, to your
10 knowledge?
11         MR. GALLAGHER:  Objection.
12     Vague, and argumentative.
13     A.   I don't remember those details.
14 But my guess is, you know, such details would
15 not be discussed during those meetings
16 usually.
17 BY MR. SLATER:
18     Q.   Did you or anybody else in your
19 presence tell Mr. Chen that your company
20 failed to sufficiently research or study the
21 chemical processes, and that's why your
22 company didn't know that NDMA was a potential
23 contaminant from the beginning?
24         MR. GALLAGHER:  Objection.

1      Vague, lacks foundation, and
2      argumentative.
3      A.   As I said, you know, you know,
4  whatever the background information provided
5  in the deviation, you know, in that deviation
6  investigation report, you know, I remember
7  that, that I, you know, as I said, I give a
8  description or, you know, basically went
9  through that some of those contents in the
10 deviation, you know, introduction part.
11 BY MR. SLATER:
12     Q.   Did anybody -- rephrase.
13         Did you or anybody else, to
14 your knowledge, tell Mr. Chen that your
15 company was aware that the valsartan your
16 company was selling was contaminated with
17 NDMA long before it came out in June of 2018
18 to the public?
19         MR. GALLAGHER:  Objection.
20     Vague, and lacks foundation.
21     A.   As I told you, you know, I
22 mean, people attended -- you know, I mean,
23 basically, you know, we didn't know, I mean,
24 you know, at a high level, before the events.

Page 614

BY MR. SLATER:
1   Q.    What do you mean, "we didn't
2   know at a high level"?
3   A.    You know, for those people, you
4   know, attending, you know, the meetings.
5   Q.    Well --
6   A.    As I said, nobody except
7   Mr. Chen -- sorry, Mr., you know, Lin, as I
8   said, he made some guess, you know, out of,
9   you know, you know, some irbesartan, you
10  know, experiment, right?  He's making some --
11  his projections, you know.
12          Nobody else -- you know, nobody
13  else, you know, know, you know, there was an
14  issue, until, you know, June the 6th, 2018.
15  Q.    Just to be clear, Mr. Lin
16  stated July 27, 2017 that what he was seeing
17  with irbesartan was similar to the NDMA that
18  occurs in valsartan when quenched with sodium
19  nitrite.  That's what he said in the e-mail.
20          And you knew that because it
21  was in the e-mail that was sent to you, so
22  you had that information, correct?
23          MR. GALLAGHER:  Objection.

Page 615

1          Compound, lacks foundation, and
2          mischaracterizes documents.
3   A.    As I told you before, you know,
4   for some reason that e-mail just slipped
5   through, you know.  So I -- you know, I had
6   no memory, I don't, you know, know until, you
7   know, you just showed me a few days ago, like
8   the day before.
9   BY MR. SLATER:
10  Q.    Well, if you had no e-mail, why
11  do you keep telling me that this was some
12  sort of a guess or something else or
13  speculation by Mr. Lin if you don't remember
14  it?
15  A.    Well, based upon -- you know,
16  now, based upon the --
17          MR. GALLAGHER:  Wait.
18          THE WITNESS:  Sorry.
19          MR. GALLAGHER:  Objection.
20          Argumentative, and asked and answered.
21  A.    You know, it's basically, yeah,
22  based upon that e-mail, yeah, now you provide
23  to me, by reading through.  Right?  You
24  provide me, you know, the day before, you

Page 616

1   know, that e-mail, right?  Yeah, I just read
2   through, you know, it looks like, you know,
3   he's making his projections.
4   BY MR. SLATER:
5   Q.    Well, he wasn't projecting
6   regarding valsartan.  He was stating it as a
7   fact that it's known that NDMA occurs in
8   valsartan when quenched with sodium nitrite.
9          And that statement in his
10  e-mail was scientifically accurate, correct?
11          MR. GALLAGHER:  Objection.
12          Lacks foundation, compound, and
13          mischaracterizes documents.
14  A.    As I told you, if you look
15  through that e-mail, okay, the data that he
16  had, okay, based upon -- you know, again,
17  based on content of that e-mail, the data
18  that he had were from the experiment with
19  irbesartan, okay?
20          There's no -- there's no data
21  mentioned with anything, like, related to,
22  you know, valsartan, right?
23          I mean, can you see, you know,
24  from the very beginning, go through this

Page 617

1   whole document?  You know, I don't see it.
2   BY MR. SLATER:
3   Q.    He didn't actually -- rephrase.
4          What he said was that he was
5   seeing with the irbesartan was similar to the
6   NDMA that occurs in valsartan when quenched
7   with sodium nitrite.
8          He didn't need to present data
9   in this e-mail because that was a fact he was
10  reciting in the e-mail which was accurate.
11  A.    No, no, no.  The --
12          MR. GALLAGHER:  Wait.
13          THE WITNESS:  Sorry.
14          MR. GALLAGHER:  Objection.
15          Lacks foundation, vague, and
16          mischaracterizes the document.
17  A.    The only data or external
18  information or publicly available information
19  related to valsartan, you know, if you can
20  see, is related to that patent, right.  So
21  that patent is actually, you know, referring
22  to, you know, impurity K in valsartan.  Okay?
23  BY MR. SLATER:
24  Q.    This was internal information

Confidential Information - Subject to Protective Order

Page 618

1  that wasn't being shared with anybody from
2  outside the company, this e-mail from July
3  2017.  It's an internal e-mail, right?
4       A.    Yeah, it is internal e-mail,
5  yeah.
6       Q.    And when -- rephrase.
7           When that e-mail states that
8  NDMA occurs in valsartan when it's quenched
9  with sodium nitrite, that's an accurate
10 statement.  That's actually the root cause of
11 the NDMA contamination, right?
12          MR. GALLAGHER:  Objection.
13      Lacks foundation, and mischaracterizes
14      the document.
15      A.    I'm not sure exactly, you know,
16 based upon -- you know, based upon that
17 particular wording, you know.
18          But, you know, to me, you know,
19 when he said quenching with, you know,
20 valsartan, you know, quenching with sodium
21 nitrite, right, the only -- as I said, you
22 know, the available, you know, information,
23 it looks like is the attachment of that
24 external patent.

Page 619

1       Okay.  That patent, if you look
2  through it, it's only talking about, you
3  know, component, you know, like impurity K
4  and L, probably.
5  BY MR. SLATER:
6       Q.    Would you be surprised if I was
7  able to show you documentation that your
8  company did chromatography and identified
9  NDMA in valsartan prior to July 27, 2017?
10 Would that surprise you?
11          MR. GALLAGHER:  Objection.
12      Argumentative.
13      A.    Yeah, I would be surprised if
14 you say, because I don't -- you know, I'm not
15 aware of that.
16 BY MR. SLATER:
17      Q.    Would it be surprising to you
18 if we were to show you documents indicating
19 that there were people within your company
20 that had figured out that there were
21 nitrosamines, likely NDMA -- rephrase.  Let
22 me rephrase it.
23          I'm going to actually ask you
24 even more directly.

Page 620

1       Did anybody in your company
2  identify NDMA through chromatography prior to
3  July 27, 2017 where you were made aware that
4  it had been identified on the test?
5       A.    Before -- I'm sorry.  Before
6  which date?
7       Q.    Before the e-mail sent by
8  Mr. Lin on July 27, 2017.
9           MR. GALLAGHER:  Objection.
10      Lack of foundation.
11      A.    I was not aware.
12 BY MR. SLATER:
13      Q.    Was anybody in your company
14 aware of that, that --
15      A.    I --
16          MR. GALLAGHER:  Objection.
17 BY MR. SLATER:
18      Q.    Was anyone in your company
19 aware of a test result that you know of that
20 showed NDMA in valsartan before July 27,
21 2017?
22          MR. GALLAGHER:  Objection.
23      Lack of foundation.
24      A.    I don't know.

Page 621

1  BY MR. SLATER:
2       Q.    To your knowledge, was anybody
3  in your company disciplined in connection
4  with the valsartan contamination with NDMA?
5       A.    I have no knowledge.
6           MR. GALLAGHER:  Objection.
7           THE WITNESS:  Sorry.
8           MR. GALLAGHER:  Lack of
9       foundation, calls for speculation.
10 BY MR. SLATER:
11      Q.    For example, did anybody lose
12 their job?
13          MR. GALLAGHER:  Same objection.
14      A.    I don't know.
15 BY MR. SLATER:
16      Q.    Was anybody reassigned?
17          MR. GALLAGHER:  Same objection.
18      A.    As I said, I don't know.  I
19 mean, this is not my job; this is human
20 resources' job.  I don't know.
21          MR. SLATER:  Let's go, Cheryll,
22      back to Exhibit 319, to the second
23      page, please.
24          Actually, let's -- just to

Page 622

1    reorient, just stay there.  Thank you.
2    BY MR. SLATER:
3        Q.    Looking at Exhibit 319, it
4    starts with a July 5, 2018 e-mail from
5    Charles Wang to someone named Jim, and we
6    just went through that e-mail a moment ago.
7            MR. SLATER:  And we can scroll
8        down to the second page of that
9        e-mail, please.  No, no, that e-mail.
10       Sorry.  Thank you.  Go to the bottom
11       of the page, please.  Yes.
12       Q.    Okay.  Now, it's actually --
13   let me ask you this question, actually.
14   Where -- rephrase.
15           Where Mr. Wang told Jim that a
16   friend of his was looking for a consultant in
17   the United States to help them define their
18   product at FDA, at that point you were aware
19   and you had authorized Mr. Wang to find an
20   independent consultant for you?
21           MR. GALLAGHER:  Are you done?
22       Objection.  Vague.
23       A.    It looks like, yeah, we asked
24   him probably, you know, yeah, to go ahead and

