Exhibit 61

Page 432

1        IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
             IN AND FOR MIAMI-DADE COUNTY, FLORIDA
2                  CIRCUIT CIVIL DIVISION
3                CASE NO. 2019-017627-CA-01
4
5   ROBERT A. SUGARMAN, Individually
    and as Personal Representative of the
6   Estate of MARILYN WENDY SESKIN,
7            Plaintiff,
8   -vs-
9
    JOHNSON & JOHNSON; JOHNSON & JOHNSON
10  CONSUMER, INC., f/k/a JOHNSON & JOHNSON
    CONSUMER COMPANIES, INC.; and PUBLIX
11  SUPER MARKETS, INC.,
12           Defendants.
    _____/
13
14             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15                      Volume 3
                    Pages 432 - 573
16
17               MIAMI-DADE COURTHOUSE
                 73 W. FLAGLER STREET
18                 MIAMI, FL 33130
                Tuesday, February 13, 2024
19               9:33 a.m. - 12:13 p.m.
20
21         The above-entitled cause came on for trial
22      before the Honorable William Thomas, Circuit Court
23      Judge, taken before Elizabeth Cordoba, RMR, CRR, FPR,
24      and Notary Public in and for the State of Florida at
25      Large.

Page 433

```
 1   APPEARANCES:
 2   ATTORNEYS ON BEHALF OF THE PLAINTIFF:
 3   MOTLEY RICE LLC
     Lance V. Oliver, Esq.
 4   Loliver@motleyrice.com
     Laura K. Stemkowski, Esq.
 5   Lstemkowski@motleyrice.com
     28 Bridgeside Boulevard
 6   Mount Pleasant, SC 29464
     (843) 216-9061
 7
     MOTLEY RICE LLC
 8   Michael J. Pendell, Esq.
     20 Church Street
 9   17th Floor
     Hartford, CT 06103
10   (860) 218-2722
     Mpendell@motleyrice.com
11
     BEASLEY ALLEN LAW FIRM
12   Leigh O'Dell, Esq.
     272 Commerce Street
13   Montgomery, AL 36104
     (334) 269-2343
14   Leigh.odell@beasleyallen.com
15   ALVAREZ LAW FIRM, THE (FL)
     Nicholas Reyes, Esq.
16   355 Palermo Avenue
     Coral Gables, FL 33134
17   (305) 444-7675
     Nick@talf.law
18
19   ATTORNEYS ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:
20   GIBSON DUNN & CRUTCHER, LLP
     Sydney Scott, Esq.
21   811 Main Street
     Suite 3000
22   Houston, TX 77002
     (346) 718-6963
23   Sascott@gibsondunn.com
24
25
```

Page 434

1    APPEARANCES (continued):

2    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Allison Brown, Esq.

3    Allison.brown@skadden.com
     One Manhattan West 395 9th Avenue

4    New York, NY 10001
     (212) 735-2173

5

     SHOOK HARDY & BACON, LLP

6    Hassia Diolombi, Esq.
     2555 Grand Boulevard

7    Kansas City, MO 64108-2613
     Hdiolombi@shb.com

8

     SHOOK HARDY & BACON, LLP

9    Michael Rayfield, Esq.
     One Rockefeller Plaza

10   Suite 2801
     New York, NY 10020

11   Mrayfield@shb.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 435

1                    INDEX OF PROCEEDINGS

2                                                        PAGE

3    Opening Statement by Mr. Oliver              501

4    Opening Statement by Ms. Brown               536

5    Certificate of Reporter                      573

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 436

1    Thereupon, the proceedings continued from Volume 2 at

2    9:33 a.m.:

3            THE COURT:  I'm told we have five of ten

4        jurors.  So it's 9:33.  So I don't know if that's a

5        sign of something.

6            So what can we take up while we're waiting for

7        the other jurors?

8            MR. OLIVER:  Your Honor, last night I called

9        Ms. Brown and let her know that as we left the

10        courthouse the bailiff said that -- I believe the

11        man's name is Juror Ruiz, disclosed that he

12        recognized or knew my local counsel, Mr. Reyes.  So I

13        talked to Mr. Reyes about that.  I told Ms. Brown.

14        And I said we are going to raise it with the Judge

15        because the man may need to be questioned, and that I

16        am raising it with the Judge.  I talked to her.  I

17        said, Look, it's y'alls call.

18            THE COURT:  Okay.  I don't know why the bailiff

19        is saying that to you.  Those aren't conversations

20        that you should be having with the bailiff.  But it

21        is not my bailiff so he is helping me.  So I have got

22        to be thankful that he's helping me.

23            Yes.  The gentleman did approach me as I was

24        going into the elevator as well.  And I told him, I

25        said, I cannot speak -- I keep saying to everybody

Page 437

1     the same thing, I cannot speak to you.  The lawyers

2     must be present every time.  But he -- but even

3     though I said that, he did say, But what if I know

4     one of the lawyers?  Now, he didn't give me the

5     specificity that you just communicated.

6         MR. OLIVER:  That's it.

7         THE COURT:  He said, What if I know one of the

8     lawyers?  And, of course, I was thinking, Well, you

9     were sitting in the room the whole time, and he was

10    sitting at the table.  And we asked, Do you know any

11    of the parties?  And so, I mean, we have to inquire.

12        But do you know him?

13        MR. REYES:  I know of him.

14        THE COURT:  What does that mean?

15        MR. REYES:  Good morning.  Nick Reyes, for the

16    record.  So, I mean, as you know, Miami private

17    school community is a small community.  I'm guessing

18    he went to either Columbus or Belen.  I went to

19    Columbus.  They are both private schools.  He's older

20    than me.  I don't know how I know him.

21        THE COURT:  Do you have his phone number?

22        MR. REYES:  I don't have his phone number --

23        THE COURT:  Are you Facebook friends or

24    anything like that?

25        MR. REYES:  I don't think we're Facebook

1           friends.  I don't use Facebook.  We are definitely

2           not Instagram friends.  I was surprised to hear that

3           he had two kids.  I don't think he knows that I have

4           children.  We're just familiar.  I don't know how we

5           are familiar, but we are familiar with each other.

6               I thought -- I mean, it was years ago.  So when

7           I got up and said my name and he didn't say anything,

8           I was questioning whether it was even him that I

9           knew.  I thought maybe he didn't recognize me.  So,

10          you know, I wasn't sure.

11              THE COURT:  Well, I don't know if -- and by the

12          way, I don't know if it matters if -- I mean, when we

13          ask the question, Do you know any of the lawyers,

14          that doesn't mean, okay, oh, we live in the same

15          neighborhood.

16              MR. REYES:  Absolutely.

17              THE COURT:  It means, do you have regular

18          contact with these people?  Do you -- are you online

19          friends?  Do you have a personal relationship?

20          Meaning, you have their cell number, you know their

21          spouse, you know their -- it's that type of thing.

22              Somebody did that one time when I was -- I

23          remember I was a brand-new lawyer and during a trial,

24          and somebody -- the judge asked, Do any of you know

25          any of the lawyers?  And the person raised their hand

Page 439

```
 1        and said, Oh, yeah, I know him.  And the judge looked
 2        at me, and I said, I don't know this guy.  And we
 3        went sidebar, and come to find out, the person
 4        happened to have seen me -- I frequent a spot that
 5        that person frequents, and so the person was saying,
 6        Oh, I know him.  No.  We never spoke, you know.
 7              And so this is a little different because you
 8        may have gone to the same school, but let's bring him
 9        in and let's ask him.
10              Rod, can you see if he's here?  I didn't see
11        him outside so I don't know if he's here.
12              MR. REYES:  And, for the record, I think he's
13        much older than I am.  We weren't in the same class.
14              THE COURT:  Do you remember what his name was?
15              MR. OLIVER:  I think it's Mr. Ruiz.
16              THE COURT:  Francisco Ruiz.  See if he is here
17        and then we'll bring him in and we'll ask whether or
18        not there -- it doesn't sound like there's an issue.
19              I always love it.  I think everybody decides to
20        reveal things once they get selected.
21              MR. OLIVER:  Well, Judge, we thought that, too.
22              THE COURT:  Like, the lady who said, Oh, my
23        English not very good, but -- and she waited and said
24        you never gave me an opportunity to say I can't be
25        here for two weeks.
```

Page 440

1          MR. OLIVER:  I did think that was kind of

2     funny.

3          We do have objections to each other's slides.

4          THE COURT:  Oh.  Let's talk about -- for

5     opening?  Let's start with plaintiff's first because

6     -- you go first.

7          MR. OLIVER:  Okay.  No.  I mean --

8          MS. BROWN:  Yes, yes, yes.  Okay.  Your Honor,

9     actually, I only have one objection --

10          THE COURT:  Okay.

11          MS. BROWN:  -- to one document, which is --

12          THE COURT:  Can I just see the document?

13          MS. BROWN:  Absolutely.  May I approach?

14          THE COURT:  Yes, ma'am.

15          MS. BROWN:  It's an Imerys document, Your

16     Honor.  It's not a Johnson & Johnson document.  So

17     it's a draft -- I don't know if it's a draft speech

18     or something from the file.

19          THE COURT:  It's a what?

20          MS. BROWN:  I don't know if it's a draft speech

21     from the documents of another company's files.  And,

22     of course, Your Honor, and the law, was clear, that

23     the first -- before they can start putting in hearsay

24     documents under the conspiracy exception to the

25     hearsay rule, they have to establish the existence of

Page 441

1          a conspiracy using non-hearsay documents.  And so

2          they would have to lay the predicate, Your Honor.

3              So putting this up in opening before a

4          conspiracy hasn't even been established, much less

5          one that would permit this internal document that

6          didn't go to J&J.  They would have to show it was in

7          furtherance of a conspiracy that they haven't even

8          established.  It's not admissible.

9              MR. OLIVER:  So, Your Honor, my response to

10         that is pretty simple.  I don't think I view the rule

11         the same way as Ms. Brown does, but what I did is I

12         put together a packet for Your Honor and,

13         conveniently, I didn't bring it to court.  I forgot

14         it.  But it has a series of documents that establish

15         the conspiracy, and I was going to make a proffer of

16         it.  What is in that packet, and what is coming, is

17         J&J's agreement to support the Cosmetic Toiletries

18         and Fragrances Association.  And then it has a series

19         of five documents showing that company or its

20         predecessor interest.

21             (Juror Ruiz entered the courtroom.)

22             THE COURT:  All right.  Sir, come forward,

23         please.

24             We were just talking -- I was explaining to the

25         lawyers that you indicated yesterday that you knew

Page 442

1      one of the lawyers.  Which lawyer do you think you

2      know?

3              JUROR RUIZ:  He is not here today.  Oh, there

4      he is.

5              THE COURT:  Okay.

6              JUROR RUIZ:  I don't know why.  I know him from

7      somewhere.

8              THE COURT:  You know him from somewhere.  Do

9      you know where you know him from?

10             JUROR RUIZ:  I don't know, man.  I just...

11             THE COURT:  Let me ask it this way:  Do you

12     have his cell number?

13             JUROR RUIZ:  No.

14             THE COURT:  Are you online friends?

15             JUROR RUIZ:  No, no.

16             THE COURT:  Have you ever been to his home?

17             JUROR RUIZ:  No.

18             THE COURT:  Do you have any personal

19     relationship with him?

20             JUROR RUIZ:  Not that I know of, no.  That's

21     what I am saying, I know of him.

22             THE COURT:  He looks familiar?  It's Miami.

23     Okay.

24             All right.  Thank you so much, Mr. Ruiz.

25             JUROR RUIZ:  Thanks.

Page 443

1           (Juror Ruiz exited the courtroom.)

2           THE COURT:  You were saying, sir?

3           MR. OLIVER:  I forgot where I was.  I have a

4       proffer, and it's going to have multiple documents

5       showing Imerys and Luzenac and Johnson & Johnson

6       working together through the CTFA.

7           In fact, that very document establishes -- it

8       says Johnson & Johnson was working with us, and we

9       were doing this together and we have considerable

10      input, Johnson & Johnson has considerable influence

11      on the CTFA, which is the organization through which

12      we allege that these two companies engaged in a

13      conspiracy to commit a tortious act.

14          So my position is, you know, if I want to run

15      the risk that Your Honor later says it's not in, then

16      that's my risk to run.  I will say that if Your Honor

17      wants to sustain the objection --

18          THE COURT:  Well, it is not your risk because

19      if I -- if I allow it and then I -- I'm sorry, if I

20      allow you to use it during opening and then I exclude

21      it during the case, then all the information that is

22      in there is already out.  The jury has already heard

23      it.  And that, to me, is a problem.

24          So I'm sustaining the objection.  Remove the

25      slide and you can use it if we get to the point where

Page 444

```
 1        you're able to establish a predicate, but I'm not

 2        going to allow it to be used in evidence.

 3             MR. OLIVER:  Your Honor, I do want to ask about

 4        that.  If I give you the proffer, will you look at

 5        that beforehand, like, you know, after this?  It's

 6        not that much stuff.  Is that something we can do?

 7             THE COURT:  You mean that would change my

 8        ruling as to opening?

 9             MR. OLIVER:  No, not that it would change

10        ruling as to opening.  I'm talking about instead of

11        trying to do this through a witness, I'm asking, if I

12        show you these documents, will you review them and

13        make a proffer to establish this is enough of a

14        predicate to introduce the documents with the

15        witness.

16             THE COURT:  I'm sorry.  Forgive me.  I'm not

17        sure what you are asking me to do.  You're asking me

18        to read your proffer and then conclude that the

19        proffer is sufficient to introduce the documents into

20        evidence?

21             MR. OLIVER:  Yes.  Or not.  It's up to you.  I

22        mean, I've done that before and judges say, okay,

23        you're making an offer of proof.

24             THE COURT:  Why don't you just do it -- I could

25        do it with -- why don't you just do it through the
```

Page 445

1    witnesses, and then if there is an objection when you

2    attempt to introduce the documents, I either sustain

3    or overrule the objection.

4         MR. OLIVER:  Okay.

5         THE COURT:  As compared to me taking time out

6    and reading a proffer and then telling you -- and

7    what happens if I tell you it's not?  Then you're

8    going to come back -- you want to edit it and come

9    back, and say, read it now and read it again and add

10   some new stuff.

11        MR. OLIVER:  Okay.  I understand.

12        THE COURT:  In other words, you would get one

13   shot at doing it at the trial, whereas you would get

14   multiple shots of doing it if we did it the other

15   way.

16        MR. OLIVER:  Okay.  I think that was her only

17   objection to my slide deck.

18        MS. BROWN:  Thank you, Your Honor.  Thank you

19   very much.

20        THE COURT:  All right.  Did you have objections

21   to their slides, sir, their presentation?

22        MR. OLIVER:  I do.  So let me go through this

23   first page.  Five, you agreed to change that?

24        MS. BROWN:  I do.

25        MR. OLIVER:  So our first objection is --

Page 446

```
 1            MS. BROWN:  Your Honor, would you like a copy
 2      of this?
 3            THE COURT:  Please.
 4            MR. OLIVER:  It would probably be a good idea.
 5            Our first objection is on Slide 17.  And
 6      defense counsel intends to highlight the genetic risk
 7      factors.  I don't mind her listing genetics as a risk
 8      factor, but they are going back to this and the Court
 9      has already ruled they don't have expert support for
10      this theory.  They are going to use --
11            THE COURT:  What theory, sir?
12            MR. OLIVER:  -- the theory that Dr. Seskin had
13      a genetic risk for ovarian cancer that she didn't
14      have.  Now, what they are going to use, I believe, is
15      her own notes.
16            Is that what these are?  I can't see.
17            MS. BROWN:  Yes.  I'm happy to explain.
18            MR. OLIVER:  Well, I want to -- let me do this.
19      Okay?
20            So these are her own notes.  And we talked
21      about the fact that she is a doctor, and we don't
22      need to do that.  And so what I was going to do in
23      opening is simply say, one time, Marilyn Seskin was
24      an anesthesiologist when she was alive.
25            THE COURT:  We are talking about this one here.
```

Page 447

1          MR. OLIVER:  Yeah, these two.

2          THE COURT:  Okay.

3          MR. OLIVER:  So I was going to say, she is an

4     anesthesiologist.  I'm not going to call her

5     Dr. Seskin.  I am going to call her Marilyn Seskin,

6     right, because of the issue Your Honor raised, and

7     that is fine with us.

8          What they've done in their argument is put

9     Dr. Seskin is making these conclusions.  But

10    Dr. Seskin didn't have the expertise in this.  She

11    was an anesthesiologist, and her husband is going to

12    testify she thought during the course of her cancer

13    treatments many different things could have caused

14    her cancer.  She was desperate to find out what it

15    was, and they are going to highlight this.

16         So we think it is argumentative, and we think

17    that it is more prejudicial than probative.  And the

18    only way that it comes in, in my opinion, is if they

19    lay a foundation through one of our experts or

20    somebody on the stand.  If they want to do that then,

21    maybe.

22         But in opening, I don't think --

23         THE COURT:  I don't understand, sir.  Are you

24    telling me that if there is an individual who is

25    diagnosed with cancer, and they believe that these

Page 448

1    are the reasons why I may have gotten cancer and they

2    write them down, they cannot -- the other side cannot

3    ask whether or not -- what were the factors that you

4    thought caused you to get cancer?

5         And by the way, not saying that she has some

6    expertise, but she just happens to be a doctor, and

7    that is why I asked that question, why are we calling

8    her doctor.

9         MR. OLIVER:  Right.

10        THE COURT:  But she is the plaintiff, and she

11   just simply says, Well, I thought maybe it was

12   because I used bleach, or I thought it was because I

13   did this.  Why is that not admissible?

14        MR. OLIVER:  On the stand, I am pretty sure I

15   agree with you, but in the form of this slide with no

16   background on Dr. Seskin and what this is, which

17   would be opening, that's what I have a problem with.

18        If they lay the foundation through a witness,

19   and they want to go to my client, Mr. Sugarman, and

20   say, Bob, are these Marilyn's notes and this is what

21   she said, they can do that.  I am not objecting to

22   that.

23        What I am objecting to is having a slide that

24   says, Dr. Seskin concluded her own --

25        THE COURT:  And I would agree with that

Page 449

```
 1        because -- and, again, I have a problem with you all
 2        calling her doctor.  Obviously, that seemed to be
 3        only my issue, because nobody else brought it up,
 4        because you both were referring to her as Dr. Seskin.
 5              MR. OLIVER:  Sure.
 6              THE COURT:  And if I was on -- if I was your
 7        client, you wouldn't refer to me as Judge Thomas.  It
 8        would be William Thomas.  The fact that I am a judge
 9        doesn't mean -- and the fact that she is a doctor, I
10        think, complicates everything because now it is
11        exactly what you just said right here.
12              They put up their -- but everybody is calling
13        her Dr. Seskin, and the problem is, is that there is
14        some suggestion that maybe she had some special
15        knowledge or some training as to this, when she was
16        an anesthesiologist.  She didn't study cancer.
17              What do you want to say in response?
18              MS. BROWN:  Thank you, Judge.  I just don't
19        want to be disrespectful.  The reason I am calling
20        her Dr. Seskin is because that is how she referred to
21        herself.  That is how they took the deposition of the
22        treater, asking about Dr. Seskin.  So it is going to
23        play, and I don't want a juror to think I am somehow
24        disrespecting her when they, in asking the treater's
25        questions, refer to her as "doctor."
```

Page 450

```
1          And so I understand it complicates things a
2     little bit, and, frankly, it probably cuts against
3     me, but this is a woman who went to medical school
4     and was an anesthesiologist, and I just feel, you
5     know --
6          THE COURT:  But she didn't study -- I always
7     say to this:  You are a lawyer.  You went to law
8     school.
9          MS. BROWN:  Right.
10          THE COURT:  And if I ask you to outline -- if
11     it was a criminal case -- I don't know your
12     background.
13          MS. BROWN:  I don't know anything about
14     criminal law.
15          THE COURT:  So if I ask you to all of a sudden
16     to start outlining, you would basically say, I really
17     can't.
18          MS. BROWN:  Sure.
19          THE COURT:  I can give you some general
20     thoughts because I went to law school, I took
21     Criminal Law I, Criminal Procedure, Criminal Law II,
22     but I can't do that with any type of authority.  I
23     don't know if this is any different than that.  She
24     is a doctor.
25          MS. BROWN:  I understand.
```

Page 451

1            THE COURT:  She is medically trained.

2            MS. BROWN:  Sure.

3            THE COURT:  But that doesn't necessarily

4      mean -- and, by the way, I always say, lawyers who

5      basically take anything that comes through the door,

6      I always think they are waiting to be sued because

7      the reality is, is that you can't possibly know all

8      these areas of law.

9            MS. BROWN:  Sure.

10           THE COURT:  And we have all been in situations

11     where we got a call from friends who said, Oh, I had

12     this.  I don't know anything what you are talking

13     about, you know.  I just don't.  I have no idea.

14           MS. BROWN:  I don't do real estate.

15           THE COURT:  I don't do probate, you know, and

16     things like that.

17           MS. BROWN:  Sure.

18           THE COURT:  So I don't know how we solve this.

19           MS. BROWN:  I will put "Marilyn Seskin."  I

20     just didn't want to be disrespectful.

21           THE COURT:  There you go.

22           MR. OLIVER:  I mean, we have the same objection

23     as to her notes on that in the opening.

24           THE COURT:  I am allowing the notes because you

25     have a good-faith basis to believe they are going to

                                                    Page 452

 1        come into evidence, and I am going to allow them to

 2        come in.

 3               MR. OLIVER:  Okay.

 4               MS. BROWN:  Yes, Your Honor.

 5               MR. OLIVER:  I assume you will change

 6        Dr. Seskin throughout.  I think that is where it was.

 7               MS. BROWN:  I would be glad to, sure.  You want

 8        me to call her Marilyn Seskin?  Is that where we are

 9        at?

10               MR. OLIVER:  That is her name, yeah.  It is

11        going to come out she is a doctor.

12               MS. BROWN:  I understand.

13               MR. OLIVER:  That is where we are.

14               MS. BROWN:  I understand.

15               MR. OLIVER:  So, Your Honor, they have used

16        Dr. Slomovitz in Slide 31.

17               THE COURT:  What number?

18               MR. OLIVER:  It's Slide 31.  Remember,

19        Dr. Slomovitz is a witness that you excluded, and

20        this is the issue that I was concerned about when you

21        excluded him.

22               I understand Your Honor said, Hey, the article

23        is in.  My concern was that defendants are going to

24        make a big deal that one of her treating physicians,

25        who cannot testify for reasons that they caused, they

Page 453

1    are going to now use that as an endorsement.  Look

2    what he wrote.  Look what he wrote.

3         If they are going to use the article with the

4    witness, fine.  But I don't think it is fair to put

5    up and make an argument -- again, this is opening,

6    and this is argumentative -- that her treating

7    physician said something or endorsed something that

8    he didn't say or endorse.

9         THE COURT:  Did he not -- so these notes here,

10    he did not say these things?

11        MR. OLIVER:  No, no.  That's --

12        THE COURT:  Oh, that is separate.

13        MR. OLIVER:  That is something separate.  This

14    is the guy who wrote the article that you excluded.

15    You excluded him, not the article.  Okay?  And, I

16    mean, I assume they are going to say, Look, her

17    treating physician, all through this article --

18        THE COURT:  Well, wait.  We should ask what she

19    is going say before we conclude --

20        MS. BROWN:  Thank you, Your Honor.

21        So these --

22        THE COURT:  One minute, please.

23        MS. BROWN:  Sure.

24        THE COURT:  We are missing Richard Gonzalez.

25        MR. OLIVER:  Is that our traveler, the one who

Page 454

```
 1        had travel problems?
 2              MS. DIOLOMBI:  Yes.
 3              MR. OLIVER:  That is the traveler.
 4              THE COURT:  And I predicted that.  And I
 5        said -- and it is unfortunate, but -- and Carlos has
 6        been calling him and not getting a response.
 7              MS. BROWN:  He is probably in transit.
 8              THE COURT:  Well, he may be stuck in transit,
 9        or he is stuck on, I just can't.  I just don't have
10        the money.  I can't get here.
11              MS. BROWN:  I understand.
12              THE COURT:  And so he may have made the
13        decision for us.  I don't know.
14              MR. OLIVER:  We don't have an objection to him
15        being --
16              THE COURT:  Replaced.
17              MR. OLIVER:  -- dismissed for that reason or
18        replaced.
19              MS. BROWN:  We would like to give him five or
20        ten more minutes.  He seemed very --
21              THE COURT:  No, we are going to do this.  We
22        will give him five or ten more minutes.
23              MR. OLIVER:  I don't have any problem with
24        that, Judge.
25              THE COURT:  I forgot.  You were going to tell
```

Page 455

1    us how or why you were going to use the slide.

2         MS. BROWN:  Thanks, Your Honor.  And I fully

3    understand the Court's ruling on Dr. Slomovitz.

4    There is no doubt, though, that he was a treating

5    physician, and the medical records that he authored,

6    Counsel wants my agreement to stipulate they will

7    come into the case.

8         So that part will come in, and Your Honor said

9    certainly his published literature will come in.  So

10   on this slide, I am just going to say, You are going

11   to get the hear from one treating physician.

12        I'm sorry --

13        THE COURT:  Oh, he is close by.  I am sorry.

14        MR. OLIVER:  I don't know that the published

15   literature comes in.

16        MS. BROWN:  Hang on.

17        So on this slide, I will talk about the

18   testimony coming from Dr. Morrissey, and you are

19   going to get to see a publication that one of her

20   treating physicians wrote on this topic.

21        That is all I am going to say.

22        THE COURT:  I don't have a problem with that.

23        MS. BROWN:  Thanks.

24        THE COURT:  Next.

25        MR. OLIVER:  My next objection was Number 33.

Page 456

1      I'm not worried about that.  It is not the end of the

2      world.

3            Your Honor, Slide 50, again, this is a

4      reference -- so Slide 50 says, pure scientist --

5      science methodology and data cannot trusted, and this

6      is about that doctor yesterday that we had an MIL on.

7      His name is Dr. Saed.

8            Our experts -- while every expert put this

9      stuff on their reliance list, what happens is a body

10     of literature develops, and all of them, theirs,

11     ours, they update it, right?

12           We are not coming in here and saying anything

13     about Dr. Saed.  He is not in this case.  And they

14     have an entire slide that focuses on articles and

15     elements that are criticizing Dr. Saed's work, but he

16     is not here.  I mean, under 90.403 in opening, I

17     don't see how that is probative.

18           THE COURT:  Can I ask, is anyone going to be

19     making reference to Dr. Saed's work?

20           MR. OLIVER:  None of our experts are.  What I

21     suspect -- and she will speak for herself -- what I

22     suspect they are going to do is make a big deal about

23     the fact that Dr. Saed did this and Dr. Saed did

24     that, and we are going to look at the jury and say,

25     We didn't hire him for a reason, and we are not

Page 457

1        talking about his studies for a reason.

2            THE COURT:  What did Dr. Saed do?

3            MR. OLIVER:  I don't think he did anything.

4            MS. BROWN:  I will be glad to explain.  So the

5        slide before Your Honor sort of sets up the issue,

6        which is that there has been a series of cell studies

7        that say, Look, if we take talcum powder and put it

8        on cells, do we see precancerous changes?  They

9        uniformly say no.  Until we get to this Harper and

10       Saed study that was actually funded by Ms. O'Dell's

11       law firm.

12           So they fund him to do the study.  He concludes

13       malignant transformation, and the peer reviewers who

14       get the article before he is trying to publish it,

15       have comments that say, this is outrageous.  This is

16       not supported by the data.

17           THE COURT:  So can I pause?

18           MS. BROWN:  Yeah.

19           THE COURT:  Who is going to introduce the fact

20       that Dr. Saed did this study and what the findings of

21       that study were?  Who is introducing that?

22           MS. BROWN:  It's on their expert's reliance

23       list.  And I think what Your Honor said yesterday is

24       you can't just, like, you know, decide not to do it.

25       Right?  That is fair across.  You put this on your

Page 458

1     reliance list.

2          THE COURT:  No, no, no.  You're right.  I did

3     say that.  But what I said, at least the context that

4     I remember saying it in, is that if your expert has

5     already reviewed it and said that they relied upon

6     it, you don't get to then come in and say, Well, just

7     don't mention that.

8          MS. BROWN:  Correct.

9          THE COURT:  Okay.  You have already testified

10    in your report or in deposition, I reviewed it and I

11    relied upon it.  You don't get to disavow it --

12         MS. BROWN:  Correct.

13         THE COURT:  -- once you go to trial.  So do you

14    have testimony at the deposition or in the expert

15    report that this was reviewed by this expert -- I

16    mean by a witness, and that that witness testified

17    that they relied upon it?

18         MS. BROWN:  Yes, sir.  Dr. Plunkett, first

19    witness coming up today, has it in her expert report

20    and was crossed on it in a deposition.  And so I will

21    cross her on it.  And then I have my own expert who

22    reviewed it in connection with all the cell studies

23    who is going to come and say why it is an outlier

24    from all the other cell studies.

25         MS. O'DELL:  Good morning, Your Honor.

Page 459

1    Dr. Plunkett did review it and she has been

2    cross-examined on it.  She is not going to mention it

3    in this trial, nor is Dr. Ness.  It's part of the

4    broader body of literature, as Mr. Oliver said.

5         THE COURT:  But there is a difference

6    between --

7         MS. O'DELL:  I understand.

8         THE COURT:  -- there's a difference between

9    reviewing it and relied upon it.  You can review a

10   lot of things, but if you just looked at it and then

11   you didn't comment on it, didn't rely upon it, it

12   didn't form a basis of your opinion, I personally

13   don't understand why it is relevant and probative to

14   anything.  But if you testify that you relied upon

15   it, and this is what -- this is how it's formed your

16   ultimate opinions in the case, then I think it's fair

17   game.

18        MS. O'DELL:  Well, Your Honor, definitely it is

19   mentioned in Dr. Plunkett's report.  I agree with

20   Ms. Brown on that.  She has been examined on it in

21   deposition.

22        Here is the concern is that these are

23   peer-reviewed comments that were -- so when Dr. Saed

24   submitted his article to a journal, there were peer

25   reviewers that were confidential.  They provided

Page 460

1          comments.  They were highly critical.  They have been

2          produced in litigation.  Dr. Plunkett has not seen

3          those comments.  It's not her article.  It's like a

4          whole sideshow for this article that they are not

5          going to mention.  So it makes it a trial within a

6          trial because --

7               THE COURT:  I'm sorry.  Did they not ask --

8          during the deposition, they did not ask about the

9          comments and the peer-reviewed comments that flowed

10         from those findings?

11              MS. O'DELL:  They did, I'm sorry, yes.  She has

12         been asked about those, but my point is there were

13         many peer-reviewed comments.  She doesn't have access

14         to them.  She is going to ask about it out of the

15         blue that there are these criticisms.  She doesn't

16         know what the state of the manuscript was at the time

17         these comments were made, how it was different from

18         what was actually published, which is all she's seen.

19         So it's an absolute sideshow.

20              So the -- sort of the prejudice and the time

21         outweighs any probative --

22              THE COURT:  The only concern I have with you

23         saying that it's a sideshow is that -- why are you

24         relying upon an article or a study and you don't know

25         how it was peer-reviewed?

Page 461

```
 1          MS. O'DELL:  Well --

 2          THE COURT:  And if you relied upon it and you

 3     didn't look into how it was peer-reviewed, then, I'm

 4     sorry, I think then whatever challenges are made to

 5     something that you relied upon, you had an obligation

 6     to be aware of what the criticisms, the professional

 7     criticisms, of the studies are because that way you

 8     would be able to make a determination as to whether

 9     or not it's something you will rely upon or something

10     you will just simply reject.

11          MS. O'DELL:  Yes, sir.  In the scientific

12     literature, what you have is the peer-reviewed,

13     published paper.  And the peer-reviewed comments are

14     never available outside in the public.

15          So this is Dr. Saed.  He submits this article

16     to be published.  There are these critical

17     peer-reviewed comments.  He gets those.  Those are

18     confidential.  They are never put out in public, but

19     because Dr. Saed is an expert in the multidistrict

20     litigation, there was discovery on that.  They were

21     "attorneys' eyes only" documents for a long time,

22     until just recently.

23          And now defendants are using them in

24     depositions to cross-examine other experts who had no

25     opportunity to see any of those.  You know, an expert
```

Page 462

1          looks at what is in the peer-reviewed --

2              THE COURT:  Why can't they just explain that?

3          Why can't -- I don't understand.  You are almost

4          telling me that we have to ignore the fact that there

5          are other peer-reviewed professionals who have looked

6          at this and been critical of it because those

7          findings were not available.

8              And I would maybe be a little more sympathetic

9          to your argument if your expert wasn't confronted

10         with this at the deposition.  So this is not like

11         this is just happening totally out of the blue

12         because your expert, even after the deposition, could

13         have looked at this stuff and could have said, Hey,

14         now that I have looked at this, I want to do an

15         errata and I want to basically -- I want to modify my

16         position in some way.  And your expert didn't.

17             MS. O'DELL:  That is fair, Your Honor.  We did

18         not do that.

19             THE COURT:  So the objection is overruled.

20             MR. OLIVER:  Okay.  Your Honor, this is my

21         final objection.  There are several slides starting

22         with Number 54.  And also on 58.  And they know

23         better than I do where all this is.  They say things

24         like the US public health authorities do not support

25         plaintiff's litigation claims.  That's argumentative

Page 463

1         and also false.

2             THE COURT:  Yeah.  I don't know anything about

3         false, but I do think it's too argumentative.

4             MR. OLIVER:  Sure.

5             MS. BROWN:  I can tone that down a little,

6         Judge.

7             MR. OLIVER:  Same on 58.

8             MS. BROWN:  Yeah.  I understand.  I understand.

9             MR. OLIVER:  I mean, basically, I don't mind if

10        they are going to show the position --

11            MS. BROWN:  Yeah, I understand.  I understand,

12        Your Honor.

13            MR. OLIVER:  -- of the -- I mean, of the

14        agency, but I don't want them saying they rejected

15        any claims, because that's just not how --

16            THE COURT:  We're waiting for one more juror.

17        We're still waiting, so is there something else we

18        can take up?

19            MS. BROWN:  Were there any outstanding --

20            MS. STEMKOWSKI:  -- deposition designations.

21            THE COURT:  Other than deposition designations.

22        No, you can leave them here.

23            MS. STEMKOWSKI:  May I approach and at least

24        give you the binders?

25            THE COURT:  Yes.

Page 464

1          MR. REYES:  Your Honor, may I be excused?

2          THE COURT:  Yes, sir.

3          MR. OLIVER:  Your Honor, as we organize

4     ourselves for opening, I was going to put a binder up

5     here and then move between here and the screen.  Is

6     that --

7          THE COURT:  You're going to do what, sir?

8          MR. OLIVER:  I was going to put my notes up

9     here, but I have got to get to the screen so I will

10    walk back and forth to the screen.

11         THE COURT:  That's no problem.

12         MR. OLIVER:  It's a touchscreen.

13         THE COURT:  Okay.  But can I tell you -- and

14    this is probably going to be a problem.  Because we

15    have the jurors -- and we're going to have ten jurors

16    and they are going to be seated there.  The juror who

17    is seated right there --

18         MR. OLIVER:  Right in front of the screen.

19         THE COURT:  -- is not going to be able to -- it

20    is going to be uncomfortable.  So what I normally ask

21    the lawyers to do is kind of move the screen down

22    towards us and then turn it at an angle.

23         MR. OLIVER:  Can we do that, Gina?

24         THE CONCIERGE:  Yes.

25         THE COURT:  It doesn't have to be dramatic, but

Page 465

1          it just has to be so it is not all in their face.

2              Or you know what we can do?  We'll just have no

3          one sit there.  We've got ten jurors.  We'll just

4          have them fill up the ten seats and maybe that will

5          solve it.  So maybe that will be okay.  Let's --

6          let's see how it works out.

7              MR. PENDELL:  Your Honor, we can move it at any

8          time, so...

9              THE COURT:  All right.  There's no more motions

10         in limine?  We're good?

11             MS. SCOTT:  We still have motions in limine,

12         Your Honor.

13             THE COURT:  Okay.

14             MS. SCOTT:  One of our -- would you like us to

15         argue here or come approach?

16             THE COURT:  It's up to you.  You're fine right

17         there.

18             MS. SCOTT:  So, Your Honor, one of the motions

19         in limine that is we have is MIL 33.  And it covers a

20         bunch of things.  One thing that I wanted to talk

21         about, because it came up yesterday in voir dire --

22         and I apologize.  I'm a Texas lawyer so I don't say

23         voir dire, I say voir dire.

24             But this issue of making charitable

25         contributions with any amounts that are received from

Page 466

1    damages.  So it was a suggestion that came out in

2    voir dire when --

3         THE COURT:  Oh, when he said you can -- give it

4    to the plaintiff and the plaintiff can do whatever

5    they want.

6         MS. SCOTT:  -- they can do whatever they want

7    with it, including donate it to charity.  So we have

8    an MIL on that that precludes any sentiment,

9    reference, argument, as to what -- to using any

10   damages for charitable contributions, for setting up

11   any cancer foundation.  You get the picture.

12        THE COURT:  I agree.  I don't know why -- why

13   is that relevant to anything?  They give you --

14   they're going to punish --

15        MR. OLIVER:  Is this your MIL on that?

16        MS. SCOTT:  Yeah.

17        MR. OLIVER:  That's fine.  I don't really have

18   a problem with that; however, I do want to make

19   something clear because this -- not her law firm, but

20   this other law firm, and I try these cases

21   frequently -- does punitive closings.  You've

22   probably seen this.  And they make a big deal, ladies

23   and gentlemen of the jury, this money is going to the

24   plaintiff.  It is going to the plaintiff.

25        If that's going to be the closing, then I need

Page 467

1    to be prepared to let my client say, Well, in point

2    of fact, I plan to give this to Sylvester Cancer

3    Research Center.  If they are telling me they're not

4    going to do that in closing, then I think it's fine.

5         THE COURT:  But I don't understand.  The money

6    is going to the plaintiff.  And the plaintiff has

7    100 percent discretion on what to do with that money.

8    I don't know why we are getting into this -- because,

9    by the way, forgive me for saying it this way, but

10   wouldn't everybody who is looking for a billion

11   dollars -- I'm making a number up -- everybody who is

12   looking for --

13        MR. OLIVER:  Your lips to God's ears.

14        THE COURT:  But everyone is looking for a

15   billion dollars.  Wouldn't they all say, But I want

16   to let you know what I am going to do with this

17   money.  I am going to give $100,000 to all the poor

18   children who can't eat.  I am going to give another

19   $250,000 to all of the orphan children, you know, all

20   those little kids -- I mean...

21        MR. OLIVER:  And that is why I am not really

22   fighting it.  I am agreeing to it.  However, I do

23   think there is a difference in me affirmatively

24   introducing it, and then, in closing, the defense

25   lawyers making argument.

Page 468

1          THE COURT:  How about we do this:  We -- nobody

2     will make any reference to it, and then if, during

3     their argument, they do make reference to it, before

4     you get up in your rebuttal close, you say, Judge,

5     can we just have a brief moment, and then you explain

6     to me what you intend to do.

7          MR. OLIVER:  Absolutely.

8          THE COURT:  And then I will rule.  And it will

9     depend, in part, on how they argue.  And then you

10    will tell me why you thought you have to do -- you

11    have to respond.

12         MR. OLIVER:  That is perfect.  That is perfect

13    with me.

14         THE COURT:  So motion granted, unless you,

15    quote/unquote, open the door.  And what open the door

16    means, we don't know.  We will have that conversation

17    at some point.

18         MS. SCOTT:  We will find out.

19         MR. OLIVER:  And that may not be their plan at

20    all.

21         (Discussion off the record.)

22         MS. BROWN:  They have sex cells attributed to

23    us in quotes, and that is not in the document.

24         THE COURT:  Sex?

25         MR. OLIVER:  That is a mistake.  You will

Page 469

1      understand when you see the picture.

2              THE COURT:  Oh.

3              MR. OLIVER:  It is interesting, Judge.

4              MS. BROWN:  All right.  Let's just take it out.

5              THE COURT:  Do you have something else, ma'am?

6              MS. SCOTT:  Yes, Your Honor.  We also have a

7      motion in limine to exclude references or evidence to

8      other litigation.  This is another issue that came up

9      yesterday in the voir dire.

10             Obviously, there have -- there's been a lot of

11     talc litigation.  A lot of the expert witnesses, as

12     Your Honor knows, are repeat players.  And so the

13     fact they have given prior testimony is going to come

14     in, but we don't believe there should be any specific

15     reference to the specific cases or the specific

16     details about that prior testimony.

17             THE COURT:  I think it depends upon how you

18     cross-examination them.  I think you are the one who

19     has total control over that because if you -- there

20     are certain things that I have seen lawyers do and

21     you invite exactly what it is that they respond --

22     that they give you.

23             So I think that depends upon -- more upon you.

24     And you can guide -- it is cross-examination, so you

25     can fully guide the witness, and you can make sure, I

Page 470

1      don't want to make reference to any specific cases,

2      but I do want to talk about some previous statements

3      that you have made.  Okay?

4           So depending upon how you ask the question --

5      now, they can't gratuitously just go ahead and start

6      throwing out cases, and you should tell them that

7      they should refrain from doing that, again, unless

8      there is some specific reason as to, That is how I

9      got to respond to your question.

10          MR. OLIVER:  Your Honor, we don't plan on doing

11     that.  I will say that the place that it is most

12     likely to come up is with our last -- I hope it's

13     going to be our last witness -- Mr. Diaz, who is

14     going to talk about the relevant information about

15     punitives and the bankruptcy.  And he is going to

16     make passing reference to it because it is a part of

17     the transaction.

18          Other than that, if they don't open the door,

19     the most that would come in would be, Hey, if they

20     did open the door, there is a certain number of

21     cases.  I mean, in their opening, they say, There is

22     all these millions of people who have used this

23     product.  At some point, it is fair, depending upon

24     what they do, to say, Well, yeah, and a lot of them

25     got cancer, and they brought these lawsuits.

Page 471

 1              THE COURT:  Like I said, it depends upon how

 2      they proceed.

 3              MR. OLIVER:  We're good to go.

 4              MR. PENDELL:  Your Honor, may I ask a

 5      clarification question?

 6              THE COURT:  Sure.

 7              MR. PENDELL:  And I apologize.  I know you only

 8      want to hear from one of us.  I just want to get

 9      clarification.

10              Here is my concern:  For example, when I have a

11      witness on the stand, I want to be able to say to the

12      jury, Have you ever testified in a trial like this

13      before?  Because my concern is if I don't do that, on

14      cross-examination, they get up and say, Hey, you have

15      testified in 20 of these cases, haven't you?

16              THE COURT:  Why can't you just ask, Have you

17      ever testified as an expert in a court of law?  And

18      the answer is yes.  Why does it have to be, Have you

19      ever testified in a trial like this before?  The

20      whole point is that you have testified as an expert

21      before?  Before in Miami-Dade County?  Yes.  In

22      Broward County?  Yes.  All across the United States?

23      Yes.

24              Does it matter if it is in a case like this?

25              MR. PENDELL:  Yes, if on cross-examination,

Page 472

1      they are going to go up and say, You have made

2      $20 million testifying in 17 talc trials, haven't

3      you?  And then it looks like I've hid that from the

4      jury.  So in that instance, that is why it matters.

5      So if they are not going to do that, then I agree

6      with you, we can do it that way.

7           THE COURT:  I am not sure I agree with you.

8      But if they stand up and ask the question in the way

9      that you just indicated, then I don't know why you

10     think that somehow, that is suggesting that you are

11     trying to hide that they had testified in talc.

12          But let me just ask:  Do you plan on asking the

13     question of the witness, You testified in 20 talc

14     cases previously?

15          MS. BROWN:  No, we do not, Your Honor.

16          MS. SCOTT:  No, we do not, Your Honor.

17          THE COURT:  So they are not asking that.

18          MR. PENDELL:  No issue.

19          MS. SCOTT:  The whole point of this is, really,

20     we saw it yesterday in voir dire, where it was like,

21     someone said if there were these other talc cases,

22     then maybe I would think something differently.  So

23     we are just trying to hedge against that prejudice,

24     Your Honor.

25          So obviously, we can speak in general terms

Page 473

1       about prior expert testimony, but we don't want to go

2       down that road that will lead to prejudice, as we

3       saw.

4              THE COURT:  I agree with you, unless, of

5       course, the door is opened.

6              MS. SCOTT:  Unless the door is opened.

7              MR. OLIVER:  We have several.

8              THE COURT:  Well, we are still waiting for the

9       juror.

10              Are we still waiting, Rod?

11              THE CLERK:  Yeah.  We are still waiting for

12       that one juror.

13              THE COURT:  Okay.  And at some point -- just so

14       that you know, he is now 40 minutes late.  And we

15       have all done this.  We have said, Oh, I am just ten

16       minutes away.  That was 20 minutes ago.  I am just

17       putting it out there for you all.  At some point, we

18       got to just -- we have got to move on.

19              He is here?

20              THE CLERK:  We are still waiting.

21              THE COURT:  Yes, ma'am.

22              I am trying to kill some time here doing the

23       motions in limine, but at some point, I am going to

24       say we have to proceed.

25              Yes, ma'am.

Page 474

1          MS. SCOTT:  Understood, Your Honor.

2          So we have a motion in limine.  It is Number 21

3     to exclude references or evidence of any third-party

4     materials.  And, specifically, there is an

5     unsolicited PowerPoint deck from a media company that

6     J&J had used in the past that just -- again,

7     unsolicited marketing PowerPoint about marketing talc

8     products to a specific demographic that Ms. Seskin

9     was not involved in.

10          THE COURT:  I don't understand when you say

11     "unsolicited."  You are saying somebody sent you a

12     proposal?

13          MS. SCOTT:  It was a pitch deck.

14          THE COURT:  Okay.  So they, basically, pitched

15     a proposal, and you never used it?

16          MS. SCOTT:  We never used it.  It was internal.

17          MR. OLIVER:  Your Honor, we are not using this.

18     This is marketing --

19          THE COURT:  So granted.

20          MR. OLIVER:  We may use the document.  We will

21     redact it.  We are not talking to marketing people.

22          THE COURT:  Ma'am.  Granted.

23          MS. SCOTT:  I think that would also cover our

24     Motion in Limine Number 2 regarding reference or

25     argument that Johnson & Johnson improperly targeted

Page 475

1    consumers based upon demographic characteristics.

2         MR. OLIVER:  No.  Your Honor, we are absolutely

3    going to talk about the fact that they targeted

4    mothers and young women, and particularly in the time

5    period that Marilyn Seskin was a young woman, and we

6    are going to see that evidence, and it is

7    indisputably relevant and indisputably a --

8         THE COURT:  I'm sorry, is she a mother?

9         MR. OLIVER:  No, she was not a mother, but

10   their marketing campaign combined the concept of

11   "this is safe enough for your baby," and in the same

12   ads, it would say it is safe enough for your body.

13   They did it all together, right?  Some of them were

14   just for babies; some of them were for mothers and

15   babies.

16        THE COURT:  Go ahead and finish your argument,

17   ma'am.

18        MS. SCOTT:  Your Honor, we believe that this

19   targeting argument is irrelevant because there is no

20   evidence that Ms. Seskin ever saw any J&J

21   advertisements or relied on any advertisements.  The

22   only sworn testimony that we have from Ms. Seskin

23   said that she saw advertisements, but not specific

24   ones.

25        And there was a question on this fact

Page 476

1    questionnaire that specifically asked, Have you

2    seen -- what are the specific marketing materials or

3    advertisements that you have seen?  And that space is

4    left blank.

5        And so there is no evidence that she even saw

6    the marketing materials that they intend to show.  I

7    mean, some of these things are -- and we -- I think

8    we talked about this in regards to

9    Dr. Freidenfelds -- some of these things, like, way

10   predate Ms. Seskin even being alive.

11       So there was, like, a 1917 World War I ad

12   disclosed on Dr. Freidenfelds' opinions, or, like, a

13   depression-era add.  So these ads of targeting, they

14   are just not relevant to this case, and they would be

15   highly prejudicial.

16       MR. OLIVER:  So those ads, first of all, are

17   not really about targeting.  Those are about

18   establishing the brand and establishing reputational

19   purity and safety and trust, and they do all that.

20       In talking about the targeting ads, with regard

21   to targeting, Marilyn Seskin was given a sworn fact

22   statement as she was dying and asked to identify ads

23   without -- she didn't have the ads, right?  I mean,

24   she was in the hospital or at her house.  She didn't

25   have somebody showing her ads.

Page 477

1          So we are not going say she saw this ad.  But

2     what our experts are going to say, and what the jury

3     can infer on its own, as well, is that, well, she was

4     alive during this time period, she said she saw

5     advertisements, and this is what the advertisements

6     looked like, right?

7          THE COURT:  At that time period.

8          MR. OLIVER:  At that time, this is what they

9     said to people and the purposes for which they

10     marketed the product.

11          Some of those sexy ads are all about, like,

12     well, you would use it as a feminine deodorant,

13     right?  That's what it's about, and that's how she

14     used it.  So it's directly relevant.

15          MS. SCOTT:  Your Honor, I think this goes to

16     the fraudulent misrepresentation claims which are

17     totally based on these ads.  There has to be a direct

18     link between the alleged misrepresentations based on

19     the ads, question if those are actionable, and the

20     plaintiff actually seeing them so that she is harmed.

21     There is no direct evidence making that link.  And so

22     these ads are completely --

23          THE COURT:  These ads, is this argument going

24     to the fraudulent misrepresentation that they said

25     something in the ads that caused Ms. Seskin to

Page 478

1          actually use the product and the product caused

2          injury?

3               MR. OLIVER:  Your Honor, it would go to

4          fraudulent misrepresentation, express warranty, the

5          ads -- almost all of their ads say this product is

6          pure and safe enough for you.

7               THE COURT:  I'm not talking about that.  I'm

8          talking about the part where you talk about how she

9          used the -- why she used the product.  Meaning,

10         connecting the marketing to her use of the product.

11         And what does --

12              MR. OLIVER:  Your Honor, I'm not sure I

13         understand your question.  Yes, we believe that she

14         trusted -- her husband testified that she trusted

15         Johnson & Johnson and has specific examples of it.

16         For example -- well, you'll hear the testimony.  She

17         trusted Johnson & Johnson.  That's going to be the

18         testimony.

19              We are going to offer these ads to show that

20         they made these statements, that they are, in fact,

21         not true.  And the jury would have to infer, based on

22         the years and based upon Bob's testimony and

23         Dr. Seskin's sworn fact sheet, that she saw these

24         representations.

25              THE COURT:  Well, why do we need the jury to

Page 479

 1          interpret that?  There has to be some evidence.  You

 2          just simply saying --

 3               MR. OLIVER:  There is evidence.

 4               THE COURT:  -- it seems like -- one minute.

 5               You seem to be taking the position that because

 6          they advertised at a time when she used the product

 7          and she said she saw advertisements, that somehow

 8          that equates to somebody saying that she had to have

 9          seen the advertisements, that -- the specific

10          advertisements -- and I don't know which ones.  Are

11          you going to show specific advertisements?

12               MR. OLIVER:  We're going to show specific

13          advertisements.

14               THE COURT:  But you have nothing to show those

15          were the ads that she actually saw.

16               MR. OLIVER:  So, Your Honor, under the consumer

17          expectations test as articulated in Aubin, the

18          Florida Supreme Court recognized that a manufacturer

19          sets its expectations with its representations to the

20          public.

21               In the following law that followed up from

22          Aubin and some other law, I think it was Dagnin.  It

23          went up to the Supreme Court, I think it was

24          Chadwick.  The Florida Supreme Court and the lower

25          court which basically grappled with this nature of

Page 480

1    fraud and what you have to prove.  And what they have

2    said is if you can show that a plaintiff was, you

3    know, alive and exposed to this advertising campaign,

4    the jury can infer.  And the jury instructions must

5    say, I believe that the plaintiff relied on a

6    statement or statements.

7        But the law is clear you don't have to prove

8    which statement he or she relied on.  Because when

9    you're talking about something like tobacco --

10        THE COURT:  But what I heard you say is just

11    simply, she was alive and she was using the product

12    at the time they were advertising.  Then that would

13    just make -- I'm thinking about in the context of

14    cigarette smoking, and somebody comes in and they

15    say, you know, well, okay, why would you start?  By

16    the way, you can bring in all these ads about why

17    they started doing something --

18        Let me finish my statement.

19        You can bring in all of these ads about why

20    somebody started to do something, and -- but that

21    person never saw any of those ads.  That doesn't make

22    it relevant because they put out all of those ads.

23    You have to at least link the ads to the person and

24    the reason why she was using the product.

25        MR. OLIVER:  That's right.  Your Honor, first

Page 481

1          of all, we go back to her sworn statement, which I

2          think they might have drafted.  It's a plaintiff's

3          fact sheet.  They might have drafted it.  They

4          certainly had input into it, right?  It comes from

5          the MDO.

6               She filled it out and said, I saw Johnson &

7          Johnson advertisements.  Her husband said, Yes, I

8          believe she saw these.  I have this relationship with

9          her.  I lived with her for 20 years, and, you know,

10         she watched television, she did all this.  She

11         trusted the Johnson & Johnson family.

12              THE COURT:  He is going to say -- the husband

13         is going to testify that Ms. Seskin actually saw

14         specific advertisements?

15              MR. OLIVER:  Not -- no.  But we don't have to

16         say that.  The case law is very clear.  We do not

17         have to identify a specific statement or statements

18         that she saw.  You just have to --

19              THE COURT:  But I'm sorry.  Are you telling me

20         she used this -- you allege that she used this

21         product for 50 years.

22              MR. OLIVER:  Fifty years, yes, ish.

23              THE COURT:  Okay.  So I'm trying to understand.

24         So you -- are you saying that you get to play

25         advertisements from, let's say, when she first

Page 482

1    started using the product?  Then every decade you get

2    to play -- I mean, because the husband, she and the

3    husband didn't get married until 2006 or something

4    like that?  2004.  Thank you, Mr. Seskin.

5        They got married in 2004.  So the only

6    knowledge he would have about any advertisements

7    would be in 2004.  And even then, he would have to

8    simply say, oh, it was a commercial that came on TV,

9    or it was -- I mean, at least link it somehow.  You

10   can't just simply say, well, they advertised.

11       MR. OLIVER:  That's not what we are saying,

12   Your Honor.  We have a sworn statement from the

13   plaintiff that said she saw Johnson & Johnson

14   advertisements.  Because of the circumstances of her

15   death and the nature of the fact sheet, she didn't

16   ever have an opportunity to say, I saw this or I saw

17   that.  But I need to back up because this is

18   critical.  Our defect claim, which is obviously

19   probably the most important claim in this case, given

20   that we have to prove the defect, relies on the

21   consumer expectations test.  There is no doubt about

22   that under Florida law.

23       Under Florida law, in order to establish what

24   consumer expectations are, the Florida Supreme Court

25   has been clear, I get to show how they established

Page 483

1      expectations with their public statements.  That's

2      how consumers know what to expect.

3           If Johnson & Johnson never said a word about

4      baby powder ever, I would have a problem.  But they

5      said a lot of words about baby powder.  In order to

6      say they failed the consumer expectations test,

7      that's relevant evidence to that defect.  So that is

8      part one.

9           THE COURT:  So there is a difference between

10     you talking about whether or not they failed the

11     consumer expectation test and somehow you allowing

12     your people to come in and testify that somehow she

13     relied upon these statements that were being made.

14          MR. OLIVER:  I'm not going to say -- no.  I'm

15     not having -- I have never personally believed that

16     experts should say somebody relied on something

17     directly because that's a very hard thing for any

18     expert to say unless they are your psychiatrist.  So

19     I'm not going to have an expert come in and say, she

20     relied on this.

21          I think reliance is something that a jury

22     infers from the circumstantial evidence that is

23     offered.  So if Your Honor thinks that an expert is

24     going to come in and say she relied on this ad,

25     that's not what they're going to say.

Page 484

1           THE COURT:  Well, are they going to link?

2       Because you have referenced to --

3           MR. OLIVER:  Yes.

4           THE COURT -- your fraud count.

5           MR. OLIVER:  Yes.

6           THE COURT:  My question is, and this is the

7       concern I am having, is I don't know how they link

8       it.  I think there's a problem with this -- there is

9       something missing in this link.  So I think you all

10      need to brief this.

11          MR. OLIVER:  What is the missing link?  I don't

12      understand.

13          THE COURT:  Because you're -- they're just

14      coming in and they're saying, Well, because they

15      advertised, and no one disputes that Johnson &

16      Johnson advertised, and she was using the product,

17      and she said -- the husband says that, yes, she

18      saw -- she said in her statement that, yeah, I saw

19      advertisements, then you get to then put into the

20      record how Johnson & Johnson was marketing and

21      advertising their product.  And, by the way, for what

22      period of time?  For the entire 50 years?

23          But you can't even say, for example, when I

24      originally started using the baby powder, I remember

25      seeing ads that showed the mother with their baby and

Page 485

1    them saying that it was fresh and it was clean.  I

2    mean, you have to -- or at least put it into a

3    decade.  But you are not putting it even into a

4    decade.

5         You're just basically saying she used the

6    product for 50 years.  And then you think that that

7    gives you carte blanches to bring in all the

8    advertisement that they have used for 50 years?  I

9    have a problem with that.

10        MR. OLIVER:  Okay.  Your Honor, I understand

11   your position, but I really think that if these are

12   excluded it is reversible error.  Because I have to

13   be able to offer you my case.

14        THE COURT:  Let me tell you all something.  I

15   am not afraid to have my name in print.  So when you

16   all use that phrase "reversible error," I do the best

17   I can with what you all give me.  I paused.  And I

18   said maybe you need to brief it.  That's my way of

19   saying, you may need to give me some more education.

20   Help me understand why I should let it in.  I am

21   obviously struggling with it.

22        But you all -- every time you all use that

23   word, by the way, I always sit back and I always say,

24   it never scares me.  I have been reversed.  Not

25   because I did something intentionally.  I thought

Page 486

```
 1          this was the law.  I did the best I could do.  If the
 2          reviewing court, there are wiser people up there, if
 3          they think I made a mistake, I learn from it and I
 4          move on.  But you have to educate me, help me make
 5          the right decision.
 6               MR. OLIVER:  So, Your Honor, I need to
 7          understand, because, quite frankly, there was a lot
 8          going on.  And Ms. Scott was talking to you while
 9          other people were talking to me, and I didn't hear
10          the first part of her motion.
11               What I want to understand is -- I know about
12          the briefing.  I got that, and we will brief whatever
13          needs to be briefed.  But I have these ads in my
14          opening.  I brought them to Ms. Brown.  She didn't
15          object.
16               THE COURT:  And I'm not disturbing your
17          opening.  I have no idea what is going.  This is a
18          motion in limine not raised in the opening.  So --
19          about the opening.  So I'm not changing your opening.
20               MR. OLIVER:  Okay.
21               THE COURT:  But, again, I don't know what
22          you're going to say during the opening.
23               MR. OLIVER:  I don't know what they're going
24          to -- if they're not trying to take it out of the
25          opening, I don't know what it is they are getting at.
```

Page 487

1          These are their statements.  I mean, it's not --
2              Well, go ahead.  Tell him.  Now, they're going
3      to make an objection about my opening.
4              MS. BROWN:  Well, I mean, in light --
5              MR. OLIVER:  They didn't make.
6              MS. BROWN:  -- and the Court's ruling, they
7      have in here "baby powder is sexy."
8              THE COURT:  But you didn't object.  I told you
9      all, you all have to look at each other's slides --
10             MS. BROWN:  That's fine.
11             THE COURT:  -- and we sat here at the beginning
12     of this and you didn't object.
13             MS. BROWN:  Understood.
14             THE COURT:  Had the juror not been late,
15     counsel would have done his presentation based upon
16     my ruling upon the objections that you made.  Now,
17     we're having this conversation, and now you're
18     saying, Well, Judge Thomas, in light of that, now we
19     want to object.
20             MS. BROWN:  Well, what I'm saying, Judge, and I
21     understand he sort of opens on this at his peril.  We
22     had full intention of getting this motion before you,
23     and when he tries to use it with a witness, then,
24     hold on, she never saw that ad.  So I didn't object
25     to the opening because these are our ads.

Page 488

1           THE COURT:  And I'm not precluding you from

2       doing that, by the way.

3           MS. BROWN:  Okay.  I understand.

4           THE COURT:  But I'm not going to require you to

5       change your opening.  But, of course, you do use your

6       opening statement to your own peril because I don't

7       ultimately know -- because when you give me that

8       memorandum, and you help to educate me a little bit,

9       if I don't see it the way you want me to see it,

10      then, unfortunately, you are stuck.

11          MR. OLIVER:  Your Honor, one thing that I want

12      clarification on, because I am not sure what Your

13      Honor is asking, you keep saying, We just want to say

14      she used baby powder and, therefore, she must have

15      seen the ads.

16          She said in a sworn statement she saw Johnson &

17      Johnson advertisements.  And the law says she

18      doesn't --

19          THE COURT:  She used the product for 50 years.

20          MR. OLIVER:  True.

21          THE COURT:  So the question is:  Did she see

22      Johnson & Johnson advertisements in 1960?  Is that

23      50 years?  In 1980?  In 1990?  Was it in 2000?  Were

24      the ads the same?  What were they -- I mean --

25          MR. OLIVER:  They were different.  We will

Page 489

1          offer them into evidence and show the difference.

2               THE COURT:  But that is the whole point.  The

3          point is that if she didn't see advertisements

4          50 years ago, how old was she?  When she first

5          started using it, with 50 years of using it --

6               MR. OLIVER:  She had it used on her as a baby.

7          She began using it, probably, based on Bob's

8          testimony and her fact sheet, when she became of

9          sexual maturity.  So, you know --

10              THE COURT:  When was that?  How old was she

11         when that happened?

12              MR. OLIVER:  So 1949, it would be '59, early

13         '60s.

14              THE COURT:  So the early '60s.  Did she see

15         advertisements back then?

16              MR. OLIVER:  I don't think anybody can tell you

17         that.  She said she saw them, okay?

18              THE COURT:  And --

19              MR. OLIVER:  I don't think the law requires

20         that either.

21              THE COURT:  And, again, we can sit here and we

22         can continue to have this conversation, and you are

23         not going to persuade me to change my thoughts unless

24         you educate me and give me some case law that maybe I

25         am wrong in the way I am thinking about it.  And how

Page 490

 1    many judges pause and say, Educate me.  Help me get

 2    to where you want me to be?

 3         You standing up there and getting frustrated

 4    because I don't seem to see it the way you want me to

 5    see it, that is not productive.  All it is, is you

 6    repeating it and saying, Why are you so thick?  Why

 7    can't you get this?  And I am saying to you, I am

 8    being thick because I am not seeing it the way you

 9    want me to see it.  Educate me.

10         And if you educate me and I see it your way, I

11    will overrule it.  And if you don't, then that is the

12    ruling.

13         MR. OLIVER:  Okay.

14         THE COURT:  And then whatever the reviewing

15    court does, if you get an adverse verdict, then if

16    they reverse it, they argued it, and then you would

17    have to try it all over again.  I can't do anything

18    more than that, and I don't think anybody could ask

19    me to do anything more than that.

20         So I gave you an invitation.  You either take

21    me up on the invitation, or you leave me to my own

22    devices, and I make the best decision I can make

23    based upon what you have given me.

24         MR. OLIVER:  We will absolutely take care of

25    that, Judge.

Page 491

```
 1              THE COURT:  The jurors are here.  Jurors coming
 2      in.
 3              (Jurors entered the courtroom.)
 4              THE COURT:  Please, ladies and gentlemen, you
 5      are the jurors that have been selected and sworn to
 6      try this case.  As we have indicated to you, we are
 7      about to do opening statements, but there are a
 8      couple of things that I have to explain to you before
 9      opening statements begin.
10              First, I have to ask, did any of you do any
11      independent research about this case?  Anybody do any
12      independent research about the case?  You've got to,
13      to answer me.  You've got to tell me.
14              THE JURORS:  No.
15              THE COURT:  Okay.  Did any of you speak to
16      anyone about the case?
17              THE JURORS:  No.
18              JUROR YESILAN:  My husband.
19              THE COURT:  You spoke to your husband about the
20      case?
21              JUROR YESILAN:  Yes.
22              THE COURT:  Ladies and gentlemen, can you all
23      just step into the jury room for just a brief moment
24      for me, please?
25              (Jurors exited the courtroom.)
```

Page 492

1           THE COURT:  Ma'am, can you just step out here

2       for a brief moment for me, please.

3           (Juror Yesilan exited the courtroom.)

4           THE COURT:  Rod, take her away from the doors.

5       I am loud.  My voice carries.

6           Okay.  I think she did that on purpose.  I

7       don't know what she is about to say, but I wanted to

8       know -- now that she is a juror, I try not to have

9       the lawyers ask the questions, but I want to give you

10      all an opportunity, if you think there is a question

11      that I should ask of her.

12          I am, obviously, going to ask her, What was the

13      conversation that you had with your husband?  Okay?

14      What did you say to him?  What did he say to you?

15      Okay?  Depending upon that response.

16          But regardless of what she says -- she is an

17      alternate juror, right?

18          MS. BROWN:  Yes.

19          MR. OLIVER:  She is.

20          THE COURT:  Regardless of what she says, she

21      will stay here for the entire period of this trial.

22      Okay?  And so whether she actually sits and

23      deliberates or not, she will sit here, and I will

24      make her stay.  But I don't want you -- when I do

25      that, I wanted to tell you all why I was doing it.  I

Page 493

1    don't want you all panicking because, you know, you

2    are concerned that she is on your panel.

3         She may be stricken, but I am not excusing her

4    because I think she did it on purpose, if she --

5    because I clearly told them not to talk to anybody

6    about the case.

7         All right.  Rod, can you bring her back in for

8    me, please?

9         (Juror Yesilan entered the courtroom.)

10        THE COURT:  All right, ma'am, you can go back

11   over to your seat.

12        All right, ma'am.  You indicated, when the

13   Court asked whether or not you had spoken to anybody

14   about the case, and you said you had spoken to your

15   husband.  What did you say to your husband?

16        JUROR YESILAN:  About what happened yesterday.

17        THE COURT:  Can you be more specific?

18        JUROR YESILAN:  I spoke about it in the case.

19        THE COURT:  Give me an example.

20        JUROR YESILAN:  Sorry, I cannot explain much

21   because my English is not enough to explain.  I can

22   understand, but I cannot talk.  I can't.

23        THE COURT:  You cannot articulate what you said

24   to your husband?

25        JUROR YESILAN:  How I can explain?  I said

Page 494

1    whatever happened.  Whoever talks, that is what I

2    speak about.

3         THE COURT:  You said specific things about the

4    case, what you understood about the case?

5         JUROR YESILAN:  Yeah, because of the, you know,

6    the talc, the powder.  That is why I talked, Johnson

7    & Johnson.

8         THE COURT:  What did he say to you?

9         JUROR YESILAN:  He didn't say anything.  He

10    just listened because he doesn't know anything about

11    it.

12         THE COURT:  I need to reinforce to you again,

13    you are not to speak to anybody about this case,

14    including your fellow jurors.  It is improper.  You

15    are not allowed to have a conversation with the

16    jurors or with anybody about this case until the very

17    end of the trial when you are in the jury room.

18         JUROR YESILAN:  Okay, but he is my husband.  I

19    have to talk with somebody.  I have to explain my

20    things.  I cannot let this -- and let it stay like

21    that.  I cannot.  It has to be somebody.

22         THE COURT:  Ma'am, you are not allowed to talk

23    to your husband --

24         JUROR YESILAN:  I cannot promise, sir.  I am

25    sorry.

Page 495

1          THE COURT:  -- about this case.

2          JUROR YESILAN:  I cannot promise.

3          THE COURT:  Well, ma'am, here is the problem,

4     is that you have to follow the orders of this Court.

5     And I pray, I am begging you to please --

6          JUROR YESILAN:  You don't have to beg me.  You

7     are not -- why are you begging me?

8          THE COURT:  Because you seem to have some

9     apprehension.  You seem to have some concern.

10          JUROR YESILAN:  Yes, I am.

11          THE COURT:  Let me finish my sentence.

12          JUROR YESILAN:  I cannot understand what they

13     say.  I have to ask somebody what he says.  I don't

14     know.  The English is not my first language.  I speak

15     Armenian, I speak Turkish, I speak a little bit of

16     French, but not fluently English.

17          THE COURT:  I am sitting up here listening to

18     you, and you are communicating well.

19          JUROR YESILAN:  Well, but --

20          THE COURT:  You answered the question.

21          JUROR YESILAN:  I don't understand.  I am

22     speaking only the basics.

23          THE COURT:  Ma'am, here is the bottom line:

24     You are here for the two to three weeks that you have

25     been selected.  There is nothing you can say.  There

Page 496

1    is nothing you can do.

2        JUROR YESILAN:  If I get sick, what you going

3    to do about it?

4        THE COURT:  There is nothing you can say, there

5    is nothing you can do that is going to change that.

6    And if you violate my order again, then,

7    unfortunately, we are going to have to have another

8    conversation, and I don't want to have that

9    conversation with you.

10        JUROR YESILAN:  I am sorry.  I cannot promise.

11        THE COURT:  Jurors coming in.

12        JUROR YESILAN:  You think I can't talk anybody?

13    Everybody can talk.

14        THE COURT:  Nobody can.

15        JUROR YESILAN:  That is what you're thinking.

16        THE COURT:  That is what I am thinking?

17        JUROR YESILAN:  Yes.

18        THE COURT:  And you should let me know if

19    somebody attempts to talk to you about the case.

20        JUROR YESILAN:  That is not my problem.

21        THE COURT:  Ma'am, I am trying.  I am really

22    trying and you are testing me.

23        Jury is coming in.

24        JUROR YESILAN:  Because you don't listen to me

25    yesterday when I talked to you.

Page 497

1          (Jurors entered the courtroom.)

2          THE COURT:  For the record, all of our jurors

3      are present.  All parties are present.

4          I need you to do a couple things for me.  The

5      first thing I need you to do for me -- everybody can

6      be seated -- is I need you to turn your phones on

7      silent or turn them off.  If you could do that for

8      me, please.  That is just so that the lawyers are not

9      interrupted during their opening, and then you all

10     will remember to turn it off.

11         The next thing, and I need to make sure you all

12     strictly comply with what I am about to say to you,

13     you are not permitted to have any conversations with

14     anyone about this case.  This includes your mother,

15     your father, your husband, your children, nobody.

16     Okay?  And that includes each other.

17         If a juror approaches you and attempts to have

18     a conversation with you about this case, if the juror

19     leans over and says, What did they say -- okay? --

20     you don't answer that question.  Okay?

21         And if a juror contacts you and attempts to

22     have a conversation with you about this case, you

23     must immediately bring that to my attention.  Write a

24     note.  You are going to have a notepad.  You write a

25     note to me and you tell me, This juror is attempting

Page 498

1     to talk about the case.  You have to let me know

2     that.  Okay?

3          When we take breaks from time to time, you are

4     not permitted to talk about this case.  When I send

5     you in the jury room, you are not permitted to talk

6     about this case.  I don't know how else I can say it.

7          It is so important that you not talk about this

8     case until the very end, when all of you are present

9     in the jury room and you have heard all the evidence

10    and I have given you instructions on the law.  That

11    is the only time you are able to talk about the case.

12         When a witness is on the witness stand, if you

13    like what the witness is saying, you don't like what

14    the witness is saying, you can't turn to the other

15    juror and say, I don't like this person.  Okay?

16    That's talking about the case.  Okay.  You can't give

17    anybody else your impressions of the testimony of any

18    of the witnesses here in court.  Okay.

19         The second thing is that in about two minutes

20    the lawyers are going to stand up and give you their

21    opening statements.  Remember, I told you what the

22    lawyers say is not evidence.  Evidence is what you

23    hear from the witnesses from the witness stand, the

24    exhibits that are admitted into evidence and any

25    facts that I tell you, you must accept as true.

Page 499

1          The lawyer speak is not evidence.  But we are

2     going to ask you to pay very close attention to the

3     opening statements of the lawyers because it's a road

4     map, it's what they believe the witnesses are going

5     to say when they actually come into court and

6     testify.  Okay.

7          Immediately after the opening statements, we

8     will then have the presentation of witnesses.  The

9     plaintiff will call their witnesses.  The defense has

10    an opportunity to cross-examine those witnesses.  And

11    after the lawyers have asked all of their questions,

12    you will have an opportunity to ask the witness a

13    question.  Okay.  But your questions are not verbal.

14    You will have a notepad and a pen.  You have to write

15    your question on a sheet of paper.  You pass the

16    paper to me.  I then review it with the lawyers, and

17    I will then make a decision as to whether or not your

18    question can be answered.

19         I will tell you now, not all of your questions

20    are going to get answered.  Okay.  It's not because

21    it's a bad question.  We are governed by rules of

22    procedure and evidence, and so we are just -- you may

23    not be trained in that, and so not all of the

24    questions that you ask can be answered.

25         The fact that I don't answer a question that

Page 500

1    you submit, that should not discourage you from

2    continuing to ask questions if you should have other

3    questions.  Okay.

4         Also, you are allowed to take notes.  You will

5    have a notepad and you can take notes.  Please don't

6    become so consumed with taking notes that you are not

7    paying attention to the testimony as it's coming in.

8         Also, I want you to remember -- and I will tell

9    you this at the end of the case -- that the fact that

10   you wrote something down on your notepad, if you

11   remember it different, okay, it's what you remember,

12   not what you wrote on the notepad.  Okay?  So don't

13   say that must be it because I wrote it down there.

14   But I remember it in a different way.  We want you to

15   focus on your independent and collective recollection

16   as compared to just simply locking it in because you

17   wrote it down on the notepad.

18        We have to take breaks periodically.  And when

19   we do, you are not permitted to discuss the case.  We

20   ask that you use the bathroom -- we're going to try

21   to have you go into the jury room, there's a bathroom

22   back there, there's water back there.  We are going

23   to ask that you use that bathroom so that the lawyers

24   can use the bathroom up here on this floor.  Because,

25   again, we want to limit the exposure that you have to

Page 501

```
 1        them so there is nothing inappropriate -- or

 2        potentially inappropriate should occur.

 3            There are some additional instructions that I

 4        am sure I am going to need to give you, but I want to

 5        get to opening statements of counsel.

 6            Counsel, would you like to give an opening

 7        statement.

 8            MR. OLIVER:  Yes, Your Honor.

 9            THE COURT:  Yes, Mr. Neuman?

10            JUROR NEUMAN:  Can we get a notepad now?

11            THE COURT:  No, because what the lawyer's say

12        is not evidence.  So I will give you the notepad as

13        soon as the opening statements are over.  Okay?

14            JUROR NEUMAN:  Thank you.

15            THE COURT:  Thank you, Mr. Neuman.

16            MR. OLIVER:  I would be thrilled to give my

17        opening statement.

18            Good morning, ladies and gentlemen of the jury.

19        As you know by now, my name is Lance Oliver and I'm

20        with the Motley Rice law firm.  I now finally have

21        the pleasure of introducing you to my client, Bob

22        Sugarman.

23            Bob, can you stand up and wave?

24            I also have the pleasure of introducing you to

25        my team who will be trying my case with me.  Over
```

Page 502

1          here we have Gina Veldman, she's my favorite person

2          to try cases with.  She keeps all of our

3          audio-visuals going and she is absolutely essential.

4               My trial partner here is Ms. Laura Stemkowski.

5          She is the second chair in this case.  You're going

6          to hear from here.

7               I have Ms. Lee O'Dell from the Beasley Allen

8          law firm, and my partner Michael Pendell, who you

9          will also hear from.

10              And you're going to hear from the four of us,

11         but there are a lot of other people working on this

12         case, other members of my team, and this is a team

13         effort.  And I want to thank them first.

14              So we are here on behalf of Bob.  But Bob is

15         here as a personal representative here on behalf of

16         his dead wife, Marilyn Seskin.  Bob is an attorney.

17         He represents local health and benefit welfare firms

18         in this area and across the State of Florida.

19              Before she passed away, his wife, Marilyn

20         Seskin, was an anesthesiologist.  And you will hear

21         evidence in this courtroom that for pretty much the

22         entirety of her life Marilyn Seskin used Johnson's

23         talc-based baby powder as a deodorant, as

24         antiperspirant.  She put it on her body.  She put it

25         in underwear.  And put it on her genitalia.  She also

Page 503

1    put it on her diaphragm, which was her chosen form of

2    birth control.  So before she would have sexual

3    intercourse, the diaphragm would have baby powder on

4    it and she would insert it into her vagina.

5        In 2016, you are going to hear evidence that

6    Marilyn Seskin was diagnosed with a form of ovarian

7    cancer called primary peritoneal carcinoma.  And it

8    was of a cell type of high-grade serous cell cancer.

9    Right now, that doesn't mean anything to you, but

10   eventually it will when you hear the expert

11   testimony.

12       From 2016 to 2019, you are going to hear that

13   Marilyn underwent four surgeries.  She had five

14   rounds of chemotherapy.  And you are going to hear

15   that Bob was with her every step of the way.  And in

16   2019, you are going to hear that, with Bob by her

17   side, she lost that battle with cancer.

18       So this is a case about Marilyn Seskin's life,

19   but it's also a case about a product and a company

20   that makes that product.  The product is Johnson's

21   talc-based baby powder.  Johnson's talc-based baby

22   powder is a cosmetic.  It is not a pharmaceutical.

23   There will be no evidence in this case that Johnson's

24   baby powder is medically necessary.  There will be no

25   evidence in this case that Johnson's baby powder

Page 504

1    saves lives.  In fact, it does not.

2        Because of this, Johnson & Johnson told its

3    customers for the entire existence of the company

4    since Johnson's baby powder was on the market, that

5    Johnson's baby powder was best for baby, best for

6    you.  They told all of their customers and the whole

7    world that it was good enough for the entire world.

8        Why does that matter?  I'm about to show you a

9    series of advertisements that relate to what messages

10   Johnson & Johnson put out there throughout Marilyn

11   Seskin's life, and before and after.  Because it set

12   the expectations in the market for what consumers

13   could expect of Johnson's baby powder.  They made

14   those statements.  They set those expectations.  And

15   you're going to hear the consumers like Marilyn

16   Seskin trusted them and believed them.

17       Johnson & Johnson understood that.  On the

18   screen you see a document that we hope to introduce

19   into evidence, which is a marketing presentation from

20   the '90s from the Johnson & Johnson companies.

21       Johnson & Johnson recognized internally that

22   this relationship of trust that it had developed with

23   women and with mothers in particular was something

24   monetarily valuable to them.  No matter how much

25   money the product actually made, that reputation was

Page 505

1    critical to their company as a whole.

2        This document shows what Johnson & Johnson

3    believed "trust" meant.  Trust in healthcare means a

4    product that will work without any unexpected adverse

5    physical or emotional effects.

6        So you probably have been asking yourself for a

7    day now, how did one of the most trusted baby product

8    manufacturers in the world end up in a courtroom as a

9    defendant in a lawsuit?  Here we have our road to the

10   courthouse.

11       In a sentence, Johnson & Johnson ended up in

12   this courtroom because that trust that they

13   engendered with their customers like Marilyn Seskin,

14   they exploited it over and over again for money.

15       So at the end of this trial, you're going to

16   have a job.  And one of those jobs is going to be to

17   determine, did the product, Johnson's baby powder,

18   cause Marilyn Seskin's cancer and death?  To answer

19   that question, you are obviously going to have to

20   learn a lot about Johnson's baby powder, the product.

21       The first thing that you might want to know

22   about that is what is in Johnson's baby powder.  We

23   are going to bring witnesses who will talk about

24   this.  We are going to bring some of the company's

25   own documents that talk about this.  And here are the

Page 506

1    things that you might not have known.  You probably

2    walked in knowing what Johnson's baby powder is.  But

3    did you know what is in it?

4         So, first of all, Johnson's baby powder is

5    made -- there are two versions.  There is a

6    cornstarch version that we allege in this case was

7    perfectly safe and Johnson & Johnson had it for many

8    years.  You can buy that.  The one we are complaining

9    about is talc-based baby powder.  Talc is a rock.

10   It's a mineral.  I didn't know that before I started

11   working on these cases.  It is mined in the ground

12   just like many other minerals.  If you grind talc up,

13   it can come in a plate-like shape, like a platy --

14   they call it platy talc in the documents.  But it can

15   also come in a needle-like shape, and that is called

16   fibrous talc.

17        Needle-like shapes are important because there

18   is another mineral that is often a contaminant of

19   talc.  That is asbestos.  The experts will tell you

20   that asbestos also comes in a needle-like shape, and

21   there is a the problem with the mineral asbestos.  It

22   is a known cancer-causing agent.  And talc also comes

23   in the needle-like shape.  But talc and asbestos grow

24   together.  You're going to hear testimony in this

25   case, you are going to see documents, that when talc

Page 507

1          and asbestos grow together in the mines, you cannot

2          effectively completely separate those things.  And we

3          claim that much of that asbestos, or some of that

4          asbestos ended up in Johnson's baby powder.

5              On the right side of the screen we have our

6          definitions.  Platy talc.  I talk about that.  The

7          International Association for the Research on Cancer,

8          we will show you evidence, has classified platy talc

9          to be a possible carcinogen.  The International

10         Research on Cancer has classified fibrous talc as

11         inflammatory, just like platy talc, but they have

12         classified it as a Group 1 carcinogen.  The

13         International Research on Cancer has established

14         asbestos as a Group 1 known carcinogen.

15             So what does this list of ingredients have to

16         do with Marilyn Seskin?

17             Well, this is what it has to do with Marilyn

18         Seskin.  You will hear evidence in this trial from

19         doctors that when talc is applied to underwear or on

20         the genitalia, it can migrate through the birth canal

21         up through the fallopian tubes and it deposits itself

22         on the ovaries and in the peritoneum.  I am going to

23         do my best not to use thousand-dollars words, but

24         that is one that is important.

25             And I want to show you what I mean.  The

Page 508

1          peritoneum is one of the places that Marilyn Seskin

2          had her cancer.  Well, I can't draw on this.  But if

3          I could draw on it, I would draw a big red circle

4          around here.  And that is because the peritoneum is

5          essentially -- they call it the peritoneal cavity.

6          It is the body cavity that houses our organs and

7          houses the female reproductive organs in particular.

8              You're going to see that this is exactly what

9          happened to Marilyn Seskin, and in 2016 she was

10         diagnosed with primary peritoneal cancer.  It was on

11         her ovaries, it was in that body cavity in the

12         peritoneum and her death certificate says fallopian

13         tube cancer.  These are interchangeable terms.

14             So this, as you have obviously guessed as Judge

15         Thomas told you, is my opening statement.  It is my

16         time to tell you what I think the evidence will show.

17         Before I jump right into that evidence, I have what

18         we call in the legal business a housekeeping matter,

19         and it just means it is something that is not really

20         directly part of the story, but you need to know up

21         front.

22             There are two defendants in this case.  The

23         first defendant, Johnson & Johnson, you have heard

24         of.  The second defendant is a company called LTL

25         Management LLC.  You have probably never heard of LTL

Page 509

1    Management LLC.  LTL Management LLC did not exist

2    until October 2021.

3        And you will learn that during the time we are

4    complaining about, Johnson's baby powder was marketed

5    and sold first by the Johnson & Johnson companies,

6    then later, they transferred that to one of their

7    wholly-owned subsidiaries called Johnson & Johnson

8    Consumer, Incorporated.

9        When LTL came into existence, Johnson & Johnson

10   consumer ceased to exist.  They put all of the

11   talc-related liabilities into this company, LTL.  It

12   does not make any products.  It does not do -- sells

13   nothing.  But it is in this courtroom because, by

14   matter of law, it has accepted the liabilities for

15   cases like this that flowed from that former company,

16   Johnson & Johnson.

17       I am only telling you that because you need to

18   know up front.  I am simply going to refer to them

19   jointly as the Johnson & Johnson companies.

20       So let's get into the evidence.  On the screen,

21   I have an advertisement from -- I believe, if we look

22   up here, it is from the -- this one is from 1920,

23   from the Ladies' Home Journal.  And the reason I am

24   showing you -- I am not saying that Marilyn Seskin

25   saw this.  She was not alive.  The reason I am

Page 510

1          showing you this is because I am trying to show you

2          how they started marketing that product.

3              Johnson & Johnson baby powder has been on the

4          market since 1894, and from the very beginning, they

5          told their customers two things about the product

6          always.  They said it is pure and it is safe.  Early

7          on, they would make appeals in advertisements to

8          medical professionals.  You'll see nurses and doctors

9          on this.  And they said things like this:  They said

10         it has the highest recognized purity.  It is best for

11         baby and best for you.

12             That "best for you" part is the most important

13         part here, because from the very beginning, Johnson &

14         Johnson, they set the expectation that it was safe

15         enough for your baby, but they also set the

16         expectation that it was good enough for you to use on

17         your body.

18             One of our experts will tell you that these

19         advertisements frequently use the word "toilet

20         powder."  And back in that time, they were more

21         modest.  They didn't have TikTok and all that stuff,

22         so they didn't say everything that was on their mind.

23             They called something a toilet powder if they

24         knew you were going to use it as, like, a feminine

25         deodorant or something like that.  It was a polite

Page 511

1    way of saying, back then, that you can put it on your

2    body.

3         This is an advertisement from the 1930s.  Why

4    is this advertisement important?  In this

5    advertisement, Johnson & Johnson actually compares

6    its Johnson's baby powder to other manufacturers'

7    products.  And in the 1930s, Johnson & Johnson says,

8    "The inferior talc used in some baby powders contain

9    sharp, needle-like particles.  You wouldn't want them

10   next to your baby's skin."

11        That is important because those needle-like

12   particles that we talked about, we believe we are

13   going to show evidence that they actually were in

14   Johnson baby powder, and that for decades, Johnson &

15   Johnson knew that.

16        This is another advertisement from the early

17   ads, and, again, it shows that Johnson & Johnson

18   marketed it for women and, ultimately, for men, to

19   use from face to feet.  They set the expectation that

20   it was okay to use this powder and safe in this way.

21        Now, you may have come into this courtroom

22   knowing a little bit about that, that Johnson had

23   marketed its product as safe and pure.  What you may

24   not have realized is that in the mid-'60s, when

25   Marilyn Seskin was coming of age -- she was born in

Page 512

1    1949; so in 1966, she was 17 years old -- Johnson &

2    Johnson started marketing to adults.  That's a

3    euphemistic term.  They actually started marketing to

4    teenagers.

5         And they didn't just tell young mothers it was

6    okay for their baby.  They led young women to believe

7    that this was sort of an acceptable deodorant and

8    acceptable form of perfume to mask natural body odors

9    that they shouldn't have been ashamed of.

10        But these ads are examples.  These ads are from

11   the '70s when Marilyn was in her early 20s.  "You

12   stop being sexy when you stop trying.  If you would

13   rather be fresh and natural, you are outdated."

14        So from the beginning, they said it was fresh.

15   They said it was pure and natural and safe, and then

16   in the '70s and '60s, they started marketing more for

17   teenagers and adults.  They kept the theme of purity,

18   but they also said, Hey, this is a way to be

19   attractive to the opposite sex or whoever you are

20   attracted to.

21        Now, we are going to bring you a PhD witness

22   who will explain all of this, and not surprisingly,

23   Johnson & Johnson's advertising worked.  This

24   document shows that in 1966, when Johnson's powder

25   began advertising to adults, sales increased

Page 513

1     tremendously.

2          So here is where they started that.  This is

3     what their competitors are doing.  And sales of

4     Johnson's baby powder went way up.

5          There is a great quote, and I may have to read

6     it.  I hope I can remember it.  Actually, I am going

7     to read this quote because I think it is really

8     important.  It is a quote about knowledge.  You have

9     all heard the quote "knowledge is power."

10         Here is the quote that I think says it even

11    better.  "There is no wealth like knowledge.  There

12    is no poverty like ignorance."

13         And this is a fancy way of saying that when you

14    have knowledge about something, it is a power, and

15    when you don't share that knowledge with something,

16    you are taking away their choice to use that

17    knowledge.

18         And the evidence in this courtroom is going to

19    show that is what Johnson & Johnson did for Marilyn

20    Seskin and for all of its female customers because it

21    didn't share the knowledge it had about the dangers

22    of its product, and if it had shared that knowledge,

23    their lives could have turned out differently.

24         So what did Johnson & Johnson conceal, at least

25    from our perspective?  This is a 1971 memo.  It is a

Page 514

1          J&J telegram.  It was not a public document.  In the

2          early 1970s, there was a cancer research institute in

3          Great Britain.  It was called the Tenovus Institute,

4          and they were doing research on various kinds of

5          cancer.  One was ovarian cancer.

6               So in 1971, the Tenovus Institute looked at

7          slides of women's tissue who had ovarian cancer and

8          found talcum powder particles, and that became big

9          news.  So this man from public relations at Johnson &

10         Johnson is telegraphing somebody else, or giving a

11         telegram, saying, Look, these guys have done this

12         research, and there is a cancer peril in talc.

13              Why does that matter at the time?  It matters

14         because the Tenovus Research Institute scientists

15         were concerned about the similarities between talc

16         and asbestos, which was a known cancer agent.

17              So you are not going to see any evidence at

18         this time that alarm bells went off in Johnson &

19         Johnson and that they went out and warned people.  In

20         fact, exactly the opposite.  You are going to see no

21         evidence that they made any effort to warn their

22         customers of this.

23              So this story goes on.  It is very interesting.

24         Johnson & Johnson, the evidence will show, wanted a

25         second opinion.  They began to follow this issue.

Page 515

1    They took the very same ovarian cancer tissue, and

2    they sent it to Mount Sinai in New York, which you

3    may have heard of.  It is a very respected hospital.

4    Good cancer institute.

5        At that time in 1971, there was a scientist

6    doing research on asbestos.  And so they sent it to

7    Mount Sinai, and they also sent some samples of their

8    baby powder, and they said, Will you look at this and

9    give us a second opinion?

10       So that scientist at Mount Sinai, first of all,

11   he found talc particles in those tissue samples.

12   But, second of all, he said, We also got a few

13   surprises, and that we observed chrysotile asbestos

14   to be present in the tissue as well.  He also found

15   fibrous talcs in Johnson's baby powder and trace

16   amounts of chrysotile asbestos in Johnson's baby

17   powder.  That is a sample that Johnson & Johnson sent

18   to them.

19       Again, when this happened, no warning bells

20   went off.  Johnson & Johnson did not make an effort

21   at that time to warn its female customers.

22       So the scientist at the Tenovus Institute might

23   have been surprised.  But the evidence is going to

24   show that Johnson & Johnson was not surprised at all

25   because Johnson & Johnson had known this for quite

Page 516

1      some time.

2           You will, for example, see some documents from

3      their own mining records showing in the 1950s that it

4      was reported to them multiple times that there were

5      certain amounts of asbestos in their talc mines.

6           This is a memo that is an example of that.  It

7      is not about the -- it is not the mine report itself.

8      It is a memo from 1969.  It was a formerly

9      confidential Johnson & Johnson document.  They

10     produced it in this litigation.

11          Johnson & Johnson executives say it is normal

12     to find different levels of tremolite.  Our experts

13     will tell you that tremolite is one form of asbestos

14     in many US talcs.  Tremolite has been banned because

15     it has needle-type crystals.  Later in the memo, he

16     says some of that matches asbestos.

17          So the memo right next to it is another

18     example.  Johnson & Johnson company, Johnson &

19     Johnson executives say -- they talk about the mines

20     in this memo, and you will see the whole memo.  But

21     they also talk about their baby powder, and they say,

22     "Our baby powder contains talc fragments classifiable

23     as fiber."  That is that fibrous talc that we talked

24     about.

25          "Occasionally, sub-trace quantities of

Page 517

1    tremolite or actinolite are identifiable under an

2    optical microscope, and these might be classified as

3    asbestos fiber."

4         No evidence that warning bells went off at

5    Johnson.  No evidence that they told anybody about

6    this publicly.  In fact, they are going to say they

7    didn't.

8         Quite the opposite.  What they did, the

9    evidence will show, is they developed a three-pronged

10   attack to protect their marketing and their product.

11   The first one was deny, deny, deny.

12        So on the screen, I have a New York Times

13   article, and the New York Times article is about a

14   study that came out in 1982.  We are going to give

15   you the actual study.  We are going to introduce the

16   actual study.

17        The reason that I use the New York Times

18   article is because it has statements from Johnson &

19   Johnson that show their position.

20        So in 1982, there was a graduate student at

21   Harvard.  And I think -- I am not sure if he had his

22   PhD at that time, but he was a young researcher.  And

23   he did what's called an epidemiological study.  An

24   epidemiological study is where you study populations

25   of people and see if a substance -- it could be

Page 518

1    anything; it could be benzene, it could be

2    cigarettes, whatever -- causes cancer.

3         It is -- you will hear from the experts,

4    epidemiology is one of the basic ways in science that

5    we know how something leads to a different disease

6    state.

7         So this young researcher, who became one of the

8    preeminent researchers on this particular area, this

9    is his first paper on this.  And he does this study

10   and shows a statistically significant association

11   between genital talcum powder use and ovarian cancer.

12   And he publishes that, and he gives interviews about

13   it.  Here it is in the New York Times.

14        Johnson & Johnson responds by criticizing the

15   study as inconclusive, and then they say, We can

16   confirm that our talc doesn't contain any asbestos.

17        And you're going to see multiple statements

18   like that over -- like that from them over and over

19   again.  And they are even going to say that.  Johnson

20   & Johnson is going to say the same thing in this

21   courtroom.

22        But that's not all that happened with

23   Dr. Cramer.  He went on to do other research.  But

24   Johnson & Johnson actually at that time sent one of

25   their executives to meet him at Harvard.  And you're

Page 519

1          going to hear testimony that he told them to warn

2          their customers about this.  That's not what they

3          did.  They tried to convince, and they did so

4          successfully for a while, this young graduate student

5          not to give public interviews about the subject.

6               So that's the first prong of their attack.

7          Deny, deny, deny.

8               The second prong of their attack was to create

9          doubt about this science as it emerged.  Now, if you

10         can see, I jumped from early '80s to 1997.  You're

11         going to see various documents over various decades.

12         Obviously, we don't have time to look at the whole

13         historical record, but our experts put it in

14         chronological order from you.

15              This is a letter from one of Johnson & Johnson

16         consultants.  They paid him.  He was hired by them.

17         His name is Dr. Alfred Wehner and this is from 1997.

18         Dr. Wehner, the evidence will show, is writing to

19         Johnson & Johnson to talk about some statements it

20         was helping the Cosmetic Toiletries and Fragrances

21         Association put out.  Johnson & Johnson worked

22         through a Washington-based trade association to put

23         out some of these statements.  And you are going to

24         hear claims that there were other industry

25         participants involved in that as well.

Page 520

1          So they would get together, Johnson & Johnson

2     would say something, the CTFA is what we call it,

3     they would say something else.  And they were trying

4     to create doubt.  So in this private letter,

5     Dr. Wehner, who they hired, called them out on that.

6          So the CTFA was saying human studies on talc

7     and cancer in industrial settings have shown that

8     industrial exposure to talc, both by skin contact and

9     inhalation, even at levels thousands of times higher

10    than lifetime consumer exposure, presents no

11    significant risk.

12         What does Dr. Wehner tell Johnson & Johnson

13    about that statement?  He says that statement is

14    outright false.  They're making false statements and

15    their own consultant told them.

16         Another statement that the CTFA was making was

17    the workshop concluded that although some of these

18    studies suggested a weak association might exist,

19    when taken together the results of the studies are

20    insufficient to demonstrate any real association.

21         So the workshop is a reference to a group that

22    the FDA, the Food and Drug Administration, got

23    together to study this issue.  And you will hear some

24    more about that.

25         But basically the CTFA said, hey, there are all

Page 521

1          these studies now.  Remember, we are in 1982.  That

2          was the first one.  At this point there are more

3          studies, and they keep showing a statistically

4          significant connection between these things.

5              So the CTFA had attacked these and said there

6          is no real association.  Dr. Wehner says this

7          statement is also inaccurate, to phrase it

8          euphemistically.

9              He told them it was false.  That's what they

10          were doing.

11             And there was actually a third aspect of this

12          that -- we went back.  I'm going to go back here.  So

13          we are also going to introduce evidence that they

14          interacted with the regulators in a way that we think

15          was not ethical.

16             Instead of actually legitimately participating

17          in the science, you're going to see that the CTFA and

18          Johnson & Johnson and maybe some other participants

19          in the industry acted to confound the regulators.

20          Every time the regulators would try to make talc

21          recognized as a carcinogen, Johnson & Johnson and

22          sometimes some of its friends would get together and

23          go on this blitz and try to stop that from happening.

24          And, quite frankly, you will see evidence that was

25          successful.

Page 522

1           So in this courtroom, what I'm going to tell

2      you is that the evidence shows this is all like a

3      house of cards for Johnson & Johnson.  They told

4      people that their product was pure and safe.  It was

5      neither pure nor safe.  They told women that this was

6      best for your baby and best for you.  That wasn't

7      true either.  They said you could use it face to

8      feet.  Not true.  They said that it didn't have

9      asbestos in it, but you will see evidence in this

10     courtroom that it did.  They said it doesn't cause

11     cancer, but you are going to hear testimony and see

12     evidence in this courtroom that it did.  And that it

13     caused cancer in my client, Marilyn Seskin.

14          And then they deny, they deny, and they deny

15     it.  And all of this is going to fall down with a

16     single piece of evidence.  So for years you will hear

17     evidence in this courtroom that Johnson & Johnson

18     interacted with the FDA, with the Food and Drug

19     Administration.  And the FDA would occasionally test

20     talcum powder products, not just Johnson's baby

21     powder but other talcum powder products as well.  And

22     for a long time the FDA had never been able to find

23     the asbestos.  And there will be debate about why

24     that was.  Our experts found it and you will hear

25     some testimony about that.

Page 523

1              But something incredible happened in 2019.

2      Well, back up a little bit.  2018.  In 2018, the FDA

3      reached out to Johnson & Johnson, and said, We are

4      working on this issue.  Can you recommend a series of

5      experts for us?  And Johnson & Johnson sent them a

6      letter back and said, sure.  They recommended three

7      experts.

8              The first expert on the list was a gentleman

9      named Dr. Andreas Saldivar.  He worked with AMA Labs.

10     Johnson & Johnson used him in litigation cases just

11     like this and recommended that the FDA use them.

12     They didn't know what the FDA was going to do with

13     them, but the FDA hired them.

14             So in 2019 Dr. Saldivar gets a bottle of baby

15     powder off the shelf and he tests it.  And do you

16     know what he finds?  He finds chrysotile asbestos in

17     that bottle.  Okay.  You are going to hear evidence

18     in this courtroom that Johnson & Johnson, from their

19     own witnesses, asked Dr. Saldivar to withdraw those

20     results and asked the FDA not to finalize those

21     results.  They didn't withdraw them and they

22     finalized them.

23             It gets better.  So the evidence is going to be

24     that Johnson & Johnson knew it had a problem.  So

25     they got an executive.  They put him on a private

Page 524

1        jet, and they sent him down to Royston, Georgia.

2        What is in Royston, Georgia?  Royston, Georgia, you

3        will hear, is where Johnson & Johnson bottled baby

4        powder.

5             So at the bottler's factory -- you've got a

6        bottle FDA tested from the shelves, right?  In

7        Royston, Georgia, you've got what is called a

8        "control sample" where they bottle a lot of baby

9        powder.  This is not just Johnson & Johnson, it could

10       be any product.  They keep a control sample for, you

11       know, litigation like this or recalls or whatever.

12       They had issues that they need to keep it back there.

13       So this is something kept in a totally separate place

14       thousands of miles away.

15            Johnson & Johnson says, Well, we figure if we

16       can prove that control sample is clean, we've got no

17       problems right?  It could have been a contamination

18       somewhere out in the world.  They take that sample,

19       they put it on the private jet, they send it to RJ

20       Lee labs.  You may even hear from RJ Lee labs in this

21       case.  It's one of their favorite labs.  What do they

22       find?  Chrysotile asbestos.  The first test they run,

23       they find chrysotile asbestos in that control sample.

24            Now, I don't want you to think that is the last

25       word.  Johnson & Johnson has a response to that.

Page 525

1    They ask asked RJ Lee labs to retest that sample, and

2    then blamed it on contamination from an air

3    conditioner in the room.  But what you are not going

4    to hear is any explanation from where that asbestos

5    came from, how it got on that air conditioner, or why

6    that lab violated its own protocols.  And common

7    sense is going to tell you that you know what

8    happened.  The bottle had asbestos in it, and the

9    control sample had asbestos in it.

10        So I showed you the road into the courthouse.

11   It's my job and my team's job to show you the road

12   out of the courthouse, which is, you know, what your

13   job is and how you're going to make your decision.

14        So in order get out of the courthouse, we have

15   got to resolve this dispute.  I am going to bring you

16   evidence about Marilyn Seskin's talcum powder use

17   over her whole life.  There are three sources that

18   you will hear this from that are, I would call,

19   primary sources.

20        Our experts will talk about it, but they are

21   going to be relying on a sworn statement that Marilyn

22   filled out I think about two weeks before she died.

23   Her husband, Bob -- she wasn't well enough to even

24   write, really, so he would ask her the answers (sic),

25   he would write the answers down for her and she

Page 526

1    signed.  She signed the sheet.  So you are going to

2    see that.  And that's going to talk about her usage

3    some.

4        You are going to hear from her husband, Bob.

5    Bob is going to tell you that he did the laundry at

6    their house, he saw the baby powder in her underwear

7    when he did the laundry in their house.  He obviously

8    saw Johnson's baby powder around house.  He knew that

9    she used it as a deodorant.  I believe he is even

10   going to testify she wouldn't use a normal chemical

11   deodorant like Right Guard, like I use, because she

12   thought that it might have some harmful effects.  So

13   she used baby powder.

14       He's also going to talk about her using it on

15   her diaphragm.  His testimony will be that she used

16   it two to three times a day.  If she showered twice a

17   day, she would use it twice a day.

18       She used it liberally.  He is also going to

19   tell you she trusted the Johnson & Johnson name.  And

20   you are going to hear testimony that in close to the

21   time of her death she did not understand the

22   connection yet between baby powder and her ovarian

23   cancer, but she had ovarian cancer.  She was going to

24   go out of town, and the evidence will be, she said,

25   Bob, I need you to get me some baby powder.  Well,

Page 527

1    Bob went to the store -- and if you're a husband, you

2    have probably done this; if you're a wife, you have

3    probably had your husband do this -- he got the wrong

4    thing, some off-brand powder.  He brought it back,

5    and he said, Here's the powder.  And she said, No, I

6    don't want that.  You got to get me Johnson's baby

7    powder.  So she trusted that product.

8         You are also going to hear evidence from her

9    college roommate, because Bob and Marilyn were

10   married late in life.  They met in the early '90s.

11   So we got the testimony of her college roommate who

12   said, When we were in college, she always had a

13   bottle of baby powder in her dorm room.  We would go

14   on camping trips on the weekends.  The girls change

15   behind one bush, the boys change behind another after

16   we were swimming and she used baby powder.

17        If I recall correctly, the roommate is going to

18   say, I thought that was an odd practice for a college

19   student, but I saw her do it and she really believed

20   in the stuff.  And sort of said, Hey, do you want

21   some?  And Diana Ronell said, No, I'm okay.  But

22   we're going to show you that she used this product

23   her whole life.

24        So how are we going to prove that the product

25   did her any harm?  Well, you're going to hear from a

Page 528

1    series of expert doctors and scientists.  The first

2    expert you are going to hear from -- he is going to

3    testify by deposition; that means we have a videotape

4    of him -- is a treater and surgeon who took out

5    Marilyn's cancer.

6        His name is Dr. Thomas Morrissey.  And

7    Dr. Morrissey is going to tell us a couple of very

8    important things.  The first thing he is going to

9    tell us is that her cancer was high-grade serous cell

10   carcinoma.  High-grade serous cell cancer.  Why does

11   that matter?

12       The doctors are going the tell you that that

13   cell type is the one that is most frequently

14   associated with talcum powder use.  Cancer -- and I'm

15   not the expert -- but cancer basically has sort of

16   two aspects to it.  There is the cell type and there

17   is where it originates or where it shows up.  Both of

18   those things will be a subject of this case.  But she

19   had the type, high-grade serous cell, that is most

20   associated with talcum powder use in the literature.

21       This is Dr. Morrissey's record.  He is also

22   going to tell you that there was cancer on the

23   surface of both her ovaries, and that he diagnosed

24   her with primary peritoneal cancer.

25       This is on her certificate of death.  Her

Page 529

1    certificate of death calls it metastatic fallopian

2    tube cancer.

3        Why am I telling you all this?  I am telling

4    you all this because I anticipate that our experts

5    will testify that primary peritoneal cancer and

6    ovarian cancer of this nature, high-grade serous

7    cell, all start in the fallopian tubes.  And when

8    those cancer cells develop in the fallopian tubes,

9    they then migrate into the ovaries or the peritoneum

10   or both.  In Marilyn's case, it was both.

11       But I expect the defendants' experts are going

12   to make a big deal and say that primary peritoneal is

13   not the right type of cancer.  It is ovarian cancer.

14   Each of our experts will explain that they use these

15   terms interchangeably, they are treated the same, and

16   it is the appropriate cell type that was caused by

17   Johnson talc-based baby powder.

18       And this is just a diagram to show you.  This

19   is the peritoneum, the lining of that body cavity,

20   and this, these little yellow spots would be if you

21   had primary peritoneal, you would have some on your

22   ovaries, and you would have some in your peritoneum.

23       So the last part of our case -- I have got to

24   go back to my expert.  Sorry.

25       So our next expert is Dr. Arthur Sitelman.

Page 530

1        Dr. Sitelman is a pathologist.  He is going to

2        confirm what I told you about the cell type.  But he

3        is also going to say something very important.

4        Dr. Sitelman used a special microscope called a

5        polarized light microscope, we'll call it PLM.  And

6        he looked at tissue slides of Marilyn's ovaries and

7        her peritoneum under that microscope.

8            The reason he did that is because if you look

9        at tissue under PLM, there are a limited number of

10       particles that will be called birefringent.

11       Basically, he will tell you, in layman's terms, that

12       means they sparkle.  So there is only a limited

13       number of things that will sparkle.  Sand is one of

14       them, for example.  He will tell you some of the

15       others.

16           But talcum powder particles are also one of

17       those things that sparkle under that microscope.  And

18       he is going to tell you after looking at multiple

19       tissue slides from Dr. Seskin, he looked in the

20       literature, he understood her usage of the powder,

21       and he saw those particles, and they were the right

22       shape, the right morphology to be talcum-based baby

23       powder, and he believes those are talcum powder

24       particles embedded in her tissue from years of use of

25       Johnson's baby powder.

Page 531

1        The next expert gentleman named Dr. Mark

2    Rigler.  Dr. Rigler is a PhD.  He is not an MD.

3    Dr. Rigler's training is in microbiology, but you

4    might hear him refer to himself as a material

5    scientist.  He goes into different areas and looks

6    for minerals in people's tissue or in different

7    products.

8        So if you wanted to identify whether a product

9    had silica in it, Dr. Rigler knows how to do that.

10   If you wanted to figure out whether insulation had

11   asbestos in it, Dr. Rigler and his laboratory know

12   how to do that.

13       So what did they do in this case?  Dr. Rigler

14   and one of his colleagues gathered up, I believe it

15   was 70-something bottles of baby powder, and they

16   also got some rail car samples from the mine that

17   produced baby powder during certain time periods.  He

18   will tell you that they gathered these bottles from,

19   I believe, the '50s, the '60s, the '70s.  They went

20   all the way up to even the '90s or the 2000s.

21       And he tested those bottles of baby powder and

22   those rail car samples, and he found asbestos and he

23   found fibrous talc in between 70 and 72 percent of

24   the bottles he tested in the rail car samples for

25   Johnson's baby powder.

Page 532

1           So the next expert we have is a woman named

2      Dr. Ness.  Dr. Ness is incredibly important because

3      in this courtroom, you are going to hear Defendants

4      talk a lot about the studies that I mentioned.  There

5      is going to be a lot of discussion about the studies.

6           Why?  Because I anticipate the defendants will

7      want to criticize those studies.  Dr. Ness is so

8      critical because of all the witnesses that will show

9      up in this courtroom, she is the only one who has

10     ever done one of those epidemiological studies.  She

11     is one of the researchers that has done that work,

12     that has done the math, that has gathered the

13     information, and published and said, There is a

14     statistically significant association between this

15     product and ovarian cancer.

16          And she will explain what we in the legal

17     profession call general causation.  She is going to

18     explain to you just how the product causes cancer.

19     She is not going to talk about Marilyn.  She didn't

20     look at that.  She is going to tell you about the

21     research.  She is going to tell you about how this

22     product leads to primary peritoneal and ovarian

23     cancer in women like Marilyn Seskin.  And she is only

24     one in this courtroom who ever did one of those

25     studies.

Page 533

1          Now, the final doctor is Dr. Chan.  Dr. Chan is

2     a specialist in gynecological oncology.  He did not

3     treat Marilyn Seskin, but he is a specialist in that.

4     And he is going to tell you that he looked at the

5     testimony in this case, he looked at the medical

6     records in this case, he considered all of the risk

7     factors that Marilyn Seskin did or did not have in

8     this case, and that he believes that Johnson's

9     talc-based baby powder, her use of that product, was

10    a substantial contributing cause to Marilyn's cancer

11    and death.

12          And he looked at all of the things the

13    defendants are going to talk about.  They are, of

14    course, going to point to all manner of other things.

15    Dr. Chan considered those things, and at the top of

16    his list was Johnson's talc-based baby powder.

17          So the final element of our case is going to be

18    my client's damages.  And damages, in this case, I

19    want you to understand, are about Bob's pain and

20    suffering.  That is what Florida law says.  It is not

21    about her pain and suffering.  It is about what my

22    client went through when he was with her through

23    three years of chemotherapy and surgeries and what

24    he's gone through after without her.

25          This is obviously not a picture of Bob.  This

Page 534

1    is somebody -- Marilyn learned to play guitar.  She

2    took guitar lessons, and this is somebody who, near

3    the time of her death, Bob got to come and play her

4    Beatles songs because she liked that.

5         You are also going to hear that while Bob was

6    by her side, one of the doctors actually said to

7    him -- let me get this right.  It is very difficult.

8         So at the end of her life, Marilyn was told she

9    needed to go to hospice.  And she didn't want to go

10   to hospice because we all know what hospice means,

11   and I told you Marilyn was an anesthesiologist.  So

12   she knew all too well what that meant.

13        So Bob ran around the hospital.  He knew some

14   of the executives.  He knew some of the doctors.

15   You've got to keep her here.  You can't put her in

16   hospice.  You can't put her in hospice.  And one of

17   the doctors, he'll testify, basically said, Look, if

18   you don't go home, I am going to have two patients,

19   not one, because he was driving himself into such a

20   state with what was going on with her that he was

21   going to end up in the hospital.

22        So Bob is going to tell you about that.  That

23   is the best I can do.  I can't do a better job than

24   he will do, and you are going to hear that directly

25   from his mouth.

Page 535

1        I want to leave you with a final thought.  And
2    the final thought is this:  There are going to be a
3    lot of questions for you at the end of this case.
4    These questions aren't going to be on your verdict
5    form.  But I think that as you listen to all of the
6    evidence that you hear from the defendants and from
7    the plaintiffs, you can decide this case by asking
8    three questions every time a piece of evidence comes
9    up.
10        The first question is:  Who is telling the
11    truth?  Why should I believe this person or not
12    believe them?
13        The second question is -- and I am going to
14    forget my second question.
15        My second question is:  What does my common
16    sense tell me, right?  And it is just like that 2019
17    testing.  It is like, Hey, they found it in the
18    bottle, they found it in the lab, and then Johnson &
19    Johnson came up with some explanation.  Common sense
20    tells you where that goes, right?  It doesn't make
21    sense.
22        And then the final is:  What is the right thing
23    to do?  If you ask those three questions with every
24    piece of evidence and every witness and every
25    argument that the lawyers make, then I think at the

Page 536

1      end of this case, you are going to agree that I

2      proved my case for my client, and that he is entitled

3      to the things that we will ask for at the end of this

4      case.

5          I know you guys have been very patient.  Thank

6      you for your time.  And even though I don't agree

7      with the defense lawyers, I would ask you to give

8      them the same attention you have given me.  So thank

9      you.

10         THE COURT:  Thank you, sir.

11         Do you all want to stand up to stretch your

12     legs for just a moment?

13         And the defense can get set up, ready to do

14     your opening argument.

15         MS. BROWN:  Thank you.  Thank you very much,

16     Your Honor.

17         (Jurors exited the courtroom.)

18         (Jurors entered the courtroom.)

19         THE COURT:  All right.  For the record, all of

20     our jurors are present.  All the parties are present.

21         You may begin your opening statement.

22         MS. BROWN:  Thank you very much, Your Honor.

23         Good afternoon, everyone.  Thank you for coming

24     back today.  My name is Alli Brown, and I am here

25     with my colleague and my good friend, Hassia

Page 537

1    Diolombi, on behalf of the folks at Johnson & Johnson

2    and LTL.

3         So this morning, you heard the plaintiff's

4    lawyer just say some really bad things about Johnson

5    & Johnson, and he made some very serious allegations

6    about the people who worked there.  He accused us of

7    selling a product for babies that causes cancer.

8         And, unfortunately, sometimes that can be an

9    easy thing to do.  It can be easy to point the finger

10   at a big corporation like ours because lots of people

11   don't like corporations.  And you guys heard that

12   when you were here yesterday, right?  You heard some

13   of your fellow jurors who were really honest with us

14   and who raised their hands and said, I don't like

15   corporations.  I think corporations get away with too

16   much.

17        But you guys are back with us today because you

18   said that you could be fair.  You said that you could

19   put aside anything that you have heard in social

20   media, on the news, any personal experiences you have

21   had with corporations in your life, and judge this

22   case on the evidence and on the facts.

23        And the evidence and the facts and the science

24   and the truth in this case is going to be that

25   Johnson's baby powder did not cause Marilyn Seskin's

Page 538

1    very, very rare peritoneal cancer.

2         And one thing I want to make very clear to you

3    all from the beginning is that there is nothing that

4    Hassia and I do in defending this case and in proving

5    to you that Johnson's baby powder was not responsible

6    for Marilyn Seskin's cancer that is in any way meant

7    to disrespect Dr. Seskin, Mr. Sugarman, or take away

8    from the pain that that family obviously went

9    through, because cancer is a horrible disease.

10        And so in proving to you that Johnson's baby

11   powder had nothing to do with her cancer, we in no

12   way meant to take away from the pain that

13   Mr. Sugarman and the whole family has obviously been

14   feeling.

15        But you are here in the courtroom now, and we

16   have been sued for something that we did not do.  And

17   because Mr. Sugarman has brought this lawsuit,

18   plaintiff, and plaintiff alone, has the burden of

19   proving to you that the claims that they made in this

20   lawsuit are true and are supported by the science and

21   the evidence.

22        And we spoke a bit about the burden of proof

23   yesterday, and we talked about how their burden is to

24   get over 50 percent, to prove to you all that it is

25   more likely than not that baby powder was the cause

Page 539

1          of this rare cancer.

2               But to be clear, their scale doesn't already

3          start at 50 percent.  When they come into this case,

4          there is nothing on their scale.  They have to give

5          you enough evidence to get that scale all the way up

6          past 51 percent.

7               MR. OLIVER:  Objection.  Misstates the law.

8               THE COURT:  Ladies and gentlemen, the Court

9          will tell you what the law is.

10              And this should just be your opening statement.

11         What is the evidence going to show?

12              MS. BROWN:  Yes, Your Honor.

13              And what the evidence is going to show is that

14         plaintiffs cannot establish, because it is not the

15         truth, that Johnson's baby powder was responsible for

16         this cancer.

17              But what I am afraid is going to happen and

18         what we already saw happen in front of you all this

19         morning is that there is going to be an effort to get

20         you so mad at a big corporation that you turn away

21         from the facts and you turn away from the evidence

22         and you turn away from the science.  And I think the

23         way that is going to happen is by cherry-picking

24         little bits and pieces of documents to try and

25         suggest to you they say something that they don't.

Page 540

1          And I want to just show you a couple that

2     happened right here this morning to give you an

3     example of what I think is going to go on in this

4     trial.

5          If I could have the ELMO, Mr. Morales, for just

6     a minute.

7          So counsel shared these slides with me this

8     morning, and this is one of the slides that went up

9     for you all to see.  As counsel was arguing to you

10    that we knew in 1969, there is asbestos in baby

11    powder.  And he put up this document, and the title

12    of it is, "Johnson & Johnson Admits Asbestos in

13    Talc."  And what he didn't tell you and what he

14    didn't show you is this document is titled "Project

15    101.  Alternate Domestic Talc Sources."

16         What he didn't tell you, but what he knows

17    because he has the documents, is that Project 101 was

18    an effort to find the very best mines that we could

19    to use talc in our baby powder.  And what he didn't

20    tell you, but he knows it because he has the

21    document, is when we found out that those mines could

22    have something called tremolite, we terminated the

23    project.

24         He showed you a document about the Grantham

25    mine that we abandoned that we decided didn't have

Page 541

1          enough high quality talc to be able to use in our

2          baby powder.  But he put it up there as if it was

3          evidence that we knew there was asbestos in Johnson's

4          baby powder.  And that is just not the truth.

5              Another thing that you saw this morning was a

6          suggestion that our own consultant was telling us

7          that the trade association was saying things that

8          weren't right.  And this was another example where

9          this document wasn't put in front of you in its

10         entirety, but you sort of got this clipped-out piece.

11         And it doesn't represent what this entire document

12         said.  And it was put up there to suggest something

13         to you that's not true.

14             It was put up there to suggest to you that

15         Dr. Wehner had concerns about talc, about the safety

16         of talc.  But when you look at the whole document --

17         and I am going to make sure that it comes into

18         evidence so you could see the whole document -- you

19         will get to see what this document really is all

20         about.

21             You see, Dr. Wehner was a consultant for us,

22         and you're going to hear we had a lot of consultants

23         along the years who helped us look at the science and

24         make sure that we were keeping up with the

25         literature.  Dr. Wehner was one of those doctors.  He

Page 542

1    even published a paper reviewing all of the

2    scientific literature on talc.

3        And what Dr. Wehner was upset about in this

4    1977 document that went up on the screen is that the

5    trade association wasn't doing a good job explaining

6    the scientific literature.  He felt so strongly about

7    this scientific literature that he was critical of

8    the way the CTFA, or the trade association, was

9    describing it.

10       And the part of the document that you didn't

11   see in that little piece that was clipped out during

12   the presentation is this.  What he talks about is the

13   workshop.  This workshop was a 1994 two-day symposium

14   sponsored by the FDA as well as industry.  What he's

15   saying is the workshop did conclude that the results

16   of these studies were ambiguous, inconsistent,

17   contradictory, and therefore inconclusive.

18   Therefore, hygienic use of cosmetic talc does not

19   present a risk to the consumer.  So why not use these

20   powerful and irrefutable arguments instead of

21   questionable mush that leaves one vulnerable to

22   counterattack?

23       He believed in the science, and this letter is

24   all about how he thought we could better explain the

25   science, not how he thought people were making false

Page 543

1    statements.

2         And there are a number of other examples that

3    went -- what went on here this morning.  And so one

4    thing I will ask of you all is you listen to the

5    evidence come in is to wait for us, because the way

6    this works is we have to go second because we got

7    sued.  We're the defendants, but wait for us to make

8    sure that we can show you things, like what the rest

9    of these documents show, because I'm afraid there is

10   going to be an effort to continue on what happened

11   here this morning.

12        If I could go back to the PowerPoint, please.

13        What the evidence unquestionably is going to

14   show, folks, is that Johnson's baby powder did not

15   cause Marilyn Seskin's rare cancer.  Johnson's baby

16   powder has been used safely for over 125 years.

17   You're going to hear that Johnson's baby powder first

18   came to market in 1894.  Johnson & Johnson itself has

19   been in existence since the late 1800s.  And what the

20   evidence is going to show is that you don't stay in

21   business as long as Johnson & Johnson has by doing

22   the types of things that were alleged here this

23   morning, by selling a consumer product that causes

24   cancer.

25        We employ over 40,000 people in the United

Page 544

1    States.  You heard many jurors yesterday or some of

2    the folks that we employ right here in Miami.  And

3    over 150,000 employees worldwide.

4         And one of the things that's just not going to

5    make a lot of sense to you all as you sift through

6    the evidence in this case is this, Johnson's baby

7    powder is a very common product.  Almost everyone has

8    used or knows somebody who has used Johnson's baby

9    powder.  Hundreds of millions, if not billions, of

10   people in this country and around the world have used

11   the product.

12        But the disease that plaintiffs -- and you're

13   going to hear the disease that plaintiffs claim that

14   it causes is extraordinarily rare.  So there are over

15   160 million women in the United States.  Each year

16   only about, thankfully, 18,000 women are diagnosed

17   with ovarian cancer.  So that's like 0.011 percent of

18   women, an extraordinarily rare disease.

19        But Ms. Seskin didn't have ovarian cancer.  And

20   you're going to see that was important to Ms. Seskin.

21   This is a note that she wrote to her doctors.  You

22   are going to see she was very involved in her medical

23   care.  And one of her medical records accidentally

24   said that she had ovarian cancer.  And she sent this

25   note back and said, Hold on, the diagnosis is not

Page 545

1        correct.  I don't have ovarian cancer.  The pathology

2        was specific for primary peritoneal cancer.  It is

3        just treated the same.

4             And that's true and you will hear that.  These

5        are cancers that are treated in the very same way.

6        But the reason it's important is that primary

7        peritoneal cancer is even more rare than ovarian

8        cancer.  So while only about 18,000 women are

9        diagnosed with ovarian cancer each year, only a

10       little more than 1,000 women, thankfully, are

11       diagnosed with this disease every year.  That is

12       0.0007 percent.  It is an extraordinarily rare

13       cancer.

14            And so one of the things that is just not going

15       to make sense is that if this very, very common

16       product that we were all exposed to caused primary

17       peritoneal cancer, where is the epidemic of primary

18       peritoneal cancer?  Why are there only 1,000 people

19       being diagnosed with the disease each year?  It

20       doesn't make common sense.  The theory of the case

21       doesn't make common sense.

22            What you are going to hear is that public

23       health authorities like the National Cancer Institute

24       have identified risk factors for ovarian cancer and

25       primary peritoneal cancer.  And what you're going to

Page 546

1          hear is that Ms. Seskin unfortunately had many of

2          those risk factors.  What the evidence is going to

3          show in this case and what is the unfortunate truth

4          is that, like a lot of things in women's health, this

5          is a women's health issue.  This is a women's health

6          disease that we do not know the cause of.  We do not

7          know what causes ovarian cancer.  But we do know some

8          things that put women at risk.  And unfortunately

9          Ms. Seskin had many of those things.

10              Being over 50 puts you at risk.  The average

11         age of diagnosis for ovarian cancer is about 63.

12         Primary peritoneal cancer is a little bit older.

13         Ms. Seskin was 66 years old when she was diagnosed,

14         right about the average age for diagnosis.  Not

15         having kids -- and we'll talk about the science

16         during the case why it is -- but not having kids

17         actually puts a woman at risk for ovarian cancer.

18         And Ms. Seskin by choice did not have children, and

19         unfortunately that put her at risk.

20              Never using birth control puts you at risk for

21         ovarian cancer and primary peritoneal cancer.  And

22         that was the oral contraceptives, like the birth

23         control pill.  And that was the case, unfortunately,

24         for Ms. Seskin.  And so she had these first three

25         risk factors.  But she had others as well.

Page 547

1           Hormone replacement therapy can put -- and this

2      is the list from the National Cancer Institute, and

3      we'll talk about it.  They don't recognize talc.

4      They don't believe there is evidence that talc puts

5      you at risk for ovarian or primary peritoneal cancer.

6           But when it comes to hormone replacement

7      therapy, what you're going to hear is that, as a

8      doctor, actually, Dr. Seskin prescribed for herself

9      her own hormone replacement therapy.  And you will

10     get to see the medical records because her doctors

11     actually were a little concerned about it.  She was

12     prescribing HRT that she would fill at a compounding

13     pharmacy at levels that caused her hormones to be

14     high.

15          And you will get to take a look at those

16     medical records, and you will see her doctors'

17     concern about some of that.  But this use went on for

18     18 years.  And the literature and the public health

19     authorities also recognize that, unfortunately, as a

20     risk factor.

21          Dr. Seskin also had undiagnosed endometriosis.

22     You will hear that is another risk factor for ovarian

23     cancer and for primary peritoneal cancer.

24          Then we are going to talk a bit in this case

25     about genetic factors.  So these factors were

Page 548

1      considered by Dr. Seskin's treating physicians.  And

2      one of the genetic mutations you all might be

3      familiar with, BRCA1 one BRCA2.  Dr. Seskin did not

4      have those.

5           But there were other genetic considerations

6      that her treating physicians looked into.  One,

7      because she was of Ashkenazi Jewish descent, and you

8      are going to hear there is literature that being of

9      Ashkenazi Jewish descent can increase a woman's risk

10     of these cancers by up to 10 percent.  And so her

11     treating physicians, this was part of her genetic

12     consultation.

13          And then you are going to hear she was tested

14     for genetic mutations and had a genetic mutation

15     called FANCC, F-A-N-C-C, or FANCC or FANCC sometimes

16     is sort of the shorthand to it.  And you are going to

17     get to see her own notes of what she thought about

18     that genetic mutation.  This is Dr. Seskin's notes.

19     And it says FANCC gene could possibly have caused

20     this, may be the underlying explanation.

21          And you are going to hear that when it comes to

22     FANCC, science is developing, and I'm not suggesting

23     to you that that's the cause or that is what you are

24     going to hear, but you're going to see what

25     Dr. Seskin thought about that and what her genetic

Page 549

1    counselors thought about that.

2         This is a case where no treating physician has

3    concluded the facts that the plaintiffs are alleging

4    in this case.  Dr. Seskin, fortunately, and we will

5    talk about it, got some of the very best care in the

6    country and even beyond.  They were able to consult

7    with physicians even outside of our country.  And not

8    one of them concluded that talcum powder caused her

9    primary peritoneal cancer.

10        You are going to hear that she was treated at

11   the Cleveland Clinic, and the Cleveland Clinic has a

12   list of what causes ovarian cancer.  And what they

13   start with is what we know is the unfortunate truth.

14   The exact cause of ovarian cancer is not yet known.

15        But they have a list very similar to the one we

16   just looked at from the National Cancer Institute.

17   Not being pregnant, endometriosis, being over the age

18   of 60, these are things that put you at risk for

19   ovarian cancer and primary peritoneal cancer.  The

20   Cleveland Clinic does not recognize talc as a risk

21   factor for ovarian.

22        She was also treated at MD Anderson or sought

23   consultation at MD Anderson.  They, too, recognize

24   the similar risk factors for ovarian cancer:  Age,

25   family history, some genetic mutations, not having

Page 550

1       children.  They do not recognize talc as a risk

2       factor.

3            She was treated at Dana-Farber in Boston.

4       Again, family history, hormone replacement,

5       nulliparity, which means not having children.

6            She was also treated at the Cancer Institute of

7       America.  There was some consultation there.  And you

8       are going to get to see they, too, recognize the very

9       same risk factors and do not recognize, because the

10      science doesn't support it, that talc is a risk

11      factor for ovarian cancer or primary peritoneal

12      cancer.

13           And also back here at the University of Miami

14      Health System, also treated there.  And you are going

15      to hear, really, about some of the great work that

16      Mr. Sugarman did in facilitating Ms. Seskin being

17      able to go to all of these different institutions to

18      be able to get the very best care that she could, but

19      that none of these institutions recognize what they

20      are claiming in this lawsuit was the cause of ovarian

21      or primary peritoneal cancer.

22           You will get to hear from some of her treating

23      physicians.  Dr. Thomas Morrissey was her surgeon,

24      and he did a videotaped deposition that you will get

25      to hear about.  And he is able to tell you he did not

Page 551

1          conclude that talcum powder was the cause, he did not

2          recommend that anyone bring a lawsuit against Johnson

3          & Johnson for talcum powder, and that he endorses and

4          agrees with the National Cancer Institute when they

5          say that there is inadequate evidence that talc can

6          cause ovarian cancer or primary peritoneal cancer.

7               You are going to hear Dr. Brian Slomovitz who

8          was one of Dr. Seskin's treating physicians, and you

9          are going to be able to see an article that he's

10         written in the scientific literature criticizing

11         studies that try to link asbestos to ovarian cancer.

12         You will get to see his thoughts on some of the

13         allegations that are being made in this case,

14         published in the scientific literature.

15              And what you are going to see are the medical

16         records where Dr. Seskin's own doctors recommended

17         that she use cosmetic talc, even after she had been

18         diagnosed with cancer, even after she had been

19         diagnosed with cancer and was unfortunately

20         undergoing chemotherapy, she was experiencing chafing

21         on her skin.  And what did the doctors recommend?

22         That she use cosmetic talc, a way to prevent this.

23         You'll see, these are her notes of the medical

24         records, use Gold Bond medicated talc.

25              And one of the other pieces of information that

Page 552

1    you are going to have to sort through and figure out

2    if it makes sense is that both Marilyn Seskin and

3    Mr. Sugarman continued to use cosmetic talc, even

4    after they decided to bring the lawsuit against us

5    alleging that we had caused this cancer.

6        You are going to hear that even after the

7    decision was made to sue us, Marilyn Seskin continued

8    to use Johnson's baby powder in the very same way she

9    had been doing and continued to use it all the way up

10   through her unfortunate passing.

11       And you are going to hear, at least as of the

12   time that we were able to ask Mr. Sugarman questions

13   in something called a deposition, years after Marilyn

14   Seskin had passed away, he was using cosmetic talc

15   himself.

16       So you are going to have to sort through

17   whether that makes sense, whether he really believed

18   that a product has asbestos and causes cancer, you

19   would still use it yourself.  You would still keep it

20   in your house.  You would still let your loved ones

21   use it.  You are going to have to sort through that

22   evidence and figure out whether that makes any sense,

23   whether that supports these lawsuit claims.

24       You are going to hear that this question about

25   whether cosmetic talc can cause ovarian cancer or

Page 553

1        primary peritoneal cancer, it is not a new question.

2        This is a question that was raised by scientists

3        decades ago, and it has been studied in

4        epidemiology-like studies of people, in cell studies

5        and animal studies, literally for decades.

6            You are going to see studies from the '80s, the

7        '90s, the 2000s.  This is something that has been

8        well studied and proven conclusively not to be

9        supported by the science.

10           You are going to hear about two different types

11       of studies in people, forward-looking studies and

12       backward-looking studies.  So these epidemiology

13       studies happen in two ways, essentially.  Women who

14       are already diagnosed with cancer can be asked, Well,

15       you now have ovarian cancer.  Did you drink coffee?

16       Did you dye your hair?  Did you use talc for feminine

17       hygiene?  Those are what are called backward-looking

18       studies.

19           And there are some limitations on those studies

20       because once you have been diagnosed with cancer, as

21       you can absolutely understand, sometimes you are

22       really trying to find a reason for it.  And so when

23       you are asked to look back and recall what you ate,

24       what you did, did you dye your hair, your

25       recollection could be biased.  And it is a phenomenon

Page 554

1          called recall bias that is mentioned in all of those

2          studies, and we will talk about it.

3                The better studies are the studies that just

4          follow women, that just say, Let's fill out a

5          questionnaire as you go through life, and every year

6          tell me, you know, are you drinking coffee?  Are you

7          drinking alcohol?  Eating hamburgers?  And you don't,

8          sort of, have that recall bias because you are not

9          sick.  You are just telling what you are doing.

10               And those studies have been done by our

11         government, not by J&J, by government organizations

12         and have consistently shown no association between

13         talc and ovarian or primary peritoneal cancer.

14               One of the first ones that may be familiar to

15         you all is the Nurses' Health Study.  Big women's

16         health study, almost 80,000 participants.

17         Questionnaire ran '82.  There was a follow-up study

18         that went through 2010.  No association with talc use

19         in ovarian cancer.  Follow-up study was done.

20               Another big women's health initiative that you

21         may all be familiar with, the Women's Health

22         Initiative study.  Perineal or feminine use of talc

23         not associated with ovarian cancer.  This had 61,000

24         women.

25               And then there was a 2016 forward-looking

Page 555

1            study, the Sister Study, that found -- and this was

2            interesting -- it found, actually, douching was

3            associated with ovarian cancer, but talc was not.

4            And one of the reasons the epidemiologists are going

5            to tell you that is an interesting finding is because

6            it suggests that there might have been something that

7            was confounding the earlier studies on talc.

8                  So if you were looking -- there might be

9            something about women who use talc that could

10           actually be driving the increased risk, and this

11           study identified douching that nobody had ever

12           thought of up until that point.  So this was an

13           important study that you will hear about.

14                 But this wasn't it.  Just recently in 2020,

15           authors came along and published in JAMA, one of the

16           most prestigious medical journals, a pooled analysis

17           of all of this forward-looking data and some

18           unpublished data to date.  They put it all together

19           and said, Let's increase the power of these studies,

20           and let's see if we can find an association.

21                 And what they found with over 252,000

22           participants, over 3 million person-years, sponsored

23           by our government, no association between the

24           feminine use of talcum powder and ovarian cancer or

25           primary peritoneal cancer.

Page 556

1          What their case is going to be based on are a

2      handful of backward-looking studies that took place

3      many years ago and that reported to show a small

4      increased risk.  And each one of those studies shows

5      recall bias.

6          And the experts are going to talk about how,

7      statistically, they show it in the study, but you

8      will be able to see the studies themselves that

9      identify this entire small risk that we are reporting

10     here could be due to recall bias, could be due to the

11     fact that we asked women after they already had

12     cancer whether they used talc, and their

13     recollection, understandably, might not be that good.

14     And the epidemiologists will talk to you about those.

15          And that is why IARC, this international

16     organization whose purpose is to classify things that

17     do cause cancer or probably cause cancer or only

18     possibly can cause cancer, put perineal use of talc

19     in this low, limited evidence category with aloe vera

20     and pickled vegetables.  And the reason they said it

21     is because this bias or confounding couldn't be ruled

22     out of some of those early studies.

23          I am going to skip through this so we can keep

24     going.  We will talk about this with some of the

25     experts.

Page 557

1          This is also critical when we talk about the

2     scientific studies because the bulk of the exposure

3     that is alleged in this case is from a talc-dusted

4     diaphragm.  And, interestingly, these studies

5     examined that type of use specifically.  They said,

6     Let's look at women who specifically use talc on

7     their diaphragms.  Is there any increased risk?

8          And they consistently said no, and this last

9     study actually found it to be protective.  They

10    actually found women using talc on their diaphragms

11    had a statistically significant decreased risk of

12    primary peritoneal cancer and ovarian cancer.

13         So aside from the forward-looking studies that

14    address these cancers overall, the studies that look

15    at the particular way that Marilyn Seskin used this

16    product find no risk at all.  There is not a single

17    epidemiology study that concludes cosmetic talc

18    causes ovarian cancer or primary peritoneal cancer.

19         You are also going to hear about the cell

20    studies that have been done.  So in addition to

21    studying humans, scientists have said, Well, you know

22    if we take a petri dish of cells and we sprinkle

23    talcum powder on it, do the cells start to change in

24    a way that could be consistent with causing cancer,

25    precancerous changes?

1          And the studies over the years uniformly show

2     no malignant transformation, cancerous

3     transformation.  Are they looking like they are

4     starting to cause cancer?  No.  Nothing is happening.

5     The talc is going on the cells and literally nothing

6     is happening.  Nothing, nothing, nothing, nothing,

7     nothing.

8          Last year, someone reported to say, Oh, we

9     found malignant transformation.  We think we have

10     discovered talc causes cancer.  And this is truly

11     remarkable because this study was paid for by one of

12     the law firms of one of the plaintiff's lawyers in

13     this case.  So once the litigation started, the

14     lawyers paid this guy to do this study, and you will

15     see the disclosure.

16          And the real scientists who had a look at this

17     article to decide whether it should be published were

18     outraged, absolutely outraged.  And you are going to

19     get to see their comments where they say, The

20     authors -- so first of all, this is the article,

21     right?  "Paid for by lawyers representing plaintiffs

22     in talcum powder litigation."  It is actually some of

23     the lawyers you will see in this case.

24          The author -- this is what the real scientists

25     in the real world say when they look at this stuff.

Page 559

```
 1        "The authors' conclusions suggesting that exposure to
 2        talcum powder is associated with ovarian cancer are
 3        outrageous and not supported by the data.  The
 4        science, the methodology, and the data cannot be
 5        trusted."
 6            The cell studies uniformly show no malignant
 7        transformation, except for the one that can't be
 8        trusted.
 9            And then you will also hear about animal
10        studies.  Another way to know this product doesn't
11        cause cancer is you will look at what happens in
12        animals.  You will hear about animal studies that
13        were done looking specifically at -- rats don't have
14        ovaries per se, they have bursas, and these studies
15        look at whether or not there were changes in the
16        bursas of the rats and there were not.
17            And then on this issue with asbestos, you are
18        going to hear a ton about asbestos, there were animal
19        studies done with our talc, the talc that we put in
20        the baby powder, and they said, Okay, let's take
21        the -- I think it was rats or maybe hamsters in this
22        one, they said, Let's inject the animals with
23        asbestos and let's see if they get mesothelioma, an
24        asbestos-related disease.  And let's also inject them
25        with Johnson talc and let's see what happens.
```

Page 560

1              And as you would expect, when we injected them

2         with asbestos, they got the asbestos cancers.  When

3         we injected them with our talc, nothing happened.

4         The same thing -- they got the same result as with

5         the saline, which was the control group.

6              So you are going to see evidence from people

7         studies, cell studies, animal studies that will prove

8         to you that this product does not cause cancer.

9         Nobody who is in charge, not of litigation, but in

10        charge of our public health in this country concludes

11        that talc causes ovarian cancer or primary peritoneal

12        cancer.

13             And I can assure you folks it is not because

14        they have not been looking at this issue.  You are

15        going to hear about a robust history of oversight

16        from the FDA.  Starting back in the 1970s when this

17        idea that talcum powder might be contaminated with

18        asbestos first came up.  It came up and you will hear

19        about how scientists thought they were reporting

20        asbestos in baby powder, and everyone went -- the

21        alarm bells sounded, as you can imagine.  And the FDA

22        sprang into action, and they did testing in the '70s,

23        they did testing in 2010.  We will talk about how

24        sensitive their testing was in 2019, they picked up

25        three fibers of contamination.  And how they

Page 561

1    continued to test in 2021, not our talc, but 2022, no

2    asbestos.

3        You are going to hear about a long history.

4    And you are going to hear about something called a

5    citizen's petition, which is going to be important to

6    some of the allegations in this lawsuit.  You are

7    going to hear that citizens can write the FDA and

8    say, FDA, we think you should put a label on a

9    product, remove a product from the shelf, this is

10   what we think you should do.  In 1983, a cancer group

11   wrote the FDA and said we think there is asbestos in

12   baby powder, cosmetic talc.  We think you should put

13   a warning on it.  And you're going to hear about all

14   the work the FDA did to evaluate whether or not that

15   claim could be true.  And you will hear about their

16   conclusion that there is no basis to conclude that

17   there is asbestos in cosmetic talc or there is a

18   health hazard, and that no warning would be

19   appropriate.

20       You are going to hear in one of those letters

21   that you saw parts of this morning referenced this

22   1994 meeting.  Two-day workshop, over a hundred

23   scientists, fifty of them from industry, forty of

24   them from universities and government, looking at

25   this issue.  Right?  The first day was whether there

Page 562

1          was an inhalation risk with talc, the second day was

2          whether there was an ovarian cancer risk.  And then

3          they published their findings and you will get to see

4          them during the trial.

5              This is what they conclude:  In joint

6          evaluation, talc is proven to be one of the safest of

7          all consumer products.  To reasonable people.  Even

8          armed with reasonable concern for prudence, these

9          clues suggest that the probability of human risk is

10         likely nonexistent under customary conditions of use.

11             You're going to hear, specifically to ovarian

12         cancer, about another petition that was filed in 2014

13         asking for an ovarian cancer warning on talcum

14         powder.  You're going to hear about the robust

15         evaluation that the FDA did, and how the FDA denied

16         that petition because there was not adequate science

17         to support it.

18             Those are the claims that are being made in

19         this lawsuit, that there should have been an ovarian

20         cancer warning on the product, and the FDA looked at

21         that in 2014 and said no, the science doesn't support

22         it.

23             Real quick, I want to run through with you what

24         our public health authorities say about this issue.

25             National Cancer Institute as a public health

Page 563

1    service analyzes and groups risk factors for

2    different cancers.  For ovarian cancer, they have

3    factors that are adequately associated with ovarian

4    cancer.  They have factors that we aren't sure about,

5    uncertain factors.  And then they have factors that

6    there is inadequate evidence that it could be

7    associated with ovarian cancer.  And that is where

8    perineal talc exposure fits.

9        The data is inadequate to support an

10   association between perineal talc exposure and

11   increased risk of ovarian cancer, and in this, when

12   you get to see the document, you will see when they

13   are talking about ovarian cancer here, they are also

14   including primary peritoneal cancer.

15       American Cancer Society, weight of the evidence

16   does not support an association between ovarian

17   cancer and genital exposure to talc-based products.

18       This is the Society of Gynecologic Oncologists.

19   They, too -- so that is all of the cancer doctors who

20   take care of people who have ovarian cancer or other

21   gynecologic cancers like primary peritoneal,

22   fallopian tube, uterine.  They have a society.

23   Doctors do not know what causes most ovarian cancers.

24   They, too, do not recognize talc as a risk factor.

25   The American College of Obstetrics and Gynecologists,

Page 564

1          or regular OB/GYN, have their own society, do not

2          recognize talc as a cause, and in fact have a

3          statement that there is no medical consensus that

4          talc causes ovarian cancer.

5              Our Centers For Disease Control actually does

6          not recommend talc as a risk factor, but believe it

7          or not, they recommend genital use of talc as a

8          treatment for genital warts.  This is on their

9          website now.  This is from 2021, still on their

10         website today.  Recommending this use, our Centers

11         For Disease Control.

12             Just like with the epidemiology, no United

13         States public health authority concludes that

14         cosmetic talc causes ovarian cancer or primary

15         peritoneal cancer.  The evidence is going to be

16         overwhelming that the science does not support the

17         claims that are being made in this lawsuit.

18             I want to leave you with one final section.  I

19         know we have been doing a lot of talking at you today

20         and we did a ton of questioning at you yesterday, so

21         I really appreciate you guys being so attentive.  But

22         I do want to talk a little bit -- because there was a

23         ton of allegations about asbestos and fibrous talc --

24         about some of the things that we did to ensure that

25         Johnson's baby powder was safe and did not contain

Page 565

1      asbestos.

2             First of all, you are going to hear about

3      picking a mine where we got our cosmetic talc from --

4      was an enormous process that took many years.  It

5      wasn't a situation where we said, all right, this

6      mine looks good, let's put this in baby powder.

7             You're going to hear about all of the testing

8      that went on before we even approved a mine to be

9      suitable to get talc from to put in our baby powder.

10     And that is what that document I started with showing

11     you was all about.  We had a whole program looking

12     for alternative mine sources.  And when we found that

13     the talc wasn't suitable to our quality standards, we

14     rejected it.

15            So you are going to hear about the

16     qualification of the mine and the testing that went

17     on at every single step of the way.  For some period

18     of time, we owned the mine in Vermont here, and for

19     some period of time we bought talc from a supplier.

20     And what you are going to hear is when we bought the

21     talc, we demanded that it meet our specification,

22     that it be tested to be asbestos-free, that it had

23     all sorts of other requirements to meet our quality

24     standards.

25            But that is not where we stopped.  Because we

Page 566

1        sort of checked the work of these folks who were

2        telling us they were selling us asbestos-free talc.

3        And the way we kid it was by testing that went well

4        beyond the industry standard.  This is a document

5        from 1978 that talks about the way we were testing

6        our talc, and talks about exceeding industry

7        standards.

8            J4-1, you're going to hear was the industry

9        standard of how to test.  Two microscopes were used,

10       x-ray defraction and polarized light microscopy.

11       Since about the late '60s, early '70s, we went beyond

12       that for all of the talc that we sold, and we use the

13       most sensitive methodology, transmission electron

14       microscopy.  And even though our suppliers were

15       certifying the talc was asbestos-free, the talc was

16       of highest quality, we hired the best lab in the

17       country.  And even plaintiff's experts will agree

18       with that.  This is Walter McCrone.  He and his wife

19       Lucy owned McCrone Laboratories, and everyone on both

20       sides of the aisle are going to agree this was the

21       best microscopy shop available during the '70s, '80s,

22       and '90s.  This is the shop when historians wanted to

23       find out if Napoleon was poisoned with arsenic, they

24       sent it to Walter McCrone to look at under a

25       microscope.  Same thing with Beethoven and lead

Page 567

1      poisoning.

2           He is the published leader in the field, and

3      his shop was testing our talc according to our

4      specifications to make sure it was safe.

5           One of the things you're going to hear, I

6      suspect, is a lot about asbestos in this case.  And

7      one of the things that is going to be clear is that

8      asbestos is everywhere.  We are all exposed to

9      asbestos.  It is in the air, it was building our

10     schools, building our homes.  And that's something

11     that the FDA has considered over the years -- let me

12     just get my clicker to work.

13          That's one of the things that the FDA has

14     considered over the years.  So when the FDA was

15     looking into this issue back in 1996 and they denied

16     the citizen's petition, they said, We don't think

17     there is asbestos in cosmetic talc.  We're going to

18     run something called a worst-case estimate of

19     exposure.  We're going to assume that there is

20     0.1 percent asbestos in cosmetic talc.  Would that

21     present a health risk to the consumer?

22          And they did a whole study on it and they

23     concluded everyone at 0.1 percent, which is a ton

24     more than is even being alleged in this case,

25     0.1 percent -- no health hazard because it would it

Page 568

1          would be less than what we're exposed to just walking

2          around the United States of America where asbestos

3          was used to build our country for many, many years.

4              So you are going to see the documents that

5          assure there was no asbestos, and even what they're

6          alleging in this case -- this is Dr. Rigler, he's

7          going to come in and say, on average, there was

8          0.0001 percent.  Even if you take them at their word,

9          that is a hundred times less than what the FDA said

10         was not a health hazard.

11             And we are going to talk, I imagine, quite a

12         lot about the contamination event that the FDA picked

13         up in 2019.  But even if you take what they found in

14         that one lot, 0.000002 percent, 5,000 times lower

15         than what the FDA said was not a health hazard.

16             And this is a good thing.  The fact that the

17         FDA was able to pick up three fibers in one line --

18         in one sample, showed that their program of

19         oversight, their program of testing and monitoring

20         cosmetic talc issues was working.  They were testing

21         from the most sensitive methods and they were able to

22         pick out what turned out to be a contaminated sample.

23             And you are going to get to see the 155 tests

24         that Johnson & Johnson did to confirm that that

25         bottle where they found three fibers in was

Page 569

1    contaminated.

2        We had a statistician tell us you would have to

3    do 23 tests of the bottle before, the bottle after,

4    the retained lot, to assure yourself that this was

5    contamination and not the talc.  That wasn't enough

6    for us.  We did 155.  155 tests, no asbestos

7    detected, to assure that the product was safe and

8    that it didn't have asbestos.

9        So we will talk about, in this case, some of

10   that testing that was done over the years, but I want

11   to just leave you with this.  Mr. Sugarman has some

12   of the bottles that he claims Dr. Seskin used.  And

13   he produced them in this lawsuit.  And as we talked

14   about at the beginning, the plaintiffs in this

15   lawsuit, they have the burden of proof.  They sued

16   us.  They have the burden of proving to you what they

17   say is true.

18       And you are going to be surprised, I think, to

19   learn they didn't test a single one of those bottles.

20   They have the bottles that they claim she used, that

21   they sued us over, that they claim have asbestos,

22   they have an expert who tests bottles for asbestos

23   and they didn't give them to us.  They didn't test

24   them.

25       You will have to sort through that and figure

Page 570

1    out why.  If it is true that they have asbestos, why

2    didn't he test them?  And then you are going to hear

3    in terms of the tissue, the pathology that exists of

4    Marilyn Seskin's surgeries where there is actual

5    tissue, they have an expert who digests that tissue

6    to look for asbestos.  He didn't do it here.

7         They have an expert who can look at pathology

8    under a proper microscope and see if there is talc or

9    not.  They didn't give it to the expert who uses the

10   microscope who can do that test.

11        You are going to see that even the

12   lower-powered microscope that they used to identify

13   what Counsel called a sparkly particle that could be

14   dirt, could be sand, could be anything, even that,

15   even if what he was identifying was talc, there is no

16   reaction in the tissue.  You are going to see there

17   is no inflammatory response.  There is nothing to

18   suggest that whatever that particle is, that it could

19   possibly be causing cancer through an inflammatory

20   response.

21        So some of the things you are going to have to

22   sort through as the evidence comes to you in this

23   case is if the plaintiffs have the burden of proof,

24   if the bottles of the tissue are available, why was

25   none of this done?

Page 571

1          I would submit to you all that the evidence is

2      going to be overwhelming, the scientific evidence is

3      going to be overwhelming that this product is safe

4      and does not cause ovarian cancer or primary

5      peritoneal cancer.

6          I would ask that you keep an open mind as you

7      see snippets of documents come to you because I

8      suspect they are going to be shown in a way they were

9      shown this morning, in a misleading way to suggest to

10     you something that is not true.  So keep an open

11     mind.

12         The way it works, we come second in the case,

13     and we very much look forward to putting on this case

14     and proving to you this product is safe.

15         Thank you all so much for your attention.  I

16     appreciate it.

17         THE COURT:  All right.  Thank you.

18         Ladies and gentlemen, your option.  We can take

19     lunch now, or we can take lunch at 1 o'clock.

20         Now?  All right.  We will be in recess until

21     1 o'clock.

22         Remember, you cannot discuss the case amongst

23     yourselves or with anyone else.  No independent

24     research.  And the parties are going to avoid you.

25     And if there is any reason anyone should attempt to

Page 572

1          communicate with you about the case, please bring

2          that to my attention as soon as you possibly can.

3                Enjoy your lunch.

4                (Jurors exited the courtroom.)

5                THE COURT:  All right.  Anything anyone wants

6          to bring to my attention?

7                Enjoy your lunch.  See you back here at 1

8          o'clock.

9                (Thereupon, the proceedings concluded for the

10         morning at 12:13 p.m., and will continue in Volume

11         4.)

12                            -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    Page 573

 1                          CERTIFICATE

 2

 3              I, ELIZABETH CORDOBA, Registered Merit

 4      Reporter, Certified Realtime Reporter, Florida

 5      Professional Reporter, certify that I was authorized and

 6      did stenographically report the foregoing proceedings and

 7      that this transcript, pages 432 through 573, is a true

 8      record of the proceedings before the Court.

 9                  I further certify that I am not a relative,

10      employee, attorney, or counsel for any of the parties nor

11      am I a relative or employee of any of the parties'

12      attorney or counsel connected with the action, nor am I

13      financially interested in the action.

14

15              Dated this February 14, 2024.

16

17

18

19                          *E Cordoba*

20                          ELIZABETH CORDOBA
                            Registered Merit Reporter
21                          Certified Realtime Reporter
                            Florida Professional Reporter

22

23

24

25

Page 574

```
 1        IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
             IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2                  CIRCUIT CIVIL DIVISION
 3               CASE NO.: 2019-017627-CA-01
 4
 5  ROBERT A. SUGARMAN, Individually and as
    Personal Representative of the Estate of
 6  MARILYN WENDY SESKIN,
 7            Plaintiff,
 8  v.
 9  JOHNSON & JOHNSON, JOHNSON & JOHNSON
    CONSUMER, INC., f/k/a JOHNSON & JOHNSON,
10  CONSUMER COMPANIES, INC., and PUBLIX
    SUPER MARKETS, INC.,
11
            Defendants.
12  _____/
13
14                   *   *   *
15                 Volume IV
16               Pages 574 - 733
17                   *   *   *
18
                   Miami-Dade County Courthouse
19                 73 West Flagler Street
                   Miami, Florida 33130
20                 Tuesday, February 13, 2024
                   1:07 p.m. - 4:40 p.m.
21
22        This cause came on for trial before the
23  Honorable William Thomas, Circuit Court Judge, taken
24  by Christine Savoureux-Mariner, FPR and Notary
25  Public in and for the State of Florida at Large.
```

```
                                                       Page 575

  1    APPEARANCES:
  2    ATTORNEYS ON BEHALF OF THE PLAINTIFF:
  3            LANCE V. OLIVER, ESQUIRE
               LAURA K. STEMKOWSKI, ESQUIRE
  4            MOTLEY RICE, LLC
               28 Bridgeside Boulevard
  5            Mount Pleasant, South Carolina  29464
               (843) 216-9061
  6            Loliver@motleyrice.com
               lstemkowski@motleyrice.com
  7            tfamiloni@motleyrice.com
               rmazingo@motleyrice.com
  8
  9            MICHAEL J. PENDELL, ESQUIRE
               MOTLEY RICE, LLC
 10            20 Church Street
               Hartford, Connecticut 06103
 11            (860) 882-1681
               Mpendell@motleyrice.com
 12
 13            LEIGH O'DELL, ESQUIRE
               BEASLEY ALLEN LAW FIRM
 14            272 Commerce Street
               Montgomery, Alabama 36104
 15            (334) 269-2343
               Leigh.odell@beasleyallen.com
 16
 17            NICHOLAS REYES, ESQUIRE
               THE ALVAREZ LAW FIRM
 18            355 Palermo Avenue
               Coral Gables, Florida 33134
 19            (305) 444-7675
               Nick@talf.law
 20
 21    ATTORNEYS ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:
 22            SYDNEY SCOTT, ESQUIRE
               GIBSON DUNN & CRUTCHER, LLP
 23            811 Main Street
               Suite 3000
 24            Houston, Texas 77002
               (346) 718-6963
 25            Sascott@gibsondunn.com
```

```
                                                 Page 576

  1    APPEARANCES: (Continued)
  2              ALLISON BROWN, ESQUIRE
                 SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
  3              One Manhattan West
                 395 9th Avenue
  4              New York, New York 10001
                 (212) 735-2173
  5              Anthony.balzano@skadden.com
                 Allison.brown@skadden.com
  6              joseph.caruso@skadden.com
  7
  8              HASSIA DIOLOMBI, ESQUIRE
                 SHOOK HARDY & BACON, LLP
  9              2555 Grand Boulevard
                 Kansas City, Missouri 64108
 10              (816) 474-6550
                 Hdiolombi@shb.com
 11              Hdiolombi@shb.com
 12
 13              MICHAEL RAYFIELD, ESQUIRE
                 SHOOK HARDY & BACON, LLP
 14              One Rockefeller Plaza
                 Suite 2801
 15              New York, New York 10020
                 (212) 989-8844
 16              Mrayfield@shb.com
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

Page 577

1                        I N D E X

2   PROCEEDING                                        PAGE

3   Continued Trial Proceedings                       578

4

5                      W I T N E S S E S

6   PLAINTIFF'S                                       PAGE

7   DR. LAURA PLUNKETT

8      Direct Examination By MS. O'DELL               584

9

10

11                      E X H I B I T S

12  PLAINTIFF'S          DESCRIPTION                   PAGE

13  Exhibit 2561         Material Safety Data Sheet    640

14  Exhibit 2559         Patent Application            681

15  Exhibit 2026         J&J Document                  686

16  Exhibit 2041         J&J Document                  689

17  Exhibit 2569         Meeting Minutes               704

18  Exhibit 2562         Petition to the FDA           709

19  Exhibit 2373         Response to Citizen Petition  712

20  Exhibit 2010         Response to Original Petition 714

21  Exhibit 2531         Johnson & Johnson's Response  718

22

23

24

25

Page 578

1              (Trial proceedings continued at 1:07 p.m.)

2              MS. BROWN:  Your Honor, can we raise one quick

3         issue with the Court, please.

4              THE COURT:  Absolutely.

5              MS. BROWN:  Thank you.  There is something

6         that was subject to a motion in limine in the

7         proposed slide deck for this witness and Ms. Scott

8         was going to raise it with the Court, with your

9         permission.

10             THE COURT:  Let's go, quickly.

11             MS. SCOTT:  Yes, of course, Your Honor.  So

12        motion in limine number 20, we're seeking to

13        exclude warnings on talc products that were not

14        manufactured by J&J.  It came up because we saw

15        that in Ms. Plunkett's direct sides.  We also have

16        the demonstrative here.  Those warnings on other

17        manufacturers' talc products is not relevant to

18        this case.  That involves Ms. Seskin's use of

19        Johnson & Johnson baby powder.

20             No other -- the allegation is she didn't use

21        any other baby powder, and so whatever warnings are

22        on other products aren't relevant or probative.  I

23        think what they are going to try to say is that

24        these warnings on other people's products go to

25        establishing some sort of industry standard, but

Page 579

1          these warnings came after this talc litigation

2          started and is responsive to that, rather than

3          setting some industry standard that J&J was

4          allegedly supposed to follow back in time.

5               MS. O'DELL:  Your Honor, these manufacturers

6          began to warn in 2017.  These bottles are from 2017

7          when Ms. Seskin was using talcum powder.  They show

8          that the industry standard, people were

9          acknowledging that you should warn -- manufacturers

10         were warning of the risk.

11              There was discussion yesterday about other

12         manufacturers, and so we think it's relevant to

13         show that there were other manufacturers

14         manufacturing body powder with talc that recognized

15         the standard was, if there is a hazard, you shall

16         warn and they did.  And they have a specific

17         ovarian cancer warning.

18              And this is in 2017 and these are bottles that

19         Dr. Plunkett found on her own and she is -- they're

20         relevant to you should have warned, they're

21         relevant to the industry standard, they're relevant

22         to how the FDA regulatory standard is applied.  So

23         we feel like they are very probative and they

24         should be admitted, just for demonstrative

25         purposes, to juxtapose the J&J baby powder label

Page 580

1    with these labels at the same time period.

2        MS. SCOTT:  Your Honor, as Ms. O'Dell

3    mentioned, these are from 2017, just after

4    Ms. Seskin was diagnosed with her cancer.  And in

5    addition, I mean, we have actually a website

6    printout from one of the manufacturers that says we

7    take women's health -- basically they're saying

8    there is no scientific proof to support this, but

9    we are just putting this on here for an abundance

10    of caution.

11        Why?  Because now Johnson & Johnson, that's

12    been three years later, three years of litigation,

13    Johnson & Johnson has been sued so now we are going

14    to put a warning.  That's not probative.

15        THE COURT:  Did any other company making talc,

16    did they put any warnings on their products?

17        MS. SCOTT:  As to ovarian cancer?

18        THE COURT:  Okay.

19        MS. SCOTT:  Not until after these lawsuits

20    were filed.

21        THE COURT:  When was the first lawsuit filed?

22        MS. SCOTT:  2014, Your Honor.

23        THE COURT:  So since 2014, there are other

24    companies that have put labels on their -- warning

25    labels on their product?

Page 581

1          MS. SCOTT:  Years later.  I mean, the example

2     that we have here is going to be 2017.

3          THE COURT:  But why can't they ask the

4     question whether or not the Johnson & Johnson was

5     aware of the fact that there were other companies

6     who made talc who put labels on the product?

7          MS. SCOTT:  Because one, Your Honor, it's

8     irrelevant.  Again, to the extent they want to put

9     this in for industry standard, the relevant time

10    period is -- this is outside of the relevant time

11    period.

12         THE COURT:  No, she didn't get cancer in 2014.

13         MS. SCOTT:  She got it in 2016, but these

14    specific products that they want to show is from

15    2017.

16         THE COURT:  I'm not sure whether or not you

17    should show the product, but I think you can ask

18    the question.  I don't know if you can compare the

19    label from 2017 to, I guess, Johnson & Johnson's

20    label, but I don't see the problem with you asking

21    the question:  Did other companies, in 2014 or

22    prior to your client, whenever your client was

23    diagnosed, did other companies put labels on

24    their -- other companies that manufactured talc,

25    did they put labels?  They did.  And your person

Page 582

1      can say they did.

2           MS. O'DELL:  Your Honor, we can definitely do

3      that.  We think a picture is always worth a

4      thousand words and so -- but I'll ask her that

5      question.  She will say specifically for ovarian

6      cancer and just so the --

7           THE COURT:  She can say that too.  I don't

8      have any problem with her saying that.

9           MS. O'DELL:  So the Court is aware, this is

10     during a time period when Ms. Seskin was continuing

11     to use the product, and I think that's relevant.

12     The other aspect as well is Ms. Scott has suggested

13     that the only thing that was going on in the world

14     was litigation, that's actually not true.  There

15     was a lot of scientific evidence.

16          THE COURT:  So the objection is sustained in

17     part and overruled in part.  I'm not going to allow

18     you to use the demonstrative and show the label,

19     but I am going to allow your expert to testify, if

20     your expert can, that during the time that

21     Ms. Seskin used the product, other companies that

22     made talc put warning labels on their product and

23     you can even enlist the testimony that those

24     warning labels included warnings as it relates to

25     ovarian cancer.

Page 583

1          MS. O'DELL:  Thank you, Your Honor.

2          MS. SCOTT:  One point just for the record,

3     Your Honor.  This is also highly prejudicial.  It

4     would lead the jury to have the inference that just

5     because other folks put labels on their products

6     for reasons completely unrelated to the science,

7     that Johnson & Johnson somehow fell below some sort

8     of standard.  And it would require us to engage in

9     a sideshow that we are engaging in now, which is

10    what motivated those other manufacturers to put

11    those labels on their product.

12         THE COURT:  You can ask that question.  I

13    don't know what you all keep saying.  All of your

14    favorite words is "sideshow."  I don't know if

15    that's code for something, but -- okay.  The jury

16    is coming in.

17         MS. SCOTT:  Thank you, Your Honor.

18         THE COURT:  Mr. Rios is saying he's having an

19    issue with his employer.  They are not going to pay

20    him.

21         (The jury enters the courtroom.)

22         THE COURT:  For the record, all of the jurors

23    are present making their way to their seats.  All

24    the parties are present.  All right.

25         All right.  Plaintiff, call your first

Page 584

1      witness.

2            MS. O'DELL:  Your Honor, we call Dr. Laura

3      Plunkett.

4  Thereupon:

5                 DR. LAURA PLUNKETT, PH.D., DABT

6            Was called as a witness and, having been first

7  duly sworn and responding "Yes, I do," was examined and

8  testified as follows:

9            THE COURT:  You can have a seat.  Give us your

10      full name, spell your last name for the record,

11      please.

12            THE WITNESS:  My name is Laura Massey Plunkett

13      L-A-U-R-A, M-A-S-S-E-Y, P-L-U-N-K-E-T-T.

14            THE COURT:  You may inquire.

15            MS. O'DELL:  Thank you, Your Honor.  Good

16      afternoon everyone.

17                    DIRECT EXAMINATION

18  BY MS. O'DELL:

19      Q    Good afternoon, Dr. Plunkett.  Would you

20  please introduce yourself to the jury.

21      A    Sure.  My name is Laura Massey Plunkett.  I

22  live in Houston, Texas.  I'm a consultant.  I own my own

23  company and I'm here to talk about issues in this case.

24      Q    Thank you very much.  I'll let you get settled

25  there.  Since you're getting your notebook set, I'll

Page 585

```
 1    make sure you're in good shape.
 2            Would you please just tell us a little bit
 3    about your professional background.  First, are you a
 4    pharmacologist?
 5        A    Yes, I have a doctoral degree in pharmacology
 6    from the University of Georgia.
 7        Q    And what are your other years of expertise?
 8        A    So I'm also Board certified in toxicology --
 9            THE COURT:  I need everything off the screen
10            unless it's already in evidence.  You may proceed.
11            THE WITNESS:  I'm Board certified in
12            toxicology and have been since 1993.  I'm also a
13            registered patent agent and I practice in the areas
14            of pharmacology, which we'll talk about in just a
15            minute, toxicology, intellectual property, which is
16            my patent work, and also I deal with regulatory
17            issues with my clients.
18    BY MS. O'DELL:
19        Q    So as we begin, Dr. Plunkett, would you mind
20    just describing and explaining what pharmacology is.
21        A    Sure.  So in simple terms, pharmacology is
22    what drugs or chemicals do to the body.  So most of us
23    are familiar with drug products we take at the pharmacy
24    and we take them for a purpose, and that purpose is what
25    pharmacologists study; what is it that the drug can do
```

Page 586

1    to your body once you ingest it.

2        Q    And you mentioned you're a toxicologist.

3    Would you describe what toxicology is and what that

4    involves.

5        A    So toxicology is very similar.  It's a study

6    of what chemicals or drugs do to the body, but it's

7    looking at the undesired or adverse, or we'll use the

8    word toxic, effects; the things you don't want to happen

9    or that it could be harmful to your health.

10            MS. O'DELL:  Your Honor, may I put up a slide

11        that summarizes Dr. Plunkett's qualifications?

12        It's not evidence, just for demonstrative purposes.

13            THE COURT:  No.

14    BY MS. O'DELL:

15        Q    Are you Board certified?

16        A    I am.  I just said --

17        Q    I'm sorry, forgive me if you just said that.

18            And let me ask you this:  Do you have

19    expertise in regulatory matters, and would you explain

20    to us what that involves?

21        A    Sure.  Yes, I do.  So in the federal

22    government here in the U.S., the different agencies that

23    are responsible for oversight of different kinds of

24    products that we're exposed to every day have a set of

25    rules called regulations, and what I do is I work with

Page 587

1    clients that may be developing a product that is

2    regulated as a drug or a medical device, food or

3    cosmetic.

4            I also work -- and that's through the FDA, and

5    I assist them in understanding what the regulations are,

6    what are the rules for developing the product, how can I

7    develop my product and actually make it to the

8    marketplace, what do I have to do, what kind of

9    information do I have to provide to the FDA, the Food

10   and Drug Administration, to obtain that approval

11   process.

12           I also worked with companies in another

13   regulatory agency called the Environmental Protection

14   Agency -- we may refer to it today as the EPA -- and

15   they regulate a different class of products.  They

16   regulate things such as household chemicals, industrial

17   chemicals, things that -- plastics and things like that

18   that make a variety of products we're exposed to.

19           They also regulate a group of products called

20   pesticides, which are products that are used in the

21   agriculture industry, to ensure that we can feed the

22   world with the safe food supply based upon the needs

23   that we have in order to feed the population.

24           But there's rules around that.  You know,

25   pesticides can have harmful effects and we have to

Page 588

1    follow the rules in order to get those products onto the

2    market.

3        Q    Okay.  Would you describe for us what we've

4    asked you to do in this case.  When we reached out to

5    you and asked you to participate in this case, what was

6    the role or the job we asked you to consider?

7        A    Sure.  So I was asked to look at the

8    substances that are in Johnson's baby powder and

9    determine whether or not there were any substances in

10   the powder that could cause a harm to health, to a

11   human, injure a human body in some way.

12            And then I was additionally asked to look at

13   the substances in that product and that issue related to

14   the harm that could be produced in light of the

15   regulations that exist, and how a cosmetic company

16   must -- what types of rules are around that they need to

17   worry about when they're putting a product on the

18   market.

19            So how does that profile of the cosmetic

20   ingredients or the product itself, the baby powder, fit

21   into that regulatory standards or rules that exist here

22   in the U.S.

23       Q    Okay.  And Dr. Plunkett, you mentioned just

24   briefly something.  I would like for you to just

25   describe your educational background and how it applies

Page 589

1    to this case.

2        A    Sure.  So my degree -- well, my first

3    Bachelor's degree was in zoology.  Sounds like a little

4    odd linked to what I do today, but zoology is actually

5    the study of physiological systems in a variety of

6    organisms, all the way from a snail up to a mammal.

7             And so it was a very useful degree for me then

8    when I went to extend my training into pharmacology.  I

9    was always interested in the way that human health can

10   be affected by exposures to things, such as a drug, and

11   that's what pharmacology is, understanding when you take

12   a drug, what happens to your body, how can you develop

13   products that actually treat disease.  So it was a good

14   fit for me when I was interested in doing further study

15   beyond my Bachelor's degree.

16            And then I did a post-doctoral training at the

17   National Institute of Health, and there I extended my

18   training and went from something that I call a whole

19   animal pharmacologist -- I used to be very interested in

20   looking at the whole organism and understanding how the

21   drug affects the whole organism, the live organism, and

22   I extended my work to be looking at the cellular level

23   and understanding how it is that drug exposures or

24   chemical exposures are affecting systems within your

25   body and how those systems in your body within the cell

Page 590

1    are responsible for the way that the drug produces the

2    desired effect or the chemical can produce the undesired

3    effect, depending on what it is that you're trying to

4    study.

5              And toxicology is an extension of what I did

6    because the original work that I did on my training, I

7    was actually looking at the toxicity of a drug in

8    humans.  So it was a general flow for me to move into

9    more work that didn't just look at understanding how

10   drugs may produce their beneficial effects or chemicals

11   can produce effects that you want them to produce, but

12   also looking at when it becomes harmful and

13   understanding the full spectrum of the kinds of effects

14   you can get from exposure to either a drug or a chemical

15   in your environment.

16       Q    And those chemicals could be in drugs or they

17   could be in cosmetics, for example; is that fair?

18       A    Yes, that's exactly right.

19       Q    So would you tell us about your work

20   experience.

21       A    So I started out, after I did my post-doc at

22   NHI, I took a faculty position at the University of

23   Arkansas in the medical school, and I was an assistant

24   professor in the pharmacology department and I had

25   accepted appointment to the toxicology department.  And

Page 591

1    there, I did what most academic scientists do; I did

2    research in a laboratory in areas that I was interested

3    in.

4            I also taught medical students in the second

5    year.  There's a course in pharmacology they had to

6    take.  I taught graduate students in the laboratory and

7    also in courses at the university.  And I was there for

8    about a little over three years.

9            And then after that, my family moved to the

10   Washington, D.C. area.  And in the D.C. area, I kind of

11   switched my career.  Went from an academic career into

12   what I do now, I just did it for a company.  I worked

13   for a company in D.C. originally called Environ, and

14   that's where I became involved in consulting projects

15   and actually got into the regulation of products and

16   understanding how my background in pharmacology and

17   toxicology fit into the way that the different federal

18   agencies set the rules for what products can be on the

19   market.

20       Q    Okay.  Have you published in what's called the

21   peer-reviewed literature?  And as you answer that

22   question, would you mind explaining what it means to

23   have peer-reviewed literature.

24       A    Sure.  Scientists, especially in academics,

25   are required to -- are expected, actually -- to take the

Page 592

1    work they do and make it available for others so they

2    understand what did I find and I'm going to explain it

3    to my colleagues.

4           And you do that in medical journals or

5    scientific journals.  And in order to get the work put

6    into those journals, you have to submit your work for

7    review by others in your field.  They are called --

8    that's what the peer-review process is.

9           So I published a number of articles in

10   peer-reviewed journal and it's a typical process that a

11   scientist -- I still do that today just because I'm not

12   working in a lab.  There are things I do and there's

13   journals that I submit articles to that are appropriate

14   for the kinds of analyses in the work I do today outside

15   of actually working in a laboratory.

16      Q    And what are some of the topics that you

17   published on?

18      A    So over the years, I've published on the

19   issues of cancer risk, looking at some of the issues

20   related to why it is that cancer may have developed in

21   an animal.  I've published on pharmacology, basic

22   studies I did in my laboratory at the University of

23   Arkansas on a variety of different kinds of drug

24   exposures.

25           I published on pharmacology -- pharmacological

Page 593

1    effects or the way that chemicals change cellular

2    mechanisms within drugs.  I've also published in the

3    area of toxicology generally looking at adverse effects

4    that could be produced by chemicals and talking about

5    how to put those toxic effects into the context of what

6    could be safe or not for a human being to be exposed to.

7         I've also published in the areas of regulatory

8    policy or regulatory standards as well for different

9    kinds of consumer products.

10        Q    Are you an expert in the area of government

11   regulation as it relates to cosmetics and

12   pharmaceuticals to toxicology, pharmacology, and

13   cariogenicity?

14        A    Yes, I am.

15        Q    Who are you employed by now?

16        A    So I now own my own company.  It's called

17   BioPolicy Solutions, and this company has been in

18   existence since 2020.

19        Q    And what type of work do you do as a part of

20   BioPolicy Solutions?

21        A    So it's the same kind of work I've been doing

22   since I joined Environ.  Since I joined Environ and I've

23   had two other companies I had before this.  I've had

24   different business partners, so we've changed the name

25   over the years.

Page 594

1          I do three basic practices.  As I said, I'm a

2    registered patent agent.  So since 1997, when I started

3    that kind of work on my own, I work with inventors,

4    mostly in the university systems, and I help them get

5    patent protection, so apply for a patent to the U.S.

6    patent and trademark office.

7          I also work with small companies that are

8    spinning out their first products and do sort of reviews

9    of the landscape of what opportunities are out there to

10   commercialize based on whether they do or don't have a

11   patent protection for their particular products.  I

12   also, since I joined Environ, had a lot of experience

13   working with clients in what I call the regulatory

14   space.  So variety of different kinds of products that

15   are regulated.

16         I'm going to focus mainly on the Food and Drug

17   Administration here because that is the regulatory

18   authority that is involved with cosmetics.  I have

19   worked on all different kinds of products regulated by

20   the FDA, but particularly in the cosmetics base, since I

21   joined Environ, and I've continued to do that, even to

22   today.

23         I have worked with cosmetic companies or

24   cosmetic ingredient manufacturers on product safety

25   assessments, on compliance with the regulatory framework

Page 595

1    that exists in the U.S., but also internationally as
2    well because different places in the world regulate
3    these products differently.  I've looked at labeling
4    issues for products.
5             I've looked at marketing and promotional
6    materials because there's certain things you can and
7    can't say depending on the kind of product that you're
8    talking about.  And for cosmetics, there's certain
9    things you can and can't say on the labels.  You can't
10   make health claims, for example, about a cosmetic
11   product.
12            I've looked at issues about contamination,
13   whether or not certain contaminants, things that could
14   be harmful in a cosmetic and what the issues would be
15   for exposure through that kind of product.
16            So it's been a wide range and a wide range of
17   different kinds of ingredients I've looked at, colors,
18   preservatives, what I call penetration enhancers
19   chemicals, that the reason they're in the product is in
20   order to help the ingredients that you want to get
21   through the skin, actually get in deeper into the skin,
22   moisturizing, anti-aging ingredients, ingredients that
23   are called bio-actives, which means that -- there's a
24   lot of cosmetics on the market now that talk about
25   wrinkle reduction, anti-aging, and those are things that

Page 596

1   actually have pharmacological activity in your skin, but

2   you have to get it into the skin to have that effect

3   occur.

4        Q    So have you provided guidance to cosmetic

5   companies about the ways in which they should comply

6   with FDA regulation?

7        A    Yes, exactly.  The clients I've worked with, I

8   have done that.

9        Q    Are you doing that currently with clients?

10       A    Yes, I currently am.

11       Q    Have you done that frequently over your

12  25-year career in this -- as part of your work?

13       A    Yes.  Especially in the last 15 to 18 years,

14  I've done more work than I used to do, I'd say, in the

15  first ten years of my career.  At Environ, we did work

16  with the cosmetic industry, but a lot of the work that I

17  have done in this area, in this space, has been more in

18  the last 15 or so years.

19       Q    Okay.  You were talking about -- let me ask

20  you this question before I go there:  In relation to

21  your work with cosmetics, have you also evaluated the

22  presence and the effects of heavy metals in cosmetic

23  products?

24       A    Yes, I have.  When I mentioned contaminants,

25  heavy metal is something that can be considered a

Page 597

1    contaminant, something that could hurt you, and so you

2    don't want that in the cosmetic product, particularly if

3    you think the heavy metal has some way it can penetrate

4    through the skin and actually get into your body.

5         Q    What would you estimate your percentage of

6    time, particularly over the last 10 to 15 years, has

7    been spent working in relation to the cosmetics base?

8         A    As I said before, I don't have an exact number

9    but it's probably about 10 to 15 percent of the time

10   that I have spent with my regulatory clients.

11        Q    Let me take you back.  You mentioned Environ,

12   which is a company you worked for earlier in your

13   career.

14             What type of work did you do for Environ,

15   specifically some of the chemicals or compounds that you

16   looked at as a part of your work there?

17        A    Sure.  So there's two that I worked on at

18   Environ that are actually relevant to the issues in this

19   particular case.

20             When I was at Environ, we did a project

21   looking at talc as a dusting product for condoms, and

22   that work was looking at -- was spurred -- we were

23   working for a condom manufacturer and the work was

24   spurred by the questions that would be raised about

25   whether or not there was a safety concern if talc was on

Page 598

1    the surface of a condom for women that would be exposed

2    through the vagina when the condom was touching the

3    surfaces internally.  There was some studies or some

4    issues that had been raised in issues about local

5    irritation and inflammation, but also it had been

6    discussed about a risk of ovarian cancer at that time as

7    well with talc exposure through this route.

8            And then I also worked at Environ on asbestos.

9    So there was a couple of projects we had that were

10   related to different industries and looking at exposure

11   mainly through inhalation pathways, but looking at the

12   issue of whether or not the worker injuries were

13   consistent with what the literature would indicate could

14   happen when you were exposed to asbestos.

15           So we were doing a risk assessment based on

16   exposure levels and what types of toxic effects asbestos

17   can cause.

18       Q    Okay.  I want to take you back a moment to

19   your work in relation to evaluating the potential risk

20   of talc being used on a condo.

21           As a part of your work, did you recommend that

22   the condom industry or those manufacturers stop using

23   talc on condoms?

24       A    My conclusion was that -- and others that were

25   working with me on the product -- was that talc could

Page 599

1    injure tissue and that it could be harmful.  And it was

2    eventually -- well, the condom manufacture industry

3    eventually removed talc as a dusting powder from their

4    products.

5            But that was the conclusions that I reached

6    and the individuals at my company that were looking at

7    this issue, talc could injure tissue could be toxic to

8    tissue when there was an internal exposure, such as on

9    the surface of a condom.

10    Q    And as a part of your work, do you interact

11    routinely -- and you mentioned some of these -- with

12    government agencies such as the FDA and others that

13    regulate chemicals and other compounds?

14    A    Yes.  In the work I do with my regulatory

15    clients, it requires me, at different times, to actually

16    have direct discussions with FDA, meetings.  I mean, I

17    had a meeting earlier last week with FDA group about one

18    of my clients and the issues that we're dealing with in

19    order to gain an authorization from the FDA for a new

20    type of food ingredient.

21    Q    In addition to your work as a patent agent and

22    what you've described in terms of consulting with

23    manufacturers, do you also do litigation work?

24    A    I do.

25    Q    Obviously, you're here.

Page 600

1    A    And I didn't mean to not mention that.  I

2    think you asked me a question about --

3    Q    This is typical.  I probably asked not the

4    best question, but you gave a good answer.  So please

5    tell us about your litigation work.

6    A    So that's the third area in my practice.  So I

7    work -- have been working, since I joined Environ, on

8    litigation cases involving injuries of humans typically

9    to certain kinds of exposures, chemicals or products,

10   drugs, medical device -- things that are in medical

11   devices, different chemicals, different failures of a

12   medical device.  I've looked at food issues; is there a

13   safety concern with certain kinds of contaminants found

14   in a food product in a litigation context.  And I've

15   continued to do that over the years.

16        I do do product liability, that's what I would

17   call this litigation, and I've worked with cosmetics,

18   medical devices, drugs, and dietary supplements in the

19   litigation space.

20   Q    What percentage of your professional time is

21   devoted to litigation?

22   A    So it depends on the month, but the average

23   for me is about a third of my time is spent in

24   litigation.  It just depends on one month to six-month

25   period.  I did very little during the pandemic because

Page 601

1    there was little active litigation going on.

2            MS. O'DELL:  Your Honor, Dr. Plunkett has

3        testified to all the elements on the slide.  Do you

4        mind if I display it for the jury?

5            THE COURT:  No.

6    BY MS. O'DELL:

7        Q    Dr. Plunkett, is that an accurate summary of

8    what you've been testifying to as part of your

9    background and qualifications?

10       A    Yes, I believe so.

11       Q    You mentioned your litigation work and the

12   percentage of time that you do that.  Have you been

13   approached by opportunities to participate in litigation

14   and decline them?

15       A    Yes.  That's the way I look at these cases,

16   exactly.

17       Q    How do you make the decision on whether you

18   get involved in a case or not?

19       A    So if I get a call or contact from somebody

20   about a new litigation area, something that I've not

21   done before or even a new case that I've not looked at

22   before in same area, I ask for some facts.  If it's

23   something that I'm familiar with, I may be able to go

24   back and look at things I've already collected, or I'll

25   collect information, do a several-hour review, ask the

Page 602

1    lawyer to potentially give me some information about

2    what the case involves, and then I make a decision based

3    on whether or not I think I can support the issues in

4    the case or not.  So I do turn down cases on a regular

5    basis.

6         Q    So you've testified -- shared with the jury

7    what we asked you to do in this case.  But once you

8    agreed to consider working with us, what methodology did

9    you employ?  What did you do to inform your opinions in

10   this case?

11        A    So since this case involves both issues

12   related to what I call the science of toxicology and

13   human health injury, as well as regulatory issues as

14   well, I did a broad search of the literature on the

15   issues that I was asked to address.  So I looked for --

16   went through the scientific literature looking for

17   information related to the toxic effects or the safety

18   issues related to talcum powder and the different

19   ingredients.  I think we are going to get into that

20   later, so I won't go into it.

21             But there's specific individual substances

22   that are found within the talcum powder bottle, so I was

23   looking across that literature.  In this particular

24   case, this is a product that's been on the market for

25   such a long time, that literature searching and look

Page 603

1    took me back to the 1920s with some literature on the

2    safety of talc.  But that's -- a lot of times that isn't

3    the case.  I can't go back that that far, but this one I

4    could.

5              And the regulatory part of the case, what's

6    important is often to understand not only what could be

7    known by looking at the scientific literature, but you

8    need to understand what does the company know about the

9    safety of the product or what kind of information did

10   the company have when they made a decision to put a

11   product on the market.  So that kind of information is

12   not public.  I can't typically go and find that by doing

13   a search in the medical literature or even an internet

14   search.

15             So that typically requires me to do what I did

16   in this case, which is to look at documents that are

17   produced by the company as part of a process called

18   discovery where the company makes documents that are

19   from their company available for somebody like me to

20   look at.  In this case -- and this isn't always the

21   case, but in this case, I was given access to a very

22   large database of documents that had been turned over by

23   the defendant, and I actually went through them on my

24   own looking for things related to the safety of talc and

25   the different constituents, looking at discussions, for

Page 604

1    example, asbestos as an issue, fibers are an issue.  I

2    looked for those kinds of documents in their internal

3    discovery.

4         I also looked at deposition testimony of

5    corporate witnesses to understand what the company said

6    about their history of how they handled this product

7    over time, you know, questions that may have been asked

8    internally and understanding how the company handled

9    those issues.  I looked at the FDA website to understand

10   if there was anything the FDA has said about these

11   particular products over time.

12        And then I looked within the internal company

13   documents as well to look at their -- any interactions

14   they had had with either the Food and Drug

15   Administration or other regulatory authorities around

16   the world about either the safety of their product or

17   some of the constituents and substances that are

18   associated with harm that may exist in their product.

19        So there were thousands of documents that I

20   looked at over time and I've been working in this area

21   for about six years, so it's not that I did it all in

22   the last two months.  Over the years, I've looked at

23   those thousands of documents and hundreds and hundreds

24   of pieces of scientific literature.

25        Q    Dr. Plunkett, do you recall approximately how

Page 605

1   many documents you -- company documents you looked at to

2   reach your opinions in this case?

3      A    So I believe it's greater than 5,000 at this

4   point when we counted it up, based on the number of

5   documents that have been used and are in boxes.

6      Q    Okay.  Let me ask you a couple other questions

7   about this area.

8           Did you perform a systematic review?  Did you

9   look at everything and analyze it in a systematic

10  approach?

11     A    Yes, I do.  As a scientist, when I'm trying to

12  answer a question about whether or not I believe, for

13  example, that something can cause harm or there can be a

14  safety concern, I don't just look for articles that say

15  it's not safe, I look at across all the information I

16  can find that is relevant to the issue of can it cause a

17  toxic effect, can it cause harm to an individual.  So it

18  is looking for evidence that exists or information that

19  exists across the universe of studies that have been

20  done.

21          And I'm not just interested in studies that

22  are in people or in humans, if they exist, but I'm

23  interested in animal studies because they tell me a lot

24  about how actually injury can occur.  And then I'm also

25  interested in studies that might have been done in a

Page 606

1    test tube or petri dish, cell studies.  I talked about

2    having training in that in the past.  Those are really

3    informative to understand why it is, for example, that

4    you might have people saying talc, in this particular

5    study, shows a relationship to cancer.

6           Why could that be?  And so you ask those

7    questions as a toxicologist, so you're looking at

8    mechanism, understanding what are the underpinnings for

9    why it makes sense that talcum powder could be

10   associated with cancer.

11   Q    Have you used the same care in your work for

12   this case that you use outside of litigation?

13   A    Yes, that's correct.

14   Q    And approximately how many hours have you

15   spent on this litigation?

16   A    Over the six years, I think it's over 1,400

17   hours now.

18   Q    And what's your rate per hour?

19   A    It's $300 an hour.

20        MS. O'DELL:  Your Honor, at this time I would

21        offer Dr. Laura Plunkett as an expert in the areas

22        of pharmacology, toxicology, FDA cosmetic

23        regulatory framework, and cosmetic industry

24        standards.

25        MS. BROWN:  Your Honor, consistent with our

Page 607

```
 1        earlier objections, we would object to the FDA

 2        regulatory framework and industry standards.

 3              THE COURT:  Next question.

 4   BY MS. O'DELL:

 5        Q    Dr. Plunkett, I'm going to ask if you would

 6   summarize your opinions in this case.  And have you

 7   prepared a slide that summarizes your opinions?

 8        A    Yes, I did.

 9              MS. O'DELL:  Your Honor, may I have permission

10        to put the slide on the screen?

11              THE COURT:  You may.

12   BY MS. O'DELL:

13        Q    Please summarize your opinions that you plan

14   to offer in this case.

15        A    Sure.  When I told you what it is that I was

16   asked to do, this first kind of summarizes that.  I've

17   looked across the information that's available and I

18   formed the opinion that asbestos, fibrous talc, and

19   platy talc in Johnson's baby powder create a significant

20   human health hazard from when the product is used in the

21   genital area.

22              The second opinion I formed has to do with

23   that historical look across the literature, and based

24   upon what I have seen since the 1960s, Johnson & Johnson

25   failed to warn consumers of ovarian cancer risks based
```

Page 608

1    on what information existed starting in the 1960s.

2         The third area is also related again to that

3    what's in the bottle.  It's my opinion that Johnson &

4    Johnson's failure to list these toxins, asbestos and

5    fibrous talc, for example, on its baby powder label is

6    consistent with FDA's definition -- I think we are going

7    to define these later -- of misbranded or an adulterated

8    product.

9         I've also formed the opinion that the

10   Johnson's baby powder, when you apply it to the genital

11   area, can migrate.  So it can move from outside the body

12   to inside the body going into the ovaries and the

13   peritoneal cavity causing inflammation as the mechanism

14   leading to cancer.

15        I've also -- again, in looking at the

16   literature as well the internal company documents that I

17   mentioned, it's my opinion that cornstarch is a safer

18   alternative to talc-based Johnson's baby powder.  And

19   the last opinion is that Johnson & Johnson failed to

20   protect consumers as a responsibility company looking at

21   my experience with the industry while interacting with

22   the regulatory agencies.  And again, we are going to

23   talk a little bit about the Food and Drug

24   Administration.

25        The other acronym here, NTP, stands for the

Page 609

1    National Toxicology Program, the other agency here in

2    the U.S., and then also Health Canada.

3         Q    Do you hold these opinions to a reasonable

4    degree of scientific certainty?

5         A    I do.

6         Q    Let's switch and talk about the regulatory

7    environment or the rules of the road for cosmetics

8    specifically, and maybe I should start there.  The jury

9    has heard from counsel this morning and a little in voir

10   dire about Johnson's baby powder, but under the U.S.

11   regulatory scheme, what type of product is Johnson's

12   baby powder?

13        A    It's cosmetic.

14        Q    And would you please define what a cosmetic is

15   under the FDA definition?

16        A    So the FDA, for any product it regulates,

17   actually has a specific definition.  So I'm going to

18   read that here just because it's important to understand

19   what the FDA calls it.

20             A cosmetic is an article intended to be

21   rubbed, poured, sprinkled, or sprayed on, introduced

22   into, or otherwise applied to the human body for the

23   purposes of cleansing, beautifying, promoting

24   attractiveness, or altering the appearance.

25             So I think these are the kinds of things that

Page 610

1    all of us probably understand if you go to the pharmacy

2    and look at in the cosmetic aisle, that's the kinds of

3    products you'll see.

4        Q    By definition, does that mean that a cosmetic

5    does not have a medical benefit?

6        A    Yes, that's correct.  Cosmetics are not being

7    marketed, they are also not regulated as a product that

8    has a benefit.

9        Q    And you mentioned the Food and Drug

10    Administration and their responsibility over cosmetics,

11    so let's talk about that.  You know, what is their

12    authority to regulate cosmetics and have you prepared

13    slide that will help explain how they regulate?

14        A    Yes, I did prepare a slide because I think

15    it's important to understand the details.

16             MS. O'DELL:  May I have permission?

17             THE COURT:  If there's no objection.

18             MS. BROWN:  No objection.

19    BY MS. O'DELL:

20        Q    So let me ask that again.  Would you please

21    explain what the FDA's authority is or is not over

22    cosmetics.

23        A    So unlike most of the products that FDA as

24    oversight of, such as drugs and medical devices, for

25    example, FDA has no responsibility for actually saying

Page 611

1    or developing the information to show that the product

2    is safe.  It's the company who markets the product that,

3    before it puts it on the market, must ensure that the

4    product is safe.  And it's all on them.  They have the

5    legal responsibility to ensure that the products they

6    market are safe.

7         Q    Have you prepared a slide that would compare

8    the FDA's responsibilities versus a company's

9    responsibility in marketing a product?

10        A    Yes, I have.

11             MS. BROWN:  Your Honor, I would just object to

12        the reading of the slides.  I think counsel --

13             THE COURT:  Sustained.

14    BY MS. O'DELL:

15        Q    Without reading the slide, Dr. Plunkett,

16    please explain what a company's responsibility is versus

17    what the FDA's responsibility is.

18             MS. BROWN:  Your Honor, can we take the slide

19        down?

20             THE COURT:  Remove the slide, please.

21             THE WITNESS:  Sure.  That's fine.

22             As I said, the company is responsible for

23        ensuring the product is safe before it's marketed.

24        Unlike other products that exist that the FDA

25        regulates, there is no premarket process for

Page 612

1    review.  So it's the company that must do that

2    safety assessment on its own and they market their

3    product.  It is only after the product enters the

4    market that FDA has specific responsibilities that

5    it is then going to undertake.

6        So that means that it's the company that does

7    the initial safety assessment, chooses their

8    ingredients based on the safety that they have to

9    define on their own and develop on their own.  They

10   are responsible for doing any testing.  If, for

11   example, they choose to put an ingredient in their

12   product and it doesn't have a basis of information

13   to show that it's safe, they are responsible for

14   doing testing to make sure that it is safe.

15       They are responsible for developing the label

16   for the product, which will tell you what is in it,

17   so the ingredients.  They are responsible for

18   listing those ingredients on the label.  They are

19   responsible for the labeling on the product and

20   putting information that truthfully tells what is

21   in the bottle and who makes the product.

22       But it is also responsible for putting other

23   information on the label that may give the consumer

24   information to understand how to use the product

25   safely because, again, it's all about safety for

Page 613

1    these particular products.

2        They are also responsible for making sure that

3    when they manufacture the products, the

4    manufacturing, they do so in a manner that doesn't

5    make the product unsafe.  So they have to make sure

6    the facility where the products are produced are

7    clean.  They have to have standards for the

8    ingredients that they put in the product.

9        So again, that's how they can ensure from time

10   to time and bottle to bottle that the product

11   they're selling is, indeed, as safe as it was the

12   date entered the market.  And that's another

13   important thing that the companies must do.

14       They are the ones that are responsible for

15   ensuring the product is safe, even after it is

16   marketed.  So they must continue to monitor their

17   products and understand if new scientific

18   information comes out that raises questions about

19   safety.  And they have to look again at the safety

20   of their product.

21       That is their job.  The FDA doesn't do any of

22   those things.  Those are all the things that the

23   company themselves must do.

24       And for other product categories, like drugs

25   and devices, things that have medical applications,

Page 614

1          some of those things are actually done by FDA and

2          certainly FDA is involved with looking at the

3          safety and the use of the products before they are

4          allowed on the market, and that is not the case for

5          cosmetics.

6     BY MS. O'DELL:

7          Q    Who has the ultimate responsibility for

8     ensuring that a cosmetic product is safe?

9          A    It's the company.  And that's from the day the

10    product first enters the market throughout the entire

11    time that the product is marketed.  It is up to the

12    company to ensure it is safe.

13         Q    Does the FDA approve the labels that go on

14    cosmetics?

15         A    No, there is no approval of labels.

16         Q    Does the FDA approve the ingredients that go

17    into a cosmetic product?

18         A    No.  Again, the company chooses their

19    ingredients that are put in the product.

20         Q    And in terms of the therapeutic benefits, you

21    said there is no therapeutic benefit, by definition, of

22    a cosmetic?

23         A    That's correct.

24         Q    And does that speak into the fact that this is

25    the regulatory framework?

Page 615

1          A    Yes, that's exactly right.  If there was a

2    therapeutic benefit or medical benefit for the use,

3    there is an ability, particularly when FDA looks at

4    these -- say a drug product before it goes on the

5    market, they can make a decision to weigh the risks and

6    the benefits.

7               So if there is a benefit, for example, if you

8    develop a drug to cure cancer, save lives, that is a

9    benefit that you may be willing to accept a little risk,

10   a little safety issue with the drug because the benefits

11   outweigh the risks.

12              That doesn't happen with cosmetics.  It's all

13   about is it safe because there is no benefit that is

14   being assigned to that particular product.

15         Q    Let's talk about the industry, for example,

16   specifically the industry standard for warning.  And

17   what is that standard in relation to the warning that

18   should be on cosmetics?

19         A    So there is a section of the FDA regulations,

20   740.1 is the number that's assigned to it, if you go to

21   the book called the Code of Federal Regulations and you

22   find it.  And it is a regulation that deals with

23   putting -- it's called establishment of a warning

24   statement.

25              It is the standard or the information that

Page 616

1    tells what it is that you're supposed to do as far as

2    how you judge whether or not a warning needs to go on.

3    What is the level of evidence or the type of information

4    that's needed in order to add a warning to a label of a

5    cosmetic product.

6        Q    Okay.  And have you prepared a slide that

7    outlines the FDA regulatory standard?

8        A    Yes, it gives the language of it.

9        Q    Thank you.  And so what is the regulatory

10   standard for having a warning on a cosmetic?

11       A    So the standard is very different from a

12   standard, for example, for a drug.  Many people have

13   read drug labels, that's why I keep pointing to that.

14   You go to the pharmacy, you'll see a warning section.

15   On the cosmetic product, the standard for putting a

16   warning on the product is the product shall bear a

17   warning whenever necessary or appropriate to prevent a

18   health hazard that may be associated with the product.

19             So it is may be associated, prevention of a

20   health hazard is the standard that applies to when a

21   warning should go on.  It's very different than the

22   standard, for example, for adding a warning to a drug

23   where the standard is not an issue of may be associated,

24   but where you have information that it's more likely

25   than not that there is actually a health hazard

Page 617

1   associated with a product.

2        Q    And once there is an identification of a

3   hazard that may be associated with a product, is the

4   requirement to warn, is it voluntary or is it

5   essentially commanded by the statute?

6        A    So in my experience, based upon working in

7   this industry, this is a mandatory standard for the

8   industry.  In other words, you're being -- if you look

9   at the language of the regulation, the product shall

10  bear a warning.

11       So it is the understanding that it's not you

12  may decide you want to put a warning, but it's giving

13  you a standard for when the warning should be put there.

14  And in my experience, that's what I have seen in terms

15  of the types of warnings that may be added to cosmetics.

16       Q    Is there a requirement that there be a

17  conclusive causal relationship between the product and

18  the potential hazard?

19       A    No, and that's why the language talks about

20  may be associated.

21       Q    And why is that important to have that

22  particular standard?

23       A    Because this is a product that has no benefit.

24  And so the idea is that, if something has the potential

25  to harm, you want the consumer to understand that that

Page 618

1   risk or that hazard or that potential is there so you
2   can make an informed choice for a product that is not
3   providing you with a benefit.
4        Q    Is the language that we see on the screen,
5   that 740.1, that part of the regulation, is that a
6   codification or sort of a written statement of the
7   industry standard?
8        A    Yes.  It was put in place in the 1970s for the
9   first time, based upon the standards that existed before
10  that within the industry.
11       Q    I want to ask you to define a few more terms
12  that are relevant to the regulatory framework.  First,
13  is the term -- what is the term misbranded, and can you
14  define that for us, and is there a definition under the
15  regulations?
16       A    Yes, there is a definition under the
17  regulations and I made a slide for that as well.
18       Q    Thank you.  What's the -- just tell us what
19  the definition of misbranded is.
20       A    So misbranding means that the information
21  that's on the label may be false or misleading.  So it's
22  the idea of not providing the consumer with all of the
23  information or putting it into a way that is not an
24  accurate representation of the product, either be it,
25  for example, failing to list ingredients that are there

Page 619

1    when you're required to list all the ingredients on the

2    label that are there, that's one of the labels issues

3    that you have to deal with cosmetic.  You are supposed

4    to provide the consumer with what is actually there in

5    the product.

6         You can also have a misbranding if you have a

7    lack of a warning or safety information when the product

8    is being used, or you could be misbranded if, for

9    example, you fail to give adequate directions for how to

10   properly use the product when you know that a use could

11   be harmful.  So, you know, you need look at what

12   information do we know, what does the company know about

13   the product, and then that information then needs to be

14   put onto the bottle when it impacts the safe use of the

15   product by the consumer.

16        Q    What is the regulatory meaning of the term

17   adulterated?

18        A    So adulterated means there is an ingredient or

19   maybe a contaminant even -- and I'm using that word

20   differently because it may be that it is something that

21   is there, intentionally there.  It could be something

22   that is unintentionally there which could be a

23   contaminant, and it is known to pose a risk to health,

24   it can injure you, then that product can be deemed

25   adulterated because that ingredient or that contaminant

Page 620

1    is going to have a harm associated with it.

2         Q    All right.  Thank you, Dr. Plunkett.

3              I want to turn our attention to sort of a new

4    topic and focus now on talc, and specifically have you

5    describe what is talc in regard to how it composes

6    Johnson's baby powder.

7         A    Okay.

8         Q    So let me just ask you:  What is talc?  Would

9    you tell us what it is from a mineral standpoint?

10        A    Sure.  First off, you have to understand talc

11   is mined from an earth.  It's actually a mineral ore

12   that is found in the earth.  It's mined, and then it's

13   processed and you can produce from that mineral ore from

14   the earth a bottle of powder.

15             So you process it and you get the powder from

16   the earth.  So talc is a mineral that comes from the

17   earth that's naturally occurring.  It's made of elements

18   of magnesium and silicate, so that's the name magnesium

19   trisilicate.

20             That's a technical term, but there's a group

21   of chemicals that are generally magnesium silicates, and

22   talc is one of those.  And it is the main substance that

23   is in the talcum powder bottle.

24        Q    Okay.  Dr. Plunkett, you have a picture on the

25   screen of an open pit mine with a truck and tractor,

Page 621

1   excavator.

2           Is that actually a picture from one of the

3   mines that Johnson & Johnson used to source baby powder?

4       A    Yes, that's correct.

5       Q    And did Johnson & Johnson used to own the

6   mines in the 1960s, '70s, '80s that sourced Johnson's

7   baby powder?

8       A    Yes, they used to source their baby powder

9   from their own mines, now they do not.  There is

10  different suppliers since the time that they have mined

11  it themselves.

12          In fact, I think we may see some documents or

13  information -- you'll see a name Imerys, a company.  You

14  may see the name Rio Tinto, you may see the name

15  Cypress, but those are all names of talc suppliers to

16  Johnson & Johnson in the time after they were -- or

17  maybe even while they were still mining themselves, but

18  definitely at the time after they were mining

19  themselves.

20      Q    Okay.  And for many years, did other companies

21  own the mines that were actually sourcing the product,

22  but it was the same mines that Johnson & Johnson had

23  owned?

24      A    Yes, that's exactly right.  They turned over

25  to other -- today you even get mining done in other

Page 622

1    countries, so talc can come from other places around the

2    world, like China.

3         Q    And what are the names of some of the -- you

4    mentioned Imerys.  What are some of the other names of

5    the talc suppliers that have supplied talc for Johnson &

6    Johnson?

7         A    So those are the names I gave you, Rio

8    Tinto -- Imerys, Rio Tinto and Cypress I think are three

9    that you may see.

10        Q    And have you seen documents in your review

11   that make clear that, at different times, Johnson &

12   Johnson was working with Imerys, for example, in

13   interacting with regulatory agencies regarding the

14   safety of talc?

15        A    Yes, the talc supplier was very involved with

16   the regulatory agencies over time, particularly in the

17   time period I think we are going to discuss somewhere in

18   the '80s, '90s, 2000s for sure.

19        Q    And did they work and collaborate together to

20   essentially defend talc as a safe ingredient?

21        A    Yes, they did.  They worked through a trade

22   organization, in particular, as well called the

23   Cosmetics, Toiletries, and Fragrances Association, CTFA,

24   both of them were members of that.

25        Q    Thank you.

Page 623

1          Have you come to learn that Johnson's baby

2   powder not only contained platy talc but it includes

3   other constituents or other components?

4      A    Yes, that's correct.  It is not just platy

5   talc, which is one of the terms I think we had a slide

6   on earlier, yes.

7      Q    And does it include asbestos?

8      A    It does.  There's been evidence for the

9   presence of asbestos in the product over time, as well

10  as fibers that are called fibrous talc.

11     Q    Okay.  And have you prepared a slide that sort

12  of helps us understand how asbestos interacts with the

13  body and also what some regulatory agencies have said

14  about asbestos?

15     A    Yes, and this was based on the research that

16  I've done.

17     Q    Okay.  As we talk about asbestos, before we

18  get into the substance, would you mind telling us some

19  of the types of asbestos that are particularly relevant

20  for this case?

21     A    Sure.  So asbestos is a term for a group of

22  different mineral substances in a group.  There's six of

23  them.  The ones we are probably going to see mentioned

24  here, there's a form called chrysotile asbestos, and

25  that's in a different shape than the other three that we

Page 624

1    may talk about, which are in a fiber form.  And that

2    would be tremolite, anthophyllite, and actinolite.  So

3    they are all asbestos, but they have different shape and

4    feature sizes so they may occur in fibrous form or they

5    may occur in a different form than that, serpentine form

6    a different structure.

7            And the structure of the shape -- I will try

8    not to use this word, but there's a word scientists

9    sometimes use called morphology, which just means the

10   size and shape of the particles.  And they may differ

11   depending upon the form of asbestos that you're talking

12   about.

13   Q    You mentioned you've seen evidence that

14   demonstrates the presence of asbestos in Johnson's baby

15   powder, but just very generally describe the evidence

16   that you've reviewed.

17   A    Sure.  So there is -- over the years from not

18   only the internal company documents, there's information

19   showing testing for the presence of asbestos in either

20   talc and/or Johnson's baby powder.

21           There has also been published scientific

22   articles that have talked about the presence of asbestos

23   in talc products, including Johnson's baby powder.  And

24   there has also been government testing that's been done

25   that has shown the presence of asbestos in talcum

Page 625

1    powder.

2        Q    Is asbestos toxic to the human tissue?

3        A    Yes, we've known since, gosh, maybe even

4    before the 1930s, but definitely by the 1930s, there was

5    a general recognition in the science literature that

6    asbestos could damage the tissue and cause -- as I

7    listed here -- it causes changes called inflammation,

8    and we are going talk about that, I think, in a little

9    bit, which means it irritates the tissue and actually

10   injures the tissue through a specific process.

11       It can also damage the DNA within cells, which

12   means it can also lead to and has been shown to lead to

13   changes that are -- cause the cell to change from a

14   normal cell to a cancerous cell.  And asbestos itself

15   has been classified or identified by regulatory bodies

16   and regulatory authorities around the world as a known

17   human carcinogen, and that information has been known

18   for decades.

19       Q    You have on the slide an acronym IARC.  What

20   is that?

21       A    So it's the International Agency for Research

22   on Cancer, and it's a body of the World Health

23   Organization.  It's an agency under the World Health

24   Organization.  It's located in France, and their mission

25   is essentially to study ways to prevent cancer.

Page 626

1          It looks at also -- they also do clinical

2    studies sometimes for cancer treatment.  Their issue is

3    focused on cancer and ways to prevent, treat, and one of

4    the things they do is they actually identify or classify

5    chemicals through a peer-review process where they get

6    scientists together to look at evidence about cancer and

7    they classify chemicals based on the risk of cancer into

8    either a known human carcinogen, into a probable human

9    carcinogen, or into a possible human carcinogen.

10          And there's some compounds they look at that

11    they may call unclassifiable, which means not enough

12    evidence to put them in one of these other categories.

13    And chemicals or compounds that they look at are

14    nominated or put before them because there's been some

15    issue or interest in understanding whether or not there

16    is a reason to provide the scientific community, but

17    also regulatory bodies as well as consumers with the

18    fact that these particular chemicals can be harmful to

19    health specifically related to cancer.

20     Q    Is IARC considered to be an authoritative

21    body?

22     A    Yes, their decisions are referenced or even

23    relied upon by some regulatory authorities when they

24    make decisions on whether to take action on either

25    regulating a chemical, maybe reducing the likelihood

Page 627

1   that people could be exposed to that chemical in some

2   way.

3        Q    Have they done a comprehensive review and

4   published a comprehensive review of their evaluation of

5   the evidence in relation to asbestos?

6        A    Yes, they've done it several times, in fact.

7   I think the first one was in 1987 was the first time

8   they looked at asbestos, and I think they've done it at

9   least one other time since then.

10       Q    And have you relied on that as an

11  authoritative source in reaching your opinions?

12       A    Yes.  Because of the fact that, when they go

13  about this process, they do a review that is based upon

14  looking at all of the potential information, not just on

15  human studies, but animal studies, scientific

16  information to bolster why it is it makes sense that

17  this particular compound can cause cancer and they also

18  look at exposure potential, how people may be exposed to

19  it.

20       Q    Okay.  And is that the type of source that

21  someone in your position, as a toxicologist and

22  pharmacologist, would routinely rely on?

23       A    Yes.

24       Q    What is the most recent systematic review that

25  IARC has done on asbestos?

Page 628

1      A    I believe it's 2012.

2      Q    Okay.  And --

3           MS. O'DELL:  Your Honor, may I have permission

4      to put the IARC up on the screen?

5           THE COURT:  Permission to put up what?

6           MS. O'DELL:  IARC -- slide about IARC on the

7      screen.

8           THE COURT:  Go ahead.  Any objection?

9           MS. BROWN:  No.  Thank you, Your Honor.

10    BY MS. O'DELL:

11     Q    So is this a slide that sort of summarizes

12    IARC's conclusion about asbestos, Dr. Plunkett?

13     A    Yes, this is the most recent review they did.

14     Q    And what did they conclude?

15     A    They concluded that asbestos and its risk,

16    first off, apply to all six types of fibers wherever

17    they were found, and it was interesting because this is

18    the monograph that was trying to make clear when we talk

19    about asbestos what are we talking about in terms of

20    cancer risk.

21          And then they also, again, found -- they give

22    you what they call their overall evaluation, and they

23    say there is sufficient evidence in humans for

24    cariogenicity of all forms of asbestos no matter what

25    those forms are.  And I think I named four of them and

Page 629

1   there's two others listed here as well.  They also
2   stated that asbestos causes mesothelioma and cancer of
3   the lung, larynx, and the ovary.
4        Q    Have other agencies evaluated whether asbestos
5   can cause ovarian cancer?
6        A    Yes.
7        Q    And what is the conclusion of the National
8   Cancer Institute as to whether asbestos can cause
9   ovarian cancer?
10       A    They also have concluded that asbestos can
11  cause ovarian cancer.
12       Q    Are you aware of a recent statement by the
13  environmental protection agency regarding asbestos and
14  ovarian cancer?
15       A    Yes.
16       Q    And did you rely on that in reaching your
17  opinions in this case?
18       A    Yes, I did.
19       Q    All right.  And what did the EPA conclude
20  about asbestos and ovarian cancer?
21       A    Again, that asbestos can cause ovarian cancer.
22       Q    And is there consensus in the scientific
23  community that asbestos is a cause or can cause ovarian
24  cancer?
25       A    Yes.  In my opinion, there is a consensus,

Page 630

1    yes.

2         Q    And the question, Dr. Plunkett:  Is there any

3    safe level of asbestos?

4         A    No, there is not.  That's what makes it a

5    unique issue and a particularly important human health

6    or hazard issue.

7         Q    And have you, you know, gathered some

8    statements by regulatory bodies and others about what

9    they've said in regards to whether there's a safe level

10   of asbestos?

11        A    Yes, I have.

12        Q    Have you prepared a slide?

13        A    I did.

14             MS. BROWN:  Objection, Your Honor, hearsay.

15             THE COURT:  Overruled.

16   BY MS. O'DELL:

17        Q    And what has NIOSH said about whether there is

18   a safe level of asbestos, Dr. Plunkett?

19        A    So NIOSH, I should probably define that.  It's

20   the National Institution for Occupational Safety and

21   Health, and their goal is to protect workers.  And the

22   NIOSH has looked at this issue and they've stated that

23   evaluation of all of the human data provides evidence

24   for a threshold -- provides no evidence for a safe level

25   or threshold for asbestos exposure.  In other words, no

Page 631

1   safe level of asbestos.

2       Q    Let me stop you there.  You've got an aspect

3   of this slide that relates to the Food and Drug

4   Administration, let me ask you the question:  Who is

5   Susan Mayne?

6       A    She is one of the directors within one of -- I

7   want to say the food agency at FDA.  Within FDA, there's

8   different centers and this is one of the centers and she

9   was a director at the time.  And she is the center that

10  is responsible for oversight of cosmetics.

11          So she would be the center director for the

12  food center under which cosmetics sits.  Even though

13  they are not a food, that's where they sit in the

14  federal government.

15      Q    And what was the statement she made in regard

16  to whether there's a safe level of asbestos?

17      A    Again, she confirms that there's general

18  agreement among federal agencies in the U.S. and WHO

19  that there is no known safe level of asbestos exposure.

20      Q    Now, as a part of your work in the case, I

21  think you mentioned that you have reviewed or read

22  depositions of corporate representatives of Johnson &

23  Johnson.  What have their statements been regarding

24  whether there's a safe level of asbestos?

25      A    Yes, more than one of the Johnson & Johnson

Page 632

1    corporate representatives have actually testified that

2    there is no safe -- known safe level of asbestos

3    exposure.

4        Q    So, Dr. Plunkett, I want to turn our attention

5    from asbestos specifically to another component or

6    ingredient of Johnson's baby powder that you mentioned

7    earlier, and that's fibrous talc.  Would you please

8    define fibrous talc.

9            When you use that term, what are you talking

10   about?

11       A    So we've used two terms, platy talc and

12   fibrous talc.  So those are different shapes and sizes.

13   The way they look actually, if you were to get them

14   under a microscope -- you have to get them under a

15   microscope to see this.

16           Platy talc means that it's in the form of a

17   plate.  It looks flat and it has sort of an irregular

18   shape.  A fibrous talc means it is presence of fiber, so

19   it's present in a long thin form.  So it looks very

20   different.  It would be more of a needlelike structure

21   versus a flat plate structure.

22           So fibrous talc is just identifying sort of

23   the shape and size, the way it looks, the way it forms

24   is different.  It looks different under a microscope.

25       Q    Did you prepare a slide with pictures of platy

Page 633

1  talc and fibrous talc just to make that -- sort of

2  pictorially make that distinction with what you just

3  described?

4      A    Yeah, because sometimes it's easier to see it

5  than speak to it.

6      Q    Is that what you were referring to, what you

7  were trying to describe?

8      A    Yes, exactly.  If you look at the one on the

9  right, you see that thin fiber needlelike structure,

10  that's a talc fiber.  On the other side, we have those

11  irregular -- almost look like flakes, that's the platy

12  talc.

13      Q    And is fibrous talc also known by other terms?

14      A    Yes, it has been referred in the literature by

15  other ways.

16      Q    And what are those?

17      A    It can be called a term called asbestiform

18  talc, which means, again, it is a fiber form of talc.

19  That's probably the other one we're going to see the

20  most frequently, if we talk about documents or we talk

21  about evidence.

22      Q    Okay.  Would you define asbestiform, please.

23      A    So asbestiform is, again, just an adjective

24  that's describing the shape, a fibrous shape.

25  Asbestiform means it has a shape or a form that makes it

Page 634

1    look like an asbestos fiber, and that's what asbestiform

2    refers to.  So asbestiform talc has a shape and size

3    that can look similar to an asbestos fiber, so a fiber

4    form of asbestos.

5              Even though asbestos and talc actually

6    chemically are different compounds, they occur together

7    often in the ground, in the ore, and so it makes sense

8    that you might find them together when you process talc

9    and you produce a powder from it through that

10   processing.  So you can find fibers of talc and you may

11   find fibers that are actually asbestos as well.

12   Q    So when you use the term asbestiform, that

13   doesn't necessarily equate asbestos, asbestiform can be

14   applied to multiple types of mineral; is that fair?

15   A    That's correct.  So that's why I have used, in

16   my slides, the name fibrous talc and then I've used

17   asbestos separately to show that these are two different

18   distinct substances that have been found in Johnson &

19   Johnson baby powder.

20   Q    Okay.  How does fibrous talc impact or affect

21   human tissue?

22   A    It has similar activity to asbestos in that it

23   causes these inflammatory changes that injures the

24   tissue through a mechanism that we're going to talk

25   about in a little bit.  Actually injures the tissue

Page 635

1   through causing inflammation.

2           Most of us may recognize inflammation if we

3   see it on our skin, that's where your skin is red,

4   irritated.  These are things you can't see because it's

5   internal in your tissue, but it's the same idea.

6           Fibrous talc also can damage DNA and it can

7   lead to, through these mechanisms, cancer formation.

8   It's been identified by IARC, as well, as a known human

9   carcinogen.

10      Q    Okay.  In terms of the IARC monograph, as it

11  refers to fibrous talc, what term did they use to refer

12  to fibrous talc?

13      A    They called it talc-containing asbestiform

14  fibers.

15      Q    In the monograph, do they discuss -- do they

16  define how talc containing asbestiform fibers could be

17  platy or could be a talc fiber?

18      A    Yes, they do.  That's what, I think, the

19  slide -- it's okay to talk about it?

20      Q    Read the pertinent information that you're

21  referring to, please.

22      A    So first off, the important thing in the

23  monograph was that the conclusions they had reached

24  about asbestos, they are now talking about how those

25  conclusions about fibers would include talc-containing

Page 636

1  asbestiform fibers.  And then they describe what that is

2  and they say talc particles are normally plates, like

3  the picture we showed.

4       But under a microscope, you may also see

5  fibers.  And they say talc may form true mineral fibers

6  that are asbestiform in habit.  So even if you're

7  looking at a plate and you may think it's a fiber,

8  that's not what we're talking about.

9       We are actually talking about being able to

10  identify, like we did in the picture, a form of talc

11  that actually looks like a fiber.

12     Q    And in the monograph, does it conclude that

13  talc containing asbestiform fibers can cause ovarian

14  cancer?

15     A    Yes, it does.

16     Q    We talked about asbestos, we're talking about

17  fibrous talc or talc fibers, now let's turn our

18  attention to platy talc.  You've described that, you've

19  shown a picture, but in terms of the characteristics of

20  platy talc, how does that interact with the body and how

21  is that different in some respects to a fiber?

22     A    Sure.  So platy talc also can cause

23  inflammatory changes in tissues.  So you can get an

24  inflammation in the tissues.  It has not been shown to

25  damage DNA in the same way that the fibers can, but it

Page 637

1  also has been reviewed by IARC and has a separate

2  listing or separate classification where platy talc has

3  been identified as a possible human carcinogen.  So we

4  have known for the other two constituents and now this

5  one is identified as possible.

6      Q    Okay.  And is one of the reasons for that

7  distinction in the evaluation because of the shape of

8  the mineral?

9      A    Yes.  There is evidence and scientific studies

10 that have been done to show that the shape of the

11 mineral affects the way that the tissue reacts to it.

12 So.

13          The fiber form is more injurious or injures

14 the tissue more readily than the platy form does.  So

15 you have to get a higher level of exposure and you get a

16 little different response.

17          They all three can cause inflammation, but the

18 cancer potency or the ability of the asbestos and the

19 fibrous talc to induce a cancer response can occur at

20 lower levels of exposure.

21     Q    And you mentioned the IARC had concluded that

22 platy talc alone is a possible carcinogen.  When did

23 they reach that decision?

24     A    That was in 2006, when they reached it.  They

25 had a meeting and it was published in 2010.  But yes,

Page 638

1    they reached that conclusion in 2006.

2         Q    And so was that information known in 2006?

3         A    Yes, it was.

4         Q    And in response to that announcement by IARC

5    that platy talc or talc not containing asbestiform

6    fibers was a possible carcinogen, what did the talc

7    supplier for Johnson & Johnson do?

8         A    They added a statement on their information

9    that was sent out with each shipment of talc from the

10   supplier to parties like Johnson & Johnson, people that

11   bought the talc.  And it actually told in that document

12   what IARC had found.

13            So it actually took the conclusions of IARC on

14   this particular compound and talked about how IARC had

15   found -- what IARC had found specifically, and that was

16   that genital use -- frequent genital use of talcum baby

17   powder, talc without asbestiform fibers, increased the

18   risk of cancer.  And they talked about it as being a

19   possible human carcinogen based on sufficient evidence

20   in humans, and I believe insufficient evidence in

21   animals.  I may have that wrong but, yes, I think that's

22   right.

23        Q    You mentioned it was a statement.  Was it

24   something called a material safety data sheet?

25        A    Yes, that's correct.  I didn't know if you

Page 639

1    wanted me to use the term yet, we hadn't introduced it,

2    but yes.

3        Q    Why don't you explain what a material safety

4    data sheet is, often referred to it as an MSDS sheet.

5    Explain to us what that is.

6        A    Sure.  It is common in my experience -- in

7    fact, I've even written these before -- when you're an

8    ingredient or chemical supplier that when you develop a

9    product that you're going to sell, when you sell it, you

10   ship it with a sheet of information that tells the

11   customer everything you know about the product in terms

12   of it could impact safety of either people that have to

13   handle or information that could be relevant to passing

14   onto people you may use that ingredient in making

15   something else.

16        So it's the idea that maybe this is

17   information that could go into labeling for products,

18   for example.  That will often be what some of that

19   information is used for.

20        But it is a requirement, for example, to ship

21   chemicals in interstate transport in the U.S. that you

22   have to have some type of safety information for a

23   company.  So the MSDS sheet is a very typical one and

24   the companies keep them on file typically also for their

25   workers to protect their workers as well so they

Page 640

1    understand, if you want to understand, what it is that

2    you're being exposed to, you can go find out how that

3    could potentially affect your health.

4        Q    Did you review the material safety data sheet

5    that the talc supplier issued in this case?

6        A    Yes, I did.

7            MS. O'DELL:  Your Honor, at this time, I'd

8        like to move into evidence P2561, which is the

9        material safety data sheet.

10           THE COURT:  Any objection?

11           MS. BROWN:  Yes, Your Honor, I object.

12           THE COURT:  Legal basis for the objection.

13           MS. BROWN:  Hearsay.

14           THE COURT:  Overruled.  It shall be received

15       over objection.

16           THE CLERK:  Into evidence.

17           (The referred-to document was marked into

18   evidence as Plaintiff's Exhibit 2561.)

19           MS. O'DELL:  Thank you, Your Honor.

20           Would you mind putting up P2561?  Thank you.

21   BY MS. O'DELL:

22       Q    Dr. Plunkett, is the material data safety

23   sheet you were describing?

24       A    Yes, that's correct.

25       Q    Just to give us the reference again, this was

Page 641

1   issued initially by the talc supplier in what year?

2       A    In -- well, this one may be 2009, but it was

3   originally issued in 2006.

4       Q    Okay.  And were they the same throughout the

5   time period?

6       A    Yes, they were.

7       Q    Have you reviewed them all throughout the

8   relevant time period?

9       A    I've looked for ones.  I don't know if I've

10  seen every year, but I certainly have seen them from

11  2006 and, like I said, I think this one may be 2009.

12          MS. O'DELL:  Gina, if I may, may I ask you to

13      turn to page 3 of the document?  Thank you.

14  BY MS. O'DELL:

15      Q    And could you direct us to the warning, the

16  carcinogenic status that's contained in the MSDS sheet.

17      A    So down here where you see IARC, under

18  carcinogenic status, it lists IARC and it says 2006.

19  That's the year they made the -- drew the conclusions,

20  the panel met, and you'll note it says "in preparation,"

21  that's because the document wasn't published until 2010.

22  And they stated that "IARC has concluded that perineal

23  use" -- that's genital use -- "of talc-based baby

24  powders is possibly carcinogenic to humans."

25              Then they also point out this is not a route

Page 642

1    of exposure relevant for workers and applies to one

2    specific use of talc only.  And since these documents

3    are often important for information for worker safety,

4    that is an appropriate statement that I'm not surprised

5    they put in there.

6         Q    And I don't know that we've used this term

7    before, it says perineal use of talc-based body powder.

8    What does that mean?

9         A    That means genital use.  So the perineum is an

10   area on the women's body that is in the area of the

11   genitals, and it's the idea of application externally on

12   that area.  And that's what the conclusion was that was

13   reached on the studies that had been done.  Human

14   studies had been done over the years that have reported

15   an increased risk of cancer in women exposed by that

16   route.

17        Q    Now, were the material safety data sheets

18   information that was received from the talc supplier by

19   Johnson & Johnson?

20        A    Yes, that's correct, and there's testimony

21   that I've seen that indicates that that was the case for

22   sure.  In other words, I expected it and the testimony

23   is that that had occurred.

24        Q    So the talc supplier provided information that

25   perineal or genital use of talc based baby powder is

Page 643

1   possibly carcinogenic to humans.  Was that information

2   conveyed to consumers?

3        A    No, it was not.

4        Q    And so based on the standard, the warning

5   standard that we talked about previously, which the

6   label of a cosmetic product shall be a warning statement

7   whenever necessary or appropriate to prevent a health

8   hazard that may be associated with a product.  In your

9   opinion, would this material safety data sheet, among

10  other evidence, but would this particularly have

11  triggered a duty on Johnson & Johnson's part to warn

12  consumers?

13       A    Yes, I believe it did.

14       Q    Let me just ask you, Dr. Plunkett:  I have a

15  bottle of baby powder here.  Sorry it's in a plastic bag

16  because we don't want to let any of the compounds spill

17  out in the courtroom, but is this a bottle of Johnson's

18  baby powder?

19       A    It is.  That's correct.

20       Q    And I'll hand it to you.  And let me just ask

21  you:  Has Johnson's baby powder ever contained a warning

22  regarding cancer risk?

23       A    No, it has not.

24       Q    Does that bottle contain a warning?

25       A    No, it does not.

Page 644

1      Q    And in looking at that bottle and, after your

2   review of bottles -- let me ask you this question:  Have

3   you reviewed numerous bottles of different types of

4   bottles that have been, you know, on the market of

5   Johnson's baby powder over the years, it's changed

6   shapes and, to a certain degree, the label, have you

7   reviewed many of those?

8      A    Yes, because there's discussion of that --

9   actually, there's discussion of some of that in the

10   literature, but there's also example bottles that I have

11   seen.  And then I've also, at one point in time, I

12   believe in 2017, went and did investigation on my own

13   just to see what was out there and if it was any

14   different than what I was aware existed.

15      Q    From your review, from your information in

16   this case, has the label for Johnson's baby powder ever

17   listed asbestos or fibrous talc as ingredients?

18      A    No, it's only ever listed the terms talc and

19   fragrance.

20      Q    Okay.  And so, Dr. Plunkett, as a result of

21   these constituents or these ingredients or components of

22   Johnson's baby powder we've discussed, asbestos, fibrous

23   talc, and platy talc, do you have an opinion as to

24   whether the genital use of Johnson's baby powder creates

25   a hazard?

Page 645

1      A    Yes, I do.

2      Q    And what's your opinion?

3      A    It's my opinion that, indeed, there is a

4   hazard to health, a potential for harm based on the

5   presence of the asbestos and the fibrous talc, as well

6   as the platy talc, within the Johnson & Johnson baby

7   powder.

8      Q    And in light of these carcinogens that you've

9   mentioned, do you have an opinion as to whether there

10  should have been a warning on the label of Johnson's

11  baby powder that genital use of baby powder can cause

12  ovarian cancer?

13     A    Yes, it's my opinion that it should.

14     Q    And as a result of Johnson & Johnson failing

15  to list on the label all the constituents, not just

16  platy talc and fragrance, but also asbestos and fibrous

17  talc, do you have an opinion as to whether the product

18  was misbranded?

19     A    Yes, I do.

20     Q    And what's your opinion?

21     A    That it was.  That would be consistent with

22  not having an accurate listing of what was actually in

23  the bottle so a consumer can understand that.

24     Q    In light of the presence of asbestos and

25  fibrous talc, under the regulatory framework, was

Page 646

1    Johnson's baby powder adulterated?

2        A    Yes, that's correct.  Particularly on the

3    issue of asbestos, which would be recognized as a

4    contaminant.

5        Q    Was Johnson & Johnson's actions, failing to

6    warn consumers of a cancer risk, inconsistent with

7    actions of a responsible cosmetic company?

8        A    Yes, I believe it is, or was.

9        Q    Was it consistent with the duties or actions

10   of a responsible company?

11       A    Oh, no, I'm sorry.  I misunderstand your

12   question.  No, it was not consistent with what a

13   responsible company should have been doing with the

14   information, in my opinion, many decades ago.

15       Q    And you mentioned earlier that you had looked

16   at the bottles or the packaging labels of other body

17   powders.  Based on your review, have other manufacturers

18   warned of the risk of cancer as a result of the using

19   body powder?

20       A    Yes, in 2017, I identified some bottles that

21   were made by others, other than Johnson & Johnson, that

22   had a warning similar to what was found in the IARC

23   statement about the relationship of genital use of

24   talcum body powders and an increased risk of cancer.

25       Q    So, Dr. Plunkett, let's transition a little

Page 647

1    bit from sort of focusing solely on the label and the

2    regulatory aspects to the process by which talcum powder

3    can cause ovarian cancer.

4            Have you prepared a slide that helps describe,

5    in very general detail, a general way the mechanism by

6    which baby powder can cause ovarian cancer?

7        A    Yes, I have.

8        Q    Okay.  All right.  Dr. Plunkett, why don't you

9    walk us through what's being depicted on this slide.

10       A    So I'm showing here that there's four basic

11   issues that I think are important to consider when

12   you're talking about how Johnson & Johnson's baby powder

13   causes ovarian cancer.  The first issue has the bottle

14   shown here.

15           The second is the first step.  You have to

16   have exposure.  So it's the idea of what does the

17   scientific literature show and what do we know, and

18   indeed -- and I think we are going to discuss this a

19   little further, but there is evidence to show that,

20   indeed, particles of talc can travel from the outside of

21   a women's body into the vagina, up the reproductive

22   tract, and can end up in the area of -- through the

23   fallopian tubes in the area of the ovary as well as in

24   the peritoneal cavity of the woman.

25           So it can travel from the outside to the

Page 648

1    inside.  With that exposure, there's scientific

2    literature, both at the level of cells and tissues, as

3    well as in animals or whole animals, and also, we also

4    have studies I've relied upon that talk about the

5    relationship of inflammation to cancer, how cancer forms

6    in humans.  And so inflammation is the process that is

7    produced by the presence of the talc particles within

8    the tissue of the woman's body.

9           And then the inflammatory process is the

10   mechanism that has been linked to ovarian cancer in a

11   large proportion of the ovarian cancers that are seen in

12   women, particularly the types of cancers that are at

13   issue in these cases.

14        Q    Okay.  Would it be helpful to describe sort of

15   the female anatomy and sort of how talcum powder can

16   enter from the perineum enter the female genital tract?

17        A    I think so.  And not everybody may be familiar

18   with it themselves.

19        Q    Have you brought an illustration that might be

20   helpful in that regard?

21        A    Yes, I did.

22        Q    And I'm going to hand you the clicker.  If you

23   want, you can -- so tell us -- would you walk us through

24   and just describe for us the anatomy and how it's

25   relevant to how talc can migrate.

Page 649

1      A    So first, this is a picture as if I was

2  standing here and you were cutting me down the middle of

3  the body.  So you are looking down through the middle,

4  and what's shown here are some of the structures we are

5  going to talk about, I think with some of the studies in

6  data or science.  So you have the label here for the

7  vagina.

8           MS. O'DELL:  Your Honor, would it be okay if

9      Dr. Plunkett approached the screen?

10          THE COURT:  She can.

11          MS. O'DELL:  May I hand her a pointer?

12          THE COURT:  Yes.

13          MS. O'DELL:  Thank you.

14          THE WITNESS:  So the vagina -- so this is the

15      outside of the body.  We have the labia, which are

16      the tissues that are outside the body that are

17      around the outside entrance to where the vagina

18      enters the body.  So we have the vagina here, we

19      are going up.  This is a cross-section cutting

20      through the uterus.

21          You enter here to the interior the uterus, so

22      vagina to uterus.  Just down here is the bladder,

23      just to orient someone if you're interested in

24      that.

25          Then you'll notice that the uterus and then up

Page 650

1          here, you have the fallopian tube, this is the

2          ovarian sac.  You can see it showing some eggs in

3          the ovarian sac.  This is all suspended within the

4          peritoneal cavity, so in the abdomen of the woman.

5               So what we are going to talk about with

6          migration is the evidence and the science that

7          shows that you can move upwards in the reproductive

8          tract, and that is something that's understood that

9          this happens in women.  Things don't just fall out.

10          Things can actually move up the tract as well.

11               And we are going to talk about the migration

12          from the talc outside the body where it's sprinkled

13          on the perineal area, genital area, maybe in your

14          underwear, and then the passage through the vagina,

15          into the uterus, and then up into the upper regions

16          of the female reproductive tract.  There was

17          another slide that shows it frontal on, which is

18          probably a little easier to see, particularly how

19          the uterus and the fallopian tubes are connected.

20               So again, we are coming through the vagina,

21          through the cervix, into the uterus, into the

22          fallopian tubes, into the area of the ovary, and

23          again, these are suspended within the abdominal

24          cavity or the peritoneal cavity.

25               MS. O'DELL:  Thank you very much.

Page 651

1    BY MS. O'DELL:

2        Q    Dr. Plunkett, have you reviewed literature

3    that describes the ability of particles applied to the

4    outside of a woman's genital area to be able to ascend

5    the genital tract to the ovaries?

6        A    Yes, I have.

7        Q    Okay.  And what was the first study that

8    essentially put the scientific world on notice that this

9    process could occur?

10       A    The first one I could identify in the

11   scientific or medical literature was from 1961.  The

12   first author was named Egli, E-G-L-I, and he was a

13   doctor and provided data on women where he -- they were

14   getting ready to have surgery and he showed that the

15   placement of carbon particles into the vagina, that

16   those particles were moving up very rapidly and quickly

17   and going through the women's reproductive system and

18   ending up in the peritoneal cavity.  The idea that

19   things were moving through the reproductive tract and

20   not just sitting where they were deposited in the

21   vagina.

22       Q    And have you seen evidence that Johnson &

23   Johnson was tracking the literature and was aware of

24   this study when it came out in the early '60s?

25       A    Yes, I have.

Page 652

1     Q     Have you also reviewed a number of other

2   papers that have described sort of the mechanisms by

3   which talc can migrate to the ovaries?

4     A     Yes, I have.

5     Q     And is this slide a summary of at least some

6   of the articles that you have reviewed and the data

7   that's helped inform your opinion?

8     A     Yes.  I mean, there's more than a dozen, maybe

9   close to 20 different articles that I have reviewed and

10   relied upon, and these are just four that were earlier

11   in time, in the '60s and in the '70s, that I thought

12   provided sort of an overview of what you can find in the

13   literature.

14     Q     Okay.  And we've talked about the Egli study,

15   the first study in 1961.  You've also included, on a

16   slide, a reference to the Henderson paper in 1971.

17           What was the importance of the Henderson paper

18   and what it said to address this question?

19     A     So it was the first paper I found that

20   actually was describing the presence of talc in variance

21   tumor tissue in samples from women who has ovarian

22   tumors and it is one, again, that -- well, it's the

23   first one that I saw that described it that way and it

24   also was another of those studies that evidence in this

25   case shows that the company was aware of as well.

Page 653

1      Q    And are all the studies that you have on the

2   screen peer reviewed?

3      A    Yes, all of these come from what is referred

4   to as the peer-reviewed public literature, and all of

5   these are in the medical literature.

6      Q    And so the Henderson paper was published in

7   1971, and you mentioned talc was found in the tissue.  I

8   think it said it was deeply embedded in the tissue; is

9   that accurate?

10     A    Yes.  And that's important because the issue

11   would be is it something that was a contamination due to

12   the way that the tissue may have been looked at in the

13   lab or was it actually something that was there before

14   the tumor or at the early stages of tumor formation or

15   before the tumor formed.  And that's what the paper is

16   talking about.

17          It's talking about the importance of finding

18   it deeply embedded in the ovarian tumors.  And the

19   authors even discuss that as related to the etiology of

20   the cancer in the paper or why the cancer formed -- I

21   shouldn't use that word, etiology -- why the cancer

22   formed in those particular women.

23     Q    And you've also included a study that's

24   referred to here as Parmley and Woodruff in 1974.  Would

25   you tell us about that study and why you felt it was

Page 654

1    relevant to your analysis in this case?

2        A    So I put this one on the slide because it was

3    probably the earliest study that I saw on paper in the

4    literature that I saw that was actually generalizing and

5    discussing the fact that, in the author's opinion, that

6    substances can gain access from the outside to the

7    inside.  They have a crude drawing that they put in the

8    paper showing particles moving from outside the woman's

9    body up into the peritoneal cavity.  And they talk about

10   how a woman's body is different than a man.

11            A man's body, that isn't a route that can

12   occur.  But environmental substances, they even talk

13   about it in terms of substances in a woman's

14   environment, have the ability to move from outside the

15   body to inside and how that could have implications for

16   women's health.

17       Q    Thank you.  And you included one last study,

18   also an early study, the Ventner study.  Tell us about

19   that just quite briefly and why it informed your

20   opinion.

21       A    So this was a little bit later study than the

22   Egli study, but it was another study that was done in

23   women that were getting ready to have surgery.  They

24   put, into the women's vagina, particles that were of a

25   size that would be similar to the types of particles,

Page 655

1    very small that you might have of a substance coming

2    from the environment, like a platy talc coming in into

3    the women's vagina.

4              They put it in there and they showed that and

5    they talked about the fact that, in this particular

6    study, the particles were able to, again, easily move

7    upward into the women's reproductive tract from where

8    they were deposited into the uterus, the tubes.

9              They talked about the connection of the

10   outside to the inside of the women's body.  So in the

11   '70s, you see papers, and then later in the '80s and

12   '90s as well, where the physicians and the investigators

13   are talking about this -- the importance of

14   understanding this as a potential route of exposure to

15   women in terms of environmental substances, things

16   coming from outside, particularly with particles and

17   talc is a particle.

18        Q    Did these early studies -- did they put

19   Johnson & Johnson on notice that a woman who was using

20   the talcum powder on her genital area could be exposing

21   her reproductive tract, her fallopian tubes, ovaries,

22   and the peritoneal cavity to talcum powder and its

23   constituents?

24        A    Yes, in my opinion, it does.

25        Q    I want to ask you about just the functioning

Page 656

1    of the vagina and how physiologically the way the female

2    reproductive tract works could assist in particles

3    moving upward.

4         A    Okay.

5         Q    Would you describe that and tell us what it is

6    and how it informed your opinion?

7         A    So I think maybe a little bit after this '70s

8    timeframe, there were publications in the literature

9    where physicians are describing something called the

10   peristaltic pump, and it was talking about the fact

11   that, in certain times during a woman's ovulatory cycle,

12   that the contractions of the vagina, as well as the

13   uterus, are assisting things moving up instead of out.

14   And it's the idea that those contractions of the vaginal

15   wall, as well as the uterus, are providing a mechanism

16   whereby things are able to be transported more rapidly.

17          It was first being discussed because it was

18   trying to understand, with sperm, how quickly can they

19   move from the time they are deposited in the vagina

20   until they get up to the ovary, and they were interested

21   in looking at that issue and understanding

22   physiologically what was going on.  After this time

23   period, I think in the '80s and '90s, it was being

24   discussed as an understood phenomenon for explaining the

25   fact that is correct women's reproductive system is not

Page 657

1   a one-way tract out with menstrual flow, but it's

2   actually that things can go up as well as come out.

3          There's papers also, I think a 2004 paper that

4   I cite and I talk about in my expert report that talks

5   about the fact there may be a misconception that,

6   indeed, the way the woman's anatomy is that it's a

7   gravity-driven, directly down route of entry, but it's

8   not.  The first slide I showed a little bit on the

9   women's anatomy cut this way, there is an angle to it.

10          So it's not that it's just gravity-driven

11  directly out, but indeed there is an angle once it's in.

12  And if you have these contractions, there is an

13  understandable way where -- why it is that you would not

14  expect things to just fall out of the women's

15  reproductive system, which is, I think, something people

16  may think, that things would just fall out.  That is not

17  what's going on here.

18          And so those papers were all really

19  informative to me in forming my opinions about migration

20  and are consistent with what I see discussed in the

21  medical literature, even up to today, and FDA has even

22  commented on this as well.

23      Q    And what was FDA's comment on whether

24  particles would migrate to the ovaries and fallopian

25  tube?

Page 658

1     A    So in 2014, there is a document that FDA put

2    out that talks and uses the word indisputable.  It says

3    that particles can migrate from the outside to the

4    inside and that evidence is indisputable.

5          MS. O'DELL:  Your Honor, I've moving to

6          another topic, which I'm happy to do.  I didn't

7          know if the Court was --

8          THE COURT:  You're good.

9    BY MS. O'DELL:

10     Q    Let's transition.  You talked about the

11    overview, migration, then you moved to inflammation, so

12    let's talk about inflammation as you've described it.

13    Doctor, so what is the process by which talcum powder

14    and its constituents -- asbestos, fibrous talc, platy

15    talc, et cetera -- can cause cancer?

16     A    So there is a large -- by this time, today,

17    there is a large body of scientific evidence to show

18    that these constituents, the asbestos, the fibers of

19    talc, the platy talc all have the ability to induce a

20    physiologic process called inflammation.  So it's an

21    irritation essentially, that's a broader word that you

22    can use.

23          But it's actually a very specific

24    physiological process where there's an injury to the

25    tissue by the presence of the particles in the area of

Page 659

1  the tissue, and that, by continued exposure to

2  particles, there is an initiation of a process that then

3  leads to changes in the cells that are being injured,

4  such that, instead of being normal cells, they become

5  abnormal cells.

6          And there's scientific evidence and

7  information that shows that that process, in some cases,

8  can lead to a triggering of a change in the cell, such

9  that it's not just abnormal but it becomes a cancer

10  cell.  So it's a process that underlies that.

11          And again, it's a generally well-accepted link

12  between cancer and what we call chronic inflammation or

13  unresolved inflammation inside the body.  You can't see

14  it with your eye.

15          You and I can see inflammation on our skin if

16  we cut ourselves.  It gets red, we may get swelling it,

17  it may itch.  That's an inflammatory process that is a

18  healing process.

19          But inside the tissue, what's happening is

20  that inflammation is not shutting down, it's continuing,

21  it's unresolved, and it leads to a series of changes

22  that take normal cells and make them abnormal cells and

23  eventually cancer cells.

24      Q    And Dr. Plunkett, I want to ask you, you used

25  some terms in your answer sort of and you talked about

Page 660

1    inflammation.  You mentioned acute and chronic.  I want

2    to step back a minute.

3              And have you prepared a slide that would help

4    discuss that?  I know you've mentioned some things, but

5    could you talk just a little bit more about the

6    differences in those types of inflammation?

7         A    So this is just -- I prepared this just to

8    kind of make sure everybody understands that

9    inflammation can resolve, and it can be the kind of

10   inflammation you see if you cut your finger, have

11   trauma, maybe you burn yourself.  Most of the time, that

12   will heal.

13             So that is an inflammatory process, and some

14   of the same changes or chemicals within the cells, in

15   cells that are injured, are leading to a healing

16   process.  But what happens with chronic inflammation,

17   inflammation that doesn't resolve, that's what the kind

18   of inflammation we're talking about it, and it actually

19   progressively destroys tissue and actually leads to

20   cancer.

21             So it is -- inflammation is not all bad.

22   Initially, inflammation can be good because it can help

23   you lead to the healing, but if it goes unchecked, it

24   leads to tissue destruction, changes in cells such that

25   you can actually get a cancer cell formed.

Page 661

1    Q    And Dr. Plunkett, have you prepared a slide

2    that will help us understand how chronic inflammation

3    can lead to these changes that lead to cancer or tumors?

4    A    Yes.  It's a stair step slide.

5    Q    I want to ask you, please, if you would just

6    walk us through it step by step, you know, from the

7    exposure, in other words, talc gets in the genital tract

8    to the fallopian tubes and ovaries, and then how that

9    can lead to ovarian cancer.

10    A    So first off, each of these little boxes are

11    stair steps here.  I've prepared and I put some wording

12    in here, and the wording is there because I have

13    scientific studies or literature that describes these

14    things.  These are actually pieces of evidence that you

15    can find within the medical literature.

16         So we talked about talc particles being able

17    to get inside the body into the fallopian tubes and the

18    ovaries.  That's the first step.

19         Once it's there, what is occurring is the

20    science would show that you can get a local injury

21    within the tissue area and you will initiate

22    inflammatory process.  So that initiation of

23    inflammation in the next step, if it does not resolve,

24    is going to actually lead to damage to cells.

25         Some of the damage that can be caused by that

Page 662

1    inflammatory chronic process is actually something

2    called mutation.  People have heard of mutations in

3    cells and people think of mutations as being linked to

4    cancer.  Well, that is true.

5         You can also get though, in addition to the

6    damage to cells being a mutation, the other thing that

7    can happen is you can change the cells so that it is no

8    longer producing the same kinds of things it did before

9    and it actually makes the cell take on new

10   characteristics, and that's number four.  The cell now

11   becomes an abnormal or what's called a precancerous

12   cell.  Genes are turned on.

13        Genes of the parts of the DNA that control the

14   machinery of the cell, what the cell does, and with the

15   presence of that chronic inflammatory process, that

16   machinery of the cell changes and the cell becomes

17   abnormal.  After the cell becomes abnormal with those

18   changes, it can actually take on the characteristics of

19   a cancer cell, that's step five.

20        Cancer cells have the ability to divide.  They

21   have the ability to be something calls immortal.  That

22   means they don't die.  They tend to just keep dividing

23   rapidly and continue to grow.  The cells continue to

24   accumulate and you get a tumor eventually, and that's

25   the next step.

Page 663

1          You get the cancer cells that accumulate, you

2    get the tumor due to the cell division, the

3    proliferation of the cells at the site at which the

4    injury and inflammation was taking place.  And so the

5    cancer cell has that ability to divide.  It has the

6    ability also to produce certain new chemical mediators

7    within it that promote the cancer in terms of it

8    continuing to develop.

9          The other thing that could happen is you

10   could -- the cells can change such that you can

11   stimulate the formation of blood vessels, and you need

12   that because you need the blood to be brought in to

13   bring nutrients to the cell so it continues on that

14   rapid growth phase.

15         So again, this was -- all of these steps here

16   are ones that are either well understood in

17   carcinogenesis, inflammation is a well-known mechanism

18   underlying carcinogenesis, including ovarian cancer, and

19   we have data to show that talc can do some of these

20   things to initiate inflammation.  We can show that

21   asbestos can do that.

22         We can show, from the literature, that fibers,

23   such as fibrous talc, can do that.  And all of those

24   things are along the way to leading a cell from exposure

25   all the way to the tumor.  So this is a mechanism that

Page 664

1    tells you something about why it makes sense that talc

2    can cause cancer.

3        Q    This is a part of your sort of explanation,

4    Dr. Plunkett.  You mentioned mutations, you talked about

5    mutations.

6            Can mutations be inherited and some be

7    acquired?  And would you explain to us the difference,

8    please?

9        A    Right.  So an acquired mutation in a cell

10   means that it is something that's handed down through

11   mother to daughter, mother to son, it comes from the DNA

12   that you have when you're born.  So that acquired

13   mutation is there and it --

14       Q    Did you say acquired or inherited?

15       A    Inherited mutation.

16       Q    I think you misspoke.  Would you mind saying

17   that again?

18       A    So an inherited mutation is one that comes

19   through your DNA from the time that you're born.  An

20   inherited mutation is one that can sit there and not

21   cause a problem, but some time in your life can actually

22   result in some physiological change and it can manifest

23   as a cancer.  Sometimes those inherited mutations,

24   however, can remain dormant.  It just depends.

25            An acquired mutation is what's occurring in

Page 665

1    this type of situation where a chemical or an exposure

2    is damaging the cell, damaging the DNA, causing a

3    mutational event such that the mutation then causes the

4    cell to change in some way.  So acquired mutations is

5    what we're talking about here in this process with the

6    chemical exposure, even though it's true that there are,

7    for example -- maybe the one that most people know about

8    is breast cancer -- there is a gene that you can inherit

9    from your mother, it's called the BRCA gene, and that's

10   an example of an inherited mutation in your DNA that

11   puts you at increased risk for breast cancer, for

12   example.

13       Q    And does it mean you are going to get breast

14   cancer?

15       A    No, not everybody who carries the gene gets

16   breast cancer.  There's a whole discussion there, but I

17   think you have other experts who are going to handle

18   that.

19       Q    I do.  So let me just ask you, Doctor:  As

20   part of your explanation also, you're talking about the

21   evidence that you've seen that talc itself can induce an

22   inflammatory response or inflammation at the cellular

23   level.

24            And have you reviewed studies that have been

25   published in the literature that show that?

Page 666

1      A     Yes, that's one of the things that I was

2   looking for when I was doing my literature search.   I

3   was looking for the evidence that showed, not only did

4   we have human data or animal data, but what was actually

5   going on at the level of a cell.

6      Q     Have you prepared a slide that sort of

7   summarizes some of those studies?

8      A     Yes, I have.

9      Q     And so let me just ask:  Why, when a cell

10  study is done, let me start there, what happens?  When

11  you say cell study, I know before you explained this to

12  me, I had no idea.

13           So what is a cell study and why are those

14  important?

15     A     So a cell study means that you have isolated

16  particular types of cells.  In the case of this table, I

17  have some cells that have been isolated from humans and

18  some cells that have been isolated from animals, in this

19  case, a mouse.

20           And the reasons these kinds of studies are

21  done is it would be unethical to expose a person and

22  then take their cells for purposes of understanding a

23  mechanism like this.  Instead, what you do is, if you

24  want to understand a mechanism, you will take cells

25  first and look at whether or not the chemical or the

Page 667

1    exposure that you're worried about has the ability to

2    induce changes that you think could be linked to the

3    toxicity or the injury you've seen in humans.  And so

4    that's what these cell studies are.

5             They are studies that were done in order to

6    understand how it is that talc can injure a human being

7    and you start at the level of the cell because that's

8    the underlying mechanism for cancer that we are

9    investigating.

10        Q    Okay.  And what have the cell studies that you

11   have reviewed, general, what have they demonstrated?

12   What have they shown and why is it important?

13        A    So the cell studies have shown that changes --

14   they've shown that cells have been injured, harmed, or

15   adversely affected by the exposure to talc, be it platy

16   talc, fibers, or asbestos.  All three of those things

17   have the ability to make changes in cells that are

18   consistent with either inflammatory mechanisms or some

19   other type of change that's related to cancer formation.

20   It isn't that you are measuring cancer in the cell, you

21   are measuring early changes that we now know are

22   consistent with the changes that have been shown to be

23   linked to cancer.

24             So it's like we are going down, we are

25   taking -- we are going from here is the tumor and cancer

Page 668

1    we see in a human and we're trying to go backwards and

2    understand how it is that could have happened.  So we

3    start by looking at what happens if you expose, for

4    example, a human ovary cell, that's the Buz'Zard study.

5    Take ovary cells from humans, expose them to talc, what

6    happens?

7            In the Shukla study, we did the same thing.

8    We took ovarian cells, put them in a petri dish and they

9    grow them and they expose them to talc, also they did

10   asbestos in that study, and they looked at what happened

11   and you can measure different things.

12           You can measure genes that change, whether or

13   not the cells take on characteristics by producing

14   chemicals that can lead to inflammation.  You can look

15   at whether the cells take on the ability to proliferate,

16   to divide rapidly in the presence of the chemical.  So

17   those are things that are discussed in this table.  They

18   are end points, the findings column or the end points

19   that were measured.

20       Q    What do you mean by "end point"?

21       A    They are the biological events that they

22   monitored, the things they looked for in the cell.  So

23   each study could only look at so many things, and so the

24   Buz'Zard study, for example, focused on cell

25   proliferation, it focused on the production of

Page 669

1    inflammatory chemicals in cell, inflammatory compounds.

2    It also looked at whether or not the cell took on

3    characteristics that were indicative of a cancer cell.

4         Whereas, the Shukla study was focusing on gene

5    changes.  It looked at whether or not certain genes that

6    were in the cell, in the DNA of the cells, were changed

7    in a way that they became pro-inflammatory such that

8    they were producing -- had the ability to lead to the

9    production of chemicals that were associated with an

10   inflammatory process.

11        So it's a lot of weeds here in these studies,

12   but as a scientist, this is where you would start when

13   you're trying to understand, again, why it is that it

14   makes sense that talc could cause cancer.  You would

15   want to see changes with these types of cellular studies

16   that then you could investigate in a whole animal to

17   actually look at tumor formation or look in human

18   studies to see whether or not you were seeing a relation

19   between exposure to talc and increased numbers --

20   increased women with ovarian cancer, for example.

21   Q    In addition to these four studies you

22   summarized here, Doctor, have you looked at other

23   studies that have examined the impact of talc at the

24   cellular level?

25   A    Yes, there's dozens of studies out there that

Page 670

1    you can look at.  Depending on the way the study was
2    designed, you are going to look at different biological
3    changes.
4            The other thing you can do in a cell that's
5    harder to do in a human is you can control the exposure
6    level.  So what I mean by that is you can take talc and
7    you can put it in a low level or you can put it in at a
8    high level, and same thing with asbestos, you can put in
9    a low level or high level, and you can see whether or
10   not the level of exposure is affecting.  It's called the
11   dose, whether that affects the response you get.
12           So those are all things you can do in a cell
13   that you couldn't do ethically in a whole human study,
14   for example.
15       Q    Have the results of the cell studies you've
16   looked at all been consistent that talc can induce
17   inflammatory changes?
18       A    Yes, that's the consistency across all the
19   studies.  They all are linked -- almost every study that
20   you see has something in it that relates to a change
21   that would be indicative of what I call pro-inflammatory
22   state, inflammation being either started or inflammation
23   continuing because of the presence of the talc.
24       Q    This morning, in opening statements, counsel
25   for Johnson & Johnson mentioned something called

Page 671

1    neoplastic transformation.  And one, I'd like you to

2    define that for us, and then I have a question for you.

3        A    Okay.  So the simple definition for me is

4    actually in my first box.  I say here, this talc at the

5    end caused ovarian cells to take on characteristics of

6    cancer cells.

7             Neoplastic transformation is a term that is

8    used in the cell studies to mean that whatever it is

9    you're looking at, that cell is taking on the

10   characteristic of a cancer cell.  It's not that it is a

11   cancer cell, it means that it is taking on the

12   characteristics for that.

13            And there's different ways that scientists

14   look at that, different end points, different ways to do

15   it, but that's a term -- I'm not sure what was being

16   referred to, obviously I wasn't here, but I've seen that

17   in the literature people have talked about.  And this

18   paper by Buz'Zard reports on this issue of neoplastic

19   transformation in the cells.  And when you read it, it's

20   talking about the cells taking on the characteristics of

21   a cancer cell.

22       Q    And in that paper, the Buz'Zard paper, was it

23   talc-like substance that caused neoplastic

24   transformation?

25       A    Yes, that's correct.

Page 672

1    Q    And in order to -- are cell studies still
2  relevant, whether they document neoplastic
3  transformation or not?
4    A    Yes.  They are absolutely relevant because the
5  issue is, in these cell studies, understanding what is
6  the initiating event.  And if the initiating event we
7  are worried about is chronic inflammation, the fact that
8  you're not measuring neoplastic transformation is not
9  the issue.  The issue is:  Are you measuring something
10  in these cell studies that can then be tied in with the
11  biology of an animal, for example?  And that would be a
12  chronic inflammatory process.
13        There is an animal study, I think we are going
14  to talk about later, that the important part of that
15  study it has to do with looking at the tissue level and
16  whether you're seeing inflammatory changes with exposure
17  to talc.
18    Q    Okay.  So in conclusion, in regard to -- let's
19  back to migration just for a moment.
20        Doctor, do you have an opinion as to whether
21  talc applied to the genital area can migrate to the
22  fallopian tubes, ovary, and peritoneal cavity?
23    A    I do.
24    Q    And what's your opinion?
25    A    The evidence in my view shows that it can

Page 673

1    migrate from the outside to the inside and up the

2    reproductive tract.

3         Q    And once there, do you have an opinion as to

4    whether talcum powder can cause chronic inflammation?

5         A    Yes.

6         Q    And what's your opinion?

7         A    Again, the evidence is clear, in my view,

8    showing that the weight of the evidence shows that

9    inflammation can be caused by exposure to talc in

10   tissues and cells, including those into the reproductive

11   tract.

12        Q    Have you prepared an animation that depicts

13   the process of migration and inflammation?

14        A    Yes, I tried to depict that, yes.

15        Q    Did you direct its creation?

16        A    Yes, I did.

17        Q    And, in fact, do you narrate it?

18        A    I do narrate it.

19        Q    Based on your review of the scientific

20   literature and your expertise and your training, does it

21   accurately and fairly depict the process?

22        A    Yes, the overall process.  And it's kind of

23   that four step process we had earlier from the bottle to

24   inside the woman and into the inflammatory process.

25             MS. O'DELL:  Your Honor, at this time, I'd

Page 674

1    like to play it.

2         THE COURT:  Well, we're going to take a break.

3    About ten minutes.  We're going to let you go out

4    here and stretch.  Leave your notepads on your

5    chair, turned face down.  Remember you cannot

6    discuss the case among yourselves or with anyone

7    else.

8         (The jurors exited the courtroom.)

9         THE COURT:  Can I ask the question:  Is this

10   animation that you're referring to, is it actually

11   going to be what she just testified to?

12        MS. O'DELL:  In many respects, yes, sir.

13        THE COURT:  Why didn't you play the animation

14   when she was testifying to it?

15        MS. O'DELL:  Because I wanted to make sure I

16   laid an adequate foundation so my counsel on the

17   other side would not object to it.

18        THE COURT:  I don't understand.  She says that

19   the animation is basically the four steps that she

20   just testified to.  So if that is the animation,

21   the only foundation you would have to lay at that

22   point was:  Did you create it?

23        MS. O'DELL:  Fair, Your Honor.  But if you see

24   it without having laid the foundation, it's really

25   hard to understand what's being depicted.

Page 675

1          THE COURT:  No, no, as she's testifying, she
2       can say this is step one, this is it as it's
3       migrating into the vagina, then it then moves here.
4       This is step two, what is step two, she says what
5       it is, and then it migrates to here.  She is just
6       going to say that is all again.
7          MS. O'DELL:  It's a very short, 20-second
8       animation.  It just shows it and I think it just
9       cements --
10          THE COURT:  Okay.  There was no objection.
11          MS. O'DELL:  Thank you.
12          MS. BROWN:  Your Honor, it wasn't played yet
13       and I would object as cumulative given that she
14       just described it in very great detail.
15          THE COURT:  Okay.  You have to use the
16       bathroom on a lower floor, unfortunately.  You can
17       use the one in the jury room after, of course, our
18       court reporter uses it.  We'll be in recess.
19          (A recess was taken at 3:14 p.m. and the
20    proceedings resumed at 3:23 p.m.:)
21          THE COURT:  The jurors asked whether or not --
22       and I've got to tell them to stop asking the
23       bailiff questions, but they asked whether or not
24       they can bring their own lunch and, of course, they
25       can and I'll tell them they can.

Page 676

1           MS. BROWN:  Your Honor, we do have that snack
2      box whenever you want us to give it to the bailiff.
3      We had talked about putting the snack box --
4           THE COURT:  You have what?
5           MS. BROWN:  Snack box for the jurors in the
6      jury room.
7           THE COURT:  Can we just put it in the jury
8      room now?
9           MS. BROWN:  I think it's upstairs.
10          THE COURT:  No, we can do it tomorrow.  This
11     is the last break for the day before we end the
12     day.
13          MS. BROWN:  Will we go to 5:00, Your Honor?
14          THE COURT:  Probably 4:30 p.m.
15          Jurors coming in.
16          (The jury enters the courtroom.)
17          THE COURT:  All right.  For the record, all
18     the jurors are present making their way to the
19     seats.  All the parties are present.  The witness
20     is on the witness stand, still under oath.
21     Everyone can be seated, get comfortable, please.
22          A couple things.  One is that, yes, you can
23     absolutely bring your lunch.  You do not have to
24     buy lunch every day.  You can bring your lunch.
25          Two, you have to make sure your phones are

Page 677

1          away, okay?  You cannot have your phones out during

2          the testimony.

3               If you need to take a break, if you happen to

4          get an alert and happen to look at it and you need

5          a moment, just say, Judge, can I take a moment, I

6          got to get this, and we'll just say no problem, go

7          into the jury room and do what you need to do,

8          okay?  But you can't be on your phone while the

9          testimony is ongoing.  You may continue your

10         examination.

11              MS. O'DELL:  Thank you, Your Honor.

12    BY MS. O'DELL:

13         Q    So, Dr. Plunkett, we talked a lot about

14    inflammation.  I want to ask you sort of a question

15    about what Johnson & Johnson knew about inflammation.

16              Have you seen evidence that would establish

17    that Johnson & Johnson has known that talc causes

18    inflammation for at least 75 years?

19         A    Yes, I have.

20         Q    What is that evidence?

21         A    So there is a publication from 1947, I

22    believe, or '48, that is published by at least two

23    authors that were employees at J&J where they were

24    looking at the effects of talcum powder versus an

25    alternative type of powder for use on surgical gloves,

Page 678

1    and the paper describes the issues that were known at

2    the time in terms of the toxicity of talc to tissues

3    when it was deposited internally, for example, on a

4    surgical glove.

5                MS. O'DELL:  And for demonstrative purposes,

6           Your Honor, I would like to display P5003, which is

7           the study that Dr. Plunkett has just referred to.

8                THE COURT:  Okay.

9    BY MS. O'DELL:

10       Q    Just very quickly, Dr. Plunkett, I would like

11   for you first to focus on the authors.  Who were the

12   authors?

13       A    So the authors are listed.  You'll see Eberl,

14   George, May, Henderson.  Those are the last names of the

15   individuals.  The first one, James Eberl is relevant to

16   another document that we may or may not discuss where he

17   was actually an inventor on a patent related to this new

18   type of powder to be used on surgical gloves.

19       Q    Okay.

20                MS. O'DELL:  And in regard to talc, I would

21           ask you, Gina, to go to the second paragraph,

22           please, in the middle.

23   BY MS. O'DELL:

24       Q    What did it say in terms of evidence of talc

25   being an irritant?

Page 679

1      A      In the paragraph I read above this, and then

2   up to this sentence is discussing the fact that studies

3   have shown the talc can be an irritant, and they say

4   here that these studies offer incontrovertible evidence

5   of the local irritant action of talcum.

6      Q      And what was being proposed as a result of

7   that understanding that talc can cause an inflammatory

8   response?

9      A      So the idea was because of the harm or danger

10  posed by the presence of talc when it's deposited

11  internally into tissues, they were looking for a new

12  alternative substance that could be used to dust the

13  gloves.  So what the talcum powder was there for was in

14  order to make the gloves easier to go on and off by the

15  surgeon, and also, to absorb some sweat, heat that gets

16  under the gloves.

17          And the idea was they were looking for a

18  satisfactory substitute.  And this paper is describing

19  studies they were doing looking at substitute substance.

20     Q      And are at least two of these authors, were

21  they employees of Johnson & Johnson?

22     A      Yes, that's correct.

23     Q      Do you see that at the bottom of page 1, at

24  the bottom, it says from the laboratories of Johnson &

25  Johnson?

Page 680

1        A    Yes, that's correct.  And again, you can

2    confirm these two names when you look at the patent

3    applications too.

4        Q    You mentioned a patent application.  Let me

5    just ask you:  So this study that we were talking about,

6    the Eberl study, was in 1948.  So employees of Johnson &

7    Johnson were on that study documenting that talc was an

8    irritant, there needed to be a substitute.  And what

9    were the next steps?  What did they do following that

10   study?

11       A    So they did what people that I work with, that

12   inventors do, they take that information and they seek

13   protection in the patent world so that they can

14   commercialize those products with that particular

15   invention or new thing they have found that could work.

16   So they sought a patent in 1953, maybe, I may be wrong

17   on the dates, five years later, four years later.

18       Q    Let me stop you right there.  Did Johnson &

19   Johnson obtain a patent on cornstarch as a substitute

20   for talc?

21       A    Yes, and I guess we didn't say that the new

22   powder they had developed was a cornstarch derivative.

23   So they were using cornstarch as the base to make this

24   new powder that they were using.

25       Q    And did you review that patent?

Page 681

1      A    I did review that patent.  Again, it's

2    something that I do all the time, so it was very

3    interesting for me to look at that.

4      Q    And you did that as part of your work in this

5    case to reach your opinions?

6      A    I did, that's correct.

7            MS. O'DELL:  And, Your Honor, at this time,

8        I'd like to move into evidence Plaintiff's Exhibit

9        2559, which is the patent application.

10           THE COURT:  Any objection?

11           MS. BROWN:  No objection, Your Honor.

12           THE CLERK:  Admitted into evidence.

13           (The referred-to document was marked into

14    evidence as Plaintiff's Exhibit 2559.)

15           MS. O'DELL:  I'll direct you to page 2 of the

16        patent.

17    BY MS. O'DELL:

18      Q    Dr. Plunkett, when was the patent issued?

19      A    In 1953.  January 20, 1953, that was on the

20    first page.

21      Q    And who were the owners of the patent and who

22    are they?

23      A    Okay.  So the owners of the patent are

24    actually the employees.  And it says here -- when it

25    says assignor down here to Johnson & Johnson, a

Page 682

1    corporation of New Jersey, and the other owner was the

2    National Starch Products, corporation of Delaware.

3           So when you're an employee and you develop a

4    new product, typically your employment relationship

5    means that if you invent something while you are an

6    employee, you have to sign the rights to your patent to

7    the company you work for.  So that means the patent now

8    becomes owned by the companies that the people worked

9    for.

10          So in this case, Mr. Eberl and I think --

11   maybe Dr. Eberl and Dr. George are the two listed on

12   here that were employees of Johnson & Johnson.

13   Q     And what was the invention that they were

14   putting forward and what was the problem that they were

15   trying to address?

16   A     So the problem they are trying to address is

17   found right up front in the patent where essentially

18   they lay out, in this first section of the patent, what

19   this invention can do that other things couldn't do and

20   why it's important.  And they talk about the toxicity of

21   talc to tissues, the problem with talc as a medical

22   dusting powder when it got internal and the fact that

23   this new powder that they have developed overcomes the

24   problems that we're seeing in terms of tissue toxicity.

25          And the other thing they point to is the fact

Page 683

1    that cornstarch can actually be absorbed in the tissue.

2    One of the things that happens with talc, the reason the

3    irritation of the tissue is important is because the

4    talc doesn't get absorbed.  It just stays there.

5            It potentially can move away, it goes up the

6    reproductive tract in women or it could move away a bit

7    from the site of where it was deposited, but the point

8    is, it doesn't get absorbed.  Whereas, the cornstarch

9    gets absorbed out of the tissue and becomes something

10   that is no longer harmful in terms of irritation once

11   it's absorbed.

12       Q    Okay.  And specifically, did they talk about

13   just exposure to the vagina?  In the patent itself, does

14   it talk about exposure and is that in the second

15   paragraph on the left side?

16       A    Yes.

17       Q    And Dr. Plunkett, explain to us what's being

18   said in the paragraph that Gina has pulled up --

19           MS. O'DELL:  Which is second paragraph, Gina,

20           if you don't mind.  So the second highlighted

21           paragraph.  Thank you.

22           THE WITNESS:  So down here, it starts with

23           the -- the sentence starts with, "There were

24           literature reports."  So they are referring to the

25           fact that it had been reported in the medical

Page 684

1        literature, and I have found that literature as
2        well that talks about when talc was put into --
3        inside the body, that depending on where it was
4        deposited, you could have injury or toxicity seen
5        in the tissue.  So what they were seeing what they
6        called granuloma of the rectum, the vagina, the
7        cervix, and the brain and various wounds, and they
8        talk about it being caused by a contaminant like a
9        podium or by talc that was traced to the surgeon's
10       gloves.  So essentially, surgeons did operations,
11       some talc gets left behind.
12            There's other studies in the literature, by
13       the way, that talk about this particular event and
14       how very little amounts can be a problem.  But
15       essentially, what they were trying to do here was
16       say here is our problem, we have talc, it can't be
17       left behind, it causes tissue injury, and now we
18       have developed a product that is different and
19       better, and that is what they lay out.
20            They show the data -- the Eberl study had data
21       in it showing that cornstarch could be absorbed and
22       that tissue irritation or injury was different with
23       cornstarch as compared to talc.
24  BY MS. O'DELL:
25       Q    You said the product was better.

Page 685

1         MS. O'DELL:  If you go down, Gina, to a little

2      bit lower.  So starting, "More particularly."

3  BY MS. O'DELL:

4      Q    Do you see that?  Is this where they outlined

5  why the product was better?

6      A    Yes.  And so the language you see here, when

7  they say more particularly the object, that's patent

8  language that lawyers use, people like me use.  It just

9  means the thing we are inventing is something which is a

10  dusting agent that the two properties that this agent

11  will have is that it is absorbable and it's harmless to

12  body tissues.

13         So they were trying to solve the problem with

14  the talc, which was the other way, injured body tissues

15  and was not absorbable.  And that's what the object of

16  this invention is or the purpose of this patent is.

17      Q    So does this patent make clear that since

18  1953, Johnson & Johnson has had a safer alternative to

19  talc in powder?

20      A    Yes, that's correct.

21      Q    And is that reflected in their own documents,

22  that they were aware they had safer alternatives to

23  talc?

24      A    Yes.  There is a number of documents that I

25  have reviewed and relied upon that talk about, over

Page 686

1    time, and after this patent, over time in the next

2    couple of decades where they are recognizing the fact

3    that cornstarch could be absorbed safely in the body,

4    that there was a difference in the tissue injury that

5    was produced by cornstarch versus talc.  And yes, it's

6    definitely something that was recognized from this time

7    going forward in discussions within the company.

8         Q    Is Plaintiff's Exhibit 2026 one of those

9    documents, J&J documents, that you reviewed and relied

10   on in reaching your opinions?

11        A    Yes.

12             MS. O'DELL:  Your Honor, at this time, I move

13        into evidence Plaintiff's Exhibit 2026.

14             THE COURT:  Any objection?

15             MS. BROWN:  I just need a moment, Your Honor,

16        I apologize.  No objection.

17             THE COURT:  It shall be received without

18        objection.

19             THE CLERK:  Admitted into evidence.

20             (The referred-to document was marked into

21   evidence as Plaintiff's Exhibit 2026.)

22             MS. O'DELL:  Gina, I would ask you to blow up

23        the top half.

24   BY MS. O'DELL:

25        Q    Dr. Plunkett, is this a Johnson & Johnson

Page 687

1    document?

2         A    Yes, it is.

3         Q    And what's the date?

4         A    February 21, 1964.

5         Q    And what's the purpose as stated in the

6    subject?

7         A    The subject is they are discussing the

8    development of cornstarch as a powder.

9         Q    Is this a report of a meeting that took place

10   within Johnson & Johnson in 1964?

11        A    That's correct.

12        Q    And it says "present."  Do you see that at the

13   top of the document?

14        A    I do.

15        Q    Based on your review of depositions and

16   documents, what's your understanding of who those

17   individuals are at Johnson & Johnson?

18        A    So I don't remember their specific titles, but

19   certainly all four of those individuals listed -- Faust,

20   Sundberg, Schoel, and Ashton -- are all employees that

21   were involved with baby powder and also sort of the

22   science issues or the -- some of the safety issues

23   around the use of baby powder.  In this particular

24   document, they had been agreeing to or they were going

25   to be doing a consumer research test to test consumers

Page 688

1    acceptability of cornstarch.

2         Q    Okay.  And if you'll turn to the third page in

3    the document, what did they conclude about talc as

4    compared to cornstarch?

5         A    So in the last -- you have it highlighted.

6    They are talking now here about what went on.  They say,

7    since the meeting earlier up there the top of the

8    paragraph, they are talking internally about the

9    comparison of talc versus cornstarch.  They say, as a

10   condom lubricant where cornstarch replaced talc because

11   it was found to be absorbed safely in the vagina where,

12   of course, talc was not.

13            So it's pointing back to this issue of the

14   fact that cornstarch in the vagina can be safely

15   absorbed, whereas, talc is not.

16        Q    Did Johnson & Johnson ever tell the public

17   that talc cannot be safely absorbed in the vagina?

18        A    I've seen no evidence of that, no.

19        Q    Did Johnson & Johnson continue to consider

20   cornstarch as a safer alternative to talc on into -- we

21   talked about the '50s, '60s, into the 1970s?

22        A    Yes, they did.

23        Q    And have you seen a memo where they are

24   discussing talc as a safer alternative?

25        A    Yes, I have.

Page 689

1            MS. O'DELL:  And, Your Honor, at this time, I

2       would move into evidence Plaintiff's Exhibit 2041.

3            THE COURT:  Any objection?

4            MS. BROWN:  2041?

5            MS. O'DELL:  Yes.

6            MS. BROWN:  Your Honor, I have no objection to

7       the admission of the document, but I do have

8       objections on the continued use of these documents

9       for the other reasons we argued.

10           THE COURT:  Understood.  It shall be admitted

11      without objection.

12           THE CLERK:  Admitted into evidence.

13           (The referred-to document was marked into

14      evidence as Plaintiff's Exhibit 2041.)

15      BY MS. O'DELL:

16      Q    Is this a J&J document?

17      A    It is, as you see at the top.

18      Q    What is the date?

19      A    April 26, 1973.  So about nine years after the

20      document we just looked at.

21      Q    Okay.  And what is -- just generally, we'll go

22      through it step by step, but what is this document

23      reporting on?

24      A    So the subject of the memo or the document is

25      listed as Windsor Mineral, so they had a mine, Windsor

Page 690

1    mine.  And so it's the source of talc at this particular

2    point in time, and they are discussing the issues around

3    the way that the company was handling the safety of the

4    talc coming from the mine as it related to whether or

5    not there was asbestos in the mine.

6        Q    So let me stop you right there.  You mentioned

7    Windsor Minerals.

8             Was Windsor Minerals owned by Johnson &

9    Johnson?

10       A    Yes, it was.

11       Q    Okay.  Specifically, I'd like to direct your

12   attention, Dr. Plunkett, to the first paragraph of the

13   memo, paragraph number 1, and it says, "It is our joint

14   conclusion that we should not rely on the clean mine

15   approach as a protective device for baby powder in the

16   current asbestos or asbestiform controversy.  We believe

17   this mine to be very clean.  However, we are also

18   confident that fiber forming or fiber type materials

19   could be found, thus the usefulness of the clean mine

20   approach for asbestos only is over."

21            From your review of the documents and your

22   understanding what was occurring at the time, what does

23   that mean?

24            MS. BROWN:  Your Honor, the question is, "What

25       does that mean?"  Speculation.

```
                                              Page 691

 1           THE COURT:  Sustained to the form of the
 2      question.
 3           MS. O'DELL:  I will rephrase my question, Your
 4      Honor.
 5   BY MS. O'DELL:
 6      Q    What is your understanding of what was being
 7   referred to when they were talking about the clean mine
 8   approach, based on your review of the documents and
 9   testimony in the case?
10           MS. BROWN:  Same objection, Your Honor.
11           THE COURT:  I'll allow it.
12           THE WITNESS:  Based the evidence I've seen and
13      the discussion about this context for this
14      document, this was the issue of the company using
15      an approach in order to essentially try to prevent
16      asbestos contamination from being within the talc
17      that was being used for the baby powder.  But they
18      are now, in this document, recognizing the issue of
19      fibers.
20           It's not just about asbestos, but there are
21      also fibers there as well, and it's the idea that
22      relying upon an approach where, if you're not
23      fine -- you don't think you're finding asbestos in
24      the mine, that doesn't mean that the powder is
25      still safe when you have to look at the issue of
```

Page 692

1      fiber.

2          And there's other documents in this time

3      period that are starting to discuss this issue as

4      well.  Later in this document, there is this issue

5      we were talking about about what you can do instead

6      and it talks about cornstarch.

7  BY MS. O'DELL:

8      Q    I'm going to now direct your attention, Dr.

9  Plunkett, to paragraph 3.

10          It says, "The current medical research is

11  confirming that it is the particular shape, not chemical

12  substance, which is harmful as such fiber like materials

13  will be suspect."

14          Is that consistent with your opinion that it's

15  part of the shape of the fiber, whether it's talc or

16  asbestos, that makes the fiber toxic to the body?

17      A    Yes, there had been scientific information and

18  literature already accumulating showing that was the

19  issue, why it is that fibers like asbestos can injure

20  the tissue has to do with the size and the shape of the

21  particle that gets into the tissue and what it can do.

22      Q    Now, Dr. Plunkett, I'd like to direct your

23  attention to page 2, paragraph B, specifically to the

24  lower part of the paragraph.

25          It says, "These talcs," referring to the

Page 693

1    Windsor mine's talcs, "contain widely varying amounts of

2    tremolite."

3              I'll stop there.  Is tremolite asbestos?

4        A    Tremolite is a fiber that is one of the

5    asbestiforms, yes.

6        Q    And it says --

7              MS. BROWN:  Your Honor, I object to the

8         prelude by counsel.  It's misreading the document.

9              THE COURT:  It's up on the screen.  It's in

10        front of the witness.

11             MS. BROWN:  She said something about Windsor

12        talc, Your Honor, and the sentence before that

13        shows that they are talking about packing

14        materials.

15             THE COURT:  You can do that on

16        cross-examination.

17             MS. BROWN:  Yes, Your Honor.

18             THE COURT:  You may continue.

19             MS. O'DELL:  Thank you.

20    BY MS. O'DELL:

21        Q    So I was reading, "These talcs contain widely

22    varying amounts of tremolite or fibrous talc."

23        A    Yes, that's what is listed.

24        Q    And it says, "Our baby powder contains talc

25    fragments classifiable as fiber occasionally subtrace

Page 694

1    quantities of tremolite or actinolite are identifiable

2    (optical microscope) and these might be classified as

3    asbestos fibers."

4         Does this document confirm that J&J understood

5    that their talcum powder, their baby powder, could have

6    not only fibrous talc but asbestos?

7    A    Yes.  And this is not the only document, but

8    this is correct.  This is one of the documents where

9    they are really specifically keying in on the issue of

10   fibers of talc.

11   Q    Lastly, I'll direct you to page 3 of the

12   document, Dr. Plunkett, to paragraph C.  Do you see

13   that?

14   A    Yes.

15   Q    What is Johnson & Johnson saying about

16   cornstarch and whether it's a safer alternative to talc?

17   And in your answer, if you'll just read what the

18   document says, please.

19   A    Sure, so C says, "Cornstarch is obviously

20   another answer.  The product, by its very nature, does

21   not contain fibers.  Furthermore, it is assimilated by

22   the body."

23   Q    So does this confirm that they understood,

24   one, that cornstarch was a safer alternative and it

25   could be absorbed safely without a long-term harmful

Page 695

1    impact?

2         A    Yes, that is correct.

3         Q    Now, Dr. Plunkett, I'd like to change topics

4    and turn to something that's called -- we talked about

5    it earlier, the National Toxicology Program or NTP.

6              First, tell us briefly, what is the National

7    Toxicology Program?

8         A    So it's a program that is a sister agency to

9    the FDA, and it is located within -- generally within

10   the Department of Health and Human Services within --

11   just like FDA is, within the federal government.  And it

12   is a specific program within the federal government

13   that's focused on toxicology testing.

14             It also provides resources for other parts of

15   the government if there is an issue that could indicate

16   a need to do a particular type of toxicology test in

17   order to address a safety issue.

18             So it is a program that also is part of the

19   overall federal government process for doing assessment

20   of carcinogens.  So they are involved in a federal

21   program where they develop a listing of compounds that

22   have been identified by the government in the U.S. as

23   been carcinogens and it's called the report on

24   carcinogens.

25        Q    Okay.  And did the National Toxicology Program

Page 696

1    commission an animal study on -- that was evaluating

2    talc?

3         A    Yes, talc was nominated to the NTP for

4    consideration and they performed some long-term animal

5    studies.  It's one of the things NTP does a lot of, they

6    have done over a hundred of them over the years.

7         Q    And did you review that study and rely on it

8    in reaching your opinions?

9         A    I did.

10             MS. O'DELL:  Your Honor, at this time, I'd

11        like to display for demonstrative purposes

12        Plaintiff's Exhibit 2564.

13             THE COURT:  You may.

14             MS. O'DELL:  Thank you.

15    BY MS. O'DELL:

16        Q    What is the title of the study, Doctor?

17        A    It's called Toxicology and Carcinogenesis

18    Studies of Talc.  Carcinogenesis being a study of cancer

19    development in the animals.

20        Q    And when was this published or made available

21    to the public?

22        A    In September of 1993.  The studies were

23    performed in the late 1980s.

24        Q    Very briefly, tell us what the study involved.

25        A    So the study involved two species of animals,

Page 697

1    rats and mice, two common species that were used in this

2    program to do cancer testing, and they treat the animals

3    or expose the animals for their lifetimes.  When I say

4    "their lifetimes," it's typically a two-year study.

5    Getting to be two years of age for a rat or mouse is

6    getting very old, so they have that two-year dosing

7    paradigm.

8            And the idea is to look at what happens to

9    exposure in an animal that may be exposed throughout

10   their lifetime, and it is meant to exaggerate the kind

11   of exposures that you or I might receive.  We might not

12   get the same exposure every day, but we might be exposed

13   continuously throughout our life to a chemical that

14   might cause harm.

15           So in order to study that in the animals,

16   they've adopted this protocol where they take the

17   animals at a certain age, usually when they've reached

18   sexual maturity, they dose them from that age on until

19   two years.  Then they sacrifice the animals and they

20   take tissues and organs and samples and they look for

21   the presence of tumors or lesions that are indicative of

22   what's called a precancerous -- remember I talked about

23   abnormal cells, they look for that.

24           In addition to doing the two-year studies,

25   they typically report -- which they did here too --

Page 698

1    toxicology studies of shorter duration.  So they pair up

2    these shorter term studies that are anywhere from -- I

3    forget, I have to look to tell you exactly how long, but

4    usually a week or 14 days.  They'll typically do a

5    three-month dosing study, and then they use those

6    studies to determine what dose they should select to

7    give to the animals in the long-term study.

8            Because one of the principles of toxicology

9    and exposure is the more you're exposed to the more

10   likely you'll see a toxic effect.  The longer you're

11   exposed to it, the more likely you'll see a toxic

12   effect, both how long and how high.

13           And so in order to make sure the animals lived

14   two years, you don't want to give them too much that

15   they'll die quickly.  So you're trying to find a dose

16   that allows you to dose the animals throughout their

17   lifetime, but also maximizing the chances you might

18   observe a toxicity to be able to know and then calculate

19   based upon the data and determine based on the data what

20   the response in a human may be.  We try to extrapolate

21   from the animals and say what might happen in a human.

22           MS. O'DELL:  Gina, if I could ask you to go to

23       the conclusion, which was, I believe, page 8 of the

24       document.

25

Page 699

1    BY MS. O'DELL:

2        Q    What was the conclusion of the study?  What

3    did they find?  What was the final report of their

4    findings?

5        A    So in this paragraph, they report that in the

6    rats -- by the way, I forgot to mention, they do both

7    males and females because there can be differences in

8    response to chemicals if you're a man or woman.  So they

9    look at males and females.

10            In the male and female rats, they saw a

11   different response in terms of the level of evidence,

12   but they saw tumors in both sexes of the rats.  They did

13   not see those tumors in the mice that were treated.

14   They looked at male and female mice.

15            The rats, they report, if you look at the

16   paragraph, that there was some evidence of carcinogenic

17   activity of talc in the male rats and, in the female

18   rats, if you go down to the next italic, there was clear

19   evidence of carcinogenic activity with talc in the

20   female rats.  And there's different types of tumors

21   being seen in different locations in the animals.

22            The female rats are seeing lung tumors and the

23   male rats are seeing a tumor that is on the adrenal

24   gland, which is a gland within our bodies, too, that

25   controls a reaction called fight or flight.  It secretes

Page 700

1    hormones that are stress hormones.

2        Q     Following the publication of the NTP study,

3    the animal study, what happened?  What took place after

4    this reporting of, in a study, talc can cause

5    carcinogenic activity, particularly in female rats?

6        A     So after this occurred, this spurred a lot of

7    interest in the toxicology community with understanding

8    what the implications of this might be based on what was

9    already known in the literature.  There had already

10   been, at this time in the late '80s, reports in the

11   literature of a relationship of ovarian cancer in women

12   exposed to talc powders.

13           And then after this study, there are

14   additional studies that start to appear in the

15   literature where investigators then look at populations

16   of people, women, exposed to talc body powders in their

17   genital area and whether or not there was a relationship

18   between that exposure and ovarian cancer.

19           It also spurred a look at lung cancer issues

20   in workers that were working in industries where talc is

21   either processed or talc is used.  Talc is used an

22   ingredient in variety of other types of consumer

23   products in lower levels or in smaller amounts, but

24   workers can be exposed.

25           So there was an interest in both the issue of

Page 701

1    lung cancer with inhalation exposure, but then also the

2    issue of whether or not talc that gets into the body can

3    cause cancer in other areas as well.

4        Q    Was talc nominated as a potential carcinogen

5    for the report on carcinogens, which is I think what you

6    referred to?

7        A    Yes.  So after this report came about and the

8    interest in the toxicology community about seven or

9    eight years later, this chemical talc was nominated to

10   the NTP for consideration in listing as a carcinogen in

11   their report.

12           The Report on Carcinogens is an initiative

13   that was put forth, I think, in the Carter

14   administration to provide a program that would focus on

15   making sure that the cancer-causing agents were

16   identified and reviewed as needed based upon scientific

17   evidence that may have accumulated or on exposures that

18   appeared to be of a problem, for example, in different

19   populations.

20           So talc was nominated to the Report on

21   Carcinogens after this study, plus some of the other

22   human studies that it showed lung tumors in workers that

23   were exposed to talc in industry, as well as some of the

24   studies shown that women exposed to talc had been

25   developing ovarian cancer as well.  So all of that

Page 702

1    information was part of why it was nominated.  It wasn't

2    just this study alone.

3           But this study was important because it was

4    well controlled, large study that attempted to look at

5    the biological basis because it had tissue samples,

6    detailed analysis in the animals, doses that you could

7    look at.  So it was kind of a more rigorous scientific

8    way to look at whether or not, in a living organism,

9    talc could indeed cause cancer.

10       Q    For the sake of time, Dr. Plunkett, were there

11   two committees that review the evidence related to

12   whether talc is a carcinogen within the National

13   Toxicology program?  And tell us just briefly about

14   that.

15       A    Within the Report on Carcinogens process,

16   yeah, there are two committees of scientists that

17   initially looked at this study and the other literature

18   I mentioned, the reports of lung cancer in workers as

19   well as the ovarian cancer cases, the reports in women.

20   They looked at that -- it's called epidemiological

21   evidence or human studies, in addition to this animal

22   study, and they used it in an assessment of whether or

23   not they thought that talc should be listed as a

24   carcinogen.

25           These first two committees were just

Page 703

1    scientists from NTP and other sister agencies, and they

2    voted to nominate it to go to the next step.  So they

3    found it, by a voting of the members, that indeed they

4    thought that the compound should be listed.

5              So it went to the next level, which is the

6    third group that makes it a more public process where

7    these two are internal scientists at the agencies.

8         Q    And just before you move on to the public

9    phase, what was the vote of those two scientific

10   committees in terms of whether it should be listed as a

11   carcinogen?

12        A    So I think the first vote was six to zero, six

13   to list, zero to not list.  And the other, I think, was

14   seven to the two.  So it ends up, when the two numbers

15   are looked together, it was 13 to two.  So the

16   scientists, as both groups, 13 were voting to list it as

17   a carcinogen and two were voting not to list it.

18        Q    And when it moved to this period for public

19   comment after the votes of those two committees to list

20   as a carcinogen, what happened?

21        A    So it went to the next step and it was

22   deferred.  So there was a public meeting that was held

23   and scientists -- there's other scientists from outside

24   the agencies that are looking at this now and there is

25   also the opportunity for the industry to actually get

Page 704

1    involved, which is what happened in this case.  And in

2    particular, after that meeting, that third step, the

3    compound was deferred.  It means it wasn't listed at

4    that point in time and this was in 2000.

5        Q    Okay.  And have you looked at the minutes from

6    that meeting that you're referring to, that public

7    meeting?

8        A    I did.

9        Q    And is that part of your work to prepare your

10   opinions in this case?

11       A    Yes, it was.

12            MS. O'DELL:  Your Honor, at this time, I'd

13       move into evidence Plaintiff's Exhibit 2569.

14            MS. BROWN:  No objection, Your Honor.

15            THE COURT:  It shall be received without

16       objection.

17            (The referred-to document was marked into

18   evidence as Plaintiff's Exhibit 2569.)

19   BY MS. O'DELL:

20       Q    Very quickly, did the meeting take place in

21   December of 2000?

22       A    It did.

23            MS. O'DELL:  Gina, if you will, please, turn

24       to page 16 of the document.

25

Page 705

1    BY MS. O'DELL:

2        Q    I want to direct your attention, Dr. Plunkett,

3    to a paragraph that begins "Mr. William Kelly."  Do you

4    see that?

5        A    I do.

6        Q    Who is William Kelly?

7        A    So he was a consultant that worked for at a

8    company called The Center for Regulatory Effectiveness,

9    and he had been working with Johnson & Johnson and the

10   talc suppliers, as well as the CTFA that we talked

11   about, the trade organizations, to develop a strategy to

12   combat this listing, this issue of being proposed for

13   listing of talc as a carcinogen.  So he was the lead

14   that was speaking at this meeting, and he had been

15   working behind the scenes for a period of time.  There's

16   evidence and documents I've seen to show that he was

17   working on behalf of the industry.

18       Q    And in here, in the paragraph, it says,

19   "Mr. William Kelly Center for Regulatory Effectiveness."

20           Did he disclose that he was working on behalf

21   of Johnson & Johnson and the talc supplier and others?

22       A    He did not.

23       Q    Would that have been an appropriate thing to

24   do in a public hearing like that?

25       A    Yes, that is.  As a scientist, I would be

Page 706

1    expected to do that, and being that he was here at a

2    meeting that was discussing science, yes, you need to

3    disclose what it is you're talking about and whether or

4    not what you're talking about has been an opinion that

5    was or a statement that has developed with support from

6    an industry group.

7         Q    And is one of the arguments that was put

8    forward by Mr. Kelly and others that talc shouldn't be

9    listed as a carcinogen because, in the past, it had

10   asbestos, but now it no longer has asbestos?  Do you

11   recall that?

12        A    Yes, that was the crux of his argument.

13   That's correct.

14        Q    And so was Mr. Kelly telling the committee

15   that Johnson's baby powder or talc, talcum powder, no

16   longer had asbestos?  Was that one of the things he put

17   forward to the committee?

18        A    Yes, he did.  He said it no longer had

19   asbestos and he was trying to say that the problem is

20   that, in the past, all those studies that have been done

21   would be talc that could have had asbestos in it, but

22   theirs doesn't.  So, as a result, he was challenging the

23   studies as whether they were applicable to talc that was

24   being produced at that time.

25        Q    Was there evidence -- have you seen evidence

Page 707

1  from Johnson & Johnson, in the documents they produced,

2  that would establish it wasn't true, that at this time

3  period or any other, for that matter, that Johnson's

4  baby powder did not contain asbestos?

5       A    I have seen such evidence, that's correct.

6       Q    And you said the outcome was this was

7  deferred?

8       A    Yes.

9       Q    And what does that mean?

10      A    If you read the minutes in the discussion

11 here, you'll see the scientists, after the public

12 comments were made, felt that they didn't think they

13 could make a decision on whether to list or not at that

14 time.  It was based upon this issue -- they discussed

15 this in their comments or their back and forth -- on the

16 issue of whether or not the talc issue was the presence

17 of asbestos or was it the presence of talc.

18      Q    So in other words, did Johnson & Johnson, and

19 others in the industry, essentially create confusion in

20 order to stop this process of having talc listed as a

21 carcinogen?

22      A    Yes.  In fact, there is a document where

23 that's their own words.

24      Q    Did Johnson & Johnson celebrate when they were

25 able to achieve this outcome?

Page 708

1    A    Yes.  Again, there are documents and evidence

2    in this particular case that show that's exactly was

3    their reaction.  This was what -- this is the -- the

4    discussion in those documents will speak for itself, but

5    essentially it is talking about a celebration of the

6    result they were attempting to get, which was to stop

7    the process of the listing.

8    Q    Let me step back for a minute and just ask

9    you, Dr. Plunkett:  Was it clear from the NTP process

10   and NTP study and other studies that you've mentioned,

11   that the genital use of talcum powder was a hazard?

12   A    Yes, absolutely.  That's a different

13   consideration that is not being discussed in this

14   document.  Absolutely.

15   Q    Was that hazard ovarian cancer?

16   A    Yes.  The hazard was ovarian cancer.

17   Q    In your opinion, based on your understanding

18   of the industry standards, did Johnson & Johnson act as

19   a responsible company to protect women and consumers in

20   the way they interacted with the National Toxicology

21   Program?

22   A    No, they did not.

23   Q    Doctor, I'd like to turn now to discuss the

24   FDA, the Food and Drug Administration.  And following

25   the publication of the NTP study and some of the other

Page 709

1   studies that were coming out at that time, in 1994, did

2   an organization by the name of Cancer Prevention

3   Coalition send a letter or petition to the FDA?  Did

4   they do that?

5          A    Yes, they did.

6               MS. O'DELL:  Your Honor, at this time, I'd

7          like to move into evidence Plaintiff's Exhibit

8          2562.

9               THE COURT:  Any objection?

10              MS. BROWN:  No objection.

11              THE COURT:  It shall be received without

12         objection.

13              (The referred-to document was marked into

14   evidence as Plaintiff's Exhibit 2562.)

15   BY MS. O'DELL:

16         Q    And Dr. Plunkett, is this the submission -- I

17   think they call it a Citizen Petition; is that correct?

18         A    Yes, Citizen Petition is a very specific type

19   of submission that's allowed under the FDA regulations.

20   Any person here in the public, if they would like to do

21   that, can go and submit this type of document to request

22   an action from the agency.

23         Q    And what did the Cancer Prevention Coalition

24   ask the FDA to do?

25         A    So they were asking the FDA, based upon --

Page 710

1    they have -- in the petition, they describe the evidence
2    that they're looking at.  They were asking for labeling
3    for the particular products, if they were going to be
4    still left on the market, the talcum powder causes
5    cancer in laboratory animals and that frequent
6    application in the genital area of women increases the
7    risk of ovarian cancer.
8              So they were tapping into the two pieces of
9    evidence that were relevant to what we just saw -- we
10   saw discussed in 2000 by the NTP, the animal data as
11   well as the human data that had accumulated, and this is
12   1994.
13        Q    And was one of the bases for the Cancer
14   Prevention Coalition, sometimes maybe referred to as
15   CPC, but this organization, was one of the bases they
16   sought a warning the presence of asbestos in talcum
17   powder?
18        A    Yes, that is specifically discussed in their
19   petition.
20        Q    Did they ask for a specific warning?
21        A    I'm sorry?
22        Q    Did they ask for a specific warning?
23        A    Well, they asked for a warning, if you'll see
24   what's on the screen, they asked for warning such as --
25   and so there was a quote for a specific language that

Page 711

1    they were asking for, yes, but they are couching it as a

2    warning such as.

3         Q    And they were seeking to have a warning for

4    ovarian cancer, correct?

5         A    Absolutely, ovarian cancer.

6         Q    And let me ask you:  I'm going to ask you

7    about who a gentleman is, John Bailey.  Who is John

8    Bailey?

9         A    John Bailey, at this time period, was the

10   acting director of the office of cosmetics, so it would

11   be the office that is responsible for FDA actions

12   related to cosmetic products ingredients.  And he --

13   since this was a petition about a cosmetic, he would be

14   the responsible part of the FDA that the petition would

15   be sent to for him to respond because it was a cosmetic

16   and the cosmetic office would respond.

17        Q    And did, in fact, he send a response for the

18   Citizen Petition?

19        A    Yes, he eventually did.  He has a clock

20   running and he did eventually do that.

21             MS. O'DELL:  Your Honor, I want to move into

22        evidence Plaintiff's Exhibit 2373.

23             THE COURT:  Any objection?

24             MS. BROWN:  No objection.

25             THE COURT:  It shall be received without

Page 712

1    objection.

2         THE CLERK:  Moved into evidence.

3         (The referred-to document was marked into

4    evidence as Plaintiff's Exhibit 2373.)

5    BY MS. O'DELL:

6    Q    Dr. Plunkett, is this the letter that John

7    Bailey wrote back to the Cancer Prevention Coalition

8    regarding the petition?

9    A    It is, yes.

10   Q    And what's the date?

11   A    The date is July 11, 1995, so it was within

12   the allowable time period.  It says that later down.

13   They have 180 days from the time the petition was filed,

14   the FDA does, to respond to the petitioner and that's

15   what he's doing.

16   Q    This is July of 1995.  And this time period

17   shortly before July of 1995, did John Bailey -- have you

18   seen documents that would demonstrate that John Bailey

19   met with representatives of Johnson & Johnson?

20   A    Yes.

21        MS. BROWN:  Objection, Your Honor, leading.

22        THE COURT:  Overruled.

23        THE WITNESS:  Yes, there is evidence to show

24      that right before this, he had done that.

25

Page 713

1    BY MS. O'DELL:

2        Q    And what was his decision as to how the

3    petition would be handled?

4        A    It's highlighted there that he decided not to

5    grant anything -- not grant the petitioner, the request,

6    and the reasoning given was the limited availability of

7    resources and other agency priorities.

8        Q    Okay.  After this letter in 1995, did John

9    Bailey remain with FDA?

10       A    For a period of time, yes, but then he left

11   and he went to the CTFA.

12       Q    And the CTFA, we referenced it, but that's the

13   Cosmetic, Toiletry, and Fragrance Association, correct?

14       A    Yes, he left the agency and went to the trade

15   organization that was involved with the products that

16   he, as a regulator, had oversight for.

17       Q    In broad terms, is that a lobbying group?

18       A    Yes, yes, you could call it that.

19       Q    As an employee of the Cosmetic, Toiletries,

20   and Fragrance Association, did ultimately John Bailey

21   become the person that was interfacing with the FDA

22   about cosmetics?

23       A    Yes, that was his -- what happened after he

24   left and went to CTFA.  He had numerous interactions

25   back with the FDA through that organization.

Page 714

1     Q    At some point -- the initial petition was in

2    1994.  At some point, there was another petition very

3    similar, I believe later on.

4          But for sake of time, did the FDA, at some

5    point years after, did they respond?  And how many years

6    did it take for the FDA to respond to the petition?

7     A    To this petition and another one that was

8    filed very similarly in '08, it wasn't until 20 years

9    after 1994, 2014, before the FDA actually finally put in

10   a response to the original petition.

11          MS. O'DELL:  Your Honor, I'd like to move into

12      evidence Plaintiff's Exhibit 2010.

13          THE COURT:  Any objection?

14          MS. BROWN:  No, Your Honor, no objection.

15          THE COURT:  It shall be received without

16      objection.

17          THE CLERK:  Admitted into evidence.

18          (The referred-to document was marked into

19   evidence as Plaintiff's Exhibit 2010.)

20   BY MS. O'DELL:

21    Q    So what is the date of this response?

22    A    April 1, 2014.

23    Q    And, Dr. Plunkett, did the FDA deny the

24   request for a warning?

25    A    Yes, they did.

Page 715

1      Q    And if you'll look down to the lower half of

2   the first page, the paragraph beginning after "careful

3   review," what does it say that the FDA concluded?

4      A    They say, in the last sentence there, that the

5   FDA did not find the data submitted, so there was data

6   submitted with the petition, that they presented

7   conclusive evidence of a causal association between talc

8   use in the perineal area and ovarian cancer.

9      Q    And is conclusive evidence of a causal

10  association the appropriate standard to have been used

11  for a cosmetic?

12     A    No, not based upon the 740.1 section that

13  we've already presented.  It's less than that.  This

14  type of standard is the type of standard you apply to

15  adding a warning to a drug.

16     Q    And is the cosmetic standard is shall require

17  a warning if a hazard may be associated; is that fair?

18     A    That is correct.

19          MS. O'DELL:  And if you'll turn to page 2 of

20      the letter, Gina, please.

21  BY MS. O'DELL:

22     Q    You know, we mentioned you testified a few

23  minutes ago that one of the bases for the petition was

24  that talc contained asbestos.  What did the FDA say in

25  response to that particular concern?

Page 716

1          A    So they actually went through a review of the

2     asbestos issue with them and they talked about the fact

3     that there had been some reports, and they go through

4     it.   But they didn't find the evidence conclusive that

5     asbestos was still in products at that point in time.

6          Q    And so if you'll jump to the bottom of the

7     page, the last sentence beginning review, "You" -- we're

8     talking to the Cancer Prevention Coalition, "have not

9     provided evidence that asbestos contaminated

10    talc-containing cosmetic products are currently being

11    marketed."

12             Do you see that?

13         A    That is correct.

14         Q    They are talking to the Cancer Prevention

15    Coalition, correct?

16         A    That is correct.

17         Q    And who had evidence that asbestos was

18    contained in Johnson's baby powder in this time period?

19         A    The company did.

20         Q    And had that evidence been provided to the

21    FDA?

22         A    Not that I'm aware of, no.

23         Q    Let me ask you to turn, Dr. Plunkett, please,

24    to page 5 of the document.   And did the FDA include

25    pertinent information about your opinions regarding talc

Page 717

1    being able to migrate to the ovaries and inflammation?

2         A    Yes, it's in the paragraph that starts with

3    "while there exists."

4              THE COURT:  Folks, is everything okay?

5              JUROR:  Yes, Your Honor.

6              THE COURT:  Thank you.

7              You may continue.

8              MS. O'DELL:  Thank you.

9    BY MS. O'DELL:

10        Q    Read to us the pertinent language, please,

11   Dr. Plunkett.

12        A    So is says, "While there exists no direct

13   proof of talc and ovarian carcinogenesis, the potential

14   for particulates to migrate from the perineum and vagina

15   to the peritoneal cavity is indisputable."

16        Q    Thank you.

17             In following this letter, this was 2014, did

18   the FDA -- so this was 2014.  After that, did the FDA

19   reach out to Johnson & Johnson and ask for information

20   regarding the safety of talc?

21        A    They did.

22        Q    What year was that?

23        A    I believe 2016.

24        Q    And have you reviewed Johnson & Johnson's

25   response to that request from the FDA?

Page 718

1      A    Yes, I have.

2           MS. O'DELL:  Your Honor, at this time, I'd

3      like to move into evidence Plaintiff's

4      Exhibit 2531.

5           THE COURT:  Any objection?

6           MS. BROWN:  No, Your Honor.

7           THE COURT:  It shall be received without

8      objection.

9           THE CLERK:  Admitted into evidence, 2531.

10          (The referred-to document was marked into

11     evidence as Plaintiff's Exhibit 2531.)

12     BY MS. O'DELL:

13     Q    Is this a letter from Johnson & Johnson?

14     A    It is, yes.

15     Q    And what's the date of the letter?

16     A    This is March of 2016.

17     Q    And who is Johnson & Johnson writing to?

18     A    They are writing to the U.S. Food and Drug

19     Administration.

20          MS. O'DELL:  And specifically, first

21     paragraph, please, Gina at the bottom.

22     BY MS. O'DELL:

23     Q    What is the specific request --

24          MS. BROWN:  Counsel, this is not a redacted

25     copy that you have on the screen.

Page 719

1              MS. O'DELL:  I'm sorry.

2    BY MS. O'DELL:

3         Q    This is Plaintiff's Exhibit 2531, and Gina did

4    a better job highlighting than I will, but this was

5    March of 2016 from Johnson & Johnson.  What was the

6    specific request that the FDA made of Johnson & Johnson?

7         A    It's the quote there, please -- they were

8    asking for safety information related to the use of

9    talc, and they say, "Please provide all safety

10   literature and data regarding talc, including data in

11   support of the safety of this active ingredient and data

12   that shows potential harmful effects for this active

13   ingredient," and they gave them a deadline of

14   March 17th and that's what this letter is in response

15   to.

16        Q    It is a letter from Jethro Ekuta, vice

17   president of regulatory affairs, North America Johnson &

18   Johnson Consumer, Inc.?

19        A    Yes, that's correct.

20        Q    Dr. Plunkett, this is a response to the FDA

21   request for information on talc; is that right?

22        A    That's correct.

23        Q    And from Johnson & Johnson Consumer, Inc.?

24        A    That is correct.

25        Q    Did they evaluate or provide information,

Page 720

1    Johnson & Johnson provide information about the

2    components or the constituents of Johnson's baby powder?

3        A    Yes, they do.

4        Q    And if you would turn to page 12 of the

5    document, please, Dr. Plunkett.

6        A    Yes.

7        Q    Do you see that?  And they state here, "No

8    asbestiform structures have ever been found during any

9    testing."

10            That's coming from Johnson & Johnson, correct?

11        A    That is correct.

12        Q    And is that a true statement?

13        A    Based on the evidence I have seen, it is not.

14        Q    Had Johnson & Johnson found asbestiform

15    structures in their talcum powder for decades by 2016?

16        A    Yes, they had.

17        Q    So that's 2016.  After 2016, let's fast

18    forward to 2019.

19            Did the FDA test Johnson's baby powder?

20        A    Yes, they did.

21        Q    And what did they find?

22        A    They found some asbestos or fibrous structures

23    in the talc.

24        Q    And following that testing, what action did

25    the FDA -- following that testing of Johnson's baby

Page 721

1    powder and other cosmetic products, what steps did the

2    FDA take?

3         A    They asked for a recall of the products.

4         Q    What about -- if I could focus your attention

5    on the working group?

6         A    I'm sorry.

7         Q    The working group's standpoint, what did --

8    what steps did they take?

9         A    Right.  So after this finding, the FDA began a

10   process to understand how widespread this was, and also

11   to address the issues of the appropriate testing to be

12   used by the industry to confirm that talc products were

13   asbestos free.  And that led to a gathering of experts

14   in a workshop in February 2020, which is one that I

15   attended.

16        Q    From a toxicology perspective, this working

17   group and what they were considering, why was it

18   important for their consideration of fibers?

19        A    What was important about it in this workshop,

20   they are specifically discussing and describing the

21   importance of the structure and the size of the

22   particles and the idea that the term elongated mineral

23   particles, or EMPs, was an appropriate way to go about

24   identifying hazards in these products based on the

25   presence of certain specific types of fiber structures.

Page 722

1          And the working group -- well, the workshop,

2    that particular topic is discussed, the idea that there

3    is more than just asbestos as a term that is relevant to

4    the safety or the hazard posed by products that may

5    contain these certain kinds of fibrous structures or

6    fibrous elements within them.

7          Q    And did that working group that was

8    considering these questions include some of the leading

9    scientists within the government as it relates to

10   asbestos and other fibrous minerals?

11         A    Yes, they brought people from a variety of

12   government agencies, experts in relevant fields.  For

13   example, they have someone from the U.S. Geologic Survey

14   to speak to mineralogy.  They had toxicology people from

15   NTP.  They had NIOSH people, worker safety people there.

16   They had experts drawn from different areas.

17         They had FDA that spoke as well talking about

18   the need to identify an appropriate approach in order to

19   ensure that, in humans that may be exposed to products

20   regulated by FDA, were indeed being exposed to products

21   that didn't pose that hazard of having the presence of

22   these kinds of fibers in them.

23         Q    And because of the health concerns associated

24   with fibers, was the FDA and other governmental agencies

25   attempting to determine the best way to test for

Page 723

1    cosmetics for the presence of asbestos?

2        A    Yes, that's something that developed out of

3    this workshop and this work by this combined government

4    cooperative assessment that was being done.  That's

5    exactly right.

6        Q    During the opening statement, counsel for

7    defense mentioned testing that had been done on

8    cosmetics in 2021 by the FDA, and I want to make

9    something clear:  Are you aware of what was tested?

10       A    Yes, I am aware of testing that was done in

11   2021 by FDA.

12       Q    Was Johnson's baby powder tested?

13       A    No, Johnson's baby powder was not one of the

14   products that was tested in 2021.

15       Q    And so just in summary of discussion about the

16   FDA and interaction we've been talking about --

17           THE COURT:  I don't know what you mean by

18       "summary," but certainly she's not going to tell us

19       everything she's already said.

20           MS. O'DELL:  No, sir, not at all.  Thank you,

21       Your Honor.

22   BY MS. O'DELL:

23       Q    Interacting with the FDA, Dr. Plunkett, did

24   J&J, on regulatory perspective, act as a responsible

25   company to protect consumers?

Page 724

1    A    I don't believe they did, no.

2    Q    Now let's turn to --

3         THE COURT:  It's 4:30 p.m.  I said we'd stop

4    at 4:30 p.m. today.

5         Ladies and gentlemen, we are going to be in

6    recess for the day.  We'll be back in session

7    tomorrow morning at 9:15 a.m.  9:15 a.m. -- okay,

8    9:30 a.m.

9         JUROR:  Can I say something --

10        THE COURT:  One minute, ma'am.

11        But I need you all to be here as close to 9:30

12   as possible, please.  We lost about an hour today

13   because we got started a little later, and I'm

14   abbreviating my calendar so that I make sure I'm

15   here at 9:30 a.m., so I need you all to do

16   everything you possibly can to please be here.

17   Remember, the goal is to try and get you the case

18   as quickly as possible, but the only way that works

19   is that we all plan on being on time, okay?

20        Remember, you cannot discuss the case amongst

21   yourself or with anyone else.  No independent

22   research about the case.  No posting, social media

23   or anything like that.

24        Have a good evening and we will see you

25   tomorrow morning at 9:30 a.m.

Page 725

1          Ma'am, you can stay behind if you want to ask

2     me a question.  You can hand the note pads to Rod

3     as you head out.

4          JUROR:  I was here today 9:30.  I come all the

5     way from Aventura, one hour, 45 minutes to come

6     here.  I came here stayed, again, 45 minutes wait

7     for other people to come here.

8          THE COURT:  Ma'am, I can't get started until

9     all ten of you are present.

10         JUROR:  I understand, but why I am here that

11    other people don't?

12         THE COURT:  We are going to encourage everyone

13    to make sure you are on time, and I'm sure

14    everybody is doing the --

15         JUROR:  It's very sad.

16         THE COURT:  -- best they possibly can.  I'll

17    see you all tomorrow at 9:30 a.m.  Thank you.

18         (The jurors exited the courtroom.)

19         THE COURT:  Okay.  Let's be honest, we know

20    she is going to be a problem throughout the whole

21    proceeding, so we've just got to kill her with

22    kindness, just smile and say good morning, how are

23    you, and hope that she'll relax a little bit.

24         All right.  You can step down.  You are on the

25    witness stand.  You should not discuss your

Page 726

1    testimony with anyone.

2         I went through -- at least I got through

3    three-quarters, if not a little more, of Hopkins.

4    I have a question on Hopkins.  He is the corporate

5    representative?

6         MS. BROWN:  He is not.  In this case, Your

7    Honor, he gave deposition testimony as the

8    corporate representative in the past.

9         THE COURT:  So this is not for this case?

10        MR. OLIVER:  It is for this case, Your Honor.

11   They put up a number of different corporate

12   representatives over time.  For example, one of

13   them I deposed, we submitted some of her testimony,

14   Dr. Nickelson.

15        Dr. Hopkins, we didn't redepose him but he

16   gives some specific testimony about the

17   admissibility of the documents that we need.  So

18   there are multiple -- they put up multiple

19   corporate representative reps during this whole

20   litigation and we are using them for different

21   purposes.  They actually replace --

22        THE COURT:  I don't know if I've heard that.

23   Let me make sure I understand.  Did you ask -- you

24   didn't -- when I say "you," I mean your team.

25        Your team is not the one asking these

Page 727

1        questions?

2            MR. OLIVER:  For Hopkins, no.  For Nickelson,

3        yes.

4            THE COURT:  I haven't read -- I've only read

5        Hopkins.  And the reason is because he's a

6        corporate rep, and so I don't think he can give

7        expert opinions.  The issues isn't what he

8        personally thinks about a particular topic, it's

9        him speaking on behalf of Johnson & Johnson.

10            And so there are several times during this

11        deposition, latter part of the deposition, where he

12        is being asked about his opinion as to certain

13        things.  And I'm not saying he's not qualified to

14        do it, I'm just saying that wasn't his purpose at

15        that deposition.

16            He was there as a corporate representative.

17        And so if he said what Johnson & Johnson did, what

18        Johnson & Johnson knew, and replied to the

19        documents in that context, I guess I would get it.

20        But it looks as if he was actually being asked, "Do

21        you know what this is?"  And, "What do you think

22        about this?"

23            And I don't think -- and so I sustained all of

24        those, but is there something I need to be aware

25        of?

Page 728

1          MS. BROWN:  Well, Your Honor, he was a

2     long-time employee of the company, and so he has a

3     lot of personal knowledge about talc safety issues.

4     So oftentimes -- and I'd have to look at what they

5     designated from -- he went up in his personal

6     capacity as well.

7          And on both sides, people asked him questions,

8     not just as the corporate rep, but as Dr. John

9     Hopkins in his personal capacity.

10         THE COURT:  Well, the objections that I've

11     read, it appeared to me that they were going

12     through a lot of documents that -- and I did ask

13     the question.  I said, well, why -- is it Blount?

14     And then there was these documents about the mine.

15     And so my first question was -- I wrote a question

16     on there.  I said, okay, whose documents are these?

17     I was like, why is he able to testify to the

18     documents?

19         And then later, when I read, it became clear

20     that these were -- they were their documents, but

21     it was done on behalf of -- or it was done in

22     conjunction with Johnson & Johnson; is that fair?

23         MS. BROWN:  Well, he would have known about

24     Blount during the time period he was working there,

25     and if something was taking place in the '90s when

Page 729

1      he was a toxicologist at the company.

2           THE COURT:  So the mining and all that, that's

3      all part of that?

4           MS. BROWN:  Yes, sir.

5           THE COURT:  I overruled those objections.  I'm

6      only asking that question because I didn't

7      understand how he was being presented.

8           Okay.  I guess I'll finish sometime tomorrow

9      morning on -- if you want what I got, I can give

10     you what I got and then I can finish the last few

11     pages tomorrow.

12          MR. OLIVER:  Your Honor, is this a good time

13     to hear an issue regarding some of the 30(b)(6)

14     testimony since we're on that subject?  It's not

15     about the specifics, but we have an argument --

16     this is not a good time?

17          THE COURT:  No, I don't want to hear about it.

18     I'm going home.

19          MR. OLIVER:  Can we be heard, Your Honor?

20          THE COURT:  At some point, it could be heard

21     but just now is not the time when it's going to be

22     heard.  What about my jury instructions?

23          MR. RAYFIELD:  We are working on those.

24          THE COURT:  Stop telling me that.  Let me tell

25     you why I want the jury instructions.  I would

Page 730

 1          think you all would want me to have the jury

 2          instructions because, by me having the jury

 3          instructions, I know all the issues that are in the

 4          case.  I normally read jury instructions before the

 5          trial even begins, and you all haven't -- you've

 6          given me your proposed jury instructions.  But I'm

 7          asking you to get together and narrow them into one

 8          set.

 9              By the way, I don't need the standard, I need

10          the substantive instructions because that is, to

11          me, is the heart of the case.  That way when I'm

12          ruling on things, I don't need to ask, maybe, so

13          many things.  It can just be -- I can know some

14          things by the jury instructions that you're

15          proposing.

16              MR. RAYFIELD:  That's exactly what we're

17          working on.  It's a single document with red lines

18          noting each of the parties different instructions

19          so it will be clear which side is proposing what.

20              THE COURT:  You all do know that was due

21          before we started the trial.

22              MR. RAYFIELD:  If I misunderstood that, I'm

23          sorry.  I thought each side's proposals were due at

24          the start of trial.

25              THE COURT:  No, no, I don't even like -- I

Page 731

1    won't even accept -- because that's more work for

2    me.  I mean, why am I going to read the plaintiff's

3    jury instruction and then read the defendant's jury

4    instructions and I just want to see plaintiff

5    proposed jury instruction, you red line them and

6    say we object -- these are the ones we agree with,

7    these are the ones we disagree with, and here are

8    the ones that they didn't even submit that we want

9    added.

10         That, to me, makes it so much easier for the

11   trial court rather than me having to flip through

12   and find out, okay, I read yours that's a

13   duplicate, I read that.  But as soon as you can get

14   them to me -- I'm talking to you, but obviously I'm

15   talking to the plaintiff as well.  As soon as you

16   can get me the jury instructions, I need the jury

17   instructions.

18         Okay.  Anything else that you want to bring to

19   my attention that requires less than five minutes?

20         MS. BROWN:  No, Your Honor.

21         THE COURT:  See you all tomorrow morning at --

22   if you get here at 9:15, if I can finish my motion

23   calendar -- I literally went through every motion

24   on my motion calendar and I already wrote what I'm

25   going to do.  So hopefully I can go through the

Page 732

1          motion calendar a little quicker, I think somebody

2          is going to have something to say about that, some

3          of the lawyers who appear, but I went through every

4          motion on my motion calendar to make sure I can get

5          through it by 9:15.

6              So if you get here by 9:15, that will give you

7          some time, and hopefully we won't have to wait for

8          the jurors.  We'll be in recess until tomorrow

9          morning at 9:15 a.m.

10              (The proceedings recessed at 4:40 p.m.)

11              (Continued in Volume III.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 733

1                              CERTIFICATE

2

3              I, CHRISTINE SAVOUREUX-MARINER, Florida

4    Professional Reporter, certify that I was authorized

5    to and did stenographically report the foregoing

6    proceedings and that this transcript is a true

7    record of the proceedings before the Court.

8              I further certify that I am not a

9    relative, employee, attorney, or counsel for any of

10   the parties, nor am I a relative or employee of any

11   of the parties' attorney or counsel connected with

12   the action, nor am I financially interested in the

13   action.

14

               Dated this 14th day of February, 2024.

15

16

17

               CHRISTINE SAVOUREUX-MARINER

18             Florida Professional Reporter

19

20

21

22

23

24

25