# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge |
| **This Document Relates to All Actions** | **Oral Argument Requested** |

## <u>MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF WAYNE GIBSON</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND .............................................................................................4

ARGUMENT .................................................................................................5

I.    MR. GIBSON'S IQVIA OPINIONS ARE ADMISSIBLE. ..........................6

    A.    PLAINTIFFS' CRITICISMS OF MR. GIBSON'S BENCHMARKS ARE INVALID AND, AT MOST, CROSS-EXAMINATION POINTS. ................................................9

    B.    PLAINTIFFS' DEPICTION OF IQVIA AS THE "GOLD STANDARD" IS UNSUBSTANTIATED AND CONTRADICTED BY IQVIA'S OWN DOCUMENTATION. .......13

II.   MR. GIBSON'S CMS SUBSIDY OPINIONS ARE ADMISSIBLE. ...........17

    A.    MR. GIBSON'S CMS SUBSIDY OPINIONS ARE RELIABLE. .......................................................................17

    B.    MR. GIBSON'S CMS SUBSIDY OPINIONS FIT THE ISSUES IN THE CASE. ...................................................22

III.  THE COLLATERAL SOURCE RULE DOES NOT BAR MR. GIBSON'S CMS SUBSIDY OPINIONS. ....................................24

IV.   MR. GIBSON'S DIR OPINIONS ARE GROUNDED IN CMS GUIDANCE AND THE FACTUAL RECORD. .........................................30

CONCLUSION .............................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1st Source Bank v. First Resource Fed. Credit Union*,
    167 F.R.D. 61 (N.D. Ind. 1996) .................................................................1, 21

*In re Air Crash Disaster Near Chicago*,
    803 F.2d 304 (7th Cir. 1986) ...........................................................................25

*Amalgamated Transit Union Local 1324 v. Roberts*,
    263 Ga. 405 (Ga. 1993) ...................................................................................26

*Asher v. Unarco Material Handling, Inc.*,
    862 F. Supp. 2d 551 (E.D. Ky. 2012) .............................................................26

*Borandi v. USAA Cas. Ins. Co.*,
    No. 2:13-CV-141 TS, 2015 U.S. Dist. LEXIS 20709 (D. Utah Feb.
    19, 2015) ..........................................................................................................26

*CDA of Am. Inc. v. Midland Life Ins. Co.*,
    No. 01-cv-837, 2006 U.S. Dist. LEXIS 97327, 2006 WL 5349266
    (S.D. Ohio Mar. 27, 2006) ...............................................................................21

*Centon Electronics, Inc. v. Bonar*,
    614 So. 2d 999 (Ala. 1993) ..............................................................................26

*City of Miami Beach v. Carner*,
    579 So. 2d 248 (Fla. Dist. Ct. App. 1991) .......................................................26

*Complaint of: Borghese Lane, LLC*, No. 2:18-cv-00533-MJH ........................20, 31

*Craig v. Y & Y Snacks, Inc.*,
    721 F.2d 77 (3d Cir. 1983) ..............................................................................29

*Crossmann Communities of N.C., Inc v. Harleysville Mut. Ins. Co.*,
    No. 4:09-CV-1379-RBH, 2013 U.S. Dist. LEXIS 138941 (D.S.C.
    Sep. 27, 2013) ..................................................................................................26

*Garofalo v. Empire Blue Cross and Blue Shield*
    67 F. Supp. 2d at 347 .......................................................................................26

*Gillespie v. Travelscape LLC*,
    2014 U.S. Dist. LEXIS 119148 .............................................................................28

*Greer v. Advantage Health*,
    880 N.W.2d 786 (Mich. 2016)..............................................................................25

*Hall v. Miller*,
    143 Vt. 135 (Vt. 1983).........................................................................................26

*Helfend v. Southern Cal. Rapid Transit Dist*,
    2 Cal.3d 1 (Cal. 1970).........................................................................................27

*In re HIV Antitrust Litig.*,
    No. 19-CV-02573-EMC, 2023 WL 3603732 (N.D. Cal. May 23,
    2023) ...................................................................................................................29

*Holbrook v. Lykes Bros. S.S. Co.*,
    80 F.3d 777 (3d Cir. 1996) ....................................................................................5

*Hurd v. Nelson*,
    714 P.2d 767 (Wyo. 1986)....................................................................................26

*In re Hydrogen Peroxide Antitrust Litig.*,
    240 F.R.D. 163 (E.D. Pa. 2007)...........................................................................24

*KW Plastics v. United States Can Co.*,
    199 F.R.D. 687 (M.D. Ala. 2000).........................................................................21

*Leitinger v. Dbart*,
    302 Wis. 2d 110 .................................................................................................27

*Lewis v. Lead*,
    178 N.E.3d 1046 (Ill. 2020).................................................................................28

*Lomax v. Nationwide Mut. Ins. Co.*,
    964 F.2d 1343 (3d Cir. 1992) ..............................................................................25

*McInnis v. A.M.F., Inc.*,
    765 F.2d 240 (1st Cir. 1985).................................................................................25

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    No. 1:15-cv-6549 (CM) (RWL), 2022 U.S. Dist. LEXIS 149561
    (S.D.N.Y. Aug. 15, 2022) .....................................................................................23

*Rametta v. Stella,*
   572 A.2d 978 (Conn. 1990) ...................................................................28

*Rease v. Anheuser-Busch, Inc.,*
   644 So. 2d 1383 (Fla. Dist. Ct. App. 1994).........................................27

*Reid v. Williams,*
   964 P.2d 453 (Alaska 1998) .................................................................25

*In re September 11 Litigation,*
   649 F. Supp. 2d 171 (S.D.N.Y. 2009) .................................................25

*Shanak v. City of Waupaca,*
   185 Wis. 2d 568 (Wis. Ct. App. 1994) ................................................26

*Smith v. Jeppsen,*
   277 P.3d 224 (Colo. 2012)....................................................................27

*Snowder v. District of Columbia,*
   949 A.2d 590 (D.C. 2008) ....................................................................29

*Snyder v. Farnam Companies, Inc.,*
   792 F. Supp. 2d 712 (D.N.J. 2011) ......................................................26

*Southern v. Plumb Tools, a Div. of O'Ames,*
   696 F.2d 1321 (11th Cir. 1983) ............................................................25

*State ex rel. Stacy v. Batavia Local School District Board of
   Education,*
   2005 Ohio 2974 (Ohio 2005)................................................................26

*Tebo v. Havlik,*
   418 Mich. 350 (Mich. 1984).................................................................27

*Tera II LLC v. Rice Drilling D, LLC,*
   No. 2:19-cv-2221, 2024 U.S. Dist. LEXIS 25788 (S.D. Ohio Feb.
   14, 2024) ...............................................................................................20

*Titchnell v. United States,*
   681 F.2d 165 (3d Cir. 1982) .................................................................29

*Travelers Indem. Co. v. Page & Assocs. Constr. Co.*,
    No. 07-97-0338-CV, 1998 Tex. App. LEXIS 7531 (Tex. App. Dec. 3, 1998) ......................................................................................26

