Exhibit 8

Confidential Information - Subject to Protective Order

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2                  CAMDEN VICINAGE
 3
       ***************************
 4     IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
       AND IRBESARTAN PRODUCTS
 5     LIABILITY LITIGATION           Civil No.
                                      19-2875
 6     ***************************  (RBK/JS)
       THIS DOCUMENT APPLIES TO ALL
 7     CASES                         HON ROBERT B.
                                     KUGLER
 8     ***************************
 9           - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER
10
11
12          Continued Remote Videotaped via
13     Zoom Deposition of JUCAI GE, held at the
14     location of the deponent, commencing at 6:40
15     a.m. China Standard Time, on the 27th of May,
16     2022, before Maureen O'Connor Pollard,
17     Registered Diplomate Reporter, Realtime
18     Systems Administrator, Certified Shorthand
19     Reporter.
20                    - - -
21
            GOLKOW LITIGATION SERVICES
22                877.370.DEPS
                deps@golkow.com
23
24
```

1  REMOTE APPEARANCES:
2
3  MAZIE SLATER KATZ & FREEMAN, LLC
   BY:  ADAM M. SLATER, ESQ.
   BY:  CHRISTOPHER J. GEDDIS, ESQ.
4      103 Eisenhower Parkway
       Roseland, New Jersey 07068
5      973-228-9898
       aslater@mazieslater.com
6      cgeddis@mazieslater.com
       Representing the Plaintiffs
7
8  MEYER WILSON CO., LPA
   BY:  LAYNE HILTON, ESQ.
9      900 Camp Street, Suite 337
       New Orleans, Louisiana 70130
10     614-255-2697
       lhilton@meyerwilson.com
11     Representing the Plaintiffs
12
13 HOLLIS LAW FIRM
   BY:  IRIS SIMPSON, ESQ.
       8101 College Blvd., Suite 260
14     Overland Park, Kansas 66210
       800-701-3672
15     iris@hollislawfirm.com
       Representing the Plaintiffs
16
17 FARR LAW FIRM
   BY:  GEORGE T. WILLIAMSON, ESQ.
18     99 Nesbit Street
       Punta Gorda, Florida 33950
19     941-639-1158
       gwilliamson@farr.com
20     Representing the Plaintiffs
21
22
23
24

1  REMOTE APPEARANCES (Continued):
2
3  SKADDEN ARPS SLATE MEAGHER & FLOM LLP
   BY:  RICHARD T. BERNARDO, ESQ.
   BY:  ALLISON M. BROWN, ESQ.
4      One Manhattan West
       New York, New York 10001-8602
5      212-735-3453
       richard.bernardo@skadden.com
6      allison.brown@skadden.com
       Representing the Defendants Zhejiang
7      Huahai Pharmaceutical Co., Ltd.,
       Prinston Pharmaceutical Inc., Huahai
8      U.S., Inc., and Solco Healthcare US,
       LLC
9
10 SKADDEN ARPS SLATE MEAGHER & FLOM LLP
   BY:  CATHERINE I. MULLALEY, ESQ.
11     500 Boylston Street
       Boston, Massachusetts 02116
12     617-573-4851
       kate.mullaley@skadden.com
13     Representing the Defendants Zhejiang
       Huahai Pharmaceutical Co., Ltd.,
14     Prinston Pharmaceutical Inc., Huahai
       U.S., Inc., and Solco Healthcare US,
15     LLC
16
17 PIETRAGALLO GORDON ALFANO BOSICK &
   RASPANTI, LLP
   BY:  FRANK H. STOY, ESQ.
18     One Oxford Centre
       Pittsburgh, Pennsylvania 15219
19     412-263-1840
       fhs@pietragallo.com
20     Representing the Defendant, Mylan
       Pharmaceuticals, Inc.
21
22
23
24

1  REMOTE APPEARANCES (Continued):
2
3  BARNES & THORNBURG, LLP
   BY:  KARA KAPKE, ESQ.
       11 S. Meridian Street
4      Indianapolis, Indiana 46204
       317-231-6491
5      kara.kapke@btlaw.com
       Representing the Defendants CVS
6      Pharmacy, Inc., and Rite Aid
       Corporation
7
8  GREENBERG TRAURIG, LLP
   BY:  VICTORIA J. LANGTON, ESQ.
9      Terminus 200
       3333 Piedmont Road NE
10     Suite 2500
       Atlanta, Georgia 30305
11     678-553-2100
       langtont@gtlaw.com
12     Representing the Defendants Teva
       Pharmaceutical Industries, Ltd., Teva
13     Pharmaceuticals SA, Inc., Actavis LLC,
       and Actavis Pharma, Inc.
14
15 Interpreter:  Dr. Yang Shao
16 Check Interpreter:  Phil Hughes
17
18 Also Present:
19 Stephanie Martin, Legal Assistant, Skadden
20 Bailey Pasho-Towns, Summer Associate, Farr
21
22 Videographer:  Judy Diaz
23
24

1
2          INDEX
   EXAMINATION              PAGE
3  JUCAI GE
4
5  BY MR. SLATER            136
6  BY MR. BERNARDO              238
7  BY MR. SLATER            268
8  BY MR. BERNARDO              284
9
10
11        E X H I B I T S
12 NO.      DESCRIPTION       PAGE
13 ZHP-42       Previously marked.
             Response to DMF
14           Information Request
             Letter, Bates
15           ZHP00079913 through
             79945...................    178
16
17 ZHP-170      Previously marked.
             Document Bates
18           ZHP02336567 through
             2336686.................  269
19 ZHP-321      Previously marked.
             WHO document, Concise
20           International Chemical
             Assessment Document 38...   229
21
22 ZHP-127A      Previously marked.
             7/13/18 e-mail with
23           attachment, Bates
             SOLCO00024223 and
24           PRINSTON00304110.........  176

Page 133

ZHP-127B      Previously marked.
              Chinese version of
              ZHP-127A................ 176

ZHP-128A      Previously marked
              Recall notice............ 177
ZHP-128B      Previously marked
              Chinese version of 128A.. 177

ZHP-460A      Gomm et al Original
              Article,
              N-Nitrosodimethylamine-
              Contaminated Valsartan
              and the Risk of Cancer... 164

ZHP-460B      Chinese version of
              Original Article........ 164
ZHP-461A      E-mail chain, Bates
              CHARLESWANG000271........ 180

ZHP-461B      Chinese version of
              ZHP-461A................. 180
ZHP-462A      6/13/18 e-mail, Bates
              CHARLESWANG000318........ 183

ZHP-462B      Chinese version of
              ZHP-462A................. 183
ZHP-463A      6-18-18 e-mail, Bates
              CHARLES WANG000391....... 185

ZHP-463B      Chinese version of 463A.. 185

ZHP-464A      June 21, 2018 e-mail,
              chain Bates
              CHARLESWANG000267........ 191

ZHP-464B      Chinese version of 464A.. 191

ZHP-465A      Document beginning To
              whom it may concern,
              Bates ZHP00374340
              through 374356........... 209

Page 134

ZHP-465B      Chinese version of 465A.. 209

ZHP-466A      Document Bates
              TEVA-MDL2875-00783229.... 215
ZHP-466B      Chinese version of 466A.. 215
ZHP-467A      E-mail chain, Bates
              TEVA-MDL00540386
              through 540389........... 217
ZHP-467B      Chinese version of 467A.. 218
ZHP-468A      June 29, 2018
              Toxicological
              Assessment for
              N-Nitrosodimethylamine
              (NDMA) in Valsartan
              Drug Substance, Bates
              TEVA-MDL2875-00068399.... 224
ZHP-468B      Chinese version of 468A.. 224
ZHP-469A      Invention Patent
              Application,
              ZHP01812101 through
              1812109.................. 268

ZHP-469B      Chinese version of 469A.. 268

Defense 1A    October 18, 2021 letter
              from US Food and Drug
              Administration with
              attached Establishment
              Inspection Report........ 258

Defense 1B    Chinese version of
              Defense 1A............... 258

Page 135

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE LINE
None.

Request for Production of Documents
PAGE LINE
None.

Stipulations
PAGE LINE
None.

Questions Marked Highly Confidential
PAGE LINE
None.

Page 136

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.

My name is Judy Diaz.  I'm a legal videographer for Golkow Litigation Services.

Today's date is May 27, 2022, and the time is 6:40 a.m.

This is the continuation of the deponent Jucai Ge.

All counsel will be noted on the stenographic record.

The witness and the interpreter are already under oath.

Counsel, you may proceed.

***

JUCAI GE, having been duly previously remotely identified and sworn, was examined and testified as follows through the interpreter:

FURTHER EXAMINATION

BY MR. SLATER:

Q.    Thank you.  Good evening --

Page 137

1  good morning.
2      A.    Good morning.
3      Q.    I forgot to ask you last night,
4  so I need to ask you a question.  Rephrase.
5          As part of your preparation,
6  did you have an opportunity to see the
7  questions that you were to be asked during
8  this deposition pursuant to the order entered
9  by the judge?
10     A.    I didn't have any chance to
11 review the list of questions.  However, I am
12 aware of the topics on which I am supposed to
13 testify.  Those three topics I am familiar
14 with.
15     Q.    I'd like to ask you a few more
16 questions about that e-mail, Exhibit 295 in
17 Mandarin, 296 in English, and then we'll move
18 on to something else.  But I need to follow
19 up on a few things you said at the end of the
20 session last night.
21     A.    All right.
22     Q.    With regard to the 2013 patent
23 that is referenced, do you know when that was
24 first seen by anybody at ZHP?

Page 138

1      A.    I did ask Jinsheng Lin and Peng
2  Dong about that.  According to Jinsheng Lin,
3  he came across this patent when he was doing
4  an online search regarding irbesartan, so he
5  attached this patent to this e-mail.
6  Therefore, Peng Dong become aware of that
7  patent because of this e-mail.
8      Q.    When did Jinsheng Lin do that
9  search and find the patent?
10         MR. BERNARDO:  Adam, you got
11 cut off at the beginning, I'm sorry.
12 BY MR. SLATER:
13     Q.    When did Jinsheng Lin do that
14 search and find the patent?
15         MR. BERNARDO:  Thank you.
16         THE WITNESS:  According to
17 Jinsheng Lin, he came across this
18 patent around the time he was writing
19 this e-mail.
20         Whether he conducted the online
21 search while he was drafting this
22 e-mail or several hours or several
23 days before he was drafting this
24 e-mail, I don't know.  All I know is

Page 139

1  that at that time he was conducting an
2  online search regarding the impurity
3  found in the technical improvement for
4  irbesartan.
5          He was trying at that time to
6  make a comparison in toxicology where
7  he came across this patent, so he
8  attached this patent to that e-mail.
9  He didn't tell me the exact time when
10 he did the online search.
11 BY MR. SLATER:
12     Q.    It's your best understanding
13 that Jinsheng Lin found the patent in
14 July 2017?  Yes or no.
15     A.    Yes.
16     Q.    Had anybody else at ZHP ever
17 found and read that 2013 patent before
18 Jinsheng Lin found it in July 2017?
19         MR. BERNARDO:  Object to the
20 form of the question.
21         MR. SLATER:  I'm going to
22 reask.  I'm sorry, Dr. Shao, I'm going
23 to reask the question because counsel
24 objected.

Page 140

1  BY MR. SLATER:
2      Q.    Had anybody else ever read the
3  2013 patent referenced in Dr. Lin's e-mail
4  before Dr. Lin found it in 2017 during his
5  online search?  Yes or no.
6          MR. BERNARDO:  Object to the
7  form of the question.
8          THE WITNESS:  I didn't ask
9  around in ZHP about the patent by
10 approaching everyone in the company.
11 I didn't ask people about that.
12         As for the e-mail itself,
13 during the preparation, I did have a
14 discussion with people like Min Li,
15 Lihong Lin, spelled as L-I-H-O-N-G,
16 last name L-I-N, Peng Dong, and
17 Jinsheng Lin.
18         I did ask Peng Dong and
19 Jinsheng Lin when they came across
20 this patent.
21         According to Peng Dong, he
22 became aware of this patent through
23 the e-mail of Jinsheng Lin in the
24 attachment.  That's how he received

Page 141

1   the information.
2        As for Jinsheng Lin, when he
3   was writing this e-mail, he was trying
4   to make a comparison in toxicology, he
5   did some online search, and he came
6   across this patent.
7        Again, I did not ask everyone
8   in ZHP about when they came across
9   this patent.
10        Based on what I was told by
11   Peng Dong, since he was in charge of
12   the technology of valsartan and he was
13   also the person in charge of the
14   technical department at Chuannan site,
15   to his knowledge, no one else knew
16   about this patent in Chuannan.
17   BY MR. SLATER:
18        Q.   Based on your investigation,
19   nobody else in ZHP was aware of this patent
20   before it was found by Jinsheng Lin?  Yes or
21   no, is that correct?
22        MR. BERNARDO:  Object to the
23   form of the question.
24        THE WITNESS:  As to my prior

Page 142

1   testimony, to the best of my
2   knowledge, before Jinsheng Lin came
3   across this patent, no one else in ZHP
4   was aware of this patent.
5        However, I did not ask everyone
6   in ZHP regarding this patent, which I
7   already told you.  Therefore, I don't
8   know whether I can respond to this
9   question with a simple yes or no.
10   BY MR. SLATER:
11        Q.   The e-mail indicates that there
12   is an extremely high GMP risk, which is also
13   referred to as a quality problem, due to the
14   formation of nitrosamine due to sodium
15   nitrite quenching of sartans.
16        That is discussed in the
17   e-mail, correct?
18        A.   That is not correct.
19        Q.   Looking at the second page of
20   the e-mail, second-to-last paragraph says in
21   part, "If it is confirmed as the above
22   speculated structure" -- which is an
23   N-nitroso compound -- "then its toxicity will
24   be very strong, and there will be an

Page 143

1   extremely high GMP risk."
2        That's what the document says?
3   That's what the words on the page say,
4   correct?  Please answer with a yes or no.
5        MR. BERNARDO:  Object to the
6   form of the question.
7        THE WITNESS:  The document does
8   say so, so that's correct.  However,
9   what the document says is inconsistent
10   with your prior statement.
11   BY MR. SLATER:
12        Q.   In that same paragraph, the
13   second-to- -- rephrase.
14        In the second-to-last paragraph
15   on the second page of the e-mail, Dr. Lin
16   also recommends "the optimization of the
17   valsartan sodium azide quenching process,"
18   correct?  That's what the words on the page
19   say, right?
20        MR. BERNARDO:  Object to the
21   form of the question.
22        THE WITNESS:  The document does
23   include such a sentence.  The document
24   does include such a sentence.

Page 144

1   BY MR. SLATER:
2        Q.   In the last paragraph on the
3   second page of the e-mail, Dr. Lin points out
4   that in the 2013 patent by the other company,
5   "they proposed that the use of sodium nitrite
6   quenching will result in the formation of
7   N-nitroso impurities."  Correct?  That's what
8   the document says, right?
9        A.   That's not the original
10   wording.  I see that in that paragraph, there
11   is a similar sentence just like that.
12        Q.   In the last paragraph on the
13   second page, Dr. Lin states that "other
14   companies have paid attention to the quality
15   problem very early on."  That quality problem
16   being the quenching with sodium nitrite
17   resulting in the formation of N-nitroso
18   impurities, correct?
19        MR. BERNARDO:  Object to the
20   form of the question.
21   BY MR. SLATER:
22        Q.   That's what the document says,
23   correct?
24        MR. BERNARDO:  Object to the

Confidential Information - Subject to Protective Order

Page 145

1   form of the question.
2       THE WITNESS:  The document does
3   say that other companies have paid
4   attention to the quality problems very
5   early on.  However, that quality
6   problem is the problem referred to in
7   the patent, not your interpretation in
8   the statement.
9   BY MR. SLATER:
10      Q.   The quality problem referred to
11  in the patent is that the use of sodium
12  nitrite quenching will result in the
13  formation of N-nitroso impurities, correct?
14      A.   The patent mentioned that
15  Impurity K will be formed.
16      Q.   And the formation of Impurity K
17  is the quality problem referred to, correct?
18      A.   That is correct.
19      Q.   Dr. Lin says at the end of the
20  e-mail -- rephrase.
21      At the end of the e-mail,
22  Dr. Lin says words to the effect of, "Leaders
23  please pay attention to this issue."
24      He's telling those on the

Page 146

1   e-mail, including yourself, that this is an
2   issue that needs to be addressed, correct?
3       MR. BERNARDO:  Object to the
4   form of the question.
5       THE WITNESS:  I don't know what
6   issue are you referring to.  Could you
7   be more specific in your question?
8   BY MR. SLATER:
9       Q.   The last sentence of the e-mail
10  says words to the effect of, "Leaders pay
11  attention to this issue," the issue being the
12  quality problem with sodium nitrite quenching
13  resulting in the formation of N-nitroso
14  impurities, correct?
