Exhibit 10

Confidential Information - Subject to Protective Order

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2                  CAMDEN VICINAGE
3
    *****************************
4
    IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
5   AND IRBESARTAN PRODUCTS
    LIABILITY LITIGATION         Civil No.
6                                19-2875
    ***************************  (RBK/JS)
7
    THIS DOCUMENT APPLIES TO ALL  HON ROBERT B.
8   CASES                         KUGLER
9   ***************************
10          - CONFIDENTIAL INFORMATION -
            SUBJECT TO PROTECTIVE ORDER
11
12
13          Remote Videotaped via Zoom
14  Deposition of MIN LI, Ph.D., commencing at 7:03
15  a.m. China Standard Time, on the 20th of
16  April, 2021, before Maureen O'Connor Pollard,
17  Registered Diplomate Reporter, Realtime
18  Systems Administrator, Certified Shorthand
19  Reporter.
20
21                  - - -
22
          GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
```

Page 2

```
1   APPEARANCES:  ALL PARTIES APPEARED REMOTELY
2
    MAZIE SLATER KATZ & FREEMAN, LLC
3   BY:  ADAM SLATER, ESQ.
    BY:  CHERYLL A. CALDERON, ESQ.
4   BY:  JULIA S. SLATER, ESQ.
    BY:  CHRISTOPHER GEDDIS, ESQ.
5        103 Eisenhower Parkway
         Roseland, New Jersey 07068
6        973-228-9898
         aslater@mazieslater.com
7        ccalderon@mazieslater.com
         cgeddis@mazieslater.com
8        Representing the Plaintiffs
9
10  GOLDENBERG LAW, PLLC
    BY:   MARLENE J. GOLDENBERG, ESQ.
11       800 LaSalle Avenue, Suite 2150
         Minneapolis, Minnesota 55402
12       612-436-5028
         mjgoldenberg@goldenberglaw.com
13       Representing the Plaintiffs
14
15  KANNER & WHITELEY, LLC
    BY:   LAYNE HILTON, ESQ.
16       701 Camp Street
         New Orleans, Louisiana 70130
17       504-524-5777
         l.hilton@kanner-law.com
18       Representing the Plaintiffs
19
20  HOLLIS LAW FIRM
    BY:   IRIS SIMPSON, ESQ.
21  BY:   C. BRETT VAUGHN, ESQ.
         8101 College Boulevard, Suite 260
22       Overland Park, Kansas 66210
         800-701-3672
23       iris@hollislawfirm.com
         Representing the Plaintiffs
24
```

Page 3

```
1
2   APPEARANCES (Continued):
3   DALIMONTE RUEB STOLLER
    BY:   BEHRAM V. PAREKH, ESQ.
4       5790 Fleet Street
        Carlsbad, California 92008
5       1-760-993-3595
6       Representing the Plaintiffs
7   MORGAN & MORGAN
    BY:   STEPHANIE JACKSON, ESQ.
8   BY:   HANNAH FUJIMAKI, ESQ.
        20 North Orange Avenue, Suite 1600
9       Orlando, Florida 32801
        sjackson@forthepeople.com
10      hfujimaki@forthepeople.com
11      Representing the Plaintiffs
12  FLEMING NOLAN JEZ, LLP
    BY:   DAVID HOBBS, ESQ.
13      2800 Post Oak Boulevard
        Houston, Texas 77056
14      713-621-7944
        david_hobbs@fleming-law.com
15      Representing the Plaintiffs
16  FARR LAW FIRM
17  BY:   GEORGE T. WILLIAMSON, ESQ.
        99 Nesbit Street
18      Punta Gorda, Florida 33950
        941-639-1158
19      gwilliamson@farr.com
20      Representing the Plaintiffs
21  SLACK DAVIS SANGER, LLP
    BY:   JOHN R. DAVIS, ESQ.
22      6001 Bold Ruler Way, Suite 100
        Austin, Texas 78746
23      512-795-8686
        jdavis@slackdavis.com
24      Representing the Plaintiffs
```

Page 4

```
1
2   APPEARANCES (Continued):
3   GREENBERG TRAURIG LLP
    BY:  KATE M. WITTLAKE, ESQ.
4       4 Embarcadero Center, Suite 3000
        San Francisco, California 94111
5       415-655-1285
        wittlakek@gtlaw.com
6       Representing the Defendants Teva
        Pharmaceutical Industries, Ltd., Teva
7       Pharmaceuticals SA, Inc., Actavis LLC,
8       and Actavis Pharma, Inc.:
9   DUANE MORRIS, LLP
    BY:   NATHAN B. REEDER, ESQ.
10      30 South 17th Street
        Philadelphia, Pennsylvania 19103
11      215-979-1164
        nbreeder@duanemorris.com
12      Representing the Defendants Zhejiang
        Huahai Pharmaceutical Co., Ltd.,
13      Prinston Pharmaceutical Inc., Huahai
        U.S., Inc., and Solco Healthcare US,
14      LLC
15
16  DUANE MORRIS, LLP
    BY:   PATRICK C. GALLAGHER, ESQ.
17      1875 NW Corporate Boulevard
        Boca Raton, Florida 33431
18      561-962-2131
        pcgallagher@duanemorris.com
19      Representing the Defendants Zhejiang
        Huahai Pharmaceutical Co., Ltd.,
20      Prinston Pharmaceutical Inc., Huahai
        U.S., Inc., and Solco Healthcare US,
21      LLC
22
23
24
```

Page 5

```
1
2   APPEARANCES (Continued):
3   DUANE MORRIS, LLP
    BY:   FREDERICK R. BALL, ESQ.
4       100 High Street
        Boston, Massachusetts 02110
5       857-488-4229
        frball@duanemorris.com
6       Representing the Defendants Zhejiang
        Huahai Pharmaceutical Co., Ltd.,
7       Prinston Pharmaceutical Inc., Huahai
        U.S., Inc., and Solco Healthcare US,
8       LLC
9
10  CIPRIANI & WERNER, P.C.
    BY:   JULIA H. FERTEL, ESQ.
11      450 Sentry Parkway
        Blue Bell, Pennsylvania 19422
12      610-567-0700
        jfertel@c-wlaw.com
13      Representing the Defendant Aurobindo
        Pharmaceuticals
14
15  PIETRAGALLO GORDON ALFANO BOSICK &
    RASPANTI, LLP
16  BY:   JASON M. REEFER, ESQ.
        One Oxford Centre
17      Pittsburgh, Pennsylvania 15219
        412-263-1840
18      jmr@pietragallo.com
        Representing the Defendant Mylan
19      Pharmaceuticals, Inc.
20
21  Also Present:  Phil Hughes
22  Videographer: Judy Diaz
23
24
```

Confidential Information Subject to Protective Order

Page 6

INDEX

EXAMINATION                    PAGE
MIN LI, Ph.D.
BY MR. SLATER                    10


E X H I B I T S
NO.      DESCRIPTION              PAGE
ZHP-208   Previously Marked.
          FDA Guidance for Industry,
          Draft Guidance............... 178
ZHP-213   Previously Marked.
          11/29/18 FDA Warning
          Letter, Bates ZHP01344159
          through 4164................. 246

ZHP-284   Previously Marked.
          E-mail chain, Bates
          NHP00405021 through 5023...... 198

ZHP-288   Previously Marked.
          E-mail with attachments,
          Bates ZHP00359796 through
          9822........................ 199
ZHP-289   Previously Marked.
          Solvias report, Bates
          ZHP02135008 through 5025...... 204
ZHP-291   Notice to Take Videotaped
          Deposition................... 12

ZHP-292   Min Li, PhD's resume.......... 59

ZHP-293   Min Li's LinkedIn Profile..... 70

Page 7

ZHP-294   PowerPoint, Center for
          Excellence for Modern
          Analytical Technologies,
          Bates ZHP00404315 through
          327......................... 74
ZHP-295   7/27/17 e-mail, Bates
          ZHP00190573 and 574........... 82
ZHP-296   English translation of
          ZHP-295...................... 84

ZHP-297   Invention Patient
          Application, Bates
          ZHP01812101 through 2109...... 107
ZHP-298   Chinese translation of
          ZHP-297...................... 107
ZHP-299   Valsartan Patent
          Investigation Report, Bates
          ZHP02336567 and ZHP02336682... 116
ZHP-300   Document titled SciFinder,
          Bates ZHP02336432 through
          6434........................ 121
ZHP-301   12/22/18 e-mail, Bates
          ZHP01391682.................. 124

ZHP-302   English translation of
          ZHP-301...................... 125
ZHP-303   Excel spreadsheet, Summary
          of CEMAT reports............. 128

ZHP-304   English version of ZHP-303.... 129

ZHP-305   Study Report of Unknown
          Peak in Residual Solvent of
          Valsartan, Bates
          ZHP01870977 through 1119...... 223

Page 8

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE  LINE
None.


Request for Production of Documents
PAGE  LINE
None.
35    14


Stipulations
PAGE  LINE
None.


Questions Marked Highly Confidential
PAGE  LINE
None.

Page 9

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now
on the record.
My name is Judy Diaz, I am a
legal videographer for Golkow
Litigation Services.
Today's date is April 20, 2021,
and the time is 7:03 a.m.
This remote video deposition is
being held in the matter of Valsartan,
Losartan, and Irbesartan Products
Liability Litigation MDL.
The deponent is Min Li, Ph.D.
All parties to this deposition
are appearing remotely and have agreed
to the witness being sworn in
remotely.
All counsel will be noted on
the stenographic record.
The court reporter is Maureen
Pollard, and will now swear in the
witness.
///

Page 10

1          MIN LI, Ph.D.,
2  having been duly remotely sworn, was examined
3  and testified as follows:
4          EXAMINATION
5  BY MR. SLATER:
6      Q.    Good evening.
7      A.    Good evening.  Yeah, I'm here.
8  Actually, it's morning here.
9      Q.    Okay.  We're here to take your
10 deposition.  Do you understand that's the
11 purpose of this proceeding?
12     A.    Sure.  Yes.
13     Q.    Have you ever been deposed
14 before?
15     A.    No.
16     Q.    This is a sworn proceeding in
17 the United States District Court.
18          Do you understand that you're
19 now under oath and must tell the truth?
20     A.    Yes, I understand.
21     Q.    If for any reason you are asked
22 a question and don't feel like you either
23 understand it or can answer it truthfully and
24 accurately for any reason based on how the

Page 11

1  question was asked or what was asked, just
2  tell me.
3      A.    Sure.
4      Q.    It may be that I mispronounce a
5  word or use scientific jargon incorrectly.
6  Whatever the case may be, you can just let me
7  know what's unclear, and I can try to
8  rephrase the question.  Okay?
9      A.    Okay.  Great.
10     Q.    During the course of the
11 deposition, there will be objections and
12 discussion between the attorneys.  That's
13 normal.  That's people preserving the record
14 for future use in the court.
15          It's not something that should
16 throw you off; I just want you to know that
17 might happen, okay?
18     A.    Okay.
19     Q.    And certainly there's no reason
20 why any objection or statement by an
21 attorney would be any sort of a prompt for
22 you to say anything or not say anything.
23 It's just the attorneys discussing their
24 legal positions on different things.

Page 12

1          So certainly that's not
2  something you would ever want to be doing, is
3  taking a cue from an attorney's objection or
4  anything they say.
5          Do you understand that?
6      A.    Okay.
7      Q.    What is your current title?
8      A.    I'm the vice-president for
9  analytical operation for Huahai
10 Pharmaceutical Company, or also known as ZHP,
11 particularly, you know, in this case.
12          MR. SLATER:  Let's put up
13 Exhibit 291, please, Cheryll.
14          (Whereupon, Exhibit Number
15 ZHP-291 was marked for
16 identification.)
17          MR. SLATER:  Great.  Thank you.
18 BY MR. SLATER:
19     Q.    On the screen is the notice to
20 take your deposition.  Have you seen this
21 document before?
22     A.    Yes.  Actually, I also have a
23 copy, yes.
24     Q.    Oh, you have a copy in front of

Page 13

1  you?
2      A.    Yes.
3      Q.    Okay.  Did you familiarize
4  yourself with the topics that you're going to
5  be questioned about tonight --
6      A.    Yes.
7      Q.    -- and for the next several
8  days?
9      A.    Yes, I think so.  You know, I
10 try my best to be familiarize myself, yes.
11     Q.    Did you prepare for this
12 deposition?
13     A.    Oh, yes.
14     Q.    What did you do to prepare for
15 the deposition?
16     A.    Mostly receiving, you know,
17 trainings from my, you know, lawyers.
18          And also I've talked to various
19 peoples, you know, because a lot of details I
20 need to, you know, find out from -- basically
21 from my level, you know.  Typically I have
22 not been involved in too many details,
23 particularly nontechnical issues.
24     Q.    You said that you spoke with

Confidential Information Subject to Protective Order

Page 14

1  your attorneys; I think you called it
2  training from your lawyers.
3          Who was it that you spoke with?
4      A.    You know, here Patrick, and
5  also Rick, Nason.  Mostly, you know, those
6  three.  Sometimes, you know, there's other,
7  like Seth.
8      Q.    Did you speak to any attorneys
9  in China in preparing for the deposition?
10     A.    No.  Because I'm a US citizen,
11  I don't think it's legally obligated for me
12  to talk to anybody, you know, or any lawyer,
13  you know, in China.
14     Q.    Did anybody tell you that?
15     A.    Yeah.  I mean, you know, the
16  lady, you know, in the general -- you know,
17  in the president office, you know, she's
18  basically managing this.  You know, that's
19  what she told me, because she's being
20  basically, you know, get in touch with, you
21  know, the Chinese lawyer for my Chinese
22  colleagues, because we want to make sure, you
23  know, right, we have to be basically abide
24  by, you know, you know, the Chinese law as

Page 15

1  well, because otherwise, you know, if you
2  have any procedural violation, you know, you
3  may get into big trouble.
4      Q.    Who did you speak with in the
5  president's office?  You said you spoke with
6  a woman about the deposition.  Who was that?
7      A.    Maggie, yeah.  Maggie Kong.
8  Yeah, yeah.
9      Q.    Can you spell her name, please?
10     A.    Last name is K-O-N-G.  She
11  usually goes by her English name, you know,
12  Maggie, but also her Chinese name is
13  Xiaofong, Xiaofong Kong.
14     Q.    And when did you speak with her
15  about the deposition?
16     A.    That was long time.  You know,
17  I think in the very early phase.  I don't
18  remember exactly, you know, how long.  Maybe,
19  like, for several months.
20     Q.    Was that the first time you
21  spoke with anybody about this deposition?
22     A.    I don't think so.
23     Q.    Who was the first person you
24  ever spoke to about the deposition?

Page 16

1      A.    I really don't remember.
2  Probably, I would assume most likely her, but
3  I, you know, because it's such a long period,
4  and I really cannot tell, like, who is
5  exactly the first person, to be honest with
6  you.  I mean, I don't have photographic, you
7  know, memory.
8      Q.    When you say it's been "such a
9  long period," can you estimate how long ago
10  it was when you first spoke with someone
11  about this deposition?
12     A.    Maybe six months.  I don't
13  know.  I mean, it's just a very rough
14  estimate.
15     Q.    Could it have been a year ago?
16     A.    I mean, if you're talking
17  about, you know, you know, starting
18  collecting, you know, the document, yeah, I
19  would say, yeah, that's about, you know, at
20  least about a year ago, yes.
21     Q.    When did you first find out
22  your deposition was going to be taken?
23     A.    I think sometime last year,
24  because I -- you know, you know, she told me

Page 17

1  I will be one of the -- you know, you know, I
2  witness, you know, will be, you know, giving
3  the testimony.  Sometime last year.
4      Q.    So you think it was maybe a
5  year ago?
6      A.    I wasn't sure.  As I said, I
7  wasn't sure exactly, you know, but sometime
8  last year, okay?
9      Q.    Well, right now it's April 19th
10  here in the States, so are we talking last
11  April?  Are we talking last summer?  Are we
12  talking before April?  Do you recall?
13     A.    As I said, I don't have
14  accurate recollection.
15     Q.    Do you have a calendar that you
16  keep that would show you when you were first
17  notified that you were going to be deposed?
18     A.    I don't keep that particular
19  calendar, like particularly when was the
20  first day that I received the notice.
21  Because I -- you know, from my perspective,
22  you know, you know, that's not important.  I
23  mean, the important thing is I know what's
24  the date and I need to prepare.

Confidential Information - Subject to Protective Order

Page 18

1    Q.    I wasn't asking you what was
2    important.  I'm just asking you if you
3    remember when it was.
4    A.    I don't remember exactly date.
5    I told you, you know, a few times already.
6    Q.    Did you receive an e-mail about
7    this deposition back in the beginning?
8    A.    Yeah, I think so.  Yeah, I
9    received an e-mail.  You know, if I go back
10   to my, you know, you know, e-mail, I mean, I
11   may be able to tell you tomorrow, you know.
12   You know, after this session I can, you know,
13   if you really wanted to have that.
14   Q.    That would be great if we could
15   have an understanding of when you first
16   learned about --
17   A.    Okay.
18   MR. GALLAGHER:  Object to the
19   extent that -- we'll take it under
20   advisement.  Object to the extent it
21   calls for any privileged information.
22   BY MR. SLATER:
23   Q.    You said the first person you
24   ever spoke to about being deposed was Maggie

Page 19

1    Kong, is that correct?
2    A.    I would say likely.
3    Q.    Who else in your company have
4    you spoken to about the deposition?
5    A.    I mean, what do you mean by --
6    you know, speaking about what?
7    Q.    Anything having to do with the
8    deposition, either the fact of the
9    deposition, what you were going to testify
10   to, how to conduct yourself, obtaining
11   information to testify.  Anything connected
12   to the deposition.
13   A.    I talked to, you know, people,
14   right?  Particularly people who travel, you
15   know, to, you know, you know, to Macao,
16   right?
17   I talked to them about
18   logistics, you know, about, you know, the
19   procedural, you know, all the details, you
20   know, the purposes just for me, you know, to
21   be able to getting to Macao and to be
22   participate in this, you know, testimony, you
23   know.  I just want to make sure, you know,
24   things will be done as arranged, right?

Page 20

1    And also talk to, like, Peng
2    Dong, you know, you know, Mr. Peng Dong,
3    quite early on during, you know, you know, at
4    the early phase of the preparation because I
5    asked him something about, you know, the
6    early -- you know, during the early stage,
7    you know, you know, how that original, you
8    know, you know, process, you know, was
9    developed, you know, you know, the so-called
10   zinc chloride, you know, process.
11   Q.    Well, we'll go back through the
12   names and what you spoke to them about, but
13   let's try to get the list of names of people
14   from your company you spoke to.  So far we
15   have Maggie Kong and we have Peng Dong.
16   Who else from your company did
17   you speak to with regard to anything
18   connected to the deposition?
19   A.    I also talked to Qiangming Li,
20   you know, as I said, mostly about logistics,
21   getting into, you know, the hotel, you know,
22   everything.  Yeah.
23   Q.    Who else?
24   A.    Who else?  And also talked to

Page 21

1    one of the staff under, you know, Qiangming
2    Li and asking about some of the specifics.
3    Q.    Who was that person?
4    A.    His name is Jun Wang.
5    Q.    Who else from your company have
6    you spoken to with regard to the deposition?
7    A.    I think that's about it.
8    Q.    You said earlier you'd spoken
9    to people in order to get some background
10   information in order to testify.
11   Who were the people that you
12   spoke to to get that background information
13   to be able to testify on the topics you were
14   designated on?
15   A.    The background -- well,
16   basically when I say "background" is, you
17   know, actually I'm referring to, you know, to
18   that particular topic regarding, you know,
19   that process change, right?
20   So with that regard I was
21   talking to, you know, Mr. Peng Dong during
22   the early phase, you know, of the
23   preparation.
24   Q.    What else did you talk to Peng

Page 22

1  Dong about besides the process change?
2  Anything?
3      A.   No, that's it.
4      Q.   What specifically did you
5  discuss with Mr. Dong regarding --
6      A.   I just -- I was asking him, you
7  know, who basically was involved, you know,
8  in that process change.
9          He said he was not clear
10 because, you know, he probably was not
11 involved, you know, during that process, I
12 mean.
13     Q.   So you spoke to Peng Dong about
14 the process change, you asked him who was
15 involved, and he said he didn't know because
16 he wasn't involved, and that was the
17 conversation?
18     A.   Yeah, pretty much, yeah.
19 Basically, you know, I was asking him, like,
20 who basically was the original sort of, like,
21 you can call, like, inventor or whatever,
22 like who developed that process.
23     Q.   And what did he tell you?
24     A.   He said, you know, you know,

Page 23

1  you know, he didn't know.
2      Q.   Can you tell me who was the
3  inventor of the process change, the zinc
4  chloride process change?
5      A.   Well, the -- you know, from the
6  document, right, from the document, you know,
7  at least some of the document, I know the
8  technology was originated from SynCore, okay,
9  which is a subsidiary of Huahai
10 Pharmaceutical.
11         But I was just asking him who,
12 you know, that individual, like specifically
13 who that individual was.
14     Q.   And he didn't know?
15     A.   He didn't -- yeah, he didn't
16 know.
17     Q.   Did you ask anybody else?
18     A.   No.
19     Q.   Did you speak to anybody from
20 SynCores?
21     A.   No.
22     Q.   Why not?
23     A.   I mean, for me, you know, I
24 mean, there's no need for me to go more

Page 24

1  deeper, you know, because I'm not a, you
2  know, a process chemist.
3          MR. GALLAGHER:  I'm going to
4  object to the line as outside the
5  scope of the 30(b)(6) topics, but
6  certainly --
7          MR. SLATER:  Patrick, you're
8  saying that my questioning about how
9  he prepared himself to testify for the
10 30(b)(6) topics is outside the scope
11 of the 30(b)(6) topics?
12         MR. GALLAGHER:  No, no.
13         MR. SLATER:  Because that's
14 what I'm doing.
15         MR. GALLAGHER:  Proceed.
16 BY MR. SLATER:
17     Q.   How long did this discussion
18 with Peng Dong take?
19     A.   Just very briefly over the
20 phone, yeah.
21     Q.   Okay.  How long did it take?
22     A.   Maybe five, ten minutes.
23     Q.   So let me -- rephrase.
24         Did you say you also spoke to

Page 25

1  Mr. Qiangming Li?
2      A.   Yes.  About the logistics,
3  traveling into Macao.
4      Q.   Did you talk to Qiangming Li
5  about anything substantive about your
6  testimony?
7      A.   No.
8      Q.   Did you ask him any questions
9  about something you might testify about?
10     A.   No.
11     Q.   The staff member Jun Wang, when
12 did you speak to that person?
13     A.   Not Jun Wang.  It's Jun, yeah.
14 J -- Jun Wang or Jun Wang.
15     Q.   I'll ask it again.
16         When did you speak to Jun Wang?
17     A.   Just a few days, like, let me
18 see, just two, three days before I came over
19 to Macao, yeah, because I just wanted to try
20 to clarify some of the, you know, you know,
21 chronology of the events, you know, for some
22 of the customers, you know, you know, or
23 their discussion.
24         Because, you know, he was the

Page 26

1 main person doing the analytical
2 investigation from the QC side, so I just,
3 you know, tried to ask him some of those, you
4 know, you know, you know, details like, you
5 know, how many customers, you know, you know,
6 like been having this.
7      You know, some of those, you
8 know, early on we characterized them as like
9 technical exchange, right, and then later on,
10 you know, it's being formally characterized
11 as a customer complaint.
12      Well, basically, you know,
13 talking about, you know, these unknown peaks,
14 you know. Yeah. So I was just trying to,
15 you know, you know, find out who -- like
16 when, you know, like the -- you know, what
17 the, you know, their question, you know, was.
18   Q.   When you say "the unknown
19 peaks," do you mean the unknown peaks that
20 later were identified as nitrosamine peaks?
21   A.   No. Actually all of the peaks,
22 all of the peaks, right, after I review, you
23 know, those documents, right, all of the
24 peaks people talking about between Huahai's

Page 27

1 customer and, yeah, all of those peaks, you
2 know, that discuss that specifically they're
3 not nitrosamine.
4      I mean, obviously, I mean, you
5 know, you know, retrospectively maybe one of
6 the tiny -- you know, now we know, right,
7 nitrosamine, you know, you know, it could
8 co-elute with one of the backgrounds. But
9 that's only, you know, you know, after, you
10 know, the facts, you know, after.
11      And then when you spike, you
12 know, the standard sample or reference sample
13 of the NDMA, you know, with a very high,
14 like, concentration, then you -- you know,
15 retrospectively you can say, hey, you know,
16 the NDMA could co-elute, you know, after, you
17 know -- actually on the shoulder of the one
18 background peaks.
19      But all of the -- you know, all
20 of the peaks, you know, people were talking
21 about, you know, retrospectively we know, you
22 know, they are not NDMA or anything, you
23 know -- you know, any other, you know,
24 nitrosamines.

Page 28

1   Q.   When you say that it can
2 co-elute with a background peak, are you
3 talking about the toluene peak?
4   A.   No. Actually, there was one
5 little peak after the toluene peak.
6   Q.   And the little peak after the
7 toluene peak turned out to be the nitrosamine
8 peak, correct?
9   A.   Oh, no, no. Actually, that
10 peak -- well, that peak in the background,
11 okay -- it's a little bit complicated. Okay.
12 In the background -- so that peak is also
13 eluted in the blank injection, okay?
14      And then in the sample
15 injection, this peak turns out -- if I
16 remember correctly, this peak turns out to be
17 n-butyl acetate, okay?
18      So that's the peak -- that's
19 the peak, you know, eluting after the toluene
20 peak. Okay. So NDMA would elute on the
21 shoulder, or sometimes may even completely
22 co-elute with this peak.
23   Q.   When did you speak to Jun Wang?
24 You said two to three days before you came to

Page 29

1 Macao. When was that?
2   A.   I came here on the 18th. Yeah.
3 So it would be like, you know, around the
4 16th, yeah.
5   Q.   The 16th would have been
6 Friday?
7   A.   Yes, is 16 Friday? Let's see.
8      Yeah, it's Friday, yes.
9   Q.   How long did you talk to Jun
10 Wang about this deposition?
11   A.   It's probably 15, 20 minutes.
12   Q.   Did you review any documents to
13 prepare for the deposition?
14   A.   Did I review any documents?
15 Yes.
16   Q.   What did you review to prepare
17 for the deposition?
18      MR. GALLAGHER: Let me just --
19 give me a minute, Min.
20      To counsel not to disclose the
21 substance of conversations that you
22 had with attorneys.
23      MR. SLATER: I didn't ask
24 anything about attorneys.

Confidential Information - Subject to Protective Order

Page 30

1         THE WITNESS:  Okay.
2         MR. GALLAGHER:  You asked about
3    documents he reviewed, which he may
4    have done with attorneys, so I'm
5    just -- he can answer the question.
6    I'm just going to caution him not to
7    disclose the substance of
8    conversations he had with attorneys.
9         Please answer the question.
10   A.    I mean, there are quite a few
11   documents here.  Yeah, for example, some of
12   the --
13   BY MR. SLATER:
14   Q.    Let me ask it very clearly.
15   A.    You know, regarding, you know,
16   unknown peak investigations.  And also like
17   ICH documents, you know, and also some of
18   our -- like SOPs, and also the deviation
19   investigation reports.  You know, I mean,
20   there's a lot of stuff.
21   Q.    Were you reading these
22   documents for the first time?
23   A.    No.  Many of -- I mean, some of
24   those, you know, obviously I read before, you

Page 31

1    know, like SOPs, ICH documents, you know.
2    But some obviously, you know, that I read,
3    you know, the very first time.
4    Q.    You met with counsel how many
5    times to prepare for deposition?
6    A.    Oh, I think like five, six
7    times.
8    Q.    When is the first time you
9    spoke to counsel about the deposition?
10   A.    I don't recall.
11   Q.    Give me your best estimate.
12   A.    Let's say -- I have to think
13   about it.  It's -- you know, in the beginning
14   it was like a weekly training, and then we --
15   you know, you know, before I came we skipped
16   one, so I don't know how many.
17        Let's say -- hypothetically
18   let's say six times, right?  So the fifth
19   time will be like a half-month ago, right?
20        So then I have another -- yeah,
21   so roughly like one and a half months ago
22   starting.  But don't hold me accountable, you
23   know, if it's a little bit off, you know.
24   But as I said, it's in the ball park.

Page 32

1    Q.    You said "before I came."  What
2    were you referring to?
3    A.    Well, the 18th of April, I mean
4    this last Sunday, came to Macao.
5    Q.    So before you came to Macao, I
6    wasn't clear, how many times did you say you
7    spoke to counsel?
8    A.    Totally, as I said, like five
9    or six times.
10   Q.    When was the first time you
11   spoke to counsel in connection?
12   A.    As I told you, by rough
13   estimation, it probably was like maybe a
14   month and a half ago.  But as I said, it
15   could be two months, you know.  But it just
16   seemed like a ball park.
17   Q.    How much time did you spend in
18   those meetings with counsel?
19   A.    Usually I would say like about
20   two hours roughly, average.
21   Q.    Okay.  Looking at the
22   deposition right now, the deposition
23   notice -- rephrase.
24        Looking at the deposition

Page 33

1    notice, let's go to the -- actually, you have
2    it in front of you, right?
3    A.    Yeah.
4    Q.    On the second-to-last page of
5    the deposition notice, there was a request
6    for your most recent resume/curriculum vitae
7    and your LinkedIn profile.
8    A.    Uh-huh.  I already provided it.
9    Q.    And those are the most recent
10   versions of both?
11   A.    Yes.
12   Q.    This also asked for
13   the complete production of any relevant
14   custodial documents for you, "including those
15   maintained on personal computers or
16   electronic devices, to the extent not
17   produced prior."
18        Are you producing any documents
19   in connection with the deposition at this
20   time?
21   A.    No.
22   Q.    You started working with ZHP in
23   2014, right?
24   A.    Yes.  September of 2014, yes.

Confidential Information - Subject to Protective Order

Page 34

1    Q.    Were you given any sort of a
2    computer at that time to do your work for
3    ZHP?
4    A.    Yes.
5    Q.    What type of computer were you
6    given when you started?
7    A.    Originally it's a ThinkPad,
8    Lenovo ThinkPad, but that computer broke
9    down.  Now I have a Microsoft, like what,
10   ProBook.
11   Q.    You said you were given a
12   Lenovo ThinkPad when you started, and then it
13   broke.  When did it break?
14   A.    When did it break.  That's a
15   very good question.  It broke during --
16   actually during a trip.  I don't remember
17   exactly.
