Exhibit 21

Confidential Information - Subject to Protective Order

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
2                    CAMDEN VICINAGE
3
    *****************************
4
    IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
5   AND IRBESARTAN PRODUCTS
    LIABILITY LITIGATION          Civil No.
6                                 19-2875
    ***************************   (RBK/JS)
7
    THIS DOCUMENT APPLIES TO ALL  HON ROBERT B.
8   CASES                         KUGLER
9   ***************************
10           - CONFIDENTIAL INFORMATION -
             SUBJECT TO PROTECTIVE ORDER
11
12
13           Continued Remote Videotaped via
14  Zoom Deposition of MIN LI, Ph.D., commencing at
15  7:08 a.m. China Standard Time, on the 22nd of
16  April, 2021, before Maureen O'Connor Pollard,
17  Registered Diplomate Reporter, Realtime
18  Systems Administrator, Certified Shorthand
19  Reporter.
20
21                   - - -
22
          GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24

Page 506

1  APPEARANCES:  ALL PARTIES APPEARED REMOTELY
2
3     MAZIE SLATER KATZ & FREEMAN, LLC
      BY:  ADAM SLATER, ESQ.
      BY:  CHERYLL A. CALDERON, ESQ.
4     BY:  JULIA S. SLATER, ESQ.
      BY:  CHRISTOPHER GEDDIS, ESQ.
5        103 Eisenhower Parkway
         Roseland, New Jersey 07068
6        973-228-9898
         aslater@mazieslater.com
7        ccalderon@mazieslater.com
         cgeddis@mazieslater.com
8        Representing the Plaintiffs
9
      HOLLIS LAW FIRM
10    BY:  IRIS SIMPSON, ESQ.
      BY:  C. BRETT VAUGHN, ESQ.
11       8101 College Boulevard, Suite 260
         Overland Park, Kansas 66210
12       800-701-3672
         iris@hollislawfirm.com
13       Representing the Plaintiffs
14
      MORGAN & MORGAN
15    BY:  STEPHANIE JACKSON, ESQ.
      BY:  HANNAH FUJIMAKI, ESQ.
16       20 North Orange Avenue, Suite 1600
         Orlando, Florida 32801
17       sjackson@forthepeople.com
         hfujimaki@forthepeople.com
18       Representing the Plaintiffs
19
      FLEMING NOLAN JEZ, LLP
20    BY:  DAVID HOBBS, ESQ.
         2800 Post Oak Boulevard
21       Houston, Texas 77056
         713-621-7944
22       david_hobbs@fleming-law.com
         Representing the Plaintiffs
23
24

Page 508

1  APPEARANCES (Continued):
2
3  DUANE MORRIS, LLP
   BY:  PATRICK C. GALLAGHER, ESQ.
4     1875 NW Corporate Boulevard
      Boca Raton, Florida 33431
5     561-962-2131
      pcgallagher@duanemorris.com
6     Representing the Defendants Zhejiang
      Huahai Pharmaceutical Co., Ltd.,
7     Prinston Pharmaceutical Inc., Huahai
      U.S., Inc., and Solco Healthcare US,
      LLC
8
9
10 DUANE MORRIS, LLP
   BY:  FREDERICK R. BALL, ESQ.
11    100 High Street
      Boston, Massachusetts 02110
12    857-488-4229
      frball@duanemorris.com
13    Representing the Defendants Zhejiang
      Huahai Pharmaceutical Co., Ltd.,
14    Prinston Pharmaceutical Inc., Huahai
      U.S., Inc., and Solco Healthcare US,
15    LLC
16
17 CIPRIANI & WERNER, P.C.
   BY:  JULIA H. FERTEL, ESQ.
18    450 Sentry Parkway
      Blue Bell, Pennsylvania 19422
19    610-567-0700
      jfertel@c-wlaw.com
20    Representing the Defendant Aurobindo
      Pharmaceuticals
21
22
23
24

Page 507

1  APPEARANCES (Continued):
2
3  FARR LAW FIRM
   BY:  GEORGE T. WILLIAMSON, ESQ.
4     99 Nesbit Street
      Punta Gorda, Florida 33950
5     941-639-1158
      gwilliamson@farr.com
6     Representing the Plaintiffs
7
8  GREENBERG TRAURIG LLP
   BY:  KATE M. WITTLAKE, ESQ.
9     4 Embarcadero Center, Suite 3000
      San Francisco, California 94111
10    415-655-1285
      wittlakek@gtlaw.com
11    Representing the Defendants Teva
      Pharmaceutical Industries, Ltd., Teva
12    Pharmaceuticals SA, Inc., Actavis LLC,
      and Actavis Pharma, Inc.:
13
14 DUANE MORRIS, LLP
15 BY:  NATHAN B. REEDER, ESQ.
      30 South 17th Street
16    Philadelphia, Pennsylvania 19103
      215-979-1164
17    nbreeder@duanemorris.com
      Representing the Defendants Zhejiang
18    Huahai Pharmaceutical Co., Ltd.,
      Prinston Pharmaceutical Inc., Huahai
19    U.S., Inc., and Solco Healthcare US,
      LLC
20
21
22
23
24

Page 509

1  APPEARANCES (Continued):
2
3  PIETRAGALLO GORDON ALFANO BOSICK &
   RASPANTI, LLP
   BY:  JOHN B. ZAPPONE, ESQ.
4     One Oxford Centre
      Pittsburgh, Pennsylvania 15219
5     412-263-1840
      jbz@pietragallo.com
6     Representing the Defendant Mylan
      Pharmaceuticals, Inc.
7
8
   Also Present:  Phil Hughes
9           Andrew Huang, Esq.
10
   Videographer: Judy Diaz
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Confidential Information Subject to Protective Order

---

```
 1              INDEX
 2  EXAMINATION              PAGE
 3  MIN LI, Ph.D.
 4  BY MR. SLATER            514
 5
 6
 7      E X H I B I T S
 8  NO.     DESCRIPTION       PAGE
 9  ZHP-210    Previously marked.
            Deviation Investigation
10          Report.................. 657
11  ZHP-212    Previously marked.
            Investigation regarding an
12          unknown impurity, Bates
            ZHP00662283 through 2309....  528
13
14
15          NEW EXHIBITS
16
    ZHP-315    7/22/18 e-mail, Bates
17          SYNCORES00028075............ 514
18  ZHP-316    E-mail chain, Bates
            CHARLESWANG000239 through
19          291......................... 537
20  ZHP-317    Safety Data Sheet, Bates
            CHARLESWANG000310 through
21          317......................... 567
22  ZHP-318    6/22/18 e-mail, Bates
            CHARLESWANG000430........... 571
23
24  ZHP-319    E-mail chain, Bates
            CHARLESWANG000447 through
```

```
 1
    ZHP-320    Nonclinical Safety
 2          Assessment of
            N-nitrosodimethylamine
 3          (NMDA) and Recommended
            Limit in Drug Product,
 4          Bates CHARLESWANG000164
            through 182................ 649
 5
    ZHP-321    Concise International
 6          Chemical Assessment
            Document 38 regarding NDMA.. 664
 7
    ZHP-315-t  English translation of
 8          ZHP-315.................... 514
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                 - - -
    DEPOSITION SUPPORT INDEX
 2                 - - -
 3
    Direction to Witness Not to Answer
 4  PAGE LINE
    None.
 5
 6
 7
 8  Request for Production of Documents
    PAGE LINE
 9  None.
10
11
    Stipulations
12  PAGE LINE
    None.
13
14
    Questions Marked Highly Confidential
15  PAGE LINE
    None.
16
17
18
19
20
21
22
23
24
```

```
 1     P R O C E E D I N G S
 2
 3       THE VIDEOGRAPHER:  We're now on
 4  the record.
 5       My name is Judy Diaz.  I am a
 6  legal videographer for Golkow
 7  Litigation Services.
 8       Today's date is April 22, 2021,
 9  and the time is 7:08 a.m.
10       This remote video deposition is
11  being held in the matter of Valsartan,
12  Losartan, and Irbesartan Products
13  Liability Litigation MDL.
14       This is the continuation of the
15  deponent Min Li Ph.D.
16       All parties to this deposition
17  are appearing remotely and have agreed
18  to the witness being sworn in
19  remotely.
20       All counsel will be noted on
21  the stenographic record.
22       The court reporter is Maureen
23  Pollard.
24       ///
```

Page 514

1    MIN LI, Ph.D.,
2 having been previously duly remotely sworn,
3 was examined and testified further as
4 follows:
5
6    MR. SLATER:  Cheryll, I think
7    we can put up Exhibit 315, the next
8    exhibit, and I think there's an
9    English translation you can put in the
10    box for counsel.
11    (Whereupon, Exhibit Numbers
12    ZHP-315 and ZHP-315-t were marked for
13    identification.)
14    MR. SLATER:  Is it possible to
15    make that a little smaller?  Let's get
16    that so we can see it.
17    FURTHER EXAMINATION
18 BY MR. SLATER:
19    Q.    In front of us we have
20 Exhibit 315, which is a July 22, 2018,
21 e-mail.
22    And if we could, let's look,
23 first of all, just at who it's written from
24 and to.  Can you just let us know what that

Page 515

1 says, please, in terms of who it's written
2 from and to?
3    A.    I don't know this person
4 X.W. Guo.  But I certainly know they're
5 recipients, Chinese name Huang Luning, he is
6 the vice president at SynCores.
7    Q.    I missed who you said.  Who was
8 the person who received it?
9    A.    Huang Luning.
10    Q.    And he's the head of SynCores?
11    A.    No, he is the vice president of
12 SynCores.
13    Q.    The vice president of SynCores.
14    So this e-mail was sent from
15 the vice president of Shanghai SynCores --
16    A.    No, I'm sorry.  I don't know
17 who the sender is, okay.  That's, you know,
18 you know, you know, like Guo, I don't know
19 who this person.  But the recipient I know.
20 I personally know him, yes.
21    Q.    So the recipient is the vice
22 president of SynCores.
23    A.    Yes.
24    Q.    And it was written, according

Page 516

1 to the e-mail, by somebody who also worked at
2 SynCores, correct?
3    A.    Yes, looks like, yeah.
4    Q.    And tell us, let's start with
5 the introduction part, what that says.
6    A.    He said, "Dr. Huang, updated
7 the data as shown below."  It said, starting
8 from the number 6, like big points, or he
9 said that, you know, you can look from the
10 number 6, which is the major, you know,
11 points, like they have like, you know, one,
12 two, three, you know, like a big points,
13 right.  So number 6.
14    Q.    Before you read 6, I just
15 wanted to establish, so -- rephrase.
16    So this e-mail was written to
17 Mr. Huang, and it says that an updated table
18 is shown, and he's starting from heading
19 number 6, it looks like, right?
20    A.    Yes, exactly, yep.
21    Q.    Let's look at -- first, it says
22 in the first one, I see a 111.4 ppm.  What is
23 that referring to?
24    A.    Just basic, you know, you know,

Page 517

1 what is written here, right.  So first, you
2 know, three characters is basically the
3 Chinese name for valsartan.  We call it
4 (Chinese pronunciation valsartan), right?
5    So there's a parentheses, 111.4
6 ppm, and the next thing he said, you know,
7 genotoxic, probably, you know, means NDMA.
8 Okay.
9    So my guess is, okay, just
10 based upon, you know, you know, what I can
11 look at here, he probably referred to a
12 particular valsartan batch which has NDMA,
13 you know, in terms of its contents, like an
14 111.4 ppm.
15    Q.    I wanted to see if we could go
16 through and just understand how we calculate
17 something.  And maybe you can help me.  I
18 want to try to convert ppm to nanograms.
19    So if we have 111.4 ppm, my
20 understanding is that we would then need to
21 know the milligrams of the pill as part of
22 the calculation, is that correct?
23    A.    Yeah, you can certainly
24 calculate based upon 111.4, yeah.

Confidential Information - Subject to Protective Order

Page 518

1    Q.    So it was a 320-milligram
2  valsartan pill and it was 111.4 ppm, would we
3  just multiply 111.4 times 320 to find the
4  nanograms?
5    A.    This would be in the unit also
6  of the milligram, right?  So, yeah, so 320
7  times 111.4, you will get -- you have to
8  divide it by 1 million, right, divide it by 1
9  million, and then the number you got should
10 be in the unit of milligram.
11   Q.    Well, it's my understanding
12 there's 1 million nanograms in a milligram,
13 is that correct?
14   A.    Well, ppm basically means 1
15 particle per million.  It doesn't matter,
16 like, yeah, what the -- you know, you know,
17 it's a ratio.
18   Q.    So if it's -- rephrase.
19        If it's measured in parts per
20 million --
21   A.    Right.  So, yeah, basically if
22 you wanted to know, you know, equivalent to
23 320 milligram a tablet, right, made from
24 dispatch, so I think the calculation would be

Page 519

1  320 times 111.4 divided by 1 million.
2        And then you've got, you know,
3  like, whatever the XYZ number, right, but the
4  unit will be milligram, because you're
5  starting from 320 milligram.
6    Q.    Well, I'm trying to calculate
7  in nanograms.
8    A.    Nanograms, then you will be --
9  let's see.  You will be nanograms, so
10 milligram, micro- -- yeah, so there you will
11 be -- let me see.  You will be -- I think
12 then you will be times 1 million again,
13 right?  So --
14   Q.    So it would just be --
15   A.    Yeah.  Yeah.  Yeah.  So
16 basically they just cancel out, then, right.
17   Q.    So to find out how many
18 nanograms this would be if it was a
19 320-milligram pill, we would multiply 111.4
20 times 320 to find out how many nanograms,
21 correct?
22        MR. GALLAGHER:  I'm going to
23   object to this line of questioning
24   because it's calling for expert

Page 520

1  testimony.
2        Look, it's not a math test.  If
3    you want to ask about facts and stuff,
4    but asking him how to calculate
5    stuff --
6        You can answer, Dr. Li.  You
7    should answer, to the extent you know
8    and can.
9  BY MR. SLATER:
10   Q.    Dr. Li, just because this way
11 we'll have a basis when we ask questions
12 later and we'll know our vocabulary, if I
13 multiply 111.4 ppm times 320 milligram,
14 assuming it was a 320-milligram pill, I come
15 up with 35,648 nanograms.
16        That would be a correct
17 calculation, correct?
18   A.    I'm sorry, what is the number
19 again that you calculated?
20   Q.    Sure.
21        111.4 parts per million times
22 320 milligrams comes to 35,648 nanograms.
23        MR. GALLAGHER:  Again, I'm
24   going to object to this as calling for

Page 521

1  expert testimony.  It's not a math
2    test.
3        MR. SLATER:  I think Dr. Li has
4    a grasp on the calculation, so I'm not
5    really sure what the objection is.
6        And this falls -- it helps us
7    to answer some of the questions and
8    the topics as we go forward.
9    A.    It looks like so, yeah, mm-hmm.
10 BY MR. SLATER:
11   Q.    Okay.  So just to have a clean
12 question and answer, the reference --
13 rephrase.
14        The reference to 111.4 ppm, if
15 we were to assume that was in a 320-milligram
16 valsartan pill, we would multiply 111.4 times
17 320 to find out how many nanograms, and here
18 that would be 35,648, correct?
19        MR. GALLAGHER:  Same objection.
20   A.    Yeah, looks like so, mm-hmm.
21        MR. SLATER:  Okay.  Let's
22   scroll down now, Cheryll, to the next
23   part.  Perfect.
24 BY MR. SLATER:

Confidential Information - Subject to Protective Order

Page 522

1    Q.   Looking now at Section 7, let's
2  walk through that.  It's my understanding it
3  refers to a DMF blank experiment.
4        What does that mean, "a DMF
5  blank experiment"?
6    A.   I don't know.  I mean, this is
7  SynCores experiment.  So let me read through.
8  I will try to see whether I can have some
9  understanding.  DMF...
10        (Witness reviewing document.)
11    A.   Okay.  So I think, yeah, it
12  looks like they just treated the DMF with
13  sodium nitrite, and also like in the presence
14  either acid or base, it looks like.  Yeah,
15  that's what -- you know, they're trying to
16  understand how NDMA would be formed from, you
17  know, DMF.  Yeah, basically it's sort of like
18  a part of a mechanistic study, yeah.
19    Q.   If I understand correctly --
20  rephrase.
21        If I understand correctly,
22  SynCores was studying the origin of how the
23  NDMA was formed as part of a root cause
24  investigation, correct?

Page 523

1    A.   Looks like, yes.
2        MR. GALLAGHER:  Objection.
3  Lacks foundation.
4  BY MR. SLATER:
5    Q.   If I understand this correctly,
6  they indicated that as long as sodium nitrite
7  is added, genotoxic impurities will be
8  generated, is that correct?
9    A.   The statement says so.  And I
10  think, you know, the genotoxic impurity here
11  looks like, you know, from the context
12  specific, was specifically referring to NDMA.
13    Q.   And I think they then said --
14  rephrase.
15        And it then refers to
16  generating this NDMA is extremely obvious in
17  an acidic environment, is that correct?
18    A.   Let me -- let me double-check.
19        Yes, looks like so.  Acidic,
20  yes, it's quite obvious, yes, was a ppm.
21    Q.   They refer to the fact that
22  this is caused by the additional reaction of
23  dimethylamine.  That is a degradant of DMF,
24  correct?

Page 524

1    A.   Yeah, the next sentence it said
2  it should be DMF decomposition becoming
3  dimethylamine and then reacted with sodium
4  nitrite under condition, yes.
5    Q.   And I think they conclude that
6  the purpose of the experiment had been
7  achieved, and that they can't explain that
8  NDMA is only derived from dimethylamine in
9  DMF because you need the sodium nitrite as
10  stated above to create the NDMA.
11        Do I understand that correctly?
12        MR. GALLAGHER:  Objection.
13  Vague, and lacks foundation.
14        You can answer, Dr. Li.
15    A.   Okay.  I think -- I think the
16  conclusion says NDMA formation, it will not
17  only originate from the methylamine that's
18  originally present in DMF.  So based -- based
19  upon, you know, what it says, right, from
20  everything written here, it -- so my
21  understanding is like under the acidic
22  condition DMF, you know, would form -- I'm
23  sorry, DMF would decompose to give
24  dimethylamine.

Page 525

1        So at least, you know, from
2  this experiment it seems like, you know,
3  there -- NDMA would from, you know, two
4  sources, right, or from two parts of the
5  dimethylamine.
6        So one part of the
7  dimethylamine would be originally present,
8  and the other part of the dimethylamine would
9  be, you know, decomposition product under the
10  acidic condition, you know, or under that
11  particular experimental condition they was
12  performing.
13  BY MR. SLATER:
14    Q.   And I think they had said --
15  rephrase.
16        They had stated above that the
17  NDMA will be created as long as sodium
18  nitrite is added.
19        Do I understand that correctly?
20    A.   The first, the very -- after
21  the column, right, yeah, the first sentence
22  says, yeah, like as long as you adding sodium
23  nitrite, yeah, it will generate NDMA.
24        And then the next sentence

Confidential Information Subject to Protective Order

Page 526

1  says, under acidic condition it will be much
2  more obvious, yeah, like a breakdown with
3  ppm.
4       And then the next one says it
5  should be DMF, you know, decomposition.
6       So for everything here, it
7  looks like, you know, the majority of the
8  NDMA, all the dimethylamine, you know, to be
9  converted into, you know, NDMA would be from
10 the decomposition of DMF.
11      Q.    Combined with the sodium
12 nitrite?
13      A.    Combined with sodium nitrite,
14 yeah, under acidic conditions.
15      Q.    And you talked yesterday about
16 the concept of connecting the dots.  This
17 would be an example of people connecting the
18 dots.  Is that fair?
19      A.    It is fair, but this is
20 after --
21      MR. GALLAGHER:  Objection.
22      A.    Sorry.  But this is, you know,
23 after, you know, this event came out and they
24 tried to understand, yeah, exactly what would

Page 527

1  happen.
2  BY MR. SLATER:
3       Q.    And as part of the analysis
4  that ZHP performed in looking back as to why
5  this happened, it was understood that this
6  was not recognized when the process was being
7  created to use zinc chloride due to
8  insufficient study and insufficient research,
9  correct?
10      MR. GALLAGHER:  Objection.
11      Vague, calls for speculation.
12 BY MR. SLATER:
13      Q.    I'll ask it again.  Let me ask
14 a new question, because counsel said that I
15 asked a question that was vague and called
16 for speculation so I want to try to fix it.
17      ZHP in 2018, in looking back,
18 concluded that the reason this was not
19 figured out and these dots were not connected
20 back in 2011 was because of insufficient
21 research and insufficient study, correct?
22      MR. GALLAGHER:  Objection.
23      Vague.
24      A.    As I already answered, you

Page 528

1  know, previously, you know, the whole
2  industry as well as, you know, the regulator,
3  you know, all, you know, had this knowledge
4  gap, obviously including ZHP.
5       MR. SLATER:  Let's take that
6  document down and go to Exhibit 212,
7  please.  If we could, Cheryll, let's
8  go to page -- the Bates number 1308 in
9  the bottom right, the last three
10 digits.
11      Actually let's stop for a
12 second.  Don't go anywhere.  I'll just
13 identify the document first.
14      Q.    We have on the screen
15 Exhibit 212, which is a report, and the topic
16 title is "Investigation regarding an unknown
17 impurity," and then in parentheses "Genotoxic
18 Impurity" with regard to valsartan.
19      Do you see that?
20      A.    Mm-hmm.
21      Q.    Okay.
22      MR. SLATER:  Let's go now to
23 page -- the page that has the 308 as
24 the last three digits, please.

