Exhibit 22

Confidential Information - Subject to Protective Order

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY

2

3      ****************************

4      IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
       AND IRBESARTAN PRODUCTS

5      LIABILITY LITIGATION           HON ROBERT B.
                                      KUGLER

6      ****************************

       THIS DOCUMENT APPLIES TO ALL

7      CASES

8      ****************************

9              - CONFIDENTIAL INFORMATION -
                SUBJECT TO PROTECTIVE ORDER

10

11

12          Continued Remote Videotaped via

13     Zoom Deposition of PENG DONG, commencing at

14     7:05 a.m. Hong Kong time, on the 1st of

15     April, 2021, before Maureen O'Connor Pollard,

16     Registered Diplomate Reporter, Realtime

17     Systems Administrator, Certified Shorthand

18     Reporter.

19

20                   - - -

21

           GOLKOW LITIGATION SERVICES

22       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com

23

24

Confidential - Information Subject to Protective Order

Page 349

1  APPEARANCES:  ALL PARTIES APPEARED REMOTELY
2
   FOR THE PLAINTIFFS:
3
    MAZIE SLATER KATZ & FREEMAN, LLC
4   BY:  ADAM SLATER, ESQ.
       CHERYLL A. CALDERON, ESQ.
5      CHRISTOPHER GEDDIS, ESQ.
       103 Eisenhower Parkway
6      Roseland, New Jersey 07068
       973-228-9898
7      aslater@mazieslater.com
       ccalderon@mazieslater.com
8      cgeddis@mazieslater.com
9         -and-
10  GOLDENBERG LAW, PLLC
    BY:  MARLENE J. GOLDENBERG, ESQ.
11     800 LaSalle Avenue, Suite 2150
       Minneapolis, Minnesota 55402
12     612-436-5028
       mjgoldenberg@goldenberglaw.com
13
          -and-
14
    KANNER & WHITELEY, LLC
15  BY:  LAYNE HILTON, ESQ.
       701 Camp Street
16     New Orleans, Louisiana 70130
       504-524-5777
17     l.hilton@kanner-law.com
18        -and-
19  HOLLIS LAW FIRM
    BY:  IRIS SIMPSON, ESQ.
20     8101 College Boulevard, Suite 260
       Overland Park, Kansas 66210
21     800-701-3672
       iris@hollislawfirm.com
22
          -and-
23
24

Page 350

1  APPEARANCES (Continued):
2
   FOR THE PLAINTIFFS:
3
   MORGAN & MORGAN
4  BY:  STEPHANIE JACKSON, ESQ.
      20 North Orange Avenue, Suite 1600
5     Orlando, Florida 32801
      sjackson@forthepeople.com
6
          -and-
7
   FLEMING NOLAN JEZ, LLP
8  BY:  DAVID HOBBS, ESQ.
      2800 Post Oak Boulevard
9     Houston, Texas 77056
      713-621-7944
10    david_hobbs@fleming-law.com
11
12  FOR THE DEFENDANTS TEVA PHARMACEUTICAL
    INDUSTRIES, LTD., TEVA PHARMACEUTICALS SA,
13  INC., ACTAVIS LLC, AND ACTAVIS PHARMA, INC.:
14  GREENBERG TRAURIG LLP
    BY:  KATE M. WITTLAKE, ESQ.
15     4 Embarcadero Center, Suite 3000
       San Francisco, California 94111
16     415-655-1285
       wittlakek@gtlaw.com
17
18
    FOR THE DEFENDANT MYLAN PHARMACEUTICALS,
19  INC.:
    PIETRAGALLO GORDON ALFANO BOSICK &
20  RASPANTI, LLP
    BY:  JOHN W. KETTERING, ESQ
21     One Oxford Centre
       Pittsburgh, Pennsylvania 15219
22     412-263-1840
       jk@pietragallo.com
23
24

Page 351

1  APPEARANCES (Continued):
2
   FOR THE DEFENDANTS ZHEJIANG HUAHAI
3  PHARMACEUTICAL CO., LTD., PRINSTON
   PHARMACEUTICAL INC., HUAHAI U.S., INC., and
4  SOLCO HEALTHCARE US, LLC:
5  DUANE MORRIS, LLP
   BY:  PATRICK C. GALLAGHER, ESQ.
6     1875 NW Corporate Boulevard
      Boca Raton, Florida 33431
7     561-962-2131
      pcgallagher@duanemorris.com
8
          -and-
9
   DUANE MORRIS, LLP
10 BY:  FREDERICK R. BALL, ESQ.
      100 High Street
11    Boston, Massachusetts 02110
      857-488-4229
12    frball@duanemorris.com
13        -and-
14 DUANE MORRIS, LLP
   BY:  NATHAN B. REEDER, ESQ.
15    30 South 17th Street
      Philadelphia, Pennsylvania 19103
16    215-979-1164
      nbreeder@duanemorris.com
17
18
   FOR THE DEFENDANT AUROBINDO PHARMACEUTICALS:
19
   CIPRIANI & WERNER, P.C.
20 BY:  CAITLIN LAWLOR, ESQ.
      450 Sentry Parkway
21    Blue Bell, Pennsylvania 19422
      610-567-0700
22    clawlor@c-wlaw.com
23
24

Page 352

1  APPEARANCES (Continued):
2
3  Interpreter:  Dr. Yang Shao
4  Check Interpreters:  Phil Hughes
                         I Ching Ng
5                        Preston Carter
6  Videographer:  Judy Diaz
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 353

1                INDEX
2   EXAMINATION                    PAGE
3   PENG DONG
4   BY MR. SLATER               357
5
6
7       E X H I B I T S
8   NO.      DESCRIPTION         PAGE
9   ZHP-205   Master Drug File amendment,
           Bates HUAHAI-US00007752
10          through 7923................   358
11  ZHP-206   Guideline on the Limits of
           Genotoxic Impurities..........   370
12
    ZHP-207   EMA Questions and answers on
13          the "Guideline on the limits
           of genotoxic impurities"......   379
14
    ZHP-208   Guidance for Industry,
15          Genotoxic and Carcinogenic
           Impurities in Drug
16          Substances and Products:
           Recommended Approaches........   386
17
    ZHP-209   IARC Monographs on the
18          Evaluation of the
           Carcinogenic Risk of
19          Chemicals to Humans...........   402
20  ZHP-210   Deviation Investigation
           Report, Bates
21          PRINSTON00075797 through
           76099.........................   426
22
23
24

Page 354

1   ZHP-211   Sun, et al article,
           Theoretical Investigation of
2          N-Nitrosodimethylamine
           formation from Nitrosation
3          of Trimethylamine.............   445
4   ZHP-212   Investigation Report, Bates
           ZHP00662283 through 2309......   460
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 355

1                - - -
           DEPOSITION SUPPORT INDEX
2                - - -
3
4   Direction to Witness Not to Answer
    PAGE LINE
    None.
5
6
7
8   Request for Production of Documents
    PAGE LINE
9   None.
10
11
    Stipulations
12  PAGE LINE
    None.
13
14
    Questions Marked Highly Confidential
15  PAGE LINE
    None.
16
17
18
19
20
21
22
23
24

Page 356

1            P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  We are now
4   on the record.
5        My name is Judy Diaz.  I am a
6   legal videographer for Golkow
7   Litigation Services.
8        Today's date is April 1, 2021,
9   and the time is 7:05 a.m.
10        This remote video deposition is
11  being held in the matter of Valsartan,
12  Losartan, and Irbesartan Products
13  Liability Litigation MDL.
14        The deponent is Peng Dong.
15        All parties to this deposition
16  are appearing remotely and have agreed
17  to the witness being sworn in
18  remotely.
19        All counsel will be noted on
20  the stenographic record.
21        YANG SHAO, Interpreter,
22  having been previously duly sworn to
23  translate the proceedings to the best of his
24  ability, translated as follows:

Page 357

1   PENG DONG,
2   having previously remotely affirmed to tell
3   the truth, was examined and testified further
4   as follows through the interpreter:
5   FURTHER EXAMINATION
6   BY MR. SLATER:
7   Q.   On the screen is a portion of
8   the Drug Master File amendment filed in
9   December 2013.
10   Do you see that?
11   A.   I see on the screen a document
12   in English. I cannot understand what it
13   says. I'm sorry.
14   MR. SLATER: Cheryll, can you
15   go to the first page of the document,
16   please?
17   Thank you.
18   Q.   I'll start over.
19   On the screen is part of the
20   Drug Master File amendment that was filed in
21   December 2013 that we've been discussing.
22   It's dated November 10, 2013.
23   Section 3.2.S.3.2, titled "Impurities."
24   Do you see the document in

Page 358

1   front of you?
2   A.   I do see a document in English
3   on the screen.
4   MR. SLATER: What exhibit
5   number is this, by the way, for the
6   record? Let's just get that into the
7   record.
8   MS. CALDERON: 205.
9   MR. SLATER: Thank you.
10   (Whereupon, Exhibit Number
11   ZHP-205 was marked for
12   identification.)
13   MR. BALL: I'm sorry, did you
14   say 205?
15   MR. SLATER: Yes.
16   MR. BALL: Thank you.
17   MR. SLATER: Let's go to
18   page 82. The Bates number, the last
19   four digits is 7833.
20   Scroll down, please, a little
21   bit.
22   BY MR. SLATER:
23   Q.   There's a heading in the middle
24   of the page that says "DMF and MTBE." And in

Page 359

1   that section, in part it states, "Based on
2   actual residual results that DMF and MTBE
3   have never been detected in Valsartan, it is
4   demonstrated that these solvents are
5   completely removed from the manufacturing
6   process and omission of the testing is
7   justified."
8   MR. SLATER: You can translate
9   that. Would you read that -- well,
10   let me start over again. I messed up.
11   Let me start over.
12   Q.   This is part of the "Residual
13   Solvents" section, and there's a heading in
14   the middle of the page that starts "DMF and
15   MTBE.
16   And it states in part in that
17   paragraph, "Based on actual residual results
18   that DMF and MTBE have never been detected in
19   Valsartan, it is demonstrated that these
20   solvents are completely removed from the
21   manufacturing process and omission of the
22   testing is justified."
23   My question is, would that
24   information have been based on the risk

Page 360

1   assessment and the process validation that
2   was performed in 2011?
3   A.   I wonder if the plaintiffs'
4   attorney could highlight the sentence you
5   just quoted in this paragraph, because in
6   this paragraph there's too much information,
7   and I cannot understand what it says here in
8   English.
9   Besides, can the plaintiffs'
10   attorney ask more specific questions?
11   Q.   Where this says that it was
12   demonstrated that the solvents DMF and MTBE
13   were completely removed from the
14   manufacturing process, was that based on the
15   risk assessment that was performed in 2011?
16   MR. BALL: Objection. Outside
17   the scope of the 30(b)(6) topics.
18   This is a regulatory document.
19   A.   I would like to ask the
20   plaintiffs' attorney whether your quotation
21   translated by the interpreter was a direct
22   quotation from the original in English from
23   this paragraph. I'm sorry, my English is not
24   good.

Page 361

BY MR. SLATER:

Q.    Can you please answer the question, sir?

A.    If the interpreter just translated what the plaintiffs' attorney just quoted directly from this paragraph, could you help me by further clarifying, because the scope of the question is too broad.

I would like to have a more specific question, or maybe the interpreter can translate this paragraph to me, because I need to get some understanding of the context.

MR. SLATER:  Okay.  Go off the clock.

You can translate the whole paragraph for him if he wants it translated.  This is off the clock.

THE INTERPRETER:  The interpreter is asked to translate this whole paragraph.

(Interpreter translating document to witness.)

A.    Thank you, Interpreter.  Now

Page 362

I'm clear.

MR. SLATER:  Before we go on the clock, is he ready to answer the question, or is he going to keep asking me questions?  Because I want to just get an answer on the record.

MR. BALL:  We're going back on the clock.  The clock is for translation only, Adam.  Please go back on the clock.

MR. SLATER:  Don't be so angry, Frederick.  It's only the early part of the deposition.  You usually don't get angry for an hour or two into it.

MR. BALL:  You know, what can I say.  Go back on the clock.

BY MR. SLATER:

Q.    Here's my question.  Did the risk assessment performed in 2011 determine that DMF and MTBE were demonstrated to be completely removed from the manufacturing process, as stated here in this DMF?

MR. BALL:  Objection.  Outside the scope of the 30(b)(6) topics.

Page 363

A.    This regulatory document is within the responsibility of the regulatory affairs department.

I cannot determine whether this is within the topics I'm designated to testify on as a corporate witness.  However, in my own capacity with regard to the question posed by the plaintiffs' attorney, I can share some of my opinions.

To the best of my recollection, this regulatory document for submission is dated in 2013, according to what has been represented to me by the plaintiffs' attorney.

In the risk assessment performed in 2011 with regard to DMF and MTBE during the process change, in the attachment it says DMF and MTBE needs to be further tested in the validation process.

