Exhibit 25

Confidential Information - Subject to Protective Order

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
2
3       ****************************
4       IN RE:  VALSARTAN, LOSARTAN,   MDL No. 2875
        AND IRBESARTAN PRODUCTS
5       LIABILITY LITIGATION              HON ROBERT B.
                                          KUGLER
6       ****************************
7       THIS DOCUMENT APPLIES TO ALL
        CASES
8
        ****************************
9
10            - CONFIDENTIAL INFORMATION -
              SUBJECT TO PROTECTIVE ORDER
11
12            Remote Videotaped via Zoom
13      Deposition of PENG DONG, commencing at 7:07
14      a.m. Hong Kong time, on the 29th of March,
15      2021, before Maureen O'Connor Pollard,
16      Registered Diplomate Reporter, Realtime
17      Systems Administrator, Certified Shorthand
18      Reporter.
19
20                    - - -
21
             GOLKOW LITIGATION SERVICES
22        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
```

Confidential Information - Subject to Protective Order

Page 2

```
 1  APPEARANCES:  ALL PARTIES APPEARED REMOTELY
 2
    FOR THE PLAINTIFFS:
 3
     MAZIE SLATER KATZ & FREEMAN, LLC
 4  BY:  ADAM SLATER, ESQ.
         CHERYLL A. CALDERON, ESQ.
 5       CHRISTOPHER GEDDIS, ESQ.
         103 Eisenhower Parkway
 6       Roseland, New Jersey 07068
         973-228-9898
 7       aslater@mazieslater.com
         ccalderon@mazieslater.com
 8       cgeddis@mazieslater.com
 9          -and-
10  HOLLIS LAW FIRM
    BY:  IRIS SIMPSON, ESQ.
11       8101 College Boulevard, Suite 260
         Overland Park, Kansas 66210
12       800-701-3672
         iris@hollislawfirm.com
13
            -and-
14
    MORGAN & MORGAN
15  BY:  STEPHANIE JACKSON, ESQ.
         20 North Orange Avenue, Suite 1600,
16       Orlando, Florida 32801
         sjackson@forthepeople.com
17
            -and-
18
    FLEMING NOLAN JEZ, LLP
19  BY:  DAVID HOBBS, ESQ.
         2800 Post Oak Boulevard
20       Houston, Texas 77056
         713-621-7944
21       david_hobbs@fleming-law.com
22
23
24
```

Page 3

```
 1  APPEARANCES (Continued):
 2
    FOR THE PLAINTIFFS:
 3
    FARR LAW FIRM
 4  BY:  GEORGE T. WILLIAMSON, ESQ.
         99 Nesbit Street
 5       Punta Gorda, Florida 33950
         941-639-1158
 6       gwilliamson@farr.com
 7
 8  FOR THE DEFENDANTS TEVA PHARMACEUTICAL
    INDUSTRIES, LTD., TEVA PHARMACEUTICALS SA,
 9  INC., ACTAVIS LLC, AND ACTAVIS PHARMA, INC.:
10  KATE M. WITTLAKE, ESQ.
    GREENBERG TRAURIG LLP
11  4 Embarcadero Center, Suite 3000
    San Francisco, California 94111
12  415-655-1285
    wittlakek@gtlaw.com
13
14
    FOR THE DEFENDANTS ZHEJIANG HUAHAI
15  PHARMACEUTICAL CO., LTD., PRINSTON
    PHARMACEUTICAL INC., HUAHAI U.S., INC., and
16  SOLCO HEALTHCARE US, LLC:
17  NATHAN B. REEDER, ESQ.
    PATRICK C. GALLAGHER, PhD, ESQ.
18  FREDERICK R. BALL, ESQ.
    DUANE MORRIS, LLP
19  30 South 17th Street
    Philadelphia, Pennsylvania 19103
20  215-979-1164
    nbreeder@duanemorris.com
21  pcgallagher@duanemorris.com
    frball@duanemorris.com
22
23
24
```

Page 4

```
 1  APPEARANCES (continued):
 2
    FOR THE DEFENDANT AUROBINDO PHARMACEUTICALS:
 3
    CAITLIN LAWLOR, ESQ.
 4     CIPRIANI & WERNER, P.C.
       450 Sentry Parkway
 5     Blue Bell, Pennsylvania 19422
       610-567-0700
 6     clawlor@c-wlaw.com
 7
 8  FOR THE DEFENDANT MYLAN PHARMACEUTICALS,
    INC.:
 9
    FRANK H. STOY, ESQ.
10     PIETRAGALLO GORDON ALFANO BOSICK &
       RASPANTI, LLP
11     One Oxford Centre
       Pittsburgh, Pennsylvania 15219
12     412-263-1840
       fhs@pietragallo.com
13
14
    Interpreter:  Dr. Yang Shao
15
16  Check Interpreters:  Phil Hughes
                          I Ching Ng
17
18  Videographer: Henry Marte
19
20
21
22
23
24
```

Page 5

```
 1               INDEX
 2  EXAMINATION                    PAGE
 3  PENG DONG
 4  BY MR. SLATER                    8
 5
 6
 7          E X H I B I T S
 8  NO.     DESCRIPTION           PAGE
 9  ZHP-191   Notice to Take Videotaped
              Oral Deposition............... 10
10
    ZHP-192   Peng Dong's Curriculum Vitae..  26
11
    ZHP-193   Guideline for Genotoxic
12            Impurity Evaluation, Bates
              ZHP01447235 through 7242......  33
13
    ZHP-194   Change Request Form, Chinese
14            version, Bates ZHP00000161
              through 214..................   64
15
    ZHP-195   Change Request Form, English
16            version, Bates ZHP01843066
              through 3119.................   64
17
18
19
20
21
22
23
24
```

Confidential Information Subject to Protective Order

- - -

## DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE  LINE
None.

Request for Production of Documents
PAGE  LINE
None.

Stipulations
PAGE  LINE
None.

Questions Marked Highly Confidential
PAGE  LINE
None.

## P R O C E E D I N G S

THE VIDEOGRAPHER:  Okay.  We are now on the record.

My name is Henry Marte.  I'm a videographer on behalf of Golkow Litigation Services.

Today's date is March 29, 2021, and the time is 7:07 a.m.

This videotaped deposition is being held in the matter of Valsartan, Losartan, and Irbesartan Products Liability Litigation.

The deponent today is Mr. Peng Dong.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

All appearances are also noted on the stenographic record.

Will the court reporter please administer the oath to the witness.

YANG SHAO, Interpreter, having been duly sworn to translate the proceedings to the best of his ability, translated as follows:

PENG DONG, having been duly affirmed to tell the truth, was examined and testified as follows:

EXAMINATION

BY MR. SLATER:

        Q.    Hello, Mr. Dong.
        A.    How are you?
        Q.    We're going to take your deposition now.  Do you understand that's the purpose of this proceeding?
        A.    I understand.  I will attend this deposition as a witness designated by the company.
        Q.    Please make sure that you tell the truth in answering every question.
        A.    I affirm that I will tell the truth.
        Q.    If you are asked a question you don't understand, please tell us, okay?

        A.    All right.
        Q.    All right.  If a lawyer objects to a question, please wait, and then you'll likely answer the question, but wait until you're told.
        A.    Okay.
        Q.    Most important, so that we get through this quickly, if I ask you a direct question, for example a yes-or-no question, please answer in a direct way.
        A.    I will tell the truth.
        Q.    Do you, in your -- rephrase.
        What language or languages do you communicate in at work?
        A.    Mandarin.
        Q.    Do you read or write English at all, whether at work or otherwise?
        A.    I do not write in English.  As for the reading, I don't do much English reading.
        Q.    Can you understand English at all?  I'm talking spoken.
        THE VIDEOGRAPHER:  Did the witness just freeze?  He looks frozen.

Confidential Information - Subject to Protective Order

Page 10

1    MR. BALL: He looks frozen.
2    MR. SLATER: Go off.
3    THE VIDEOGRAPHER: All right.
4  The time is 7:13 a.m. Off the record.
5    (Off the record.)
6    THE VIDEOGRAPHER: All right.
7  We are back on the record. The time
8  is 7:15 a.m.
9  BY MR. SLATER:
10   Q.   Before we disconnected, I
11 asked, "Do you understand" -- I can't
12 remember if this was answered. Rephrase.
13      Do you understand spoken
14 English at all?
15   A.   I would speak very little
16 English, except for the greetings "hello" and
17 "bye-bye."
18      MR. SLATER: Let's mark the
19 deposition notice, whatever exhibit
20 we're up to.
21      (Whereupon, Exhibit Number
22 ZHP-191 was marked for
23 identification.)
24      MR. SLATER: Cheryll, if you

Page 11

1  could mark it, put it up on the
2  screen, and then tell us what exhibit
3  number it is, that would be great.
4    MR. BALL: I object to the use
5  of this document without a
6  translation.
7    To the degree that Dr. Shao can
8  translate it for Mr. Peng, I would
9  instruct Mr. Peng to go ahead and
10 answer, or ask Dr. Shao to translate
11 whatever he needs to translate to
12 fully understand the document.
13   THE WITNESS: I need the
14 interpreter to translate the whole
15 document.
16   MR. SLATER: Yeah, we're not
17 going to do that. I'm going to ask my
18 questions, and I'm going to continue.
19   Mr. Ball, if you want to tell
20 him not to answer questions, you can
21 instruct him not to answer. You don't
22 even know what I'm going to ask.
23   But I'm not going to sit here
24 while the whole deposition notice is

Page 12

1  translated when it's not necessary for
2  my questions.
3    MR. BALL: And we could go off
4  the record and talk about this, or you
5  can listen to the objection that I
6  made.
7    MR. SLATER: I heard your
8  objection. He just asked to read the
9  whole document. We're not going down
10 that road.
11   MR. BALL: Mr. Slater, you
12 could have provided a translated
13 document. You chose not to. That's
14 really not my problem that you chose
15 not to.
16   MR. SLATER: All right. Let's
17 continue.
18 BY MR. SLATER:
19   Q.   Mr. Peng -- Mr. Dong, were you
20 aware that a deposition notice applies to
21 this deposition?
22   A.   I'm not quite sure.
23   Q.   Did anybody ever translate the
24 deposition notice for you, to your knowledge,

Page 13

1  and tell you what it said?
2    A.   To the best of my recollection,
3  no.
4    Q.   Do you know the topics on which
5  you're supposed to be testifying tonight?
6    A.   I have some knowledge on those
7  topics.
8    Q.   What do you think the topics at
9  this deposition are?
10   A.   For that I need to read the
11 original document.
12   Q.   If you don't know what the
13 document says, why do you need me to read it
14 to you?
15   MR. BALL: Objection.
16   A.   There are several topics where
17 I need to testify on. However, it is
18 impossible for me to recite all those topics
19 one by one.
20 BY MR. SLATER:
21   Q.   Recite one for me, please.
22   A.   To the best of my recollection,
23 as a corporate witness, I am supposed to
24 testify on the topic of valsartan changes.

Page 14

1  Q.   When you say "valsartan
2  changes," do you mean valsartan process
3  changes?
4          MR. BALL:  Objection to form.
5      A.   I would like the opposing
6  counsel to indicate the time frame when you
7  say "valsartan process changes."
8  BY MR. SLATER:
9      Q.   You said you're testifying on
10  valsartan changes.  I asked you if you meant
11  valsartan process changes.  It's a yes-or-no
12  question.
13          MR. BALL:  Objection to form.
14      A.   My understanding regarding
15  valsartan changes might be different from the
16  opposing counsel's understanding of valsartan
17  changes.
