Exhibit 45

Confidential Information - Subject to Protective Order

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2                 CAMDEN VICINAGE

3                    -   -   -

    IN RE:  VALSARTAN,      :   MDL NO. 2875
4   LOSARTAN, AND           :
    IRBESARTAN PRODUCTS      :   CIVIL NO.
5   LIABILITY LITIGATION     :   19-2875
    _____   :   (RBK/JS)
6                            :

    THIS DOCUMENT APPLIES   :   HON. ROBERT
7   TO ALL CASES            :   B. KUGLER

8          - CONFIDENTIAL INFORMATION -
            SUBJECT TO PROTECTIVE ORDER
9
                     VOLUME II
10
                     -   -   -
11
                   May 28, 2021
12
                     -   -   -
13

14          Continued videotaped remote
    deposition of JUN DU, taken pursuant to
15  notice, was held via Zoom
    Videoconference, beginning at 9:12 a.m.,
16  EST, on the above date, before Michelle
    L. Gray, a Registered Professional
17  Reporter, Certified Shorthand Reporter,
    Certified Realtime Reporter, and Notary
18  Public.
19
                     -   -   -
20

21          GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
22              deps@golkow.com
23
24

---

Page 218

1
2    ZOOM APPEARANCES:
3    MAZIE SLATER KATZ & FREEMAN, LLC
     BY:  ADAM SLATER, ESQ.
4        CHERYLL A. CALDERON, ESQ.
         CHRISTOPHER J. GEDDIS, ESQ.
5        MICHAEL R. GRIFFITH, ESQ.
         JULIA S. SLATER, ESQ.
6    103 Eisenhower Parkway, 2nd Floor
     Roseland, New Jersey 07068
7    (973) 228-9898
     aslater@mazieslater.com
8    ccalderon@mazieslater.com
     cgeddis@mazieslater.com
9    mgriffith@mazieslater.com
     jslater@mazieslater.com
10   Representing the Plaintiffs
11   GOLDENBERG LAW, PLLC
     BY:  MARLENE J. GOLDENBERG, ESQ.
12   800 LaSalle Avenue, Suite 2150
     Minneapolis, Minnesota 55402
13   (612) 436-5028
     mjgoldenberg@goldenberglaw.com
14   Representing the Plaintiffs
15
     FARR LAW FIRM, P.A.
16   BY:  GEORGE T. WILLIAMSON, ESQ.
     99 Nesbit Street
17   Punta Gorda, Florida 33950
     (941) 639-1158
18   gwilliamson@farr.com
     Representing the Plaintiffs
19
20   FLEMING NOLEN JEZ, LLP
     BY:  DAVID HOBBS, ESQ.
21   2800 Post Oak Boulevard, Suite 4000
     Houston, Texas 77056
22   (713) 621-7944
     david_hobbs@fleming-law.com
23   Representing the Plaintiffs
24

---

Page 219

1
2    ZOOM APPEARANCES:  (Cont'd.)
3    LOWEY DANNENBERG, P.C.
     BY:  ANTHONY CHRISTINA, ESQ.
4    One Tower Bridge
     100 Front Street, Suite 520
5    Bridgeport, Pennsylvania 19428
     (215) 399-4782
6    Achristina@lowey.com
     Representing the Plaintiffs
7
8    HOLLIS LAW FIRM, P.A.
     BY:  IRIS SIMPSON, ESQ.
9    8101 College Boulevard
     Suite 260
10   Overland Park, Kansas 66210
     (913) 385-5400
11   isimpson@hollislawfirm.com
     Representing the Plaintiffs
12
13   MORGAN & MORGAN
     BY:  HANNAH FUJIMAKI, ESQ.
14       STEPHANIE JACKSON, ESQ.
15   600 N, Pine Island Road
     Suite 400
16   Plantation, Florida 33324
     (954) 318-0268
17   hfujimaki@forthepeople.com
     sjackson@forthepeople.com
18   Representing the Plaintiffs
19
20   RIVERO MESTRE LLP
     BY:  CHARLIE WHORTON, ESQ.
21   2525 Ponce De Leon Boulevard
     Miami, Florida 33134
22   (305) 455-2500
     cwhorton@riveromestre.com
23   Representing the Plaintiffs
24

---

Page 220

1
2    ZOOM APPEARANCES:  (Cont'd.)
3    DUANE MORRIS, LLP
     BY:  SETH A. GOLDBERG, ESQ.
4        BARBARA G. SCHWARTZ, ESQ.
         RAYMOND VANDERHYDEN, ESQ.
5    30 South 17th Street
     Philadelphia, Pennsylvania 19103
6    (215) 979-1164
     sagoldberg@duanemorris.com
7    baschwartz@duanemorris.com
     ravanderhyden@duanemorris.com
8            - and -
9    DUANE MORRIS, LLP
     BY:  GREGORY D. HERROLD, ESQ.
10   1940 Route 70 East, Suite 100
     Cherry Hill, New Jersey 08003
11   (856) 874-4225
     Gdherrold@duanemorris.com
12   Representing the Defendants, Zhejiang
     Huahai Pharmaceutical Co., Ltd., Prinston
13   Pharmaceutical Inc., Huahai U.S., Inc.,
     and Solco Healthcare US, LLC
14
15   GREENBERG TRAURIG, LLP
     BY:  KATE WITTLAKE, ESQ.
16   4 Embarcadero Center
     Suite 3000
17   San Francisco, California 94111
     (415) 655-1285
18   wittlakek@gtlaw.com
     Representing the Defendants, Teva
19   Pharmaceutical Industries, Ltd., Teva
     Pharmaceuticals USA, Inc., Actavis LLC,
20   and Actavis Pharma, Inc.
21
22
23
24

---

Page 221

1
2    ZOOM APPEARANCES:  (Cont'd.)
3    PIETRAGALLO GORDON ALFANO BOSICK &
     RASPANTI, LLP
4    BY:  FRANK H. STOY, ESQ.
     One Oxford Centre
5    38th Floor
     Pittsburgh, Pennsylvania 15219
6    (412) 263-1840
     fhs@pietragallo.com
7    Representing the Defendant, Mylan N.V.,
     Mylan Pharmaceuticals Inc., and Mylan
8    Laboratories Limited
9
     FALKENBERG IVES, LLP
10   BY:  KATHERINE PLOMINSKI-GLOEDE, ESQ.
     230 W. Monroe Street, Suite 2220
11   Chicago, Illinois 60606
     (312) 566.4808
12   KPG@falkenbergives.com
     Representing the Defendant, Humana
13
14
15   ALSO PRESENT:
16   Dr. Yang Shao
     (Interpreter)
17
     Evelyn Yang Garland
18   (Check Interpreter)
19   Phil Hughes
     (Check Interpreter)
20
     VIDEOTAPE TECHNICIAN:
21   (Judy Diaz)
22
23
24

---

Page 222

- - -

# I N D E X

- - -

Testimony of:

JUN DU

By Mr. Slater          226

- - -

# E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE

ZHP-433     Isolation and          244
            Identification
            Of Process Impurities
            (Jing Nie)

ZHP-434     E-mail Thread          275
            11/2/18
            Subject, Happy Chinese
            New Year!
            ZHP 00675949-56

Page 224

- - -

# DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 223

- - -

# P R E V I O U S L Y   M A R K E D
# E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE

ZHP-204     Deviation Report          287
            ZHP 00004352-71

ZHP-212     Investigation          251
            Report
            6/6/18
            ZHP 00662283-09

ZHP-213     Warning Letter          234
            11/29/18
            ZHP 01344159-64

ZHP-312     Establishment          230
            Inspection Report
            7/23/18
            PRINSTON 00162349-06

ZHP-319     E-mail Thread          280
            7/17/18
            Subject, Hello and
            Help
            CHARLESWANG 000447-49

ZHP-321     Concise          288
            International
            Chemical Assessment
            Document 38
            NDMA
            WHO 2002

Page 225

THE VIDEOGRAPHER:  We are now on the record.

My name is Judy Diaz, I'm a legal videographer for Golkow Litigation Services.

Today's date is May 28, 2021, and the time is 9:12 a.m.

This remote video deposition is being held in the matter of valsartan, losartan, and irbesartan products liability litigation MDL.

This is the continuation of the deponent Jun Du.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

All counsel will be noted on the stenographic record.

The court reporter is Michelle Gray.

