# Exhibit 48

Confidential Information - Subject to Protective Order

```
 1         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2                 CAMDEN VICINAGE
                    -   -   -
 3
     IN RE:  VALSARTAN,      :   MDL NO. 2875
 4   LOSARTAN, AND           :
     IRBESARTAN PRODUCTS      :   CIVIL NO.
 5   LIABILITY LITIGATION     :   19-2875
     _____ :   (RBK/JS)
 6                           :
     THIS DOCUMENT APPLIES   :   HON. ROBERT
 7   TO ALL CASES            :   B. KUGLER
 8        - CONFIDENTIAL INFORMATION -
           SUBJECT TO PROTECTIVE ORDER
 9
10                  -   -   -
11             April 5, 2021
12                  -   -   -
13
14        Videotaped remote deposition of
     ERIC GU, Ph.D., taken pursuant to notice,
15   was held via Zoom Videoconference,
     beginning at 7:02 a.m., China Standard
16   Time, on the above date, before Michelle
     L. Gray, a Registered Professional
17   Reporter, Certified Shorthand Reporter,
     Certified Realtime Reporter, and Notary
18   Public.
19
                    -   -   -
20
21        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
22            deps@golkow.com
23
24
```

Confidential Information, Subject to Protective Order

Page 2

1
2   ZOOM APPEARANCES:
3   MAZIE SLATER KATZ & FREEMAN, LLC
    BY:  ADAM SLATER, ESQ.
4       CHERYLL A. CALDERON, ESQ.
        CHRISTOPHER J. GEDDIS, ESQ.
5   103 Eisenhower Parkway
    2nd Floor
6   Roseland, New Jersey 07068
    (973) 228-9898
7   aslater@mazieslater.com
    ccalderon@mazieslater.com
8   cgeddis@mazieslater.com
    Representing the Plaintiffs
9
10  HOLLIS LAW FIRM, PA
    BY:  IRIS SIMPSON, ESQ.
11  8101 College Boulevard
    Suite 260
12  Overland Park, Kansas 66210
    (913) 385-5400
13  isimpson@hollislawfirm.com
    Representing the Plaintiffs
14
15  MORGAN & MORGAN
    BY:  HANNAH FUJIMAKI, ESQ.
16  600 N. Pine Island Road
    Suite 400
17  Plantation, Florida 33324
    (954) 318-0268
18  hfujimaki@forthepeople.com
    Representing the Plaintiffs
19
20
21
22
23
24

Page 4

1
2   ZOOM APPEARANCES:  (Cont'd.)
3   CIPRIANI & WERNER, P.C.
    BY:  CAITLIN E. LAWLOR, ESQ.
4   450 Sentry Parkway
    Suite 200
5   Blue Bell, Pennsylvania 19422
    (610) 567-0700
6   Clawlor@c-wlaw.com
    Representing the Defendant, Aurobindo
7   Pharma, USA, Inc. and Aurolife Pharma,
    LLC
9   ALSO PRESENT:
10  VIDEOGRAPHER:
11  Judy Diaz
12  Phil Hughes
13  (Check Interpreter)
14
15
16
17
18
19
20
21
22
23
24

Page 3

1
2   ZOOM APPEARANCES:  (Cont'd.)
3   DUANE MORRIS, LLP
    BY:  FREDERICK R. BALL, ESQ.
4   100 High Street, Suite 2400
    Boston, Massachusetts 02110
5   (857) 488-4229
    frball@duanemorris.com
6       - and -
7   DUANE MORRIS, LLP
    BY:  NATHAN B. REEDER, ESQ.
8   30 South 17th Street
    Philadelphia, Pennsylvania 19103
9   (215) 979-1164
    nbreeder@duanemorris.com
10
        - and -
11
12  DUANE MORRIS, LLP
    BY:  PATRICK C. GALLAGHER, Ph.D., ESQ.
13  1875 NW Corporate Boulevard
    Suite 300
14  Boca Raton, Florida 33431
    (561) 962-2131
15  Pcgallagher@duanemorris.com
    Representing the Defendants, Zhejiang
16  Huahai Pharmaceutical Co, Ltd., Prinston
    Pharmaceutical Inc., Huahai U.S., Inc.,
17  and Solco Healthcare US, LLC
18  GREENBERG TRAURIG, LLP
    BY:  STEVEN M. HARKINS, ESQ.
19  Terminus 200
    3333 Piedmont Road NE
20  Suite 2500
    Atlanta, Georgia 30305
21  (678) 553-2312
    Representing the Defendants, Teva
22  Pharmaceutical Industries, Ltd., Teva
    Pharmaceuticals USA, Inc., Actavis LLC,
23  and Actavis Pharma, Inc.
24

Page 5

1
2               - - -
              I N D E X
3               - - -
4
5   Testimony of:
               ERIC GU, Ph.D.
6     By Mr. Slater          12
7
8
9
10
11              - - -
             E X H I B I T S
12              - - -
13
14  NO.         DESCRIPTION         PAGE
15  ZHP
    Gu-223      Notice of Deposition  21
16
17  ZHP
    Gu-224      Curriculum Vitae      33
            Eric Gu, Ph.D.
18
19  ZHP
    Gu-225      PowerPoint            49
            Shanghai SynCores
20          Technologies, Inc.
            July of 2013
21          ZHP-01397317
22
23
24

Page 6

- - -

E X H I B I T S (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

ZHP Gu-226    E-mail Thread          54
              3/7/14
              Subject, SynCores
              Presentation
              ZHP-01397314-15

ZHP Gu-227    Contract Assessment    101
              Table
              ZHP-00000215

ZHP Gu-228    Letter                 150
              Re:  Object:
              Submission of CAPA
              Plan to Joint Inspection
              ZHP 00493875-04

ZHP Gu-229    ICH                    253
              Pharmaceutical
              Development Q8(R2)
              August 2009

ZHP Gu-230    ICH                    254
              Quality Risk
              Management Q9
              November 2005

ZHP Gu-231    Pharmaceutical         255
              Quality System Q10
              June 2008

Page 7

- - -

E X H I B I T S (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

ZHP Gu-232    Final GMP              255
              Inspection Report
              ZHP 01862672-31

Page 8

- - -

P R E V I O U S L Y   M A R K E D
E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE

ZHP-197      Tetrahedron            172
             N-dimethylformamide
             More than a Solvent

ZHP-199      R&D Report of          119
             Valsartan
             SC-1141
             ZHP 00076653

ZHP-206      EMEA Guideline         89
             On the Limits of
             Genotoxic Impurities

ZHP-208      Guidance for           68
             Industry Genotoxic
             & Carcinogenic
             Impurities in Drug
             Substances

Page 9

- - -

P R E V I O U S L Y   M A R K E D
E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE

ZHP-209      IARC Monographs        64
             On the Evaluation of the
             Carcinogenic Risk of
             Chemicals to Humans

ZHP-217      SYNCORES00037104-91    140

Confidential Information Subject to Protective Order

Page 10

```
1                - - -
2        DEPOSITION SUPPORT INDEX
3                - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11 Stipulations
12 PAGE   LINE
   None.
13
14 Questions Marked
15 PAGE   LINE
   None.
16
17
18
19
20
21
22
23
24
```

Page 11

```
1                - - -
2        THE VIDEOGRAPHER:  We are
3  now on the record.  My name is
4  Judy Diaz.  I'm a legal
5  videographer from Golkow
6  Litigation Services.
7        Today's date is April 5,
8  2021, and the time right now is
9  7:02 a.m.
10        This remote video deposition
11 is being held in the matter of
12 Valsartan, Losartan, and
13 Irbesartan Products Liability
14 Litigation MDL.
15        The deponent is Dr. Eric Gu,
16 Ph.D.
17        All parties to this
18 deposition are appearing remotely
19 and have agreed to the witness
20 being sworn in remotely.
21        All counsel will be noted on
22 the stenographic record.
23        The court reporter is
24 Michelle Gray and will now swear
```

Page 12

```
1  in the witness.
2                - - -
3        ... ERIC GU, Ph.D., having
4  been first duly affirmed/sworn,
5  was examined and testified as
6  follows:
7                - - -
8        EXAMINATION
9                - - -
10 BY MR. SLATER:
11     Q.   Dr. Gu, hello.
12     A.   Hello.
13     Q.   My name is Adam Slater.  I'm
14 going to take your deposition for the
15 next two days.
16     A.   Okay.
17     Q.   You understand that's what
18 we're here for?
19     A.   Yes.
20     Q.   Have you ever had your
21 deposition taken before?
22     A.   No.
23     Q.   It's important that you
24 understand a few things and that we
```

Page 13

```
1  confirm a few things before we start.
2  Okay?
3      A.   Okay.
4      Q.   First of all, you understand
5  that you're now under oath and must tell
6  the truth?
7      A.   Yes, I do.
8      Q.   Okay, great.  We would
9  appreciate direct, accurate, responsive
10 information in response to our questions
11 that will allow us to go through this
12 more quickly and more efficiently.  Okay?
13     A.   Okay.
14     Q.   If I ask you a question that
15 doesn't make sense to you for some
16 reason -- I may mispronounce a term, I
17 may ask a question -- or I just don't ask
18 a question in an artful way based on the
19 scientific issue, or whatever it may be.
20         If for any reason I ask you
21 a question that you don't understand and
22 don't think that you can testify in
23 response to both truthfully and
24 completely, just tell me, and you'll tell
```

Confidential Information Subject to Protective Order

Page 14

1 me what's unclear, and we'll try to
2 rephrase the question.  Okay?
3       A.    Okay, sure.
4       Q.    Attorneys will talk during a
5 deposition and make objections at times.
6 That's normal.  I would just ask that you
7 allow the objection to be discussed and
8 then I would think in most cases you'd go
9 ahead and answer the question.  But
10 that's for your counsel to decide.  Okay?
11      A.    Okay.
12      Q.    Did you have the opportunity
13 to prepare for this deposition?
14      A.    Yes, I have.
15      Q.    Can you tell me what you did
16 to prepare for the deposition?
17      A.    Reviewed some documents and
18 I talked to my counsels.
19      Q.    Do you know how much time
20 you spent preparing for the deposition?
21      A.    I didn't count, you know,
22 exactly how many times.  But let's see.
23 A few sessions with my counsels and
24 reviewed some documents.  Spent about,

Page 15

1 let's say -- I don't know, 20, 40 hours.
2       Q.    20 to 40 hours?
3       A.    No, I just -- rough numbers.
4 I didn't count.  I didn't -- you know --
5       Q.    I'm just repeating what --
6 I'm just repeating what you said to make
7 sure that I heard you correctly.  Did you
8 say 20 to 40 hours is your estimate?
9       A.    No.  Take that away.  I
10 didn't count.  I don't know.  If you are
11 talking about reading documents, I just
12 reading from time to time.
13      Q.    You said that you met -- or
14 rephrase.
15            You said that you spoke to
16 your counsel.  Which attorney or
17 attorneys did you speak to in preparation
18 for the deposition?
19      A.    Rick, Patrick, and I think
20 Nathan, yeah.
21      Q.    Mason, you said?
22      A.    Nathan.  N-A-T-H-A-N, yeah.
23      Q.    Nathan.  Got it.  Any other
24 attorneys that you spoke to?

Page 16

1       A.    Nope.
2       Q.    How many times did you speak
3 with any one or more of those attorneys
4 that you listed?
5       A.    I think about four or five
6 times.
7       Q.    When was the first time you
8 spoke to them to prepare?
9       A.    That was about, let's see, a
10 month ago, you know.  We schedule a
11 meeting that's every -- usually Tuesday
12 night, China times.
13      Q.    How long would each meeting
14 take?  Was it the same amount of time
15 each time?  Was it different?  Can you
16 tell me, please?
17      A.    It could be different.
18 Sometimes take, let's say, a couple
19 hours, sometimes one and a half, you
20 know.
21      Q.    So one and a half to two
22 hours each time?
23      A.    That's about right.  Yeah.
24 I remember there the one meeting maybe

Page 17

1 last about three hours or so.
2       Q.    Did any of your meetings
3 with your attorneys to prepare for this
4 deposition last more than three hours?
5       A.    Let me think.  More than
6 three hours?  No, I don't recall.
7       Q.    What if any documents did
8 you review in preparation for the
9 deposition?
10      A.    You know, I wasn't with the
11 company until 2014, so I, you know, find
12 all those documents, research report and
13 risk assessment and those documents
14 relate to my -- to my -- you know, to my
15 job.
16      Q.    Okay.  You said a research
17 report.  Which research report?
18      A.    The process, you know,
19 developed back in 2011 or so.
20      Q.    Are you talking about the
21 process development research report from
22 SynCores?
23      A.    Yes, you are right.
24      Q.    When you said risk

Confidential Information - Subject to Protective Order

1 assessment, what risk assessment were you
2 referring to?
3     A.   That was I would say after
4 2018, June, and we did some of the, you
5 know, how else, you know, toxic impurity
6 was formed, the investigation, the
7 research assessment -- the risk
8 assessment, you know, to see where the
9 GTI formed, how we going to -- how we can
10 remove that.
11     Q.   Are you talking about after
12 in June of 2018 the NDMA and the NDEA was
13 discovered and SynCores was asked to try
14 to help develop an optimized process to
15 prevent the formation of those
16 impurities?
17     A.   Yes and no.  That was out of
18 2018, June, when we discovered NDMA and
19 NDEA.
20         The first thing we did was
21 to, you know -- doing the laboratory
22 research to find out how this was formed
23 in the process and how -- that's first --
24 that's one thing.

1         Second thing is -- no, let
2 me backwards.  Okay.
3         To develop a method how we
4 are going to detect the NDMA first.  Then
5 we see how we can remove that from the
6 process.  The entire risk assessment
7 research in the laboratory.
8     Q.   Any other documents that you
9 reviewed?
10     A.   Let me remember.  The --
11 also the 483, and the response to the 483
12 and some of the, you know, raw data that
13 relates to the research report.
14     Q.   I'm sorry.  I missed the
15 last thing that you said.
16     A.   The data for the research
17 report.
18     Q.   The data for the --
19     A.   From other ones -- yeah,
20 yeah.
21     Q.   The data for which research
22 report?
23     A.   You know, for the risk
24 assessment report.

1     Q.   In -- that was performed in
2 2018?
3     A.   Yeah, that was performed at
4 2018.  I recall that's maybe -- yeah,
5 2018.  The exactly month, I don't
6 remember.  It's probably July or August
7 or afterwards.
8     Q.   Were you involved in that
9 risk assessment?
10     A.   Yeah, I was involved, you
11 know, of course, the allocation, the
12 walkthroughs, and review the reports.
13     Q.   One second.  I'm having a
14 little computer issue here.  I've got to
15 fix it.
16     A.   Okay.
17     Q.   Stay on the record.  Don't
18 worry.
19     A.   All right.
20     Q.   Any other documents that you
21 can recall reviewing in preparation for
22 the deposition?
23     A.   You know, yes.  Other
24 documents such as the, you know, SOPs and

1 these type of document.
2     Q.   You said SOPs and what else?
3     A.   I reviewed many documents.
4 User log, there's reports, SOPs, and 483
5 document, and those documents.  That's
6 pretty much it.
7         MR. SLATER:  Cheryll, I
8     don't know what exhibit we're on,
9     but maybe you can say it when you
10     put it up.  But let's put up the
11     deposition notice, please.
12         MS. CALDERON:  Sure.  It's
13     223, is the next exhibit.
14         (Document marked for
15     identification as Exhibit
16     ZHP-223.)
17 BY MR. SLATER:
18     Q.   All right.  Have you seen
19 this document?
20     A.   Let's see.  No.  No.
21     Q.   Did you search for any
22 documents that may be produced to us
23 tonight as part of your deposition?
24     A.   Search what document?

Confidential Information - Subject to Protective Order

Page 22

1    Q.   Any of your personal
2 documents that may relate to this case,
3 did you search to see if you had any that
4 had not been previously collected so they
5 can be provided tonight?
6    A.   As far as I understand, all
7 the document has been provided to you.
8    Q.   Yeah, my question is this:
9 In connection with this deposition, did
10 you search to see if any relevant
11 documents to this litigation had not
12 previously been produced so they could be
13 produced to us in connection with the
14 deposition.
15    A.   That's a good question.  How
16 would I know?  Okay.  I don't know.  What
17 are you talking about?
18    Q.   Did you make any effort to
19 identify documents that were not
20 previously produced to us as part of this
21 litigation?
22    A.   The answer is no.
23    Q.   Do you keep handwritten
24 notes in connection with your work?

Page 23

1    A.   Not always.  But sometimes I
2 do.
3    Q.   Any handwritten note --
4       MR. BALL:  If you give me an
5       opportunity to object.  I'd
6       appreciate it.  Sorry.
7 BY MR. SLATER:
8    Q.   Any handwritten notes that
9 you may have created with regard to
10 valsartan, do you know if those were
11 produced to us?
12    A.   You know what, valsartan,
13 hand writing notes, no, I don't have it.
14 I don't have any -- a lot of hand notes.
15    Q.   Do you have any handwritten
16 notes that you ever created in connection
17 with your work on valsartan?
18    A.   Okay.  Let me be clear.  I
19 don't make hand notes, you know, for this
20 valsartan, you know, case.
21    Q.   How about during your work
22 on the optimized process for valsartan?
23 Did you create any notes in connection
24 with that?

Page 24

1    A.   No.  Usually I just order --
2 you know, plan the research work.  I
3 don't make any notes.
4    Q.   Did you type any notes in
5 connection with the valsartan project?
6    A.   I type some e-mails, but not
7 notes.
8    Q.   So in the production of
9 documents, we should be able to find
10 e-mails that you sent with regard to the
11 valsartan optimized process?
12    A.   Could you repeat the
13 question again?
14    Q.   Sure.  Did you send e-mails
15 in connection with your work on the
16 valsartan project in 2018?
17    A.   Do I produce e-mails
18 regarding to the valsartan project?  Is
19 that what you're saying?
20    Q.   Did you type any e-mails and
21 send any e-mails in connection with the
22 valsartan project in 2018?
23    A.   I don't recall.  That was
24 2018.  But I do participate in the

Page 25

1 project.
2    Q.   Would you expect that in
3 your custodial folder of your e-mails, we
4 should find e-mails with regard to the
5 valsartan project, e-mails both from you
6 and to you?
7    A.   I don't know.  Maybe.
8    Q.   When you said maybe, that
9 gives me pause, so I have to ask you.
10       In your preparation for this
11 deposition, did you review any e-mails
12 that you either sent or received about
13 the valsartan project in 2018?
14    A.   I didn't review my e-mails.
15 I don't have such habits.  I only review
16 the documents.
17    Q.   In your work at SynCores, do
18 you use more than one computer?
19    A.   I have one computers.
20    Q.   You've used one computer the
21 whole time you've been there?
22    A.   I used more than one
23 computer.  Let's say, one computer broke
24 down, it was stolen, I replaced another

Confidential Information - Subject to Protective Order

Page 26

¹ one. Yeah, any given time, I had one
² computers.
³     Q.   Did you say that your
⁴ computer broke or did you say it was
⁵ stolen or both?  I thought you said --
⁶     A.   I recall I lost, let's say,
⁷ one computer when I travel.  One computer
⁸ was broken down and it crashed.
⁹     Q.   When did you lose a computer
¹⁰ when you traveled?
¹¹     A.   That's a good question.
¹² Let's see.  Let me try and remember that.
¹³ That was maybe in 2016 or so when I
¹⁴ travel from San Francisco back to
¹⁵ Shanghai.  I lost my computer one time,
¹⁶ yeah.
¹⁷     Q.   When was that?
¹⁸     A.   I just left on the airplane.
¹⁹ And I find out, you know, I didn't have
²⁰ my computer.  I call the airline.  They
²¹ said they didn't find it, so...
²²     Q.   When?
²³     A.   I don't remember exactly the
²⁴ time.  I thought maybe it was 2016 time

Page 27

¹ frame.
²     Q.   Was the information on that
³ computer backed up somewhere so that the
⁴ data or information on the computer was
⁵ not lost?
⁶     A.   The computer, you know, was,
⁷ you know, backed up from time to time.
⁸ But I'm not sure 100 percent, maybe lost
⁹ some data.
¹⁰     Q.   Was there ever a point where
¹¹ you lost the computer where you realized
¹² something that you needed couldn't be
¹³ found because it was on that computer?
¹⁴     A.   I didn't think so, because
¹⁵ it didn't impact my work.
¹⁶     Q.   You said another computer --
¹⁷ well, let me ask you this.
¹⁸          The computer that you lost
¹⁹ when you were traveling, was that a
²⁰ laptop?
²¹     A.   Laptop.
²²     Q.   What type of laptop?
²³     A.   Gee, that was -- I remember,
²⁴ what was that?  That was -- I think it

Page 28

¹ was ThinkPad because I used a few brands.
² One is Acer.  One is the ThinkPad.  One
³ is -- I used a Dell in the past.  I think
⁴ it was a ThinkPad.
⁵     Q.   And you said that you had a
⁶ computer that broke and crashed.  Was
⁷ that a different computer?
⁸     A.   I think that was a Acer.
⁹ A-C-E-R.  You know that brand there.
¹⁰     Q.   A-C-R?
¹¹     A.   A-C-E-R, Acer.
¹²     Q.   When did that happen?
¹³     A.   That was 2017 or '18, some
¹⁴ time there.  I don't keep notes of that.
¹⁵ I'm sorry.  That was -- I just give you
¹⁶ rough timeline.
¹⁷     Q.   When you said it broke and
¹⁸ crashed, did you turn it back into the
¹⁹ company?  Was it a company computer?
²⁰     A.   Yeah, I turned it back to
²¹ company.  They tried to fix it, but they
²² failed.
²³     Q.   Do you know what happened to
²⁴ the data and information that was on the

Page 29

¹ computer?
²     A.   I'm sorry.  It's lost.
³     Q.   Was any of the data that was
⁴ lost when the computer broke relevant to
⁵ the valsartan project in 2018?
⁶     A.   I don't think so.  Because
⁷ the computer was backed up from time to
⁸ time.  If it was lost, lost less than,
⁹ let's say, you know, a few weeks of data,
¹⁰ okay.
¹¹     Q.   Since that time when that
¹² computer broke and crashed, have you used
¹³ the same computer up till now?
¹⁴     A.   I think so, yeah.
¹⁵     Q.   What type of computer is
¹⁶ that?
¹⁷     A.   It's a ThinkPad.
¹⁸     Q.   Do you have that computer
¹⁹ with you?
²⁰     A.   In the room, in my bedroom.
²¹     Q.   The computer that you're
²² using for the deposition is what type of
²³ computer?
²⁴     A.   It's a Lenovo X390.

Confidential - Information Subject to Protective Order

Page 30

1    Q.   Was that provided to you
2  by -- well, rephrase.
3         Who provided that computer
4  to you?
5    A.   The company computer.
6    Q.   Which company provided that
7  to you?
8    A.   ZHP.
9    Q.   Do you consider yourself to
10 work for ZHP?
11   A.   Yes.  And I work for
12 SynCores, but ZHP is the majority holder
13 of SynCores.
14        MR. SLATER:  Cheryll, let's
15 go to Exhibit A of the deposition
16 notice, please.
17 BY MR. SLATER:
18   Q.   Have you seen that page or
19 those lists of topics before right now?
20   A.   Could you expand a little
21 bit, please?
22   Q.   Have you ever seen that
23 document in front of you, Exhibit A
24 listing 30(b)(6) topics?  Have you seen

Page 31

1  that before?
2         MR. BALL:  I think he asked
3  if she can expand it, Adam.
4         MR. SLATER:  Oh, expand it.
5  I thought he said if I could
6  explain it.
7         MR. BALL:  No, expand it.
8         MR. SLATER:  Are you able to
9  make it bigger, Cheryll?  Great.
10 BY MR. SLATER:
11   Q.   Does that help you, sir?
12   A.   Yes, that help.  Yes, I saw
13 these two items.  Yes, I saw this from
14 somewhere, maybe talking to my counsel
15 sometimes, yeah.
16   Q.   So I'll just ask again.
17 This page, Exhibit A, have you seen the
18 page before?
19   A.   Yes.
20   Q.   And did you review the
21 topics listed and prepare yourself to
22 testify on those topics?
23   A.   Yes, exactly.
24        MR. SLATER:  Let's go to the

Page 32

1  next page, please, Cheryll, this
2  document.
3  BY MR. SLATER:
4    Q.   We asked for your most
5  recent curriculum vitae or LinkedIn
6  profile.  We were provided a document
7  we're going to go through shortly.  I
8  just want to ask, do you have a LinkedIn
9  profile?
10   A.   I haven't, you know, been
11 used LinkedIn -- I just, you know -- I
12 haven't used LinkedIn for a while.
13   Q.   But do you have a LinkedIn
14 profile?
15   A.   I used LinkedIn long time
16 ago.  I don't know anything about
17 LinkedIn profiles.
18   Q.   You know what LinkedIn is,
19 right?
20   A.   I know that's -- you know,
21 connecting people looking for a job, you
22 know, hiring people, you know, website.
23   Q.   If I wanted to find --
24 rephrase.

Page 33

1         If I researched for you on
2  LinkedIn, would I find a profile for you?
3    A.   I'm sure you can.  You can
4  try.  I think I'm on LinkedIn.
5    Q.   Do you go on LinkedIn from
6  time to time?
7    A.   Not very often.  The last
8  time I used LinkedIn is about a couple
9  months ago maybe, or whenever I got a
10 message for anything.
11        MR. SLATER:  Okay.  Cheryll,
12 we can take this document down and
13 put up his CV as Exhibit 224 when
14 you get a chance.  Perfect.
15        (Document marked for
16 identification as Exhibit
17 ZHP-224.)
18 BY MR. SLATER:
19   Q.   We've put a document up on
20 the screen as Exhibit 224.
21        Can you tell me what that
22 is, please?
23   A.   That's my CV.
24   Q.   Is it up to date?

Page 34

1    A.   Yeah.
2    Q.   Is it -- rephrase.
3         Is this CV accurate?
4    A.   Yes.
5    Q.   Let's go to the section
6 under professional experience.  It says
7 Shanghai SynCores Technology Inc.
8 Limited, February 2014 to the present.
9    A.   Mm-hmm.
10    Q.   Is that accurate?
11    A.   Yes.
12    Q.   This says your title is
13 general manager.  Is that your current
14 title?
15    A.   Hold on -- okay.  It's the
16 same.
17    Q.   This has your title as
18 general manager.  Is that correct?
19    A.   Correct.
20    Q.   And is your current title
21 general manager?
22    A.   Yes.
23    Q.   Have you held any other
24 titles at Shanghai SynCores?