Page 623

1    try to find.
2            MR. SLATER:  Okay.  Now let's
3        go up to the next e-mail, please.
4        Thank you.
5    BY MR. SLATER:
6        Q.    In response to Charles Wang's
7    e-mail on July 5th at 1:50 p.m., Jim
8    MacDonald, we can see his e-mail, writes back
9    to Charles.
10           Do you see that?
11       A.    Yeah, mm-hmm.
12       Q.    He says, "Good to hear from
13   you.
14           "I am at the beach with my
15   family.  I'll be back in the office from
16   Monday and" I will give you -- "and will give
17   you a call.  It will be good to catch up.
18           "Best regards, Jim."
19           So that was the response,
20   correct?
21       A.    Mm-hmm.
22           MR. SLATER:  Okay.  Now let's
23       scroll to the next e-mail, and I think
24       that the very beginning of that e-mail

Page 624

1    is at the bottom of the first page.
2    Perfect.
3        Q.    Charles Wang then responds on
4    July 5, 2018 at 10:27 p.m., so this is still
5    on the same day as the first e-mail.
6            Do you see that?
7        A.    Yeah, mm-hmm, it's July 5th,
8    yeah, 2018.
9        Q.    Writes to Jim MacDonald.
10       A.    Mm-hmm.
11       Q.    And he says, "Hi Jim, Nice to
12   hear from you.  Hope everything is going
13   well."
14           MR. SLATER:  You can scroll
15       down now, Cheryll, so we have the
16       whole e-mail.
17       Q.    Okay.  I'll start over.
18           The e-mail reads, "Hi Jim, Nice
19   to hear from you.  Hope everything is going
20   well.
21           "Sorry to disturb you during
22   your vacation.  My friend's company will have
23   a face-to-face meeting with FDA to debit if
24   they should recall their product in US market

Page 625

1    next Thursday and likes to get some advice
2    from people like you quickly."
3            Do you see that?
4        A.    Yes.
5        Q.    And that's consistent with what
6    you had discussed with Mr. Wang, that you
7    were looking to bring in another consultant
8    to help prepare for that meeting, correct?
9            MR. GALLAGHER:  Objection to
10       the extent it mischaracterizes
11       testimony.
12           You can answer.
13       A.    As I -- yeah, as I said, yeah,
14   it looks like, yeah, we, you know, we --
15   basically we took his recommendation to
16   looking for, yeah, an expert on the -- you
17   know, yeah, on that particular, you know,
18   carcinogenicity area, yeah.
19   BY MR. SLATER:
20       Q.    And again, as you said earlier,
21   you had a lot of trust in Mr. Wang,
22   considered him to be a reliable expert, so
23   you asked him to go find you the most
24   qualified person he could find basically,

Page 626

1  right?
2      A.    Yeah, it looks like.
3      Q.    This e-mail continues --
4  rephrase.
5          The e-mail continues, "Not sure
6  if you heard Huahai Pharma Group, one of the
7  largest generic drug company in China with a
8  branch in US (Cranberry, NJ). Li knows their
9  US CEO as well."
10     Q.    Do you know who Li is?
11     A.    I have no idea.
12     Q.    Do you know if that's you
13 that's being referred to?
14     A.    Based upon the content, it
15 should not be me.
16     Q.    So the -- rephrase.
17         The e-mail continues.  "Li
18 knows their US CEO as well.  Huahai has a
19 product in US market with the maximum daily
20 dose of 320 milligrams, which recently was
21 found containing high Nitrosodimethylamine
22 (NDMA, not know exactly how much but around
23 30 parts per million)."
24         I want to stop there.

Page 627

1      Q.    Do you see the reference to
2  30 parts per million?
3      A.    Yes.
4      Q.    And we've been through the test
5  results already earlier in your deposition.
6  You would agree with me that 30 parts per
7  million is actually on the very low side
8  compared to the ranges of NDMA that was found
9  in the zinc chloride process valsartan,
10 correct?
11         MR. GALLAGHER:  Objection.
12     Vague.
13     A.    The average, as far as I can
14 remember, is somewhere around like 55 or
15 maybe, you know, between 55 and 60 ppm
16 average.
17 BY MR. SLATER:
18     Q.    That's your best recollection?
19     A.    Yes.
20     Q.    We went through the list, the
21 numbers ranged up as high as 188.1, 165.1,
22 172.3, there were some -- some very high
23 numbers on that chart that we went through
24 the other day, correct?

Page 628

1          MR. GALLAGHER:  Objection.
2      Vague, and lacks foundation.
3      A.    Yes.  But these are, you know,
4  very small fractions.  We also have very low
5  numbers, like single digit numbers.
6  BY MR. SLATER:
7      Q.    Continuing in the e-mail,
8  Charles Wang writes, "Their client in EU" --
9  and that would be the European Union?
10     A.    Yeah, it should be.
11     Q.    And when they talk about --
12 rephrase.
13         When he speaks about your
14 client in the EU, he's talking about
15 Novartis, right?
16         MR. GALLAGHER:  Objection.
17     Lack of foundation.
18     A.    I would say probably, but I
19 wouldn't be 100 percent.  It probably is
20 Novartis.
21 BY MR. SLATER:
22     Q.    It says, "Their client in EU
23 said it should be at 0.3 parts per million
24 based on TD50 calculation."

Page 629

1          That was what Novartis said,
2  correct?
3      A.    That was Novartis said it at
4  one point, yeah.  As I said, you know, some
5  early discussion with Novartis, you know,
6  they were basing the TD50 from a primate, but
7  then the, you know, the threshold would be
8  lower, yeah.
9          But this one, as I said, it
10 looks like based upon the rodent, you know,
11 studies.
12     Q.    And the 0.3 that Novartis
13 recommended actually is the number the FDA
14 ended up agreeing on as well, correct?
15         MR. GALLAGHER:  Objection.
16     Outside the scope, and lack of
17     foundation.
18     A.    I would say eventually.  You
19 know, at a very early stage, you know, FDA
20 did take this as an interim spec, and then
21 the, you know, the official allowable intake
22 at that time, you know, as I said, was --
23 should be absent.
24         But then, you know, after you

Page 630

1  know, maybe about a year or so, you know, now
2  FDA basically broadened that to, you know,
3  0.3 ppm.
4  BY MR. SLATER:
5      Q.    The e-mail continues.  "They
6  would like to know if they can argue to set
7  limit higher based on NDMA is considered a
8  Class 2A carcinogen (limit at threshold of
9  toxicological concern of 1.5 micrograms per
10  day) and the longest duration of human
11  exposure in US will be less than 3 years."
12          Do you see that?
13      A.    Yes.
14      Q.    And we went through earlier the
15  e-mail where Charles Wang actually told you
16  that NDMA actually should be a class A -- a
17  class -- rephrase.
18          And we went through earlier the
19  e-mail where Charles Wang told you he thought
20  NDMA met the criteria for a Class 1
21  carcinogen.  We saw that e-mail a few minutes
22  ago, right?
23          MR. GALLAGHER:  Objection.
24  Lack of foundation, and to the extent

Page 631

1  it mischaracterizes the document and
2  testimony.
3      A.    Yes, we looked through that
4  document.  But as I indicated, okay, that's
5  the MSDS, you know, from that particular
6  chemical company, okay.
7          Based upon today's knowledge,
8  you know, if they talking about that
9  classification based upon IARC, you know,
10  that information was incorrect, okay.  The
11  IARC categorization as of today is still 2A,
12  Class 2A.
13  BY MR. SLATER:
14      Q.    The e-mail continues.  "Let me
15  know if your company can help.  I will ask
16  them to contact you directly and send you
17  more details.
18          "Thanks a lot for your help and
19  enjoy your vacation.  Best, Charles."
20          And that's how that e-mail
21  ended, correct?  Do you see that?
22      A.    Yes.
23          MR. SLATER:  Let's go now,
24  Cheryll, to the next e-mail in the

Page 632

1  chain which starts about a third of
2  the way down the first page of this
3  page.  Perfect.
4      Q.    On July 6, 2018, the next day,
5  at 11:11 a.m., Jim MacDonald responds.
6          Do you see the e-mail?
7      A.    Yes.
8      Q.    And we now can see where Jim
9  MacDonald comes from, he has a company called
10  Synergy Partners Research & Development
11  Solutions, and he's listed as James S.
12  MacDonald Ph.D, Founding Partner, right?
13      A.    Yes.
14      Q.    Jim MacDonald writes, "Charles,
15  I'm afraid I can't be of much help in this
16  case particularly on this time scale.
17          "NMDA (or dimethylnitrosamine)
18  is a pretty well-known toxin and animal
19  carcinogen with lots of discussion on
20  permissible levels in drinking water and
21  products.  Even though the compound is found
22  in cured meats and some groundwater, the body
23  of evidence on this suggests pretty clearly
24  that this is a likely human carcinogen at

Page 633

1  sufficient exposures."
2          Do you see that?
3      A.    Yes.
4      Q.    And a likely human carcinogen
5  means something that likely causes cancer in
6  humans, that's what that means, correct?
7      A.    I think I went through this
8  topic many times.  It is a, you know,
9  probable human carcinogen.
10      Q.    He continues.  "The argument
11  that the company would have to make to keep
12  this product on the market will be very
13  difficult with this profile.  I'm not exactly
14  sure where one would begin given the very
15  high levels you think they are seeing."
16          I want to stop there.
17          When he refers to the very high
18  levels, we just saw in the earlier e-mail
19  that he was quoted a level of 30 parts per
20  million in the prior e-mail, correct?
21          MR. GALLAGHER:  Objection.
22  Lack of foundation, and calls for
23  speculation.
24      A.    Let me read through, okay?