*UGI Sunbury LLC v. 1.7575 Acres*,
    949 F.3d 825 (3d Cir. 2020) ...................................................................5

*United Protective Workers of America, Local No. 2 v. Ford Motor Co.*,
    223 F.2d 49 (7th Cir. 1955) ..................................................................26

*United States v. City of Twin Falls, Idaho*,
    806 F.2d 862 (9th Cir. 1986) ................................................................26

*United States v. Mitchell*,
    365 F.3d 215 (3d Cir. 2004) .................................................................18

*Wilson v. Burch Farms*,
    627 S.E.2d 249 (N.C. Ct. App. 2006)...................................................26

*In re Zetia (Ezetimibe) Antitrust Litigation*,
    No. 18-md-2836, 2023 WL 3064462 (E.D. Va. Apr. 18, 2023) ..........29

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) .............................................5, 21

**Statutes**

CT Gen. Stat. § 52-225b ............................................................................25

Fla. Stat. § 768.76(2)..................................................................................25

GL ch. 231, § 60G......................................................................................25

Minn. Stat. § 548.251 .................................................................................25

N.D. Cent. Code, § 32-03.2-06 ..................................................................25

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) ...................................................27

Fed. R. Evid. 703 .......................................................................................16

## PRELIMINARY STATEMENT

Wayne Gibson is a pharmaceutical claims and payments specialist with more than 25 years of experience applying financial modeling and data-intensive complex claims analysis to pharmaceutical transactions. His opinions rebut the damages calculations proffered by Plaintiffs' damages expert, Dr. Rena Conti, for the upcoming third-party payor ("TPP") trial. His methodology consists of replicating Dr. Conti's payment calculations using her same data and assumptions, and evaluating whether her calculations achieve their stated goal of measuring "the total amount paid by each Plaintiff" for at-issue valsartan drugs. He concludes they do not, for multiple reasons falling squarely within his qualifications and experience, supported by reliable empirical methodologies and applicable literature, and precisely fitting the damages issues to be tried. Plaintiffs' Motion to Exclude Opinions of Wayne Gibson ("Motion" or "Mot.") should therefore be denied.

***First***, Plaintiffs' challenges to the reliability of Mr. Gibson's opinions evaluating the IQVIA Xponent pricing data on which Dr. Conti relies for her initial class-wide damages calculation have no merit. Mr. Gibson rigorously compares the IQVIA pricing data against three independent benchmarks of real-world pharmaceutical pricing data, and consistently finds the same result: the IQVIA pricing data grossly overstate the amounts paid by TPPs for valsartan prescriptions and inflate Dr. Conti's damages calculations. Notably, two of Mr. Gibson's real-

world pricing benchmarks are the ***same data sets*** relied upon by Dr. Conti in the two other calculations she performed in this case. IQVIA's own documentation confirms Mr. Gibson's results, clearly warning against treating its survey-based estimates as fact or using them as evidence in legal proceedings. And Dr. Conti admits it is the data analyst's job to "double-check" vendor data like the IQVIA Xponent data. Plaintiffs' criticisms of Mr. Gibson's meticulous empirical analyses simply ignore what Mr. Gibson actually did and provide no basis to exclude his opinions.

***Second***, Plaintiffs' criticisms of the reliability and fit of Mr. Gibson's opinions relating to subsidies paid by the Centers for Medicare and Medicaid Services ("CMS") under the Part D program to cover the costs of at-issue valsartan drugs also fall flat. Between 56% to 58% of the transactions used in both of Dr. Conti's class-wide calculations involve Medicare Advantage Part D plans ("MAPDs") and Medicare Part D plans ("PDPs"). Mr. Gibson's analysis of Dr. Conti's calculations reveals that she has failed to account for subsidies paid by CMS to cover the costs of at-issue valsartan drugs under these plans. In particular, Mr. Gibson finds that Dr. Conti has failed to account for valsartan drug costs covered by CMS under the Low-Income Cost-Sharing Subsidy ("LICS"), the catastrophic coverage reinsurance subsidy, and the Part D direct subsidy. Mr. Gibson's CMS analysis is grounded in dozens of published sources, including CMS guidance, and a thorough examination of Prescription Drug Event ("PDE") data produced by Plaintiffs. Contrary to

Plaintiffs' groundless criticisms, Mr. Gibson quantifies each of Dr. Conti's omissions, ties each omission to the at-issue valsartan drugs, and shows that Dr. Conti's focus on the "point of sale" is erroneous because the amount charged at the point of sale fails to capture the actual costs incurred by TPPs.

***Third***, Plaintiffs erroneously assert that Mr. Gibson's CMS opinions are barred by the collateral source rule, which generally prohibits the introduction of evidence of payments made by third parties to ***compensate*** a plaintiff for ***tortious*** injuries. Plaintiffs do not even attempt to ground their challenge in the governing collateral source rule statutes or case law of the at-issue states, many of which have either abrogated or significantly limited the scope of the rule. Those that do still recognize the collateral source rule do not apply it to breach-of-warranty claims, which sound in contract, not tort law. And there is no indication that any of these states would consider CMS subsidies negotiated with sophisticated TPPs to cover beneficiaries' drug costs to be collateral source payments, because the CMS subsidies are contractual consideration, not compensation for TPPs' injuries.

***Fourth***, Plaintiffs' methodological and factual criticisms of Mr. Gibson's opinions with respect to direct and indirect remuneration ("DIR")—i.e. rebates and price concessions paid to TPP class members—fail because his DIR opinions are well-grounded in both literature and the factual record.

For all of these reasons, Plaintiffs' Motion should be denied.

3

## <u>BACKGROUND</u>

Mr. Gibson is a Senior Managing Director in the Health Solutions Practice of FTI Consulting. Gibson Decl. ¶ 1. He has over 25 years of experience performing complex claims analysis of pharmaceutical transactions. *Id*. He has a Master's degree in Economics from the University of Delaware. *Id*. Mr. Gibson regularly consults for and counsels clients that are MAPDs and PDPs, and the methodologies and analyses he has applied in this case match his professional work outside of litigation, as well as the work of other professionals in his field. Gibson 2023 Dep. at 248:16-249:17, 251:11-252:2. Applying these methods and his experience, Mr. Gibson duplicates Dr. Conti's damages calculations using her same data and logic files, evaluates the IQVIA Xponent pricing data on which she relies, and critiques her failure to measure "the total amount paid by each Plaintiff" by failing to account for costs the TPP class members never incurred, including CMS subsidies and DIR.[1]

---

[1] *See* Rebuttal Expert Declaration of Wayne T. Gibson (July 17, 2023) ("Gibson Decl.") (Ex. A to Cert. of Gregory E. Ostfeld ("Ostfeld Cert.")) ¶¶ 17-18, 24, 26.b, 27-29, 35, 48-49, 53-55, 57, 62, 88-89, 110, 125, 132, 146, 148-49; Supplemental Rebuttal Expert Declaration of Wayne T. Gibson ("Gibson Suppl. Decl.") (Ostfeld Cert. Ex. B.) ¶¶ 16, 21, 23.a, 35, 40, 54, 61, 70, 83; Deposition of Wayne T. Gibson (Sept. 20, 2023) ("Gibson 2023 Dep.") (Ostfeld Cert. Ex. C) at 52:22-53:12, 159:24-163:13, 167:2-168:10, 169:22-170:8, 278:11-279:7; Deposition of Wayne T. Gibson (Feb. 5, 2024) ("Gibson 2024 Dep.") (Ostfeld Cert. Ex. D) at 109:15-110:20. *Compare* Damages Expert Declaration of Rena Conti, Ph.D. (Feb. 3, 2023) ("Conti Decl.") (Ostfeld Cert. Ex. E) ¶ 5 & Att. C ¶¶ 8, 56; Supplemental Damages Expert Declaration of Rena Conti, Ph.D. (Dec. 1, 2023) ("Conti Suppl. Decl.") (Ostfeld Cert. Ex. F) ¶ 1.