15      MR. BERNARDO:  Object to the
16  form of the question.
17      THE WITNESS:  That is
18  incorrect.  I believe it is very
19  clear, after communication with
20  Dr. Lin and reading this e-mail, that
21  he heard from a friend of his that
22  someone has already tested out
23  Impurity K in our crude product.
24  Therefore, he was asking the leaders

Page 147

1   to pay attention and find out whether
2   there's also Impurity K in valsartan.
3       You cannot take the last
4   sentence out of context.  You have to
5   interpret this sentence with the
6   preceding sentences.
7   BY MR. SLATER:
8       Q.   Dr. Lin referred at the top of
9   the page to the fact that the impurity that
10  was being seen in the irbesartan was similar
11  to the NDMA that occurs in valsartan when
12  quenched with sodium nitrite.
13      We've talked about that before.
14  He said that up above, right?
15      MR. BERNARDO:  Object to the
16  form of the question.
17      THE WITNESS:  I believe I have
18  already responded to your questions
19  regarding this topic yesterday.
20  BY MR. SLATER:
21      Q.   So the answer is yes, correct?
22      A.   No, it's not like that.
23      Q.   After this e-mail was sent, you
24  testified last night that Peng Dong and

Page 148

1   Jinsheng Lin tested valsartan for Impurity K,
2   correct?
3       MR. BERNARDO:  Object to the
4   form of the question.
5       THE WITNESS:  I did not say
6   both of them tried to test out
7   Impurity K from valsartan yesterday.
8       What I said, also supported by
9   the content of this e-mail, is that a
10  friend of Dr. Lin's gave him the
11  information that someone has already
12  tested Impurity K from irbesartan, so
13  he did some verification by consulting
14  an analysis and failed to find
15  Impurity K from irbesartan.
16      After he informed Peng Dong,
17  Peng Dong was also aware of the
18  result, that there was no Impurity K
19  identified in an analytical result.
20  BY MR. SLATER:
21      Q.   So it's your testimony that
22  when Dr. Lin tested valsartan for
23  Impurity K -- rephrase.
24      So -- rephrase.

Confidential Information - Subject to Protective Order

Page 149

1    It's your testimony that when
2 Jinsheng Lin tested the valsartan for
3 Impurity K, the test showed that there was no
4 Impurity K? Is that your testimony? Yes or
5 no.
6         MR. BERNARDO: Object to the
7    form of the question.
8         THE WITNESS: No, that's not
9    what I said. What I said was Jinsheng
10   Lin conducted analysis of Impurity K
11   in our valsartan.
12 BY MR. SLATER:
13   Q.    Was there Impurity K in ZHP's
14 valsartan?
15        MR. BERNARDO: Object to the
16   form of the question.
17        THE WITNESS: During the recent
18   communication with Jinsheng Lin, he
19   told me that he failed to find any
20   Impurity K in those batches he
21   analyzed in our valsartan.
22 BY MR. SLATER:
23   Q.    Do you know whether ZHP ever
24 tested its valsartan manufactured with the

Page 150

1 zinc chloride process and identified
2 Impurity K as an impurity? Yes or no.
3    A.    What time frame are you
4 referring to?
5    Q.    Ever. Any time.
6    A.    To the best of my knowledge,
7 after 2018, Impurity K was identified after
8 further analysis of our valsartan.
9    Q.    After this July 27, 20- --
10 rephrase.
11        After this July 27, 2017 e-mail
12 was sent by Dr. Lin, did ZHP test its
13 valsartan manufactured with the zinc chloride
14 process for NDMA before June of 2018? Yes or
15 no.
16   A.    No. At that time, we were not
17 aware of the existence of NDMA.
18   Q.    Is there any documentation of
19 Jinsheng Lin or Peng Dong analyzing ZHP's
20 valsartan for Impurity K before June of 2018?
21   A.    They did conduct the analysis
22 for confirmation. However, during the
23 preparation, I did not ask them about the
24 documentation of such confirmation. So I'll

Page 151

1 have to go back and check.
2    Q.    We reviewed the entire document
3 production in this litigation today and could
4 find nothing indicating Peng Dong, Jinsheng
5 Lin, or anybody else in ZHP evaluated
6 valsartan for Impurity K before June 2018.
7         Are you aware of any such
8 documentation in existence?
9         MR. BERNARDO: Object to the
10   form of the question.
11        THE WITNESS: To the best of my
12   knowledge, since I work in the QA
13   department, all I know is that for
14   impurity verification or confirmation,
15   the verification has to be done
16   through methods such as LC-MS. For
17   specifics, I believe we have to
18   consult with the analytical personnel.
19        However, also to the best of my
20   knowledge, for some impurity
21   verifications, there would not be
22   documentation such as chromatograms.
23   Therefore, I believe we have to
24   consult with the specific analytical

Page 152

1 staff.
2 BY MR. SLATER:
3    Q.    Is it your understanding
4 Jinsheng Lin used LC-MS testing to try to
5 identify Impurity K in the valsartan in 2017?
6    A.    According to Jinsheng Lin,
7 after he sent out this e-mail, he conducted
8 the analysis using LC-MS, and the analytical
9 result showed that there was no Impurity K
10 found.
11   Q.    If anybody were to say that a
12 pharmaceutical company could not have known
13 that quenching the valsartan with sodium
14 nitrite could result in the formation of
15 N-nitroso impurities, for example, NDMA, that
16 would be incorrect, since we know from the
17 patent that another company in China knew
18 that as of the time they drafted their patent
19 in 2013, correct?
20        MR. BERNARDO: Object to the
21   form of the question.
22        THE WITNESS: That's incorrect.
23 BY MR. SLATER:
24   Q.    It's right there in the patent.

1  It says it in the patent dated 2013 by this
2  other company.
3          They figured it out, right?
4          MR. BERNARDO:  Object to the
5      form of the question.
6          MR. SLATER:  I'll ask the
7      question differently.
8  BY MR. SLATER:
9      Q.    That's what the patent says.
10  That's what the words on the page of the
11  patent say, correct?
12          MR. BERNARDO:  Object to the
13      form of the question.
14          THE WITNESS:  That's incorrect.
15      The patent says that the Impurity K
16      will be formed.  The patent didn't say
17      anything about the formation of NDMA.
18      In fact, the patent didn't mention
19      NDMA at all.
20  BY MR. SLATER:
21      Q.    The patent says N-nitroso --
22  rephrase.
23          The patent refers to the
24  formation of N-nitroso impurities.  That's

1  what the word on the page says, correct?
2          MR. BERNARDO:  Objection to
3      form.
4          THE WITNESS:  In the patent it
5      says the Impurity K is one of the
6      nitroso compounds.
7          And regretfully, had the patent
8      been written about the formation of
9      NDMA, it would have mentioned NDMA.
10      But NDMA was not mentioned in
11      the patent, and instead it said that
12      Impurity K is one of the nitroso
13      compounds.
14  BY MR. SLATER:
15      Q.    The point is, doesn't this
16  patent in 2013 -- this other company
17  disclosed that the sodium nitrite quenching
18  could create an N-nitroso compound impurity,
19  correct?
20      A.    No, that's not correct.  The
21  patent says it was for Impurity K, not
22  nitroso compound impurities.  While
23  Impurity K is one of the nitroso compound
24  impurity, the nitroso compound would include

1  hundreds of different compounds.
2      Q.    Before 2017, did ZHP ever test
3  any of its valsartan for Impurity K?  Yes or
4  no.
5      A.    To the best of the information
6  that I collected, given that I didn't
7  approach everyone in the company, the answer
8  is no.
9      Q.    The testing that Jinsheng Lin
10  did in 2017 for Impurity K was required to be
11  documented by cGMP because it was testing for
12  a highly toxic impurity in the valsartan,
13  correct?
14      A.    That's incorrect.
15      Q.    So it's your testimony as the
16  director of quality assurance at ZHP that
17  your company can test for highly toxic
18  impurities that are suspected in your drug
19  products and fail to document that testing or
20  the results of the testing?  That's your
21  testimony now, correct?
22          MR. BERNARDO:  Object to the
23      form of the question.
24          THE WITNESS:  That's incorrect,

1      because according to Jinsheng Lin,
2      he did conduct the analysis using LC-MS.
3          However, as for the
4      documentation, I already told you I
5      have to consult with specific
6      analytical staff.
7          But he told me he used LC-MS
8      for the analysis to analyze commercial
9      batches.
10          As for the documentation, we
11      have to confirm with specific
12      analytical staff.
13  BY MR. SLATER:
14      Q.    Pursuant to ZHP's SMPs, it was
15  required that such testing be documented,
16  correct?
17      A.    As in my prior testimony, I
18  already stated that this is an analysis and
19  verification instead of a test.
20      Q.    It was an analysis and a
21  verification with an LC-MS testing method,
22  correct?
23      A.    That's correct.  That's what he
24  told me.

Confidential Information - Subject to Protective Order

---

Page 157

Q.   Am I correct that if a test was performed -- well, rephrase.

You would agree with me that such testing is required to be documented, correct?

MR. BERNARDO:  Object to form.

THE WITNESS:  As I told you before, I am not one of the analytical staff, and I didn't realize that you would ask for such specifics.  So when I asked around to gather information, I did not ask for such details.

Again, what he did was analysis and verification, not a test.  He simply conducted the analysis and verification based on the existing LC-MS method.  I believe he must have the original chromatogram.

BY MR. SLATER:

Q.   Why wasn't that original chromatogram produced to us in discovery?

MR. BERNARDO:  Object to the form of the question.

THE WITNESS:  I'm not familiar

---

Page 158

with the discovery process and the production process, so I'm not sure whether the chromatograms were produced or not.

However, according to him, he did the analysis and verification based on the previous LC-MS chromatograms.  For that I have to go ask specific analytical staff.  I didn't realize that such details would be asked about this time.

MR. SLATER:  Chris, let's go to the patent filed July 17, 2018, the Abstract, please.

Can you make that a little bigger, please, Chris?

Don't be so grudging.  Can you get it a little bigger, or no?

MR. GEDDIS:  Which part do you want?

MR. SLATER:  Let's do the top half first with the date on it, etcetera.

Q.   Okay.  So I'm showing you a

---

Page 159

patent that was filed July 17, 2018.

MR. SLATER:  And let's minimize it a little more so we can look at the title now.

You're going to just have to make it smaller.  I can't read it.

You can just make it smaller, Chris, just so we can all see it.

That's fine, I'll take a shot.

Perfect.  Okay.

BY MR. SLATER:

Q.   On the screen is a July 17, 2018 filed patent titled "Method for Synthesizing Valsartan," and you can see on the left side the inventors are listed.  It includes Peng Dong, Jinsheng Lin, Min Li, and several other people.

Do you see that?

A.   It's kind of blurry to me.  Can you blow it up?

Now I see.

MR. SLATER:  Let's go into the text, the first paragraph, please.

Perfect.

---

Page 160

Q.   In the abstract --

A.   Sorry.

Q.   In the Abstract for the patent, a little more than halfway down, there's a sentence says, "The synthesization method provided in the present invention can avoid from the process source the possibility that highly toxic impurities such as N-nitrosodimethylamine (NDMA), a valsartan impurity K, and valsartan N-chloride generated in the azide quenching process are introduced into the valsartan methyl ester intermediate, and are further introduced into the valsartan active ingredient, thereby ensuring the valsartan medication safety."

That's the last sentence of that section.  Do you see that?

A.   Actually, the font is quite small to me.  Can you zoom in?

MR. GEDDIS:  I'll zoom in on the Chinese.

THE WITNESS:  Well, if you zoom in, then half is cut off.

MR. BERNARDO:  Is there any way

---

Page 161

1   to expand the dialog box so she could
2   actually read the text? This is
3   not...
4          MR. GEDDIS: It's all been
5   submitted to the link, so she can
6   access it there.
7          MR. BERNARDO: Dr. Shao, can
8   you point that out to her?
9          THE WITNESS: I do see such a
10  paragraph.
11  BY MR. SLATER:
12      Q.   And the inventors who filed
13  this patent, including Jinsheng Lin and Peng
14  Dong and Min Li, correctly referred to NDMA
15  as a highly toxic impurity, correct?
16          MR. BERNARDO: Object to the
17  form of the question.
18          THE WITNESS: Well, the
19  document does say so, and the Chinese
20  translation says the same thing.
21  BY MR. SLATER:
22      Q.   At the very end of that
23  sentence, it also indicated that these
24  changes to the manufacturing process were

Page 162

1   necessary to ensure the valsartan medication
2   safety, correct?
3       A.   Well, I see the wording in this
4   paragraph, "thereby ensuring the valsartan
5   medication safety."
6       Q.   And you would certainly --
7   rephrase.
8           And certainly having NDMA in
9   ZHP's valsartan increases the risk for
10  persons taking those pills to develop cancer.
11  That's why it's called a probable carcinogen,
12  correct?
13          MR. BERNARDO: Object to the
14  form of the question.
15          THE WITNESS: That's incorrect.
16  That's completely incorrect.
17          MR. SLATER: You can take that
18  document down, Chris.
19          MR. BERNARDO: Adam, whenever
20  you get to a breaking point, we've
21  been going for over an hour.
22          MR. SLATER: Okay. This is a
23  good time.
24          MR. BERNARDO: Okay. Thank

Page 163

1   you.
2           THE VIDEOGRAPHER: The time
3   right now is 7:43 a.m. We're off the
4   record.
5           (Whereupon, a recess was
6   taken.)
7           THE VIDEOGRAPHER: The time
8   right now is 7:58 a.m. We're back on
9   the record.
10  BY MR. SLATER:
11      Q.   With regard to the NDMA in the
12  valsartan, without us trying to quantify how
13  much risk there was, you would agree with me
14  that the NDMA in the valsartan increased the
15  risk to some level for the people who took
16  those pills to develop cancer, correct?
17      A.   I disagree.
18          MR. SLATER: Let's put up the
19  Gomm study.
20      Q.   You have this in your binder,
21  correct? You told me that you have it at
22  item number 8 in your binder?
23      A.   I have reviewed this document
24  before, yes.

Page 164

1           MR. SLATER: Just for the
2   record, Chris, what exhibit number is
3   this?
4           MR. GEDDIS: 460.
5           (Whereupon, Exhibit Numbers
6   ZHP-460A and ZHP-460B were marked for
7   identification.)
8   BY MR. SLATER:
9       Q.   Looking at the first page
10  towards the bottom of the first paragraph on
11  the right-hand column, it states in part,
12  "NDMA is one of the most potent mutagenic
13  carcinogens in animal models and was
14  classified by the International Agency for
15  Research on Cancer (IARC) as probably
16  carcinogenic to humans."
17          Do you see that?
18          INTERPRETER SHAO: The
19  interpreter would then read the
20  corresponding paragraph in the Chinese
21  translation.
22          THE WITNESS: Yes, I see it.
23          MR. SLATER: Let's go to
24  page 360, Chris. Left-hand column of

Confidential Information - Subject to Protective Order

Page 165

1  page 360.  Perfect.  The Biological
2  background, I'm going to look at the
3  first sentence or two.
4      Q.    Looking now at page 360,
5  there's a heading that says, "Biological
6  background," and it starts out, "NDMA is
7  classified by the IARC as probably
8  carcinogenic (group 2A).  It is carcinogenic
9  in the tissues of experimental animal species
10  with metabolism similar to that of human
11  tissues."
12          Do you see that?
13      A.    Yes, I see it.
14          MR. SLATER:  Let's go back to
15      the first page, Chris.
16      Q.    In the Summary of the study in
17  the Results section, the last sentence
18  states, "A statistically significant
19  association was found, however, between
20  exposure to NDMA-contaminated valsartan and
21  hepatic cancer (adjusted HR 1.16; 95 percent
22  confidence interval [1.03; 1.31])."
23          Do you see that?
24      A.    Yes, I see it.

Page 166

1      Q.    Looking now at the Conclusion,
2  it says, "These findings suggest that the
3  consumption of NDMA-contaminated valsartan is
4  associated with a slightly increased risk of
5  hepatic cancer."
6          Do you see that?
7      A.    Yes, I see it.
8      Q.    Coming back to the question I
9  asked you right before we looked at the Gomm
10  study, I asked you, with regard to the NDMA,
11  without us trying to quantify how much risk
12  there was, you would agree with me that the
13  NDMA in the valsartan increased the risk to
14  some level for the people who took those
15  pills to develop cancer?
16          MR. BERNARDO:  Object to the
17      form of the question.
18  BY MR. SLATER:
19      Q.    This study that you brought
20  with you to the deposition indicates yes,
21  there is an increased risk of liver cancer,
22  correct?
23          MR. BERNARDO:  Object to the
24      form of the question.