18        When did it break.  Probably
19   somewhere between 2017 to 2018, but, you
20   know, I don't have an accurate, you know,
21   recollection exactly, like, which year.
22   Q.    When your computer broke, did
23   you notify your company that you needed a new
24   computer?

Page 35

1    A.    Oh, yeah, mm-hmm.
2    Q.    Who did you notify?
3    A.    IT.
4    Q.    And they got you a new
5    computer?
6    A.    Yes.
7    Q.    There would be a record within
8    the company of you asking for a new computer
9    and getting that computer.  I assume
10   something like that gets documented, right?
11   A.    Oh, sure, sure, uh-uh.
12   Q.    So if we need to know when your
13   computer broke and when you got your new
14   computer, the company should be able to
15   provide that information, right?
16   A.    Yeah.  If I ask, they should be
17   able to provide, yes.
18        MR. SLATER:  Counsel is going
19        to ask me to send an e-mail or
20        something after the deposition to
21        confirm the request, but that's going
22        to be another one of the things we're
23        going to request.
24        MR. GALLAGHER:  Please put it

Page 36

1    in writing, and we'll take it under
2    advisement.
3    BY MR. SLATER:
4    Q.    When you said the computer
5    broke on a trip, what happened to the
6    computer?
7    A.    It just could not start, so I
8    think eventually it turns out to be, you
9    know, a hard drive failure.
10   Q.    What happened to the data that
11   was on the computer?
12   A.    I would say, according to the
13   IT guys -- well, quite a few documents
14   actually became permanently damaged, but the
15   majority of them was able to be restored,
16   yeah.
17   Q.    You said documents were
18   permanently damaged?
19   A.    Some of the documents, yeah,
20   because of the hardware, you know, failure.
21   Q.    What types of documents were
22   permanently damaged?
23   A.    Well, it's -- you know, there's
24   different kinds.

Page 37

1    Q.    Well, tell me, please, which
2    ones?
3    A.    Like some of those, like,
4    research papers, you know, some of those
5    research, you know, you know, investigation
6    report.  And even, you know, some personal,
7    you know, like pictures.
8    Q.    Was your computer backed up
9    periodically?
10   A.    What do you mean, "backed up"?
11   Like backed up to, like, an external drive?
12   Q.    I mean backed up so that the
13   data was held in a separate location so that
14   if your computer stopped working, the data
15   wouldn't be lost.
16   A.    I -- you know, I didn't do
17   that.
18   Q.    Is there any protocol in your
19   company to back up computers periodically?
20   A.    Well, for important documents,
21   you know, you know, the company have archive,
22   so I don't need to, you know, you know, to
23   archive like, you know, by myself.
24   Q.    How about your e-mails?  Were

Page 38

1 any of your e-mails lost when your computer
2 broke?
3     A.    No.  E-mail, you know, it's
4 always there, e-mail, you know, because it's
5 always in the server.
6           That's, you know, that's what
7 the IT -- you know, at least, you know, it
8 will be preserved according to the company
9 policy, you know, for as long as the company
10 policy, you know, you know, would allow.
11    Q.    What does the company policy
12 require?
13    A.    I don't have the specifics.
14    Q.    You've been there since 2014.
15 Is it your understanding that all the e-mails
16 you've sent or received have been backed up
17 or held on a server?
18    A.    As I said, yeah, I mean, as
19 long as, you know, you know, the company, you
20 know, policy says, you know, how long it will
21 keep, you know, in company server, it will be
22 there.  You know, so that regardless, you
23 know, my personal computer's failure, it will
24 be there.

Page 39

1     Q.    Has there ever been a time
2 since your computer broke where you realized
3 that a document or any data was lost and you
4 couldn't retrieve it, couldn't find it?
5     A.    No.  I always be able to
6 retrieve, you know, from either my e-mail or
7 from, you know, you know, company's archive,
8 or from my colleagues, you know.
9     Q.    The ThinkPad, is that a desktop
10 or is that a laptop or something else?
11    A.    Laptop.  Nobody use desktop
12 anymore, as far as I know, I mean, you know,
13 for personal use.
14    Q.    Well, in your work at ZHP, have
15 you had a desktop computer in addition to the
16 laptop?
17    A.    No.
18    Q.    Never had a desktop computer?
19    A.    I think it's totally obsolete
20 for the purpose, you know, you know, people
21 doing office work.  I mean, at least for me,
22 I mean.
23    Q.    I'd like to be a little more
24 precise on the timing of when your computer

Page 40

1 broke, if you can recall.  Otherwise we're
2 obviously going to make our request, but it
3 might help.
4           Did it occur in -- you said --
5 well, rephrase.
6           With regard to when your
7 computer broke, was that in 2017, or was that
8 in 2018?
9     A.    As I said, just around that
10 period.  I need to -- I need to -- you know,
11 as I said, I'll talk to my IT guys, you know,
12 you know.  They will have the record, right,
13 when the replacement happened.
14    Q.    When you -- rephrase.
15          When your Lenovo ThinkPad
16 broke, did you say that you got a Microsoft
17 ProBook --
18    A.    Yes.
19    Q.    -- as your new computer?
20    A.    Yes.
21    Q.    And that's another laptop?
22    A.    Yes.
23    Q.    Is that the same computer, the
24 one you use today?

Page 41

1     A.    Yes.
2     Q.    So --
3     A.    Well, no.  I'm sorry, no.  Hold
4 on, hold on.  This is -- no.  This is the
5 company's -- you know, you know, the solely
6 dedicated computer, you know, right?  What
7 we're talking about right now, okay?
8           What I'm saying is, you know,
9 you know, the PC or the laptop I'm using for
10 my business, right, or company business,
11 yeah, is a Microsoft, you know, ProBook,
12 okay?
13    Q.    During the time you've worked
14 at ZHP, have you also owned other computers
15 for personal use, other than the Lenovo
16 ThinkPad and the Microsoft ProBook?
17    A.    No.
18    Q.    Did you use the ThinkPad and
19 the ProBook -- rephrase.
20          Did you use the Lenovo ThinkPad
21 not only for company business, but also for
22 personal e-mail?
23    A.    No, I don't think so.  I mean,
24 only maybe for -- let me see.  Did I -- for

Page 42

1 personal -- I cannot guarantee, like, I
2 haven't, like, receive a single, like, a
3 personal e-mail. But I can say usually I
4 don't use that for, you know, you know, for
5 personal e-mails, okay.
6     Q.    What computer -- during the
7 time -- rephrase.
8          During the time you had the
9 Lenovo ThinkPad, what computer did you use
10 for your personal e-mails?
11     A.    Well, the personal e-mail --
12 let's see. The personal e-mail -- well, I
13 used the personal e-mail, you know, through
14 the web, right, to access my personal e-mail.
15 I mean is that, is -- to me,
16 you know, you know, I wasn't sure that
17 constitutes as the personal use of the
18 Microsoft, you know, you know, you know, like
19 the ProBook.
20     Q.    Let's try to take this one step
21 at a time.
22          When you had the Lenovo
23 ThinkPad, you had a ZHP e-mail address,
24 right?

Page 43

1     A.    Yes, uh-huh.
2     Q.    Did you also have a personal
3 e-mail address not related to your work?
4     A.    Yes, I have a personal e-mail
5 address.
6     Q.    Did you use that personal
7 e-mail through the Lenovo ThinkPad?
8     A.    Yes. Sometimes, yes.
9     Q.    Did you ever use the personal
10 e-mail for business?
11     A.    I don't think so. There may be
12 very -- maybe, you know, very few occasions,
13 right, one or twice, somehow, you know, some
14 of the e-mail, you know, may just get crossed
15 over.
16          You know, because sometimes
17 when you type, you know, you know, the e-mail
18 address, you know, you know, some of these
19 will automatically show up, because my
20 personal e-mail address has some parts of the
21 e-mail address similar to my company e-mail
22 address; for example, like the words "Min
23 Li."
24     Q.    You're saying somebody could

Page 44

1 try to send an e-mail to you to your work
2 e-mail, and because "Min Li" is in your
3 e-mail address, it would come to your
4 personal e-mail?
5     A.    No, no, no, no. What I'm just
6 trying to say is sometimes if I, you know,
7 you know, try to, like -- you know, sometimes
8 when I send an e-mail I, you know, also maybe
9 want to cc myself.
10          And so when I type, you know,
11 my company's, you know, you know, e-mail
12 address, you know, my personal e-mail
13 address, you know, sometimes may accidentally
14 be typed in, you know.
15     Q.    On the Microsoft ProBook, have
16 you used your personal e-mail?
17     A.    I also, as I said, access my
18 personal e-mail accounts from time to time.
19 You know, that's pretty much, you know, you
20 can say that I use, you know, that computer
21 for personal use.
22     Q.    Did you use your personal
23 e-mail on the Microsoft ProBook for business
24 e-mails?

Page 45

1     A.    No.
2     Q.    Do you know if either of your
3 computers was taken into the control of
4 either IT or your lawyers to be searched in
5 order to pull off documents in connection
6 with this litigation?
7     A.    My Microsoft ProBook, yes, was
8 taken into, yeah, that purpose, yes.
9     Q.    When?
10     A.    They have gone through, yeah,
11 my personal ProBook, yes.
12     Q.    When?
13     A.    I think sometime last year.
14 Again, you know, I have so many things
15 ongoing, you know, I don't remember exactly.
16 Yeah. It should be sometime last year.
17     Q.    Sometime in 2020?
18     A.    It looks like. But again, you
19 know, like I said, I need to, you know, find
20 out. If you really wanted that exactly date,
21 I think -- you know, or exactly period, I can
22 find out for you.
23     Q.    Well, I want your best
24 recollection right now. We may request that

Page 46

1 also. But what's your best recollection,
2 that your computer was taken in order to take
3 documents off it for this litigation in 2020?
4    A.    Yeah, I think it should be
5 sometime last year.
6    Q.    Who was it that did that? Who
7 approached you?
8    A.    Who approached me.
9        Again, this whole activity from
10 Huahai or ZHP's perspective, it was
11 coordinated, again, by Maggie Kong.
12    Q.    So if Maggie Kong keeps good
13 records, she probably knows when everybody
14 was first told about their depositions and
15 when people were told to bring their
16 computers in to be swept?
17        MR. GALLAGHER: Sorry. I'm
18    going to object to the extent you're
19    asking for information that would
20    constitute attorney/client privileged
21    information.
22        MR. SLATER: How would that be
23    privileged? I'm asking this witness
24    about another person he works with,

Page 47

1    who is not a lawyer.
2        MR. GALLAGHER: To the extent
3    there was attorney/client privileged
4    information in those discussions, I
5    caution him not to disclose that.
6 BY MR. SLATER:
7    Q.    Did you ever use your personal
8 e-mail to talk to anybody -- well, rephrase.
9        Do you know if your personal
10 e-mail was collected -- well, rephrase.
11        Do you know if your personal
12 e-mail was reviewed to see if work e-mails
13 were on your personal e-mail?
14    A.    I'm sorry, it's -- could you
15 rephrase?
16    Q.    Sure.
17        Do you know whether any e-mails
18 on your personal e-mail that related to your
19 work at ZHP were pulled off the computer and
20 provided to us?
21    A.    I don't know, because I
22 don't -- I don't know what being pulled off.
23 I have no idea.
24    Q.    And just so I understand, in

Page 48

1 terms of your personal e-mail, what do you
2 have, a Yahoo and a Hotmail address? You use
3 both of those?
4    A.    I just have a Yahoo as my, you
5 know, active, you know, you know, e-mail.
6        I mean, you know, you know,
7 from years ago may have some other, you know,
8 but those, you know, essentially they are
9 that e-mail, I mean, right? Like many years
10 ago I may have like an AT&T, you know,
11 e-mail, but only -- I would say only, you
12 know, live personal e-mail is my Yahoo
13 e-mail.
14    Q.    And that would be
15 minli88@yahoo.com?
16    A.    Yes.
17    Q.    From 2014 to now, is that the
18 only e-mail address that you've used for your
19 personal e-mail?
20    A.    Yes.
21    Q.    Do you also have a smartphone
22 of some type that you use for work?
23    A.    I have my personal phone.
24    Q.    What type of phone is that?

Page 49

1    A.    It's a Huawei smartphone.
2    Q.    Can you spell that for me,
3 please?
4    A.    Huawei, H-U-A-W-E-I. Huawei is
5 the leading smartphone company in China.
6    Q.    How long have you had the
7 Huawei phone?
8    A.    I have my current phone since
9 last year.
10    Q.    What did you have before last
11 year?
12    A.    What I had before last year, I
13 had another Huawei, but that one had some
14 issue, so I switched to the current one.
15    Q.    What was the issue with that
16 phone?
17    A.    The -- it's quite a funny --
18 the -- you know, you know, the screen pops
19 off. It's not completely pops off, but it
20 just -- you know, I never see something like
21 this before. You know, you know, the screen,
22 the center of the screen, it just swells.
23 And it's still usable, you know, but it's
24 just -- it feels like it can broke down any

Page 50

1  time, so, yeah, so I just switched to another
2  one.  Yeah.
3      Q.    How long did you have that
4  phone for, the swelling phone?
5      A.    The swelling phone, maybe two,
6  three years.
7      Q.    What did you have before that?
8      A.    Before that I had a Samsung
9  smartphone.
10     Q.    Was the Samsung phone the one
11 you were using as of 2014 when you joined
12 ZHP?
13     A.    That was, yes.
14     Q.    What happened to the Samsung
15 phone?
16     A.    That phone was -- initially it
17 had some battery problem, you know,
18 essentially it was very difficult or even
19 sometimes even impossible to charge.
20         Sometimes, you know, when the
21 battery completely dead and you may be able
22 to recharge a little bit, but then eventually
23 to the point it become completely, you know,
24 you know, you cannot charge, so it's just

Page 51

1  dead.
2      Q.    Did you ever have a different
3  phone that you used in the United States
4  versus the phone you used in China?
5      A.    I have a phone that I use,
6  yeah, in the US.
7      Q.    Which phone is that?
8      A.    It's another Samsung.
9      Q.    That's the phone you have
10 currently?
11     A.    Currently I have two phones.
12 One, you know, you know, I mostly for, you
13 know, for the phone calls, you know, or
14 sometimes for the phone messages, you know,
15 receiving from the United States.
16         And, you know, you know, for
17 everything else, you know, that I use my
18 China-based phone, because that's the best --
19 that's the best way, you know, you have to
20 deal with.
21     Q.    So the Samsung phone you
22 currently have that you use for phone calls
23 and phone messages, how long have you had
24 that phone?

Page 52

1      A.    How long I get that phone.
2  That's a good question.
3         That should be -- let's see.  I
4  would say probably end of 2013, something
5  like that.
6      Q.    So the Samsung phone that you
7  have for your phone calls and phone messages
8  you had when you joined ZHP?
9      A.    But at the same time I, you
10 know, I bought, you know, the other -- well,
11 actually, let's see.
12         I used another Samsung phone,
13 you know, you know, turned that into, you
14 know, you know -- yeah, I don't remember, you
15 know, the other Samsung phone that I
16 either -- that I bought in China or that I
17 bought in the US.
18         But anyhow, you know, I was
19 having two Samsung phones, okay.  One is, as
20 I said, that I still use today, but mostly
21 for phone calls or messages to/from United
22 States, okay.
23         The other phone, as I said, I
24 don't remember either that I bought it in the

Page 53

1  US or bought it in China.  But I used the
2  other one -- you know, during, you know, the
3  period that I joined ZHP, I used the other
4  one as my personal phone in China.
5      Q.    The Samsung phone that you
6  currently have, am I correct that that was
7  the phone that you were using back when you
8  joined ZHP in 2014, the Samsung phone?
9      A.    That phone was also -- yeah,
10 that phone was also there, yeah.  I mean,
11 that phone, fortunately, is still working.
12 Maybe -- you know, maybe I -- you know, you
13 know, maybe the reason it's still working is
14 that I didn't use that much, you know what
15 I'm saying?  It's only for, you know, you
16 know, for checking, you know, sometimes for
17 checking the phone messages, you know,
18 sending, you know, you know, phone messages.
19     Q.    How about sending text messages
20 and receiving text messages?
21     A.    Oh, yeah, yeah.  When I say in
22 sending phone messages, what I mean is
23 actually mostly for sending text messages.
24     Q.    And those text messages would

Confidential Information - Subject to Protective Order

Page 54

1    relate to work and for personal?
2        A.    No, no.  Mostly personally.
3        Q.    Did you ever send text messages
4    on your Samsung phone that you still have
5    related to work?
6        A.    No.
7        Q.    Not once?
8        A.    No.
9        Q.    Did you ever send text messages
10   on any other phone related to work?
11       A.    No.  I don't like, you know,
12   text messages.
13       Q.    Well, you had three different
14   phones for work purposes.  Did you ever send
15   text messages related to work on any of those
16   three phones?
17       A.    No.
18       Q.    Do you know if those phones, if
19   any of your -- rephrase.
20             Do you know if any of your
21   phones were taken by your company so that the
22   information on the phones could be downloaded
23   and then reviewed for production to us as
24   part of the litigation?  Did they take your

Page 55

1    phone or phones?
2        A.    Did they take my phones.  I
3    don't think so.  I don't remember.  I don't
4    remember if they did that.
5        Q.    Did anybody ever tell you at
6    any point that you needed to save your
7    documents and information and not delete
8    anything because of this litigation?
9        A.    Oh, yes, mm-hmm.
10       Q.    When was that?
11       A.    The very first time, it must be
12   two, three years ago, I think.
13       Q.    How did you --
14       A.    But again --
15       Q.    Was it someone who spoke to
16   you, or did you get something in writing?
17       A.    Somebody sending through the
18   e-mail.  Yeah, I think it should be someone,
19   you know, of, you know, Maggie Kong's staff,
20   you know, one of her staff.
21       Q.    Do you ever use WeChat?
22       A.    Yes.
23       Q.    How long have you been using
24   WeChat?

Page 56

1        A.    How long.  For quite long.
2        Q.    Do you use WeChat for work
3    purposes?
4        A.    No.
5        Q.    Never?
6        A.    Never.  I mean, if you --
7    sometimes, you know, we use WeChat to do
8    the -- sort of like, you know, like phone
9    conversations.  I don't know if you consider
10   that's, you know, you know, for work
11   purposes.  You know, that will be, you know,
12   the only, you know, only way.
13             MR. SLATER:  Cheryll, you can
14        take down the dep notice.  That's
15        fine.
16       Q.    I don't understand,
17   respectfully, what you just said, so I'll ask
18   it again.
19             Have you ever used WeChat for
20   purposes of your work for ZHP?
21       A.    As I said, you know, sometimes
22   we use WeChat sort of like as a -- you know,
23   use that as a phone function.
24       Q.    Okay.

Page 57

1        A.    So if you consider that that's,
2    you know, you know, as work related, that
3    would be the only -- you know, only occasion.
4        Q.    How often does that happen?  Do
5    you do that all the time or --
6        A.    It happens -- I wouldn't say
7    all the times, but it happens from time to
8    time, yeah.  Because, you know, you know,
9    sometimes, you know, you know, the other, you
10   know, colleague, maybe they're not
11   accessible, only through the WIFI, you know.
12   So during that circumstances, you know,
13   WeChat, you know, may be, you know, the most
14   effective way, you know, just to talk to
15   them.
16       Q.    Do you ever use the
17   videoconferencing WeChat as part of your
18   work?
19       A.    No.
20       Q.    You never have?
21       A.    Never.  I don't like the video
22   function.
23       Q.    Do you use videoconferencing in
24   any other mode or from any other application

Page 58

1  for your work?
2      A.    For other.  I don't -- usually
3  we just have teleconference, yeah, because,
4  you know, using video function, it takes a
5  lot of memory, you know, slow down the
6  effectiveness of the communications.
7      Q.    My question is this.  Have you
8  used videoconferencing as part of your work?
9      A.    As I said, I don't recall it.
10 You know, we -- as I said, we usually just,
11 you know, do the audio conference.
12     Q.    You said usually you do.  Does
13 that mean sometimes you do videoconference?
14     A.    Well, because I don't remember,
15 you know what I'm saying?  There may be
16 some -- maybe there's one time, you know,
17 someone insisted for whatever the reason.
18 But I just don't recall, okay?
19     Q.    Do you share documents over
20 WeChat?
21     A.    No.
22     Q.    Have you ever for work?
23     A.    No, not for work.  At least for
24 me.

Page 59

1      Q.    Do you know if your
2  conversations on WeChat have been recorded?
3      A.    I don't know.  I mean, like, I
4  don't notice there's any recording function
5  imbedded, like, in WeChat.
6          As far as I know, you know, I
7  never recorded any conversations, you know,
8  but from the other side, whether they record
9  or not, I have no idea.
10     Q.    So you wouldn't, for example,
11 be posting documents on WeChat?  Coming back
12 to that again.  I just want to be clear.
13         Let me ask it more clearly.
14 Have you ever posted documents or shared
15 documents on WeChat?
16     A.    No.
17         MR. SLATER:  Let's go to the
18 Exhibit 292, I guess it will be, the
19 resume, please.
20         (Whereupon, Exhibit Number
21 ZHP-292 was marked for
22 identification.)
23 BY MR. SLATER:
24     Q.    So on the screen is

Page 60

1  Exhibit 292.  Is that your current resume,
2  CV?
3      A.    Yeah, mm-hmm.
4      Q.    Is it accurate?
5      A.    Yeah, it is accurate.
6      Q.    I want to ask you a little bit
7  about your work before you joined ZHP.
8          According to the document, you
9  were employed by Merck & Company before you
10 joined ZHP, is that correct?
11     A.    Mm-hmm, yes.
12     Q.    What was the work did you at
13 Merck?
14     A.    As I described, you know, I
15 think, quite clearly in my summary -- yeah,
16 can you go down a little bit? -- everything
17 basically is pretty much in there.
18         MR. SLATER:  Go all the way
19 down, please.
20     A.    I actually worked, you know,
21 you know, for Merck twice, right, first
22 starting from 1998 through 2005, and then
23 2005 to -- you know, I switched to
24 Schering-Plough.  And by the end of 2009,

Page 61

1  Schering-Plough was acquired by Merck, so
2  essentially, or effectively, I went back to
3  Merck.
4          Could you enlarge, you know,
5  the text a little bit?  Yeah.
6          Yeah, basically, you know, you
7  know, I -- when I was at Merck or
8  Schering-Plough or after, you know, after the
9  merger, I have a group of scientists that,
10 you know -- you know, working in my teams.
11         We, you know, pretty much as I
12 said, you know, do the atypical --
13 manufacturing atypical and all of the
14 scientific investigations, analytical method
15 development, validation, manufacturing
16 process, you know, improvement.
17         And, you know, the main focus
18 was to do the drug degradation mechanism
19 studies and also elucidation of the
20 structures of drug degradation products,
21 utilizing various LC-MS.
22         As I listed here Thermo
23 LTQ/Orbitrap, you know, Waters MALDI-TOF, and
24 Waters Q-Tof, you know, these are all the

Page 62

1  different, you know, types of, you know, LC,
2  you know, liquid chromatography, mass
3  spectrometry instrument utilized for, you
4  know, impurity, structure elucidation
5  purposes.
6      Q.    Did you ever --
7      A.    I -- I'm sorry, go ahead.
8      Q.    Did you ever -- rephrase.
9          Did you ever have any
10 involvement with Merck's losartan
11 formulations?
12     A.    No.
13     Q.    You mentioned -- well,
14 rephrase.  I want to ask you about a few
15 things in your resume, some of the
16 terminology.
17         One of things you say about
18 your time at Merck is that your laboratory
19 was "very well equipped with state-of-the-art
20 analytical instruments including 9 mass
21 spectrometers of different capabilities."
22     A.    Right.
23     Q.    During what time period did you
24 have that state-of-the-art --

Page 63

1      A.    That was mostly study from
2  2005, and that was the time that I joined
3  Schering-Plough.
4          So since my joining, I start
5  to, you know, establish and also was
6  expanding my, you know, my team.
7          So eventually, I think two to
8  three years into that time, like I would say
9  around, you know, maybe 2008, I have these
10 full set of, you know, equipments.
11         Yeah, I would say, yeah,
12 because 2009 we already -- end of 2009 we
13 already acquired by Merck.  Yeah, so it's
14 somewhere around 2008, the instrument
15 capability of my team reached to -- you know,
16 essentially to, you know, to a peak.
17     Q.    You mentioned drug degradation
18 studies.  What is a drug degradation study?
19     A.    Well, anything well decomposed
20 over time, you know, it's -- the difference
21 is just, you know, to the extent.  Some are
22 very stable, but still they may decompose,
23 you know, a little bit.  Some will decompose
24 more obviously than the others, right?

Page 64

1          So essentially, you know, a
2  drug molecule at the time, it will, you know,
3  disintegrate, you know, become somebody else.
4  So we need to identify, you know, those
5  unknown impurities and, you know, to know,
6  you know, what they are, and in order to
7  better control them or to understand how they
8  would form, why, you know, they would form.
9      Q.    Would these studies be
10 performed as part of a risk assessment before
11 the manufacturing process or during the
12 manufacturing process?
13     A.    No, no.  Actually, when I was
14 at the Merck, also at Schering-Plough, my
15 team was supporting commercialized products,
16 okay?
17         So all of the events, they
18 happened many years after these products were
19 launched.  Even for the commercial product
20 they were on the market for 30, 40 years.
21         Over time was the improvement
22 of analytical methods and also the
23 improvement of the -- you know, the
24 sensitivity of the methods, new impurity, you

Page 65

1  know, will emerge or will -- you know, they
2  actually sometimes, in some, you know, cases,
3  you know, those impurities, they've always
4  been there; it's just because, you know, the
5  old methodology was not sensitive or specific
6  enough.  You know, they were just there, you
7  know, undetected.
8          But then one day, you know,
9  sometimes by a rather, you know,
10 coincidental, you know, you know, factors,
11 you know, they become known.  So, yeah, so
12 then my team quite often will be called in to
13 do the investigation.
14     Q.    Do you recall any specific
15 examples of those decomposing chemicals that
16 Merck had found, where it had been happening
17 for a long time and your company didn't know
18 it?
19     A.    Oh, yeah.  Oh, yeah.  I can
20 give you one example.  For that example we
21 also published a paper, actually.  Yeah.
22         So there was one product, it
23 containing a, you know, drug substance, or
24 also we can call it active pharmaceutical

Confidential Information Subject to Protective Order

Page 66

1  ingredients.
2          You know, that API was
3  betamethasone dipropionate, okay, which is a
4  steroids, you know, anti-inflammatory, you
5  know, you know, steroids.  It's a lotion
6  product, okay, as far as I can remember.
7          And the reason that I can
8  remember is because that was the -- that was
9  the first, you know, significant
10 investigation my team was working on, right?
11         So there was, you know, a known
12 degradation product, okay?  So that
13 degradation product was a hydrolytic, you
14 know, degradation product.  It's called
15 21-monopropionate of betamethasone.
16         And at this degradation
17 product -- I'm sorry.
18         This degradation product has
19 always been known.  You know, they eluted at
20 one particular place, right?  And then all of
21 a sudden there was one day in the QC lab, it
22 just happened to be maybe that one particular
23 column has slightly better resolution than
24 the others, right, and that peak is splitted

Page 67

1  into two peaks, okay?  It just barely, you
2  know, you know, split it, right?
3          And according to the SOP of the
4  QC lab, once you have the splitting on a --
5  you know, you know, on a particular peak,
6  right, you have to do investigation, right?
7  Because according to the SOP, you have to do
8  what we call a drop line integration, right?
9          So basically, then, the major
10 one is still this monoester, which is a known
11 degradant, but the other one become an
12 unknown peak, right?
13         So then my, you know, my group
14 did a comprehensive, you know, investigation
15 using LC-MS and also utilizing NMR, and so
16 finally we were able to find, you know,
17 another degradant that has been unknown for
18 this particular, you know, you know, drug
19 substances.
20         And betamethasone dipropionate
21 at the time, I think around maybe 2007 we did
22 the investigation at, you know,
23 Schering-Plough at the time, that product was
24 already, I was told, on the market for like

Page 68

1  20, 30 years already.
2          So based upon the structure
3  that we determined, then we start to search
4  the literature, right?  And then based upon
5  the literature, you know, you know, this
6  particular degradant, you know -- basically
7  historical, you know, literature provided
8  some clue as to how, you know, this
9  degradation could come, right, or, you know,
10 could happen.
11         But based upon, you know, you
12 know, larger reasoning, we figured that
13 this -- you know, the literature results
14 cannot completely explain, you know, you
15 know, the phenomenon that we see.
16         So based upon that and also,
17 you know, and also based upon the stability
18 results, we finally able to -- you know, to
19 find out a new or a novel degradation
20 mechanism from betamethasone dipropionate.
21         So we also, you know,
22 provide -- actually published another paper
23 specifically describing the -- you know, you
24 know, this newly formed, you know,

Page 69

1  degradation mechanism, even for a
2  product that has been on the market for
3  nearly 30 years.
4          There will still be, as I said,
5  even with the progress, you know, of the
6  technology, you know, better, you know,
7  sensitivity, better, you know, specificity.
8  You know, we're able to, you know, to find
9  out, and also we're able to resolve those
10 issues.
11         So after that --
12     Q.   I'm sorry to interrupt.  All I
13 asked is if you recall any instances.  I
14 didn't ask you for the full story.
15     A.   Okay.  All right.  Okay, sorry.
16 Yeah, I thought you...
17         MR. GALLAGHER:  Adam, we've
18         been going about an hour and ten
19         minutes.  You can ask a few more
20         questions, but maybe at some point we
21         can take a break.
22         MR. SLATER:  Whatever you want
23         to do.
24         ///

Page 70

BY MR. SLATER:

1 Q. I'm looking at your -- let's go
2 to the first page, now, of the resume.
3 A. Sure.
4 So maybe after the resume
5 question, we can take a break?
6 MR. SLATER: Why don't you go
7 take the break now.
8 THE WITNESS: Okay. So we have
9 what, 10, 15 minutes or what?
10 MR. SLATER: Let's go off the
11 record, please.
12 THE VIDEOGRAPHER: The time
13 right now is 8:12 a.m. We're now off
14 the record.
15 (Whereupon, a recess was
16 taken.)
17 THE VIDEOGRAPHER: The time
18 right now is 8:27 a.m. We're back on
19 the record.
20 (Whereupon, Exhibit Number
21 ZHP-293 was marked for
22 identification.)
23 BY MR. SLATER:

Page 71

1 Q. On the screen is Exhibit 293.
2 Do you recognize that document?
3 A. Oh, yeah.
4 Q. What is it?
5 A. Right now it's just, you know,
6 the starting of the summary of my LinkedIn
7 page.
8 MR. SLATER: All right.
9 Cheryll, can you scroll down to where
10 it talks about -- right there.