Page 529

1       A.    One thing, you know, but just
2  by looking at this document it looks like
3  this is only a draft.  We have -- I think
4  have a final, finalized, you know, signed
5  document.  So I don't know, should we look at
6  the final document?
7       Q.    No, we'll look at this
8  document.
9       MR. SLATER:  Scroll down a
10 little further, Cheryll, so we get the
11 bottom half of the page, please.
12 Perfect.
13      Q.    Section 5.2 is titled "Control
14 strategy."
15      Do you see that?
16      A.    Mm-hmm.
17      Q.    Under the heading of 5.2,
18 "Control strategy," it says, "Due to
19 insufficient extent and depth of process
20 research at the early stage, as well as
21 insufficient study and understanding of
22 potential genotoxic impurities, only side
23 reaction product and degradation products
24 were studied, and was unaware of the further

Confidential Information - Subject to Protective Order

Page 530

1  reaction between degradation products and raw
2  material."
3          Do you see what I just read?
4      A.   Mm-hmm.
5      Q.   So certainly as of the time
6  this document was drafted, the conclusion at
7  that time was that there was insufficient
8  extent and depth of process research as well
9  as insufficient study and understanding of
10  potential genotoxic impurities.  That's what
11  the document states, correct?
12          MR. GALLAGHER:  Object to the
13      questions on this document to the
14      extent the witness said this is not a
15      final version and asked to see the
16      final version.
17          But, Dr. Li, you should answer,
18      if you can answer.
19      A.   I mean, yeah, based upon this
20  version, you know, this is what it says.  But
21  as I said, you know, this statement is still
22  consistent, you know, with the fact, you
23  know, that I already said that, you know, the
24  whole industry as well as, you know, ZHP and

Page 531

1  also the regulators, you know, everybody had
2  the same knowledge gap at the time.
3          MR. SLATER:  Take that document
4      down, please.
5  BY MR. SLATER:
6      Q.   Who is Charles Wang?
7      A.   Charles Wang, who is a
8  toxicologist, you know, who is the consultant
9  of Huahai or ZHP.
10      Q.   Was he somebody that was an
11  independent consultant, had his own company?
12      A.   Sort of, yeah.
13      Q.   What do you mean "sort of"?
14      A.   He was doing, you know, that --
15  you know, he is a long-time friend, and so,
16  you know, you know, he is a trained
17  toxicologist, so when we had a -- you know,
18  you know, this issue, you know, when this
19  issue came out we came to him, you know, for
20  help.
21      Q.   I asked you if he had an
22  independent consulting company.  Did he have
23  an independent consulting company?
24      A.   That I don't know.  I mean, you

Page 532

1  know, whether he set up -- you know, I don't
2  know.  I had no details about this.
3      Q.   You said he was a long-time
4  friend.  Who was he a long-time friend of?
5      A.   Myself.
6      Q.   How did you know him?
7      A.   We know him because, you know,
8  he and I, we both have been the member of a
9  professional, you know, association, it's
10  called Sino-American Pharmaceutical
11  Association, and he and I, you know, were
12  both, you know, like a member, like long-time
13  members.  This is a nonprofit, you know,
14  professional organizations started in New
15  Jersey, I think around time of 1993.
16      Q.   Did you ever work together?
17      A.   No, we never worked together.
18      Q.   And by the way, I think I
19  forgot to ask you the other day, there's
20  someone at ZHP named Eric, and if I don't
21  pronounce his name correctly, let me -- Eric
22  Tsai, T-S-A-I?
23      A.   Eric Tsai, yeah.
24      Q.   Did you work with him in the

Page 533

1  past before you came to ZHP?
2      A.   We actually worked in the same
3  company, but we were not in the same
4  department.  Yeah.
5      Q.   What company did you work at
6  with Eric Tsai?
7      A.   Merck & Company.  When I first
8  joined Merck & Company in 1998, Eric Tsai, he
9  was already there.  Yeah.  And I left Merck
10  the first time in 2005, as far as I remember,
11  he still was, you know, with Merck.  Yeah.
12      Q.   Was it just a coincidence that
13  the two of you ended up at ZHP, or was there
14  some connection there?
15      A.   Perfectly coincidental.
16      Q.   Coming back to Charles Wang,
17  you said he was a long-time friend.  When did
18  you meet him?
19          MR. GALLAGHER:  Adam, are we
20      moving on from the 30(b)(6) to
21      individual?
22          MR. SLATER:  No, we're not.
23          MR. GALLAGHER:  I'm going to
24      object to all this as outside the

Confidential Information - Subject to Protective Order

Page 534

1  scope of the 30(b)(6).
2       MR. SLATER:  I'm confident that
3  it's within the scope.  I'm confident
4  that I'm allowed to ask who he was,
5  because you know who he is, so I don't
6  think you should have an issue with me
7  asking the questions.
8       MR. GALLAGHER:  I don't have a
9  problem with you asking the questions.
10 It's just that it's outside the scope
11 of the 30(b)(6).
12      MR. SLATER:  We disagree.
13      So I'm going to continue now,
14 okay?
15      MR. GALLAGHER:  Absolutely.
16 It's outside the scope of the
17 30(b)(6), but Dr. Li should answer to
18 the extent he knows personally.
19 BY MR. SLATER:
20      Q.    So I'll ask the question again,
21 Doctor.
22      A.    It's such a long time, you
23 know.
24      Q.    Let me ask the question again.

Page 535

1  I don't mean to interrupt you, but let me
2  just ask the question.
3       A.    Okay.  Sure.
4       Q.    How long -- well, rephrase.
5       When did you meet Charles Wang?
6       MR. GALLAGHER:  Objection.
7  Outside the scope.
8       A.    You know, there's such a long
9  time, so I don't remember exactly which year.
10 I would say somewhere, you know, like --
11 probably I would say in late, you know, '90s,
12 or maybe early 2000.  You know, like late
13 1990s, somewhere around that period.
14 BY MR. SLATER:
15      Q.    When you said he was a
16 long-time friend, I might have misheard.  I
17 thought maybe that you said "of us," or in
18 plural.  So was it with somebody else at ZHP?
19      MR. GALLAGHER:  Objection.
20 Outside the scope.
21      You can answer.
22      THE WITNESS:  Yeah, sorry.
23      I don't know, you know, who
24 else, you know, you know, he himself

Page 536

1  considered to be a long-time friend.
2  I really don't know.  I cannot speak
3  for him, okay.
4  BY MR. SLATER:
5       Q.    Did he know anyone else at ZHP,
6  to your knowledge?
7       A.    Oh, yes.
8       MR. GALLAGHER:  Objection.
9  Outside the scope.
10      THE WITNESS:  Sorry.
11 BY MR. SLATER:
12      Q.    Who?
13      MR. GALLAGHER:  Objection.
14 Outside the scope.
15 BY MR. SLATER:
16      Q.    Who else did he know at ZHP, to
17 your knowledge?
18      MR. GALLAGHER:  Objection.
19 Outside the scope.
20      A.    I mean, based upon my personal
21 knowledge, you know, he knows Mr. Jun Du.
22 BY MR. SLATER:
23      Q.    Do you have any idea how they
24 knew each other?

Page 537

1       MR. GALLAGHER:  Objection.
2  Outside the scope.
3       A.    As far as I understand, they
4  probably -- okay, that's just my guess.  They
5  probably, you know, essentially, you know,
6  you know, came to know each other.
7       Also through the same
8  organization, you know, because, you know,
9  this organization, you know, that I just
10 mentioned, it's scientific, you know, you
11 know, oriented.  And so every year, you know,
12 this organization will be, you know, you
13 know, holding like conferences, scientific
14 conferences, you know, you know, career, like
15 a workshop, you know, things like that.
16      And Huahai US, you know, at
17 least for a period of time, you know, was
18 the -- you know, the sponsor of some of the
19 meeting events.
20      MR. SLATER:  Let's put up our
21 next exhibit.  We'll call it Number
22 316.  It's CHARLESWANG000289.
23      (Whereupon, Exhibit Number
24 ZHP-316 was marked for

Confidential Information - Subject to Protective Order

Page 538

1     identification.)
2          MR. SLATER:  Let's go to the
3     beginning of the e-mail chain on the
4     second page, please.
5          I want to get the e-mail --
6     yeah.  Can you, Cheryll, possibly
7     scroll up so we can get the -- no, the
8     other way.  There you go.  Stop.
9     Perfect.
10    BY MR. SLATER:
11        Q.    Looking now at the second page
12    of this e-mail chain where the Bates number
13    is CHARLESWANG000290.
14             Do you see that?
15        A.    000290.  Where is the --
16        Q.    It's probably behind the
17    pictures of people.
18        A.    Oh, let me see.  Sorry.  Okay.
19    Oh, yeah, mm-hmm.
20        Q.    Looking at this e-mail chain,
21    starting with the first e-mail in the chain,
22    which starts at the bottom of the second
23    page, it's an e-mail from yourself, Min Li,
24    to Charles Wang, June 6, 2018.

Page 539

1          And you say you're
2     forwarding -- or subject says "Forward:  WHO
3     Report," and you say, "Please see the
4     report."
5         A.    Can I see that?  I'm sorry.
6     Can I see that word?
7         Q.    I'm just asking, do you see
8     what I just read, the June 6, 2018 date?
9         A.    Yeah, I see the date, but I
10    don't see any content.
11        Q.    That's the e-mail that we were
12    provided, so I'll ask the next question.
13             June 6, 2018 is the day after
14    Novartis confirmed to your company that they
15    had identified the NDMA in the valsartan we
16    were testing through the outside lab,
17    Solvias.
18             We went through that yesterday,
19    right?
20        A.    That was -- as I said, we
21    received the e-mail, you know, you know, they
22    indicated they suspect, you know, that that
23    was the NDMA.
24        Q.    And this is the -- rephrase.

Page 540

1          This is the next day, June 6th,
2     correct?
3         A.    Yes.
4         Q.    You say in this e-mail, "Please
5     see the report."  I assume you had spoken
6     with Charles Wang before you sent this
7     e-mail.
8              Do you recall?
9         A.    I do not recall.
10             Could I just see, you know, you
11    know, that particular content that you just,
12    you know, reading twice already?
13        Q.    I'm reading literally what's
14    right in front of you, sir.
15        A.    Oh, "Please see the report."
16    Yeah.  Yeah.
17        Q.    It looks like you had written
18    to Charles Wang from Yahoo Mail on Android.
19             Do you see that?
20        A.    Yes, mm-hmm.
21        Q.    What's an Android?
22        A.    What's Android?  That was my,
23    you know, US, you know, cell phone, you know,
24    you know, at that time, it looks like.

Page 541

1         Q.    Do you know who the
2     manufacturer is of the Android?
3         A.    I don't remember.  It could
4     be -- let's see.  It could be a Samsung, you
5     know, smartphone, but I really don't remember
6     exactly.
7         Q.    Was that phone turned in to be
8     checked to produce documents to us as part of
9     the production obligations in this
10    litigation?
11        A.    That phone has been dead, I
12    think.  Yeah, that phone -- so I think I, you
13    know, changed to my current phone.  That
14    phone has been -- yeah.
15        Q.    That phone is dead?
16        A.    Yeah.
17        Q.    Is it buried?  Is it buried, or
18    is it still available?
19        A.    No, it's no longer available.
20    It has been disposed, you know, because it's
21    no longer usable, totally unusable.
22        Q.    We know it was working on
23    June 6, because we see the e-mail that you
24    sent from your Android, right?

Confidential Information Subject to Protective Order

Page 542

1    A.    Yes.
2    Q.    June 6, 2018 it was working,
3 right?
4    A.    Oh, yeah, uh-huh.
5    Q.    When did it stop working?
6    A.    When did it stop working.
7 Sometime after -- I don't -- see, I don't
8 remember exactly.  It -- let me see.  I just
9 don't remember, you know, you know, all of
10 these details.
11    Q.    Did that phone die in 2018 or
12 2019?
13    A.    I just --
14       MR. GALLAGHER:  Objection.
15       THE WITNESS:  Sorry, go ahead.
16       MR. GALLAGHER:  Objection.
17    Asked and answered.
18       You can answer, Dr. Li.
19    A.    Yeah.  I just don't remember
20 right now.  I mean...
21 BY MR. SLATER:
22    Q.    Did you pay for that phone, or
23 did your company pay for it?
24    A.    I paid for that phone myself.

Page 543

1    Q.    When you replaced that phone,
2 did you do that yourself, or did the company
3 have any part of you replacing the phone?
4    A.    Everything, you know, I did
5 myself, like I paid for myself.
6    Q.    The phone that you replaced
7 this Android with is what, what type of
8 phone?
9    A.    It should be, you know, this
10 new Samsung phone that I'm using right now.
11    Q.    Do you know what type of phone
12 it is?
13    A.    What type of this phone.  At
14 the time that I bought it should be kind of
15 like a top of the line, you know, you know,
16 Samsung phone, but I don't remember exactly,
17 you know, the model.
18    Q.    Is it in the room with you
19 right now?
20    A.    Yeah, it is in this room, yeah.
21 I can take a look if you want.
22    Q.    Can you take a look right now
23 and tell me what kind of phone it is?
24    A.    Sure.

Page 544

1       Oh, let me see, it's probably
2 from the setting, right, looking about the
3 phone.  Okay.  It's model number SM-N950U.
4    Q.    Is it an Android, is it a
5 model -- is that the model?
6    A.    Yeah, it should be Android
7 operating, yeah.  Everybody else, yeah, I
8 think other than -- other than the, like,
9 Apple, right.
10    Q.    When you bought this new phone,
11 did you get some sort of a warranty or some
12 sort of protection plan where if something
13 happened to it you could use that to help fix
14 it?
15    A.    No.
16       MR. GALLAGHER:  I'm going to
17    object to this line as outside the
18    scope as well.
19       But please go ahead.
20    A.    Yeah, I think we usually don't
21 buy those protection plans.
22 BY MR. SLATER:
23    Q.    What would you need to do to
24 tell me the day that you got the new phone so

Page 545

1 we'd know when you replaced the old phone?
2       MR. GALLAGHER:  Objection.
3    Asked and answered.
4    A.    I really need to, you know, dig
5 into some of the detail if I, you know, if I,
6 you know, you know, have to tell you exactly
7 the -- I need to -- I need to do some
8 research.
9 BY MR. SLATER:
10    Q.    Sometimes the Samsung phones
11 have the name on the back of the phone.  Can
12 you look at the back of your phone and see
13 what type you have now?
14    A.    The name of the phone.  On the
15 back cover of my phone?  Let me see.  I need
16 to remove the protection.  Hold.  Galaxy
17 Note 8, yeah.
18    Q.    You said Galaxy Note 8?
19    A.    Yes.
20    Q.    Was your Galaxy Note 8 phone
21 provided to your company for documents and
22 information to be provided to us as part of
23 this litigation?
24    A.    No.  Because, you know, once I

Confidential Information Subject to Protective Order

Page 546

1  got this Galaxy phone, you know, it's -- I
2  don't think it's been used with this
3  communication.
4      Q.    Where did you get the phone?
5  Did you buy it at a store?
6      A.    Yeah, I buy it in the store,
7  yes.
8      Q.    What store did you buy it at?
9          MR. GALLAGHER:  I'm going to
10  object to this entire line as outside
11  the scope and, you know, bearing
12  into --
13          MR. SLATER:  Well, I'll ask you
14  a question, Counsel, maybe it will
15  move things along.
16          Can you represent right now
17  that Dr. Li's phones were both
18  properly collected and reviewed to
19  make productions of documents and
20  information to us pursuant to the
21  discovery obligations in this
22  litigation?
23          MR. GALLAGHER:  I can represent
24  that we collected from all the devices

Page 547

1  that we needed to collect from to get
2  the documents to meet our discovery
3  obligations.
4          MR. SLATER:  Does that include
5  the phone he was using on -- rephrase.
6          Does that include the phone
7  that was being used on June 6, 2018?
8          MR. GALLAGHER:  I think he told
9  you that phone is -- no longer exists.
10          MR. SLATER:  Well, I'm asking
11  you because we're asking these
12  questions so we can match up the dates
13  and find out when the phone "died" and
14  we're going to track that phone.
15          MR. GALLAGHER:  If you want
16  to -- if you want to continue, I'm
17  just objecting as outside the scope
18  and, you know, veering in wildly
19  irrelevant.
20          If you want to, you know,
21  submit a request in writing for us to
22  look at something, we're happy to do
23  that.  But you're welcome to do your
24  deposition as you'd like.  I'm just

Page 548

1      objecting outside the cope and veering
2      into wildly irrelevant.
3  BY MR. SLATER:
4      Q.    While we're on it, I had asked
5  you on the first night of the deposition when
6  you were first told about the deposition, and
7  you said it was by an e-mail about six months
8  ago, and I asked if you would check that
9  date.  Did you do so?
10      A.    I'm sorry, check what?
11      Q.    The date of the e-mail that you
12  received the first time you were told you
13  were going to be deposed in this litigation.
14          MR. GALLAGHER:  Object as
15          calling for speculation, and to the
16          extent it calls for attorney/client
17          privileged information.
18          And to the extent you know and
19          can answer without disclosing
20          information regarding communications
21          with your attorneys, you can.  But to
22          the extent it would disclose
23          information communicated from
24          attorneys for ZHP, I instruct you not

Page 549

1  to answer.
2      A.    So -- so I -- you know, well,
3  first of all, I haven't had a chance, you
4  know, you know, you know, to do that.  But I
5  guess after, you know, after this deposition,
6  you know, I can take some effort, you know,
7  to look it up.
8          But, you know, these past few
9  days, you know, I have been very exhausted,
10  and I also need to, you know, read through
11  some of the, you know, documentation, you
12  know, right, to -- for continuous prepare,
13  you know, for this deposition, so I really
14  haven't done, you know, this information
15  search.
16  BY MR. SLATER:
17      Q.    You told me on -- rephrase.
18          You told me that it would have
19  been an e-mail from Maggie Kong, so you could
20  just search your e-mails for her name and
21  see --
22      A.    No, I said that --
23          MR. GALLAGHER:  Let me -- slow
24  down.  Sorry.

Page 550

1     Again, I'm going to object to
2  the extent you're asking him to
3  speculate, and to the extent it calls
4  for attorney/client privileged
5  information.
6     Adam, if you want to send us a
7  request we can -- in writing, we can
8  go back and look, and to the extent
9  that it doesn't involve
10  attorney/client information we can
11  share that.
12     A.   I think, yeah, I think, I think
13  my counsel will provide an accurate, you
14  know, dates, yeah.
15  BY MR. SLATER:
16     Q.   We also talked the other day
17  about when your Lenovo ThinkPad broke and you
18  replaced it.  Did you look into what the date
19  was when that happened?
20     A.   That --
21     MR. GALLAGHER:  Same objection.
22  BY MR. SLATER:
23     Q.   Lenovo ThinkPad, I'm sorry.
24     A.   That, as I said, that probably,

Page 551

1  let's see, I think it's -- it's probably
2  somewhere around May 2018.
3     But again, you know, you know,
4  I need to go back, you know, to talk to, you
5  know, my IT people, you know, to see what
6  exactly date, you know, they provided, you
7  know, this current one, you know, to me.
8     MR. GALLAGHER:  And, again,
9     Adam, same objections.  And if you
10     want to send us a request in writing,
11     we can take that under advisement.
12  BY MR. SLATER:
13     Q.   Why did you contact Charles
14  Wang -- well, rephrase.  Let me ask you this.
15  Did you contact Charles Wang as
16  a result of Novartis notifying your company
17  of the identification of NDMA on June 5,
18  2018?  Is that why you contacted him?
19     MR. GALLAGHER:  Objection.
20     Vague, and lacks foundation.
21     A.   The reason -- first of all,
22  obviously, you know, because we received a
23  notice and we, you know, need to have an
24  expertise, you know, to evaluate from the,

Page 552

1  you know, toxicological perspective.
2     And also, as I said, because he
3  is a long-time friend of mine, and I know he
4  is a toxicologist, so that's how, you know, I
5  naturally, you know, thought of him and
6  turned to him for help.
7  BY MR. SLATER:
8     Q.   Did you see him as an expert in
9  toxicology?
10     A.   Oh, yeah, yeah.
11     Q.   Did you consider him somebody
12  who would provide you reliable information?
13     A.   Yes.
14     Q.   Was he somebody that you
15  trusted?
16     A.   Oh, yes.
17     MR. SLATER:  Let's scroll up,
18     Cheryll, to the next e-mail in the
19     chain on the second page.  Perfect.
20     Q.   Now, looking at the June 10,
21  2018 e-mail sent at 11:49 a.m. from Charles
22  Wang to yourself, do you see that?
23     A.   Mm-hmm.
24     Q.   I have another question.

Page 553

1  Rephrase.
2     Why is it that you and Charles
3  Wang were communicating on your Yahoo
4  accounts rather than on business accounts?
5     A.   I think the main reason is, you
6  know, he is a long-time friend of mine, and,
7  you know, we've been using, you know, Yahoo
8  e-mail or personal e-mail, you know, for
9  quite long.
10     So during that time, you know,
11  because this events was so urgent, right, so
12  I, you know, did it, you know, just
13  naturally, you know.
14     And because, you know, his
15  Yahoo e-mail is also like sort of like stored
16  on my, you know, Yahoo, right?  So once I
17  type, you know, like "Charles," that e-mail
18  naturally will appear.
19     So, yeah, it's urgent, it's for
20  convenient.  Yeah, that's how it happened.
21     Q.   Did you or anybody else from
22  ZHP, to your knowledge, contact any other
23  toxicologists or experts regarding the health
24  or safety issues with NDMA in June 2018?