In the process validation afterwards, based on the requirements of ICH, quality standards were formulated regarding DMF and MTBE.  Both solvents were tested for any residues in the process of the

Page 364

validation.

After the validation was complete, between 2012 and 2013, when valsartan was manufactured using the zinc chloride process, DMF and MTBE were continuously being tested.

I believe, based on the work I just mentioned with regard to DMF and MTBE as solvents, the conclusion was strong that it has been demonstrated that DMF and MTBE could be completely removed.

Q.    Thank you.

So the answer was yes, correct?

MR. BALL:  Objection.  Mischaracterizes his testimony.

A.    I do not understand what the plaintiffs' attorney was referring to when he said "So the answer was yes."

BY MR. SLATER:

Q.    All right.  Let's go to page 147, which the last four Bates numbers are 7898.

That was pretty good.  We did one question in 25 minutes.  We're cruising.

Page 365

1      Were you told that it's
2 acceptable to take as long as you possibly
3 can and give the longest possible answer
4 possible every single time in order to take
5 up the time in our deposition?  Were you told
6 that's acceptable for this deposition?
7           MR. BALL:  Objection.  Vague.
8           By whom?
9 BY MR. SLATER:
10    Q.    You can answer.
11           MR. BALL:  Before he answers --
12 you don't need to translate this.
13           Adam, he's tried to provide you
14 with a complete answer.  I mean,
15 that's all I can say.
16           Okay.  Go ahead.
17           MR. SLATER:  Wait a second.
18 Why did you just put that in there
19 before he translates it so that -- are
20 you asking him to translate that?
21           MR. BALL:  No.  I'm not asking
22 him to translate what I just said.
23           MR. SLATER:  I don't appreciate
24 the speaking -- I don't --

Page 366

1           MR. BALL:  I said, don't
2 translate what I just said.  I'm
3 telling you, if you're going to accuse
4 my witness of trying to slow down your
5 deposition, I'm going to say on the
6 record he's trying to give the best
7 answer he can to the questions you're
8 asking.
9           Now he can answer the question.
10           MR. SLATER:  Please answer.
11 Please read the answer.
12    A.    I would protest against such
13 statement from the plaintiffs' counsel.  I
14 deem it as a personal attack on me.
15           The document presented to me by
16 the plaintiffs' attorney is in English, and
17 my English skill is poor, so I have to ask
18 the interpreter to translate the content of
19 the document to me.
20           Besides, while he was
21 translating, the time was off.
22    Q.    Were you required to produce --
23           MR. SLATER:  I'm sorry.  What?
24           THE INTERPRETER:  The witness

Page 367

1 hasn't completed the testimony yet.
2    A.    I believe had the exhibits
3 presented to me been in Chinese, then we
4 would have been much more efficient.
5           With regard to the questions
6 posed by the plaintiffs' attorney, I believe
7 I have provided accurate responses in the
8 most proper way I think.
9           If the plaintiffs' attorney has
10 any questions regarding my answers, then we
11 can have a discussion.  However, I believe
12 the previous question posed by the
13 plaintiffs' attorney was a personal attack on
14 me.
15           MR. SLATER:  Cheryll, can you
16 scroll down so we can see the top of
17 the page also?
18           Thank you.
19 BY MR. SLATER:
20    Q.    Page 147 of this document --
21 Bates 7898 are the last four digits -- is the
22 discussion about genotoxicity.
23           My question is, genotoxicity
24 was evaluated, or was supposed to be

Page 368

1 evaluated, as part of the risk assessment for
2 the zinc chloride process, correct?
3    A.    I would like the plaintiffs'
4 attorney to clarify which time frame and
5 which process were you referring to.
6    Q.    2011, and I said the zinc
7 chloride process.
8    A.    Okay.  In 2011, during the
9 valsartan zinc chloride process change, we
10 conducted impurity analysis and risk
11 assessment based on the requirements of laws
12 and regulations, which included the risk
13 assessment on genotoxic impurities.
14           The work we conducted in 2011
15 was based on the knowledge of the
16 authorities, the industry, and ZHP.
17    Q.    The 2011 risk assessment for
18 genotoxic impurities for the zinc chloride
19 process was a failure because it failed to
20 detect the presence of NDMA, correct?
21           MR. BALL:  Objection.
22 Mischaracterizes his earlier
23 testimony, and calls for opinion.
24           MR. SLATER:  I wasn't

Page 369

1  characterizing his testimony.  I was
2  asking him a direct question.  I'll
3  expect a yes or no.
4         MR. BALL:  Calls for opinion
5  and expert testimony.
6         MR. SLATER:  No, it doesn't.
7  It's a fact question.
8         MR. BALL:  No, it isn't, Adam.
9  BY MR. SLATER:
10  Q.    Go ahead and answer.
11  A.    The statement provided by the
12  plaintiffs' attorney was incorrect.  That was
13  not what I tried to express.
14         The risk assessment, including
15  the risk assessment of genotoxic impurities,
16  had to be performed based on the situation
17  and background at that time.
18         In 2011, the authorities, the
19  industry, and ZHP did not have any knowledge
20  of the formation of NDMA in valsartan zinc
21  chloride process.
22  Q.    This has a summary and refers
23  to the EMEA CHMP guideline on the limits of
24  genotoxic impurities effective as of

Page 370

1  January 1, 2007.
2         Was that relied on by ZHP in
3  evaluating genotoxic impurities for the zinc
4  chloride process in 2011?
5  A.    Based on the information I
6  collected with regard to our work done in
7  2011 as a corporate witness, when the risk
8  assessment for the impurities was performed,
9  this guideline was used as a reference.
10         MR. SLATER:  Cheryll, if you
11  could, could you pull that guideline
12  up, please?  It's the one that's
13  dated -- it says London, 28 June 2006
14  in the top right.
15         Thank you.
16  BY MR. SLATER:
17  Q.    On the screen is Exhibit -- I
18  think we're at 206, right?
19         (Whereupon, Exhibit Number
20  ZHP-206 was marked for
21  identification.)
22  BY MR. SLATER:
23  Q.    Start over.
24         On the screen is Exhibit 206,

Page 371

1  which is the guideline that we just discussed
2  from the EMEA, and I'd like to turn now to
3  Section 4 on page 4 of 8 at the very top.
4         The first paragraph under
5  Section 4, which is titled "Toxicological
6  Background," says, "According to current
7  regulatory practice it is assumed that
8  (in vivo) genotoxic compounds have the
9  potential to damage DNA at any level of
10  exposure and that such damage may
11  lead/contribute to tumor development.  Thus
12  for genotoxic carcinogens it is prudent to
13  assume that there is no discernible threshold
14  and that any level of exposure carries a
15  risk."
16         My question is, since your
17  company consulted this standard in 2011, your
18  company knew the information I just read,
19  correct?
20  A.    The question posed by the
21  plaintiffs' attorney was based on the English
22  paragraph on the screen.
23         As for the content of this
24  quote in English, the interpreter already

Page 372

1  translated that to me, and I already
2  understood the meaning of the quote.
3         However, could the plaintiffs'
4  attorney repeat his pending question in
5  English again so that I can fully understand
6  the question and provide an accurate answer?
7  Q.    ZHP knew the information in
8  that paragraph in 2011 when it performed its
9  risk assessment on the zinc chloride process,
10  correct?
11  A.    As the corporate witness, I
12  retrospectively reviewed many documents and
13  noticed that ZHP used this official document
14  as a reference when they performed the risk
15  assessment.
16         As for the person that was
17  performing the risk assessment, whether he or
18  she specifically paid attention to what has
19  been quoted by the plaintiffs' attorney
20  regarding the background, I'm not sure.
21  Q.    Let's go now to page 5 of 8.
22  The very bottom of the page is Section 5.2.3.
23         Section 5.2.3 of this document,
24  which ZHP relied on in 2011, as you've told

Confidential Information Subject to Protective Order

1  us, is titled "Application of a Threshold of
2  Toxicological Concern."
3          MR. SLATER:  And what I'd like
4  to do is turn to the next page to go
5  to a paragraph in the middle of the
6  next page as part of this.
7          Perfect.
8      Q.    It says right in the middle of
9  the page, "Some structural groups were
10 identified to be of such high potency that
11 intakes even below the threshold of
12 toxicological concern" -- "TTC" -- "would be
13 associated with a high probability of a
14 significant carcinogenic risk."  And then it
15 cites "(Cheeseman et al. 1999 and Kroes
16 et al. 2004)."
17         "This group of high potency
18 genotoxic carcinogens comprises
19 aflatoxin-like, N-nitroso-, and
20 azoxy-compounds that have to be excluded from
21 the threshold of toxicological concern
22 approach.  Risk assessment of members of such
23 groups require compound-specific toxicity
24 data."

1          That information was known to
2  ZHP in 2011, correct?
3      A.    Based on the information I
4  collected as a corporate witness, in 2011
5  when ZHP conducted impurity risk assessment
6  for valsartan zinc chloride process change,
7  we used this document shown on the screen as
8  a reference.
9          With regard to the description
10 provided by the plaintiffs' attorney
11 specifically and translated by the
12 interpreter, ZHP conducted risk analysis or
13 risk assessment for sodium nitrite during the
14 valsartan zinc chloride process change in
15 2011.
16     Q.    And all of the information we
17 went through from this guidance was known to
18 ZHP when it conducted the risk assessment for
19 the TEA process with sodium nitrite
20 quenching, correct?
21     A.    For the triethylamine process,
22 based on the requirements of laws and
23 regulations, ZHP likewise conducted testing
24 of sodium nitrite.

1      Q.    Can you answer my question,
2  which is, all the information we've gone
3  over -- rephrase.
4          Can you answer my question that
5  all of the information in this guideline from
6  the EMEA, the European Medicines Agency, was
7  also available and known to ZHP in conducting
8  the risk assessment for the TEA process with
9  sodium nitrite quenching, correct?
10         MR. BALL:  Objection.  Vague
11 with time frame.
12         But, Peng, to the degree you
13 can answer his question yes or no --
14         MR. SLATER:  2011.
15         MR. BALL:  -- please try to do
16 so.  To the degree you need to expand
17 upon it to answer thoroughly, feel
18 free.
19     A.    What format of knowledge are
20 you referring to when you were saying that in
21 2011, when ZHP was conducting risk assessment
22 for TEA process, the information on the
23 screen was already known to ZHP?
24         ///

1  BY MR. SLATER:
2      Q.    Was the risk assessment for the
3  TEA process with sodium nitrite quenching
4  conducted in 2011?
5      A.    I'm sorry, but could you ask
6  your question more specifically?
7      Q.    No.  I wouldn't know how to do
8  that.
9      A.    The interpreter's translation
10 was very clear to me, but still I cannot
11 understand your question.
12         Maybe you can clarify what your
13 question is or what you were referring to so
14 that I can provide an accurate answer.
15     Q.    When did ZHP conduct the risk
16 assessment for the TEA process with sodium
17 nitrite quenching to manufacture valsartan?
18     A.    Based on the documents I
19 reviewed as a corporate witness, I believe it
20 was conducted in 2011.
21         MR. SLATER:  Cheryll, if you
22 have the next document, the EMA
23 document, the "Questions and answers
24 on the 'Guideline on the limits of

Page 377

1  genotoxic impurities,'" I'd like to
2  pull that up, please.
3       MS. CALDERON:  I would need a
4  minute on that, so...
5       MR. SLATER:  Forget it, then.
6  Let's go back -- let's take this
7  document down and let's go back to the
8  DMF, page 147, where we were before,
9  and then we're going to go from there
10  to the FDA guidance document that's
11  referenced, the FDA draft guidance.
12  BY MR. SLATER:
13       Q.    Going back to the discussion
14  about genotoxicity, in the summary, after
15  referencing the EMEA guideline, it also
16  referenced FDA draft guideline "Genotoxic and
17  Carcinogenic Impurities in Drug Substances
18  and Products: Recommended Approaches," which
19  it states "is applicable to the applications
20  for existing active substances."
21       That was another guidance that
22  was relied on in 2011 by ZHP in performing
23  its risk assessments of both TEA process with
24  sodium nitrite quenching and TEA process with

Page 378

1  zinc chloride, correct?
2       A.    Based on the FDA guideline
3  mentioned by the plaintiffs' counsel, which
4  is in English and is also shown on the
5  screen, and based on the document shown now
6  on the screen, I am able to draw the same
7  conclusion.
8       Q.    Can you read that first
9  paragraph in English?  Are you able -- I'm
10  not asking you to, but are you able to?
11       A.    I can recognize certain words;
12  for example, "impurities," "FDA," "drug."
13       MR. SLATER:  Cheryll, you said
14  you found the EMA question and answer
15  document, so let's put that up first.
16  Okay.
17       I've now put on the screen --
18  before we get to the FDA guideline, I
19  have the EMA "Questions and answers on
20  the Guideline on the limits of
21  genotoxic impurities" up on the
22  screen, which I think is Exhibit 207
23  now.
24       ///