18          If I am not provided with the
19  real intention and a clear question from the
20  opposing counsel, then it is impossible for
21  me to provide an accurate response to his
22  question.
23  BY MR. SLATER:
24      Q.   When you said that you're here

Page 15

1  to testify on valsartan changes, what did you
2  mean by that?
3      A.   When I said "valsartan
4  changes," I was referring to the questions
5  that I received or the topics I became aware
6  of that I need to testify as a corporate
7  witness.
8          In order to provide an accurate
9  response, either I would be presented with
10  the original document or the interpreter
11  could translate the document for me.
12          MR. SLATER:  Counsel, I'm just
13  going to ask you to instruct your
14  witness to actually give responsive
15  answers, because this is not
16  responsive.  It's canned stuff.  And
17  I'm not going to have my time taken by
18  these kinds of answers.
19          MR. BALL:  Adam, he's giving
20  responsive answers.  I'm not going to
21  instruct him to do anything.
22          MR. SLATER:  I reserve my right
23  to seek sanctions for this time.
24          MR. BALL:  Fine.

Page 16

1          And, Adam, as you know, that's
2  inappropriate to threaten sanctions.
3          MR. SLATER:  I didn't threaten.
4  I said --
5          MR. BALL:  And if you -- Adam,
6  let me finish, please.
7          If you do it again, if you
8  continue to do that, we will consider
9  filing a counter motion if you do.
10          You have the document in front
11  of you.  You can show him the
12  questions.  They can be translated.
13  You chose not to do that.  That's
14  really not my problem, again.
15          And if you want to go off the
16  record and not take up your time and
17  discuss these issues, I'm happy to do
18  that.
19          MR. SLATER:  We'll just make a
20  record.  It's fine.  Let your witness
21  keep answering this way.  He's
22  obviously doing it at instruction of
23  counsel, right?  I mean, you're in
24  charge, right?

Page 17

1          MR. BALL:  Objection.  Calls
2  for attorney/client privilege.
3          MR. SLATER:  Okay.
4  BY MR. SLATER:
5      Q.   Did you prepare for this
6  deposition?
7      A.   I did some preparation.
8      Q.   Who did you prepare for this
9  deposition with?
10      A.   I reviewed some documents.
11      Q.   I asked you who you prepared --
12  rephrase.
13          I asked you who you prepared
14  with.  What people did you prepare for the
15  deposition with?
16      A.   I did collect some internal
17  information from my colleagues at ZHP.
18      Q.   Who?
19      A.   There are a quite a few.  Would
20  you like to know the names of each of them?
21      Q.   Yes.  List the names to the
22  best of your ability, please.
23      A.   Since I was not involved in any
24  work related to valsartan before 2014, I did

Confidential Information Subject to Protective Order

1  approach some people to gather information
2  about valsartan.
3      Q.   I asked you to list the names
4  of the people.  Can you just list the names
5  for me, please?
6      A.   What do you mean by listing
7  their names?  Do you want me to orally
8  repeat?
9      Q.   Yes.  I would like you to tell
10  me their names.  This is a sworn oral
11  deposition, so please speak the names.
12      MR. BALL:  Objection.
13  Harassment.
14      MR. SLATER:  Harassment because
15  I -- wait a second.  Harassment?  He
16  said, "Would you like me to list the
17  names" three questions ago.  I said
18  "Yes," and now he's acting like he
19  doesn't understand what I'm asking.
20  Counsel, it's like five or six
21  times he's done this already.  It's
22  outrageous.
23      MR. BALL:  Please go off the
24  record for a second.

1      THE VIDEOGRAPHER:  All right.
2  The time is 7:32 a.m.  Off the record.
3      (Off the record discussion.)
4      THE VIDEOGRAPHER:  The time is
5  7:34 a.m.  Back on the record.
6  BY MR. SLATER:
7      Q.   Please tell me the name of each
8  person you spoke with to prepare for this
9  deposition.
10      A.   Every name?  There are many
11  names.  I'm afraid I cannot recall each and
12  every name.
13      Q.   List the ones you can recall,
14  please, speaking them to me, please.
15      A.   Let me see.
16      THE INTERPRETER:  The
17  interpreter would like to clarify with
18  the witness.
19      A.   For example, Yueling Hu,
20  spelled as Y-U-E-L-I-N-G, last name H-U.
21      Q.   That's the only name you can
22  remember?
23      A.   That's all I can recall as of
24  now.

1      Q.   Did you speak to any lawyers to
2  prepare for the deposition?
3      A.   I did talk with attorneys in
4  the past.
5      Q.   To prepare for this deposition?
6      A.   We did have some conversation.
7      Q.   Which lawyers did you speak to?
8      A.   For example, this attorney from
9  our side.
10      Q.   Mr. Dong, can you tell me the
11  name of each lawyer that helped prepare you
12  for this deposition, please?
13      A.   I did have some conversation
14  with the attorneys.
15      Q.   What are their names?
16      A.   My English skill is poor, so if
17  I pronounce correctly, I believe his name is
18  Rick.
19      Q.   Who else?
20      A.   I'm afraid I cannot pronounce
21  the name of that person.
22      Q.   Tell me the name of any Chinese
23  lawyers who helped to prepare you for the
24  deposition, please.

1      MR. BALL:  Objection to form.
2      A.   What do you mean by any Chinese
3  attorneys?
4  BY MR. SLATER:
5      Q.   An attorney from China whose
6  name you can remember.
7      A.   To the best of my recollection,
8  I never had a conversation with so-called
9  Chinese attorneys.
10      Q.   So is the attorney who you
11  said, Rick, the lawyer who is on this
12  deposition with us, Mr. Rick Ball?
13      A.   That is correct.
14      Q.   How many times did you speak to
15  him to prepare for the deposition?
16      A.   We did talk to each other for a
17  few times.  However, I do not recall the
18  exact time, or times.
19      Q.   For how long did you speak to
20  Mr. Ball preparing for the deposition?
21      A.   What do you mean by -- how long
22  is the conversation?
23      Q.   How much time did you speak to
24  him for over the course of your discussions

Confidential Information Subject to Protective Order

Page 22

1  with him preparing for the deposition?
2        MR. BALL:  Objection to form.
3      A.    I did have some discussion with
4  him.  However, I would like some
5  clarification from the plaintiffs' attorney.
6        Do you mean the total length of
7  time for the discussion between us?
8  BY MR. SLATER:
9      Q.    Yes.
10     A.    I don't recall.
11     Q.    Was it more than an hour?
12     A.    My conversation with that
13  attorney took more than an hour.
14     Q.    More than five hours?
15     A.    Well, maybe.
16     Q.    Did you bring any documents to
17  give to me as part of this deposition?
18     A.    I don't understand your
19  question.  What do you mean by bringing any
20  document to you?
21     Q.    Are you producing any documents
22  in connection with the deposition?
23        MR. BALL:  Objection.  Vague.
24     A.    I don't understand what you

Page 23

1  mean.
2  BY MR. SLATER:
3      Q.    Okay.  Do you know what a
4  document is?
5      A.    There are many types of
6  documents.
7      Q.    Great.  Are you producing any
8  types of documents as part of this
9  deposition?  Are you bringing anything --
10  rephrase.
11        Are there any documents that
12  you're producing as part of this deposition,
13  any type?
14        MR. BALL:  Objection to form.
15     A.    I don't understand the word
16  "producing."
17  BY MR. SLATER:
18     Q.    At your work, do you
19  communicate with your coworkers by e-mail?
20     A.    Yes.
21     Q.    Has that been true since you
22  first started to work for ZHP?
23     A.    Let me see.  It has been a long
24  time between now and my first day at ZHP.

Page 24

1        To the best of my recollection,
2  at that time I was at a very junior level,
3  and I was not authorized to apply for an
4  e-mail address.
5      Q.    Are you saying you didn't use
6  e-mail when you first started working at ZHP?
7      A.    That is correct.
8      Q.    When did you first get e-mail
9  at your company?
10        Let me ask it differently.
11  Withdrawn.  New question.
12        When did you first have an
13  e-mail address at your work at ZHP?
14     A.    I believe it was a long time
15  ago that I started to have my work e-mail at
16  ZHP.  I do not recall.
17     Q.    Did you have e-mail at ZHP
18  before December 12, 2017?
19     A.    Yes.
20     Q.    Did you send and receive
21  e-mails before December 12, 2017 in your work
22  at ZHP?
23     A.    From that date or since that
24  date, I have been receiving and sending

Page 25

1  e-mails using my work e-mail address in the
2  course of my employment.
3      Q.    I asked if you did so before
4  December 12, 2017.  Please answer that
5  question.
6      A.    Yes.
7      Q.    Do you know when you first sent
8  or received e-mails in your work at ZHP?
9      A.    I don't recall, since it was
10  long time ago.
11        MR. SLATER:  Cheryll, I want to
12  put up the CV only if it was produced
13  by ZHP to us.  So can you tell me, was
14  it produced by ZHP, or did we get it
15  from somewhere else?  Did we get it
16  from them, or did we get it from
17  somewhere else?
18        I'm asking my associate.  It's
19  not a question.
20        MS. CALDERON:  We received the
21  CV from counsel.
22        MR. SLATER:  Great.  Put it on
23  the screen.  Next exhibit, 192.
24        ///

Confidential Information - Subject to Protective Order

Page 26

1          (Whereupon, Exhibit Number
2     ZHP-192 was marked for
3     identification.)
4  BY MR. SLATER:
5     Q.    Mr. Dong, in front of us is the
6  CV -- rephrase.
7          Mr. Dong, you can't read the
8  document in front of you, right?
9     A.    Well, I am only familiar with a
10 few words in this document.
11         MR. SLATER:  For the record,
12    this document was produced to us by
13    counsel as Mr. Dong's CV.  Just making
14    that record.
15    Q.    Mr. Dong, do you have a CV in
16 the Chinese or Mandarin language that you'd
17 be able to read completely?
18    A.    To the best of my recollection,
19 I do not have my CV in Chinese.  And this
20 version was actually written by a colleague
21 of mine when I told him the content.
22    Q.    Do you know whether it's
23 accurate or not?
24    A.    What do you mean by this

Page 27

1  document accurate or not?
2     Q.    Is the information correct?
3     A.    Which specific entry are you
4  referring to?
5     Q.    The whole thing.
6          MR. BALL:  Again, I'm going to
7     object to the use of this document.
8          If you want to translate
9     certain sections and have Dr. Shao
10    translate sections of it, he can
11    answer questions about it.  Just what
12    he just told you, Adam.
13 BY MR. SLATER:
14    Q.    I'm waiting for an answer.
15    A.    Excuse me.  What was the
16 original question of the plaintiffs'
17 attorney?
18    Q.    What department do you work in?
19         MR. BALL:  Object to form.
20    A.    When you say do I work, do you
21 mean my current job position?
22 BY MR. SLATER:
23    Q.    Yes.
24    A.    Right now I work in the

Page 28

1  technical department at Chuannan facility of
2  ZHP.
3     Q.    What is the responsibility of
4  the technical department?
5     A.    Are you referring to the
6  responsibilities of my position or the whole
7  department when you said "the responsibility
8  of the technical department"?
9     Q.    When I said -- rephrase.
10         The technical department.
11 That's why I asked the question that way.
12         Hold on.  Hold on.
13         The technical department, the
14 whole department.
15    A.    The responsibility of the
16 technical department covers two areas.  One
17 is management of technology, or technical
18 management.  The other area is improvement of
19 the process or processes.
20    Q.    What processes are you
21 referring to?
22    A.    I did not say "processes," so I
23 don't understand the question.