The witness and interpreter

Confidential Information Subject to Protective Order

Page 226

1    are already under oath.
2              - - -
3          ... YANG SHAO and EVELYN
4    YANG GARLAND, having been
5    previously duly sworn, translated
6    Chinese to English, as follows:
7              - - -
8          ... JUN DU, having been
9    previously sworn, was examined and
10   testified as follows:
11             - - -
12       CONTINUED EXAMINATION
13             - - -
14   BY MR. SLATER:
15       Q.   On the screen we have
16   Exhibit 430.
17          Let's look at the bottom
18   paragraph on the first page please.
19          This is your letter to the
20   FDA August 26, 2018.
21          The bottom paragraph says --
22       MR. SLATER:  I'm sorry.
23   I'll start over.
24       THE WITNESS:  Can you give

Page 227

1    me a few seconds to take a look at
2    this document?
3    BY MR. SLATER:
4        Q.   Yeah, all right.  I didn't
5    even -- I was halfway through my question
6    so I'll start over.  But you can go ahead
7    and look first.
8        MR. SLATER:  Keep track of
9    the time, please.
10       THE WITNESS:  I'm ready.
11   BY MR. SLATER:
12       Q.   Looking now at Exhibit 430,
13   which is your August 26, 2018 letter to
14   the FDA.  I want to look at the bottom
15   paragraph on Page 1.
16          You wrote in this letter,
17   "One of the key questions about this
18   inspection as well as about our own
19   investigation is," quote -- and quoting
20   what the FDA asked -- "'why NDMA was not
21   detected or considered during the process
22   change from the triethylamine process to
23   zinc chloride process.'"
24          Do you see where that's

Page 228

1    stated at the bottom of the letter?
2        A.   Yes.
3        Q.   One thing I just want to
4    clarify is, in retrospect you also found
5    out that there was NDMA and NDEA from the
6    TEA process, the triethylamine process
7    with sodium nitrite quenching.  It turned
8    out that also had the nitrosamine
9    contamination, correct?
10       A.   One, that question was
11   responded at that time.  The issue of TEA
12   or NDEA was not discovered yet.  Besides
13   NDEA is not a contaminant, it is an
14   impurity rather.
15       Q.   Your response states, "As
16   revealed by our investigation, the
17   ultimate reason for the presence of NDMA
18   in valsartan API is due to this process
19   change in which the solvent
20   dimethylformamide (DMF) was introduced
21   and its impurity/degradant,
22   dimethylamine, unexpectedly reacts with
23   nitrous acid (generated in situ between
24   sodium nitrite and hydrochloric acid)

Page 229

1    during the subsequent quenching step in
2    the presence of the product of that
3    step."
4           That is what you told the
5    FDA in terms of why the NDMA formed with
6    the zinc chloride process, correct?
7        A.   That is correct.  That's
8    what this letter says.
9        Q.   And that change to the zinc
10   chloride process which led to this
11   process impurity of NDMA allowed you, and
12   allowed ZHP, to reduce costs and increase
13   yield for the valsartan API, correct?
14       A.   I believe it should be put
15   in this way.  Why we changed the process
16   was to improve the yield and reduce the
17   waste.  This would be a process that any
18   API manufacturer would pursue and with
19   the term "fast, effective."  This is
20   rather a normal activity or practice.
21       MR. SLATER:  Cheryll, let's
22   digress for a moment and go to
23   Exhibit 312, please, and then
24   we'll come back to this document.

Confidential Information - Subject to Protective Order

Page 230

1      Let's go if we could, to the
2  cover first.
3          (Previously marked Exhibit
4      ZHP-312.)
5  BY MR. SLATER:
6      Q.   Looking at Exhibit 312, this
7  is the FDA establishment inspection
8  report for the inspection from July 23,
9  2018 to August 3, 2018.  Do you see that
10 on the screen?
11     A.   Hold on, let me take a look.
12          Excuse me, what exhibit
13 number is this?
14     Q.   312.
15     A.   Thank you.  I see it.
16     Q.   Let's go, if we could, to
17 Page 25 of 58; the Bates number at the
18 bottom is Prinston00162373 for that page.
19          Perfect.
20     A.   Please allow me a few
21 seconds to review this EI report.
22          MR. SLATER:  Keep track of
23     the time, please.
24          THE WITNESS:  I'm ready.  I

Page 231

1  just finished reviewing.
2  BY MR. SLATER:
3      Q.   Looking now at the
4  paragraph, the short paragraph --
5  rephrase.
6          Looking at the paragraph in
7  the middle of the page which is reciting
8  the discussions with the FDA
9  investigators, it states in part,
10 "Mr. Jun Du, executive vice president,
11 apologized and stated the change control
12 should have stated the purpose of the
13 change was to save money.  Mr. Du further
14 stated the cost reduction was so
15 significant it is what made it possible
16 for the firm to dominant the world market
17 share."
18          The process change that's
19 being discussed there is the change to
20 the zinc chloride process, correct?
21     A.   Hold on.  I'm scrolling to
22 this page.
23          Yes, I see it.  That's what
24 the EI report says.

Page 232

1      Q.   Let's go back now to --
2      A.   However, I do not agree with
3  the statement here.  I did not make such
4  an apology, and I do not understand why
5  it was written here.  I did not state
6  that the cost reduction would cause
7  dominant world market share.
8      Q.   Let's go back to Exhibit 430
9  please.  Let's look now at Page 2 of the
10 letter.
11          Let's look now at the third
12 paragraph on the page, please.  Can
13 you -- rephrase.
14          Your letter to the FDA
15 states in the third paragraph on Page 2,
16 in the current -- excuse me, I've got to
17 start over.
18          Looking at Paragraph 3 on
19 Page 2 now, your letter states, "In the
20 current NDMA event, it is not the
21 residual DMF that reacts with nitrous
22 acid of the next step, but rather it is
23 the trace amount of dimethylamine, an
24 impurity/degradant of DMF that reacts

Page 233

1  with nitrous acid to form NDMA, which
2  adds a further dimension over the current
3  thinking, logic and strategy for the
4  evaluation of potential genotoxic
5  impurities.  It is this extra dimension
6  over the current industry practice that
7  obscured us from foreseeing this impurity
8  during the process change from
9  triethylamine process to zinc chloride
10 process."
11          That's what you told the FDA
12 in this letter to try to explain why your
13 company didn't realize when they
14 instituted the zinc chloride process that
15 it would be bringing in a risk of
16 creating NDMA, right?
17     A.   What are you referring to by
18 "the company"?
19     Q.   ZHP, who you were -- who you
20 were writing on behalf of -- rephrase.
21          ZHP, on whose behalf you
22 were writing this letter as executive
23 vice president.
24     A.   That is correct.  That's

Page 234

1 what ZHP wrote.
2     Q.   You signed the letter as
3 executive vice president of the company,
4 right?
5     A.   That is correct.  I signed
6 this letter on behalf of ZHP.
7         MR. SLATER:  Let's go now,
8     Cheryll if we could to
9     Exhibit 213, the FDA's response.
10         (Previously marked Exhibit
11     ZHP-213.
12 BY MR. SLATER:
13     Q.   On the screen we have
14 Exhibit 213, which is the FDA's
15 November 29, 2018 letter written in
16 response to your August 26, 2018 letter
17 that we were just discussing.
18     A.   Could you give me a few
19 seconds to review this document.  I am
20 ready.
21     Q.   First of all, in the middle
22 of the first page the fourth paragraph
23 down states, "We reviewed your August 26,
24 2018 response in detail and acknowledge

Page 235

1 receipt of your subsequent
2 correspondence."
3         The August 26th letter is
4 the letter we were just discussing prior
5 to this document, correct?
6     A.   That is correct.
7     Q.   Just above the sentence that
8 I just read, the FDA informed you, on
9 November 29, 2018, "Because your methods,
10 facilities, or controls for
11 manufacturing, processing, packing, or
12 holding do not conform to cGMP, your API
13 are adulterated within the meaning of
14 Section 501(a)(2)(B) of the Federal Food,
15 Drug, and Cosmetic Act, 21 U.S.C.
16 351(a)(2)(B)."
17         Do you know what adulterated
18 means?
19     A.   I do.
20     Q.   What does adulterated mean?
21     A.   What they meant was that it
22 was involved in a fraud or fake
23 substance.  However, this is their
24 uniform statement in the warning letter.

Page 236

1     If you try to find out what they
2 specifically referred to, you have to
3 resort to the text below.
4         MR. GOLDBERG:  Just note my
5     objection to the last question as
6     calling for a legal conclusion.
7 BY MR. SLATER:
8     Q.   Going up one more paragraph,
9 there's a single sentence paragraph that
10 says, "This warning letter summarizes
11 significant deviations from current good
12 manufacturing practice (cGMP) for active
13 pharmaceutical ingredients (API)."
14         And what I'd like to now do
15 is go through one of the specifics.  If
16 we can turn now to Page 4 of the letter,
17 which the Bates stamp is ZHP01344162 for
18 that page so we can look at one of the
19 specific examples.
20         And number -- rephrase.
21         Number 2, "Failure to
22 evaluate the potential effect that
23 changes in the manufacturing process may
24 have on the quality of your API."