Page 35

1    A.   No, that's the only title I
2 have.  In China we call it general
3 manager, but manager as president of the
4 company.  So basically, I think that's
5 the same.
6    Q.   Are you the president of the
7 company?
8    A.   Yes.
9    Q.   Have you been the president
10 of Shanghai SynCores since February 2014?
11    A.   Yes.
12    Q.   When was the first time that
13 you ever had any involvement with
14 valsartan?
15    A.   The first time was -- let me
16 think.  The first time I was involved in
17 the valsartan, you know, project, that
18 was -- that was -- that was after 2018,
19 June, okay, when we -- you know, when we
20 had a notice.  About July time frame, I
21 got a notice from the ZHP.
22    Q.   Well, let's be clear.  When
23 was the first time that you had
24 involvement with valsartan.  Was it in

Page 36

1 July of 2018?
2    A.   Yes, after July -- after
3 June of the 2018.
4    Q.   Well, I want to be clear.
5 When you say your first involvement with
6 valsartan was after June of 2018, are you
7 saying that first involvement was in July
8 of 2018?
9    A.   If I remember correct, you
10 know, when you are talking about when I
11 was involved in the valsartan project,
12 yes.  It was after June of 2018.
13    Q.   When did you first learn
14 that valsartan was contaminated with NDMA
15 and NDEA?
16    A.   Like I just said, that was
17 after June of 2018.
18    Q.   After June of '18?
19    A.   Yeah.
20    Q.   So you didn't hear anything
21 about the NDMA impurity in valsartan in
22 June of 2018?  That's not something that
23 you heard about at all during that month?
24    A.   You just confused me.  Would

Page 37

1 you repeat the question again?
2    Q.   Sure.  Did you learn in
3 June 2018 that valsartan was contaminated
4 with NDMA?
5    A.   I just learn after June of
6 2018 that valsartan may be contaminated
7 with the NDMA.
8    Q.   When did you learn that,
9 what day?
10    A.   What day?  I can't tell you
11 what day.  But that's the -- June or July
12 time frame of 2018.
13    Q.   Looking at your CV, there
14 are six bullet points describing your
15 responsibilities as general manager.
16         Do you see that?
17    A.   Yes, I see that.
18    Q.   The first one is, "Select
19 and develop of new product for
20 development pipeline."
21         Correct?
22    A.   Yes.
23    Q.   Does that include valsartan?
24    A.   No.  Usually we develop new

Confidential Information - Subject to Protective Order

Page 38

1 product. Okay. Valsartan is a very old
2 product. So that's not including
3 valsartan.
4        Q.   This says in the second
5 bullet point, "Provide CMC service for
6 NCE development."
7            What does that mean?
8        A.   CMC service for the NCE --
9 NCE is new chemical entity, okay. We
10 develop the, you know, chemical process
11 and the manufacturing service to those,
12 you know, new compounds, okay, new
13 chemicals.
14       Q.   The third bullet point says,
15 "Providing process research and
16 development scaleup and tech support
17 services."
18       A.   Yes. We develop the process
19 research at the laboratory scales, and
20 scale up is to kilogram scale at the lab
21 and, you know, tech support for the pilot
22 program manufacturing process.
23       Q.   Let's break that down a
24 little. Where you said providing process

Page 39

1 research and development, what is that
2 specifically referring to?
3        A.   Referring to when you have a
4 process -- chemical process, you do the
5 process starting, we call that process
6 starting. And once you find the process
7 parameters, okay, you -- you know, you --
8 that's pretty much it. Let me stop right
9 there. That's called process research.
10           If there's no process for a
11 particular chemical, we develop a, you
12 know, chemical process for that.
13       Q.   What does scale up mean?
14       A.   Scale up is in the
15 laboratory scale, you're doing, let's
16 say, milligram to gram scale chemical
17 process. And at the laboratory, we
18 trying this -- make sure this works,
19 doing some feasibility studies to scale
20 this up to, let's say, 100-gram scale or
21 even kilogram scales.
22       Q.   That's all in the
23 laboratory?
24       A.   Yeah, laboratory. Scale up

Page 40

1 is in the kilogram laboratory, what we
2 call kilo labs.
3        Q.   What is pilot scale? You
4 mentioned that earlier?
5        A.   Pilot scale is even bigger
6 than the kilogram scale. Kilogram scale
7 you can do, let's say, chemistry trying
8 to, let's say, collect 100-gram or even
9 up to kilogram scale of the part.
10           But in the pilot plan, you
11 are using much bigger vessels. Okay.
12 For vessel scale, you can use, let's say,
13 500 liters to 1,000 liters to making,
14 let's say, tens of gram of the product,
15 you can do like the pilot scale.
16       Q.   Why do you go from the lab
17 scale up to milligrams, grams, and
18 kilograms within the lab and then go up
19 to pilot scale? What is the purpose of
20 moving up to larger quantities?
21       A.   Because you can make a
22 chemical conversion or process that work
23 for in the laboratory, you know, on a
24 small scale size, let's I said, from gram

Page 41

1 to even kilogram. You work that well.
2            But if you want to further
3 scale that up, we do in the pilot --
4 pilot plan, pilot scale. In that case we
5 making, let's say, tens of kilograms of
6 materials. The process work in the
7 laboratory may not work well in the pilot
8 scale as you further scale it up because
9 of the material transfer, or heat
10 transfer, they are completely different
11 product scales.
12           So that's why you have to do
13 it that way, okay. Once after the pilot
14 scale, the further scale is -- happens to
15 be a commercial scale.
16       Q.   So after pilot scale you go
17 to commercial scale?
18       A.   Yes, yes. That's usually
19 the process, you know, is. From lab
20 scale to the kilogram to the pilot scale,
21 further scale up to the commercial
22 scales.
23           Commercial scale depends on
24 what -- how many quantity the batch size

Confidential Information - Subject to Protective Order

Page 42

¹ you want to make and design the
² equivalent setup that fits the purpose.
³     Q.   This scale-up process from
⁴ lab to pilot and then to commercial, is
⁵ this something that is required by good
⁶ manufacturing practices?
⁷     A.   Yes.  Exactly.  Because that
⁸ is also common industrial, you know,
⁹ practice up to today.  It gives you much
¹⁰ more confidence you can, you know, make
¹¹ the process happen.  That's how you make
¹² the process happen in the commercial
¹³ scale.
¹⁴     Q.   When you said so that you
¹⁵ can make the process happen, do you mean
¹⁶ so the process will yield the product
¹⁷ that you were expecting it to yield and
¹⁸ meet the quality standards?
¹⁹     A.   Yes, yes.  That's
²⁰ basically -- is because the laboratory
²¹ scale give you the -- let's say
²² qualitative material.  You have to prove
²³ that you can do to that in commercial
²⁴ scale.  That's -- you have to go through

Page 43

¹ the process as we discussed.
²     Q.   Is commercial scale when
³ you're actually manufacturing for sale or
⁴ is that a step before you're
⁵ manufacturing to sell to customers?
⁶     A.   Commercial scale is for
⁷ sale.
⁸     Q.   Okay.  Does the risk
⁹ assessment process continue at both the
¹⁰ lab scale and pilot scale?
¹¹     A.   Yes, the risk assessment is
¹² the same way, doing the same way.
¹³     Q.   And tell me if I understand
¹⁴ this.  As you go from lab and then up
¹⁵ through pilot scale and add more quantity
¹⁶ of material, you continue the risk
¹⁷ assessment because you may get different
¹⁸ data as you add more product and you
¹⁹ start to do the process on a larger
²⁰ scale.  Does that make sense?
²¹     A.   Yeah.  At the end you have
²² to repeat the process.  The laboratory
²³ scale and, you know, kilogram scale are
²⁴ only give you supporting data.

Page 44

¹     But sometimes we do
² laboratory scale, go straight to the
³ pilot scale.  Or sometimes you go
⁴ straight to commercial scale to
⁵ collecting data.  But at the end,
⁶ commercial scale data is the, you know,
⁷ final data.
⁸     Q.   When you say the commercial
⁹ scale data is the final data, are you
¹⁰ referring to as part of the risk
¹¹ assessment process?
¹²     A.   Yes.
¹³     Q.   So if I understand
¹⁴ correctly, the risk assessment process
¹⁵ starts in the beginning, and it goes all
¹⁶ the way through actual manufacture for
¹⁷ sale to customers.  Did I understand that
¹⁸ correctly?
¹⁹     A.   You're not correct.  Could
²⁰ you repeat that again?
²¹     Q.   Sure.  Do I -- am I correct
²² that the risk assessment process starts
²³ at the lab-scale level, continues at the
²⁴ pilot-scale level, and continues at the

Page 45

¹ commercial scale as well?
²     A.   Yes.  That's supposed to be
³ the process, yeah.
⁴     Q.   Your CV says in the fourth
⁵ bullet point, provide analytical method
⁶ development and separation service.  What
⁷ is analytical method development?  What
⁸ does that mean?
⁹     A.   That's the -- that's a good
¹⁰ question, because in the -- in our
¹¹ capacity, we doing the new product
¹² research.  So for the process research,
¹³ you have to have a method to detect the,
¹⁴ you know, the intermediates, the -- you
¹⁵ know, so you have to develop a method to
¹⁶ specifically detect those intermediates.
¹⁷     So we have to develop
¹⁸ analytical method for each new product or
¹⁹ for each new step of the product.  And we
²⁰ also -- that's one part.  Okay.  Is that
²¹ clear?
²²     Q.   Yes.
²³     A.   Okay.  The next part is
²⁴ separation services.  We do some of the

Confidential Information Subject to Protective Order

Page 46

1  separation for those, let's say,
2  intermediates or impurities, okay, to get
3  the reference standard, okay. We call
4  that separation services.
5      Q.   And when you said to get the
6  reference standard, you mean the
7  standards that are applied when the
8  analytical testing is performed so that
9  there's a reference standard to compare
10  the results to?
11     A.   Yes, because some of the
12  material, let's say, for the new product
13  development, those, let's say,
14  intermediates or, let's say, impurities,
15  they are not commercially available. So
16  you have to, you know, separate it from
17  the reactive standard, in order to get
18  the reference data material to compare
19  with so you know what you are testing.
20     Q.   When you say, so you know
21  what you are testing, is that referring
22  to so that you know what the results
23  you're obtaining through your testing
24  match up to?

Page 47

1      MR. BALL:  Objection to
2  that.
3      THE WITNESS:  Let me give
4  you an example.  How's that?
5  Okay?  Let's say you making -- you
6  want to hear that?
7  BY MR. SLATER:
8      Q.   Yes, that would be great.
9      A.   Sorry?
10     Q.   That would be great, yes.
11     A.   So when you're making a
12  compound A to B, let's say, right, the B
13  is not a commercially available material.
14  That's why you have to, you know, pure --
15  B to purify to get a structure identified
16  to get the purity data so that you can
17  use that as a reference, okay, for the
18  future testing.
19     Q.   Okay.  The fifth bullet
20  point, "Provide process safety and HAZOP
21  and engineering solution consulting,"
22  does that have to do with safety in the
23  manufacturing process?
24     A.   Yes.  That's called process

Page 48

1  safety, okay.  It's -- you know, we doing
2  the process safety assessment for all
3  those chemical transformations, you know,
4  material safety, process safety, you
5  know, to make sure, okay, the process,
6  you know, being transferred to the pilot
7  scale, commercial scale is safe to run.
8      Q.   The sixth bullet point says
9  that you, "Develop green enzymatic
10  technology for pharmaceutical
11  production."
12         What is that referring to?
13     A.   Oh, that's another section,
14  okay.  We develop the, you know,
15  biological method let's say, for example,
16  using enzyme to much better chemical
17  transformations when we have the
18  formations, you know, those new
19  technology, in order to be more green,
20  which means much less waste, you know,
21  gas waste or liquid waste or, you know,
22  solid waste.
23         That's a new area we have
24  been working on.

Page 49

1      MR. SLATER:  I think we can
2  take that down.  And then we're
3  going to put up a PowerPoint
4  presentation that I'm told is from
5  July of 2013.
6      THE WITNESS:  July 2013.
7  Okay.
8      MR. SLATER:  And I think
9  Bates number is ZHP-01397317.
10     (Document marked for
11  identification as Exhibit
12  ZHP-225.)
13     MR. SLATER:  And I think we
14  should use the color version,
15  Cheryll.
16  BY MR. SLATER:
17     Q.   The document that we have on
18  the screen, which I guess is
19  Exhibit 225 --
20     A.   Okay.
21     Q.   -- is a PowerPoint we were
22  provided and we're told that the date is
23  in July of 2013.
24         Does this look familiar to

Page 50

1  you?
2       A.   Yeah.  It's a SynCores PPT.
3       Q.   You said it's the
4  SynCores -- did you say PPP?
5       A.   No, PPT.  PowerPoint
6  presentation.
7       Q.   Got it.  What use was made
8  of this -- rephrase.
9            How was this PowerPoint
10  used?  Who would have used it?
11       A.   This is -- you know, I don't
12  know -- actually, this version, I haven't
13  seen it, okay.  But this is used when you
14  introduce your company to the clients,
15  you know, for that purpose.
16       Q.   The pages are not all
17  numbered.  So I'm having trouble giving
18  Cheryll a page number to go to.
19            MR. SLATER:  I'm trying to
20       get to a page more than halfway
21       through that says "R&D
22       Capabilities."
23            THE WITNESS:  Okay.
24            MR. SLATER:  But, Cheryll,

Page 51

1       you'll have to -- you're going to
2       have to scroll ahead.  I'll look
3       and see if the pages in the
4       other -- the black and white
5       version, but I don't have -- I
6       don't have it.  So you're just
7       going to have to scroll forward.
8       Good.  Thank you.
9  BY MR. SLATER:
10       Q.   This page describes some of
11  the research and development capabilities
12  for SynCores.  And I'm interested in the
13  middle one, analytical, where it says,
14  "Genotoxic impurity analysis."
15            Do you see that?
16       A.   Yeah, I see that.
17       Q.   And what is your
18  understanding of what that means,
19  genotoxic impurity analysis?
20       A.   That -- you said the
21  document was produced when?
22       Q.   The document was dated in
23  2013.
24       A.   Okay.  The genotoxic

Page 52

1  impurity, that was the concept, you know,
2  we slowly trying to grasp on it.  The ICH
3  M7 was not formally being set until 2016,
4  okay.  But we slowly know there are
5  genotoxic impurities, the concept at that
6  time.
7       Q.   Okay.  What does genotoxic
8  impurity analysis mean?
9            MR. BALL:  Objection.
10  Vague.
11            THE WITNESS:  I'm sorry.
12            MR. BALL:  I said objection.
13  Vague.
14            THE WITNESS:  Okay.  Do I
15  have to answer that?
16            MR. BALL:  Yes, you need to
17  answer it to the degree you can.
18            THE WITNESS:  Okay.  It
19  could have caused the gene to
20  mutate, okay.  That's called
21  genotoxic impurities.
22            THE VIDEOGRAPHER:  I'm sorry
23  to interrupt.  I'm the
24  videographer.

Page 53

1            Doctor, can you center
2       yourself on the screen, please.
3       Thank you.
4            THE WITNESS:  Let me --
5       okay.  Is that better?
6            THE VIDEOGRAPHER:  Yeah,
7       that's much better.  Thank you
8       very much.
9  BY MR. SLATER:
10       Q.   Can I ask you -- rephrase.
11            What is your e-mail address
12  at SynCores?
13       A.   HGu@SynCores.net, I think,
14  yeah, .net, yeah.
15       Q.   We're looking at the
16  indication of genotoxic impurity
17  analysis.  And you told me genotoxic
18  impurity is an impurity that can cause a
19  gene to mutate, correct?
20       A.   Yes.  I said potentially
21  that could cause gene to mutate.
22       Q.   Is it considered -- well,
23  rephrase.
24            What does it mean, as used

Confidential Information - Subject to Protective Order

1  here, genotoxic impurity analysis?  What
2  is a genotoxic impurity analysis as used
3  here?
4       A.    That was, you know, the PPT
5  was done before I was even join the
6  SynCores, okay, but I can tell you this,
7  after I join in 2014, okay, that was only
8  a new concept.  That was maybe only a,
9  you know, fashion statement in 2013.
10       MR. SLATER:  Cheryll, I
11       don't want to take it down.  But
12       if you can put up the e-mail dated
13       March 7, 2014, as Exhibit 226.
14       (Document marked for
15       identification as Exhibit
16       ZHP-226.)
17       MR. SLATER:  We'll come back
18       to the PowerPoint, but let's do
19       that first.
20       THE WITNESS:  Okay.
21  BY MR. SLATER:
22       Q.    We've put on the screen
23  Exhibit 226, which is a March 7, 2014
24  e-mail sent by Jie Wang, J-I-E, Wang, to

1  you and copied to a few people.
2       Do you see that?
3       A.    I see that.
4       Q.    And the e-mail says, "Eric,"
5  and that would be you, right?
6       A.    Yes.
7       Q.    "Eric, please see attached
8  previous SynCores presentation, which in
9  my view serves the purpose and principle
10  for basically covering both research and
11  development and production capabilities,
12  detailed illustration of development
13  capabilities, and services of/by
14  SynCores.  Of course, you may want to
15  update here and there as appropriate so
16  we can finalize it today."  Signed Jie
17  Wang.
18       Do you see what I just read?
19       A.    Yes.  I saw it, yep.
20       Q.    Okay.  And I can represent
21  to you that this -- the PowerPoint that
22  we've been going through is the SynCores
23  presentation 2013/7/12 PowerPoint
24  referred to as an attachment to this

1  e-mail.
2       Do you see that?
3       A.    Okay.  Yes.
4       Q.    Does this help to refresh
5  your memory at all that you saw this
6  PowerPoint in 2014?
7       A.    It doesn't, because there is
8  so many version of the SynCores PPT.
9       Q.    Okay.  Let's go back to the
10  PowerPoint.
11       A.    Okay.
12       Q.    The term "genotoxic impurity
13  analysis."
14       A.    Mm-hmm.
15       Q.    What is -- what is a
16  genotoxic impurity analysis?  Please tell
17  me what that means.
18       MR. BALL:  Objection.
19       Vague.
20       THE WITNESS:  Do I have to
21       answer that?
22       MR. BALL:  Yes, unless I
23       instruct you not to answer,
24       Dr. Gu, you have to answer.

1       THE WITNESS:  Okay.
2       Genotoxic impurity analysis, I
3       don't know what -- because that's
4       only few words put on a PPT.
5       Maybe they tried to impress some
6       clients or not, okay.  Maybe they
7       did some genotoxic impurity
8       analysis back in 2013.
9       But if you ask me what is
10       genotoxic impurity analysis, I
11       can't tell you, because that's
12       just a PPT.
13  BY MR. SLATER:
14       Q.    Does SynCores perform
15  genotoxic impurity analysis?
16       A.    At what time frame?  Could
17  you put it in the context?
18       Q.    Now.  Currently.
19       A.    Yes, we do.  Because we
20  have, you know, a process to do the
21  genotoxic impurity, you know, assessment
22  protocols.  We not necessarily do
23  analysis, but first thing we do is use --
24  there's two database post by the FDA to

Confidential Information - Subject to Protective Order

Page 58

1 do computer analysis first.
2          If you call that analysis,
3 too, okay, but the software wasn't
4 available back in 2013.  Nowadays, we do
5 have two software to do the -- to do the
6 analysis today.
7      Q.   You said that genotoxic
8 impurities analysis was a new concept in
9 2013?  Did you say that?
10      A.   That's the concept being
11 discussed in industry, okay.
12      Q.   Are you aware that the FDA
13 had a guidance for injury dated --
14 rephrase.
15          Are you aware that the FDA
16 had a guidance for the industry titled
17 "Genotoxic and Carcinogenic Impurities in
18 Drug Substances and Products:
19 Recommended Approaches," dated in
20 December 2008?  Are you aware of that?
21      A.   That was -- you know, that
22 was a discussion version, a draft.  I
23 think I saw that, yeah.  That was way --
24 long way back.

Page 59

1      Q.   When ZHP developed the zinc
2 chloride process, it knew that it had to
3 undertake a genotoxic impurity analysis,
4 correct?
5      A.   Could you -- could you
6 repeat the question again?  When ZHP
7 what?
8      Q.   Actually, I'll rephrase it
9 differently.
10          When SynCores and ZHP
11 developed the zinc chloride process, they
12 knew they had to conduct a genotoxic
13 impurity analysis, correct?
14          MR. BALL:  Objection.
15 Compound.
16          THE WITNESS:  I don't know
17 how to -- let me think, okay, how
18 to answer this question.
19          When SynCores develop the
20 zinc chloride process, we have to
21 do genotoxic impurity analysis?
22          Is that what you're asking?
23 BY MR. SLATER:
24      Q.   Yes.

Page 60

1      A.   Yeah, based on our knowledge
2 at that time, you know, if there was a
3 suspected genotoxic impurity in the
4 process, we will do the analysis.
5      Q.   When ZHP -- well, rephrase.
6          Was SynCores involved in the
7 development of the manufacturing process
8 for valsartan with sodium nitrite
9 quenching?
10      A.   In the lab scale, yes.
11      Q.   With regard to the valsartan
12 sodium nitrite quenching process, was
13 SynCores and ZHP responsible to perform a
14 genotoxic impurity analysis?
15          MR. BALL:  Objection.
16 Compound.
17          THE WITNESS:  When you know,
18 you will do the analysis.  If you
19 don't know okay, you will not.
20 BY MR. SLATER:
21      Q.   I'm sorry.  I didn't
22 understand the answer.  If maybe -- can
23 just say that again?
24      A.   Let me say it.  Okay.  When

Page 61

1 you know, you know, there is a suspected
2 genotoxic impurity in the process, you
3 will do the analysis.  If you do not know
4 at that time, okay, if you don't know,
5 what are you going to do?
6      Q.   That's why identification of
7 the potential impurity is so important as
8 part of the risk assessment, correct?
9          MR. BALL:  Objection.
10 Mischaracterizes his earlier
11 testimony.
12          THE WITNESS:  That's a
13 general -- general question.
14          Could you repeat with
15 specificity?  What are you talking
16 about?
17 BY MR. SLATER:
18      Q.   It's important to identify
19 potential -- rephrase.
20          It is important to identify
21 potential genotoxic impurities so that
22 the risk assessment can look to see if
23 they're being formed as part of the risk
24 assessment, correct?

Confidential Information Subject to Protective Order

Page 62

1    MR. BALL: Same objection.
2    THE WITNESS: Like I say,
3  again, okay, if you know, you will
4  look for it.
5    Okay. If you do not know,
6  what are you looking for?
7  BY MR. SLATER:
8    Q.   And as I asked you before,
9  that's why it's so important to identify
10 the potential genotoxic impurities so
11 that you can look for them, correct?
12   MR. BALL: Objection. Asked
13 and answered.
14   THE WITNESS: You asked me
15 the question several times. Let
16 me say it again.
17   If you do know, you will
18 look for it. If you do not know,
19 you are not looking for it.
20 That's not --
21 BY MR. SLATER:
22   Q.   If you don't know because
23 you performed an inadequate evaluation of
24 potential impurities, then you have

Page 63

1  violated good manufacturing practices,
2  correct?
3    MR. BALL: Objection.
4  Compound.
5    THE WITNESS: That --
6    MR. BALL: I'm sorry.
7  Objection, foundation.
8    THE WITNESS: Adam, you're
9  very funny. Okay. You're trying
10 to put the answer into my mouth
11 several times already. Okay.
12 BY MR. SLATER:
13   Q.   Could you answer my
14 question, please?
15   A.   Answer what? I forgot your
16 question again. Okay. You asked me
17 three times. You confused me. Okay.
18 Could you repeat that again?
19   Q.   If a manufacturer -- well,
20 I'll ask it more specifically to your
21 company.
22   If SynCores, who was working
23 with ZHP, failed to identify potential
24 genotoxic impurities because of a lack of

Page 64

1  adequate scientific analysis, that would
2  be a violation of good manufacturing
3  practices, correct?
4    MR. BALL: Objection.
5  Foundation.
6    THE WITNESS: Okay. Like I
7  said again, okay, at that time
8  okay, it's knowledge based. If
9  you knew, okay -- I think SynCores
10 did a comprehensive study for that
11 process already, okay.
12   In that time, okay, we
13 didn't know, okay. Nobody knows.
14 Even the FDA doesn't know. And
15 the industry doesn't know. So I
16 don't know -- your question or how
17 to answer your question. But I'll
18 just disagree.
19   MR. SLATER: Cheryll, do you
20 have handy Exhibit 209 that we
21 used last week? If you do, I'd
22 like to pull it up.
23   Thank you.
24    (Previously marked

Page 65

1    ZHP-209.)
2  BY MR. SLATER:
3    Q.   What's on the screen is
4  Exhibit 209, which is titled "IARC
5  Monographs on the Evaluation of the
6  Carcinogenic Risk of Chemicals to
7  Humans." And it's dated May 1978.
8    Do you see that in front of
9  you?
10   A.   Yeah. It's a red color.
11 It's difficult to read. Go ahead.
12   MR. SLATER: Let's go, if we
13 could, Cheryll, to Page 36.
14   Perfect. Thank you.
15 BY MR. SLATER:
16   Q.   Looking now at the third
17 paragraph on Page 36. It says, in the
18 first sentence, "It has been known since
19 1865 that the reaction of dimethylamine
20 hydrochloride with sodium nitrite at an
21 acidic pH yields NDMA."
22   Do you see that?
23   A.   Yeah, I'm reading that,
24 yeah.

Confidential Information - Subject to Protective Order

Page 66

1    Q.   You would agree with me that
2  SynCores and ZHP were responsible to know
3  of that potential chemical reaction when
4  they were developing the valsartan
5  manufacturing processes, correct?
6          MR. BALL:  Objection.
7  Vague.
8          THE WITNESS:  We did many
9    research and also the reference
10   search, okay -- has been
11   suggested -- because this is a
12   very, very, you know --
13   dimethylamine hydrochloride with
14   sodium nitrite at an acidic pH,
15   it's all very vague and, you know,
16   general comments.  They didn't
17   specify what the exact condition
18   was.
19        So I don't know how to
20   answer your question.  It has been
21   suggest.  It doesn't have any data
22   to it.
23        Okay.  I just consider this
24   as a general statement.

Page 67

1        Yep.  Go ahead.
2  BY MR. SLATER:
3    Q.   I'll ask again.
4    A.   Mm-hmm.
5    Q.   When ZHP was developing the
6  zinc chloride process, ZHP was
7  responsible to know that dimethylamine
8  and sodium nitrite, which could be
9  converted to nitrous acid in the
10 manufacturing process, could react and
11 form NDMA, right?
12   A.   Yeah, what are you referring
13 to?  Because we don't use dimethylamine.
14 We use DMF.
15   Q.   So you agree that ZHP and
16 SynCores were responsible to know what I
17 just asked you when they were developing
18 the process; is that correct?
19   A.   No, that's not correct.
20   Q.   Well, did SynCores and ZHP
21 know in 2011 that dimethylamine and
22 nitrous acid could react to form NDMA?
23 Did they know that?
24        MR. BALL:  Objection.