Page 634

BY MR. SLATER:
Q.    Just so you understand my question, when he refers to the very high levels you think they are seeing, I had just shown you in the prior e-mail that Charles Wang, or Wang, had quoted him 30 parts per million.
Do you remember that?
MR. GALLAGHER:  Objection. Lack of foundation, and calls for speculation.
A.    Yes, I remember that 30 parts per million number, yes.
BY MR. SLATER:
Q.    So this toxicologist -- rephrase.
So this toxicologist who Charles Wang was going to on your behalf was actually telling you that 30 parts per million were very high levels, and we've already established the levels were actually higher, correct?
MR. GALLAGHER:  Objection. Lack of foundation, compound, and

Page 635

vague.
A.    The average value is higher than 30 ppm.  But, you know, there was, you know, certain numbers of batches that were below 30 ppm.
BY MR. SLATER:
Q.    You told me the average a moment ago was, your best recollection, was 55 to 60 parts per million, correct?
A.    Yes.
Q.    And going back to the math that we did before, if it was 60 parts per million for a 320-milligram pill, that would be 19,200 nanograms, correct?  60 times 320, right?
MR. GALLAGHER:  Objection. Calls for speculation and expert testimony.
Are you asking him to do the calculation?  Do you have a calculator?
BY MR. SLATER:
Q.    You certainly don't -- you can agree with me or you can check it yourself,

Page 636

or you can disagree with my math.
A.    So your calculation based upon what, 60 ppm or --
Q.    Right, 60 ppm for a 320-milligram pill would be 19,200 nanograms of NDMA, correct?
MR. GALLAGHER:  Same objection.
A.    19,000 -- wait a second.  You said 19,000 -- what is the rest of the number?
BY MR. SLATER:
Q.    19,200.
A.    200 nanogram.
Q.    Right.  That's the number, right?
A.    Probably.  I mean, you know, I didn't check myself.  But it's probably on the ball park.
Q.    And if it was 60 parts per million, the average that you told me, and a 160-milligram pill, we do 60 times 160 and come up with 9,600 nanograms, correct?
MR. GALLAGHER:  Same objection.
A.    Hold on, let me double-check.

Page 637

So 60, right, 60 times 320.
Yeah, 19,200 nanogram, yeah, for the 60 ppm for 320 milligram, yeah.
BY MR. SLATER:
Q.    The ultimate limit that the FDA set was 96 nanograms, correct?
A.    Yes.
MR. GALLAGHER:  Objection. Outside the scope.
BY MR. SLATER:
Q.    So if we take 19 -- rephrase.
So if we take 60 parts per million -- rephrase.
If we take a 320-milligram pill, which would be 19,200 nanograms of NDMA, and we divide that by 96, it comes to 200.
So that would be 200 times the limit that the FDA ended up setting, correct?
MR. GALLAGHER:  Objection. Lack of foundation, and outside the scope, and calls for expert testimony.
A.    The calculation, it looks like it's correct.  19,200 divided by 96 is 200.

Page 638

BY MR. SLATER:

Q.   And even for a 160-milligram pill, we'd be talking about 100 times the FDA limit of 96 nanograms, right?

MR. GALLAGHER:  Objection. Lacks foundation, outside the scope, and calls for expert testimony.

A.   The calculation seems to be correct.

BY MR. SLATER:

Q.   And that's -- rephrase.

And those numbers are based on 60 parts per million, which is double the 30 parts per million that this toxicologist who was being consulted on your behalf said were already very high levels, correct?

MR. GALLAGHER:  Objection. Lacks foundation, vague.

A.   I mean, whatever it says in the e-mail, you know, I mean, it's there.

BY MR. SLATER:

Q.   Reading the e-mail further, Mr. -- rephrase.

Reading the e-mail further,

Page 639

James MacDonald says, "I think the strategy I would probably recommend would be to come up with a CMC plan to remove the contaminant (at least to minimally detectable levels) while they recall the existing product and re-formulate. I expect this is not what they would want to hear but, unless there is a compelling reason to leave this product on the market (e.g.: only product available to treat a serious, life-threatening disease), I would expect the FDA would ask for a recall. I'd be interested to know what happens at the FDA meeting. These things are always very difficult to predict - but this is not a good position for this product in my view.

"Hope all is well with you.

"Best regards, Jim."

Do you see that?

A.   Yes.

Q.   And Mr. Wang relayed to you that he had spoken with Jim MacDonald and what the result of that interaction had been after he had heard from Mr. MacDonald, correct?

Page 640

MR. GALLAGHER:  Objection. Lacks foundation.

A.   I don't remember the details. He probably talked to me verbally, at least.

BY MR. SLATER:

Q.   He certainly would have let you know, hey, I spoke to Jim MacDonald, the guy I thought could help us, unfortunately this is the response I got.

He at least would have let you know what happened and what the information was, right?

MR. GALLAGHER:  Objection. Lacks foundation, calls for speculation.

A.   I just said I don't remember the detail, okay?

And one thing, you know, you know, I think I need to maybe provide, you know, some of the, you know, background, okay?

You know, even in this ongoing, right here it's mentioned, you know, this like, you know, upcoming meeting with FDA,

Page 641

okay, so during that meeting, you know, FDA still asked us to be on hold with regard to our, you know, question whether we should do the recall immediately, okay?

So the thing is, you know -- or the fact, you know, indicate at that time FDA still was not sure, you know, obviously, you know, because by considering, you know, the potential drug shortage. So FDA still wasn't sure, you know, what a level or an interim limit should be set, you know, to -- that is, you know, potentially to allow some batch.

For example, you know those batch below 30 ppm, you know, still temporarily remain on the market, you know, to address, you know, the potential, you know, drug shortage issue.

MR. SLATER:  Going now to the top of the page, please.

BY MR. SLATER:

Q.   The next e-mail in this document is July 17, 2018, Charles Wang writes to Jim MacDonald.

Do you see that?

Confidential Information - Subject to Protective Order

Page 642

1    A.    Mm-hmm.
2    Q.    He says, "Hi Jim.  You may have
3  already seen this," and then he has the link
4  to Press Announcements.
5          "It is exactly like you
6  expected, and I agreed with your call.
7          "Thanks again for your help.
8  Keep in touch for the future collaboration
9  opportunity."
10         Do you see that?
11   A.    Yes.
12   Q.    And this would have been the
13  announcement of the recall, correct?
14         MR. GALLAGHER:  Objection.
15  Lacks foundation.
16   A.    That's July 17th.
17         So can we go down?  Okay.
18         So the previous one was the
19  July 6th.  So whether this is related to
20  recall, you know, we can take a look, you
21  know.
22         Can we, you know, take a look
23  of this announcement?
24         ///

Page 643

1  BY MR. SLATER:
2    Q.    I'm just asking if you agree
3  with me that he would have been talking about
4  the recall at that point, on July 17, 2018.
5          MR. GALLAGHER:  Objection.
6  Lacks foundation.
7    A.    I mean, eventually FDA, yeah,
8  basically agree, you know, with us, you know,
9  at that time, you know.  They, you know,
10  allow us to, you know, to initiate the
11  recall, you know, for those batches, you
12  know, impacted.  Yeah.
13         But I'm not sure whether, you
14  know, if this particular July 17th.  But it
15  looks like, but, you know -- but essentially,
16  as I said, that during the -- you know, that
17  upcoming meeting, you know, a teleconference
18  meeting with FDA, you know, FDA at the time
19  still asked us to hold on the recall.
20  BY MR. SLATER:
21   Q.    Where -- rephrase.
22         Charles Wang, as we can see in
23  this e-mail, told Jim MacDonald, "I agreed
24  with your call."

Page 644

1          MR. GALLAGHER:  Objection.
2  Lacks foundation.
3  BY MR. SLATER:
4    Q.    Did Charles Wang tell you that
5  he agreed with Jim MacDonald's call on what
6  should happen here?
7          MR. GALLAGHER:  Objection.
8  Lacks foundation.
9    A.    So the e-mail, you know, yeah,
10  says whatever, yeah, he says.  I mean, as I
11  told you, you know, from the very beginning,
12  you know, after, you know, you know, you
13  know, you know, we determined the root cause,
14  you know, we determined -- you know, we
15  developed a method and we, you know,
16  determined the range or the average of the
17  contents, as I said, we immediately, you
18  know, approach FDA, ask whether we should do,
19  you know, immediate recall, you know, as I
20  said.
21         But it looks like, you know,
22  it's probably, based upon the contents, you
23  know, the likely scenario would be, yeah, by
24  July 17th FDA made this announcement, and

Page 645

1  also we also received, you know, FDA's
2  instruction, you know, to start recall, as we
3  have been asking FDA, you know, you know,
4  whether we should do, you know, immediately
5  or as soon as, you know, it should be done.
6          MR. SLATER:  Cheryll, if you
7  could scroll down a little bit more,
8  please.  Perfect.
9  BY MR. SLATER:
10   Q.    I want to go back to the e-mail
11  from July 6th where it's documented that
12  Dr. MacDonald told Charles Wang that the body
13  of evidence suggests pretty clearly that this
14  is a likely human carcinogen at sufficient
15  exposures.  Do you recall we talked about
16  that a few moments ago?
17   A.    Yes.
18   Q.    Charles Wang told you the same
19  thing, right?
20         MR. GALLAGHER:  Objection.
21  Lacks foundation, and I'm going to
22  object to outside the scope.
23         Adam, I've let you ask
24  questions about this --

Page 646

```
1         MR. SLATER:  I don't know why
2    you're saying this, Patrick.  This is
3    ZHP's evaluation of knowledge of the
4    health risks of nitrosamines,
5    Topic 36.
6         MR. GALLAGHER:  Nobody from --
7    nobody from ZHP is on this e-mail.
8    Nobody from ZHP is on this e-mail.  He
9    said he doesn't recall talking to him.
10        MR. SLATER:  Are you going to
11   testify now?  Relax.  Are you going to
12   testify now?
13        MR. GALLAGHER:  No, I'm
14   objecting it's outside the scope.  You
15   told -- you just said ZHP's knowledge.
16   Nobody from ZHP is on this e-mail.
17        MR. SLATER:  Are you testifying
18   now --
19        MR. GALLAGHER:  You're trying
20   to put words in Dr. Wang's mouth of
21   what he told Dr. Li.  He said he
22   doesn't recall.  I'm just objecting
23   outside the scope.  Ask your
24   questions.
```