# ARGUMENT[2]

Under Rule 702, a trial judge "has three duties: (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993)). Importantly, the application of the Rule 702 standard "is different" for defense rebuttal experts, who can "help the jury to evaluate testimony by plaintiff[s'] expert [on] an issue on which plaintiff[s] bear] the burden of proof." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996). Defense rebuttal experts "have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007). Mr.

---

[2] Plaintiffs do not seek to exclude several of Mr. Gibson's opinions, including regarding: (1) the background of the Medicare Part D programs, the CMS bid process, and the CMS reconciliation process (Gibson Decl. ¶¶ 27-48); (2) Dr. Conti's erroneous inclusion of damages for unknown plan types that are cannot be confirmed to be TPP class members (*id.* ¶¶ 81-88); (3) Dr. Conti's failure to exclude amounts paid by non-class members as secondary or tertiary payers (Gibson Suppl. Decl. ¶¶ 35-37); and (4) Dr. Conti's failure to exclude claims paid by non-class members as primary payers (*id.* ¶¶ 38-39). These opinions should also be admitted.

Gibson's opinions easily satisfy these standards.

## I.     **MR. GIBSON'S IQVIA OPINIONS ARE ADMISSIBLE.**

Plaintiffs do not dispute that Mr. Gibson is qualified to testify about IQVIA Xponent pricing data and the data set's deficiencies. Plaintiffs instead challenge the reliability of Mr. Gibson's critiques by falsely asserting that he relies on "a single unauthenticated hearsay email" as the primary basis for his opinions. (Mot. at 10.) But as Mr. Gibson's testimony makes clear, that email is merely "confirmational" of his empirical comparisons of the IQVIA pricing data against multiple independent benchmarks of real-world transactions and prices, which consistently show that the IQVIA pricing is significantly higher than every other benchmark. Gibson 2023 Dep. at 194:6-195:21, 270:12-271:19. Dr. Conti herself testified that because the IQVIA data are ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Deposition of Rena Conti (Feb. 1, 2024) ("Conti 2024 Dep.") (Ostfeld Cert. Ex. G) at 83:15-84:22 (emphasis added). Mr. Gibson agrees, and testified that the appropriate "double-check" is to compare ███ █████████████████████████ from  IQVIA ████████████████████ ████████████████████████████████████████████ Gibson 2024 Dep. at 91:22-93:8. That is exactly what Mr. Gibson has done, comparing the IQVIA pricing data against three independent benchmarks.

First, Mr. Gibson compares the IQVIA data against ███████████████

████████████████████████████████████████████████████████████████████

███████████████████████████. Gibson Decl. ¶¶ 69-71 & Tables B1 and

B2. The benchmark CMS data set aggregates the transactional prices of ***100%*** of

Part D transactions reported to CMS, and Mr. Gibson performs an apples-to-apples

comparison ██████████████████████████████████████████████████████████

███████████████████ *Id*.; Gibson 2023 Dep. at 202:15-203:4, 204:20-205:25;

Gibson 2024 Dep. at 34:8-35:16, 36:3-38:3, 40:7-19, 59:11-60:3, 90:5-91:15.

Second, he compares the IQVIA pricing data ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████. Gibson Decl. ¶ 72. He finds that the IQVIA pricing

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██. *Id*. ¶¶ 72-80 & Tables B3 to B5. As Mr. Gibson explains, ██████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. Gibson 2024

Dep. at 25:11-26:11, 37:1-38:3, 53:9-54:13, 90:5-91:15, 101:23-103:3. Dr. Conti

agrees, which is why she chose ██████████████████████████ when calculating

MSP's individual damages. *See* Conti Decl. ¶ 7. The fact that Mr. Gibson (unlike Dr. Conti) actually compared the two data sets when addressing class-wide damages shows that Mr. Gibson's opinions are reliable and that Dr. Conti's are not.

Third, Mr. Gibson compares the IQVIA pricing ███████████████████ ███████████████████████████████████████████. Gibson Suppl. Decl. ¶¶ 24-31. The █████████████████ are the ***same*** data Dr. Conti used in her second class-wide damages calculation, █████████████████████████████ █████████████████████. Conti Suppl. Decl. ¶¶ 2, 5-9, Tables 1-3. And again, ███████████████████████████████████████████████████ ██████████████████████████████████████████████. Gibson 2024 Dep. at 25:11-26:11, 37:1-38:3, 53:9-54:13, 90:5-91:15, 101:23-103:3. Mr. Gibson finds that on average, the real-world █████████████████████████████ ██████████████████████████. Gibson Supp. Decl. ¶¶ 24-25 & Table A1.

Finally, he finds that the average prices reflected in the three real-world benchmark data sets—█████████████████████████████████████ █████████████████████████—are consistent, whereas ███████████████████ ███████████████ are grossly overstated when compared to all three benchmark data sets. *Id*. ¶¶ 26-31 & Tables A2-A4; Gibson 2024 Dep. at 37:1-38:3, 59:11-60:3, 101:5-24, 103:5-24, 105:5-13, 121:7-122:6, 123:4-16, 128:6-129:10. Mr. Gibson's consistent results across three benchmarks of empirical comparison—two of which

8

Dr. Conti also relied upon in her own calculations—provide overwhelming support for Mr. Gibson's conclusion that the IQVIA prices are greatly overstated and Dr. Conti's resulting calculation is grossly inflated. *Id*.

In short, Mr. Gibson performed a rigorous "double-check" of the IQVIA data, and of Dr. Conti's calculations based on the data, by comparing them to legitimate benchmarks. Plaintiffs' criticisms do not have any merit, much less justify excluding Mr. Gibson's opinions under Rule 702.

**A.    Plaintiffs' Criticisms Of Mr. Gibson's Benchmarks Are Invalid And, At Most, Cross-Examination Points.**

Plaintiffs' critiques of Mr. Gibson's benchmarks and cherry-picking of supposed "admissions" should be rejected.