Page 167

1          THE WITNESS:  That's incorrect.
2  BY MR. SLATER:
3      Q.    Are you saying that the Gomm
4  study didn't find a statistically significant
5  increased risk of developing liver cancer?
6      A.    As for the NDMA in valsartan,
7  even though there was some statistical
8  significance, it says here no association was
9  found with the risk of cancer overall.
10          That is because, apart from the
11  data, they failed to exclude certain factors
12  that would have certain effects.  That's
13  written in their conclusion.
14          So if you only refer to what's
15  said in the front in the Summary, actually
16  that only described the research direction
17  based on IARC's definition.
18          And in terms of the research
19  content, that is inconsistent with your
20  statement.  That's why I say it is incorrect.
21      Q.    The study -- rephrase.
22          Are you aware that studies like
23  this report the results based on statistical
24  analysis?  Yes or no.

Page 168

1          MR. BERNARDO:  Object to the
2      form of the question.
3          THE WITNESS:  I read what's
4      said here.  Indeed, this study is
5      based on statistical analysis.
6      However, I also said your conclusion
7      is incorrect.
8  BY MR. SLATER:
9      Q.    I asked you if the NDMA
10  increased the risk to some level for the
11  people who took those pills to develop
12  cancer.
13          This study indicates that there
14  was a statistically significant increased
15  risk to develop liver cancer.  That's what
16  the finding was in the study with regard to
17  liver cancer, correct?
18          MR. BERNARDO:  Object to the
19      form of the question.
20          THE WITNESS:  No, it's not
21  correct.
22  BY MR. SLATER:
23      Q.    The words on the page of the
24  study document indicate that the study

Confidential - Information - Subject to - Protective Order

---

Page 169

1  identified an increased risk of liver cancer.
2      That is a true statement,
3  correct?
4      MR. BERNARDO:  Object to the
5    form of the question.
6      THE WITNESS:  That's incorrect.
7  BY MR. SLATER:
8    Q.    So you disagree with the
9  finding documented in the study that there
10 was a statistically significant increased
11 risk for liver cancer, correct?
12     MR. BERNARDO:  Object to the
13   form of the question.
14 BY MR. SLATER:
15   Q.    Based on your extensive
16 experience as a toxicologist?
17     MR. BERNARDO:  Object to the
18   form of the question.
19     THE WITNESS:  That is
20   completely incorrect.
21     As I stated very clearly in my
22   prior testimony, I am not a
23   toxicologist, nor am I a
24   pharmacologist.

---

Page 170

1  BY MR. SLATER:
2    Q.    Very simple question.
3      Do you deny that the words on
4  the page of this scientific article indicate
5  that they found a statistically significant
6  increased risk for liver cancer?
7      MR. BERNARDO:  Object to the
8    form of the question.
9      THE WITNESS:  There was no
10   denial in my prior response.  I was
11   simply stating the fact that this
12   sentence only described the process of
13   the study.
14     As for the conclusion of the
15   study, you would have to see the
16   section Conclusion, where it says no
17   association was found with the risk of
18   cancer at all.
19     So you cannot just focus on one
20   sentence which only described the
21   research process and neglect the
22   overall conclusion.
23 BY MR. SLATER:
24   Q.    I asked you a question about

---

Page 171

1  the finding of liver cancer.  Can you please
2  answer with regard to the finding of liver
3  cancer, which is all I asked you about?
4    A.    Sure.
5    Q.    The study found an increased
6  risk for liver cancer, correct?
7      MR. BERNARDO:  Object to the
8    form of the question.
9      THE WITNESS:  That is
10   incorrect, because even though it says
11   here there's a statistically
12   significant slight increased risk of
13   liver cancer as the conclusion,
14   there's no association indicating this
15   causal effect relationship, even
16   though statistically there was some
17   relationship.
18     So you cannot say that NDMA in
19   valsartan increased the risk of liver
20   cancer.
21 BY MR. SLATER:
22   Q.    Do you know that all such
23 studies are stated in terms of whether there
24 is a statistical association shown?  Are you

---

Page 172

1  aware that that's the language of these types
2  of studies?
3      MR. BERNARDO:  Object to the
4    form of the question.
5      THE WITNESS:  As I stated
6    earlier, I was neither a toxicologist
7    nor a pharmacologist.
8      In order to prepare for this
9    deposition, I worked very hard and did
10   a lot of homework, which includes
11   reviewing this study report and
12   noticed very explicit conclusion.
13     With that conclusion, I
14   conducted discussion with experts.
15   That's why I said I worked hard for
16   this deposition.
17     So I disagree with you.
18 BY MR. SLATER:
19   Q.    Now can you answer my question,
20 please, with a yes or no?
21   A.    In addition, I only reviewed
22 those two study reports.  I did not review
23 any other study reports, so I don't know what
24 kind of language they used.

---

Confidential Information - Subject to Protective Order

Page 173

1    Q.    When you say you don't know
2  what language they used, you're saying you
3  don't know that these types of studies, that
4  the results are stated in terms of whether or
5  not there's a statistical association?
6          MR. BERNARDO:  Object to the
7      form of the question.
8          THE WITNESS:  Well, I don't
9      know.
10  BY MR. SLATER:
11   Q.    Do you know what it means for
12  NDMA to be a genotoxic impurity?
13   A.    I agree that NDMA is a
14  genotoxic impurity.  However, I do not get
15  your question as to what it means.  Can you
16  be more specific?
17   Q.    Do you know what it means for
18  something to be genotoxic?
19   A.    Maybe it has certain effects
20  such as DNA mutagenic.
21          MR. SLATER:  Can you just tell
22      me what that answer was?  "DNA" -- did
23      you say "mutagenic"?
24          Dr. Shao, I'm asking what you

Page 174

1  said.  I didn't hear the word.
2          INTERPRETER SHAO:  Yeah.  Yeah.
3      The interpreter did say "mutagenic."
4          MR. SLATER:  Thank you.
5    Q.    The reason that ZHP stopped
6  selling the valsartan with NDMA impurity was
7  because ZHP knew that the potential risk to
8  patients of taking those pills was an
9  unacceptable health risk, correct?
10          MR. BERNARDO:  Object to the
11      form of the question.
12          THE WITNESS:  That is not
13      correct.
14          MR. SLATER:  Let's look at the
15      Gomm study again.
16          We're on it.  Page 360,
17      left-hand column.
18    Q.    Looking again at the Gomm
19  study, which you yourself brought to this
20  deposition, in the middle of the right-hand
21  side under the heading Regulatory and public
22  health implications, the second-to-last
23  sentence says, "The immediate recall of all
24  potentially NDMA-contaminated valsartan drug

Page 175

1  products by regulatory authorities worldwide
2  was necessary in order to protect public
3  health."
4          Do you see that?
5    A.    Yes, I see it.
6    Q.    So the authors of the Gomm
7  study thought that it was necessary to recall
8  the NDMA-contaminated valsartan drug products
9  to protect public health, right?
10          MR. BERNARDO:  Object to the
11      form of the question.
12  BY MR. SLATER:
13    Q.    Let me withdraw the question.
14          Do you agree that it was
15  necessary to recall the valsartan --
16  withdrawn, actually.
17          MR. SLATER:  Chris, I'm going
18      to change gears and go to another
19      document, so you can take that down.
20    Q.    You would agree with me that
21  the risk posed by the presence of the NDMA in
22  your company's valsartan was unacceptable,
23  correct?
24          MR. BERNARDO:  Object to the

Page 176

1      form of the question.
2          THE WITNESS:  I disagree.
3  BY MR. SLATER:
4    Q.    In terms of the health and
5  safety for patients, the levels of NDMA found
6  in your company's valsartan were not
7  acceptable from a health standpoint, correct?
8          MR. BERNARDO:  Object to the
9      form of the question.
10          THE WITNESS:  It's completely
11      incorrect.
12  BY MR. SLATER:
13    Q.    From ZHP's perspective, the
14  health risk posed by the levels of NDMA found
15  in ZHP's valsartan was never acceptable,
16  correct?
17          MR. BERNARDO:  Object.
18          THE WITNESS:  It's not correct.
19          MR. SLATER:  Chris, let's go to
20      Exhibit -- previously utilized,
21      Exhibit 127.
22          (Whereupon, Exhibit Numbers
23      ZHP-127A and ZHP-127B were previously
24      marked for identification.)

Page 177

BY MR. SLATER:

Q.    This is an e-mail dated July 13, 2018 written by Hai Wang to someone named Mike Shea.

And he says, "Dear Mike, Please see Valsartan and Valsartan HCZT Recall Notification and Press Release attached. Sincerely apologize for any inconvenience this recall may cause."

And you know who Hai Wang is, correct?  Who is that?

A.    Of course.  I know that Hai Wang is the head of sales in our US company.

MR. SLATER:  Let's go now to the attachment to that e-mail, which is Exhibit 128.

(Whereupon, Exhibit Numbers ZHP-128A and ZHP-128B were previously marked for identification.)

BY MR. SLATER:

Q.    This is the recall notice referred to by Hai Wang.

Do you see that?

A.    I see this document now.

Page 178

Q.    And you can see in the middle of the page -- rephrase.

And you can see in the middle of the page, it states, "The exposure to the impurity N-nitrosodimethylamine (NDMA) that was detected in valsartan product line presents an unacceptable carcinogenic risk to the intended patient population."

That's what the press release and information to the customers in the United States stated per this document, correct?

A.    That document says so.  That did not reflect our company's perspective. This was added by FDA.

MR. SLATER:  Chris, let's take that down.  And let's go -- I'm going a little out of order of my plan, but let's go to Exhibit 42 if we could, please.

(Whereupon, Exhibit Number ZHP-42 previously marked for identification.)

///

Page 179

BY MR. SLATER:

Q.    This document, which I can tell you is dated September 1, 2018, was submitted by ZHP to the FDA and titled "Response to DMF" -- which is Drug Master File -- "Information Request Letter."

Do you see that?

A.    Yes, I see it.

MR. SLATER:  Chris, let's go, if we could, to page 8 of 33.

Q.    This is a table listing testing of over 700 batches of the valsartan produced with the zinc chloride process and the NDMA results in parts per million.

Do you see that?

A.    Yes, I see it.

Q.    And you can see that these levels range from, in the first column, 76 parts per million down to 37 parts per million at the bottom of that first column; in the next column, lines 420 and 421, levels of 107 and 107.9 parts per million.

Do you see that?

A.    Yes, I see it.

Page 180

MR. SLATER:  Let's go to page 11 of 33, the top right of that.

Q.    You can see more results.  I'm just starting at column 517 at the top.

167.3, 188.1, 101.9, 115.5, 164.3, 165.1, 172.3, 164.1, etcetera.

You see these are the levels of the NDMA that was found, and you're aware of that, right?

A.    Yes, I have reviewed this document.

MR. SLATER:  Okay.  Let's take that document down.

Chris, let's go to CHARLESWANG-271, please.

(Whereupon, Exhibit Numbers ZHP-461A and ZHP-461B were marked for identification.)

BY MR. SLATER:

Q.    This is an e-mail dated June 10, 2018 from Charles Wang to Min Li.

Are you aware that Charles Wang was a toxicologist who was hired by Min Li to consult for ZHP on the NDMA contamination?

Confidential Information Subject to Protective Order

Page 181

A. To my knowledge, I'm aware that Dr. Wang is a toxicologist and a pharmacologist. He was hired by our company to conduct corresponding research after the NDMA incident.

Q. You can see this refers to an attachment, which we'll get to in a moment, which was referred to as "NDMA Safety Assessment and Recommended Limit in Drug Product."

And that's because Charles Wang was hired to advise ZHP as to what would be a reasonable limit for NDMA in the drugs that had been manufactured, correct?

MR. BERNARDO: Object to the form of the question.

THE WITNESS: We did hire Dr. Wang to advise us on the NDMA level standard, because at that time from the regulatory perspective, there was no such standard. So we hired him to see from the regulatory point of view what level should be reasonable.

///

Page 182

BY MR. SLATER:

Q. In fact, ICH M7 had categorized NDMA as part of the cohort of concern, which were chemicals with structures that had extremely high carcinogenic potency, which required a substance-by-substance, case-by-case analysis to establish the levels, and that was something that was understood in ICH at least as of 2013, if not earlier, correct?

MR. BERNARDO: Object to the form of the question.

BY MR. SLATER:

Q. Or do you not know?

A. I am aware of general requirements for the levels of mutagenic -- or genotoxic, rather, impurities, but I do not recall the specific requirements.

Q. Looking now at the text of the e-mail, Charles Wang wrote to Min Li and said, "The attached is draft report for N-nitrosodimethylamine. I can take out the limit of 0.011 parts per million if you are unable to achieve it. See if your client

Page 183

accept the limit recommended based on the maximum intake of NDMA via food or exposure of indoor air. The limit of 0.011 parts per million is calculated based on the EPA recommended limit for underground water, which won't cause the risk to exceeding the tumorigenesis rate of 10e-6 in lifespan of human being."

Do you see what I just read?

A. Yes, I see that through the translation.

MR. SLATER: Let's go now, Chris, to CHARLESWANG-318.

(Whereupon, Exhibit Numbers ZHP-462A and ZHP-462B were marked for identification.)

BY MR. SLATER:

Q. In this document dated June 13, 2018, Charles Wang wrote to Min Li to enclose a revised report with major changes listed below.

And you can see he raised the recommended levels now for interim specification 2 parts per million, long-term

Page 184

specification .625 parts per million.

Do you see that?

A. Yes, I see it.

Q. So in the first report -- rephrase.

When the first report was sent over, Charles Wang said that he can take out the limit he had established if ZHP was unable to achieve a level that low. Then in this revised report, he's raised the levels.

And if you compare those levels to what I showed you on the table in the DMF update, those levels far exceeded all of these levels, correct?

MR. BERNARDO: Object to the form of the question.

MR. SLATER: I'm going to withdraw the question.

BY MR. SLATER:

Q. In the first e-mail on June 10th, Charles Wang offered to take out the limit he had calculated if ZHP couldn't meet it. Now here we are three days later, and he's increasing the limits to be asked

Confidential Information - Subject to Protective Order

Page 185

1  for by ZHP.
2       Do you see that?
3       A.   I've seen both e-mails.  After
4  reading both e-mails, my understanding is
5  that this described the process where we were
6  trying to set a standard, because at that
7  time the regulatory authorities hadn't set up
8  any such standard.
9       Q.   At this point ZHP was trying to
10 support the highest level possible in the
11 hope that it could sell the pills that were
12 contaminated with NDMA rather than having to
13 recall all those pills, right?
14      MR. BERNARDO:  Object to the
15      form of the question.
16      THE WITNESS:  That's incorrect.
17 BY MR. SLATER:
18      Q.   Let's go now to
19 CHARLESWANG-391.
20      (Whereupon, Exhibit Numbers
21      were marked ZHP-463A and ZHP-463B for
22      identification.)
23 BY MR. SLATER:
24      Q.   This document is dated June 18,

Page 186

1  2018, and Charles Wang writes to Min Li,
2  having revising the limit again, and now he
3  has the limit set at 31.2 parts per million.
4       Do you see that?
5       A.   I see that.
6       Q.   You are aware that the FDA set
7  a limit of .03 parts per million, correct,
8  far lower than the 31.2 that ZHP tried to
9  convince the FDA to accept, right?
10      MR. BERNARDO:  Object to the
11      form of the question.
12      MR. SLATER:  I'll withdraw the
13      question and ask it differently.
14 BY MR. SLATER:
15      Q.   The FDA ultimately set a limit
16 of .03 parts per million, which was very
17 close to the first recommendation by Charles
18 Wang, in the report where he said he would
19 change the number if ZHP wanted him to
20 because they couldn't achieve that number,
21 correct?
22      MR. BERNARDO:  Object to the
23      form of the question.
24      THE WITNESS:  That's completely

Page 187

1  incorrect, because in the period of
2  time when this e-mail was written, the
3  regulatory authorities did not come up
4  with any standard for NDMA.
5       So at that time Dr. Min Li was
6  simply discussing with Dr. Charles
7  Wang what type of limit would be
8  appropriate.
9       By the way, the eventual
10 standard was not up to ZHP to set.  We
11 could only follow the standards set by
12 regulatory authorities such as FDA.
13      So this only shows the process
14 of discussion as they were trying to
15 find out what limit would be
16 appropriate and acceptable.
17 BY MR. SLATER:
18      Q.   In terms of what actually
19 happened in June of 2018, the consensus among
20 those scientists responsible for this issue
21 in the United States was that this risk was
22 unacceptable for patients, correct?  Meaning
23 the risks posed by the levels of NDMA found
24 in ZHP's valsartan, right?