11 Perfect. No. A little more up. Yes,
12 perfect.
13 Q. Your LinkedIn page says that
14 you established something called CEMAT,
15 C-E-M-A-T.
16 A. Yes, CEMAT.
17 Q. What is that?
18 A. Basically, it's just like --
19 you know, in the sense that I rebuilt my, you
20 know, research team at Huahai.
21 You know, the mission is pretty
22 much the same, you know, you know, in terms
23 of, you know, supporting those issues related
24 to pharmaceutical impurities, and those are

Page 72

1 the most challenging, you know, issues, as I
2 put there, yeah, the most challenging
3 technical issues.
4 Q. When I ask what CEMAT is, is it
5 a laboratory or a separate office, or is
6 it -- let me ask this question.
7 In terms of what CEMAT is, is
8 it part of ZHP?
9 A. Yes.
10 Q. Where is it located?
11 A. It's located in headquarter of
12 ZHP, E Linghai, Zhejiang Province, China.
13 Q. Which facility?
14 A. Which facility. It's in
15 Xunqiao facility, yeah, Xunqiao site.
16 Q. Why was it necessary for you to
17 establish CEMAT?
18 A. Why it's necessary?
19 Q. Let me ask the question very
20 specifically.
21 What was the specific need --
22 well, rephrase.
23 What was the specific reason
24 why CEMAT was established?

Page 73

1 A. Well, basically to improve, you
2 know, the company's, you know, capability,
3 you know, in this particular field.
4 Q. And that field would include
5 the identification of impurities in drug
6 products?
7 MR. GALLAGHER: Objection.
8 Vague.
9 THE WITNESS: I'm sorry.
10 MR. GALLAGHER: You can answer.
11 THE WITNESS: Okay.
12 Yes, drug products as well as
13 new drug substances.
14 BY MR. SLATER:
15 Q. Is API a drug substance?
16 A. Yeah. API, yeah, is another
17 name usually for drug substance, yes.
18 Q. When I said "drug products,"
19 you were thinking finished dose?
20 A. Yes. That's usually people,
21 you know, call it, yes.
22 Q. The identification of
23 impurities in drug substances is an important
24 part of cGMP, correct?

Confidential Information - Subject to Protective Order

Page 74

1    MR. GALLAGHER:  Objection.
2    Vague.
3        You can answer.
4        THE WITNESS:  Okay.
5    A.    Identification is -- yes, it's
6    part of the cGMP requirements, correct.
7        MR. SLATER:  Cheryll, let's put
8    up the next exhibit, this PowerPoint
9    that we have regarding CEMAT, just to
10   identify it for a moment.  I believe
11   it's ZHP00404315 to 327.
12       (Whereupon, Exhibit Number
13   ZHP-294 was marked for
14   identification.)
15   A.    The exhibit is gone?  Okay.
16   BY MR. SLATER:
17   Q.    Do you see the PowerPoint we've
18   put on the screen?
19   A.    Yeah, sure.
20   Q.    Did you create that PowerPoint?
21   A.    My associates probably prepared
22   a draft and then I finalized it, yes.
23   Q.    What was the purpose of
24   creating this PowerPoint?

Page 75

1    A.    Well, there's multiple
2    purposes.  You know, one, just to present to,
3    you know, our colleagues, you know, and
4    sometimes, you know, present to, you know, to
5    my boss, you know, during the, like,
6    quarterly meetings, you know, particularly in
7    the early days.
8        You know, you need to, you
9    know, you need to show, you know, right, what
10   you can achieve.
11       MR. SLATER:  I'm sorry.  Let's
12   go to the page after the cover page,
13   please?  Perfect.
14   Q.    Looking at the Mission of
15   CEMAT, it says, "To solve the most
16   challenging technical problems encountered
17   from research and development to scale up and
18   manufacture of drug substances and finished
19   products, particularly those related to
20   process impurities, degradation products, and
21   solid state and polymorphism."
22       Do you see that?
23   A.    Mm-hmm, sure.
24   Q.    When this -- rephrase.

Page 76

1        Process impurities would
2    include, for example, the NDMA created
3    by the zinc chloride process; that's a
4    process impurity, correct?
5    A.    Retrospectively, yes.
6    Q.    And the creation of NDMA and
7    NDEA in the TEA process with sodium nitrite
8    quenching, those would be process impurities,
9    correct?
10   A.    Right.
11   Q.    And in both those -- rephrase.
12       After both those manufacturing
13   processes -- well, rephrase.
14       For the zinc chloride process,
15   the root cause of the creation of NDMA was
16   that the dimethylformamide was decomposing to
17   create dimethylamine, which then reacted
18   during the process with nitrous acid to
19   create NDMA, correct?
20       MR. GALLAGHER:  Objection.
21   Vague, and foundation.
22   BY MR. SLATER:
23   Q.    That's the root cause, correct?
24   A.    Yeah, that's the root cause

Page 77

1    retrospectively after, you know, the events
2    occurred and we did quite a, you know,
3    retrospective analysis, yes.
4    Q.    And that retrospective analysis
5    occurred when?
6    A.    After the June 6th -- you know,
7    when the events was first came out.
8    Q.    Going to the TEA process with
9    sodium nitrite quenching, the root cause for
10   the NDMA and NDEA was that triethylamine
11   hydrochlorothiazide was used as a catalyst.
12   That substance then would give off or produce
13   diethylamine or dimethylamine, and one or the
14   other or both would then react with nitrous
15   acid to create NDEA and NDMA.
16       That's the root cause in that
17   manufacturing process, correct?
18       MR. GALLAGHER:  Objection.
19   Vague, foundation, and compound.
20       You can answer.
21   A.    Okay.  The root cause, I think
22   actually, based upon my understanding, they
23   are slightly different.
24       The -- you know, the reason

1   that I'm saying that is, you know, based upon
2   all of the new knowledge, right, that
3   accumulated by the industry, as well as, you
4   know, from the regulators, okay?
5           For the formation for the TEA
6   process, for the formation of the TEA,
7   basically you have two mechanisms.  One is
8   the DEA is a typical process impurity of TEA,
9   so DEA would also, yeah, would react with the
10  nitrous acid to perform NDEA.
11          But also, according to, as I
12  said, again, updated, you know, you know,
13  information, the triethylamine could also
14  react with nitrous acid, but the efficiency
15  is not as high as the reaction with the TEA,
16  right?
17          So -- yeah, so basically, you
18  know, that's the mechanism for that process,
19  okay, or the root cause.
20          And for NDMA, for its presence
21  in the TEA process, and I think the root
22  cause is the -- in some of the TEA raw
23  material it may contain a trace amount of,
24  you know, of dimethylamine, okay, so that's

1   one root cause.
2           I think that there's another
3   root cause for the presence of NDMA in the
4   TEA process, which is from, you know, for --
5   as far as I remember, for very limited, you
6   know, batch numbers.  Because for some of
7   the, you know, product, they were
8   manufactured, you know, using the share line,
9   you know, with the zinc chloride valsartan.
10  And I think, you know, so for those limited
11  number of batches, that's another root cause.
12          So I think that's pretty much,
13  you know, yeah, the root cause, you know, you
14  know, for the TEA process for NDMA and NDEA.
15  Q.    When you refer to the shared
16  production line, are you talking about
17  cross-contamination?
18  A.    Well, that's one way, you know,
19  from some of the inspections, you know, you
20  know, people use that phrase, but I would
21  say, rather, it's carryover, you know, of
22  some of the residual impurities.
23  Q.    And when was that learned?
24  When was that root cause figured out?

1   A.    It was during, you know, again,
2   part of the retrospective, you know,
3   investigations.
4           And also those knowledge, you
5   know, was not gained instantaneously.  And
6   obviously, you know -- I mean, it's like if
7   you look at some of the FDA's -- their
8   training material, FDA's announcement, you
9   know, you know, this whole thing is very
10  complicated, you know, so it takes time and
11  great efforts, right?
12          So you will first, you know,
13  reveal the most obvious, and then eventually,
14  you know, when time goes by, you know.  And
15  so some of the other minor contributing
16  factors was also being, you know, discovered.
17  Q.    Before June of 2018, did ZHP
18  ever have any information indicating that any
19  of the valsartan manufacturing processes
20  could cause any nitrosamine to be created?
21  A.    No.  The whole industry, as
22  well as the regulator, did not have that
23  knowledge, including ZHP.
24  Q.    And I've seen some vocabulary

1   in some things that I've read, so I just want
2   to make sure we're on the same page as to
3   what certain things mean as we go forward if
4   we could, please.
5   A.    No problem.
6   Q.    So I've seen the term
7   "nitrosamine" and I've seen the term "nitroso
8   compound" or "N-nitroso compound."
9           Does that all basically mean
10  the same thing?
11  A.    No.  To be scientifically
12  precise, they are not the same.
13          Nitroso compound is a very --
14  you know, I'm a scientist, okay, right?  If
15  somebody just tell me nitroso compound, you
16  know, you know, any compound have a nitroso
17  group, they're called a nitroso compound.  So
18  nitrosamine is just a subtype of the nitroso
19  compound, all right?
20          And the same thing, you know,
21  N-nitroso compound is also a subtype of
22  nitroso compound, but N-nitroso compound
23  including the nitrosamine.
24          MR. SLATER:  Cheryll, let's

Confidential Information - Subject to Protective Order

Page 82

1    take this document down, and go to
2    document -- now what are we up to,
3    294?  Is the next document 294?
4        Is the next exhibit 294?
5        THE STENOGRAPHER:  295.
6        MR. SLATER:  295.  I'm always
7    off by one, Maureen.
8        (Whereupon, Exhibit Number
9    ZHP-295 was marked for
10   identification.)
11       MR. SLATER:  Looking at Exhibit
12   295, let's put up ZHP00190573.
13   BY MR. SLATER:
14       Q.   This is an e-mail dated
15   July 27, 2017.
16       Do you see that?
17       A.   Okay.
18       Q.   Do you see the date in the top
19   right?
20       A.   Let's see.  Yeah, uh-huh.
21       Q.   And you can see the person who
22   wrote it up in the top left.  You can see
23   Jinsheng Lin.
24       Do you see that?

Page 83

1        A.   Yes.  He was, yeah, one of my
2    staff, yes.
3        Q.   What was his role?  What was
4    his title?
5        A.   His title right now is
6    technical associate director, I think.
7    Something like that, yeah.
8        Q.   Would it have been the same
9    title back in July of 2017?
10       A.   No.  He had one -- at least one
11   promotion.  He maybe at the time was like
12   assistant, you know, like technical director,
13   you know, but I don't, you know, keep those
14   things, you know, you know, you know, up and
15   running all the time in my mind.  Yeah.  But
16   he -- yeah, he is one of the key technical
17   person in my team.
18       MR. GALLAGHER:  Adam, do you
19   have an English language version of
20   this document?
21       MR. SLATER:  We do.  I think
22   Cheryll can put it into that.
23       MR. GALLAGHER:  Into the link?
24   Great.

Page 84

1        MR. SLATER:  The link, the
2    hopper.
3        (Whereupon, Exhibit Number
4    ZHP-296 was marked for
5    identification.)
6        A.   That will be better for most of
7    you guys.  Yeah, for me that's fine, but...
8        MR. SLATER:  Okay if I proceed?
9        MR. GALLAGHER:  Yes, please.  I
10   see it.  It's up.
11   BY MR. SLATER:
12       Q.   So it says -- rephrase.
13       This e-mail dated by one of
14   your key technical people, Jinsheng Lin, it
15   says it's to multiple people.  And I just --
16   tell me if I get these names right.  Jucai
17   Ge, Tianpei Huang, Wangwei Chen, Wenquan Zhu.
18       A.   Okay.
19       Q.   Wenbin Chen.
20       A.   Uh-huh.
21       Q.   Mr. Li.
22       A.   That's me.  Yeah, that's me.
23       Q.   Peng Dong?
24       A.   Wait a second.  Oh, wait.  I'm

Page 85

1    still seeing the Chinese version.  Are you
2    reading the English version?
3        Q.   I'm certainly not reading the
4    Chinese; I'm reading the English.  But I'm
5    just going through the names right now.
6        A.   Yeah, sure.  Yeah, go ahead.
7        Q.   So we just -- we established
8    you're one of the people who received this
9    e-mail, correct?
10       A.   Oh, yes.
11       Q.   Also Peng Dong?
12       A.   Mm-hmm.
13       Q.   Lihong Lin?
14       A.   Mm-hmm.
15       Q.   Yanfeng Liu?
16       A.   Yes, that's pretty close.
17       Q.   Peng Wang?
18       A.   Penh Wang, yes.
19       Q.   And Wenling Zhang.
20       A.   Yes.
21       Q.   Okay.  And it looks like the
22   subject is "Valsartan Impurity K."
23       Does it say that, or is that an
24   attachment?

Page 86

1    A.    Yeah, "Valsartan Impurity K,"
2 yes.
3    Q.    Okay.  So the subject is
4 "Valsartan Impurity K," correct?
5    A.    Yes, looks like, yes.
6    Q.    And this is to -- it's
7 addressed to Ms. Ge.  Is that pronounced
8 right, G-E, Ge?
9    A.    Yeah, yeah.  Yes.  That's
10 perfect almost, yes.
11    Q.    And they're talking about
12 impurity they see in one of the production
13 processes, correct?
14    A.    Yeah, mm-hmm.
15    MR. SLATER:  And let's turn to
16    the second page now of the document,
17    please, at the top.
18    Q.    Tell me if I have this pretty
19 much correct.  At the top it says, "Through
20 the secondary mass spectrometry analysis" --
21 and I want to stop there.
22       What is secondary mass
23 spectrometry analysis?
24    A.    It's basically you have --

Page 87

1 well, actually, you know, you have three
2 stages.  You're going to the -- first the
3 mass detector, right?  It's looking for the
4 parent molecule away, or the parent most
5 usually like protonated molecular eye.
6       And then you're going to a
7 collision cell, you know, you know, you know,
8 usually with gas, either nitrogen, helium,
9 or, you know, some other gas, and to break
10 them apart.
11       And then you have, you know, a
12 number of, you know, you know, what do we
13 call it, fragments, right?  And then you go
14 to another, you know, mass detector.  Yeah.
15 So sometimes it's also called a triple quad
16 mass spectrometry, but sometimes just called
17 MS2 or /MS.
18    Q.    Again starting -- rephrase.
19       Starting at the top, it says,
20 "Through the secondary mass spectrometry
21 analysis, it can be inferred that the extra
22 NO substituent is in the cyclic compound
23 fragment, and it is very likely that it is an
24 N-NO compound; it is similar to the

Page 88

1 N-nitrosodimethylamine that occurs in
2 valsartan when quenched with sodium nitrite,
3 and its structure is very toxic.  Its
4 possible formation route is shown as
5 follows," and then we have the diagrams.
6       Did I get that right?
7    A.    Yeah, yeah, it looks like.
8    Q.    And if we go further down below
9 the pictures, there is the second paragraph
10 after the pictures.
11       MR. SLATER:  You can keep
12    scrolling down, please, Cheryll.
13    Q.    Looking now at the second
14 paragraph under the diagrams, the e-mail
15 says, "If it is confirmed as the above
16 speculated structure, then its toxicity will
17 be very strong, and there will be an
18 extremely high GMP risk.  This is a common
19 problem in the production and synthesis of
20 sartan APIs.  It is recommended to improve
21 other quenching processes (such as NaClO)
22 along with the optimization of the valsartan
23 sodium azide quenching process."
24       Did I get that pretty much

Page 89

1 right?
2    A.    Yeah, it sounds like.  Yeah.
3    Q.    And then going to the last
4 paragraph of this e-mail you received
5 July 27, 2017, it says, "I've also attached a
6 patent of a 2013 sodium azide NaClO quenching
7 method by Zhejiang Second Pharma Co.,
8 Limited.  They proposed that the use of NaNO2
9 quenching will result in the formation of
10 N-NO impurities.  At the same time, they used
11 ZHP's crude Valsartan in their LC-MS test and
12 detected this impurity.  This indicates that
13 other companies have paid attention to the
14 quality problem very early on.  So leaders
15 please pay attention to this issue."
16       And then it's signed Jinsheng
17 Lin, CEMAT, July 27, 2017, correct?
18    A.    Yeah, looks like, uh-huh.
19    Q.    And if we go back up to the top
20 now, just to reiterate a couple things, it
21 said in part that what was being seen here
22 was similar to the NDMA that occurs in
23 valsartan when quenched with sodium nitrite,
24 correct?  You saw that language up at the

Page 90

1 top?
2      A.    Yes.
3            MR. GALLAGHER:  Objection.
4      Vague, and mischaracterizes the
5      document.
6 BY MR. SLATER:
7      Q.    And, therefore, as of July 27,
8 2017, you and others in your company knew
9 that when valsartan was quenched with sodium
10 nitrite, it was forming in NDMA, correct?
11           MR. GALLAGHER:  Objection.
12     Again, vague and mischaracterizes the
13     document.
14     A.    You know, you know, I have
15 received a lot of e-mails, and it looks like
16 my name was there.  But somehow I don't know,
17 you know -- you know, he didn't specifically
18 follow up with me or brought that, you know,
19 specifically to my attention.
20 BY MR. SLATER:
21     Q.    Well, that's what the e-mail
22 says, right?
23     A.    Right, right, I know.  Yeah, I
24 know that my name was there, but I, you know,

Page 91

1 receive huge amount of e-mail.
2            Usually, you know, for
3 something -- I told them if something, you
4 know, you know, they feel important, they
5 should remind me or, you know, you know,
6 brought up, you know, to my attention.
7      Q.    And going down further to that
8 second-to-last paragraph we read, just to
9 reiterate and walk through, Jinsheng Lin had
10 written, "If it is confirmed as the above
11 speculated structure, then its toxicity will
12 be very strong, and there will be an
13 extremely high GMP risk."
14           That's what he wrote, correct?
15     A.    That's what he wrote, but, you
16 know, he's not a toxicologist, so I think
17 that's his speculation.
18     Q.    Well, certainly with regard to
19 NDMA in valsartan, that would be, and turned
20 out to be, a significant GMP problem when it
21 was discovered outside of ZHP, correct?
22     A.    Let me see.  Which --
23           MR. GALLAGHER:  Objection.
24     Calls for speculation.

Page 92

1            You can answer, Dr. Li.
2      A.    I'm sorry, what is the question
3 again?  Sorry.
4 BY MR. SLATER:
5      Q.    Sure.
6            When people outside ZHP learned
7 that the valsartan manufacturing process was
8 creating NDMA, that was a significant GMP
9 problem, correct?
10     A.    Well, that's what he said, yes.
11     Q.    And he also said this is a
12 common problem in the production and
13 synthesis of sartan APIs.  So at that point
14 people within ZHP knew that with the
15 manufacture of their sartan APIs,
16 nitrosamines were being created.
17           That's what he's referring to
18 in this e-mail, correct?
19     A.    That, it looks like, is the
20 case.
21     Q.    And then he says, "It is
22 recommended to improve other quenching
23 processes (such as NaClO)."
24           And if you could translate that

Page 93

1 for me, please.
2      A.    I'm sorry, which one here?
3      Q.    The NaClO.  Is that sodium
4 nitrite?
5      A.    No.  That's the -- no, that's
6 another quenching reagent.  No, it's not
7 sodium nitrite.
8      Q.    What is it?
9      A.    It's one of the
10 chloro-containing, you know, acid.  This one
11 is actually the main ingredient in bleach.
12     Q.    Hypochlorite.
13     A.    Yeah.
14     Q.    Is that hypochlorite?
15     A.    Yeah, I think it should be that
16 one, yes.
17     Q.    Let me ask it again then, now
18 that I just figured it out with you.
19           With my -- all right.  Let me
20 rephrase.
21           He wrote, "It is recommended to
22 improve other quenching processes, such as
23 hypochlorite" -- that's actually bleach,
24 right?

Confidential Information Subject to Protective Order

Page 94

1    A.    Yes.
2    Q.    -- "along with the optimization
3  of the valsartan sodium azide quenching
4  process."
5        So he's recommending that the
6  sodium azide quenching process that you had
7  been using be optimized, be improved,
8  correct?
9    A.    Looks like, yes.
10   Q.    And going back to the next
11 paragraph, he actually points out that he is
12 attaching a patent, which we'll pull out in
13 just a moment, from a 2013 sodium azide
14 hypochlorite quenching method by a different
15 company, Zhejiang Second Pharma Co., Limited.
16       That's another company in
17 China, correct?
18   A.    Yes.
19   Q.    And, again, the NaClO, that's
20 hypochlorite, which is bleach, correct?
21   A.    Yes.
22   Q.    And he says that that company
23 "proposed that the use of NaNO2 quenching
24 will result in the formation of N-NO

Page 95

1  impurities."
2        NaNO2 is sodium nitrite,
3  correct?
4    A.    NaNO2, yes.
5    Q.    And N-NO impurities would be
6  nitrosamine impurities, correct?
7    A.    I'm sorry, which one?
8    Q.    Where it says "N-NO," those
9  would be nitrosamine impurities, correct?
10   A.    I'm sorry.  I don't know which
11 you're referring to.
12       MR. SLATER:  Scroll down a
13       little, Cheryll.  I think it's cut
14       off.
15   Q.    In the last paragraph?
16   A.    Oh, yeah.  Yeah, it's N-NO,
17 yeah, impurity, yes.  It's N-nitro impurity,
18 yes.
19   Q.    And he then says, "At the same
20 time, they used ZHP's crude Valsartan in
21 their LC-MS test and detected this impurity."
22       And "LC-MS," that would be
23 liquid chromatography-mass spectrometry?  Do
24 I have that right?

Page 96

1    A.    Yeah, mm-hmm.
2    Q.    And again, as I'm going to show
3  you in a moment, he's talking about what he
4  read in this patent by this other company in
5  China.
6        And he then says, "This
7  indicates that other companies have paid
8  attention to the quality problem very early
9  on."
10       Do you see that?
11   A.    Mm-hmm.
12   Q.    And this quality problem he's
13 talking about is the sodium nitrite quenching
14 leading to the creation of nitrosamines,
15 correct?
16   A.    Looks like.
17   Q.    And he then says, "So leaders
18 please pay attention to this issue."
19       And when he's referring to
20 "leaders," would that be the people on this
21 e-mail, including yourself and Peng Dong and
22 Lihong Lin, and the others on that e-mail?
23       MR. GALLAGHER:  Objection.
24       Vague, and calls for speculation.

Page 97

1        You can answer, Dr. Li.
2    A.    Yeah, it looks like at least
3  the two, yes.
4  BY MR. SLATER:
5    Q.    Now let's go, if we could --
6  well, actually, let me ask you this question.
7        This e-mail -- we have
8  something called metadata, and metadata is
9  information we get when we get produced
10 documents; where they came from, who authored
11 them, etcetera.  That's something we exchange
12 as part of this litigation.
13   A.    Okay.
14   Q.    The metadata on this said that
15 this came from a folder titled "Documents"
16 from your old computer, which apparently,
17 according to the metadata, was copied from
18 your old desktop into your new computer in or
19 about June 2018.
20       Do you remember doing that?
21   A.    I'm sorry?
22       MR. GALLAGHER:  Objection.
23       Objection.  Vague and foundation.
24       ///

Page 98

BY MR. SLATER:

Q.   Do you remember doing that, copying this document from one computer into another computer in or about June of 2018?

A.   I didn't do that.

Q.   So if that happened, somebody else would have done it, and that would have been stored in --

A.   Probably IT, yeah.  As I said -- yeah.

Q.   So this e-mail clearly is -- rephrase.

So based on this e-mail, your company was -- well, let me rephrase this.

Did your company ever tell the FDA or any other regulators about its knowledge about the creation of nitrosamines including NDMA from the quenching with sodium nitrite?

Do you recall your company telling the FDA or any regulatory authorities about that?

A.   Well --

MR. GALLAGHER:  Objection.

Page 99

Vague.

A.   In this particular case, you know, he's talking -- well, that particular case with, you know, irbesartan, right?  And so he's, you know, you know, you know, making a kind of a, you know, you know, guess.

You know, I mean, all of the language that you can see, you know, you know, yeah, because the reaction, you know, that he showed is irbesartans, yeah.

BY MR. SLATER:

Q.   Well, if we go to the top of this page --

MR. SLATER:  Could you scroll up, please, Cheryll, the top of the second page?  Thanks.

Q.   -- just to be clear, he specifically said that "It is similar to the NDMA that occurs in valsartan when quenched with sodium nitrite," and it's very toxic.

A.   That's -- he's, you know, you know -- yeah, he's making a guess.  Yeah, because -- because, you know, what he found is, you know, is this N-, you know, nitroso

Page 100

compound with irbesartan, yeah.  It's not valsartan.  But based upon that, yeah, it looks like he's making -- you know, making his guess.

Q.   Well, he's comparing it and calling it similar to the NDMA that forms in valsartan when quenched with sodium nitrite.

That's what he said, right?

A.   Yeah, that's -- again, you know, you know, that's his, you know, his guess or his speculation.

Q.   Well, he doesn't say he's guessing or speculating, does he?

A.   He didn't say, but basically from the context, you know, yeah.  I mean, it's obvious.

Q.   Well, it's also obvious he said in the second-to-last paragraph, if we scroll down to it, that "If it is confirmed as the above speculated structure in this irbesartan, then its toxicity will be very strong, and there will be an extremely high GMP risk."

Meaning if it's a nitrosamine,

Page 101

it's going to be very toxic, and that's going to be a significant GMP problem, right?

That's what he said in this e-mail, correct?

A.   He said that; but, again, you know, he's not a toxicologist, right?  And now we know, you know, based upon, you know, some of the FDA's training -- you know, training material, not all, you know, N-nitroso compound are, you know, as toxic, okay.

Quite a few of them, if you look at FDA's training, you know, PPTs there are quite of few N-nitroso compound that they are not, you know, not, you know, you know, you know, genotoxic, or they are not mutagenic.

So, again, you know, yeah, he's making, you know, you know, his own judgment, you know, outside of his, you know, you know, you know, expertise.

Q.   He turned out to be correct, right?  Because NDMA and NDEA are considered to be mutagenic/genotoxic impurities,

Confidential Information - Subject to Protective Order

Page 102

1  correct?
2        MR. GALLAGHER:  Objection.
3  Calls for speculation.
4        You can answer.
5     A.    Yeah.  Right now, yeah.  And
6  it's considered as probable, you know, you
7  know, carcinogenic, you know, to human.  But
8  it's, you know, it's probable.
9        And also, again, based upon,
10  you know, some recent FDA's training
11  material, you know, I just went through as
12  part of the preparation.
13        And endogenously formed NDMA
14  could be, you know, somewhere between 1,000
15  or even greater than 2,000 microgram per day.
16  You know, basically, you know, those NDMA,
17  they -- you know, you know, you know, it is
18  formed, you know, inside the body, like
19  inside a human body, after, you know,
20  ingestion, you know, of regular foods.
21     Q.    NDMA was being formed by the
22  manufacturing process, as we agreed earlier.
23  It was a process impurity in the valsartan,
24  correct?

Page 103

1     A.    Yes.
2     Q.    And it would never be
3  acceptable to have NDMA at the levels it was
4  found in your company's valsartan.  That
5  would never be acceptable, that could never,
6  ever be permissible, correct?
7        MR. GALLAGHER:  Objection.
8  Lacks foundation, and outside the
9  scope.
10     A.    Yeah, that's not accurate,
11  okay?  That's not accurate.  If you look at
12  FDA's -- you know, at least the most recent,
13  you know, there is an acceptable limit for
14  NDMA or NDEA, okay?
15  BY MR. SLATER:
16     Q.    Are you aware that every single
17  batch of valsartan manufactured with both the
18  sodium nitrite quenching process with TEA and
19  the zinc chloride process, that every single
20  batch exceeded the FDA's stated limits?
21        Are you aware of that?
22        MR. GALLAGHER:  Objection.
23  Outside the scope.
24     A.    That's not accurate, okay?  You

Page 104

1  know, as I indicated for the TEA process, you
2  know, based upon my knowledge
3  retrospectively, only very limited batch, you
4  know, had NDMA exceeding, you know, the
5  limit, as well as for -- I think for the --
6  for NDEA, there's also limited numbers.
7        So for the TEA process, as far
8  as I can remember, the vast majority of the
9  batches, they still met the acceptable -- the
10  current acceptable limit, although those
11  limits are retrospective.
12  BY MR. SLATER:
13     Q.    The zinc chloride process,
14  every single batch that was manufactured and
15  then sold in the United States exceeded the
16  limit set by the FDA, correct?
17        MR. GALLAGHER:  Objection.
18  Outside the scope.
19        You can answer.
20     A.    Okay, retrospectively, yes.
21  But, you know, to be clear, you know, there
22  was no specification before the events.
23  BY MR. SLATER:
24     Q.    When Jinsheng Lin said at the

Page 105

1  end of this e-mail, "This indicates that
2  other companies have paid attention to the
3  quality problem very early on," when he was
4  referring to the 2013 patent application, and
5  then said, "So leaders please pay attention
6  to this issue," he was giving you a good
7  warning that this needed to be taken care of
8  and fixed right away, because it was a
9  serious quality problem with a very toxic
10  substance, correct?
11        MR. GALLAGHER:  Objection.
12  Vague, and mischaracterizes the
13  document.
14     A.    As I said, you know, you know,
15  now looking back, you know, you know, he's
16  making, you know, his judgment, okay.
17        Also, he's -- you know,
18  particularly with regard to the potential
19  toxicity of NDMA, because he's not a
20  toxicologist.
21  BY MR. SLATER:
22     Q.    Well, he was right that this
23  was a quality problem and that it needed to
24  be taken care of.  That was a good decision

Page 106

1  by him to recommend to you and the other
2  leaders to fix this problem, this quality
3  problem, in 2017, right?
4         MR. GALLAGHER:  Objection.
5  Vague, and calls for speculation.
6      A.   Again, as I said, you know,
7  he's making, you know, you know, those
8  guesses.
9  BY MR. SLATER:
10     Q.   Whatever you want to call it,
11 he was correct, right?
12     A.   Again, you know, he's making
13 those speculations outside of his, you know,
14 expertise.
15     Q.   Let's go to -- well, rephrase.
16 Let me just tie this up.
17        When people outside ZHP found
18 out what ZHP knew at least as of July 2017,
19 and likely earlier, since he's talking about
20 what was already known, when the rest of the
21 world found out about it, you couldn't sell
22 your valsartan anymore because of the
23 contamination with the NDMA, correct?
24        MR. GALLAGHER:  Objection.

Page 107

1      Vague, and outside the scope.
2      A.   Again, you know, as I said,
3  he's making his speculations.