Page 554

1    A.    I don't recall.  I mean, for me
2 I only contacted the Charles Wang.  But
3 anyone else, you know, from ZHP contact
4 anybody else, I just don't know.
5    Q.    Was Charles Wang the only
6 outside toxicologist your company consulted
7 in connection with the NDMA in the valsartan?
8    A.    I cannot -- you know, I do not
9 have this knowledge like somebody else did.
10    Q.    Is there any other toxicologist
11 other than Charles Wang that anybody at ZHP
12 consulted with or spoke to regarding the NDMA
13 in valsartan?
14        MR. GALLAGHER:  Objection.
15    Vague.
16    A.    You know, as I said, you know,
17 from my perspective, I only contact or
18 consulted with Charles Wang.
19 BY MR. SLATER:
20    Q.    As part of your preparation to
21 testify for your company, did you ask others
22 if they had contacted any other
23 toxicologists?
24    A.    I haven't asked.

Page 555

1    Q.    Looking now at the June 10,
2 2018 e-mail, Charles Wang wrote to you and
3 said, "Hi Min, The attached is draft report
4 for NDMA."
5    A.    Mm-hmm.
6    Q.    "I can take out the limit of
7 0.011 parts per million if you are unable to
8 achieve it."
9        Do you see that?
10    A.    Mm-hmm.
11    Q.    So in this report that he
12 wrote, he put in a maximum acceptable limit
13 of 0.011 parts per million for on a
14 going-forward basis, correct?
15    A.    Yes.
16    Q.    And he asked you if you --
17 he -- rephrase.
18        And he's asking you here, do
19 you want me to change it if ZHP can't get to
20 that level; that's what he's asking you,
21 correct?
22    A.    Mm-hmm, yes.
23    Q.    Is that what a good scientist
24 does in providing scientific advice, provide

Page 556

1 their opinion and their advice, but then say,
2 well, I'll change it if for commercial
3 purposes you need me to?
4        MR. GALLAGHER:  Objection.
5    Vague.
6    A.    I think your statement is
7 twisted, you know, the fact.  Okay.
8        At that time, okay, nobody had
9 any idea like what limit should be set, okay.
10 So very naturally there would be a
11 discussion, what would be a reasonable, you
12 know, you know, limit to set, okay.
13        So I think that, you know,
14 based upon the context, you know, everything
15 is written here, it looks like, you know, the
16 0.011 ppm was a number, if I remember
17 correctly, you know, proposed by a Novartis,
18 you know, toxicologist, okay.
19        And that person, you know, you
20 know, derived this number from, I think, an
21 animal study.  It's not based upon rodent,
22 okay.  I think it's based upon, you know, a
23 primate, maybe monkey or something.
24        So that, you know, from that

Page 557

1 PD50, you know, that person derived a limit
2 of 0.011 ppm.  Okay.
3        So later, you know, I think if
4 you look at the European regulatory, you
5 know, you know, document, you know, they
6 spent, you know, quite a -- you know, you
7 know, quite a few, like maybe one page or
8 whatever, discussing what the value should be
9 used.
10        So I think the conclusion or
11 the eventual consensus is that for those, you
12 know, animal carcinogenic study, it would
13 have been more reliable to use, you know, you
14 know, data from rodent.
15        The very reason was because
16 primate -- you know, the lifespan of primate,
17 you know, is too long, right?  You know, so
18 you would have -- you know, quite a lot of
19 other factors would impact, you know, how a
20 tumor would be produced.
21        So I think, you know, if you
22 ask somebody, you know, you know, who are
23 familiar or some, you know, like a
24 toxicologist who are familiar, you know, with

Page 558

1 these issues, you know, or everything that I,
2 you know, you know, you know, are talking
3 about here, you know, people would agree, you
4 know.
5        So that's how the 0.3 ppm,
6 right? It's from a rodent, you know, study.
7 Okay.
8        So yeah, at the very beginning,
9 you know, as I said, even FDA or European
10 regulatory agency, you know, you know, didn't
11 know, you know, how to set, and -- yeah, so
12 it's very -- you know, everything, you know,
13 was progressing, and actually is still, you
14 know, progressing.
15 BY MR. SLATER:
16     Q.    Reading along in the e-mail,
17 Charles Wang said, "I can take out the limit
18 of 0.011 ppm if you are unable to achieve it.
19 See if your client accept the limit
20 recommended based on the maximum intake of
21 NDMA via food or exposure of indoor air.  The
22 limit of 0.011 ppm is calculated based on the
23 EPA recommended limit for underground water,
24 which won't cause the risk to exceeding the

Page 559

1 tumorigenesis rate of 10e-6 in lifespan of
2 human being. Let me know if you any comments
3 or questions."
4        That's what he wrote to you,
5 right?
6     A.    Okay. Oh, yeah. So -- yeah,
7 okay. So based upon -- I'm sorry. Yeah,
8 based upon, you know, you know, this whole
9 e-mail, yes.
10       So I take it back, you know,
11 you know, referring the 0.011 ppm, you know.
12       But between Novartis and the
13 ZHP, we did have that communications, you
14 know, in terms of what limit, you know, you
15 know, should be set.
16       So, as I said, the data from,
17 you know, you know, you know, from that
18 primate, it would be lower than 0.3.
19       So, I mean, this 0.011 could be
20 from, you know, the primate, okay, because
21 they are -- you know, both are lower than the
22 0.3.
23       But, you know, in the end, as I
24 said, you know, after, you know, all of the,

Page 560

1 you know, you know, discussion progressing,
2 so now regulatory agencies, particularly
3 like, you know, FDA, right, now is setting a
4 limit of 0.3, which is based upon, you know,
5 the rodent carcinogenic study.
6        MR. SLATER:  Cheryll, if you
7 could scroll up to the next page so we
8 can get to the beginning of the next
9 e-mail, which starts on the next page,
10 please. Perfect.
11     Q.    Later that day now on June 10,
12 2018 at 9:09 p.m., where the prior e-mail had
13 been at 11:49 a.m., Charles Wang writes to
14 you again.
15       Do you see that?
16     A.    Mm-hmm.
17     Q.    He writes to you to provide you
18 a statement in the ICH M7 guideline.
19       Do you see that?
20     A.    Yeah, "TTC-based Acceptable
21 Intakes." Okay. Mm-hmm.
22     Q.    And it has some threshold of
23 toxicological concern-based acceptable
24 intakes, and it has some information on that.

Page 561

1        Do you see that?
2     A.    Yeah, let me read through.
3 TTC-based...
4        (Witness reviewing document.)
5        THE WITNESS:  So that's the
6 first paragraph, 7.2, "Based on
7 Compound Specific Risk Assessment."
8        Okay. "Mutagenic Impurities
9 with Positive Carcinogenicity Data
10 (Class 1 in Table 1).
11 Compound-specific risk assessments to
12 derive acceptable intakes should be
13 applied instead of the TTC-based
14 acceptable intake where sufficient
15 carcinogenicity data exist. For a
16 known mutagenic carcinogen, a
17 compound-specific acceptable intake
18 can be calculated" -- "and
19 linear extrapolation as a default" --
20 okay. Yeah.
21        MR. GALLAGHER:  Doctor, when
22 you read out loud, the court reporter
23 has to take everything down that
24 you're saying. So just when you're

Confidential Information - Subject to Protective Order

Page 562

1  reviewing the document, for ease of
2  everyone, the document says what it
3  says.
4       THE WITNESS:  Okay.  I'm sorry.
5  Yeah.
6       Yeah, I finished reading, yes.
7       MR. SLATER:  Counsel, I would
8  appreciate it if you would not
9  instruct your witness not to say
10 things out loud.
11      MR. GALLAGHER:  I'm not
12 instructing him not to say things.  I
13 think he didn't realize.
14      THE WITNESS:  Well, yeah, I
15 just read through the e-mail.
16      MR. GALLAGHER:  If you feel
17 it's necessary for you to read it out
18 loud, you should read it out loud.
19 I'm not sure if that's what you were
20 intending to do, so...
21      Please proceed.
22      THE WITNESS:  Okay.
23 BY MR. SLATER:
24      Q.   You can see that after --

Page 563

1  rephrase.
2       You can see that in this e-mail
3  Charles Wang says.  "Hi Min, See statement in
4  ICH M7 regarding" -- and then you see that's
5  what it says, right?
6       A.   Mm-hmm.
7       Q.   And then he has some
8  information about acceptable intake levels
9  and it depends on what class somebody is
10 placed in.
11      Do you see that?
12      A.   Yes.
13      MR. SLATER:  Cheryll, if you
14 could scroll down to the top half of
15 the following page, we'll go to the
16 carryover, and there's a table.
17      Q.   And you remember, that table is
18 in the ICH M7 guideline, correct?
19      A.   Yes.
20      Q.   And we see it says Table 1 --
21      MR. SLATER:  Scroll up a
22 millimeter more so we can get the
23 bottom of the e-mail, please.  Just a
24 little -- that's it.  Perfect.

Page 564

1       Q.   We see the table, and then you
2  can see underneath that it says, "NDMA should
3  be Class 1 compound" giving its" -- "given
4  its well known mutagenicity nature of this
5  compound.  Charles."
6       Do you see that?
7       A.   Yes.
8       Q.   So he's saying that it should
9  fall into Class 1 under the ICH guidelines,
10 which is defined as a known mutagenic
11 carcinogen, correct?
12      MR. GALLAGHER:  Objection.
13 Vague, and calls for speculation.
14      A.   It's a known mutagenic
15 carcinogenic to animal.
16 BY MR. SLATER:
17      Q.   A Class 1 impurity is defined
18 on this table as a known mutagenic
19 carcinogen, and he's saying NDMA should fall
20 into that class, correct?
21      MR. GALLAGHER:  Objection.
22 Vague, calls for speculation, and to
23 the extent it calls for expert
24 testimony.

Page 565

1       A.   That's what he said.
2       But I should emphasize, in this
3  particular case NDMA is a known mutagenic
4  carcinogen to animal.
5  BY MR. SLATER:
6       Q.   Let's go up now to the
7  beginning of the e-mail.  Rephrase.
8       Let's go to the beginning of
9  the whole -- rephrase.
10      Let's go to the top now, to the
11 last e-mail in the chain, please.
12      MR. SLATER:  Thank you,
13 Cheryll.
14      Q.   Looking now at the next e-mail
15 in the chain, June 12, 2018, Charles Wang
16 wrote to you at 3:18, it looks like.
17      Do you see that?
18      A.   Yes.
19      Q.   And he says -- rephrase.
20      In this e-mail Charles Wang
21 says, "Hi Min, Looks like IARC does consider
22 NDMA as a Class 2A agent.  However, according
23 to the definition of Class 2 in ICH M7(R1)
24 guideline, the Class 2 compound should be a

Page 566

1    "Known mutagens with unknown carcinogenic
2    potential (bacterial mutagenicity positive*,
3    no rodent carcinogenicity data)."
4         Do you see that?
5         A.    Yes.
6         Q.    And he actually highlighted the
7    "no rodent carcinogenicity data."
8         Do you see that?
9         A.    Let's see.  No rodent -- yeah,
10   highlighted, yes.
11        Q.    The e-mail continues, "There
12   are plenty rodent carcinogenicity data for
13   NDMA (see revised report in the attached,
14   page 4).  In Fisher MSDS, NDMA has been
15   classified as Class 1B for carcinogenicity
16   (attached)."
17        Do you see that?
18        A.    Yes.
19        Q.    He then says, "Guess you can
20   argue with your client and see if they accept
21   IARC's classification and agree to control
22   the level at threshold of toxicological
23   concern (1.5" -- is that micrograms or
24   milligrams per day?

Page 567

1         A.    Microgram.
2         Q.    And we went over yesterday, and
3    I can pull it out if we need to, that the ICH
4    M7 guideline actually said that's
5    inapplicable to those compounds that are
6    considered to be in the cohort of concern
7    like nitrosamine compounds.  Remember we went
8    through that yesterday?
9         MR. GALLAGHER:  Objection to
10   the extent it mischaracterizes his
11   testimony.
12        A.    Yes, we did went through.
13        MR. SLATER:  In fact, Cheryll,
14   let's pull up now as Exhibit 317 the
15   material safety data sheet referred to
16   here by Charles Wang.
17        (Whereupon, Exhibit Number
18   ZHP-317 was marked for
19   identification.)
20   BY MR. SLATER:
21        Q.    You know what a material safety
22   data sheet is, correct?
23        A.    Yes.
24        Q.    What is a material safety data

Page 568

1    sheet?
2         A.    Well, based upon my
3    understanding, it is a document that
4    typically utilized in the storage and
5    transportation of a chemical.
6         Q.    It also provides hazard and
7    risk information about the chemical, correct?
8         A.    Right.  Being one of the
9    section or two, you know, some of the
10   sections, they talk about -- yeah, that's
11   why, you know, just to help people, you know,
12   to be properly handling, you know, the
13   chemical during the transportation or
14   storage.
15        Q.    Looking now at the
16   Classification section, under
17   "Carcinogenicity" it says "Category 1B,"
18   correct?
19        A.    I'm sorry, where?
20        MR. SLATER:  You've got to
21   scroll up, Cheryll, just to get that
22   box that has the categories in it.
23   Perfect.  That's good.  Yeah.  I don't
24   want to go to the next page.  No, I

Page 569

1    don't want to go to the next page.
2         Q.    Looking at the classification
3    category, I'm just looking to identify what
4    Charles Wang was referring to, he said that
5    it refers to NDMA as a Class 1B.
6         Do you see that?
7         A.    Mm-hmm.  Yes.
8         MR. GALLAGHER:  Objection.
9         MR. SLATER:  Okay.  We can take
10   that down.
11        A.    But I don't know how, you know,
12   this MS --
13        MR. SLATER:  Cheryll, you can
14   take that down.  We're going to the
15   next document.
16        MR. GALLAGHER:  You can
17   complete your answer.  And if you need
18   to see the document, we can --
19   BY MR. SLATER:
20        Q.    I'll put it back up.  I --
21        A.    You know, I --
22        Q.    If you want to see the document
23   again, I'll go through the whole thing --
24        A.    That's fine.  But I just need

1  to point out, you know, it looks to me, you
2  know, I don't know -- first of all, I don't
3  know what this Class 1B, you know, in this
4  particular MSDS, you know, they are referring
5  to.
6       Okay.  If they are referring to
7  the same, you know, you know, IARC
8  categorization, you know, then it is just not
9  correct, because if they look at the, you
10  know, IARC classification, you know, even as
11  of today, you know, NDMA is classified as 2A,
12  okay.
13       Q.    We literally just went through
14  in Exhibit 316 where Charles Wang, who you
15  told us earlier is an expert, someone who is
16  reliable and who you trust, told you that he
17  disagrees with the Class 2A classification.
18  That is what the e-mail said.
19       Is that a correct statement
20  that I just made?  Yes or no.
21       A.    He --
22       MR. GALLAGHER:  Objection.
23  Calls for speculation, to the extent
24  it mischaracterizes the document and

1  the testimony.
2       A.    You know, you know, from the
3  e-mail he just referring to this MSDS, okay.
4  He didn't, you know, you know, you know, go
5  further commenting, you know, on how this
6  Class 1B, you know, was assigned or whether
7  it's -- it may be misleading or this may be
8  incorrect.  You know, this is just a -- you
9  know, based upon everything, you know, that I
10  know.
11       MR. SLATER:  Okay.  Cheryll,
12  I'm going to skip ahead two exhibits
13  in our list to CHARLESWANG000430,
14  please, and we'll make that
15  Exhibit 318.
16       (Whereupon, Exhibit Number
17  ZHP-318 was marked for
18  identification.)
19  BY MR. SLATER:
20       Q.    On the screen is Exhibit 318, a
21  June 22, 2018 e-mail from Charles Wang to
22  yourself, correct?
23       A.    Yes.
24       Q.    Now, in this e-mail he's still

1  on his Yahoo account, but you're on your work
2  account.  Do you know why that is?
3       A.    You know, again, I don't
4  remember exactly, you know, you know, you
5  know, you know, that I talked to him or
6  whatever.  So I would say a reasonable
7  explanation is, you know, as I explained, you
8  know, right, you know, in the -- during the
9  very early phase, you know, it was quite
10  urgent so I just sent him through my personal
11  e-mail, right.
12       And but then, you know, a few
13  days or, you know, after this event, you
14  know, I probably communicated or talked with
15  him, you know, over the phone or whatever,
16  you know, just I -- I just told him, you
17  know, probably, you know, he should utilize
18  my company e-mail.
19       Q.    Looking now at this e-mail,
20  Exhibit 318, Charles Wang writes to you, and
21  in the first paragraph he's providing you
22  some information about some -- a paper and
23  some sort of a reply to a paper.
24       Do you see that?

1       A.    I'm sorry, what?
2       Q.    Rephrase.  Withdraw it.
3       MR. SLATER:  Could you scroll
4  up, please, Cheryll, a little more so
5  we can capture the -- that's it.
6  Perfect.
7       Q.    Looking now at the June 22,
8  2018 e-mail, which we've marked as
9  Exhibit 318, to you, and I want to look, if
10  we could, at the second paragraph of that
11  e-mail, okay?
12       A.    Mm-hmm.
13       Q.    Charles Wang says, "Hi Min,"
14  and then in the second paragraph says, "I
15  suggest Huahai to hire a carcinogenicity
16  expert consultant to perform the analysis,
17  who knows risk assessment of carcinogen and
18  kept updated in regulatory guideline and
19  standards in this field.  If needed, I can
20  recommend a couple to you for consideration.
21       "Best, Charles."
22       Do you see that?
23       A.    Yes.
24       Q.    So he's basically telling you,

Page 574

¹ I think we need to get somebody in who is a
² real high-level expert in this field to help
³ us out with this project, and he's willing to
⁴ reach out to people he knows to try to get
⁵ you such an expert, correct?
⁶          MR. GALLAGHER:  Objection.
⁷ Mischaracterizes the document.
⁸     A.     Yeah, he said he can recommend
⁹ a couple, yes.
¹⁰          MR. SLATER:  Let's take that
¹¹ down now.  And we're going to go to
¹² Exhibit 319, which is going to be
¹³ CHARLESWANG000447.
¹⁴          (Whereupon, Exhibit Number
¹⁵     ZHP-319 was marked for
¹⁶     identification.)
¹⁷          MR. SLATER:  If we could, let's
¹⁸ go to the first e-mail in the chain,
¹⁹ which starts at the very bottom of the
²⁰ second page, please.  Perfect.
²¹ BY MR. SLATER:
²²     Q.     The first e-mail in the chain
²³ starting at the bottom of the second page is
²⁴ dated July 5, 2018 at 1:50 p.m.

Page 575

¹          Do you see that?
²     A.     Mm-hmm.  Yep.
³     Q.     The e-mail reads, "Hi Jim, Long
⁴ time no see.  Hope everything is going well."
⁵          MR. SLATER:  Let's scroll down
⁶ to see the rest of the e-mail.
⁷     Q.     "Friend of mine is looking
⁸ forward a consultant in United States to help
⁹ them define their product at FDA.  Give me a
¹⁰ call if you are interested.  My cell number
¹¹ is" -- and then the cell number is redacted.
¹²          Do you see that?
¹³     A.     Yes.
¹⁴     Q.     Then he says -- rephrase.
¹⁵          Then Charles Wang says, "For
¹⁶ your information, I have moved back to US and
¹⁷ still working for GSK" -- that would be
¹⁸ GlaxoSmithKline, correct?
¹⁹     A.     Yeah, looks like, uh-huh.
²⁰     Q.     -- "still working for
²¹ GlaxoSmithKline in their safety assessment
²² group in Upper Merion, Pennsylvania.  Hope to
²³ meet you again sometimes for catch up.
²⁴          "Talk to you later and enjoy

Page 576

¹ your summer.
²          "Best regards, Charles."
³          Do you see that?
⁴     A.     Mm-hmm.
⁵     Q.     And are you aware that, in
⁶ fact, Charles Wang at that time was the
⁷ director of safety assessment for
⁸ GlaxoSmithKline?
⁹     A.     I don't know -- I don't
¹⁰ remember his title, but, yeah, it looks --
¹¹ yeah, he was working, yeah, for GSK.
¹²     Q.     Did GSK know that in June and
¹³ July of 2018 Charles Wang was consulting for
¹⁴ ZHP regarding the NDMA contamination in
¹⁵ valsartan?
¹⁶          MR. GALLAGHER:  Objection.
¹⁷ Vague, and calls for speculation.
¹⁸     A.     I have no knowledge of that.
¹⁹ BY MR. SLATER:
²⁰     Q.     Did Charles Wang ever say to
²¹ you anything to the effect of, I'll do this
²² for you, but we can't tell my employer, or we
²³ can't let my employer know that I'm
²⁴ consulting on the side for another

Page 577

¹ pharmaceutical company?
²          MR. GALLAGHER:  Objection.
³ Argumentative, and foundation.
⁴     A.     I don't think this kind of
⁵ conversation ever occurred.
⁶ BY MR. SLATER:
⁷     Q.     Why did you consult with
⁸ Charles Wang, who was employed another
⁹ company, rather than hiring an independent
¹⁰ toxicological consultant?
¹¹          MR. GALLAGHER:  Objection.
¹² Lacks foundation.
¹³     A.     As I told you, he has been a
¹⁴ long-time friend of mine, okay, and we didn't
¹⁵ know anybody, you know, else in terms of the,
¹⁶ you know, professional toxicologist, right?
¹⁷ And due to the urgency, you know, you know,
¹⁸ of this nature, we had to, you know, invoke
¹⁹ him, right?
²⁰          I don't know if you understand,
²¹ you know, the procedure if you want to hire
²² somebody, right, from a company.  Like, you
²³ know, there's a lot of red tape you have to
²⁴ go through.