Page 379

1       (Whereupon, Exhibit Number
2  ZHP-207 was marked for
3  identification.)
4  BY MR. SLATER:
5       Q.    What I'm going to do is -- this
6  is dated September 23, 2010.
7       MR. SLATER:  I'd like to turn
8  to the second page, please, Section 2.
9       Q.    And right in the middle of the
10  page, it says -- it talks about levels of
11  mutagenic impurity right in the middle of the
12  page, and what I want to focus on, where it
13  talks about the standard of "as low as
14  reasonably practical" guideline, it says
15  ALARP considerations can apply "unless it is
16  a structure of very high concern; for
17  example, N-nitroso compounds."
18       My question is this.  ZHP knew
19  in 2011 that N-nitroso compounds were
20  structures of very high concern, correct?
21       A.    I would like to ask the
22  plaintiffs' attorney what "ALARP" means.  I
23  don't understand what it means.
24       Q.    As stated in Question 2 just

Page 380

1  above what I read, it means "as low as
2  reasonably practicable."
3       It actually says, to give you a
4  little more information, Question 2 starts
5  out stating, "The guideline indicates that it
6  is necessary to reduce a known or suspected
7  mutagenic impurity to as low as reasonably
8  practicable (ALARP) even if the level is
9  below the threshold of toxicological concern
10  (TTC)."
11       I hope that helps.
12       A.    Okay.  Thank you very much.
13  Could you repeat your question again?
14       Q.    As stated on this page,
15  N-nitroso compounds are described as "a
16  structure of very high concern" as part of
17  Section -- Question 2, the answer.
18       That was known to ZHP in 2011,
19  correct?
20       A.    In 2011, based on the knowledge
21  of the authorities, the industry, and ZHP, we
22  conducted our corresponding work.  For
23  example, for sodium nitrite, we added testing
24  of residual sodium nitrite in the validation

Confidential Information - Subject to Protective Order

Page 381

1  batches.
2        MR. BALL:  Peng, to the degree
3     you can answer the question he asked
4     in a yes or no, or if you have to
5     qualify it, that's fine.
6        And, Adam -- please don't
7     translate the rest of this,
8     Dr. Shao -- Adam, we've gone about
9     75 minutes plus with translation, so
10    maybe we can try to get this question
11    answered and take a break.
12       MR. SLATER:  Okay.
13    A.    Okay.  Thank you.
14 BY MR. SLATER:
15    Q.    Did -- rephrase.
16       Was ZHP aware in 2011 that
17 N-nitroso compounds were structures to be of
18 very high concern according to the European
19 Medicines Agency?  Yes or no.
20    A.    Your question is not a simple
21 answer that I can simply answer with a yes or
22 no.
23       In 2011, ZHP conducted
24 corresponding work based on the knowledge of

Page 382

1  the authorities, the industry, and ZHP
2  valsartan zinc chloride process at that time.
3  The authorities also included EDQM.
4        MR. SLATER:  Go off the record.
5        THE VIDEOGRAPHER:  The time
6     right now is 8:25 a.m.  We're now off
7     the record.
8        (Whereupon, a recess was
9     taken.)
10       THE VIDEOGRAPHER:  The time
11    right now is 8:42 a.m.  We're back on
12    the record.
13 BY MR. SLATER:
14    Q.    At the very bottom of page 2,
15 this refers to "a class of very potent
16 genotoxic carcinogens," and that includes,
17 according to this, N-nitroso compounds.
18       You agree that a N-nitroso
19 compound is a very potent genotoxic
20 carcinogen, correct?
21       MR. BALL:  Objection. Calls
22    for opinion.
23    A.    I need the plaintiffs' attorney
24 to point out where that statement is on this

Page 383

1  page; and, if possible, I would like
2  interpreter to translate the context.
3        MR. SLATER:  Great.  Go off the
4     time.
5        It's the very bottom, number 3,
6     little three iii's.  It says, "Yes,
7     genotoxicity testing."
8        You can translate that for him
9     if you'd like.
10       (Interpreter translating
11    document to witness.)
12    A.    Now I'm clear.  Thank you,
13 Interpreter.
14       MR. BALL:  Back on the timer,
15    please.
16       MR. SLATER:  Is he answering or
17    is he talking?
18       Okay.  Let's go back on the
19    timer.
20       We're all talking over each
21    other.  Let's stop for one second.
22    Sorry, Dr. Shao.
23 BY MR. SLATER:
24    Q.    We're back on the timer.

Page 384

1  Please answer the question.
2     A.    I would like the question to be
3  repeated because it took some time for the
4  translation.  I'm sorry.
5     Q.    This says that N-nitroso
6  compounds belong to a class of very potent
7  genotoxic carcinogens.
8        You agree with that, correct?
9        MR. BALL:  Objection.  Calls
10    for opinion and expert testimony.
11    A.    From the plaintiffs' attorney's
12 statement as well as the interpreter's
13 interpretation for the corresponding content,
14 now I understand what it says on the screen
15 in English, which matches the statement of
16 the plaintiffs' attorney.
17       However, I'm not a
18 toxicologist.  I'm not able to provide a
19 corresponding accurate judgment.
20 BY MR. SLATER:
21    Q.    What I just read was known to
22 ZHP in 2011, correct?
23    A.    Are you referring to the third
24 paragraph on the screen translated by the

Page 385

1  interpreter just now by saying what I just
2  read?
3       Q.    Yes.
4       A.    As a corporate witness, based
5  on the information I collected, after
6  reviewing certain documents, ZHP did use this
7  regulatory document as a reference during
8  valsartan's zinc chloride process change in
9  2011.
10           However, in my personal opinion
11  as to whether the specific operator paid
12  attention to the third paragraph on the
13  screen that was just quoted by the
14  plaintiffs' attorney, I cannot give an
15  affirmative answer.  In other words, I'm not
16  sure.
17           However, during the valsartan
18  zinc chloride process validation in 2011, ZHP
19  did add testing for sodium nitrite.
20       MR. SLATER:  Let's take this
21  document down, and let's put up the
22  Guidance for Industry from the FDA.
23           This is Exhibit 208.  It's the
24  FDA Guidance for Industry regarding

Page 386

1  Genotoxic and Carcinogenic Impurities
2  in Drug Substances and Products:
3  Recommended Approaches that was cited
4  in the DMF update in December 2013.
5       (Whereupon, Exhibit Number
6  ZHP-208 was marked for
7  identification.)
8       MR. SLATER:  What I would like
9  to do now is turn to page 7, please.
10  BY MR. SLATER:
11       Q.    Section IV is titled
12  "Recommended Approaches" -- let me rephrase
13  that.
14           Looking now at Section IV-A,
15  titled "Prevention of Genotoxic and
16  Carcinogenic Impurity Formation," I'm going
17  to read something, Mr. Dong, and I'm going to
18  ask you to listen to this and tell me if ZHP
19  agrees with this statement, okay?
20           And I'm going to now read it.
21  "Since drug-related impurities presumably
22  provide limited, if any, therapeutic benefits
23  and because of their potential to cause
24  cancer in humans, every feasible technical

Page 387

1  effort should be made to prevent the
2  formation of genotoxic or carcinogenic
3  compounds during drug substance synthesis or
4  drug product manufacturing."
5       A.    I'm -- I was paying a lot of
6  attention to the interpreter's translation.
7  Can you please repeat your question?
8       Q.    Do you agree with the statement
9  that I just read to you from this FDA
10  guidance document?
11       A.    As for this guidance document,
12  in my personal opinion, since it is a legal
13  document, I'm not able to evaluate it with a
14  simple yes or no.
15       Q.    Are you refusing to answer the
16  question?
17           MR. BALL:  Hold on.  That's not
18  what he said.  He said he can't answer
19  your question.  Maybe if you rephrased
20  it.
21           MR. SLATER:  Really?  Like four
22  or five times for the next half-hour,
23  maybe?
24           MR. BALL:  Adam, if that's what

Page 388

1  it takes, feel free.  I can't help how
2  you're asking questions.
3           MR. SLATER:  I don't know why
4  you're -- I don't need to be
5  addressed.  I'm looking at the
6  document.  I don't need to be coached.
7  Thank you.
8  BY MR. SLATER:
9       Q.    You realize -- well, rephrase.
10           Does ZHP agree with the
11  statement that I read, quoting from the FDA
12  guidance document?
13       A.    I think as for this FDA
14  guidance document, we as a company cannot say
15  we agree or don't agree.  Rather, we should
16  conduct our work based on our current
17  knowledge as well as the requirement of this
18  guidance document.
19       Q.    One feasible technical effort
20  to prevent -- rephrase.
21           It would have been feasible to
22  perform gas chromatography-mass spectrometry
23  to see if there were any nitrosamine
24  impurities as part of the risk assessment.

Page 389

1    That would have been feasible,
2 correct?
3        MR. BALL:  Objection.
4 Speculative.
5    A.    In 2011, during the development
6 of valsartan zinc chloride process, ZHP
7 conducted our work based on the knowledge
8 then.
9        However, at that time, the
10 authorities, the industry, or ZHP did not
11 have any knowledge on the nitrosamine
12 impurities, including its detection methods.
13 BY MR. SLATER:
14    Q.    We'll come back to that.
15        ZHP did use mass spectrometry
16 to evaluate potential impurities as part of
17 its risk assessment for the zinc chloride
18 process, correct?
19    A.    I'm sorry, but I do not
20 understand your question.  I wonder if you
21 can break this question into shorter ones
22 since it's a little bit too long to me, and
23 then ask shorter questions one by one, or you
24 can ask a more specific question.

Page 390

1    Q.    No, I don't think we're going
2 to do that.  We're not going to bleed the
3 clock much longer on this one.
4        MR. SLATER:  Go to page 8, the
5    top of page 8, please, Cheryll.
6    Q.    ZHP was aware from this
7 document that N-nitroso structures "have
8 extremely high carcinogenic potency and are
9 excluded from the threshold approach," as it
10 states at the bottom of the top carryover
11 paragraph.  ZHP knew that in 2011, correct?
12    A.    The interpreter already
13 provided me with a very clear translation;
14 however, I do not get your question because
15 it's a little bit too long.  Can you break
16 into shorter ones or ask more specific
17 questions?
18    Q.    From -- rephrase.
19        Based on this document -- well,
20 rephrase.
21        As stated in this document,
22 N-nitroso compounds "have extremely high
23 carcinogenic potency and are excluded from
24 the threshold approach."

Page 391

1        ZHP knew that in 2011, correct?
2    A.    I'm not quite sure what you
3 mean by "excluded from the threshold
4 approach."
5    Q.    ZHP knew in 2011 that N-nitroso
6 compounds such as NDEA and NDMA had extremely
7 high carcinogenic potency, knew that in 2011,
8 correct?
9        MR. BALL:  Objection.  Calls
10    for expert testimony.
11 BY MR. SLATER:
12    Q.    Answer the question, please.
13    A.    I would like to tell you that I
14 don't quite get your question.  What form of
15 knowledge are you referring to by ZHP knew in
16 2011?
17    Q.    You're asking me to define what
18 it means to know something?
19    A.    I would like you to be more
20 specific; for example, the form of the
21 knowledge or the scope of the knowledge.
22    Q.    This document was known to ZHP
23 in 2011, and ZHP knew all the contents,
24 including that sentence I read, correct?

Page 392

1    A.    I'm sorry.  I need you to point
2 out where the sentence you just referred to
3 is in this paragraph, and then I would like
4 to ask the interpreter to translate for me.
5        MR. SLATER:  Go off the timer.
6        Dr. Shao, it's at the top, the
7    carryover paragraph.  There's a
8    sentence that starts, "However, there
9    are some compounds."
10        Do you see that?
11        THE INTERPRETER:  Yes.
12        MR. SLATER:  It's that sentence
13    that I'm reading.
14        (Interpreter translating
15    document to witness.)
16        THE INTERPRETER:  The
17    interpreter is asked to translate the
18    whole paragraph.
19        MR. SLATER:  Hey, I'm not the
20    guy trying to get out of Macao on
21    Thursday night or Friday morning, so
22    if he wants you to translate -- you're
23    talking about starting on the prior
24    page?  Go ahead.  Have at it.  You can

Confidential Information – Subject to Protective Order

Page 393

1   go back.  As long as he wants to
2   spend -- I don't know what else to
3   tell him.  I mean, it's a really long
4   paragraph.
5          (Interpreter translating
6   document to witness.)
7      A.    I believe I need to understand
8   the background or the context of this
9   sentence in order to give you a response
10  that's accurate.
11  BY MR. SLATER:
12     Q.    You don't have to explain
13  yourself to me if you want Dr. Shao to read
14  it to you.  But we're not on the clock, and
15  we're not going to go until 3:00 o'clock in
16  the morning tonight.  So all I'm saying is
17  we're probably going to be continuing Friday
18  night.  That's all I'm saying.
19         MR. BALL:  Adam, you don't get
20  to make that decision.
21         MR. SLATER:  So we're just
22  going to go until 3:00 in the morning
23  tonight?
24         MR. BALL:  No.  We're going to

Page 394

1   go the five hours of translation time
2   that you are allowed.
3          MR. SLATER:  Okay.  Well, thank
4   you for telling me what I'm going to
5   do, but, you know, this --
6          MR. BALL:  No, I'm not telling
7   you what you're going to do.
8          MR. SLATER:  We're going to do
9   this for 15, 20 minutes now, this
10  paragraph, on a simple question.
11         Maybe there's an easier way
12  through this if you suggest -- well,
13  you do whatever you want.  I'm not
14  going to --
15         MR. BALL:  You already said I
16  shouldn't coach you on how to ask
17  questions, Adam.
18         MR. SLATER:  I'm sorry.  I
19  don't know how to ask questions?
20         MR. BALL:  I said you already
21  suggested I should not help you ask
22  questions.
23         MR. SLATER:  No, you shouldn't.
24         MR. BALL:  So...