24    Q.    That was the translation I was

Page 29

1  given.  You said "process or processes,"
2  so...
3          THE INTERPRETER:  The
4     interpreter clarifies that in Chinese
5     there is no singular or plural form.
6     So, to be complete, the interpreter
7     choose to use both the singular or the
8     plural form, just in case.
9     Q.    Okay.  I'll ask a new question.
10         What process are you referring
11 to?
12    A.    The responsibility of the
13 technical department is to improve and
14 upgrade the manufacturing process for the
15 products under our management.
16         MR. BALL:  Please don't
17    translate this.
18         Adam, are you asking him in his
19    capacity as a 30(b)(6) witness?  His
20    individual capacity?
21         Can I finish, please?  I
22    thought the deposition started with
23    the 30(b)(6) questions.
24         MR. SLATER:  I think I'm

Page 30

1    allowed to find out who the witness is
2    and what department he works in as
3    part of the 30(b)(6).
4          MR. BALL:  I just want to make
5    sure that these -- then I'm going to
6    object.
7          And I'm just going to put on
8    the record these answers, I believe,
9    are outside the scope of the 30(b)(6)
10   and don't bind the company.
11         Go ahead.
12         MR. SLATER:  I'm sorry.  You
13   think that me asking the 30(b)(6)
14   witness what his department does is
15   outside the scope of the deposition?
16         MR. BALL:  Yes, I do believe
17   that.  Outside the scope of the
18   30(b)(6).  You can ask him in his
19   individual capacity, and that's fine.
20   He's not binding the company.
21         MR. SLATER:  That's great.  We
22   disagree.
23   BY MR. SLATER:
24   Q.    What are your responsibilities

Page 31

1    in your position?
2    A.    My own responsibilities would
3    cover three areas.
4          First, management of the
5    department.  Second, to organize my
6    subsidiaries to conduct technical management.
7    The third one, participation in organization
8    of the improvement of manufacturing process
9    for the product we manage.
10   Q.    Your current title is deputy
11   director of the technical department, is that
12   correct?
13   A.    That is correct.
14   Q.    When did you get that title?
15   What day?
16   A.    I do not recall the specific
17   month and day.
18   Q.    Tell me what you do recall.
19   A.    To the best of my recollection,
20   I was promoted to that title in early 2018,
21   but I do not recall the specific month and
22   date.
23   Q.    Your prior title was assistant
24   director, correct?

Page 32

1    A.    In Chinese, literally it's
2    translated as director assistant.
3          MR. SLATER:  I'm going to go
4    into a new area now.  I don't know
5    when you need your first break.  I
6    know that you need breaks
7    periodically, so I just...
8          THE INTERPRETER:  The
9    interpreter would request a brief
10   break in order to start the realtime.
11         MR. SLATER:  Great.  Let's go
12   off.
13         MR. BALL:  Okay.  Hold on, hold
14   on.
15         Dong, do you have -- is your
16   breakfast there?  Do we need to take
17   15 minutes, or are we just going to
18   take 10?
19         MR. SLATER:  Go off the video.
20   We're not using my time to get his
21   breakfast menu, please.
22         THE VIDEOGRAPHER:  All right.
23   The time is 8:08 a.m.  Going off the
24   record.

Page 33

1          (Whereupon, a recess was
2    taken.)
3          THE VIDEOGRAPHER:  The time is
4    8:24 a.m.  Back on the record.
5          (Whereupon, Exhibit Number
6    ZHP-193 was marked for
7    identification.)
8    BY MR. SLATER:
9    Q.    Do you see this exhibit in
10   front of you titled "Guideline for Genotoxic
11   Impurity Evaluation"?
12   A.    I see it.
13   Q.    Look at Section 2, please.
14   This states in part, "All intermediates and
15   APIs produced under GMP conditions must be
16   identified for genotoxic impurities."
17         Do you see that?
18   A.    I see it.  The document does
19   state so.
20   Q.    Identification of genotoxic
21   impurities is part of the risk assessment
22   evaluation, correct?
23   A.    Per the requirements of ICH, we
24   would confirm the quality specifications of

Page 34

1  API.
2     Q.    This applies to valsartan,
3  correct?
4         Let me reask the question.
5  Hang on.  Let me reask the question.
6         What you just stated would
7  apply to valsartan, correct?
8     A.    For API products, including
9  valsartan API, we would confirm the quality
10 specifications per the requirements of ICH.
11    Q.    Part of evaluating -- rephrase.
12        Part of this process includes
13 identifying all genotoxic impurities,
14 correct?
15    A.    What do you mean by "part of
16 this process"?
17    Q.    The GMP process to ensure the
18 product meets quality requirements.
19    A.    Can you repeat your question by
20 putting what you just said?  I'm sorry.
21    Q.    No.
22        Let's go to Section 4.2.1.  In
23 part, this says, "Sources of genotoxic
24 substances include raw materials, reagents,

Page 35

1  solvents, intermediates, and by-products,"
2  correct?
3     A.    The document does say so in
4  Chinese.
5     Q.    And your company knew that from
6  the time it began to manufacture valsartan,
7  correct?
8     A.    I believe this document should
9  have an effective date.  I'm sorry, I missed
10 the effective date.
11    Q.    My question --
12        MR. SLATER:  Move to strike.
13    Q.    What I just read in 4.2.1 your
14 company has known from the first day it ever
15 manufactured valsartan, correct?
16    A.    I need to know the effective
17 date of this document.
18    Q.    Do you know if your company
19 knew the sources of genotoxic substances when
20 it first started manufacturing valsartan?
21 Yes or no.
22    A.    We conducted our work based on
23 the requirements of ICH as well as the
24 regulations of our internal SOPs.

Page 36

1         As for those ICH requirements
2  and SOPs, they had certain effective period
3  of time, and that would start with an
4  effective date.
5         MR. SLATER:  Move to strike.
6     Q.    It's a very simple question.
7  The information I read to you in
8  Section 4.2.1, did ZHP know the sources of
9  the genotoxic substances when it first
10 started manufacturing valsartan?  Yes or no.
11 Did it know that list or not?
12    A.    Section 4.2.1 is indeed
13 included in this document.  However, I need
14 to know the effective date of this document.
15        In addition, we conducted our
16 work in developing the manufacturing process
17 of valsartan based on the requirements of ICH
18 then, as well as the internal SOP regulations
19 then.
20        MR. SLATER:  Move to strike.
21    Q.    I'm going to ask you a question
22 not referring to this document to try to get
23 you to answer responsively.
24        From the time ZHP began to

Page 37

1  manufacture valsartan, did it know that the
2  sources of genotoxic substances included raw
3  materials, reagents, solvents, intermediates,
4  and by-products?  Yes or no.
5     A.    When ZHP first started to
6  manufacture valsartan, they conducted the
7  work based on the requirement of ICH then, as
8  well as the regulations of the internal SOP
9  then.
10        When I mentioned ICH and SOP, I
11 was referring to the documents then.
12        MR. SLATER:  Move to strike.
13    Q.    Can you just answer with a yes
14 or no, please, the actual question I asked?
15    A.    What was your original question
16 again?
17        MR. SLATER:  Go off the record.
18        THE VIDEOGRAPHER:  All right.
19 The time is 8:40 a.m.  Off the record.
20        (Off the record discussion.)
21        THE VIDEOGRAPHER:  The time is
22 8:41 a.m.  Back on the record.
23 BY MR. SLATER:
24    Q.    I am told that this document

Confidential Information - Subject to Protective Order

Page 38

1  was created in 2011.
2          MR. BALL:  Objection to form.
3          MR. SLATER:  What's the
4  objection?
5          MR. BALL:  Foundation.  You
6  were told, Adam?
7          MR. SLATER:  You're really
8  having a fun time over there, Rick,
9  aren't you?
10         MR. BALL:  You know, Adam, I'm
11 going to make my objections.  You
12 asked me what my objection was, and I
13 just told you.
14         MR. SLATER:  I hadn't even
15 finished my sentence, but --
16         MR. BALL:  Okay.
17         MR. SLATER:  -- keep having a
18 grand time over there.  It's fine.
19 BY MR. SLATER:
20     Q.   I'm told that the metadata for
21 this document shows that it was created in
22 2011.  Do you know whether that's correct or
23 not?
24         MR. BALL:  Objection to form.

Page 39

1      A.   Can you show me the time?  I
2  cannot find that time in this document.
3  BY MR. SLATER:
4      Q.   I asked you if you know.
5  Either the answer is yes or no.
6          MR. BALL:  Objection to form.
7      A.   Judging from what is shown to
8  me on the screen, it is impossible for me to
9  tell when this document was created, nor
10 could I tell that -- what the effective date
11 of this document is.
12 BY MR. SLATER:
13     Q.   Have you ever seen this
14 document --
15         MR. SLATER:  Move to strike.
16     Q.   Have you ever seen this
17 document --
18         MR. BALL:  Oppose the motion.
19         MR. SLATER:  I'm going to start
20 over.
21 BY MR. SLATER:
22     Q.   Have you ever seen this
23 document before?
24     A.   When you said have I seen this

Page 40

1  document before, what time frame are you
2  referring to?
3      Q.   Ever in your life before today.
4      A.   To the best of my recollection,
5  I have seen this document before.  It seems
6  so.
7      Q.   Have you ever used this
8  document in your work?
9      A.   In the course of my employment,
10 we conducted our work based on the
11 requirements of ICH and SOP then.
12         MR. SLATER:  Move to strike.
13         MR. BALL:  Oppose the motion.
14 BY MR. SLATER:
15     Q.   Mr. Dong, did I ask you about
16 ICH?  No, I didn't.
17         Did I ask you about any other
18 SOPs?  No, I didn't.
19         I would appreciate, like I
20 asked you up front, to be courteous and
21 comply with your obligations under the United
22 States Federal Rules of Civil Procedure and
23 answer the questions I actually ask you.  I
24 would really appreciate that.  It would make

Page 41

1  things go a lot smoother for everybody.
2          MR. BALL:  Objection to form.
3  I don't even know if that was a
4  question.
5          MR. SLATER:  No.  It was a
6  request for the witness to actually
7  make some minimal effort to be
8  responsive.
9          MR. BALL:  Objection.
10 Harassment.
11         Go ahead and translate it.
12     A.   I will tell you the truth.
13 BY MR. SLATER:
14     Q.   Look at Section 4.2.3.  It says
15 in part, "After product pilot, genotoxic
16 impurities should be preliminarily determined
17 and included in the development report."
18 Correct?
19         MR. BALL:  Objection to form.
20     A.   According to this document, it
21 says in this section, "After the research and
22 development of the product pilot, genotoxic
23 impurities should be preliminarily determined
24 and included in the development report."

Page 42

1    That's what it says in Chinese.
2    BY MR. SLATER:
3        Q.    Look at 4.2.4.  That says, "The
4    identification of genotoxic impurities should
5    include confirmed structure of genotoxic
6    impurities and confirm analysis method and
7    residual limit of the impurity."  Correct?
8        MR. BALL:  Objection to form.
9        A.    According to this document, the
10   Chinese version does say so in
11   Section 4.2.4.
12   BY MR. SLATER:
13       Q.    Let's go to Section 4.3.1.
14   This section says, "The technical department
15   organizes relevant departments to evaluate
16   all raw materials, reagents, solvents,
17   intermediates, and by-products of the product
18   and evaluate whether they contain genotoxic
19   substances."  Correct?
20       MR. BALL:  Objection to form.
21       A.    In Section 4.3.1 of this
22   document, the Chinese version says, "The
23   technical department should organize relevant
24   departments to evaluate all raw materials,

Page 43

1    reagents, solvents, intermediates, and
2    by-products of the product, and evaluate
3    whether there are any genotoxic substances in
4    them."  That's what the Chinese says.