Page 237

1         Again, the change they're
2 talking about here is the change to the
3 zinc chloride process, right?
4     A.   What they discussed here was
5 the zinc chloride process change for
6 valsartan.
7     Q.   The FDA specifically states,
8 "In November 2011 you approved a
9 valsartan API process change (PCRC -
10 110125) that included the use of the
11 solvent DMF."
12         That is what occurred as
13 part of the zinc chloride process change,
14 correct?
15     A.   That is correct.  It was
16 also approved by the FDA.
17     Q.   Your -- rephrase.
18         The FDA continues, "Your
19 intention was to improve the
20 manufacturing process, increase product
21 yield, and lower production costs.
22 However, you failed to adequately assess
23 the potential formation of mutagenic
24 impurities when you implemented the new

Confidential Information Subject to Protective Order

Page 238

¹ process. Specifically, you did not
² consider the potential for mutagenic or
³ other toxic impurities to form from DMF
⁴ degradants, including the primary DMF
⁵ degradant, dimethylamine. According to
⁶ your ongoing investigation, dimethylamine
⁷ is required for the probable human
⁸ carcinogen NDMA to form during the
⁹ valsartan API manufacturing process.
¹⁰ NDMA was identified in valsartan API
¹¹ manufactured at your facility."
¹²            And I want to stop there and
¹³ just confirm, when they talk about NDMA
¹⁴ was identified, they are talking about
¹⁵ NDMA in the valsartan API that was
¹⁶ manufactured with the zinc chloride
¹⁷ process, correct?
¹⁸      A.    The -- that is correct. The
¹⁹ FDA opined here that, retrospectively
²⁰ speaking, after the discovery of the
²¹ formation of NDMA, the decomposition or
²² degradation of DMF was not considered in
²³ the process change. However, when FDA
²⁴ approved this process change, they did

Page 239

¹ not consider the degradation of DMF
² either. Therefore, FDA considered this
³ impurity as an unexpected impurity.
⁴      Q.    The next paragraph of the
⁵ letter states -- rephrase.
⁶            The next paragraph of the
⁷ letter from the FDA says, "You also
⁸ failed to evaluate the need for
⁹ additional analytical methods to ensure
¹⁰ that unanticipated impurities were
¹¹ appropriately detected and controlled in
¹² your valsartan API before you approved
¹³ the process change. You are responsible
¹⁴ for developing and using suitable methods
¹⁵ to detect impurities when developing, and
¹⁶ making changes to your manufacturing
¹⁷ processes. If new or higher levels of
¹⁸ impurities are detected, you should fully
¹⁹ evaluate the impurities and take action
²⁰ to ensure the drug is safe for patients."
²¹            And when the FDA pointed out
²² that this was ZHP's manufacturing
²³ process, that was correct, ZHP developed
²⁴ the zinc chloride process, implemented

Page 240

¹ it, and used it to manufacture the API
² and finished dose that ZHP sold, correct?
³      A.    What you just read was
⁴ indeed the content of this warning letter
⁵ from the FDA.
⁶            Could you please repeat your
⁷ question?
⁸      Q.    When the FDA refers to your
⁹ manufacturing processes, that is correct,
¹⁰ ZHP developed the zinc chloride
¹¹ manufacturing process, ZHP implemented
¹² it, and the API manufactured with that
¹³ process was sold by ZHP, correct?
¹⁴      A.    The process change referred
¹⁵ to here was the zinc chloride process
¹⁶ change, which was also approved by the
¹⁷ FDA and used by ZHP in their
¹⁸ manufacturing. Prinston as the ANDA
¹⁹ holder also used the API approved by the
²⁰ FDA. Our company also sold this product
²¹ in the U.S. market.
²²            In addition, with regard to
²³ the questions raised in this warning
²⁴ letter from the FDA, ZHP provided their

Page 241

¹ own responses to each and every question
² in this warning letter, including their
³ explanations or clarifications, their own
⁴ opinions, as well as related improvement
⁵ actions such as CAPA actions.
⁶            If you want to find out the
⁷ opinion of ZHP, please review the
⁸ response to this warning letter.
⁹            To the best of my personal
¹⁰ understanding, FDA accepted our response.
¹¹      Q.    When you refer -- rephrase.
¹²            When the FDA refers to your
¹³ manufacturing processes here, the one
¹⁴ that they are specifically talking about
¹⁵ is the zinc chloride manufacturing
¹⁶ process for valsartan, correct?
¹⁷      A.    The manufacturing process
¹⁸ referred to in the document we are
¹⁹ looking at right now is indeed the zinc
²⁰ chloride process change, judging from the
²¹ process change number.
²²      Q.    The last sentence of this
²³ paragraph that states, "If new or higher
²⁴ levels of impurities are detected, you

Page 242

[1] should fully evaluate the impurities and
[2] take action to ensure the drug is safe
[3] for patients."
[4]         You agree that ensuring the
[5] drug is safe for patients needs to be the
[6] most important thing that ZHP should have
[7] done, correct?
[8]     A.   In response to your
[9] question, the statement you just quoted
[10] was regarding to -- our response to our
[11] 483 letter.  The FDA's opinion was that
[12] our original response was not sufficient.
[13] We should continue to evaluate and take
[14] corrective actions to ensure the safety
[15] of the drugs.  That is my personal
[16] opinion.
[17]         Once again, with regard to
[18] all the questions raised in this letter,
[19] ZHP had already provided an official or
[20] formal response.
[21]     Q.   The last sentence of this
[22] paragraph states, "If new or higher
[23] levels of impurities are detected, you
[24] should fully evaluate the impurities and

Page 243

[1] take action to ensure the drug is safe
[2] for patients."
[3]         I want to focus on the last
[4] part, "ensuring the drug is safe for
[5] patients."
[6]         Do you agree that is the
[7] most important rule that you need to
[8] follow, and that ZHP needed to follow, in
[9] manufacturing drugs for sale to patients?
[10]         MR. GOLDBERG:  Objection to
[11] form.  Misstates testimony.
[12]         THE WITNESS:  To any drug
[13] manufacturer, ensuring the
[14] product -- let me put it this way.
[15] Let me start all over again.
[16]         To any drug manufacturer
[17] utilizing their utmost knowledge
[18] and effort to ensure the safety to
[19] the patient for any of their
[20] product is correct.
[21]         This statement is correct.
[22]         MR. SLATER:  Cheryll, I want
[23] to go to another document.  Don't
[24] lose this.  We'll come right back

Page 244

[1] to it.
[2]         I want to go to an article
[3] titled Isolation and
[4] Identification of Process
[5] Impurities in Crude Valsartan.
[6] There we go.
[7]         Just for the record what
[8] exhibit number is this?
[9]         MS. CALDERON:  433.
[10]         (Document marked for
[11] identification as Exhibit
[12] ZHP-433.)
[13] BY MR. SLATER:
[14]     Q.   433.  Thank you.
[15]         Looking now at Exhibit 433,
[16] this is an article that was published in
[17] the Journal of Liquid Chromatography &
[18] Related Technologies in 2006.
[19]         And if we could, let's go to
[20] the second page so we can see who the
[21] authors are.
[22]         Do you see there's three
[23] authors, and the third one is Danhua Wang
[24] from ZHP?