Page 68

1  Compound.
2        THE WITNESS:  Like I said,
3  okay, we used DMF.  We are not
4  using dimethylamine.  And it also
5  says dimethylamine hydrochloride,
6  okay.  Read it carefully.
7        And at an acidic pH.  I
8  don't know what you are referring
9  to by acidic pH.  PH 6.5 is
10 acidic.  But pH is minus two?  I
11 don't know.  I just could not
12 comprehend this.  Okay.  I just
13 don't -- this is general comments.
14        MR. SLATER:  Cheryll, you
15 can take this document down.
16        Let's go, if we could, to --
17 if you can go to 208.
18 Exhibit 208, Cheryll, the guidance
19 for industry from the FDA from
20 2008.  Let's put that up if we
21 could.
22        (Previously marked
23 ZHP-208.)
24 BY MR. SLATER:

Page 69

1    Q.   On the screen we have
2  Exhibit 208, which is the FDA's guidance
3  for industry, "Genotoxic and Carcinogenic
4  Impurities in Drug Substances and
5  Products:  Recommended Approaches," again
6  dated in December 2008.
7    A.   Mm-hmm.
8    Q.   You are familiar with this
9  document, correct?
10   A.   Yes, I'm familiar with that.
11        MR. SLATER:  Let's go, if we
12   could, to Page 7, please, Cheryll.
13 BY MR. SLATER:
14   Q.   In Section 4-A the title is
15 "Prevention of Genotoxic and Carcinogenic
16 Impurity Formation."
17        Do you see that?
18   A.   Yeah.  Could you -- could
19 you expand that a little bit.  It's very
20 small.
21   Q.   This -- rephrase.
22        The section says --
23 rephrase.
24        This states, "Since

Confidential Information – Subject to Protective Order

Page 70

[1] drug-related impurities presumably
[2] provide limited, if any, therapeutic
[3] benefits and because of their potential
[4] to cause cancer in humans, every feasible
[5] technical effort should be made to
[6] prevent the formation of genotoxic or
[7] carcinogenic compounds during drug
[8] substance synthesis or drug product
[9] manufacturing."
[10]       Do you see what I just read?
[11]    A.   Yeah, I saw it.
[12]    Q.   And what I just read, as a
[13] matter of risk assessment, SynCores was
[14] responsible to know that information in
[15] 2011, correct?
[16]    A.   Yeah.  2011.
[17]    Q.   ZHP was also responsible to
[18] know this information as well, correct,
[19] in 2011?
[20]       MR. BALL:  Objection.
[21]    Vague.
[22]       THE WITNESS:  2011, yes.
[23]    That -- yeah.  Okay.  Go ahead.
[24] BY MR. SLATER:

Page 71

[1]    Q.   In developing the zinc
[2] chloride manufacturing process, every
[3] feasible technical effort needed to be
[4] made to prevent the formation of
[5] genotoxic or carcinogenic compounds
[6] during drug substance synthesis or drug
[7] product manufacturing, correct?
[8]    A.   That's not correct.  Further
[9] read that okay.  "However, we recognize
[10] that completely preventing the formation
[11] of or removing an impurity of concern may
[12] not be possible in many cases."
[13]       Do you read that?
[14]    Q.   I'm sorry.  Is that your
[15] answer?
[16]    A.   Keep reading.  Okay.  Finish
[17] the last sentence of Section A for me,
[18] please.
[19]    Q.   Is that your answer to the
[20] question, sir?
[21]    A.   No, it's not.  Because
[22] that's only part of my answer.  Okay.
[23]       This is the only draft
[24] version of the guidance at that time.  We

Page 72

[1] are still discussing that because there
[2] are many things that we do not
[3] understand.  We humans are not capable of
[4] everything.  This is the one case.  This
[5] is scientific questions.
[6]    Q.   Do you know that your
[7] company -- well, rephrase.
[8]       Do you know that ZHP cited
[9] this guidance in submitting the updated
[10] DMF in December of 2013 to the FDA?
[11]       MR. BALL:  Objection.
[12]    Beyond the scope.
[13]       THE WITNESS:  This --
[14]       MR. BALL:  Eric, let me
[15]    finish, please.
[16]       Objection.  Outside the
[17]    scope of his 30(b)(6) topics.
[18]       Go ahead.
[19]       THE WITNESS:  Adam, could
[20]    you repeat the question again?
[21] BY MR. SLATER:
[22]    Q.   Yeah.  With regard to this
[23] FDA guidance, are you aware that ZHP
[24] cited to it in submitting the DMF for the

Page 73

[1] zinc chloride process to the FDA in
[2] December 2013?
[3]       MR. BALL:  Same objection.
[4]       THE WITNESS:  I didn't know,
[5]    because submitting DMF is not a
[6]    part of my job.
[7] BY MR. SLATER:
[8]    Q.   Did SynCores confirm that
[9] there were no -- rephrase.
[10]       Did SynCores confirm the
[11] genotoxic impurity profile for the zinc
[12] chloride process as part of its work in
[13] 2011?
[14]       MR. BALL:  Objection.
[15]    Foundation.
[16]       THE WITNESS:  I don't know
[17]    how to answer.
[18]       Adam, could you make this
[19]    question more direct.
[20] BY MR. SLATER:
[21]    Q.   Did SynCores do a genotoxic
[22] impurity analysis in connection with the
[23] zinc chloride process?
[24]    A.   Did SynCores do a genotoxic

Confidential Information - Subject to Protective Order

Page 74

1 impurity analysis with the process; is
2 that right?
3       Q.   With the zinc chloride
4 process, correct.
5       A.   Like I said, okay, we -- I'm
6 sure -- you know, I wasn't with the
7 company at that time.  But I'm sure we
8 did that.  If we knew, okay, there was a
9 genotoxic impurity, we would do analysis.
10      Q.   Well, did SynCores look for
11 nitrosamine impurities in the zinc
12 chloride process manufacturing process?
13         MR. BALL:  Objection.
14      Vague.
15 BY MR. SLATER:
16      Q.   I'll ask it differently.
17 When SynCores was helping to develop the
18 zinc chloride process, did it identify
19 NDMA as a potential impurity that had to
20 be tested for?
21      A.   As I said, okay, at 2011, we
22 did the process development based on the
23 ICH guidelines.  And at that time, okay,
24 we follow the GMP protocols.  And we

Page 75

1 didn't know the NDMA was the potential
2 impurity in the process.  And the
3 industry didn't know.  The FDA doesn't
4 know.  And nobody knows at that time.
5      Q.   You didn't know that NDMA
6 was a potential impurity of the process
7 because the people responsible failed to
8 do an adequate scientific analysis of the
9 potential chemical reactions and
10 degradants from those chemicals, correct?
11         MR. BALL:  Objection.
12      Mischaracterizes his earlier
13      testimony.
14         THE WITNESS:  No, I
15      disagree.  I answered that
16      question many times already.  I
17      don't know how many times you want
18      me to repeat that.
19 BY MR. SLATER:
20      Q.   So is it your testimony that
21 SynCores did a thorough scientific
22 analysis of potential chemical reactions
23 and missed NDMA as part of the thorough
24 analysis?

Page 76

1         MR. BALL:  Objection.
2      Mischaracterizes his earlier
3      testimony.
4         THE WITNESS:  Do I have to
5      answer that again?  I answered
6      this several times.
7         MR. BALL:  You have to
8      answer the question, okay.  Feel
9      free to answer yes or no.  If you
10     have to qualify it, feel free to
11     qualify it.
12        THE WITNESS:  Adam, I just
13     disagree with you.  It doesn't
14     matter how you ask it.
15        We, SynCores, did a --
16     thorough studies at that time
17     based on our knowledge about the
18     valsartan process.  We followed
19     the cGMP guidelines.  We follow
20     the ICH guidelines.  We did all we
21     can.
22        But unfortunately, at that
23     time nobody, including SynCores
24     and ZHP, including all other

Page 77

1 company making valsartan,
2 including FDA, EDQM, all of those
3 regulatory agencies, nobody knows
4 that.
5 BY MR. SLATER:
6      Q.   Who at SynCores evaluated
7 the potential for DMF to degrade or
8 decompose and form other substances as
9 part of the manufacturing process?  Who
10 was responsible for that analysis?
11        MR. BALL:  Objection.
12     Foundation.
13        THE WITNESS:  Adam, your
14     question is confused, okay.  At
15     that time?  Doing what?
16 BY MR. SLATER:
17      Q.   You said the question was
18 confusing?
19      A.   Yeah.  Could you please ask
20 more precise?
21      Q.   Who at SynCores evaluated
22 potential degradation of DMF as part of
23 the zinc chloride process?
24        MR. BALL:  Objection.

Confidential Information - Subject to Protective Order

Page 78

1    Vague.  Foundation.
2        THE WITNESS:  At what time?
3  BY MR. SLATER:
4    Q.   During the development of
5  the zinc chloride process.
6    A.   I don't know who because I
7  can tell you this, okay.  You know, of
8  course, you know, we select a solvent
9  based on stability.  And I think that's
10  good for the process.
11       MR. SLATER:  Michelle, can
12    you read that answer back for me,
13    please, when you get a moment.
14       MR. BALL:  Adam, we've gone
15    an hour 20.  Why don't we wrap up
16    with one more question and take a
17    break.
18       THE WITNESS:  My breakfast
19    should be -- should arrive.
20       MR. BALL:  We're going to
21    take a break here, Dr. Gu.
22       (Whereupon, the court
23    reporter read back the requested
24    portion of testimony.)

Page 79

1  BY MR. SLATER:
2    Q.   Did anybody at SynCores
3  evaluate the potential for DMF to degrade
4  during the zinc chloride process when
5  SynCores was helping to develop the zinc
6  chloride process?
7    A.   Okay.  Adam, let me answer
8  your question that way.  Because DMF is a
9  very stable solvent, it is commonly used
10  in the industry widely, and it has a
11  boiling point of 152 degrees celsius.
12  And it's below our process temperatures.
13       And we believe the DMF was
14  very stable at that time.  And so are
15  other companies that manufacture who are
16  also using the DMF for the process.  So
17  we think, okay, that the DMF is very
18  stable at that time.
19    Q.   Is there any particular
20  report that you're referring to when you
21  tell me that the boiling point was
22  analyzed in order to determine there was
23  no risk of it degrading during the zinc
24  chloride process?

Page 80

1        MR. BALL:  Objection.
2    Mischaracterizes --
3  BY MR. SLATER:
4    Q.   Is that in a document
5  somewhere?
6        MR. BALL:  Objection.
7    Mischaracterizes his earlier
8    testimony.
9        THE WITNESS:  Okay.  Can we
10    take a break now?
11       MR. BALL:  No, go ahead and
12    answer the question, Eric.  Then
13    we can take a break.
14       THE WITNESS:  Because he's
15    confuse -- Adam, I'm sorry,
16    because your question is so
17    confusing, okay, you know, I
18    just --
19  BY MR. SLATER:
20    Q.   I'm asking, is there a
21  particular report or document that you're
22  referring to that actually states the
23  information you just said about
24  evaluating DMF and its boiling point in

Page 81

1  connection with potential degradation of
2  DMF.  I want to know, is that documented
3  anywhere back during the development
4  process?
5        MR. BALL:  Objection.
6    Mischaracterizes his earlier
7    testimony.
8        THE WITNESS:  I don't know
9    what you are -- you know, what
10    report are you talking about for
11    this particular process.  You
12    know, put it into context.
13       You know, what are you
14    referring to?
15  BY MR. SLATER:
16    Q.   Is there any document from
17  SynCores or ZHP that documents that
18  potential degradation of DMF as part of
19  the zinc chloride process was evaluated
20  and that somebody determined, because of
21  the boiling point, it wasn't a concern?
22    A.   If the boiling point was a
23  concern, boiling point was the indication
24  of how stable the solvent is.

Page 82

1    Q.   Is there any document that
2  has that information in it, that that was
3  actually considered back when the zinc
4  chloride process was being developed?
5    A.   I don't know how to answer
6  these questions.  Okay.  Let me state it
7  again, okay.
8         The DMF was distilled, okay,
9  off to make the DMF.  It must be stable
10 at that temperature, right?
11    MR. BALL:  Okay, Adam.  Can
12 we take a break now?
13    MR. SLATER:  Is he done with
14 the answer?  As long as he's done,
15 we can.
16    THE WITNESS:  Yeah, I'm
17 done, okay.  Because I tell you
18 the DMF was distilled off to make
19 the DMF solvent.  It has to be
20 stable at those temperatures;
21 otherwise, DMF cannot be made.
22    MR. SLATER:  All right.  We
23 can take a break.
24    MR. BALL:  Thank you.

Page 83

1    THE VIDEOGRAPHER:  The time
2  right now is 8:25 a.m.  And we're
3  now off the record.
4    (Short break.)
5    THE VIDEOGRAPHER:  The time
6  right now is 8:42 a.m.  We are
7  back on the record.
8  BY MR. SLATER:
9    Q.   Looking again at the
10 PowerPoint that was provided to you in
11 2014, there was a page titled "Analytical
12 Capabilities."
13        Do you see that?
14    A.   Yes, I do.
15    Q.   And this talks about process
16 research and development and
17 manufacturing support, correct?
18    A.   Yes.
19    Q.   The third bullet point under
20 that says, "Identification of impurity,
21 structure elucidation."
22        Do you see that?
23    A.   Yes, I do.
24    Q.   What does it mean,

Page 84

1  identification of impurity?
2    A.   Identification of impurity
3  is, you know, for the reactions, there
4  might be side reactions.  We trying to
5  see -- excuse me, pardon -- to identify
6  impurity could be found in the process or
7  in the APIs or even in intermediates.
8    Q.   That requires an analysis of
9  the chemical reactions, correct?
10    A.   Yes.  We mainly focus on the
11 main reactions.
12    Q.   Well, you just said it.  The
13 main reactions and the side reactions
14 have to all be evaluated, correct?
15    A.   Yes.  We focus on the main
16 reactions.
17    Q.   You keep saying you focus on
18 the main reactions.  You also have to
19 evaluate the side reactions, correct?
20    A.   Yes, when you say you
21 should, a lot of things you should, yeah.
22 But as I said, you know, we focus on the
23 main reactions.
24    Q.   Good manufacturing practices

Page 85

1  requires evaluation of the main reactions
2  and the side reactions, correct?
3    MR. BALL:  Objection.
4    Vague.
5    THE WITNESS:  The GMP says
6    that?
7  BY MR. SLATER:
8    Q.   Correct.
9    A.   Yes, correct.
10    Q.   The reaction whereby DMF
11 decomposed to form dimethylamine, was
12 that a side reaction?
13    A.   That was not.  That was not
14 even side reactions.  That's the, you
15 know, solvent, you know, decomposing,
16 okay.
17    Q.   The reaction between
18 dimethylamine and nitrous acid, was that
19 a side reaction?
20    A.   You know, we define a side
21 reaction, is the -- you know, reactant,
22 react with the -- you know, bi-part.
23        In this case, the DMF
24 decomposed to DMA.  That was not even a

Page 86

1 side reactions.
2      Q.   The reaction between
3 dimethylamine, which you referred to as
4 DMA, and nitrous acid to form NDMA, is
5 that a side reaction?
6      A.   I don't know how to define
7 that.  Usually the reaction reacts with
8 reactants in a different way.  We call
9 that side reactions.
10      Q.   What do you call the
11 reaction between DMA and nitrous acid
12 that formed NDMA?  What do you refer to
13 that as?
14      A.   We didn't know there's a
15 DMA.  We only know there's a DMF at that
16 time.  So nowadays you ask me the DMA
17 with the sodium nitrite.  I don't know
18 how to call that.  But that's the -- has
19 nothing to do with the main reactants,
20 okay.  It's the, you know, acid and base
21 used in reactions.
22           I don't know how to call
23 that.  I don't have a definition for
24 that.

Page 87

1      Q.   I'm sorry.  I didn't meant
2 to say -- that's a chemical reaction,
3 correct?
4      A.   Yeah.  You can call that.
5      Q.   What is structure
6 elucidation?  I see that word there.
7 What does that mean?
8      A.   Structure elucidation means,
9 you know, when you did the reactions, you
10 found an impurity in the process, you are
11 trying to, you know, identify if
12 possible.
13           If not, okay, you try to
14 elucidate, okay, what's the potential
15 structure could be.
16      Q.   The fourth bullet point
17 says, "Genotoxic risk assessment for
18 API."
19           Do you see that?
20      A.   Yes, I see that.
21      Q.   What does that mean?
22      A.   Genotoxic risk assessment,
23 what does it mean by that?  For the APIs.
24 Okay.

Page 88

1      Q.   What does that mean?
2      A.   Let's say for the API, it's,
3 you know, similar structure, that could
4 be the risk -- could impose risk of
5 genotoxic impurity.  We assess that.
6      Q.   The risk assessment for
7 genotoxic impurity as part of the zinc
8 chloride process was required by GMP,
9 correct?
10      A.   As I said, okay, the
11 guideline for that time is a draft
12 document.  It's not commonly used for the
13 industry yet, okay.
14      Q.   So it's your testimony that
15 a genotoxic risk assessment was not
16 required by GMP when SynCores and ZHP
17 developed the zinc chloride process?
18      A.   I don't want you to confuse
19 with GMP with genotoxic risk assessment.
20           The document that you just
21 showed me, okay, that was only the draft
22 version.  It is not finalized yet.
23      Q.   I'll ask again.  Did good
24 manufacturing practices require SynCores

Page 89

1 and ZHP to perform a genotoxic risk
2 assessment as part of the development of
3 the zinc chloride process?
4           MR. BALL:  Objection.  Asked
5      and answered.
6           Go ahead.
7           THE WITNESS:  Let me just
8      rectify your concept.  GMP is
9      called cGMP, okay.
10           As the GMP guideline moving
11      forward, it's called current good
12      manufacturing practice.
13           As in this case, it's
14      genotoxic impurity risk assessment
15      still in the draft version here.
16           MR. SLATER:  Michelle, could
17      you read that answer back to me,
18      please.
19           (Whereupon, the court
20      reporter read back the requested
21      portion of testimony.)
22           MR. SLATER:  Cheryll, if you
23      could, let's put up Exhibit 206
24      from last week's deposition,

Confidential Information Subject to Protective Order

Page 90

1    please.  Please turn -- let's look
2    at the cover actually.
3           (Previously marked
4    ZHP-206.)
5    BY MR. SLATER:
6        Q.   On the screen we have
7    Exhibit 206, which is the EMA guidelines
8    that were in effect from January 1, 2007
9    to January 31, 2018, titled "Guideline on
10   the Limits of Genotoxic Impurities."
11          Do you see that?
12       A.   Yeah, I see that line there
13   in the middle.
14       Q.   Would you agree with me that
15   by 2011, the need to evaluate for
16   genotoxic impurities was well established
17   in the pharmaceutical manufacturing
18   industry?
19          MR. BALL:  Objection.
20   Vague.
21          THE WITNESS:  It is not --
22   could you let me read the
23   document, you know?  Don't just
24   show me a line, okay.  Can I read

Page 91

1    that?
2           MR. SLATER:  Sure.
3           Let's go off the time so
4    we're not -- the time stops
5    running and you can read it.  You
6    have as much time as you want.
7           THE WITNESS:  Can you scroll
8    it down?  How can I do that?
9           MS. CALDERON:  Do you want
10   me where to go?
11          THE WITNESS:  Keep going.
12   Guidelines, yeah, okay.
13          MR. BALL:  Dr. Gu, in the
14   chat, you can pull the document up
15   yourself.  Do you remember how to
16   do that?
17          THE WITNESS:  I seem to
18   see -- let's see.
19          MR. BALL:  Cheryll, you may
20   have to help him out with the
21   exhibit number.
22          MS. CALDERON:  Sorry.  I was
23   on mute.  It's 206.
24          MR. BALL:  So it might be a

Page 92

1    little more efficient, Dr. Gu, if
2    you can just go into the chat and
3    pull it up yourself.
4           THE WITNESS:  Yeah, I
5    just go the link, right?
6           MR. BALL:  Yeah, yeah, go to
7    the link, and then it's
8    Exhibit 206.
9           THE WITNESS:  Okay.  206.
10          MR. BALL:  If you can just
11   let us know when you're done
12   looking at it.
13          THE WITNESS:  Okay.
14          MR. BALL:  Thank you.
15          THE WITNESS:  Okay, I'm
16   done.
17          MR. BALL:  Okay.
18   BY MR. SLATER:
19       Q.   You got me on a bite of my
20   sandwich.
21          MR. BALL:  I got up and had
22   a bite too while he was reading
23   it.
24          MR. SLATER:  Okay.  We can

Page 93

1    go back on.
2           THE WITNESS:  Okay.
3    BY MR. SLATER:
4        Q.   This document was known to
5    SynCores and ZHP by 2011, correct?
6           MR. BALL:  Objection.
7    Compound.
8           THE WITNESS:  I don't
9    know -- I don know whether --
10   BY MR. SLATER:
11       Q.   I've got to ask it
12   differently because counsel is objecting
13   as a compound question.  So let me figure
14   out if I understand it, so I'll ask the
15   question differently.
16          By 2011, SynCores was aware
17   of this document, correct?
18       A.   Yeah, I assume, yes, because
19   this is the common document.
20       Q.   By 2011, ZHP was aware of
21   this document, correct?
22       A.   You know, I just can suppose
23   that.  I suppose they know.  But I don't
24   know exactly if they know or not.

Confidential Information Subject to Protective Order

Page 94

1    Q.   Just to be clear about
2  something -- well, let me rephrase.
3         SynCores is a wholly owned
4  subsidiary of ZHP, correct?
5    A.   Yes, correct.
6    Q.   And I think you said at the
7  early part of the deposition, you
8  consider yourself to be an employee of
9  ZHP, correct?
10   A.   Like I said, yes or no, I
11  was employed by the SynCores.  SynCores
12  is owned by ZHP.  So in a sense, yes.
13   Q.   For example, the computer
14  you're using during this deposition came
15  from ZHP, correct?
16   A.   Yes, that's correct.
17        MR. SLATER:  Let's turn to
18        Page 4 of 8, please, Cheryll.
19  BY MR. SLATER:
20   Q.   Section 4, titled
21  "Toxicological Background," states,
22  "According to current regulatory
23  practice, it is assumed that in vivo
24  genotoxic compounds have the potential to

Page 95

1  damage DNA at any level of exposure and
2  that such damage may lead/contribute to
3  tumor development.
4         "Thus, for genotoxic
5  carcinogens, it is prudent to assume that
6  there is no discernable threshold and
7  that any level of exposure carries a
8  risk."
9         Do you see what I just read?
10   A.   Yes, I see.
11   Q.   When SynCores was involved
12  in the development of the zinc chloride
13  process, SynCores was aware of that
14  information that I just read, correct?
15   A.   Yes.  I assume, yes.
16   Q.   When ZHP was developing the
17  zinc chloride process, ZHP was familiar
18  with that information, correct?
19   A.   I wouldn't say for ZHP or
20  for other people.  But I'll assume that's
21  the case.
22   Q.   The same answers would apply
23  to the TEA process with sodium nitrite
24  quenching, correct?

Page 96

1        MR. BALL:  Objection.
2  Vague.  Time frame.
3        THE WITNESS:  Yeah.
4        MR. SLATER:  Let's go to
5        Page 6 of 8, please, Cheryll.
6        Perfect.
7  BY MR. SLATER:
8    Q.   In the first full -- excuse
9  me.
10        In the first -- sorry.
11        In the first full paragraph,
12  this states some structural groups were
13  identified to be of such high potency
14  that intakes even below the threshold of
15  toxicological concern, or TTC, would be
16  associated with a high probability of a
17  significant carcinogenic risk," citing,
18  Cheeseman, et al., 1999; and Kroes, et
19  al, 2004.
20        "This group of high potency
21  genotoxic carcinogens comprises
22  aflatoxin-like, n-nitroso and azoxy
23  compounds that have to be excluded from
24  the TTC approach.  Risk assessment of

Page 97

1  members of such groups requires
2  compound-specific toxicity data."
3         Do you see what I just read?
4    A.   I see what just read, yes.
5    Q.   And you see that the term
6  "risk assessment" is used in connection
7  with the evaluation of those potential
8  carcinogens, correct?
9    A.   Yes.
10   Q.   And the n-nitroso compounds
11  would include NDEA and NDMA, correct?
12   A.   I don't know.  It's called
13  n-nitroso compounds, yeah, because
14  n-nitroso compounds, it includes many of
15  those.  I assume NDMA and NDEA is part of
16  it, yes.
17   Q.   And certainly by 2011, the
18  risk assessment performed by SynCores
19  needed to evaluate whether or to what
20  extent such genotoxic impurities might
21  exist in the manufactured product,
22  correct?
23   A.   Adam, would you repeat your
24  question again?

Page 98

1    Q.   Sure.  When SynCores was
2  involved in the development of the zinc
3  chloride process, it knew it had to
4  evaluate as part of its risk assessment
5  to make sure that no such genotoxic
6  impurities would be in the product,
7  correct?
8          MR. BALL:  Objection.
9      Vague.
10         THE WITNESS:  Adam, let me
11     answer your question that way.
12         SynCores work assessed risk,
13     you know, of the genotoxic
14     impurity based on the knowledge
15     they have known for the process.
16 BY MR. SLATER:
17     Q.   Did SynCores evaluate the
18 potential decomposition of DMF into DMA
19 as part of the zinc chloride process?
20     A.   At that time, okay,
21 SynCores, we believe the DMF is very
22 stable solvent.  We didn't know it
23 decomposed to the DMA and the particular
24 reaction conditions.

Page 99

1          And also, if you want to
2  know when it's decomposed to DMA or not,
3  you need to specify a method to do that.
4  I believe we didn't know, and we didn't
5  do that.
6      Q.   So am I correct that was not
7  considered as part of the risk
8  assessment?
9          MR. BALL:  Objection.  Asked
10     and answered.
11         THE WITNESS:  You just
12     changed my answers, okay.
13         We do whatever possible with
14     the knowledge base at that time,
15     we did our risk assessment for the
16     process.
17 BY MR. SLATER:
18     Q.   As part of SynCores
19 development of the sodium nitrite
20 quenching process for the TEA process,
21 did SynCores take into account the
22 possibility that triethylamine
23 hydrochloride could contain diethylamine
24 or dimethylamine?

Page 100

1    A.   SynCores -- I don't believe
2  SynCores did the triethylamine process.
3  We did at SynCores the DMF process.
4      Q.   Did SynCores or anybody at
5  SynCores do any sort of a scientific
6  literature search regarding the chemicals
7  and the chemical reactions that were
8  going to occur in the zinc chloride
9  process it was developing?
10     A.   I'm sure we did the, you
11 know, literature search based on what's
12 available to us.
13         MR. SLATER:  Cheryll, what
14     I'd like to do is first put up, I
15     guess, the -- it looks like we
16     have the English and Chinese
17     language versions.  It looks like
18     they have the same Bates number
19     for the contract review form.  I
20     have ZHP-00000215.
21         Can we put that up, please.
22         MS. CALDERON:  Sure.  Just
23     give me one minute.
24         MR. SLATER:  Yeah, the --

Page 101

1  exactly.  That's the Bates number.
2  ZHP-00000215.  It's a
3  Chinese-language document.
4          Okay.  This is exhibit --
5      what number are we up to?  Is it
6      227?
7          MS. CALDERON:  Yes.
8          (Document marked for
9      identification as Exhibit
10     ZHP-227.)
11 BY MR. SLATER:
12     Q.   Looking now at Exhibit 227,
13 can you tell me what this document is,
14 please?
15     A.   It's called the, you know --
16 ZHP's, you know, contract assessment
17 table.
18     Q.   That's the title?
19     A.   Yeah.
20     Q.   In the section on the
21 details of the contract, which is the
22 second section, does this talk about
23 Shanghai SynCores Technologies, Inc., and
24 what its role would be?

Confidential Information Subject to Protective Order

1    A.   You want me to translate
2 that to you line by line?
3    Q.   No.  If you could answer my
4 question, please.
5    A.   The second -- the second
6 line, or second -- you know, row, it just
7 says they're going to, you know, hire
8 Shanghai SynCores to do the, you know,
9 process development and with some of the,
10 you know, targets.  Let's say, one, two,
11 three, four.  And that's about it.  And
12 how much the contract will pay.
13    Q.   I see Items 1, 2, 3, and 4
14 in the section of the details of the
15 contract.
16        Do you see that?
17    A.   I see that, yes.
18    Q.   With regard to impurities,
19 what does that say in Number 3?
20    A.   Number 3 says single --
21 single -- a single -- one single impurity
22 should be equal or less than 0.1 percent.
23    Q.   What does Number 4 say about
24 impurities?

1    A.   Number 4 is the total
2 impurity equal or less than 0.3 percent.
3    Q.   Does the document state
4 anything regarding genotoxic impurities?
5    A.   It didn't put into words,
6 but I'm sure it's all in the, you know,
7 let's say, the total impurity or single
8 individual impurity.
9    Q.   My question is, does this
10 document specifically address genotoxic
11 impurities?
12    A.   On the paper, reading word
13 by word, no.
14    Q.   If you could, could you
15 explain to me in general terms, what was
16 the arrangement between SynCores and ZHP
17 regarding the zinc chloride process?
18 What was SynCores hired to do?
19        MR. BALL:  Objection.  Vague
20    to time frame.
21        THE WITNESS:  Do I have to
22    answer?
23        MR. BALL:  Yes, you need to
24    answer.  Sorry.  Unless I tell you

1 not to answer, you have to answer.
2        THE WITNESS:  Okay.  The ZHP
3    hired Shanghai SynCores to develop
4    a new process with the target of
5    one, two, three, four.
6        Is that clear?
7 BY MR. SLATER:
8    Q.   Let's go through one and
9 two.  Number 1 says "Content, HPLC" --
10 well, actually let me ask you this.  What
11 does Number 1 say?
12    A.   Number 1 is we call the
13 content or called the assay by HPLC, 98.0
14 to 102.0 percent.
15    Q.   And what does that
16 represent, 98 to 102 percent?
17    A.   That's usually is the API
18 content.  We call that weight by weight
19 assay.  Okay.  So using HPLC to analyze
20 that, the content should be between 98.0
21 to 102.0, you know, range.
22    Q.   And in the details of the
23 contract section, Number 2, what does
24 that state?

1    A.   It says the reaction yield
2 should be greater or equal to 40 percent.
3    Q.   And what is the reaction
4 yield?  What is that referring to?
5    A.   We try and make A plus B
6 equals C.  We want to, let's say, to see
7 the recovery is -- we call that yield.
8 Okay.  It should be more than -- or equal
9 or more than 40 percent.
10        MR. SLATER:  Cheryll, could
11    you go, if you could, to the page
12    with Bates Number 217 on it,
13    please.
14 BY MR. SLATER:
15    Q.   Towards the top of the page
16 I see a section that has a one, two,
17 three listed.
18        Do you see that section?
19    A.   Yes, I see that.
20    Q.   What's the heading for that
21 section?  What does it say is the
22 heading?
23    A.   The heading is -- Number 1
24 is the, you know, the content for the

¹ development work.
²     Q.   What is the heading though?
³ What is the title of that section?
⁴     A.   You are talking about the
⁵ SynCores responsible for ZHP to develop a
⁶ valsartan new process.
⁷     Q.   Is that what it says right
⁸ above the Number 1?
⁹     A.   Right above Number 1 is the
¹⁰ contract technical content and the
¹¹ requirement.
¹²     Q.   Number 2, next to the Number
¹³ 2, does that say requirements?
¹⁴     A.   Yeah.  It says requirements.
¹⁵     Q.   And under the heading of
¹⁶ requirements, Number 1, does that refer
¹⁷ to, "Upon completion of process
¹⁸ development"?
¹⁹     A.   Mm-hmm.
²⁰     Q.   "Party B" -- and party B
²¹ would be SynCores, correct?
²²     A.   Yeah.  Party B, yes.
²³     Q.   "SynCores shall complete
²⁴ three validation batches."