Page 647

```
1         MR. SLATER:  Would you like to
2    testify?  We could place you under
3    oath if you want?  I mean, you're
4    literally -- you realize how far over
5    the line what you just did is.  Please
6    don't do that again.  I'd really
7    appreciate it.
8    BY MR. SLATER:
9         Q.    Did Charles Wang tell you that
10   it was clear to him that NDMA was a likely
11   human carcinogen at sufficient exposures when
12   you were consulting with him?
13        MR. GALLAGHER:  Objection.
14   Lack of foundation.
15        A.    As I said, I don't remember,
16   you know, such details, okay.  But based
17   upon, you know, the e-mail communication with
18   him, yeah, he indicated, yeah, it's a likely,
19   you know, human carcinogen, okay, based upon,
20   you know, the results from animal studies.
21   Right.  It's likely, you know, it's a
22   probable, you know, it's -- you know, it's
23   the same meaning.
24        I mean, just like in, you know,
```

Page 648

```
1    IARC, you know, you know, classification to
2    be, you know, 2A, you know, basically means,
3    you know, you know, it's a potential or
4    probable, you know, to human based upon, you
5    know, animal, you know, you know, studies.
6    BY MR. SLATER:
7         Q.    Did you or anybody from your
8    company ever tell the FDA that a toxicologist
9    who was hired by your company advised you
10   that NDMA was a likely human carcinogen?
11        MR. GALLAGHER:  Objection.
12   Outside the scope, and calls for
13   speculation.
14        A.    I don't remember, you know --
15        MR. GALLAGHER:  And lack of
16   foundation.
17        MR. SLATER:  Just bear with me
18   for a second.  I think I misplaced a
19   document.  Sorry, everyone, but I'm a
20   little confused.
21        Okay.  I got it.  Okay.
22        We can take this one down.  And
23   let's go to -- the last one was 319,
24   right?  Let's go to Exhibit 320, which
```

Page 649

```
1    starts with CHARLESWANG000164.
2         (Whereupon, Exhibit Number
3    ZHP-320 was marked for
4    identification.)
5         MR. SLATER:  And what I'd like
6    to do is go to page -- the Bates
7    number is 179.  Go to the very top.  I
8    just really want to go to the very top
9    of the page, actually.
10   BY MR. SLATER:
11        Q.    Do you see at the top it says,
12   "WeChat communication with Min Li and Jun Du,
13   July 8, 2018"?
14        A.    Okay.
15        Q.    Do you see that?
16        A.    Mm-hmm.
17        Q.    And do you recall that you
18   communicated through WeChat with Charles Wang
19   and -- or Charles Wang and Jun Du?
20        A.    I don't recall the details.
21        Q.    Why was Jun Du involved in any
22   of your interactions with Charles Wang?
23        A.    Why?  I mean he's the -- you
24   know, first of all, he's the executive vice
```

Page 650

1  president of the company, and also he's the
2  head of Huahai in the US and also, you know,
3  the Prinston Pharma.
4      Q.    Did you tell Jun Du the
5  feedback you got from Charles Wang after he
6  had communicated with Jim MacDonald in early
7  July 2018?
8          MR. GALLAGHER:  Objection.
9  Vague, and lack of foundation.
10     A.    I'm sorry, could you repeat the
11 question?
12 BY MR. SLATER:
13     Q.    Sure.
14         Did you tell Jun Du the
15 feedback you got from Charles Wang after he
16 had communicated with Jim MacDonald in early
17 July of 2018?
18     A.    I don't remember -- sorry.
19         MR. GALLAGHER:  Objection.
20 Lack of foundation.
21     A.    I mean, as I said, I don't
22 remember, you know, such details, but at a
23 such -- you know, at a certain point, you
24 know, he came to know.

Page 651

1  BY MR. SLATER:
2      Q.    At some point you told him?
3      A.    I don't remember whether I
4  told -- told him or Charles Wang told him.  I
5  just don't remember, you know, you know, the
6  details.
7      Q.    Now, what I want to do is go to
8  the very first page of this document now, the
9  Bates number 164.  Let's go back up to the
10 top.
11         And this was a draft report
12 that Charles Wang provided.
13         MR. SLATER:  Cheryll, if you
14     could scroll down to the bottom half
15     of the page just so we can show that.
16     Q.    And you recall Charles Wang
17 provided some potential draft reports for you
18 about safety assessments for NDMA?
19         MR. GALLAGHER:  Objection.
20 Lack of foundation.
21     A.    There are probably some draft,
22 yes.
23 BY MR. SLATER:
24     Q.    What I'd like to do now is --

Page 652

1          MR. SLATER:  Cheryll, can you
2  go to page 10 of this?  The Bates
3  number is 173, please.
4      Q.    There's a table that we see on
5  this page, and it says, "Table 1:  Reasonable
6  Worst-Case Estimates of Daily Intake of NDMA
7  by the General Population in the Sample
8  Country."
9          Do you see that?
10     A.    Yes.
11     Q.    Do you know where that table
12 came from?
13         MR. GALLAGHER:  Objection.
14 Lack of foundation.
15     A.    Right now I don't, just don't
16 remember the details.
17 BY MR. SLATER:
18     Q.    To the ex -- well, rephrase.
19 Or withdrawn actually.
20         Okay.  Let's -- just so that
21 you can be familiar with this table, you see
22 that it talks about how people can be exposed
23 to NDMA and -- during the day, and it lists
24 on the left-hand column things like air,

Page 653

1  water, food, indoor air, groundwater, beer,
2  and shampoo.
3          Do you see that?
4          MR. GALLAGHER:  Objection.
5  Vague, and lack of foundation.
6      A.    It is listed there.
7          MR. SLATER:  Okay.  Let's take
8  that down now and go to Exhibit 210.
9          Give me a second.  You know, I
10 apologize, Cheryll, can you go back to
11 the prior exhibit, please?  I'm sorry
12 to make you go back, it's Exhibit 320.
13         If you could, go back, go back
14 to page Bates number 182, please.
15 It's page 19 of the report, of the
16 draft.
17 BY MR. SLATER:
18     Q.    This is at the end of that
19 draft report that Charles Wang provided.  Do
20 you see this, he provided a biography?
21     A.    Yes.
22         MR. GALLAGHER:  Objection.
23 Lack of foundation, and
24 mischaracterizes testimony.

Page 654

1    MR. SLATER:  What's the lack of
2  foundation?  It's a document you
3  produced to us.
4    MR. GALLAGHER:  The document
5  Charles -- it came from Charles Wang.
6  You haven't established with the
7  witness or what --
8    MR. SLATER:  What haven't I
9  established?  I'm sorry.
10    MR. GALLAGHER:  You don't know
11  what the document is.  It's a document
12  that was produced from Charles Wang.
13    MR. SLATER:  We already
14  established it's a draft that was --
15  of a report that was provided dated
16  June 15, 2018.  We already went over
17  that with the witness.  We already
18  established that's what they were
19  getting from Charles Wang.
20    MR. GALLAGHER:  I don't think
21  you established where it came -- it's
22  a document that was produced from
23  Charles Wang, and it's dated June 15,
24  2018.  I don't think you've

Page 655

1  established anything else about this
2  document.
3    MR. SLATER:  Okay.
4  BY MR. SLATER:
5    Q.    Looking now at the biography
6  that Charles Wang put in there, I just went
7  through this for a moment, and he gives some
8  of his background and he says that, around
9  the middle, he was the "Vice President of
10  Drug Safety and Regulatory Affairs at Hua
11  Medicine, Limited, a US VC funded
12  biopharmaceutical company in China."
13    A.    I'm sorry, where that word?
14    Q.    Right in the middle of the
15  biography.
16    A.    Okay.  Dr. Wang, okay.  Was the
17  vice president.  Let me read through.
18       (Witness reviewing document.)
19    A.    Yeah, okay.  Yeah.
20    Q.    Then it says -- rephrase.
21       It says that he was "Director
22  of Toxicology at Johnson & Johnson PRD,"
23  whatever that firm is, and "Senior Scientist
24  at Novartis Pharmaceutical Corp. in the

Page 656

1  United States."
2       Do you see that?
3    A.    Yes.
4    Q.    Do you know why this doesn't
5  list the fact that he was currently working
6  at GlaxoSmithKline?
7    MR. GALLAGHER:  Objection.
8  Calls for speculation.
9    A.    I have no idea.
10    MR. SLATER:  All right.  Now we
11  can go back to the other exhibit.
12  Thank you, Cheryll.  Exhibit 210.
13       You know what?  I lied again.
14  I'm sorry.  If you could go back to
15  page 10 again of the other document,
16  I'm sorry.  I'm trying to make life
17  difficult tonight for you.
18  BY MR. SLATER:
19    Q.    Just above the table that we
20  were discussing a moment ago, there's a line
21  that says.  "The worst-case estimation of
22  daily intake of NDMA from different sources
23  by general population at different age are
24  listed below."  And it says "[66]."