First, Plaintiffs assert that IQVIA is a larger data set supposedly encompassing, according to Dr. Conti, " ███████████████████████████ ███████████ (Mot. at 12.) That is inaccurate. IQVIA states in its documentation that it seeks ████████████████████████, but does not define what ███████ means, what the survey reach is, what the response rate is, or how many survey respondents respond with the actual price paid as opposed to list price. Gibson 2024 Dep. at 30:18-34:7, 88:10-89:15. Because IQVIA does not publish its response rate, ████████████████████████████████████████████████ ████████████████████████. *Id*. at 89:24-90:4, 94:4-95:13. If anything, the IQVIA data set with respect to Part D transactions is ***under***-inclusive, ███████████

9

██████████████████████████████████████████████████████

████████. *Id*. at 40:7-19. And the nearly ██████████████████████████

███████████ set contain transaction-level details that can be validated and are consistent with every other benchmark, unlike the IQVIA data, which cannot be validated and are inconsistent with every benchmark. *Id*. at 90:5-91:21, 95:14-95:6.

Second, Plaintiffs state that the pharmacy claims data exclusively represent ████████████████████████████████████████—which according to Dr. Conti—carry lower costs ██████████████████████ and that Mr. Gibson ████████████████████████████████████████████ ████████████ not doing███████████████████████████████████ (Mot. at 12-13.) However, while Mr. Gibson agrees that drug prices are variable, he specifically testified that this variability ***has no impact*** on his analysis, and also ***disagreed*** that the use of ██████████████████████ prices in the pharmacy claims data skews average prices downward, because such data represent a ██████████████████████ of ***all*** at-issue valsartan transactions. Gibson 2024 Dep. at 99:23-103:24. Indeed, Dr. Conti found the ***same*** pharmacy claims data sufficiently reliable to perform a separate class-wide damages calculation. Conti Suppl. Decl. ¶ 13. Moreover, the pharmacy claims data produce results consistent with the SummaCare and Emblem claims data and the CMS Part D data, both of which are inclusive of ***all transactions*** within their respective populations and are

10

*not* limited to large chains or grocery stores. *Id*. Regardless, large chain and grocery store prices certainly would not explain the ███████████████████████████

████████████████████████████████████████████████████

███████████████████████████. *Id*. at 103:5-24.

Third, Plaintiffs contend that Mr. Gibson "ignores" Dr. Conti's assertion that the pharmacy claims data pricing and the IQVIA pricing supposedly "become much more consistent" as the pharmacy data "begins to approximate IQVIA in terms of quantities[.]" (Mot. at 14-15.) In reality, Mr. Gibson vigorously ***disagreed*** with this assertion, explaining that Dr. Conti's assumption that IQVIA represents the correct volume estimates is methodologically unsound because IQVIA does not publish its response rate or other details necessary to validate its estimates. *Id*. at 89:24-90:4, 94:4-95:13. Moreover, when the IQVIA prices are compared to the SummaCare and Emblem claims data and to the CMS Part D data, both of which represent ***100%*** of the IQVIA volume for their respective populations, the same large price disparities persist. *Id*. at 99:23-103:24. And as Mr. Gibson further explains, Dr. Conti's best example of her consistency-with-volume theory (Torrent)—which notably represents ██████████████████████████████—still reflects an overall discrepancy of prices ████████████████████████████████████████

███████████████████████████████████████████████. *Id*. at 96:8-99:5. The supposed relationship between volume and pricing consistency collapses

11

altogether for ZHP, ██████████████████████████████

██████████████████████████████████████████████

████████████████████████████. *Id.* at 99:6-22.

Fourth, Plaintiffs falsely assert that Mr. Gibson "failed to account" for the supposed fact that the pharmacy claims data "contains a significantly greater percentage of mail order prescriptions" than the "much larger IQVIA sample." (Mot. at 15.) That is just a redux of Plaintiffs' "large chain and grocery stores" criticism and suffers from the same deficiencies. In fact, Mr. Gibson noted that IQVIA's own FAQ document acknowledges that its (undefined) "coverage" is lower for mail order versus retail, suggesting the IQVIA sample is more likely to be under-representative of mail order. *Id.* at 30:18-31:15. And mail-order prices still would not explain the

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████. *Id.* at 105:5-13.

Fifth, Plaintiffs falsely assert that Mr. Gibson "concedes" that the CMS Part D data is not "reliable to extrapolate general market pricing" and "made no effort to compare Part D pricing to commercial pricing[.]" (Mot. at 15). What Mr. Gibson actually said was that his benchmark analysis using the CMS Part D data "████

████████████████████████████████████████ which represents ██████

████████████████████████████████ and ██████████████████████████

report. Gibson 2024 Dep. at 41:4-42:10 (emphasis added). Mr. Gibson separately compared the IQVIA pricing data to the pharmacy claims data pricing, which was inclusive of commercial prices, and the results were consistent. *Id*. at 36:3-38:3, 42:11-43:12, 90:5-91:21. The point of his analysis is not to capture ███████ ██████████ in one data set, but to evaluate the IQVIA pricing against multiple real-world benchmarks and to test it for consistency against each benchmark—with the result being that IQVIA prices were consistently overstated when compared to every benchmarks. *Id*. at 59:11-60:3.

In sum, Mr. Gibson is the only expert to undertake the "double check" that Dr. Conti acknowledged it is an analyst's job to perform, and is the only expert to "dig" into all three available real-world benchmark data sources to compare the IQVIA pricing data against known benchmarks for accuracy. Plaintiffs' critiques of that rigorous analysis are, at most, cross-examination points for the jury to consider when it weighs Mr. Gibson's testimony.

**B.    Plaintiffs' Depiction Of IQVIA As The "Gold Standard" Is Unsubstantiated And Contradicted By IQVIA's Own Documentation.**

Plaintiffs' other attempt to undermine the reliability of Mr. Gibson's IQVIA opinions is to assert that he is an "outlier" when compared to deposition testimony from other witnesses that Plaintiffs offer to substantiate Dr. Conti's *ipse dixit* characterization of IQVIA data as the "gold standard" for the industry. (Mot. at 11-12.) But Plaintiffs mischaracterize the testimony on which they rely and ignore

IQVIA's own documentation, which confirms Mr. Gibson's analyses and opinions.

None of the witnesses cited by Plaintiffs identified IQVIA as the "gold standard" for "pricing data in this industry," as Plaintiffs assert. (Mot. at 11 (emphasis added).) For example, Hai Wang testified that IQVIA is a "benchmark" not for pricing, but rather for "sales information" and "marketing data." (Mot. Ex. 7 at 48:3-49:9; Mot. Ex. 8 at 499:14-502:15.) Lauren Stiroh specifically cautioned that the reliability of IQVIA data depends on "what it is that I am using it for" and that the data ███████████████████████████████████████████████████ ████████████████ (Mot. Ex. 9 at 81:6-83:5.) And when Timothy Kosty was asked by Plaintiffs' counsel whether IQVIA data is the "gold standard," he merely responded that IQVIA is the "leading provider" of data to perform specific tasks like ███████ ██████████████████████████████████████ (Ex. 10 at 134:1-15). Notably, Plaintiffs omit Mr. Kosty's testimony in the same answer that ████████████████ ███████████████████████████████████ as well as his criticisms of Dr. Conti's use of the IQVIA data. (Dep. of Timothy Kost ("Kosty 2022 Dep.") 133:13-134:8, 161:8-162:14, 331:15-25, Feb. 24, 2022 (Ostfeld Cert. Ex. H).)