Page 188

1       MR. BERNARDO:  Object to the
2       form of the question.
3       THE WITNESS:  This is
4       completely incorrect.
5  BY MR. SLATER:
6       Q.   Well, in fact, the scientists
7  who made the decisions -- well, rephrase.
8       Well, in fact, the decision was
9  made to set the limit for NDMA at .03 parts
10 per million.  That's far lower than the
11 levels that were in ZHP's valsartan, which
12 means the decision was made that the levels
13 in ZHP's valsartan were unacceptable,
14 correct?
15      MR. BERNARDO:  Object to the
16      form of the question.
17      MR. SLATER:  I'm sorry,
18      Dr. Shao.  Let me withdraw the
19      question and reask it.
20 BY MR. SLATER:
21      Q.   The FDA set the level at
22 0.3 parts per million, which is far lower
23 than the levels that were shown in the ZHP
24 valsartan, which shows that the decision was

Confidential Information - Subject to Protective Order

Page 189

1  made that the levels in ZHP's valsartan were
2  unacceptable, correct?
3          MR. BERNARDO:  Object to the
4      form of the question.
5          THE WITNESS:  From the
6      regulatory point of view, ZHP, our
7      company, agrees that to FDA the level
8      of NDMA was unacceptable.
9          However, we do not agree that
10     the NDMA in ZHP's valsartan would
11     cause harm to the patients and pose
12     carcinogenic risk.  We don't agree
13     with that, because that's two
14     different perspectives.
15 BY MR. SLATER:
16     Q.    It's unacceptable because of
17 the safety risk.  That's the definition of
18 "unacceptable," right?
19         MR. BERNARDO:  Object to the
20     form of the question.
21         THE WITNESS:  That's completely
22     incorrect.  As I said before, from the
23     regulatory point of view, we have to
24     be very careful and conservative.

Page 190

1          In that case, the level of NDMA
2      in our valsartan product is
3      unacceptable.  However, from the
4      scientific point of view, it doesn't
5      mean that the NDMA in valsartan would
6      pose carcinogenic risk.  That's
7      completely different thing.
8  BY MR. SLATER:
9      Q.    If I understand what you're
10 saying, you're saying from the regulatory
11 perspective, the regulators are very
12 conservative in setting what's unacceptable
13 levels of NDMA because they need to be very
14 protective of people's health, right?
15     A.    Can you repeat your question or
16 rephrase your question?  I don't understand
17 your question.
18     Q.    I'll ask it differently.
19         When you say the levels were
20 unacceptable from a regulatory perspective,
21 that's the reason why the pills could not be
22 sold with those levels of NDMA, correct?
23     A.    Based on the current level set
24 up by FDA, then the answer is yes, we have to

Page 191

1  follow the requirements of FDA.  And the
2  pills with such a level would be
3  unacceptable.
4      Q.    The levels set by the FDA were
5  based on a TD50 analysis, correct?
6      A.    Well, I didn't go into such a
7  detail to find out about how they set up the
8  levels.  All I know is that they did set a
9  level.
10     Q.    Do you know what "TD50" means?
11     A.    A little, but I can't say I
12 have a clear understanding.  After all, I'm
13 not a toxicologist nor a pharmacologist.
14         MR. SLATER:  Let's go, Chris,
15     to CHARLESWANG-267, please.
16         (Whereupon, Exhibit Numbers
17     ZHP-464A and ZHP-464B were marked for
18     identification.)
19 BY MR. SLATER:
20     Q.    The e-mail at the bottom part
21 of this page was sent by Min Li to Charles
22 Wang on June 21, 2018, regarding a paper on
23 NDMA high-low dose prediction.
24         And he says to Charles Wang,

Page 192

1  "Hi, Charles.  I need your brain again to
2  take a quick look of this paper.  It seems to
3  me that using high dose experiments may not
4  be able to predict low dose results.  My goal
5  is trying to demonstrate that a previously
6  reported TD50 for NDMA as cited by our client
7  in her report may not be accurate.
8          "I will talk to you later
9  today."
10         And then up above you say,
11 "This is the Reply from the authors of the
12 paper I sent to you below.  It may also help
13 you to evaluate."
14         Do you see that?
15     A.    I see it.
16         MR. SLATER:  Let's go now to
17     CHARLESWANG-430.
18     Q.    Charles Wang responds to Min Li
19 on June 22, 2018, and says, "Hi Min, the
20 paper and Reply that you sent to me were
21 published in early '90s.  They are outdated.
22 We should obtain the data from the current
23 publication, especially those published on
24 Regulatory Authority website, EPA, FDA, NIH,

Confidential Information - Subject to Protective Order

Page 193

1  WHO, etc.  The TD50 for NDMA listed on NIH
2  website are 0.0959 in rats and 0.189 in
3  mice" -- and it gives a link,
4  "NITROSODIMETHYLAMINE.html and in 2016 EFSA
5  Journal 2016 (see attached)."  So there's
6  this link and the citation.
7       He then says, "NDMA is a well
8  known carcinogen in animals and probable
9  carcinogen in human based on EPA
10  classification (Class 2A).
11       "I suggest Huahai to hire a
12  carcinogenicity expert consultant to perform
13  the analysis, who knows risk assessment of
14  carcinogen and kept updated in regulatory
15  guideline and standards in this field.  If
16  needed, I can recommend a couple to you for
17  consideration."
18       Do you see that that was the
19  response by Charles Wang to Min Li, who had
20  in the prior e-mail sent a paper where he was
21  trying to refute the use of high-dose animal
22  experiments to predict low-dose results?
23       You see that, correct?
24       MR. BERNARDO:  Object to the

Page 194

1  form of the question.
2       THE WITNESS:  I do see what the
3  e-mail says.  However, your statement
4  fails to reflect the meaning or
5  intention of this e-mail.
6       MR. BERNARDO:  Adam, when you
7  hit a breaking point, we'd like a
8  break.
9       MR. SLATER:  I'll take a break
10  now.
11       MR. BERNARDO:  Great.  Thank
12  you.
13       THE VIDEOGRAPHER:  The time
14  right now is 9:15 a.m.  We're off the
15  record.
16       (Whereupon, a recess was
17  taken.)
18       THE VIDEOGRAPHER:  The time
19  right now is 9:28 a.m.  We're back on
20  the record.
21  BY MR. SLATER:
22       Q.    You just said you disagreed
23  with my question.  Are you now saying that
24  you do understand the TD50 analysis that you

Page 195

1  said before you did not truly understand?
2       A.    Maybe you misunderstood me.  I
3  already told you that I know a little bit
4  about TD50, but I do not know the specifics.
5  After all, I'm not a toxicologist nor a
6  pharmacologist.
7       In general, I understand when
8  setting the limit, TD50 is just to be used to
9  calculate the acceptable limit.  That's all I
10  know.
11       Q.    The response by Charles Wang to
12  Min Li that we just read a moment ago
13  confirming that NDMA is a well-known
14  carcinogen in animals and probable carcinogen
15  in humans based on EPA classification is
16  consistent with the scientific consensus that
17  ingesting NDMA as a contaminant of valsartan
18  posed a health risk to those people that took
19  the pills, correct?
20       A.    That is incorrect.
21       MR. SLATER:  Let's go to
22  CHARLESWANG-447, please.
23       Q.    Looking at the very bottom of
24  this first page, which goes over to the

Page 196

1  second page, let's start with that e-mail
2  sent by Charles Wang on July 5, 2018 to Jim
3  MacDonald.
4       MR. SLATER:  And you can scroll
5       over to the top of the second page,
6       please, Chris?
7       Q.    The e-mail from Charles Wang to
8  Jim MacDonald states, "Hi Jim, Nice to hear
9  from you.  Hope everything is going well.
10  Sorry to disturb you during your vacation.
11  My friend's company will have a face-to-face
12  meeting with FDA to" -- it says, "debit if
13  they should recall their product in US market
14  next Thursday, and likes to get some advice
15  from people like you quickly."  And I want to
16  stop there.
17       You recall that in the prior
18  e-mail, Charles Wang had suggested to Min Li
19  to hire a carcinogenicity expert consultant
20  to perform the analysis who knows risk
21  assessment of a carcinogen and kept updated
22  in the regulatory guideline and standards in
23  this field, and you can see this is an e-mail
24  written to somebody with that background.

Confidential Information Subject to Protective Order

Page 197

1    Do you see that?
2    A.    I see this.
3    Q.    The e-mail continues in the
4    second paragraph, "Not sure if you heard,
5    Huahai Pharma Group, one of the largest
6    generic drug company in China with a branch
7    in US (Cranberry, New Jersey).  Li knows
8    their US CEO as well.  Huahai has a product
9    in US market with the maximum daily dose of
10   320 milligrams, which recently was found
11   containing high nitrosodimethylamine (NDMA,
12   not know exactly how much but around 30 parts
13   per million).  Their client in European Union
14   said it should be at 0.33 parts per million,
15   based on TD50 calculation.  They would like
16   to know if they can argue to set limit higher
17   based on NDMA is considered a Class 2A
18   carcinogen (limit at threshold of
19   toxicological" -- I'm blanking on the rest of
20   it, but "TTC of 1.5 ug per day) and the
21   longest duration of human exposure in US will
22   be less than three years.
23         "Let me know if your company
24   can help.  I will ask them to contact you

Page 198

1    directly and send you more details."
2         Do you see that?
3    A.    I see it.  I see it.
4    Q.    Just to make it clear, I had
5    forgotten TTC for a moment.  That's threshold
6    of toxicological concern.
7         Are you aware of that?
8    A.    Like TD50, I know a little bit
9    about TTC, but I do not know the specifics.
10   All I know is that in general, TD50 or TTC
11   will be used to calculate the acceptable
12   limit.  Actually, there are quite a few ways
13   to make use of those data.
14   Q.    Looking at a few things stated
15   in this e-mail, Charles Wang called it "high
16   nitrosodimethylamine" and said he thought it
17   was around 30 parts per million.
18         Do you see that?
19   A.    Yes, I see it.
20   Q.    And you recall from the prior
21   e-mails we went through that after starting
22   at a level of .0111 parts per million,
23   Charles Wang actually went all the way up to
24   31.2 parts per million, which is just a

Page 199

1    little bit higher than what he thought was
2    the levels being seen in the valsartan of
3    30 parts per million.
4         Do you remember he went up to
5    31.2?
6         MR. BERNARDO:  Object to the
7    form of the question.
8         THE WITNESS:  I see both
9    e-mails, and you're correct.  The
10   limit was indeed increased to 31.2.
11         However, I would point out that
12   your understanding or interpretation
13   of all those e-mails are completely
14   wrong.
15         As seeing this e-mail, it did
16   say that the longest duration of human
17   exposure in the US would be less than
18   three years.  So when they do the
19   calculation, they're calculating the
20   total amount and they are calculating
21   using a different data from different
22   angles; therefore, I'm unfamiliar with
23   what Dr. Wang was going through at
24   this time.

Page 200

1         In order to calculate a
2    reasonable acceptable limit, they have
3    to calculate based on the long-term
4    exposure and short-term exposure.
5         For example, at that time our
6    valsartan was not in the US market for
7    three years yet, so it's not like they
8    tried to increase the limit on purpose
9    so that we could avoid the recall.
10        It was, rather, a process where
11   they would discuss with FDA regarding
12   the limit considering the time of our
13   valsartan in the market.
14        So this, rather, is the process
15   to set the limit.  After all,
16   eventually it was up to FDA to set the
17   limit and make the approval.
18   BY MR. SLATER:
19   Q.    My question was simply to
20   confirm that the level of 31.2 parts per
21   million which Charles Wang increased up to
22   after starting at .0111 parts per million was
23   just a little higher than the 30 parts per
24   million that he believed was the levels in

Confidential Information - Subject to Protective Order

Page 201

1  ZHP's valsartan.
2       That's a correct statement,
3  correct?
4       MR. BERNARDO:  Object to the
5  form of the question.
6       INTERPRETER SHAO:  The
7  interpreter is asked to repeat the
8  rendition.
9       THE WITNESS:  That's incorrect.
10 That is completely incorrect.
11 BY MR. SLATER:
12 Q.    Charles Wang didn't increase
13 the levels in his reports from .0111 parts
14 per million up to 31.2 parts per million?  I
15 thought we just went through that in the
16 documents.
17      Are you disagreeing that his
18 level went up to 31.2?
19      MR. BERNARDO:  Object to the
20 form of the question.
21      THE WITNESS:  As stated in my
22 prior testimony, your understanding or
23 interpretation of all these e-mails
24 were not completely correct.

Page 202

1       I remember the original level
2  of .01 ppm was based on the long-term
3  level of the -- or long-term exposure,
4  rather, to the groundwater.  But the
5  limit has to be associated with the
6  duration of exposure.
7       So over here they were talking
8  about the exposure time of three
9  years, which is much shorter.  So they
10 were wondering whether the limit can
11 be increased to 31.2 ppm.
12      Once again, the limit has to be
13 associated with the duration of
14 exposure in terms of years.  And what
15 we see here is actually the scientific
16 discussion period where theoretically
17 they want to see how much the limit
18 can go to.
19      It's not like, oh, they already
20 know -- or he already knew, rather,
21 that ZHP's valsartan has about 30 ppms
22 NDMA, so he would increase the limit
23 to 31.2, just a little bit above it.
24      We're looking at a theoretical

Page 203

1  discussion process here.
2  BY MR. SLATER:
3  Q.    You don't understand that they
4  were going to meet with the FDA to talk about
5  the limit going forward, and that was going
6  to be the determiner of whether they could
7  continue to sell the pills that they had
8  manufactured contaminated with NDMA?
9       Do you not understand that?
10      MR. BERNARDO:  Object to the
11 form of the question.  Sorry.
12      THE WITNESS:  As seen in this
13 e-mail, he was simply trying to
14 collect some information and data from
15 the expert so that such data can be
16 used in the face-to-face meeting with
17 FDA.
18      As you know, our company does
19 not conduct any toxicological or
20 pharmacological studies; therefore, we
21 have to rely on experts for their
22 information.
23      One thing is for sure, is that
24 whether valsartan could be sold or had

Page 204

1  to be recalled at that time was not
2  decided by ZHP.  Rather, it would be
3  up to FDA to make the approval, not
4  ZHP.
5       So we were trying to take
6  multiple approaches to collect the
7  information and data so that we could
8  conduct a meaningful discussion
9  face-to-face with FDA.
10 BY MR. SLATER:
11 Q.    You see that Charles Wang
12 states that ZHP's client in EU, European
13 Union, said that the limit should be at
14 0.3 parts per million based on TD
15 calculation.  And as you're aware, that's the
16 level the FDA actually adopted, correct?
17      MR. BERNARDO:  Object to the
18 form of the question.
19      THE WITNESS:  The e-mail does
20 say that the client in the EU said it
21 should be added .3 ppm based on TD50
22 calculation.
23      However, my understanding is
24 that is also based on long-term

Confidential Information Subject to Protective Order

Page 205

1  exposure with no limit of a time
2  period.
3          So we're talking about
4  different standards right here.
5          MR. SLATER:  Let's go to the
6      first page of the e-mail.
7      Q.    Now let's look at Jim
8  MacDonald's response, Jim MacDonald from
9  Synergy Partners R&D Solutions, who is the
10  carcinogenicity expert consultant that
11  Charles Wang reached out to after asking for
12  clearance from Min Li to do so.
13          He writes, "Charles, I'm afraid
14  I can't be of much help in this case
15  particularly on this time scale.  NDMA (or
16  dimethylnitrosamine) is a pretty well-known
17  toxin and animal carcinogen."
18          I'm going to stop there.
19          Do you see where I'm reading?
20      A.    I do see what's written here.
21  However, I do not know what this person is --
22  or who this person is, rather, because I did
23  not do any study on it.
24      Q.    You said you interviewed

Page 206

1  Charles Wang as part of your preparation for
2  this deposition, correct?
3          MR. BERNARDO:  Object to the
4      form of the question.
5          THE WITNESS:  That's incorrect.
6      I never mentioned his name.  I did say
7      I read Dr. Wang's report instead.
8  BY MR. SLATER:
9      Q.    Continuing in the e-mail a
10  little further down from where I just read,
11  Jim MacDonald states, "The body of evidence
12  on this suggests pretty clearly that this is
13  a likely human carcinogen at sufficient
14  exposures.  The argument that the company
15  would have to make to keep this product on
16  the market will be very difficult with this
17  profile.  I'm not exactly sure where one
18  would begin given the very high levels you
19  think they are seeing."
20          And just to be clear, the "very
21  high levels" he's referring to are what
22  Charles Wang had said in the prior e-mail,
23  around 30 parts per million.
24          That was the level he quoted,

Page 207

1  correct?
2          MR. BERNARDO:  Object to the
3      form of the question.