4  BY MR. SLATER:
5      Q.   Well, whatever you want to call
6  it, he was correct that the sodium nitrite
7  quenching was creating nitrosamines, which
8  was a serious GMP problem, correct?
9         MR. GALLAGHER:  Objection.
10 Vague, and outside the scope.
11        You can answer.
12     A.   In terms of a GMP, you know,
13 Ms. Ge would be in a better position, you
14 know, to answer that.
15        MR. SLATER:  Let's go, Cheryll,
16 if we could, to the patent application
17        referred to here.  Let's go to the
18        English version.
19        (Whereupon, Exhibit Numbers
20 ZHP-297 and ZHP-298 were marked for
21 identification.)
22 BY MR. SLATER:
23     Q.   We're just getting the document
24 up.  Great.

Page 108

1         So I can represent to you that
2  on the metadata, this is the attachment
3  referred to as the patent application.  Do
4  you see that?  With an application
5  announcement date of March 5, 2014 in the top
6  right.
7      A.   Yes.
8         MR. SLATER:  And just for the
9  record, Cheryll, could you scroll to
10 the bottom, and we'll just read off
11 the Bates number that is printed on
12 this?
13        It says ZHP01812101.
14        Now, if you could scroll down a
15 little more, Cheryll.  Let's just get
16 the abstract fully shown here.  No,
17 no, the other way.  The other up.
18 Perfect.
19     Q.   Looking at the Abstract of this
20 patent application, I want to go down to the
21 last long sentence at the bottom, and it says
22 starting six lines from the bottom, "In the
23 method of the present invention, the use of
24 hypochlorite can cut off the source of

Page 109

1  nitrous acid and eliminate the generation of
2  valsartan impurity K, and, with the
3  adjustment of other conditions, it can
4  prevent the generation of other impurities
5  that are difficult to handle, allowing the
6  preparation of high-purity valsartan
7  products."
8         Do you see that?
9      A.   Mm-hmm.
10     Q.   And per the e-mail that we just
11 went through from Mr. Lin, he talked about
12 how the people who filed this patent at this
13 other company actually were looking at a way
14 to prevent these nitrosamine impurities from
15 forming by substituting something else for
16 sodium nitrite.
17        Do you recall we just went
18 through that?
19     A.   Yes.  But here, you know, you
20 know, based upon what I see here, right, this
21 patent is specifically, you know, talking
22 about, you know, the impurity K, okay?
23        So retrospectively we know
24 that, you know, the impurity K is an

Case 1:19-md-02875-RMB-SAK    Document 2663-10    Filed 02/26/24    Page 30 of 74
confidential information - subject to protective order
PageID: 98363

Page 110

1  N-nitroso impurity, right, but that impurity,
2  it looks like, you know, you know, Novartis,
3  they already knew, right, during their
4  initial filing. Okay. And also they did an
5  Ames test of the so-called impurity K, and it
6  turns out, you know, the Ames test results
7  was negative, right?
8      So according to a European, you
9  know, authority document, this impurity, you
10 know, you know, has been controlled as a
11 regular normal impurity, okay, at the level
12 of 1,000 ppm.
13     Q.   I guess we could talk about
14 that for a moment.
15     You realize that whatever the
16 results of the Ames test was, the regulatory
17 authorities said it should be treated as a
18 mutagenic genotoxic impurity, correct?
19         MR. GALLAGHER: Objection.
20     Foundation, calls for speculation, and
21     outside the scope.
22     You can answer.
23     A.   According to M7, if the results
24 of Ames test, if it's negative, you could

Page 111

1  control that or treat that as a regular
2  impurity.
3      So in this particular case,
4  impurity K has been treated by Novartis,
5  which is the original innovator of valsartan
6  as a regular impurity. So its level is at
7  1,000 ppm.
8  BY MR. SLATER:
9      Q.   Let's look at -- well,
10 rephrase.
11     You're aware that the
12 regulatory authorities actually determined
13 not to treat it as a regular impurity and
14 said it had to be treated as a genotoxic
15 impurity, correct?
16         MR. GALLAGHER: Objection.
17     A.   Not for -- sorry.
18         MR. GALLAGHER: Go ahead.
19     Outside the scope.
20     You can answer.
21     A.   Yeah, not for impurity K. As I
22 said, impurity K has been controlled as a
23 regular impurity, although it is N-nitroso
24 impurities.

Page 112

1  BY MR. SLATER:
2      Q.   NDMA and NDEA are not treated
3  as regular impurities; they're treated as
4  what they are, potent genotoxic impurities,
5  correct?
6          MR. GALLAGHER: Objection.
7      Vague, and calls for speculation.
8      A.   They are different. NDMA, you
9  know, you know, you know, every N-nitroso
10 compound, they are different. As I, you
11 know, early -- you know, you know, early on,
12 as I indicated, there are quite a few, you
13 know, N-nitroso, you know, compounds, they
14 are not mutagenic.
15         MR. SLATER: Hang on. Let's
16     see where I want to go to now in this
17     document.
18         Let's go to page 5,
19     paragraph 17, please. No, we're way
20     past it. Paragraph 17. I see what
21     you're doing, actually. You're right.
22     There you go. Perfect.
23     Q.   Paragraph -- or Section --
24 rephrase.

Page 113

1      Section 17 is talking about --
2  well, actually, let's go -- yeah, all right.
3  Rephrase.
4      In 17 it talks about, "In the
5  present invention, the improvement of Step 3
6  reaction can effectively prevent valsartan
7  impurity K from forming; since valsartan
8  impurity K is a nitroso compound that is
9  highly toxic, the control of impurity K in
10 valsartan so that it is not detected is the
11 objective of the valsartan preparation method
12 of the present invention."
13     Do you see what I just read?
14     A.   Yes.
15         MR. SLATER: Now let's go, if
16     we could, to paragraph number 33.
17     Q.   It says in paragraph 33,
18 starting in the second sentence, "Through the
19 control of the reaction conditions, the
20 valsartan product is synthesized while the
21 formation of other impurities is minimized,
22 allowing effective control of the content of
23 impurities, thereby preparing high-purity
24 valsartan products, and enhancing their

1  quality, which is of great significance for
2  ensuring the safety of valsartan APIs."
3        Do you see that?
4     A.   Mm-hmm.
5     Q.   And you would certainly agree
6  with me that if you could prevent the
7  creation of nitrosamines by substituting
8  something for sodium nitrite, that's good for
9  safety, correct?
10    A.   This is something unknown, and
11 it's speculative.  Because if you use other
12 quenching, you know, reagent, you might
13 create something new, some -- you know, some
14 new problems, okay.
15    Q.   That's why you test it and
16 study it before you sell it on the market for
17 patients to take it, right?
18        MR. GALLAGHER:  Objection.
19    Vague.
20    A.   Yes.  You will do the -- yeah,
21 you will do the risk analysis.  But based
22 upon the claim, you know, you know, in this
23 patent, you know, particularly with regard to
24 impurity K, you know, they claim is highly

1  toxic, but actually it is not based upon, you
2  know, the knowledge that we know today.
3  BY MR. SLATER:
4     Q.   Well, you're not saying NDMA
5  and NDEA aren't toxic, because they're
6  accepted to be highly toxic and unacceptable
7  to be included in the API.
8     A.   Well, I am -- the focus of this
9  patent is, you know, is impurity K, okay.  So
10 anything, you know, you know, beyond that,
11 you know, is their speculation, right?
12        And also, you know, they claim
13 vitamin -- I'm sorry -- the impurity K, you
14 know, is highly toxic, you know, based upon,
15 you know, whatever, you know, available from
16 either European regulatory, you know, you
17 know, agency, I think this statement is not
18 correct.
19    Q.   We've confirmed as through the
20 e-mail we went through from Mr. Lin earlier
21 that your company had this patent in its
22 files, correct?
23    A.   You know, right.  It looks like
24 at least Mr. Lin has it.  I don't know --

1  yeah.  Well, he sent it to other people.
2  Yeah.
3     Q.   And this would have been
4  available to and would have been reviewed by
5  your company most likely in 2014 when it was
6  available to be seen, correct?
7     A.   I don't know.
8        MR. GALLAGHER:  Objection.
9  Calls for speculation.
10        MR. SLATER:  All right.  Let's
11 go to the next document.  We can take
12 this down.  Cheryll, let's go to
13 ZHP02336567.
14        (Whereupon, Exhibit Number
15 ZHP-299 were marked for
16 identification.)
17 BY MR. SLATER:
18    Q.   Do you see that on the screen?
19    A.   Mm-hmm.
20    Q.   Okay.  You see the title is
21 "Valsartan Patent Investigation Report"?  Is
22 that a fair reading of that?
23    A.   Yeah, it's accurate.
24    Q.   And if you turn now to the next

1  page -- and we didn't bring up the whole
2  document for time's sake, but let's go to the
3  second page of this document, which is page
4  ZHP02336682.
5        You can see in the middle of
6  the page the patent number of CN 103613558,
7  which is the patent number that was on the
8  patent we just looked at.
9        Do you see that?
10    A.   Mm-hmm.
11        MR. GALLAGHER:  I'm going to
12 object to the extent this document --
13 it appears you're representing that
14 this document is incomplete, so I'm
15 just going to object to that extent.
16        But you can proceed with your
17 questions.
18        MR. SLATER:  What I'm
19 representing is that we have the front
20 for you, and we have this page,
21 because that's what we wanted to talk
22 about.  But we certainly can provide
23 you the entire document if you want at
24 the break, if you want to go through

Confidential Information - Subject to Protective Order

Page 118

1  it. We were just wanting to focus on
2  this for time purposes.
3      MR. GALLAGHER: I'm just making
4  clear for the record, you know, if
5  your questions -- you're happy with an
6  incomplete document.
7      MR. SLATER: Are you objecting
8  to my use of the document in this
9  form?
10     MR. GALLAGHER: I'm just noting
11  an objection that the document is
12  incomplete. I don't know what is in
13  the rest of the document. If for your
14  questions you feel like the cover page
15  and this page is insufficient --
16  BY MR. SLATER:
17     Q.    Okay. So looking now at the
18  section we're talking about now, it says the
19  title of the invention was "A Method for
20  Preparing Valsartan," correct?
21     A.    Yes.
22     Q.    The applicant was Zhejiang
23  Second Pharma Company, Limited, correct?
24     A.    Yes.

Page 119

1      Q.    And if you go down to the
2  bottom so that we can cut to the chase, it
3  says, "Patent infringement analysis. The
4  Huahai process does not add sodium
5  hypochlorite, so it does not constitute an
6  infringement."
7      Do you see that?
8      A.    Mm-hmm.
9      Q.    And I can tell you from the
10  metadata this document was last modified
11  November 4, 2014, according to the document.
12      If that's what the metadata
13  shows, you would expect that your company had
14  access to and reviewed that patent in 2014,
15  correct?
16      MR. GALLAGHER: Objection.
17  Foundation, and compound.
18      A.    It looks like this -- you know,
19  you know, we have a patent group, okay, and
20  it looks like this is a report generated, you
21  know, by that patent, you know, group, okay.
22      And again, you know, this
23  particular patent, the focus is related to
24  impurity K. Okay. It didn't even -- yeah,

Page 120

1  looks like, you know, based upon the material
2  that you just showed, you know, it just
3  didn't specifically mention, you know,
4  anything else. You know, it just vaguely
5  say, you know, for all other or other
6  impurities, but it just -- there is no
7  specification, you know, specifics.
8  BY MR. SLATER:
9      Q.    I'm just honestly trying to
10  just establish the time period when it was
11  reviewed.
12     A.    Yeah, that's fine. Yeah, yeah,
13  that's fine, yeah.
14     Q.    Okay. So you could agree based
15  on what I've told you this was reviewed
16  likely in 2014 by someone in your company,
17  correct?
18      MR. GALLAGHER: Objection.
19  Foundation, and calls for speculation.
20     A.    It looks like it.
21      MR. SLATER: I think we have --
22  Cheryll, do you have the second
23  document also where this is referred
24  to, the second ZHP document?

Page 121

1      We don't have to go to that,
2  actually. We're going to go to the
3  next document. Oh, you have it. Oh,
4  you know what? You put it up. You're
5  so quick, I can't waste that effort.
6      (Whereupon, Exhibit Number
7  ZHP-300 was marked for
8  identification.)
9  BY MR. SLATER:
10     Q.    On the screen is ZHP02336432,
11  which is a summary of patents for a patent
12  search. And I can tell you based on the
13  metadata this was modified May 23, 2014.
14      That's what the metadata shows,
15  okay?
16     A.    Okay.
17     Q.    And if we go to the second page
18  of this document, the bottom of the page,
19  number 4, you can see that this is a
20  discussion of the same patent you see that
21  we've been talking about.
22      Do you see that? Same number,
23  CN 103613558. Do you see that?
24     A.    Where? I'm sorry. Where

Confidential Information - Subject to Protective Order

Page 122

1  exactly the number?
2      Q.    Right in the middle of the
3  page. I mean right in the middle of the
4  "From" section.
5      A.    Oh, yeah, yeah, yeah. Okay,
6  yeah. I saw that, mm-hmm.
7      Q.    And this document, which was
8  compiled in 2014 within ZHP, at the very end
9  of that description says, "The method
10 inhibits the generation of valsartan impurity
11 K and other impurities hard to treat, so as
12 to yield high-purity valsartan."
13         Do you see that?
14         MR. GALLAGHER: Objection.
15 Foundation, and calls for speculation.
16     A.    I'm sorry, where the language?
17 BY MR. SLATER:
18     Q.    The last sentence.
19     A.    Last sentence, "and other
20 impurities hard to treat so as to" -- okay,
21 yeah.
22     Q.    So at the very least, ZHP was
23 aware, at least as of 2014, that there were
24 other companies out there trying to eliminate

Page 123

1  the quality problem created by having
2  nitrosamines yielded through sodium nitrite
3  quenching.
4         Your company would have been
5  aware that others were doing that, correct?
6         MR. GALLAGHER: Objection.
7  Foundation, and mischaracterizes the
8  document and the testimony.
9      A.    It looks like somebody in the
10 company, yeah, aware of this patent. But
11 again, you know, this patent, as I said, is
12 focused on impurity K.
13         MR. SLATER: All right. The
14 next document I have is probably going
15 to take a little while, and I think
16 I've been going about an hour. I'm
17 happy to keep going. I'm going to
18 need 15, 20 minutes at least for the
19 next document. So you tell me,
20 Patrick.
21         MR. GALLAGHER: Dr. Li, it's
22 really up to you. Do you want to take
23 a break now, or do you want to go for
24 another 15 minutes?

Page 124

1         MR. SLATER: We can take a
2  break now, yes.
3         Go off the record then.
4         THE VIDEOGRAPHER: The time
5  right now is 9:24 a.m., and we're off
6  the record.
7         (Whereupon, a recess was
8  taken.)
9         (Whereupon, Exhibit Number
10 ZHP-301 was marked for
11 identification.)
12         THE VIDEOGRAPHER: The time
13 right now is 9:43 a.m. We're back on
14 the record.
15 BY MR. SLATER:
16     Q.    On the screen we have
17 Exhibit 301, an e-mail from December 22,
18 2018.
19         Do you see that?
20     A.    Yes, mm-hmm.
21         MR. GALLAGHER: Adam, is there
22 an English language version of this
23 document?
24         MR. SLATER: That's a good

Page 125

1  question. I don't know.
2         Let's go off for a second. If
3  there isn't, we'll create one right
4  now.
5         THE VIDEOGRAPHER: Off the
6  record?
7         MR. SLATER: Yes.
8         THE VIDEOGRAPHER: The time
9  right now is 9:44 a.m. We're off the
10 record.
11         (Off the record discussion.)
12         (Whereupon, Exhibit Number
13 ZHP-302 was marked for
14 identification.)
15         THE VIDEOGRAPHER: The time
16 right now is 9:44 a.m. We're back on
17 the record.
18 BY MR. SLATER:
19     Q.    Looking now at this e-mail --
20 rephrase.
21         Looking at Exhibit 301, it's an
22 e-mail that was sent to you and a few other
23 people on December 22, 2018, is that correct?
24     A.    Yes.

1    Q.    Who was the e-mail written by?
2    A.    Also from Mr. Lin.
3    Q.    The same person who wrote that
4  e-mail of July 27, 2017 that we went through
5  earlier?
6    A.    Mm-hmm.
7    Q.    And he writes to yourself, and
8  who else is copied?  Who else was this
9  written to?
10   A.    Mr., you know, Zhu and Chen,
11 Chen Wenbin, yeah.
12   Q.    Who are those people?  Let's
13 take them one at a time, if you could,
14 please.
15   A.    These two, Mr. Zhu and also
16 Mr. Chen, Mr. Zhu is actually my direct
17 report.
18   Q.    He reports to you?
19   A.    Yes.
20   Q.    What's his title?
21   A.    He is -- the title is the
22 director for CEMAT, yeah.  Analytical --
23 yeah.
24   Q.    I'm sorry.  You said

1  "analytical" --
2    A.    It should be director of
3  analytical chemistry or something like that,
4  or just, you know, director of analysis,
5  yeah.  In Chinese we call (speaking Chinese).
6    Q.    And the other person, Mr. Chen,
7  who is that?
8    A.    He is under Mr. Zhu.  He is the
9  associate -- yeah, should be the associate
10 director, yeah.
11   Q.    And tell me if I understand
12 what this e-mail is saying.  It has -- first
13 of all, it has an attachment, which we're
14 going to get to in a moment.
15         It is a summary of CEMAT
16 projects with a long report review cycle.
17         Do I understand that?
18   A.    Right.  Right.
19   Q.    The e-mail reads -- rephrase.
20         The e-mail reads, "Mr. Li:
21 Attached please find the summary of 27 recent
22 projects with a report review cycle of more
23 than two months, including 16 impurity
24 studies, one solid-state analysis, three

1  structural confirmations, and seven
2  genotoxicity assessments.  I hope to
3  communicate with you and find a way to
4  shorten the report review cycle, thank you."
5         Did I read that in a fairly
6  accurate way?
7    A.    Yes.
8    Q.    And it was signed by Jinsheng
9  Lin at CEMAT, December 22, 2018, correct?
10   A.    Yes.
11         MR. SLATER:  Let's now go to
12 the attachment, which is the summary
13 of the CEMAT projects with a long
14 report review cycle.
15         THE WITNESS:  Okay.
16         MR. SLATER:  And that will be
17 Exhibit 302.
18         THE STENOGRAPHER:  I think it's
19 303.  302 was the English version.
20 303.
21         MR. SLATER:  Thank you.
22         (Whereupon, Exhibit Number
23 ZHP-303 was marked for
24 identification.)

1    A.    Could you enlarge?  It's really
2  difficult to see from my end.
3  BY MR. SLATER:
4    Q.    We're going to when we scroll
5  up to it.
6         MR. SLATER:  But I also --
7  Patrick, if you'd like, I think we
8  have an English version of this
9  machine translated, is that correct?
10        MR. GALLAGHER:  That would be
11 awesome if you do.
12        MR. SLATER:  So we'll load that
13 up before I ask any questions.
14        Let me know, Cheryll, when it's
15 been loaded.
16        MR. GALLAGHER:  There it is.
17 You're good to go.
18        (Whereupon, Exhibit Number
19 ZHP-304 was marked for
20 identification.)
21        MR. SLATER:  So looking now at
22 this spreadsheet, let's go, if we
23 could, to Tab 1.3, Row 53.  Perfect.
24 Scroll down a millimeter.  Do we have

Page 130

1    the top of 53?
2            Sorry, I shouldn't have made
3    you do it.
4        A.    Go the other way.  Could you
5    make it bigger?
6    BY MR. SLATER:
7        Q.    We'll make it bigger and work
8    our way down?
9        A.    Could you make it even bigger?
10           MS. CALDERON:  Give me one
11   second.  I'm working on it.
12           THE WITNESS:  Okay.
13           MR. SLATER:  Just make it
14   bigger and then we'll scroll through
15   it as we go, so you don't have to try
16   to fit the whole thing on one page.
17   Make it nice and big.  There we go.
18           MS. CALDERON:  Sorry.
19           MR. SLATER:  Don't worry about
20   it.  No one else can do it.
21           MS. CALDERON:  Obviously I
22   can't either.
23           MR. SLATER:  Keep going.  You
24   got it.  You're going slowly down.

Page 131

1        Now you're at 172 again.
2            MS. CALDERON:  That's it.
3            MR. SLATER:  Thank you.
4    BY MR. SLATER:
5        Q.    Okay.  Looking now in Box 53,
6    at the top it talks about Investigation on
7    the RT 26-minute impurity in irbesartan crude
8    product.
9            Do you see that?
10       A.    Mm-hmm.
11       Q.    It says the responsible person
12   was Tianpei Huang, new project in July 2017,
13   completed in April and no longer updated in
14   May.
15           Do you see that?
16       A.    Mm-hmm.
17       Q.    And again, who is Mr. Huang?
18       A.    She is one of the analysts at
19   the time.
20       Q.    She was an analyst at CEMAT?
21       A.    Yes.  She was, actually.
22       Q.    It says, "The project was
23   authorized by the Technology Department of
24   Chuannan in Plant 1."

Page 132

1            Do you see that?
2        A.    I'm sorry, where?
3        Q.    Where we just read.  It says,
4    "The project was authorized by the technology
5    department of Chuannan in Plant 1."
6        A.    Which line?
7        Q.    Right after I just read about
8    "no longer updated in May" in red.
9        A.    Wait a second.  Oh, the red,
10   okay.  Yeah.  Yeah, they actually, yeah, ask
11   CEMAT to do the investigation, yes.
12       Q.    So how does that work?  You
13   have Chuannan and Xunqiao, if I'm pronouncing
14   those right, if they have something like an
15   impurity investigation they need to do, they
16   ask CEMAT to do that work for them?
17       A.    Well, sometimes they will do by
18   themself along with, you know, Chuannan QC.
19   But if they cannot resolve, yeah, they
20   usually send it to us.
21       Q.    And then I'm going to read a
22   little further.  It says, "Due to the
23   incomplete quenching of sodium azide caused
24   by the separate treatment of irbesartan

Page 133

1    sodium azide wastewater, there is a frequent
2    occurrence of muffled explosion in the
3    production process, so the technology
4    department carried out the technical
5    improvement by which the sodium azide
6    quenching takes place in the unstratified
7    step in the crude irbesartan process."
8            Do I have that correct?
9            MR. GALLAGHER:  I'm going to
10   object to this as outside the scope.
11           But please answer to the extent
12   you know and can.
13       A.    Yeah.
14   BY MR. SLATER:
15       Q.    It then continues -- and, by
16   the way, when it talks about the
17   "unstratified step in the crude irbesartan
18   process," what does that refer to,
19   "unstratified," in that context?
20       A.    Unstratified.  I'm sorry, I
21   don't understand exactly what you mean by
22   "unstratified."
23       Q.    Well, I'll ask the question
24   differently then.  Let me just continue.

Page 134

1    It continues, "However, after
2  the improvement there is an unknown impurity
3  of about 0.5 percent at 26 minutes in the
4  crude irbesartan, and the structure of this
5  impurity needs to be investigated."
6    Do you see that?
7    MR. GALLAGHER:  Again, I'm
8  going to object as outside the scope.
9    But please answer to the extent
10  you know and can.
11    A.    So could you point out exactly,
12  like, which line?  I'm sorry.  Because, you
13  know, the English and the Chinese, you know,
14  version --
15  BY MR. SLATER:
16    Q.    Can I point out exactly what
17  line?  I'm not going to be able to point out
18  exactly what line.  How about this is all
19  above the "July Process Update."
20    Do you see that?
21    A.    Let me -- how about let me --
22  you know, let me take a little bit of time
23  and read this through, okay?
24    Q.    Sure.  Let's go off the timer,

Page 135

1  and you can take a look, and then we'll walk
2  through it a little more generally.  That's a
3  good idea?
4    A.    Okay.
5    MR. SLATER:  Stay on the
6  record, off the clock.  No problem.
7    (Witness reviewing document.)
8    THE WITNESS:  Okay.  I
9  basically read through.  We can go
10  ahead.
11  BY MR. SLATER:
12    Q.    I'll start over.
13    In this Box 53, you can see
14  there's a discussion of the investigation of
15  the impurity in the irbesartan crude product
16  that we were talking about per that prior
17  e-mail that Jinsheng Lin wrote, correct?
18    MR. GALLAGHER:  I'm going to
19  object to the questioning about this
20  box as outside the scope so I don't
21  have to keep repeating it.
22    MR. SLATER:  That's fine.
23  You've got that objection.
24    ///

Page 136

1  BY MR. SLATER:
2    Q.    And you said "correct," right,
3  Dr. Li?
4    A.    I'm sorry, say that again?
5    Q.    What they're discussing in this
6  Box 53 is a study, a research project that
7  was being performed that followed from that
8  e-mail that Jinsheng Lin wrote that we talked
9  about a few minutes earlier, correct?
10    A.    It looks like.
11    Q.    Then there's process updates
12  going forward.  And it shows, for example, in
13  July, in part it says that "Based on the
14  process of generation, the impurity should be
15  a nitroso compound in irbesartan.  The
16  degradation experiment is currently being
17  carried out, and subsequently the sample will
18  be prepared."
19    That's correct in part, right?
20    A.    Mm-hmm.
21    Q.    And when they refer to "a
22  nitroso compound," we're talking about a
23  nitrosamine, correct?
24    A.    This nitrosamine is the nitroso

Page 137

1  compound on the irbesartan, okay.  It's very
2  specific.
3    Q.    Then there's an August process
4  update in August 2017 that said, "The forced
5  degradation experiment proved that the
6  impurity was a result of the reaction of
7  irbesartan with sodium nitrite and
8  hydrochloric acid.  At present, the impurity
9  has been prepared by thin layer
10  chromatography."
11    Do I have that correct?
12    A.    Yes.
13    Q.    Then in September there's a
14  process update that says, "The impurity
15  standard production has been separated and
16  was sent to Dan Li for nuclear magnetic
17  resonance."
18    My first question is, who is
19  Dan Li?
20    A.    She is a person specializing in
21  NMR structure characterization, or nuclear
22  magnetic resonance.
23    Q.    And what's the purpose of that
24  test in this context?  What would that be

Confidential Information - Subject to Protective Order

Page 138

1  trying to show?
2      A.    Trying to elucidate, you know,
3  the structure.
4      Q.    The structure of the
5  nitrosamine?
6      A.    No, that particular, you know,
7  nitroso compound with irbesartan.
8      Q.    And then it points out that
9  there was a malfunction of the equipment so
10 the test couldn't start at that time.
11         Do I have that right?
12     A.    Yes.
13     Q.    And then if we go forward,
14 there are updates in October and November,
15 and then in December it says the research
16 report is being completed, correct?
17     A.    Yes.
18     Q.    And then in January, now
19 January 2018, it says that the research
20 report was completed pending review, correct?
21     A.    Correct.
22     Q.    Then we go forward into March.
23 There's no update in March, right?  Just
24 says, "No update"?

Page 139

1      A.    Right.
2      Q.    And then in April it says,
3  "After discussing with Mr. Li, as the project
4  involves an impurity that is sensitive so no
5  research report will be issued and no further
6  updates will be made."  Correct?
7      A.    It looks like so.
8      Q.    So you instructed that this
9  research project not go forward any further
10 and no report to be issued, as documented
11 here, correct?
12         MR. GALLAGHER:  Objection.
13 Foundation, and assumes facts.
14 BY MR. SLATER:
15     Q.    That is what it says, correct?
16     A.    Based upon what it says, yeah,
17 it looks like so.
18     Q.    Do you know where that report
19 is?
20     A.    I don't recall.
21     Q.    Where would we look to find
22 that report?  Because I can represent we've
23 been looking for it and have been unable to
24 find it.

Page 140

1         Do you have any idea where we
2  would look to find that report?
3      A.    I don't -- I don't recall.  You
4  know, I don't even recall this particular
5  discussion.  I mean, you know, this so long,
6  you know, you can see there's so many
7  projects, you know, ongoing.  So I really
8  don't, you know, remember the specifics.
9      Q.    And, again, this says that the
10 reason why the research report was not to be
11 issued and not to be updated any further was
12 after discussing with you, you had pointed
13 out that the project involves an impurity
14 that is sensitive.
15         That's what the document shows,
16 correct?
17     A.    It looks like so.
18     Q.    And reading that doesn't
19 refresh your recollection of telling your
20 team to -- not to do anything further with
21 the report and not to issue it?  You don't
22 recall that?
23     A.    As I said, I don't remember,
24 you know, the specifics.  Maybe the reason

Page 141

1  is, you know, you know, I can -- maybe the
2  reason is basically this is not, you know,
3  relevant to a real process, right?  Because
4  this is a trial and, you know, they -- you
5  know, during the trial they change the way of
6  the -- you know, of the quenching, right?
7         So, yeah, so basically, you
8  know, you know, this compound would not be
9  present in a normal registered, you know, the
10 process.
11         So maybe I want to just, you
12 know, ask them to -- because issuing this
13 could be -- could have caused some confusion.
14 You know, people may confuse the presence of
15 this particular impurity with the registered,
16 you know, process.
17     Q.    You testified a few moments ago
18 you don't recall this at all.  So everything
19 you're telling me about what might have
20 happened --
21     A.    This is what I'm trying to --
22 you know, it's a -- you know, what I'm trying
23 to, you know, you know, reconfigure, you
24 know, a possible scenario.  You know, this is

1  not, you know, you know, what really may
2  happen.  You know what I'm saying?  It's
3  just, you know, give some, you know,
4  speculation, you know what I'm saying?
5          But, yeah, definitely I don't
6  remember exactly, you know, what I had said
7  during that particular time.  Okay?
8      Q.    Well, this document certainly
9  sets forth that you were concerned at the
10 time that the impurity was a sensitive
11 impurity, and that would be talking about a
12 nitrosamine impurity; that you were concerned
13 about that, right?
14     A.    Well, as I said, you know, you
15 know, the possible reason, right?  As I said,
16 it's a possible reason.
17         You know, maybe I wanted to
18 avoid, you know, the confusion of an
19 impurity, you know, from this trial, you
20 know, process, with an impurity from the real
21 ones.  Okay.
22         But again, look at this
23 particular, you know, impurity, you know,
24 this particular impurity itself, you know, if

1  you look at a structure, it's not a typical
2  N-nitroso compound, okay?
3          And based upon everything that
4  we have know, you know, for now, you know,
5  you know, if we were to do an Ames test on
6  this particular, you know, nitroso compound
7  of irbesartan, I would say, you know, you
8  know, you know, a reasonable projection
9  was -- you know, would be the Ames would very
10 be likely be negative, okay, you know, based
11 upon everything, you know, that we know by
12 now, you know, based upon what they call a
13 QSAR, quantitative structure-activity
14 analysis.