Confidential Information - Subject to Protective Order

Page 578

1         So due to the very urgent
2   nature, you know, we tried to solve this
3   problem as soon as possible.  So I naturally,
4   you know, you know, think of him and, you
5   know, just contact him.
6   BY MR. SLATER:
7         Q.    When you say "there's a lot of
8   red tape," red tape at ZHP to hire a
9   professional consultant who is independent?
10        MR. GALLAGHER:  Objection.
11  Foundation.
12        Go ahead.
13        A.    From a company perspective, no
14  matter, you know, who you hire, okay, you
15  have to go through certain procedures, right?
16  Like, you know, a contract for service, you
17  know, like a confidential, you know,
18  agreement, whatever.  You know, this will
19  take at least a few days.
20        But here, you know, because the
21  urgency, you know, of the nature, right, we
22  don't want to waste any single day.
23  BY MR. SLATER:
24        Q.    So you didn't pay Charles Wang

Page 579

1   for any of the consulting he did for ZHP?
2         A.    That I have no idea.
3         Q.    You don't know if Charles Wang
4   was paid for the work he did for ZHP?
5         A.    I have no knowledge of that,
6   okay, because this is -- you know, this has
7   been outside of my -- you know, yeah, because
8   I'm -- as I said, I'm a technical person.  I
9   just reach out to him, you know, you know,
10  for his help.
11        Q.    Did you ever discuss with
12  Charles Wang the subject of him being
13  compensated for consulting for ZHP while he
14  was employed by GlaxoSmithKline as their
15  director of safety assessment?
16        MR. GALLAGHER:  Objection.
17  Lacks foundation.
18        A.    As I said, you know, for this
19  matter I don't know.  I have no idea.
20  BY MR. SLATER:
21        Q.    You have no idea if you ever --
22  well, let me ask the question.  I want to
23  make sure I'm clear.
24        Did you ever ask any --

Page 580

1   rephrase.
2         Did anybody ever tell you that
3   Charles Wang was paid anything for consulting
4   for ZHP with regard to the NDMA contamination
5   of ZHP's valsartan?
6         A.    I don't remember.
7         MR. GALLAGHER:  Objection.
8   Foundation.
9   BY MR. SLATER:
10        Q.    That would be pretty easy to
11  find out, right?  If we requested that from
12  you, your company should have a record if
13  they paid him, right?
14        MR. GALLAGHER:  Objection.
15  Lacks foundation.
16        A.    You can -- I would say you can
17  make, you know, a request, right, just like
18  Patrick said.  You can make a request, you
19  know, through all counsel.  They can find out
20  for you.
21  BY MR. SLATER:
22        Q.    Would Jun Du know if Charles
23  Wang was paid for the work he did for ZHP?
24        MR. GALLAGHER:  Objection.

Page 581

1   Calls for speculation.
2         A.    You can ask him, okay?
3   BY MR. SLATER:
4         Q.    Did you ever speak to the
5   chairman of your company, Mr. Chen, regarding
6   any of your interactions with Charles Wang
7   and what he was telling you?
8         A.    No.
9         Q.    Did you ever speak to Baohua
10  Chen at all about the nitrosamine
11  contamination of valsartan sold by ZHP?  Did
12  you ever discuss that with him?
13        A.    We discussed the matter, you
14  know, in meetings.
15        Q.    Meetings in person?
16        A.    No, not in person.
17        Q.    How were those meetings held?
18        A.    I mean, like, you know, when
19  this event basically occurred, you know, you
20  know, it become the top priority of the
21  company.
22        So as the CEO of the company,
23  you know, you know, he organized, you know,
24  quite a few meetings, basically just to

Page 582

1 ensure, you know, the investigation being
2 conducted, you know, as soon as possible,
3 and, you know, basically just ask us, you
4 know, what kind of resources that we need,
5 basically.
6     Q.    Were those meetings that you
7 talked about held in person?  Well, rephrase.
8         You said the meetings were not
9 held in person.  So how were they held?
10     A.    You know, with a group, like,
11 you know, with a group of peoples.
12     Q.    Was it over the telephone?  Was
13 it by videoconference?  How did you
14 communicate with one another in those
15 meetings?
16     A.    Sir, as I said, there are
17 different meetings, okay?  Some meetings, I
18 don't -- you know, I don't remember, you
19 know, you know, all the details.  But some
20 meetings, you know, all the participants, you
21 know, were attending in person, some meetings
22 probably, you know, involving some
23 telecommunications.
24     Q.    So you did have meetings in

Page 583

1 person with Mr. Chen about the nitrosamine
2 contamination of the valsartan?
3     A.    Well, in person, okay, I
4 thought you mean like, like, just, you know,
5 like one-on-one meeting, you know.  But,
6 yeah, like a -- when -- a group of meeting,
7 yeah, both Mr. Chen and I as well as other
8 members of the management, yeah.  Yeah, at
9 least, you know, yeah, we were attending some
10 of the meeting, you know, when both Mr. Chen
11 and myself were physically, you know,
12 attending the meetings.
13     Q.    So you said meetings took place
14 in person, right?
15     A.    Some meeting, yeah, some
16 meeting, yeah, were attended in person, yes.
17     Q.    Were some of the meetings by
18 videoconference?
19     A.    Yeah, uh-huh.  Not
20 videoconference.  I don't think you -- you
21 know, you -- we don't have videoconference,
22 usually just teleconference.
23     Q.    You said usually
24 teleconference.  Did at least one of the

Page 584

1 meetings involving Mr. Chen regarding the
2 nitrosamine contamination of the valsartan
3 take place over videoconference?
4     A.    I don't remember that ever
5 happened.
6         MR. GALLAGHER:  Adam, we've --
7         you can finish -- we've been going
8         about an hour and 20 minutes.  When
9         you get to a natural --
10 BY MR. SLATER:
11     Q.    Did any of the meetings take
12 place by telephone?
13     A.    As I said, some of the meeting
14 may, you know, may be held, you know, with
15 some attendants, okay, joining by
16 teleconference.
17     Q.    Teleconference means by
18 telephone?
19     A.    Yeah, by telephone, yes.
20     Q.    Did you attend every meeting
21 that Mr. Chen organized and attended
22 regarding the nitrosamine contamination of
23 ZHP's valsartan?
24     A.    I don't think so, like did I

Page 585

1 attended every meeting, because there's a
2 different, you know, you know, you know,
3 aspects dealing with this issue, right.
4         And, for example, the issue
5 regarding like recall, you know, because I --
6 you know, as I said, I'm a technical person,
7 those meetings, you know, I never attended,
8 you know, those kind of meetings because it's
9 outside of my scope, outside of my
10 responsibility.
11     Q.    You said --
12     A.    Yeah.
13     Q.    You said that Mr. Chen
14 organized meetings because he was the CEO.
15 So you don't know how many meetings took
16 place or who attended all those meetings?
17         MR. GALLAGHER:  Objection.
18         Calls for speculation.
19         Go ahead.
20     A.    As I said, you know, I -- those
21 information I'm not, you know, within my
22 responsibility, okay.
23 BY MR. SLATER:
24     Q.    Well, I'm not asking for your

Confidential Information - Subject to Protective Order

Page 586

1  responsibility.  I'm asking if you know how
2  many meetings took place and who attended
3  each of them.
4       A.   I don't --
5            MR. GALLAGHER:  Objection.
6  Calls for speculation.
7       A.   I don't remember.
8  BY MR. SLATER:
9       Q.   How many meetings did you
10 attend with Mr. Chen regarding the
11 nitrosamine contamination of ZHP's valsartan?
12      A.   Again, I don't have accurate
13 numbers.
14      Q.   Was it 10 meetings, was it 20
15 meetings?  Can you estimate, please?
16      A.   I just cannot.
17      Q.   You have no idea how many
18 meetings you attended with Mr. Chen?
19      A.   I don't keep, you know, you
20 know, you know, those things.
21      Q.   I'm just asking if you can
22 recall how many meetings.  You said this was
23 top priority of the company at the time.  I
24 would think you could recall roughly how many

Page 587

1  meetings you attended with the chairman of
2  the company about this crisis.
3            MR. GALLAGHER:  Objection.
4  Argumentative, and asked and answered.
5  BY MR. SLATER:
6       Q.   Can you recall?
7       A.   No, I cannot recall the
8  accurate number.
9       Q.   Can you give me an estimate?
10           MR. GALLAGHER:  Objection.
11 Asked and answered.
12      A.   As I said, you know, I don't
13 want to provide -- you know, you know,
14 because I don't have this memory, so I don't
15 want to, you know, provide any specific
16 number, okay?
17 BY MR. SLATER:
18      Q.   Well, can you tell me your best
19 estimate, please, or are you unwilling to do
20 so?
21           MR. GALLAGHER:  Objection.
22 Argumentative, and asked and answered.
23      A.   So if you want to say, you
24 know, the best estimate by now, you know, you

Page 588

1  know, at this time I would say probably, you
2  know, maybe single digit or maybe up single
3  digit.
4  BY MR. SLATER:
5       Q.   What does that mean, "single
6  digit or maybe up single digit"?
7       A.   Like, you know, anywhere like
8  maybe between five or nine or something like
9  that.
10      Q.   Do you recall what was
11 discussed in those meetings?
12      A.   As I said, I don't, you know,
13 recall all the exact, you know, you know, you
14 know, contents.  Basically, you know, you
15 know, the instruction was, you know, we need
16 to, you know, put all the efforts -- you
17 know, the company will support utilizing all
18 the resources, you know, to push this forward
19 as soon as possible.
20      Q.   Using all the resources -- I'm
21 sorry.
22           When you say using all the
23 resources, did that include making sure that
24 there wouldn't be any "red tape" like you

Page 589

1  said before if you needed to hire an expert
2  consultant to advise the company, for
3  example, on toxicology?
4            MR. GALLAGHER:  Objection.
5  Lack of foundation.
6       A.   This topic was not discussed,
7  okay.  So in terms of the resources, from my
8  perspective, okay, it was, you know, you
9  know, we need to -- we need to purchase
10 additional, you know, high-end instrument,
11 okay, particularly like a mass spectrometry,
12 a GC-MS, GC-MS/MS, you know, stuff like that.
13 So he indicated he will give the full
14 support, like, you know, as long as, you
15 know, yeah, like how many, whatever, you
16 know, whenever that I, you know, propose he
17 will, you know, approve the purchase of these
18 instrument.
19 BY MR. SLATER:
20      Q.   Were notes or minutes taken of
21 these meetings with Mr. Chen?
22      A.   I don't remember.
23      Q.   Did you take notes of these
24 meetings?

**Page 590**

1    A.    No.
2    Q.    Did you see anybody else taking
3  notes during these meetings?
4    A.    I didn't pay attention to that.
5    Q.    So you would go to meetings
6  with the chairman of the company about a
7  situation that was the top priority of the
8  company, and you wouldn't take any notes
9  during those meetings at all?
10         MR. GALLAGHER:  Objection.
11  Argumentative.
12         And we're getting close to --
13         towards an hour and a half, if you get
14         close to a breaking point.
15    A.    I didn't take note.
16  BY MR. SLATER:
17    Q.    Is that your typical practice,
18  you go to important meetings and you take no
19  notes at all?
20         MR. GALLAGHER:  Objection.
21  Vague, and argumentative.
22    A.    Because those meetings, you
23  know, you know, from my perspective, as I
24  said, you know, it's very specific, okay.

**Page 591**

1  Because for me, I just need to have the
2  funding to purchase these instrument, so, you
3  know, for these simple things I don't think
4  it's necessary, you know, for me to take
5  note.  You know, he just, yes, you know, then
6  go ahead.
7  BY MR. SLATER:
8    Q.    Are you saying that you had
9  five to nine meetings, which is your
10  estimate, and at every one you discussed
11  buying equipment to do testing, and that was
12  the whole meeting every time?  You're not
13  saying that, are you?
14    A.    No, I'm not saying that.
15         MR. GALLAGHER:  Objection.
16  BY MR. SLATER:
17    Q.    Do you remember what else was
18  discussed in those meetings with Mr. Chen,
19  the chairman of the company?
20    A.    Look, you know, as I said, I
21  don't remember, you know, exactly, you know,
22  you know, all the other things, okay.
23         The most obvious things is, or
24  the most clear thing is that Mr. Chen was

**Page 592**

1  fully support, okay, in terms of, you know,
2  allocating funding, you know, for the
3  instrument, you know, that I need.
4         The other meeting, it's most
5  likely he was asking, you know, for our
6  progress, for example, how the method
7  development was ongoing, you know, stuff like
8  that.
9    Q.    Okay.  Did Mr. Chen say any --
10  well, rephrase.
11         Did Mr. Chen ever tell you or
12  the people in your meetings -- rephrase.
13         During the meetings you
14  attended with Mr. Chen, did he take notes?
15  Did you ever see him taking notes?
16    A.    No.
17    Q.    Did anybody take notes in these
18  meetings that you ever observed?
19    A.    I just pay attention mostly to
20  Mr. Chen when I spoke, you know, to him.
21    Q.    When you were in these
22  meetings, did you ever notice anybody in the
23  meetings taking notes?
24    A.    I don't re --

**Page 593**

1         MR. GALLAGHER:  Objection.
2         Go ahead.
3    A.    I don't recall, okay?
4  BY MR. SLATER:
5    Q.    So a roomful of people meeting
6  with the chairman of the company about a
7  situation that's the top priority of the
8  company multiple times, in all those meetings
9  you never took notes, Mr. Chen never took
10  notes, and you never saw anyone else take
11  notes.
12         That's your best recollection,
13  is that what you're testifying?
14         MR. GALLAGHER:  Objection.
15  Argumentative, asked and answered,
16  vague, and compound.
17    A.    That's not what exactly what I
18  told you.  Okay.  What I can tell you is
19  Mr. Chen, he didn't take notes, okay?  And I
20  didn't take note.  Who else, I don't
21  remember, okay?
22  BY MR. SLATER:
23    Q.    Were there ever agendas
24  circulated for these meetings; for example,

Page 594

1    by e-mail?
2        A.    I don't know.  I don't
3    remember.
4        Q.    When these meetings were
5    scheduled, were e-mails sent out or any sort
6    of calendar sent out so everybody would know
7    the date and time and place of the meetings?
8        A.    I don't remember.  I mean, but
9    one thing is, you know, usually, okay, I can
10   tell you my -- usually, like for Mr. -- you
11   know, for meetings with Mr. Chen, usually,
12   you know, his, you know, secretary, you know,
13   would make phone calls.
14           And one of the reason probably
15   was he was quite busy, so we just -- you
16   know, a lot of times we just stand by.  And
17   so once he had time, his secretary would
18   call, call us, you know, to go to meeting
19   rooms, you know, with him.
20       Q.    Who was his secretary?  What's
21   her name?
22       A.    There is a --
23       Q.    Who is Mr. Chen's secretary?
24       A.    There are a group, you know, of

Page 595

1    people, okay.  I don't know exactly, you
2    know, who would be designated.
3            I think the best, you know,
4    answer, if you can, you know, maybe you can
5    also go through my counsel, you know, making
6    a formal request, they can provide it, you
7    know, from the staff of Mr. Chen.  You know,
8    they probably can give you, you know, a much
9    more accurate, you know, because I don't want
10   to, you know, you know, guess.
11       Q.    You know who works for
12   Mr. Chen.  Tell us the names of the people
13   that work for him as his secretaries and
14   assistants.
15           MR. GALLAGHER:  Objection.
16       Asked and answered.
17           And, Adam, we've been going
18       over an hour and a half now.
19           MR. SLATER:  I'm in the middle
20       of a line of questioning.  I don't
21       want to break this deposition now.  I
22       don't think it would be appropriate.
23           MR. GALLAGHER:  I'm not sure
24       where you're going, but okay.

Page 596

1        A.    His chief of staff, okay, is
2    Ms. Maggie Kong, as I mentioned the other
3    day.
4    BY MR. SLATER:
5        Q.    Is she the person who would
6    call you to tell you meetings were being
7    scheduled?
8        A.    Sometimes she called me;
9    sometimes, you know, her staff.
10       Q.    Who are the staff members that
11   worked for her who would contact you?
12       A.    You know, there would be
13   different, you know, people, okay, so I don't
14   remember, you know, you know, very
15   specifically for, you know, exactly, you
16   know, who under her, you know, called me,
17   okay?
18       Q.    Can you remember anybody else's
19   name that contacted you, other than Maggie
20   Kong?
21       A.    I mean, you know, this is for
22   so long, so I couldn't, you know, give you an
23   accurate.  You know, I don't want to provide,
24   you know, you know, you know, anything, you

Page 597

1    know, inaccurate, okay.
2            So only thing for sure, you
3    know, yeah, it would be somebody -- you know,
4    yeah, sometimes could be her; sometimes, you
5    know, could be someone, you know, you know,
6    of her staff.
7        Q.    After these meetings would take
8    place, what would Mr. Chen do in terms of
9    taking action based on the meetings?
10           MR. GALLAGHER:  Objection.
11       Lack of foundation, and calls for
12       speculation.
13       A.    I don't pay attention to, you
14   know, other things, as I said, you know,
15   because my, you know, main function or my
16   main responsibility was to ensure the
17   technical investigation, you know, move
18   forward as soon as possible.
19   BY MR. SLATER:
20       Q.    Did Mr. Chen give any
21   instructions at these meetings?  Other than
22   you said he said, okay, you can buy that
23   machine that you were asking about, did he
24   ever give any other instructions?

Page 598

1    A.   As I said, I don't --
2         MR. GALLAGHER:  Objection.
3    Lacks foundation.
4    A.   As I said, you know, my only
5    focus, you know, was, you know, you know, for
6    the part of the responsibility, you know,
7    from my perspective.
8    BY MR. SLATER:
9    Q.   Was Mr. Chen aware that at
10   least as of July 27, 2017 there were people
11   in your company that knew that NDMA was in
12   valsartan that your company was selling?
13   A.   He had no idea.
14        MR. GALLAGHER:  Objection.  No
15   foundation.
16   BY MR. SLATER:
17   Q.   How do you know he had no idea?
18   A.   Because I told you, you know,
19   as I told you before already, okay.
20   Q.   Did anybody who either sent or
21   received that e-mail ever tell Mr. Chen or
22   tell someone else who told Mr. Chen about
23   that?
24        MR. GALLAGHER:  Objection.

Page 599

1    BY MR. SLATER:
2    Q.   Do you know?
3         MR. GALLAGHER:  Objection.
4    Vague, and lacks foundation.
5    A.   As I said, I -- you know, I
6    don't remember, or I don't know, you know,
7    who else on that e-mail list, you know, what
8    they did afterwards.
9    BY MR. SLATER:
10   Q.   You don't know if Mr. Chen was
11   aware that your company knew about the NDMA
12   in the valsartan as of July 2017?
13        MR. GALLAGHER:  Objection.
14   Vague, lacks foundation, and
15   mischaracterizes the documents and
16   testimony.
17   A.   I'm pretty sure he -- you know,
18   he didn't know.  Otherwise, you know, he
19   probably, you know, will talk to me.
20   BY MR. SLATER:
21   Q.   Why do you say that?
22   A.   Well, because, you know, if
23   it's really, you know, you know, you know,
24   you know, a big issue, you know, yeah,

Page 600

1    he will.  You know, particularly, you know,
2    this is, you know, right, related to an
3    investigation of an impurity, right?
4         Mr. Chen, you know, you know,
5    he is just at the very top.  He wouldn't, you
6    know, have those details, information,
7    unless, you know, you know, you know, I
8    became aware, and then I, you know, will
9    report that to him, or somebody like from QA
10   or whatever.
11        But as I said, you know, if
12   people on that list, you know, they -- you
13   know, they feel or whatever, you know, this
14   is an issue, or they may not.  As I said, you
15   know, they may -- they may not, you know, or
16   they think, you know, Mr. Lin's claim may be,
17   you know, way exaggerated.
18   Q.   Well, his claim wasn't
19   exaggerated.  He was 100 percent accurate
20   about valsartan containing NDMA, correct?
21        MR. GALLAGHER:  Objection.
22   Wait, Min.
23        THE WITNESS:  Sorry.
24        MR. GALLAGHER:  Objection.

Page 601

1    Vague, lacks foundation, calls for
2    speculation, and mischaracterizes
3    documents and testimony.
4    A.   I think I answered this
5    question, you know, several times, okay.
6    BY MR. SLATER:
7    Q.   Did you tell Mr. Chen that in
8    April of 2018 you told Mr. Lin, who worked
9    for you, not to complete or not to issue --
10   rephrase.
11        Did you tell Mr. Chen at any
12   time that in April 2018 you told Mr. --
13   rephrase.
14        Did you tell Mr. Chen at any
15   time that in April 2018 you directed that a
16   report that had been written regarding
17   concern about nitrosamines in irbesartan, and
18   you had instructed that that report not be
19   issued because of the fact that the impurity
20   was sensitive?
21        Did you tell Mr. Chen that?
22   A.   No.
23        MR. GALLAGHER:  Objection.
24        THE WITNESS:  Sorry.

Confidential Information - Subject to Protective Order

Page 602

1    MR. GALLAGHER:  Objection.
2    Outside the scope, vague, compound,
3    and lacks foundation.
4    A.    The answer is no.
5  BY MR. SLATER:
6    Q.    You said that Mr. Chen was
7  organizing these meetings.  Based on your
8  understanding and what you observed, was he
9  very actively interested in what was
10 happening with the contamination of valsartan
11 with nitrosamines?
12   A.    As I've said, that he is on top
13 of the progress, okay?  He didn't know, you
14 know, all those technical details.  It's not
15 his job.
16        I just want to make sure --
17 yeah.
18   Q.    I'm sorry.
19        How do you know he didn't know
20 the technical details?
21        MR. GALLAGHER:  Objection.
22   Vague, and calls for speculation.
23   A.    He is the CEO of the company.
24 So if you talk to head -- like a CEO of

Page 603

1  Novartis, you know, he would -- would that
2  person know the technical details of NDMA?
3  BY MR. SLATER:
4    Q.    I don't know if -- I don't
5  know, if it turned out that NDMA was
6  contaminating one of their drug substances
7  and that substance -- and the NDMA was
8  carcinogenic, yeah, I would think the
9  Novartis CEO would want to know everything
10 about it, if you're asking me.
11        MR. GALLAGHER:  Objection.
12        Wait.  Wait, Min.
13        Objection.  Vague,
14   hypothetical, calls for speculation.
15 BY MR. SLATER:
16   Q.    Do you know that --
17        MR. GALLAGHER:  Just for the
18 record, we've been going for an hour and
19 40 minutes now, and I'm sure the court
20 reporter would love a break, but --
21 BY MR. SLATER:
22   Q.    Do you know that Mr. Chen --
23        MR. GALLAGHER:  -- your
24   deposition.