Page 395

1          MR. SLATER:  I was going to
2   say, possibly suggest to your client
3   there's an easier way to do this.
4          How about this.  I'll do you a
5   favor here.  Let's go back on the
6   timer.
7   BY MR. SLATER:
8      Q.    Does ZHP agree or disagree with
9   the FDA's statement that N-nitroso compounds
10  have extremely high carcinogenic potency?
11         MR. BALL:  Objection.  Calls
12  for expert testimony.
13     A.    May I proceed to answer?
14         MR. BALL:  Please.
15  BY MR. SLATER:
16     Q.    That would be wonderful.
17     A.    As a company, I don't think we
18  can simply agree or disagree with FDA's
19  corresponding guidelines.  What we were
20  supposed to do was to conduct the
21  corresponding work based on the requirements
22  of the laws and regulations at that time.
23     Q.    That includes conducting the
24  work in accordance with this guidance

Page 396

1   document, correct?
2      A.    From the document you just
3   showed me on the screen, which was a document
4   that ZHP submitted to FDA, I saw that
5   corresponding work was conducted using this
6   FDA's guidance document as a reference.
7          MR. SLATER:  Cheryll, let's go
8   to the last page of this document,
9   page 13, the Decision Tree Flow
10  Diagram.
11     Q.    Appendix A to this FDA guidance
12  is a Decision Tree Flow Diagram, and the
13  first thing in the flow is to identify the
14  impurity.
15         Do you see that at the top of
16  the flowchart?
17     A.    Are you referring to the box on
18  top of this flowchart which has an English
19  word followed by the word "impurity"?
20     Q.    Yes, I am.
21     A.    I do see that box.
22     Q.    And you agree that in trying to
23  prevent genotoxic impurities, the most
24  important thing to do is to identify that the

Confidential Information - Subject to Protective Order

---

Page 397

1 impurities are there, correct?
2     A.   I disagree with your statement.
3 The work conducted involved many departments,
4 and it was very complex and complicated.
5 Therefore, it is not appropriate to say
6 certain work was very important or the most
7 important.
8     Q.   If you don't identify the
9 impurity -- withdrawn.  It doesn't matter.
10 It's obvious.
11         MR. SLATER:  Let's go back to
12     the DMF, page 148 of the DMF, please,
13     Cheryll.
14         Scroll up a little more.
15         Perfect.
16     Q.   Looking now at page 148 of the
17 DMF dated November 10, 2013, this is the
18 Discussion on Impurities and the table of
19 organic impurities.
20         MR. SLATER:  What I'd like to
21     do is scroll down, please, to the text
22     at the bottom of the page.
23     Q.   And this says in part, "there
24 is not any high potency genotoxic group, such

---

Page 398

1 as, aflatoxin-like, N-nitroso-, and
2 azoxy-compound has been included in these
3 impurities."  I'm going to stop there.
4         That was part of the risk
5 assessment performed in 2011, that statement,
6 correct?
7     A.   I need you to point out which
8 paragraph and which sentence you just quoted.
9 I would like the interpreter to translate the
10 whole paragraph in order to understand the
11 context.
12         MR. SLATER:  Go off the timer.
13         It's the last paragraph on the
14     page that starts, "Regarding of the
15     impurity D-J."
16     A.   Okay.  Thank you, Interpreter.
17 I'm ready to answer a question.
18     Q.   Okay.  Go ahead and answer the
19 question, please.
20     A.   I'm sorry.  It took some time
21 for the interpreter to translate the
22 document, so would you please repeat the
23 pending question?
24     Q.   The statement that "there is

---

Page 399

1 not any high potency genotoxic group, such
2 as, aflatoxin-like, N-nitroso-, and
3 azoxy-compound has been included in these
4 impurities."
5         That was a statement based on
6 the risk assessment performed in 2011,
7 correct?
8     A.   That's not correct.
9         MR. BALL:  Adam, I just want to
10     make sure we went back on the timer.
11     A.   With regard to your question
12 quoting the sentence in English in the last
13 paragraph on the screen, as well as the
14 information I collected through the
15 translation of the two paragraphs by the
16 interpreter, I believe ZHP had this statement
17 based on the impurities D and J, or "D to J
18 and hydrolysis product," which is the prior
19 sentence to the sentence you just quoted.
20 BY MR. SLATER:
21     Q.   The basis of that statement was
22 the risk assessment that was conducted by
23 ZHP, correct?
24     A.   I would like you to clarify

---

Page 400

1 what you are referring to by that statement.
2         MR. SLATER:  Scroll up to the
3     top of the table.
4         Perfect.
5     Q.   At the top of the page where it
6 says "Organic impurities," ZHP wrote in this
7 document "All the potential organic
8 impurities are demonstrated in Valsartan
9 listed as follows," and then there's that
10 whole table.
11         And nowhere does it include
12 NDMA, correct?
13     A.   Where it says "all the
14 potential organic impurities" was based on
15 the knowledge and understanding at that time.
16 That's the validation and the conclusion we
17 made.
18     Q.   That was also based on the
19 failure of the scientific analysis to be
20 thorough in performing the risk assessment,
21 correct?
22         MR. BALL:  Objection.  Calls
23     for opinion.
24     A.   What you said is not correct.

---

Confidential Information Subject to Protective Order

Page 401

1    In 2011, when ZHP was
2 conducting valsartan zinc chloride process
3 change, our work was based on the knowledge
4 of the authorities, the industry, and ZHP at
5 the time.
6    The scientific method for the
7 potential impurity analysis was also based on
8 the understanding and knowledge at that time.
9 BY MR. SLATER:
10    Q.    Bottom line -- withdrawn.
11    MR. SLATER:  Let's take this
12 document down.
13    This is a colorful one.
14    By the way, are we at a break
15 or should we keep going?  Because I'm
16 starting a new document.
17    MR. BALL:  We have roughly
18 27 minutes until we've got 70 minutes.
19    MR. SLATER:  Oh, really?  Okay.
20    MR. BALL:  Yes.
21    MR. SLATER:  Great.
22    This is Exhibit 208, right?
23 Wild guess?
24    THE STENOGRAPHER:  209.

Page 402

1    MR. SLATER:  Like I said, this
2 is Exhibit 209.
3    (Whereupon, Exhibit Number
4    ZHP-209 was marked for
5    identification.)
6 BY MR. SLATER:
7    Q.    This is Exhibit 209, which is
8 from the International Agency for Research on
9 Cancer, known as IARC, and it's the "IARC
10 Monographs on the Evaluation of the
11 Carcinogenic Risk of Chemicals to Humans,
12 Some N-Nitroso Compounds," and it's dated in
13 the bottom left as May 1978.
14    MR. SLATER:  If you could just
15 scroll up a little, Cheryll, please.
16    Q.    IARC monographs --
17    MR. BALL:  Adam, I can't see
18 the bottom.
19    There we go.  Thank you.
20 BY MR. SLATER:
21    Q.    IARC monographs were known in
22 the scientific community well before and
23 certainly as of 2011, correct?
24    MR. BALL:  Objection.  Calls

Page 403

1 for speculation and vague.
2    MR. SLATER:  All right.  I'll
3 ask it differently then.
4    Well, actually, no, I won't.
5 I'll ask it differently but ask the
6 same question.
7 BY MR. SLATER:
8    Q.    IARC monographs were well-known
9 in the scientific community by 2011, correct?
10    MR. BALL:  Objection.  Calls
11 for speculation.
12    A.    I am not able to provide an
13 accurate answer.
14    As for the validation in the
15 scientific community, I believe it is beyond
16 the scope of the topics I am designated to
17 testify on.
18 BY MR. SLATER:
19    Q.    ZHP knew of the existence of
20 IARC monographs by 2011, correct?
21    A.    I cannot provide you with an
22 accurate answer.  By 2011, ZHP might have
23 known or might have not known the existence.
24 I haven't reviewed any related documents, so

Page 404

1 I cannot give you an accurate answer.
2    Q.    What documents did you review
3 to prepare for this deposition?
4    MR. BALL:  Objection to the
5    degree that it goes to --
6    MR. SLATER:  I didn't ask the
7    question in a way that would invade on
8    privilege.
9 BY MR. SLATER:
10    Q.    Answer the question.
11    MR. BALL:  Adam, can I finish,
12 please?  I get to make my -- you get
13 to ask your questions; I get to make
14 my objections.
15    Objection on the basis of the
16 attorney/client privilege.  To the
17 degree they're documents that he
18 reviewed with counsel, please don't
19 disclose those.
20    MR. SLATER:  That's an
21 inappropriate objection.  I did not
22 ask him that.  You're feeding
23 something into it to try to convolute
24 the question.

Confidential Information Subject to Protective Order

Page 405

1   MR. BALL:  We're not.  You
2  asked him what documents did he
3  review.
4   MR. SLATER:  That's all I asked
5  him.
6   MR. BALL:  Yes, and I'm telling
7  him he can answer to the extent they
8  weren't documents that we showed him.
9   MR. SLATER:  That's an improper
10  instruction.
11   MR. BALL:  I disagree.
12  BY MR. SLATER:
13   Q.   What documents did you review
14  to prepare for this deposition?
15   MR. BALL:  Same objection.
16   A.   As a corporate witness for this
17  deposition, I reviewed documents related to
18  our previous work; for example, the process
19  change document that we have been discussing
20  about over the past few days, validation
21  documents, as well as batch records.
22  BY MR. SLATER:
23   Q.   Is that all you reviewed?
24   A.   Since you're asking for all the

Page 406

1  documents, would ICH document be counted?
2   Q.   Yes.
3   A.   I did review some ICH
4  documents.  As for the others, it happened
5  some time ago, and I do not recall.
6   Q.   Are those documents that you
7  reviewed in a file, either in paper or on
8  computer?
9   A.   Some of the documents I
10  reviewed, such as process procedures,
11  changes, validations, batch records, are in
12  the hard-copy form stored in an archive.
13   Q.   Did you review any IARC
14  monographs?
15   A.   I'm sorry, my English is poor.
16  What do you mean by "IARC" or the English
17  word to that effect?
18   Q.   IARC, International Agency for
19  Research on Cancer.
20   A.   Personally speaking, I haven't
21  reviewed this document.
22   MR. BALL:  Adam, we've probably
23  gone long enough that the translator
24  needs a break.

Page 407

1   MR. SLATER:  Okay.
2   THE VIDEOGRAPHER:  Are we going
3  off the record?
4   MR. SLATER:  Yes.
5   THE VIDEOGRAPHER:  The time
6  right now is 9:49 a.m.  We're now off
7  the record.
8   (Whereupon, a recess was
9  taken.)
10   THE VIDEOGRAPHER:  The time
11  right now is 10:06 a.m.  We're back on
12  the record.
13   MR. SLATER:  That is not the
14  document, Cheryll.
15   Cheryll, please take that down.
16  Cheryll.
17   MR. BALL:  Adam, I didn't look
18  at it at all, I swear.
19   MR. SLATER:  It's our chat, but
20  I hope it wasn't -- if it's recorded,
21  I'm going to ask to have it edited out
22  if possible.  Do you mind?
23   MR. BALL:  No, I don't mind.  I
24  know that was a technological error.