5    BY MR. SLATER:
6        Q.    The technical department is the
7    department that you work in, correct?
8        MR. BALL:  Objection to form.
9        A.    Do you mean the technical
10   department described in this document when
11   you say "technical department"?
12   BY MR. SLATER:
13       Q.    Is the technical department
14   referenced in 4.3.1 the department you work
15   in?
16       MR. BALL:  Objection to form.
17       A.    The technical departments
18   referred in this document under Section 4.3.1
19   refer to all the technical departments in
20   ZHP's facilities.  My department is only one
21   of them.
22   BY MR. SLATER:
23       Q.    This instruction to the
24   technical departments would also apply to

Page 44

1    your technical department, the one you work
2    in, correct?
3        MR. BALL:  Objection to form.
4    BY MR. SLATER:
5        Q.    Let me stop.  Let me stop.  Let
6    me withdraw the question.
7        There's a technical department
8    for the Chuannan facility where the valsartan
9    API was manufactured, correct?
10       MR. BALL:  Objection to form.
11       A.    There is a technical department
12   at the Chuannan facility of ZHP.
13   BY MR. SLATER:
14       Q.    This guideline applies to that
15   technical department, correct?
16       MR. BALL:  Objection to form.
17       A.    Are you referring to this SOP
18   by "this guideline"?
19   BY MR. SLATER:
20       Q.    Yes.
21       A.    Can you repeat the pending
22   question?  I'm sorry.
23       Q.    This guideline that is on the
24   screen applies to the technical department in

Page 45

1    Chuannan, correct?
2        MR. BALL:  Objection -- sorry.
3        Objection to form.
4        A.    The technical department in
5    Chuannan should conduct their work based on
6    the current SOP.
7    BY MR. SLATER:
8        Q.    When Section 4.3.1 refers to
9    the "technical departments" plural, that
10   includes the technical department at
11   Chuannan, correct?
12       MR. BALL:  Objection to form.
13       A.    After this SOP became
14   effective, all the technical departments
15   referred to under Section 4.1 point --
16       THE INTERPRETER:  The
17       interpreter's correction.
18       A.    -- under Section 4.3.1,
19   including the technical department in
20   Chuannan, need to conduct their work based on
21   the effective SOP at that time.
22   BY MR. SLATER:
23       Q.    Look at 4.4.1.  The first part
24   says, "Genotoxic substances are potentially

Page 46

1 destructive to DNA at any intake level, and
2 this damage may lead to tumors." Correct?
3         It says that in part, correct?
4         MR. BALL: Objection to form.
5    A.    One sentence under
6 Section 4.4.1 of this document does say that
7 "Genotoxic substances are potentially
8 destructive to DNA at any intake level, and
9 this damage may lead to tumors."
10         This sentence is only within
11 this paragraph under Section 4.4.1.
12 BY MR. SLATER:
13    Q.    Go to Section 4.4.11. This
14 indicates that "Genotoxic impurities and
15 their residual limits as found by the company
16 are found in Appendix A." Correct?
17         MR. BALL: Objection to form.
18    A.    In this document under
19 Section 4.4.11, the sentence in Chinese does
20 say, "The genotoxic impurities and their
21 residual limits as determined by the company
22 are found in Appendix A."
23         In addition, could you please
24 scroll up this document a little bit? It

Page 47

1 makes me feel tired when I have to look down
2 at this paragraph. I'm sorry.
3         MR. SLATER: I don't
4    understand. Move to strike the last
5    part.
6         MR. BALL: Oppose the motion.
7 BY MR. SLATER:
8    Q.    Mr. Dong, if you look in the
9 top left, it says number "API-R&D-002."
10         Do you see that?
11         MR. BALL: Objection to form.
12    A.    As shown on the screen, on this
13 document at the upper left corner, there is
14 indeed a number "API-R&D-002."
15 BY MR. SLATER:
16    Q.    By -- rephrase.
17         Since it says "002," this is
18 version 2 of this guideline, correct?
19         MR. BALL: Objection to form.
20    A.    This is a document number.
21 BY MR. SLATER:
22    Q.    That's your answer?
23         MR. BALL: Objection to form.
24    A.    I'm sorry. I don't understand

Page 48

1 your question. Are you asking me whether I'm
2 done with responding to the previous
3 question?
4 BY MR. SLATER:
5    Q.    Because it says "002," that
6 means it's the second version. You know how
7 your documents are written in your company,
8 right?
9         MR. BALL: Objection to form.
10    Harassment.
11    A.    I need to review the whole
12 document before responding to the opposing
13 counsel's question.
14 BY MR. SLATER:
15    Q.    We can go off the record if you
16 want to read the whole document.
17         MR. BALL: No, we won't. He
18    can read it on the record. He will
19    take the time, your time, to do that.
20         MR. SLATER: I'm sorry, but
21    we're not going to. I'm not going to
22    sit while he reads the whole document.
23    I don't know what he's reading for.
24    The date of the document is not on it,

Page 49

1 so I don't know what he's looking for.
2         MR. BALL: Well, then, I don't
3    know what he's looking for either.
4    Why don't you ask him. But we're not
5    going off the record.
6         MR. SLATER: This isn't how
7    we're going to do this.
8         MR. BALL: We're not going off
9    the record.
10         MR. SLATER: I've got a
11    different way of asking it, Mr. Ball.
12 BY MR. SLATER:
13    Q.    Mr. Dong, do you know if this
14 is the only version of this document or not?
15 Yes or no. It's a simple yes-or-no question.
16         MR. BALL: Objection to form.
17    A.    In order to provide an accurate
18 answer, I need to review the whole document.
19 BY MR. SLATER:
20    Q.    Okay. Well, you can do that on
21 your own time.
22         MR. SLATER: Let's go to
23    Appendix A. Perfect.
24    Q.    This is Appendix A, correct?

Confidential Information - Subject to Protective Order

---

Page 50

1    MR. BALL:  Objection to form.
2    A.    It says here after "Attachment
3 A," "List of genotoxic impurities by ZHP."
4 That's what it says.
5 BY MR. SLATER:
6    Q.    In line 7, line 9, and line 10,
7 the product in the right-hand column is
8 valsartan, correct?
9    MR. BALL:  Objection to form.
10    A.    In line 7, line 9, and line 10
11 of this document, in the right-hand column,
12 the product in Chinese is valsartan.
13 BY MR. SLATER:
14    Q.    The left-hand column is the
15 list of impurities.
16    Do you see that?
17    MR. BALL:  Objection to form.
18    MR. SLATER:  What's your
19 objection, Counsel?
20    MR. BALL:  My objection is, why
21 don't you -- never mind.  I don't --
22 my objection is that's vague, first
23 off.
24    MR. SLATER:  Are you just

---

Page 51

1 objecting to form to --
2    MR. BALL:  You haven't laid a
3 foundation.  You haven't laid a
4 foundation.
5    MR. SLATER:  Okay.  I think
6 you're objecting to form every time
7 you can't read the language, just
8 to -- just for the heck of it.  I
9 mean --
10    MR. BALL:  As far as I know,
11 Adam, you don't read Chinese.
12    MR. SLATER:  No, I don't.
13    MR. BALL:  So I'm not relying
14 on your translation of it.
15    MR. SLATER:  Okay.  So you're
16 objecting to the form in case the
17 translation is wrong?
18    MR. BALL:  I'm objecting to
19 the -- I'm objecting that you did not
20 lay a foundation for what the
21 left-hand column says.
22    MR. SLATER:  Okay.  That's what
23 that question was, actually.
24    MR. BALL:  No, it wasn't.  It

---

Page 52

1 was "The left-hand column
2 says...correct?"  Which is you
3 translating the left-hand column and
4 asking my witness if that's what it
5 says.
6    MR. SLATER:  Yes.  Right.  And
7 then if it's -- and then -- all right.
8 And then if he's -- all right.
9 Whatever.  You know what?  Nice.
10 Good.
11 BY MR. SLATER:
12    Q.    The left-hand column, the title
13 is "List of impurities," correct?
14    MR. BALL:  Objection to form.
15    A.    In this list, the second column
16 at the top says in Chinese "Names of the
17 impurities of genotoxicity."  That's what it
18 says in Chinese.
19 BY MR. SLATER:
20    Q.    Next to number 7 in that
21 column, it says "azide," correct?
22    MR. BALL:  Objection to form.
23 BY MR. SLATER:
24    Q.    I'll ask it differently.

---

Page 53

1    How about we'll do it this way.
2 On line 7 in the impurities column that you
3 just read the title for, what is the impurity
4 that's listed there?
5    A.    In this table under the second
6 column in line 7, it says "azide" here.
7    Q.    What does it say in line 9 in
8 that column for valsartan?
9    A.    What do you mean by "line 9 in
10 that column for valsartan"?  Are you asking
11 me to read aloud the content of the whole
12 line 9?
13    Q.    In the column that's titled
14 "Names of the impurities," next to the number
15 9, what does it say for the impurity?
16    A.    In the table as shown on the
17 screen, under column 2 in line 9, it says
18 "Bromo OBTN."
19    Q.    What does it say directly
20 beneath that on line 10 in that column?
21    A.    In the table shown on the
22 screen, under column 2 in line 10, it says
23 "Bromo OBTN tetrazole."
24    Q.    Let's go to the prior page.

---

Confidential Information - Subject to Protective Order

Page 54

1    Looking at the top of this
2 page, does this tell you whether this is the
3 first version of this guideline or not?
4    A.    According to what's shown on
5 the screen, it says here in Chinese, "This
6 document is a new document."  Based on that,
7 I can determine that this document is a first
8 version.
9        MR. BALL:  I didn't hear what
10 you said.  You "can determine" or you
11 "can't determine"?
12        I'm asking the translator what
13 he said.
14        THE INTERPRETER:  The
15 interpreter would repeat.
16    A.    I can, C-A-N, determine this is
17 a first version.
18 BY MR. SLATER:
19    Q.    To your recollection, has --
20 we'll rephrase.
21        When the process change
22 occurred to include zinc chloride in the
23 process, was this guideline applied by ZHP?
24    A.    I'm sorry.  Since I did not see

Page 55

1 the effective date of this document, I cannot
2 provide an accurate response to your
3 question.
4    Q.    I can scroll -- rephrase.
5        There is no effective date on
6 the document.  Not written on it.
7        MR. BALL:  Objection to form.
8        I don't know if there's a question.
9 BY MR. SLATER:
10    Q.    Here's the question.  You --
11 we'll rephrase.
12        Was this guideline applied to
13 the zinc chloride process change for
14 valsartan?  Yes or no.
15        MR. BALL:  Objection to form.
16    A.    During the process change for
17 valsartan, we conducted our work based on the
18 ICH and SOP requirements at that time.
19        MR. SLATER:  Move to strike.
20 BY MR. SLATER:
21    Q.    Is the answer yes?
22        MR. BALL:  Oppose the motion.
23        MR. SLATER:  Move to strike.
24        ///

Page 56

1 BY MR. SLATER:
2    Q.    Is the answer --
3        MR. BALL:  Oppose the motion.
4        MR. SLATER:  I'm just saying it
5 because you talked over me.
6 BY MR. SLATER:
7    Q.    Is the answer yes or no?
8 Please answer.
9        MR. BALL:  Objection to form.
10    A.    Could you repeat the question?
11 BY MR. SLATER:
12    Q.    How did I know you were going
13 to ask me that?  I'll try it for the third
14 time.