Page 245

[1]     A.   I see it.
[2]     Q.   So this is an article
[3] published in 2006 in a medical journal
[4] and one of the authors was a ZHP
[5] employee.  You see that, correct?
[6]     A.   I see it.  However, could
[7] you please give me a few seconds to
[8] review this document, because I've never
[9] seen this document before, nor do I have
[10] the relevant technical knowledge.
[11]         MR. SLATER:  Let's keep time
[12] on this.
[13]         THE WITNESS:  I'm ready.
[14] BY MR. SLATER:
[15]     Q.   Looking at the introduction
[16] to this 2006 article authored in part by
[17] a ZHP employee, it starts out stating,
[18] "The quality and safety of
[19] pharmaceuticals can be significantly
[20] effected by the presence of impurities."
[21]         Do you see what I just read?
[22]     A.   That's correct.  That's what
[23] it says here.
[24]     Q.   In the case of ZHP's

Page 246

1 valsartan, the quality and safety of the
2 valsartan was significantly affected by
3 the presence of nitrosamine impurities,
4 correct?
5          MR. GOLDBERG:  Objection to
6     form.  Vague.
7          THE WITNESS:  Could you
8     please repeat your question?
9 BY MR. SLATER:
10     Q.   The quality and safety of
11 the valsartan manufactured by ZHP was
12 significantly effected by the presence of
13 nitrosamine impurities, NDMA and NDEA,
14 correct?
15          MR. GOLDBERG:  Objection to
16     form.  Vague.
17          THE WITNESS:  I do not agree
18     with your opinion.  If we are
19     talking about a product of
20     quality, if the manufacturer
21     manufactures the product, if the
22     process approved by the FDA, and
23     the manufacturing was in
24     compliance with the requirements

Page 247

1     of the GMP, then that product
2     would be considered a product of
3     quality.
4          As for the safety of a
5     product, it's up to the science to
6     identify and determine the safety.
7          One, ZHP manufactured this
8     product.  FDA did not require us
9     to test NDMA, nor did it set any
10     standard for NDMA.
11          MR. SLATER:  Let's go back
12     to the warning letter please.
13          Not that warning letter.
14          Perfect.
15 BY MR. SLATER:
16     Q.   Looking now  -- rephrase.
17          Going back now to the
18 November 29, 2018 FDA warning letter.
19 Under Section 2, the third paragraph
20 states, "Your response states that
21 predicting NDMA formation during the
22 valsartan manufacturing process required
23 an extra dimension over current industry
24 practice and that your process

Page 248

1 development study was adequate.  We
2 disagree.  We remind you that common
3 industry practice may not always be
4 consistent with cGMP requirements and
5 that you are responsible for the quality
6 of drugs you produce."
7          When they refer to the cGMP
8 requirements, as we already talked about
9 on the first page of this letter, the FDA
10 indicated that this warning letter
11 summarizes significant deviations from
12 current good manufacturing practice, cGMP
13 for active pharmaceutical ingredients
14 (API), correct?
15     A.   The first paragraph you just
16 quoted as the FDA's response that all the
17 way to the end, it says the common
18 industry practice may not always be
19 consistent with cGMP requirement.  I saw
20 that in the warning letter.
21          For the second paragraph you
22 just quoted, I could not find where it
23 was in the warning letter.  Could you
24 point out where that paragraph came from?

Page 249

1     Q.   I just read the third
2 paragraph under Heading Number 2 which
3 states, "Your response states that
4 predicting NDMA formation during the
5 valsartan manufacturing process required
6 an extra dimension over current industry
7 practice and that your process
8 development study was adequate.  We
9 disagree.  We remind you that common
10 industry practice may not always be
11 consistent" -- actually, you know what, I
12 withdraw that.  I just realized what you
13 asked.
14          The second paragraph I
15 referred to is on the first page of the
16 letter.  Let's go back to the first page
17 of the letter.
18          It's the second paragraph
19 under where it says, "Dear Mr. Du."
20          It says, "This warning
21 letter summarizes significant deviations
22 from current good manufacturing practice
23 (cGMP) for active pharmaceutical
24 ingredients (API)."

Page 250

1    A.   That is correct.  The
2  paragraph you just quoted was indeed in
3  this warning letter.
4    Q.   Let's go back to where we
5  were now on the fourth page of the
6  letter.
7        Where the FDA says, "You are
8  responsible for the quality of drugs you
9  produce," you agree, ZHP is responsible
10  for the quality of drugs that ZHP
11  produces, right?
12    A.   Is this your question or
13  you're merely quoting the warning letter?
14    Q.   I'm asking, do you agree
15  that ZHP is responsible for the quality
16  of drugs that ZHP produces?
17    A.   That is correct.  By the
18  time that this last inspection by the FDA
19  took place in 2018, for our manufacturing
20  we passed all the FDA inspections prior
21  to that and it was in compliance with the
22  GMP.
23        MR. SLATER:  Go to Page 6
24    now of the letter please.

Page 251

1  BY MR. SLATER:
2    Q.   The first full paragraph on
3  Page 6 is a one sentence paragraph that
4  says, "FDA placed your firm on Import
5  Alert 66-40 on September 28, 2018."
6        That import alert precluded
7  ZHP from selling its valsartan API
8  manufactured with the zinc chloride
9  process into the United States of
10  America, correct?
11    A.   This import ban stopped the
12  manufacturing of API products at our
13  Chuannan facility.  Not limited to
14  valsartan.  That's a decision made by the
15  FDA.
16        MR. SLATER:  Okay.  We can
17    take that document down now.
18        Let's go to Exhibit 212.
19        (Previously marked Exhibit
20    ZHP-212.)
21        MR. GOLDBERG:  Adam, if
22    you're in between documents, can
23    we just take a two-minute break,
24    not a long break?

Page 252

1        MR. SLATER:  Sure.
2        MR. GOLDBERG:  Thank you.
3        MR. SLATER:  Let's go off
4  the record.
5        THE VIDEOGRAPHER:  The time
6  right now is 10:08 a.m.
7    We're off the record.
8    (Short break.)
9        THE VIDEOGRAPHER:  The time
10  right now is 10:12 a.m.  We're
11  back on the record.
12  BY MR. SLATER:
13    Q.   With regard to the
14  November 29, 2018 letter written by the
15  FDA, the FDA was not aware, to your
16  knowledge, that as of at least July 2017,
17  multiple people at ZHP were aware that
18  there was NDMA in the valsartan, correct?
19        MR. GOLDBERG:  Objection to
20    form.  Mischaracterizes the
21    document.  Assumes facts not in
22    evidence.
23        THE WITNESS:  I do not agree
24    with your opinion.

Page 253

1        Yesterday I've already
2    responded to your questions
3    regarding this topic many times.
4  BY MR. SLATER:
5    Q.   When you say you don't
6    agree, are you saying that you believe
7    the FDA was aware as of November 29,
8    2018, that people within ZHP knew, at
9    least as of July 2017, that there was
10    NDMA in the valsartan?
11        MR. GOLDBERG:  Objection to
12    form.  Assumes facts.
13    Mischaracterizes the document.
14        THE WITNESS:  Why I do not
15    agree with your opinion, I
16    believe, is that you speculated
17    that ZHP had already known this by
18    2017.
19        I have already responded to
20    this lines of questions that the
21    relevant personnel at ZHP
22    responded to FDA's 483 letter or
23    their questions during the
24    inspection truthfully, which is

Page 254

1    ZHP had no knowledge of the
2  existence of NDMA in the valsartan
3  process prior to June 2018.
4  BY MR. SLATER:
5    Q.   As of November 29, 2018, had
6  ZHP notified the FDA that there were
7  people within ZHP who were aware that
8  there was NDMA in valsartan at least as
9  of July 2017, had that information been
10  provided to the FDA?
11    MR. GOLDBERG:  Objection to
12  form -- objection to form.
13  Assumes facts, mischaracterizes
14  the document, and asked and
15  answered yesterday.
16    THE WITNESS:  This is a
17  hypothetical question you raised.
18  My response to that will remain
19  the same as in my prior response.
20  BY MR. SLATER:
21    Q.   The answer is no, ZHP had
22  not communicated that information to the
23  FDA as of November 29, 2018, correct?
24    MR. GOLDBERG:  Objection to

Page 255

1  form.  Mischaracterizes the
2  document.  Assumes facts not in
3  evidence.  Asked and answered.
4    THE WITNESS:  My response to
5  this question would be that when
6  ZHP provided the response in 2019
7  or in 2018, they did that based on
8  our knowledge and the facts.
9    Your speculation did not
10  stand.  Therefore, I don't think
11  it is necessary for me to respond
12  to this question.
13  BY MR. SLATER:
14    Q.   As of today, May 28, 2021,
15  has ZHP, Huahai U.S., Prinston or
16  Solco -- well, let me rephrase.
17    As of today, May 28, 2021,
18  has ZHP notified the FDA that as of
19  July 2017 there were people within ZHP
20  who knew there was NDMA in valsartan, yes
21  or no?
22    MR. GOLDBERG:  Objection.
23  Assumes facts not in evidence.
24  Mischaracterizes the document.

Page 256

1  Asked and answered yesterday.
2    THE WITNESS:  You just put
3  your speculation into your
4  question.  And I've already
5  responded to that question many
6  times yesterday and today.
7    With regard to the
8  speculation embedded in your
9  question, I will tell you that
10  ZHP's relevant personnel were not
11  aware of the NDMA existence in
12  2017.  They did not become aware
13  of NDMA until June 2018.
14    As I said before, for your
15  hypothetical question that was not
16  complete, I would not respond to
17  this question.
18  BY MR. SLATER:
19    Q.   As of today, May 28, 2021,
20  has ZHP ever notified the FDA about the
21  July 2017 e-mail from Jinsheng Lin or
22  provided that e-mail to the FDA?  Yes or
23  no?
24    A.   No.