¹     A.   Mm-hmm.
²     Q.   And what else does it say
³ about those three validation batches?
⁴     A.   You mean keep -- what are
⁵ you -- what are you asking?
⁶     Q.   If you could read the rest
⁷ of the sentence, please.
⁸     A.   Okay.  "Shall complete three
⁹ validation batches.  Yield and the
¹⁰ quality meets the requirement, or India
¹¹ you know, require, you know, a range.
¹²     Q.   Does it refer to a
¹³ successful test of the process?
¹⁴     A.   Test of the process of what?
¹⁵     Q.   In Number 1 that you just
¹⁶ read from, does it refer to a successful
¹⁷ test of the process?
¹⁸     A.   Yeah.  Yes.  Successful test
¹⁹ of the process in the pilot scale.
²⁰     Q.   Is that saying SynCores
²¹ would conduct the pilot scale study?
²²     A.   No.  On the paper it reads
²³ that way.  Usually the pilot scale is on
²⁴ the commercial side.

¹     Q.   So the reasonable
² understanding of this agreement would be
³ that after the development of the process
⁴ at the lab-scale level by SynCores, that
⁵ ZHP would then perform the pilot scale
⁶ testing?
⁷     A.   Yes, that's correct.
⁸     Q.   Tell me if I understand this
⁹ right.  Only ZHP could conduct the pilot
¹⁰ scale testing because only ZHP would have
¹¹ the facilities that would be able to
¹² conduct that level of testing, as
¹³ compared to SynCores?
¹⁴     A.   Yes.  SynCores does not have
¹⁵ the equipment or the facility to do that.
¹⁶     MR. SLATER:  Cheryll, can
¹⁷     you scroll down to the bottom half
¹⁸     of the page, please.  Cheryll?
¹⁹     Bueller?  Thank you.
²⁰     Had to get a "Bueller" into
²¹     this deposition.
²² BY MR. SLATER:
²³     Q.   Looking now at the bottom
²⁴ half of this page, which is Bates Number

¹ 217 are the last three digits.  I think
² this indicates in its heading, "Technical
³ Indicators and Parameters to be Met."
⁴     Is that a fair reading of
⁵ that?
⁶     A.   Yes.  That's item Number 1,
⁷ yeah.
⁸     Q.   And Number 1, what does that
⁹ say, Number 1.  If you could just read
¹⁰ the first Number 1.
¹¹     MR. BALL:  Adam, do you want
¹²     him to translate it?  Or do you
¹³     want him to give the gist of it.
¹⁴     MR. SLATER:  I think it's
¹⁵     probably best if he just reads it
¹⁶     to me.
¹⁷     THE WITNESS:  In Chinese?
¹⁸     Or translate into English,
¹⁹     right?
²⁰ BY MR. SLATER:
²¹     Q.   Thank you.
²²     A.   Okay.  That's the content,
²³ HPLC should be between a range of 98.0 to
²⁴ 102.0 percent.

1    Q.   I'm sorry.  I'm talking
2  about the Number one above that.
3    A.   Oh, Number one above that.
4    Q.   Yes.
5    A.   Okay.  Supposed to reach the
6  technical indication in the parameters.
7    Q.   Let me take a stab at it.
8  Tell me if my reading is a fair reading.
9    A.   Okay.
10    Q.   And I'm now -- rephrase.
11    I'm looking now at the
12  bottom part of the page, that's Page 1,
13  which is Bates 217, the second section
14  for the technical indicators and
15  parameters to be met.  There's a Number 1
16  underneath that.
17    A.   Mm-hmm.
18    Q.   Which I read as, "The purity
19  and content of the final product sample
20  provided by Party B," which we've agreed
21  is SynCores, "shall meet the quality
22  standards of the valsartan process, and
23  the quality standards are provided as
24  follows."

1    Do I have that read right?
2    A.   Yeah.  You know, yes, you
3  are right.  But if you're reading this
4  directly, it didn't say that much.  Okay.
5  You just said a lot, which is not
6  reflected in the -- in this document.
7    Q.   Was my reading of it a fair
8  understanding of what it was stating?
9    A.   Yeah.  I mean, actually,
10  yeah, you can say that.
11    Q.   And then the four items
12  below are the four items that we went
13  through previously, correct?
14    A.   Yes, the same.
15    Q.   And those quality standards
16  were set in advance by ZHP, correct?
17    A.   That's correct.  That is the
18  ZHP's requirement.
19    Q.   If SynCores determined based
20  on its own risk assessment that there was
21  a potential genotoxic impurity that could
22  be created due to the chemical reactions
23  in the process, would SynCores have been
24  required to advise ZHP of that?

1    MR. BALL:  Objection.
2  Speculation.
3    THE WITNESS:  Yeah.  If we
4  knew okay, then we would discuss
5  that with ZHP, or report to ZHP.
6  BY MR. SLATER:
7    Q.   I think this document
8  actually states the amount paid to be per
9  the contract.  Can you tell me what that
10  amount was?
11    A.   If you scroll back up, I
12  think -- I think it's 200,000 -- if I
13  remember correctly.  200,000 -- keep
14  going back, yeah, up, up, up.
15    Where did I read it?  If you
16  keep going up.  Oh, it's not there.  Then
17  it's going down somewhere.  I saw it -- I
18  think I saw it somewhere.  It's 200,000
19  RMB somewhere, going down, and also said
20  how the amount is going to be paid.
21  Going down.  Right there.
22    The contract total amount
23  will be 200,000 RMB and will be paid
24  in -- first, we were paid 100,000 RMB.

1  The second payment would be another
2  100,000 RMB.
3    Q.   And did SynCores perform
4  this contract and get paid on this
5  contract?
6    A.   Oh, I didn't talk to the --
7  assume, yeah, they perform the contract,
8  they get paid.
9    MR. SLATER:  Cheryll, can
10  you go to the page where the Bates
11  number is 222, please.  Can you
12  scroll up a little bit more?
13  Perfect.
14  BY MR. SLATER:
15    Q.   Tell me if I'm correct, that
16  in the box on the left, the second box
17  from the top, all the way to the left, it
18  has -- it lists the developer, Party B,
19  as SynCores?
20    A.   Yes.
21    Q.   And it lists a legal
22  representative for SynCores.  Who is
23  listed?
24    A.   Mr. Chen.

Confidential Information - Subject to Protective Order

1    Q.   Mr. Chen, the chairman of
2  ZHP?
3    A.   Yes.
4    Q.   Do you know why he's listed
5  as the legal representative for SynCores?
6    A.   I don't know why, because
7  when they set up the company, Mr. Chen
8  was the legal representative.  I think
9  that's -- has been changed since then.
10    Q.   Do you know what Mr. Chen's
11  involvement was, if any, in this contract
12  or the work done under this contract?
13    A.   None.
14    Q.   When you say none, what do
15  you mean?
16    A.   He didn't involved at all,
17  okay, for the SynCores business.
18    Q.   Have you spoken with
19  Mr. Chen, the chairman of ZHP, about the
20  NDMA and NDEA impurities in valsartan?
21    A.   At what time?
22    Q.   At any time, have you
23  discussed that with him?
24    A.   I think so, yes.  That was

1  like sometime in the late 2018 when we
2  discovered there was a problem, we had a
3  few meetings together.
4    Q.   Was it just you and him or
5  were there other people involved too?
6    A.   I remember there was other
7  people involved as well.
8    Q.   What, if anything, do you
9  recall him stating about the impurities?
10    A.   Yeah.  He ask us, every
11  department, do whatever we can to find
12  out what -- you know, what is it, okay.
13  And then we arrange for the risk
14  assessment work to be done.
15    Q.   You're saying he arranged
16  for the risk assessment work to be done,
17  or he told you and the other departments
18  to do so?
19    A.   Told us to do so, yeah.
20    Q.   Were the results reported to
21  him?
22    A.   Usually he is not involved
23  into that much, with the technical part.
24  He just being told of the results.

1    Q.   Do you know if the results
2  were reported to him?
3    A.   I think so.  He must know
4  the results.
5    Q.   Do you know what, if
6  anything, he did in response to learning
7  the results of the risk assessments?
8    A.   Adam, could you -- could you
9  repeat the question again?  I didn't
10  quite --
11    Q.   Sure.  Do you know what --
12  sure.
13        Do you know what Mr. Chen,
14  the chairman of ZHP, did in response to
15  learning the results of the risk
16  assessment regarding the impurities that
17  were discovered in 2018?
18    A.   Usually we give the
19  suggestion.  So what we are supposed to
20  do, how we are going to report and do
21  what, you know, do what supposed -- you
22  know, what has to be done, he approves
23  that.  He usually allocate resource, you
24  know, funding for us.

1    Q.   Do you know what, if any,
2  specific concerns he had about this?
3    A.   Yeah, to make sure that we
4  follow all the guidelines, we follow --
5  do whatever we can to -- you know, to
6  protect the patients and you, know,
7  receive -- for example, recall the
8  materials, all those other things.
9    Q.   Do you recall him stating
10  that, or is this what you're assuming he
11  did?
12    A.   I think I heard -- you know,
13  in a meeting, he said about that, okay.
14    Q.   When was that meeting?
15    A.   I don't remember exactly,
16  but that was -- that was when we learned
17  about it in a meeting to discuss this
18  matter.
19    Q.   When you say you learned
20  about it, what do you mean by that?
21  Learned about what?
22    A.   Learned about there are
23  potential genotoxic impurity in the
24  valsartan, while we are still confirming,

Confidential Information - Subject to Protective Order

Page 118

1 developing a method.  And Mr. Chen said
2 let's do that first, okay, while we're
3 still doing the research, to take some
4 proactive steps to protect the patients,
5 okay.
6     Q.   Who else attended that
7 meeting?
8     A.   I think the regulatory
9 people, the quality people, the
10 manufacturing people participated --
11 participated here.
12     Q.   Where did this meeting take
13 place?
14     A.   I remember it's in the ZHP.
15     Q.   Where in ZHP?
16     A.   ZHP, the head of quality,
17 Shengzhou, it's in the Zhejiang province.
18     Q.   And which room did it take
19 place?  Do you recall?
20     A.   There's quite a few meeting
21 room.  I'm sure it's one of them on the
22 first floor.
23     Q.   Do you know if minutes were
24 taken of that meeting?

Page 119

1     A.   I don't know.  Because I'm
2 not -- I don't know.
3          MR. SLATER:  Let's pull up,
4     Cheryll, if we could -- we can
5     take that down.  Exhibit 199.
6          (Previously marked
7     ZHP-199.)
8 BY MR. SLATER:
9     Q.   Do you see the document that
10 we've put on the screen as Exhibit 199?
11     A.   Yes.  It says Peng Dong ZHP
12 199, yes.
13     Q.   Are you familiar with this
14 document?
15     A.   I think I saw it in the
16 past.
17     Q.   This is the SynCores
18 research and development report of
19 valsartan (SC-1141), correct?
20     A.   Yes, correct.
21     Q.   Looking at Number 1, the
22 project target, it talks about
23 optimization of the process.  And I want
24 to stop there.

Page 120

1          What does optimization mean?
2     A.   Optimization means, okay,
3 when you have a process to make, you
4 know, a particular compound, you want to
5 do the process optimization to fine tune
6 the process parameters.
7          We call that -- in order to
8 maximize the yield and give you better
9 quality, intermediate or product, or
10 better safety profiles, good quality of
11 product, that's called optimization.
12     Q.   This says that one of the
13 goals was to improve the total yield of
14 the valsartan, correct?
15     A.   Yeah.  That was one of the
16 goals, yes.
17     Q.   How would that be beneficial
18 to improve the yield?
19     A.   Improve the yield, you can
20 reduce the waste.  That always will be
21 beneficial to the environment.
22     Q.   What are the other benefits
23 of improving the yield?
24     A.   Other benefits improving

Page 121

1 yield could lower the cost.
2     Q.   One of the benefits of
3 improving the yield is to lower the cost,
4 correct?
5     A.   That's not always the case
6 because you improve the yield, you know,
7 that's with the -- the assumption is that
8 you have to produce better quality
9 materials.  If that assumption couldn't
10 be met, it's useless to improve the
11 yield.
12     Q.   In the case of the valsartan
13 zinc chloride process, improving the
14 yield lowered the cost, correct?
15     A.   No.  Like I said, again --
16 okay, let me repeat it one more time.
17          Improve the yield, lower the
18 cost under the precondition is better
19 quality material to be made.
20          If that precondition could
21 not be met, you know, forget about
22 improving the yield.
23     Q.   So you're saying with
24 valsartan's zinc chloride process, it was

Page 122

1   not better quality than the prior
2   process?
3           MR. BALL:  Objection.
4       Mischaracterizes his earlier
5       testimony.
6           THE WITNESS:  You know, if
7       the product is not better quality,
8       the FDA would not approve that.
9       This drug business is heavy
10      regulated.  You have to meet the
11      FDA requirement first before we
12      can do anything else.
13  BY MR. SLATER:
14      Q.   In the case of valsartan,
15  the zinc chloride process, was the yield
16  improved and the cost lowered?
17          MR. BALL:  Objection.
18      Compound and outside the scope.
19          THE WITNESS:  You know, we
20      are developing a process with many
21      goals, okay.  If the yield was
22      improved, I assume the cost would
23      be lower, but that's not always
24      the case.

Page 123

1   BY MR. SLATER:
2       Q.   Well, in this case, that's
3   what occurred, right?
4           MR. BALL:  Objection.
5       Outside the scope.
6           THE WITNESS:  I didn't know,
7       because let's say you change the
8       process, you're using different
9       chemicals, sometimes even the
10      yield is improved, but the cost
11      might not be lower.
12  BY MR. SLATER:
13      Q.   Well, okay.  So you don't
14  know the answer to the question?  Is that
15  what it is?
16      A.   I didn't know the -- because
17  the cost -- the cost, you know, how much
18  cost was reduced, that number would be
19  generated at the commercial side.  We
20  don't do the -- we just do a rough
21  estimation.  But the final number come
22  out of the commercial side.
23      Q.   I'm just trying to make sure
24  I understand.  With regard to the

Page 124

1   question of whether the yield of
2   valsartan was improved and the cost was
3   lowered as a result, you don't know the
4   answer, correct?
5           MR. BALL:  Objection.
6       Compound.  And outside the scope.
7           THE WITNESS:  Adam, like I
8       said, again, for research people,
9       you know, we doing the -- the goal
10      is to make better quality
11      materials to improve the yield.
12      That's always the objective.
13          But at the end, what's the
14      final cost for the material going
15      to be at the commercial scale is
16      decided by the commercial
17      manufacturers, because calculating
18      the cost is quite a complicated
19      process.
20  BY MR. SLATER:
21      Q.   You said that SynCores' goal
22  was better quality materials, correct?
23      A.   Yes.  As I said, it has to
24  be, because if you making changes, you

Page 125

1   know, if you don't make a better -- equal
2   or better quality material, the FDA won't
3   approve that.
4       Q.   And it's your understanding
5   that the FDA approved the material
6   manufactured by the zinc chloride
7   process?
8       A.   Yes.  FDA, we send the
9   change to FDA, to the EDQM, to those
10  regulatory bodies, okay.  They approve
11  that.
12      Q.   Did the FDA actually test
13  the material and approve it?
14          MR. BALL:  Objection.
15      Outside the scope.
16          MR. SLATER:  I'm responding
17      to his statement, so I think I
18      can --
19          MR. BALL:  Adam, Adam, I'm
20      allowed to make my objection.
21          MR. SLATER:  Yeah, I know.
22      I'm just saying I think because he
23      said it, I have to follow up on
24      his answer.

Confidential Information - Subject to Protective Order

Page 126

1     MR. BALL:  You don't have to
2  follow up.  You can follow up if
3  you choose to.
4     MR. SLATER:  I feel
5  compelled to do so.
6     THE WITNESS:  Okay.  So I
7  can answer that, right?
8     MR. BALL:  Go ahead.
9     THE WITNESS:  Okay.  Adam,
10  you're asking the FDA take the
11  material to do testing?  Right?
12 BY MR. SLATER:
13    Q.   Right.
14    A.   You might have to talk to
15 the regulatory people.  But as far as I
16 understood, okay, the FDA come to, you
17 know, audit or inspect how you do the
18 analysis.  But the FDA, sometimes they do
19 take samples back to analyze that.
20    But in this case, I don't
21 know.  I would assume -- I wouldn't --
22 you know, I do not know.  I just don't
23 know whether the FDA take the samples
24 back and do an analysis or not.

Page 127

1     Q.   You said SynCores' goal was
2  to develop better quality materials.
3     As you sit here now, you
4  would agree with me that the material was
5  not better quality.  It actually
6  contained NDMA, which was an unintended
7  genotoxic impurity, correct?
8     MR. BALL:  Objection.
9  Mischaracterizes his earlier
10  testimony.
11     THE WITNESS:  Adam, okay, as
12  I said, okay, for the
13  pharmaceutical business, you have
14  to make an equal or better quality
15  materials in order to be approved
16  by any regulatory bodies, okay?
17     You know, did I answer your
18  question?  Or do I have to repeat
19  myself?
20 BY MR. SLATER:
21    Q.   As you sit here right now,
22 the valsartan manufactured by the zinc
23 chloride process which was developed by
24 SynCores produced valsartan with an

Page 128

1  unacceptable quality risk, correct?
2     MR. BALL:  Objection.
3  Mischaracterizes his earlier
4  testimony.
5     MR. SLATER:  I'm not
6  characterizing testimony.  I'm
7  making an informed --
8     MR. BALL:  Well, what are
9  you -- are you asking a question?
10     MR. SLATER:  I'm asking if
11  he agrees with that statement.
12     THE WITNESS:  Adam, let me
13  just -- Adam, the process was meet
14  the FDA requirement.  It has been
15  approved by the FDA and the EDQM.
16 BY MR. SLATER:
17    Q.   Did SynCores intend to
18 develop a process that would yield
19 valsartan that contained NDMA?
20    A.   Adam, no.
21    Q.   Speaking for SynCores, do
22 you agree that the contamination of the
23 valsartan with NDMA was unacceptable?
24     MR. BALL:  Objection.

Page 129

1  Vague.
2     THE WITNESS:  Adam, okay,
3  you know, would you -- is this a
4  question or is this a statement?
5 BY MR. SLATER:
6     Q.   It's a question.  Do you
7  agree with my statement that the NDMA
8  impurity was unacceptable?
9     A.   Could you put this into
10 content?  This is a general statement,
11 okay.
12     If you ask me now, okay,
13 after we go through all those we know,
14 then I can answer your question.  But at
15 that time, we didn't know.
16     So, Adam, could you repeat
17 your question again?  I don't know how to
18 answer your question now.
19    Q.   As you sit here right now,
20 you agree with me that the NDMA
21 contamination of the valsartan
22 manufactured by the zinc chloride process
23 was unacceptable?  Do you agree with that
24 statement?

Confidential Information - Subject to Protective Order

---

Page 130

1     MR. BALL:  Objection.
2 Vague.  Asked and answered.
3     THE WITNESS:  Adam, are you
4 talking about now?
5 BY MR. SLATER:
6     Q.   Yes.
7     A.   2021, or after 2018, June,
8 yes, that is not acceptable.
9     Q.   Looking at this agreement --
10     MR. SLATER:  If we can
11 scroll down to the bottom half of
12 the first page, please, Cheryll.
13     Perfect.  Thank you.
14 BY MR. SLATER:
15     Q.   This sets forth a
16 specification of crude valsartan.
17     Do you see that?
18     A.   Specification of crude, yes.
19     Q.   Just so that we have our
20 vocabulary straight between us, what does
21 that mean, crude valsartan?
22     A.   Crude valsartan is the crude
23 product in the reaction.  It hasn't been
24 final purified yet by reconciliation

---

Page 131

1 process.  That's called crude.
2     Q.   What, if any, impurities are
3 identified in these specifications?
4     A.   I'm sorry.  What was your
5 question again?
6     Q.   Under Number 1, the
7 specification of crude valsartan, what,
8 if any, impurities are addressed?
9     A.   You know, D-isomers is
10 specified in there.  And the impurity H,
11 okay, is -- and other unknown impurities.
12 And the total amount of impurity allowed
13 is in the table.
14     Q.   Who established those
15 specifications?
16     A.   The specification of the
17 crude valsartan is established by the
18 ZHP.
19     Q.   Did SynCores utilize gas
20 chromatography-mass spectometry to
21 evaluate potential impurities in the
22 valsartan it was developing per this
23 contract?
24     A.   Adam, could you -- could you

---

Page 132

1 rephrase that again?
2     Q.   Sure.  Did SynCores use gas
3 chromatography-mass spectometry to try to
4 identify unknown impurities that may have
5 developed in the development of the zinc
6 chloride process?
7     A.   The answer is SynCores use
8 the GC.  GC-mass was not available for
9 SynCores at that time.  So the GC-MS is
10 not so commonly seen in the -- in the,
11 you know -- the commercial side or other
12 manufacturers.
13     We use GC, okay, to analyze
14 the -- residual solvents, GC alone.
15     Q.   Number 2 at the bottom of
16 the page says, "Specification of final
17 API."
18     MR. SLATER:  Cheryll, if you
19 could then scroll to the next page
20 so we can see the table that would
21 be great.  Thank you.
22 BY MR. SLATER:
23     Q.   And just to be clear, when
24 this says specification of final API,

---

Page 133

1 what does that mean as shown on this
2 table?
3     A.   I didn't see it say -- I
4 didn't see it say anywhere this is final
5 API.  Maybe that's being blacked out.
6     Q.   No.  That was at the bottom
7 of the prior page.
8     MR. SLATER:  Cheryll, please
9 show him again just so we don't
10 have a question.
11     THE WITNESS:  Oh, yeah,
12 yeah, I see it.  Specification of
13 final API.  Okay.  Scroll down.
14 Thank you.  Yeah.
15     Adam, what's your question?
16 BY MR. SLATER:
17     Q.   Starting with, what is the
18 final API, just so we have our vocabulary
19 straight?
20     A.   Final API is the API -- is a
21 finalized API, is finished API after the
22 purification process.  That would be used
23 for the formulation manufacturer to make
24 the final dosages.  That's called final

---

1 API.

2    Q.   Who set the specifications
3 set forth on this table?

4    A.   Those specifications have to
5 meet the FDA requirements.  So is --
6 asking who's setting those
7 specifications?  ZHP, FDA, EDQM, all
8 those regulatory bodies.

9    Q.   So the zinc chloride
10 process, based on your understanding
11 needed to meet the preexisting
12 specifications in order to be able to
13 continue to be sold?

14    A.   Yes, you have to -- like I
15 said, okay, the zinc chloride process has
16 to produce the final valsartan equal or
17 better quality than the other process in
18 order to be -- you know, in order you can
19 get approval from the FDA or other
20 regulatory bodies and then you can sell
21 on the market.  That's the preconditions.

22    Q.   Bear with me a second.  I'm
23 trying to find a specific page.

24    A.   I'll grab a water, okay, one

1 second.

2    Q.   Go ahead.

3       MR. SLATER:  Cheryll, go
4 to -- the Bates number is 76 --
5 well, I'll give you the last two
6 digits, 60.  And I think it's
7 sideways.  You're going to have to
8 do your rotation thing.  Maybe
9 not.  Good.

10       MR. BALL:  I think it's only
11 sideways in the Chinese version,
12 or maybe it got rotated.

13       MR. SLATER:  Yeah, I think
14 she's -- yeah, because Cheryll is
15 faster than both of us.

16 BY MR. SLATER:

17    Q.   Okay.  Looking at the center
18 of this page.

19    A.   Okay.

20    Q.   It says, Number 2 -- and I
21 guess -- rephrase.

22       Looking at the center of
23 this page, it says, "The other catalyst
24 systems were also used in this reaction.

1 In the system from Huahai, zinc
2 chloride/DMF/NaN3," which I think is
3 sodium nitrite, "is the best conditions."

4       Do I have that correctly?

5 Do I have that correct?

6    A.   Yes.  That's translated
7 version.  Yes, that's correct.

8    Q.   What does that mean, when
9 this characterizes the zinc chloride
10 process as the best conditions?  What is
11 that referring to?

12    A.   Usually we referring to
13 that, after we did all those testing, for
14 example, using different catalyst besides
15 zinc chloride, and different solvent
16 systems and a combination of solvent and
17 sodium azide.

18       You know, we compare all
19 those different studies, okay, and the
20 process, you know, parameter
21 formulations, okay, different
22 temperatures, rinse, you know, for all
23 those conditions.

24       After we had done that, then

1 we analyzed the valsartan produced
2 at different conditions, you know, based
3 on the quality material produced, the
4 yield, the process safety, and, you know,
5 the process capabilities.  Have to assess
6 all those parameter together.

7       But the main focus is the
8 quality has to be equal or better than
9 the, you know, the original process, that
10 precondition.  You know, this is the best
11 condition that could do that, okay, to
12 meet the requirements.

13    Q.   You have to have the
14 required quality, but it also had to
15 increase the yield in order to be
16 acceptable per the contract, correct?

17    A.   Yes.  You know, as I said,
18 okay, you have to, first of all, make it
19 equal or better quality material.  And
20 then you can talk about other things,
21 like improving yield, improving process
22 safety, reduce the cycle time, all those
23 other parameters.

24       MR. SLATER:  Cheryll, go if

Confidential Information Subject to Protective Order

Page 138

1    you could, to Page 75, is the last
2    two digits.
3  BY MR. SLATER:
4    Q.   This is the final page of
5  this report.  And Number 6 says, "Future
6  improvement."
7    A.   Mm-hmm.
8    Q.   "The synthesis process of
9  crude valsartan and the purification
10 process, including the solvent system,
11 need to be further optimized at the pilot
12 scale."
13       And then in the bottom right
14 it has Shanghai SynCores Technologies,
15 Inc., January 20, 2011.
16   A.   Mm-hmm.  Yes.
17   Q.   What is that referring to in
18 terms of what needed to be further
19 optimized at the pilot scale?
20   A.   That's -- that is, you
21 know -- almost you can find those in
22 many, many of the reports, because we did
23 the laboratory scale, okay.  They're
24 going to take that into the pilot scale.

Page 139

1  Sometimes it's very easy to scale up.
2  Sometimes they might encounter some
3  difficulties.
4        This is a cover statement
5  that we put on it to protect SynCores,
6  you know, to make sure SynCores gets
7  paid.  It is a very general statement,
8  okay.  We put that almost on all the
9  reports.
10   Q.   I think you told me earlier
11 in the deposition a way that the
12 development process is supposed to flow,
13 you're supposed to have a lab scale, then
14 a pilot scale, and then go to commercial
15 scale, correct?
16   A.   Yes.  Correct.
17   Q.   The date of January 20th,
18 2011, does that represent the date on
19 which SynCores completed its work on this
20 process and handed that over to ZHP?
21   A.   We issue report for the ZHP,
22 yes.  That's probably, you know -- we
23 finish our work and hand over to the ZHP.
24   Q.   I'm being told that we're

Page 140

1  over an hour and that we're supposed to
2  take a break; is that correct?
3    A.   Yeah.
4        MR. BALL:  It's up to you.
5  We can go -- I was trying to go
6  about an hour 20.  But it's up to
7  you if you want to take a break
8  now.  That's fine with me.
9        MR. SLATER:  Let's take a
10 break, because I just -- it's a
11 good transition point.
12       MR. BALL:  Okay.  That's
13 fine.  Thanks.
14       THE VIDEOGRAPHER:  The time
15 right now is 9:58 a.m.  We're now
16 off the record.
17       (Short break.)
18       THE VIDEOGRAPHER:  The time
19 right now is 10:13 a.m.  We're
20 back on the record.
21       (Previously marked
22 ZHP-217.)
23 BY MR. SLATER:
24   Q.   On the screen is a document

Page 141

1  marked as 217, and I'd appreciate if you
2  could tell me what this document is, if
3  you know.  And if you need to scroll
4  through, we can scroll through the first
5  couple pages for you.
6    A.   Yes, please.  Scroll a
7  couple pages for me.
8        MR. SLATER:  Go ahead
9  Cheryll, show him this page
10 slowly, and then the next page.
11       And you can tell her to stop
12 if you need it stopped.
13       THE WITNESS:  Okay.  Go
14 ahead.  Keep going, slowly, yeah.
15 Yeah.  Go ahead.  Go ahead, yeah.
16 Keep going.
17       MS. CALDERON:  It's an
18 88-page document.
19       THE WITNESS:  I get a rough
20 idea of it.  That's fine.  That's
21 okay.
22       MR. BALL:  Adam, I don't
23 know if you heard him, he said
24 okay.  He's seen enough of it.