Page 657

1       And what I'd like to do, if we
2  could.  Is go to the references at the end of
3  the report, and it's page 14, the Bates
4  number is 177, to see what reference 66 is
5  and where that table came from.
6       And you see reference 66?
7    A.    Yes.
8    Q.    It's a citation from the
9  "Concise International Chemical Assessment
10  Document 38, N-nitroso dimethylamine," which
11  is NDMA, and it gives the authors' names, and
12  it says it was from the World Health
13  Organization in Geneva 2002, page 13.
14       Do you see that?
15    A.    Yes.
16    MR. SLATER:  Let's try this for
17  the fourth time.  Can we please go to
18  Exhibit 210 now.  Exhibit 210 is the
19  Deviation Investigation Report.
20       And let's scroll down to make
21  sure we have exactly which it is and
22  what the date is.  Perfect.
23    Q.    And it's dated -- it says
24  "Preparation Date:  November 5, 2018," and

Page 658

1 then on the next page there's a list of
2 signatures, report, review and approval,
3 showing this was signed and finalized,
4 correct?
5     A.    Yes.
6     Q.    And the deviation investigation
7 report, this is a document that's laying out,
8 among other things, the root cause and the
9 significance of the contamination, correct?
10     MR. GALLAGHER:  Objection to
11 the extent it mischaracterizes the
12 document.
13     A.    It investigate the root cause
14 or the likely root cause.
15 BY MR. SLATER:
16     Q.    This is -- rephrase.
17         This is a document that's
18 supposed to be fully accurate, right?
19     A.    Based upon the knowledge at the
20 time.
21     Q.    This document is supposed to be
22 fair and balanced in terms of providing
23 information, right?
24     MR. GALLAGHER:  Objection.

Page 659

1     Vague.
2     A.    As I said, to the best
3 knowledge available at that time.
4 BY MR. SLATER:
5     Q.    Would you agree that this
6 document should be an honest, scientifically
7 rigorous document in terms of its analysis?
8     MR. GALLAGHER:  Objection.
9     Vague.
10     A.    Again, I said, you know, it's
11 to the best knowledge, you know, of the
12 authors at the time.
13     MR. SLATER:  Cheryll, let's go,
14 if we could, to page 10 of 236,
15 please, the very top.
16         By the way, everyone, I have
17 zero idea about time, so I don't know
18 where you're at.  I'm about to start
19 in on this document, so now would
20 probably be a good break time if we're
21 at that point.
22     MR. GALLAGHER:  I think we're
23 just a little bit over an hour, so
24 I'll leave it to you.

Page 660

1     MR. SLATER:  Let's do that,
2 because otherwise we'll break up in
3 the middle.
4     MR. GALLAGHER:  Okay.
5     MR. SLATER:  So let's take a
6 break.
7         How long do you want?
8     MR. GALLAGHER:  Dr. Li, how
9 long would you like for a break?
10     THE WITNESS:  15 minutes.  Or
11 maybe we come back at, what, 10:25?
12     MR. GALLAGHER:  Sounds great.
13     MR. SLATER:  Whatever you want.
14 Sounds good.
15     THE VIDEOGRAPHER:  The time
16 right now is 10:09 a.m.  We're off the
17 record.
18         (Whereupon, a recess was
19 taken.)
20     THE VIDEOGRAPHER:  The time
21 right now is 10:27 a.m.  We're back on
22 the record.
23 BY MR. SLATER:
24     Q.    Looking here at the deviation

Page 661

1 investigation report, this is Section 3.1.2,
2 titled "NDMA Physiochemical Characteristics
3 and Toxicological Evaluation of NDMA."
4         Do you see that?
5     A.    Yes.
6     Q.    The toxicological evaluation
7 would be the part of the report where you got
8 consulting services from Dr. Wang, right?
9     A.    Yeah, it should be.
10     MR. SLATER:  And let's turn, if
11 we could, to the next page.  Scroll up
12 a little bit.  A little more.  Thank
13 you.
14     Q.    Looking now at page 11 of this
15 report, you can see that there's a citation
16 to something that was stated in the report to
17 the Concise International Chemical Assessment
18 Document 38 on NDMA, which we just saw before
19 was cited in Dr. Wang's report, correct?
20     A.    Yes.
21     Q.    And one thing to be clear --
22 rephrase.
23         To be clear, ZHP would only
24 cite scientifically reliable literature in

Page 662

1  this report, correct?
2      A.    As I said, again, you know,
3  based upon the best knowledge, and also, like
4  you said, you know, this data is likely, you
5  know, yeah, from, yeah, Dr. Wang's report,
6  yes.
7      Q.    Would ZHP cite literature or
8  articles in this report that it did not
9  believe was scientifically reliable?
10     A.    It shouldn't.
11            MR. SLATER:  Let's turn to the
12  next page, page 12 of this report.
13     Q.    We can actually see that that
14  table that was cited in Dr. Wang's report and
15  cited to that World Health Organization study
16  is also actually found right here in the
17  deviation investigation report, correct?
18     A.    Yes.
19            MR. SLATER:  Let's scroll down
20  a little bit.
21     Q.    There's a section titled
22  "Animal Toxicity Studies," and it says in
23  part --
24            MR. SLATER:  Scroll down a

Page 663

1      little more, actually.  Perfect.
2      Q.    Under the "Animal Toxicity
3  Studies" section, it says in part in that
4  second paragraph, "Carcinogenicity studies in
5  animals demonstrated that NDMA is
6  carcinogenic.  However, no evidence is
7  available to confirm that NDMA is
8  carcinogenic in humans.  Nevertheless, NDMA
9  is considered a probable human carcinogen
10  based on projection from the animal studies."
11            And that's the -- that's what
12  your company stated in this deviation
13  investigation report, correct?
14     A.    Yes.
15     Q.    Now, we had talked a moment ago
16  that the table up above came from the World
17  Health Organization study, the Concise
18  International Chemical Assessment document
19  regarding NDMA.
20            Do you recall that?
21     A.    Yes.
22     Q.    And what we can do now is we
23  can take this document down, and we can go --
24            MR. SLATER:  I guess -- I don't

Page 664

1  know what the next exhibit would be.
2  Is it 321?
3            THE STENOGRAPHER:  Yes, it is.
4            MR. SLATER:  Okay.  Let's go,
5  Cheryll, to Exhibit 321, the actual
6  Concise International Chemical
7  Assessment Document 38 regarding NDMA
8  that's cited here in the deviation
9  investigation report.  Thank you.
10            (Whereupon, Exhibit Number
11  ZHP-321 was marked for
12  identification.)
13  BY MR. SLATER:
14     Q.    And you can see that that's the
15  title.
16            MR. SLATER:  And if you can
17  scroll down, Cheryll, just to confirm
18  the date of it at the bottom, please.
19  Perfect.
20     Q.    You can see the "World Health
21  Organization, Geneva, 2002," correct?
22     A.    Yes.
23     Q.    Let's first, just to be sure --
24  rephrase.

Page 665

1            MR. SLATER:  Turn, if you
2  could, Cheryll, to page 1.  It's a
3  couple pages ahead.
4            And you see there's a section
5  that says -- rephrase.  Stop, stop,
6  stop, stop.
7      Q.    You see it says "Procedures,"
8  correct?
9      A.    Yes.
10            MR. SLATER:  Scroll down,
11  please, Cheryll, so we capture the
12  last two paragraphs on this section.
13  Perfect.
14     Q.    You can see that the second
15  paragraph under the Procedures talks about
16  how the first draft was prepared.  It says,
17  "The first draft is based on existing
18  national, regional, or international review."
19  And there's more information.
20            Do you see that?
21     A.    Yes.
22     Q.    And then the next paragraph
23  says, "The draft is then sent to an
24  international peer review by scientists known

Page 666

1  for their particular expertise and by
2  scientists selected from an international
3  roster compiled by IPCS through
4  recommendations from IPCS national Contact
5  Points and from IPCS" participation --
6  "participating institutions."
7          And peer review is an important
8  thing in scientific literature because that's
9  one of the important stamps of reliability
10 for scientific literature, correct?
11     A.   Yes.
12        MR. SLATER:  Let's go now,
13 Cheryll, if we could, to page 13.  13.
14 The very top.  Perfect.
15     Q.   We can see here on page 13 that
16 the table that we've been talking about that
17 was copied into Dr. Wang's report and into
18 the deviation investigation report is found
19 in this article as cited.
20        Do you see that?
21     A.   Yes.
22        MR. SLATER:  Let's go now,
23 Cheryll, to page 26, if we could.  And
24 if you could go down to the last part

Page 667

1  of that page, Section 12, there's a
2  little paragraph there.  On this page,
3  just go to the bottom of the page.
4          Oh no.  I'm getting a feeling
5  like a frozen computer issue is
6  happening.  "Frozen."  I just got a
7  text from Cheryll, "Frozen."
8          Could we go off for a moment
9  just while she fixes her issue,
10 please?
11        MR. GALLAGHER:  Sure.
12        THE VIDEOGRAPHER:  The time
13 right now is 10:35 a.m.  We're now off
14 the record.
15        (Whereupon, a recess was
16 taken.)
17        THE VIDEOGRAPHER:  The time
18 right now is 10:40 a.m.  We're back on
19 the record.
20 BY MR. SLATER:
21     Q.   I want to go through the
22 document a little bit, this article.  First
23 we'll start in Section 12 titled "Previous
24 Evaluations By International Bodies."