These witnesses do not validate Dr. Conti's methodology, nor do they render Mr. Gibson an "outlier." To the contrary, they describe using IQVIA's data as it was intended to be used—to track market share, market trends, and market behavior. That aligns with IQVIA's own documentation.

14

First, IQVIA's "Data Disclosure Policy: Legal Proceedings and Government Investigations," states in relevant part:



2024 Gibson Dep. at 113:2-115:15, Ex. 22 at 3 (emphases added).

Second, the "IQVIA Information Services Published Specifications" states:





*Id.* at 115:16-120:16, Ex. 23 at 1-2 (emphases added).

Third, IQVIA wrote in response to a specific inquiry about the use of pricing data from the IQVIA Xponent data set:



Gibson Decl. ¶ 63 & n.29 (emphasis added).

Plaintiffs do not contest the admissibility of the first two published IQVIA documents, much less attempt to explain how Mr. Gibson's opinions are inconsistent with them. Plaintiffs do challenge Mr. Gibson's reliance on the third document as a "single unauthenticated hearsay email[.]" (Mot. at 10.) However, an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed," and "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. Mr. Gibson testified that he spoke with one of the parties to the email to verify its contents, and

that he views the email as "confirmational" of his empirical opinions. Gibson 2023 Dep. at 180:18-182:25, 270:12-271:19. Dr. Conti and Mr. Gibson both agree it is the data analyst's job to "double check" vendor data. Conti 2024 Dep. at 83:15-84:22; Gibson 2024 Dep. at 91:22-93:8. Thus, Mr. Gibson had good grounds for considering the email, as well as the two published IQVIA documents—all of which highlight the reliability of his opinions and the unreliability of Dr. Conti's.[3]

## II.    MR. GIBSON'S CMS SUBSIDY OPINIONS ARE ADMISSIBLE.

Plaintiffs seek to exclude Mr. Gibson's opinions criticizing Dr. Conti's failure to account for CMS subsidies for at-issue valsartan drugs for Part D plan beneficiaries—███████████████████████████████ ██████████—on grounds of reliability and fit (as well as the collateral source rule, addressed in § III, *infra*). Plaintiffs' challenges fail for multiple reasons.

### A.    Mr. Gibson's CMS Subsidy Opinions Are Reliable.

In critiquing Dr. Conti's damages calculations, Mr. Gibson relies on the exact same data sets and logic files as Dr. Conti. Gibson Decl. ¶¶ 20-24; Gibson Suppl. Decl. ¶¶ 18-21; Gibson 2023 Dep. at 250:7-24. He then evaluates the results to

---

[3] Plaintiffs vaguely assert in a single sentence that Mr. Gibson's IQVIA opinions would not be "useful" to the jury—i.e., do not "fit" the facts of this case. (Mot. at 10.) However, Mr. Gibson's opinions will necessarily assist the jury in evaluating the credibility and correctness of Dr. Conti's inflated initial class-wide damages calculation, which relies solely on the IQVIA Xponent pricing data.

determine whether the calculations achieve their goal of measuring ███████████ ███████████████████████ for at-issue valsartan drugs. Mr. Gibson applies CMS guidance and uses the same analytical methods he and other professionals in his field routinely employ. Gibson 2023 Dep. at 250:25-253:6. He applies those methods in the same manner as in his day-to-day non-litigation work. *Id.* at 252:25-253:6. Mr. Gibson supports his opinions by specific citation to ***dozens of published sources***, including CMS guidance and literature used in the day-to-day operations of MAPDs and PDPs. Gibson Decl. ¶ 22 & fns. 2, 8-21, 26-27, 30, 40-43, 47-51, 53, 58-62, Ex. 2; Gibson Suppl. Decl. ¶ 19 & fns. 11-14, Ex. 2. Plaintiffs do not take issue with Mr. Gibson's analytical methods or the literature and publications on which he relies. Instead, they focus on his results, which is not a Rule 702 issue. *See United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004).

Regardless, Plaintiffs' criticisms lack merit. First, Plaintiffs assert in blanket fashion with respect to all of the CMS subsidy opinions that "none of these purported amounts is quantified by Mr. Gibson," and fault Mr. Gibson for not "present[ing] a calculation quantifying the purported offsets[.]" (Mot. at 4, 8). That is simply false. Mr. Gibson meticulously quantifies each of his opinions:

- ███████████████████████████████████████████████████████████████████
  Gibson Decl. ¶¶ 50, 59, Tables A1 & A2; Gibson Suppl. Decl. ¶ 26, Table A2; Gibson 2023 Dep. at 208:21-209:11.

18



- ████████████████████████████████████ Gibson Decl. ¶¶ 91-111 & Table C1.

- Of these claims, ████████████████████ ████████████████████████████████████ *Id*.

- ████████████████████████████████████ ████████████████████████████████████ *Id*. ¶¶ 96-110

- ████████████████████████████████████ *See* Gibson Suppl. Decl. ¶¶ 40-61.

- ████████████████████████████████████ Gibson Decl. ¶¶ 50 n.22, 134-142, Figures D1, D2, & D3; Gibson 2023 Dep. at 103:23-106:14.

- ████████████████████████████████████ Gibson Decl. ¶ 61.

To the extent Plaintiffs are complaining that these quantifications do not also

include a complete alternative damages calculation, that is due to Plaintiffs' refusal to produce the data sought by Mr. Gibson to perform such a calculation. Gibson Decl. ¶¶ 25-26, 60.[4] In any event, Mr. Gibson is not obliged to undertake his own calculations. Rather, because Plaintiffs have the burden of proof on damages, Defendants' rebuttal damages expert need only identify flaws in Plaintiffs' expert's calculations. *See Complaint of: Borghese Lane, LLC*, No. 2:18-cv-00533-MJH, 2023 U.S. Dist. LEXIS 75270, at *77-78 (W.D. Pa. Apr. 27, 2023) ("Respondents are not obliged to offer an alternative calculation or methodology on reasonableness in said calculation. Mr. Crivici's report primarily seeks to rebut Movants' calculations by identifying what he opines are flaws and/or missing information. Such opinions are proper for purposes of rebuttal … . To the extent that Movants disagree with Mr. Crivici's assessments, said disagreement is best addressed in cross-examination."); *see also Tera II LLC v. Rice Drilling D, LLC*, No. 2:19-cv-2221, 2024 U.S. Dist. LEXIS 25788, at *42 (S.D. Ohio Feb. 14, 2024) (rebuttal experts "are not required to suggest alternate theories of damages or conduct

---

[4] Mr. Gibson's analysis requires ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Gibson Decl. ¶¶ 25-26. Mr. Gibson requested the additional data he needed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) to perform his own calculation, and Plaintiffs refused the request. *Id*. ¶ 26; *see also* Gibson 2023 Dep. at 99:5-100:5. Defendants moved to compel production of these materials, and that motion was denied with respect to these materials. (*See* ECF 2178, 2249.)