4          THE WITNESS:  I don't quite
5      understand your question, because I
6      don't see your quotation in this
7      e-mail.  I cannot see the English
8      version, so I can only rely on the
9      Chinese translation.
10  BY MR. SLATER:
11      Q.    And in fact, 30 parts per
12  million, which was the level quoted by
13  Charles Wang in the prior e-mail that we went
14  through, would be at the low end of what I
15  showed you on that table in the DMF update
16  that we went through, where I showed you
17  those many results that went up close to
18  200 parts per million and many over 100 parts
19  per million.
20          Remember we saw that?
21      A.    Yes, I did see the result of
22  NDMA.
23      Q.    Jim MacDonald then says a
24  little further down, "I expect this is not

Page 208

1  what they would want to hear but, unless
2  there is a compelling reason to leave this
3  product on the market (for example, only
4  product available to treat a serious,
5  life-threatening disease), I would expect the
6  FDA would ask for a recall."
7          And then a little further down
8  he says, "These things are always very
9  difficult to predict - but this is not a good
10  position for this product in my view."
11          Do you see that?
12      A.    I heard the translation, but I
13  can't read English.
14      Q.    Going to the top of the page,
15  Charles Wang wrote to Jim MacDonald a few
16  weeks later, July 17, 2018, and said, "Hi
17  Jim, You may have seen this."  And it's a
18  link to the announcement of the recall, I
19  represent to you, and he says, "It is exactly
20  like you expected, and I agreed with your
21  call."
22          You see that, correct?
23      A.    I don't know -- I don't know
24  where it is in this document.  I can't read

Confidential Information - Subject to Protective Order

Page 209

English, but I heard the Chinese translation.

MR. SLATER: All right, Chris. Let's go now -- take that down, and let's go to ZHP "to whom it may concern," which I believe is ZHP00374340. Let's start with that and show that to the witness.

(Whereupon, Exhibit Numbers ZHP-465A and ZHP-465B were marked for identification.)

BY MR. SLATER:

Q. This document states about halfway down the first page, "This information package, provided to Huahai's customers who have purchased Valsartan DS (CEP 2010-072), consists of the following four parts:

"Background of the event;

"Root cause investigation;

"Risk assessment based on toxicological evaluation;

"Recommended actions and future plan."

And this would have been

Page 210

something that would have been sent to the customers who were purchasing ZHP's valsartan, correct?

A. Based on the translation, I would like to think so.

MR. SLATER: Now, Chris, let's go to -- now that we've seen this document, I want to pull up a version of it that was actually produced by Teva, one of those customers who received it, and it's TEVA-MDL2875-00783229.

Q. And I can represent to you this is the same document we just looked at. It was the one that was produced by Teva as they had received it.

MR. SLATER: And let's go, if we could, to page 14 -- actually, page 13 out of 17.

Q. Looking now at page 13, there's a heading towards the bottom of the page, "Section 3.1.5, IARC Classification and Rationale for Proposed Daily Limits Based on Lifetime and One to Ten Years of Exposure."

Page 211

And if we flip over to the next page to the conclusion of that page in terms of what customers of ZHP were being told --

MR. SLATER: Let's go to page 14. Please go to page 14.

MR. GEDDIS: This is page 14, Adam.

MR. SLATER: Oh, okay. Now it is.

BY MR. SLATER:

Q. Continuing, we see that ZHP was advocating here for a limit of 31.2 parts per million. It says, "For the maximum dose of patients that take valsartan drug products at the maximum daily dose of 320 milligrams for one to ten years."

Do you see that?

MR. BERNARDO: Object to the form of the question.

Can somebody put their phone on mute?

MR. WILLIAMSON: I think, Ms. Kapke, that's your microphone.

MR. SLATER: Yeah, I'm just

Page 212

going to clean this up. I'm going to start over because we had a couple little glitches there.

Q. So starting on page 13 where we started, Section 3.1.5 is titled "IARC Classification and Rationale for Proposed Daily Limits Based on Lifetime and One to Ten Years of Exposure."

And if we go over to the next page, this section concludes with the statement, "Therefore, the limit of NDMA in valsartan drug products can be set at 31.2 parts per million for the maximum dose" -- it gives a calculation -- "if patients take valsartan drug products at the maximum daily dose of 320 milligrams for one to ten years."

So you can see that ZHP included in this recommendation to its customers, including Teva, a 31.2 parts per million acceptable limit.

Do you see that?

MR. BERNARDO: Object to the form of the question.

Page 213

1   THE WITNESS:  I heard the
2   Chinese translation.  I cannot read
3   English here, but I did see the
4   numbers you mentioned in your
5   question.
6   As I said earlier, we looked at
7   the e-mails among Dr. Wang, Min Li,
8   and the so-called expert.  I could
9   tell that they were in the process of
10  discussing the limit setting.
11  What we see here is only a
12  letter to our client.  Once again, the
13  limit is not set by ZHP; rather, it's
14  set by FDA.  That's why we needed to
15  bring all the information data to our
16  face-to-face meeting with FDA.
17  MR. SLATER:  Let's go back to
18  the prior page, page 13.  Beginning of
19  that section.
20  MR. BERNARDO:  Adam, I'm sorry
21  to interrupt --
22  MR. GEDDIS:  What page, Adam?
23  MR. SLATER:  Page 13.
24  MR. BERNARDO:  I thought she

Page 214

1   asked if there was a Chinese version,
2   maybe --
3   MR. SLATER:  Yes, it's been
4   sitting in the exhibit folder.
5   MR. BERNARDO:  Dr. Shao, would
6   you just remind Ms. Ge that she has
7   access to the Chinese version so she
8   can look at it if she'd like?
9   INTERPRETER SHAO:  Could the
10  counsel remind the witness of the
11  exhibit number?
12  MR. SLATER:  Chris, what's the
13  exhibit number?
14  MR. GEDDIS:  466.
15  THE WITNESS:  I can't find this
16  document.
17  MR. GEDDIS:  You might have to
18  refresh the window.
19  MR. SLATER:  Why don't you do
20  that.  Let's do whatever we need to do
21  to get it for her.
22  THE WITNESS:  Well, it seems
23  like I found the link, I clicked, and
24  they were asking for password.  When I

Page 215

1   tried to click on the link, they were
2   asking for a password.
3   Now I see.  What's the number
4   again?
5   MR. SLATER:  466.  466B.
6   (Whereupon, Exhibit Numbers
7   ZHP-466A and ZHP-466B were marked for
8   identification.)
9   THE WITNESS:  Hold on.  Let me
10  download this document first.
11  Now I can open it.
12  BY MR. SLATER:
13  Q.   Can't open it, or can?
14  A.   I am able to open it.
15  Q.   Great.  Go to page 13, please.
16  A.   I just want to confirm whether
17  this document is a machine-translated file --
18  Q.   Yes.
19  A.   -- because looking at the
20  format, it looks weird.
21  Q.   Yes.
22  Looking at page 13, the last
23  heading that we were reading underneath, in
24  terms of the method that was followed to

Page 216

1   calculate that 31.2 parts per million, this
2   states, "Per ZHP, in IARC (International
3   Agency for Research on Cancer, a World Health
4   Organization organization) classification,
5   NDMA is classified as Class 2A.  Hence, the
6   daily intake of NDMA can be controlled at or
7   below the acceptable limit (appropriate
8   threshold of toxicological concern)," and it
9   gives that number for lifetime exposure
10  "according to ICH guideline M7(R1)."  So that
11  was part of the rationale for this statement.
12  Do you see that?
13  A.   Well, the Chinese translation
14  of this document is all scrambled and
15  illegible.  But I did hear the Chinese
16  translation.
17  MR. SLATER:  Now, I just want
18  to flip back for one moment to
19  page 12.
20  Q.   At the bottom of the page
21  you'll see a table, and under the table it
22  refers to a World Health Organization report.
23  A table from the report is shown above, and
24  then just at the bottom of the page there's a

Case 1:19-md-02875-RMB-SAK    Document 2663-9    Filed 02/26/24    Page 25 of 43
confidential information subject to protective order
PageID: 98315

1 citation to that report from the World Health
2 Organization in 2002.
3          Do you see that at the bottom
4 of that page, page 12?
5     A.    Yeah, I see that.  However, the
6 translation is really weird here.
7          MR. SLATER:  Let's go now --
8 let's take that document down, and
9 let's go to TEVA-MDL2875-00540386,
10 please.
11          (Whereupon, Exhibit Number
12     ZHP-467A and ZHP-467B were marked for
13     identification.)
14 BY MR. SLATER:
15     Q.    Starting right at the top of
16 the page, there's an e-mail from Raphael
17 Nudelman, and we can see who he is down below
18 in the signature line; he's a Ph.D., ERT
19 director of chemical and computational
20 toxicology at Teva.
21          And he's writing to somebody at
22 Teva regarding "Urgent Valsartan Safety
23 Assessment Request."
24          Do you see what I'm talking

1 about?  Do you see the e-mail in front of
2 you?
3          MR. BERNARDO:  Object to the
4     form of the question.
5          THE WITNESS:  I see this e-mail
6     because I heard the Chinese
7     translation.  I can tell this is an
8     internal communication within Teva.
9 BY MR. SLATER:
10     Q.    Looking now at the second
11 paragraph, Dr. Nudelman says, "I indeed had
12 considerable reservations to the Huahai
13 assessment which concluded with a large
14 difference in the overall permitted daily
15 exposure of NDMA.  Huahai's understanding of
16 the IARC categories, their incorrect use of
17 the ICH M7 categories, and incorrect use of
18 the LTL, brings me to the conclusion that
19 their assessment was totally unacceptable."
20          Do you see that?
21          MR. BERNARDO:  Object to the
22     form of the question.
23          THE WITNESS:  Well, the
24     interpreter kept going, so I just

1 heard the translation.
2 BY MR. SLATER:
3     Q.    A little further down it says,
4 "The fact that NDMA was present in Valsartan
5 since 2012 cannot be used as a justification
6 for its safety.  Carcinogenicity can still
7 develop in patients who received this drug
8 containing NDMA in the past 6 years."
9          So you see that Dr. Nudelman
10 from Teva thought that there is an increased
11 risk of cancer to people who took valsartan
12 manufactured with ZHP's contaminated API.
13          You see that, right?
14          MR. BERNARDO:  Object to the
15     form of the question.
16          MS. LANGTON:  Join.
17          THE WITNESS:  Well, I just
18 heard the interpreter's Chinese
19 translation even though I could not
20 tell what's written here.
21          My understanding to the e-mail
22 is that this is an internal
23 communication within Teva as to who
24 this person is.  Even though it has

1 some description here, it's still
2 unclear to me.
3          Furthermore, I do not know
4 where you could find the supportive
5 data in human to support his statement
6 about a carcinogen.  I have talked
7 with quite a few experts, and they
8 were telling me there was not data in
9 humans to support that it was a human
10 carcinogen.
11          Since this is merely an
12 internal communication within Teva, I
13 would not make any comment on the
14 content of this e-mail.
15 BY MR. SLATER:
16     Q.    The so-called experts you spoke
17 to were hired and paid by ZHP.  Do I
18 understand that correctly?
19     A.    I don't think your
20 interpretation is correct.
21     Q.    Looking at the e-mail a little
22 further -- I'll start over.
23          Looking a little further down,
24 two more paragraphs, Dr. Nudelman, the

Page 221

1  director of chemical and computational
2  toxicology at Teva, says, "I fully agree that
3  hypertension treatment is chronic and the
4  less-than-lifetime (LTL) argument cannot be
5  used in this case."
6      So that would disagree with the
7  idea that you could have different levels
8  based on the assumption that somebody would
9  use the drug for a short period of time.
10     Do you understand that?
11     MR. BERNARDO:  Object to the
12  form of the question.
13     MS. LANGTON:  Join.
14     THE WITNESS:  Through the
15  Chinese translation, I understand what
16  you are talking about.
17     My understanding of this
18  paragraph is that they were still in
19  discussion on the limit setting for
20  NDMA in valsartan, as to how high the
21  limit would be, and it's up to the FDA
22  and EU's regulatory authorities to
23  set.
24     Before they set such limits,

Page 222

1  they were still talking about it
2  themselves based on their knowledge
3  and understanding.  That's quite
4  common for such complications.
5      My understanding is that it is
6  up for the EU's regulatory authority
7  to set the limit in Europe.  If it's
8  in the US, then it is up to FDA to
9  approve such limits.
10     Before they approve such
11  limits, everyone was still discussing
12  among themselves based on their
13  knowledge and understanding, but
14  eventually whatever limit approved by
15  FDA would be the final limit.
16  BY MR. SLATER:
17     Q.   If ZHP advocated for
18  unreasonably high levels in the hope of being
19  able to sell more of the pills and make more
20  money, that would have been completely
21  inappropriate and wrong, right?
22     MR. BERNARDO:  Object to the
23  form of the question.
24     THE WITNESS:  I believe your

Page 223

1  question is very weird, because ZHP
2  never tried to sell more pills and
3  make more money.
4      That is why, once we learned
5  about the NDMA in valsartan, we
6  immediately approached FDA and EU.  We
7  never hoped that we would sell more
8  valsartan.
9      As for the e-mails that we just
10 looked at back and forth among those
11 people, we were trying to get help
12 from experts and get their advice,
13 information, and data so that we could
14 take all these to the FDA for
15 communication.
16     We would not take any action
17 until those actions would be approved
18 by FDA.  Whatever work we conduct has
19 to be conformed to FDA's requirement.
20     MR. SLATER:  Let's go now to
21 TEVA-00068399.
22     MR. BERNARDO:  Break, Adam?
23     MR. SLATER:  I'd like to finish
24 this line with this document, if I

Page 224

1  could, please.
2      MR. BERNARDO:  Sure.
3      (Whereupon, Exhibit Numbers
4  ZHP-468A and ZHP-468B were marked for
5  identification.)
6  BY MR. SLATER:
7      Q.   This is the toxicological
8  assessment for NDMA prepared by Dr. Nudelman
9  at Teva.  And you can see towards the bottom
10 is the Assessment, where he says in the
11 middle of that section, "The ICH M7(R1)
12 guideline for mutagenic impurities considers
13 compounds which are mutagenic carcinogens as
14 Class 1 substances that need to be controlled
15 according to compound-specific accepted
16 limits.  The M7 guideline explains that this
17 compound-specific accepted limit is linearly
18 extrapolated from the TD50 value."
19     And then in the next line he
20 states, "For the highest dose of Valsartan
21 (320 milligrams per day) the limit for NDMA
22 calculates to 0.57 parts per million."
23     Do you see that?
24     MR. BERNARDO:  Object to the

Confidential Information - Subject to Protective Order

Page 225

1    form of the question.
2         THE WITNESS:  I heard the
3    translation, and I also saw some of
4    the numbers.
5    BY MR. SLATER:
6         Q.    When you were being prepared to
7    testify in this deposition on the increased
8    risk questions, you were given some
9    information and spoke to paid experts for
10   ZHP, but you weren't shown these documents
11   that I'm showing you now, right?
12        MR. BERNARDO:  Object to the
13   form of the question.
14   BY MR. SLATER:
15        Q.    I'll ask it differently.
16        When you were being prepared
17   for this deposition, were you shown these
18   documents where they reacted to the positions
19   that ZHP took at the time in 2018?
20        I just want to know, were you
21   given this information to help prepare
22   yourself for this deposition?
23        MR. BERNARDO:  Object to the
24   form of the question.

Page 226

1         THE WITNESS:  My first point is
2    I did not read any of the internal
3    complication documents within Teva.
4         My second point is that,
5    indeed, the -- my second point is that
6    for this preparation of the
7    deposition, I did a lot of preparation
8    work.
9         My third point is that I don't
10   believe I need to review the internal
11   communication documents within Teva,
12   because at that time in setting the
13   limits -- or acceptable limit, that
14   is, for the NDMA in valsartan, people
15   were discussing with themselves.  They
16   were also consulting with external
17   experts.
18        But eventually it's not up to
19   those enterprises to set the limit.
20   Whatever limit has to be approved by
21   FDA, which they did.  As you can see
22   later, FDA and EU set the limit and
23   made it public in their public
24   announcement.

Page 227

1         So for us, we have to follow
2    FDA or EU's GMP official requirement
3    in order to conduct our work.
4         To me, such internal technical
5    communication is very normal.  I don't
6    believe I need to review any documents
7    within Teva.  All I need to do is to
8    follow FDA for the requirements they
9    set.
10        MR. SLATER:  Rick, did you say
11   you wanted to take a break for a
12   couple minutes?
13        MR. BERNARDO:  Yes, please.
14        MR. SLATER:  Okay.
15        THE VIDEOGRAPHER:  The time
16   right now is 10:48 a.m.  We're off the
17   record.
18        (Whereupon, a recess was
19   taken.)
20        THE VIDEOGRAPHER:  The time
21   right now is 11:02 a.m.  We're back on
22   the record.