15         You know, I mean, it's the same
16 thing like impurity K, right?  Because, you
17 know, see, the reason is why those compounds
18 may be Ames negative is because you have
19 to -- you know, when you look at the activity
20 of a compound, you know, one of the things
21 you also have to look at is the serial
22 chemistry, right?
23         So based upon the knowledge
24 that we have, you know, gained, you know, up

1  to now, you know, for those, you know, like
2  large molecule and nitroso compound,
3  particularly with substituents surrounding
4  the, you know, nitroso compound, if they are
5  big, typically you tend to have this kind of
6  a, you know, nitroso compound to be Ames
7  negative.
8      Q.    At this time, as documented --
9  well, rephrase.  I want to just go over a
10 couple of basic facts that we have here,
11 okay?
12     A.    Mm-hmm.
13     Q.    One of the things we know is
14 that this demonstrates, as did the e-mail we
15 went through before, that ZHP was aware that
16 the sodium nitrite quenching was creating
17 nitrosamine impurities.  That you knew.
18     A.    We knew based upon this
19 document --
20         MR. GALLAGHER:  Objection.
21 Misstates the testimony.
22         Go ahead.  Go ahead.
23     A.    I'm sorry.
24         Based upon document, yeah, we

1  knew specifically the nitroso compound of
2  irbesartan, okay.  And also, irbesartan is
3  the main ingredient of that particular
4  reaction.
5      Q.    And you also knew per the
6  e-mail we went through that NDMA occurs in
7  valsartan when it was quenched with sodium
8  nitrite.  That was known as of July 2017.
9  That's why that was stated by Jen Sheng Lin,
10 correct?
11         MR. GALLAGHER:  Objection.
12 Mischaracterizes.
13     A.    As I told you, you know, you
14 know, for that e-mail, you know, I do not
15 recall.  Now looking back, you know, you
16 know, basically, as I said, anything about,
17 you know, you know, valsartan is huge
18 speculation because, you know, you know, the
19 data that's shown here is specifically
20 regarding to irbesartan.
21 BY MR. SLATER:
22     Q.    Well, why don't we do this.
23 Let's just -- in fairness, let's go back to
24 the e-mail to get ourselves oriented here.

Confidential - Information - Subject to Protective Order

Page 146

1    A.    Okay.
2    Q.    And that was Exhibit -- gosh, I
3  lost track of which exhibit it was.  Cheryll
4  knows.  She's going to find it.
5        MS. CALDERON:  Do you want me
6  to put it up?
7        MR. SLATER:  I would, please.
8        And if we can clarify for the
9  record what exhibit number that was,
10  I'll write it on here so I won't
11  forget again.
12        MS. CALDERON:  Hang on one
13  second.  It's 295.
14        MR. SLATER:  Great.  Thank you.
15  And let's go to the top of the second
16  page again.  Just -- okay.
17    Q.    Looking now at the top of the
18  second page of Exhibit 295, which was an
19  e-mail dated July 27, 2017, from Jinsheng Lin
20  in your CEMAT facility, he pointed out that
21  what was being seen with the irbesartan is
22  similar to the NDMA that occurs in valsartan
23  when quenched with sodium nitrite.
24        That's part of what Jinsheng

Page 147

1  Lin said in that e-mail, correct?
2    A.    Well, in his -- see, in the
3  beginning of the sentence, he said, you know,
4  it's likely, you know, or most likely, right?
5  So -- yeah, so that's a speculation.
6  BY MR. SLATER:
7    Q.    Well, actually, let's walk
8  through it then.
9        What he said was, "Through the
10  secondary mass spectrometry analysis, it can
11  be inferred that the extra NO substituent is
12  in the cyclic compound fragment, and it is
13  very likely that it is an N-NO compound."
14        That's talking about what's
15  being seen in the irbesartan, correct?
16    A.    Yes.
17    Q.    Then after the semicolon he
18  states, "It is similar to the NDMA that
19  occurs in valsartan when quenched with sodium
20  nitrite," correct?
21        MR. GALLAGHER:  Objection.
22  Mischaracterizes.
23  BY MR. SLATER:
24    Q.    That's what it says, right?

Page 148

1        MR. GALLAGHER:  I guess I want
2  to clarify.  Are you looking at the
3  English language translation, or are
4  you looking at the actual Chinese
5  language document?
6        MR. SLATER:  Well, I don't know
7  why that matters, honestly.  You have
8  them.
9        MR. GALLAGHER:  I don't see any
10  semicolons in the Chinese language
11  document.
12        THE WITNESS:  Yeah, in the
13  Chinese language, it's just a regular
14  comma.  Yeah, it's a comma.
15        MR. SLATER:  Okay.  There's a
16  semicolon objection.  I'm going to fix
17  it.  I'll start a new question.
18  BY MR. SLATER:
19    Q.    After pointing out what we just
20  established had to do with irbesartan,
21  Mr. Lin then says, "It is similar to the NDMA
22  that occurs in valsartan when quenched with
23  sodium nitrite."
24        That's what he says in this

Page 149

1  document July 27, 2017, correct?
2    A.    Yes.
3    Q.    Do you know how long your
4  company knew that NDMA occurs in valsartan
5  when quenched with sodium nitrite, how long
6  before July of 2017 people in your company
7  knew that?
8    A.    I don't know.  Looks like only
9  he knows at the time.
10    Q.    He was the one who did the
11  patent review, right, that we went through
12  before, going back to 2014 on this, right?
13    A.    Mm-hmm.
14    Q.    So at least this person who you
15  told us was a, and remains an important
16  person in your organization was looking at
17  this issue going back to 2014.  We've
18  established that with the document, correct?
19        MR. GALLAGHER:  Objection.
20  Mischaracterizes the testimony.
21        But please answer.
22    A.    Yes.
23  BY MR. SLATER:
24    Q.    And we also know that he was

Confidential Information - Subject to Protective Order

Page 150

1  concerned -- rephrase.
2        And we also know that he was
3  concerned --
4        MR. SLATER:  If we scroll down
5    to the second-to-last paragraph on
6    this page.
7    Q.    -- that with regard to the
8  irbesartan, if it was in a nitrosamine
9  compound, "then its toxicity will be very
10  strong, and there will be an extremely high
11  GMP risk."
12        That's what he says, right?
13        MR. GALLAGHER:  Objection.
14    Outside the scope.
15    A.    Again, as I said, you know,
16  he's making speculation outside of his
17  expertise.
18  BY MR. SLATER:
19    Q.    Well, what he's doing is
20  analyzing what we know from earlier testimony
21  you gave was the root cause for the NDMA
22  formation which was caused by the sodium
23  nitrite, correct?
24    A.    Part of the -- yes.

Page 151

1    Q.    So he was correct that the
2  sodium nitrite quenching creating
3  nitrosamines was a serious GMP problem.
4        He was correct about that,
5  right?
6        MR. GALLAGHER:  Objection.
7    A.    That's speculation.
8  BY MR. SLATER:
9    Q.    Well, if you want to call it
10  speculation, that's fine.  But it was
11  confirmed, and that's the root cause analysis
12  that you've already testified to that your
13  company came to, right?
14    A.    After, you know -- yeah, after
15  the events, yes.
16    Q.    Well, that's what was disclosed
17  after the events, but this e-mail shows that
18  people in your company knew about this,
19  including yourself when you got this e-mail,
20  in July of 2017, right?
21    A.    As I said, you know, you know,
22  I am -- you know, I was under this, but I --
23  you know, as I said, I didn't have time to,
24  you know, go through everything and, you

Page 152

1  know, I don't recall, you know, specifically
2  looking through this e-mail.
3    Q.    And, in fact, the right thing
4  to do at this point when you're -- rephrase.
5        The right thing to do -- as
6  soon as your company knew that nitrosamines
7  were being yielded by the sodium nitrite
8  quenching, the right thing to do would have
9  been to stop production and optimize the
10  process at that time and reveal to world
11  regulatory authorities this problem, right?
12        That would have been the right
13  thing to do when your company discovered this
14  internally, right?
15        MR. GALLAGHER:  Objection.
16    Vague, outside the scope, and calls
17    for speculation.
18    A.    You know, I don't know, or I
19  didn't know at the time how far, you know,
20  you know, this went through, right.
21        He sent to those people.  I
22  didn't know, and I do not know, you know, how
23  those people -- their response.  They may
24  ignore or they may think this -- you know,

Page 153

1  maybe he's -- Mr. Lin's speculation.
2        So, basically, it looks like it
3  didn't, you know, go far.
4  BY MR. SLATER:
5    Q.    In retrospect, it's too bad it
6  didn't go far because the right thing to do
7  would have been to disclose this to the
8  regulatory authorities and stop production,
9  right?
10        MR. GALLAGHER:  Objection.
11    Vague, outside the scope, calls for
12    speculation, and asked and answered.
13        THE WITNESS:  I mean, do I need
14    to answer?
15        MR. GALLAGHER:  Answer to the
16    extent -- you know, to the extent you
17    can.
18        THE WITNESS:  Sure.
19        I mean basically, you know, for
20  me it's the same thing.  I mean,
21  retrospectively, you know, you know,
22  it might be, but at the time people
23  may thought, you know, he just, you
24  know, making his speculations and --

Page 154

BY MR. SLATER:

Q.    Well, looking at the last sentence, he said -- rephrase.

Looking at the last paragraph, he said in part, after looking at the patent going back to 2013 and 2014 from one of your competitors, that that indicated that other companies had paid attention to the quality problem very early on, and that quality problem is sodium nitrite quenching creating nitrosamines in your company's sartans, including valsartan, correct?

That's what we've established, correct?

A.    Well, again --

MR. GALLAGHER:  Objection. Mischaracterizes the testimony and the documents.

A.    Right. I mean, you know, once again, that N-nitroso compound, right, specified in the patent, you know, was, you know, impurity K, okay.

So this impurity K, as I said, has been controlled as a regular impurity,

Page 155

okay? Its level is 1,000 ppm.

BY MR. SLATER:

Q.    Is that what you believe the FDA permitted your company -- rephrase.

Is that your understanding of the FDA's position on that impurity?

MR. GALLAGHER:  Objection. Outside the scope.

THE WITNESS:  I'm sorry. Go ahead.

MR. GALLAGHER:  Objection. Outside the scope.

To the extent you know, please answer.

A.    Okay. I mean, FDA is well aware of the impurity K is Ames negative, okay.

BY MR. SLATER:

Q.    I'm just asking, do you know what the FDA's position was on the impurity K? Do you know whether they thought it could be handled as a regular impurity or whether they said it had to be limited to 0.3 ppm?

Do you know?

Page 156

MR. GALLAGHER:  Objection. Outside the scope.

To the extent you know personally, you can answer.

A.    I do not know what FDA's, you know, you know, specific requirement at this time, okay?  But in one of the communications I think came, you know, from FDA last year, they asked us to do some further in vivo animal study on the impurity K, okay, which we did.

We did a particular in vivo, you know, enrolled in animal studies according to the principle of, you know, ICH M7, and we submitted this, you know, you know, proposal back to FDA.

I think our proposal was to -- you know, essentially there is no need to control at such low level. It would be controlled, you know, based upon our current, you know, process.

I don't remember exactly, you know, what specific, you know, specification that we'd propose. It could be like several

Page 157

hundredths of ppm.

BY MR. SLATER:

Q.    Let's be clear. You're talking about impurity K, right?

A.    Right.

Q.    You're not talking about NDMA or NDEA, right?

A.    No.

Q.    Because those would never be acceptable at regular levels, right?

A.    Retrospectively we know, yes.

Q.    And you knew that the FDA guidances and the European guidances all said that nitrosamine compounds needed to be excepted from the threshold approach because they're considered so dangerous, they couldn't even be allowed to be included based on the standard threshold approach.

Were you aware of that?

MR. GALLAGHER:  Objection. Outside the scope, and lack of foundation.

A.    Retrospectively, based upon M7, yeah. That's in general. But as I said, you

Confidential Information Subject to Protective Order

Page 158

1  know, the European, you know, authority, they
2  specifically had a discussion on impurity K,
3  you know, in which obviously that's after,
4  you know, these events came out.
5      And they specifically, you
6  know, you know, at the time at least they
7  allow the original -- it looks like the
8  original Novartis specification at 1,000 ppm.
9  BY MR. SLATER:
10     Q.    Let's come back now to this
11 e-mail where I was reading with you, where
12 Jinsheng Lin said, "This indicates that other
13 companies have paid attention to the quality
14 problem very early on."
15     Just to be clear, the quality
16 problem was sodium nitrite quenching creating
17 nitrosamines, correct?
18     A.    Again, as I said, he's making
19 speculations, and that pattern is
20 specifically talking about impurity K.
21     Q.    Well, he also talked above
22 about NDMA forming in valsartan when it's
23 quenched with sodium nitrite.  He also
24 pointed out that your company knew that as

Page 159

1  well.
2      He talked about that, right?
3      A.    He talked about only he knew.
4  I don't know anybody else at that time, you
5  know, before his e-mail.
6      Q.    When -- well, rephrase.
7      When you and Peng Dong and
8  Linda Lin and the others in that e-mail got
9  this e-mail, if that was the first time that
10 you saw that, shouldn't that have been an
11 alarm bell going off in your head and say,
12 "My gosh, there's NDMA forming in our
13 valsartan; this is a major problem"?
14     That would have been the
15 appropriate response, right?
16     MR. GALLAGHER:  Objection.
17 Vague.
18     A.    I mean, retrospectively, you
19 know, you know, if I went through or if
20 Mr. Lin specifically came to me, you know,
21 that might be, you know, the starting of the,
22 you know, of the action time.
23     But as again, you know, it
24 looks like this e-mail just slipped through

Page 160

1  from my sight.
2  BY MR. SLATER:
3      Q.    And slipped through Linda Lin's
4  sight and Peng Dong?  All of those, none of
5  them did anything?
6      A.    That, I don't know.  I -- you
7  know, I have no knowledge, you know.
8      Q.    Do you know why it is that this
9  e-mail, which was sent to Ms. Ge and to Peng
10 Dong and Linda Lin, that it didn't show up in
11 any of their custodial files, and none of
12 them are listed as duplicate custodians on
13 this document?
14     Do you know why that happened?
15     MR. GALLAGHER:  Objection.
16     A.    I don't know.
17     MR. GALLAGHER:  Outside the
18 scope.
19 BY MR. SLATER:
20     Q.    You don't know?
21     Do you know why the report
22 that's referenced in the spreadsheet that we
23 went through that documents in April of 2018
24 you said, "The report will not be issued and

Page 161

1  it shouldn't be updated any further due to
2  the sensitivity of this impurity," do you
3  know why that report has never been produced
4  to us?
5      MR. GALLAGHER:  Objection.
6  Outside the scope.
7      A.    I have no idea.
8  BY MR. SLATER:
9      Q.    One way to try to get that
10 would be to search the custodial files of
11 Dan Li and Tianpei Huang.  They might have it
12 in their custodial files, correct?
13     MR. GALLAGHER:  I'm going to
14 object to these questions as
15 argumentative, they're so far outside
16 the scope.
17     Why you would ask Mr. Li about
18 searching documents of other people
19 makes absolutely no sense.
20     So, you know, Dr. Li, you can
21 answer to the extent you have any
22 knowledge of this.
23     But, Adam, I think you need to
24 move on.

Confidential Information - Subject to Protective Order

Page 162

1    MR. SLATER:  Well, these people
2  work for him, and he knows where they
3  keep their documents and how they keep
4  their files.
5    MR. GALLAGHER:  Those aren't
6  the questions you're asking.
7    A.    They are the first-line
8  analysts, okay, and they usually -- you know,
9  they don't talk to me, you know, very often,
10  you know, at my level.
11  BY MR. SLATER:
12    Q.    If that report was destroyed,
13  would that be acceptable in terms of how your
14  department operates?
15    A.    I don't know whether it's been
16  destroyed or not.
17    Q.    If it was destroyed, would that
18  be acceptable?
19    A.    That's a hypothetical question.
20  It may be destroyed or, you know, per
21  company's -- you know, because everyone, you
22  know, company has certain -- as I mentioned,
23  you know, you know, on the company server, if
24  you deleted something, you know, because from

Page 163

1  time to time your mailbox fill up, and some
2  people, you know, you know, they have -- may
3  have to have it to, you know, very often to
4  delete it, right?
5    So after, you know, certain
6  period of the deletion it will be
7  automatically, you know, like, taken from,
8  you know, the company server.
9    Q.    Let's also talk about -- well,
10  rephrase.
11    We talked about the patent, and
12  you spoke about impurity K a bunch of times.
13    A.    Mm-hmm.
14    Q.    A very important message in
15  these e-mail and in that patent is that it
16  was figured out, your company knew it and
17  others started to figure it out on the
18  outside, that the way to avoid creating
19  nitrosamine compounds was to not quench with
20  sodium nitrite.
21    That's an important lesson
22  that's being discussed here, right?
23    MR. GALLAGHER:  Objection.
24  Mischaracterizes the testimony and the

Page 164

1  documents.
2  BY MR. SLATER:
3    Q.    I'll ask it -- there's an
4  objection.  Let me ask a different question,
5  because there's an objection.  So I'm going
6  to strive for a better question.
7    The -- rephrase.
8    Knowing that sodium nitrite
9  quenching in the manufacture of valsartan was
10  an important part of causing nitrosamines to
11  be formed, that was important information,
12  right?
13    MR. GALLAGHER:  Objection.
14  Vague.
15    You can answer.
16    A.    You know, again, that patent
17  specifically talking about impurity K, okay.
18  Anything else, there is no specifics.
19  BY MR. SLATER:
20    Q.    Well, what it talks --
21  rephrase.
22    The patent talks about how to
23  avoid creating nitroso compounds.  And that's
24  the way you avoid it, is by not quenching

Page 165

1  with sodium nitrite, correct?
2    A.    Again, as I mentioned, every
3  nitroso compound, you know, is different,
4  okay, specifically for the impurity K.  Now
5  we know, you know, it's, again, Ames
6  negative.
7    So, you know, so do not confuse
8  or replace that, you know, nitroso compound
9  with NDMA.
10    I mean, you know, in that
11  patent, as far as, you know, based upon the
12  information that you presented, you know, I
13  don't see so far, you know, in that patent,
14  there's any specific mention of NDMA in that
15  patent.
16    Q.    No.  What there's mention of is
17  that your competitor wanted to eliminate
18  sodium nitrite as the quenching agent and
19  instead used bleach so that it wouldn't form
20  nitrosamines as part of the process, correct?
21    A.    I mean, again, you know --
22    MR. GALLAGHER:  Objection.
23    A.    -- that nitrosamine is not
24  NDMA, okay, is impurity K.  So, you know,

Confidential Information - Subject to Protective Order

Page 166

1  okay, they are different.
2  BY MR. SLATER:
3    Q.    At the very bottom of this
4  page, which is, I think, where we went off on
5  this tangent, but let me bring it back and
6  then we'll move on.
7          At the bottom of this page
8  Jinsheng Lin said, "This indicates that other
9  companies have paid attention to the quality
10  problem very early on.  So leaders please pay
11  attention to this issue."
12          That was a warning that you
13  said either slipped through the cracks or was
14  ignored, but it's a warning that should have
15  been listened to, right?
16          MR. GALLAGHER:  Objection.
17      Mischaracterizes the testimony, and
18      mischaracterizes the documents.
19      A.    I think I already, you know,
20  you know, answered your question before.
21  BY MR. SLATER:
22      Q.    Well, in retrospect, you would
23  agree with me that whenever the company knew
24  at some point before July of 2017 that NDMA

Page 167

1  was occurring in valsartan when quenched with
2  sodium nitrite, you would agree that as soon
3  as that was known, action should have been
4  taken to stop manufacturing by that process
5  until it could be optimized to prevent NDMA
6  from being created, correct?
7          MR. GALLAGHER:  Objection.
8      Vague, calls for speculation, and
9      outside the scope.
10      A.    Again, I think I already, you
11  know, answered your question before.  I mean,
12  if you wanted me to repeat, you know, I
13  mean...
14  BY MR. SLATER:
15      Q.    Well, I'm just asking you
16  simply, would you acknowledge sitting here
17  now -- I'll ask it differently.
18          Do you wish when Jinsheng Lin
19  sent this e-mail in July of 2017 that it
20  hadn't been ignored and it didn't fall
21  through the cracks, and that your company had
22  taken immediate action to stop manufacturing
23  valsartan with sodium nitrite quenching?
24          MR. GALLAGHER:  Objection.

Page 168

1      Vague, calls for speculation, and
2      outside the scope.
3      A.    I mean, at a time of point, if
4  someone went through, you know, and if they
5  are like process, you know, people, they
6  probably, you know, as I said, you know, just
7  saw him, you know, just making unrealistic
8  projections.  That's my guess.  That's my
9  guess.
10  BY MR. SLATER:
11      Q.    Well, you're calling it an
12  unrealistic projection.  In fact, he was
13  100 percent right.
14      A.    No, he is not 100 percent
15  right.  As I said, you know, he's making, you
16  know, those things -- as I said, you know,
17  not everything -- by now we know not every
18  nitrosamine is highly toxic, okay?
19          Like impurity K, based upon,
20  you know, everything that we now know, you
21  know, it has been controlled but treated as a
22  regular impurity at 1,000 ppm, you know, that
23  was by Novartis, the original inventor of
24  valsartan.

Page 169

1      Q.    You're certainly not telling me
2  that valsartan with NDMA is acceptable to be
3  sold with 1,000 ppm.
4          You're not saying that, are
5  you?
6      A.    I'm saying --
7          MR. GALLAGHER:  Objection.
8      Mischaracterizes.
9          THE WITNESS:  I'm sorry again.
10      I'm saying since the beginning
11      impurity K, which is also a
12      nitrosamine compound, okay, right, the
13      impurity K has been allowed by
14      Novartis as well as by regulatory
15      agencies, okay, at 1,000 ppm since the
16      very beginning.
17  BY MR. SLATER:
18      Q.    Didn't we establish a little
19  earlier that you don't know what the FDA
20  decision was with regard to impurity K?
21      A.    I told you that --
22          MR. GALLAGHER:  Objection.
23      Outside the scope, asked and answered.
24      A.    I told you I don't know what's

Confidential Information - Subject to Protective Order

Page 170

1  the current FDA position.  But I told you,
2  you know, based upon a European regulatory
3  agency's, you know, a document, right, after,
4  you know, these events, they specifically
5  discussed, you know, impurity K.
6        So based upon the knowledge
7  from there, you know, that's how we came to
8  know the impurity K has been, you know, at
9  least, you know, towards that point, being
10  controlled by Novartis at 1,000 ppm.
11  BY MR. SLATER:
12      Q.   Okay.  I'm asking about NDMA
13  now.  You understand that, right?
14      A.   If you want to talk, yeah, we
15  can talk now.
16      Q.   It would never be acceptable to
17  sell valsartan contaminated with NDMA, right?
18  That would never be acceptable, right?
19          MR. GALLAGHER:  Objection.
20  Vague, outside the scope, and calls
21  for speculation.
22      A.   You know, I'm not a
23  toxicologist, okay?  So if you really want me
24  to answer this question, I may give you my

Page 171

1  personal, you know, limited understanding by
2  going through, you know, you know, the
3  documents released by FDA particularly, some
4  very recent, you know, training documents by
5  FDA, right?
6        So, I mean, for a reliable
7  intake on the specification for NDMA, even
8  from the perspective of FDA, they have
9  changed quite a bit, okay?
10        At the very beginning after,
11  you know, you know, these events, FDA's
12  position for NDMA was it should be absent.
13  Okay.  So basically, you know, you know, the
14  specification would be defined by the limit
15  of detection of a particular, you know,
16  analytical method.
17        But then, you know, after I
18  don't know how long, maybe about a year or
19  so, FDA, you know, then said that, you know,
20  after all of the understanding, you know,
21  the new knowledge, you know, now they allow,
22  you know, it to be present like 96 nanogram
23  per day, right, for, you know, valsartan.
24        And also if you look through

Page 172

1  some of the most recent training, FDA's, you
2  know, like training, you know, you know, you
3  know, training slides, it -- you know, you
4  know, it mentioned that, you know, as I said
5  earlier, you know, endogenously formed NDMA
6  could be, you know, anywhere from 1,000 to
7  more than 2,000 microgram per day.  So this
8  is, you know, extremely high.  I mean...
9        So basically, you know, without
10  taking any medication, anyone will have that
11  much of NDMA in you and me and everybody
12  else's body, okay, 1,000 to more than 2,000
13  microgram per day.  This is from the official
14  FDA's, you know, you know, training
15  documents.
16        So basically our understanding
17  with regard to, you know, you know, the
18  potential toxicity of NDMA, it looks like
19  it's still progressing.
20  BY MR. SLATER:
21      Q.   The FDA is not permitting ZHP
22  to sell valsartan with NDMA impurity in the
23  United States even up until the present day,
24  correct?

Page 173

1          MR. GALLAGHER:  Objection.
2  Outside of the scope.
3  BY MR. SLATER:
4      Q.   Correct statement, right?
5      A.   At this point, you know, the
6  import ban is still there, but there's a lot
7  of reasons.  I think partly because of the
8  pandemic.
9        We had a meeting with FDA, I
10  think at the end of 2019.  During that
11  meeting, you know, FDA has pretty much, you
12  know, accepted our explanation, our
13  responses, and the consensus was they would
14  come over early 2020 to come over on site to
15  do like, you know, a follow-up inspection.
16      Q.   The fact stands that from the
17  time the FDA learned about NDMA in valsartan,
18  they told ZHP to stop selling it and recall
19  it, right?
20      A.   The only --
21          MR. GALLAGHER:  Objection.
22  Outside the scope, and
23  mischaracterizes, lack of foundation.
24          Go ahead.

Page 174

1    THE WITNESS:  Yeah, sorry.
2  Yeah.
3    I mean, only after certain
4  period, you know, of the
5  investigation, you know, and then, you
6  know, FDA had the warning letter and
7  also the import ban.
8    And, you know, once we
9  confirmed, you know, the presence of
10  NDMA, you know, in valsartan, we
11  reported it to the FDA, and we give
12  FDA our methods, and also we give FDA
13  our testing results, right, only like
14  maybe like two, three weeks, you know,
15  after June 6th.
16    And we had been talking to FDA,
17  asking for their guidance as to what
18  we should do, right?  Whether we
19  should -- to do the recall, you know,
20  immediately or whatever.
21    But, you know, I think, you
22  know, during some of the early
23  response from FDA, you know, FDA still
24  at the time wasn't sure how to -- you

Page 175

1  know, how to move forward.  They
2  specifically asked us to hold on, you
3  know, you know, to any recall, you
4  know, that we would like to do.
5  BY MR. SLATER:
6    Q.   You spoke to the FDA, right?
7    A.   Yeah, yeah.  I was in the
8  meeting with FDA, yeah, at the end of, you
9  know, 2019, yes.
10    Q.   Did you tell the FDA that your
11  company knew going back to at least July of
12  2017 and likely earlier, that you knew that
13  NDMA was occurring in valsartan due to the
14  quenching with sodium nitrite?
15    Did you tell that to the FDA?
16    A.   I didn't have that knowledge,
17  as I said.  Although, you know, it looks like
18  I was on the e-mail.  But, as I said, I, you
19  know --
20    Q.   Did anybody tell that to the
21  FDA from your company in 2018 or 2019 or 2020
22  or 2021?
23    MR. GALLAGHER:  Objection.
24  Outside the scope.

Page 176

1    To the extent you know, Dr. Li,
2  you can answer.
3    A.   Yeah, to the extent -- probably
4  not, to the extent that I know.
5  BY MR. SLATER:
6    Q.   Well, speaking for ZHP
7  regarding the root cause investigation, as
8  part of that interaction with the FDA on your
9  root cause investigation, did you tell the
10  FDA that you had knowledge going back to 2017
11  and likely earlier that quenching the
12  valsartan with sodium nitrite was creating
13  NDMA?
14    Did you tell the FDA that?
15    A.   As I said --
16    MR. GALLAGHER:  Hang on,
17  Dr. Li.  Sorry.  Just pause for a
18  minute after the question to give me a
19  chance to object.
20    So objection, outside the
21  scope.
22    The topic number 2 is the root
23  cause investigation for nitrosamine
24  impurities, including NDMA and NDEA in

Page 177

1  the ZHP API, as we've discussed that,
2  and you have other topics about
3  regulatory issues and discussions with
4  FDA that's not within the topics for
5  today.  So outside the scope.
6    Dr. Li, to the extent you know
7  personally, you can answer.
8    MR. SLATER:  I'll ask the
9  question again.
10  BY MR. SLATER:
11    Q.   As part of ZHP's root cause
12  investigation, did ZHP share with the FDA
13  that ZHP knew going back to at least
14  July 2017 and likely earlier that the
15  quenching of the valsartan with sodium
16  nitrite was the cause of the creation of
17  NDMA?
18    MR. GALLAGHER:  Objection.
19  Outside the scope.
20    To the extent you know
21  personally, you can answer, Dr. Li.
22    A.   I think I already, you know,
23  answered that question.
24    ///

Page 178

1  BY MR. SLATER:
2      Q.   The answer is no, nobody told
3  the FDA, right?
4      A.   As far as I aware.
5          MR. SLATER:  Cheryll, let's
6      take this down and so, if we could --
7      see how quick you are -- to
8      Exhibit 208, which is the FDA Draft
9      Guidance from December 2008.
10         MS. CALDERON:  It will take me
11     a minute.
12         MR. SLATER:  I thought you were
13     going to pull it up and say you read
14     my mind.
15     Q.   Let me ask you this while
16  Cheryll is looking for the document.
17         MR. SLATER:  You can leave this
18     e-mail up for a moment, Cheryll.
19     Q.   Did ZHP ever share this
20  July 27, 2017 e-mail with the FDA?
21         MR. GALLAGHER:  Objection.
22     Outside the scope.
23         Dr. Li, to the extent you know
24     personally, you can answer.

Page 179

1      A.   I don't know personally.
2  BY MR. SLATER:
3      Q.   Did you tell the FDA, as part
4  of your interactions with them when they were
5  trying to learn the root cause of what had
6  happened, that you had directed people in
7  your department to cease work on a report
8  that was being prepared regarding the
9  creation of nitroso compounds due to sodium
10  nitrite quenching because of the sensitivity
11  of the impurity?
12         Did you tell that to the FDA?
13         MR. GALLAGHER:  Objection.
14     Outside the scope, mischaracterizes
15     testimony and documents.
16     A.   I didn't ask them to seize --
17  you know, to seize the work.  The work has
18  already been done, right.