Page 604

1  BY MR. SLATER:
2    Q.    Do you know that Mr. Chen has a
3  master's in chemical engineering?
4    A.    That I --
5        MR. GALLAGHER:  Objection.
6    A.    Sorry.
7  BY MR. SLATER:
8    Q.    Do you know that Mr. Chen has a
9  background in chemistry or chemical
10 engineering?  Are you aware of that?
11        MR. GALLAGHER:  Objection.
12   Outside the scope.
13   A.    I know he at least had a
14 college degree, okay, but everything else I
15 really didn't pay attention.
16        MR. SLATER:  You can take a
17   break now.  Go off the record.
18        THE VIDEOGRAPHER:  The time
19   right now is 8:47 a.m.  We're now off
20   the record.
21        (Whereupon, a recess was taken)
22        THE VIDEOGRAPHER:  The time
23   right now is 9:05 a.m.  We're back on
24   the record.

Page 605

1  BY MR. SLATER:
2    Q.    Do you know -- well, wait a
3  second.
4        Do you know whether any record
5  was made of Mr. Chen's interactions with
6  other people in the company about the
7  valsartan contamination?
8    A.    I have no idea.
9        MR. GALLAGHER:  Objection.
10   Calls for speculation, and
11   foundation -- lack of foundation.
12 BY MR. SLATER:
13   Q.    Can you recall, other than
14 discussing the equipment that you needed,
15 anything else that you told Mr. Chen
16 connected to the valsartan contamination with
17 nitrosamines?
18   A.    I'm sorry, say that again?
19   Q.    Sure.
20        Do you remember anything you
21 told Mr. Chen regarding the nitrosamine
22 contamination of valsartan?
23        Earlier you told us you
24 discussed some equipment you needed.

Page 606

1 Anything else?
2      A.    As far as I can remember, you
3 know, those are the items that I -- was
4 the -- you know, was the main topic.
5 Everything else I really, you know, do not
6 recall.
7           But instrument, you know, was
8 really an urgent needs because we need to,
9 you know, have those instruments to be in
10 place.
11      Q.    What instrument --
12      A.    Sorry --
13      Q.    What instrument or instruments
14 did you discuss the need for?
15      A.    GC-MS, and also GC-MS/MS in
16 particular, at least initially.  And then
17 later on there's also -- I think, you know,
18 we discussed like some LC-MS equipment.
19      Q.    Didn't you already have a GC-MS
20 machine?
21      A.    That --
22           MR. GALLAGHER:  Objection.
23      A.    Sorry, go ahead.  I'm sorry.
24           You know, we were facing with

Page 607

1 thousands, you know, batches of valsartan
2 need to be tested, okay, so a single, you
3 know, GC-MS, you know, would not be
4 sufficient, right.
5           And also that, you know,
6 particular GC-MS also was needed, you know,
7 to develop and optimize, you know, analytical
8 methods.  So we need to place the GC-MS also
9 in the QC.  Because in QC, in Chuannan CC
10 there had been no GC-MS instrument, so we
11 need to put these, you know, instrument into
12 Chuannan QC site, right.
13           So eventually, you know,
14 Chuannan QC site became the, you know, the
15 main testing site for those, you know,
16 thousands batches of commercial, you know,
17 batches of the valsartan.
18 BY MR. SLATER:
19      Q.    Was Mr. Chen told during these
20 meetings that multiple customers of ZHP had
21 since 2014 been complaining that there was
22 unknown peaks and interference on
23 chromatograms, and they were concerned about
24 what impurities might be there, and that they

Page 608

1 kept asking for an answer from ZHP and
2 couldn't get an answer?
3           MR. GALLAGHER:  Objection.
4      Lacks foundation, and mischaracterizes
5      documents and testimony.
6      A.    Such detail, you know, such
7 technical details were never discussed, you
8 know, at, you know, Mr. Chen's level.
9 BY MR. SLATER:
10      Q.    Was there discussion about how
11 your company should -- rephrase.
12           In these meetings with
13 Mr. Chen, was there discussion about how your
14 company should interact with the FDA?
15           MR. GALLAGHER:  Objection.
16      Outside the scope.
17           THE WITNESS:  Pardon.  Go
18      ahead.
19           MR. GALLAGHER:  Objection.
20      Outside the scope.
21           To the extent you know
22      personally, Mr. Li, you should answer.
23      A.    Anything as far as I know,
24 anything, you know, relating to interacting

Page 609

1 with regulatory agencies was taken care of by
2 the RA department.  Mr. Chen would not have,
3 you know, such detailed knowledge, you know,
4 how to interact.
5 BY MR. SLATER:
6      Q.    How do you know that?  Do
7 you -- did you attend the meetings with the
8 regulatory people that he attended?
9      A.    I don't remember.  But as I
10 said, based upon my, you know, my
11 observation, okay, he just would not be
12 involved in too much, you know, operational
13 details, okay.  He's only pay attention to
14 high levels, okay, like every --
15      Q.    One of your very profitable
16 drugs was contaminated with something that
17 caused cancer.  That's about as high level as
18 it gets, right?
19           MR. GALLAGHER:  Objection.
20      Argumentative.
21      A.    I don't want to comment on
22 that, okay.
23 BY MR. SLATER:
24      Q.    Do you know whether or not

Confidential Information - Subject to Protective Order

Page 610

1  Mr. Chen ever discussed with anybody how your
2  company should interact with the FDA?
3      A.   I don't remember -- sorry.
4          MR. GALLAGHER:  Objection.
5  Outside the scope, and asked and
6  answered.
7      A.   I don't remember.
8  BY MR. SLATER:
9      Q.   At any of these meetings that
10  you attended, did Mr. Chen ever ask you, how
11  did this happen, and ask for an explanation
12  for how this could happen?
13          MR. GALLAGHER:  Objection.
14  Vague.
15  BY MR. SLATER:
16      Q.   Time out.  I'm going to ask the
17  question again because counsel said it's
18  vague, so in case, in case, you know, that
19  objection will be sustained I'm going to ask
20  the question again.
21          Did Mr. Chen ever ask you, how
22  was it that our valsartan could be
23  contaminated with a nitrosamine and we didn't
24  know about it?  Did he ever ask that

Page 611

1  question?
2      A.   I don't remember specifically,
3  okay, he -- like he specifically asked that
4  question, okay.  But I can tell you at least
5  in one of those meetings like, like I
6  explained to everyone, you know, you know,
7  the root cause analysis as we put into this
8  deviation report.
9      Q.   When you say the deviation
10  report, you mean the deviation investigation
11  reports that were provided to the FDA?
12      A.   Yes.
13          MR. GALLAGHER:  Objection.
14  Lacks foundation.
15      A.   The deviation report actually,
16  you know, you and I, we just went through,
17  you know, an early draft version.  Yeah, I
18  think that -- that's the deviation, you know,
19  investigation report.
20          But what you presented, you
21  know, was only -- you know, looks like an
22  early version.  It's not the final, finalized
23  version.
24          ///

Page 612

1  BY MR. SLATER:
2      Q.   Did you tell Mr. Chen that in
3  multiple drafts the deviation investigation
4  report stated that your company had
5  insufficiently researched and studied the
6  chemical processes, and then somebody made
7  the decision to take that language out of the
8  report before the report was finalized?  Did
9  you or anyone tell them that, to your
10  knowledge?
11          MR. GALLAGHER:  Objection.
12  Vague, and argumentative.
13      A.   I don't remember those details.
14  But my guess is, you know, such details would
15  not be discussed during those meetings
16  usually.
17  BY MR. SLATER:
18      Q.   Did you or anybody else in your
19  presence tell Mr. Chen that your company
20  failed to sufficiently research or study the
21  chemical processes, and that's why your
22  company didn't know that NDMA was a potential
23  contaminant from the beginning?
24          MR. GALLAGHER:  Objection.

Page 613

1          Vague, lacks foundation, and
2  argumentative.
3      A.   As I said, you know, you know,
4  whatever the background information provided
5  in the deviation, you know, in that deviation
6  investigation report, you know, I remember
7  that, that I, you know, as I said, I give a
8  description or, you know, basically went
9  through that some of those contents in the
10  deviation, you know, introduction part.
11  BY MR. SLATER:
12      Q.   Did anybody -- rephrase.
13          Did you or anybody else, to
14  your knowledge, tell Mr. Chen that your
15  company was aware that the valsartan your
16  company was selling was contaminated with
17  NDMA long before it came out in June of 2018
18  to the public?
19          MR. GALLAGHER:  Objection.
20  Vague, and lacks foundation.
21      A.   As I told you, you know, I
22  mean, people attended -- you know, I mean,
23  basically, you know, we didn't know, I mean,
24  you know, at a high level, before the events.

Page 614

1  BY MR. SLATER:
2      Q.    What do you mean, "we didn't
3  know at a high level"?
4      A.    You know, for those people, you
5  know, attending, you know, the meetings.
6      Q.    Well --
7      A.    As I said, nobody except
8  Mr. Chen -- sorry, Mr., you know, Lin, as I
9  said, he made some guess, you know, out of,
10 you know, you know, some irbesartan, you
11 know, experiment, right?  He's making some --
12 his projections, you know.
13            Nobody else -- you know, nobody
14 else, you know, know, you know, there was an
15 issue, until, you know, June the 6th, 2018.
16     Q.    Just to be clear, Mr. Lin
17 stated July 27, 2017 that what he was seeing
18 with irbesartan was similar to the NDMA that
19 occurs in valsartan when quenched with sodium
20 nitrite.  That's what he said in the e-mail.
21            And you knew that because it
22 was in the e-mail that was sent to you, so
23 you had that information, correct?
24            MR. GALLAGHER:  Objection.

Page 615

1      Compound, lacks foundation, and
2      mischaracterizes documents.
3      A.    As I told you before, you know,
4  for some reason that e-mail just slipped
5  through, you know.  So I -- you know, I had
6  no memory, I don't, you know, know until, you
7  know, you just showed me a few days ago, like
8  the day before.
9  BY MR. SLATER:
10     Q.    Well, if you had no e-mail, why
11 do you keep telling me that this was some
12 sort of a guess or something else or
13 speculation by Mr. Lin if you don't remember
14 it?
15     A.    Well, based upon -- you know,
16 now, based upon the --
17            MR. GALLAGHER:  Wait.
18            THE WITNESS:  Sorry.
19            MR. GALLAGHER:  Objection.
20 Argumentative, and asked and answered.
21     A.    You know, it's basically, yeah,
22 based upon that e-mail, yeah, now you provide
23 to me, by reading through.  Right?  You
24 provide me, you know, the day before, you

Page 616

1  know, that e-mail, right?  Yeah, I just read
2  through, you know, it looks like, you know,
3  he's making his projections.
4  BY MR. SLATER:
5      Q.    Well, he wasn't projecting
6  regarding valsartan.  He was stating it as a
7  fact that it's known that NDMA occurs in
8  valsartan when quenched with sodium nitrite.
9            And that statement in his
10 e-mail was scientifically accurate, correct?
11            MR. GALLAGHER:  Objection.
12 Lacks foundation, compound, and
13 mischaracterizes documents.
14     A.    As I told you, if you look
15 through that e-mail, okay, the data that he
16 had, okay, based upon -- you know, again,
17 based on content of that e-mail, the data
18 that he had were from the experiment with
19 irbesartan, okay?
20            There's no -- there's no data
21 mentioned with anything, like, related to,
22 you know, valsartan, right?
23            I mean, can you see, you know,
24 from the very beginning, go through this

Page 617

1  whole document?  You know, I don't see it.
2  BY MR. SLATER:
3      Q.    He didn't actually -- rephrase.
4            What he said was that he was
5  seeing with the irbesartan was similar to the
6  NDMA that occurs in valsartan when quenched
7  with sodium nitrite.
8            He didn't need to present data
9  in this e-mail because that was a fact he was
10 reciting in the e-mail which was accurate.
11     A.    No, no, no.  The --
12            MR. GALLAGHER:  Wait.
13            THE WITNESS:  Sorry.
14            MR. GALLAGHER:  Objection.
15 Lacks foundation, vague, and
16 mischaracterizes the document.
17     A.    The only data or external
18 information or publicly available information
19 related to valsartan, you know, if you can
20 see, is related to that patent, right.  So
21 that patent is actually, you know, referring
22 to, you know, impurity K in valsartan.  Okay?
23 BY MR. SLATER:
24     Q.    This was internal information

Page 618

1  that wasn't being shared with anybody from
2  outside the company, this e-mail from July
3  2017.  It's an internal e-mail, right?
4       A.    Yeah, it is internal e-mail,
5  yeah.
6       Q.    And when -- rephrase.
7            When that e-mail states that
8  NDMA occurs in valsartan when it's quenched
9  with sodium nitrite, that's an accurate
10  statement.  That's actually the root cause of
11  the NDMA contamination, right?
12           MR. GALLAGHER:  Objection.
13      Lacks foundation, and mischaracterizes
14      the document.
15      A.    I'm not sure exactly, you know,
16  based upon -- you know, based upon that
17  particular wording, you know.
18           But, you know, to me, you know,
19  when he said quenching with, you know,
20  valsartan, you know, quenching with sodium
21  nitrite, right, the only -- as I said, you
22  know, the available, you know, information,
23  it looks like is the attachment of that
24  external patent.

Page 619

1       Okay.  That patent, if you look
2  through it, it's only talking about, you
3  know, component, you know, like impurity K
4  and L, probably.
5  BY MR. SLATER:
6       Q.    Would you be surprised if I was
7  able to show you documentation that your
8  company did chromatography and identified
9  NDMA in valsartan prior to July 27, 2017?
10  Would that surprise you?
11           MR. GALLAGHER:  Objection.
12      Argumentative.
13      A.    Yeah, I would be surprised if
14  you say, because I don't -- you know, I'm not
15  aware of that.
16  BY MR. SLATER:
17      Q.    Would it be surprising to you
18  if we were to show you documents indicating
19  that there were people within your company
20  that had figured out that there were
21  nitrosamines, likely NDMA -- rephrase.  Let
22  me rephrase it.
23           I'm going to actually ask you
24  even more directly.

Page 620

1       Did anybody in your company
2  identify NDMA through chromatography prior to
3  July 27, 2017 where you were made aware that
4  it had been identified on the test?
5       A.    Before -- I'm sorry.  Before
6  which date?
7       Q.    Before the e-mail sent by
8  Mr. Lin on July 27, 2017.
9           MR. GALLAGHER:  Objection.
10      Lack of foundation.
11      A.    I was not aware.
12  BY MR. SLATER:
13      Q.    Was anybody in your company
14  aware of that, that --
15      A.    I --
16           MR. GALLAGHER:  Objection.
17  BY MR. SLATER:
18      Q.    Was anyone in your company
19  aware of a test result that you know of that
20  showed NDMA in valsartan before July 27,
21  2017?
22           MR. GALLAGHER:  Objection.
23      Lack of foundation.
24      A.    I don't know.

Page 621

1  BY MR. SLATER:
2       Q.    To your knowledge, was anybody
3  in your company disciplined in connection
4  with the valsartan contamination with NDMA?
5       A.    I have no knowledge.
6           MR. GALLAGHER:  Objection.
7           THE WITNESS:  Sorry.
8           MR. GALLAGHER:  Lack of
9      foundation, calls for speculation.
10  BY MR. SLATER:
11      Q.    For example, did anybody lose
12  their job?
13           MR. GALLAGHER:  Same objection.
14      A.    I don't know.
15  BY MR. SLATER:
16      Q.    Was anybody reassigned?
17           MR. GALLAGHER:  Same objection.
18      A.    As I said, I don't know.  I
19  mean, this is not my job; this is human
20  resources' job.  I don't know.
21           MR. SLATER:  Let's go, Cheryll,
22      back to Exhibit 319, to the second
23      page, please.
24           Actually, let's -- just to

Page 622

1    reorient, just stay there.  Thank you.
2    BY MR. SLATER:
3        Q.    Looking at Exhibit 319, it
4    starts with a July 5, 2018 e-mail from
5    Charles Wang to someone named Jim, and we
6    just went through that e-mail a moment ago.
7            MR. SLATER:  And we can scroll
8        down to the second page of that
9        e-mail, please.  No, no, that e-mail.
10       Sorry.  Thank you.  Go to the bottom
11       of the page, please.  Yes.
12       Q.    Okay.  Now, it's actually --
13   let me ask you this question, actually.
14   Where -- rephrase.
15           Where Mr. Wang told Jim that a
16   friend of his was looking for a consultant in
17   the United States to help them define their
18   product at FDA, at that point you were aware
19   and you had authorized Mr. Wang to find an
20   independent consultant for you?
21           MR. GALLAGHER:  Are you done?
22       Objection.  Vague.
23       A.    It looks like, yeah, we asked
24   him probably, you know, yeah, to go ahead and

Page 623

1    try to find.
2            MR. SLATER:  Okay.  Now let's
3        go up to the next e-mail, please.
4        Thank you.
5    BY MR. SLATER:
6        Q.    In response to Charles Wang's
7    e-mail on July 5th at 1:50 p.m., Jim
8    MacDonald, we can see his e-mail, writes back
9    to Charles.
10           Do you see that?
11       A.    Yeah, mm-hmm.
12       Q.    He says, "Good to hear from
13   you.
14           "I am at the beach with my
15   family.  I'll be back in the office from
16   Monday and" I will give you -- "and will give
17   you a call.  It will be good to catch up.
18           "Best regards, Jim."
19           So that was the response,
20   correct?
21       A.    Mm-hmm.
22           MR. SLATER:  Okay.  Now let's
23       scroll to the next e-mail, and I think
24       that the very beginning of that e-mail

Page 624

1    is at the bottom of the first page.
2        Perfect.
3        Q.    Charles Wang then responds on
4    July 5, 2018 at 10:27 p.m., so this is still
5    on the same day as the first e-mail.
6            Do you see that?
7        A.    Yeah, mm-hmm, it's July 5th,
8    yeah, 2018.
9        Q.    Writes to Jim MacDonald.
10       A.    Mm-hmm.
11       Q.    And he says, "Hi Jim, Nice to
12   hear from you.  Hope everything is going
13   well."
14           MR. SLATER:  You can scroll
15       down now, Cheryll, so we have the
16       whole e-mail.
17       Q.    Okay.  I'll start over.
18           The e-mail reads, "Hi Jim, Nice
19   to hear from you.  Hope everything is going
20   well.
21           "Sorry to disturb you during
22   your vacation.  My friend's company will have
23   a face-to-face meeting with FDA to debit if
24   they should recall their product in US market

Page 625

1    next Thursday and likes to get some advice
2    from people like you quickly."
3            Do you see that?
4        A.    Yes.
5        Q.    And that's consistent with what
6    you had discussed with Mr. Wang, that you
7    were looking to bring in another consultant
8    to help prepare for that meeting, correct?
9            MR. GALLAGHER:  Objection to
10       the extent it mischaracterizes
11       testimony.
12           You can answer.
13       A.    As I -- yeah, as I said, yeah,
14   it looks like, yeah, we, you know, we --
15   basically we took his recommendation to
16   looking for, yeah, an expert on the -- you
17   know, yeah, on that particular, you know,
18   carcinogenicity area, yeah.
19   BY MR. SLATER:
20       Q.    And again, as you said earlier,
21   you had a lot of trust in Mr. Wang,
22   considered him to be a reliable expert, so
23   you asked him to go find you the most
24   qualified person he could find basically,

Page 626

1 right?
2      A.    Yeah, it looks like.
3      Q.    This e-mail continues --
4 rephrase.
5          The e-mail continues, "Not sure
6 if you heard Huahai Pharma Group, one of the
7 largest generic drug company in China with a
8 branch in US (Cranberry, NJ).  Li knows their
9 US CEO as well."
10         Do you know who Li is?
11     A.    I have no idea.
12     Q.    Do you know if that's you
13 that's being referred to?
14     A.    Based upon the content, it
15 should not be me.
16     Q.    So the -- rephrase.
17         The e-mail continues.  "Li
18 knows their US CEO as well.  Huahai has a
19 product in US market with the maximum daily
20 dose of 320 milligrams, which recently was
21 found containing high Nitrosodimethylamine
22 (NDMA, not know exactly how much but around
23 30 parts per million)."
24         I want to stop there.

Page 627

1          Do you see the reference to
2 30 parts per million?
3      A.    Yes.
4      Q.    And we've been through the test
5 results already earlier in your deposition.
6 You would agree with me that 30 parts per
7 million is actually on the very low side
8 compared to the ranges of NDMA that was found
9 in the zinc chloride process valsartan,
10 correct?
11         MR. GALLAGHER:  Objection.
12     Vague.
13     A.    The average, as far as I can
14 remember, is somewhere around like 55 or
15 maybe, you know, between 55 and 60 ppm
16 average.
17 BY MR. SLATER:
18     Q.    That's your best recollection?
19     A.    Yes.
20     Q.    We went through the list, the
21 numbers ranged up as high as 188.1, 165.1,
22 172.3, there were some -- some very high
23 numbers on that chart that we went through
24 the other day, correct?