Page 408

1  I'm not going to -- in the same way I
2  don't think you want to see the texts
3  that I'm sending to Patrick during the
4  deposition.
5   MR. SLATER:  Unless you're
6  telling him what's going on in the
7  last four minutes of the Knicks game,
8  which I'm now missing when it's a
9  two-point game, then no.
10   MR. BALL:  I am not.  Although
11  I am going to point out that it's the
12  women's final, NCA final, on next
13  Sunday for Mr. Gu -- for Dr. Gu, so I
14  find that highly disappointing.
15   MR. SLATER:  All right.  Let's
16  go on the clock.
17   And, Cheryll, let's go to
18  page 36, please.
19   That's not the right page.
20  That's page 38.
21   MS. CALDERON:  You cut out.
22  Can you repeat the page?
23   MR. SLATER:  Page 36.
24  Probably talking too soft as

Page 409

1    usual.
2    BY MR. SLATER:
3        Q.    Looking at the third paragraph,
4    the first sentence says, "It has been known
5    since 1865 that the reaction of dimethylamine
6    hydrochloride with sodium nitrite at an
7    acidic pH yields N-nitrosodimethylamine,"
8    which I think we can agree is NDMA.
9        Did ZHP have that knowledge in
10   2011?
11       THE INTERPRETER:  The
12   interpreter is asked to repeat the
13   rendition.
14       MR. SLATER:  One second.  Is he
15   asking you to translate it for him?
16       THE INTERPRETER:  No.
17       MR. SLATER:  All right.  Go
18   ahead, read it again.
19       THE INTERPRETER:  Signal is not
20   stable, so the witness --
21       MR. SLATER:  Okay, it's fine.
22   It's fine.  You don't have to explain,
23   Dr. Shao.  You can just read it to
24   him.

Page 410

1        A.    In 2011, ZHP had no knowledge
2    of the formation of NDMA during the valsartan
3    zinc chloride process.
4        Considering the English
5    sentence you just quoted, by now ZHP has
6    never manufactured valsartan using
7    dimethylamine hydrochloride in the process.
8        Q.    The zinc chloride process was
9    yielding dimethylamine, which was then
10   reacting with nitrous acid to create NDMA,
11   correct?
12       A.    I would like you to clarify
13   which time frame or what context you're
14   referring to in your question.
15       Q.    The entire time ZHP
16   manufactured valsartan with the zinc chloride
17   process, the process was yielding
18   dimethylamine, which was reacting with
19   nitrous acid to form NDMA, correct?
20       A.    During the development of
21   valsartan zinc chloride process in 2011, ZHP
22   had no knowledge of the formation of NDMA in
23   the valsartan zinc chloride process.
24       Q.    Can you answer my question,

Page 411

1    please, as to what you know right now,
2    speaking for ZHP?
3        MR. SLATER:  Actually, I'm not
4    going to ask.  I asked it twice; he
5    doesn't want to answer it.  We'll seek
6    our remedy.
7        Once --
8        MR. BALL:  Hold on.  I'm sorry,
9    I was muted.
10       I disagree with the proposition
11   that he doesn't want to answer it.  He
12   tried to answer it.
13       Maybe if you rephrase the
14   question, Adam.
15       MR. SLATER:  It's not working.
16   Every time I rephrase, I get another
17   question back.  So it's just -- it's
18   like -- it's fruitless.  So I'll go to
19   the next question.
20   BY MR. SLATER:
21       Q.    Once ZHP learned that there was
22   dimethylamine reacting with nitrous acid in
23   the zinc chloride process, ZHP knew that it
24   had to optimize that process to prevent NDMA

Page 412

1    from forming, correct?
2        A.    In 2011, ZHP had no knowledge
3    of the formation of NDMA in valsartan zinc
4    chloride process.
5        MR. BALL:  I think there's
6    confusion there.  I think he's asking
7    when they found out, what -- did they
8    take steps to optimize the process.
9        Is that a fair
10   characterization, Adam, of what you
11   were asking?
12       MR. SLATER:  Yes.
13       A.    If my attorney correctly
14   characterized your question, then my answer
15   would be as follows.
16       After June 2018, when ZHP found
17   the NDMA impurity in the valsartan zinc
18   chloride process, ZHP organized corresponding
19   departments and conducted corresponding work,
20   including optimizing the process.
21   BY MR. SLATER:
22       Q.    ZHP realized that it would
23   never be appropriate to put dimethylamine
24   with nitrous acid where those two substances

Page 413

1  could react together, because there would be
2  a risk of creating NDMA, right?
3      A.    Can you break this long
4  question into shorter ones and ask them one
5  by one --
6      Q.    Sure.
7      A.    -- or be specific in your
8  question? Because your question is a little
9  bit too long. I'm sorry.
10     Q.    No problem.
11           I'm asking about the time
12 period of 2011.
13           MR. SLATER: Please tell him
14     that.
15     Q.    First I want to ask about
16 dimethylamine.
17           MR. SLATER: Please tell him.
18     Q.    In 2011, ZHP knew that
19 dimethylamine could react with nitrous acid
20 to form NDMA. As a matter of chemistry, ZHP
21 knew that, correct?
22     A.    I would like to ask you the
23 scope and the person you're referring to by
24 "as a matter of chemistry."

Page 414

1      Q.    The people in charge of the
2  risk assessments for the valsartan
3  manufacturing processes.
4      A.    The key person in charge of the
5  risk assessment for valsartan zinc chloride
6  process in 2011 already left the company, so
7  I cannot offer my evaluation of his personal
8  knowledge of chemistry as a corporate
9  witness.
10           All I can do is to use the
11 documents that are available to me, such as
12 the process change, process validation, and
13 review them to find out about the
14 circumstances at that time.
15     Q.    Who is that person who left the
16 company?
17     A.    For example, the manager in the
18 technical department, Kai Yang, spelled as
19 K-A-I, last name Y-A-N-G.
20     Q.    Did you review his notes and
21 his files?
22     A.    I did review some of the
23 documents he approved.
24     Q.    I guess we'll check our files

Page 415

1  to see if we have those documents. Doesn't
2  sound familiar.
3           Were those notes? Rephrase.
4           What type of documents were
5  they? Were they notes? Were they memos?
6  Were they books? What were they?
7      A.    The documents I reviewed are
8  mostly the files retained by the company; for
9  example, the process change documents where
10 Kai Yang put his signature on.
11     Q.    Would ZHP have ever knowingly
12 put dimethylamine and nitrous acid together
13 as part of the manufacturing process for
14 valsartan?
15           MR. BALL: Objection. Calls
16     for speculation.
17     A.    In 2011, during the valsartan
18 zinc chloride process change, ZHP had no
19 specific knowledge of the formation of NDMA
20 in the valsartan zinc chloride process.
21           MR. SLATER: Cheryll, turn to
22     page 40, please.
23     Q.    This paragraph says in part
24 that "The principal techniques employed by

Page 416

1  the analysis of volatile N-nitrosamines have
2  been described in a recent publication," it
3  gives the citation to Preussmann 1978, and
4  then refers to "The relative merits of high-
5  and low-resolution mass spectrometry...since
6  use of mass spectrometry as a confirmatory
7  technique is particularly important."
8           You would agree with me,
9  knowing what you know now, that mass
10 spectrometry is the best way to identify NDEA
11 and NDMA in valsartan, correct?
12           MR. BALL: Objection. Calls
13     for speculation, expert opinion, and
14     opinion.
15           MR. SLATER: Actually, I'm
16     going to withdraw the question. I'm
17     withdrawing the question. I'm asking
18     it differently.
19 BY MR. SLATER:
20     Q.    This paragraph refers to the
21 use of high- and low-resolution mass
22 spectrometry to identify volatile
23 N-nitrosamines.
24           You agree that is the proper

Page 417

1    method to identify NDEA and NDMA in
2    valsartan, correct?
3         MR. BALL:  Objection.  Calls
4    for speculation, calls for expert
5    opinion.
6         MR. SLATER:  It calls for the
7    analytical process they employed.
8         MR. BALL:  No.  That's not what
9    you asked, Adam.  You did not ask what
10   did they employ.  You asked if it's
11   the best way to do it.
12        MR. SLATER:  Your objection is
13   not --
14        MR. BALL:  You --
15        (Cross-talking.)
16        MR. SLATER:  Why are you
17   yelling over me?
18        MR. BALL:  I'm not trying to
19   yell over you.  I'm trying to finish
20   my -- you interrupted me, and you
21   said, that's what I said, and that's
22   not what you said.
23        MR. SLATER:  You just said that
24   my question is speculative when you

Page 418

1    know that's exactly what they did.
2         MR. BALL:  No, Adam, I didn't.
3    Your question was "Is it the best
4    way."  Then you said, "What I asked is
5    what did they use."
6         That's a totally different
7    question.  If you want to ask what did
8    they use, that's not speculative.
9         MR. SLATER:  All right.  Are we
10   going to now -- I don't want this
11   interpreted for the witness.
12        MR. BALL:  It doesn't need to
13   be interpreted.  I'm not asking --
14        MR. SLATER:  Then let's have
15   him answer.
16        MR. BALL:  I do want my
17   objection interpreted, though.
18        MR. SLATER:  Why?
19        MR. BALL:  Because it's
20   speculative the way you formed the
21   question.
22        MR. SLATER:  Why does he need
23   to know what you're saying?  So he can
24   then --

Page 419

1         (Cross-talking.)
2         MR. BALL:  No.  I said it is
3    speculative and calls for expert
4    opinion is a totally proper objection,
5    given how you phrased the question.
6         MR. SLATER:  I don't understand
7    why you want your client to hear that
8    you said that.  He always repeats what
9    you say.
10        MR. BALL:  Adam, I'm allowed
11   make my objections, and he's allowed
12   to hear them.
13        MR. SLATER:  All right.  Go
14   ahead.  I'm trying to get through
15   this.  I guess I can't.
16        MR. BALL:  No, you're not.  I
17   just gave you the form of a question
18   that I would not object to.
19        MR. SLATER:  I'll ask a
20   different question, then.
21        I haven't asked the question
22   yet, Dr. Shao.
23        THE INTERPRETER:  Okay.
24        MR. SLATER:  What did you want

Page 420

1    to say?
2         THE INTERPRETER:  Go ahead.
3         MR. SLATER:  I don't know.
4    Were you asking me something or --
5         THE INTERPRETER:  The
6    interpreter needs to re-log on to
7    realtime.  Can we just --
8         MR. SLATER:  Off the record.
9    Let's go off the record.
10        THE VIDEOGRAPHER:  The time
11   right now is 10:33 a.m.  We're now off
12   the record.
13        (Whereupon, a recess was
14   taken.)
15        THE VIDEOGRAPHER:  The time
16   right now is 10:36 a.m.  We're back on
17   the record.
18   BY MR. SLATER:
19        Q.    You stated earlier that back in
20   2011, at that time nobody had any knowledge
21   on nitrosamine impurities, including its
22   detection methods.
23        However, here in a 1978 IARC
24   monograph, it specifically says here that the

Page 421

1  principal techniques used are high- and
2  low-resolution mass spectrometry.
3        MR. BALL: Objection. That
4    mischaracterizes his earlier
5    testimony.
6        Go ahead and answer.
7  BY MR. SLATER:
8    Q.    Correct?
9        Wait. Actually, I'll ask it
10 differently, then.
11        This publication in 1978 says
12 that the principal technique to analyze
13 volatile nitrosamines, which would include
14 NDMA and then DMA, is high- and
15 low-resolution mass spectrometry.
16        Did ZHP know that in 2011?
17    A.    I would like to ask you what
18 publication you're referring to that's
19 published in 1978. Is that the document
20 that's presented on the screen?
21    Q.    Yes.
22    A.    Can you point out which
23 sentence on this paragraph you are referring
24 to?