15        Was this guideline applied and
16 used when the process change to the zinc
17 chloride process for valsartan was made?
18        MR. BALL:  Objection to form.
19 BY MR. SLATER:
20    Q.    Yes or no.
21        MR. BALL:  Objection to form.
22    A.    During the process change for
23 valsartan, we conducted corresponding work
24 based on the requirements of ICH then, as

Page 57

1 well as the requirements of the SOP at that
2 time.
3        MR. SLATER:  Move to strike.
4        MR. BALL:  Oppose the motion.
5        MR. SLATER:  Mr. Ball, he
6 hasn't answered the question.
7        MR. BALL:  I believe he has, at
8 least six or seven times.
9        MR. SLATER:  Tell me what I'm
10 missing about the -- is the answer yes
11 or no, then?  Was this actually
12 utilized with the process change?
13 Because I can't figure it out from his
14 answer.
15        Would you tell me what that
16 answer is?
17        MR. BALL:  Are you asking me or
18 are you asking the witness?
19        MR. SLATER:  I'm asking you,
20 because you keep saying his answer is
21 responsive.  So tell me whether or not
22 the answer was yes or no.
23        MR. BALL:  I'm not going to --
24 I'm not here to answer questions,

Page 58

1  Adam.  I'm sorry you don't like the
2  answer you're getting from the
3  witness.
4       MR. SLATER:  I don't not like
5  the answer.  He won't answer the
6  question.
7       MR. BALL:  Adam, I'm sorry you
8  don't like the answer.  Again, you can
9  take it up with the Court.
10      MR. SLATER:  Is that what you
11 want me to do?
12      MR. BALL:  I want you to -- I
13 don't want you to keep asking that
14 same question over and over again
15 because you don't like the answer
16 you're given.
17      MR. SLATER:  It's not that I
18 don't like it.  It's that he won't
19 answer the question, and I can't
20 understand what he's saying.  He's not
21 addressing what I'm asking.
22      I mean, I think there's some
23 obligation by a lawyer to tell their
24 client to be responsive in a federal

Page 59

1  proceeding.
2       MR. BALL:  Adam, I believe he
3  is being responsive.  He's answering
4  the question to the best of his
5  ability.
6       MR. SLATER:  Really?
7       MR. BALL:  Yes.
8       MR. SLATER:  Okay.  We'll try
9  it one last time, and then we'll have
10 our nice record.
11 BY MR. SLATER:
12      Q.    Mr. Dong, was this guideline
13 utilized as part of the evaluation of
14 potential genotoxic impurities for the zinc
15 chloride process change?  Yes or no.
16      And I'm asking you to either
17 say yes or no.
18      MR. BALL:  Objection.
19      You don't get to tell the
20 witness how to answer a question,
21 Adam.
22      Objection to form.
23      A.    Your question is quite long.  I
24 just heard from the interpreter that this

Page 60

1  guideline is part of the SOP.  I want to find
2  out, which part are you referring to?
3       MR. SLATER:  Mr. Interpreter, I
4  don't understand that.  He's now
5  saying that he doesn't understand your
6  interpretation, and he's asking me to
7  fix your interpretation?
8       What's going on here?  I mean,
9  is that what he actually just said?
10      A.    Your question was translated by
11 the interpreter, but it was very long.
12 Through the interpreter, I heard that you
13 referred to this guideline as part of the
14 SOP, so I just wonder, which part of the SOP
15 are you referring to?
16      MR. SLATER:  Move to strike all
17 this nonresponsive evasion.
18      MR. BALL:  Oppose the motion.
19 BY MR. SLATER:
20      Q.    Was this guideline utilized in
21 connection with the zinc chloride process
22 change?  Yes or no.
23      MR. BALL:  Objection to form.
24      A.    During the zinc chloride

Page 61

1  process change, we conducted the
2  corresponding work based on the requirements
3  of ICH at that time, as well as the
4  requirements of the SOP at that time.
5  BY MR. SLATER:
6       Q.    Was this guideline one of those
7  SOPs that was utilized?
8       A.    Judging from what is shown on
9  the screen, I cannot tell the effective date
10 of this SOP.  I need to review the whole
11 document in order to understand this SOP.
12      MR. SLATER:  Let's go off the
13 record.  I think it's time for a
14 break, right?
15      MR. BALL:  It is time for a
16 break.
17      THE VIDEOGRAPHER:  The time is
18 9:35 a.m.  Off the record.
19      (Whereupon, a recess was
20 taken.)
21      THE VIDEOGRAPHER:  The time is
22 9:49 a.m.  Back on the record.
23 BY MR. SLATER:
24      Q.    The metadata for this document

Page 62

1  says it was modified on June 17, 2011.  I'm
2  just telling you what the metadata says
3  provided by your lawyer.
4          Knowing that and looking at the
5  document, you can look at it and tell me
6  whether or not this guideline was applied to
7  the zinc chloride process change for
8  valsartan.
9          MR. BALL:  Objection to form.
10     A.    Judging from what has been
11  shown on the screen, I cannot give you an
12  accurate answer.
13          As for the process change for
14  valsartan, we conducted the corresponding
15  work based on the requirements of ICH then
16  and the requirements of SOP then.
17          MR. SLATER:  Move to strike
18     from "as for" forward.
19          MR. BALL:  Oppose the motion.
20  BY MR. SLATER:
21     Q.    What do you need to see in
22  order to answer the question?
23     A.    What is your question?
24          MR. SLATER:  I'm going to take

Page 63

1  that as the witness has been asked
2  enough times, he's going to refuse to
3  answer and/or he's unprepared as a
4  30(b)(6).
5          We're going to move to the next
6  document, and that's how we're going
7  to conduct ourselves today.
8          MR. BALL:  Objection.
9          MR. SLATER:  Take the document
10  down.  We've made a full record on
11  that issue with that document.  I
12  think that's sufficient to establish
13  what's going on here.
14          Now, what we're going to do
15  next is pull up -- I'm going to be
16  working with two documents.  We have
17  an English version and we have a
18  Chinese version, both of which were
19  provided by ZHP.  I'm letting counsel
20  know so they know what's going on.
21          So I'm going to put on the
22  screen -- what's the next exhibit?
23  193 or 194?
24          I'm asking the court reporter,

Page 64

1          actually.
2          THE STENOGRAPHER:  194.
3          (Whereupon, Exhibit Number
4     ZHP-194 was marked for
5     identification.)
6          MR. SLATER:  So let's put up
7     Exhibit 194, which is ZHP00000161.
8          And we're going to also mark as
9     Exhibit 195 the English version of
10     this document, which is ZHP01843066
11     through 3119, which I suppose we can
12     put into the chat so if defense
13     counsel wants to look at the document
14     I'm going to be using to refer to,
15     he'll have the ability to do that.
16          (Whereupon, Exhibit Number
17     ZHP-195 was marked for
18     identification.)
19          MR. BALL:  It's not up in the
20     chat yet, Adam, but go ahead and get
21     started.
22  BY MR. SLATER:
23     Q.    Do you see Exhibit 195, titled
24  "Change Request Form"?

Page 65

1     A.    Indeed, on the screen there's a
2  document shown to me.  However, I cannot tell
3  from the screen the exhibit number.
4     Q.    Do you see the "Title:  Change
5  Request Form" right there at the top of the
6  document?
7     A.    In this document, on the upper
8  part of this page, first row, middle column,
9  in Chinese it says "Change Request Form."
10     Q.    Sir, I'd appreciate it if you
11  can just answer "yes."  It would be easier if
12  you just say "yes" instead of repeating my
13  question and saying -- and rereading the
14  whole question back as your answer.
15     A.    I will tell you the form.
16     Q.    Section 1, the Change Title is
17  "Process Change for Valsartan Process II,"
18  correct?
19          MR. BALL:  Mr. Hobbs, it's
20     still not up in the chat.
21          Go ahead.
22          MR. SLATER:  It's ZHP01843066.
23          It's not a question for the
24     witness.  That's for my team, just to

Confidential Information - Subject to Protective Order

Page 66

1  make sure they have the right one.
2      Okay.  What are we doing?
3      MR. BALL:  The only thing
4  that's up in the chat is the ZH -- is
5  the Bates number for it.  There's no
6  actual document.
7      MS. CALDERON:  Mr. Ball, this
8  is Cheryll Calderon.
9      The exhibit link was available
10  in the chat.  That's a public link for
11  you and your witness.
12     MR. BALL:  I just tried to --
13     MS. CALDERON:  So it's that
14  thing.
15     MR. BALL:  Oh.  Hold on.
16     Got it.  Okay.  Sorry.
17  BY MR. SLATER:
18     Q.   Okay.  Mr. Dong, are you
19  familiar with this document, which is the
20  "Process Change for Valsartan Process II"?
21     Are you familiar with the
22  document?
23     A.   On this page, the table where
24  it says "Change Title," next to it, it says

Page 67

1  "Process Change for Valsartan Process II."
2      Q.   The effective date is June 15,
3  2011, correct?  Do you see that at the top
4  right?
5      A.   In the table, on the upper
6  right corner, there is an effective date
7  which says June 15, 2011.  However, this
8  effective date is not the effective date of
9  the process change; rather, it is the
10  effective date of this version of Change
11  Request Form.
12     Q.   This is the final version of
13  this document, correct?
14     MR. BALL:  Objection to form.
15     MR. SLATER:  One second.
16  What's the objection?
17     MR. BALL:  Adam, you haven't
18  laid a foundation.  Ask -- you know,
19  every time you say "correct," that's
20  an improper way to form the question.
21  You know it and I know it.
22     MR. SLATER:  Are you
23  representing this isn't the final
24  version of the document?

Page 68

1      MR. BALL:  I'm not representing
2  anything.  Ask him whether or not it
3  is.
4      MR. SLATER:  Counsel, we just
5  don't agree.  It's not a legitimate
6  objection.
7      MR. BALL:  That's a --
8      MR. SLATER:  I'll ask a
9  different question, because we all
10  know it's the final version.  So he
11  can say this version all he wants, but
12  we'll move on.
13  BY MR. SLATER:
14     Q.   This is the change request form
15  for the change to the zinc chloride --
16  withdrawn.
17     This is the change request form
18  for the zinc chloride process for valsartan,
19  correct?
20     MR. SLATER:  You know what?
21  Stop.  Stop.  Time out.  Withdrawn.
22  Withdrawn.
23     You know what?  I got this
24  figured out now.  Thank you, Rick.  I

Page 69

1  got it.  We're good now.
2  BY MR. SLATER:
3      Q.   Look in the left-hand column to
4  the word "Proposed."  Do you see that line
5  that says "Proposed"?
6      A.   Can you scroll up the screen a
7  little bit?
8      Yes, I see it.
9      Q.   And it then says next to that,
10  "Process II crude product preparation process
11  would use zinc chloride as catalyst."
12  Correct?
13     A.   In this table, in the line of
14  proposed change, next to the word "Proposed,"
15  there was a sentence written in Chinese which
16  says "Process II crude product preparation
17  process would use zinc chloride as catalyst."
18     This is just one sentence of
19  the content in that entry.
20     MR. SLATER:  Move to strike the
21  "This is just one sentence" part.
22     MR. BALL:  Objection to form.
23  Oppose the motion.
24         ///

Confidential - Information - Subject to - Protective - Order

Page 70

BY MR. SLATER:

Q.    Mr. Dong, I asked you a bunch
of times, can you just answer with a "yes" if
the answer is a yes, instead of repeating the
whole question, please?

A.    I will tell you the truth.

Q.    Looking down --

MR. SLATER:  Scroll down,
Cheryll, further down.