Page 257

1    Q.   As of today, May 28, 2021,
2  has ZHP notified Prinston or Solco or
3  Huahai U.S., about the existence of the
4  July 2017 Jinsheng Lin e-mail or provided
5  that e-mail to those companies?
6    A.   What are you referring to
7  about --
8    THE INTERPRETER:  The
9  interpreter will start all over
10  again.
11    THE WITNESS:  What are you
12  referring to by every company?
13  BY MR. SLATER:
14    Q.   As of today, May 28, 2021,
15  has ZHP provided the July 27, 2017,
16  Jinsheng Lin e-mail to Prinston, Solco,
17  or Huahai U.S., or advised any of those
18  three companies about the contents of
19  that e-mail?  Yes or no?
20    A.   No.
21    Q.   As of today, May 28, 2021,
22  do you intend to provide the July 27,
23  2017, Jinsheng Lin e-mail to the FDA?
24    MR. GOLDBERG:  Objection to

Page 258

1  form -- objection to form. Calls
2  for privileged information.
3       You can answer to the extent
4  that you're not going to disclose
5  information that you discussed
6  with your counsel.
7       THE WITNESS:  With regard to
8  this question, it is up to ZHP's
9  QA department, QC department, and
10 other related departments to
11 decide if it is necessary to
12 report that information to the
13 FDA.
14      It is not up to the CEO to
15 decide whether it is necessary or
16 not.
17      In addition, Prinston did
18 not receive such information from
19 the finished dose facilities at
20 ZHP.
21 BY MR. SLATER:
22   Q.   You are the CEO of Prinston,
23 Solco, and Huahai U.S.  Therefore, all
24 three of those companies are aware of the

Page 259

1  existence of the e-mail and its contents,
2  correct?
3    A.   Could you repeat your
4  question?
5    Q.   You are the CEO of Prinston,
6  Solco, and Huahai U.S., therefore, since
7  you know about and have read the e-mail,
8  all three companies are fully aware of
9  the content of that e-mail, correct?
10   A.   I do not agree with your
11 statement.  That is because even though I
12 became aware of this e-mail last week, I
13 do not know the background and the
14 technical specifics of this e-mail, nor
15 did the QA department, QC department,
16 technology department or the
17 manufacturing department, or any other
18 relevant department at ZHP, provide any
19 explanation to point out whether this was
20 a quality issue or any other type of
21 issue.
22      I did not receive any
23 official or formal quality assurance
24 feedback through the official channel to

Page 260

1  reflect this is an issue.
2       In Prinston, Solco and
3  Huahai U.S., the QA department and the
4  regulatory affairs department conduct
5  their daily business based on the
6  information they receive from the
7  official channel.
8    Q.   Have you asked anybody to
9  provide you the background and technical
10 specifics of the July 27, 2017 e-mail
11 from Dr. Jinsheng Lin?  Yes or no?
12      MR. GOLDBERG:  Objection to
13 form.  Asked and answered
14 yesterday.
15      THE WITNESS:  I have already
16 responded to this question
17 yesterday.
18      As a CEO, it would not be
19 necessary for me to collect
20 information about the technical
21 specification -- specifics.
22      For the technical specifics
23 it would be the QA department, QC
24 department, technology department,

Page 261

1  CEMAT, as well as other related
2  departments to conduct an
3  investigation and make a decision
4  accordingly.
5       This is beyond the scope of
6  my job description or job
7  responsibility.
8  BY MR. SLATER:
9    Q.   So the answer to my question
10 is no, you haven't asked to be provided
11 that information?
12   A.   The answer to this question
13 would be no.  That is because I do not
14 have the technical knowledge to
15 understand.  It was also beyond the scope
16 of my job responsibilities.
17   Q.   As the vice chairman of the
18 Board of Directors for ZHP and executive
19 vice president of ZHP, do you want ZHP to
20 disclose the July 27, 2017, Dr. Jinsheng
21 Lin e-mail to the FDA?  Yes or no?
22      MR. GOLDBERG:  Objection to
23 form.
24      THE WITNESS:  First of all,

Page 262

1  as a vice chair of the Board of
2  Directors at ZHP, we are at the
3  very high level.  We did not
4  participate or get involved in the
5  routine activities.  It was up to
6  the corresponding departments,
7  such as the technology department,
8  quality department, or people at
9  the professional level to make
10  such decisions.
11         Since you mentioned my title
12  of executive vice president, that
13  was just an interim assignment.  I
14  was not supposed to manage daily
15  operations and that was beyond my
16  job responsibilities.
17  BY MR. SLATER:
18     Q.   Is the answer yes, I want
19  that information to be provided to the
20  FDA, or is the answer no, I don't want to
21  provide that e-mail to the FDA?  Which
22  one is it?
23         MR. GOLDBERG:  Objection to
24     form.

Page 263

1         THE WITNESS:  My answer to
2  your question is that it's up to
3  the ZHP's QA department, QC
4  department, and other related
5  departments to make a decision if
6  a report should be provided to the
7  FDA or not.
8  BY MR. SLATER:
9     Q.   The right thing to do is to
10  provide that July 27, 2017 e-mail to the
11  FDA immediately, correct?
12         MR. GOLDBERG:  Objection to
13     form.  Calls for a legal
14     conclusion.
15         THE WITNESS:  I do not agree
16     with your statement.  That is
17     because whether it is the right
18     thing to do or not, I do not have
19     the professional knowledge to make
20     such a judgment.
21  BY MR. SLATER:
22     Q.   You are the vice chairman of
23  the Board of Directors of ZHP.  What is
24  your view as to what the right thing is

Page 264

1  to do?  Is your view that the e-mail
2  should be provided to the FDA?  Yes or
3  no?
4         MR. GOLDBERG:  Objection to
5     form.
6         THE WITNESS:  I already
7     responded to your question just
8     now.
9         First of all, we do not
10     interfere with the daily
11     operations.
12         Secondly, the QA department,
13     QC department, CEMAT, and other
14     related departments should make a
15     decision on such technical issues.
16  BY MR. SLATER:
17     Q.   Do you intend to release the
18  July 27, 2017 e-mail publicly so that the
19  financial markets will be aware of the
20  existence of that document?  Yes or no?
21         MR. GOLDBERG:  Objection to
22     form.  Relevance.
23         THE WITNESS:  I already
24     responded to your question just

Page 265

1     now.
2         My response will remain the
3     same.
4  BY MR. SLATER:
5     Q.   Is the answer yes, we
6  believe that we should provide that --
7  rephrase.
8         Is the answer yes, that as
9  vice chairman of the Board of Directors,
10  I think that the responsible thing to do
11  is to release this information to the
12  financial markets, as you are vice
13  chairman of the Board of Directors of a
14  publicly traded company, or is the answer
15  no, we don't need to release that
16  information?
17         MR. GOLDBERG:  Objection to
18     form.  That question calls for
19     speculation.  It's ambiguous and
20     vague.
21         And you can answer the
22     question.
23         Let me just note for the
24     record that portion of the

Confidential Information Subject to Protective Order

Page 266

1    transcript moving to a protective
2    order of any answers about that.
3         If another question is posed
4    like that, we'll instruct the
5    witness not to answer. This is
6    going so far outside the scope of
7    what the deposition in this case
8    should be about, and I'm allowing
9    the witness to answer the
10   questions so we get through the
11   deposition.
12        However, you've now spent
13   the better part of two and a half
14   hours on one document. It's your
15   entire case, I get that.
16        But it is certainly
17   something that I think Judge
18   Vanaskie would say enough is
19   enough.
20        MR. SLATER: I have a new
21   question.
22        THE WITNESS: I need to
23   repeat my answer to your question.
24        As a vice chairman of the

Page 267

1    Board of Directors, I do not
2    intervene in the specific
3    operations.
4         As to whether there would be
5    an influence in ZHP's specific
6    actions or whether to take such an
7    action or not, which is to provide
8    a report in the financial market,
9    it depends on the quality
10   department, the technology
11   department, as well as other
12   related departments, as ZHP
13   decide, whether or not to take
14   such an action and whether it is
15   worthwhile to take such an action.
16   BY MR. SLATER:
17        Q.   Do you believe that the
18   July 27, 2017 e-mail should be made
19   public so that the patients who took the
20   valsartan with the NDMA impurity will be
21   aware of the existence of the document?
22   Yes or no?
23        A.   I do not agree with your
24   statement. That is because with regard