Confidential Information - Subject to Protective Order

Page 142

1    THE WITNESS:  Yeah, I got an
2  idea, yeah.
3  BY MR. SLATER:
4    Q.   All right.  Can you tell me
5  what this document is, please?
6    A.   It's the application for
7  the, you know, technical project, okay.
8  And also it's a feasibility study report
9  for valsartan.  The topic name is, you
10  know, hypotensive drug valsartan,
11  production process and, you know, for
12  process improvement.  That's the project.
13    Q.   Well, who was involved in
14  doing this project?
15    A.   Based on the document you
16  show me, the responsible units or company
17  is ZHP.
18    Q.   And who were they
19  contracting with in this agreement?
20    A.   This one we're contract with
21  ZHP.
22    Q.   Was there a university
23  involved in this project?
24    A.   I didn't see that.  But

Page 143

1  under -- in the document it should -- but
2  on this page right here, it says the
3  responsible company or unit is called
4  ZHP.
5    Q.   I think we're going to have
6  to go through it a little more to get
7  this.  I'm told that this is a draft
8  application seeking funding to support a
9  valsartan research project to be carried
10  out by Zhejiang University of Technology?
11    A.   No, because the document
12  show me the page right here, the
13  responsible units or company is ZHP,
14  Zhejiang Huahai, you know, ZHP.  It
15  doesn't say anybody else.
16    Q.   Are you saying this is an
17  agreement by ZHP with itself?
18    A.   No.  This is the application
19  to seek the project, you know, for the
20  process improvement from the government,
21  okay.
22    Q.   I think -- all right.  We
23  were -- I was saying what you were
24  saying, but I was saying it inartfully.

Page 144

1  So let me try this again.
2    A.   Mm-hmm.
3    Q.   This was ZHP applying to get
4  funding to have this project performed
5  with Zhejiang University of Technology,
6  correct?
7    A.   No.  If in this page, okay,
8  if you -- one, two, three, four, five --
9  the fifth line, right there, okay.  It
10  says Zhejiang Huahai.  That's ZHP.  It
11  didn't say Zhejiang University.
12    Q.   All right.  You know what?
13  We'll come back to this when I can give
14  you some more precise information,
15  because I do want to go through this, but
16  not now through this process.
17    A.   Okay.  Maybe -- okay.
18    Q.   If you're telling me it's
19  not with that university, then I'll
20  accept that for now and then perhaps come
21  back to it later.
22    A.   No, from the page, the
23  document show me so far, I only see
24  Zhejiang Huahai, ZHP.

Page 145

1    Q.   Right.  Are you familiar
2  with Zhejiang University of Technology
3  having any involvement at all with doing
4  any research in connection with the
5  valsartan project?
6    A.   I haven't seen a document
7  that relates to the Zhejiang -- you said
8  Technology University, not Zhejiang
9  University, right?
10    Q.   Yeah, Zhejiang University of
11  Technology, I was told.
12    A.   Okay.  Zhejiang University,
13  yeah, that's the -- I heard about they
14  were involved in early days, but I don't
15  see in the document.
16    Q.   When you say you heard about
17  them being involved in the early days,
18  what are you referring to?
19    A.   When I talk -- when I try to
20  prepare for the deposition, also talking
21  to people that I know are involved in the
22  project early days.  They tell me they
23  work with the Zhejiang University of
24  Technology in the past.

Page 146

1    MR. BALL:  Adam, I'm
2 assuming you're eventually going
3 to round this back into the
4 deposition topics.
5    MR. SLATER:  This has to do
6 with the evaluation of the
7 process.
8    MR. BALL:  That's unclear to
9 me so far that that has anything
10 to do with the evaluation process.
11 That's why I asked you, are you
12 eventually --
13    MR. SLATER:  I don't know.
14 I mean, I can't tell you more than
15 that's what this contract is for.
16 That's what I'm told about all the
17 reviewers who reviewed the
18 document, that that's the purpose
19 of it.
20 BY MR. SLATER:
21    Q.   Okay.  Why don't we do this,
22 why don't we go to page -- Bates Number
23 183.
24    A.   183.  Hold on.  Hold on.  Go

Page 147

1 back a little bit.  Okay.  Keep going
2 down one more page.  Stop right here.
3    Yeah, I see Party B is the
4 Zhejiang University of Technology on the
5 right side.
6    Q.   You said the university is
7 Party B, correct?
8    A.   Yeah.  Actually this is --
9 Party A is ZHP.  Party B is the Zhejiang
10 University of Technology.
11    Q.   And if we turn back now to
12 the page with the 183 on it.  See if
13 that -- I'm going to show it to you and
14 ask you if that helps.
15    A.   Okay.
16    MR. SLATER:  That's good.
17 BY MR. SLATER:
18    Q.   If this helps you to be able
19 to tell me what the purpose of this
20 project was, as part of the overall
21 valsartan project?
22    A.   Okay.
23    Q.   Did I miss the answer to the
24 question?

Page 148

1    A.   I'm sorry?
2    Q.   You didn't answer the
3 question yet?
4    MR. BALL:  No, I don't think
5 he understood there was a question
6 pending.
7    MR. SLATER:  Okay.  Yeah, I
8 just realized that we were all
9 both sitting here.
10 BY MR. SLATER:
11    Q.   Does that help up -- well,
12 let me ask you this.
13    What was the purpose for
14 which this project was -- well, rephrase.
15    What was the purpose of this
16 project as part of the overall valsartan
17 project?
18    A.   You know, if you -- if you
19 read the title in the first page, the
20 project starts at the 2011 some time,
21 finish in 2013.  And this is the
22 application for the funding from the
23 government, for the further improvement
24 process.

Page 149

1    Q.   In terms of the development
2 of the zinc chloride process, was any of
3 this work relied on by SynCores or did
4 SynCores do its work independently?
5    A.   Because this document only
6 in the SynCores file, SynCores didn't
7 participate in this, you know, project.
8 Because you show me, this is application
9 form.  I don't know if this is being
10 approved, project being carried out, or
11 what's -- you know, what was happening.
12    Q.   To your knowledge, was this
13 project carried out and relied on at all
14 by ZHP?
15    A.   I don't know because I
16 didn't, you know, ask.  And this is the
17 first time I saw it.  And this is an
18 application for funding, okay, from the
19 government, for the process improvement.
20 But SynCores, okay, SynCores didn't do
21 anything with this -- has any
22 relationship with this so-called
23 application.
24    MR. SLATER:  All right.  We

Page 150

1  can take that document down.
2      Now what I'd like to do,
3  Cheryll, is if we can go to
4  ZHP-00493875.
5      (Document marked for
6  identification as Exhibit
7  ZHP-228.)
8  BY MR. SLATER:
9      Q.   This is a letter that was
10  sent by ZHP to the EMEA -- rephrase.
11      This is a letter dated
12  November 14, 2018.  The date, I can tell
13  you, comes from the metadata.
14      A.   Mm-hmm.
15      Q.   The date's not on the
16  document.  But that's the date in the
17  metadata.
18      A.   Mm-hmm.
19      Q.   This -- new question.
20      This November 14, 2018
21  letter was written by ZHP and signed by
22  Jenson Ye, vice president of quality of
23  ZHP, to the EMA and EDQM regarding their
24  joint inspection of ZHP's facilities

Page 151

1  September 10 to 13, 2018.  Are you
2  familiar with this?
3      A.   Yes.  I know that -- I know
4  that inspection, yes.
5      Q.   You did not personally
6  attend that inspection, correct?
7      A.   I think I was there.  That's
8  2018.  I believe September.  I think I
9  was there.
10      Q.   This says in the letter,
11  "Object:  Submission of CAPA plan to
12  joint inspection between EMA (AIFA/AEMPS)
13  and EDQM on 10-13 September 2018."
14      A.   Mm-hmm.
15      Q.   These are European
16  regulatory agencies?
17      A.   Yes.  I think they are
18  Italian agencies and Spain, you know,
19  EDQM, and those agencies, yes, joint
20  inspections.
21      Q.   The letter says, "We refer
22  to the e-mail received on October 18,
23  2018, sharing the list of deficiencies
24  the inspection team reports that it

Page 152

1  observed during the joint EMA EDQM
2  inspection conducted on 10-13 September
3  2018.  Please find attached the CAPA plan
4  and relevant documentations as
5  attachments."
6      Do you see that?
7      A.   I see that, yeah.  Could you
8  expand that a little bit because the
9  letter is very small.
10      Okay.  Thank you.  It's
11  better.
12      Q.   There's some bullet points
13  down below.
14      MR. SLATER:  If you can
15  scroll up a little bit, Cheryll,
16  to get the bottom.  Perfect.
17  BY MR. SLATER:
18      Q.   This says in that first
19  bullet point, "The risk assessment has
20  taken account of the mechanistic
21  chemistry."
22      I want to stop there.  What
23  does mechanistic chemistry mean as it's
24  used there?

Page 153

1      A.   That's called mechanistic
2  chemistry, is the mechanism, okay, you
3  know, how a particular compound was, you
4  know, reacted, which atom to atom to
5  making bonds, okay.  That means if you
6  had a Compound A, we want to know how
7  Compound A was formed in the process.
8  That's called mechanistic chemistry.
9      Q.   You know, I neglected to ask
10  this before.  I just want to make sure
11  for the record.
12      MR. SLATER:  What exhibit
13  number is this?
14      THE WITNESS:  You're asking
15  me?
16      MR. SLATER:  No.
17      MS. CALDERON:  228.
18      MR. SLATER:  I'm sorry.
19  What?
20      MS. CALDERON:  228.
21      MR. SLATER:  328?
22      MS. CALDERON:  228.
23      MR. SLATER:  Okay.  Yeah, it
24  sounded like we skipped 100 there.

Confidential Information - Subject to Protective Order

Page 154

1       MR. BALL:  Yeah, I heard 328
2    also, Adam, and I was like whoa.
3  BY MR. SLATER:
4       Q.   So going back to where we
5  were, "The risk assessment has taken
6  account of the mechanistic chemistry, the
7  likely sources for introduction of
8  contaminants at the key steps of the
9  method of synthesis so as to address the
10  potential hazards with a view to
11  qualifying and quantifying the levels of
12  risk so that appropriate measures are put
13  in place to control and/or minimize the
14  occurrence of process-related
15  contaminants such as NDMA and NDEA."
16       Do you see the paragraph I
17  just read?
18       A.   Yes, I did.  It's right
19  here.
20       Q.   When ZHP refers to
21  qualifying and quantifying the levels of
22  risk, what does that mean?
23       A.   Qualifying and quantifying
24  the level of the risks, what does that

Page 155

1  mean?  Is that they want to, first of
2  all, to, you know, qualify, see how much
3  is in there, and quantify it to see if
4  the level of -- is below the TTC.
5       Q.   With regard to the TTC, do
6  you recall we went through the EMEA
7  guidance earlier, and it said that with
8  certain compounds, including n-nitroso
9  compounds, you don't use the TTC
10  approach?
11       A.   You know, yes, that was the
12  document that you showed me earlier.  But
13  up to today we are, you know, even talk
14  with the FDA, EDQM, we are back into
15  the -- you know, using the TTC to
16  calculate the allowable limits.  That is
17  happening now.
18       Q.   Are you testifying that the
19  TTC approach is being used with regard to
20  NDMA and NDEA at this point?
21       A.   No, no, no.  Put it in
22  context.  Nitrosamine, Okay.  NDMA and
23  NDEA is a part of the nitrosamine as a
24  category of the compounds.

Page 156

1       Q.   But you're not testifying
2  that the TTC approach is being applied to
3  NDMA or NDEA as impurities in drugs, are
4  you?
5       MR. BALL:  Objection.
6    Vague.
7       THE WITNESS:  I don't
8    understand -- I didn't quite
9    comprehend your question.  Could
10    you rephrase that?
11  BY MR. SLATER:
12       Q.   You testified that the
13  qualifying and quantifying of the risk
14  was directed to establishing the TTC.
15       I then asked you to confirm
16  and I'm asking you now, you're not saying
17  that the regulatory agencies have told
18  you they are going to apply the TTC
19  approach to nitrosamine impurities,
20  correct?
21       A.   I just -- you know, I'm a
22  little confused.  Okay.
23       Q.   Okay.  I'll ask it --
24       A.   Please simplify your

Page 157

1  question a little bit.
2       Q.   You mentioned the TTC
3  approach.
4       A.   Mm-hmm.
5       Q.   Why did you mention that?
6       A.   Because TTC approach is the
7  common, you know, standard.  We have to
8  have a standard, right?  That's the very
9  common standard to use.
10       Q.   And then I asked you before,
11  you understand that per the documents
12  that I showed you earlier, the TTC
13  approach is not applied to nitrosamine
14  impurities.  You understand that?
15       MR. BALL:  Objection.
16       THE WITNESS:  No, I don't,
17    because, Adam, as this -- as we
18    gain more and more understanding
19    of the genotoxic impurity, the
20    standard is changing, okay.  It's
21    always, you know, to optimizing
22    the process.
23       It's kind of confusing,
24    because we're talking about --

Page 158

1  sitting over here talking about
2  the NDMA and NDEA for the
3  valsartan.
4      But as you recall, okay,
5  when the case -- when this issue
6  happened back in 2018, we talked
7  to the U.S. FDA.  They set the
8  limits to 1 ppb level, okay.
9      After, let's say, the
10 metformin, ranitidine happen in
11 the case, it's back to the TTC
12 level again now, It's back to .3
13 ppm.
14     So as you know, as I said
15 before, for the cGMP practice for
16 the FDA guidance, always changing,
17 as we gain more and more
18 understandings, okay.
19     So I don't know how to
20 answer your question.  But this is
21 the case, okay.
22 BY MR. SLATER:
23     Q.   I guess since you introduced
24 the subject, I think it's worth talking

Page 159

1  about for a few moments.
2      A.   Sure.
3      MR. SLATER:  Let's go back,
4  Cheryll, to Exhibit 206, please.
5      Let's go with the cover
6  first of this page, to orient
7  ourselves.  I mean the cover of
8  the document, the first page of
9  the document.
10     MS. CALDERON:  The first
11 page of 206?
12     MR. SLATER:  Yep.  Thank
13 you.
14 BY MR. SLATER:
15     Q.   To orient ourselves, this is
16 the guideline on the limits of genotoxic
17 impurities from the European Medicines
18 Agency dated June 28, 2006, correct?
19     A.   Right.
20     Q.   And according to this
21 document it was valid January 1, 2007 to
22 January 31, 2018, correct?
23     A.   Yes.
24     MR. SLATER:  Let's go now to

Page 160

1      Page 6 out of 8, please.
2  BY MR. SLATER:
3      Q.   In the first full paragraph
4  it says, "Some structural groups were
5  identified to be of such high potency
6  that intakes even below the TTC would be
7  associated with a high probability of a
8  significant carcinogenic risk," citing
9  Cheeseman, et al., 1999, and Kroes,
10 K-R-O-E-S, et al., 2004.
11     "This group of high-potency
12 genotoxic carcinogens comprises
13 aflatoxin-like n-nitroso and azoxy
14 compounds that have to be excluded from
15 the TTC approach.  Risk assessment of
16 members of such groups requires
17 compound-specific toxicity data."
18     You see what I just read
19 obviously, right?
20     A.   Yeah.  I just -- I read it.
21     Q.   So according to the European
22 Medicine Agencies, they made it clear
23 they do not apply the TTC approach to
24 nitrosamines, correct?

Page 161

1      MR. BALL:  Objection.
2  Mischaracterizes the document.
3      THE WITNESS:  So if that's
4  not the case, then what is it
5  then?  What's the limit?
6  BY MR. SLATER:
7      Q.   Are you aware that limits
8  have been set?
9      A.   From this document, I don't
10 see where the limit is being set.  If
11 this is not the limit, then what is the
12 limit?
13     Q.   Well, let me ask you --
14 actually, let's go back to your question
15 back to me.  You asked me what's the
16 limit.
17     A.   Mm-hmm.
18     Q.   The first step is that the
19 risk assessment is supposed to identify
20 the existence of the impurity, correct?
21     A.   Yeah, you have to know that,
22 okay.  First of all, you find out if this
23 is existing in the process.
24     Q.   And then --

Page 162

1    A.    Second of all -- go ahead.
2    Q.    Once you identify that the
3 impurity exists, then you go to the next
4 steps of the risk assessment to analyze
5 what is the risk and eventually determine
6 whether or not it's acceptable or not to
7 have that impurity and at what level,
8 correct?
9    A.    Yes.  First of all, you have
10 to know what -- you know, if this
11 process -- if the impurity exist in the
12 process.
13       Second of all, you have to
14 develop a method specifically to detect
15 if this is there, okay.
16       Third of all, you have to
17 quantify that, okay.  See, hope you have
18 a reference data material to quantify
19 that.
20       Fourth of all, then you set
21 the limits, okay, see if it's below the
22 set limit.
23    Q.    Because ZHP never identified
24 the nitrosamine impurities, it never was

Page 163

1 able to get to the second, third, or any
2 other steps of the risk assessment
3 process, correct?
4       MR. BALL:  Objection.
5    Vague.
6       THE WITNESS:  Adam, at this
7    time, okay, the entire industry,
8    the FDA, the EDQM, nobody knows
9    that was the risk that existed in
10    the valsartan.
11       So putting this into
12    content, okay, no one knows at
13    that time back before existed in
14    valsartan back in 2011.
15 BY MR. SLATER:
16    Q.    Okay.  I'm asking now about
17 ZHP.  The company that manufactured and
18 sold the drug, okay?  I'm only asking
19 about ZHP.
20    A.    Okay.  You are asking ZHP,
21 but I don't think ZHP was the only one
22 making valsartan and sold in the U.S.
23 market.
24    Q.    Well, the subject of this

Page 164

1 deposition is ZHP, what they did and what
2 they know.  So that's what I'm asking you
3 about.  So that's what I'm attempting to
4 address in these questions.
5    A.    Okay.
6    Q.    You would agree with me it's
7 not an acceptable response for ZHP to
8 have failed to do an adequate risk
9 assessment, but then point the finger at
10 another company and say, "Well, they
11 failed to do an adequate risk assessment
12 also, so we're not so bad."
13       That's not an acceptable
14 response, right?
15       MR. BALL:  Objection.
16    Foundation.  Mischaracterizes his
17    testimony.
18       THE WITNESS:  Adam, I didn't
19    say that, Adam.
20       I just don't know how to
21    answer your question.  You keep
22    going backwards and forwards with
23    these questions, okay.
24       Just -- let me just tell

Page 165

1 you, okay.  ZHP at that time
2 didn't know, okay, there was a
3 risk with the, you know, the GTI
4 in the valsartan.
5       We did whatever we can.  We
6 follow the ICH guidelines, we
7 follow the cGMP guidelines to do
8 the research, to do -- to
9 manufacture the products, which
10 approved by the EDQM and FDA.
11       And I think we did our best,
12 you know, to make sure the
13 valsartan meets the EDQM and also
14 FDA's requirements.
15 BY MR. SLATER:
16    Q.    When ZHP developed the zinc
17 chloride process, was any other
18 manufacturer in the world manufacturing
19 valsartan by the zinc chloride process,
20 to your knowledge?
21    A.    You know, I wouldn't
22 speculate.  But I'm sure there were.
23    Q.    I'm asking if you know.
24    A.    It's on the record?

Confidential Information - Subject to Protective Order

Page 166

1    MR. BALL:  Yeah, go ahead
2 and answer, I mean --
3    THE WITNESS:  I'm sure --
4 I'm sure there are other people in
5 the same process doing that.
6 BY MR. SLATER:
7    Q.   Well, let's break that down
8 then.  Who was using the zinc chloride
9 process identical to ZHP's process before
10 ZHP?  Which manufacturer?
11    A.   You know, Adam, you're
12 talking about identical.  That's
13 100 percent identical?
14    Q.   Right.  The same exact
15 process, the same chemicals, the same
16 solvents, the same specifications,
17 everything.  Was there another company
18 before ZHP that was utilizing that
19 process?
20    A.   Adam, we talk to the people
21 in the same field.  I wouldn't speculate
22 on identical, per se, okay.  But I'm sure
23 there are other people using similar
24 process, using zinc chloride, also the

Page 167

1 DMF solvent systems.
2    Q.   Who?  Who was?  Please tell
3 me.
4    A.   Adam, you're talking about
5 the identical process.  I wouldn't say
6 who.  I don't know who.  If it is
7 identical, I don't know.  Because there
8 are more than ten producers, you know,
9 globally.
10    Q.   When ZHP developed the zinc
11 chloride process, it was attempting to
12 differentiate itself from other
13 manufacturers for the purpose of
14 accumulating market share, correct?
15    MR. BALL:  Objection.
16 Outside the scope.
17    THE WITNESS:  Adam, that's
18 not part of my responsibility.
19 I'll tell you one more time.  When
20 we trying to improve the process,
21 the number one goal, precondition,
22 is making better quality product.
23 Okay.  In the meantime, if we can,
24 to improve the yield, reduce

Page 168

1 waste.
2 BY MR. SLATER:
3    Q.   Let's come back to your
4 statement from a couple of moments ago.
5    A.   Okay.
6    Q.   During the time -- well,
7 rephrase.
8    When ZHP began to
9 manufacture and sell valsartan with the
10 zinc chloride process, which other
11 company or companies in the world were
12 using the same process to manufacture
13 valsartan?
14    MR. BALL:  Objection.
15 Speculative.
16    If you can answer, please
17 do.
18    THE WITNESS:  Okay.  You
19 know, Adam, as I said before,
20 there are more ten producers of
21 valsartan in the field.  We talk
22 in the conference with other
23 people.  I know there were some
24 people doing that.

Page 169

1 BY MR. SLATER:
2    Q.   Who?
3    A.   Adam, I wouldn't give the
4 names, because I'm not 100 percent sure.
5 Okay.  I'm not sure it's 100 percent
6 identical.  But I wouldn't give names.
7    Q.   If two companies -- or if
8 two -- rephrase.
9    If two or three other
10 companies were using the same process as
11 ZHP independently, the zinc chloride
12 process, and all of the companies, ZHP
13 and the others, failed to identify the
14 potential for nitrosamine impurities, are
15 you saying that makes all of them have an
16 excuse, or does that mean all of them
17 failed to do an adequate risk assessment?
18    MR. BALL:  Objection.
19 Mischaracterizes his testimony.
20 And compound.
21    THE WITNESS:  Adam, you say
22 that.  I didn't say that, okay.
23 BY MR. SLATER:
24    Q.   Then I guess we'll come back

Confidential Information Subject to Protective Order

Page 170

[1] to where I originally was.  I'm asking
[2] about ZHP and what ZHP did.
[3]     A.   ZHP did whatever possible to
[4] improve the process, to make sure that we
[5] make better or equal quality product, to
[6] follow all the ICH guidelines, to
[7] the cGMP guidelines, to gain approval
[8] from the FDA and EDQM for the valsartan
[9] product.  That's for this case.  That's
[10] what has been done.
[11]     Q.   Are you saying that it was
[12] impossible for ZHP to identify the
[13] potential for nitrosamine impurities with
[14] the zinc chloride process?  Are you
[15] saying that was impossible to figure out?
[16]     MR. BALL:  Objection.
[17] Mischaracterizes his testimony and
[18] vague.
[19]     THE WITNESS:  Put a time
[20] frame, the content.
[21] BY MR. SLATER:
[22]     Q.   When ZHP developed the zinc
[23] chloride process, are you saying that it
[24] was impossible for ZHP to identify the

Page 171

[1] potential nitrosamine impurities as part
[2] of the process?
[3]     MR. BALL:  Objection --
[4]     THE WITNESS:  That
[5] was back --
[6]     MR. BALL:  Eric, let me
[7] finish, please.
[8]     Objection.  Mischaracterizes
[9] his earlier testimony.
[10]     Go ahead and answer.
[11]     THE WITNESS:  Okay.  That's
[12] back in 2011.  And, you know, it's
[13] because of detecting a low level
[14] of the genotoxic impurity, it
[15] requires many things, okay.
[16]     First of all, you have to --
[17] you have the knowledge to know,
[18] okay, it could exist in the
[19] valsartan product.
[20]     The second thing is you have
[21] to develop a very specified method
[22] with the high resolution -- as you
[23] just mentioned GC-MS in order to
[24] detect that.

Page 172

[1]     So coming back to your
[2] questions, back in 2011, without
[3] those preconditions, yes, it's
[4] impossible to detect NDMA and NDEA
[5] in the valsartan product.
[6]     MR. SLATER:  Cheryll let's
[7] take this document down and go to
[8] Exhibit 197, please.
[9]     Thank you.
[10]     (Previously marked
[11] ZHP-197.)
[12] BY MR. SLATER:
[13]     Q.   This was an article that was
[14] published in 2009.  It's an article about
[15] DMF.  Do you see that on the screen?
[16]     A.   It says, "DMF, much more
[17] than a solvent."  Is that what you're
[18] talking about?
[19]     Q.   Correct.
[20]     A.   It's Tetrahedron Letters,
[21] yeah.  Okay.
[22]     Q.   Tetrahedron, you know that
[23] journal, correct?
[24]     A.   Oh, yes.  It's popular

Page 173

[1] journal.
[2]     Q.   Well regarded, well
[3] respected, right?
[4]     A.   It's not first tier, but
[5] it's second tier.
[6]     MR. SLATER:  Let's go,
[7] Cheryll, to page -- it's the third
[8] page, right-hand column, Number 3.
[9]     THE WITNESS:  It's very
[10] small.  Adam, would you expand
[11] that a little bit?  I can't read
[12] it.
[13]     MR. SLATER:  You can make it
[14] bigger.
[15]     THE WITNESS:  Okay.  That's
[16] bigger than before.  Okay.
[17]     MR. SLATER:  You can -- you
[18] can slide it over, Cheryll.  It's
[19] hidden, I think, behind the --
[20] perfect.
[21]     THE WITNESS:  Okay.  Good.
[22] BY MR. SLATER:
[23]     Q.   Here in this article
[24] Number 3 says, "Source of carbon

Page 174

1 monoxide. DMF decomposes slightly at its
2 boiling point to afford dimethylamine and
3 carbon monoxide, this reaction occurring
4 even at room temperature in the presence
5 of acidic or basic materials. This
6 observation has led to the use of DMF as
7 a carbonylating agent."
8        Do you see that?
9        A.  I see that.
10       Q.  You would agree with me that
11 it was publicly known in the chemistry
12 field that DMF could decompose to yield
13 dimethylamine, correct?
14       MR. BALL:  Objection. Calls
15    for expert testimony.
16       THE WITNESS:  It's a
17    scientific question, okay. That's
18    a very general comment, okay.
19    It's almost meaningless.
20 BY MR. SLATER:
21       Q.  Well, this publicly
22 available medical journal --
23       A.  It's chemistry journal,
24 Adam.