Page 668

1          And this states, "NDMA has been
2  classified by the International Agency for
3  Research on Cancer (IARC, 1987) as a
4  'probable human carcinogen (Group 2A),' based
5  upon sufficient evidence of a carcinogenic
6  effect in experimental animal species and the
7  demonstrated similarities in its metabolism
8  by human and rodent tissues."
9          Do you see that?
10     A.   Yes.
11     Q.   And in terms of the risks to
12 humans as compared to animals, you certainly
13 don't disagree that there are similarities in
14 the metabolism of humans and rodents as
15 stated here, you certainly don't disagree
16 with that, right?
17     A.   Whatever that statement says.
18     Q.   Let's go now to page 16.
19 Page 16, heading 8.4, it says
20 "Carcinogenicity," and again that's whether
21 something causes cancer, right?
22     A.   Yes.
23     Q.   And if you go a little further
24 down actually, let's go to Section 8.5,

Page 669

1  perfect, Section 8.5 is "Genotoxicity and
2  related end-points."
3          And genotoxicity is where --
4  well, you can explain it.  Tell me, what's
5  your understanding of genotoxicity?
6     A.   Any chemical substances, you
7  know, where they chemically react with DNA.
8     Q.   And this states in numerous --
9  well, rephrase.  Let me just take a step
10 back.
11        NDMA is a genotoxic substance,
12 correct?
13        MR. GALLAGHER:  Objection.
14 Vague, and calls for expert testimony.
15     A.   It is.
16 BY MR. SLATER:
17     Q.   NDEA is also a genotoxic
18 substance, correct?
19        MR. GALLAGHER:  Same
20 objections.
21     A.   Yes.
22 BY MR. SLATER:
23     Q.   This section states, "In
24 numerous studies conducted in vitro in

Confidential Information - Subject to Protective Order

Page 670

1 bacterial and mammalian cells, there has been
2 overwhelming evidence that NDMA is mutagenic
3 and clastogenic (reviewed in IARC, 1978;
4 ATSDR, 1989).  Increased frequency of gene
5 mutations, chromosomal damage, sister
6 chromatid exchange, and unscheduled DNA
7 synthesis have been observed in a wide
8 variety of cell types, in assays conducted in
9 the presence or absence of metabolic
10 activation.  Positive results have been
11 observed in human as well as rodent cells."
12        Do you see that?
13      A.   Yes, that's what it said.
14      Q.   Then it says, "Similarly, clear
15 evidence of genetic effects has also been
16 observed in in vivo studies," correct?
17      A.   In vivo studies, mm-hmm.
18        MR. SLATER:  Let's go now, if
19      we could, Cheryll, to page 21.  This
20      is Section 9, "Effects on Humans."
21      And if you could scroll down, Cheryll,
22      to the second paragraph under there.
23      Q.   The second paragraph starts
24 out, "Relevant epidemiological studies

Page 671

1 include case-control investigations in which
2 the potential risks of cancer of the
3 stomach," and I'm going to skip the citation
4 names for now, "upper digestive tract, and
5 lung associated with the ingestion of NDMA
6 have been assessed."
7        So they're citing to studies
8 that have looked at whether or not there's a
9 risk to humans from NDMA, correct?
10      A.   It looks like.
11        MR. SLATER:  Let's go now to
12      the other -- the second column at the
13      top, please.  Let's get that top half
14      of the page.  Perfect.
15      Q.   Continuing this section
16 regarding effects on humans of NDMA, it says,
17 "In three of four case-control studies, there
18 was a positive relationship with evidence of
19 exposure-response for the intake of NDMA and
20 gastric cancer."
21        You see that citations, there's
22 three articles cited right there?
23      A.   Yes.
24      Q.   Then if we go a little further

Page 672

1 down, it says, "In two case-control studies
2 in which matching or control for confounders
3 was rather more extensive than that for the
4 investigations of gastric cancer mentioned
5 above, three [sic] were clear
6 exposure-response relationships for NDMA and
7 lung cancer."
8        Do you see that?
9      A.   Yes.
10      Q.   And what they're talking about
11 here with this -- this -- rephrase.
12        And what they're talking about
13 here is that there are epidemiologic studies
14 that have been done showing that there is a
15 clear relationship between NDMA and humans
16 developing certain cancers, correct?  That's
17 what they're talking about?
18        MR. GALLAGHER:  Objection.
19      Foundation, calls for expert
20      testimony.
21      A.   Well, they're talking about
22 some, like you said, epidemiology, you know,
23 studies.
24            ///

Page 673

1 BY MR. SLATER:
2      Q.   It continues, "In almost all
3 studies, associations between the cancers of
4 interest and nitrate, nitrite, and NDMA were
5 examined; results were relatively consistent
6 in this regard, with there being an
7 association with cancer most commonly with
8 NDMA"; and then it says, "results for nitrite
9 were mixed, and there was an inverse
10 association with nitrate."
11        Do you see what I just read?
12      A.   Yes.
13      Q.   And -- rephrase.
14        When they talk about an
15 association with cancer most commonly seen
16 with NDMA, they're talking about cancer in
17 human beings, correct?
18        MR. GALLAGHER:  Objection.
19      Calls for expert testimony, and
20      outside the scope.
21      A.   I'm not sure they are purely
22 talking about, you know, with cancer in
23 human, just based upon, you know, this
24 statement.

Page 674

BY MR. SLATER:

Q.    This section is "Effects on Humans," and it's relating the results of epidemiologic studies.

Those would be studies of cancer in human beings, correct?

MR. GALLAGHER:  Objection. Calls for speculation, and lack of foundation.

A.    Let me read through that part, okay?

BY MR. SLATER:

Q.    You understand the question is, these are epidemiologic studies regarding causation of cancer in human beings, and I'm just asking you to confirm this has to do with humans.

MR. GALLAGHER:  Lack of foundation, and outside the scope.

A.    Well, these studies' subject, yes, was tried to evaluate.

BY MR. SLATER:

Q.    Cancer in human beings due to NDMA, that's what this is looking at,

Page 675

correct?

A.    Looks like.

MR. SLATER:  Let's go now, if we could, to the next page, please, page 22 of this article.

Q.    In the top left --

MR. SLATER:  Perfect, Cheryll. Thank you.

Q.    In the top left, the first full paragraph it says, "There appears to be no qualitative difference between rodents and humans in the formation of DNA adducts following exposure to NDMA."

Do you remember we went through a study last night that actually talked about studying the adducts that are caused -- the DNA adducts caused by exposure to NDMA?

Do you recall we talked about that last night?

A.    Yes.

Q.    And that's a very important part of a mutagenic, genotoxic substance is the formation of DNA adducts as part of the process whereby somebody will eventually

Page 676

develop cancer, correct?

MR. GALLAGHER:  Objection. Vague, calls for expert testimony.

A.    I think it does ask for speculation.  Okay.  Based upon my limited knowledge, you know, once, you know, a piece of DNA, for example, was alkylated, different species, you know, they may have different defense system, okay?  They can dealkylate.

So, you know, it still -- you know, you just make -- you cannot be 100 percent sure, okay, just simply because of the presence of alkylated DNA, you know. Because otherwise, you know, if what you're saying, you know, is true, then there will be no difference between, you know, you know, the mutagenicity with carcinogenicity, okay? These are the two different levels.  Okay.

So you were equating those two things, you know, you know, to be the same meaning, so I don't think that's accurate.

BY MR. SLATER:

Q.    Mutagenicity is the ability to

Page 677

actually damage the DNA, leading to cancer, right?

A.    That's just a potential.

MR. GALLAGHER:  Objection. Calls for expert testimony.

BY MR. SLATER:

Q.    I'm asking you what "mutagenicity" means.  That means that something damages DNA, leading to cancer, correct?

MR. GALLAGHER:  Objection. Calls for expert testimony.

A.    As I said, you know, your statement is not accurate, okay.  That's just a potential -- you know, you know, a potential source leading to.  Because otherwise, why people or why scientists will have two different terms?

And also, you know, it's very clear, you know, you know, mutagenicity, you know, can but do not necessarily are carcinogenetic.  I mean, you can -- you know, you can find it, like, in some documents, maybe even in M7 itself or some related

Page 678

1  document.
2  BY MR. SLATER:
3      Q.    Do you know what a mutagenic,
4  genotoxic substance is?
5      A.    I mean, do I know some chemical
6  part of being mutagenic?
7      Q.    Do you know what those terms
8  mean?
9      A.    As I said, yeah.  You know, as
10  I said, "mutagenic" means, you know, a
11  chemical substance will chemically react with
12  DNA.
13          But whether or not, you know,
14  that reactivity or formation of the DNA
15  adduct either will lead to, you know, cancer,
16  you know, that's another -- you know, another
17  question.  Okay.  It may or it may not, you
18  know.
19          So you trying to equating them,
20  you know, you know, you know, the
21  mutagenicity, you're trying to equating them,
22  you know, to carcinogenicity, you know.  This
23  is -- you know, this is not correct.
24      Q.    I'm actually just -- okay.

Page 679

1  I'll withdraw that.
2          When I said "I'll withdraw
3  that," it was the first two words I said
4  almost starting this question.  Okay?
5          Continuing to read this, it
6  says, "In a case of suspected NDMA poisoning
7  in a human male, methylation of liver DNA was
8  evident at both the N7 and O6 positions
9  of" --
10      A.    I'm sorry.  I'm sorry.  Hold
11  on.  I don't see -- I'm not seeing, you know,
12  the paragraph that you're reading.
13      Q.    Sure.
14          I'm in the left column, the
15  first full paragraph.  We just went through
16  the first sentence.  Now I'm at the second
17  sentence.
18      A.    The second -- oh, okay, yeah.
19      Q.    The second sentence --
20  rephrase.
21          This paragraph continues, "In a
22  case of suspected NDMA poisoning in a human
23  male, methylation of liver DNA was evident at
24  both the N7 and O6 positions of guanine," and

Page 680

1  it gives a citation.
2          Then it says, "Using an
3  immunohistochemical technique, Parsa et al.
4  (1987) detected the formation of
5  06-methylguanine in human pancreatic explants
6  incubated in vitro with NDMA."
7          So those are some of the
8  sources cited for the proposition at the
9  beginning of the paragraph indicating there
10  appears to be no qualitative difference
11  between rodents and humans in the formation
12  of DNA adducts following exposure to DNA --
13  NDMA.
14          That's what it's stating,
15  correct?
16          MR. GALLAGHER:  Objection to
17      the extent it mischaracterizes the
18      document.
19      A.    Just by reading through, you
20  know, you know, you know, this particular
21  sentence, okay, it seems like -- because when
22  you're talking about, you know, poisoning or
23  NDMA poisoning, you know, based upon my
24  limited knowledge, okay, it seems to be