independent damages calculations; instead, they are entitled to criticize [plaintiffs' expert's] damages calculations").[5]

Second, Plaintiffs challenge the reliability of the "direct subsidy" portion of Mr. Gibson's CMS opinions, asserting that the direct subsidy is "categorically unrelated" to valsartan, and that it is a "general" payment made "prospectively" based on the plan's "bid for the upcoming year." (Mot. at 7-8.)[6] That mischaracterizes the subsidy. The direct subsidy is used to purchase specific drugs to treat particular conditions—for example, the direct subsidy is applied to patients with hypertension or pulmonary hypertension to purchase drugs specifically used to treat these conditions, i.e. valsartan. Gibson Decl. ¶¶ 114-18; *see also* Gibson 2023 Dep. at 93:5-13 ███████████████████████████████████ ███████████████████████████████████ *id*. at 94:22-95:3. As

---

[5] *See also In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 285; *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-cv-837, 2006 U.S. Dist. LEXIS 97327, 2006 WL 5349266, at \*17 (S.D. Ohio Mar. 27, 2006); *KW Plastics v. United States Can Co.,* 199 F.R.D. 687, 692 (M.D. Ala. 2000); *1st Source Bank v. First Resource Fed. Credit Union,* 167 F.R.D. 61, 65 (N.D. Ind. 1996).

[6] Plaintiffs seek to apply the same criticism to the so-called "risk corridor subsidy," but Mr. Gibson never criticized Dr. Conti for failing to account for risk corridors. The only two references in his reports to the "risk corridor" are with respect to his professional background and a general description of how the CMS bid process works. Gibson Decl. ¶¶ 3, 31. Plaintiffs' counsel asked Mr. Gibson about risk corridors at his deposition, and Mr. Gibson answered the questions, but he has offered no opinion critical of Dr. Conti based on risk corridors. *See* Gibson 2023 Dep. at 140:22-142:12. The "risk corridor subsidy" is a non-issue.

Mr. Gibson has shown, it is possible to isolate the specific portion of the direct subsidy used to buy hypertension drugs and to compare that amount to the amounts paid for valsartan. Gibson Decl. ¶¶ 50 n.22, 119-142, Figures D1, D2, & D3; Gibson 2023 Dep. at 103:23-106:14. And it is further possible (using the MMR reports that Plaintiffs refused to produce) to isolate the specific portion of the direct subsidy used to treat the same condition in the same patient, and thus to allocate the direct subsidy specifically to valsartan drug purchases. Gibson 2023 Dep. at 97:21-100:19. Moreover, direct subsidies are not just paid prospectively based on the bid for the upcoming year, but vary throughout the year and are also paid monthly and retrospectively through the reconciliation process. Gibson 2023 Dep. at 53:13-68:13.

Thus, none of Plaintiffs' criticisms implicate the reliability of Mr. Gibson's methodology or application of that methodology. Rather, at most, Plaintiffs have again simply identified points on which they might cross-examine Mr. Gibson.

### B.    Mr. Gibson's CMS Subsidy Opinions Fit The Issues In The Case.

Mr. Gibson's CMS subsidy opinions also fit the issues in the case, because they identify a gaping flaw in Dr. Conti's damages calculations—she would award amounts that the TPP class members ***did not incur*** for at-issue valsartan drugs, and that CMS paid instead. As the Southern District of New York held in denying a similar motion *in limine* to exclude expert testimony regarding the same CMS subsidies: "***This is not even a close question*** – subsidies, of all forms, are a damages

set off and the jury (assuming we have a jury trial on damages) will be so instructed." *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-6549 (CM) (RWL), 2022 U.S. Dist. LEXIS 149561, at *37 (S.D.N.Y. Aug. 15, 2022) (emphasis added). The court held: "Any benefits, including discounts or subsidies, that flowed to a plaintiff ***must be used to reduce the amount of damages suffered by that plaintiff***. Therefore, as a matter of law, to the extent Class Members receive any form of payment that covers all of part of its memantine prescription costs, those payments must be deducted from damages." *Id*. (emphasis added). The court held that it was for the "trier of fact" alone to consider the "complex set of coverages and reimbursements," and determine "exactly how much of the cost of memantine to the Plaintiffs class members ***ends up being borne by the Government, not the class member***." *Id*. at *38 (emphasis added). The court explained:

> [T]hese criticisms of Dr. Vogt's work … do not present legal issues for the court to resolve. The court only rules o[n] what the measure of damages is. And the measure of damages is the actual damage - the out-of-pocket cost - that is suffered by a third-party payor as a result of being overcharged for memantine. ***Whether Dr. Vogt has calculated that measure correctly in light of the various government reimbursement programs presents a question of fact for the trier of fact - not a ruling of law for the court to make. Whether aspects of what Plaintiffs characterize as "premiums" operate to reduce the out-of-pocket cost of memantine to a third-party payor is also a question of fact for the trier of fact - not a ruling of law for the court to make.*** All of this is fair game for cross examination.

*Id*. at *39-40 (emphasis added).

Plaintiffs dispute none of this, but assert that Mr. Gibson's opinion does not

"fit" because he supposedly "confirmed" that the CMS subsidies at issue would not affect the TPP's "obligations at the point of sale." (Mot. at 5). That erroneously presumes Dr. Conti is correct in her insistence that the "point of sale" is the only relevant time frame. As Mr. Gibson explains, focusing solely on the amount ██████████████████ at the point of sale ████████████████████████████ ████████████████████████████████████████████████████████ and is ████████████████████████████████████████████████ which ██████████████████████████████████ MAPDs and PDPs covering ██████████████████████████████████████████ Gibson Decl. ¶¶ 28, 35, 49; *see also id.* ¶¶ 42, 91-92, 98-99, 125, 131-32, 144; Gibson 2023 Dep. at 52:22-53:12, 115:14-117:17, 159:24-160:19, 167:2-168:10. Dr. Conti ████████████████████████████████ for calculating a TPP's ████████ based on the drug costs ████████████████████████ and CMS guidance directly contradicts her view. Gibson Decl. ¶¶ 52-53, 57. The lack of a reliable basis for Dr. Conti's "point of sale" premise is grounds to exclude her opinions, not Mr. Gibson's, but at most the dueling "opinions of battling experts" are a matter for the jury. *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 171 (E.D. Pa. 2007).

## III.  THE COLLATERAL SOURCE RULE DOES NOT BAR MR. GIBSON'S CMS SUBSIDY OPINIONS.

Plaintiffs separately attempt to exclude Mr. Gibson's CMS subsidy opinions through a misapplication of the collateral source rule. (Mot. at 5-7.) A federal court

sitting in diversity "must apply the collateral source rule of the state whose law governs the case[.]" *In re Air Crash Disaster Near Chicago*, 803 F.2d 304, 308 (7th Cir. 1986); *see also Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343, 1345 (3d Cir. 1992); *McInnis v. A.M.F., Inc.*, 765 F.2d 240, 245 (1st Cir. 1985); *Southern v. Plumb Tools, a Div. of O'Ames*, 696 F.2d 1321, 1323 (11th Cir. 1983).