23        MR. SLATER:  All right.  Chris,
24   can we put the information package to

Page 228

1    the customers back up and go to
2    page 12, where we were before?
3    BY MR. SLATER:
4         Q.    You see the table that is shown
5    there, and it says, "According to a World
6    Health Organization report, a table of the
7    report is shown above.  A reasonable
8    worst-case estimation of daily intake of NDMA
9    from different sources by general population
10   at different age groups are listed in the
11   table above."  And then it gives an example,
12   and it cites to a World Health Organization
13   study from 2002.
14        Have you actually looked at
15   that World Health Organization document that
16   is cited by ZHP in this information packet to
17   its customers?
18        A.    Are you asking me whether I
19   reviewed this document generated by Huahai,
20   or I reviewed the WHO report cited by this
21   document?
22        Q.    The WHO report from 2002.
23        A.    No, not for this one.
24        Q.    Okay.  Let's go now to the

Page 229

¹ World Health Organization document, ZHP-321.

²         (Whereupon, Exhibit Number

³    ZHP-321, previously marked for

⁴    identification.)

⁵ BY MR. SLATER:

⁶    Q.    This is the World Health

⁷ Organization report from 2002 titled

⁸ "N-nitrosodimethylamine," and that is what is

⁹ cited in that information packet to ZHP's

¹⁰ customers.

¹¹         And what I'd like to do now is

¹² turn to page 13, where we can then see that

¹³ it's the same table that we just saw in the

¹⁴ information packet to the customers.

¹⁵         There it is.

¹⁶         Do you see that that's the same

¹⁷ table, "Reasonable worst-case estimates of

¹⁸ daily intake of NDMA"?

¹⁹    A.    I see the table, and I also see

²⁰ numbers in this table, but I'm not sure I

²¹ understand what it says in that table.

²²         MR. SLATER:  Let's go now to

²³    page 23.  Actually, let's go to

²⁴    page 22 to start.

Page 230

¹    Q.    You can see on page 22 in the

² bottom right is a heading called

³ "Carcinogenicity."

⁴         MR. SLATER:  And let's now

⁵    continue over to the next page, to the

⁶    end of that section at the top

⁷    right-hand corner of page 23.

⁸    Q.    And this document states,

⁹ "Therefore, owing to the considerable

¹⁰ evidence of carcinogenicity of NDMA in

¹¹ laboratory species, evidence of direct

¹² interaction with DNA consistent with tumour

¹³ formation, and the apparent lack of

¹⁴ qualitative species-specific differences in

¹⁵ the metabolism of this substance, NDMA is

¹⁶ highly likely to be carcinogenic to humans."

¹⁷         That language I've just read

¹⁸ was not included in what was sent in the

¹⁹ information packet to ZHP's customers.  Only

²⁰ that table that we showed a few pages earlier

²¹ was shown to them, correct?

²²         MR. BERNARDO:  Object to the

²³    form of the question.

²⁴         THE WITNESS:  I saw both this

Page 231

¹ article and the letter to our clients.

² However, I do not read English, so I'm

³ not sure whether the paragraph you

⁴ just read was included in the letter

⁵ to the customers.

⁶         Seems to me that they are just

⁷ referring to experiments, laboratory

⁸ animals, regarding NDMA.  So I'm not

⁹ sure whether this paragraph was

¹⁰ included in that letter.  After all, I

¹¹ cannot read English.

¹²         MR. SLATER:  Let's go back to

¹³    page 21.

¹⁴    Q.    This shows that in section 9,

¹⁵ "Effects on Humans," that, in fact, there was

¹⁶ analysis of studies having to do with human

¹⁷ intake of NDMA.

¹⁸         So you had just wondered if

¹⁹ human studies were considered, and I'm

²⁰ showing that to you.

²¹         Do you see that?

²²         MR. BERNARDO:  Object to the

²³    form of the question.

²⁴         Is there a translated version

Page 232

¹ of this?

²         THE WITNESS:  I cannot read

³ this article because they are in

⁴ English.  I can figure the number 9,

⁵ but I'm not sure whether that's

⁶ referring to the effects on human.

⁷ BY MR. SLATER:

⁸    Q.    There is a Chinese translation,

⁹ as with every one of the documents that we've

¹⁰ used in this deposition.  So you've always

¹¹ had the opportunity to access that in the

¹² same place.

¹³         MR. BERNARDO:  I'll note for

¹⁴    the record that with respect to the

¹⁵    machine, the translator has observed

¹⁶    that most, if not all, of the Chinese

¹⁷    translations are unintelligible and

¹⁸    confusing.

¹⁹         MR. SLATER:  I'm not going to

²⁰    argue the point with you, Counsel.

²¹         MR. BERNARDO:  I'm not asking

²²    you to.

²³         MR. SLATER:  You asked if there

²⁴    was a translation; I said yes.

Page 233

1  MR. BERNARDO: You said more
2  than that.
3  BY MR. SLATER:
4  Q. In preparing for this
5  deposition, am I correct you were not aware
6  that ZHP had in its possession this study,
7  which concluded that NDMA is highly likely to
8  be carcinogenic to humans? Yes or no.
9  MR. BERNARDO: Object to the
10  form of the question.
11  THE WITNESS: That's incorrect.
12  BY MR. SLATER:
13  Q. So you did review this report?
14  A. No. Because what's written
15  here is all in English, I can't understand
16  it.
17  Q. It's a very simple question.
18  Did you have this report
19  provided to you, either in English or in
20  Mandarin, as part of your preparation for
21  this deposition? Yes or no.
22  MR. BERNARDO: Object to the
23  form of the question.
24  THE WITNESS: During the

Page 234

1  preparation, I have reviewed many
2  documents.
3  And I don't think I need to
4  review this document because in terms
5  of preparation, what I have done is
6  sufficient.
7  BY MR. SLATER:
8  Q. It was sufficient for you to be
9  prepared by paid experts for ZHP who were
10  paid to dispute the increased risk, as
11  opposed to reading a report from the World
12  Health Organization indicating that NDMA is
13  highly likely to be carcinogenic to humans?
14  Is that what you're telling me? Yes or no.
15  MR. BERNARDO: Object to the
16  form of the question.
17  THE WITNESS: That's totally
18  incorrect.
19  BY MR. SLATER:
20  Q. Were you aware when you were
21  being prepared for this deposition that this
22  World Health Organization report from 2002
23  was in ZHP's files? Yes or no.
24  A. I didn't verify that. However,

Page 235

1  even after they mentioned this report, I read
2  the conclusion from IARC. So I don't think I
3  need to read many documents, because IARC's
4  conclusion is very clear to me.
5  Q. The IARC conclusion that NDMA
6  is a probable human carcinogen, that's what
7  you're referring to, correct?
8  A. In IARC's conclusion, it was
9  written very clearly that out of practical
10  concerns, even though there was no human
11  data, out of the practical concern for the
12  high-dose scenario, NDMA is regarded as a
13  probable human carcinogen.
14  Q. The IARC monograph actually
15  doesn't say anything about high dose; it just
16  says it's a probable human carcinogen,
17  actually, right?
18  MR. BERNARDO: Object to the
19  form of the question.
20  THE WITNESS: That's incorrect.
21  IARC did mention that so far they
22  still don't have any human data. They
23  do have, however, some data of
24  high-dose animals.

Page 236

1  BY MR. SLATER:
2  Q. Are you aware that it would be
3  unethical to study the effects of NDMA on
4  humans because of the strong evidence of
5  carcinogenicity? Yes or no, are you aware of
6  that?
7  MR. BERNARDO: Object to the
8  form of the question.
9  THE WITNESS: I don't get your
10  question. Are you referring to
11  imposing NDMA onto human beings?
12  BY MR. SLATER:
13  Q. Are you aware that it would be
14  unethical to deliberately give NDMA to humans
15  in order to study whether and to what extent
16  it would cause cancer in humans because of
17  the strong evidence of it being a mutagenic,
18  genotoxic carcinogen?
19  Are you aware of that? Yes or
20  no.
21  MR. BERNARDO: Object to the
22  form of the question.
23  THE WITNESS: As I told you
24  before, I am not a toxicologist nor a

Confidential Information Subject to Protective Order

Page 237

1  pharmacologist.  All I have to do is
2  to rely on the agencies, well-known
3  agencies and experts.
4        As for the human data, I don't
5  know how they would have conducted
6  their analysis, whether they used any
7  human data or not.
8        However, I also don't know how
9  they did not -- how they conducted
10  statistical analysis on that.  I
11  didn't realize that I have to prepare
12  to such details for this deposition.
13        MR. SLATER:  I have no further
14  questions at this time.  I'll hand the
15  witness -- pass the witness, I
16  guess -- to defense counsel.
17        MR. BERNARDO:  Just give me a
18  couple minutes.
19        THE VIDEOGRAPHER:  The time
20  right now is 11:26 a.m.  We're off the
21  record.
22        (Whereupon, a recess was
23  taken.)
24        THE VIDEOGRAPHER:  The time

Page 238

1  right now is 11:32 a.m.  We're back on
2  the record.
3        EXAMINATION
4  BY MR. BERNARDO:
5     Q.    Good morning, Ms. Ge.  We
6  obviously know each other, but let me
7  introduce myself for the record.  I'm Richard
8  Bernardo.  I'm counsel for ZHP.
9        Thank you for taking the time
10  to talk with Mr. Slater and me as well.  I
11  know you had to travel a distance to
12  participate in this deposition.
13        Ms. Ge, I just want to talk to
14  you a little bit about your background and
15  just make sure we clarify what might be some
16  confusion through some earlier questions.
17        Tell the jury what your
18  education is, Ms. Ge.
19     A.    Of course.  Good morning,
20  everyone.  My name is Jucai Ge.  I am
21  currently the quality assurance director for
22  API in ZHP.
23        As for my educational
24  background, in 2002 I graduated from Tianjin

Page 239

1  Institute of Technology with a major in
2  pharmacology, and I joined ZHP after there,
3  after then, after that time.  I have been
4  around ZHP ever since.
5     Q.    Thank you, Ms. Ge.
6        And what year did you graduate
7  with a major in pharmacology?
8     A.    2000.
9     Q.    And so you've been at ZHP since
10  approximately 2000?
11     A.    That is correct.  Time flies.
12  I feel that as if yesterday, you know, I was
13  still on campus, and suddenly more than two
14  decades have already passed.
15     Q.    22 years is a long time.
16        Ms. Ge, would you help the jury
17  understand just briefly what a quality
18  assurance director does?  What are your
19  responsibilities?
20     A.    As a director of quality
21  assurance, in general, I'm in charge of the
22  construction or establishment, maintenance of
23  the quality system, work with any GMP
24  inspections.

Page 240

1        Also, right now I am in charge
2  of the supplier qualification.
3        At the same time, I'm also in
4  charge of setting up the quality system for
5  one of the subsidiary companies of ZHP.
6     Q.    So 22 years at ZHP, Ms. Ge.
7  Fair to say you like working at ZHP?
8        MR. SLATER:  Objection.
9        You can answer.
10        THE WITNESS:  Of course.
11  Otherwise, who would stay in the same
12  company for over 20 years?
13        The reason why I've been
14  working with ZHP is because I like the
15  working environment here, which is
16  very good.  Everyone around me is very
17  nice, they work hard, and they've been
18  very careful and diligent.
19        Also, it's -- basically, a lot
20  of people who either joined the
21  company at the same time as I did or
22  joined the company before I did are
23  even still with ZHP, so they're being
24  with ZHP for over 20 years or close to

Page 241

1    20 years.  So after all, the work
2    environment is very good here.
3  BY MR. BERNARDO:
4    Q.    Do you feel you also work hard
5  and diligently, given your responsibilities
6  as the director of quality assurance?
7          MR. SLATER:  Objection.
8          You can answer.
9          THE WITNESS:  Of course.  As I
10  said, in such a working environment,
11  everyone is working hard and seriously
12  and diligently.  We all work together
13  trying to fulfill our responsibilities.
14          That is just definitely
15  necessary because, after all, ZHP
16  doesn't belong to one person; it
17  belongs to all of us.  That's why I
18  think for this working environment,
19  everyone is working hard.
20  BY MR. BERNARDO:
21    Q.    Mr. Slater asked you a number
22  of questions suggesting that ZHP knew that
23  NDMA formed in valsartan as early as the
24  summer of 2017, but didn't disclose that

Page 242

1  information.
2          Do you recall those questions?
3          MR. SLATER:  Objection.
4          You can answer.
5          THE WITNESS:  We had a lot of
6  communications on this line of
7  questions.  I don't know whether he
8  got my feedback.
9          To the best of my knowledge and
10  based on my 20 years of experience in
11  ZHP, I can respond very responsively
12  that before July 2017, or even before
13  June 2018 when Novartis suggested to
14  us that there might be NDMA in
15  valsartan, nobody at ZHP knew there
16  was NDMA in valsartan.  I just want to
17  clarify that.
18  BY MR. BERNARDO:
19    Q.    How do you know that, Ms. Ge?
20    A.    That is because before
21  June 2018 there was not an analytical method
22  that would identify NDMA in valsartan.
23          That is one of the most
24  important reasons.  If you don't have the

Page 243

1  right analytical method, how could you
2  identify NDMA in a test.
3    Q.    What about Jinsheng Lin, the
4  author of the document that you spent a fair
5  amount of time discussing with Mr. Slater?
6  Do you have an understanding whether he in
7  particular knew that NDMA formed in valsartan
8  in 2017?
9          MR. SLATER:  Objection.
10          You can answer.
11          THE WITNESS:  That is
12  impossible, because I asked him and he
13  told me that at that time he was not
14  aware of the existence of NDMA in
15  valsartan.
16          He only -- his understanding of
17  the impurity was only restricted to
18  the knowledge he got from the patent
19  that was attached to that e-mail.  At
20  that time, he was not in charge of
21  this valsartan product.
22  BY MR. BERNARDO:
23    Q.    Let me break that down a little
24  bit, Ms. Ge, in following up on some of

Page 244

1  Mr. Slater's questions about Mr. Lin's
2  knowledge.
3          So before he wrote the memo,
4  what is your knowledge of the information
5  that was available regarding NDMA, if
6  anything?
7    A.    I communicated with him and had
8  a discussion with him regarding this topic.
9          According to him, in general,
10  NDMA was a common, natural N-nitroso
11  compound.  It's a very common compound.  And
12  he was not aware that NDMA was in valsartan.
13  That was his general knowledge at that time.
14    Q.    Thank you.
15          You talked quite a bit in your
16  testimony about a patent application.
17          Do you remember that?
18    A.    Well, yes.
19    Q.    And do you have -- and as I'm
20  recalling your testimony, it was that Mr. Lin
21  had this patent application before he wrote
22  his July 27, 2017 memo that you discussed, is
23  that correct?
24          MR. SLATER:  Objection.

Confidential Information - Subject to Protective Order

Page 245

1    You can answer.
2    THE WITNESS:  I communicated
3  with Jinsheng Lin on this topic, and I
4  also provided my response, being the
5  prior testimony.
6    At that time when he was
7  writing the e-mail, either it was
8  several hours prior to that or
9  sometime on the same day.  Whichever
10  the case, he could not recall, he was
11  trying to make a comparison about in
12  toxicology; therefore, he conducted an
13  online search and found this patent.
14  BY MR. BERNARDO:
15    Q.   And by "this patent," Ms. Ge,
16  you're referring to the one that he attached
17  to the July 27, 2017 memo?
18    A.   That is correct.
19    Q.   So he did some online research,
20  found this patent application that he
21  discussed.
22    Let's talk about that.  Does
23  the patent application anywhere discuss NDMA?
24    MR. SLATER:  Objection.

Page 246

1    You can answer.
2    THE WITNESS:  NDMA was not
3  discussed from cover to cover in the
4  entirety of this patent.
5  BY MR. BERNARDO:
6    Q.   So what does the patent
7  application discuss, Ms. Ge?
8    A.   That patent discussed
9  Impurity K in valsartan.
10    Q.   And what is Impurity K?
11    A.   Impurity K is also one of the
12  N-nitroso compounds.
13    Q.   Do you recall that Mr. Slater
14  raised the patent referred to nitroso
15  compounds, plural?
16    Do you recall that?
17    A.   Yes, he did.  However, I also
18  told him that Impurity K is one of the
19  N-nitroso compounds.
20    Q.   Now, do you have an
21  understanding, Ms. Ge, about how many known
22  nitroso compounds there are?
23    A.   As I told Mr. Slater this
24  morning, there were thousands, if not tens of

Page 247

1  thousands, of nitroso compounds in the world.