19  BY MR. SLATER:
20     Q.   Well, do you think the FDA
21  would like to see that e-mail now?  Do you
22  think they'd be interested in it?
23         MR. GALLAGHER:  Objection.
24     Outside the scope, calls for

Page 180

1  speculation.
2  BY MR. SLATER:
3      Q.   You've interacted with the FDA,
4  you know the interest they have in this
5  nitrosamine impurity issue.  Do you think
6  they'd like to see the e-mail now?
7          MR. GALLAGHER:  Objection.
8      Still calls for speculation.
9      A.   I don't know.
10  BY MR. SLATER:
11     Q.   We've put up on the screen
12  Exhibit 208, the FDA "Guidance for Industry"
13  regarding "Genotoxic and Carcinogenic
14  Impurities in Drug Substances and Products,"
15  with the "Recommended Approaches."
16         And this is FDA guidance.
17  You're familiar with this document, aren't
18  you?
19     A.   I read through it before.
20         MR. SLATER:  And let's go to
21     page 8, please, Cheryll, the top
22     carryover paragraph, please.  You got
23     it.  I just want the top -- the top of
24     the page.  Scroll up.  Yes.  Perfect.

Page 181

1      Q.   Looking at the --
2          MR. SLATER:  Can you scroll up
3      more?  Because it's confusing,
4      actually.  No, the other way.  Yes.
5      All right.  Perfect.
6      Q.   Looking at the carryover
7  paragraph on page 8, they're talking about
8  the threshold approach.  And you've been
9  talking about threshold during this
10  deposition, correct?
11     A.   We had some discussion, yeah,
12  about the specification, yeah.
13     Q.   And as of 2008, looking at the
14  last sentence in that carryover paragraph on
15  page 8, it says, "However, there are some
16  compounds containing certain structural
17  groups, (aflatoxin-like-, N-nitroso- and
18  azoxy-structures) that have extremely high
19  carcinogenic potency and are excluded from
20  the threshold approach."
21         Do you see what I just read?
22     A.   Mm-hmm.
23     Q.   In terms of the knowledge of
24  the health risks and what's acceptable, your

Confidential Information - Subject to Protective Order

1  company, ZHP, absolutely knew this after it
2  came out in 2008, right?
3          MR. GALLAGHER:  Objection.
4      Outside the scope, and lacks
5      foundation.
6      A.    That was before my joining the
7  company.  I had no specific knowledge, but my
8  guess, it should be -- somebody should have
9  read through this document.
10 BY MR. SLATER:
11     Q.    Certainly.
12         And in the context of Topic 36,
13 which was ZHP's evaluation and knowledge of
14 the health risks of nitrosamines, this is
15 important information saying that N-nitroso
16 structures "have extremely high carcinogenic
17 potency and are excluded from the threshold
18 approach."
19         That's an important piece of
20 information, correct?
21         MR. GALLAGHER:  Objection.
22     Vague.
23     A.    That's what it state in this
24 document.  Okay.

1          But also, you know, I think in
2  this document, or maybe in a more updated,
3  you know, M7, it also said, you know, you
4  know, these approach usually are very
5  conservative.
6  BY MR. SLATER:
7      Q.    Well, M7 says that "Some
8  structural groups were identified to be of
9  such high potency that intakes even below the
10 threshold of toxicological concern would
11 theoretically be associated with a potential
12 for a significant carcinogenic risk.  This
13 group of high potency mutagenic carcinogens,"
14 referred to as the "cohort of concern,"
15 "comprises aflatoxin-like-, N-nitroso-, and
16 azoxy compounds."
17         You know that's what M7 says,
18 right?
19     A.    Yes.  But also it said
20 potential, yeah.
21     Q.    The point is this.  The
22 regulators around the world have determined
23 that with the N-nitroso compounds, the risk
24 of causing cancer to humans is too high to

1  allow that to be in these drug substances,
2  correct?
3          That's the decision that's been
4  made around the world, correct?
5          MR. GALLAGHER:  Objection.
6      Outside the scope, calls for
7      speculation, and calls for expert
8      testimony.
9      A.    As I said, you know, based upon
10 some recently released material, training
11 material by FDA, I think, you know, the
12 potential risk -- our knowledge of the
13 potential risk is still evolving, okay.
14         And also, as I said, some of
15 the N-nitroso compounds, they are not
16 genotoxic, okay, like impurity K.
17         But anything else, you know, I
18 think it will up to, you know, a professional
19 toxicologist, you know, to do further
20 evaluation.
21 BY MR. SLATER:
22     Q.    In terms of ZHP's evaluation
23 and knowledge of the health risks of
24 nitrosamines, you would certainly agree with

1  me that with regard to NDMA and NDEA, the
2  nitrosamines at issue in this litigation,
3  they're considered to be high potency
4  mutagenic carcinogens, correct?
5      A.    They're considered to be --
6  well, those are the data based upon animal
7  studies, okay.  They are considered as
8  potential or probable carcinogenic to humans,
9  so this has not been fully confirmed.
10     Q.    Based on the studies that have
11 been performed, they're considered to be
12 probable high potency mutagenic carcinogens.
13 That's the considered wisdom at present,
14 correct?
15         MR. GALLAGHER:  Objection.
16     Vague.
17     A.    As I said, you know, the common
18 consensus based upon FDA's release document
19 or European, you know, regulators, yeah, NDMA
20 or NDEA, they are potential or probable, you
21 know, carcinogen to human.
22 BY MR. SLATER:
23     Q.    The word is "probable."
24 They're considered probable, correct?

Page 186

1    A.    Probable, you know, which means
2  it's not confirmed.  It's not fully
3  confirmed.
4    Q.    You're a scientist.  "Probable"
5  means more likely than not, right?
6    A.    Probably is probable, whatever
7  that -- you know, yeah, we can look at the
8  dictionary, yeah, probable, yeah.
9          But, again, probable, you know,
10 you know, again, is not a sure thing.  I
11 mean, probable, you know, a lot of things
12 could be probable but eventually didn't
13 happen.
14   Q.    You mentioned the word --
15 rephrase.
16         You used the word a moment ago
17 "consensus."  The consensus among those
18 people who are responsible for this issue is
19 NDMA and NDEA are probable human carcinogens,
20 and they shouldn't be in drug substances for
21 that reason, because it's considered to be
22 too high a risk for humans, correct?
23         MR. GALLAGHER:  Objection.
24 Vague --

Page 187

1  BY MR. SLATER:
2    Q.    That's the consensus, right?
3          MR. GALLAGHER:  Objection.
4  Vague, calls for speculation, and
5  expert testimony.
6    A.    Your question is not accurate.
7  You know, and I think I answered that
8  question before, okay?
9          You know, based upon, you know,
10 the current, you know, consensus, at least
11 from FDA, okay, you know, based upon your
12 process, I mean, obviously the best way would
13 be to avoid.  But we know, you know, for
14 the -- you know, for the -- you know, for the
15 valsartan, you know, you know, process
16 chemistry, it looks like, you know, you just
17 cannot avoid, you know, the formation.
18         So it's a certain level of NDMA
19 would be allowed, okay.  So, as I said, right
20 now the consensus is 96 nanogram per day,
21 okay.  That's considered to be lifetime, you
22 know, you know, allowable intake level.
23 BY MR. SLATER:
24   Q.    The levels of NDMA in ZHP's

Page 188

1  valsartan far exceeded that level, correct?
2    A.    Based upon the current
3  knowledge, yes.
4    Q.    The levels of NDMA in ZHP's
5  valsartan are considered to be unacceptable
6  for human consumption, right?
7          MR. GALLAGHER:  Objection.
8  Vague.
9    A.    That's retrospective.  That's
10 based upon today's knowledge, okay.  This may
11 change over time, you know, either be
12 tightened or even maybe be loosened, okay,
13 because the reason, again, you know, based
14 upon FDA release the training document, you
15 know, they endogenously formed NDMA, right?
16         As I said, you know, anybody
17 like you and me, you know, just by, you know,
18 changing the normal food, the NDMA then will
19 be formed because of just simply by taking
20 the food, it will be produced anywhere
21 between 1,000 microgram to 2,000 -- you know,
22 more than 2,000 microgram per day.
23   Q.    What are you quoting for those
24 numbers?

Page 189

1    A.    Those are from the recent FDA
2  trainings, you know, you know, document.  I
3  think, you know, my counsel can send these
4  documents to you.  I mean, these are, you
5  know, publicly available information.
6    Q.    Are you telling us that because
7  certain nitrosamines can form at very low
8  levels in nature, that it's acceptable that
9  ZHP was selling valsartan --
10         (Over-speaking.)
11   A.    No, no, no.  Don't twist.
12   Q.    Are you saying that or not?
13   A.    No, I'm not saying that.  I'm
14 just saying the fact, okay?  I'm not
15 saying -- okay.  What I'm telling you is
16 several facts, okay, right?
17         First of all, you know,
18 FDA's -- after the events, right, FDA's --
19 first of all, you know, at the time, you
20 know, nobody knew, you know, know, you know,
21 immediately what the -- you know, a limit or
22 an interim limit should be, right?
23         And then so after some time,
24 you know, the interim limit was established,

Page 190

¹ okay? The interim limits was 96 nanogram per
² day, okay.
³        And then, you know, after some
⁴ time FDA's position was that NDMA, also NDEA,
⁵ should be absent, right?
⁶        And then more recently, you
⁷ know, they loosened the standard, okay,
⁸ they -- you know, the NDMA now, you know,
⁹ being allowed, you know, to a maximum level
¹⁰ 96 nanogram per day, right?
¹¹        So -- but in the training,
¹² FDA's training material, you know, you know,
¹³ they had those things, you know, they had,
¹⁴ you know, those discussions.
¹⁵        So, yeah, so based upon that,
¹⁶ you know, you know, you know, you know, the
¹⁷ material -- okay, also based upon the
¹⁸ principle of M7, right?
¹⁹        And that's a reasonable
²⁰ speculation that, you know, FDA or
²¹ somebody -- you know, other regulator they
²² may, you know, change the acceptable limits
²³ in the future, okay?
²⁴        You know, because if you look

Page 191

¹ at the -- you know, the M7, right, it says if
² data, you know, potential genotox impurity,
³ if they -- you know, if they come, you know,
⁴ if the source for another source, right,
⁵ other than a medication is more than, you
⁶ know, what you can take from a medical
⁷ product, you know, then -- you know, then in
⁸ general, you know, you know, their level, you
⁹ know, may be -- you know, may be loosened,
¹⁰ okay, based upon, you know, that fact.
¹¹     Q.    The levels of NDMA in ZHP's
¹² valsartan would never have been acceptable in
¹³ 2014, 2015, 2016, 2017, or 2018?
¹⁴        MR. GALLAGHER:  Objection.
¹⁵    Vague, compound.
¹⁶ BY MR. SLATER:
¹⁷     Q.    Do you agree with me those
¹⁸ levels were so high, they never would have
¹⁹ been acceptable in any of those years,
²⁰ correct?
²¹        MR. GALLAGHER:  Objection.
²²    Vague, compound, calls for
²³    speculation, and expert testimony.
²⁴     A.    You know, retrospectively, you

Page 192

¹ know, that would be the case.  But don't
² forget, you know, we have the -- you know, we
³ didn't have that specification.  And all the,
⁴ you know, all the specification that we
⁵ tested, you know, and released upon, they
⁶ have been submitted and also approved by
⁷ regulatory agencies, including FDA.
⁸ BY MR. SLATER:
⁹     Q.    Well, you're certainly not
¹⁰ telling me that ZHP and yourself, who joined
¹¹ the company in 2014, could have thought that
¹² the levels of NDMA in your valsartan would
¹³ have been acceptable back in 2014 or 2015 or
¹⁴ 2016 or 2017 or 2018?
¹⁵        You're not telling me that ZHP
¹⁶ would have thought these levels would have
¹⁷ been acceptable, are you?
¹⁸        MR. GALLAGHER:  Objection.
¹⁹     A.    As I said --
²⁰        MR. GALLAGHER:  Wait, hang on.
²¹        Objection.  Vague, compound,
²²    calls for speculation, expert
²³    testimony, and asked and answered.
²⁴        ///

Page 193

¹ BY MR. SLATER:
²     Q.    At that time, you didn't need
³ to say it's retrospective.  In 2015, for
⁴ example, I'm looking at the levels on the
⁵ documents submitted to the FDA.  You had
⁶ levels of over 100 parts per million in some
⁷ batches.
⁸        You could never have thought
⁹ that was acceptable to sell under any
¹⁰ circumstances at that time, right?
¹¹        MR. GALLAGHER:  Objection.
¹²    Vague, calls for expert testimony,
¹³    argumentative, and lacks foundation.
¹⁴     A.    Again, with a specific level,
¹⁵ you know, this is outside of my expertise.
¹⁶ As I said, this up to toxicologists, also
¹⁷ regulators, you know, finally, you know, you
¹⁸ know, their job to determine.
¹⁹ BY MR. SLATER:
²⁰     Q.    Validation batch number 1,
²¹ batch number C5355-12-003 manufactured on
²² December 28, 2011 was tested by your company
²³ at NDMA level of 76 parts per million.
²⁴        That level, your company never

Confidential Information - Subject to Protective Order

Page 194

1  would have thought was acceptable for sale at
2  any point during the entire time valsartan
3  was sold, correct?
4          MR. GALLAGHER:  Objection.
5      Outside the scope, vague, calls for
6      speculation, and expert testimony.
7          THE WITNESS:  I don't know, do
8      I need to answer the question?
9          MR. GALLAGHER:  Yes.  To the
10     extent you know, you should answer.
11     A.    I mean, basically, as I said,
12 you know, retrospectively, you know, you
13 know, those levels are above the current,
14 okay, established limit.
15 BY MR. SLATER:
16     Q.    Those levels were so high that
17 if your company had actually acknowledged to
18 the outside world that NDMA was forming due
19 to the sodium nitrite quenching, you know,
20 and you can agree with me right now, your
21 sale of valsartan would have been shut down
22 immediately as soon as your company disclosed
23 that, correct?
24         MR. GALLAGHER:  Objection.

Page 195

1      Argumentative, calls for speculation,
2      and expert testimony.
3      A.    That's not the case, okay.  As
4  I told you, once we -- you know, after -- you
5  know, after that particular event, after we
6  have got, you know, those data, right, from
7  the initial, like, 50 batches or so, we
8  reported, you know, like up to two, three
9  weeks roughly, we reported it to the FDA.
10         We asked them their guidance,
11 okay, and we mentioned, I think, you know, at
12 least in one of the communications whether we
13 should do the recall.  And they specifically
14 told us to be hold on.
15         So this is not what you're
16 saying, you know, you know, all right?
17         So, essentially, it need to be
18 evaluated by, you know, experts.
19         MR. GALLAGHER:  Adam, we've
20     been going almost an hour and
21     20 minutes.
22         MR. SLATER:  I just have a
23     couple quick follow-up questions, and
24     then we can take a break.

Page 196

1          MR. GALLAGHER:  Okay.
2  BY MR. SLATER:
3      Q.    The FDA never indicated that
4  the NDMA levels in the valsartan sold by your
5  company were acceptable.  All they said is
6  they had to figure out how much supply was
7  out there due to the extent of the
8  contamination of your pills, and they had to
9  just make sure that there was enough
10 medication out there for people's blood
11 pressure to be controlled for a short period
12 of time.
13         That's all the FDA let you do,
14 right?
15         MR. GALLAGHER:  Objection.
16     Outside the scope, and lacks
17     foundation.
18     A.    I don't know, you know, because
19 I'm not the person, you know, to be directly
20 involved with the -- you know, with the
21 recall.
22         So I don't -- you know, I don't
23 know exactly, you know, what you, you know,
24 just said to me, okay, but, you know,

Page 197

1  assuming that's true, so at least, you know,
2  what that indicate, you know, there is no,
3  you know, immediate, you know, you know -- I
4  mean, it still be tolerable considered, you
5  know, that particular medical need.
6          And again, you know, you know,
7  the level, like you said, 70-some ppm, is
8  not, you know -- you have saying, you know,
9  you know, you know, consider, for example,
10 like ranitidine, right?
11         If you look at ranitidine,
12 okay, this is a compound or is a medication
13 developed by, you know, GSK or its precursor,
14 you know, company, like SmithKline, like
15 about 40 years ago, okay?
16         And now we know that, you know,
17 you know, the level, you know, you know, of
18 this, you know, probably -- I think the
19 actual level was like 47 micrograms or
20 something.
21         So, yes, so that's, you know,
22 higher than I think our, you know, you know,
23 NDMA, you know, in those batches.
24         MR. SLATER:  I think that we

Page 198

1  can take a break off of the ranitidine
2  testimony and take a break, so we can
3  go off the record.
4       THE VIDEOGRAPHER:  The time
5  right now is 11:01 a.m.  We're now off
6  the record.
7       (Whereupon, a recess was
8  taken.)
9       THE VIDEOGRAPHER:  The time
10  right now is 11:16 a.m.  We're back on
11  the record.
12  BY MR. SLATER:
13      Q.    We're looking at Exhibit 284,
14  and this is an e-mail sent by some people at
15  Novartis to ZHP on May 22, 2018.
16      Do you see that?
17      A.    Yeah, it looks like, yeah.
18  Mm-hmm.
19      Q.    And the e-mail says, "Dear
20  Huahai colleagues, During our analysis of
21  residual solvents by GC (using a combined
22  method) at Novartis we have found a number of
23  solvents that we cannot identify for the
24  following batches.  The peak areas vary

Page 199

1  depending on the batch.  These are the
2  batches analyzed."
3       And they give the list of the
4  batches, right?
5       A.    It looks like, mm-hmm.
6       Q.    And ultimately they also attach
7  their gas chromatography method for ZHP to
8  review and ask, "I would appreciate your
9  support on this and feel free to call me if
10  any further information is required."
11       So they were asking ZHP, what
12  are these unknown peaks in these various
13  batches of valsartan API, correct?
14       A.    Yes, mm-hmm.
15       Q.    And we know in retrospect, as
16  you've said earlier, that gas
17  chromatography-mass spectrometry, if focused
18  at that time, would show NDMA, correct?
19       MR. GALLAGHER:  Objection.
20  Mischaracterizes testimony.
21       A.    No, I didn't.
22  BY MR. SLATER:
23       Q.    Well, let's go further then.
24  Let's go now to Exhibit 288.

Page 200

1       And this is June 5, 2008 --
2  rephrase.
3       Looking now at Exhibit 288,
4  this is a June 5, 2018 e-mail, again from
5  Novartis to multiple people in your company,
6  including yourself, correct?
7       A.    Let me see whether -- am I on
8  it?  Let me --
9       Q.    Second-to-last line of the CC
10  list.
11       A.    Oh, yes, mm-hmm.  Yeah.
12       Q.    You're there, and just above
13  you is Peng Dong.
14       Do you see that?
15       A.    Yes, mm-hmm.  I saw him, yes.
16       Q.    Two of the people who received
17  that July 2017 e-mail we've gone through from
18  Jinsheng Lin, correct?
19       A.    Yes, mm-hmm.
20       Q.    And at this point now Novartis
21  advises you that "We have done some tests in
22  Solvias labs for Novartis of three batches of
23  Huahai material and have a tentative
24  assessment."

Page 201

1       And they then point out that
2  they're asking for your company to assess
3  this and comment as soon as possible, right?
4       A.    Yeah, looks like, mm-hmm.
5       MR. SLATER:  And as we flip
6  through, Cheryll, if could you go
7  forward to the page that says 798,
8  with regard to the first batch that
9  was tested.
10       Q.    Do you see there that there's
11  identification of NDMA, and it says
12  "tentative," correct?
13       A.    Yes.
14       Q.    And you're familiar with this
15  document, right?  So you know that for the
16  next two batches, the same finding was made,
17  right?
18       A.    Mm-hmm.
19       Q.    And the NDMA in the valsartan
20  is what was discussed by Jinsheng Ling in the
21  July 2017 e-mail, correct?
22       A.    He was not specifically at the
23  time talking about this particular peak.  He
24  just -- at that time he was making, you know,

Page 202

1   you know, a guess.
2       Q.   He was -- well, he -- rephrase.
3           He said that NDMA occurs in
4   valsartan when quenched with sodium nitrite,
5   and this here in June of 2018 is Novartis
6   bringing to your attention that they
7   tentatively think they've identified a peak
8   that shows NDMA in valsartan, correct?
9       A.   Yes.
10      Q.   At any point in the
11  communications with Novartis, did you or
12  anybody else from ZHP tell Novartis that your
13  company knew at least as of July 2017 that
14  NDMA was forming in the valsartan that was
15  quenched with sodium nitrite?
16          Did you tell Novartis about
17  that?
18      A.   I don't remember what we
19  responded.  I mean, can you go down to the --
20  or go through the whole e-mail?
21      Q.   Well, this is the e-mail.
22  There's no response to it.  That's the
23  e-mail.  You're seeing at the top of the
24  first page --

Page 203

1           MR. SLATER:  Cheryll, you can
2       go back to the beginning.
3       Q.   -- that is the e-mail.
4       A.   That's the whole?
5       Q.   So my question is this.
6           Did ZHP tell Novartis that ZHP
7   knew at least as of July 2017 that there was
8   NDMA in its valsartan?  I just want to know
9   if your company told that to Novartis.
10      A.   I don't remember.  I don't
11  know.  I mean, I -- you know, I was not
12  involved, you know, in most of those, you
13  know, you know, e-mail communication.  I
14  was -- some of those e-mail communication,
15  just telling them about some technical
16  issues, I think.
17      Q.   Well -- rephrase.
18          Have you seen anything
19  indicating that ZHP disclosed to Novartis
20  when Novartis came with its concerns about
21  these unknown peaks that your company already
22  knew that there was NDMA in the valsartan?
23      A.   I have no knowledge.
24      Q.   You haven't seen anything that

Page 204

1   shows that that was disclosed, right?
2       A.   Not as far as I know.
3       Q.   Let's now go to Exhibit 289,
4   which is the report from Solvias that was
5   provided with the June 5, 2018, e-mail.
6           You've seen this report,
7   correct?
8       A.   Yes.
9           MR. SLATER:  And let's go now
10      to the second page of this document
11      where the objective is listed.
12      Perfect.
13      Q.   And the objective of this study
14  was as follows.  "Unknown compounds were
15  detected in the analysis of residue solvents
16  in Valsartan, a product of Novartis
17  International Pharmaceuticals."  I'll stop
18  there.
19          And the reason it says that is
20  because, as you know, Novartis had purchased
21  this API from ZHP and then provided it to
22  Solvias to test it, correct?
23      A.   Yes.
24      Q.   And then this says, "Solvias

Page 205

1   received the task from Novartis to analyse
2   and identify the unknown compounds using
3   Headspace GC/MS analysis."
4           And I want to stop there and
5   ask you, "GC/MS analysis" is gas
6   chromatography-mass spectrometry, correct?
7       A.   Yes.
8       Q.   That's a technology that's been
9   available -- as of 2018, for how long had
10  that been available?
11      A.   It was quite long.
12      Q.   And then it says, "This report
13  summarizes the results of this analysis."
14  Correct?
15      A.   Mm-hmm.
16      Q.   And by the way, when you say
17  that GC-MS was available for quite a long
18  time, it certainly was available as of 2011
19  when these processes were being developed by
20  ZHP, correct?
21      A.   It was available as an
22  instrument, you know, to the market.
23          I just -- you know, you know,
24  yesterday I just asked, you know, you know,

Page 206

1 Mr., you know, Chen, you know, Wenbin Chen,
2 you know, also on one of the e-mails, I ask
3 him when we receive the first one.
4        I think it was somewhere like
5 in 2013, Huahai, or at least, you know, you
6 know, that organization prior to my joining,
7 you know, that technical, you know,
8 supporting group, you know, was getting the
9 first one somewhere in 2013, yes.
10       Q.   When you're testifying right
11 now, are you testifying that you know that
12 ZHP got its first GC-MS machine in 2013?
13       A.   Yes.
14       Q.   Are you sure they didn't have
15 one earlier?
16       A.   Well, at least not in my
17 organization, on my prior, you know,
18 organization that I inherited.
19       Yeah, they may have -- I don't
20 know.  I mean, like, you know, in the
21 headquarters, you know, organizations, you
22 know, like in Xunqiao, right, yeah, that was
23 the first GC-MS that was there.
24       Q.   One of the things that a

Page 207

1 company like ZHP should do is make sure that
2 it obtains the type of technology that's
3 available for it to manufacture quality
4 substances, correct?
5        MR. GALLAGHER:  Objection.
6        Vague, and outside the scope.
7        A.   You know, the residual solvent
8 method typically uses GC-FID technology,
9 okay?  So for those, you know -- so typically
10 people will not do the GC-MS, you know, to
11 develop a residual solvent method.
12 BY MR. SLATER:
13       Q.   It's been known since the 1970s
14 and going back that GC-MS is the best way to
15 identify nitrosamines, correct?
16       MR. GALLAGHER:  Objection.
17       Vague, lacks foundation, calls for
18       speculation and expert testimony, and
19       outside the scope.
20       MR. SLATER:  It's outside the
21       scope of the chromatogram and mass
22       spectrometry with --
23       (Over-speaking.)
24       MR. GALLAGHER:  I would

Page 208

1 withdraw the outside the scope
2 objection.
3        But it's vague, lacks
4 foundation, and calls for speculation
5 and expert testimony.
6 BY MR. SLATER:
7        Q.   You know that, right, that it's
8 been known for many years, going back at
9 least to the 1970s, that GC-MS is the best
10 method to identify nitrosamines, correct?
11       MR. GALLAGHER:  Same
12       objections.
13       A.   I only know retrospectively
14 people have done, you know, previously, but
15 not, you know, with valsartan or any other
16 sartans.
17       And, you know, when you
18 mentioned 1970s, I don't remember, you know,
19 you know, the specific time frame.
20       But again, GC-MS has been
21 mostly, you know, more like a research tool
22 for QC residual solvent method.  GC-FID
23 method remains to be, even as of today, you
24 know, the choice of, you know, of the method

Page 209

1 for controlling residual solvents.
2        MR. SLATER:  Well, let's now go
3 to page -- the Bates number is 13 in
4 the bottom right.  Keep going.  Let's
5 get the whole bottom half of the page
6 in.  Perfect.  Thank you, Cheryll.
7 BY MR. SLATER:
8        Q.   Looking now at Figure 2 in the
9 Solvias report, it's a chromatogram of
10 valsartan, and it has the batch number
11 18-038M01, provided by Novartis to Solvias.
12       Do you see that?
13       A.   Mm-hmm.
14       Q.   Can you tell what type of
15 chromatogram that is?
16       A.   Yeah, it looks like a
17 chromatogram from GC-MS analysis.
18       Q.   And if you look at it, it says
19 that Table 4 -- rephrase.
20       First of all, looking at the
21 chromatogram itself -- actually, we'll come
22 back to that.  Looking at -- rephrase.
23       Below the Figure 2, the
24 chromatogram, it says in part, "Table 4

Page 210

1  displays the corresponding retention times
2  and calculated relative retention times."
3          Do you see that?
4      A.    Mm-hmm.  Okay.
5          MR. SLATER:  And if we scroll
6  to the next page, and then we'll
7  scroll back in a moment, but if we
8  scroll to the next page -- perfect.
9      Q.    You see at number 18 toluene
10  with a retention time of 10.46.
11          Do you see that?
12      A.    Mm-hmm.
13      Q.    And then right below it, number
14  19, it says "not applicable, 12.25."
15          Do you see that?
16      A.    Mm-hmm.
17      Q.    And the "not applicable" there
18  means it hasn't been identified, right?
19      A.    Probably.
20      Q.    And then if you scroll further
21  down into the next table, 5, it says
22  "Tentative identification of unknown peaks
23  detected in Valsartan."
24          MR. SLATER:  Cheryll, if you

Page 211

1      scroll further, please.
2      Q.    18 and 19 matching up again, at
3  18 we have toluene, correct?
4      A.    Mm-hmm.
5      Q.    And 19, NDMA, and they call it
6  "tentative," right?
7      A.    Right.
8      Q.    So based on this, if we go back
9  now to the chromatogram at Figure 2, the
10  toluene is that peak on the right, the taller
11  peak third from the right.  And I know that
12  the writing is incredibly small.  We can
13  probably blow it up quite a bit.
14          MR. SLATER:  So let's do that.
15      A.    Sure.
16      Q.    I don't know if we can blow it
17  up enough, but I can tell you --
18      A.    Okay.
19      Q.    -- that says toluene, 10.46.
20      A.    Okay.  All right.  Okay.  This
21  one.  Okay.
22          MR. SLATER:  Good job, Cheryll.
23      Q.    And then the NDMA peak that
24  they identified at 12.25 --

Page 212

1          MR. SLATER:  If you scroll down
2  a little further down, Cheryll.
3  Perfect.  And scroll to the right so
4  we can see the peak to the right.
5      Q.    That next peak to the right of
6  the toluene is 12.25.
7          Do you see that?
8      A.    Yes, mm-hmm.  Okay.
9      Q.    And to -- rephrase.
10          And using your terminology, in
11  retrospect and as proven -- well, rephrase.
12          As proven here and as you
13  subsequently confirmed, that's the NDMA peak,
14  correct?
15      A.    I don't know, you know -- wait
16  a second.  I think on the table, you know,
17  you know, it was their method.  This is not
18  NDMA.  I think, you know, if I remember
19  correctly just moments ago, the other way
20  should be like, what, 15 something, or what?
21  Can you go down the list?
22      Q.    Sure.  And you can tell me
23  which one is the NDMA peak.  Why don't we do
24  that.

Page 213

1      A.    Well, you know, I'm not very
2  familiar with Novartis', you know -- you
3  know, all of those details, okay.  Yeah,
4  going down the other -- yeah.
5          MR. SLATER:  Go to the next
6  table, Cheryll.
7      A.    Yeah, yeah, yeah, yeah, yeah.
8  Because I don't think -- yeah, it shows the
9  retention time like 15 something.  19.
10          Yeah, 15 -- yeah, see that,
11  yeah, 15 point -- almost 16 minutes.  So it
12  should not be that one immediately after, you
13  know, the toluene with their method.
14      Q.    Well, in fact, if you look at
15  the retention times for the two different
16  tables, they're actually different, and the
17  one that matches up to the chromatogram is
18  the 10.46 and the 12.25.
19          Do you know why those numbers
20  are different?
21      A.    I don't know.  I mean, it's
22  their method.
23          THE WITNESS:  Can we go up,
24  yeah, and take a look at toluene in

Page 214

1    the first table?  Yeah.  I mean, this
2    one -- yeah.
3        A.    See where the toluene -- yeah,
4    on the first table -- what's the retention
5    time?