Page 628

1          MR. GALLAGHER:  Objection.
2     Vague, and lacks foundation.
3      A.    Yes.  But these are, you know,
4 very small fractions.  We also have very low
5 numbers, like single digit numbers.
6 BY MR. SLATER:
7      Q.    Continuing in the e-mail,
8 Charles Wang writes, "Their client in EU" --
9 and that would be the European Union?
10     A.    Yeah, it should be.
11     Q.    And when they talk about --
12 rephrase.
13         When he speaks about your
14 client in the EU, he's talking about
15 Novartis, right?
16         MR. GALLAGHER:  Objection.
17     Lack of foundation.
18     A.    I would say probably, but I
19 wouldn't be 100 percent.  It probably is
20 Novartis.
21 BY MR. SLATER:
22     Q.    It says, "Their client in EU
23 said it should be at 0.3 parts per million
24 based on TD50 calculation."

Page 629

1          That was what Novartis said,
2 correct?
3      A.    That was Novartis said it at
4 one point, yeah.  As I said, you know, some
5 early discussion with Novartis, you know,
6 they were basing the TD50 from a primate, but
7 then the, you know, the threshold would be
8 lower, yeah.
9          But this one, as I said, it
10 looks like based upon the rodent, you know,
11 studies.
12     Q.    And the 0.3 that Novartis
13 recommended actually is the number the FDA
14 ended up agreeing on as well, correct?
15         MR. GALLAGHER:  Objection.
16     Outside the scope, and lack of
17     foundation.
18     A.    I would say eventually.  You
19 know, at a very early stage, you know, FDA
20 did take this as an interim spec, and then
21 the, you know, the official allowable intake
22 at that time, you know, as I said, was --
23 should be absent.
24         But then, you know, after you

Page 630

1  know, maybe about a year or so, you know, now
2  FDA basically broadened that to, you know,
3  0.3 ppm.
4  BY MR. SLATER:
5      Q.    The e-mail continues.  "They
6  would like to know if they can argue to set
7  limit higher based on NDMA is considered a
8  Class 2A carcinogen (limit at threshold of
9  toxicological concern of 1.5 micrograms per
10 day) and the longest duration of human
11 exposure in US will be less than 3 years."
12        Do you see that?
13     A.    Yes.
14     Q.    And we went through earlier the
15 e-mail where Charles Wang actually told you
16 that NDMA actually should be a class A -- a
17 class -- rephrase.
18        And we went through earlier the
19 e-mail where Charles Wang told you he thought
20 NDMA met the criteria for a Class 1
21 carcinogen.  We saw that e-mail a few minutes
22 ago, right?
23        MR. GALLAGHER:  Objection.
24 Lack of foundation, and to the extent

Page 631

1  it mischaracterizes the document and
2  testimony.
3      A.    Yes, we looked through that
4  document.  But as I indicated, okay, that's
5  the MSDS, you know, from that particular
6  chemical company, okay.
7          Based upon today's knowledge,
8  you know, if they talking about that
9  classification based upon IARC, you know,
10 that information was incorrect, okay.  The
11 IARC categorization as of today is still 2A,
12 Class 2A.
13 BY MR. SLATER:
14     Q.    The e-mail continues.  "Let me
15 know if your company can help.  I will ask
16 them to contact you directly and send you
17 more details.
18        "Thanks a lot for your help and
19 enjoy your vacation.  Best, Charles."
20        And that's how that e-mail
21 ended, correct?  Do you see that?
22     A.    Yes.
23        MR. SLATER:  Let's go now,
24 Cheryll, to the next e-mail in the

Page 632

1  chain which starts about a third of
2  the way down the first page of this
3  page.  Perfect.
4      Q.    On July 6, 2018, the next day,
5  at 11:11 a.m., Jim MacDonald responds.
6          Do you see the e-mail?
7      A.    Yes.
8      Q.    And we now can see where Jim
9  MacDonald comes from, he has a company called
10 Synergy Partners Research & Development
11 Solutions, and he's listed as James S.
12 MacDonald Ph.D, Founding Partner, right?
13     A.    Yes.
14     Q.    Jim MacDonald writes, "Charles,
15 I'm afraid I can't be of much help in this
16 case particularly on this time scale.
17        "NMDA (or dimethylnitrosamine)
18 is a pretty well-known toxin and animal
19 carcinogen with lots of discussion on
20 permissible levels in drinking water and
21 products.  Even though the compound is found
22 in cured meats and some groundwater, the body
23 of evidence on this suggests pretty clearly
24 that this is a likely human carcinogen at

Page 633

1  sufficient exposures."
2          Do you see that?
3      A.    Yes.
4      Q.    And a likely human carcinogen
5  means something that likely causes cancer in
6  humans, that's what that means, correct?
7      A.    I think I went through this
8  topic many times.  It is a, you know,
9  probable human carcinogen.
10     Q.    He continues.  "The argument
11 that the company would have to make to keep
12 this product on the market will be very
13 difficult with this profile.  I'm not exactly
14 sure where one would begin given the very
15 high levels they think they are seeing."
16        I want to stop there.
17        When he refers to the very high
18 levels, we just saw in the earlier e-mail
19 that he was quoted a level of 30 parts per
20 million in the prior e-mail, correct?
21        MR. GALLAGHER:  Objection.
22 Lack of foundation, and calls for
23 speculation.
24     A.    Let me read through, okay?

Page 634

BY MR. SLATER:

Q.    Just so you understand my question, when he refers to the very high levels you think they are seeing, I had just shown you in the prior e-mail that Charles Wang, or Wang, had quoted him 30 parts per million.

Do you remember that?

MR. GALLAGHER:  Objection. Lack of foundation, and calls for speculation.

A.    Yes, I remember that 30 parts per million number, yes.

BY MR. SLATER:

Q.    So this toxicologist -- rephrase.

So this toxicologist who Charles Wang was going to on your behalf was actually telling you that 30 parts per million were very high levels, and we've already established the levels were actually higher, correct?

MR. GALLAGHER:  Objection. Lack of foundation, compound, and

Page 635

vague.

A.    The average value is higher than 30 ppm.  But, you know, there was, you know, certain numbers of batches that were below 30 ppm.

BY MR. SLATER:

Q.    You told me the average a moment ago was, your best recollection, was 55 to 60 parts per million, correct?

A.    Yes.

Q.    And going back to the math that we did before, if it was 60 parts per million for a 320-milligram pill, that would be 19,200 nanograms, correct?  60 times 320, right?

MR. GALLAGHER:  Objection. Calls for speculation and expert testimony.

Are you asking him to do the calculation?  Do you have a calculator?

BY MR. SLATER:

Q.    You certainly don't -- you can agree with me or you can check it yourself,

Page 636

or you can disagree with my math.

A.    So your calculation based upon what, 60 ppm or --

Q.    Right, 60 ppm for a 320-milligram pill would be 19,200 nanograms of NDMA, correct?

MR. GALLAGHER:  Same objection.

A.    19,000 -- wait a second.  You said 19,000 -- what is the rest of the number?

BY MR. SLATER:

Q.    19,200.

A.    200 nanogram.

Q.    Right.  That's the number, right?

A.    Probably.  I mean, you know, I didn't check myself.  But it's probably on the ball park.

Q.    And if it was 60 parts per million, the average that you told me, and a 160-milligram pill, we do 60 times 160 and come up with 9,600 nanograms, correct?

MR. GALLAGHER:  Same objection.

A.    Hold on, let me double-check.

Page 637

So 60, right, 60 times 320.

Yeah, 19,200 nanogram, yeah, for the 60 ppm for 320 milligram, yeah.

BY MR. SLATER:

Q.    The ultimate limit that the FDA set was 96 nanograms, correct?

A.    Yes.

MR. GALLAGHER:  Objection. Outside the scope.

BY MR. SLATER:

Q.    So if we take 19 -- rephrase.

So if we take 60 parts per million -- rephrase.

If we take a 320-milligram pill, which would be 19,200 nanograms of NDMA, and we divide that by 96, it comes to 200.

So that would be 200 times the limit that the FDA ended up setting, correct?

MR. GALLAGHER:  Objection. Lack of foundation, and outside the scope, and calls for expert testimony.

A.    The calculation, it looks like it's correct.  19,200 divided by 96 is 200.

Page 638

1  BY MR. SLATER:
2      Q.    And even for a 160-milligram
3  pill, we'd be talking about 100 times the FDA
4  limit of 96 nanograms, right?
5          MR. GALLAGHER:  Objection.
6      Lacks foundation, outside the scope,
7      and calls for expert testimony.
8      A.    The calculation seems to be
9  correct.
10 BY MR. SLATER:
11     Q.    And that's -- rephrase.
12          And those numbers are based on
13 60 parts per million, which is double the
14 30 parts per million that this toxicologist
15 who was being consulted on your behalf said
16 were already very high levels, correct?
17          MR. GALLAGHER:  Objection.
18     Lacks foundation, vague.
19     A.    I mean, whatever it says in the
20 e-mail, you know, I mean, it's there.
21 BY MR. SLATER:
22     Q.    Reading the e-mail further,
23 Mr. -- rephrase.
24          Reading the e-mail further,

Page 639

1  James MacDonald says, "I think the strategy I
2  would probably recommend would be to come up
3  with a CMC plan to remove the contaminant (at
4  least to minimally detectable levels) while
5  they recall the existing product and
6  re-formulate.  I expect this is not what they
7  would want to hear but, unless there is a
8  compelling reason to leave this product on
9  the market (e.g.: only product available to
10 treat a serious, life-threatening disease), I
11 would expect the FDA would ask for a recall.
12 I'd be interested to know what happens at the
13 FDA meeting.  These things are always very
14 difficult to predict - but this is not a good
15 position for this product in my view.
16          "Hope all is well with you.
17          "Best regards, Jim."
18          Do you see that?
19     A.    Yes.
20     Q.    And Mr. Wang relayed to you
21 that he had spoken with Jim MacDonald and
22 what the result of that interaction had been
23 after he had heard from Mr. MacDonald,
24 correct?

Page 640

1          MR. GALLAGHER:  Objection.
2      Lacks foundation.
3      A.    I don't remember the details.
4  He probably talked to me verbally, at least.
5  BY MR. SLATER:
6      Q.    He certainly would have let you
7  know, hey, I spoke to Jim MacDonald, the guy
8  I thought could help us, unfortunately this
9  is the response I got.
10          He at least would have let you
11 know what happened and what the information
12 was, right?
13          MR. GALLAGHER:  Objection.
14     Lacks foundation, calls for
15     speculation.
16     A.    I just said I don't remember
17 the detail, okay?
18          And one thing, you know, you
19 know, I think I need to maybe provide, you
20 know, some of the, you know, background,
21 okay?
22          You know, even in this ongoing,
23 right here it's mentioned, you know, this
24 like, you know, upcoming meeting with FDA,

Page 641

1  okay, so during that meeting, you know, FDA
2  still asked us to be on hold with regard to
3  our, you know, question whether we should do
4  the recall immediately, okay?
5          So the thing is, you know -- or
6  the fact, you know, indicate at that time FDA
7  still was not sure, you know, obviously, you
8  know, because by considering, you know, the
9  potential drug shortage.  So FDA still wasn't
10 sure, you know, what a level or an interim
11 limit should be set, you know, to -- you
12 know, potentially to allow some batch.
13          For example, you know those
14 batch below 30 ppm, you know, still
15 temporarily remain on the market, you know,
16 to address, you know, the potential, you
17 know, drug shortage issue.
18          MR. SLATER:  Going now to the
19     top of the page, please.
20 BY MR. SLATER:
21     Q.    The next e-mail in this
22 document is July 17, 2018, Charles Wang
23 writes to Jim MacDonald.
24          Do you see that?

Page 642

1    A.    Mm-hmm.
2    Q.    He says, "Hi Jim.  You may have
3  already seen this," and then he has the link
4  to Press Announcements.
5         "It is exactly like you
6  expected, and I agreed with your call.
7         "Thanks again for your help.
8  Keep in touch for the future collaboration
9  opportunity."
10        Do you see that?
11   A.    Yes.
12   Q.    And this would have been the
13 announcement of the recall, correct?
14        MR. GALLAGHER:  Objection.
15 Lacks foundation.
16   A.    That's July 17th.
17        So can we go down?  Okay.
18        So the previous one was the
19 July 6th.  So whether this is related to
20 recall, you know, we can take a look, you
21 know.
22        Can we, you know, take a look
23 of this announcement?
24        ///

Page 643

1  BY MR. SLATER:
2    Q.    I'm just asking if you agree
3  with me that he would have been talking about
4  the recall at that point, on July 17, 2018.
5         MR. GALLAGHER:  Objection.
6  Lacks foundation.
7    A.    I mean, eventually FDA, yeah,
8  basically agree, you know, with us, you know,
9  at that time, you know.  They, you know,
10 allow us to, you know, to initiate the
11 recall, you know, for those batches, you
12 know, impacted.  Yeah.
13        But I'm not sure whether, you
14 know, if this particular July 17th.  But it
15 looks like, but, you know -- but essentially,
16 as I said, that during the -- you know, that
17 upcoming meeting, you know, a teleconference
18 meeting with FDA, you know, FDA at the time
19 still asked us to hold on the recall.
20 BY MR. SLATER:
21   Q.    Where -- rephrase.
22        Charles Wang, as we can see in
23 this e-mail, told Jim MacDonald, "I agreed
24 with your call."

Page 644

1         MR. GALLAGHER:  Objection.
2  Lacks foundation.
3  BY MR. SLATER:
4    Q.    Did Charles Wang tell you that
5  he agreed with Jim MacDonald's call on what
6  should happen here?
7         MR. GALLAGHER:  Objection.
8  Lacks foundation.
9    A.    So the e-mail, you know, yeah,
10 says whatever, yeah, he says.  I mean, as I
11 told you, you know, from the very beginning,
12 you know, after, you know, you know, you
13 know, you know, we determined the root cause,
14 you know, we determined -- you know, we
15 developed a method and we, you know,
16 determined the range or the average of the
17 contents, as I said, we immediately, you
18 know, approach FDA, ask whether we should do,
19 you know, immediate recall, you know, as I
20 said.
21        But it looks like, you know,
22 it's probably, based upon the contents, you
23 know, the likely scenario would be, yeah, by
24 July 17th FDA made this announcement, and

Page 645

1  also we also received, you know, FDA's
2  instruction, you know, to start recall, as we
3  have been asking FDA, you know, you know,
4  whether we should do, you know, immediately
5  or as soon as, you know, it should be done.
6         MR. SLATER:  Cheryll, if you
7         could scroll down a little bit more,
8         please.  Perfect.
9  BY MR. SLATER:
10   Q.    I want to go back to the e-mail
11 from July 6th where it's documented that
12 Dr. MacDonald told Charles Wang that the body
13 of evidence suggests pretty clearly that this
14 is a likely human carcinogen at sufficient
15 exposures.  Do you recall we talked about
16 that a few moments ago?
17   A.    Yes.
18   Q.    Charles Wang told you the same
19 thing, right?
20        MR. GALLAGHER:  Objection.
21        Lacks foundation, and I'm going to
22        object to outside the scope.
23        Adam, I've let you ask
24        questions about this --

Page 646

1    MR. SLATER:  I don't know why
2 you're saying this, Patrick.  This is
3 ZHP's evaluation of knowledge of the
4 health risks of nitrosamines,
5 Topic 36.
6    MR. GALLAGHER:  Nobody from --
7 nobody from ZHP is on this e-mail.
8 Nobody from ZHP is on this e-mail.  He
9 said he doesn't recall talking to him.
10    MR. SLATER:  Are you going to
11 testify now?  Relax.  Are you going to
12 testify now?
13    MR. GALLAGHER:  No, I'm
14 objecting it's outside the scope.  You
15 told -- you just said ZHP's knowledge.
16 Nobody from ZHP is on this e-mail.
17    MR. SLATER:  Are you testifying
18 now --
19    MR. GALLAGHER:  You're trying
20 to put words in Dr. Wang's mouth of
21 what he told Dr. Li.  He said he
22 doesn't recall.  I'm just objecting
23 outside the scope.  Ask your
24 questions.

Page 647

1    MR. SLATER:  Would you like to
2 testify?  We could place you under
3 oath if you want?  I mean, you're
4 literally -- you realize how far over
5 the line what you just did is.  Please
6 don't do that again.  I'd really
7 appreciate it.
8 BY MR. SLATER:
9    Q.   Did Charles Wang tell you that
10 it was clear to him that NDMA was a likely
11 human carcinogen at sufficient exposures when
12 you were consulting with him?
13    MR. GALLAGHER:  Objection.
14 Lack of foundation.
15    A.   As I said, I don't remember,
16 you know, such details, okay.  But based
17 upon, you know, the e-mail communication with
18 him, yeah, he indicated, yeah, it's a likely,
19 you know, human carcinogen, okay, based upon,
20 you know, the results from animal studies.
21 Right.  It's likely, you know, it's a
22 probable, you know, it's -- you know, it's
23 the same meaning.
24    I mean, just like in, you know,

Page 648

1 IARC, you know, you know, classification to
2 be, you know, 2A, you know, basically means,
3 you know, you know, it's a potential or
4 probable, you know, to human based upon, you
5 know, animal, you know, you know, studies.
6 BY MR. SLATER:
7    Q.   Did you or anybody from your
8 company ever tell the FDA that a toxicologist
9 who was hired by your company advised you
10 that NDMA was a likely human carcinogen?
11    MR. GALLAGHER:  Objection.
12 Outside the scope, and calls for
13 speculation.
14    A.   I don't remember, you know --
15    MR. GALLAGHER:  And lack of
16 foundation.
17    MR. SLATER:  Just bear with me
18 for a second.  I think I misplaced a
19 document.  Sorry, everyone, but I'm a
20 little confused.
21    Okay.  I got it.  Okay.
22    We can take this one down.  And
23 let's go to -- the last one was 319,
24 right?  Let's go to Exhibit 320, which

Page 649

1 starts with CHARLESWANG000164.
2    (Whereupon, Exhibit Number
3 ZHP-320 was marked for
4 identification.)
5    MR. SLATER:  And what I'd like
6 to do is go to page -- the Bates
7 number is 179.  Go to the very top.  I
8 just really want to go to the very top
9 of the page, actually.
10 BY MR. SLATER:
11    Q.   Do you see at the top it says,
12 "WeChat communication with Min Li and Jun Du,
13 July 8, 2018"?
14    A.   Okay.
15    Q.   Do you see that?
16    A.   Mm-hmm.
17    Q.   And do you recall that you
18 communicated through WeChat with Charles Wang
19 and -- or Charles Wang and Jun Du?
20    A.   I don't recall the details.
21    Q.   Why was Jun Du involved in any
22 of your interactions with Charles Wang?
23    A.   Why?  I mean he's the -- you
24 know, first of all, he's the executive vice

Confidential Information - Subject to Protective Order

Page 650

1  president of the company, and also he's the
2  head of Huahai in the US and also, you know,
3  the Prinston Pharma.
4      Q.    Did you tell Jun Du the
5  feedback you got from Charles Wang after he
6  had communicated with Jim MacDonald in early
7  July 2018?
8          MR. GALLAGHER:  Objection.
9  Vague, and lack of foundation.
10     A.    I'm sorry, could you repeat the
11 question?
12 BY MR. SLATER:
13     Q.    Sure.
14         Did you tell Jun Du the
15 feedback you got from Charles Wang after he
16 had communicated with Jim MacDonald in early
17 July of 2018?
18     A.    I don't remember -- sorry.
19         MR. GALLAGHER:  Objection.
20 Lack of foundation.
21     A.    I mean, as I said, I don't
22 remember, you know, such details, but at a
23 such -- you know, at a certain point, you
24 know, he came to know.

Page 651

1  BY MR. SLATER:
2      Q.    At some point you told him?
3      A.    I don't remember whether I
4  told -- told him or Charles Wang told him.  I
5  just don't remember, you know, you know, the
6  details.
7      Q.    Now, what I want to do is go to
8  the very first page of this document now, the
9  Bates number 164.  Let's go back up to the
10 top.
11         And this was a draft report
12 that Charles Wang provided.
13         MR. SLATER:  Cheryll, if you
14     could scroll down to the bottom half
15     of the page just so we can show that.
16     Q.    And you recall Charles Wang
17 provided some potential draft reports for you
18 about safety assessments for NDMA?
19         MR. GALLAGHER:  Objection.
20 Lack of foundation.
21     A.    There are probably some draft,
22 yes.
23 BY MR. SLATER:
24     Q.    What I'd like to do now is --

Page 652

1          MR. SLATER:  Cheryll, can you
2      go to page 10 of this?  The Bates
3      number is 173, please.
4      Q.    There's a table that we see on
5  this page, and it says, "Table 1:  Reasonable
6  Worst-Case Estimates of Daily Intake of NDMA
7  by the General Population in the Sample
8  Country."
9          Do you see that?
10     A.    Yes.
11     Q.    Do you know where that table
12 came from?
13         MR. GALLAGHER:  Objection.
14 Lack of foundation.
15     A.    Right now I don't, just don't
16 remember the details.
17 BY MR. SLATER:
18     Q.    To the ex -- well, rephrase.
19 Or withdrawn actually.
20         Okay.  Let's -- just so that
21 you can be familiar with this table, you see
22 that it talks about how people can be exposed
23 to NDMA and -- during the day, and it lists
24 on the left-hand column things like air,

Page 653

1  water, food, indoor air, groundwater, beer,
2  and shampoo.
3          Do you see that?
4          MR. GALLAGHER:  Objection.
5  Vague, and lack of foundation.
6      A.    It is listed there.
7          MR. SLATER:  Okay.  Let's take
8      that down now and go to Exhibit 210.
9          Give me a second.  You know, I
10     apologize, Cheryll, can you go back to
11     the prior exhibit, please?  I'm sorry
12     to make you go back, it's Exhibit 320.
13         If you could, go back, go back
14     to page Bates number 182, please.
15     It's page 19 of the report, of the
16     draft.
17 BY MR. SLATER:
18     Q.    This is at the end of that
19 draft report that Charles Wang provided.  Do
20 you see this, he provided a biography?
21     A.    Yes.
22         MR. GALLAGHER:  Objection.
23 Lack of foundation, and
24 mischaracterizes testimony.