Page 422

1    Q.    Why? Can you read English?
2    A.    You just mentioned about the
3  high-resolution mass spectrometry. I want to
4  make sure high-resolution mass spectrometry
5  is indeed referred to in this paragraph.
6    Q.    But if I show you where it is
7  in the paragraph, if you can't read English,
8  how is that going to help you for me to point
9  out where it is?
10    A.    At least I can confirm that it
11 was indeed mentioned in the publication in
12 1978.
13    Q.    But you don't read English, so
14 how is it going to help you for me to point
15 out where it says it in this paragraph? Are
16 you going to read it?
17    A.    I just want to confirm that
18 what you just said is indeed included in the
19 publication in 1978, rather than your own
20 understanding and judgment.
21    Q.    Mr. Dong, I would appreciate it
22 if you would actually answer my question.
23        Do you speak English?
24        Let me -- why are you asking to

Page 423

1  know where it is in the paragraph when you've
2  already told us under oath that you can't
3  read this language?
4    A.    I did say that I cannot read
5  English. That's a fact. However, I believe
6  I'm entitled to know that statement is
7  indeed included in a publication in 1978. I
8  want to confirm it is a fact.
9    Q.    Okay. Then why don't you do
10 this, Mr. Dong.
11        Do you see this paragraph in
12 front of us? Why don't you read what you can
13 of that paragraph. Since you're going to
14 confirm it, confirm it out loud for us,
15 please. You'll see it in the fifth line,
16 sixth line, you'll see it. Fifth line.
17        MR. BALL: Objection.
18    Harassment.
19        MR. SLATER: It's not
20    harassment.
21        MR. BALL: It is.
22        MR. SLATER: The witness said
23    he wants to confirm this by reading it
24    himself, so I'm telling him --

Page 424

1        MR. BALL: No, he did not say
2    he wanted to --
3  BY MR. SLATER:
4    Q.    It's the fifth line.
5        MR. BALL: He did not say he
6    wanted to read it himself. That
7    mischaracterizes what he said. He
8    said he'd like you to tell him where
9    it is.
10        Tell him where it is, and we
11    can go on.
12        MR. SLATER: Great. It's in
13    the fifth line, it starts.
14    A.    Could you repeat your question?
15 Had that not been the discussion, I would
16 have recalled the question.
17 BY MR. SLATER:
18    Q.    I have no idea what my question
19 was. You totally distracted me. You
20 defeated me on that one.
21        MR. SLATER: Maureen, if you
22    can find that for me, can you remind
23    me what my question was, please?
24        ///

Page 425

1    (Whereupon, the reporter read
2    back the requested question.)
3    A.    In 2011, ZHP had no knowledge
4    of the formation of NDMA in valsartan zinc
5    chloride process.
6    When nobody had such knowledge,
7    there was no reason to adopt additional
8    method to test unexpected impurities or the
9    impurities that we were unable to speculate.
10   That is basically beyond our expectation.
11   As for your statement that I
12   successfully distracted you just now, that's
13   not true.  I was merely asking you to be more
14   specific and clear for your questions.
15   BY MR. SLATER:
16   Q.    So you won't answer my
17   question?
18   A.    I believe I've already provided
19   a response to your question.
20   In 2011, during the development
21   of valsartan zinc chloride process, ZHP did
22   not have any specific knowledge of the
23   formation of NDMA in the valsartan zinc
24   chloride process.

Page 426

1    When nobody had such specific
2    knowledge, I don't believe we take into
3    consideration any further approaches.
4    MR. SLATER:  Okay.  Let's take
5    this document down.  I give up.  Move
6    on to the next thing.
7    Take that down, Cheryll.  Let's
8    go to the other document that I
9    started to identify before, the
10   deviation -- perfect.
11   (Whereupon, Exhibit Number
12   ZHP-210 was marked for
13   identification.)
14   BY MR. SLATER:
15   Q.    Exhibit 210.  Mr. Dong, you've
16   seen this document before, correct?
17   A.    I did review a deviation
18   investigation report with the number
19   DCE-18003.  However, I cannot be 100 percent
20   sure the document I reviewed was completely
21   consistent with the document shown on the
22   screen.
23   MR. SLATER:  Let's go to the
24   next page, Cheryll.

Page 427

1    Thank you.
2    Q.    Here on the page with Bates
3    number 75798, there's a list of people who
4    reviewed and approved this report.  Your name
5    appears, and you signed this report, correct?
6    A.    That's correct.  As shown on
7    the screen, on the third line my name is
8    listed here.  I did review and approve this
9    report.
10   MR. SLATER:  Let's go to page 5
11   of 236.
12   Q.    Section 3.1.1 is the "NDMA
13   Event Description."
14   Do you see that?
15   A.    I see it under 3.1.1.  There's
16   a Chinese sentence which says "Valsartan
17   (zinc chloride process) NDMA Event General
18   Description."
19   Q.    In the first paragraph it
20   refers to -- rephrase.
21   At the end of the first
22   paragraph, it says, "Please refer to
23   Deviation Investigation No.:  DCE-18001 for
24   details."

Page 428

1    My question is, have you seen
2    that report in Chinese, meaning in the
3    Chinese language, DCE-18001?
4    A.    I did review the deviation
5    investigation report with the number
6    DCE-18001.
7    Q.    In the Chinese language?
8    A.    I only read the Chinese
9    version.  I do not recall whether the
10   document I reviewed was only the Chinese
11   version or the bilingual version in both
12   Chinese and English.
13   Q.    The second paragraph says in
14   part, "Due to the fact that NDMA is a
15   recently found unexpected impurity with the
16   nature of probable carcinogen, the incident
17   of the deviation has received great attention
18   from Huahai's top management."
19   Does top management go all the
20   way up to Baohua Chen?  Did he give his great
21   attention to this issue?
22   MR. BALL:  Adam, can you scroll
23   down, please?  I can't read.  You have
24   to scroll down.  I can't see it.

Page 429

1    A.   I'm sorry, I don't know who
2  you're referring to by "Baohua Chen."
3    Q.   Mr. Chen, the chairman of ZHP.
4    A.   Are you referring to the
5  chairman of ZHP Baohua Chen, spelled as
6  B-O-H-U-A, C-H-E-N?
7    Q.   Yes.
8    A.   Now I understand.  I believe
9  there was a misspelling in the English
10  version.  That's why I didn't hear very
11  clearly.  I'm sorry.
12       I'm sorry.  Can you repeat your
13  question?
14    Q.   You don't remember my question?
15    A.   I'm sorry.  We just had some
16  discussion about a person's name.  I do not
17  recall the question.  I'm sorry.
18    Q.   When this paragraph refers to
19  the issue having "received great attention
20  from Huahai's top management," does that
21  include Mr. Chen, the chairman of ZHP?
22    A.   I believe after this incident
23  happened, some company leaders reported this
24  incident to Mr. Chen.

Page 430

1    Q.   Do you know who did that?
2    A.   I don't know.  Actually, there
3  are quite a few levels between my pay level
4  and Mr. Chen.
5    Q.   You said people informed him.
6  Which people?
7    A.   I don't know who specifically
8  informed him.  However, with regard to the
9  seriousness of this incident, to the best of
10  my understanding, there must be someone who
11  reported this incident to Mr. Chen.
12    Q.   This says a little further
13  down, "NDMA reference standard was
14  immediately purchased and the identity of the
15  impurity was confirmed as NDMA by GC-MS
16  method."
17       Do you see that?  Yes or no.
18  Do you see that?  Yes or no.
19    A.   On the screen I do see the
20  sentence referred to by you.  It is one of
21  the sentences in the Deviation Investigation
22  Report with the number DCE-18003.
23       MR. SLATER:  Maureen, could you
24    read that answer back to me, please?

Page 431

1       (Whereupon, the reporter read
2    back the above answer.)
3  BY MR. SLATER:
4    Q.   Were you in charge of the --
5  actually, you know what, we'll get to that.
6  We'll get to that.
7       MR. SLATER:  Let's go to
8    page 60, please.
9       MR. BALL:  Adam, we have about
10  five minutes before the next break.
11       MR. SLATER:  So what do you
12    want to do?
13       MR. BALL:  It's up to you.  I'd
14    like to talk to you.  We can go off
15    the record now --
16       MR. SLATER:  All right.  Let's
17    go off the record.
18       MR. BALL:  I just need to
19    clarify something with you.
20       THE VIDEOGRAPHER:  The time
21    right now is 11:07 a.m.  We're now off
22    the record.
23       (Whereupon, a recess was
24    taken.)

Page 432

1       THE VIDEOGRAPHER:  The time
2    right now is 11:20 a.m.  We're back on
3    the record.
4  BY MR. SLATER:
5    Q.   Section 4 -- rephrase.
6       Table 4-2 is titled
7  "Differences in different Valsartan
8  manufacturing process."
9       Do you see that?
10    A.   I see it.
11       MR. SLATER:  Let's go to the
12    next page, please, page 61.
13       Scroll down, please.
14       More.  I want the bottom box.
15       Yes, perfect.  Okay.
16    Q.   There's a box that says "TEA
17  process (with sodium nitrite quenching)."
18       Do you see that?
19       This was the process used
20  before the zinc chloride process was put into
21  effect, right?
22    A.   I'm sorry.  Are you referring
23  to the box that says "TEA process (with
24  sodium nitrite quenching)"?  Are you

Page 433

1 referring to this box?
2     Q.    Yes.  That's exactly what I
3 just identified for you a question ago.
4     A.    Yes, I see it.
5     Q.    Did you study English at
6 university?
7     A.    I did study English at college;
8 however, I did poor in English class.
9     Q.    Did you have to demonstrate
10 English proficiency in order to graduate?
11     A.    I'm sorry to tell you that in
12 order to graduate from a college in China,
13 you have to pass level 4 English test.  For
14 that test, I took six or seven times until
15 finally I passed that test.  I'm sorry.
16     Q.    Did you read English language
17 material when you were studying chemistry?
18     A.    Are you referring to my time in
19 college?
20     Q.    Yes.
21     A.    No.
22     Q.    Let's look at this box now.
23 Rephrase.
24         We're looking now at the "TEA

Page 434

1 process (with sodium nitrite quenching)."
2 And it first says, number 1, "Triethylamine
3 hydrochloride was used as catalyst.  Sodium
4 nitrite was used for quenching after
5 reaction."  Correct?
6     A.    On the right column in the box
7 of "TEA process," I do see description in
8 Chinese that's basically consistent with your
9 quote.
10     Q.    Number 2 says, "No DMF solvent
11 is added in crude step, and no dimethylamine
12 will be degraded."
13         Do you see that?
14     A.    Yes.  In the line of "TEA
15 process" on the third column from left, I do
16 see your description in Chinese.
17     Q.    Number 3 says, "Triethylamine
18 hydrochloride may contain diethylamine and
19 dimethylamine, react with nitrous acid
20 (formed by sodium nitrite and hydrochloric
21 acid) during the next quenching reaction, and
22 NDMA and NDEA may be formed."
23         Do you see that?
24     A.    Yes, I see it.  In the

Page 435

1 deviation investigation report shown on the
2 screen, I do see such description.
3     Q.    And based on ZHP's evaluation,
4 that actually was occurring, correct?  That's
5 how NDMA and NDEA were being formed, with the
6 TEA process with sodium nitrite quenching,
7 right?
8     A.    I'm sorry, your question is a
9 little bit too long, and I didn't quite get
10 your question.
11         What are you referring to by
12 "that actually was occurring"?  What's
13 "that"?
14     Q.    Number 3 describes the root
15 cause for the NDMA and NDEA impurities in the
16 TEA process with sodium nitrite quenching
17 valsartan, correct?
18     A.    With regard to the NDEA and
19 NDMA impurities that were generated from the
20 TEA process of valsartan, in 2018, after NDMA
21 impurity was discovered in valsartan, ZHP
22 conducted the process deviation
23 investigation, and this was one of the
24 findings in the investigation.

Page 436

1     Q.    The risk assessment for TEA
2 process with sodium nitrite quenching failed
3 to disclose this potential risk for this
4 contamination as described in number 3,
5 correct?
6     A.    In 2011, the authorities, the
7 industry, and ZHP did not have any knowledge
8 regarding the formation of nitrosamines in
9 the valsartan TEA process.
10     Q.    Answer my question, please.
11     A.    I believe I've already offered
12 my response to your question.
13     Q.    ZHP failed to identify the risk
14 of these impurities forming as part of its
15 risk assessment for the TEA process with
16 sodium nitrite quenching, correct?
17     A.    In 2011, the authorities, the
18 industry, or ZHP did not have any knowledge
19 of the formation of nitrosamines in the
20 valsartan triethylamine process.
21         MR. BALL:  Adam, I think he's
22     trying to answer your question.  Would
23     you like me to rephrase it in a way he
24     might be able to answer it more

Confidential Information – Subject to Protective Order

Page 437

1  easily?
2        MR. SLATER:  If it's going to
3  help.
4        MR. BALL:  I think it might.
5        In 2011, did ZHP identify that
6  NDMA or NDEA could be formed as part
7  of the TEA process when it conducted
8  its risk analysis?
9        And that's a yes -- if he can
10  answer that yes or no, we would all
11  appreciate it.
12      A.    I would like to ask you whether
13  my attorney correctly characterized your
14  question or what you wanted to ask.
15  BY MR. SLATER:
16      Q.    Yes, please answer it with a
17  yes or no.
18        THE INTERPRETER:  The
19  interpreter is asked to repeat the
20  rendition of the question provided by
21  the witness attorney.
22      A.    In 2011, when ZHP conducted the
23  risk assessment for the TEA process, ZHP did
24  not identify tri- -- did not identify

Page 438

1  nitrosamines as potential impurities.  That
2  was based on the knowledge of the
3  authorities, the industry, and ZHP at that
4  time.
5      Q.    ZHP certainly knew by 2011 --
6  rephrase.
7        ZHP knew in 2011 that the
8  reaction of dimethylamine and a nitrosating
9  agent such as nitrous acid could form NDMA,
10  correct?
11      A.    In 2011, ZHP did not have any
12  knowledge of the formation of nitrosamine in
13  the valsartan zinc chloride process or the
14  TEA process.
15        MR. SLATER:  Let's go to the
16  next page, the box at the top half of
17  the page, please.
18        Excellent.
19      Q.    This box now addresses the zinc
20  chloride process.
21        Do you see that?
22      A.    Yes.  I see that on the screen
23  there's a box for the zinc chloride process.
24      Q.    And on the right-hand side this