Okay.  Perfect.

Q.    Looking now at the box towards
the bottom, No. 4, it says, "If it is the
critical change?"  And it says "Yes."

Do you see that?

A.    At the bottom of this page, on
line 4, when it was asked if this is the
critical change, indeed, the box for "Yes"
was checked.

Q.    At the very bottom of the
page --

MR. SLATER:  Scroll down,
Cheryll, to the very bottom.

Okay.  Stop.

Q.    At the very bottom of the page,

Page 71

it says in the bottom left "Reference:
change control procedure (SMP-018)," correct?

A.    On the bottom of the screen,
there is a line that says in Chinese,
"Reference document: change control procedure
(SMP-018)."

Q.    That means that SMP applied to
this change request, correct?

A.    The SMP in this document is the
reference for the platform of -- not
platform -- template, rather, of this
document.

Q.    Go on to the next page, please,
page 2.

Box 2, "Change Control
Classification," the box checked is "Critical
Change," correct?

A.    On the screen in the line of
"Change Control Classification," "Critical
Change" was indeed checked.

Q.    The second box for "Minor
Change" was not checked, correct?

A.    In the line of "Change Control
Classification," the option "Minor Change"

Page 72

was not checked.

MR. SLATER:  Scroll down,
please, Cheryll.

A little more.  More.  A little
more.

Okay.  Perfect.

Q.    There's a box that says "Change
control Related Department(s)," and for the
"Process Change," a series of departments is
checked, correct?

Actually, you know what?
Withdraw that question.  Forget it.  I don't
care.

Looking now at the Explanation
Section, this provides the explanation for
why this was being done, correct?

MR. BALL:  Objection to form.

A.    On the screen in the
Explanation Section, there is a paragraph
written in Chinese.

MR. SLATER:  Move to strike.

MR. BALL:  Oppose the motion.

BY MR. SLATER:

Q.    Sir, did I ask you what

Page 73

language it's written in?

A.    I will tell the truth.

Q.    You will tell the truth?  I
need you to answer my questions.  I didn't
ask you what language it's written in, so I
don't understand why you told me that.
Telling the truth is actually answering the
question responsively.

MR. BALL:  Objection.
Harassment.

MR. SLATER:  It's not
harassment, because, Counsel, you're
sitting there smiling, as if you think
this is a good idea that your client
has been doing this for over two hours
and has taken most of the time with
nonresponsive answers.

MR. BALL:  Adam, I cannot help
the questions you ask.

MR. SLATER:  No, he's not
answering.

Did I ask him what language it
was written in?  No.  So why don't you
tell him, please, "Sir, don't tell him

Confidential Information - Subject to Protective Order

Page 74

1  what language it's in if he didn't ask
2  that question."
3        I mean, I don't understand why
4  you wouldn't want to cooperate in good
5  faith.
6        MR. BALL:  We are cooperating
7  in good faith.
8        MR. SLATER:  No, you're not.
9        MR. BALL:  It's your questions.
10 BY MR. SLATER:
11     Q.   Okay.  So now we'll go to the
12 next question.
13       In the Explanation Section, it
14 says, "This is a process change for current
15 Valsartan manufacturing process II," then in
16 parentheses, "(triethylamine hydrochloride
17 process) in Workshop II.  In crude product
18 preparation process the catalyst for
19 tetrazole forming reaction is changed from
20 triethylamine hydrochloride to zinc chloride.
21 In order to enhance conversion rate, reduce
22 the level of D-valsartan via racemization and
23 improve the yield or output quality of crude
24 product.  The bond acid reagent in acylation

Page 75

1  reaction process is changed to reduce cost.
2  The process validation studies would be
3  arranged in Workshop II of Chuannan East
4  Zone."
5        My only question is, did you
6  see what I just read?  It's a yes-or-no
7  question.
8        MR. BALL:  Objection to form.
9     A.    What I read in the Explanation
10 Section on the screen is basically consistent
11 from the interpreter's interpretation of the
12 opposing counsel's question.
13 BY MR. SLATER:
14     Q.    Let's go to the next page,
15 page 3.
16       Under the "TE" section, in the
17 Explanation Section it says, "This change
18 request is agreed.  The process validation
19 should be performed.  The manufacturing
20 process instructions and batch record shall
21 be revised.  The stability studies shall be
22 conducted.  Yang Kai, November 27, 2011."
23       Do you see what I just read?
24     A.    On the screen under the TE

Page 76

1  section in the Explanation Section, the
2  description in Chinese is basically
3  consistent with the interpreter's translation
4  of the opposing counsel's question.
5     Q.    What is "process validation" as
6  that term is used there?
7     A.    Process validation is one of
8  the managed activities under GMP.
9     Q.    What is process validation
10 supposed to accomplish?
11    A.    The purpose of a process
12 validation depends on the description
13 specified in the process change plan.  Or
14 process validation plan, that is.
15    Q.    Go to the next page.
16       Looking at Section 3 for the
17 quality control department, in the
18 Explanation Section it says, "The residue of
19 zinc chloride and residue of solvents used in
20 the process need to be tested for quality
21 review.  The relevant method validation
22 should be completed."
23       Do you see that?
24    A.    On the screen, under the

Page 77

1  section of quality control department in the
2  Explanation Section, the description in
3  Chinese is basically consistent with the
4  interpretation of the plaintiffs' original
5  statement.
6     Q.    The reason this -- rephrase.
7        One of the reasons for this
8  quality review is to identify any impurities
9  due to the new process, correct?
10       MR. BALL:  Objection to form.
11    A.    I don't understand what the
12 opposing counsel is referring to by "this
13 review."
14 BY MR. SLATER:
15    Q.    The quality review that is
16 referenced in the Explanation Section that I
17 just read.
18    A.    Can you repeat the complete
19 question again?
20       MR. SLATER:  Read it back to
21 him, please.  The interpreter.  You
22 can read it back to him, right?  I
23 don't need to ask it again.  You have
24 it.  Just please read it back to him

Page 78

1  again.
2      THE INTERPRETER:  For the
3  record, the interpreter is asked to
4  repeat the rendition of a previous
5  question.
6      A.   The QC department will, based
7  on its departmental responsibility as well as
8  the content of the change application, to
9  conduct an assessment.
10     MR. SLATER:  Move to strike.
11     MR. BALL:  Oppose the motion.
12 BY MR. SLATER:
13     Q.   Let's go now to the bottom of
14 the document, the regulatory affairs section,
15 please.
16     Looking at the bottom of the
17 document, the regulatory affairs section, in
18 the explanation, the third sentence says,
19 "This change is critical, and CEP major
20 changes procedure would be applied."
21     That's what it says, right?
22     A.   On the screen in the section of
23 RA department in the Explanation Section, the
24 third sentence here in this Chinese paragraph

Page 79

1  says, "This change is critical, and CEP" -- I
2  don't know how to pronounce the next English
3  word, which is followed by "changes would be
4  applied."
5      MR. SLATER:  Let's go to the
6  next page.  Perfect.
7      Q.   Looking now at Section 3, the
8  quality assurance section, line 23 says,
9  "Evaluate if it againsts cGMP code; (if so,
10 describe the article and reject it)."  And
11 the box for "No" is checked?
12     Do you see that?
13     A.   As shown on the screen, in the
14 section for quality assurance department,
15 line 23, it says here in Chinese, "Evaluate
16 if it is against the cGMP code; (if so,
17 describe the article that is against the code
18 and reject that change request)."  And the
19 "No" box next to it was checked.
20     Q.   If this change was against cGMP
21 code, it was supposed to be rejected.  That
22 is what that says, correct?
23     MR. BALL:  Objection.
24 Foundation.

Page 80

1      A.   This process change, as well as
2  the work we conducted, were done based on the
3  requirements of the SOP and the GMP.
4      MR. SLATER:  Move to strike.
5      MR. BALL:  Oppose the motion.
6  BY MR. SLATER:
7      Q.   I would appreciate it if you
8  would make an effort to answer my question,
9  Mr. Dong.
10     A.   I will tell the truth.
11     Q.   Okay.  Then let's tell the
12 truth in answering this question and actually
13 answer the question I ask.  That's what I'm
14 asking.
15     MR. BALL:  Objection to form.
16 BY MR. SLATER:
17     Q.   I'll try it one last time with
18 you on this one.  New question.
19     MR. SLATER:  Interpreter, are
20 you going to have to interpret what I
21 just did?  Because if you do, I'd
22 rather you do it before I ask the
23 question.
24     Q.   Line number 23 required that

Page 81

1  the change be rejected if this process change
2  did not comply in any way with cGMP, correct?
3      MR. BALL:  Objection to form.
4  BY MR. SLATER:
5      Q.   Yes or no.
6      A.   We conducted our work for any
7  changes based on the requirements of our SOP
8  as well as the GMP.
9      MR. SLATER:  Move to strike.
10 That's not what I asked.
11     MR. BALL:  Oppose the motion.
12 BY MR. SLATER:
13     Q.   Mr. Dong, you took an oath to
14 answer these questions, so please answer the
15 question.
16     MR. BALL:  Objection.
17     A.   I will tell the truth.
18     For the process changes, we
19 conducted our work under the condition of
20 being in compliance with the SOP and the GMP.
21 BY MR. SLATER:
22     Q.   If your company did not comply
23 with your SOPs -- rephrase.
24     If your company did not comply

Page 82

1 with GMP, the process change never should
2 have been -- let me rephrase it. Let's get
3 to the cut. Let's get to it. Hang on.
4         Your company was legally
5 required to comply with GMP with the process
6 change, correct?
7         MR. BALL: Objection to form.
8     A.    What legal requirements are you
9 referring to?
10 BY MR. SLATER:
11     Q.    The regulations of the United
12 States of America, including the FDA.
13         MR. BALL: Objection to form.
14     A.    We conducted our work for our
15 process change under the premise that they
16 are in compliance with the requirement of
17 GMP, including the US GMP.
18         MR. SLATER: Move to strike.
19         MR. BALL: Oppose the motion.
20 BY MR. SLATER:
21     Q.    What I asked is if your company
22 was required to comply with GMP in order to
23 be in compliance with United States law.
24         MR. BALL: Objection to form.

Page 83

1 BY MR. SLATER:
2     Q.    I didn't ask if you did comply;
3 I asked if you were required to comply. Yes
4 or no.
5         MR. BALL: Objection to form.
6     A.    We would conduct our work in
7 compliance with the corresponding
8 requirements of GMP and SOP.
9         MR. SLATER: Move to strike.
10         MR. BALL: Oppose the motion.
11         MR. SLATER: All right. We'll
12 just keep making our record. I mean,
13 I just can't get an answer to a
14 question from this witness.
15         Scroll down a little more,
16 Cheryll, please.
17         Thanks. Perfect.
18     Q.    Here on page 5 of this document
19 in the Explanation Section, number 1, it says
20 "Technology department prepare process
21 validation protocol, and organize process
22 validation."
23         Do you see that?
24     A.    On the screen, in the

Page 84

1 Explanation Section on the first line, there
2 was a sentence in Chinese which fits this
3 description.
4     Q.    With regard to this change for
5 this API, what was the purpose of the process
6 validation?
7     A.    As for the purpose of the
8 process validation for valsartan this time, I
9 need to check the process validation plan.
10     Q.    What was the purpose of the
11 process validation?
12     A.    Which process validation are
13 you referring to?
14     Q.    The process validation referred
15 to in this document for this process change
16 that you were designated by your company to
17 testify about.