Page 268

1    to this e-mail of 2017, ultimately it's
2    the QA department, QC department, and
3    other related departments to decide how
4    to handle this e-mail.
5         It does not depend on my
6    personal judgment or speculations,
7    because I do not have the relevant
8    knowledge to do so.
9         Q.   Do you as the vice chairman
10   of the Board of Directors of ZHP, as well
11   as, as the CEO of Prinston, Solco, and
12   Huahai U.S., believe that this e-mail
13   should be made public so that the
14   patients who took the valsartan with the
15   NDMA and NDEA impurity will know about
16   the existence and contents of the e-mail?
17   Yes or no?
18        A.   As a matter of fact I have
19   already responded to this question many,
20   many, many times, as I just did now.
21   Therefore, I would remain the same in my
22   response and I would not repeat that
23   answer.
24        MR. SLATER: Let's go --

Page 269

1         Cheryll, let's take -- oh. We're
2    actually in this document. Can
3    you go back to the fourth page of
4    this document, please,
5    Exhibit 213?
6         Perfect.
7    BY MR. SLATER:
8         Q.   Looking at Exhibit 213, the
9    November 29, 2018, FDA warning letter. I
10   want to look again at the third paragraph
11   under Heading Number 2.
12        The sentence that states,
13   "Your response states that predicting
14   NDMA formation during the valsartan
15   manufacturing process required an extra
16   dimension over current industry practice
17   and that your process development study
18   was adequate."
19        With regard to that
20   statement by the FDA characterizing your
21   response, isn't it true that, in fact,
22   the reason that these reactions were not
23   understood from the outset by ZHP was due
24   to insufficient process research and

Page 270

¹ insufficient study in understanding of
² genotoxic impurities, isn't that the
³ reason?
⁴          A.   I do not agree with your
⁵ statement.  In response to the paragraph
⁶ you just quoted in the FDA's warning
⁷ letter, ZHP has already provided an
⁸ official response in writing.  I would
⁹ rather not provide my personal
¹⁰ speculation here.
¹¹          MR. SLATER:  Cheryll, let's
¹²     go to Exhibit 212, please.
¹³ BY MR. SLATER:
¹⁴     Q.   Exhibit 212 is a draft of
¹⁵ the deviation investigation report titled
¹⁶ Investigation Regarding an Unknown
¹⁷ Impurity (Genotoxic Impurity).
¹⁸          Do you see that on the
¹⁹ screen?
²⁰     A.   That is correct.
²¹          I would request a few
²² seconds to review this document.
²³          MR. SLATER:  Keep time on
²⁴     this, please.

Page 271

¹          THE WITNESS:  I am ready.  I
²     have finished the review.
³ BY MR. SLATER:
⁴     Q.   Let's go to Section 5.2, the
⁵ Bates number, the last three digits is
⁶ 308.
⁷          Looking now at Section 5.2
⁸ titled Control Strategy.  The document
⁹ states in part, "Due to insufficient
¹⁰ extent and depth of process research at
¹¹ the early stage, as well as insufficient
¹² study and understanding of potential
¹³ genotoxic impurities, only side reaction
¹⁴ product and degradation products were
¹⁵ studied, and was unaware of the further
¹⁶ reaction between degradation products and
¹⁷ raw material."
¹⁸          That's what this document
¹⁹ states, correct?
²⁰     A.   Hold on.  I'm scrolling to
²¹ this page.
²²          I see this document.
²³     Q.   That's what the language
²⁴ states, correct?

Page 272

¹     A.   First of all, I don't think
² this document is an official document.
³ Just it is in the format of a draft.
⁴     Q.   The information I just read
⁵ was not what ZHP told the FDA, correct?
⁶     A.   I don't know, because I do
⁷ not get involved in the specifics of a
⁸ deviation investigation.
⁹     Q.   The information that I just
¹⁰ read is not what your letter to the FDA
¹¹ dated August 26, 2018 told the FDA,
¹² right?
¹³     A.   I am not sure because I have
¹⁴ not compared the two documents to find
¹⁵ out the difference.
¹⁶          MR. SLATER:  Cheryll, let's
¹⁷     go back to Exhibit 430.  Page 2.
¹⁸     Third paragraph.  The fifth line
¹⁹     down.
²⁰ BY MR. SLATER:
²¹     Q.   You said, "It is this extra
²² dimension over the current industry
²³ practice that obscured us from foreseeing
²⁴ this impurity during the process change

Page 273

¹ from triethylamine process to zinc
² chloride process."
³          That's what you told the
⁴ FDA, which is very different from what
⁵ this Document 212 that we just read
⁶ states, correct?
⁷     A.   I do not agree with your
⁸ statement because it says here it
⁹ requires a more complex -- well, an extra
¹⁰ dimension that is more complex research
¹¹ and development.
¹²          In the previous document we
¹³ just looked at, it says the R&D, or
¹⁴ research and development, was
¹⁵ insufficient, but after all, the reason
¹⁶ was the lack of knowledge.  Therefore, I
¹⁷ believe there is just different ways of
¹⁸ description between the two documents.
¹⁹          And in this letter it was
²⁰ more clear in the description of the
²¹ cause or the reason.  In the previous
²² document that we just looked at, the
²³ description there was more in general.
²⁴          I have to emphasize again

Confidential Information - Subject to Protective Order

Page 274

¹ that I do not have the ability to conduct
² an investigation like the QA department
³ does.  I only provide my personal opinion
⁴ based on the statements in those
⁵ documents.
⁶         MR. SLATER:  Let's go back,
⁷     if we could, to Exhibit 212, where
⁸     we were.
⁹ BY MR. SLATER:
¹⁰     Q.   Going back to the language
¹¹ in Exhibit 212, the draft of the
¹² deviation investigation report, this very
¹³ clearly states that the problem was
¹⁴ "insufficient extent and depth of process
¹⁵ research at the early stage, as well as
¹⁶ insufficient study and understanding of
¹⁷ potential genotoxic impurities."
¹⁸         That's the language in the
¹⁹ document, correct?
²⁰     A.   Well, what you just quoted
²¹ was indeed what this document says.
²² However, this paragraph continues to say
²³ that with the development and progress of
²⁴ science, as well as the in-depth

Page 275

¹ understanding of research, the potential
² genotoxic impurities, this issue is
³ gradually understood.
⁴         MR. SLATER:  Let's go off
⁵     the record.
⁶         THE VIDEOGRAPHER:  The time
⁷     right now is 11:02 a.m.  We are
⁸     off the record.
⁹         (Short break.)
¹⁰         THE VIDEOGRAPHER:  The time
¹¹     right now is 11:17 a.m.  We're
¹²     back on the record.
¹³         MR. SLATER:  Cheryll, let's
¹⁴     go to the document ZHP00675949.
¹⁵     What exhibit number is this
¹⁶     now?
¹⁷         (Document marked for
¹⁸     identification as Exhibit
¹⁹     ZHP-434.)
²⁰         MS. CALDERON:  434.
²¹         MR. SLATER:  Thank you.
²² BY MR. SLATER:
²³     Q.   Looking now at Exhibit 434,
²⁴ this is an e-mail chain between and among

Page 276

¹ some people at ZHP and Charles Wang.  Do
² you see that?
³     A.   Can you give me a few
⁴ seconds for me to open this document from
⁵ the link.
⁶         MR. SLATER:  Time this,
⁷     please.
⁸         THE WITNESS:  What document
⁹     number is this?  I do not see it
¹⁰     in the link.
¹¹         MR. SLATER:  434 is the
¹²     exhibit number.
¹³         THE WITNESS:  Could you give
¹⁴     me a few seconds to review it?
¹⁵     I'm ready.
¹⁶ BY MR. SLATER:
¹⁷     Q.   Charles Wang is a
¹⁸ toxicologist who was consulted by Min Li,
¹⁹ correct?
²⁰     A.   That is correct.
²¹     Q.   Charles Wang was employed by
²² another company, Glaxo, at the time that
²³ he was consulted by Min Li, correct?
²⁴     A.   I'm not sure.