Page 175

1       Q.  Thank you. This publicly
2 available chemistry journal --
3       A.  Mm-hmm.
4       Q.  -- specifically points out
5 knowledge that DMF can decompose to yield
6 dimethylamine, correct?
7       A.  You know what, because we
8 are published in different journals,
9 okay, the editor, okay, has to carefully
10 review all those statements. This is a
11 common, general statement. It didn't
12 mean anything because reading the
13 document says, okay, DMF decomposed
14 slightly. What do you mean by slightly,
15 first of all?  At its boiling point to
16 have formed dimethylamine and carbon
17 monoxide. Okay. Show me data, number
18 one.
19       Number two, the reaction
20 occurring even at room temperature in the
21 presence of some acidic or basic
22 materials, you know, what kind of acidic
23 or what kind of basic materials?  You
24 have to put this into content.  We

Page 176

1 talking about scientific questions.
2        This is meaningless to us
3 because I see those comments all the
4 time. If the auditor didn't inspect or
5 read those comments carefully, it's
6 there. Those we call scientific garbage.
7        Q.  That statement that I just
8 read to you is a true statement, correct?
9        A.  You know what, Adam, because
10 we publishing papers, we publishing and
11 thus, later find out that's not true.
12 That's correct. Okay.
13        I wouldn't comment on those,
14 because you can find many of the comments
15 almost in many literature. This
16 statement does not give you any details.
17 That's -- that I consider as a general
18 comments.
19        I want to say, you know,
20 H2O, the water decompose even by the room
21 temperature, slightly, by the way.
22        Q.  Did anybody --
23        MR. BALL:  Hold on. Hold
24    on.  I think he's getting some

Page 177

1 water.
2        THE WITNESS:  I get some
3    water. Sorry. Go ahead.
4 BY MR. SLATER:
5        Q.  Did anybody from ZHP take
6 into account the potential for DMF to
7 decompose and yield dimethylamine and ask
8 the types of questions you just asked in
9 terms of at what temperature, under what
10 conditions, and try to figure out whether
11 or not there was a risk of DMF
12 decomposing to yield dimethylamine in the
13 zinc chloride process?
14        MR. BALL:  Objection.
15    Vague.
16        THE WITNESS:  Adam, we
17    discussed this, you know,
18    previously, okay, just a while
19    ago. DMF is commonly known and
20    widely used solvent with boiling
21    point above 152. It's a stable
22    solvent.  It's used widely.
23        And we, because all
24    operating temperature is much

Confidential Information Subject to Protective Order

Page 178

1  below the boiling point, we
2  consider DMF is stable.
3      So is the FDA and EDQM and
4  other colleagues industrywise.
5  BY MR. SLATER:
6      Q.   The use of DMF in the zinc
7  chloride process was especially of
8  concern because when dimethylamine was
9  yielded due to decomposition, that then
10 reacted with nitrous acid to form NDMA,
11 correct?
12     MR. BALL: Objection. Calls
13 for an opinion. Vague.
14     THE WITNESS: You know,
15 Adam, when you're talking about
16 DMF decomposing into DMA, even
17 now, we found it decompose at ppm
18 levels, all right.
19     So you consider that stable
20 or not stable?
21 BY MR. SLATER:
22     Q.   Is my statement correct?
23     A.   Not correct.
24     Q.   Well, isn't the root cause

Page 179

1  for the NDMA contamination of valsartan
2  with the zinc chloride process tied to
3  the degradation or decomposition of DMF
4  to yield dimethylamine?  Isn't that --
5  isn't that a critical part of the
6  formation of NDMA in valsartan?
7      A.   Adam, first of all, let's
8  separate that.  Okay.  First of all,
9  you're asking me DMF is a stable solvent
10 or not.  Okay.  Let me answer that
11 question.  That is, okay.
12     Second part of question,
13 later we found out, 2018, even, you know,
14 minor decomposition of DMA produced --
15 DMF resulted in DMA, to the PPM level.
16 It resulted in the NDMA, that answer --
17 that question, the answer is yes.
18     Q.   So what is described in this
19 medical journal article -- rephrase.
20     What is described in this
21 chemistry journal is what occurred during
22 the manufacture of valsartan with the
23 zinc chloride process, correct?
24     MR. BALL: Objection.

Page 180

1  Mischaracterizes his earlier
2  testimony.
3      MR. SLATER: I'm not
4  characterizing his testimony.  I'm
5  asking him a question.
6      MR. BALL: Well, ask him a
7  question.  Don't say "correct,"
8  Adam?
9      THE WITNESS: Yeah.
10 BY MR. SLATER:
11     Q.   Please answer.
12     A.   Adam --
13     MR. BALL: You can answer,
14 Dr. Gu.
15     THE WITNESS: It's not the
16 same.
17 BY MR. SLATER:
18     Q.   Did DMF degrade to yield
19 dimethylamine as part of the zinc
20 chloride process?
21     A.   Yes.  As I said, Adam, put
22 this in content.  At what level it
23 decomposes?
24     Q.   And when nitrous acid was

Page 181

1  applied and reacted with the
2  dimethylamine, that resulted in the
3  creation of NDMA, correct?
4      A.   Yeah, that was after 2018 we
5  did some sort of studies using high
6  resolution GC-MS to find if that's the
7  case at the ppm levels.
8      Q.   Well, actually what happened
9  was Novartis discovered it and told you
10 that --
11     A.   No, Adam --
12     Q.   Let me finish.  What
13 actually occurred was Novartis discovered
14 this and then advised ZHP.  ZHP did not
15 discover this on its own, right?
16     A.   No.  Adam, my side of
17 version is this, okay.  Novartis
18 suspected unknown peaks.  Then they
19 contract this outside to a professional
20 testing lab.  Then they told us they
21 suspect that's going to be the NDMA.
22     Okay.  That's the story I
23 know.  Then we come back, okay, looking
24 forward -- or looking carefully for the

Page 182

¹ NDMA.  Developed a specific method to
² detect that.  Then we found out that's
³ the NDMA.
⁴          Adam, that's my version of
⁵ the -- that's my knowledge of what is
⁶ this case.
⁷     Q.   If Novartis had not brought
⁸ this to ZHP's attention, there's no
⁹ reason to believe ZHP would have figured
¹⁰ this out by themselves, right?
¹¹     A.   Novartis only --
¹²          MR. BALL: Objection.  Eric,
¹³ please let me --
¹⁴          THE WITNESS:  Go ahead.
¹⁵          MR. BALL:  Eric, please let
¹⁶ me get my objections out.
¹⁷          Objection.  Calls for
¹⁸ speculation.
¹⁹          Go ahead.
²⁰          THE WITNESS:  Okay.  Adam,
²¹ Novartis noticed there is unknown
²² peaks is suspected to be NDMA,
²³ because, as you know, when you
²⁴ want to detect -- let's say an

Page 183

¹ unknown peak or specified in
² compounds, you have to, first of
³ all, you have to develop a
⁴ specified method to detect that.
⁵     As far as I know, okay, we
⁶ did many studies and develop the,
⁷ you know, high resolution test
⁸ method and provide it to the FDA,
⁹ which becomes the final, you know,
¹⁰ standard method to detect NDMA.
¹¹ BY MR. SLATER:
¹²     Q.   Let's go back to where we
¹³ started with this scientific journal.
¹⁴     A.   Okay.
¹⁵     Q.   It was known in the
¹⁶ chemistry community that DMF could
¹⁷ decompose to yield dimethylamine under
¹⁸ certain circumstances.  That's a correct
¹⁹ statement, correct?
²⁰     A.   Under certain circumstances,
²¹ yes.
²²     Q.   There came a point when
²³ ZHP -- well, rephrase.
²⁴          There came a point -- well

Page 184

¹ let me ask you this.  Rephrase.
²          Was it Shanghai SynCores
³ that came up with the idea to use DMF in
⁴ this process?
⁵     A.   You know, Adam, it's not,
⁶ because we screen many solvent, also
⁷ combination of solvent, okay, to see
⁸ which process will make better quality
⁹ materials, improve the yield, to reach
¹⁰ all those requirements.
¹¹          Then we -- based on the data
¹² analysis, we found out, okay, using the
¹³ DMF solvent system, give you the better
¹⁴ quality materials, higher yield, all
¹⁵ those, then we decide to use the DMF.
¹⁶     Q.   Shanghai SynCores made the
¹⁷ decision to use DMF in the zinc chloride
¹⁸ process that came from SynCores, correct?
¹⁹     A.   Adam, let me rephrase that
²⁰ again.  Shanghai SynCores screen many
²¹ solvent systems, and it turns out that
²² DMF solvent system gives the better
²³ quality materials, and that's why finally
²⁴ DMF was chosen.

Page 185

¹     Q.   When you say better quality,
² you're not taking into account the fact
³ that it was leading to the creation of
⁴ NDMA, correct?
⁵     A.   Adam, let's put a time
⁶ frame.  No one knows at that time.
⁷     Q.   When -- well, rephrase.
⁸          The reality was that the
⁹ zinc chloride process valsartan did not
¹⁰ have acceptable quality because it
¹¹ contained NDMA in it, correct?
¹²     A.   Adam, let me again put this
¹³ time frame on this, okay.  Now, after
¹⁴ 2018, after we did so many research,
¹⁵ discovered that's the case, it is not
¹⁶ acceptable after 2018.
¹⁷     Q.   Well, it wasn't acceptable
¹⁸ in 2011, 2012, 2013, 2014, 2015, 2016,
¹⁹ and 2017 either.  You just hadn't
²⁰ discovered that it had the NDMA in the
²¹ valsartan, correct?
²²     A.   Adam, we didn't know.
²³     Q.   You didn't know, and it
²⁴ wasn't acceptable.  Just because you

Confidential Information - Subject to Protective Order

Page 186

1 didn't know didn't make it acceptable,
2 right?
3          MR. BALL:  Objection --
4          THE WITNESS:  You should ask
5     FDA to answer that question,
6     because no one knows.  FDA doesn't
7     know.  EDQM doesn't know.  Okay.
8     Nobody knows.
9          You shouldn't ask the
10    question to me, because I'm not
11    regulatory bodies.  I'm not in a
12    position to approve that, okay.
13 BY MR. SLATER:
14    Q.   So is the explanation from
15 SynCores that even though you made this
16 glaring error and didn't realize this
17 risk, you're saying that other people
18 missed it too, so it's okay that you did?
19          MR. BALL:  Objection.
20    Mischaracterizes his testimony.
21          THE WITNESS:  Adam, nice
22    try.  State it again.
23 BY MR. SLATER:
24    Q.   Are you saying that

Page 187

1 SynCores' failure to identify the risk of
2 NDMA is excused because there are others
3 who didn't realize this also?
4          MR. BALL:  Objection.
5     Mischaracterizes his testimony.
6          THE WITNESS:  Adam, where
7     did you get -- where did you get
8     that idea from?  I didn't say
9     that.
10 BY MR. SLATER:
11    Q.   Okay.  So SynCores and ZHP
12 are responsible for the fact that NDMA
13 was in the valsartan, correct?
14          MR. BALL:  Objection.
15    Compound and mischaracterizes his
16    testimony.
17 BY MR. SLATER:
18    Q.   I'll ask the question again.
19 ZHP is responsible for the fact that the
20 NDMA was in its valsartan, correct?
21    A.   ZHP and SynCores are what?
22    Q.   Responsible for the NDMA
23 being in the valsartan pills.  You're not
24 blaming someone else, right?

Page 188

1          MR. BALL:  Objection.
2     Mischaracterizes his testimony.
3          THE WITNESS:  Whoops, sorry,
4     I have to put on the power.  It's
5     running out of power.  Hold on.
6     Okay.  There you go.  Sorry, Adam.
7     Okay.  Here you go.
8 BY MR. SLATER:
9     Q.   Can you answer my question.
10 You're not blaming somebody else for
11 that, right?
12          MR. BALL:  Objection.
13    Mischaracterizes his testimony.
14          THE WITNESS:  What to blame?
15    Because no one knows at that time.
16 BY MR. SLATER:
17    Q.   Let's go back through this
18 now.  SynCores decided to use DMF,
19 correct?
20    A.   SynCores does not decide
21 anything.  SynCores, based on scientific
22 research, find the base solvent to make
23 the better -- best quality materials.
24    Q.   Did that scientific research

Page 189

1 include research into the potential
2 decomposition products of DMF under the
3 conditions of the zinc chloride process?
4    A.   Adam, we have been coming
5 back to discuss almost four or five times
6 already.  Do you really want me to repeat
7 that?
8    Q.   You just made a statement
9 that the use of DMF was based on
10 scientific research.  So my question is
11 whether that scientific research included
12 analysis of the potential decomposition
13 products of using DMF under the
14 conditions of this process?
15    A.   As we -- we humans, okay, we
16 learn every day, as scientific issues
17 being discovered more and more.  Remember
18 back in the old days, we think the earth
19 is square.
20    Q.   The question remains, did
21 the scientific research relied on to use
22 DMF include scientific research into the
23 potential decomposition products of DMF
24 used in the zinc chloride process?

Page 190

1    MR. BALL:  Objection.
2    Dr. Gu, if you can answer this yes
3    or no, please do.  To the degree
4    that you need to provide an
5    explanation, please do that.
6        THE WITNESS:  Okay.  Adam, I
7    think I'm answering your question
8    another way, okay.  Nowadays, we
9    are looking back -- we looking
10   backwards, as we have the better
11   equipment, more knowledge, yes,
12   that's not acceptable now.
13   BY MR. SLATER:
14   Q.    So let's look at what --
15   what it took to determine that it was
16   DMF -- rephrase.
17       Let's look at what it took
18   to determine this in -- rephrase,
19   actually.
20       A moment ago you said that
21   this is like when people thought the
22   earth was square.
23       Are you saying that DMF
24   decomposing to yield dimethylamine, as of

Page 191

1    2011, was the equivalent of people who
2    thought the earth was square or was flat?
3    A.    No.  That's just -- you
4    know, okay, DMF is a very stable solvent,
5    okay.  Even today, now, okay, it is
6    commonly -- it's still is widely used in
7    industry, okay.
8        DMF decomposing to DMA or
9    carbon monoxide, at what levels?  Now we
10   are talking about GTI materials or ppm
11   levels.  We just discovered, learned that
12   after 2018.
13   Q.    SynCores knew when it
14   decided to use DMF that it was --
15   rephrase.
16       If SynCores had reviewed,
17   for example, this article, SynCores would
18   have been required to ask the types of
19   questions you're asking now, Meaning
20   under what circumstances could that
21   possibly happen when we manufacture
22   valsartan, correct?
23       MR. BALL:  Objection.  Calls
24   for speculation.  And vague.

Page 192

1    Required by whom or what?
2        MR. SLATER:  I'll ask the
3    question differently.
4    BY MR. SLATER:
5    Q.    Because SynCores and --
6    rephrase.
7        Because SynCores never took
8    into account potential decomposition of
9    DMF to yield DMA, it never evaluated the
10   risk that DMA would react with nitrous
11   acid to form NDMA, correct?  That's a
12   correct statement, correct?
13   A.    I'm trying to comprehend.
14   What do you mean by "correct"?
15   Q.    Is that right?  Is that
16   accurate?
17   A.    Because when SynCores did
18   the process improvement, we assess the
19   risk, okay, forming the impurity.  That's
20   why you see the specification says any
21   unknown impurity should be below
22   0.1 percent.  That's the FDA -- ICH
23   guidelines, okay.
24       We are searching for any

Page 193

1    impurity.  You know, we have to identify
2    any impurity above 0.1 percent, okay,
3    whatever the particular case is.
4        So as you mentioned, okay,
5    SynCores didn't do -- find the NDMA,
6    NDEA, because which is a much lower level
7    impurities, which ICH guidelines, FDA
8    guidelines didn't require that.
9        And you just measure, okay,
10   even after 2018, Novartis noticed ZHP,
11   say that is a known impurity, which could
12   be -- which might be.
13       So we learned about the NDMA
14   and NDEA, those GTI impurity, in the
15   valsartan process after we go through so
16   many years, we learned more and more, and
17   we finally discover that is the case.
18       So I don't know whether your
19   question is -- your comments is correct
20   or not, I wouldn't comment.  That's my
21   response.
22   Q.    I went through with you a
23   few moments ago, the EMEA standards going
24   back to 2007, which said that with

Page 194

¹ nitrosamines, the threshold approach
² doesn't apply.
³         Do you remember that?
⁴     A.   Yes, I remember that.
⁵ Nitrosamine compound.
⁶     Q.   And that was established as
⁷ of 2007, years before you were developing
⁸ the zinc chloride process, correct?
⁹     A.   Yes, that's correct.
¹⁰    Q.   So if -- if you had actually
¹¹ identified the NDMA impurity, you then
¹² would have had to work to try to
¹³ determine whether there was any
¹⁴ acceptable level of NDMA in the valsartan
¹⁵ at that time.  You would have had to
¹⁶ actually explore that and analyze it,
¹⁷ correct?
¹⁸         MR. BALL:  Objection.
¹⁹     Vague.
²⁰         THE WITNESS:  You know, the
²¹     document that you just show me is
²²     European, you know, document.
²³     Okay.  But you know what?  Our
²⁴     process is also applied by the

Page 195

¹     EDQM.  So you're right, there's
²     many, many guidelines, documents,
³     even some forecasts out there.
⁴         But you know what?  The
⁵     process is approved by the EDQM.
⁶ BY MR. SLATER:
⁷     Q.   Just to be clear, you agree
⁸ with me that the TTC approach could not
⁹ have been applied if you had actually
¹⁰ identified the NDMA impurity, correct?
¹¹    A.   That's not correct.
¹²         MR. BALL:  Objection.
¹³         THE WITNESS:  Rick, go
¹⁴     ahead.
¹⁵         MR. BALL:  Objection.
¹⁶     Mischaracterizes earlier
¹⁷     testimony.
¹⁸         Go ahead, Eric.
¹⁹         THE WITNESS:  You know, the
²⁰     TTC approach, these days, okay,
²¹     it's been changing back and forth,
²²     as we discussed with FDA and EDQM.
²³     You confuse me there, okay.
²⁴         Even nowadays we using the

Page 196

¹         TTC as the limit setting for
²     the -- for the potential genotoxic
³     impurities.
⁴         As for the nitrosamines
⁵     series, what's the approach to set
⁶     limits, whether it's using TTC or
⁷     other ppb, or other things, okay,
⁸     I have to double confirm.  But I
⁹     disagree with you.
¹⁰ BY MR. SLATER:
¹¹    Q.   Well, you're certainly not
¹² using the TTC approach with regard to
¹³ nitrosamine impurities, correct?
¹⁴    A.   That's not correct.  Because
¹⁵ as you know, okay, the guidelines, the
¹⁶ ICH, you know, guidelines, they started
¹⁷ from Q3, Q7, Q9, M3, M7, M9.  It's also
¹⁸ improved or modified as we gain more and
¹⁹ more knowledge.
²⁰         Now the question you asked
²¹ me whether the nitrosamine should not use
²² the TTC to set the limits, I think I
²³ better draft a letter to ask the FDA
²⁴ whether this has been changed or not.

Page 197

¹     Okay.  What -- how should we set the
²     TTC -- set the limits.
³     Q.   Well, according to the EMEA,
⁴ it says risk assessment of members of
⁵ such groups, including nitrosamines,
⁶ requires compound-specific toxicity data.
⁷ It's supposed to be done item by item,
⁸ isn't it?  Or do you not know?
⁹     A.   Adam, that's just giving a
¹⁰ level -- because all those so-called
¹¹ potential genotoxic impurities, they
¹² giving high the dose to the animals.
¹³ Then they extrapolate the data into
¹⁴ humans.  It's all for reference.  There's
¹⁵ no human data for that.
¹⁶     Q.   Based on the information
¹⁷ available to ZHP, ZHP evaluated the risk
¹⁸ and determined it needed to quarantine
¹⁹ and recall all of the valsartan that it
²⁰ had distributed in the United States,
²¹ correct?
²²     A.   Yes, as far as we
²³ understand.  Even at that time, we
²⁴ suspect that unknown peak is NDMA and

Confidential Information - Subject to Protective Order

1 NDEA, you know, from protecting the
2 patient's interest, ZHP take the, you
3 know, proactive step to recall all those
4 materials on the market.
5     Q.   You're aware --
6     A.   Following with investigation
7 to further confirm, okay, that's the, you
8 know, GTI impurity that existed in the
9 valsartan, and all other sartans as well.
10     Q.   You're aware that ZHP
11 attempted to get the FDA to approve much
12 higher levels than what the FDA
13 eventually set as the limitation?  You
14 are aware of that?
15        MR. BALL:  Objection.
16     Outside the scope.
17        THE WITNESS:  Adam, could
18     you give me more details?  I don't
19     know --
20 BY MR. SLATER:
21     Q.   Well, did ZHP advocate for a
22 level of 4.7 ppm to be acceptable in the
23 valsartan?
24     A.   Adam, I wouldn't even --

1        MR. BALL:  Objection.  Hold
2     on.
3        Objection.  Outside the
4     scope.
5        MR. SLATER:  This isn't
6     outside the scope because --
7        MR. BALL:  Sure, it is.
8        MR. SLATER:  It goes to the
9     evaluation conducted by ZHP with
10     regard to the health --
11        MR. BALL:  That's not what
12     you're asking him.  You're asking
13     what they told FDA.  You're not
14     asking what their evaluation was.
15        MR. SLATER:  This -- of
16     course it is.  This is what the
17     outcome of their evaluation was,
18     to tell the FDA they thought this
19     was safe.  So of course --
20        MR. BALL:  So, Adam, ask him
21     a question about that.  Don't ask
22     him what he told the FDA -- what
23     he didn't tell the FDA.
24        MR. SLATER:  With all due

1     respect, I think my question is
2     appropriate.
3        MR. BALL:  Okay.  And that's
4     totally fine.  I'm just making my
5     objection.  The court can totally
6     disagree with me.
7 BY MR. SLATER:
8     Q.   Are you aware of the levels
9 in ppm that ZHP advocated to the FDA as
10 being safe for the NDMA-contaminated
11 valsartan?
12     A.   Adam, talking to FDA is not
13 part of the job of SynCores.  We do not
14 participate.  Only do research, provide
15 scientific data.
16     Q.   When ZHP advocated those
17 levels, did they do so based on a health
18 and safety evaluation or did they do so
19 based on a commercial analysis wanting to
20 sell the pills that it had manufactured?
21        MR. BALL:  Objection.
22     Beyond the scope.
23        THE WITNESS:  Adam,
24     that's -- let me just rephrase

1     that, okay.
2        Pharmaceutical business is
3     heavily regulated, okay.  That's
4     why ZHP might have to talk to FDA,
5     gets approval, okay.
6        That's a continuous, you
7     know, improving process, to make
8     sure the drug sold on the market
9     are safe for patients.
10 BY MR. SLATER:
11     Q.   Was ZHP surprised to learn
12 in 2018 -- I'll withdraw that, actually.
13        If a proper risk assessment
14 had been performed, SynCores would have
15 evaluated whether or to what extent DMF
16 was decomposing to yield DMA, otherwise
17 known as dimethylamine, as part of the
18 zinc chloride process, correct?
19        MR. BALL:  Objection.  Asked
20     and answered.
21        THE WITNESS:  Adam, I think
22     I answered the question several
23     times already.
24        MR. BALL:  Go ahead and

Confidential Information - Subject to Protective Order

Page 202

1  answer it again if you can,
2  Eric -- Dr. Gu.
3         THE WITNESS:  Okay.
4  SynCores did what we can, okay,
5  following the ICH guidelines, GMP
6  guidelines, to study valsartan at
7  that time in 2011.
8         I think we did, you know,
9  whatever we can, okay, to assess,
10  you know -- to make sure that we
11  make the better quality valsartan
12  at the time.
13  BY MR. SLATER:
14     Q.  In retrospect, as you sit
15  here now, you would agree with me that
16  the scientific analysis of potential
17  impurities was inadequate.  You would
18  agree with that now, looking back,
19  correct?
20     A.  Looking back, from the
21  standpoint of now, okay, as we have more
22  advanced -- you know, much more sensitive
23  instrument, we get more and more
24  knowledge about the process and genotoxic

Page 203

1  impurity, yes.  The answer is yes, under
2  that preconditions.
3         That's why, as I said, the
4  ICH guideline, the GMP are always
5  changing and modifying as we gain more
6  and more scientific knowledge.  It's
7  called cGMP guidelines.  It's always
8  current.
9         So that's why the ICH
10  guideline always, you know, updating,
11  gaining more and more sections.
12     Q.  Let's go through that.
13  Number one, GC-MS, otherwise known as gas
14  chromatography mass spectometry, was a
15  known available technology in 2011,
16  correct?
17     A.  GC-MS is the -- is the
18  technology, sure, it existed back in
19  2011, yes.
20     Q.  Did ZHP actually use GC-MS
21  as part of any of its evaluations of any
22  of the drugs it was manufacturing back in
23  2011?  Do you know?
24     A.  I -- I didn't know, because

Page 204

1  I wasn't there.  But I know in 2011,
2  GC-MS is not widely used in industry.  We
3  using GC a lot, okay, to detect in the
4  reduced solvent those unknown peaks.
5         SynCores at that time does
6  not have GC-MS.
7     Q.  You don't know if ZHP did?
8     A.  I didn't ask.  I'm not sure.
9     Q.  It was known in 2011 that
10  GC-MS was best way to identify
11  nitrosamine impurities, correct?
12         MR. BALL:  Objection.
13  Vague.  And calls for an expert
14  opinion.
15         THE WITNESS:  Adam, I cannot
16  tell you that, because at 2011,
17  okay -- 2011, no one knows there's
18  NDMA in the, you know -- many
19  product.  For the valsartan, we
20  didn't know it's in there.  So I
21  wouldn't be speculating.  GC-MS is
22  the better -- you know, the best
23  equipment to detect NDMA and NDEA.
24  BY MR. SLATER:

Page 205

1     Q.  It was known that GC-MS was
2  the best equipment to identify NDEA and
3  NDMA.  That was known in 2011, correct?
4         MR. BALL:  Objection.  Calls
5  for expert opinion.
6         THE WITNESS:  Adam, I don't
7  know.  Because GC and GC-MS are
8  two different type of equipment.
9  GC-MS is designed to detect, you
10  know, qualifying those low level
11  impurities much better than the
12  GC.  That's all I can say.
13  BY MR. SLATER:
14     Q.  I'll try it differently.
15  Maybe this will help.
16         You would agree with me that
17  ZHP knew by 2011 that mass spectometry
18  was the best way to identify
19  nitrosamines, correct?
20     A.  That's not correct.  ZHP
21  didn't know.
22     Q.  Did SynCores know that?
23     A.  SynCores does not know
24  either.  We only have GC at SynCores at

Confidential Information - Subject to Protective Order

Page 206

1 that time.
2         As I said again, okay,
3 industrywise, even the FDA, EDQM, they
4 all know GC is the popular equipment in
5 the, you know -- in the pharmaceutical
6 industries.
7     Q.   Have there been other times
8 where at SynCores you've developed a lab
9 scale process where there was a risk to
10 create nitrosamines where you didn't try
11 to test to see if that impurity was being
12 created or not?  Is there another example
13 you can give me?
14     A.   What examples?  Adam, I'm
15 confused.  What example are we talking
16 about?  SynCores different product?
17 What?
18     Q.   Is there a time where
19 SynCores developed a process to develop
20 or to manufacture a drug product, thought
21 that nitrosamine impurities were
22 potential outputs, and didn't try to test
23 to determine whether there were actually
24 nitrosamine impurities?

Page 207

1         MR. BALL:  Objection.
2     Outside the scope.
3         THE WITNESS:  Adam, the
4     answer is no.
5 BY MR. SLATER:
6     Q.   That would be reckless,
7 right?
8     A.   You know --
9         MR. BALL:  Objection.
10     Mischaracterizes his testimony.
11         THE WITNESS:  Why you want
12     to do that?
13 BY MR. SLATER:
14     Q.   If SynCores or ZHP knew that
15 a nitrosamine could potentially be
16 created by the manufacturing process, it
17 would have been reckless not to try to
18 test to identify that impurity, right?
19         MR. BALL:  Objection.
20     Compound, and mischaracterizes his
21     testimony, and it's asked and
22     answered.
23         THE WITNESS:  Okay.  Adam,
24     if we know, okay, if we suspect,

Page 208

1     okay, we have to do the thorough
2     studies, do the entire risk
3     assessment to get that out of the
4     process, get that impurity out --
5     under control in the final drug,
6     APIs.
7 BY MR. SLATER:
8     Q.   Are you aware that Novartis
9 detected the NDMA peak with gas
10 chromatography?
11     A.   No.  As I said again,
12 Novartis use GC to give you -- they
13 suspect, okay.  That's a unknown peak.
14 They labeled it as unknown peak.
15     Q.   And then Novartis took the
16 next step and investigated that peak and
17 learned that it was likely NDMA, correct?
18     A.   Adam, we talk about this
19 just a while ago.  Novartis, you know,
20 suspect a peak, which labeled as unknown
21 peak.  Then they send this issues to the
22 external professional laboratories.  The
23 results they give out is also this highly
24 suspect that could be the peak.