Page 681

1  related to acute, you know, poisoning, which
2  means, you know, will be extremely high, you
3  know, levels of, you know, NDMA, okay.
4          So the acute poisoning, it
5  would be different, you know, in terms of the
6  mechanism, you know, for the -- you know, for
7  the cause or potential, you know, you know,
8  you know, you know, cause to cancer.  You
9  know, I think they are two different
10  mechanisms, okay.
11          So, again, you know, as I said,
12  you know, you know, the DNA adducts, you
13  know, you know, you know, alone, you know,
14  will not necessarily, you know, leading to,
15  you know, cancer.
16          But, again, you know, I think
17  that this will need a -- you know, a
18  professional, you know, toxicologist, you
19  know, to give, you know, more precise and
20  accurate, you know, know, evaluation or statement.
21  BY MR. SLATER:
22      Q.    To be clear as we continue to
23  read through this article, this was an
24  article that was cited in ZHP's deviation

Page 682

1  investigation report dated November 5, 2018,
2  correct?
3      A.    We cited particularly that
4  table.  Very specific.
5      Q.    You cited this paper, and you
6  cited it for that table that we looked at,
7  right?  The table about various substances
8  and what may -- what may be the NDMA levels,
9  remember?
10        That was why it was cited,
11  right?
12     A.    Yeah, yeah.  The very reason we
13  cited it, because of the origin of this
14  table.
15     Q.    What you didn't do is cite any
16  of these other things I've been reading so
17  far about, for example, the epidemiologic
18  studies relating to humans developing cancer
19  as a result of exposure to NDMA.
20        Those -- that part of the
21  article wasn't cited in your deviation
22  investigation report on the toxicological
23  effects of having NDMA in your valsartan,
24  right?

Page 683

1        MR. GALLAGHER:  Objection.
2     Foundation, and to the extent it
3     mischaracterizes the document or --
4     A.    Look.  In that deviation
5  report, okay, we clearly indicated, okay,
6  NDMA, you know, you know, I think is
7  carcinogenic to animals, okay.  It's a
8  probable, you know, carcinogenic to human.
9  Okay.
10        So everything, you know, that
11  you presented here, right, do not change the
12  fact, okay.  Even as of today NDMA is still
13  being characterized as a Class 2A compound,
14  which -- you know, which means, you know, as
15  I said, it's carcinogenic to animal, and it's
16  a probable, you know, carcinogenic to human.
17        So -- and another thing, you
18  know, I also wanted to, you know, point out,
19  you know, in terms of, you know, of these
20  like -- you know, like you mentioned, you
21  know, epidemiology, you know, studies, right,
22  these were all performed in early '90s, okay?
23        And as I also mentioned, you
24  know, yesterday, also maybe, you know, the

Page 684

1  day before, you know, we have more recent,
2  you know, you know, epidemiological, you
3  know, studies.
4        And in at least, you know, you
5  know, some of those studies, you know, the
6  conclusions, you know, are not consistent
7  with the conclusion showed up, you know, in
8  these early '90, you know, papers or studies.
9        MR. SLATER:  Cheryll, let's
10     scroll down just so I can get the
11     bottom right-hand half of the page,
12     too.  No, too far.  Don't try to speed
13     us up here.  A little more.  Perfect.
14     Thank you.
15  BY MR. SLATER:
16     Q.    Looking now at Section 11
17  that's titled "Effects Evaluation," and 11.1,
18  "Evaluation of health effects," and 11.1.1
19  says "Hazard identification."
20        Do you see that?
21     A.    Yes, I do.
22     Q.    In the hazard identification
23  section, that first paragraph, it says,
24  "Although NDMA is acutely toxic and induces

Page 685

1  hepatic damage in several species at dose
2  levels of approximately 1 mg/kg body weight
3  per day in short-term experiments, the main
4  concern is its carcinogenicity.  NDMA has
5  been consistently shown to be a potent
6  carcinogen in all experimental species
7  studied."
8        Do you see that?
9     A.    Yeah, experimental species,
10  yeah, means animals, yeah.
11     Q.    You've mentioned animal studies
12  many times, and I think you made that point
13  multiple times.  So why haven't there been
14  human studies done where humans have been
15  given NDMA to see what happens to humans?
16     A.    That would be unethical.
17     Q.    It would be unethical, right?
18  That's what you said?
19     A.    Yes.
20     Q.    Because --
21     A.    Knowingly, yes, if you
22  knowingly do that, yes.
23     Q.    It would be unethical because
24  you would know that you're likely -- well,

Page 686

rephrase.

It would be unethical because you would be increasing the risk that these people would get cancer from having the NDMA put into their body, right?

MR. GALLAGHER:  Objection. Lacks foundation, and calls for expert testimony.

A.    As I think I already answered that question.  It's just considering the potential risk.  If you knowingly to do that experiment, it will be unethical.

BY MR. SLATER:

Q.    It would be unethical to knowingly give humans NDMA, correct?

MR. GALLAGHER:  Objection. Calls for expert testimony.

A.    I think I already made that clear.

BY MR. SLATER:

Q.    And it would certainly be unethical to give humans NDMA in the levels that were found in the valsartan pills deliberately and knowingly, correct?

Page 687

MR. GALLAGHER:  Objection. Calls for expert testimony, and outside the scope.

A.    It's the same principle.

BY MR. SLATER:

Q.    Looking now, if we can scroll down to 11.1.1.1, "Carcinogenicity" is the next section.

Do you see that?

A.    Mm-hmm.

MR. SLATER:  Let's scroll now to the next page, please, the left-hand column, the first full paragraph.  Let's get that up.  That's just the carryover paragraph.  Please go down a little further.  That's perfect.  Okay.

Q.    So -- rephrase.

In the left-hand column, the first full paragraph, I want to start in the second sentence.  It says, "The weight of evidence of the carcinogenicity of NDMA in mammalian species is consistent and convincing.  Moreover, the pattern of tumor

Page 688

development is characteristic of that for a mode of action of carcinogenesis involving direct interaction with genetic material.  In available studies, NDMA has induced tumors in all species examined (mice, rats, hamsters), at relatively low doses in some cases, irrespective of the route of exposure," whether oral or inhalation.  "Tumors were induced in a wide range of tissues, including the liver, Leydig cells, lungs, kidney, and nasal cavity, in the absence of significant non-neoplastic effects, in the limited number of studies in which these were well examined."

Do you see what I just read?

A.    Yes.

Q.    That language was not placed into the deviation investigation report that we were discussing a few moments ago, correct?

A.    As I indicate to you, you know, by reading through, you know, this whole sentence or whatever, it's still talking about, you know, its being a carcinogen to

Page 689

animals, okay, so we clearly made that statement in the deviation report.

Q.    My question is this.  The language I just read is not set forth in the deviation investigation report, correct?

A.    The deviation report is not intended, you know, to go into such a, you know, extensive, you know, you know, discussion, okay.  So it's basically state, you know, the fact, you know, that fact, you know, is consistent, you know, with everything, you know, this report or this particular paragraph, you know, states.

Q.    Let's continue.

MR. SLATER:  Can you scroll down a little more, Cheryll, just to capture the bottom of the paragraph?

Q.    The -- rephrase.

This first full paragraph on page 23 of this study continues, "Where it was reported, time to first tumor was relatively short.  The incidence of specific tumors has been increased following administration of even a single dose or

Confidential Information - Subject to Protective Order

Page 690

repeated doses for short periods (i.e. 2-3
weeks); tumors have also been observed in the
offspring of exposed pregnant rats and mice."
        Do you see that?
        A.   I'm sorry, which -- which
paragraph?
        Q.   It's the same paragraph we were
just reading in --
        A.   Oh, okay, okay, okay, sure.
Uh-huh, uh-huh.
        Q.   What I just read, along with
the other things that I read above that, goes
to the concept of this being a potent
mutagenic carcinogen, correct?
        MR. GALLAGHER:  Objection.
    Vague, calls for expert testimony.
        A.   Again, you know, everything is
talk about here is still, you know, related
to animals.
        MR. SLATER:  Cheryll, could you
    scroll down so we capture the last two
    paragraphs in that column, please?
    Perfect.
        Q.   This article continues on

Page 691

page 23, the last two paragraph -- rephrase.
        Continue on page 23 of the
article, the second to last paragraph in the
left column says, "NDMA has been consistently
mutagenic and clastogenic in human and rodent
cells exposed to in vitro.  Clear evidence of
genetic effects has also been observed in a
number of tissues from animals exposed to
this substance.  Notably, genotoxic effects
have been observed in tissues (i.e., liver,
kidney, lung) where tumors mainly arise
following experimental exposure to NDMA and
in germ cells."
        Do you see that?
        A.   Yes.
        Q.   This continues now in the last
paragraph in the left column, "DNA adducts
(in particular, O6-methylguanine) formed by
the methyldiazonium ion generated during
metabolism likely play a critical role in
NDMA carcinogenicity.  Observed variations in
carcinogenicity among species and strains
correlate well with variations in activity of
O6-methylguanine DNA-methyltransferase.