Here, Plaintiffs make no attempt to frame their collateral source argument within any of the applicable 42 state laws at issue in this trial. That is presumably because several states have abrogated the collateral source doctrine in whole or in part. *See, e.g., In re September 11 Litigation*, 649 F. Supp. 2d 171, 179 (S.D.N.Y. 2009) (stating that N.Y. CPLR § 4545 "abrogated almost entirely" the common law collateral source rule in New York); *Greer v. Advantage Health*, 880 N.W.2d 786, 787 (Mich. 2016) (describing Michigan's "abrogation" of common law collateral source rule); *Reid v. Williams*, 964 P.2d 453, 457 n.7 (Alaska 1998) (discussing history of "[l]egislation abrogating the common law collateral source rule" being "enacted throughout the United States").[7]

Moreover, an "overwhelming majority" of states that still recognize the rule

---

[7] *See also, e.g.*, ALM GL ch. 231, § 60G; Minn. Stat. § 548.251; N.D. Cent. Code, § 32-03.2-06. Other states, like Florida, expressly exclude "benefits received under Medicare" from the definition of a "collateral source." Fla. Stat. § 768.76(2); *see also* CT Gen. Stat. § 52-225b (limiting definition of "collateral source" payments to two categories of private payments). These are just a few illustrative examples.

"have explicitly refused to import the collateral source rule into the law of contracts." *Asher v. Unarco Material Handling, Inc.*, 862 F. Supp. 2d 551, 554-55 (E.D. Ky. 2012) (collecting cases).[8] A claim for breach of express warranty "sound[s] in contract." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 720 (D.N.J. 2011). Excluding Mr. Gibson's opinions under the collateral source rule would thus, at a minimum, introduce error as to the breach of express warranty claims by excluding evidence directly relevant to the question of whether Dr. Conti's

---

[8] *See also, e.g.*, *United States v. City of Twin Falls, Idaho*, 806 F.2d 862, 873 (9th Cir. 1986) ("We have found no authority to support the application of the collateral source rule in the contracts field."); *United Protective Workers of America, Local No. 2 v. Ford Motor Co.*, 223 F.2d 49, 54 (7th Cir. 1955) (similar); *Crossmann Communities of N.C., Inc v. Harleysville Mut. Ins. Co.*, No. 4:09-CV-1379-RBH, 2013 U.S. Dist. LEXIS 138941, at *82 (D.S.C. Sep. 27, 2013) ("The collateral source rule only applies to tort claims. It has no bearing on the breach of contract claims which form the basis of the present action."); *Amalgamated Transit Union Local 1324 v. Roberts*, 263 Ga. 405, 408 (Ga. 1993) ("evidence which would clearly be inadmissible in a tort case under the collateral source rule may nevertheless be relevant and admissible in a breach of contract case"); *Hurd v. Nelson*, 714 P.2d 767, 771 (Wyo. 1986) ("Succinctly stated, an obligation in tort is not satisfied by payment from a collateral source while payment from a collateral source may satisfy a contractual obligation."); *Borandi v. USAA Cas. Ins. Co.*, No. 2:13-CV-141 TS, 2015 U.S. Dist. LEXIS 20709, at *1-2 (D. Utah Feb. 19, 2015); *Garofalo*, 67 F. Supp. 2d at 347; *Wilson v. Burch Farms*, 627 S.E.2d 249, 257 (N.C. Ct. App. 2006); *State ex rel. Stacy v. Batavia Local School District Board of Education*, 2005 Ohio 2974, ¶ 38 (Ohio 2005) (citation omitted); *Travelers Indem. Co. v. Page & Assocs. Constr. Co.*, No. 07-97-0338-CV, 1998 Tex. App. LEXIS 7531, at *2 (Tex. App. Dec. 3, 1998); *Shanak v. City of Waupaca*, 185 Wis. 2d 568, 589 (Wis. Ct. App. 1994); *Centon Electronics, Inc. v. Bonar*, 614 So. 2d 999, 1004 (Ala. 1993); *City of Miami Beach v. Carner*, 579 So. 2d 248, 253-54 (Fla. Dist. Ct. App. 1991). Indeed, of the subclass states, only Vermont has applied the collateral source rule to actions sounding in contact. *See Hall v. Miller*, 143 Vt. 135, 143 (Vt. 1983).

calculation awards more damages than necessary to compensate Plaintiffs for Defendants' alleged breach. On that basis alone, Plaintiffs' motion should be denied.

Nor is there any basis for excluding Mr. Gibson's subsidy opinions as to the fraud-based claims under those states that still recognize the collateral source rule. "A collateral source is a person or company, wholly independent of an alleged tortfeasor, that **compensates an injured party for that person's injuries**." *Smith v. Jeppsen*, 277 P.3d 224, 228 (Colo. 2012) (emphasis added).[9] But CMS subsidies are **not** compensation for injuries. They are contractual consideration paid by CMS to cover various costs—including specific drug costs—based on a variety of factors, including actuarial calculations, demographic profiles, documented health conditions, and the CMS reconciliation process. Gibson Decl. ¶¶ 27-48; Gibson 2023 Dep. at 53:13-68:13. Subsidies like LICS, catastrophic coverage reinsurance subsidies, and direct subsidies thus are not injury compensation, but negotiated contractual amounts applied to drug costs that must be accounted for to determine

---

[9] *See also Black's Law Dictionary* (10th ed. 2014) (defining "collateral-source rule" as "[t]he doctrine that if an injured party receives **compensation for the injuries** from a source independent of the tortfeasor, the payment should not be deducted from the damages that the tortfeasor must pay.") (emphasis added); *Tebo v. Havlik*, 418 Mich. 350, 366 (Mich. 1984) ("The common-law collateral-source rule provides that the recovery of damages from a tortfeasor is not reduced by the plaintiff's receipt of money **in compensation for his injuries** from other sources.") (emphasis added); *Leitinger v. Dbart*, 302 Wis. 2d 110, 129 (Wis. 2007 (similar); *Rease v. Anheuser-Busch, Inc.*, 644 So. 2d 1383, 1387 n.3 (Fla. Dist. Ct. App. 1994) (similar); *Helfend v. Southern Cal. Rapid Transit Dist*, 2 Cal.3d 1, 6 (Cal. 1970) (similar).

27

████████████████████████████████████████████████████████ Gibson Decl.

*Id*. ¶ 48. The collateral source rule's rationale does not apply to these subsidies, because "a defendant [does not] 'benefit' from avoiding compensating the plaintiff for a ***noninjury***." *Lewis v. Lead*, 178 N.E.3d 1046, 1059-61 (Ill. 2020) (emphasis added) (holding that in "economic tort cases, dollars are not just damages, they are the claim itself," which makes a claim for pure economic injury "***fundamentally different*** from our collateral source jurisprudence"); *see also Gillespie v. Travelscape LLC*, 2014 U.S. Dist. LEXIS 119148, at *6 (W.D. Wash. Aug. 26, 2014 (applying Washington law) ("[T]he collateral source rule is inapplicable where a plaintiff cannot plead that he or she has suffered the damages sought.").