2  However, this patent only mentioned
3  Impurity K.
4    Q.   I want to go back to the
5  July 27, 2017 memo.
6    Now, you testified, Ms. Ge,
7  that you took steps to investigate what
8  Dr. Lin was trying to communicate in this
9  memo, is that correct?
10    MR. SLATER:  Objection.
11    You can answer.
12    INTERPRETER SHAO:  The
13  interpreter is asked to repeat the
14  rendition.
15    THE WITNESS:  I don't quite
16  understand this question.  Are you
17  referring to the investigation on
18  Impurity K?
19  BY MR. BERNARDO:
20    Q.   No. Thank you for asking me to
21  clarify if you don't understand, Ms. Ge.
22    I just want to understand what
23  you personally did to try and get an
24  understanding of what the memo was

Page 248

1  communicating.
2    A.   After I read this -- oh, by the
3  way, I now understand your question.
4    After I read this e-mail, I got
5  very confused because this e-mail was written
6  in such a lousy way.
7    In order to correctly
8  understand what this e-mail was talking
9  about, I did a lot of work, including reading
10  the whole entirety of this e-mail as well as
11  the attached patent.
12    I also approached relative
13  people, including Jinsheng Lin and Peng Dong,
14  for communication.
15    Afterwards, I read the entirety
16  of the e-mail again.  Then finally I got what
17  it was communicating about.  After all, this
18  e-mail was written in such a poor way.
19    Q.   And after you took the steps
20  you just described, Ms. Ge, tell the jury
21  what your understanding of what was being
22  communicated in the memo.
23    A.   After communication with other
24  people, as well as my hard work, I developed

Confidential Information - Subject to Protective Order

Page 249

1 an understanding of the communication, being
2 this e-mail.
3        As seen in the title, it was
4 about N-nitroso impurity found in the
5 technical improvement of irbesartan, and he
6 was trying to conduct a structural and a
7 toxicological comparison between that
8 impurity and the Impurity K in valsartan as
9 well as NDMA, with NDMA being one of the
10 naturally occurring N-nitroso compounds.
11 That's why he included that impurity,
12 Impurity K, and NDMA in his memo.
13        However, the whole e-mail was
14 about the analysis of the impurity found in
15 the technical improvement of irbesartan.
16    Q.   The sentence that Mr. Slater
17 read you -- and you can pull it up if you
18 want to refresh your recollection -- says
19 that what was occurring in irbesartan was
20 similar to the NDMA that occurs in valsartan
21 when quenched with sodium nitrite.
22        Do you recall that sentence?
23    A.   As for that sentence -- hold
24 on. Let me read it.

Page 250

1        I recall it. I see it now.
2    Q.   Thank you.
3        Can you help the jury
4 understand, Ms. Ge, how to reconcile that
5 sentence with the testimony you've given
6 today and yesterday about your understanding
7 of the overall document?
8        MR. SLATER:  Objection.
9        You can answer.
10        THE WITNESS:  Yes, I can.
11        For the entirety of this
12 e-mail, it was talking about this
13 N-nitroso compound impurity found in
14 the technical improvement of
15 irbesartan.
16        However, this e-mail was
17 written in such a lousy way, so in
18 terms of the discussion on the
19 structure, it was very confusing.
20        At that time he was only trying
21 to make a comparison in structure;
22 therefore, he was trying to find
23 something, and he came across this
24 patent which talked about Impurity K

Page 251

1 when it was generated by quenching
2 with sodium nitrite of valsartan. And
3 the patent did not mention NDMA at
4 all.
5        When he was trying to make this
6 structural and toxicological
7 comparison between the impurity found
8 in irbesartan and Impurity K, he also
9 included NDMA because all three were
10 in the category of N-nitroso
11 compounds.
12        When he was trying to make this
13 comparison of the nitroso compounds,
14 he actually was trying to compare with
15 the Impurity K found in valsartan
16 mentioned by this patent. He included
17 NDMA in the toxicological comparison.
18 That is because NDMA is a very common
19 compound.
20        After all, none of us had the
21 background of toxicology or
22 pharmacology, so it's easier for us to
23 understand why he included NDMA in the
24 comparison. But at that time, he was

Page 252

1 not aware of the existence of NDMA in
2 valsartan.
3        This e-mail was written in such
4 a lousy way, so when all the
5 paragraphs were put together, the
6 whole e-mail was very confusing.
7 BY MR. BERNARDO:
8    Q.   I want to go back to
9 Impurity K. I think you testified that is a
10 nitroso compound, correct?
11    A.   That is correct.
12    Q.   And that patent application
13 that Mr. Lin attached to his July 27, 2017
14 memo claims that Impurity K forms in
15 valsartan, right?
16    A.   That is correct.
17    Q.   And at the end of the memo,
18 Mr. Lin says that the company should pay
19 attention to that issue, Impurity K forming
20 in valsartan, correct?
21        MR. SLATER:  Objection.
22        You can answer.
23        THE WITNESS:  That is correct.
24        ///

Page 253

BY MR. BERNARDO:

Q.    And do you, Ms. Ge, have an understanding of whether the company, in fact, paid attention to that issue?

MR. SLATER: Objection. You can answer.

THE WITNESS: Yes, the company did pay attention.

BY MR. BERNARDO:

Q.    Explain to the jury how the company paid attention.

MR. SLATER: Objection. You can answer.

THE WITNESS: I communicated with Dr. Lin. According to him, LC-MS was used in the analytics and the verification, and the result was that there was no Impurity K found in valsartan. This result was delivered to the technical department at Chuannan site.

BY MR. BERNARDO:

Q.    I want to circle back, Ms. Ge, to the beginning of this discussion we just

Page 254

had, all the way back to plaintiffs' allegation that ZHP knew about NDMA in 2017 and hid it and didn't do anything about it.

In light of the discussion we just had the last few minutes, do those allegations even make sense to you?

MR. SLATER: Objection. You can answer.

THE WITNESS: They make no sense to me at all. I already testified in the prior statement that before June 2018, nobody in ZHP knew about the existence of NDMA in our valsartan.

And I also told everyone that one of the most important reasons is that we were lacking a method to identify NDMA.

BY MR. BERNARDO:

Q.    I want to switch gears to the FDA correspondence that Mr. Slater discussed with you.

Do you recall that correspondence? And you can pull it up, but

Page 255

I just want to talk generally about it.

A.    In general, I recall the correspondence.

Q.    So in that correspondence, do you recall FDA noted a number of deficiencies?

MR. SLATER: Objection. You can answer.

THE WITNESS: In the warning letter, they noted two deficiencies.

BY MR. BERNARDO:

Q.    And my question, Ms. Ge, is, are those letters that you discussed with Mr. Slater in your earlier testimony the end of the story, or did ZHP continue to work with FDA with respect to the issues discussed in the warning letter?

MR. SLATER: Objection. You can answer.

THE WITNESS: I stated in my prior testimony, after we received this warning letter from FDA, we were very serious and careful in response. It took us several years back and

Page 256

forth with the FDA for the communication.

We also gathered a lot of manpower and relative departments for the response in order to work with FDA. We also did a lot of corrections and improvements accordingly.

Eventually FDA issued a report stating that we are -- or we were at the time of the report in compliance with cGMP.

BY MR. BERNARDO:

Q.    You stole my later question, Ms. Ge. We'll get there.

Before we do, so several years you worked with the FDA. Did you provide them additional information and support of ZHP's position regarding its compliance with GMP?

MR. SLATER: Objection. You can answer.

THE WITNESS: Yes, we did. In both the response to their warning letter and our communication with FDA,

Page 257

1    we had been communicating with them
2    our position that we had always been
3    in compliance with GMP.
4  BY MR. BERNARDO:
5    Q.    And in addition to providing
6  them communication, did you meet with FDA?
7        MR. SLATER:  Objection.
8        You can answer.
9        THE WITNESS:  To the best of my
10   knowledge, we did.
11 BY MR. BERNARDO:
12   Q.    And was there ultimately any
13  kind of an inspection to see if the issues
14  that they raised were addressed or if they
15  would agree with ZHP's position?
16       MR. SLATER:  Objection.
17       You can answer.
18       THE WITNESS:  After receiving
19  the warning letter, we responded to
20  the warning letter.  We continued to
21  communicate with them.
22       So FDA arranged an on-site
23  inspection.  Afterwards they issued an
24  EIA report stating that we were in

Page 258

1    compliance with GMP.
2  BY MR. BERNARDO:
3    Q.    Ms. Ge, I'd like to show you
4  what's been marked as Defense Exhibit 1A,
5  which is the English version, and 1B which is
6  the Chinese version.
7        (Whereupon, Exhibit Number
8    Defense 1A and Defense 1B were marked
9    for identification.)
10       THE WITNESS:  Hold on.  Let me
11   find the Chinese version.
12       INTERPRETER SHAO:  The
13   interpreter could not find a link to
14   1A.
15       MR. BERNARDO:  Stephanie, can
16   you help us here?
17       MS. MARTIN:  Yep.  You probably
18   just need to refresh.  I just loaded
19   it seconds ago.
20       THE WITNESS:  Are you referring
21   to 466B?
22       MS. MARTIN:  Defense 1B.
23       THE WITNESS:  Hold on.  1B.
24       MS. MARTIN:  And the prefix is

Page 259

1    Defense, not ZHP.  It's Defense 1B.
2        THE WITNESS:  I see it.  I see
3    it.
4  BY MR. BERNARDO:
5    Q.    Are you there, Ms. Ge?
6    A.    I see it.  I see it.
7    Q.    And, Ms. Ge, what's been marked
8  as Defense 1A and in Chinese 1B is an
9  October 18, 2021 letter from US Food and Drug
10 Administration.
11       Are you familiar with this
12 document?
13   A.    I've reviewed this document
14 before.
15   Q.    Is this document the one that
16 you were referring to in terms of the
17 document in which the FDA made conclusions
18 following the several-year process we just
19 discussed?
20       MR. SLATER:  Objection.
21       You can answer.
22       THE WITNESS:  That is correct.
23       The letter also says from
24 July 19, 2021 to July 29, 2021 they

Page 260

1    conducted an inspection of our
2    facility and came up with this
3    conclusion.
4  BY MR. BERNARDO:
5    Q.    I'd like to draw your
6  attention, Ms. Ge, to the first paragraph,
7  the middle of the first paragraph.  And it
8  says, "FDA has determined that the inspection
9  classification of this facility is a" -- "is
10 'no action indicated.'"  And then in
11 parentheses it says "(NAI).  Based on this
12 inspection, this facility is considered to be
13 in an acceptable state of compliance with
14 regard to current good manufacturing
15 practice."  And then in parentheses it says
16 "(CGMP)."
17       Do you see that?
18   A.    Yes, I see it, indeed.
19   Q.    And is what I just read the
20 conclusion that FDA reached after the
21 back-and-forth over four years that you just
22 described in your earlier testimony with ZHP
23 and the FDA?
24       MR. SLATER:  Objection.

Page 261

1  You can answer.
2  THE WITNESS:  That is correct.
3  Not only based on our response to them
4  and our communication to them, FDA
5  also conducted an on-site inspection
6  and verification.
7  Based on all the material they
8  received, they came up with the
9  conclusion that our facility is an NAI
10  facility and that we are in compliance
11  with cGMP.
12  BY MR. BERNARDO:
13  Q.    And again, NAI that you just
14  referred to means "no action indicated"?
15  MR. SLATER:  Objection.
16  You can answer.
17  THE WITNESS:  That is correct.
18  "NAI" is one of the terms used by FDA,
19  meaning "no action indicated."
20  BY MR. BERNARDO:
21  Q.    Drawing your attention to
22  further down on the same page, the last
23  paragraph, it says, "FDA has concluded that
24  this inspection is 'closed' under 21 CFR

Page 262

1  20.64(d)(3)."
2  Do you see that?
3  A.    Yes.
4  Q.    Do you have an understanding of
5  what that means, Ms. Ge?
6  A.    Not only this sentence, but
7  also including the EIR report and the warning
8  letter and our responses, the whole process
9  is closed.
10  INTERPRETER SHAO:  The
11  interpreter would like to make a
12  global correction if necessary, about
13  EIR report.  In the prior translation,
14  it may be mistakenly translated as
15  "EIA report."
16  A.    After the inspection of
17  facility was regarded as NAI, and they came
18  up with the conclusion that we were in
19  compliance with cGMP, which means that all
20  that happened prior to that, including the
21  warning letters, was closed.  That's my
22  understanding.
23  BY MR. BERNARDO:
24  Q.    And, Ms. Ge, does this

Page 263

1  October 18, 2021 report go through in the
2  following 24 pages discussions of the various
3  deficiencies or issues that were first raised
4  in the 2018 warning letter, to your
5  knowledge?
6  MR. SLATER:  Objection.
7  You can answer.
8  THE WITNESS:  That is correct.
9  BY MR. BERNARDO:
10  Q.    If you look way at the back of
11  the report, Ms. Ge, on pages 22, 23, and -- I
12  guess 22 and 23, it lists out a number of
13  exhibits.
14  Do you see that?
15  MR. SLATER:  Objection.
16  THE WITNESS:  Yes, I see them.
17  MR. BERNARDO:  Steph, would you
18  bring up page 22, please?
19  Thank you.
20  BY MR. BERNARDO:
21  Q.    And if you see in the right,
22  Ms. Ge, it gives you page numbers, and if you
23  add them up, there are hundreds of pages, is
24  that fair?

Page 264

1  A.    I believe that is the case.
2  Q.    And do you have an
3  understanding of what these exhibits are
4  generally, Ms. Ge?
5  A.    Yes, I do.
6  Q.    And tell us what they are,
7  please.
8  A.    Those exhibits were the
9  documents they reviewed and collected and
10  brought back to FDA in their inspection in
11  2018.  These documents are all quality
12  documents.
13  Q.    So these are documents that ZHP
14  provided in support of its position during
15  this period of back-and-forth with FDA over
16  several years?
17  MR. SLATER:  Objection.
18  THE WITNESS:  That is correct.
19  This is an incomplete list of
20  documents we provided in the
21  back-and-forth communication with FDA
22  over those few years.
23  There are quite a few documents
24  that were not listed here.

Page 265

BY MR. BERNARDO:

Q.    Thank you, Ms. Ge.

I just want to take a minute to go through one example of an issue they discuss.

And if you could turn to page 9 of Exhibit 1A and 1B.  So if you look at page -- I'm sorry.

A.    I see it.

Q.    Thank you.

If you look at the section -- there's a section called Customer Complaints.

Do you see that?

Or "Customer Complaint."  I'm sorry.

A.    Yes, I see it.

Q.    And I want you to look in the middle of that paragraph, where it says, "A total of eight technical communications were investigated as complaints for unknown peaks."

Do you see that?

A.    Yes, I see it.

Q.    And it continues to say, "The

Page 266

firm performed the investigation and assessed if the peaks were part of the impurity profile of the API or resulted as part of the manufacturing process.  The investigation report was provided to the customers."

Do you see that?

A.    I see it.

Q.    And do you recall Mr. Slater raised with you the issue of unknown peaks that was raised in November of 2018 and that they hadn't been investigated?

Do you recall that?

MR. SLATER:  Objection.

You can answer.

THE WITNESS:  I don't quite recall.

BY MR. BERNARDO:

Q.    Okay.  Well, let me ask you to read on with me, where it says, "None of the technical communications reviewed were related to nitrosamine issues."

Do you see that?

MR. SLATER:  Objection.

You can answer.

Page 267

THE WITNESS:  I see it.  That's true.

BY MR. BERNARDO:

Q.    So am I understanding this correctly, that FDA looked at these unknown peaks and concluded that none of them related to nitrosamine issues, is that correct?

MR. SLATER:  Objection.

You can answer.

THE WITNESS:  That is correct.

BY MR. BERNARDO:

Q.    And going back to what we talked about on the first page, so after this investigation, as we just went over a little while ago, FDA found that ZHP was in compliance with cGMP, is that correct?

MR. SLATER:  Objection.

You can answer.

THE WITNESS:  That is correct.

MR. BERNARDO:  Thank you, Ms. Ge.

And subject to any questions I might follow up that Mr. Slater may ask, I have no further questions at

Page 268

this point, but I do want to thank you for your time and your travel to live testimony here.

THE WITNESS:  I would like also to thank you and your colleagues for your help in preparation of the three topics, because I really got a lot of help from you.  Thank you.

MR. SLATER:  Chris, let's put up the patent in Mandarin, ZHP01812101, please.  Perfect.

(Whereupon, Exhibit Numbers were ZHP-469A and ZHP-469B were marked for identification.)

FURTHER EXAMINATION

BY MR. SLATER:

Q.    Do you see on the screen is the patent we've been talking about that was referenced in Jinsheng Lin's e-mail?  Do you see that on the screen?