6            Oh, hold on.  I'm sorry.  Okay.
7    Okay.  So -- okay.  So, yeah, somehow, you
8    know, the retention time, they're quite
9    different.  On this table toluene is like
10   10.46, yeah.
11           MR. SLATER:  Let me see if we
12       can -- go to the chromatogram, please,
13       Cheryll.  Just let's go to the
14       picture.
15       Q.    Maybe we can find a common
16   ground.  What we do know is this.  The
17   toluene elutes, and then the NDMA elutes to
18   the right of it, correct?
19       A.    No.  Actually, if you're
20   talking about, you know, ZHP's method, okay,
21   what I can tell you the profile.
22           Okay.  Yeah.  So we have the
23   toluene and then we have the next, like,
24   somewhat, you know, more obvious peak, like

Page 215

1    the one, you know, you just trying to point
2    out to me like 12 point something, right?
3    But I'm not saying our method, you know, they
4    have this retention time, okay.  I'm just
5    talking about, you know, you know, the
6    elution profile, okay?
7            So after the first somewhat
8    more obvious peak, after the toluene, based
9    upon our, you know, analysis, it's not NDMA,
10   okay?  That, you know, that peak was n-butyl
11   acetate, okay?  And so based upon our
12   analysis retrospectively, the NDMA eluting at
13   the shoulder peak of the n-butyl acetate.
14       Q.    Okay.  So -- rephrase.
15           So the NDMA is to the right of
16   the toluene, correct?
17       A.    It's right to the toluene, and
18   also it's right to the first -- you know,
19   yeah, right to the n-butyl acetate.
20       Q.    And on this test Solvias was
21   able to tentatively identify the NDMA peak,
22   correct?
23       A.    Based upon, yeah, their report,
24   yes.

Page 216

1        Q.    And let me -- explain -- tell
2    me if I understand this correctly.  If you do
3    an appropriate risk assessment and know that
4    NDMA potentially formed, and you used GC-MS
5    and looked for NDMA, you can find it, right?
6            MR. GALLAGHER:  Objection.
7        Vague and compound, and calls for
8        speculation.
9        A.    I mean, retrospectively, if you
10   want to specifically look for it using GC-MS
11   or, you know, GC-MS/MS, yeah, you might be
12   able to find it, yes.
13   BY MR. SLATER:
14       Q.    And that's ultimately what
15   happened, right?  When ZHP was looking for it
16   after Novartis came to you, you identified
17   it, right?
18       A.    Yes.
19       Q.    And in fact, as we've talked
20   about earlier in the deposition, we've now
21   seen an e-mail showing that it was discussed
22   within your company almost a year earlier,
23   that your company already knew that NDMA was
24   in the valsartan, correct?

Page 217

1        A.    It's not, you know, ZHP knew.
2    I mean, it was Mr. Lin, you know, he made
3    that speculation.
4        Q.    He shared that information with
5    you, Peng Dong, Linda Lin, Jucai Ge, people
6    who had important positions in ZHP, right?
7            MR. GALLAGHER:  Objection.
8        Vague.
9        A.    People who are employed by ZHP
10   at the time, yes.
11   BY MR. SLATER:
12       Q.    In important positions, in
13   high-level positions, correct?
14           MR. GALLAGHER:  Objection.
15       Vague.
16       A.    For some of them, I'm not sure.
17   You know, it could be defined as high-level.
18   For myself, yes, I'm at a high-level
19   position, but not necessarily for every
20   single one of them.
21   BY MR. SLATER:
22       Q.    Peng Dong had a -- what about
23   Peng Dong?  What position was he in?
24       A.    He was -- probably at the time

Case 1:19-md-02875-RMB-SAK   Document 2663-10   Filed 02/26/24   Page 57 of 74
confidential information - Subject to Protective Order
PageID: 98390

1 was a technical manager, so I would say this
2 is a middle-level.
3      Q.    How about Jucai Ge?
4      A.    She was the QA.  You know,
5 she's a QA person, yeah.  She's responsible,
6 you know, for the QA department.
7      Q.    The QA is the quality assurance
8 department, right?
9      A.    Right.
10      Q.    What does the quality assurance
11 department do?
12      A.    They want to ensure, you know,
13 product being manufactured according to, you
14 know, predefined or particularly, you know,
15 file the registrations for the regulatory
16 authorities.
17      Q.    And Linda Lin was in the
18 regulatory affairs department, correct?
19      A.    Yes.
20      Q.    She had a significant position,
21 right?
22      A.    She's the head of the
23 regulatory affairs.
24      Q.    And all of those people were

1 put on notice at least as of July 2017 that
2 there was NDMA in the valsartan, right?
3      A.    I mean, based upon that e-mail,
4 I mean, you know, Mr. Lin made that e-mail.
5 But again, you know, it looks like -- you
6 know, it's just people maybe didn't go
7 through or people maybe just saw that he's
8 making, you know, exaggerations or...
9      Q.    But in reality he was right,
10 and that's been proven, correct?
11           MR. GALLAGHER:  Objection.
12      Asked and answered, and
13      mischaracterizes the testimony.
14      A.    As I --
15           I mean, do I need to answer?
16           MR. GALLAGHER:  You can answer.
17           THE WITNESS:  Okay.
18           I mean, as I, you know,
19      answered earlier, I mean, basically,
20      you know -- you know, at that time,
21      you know, you know, as I said, he was
22      making his guess.
23           But also, you know, the topic
24      of the e-mail was talking about

1      irbesartan, not -- you know, that
2      particular irbesartan, you know,
3      N-nitroso compound of the irbesartan,
4      so it's not, you know, NDMA.
5 BY MR. SLATER:
6      Q.    Well, you knew in April 2018
7 that you didn't want that report that your
8 department was working on to be completed or
9 shown to anybody, and that's why you said --
10      A.    No.  No, it's --
11      Q.    -- not to go further with that
12 report, right?
13      A.    Well, see, I mean, you know,
14 the -- you know, as I said, the work has
15 already been -- you know, been done.
16           You know, the reason, as I have
17 explained, you know, I don't want to create a
18 confusion, you know what I'm saying?  And,
19 you know, you know, was mixed up with, you
20 know, those things.
21           You know, because, you know,
22 the topic of that document, you know, was
23 about, you know, an impurity.  That impurity
24 was not even, you know, you know, you know,

1 in a real impurity present in a commercial
2 product.
3           I mean, it was during, you
4 know, the -- you know, the further -- or the
5 trial, you know, in order to further, or
6 trying to, you know, improve the quenching
7 process of irbesartan.
8      Q.    And Mr. Lin, who was doing a
9 very good job at the time, said, if this is a
10 nitroso compound, we have a real problem
11 here, similar to the problem we have with
12 valsartan.
13           He was doing a good job, and
14 turned out in the end to have been the
15 correct person, right?
16           MR. GALLAGHER:  Objection.
17      Compound, mischaracterizes testimony,
18      asked and answered.
19      A.    Again, you know, as I said, at
20 least at that time or, you know, those guess
21 or projection, you know, as I indicated to
22 you, not all he said, you know, was correct,
23 okay?
24           Some he's making -- you know,

Page 222

1  he's, you know, guess, and he's also, you
2  know, particularly with regard to, you know,
3  the potential toxicity of the irbesartans,
4  that particular N-nitroso derivative of
5  irbesartan.
6        You know, I don't think, you
7  know, it was appropriate for him to make that
8  judgment.  You know, he is not a
9  toxicologist.
10        MR. SLATER:  Cheryll, let's go
11    to Exhibit 234, if we could, please,
12    which is the other document that was
13    provided in that Exhibit 288 to
14    Novartis by ZHP.
15        That is not the document I was
16    expecting.  I gave you the Bates
17    number.  It should be the "Study
18    Report of Unknown Peak in Residual
19    Solvent of Valsartan."
20        THE WITNESS:  Okay.
21        MR. SLATER:  I'm talking to
22    Cheryll, though, but it's going to
23    come to you in a moment.
24        THE WITNESS:  Okay.

Page 223

1        MR. SLATER:  One second.
2        Cheryll, what exhibit is this?
3        MS. CALDERON:  I have to check.
4    Give me one second.
5        MR. SLATER:  I had 234 on it.
6    I want to make sure we have it for the
7    record.
8        MS. CALDERON:  I'm not sure.  I
9    have to look.  It's not --
10        MR. SLATER:  I don't want to
11    waste any more time with this, so
12    let's just mark it again.  What number
13    are we up to?
14        THE STENOGRAPHER:  305.
15        (Whereupon, Exhibit Number
16    ZHP-305 was marked for
17    identification.)
18  BY MR. SLATER:
19    Q.    Do you see what we've put up as
20  Exhibit 305, "Study Report of Unknown Peak in
21  Residual Solvent of Valsartan"?
22    A.    Mm-hmm.
23    Q.    You're familiar with this,
24  correct?

Page 224

1    A.    I went through this report,
2  yes.
3    Q.    Okay.  And if we turn to the
4  next page, it's dated May 31, 2018, correct?
5        Do you see that?
6    A.    Yes.
7    Q.    If we turn to the next page, it
8  was actually signed off by several people,
9  including --
10        MR. SLATER:  If you could turn
11    to the next page, Cheryll.  Thanks.
12    Q.    You see it was signed off by
13  multiple people, including Peng Dong,
14  correct?
15    A.    Mm-hmm.
16        MR. SLATER:  And now if we go
17    to the next page, please.  Let's go
18    past the "Contents."  I'm sorry.
19    Let's go to the "Background" section,
20    next page.  So we're now on page 2 of
21    23.
22    Q.    So there's a "Background"
23  section of this report that talks about the
24  fact that there were many unknown peaks

Page 225

1  identified with the residual solvent for
2  valsartan with the Huahai method, correct?
3    A.    Yes, mm-hmm.
4    Q.    And just below that
5  "Background" section there's Figure 1, which
6  is titled as a "Typical chromatogram of
7  Huahai method."
8        Do you see that?
9    A.    Mm-hmm.
10    Q.    What does that mean, "typical
11  chromatogram"?
12    A.    "Typical" usually means
13  representative, which means, you know, it can
14  be an example to illustrate.
15    Q.    And it says "FID."  So is this
16  a gas chromatography-FID test?
17    A.    Yes.
18    Q.    And you can see a little better
19  on this -- rephrase.
20        And you can see the peaks are
21  labeled, and the peak that's labeled farthest
22  to the right with a label is toluene.
23        Do you see that?
24    A.    Yeah, mm-hmm.

Page 226

1    Q.    And then there's a series of
2    unidentified smaller peaks to the right of
3    that?
4    A.    Yes.
5    Q.    And without figuring out which
6    one it is or exactly where it is, we know in
7    hindsight that the NDMA can be identified
8    there if one looks for it with gas
9    chromatography-mass spectrometry, correct?
10   A.    No, that's not correct.
11   Q.    If you were to be asked to go
12   and use GC-MS to look for NDMA, you don't
13   think you could identify it on this sample?
14   A.    GC-MS and GC-FID, they are two
15   different, quite different methods.
16   Q.    No, let me ask the question
17   differently, because that's not what I -- I
18   get why you're saying that, though.
19        If one decided to test by GC-MS
20   instead of GC-FID, this batch, and actually
21   looked for NDMA, it would be able to be
22   identified with the GC-MS, correct?
23   A.    If you -- what we found out,
24   okay, if you just use, you know -- you know,

Page 227

1    basically if you use the conditions, right,
2    including the sample concentrations as in
3    this GC-FID method, if you then turn that
4    into a GC-MS method based upon our
5    retrospective, you know, analysis, you will
6    not be able to see NDMA, okay?
7         And then I think that during
8    this investigation, the concentration of the
9    sample, you know, was increased by 20 times.
10   And even that, with the GC-MS chromatogram,
11   you know, you can see, you know, I think in
12   some of the figures, you know, I think in
13   some of the figures, you know, in this report
14   the NDMA peak was still not very obvious.  It
15   was buried among other, you know, unknown
16   peaks.
17   Q.    The other night Qiangming Li
18   testified that the NDMA peak eluted on the
19   GC-FID between 14.2 and 14.5.
20        Does that sound correct to you?
21   A.    I don't know.  I mean,
22   because -- from --
23        MR. GALLAGHER:  Objection.
24        THE WITNESS:  Sorry.

Page 228

1         MR. GALLAGHER:  Go ahead.
2    A.    You know, you know, I cannot
3    confirm, you know, the specific time range,
4    okay.  But I can tell you, you know, just
5    look at this, you know, you know, Figure 1,
6    right.
7         You know, basically after the
8    toluene peak, you have like three, right,
9    roughly three peaks, right?  You see that?
10   Three little peaks?
11   Q.    Yes.
12   A.    Right?  Okay.  As I, you know,
13   communicate, you know, to you earlier, the
14   first little peak appears to be -- okay,
15   there are two folds, okay.
16        In the blank injection, there
17   was also a blank peak, okay, eluting at that
18   region, okay.
19        With the real sample, at least
20   for some batches, okay, what we found is, you
21   know, this peak was n-butyl acetate, okay,
22   and then NDMA, you know, you know, it would
23   elute at the shoulder, you know, you know,
24   you know, of this peak.  If you, you know,

Page 229

1    making a reference then of NDMA with high
2    enough concentration, you know, it will, you
3    know, show a peak at that region.
4         But with the regular batch,
5    basically, you know, the NDMA is just -- you
6    know, sometimes, you know, it just co-elute,
7    complete co-elute, sometimes may be a very
8    tiny, you know, shoulder peak there.
9    Q.    Solvias found it, right?
10   A.    They were using a quite
11   different, okay, method, okay.  If you
12   notice, you know, one of the, you know, major
13   differences, they were using NMP as the
14   sample.  You know, this particular method,
15   ZHP's method utilizing DMSO, okay.
16        So when you use different
17   sample diluents, you will have different
18   background peaks, okay?
19        So at that particular region,
20   when they turned that -- their NMP method
21   into the corresponding GC-MS method, and also
22   because, you know, the -- because NMP, you
23   know, is a higher-volume point as compared to
24   DMSO, right?  So we did a comparison of the

Page 230

1  two methods.
2         Their, you know, like
3  incubation temperature, I think it was like
4  at least 15 degrees Celsius higher, you know,
5  you know, than the ZHP's method.
6         So the bottom line is, you
7  know, their GC-MS method appears to be more
8  sensitive than ZHP's, you know, GC-MS method.
9     Q.    The point is, the technology
10 and the methodology was clearly available to
11 identify the NDMA, correct?
12    A.    Well, but first of all -- yes,
13 the answer is yes, but, see, the first -- you
14 know, you need to know what to look for,
15 right? Yeah.
16    Q.    When you say "you need to know
17 what to look for," you're talking about a
18 risk assessment, right?
19    A.    Right.
20    Q.    And that's a very important
21 part of testing, is that the risk assessment
22 done as the threshold needs to be thorough,
23 right?
24        MR. GALLAGHER:  Objection.

Page 231

1     Vague.
2  BY MR. SLATER:
3     Q.    I'll ask it differently.
4         The risk assessment is the step
5  that's taken before you do the testing so
6  that you have thought through what you should
7  be looking for, correct?
8     A.    The risk assessment is actually
9  in the very beginning of the development of
10 this particular valsartan process.  So as a
11 QC, you know, you know, as a daily QC
12 operation, you don't do the risk, you know,
13 you know, you know, assessment, you know, at
14 that period.
15    Q.    Well, if you get back --
16 rephrase.
17        If you have a customer like
18 Novartis that comes to you and says there's
19 unknown peaks, part of the way you then try
20 to study and figure out what those peaks are
21 is to do a risk assessment to figure out what
22 might they be so you know what you should
23 look for, correct?
24    A.    Well, you know, you know, in

Page 232

1  this particular case with Novartis, you know,
2  they -- you know, in the very beginning, you
3  know, they were raising some specific, you
4  know, unknown impurities with a defined
5  retention time.  Okay.
6         So throughout this process we
7  have been working with Novartis, you know, to
8  try to identify those little unknown peaks.
9     Q.    When you were working with
10 Novartis to identify the peaks, did anybody
11 from ZHP tell Novartis that you knew that
12 NDMA is in the valsartan so that they would
13 know to look for the NDMA?
14    A.    I don't think people involved,
15 you know, in the communications, you know,
16 directly with Novartis, you know, had that
17 knowledge before the events.
18    Q.    Well, we know Peng Dong signed
19 off on this unknown peak report, and he was
20 on the e-mail in July of 2017, right?
21    A.    He was.  But I don't know how
22 much, you know, you know, you know, he really
23 went through, or -- basically, you know, I
24 didn't know what happened, you know, after

Page 233

1  Mr. Lin, you know, sent out his e-mail.
2         I mean, it looks like nobody
3  responded to anything, so I don't know.
4  People may just, as I said, for whatever the
5  reason, there's no, you know, resonance, I
6  will say.
7     Q.    With regard to the risk
8  assessment that needed to be done -- well,
9  rephrase.
10        With regard to the risk
11 assessment, you pointed out it's done in the
12 very beginning when the process is developed.
13 But that's also an ongoing process, risk
14 assessment, during the lifecycle of the drug
15 substance, correct?
16    A.    There is an ongoing, but
17 usually with a particular, you know, you
18 know, reason, yeah.
19    Q.    So, for example, where a
20 customer says, there's unknown peaks, we want
21 to know what these are, we want to know what
22 these potential impurities are, that's a
23 reason to perform a risk assessment in
24 conjunction with the testing, right?  That's

Confidential Information - Subject to Protective Order

---

Page 234

1  good science, right?
2      A.   Well, based upon, you know, you
3  know, you know, retrospective, you know, you
4  know, communications, right.  And the ZHP
5  teams, you know, looks like, you know, focus
6  on what the customer, you know, communicated,
7  you know, to the team.
8      Q.   Well, what I'm asking is this.
9  It's good science under these circumstances,
10 where a customer reports unknown peaks and is
11 concerned about impurities, to do a risk
12 assessment, evaluate the chemical reactions
13 that can occur, and have some idea of what
14 you're looking for, right?
15          That's good science, isn't it?
16     A.   Well, usually what happen,
17 okay, when people, you know, you know -- you
18 know, first of all, okay, for a -- like a
19 residual solvent method, right, like a GC-FID
20 method, there is no -- like a threshold for
21 any unknown peak, you know, to be identified,
22 even as of today.  Okay.
23          So when people talking about
24 these small unknown peaks, you know, that's

---

Page 235

1  how people, you know, treated it, you know,
2  initially as a technical issues, and so
3  people focus on trying to resolve, you know,
4  those identities, you know, to the customer.
5          Because the customer wanted to
6  have very specific answers, right, and so --
7  you know, so from my, you know,
8  understanding, you know, they -- at least at
9  the time they were not requesting, you know,
10 for anything other than they were, you know,
11 you know, requested.
12          So, yeah, so that's how, you
13 know, the focus of the ZHP team basically,
14 you know, just tried to, you know, meet, you
15 know, the needs of the customer to get the
16 answer to them as soon as -- you know, as
17 they can.
18     Q.   The quickest way to get the
19 answer to Novartis would have been to tell
20 them that there was NDMA in the valsartan,
21 right?
22     A.   As I said, the team, you know,
23 you know, the people involved, you know,
24 directly with the communication, you know,

---

Page 236

1  they -- you know, as I said, like you said,
2  you know, like Mr. -- although Mr. Peng Dong,
3  you know, he was signing off and he was on
4  the e-mail, but, you know, whatever, you
5  know, for that reason, you know, basically,
6  as I said, you know, Mr. Lin's e-mail just,
7  you know, for whatever reason didn't
8  generate, you know, any resonance.
9      Q.   Well, it generated a report
10 that in April of 2018 you directed your team
11 not to complete and not to issue because
12 there was a sensitive impurity discussed.
13     A.   This impurity --
14          MR. GALLAGHER:  Objection.
15 BY MR. SLATER:
16     Q.   Isn't that why it didn't
17 resonate?
18          MR. GALLAGHER:  Objection.
19 Outside the scope, mischaracterizes
20 testimony, and mischaracterizes the
21 document.
22     A.   As I indicated, you know, that
23 impurity is completely different from NDMA.
24 I mean, that's the N-nitroso derivative of

---

Page 237

1  irbesartan, so it's completely different.
2  BY MR. SLATER:
3      Q.   Before we go back into this
4  report, I just want to make sure we're on the
5  same page.
6          The assessment of the potential
7  explanation for the impurities involves a
8  chemical analysis, right?  You have to do
9  that analysis as part of the testing process,
10 right?
11     A.   No.  Well, typically you do a
12 mechanistic analysis, you know, based upon
13 that mechanistic analysis or based upon the
14 knowledge when this particular process was
15 developed, right.
16          And if the analysis, you know,
17 indicate there's some level of risk, then you
18 will follow up to do a -- what is called a
19 confirmatory testing.
20          But if the risk assessment, you
21 know, at that time, or if the knowledge, you
22 know, because of the knowledge gap, you know,
23 it didn't turn up as a risk, you -- you know,
24 you would not necessarily, you know, to do,

---

1  you know, you know, an analysis.
2      Q.    Was CEMAT doing this testing
3  that's represented in this unknown peak
4  study?
5      A.    This particular work, you know,
6  in this report, okay, it was done, you know,
7  you know, you know, by the QC as well as, you
8  know, with, you know, CEMAT, yes.  So it's a
9  combination, yes.
10     Q.    Were you involved?
11     A.    I was not directly involved.
12     Q.    Did you have visibility to it?
13 Were you aware of what was being done?
14     A.    Well, only at the time, you
15 know, they couldn't figure out, you know,
16 some identities, you know, of a particular
17 unknown peak, then they will come to me, you
18 know, asking for possible solutions.
19         Yeah, I did help him, you know,
20 provided some strategies, you know, to help
21 him -- to help them, you know, getting, you
22 know, the elucidation of some, you know,
23 unknown peaks.
24     Q.    And what strategies did you

1  help with?
2      A.    One of the strategy that I told
3  him to use is to use butyrated DMSO.
4         The reason for that is, you
5  know, quite a few of those interfering or
6  background peaks, they were minor degradation
7  products of DMSO, okay, with this particular
8  method because DMSO, you know, you know,
9  retrospectively that we found that, you know,
10 it -- or during the process of this
11 investigation we found out it will decompose
12 to give, you know, a number of, you know,
13 minor degradants.
14         I think some of those are, you
15 know, you know, mentioned in the reports,
16 like dimethyl, you know, you know, sulfide or
17 dimethyl disulfide.
18         So the reason that I suggest
19 them to use butyrated one is that, you know,
20 you know, based upon the GC-MS analysis, you
21 can -- if you see any peak, right, with what
22 we call the mass shift, okay, and then we can
23 basically, you know, understand, you know,
24 the origin of that unknown peak, whether it's

1  originated from DMSO or it's originated from
2  some other reasons.
3         MR. SLATER:  Cheryll, let's go
4  in this report to page 19 of 23,
5  please.  Or not.
6         MS. CALDERON:  You know what?
7         MR. SLATER:  Frozen?
8         MS. CALDERON:  I am frozen.
9  Can you hear me?
10         MR. SLATER:  Yes.
11         MS. CALDERON:  Okay.  Can you
12 repeat what you said?  Because I
13 froze.
14         MR. SLATER:  Sure.  If you
15 could turn to page 19 of 23, please.
16         MS. CALDERON:  Okay.  Sorry.
17         MR. SLATER:  No problem.  The
18 thing doesn't want to move.
19         THE WITNESS:  It's getting
20 late.
21         MR. SLATER:  It's worn out.
22         MS. CALDERON:  Let me restart.
23         MR. SLATER:  I think you were
24 there.  Oh, okay.

1         MS. CALDERON:  How's that?
2         MR. SLATER:  I'll let you know
3  when it comes up.
4         Perfect.  Scroll up a little
5  tiny bit more, get the whole risk
6  assessment in there.  Perfect.
7  BY MR. SLATER:
8      Q.    This study report of unknown
9  peaks from May of 2018 contains a Risk
10 Assessment here on page 19.
11         Do you see that?
12     A.    Mm-hmm.
13     Q.    And the Risk Assessment says,
14 "It is shown from above, each unknown peak
15 has either been identified or the source of
16 which identified, and the results are far
17 lower than the specification by quantitative
18 analysis."  I want to stop there.
19         The reference to
20 "specification" has to do with already
21 identified solvents or other substances that
22 you already know may be there, correct?
23     A.    In this particular case, yes.
24 It looks like utilizing 10 percent of the

Page 242

1    toluene ICH, you know, standard.
2        Q.    And it says, "Control of these
3    unknown peaks by comparing to the peak area
4    of 10 percent toluene (ICH limit 89 parts per
5    million) presents no risk."  And then it
6    says, "Please refer to the following table
7    for details."
8            I want to stop there.  When it
9    refers to 89 parts per million presenting no
10   risk, is that a judgment that was made that
11   as long as something that's not identified is
12   less than 89 parts per million, you don't
13   have to worry about it?
14       A.    Well, this 89 percent numbers
15   or criteria, based upon, you know, what I was
16   told, you know, it came from one of Novartis'
17   document.
18           So basically during -- in our
19   conversation, you know, at least at one time,
20   the Novartis practice was that, you know, at
21   that time, you know, you do not necessarily
22   need to investigate any unknown peaks, okay,
23   with peak area lower than toluene, you know,
24   standard of -- you know, or toluene, you

Page 243

1    know, reference solution has 89, you know,
2    ppm concentrations.
3        Q.    Coming back to my question, it
4    appears to me the risk assessment was as long
5    as an unknown peak is less than 89 parts per
6    million, there's no risk; you don't have to
7    be concerned about it even if you can't
8    identify what it is.
9            Do I understand that correctly?
10       A.    No.  That's not what it says.
11   I mean, basically, you know, it looks like
12   whoever made that risk assessment, you know,
13   people utilized, you know, what Novartis at
14   least, you know, you know, had done, you
15   know, at one point.
16           Because even as of today, you
17   know, as to what a threshold, you know, you
18   need to identify for unknown peaks with
19   GC-FID method.  Is still -- there's no fixed
20   answer to that.
21       Q.    Well, the answer is that the
22   NDMA -- well, rephrase.  We'll come back to
23   it.
24           MR. SLATER:  Let's go now to

Page 244

1    the conclusion on page 23 of 23.  Can
2    you scroll up just a little bit just
3    so we capture the bottom of the
4    conclusion, please?  Perfect.
5        Q.    The conclusion of the report
6    repeats the risk assessment, saying that "The
7    unknown peaks can be controlled by comparing
8    to the peak area of 10 percent toluene, ICH
9    limit (89 parts per million).  The product
10   quality is less likely to be impacted."
11           Same conclusion as the risk
12   assessment, right?
13       A.    Mm-hmm, yes.
14       Q.    Now, in retrospect, there was
15   NDMA there, and that was affecting the
16   quality of the product, right?
17       A.    Yes.  But here, you know, the
18   subject of this investigation, you know,
19   would focus on that nine, you know, unknown
20   peaks.  So that conclusion was made based
21   upon assessment of those nine unknown peaks.
22   So NDMA was not among one of them.
23       Q.    Okay.  Well, when you say NDMA
24   was not among them, NDMA was not being looked

Page 245

1    for because nobody actually said we need to
2    look for NDMA, right?
3        A.    Well, whoever -- you know, you
4    know, people doing this particular, you know,
5    or people -- I mean, particularly the main --
6    you know, the main author, right, you know,
7    of this investigation, he had no knowledge.
8        Q.    And he didn't -- he didn't do
9    or didn't have available to him a risk
10   assessment advising of the potential
11   development of NDMA, right?  That was not
12   provided, correct?
13       A.    I don't know whether, you know,
14   somebody provide it or not.  But based upon,
15   you know, what's presented here, you know, it
16   looks like the risk assessment was solely
17   based upon, you know, that nine unknown
18   peaks.
19       Q.    And the person who authored
20   this report certainly didn't document knowing
21   what was known by others in the company, that
22   there was NDMA in the drug substance,
23   correct?
24       A.    As I said, you know, the main

Page 246

1  author, he had no knowledge.
2          MR. SLATER:  Why don't we go
3      off the record for a second.
4          THE VIDEOGRAPHER:  The time
5      right now is 12:13 p.m.  We're now off
6      the record.
7          (Whereupon, a recess was
8      taken.)
9          THE VIDEOGRAPHER:  The time
10     right now is 12:26 p.m.  We're back on
11     the record.
12 BY MR. SLATER:
13     Q.    So we have on screen
14 Exhibit 213, which is an FDA Warning Letter
15 dated November 29, 2018.
16         Do you see that?
17     A.    Mm-hmm.
18     Q.    And you understand this warning
19 letter followed from the FDA inspection from
20 July 23 to August 3 at ZHP's facilities,
21 correct?
22         MR. GALLAGHER:  Objection.
23     Outside the scope.
24         You can answer to the extent

Page 247

1      you know personally.
2      A.    Well, that I know, it's issued
3  after the inspection.
4      Q.    Right.  And you can see in the
5  first paragraph the dates of the inspection
6  were July 23 to August 3, 2018.
7          Do you see that?
8      A.    Yeah, mm-hmm.
9      Q.    So if we scroll down a little
10 further down on this page, deviation number 1
11 is titled, "Failure of your quality unit to
12 ensure that quality-related complaints are
13 investigated and resolved."  Right?
14     A.    I saw the title.
15         MR. SLATER:  Let's go down to
16     the next page and look at part of what
17     was discussed somewhat relevant to
18     what we just talked about.
19         You can scroll down further,
20     Cheryll, because I want to -- that's
21     good right there.  Thank you.
22     Q.    So you see a paragraph that
23 starts with the word "Our investigators"?
24     A.    Mm-hmm.

Page 248

1      Q.    The FDA advised your company,
2  "Our investigators also noted other examples
3  of your firm's inadequate investigation of
4  unknown peaks observed in chromatograms."
5          I want to stop there.  That's
6  what we were just talking about, is ZHP's
7  study report on unknown peaks in May of 2018,
8  correct?
9      A.    I'm sorry, say that again?
10     Q.    We were just discussing the
11 study report of unknown peaks in residual
12 solvent of valsartan a few moments ago,
13 correct?
14     A.    Right, mm-hmm.
15     Q.    And here the FDA's pointing out
16 that they thought that the investigation of
17 unknown peaks observed in chromatograms was
18 inadequate.
19         That's what the FDA found,
20 correct?
21     A.    That's what they statement.  I
22 think we had a -- you know, an explanation
23 and a response.
24     Q.    This points out, "For example,

Page 249

1  valsartan intermediates," and it gives some
2  numbers of those batches, "failed testing for
3  an unknown impurity (specification less than
4  or equal to 0.5 percent) with results of
5  0.56 percent for both batches.  Your action
6  plan indicated that the impurity would be
7  identified as part of the investigation;
8  however, you failed to do this."