Page 654

1    MR. SLATER:  What's the lack of
2  foundation?  It's a document you
3  produced to us.
4    MR. GALLAGHER:  The document
5  Charles -- it came from Charles Wang.
6  You haven't established with the
7  witness or what --
8    MR. SLATER:  What haven't I
9  established?  I'm sorry.
10    MR. GALLAGHER:  You don't know
11  what the document is.  It's a document
12  that was produced from Charles Wang.
13    MR. SLATER:  We already
14  established it's a draft that was --
15  of a report that was provided dated
16  June 15, 2018.  We already went over
17  that with the witness.  We already
18  established that's what they were
19  getting from Charles Wang.
20    MR. GALLAGHER:  I don't think
21  you established where it came -- it's
22  a document that was produced from
23  Charles Wang, and it's dated June 15,
24  2018.  I don't think you've

Page 655

1  established anything else about this
2  document.
3    MR. SLATER:  Okay.
4  BY MR. SLATER:
5    Q.    Looking now at the biography
6  that Charles Wang put in there, I just went
7  through this for a moment, and he gives some
8  of his background and he says that, around
9  the middle, he was the "Vice President of
10  Drug Safety and Regulatory Affairs at Hua
11  Medicine, Limited, a US VC funded
12  biopharmaceutical company in China."
13    A.    I'm sorry, where that word?
14    Q.    Right in the middle of the
15  biography.
16    A.    Okay.  Dr. Wang, okay.  Was the
17  vice president.  Let me read through.
18    (Witness reviewing document.)
19    A.    Yeah, okay.  Yeah.
20    Q.    Then it says -- rephrase.
21    It says that he was "Director
22  of Toxicology at Johnson & Johnson PRD,"
23  whatever that firm is, and "Senior Scientist
24  at Novartis Pharmaceutical Corp. in the

Page 656

1  United States."
2    Do you see that?
3    A.    Yes.
4    Q.    Do you know why this doesn't
5  list the fact that he was currently working
6  at GlaxoSmithKline?
7    MR. GALLAGHER:  Objection.
8  Calls for speculation.
9    A.    I have no idea.
10    MR. SLATER:  All right.  Now we
11  can go back to the other exhibit.
12  Thank you, Cheryll.  Exhibit 210.
13    You know what?  I lied again.
14  I'm sorry.  If you could go back to
15  page 10 again of the other document,
16  I'm sorry.  I'm trying to make life
17  difficult tonight for you.
18  BY MR. SLATER:
19    Q.    Just above the table that we
20  were discussing a moment ago, there's a line
21  that says.  "The worst-case estimation of
22  daily intake of NDMA from different sources
23  by general population at different age are
24  listed below."  And it says "[66]."

Page 657

1    And what I'd like to do, if we
2  could.  Is go to the references at the end of
3  the report, and it's page 14, the Bates
4  number is 177, to see what reference 66 is
5  and where that table came from.
6    And you see reference 66?
7    A.    Yes.
8    Q.    It's a citation from the
9  "Concise International Chemical Assessment
10  Document 38, N-nitroso dimethylamine," which
11  is NDMA, and it gives the authors' names, and
12  it says it was from the World Health
13  Organization in Geneva 2002, page 13.
14    Do you see that?
15    A.    Yes.
16    MR. SLATER:  Let's try this for
17  the fourth time.  Can we please go to
18  Exhibit 210 now.  Exhibit 210 is the
19  Deviation Investigation Report.
20    And let's scroll down to make
21  sure we have exactly which it is and
22  what the date is.  Perfect.
23    Q.    And it's dated -- it says
24  "Preparation Date:  November 5, 2018," and

Page 658

1  then on the next page there's a list of
2  signatures, report, review and approval,
3  showing this was signed and finalized,
4  correct?
5      A.    Yes.
6      Q.    And the deviation investigation
7  report, this is a document that's laying out,
8  among other things, the root cause and the
9  significance of the contamination, correct?
10         MR. GALLAGHER:  Objection to
11  the extent it mischaracterizes the
12  document.
13     A.    It investigate the root cause
14  or the likely root cause.
15  BY MR. SLATER:
16     Q.    This is -- rephrase.
17         This is a document that's
18  supposed to be fully accurate, right?
19     A.    Based upon the knowledge at the
20  time.
21     Q.    This document is supposed to be
22  fair and balanced in terms of providing
23  information, right?
24         MR. GALLAGHER:  Objection.

Page 659

1      Vague.
2      A.    As I said, to the best
3  knowledge available at that time.
4  BY MR. SLATER:
5      Q.    Would you agree that this
6  document should be an honest, scientifically
7  rigorous document in terms of its analysis?
8          MR. GALLAGHER:  Objection.
9      Vague.
10     A.    Again, I said, you know, it's
11  to the best knowledge, you know, of the
12  authors at the time.
13         MR. SLATER:  Cheryll, let's go,
14  if we could, to page 10 of 236,
15  please, the very top.
16         By the way, everyone, I have
17  zero idea about time, so I don't know
18  where you're at.  I'm about to start
19  in on this document, so now would
20  probably be a good break time if we're
21  at that point.
22         MR. GALLAGHER:  I think we're
23  just a little bit over an hour, so
24  I'll leave it to you.

Page 660

1          MR. SLATER:  Let's do that,
2  because otherwise we'll break up in
3  the middle.
4          MR. GALLAGHER:  Okay.
5          MR. SLATER:  So let's take a
6  break.
7          How long do you want?
8          MR. GALLAGHER:  Dr. Li, how
9  long would you like for a break?
10         THE WITNESS:  15 minutes.  Or
11  maybe we come back at, what, 10:25?
12         MR. GALLAGHER:  Sounds great.
13         MR. SLATER:  Whatever you want.
14  Sounds good.
15         THE VIDEOGRAPHER:  The time
16  right now is 10:09 a.m.  We're off the
17  record.
18         (Whereupon, a recess was
19  taken.)
20         THE VIDEOGRAPHER:  The time
21  right now is 10:27 a.m.  We're back on
22  the record.
23  BY MR. SLATER:
24     Q.    Looking here at the deviation

Page 661

1  investigation report, this is Section 3.1.2,
2  titled "NDMA Physiochemical Characteristics
3  and Toxicological Evaluation of NDMA."
4          Do you see that?
5      A.    Yes.
6      Q.    The toxicological evaluation
7  would be the part of the report where you got
8  consulting services from Dr. Wang, right?
9      A.    Yeah, it should be.
10         MR. SLATER:  And let's turn, if
11  we could, to the next page.  Scroll up
12  a little bit.  A little more.  Thank
13  you.
14     Q.    Looking now at page 11 of this
15  report, you can see that there's a citation
16  to something that was stated in the report to
17  the Concise International Chemical Assessment
18  Document 38 on NDMA, which we just saw before
19  was cited in Dr. Wang's report, correct?
20     A.    Yes.
21     Q.    And one thing to be clear --
22  rephrase.
23         To be clear, ZHP would only
24  cite scientifically reliable literature in

Page 662

1  this report, correct?
2      A.    As I said, again, you know,
3  based upon the best knowledge, and also, like
4  you said, you know, this data is likely, you
5  know, yeah, from, yeah, Dr. Wang's report,
6  yes.
7      Q.    Would ZHP cite literature or
8  articles in this report that it did not
9  believe was scientifically reliable?
10      A.    It shouldn't.
11          MR. SLATER:  Let's turn to the
12  next page, page 12 of this report.
13      Q.    We can actually see that that
14  table that was cited in Dr. Wang's report and
15  cited to that World Health Organization study
16  is also actually found right here in the
17  deviation investigation report, correct?
18      A.    Yes.
19          MR. SLATER:  Let's scroll down
20  a little bit.
21      Q.    There's a section titled
22  "Animal Toxicity Studies," and it says in
23  part --
24          MR. SLATER:  Scroll down a

Page 663

1      little more, actually.  Perfect.
2      Q.    Under the "Animal Toxicity
3  Studies" section, it says in part in that
4  second paragraph, "Carcinogenicity studies in
5  animals demonstrated that NDMA is
6  carcinogenic.  However, no evidence is
7  available to confirm that NDMA is
8  carcinogenic in humans.  Nevertheless, NDMA
9  is considered a probable human carcinogen
10  based on projection from the animal studies."
11          And that's the -- that's what
12  your company stated in this deviation
13  investigation report, correct?
14      A.    Yes.
15      Q.    Now, we had talked a moment ago
16  that the table up above came from the World
17  Health Organization study, the Concise
18  International Chemical Assessment document
19  regarding NDMA.
20          Do you recall that?
21      A.    Yes.
22      Q.    And what we can do now is we
23  can take this document down, and we can go --
24          MR. SLATER:  I guess -- I don't

Page 664

1  know what the next exhibit would be.
2  Is it 321?
3          THE STENOGRAPHER:  Yes, it is.
4          MR. SLATER:  Okay.  Let's go,
5  Cheryll, to Exhibit 321, the actual
6  Concise International Chemical
7  Assessment Document 38 regarding NDMA
8  that's cited here in the deviation
9  investigation report.  Thank you.
10          (Whereupon, Exhibit Number
11  ZHP-321 was marked for
12  identification.)
13  BY MR. SLATER:
14      Q.    And you can see that that's the
15  title.
16          MR. SLATER:  And if you can
17  scroll down, Cheryll, just to confirm
18  the date of it at the bottom, please.
19  Perfect.
20      Q.    You can see the "World Health
21  Organization, Geneva, 2002," correct?
22      A.    Yes.
23      Q.    Let's first, just to be sure --
24  rephrase.

Page 665

1          MR. SLATER:  Turn, if you
2  could, Cheryll, to page 1.  It's a
3  couple pages ahead.
4          And you see there's a section
5  that says -- rephrase.  Stop, stop,
6  stop, stop.
7      Q.    You see it says "Procedures,"
8  correct?
9      A.    Yes.
10          MR. SLATER:  Scroll down,
11  please, Cheryll, so we capture the
12  last two paragraphs on this section.
13  Perfect.
14      Q.    You can see that the second
15  paragraph under the Procedures talks about
16  how the first draft was prepared.  It says,
17  "The first draft is based on existing
18  national, regional, or international review."
19  And there's more information.
20          Do you see that?
21      A.    Yes.
22      Q.    And then the next paragraph
23  says, "The draft is then sent to an
24  international peer review by scientists known

Page 666

1 for their particular expertise and by
2 scientists selected from an international
3 roster compiled by IPCS through
4 recommendations from IPCS national Contact
5 Points and from IPCS" participation --
6 "participating institutions."
7      And peer review is an important
8 thing in scientific literature because that's
9 one of the important stamps of reliability
10 for scientific literature, correct?
11      A.   Yes.
12      MR. SLATER:  Let's go now,
13 Cheryll, if we could, to page 13.  13.
14 The very top.  Perfect.
15      Q.   We can see here on page 13 that
16 the table that we've been talking about that
17 was copied into Dr. Wang's report and into
18 the deviation investigation report is found
19 in this article as cited.
20      Do you see that?
21      A.   Yes.
22      MR. SLATER:  Let's go now,
23 Cheryll, to page 26, if we could.  And
24 if you could go down to the last part

Page 667

1 of that page, Section 12, there's a
2 little paragraph there.  On this page,
3 just go to the bottom of the page.
4      Oh no.  I'm getting a feeling
5 like a frozen computer issue is
6 happening.  "Frozen."  I just got a
7 text from Cheryll, "Frozen."
8      Could we go off for a moment
9 just while she fixes her issue,
10 please?
11      MR. GALLAGHER:  Sure.
12      THE VIDEOGRAPHER:  The time
13 right now is 10:35 a.m.  We're now off
14 the record.
15      (Whereupon, a recess was
16 taken.)
17      THE VIDEOGRAPHER:  The time
18 right now is 10:40 a.m.  We're back on
19 the record.
20 BY MR. SLATER:
21      Q.   I want to go through the
22 document a little bit, this article.  First
23 we'll start in Section 12 titled "Previous
24 Evaluations By International Bodies."

Page 668

1      And this states, "NDMA has been
2 classified by the International Agency for
3 Research on Cancer (IARC, 1987) as a
4 'probable human carcinogen (Group 2A),' based
5 upon sufficient evidence of a carcinogenic
6 effect in experimental animal species and the
7 demonstrated similarities in its metabolism
8 by human and rodent tissues."
9      Do you see that?
10      A.   Yes.
11      Q.   And in terms of the risks to
12 humans as compared to animals, you certainly
13 don't disagree that there are similarities in
14 the metabolism of humans and rodents as
15 stated here, you certainly don't disagree
16 with that, right?
17      A.   Whatever that statement says.
18      Q.   Let's go now to page 16.
19 Page 16, heading 8.4, it says
20 "Carcinogenicity," and again that's whether
21 something causes cancer, right?
22      A.   Yes.
23      Q.   And if you go a little further
24 down actually, let's go to Section 8.5,

Page 669

1 perfect, Section 8.5 is "Genotoxicity and
2 related end-points."
3      And genotoxicity is where --
4 well, you can explain it.  Tell me, what's
5 your understanding of genotoxicity?
6      A.   Any chemical substances, you
7 know, where they chemically react with DNA.
8      Q.   And this states in numerous --
9 well, rephrase.  Let me just take a step
10 back.
11      NDMA is a genotoxic substance,
12 correct?
13      MR. GALLAGHER:  Objection.
14 Vague, and calls for expert testimony.
15      A.   It is.
16 BY MR. SLATER:
17      Q.   NDEA is also a genotoxic
18 substance, correct?
19      MR. GALLAGHER:  Same
20 objections.
21      A.   Yes.
22 BY MR. SLATER:
23      Q.   This section states, "In
24 numerous studies conducted in vitro in

Confidential Information - Subject to Protective Order

Page 670

1 bacterial and mammalian cells, there has been
2 overwhelming evidence that NDMA is mutagenic
3 and clastogenic (reviewed in IARC, 1978;
4 ATSDR, 1989). Increased frequency of gene
5 mutations, chromosomal damage, sister
6 chromatid exchange, and unscheduled DNA
7 synthesis have been observed in a wide
8 variety of cell types, in assays conducted in
9 the presence or absence of metabolic
10 activation. Positive results have been
11 observed in human as well as rodent cells."
12      Do you see that?
13   A.   Yes, that's what it said.
14   Q.   Then it says, "Similarly, clear
15 evidence of genetic effects has also been
16 observed in in vivo studies," correct?
17   A.   In vivo studies, mm-hmm.
18      MR. SLATER: Let's go now, if
19 we could, Cheryll, to page 21. This
20 is Section 9, "Effects on Humans."
21 And if you could scroll down, Cheryll,
22 to the second paragraph under there.
23   Q.   The second paragraph starts
24 out, "Relevant epidemiological studies

Page 671

1 include case-control investigations in which
2 the potential risks of cancer of the
3 stomach," and I'm going to skip the citation
4 names for now, "upper digestive tract, and
5 lung associated with the ingestion of NDMA
6 have been assessed."
7      So they're citing to studies
8 that have looked at whether or not there's a
9 risk to humans from NDMA, correct?
10   A.   It looks like.
11      MR. SLATER: Let's go now to
12 the other -- the second column at the
13 top, please. Let's get that top half
14 of the page. Perfect.
15   Q.   Continuing this section
16 regarding effects on humans of NDMA, it says,
17 "In three of four case-control studies, there
18 was a positive relationship with evidence of
19 exposure-response for the intake of NDMA and
20 gastric cancer."
21      You see that citations, there's
22 three articles cited right there?
23   A.   Yes.
24   Q.   Then if we go a little further

Page 672

1 down, it says, "In two case-control studies
2 in which matching or control for confounders
3 was rather more extensive than that for the
4 investigations of gastric cancer mentioned
5 above, three [sic] were clear
6 exposure-response relationships for NDMA and
7 lung cancer."
8      Do you see that?
9   A.   Yes.
10   Q.   And what they're talking about
11 here with this -- this -- rephrase.
12      And what they're talking about
13 here is that there are epidemiologic studies
14 that have been done showing that there is a
15 clear relationship between NDMA and humans
16 developing certain cancers, correct? That's
17 what they're talking about?
18      MR. GALLAGHER: Objection.
19 Foundation, calls for expert
20 testimony.
21   A.   Well, they're talking about
22 some, like you said, epidemiology, you know,
23 studies.
24      ///

Page 673

1 BY MR. SLATER:
2   Q.   It continues, "In almost all
3 studies, associations between the cancers of
4 interest and nitrate, nitrite, and NDMA were
5 examined; results were relatively consistent
6 in this regard, with there being an
7 association with cancer most commonly with
8 NDMA"; and then it says, "results for nitrite
9 were mixed, and there was an inverse
10 association with nitrate."
11      Do you see what I just read?
12   A.   Yes.
13   Q.   And -- rephrase.
14      When they talk about an
15 association with cancer most commonly seen
16 with NDMA, they're talking about cancer in
17 human beings, correct?
18      MR. GALLAGHER: Objection.
19 Calls for expert testimony, and
20 outside the scope.
21   A.   I'm not sure they are purely
22 talking about, you know, with cancer in
23 human, just based upon, you know, this
24 statement.

Confidential Information - Subject to Protective Order

Page 674

BY MR. SLATER:

Q.    This section is "Effects on Humans," and it's relating the results of epidemiologic studies.

Those would be studies of cancer in human beings, correct?

MR. GALLAGHER:  Objection. Calls for speculation, and lack of foundation.

A.    Let me read through that part, okay?

BY MR. SLATER:

Q.    You understand the question is, these are epidemiologic studies regarding causation of cancer in human beings, and I'm just asking you to confirm this has to do with humans.

MR. GALLAGHER:  Lack of foundation, and outside the scope.

A.    Well, these studies' subject, yes, was tried to evaluate.

BY MR. SLATER:

Q.    Cancer in human beings due to NDMA, that's what this is looking at,

Page 675

correct?

A.    Looks like.

MR. SLATER:  Let's go now, if we could, to the next page, please, page 22 of this article.

Q.    In the top left --

MR. SLATER:  Perfect, Cheryll. Thank you.

Q.    In the top left, the first full paragraph it says, "There appears to be no qualitative difference between rodents and humans in the formation of DNA adducts following exposure to NDMA."

Do you remember we went through a study last night that actually talked about studying the adducts that are caused -- the DNA adducts caused by exposure to NDMA?

Do you recall we talked about that last night?

A.    Yes.

Q.    And that's a very important part of a mutagenic, genotoxic substance is the formation of DNA adducts as part of the process whereby somebody will eventually

Page 676

develop cancer, correct?

MR. GALLAGHER:  Objection. Vague, calls for expert testimony.

A.    I think it does ask for speculation.  Okay.  Based upon my limited knowledge, you know, once, you know, a piece of DNA, for example, was alkylated, different species, you know, they may have different defense system, okay?  They can dealkylate.

So, you know, it still -- you know, you just make -- you cannot be 100 percent sure, okay, just simply because of the presence of alkylated DNA, you know. Because otherwise, you know, if what you're saying, you know, is true, then there will be no difference between, you know, you know, the mutagenicity with carcinogenicity, okay? These are the two different levels.  Okay.

So you were equating those two things, you know, you know, to be the same meaning, so I don't think that's accurate.

BY MR. SLATER:

Q.    Mutagenicity is the ability to

Page 677

actually damage the DNA, leading to cancer, right?

A.    That's just a potential.

MR. GALLAGHER:  Objection. Calls for expert testimony.

BY MR. SLATER:

Q.    I'm asking you what "mutagenicity" means.  That means that something damages DNA, leading to cancer, correct?

MR. GALLAGHER:  Objection. Calls for expert testimony.

A.    As I said, you know, your statement is not accurate, okay.  That's just a potential -- you know, you know, a potential source leading to.  Because otherwise, why people or why scientists will have two different terms?

And also, you know, it's very clear, you know, you know, mutagenicity, you know, can but do not necessarily are carcinogenetic.  I mean, you can -- you know, you can find it, like, in some documents, maybe even in M7 itself or some related

Page 678

1 document.
2 BY MR. SLATER:
3 Q. Do you know what a mutagenic,
4 genotoxic substance is?
5 A. I mean, do I know some chemical
6 part of being mutagenic?
7 Q. Do you know what those terms
8 mean?
9 A. As I said, yeah. You know, as
10 I said, "mutagenic" means, you know, a
11 chemical substance will chemically react with
12 DNA.
13 But whether or not, you know,
14 that reactivity or formation of the DNA
15 adduct either will lead to, you know, cancer,
16 you know, that's another -- you know, another
17 question. Okay. It may or it may not, you
18 know.
19 So you trying to equating them,
20 you know, you know, you know, the
21 mutagenicity, you're trying to equating them,
22 you know, to carcinogenicity, you know. This
23 is -- you know, this is not correct.
24 Q. I'm actually just -- okay.