Page 439

1  says, starting with number 2, "Zinc chloride
2  is used as catalyst for the crude step of
3  valsartan (zinc chloride process)."
4        Do you see that?
5      A.    Yes, I see that.  What you just
6  described is one of the sentences in the box
7  of the zinc chloride process on the third
8  column.
9      Q.    Number 3 says, "DMF solvent was
10  added in the crude step.  DMF was degraded
11  into dimethylamine, react with nitrous acid
12  (formed by sodium nitrite and hydrochloric
13  acid) during the next quenching reaction, and
14  NDMA may be formed."
15        Do you see that?
16      A.    Yes, I see that as part of the
17  content under number 3 in the line of "Zinc
18  chloride process" under the column of -- the
19  first column from the right.
20      Q.    That is the root cause for the
21  NDMA contamination of the zinc chloride
22  process valsartan, correct?
23      A.    What you just said, "NDMA
24  contamination," I need to point out that

Page 440

1  NDMA, rather, is an impurity formed in the
2  valsartan zinc chloride process.  It is not a
3  contaminant.  We did not have such knowledge
4  until June 2018.
5        As for the definitions for the
6  impurities and the contaminants,
7  respectively, you may find accurate
8  descriptions in ICH Q3A.
9      Q.    Number 4 says, "Without
10  introducing triethylamine, diethylamine would
11  not be introduced and no NDEA would be
12  formed."
13        Do you see that?
14      A.    I see that under number 4 in
15  the box of "Zinc chloride process" under the
16  first column from right.
17      Q.    The reason that is referred to
18  there is because the triethylamine with the
19  sodium nitrite quenching process was
20  combining with nitrous acid, NDEA, in that
21  process, correct?
22      A.    The interpreter's translation
23  was very clear; however, I do not understand
24  your question.  Could you be more specific or

Page 441

1 clear?
2     Q.    Why is that sentence --
3 rephrase.
4         What is the purpose of that
5 sentence, number 4?  Why is that stated?
6     A.    In this box under number 4, I
7 do see what you just talked about.
8         As for the reason why this
9 sentence is here, I need to have a quick
10 review of the context in order to provide you
11 with an answer.
12        MR. SLATER:  Let's go off the
13 clock.
14     A.    Can you scroll up a little bit?
15 I need to read the content above this box.
16 Just scroll up until I see the first page.
17        MR. BALL:  I think he's talking
18 the other direction.  The other
19 direction.
20        There we go.
21        MR. SLATER:  I'm glad you're
22 doing this, Cheryll, and not me.
23     A.    Keep going.  Keep going until I
24 see the top of this table.

Page 442

1         MR. BALL:  There we go.
2     A.    Just keep going.
3         MR. BALL:  I think she may have
4 gone too far.  He said he wanted to
5 see the top of the table.
6     A.    Keep going.
7         MR. SLATER:  The top of the
8 table is on page 60.
9         MR. BALL:  Okay.  Thank you.
10 Thank you.  Adam.
11     A.    I need to see.  I need to see
12 what's above this Table 4-2.  Keep going.
13        Keep going.  Keep going.
14        That's it.
15        I finished reviewing.
16        MR. BALL:  We can go back on
17 the clock, please.
18        MR. SLATER:  Wait, let's get to
19 the spot first.  Hang on.
20        MR. BALL:  Okay.
21        MR. SLATER:  Almost there.
22        Bingo.
23 BY MR. SLATER:
24     Q.    Okay.  Please answer the

Page 443

1 question.
2         Why is sentence number 4 there?
3 What is that communicating to us?
4     A.    After reviewing part of this
5 document, I found out that this table is
6 actually describing the differences between
7 different valsartan processes.
8         In the table analysis, the
9 formation of nitrosamines was conducted for
10 different valsartan processes.  That was
11 based on the knowledge that ZHP did not
12 obtain until June 2018.
13        More specifically, regarding
14 number 4, in my personal opinion, maybe that
15 is because comments on the specific impurity
16 was made in the previous process analysis;
17 therefore, comments on NDEA is also included
18 here.  That's my personal opinion.
19     Q.    When you say this was not known
20 in 2011, are you saying it was not known that
21 amines, A-M-I-N-E-S, had been demonstrated to
22 react with nitrous acid to produce
23 nitrosamines?
24        MR. BALL:  Objection.  Vague.

Page 444

1     A.    Are you referring to 2011?  I
2 just want to confirm time frame.
3 BY MR. SLATER:
4     Q.    Yes.
5     A.    In 2011, ZHP did not have any
6 knowledge of the formation of nitrosamine in
7 the valsartan manufacturing processes,
8 including valsartan zinc chloride process and
9 valsartan TEA quenching process.  This
10 applies to the industry and the authority at
11 that time, too.
12     Q.    I'll try it again.
13        Are you saying that ZHP did not
14 know in 2011 that amines, A-M-I-N-E-S, had
15 been demonstrated to react with nitrous acid
16 to produce N-nitrosamines?
17     A.    I've already provided an answer
18 to your question.  If you want to try the
19 same question again, could you please
20 clarify, when you say "amines," are you
21 referring to the primary amines, secondary
22 amines, or tertiary amines?  Are you
23 referring to amines with certain molecular
24 weights?

Confidential Information - Subject to Protective Order

Page 445

1    Q.    Any amines, you tell me, which
2  ZHP knew about that could react with nitrous
3  acid to produce nitrosamines in 2011.
4    A.    I just asked to you clarify
5  certain vague terms in your question in order
6  for me to provide you with a more accurate
7  response.
8          Based on the current knowledge
9  regarding the formation of nitrosamines, not
10  all forms of amines would form nitrosamine.
11  That's the knowledge we have as of now.
12          Maybe in 100 years or
13  500 years, the investment of the science and
14  technology will provide us with new
15  discoveries.  Maybe.
16          MR. SLATER:  Cheryll, I don't
17      want to lose this page, but I'd like
18      to bring up an article that I think
19      you have now, and I think we're up to
20      Exhibit 211.
21          Perfect.
22          (Whereupon, Exhibit Number
23      ZHP-211 was marked for
24      identification.)

Page 446

1  BY MR. SLATER:
2    Q.    On the screen is Exhibit 211,
3  which is a journal article published in the
4  "Journal of Physical Chemistry" in 2010,
5  titled "Theoretical Investigation of
6  N-Nitrosodimethylamine Formation from
7  Nitrosation of Triethylamine."
8          And the authors' names are Zhi
9  Sun, Yong Dong Liu, and Ru Gang Zhong, and it
10  says they're from the College of Life Science
11  & Bioengineering, Beijing University of
12  Technology in Beijing, and that this was
13  received by this journal June 16, 2009, and
14  then it was received again in November 2009,
15  and it was on the web published December 16,
16  2009.
17          MR. SLATER:  And that last
18      thing I said about the publication
19      date is at the bottom, so, Cheryll, in
20      fairness, please scroll to the bottom
21      so Mr. Ball can see it.  And I'm sure
22      it's in our chat, too.
23          MR. BALL:  Thank you.
24          MR. SLATER:  No problem.

Page 447

1  BY MR. SLATER:
2    Q.    Was ZHP -- rephrase.
3          In ZHP's thorough scientific
4  analysis during its risk assessment for the
5  TEA process with sodium nitrite quenching and
6  for the zinc chloride process in 2011, did
7  the risk assessment team read this article?
8    A.    As to whether ZHP's valsartan
9  risk assessment team read this article in
10  2011, as you asked, I am unable to provide an
11  accurate response because this is the first
12  time I ever see this document.
13          Based on the information I
14  collected as well as the documents I reviewed
15  as a corporate witness, in 2011 ZHP had no
16  knowledge of the formation of nitrosamines in
17  valsartan manufacturing process, which
18  include zinc chloride process as well as the
19  TEA process.
20    Q.    Is diethylamine a secondary or
21  tertiary amine?
22    A.    From the chemistry's
23  perspective, the diethylamine is a secondary
24  amine.

Page 448

1    Q.    Is dimethylamine also a
2  secondary amine?
3    A.    That's correct.  The
4  dimethylamine is also a secondary amine.
5    Q.    This says in the second
6  paragraph, "Because dialkylnItrosamines are
7  of great interest in carcinogenesis, much
8  attention has been focused on their formation
9  mechanism, especially from secondary amines."
10  I'm going to stop there.
11          They say "much attention has
12  been focused on their formation...from
13  secondary amines."  Was any attention focused
14  on their formation mechanism from secondary
15  amines by ZHP in 2011?
16    A.    What ZHP was focusing on in
17  2011 was to produce products with quality
18  specifications that would be in compliance
19  with the ICH requirement, and ZHP's knowledge
20  at that time, including the valsartan
21  products.
22          As for the research of the
23  formation mechanism of nitrosamines, I
24  believe it was the interest of independent

Confidential Information - Subject to Protective Order

Page 449

1 academic people.
2        Also, based on what you have
3 just said and what has been translated to me
4 in your question, you mentioned something
5 like a secondary amine.
6        In ZHP's valsartan
7 manufacturing processes, in particular in the
8 valsartan zinc chloride process, DMF was used
9 as a solvent. From the chemical point of
10 view, DMF is an amide, spelled as A-M-I-D-E.
11 It's not a secondary amine.
12        In the valsartan TEA
13 hydrochloride process, triethylamine is a
14 tertiary amine, not a secondary amine.
15 That's all I have to say.
16        MR. SLATER: Maureen, can you
17     just read back the last sentence of
18     what was just translated as the
19     answer, please?
20        (Whereupon, the reporter read
21     back the above answer.)
22     Q.    This article states in the
23 second paragraph in part, "Consequently, NDMA
24 is generally believed to be formed from the

Page 450

1 reactions of dimethylamine (DMA) and
2 nitrosating agents, such as N203, N204, and
3 ONCl. In addition to secondary amines,
4 however, a wide variety of tertiary amines
5 have also been demonstrated to react with
6 nitrous acid to produce N-nitrosamines in
7 aqueous solution."
8        What I just read to you from
9 this article from 2010, that information was
10 easily available to ZHP in 2011, correct?
11        MR. BALL: Objection. Asks for
12     opinion.
13     A.    I don't agree with -- I don't
14 agree with your statement that in 2011 ZHP
15 can easily find that information. That
16 involves resources as well as methods for
17 searching for such information. It's nothing
18 simple.
19        As for the sentence you just
20 quoted, from the chemistry point of view, for
21 dimethylamine, or DMA, as well as chemicals
22 such as N203, N204, ONCl, ZHP did not use any
23 of those chemicals directly in our
24 manufacturing processes.

Page 451

1        What I mean is that these
2 chemicals are not the raw materials used in
3 the process.
4        MR. BALL: Adam, it's probably
5     about time for a break.
6        MR. SLATER: Okay. Let's go
7     off.
8        THE VIDEOGRAPHER: The time
9     right now is 12:22 p.m. We're now off
10     the record.
11        (Whereupon, a recess was
12     taken.)
13        THE VIDEOGRAPHER: The time
14     right now is 12:35 p.m. We're back on
15     the record.
16 BY MR. SLATER:
17     Q.    If ZHP had figured out that
18 diethylamine and/or dimethylamine was a
19 potential degradation product of either of
20 these manufacturing processes for valsartan,
21 they would have had to change the processes
22 to avoid the nitrosating reactions, correct,
23 back in 2011?
24     A.    This is a hypothetical

Page 452

1 question. I don't answer any hypothetical
2 question.
3        However, with that, in 2011,
4 ZHP conducted corresponding work based on our
5 knowledge at that time, as well as the
6 requirements of ICH.
7     Q.    Well, ICH required ZHP to do a
8 careful scientific analysis in performing its
9 risk assessment for impurities, correct?
10     A.    In 2011, based on the
11 requirements of ICH at that time as well as
12 our knowledge and understanding of valsartan
13 zinc chloride process, ZHP conducted
14 corresponding work using scientific methods.
15     Q.    Actually, ZHP did an
16 insufficient level of research into the
17 process and failed to figure out the risks
18 for impurities that it was creating with its
19 valsartan manufacturing processes in 2011,
20 correct?
21        MR. BALL: Objection. Calls
22     for opinion and expert testimony.
23     A.    In 2011, ZHP conducted
24 corresponding work using scientific methods

Confidential Information - Subject to Protective Order

Page 453

1  based on our knowledge of valsartan zinc
2  chloride process at that time.
3          Meanwhile, the related work was
4  submitted to EDQM and FDA.  During this
5  period of time, there were experts who
6  reviewed and approved such work.
7      Q.    Which experts reviewed and
8  approved this work?  Give me their names,
9  please.
10     A.    I'm sorry, I don't know.  That
11 is because after we submitted our work to the
12 authorities, we don't know who the
13 authorities hired to conduct the review and
14 approval.
15     Q.    You don't know if anybody at
16 the authorities even read what was submitted
17 with regard to the sodium nitrite quenching
18 and zinc chloride processes.  You don't even
19 know if anybody there even read what you
20 submitted, correct?
21     A.    To the best of my knowledge,
22 after we submitted documents to EDQM, the
23 authority did provide a response.
24         I also know that related