18     A.    As for the purpose of the
19 process validation for this proposed process
20 change for the valsartan, I need to check the
21 process validation plan in order to provide
22 you with an accurate answer.
23         In general, process validation
24 is to confirm whether the product can be

Page 85

1 stably manufactured under the current scale
2 of the process.
3     Q.    Mr. Dong, did you say you have
4 two computer screens in front of you?
5     A.    That is correct.
6     Q.    So you can actually -- when I
7 ask a yes-or-no question, you can actually
8 answer the question with a yes or no when you
9 choose to, apparently, is that correct?
10         MR. BALL: Objection to form.
11     A.    Can you repeat your question
12 here?
13 BY MR. SLATER:
14     Q.    No, I can't.
15         Your company was supposed to
16 perform a risk assessment as part of the
17 process validation -- rephrase.
18         Your company was supposed to
19 perform a risk assessment as part of the
20 process change evaluation, correct?
21         MR. BALL: Objection to form.
22     A.    What do you mean by "was
23 supposed to"?
24         ///

Confidential Information - Subject to Protective Order

BY MR. SLATER:

Q.    Required to.

A.    We conducted corresponding work based on the requirements of ICH and SOP.

MR. SLATER:  Move to strike.

MR. BALL:  Oppose the motion.

BY MR. SLATER:

Q.    I didn't ask you what you did; I asked you what you were required to do.  So please answer that question.

A.    We conducted corresponding work based on the requirements of ICH and SOP.  I mean the ICH and SOP at that time.

MR. SLATER:  Move to strike.

MR. BALL:  Oppose the motion.

BY MR. SLATER:

Q.    Was your company required to perform a risk assessment in connection with the process change to the zinc chloride process?  Yes or no.

A.    In 2011 for the process change using zinc chloride for valsartan, we conducted corresponding work based on the requirements of ICH and SOP at that time.

MR. SLATER:  Move to strike.

MR. BALL:  Oppose the motion.

MR. SLATER:  For the interpreter, I think we might be at your time.  I can continue, but I just want to make sure.  Someone just pinged me that you might be up to your time.

MR. BALL:  Yeah, we're at 63 minutes, Adam.

MR. SLATER:  All right.  Let's go off the record.

THE VIDEOGRAPHER:  The time is 10:56 a.m.  Off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 11:15 a.m.  Back on the record.

MR. SLATER:  Let's go now, Cheryll, please, to Attachment 2.  Perfect.

BY MR. SLATER:

Q.    This is Attachment 2 to the change request form.

What is the purpose of Attachment 2 as part of this document?  Why is it there?

A.    On the screen it is shown the Attachment 2 to the change request form for the zinc chloride process change in 2011.  Attachment 2 is the change action list.

Q.    What is the change action list?  What is the significance of that?

A.    The change action list details the actions each department needed to take.

Q.    Those actions had to be taken in order for the change to be approved, correct?

A.    The change action list is required by the SOP as one of the requirements.

Q.    Item number 5 --

MR. SLATER:  Let's go down to number 5, please, Cheryll.

Q.    Item number 5 indicates that regulatory affairs updates the DMF and notifies customers and authorities, correct?

A.    The Chinese writing in item

number 5 on the screen does say so.

Q.    Go to the next page, please.  The Bates number is 073, are the last three digits.

MR. SLATER:  And please go to item 5 as well, Cheryll.

Q.    This page indicates that all actions had been implemented, the change control could be approved and closed, correct?

A.    I'm sorry.  I'm not sure which section the plaintiffs' attorney is referring to specifically.

Q.    In the top section, number 1, "If all actions have been implemented?"  It says "Yes."

Number 2 says, "If approve to close up the change control?"  And it says "Yes."  Correct?

A.    That is correct.

Q.    Number 3 says that the first product batch number produced after the change would be number C5355-12-001, correct?

A.    That is correct.

Confidential Information - Subject to Protective Order

Page 90

1    Q.    Going now in the Explanation
2  Section, number 5 says, "December 20, 2013,
3  regulatory affairs completed the DMF update,
4  submission to authority and notification to
5  customers."  Correct?
6    A.    On the screen in the
7  Explanation Section, there is a paragraph,
8  item number 5, it says, "On December 20,
9  2013, the regulatory affairs department
10 completed the update of the DMF document and
11 submitted it to the authority, in addition to
12 notification to the customers."
13   Q.    Why was it required as part of
14 this process change to update the DMF?
15   A.    Our process change requires the
16 approval from FDA, per FDA's regulations, in
17 order to implement the change in the US
18 market.  That's the reason why the DMF
19 document needed to be updated.
20   Q.    Are you aware that the FDA
21 doesn't approve a DMF?
22        MR. BALL:  Objection to form.
23 Outside the scope of the 30(b)(6).
24        I assume you're asking him in

Page 91

1  his individual capacity, Adam?
2        MR. SLATER:  I'm asking -- it's
3  part of their change control request
4  document.  It's part of his topic.
5  This document is at the heart of his
6  topic.  I just --
7        MR. BALL:  Adam, I'm asking --
8  Adam, I'm asking you if you're asking
9  him in his individual capacity whether
10 or not he knows it's something that
11 FDA requires or doesn't require.
12        MR. SLATER:  I'm asking him in
13 his capacity as a 30(b)(6) witness who
14 just made an affirmative statement in
15 his capacity as a 30(b)(6) witness.
16        He said something, and I'm
17 asking him a question about what he
18 said as an answer to a question within
19 the scope of his topic.
20        MR. BALL:  I believe it's
21 outside the scope.
22        He can answer.
23        THE INTERPRETER:  Counsel, does
24 the interpreter need to translate the

Page 92

1  dialogue between the counsel?
2        MR. SLATER:  No.  No.
3    A.    I don't remember the pending
4  question.
5  BY MR. SLATER:
6    Q.    Are you aware that the FDA does
7  not approve a DMF?  It's not for that
8  purpose?
9        MR. BALL:  Same objection.
10 BY MR. SLATER:
11   Q.    Are you aware of that?
12   A.    The question from the
13 plaintiffs' attorney was indeed beyond the
14 scope of my testimony as the corporate
15 witness.
16        However, based on the personal
17 understanding, for our process change, we
18 were obligated to submit the updated DMF
19 document to FDA for the authority.
20   Q.    You were required by your
21 internal standard operating procedures, but
22 the FDA did not actually approve the DMF,
23 correct?
24        MR. BALL:  Objection to form,

Page 93

1  and outside the scope.
2    A.    Counsel's question was indeed
3  beyond the scope of my testimony as a
4  corporate witness.
5        MR. BALL:  He should answer
6  anyway, if he can.
7    A.    However, to the best of my
8  personal knowledge, it was our regulatory
9  affairs department's responsibility to
10 conduct the communication between ZHP and the
11 authorities.  That's their job description.
12 BY MR. SLATER:
13   Q.    We'll come back to the DMF in a
14 second.
15        Are you -- you said before
16 you're looking at two screens, right?
17   A.    That is correct.
18   Q.    All right.  What's on the two
19 screens?
20   A.    The computer I'm using right
21 now is the one that I use to conduct this
22 Zoom meeting.  On the screen it shows the
23 exhibit.
24        The other computer shows the

Confidential Information - Subject to Protective Order

Page 94

1 screen saver right now.  There's nothing
2 ongoing in the other computer.
3     Q.    When I asked you the questions
4 about the DMF, why did you say that the
5 question was beyond the scope of the topics
6 of your testimony as a corporate witness?
7 Why did you say that?
8     A.    As a corporate witness, I am
9 supposed to, or I am responsible for the
10 discussion regarding those topics.
11    Q.    Do you remember the beginning
12 of the deposition when you couldn't remember
13 the topics?
14        MR. BALL:  Objection to form.
15 BY MR. SLATER:
16    Q.    Now you're an expert on the
17 topics --
18        MR. BALL:  Objection to form.
19 BY MR. SLATER:
20    Q.    -- and you repeat objections?
21 Why is that, sir?
22        MR. BALL:  Objection to form.
23    A.    As for the questions I'm
24 supposed to answer as a corporate witness, I

Page 95

1 do have some understanding, or I may say I do
2 recall some of the topics.
3        However, if you ask me to
4 accurately recite all the topics I need to
5 respond to as a corporate witness or you want
6 me to give an accurate response to my
7 questions as to what topics I'm supposed to
8 answer as a corporate witness, I would like
9 you to present that document to me for my
10 response.
11        MR. BALL:  And, for the record,
12    that was the first document that
13    Mr. Slater put up, and he did not show
14    any of the corporate topics.
15        MR. SLATER:  I'm not really
16    sure why I would.  Your client doesn't
17    read English.
18        MR. BALL:  You could have had
19    them translated, Adam, by the
20    translator.  That's why we have him.
21        MR. SLATER:  I didn't think it
22    was necessary for what I wanted to ask
23    him.  But thank you for your kind
24    advice.

Page 96

1 BY MR. SLATER:
2     Q.    When you said the question was
3 beyond the scope of your testimony, did you
4 come up with that on your own, or were you
5 repeating the objection by your attorney?
6        MR. BALL:  Objection to form.
7     A.    I came up with the
8 corresponding judgment.  That was because my
9 obligation was to answer the questions
10 related to the technical department.
11        As for the DMF document, that
12 was related to the regulatory affairs
13 activities.  I believe the colleagues of mine
14 from the regulatory affairs department should
15 answer those questions.
16 BY MR. SLATER:
17    Q.    The change request form --
18 rephrase.
19        You agree with me that any
20 information put in that DMF based on this
21 change process needed to be completely
22 accurate, correct?
23        MR. BALL:  Objection to form.
24        And outside of the scope of the

Page 97

1 30(b)(6) topics.
2     A.    I do not understand what the
3 opposing counsel was referring to with regard
4 to any DMF information.
5 BY MR. SLATER:
6     Q.    Okay.  Go to the next page,
7 please.  This is -- let me just get to it.
8        On the English, it's 074 is the
9 last three digits -- I'm not done.  And in
10 the Chinese, it's 0169 are the last digits of
11 the Bates number.
12        Section -- rephrase.
13        The title of this page says
14 "Valsartan Process II (Zinc Chloride Process)
15 Changes Summary," and Section I is "Reasons
16 for Changes."
17        And it says in the first
18 paragraph, "There were some defects and
19 inadequacies for the previous manufacturing
20 process of Valsartan, such as the low yield
21 in some steps, high production cost, three
22 wastes pollution problems, etcetera."
23        Do you see where I just read?
24    A.    On the screen, I did find what

Confidential Information - Subject to Protective Order

Page 98

1   the interpreter provided as the rendition.
2       Q.    In Section I on page Bates 0169
3   under "Reasons for Changes," in the third
4   line it says, "From 2010, ZHP had
5   commissioned Shanghai SynCore Technologies,
6   Inc. to optimize the previous synthesis
7   process of Valsartan (Process II,
8   Trimethylamine Hydrochloride Process),
9   focusing on the new tetrazole formation
10  process development of crude step."
11      Do you see that?  I want to ask
12  you a question about it.  Literally the
13  question is, do you see that.
14      A.    On the screen, I do see the
15  interpreter's rendition of the opposing
16  counsel's statement.  However, it is just one
17  sentence in the paragraph under Section I.
18      MR. SLATER:  Move to strike
19      that last part saying it was just one
20      sentence.
21      MR. BALL:  Oppose the motion.
22  BY MR. SLATER:
23      Q.    Further down in that paragraph,
24  there's a reference to "the lab-scale studies

Page 99

1   results (R&D report No.: SC-1141)."