Page 277

¹     Q.   Did you ever speak to
² Charles Wang?
³     A.   Yes.
⁴     Q.   Did you know Charles Wang
⁵ outside of being introduced to him
⁶ through Min Li?
⁷     A.   Could you please repeat your
⁸ question?
⁹     Q.   Did you know Charles Wang
¹⁰ independently from being introduced to
¹¹ him by Min Li?
¹²         Let me ask it differently.
¹³ Did you meet Charles Wang through Min Li?
¹⁴     A.   No.
¹⁵     Q.   How did you meet Charles
¹⁶ Wang?
¹⁷     A.   I met him in a conference.
¹⁸     Q.   ZHP consulted Charles Wang
¹⁹ because you respected Charles Wang as a
²⁰ Ph.D. toxicologist, correct?
²¹         MR. GOLDBERG:  Objection to
²²     form.
²³         THE WITNESS:  What field of
²⁴     work are you referring to when you

Page 278

1    said ZHP consulted him?
2 BY MR. SLATER:
3    Q.   ZHP consulted Charles Wang
4 with regard to various toxicology
5 questions in 2017 and 2018, correct?
6    A.   I'm not sure about that.
7       All I know is that ZHP
8 consulted Charles Wang through Min Li on
9 related knowledge to NDMA in valsartan in
10 toxicology.
11    Q.   Looking at Exhibit 319, at
12 the very top of the first page is a
13 July 7th -- rephrase.
14       Looking at Exhibit 434 at
15 the top of the first page is an e-mail
16 dated November 2, 2018, confirming that
17 Charles Wang was paid for the work he did
18 for ZHP, correct?
19    A.   That's what this e-mail
20 says, but I have never seen this e-mail
21 before.
22       I do not know whether he has
23 been paid or not either.
24    Q.   This e-mail documents that

Page 279

1 Charles Wang was paid, as of November 2,
2 2018, for nine reports of 45,000 rmb.
3 That's what the e-mail confirms, right?
4       MR. GOLDBERG:  Objection.
5    Foundation.
6       THE WITNESS:  That is
7    correct.  However, I do not know
8    the specifics.  That's what this
9    e-mail says.
10 BY MR. SLATER:
11    Q.   What does 45,000 rmb mean,
12 do you know?
13    A.   It's a simple question, and
14 I would provide a simple answer.
15       45,000 rmb is the amount in
16 45,000 rmb.
17    Q.   What does rmb stand for?
18    A.   Rmb stands for the Chinese
19 currency.
20    Q.   What is the equivalent of
21 45,000 rmb in United States dollars?
22       MR. GOLDBERG:  Objection to
23    form.
24       THE WITNESS:  The exchange

Page 280

1    rate between rmb and U.S. dollar
2    fluctuates with time.
3 BY MR. SLATER:
4    Q.   Can you give me some
5 approximate idea to the best of your
6 ability right now please.  Just to give
7 me a range of what 45,000 rmb would
8 correspond to in U.S. dollars.  I'm not
9 holding you to the exact number.
10    A.   Based on the current
11 exchange rate, 1 USD is equivalent to
12 6.4 rmb based on which you can do a
13 simple calculation.
14       MR. SLATER:  Let's go to
15    Exhibit 319, please.
16       (Previously marked Exhibit
17    ZHP-319.)
18       THE WITNESS:  Can you allow
19    me to find this document in the
20    link.
21       I have found it.  Can you
22    give me a few seconds to review
23    it?
24       MR. SLATER:  Fine.  We keep

Page 281

1    track of all the time.  We can
2    take whatever time you need.
3       THE WITNESS:  I'm ready.
4 BY MR. SLATER:
5    Q.   Looking at Exhibit 319,
6 there is an e-mail from Jim MacDonald,
7 Ph.D., to Charles Wang, following from
8 the back and forth between Dr. MacDonald
9 and Dr. Wang where Dr. Wang had consulted
10 Jim MacDonald.
11       Do you see that e-mail in
12 the middle of the first page here?
13    A.   I see this e-mail.  It is
14 also the first time I see this e-mail.
15    Q.   In this e-mail Dr. MacDonald
16 tells Charles Wang, "I'm afraid I can't
17 be of much help on this case particularly
18 on this time scale.  NDMA (or
19 dimethylnitrosamine) is a pretty
20 well-known toxin and animal carcinogen
21 with lots of discussion on permissible
22 levels in drinking water and products.
23 Even though the compound is found in
24 cured meats and some groundwater, the

Page 282

1 body of evidence on this suggest pretty
2 clearly that this is a likely human
3 carcinogen at sufficient exposures. The
4 argument that the company would have to
5 make to keep this product on the market
6 will be very difficult with this profile.
7 I'm not exactly sure where one would
8 begin given the very high levels you
9 think they are seeing. I think the
10 strategy I would probably recommend would
11 be to come up with a CMC plan to remove
12 the contaminant (at least to minimally
13 detectable levels) while they recall the
14 existing product and reformulate. I
15 expect this is not what they would want
16 to hear, but unless there is a compelling
17 reason to leave this product on the
18 market, (e.g., only product available to
19 treat a serious life-threatening
20 disease), I would expect that the FDA
21 would ask for a recall. I would be
22 interested to know what happens at the
23 FDA meeting. These things are always
24 very difficult to predict, but this is

Page 283

1 not a good position for this product in
2 my view. Hope all is well with you.
3 Best regards, Jim."
4        Do you see what I just read?
5     A.   Yes.
6     Q.   Then up above that, on
7 July 17, 2018, Charles Wang writes to Jim
8 MacDonald and forwards him a link showing
9 that the valsartan had been recalled. Do
10 you see that?
11    A.   Yes.
12    Q.   You were speaking with
13 Charles Wang during this time period,
14 correct, June and July of 2018?
15    A.   That is correct.
16    Q.   And you were aware of the
17 information Charles Wang had and what he
18 had learned from Dr. MacDonald as well,
19 correct?
20        MR. GOLDBERG:  Objection to
21 form.  Foundation.
22        THE WITNESS:  I don't know.
23    I do not have the professional
24    knowledge and he would not discuss

Page 284

1    such things with a person that
2    doesn't have professional
3    knowledge like me.
4 BY MR. SLATER:
5    Q.   Have you seen the deposition
6 testimony given from Min Li?
7    A.   Would you please repeat your
8 question?
9    Q.   Have you seen Min Li's
10 deposition transcript and read what he
11 testified to about your interactions with
12 Charles Wang?
13    A.   No, I've not seen it.
14    Q.   Were you on calls with
15 Charles Wang and Min Li together where
16 all three of you spoke?
17    A.   Are you suggesting that we
18 discussed as a group, the three of us?
19    Q.   Did you, Charles Wang, and
20 Min Li discuss the NDMA contamination of
21 valsartan together on conference calls or
22 in WeChat?
23    A.   First of all, I do not agree
24 with your statement that NDMA is a

Page 285

1 contaminant.
2        Secondly, I believe there
3 was some discussion among the three of us
4 in WeChat.
5        MR. SLATER:  Take that
6    document down.  Let's go to
7    Exhibit 210.
8        It's not coming up on my
9    screen for some reason.  There we
10    go.
11 BY MR. SLATER:
12    Q.   Looking now at Exhibit 210.
13 This is the deviation investigation
14 report prepared November 5, 2018,
15 according to the front of the document.
16        This was an official report
17 prepared by ZHP with regard to the
18 nitrosamine contamination of the
19 valsartan, correct?
20    A.   It is about an investigation
21 regarding unknown impurity of valsartan
22 API TEA process.
23        MR. SLATER:  Let's go to
24    Page 11 of 236, please.

Page 286

1    Actually, let's go to
2 Page 10 first, Cheryll.
3    THE WITNESS:  Please allow
4 me some time to scroll to this
5 page.
6    MR. SLATER:  Keep time on
7 this as well please.
8    THE WITNESS:  I am ready.
9 BY MR. SLATER:
10    Q.   On Page 10, the heading at
11 the top of the page is 3.1.2, NDMA,
12 Physiochemical characteristics and
13 toxicological evaluation of NDMA.
14    And I'd like to now turn to
15 Page 11.  And you can see in the second
16 paragraph there's a citation to an
17 article titled Concise International
18 Chemical Assessment Document 38.
19 N-nitrosodimethylamine, published by the
20 World Health Organization in 2002.
21    Do you see that citation?
22    A.   Yes.
23    Q.   So this is an official
24 report that was prepared by ZHP citing to

Page 287

1 that article, correct?
2    A.   Judging from what it says in
3 this document, that's correct.
4    MR. SLATER:  Cheryll, is it
5 possible, this might take you a
6 moment, can you try to also pull
7 up Exhibit 204, please.
8    (Previously marked Exhibit
9 ZHP-204.)
10    THE WITNESS:  Hold on.  Let
11 me open this document too, from
12 the link.
13    MR. SLATER:  That's not the
14 version that I have in front of
15 me, marked as 204.
16    This is a problem.  All
17 right.
18    THE WITNESS:  I don't see
19 that.
20    MR. SLATER:  No, take --
21 take the document down.
22    All right.  Let's go now to
23 Exhibit 321, which is the World
24 Health Organization article that