Page 209

1         And then they noticed the
2 ZHP.  ZHP, the scientists, the
3 developers, specified a method and
4 finalized, confirmed, okay, that's the
5 structure, is the NDMA.  That's my side
6 of -- my version of how this happened.
7     Q.   Novartis notified ZHP of
8 this suspicious peak and then when ZHP
9 did not investigate it further, Novartis
10 went to Solvias, the independent lab, and
11 Solvias, the independent lab, performed
12 GC-MS and identified it as likely NDMA.
13 That's what occurred, correct?
14         MR. BALL:  Objection.
15     Foundation.
16         THE WITNESS:  Adam, I think
17     I told you my version of story
18     several times, okay.
19         Novartis noticed us that
20     could be a suspect peak.  They
21     labeled as unknown peak, okay.
22     ZHP, when we learned that, okay,
23     we did our study to finally
24     determine that's the NDMA.

Confidential Information - Subject to Protective Order

Page 210

1    We developed a specific
2  method to detect that.
3    MR. BALL:  So Adam, we've
4  gone almost 80 minutes.  I'm happy
5  to let you continue this line of
6  questioning if you want or we can
7  take a break.
8    MR. SLATER:  It's up to you.
9  I can keep going.
10    MR. BALL:  Okay.  Go ahead.
11  Keep going, as long as Dr. Gu is
12  fine.
13    THE WITNESS:  Why don't we
14  take ten minutes off.  I'm hungry.
15    MR. BALL:  Fair enough.
16    THE VIDEOGRAPHER:  The time
17  right now is 11:31 a.m.  We're now
18  off the record.
19    (Short break.)
20    THE VIDEOGRAPHER:  The time
21  right now is 11:44 a.m.  We are
22  back on the record.
23  BY MR. SLATER:
24    Q.   Just to reorient ourselves,

Page 211

1  Novartis noted a peak that was concerning
2  to it on regular gas chromatography,
3  correct?
4    A.   Novartis discover -- they
5  call it unknown peaks.
6    Q.   You told me earlier, and I
7  think -- rephrase.
8    I think you agreed with me
9  earlier, risk assessment occurs for the
10  lifecycle of the product, correct?
11    A.   Risk assessment, if you're
12  looking at the ICH M7, okay, risk
13  assessment is -- usually applies to new
14  product, okay.
15    For the commercialized
16  product being approved by the FDA and
17  EDQM, they are not request to going back
18  to look for -- looking for the -- how
19  should I say it?  Okay.
20    Just directly to your
21  question, you know, part of quality
22  should be continuously monitored.
23    Q.   And one of the things that
24  must be monitored is unknown peaks that

Page 212

1  may show up on gas chromatography,
2  correct?
3    A.   Yeah.  Once you find out
4  there is unknown peak, they should do
5  the -- you know, try to investigate it,
6  what's the unknown peak, you know.
7    Q.   The unknown peak that was
8  seen by Novartis was fully available to
9  ZHP as well, correct?
10    MR. BALL:  Objection.
11    THE WITNESS:  I wouldn't
12  comment on that.
13    Rick, go ahead.
14    MR. BALL:  No, that's fine.
15  Go ahead.
16    THE WITNESS:  I wouldn't
17  comment on that.  That's the --
18  unknown peak, maybe it was
19  communicated to ZHP quality units.
20  BY MR. SLATER:
21    Q.   The quote-unquote unknown
22  peak that Novartis saw was actually a
23  peak that had been repeating from the
24  beginning when ZHP began to manufacture

Page 213

1  valsartan with the zinc chloride process,
2  correct?
3    A.   Adam, let me -- let me tell
4  you what I know, okay, because I didn't
5  know there is, you know, unknown peak was
6  discovered after 2016 or so.  I wouldn't
7  comment on that, because I'm not in the
8  quality unit.
9    Q.   Well, in terms of ZHP's
10  evaluation and knowledge of the risk of
11  the creation of nitrosamines, an
12  important part of that evaluation would
13  have been evaluation of unknown peaks,
14  correct?
15    A.   Adam, I didn't quite
16  comprehend your questions.
17    Q.   ZHP was responsible to
18  evaluate any unknown peaks seen with its
19  valsartan, correct?
20    MR. BALL:  Objection.
21  Vague.
22    THE WITNESS:  ZHP were doing
23  investigations for those unknown
24  peaks as ongoing efforts.

Confidential Information - Subject to Protective Order

Page 214

BY MR. SLATER:
Q.   The peak that Novartis saw, had ZHP evaluated that peak previous to that?
A.   Previous to what?
Q.   To when Novartis brought it to ZHP's attention?
A.   I don't know, because as I said, Adam, I'm not in the quality unit. I'm don't know the time frame, or exactly the time, what was happening that time.
Q.   ZHP certainly had an independent duty to be continuously monitoring the product quality, including looking for unknown peaks or aberrant peaks, correct?
        MR. BALL:  Objection. Vague.  Calls for a legal conclusion.  I think.
        THE WITNESS:  Adam -- Rick, can I answer the question?
        MR. BALL:  Yeah, please answer.
        THE WITNESS:  As you know,

Page 215

the pharmaceutical companies did do the annual review, quality review every year.  And they file with the FDA or EDQM, those regulatory bodies, okay.
BY MR. SLATER:
Q.   Did ZHP notify the FDA or the European authority there was an unknown peak showing up on gas chromatography that ZHP was not further evaluating?
        MR. BALL:  Objection. Mischaracterizes the earlier testimony, and foundation.
        THE WITNESS:  You know, Adam, I'm not in the quality unit or QA or regulatory department. They communicate with EDQM and FDA on a yearly basis about those commercial product, okay.
        SynCores are not involved in that.
BY MR. SLATER:
Q.   We were talking about

Page 216

Novartis a few minutes ago.  And let me ask -- rephrase.
        Speaking of Novartis, can you tell me why it was that Novartis noticed the NDMA peak and then further evaluated it through an independent lab and confirmed it was NDMA before ZHP did?
        MR. BALL:  Objection. Mischaracterizes his earlier testimony.
        Go ahead -- or go ahead, Eric, Dr. Gu.
        THE WITNESS:  Okay. Novartis they discovered an unknown peak, okay.  They turn over this question to the contract laboratory to do further studies.
        I'm sure, okay -- I wouldn't speak for my QC and quality units. I'm sure they also investigating those, you know, unknown peaks as their routine work.
BY MR. SLATER:
Q.   If I understand what you

Page 217

said, you were saying that you were sure that the quality assurance and qualify control units were evaluating those peaks independently already?
A.   I'm sorry, Adam.  I didn't --
Q.   Did you testify that it's your understanding that the QA and QC departments at ZHP were independently evaluating that unknown peak that Novartis found on their own before Novartis came to them?
A.   You know, they -- because Novartis is one of our clients, so I'm sure they keep talking to each other. They have to set the limits which meets the FDA also as well as the Novartis, you know, specifications.
        When it seems like unknown peak was discovered, I'm sure they communicated with each other.  They do all -- they all doing their own independent research on those unknown peaks.

Confidential Information - Subject to Protective Order

Page 218

1   Q.   Since ZHP was the
2  manufacturer, you would think that ZHP
3  should have been the one to notice the
4  unknown peak and identify what it was
5  before one of its customers had to bring
6  it to its attention, right?
7   A.   Adam, how can I answer this
8  question.  Because each company doing
9  their own studies, okay.  What you miss,
10 other people may catch it.  Okay.  That's
11 why in the scientific community, or even
12 clients in the supplies, quality is
13 always talking to each other, to share
14 information, to discuss, to discover more
15 and more about the product.
16        There's no such question,
17 should or should not, okay.  It's
18 scientific issues.
19        As I mentioned earlier, for
20 those NDMA, NDEA, those lower level below
21 ppm level, you know, impurities, it was
22 not -- it was not so easy to detect.  You
23 have to develop a specific method in
24 order to discover, qualify, and quantify

Page 219

1  those impurity.
2        That's a -- you know, it's
3  quite a challenging work, especially for
4  those very lower limit impurities, or
5  unknown peaks.
6        MR. SLATER:  My internet
7     connection got a little funky
8     there.  Michelle, could you, if
9     you have a moment, read me that
10    answer back because I was -- all I
11    was hearing was mechanical sounds
12    because of my internet connection.
13       MR. BALL:  Essentially what
14    he was saying, he was channelling
15    Mr. Roboto.
16       MR. SLATER:  That's pretty
17    much what I was getting.  It was a
18    good song.
19       (Whereupon, the court
20    reporter read back the requested
21    portion of testimony.)
22 BY MR. SLATER:
23    Q.   Are you aware that ZHP
24 actually certified in the DMF that there

Page 220

1  were no n-nitroso impurities in the
2  valsartan manufactured with the zinc
3  chloride process?
4        MR. BALL:  Objection.
5     Vague.  And outside the scope.
6        THE WITNESS:  Adam, DMF
7     filing is, you know, regulatory
8     department's, you know, job.
9        SynCores or me personally
10    don't get involved into the DMF
11    filings or regulatory
12    communication with EDQM or FDA.  I
13    couldn't answer your questions.
14 BY MR. SLATER:
15    Q.   As a matter of risk
16 assessment, the only way you could state
17 with certainty that there were no
18 n-nitroso impurities in the valsartan
19 would be to test with GC-MS method,
20 correct?
21       MR. BALL:  Objection.  Calls
22    for expert testimony.
23       THE WITNESS:  The only way
24    you can do that, first of all, you

Page 221

1  would know or you would suspect
2  that there were such impurities.
3        Second of all, you need the
4  high resolution mass to have the
5  capability to detect such lower
6  level impurity.
7        Third of all, you have to
8  develop a method specifically to
9  detect the impurity without any
10 interferes with the other
11 substance in the matrix.
12       So it's quite a challenging
13 work.
14 BY MR. SLATER:
15    Q.   Okay.  Once Novartis told
16 ZHP about this suspicious peak, ZHP was
17 able to confirm it was NDMA within days,
18 right?
19    A.   I don't know exactly how
20 long that takes.
21       THE WITNESS:  Rick, you have
22    something to say?
23 BY MR. SLATER:
24    Q.   Yeah, let me -- I'll re-ask

Confidential Information Subject to Protective Order

Page 222

1 it again because I paused. Not your
2 fault. I just paused before you started
3 to talk.
4        When ZHP was notified by
5 Novartis of this potential NDMA peak, ZHP
6 was able to confirm it was NDMA very
7 quickly, right?
8        MR. BALL: Objection.
9 Vague.
10        THE WITNESS: Adam, okay, I
11     think when we, you know, noticed
12     that there's an unknown peak, you
13     know, that may be that GTI, ZHP,
14     you know, utilized many resources,
15     including external -- you know,
16     external contract laboratories,
17     and also internally, you know,
18     many people work on that.
19        I don't know how quickly is
20     that. I did not keep the
21     timestamps for that.
22 BY MR. SLATER:
23     Q.    Five or six days, does that
24 sound correct to you? June 5th to

Page 223

1 June 11th?
2     A.    I don't know exactly. But
3 you know, I think about a week or so,
4 because once you have the lead, okay, you
5 know, what you're looking for, and you
6 can get the reference data material from
7 the market, and you have the equipment to
8 do such a job, and you also use different
9 contract labs, because ZHP committed many
10 resources to find out what's -- what the
11 unknown peaks are.
12        So it's -- there are -- it's
13 great efforts, okay, to get that turned
14 around really quickly. I don't know how
15 long that takes. I don't have a
16 timestamp.
17        But as you said -- you
18 mentioned, maybe you are right, within a
19 week or so. But within a week, so they
20 did so many experiments, so many people
21 gets involved, okay.
22        You know what they're
23 looking for. That's a different --
24 that's a whole different stories.

Page 224

1     Q.    Well, Novartis did not
2 understand the manufacturing process for
3 the valsartan as well as ZHP did, right?
4 You would agree, ZHP understood the
5 process better, right?
6        MR. BALL: Objection. Calls
7     for speculation.
8        THE WITNESS: Okay. Adam,
9     because we provide the process
10     description to the Novartis.
11        To some extent, I think, you
12     know, yes, of course, ZHP knows a
13     little more. But I'm sure
14     Novartis knows a lot too.
15 BY MR. SLATER:
16     Q.    Are you aware that on
17 June 9, 2018, Novartis asked ZHP if ZHP
18 was destroying the excess azide with
19 sodium nitrite?
20     A.    I'm sorry. I didn't
21 quite -- I'm sorry, Adam. Could you say
22 it again?
23     Q.    Sure. Are you aware -- are
24 you aware that on June 9, 2018, Novartis

Page 225

1 asked ZHP if ZHP was eliminating the
2 excess azide with the addition of sodium
3 nitrite and was doing so in the presence
4 of the valsartan product? Are you aware
5 that Novartis had to ask that question to
6 find that information out?
7     A.    I didn't know, because, you
8 know, Novartis asked ZHP about that.
9 That's called quenching the excess sodium
10 azide, which is quite a toxic materials.
11     Q.    That's when the nitrous acid
12 from the sodium nitrite reacted with the
13 DMA and formed the NDMA, correct?
14     A.    That was later, when we did
15 the full scope of the risk assessment.
16 We do the mechanistic studies of how this
17 was formed. Then we later find out
18 that's the case.
19     Q.    So I come back to my
20 original question.
21        Shouldn't ZHP have noted the
22 unknown peak and done this whole
23 investigation on its own before any of
24 its customers had to bring this to its

Page 226

1 attention?

2         MR. BALL:  Objection.  Calls
3 for speculation.  Mischaracterizes
4 his previous testimony.

5         THE WITNESS:  Adam, do I
6 have to answer the question?

7         MR. BALL:  Yes, you need to
8 answer.

9         THE WITNESS:  Okay.  Adam,
10 as I mentioned earlier, there is
11 no should or should not.  It's a
12 scientific question.  It's quite a
13 challenging question.

14         In the scientific
15 communities, okay, we communicate
16 with each other.  We share
17 information.  We share technology.
18 We share the method.  I wouldn't,
19 you know, speculating who should
20 or who should not discover this
21 issue first.

22 BY MR. SLATER:

23     Q.   Well, this product was not
24 some product that the scientific

Page 227

1 community collectively was selling.  This
2 was a product ZHP was selling and
3 profiting from, correct?

4         MR. BALL:  Objection.
5 Outside the scope and compound.

6         THE WITNESS:  Well,
7 actually, Adam, Novartis is the
8 originators.  They make the
9 product much longer than ZHP has
10 been.

11 BY MR. SLATER:

12     Q.   Who did?

13     A.   Novartis.

14     Q.   You're saying Novartis
15 manufactured valsartan with the zinc
16 chloride process?

17     A.   I don't know what process
18 they use, but they make the valsartan
19 much longer than the ZHP.

20     Q.   You're not aware that ZHP
21 was continually trying to increase the
22 yield, and that's how they ended up
23 having SynCores develop the zinc chloride
24 process, by a different process than what

Page 228

1 Novartis had been doing?

2     A.   I'm not aware of that,
3 because our -- SynCores is developing a
4 method with the clients to making better
5 quality materials, lower waste, and much
6 safer process.

7     Q.   Well, the Novartis process
8 to manufacture Diovan worked fine, right?

9         MR. BALL:  Objection.

10 BY MR. SLATER:

11     Q.   Let me ask it again.

12         The Novartis process to
13 manufacture Diovan, the original brand
14 name, that worked fine, right?

15         MR. BALL:  Objection.
16 Speculation.  And vague.

17         THE WITNESS:  I don't know.
18 I don't know what you mean by
19 fine, okay.

20 BY MR. SLATER:

21     Q.   Well, it was approved.  They
22 sold Diovan.  There was never a recall
23 for nitrosamines being in the Diovan.
24 Those are true statements, correct?

Page 229

1         MR. BALL:  Objection.
2 Compound.

3         THE WITNESS:  Adam, could
4 you -- could you -- forgive me,
5 okay.  Could you repeat that
6 question again?

7         So they make the Diovan --
8 actually, we're talking about
9 valsartan compound, right?  Diovan
10 is the commercial name for the
11 compound -- for the drug?

12 BY MR. SLATER:

13     Q.   Diovan was the brand name.

14     A.   Brand name.  We're talking
15 about valsartan API, right?

16     Q.   Correct.

17     A.   Okay.

18     Q.   When Novartis was
19 manufacturing and selling Diovan, it was
20 not contaminated with nitrosamines,
21 correct?

22         MR. BALL:  Objection.  Calls
23 for speculation.

24         THE WITNESS:  Adam, I don't

Page 230

1  know.  I haven't tested Novartis
2  compounds yet.
3  BY MR. SLATER:
4      Q.   When you were optimizing the
5  process to manufacture valsartan, did you
6  look into how was valsartan manufactured
7  previously when it was brand?
8      A.   That's the Novartis process.
9  We search the literature, patents,
10  everything, okay, there's many versions
11  of the process out there.
12      Q.   Did any of those versions
13  include the use of DMF?
14      A.   In public information?
15      Q.   Any of the information that
16  you had access to.
17      A.   Well, we only had access to
18  public information.  We could not access
19  other company's trade secrets.  So I will
20  not answer that question.
21      Q.   Well, from everything you
22  saw, you never saw use of DMF by
23  Novartis, right?
24          MR. BALL:  Objection.

Page 231

1      Vague.
2          THE WITNESS:  Adam, I don't
3      know.  I don't know how Novartis
4      make that.
5  BY MR. SLATER:
6      Q.   Why was it that Novartis
7  needed to bring the unknown peak -- well,
8  rephrase.  Let me ask it differently.
9          Why was it that Novartis had
10  to bring the NDMA peak to the attention
11  of ZHP?  Why didn't ZHP discover it
12  first?  As a matter of factual
13  information, why was that?
14          MR. BALL:  Objection.
15          THE WITNESS:  Rick, go
16      ahead.
17          MR. BALL:  Calls for
18      speculation.
19          Go ahead.
20          THE WITNESS:  Adam, as I
21      said, again, okay, in the past,
22      Novartis bring this to our
23      attention, label it as an unknown
24      peak, which suspect could be that.

Page 232

1  BY MR. SLATER:
2      Q.   But my question is why
3  didn't ZHP figure this out first?  Why
4  did it take till Novartis brought it to
5  ZHP's attention?
6          MR. BALL:  Objection.  Calls
7      for speculation.  To the degree
8      that you can answer, please do,
9      Eric.
10          THE WITNESS:  Okay.  I think
11      we discussed that in the earlier,
12      okay.
13          This is -- I said it's a
14      lower level impurity.  It is an
15      unknown peak, initially labeled
16      as -- you know, as we have that
17      much knowledge about it.
18          As the time passing by,
19      doing more and more research, then
20      we finally, okay, identify this as
21      the NDMA.
22  BY MR. SLATER:
23      Q.   You would agree with me that
24  as a matter of risk assessment and

Page 233

1  evaluation for impurities, ZHP should
2  have evaluated that NDMA peak as soon as
3  ZHP saw it, correct?
4          MR. BALL:  Objection.
5      Vague.  Foundation.
6          THE WITNESS:  Adam, we talk
7      about should have or should not.
8      I don't know how to answer you
9      this question.  I think I answered
10      this question before.
11  BY MR. SLATER:
12      Q.   As a matter of current good
13  manufacturing practices, when ZHP saw
14  that NDMA peak, it should have
15  investigated it and identified it as soon
16  as it saw it, right?
17          MR. BALL:  Objection.
18      Foundation.
19          THE WITNESS:  Adam, that was
20      labeled as unknown peaks, okay.
21  BY MR. SLATER:
22      Q.   Well, an unknown in a drug
23  that's going to be taken by human beings
24  has a potential risk, right?

Page 234

1    A.   Adam, if you look at the
2  many other drug as well, the FDA, ICH
3  guideline clearly specifies if it's below
4  0.1 percent, you don't have to qualify,
5  quantify.  If it's above 0.1 percent, you
6  have to know the structures.
7          As we all know, if you go in
8  further, okay, the drug substance is,
9  let's say, 99.9 percent pure, there are
10 still many so-called unknown peaks in
11 there.  It depends on the qualitative
12 limits.
13         Let's say for a compound,
14 the unknown peak is 0.05 percent, you
15 don't have to do structure analysis.  You
16 don't have to know what it is.  That's
17 the current -- even today, that's a
18 current FDA guidelines.
19         You know, in this case, we
20 are talking about the NDMA, which is much
21 lower than 0.05 percent.  And that's why
22 this is so difficult, okay, to making a
23 drug and know all the so-called unknown
24 peaks in the drug substance or drug

Page 235

1  product.
2          It's our efforts in the
3  industry continuously to advance and
4  improve ourselves, we try to gain an
5  understanding of all those unknown peaks
6  in any drug substance.  But that's almost
7  impossible job for this time -- at this
8  time now.  But we will eventually get
9  there.
10     Q.   I didn't mean to interrupt
11 you.  Were you done?
12     A.   Yeah, I'm done.
13     Q.   Why did Novartis figure out
14 the importance of DMF in this whole
15 situation before ZHP did?
16         MR. BALL:  Objection.  Calls
17     for speculation.
18         THE WITNESS:  I don't know.
19         MR. BALL:  Mischaracterizes
20     earlier testimony.
21         THE WITNESS:  Rick, okay,
22     can I answer now?
23         MR. BALL:  Yes, please.
24         THE WITNESS:  I don't know

Page 236

1  who discovered this, you know,
2  phenomenon first, okay, Novartis
3  or ZHP.  I wouldn't speculate on
4  that.
5  BY MR. SLATER:
6     Q.   Well, you know for a fact
7  that Novartis was asking questions about
8  DMF of ZHP before ZHP ever considered DMF
9  as being part of the process leading to
10 the NDMA peak and the presence of NDMA in
11 the valsartan, correct?  That's a fact,
12 right?
13         MR. BALL:  Objection.
14     Foundation.
15         THE WITNESS:  Adam, I didn't
16     get involved with a communication
17     or with Novartis.  I do not know.
18     But as far as we know, okay, we
19     did the risk assessment.  We found
20     out, okay, that could be in the
21     one that could pass, that form the
22     NDMA.
23 BY MR. SLATER:
24     Q.   What I'm trying to get at

Page 237

1  is, what was it about ZHP's evaluation
2  that caused it to not connect DMF to
3  that, quote, unknown peak that turned out
4  to be NDMA until after Novartis started
5  questioning the use of DMF in the context
6  of that peak?  I'm asking, why did ZHP
7  not figure this out first?  Why did it
8  need Novartis to take it there?
9          MR. BALL:  Objection.  Asked
10     and answered.  Foundation.
11         THE WITNESS:  Adam, as I
12     said, I am not getting involved
13     with communication with Novartis.
14     That is the quality
15     responsibility.
16         As to your question, why ZHP
17     did not find out before Novartis,
18     I do not know.
19 BY MR. SLATER:
20     Q.   Wouldn't the answer be that
21 the quality risk assessment was
22 inadequate by ZHP?
23         MR. BALL:  Objection.  Calls
24     for opinion and expert testimony,

Confidential Information - Subject to Protective Order

Page 238

1    and mischaracterizes his
2    testimony.
3         THE WITNESS:  We keep going
4    there.  Adam, can we skip that?
5         MR. BALL:  Go ahead and
6    answer again, Dr. Gu.
7         THE WITNESS:  I just
8    disagree with Adam.  I said it
9    many, many times already, okay.
10   This is -- as the technology
11   advances, as the, you know,
12   detection equipment gets --
13   advances, we gain more and more
14   knowledge about those drug
15   substance, all those unknown peaks
16   or impurities in the compounds.
17   It takes time.
18   BY MR. SLATER:
19        Q.   Speaking for ZHP in this
20   deposition, are you thankful that
21   Novartis figured out that this unknown
22   peak needed to be investigated so that
23   the NDMA could be discovered?
24        MR. BALL:  Objection.

Page 239

1         THE WITNESS:  You know what,
2    Adam, we also share our
3    information with Novartis as well.
4         Yes, we were appreciative,
5    okay, the technology and
6    advancement, people discover more
7    and more.
8         You know, if you're asking
9    me whether we thankful, sure, if
10   somebody help me to improve the
11   drug safety, I want to be
12   thankful.  So are other companies
13   as well.
14        MR. SLATER:  Cheryll let's
15   go back to Exhibit 228, if we
16   could, if you're still there.  I
17   know you're still there.  I'm just
18   kidding.
19        MR. BALL:  I'm not being
20   rude.  I'm just getting a bottle
21   of water.  I'll be right back.  Go
22   ahead and go.  I can still hear
23   you.
24        MR. SLATER:  I've got to

Page 240

1    read something.
2         Cheryl, let's go to Page 12
3    of 28 on this.  And we're back in,
4    just for the record, Exhibit 228,
5    the letter from ZHP to the
6    European agencies.
7         Yeah, good luck with the
8    turning of the document.
9    BY MR. SLATER:
10        Q.   I'm looking now at --
11   actually, did I say -- what page did I
12   say?  12.  Let me go back to that.
13        A.   Adam, can you expand the
14   document?  It's so -- the letter so
15   small.
16        MR. BALL:  Yeah, Adam, I can
17   barely read this.  If we can
18   enlarge the screen.
19        MR. SLATER:  It's fine.  I'm
20   just going to figure this out.
21        Yeah, go to Page, actually,
22   Cheryll, 12, if you're on it.
23   Yeah, good.  And you can expand
24   it.  I'm looking at Box B, so the

Page 241

1    top box I'm not focusing on if you
2    need more space.  And I'm looking
3    at the box on the left.
4    BY MR. SLATER:
5         Q.   Looking at Box 4B in this
6    document, this is per the agencies,
7    European agencies.  It says that, "The
8    inspection team reviewed the
9    documentation for complaint CC-18004,
10   received on May 22nd, 2018, from customer
11   Novartis in Ireland.  Unknown peak
12   detected on 16 batches of valsartan."
13        Do you see that?
14        A.   Yeah, I see that.
15        Q.   And as we know now, that
16   unknown peak -- unknown peak represented
17   NDMA, correct?
18        A.   I wasn't involved.  Probably
19   that's the unknown peak, yep.
20        Q.   And then in B1, little
21   single i, it says, "They provided typical
22   chromatogram of valsartan (GC residual
23   solvents) used to identify the unknown
24   peaks and to provide an answer to

Confidential Information - Subject to Protective Order

1  Novartis's complaint, was not related to
2  any of the batches concerned by the
3  complaint, but was related to complaint
4  investigations requested by Sun
5  Pharmaceuticals in November 2016."
6         I want to stop there.  Are
7  you aware of the fact that Sun
8  Pharmaceuticals was complaining of
9  unknown peaks in November of 2016?
10      A.  I'm not in the QC or QA
11 department.  I'm not aware of that.
12      Q.  Then according to ii, it
13 says, "After being asked why no direct
14 comparison of the unknown peaks observed
15 by Novartis and their own GC
16 chromatograms had been made, the company
17 stated that they were not in possession
18 of the customer's method at the time of
19 the complaint.  However, after a review
20 of GC audit trails, it became evident
21 that the company had already obtained the
22 Novartis method in December of 2017.
23      "From further checks on the
24 communications between the company and

1  Novartis, it became evident that Novartis
2  had shared the GC-FID method with Z.
3  Huahai already in July of 2017 as a means
4  of supporting investigations on unknown
5  peaks."
6         So I'm going stop there.
7         So are you aware -- or were
8  you aware before now that as of 2017,
9  Novartis's method to evaluate these peaks
10 was already in ZHP's possession?  Did you
11 not know that before now?
12      A.  I'm not knowing that before
13 now.  And also, be very specific, okay.
14 You look in the document.  They only
15 share the GC-FID method with ZHP.  It's
16 very -- clearly states in there.  That's
17 only the -- that's the observation of the
18 European EDQM inspection, right?
19      MR. SLATER:  Let's go,
20  Cheryll, back to Page 10, Box
21  Number 3.
22      THE WITNESS:  Page 10.
23      MR. SLATER:  Perfect.
24 BY MR. SLATER:

1      Q.  This says, "As part of the
2  root cause analysis" -- rephrase.
3         Looking again here at the
4  letter from ZHP to the European agencies,
5  November 14, 2018, Box 3, first is the
6  observation by the European regulatory.
7  And it states as follows:
8         "As part of the root cause
9  analysis of the NDMA/NDEA contamination,
10 the development of the 2011/2012 revised
11 valsartan manufacturing process
12 (introduction of the zinc chloride
13 process) was reviewed and the following
14 observations were made."
15        Are you following where I'm
16 reading, correct?
17      A.  Yeah, I'm following.
18      Q.  Let's go now to the box --
19      MR. SLATER:  You can scroll
20  down, Cheryll.  Thank you.
21 BY MR. SLATER:
22      Q.  And A says, "The modified
23 process was developed by the Huahai
24 Pharmaceuticals research and development