Page 692

Putative pathways for the metabolism of NDMA
are similar in rodents and humans, and indeed
the formation of O6-methylguanine has been
detected in human tissues exposed to NDMA."
        You see what I just read, I
assume, correct?
        A.   Yes.
        Q.   So in this article which your
company cited in its deviation investigation
report, they're essentially building the case
for the similarities between humans and
animals that are significant in determining
whether NDMA causes cancer in humans; that's
basically what they're discussing and
building to here, correct?
        A.   As I said, you know --
        MR. GALLAGHER:  Objection,
    vague.  Objection.  Vague, calls for
    expert testimony, and to the extent it
    mischaracterizes the document.
        A.   Again, you know, it -- as I
said, everything, you know, presented here,
you know, it -- it's only, you know,
indicate, you know, it's a -- it's a

Page 693

carcinogenic to animals and it's a probable
carcinogenic to humans.
BY MR. SLATER:
        Q.   Let's go up -- well, let me ask
you this question before we scroll any
further.
        In terms of what's likely, at
the levels that we've gone through in this
deposition, there are some people who took
the valsartan sold by ZHP that was
contaminated with NDMA who will or already
have developed cancer at least in part
because of their exposure to that NDMA,
correct?
        MR. GALLAGHER:  Objection.
    Vague, lacks foundation, calls for
    speculation, and calls for expert
    testimony.
        A.   This is way beyond, okay, my
scope, okay.  It need to be examined, or it
need to be evaluated by medical doctors or,
as I said, or as well as toxicologists.
BY MR. SLATER:
        Q.   Knowing the science available

Case 1:19-md-02875-RMB-SAK    Document 2648-29    Filed 02/16/24    Page 50 of 53
confidential information - Subject to Protective Order
PageID: 97027

Page 694

1  to ZHP, it is certainly more likely than not
2  that at the levels of NDMA seen in the
3  valsartan sold by ZHP, there are some people
4  who took that who will likely or already have
5  likely developed cancer at least in part due
6  to that exposure to NDMA.
7         We don't have to argue about
8  how many people, we don't have to argue about
9  which cancers.  But you can agree that that's
10  happened to some people, or will, correct?
11         MR. GALLAGHER:  Objection.
12         Vague, lacks foundation, calls for
13         speculation, calls for expert
14         testimony, outside the scope, and
15         argumentative.
16         A.    That's your -- yeah, basically,
17  again, that's your speculation, okay.  As far
18  as I know, this is not a fact, okay, as, you
19  know, until -- you know, up to this point.
20  Okay.  That's your speculation.
21  BY MR. SLATER:
22         Q.    Well, it's certainly likely
23  that that will happen or has happened to some
24  people, correct?

Page 695

1         MR. GALLAGHER:  Objection.
2         Vague, lacks foundation, calls for
3         speculation, calls for expert
4         testimony, outside the scope, and
5         argumentative.
6         A.    You know, as I said, I have
7  responded multiple times.  That's your
8  speculation.
9  BY MR. SLATER:
10         Q.    You would certainly agree with
11  me that the people who took the valsartan
12  manufactured by ZHP and contaminated with
13  NDMA have an increased risk as a result of
14  that exposure to develop cancer.
15         You'll agree with that, right?
16         MR. GALLAGHER:  Objection.
17         Vague, lacks foundation, calls for
18         speculation, calls for expert
19         testimony, outside the scope, and
20         argumentative.
21         A.    You know, you want me to repeat
22  still the same answer.  You know, you are
23  making a speculation.
24         MR. SLATER:  Let's look at the

Page 696

1  article, the top right-hand column of
2  this page, page 23.
3         Q.    Looking again at this article
4  cited by ZHP and relied on by ZHP in its
5  deviation investigation report, the top right
6  column on page 23 -- do you see where I am?
7         A.    The top right, the first
8  paragraph?
9         Q.    Yes.
10         A.    Okay, yeah, I see that.
11         Q.    It says, "Therefore, owing to
12  the considerable evidence of carcinogenicity
13  of NDMA in laboratory species, evidence of
14  direct interaction with DNA consistent with
15  tumour formation, and the apparent lack of
16  qualitative species-specific differences in
17  the metabolism of this substance, NDMA is
18  highly likely to be carcinogenic to humans."
19         That's what this article
20  states, correct?
21         A.    Yeah.  Based upon, you know,
22  the last sentence, you know, you know,
23  another way to say is NDMA, you know, is a
24  probable, you know, carcinogen to human.

Page 697

1  It's still the same thing.
2         Q.    Yeah.  Probable, yeah.
3         A.    Highly likely, you know, is
4  probable.
5         So that's why, you know, as I
6  said, IARC, you know, even as of today, you
7  know, after what, like more than 20 years,
8  you know, you know, after the publishing of
9  this article, you know, it's still the same
10  characterization as 2A, you know, Class 2A.
11         Q.    "Highly likely to be
12  carcinogenic to humans" means that it --
13  rephrase.
14         "Highly likely to be
15  carcinogenic to humans" means exposure to
16  NDMA will cause cancer in humans, correct?
17         MR. GALLAGHER:  Objection.
18         Vague, calls for speculation, and lack
19         of foundation, and outside the scope.
20         A.    See, again, you know, you just
21  try to twist, you know, you know, the fact.
22  Okay.  You try to twist "highly likely" or,
23  you know, you know, "probable."  You know,
24  you try to equating them to certainty, okay.

Page 698

1 That's just not the case.
2 BY MR. SLATER:
3     Q.    In medicine and in science,
4 there's a reasonable degree of probability.
5 You know that concept, right?
6         MR. GALLAGHER:  Objection.
7     Vague, calls for expert testimony, and
8     outside the scope.
9         Dr. Li, to the extent you know.
10     A.    To the extent -- yeah, there's
11 a possibility, yeah.
12 BY MR. SLATER:
13     Q.    I asked you a different
14 question.
15         You understand the concept of
16 reasonable degree of scientific probability
17 or scientific -- rephrase.
18         Do you understand the concept
19 of reasonable degree of scientific certainty?
20         MR. GALLAGHER:  Objection.
21     Vague.
22     A.    Yeah.  So I don't know what
23 you're specifically try to, you know, to say
24 or to, you know, referring to.

Page 699

1 BY MR. SLATER:
2     Q.    Well, I'll ask the question
3 differently.
4         NDMA is highly likely to be
5 carcinogenic to humans.  That's why your
6 company had to stop selling valsartan
7 contaminated with NDMA, correct?
8         MR. GALLAGHER:  Objection.
9     Vague, lacks foundation, and outside
10     the scope.
11     A.    As I responded earlier, as I
12 said, you know, to stop distribution, you
13 know, as a responsible company it's -- you
14 know, once, you know, the company, you know,
15 became to know, and also, you know, after we
16 developed the method, right, and we know the
17 range, then we immediately, you know, you
18 know, contact FDA.  You know, so that
19 decision, you know, was based upon, you know,
20 this potential risk.  Okay?
21 BY MR. SLATER:
22     Q.    Your company stopped selling --
23 well, let me ask it this way.
24         At the levels of contamination

Page 700

1 that we've gone through in this deposition,
2 it would be unacceptable and, using your
3 word, unethical to sell valsartan with those
4 levels of NDMA contamination, correct?
5         MR. GALLAGHER:  Objection.
6     Vague, mischaracterizes testimony,
7     calls for speculation, calls for
8     expert testimony, and outside the
9     scope.
10     A.    You know, as I said, you know,
11 if you knowingly do that, okay.
12 BY MR. SLATER:
13     Q.    I'm sorry, what did you say?
14     A.    As I said before, you know, if
15 you knowingly doing that.
16         MR. SLATER:  Thank you.
17         Patrick, I don't know if you
18 have any questions.  I can reserve the
19 rest of my time, or we can conclude
20 the deposition now.
21         MR. GALLAGHER:  I'm happy to
22 conclude the deposition.
23         MR. SLATER:  Thank you very
24 much.  I'm done.

Page 701

1         MR. GALLAGHER:  Thank you.
2         THE VIDEOGRAPHER:  The time
3 right now is 11:17 a.m.  We're now off
4 the record.
5         (Whereupon, the deposition was
6 concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 702

CERTIFICATE

1
2
3        I, MAUREEN O'CONNOR
POLLARD, Registered Diplomate
4    Reporter, Realtime Systems
Administrator, and Certified Shorthand
5    Reporter, do hereby certify that prior
to the commencement of the
6    examination, MIN LI, Ph.D., was remotely
duly identified and sworn by me to
7    testify to the truth, the whole truth,
and nothing but the truth.
8            I DO FURTHER CERTIFY that
the foregoing is a verbatim transcript
9    of the testimony as taken
stenographically by and before me at
10   the time, place, and on the date
hereinbefore set forth, to the best of
11   my ability.
12           I DO FURTHER CERTIFY that
I am neither a relative nor employee
13   nor attorney nor counsel of any of the
parties to this action, and that I am
14   neither a relative nor employee of
such attorney or counsel; and that I am
15   not financially interested in the
action.
16
17

18   _____
19   MAUREEN O'CONNOR POLLARD
NCRA Registered Diplomate Reporter
20   Realtime Systems Administrator
Certified Shorthand Reporter
21   Notary Public

22   Dated:  April 23, 2021
23
24

Page 703

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8            After doing so, please sign the
9    errata sheet and date it.  It will be
10   attached to your deposition.
11           It is imperative that you return
12   the original errata sheet to the deposing
13   attorney within thirty (30) days of receipt
14   of the deposition transcript by you.  If you
15   fail to do so, the deposition transcript may
16   be deemed to be accurate and may be used in
17   court.
18
19
20
21
22
23
24

Page 704

- - - - - -
E R R A T A
- - - - - -

1
2
3    PAGE  LINE  CHANGE
4    ____  ____  _____
5    REASON: _____
6    ____  ____  _____
7    REASON: _____
8    ____  ____  _____
9    REASON: _____
10   ____  ____  _____
11   REASON: _____
12   ____  ____  _____
13   REASON: _____
14   ____  ____  _____
15   REASON: _____
16   ____  ____  _____
17   REASON: _____
18   ____  ____  _____
19   REASON: _____
20   ____  ____  _____
21   REASON: _____
22   ____  ____  _____
23
24

Page 705

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4        I, _____, do
Hereby certify that I have read the foregoing
5    pages, and that the same is a correct
transcription of the answers given by me to
6    the questions therein propounded, except for
the corrections or changes in form or
7    substance, if any, noted in the attached
Errata Sheet.
8
9
10   _____
Min Li, Ph.D.            Date
11
12
13
14
15
16
17   Subscribed and sworn
To before me this
18   _____ day of _____, 20____.
19   My commission expires: _____
20   _____
Notary Public
21
22
23
24

Confidential Information - Subject to Protective Order

Page 706

1          LAWYER'S NOTES
2    PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____