Although Plaintiffs point to Mr. Gibson's use of the word "offset" at his deposition (Mot. at 5), an "offset" is not the same thing as a collateral source payment, and especially not as Mr. Gibson uses the term. As he explained, the "total amount paid" by the TPPs must take subsidies into account ██████████████ ███████████████████████████ meaning they must be ████████████ and ████████████████ Dr. Conti's calculation. Gibson 2023 Dep. 159:24-163:13 (emphasis added). Subtracting subsidies from TPPs' damages for drug costs they never incurred is entirely distinct from excluding compensation for injuries. *See Rametta v. Stella*, 572 A.2d 978, 979-81 (Conn. 1990) (holding that the collateral source rule does not apply where payments received "are not payments of

28

compensation for the plaintiff's injury or loss" but "a completely independent act"); *Snowder v. District of Columbia*, 949 A.2d 590, 602 n.9 (D.C. 2008) (collateral source rule does not apply to payments that are not for "damages from a tortfeasor").

Plaintiffs' authorities do not assist them. Two of the cases illustrate and reinforce the inapplicability of the collateral source rule outside of the compensation context, applying the Pennsylvania rule to exclude evidence of compensation paid for the very injuries under litigation. *See Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir. 1983) (applying rule to unemployment benefits for plaintiff asserting wrongful termination); *Titchnell v. United States*, 681 F.2d 165, 174-76 (3d Cir. 1982) (applying rule to Medicare payments for medical expenses incurred as a result of injury in medical malpractice action). The third case involved state antitrust law and held "that a ***tortfeasor*** should be held accountable for the wrong done and should not benefit from the fact ***that the victim later escapes some of the consequences of the harm***." *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 3603732, at *2 (N.D. Cal. May 23, 2023) (emphases added). It does not apply to breach of warranty claims or to subsidies not paid as compensation for "the consequences of the harm." And the fourth case does not involve the collateral source rule at all; it simply found that evidence of "pass-on overcharges" in the form of higher Part D premiums were too attenuated to trace to overcharges for the brand or generic drugs at issue. *In re Zetia (Ezetimibe) Antitrust Litigation*, No. 18-md-2836, 2023 WL

3064462, at *5 (E.D. Va. Apr. 18, 2023).

For all of these reasons, Plaintiffs' reliance on the collateral-source rule contravenes the applicable law, misconstrues Mr. Gibson's CMS-subsidy opinions and does not support exclusion of his testimony.

## IV.   MR. GIBSON'S DIR OPINIONS ARE GROUNDED IN CMS GUIDANCE AND THE FACTUAL RECORD.

Finally, Plaintiffs also seek to exclude Mr. Gibson's opinions regarding Dr. Conti's failure to account for direct and indirect remuneration, or DIR, as "lacking any basis in the factual record and lacking any methodology[.]" (Mot. at 8-10.) Plaintiffs are wrong on both points. Mr. Gibson grounds his DIR opinions in CMS's bid guidance to TPPs and 42 CFR 423.308, which define DIR as



Gibson Decl. ¶ 42 & n.14 (emphasis added). As Mr. Gibson notes,

*Id*. ¶ 13. Mr. Gibson also cites literature reflecting that

*Id*. ¶ 147. He uses DIR annual reports submitted

by SummaCare to illustrate how DIR data are captured, ███████████████████

███████████████████████████████ *Id.*

Plaintiffs falsely assert that "valsartan DIR simply does not exist," based on an interrogatory answer from one of the retail pharmacy defendants indicating that it could not calculate DIR on a per-prescription or per-drug basis. (Mot. at 8-9.) The fact that a pharmacy cannot calculate DIR for valsartan, however, is not responsive to Mr. Gibson's opinion. As Mr. Gibson explained, the drug-specific DIR detail is in the hands of the ***TPPs***, not the manufacturers or pharmacies. Gibson Decl. ¶¶ 13, 147. Indeed, Mr. Gibson testified that it is possible to calculate ███████████

███████████████████████████████ and doing so simply requires the ***TPPs*** to provide information ███████████████ and is not available to Defendants. Gibson 2023 Dep. at 169:9-175:9. It is both methodologically reliable and fitting for Mr. Gibson to identify deficiencies in Dr. Conti's calculation based on her failure to exclude DIR amounts never incurred by the TPPs based on records the TPP class members possess and failed to provide. *See Complaint of: Borghese Lane, LLC*, 2023 U.S. Dist. LEXIS 75270, at *77-78.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion to exclude certain opinions of Wayne Gibson should be denied.

Dated: February 26, 2024                    Respectfully submitted,

                                            */s/ Gregory E. Ostfeld*
                                            Gregory E. Ostfeld
                                            GREENBERG TRAURIG, LLP
                                            Tiffany M. Andras
                                            77 West Wacker Drive, Suite 3100
                                            Chicago, Illinois 60601
                                            Tel: (312) 456-8400
                                            ostfeldg@gtlaw.com
                                            andrast@gtlaw.com

                                            Lori G. Cohen, Esq.
                                            Victoria Davis Lockard
                                            Steven M. Harkins
                                            Terminus 200
                                            3333 Piedmont Rd., NE, Suite 2500
                                            Atlanta, Georgia 30305
                                            Tel: (678) 553-2385
                                            Fax: (678) 553-2386
                                            cohenl@gtlaw.com
                                            lockardv@gtlaw.com
                                            harkinss@gtlaw.com

                                                *Attorneys for Teva Pharmaceuticals
                                                USA, Inc., Actavis LLC, and Actavis
                                                Pharma, Inc.*

                                            By: */s/ Jessica Davidson*
                                            SKADDEN, ARPS, SLATE, MEAGHER &
                                            FLOM LLP
                                            Jessica Davidson (NY Bar No. 6034748)
                                            *Liaison Counsel for Manufacturer
                                            Defendants*

                                            Allison M. Brown (NJ Bar No. 044992012)
                                            One Manhattan West
                                            New York, New York 10001
                                            Phone: (212) 735-3222
                                            Fax: (917) 777-3222

jessica.davidson@skadden.com
allison.brown@skadden.com

Nina R. Rose (DC Bar No. 975927)
1440 New York Avenue, N.W.
Washington, D.C. 20005
Phone: (202) 371-7000
Fax: (202) 661-0525
nina.rose@skadden.com

*Attorneys for Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai U.S., Inc., Prinston Pharmaceutical Inc., and Solco Healthcare U.S., LLC*

/s/ Alexia R. Brancato
Alexia R. Brancato
Devora W. Allon
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-5967
Fax: (212) 446-6460
alexia.brancato@kirkland.com
devora.allon@kirkland.com

*Attorneys for Defendants Torrent Pharmaceuticals Ltd. and Torrent Pharma, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 26, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants in this matter.

*/s/ Gerond J. Lawrence*
Gerond J. Lawrence
Greenberg Traurig, LLP