A.    Yes.

Q.    And you see in the top right there's a number for the patent, 103613558.

Do you see that?

Confidential Information - Subject to Protective Order

Page 269

1    A.    Hold up.  Let me find it.  Are
2  you --
3    Q.    Top right corner.
4    A.    -- referring to the application
5  announcement number?
6    Q.    Yes.
7    A.    I see it.
8    Q.    Great.  Let's put that aside
9  for a second and let's go to the valsartan
10  patent investigation report now.
11         Have you ever seen this
12  document?
13         (Whereupon, Exhibit Number
14    ZHP-170 was marked for
15    identification.)
16    A.    I saw the patent application
17  document, which was listed as one of the
18  exhibits on the list that was shown to me
19  previously.
20  BY MR SLATER:
21    Q.    Do you see the document on the
22  screen?
23    A.    I see the document on the
24  screen.

Page 270

1    Q.    What is the title of the
2  document?
3    A.    It says here, "Valsartan Patent
4  Investigation Report?
5         MR. SLATER:  And let's go
6  now -- let's go now to the page which
7    is ZHP02336682.
8         Perfect.
9    Q.    Do you see right there in the
10  middle of the page the number for the patent
11  that we've been talking about that was
12  referenced in the Jinsheng Lin e-mail?  Do
13  you see the number right there?
14    A.    Yes, I see it.
15    Q.    And this document, it's my
16  understanding from the metadata, was last
17  modified -- well, let me actually ask it
18  differently.
19         It's my understanding that this
20  is the 2015 fourth quarter update of the
21  valsartan patent investigation report.
22         Do you have any reason to doubt
23  that?
24    A.    Well, I don't know where you

Page 271

1  came up with this time point like first
2  quarter of 2015.  I've never read this
3  document before, so I don't even know how you
4  could come up with that number.
5    Q.    I'm going to tell you in one
6  second.
7         Wait a second.  Hang on.
8  You'll have to just bear with me for one
9  second.
10         I got it.  The electronic file
11  name of the document, I'm advised, is that is
12  the 2015 Q4 update.
13         So my question is this.
14  Assuming that to be correct, ZHP actually had
15  reviewed this patent several years before
16  Jinsheng Lin saw it, because it would be back
17  in, at least at the latest, 2015, a couple
18  years earlier than his e-mail, and that would
19  undercut everything he told you, wouldn't it?
20         You can answer that question.
21         MR. BERNARDO:  Object to the
22    form of the question.
23         THE WITNESS:  That's not
24    correct.

Page 272

1  BY MR. SLATER:
2    Q.    If this is -- rephrase.
3         If I am correct that this
4  valsartan patent investigation report that
5  you're looking at was updated at the latest
6  2015 fourth quarter, that would mean that ZHP
7  had it in its possession and had reviewed the
8  patent no later than 2015, correct?
9         MR. BERNARDO:  Object to the
10    form of the question.
11         THE WITNESS:  That's not
12    correct.  I don't know how you came up
13    with the idea that this patent was
14    reviewed in the fourth quarter of
15    2015.  The document itself didn't say
16    so.
17  BY MR. SLATER:
18    Q.    Wait one second.
19         All right.  We're putting a
20  document up.  Just so you know, we're pulling
21  up the documentation that I believe will show
22  the date.
23         Let me ask you this question.
24  If, in fact, this patent was reviewed in 2014

Confidential Information - Subject to Protective Order

Page 273

1  or 2015, you would agree that ZHP should have
2  taken action in response to what it learned
3  from the patent at that time, correct?
4           MR. BERNARDO:  Object to the
5       form of the question.
6           THE WITNESS:  Your hypothesis
7       is not legitimate.
8           Based on my communication with
9       Jinsheng Lin and Peng Dong, it's true
10      that they were not aware of this until
11      2017 after a search was conducted.
12      Prior to that, they were not aware of
13      this.
14  BY MR. SLATER:
15      Q.   I'm going to advise you that
16  the metadata for this document indicates that
17  it was last modified November 4, 2014.
18           So based on that, your company
19  actually did have access to this patent, and
20  in fact, part of what your company routinely
21  does is patent infringement analysis to make
22  sure you're not infringing other patents,
23  correct?
24           MR. BERNARDO:  Object to the

Page 274

1       form of the question.
2           THE WITNESS:  I don't know the
3       patent analysis that you just
4       mentioned.  After all, I work in the
5       quality assurance department.
6           Also, I was not told to be
7       prepared for the topic of patent for
8       this deposition.
9  BY MR. SLATER:
10      Q.   You walked into this deposition
11  with a binder containing a patent and used
12  that as the justification for your
13  explanation for the Jinsheng Lin e-mail, and
14  you're saying you came here not ready to talk
15  about a patent?
16           MR. BERNARDO:  Object to the
17      form of the question.
18  BY MR. SLATER:
19      Q.   Specifically, the patent that
20  you walked into this deposition expecting to
21  talk about?
22           Let me rephrase it.  I'm going
23  to withdraw it and start again.
24           You're saying you were not

Page 275

1  expecting to talk about the patent that you
2  actually have in your binder and that you
3  prepared to talk about as part of your
4  explanation for the Jinsheng Lin e-mail?
5           Is that your testimony under
6  oath?
7           MR. BERNARDO:  Object to the
8       form of the question and the
9       characterization of her testimony.
10          THE WITNESS:  You must have
11      misunderstood my prior testimony,
12      because my prior testimony didn't say
13      so.
14          Talking about this patent, I
15      was told that basically I need to talk
16      about the topic of ZHP's knowledge of
17      NDMA.  With that, this e-mail with the
18      attached patent would be in the scope.
19      So I prepared for that patent.
20          I was not prepared in general
21      for the topic of patents.
22          MR. SLATER:  Let's take that
23      down.
24          ///

Page 276

1  BY MR. SLATER:
2      Q.   You went through some
3  correspondence between ZHP and the FDA years
4  after the FDA warning letter was sent.
5           Remember you just talked about
6  that with your counsel?
7      A.   I went through the related
8  response, yes.
9      Q.   None of that later
10 correspondence indicated that ZHP didn't
11 violate -- let me start over.
12          None of the -- rephrase.
13          None of that correspondence
14 indicated that ZHP did not deviate from cGMP,
15 meaning -- I've got to -- sorry, I'm tired.
16 I'm going to start over.
17          MR. BERNARDO:  Take three.
18          MR. SLATER:  I'm almost done,
19      so let's see if I can just muster
20      enough energy to get one coherent
21      sentence out.
22 BY MR. SLATER:
23      Q.   None of that -- rephrase.
24          None of those communications

Page 277

1  from the FDA stated that ZHP was in
2  compliance with cGMP when it was
3  manufacturing and selling the valsartan that
4  was contaminated with NDMA, correct?
5        MR. BERNARDO:  Object to the
6     form of the question.
7        THE WITNESS:  Your question
8     sounds very strange to me.  That is
9     because in our response to FDA's
10    letter, we already stated our
11    company's position that we have been
12    in compliance with cGMP in response to
13    FDA's findings.
14        While we were working with
15    them, we always insisted that we have
16    been in high-quality -- high-quality
17    compliance with GMP during all the
18    responses to FDA.
19 BY MR. SLATER:
20    Q.    The FDA obviously disagreed and
21 felt that when you manufactured the valsartan
22 and the manufacturing process was creating
23 NDMA that was contaminating the pills for
24 years, that despite ZHP thinking they were

Page 278

1  doing everything right, the FDA just
2  disagreed, right?
3        MR. BERNARDO:  Object to the
4     form of the question.
5        THE WITNESS:  As in the later
6     correspondence with the FDA, as well
7     as the report presented by Rich just
8     now, FDA asked us to keep providing
9     exhibits and evidence, which we did.
10        After receiving and reviewing
11    those exhibits, they also conducted an
12    online inspection.
13        Finally they came to the
14    conclusion that our facility is in the
15    status of NAI, and in their report
16    they also acknowledged that we were in
17    compliance with cGMP.
18 BY MR. SLATER:
19    Q.    Right.
20        After three years of fixing the
21 problems, changing your manufacturing
22 process, and taking steps to try to correct
23 the deviations the FDA had found, after those
24 three years or so, then they released the

Page 279

1  import ban and said that you were in
2  compliance.  That's what happened?
3        MR. BERNARDO:  Object to the
4     form of the question.
5        THE WITNESS:  That is
6     incorrect.  As in my prior statement,
7     right after receiving the warning
8     letter from FDA, we responded to FDA
9     our position is that we were always in
10    compliance with cGMP.
11        FDA did not disagree with that.
12    Instead, they just asked us to submit
13    more exhibits, more documents, and
14    then they reviewed all those
15    documents, and that's about it.  So
16    that is my first point.
17        Second point is that, indeed,
18    in order to work with the FDA, we made
19    some corrections and improvements.
20    But that didn't mean that we were not
21    in compliance with GMP.
22 BY MR. SLATER:
23    Q.    So when the FDA said in the
24 warning letter of November 29, 2018 that your

Page 280

1  methods, facilities, or controls for
2  manufacturing, processing, packing, or
3  holding do not conform to cGMP and your API
4  were adulterated, the FDA was telling you
5  they thought you were doing a good job and
6  there were no problems?
7        Is that your understanding?
8        MR. BERNARDO:  Object to the
9     form of the question.
10        INTERPRETER SHAO:  Sorry, the
11    interpreter is asked for a repeat of
12    the rendition, simply because the
13    witness was distracted with a phone
14    call from the front desk.
15        THE WITNESS:  That is
16    incorrect.  Your interpretation is
17    incorrect.  That is incorrect.  Your
18    understanding is incorrect.
19        Actually, it is within the
20    scope of FDA's authority to issue a
21    warning letter to us, which they did
22    in 2018.  They also gave us the right
23    to come up with a response.
24        In that response, we already

Confidential Information Subject to Protective Order

Page 281

1   made our position very clear that we
2   were in compliance with cGMP, but we
3   still communicated with them.
4           FDA never disagreed with us.
5   They only asked us to provide
6   additional documents and evidence and
7   asked us to do this, then do that, but
8   they never disagreed with us that we
9   were in compliance with CGMP.
10          After working with the FDA and
11  submitting all the documents,
12  eventually FDA issued this EIR report,
13  which was shown in the approval
14  letter.
15  BY MR. SLATER:
16      Q.   You also had to change your
17  manufacturing process so that you would not
18  create NDMA and contaminate your valsartan
19  with it any longer.
20      That's a true statement?
21  Please say yes or no.
22          MR. BERNARDO:  Object to the
23      form of the question.
24          THE WITNESS:  It is not a true

Page 282

1   statement.
2   BY MR. SLATER:
3       Q.   So ZHP continued to manufacture
4   valsartan with the zinc chloride sodium
5   nitrite quenching process creating NDMA, and
6   you were allowed to keep selling valsartan
7   with NDMA?
8           Is that your testimony to this
9   jury?
10          MR. BERNARDO:  Object to the
11      form of the question.
12          THE WITNESS:  This is totally
13      incorrect.
14          MR. SLATER:  I'm done.
15          MR. BERNARDO:  Okay.  And at
16      the risk of being shot, I just have a
17      few very quick questions.
18          MR. SLATER:  Then I'm going to
19      have more follow-up, I'm telling you
20      right now.  I'm trying to -- and
21      this -- I can't get -- let me tell you
22      where I'm coming from on this.
23          I can't get a straight answer
24      to simple questions.  Simple things

Page 283

1   are all denied.
2           I was going to end the
3   deposition just to mercifully put us
4   out of our misery, but I will tell you
5   right now if you ask more questions,
6   I'm going to follow up, and I'm going
7   to go until she finally admits basic
8   facts.
9           You can do whatever you want.
10  But I have a lot more that I would do
11  normally, but I'm just willing to
12  stop.  But if you're going to
13  continue, then I'm going to continue,
14  and that's what we're going to do.
15          Because if I can't get a
16  straight answer to a question -- I
17  just spent 20 minutes trying to get
18  her to admit such basic things; she
19  doesn't want to do it.
20          You do whatever you want, but
21  I'm coming back after you're done and
22  I'm following up again.
23          MR. BERNARDO:  I'm not going to
24  go back and forth with you, Adam,

Page 284

1   other than to say I disagree with you.
2           If you want to follow up the
3   questions I have with respect to the
4   topic and the specific questions I am
5   asking her, you may.  You may not go
6   and reopen the deposition on other
7   questions.
8           MR. SLATER:  Oh, really?  You
9   mean like when you just went into
10  documents I hadn't even asked any
11  questions about on your questioning?
12          You can continue.  Go ahead.
13          FURTHER EXAMINATION
14  BY MR. BERNARDO:
15      Q.   Ms. Ge, do you have
16  responsibility for evaluating patents for
17  infringement?
18      A.   No.  As I stated earlier, I was
19  not responsible for patents.  I worked in the
20  QA.
21      Q.   Do you know what the process is
22  for evaluating patents for patent
23  infringement?
24      A.   I'm not familiar with this

Confidential - Information Subject to Protective Order

---

Page 285

1  process at all. My scope is GMP, which has
2  nothing to do with it.
3      Q.   Do you have an understanding of
4  how reports like the one that Mr. Slater
5  showed you a few minutes ago are prepared?
6      A.   I already stated just now, I
7  have no idea at all.
8      Q.   Do you know if they're even
9  reviewed?
10     A.   I don't know. I've never seen
11 this document before.
12         MR. BERNARDO: That's all I
13 have.
14         MR. SLATER: No further
15 questions.
16         MR. BERNARDO: Thank you very
17 much, Ms. Ge. I hope you have safe
18 travels back to your home.
19         MR. SLATER: Very nice to see
20 you. We'll see you in New Jersey
21 probably at some point soon.
22         THE VIDEOGRAPHER: The time
23 right now is 1:17 p.m. We're off the
24 record.

---

Page 286

1          (Whereupon, the deposition was
2  concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 287

1
2          CERTIFICATE
3      I, MAUREEN O'CONNOR
   POLLARD, Registered Diplomate
4  Reporter, Realtime Systems
   Administrator, and Certified Shorthand
5  Reporter, do hereby certify that prior
   to the commencement of the
6  examination, JUCAI GE, was remotely
   duly identified and sworn by me to
7  testify to the truth, the whole truth,
   and nothing but the truth.
8      I DO FURTHER CERTIFY that
   the foregoing is a verbatim transcript
9  of the testimony as taken
   stenographically by and before me at
10 the time, place, and on the date
   hereinbefore set forth, to the best of
11 my ability.
12     I DO FURTHER CERTIFY that
   I am neither a relative nor employee
13 nor attorney nor counsel of any of the
   parties to this action, and that I am
14 neither a relative nor employee of
   such attorney or counsel, and that I
15 am not financially interested in the
   action.
16
17
18  _____
19  MAUREEN O'CONNOR POLLARD
    NCRA Registered Diplomate Reporter
20  Realtime Systems Administrator
    Certified Shorthand Reporter
21  Notary Public
22  Dated: June 2, 2022
23
24

---

Page 288

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8          After doing so, please sign the
9  errata sheet and date it. It will be
10 attached to your deposition.
11         It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt
14 of the deposition transcript by you. If you
15 fail to do so, the deposition transcript may
16 be deemed to be accurate and may be used in
17 court.
18
19
20
21
22
23
24

---

Page 289

```
 1         - - - - - -
              E R R A T A
 2         - - - - - -
 3    PAGE LINE CHANGE
 4    ____ ____ _____
 5      REASON: _____
 6    ____ ____ _____
 7      REASON: _____
 8    ____ ____ _____
 9      REASON: _____
10    ____ ____ _____
11      REASON: _____
12    ____ ____ _____
13      REASON: _____
14    ____ ____ _____
15      REASON: _____
16    ____ ____ _____
17      REASON: _____
18    ____ ____ _____
19      REASON: _____
20    ____ ____ _____
21      REASON: _____
22    ____ ____ _____
23
24
```

Page 290

```
 1
 2       ACKNOWLEDGMENT OF DEPONENT
 3
 4       I, _____, do
     Hereby certify that I have read the foregoing
 5   pages, and that the same is a correct
     transcription of the answers given by me to
 6   the questions therein propounded, except for
     the corrections or changes in form or
 7   substance, if any, noted in the attached
     Errata Sheet.
 8
 9
     _____
10   WITNESS NAME          DATE
11
12
13
14
15
16
     Subscribed and sworn
17   To before me this
     _____ day of _____, 20____.
18
     My commission expires: _____
19
20   _____
     Notary Public
21
22
23
24
```

Page 291

```
 1        LAWYER'S NOTES
 2   PAGE LINE
 3   ____ ____ _____
 4   ____ ____ _____
 5   ____ ____ _____
 6   ____ ____ _____
 7   ____ ____ _____
 8   ____ ____ _____
 9   ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
```