9      A.    No, we did that, actually.  We
10 did afterward.  I mean, at the time of this
11 warning letter, you know, the investigation,
12 I think, was still ongoing, okay.
13         So actually as part of the --
14 you know, of the CAPA or the commitment, you
15 know, we actually, you know, did an
16 investigation, but we didn't resolve, you
17 know, the whole structure, okay.
18         And we, you know, you know, we
19 told the, you know, the investigator, you
20 know, this is a process impurity, you know,
21 structurally related to that of valsartan
22 intermediate.  But we didn't know its exact
23 structure, right?
24         So, yeah, so the investigation

Page 250

1  was ongoing, and eventually, you know, we
2  resolved, you know, you know, that structure,
3  okay.
4      Q.    You said you resolved that
5  structure.
6      A.    Right.
7      Q.    You mean you find NDMA?
8      A.    Yes, finally with NMR we were
9  able to identify those structures, yes, and
10  which is confirmed it is a process-related,
11  you know, impurity of that intermediate,
12      Q.    But by this time it was already
13  identified as NDMA, right?
14      A.    You mean by the time of --
15  yeah, of this warning letter, yeah.  NDMA,
16  yes, that already was identified.  But this
17  is -- you know, FDA was talking about, you
18  know, this is, you know, a completely
19  different impurity.  Yeah.
20      Q.    What do you mean, the FDA's
21  saying it's a completely different impurity?
22      A.    Well, you know, here they
23  specifically pointing out to -- you know, to
24  that, you know, particular impurity, you

Page 251

1  know, given a value of 0.56 percent, right?
2  Yeah.  So, yeah, so that's not an NDMA or any
3  other nitroso, you know, compound.
4      Q.    So coming back to the FDA's
5  comments, they're indicating that --
6  rephrase.
7          Coming back to the FDA's
8  warning letter, the FDA stated your action
9  plan, that would be ZHP's action plan, given
10  on a prior date, correct?
11      A.    Yeah, our plan is, you know, we
12  will continue, you know, to do, you know, the
13  structure elucidation, okay.
14          Basically, you know, as part
15  of, like, this OOS investigation, okay,
16  although, you know, we tried to identify
17  unknown peaks as soon, you know, or as
18  quickly as possible, but sometimes, you know,
19  an unknown peak, you know, structure takes
20  time, right.
21          So during that kind of, you
22  know, you know, situation, what you can do
23  is, you know, basically once we know, you
24  know, you know, the basic information of this

Page 252

1  particular impurity, and also I think we did
2  the assessment at the time, this impurity is
3  just not -- you know, actually was not being
4  carried over into the downstream product,
5  right?
6          So, therefore, you know, the
7  risk was, you know, was very limited or
8  negligible.  So that's how, you know, QA
9  decided, you know, to, you know, basically to
10  close the main investigation, but with a
11  follow-up, you know, cover.  Okay.  That's a
12  very typical, you know, way, you know, you
13  know, in the industry, you know, to do those,
14  like, impurity related, you know,
15  investigation.
16      Q.    Well, the FDA didn't seem happy
17  with status of the investigation.
18      A.    Well, that's -- I think that's
19  their, you know, misunderstanding, you know,
20  from my perspective.
21          So I think, as I said, during
22  the final meetings or the last meeting, you
23  know, being on-site at FDA, and also in our
24  follow-up, you know, responses, you know, we

Page 253

1  stated very clearly, you know, you know, to
2  the FDA, you know, this follow-up action has
3  been completed.  Yeah.
4      Q.    The FDA continues to state,
5  "Additionally, residual solvent chromatograms
6  for valsartan API validation batches
7  manufactured using your zinc chloride
8  process, with DMF in 2012," and then it gives
9  the three validation batch numbers, "show at
10  least one unidentified peak eluting after the
11  toluene peak in the area where the presence
12  of NDMA was suspected to elute."
13      A.    Again, you know, this peak, as
14  I indicated to you, based upon our
15  retrospective analysis, that first, you know,
16  you know, visible, you know, small peaks
17  based upon our investigation, it was n-butyl
18  acetate.
19      Q.    And I think you explained the
20  NDMA was right next to that.
21      A.    It's on the shoulder.  As I
22  said, after if we inject it with a, you know,
23  a more concentrated sample, like a pure
24  sample, right, and -- you know, then we would

Page 254

1  find out.
2          But in the chromatogram of a
3  real sample, right, you know, like we analyze
4  using the GC-FID method.
5          To analyze a real sample, the
6  NDMA peak was basically, you know, submerged
7  with, overwhelmed by this, you know,
8  proceeding peak which is the n-butyl acetate.
9      Q.    As a matter of good
10 manufacturing practices, it's not acceptable
11 to do a test, not identify the peak, and just
12 say, well, it's pretty small, so we don't
13 really have to worry about identifying it.
14         That's not acceptable, right?
15     MR. GALLAGHER:  Objection.
16 Vague, and calls for speculation.
17     A.    We follow ICH guidance, okay,
18 in terms of, you know, what needs to be
19 identified, what -- you know, you know, you
20 do not necessarily need to identify it.
21 BY MR. SLATER:
22     Q.    It's not acceptable where
23 you're trying to identify what an unknown
24 peak is to run your standard test, not

Page 255

1  identify it, and just assume it's fine,
2  because you know that even something with a
3  very, very small peak, something that's
4  barely perceptible, if it's a
5  mutagenic/genotoxic impurity, that can be
6  dangerous and be in the product, right?
7      MR. GALLAGHER:  Objection.
8  Vague, lacks foundation, and compound.
9      A.    You know, for those very
10 low-level potential genotoxic impurity, you
11 would need to develop a specific method,
12 okay, to -- you know, to detect them, to
13 control them, okay.
14         For any other method, right,
15 like, for example, this residual solvent
16 method, they just are not adequate, okay, to
17 look for those unknown peaks, okay.
18         Time again, you know, I mean,
19 you know, based upon our retrospective
20 investigation, you know, the GC-FID method is
21 just -- you know, its intended -- its
22 original intended purpose is to monitor those
23 residual solvents.  That's its intended
24 purpose.

Page 256

1          So its intended purpose is not
2  to, you know, identify, you know, any little,
3  you know, you know, unknown peaks, right?
4          So, you know, and once again,
5  as I mentioned, even as of today, in ICH Q3C,
6  which is the most relevant ICH guidance
7  governing the residual solvent, okay, even in
8  that guidance today there is no specific
9  requirement in terms of, you know, above what
10 threshold an unknown peak need to be
11 identified.
12     Q.    One of the things that you need
13 to know as a drug manufacturer is the
14 limitations of GC-FID.
15         That's one thing you need to be
16 aware of, right?
17     A.    Well, it's all depends upon
18 what's the intended purpose, right?  So with
19 the intended purpose for the residual
20 solvents, the GC-FID method is perfectly
21 suitable for that purpose.
22     Q.    Well -- rephrase.
23         Here you had unknown peaks,
24 didn't know what they were, according to the

Page 257

1  documents, and made a decision, it's a low
2  amount, we don't have to be concerned.
3          That was the decision that was
4  made, right?
5      A.    Look, as I -- once again, you
6  know, with the GC-FID method, okay, if you go
7  into any pharmaceutical company, okay,
8  including like my former, you know, employer,
9  right, Merck & Company or any other, you
10 know, like Schering-Plough, you know, these
11 are the very famous, you know, multinational
12 companies, okay, you know, people will not --
13 you know, for a residual solvent method, they
14 will not going through every tiny little
15 peaks to identify, you know, what they are,
16 okay, you know, at least, you know, you know,
17 before, you know, that event came out, right?
18         So -- so basically, you know,
19 as I said, you know, it's -- you know, you
20 will need to develop, okay, and also it need to
21 be above -- you know, like, for example, like
22 in our conversation with Novartis or with
23 some other, you know, you know, customers,
24 right, they were, you know, also, at least

Page 258

1 some of them, they were not sure, you know,
2 what a specific threshold, you know, it need
3 to be set.
4          So, but from our perspective,
5 if customer had that particular request for
6 certain specific, you know, unknown peaks,
7 yeah, we will do the investigation and try
8 to, you know, identify or try to find, you
9 know, the potential source, you know, you
10 know, for those unknown peaks.
11     Q.    It sounds like you're telling
12 me it's really hard to find it, but Novartis,
13 plus using an outside lab, they found the
14 NDMA, and it wasn't even their drug
15 substance. They found it before ZHP did on
16 these chromatograms, is what you're -- and
17 you're telling me it was too hard to figure
18 it out?
19     A.    Yes. Don't forget, these are
20 the two different methods, okay? Two
21 different methods, you know, you know, their
22 critical, you know, method parameters, they
23 are quite different. Okay.
24          Even for GC-FID, if you run on

Page 259

1 different instrument, sometimes, you know,
2 the sensitivity can be vary quite a bit.
3 Okay.
4          So, you know, and also, you
5 know, some of our customer, they had a, you
6 know, similar question regarding the unknown
7 peaks, right? They also did a GC-MS
8 analysis. Okay, they didn't, you know, find,
9 you know, you know, NDMA.
10          I mean, and also we supply, you
11 know, our product, right, with the zinc
12 chloride. You know, I think shortly after
13 the zinc chloride, you know, was approved by,
14 you know, regulators, right, we supplied to
15 Novartis', you know, subsidiary company,
16 Sandoz, right. Sandoz, at least at that
17 time, was part of Novartis.
18          So we supply Sandoz valsartan
19 for quite, you know, long period. And so as
20 a unit of Novartis, you know, they haven't
21 had any, you know, you know, issues, or
22 didn't, you know, even have questions, I
23 think, as far as I understand, okay.
24     Q.    Just to get back to my

Page 260

1 question, Novartis, enlisting the help of an
2 outside lab, identified the NDMA, right? It
3 wasn't so hard to do. They did it, right?
4     A.    Look, we supplied Novartis,
5 right, you know, all material like commercial
6 skill batches, at least, you know, by the end
7 of 2017, right. And they received, you know,
8 a lot of those.
9          So from there, you know, I
10 mean, I don't know why they, you know, you
11 know, sended it to the outside lab or
12 whatever.
13          So at least, you know, they --
14 usually, when you go into business trying to
15 have a new, you know, vendor, you know, you
16 will do the analysis or in-depth, you know,
17 you know, analysis, you know, for the sample
18 that you're going to be for your commercial,
19 you know, productions.
20          So during that period, you
21 know, Novartis, you know, their own lab, you
22 know, still not was able to find. So my
23 guess is, you know, once they contract this
24 out to a certain lab, they just happen to be,

Page 261

1 you know, utilizing a different, you know,
2 you know, method.
3          Okay. That method, it appears
4 to be, you know, somewhat more sensitive than
5 ZHP's method. Okay.
6          So if we -- you know, if
7 someone would keep using that -- you know,
8 you know, that condition that's originally
9 intended for the GC-FID, you know, I think
10 it's very fair to say, you know, NDMA, you
11 know, at the -- you know, the level that's
12 produced or that's present, you know, you
13 know, you know, in ZHP's batches, you know,
14 it was very difficult, if not entirely
15 possible, I mean, to be adequately detected.
16 Okay.
17     Q.    You're aware that starting in
18 2014, complaints came in on a pretty regular
19 basis from your customers pointing out
20 unknown peaks and asking for answers.
21          You do know that there were
22 multiple complaints and requests for
23 information, right?
24          MR. GALLAGHER: Objection.

Confidential Information - Subject to Protective Order

Page 262

1    Vague, and lacks foundation.
2        You can answer.
3    A.    Yeah.  I mean -- yeah, I mean,
4    retrospectively, you know, you know, for
5    some -- you know, you know, during the later
6    stage of the investigation, you know, you
7    know, yeah.
8        For example, with Novartis,
9    also with Sun Pharma at the time, yeah, I
10   was -- you know, later was also being
11   consulted, you know, you know, how to, you
12   know, address the origin or the identity.
13       But essentially, you know, it's
14   the same set of the, you know, phenomenon,
15   right?  And so my guess is, you know, in our
16   registered DMF or whatever, you know, the
17   other kind of dossier, you know, you know, we
18   just supplied to those customers, right,
19   within -- you know, using the same set of
20   documents, right?
21       And in those, you know,
22   regulatory approved documents, you know,
23   there was no, you know, specific information
24   about, you know, some of those peaks.  So

Page 263

1    that's why, you know, you know, some people,
2    you know, they turn out to be having, you
3    know, the same kind of question.
4        But again, you know, you know,
5    based upon my, you know, knowledge, you know,
6    first of all, you know, they -- initially at
7    least, they all concentrated on relatively
8    large peaks.  And they ask for a certain
9    specific, you know, set of peaks, right, and
10   then we work with them, you know.
11       And also for some of the later
12   coming in, you know, questions, we would
13   sometimes utilize, you know, the previously,
14   you know, obtained results to help answer.
15       For example, like in Novartis'
16   cases, like I think we utilized some of the
17   results, you know, we provided to Sun Pharma.
18       And again, you know, some of
19   those company, they have been, you know,
20   continuously, you know, you know, you know,
21   buying, you know, commercial batches of --
22   you know, of, you know, valsartan, up to a
23   point that, you know, we sent out the notice,
24   you know, for suspension and also for recall.

Page 264

1    BY MR. SLATER:
2        Q.    Coming back to my question,
3    you're aware that there were multiple
4    complaints made by customers in 2014, 2015,
5    2016, 2017, and 2018, saying that there were
6    unknown peaks on their own testing, and they
7    were looking for answers from ZHP as to what
8    was the cause of those peaks.
9        That's a correct statement,
10   right?
11       MR. GALLAGHER:  Objection.
12   Lacks foundation.
13       THE WITNESS:  Sorry.
14       MR. GALLAGHER:  Go ahead.
15   A.    As I indicated, I didn't know,
16   or I was not informed, you know, initially.
17   And in some of those conversation, you know,
18   late in the investigation, as I said, I was
19   being consulted, you know, you know, or I was
20   try -- you know, they tried to pull me to
21   help them to find out, you know, you know,
22   the identity or the potential sources.
23   BY MR. SLATER:
24       Q.    All I'm asking is to confirm --

Page 265

1    rephrase.
2        All I'm looking to confirm
3    right now is -- rephrase.
4        You can confirm for me that
5    starting in 2014 with Ranbaxy and Sun Pharma,
6    then Vertex, then Glenmark, then Sun Pharma,
7    then Aurobindo, then Novartis, from 2014 to
8    2018, there were repeated customer complaints
9    pointing to unknown peaks, correct?
10       MR. GALLAGHER:  Objection.
11   Vague, lacks foundation, asked and
12   answered.
13   A.    Some of those, they were
14   treated as technical, you know, exchange,
15   okay?  And some of the customer, you know,
16   you know, you know, at the time they, you
17   know, they have this question, they were
18   already, you know, receiving our commercial,
19   you know, batches, as far as I know.
20       So they just wanted to know a
21   little bit further, you know, the identity
22   of, as I said, a certain specific numbers of
23   unknown peaks.  Okay.
24       Every time -- I mean, you know,

Confidential Information - Subject to Protective Order

Page 266

1  basically they are the same set of the
2  unknown peaks, right?
3         And as I said, you know, the
4  reason why different company ask, you know,
5  those questions is, my guess is probably
6  because, you know, in our, you know, official
7  documents, right, like the DMF or some other,
8  you know, regulatory approved documents, you
9  know, in there, there was, you know, no
10  information on some of those, like, very
11  small peaks.  So -- you know, so, yes.
12         So it's the same kind of
13  questions, and every time, as I said, we
14  tried to do, you know, what we can to
15  identify these peaks.
16         I think, you know, in the end,
17  you know, we -- for all of the concerned
18  peaks, you know, I think, you know, we were
19  able to find the identity or the potential
20  sources.
21     Q.    You realize these companies
22  that were complaining to ZHP about these
23  unknown peaks, they weren't asking for the
24  information because they were curious.  They

Page 267

1  were asking what those peaks represented
2  because they had quality obligations and GMP
3  obligations and wanted to make sure that the
4  substance they were purchasing from ZHP met
5  the quality standards and was safe.
6         That's why they were asking,
7  right?
8         MR. GALLAGHER:  Objection.
9  Lacks foundation, and calls for
10  speculation.
11     A.    It's a continuous process for
12  improvement.  And, you know, that's why, you
13  know, you know, we understand our customers'
14  concerns, right?
15         That's why every time, you
16  know, they have a question, we responded, you
17  know, and we trying to resolve, you know, the
18  issue as well as, you know, possible.
19         And particularly during my, you
20  know, you know, review of some of the
21  documents, you know, with Novartis, you know,
22  I think like in late May 2018, you know,
23  there's one e-mail from Novartis, you know,
24  they -- you know, they thank us, you know, to

Page 268

1  get the results, you know, they need like
2  very -- you know, very quickly.
3         But, you know, again, as I
4  said, those regulatory document, you know, we
5  have the agency or regulatory, you know,
6  approve the specification at the time.
7  BY MR. SLATER:
8     Q.    The responsibility for the
9  quality of the valsartan API was ZHP's
10  responsibility, right?
11     A.    Yes.
12     Q.    And despite -- rephrase.
13         Despite that, Novartis
14  identified the NDMA before ZHP did in
15  June 2018, right?
16     A.    It's the third-party lab, okay,
17  and they -- you know, initially, you know,
18  they tentatively identified, and they
19  communicated it to us.
20         And upon the receipt of the
21  information, we immediately, you know,
22  purchased the reference materials, developed
23  method, and -- yeah, so we very quickly
24  confirmed their results.

Page 269

1         And also, within a very short
2  period of time, we developed an adequate
3  quantitative methods.  So we will be able
4  to very quickly to come up with, you know,
5  you know, quite reliable NDMA results, okay,
6  in those, you know, batches, particularly
7  those batches, you know, you know, we
8  discussed with Novartis.
9     Q.    Well, just to be clear, ZHP
10  already knew that the NDMA was in the
11  valsartan, we've already established that, at
12  least as of July 2017.
13     A.    As I told you, at that time,
14  you know, Mr., you know, Lin's, you know,
15  e-mail, you know, as I said, it looks like
16  didn't go far.
17         So company as a whole, you
18  know, it didn't have that knowledge until,
19  you know, receiving that Novartis, you know
20  e-mails.
21     Q.    Well, what happened was
22  Novartis figured out that there was NDMA
23  there, enlisting the services of a
24  third-party lab to help it, and then

Page 270

1 basically told ZHP that ZHP needed to take
2 the steps to notify the authorities and take
3 steps to deal with the severe quality
4 problem.
5         That's the only reason ZHP told
6 anybody what happened here, was because
7 Novartis pushed you to do it, right?
8     A.    No.
9         MR. GALLAGHER:  Objection.
10     Vague, lacks foundation.
11 BY MR. SLATER:
12     Q.    If Novartis had not come along,
13 there's no reason to believe that ZHP would
14 have told anybody about the NDMA, right?
15         MR. GALLAGHER:  Objection.
16     A.    That's your speculation.
17         MR. GALLAGHER:  Lacks
18     foundation.
19 BY MR. SLATER:
20     Q.    We know that in July of 2017,
21 it was discussed in an e-mail that valsartan
22 had NDMA in it, and ZHP didn't tell anybody
23 about that, right?
24     A.    My answer -- you know, I think

Page 271

1 I already answered that question multiple
2 times.
3     Q.    Well, let's look right in the
4 middle of the page where we just went through
5 this -- well, rephrase.
6         Looking now at the middle of
7 this page in Exhibit 213, the FDA Warning
8 Letter of November 2018, it says, "Your
9 response states that NDMA was difficult to
10 detect.  However, if you had investigated
11 further, you may have found indicators in
12 your residual solvent chromatograms alerting
13 you to the presence of NDMA."
14         And then they point out, the
15 FDA says, "For example, you told our
16 investigators you were aware of a peak that
17 eluted after the toluene peak in valsartan
18 API residual solvent chromatograms where the
19 presence of NDMA was suspected to elute."
20         So -- and then they say -- just
21 to be clear, they say, "At the time of
22 testing, you considered this unidentified
23 peak to be noise and investigated no
24 further."  So I want to stop there.

Page 272

1         You certainly would agree with
2 me that the FDA's right; that you stopped
3 your investigation before figuring out the
4 answer, and then it was only when Novartis
5 figured it out that the answer came out,
6 right?
7         MR. GALLAGHER:  Objection.
8     Mischaracterizes testimony, and lacks
9     foundation.
10         You can answer.
11     A.    Let me give you a -- I try to
12 give you a full answer, okay, part by part or
13 little by little.  Okay?
14         The FDA statement, the first
15 one says, "Your response states that NDMA was
16 difficult to detect," okay?
17         So this was -- FDA's basically
18 repeating our language at the time, right?
19 Okay.  If you look at, you know, Dr. Janet
20 Woodcock's statement, okay, she released
21 during January -- in January 2019, right
22 after, you know, this event came out, in
23 that, you know, statement, you know, there is
24 one sentence, something like, you know, it

Page 273

1 said, the -- like, the property of NDMA made
2 it difficult to be detected by, like, a
3 normal or routine analytical test method.
4 Something like that.  Okay.
5         So, you know, so basically
6 combining everything that I told you, you
7 know, with the GC-FID method, okay, you know,
8 again, you know, you know, this peak, right,
9 that I -- you know, that we told, you know,
10 this particular inspector, right, the peak
11 eluting after the toluene, you know, as I
12 said, this is not NDMA.
13         NDMA is just -- yeah, just at
14 the noise level, you know.  As I said, at the
15 NDMA in the real sample, you know, it was
16 just among the smallest, you know, peaks,
17 okay.  So it's -- you know, it's just that --
18 you know, at that kind of level.
19         So that's -- you know, that's
20 exactly what happened.  I mean, all right.
21 So you know, basically, again, as I
22 indicated, you know, the nature of the GC-FID
23 method is not designed to detect, you know,
24 such low level peaks.  Its purpose is to

Confidential Information - Subject to Protective Order

Page 274

1  monitor, you know, the residual solvents
2  that, you know, that one particular process
3  utilized, you know, in that process.
4       So from that perspective, you
5  know, that GC-FID residual solvent method is
6  still, you know, suitable.  Okay.  I think
7  that, you know, we're still utilizing this
8  residual solvent method, okay, to release the
9  valsartan API or drug substances, okay, to,
10  you know, European, you know, customers,
11  after we modify, you know, the process of
12  valsartan API.
13  BY MR. SLATER:
14      Q.   ZHP modified its SOPs so that
15  following this revelation to the public about
16  the NDMA, now you're required to use GC-MS to
17  identify unknown peaks as a matter of course,
18  right?
19           MR. GALLAGHER:  Objection to
20      form.
21      A.   Well --
22  BY MR. SLATER:
23      Q.   That's what the SOP says now,
24  right?

Page 275

1      A.   Our SOP -- yeah, because of --
2  yeah, based upon -- yeah, based upon the
3  investigation, or the outcome, you know, of
4  the investigation, our SOP now requires any
5  unknown peaks, okay, with a signal-to-noise
6  greater than 10 would be investigated, okay?
7  And both FDA and also regulatory agency, they
8  agree with this threshold, okay?  So that's
9  number one, all right?
10       And since then we have done
11  tremendous, you know, you know, amount of
12  testing utilizing GC-MS, even GC-MS/MS,
13  right, and we have done so many tests.  And
14  so far we were not able to find another
15  nitrosamine, you know, you know, you know,
16  with this approach.  Okay?
17      Q.   Well, if you're talking about
18  batching going forward, you were required to
19  optimize the process so you wouldn't form
20  nitrosamines, right?
21      A.   Nitrosamine could still be
22  present, okay, based upon the nature of the
23  chemistry.  Okay?  It all depends upon how
24  much, right?

Page 276

1           Right now, you know, I can tell
2  you it's way below the detection limit of the
3  original detection limit that we established,
4  you know, after these events, because, as I
5  mentioned to you in the very beginning, FDA,
6  you know, the original position was it should
7  be absent, right?
8           So based upon FDA's, you know,
9  published analytical method for NDMA as well
10  as for NDEA, and for NDMA the FDA's, you
11  know, limit of quantitation is 5 ppb, okay.
12  For NDEA the limit was 1 ppb, right?  So our
13  valsartan now is able to meet both, you know,
14  you know, you know, requirement.
15          Although, as I said, you know,
16  you know, FDA has basically retreated, you
17  know, from their original position, right?
18  Now it's being allowed, you know, you know,
19  you know, for example, like for NDMA, now
20  they allow, you know, 96 nanogram per day,
21  which would translate into 300 ppb's, okay?
22          And so our product, our, you
23  know, valsartan utilized this newly, you
24  know, developed or modified process.  Okay.

Page 277

1  We are able to generate, you know, you know,
2  valsartan way below, you know, the 300 ppb,
3  okay?  So it's below, you know, you know, 5
4  ppb.  So it's 60 times lower, you know, for
5  the method, the detection limit.
6           MR. SLATER:  Let's look at
7      page 4 of the warning letter, Cheryll,
8      if you're still there.  Thank you.
9      Okay.  Could you scroll up a little
10     bit more, please?
11      Q.   Okay.  Under number 2, the
12  second paragraph, starting with the second
13  sentence, the FDA advised you, "You are
14  responsible for developing and using suitable
15  methods to detect impurities when developing,
16  and making changes to your manufacturing
17  processes.  If new or higher levels of
18  impurities are detected, you should fully
19  evaluate the impurities and take action to
20  ensure the drug is safe for patients."
21          My first question is, do you
22  see what I just read?
23      A.   Let's see.  Which paragraph?
24  I'm sorry.

Page 278

1    Q.    Second paragraph under
2  number 2.
3    A.    Second paragraph.  Oh, starting
4  with "You also failed to," right?
5    Q.    Yes.
6    A.    Okay.  Let me read through.
7  I'm sorry.  It's getting a little bit too
8  long.  You also... okay.
9        (Witness reviewing document.)
10    A.    So I don't know, you know,
11  whether this is specifically referenced here.
12  If here, you know, FDA specifically, you
13  know, referring to NDMA issue, I think this
14  is in a statement, you know, after the fact.
15    Q.    This is my question.  You saw
16  what I just read, right?
17    A.    Yeah.  I read through the
18  second paragraph, yes.
19    Q.    You would agree with me that
20  that is a correct statement of ZHP's
21  responsibilities under good manufacturing
22  practices, right?
23    A.    See, the precondition here is
24  you need to know, or you have that knowledge,

Page 279

1  at the time of the process change.  So that
2  process change was made somewhere around 2011
3  to 2012.
4    Q.    The point is, you would agree
5  that ZHP, like any drug manufacturer, is
6  responsible to use -- develop and use
7  "suitable methods to detect impurities when
8  developing, and making changes to,
9  manufacturing processes."
10        You agree with that statement,
11  right?
12    A.    If during that period, right,
13  during that initial development time, if
14  someone, you know, involved in -- you know,
15  in that, you know, development of that
16  process, yeah, if they knew, they would
17  develop a suitable method.
18    Q.    And you also agree that "If new
19  or higher levels of impurities are detected,
20  you should fully evaluate the impurities and
21  take action to ensure the drug is safe for
22  patients"?
23        You agree with that statement,
24  right?

Page 280

1    A.    As I said, if it's a general
2  statement, right.  You know, for any -- like
3  a regular, you know, impurity that really
4  being, you know, appropriately detected like
5  it was any -- like, you know, what we called
6  a related substance method, you know, you
7  know, or whether, you know, we will do the
8  impurity, you know, identifications.  I
9  mean...
10    Q.    ZHP was required to fully
11  evaluate the impurities and take action to
12  ensure that the valsartan was safe for
13  patients.  That you'll agree with, right?
14    A.    Again, you know, if we knew at
15  the time, you know, yeah, we will do that,
16  yes.
17    Q.    Well -- rephrase.
18        MR. SLATER:  You know what?
19  Now we can break.
20        MR. GALLAGHER:  Okay.
21        MR. SLATER:  Off the record.
22        THE VIDEOGRAPHER:  The time
23  right now is 1:07 p.m.  We're now off
24  the record.

Page 281

1        (Whereupon, the deposition was
2  adjourned.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential Information - Subject to Protective Order

Page 282

CERTIFICATE

1
2        I, MAUREEN O'CONNOR
3   POLLARD, Registered Diplomate
    Reporter, Realtime Systems
4   Administrator, and Certified Shorthand
    Reporter, do hereby certify that prior
5   to the commencement of the
    examination, MIN LI, Ph.D., was remotely
6   duly identified and sworn by me to
    testify to the truth, the whole truth,
7   and nothing but the truth.
8        I DO FURTHER CERTIFY that
    the foregoing is a verbatim transcript
9   of the testimony as taken
    stenographically by and before me at
10  the time, place, and on the date
    hereinbefore set forth, to the best of
11  my ability.
12       I DO FURTHER CERTIFY that
    I am neither a relative nor employee
13  nor attorney nor counsel of any of the
    parties to this action, and that I am
14  neither a relative nor employee of
    such attorney or counsel, and that I
15  am not financially interested in the
    action.
16
17
    _____
18
19  MAUREEN O'CONNOR POLLARD
    NCRA Registered Diplomate Reporter
20  Realtime Systems Administrator
    Certified Shorthand Reporter
21  Notary Public

22  Dated:  April 20, 2021
23
24

Page 283

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8        After doing so, please sign the
9   errata sheet and date it.  It will be
10  attached to your deposition.
11       It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24

Page 284

1        - - - - - -
          E R R A T A
2        - - - - - -
3   PAGE  LINE  CHANGE
4   ___  ___  _____
5     REASON: _____
6   ___  ___  _____
7     REASON: _____
8   ___  ___  _____
9     REASON: _____
10  ___  ___  _____
11    REASON: _____
12  ___  ___  _____
13    REASON: _____
14  ___  ___  _____
15    REASON: _____
16  ___  ___  _____
17    REASON: _____
18  ___  ___  _____
19    REASON: _____
20  ___  ___  _____
21    REASON: _____
22  ___  ___  _____
23
24

Page 285

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4        I, _____, do
    Hereby certify that I have read the foregoing
5   pages, and that the same is a correct
    transcription of the answers given by me to
6   the questions therein propounded, except for
    the corrections or changes in form or
7   substance, if any, noted in the attached
    Errata Sheet.
8
9
10  _____
    Min Li, Ph.D.            Date
11
12
13
14
15
16
17  Subscribed and sworn
    To before me this
18  _____ day of _____, 20____.
19  My commission expires: _____
20  _____
21  Notary Public
22
23
24

Page 286

1       LAWYER'S NOTES

2  PAGE  LINE

3  ____  ____  _____

4  ____  ____  _____

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  ____  ____  _____