Page 679

1 I'll withdraw that.
2 When I said "I'll withdraw
3 that," it was the first two words I said
4 almost starting this question. Okay?
5 Continuing to read this, it
6 says, "In a case of suspected NDMA poisoning
7 in a human male, methylation of liver DNA was
8 evident at both the N7 and O6 positions
9 of" --
10 A. I'm sorry. I'm sorry. Hold
11 on. I don't see -- I'm not seeing, you know,
12 the paragraph that you're reading.
13 Q. Sure.
14 I'm in the left column, the
15 first full paragraph. We just went through
16 the first sentence. Now I'm at the second
17 sentence.
18 A. The second -- oh, okay, yeah.
19 Q. The second sentence --
20 rephrase.
21 This paragraph continues, "In a
22 case of suspected NDMA poisoning in a human
23 male, methylation of liver DNA was evident at
24 both the N7 and O6 positions of guanine," and

Page 680

1 it gives a citation.
2 Then it says, "Using an
3 immunohistochemical technique, Parsa et al.
4 (1987) detected the formation of
5 06-methylguanine in human pancreatic explants
6 incubated in vitro with NDMA."
7 So those are some of the
8 sources cited for the proposition at the
9 beginning of the paragraph indicating there
10 appears to be no qualitative difference
11 between rodents and humans in the formation
12 of DNA adducts following exposure to DNA --
13 NDMA.
14 That's what it's stating,
15 correct?
16 MR. GALLAGHER: Objection to
17 the extent it mischaracterizes the
18 document.
19 A. Just by reading through, you
20 know, you know, you know, this particular
21 sentence, okay, it seems like -- because when
22 you're talking about, you know, poisoning or
23 NDMA poisoning, you know, based upon my
24 limited knowledge, okay, it seems to be

Page 681

1 related to acute, you know, poisoning, which
2 means, you know, will be extremely high, you
3 know, levels of, you know, NDMA, okay.
4 So the acute poisoning, it
5 would be different, you know, in terms of the
6 mechanism, you know, for the -- you know, for
7 the cause or potential, you know, you know,
8 you know, you know, cause to cancer. You
9 know, I think they are two different
10 mechanisms, okay.
11 So, again, you know, as I said,
12 you know, you know, the DNA adducts, you
13 know, you know, you know, alone, you know,
14 will not necessarily, you know, leading to,
15 you know, cancer.
16 But, again, you know, I think
17 that this will need a -- you know, a
18 professional, you know, toxicologist, you
19 know, to give, you know, more precise and
20 accurate, you know, know, evaluation or statement.
21 BY MR. SLATER:
22 Q. To be clear as we continue to
23 read through this article, this was an
24 article that was cited in ZHP's deviation

Confidential Information – Subject to Protective Order

Page 682

1  investigation report dated November 5, 2018,
2  correct?
3      A.    We cited particularly that
4  table.  Very specific.
5      Q.    You cited this paper, and you
6  cited it for that table that we looked at,
7  right?  The table about various substances
8  and what may -- what may be the NDMA levels,
9  remember?
10        That was why it was cited,
11  right?
12     A.    Yeah, yeah.  The very reason we
13  cited it, because of the origin of this
14  table.
15     Q.    What you didn't do is cite any
16  of these other things I've been reading so
17  far about, for example, the epidemiologic
18  studies relating to humans developing cancer
19  as a result of exposure to NDMA.
20        Those -- that part of the
21  article wasn't cited in your deviation
22  investigation report on the toxicological
23  effects of having NDMA in your valsartan,
24  right?

Page 683

1        MR. GALLAGHER:  Objection.
2    Foundation, and to the extent it
3    mischaracterizes the document or --
4      A.    Look.  In that deviation
5  report, okay, we clearly indicated, okay,
6  NDMA, you know, you know, I think is
7  carcinogenic to animals, okay.  It's a
8  probable, you know, carcinogenic to human.
9  Okay.
10        So everything, you know, that
11  you presented here, right, do not change the
12  fact, okay.  Even as of today NDMA is still
13  being characterized as a Class 2A compound,
14  which -- you know, which means, you know, as
15  I said, it's carcinogenic to animal, and it's
16  a probable, you know, carcinogenic to human.
17        So -- and another thing, you
18  know, I also wanted to, you know, point out,
19  you know, in terms of, you know, of these
20  like -- you know, like you mentioned, you
21  know, epidemiology, you know, studies, right,
22  these were all performed in early '90s, okay?
23        And as I also mentioned, you
24  know, yesterday, also maybe, you know, the

Page 684

1  day before, you know, we have more recent,
2  you know, you know, epidemiological, you
3  know, studies.
4        And in at least, you know, you
5  know, some of those studies, you know, the
6  conclusions, you know, are not consistent
7  with the conclusion showed up, you know, in
8  these early '90, you know, papers or studies.
9        MR. SLATER:  Cheryll, let's
10    scroll down just so I can get the
11    bottom right-hand half of the page,
12    too.  No, too far.  Don't try to speed
13    us up here.  A little more.  Perfect.
14    Thank you.
15 BY MR. SLATER:
16     Q.    Looking now at Section 11
17  that's titled "Effects Evaluation," and 11.1,
18  "Evaluation of health effects," and 11.1.1
19  says "Hazard identification."
20        Do you see that?
21     A.    Yes, I do.
22     Q.    In the hazard identification
23  section, that first paragraph, it says,
24  "Although NDMA is acutely toxic and induces

Page 685

1  hepatic damage in several species at dose
2  levels of approximately 1 mg/kg body weight
3  per day in short-term experiments, the main
4  concern is its carcinogenicity.  NDMA has
5  been consistently shown to be a potent
6  carcinogen in all experimental species
7  studied."
8        Do you see that?
9      A.    Yeah, experimental species,
10  yeah, means animals, yeah.
11     Q.    You've mentioned animal studies
12  many times, and I think you made that point
13  multiple times.  So why haven't there been
14  human studies done where humans have been
15  given NDMA to see what happens to humans?
16     A.    That would be unethical.
17     Q.    It would be unethical, right?
18  That's what you said?
19     A.    Yes.
20     Q.    Because --
21     A.    Knowingly, yes, if you
22  knowingly do that, yes.
23     Q.    It would be unethical because
24  you would know that you're likely -- well,

Page 686

1  rephrase.
2        It would be unethical because
3  you would be increasing the risk that these
4  people would get cancer from having the NDMA
5  put into their body, right?
6        MR. GALLAGHER:  Objection.
7        Lacks foundation, and calls for expert
8        testimony.
9     A.   As I think I already answered
10 that question.  It's just considering the
11 potential risk.  If you knowingly to do that
12 experiment, it will be unethical.
13 BY MR. SLATER:
14    Q.   It would be unethical to
15 knowingly give humans NDMA, correct?
16       MR. GALLAGHER:  Objection.
17       Calls for expert testimony.
18    A.   I think I already made that
19 clear.
20 BY MR. SLATER:
21    Q.   And it would certainly be
22 unethical to give humans NDMA in the levels
23 that were found in the valsartan pills
24 deliberately and knowingly, correct?

Page 687

1        MR. GALLAGHER:  Objection.
2        Calls for expert testimony, and
3        outside the scope.
4     A.   It's the same principle.
5  BY MR. SLATER:
6     Q.   Looking now, if we can scroll
7  down to 11.1.1.1, "Carcinogenicity" is the
8  next section.
9        Do you see that?
10    A.   Mm-hmm.
11       MR. SLATER:  Let's scroll now
12 to the next page, please, the
13 left-hand column, the first full
14 paragraph.  Let's get that up.  That's
15 just the carryover paragraph.  Please
16 go down a little further.  That's
17 perfect.  Okay.
18    Q.   So -- rephrase.
19       In the left-hand column, the
20 first full paragraph, I want to start in the
21 second sentence.  It says, "The weight of
22 evidence of the carcinogenicity of NDMA in
23 mammalian species is consistent and
24 convincing.  Moreover, the pattern of tumor

Page 688

1  development is characteristic of that for a
2  mode of action of carcinogenesis involving
3  direct interaction with genetic material.  In
4  available studies, NDMA has induced tumors in
5  all species examined (mice, rats, hamsters),
6  at relatively low doses in some cases,
7  irrespective of the route of exposure,"
8  whether oral or inhalation.  "Tumors were
9  induced in a wide range of tissues, including
10 the liver, Leydig cells, lungs, kidney, and
11 nasal cavity, in the absence of significant
12 non-neoplastic effects, in the limited number
13 of studies in which these were well
14 examined."
15       Do you see what I just read?
16    A.   Yes.
17    Q.   That language was not placed
18 into the deviation investigation report that
19 we were discussing a few moments ago,
20 correct?
21    A.   As I indicate to you, you know,
22 by reading through, you know, this whole
23 sentence or whatever, it's still talking
24 about, you know, its being a carcinogen to

Page 689

1  animals, okay, so we clearly made that
2  statement in the deviation report.
3     Q.   My question is this.  The
4  language I just read is not set forth in the
5  deviation investigation report, correct?
6     A.   The deviation report is not
7  intended, you know, to go into such a, you
8  know, extensive, you know, you know,
9  discussion, okay.  So it's basically state,
10 you know, the fact, you know, that fact, you
11 know, is consistent, you know, with
12 everything, you know, this report or this
13 particular paragraph, you know, states.
14    Q.   Let's continue.
15       MR. SLATER:  Can you scroll
16 down a little more, Cheryll, just to
17 capture the bottom of the paragraph?
18    Q.   The -- rephrase.
19       This first full paragraph on
20 page 23 of this study continues, "Where it
21 was reported, time to first tumor was
22 relatively short.  The incidence of specific
23 tumors has been increased following
24 administration of even a single dose or

Page 690

1 repeated doses for short periods (i.e. 2-3
2 weeks); tumors have also been observed in the
3 offspring of exposed pregnant rats and mice."
4        Do you see that?
5     A.   I'm sorry, which -- which
6 paragraph?
7     Q.   It's the same paragraph we were
8 just reading in --
9     A.   Oh, okay, okay, okay, sure.
10 Uh-huh, uh-huh.
11    Q.   What I just read, along with
12 the other things that I read above that, goes
13 to the concept of this being a potent
14 mutagenic carcinogen, correct?
15       MR. GALLAGHER:  Objection.
16    Vague, calls for expert testimony.
17    A.    Again, you know, everything is
18 talk about here is still, you know, related
19 to animals.
20       MR. SLATER:  Cheryll, could you
21    scroll down so we capture the last two
22    paragraphs in that column, please?
23    Perfect.
24    Q.   This article continues on

Page 691

1 page 23, the last two paragraph -- rephrase.
2        Continue on page 23 of the
3 article, the second to last paragraph in the
4 left column says, "NDMA has been consistently
5 mutagenic and clastogenic in human and rodent
6 cells exposed to in vitro.  Clear evidence of
7 genetic effects has also been observed in a
8 number of tissues from animals exposed to
9 this substance.  Notably, genotoxic effects
10 have been observed in tissues (i.e., liver,
11 kidney, lung) where tumors mainly arise
12 following experimental exposure to NDMA and
13 in germ cells."
14       Do you see that?
15    A.   Yes.
16    Q.   This continues now in the last
17 paragraph in the left column, "DNA adducts
18 (in particular, O6-methylguanine) formed by
19 the methyldiazonium ion generated during
20 metabolism likely play a critical role in
21 NDMA carcinogenicity.  Observed variations in
22 carcinogenicity among species and strains
23 correlate well with variations in activity of
24 O6-methylguanine DNA-methyltransferase.

Page 692

1 Putative pathways for the metabolism of NDMA
2 are similar in rodents and humans, and indeed
3 the formation of O6-methylguanine has been
4 detected in human tissues exposed to NDMA."
5        You see what I just read, I
6 assume, correct?
7     A.   Yes.
8     Q.   So in this article which your
9 company cited in its deviation investigation
10 report, they're essentially building the case
11 for the similarities between humans and
12 animals that are significant in determining
13 whether NDMA causes cancer in humans; that's
14 basically what they're discussing and
15 building to here, correct?
16    A.   As I said, you know --
17       MR. GALLAGHER:  Objection,
18    vague.  Objection.  Vague, calls for
19    expert testimony, and to the extent it
20    mischaracterizes the document.
21    A.   Again, you know, it -- as I
22 said, everything, you know, presented here,
23 you know, it -- it's only, you know,
24 indicate, you know, it's a -- it's a

Page 693

1 carcinogenic to animals and it's a probable
2 carcinogenic to humans.
3 BY MR. SLATER:
4     Q.   Let's go up -- well, let me ask
5 you this question before we scroll any
6 further.
7        In terms of what's likely, at
8 the levels that we've gone through in this
9 deposition, there are some people who took
10 the valsartan sold by ZHP that was
11 contaminated with NDMA who will or already
12 have developed cancer at least in part
13 because of their exposure to that NDMA,
14 correct?
15       MR. GALLAGHER:  Objection.
16    Vague, lacks foundation, calls for
17    speculation, and calls for expert
18    testimony.
19    A.   This is way beyond, okay, my
20 scope, okay.  It need to be examined, or it
21 need to be evaluated by medical doctors or,
22 as I said, or as well as toxicologists.
23 BY MR. SLATER:
24    Q.   Knowing the science available

Confidential Information - Subject to Protective Order

Page 694

1  to ZHP, it is certainly more likely than not
2  that at the levels of NDMA seen in the
3  valsartan sold by ZHP, there are some people
4  who took that who will likely or already have
5  likely developed cancer at least in part due
6  to that exposure to NDMA.
7       We don't have to argue about
8  how many people, we don't have to argue about
9  which cancers.  But you can agree that that's
10  happened to some people, or will, correct?
11       MR. GALLAGHER:  Objection.
12       Vague, lacks foundation, calls for
13       speculation, calls for expert
14       testimony, outside the scope, and
15       argumentative.
16       A.    That's your -- yeah, basically,
17  again, that's your speculation, okay.  As far
18  as I know, this is not a fact, okay, as, you
19  know, until -- you know, up to this point.
20  Okay.  That's your speculation.
21  BY MR. SLATER:
22       Q.    Well, it's certainly likely
23  that that will happen or has happened to some
24  people, correct?

Page 695

1       MR. GALLAGHER:  Objection.
2       Vague, lacks foundation, calls for
3       speculation, calls for expert
4       testimony, outside the scope, and
5       argumentative.
6       A.    You know, as I said, I have
7  responded multiple times.  That's your
8  speculation.
9  BY MR. SLATER:
10       Q.    You would certainly agree with
11  me that the people who took the valsartan
12  manufactured by ZHP and contaminated with
13  NDMA have an increased risk as a result of
14  that exposure to develop cancer.
15       You'll agree with that, right?
16       MR. GALLAGHER:  Objection.
17       Vague, lacks foundation, calls for
18       speculation, calls for expert
19       testimony, outside the scope, and
20       argumentative.
21       A.    You know, you want me to repeat
22  still the same answer.  You know, you are
23  making a speculation.
24       MR. SLATER:  Let's look at the

Page 696

1  article, the top right-hand column of
2  this page, page 23.
3       Q.    Looking again at this article
4  cited by ZHP and relied on by ZHP in its
5  deviation investigation report, the top right
6  column on page 23 -- do you see where I am?
7       A.    The top right, the first
8  paragraph?
9       Q.    Yes.
10       A.    Okay, yeah, I see that.
11       Q.    It says, "Therefore, owing to
12  the considerable evidence of carcinogenicity
13  of NDMA in laboratory species, evidence of
14  direct interaction with DNA consistent with
15  tumour formation, and the apparent lack of
16  qualitative species-specific differences in
17  the metabolism of this substance, NDMA is
18  highly likely to be carcinogenic to humans."
19       That's what this article
20  states, correct?
21       A.    Yeah.  Based upon, you know,
22  the last sentence, you know, you know,
23  another way to say is NDMA, you know, is a
24  probable, you know, carcinogen to human.

Page 697

1  It's still the same thing.
2       Q.    Yeah.  Probable, yeah.
3       A.    Highly likely, you know, is
4  probable.
5       So that's why, you know, as I
6  said, IARC, you know, even as of today, you
7  know, after what, like more than 20 years,
8  you know, you know, after the publishing of
9  this article, you know, it's still the same
10  characterization as 2A, you know, Class 2A.
11       Q.    "Highly likely to be
12  carcinogenic to humans" means that it --
13  rephrase.
14       "Highly likely to be
15  carcinogenic to humans" means exposure to
16  NDMA will cause cancer in humans, correct?
17       MR. GALLAGHER:  Objection.
18       Vague, calls for speculation, and lack
19       of foundation, and outside the scope.
20       A.    See, again, you know, you just
21  try to twist, you know, you know, the fact.
22  Okay.  You try to twist "highly likely" or,
23  you know, you know, "probable."  You know,
24  you try to equating them to certainty, okay.

Confidential Information Subject to Protective Order

Page 698

1  That's just not the case.
2  BY MR. SLATER:
3      Q.    In medicine and in science,
4  there's a reasonable degree of probability.
5  You know that concept, right?
6          MR. GALLAGHER:  Objection.
7      Vague, calls for expert testimony, and
8      outside the scope.
9          Dr. Li, to the extent you know.
10     A.    To the extent -- yeah, there's
11  a possibility, yeah.
12  BY MR. SLATER:
13     Q.    I asked you a different
14  question.
15          You understand the concept of
16  reasonable degree of scientific probability
17  or scientific -- rephrase.
18          Do you understand the concept
19  of reasonable degree of scientific certainty?
20          MR. GALLAGHER:  Objection.
21      Vague.
22     A.    Yeah.  So I don't know what
23  you're specifically try to, you know, to say
24  or to, you know, referring to.

Page 699

1  BY MR. SLATER:
2      Q.    Well, I'll ask the question
3  differently.
4          NDMA is highly likely to be
5  carcinogenic to humans.  That's why your
6  company had to stop selling valsartan
7  contaminated with NDMA, correct?
8          MR. GALLAGHER:  Objection.
9      Vague, lacks foundation, and outside
10     the scope.
11     A.    As I responded earlier, as I
12  said, you know, to stop distribution, you
13  know, as a responsible company it's -- you
14  know, once, you know, the company, you know,
15  became to know, and also, you know, after we
16  developed the method, right, and we know the
17  range, then we immediately, you know, you
18  know, contact FDA.  You know, so that
19  decision, you know, was based upon, you know,
20  this potential risk.  Okay?
21  BY MR. SLATER:
22     Q.    Your company stopped selling --
23  well, let me ask it this way.
24          At the levels of contamination

Page 700

1  that we've gone through in this deposition,
2  it would be unacceptable and, using your
3  word, unethical to sell valsartan with those
4  levels of NDMA contamination, correct?
5          MR. GALLAGHER:  Objection.
6      Vague, mischaracterizes testimony,
7      calls for speculation, calls for
8      expert testimony, and outside the
9      scope.
10     A.    You know, as I said, you know,
11  if you knowingly do that, okay.
12  BY MR. SLATER:
13     Q.    I'm sorry, what did you say?
14     A.    As I said before, you know, if
15  you knowingly doing that.
16          MR. SLATER:  Thank you.
17          Patrick, I don't know if you
18      have any questions.  I can reserve the
19      rest of my time, or we can conclude
20      the deposition now.
21          MR. GALLAGHER:  I'm happy to
22      conclude the deposition.
23          MR. SLATER:  Thank you very
24      much.  I'm done.

Page 701

1          MR. GALLAGHER:  Thank you.
2          THE VIDEOGRAPHER:  The time
3  right now is 11:17 a.m.  We're now off
4  the record.
5          (Whereupon, the deposition was
6  concluded.)

Confidential Information Subject to Protective Order

Page 702

CERTIFICATE

1
2
3       I, MAUREEN O'CONNOR
POLLARD, Registered Diplomate
4  Reporter, Realtime Systems
Administrator, and Certified Shorthand
5  Reporter, do hereby certify that prior
to the commencement of the
6  examination, MIN LI, Ph.D., was remotely
duly identified and sworn by me to
7  testify to the truth, the whole truth,
and nothing but the truth.
8       I DO FURTHER CERTIFY that
the foregoing is a verbatim transcript
9  of the testimony as taken
stenographically by and before me at
10  the time, place, and on the date
hereinbefore set forth, to the best of
11  my ability.
12       I DO FURTHER CERTIFY that
I am neither a relative nor employee
13  nor attorney nor counsel of any of the
parties to this action, and that I am
14  neither a relative nor employee of
such attorney or counsel; and that I
15  am not financially interested in the
action.
16
17

18  _____
19  MAUREEN O'CONNOR POLLARD
NCRA Registered Diplomate Reporter
20  Realtime Systems Administrator
Certified Shorthand Reporter
21  Notary Public

22  Dated:  April 23, 2021
23
24

Page 703

INSTRUCTIONS TO WITNESS

1
2
3       Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8       After doing so, please sign the
9  errata sheet and date it.  It will be
10  attached to your deposition.
11       It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24

Page 704

1      - - - - - -
E R R A T A
2      - - - - - -
3  PAGE  LINE  CHANGE
4  ___ ___ _____
5    REASON: _____
6  ___ ___ _____
7    REASON: _____
8  ___ ___ _____
9    REASON: _____
10  ___ ___ _____
11    REASON: _____
12  ___ ___ _____
13    REASON: _____
14  ___ ___ _____
15    REASON: _____
16  ___ ___ _____
17    REASON: _____
18  ___ ___ _____
19    REASON: _____
20  ___ ___ _____
21    REASON: _____
22  ___ ___ _____
23
24

Page 705

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4       I, _____, do
Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9
10  _____
Min Li, Ph.D.          Date
11
12
13
14
15
16
17  Subscribed and sworn
To before me this
_____ day of _____, 20_____.
18
My commission expires: _____
19
20  _____
Notary Public
21
22
23
24

Page 706

1    LAWYER'S NOTES
2  PAGE LINE
3   ____ ____  _____
4   ____ ____  _____
5   ____ ____  _____
6   ____ ____  _____
7   ____ ____  _____
8   ____ ____  _____
9   ____ ____  _____
10  ____ ____  _____
11  ____ ____  _____
12  ____ ____  _____
13  ____ ____  _____
14  ____ ____  _____
15  ____ ____  _____
16  ____ ____  _____
17  ____ ____  _____
18  ____ ____  _____
19  ____ ____  _____
20  ____ ____  _____
21  ____ ____  _____
22  ____ ____  _____
23  ____ ____  _____
24  ____ ____  _____