Page 454

1  documents pertaining to valsartan zinc
2  chloride process were also submitted as
3  attachments.
4      Q.    It's a simple question.  You
5  don't know if anybody actually read anything
6  about the process change details at any
7  authority that your company submitted
8  anything to about the changes, correct?
9          MR. BALL:  Objection.  Outside
10     the scope of the 30(b)(6) topics.
11     These are regulatory.
12         MR. SLATER:  I'm following up
13     on his answer.
14         MR. BALL:  That's fine, Adam,
15     I'm not telling him not to answer.
16         MR. SLATER:  I understand.  I'm
17     just stating for the record why I
18     think it's appropriate to follow up on
19     his response.
20         MR. BALL:  Okay.
21     A.    In 2011, ZHP already submitted
22 documents regarding valsartan zinc chloride
23 process change to the authorities for review
24 and assessment, and those authorities have

Page 455

1  already provided responses.
2          In my personal opinion, I
3  personally believe EDQM or FDA as authorities
4  did conduct review and assessment to the
5  valsartan zinc chloride process change.
6          As for the names of the
7  reviewers, I believe that is beyond the scope
8  of 30(b)(6) topics, and that's beyond the
9  scope of information I need to collect.
10     Q.    Let's go back to my original
11 question before we went off on this tangent.
12         In evaluating the potential
13 impurities that would potentially form during
14 these processes, the sodium nitrite quenching
15 and the zinc chloride process, there was an
16 insufficient extent and depth of process
17 research, which resulted in the risk
18 assessment failing to identify the risks of
19 nitrosamines, correct?
20         MR. BALL:  Objection.  Calls
21     for opinion and expert testimony.
22     A.    I don't agree with your
23 statement.  When we talked about the extent
24 and the depth of the process research, we

Page 456

1  need to do that with the background in our
2  mind.  Without the background, it is
3  inappropriate to talk about the extent and
4  the steps of the process research.
5      Q.    During the risk assessment
6  process, there was insufficient study and
7  understanding of potential genotoxic
8  impurities on the part of the -- on the part
9  of ZHP in evaluating both the sodium nitrite
10 quenching process and the zinc chloride
11 process, which resulted in failing to
12 identify the risk of nitrosamine impurities,
13 correct?
14         MR. BALL:  Objection.
15     Compound, calls for opinion, and calls
16     for expert testimony.
17     A.    I would like you to be more
18 specific in your question, or ask the
19 questions one by one; therefore, I can
20 provide you with a more accurate response.
21 It's getting late.  I'm a little bit tired,
22 I'm sorry.
23 BY MR. SLATER:
24     Q.    But it's the morning for you.

Page 457

1   We're the ones in the middle of the night.
2        Okay.  It's okay.  I'm kidding.
3   It's okay.
4        There was insufficient study
5   and understanding of potential genotoxic
6   impurities in the risk assessment process for
7   both the sodium nitrite quenching and zinc
8   chloride processes in 2011, correct?
9        MR. BALL:  Objection.
10   Compound, calls for opinion, calls for
11   expert testimony.
12   A.     The question you just asked is
13   still a little bit too long, and you can
14   still ask those questions one by one.
15   However, for the pending question, I will try
16   to answer part of your question.
17        In 2011, ZHP conducted
18   corresponding work using scientific methods
19   based on the ICH requirements then, as well
20   as our knowledge and understanding at that
21   time.  Afterwards the results from that work
22   were submitted to the authorities.
23        After the work results were
24   submitted to the authorities, authorities

Page 458

1   such as EDQM provided their recognition and
2   approval by the corresponding experts of
3   theirs and provided the approval.  The
4   corresponding approval documents were
5   included in the valsartan zinc chloride
6   process change documents in 2011.
7   Q.   I'll try it one last time.
8        I'm not asking about what
9   anyone else did, so I would appreciate it if
10   you would not tell me about regulatory
11   authorities or people outside ZHP, because
12   I'm not asking about any of them.
13        I'm only asking about ZHP and
14   what it did in its risk assessment.
15        MR. SLATER:  Please translate
16        that for Mr. Dong so he'll understand
17        that and understand what I'm asking,
18        and then I'll ask the question.
19   Q.    Here's my question now, having
20   given you that background.
21        In ZHP's risk assessment, ZHP
22   insufficiently studied and insufficiently
23   understood the potential genotoxic impurities
24   as part of its risk assessment, and thus

Page 459

1   didn't identify the risk of forming
2   nitrosamines in the sodium nitrite quenching
3   and zinc process -- zinc chloride process,
4   correct?
5        MR. BALL:  Objection.  Calls
6        for opinion, calls for expert
7        testimony.  May be compound; I'm not
8        entirely sure at this point listening
9        to it.
10   A.    I don't agree with your
11   statement.  For each and every of your
12   question, I already provided corresponding
13   response.
14        With regard to the external
15   authorities in your question, for example the
16   EDQM review and assessment, that is part of
17   the ZHP's process change.  For the process
18   change application, that is the action that
19   the regulatory affairs department had to take
20   and followed up.
21        Had EDQM not provided the
22   corresponding approvals certificate, ZHP's
23   valsartan would have never been sold in the
24   European market, and ZHP's valsartan zinc

Page 460

1   chloride process change would have never been
2   closed.
3        I'm just using EDQM as an
4   example.
5        MR. SLATER:  Cheryll, let's go
6        to Exhibit 212, please, the next
7        exhibit.
8        (Whereupon, Exhibit Number
9        ZHP-212 was marked for
10        identification.)
11   A.    I'm sorry, I haven't finished
12   yet.  Should I --
13        MR. SLATER:  Take it down,
14        then.  Let's wait.
15   BY MR. SLATER:
16   Q.    You hadn't finished.  Okay.
17   A.    Thank you very much for letting
18   me finish my testimony.
19        In 2011, ZHP conducted
20   corresponding work using scientific methods
21   based on the requirements of ICH at that
22   time, as well as the corresponding knowledge
23   that ZHP had at that time.
24        The results of our work were

Page 461

1  submitted to the regulatory authorities, such
2  as EDQM, and EDQM as a regulatory authority
3  did provide ZHP with the approval
4  certificate.
5          That's all I have to say.
6          MR. SLATER:  Okay.  Let's go to
7      the next exhibit now, please, Cheryll,
8      Exhibit 212.  And this is ZHP-662283.
9          Scroll back to the top, please.
10     Thanks.
11     Q.    And you can see this is an
12  investigation report, and it's regarding the
13  June 6, 2018 date of incident.
14          And there's a list of people
15  that are expected to review and sign, and
16  you're one of the people listed, correct?
17     A.    I have two questions for the
18  pending question.
19          First of all, you mentioned
20  that the date for this investigation report
21  is sometime in 2016.  I cannot see the date
22  2016 on this report.
23          Secondly, this report, to the
24  best of my recollection, is part of the

Page 462

1  investigation, and it's only a draft.  I
2  wonder whether a draft can be used as an
3  exhibit.
4          MR. BALL:  Adam, would you like
5      me to answer that second question?
6          MR. SLATER:  Sure.
7          MR. BALL:  Yes.
8      A.    Okay.  Thank you.
9  BY MR. SLATER:
10     Q.    If Dr. Shao said 2016 -- either
11  I said it by accident or -- I don't know, but
12  I'll -- the date of incident is June 6, 2018,
13  to answer your question.  That's what I was
14  referring to.
15          Do you see that?
16     A.    Thank you.  The information is
17  very clear.
18     Q.    I'll reask the question, and
19  we'll hopefully get off to a good start here.
20          We're now looking at
21  Exhibit 212, which is a draft of an
22  Investigation Report titled "Investigation
23  regarding an unknown impurity," and then in
24  parenthesis "(Genotoxic Impurity)" for date

Page 463

1  of incident June 6, 2018.
2          Do you see that in front of
3  you?
4      A.    I see it.  On the screen I see
5  the corresponding Chinese description,
6  "Investigation regarding an unknown impurity
7  (Genotoxic Impurity)."
8          MR. SLATER:  Please scroll
9      down, Cheryll, to the bottom of this
10     front page.
11     Q.    Okay.  This says at the
12  bottom -- there's someone named Yuelin Hu,
13  assistant director in the quality assurance
14  department.  That's the person who is listed
15  as the custodian of this document.
16          Who is that person?
17     A.    I have to make a clarification
18  here.
19          What I see here, the name
20  listed in this table at the bottom is Yuelin
21  Hu.  I just want to make sure we're talking
22  about the same person.
23     Q.    Yes.
24     A.    Yuelin Hu is a colleague of

Page 464

1  mine in the QA department.  His title is
2  assistant director.  He is responsible for
3  reviewing and approving this report.  He's
4  not responsible for the custody of this
5  report.
6          MR. SLATER:  Let's go, Cheryll,
7      in this document to the page that's
8      Bates-numbered 308, please.
9          Go up a little more.
10         Okay.  Perfect.  That's good.
11     Q.    Looking at paragraph 5.2 with
12  the title "Control strategy" -- do you see
13  that heading right there?
14     A.    Can you zoom in a little bit?
15  The font is too small.  I cannot see it very
16  clearly.
17     Q.    The heading 5.2 says "Control
18  strategy," correct?
19     A.    That is correct.
20     Q.    And looking now at what it says
21  in this paragraph, it says, "Due to
22  insufficient extent and depth of process
23  research at the early stage, as well as
24  insufficient study and understanding of

Page 465

1 potential genotoxic impurities, only side
2 reaction product and degradation products
3 were studied, and was unaware of the further
4 reaction between degradation products and raw
5 material."
6         Do you see what I just read?
7     A.    I see that.  It's one of the
8 sentences in the paragraph under Section 5.2
9 on the screen.
10         THE INTERPRETER:  The
11 interpreter would like to call it a
12 night.
13         MR. BALL:  Adam, we have --
14 yeah, we have like five minutes left.
15         MR. SLATER:  If -- we can go
16 off the record.
17         THE VIDEOGRAPHER:  The time
18 right now is 1:18 p.m.  We're now off
19 the record.
20         (Whereupon, the deposition was
21 adjourned.)
22
23
24

Page 466

1         CERTIFICATE
2         I, MAUREEN O'CONNOR
3 POLLARD, Registered Diplomate
   Reporter, Realtime Systems
4 Administrator, and Certified Shorthand
   Reporter, do hereby certify that prior
5 to the commencement of the
   examination, PENG DONG, was remotely
6 duly identified and sworn by me to
   testify to the truth, the whole truth,
7 and nothing but the truth.
8         I DO FURTHER CERTIFY that
   the foregoing is a verbatim transcript
9 of the testimony as taken
   stenographically by and before me at
10 the time, place, and on the date
   hereinbefore set forth, to the best of
11 my ability.
12         I DO FURTHER CERTIFY that
   I am neither a relative nor employee
13 nor attorney nor counsel of any of the
   parties to this action, and that I am
14 neither a relative nor employee of
   such attorney or counsel; and that I
15 am not financially interested in the
   action.
16
17
18 _____
19 MAUREEN O'CONNOR POLLARD
   NCRA Registered Diplomate Reporter
20 Realtime Systems Administrator
   Certified Shorthand Reporter
21 Notary Public
22 Dated:  April 2, 2021
23
24

Page 467

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4 carefully and make any necessary corrections.
5 You should state the reason in the
6 appropriate space on the errata sheet for any
7 corrections that are made.
8         After doing so, please sign the
9 errata sheet and date it.  It will be
10 attached to your deposition.
11         It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt
14 of the deposition transcript by you.  If you
15 fail to do so, the deposition transcript may
16 be deemed to be accurate and may be used in
17 court.
18
19
20
21
22
23
24

Page 468

1         - - - - - -
          E R R A T A
2         - - - - - -
3 PAGE  LINE  CHANGE
4 ____ ____ _____
5    REASON: _____
6 ____ ____ _____
7    REASON: _____
8 ____ ____ _____
9    REASON: _____
10 ____ ____ _____
11    REASON: _____
12 ____ ____ _____
13    REASON: _____
14 ____ ____ _____
15    REASON: _____
16 ____ ____ _____
17    REASON: _____
18 ____ ____ _____
19    REASON: _____
20 ____ ____ _____
21    REASON: _____
22 ____ ____ _____
23
24

Page 469

ACKNOWLEDGMENT OF DEPONENT

I, _____, do
Hereby certify that I have read the foregoing
pages, and that the same is a correct
transcription of the answers given by me to
the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

_____
PENG DONG              DATE

Subscribed and sworn
To before me this
_____ day of _____, 20____.

My commission expires: _____

_____
Notary Public

Page 470

LAWYER'S NOTES

PAGE  LINE

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____