2       What does that mean, "lab-scale
3   studies results"?
4       A.    On the screen under Section I,
5   reasons for the change, the paragraph under
6   it, in the last sentence there was this
7   reference based on the lab study -- lab-scale
8   study results SC-1141.  That refers to the
9   research and development report provided by
10  Shanghai Kesheng Company Limited, Kesheng
11  spelled as K-E-S-H-E-N-G Company Limited.
12      MR. SLATER:  Move to strike.
13      MR. BALL:  Oppose the motion.
14  BY MR. SLATER:
15      Q.    What was the purpose of the
16  lab-scale studies results referred to under
17  Section I where it says "Reasons for
18  Changes"?
19      A.    The lab-scale study result
20  mentioned in the Reasons for Changes under
21  Section I of this document on the screen
22  refers to the lab-scale study report provided
23  by Kesheng, spelled as K-E-S-H-E-N-G.
24      MR. SLATER:  For the

Page 100

1   interpreter, it says "Shanghai
2   SynCore," so I don't know why you keep
3   saying "Kesheng."  I'm not sure where
4   Kesheng is coming from.  It says
5   SynCore in this.  I don't know what
6   Kesheng is.
7       THE INTERPRETER:  For the
8   record, the English document had a
9   misinterpretation.  The interpreter
10  provided the rendition based on the
11  witness' testimony, which was
12  consistent with what's written here in
13  Chinese.
14      MR. SLATER:  I mean, my
15  checkers don't agree, but -- I don't
16  know what to do.
17      MR. BALL:  Hey, Adam?  To the
18  best of my knowledge, it's referring
19  to SynCore also.  Just putting that
20  out there.
21      MR. SLATER:  Yeah.  I would
22  think it's got to be accurate.
23      MR. BALL:  Right.
24      MR. SLATER:  If SynCore -- it

Page 101

1   was carefully, I assume, translated
2   into the English here.
3       MR. BALL:  Yeah.  So, to the
4   best of my knowledge, it's SynCore
5   also.  So...
6       MR. SLATER:  Okay.  I guess
7   I'll move to strike because I still
8   don't --
9       THE INTERPRETER:  The
10  interpreter --
11      MR. SLATER:  -- know what the
12  purpose of the lab-scale studies was,
13  but it's okay.
14      THE INTERPRETER:  The
15  interpreter interprets what he hears.
16      MR. SLATER:  Yeah.  No, I
17  understand.  I'm just -- we're trying
18  to figure out why he's saying
19  "Kesheng" when the official document
20  from ZHP says "Shanghai SynCore" as
21  the interpretation.  So I'm trying to
22  figure out why he'd be saying
23  "Kesheng" if the English document says
24  "Shanghai SynCore Technologies."

Page 102

BY MR. SLATER:
Q.   Let's go to Section II.
MR. BALL:  I'm sorry.  What are we doing?
MR. SLATER:  Looking at Section II.  Yeah, let me -- I'll start over.
We're looking at Section II.
I don't know where we're going there.  You don't have to scroll down.
MR. BALL:  Yeah, I'm sorry.  I thought you said "go back to."  That's why I was confused.
MR. SLATER:  No, no.  I'm talking to Cheryll.  I actually didn't want to -- yeah, keep going a little bit more.
Perfect.  And you'll just walk down with me, Cheryll.
BY MR. SLATER:
Q.   Under Section II, there's a box titled "Raw Materials Changes Comparison."
Let's go to the next page now, where there's the comparison of the raw materials.

Page 103

I'm withdrawing the question.  I'm going to go to the next section.  I'm sorry.  I'm going to go to the next section.
Looking now at the box titled 2 on -- 170 is the Bates number.  The box starts on that page, and the title is "Main Materials Charging and Production Capacity Comparison."  And if we scroll to the next page --
MR. SLATER:  I want to go to the middle of the page, please.
Q.   If you go down to the "Crude" section, this indicates that triethylamine hydrochloride was replaced with zinc chloride.
Do you see that?
A.   On the screen in a box for crude product step, the description in Chinese does say that triethylamine hydrochloride was replaced with zinc chloride.
However, the title of this table that the opposing counsel just referred to cannot be seen on the screen.

Page 104

MR. SLATER:  Move to strike from "however" forward.
MR. BALL:  Oppose the motion.
BY MR. SLATER:
Q.   The next line is "Sodium azide," and it says 112.5 kilograms is replaced by sodium azide 250 kilograms.
Do you see that?
A.   On the screen, in the box for crude products step, there is a line where the Chinese indicates that sodium azide was increased from 112.5 kilograms to 250 kilograms.
Q.   If you go down three more boxes, it indicates that sodium nitrite was increased from 100 kilograms to 250 kilograms, correct?
A.   On the screen, in the box for crude product step, there was a line where the Chinese description indicates the amount of sodium nitrite used was increased from 100 kilograms to 250 kilograms.
Q.   And if we go up to the prior box for a moment -- you can leave it where it

Page 105

is because we can see the last entry -- this indicates in the "Acylation" section that DMF, dimethylformamide, had been added to the process, correct?
A.   On the screen, in the box for the staff of acetylation --
THE INTERPRETER:  The interpreter's correction.
A.   On the screen, in the box of "Acylation," there is a line where it indicated that DMF was added to the process.
Q.   As part of the change control process, these changes in the substances used to manufacture valsartan had to be evaluated for impurities, correct?
MR. BALL:  Objection to form.
A.   We conducted corresponding work based on the requirements of ICH and SOP.  What I mean is the ICH and SOP at that time.
BY MR. SLATER:
Q.   So your answer is yes, you were required to perform a risk assessment for potential impurities resulting from these changes in the substances used to manufacture

Confidential Information - Subject to Protective Order

Page 106

1    valsartan, correct?
2          MR. BALL:  Objection to form.
3          THE VIDEOGRAPHER:  It's just
4    his connection.
5          MR. BALL:  I was going to say,
6    did we just lose his connection?
7          THE VIDEOGRAPHER:  That's his
8    internet lagging behind.  We're going
9    to know in about five to ten seconds
10   if he disconnected or not, or whether
11   he regroups.
12         I think he's going to
13   disconnect.  Do you guys want to go
14   off the record?
15         MR. BALL:  Why don't we go off
16   the record.
17         THE VIDEOGRAPHER:  The time is
18   12:04 p.m.  Off the record.
19         (Off the record.)
20         THE VIDEOGRAPHER:  The time is
21   12:05 p.m.  We are back on the record.
22    A.   I'm sorry, I just lost the
23   connection.  Would the interpreter like me to
24   repeat my response?

Page 107

1    BY MR. SLATER:
2     Q.   Yes.
3     A.   Just now the plaintiffs'
4    attorney failed to accurately describe what I
5    wanted to express.
6          What I wanted to express is
7    that in 2011 for the process change using
8    zinc chloride in the manufacturing of
9    valsartan, based on the ICH and SOP at that
10   time, we conducted corresponding work.
11         MR. SLATER:  Move to strike.
12         MR. BALL:  Oppose the motion.
13   BY MR. SLATER:
14    Q.   Underneath the box where I was
15   just reading from, in number 1 it says that
16   "The tetrazole formation system is changed
17   and the quantity of sodium azide is
18   increased," correct?
19    A.   On the screen, in the box for
20   crude product step, there is a sentence in
21   Chinese which says, "For crude product, the
22   tetrazole reaction system has changed.  The
23   amount of sodium azide used is increased."
24   This sentence is just one sentence among many

Page 108

1    sentences in this box.
2          MR. SLATER:  Move to strike the
3    observation that "This is just one
4    sentence."
5     Q.   I thank you for telling me
6    that.
7          MR. BALL:  Oppose the motion.
8    BY MR. SLATER:
9     Q.   Number 2 says, "Sodium azide
10   used for the quenching is increased due to
11   the increase of sodium azide."
12         That should actually say sodium
13   nitrite used for the quenching is increased,
14   correct?
15    A.   On the screen, in a box for
16   crude product step, there is a sentence in
17   Chinese which says, "The amount of sodium
18   nitrite used in the quenching step was
19   increased because that was a corresponding
20   increase based on the increase of the charged
21   amount of sodium azide."
22         Over here the wording "sodium
23   nitrite used in the quenching" means the
24   amount of sodium nitride used in the

Page 109

1    quenching step.
2     Q.   Thank you for that.
3          So in the Chinese, it's
4    accurate.  The English translation said
5    "sodium azide used for the quenching."  It
6    should have said "sodium nitrite"?
7     A.   I am sorry.  I cannot read the
8    English version.  The interpreter did not
9    translate the English version to me, so I
10   have no idea what the English version says.
11         MR. SLATER:  Go to, if we
12   could -- you know, I just looked at
13   what time it is.  We can go off the
14   record and break for the night.
15         MR. BALL:  Okay.  Can I get
16   when we go off how much time we've
17   gone total?
18         THE VIDEOGRAPHER:  We went for
19   four hours and 12 minutes.
20         But the time is 12:14 p.m.  We
21   are going off the record.
22         (Whereupon, the deposition was
23   adjourned.)
24

Confidential Information - Subject to Protective Order

Page 110

CERTIFICATE

1
2
3      I, MAUREEN O'CONNOR
POLLARD, Registered Diplomate
4  Reporter, Realtime Systems
Administrator, and Certified Shorthand
5  Reporter, do hereby certify that prior
to the commencement of the
6  examination, PENG DONG, was remotely
duly identified and sworn by me to
7  testify to the truth, the whole truth,
and nothing but the truth.
8          I DO FURTHER CERTIFY that
the foregoing is a verbatim transcript
9  of the testimony as taken
stenographically by and before me at
10  the time, place, and on the date
hereinbefore set forth, to the best of
11  my ability.
12          I DO FURTHER CERTIFY that
I am neither a relative nor employee
13  nor attorney nor counsel of any of the
parties to this action, and that I am
14  neither a relative nor employee of
such attorney or counsel; and that I
15  am not financially interested in the
action.
16
17
18  _____
19  MAUREEN O'CONNOR POLLARD
NCRA Registered Diplomate Reporter
20  Realtime Systems Administrator
Certified Shorthand Reporter
21  Notary Public
22  Dated:  March 30, 2021
23
24

Page 111

INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.  It will be
10  attached to your deposition.
11      It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt
14  of the deposition transcript by you.  If you
15  fail to do so, the deposition transcript may
16  be deemed to be accurate and may be used in
17  court.
18
19
20
21
22
23
24

Page 112

1      - - - - - -
E R R A T A
2      - - - - - -
3  PAGE  LINE  CHANGE
4  ___ ___ _____
5    REASON: _____
6  ___ ___ _____
7    REASON: _____
8  ___ ___ _____
9    REASON: _____
10  ___ ___ _____
11    REASON: _____
12  ___ ___ _____
13    REASON: _____
14  ___ ___ _____
15    REASON: _____
16  ___ ___ _____
17    REASON: _____
18  ___ ___ _____
19    REASON: _____
20  ___ ___ _____
21    REASON: _____
22  ___ ___ _____
23
24

Page 113

1
2  ACKNOWLEDGMENT OF DEPONENT
3
4      I, _____, do
Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9
10  _____
PENG DONG                    DATE
11
12
13
14
15
16
17  Subscribed and sworn
To before me this
18  _____ day of _____, 20____.
19  My commission expires: _____
20  _____
21  Notary Public
22
23
24

Page 114

1        LAWYER'S NOTES
2   PAGE  LINE
3   ____ ____ _____
4   ____ ____ _____
5   ____ ____ _____
6   ____ ____ _____
7   ____ ____ _____
8   ____ ____ _____
9   ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____