Page 288

1 was referenced in the deviation
2 investigation report.
3    This is Exhibit 321.
4    (Previously marked Exhibit
5 ZHP-321.)
6    THE WITNESS:  Hold on.  I
7 don't see that in the link.
8    Okay.  I see it.
9    Could you allow me a few
10 seconds to review this document?
11    I am ready, but I cannot
12 understand this document.
13 BY MR. SLATER:
14    Q.   Let's go to Page 23, please.
15 Top of the page.
16    A.   Hold on.  Let me scroll to
17 Page 21.
18    MR. GOLDBERG:  I think it's
19 23, Jun.
20    THE WITNESS:  I'm ready.
21 I'm on this page.
22 BY MR. SLATER:
23    Q.   Looking at the top of
24 Page 23 in this article that was cited in

Page 289

1 ZHP's own deviation investigation report,
2 it states in the top right, "Therefore,
3 owing to the considerable evidence of
4 carcinogenicity of NDMA in laboratory
5 species, evidence of direct interaction
6 with DNA consistent with tumor formation,
7 and the apparent lack of qualitative
8 species-specific differences in the
9 metabolism of this substance, NDMA is
10 highly likely to be carcinogenic to
11 humans."
12    And that language again is
13 found in an article cited by ZHP in its
14 own deviation investigation report,
15 correct?
16    A.   It does not sound the same
17 as the quote you just provided.  I did
18 not make the comparison myself.
19    Q.   Are you saying that I didn't
20 read the language accurately?
21    A.   What you just quoted from
22 this document was right.
23    Q.   The World Health
24 Organization article from 2002 concluded

Page 290

¹ that NDMA is highly likely to be
² carcinogenic to humans, correct?
³     A.   Judging from what it says in
⁴ this document, the statement you just
⁵ made is correct.
⁶         MR. SLATER:  Cheryll, can
⁷     you go back to Exhibit 204,
⁸     please.  I'd like to get to the
⁹     part where the deviation report,
¹⁰     DCE-18001 begins.
¹¹         THE WITNESS:  Hold on.  Give
¹²     me some time to review.
¹³         MR. SLATER:  You can do
¹⁴     whatever you want.  I'm just
¹⁵     getting to the document where I
¹⁶     want to use it.
¹⁷         THE WITNESS:  So what's the
¹⁸     exhibit number again --
¹⁹         MR. SLATER:  204.
²⁰         THE WITNESS:  What I opened
²¹     from the link is different from
²²     what you're showing on the screen.
²³ BY MR. SLATER:
²⁴     Q.   You need to scroll 12 pages

Page 291

¹ in and you'll find this page.
²         MR. SLATER:  Please keep
³     track of all this time.  I'm
⁴     literally going to bring him to
⁵     one page and identify that the WHO
⁶     article is identified again.  So
⁷     all this time is unnecessary.
⁸         MR. GOLDBERG:  Counsel, you
⁹     keep doing that and it is --
¹⁰     you're the one directing the
¹¹     witness to the documents.
¹²         The -- he is scrolling
¹³     through, and he has told you that
¹⁴     he can't find the page you're
¹⁵     referring to.  Okay.
¹⁶         You've got to give the
¹⁷     witness a chance to look at the
¹⁸     document and get to the page.
¹⁹         MR. SLATER:  Nobody is
²⁰     stopping him from doing that.  The
²¹     page that I'm --
²²         MR. GOLDBERG:  This is your
²³     time and we're -- and your
²⁴     continual reference to the time,

Page 292

¹     you don't have to do it every
²     single time the document goes up.
³     Your people are taking -- keeping
⁴     that time.
⁵         THE WITNESS:  Can you repeat
⁶     the exhibit number?  I go to
⁷     Exhibit 204, but the one that I
⁸     see is different from what you
⁹     have shown.
¹⁰ BY MR. SLATER:
¹¹     Q.   This is the exhibit.  It's
¹²     Page 12 of the exhibit.
¹³     A.   I would like you to tell me
¹⁴ the exhibit number again?  What's the
¹⁵ number, 200 and what?
¹⁶         MR. SLATER:  I can't do
¹⁷     this.  Cheryll, can you help him,
¹⁸     please?
¹⁹         MS. CALDERON:  Mr. Du, it's
²⁰     page -- Exhibit 204, ZHP
²¹     Exhibit 204.
²²         And then you can just -- you
²³     can actually just go to the little
²⁴     box at the top that says "of 120."

Page 293

¹     You can put in the number 12.
²         This is the front of the
³     page.  Then you just scroll down
⁴     to the 12th page.
⁵         Do you see that?  Right
⁶     there.
⁷         THE WITNESS:  I see it.  I
⁸     see it.  We are on different
⁹     pages.
¹⁰         MS. CALDERON:  Yes.
¹¹         THE WITNESS:  Now I see it.
¹² BY MR. SLATER:
¹³     Q.   Looking within Exhibit 204,
¹⁴ is the deviation investigation report
¹⁵ dated July 20, 2018, it's entitled
¹⁶ Investigation regarding a Suspected
¹⁷ Genotoxic Impurity of Valsartan,
¹⁸ DCE-18001.
¹⁹         Do you see that?
²⁰     A.   Yes.
²¹         MR. SLATER:  Cheryll, please
²²     turn to Page 24 of 33 within
²³     this -- this document.  It's
²⁴     ZHP0004388.

Page 294

BY MR. SLATER:

Q.   Looking at the bottom paragraph on this page, there is a citation to the World Health Organization article from 2002 that we just looked at. Do you see that?

A.   Please allow me to scroll to this page before answering your question. I'm ready.

Q.   Do you see that the World Health Organization article from 2002 is cited in the ZHP deviation investigation report that we're looking at?

A.   Yes.

Q.   And that's in the section titled 4.1.2, Probable Routes of Human Exposure and Average Daily Intake/Exposure From Environment.

Do you see that's the heading at the top of the page?

A.   Yes.

Q.   And again, that World Health Organization article that is cited in your company's official report concluded

Page 295

that NDMA is highly -- highly likely to be carcinogenic to humans. We just went over that, correct?

A.   That is correct.

MR. SLATER:  Thank you. I have no further questions at this time, subject to my right to request continuation or additional testimony based on motion practice subsequent to the deposition.

Thank you.

MR. GOLDBERG:  We'll take a few minute break and then we'll come back in. Can we go off the record for a few minutes?

THE VIDEOGRAPHER:  The time right now is 11:52 a.m. We are off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 12:05 p.m. We're back on the record.

MR. GOLDBERG:  We have no questions for the witness at this

Page 296

time. Thank you.

MR. SLATER:  Okay. Thanks everybody.

THE VIDEOGRAPHER:  The time right now is 12:06 p.m. We are off the record.

(Excused.)

(Deposition concluded at approximately 12:06 p.m.)

Page 297

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, JUN DU, have the opportunity to read and sign the deposition transcript.

_____
MICHELLE L. GRAY,
A Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public
Dated:  June 2, 2021

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 298

INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition
4 over carefully and make any necessary
5 corrections.  You should state the reason
6 in the appropriate space on the errata
7 sheet for any corrections that are made.
8      After doing so, please sign
9 the errata sheet and date it.
10      You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14      It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 300

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4      I,_____, do
5 hereby certify that I have read the
6 foregoing pages, 217 - 301, and that the
7 same is a correct transcription of the
8 answers given by me to the questions
9 therein propounded, except for the
10 corrections or changes in form or
11 substance, if any, noted in the attached
12 Errata Sheet.
13
14
15 _____
16 JUN DU                    DATE
17
18
19 Subscribed and sworn
   to before me this
20 _____ day of _____, 20_____.
21 My commission expires:_____
22
   _____
23 Notary Public
24

Page 299

1      - - - - -
       E R R A T A
2      - - - - -
3
4 PAGE  LINE  CHANGE
5      _____
6   REASON: _____
7      _____
8   REASON: _____
9      _____
10  REASON: _____
11     _____
12  REASON: _____
13     _____
14  REASON: _____
15     _____
16  REASON: _____
17     _____
18  REASON: _____
19     _____
20  REASON: _____
21     _____
22  REASON: _____
23     _____
24  REASON: _____

Page 301

1      LAWYER'S NOTES
2 PAGE  LINE
3 ____  ____  _____
4 ____  ____  _____
5 ____  ____  _____
6 ____  ____  _____
7 ____  ____  _____
8 ____  ____  _____
9 ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____