1  facility, Shanghai SynCores Technologies
2  Inc.  Contrary to what the company stated
3  in their retrospective analysis of the
4  process change, the core principles of
5  ICH Q8, Q9, and Q10 were not considered
6  and potential impurity profiles and
7  associated risks were not addressed by
8  the R&D laboratory."
9         Let's stop there now.  The
10 R&D laboratory, again, is SynCores, your
11 company, correct?
12      A.  Yes.
13      Q.  And you would agree that the
14 core principles of ICH Q8, Q9, and Q10
15 were not considered in SynCores'
16 evaluation, correct?
17      A.  You know what, Adam, because
18 this observation was done -- am I right,
19 2018 sometime?
20      Q.  Yes.
21      A.  Okay.  Yes, at 2018 looking
22 back to the 2010 or 2011, you can make
23 all those comments.
24        Don't forget, okay, this

1 process, the part was approved by EDQM as
2 well.  Between 2011 and 2012, and 2018,
3 EDQM, they have inspect Huahai many times
4 as well, okay.
5        Third of all, I'm not sure
6 if the ICH, Q8, Q9, Q10 was out there in
7 2010 or '11.
8        So you cannot look in the
9 back mirror and try to finger pointing at
10 people that they do not know.
11        But this document looks
12 interesting, okay.  Keep that in mind,
13 the entire process was approved by the
14 same agency.
15     Q.   This says that, "As the
16 result of what we just talked about,
17 potential impurity profiles and
18 associated risks were not addressed by
19 the research and development laboratory,"
20 which again is SynCores.
21        And, again, looking back on
22 that now, and even in 2018, that's a
23 correct statement, right?
24     A.   Yeah, looking back, now,

1 yes, you can say that.
2     Q.   Looking now at Letter B, it
3 states, "Furthermore, no risk assessment
4 was made by the company to identify the
5 impurities related to the new solvent
6 used (DMF) when implementing the process
7 proposed by research and development."
8        Do you see that?
9     A.   I see that.
10     Q.   And this is speaking to ZHP
11 not performing a risk assessment to
12 identify the impurities related to the
13 new solvent used, which was DMF.  That's
14 a correct statement, ZHP did no risk
15 assessment on the DMF, correct?
16     A.   I disagree with that,
17 because the 2010 or 2011, we screened
18 all -- many different kind of solvent,
19 including DMF, okay.
20        We believe the DMF was, you
21 know, very stable.  It's a good solvent
22 to use.  It produces better quality
23 material of valsartan at that time.  But
24 today, now, once they find out all those

1 information, as the risk assessment has
2 been done, it's easy to say, because
3 looking back into 2011.
4     Q.   Are you testifying that ZHP
5 performed a risk assessment to identify
6 the impurities related to DMF?
7     A.   You know, Adam, as we talk
8 about it, okay, DMF is a commonly known
9 solvent.  You know, even actually what
10 you're talking about, we use tons of DMF,
11 okay.  Decompose into, let's say, ppm
12 levels.  I don't know if you have any
13 idea about the scale differences, okay.
14        So when you're talking about
15 something stable and something is not
16 stable, you have to put it on the scale.
17     Q.   I'll try again.
18        Are you saying that ZHP
19 actually performed a risk assessment to
20 identify the impurities related to the
21 use of DMF when implementing the zinc
22 chloride process?  Are you saying that
23 ZHP did that risk assessment?
24     A.   I can --

1        MR. BALL:  Objection.  Asked
2 and answered.
3        THE WITNESS:  Rick, can I
4 answer now?
5        MR. BALL:  Yes.
6        THE WITNESS:  Okay.  I don't
7 know about ZHP, but for SynCores
8 we did a solvent screening for
9 many different solvents, including
10 MMP, MTBE, dioxides, many
11 solvents, okay.  That's all I can
12 tell you.
13        We did the, you know,
14 solvent screening, or risk
15 assessment for the selection of a
16 solvent.
17 BY MR. SLATER:
18     Q.   You've not seen any
19 documents or been told by any person in
20 preparing for this deposition that ZHP
21 performed a risk assessment to identify
22 the impurities related to the use of DMF,
23 correct?
24     A.   That's, I don't know what to

Page 250

1  answer.  What's correct?  Okay.  I don't
2  see any document.  Just use the DMF
3  solvent risk assessment in the past.
4        The answer is I didn't see
5  any documents.  But the solvent usage for
6  the researchers, we just basically, you
7  know, look into solvents, stability,
8  boiling points, and, you know, see if
9  it's suitable for the process.
10       But, you know, at the end,
11  okay, we have to analyze the final
12  product, the valsartan in this case, see
13  which -- the quality of the valsartan is
14  to remain better quality than the -- or
15  equal or better quality than the, you
16  know, original process.  We're talking
17  about process optimization right here.
18     Q.   What you did not look at was
19  potential impurities that could result
20  from the use of DMF in the process.  That
21  was something that you did not look at,
22  correct?
23       MR. BALL:  Objection.  Asked
24     and answered.

Page 251

1       THE WITNESS:  Adam, I'm
2     confused.
3       We look at everything we can
4     look, okay, based on the knowledge
5     base at the time.  And we follow
6     all those GMP guidelines, ICH
7     guidelines.  And we make better
8     quality materials and getting
9     approved from the FDA and EDQM.
10  BY MR. SLATER:
11     Q.   Is there -- well, let me ask
12  you this.
13       Are you saying that
14  valsartan contaminated with NDMA was
15  better quality than valsartan
16  contaminated with NDMA and NDEA, which
17  was the fact with the valsartan
18  manufactured by the sodium nitrite
19  quenching process?  Is that the point
20  that you're making?
21       MR. BALL:  Objection.
22     Mischaracterizes his earlier
23     testimony.
24       THE WITNESS:  Adam, put your

Page 252

1  question into content, okay.
2       That was 2011.  We didn't
3  know.  If we know that, that
4  wouldn't happen.
5       MR. SLATER:  Cheryll, I'm
6  going to put up a few more
7  documents.  We may come back to
8  this.  But you can take it down
9  for now.
10       What I want to go to now is
11  some of the ICH standards.  I want
12  to start with the ICH standard
13  titled "Pharmaceutical Development
14  Q8, Revision 2," dated
15  August 2009.
16       MS. CALDERON:  Give me one
17  second.
18       MR. SLATER:  Yeah, no
19  problem.
20       Okay.  Thank you, Cheryll.
21       MR. BALL:  Excuse me.
22       MR. SLATER:  I take that as
23  validation.
24       Looking on the screen --

Page 253

1  what exhibit is this now?  I'm
2  sorry.  I can never keep track of
3  exhibit numbers.
4       MS. CALDERON:  229.
5       (Document marked for
6     identification as Exhibit
7     ZHP-229.)
8       THE WITNESS:  229.
9  BY MR. SLATER:
10     Q.   Looking now on the screen at
11  Exhibit 229, this is ICH Standard Q8
12  titled "Pharmaceutical Development" dated
13  2009.
14       Do you see that?
15     A.   Yes.
16     Q.   During your prior testimony,
17  you questioned whether or not the ICH
18  guidelines that were cited by the
19  European authorities had been in effect
20  when the valsartan zinc chloride process
21  was being developed.
22       Do you remember you had
23  mentioned that during your testimony?
24     A.   Yeah.

Confidential Information - Subject to Protective Order

1    Q.   So I'm showing you Q8.  You
2  can see that was in effect as of August
3  of 2009.
4          You see that, correct?
5    A.   That's Revision 2, yep.
6          MR. SLATER:  Okay.  Now,
7  let's take that down and go to Q9,
8  titled "Quality Risk Management"
9  as Exhibit 230.
10          (Document marked for
11  identification as Exhibit
12  ZHP-230.)
13          MR. SLATER:  When you get to
14  it, Cheryll.
15  BY MR. SLATER:
16    Q.   On the screen is
17  Exhibit 230, titled "Quality Risk
18  Management, Q9."  You can see the date
19  for that is November 9, 2005, correct?
20    A.   Yes.
21    Q.   So that also was in effect
22  before 2010, correct?
23    A.   Yes.
24          MR. SLATER:  Now, let's go

1  to Exhibit 231, which will be Q10,
2  titled "Pharmaceutical Quality
3  System."
4          (Document marked for
5  identification as Exhibit
6  ZHP-231.)
7  BY MR. SLATER:
8    Q.   On the screen is
9  Exhibit 231, titled "Pharmaceutical
10  Quality System, Q10" dated June 4, 2008.
11  Do you see that?
12    A.   I see it.
13    Q.   This shows that this
14  standard also was in effect before 2010,
15  correct?
16    A.   Yeah.
17          MR. SLATER:  You can take
18  that down.
19          Let's go now as Exhibit 232,
20  let's go to a new document, which
21  will be ZHP-01862672, the final
22  cGMP inspection report from the
23  European authorities.
24          (Document marked for

1  identification as Exhibit
2  ZHP-232.)
3  BY MR. SLATER:
4    Q.   Exhibit 232 states at the
5  very beginning that this is the final
6  good manufacturing practices inspection
7  report and states, "This final inspection
8  report is issued after assessment of the
9  company's answers and corrective action
10  plan received on 14th of November 2018."
11          Do you see that?
12    A.   Could you expand that a
13  little bit?  I see it -- I see it now.
14  14th November, '18, yeah.
15    Q.   And this indicates as we
16  read down --
17          MR. SLATER:  If you can
18  scroll down, Cheryll, about
19  halfway down.
20  BY MR. SLATER:
21    Q.   It confirms that the
22  inspection date was September 10 to 13,
23  2018.
24          Do you see that?

1    A.   Yeah.
2          MR. SLATER:  Then if you
3  scroll down a little further,
4  please, Cheryll.
5  BY MR. SLATER:
6    Q.   It shows the names of the
7  inspectors who actually attended.  Let's
8  go down to the next page, at top of the
9  page.
10          MR. SLATER:  You can scroll
11  up a little bit.
12  BY MR. SLATER:
13    Q.   It says, "Introduction,
14  scope of inspection."
15          It says, "The joint EMA/EDQM
16  inspection took place in the context of
17  the EDQM CEP procedure and the Article 31
18  referral procedure, according to
19  directive 2001/83/EC that was triggered
20  after the detection of an impurity, NDMA,
21  in the valsartan active substance
22  supplied by several companies to
23  manufacturers which produce some of the
24  valsartan medicines available in the EU."

Page 258

1    Do you see that?
2    A.   Mm-hmm.  Yes, I see it.
3    MR. SLATER:  Go to the next
4  page, please, Cheryll, which is
5  Page 3.
6  BY MR. SLATER:
7    Q.   And towards the bottom is a
8  list of key personnel that were met
9  during the inspection.
10    Do you see where --
11  rephrase?
12    Looking now at Page 3 of
13  this report, which is ZHP-1862674, is a
14  list of key personnel from, I suppose,
15  ZHP or its affiliates that met with the
16  inspectors.
17    Do you see that?
18    A.   I see it, yep.
19    Q.   And the first two names, I
20  just want to identify who they are for
21  the record.  The first one is Baohua
22  Chen, president.
23    Do you see that?
24    A.   Yes, I see it.

Page 259

1    MR. BALL:  Adam, I'm
2  guessing you're going to swing
3  this back towards, at some point,
4  to the actual 30(b)(6) topics.
5    MR. SLATER:  I can introduce
6  the foundation and some
7  information about a document.
8    MR. BALL:  All I did, Adam,
9  is asking.  Are you going to swing
10  it back to the 30(b)(6) topics?
11    MR. SLATER:  I think I'm
12  right in the 30(b)(6) topics.
13    MR. BALL:  No, you're not.
14  You're asking about the inspection
15  that was performed by the EDQM.
16  Not within his 30(b)(6).
17    MR. SLATER:  I think --
18    MR. BALL:  In the final
19  inspection report.
20    MR. SLATER:  I'm sorry.  I
21  really do honestly think that this
22  is appropriate.  It's a
23  document --
24    MR. BALL:  I'm not

Page 260

1  instructing him not to answer.
2  I'm asking, can you swing back to
3  that, please?
4    MR. SLATER:  Well, I think
5  I'm in it.
6    MR. BALL:  Okay.  I don't.
7  I'm not instructing him not to
8  answer.
9  BY MR. SLATER:
10    Q.   Okay.  The first person --
11  rephrase.
12    On this list of key
13  personnel met during the inspection by
14  the European inspectors, it lists the
15  first person is Baohua Chen, president,
16  and that's the chairman of all of ZHP,
17  correct?
18    A.   Yes.
19    Q.   And then Jun Du, it says
20  executive vice president.  And you know
21  Mr. Du, correct?
22    A.   Yes.
23    Q.   I think you might have said
24  earlier that you thought you attended

Page 261

1  these inspections; is that correct or --
2    A.   I was -- when they was
3  there, I just go to the site.  And I know
4  they -- and I was -- I was there, once.
5  Yeah.
6    Q.   I've scrolled through, and
7  unless I missed it, I didn't see your
8  name.  But I'm just going to scroll
9  through.  I just want to make sure
10  whether you were noted as being there.
11  So I don't see you on that first page.
12  Let's go to the second page.
13    MR. SLATER:  And, Cheryll,
14  if you can just slowly scroll
15  through.
16    THE WITNESS:  But you don't
17  have to scroll through, because
18  inspection usually the people join
19  is the QA/QC manufacturing side.
20    MR. SLATER:  Let's go then
21  to -- I think you're there.
22  You're on the right page.  Scroll
23  down a little bit further, please,
24  Cheryll.  Little more.  Let's get

Confidential Information Subject to Protective Order

Page 262

1 the bottom. Perfect.
2 BY MR. SLATER:
3      Q.   So now they're listing in
4 the letter the major deficiencies they
5 found. I would like -- and I would like
6 to focus on a couple of them.
7           One, it says, "The
8 investigation is conducted in the context
9 of the NDMA/NDEA contamination of
10 valsartan showed significant flaws."
11          Do you see that?
12     A.   I see it. First
13 observation, yes.
14     Q.   This is listed as a major
15 deficiency.
16          Do you see that?
17     A.   I see it.
18     Q.   Number 2 in the list of
19 major deficiencies states, "The company's
20 risk assessment performed in the context
21 of the development/implementation of the
22 optimized valsartan process conducted in
23 July/August 2018 was not satisfactory.
24 Moreover, the company did not identify

Page 263

1 the need to develop a control strategy to
2 reduce new risks introduced with the
3 optimized process."
4           Do you see that?
5      A.   Right there, I see it, yes.
6      Q.   And were you involved in the
7 development of the optimized valsartan
8 process?
9      A.   We -- no. We did risk
10 assessment. We didn't do optimized
11 valsartan process.
12          MR. SLATER: Okay. Let's go
13     now to the next page. Actually,
14     it's a few pages further. Page 8,
15     please. Yeah, let's go down a
16     little more. I want to see more
17     of the quality management section.
18     Perfect. Thank you very much.
19 BY MR. SLATER:
20     Q.   Looking now at the quality
21 management section, this states in the
22 second paragraph, "During the inspection
23 the firm was requested to provide a
24 summary of the events and the subsequent

Page 264

1 actions. The firm identified a 2011/2012
2 manufacturing process change as root
3 cause for the NDMA contamination."
4           I want to stop there.
5           And that's consistent with
6 your understanding, as well, correct,
7 that the root cause for the NDMA
8 contamination was the manufacturing
9 process change to the zinc chloride
10 process?
11     A.   Yeah, that was after
12 June '18. We did the risk assessment.
13 We find that's the case.
14     Q.   This says -- rephrase.
15          Continuing here in the
16 second paragraph under quality management
17 it says, "The process change was based on
18 ZHP's Shanghai R&D laboratory (Shanghai
19 SynCores Technologies, Inc.). The
20 laboratory had been requested to perform
21 process improvements studies because a
22 number of issues had been identified
23 within the TEA process, such as," and
24 then it gives a list of issues.

Page 265

1           Do you see that?
2      A.   Yes, I see it.
3      Q.   This says that a report was
4 prepared on 20 January 2011, and that,
5 "The laboratory studies investigated
6 initially potential improvements of the
7 TEA process, for instance by changing
8 solvent ratios, but this was concluded as
9 not successful because of increased costs
10 and yields still below expectations."
11          That's correct, right?
12     A.   Let's see. The TEA process.
13 I don't think I recall the TEA process
14 reports.
15          Okay. Go ahead. I saw it.
16 It lists -- this is right there.
17     Q.   Reading further in now the
18 third paragraph under quality management
19 it states, "Further studies lead to the
20 development of the zinc chloride process
21 by changing solvents and reagents, for
22 example, zinc chloride, DMF."
23          Do you see that?
24     A.   Yes.

Page 266

1    Q.    This states, "Trials on
2  different conditions were performed, and
3  a final recommendation was provided to
4  ZHP Chuannan.  The project report did not
5  address the formation of impurities or
6  the change of the impurity profile
7  itself."
8       Do you see that?
9    A.    I see the statement, yes.
10    Q.    And the failure to address
11  the formation of impurities or the change
12  of the impurity profile was a deviation
13  from good manufacturing practices, right?
14    A.    What was that?  You read a
15  statement, or that's a question?
16    Q.    I'm asking you to confirm
17  that the failure by SynCores to address
18  the formation of impurities and the
19  change of the impurity profile were
20  violations of good manufacturing
21  practices at the time, correct?
22       MR. BALL:  Objection.
23    Foundation.
24       THE WITNESS:  Adam, we keep

Page 267

1  asking this question many, many
2  times.
3       You put this into content.
4  That's back in 2010 and 2011.  We
5  did whatever we can.  We follow
6  GMP guidelines.  We follow the ICH
7  guidelines.  We keep the process
8  change.  We make sure that we
9  produce better quality, which is
10  approved by EDQM and FDA.
11       Why are you always coming
12  back with the same question asking
13  me correct or not?  Please don't.
14  You're confusing me now.
15  BY MR. SLATER:
16    Q.    The failure by SynCores to
17  address the formation of impurities and
18  the change of the impurity profile
19  violated good -- current good
20  manufacturing practices at the time,
21  correct?
22       MR. BALL:  Objection.
23       THE WITNESS:  That's not
24  correct.  You're looking

Page 268

1  backwards.  I'm sick and tired of
2  this question.
3  BY MR. SLATER:
4    Q.    Looking backwards, right
5  now, you would agree it violated current
6  good manufacturing practices, right?
7       MR. BALL:  Objection.
8       THE WITNESS:  I disagree.
9  Look in the content.  Put in the
10  time frame, Adam, please.
11  BY MR. SLATER:
12    Q.    Let's just go slow.  Because
13  I think maybe if you listen to my
14  question, maybe it won't be as
15  contentious.  This says -- well, I'm
16  asking you this:  The failure by SynCores
17  to address the formation of impurities or
18  the change of the impurity profile, I'm
19  asking, was that a violation of current
20  good manufacturing practices to fail to
21  do those things?
22       MR. BALL:  Objection.
23    Foundation.  Vague.
24       THE WITNESS:  Adam, you

Page 269

1  making me confused.
2  BY MR. SLATER:
3    Q.    I'll try to ask it a little
4  differently.
5       You would agree with me that
6  current good manufacturing practices
7  required SynCores to address the
8  formation of impurities connected with
9  the change to the zinc chloride DMF
10  process, correct?
11    A.    I don't know what's correct
12  anymore.  Because David -- Adam, when we
13  doing things now, we may have to file
14  this to find out it's not right again.
15       So you're asking me back in
16  2010, '11, violate the GMP regulation or
17  not, the answer is no, because at that
18  time we follow all the GMP regulations.
19    Q.    Reading further --
20       MR. SLATER:  If you can
21  scroll down a little more,
22  Cheryll, please.  Thank you.
23  BY MR. SLATER:
24    Q.    Reading further down now

Confidential Information - Subject to Protective Order

Page 270

¹ underneath the quality management
² section, it says "D2. Major. As part of
³ the root cause analysis of the NDMA/NDEA
⁴ contamination, the development of the
⁵ 2011/2012 revised valsartan manufacturing
⁶ process (introduction of the zinc
⁷ chloride process) was reviewed and the
⁸ following observations were made."
⁹       Do you see where I'm
¹⁰ reading?
¹¹    A.   Yes.  I see what you're
¹² reading.
¹³    Q.   This states under D2-A, "The
¹⁴ modified process was developed by the
¹⁵ Huahai Pharmaceuticals R&D facility,
¹⁶ Shanghai SynCores Technologies, Inc.
¹⁷ Contrary to what the company stated in
¹⁸ their retrospective analysis of the
¹⁹ process change, the core principles of
²⁰ ICH Q8, Q9, and Q10 were not considered
²¹ and potential impurity profiles and
²² associated risks were not addressed by
²³ the R&D laboratory."
²⁴       You see what I just read,

Page 271

¹ correct?
²    A.   I read it.  But that's a
³ general statement.  I would like to be
⁴ more specific, okay.
⁵    Q.   Right.  So you were just
⁶ saying a moment ago that you believed
⁷ that SynCores followed all of the
⁸ requirements for good manufacturing
⁹ practices.  Based on what I just read to
¹⁰ you, that's what the -- that's what was
¹¹ being told to the European authorities
¹² back in 2018, and the European
¹³ authorities disagreed and said that the
¹⁴ core principals of ICH Q8, Q9, and 10
¹⁵ were not considered.
¹⁶       Do you see that?
¹⁷    A.   I see that.  Adam, don't
¹⁸ forget, okay, the same process was
¹⁹ developed and approved by EDQM, and they
²⁰ would inspect us many times before 2018.
²¹ If they knew that, okay, why -- why
²² should they approve that?  Same as for
²³ the FDA.
²⁴    Q.   Are you saying that the

Page 272

¹ failure by SynCores to identify the
² potential impurity profile and associated
³ risks with the zinc chloride process is
⁴ actually the fault of a regulatory
⁵ authority?
⁶       MR. BALL:  Objection.
⁷ Mischaracterizes his testimony.
⁸ That's not what he said.
⁹       THE WITNESS:  Adam, I'm
¹⁰ really tired of these questions.
¹¹ How many times do you want me to
¹² repeat?
¹³       You cannot -- you cannot
¹⁴ look at things now, okay, and
¹⁵ looking back ten years ago, I'm
¹⁶ sure there's some things okay now,
¹⁷ today, that would be not okay
¹⁸ after ten years.  So don't confuse
¹⁹ me, please.
²⁰ BY MR. SLATER:
²¹    Q.   Well, what I'm asking you is
²² this:  Are you saying that ZHP's failure
²³ to identify potential impurities and
²⁴ associated risks with those impurities

Page 273

¹ was not the fault of ZHP, but rather the
² fault of a regulatory agency that didn't
³ identify that ZHP had missed this?
⁴       MR. BALL:  Objection.
⁵ Mischaracterizes his testimony.
⁶       THE WITNESS:  Adam, this
⁷ is -- I don't know.  Next I'm
⁸ going to count how many times you
⁹ say that.
¹⁰       It was out of our knowledge
¹¹ at that time.  I'm not blaming
¹² anybody else, okay.  We just don't
¹³ know.  Nobody knows.  The industry
¹⁴ doesn't know.  The FDA doesn't
¹⁵ know.  The EDQM doesn't know at
¹⁶ that time.
¹⁷ BY MR. SLATER:
¹⁸    Q.   Without telling me why this
¹⁹ happened, just tell me if I'm correct
²⁰ that this did happen and I'm reading
²¹ right from the document.
²²       "Potential impurity profiles
²³ and associated risks were not addressed
²⁴ by SynCores."  And I'm talking about

Confidential Information - Subject to Protective Order

Page 274

1  specific to the use of DMF.
2          Is that a true statement?
3          MR. BALL:  Hold on.  Where
4  are you in the document?  I don't
5  even see where you are in the
6  document.
7          THE WITNESS:  Yeah, I don't
8  see it either.
9          But it's just a general
10  statement.
11  BY MR. SLATER:
12      Q.   What I'm going to ask you is
13  this: I'm using what's in the bottom of
14  the document, but I'm going to ask you a
15  straight question.  I'm not asking you
16  why this happened.  That's not my
17  question.
18          I'm just asking factually,
19  is this true.
20          SynCores failed to consider
21  the potential impurity profiles and
22  associated risks attendant to the use of
23  DMF in the zinc chloride process.
24          Is that a true statement?

Page 275

1      A.   Adam, that's not true,
2  because like I said, when we do any
3  process optimization or improvement, the
4  first thing we do is a precondition.  So
5  we compare impurity profile with original
6  process.  That has to be done before we
7  can -- moving forward.
8      Q.   Is there a document that you
9  can point me to that shows somebody at
10  SynCores evaluating the impurity profile
11  for DMF as it would be used in the zinc
12  chloride process?  Is there a document
13  that can show me that?
14      A.   For scientific communities
15  you are comparing the detailed analysis
16  of C of A, certificate of analysis.  They
17  list each individual impurities in the
18  table.  You can go back and compare.
19      Q.   You're telling me if I go
20  back tonight and look for the certificate
21  of analysis file, I'll see one for DMF
22  that will evaluate the potential
23  impurities of DMF or related to DMF in
24  the zinc chloride process?

Page 276

1      A.   Adam, you should have gained
2  more knowledge about the pharmaceutical
3  analysis.  It may not say specifically to
4  the DMF or zinc chloride.  But in the
5  impurity profile, it will compare new,
6  old, different solvent, different
7  catalyst, different temperatures,
8  different everything.
9          It would compare that.  You
10  want to make sure the new process will
11  produce better quality materials.
12      Q.   Will I see a document if I
13  look in the files in connection with the
14  development of this process where
15  somebody evaluated potential impurities
16  with DMF, including decomposition or
17  degradation impurity known as DMA,
18  dimethylamine, will I actually see a
19  document that lists that as something
20  that was considered?
21      A.   Adam, you going back to the
22  other question again.
23          Adam, for anybody, or do
24  anything, they may not record every --

Page 277

1  each individual details.  You're asking
2  too much.  You have to know, to learn,
3  how to see the CoA, how to compare
4  impurity profiles.
5          MR. SLATER:  And on that
6  note I think we've reached five
7  hours.
8          MR. BALL:  Five hours and
9  7 minutes.
10          (Discussion was held off the
11  stenographic record.)
12          THE VIDEOGRAPHER:  The time
13  right now is 12:57 p.m.  We're now
14  off the record.
15              *****
16          (Excused.)
17          (Deposition adjourned at
18  approximately 12:57 p.m. China
19  Standard Time)
20
21
22
23
24

Page 278

 1
 2              CERTIFICATE
 3
 4
 5       I HEREBY CERTIFY that the
    witness was duly affirmed/sworn by me and
 6  that the deposition is a true record of
    the testimony given by the witness.
 7
         It was requested before
 8  completion of the deposition that the
    witness, ERIC GU, Ph.D., have the
 9  opportunity to read and sign the
    deposition transcript.
10
11
12  _____
    MICHELLE L. GRAY,
13  A Registered Professional
    Reporter, Certified Shorthand
14  Reporter, Certified Realtime
    Reporter and Notary Public
15  Dated:  March 7, 2021
16
17
18       (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 279

 1        INSTRUCTIONS TO WITNESS
 2
 3       Please read your deposition
 4  over carefully and make any necessary
 5  corrections.  You should state the reason
 6  in the appropriate space on the errata
 7  sheet for any corrections that are made.
 8       After doing so, please sign
 9  the errata sheet and date it.
10       You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14       It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 280

 1     - - - - - -
              E R R A T A
 2     - - - - - -
 3
 4  PAGE  LINE  CHANGE
 5  _____ _____ _____
 6    REASON:  _____
 7  _____ _____ _____
 8    REASON:  _____
 9  _____ _____ _____
10    REASON:  _____
11  _____ _____ _____
12    REASON:  _____
13  _____ _____ _____
14    REASON:  _____
15  _____ _____ _____
16    REASON:  _____
17  _____ _____ _____
18    REASON:  _____
19  _____ _____ _____
20    REASON:  _____
21  _____ _____ _____
22    REASON:  _____
23  _____ _____ _____
24    REASON:  _____

Page 281

 1
 2    ACKNOWLEDGMENT OF DEPONENT
 3
 4       I,_____, do
 5  hereby certify that I have read the
 6  foregoing pages, 1 - 282, and that the
 7  same is a correct transcription of the
 8  answers given by me to the questions
 9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  ERIC GU, Ph.D.              DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20_____.
21  My commission expires:_____
22
    _____
23  Notary Public
24

Page 282

1     LAWYER'S NOTES
2 PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____