# EXHIBIT 1

Witness: *Chodosh*
Exhibit: 5
Date: 9/29/21
Margaret Reihl, CCR, CRR, RPR

## Opinions of Lewis A. Chodosh, M.D., Ph.D.

This report is offered pursuant to Rule 26 of the Federal Rules of Civil Procedure.  Each of the opinions I have offered in this report is given to a reasonable degree of scientific and medical certainty, and is based on the methods and procedures of science, materials and literature I have reviewed in connection with this litigation, my knowledge of recognized medical and scientific principles, and methodology reasonably relied upon by members of my profession, as well as my education, training, knowledge, and experience.

My curriculum vitae is attached as Exhibit A to this report.  During the previous 4 years, I have testified as an expert at 1 deposition, and I have not testified as an expert in any trials.  My testimony list is attached as Exhibit C.  A My fees charged in connection with this engagement are consistent with my normal practice for such work.  My rate for reviewing materials, preparing reports, and deposition and trial testimony is $850 per hour.

A list of materials that I considered in rendering the opinions offered in this report is attached as Exhibit B.  I reserve the right to supplement this list, as well as to amend and supplement the opinions expressed in this report.  I also reserve the right to respond to and rebut all information provided in discovery, which I understand is ongoing, and any opinions offered by Plaintiffs' experts at their depositions or at trial.

Citations to specific reference material also are offered in this report, where I believe it necessary to cite a specific source; otherwise, my opinions are derived from a combination of reference sources, my own scientific and clinical experience, and general medical and scientific knowledge.  This report is not intended to be an exhaustive recitation of all of my opinions.

## Background and Qualifications

1.      I am a physician and cancer researcher.  I graduated summa cum laude, Phi Beta Kappa from Yale University in 1981 with Distinction in Molecular Biophysics and Biochemistry.  In 1989, I simultaneously received my M.D. degree from Harvard Medical School, where I graduated magna cum laude, and my Ph.D. degree in Biochemistry from the Massachusetts Institute of Technology under the mentorship of Dr. Phillip Sharp, who received the 1993 Nobel Prize in Physiology or Medicine.  Dr. Sharp won the Nobel Prize for his discovery that each of our genes is split into pieces in our genome and for his work determining how a messenger RNA corresponding to a complete gene is spliced together from these pieces.

2.      After a residency in Internal Medicine at the Massachusetts General Hospital, I completed a clinical fellowship in Endocrinology at the Massachusetts General Hospital in 1992.  I then performed a postdoctoral research fellowship in cancer genetics and developmental biology with the Chairman of the Department of Genetics at Harvard Medical School, Dr. Philip Leder.  Dr. Leder is widely credited with deciphering the genetic code by which the DNA sequences that encode genes are translated into proteins via a messenger RNA intermediate.  In addition, Dr. Leder received the 1987 Albert Lasker Basic Medical Research

Award for his discovery of one of the first oncogenes recognized to cause human cancer, and his determination of how that oncogene was activated by a chromosomal rearrangement. Dr. Leder went on to create the very first genetically engineered mouse model for human cancer in order to prove that this oncogene could cause cancer in a living organism.

3.      During my training, I received a number of additional honors including the Emerson Tuttle Cup for Distinguished Academic Achievement from Yale University, the Leon Reznick Memorial Prize for Excellence in Research from Harvard Medical School, and appointment to the Medical Scientist Training Program at Harvard.

4.      I began my independent scientific career as an assistant professor at the University of Pennsylvania in 1994. As a faculty member in the Perelman School of Medicine at the University of Pennsylvania, I have received a number of awards and honors, including the Charles E. Culpeper Foundation Scholarship in Medical Science (one of three such awards made nationally to young physician-scientist faculty), the AACR-Sidney Kimmel Cancer Symposium for Cancer Research Scholar Award, and selection as the inaugural recipient of the Perelman Professorship and Endowed Chair in Cancer Biology. In 2002, I was elected to the American Society for Clinical Investigation. Established in 1908, the ASCI is one of the nation's oldest and most respected medical honor societies and is comprised of physician-scientists elected "for their outstanding records of scholarly achievement in biomedical research". In 2008, I was elected to the Association of American Physicians. Founded in 1885, the AAP is an honorary society whose goals include "the pursuit of medical knowledge, and the advancement through experimentation and discovery of basic and clinical science and their application to clinical medicine". In 2017, I was elected to the National Academy of Medicine, which is a part of the National Academies of the United States that were established by an act of Congress and signed into law in 1863 by Abraham Lincoln. Election to the NAM is considered one of the highest professional honors in medicine and medical research.

5.      As a physician-scientist, the majority of my time is spent leading a research laboratory of approximately twenty-five graduate students, undergraduate students, research technicians, physicians and postdoctoral fellows in a comprehensive research program aimed at understanding the fundamental mechanisms that cause cancer, including understanding why cancers arise and progress in patients. As a principal investigator of a laboratory and as a mentor, I teach graduate students and postdoctoral researchers in the laboratory how to function as rigorous, critical-thinking experimental scientists, including how to design appropriate laboratory experiments to answer important biological questions, how to interpret the resulting data, how to prepare results for peer-review and publication, and how to critically read the scientific literature.

6.      In addition, as a professor at the University of Pennsylvania I teach medical students, graduate students and undergraduate students in the classroom about principles of cancer biology, cancer epidemiology, and cancer therapy. I also teach physicians about cancer biology.

7.      As a principal investigator of a laboratory at the University of Pennsylvania, I have focused on understanding the causes of cancer and on using that information to devise better methods of cancer prevention and treatment for patients. I am especially interested in

understanding the natural history by which human cancers arise and progress to more advanced stages, including the process of metastasis and the development of therapeutic resistance.

8.      My laboratory uses a broad array of *in vivo* and *in vitro* models to study genes and mechanisms that are involved in the development of cancer in the breast and other tissues, including those related to inherited and acquired mutations in tumor suppressor genes and oncogenes.  The first several publications from my laboratory focused on the *BRCA1* and *BRCA2* tumor suppressor genes.  These two genes are involved in the cellular response to DNA damage and play key roles in suppressing cancers of the breast, ovary, pancreas, and other tissues. inherited mutations in *BRCA1* and *BRCA2* are responsible for the majority of cases of familial breast and ovarian cancer.  Subsequent studies from my laboratory over nearly three decades have focused on the roles played by a variety of oncogenes, tumor suppressor genes, signaling pathways and genomic alterations in the development and progression of human cancers.

9.      Model systems employed in my laboratory include in vitro studies of human and rodent cells in culture, studies of tissues from human patients, studies of genetically engineered mouse and rat models of human cancer, and studies of cell and tissue samples from cancer patients in the clinic.  Particular areas of interest include: the function of oncogenes and tumor suppressor genes in cancer, metastasis, tumor dormancy (in cases where that occurs) and tumor recurrence; developmental windows of susceptibility to cancer initiation; the role of signal transduction pathways in cancer; the mechanisms by which cancers escape therapy; the role of inflammation, immunity, angiogenesis and the tumor microenvironment in cancer development and progression; the mechanisms controlling adipocyte (fat cell) differentiation; the roles of tumor initiating cells (*i.e.*, "cancer stem cells") in cancer; the mechanisms of metabolic regulation in cancer development and progression and in normal tissue physiology; the use of genomics and computational approaches to understand genetic programs in organ development and carcinogenesis; the use of noninvasive imaging approaches to study tumor biology; and the development of new diagnostic tests to address unmet needs in clinical oncology.  In pursuit of these goals, my laboratory has developed several novel genetically engineered animal models for cancer, as well as a number of innovative approaches for analyzing large genomic data sets, imaging cancers, and identifying ultra-rare cancer cells that remain in some patients' bodies after they complete treatment.  My laboratory is also integrally involved in the design and execution of clinical trials for cancer patients, including the analysis of clinical samples from patients enrolled in clinical trials investigating new treatments for cancer.

10.     I currently serve as Perelman Professor and Chairman of the Department of Cancer Biology at the Perelman School of Medicine at the University of Pennsylvania, and I am a Professor with Tenure in the Department of Cancer Biology and in the Department of Medicine in the Division of Endocrinology, Diabetes and Metabolism.  I also serve as Associate Director for Basic Science in the Abramson Cancer Center at the University of Pennsylvania, one of 51 National Cancer Institute-designated Comprehensive Cancer Centers in the United States, a designation that fewer than 4% of cancer centers in the Unites States receive.  I have served as Director of Cancer Genetics, and now serve as Director of Tumor Biology, in the Abramson

3

Family Cancer Research Institute. I also co-founded and serve as co-Director of the 2-PREVENT Translational Center of Excellence at the Abramson Cancer Center, which is a multidisciplinary center aimed at preventing deaths from breast cancer recurrence in patients through novel clinical trials based upon scientific discoveries in the laboratory. Through these roles I contribute to, and help oversee the research programs of, more than 100 faculty members at the University of Pennsylvania who are focused on understanding the causes of human cancers, and the mechanisms that underlie their aggressive behavior and response to treatment.

11.     In addition, I currently serve as a member of the scientific advisory board for the Dana-Farber/Harvard Cancer Center at Harvard Medical School, and I served for more than 15 years as a member of the scientific advisory board for the Harvard Nurses' Health Studies I and II. I have served as Principle Investigator for a Department of Defense Breast Cancer Center of Excellence, and for 10 years I served as Principal Investigator for one of the sites of the National Cancer Institute's Mouse Models for Human Cancers Consortium. I am Editor-in-Chief of the scientific journal *Breast Cancer Research*, and I have served as a Senior Editor of *Cancer Research* and on the editorial boards of *Cancer Biology and Treatment* and the *Journal of Mammary Biology and Neoplasia*. I also regularly serve as a peer reviewer for numerous journals, including *Nature*, *Science*, *Cell*, *Nature Medicine*, *Cancer Cell*, *Science Translational Medicine* and many others.

12.     In my capacity as Principal Investigator, I have been awarded more than $60 million in extramural grants to support research in my laboratory, primarily from the National Cancer Institute, as well as from the Department of Defense and a variety of charitable foundations focused on supporting cancer research. I am also an Attending Staff Physician in good standing at the Hospital of the University of Pennsylvania and I am licensed to practice medicine in the states of Pennsylvania and Massachusetts. A more complete statement of my education, background, publications, and other work in the fields of cancer, molecular biology and developmental biology is contained in my CV that accompanies this report.

13.     I maintain an office and my laboratory at 614 Biomedical Research Building II/III, 421 Curie Boulevard, Philadelphia, Pennsylvania.

14.     The following opinions are based on my education, training, research, experience, knowledge of the literature, and information available to me at this time, and are based on a reasonable degree of medical and scientific probability and/or medical and scientific certainty. These opinions are offered to address issues related to general causation in this litigation. I may amend or supplement these opinions should any additional information be provided to me or if I learn of additional scientific literature that is relevant to this case. I may also amend or supplement this report in order to offer opinions on specific causation, or to rebut or respond to claims made by Plaintiffs' experts. I may use medical records, graphics or other materials to illustrate my opinions.

15.     In addition to the current litigation that is the focus of this report, I have served as a consultant to the Department of Justice in a matter relating to vaccines and cancer. I have also participated in litigation as an expert witness and consultant in the matter of Hormone Replacement Therapy and breast cancer, in the matter of Actos and bladder cancer, in the

4

matter of talc and ovarian cancer, and in matters relating to asbestos exposure and mesothelioma in patients with inherited mutations in tumor suppressor genes. My rates for consultation in this matter are $850 per hour for testimony and all other work.

**Overview**

This report will address:

A. Background on human cancer causation

B. Evaluation of the claim that the presence of NDMA and/or NDEA in valsartan products is carcinogenic

C. Response to Plaintiffs' claims

**Summary**

**A. Background: Human Cancer Causation**

**Cancer is a genetic disease caused by the accumulation of mutations in critical regulatory genes within the same cell**

16.     A tumor (or neoplasm) is an abnormal collection of cells that may be either benign or malignant. In benign tumors, abnormal cells remain clustered together and do not invade surrounding tissues. Malignant tumors, which are also referred to as cancers, do invade surrounding tissues and frequently metastasize to distant sites in the body.

17.     Cancer is a disease in which abnormal cells bearing mutations (*i.e.*, errors in the DNA sequence of gene) divide in an uncontrolled manner and are able to invade other tissues in the body. DNA mutations may be inherited or acquired after birth.

18.     There are well over 100 different types of cancer in humans, with many of these being subclassified into multiple subtypes. Despite this diversity, human cancers that arise in different tissues share many common properties.[1,2] Thus, the word "cancer" refers to a collection of distinct diseases that share a set of cardinal features. Cancers are sometimes referred to by clinicians as "solid" or "liquid". Solid tumors include carcinomas, sarcomas and cancers of the nervous system, whereas liquid tumors principally consist of leukemias and lymphomas.

19.     Carcinomas are solid cancers that arise from epithelial cells, which are cells that line the organs of our bodies, such as the lung, breast, ovary, uterus, fallopian tube, prostate, bladder, oral cavity, esophagus, stomach, liver, pancreas, small intestine, and colon. Carcinomas represent approximately 85% of all human cancers and are far more common

5

than other types of cancer, such as leukemias, lymphomas, sarcomas, mesotheliomas, or cancers of the nervous system.

20.     Cancer is frequently referred to in the scientific and medical literature as being a genetic disease. This refers to the fact that the process by which normal cells become cancerous entails the accumulation of genetic mutations in critical genes within the DNA of a single cell. Mutations can consist of point mutations (*i.e.*, single nucleotide changes), small insertions and deletions (*i.e.*, "INDELs"), copy number changes (*e.g.*, amplifications or deletions), gain or loss of all or parts of chromosomes, chromosomal translocations, or aneuploidy (abnormal numbers of chromosomes). Mutations may be either inherited (*e.g.*, *BRCA1*, *BRCA2*, *TP53*, *RB*, etc.), in which case they are present in every cell of the body, or acquired "somatically" after birth in an individual cell or cells as a consequence of normal cellular function and aging, or exposure to mutagenic agents.

21.     Inherited mutations are often referred to as "germline" mutations, because they are present in either the sperm or egg (which are classified as "germ" cells) that gives rise to the fertilized egg. Since the fertilized egg represents the ancestral cell that gives rise to every cell of the resulting newborn child, any "germline" mutation will be present at birth in every one of a child's cells. Because a newborn child is made up of 1-2 trillion cells, a child with an inherited mutation begins its life with more than 1 trillion mutations.

22.     Conceptually, the development of a cancer from a single, normal cell of origin to a cancer that can be detected clinically can be thought of as occurring in two stages. First, mutations in critical regulatory genes must accumulate within the same cell in a sufficient number, and in an appropriate combination, to generate the first (or ancestral) cancer cell. For cancers in adults, this process is believed to take many years, in most cases several decades.[3,4] Second, this initial ancestral cancer cell must subsequently expand in number to reach a clinically detectable size, which occurs via an imbalance between cell proliferation (also referred to as cell division) and cell death (also referred to as apoptosis or necrosis). This gradual expansion in cell number results in the accumulation of enough cells to reach a size that can be clinically detected, whether by medical imaging or by palpation, which is typically greater than 1 billion cancer cells. This net expansion of cancer cells is believed to occur over a period of years, typically a decade or more.[3,5] Importantly, the imbalance in cell proliferation and cell death that results in the net expansion of cancer cell number (also referred to as tumor growth) is typically driven by the same mutations that led to the development of the first cancer cell.

23.     The behavior of normal cells in our bodies is tightly regulated, particularly with respect to whether (and when) a cell proliferates, whether (and when) a cell dies, and whether (and when) an undifferentiated cell such as a stem cell differentiates into a mature cell. In essence, the behavior of normal cells is controlled by signals emanating from the community of cells in the body, as well as the immediate environment of the cell, to ensure that all cells function in a coordinated manner in the organism as a whole. In addition, normal cells have a wide variety of safeguard mechanisms that allow them to repair DNA damage that they may sustain in the course of their everyday 'life', so that these do not result in mutations[3]. Additional safeguard

mechanisms allow damaged cells to initiate a 'self-destruct' program (termed programmed cell death or apoptosis) to destroy themselves if for some reason they are unable to repair DNA damage they have sustained. These, along with many other systems operating in cells and in the body, function as safety mechanisms that help prevent the development of cancer.

24.    The essence of cancer is that mutations in critical growth control genes within the cancer cell generate all of the signals that the cancer cell requires in order to form a tumor. That is, the signals that are required for the survival, growth and proliferation of normal cells in our bodies typically originate <u>outside</u> the cell (*i.e.*, from the cells that surround it and from the bloodstream in the form of growth factors, hormones, etc.), and these signals are tightly regulated. In contrast, the signals that are required for the survival, growth and proliferation of cancer cells principally originate <u>inside</u> the cancer cell as a consequence of mutations in critical regulatory genes. These mutations result in the constitutive activation or inactivation of regulatory genes, which in turn drive uncontrolled cellular proliferation and cell survival, and abrogate normal differentiation pathways.

25.    Importantly, the human body contains trillions of cells, the cells in our bodies undergo approximately $10^{16}$ cell divisions in our lifetimes (that is, 10 quadrillion – or 10 million, billion cell divisions) and every gene in our genome is estimated to undergo mutation $10^{10}$ (10 billion) times in our lifetimes, simply as a consequence of the normal function of the cells that make up our bodies.[3,6] This alone indicates that a single mutation cannot be enough to cause cancer in humans.

26.    When one considers the enormous number of cells in our bodies in combination with our long lifespan, events important in causing cancer that may be quite rare when considering only a single cell in the body (*e.g.*, the accumulation of mutations in critical regulatory genes), may nevertheless be quite likely to occur in at least one cell in the body over the course of a lifetime.

27.    The process by which a normal cell is transformed into a cancer cell is generally believed to require at least six different genetic mutations in critical genes ("cause"). Each of these mutations generally confers a new property or "hallmark" of cancer on the once-normal cell, such as: (1) self-sufficiency in growth signals; (2) insensitivity to anti-growth signals; (3) the ability to evade apoptosis (or programmed cell death); (4) the ability to induce the formation of new blood vessels; (5) the ability to proliferate forever; and (6) the ability to invade tissues and spread to other parts of the body (*i.e.*, metastasis).[1,3]

**Cancer is caused by mutations in oncogenes and tumor suppressor genes**

28.    Cancer is caused by the accumulation of mutations in multiple critical growth control genes. These genes fall into two general classes: oncogenes and tumor suppressor genes.

29.    An oncogene is a gene that, when constitutively activated by mutation, acts to promote tumor development, typically by driving unregulated cell growth, proliferation and/or survival. Oncogenes are most commonly derived from their non-mutated cellular counterparts (proto-oncogenes) by mutations that occur in cells of the body (*i.e.*, somatic

cells) during a patient's lifetime. Proto-oncogenes typically regulate cell growth, proliferation and survival. There are dozens of established oncogenes, including RAS, MYC, NOTCH1, PIK3CA, HER2, c-MET, EGFR, BRAF, FGFR1, AKT and BCR-ABL.

30.    When functioning appropriately, the proteins encoded by tumor suppressor genes act to prevent tumor formation, typically by relaying growth-inhibitory signals, sensing and repairing DNA damage, or inducing programmed cell death in response to cellular stresses or warning signals. When mutations inactivate tumor suppressor genes, tumor development is promoted. There are dozens of known tumor suppressor genes, including TP53, RB, BAP1, p16, BRCA1, BRCA2, APC, and PTEN. Mutations in tumor suppressor genes may occur in somatic cells during a patient's lifetime, or they may be inherited from one or both parents. Inherited mutations in tumor suppressor genes are responsible for causing a variety of different inherited cancers and cancer susceptibility syndromes, whereby rates of certain cancers or groups of cancers occur within an extended family tree at higher rates than would be expected by chance. Importantly, it is also often the case that patients inheriting known cancer-predisposing mutations in tumor suppressor genes do not have an obvious family history of cancer.

31.    The net result of the accumulation of mutations in oncogenes and tumor suppressor genes within a cancer cell is, among other things, that that cancer cell can proliferate and survive in an autonomous and unregulated manner. That is, the unregulated growth of cancers is a consequence of mutational events that occur inside the cancer cell, and the autonomous behavior of cancers is a direct consequence of these mutations.

32.    Over the past decade, the genomes (*i.e.*, DNA genetic code) of many different types of human solid cancers – including those of the breast, ovary, colon, lung, prostate, stomach, esophagus, pancreas, bladder, mesothelium and others – have been sequenced in order to identify mutations in oncogenes and tumor suppressor genes that occurred during cancer development[7]. These studies have revealed that overlapping, though distinct, sets of oncogenes and tumor suppressor genes are mutated within different types of human cancers. This indicates that alterations in similar molecular pathways underlie the development of human solid cancers arising in different organs. For example, mutations in the p53 pathway are commonly found in many different types of human cancer. Despite this similarity, however, the specific sets of oncogenes and tumor suppressor genes that are recurrently (*i.e.*, commonly) mutated in different types of cancer tend to be distinct from each other.

33.    Just as there are multiple oncogenes and tumor suppressor genes that are mutated within each cancer, the growth of any particular cancer is influenced by many different oncogenic pathways and is rarely, if ever, dependent upon a single pathway. This is one of the reasons why treating cancer effectively is so challenging. In addition, since there are many oncogenes and many tumor suppressor genes, the number of potential combinations of mutations in oncogenes and tumor suppressor genes that can result in cancer is enormous, so much so that almost no two cancers contain precisely the same set of mutated oncogenes and tumor suppressor genes. When combined with the many genetic (and other) differences between individuals (no two people are identical), this heterogeneity underscores why no two

cancers are identical.  Nevertheless, cancers have many properties that are shared, including many molecular features that are shared, particularly within the same type of cancer.

**Mutations, gene expression changes, and epigenetic alterations**

34.    Substances and exposures that can cause cancer are referred to as carcinogens.  Most known human carcinogens are mutagens.  Genotoxic or mutagenic agents cause DNA damage that, if unrepaired and passed on to a daughter cell, results in mutations.  Many known human carcinogens, such as x-rays, ultraviolet light, viruses that insert their DNA into their host's genome, and certain chemicals in cigarette smoke, are known to cause DNA damage that can result in mutations.  Such carcinogens are therefore referred to either as "genotoxic carcinogens" or "mutagens".

35.    Since mutations resulting from DNA damage can take a wide variety of forms, including single nucleotide changes, small insertions/deletions, and chromosomal amplifications, deletions, translocations and aneuploidy, a single type of test cannot detect all genotoxic agents.  Consequently, prior to the development and implementation of the full battery of tests capable of sensitively detecting the many types of DNA damage that can lead to mutations, some agents that were known to cause cancer were not found to be mutagenic when tested using only a limited number of assays, such as the Ames test.  As a result, some of these agents were referred to as "non-genotoxic carcinogens".  However, with subsequent testing using a broader range of assays it became clear that many of these agents did, in fact, cause DNA damage.  Accordingly, by using a battery of tests capable of detecting the different types of mutations that can occur in cells, it is clear that many so-called "non-genotoxic carcinogens" actually do induce mutations in genes and/or chromosomes and therefore are, in fact, genotoxic.  Thus, referring to an agent as a "non-genotoxic carcinogen" in no way implies that that agent does not cause mutations.  Notably, valsartan has been tested using a battery of assays that cover the full spectrum of mutation types that can occur in cells, and has been found to be non-genotoxic, non-mutagenic and non-carcinogenic.[8]

36.    Gene "expression" refers to the process by which the DNA encoding a gene, which is composed of a linear chain of deoxynucleotides, is "transcribed" to yield a messenger RNA (mRNA), which is composed of a linear chain of ribonucleotides that mirrors that of the gene.  This mRNA is then "translated" by ribosomes in the cell to yield a protein, which is composed of a linear chain of amino acids specified by the mRNA nucleotide sequence.

37.    The expression of each of the ~20,000 genes within each of the ~30 trillion cells in our bodies is tightly regulated in response to a variety of conditions inside the cell as well as external factors in a cell's local environment.  This results in the transient up-regulation and down-regulation of the expression of a wide variety of genes and a wide variety of signaling pathways that relay messages within and between cells.  These transient, tightly regulated changes in gene expression and activity are essential for the proper function of our cells and for our bodies as a whole.

38.    It would be a mistake to equate the transient regulation of genes and signaling pathways that is part and parcel of normal cellular physiology with the impact of mutations in

cancer associated genes that constitutively turn "on" the activity of oncogenes or turn "off" the activity of tumor suppressor genes. Regulated changes in gene expression that occur during the normal cellular response to internal and external stimuli are transient, tightly regulated and required for our survival. In contrast, mutations that constitutively activate oncogenes or inactivate tumor suppressors result in the loss of regulation of those proteins and the pathways in which they play a role. It is this lack of regulation that results in the uncontrolled survival, growth, and proliferation signals characteristic of cancer cells.

39.     Gene expression can also be regulated by epigenetic changes in cells. Epigenetic changes in gene expression are heritable (from one cell generation to the next) and do not involve alterations (*i.e.*, mutations) in the DNA nucleotide sequence of the genome. Rather, epigenetic changes typically result either from a variety of post-translational modifications of histone proteins that package DNA (*e.g.*, lysine/arginine methylation, lysine acetylation, serine/threonine phosphorylation, etc.), or from DNA methylation, which principally occurs as 5-methylcytosine residues at CpG dinucleotide sites in the genome. Clusters of CpG sites, referred to as CpG "islands", occur throughout the genome, particularly in areas of the genome that encode genes or that regulate gene expression.

40.     As with transient changes in gene expression, the epigenetic regulation of gene expression is a normal physiological process that is essential for the proper function of our cells and tissues. It would be a mistake to equate the epigenetic regulation of gene expression with the impact of mutations in cancer associated genes, such as oncogenes or tumor suppressor genes. However, like the normal counterparts of oncogenes or tumor suppressor genes, epigenetic regulators can also be mutated in human cancers and, in doing so, these mutant regulators can function as oncogenes or tumor suppressor genes.

41.     It would also be a mistake to equate the type of DNA methylation that mediates epigenetic changes in gene expression (*i.e.*, methylation at position 5 of cytosine to generate 5-methylcytosine) with the types of DNA damage that are induced by endogenous or exogenous alkylating agents, which may alkylate DNA at a variety of sites (*e.g.*, $O^6$-methylguanine). For example, in contrast to the normal physiologic role played by 5-methylcytosine present in CpG dinucleotides, methylated bases such as $O^6$-methylguanine constitute forms of DNA damage that must be repaired prior to DNA replication in order to prevent the occurrence of mutations.

**Cancer is a disease of aging and develops over many years**

42.     As articulated above, for human cancers that occur in adults the process by which the mutations required to transform a normal cell into a cancer cell accumulate is generally believed to take decades.[3] It is for this reason that cancers that occur in adults are generally considered a disease of aging. Aging, in turn, is believed to be principally responsible for the mutations that result in most adult cancers, since the normal daily operation of our cells involves the generation of DNA damage that can result in mutations. These normal cellular processes may be referred to as "endogenous" sources of mutation. Although some types of human cancer have also been linked to exposures to mutagenic agents in the environment (*i.e.*, "exogenous" sources of mutation), in medical practice it is generally difficult, and in many cases impossible, to distinguish which mutations in a particular patient's cancer were

caused by endogenous versus exogenous processes, with the notable exception of mutations that are inherited.

43.    Consistent with the long period of time required for the development of human cancers, human cancers with a discernable cause are usually diagnosed years or decades after the inferred causal event, as has been documented for many types of human cancer, including cigarette smoking and lung cancer, asbestos and pleural mesothelioma, ionizing radiation (*i.e.*, x-rays) and many forms of cancer, and ultraviolet light and melanoma. Given the extended periods of time required for sporadic human cancers to develop, there is no reliable scientific method to precisely determine when the first cancer cell arose in an individual patient. It is also generally not known when the first mutation occurred in the cell that ultimately developed into the first cancer cell. However, one exception to this is when a patient inherits a mutation in a critical cancer-related gene from one of their parents, every one of the trillions of cells in that person's body is known to contain a cancer-causing mutation at birth. Another important caveat is that while it is not possible to precisely determine when the first cancer cell arose in an individual patient, it is possible to reasonably estimate the minimum time periods and average time periods that are required for the development of cancers.

44.    Perhaps the clearest manifestation of cancer in adults being a disease of aging is the observation that a patient's risk of being diagnosed with cancer increases exponentially with age. Observed rates for most adult cancers are relatively low for individuals in their 30s and 40s. Cancer rates begin to accelerate rapidly as patients age into their 50s, 60s and 70s. Furthermore, the magnitude of the exponential increase in cancer incidence as a function of age strongly suggests that multiple (*i.e.*, six or more) infrequent events (*i.e.*, mutations) must occur in specific, critical regulatory genes within the same cell in order to generate the first cancer cell. The requirement for multiple mutations to accumulate in critical regulatory genes within the same cell in order to create the first cancer cell is, in part, responsible for the long latency between exposure to an agent that causes cancer (like ionizing radiation) and clinical detection of the resulting cancer.

45.    Another reason why human cancers take decades to develop is the net growth rate of cancer cells. There is a long period of time required for a normal cell to accumulate the multiple mutations required to generate the first cancer cell. It also takes a long period of time – typically years or even more than a decade – for that initial cancer cell to proliferate enough times to offset the high rates of cell death often seen in cancers and thereby enable an incipient tumor to accumulate a sufficient number of cancer cells to reach a clinically detectable size. As above, most human cancers are not detected until they contain billions of cancer cells.

46.    For example, most breast cancers are believed to develop over a period of 30-50 years, as revealed by studies of women exposed to ionizing radiation (a known cause of breast cancer) during the atomic bomb blasts in Hiroshima and Nagasaki in 1945.[9-13] Remarkably, the great majority of the 'excess' breast cancers attributable to radiation exposure in survivors of the atomic bomb blasts occurred 30-50 years after exposure, which is in accordance with what we know about the natural history of breast cancer in human beings.

47.    Similar to breast cancer, it has been estimated that the length of time required for the formation of a clinically detectable colon cancer is 30 – 50 years, and that each of the several rate-limiting events required for cancer formation may take, on average, 10 – 15 years or more.[3] Consistent with this, one of the key steps of colon cancer formation – the transition from polyp to invasive cancer – has been estimated by some to take as long as 17 years[3]. This represents the biological underpinning of the clinical guideline for performing screening colonoscopy in adults beginning at age 50 and, in the absence of positive findings (e.g., polyps), only repeating colonoscopy at 10-year intervals. Screening colonoscopy has been repeatedly proven to be an effective means to prevent the development of invasive colon cancers by removing pre-cancerous polyps. In light of that, its efficacy is predicated on the fact that human cancers, like colon cancers, have very long latencies on the order of decades. Put simply, if human cancers developed as rapidly as Plaintiffs' expert, Dr. Panigrahy, claims in this litigation, screening colonoscopy would never work. In fact, it does.

48.    Similar to breast and colon cancer, the development of most common human cancers, including lung cancer, prostate cancer, ovarian cancer, pancreas cancer, stomach cancer, pleural mesothelioma, and many others, has been estimated to typically occur over 30-50 years, or longer[3]. This, in turn, is consistent with the exponential increase in the incidence of each of these cancers as a function of age, and with epidemiological data in those instances in which exposure to a known carcinogenic agent is involved.

49.    Although the time course for the development of a human cancer is typically on the order of several decades, in some instances it is possible to detect an increase in cancer incidence in a shorter period of time. Accordingly, cohort studies with decades of follow-up can detect risks associated with the development of solid cancers over periods of time that are shorter than the median latency of those cancers. Returning to the example of breast cancer in survivors of the atomic bomb blasts at Hiroshima and Nagasaki, a discernable increase in breast cancer incidence attributable to ionizing radiation became evident in this population after approximately 11 years.[9-13] One model that would explain this observation is that these cancers could have resulted from x-ray-induced mutations in non-cancerous breast cells that had already accumulated mutations in multiple critical genes, such that the mutation induced by ionizing radiation was the 'final' mutation needed to create the first cancer cell. It is notable that, even in this scenario, these newly formed cancers did not reach a clinically detectable size for more than a decade. This is consistent with a variety of other observations indicating that it may take on the order of a year for the net number of cancer cells in a human breast cancer to double in a typical patient.[5] Consequently, from the moment that first cancer cell is created, it still takes more than a decade to accumulate the 1 billion or more cancer cells that is required for that cancer to come to clinical detection.

50.    When considering the decades-long latency of most human cancers, a natural question that arises is why do children develop cancer, and how they can do so in shorter periods of time than those alluded to above. A potential misconception would be to assume that the amount of time that is required for some types of solid cancers to develop in adults can be inferred from the amount of time that it takes for different types of solid cancers to develop in children. It cannot. The fact that children sometimes develop cancer indicates that those particular types

of cancer can develop over a period of less than 10-15 years.  However, there are several important differences between pediatric cancers and adult cancers that likely account for temporal differences in their incidence.  First, as would be expected based on the concept that cancer is a disease of aging, cancer is a relatively uncommon disease in children compared to adults.  Second, most types of solid cancer that do occur in children, such as medulloblastoma, neuroblastoma, Wilms tumor, retinoblastoma, osteosarcoma, and rhabdomyosarcoma, rarely, if ever, occur in adults.  Conversely, it is extremely rare for children to be diagnosed with cancers of the lung, breast, prostate, colon, ovary, pancreas or bladder, which together represent the most common types of cancer that occur in adults.  And for those types of cancer that do occur in both adults and children, their relatively frequency is markedly different.  For example, leukemias and lymphomas account for more than 40% of childhood cancers, whereas these types of cancer account for less than 10% cancers in adults.  These facts preclude direct inferences regarding the amount of time that it takes for adult solid cancers to develop to be drawn from the amount of time that it takes for different types of solid cancers to develop in children.  Third, many childhood cancers are believed to result, at least in part, from inherited mutations in tumor suppressor genes, such as TP53 and RB, whose normal functions are to prevent cancer.  Inherited mutational inactivation of these, or other, tumor suppressor genes in the fertilized egg that gives rise to a newborn child therefore dramatically increases that child's probability of developing cancer.  This increased probability of developing cancer can be understood from the fact that such children are born with a critical mutation in every cell in their body and, as such, have trillions of mutations in their bodies when they are born.  Fourth, pediatric cancers are generally believed to be less complex at the genetic level than solid cancers that occur in adults.  That is, whereas solid cancers in adults are generally believed to require at least 6-8 mutations in critical genes within the same cell, pediatric cancers are believed to harbor mutations in perhaps one or two critical genes.  Since many fewer mutations are believed to be required to cause the formation of pediatric cancers compared to adult cancers, such as bladder cancer, this process likely takes far less time in children.  Taken together, these factors indicate that the pathogenesis of pediatric cancers follows rules that are very different from those governing adult cancers and precludes direct inferences regarding the amount of time that it takes for adult solid cancers to develop from being drawn based upon observations in children.

51.     Another potential misconception would be to assume that the amount of time that it takes to develop a cancer in a human being can be inferred from the amount of time that it takes to develop a cancer in a mouse or a rat.  It cannot.  One way to envision this is that "time" is dramatically accelerated in mice and rats compared to human beings.  To illustrate this fact, it is worth noting that mice live for two to three years (rather than the typical 70 to 80-year life span in humans), their gestational period is 18.5 days (rather than 280 days in humans), and they reach sexual maturity in 28 days (rather than the 13 years required in children).  For these reasons and others, there is no scientifically reliable method for estimating the latency of a disease process in humans based upon the latency for a potentially related disease process in laboratory animals.

**Mutations occur as a consequence of aging and are an inescapable consequence of the way our cells work**

52.     During many years of investigation, scientists have identified the cause of some of the mutations that cause cancers.  For some types of cancer, these include agents in the environment, such as ionizing radiation, chemical carcinogens and certain viruses.  For other types of cancer, however, environmental carcinogens appear unlikely to play a significant role.

53.     Beyond these environmental exposures to carcinogens, however, it is clear that mutations occur frequently simply as a consequence of being alive.  That is, our DNA is constantly being damaged and repaired as a consequence of the normal daily function of our cells.[3,14]  For example, mitochondria – which can be thought of as tiny engines within our cells that use breakdown products of sugar (*i.e.*, glucose) as a fuel to generate energy – produce reactive oxygen species (ROS) as a byproduct of energy production.  Although ROS play essential roles in normal cell physiology, ROS can also damage DNA within the cells in which they are produced, potentially leading to mutations.  These causes of mutation are therefore considered to be unavoidable because they are "endogenous" (*i.e.*, due to factors within the body and/or within cells), rather than "exogenous" (*i.e.*, due to environmental factors outside of the body and/or outside of cells).

54.     For these reasons, it is clear that developing cancer does not require exposure to an environmental carcinogen.  Rather, mutations and cancer are frequently caused by endogenous 'exposures' that result from the normal functions of our cells.  As an example of the inescapable nature of endogenous mutations, it is universally accepted that laboratory animals that are housed under extremely clean conditions without any exposures to environmental carcinogens for their entire lifetimes, still commonly develop spontaneous cancers over the course of their lifetime.

55.     The fact that endogenous DNA damage occurs as a consequence of normal cell function likely explains – at least in part – why most adult solid cancers are a disease of aging.[3]  Mutations that occur as a consequence of aging are almost certainly sufficient to cause human cancers, even in the absence of exposure to mutagenic agents in the environment.  Indeed, current scientific evidence suggests that, for many cancers, molecular processes that normally occur within cells make a far greater contribution to the number of mutations that occur in those cells than do mutagenic agents in the environment to which people may be exposed.  In his textbook, the "*Biology of Cancer*", Dr. Robert Weinberg highlights the astonishingly large number of DNA damaging events that occur in our cells every day, simply as a consequence of living:[3]

> "*12.5 Cell genomes are under constant attack from endogenous biochemical processes*" [Title of chapter section, p. 523]
>
> "*In recent decades, however, analytical techniques of greatly improved sensitivity have allowed researchers to detect altered bases and nucleotides in the DNA of normal cells that have not been exposed to exogenous mutagens.  The results of these analyses have caused a profound shift in thinking about the origins of most of the mutant genes*

*present in the genomes of human cells, because they have shown that endogenous
biochemical processes usually make far greater contributions to genome mutation than
do exogenous mutagens. Since mutagenic events, independent of their origin, are
potentially carcinogenic, this has forced a rethinking of how many human cancers
arise."* (Pg. 523)

*"By some estimates, as many as 10,000 purine bases are lost by depurination each day
in a mammalian cell. (This amounts to more than $10^{17}$ chemically altered nucleotides
generated each day in the human body!)"* (Pg. 524-5)

*"Taken together, the continuing hail of damage from oxidation, depurination,
deamination, and methylation, which together may alter as many as 100,000 bases per
cell genome each day, greatly exceeds the amount of damage created by exogenous
mutagenic agents in most tissues."* (Pg. 527)

**If not inherited, the cause of the mutations that result in cancer are usually not known**

56.     Although some of the factors that can potentially give rise to mutations have been
identified by scientists, either in the environment or inside cells as a consequence of aging,
despite intensive investigation we do not know the precise factors within a cell that determine
whether a somatic mutation will occur in any given context. Consequently, unless it is an
inherited mutation known to cause cancer, we seldom know the cause of the mutations that
gave rise to a particular patient's cancer. However, given the enormous amount of DNA
damage that occurs in cells each day due to endogenous processes, it is most likely the case
that the mutations that gave rise to a particular patient's cancer are simply a consequence of
normal cell function and aging.

57.     In this regard, even though it is known that human cancers are caused by the
accumulation of mutations in multiple oncogenes and tumor suppressor genes, in the clinical
setting physicians typically do not know the identity of the cancer-causing mutations in any
given patient's cancer. Moreover, even if a somatic mutation in a particular oncogene or tumor
suppressor gene is detected in a particular patient's cancer, what caused that mutation to occur
is usually not known. For these reasons and others, even though we can determine with
reasonable medical certainty that a particular cancer was caused by the oncogenic mutations
present within it, we typically do not know the cause of those mutations and, in this sense, we
typically cannot determine the cause of an individual person's cancer.

58.     One exception to this occurs in the case of inherited mutations in genes, such as BRCA1,
TP53, BAP1, and others. These inherited mutations have been demonstrated experimentally to
cause cancer, are associated with enormous increases in cancer risks, and are present in the
initial fertilized egg and, therefore, in every cell of the body. Since cancer is known to be caused
by mutations in oncogenes and tumor suppressor genes, in those instances in which such
mutations are identified in a patient's cancer, it is highly likely that those mutations contributed
to the development of that cancer. This is particularly true in the case of inherited mutations in
tumor suppressor genes, whose mutation may be associated with a massive increase in risk of

cancer that is comparable in magnitude to the increased risk of lung cancer associated with chronic cigarette smoking.

59.     Put another way, in any individual cancer it is impossible to rule out a causal contribution of mutations in oncogenes or tumor suppressor genes to the development or growth of that cancer, and it is very likely that most of these mutations are due to endogenous processes. Indeed, pathogenic mutations in oncogenes and tumor suppressor genes identified in a particular cancer can logically be assumed to have causally contributed to the formation of that cancer.

60.     In summary, there is no generally accepted scientific method for ruling out a substantial contribution of mutations in oncogenes and tumor suppressor genes accruing over time to the development of a cancer, cellular proliferation within a cancer, or tumorigenic effects such as cell survival, invasion, angiogenesis or metastasis. Moreover, the mutations that are present in any given cancer are often not determined in the clinical setting, and – even if they were – the causes of those mutations can only rarely ever be determined. For these reasons and others, medical science usually cannot determine the cause of an individual person's cancer.

**Proliferation alone does not cause cancer**

61.     As noted above, in any given patient the first cancer cell forms by means of the stepwise accumulation of multiple mutations in key growth control genes within the same cell. Once formed, that first cancer cell grows into a clinically detectable cancer through the net proliferation and accumulation of cancer cells.

62.     Cell proliferation is a normal physiological process that is ongoing and required for the health and maintenance of our tissues. In fact, without daily cell proliferation, we would die. While it is true that there must be some proliferation in order for cancer cells to accumulate, it is not true that if increased cell proliferation is present then the development of cancer is more likely. That is, current scientific thinking does not support the notion that the more rapid the rate of proliferation in a normal tissue, the greater the likelihood of that tissue developing cancer. For example, cell proliferation rates in bone marrow are amongst the highest in the human body, but cancers of bone marrow cells are quite rare compared to cancers of tissues with far lower proliferation rates, such as the lung and breast.

63.     Processes that stimulate cell proliferation also often increase the rate of cell death. As such, since the growth of a subclinical cancer results from a net increase in the number of cancer cells, it is essential to account for changes in rates of cell death since an increase in the rate of cell death could result in a <u>decrease</u> in the number of cancer cells, even if proliferation continued – or even increased in rate – in that cancer.

64.     A potential misconception is that cellular proliferation is, in and of itself, carcinogenic for the reason that increased rates of proliferation are associated with increased rates of replication of cellular DNA, which in turn may increase the chances that cells will accumulate genetic errors, or mutations. This hypothesis is unsupported by the body of scientific literature. At best, this supposition is speculative as proliferation-induced mutation is a hypothetical

consequence of proliferation, as opposed to a known consequence of proliferation in a given context.

65.    Since the replication of DNA that accompanies cell proliferation formally has the potential to generate daughter cells harboring mutations in their DNA code, the body has developed safeguard mechanisms to prevent this from happening. These are predicated on the fact that DNA damage cannot give rise to a mutation unless the cell in which the DNA damage occurred replicates (*i.e.*, copies) its DNA and divides before that damage has been repaired. Since preserving the integrity of the DNA code within our cells is essential for life, our cells have developed numerous mechanisms for repairing DNA damage and thereby preventing the accumulation of cells bearing mutations. Such systems include base excision repair (BER), nucleotide excision repair (NER), homologous recombination (HR), mismatch repair (MMR), and others. Consequently, the same factors that stimulate cells to proliferate also turn on the expression of DNA damage sensing and repair proteins, such as BRCA1 and BRCA2, to ensure the faithful replication of DNA. As such, the induction of DNA repair proteins in proliferating cells is a normal cellular response that protects against mutations.

66.    Beyond these DNA repair systems, additional cellular safety mechanisms exist that ensure that a cell has adequate time to repair DNA damage prior to replicating its genome in preparation for cell division. One such safety mechanism is mediated by the p53 tumor suppressor protein in which detection of the presence of DNA damage within a cell triggers that cell to halt its progression through the cell cycle, thereby giving the cell time to repair that DNA damage before it replicates its DNA or divides. In doing so, p53 prevents the occurrence of a mutation. Importantly, if for some reason the DNA damage in a cell cannot be repaired, p53 has the ability to trigger a "self-destruct" mechanism within that cell that forces it to undergo apoptosis (*i.e.*, programmed cell death), thereby leading to the elimination of that cell from the body. As a consequence, cells bearing DNA damage that cannot be repaired adequately prior to cell division can be eliminated. For this reason, a cell with DNA damage that is stimulated to proliferate may paradoxically be more likely to be eliminated through physiological safeguard mechanisms of this kind than a cell with DNA damage that is not stimulated to proliferate.

67.    For the reasons enumerated above, one cannot simplistically link proliferation, mutation rates and cancer risk. Accordingly, it is factually incorrect to assume that a higher rate of cellular proliferation per se results in a greater mutation rate. While statements to this effect can be found in the scientific and medical literature, I am not aware of any published body of medical or scientific evidence demonstrating that a tissue that is proliferating at a higher rate accumulates mutations at a higher rate than that same tissue proliferating at a lower rate.

68.    Indeed, a variety of evidence exists indicating that proliferation is not intrinsically linked to cancer risk, including the observations that: (1) proliferation rates in normal tissues are generally poorly correlated – if at all – with the incidence of cancers arising in those tissues; (2) an enormous amount of cellular proliferation is required for the development of a newborn child from a single fertilized egg, yet cancers in newborn children are exceptionally rare; (3) pregnancy has long been known to confer lifetime protection against the development of breast cancer, despite the fact that it is associated with high rates of cellular proliferation; and

(4) pregnancy protects against breast cancer even in women who already have breast cells with mutations, such as was the case with women exposed to ionizing radiation during the atomic bomb blasts at Hiroshima and Nagasaki.[9-13,15] For these and other reasons, proliferation per se cannot be equated with an increase in cancer risk.

**Risk factors**

69.    Multiple risk factors have been elucidated for different human cancers, although the magnitude of many of these established risk factors is relatively small. Moreover, many patients who develop cancer have no apparent risk factors, other than age and/or gender. This likely reflects the fact that cancer is in many ways an unavoidable consequence of aging that has a random (or stochastic) component.

70.    More importantly, it is essential to emphasize that there is a critical difference between a risk factor for a disease and a cause of that disease. A risk factor for cancer is merely a correlation between some factor and the development of cancer. The associations that risk factors represent cannot be equated with causality any more than having gray hair can be considered a cause of cancer – even though having gray hair is strongly associated with the development of cancer.

71.    For a broad array of reasons, there is no accepted methodology, or reliable scientific or medical basis, to evaluate known and unknown risk factors in order to determine the cause of a particular patient's cancer, with the exception of inherited mutations in tumor suppressor genes that are known to cause cancer. First and foremost, risk factors cannot be considered causes; thus, 'ruling out' risk factors cannot logically be considered to be tantamount to ruling out potential causes of a patient's cancer. For example, obesity is an established risk factor for postmenopausal breast cancer, but no physician can reliably tell a patient that their breast cancer was caused by obesity. And even if risk factors were causes (they are not), they still could not explain causation for most patients. For example, risk factors for breast cancer include earlier age at menarche, later age at menopause, nulliparity, late age at first childbirth, lack of breastfeeding, obesity, mammographically dense breast tissue, family history of breast cancer, and others. However, each of these risk factors is associated with only a relatively small increase in risk and, in aggregate, a woman's risk factor profile is a notoriously poor predictor of her likelihood of developing breast cancer in her lifetime. Consistent with this, most women who develop breast cancer do not have known risk factors other than being female and growing older. For these reasons, a physician cannot ascertain the cause of a woman's breast cancer simply by ruling out known risk factors – because the list of potential causes for breast cancer do not explain why most women get breast cancer. Indeed, if the list of potential causes for breast cancer included being female and growing older, these would most often be the "causes" of cancer that remained after "ruling out" other risk factors.

72.    Second, while cancer risk estimation may be reasonably accurate when applied to large populations, it is highly inaccurate when applied to individuals. Thus, even if risk factors were somehow able to establish causality across large populations, they would most likely be unable to do so in individuals.

73.     Third, since most cancers likely arise from endogenous sources of mutations attributable to aging, aging (that is, being alive) itself is one of the most powerful risk factors for cancer and rarely, if ever, can be eliminated as a potential cause of adult human cancers.

74.     A fourth reason why there is no accepted methodology, or reliable scientific or medical basis, to evaluate known and unknown risk factors in order to determine the cause of a particular patient's cancer is that, for many types of human cancer, medical science has only determined some of the potential causes or potential risk factors. Consequently, there is no reliable method to arrive at the "correct" cause simply by ruling out the incomplete set of causes (or risk factors) that do not appear to be operative in that patient.

75.     The above notwithstanding, medical science has established that cancers are caused by the accumulation of mutations in critical genes within the same cell. It has also established that somatic mutations (those mutations that are not inherited in germ cells) typically occur as a consequence of the natural process of aging, and that such mutations occur even in the absence of any exposure to environmental or dietary mutagens. For this reason, aging-associated mutations must be considered as a potential cause of virtually every cancer that occurs in an adult.

76.     To the extent that lists of potential causes of human cancers typically do not include mutations that occur as a consequence of the normal aging process, such lists are inherently incomplete. Since the current state of medical science does not permit the cause of each of the mutations that gave rise to a particular patient's cancer to be ascertained with medical certainty, the specific cause of a person's cancer typically cannot be determined by "ruling out" all other potential causes until a final suspected cause remains. Put another way, the final suspected "cause" of the cancer-causing mutations that most often remains for patients after ruling out known causes would be "idiopathic", which simply means that most people who develop cancer do so for reasons that cannot be determined with any reasonable degree of medical certainty.

77.     For example, many would consider exposure to ionizing radiation, or inherited mutations in BRCA1 or BRCA2, to be known causes of human breast cancer. However, together these causes account for only a very small fraction of breast cancer cases. To attempt to ascertain the cause of a particular patient's breast cancer would, in the great majority of cases, rule out these two known causes, leaving only "idiopathic" as the suspected "cause". That is, the list of causes for human breast cancer is so grossly incomplete as to preclude the utility of differential diagnosis.

78.     In this regard, if lists of causes of human cancer were truly comprehensive, they would include "aging-related mutations" and this would most often be the suspected cause that would remain after "ruling out" other possible causes. Moreover, since aging-related mutations generally cannot be ruled out as a cause of cancer, it is typically difficult, if not impossible, to eliminate aging as a cause of cancer. That is, when it comes to cancer, the fundamental premise upon which the utility of differential diagnosis rests – that all possible causes can either be ruled in or ruled out – only rarely can ever be met.

19

**NDMA and NDEA: Background**

79.     *N*-Nitrosodimethylamine (NDMA, CAS 62-75-9) and *N*-Nitrosodiethylamine (NDEA, CAS 55-18-5) are dialkylnitrosamines, which are members of the *N*-nitroso class of compounds that contain both a nitroso (−N-N+O) functional group and an amine group (-NR$_2$, where R represents an alkyl group or H).[16,1718]  For NDMA, R=CH$_3$, corresponding to a chemical formula of C$_2$H$_6$N$_2$O, a chemical structure of (CH$_3$)$_2$-N-N=O, and a molecular weight of 74.083.[16-18]  For NDEA, R=CH$_3$CH$_2$, corresponding to a chemical formula of C$_4$H$_{10}$N$_2$O, a chemical structure of (CH$_3$CH$_2$)$_2$-N-N=O, and a molecular weight of 102.14.  NDMA and NDEA are semivolatile oily liquids that are miscible in water and have boiling points of ~154$^o$C and ~177$^o$C, respectively.[16-18]

80.     NDMA is found in the environment in air, water and soil, where it is formed by a chemical reaction between nitrosating agents (e.g., nitrite) and nitrosatable substrates (e.g., secondary amines), which are ubiquitously present in the environment.[16-18]  For example, NDMA can be synthesized from amine compounds, nitrate and nitrite in the soil by bacteria.  NDMA is rapidly degraded by sunlight-induced photolysis, but can be generated in the atmosphere at night by the reaction of dimethylamine (DMA) with nitrogen oxides.[16,17]

81.     NDMA can also be generated as a by-product of industrial processes that employ amines, nitrate and/or nitrite, such as of rubber, pesticide and dye manufacturing, leather tanning, and food processing.[16-19]  NDMA is most commonly formed when alkylamines react with nitrite, nitrous acid, nitrogen oxides.  NDMA is present in exhaust fumes of diesel vehicles, may be generated by chemical reaction in sewage containing alkylamines and nitrate or nitrite, and is formed during treatment of drinking water as a consequence of chlorination processes.[16,17,20]  NDMA is also present in some pesticides, either due to the manufacturing process or to formation under storage conditions.[16,17]

82.     Human exposures to *N*-nitrosamines can be classified as either exogenous or endogenous.  While NDMA and NDEA are but two members of the N-nitrosamine family, NDMA is by far the best studied.  Exogenous exposures involve pre-formed NDMA, whereas endogenous exposures entail the synthesis of *N*-nitrosamines within the body.  Significant sources of exogenous exposure to NDMA principally include indoor air (*i.e.*, environmental tobacco smoke), drinking water, food, beverage alcohol, tobacco, consumer products, and occupational exposures in certain industries.

83.     Among exogenous exposures, tobacco generally entails the highest exposures.[17,19]  In the absence of primary or secondary tobacco exposure, food is generally considered to be the principal determinant of exogenous exposure via intake of preformed NDMA, with beverage alcohol and drinking water accounting for progressively smaller percentages.[16,17,19]

84.     Tobacco is a major source of exposure to high levels of nitrosamines, which are classified as volatile, non-volatile, and tobacco-specific N-nitrosamines.[21-25]  NDMA is considered a semi-volatile nitrosamine.  NDMA is formed both during the curing and fermentation process, as well as during combustion.[16,17,19]  Nicotine can also serve as a precursor to NDMA formation,[21-23] and smokeless tobacco is also a significant source of NDMA

exposure. Environmental tobacco smoke (ETS) exposure (including mainstream smoke) has been estimated at 0.04-0.13 ug/kg/d due to ETS-contaminated indoor air, based on exposure to air concentrations that may be as high as 0.24 ug/m$^3$ for 21 hr/d.[17] Sidestream tobacco smoke concentrations of NDMA are on the order of 10-100-fold higher than mainstream smoke.[26] The ETS emission factor of NDMA for cigarettes can be greater than 500 ng/cigarette, although lower levels have also been reported.[26] Consequently, tobacco-related exposures may be 0.08-5.6 ug/d depending on level of cigarette smoking, for an upper range that may be as high as 2 mg per year, which is several times higher than likely dietary exposures to NDMA.[16,17,19]

85.     Besides tobacco, food is estimated to be the major source of exogenous exposure to NDMA and other nitrosamines in humans.[16,17,25,27,28] Foods that tend to have the highest levels of NDMA and nitrosamines can be categorized into several groups. These include: (1) Foods preserved by nitrite and/or nitrate, such as cured meats (especially bacon) and cheeses; (2) Pickled and salt-preserved foods, particularly pickled vegetables in which bacterial reduction of nitrate to nitrite may occur; (3) Smoked meats and fish, due to nitrogen oxides in smoke; (4) Malt beverages, including beer and whiskey, principally due to drying of malt by hot flue gases; (5) Foods dried by combustion gases, such as dried milk products, malt, spices, due to nitrogen oxides in drying gases; and (6) Foods stored under humid conditions due to nitrosamine formation by contaminating bacteria.[16,17,19]

86.     Precise quantification of dietary exposures to preformed NDMA and other nitrosamines in food is extremely difficult, in part because concentrations of NDMA and other nitrosamines in different foods change over time, can differ by geographic region, and are affected by numerous variables, including the method of preparation or preservation.[16,17,19] In addition, the types of foods consumed, as well as serving sizes, vary widely between individuals and data derived from self-reporting on dietary questionnaires are notoriously inaccurate.[29] It is also reasonable to note that dietary exposures relevant to cancer development likely occur decades prior to cancer diagnosis.

87.     With these caveats in mind, reasonable estimates of daily dietary intake of NDMA can be made. For example, evaluating dietary NDMA levels (excluding beer or tobacco) from seven studies[30-36] yields an estimate of average daily intake of 0.164 ug/d, which would correspond to 0.0023 ug/kg/d for a 70 kg person, and a cumulative exposure of 4.19 mg over a 70-year lifetime. Liteplo et al.[17] reported "reasonable worst-case estimates" for daily intake of NDMA from food (excluding tobacco or beer/whiskey) for ages 20-59 years, which ranged from 0.0043 − 0.011 ug/kg/d. This would correspond to 0.30 − 0.77 ug/d, 110 − 281 ug/year, and 7.7 − 19.7 mg over a 70-year lifetime for a 70 kg person.

88.     For reference, the FDA Acceptable Daily Intake (ADI) for NDMA is 96 ng/d, which corresponds to 35 ug per year and 2.45 mg over a 70-year lifetime (see below). Thus, daily dietary intake of NDMA, even excluding tobacco and beer, may often exceed the FDA ADI. Indeed, the estimates above for NDMA intake in food would range from 1.7 − 8.0-times higher than the FDA ADI. [17]

89.     Liteplo et al.[17] estimated "reasonable worst-case estimates" of daily intake of NDMA in beer of 0.0009 ug/kg/d, which corresponds to 23 ug/year.

90.     Although levels of nitrosamines in both food and beer have likely decreased in recent years relative to when many measurements of NDMA in foodstuffs were made, relatively few data exist defining the extent to which NDMA levels in different foods may have decreased.[37] In this regard, given that dietary exposures relevant to cancer development likely occur decades prior to diagnosis, it is pertinent that patients being treated with angiotensin II receptor blockers (ARBs), like valsartan, are generally older and therefore have had decades of lifetime exposure to nitrosamines from both exogenous sources (such as food, water, air, tobacco and beer) and from endogenous sources (see below).  Accordingly, lifetime dietary exposures for such patients are likely to have included the higher levels of nitrosamines that were present in foods and malt beverages in the past.

91.     Liteplo et al. reported "reasonable worst-case estimates" for daily intake of NDMA from food, water, and outdoor air (excluding tobacco or beer/whiskey) as being unlikely to exceed 0.008 ug/kg/d.[17]  This would correspond to 0.56 ug/d, 204 ug/year, or 14.3 mg over the 70-year lifetime of a 70 kg person).  The estimated daily intake of NDMA from food, air and water for ages 20-59 years ranged from 0.005 – 0.016 ug/kg/d.[17]  This would correspond to 0.35 – 1.2 ug/d, 128 – 409 ug/year, and 8.95 – 28.6 mg over a 70-year lifetime for a 70 kg person.  These estimates above for NDMA intake in food, water and air range from 3.6 – 11.7-times higher than the FDA ADI.  Exposures would be higher for persons drinking beer and/or whiskey, and might be up to an order of magnitude higher for those with tobacco exposures.[17]

92.     NDMA is also present in a number of consumer products, including personal care products and cosmetics such as shampoos, hair conditioners, bath and shower gels, and other products.  Similarly, products containing rubber that contact the skin have NDMA, including latex gloves, baby bottle rubber nipples and pacifiers, ranging from 8.6 – 25 mg/kg NDMA.[17] Few data exist on the quantities of NDMA that might be absorbed via these routes of exposure.

93.     Although NDMA has been more intensively studied than most other *N*-nitrosamines, NDMA is only one of the nitrosamines present in food and tobacco, or in industrial settings to which humans are exposed.  Other nitrosamines, including NDEA, *N*-Nitrosodi-n-propylamine (NDPA), *N*-Nitrosodi-n-butylamine (NDBA), *N*-Nitrosomethylethylamine (NMEA) and *N*-Nitrosopyrrolidine (NYPR), have been reported to be present in foods, beverages, drugs, and tobacco smoke.[16,17,19]  The average intake of volatile nitrosamines, including NDMA, is estimated at approximately 1 ug per day[38].

94.     Since NDMA is a by-product of certain manufacturing processes, occupational exposures occur, most commonly via inhalation or dermal contact.  This is the case in rubber and tire manufacturing, pesticide manufacturing, leather tanneries, dye manufacturing, fish meal production, rocket fuel industries, and others.[16,17]

95.     Beyond exogenous exposures to NDMA from food, water, air, tobacco, beer, whiskey, and consumer products, endogenous exposures to NDMA are increasingly appreciated to be a major source – if not the major source – of exposure to NDMA and other nitrosamines.[30,39-42] Indeed, far from being synthetic molecules, NDMA and other nitrosamines are formed endogenously within the body, as a consequence of normal human physiology.[30,39-44]  NDMA and other nitrosamines are formed endogenously from precursor compounds contained in

22

food, particularly secondary amines such as DMA in meats and fish, and nitrate and nitrite in vegetables. Indeed, reduction of nitrate by oral bacteria is considered to be the predominant source of nitrite in humans.[17,45] NDMA and other nitrosamines are formed endogenously in the gastrointestinal (GI) tract due to the metabolism of red meat in the presence of bacteria in the GI tract via a process dependent upon the presence of heme in red meat.[41,46-50] NDMA and other N-nitrosamines may also be formed by acid-catalyzed nitrosation, such as in the stomach, as well as by enzyme-catalyzed nitrosation.[51-55] Systemic nitrosation is driven by the family of enzymes known as nitric oxide (NO) synthases, which generate nitric oxide from the amino acid arginine.[56-58] Consistent with the endogenous formation of nitrosamines, including NDMA, $O^6$-methylguanine DNA adducts are observed in DNA in experimental animals that have not been exposed to environmental methylating agents, and in humans who are thought not to have been exposed to environmental methylating agents.[59-61]

96.    Importantly, endogenous production of NDMA can be estimated to result in exposures that are approximately 1,875-fold higher than the highest estimated levels of exogenous exposure due to pre-formed NDMA in food, drinking water and air.[17] For example, Hrudey (2013)[30] utilized three different data types to estimate the amount of daily endogenous NDMA formation in humans. These estimates were: (a) 900 ug/d (12 ug/kg/d) based upon analysis of NDMA levels in blood samples considered in combination with blood clearance rates; (b) 1,360 ug/d (18 ug/kg/d) based upon levels of $O^6$-methylguanine in DNA from human blood, with estimates ranging as high as 17,000 ug/d; and (c) very wide estimates of endogenous NDMA formation based upon urinary excretion that encompassed the values estimated via the other two method. An average daily exposure to endogenously produced NDMA of 15 ug/kg/d, which represents the mean between estimation methods (a) and (b), would correspond to 1,050 ug/d for a 70 kg person, and 26.8 grams of NDMA over a 70-year lifetime. This level is approximately 1,875-times higher than the highest estimate of daily exposure to exogenous NDMA in food, drinking water and air[17], and nearly 11,000-times higher than the FDA ADI of 0.096 ug/d.

97.    Using methodology analogous to Hrudey, Tannenbaum (1980)[62] estimated similar levels of endogenous NDMA production (670 ug/d). Vermeer (1998)[42] estimated that 174 ug/d of NDMA was produced endogenously in adult humans, based on data(Spiegelhalder 1982)[63] that 0.5% of NDMA formed is excreted in the urine. Further, Jakszyn (2006)[41] estimated that endogenous production of nitroso compounds (ENOCs) is 93-times greater than dietary exposure to NDMA, and these authors (and others) suggested that ENOC formation may account for observed associations between dietary red meat and processed meat intake and gastric cancer risk. Interestingly, while Jakszyn et al. found a significant increase in non-cardia cancer risk associated with endogenous exposure to NOCs, they did not find an association with pre-formed NDMA intake.[41] This finding is consistent with a model in which endogenous N-nitrosamine formation is of a substantially greater magnitude – and therefore more biologically important – than dietary intake of pre-formed nitrosamines.

98.    The data above indicate that endogenous exposures to NDMA are likely to be at least two, and likely three, orders of magnitude higher than exposures to preformed NDMA in food, air and water combined. These data, and others, strongly suggest that the greatest human

23

exposure to NDMA, by far, occurs as a consequence of endogenous processes, not dietary intake.

**NDMA and NDEA: Biological Effects in Animals**

99.    Ingested NDMA is absorbed rapidly.  NDMA can also be absorbed through dermal contact, and by inhalation, although quantitative information related to the extent and timing of absorption is less clear.[16,17]  NDMA and other nitrosamines in the circulation are cleared rapidly with both hepatic and non-hepatic clearance.[16-19]  First-pass clearance within the liver following ingestion is a major contributor to clearance.[16,64,65]  NDMA and its metabolites can be excreted in urine or exhaled as carbon dioxide.  It has been estimated that less than 0.5% of NDMA is excreted in urine unchanged.[17,63]

100.    Acute exposure to high doses of NDMA causes hepatotoxicity and liver failure in animals and in humans, as well as bleeding disorders, likely due at least in part to the hepatic first-pass clearance.[16]  Exposure to lower doses of NDMA in animals result in elevated liver function tests.[16,17]  These toxicities typically occur at doses higher than those associated with carcinogenesis.  Liver toxicity has also been observed in humans in those rare instances in which acute exposure to NDMA has occurred at high doses.[16].

101.    NDMA can be metabolized to formaldehyde and methylamine, and also to formaldehyde and monomethylnitrosamine, which can ultimately be converted to a methyldiazonium ion following activation by the cytochrome P450 system, particularly CYP2E1[16,17,19,66].  NDEA is also metabolized by CYP2E1 and can be converted to an ethyldiazonium ion.[67-69]  These ions are electrophiles capable of reacting with macromolecules and can methylate (or ethylate, in the case of NDEA) proteins, RNA and DNA.  The methyldiazonium ion has a very short half-life, such that the molecules with which it may interact are likely to be within the same cell – and certainly the same tissue – in which activation occurred.[17]

102.    NDMA and NDEA are promutagens, which means that they are not capable of causing mutations until they have been metabolized (*i.e.*, chemically converted) into a mutagenic form.  Thus, NDMA and NDEA have been shown to be mutagenic in vitro and in vivo in animals following metabolic conversion to a methyldiazonium/ethyldiazonium by virtue of their ability to alkylate DNA.  For example, NDMA-mediated methylation of DNA can result in the generation of $N^7$-methylguanine, $N^3$-methyladenine, $O^6$-methylguanine, and $O^4$-methylthymine DNA adducts.[66,70-74]  The most common DNA adduct formed as a consequence of NDMA is $N^7$-methylguanine, which represents approximately two-thirds of all adducts formed.  In contrast, $O^6$-methylguanine has been estimated to represent only 7% of DNA adducts generated by NDMA.[71-73]  Each of the above DNA adducts has different properties.  For example, $O^6$-methylguanine is considered promutagenic, whereas $N^7$-methylguanine is not.[17]  DNA adducts have been used as biomarkers of exposure to NDMA.  However, since $N^7$-methylguanine is not mutagenic, it does not represent an accurate biomarker for NDMA-associated mutagenicity.  Further, these DNA adduct biomarkers do not distinguish between endogenous versus exogenous exposures.[17]

103.    As noted above NDMA is generated endogenously by both chemical and biological mechanisms at levels substantially higher than exogenous exposures to NDMA from food, air and water.  Consequently, the DNA adducts that can result from exogenous exposure to NDMA are chemically indistinguishable from the DNA adducts that can result from endogenous exposure to NDMA (*i.e.*, in absence of exogenous NDMA exposure).[60,73,75]  Moreover, levels of DNA adducts that result from endogenous NDMA exposures may be comparable to, or greater than, those associated with exogenous exposure.[60,73,75]  For these reasons, while methylated DNA adducts represent a biomarker for DNA damage, these adducts to not distinguish DNA damage resulting from exogenous NDMA exposures from DNA damage that results from normal physiologic (*i.e.*, endogenous) processes.

104.    Methylated DNA adducts that can form as a result of NDMA exposure are repaired over time by means of several endogenous error-free repair pathways.[76]  $O^6$-methylguanine is repaired by $O^6$-methylguanine-DNA methyltransferase (MGMT), whereas $N^7$-methylguanine and $N^3$-methyladenine are repaired by N-alkyladenine-DNA glycosylase and the base excision repair (BER) pathway.  The fact that these endogenous DNA repair systems exist – particularly MGMT – underscores the fact that DNA damage from alkylating agents such as NDMA is a normal physiological event.[77]  Put another way, the enzyme MGMT, and the BER, NER and other DNA damage sensing and repair pathways, did not develop evolutionarily in order to repair DNA damage caused by man-made chemicals.

105.    Of critical importance, DNA adducts that are successfully repaired by these endogenous DNA repair systems, or that lead to the death of the cell containing those DNA adducts, do not result in mutations.[38]  Only those DNA adducts that are still present at the time of DNA replication have the potential to give rise to mutations.  This reflects the critical distinction between DNA damage and mutation.

106.    Given the ability of DNA repair systems to prevent mutations following exposure to DNA damaging agent (*e.g.*, genotoxic agent) such as NDMA, DNA repair is a critical determinant of dose-response effects for mutations induced by alkylating agents.  That is, DNA adducts resulting from low-level exposures to agents like NDMA can be effectively and completely repaired, thereby avoiding the generation of mutations.  In contrast, DNA adducts resulting from high-level NDMA exposures may lead to cell death (in which case mutations are not generated), or to mutations in those cells that replicate DNA containing unrepaired $O^6$-methylguanine adducts.  Consequently, thresholds are observed for mutagenicity related to nitrosamine exposures such as NDMA, whereby DNA repair results in a non-linear dose-response for both mutagenesis and carcinogenesis for agents such as NDMA[78,79] and other mutagenic agents.[71,80-89]  Indeed, as Guerard et al. stated: "For alkylating agents, DNA repair seems to be the pivotal mechanism in preventing genotoxicity at low doses, but other mechanisms are also involved such as MMR-mediated cell death to eliminate $O^6$MeG Harboring cells from the poplations."[81].  Consistent with this, Gollapudi *et al*. quantified in vivo mutation rates in the livers of rats that had been administered increasing doses of NDMA.[90]  They found that the number of mutations was not elevated by treatment of rats with nine doses of NDMA at levels of 200 ug/kg/d or 600 ug/kg/d.  Instead, a significant increase in mutations was not observed until doses of 2,000 ug/kg/d NDMA were administered.  First, these data provide

25

additional evidence suggesting the existence of a threshold for NDMA-induced mutation in vivo. Second, it is worth noting that the lowest daily dose required to induce a detectable increase in mutations in rat liver, which is the most sensitive target tissue for NDMA-induced carcinogenesis in rats, was nearly 7,000 times higher than the highest dose of NDMA measured in any valsartan product.

107.    For the above reasons, it would be scientifically incorrect to assume that each molecule of NDMA that is absorbed following exposure results in a mutation in DNA. First, not all NDMA is converted to a methyldiazonium ion. Second, since there is a very large number of molecules (*i.e.*, proteins, RNAs, DNA) in the cell with which a methyldiazonium ion can interact, the probability that a given methyldiazonium ion will methylate DNA, as opposed to another molecule, is considerably less than 1. Third, even for those ions that do methylate DNA, the probability of generating $O^6$-methylguanine, as opposed to a non-mutagenic DNA adduct such as $N^7$-methylguanine, is far less than 1. Fourth, even if an $O^6$-methylguanine adduct is formed, it may be repaired prior to DNA replication, or the cell in which it was generated may undergo DNA damage-induced apoptosis, such that no cellular mutation results. For these, and other, reasons, only a fraction of ingested NDMA molecules are likely to result in mutations, and there is almost certainly a threshold below which NDMA exposure does not result in mutations.

108.    When administered at high doses, NDMA and NDEA reproducibly causes liver cancer in multiple species of laboratory animals and the liver appears to be the most sensitive site for tumorigenesis.[16,17,38,67,91-94] NDMA is also associated with a limited number of additional types of tumors in laboratory animals, predominantly those of the lung and kidney, with some variation observed across the wide range of animal species that have been tested, and occasional Leydig cell tumors of the testis.[16,17,38,91,92] NDEA is associated with both liver and esophageal cancer in rats.[67] At sufficient doses, NDMA-induced cancers consistently occur across a range of species, including rats, mice and hamsters, and by a variety of routes of exposure, including oral administration, inhalation and injection. However, while NDEA has been shown to cause liver tumors in non-human primates, NDMA has not.[38,95] Contrary to claims by Dr. Panigrahy that NDMA reproducibly causes cancers in a broad spectrum of tissues in experimental animals, most chronic oral carcinogenicity studies of rats, mice, and other experimental animals demonstrate carcinogenicity principally in the liver, with other consistent associations restricted to lung and kidney.[16,17,19,93]

109.    The most extensive study for addressing carcinogenic effects of NDMA and NDEA in animals is generally considered to be those conducted by Peto (1991).[96,97] In this lifetime exposure experiment, 15 groups of 60 male and 60 female Coloworth-Wistar rats were provided increasing concentrations of NDMA or NDEA in drinking water ranging from 0.033-16.9 ppm, corresponding to daily intake estimates of approximately 0.001 – 0.697 mg/kg/d for males and 0.002-1.224 mg/kg/d for females. 120 males and 120 females served as controls. Groups of animals were sacrificed at 12 months and 18 months, with the remainder followed until death. Dose-related increases in tumor incidence were observed in the liver in both male and female rats, and included hepatocellular carcinoma and biliary cystadenoma. Dose-related increases in esophageal carcinoma and nasopharyngeal tumors were observed in the rats for

NDEA, but not NDMA.  Background rates of liver tumors in rats were observed in the absence of treatment.

110.    The lowest dose of NDMA observed to induce a significant increase in tumorigenesis, defined as that dose at which a 5% increase in tumorigenesis was observed (summarized/analyzed in Liteplo, 2002), was for biliary cystadenomas in female rats, which occurred at 0.034 mg/kg/d for biliary cystadenoma, and 0.082 mg/kg/d, hepatic carcinoma.[17,96,97]  The corresponding doses for tumorigenesis in male rats were 0.035 mg/kg/d for biliary cystadenoma and 0.078 mg/kg/d for hepatic carcinoma.

111.    Because of substantial background rate of hepatic tumors (approximately 8%) in rats followed for their lifetime, it was not possible to observe a dose-response effect of NDMA-induced tumorigenesis substantially below 0.034 mg/kg/d, which corresponds to an exposure in rats achieved by administering ~0.5 ppm NDMA in drinking water.[96,97]  In contrast, due to the absence of background esophageal tumors, a no observed effect level for NDEA was evident at 0.264 ppm, corresponding to 0.0108 mg/kg/d for male rats and 0.019 mg/kg/d for female rats.[96,97]  That is, there was no increased incidence of tumors in rats treated with doses of NDEA as high as 0.0108 mg/kg/d (0.264 ppm).

112.    Importantly, animal studies of the carcinogenic effects of ingested NDMA consistently indicate that there are a limited number of tissues for which clear evidence exists for a dose-dependent tumorigenic effect in animals, and these include the liver, lung, kidney and, potentially, Leydig cell tumors of the testis.[16,17,93,94,96-98]  Thus, oral ingestion of NDMA cannot reasonably be considered to be a universal carcinogen.  Indeed, there are no carcinogens that I am aware of that cause cancer in all tissues.

**NDMA and NDEA: Biological Effects in Humans**

113.    As noted above, exposures to NDMA and NDEA in humans can occur by ingestion, inhalation, or dermal contact.[16,17,19]  Importantly, when exposures to NDMA and NDEA in human beings do occur, they are typically to a complex mixture of nitrosamines.[16,17,19]  Consequently, biological effects of exogenous exposures to individual nitrosamines in humans cannot easily be distinguished from each other.  Moreover, a corollary to this would be that cumulative exposures to nitrosamines in human beings are nearly always higher than those to NDMA alone.

114.    Another factor complicating the inference of biological effects of nitrosamine exposures in human beings is the inherent difficulty in distinguishing exogenous exposures from the substantial levels of endogenous production of nitrosamines in humans, which may be two to three orders of magnitude higher than exogenous exposures, as discussed above.

115.    Although NDMA and NDEA are known carcinogens in laboratory animals, they are not known carcinogens in humans.  No cancers in humans have been conclusively demonstrated to result from exposure to NDMA or NDEA.  There are no dose-response data from which to infer levels of exposure to NDMA or NDEA that might cause human cancers.  Moreover, no regulatory agency has classified NDMA or NDEA as a known human carcinogen (see below).

116.    Epidemiological studies of the effects of NDMA and NDEA principally consist of dietary studies and occupational exposure studies.[29]  Each of these types of studies is subject to a variety of important limitations that preclude reliable interpretations regarding the potential carcinogenic effects of NDMA and NDEA in human populations.

117.    For example, dietary epidemiology studies typically rely upon observational study designs based on self-reported dietary behavior.  Beyond the fact that observational studies can never fully control for unrecognized bias and confounding, perhaps the major drawback to observational dietary studies is measurement error in dietary assessment.[29]  First and foremost, the actual NDMA content in foods to which study subjects are exposed is rarely, if ever, measured in observational dietary studies.  Rather, NDMA intake is inferred based on prior measurements of NDMA content in different foods, coupled with assessments of dietary intake that are typically based on self-reporting.  The use of pre-existing data on NDMA content in food is itself associated with a variety of limitations and potential errors, including variation in NDMA levels even in the "same" food from different geographical regions, or grown, prepared or preserved in different ways.[29]  Moreover, dietary assessments based on self-reporting are notoriously inaccurate (*e.g.*, do not correspond to actual intake), irrespective of whether the dietary assessment tool itself is "validated", insofar as validation of such tools generally refers to the presence of a correlation between dietary intake estimates based on the use of different assessment tools.[29]  The complexity of human dietary patterns and practices is difficult to capture within a food questionnaire, self-reporting of foods consumed as well as portion sizes is subject to marked distortion and bias, and food histories queried many years after the meaningful exposures likely occurred (*i.e.*, with regard to cancer development) are intrinsically limited.  For these reasons, and others, the actual dietary NDMA exposures of participants in observational dietary epidemiology studies is almost always unknown.

118.    An additional critical drawback of dietary epidemiology studies is related to the complexity of foodstuffs.  Foods typically contain thousands of chemical compounds, only a small minority of which may be measured.  Even with respect to a single family of compounds, such as nitrosamines, multiple members of a family of molecules may be present in differing amounts in different foods.  Consequently, there is a fundamental statistical limitation of interpreting correlations between the estimated dietary intake of a particular chemical (e.g., NDMA) and an outcome, because there are simply far more variables with respect to food composition than there are observations of outcomes.  That is, there are not enough study participants, and not enough measures of the many different chemical compounds in the food they consumed (if any), to reliably determine the effect of one chemical compound.  For example, an observed association of NDMA with a particular clinical outcome could result if estimated NDMA intake was merely a marker for another unknown or unmeasured exposure – even another nitrosamine.  If the estimated NDMA dietary intake for a particular individual is high because they eat large amounts of bacon, there are obviously many other chemical compounds in bacon besides NDMA, and there are likely many things that differ between people who eat large amounts of bacon and those who do not, besides NDMA intake.  Still more complex, if a person has a high estimated NDMA intake due to consumption of processed or grilled red meat, effects due to consumption of preformed NDMA cannot reasonably be separated from effects due to the endogenous generation of NDMA in the GI tract due to the

presence of heme in red meat, or to the generation of preformed carcinogens such as heterocyclic amines at high temperatures. These factors, and others, impair the reliability with which inferences can be drawn between the dietary consumption of a single constituent in foods and a particular clinical outcome, and these limitations are compounded further when the actual constituents consumed are not accurately measured, if at all.

119. In light of the above considerations it is evident that available dietary epidemiological studies focused on NDMA (a) do not actually measure NDMA intake in study participants; (b) do not measure the amounts of the thousands of other chemical constituents present in the food consumed by study participants; (c) cannot reliably distinguish potential effects of NDMA from the other constituents in food; (d) are unlikely to accurately measure food intake of study participants, irrespective of the chemical constituents contained within it; (e) do not measure food intake during the periods of time in which cancers actually form; (f) cannot rule out potential confounders and biases as explanations for any observed associations; and (g) cannot demonstrate cause and effect. For these reasons, and other, there is no medical or scientific basis by which existing dietary epidemiological studies of NDMA could reliably attribute any observed differences in cancers among study participants to NDMA.

120. These fundamental limitations of dietary epidemiology studies are exemplified by the many studies attempting to attribute cancer protective effects of food to specific vitamins and other chemical constituents in food. Numerous chemoprevention trials have been designed to test cancer prevention hypotheses based on epidemiological observations from dietary studies, coupled with apparently consistent evidence in animal and other experimental models, suggesting protective effects for a wide range of vitamins, nutrients and foods, including beta carotene, retinoids, selenium, vitamin C, vitamin D, vitamin E, antioxidants, and others. In the great majority of cases, randomized controlled trials have failed to find the predicted cancer-protective effect, and in some cases have demonstrated the opposite effect – an increase in cancer incidence or mortality.[99-107] These repeated failures to confirm cancer-related hypotheses based on dietary epidemiological studies highlight the marked limitations of observational dietary studies, and suggest a variety of possibilities, including that the dietary studies reached an incorrect result (*e.g.*, unrecognized confounding, etc.), that the effect observed was due to a different component or combination of components of food than the one measured, or that the component of food was simply a biomarker for an unrecognized protective factor or behavior.

121. Like dietary epidemiology studies, occupational studies related to the effects of NDMA exposure are also subject to important limitations that preclude reliable inferences regarding the effects of low-dose oral consumption of NDMA. These include the different route of exposure (inhalation vs. oral ingestion), higher levels of exposure, simultaneous exposure to multiple different potentially carcinogenic substances (*e.g.*, rubber dust, rubber fumes, NDMA, and other nitrosamines in rubber and tire manufacturing workers), and lack of information on important confounders (*e.g.*, smoking).

**Assessments of Carcinogenicity by Regulatory Agencies**

122.    The U.S. Environmental Protection Agency (EPA) has classified NDMA as a "Group B2: Probable human carcinogen", which EPA defined under the 1986 guidelines as an agent for which "there is inadequate evidence that it can cause cancer in humans but at present it is far from conclusive".[18,98,108] This designation was for chronic inhalation.[108] Group B2 typically contains agents for which there is "sufficient" evidence from animal studies, but for which there is "inadequate evidence" or "no data" from epidemiologic studies.

123.    The U.S. Department of Health and Humans Services has classified NDMA as "reasonably anticipated to be a human carcinogen".[109]

124.    The American Conference of Governmental Industrial Hygienists (ACGIH) has classified carcinogenicity of NDMA as Group A3, which denotes a "confirmed animal carcinogen with unknown relevance to humans."[110] Specifically, the A3 designation indicates that "the agent is carcinogenic in experimental animals at a relatively high dose, by route(s) of administration, at site(s), or histologic type(s), or by mechanism(s) that may not be relevant to worker exposure. Available epidemiologic studies do not confirm an increased risk of cancer in exposed humans. Available evidence does not suggest that the agent is likely to cause cancer in humane except under uncommon or unlikely routes or levels of exposure."[110]

125.    IARC (1978) has classified both NDMA and NDEA as Class 2A (*i.e.*, "probable") carcinogens based on sufficient evidence for carcinogenicity in experimental animals, similarities in its metabolism in human and rodent tissues, and inadequate evidence in humans.[93] Despite acknowledging the absence of epidemiological data, the IARC Working Group indicated that NDMA "should be regarded for practical purposes as if it were carcinogenic to humans." However, as articulated in their Monographs, IARC does not extrapolate exposure-response relationships beyond the available data, including from higher to lower exposures, or from experimental animals to humans.[111] In addition, IARC does not review quantitative risk characterizations developed by other health agencies.[111] Accordingly, IARC's determination of a carcinogenic hazard is essentially performed without regard to dose. That is, even if IARC designates a substance as a probable carcinogen based on high dose exposures in animals, it does not extrapolate this animal hazard to lower doses, or to human beings, and it therefore does not make a determination of whether an agent is likely to be carcinogenic to human beings at the low doses to which human beings might be exposed. In effect, IARC formulates an opinion on whether *any* dose of that agent might be carcinogenic, irrespective of whether it is a dose that might be encountered by human beings. In addition, IARC states that Monographs represent the views and expert opinions solely of the particular IARC Working Group assembled for that evaluation, and are not the view or opinions of the World Health Organization.

126.    The European Medicines Agency (EMA) has classified NDMA as a "probable human carcinogen (a substance that could cause cancer) on the basis of animal studies."[112,113]

127.    Health Canada (2018) has classified NDMA as a "probable human carcinogen" "based primarily on animal studies."[114]

128.    Thus, assessments by each of the above agencies are based almost exclusively on evidence for carcinogenicity in experimental animals.  In no case has an agency classified NDMA or NDEA as known human carcinogens, and no agency has cited human epidemiological evidence as supporting the designation of NDMA or NDEA as "probable" carcinogens.

**NDMA, NDEA and Valsartan**

129.    Valsartan is an angiotensin II receptor blocker (ARB) used to treat hypertension and heart failure.  It is manufactured in 40 mg, 80 mg, 160 mg and 320 mg dosages and is taken orally either daily or twice daily, with a maximum dosage of 320 mg.

130.    In July 2018, the FDA announced the detection of NDMA in the active pharmaceutical ingredient (API) of certain valsartan products.  In August 2018, the FDA announced the detection of NDEA in the API of certain valsartan products.  Ultimately, multiple lots of generic valsartan were recalled in the U.S. due to the presence of NDMA and/or NDEA.

131.    The central question at this stage of this litigation is whether exposure to NDMA and/or NDEA *at the doses to which Plaintiffs were potentially exposed via ingestion of valsartan, and within the time frame in which they were potentially exposed*, could have caused the types of cancer in human beings that are claimed in this litigation.

132.    By using NDMA testing data from the FDA for valsartan products,[115] coupled with date ranges that particular valsartan products potentially containing NDMA were available on the U.S. market,[116] it is possible to calculate the theoretical maximum amounts of NDMA to which Plaintiffs could conceivably have been exposed from a particular product.  For example, in calculating this theoretical 'highest exposure' to NDMA from Teva valsartan, I assumed that on any given day a hypothetical Plaintiff took the Teva valsartan product available on the market on that day that had the highest measured level of NDMA, starting conservatively from the date of FDA's approval of a process change by Teva's API manufacturer, September 29, 2014, until the date of Teva's final recall of valsartan products, November 27, 2018.  To make this calculation even more conservative, I further assumed that on the day of product recall (*i.e.*, the last day that a Teva valsartan product was available on the U.S. market), a theoretical Plaintiff filled a 90-day prescription for the Teva valsartan product available on the U.S. market on that day, and continued to take that product for the entire 90-day duration of the prescription.

133.    The maximum level of NDMA measured in any Teva valsartan product was 16.55 ug of NDMA in a 320 mg valsartan tablet.  For a 70 kg person, this would correspond to a daily NDMA exposure of 0.000236 mg/kg/d.  NDMA levels in multiple tested lots of Teva valsartan products were below the limits of detection.  NDMA levels in other tested lots ranged from 6.94-16.55 ug/tablet.  Thus, while 16.55 ug of NDMA represents an absolute upper bound on the amount of NDMA in a Teva valsartan product during the relevant time frame, it is extremely unlikely that any Plaintiff was exposed to these levels in every (or possibly in any) valsartan tablet that they ingested over the period in which they were taking valsartan products.  Consequently, it is very likely that the average exposure to NDMA for any patient taking a valsartan product was substantially less than 16.55 ug/d.

134.    The maximum theoretical duration of exposure to NDMA in a Teva valsartan product was 1611 days, based upon the first date that an NDMA-containing Teva valsartan product potentially containing NDMA became available on the U.S. market, 9/29/2014, until the date of recall on 11/27/2018, with an additional 90-day period added per assumption (d) below if a Plaintiff happened to fill a 90-day prescription for the Teva valsartan product available on the U.S. market on the day of recall.  A Teva valsartan product containing 16.55 ug/tablet was available on the U.S. market from 9/29/2014-7/16/2018 (1387 days).  However, Teva valsartan products available from 7/17/2018-11/27/2018 (134 days) were tested and determined by the FDA to have NDMA levels that were below the limits of detection.[115,116]

135.    In light of the above, the maximum theoretical total NDMA exposure that conceivably could have occurred due to a Plaintiff taking an NDMA-containing Teva valsartan product can be estimated based on a series of assumptions, irrespective of however unlikely these assumptions may be.  These conservative assumptions include: (a) the Plaintiff filled a prescription on the first day that a Teva valsartan product potentially containing NDMA was approved for sale in the U.S. under the process change; (b) that Plaintiff continued to take Teva valsartan products for the entire period from 9/29/2014-11/27/2018; (c) each and every Teva valsartan tablet that they received, and ingested, over the entire 4.4 year interval contained the highest measured dose of NDMA in any Teva valsartan product available on the U.S. market on that day; and (d) on the day of product recall they filled a 90-day prescription for the Teva valsartan product available on the U.S. market on that day, and continued to take that product for the entire 90-day duration of the prescription.  If all of these assumptions were met, the maximum theoretical total NDMA exposure due to Teva valsartan product consumption would have be = (16.55 ug/tablet x 1387 days) + (0 ug/tablet x 134 days) = 22.96 mg NDMA.  Again, for the reasons cited above, it is extremely unlikely that any Plaintiff was exposed to this amount of NDMA, because it is extremely unlikely that any Plaintiff fulfilled all four of the assumptions on which this theoretical 'highest exposure' calculation is based.  Consequently, it is almost certainly the case that the cumulative exposure to NDMA for any Plaintiff taking a Teva valsartan product was substantially less than 22.96 mg.

136.    In an analogous manner, it is possible to calculate the theoretical maximum total amount of NDMA to which Plaintiffs could conceivably have been exposed from *any* valsartan product produced by any combination of manufacturers.  For this theoretical 'highest exposure' calculation, I assumed that on any given day a theoretical Plaintiff took the valsartan product available on the market on that day that had the highest measured level of NDMA, irrespective of manufacturer, from the first date that a valsartan product potentially containing NDMA was first approved for sale on the U.S. market, until the last recall date of 12/31/2018.  In addition, I again used all four assumptions (a-d) above in order to calculate the theoretical maximum total amount of NDMA to which Plaintiffs could conceivably have been exposed.

137.    Using NDMA testing data from the FDA for valsartan products,[115] coupled with date ranges that different valsartan products were approved for sale in the U.S.,[116] I identified the valsartan product with the highest level of NDMA that was available on the U.S. market for each day from 9/29/2014-12/31/2018.  This permitted me to calculate the theoretical maximum exposure that conceivably could have occurred if a Plaintiff met all of the above

assumptions, a-d. This would correspond to a Plaintiff taking the following manufacturers' valsartan products for the following indicated time periods: 9/27/2014-2/8/2016 (Teva Pharmaceuticals, 16.55 ug/tab, 498 days); 2/9/2016-7/18/2018 (Prinston Pharmaceutical, 20.19 ug/tab, 891 days); and 7/19/2018-8/22/2018 (Torrent Pharmaceuticals, 11.53 ug/tab, 35 days). From 8/23-2018-12/31/2018, no valsartan product on the U.S. market contained NDMA above the limit of detection. This hypothetical scenario corresponds to a theoretical maximum total NDMA exposure of 26.64 mg over 1611 days. Again, it bears noting that it is extremely unlikely that any Plaintiff was exposed to this amount of NDMA, because it is extremely unlikely that any Plaintiff fulfilled all four of the assumptions on which this theoretical 'highest exposure' calculation is based. In particular, it is almost inconceivable that any Plaintiff happened to take the exact lot of valsartan product that contained the highest amount of NDMA every day during this 4.4-year period. Consequently, it is almost certainly the case that the cumulative exposure to NDMA for any Plaintiff taking any valsartan product was substantially less than 26.64 mg.

138.    In precisely the same manner, by using NDEA testing data from the FDA for valsartan products,[115] coupled with date ranges that different manufactured lots of valsartan were available on the U.S. market,[116] it is possible to calculate the theoretical maximum amounts of NDEA to which Plaintiffs could conceivably have been exposed from a particular valsartan product. Again using Teva as an example, the maximum level of NDEA measured in any Teva valsartan product was 0.77 ug of NDEA in a 320 mg valsartan tablet. For a 70 kg person, this would correspond to a daily NDEA exposure of 0.000011 mg/kg/d. NDEA levels in multiple tested lots of Teva valsartan products were either below the limits of detection, or ranged from 0-0.03 ug/tablet. NDEA levels in other tested lots ranged from 0-0.77 ug/tablet. Thus, while 0.77 ug represents an upper bound on the amount of NDEA in a Teva valsartan product during the relevant time frame, it is nevertheless unlikely that any one person was exposed to these levels in every (or possibly in any) valsartan tablet that they ingested.

139.    Applying the same assumptions used above for NDMA, the maximum theoretical duration of exposure to NDEA in a Teva valsartan product was 1611 days, based upon the first date that an NDEA-containing Teva valsartan product was approved for sale in the U.S., 9/29/2014, until the date of recall on 11/27/2018, with an additional 90 days added per assumption (d). A Teva valsartan product containing 0.77 ug/tablet was available on the U.S. market from 9/29/2014-7/16/2018 (1387 days).[115,116] From 7/17/2018-11/27/2018 (134 days) the Teva valsartan product with the highest level of NDEA was 0.03 ug/tablet. I then assumed that a Plaintiff filled a 90-day prescription on the day of product recall for this Teva valsartan product and continued to take that product for the entire 90-day duration of the prescription. If all of the above assumptions were met, however unlikely that might be, the maximum theoretical total NDEA exposure due to Teva valsartan product consumption would have be = (0.77 ug/tablet x 1387 days) + (0.03 ug/tablet x 134 days) + (0.03 ug/tablet x 90 days) = 1,075 ug NDEA. Again, for the reasons cited above, it is extremely unlikely that any Plaintiff was exposed to this amount of NDEA, because it is extremely unlikely that any Plaintiff fulfilled all four of the assumptions on which this theoretical 'highest exposure' calculation is based. Consequently, it is almost certainly the case that the cumulative exposure to NDEA for any Plaintiff taking a Teva valsartan product was substantially less than 1,075 ug.

140.    In a manner analogous to the calculation performed for NDMA, I calculated the theoretical maximum total amount of NDEA to which Plaintiffs could conceivably have been exposed from *any* valsartan product produced by any combination of manufacturers. I assumed that on any given day a theoretical Plaintiff took the valsartan product available on the market on that day that had the highest measured level of NDEA, irrespective of manufacturer, from the first date that a valsartan product potentially containing NDEA was sold in the U.S., 9/21/2012, until the last date a valsartan product potentially containing NDEA was recalled, 12/31/2018. In addition, I again used all four assumptions (a-d) above in order to calculate the theoretical maximum total amount of NDEA to which Plaintiffs could conceivably have been exposed.

141.    Using NDEA testing data from the FDA for valsartan products,[115] coupled with date ranges that different manufactured lots of valsartan were available on the U.S. market,[116] I identified the valsartan product with the highest level of NDEA that was available on the U.S. market for each day from 9/21/2012 – 12/31/2018. This permitted me to calculate the theoretical maximum exposure that conceivably could have occurred if a Plaintiff met all of the above assumptions, a-d. This would correspond to a Plaintiff taking the following manufacturers' valsartan products for the following indicated time periods: 9/21/2012-9/28/2014 (Mylan Pharmaceutical, 0.38 ug/tab, 738 days); 9/29/2014-12/31/2014 (Teva Pharmaceuticals, 0.77 ug/tab, 72 days); 1/1/2015-8/22/2018 (Torrent Pharmaceuticals, 1.31 ug/tab, 1330 days); 8/23/2018-12/4/2018 (Mylan Pharmaceutical, 0.38 ug/tab, 104 days), and 12/5/2018-12/31/2018 (Aurobindo Pharma, 0.19 ug/tab,27 days), plus 90 additional days for Aurobindo Pharma at 0.19 ug/tab. This corresponds to a theoretical maximum total NDMA exposure of 2,157 ug over 2,383 days. Again, it bears noting that it is extremely unlikely that any Plaintiff was exposed to this amount of NDEA, because it is extremely unlikely that any Plaintiff fulfilled all four of the assumptions on which this theoretical 'highest exposure' calculation is based. In particular, it is almost inconceivable that any Plaintiff happened to take the exact lot of valsartan product that contained the highest amount of NDEA every day during this 6.5-year period, even if they were taking a valsartan product for that entire period of time. Consequently, it is almost certainly the case that the cumulative exposure to NDEA for any Plaintiff taking any valsartan product was substantially less than 2,157 ug.

142.    To my knowledge, the actual amounts of NDMA and/or NDEA to which individual Plaintiffs in this litigation may have been exposed has not been documented. Moreover, while it is theoretically possible to meet each of the four assumptions outlined above, it is nevertheless highly unlikely to have actually occurred for any given Plaintiff. Accordingly, the above estimates of maximum theoretical exposures to NDMA and NDEA are hypotheticals presented to provide a concrete, if extreme, upper bound for the purposes of evaluating theoretical risks in the context of other exogenous and endogenous exposures to NDMA and NDEA.

**Regulatory Agencies: Risk Estimates**

143.    The U.S. Food and Drug Administration has set an Acceptable Daily Intake (ADI) of 96 ng/d for NDMA, and 26.5 ng/d for NDEA, for pharmaceutical products. These ADI values were

34

estimated by the FDA to result in <1 excess case of cancer per 100,000 people, if taken every day for 70 years. These ADI values for NDMA and NDEA are equivalent to exposures of 35 ug/year and 2.45 mg over a 70-year lifetime for NDMA, and 9.7 ug/year and 678 ug over a 70-year lifetime for NDEA.

144.    In effect, these ADI values were derived by linear extrapolation from high oral doses of NDMA and NDEA in a lifetime exposure study that resulted in tumors in 50% of rats (Peto 1991),[96,97] to a far lower dose estimated to be associated with an increase of 1:100,000 cancers in humans over a 70-year lifetime. There are several important elements of this extrapolation. First, this estimation approach is derived from back extrapolation of animal studies, rather than human studies, since no human studies exist that demonstrate a cause and effect relationship between NDMA or NDEA exposure and the development of cancer. Second, these ADI values are based on linear low-dose extrapolation; namely, the assumption that the dose-response for NDMA and NDEA-induced carcinogenesis remains linear even at extremely low doses that are many orders of magnitude lower than what can possibly be measured, even in experimental animal models. Thus, there is no body of direct evidence to support the linear dose-response assumption for NDMA and NDEA at the extremely low doses to which patients could theoretically have been exposed. Further, as discussed below, there is direct evidence to the contrary suggesting that the linear low-dose assumption is unlikely to be true for NDMA and NDEA. Third, while it is understandable why the safety mandate of the FDA would lead it to err on the side of conservative risk estimates, it nevertheless bears noting that a 1:100,000 threshold for cancer development is extraordinarily conservative, particularly considering that the lifetime risk of being diagnosed with cancer is approximately 1 in 2, which constitutes a risk that is 50,000 times higher than FDA estimates of cancer risks attributable to lifetime exposure to NDMA at 96 ng/d or to NDEA at 26.5 ng/d. Indeed, the FDA has noted that "consuming up to 0.096 micrograms of NDMA of 0.0265 micrograms of NDEA per day is considered reasonably safe for human ingestion based on lifetime exposure."[115,117]

145.    Based upon its evaluation of NDMA-containing valsartan products, the FDA estimated that the amount of NDMA contained in valsartan products might be associated with a theoretical excess lifetime cancer risk of 1:8,000 people if exposures occurred continuously at the maximum possible daily dose for a maximum duration of 4 years. Similarly, the FDA estimated that the amount of NDEA contained in valsartan products might be associated with a theoretical excess lifetime cancer risk of 1:18,000 people if exposures occurred continuously at the maximum possible daily dose for a maximum duration of 4 years.

146.    The FDA also noted that "in reality, the vast majority of patients exposed to NDMA through [angiotensin II receptor blockers] ARBs received much smaller amounts of the impurity than this worst-case scenario, and, since not all ARBs are affected, it's very likely that a patient taking an ARB for four years would not have always received one of the affected products." Consequently, FDA indicated that while they had based their cancer risk estimates on the highest daily dose, "many people may have taken lower doses, and therefore, their risks would theoretically be less. FDA expects the actual cancer risk to most consumers to be lower than our estimate." Indeed, FDA characterized the cancer risks associated with valsartan containing NDMA and/or NDEA as "very low". In addition, the FDA also indicated that they "strongly

believe the risks, such as stroke, of abruptly discontinuing these important medicines far outweighs the low risk associated with continuing the medications with these impurities," and, on that basis, advised that "patients should continue taking their medicine until their pharmacist provides a replacement or their doctor provides an alternative treatment option – even if they learn that their ARB medicine is recalled."

147.    Using similar risk estimation approaches, Health Canada estimated a maximum theoretical excess lifetime cancer risk of 1:11,600 due to consumption of NDMA-containing valsartan products, assuming an average level of NDMA of 60 ppm, a dosage of 320 mg valsartan, and exposure for 3 years, which corresponds to the longest time that NDMA and/or NDEA-containing valsartan products were on the Canadian market.[114]  Health Canada also noted that "it is important to keep in mind that the actual health risk varies from person to person, and depends on factors including daily dose, how long the affected valsartan was taken, and the actual level of NDMA present in the finished product", that "we are all exposed to low levels of NDMA", that "to put these estimates into a broader context, nearly 1 in 2 Canadians is expected to develop cancer during their lifetime," and that NDMA "is not expected to cause harm when ingested in very low levels."

**Theoretical maximum levels of NDMA exposure from valsartan products are orders of magnitude lower than levels of endogenous NDMA production**

148.    The highest conceivable total amounts of NDMA and/or NDEA to which Plaintiffs could possibly have been exposed due to ingestion of valsartan products are more than three orders of magnitude lower than the lowest dose associated with a detectable increase in cancer in rats, and are two to three orders of magnitude lower than estimates of endogenous NDMA production.  When considering that, for the reasons cited above, the cumulative exposure to NDMA and/or NDEA for any patient taking a valsartan product was almost certainly substantially lower than the highest conceivable cumulative amount, the magnitude of the difference between a patient's cumulative exposure to NDMA and/or NDEA due to ingestion of valsartan products and the lowest dose of NDMA and/or NDEA associated with a detectable increase in cancer in rats is likely even greater.

149.    As above, estimates of endogenous levels of daily NDMA production range from 174 ug/d (Vermeer 1998)[42] to 1,360 ug/d (Hrudey 2013),[30] and higher.  In my opinion, the most thorough and systematic analysis was that of Hrudey, which estimated endogenous NDMA production using multiple distinct approaches at 900 ug/d (12 ug/kg/d) based upon analysis of NDMA levels in blood samples in combination with blood clearance rates, and 1,360 ug/d (18 ug/kg/d) based upon levels of $O^6$-methylguanine in DNA from human blood.  Thus, the mean of these two estimation methods would yield an average daily exposure to endogenously produced NDMA of 15 ug/kg/d, which for a 70 kg person would correspond to a daily NDMA exposure of 1,050 ug/d, and a cumulative exposure of 26.8 grams (26,800 mg) of NDMA over a 70-year lifetime.  This level of endogenous NDMA exposure is approximately 1,875-times higher than the highest estimate of NDMA daily dietary intake,(Liteplo, 2002)[17] and nearly 11,000-times higher than the FDA ADI of 0.096 ug/d.

150.    Again using Teva as an example, and assuming a maximum theoretical daily exposure to NDMA from ingestion of Teva valsartan products of 16.55 ug, this amount of NDMA is 10.5-times lower than estimates of endogenous daily production of NDMA by Vermeer, and 64-times lower than the average estimate of endogenous daily NDMA production by Hrudey. Thus, even ignoring daily exogenous exposure to NDMA due to diet, the maximum theoretical amount of NDMA in Teva valsartan products to which a patient might have been exposed represents just 1.6% – 9.5% of the amount of NDMA that is estimated to be produced endogenously each day.

151.    When considering maximum theoretical daily exposure to NDMA from ingestion of *any* valsartan product, which was 20.19 ug, this amount of NDMA is 8.6-times lower than estimates of endogenous daily production of NDMA by Vermeer, and 52-times lower than the average estimate of endogenous daily NDMA production by Hrudey. Thus, even ignoring daily exogenous exposure to NDMA due to diet, the maximum theoretical amount of NDMA in *any* valsartan product to which a patient might have been exposed represents just 1.9% – 11.6% of the amount of NDMA that is estimated to be produced endogenously each day.

152.    When evaluating cancer risk associated with exposures to carcinogenic agents, total lifetime exposure is a more accurate measure of lifetime cancer risk than daily exposure. As above, the maximum theoretical total exposure to NDMA to which a Plaintiff could conceivable have been exposed due to ingesting Teva valsartan products was 22.96 mg, if and only if each and every Teva valsartan tablet that they ingested over the entire 1,610-day interval contained the highest measured dose of NDMA in any Teva valsartan product available on the U.S. market on that day. In contrast, estimates of cumulative lifetime endogenous NDMA production based on Hrudey correspond to 26.8 grams of NDMA over a 70-year lifetime. This level of NDMA exposure due to endogenous production is greater than 1,100-times higher than the maximum theoretical total exposure to NDMA due to ingestion of Teva valsartan products. Thus, the maximum theoretical cumulative exposure to NDMA from Teva valsartan products represents – at most – just 0.1% of estimated total lifetime exposure to NDMA produced endogenously. Moreover, as discussed above, only a fraction of ingested NDMA molecules are likely to result in mutations, and there is almost certainly a threshold below which NDMA exposure does not result in mutations.

153.    When considering maximum theoretical total cumulative exposure to NDMA from ingestion of *any* combination of valsartan product, which was 26.6 mg, if and only if each and every valsartan tablet that they ingested over the entire 1,610-day interval contained the highest measured dose of NDMA in any valsartan product available on the U.S. market on that day. In contrast, estimates of cumulative lifetime endogenous NDMA production based on Hrudey correspond to 26.8 grams of NDMA over a 70-year lifetime. This level of NDMA exposure due to endogenous production is 1,000-times higher than the maximum theoretical total exposure to NDMA due to ingestion of any NDMA-containing valsartan product. Again, this indicates that the maximum theoretical cumulative exposure to NDMA from valsartan products represents – at most – just 0.1% of estimated total lifetime exposure to NDMA produced endogenously.

**Theoretical maximum levels of NDMA and/or NDEA exposure from valsartan products are orders of magnitude lower than the lowest levels of NDMA or NDEA observed to cause cancer in experimental animals**

154.    The maximum level of NDMA measured in any Teva valsartan product was 16.55 ug of NDMA in a 320 mg valsartan tablet, which corresponds to a daily NDMA exposure of 0.000236 mg/kg/d for a 70 kg person.  In Peto 1991, the lowest dose of NDMA demonstrated to detectably increase the incidence of cancer in rats was 0.034 mg/kg/d, for biliary cystadenoma.[96,97]  On a daily basis, 0.034 mg/kg/d NDMA would correspond to 2,380 ug/d NDMA for a 70 kg person.  This daily amount of NDMA determined by Peto is 144-times higher than the highest level of NDMA contained in any lot of any Teva valsartan product.

155.    The maximum level of NDMA measured in any valsartan product was 20.19 ug of NDMA in a 320 mg valsartan tablet, which corresponds to a daily NDMA exposure of 0.000288 mg/kg/d for a 70 kg person.  Given the lowest daily dose of NDMA demonstrated to detectably increase the incidence of cancer in rats of 0.034 mg/kg/d in Peto 1991,[96,97] which would correspond to 2,380 ug/d NDMA for a 70 kg person, this daily amount of NDMA determined by Peto 1991 is 118-times higher than the highest level of NDMA measured in any lot of any valsartan product.

156.    Similarly, when considering total lifetime exposures and cancer risk, lifetime exposure to 0.034 mg/kg/d NDMA in rats would correspond to an exposure of 60,850,650 ug over a 70-year lifetime for a 70 kg person.  By comparison, the maximum theoretical total exposure to NDMA to which a Plaintiff could conceivably have been exposed due to ingestion of Teva valsartan products was 22,955 ug.  This amount is 2,650-fold lower than the lowest dose of NDMA shown to cause a detectable increase in cancer in rats.  Analogously, the maximum theoretical total exposure to NDMA to which a Plaintiff could conceivably have been exposed due to ingestion of *any* combination of valsartan products was 26,635 ug.  This amount is approximately 2,280-fold lower than the lowest dose of NDMA shown to cause a detectable increase in cancer in rats.  Thus, the maximum theoretical total exposure to NDMA to which a Plaintiff could conceivably have been exposed due to ingestion of *any* combination of valsartan products was still more than three orders of magnitude *lower* than the lowest dose of NDMA shown to cause a detectable increase in cancer in rats.

157.    Beyond these reasons, even if one were to assume for the sake of a logical exercise that there is evidence that ingestion of valsartan products resulted in exposure to levels of NDMA that were substantial enough to cause cancer in human beings (there is not), it would still be impossible to rule out other sources of NDMA exposure as a cause, given the many other exogenous sources of NDMA and other nitrosamine exposures, including food, water, air, beer and tobacco, and especially given endogenous levels of production of NDMA that are orders of magnitude higher than any amount of NDMA in the valsartan products to which Plaintiffs could theoretical have been exposed.

158.    As above, the highest level of NDEA measured in any lot of any Teva valsartan product was 0.77 ug per tablet.[115]  NDEA lifetime carcinogenicity studies in rats by Peto (1991) revealed a no observed effect level for NDEA evident at 0.264 ppm, corresponding to a daily dose of

0.0108 mg/kg/d NDEA for male rats and 0.019 mg/kg/d for female rats.[96,97]  That is, rats treated with doses of NDEA as high as 0.0108 mg/kg/d (0.264 ppm) showed no detectable increase in tumorigenesis.  A daily dose of 0.0108 mg/kg/d in rats would correspond to 756 ug/d NDEA for a 70 kg person.  Thus, the maximum theoretical daily exposure to NDEA from Teva valsartan products was 982-fold (nearly three orders of magnitude) *lower* than a dose of NDEA that did not cause tumors in rats when administered for their entire lifetime.

159.    The highest level of NDEA measured in *any* valsartan product was 1.31 ug/tablet.[115]  Thus, compared to the observed no effect level of 0.0108 mg/kg/d in rats determined by Peto,[96,97] which corresponds to 756 ug/d NDEA for a 70 kg person, the maximum theoretical daily exposure to NDEA from the valsartan product containing the highest measured level of NDEA was still 577-fold *lower* than a dose of NDEA that did not cause tumors in rats when administered for their entire lifetime.

160.    When considering total cumulative exposures, lifetime exposure to 0.0108 mg/kg/d NDEA in rats (the no observed effect level) would correspond to an exposure of 19,329,030 ug over a 70-year lifetime for a 70 kg person.  By comparison, the maximum theoretical total exposure to NDEA to which a Plaintiff could conceivably have been exposed due to ingestion of Teva valsartan products was 1,075 ug.  Thus, the maximum theoretical cumulative exposure to NDEA from Teva valsartan products was more than 18,000-fold lower than the lowest dose of NDEA shown to cause tumors in rats, if administered over a lifetime.  Analogously, the maximum theoretical total exposure to NDEA to which a Plaintiff could conceivably have been exposed due to ingestion of *any* combination of valsartan products was 2,157 ug.  This amount is nearly 9,000-fold lower than the lowest dose of NDEA shown to cause a detectable increase in cancer in rats if administered over a lifetime.  Thus, the maximum theoretical total exposure to NDEA to which a Plaintiff could conceivably have been exposed due to ingestion of *any* combination of valsartan products was approximately four orders of magnitude *lower* than the lowest dose of NDEA shown to cause a detectable increase in cancer in rats.

**Limitations of linear low-dose threshold extrapolation**

161.    As above, estimates of the ADI for NDMA and NDEA by the FDA, EMA and other agencies were derived based on linear low-dose extrapolation. In effect, linear low-dose extrapolation determines a linear response for very high exposures in the observable dose-response range, and then extrapolates that to very low doses at which effects cannot actually be observed above background.  Specifically, in this approach, high levels of NDMA or NDEA are used to identify a dose at which tumors are induced in 50% of rats.  Linear extrapolation is then used to calculate the far lower dose that would be predicted to be associated with an increase of only 1 cancer in 100,000 people (0.001% tumor incidence) exposed to that dose over a 70-year lifetime.

162.    Critically, this approach relies on the assumption that the dose-response for NDMA and NDEA-induced carcinogenesis remains linear even at extremely low doses.  In this regard, it is essential to note that these extremely low doses are many orders of magnitude lower than what is possible to measure, even in experimental animal models.  Furthermore, as emphasized above, the maximum theoretical doses of NDMA and/or NDEA to which patients could have

been exposed as a result of ingesting valsartan products are several orders of magnitude lower than the lowest doses of these agents that have been observed to cause cancer. Accordingly, using linear low-dose extrapolation to define an ADI for NDMA (and for NDEA) and estimate cancer risk at these extremely low levels of exposure must, by necessity, encompass the assumptions upon which linear low-dose extrapolation is based. Consequently, an estimate of potential cancer risk attributable to the very low levels of NDMA and NDEA associated with ingestion of valsartan products cannot be based upon direct evidence of cancer risk, even in range of the maximum theoretical exposures to NDMA and NDEA that might have occurred in some patients.

163. There are several important limitations to estimating cancer risk by linear low-dose extrapolation.[79,118,119] First, because no human studies exist that demonstrate a cause and effect relationship between NDMA or NDEA exposure and the development of cancer, this estimation approach is necessarily based on extrapolation from animal studies, rather than human studies. Second, because tumor incidence cannot be measured at such low doses, there is no body of direct evidence to support the linear low-dose-response assumption for NDMA and NDEA at the extremely low doses to which patients could theoretically have been exposed. In fact, as discussed below, there is direct evidence to the contrary, which suggests that the linear low-dose assumption is unlikely to be true for NDMA and NDEA.

164. Fundamentally, linear low-dose extrapolation in this context is based on the assumption that there is no threshold dose below which exposure to NDMA, or NDEA, does not result in an increased risk of cancer. Put another way, this risk estimation approach assumes that exposure to one molecule of NDMA or NDEA is sufficient to increase cancer risk. Indeed, Dr. Panigrahy clearly espouses this belief, upon which he bases his evaluation of whether or not NDMA and/or NDEA can cause cancer in human beings:

> "Because a genotoxic chemical can permanently induce DNA damage and mutations, there is viewed to be no safe exposure threshold or dose with genotoxic carcinogens[30,31]. This is based on the assumption that even one molecule of genotoxic chemicals may induce a mutation that may cause cancer[31,237]."[120]

165. The belief that there is no threshold for the carcinogenic effect of genotoxic agents and, therefore, "no safe level" is a fallacy that – as discussed throughout this report – is contradicted by basic tenets of biology, as well as abundant scientific evidence demonstrating thresholds for the carcinogenic and mutagenic effects of agents like NDMA and NDEA that result from the existence of error-free DNA repair systems.[71,80-85] Beyond these scientific reasons, however, even straightforward risk calculations related to the probability of developing cancer in response to a carcinogenic exposure clearly demonstrates the same point – namely, that the proposition that even a single molecule of a carcinogen may cause cancer and therefore cannot be considered safe, defies common sense.

166. For example, Dr. Steven Hrudey discusses cancer risk associated with exposure to 2,3,7,8 tetrachlorodibenzo-*p*-dioxin (TCCD),[121] because it is one of the most potent known carcinogens. Dr. Hrudey calculates based on the potency factor for TCCD q1* (mg/kg/d)$^{-1}$ of $1.56 \times 10^5$, which is based on linear extrapolation from the TD50 value (and is therefore a

conservative estimate), administering a dose of one molecule per day of TCCD (corresponding to $0.9 \times 10^{-20}$ mg/kg/d for a 60 kg person) for 70 years (which is 25,550-times higher than exposure to a single molecule) would correspond to a lifetime risk of cancer of $1.4 \times 10^{-15}$. That is, approximately 1 in 1 quadrillion.[121]  To put that in perspective, Dr. Hrudey points out that, if this dose of TCCD were given every day to every person in the world for every person's entire lifetime, there would be less than a 1 in 100,000 chance that anyone on the entire planet would ever develop cancer as a result.  This illustrates in the starkest of terms that, while different people might have different definitions of "safe", "under any realistic concept of practicality, there is indeed a safe level of exposure to cancer-causing chemicals".[121]

167.     Indeed, even this TCCD estimate is an overestimate, because it is based on linear low-dose extrapolation.  As alluded to above, there are several important limitations to estimating cancer risk by linear low-dose extrapolation.  First, linear low-dose extrapolation ignores the existence of substantial endogenous (*i.e.*, "background") sources of DNA damage, described elsewhere in this report, that occur as a consequence of the normal physiology of cells.  That is, exogenous exposures to very low levels of NDMA and NDEA that would be associated with levels of DNA damage far lower than those that occur endogenously due to normal physiological processes would not be anticipated to yield an observable increase in cancer risk.  Moreover, even putting aside the numerous endogenous causes of DNA damage, the maximum theoretical exogenous exposures to NDMA at issue here are orders of magnitude lower than endogenous exposures to NDMA.

168.     Second, linear low-dose extrapolation ignores the existence of background exposures to many known mutagens in the environment, such as x-rays, asbestos, and the numerous other chemicals and natural products to which we are all exposed each day.  For example, asbestos fibers are nearly ubiquitously present in air.  Consequently, we are all exposed to asbestos every day.  To estimate these lifetime exposures, the average person breathes in approximately 11,000 liters of air per day, which corresponds to 11 $m^3$.  Using estimates for asbestos fiber content of 100 fibers/cubic meter (f/$m^3$) in urban settings, the average person would inhale approximately 1,100 asbestos fibers per day, which corresponds to approximately 400,000 asbestos fibers per year.[122]  This means that over the course of a 70-year lifespan, the average person lacking any occupational exposure to asbestos would inhale somewhere on the order of 28 million asbestos fibers.  In the occupational setting, OSHA regulations call for workplace air concentrations of asbestos to be less than 100,000 f/$m^3$, which for someone working an 8-hour day would correspond to inhalation of 1.8 million fibers per week, more than 90 million fibers per year, and 3.7 billion fibers of asbestos over the course of a 40-year career, solely due to asbestos exposure during working hours.  Thus, inhalation of 28 million – 3.7 billion fibers of asbestos over the course of a lifetime is not associated with a detectable increase in the development of asbestos-related cancers in human beings.  This underscores the fallacy of a model that postulates that exposure to a single molecule of a mutagen will increase the risk of cancer, as is implicit in Dr. Panigrahy's report.

169.     Third, and especially important, linear low-dose extrapolation ignores the existence of endogenous error-free DNA repair systems, as well as other rate-limiting events required for

41

the effects of NDMA and NDEA, that result in exposure thresholds for carcinogenic effects below which tumor formation will not occur. As a consequence, low levels of NDMA or NDEA-induced DNA damage that can be repaired by these DNA repair systems prior to DNA replication will not result in mutations and therefore cannot result in carcinogenesis. By definition, then, these repair systems will result in the existence of thresholds for mutation and carcinogenicity for agents such as NDMA and NDEA. Indeed, multiple studies support the existence of a threshold for a no observed effect for a number of mutagenic carcinogens, including alkylating agents such as N-nitroso compounds.[71,79-85,90] As such, it is very likely the case that exposure to very low levels of NDMA and/or NDEA does not result in an increase in mutation frequency, or in carcinogenesis, because the low levels of DNA damage that may be associated with these exposures can be adequately repaired by the endogenous DNA repair systems present in all our cells.

170.    These and other considerations imply that the assumptions underlying linear low-dose extrapolation result in inappropriately low, overly conservative estimates for cancer risks at extremely levels of exposure at which effects cannot be measured experimentally.

**Epidemiology of valsartan products containing NDMA**

171.    To date, two epidemiological studies have explored the association between valsartan products containing NDMA and the risk of cancer.[123,124] Pottegard et al. reported a nationwide Danish cohort study based on healthcare system registry data reported no statistically significant elevated overall risk of cancer (HR 1.09 [95% confidence interval [0.85; 1.41]], and no increase in the risk of several individual cancers after exposure to NDMA-containing valsartan drug products with a median follow-up of 4.6 years.[124] These included bladder cancer, breast cancer, colorectal cancer, kidney cancer, lung cancer, melanoma, pancreas cancer, prostate cancer, and uterine cancer. No liver cancers occurred in individuals exposed to NDMA-containing valsartan products. The authors concluded that "the results do not imply a markedly increased short-term overall risk of cancer in users of valsartan contaminated with NDMA," although they noted uncertainty about single cancer outcomes and the need for longer follow-up. Limitations of this study included a relatively small size of 5,150 patients, the reliance of exposure ascertainment on assumptions about NDMA content, and relatively short follow-up.

172.    Gomm et al. reported results from a cohort study based on longitudinal data from a German health insurance provider, which included 780,871 people who had filled a prescription of valsartan between 2012 and 2017.[123] They found no association between exposure to potentially NDMA-containing valsartan (in comparison with exposure to valsartan not believed to contain NDMA) and the overall risk of cancer (adjusted HR 1.00, 95% confidence interval [0.98; 1.02]). Nor were associations found between exposure to potentially NDMA-containing valsartan and bladder cancer, breast cancer, colorectal cancer, kidney cancer, lung cancer, malignant melanoma, pancreas cancer, prostate cancer, or uterine cancer. The authors did identify a nominally statistically significant association between exposure to valsartan and hepatic cancer (adjusted HR 1.16, 95% confidence interval [1.03; 1.31], although no dose-dependent effect on the risk of liver cancer was found for higher exposure to potentially NDMA-containing valsartan, and results were not corrected for multiple testing, given that

associations for 10 individual cancers were evaluated. Moreover, Pottegard did not observe any cases of liver cancer in their cohort. Limitations of this study included the inability to rule out residual confounding, the lack of information regarding important risk factors for cancer such as smoking, alcohol and nutritional habits, the lack of information on the precise NDMA content of individual valsartan tablets, and the limited follow-up time of just over 3 years. Importantly, the authors stated that "the present study can only state the existence of a statistical association. Causality cannot be inferred."

173.    Despite significant limitations, particularly the short length of follow-up given the mutagenic mechanism of action of NDMA, the above studies do suggest that exposure to valsartan containing NDMA is not associated with a substantial increase in cancer risk within 3 years and 4.6 years, respectively. Notably, this time frame is similar to, if not longer than, that claimed by Dr. Panigrahy in this litigation to be sufficient for NDMA-induced cancers in human beings.[120]

**Claimed latencies for Plaintiffs' cancers are too short to be plausibly related to NDMA or NDEA exposure due to valsartan products.**

174.    As discussed in this report, the vast majority of adult solid cancers are generally believed to develop over a period of 30-50 years. Moreover, estimates of the shortest possible period of time for the development of a clinically detectable cancer following exposure to a mutagenic agent – even though that might only occur in a small minority of cases – is on the order of 11 years or more, as in the case of breast cancer following exposure to ionizing radiation.

175.    In contrast to these expectations, which are solidly grounded on decades of research regarding the time frame in which human cancers develop, the latencies for the cancers that Plaintiffs allege in this litigation would be far shorter than what fundamental tenets of cancer biology tell us is possible. Specifically, based on Plaintiff's Fact Sheets for those Plaintiffs who provided dates for first use of valsartan and for cancer diagnosis, it is possible to calculate the time elapsed from the date when that Plaintiff began taking valsartan (irrespective of manufacturer), or the date the first valsartan product potentially containing NDMA became available for purchase in the United States – whichever came last – to the date of their cancer diagnosis. For Plaintiffs in this MDL as of July 19, 2021, this information was available for more than 600 Plaintiffs. Among these, the average time from initiation of use of potentially NDMA-containing valsartan to tumor diagnosis was approximately 3 – 4 years. Moreover, for more than a dozen Plaintiffs, valsartan usage began *after* they were diagnosed with cancer.

176.    On its face, for the reasons discussed in this report, the time periods between first exposure to potentially NDMA and/or NDEA-containing valsartan products and diagnosis with cancer for cancers that arose in Plaintiffs are far too short to be plausibly related to the use of NDMA and/or NDEA-containing valsartan products. Rather, it is almost certainly the case that these cancers already existed, but had not yet been clinically detected, prior to the first exposure to NDMA and/or NDEA-containing valsartan products. In short, it is not possible for NDMA- and/or NDEA-containing valsartan products to have caused cancers that were already present. Similarly, based on a wealth of information about the behavior of human primary

cancers, there is every expectation that these subclinical cancers would have come to clinical detection irrespective of valsartan use, with no evidence whatsoever to the contrary.

177.    It is also notable that, of the 682 cancers types provided by Plaintiffs as of July 19, 2021, only 11% are cancers of the liver, 9% are cancers of the kidney, 3% are cancers of the esophagus, and less than 1% are cancers of the lung.  That is, the types of cancer claimed by Plaintiffs to have been caused by ingestion of valsartan containing NDMA and/or NDEA do not show the same pattern that has consistently been reported in animal studies for high-level NDMA and/or NDEA exposures across animal species: namely, a strong preponderance of liver cancer, with some lung and kidney cancers observed for NDMA exposure, and liver and esophageal cancers observed for NDEA exposure[38].  Thus, only 25% of claimed cancers in Plaintiffs to this point in time are types of cancer that are reproducibly caused in animals by NDMA and NDEA, and none of these types of cancer has a demonstrated association with exogenous exposure to these agents in humans.

178.    It is also worth noting that there is no "signature" genetic lesion associated with NDMA or NDEA that would enable a cancer caused by NDMA or NDEA to be reliably identified.  This is particularly the case since endogenously formed nitrosamines, including NDMA, result in identical DNA adducts to exogenously ingested NDMA, as do a variety of other agents.

179.    In summary, for the reasons discussed throughout this report, I conclude that exposure to NDMA and/or NDEA in valsartan, at the doses to which Plaintiffs were potentially exposed, and for the durations to which Plaintiffs were potentially exposed, does not cause cancer in human beings.  Additionally, exposure during the time frames to which Plaintiffs were potentially exposed could not have caused any of the cancers claimed in this litigation.  These opinions are based on scientifically valid reasoning and methodology, as I would practice in my daily profession, as well as my education, training, knowledge, and experience, and the materials that I have reviewed in this matter, and is stated to a reasonable degree of scientific and medical certainty.


**RESPONSES TO PLAINTIFFS' EXPERTS**

**Response to Report of Dr. Dipak Panigrahy[120]**

**Overview**

180.    The central question at this stage of this litigation is whether exposure to NDMA and/ or NDEA *at the doses to which Plaintiffs were potentially exposed via ingestion of valsartan, and within the time frame in which they were potentially exposed*, could have caused the types of cancer in human beings that are claimed in this litigation.

181.    Dr. Panigrahy fails to address the question of whether exposure to NDMA and/or NDEA causes cancer in human beings *at the doses to which Plaintiffs were potentially exposed*. Rather, the evidence that he presents is focused almost exclusively on exposures to NDMA and NDEA in experimental animals that are orders of magnitude greater than any exposure claimed

44


in this litigation.  Similarly, Dr. Panigrahy provides no consistent body of evidence demonstrating that NDMA and/or NDEA exposures at the doses to which Plaintiffs were potentially exposed causes cancer in human beings.

182.    Dr. Panigrahy also fails to reasonably address the question of whether exposure to NDMA and/or NDEA causes cancer *within the time frame in which Plaintiffs were potentially exposed relative to their diagnoses*.  Rather, his claims regarding the exceptionally short period of time from exposure to valsartan potentially containing NDMA and/or NDEA to diagnosis of cancer are contradicted by his own report, and by an overwhelming body of scientific and medical evidence and iron-clad consensus of the scientific community.

183.    Dr. Panigrahy refers to IARC, EPA and NTP as "authoritative" agencies, but does not accept their conclusions about the potential carcinogenicity of NDMA and NDEA in human beings.  Each of these agencies has classified NDMA and NDEA as "possibly carcinogenic" or "reasonably anticipated to be carcinogenic".  None of them have classified either of these agents as a known human carcinogen.  In contrast, in reviewing much of the same literature, Dr. Panigrahy claims that NDMA and NDEA <u>are</u> carcinogenic in human beings and, in doing so, reaches a conclusion that no scientific body or regulatory agency has reached, including those agencies that Dr. Panigrahy considers to be "authoritative".

184.    Dr. Panigrahy claims that NDMA causes liver cancer, bladder cancer, multiple myeloma, non-Hodgkin lymphoma, leukemia, gastric cancer, small intestine cancer, large intestine cancer, colorectal cancer, rectal cancer, pancreas cancer, esophageal cancer prostate cancer, lung cancer and kidney cancer in human beings.  I am not aware of any body of medical or scientific evidence demonstrating that NDMA causes any type of cancer in human beings.  Nor does Dr. Panigrahy present evidence that NDMA causes cancer in human beings at the doses to which Plaintiffs in the litigation could conceivably have been exposed as a consequence of ingesting valsartan products.  Nor has any regulatory agency concluded that NDMA is a known cause of human cancer.

185.    Dr. Panigrahy claims that NDEA causes liver cancer, lung cancer, gastric cancer, blood cancers, esophageal cancer and kidney cancer in animals, but he presents no evidence that NDEA causes cancer in human beings, much less at the doses to which Plaintiffs in the litigation could conceivably have been exposed as a consequence of ingesting valsartan products.  Nevertheless, he concluded that NDEA causes human cancers of the liver, lung, stomach, esophagus, kidney, blood, pancreas, bladder, colon, rectum and prostate.  I am not aware of any body of medical or scientific evidence demonstrating that NDEA causes any type of cancer in human beings.  Nor has any regulatory agency concluded that NDEA is a known cause of human cancer.

**Levels of Exposure**

186.    Dr. Panigrahy does not address the question of whether exposure to NDMA and/or NDEA causes cancer *in human beings at the doses to which Plaintiffs were potentially exposed*.  Rather, the evidence that he presents is focused almost exclusively on exposures to NDMA and NDEA in experimental animals.  Moreover, these exposures in animals are orders of magnitude

greater than those to which Plaintiffs could conceivable have been exposed as a consequence of ingesting NDMA- or NDEA-containing valsartan products. Furthermore, Dr. Panigrahy provides no consistent body of evidence demonstrating that NDMA and/or NDEA exposure at the doses to which Plaintiffs were potentially exposed causes cancer in human beings. Ironically, the concentrations of NDMA in animal studies that Dr. Panigrahy repeatedly refers to as "low" or "very low" are actually extremely high – orders of magnitude higher than those at issue in this litigation.

187.    Indeed, many of the biological effects that Dr. Panigrahy claims for NDMA and NDEA, such as inflammation, immunosuppression, are effects that occur at far higher exposures to NDMA and NDEA than Plaintiffs could have been exposed to, and Dr. Panigrahy provides no evidence that these effects occur in animals exposed to the same range of doses alleged to have occurred in Plaintiffs. This is true for virtually all of the effects discussed, including inflammation, immunosuppression, and carcinogenesis itself. Several of the studies reporting these effects, which Dr. Panigrahy relies upon, were conducted at extremely high, toxic doses of NDMA and/or NDEA that are thousands of times higher than the doses at which these agents induce tumors in experimental animals, and millions of times higher than exposures to NDMA or NDEA to which Plaintiffs could conceivably have been exposed (see below). Such studies do not reliably inform a scientific conclusion about the effects of these agents on the processes in question.

188.    Inexplicably, Dr. Panigrahy excludes consideration of the only two epidemiological studies of cancer incidence in patients who ingested valsartan products that potentially contained NDMA and NDEA for the relatively short period of time in which valsartan products potentially containing NDMA and/or NDEA were on the market. That is, he excludes from consideration the two studies of participants who essentially match the Plaintiffs in this litigation. Instead, defying logic, as a basis for his opinions on human carcinogenicity Dr. Panigrahy relies heavily and disproportionately on the Hidajat et al. study of occupational exposure in rubber factory workers,[125] who were exposed to far higher levels of NDMA than Plaintiffs in this litigation, whose route of exposure was different than Plaintiffs in this litigation (inhalation rather than ingestion), who were exposed for far longer periods of time than Plaintiffs in this litigation, and who were simultaneously exposed to multiple agents (rubber dust, rubber fumes, other nitrosamines) to which Plaintiffs in this litigation were not exposed, and which this study claims cause essentially the same set of cancers as high level NDMA exposure. Indeed, it is highly unlikely that the effects of exposure to NDMA in these workers could be isolated from those due to exposure to the other agents reported by these authors to cause a similar set of cancers, much less to accurately measure these exposures. In this regard, I agree with Plaintiffs' expert Dr. Madigan that Hidajat et al. "considered each contaminant (rubber dust, rubber fumes, nitrosamine sum score, NDMA, and NMor) separately so the specific cause of the increased cancer mortality cannot be pinpointed."[126] Moreover, basic, essential factors in this study regarding exposures are unknown, as are smoking history or history of other potentially significant confounding risk factors such as alcohol use, as would be required to draw reliable conclusions.

**Latency**

189.    Dr. Panigrahy's claim that NDMA and NDEA can cause cancer in human beings within a few years, or even months, of exposure is directly contradicted by – and fails to consider – an overwhelming and long-standing body of medical and scientific evidence and consensus of the scientific community that human cancers take decades to develop.

190.    Plaintiffs in this litigation allege that their cancers were caused by low dose exposure to NDMA and/or NDEA for short periods of time as a consequence of ingesting valsartan products containing these compounds.  Remarkably, though Dr. Panigrahy claims that NDMA and NDEA can cause cancer within a few months, he nevertheless discounts and largely excludes consideration of the only two epidemiological studies of cancer incidence in patients who took valsartan potentially containing NDMA and/or NDEA for relatively short periods of time because the period of follow-up (3 years[123] to 4.6 years[124]) was insufficient.  Dr. Panigrahy's contention is internally inconsistent – if NDMA and NDEA can cause cancer in extremely short periods of time (*i.e.*, months to a few years) as Dr. Panigrahy claims, then these two studies do in fact address the central question in this litigation in the very population of patients at issue.  If, on the other hand, Dr. Panigrahy claims that 3 – 4.6 years of follow-up, as was reported in these two studies, is too short relative to the natural history of human cancer to be able to identify a significant increase in cancer incidence in patients taking valsartan potentially containing NDMA/NDEA, then this opinion contradicts his own claim – and a central claim of this litigation – that short term exposure to low levels of NDMA and/or NDEA in valsartan products can cause cancer within months or years.

191.    Conversely, in order to support his claim that short term exposure of Plaintiffs to extremely low doses of NDMA and/or NDEA by an oral route of administration caused cancers to develop within months to a few years of exposure, Dr. Panigrahy relies almost exclusively on a single occupational study of rubber factory workers who were exposed to extremely high doses of NDMA for many years by a respiratory route.[125]  Dr. Panigrahy supports this choice as being driven by the fact that follow-up in this study was 49 years, such that the cancers that occurred in workers could be accurately assessed.  In contrast to Dr. Panigrahy's claim in this litigation that NDMA and/or NDEA exposures due to ingestion of valsartan products can cause cancer within months to a few years (time spans that were encompassed by the two valsartan epidemiological studies that Dr. Panigrahy rejected as uninformative due to their "short" follow-up), his choice to rely upon Hidajat et al. suggests the reality of his view – namely his tacit agreement with the overwhelming medical and scientific consensus that human cancers take decades to develop after exposure to a 'cause'.  For these reasons, and others, Dr. Panigrahy's claims expressed in his report are internally contradictory, lack logic, and undercut – if not invalidate – his stated opinions in this litigation.

192.    Dr. Panigrahy states that "Recent exposure to potent carcinogens…is more likely to be a significant factor in causation that historical exposures".  In fact, the opposite would be expected to be true based on our understanding of the mechanisms of action of mutagens and the long latencies for human cancer.  For example, for a hypothetical woman exposed to high doses of medical x-rays as an adolescent, and then again as a 50-year old, who is then

diagnosed with breast cancer at age 52, it is undeniably the case that the x-ray exposure that occurred during adolescence would be considered a more "significant" causal factor than the exposure that occurred at age 50, two years prior to diagnosis, in part because this latency is far too short to be plausibly related. I am therefore at a loss to understand the basis for Dr. Panigrahy's counter-intuitive statement, and I find no evidence provided in his report to support this claim, which is contradicted by fundamental tenets of cancer biology.

**Tumor Dormancy**

193.    Dr. Panigrahy's claim that dormant occult tumors are likely to be common and that NDMA activates dormant tumor cells is a postulated mechanism employed to circumvent what is firmly established regarding the long latencies for human cancers, so as to conclude instead that exposure to NDMA can result in the development of human cancers with much shorter latencies (*i.e.*, well under 10 years) that are biologically implausible. In fact, the cancers claimed by Plaintiffs to have been caused by valsartan products containing NDMA and/or NDEA are known to have typically long latencies of several decades or more.

194.    The term "dormancy" typically refers to the latency with which tumors recur, not the latency for primary tumor formation. That is, dormancy is thought to occur in residual tumor cells that escape the primary tumor prior to its detection, survive therapy for the primary tumor, and persist in their host for long periods of time prior to emerging as clinically detectable recurrent tumors. Consequently, it is surprising that, throughout his report, Dr. Panigrahy refers to "tumor dormancy escape" as being somehow similar, analogous, or relevant to "cancer induction" by a genotoxic carcinogen. This contention is misleading and incorrect. The concept of tumor dormancy typically refers to microscopic cancer cells that disseminated from a primary cancer to distant sites prior to diagnosis, survived therapy and then exist in a dormant or latent state, but retain the potential to resume growth and give rise to recurrent metastatic cancers, sometimes after many years. Thus, the concept of tumor dormancy refers to properties of disseminated (*i.e.*, metastatic) cancer cells and the kinetics with which they give rise to recurrent metastatic cancers. Accordingly, the existence of dormant disseminated cancer cells and their propensity to give rise to metastatic recurrent cancers does not speak to how long it takes for primary cancers to develop following exposure to a carcinogenic agent.

195.    There is no body of evidence that I am aware of that dormancy occurs in primary cancers. Rather, "dormancy" almost invariably refers to "dormancy" in metastatic disseminated tumor cells following the removal and treatment of the primary tumor from which they disseminated.

196.    Dr. Panigrahy's speculation about whether exposure to NDMA could cause "dormant" cancers to resume growth would only be relevant in the case of a previously treated cancer patient who subsequently ingested NDMA and then experienced tumor recurrence – which would typically occur at a metastatic site. I am not aware of any Plaintiff in this litigation whose claim is that ingestion of NDMA and/or NDEA-containing valsartan products caused a metastatic recurrence of a previously diagnosed and definitively treated cancer. Moreover, I am not aware of any body of clinical or experimental evidence demonstrating that ingestion of

low doses of NDMA or NDEA cause the reactivation of dormant tumor cells and/or acceleration of tumor recurrence at metastatic sites.

197.    Dr. Panigrahy's claim that the identification of "pre-cancerous" lesions or subclinical cancers in tissues from autopsy patients who died of non-cancer related causes provides evidence that these lesions were dormant is surprisingly simplistic and quite clearly incorrect. The existence of "pre-cancerous" lesions or subclinical cancers in tissues from autopsy patients does not imply, or even provide evidence, that these lesions were "dormant". Rather, the identification of pre-cancerous of subclinical cancers in autopsy patients is the simple and inevitable consequence of the decades-long natural history of cancer development in human beings, whereby identifying such lesions in people who die from unrelated causes would be entirely expected. In fact, since dormancy refers to a state of reversible quiescence in disseminated (*i.e.*, metastatic) tumor cells following treatment of a primary tumor, establishing its existence requires demonstration that cells are actually capable of reactivating growth – conditions that cannot be met in autopsy specimens. Rather, Dr. Panigrahy has conflated the actual fact of tumor latency (*i.e.*, tumors take decades to develop in human beings) with his imagined form of primary tumor dormancy in which a subclinical primary tumor exists in a zero net-growth phase that would never have come to clinical detection unless 'reawakened'. There is no body of medical or scientific evidence that I am aware of that such dormant primary cancers exist.

**Risk calculations**

198.    Regulatory limits for acceptable daily intake (ADI) are intended to be extremely conservative. For example, the ADI for NDMA of 96 ng/d was estimated by the FDA to correspond to an incremental risk no higher than 1 additional case of cancer in 100,000 people exposed for 70 years. However, this does not imply that an exposure higher than the ADI will cause harm. Indeed, the FDA has noted that "consuming up to 0.096 micrograms of NDMA of 0.0265 micrograms of NDEA per day is considered reasonably safe for human ingestion based on lifetime exposure."[115] Thus, Dr. Panigrahy's claim that "human cumulative exposure to greater than 96 nanograms per day of NDMA or greater than 26.5 nanograms per day of NDEA increases one's risk of developing cancer" is unsupported by any direct evidence. Indeed, average daily dietary exposures to preformed NDMA are multiples of the FDA ADI, endogenous NDMA production is estimated to be 3 to 4 orders of magnitude higher than the FDA ADI, and the FDA ADI is approximately 25,000-times lower than the lowest dose of NDMA shown to cause cancer in rats.

199.    Contrary to Dr. Panigrahy's interpretation, Peto 1991 did not demonstrate that the dose-response to NDMA remains linear at doses substantially below 1 ppm. Indeed, animals dosed with levels of NDMA at 0.033, 0.066, 0.132 and 0.264 ppm did not have an elevated incidence of cancer compared with controls. Rather, Peto assumes that a linear relationship between exposure and cancer incidence observed at high doses is maintained at levels of exposure that are too low to measure any increase at all in cancer incidence relative to background cancer levels in control animals.

200.    As articulated elsewhere in this report, linear low-dose extrapolation essentially assumes that one molecule of an agent will cause one mutation. However, if there is DNA repair (which there is), then this assumption is false, such that the rate of mutation will be less than linear at lower doses. Indeed, this is precisely the case for NDMA and NDEA. As discussed in detail above, endogenous enzymes exist that repair the alkylating DNA lesions (e.g., $0^6$-methylguanine). Accordingly, at low levels of exposure, DNA adducts may be effectively repaired thereby preventing mutation, and it may not be until the levels of exposure (and, therefore, of adducts) becomes so high as to overwhelm the endogenous system for repairing such lesions, leaving some unrepaired to result in mutation. Even then, such cells may potentially undergo apoptosis. Indeed, the very time courses of DNA adduct levels following exposure discussed by Dr. Panigrahy point to this – after reaching a peak a few hours after exposure, DNA adduct levels subsequently decline, due both to DNA repair and cell death for heavily adduct-affected cells.

**"Key" Characteristics of Carcinogens**

201.    Dr. Panigrahy argues that NDMA and NDEA can be conclusively demonstrated to be human carcinogens based upon how many "key" characteristics these agents share with known carcinogens. This is an oddly indirect argument that circumvents a basic truth. An agent can definitively be considered a human carcinogen if, and only if, it causes cancer in human beings. Similarly, an agent can only be considered an animal carcinogen if, and only if, it can be demonstrated to cause cancers in multiple species of animals. That is the definition of a carcinogen. If an agent cannot be shown to cause cancer, then it cannot be conclusively determined to be a carcinogen. Accordingly, the number of "key characteristics" that NDMA and NDEA may share with known carcinogens cannot provide evidence that NDMA and NDEA are human carcinogens. Moreover, identification of an agent as an animal carcinogen does not mean that it is a meaningful human carcinogen. For example, multiple carcinogens reported to cause tumors in rats and/or mice have not been implicated as likely causes of human cancer[127].

202.    The notion advanced by Dr. Panigrahy that the potency of a carcinogen is proportional to the number of "key characteristics" that Dr. Panigrahy estimates that it has (i.e., an agent that possesses 9 key characteristics is a more potent carcinogen than an agent that possesses 4 key characteristics) is without logic or method. The potency of a carcinogen is a quantitative measure determined by how many molecules of that substance are required to cause cancer in a particular experimental system – not by analogy with Dr. Panigrahy's "key characteristics".

203.    It is also worth noting that most, if not all, of the "key" characteristics of carcinogens that Dr. Panigrahy cites are characteristics that are also possessed by numerous endogenous molecules. That is, being alive is carcinogenic.

**Inflammation**

204.    Dr. Panigrahy claims that NDMA stimulates chronic inflammation, and that this is a mechanism by which it causes cancer. I am not aware of any body of scientific or medical evidence that NDMA or NDEA causes inflammation at doses comparable to those to which Plaintiffs in this litigation could conceivably have been exposed as a consequence of ingesting

valsartan products. Rather, Dr. Panigrahy relies on studies in experimental animals that used far higher doses of NDMA and/or NDEA than those sufficient to cause tumors in those animals, and far higher still than the amounts of NDMA or NDEA to which Plaintiffs in the litigation could conceivably have been exposed.[128] This fact argues against Dr. Panigrahy's suggestion that the carcinogenic effects of NDMA and/or NDEA in animals are mediated by (hypothesized) effects of these agents on inflammation, since these effects predominantly occur at doses far higher than those causing tumors in animals.

205.    Demonstrating that cancers caused by NDMA in experimental animals contain inflammatory cells does not provide evidence that NDMA-induced inflammation causes cancer.

206.    Inflammation is a medical term that describes the body's response to injury, and is characterized by an influx of white blood cells from the immune system, changes in the vasculature, redness, heat, pain, swelling and alterations in a variety of cytokines and signaling pathways. Inflammation is ordinarily a protective response that is both beneficial to the organism and essential for life, since it is typically aimed at resolving cellular injury, repairing damaged tissues, and restoring normal tissue function.

207.    The immune cells involved in inflammation may include cells of the innate immune system, such as macrophages, neutrophils and eosinophils, as well as cells of the adaptive immune system, such as T and B lymphocytes. As the many cell types and cell-cell interactions involved in the innate and adaptive immune response to inflammation are extraordinarily complex and context-dependent, the term "inflammation" encompasses a broad array of host responses to different types of injuries in different sites in the body that, in turn, may be initiated by a broad array of stimuli. As such, the effects of "inflammation" on any process in question must be studied in the specific context in which it occurs in order to evaluate the various, potentially conflicting effects that it may have.

208.    The cells of the immune system constitute an important defense mechanism against the development and growth of human cancers. For example, activation of inflammatory cells by cytokines and cell-cell interactions constitutes an important element of the immune response to abnormal cells and cancer cells, in a process referred to as "immunosurveillance". At the same time, chronic inflammation has been implicated in a number of human cancers. Thus, inflammation is known to have both pro- and anti-tumorigenic effects. Accordingly, the observation that immune cells are present within a tumor does not provide information on the functional consequences of those immune cells on the existing tumor (if any), nor any reliable indication of whether immune cells played any role in the development of that tumor, positive or negative. Indeed, a number of recent studies have revealed that the presence of immune cells within some human cancers is a positive prognostic sign associated with better patient outcome, and their presence has been interpreted as possibly reflecting an immune response against the tumor.

209.    For the above reasons, "inflammation" can play both positive and negative roles in human disease. More specifically, the immune system plays both pro-tumorigenic and anti-tumorigenic roles. These interactions are complex and change over time. They are not monolithic.

210.    Further highlighting the complex nature of the relationship between inflammation and cancer, chronic systemic inflammatory states are not consistently associated with increased risks of carcinomas. For example, rheumatoid arthritis (RA) is associated with increased systemic levels of pro-inflammatory cytokines such as Tumor Necrosis Factor (TNF), Interleukin 1 (IL-1) and Interleukin 6 (IL-6). Despite this systemic, chronic inflammatory state, RA is associated with a decreased risk of colorectal cancer and breast cancer, and an increased risk of lung cancer. In an analogous manner, Systemic Lupus Erythematosus (SLE) is a chronic inflammatory disease mediated by elevations in pro-inflammatory cytokines, such as TNF, IL-1 and interferons. SLE is associated with a decreased risk of breast, ovarian and endometrial cancer. In contrast, risks of hematologic malignancies, such as leukemias and lymphomas, may be elevated in chronic inflammatory states, such as RA and SLE. As such, the association of chronic inflammation and cancer may be positive, negative, or non-existent and is dependent on cancer type.

211.    There is clear evidence that inflammation is caused by cancers. That is, the same mutations within tumor cells that cause cancer also induce changes in the tumor's microenvironment, and these changes may include inflammation.

212.    In contrast, while inflammation and the immune system may influence the behavior of human cancers, cancer is fundamentally a genetic disease that is generated and driven by the particular mutations in oncogenes and tumor suppressor genes present within each tumor. I am not aware of any compelling body of scientific evidence that inflammation causes mutations, or is sufficient to cause cancer, in human beings. And even if we were to assume that inflammation did cause cancer, there are many types of inflammation, including obesity, chronic inflammatory conditions, acute inflammatory conditions, responses to physical injury, etc. whose effects could not logically be separated from the inflammation postulated to occur as a consequence of NDMA exposure.

213.    Irrespective of generalizations regarding the potential positive or negative effects of inflammation on the development of different types of cancer, it is essential to note that inflammation has not been demonstrated to cause cancer in humans. In this regard, while it is possible that inflammation and the immune system may play positive or negative roles at different stages of tumor development and progression, it is impossible to know what impact these factors may have had, if any, at any specific stage in a particular patient's cancer. Moreover, while inflammation and the immune system may influence the behavior of human cancers, cancer is fundamentally a genetic disease that is generated and driven by the particular mutations in oncogenes and tumor suppressor genes present within each tumor. As such, while it may be difficult, if not impossible, to ascertain what role, if any, inflammation or the immune system may have had on a particular patient's cancer, it clearly is possible to conclude that the mutations present in critical genes within each cell of that cancer are principally responsible for its development and behavior.

214.    Nevertheless, to the extent that inflammation may play a role in the development or progression of some human cancers, there are numerous sources of inflammation in humans that impinge on all tissue types at risk for cancer development.

215.    As an example of the multiple potential endogenous sources of inflammation in humans, it is now widely appreciated that obesity is associated with a chronic inflammatory state.  In this regard, it is also clearly established that obesity is a risk factor for many types of human cancer.  The mechanisms underlying the association between obesity and cancer risk have yet to be fully elucidated, but several hypotheses have been proposed.  These include hyperinsulinemia and increased bioavailability of insulin-like growth factors, changes in adipokines such as leptin, adiponectin and hepatocyte growth factor (HGF), increased bioavailable estradiol levels, and increased levels of inflammatory cytokines such as IL-6 and TNF-alpha.  The levels of several of the above hormones, growth factors and cytokines have been associated with alterations in cancer risk.  Further, there are undoubtedly many other biological differences between obese and non-obese individuals that are relevant to cancer etiology and risk that have yet to be elucidated.  As such, to the extent that chronic inflammation may play a role in the pathogenesis of human cancers, obesity could not be discounted as a cause of that inflammation.

216.    One mechanism by which some Plaintiffs' experts have suggested that inflammation might contribute to carcinogenesis is through reactive oxygen species (ROS) generation by inflammatory cells, which might theoretically contribute to the generation of mutations in non-tumorigenic cells.  Importantly, this mechanism is largely, if not entirely, hypothetical as ROS generated by inflammatory cells would have to cross the extracellular space, gain entrance into the cell of origin for cancers, cross the cytoplasm and gain entrance into the nucleus in order to be able to engender DNA damage.  Since ROS are generally believed to be very short-lived molecular species, this is highly unlikely to be a substantial source of mutations compared to the abundant ROS that are produced within each cell by mitochondria.  As such, to the extent that ROS may contribute to DNA damage and the generation of mutations within human cells, the offending ROS are most likely generated within those cells by mitochondrial processes.  Regardless, there is no reliable scientific method by which the relative contributions of ROS produced by mitochondria and ROS produced by inflammatory cells could be ascertained.

**Immunosuppression**

217.    Dr. Panigrahy claims that NDMA causes immunosuppression and that this "key characteristic" contributes to its ability to cause cancer.  I am not aware of any body of scientific or medical evidence that NDMA or NDEA causes immunosuppression at doses comparable to those to which Plaintiffs in this litigation could conceivably have been exposed as a consequence of ingesting valsartan practices.  Rather, as in the case of his claims regarding inflammation, Dr. Panigrahy relies on studies in experimental animals that used far higher doses of NDMA and/or NDEA than those sufficient to cause tumors in those animals, and far higher still than the amounts of NDMA or NDEA to which Plaintiffs in the litigation could conceivably have been exposed.[129,130]  For example, in support of his contention that chronic exposure to NDMA induces "a marked and persistent immunosuppression of cellular and humoral responses in mice", Dr. Panigrahy cites Desjardins et al. (1992).[130]  In fact, Desjardins et al. state: "No visible changes in immunological parameters were noted at the 1 ppm NDMA dose."[130], which is a dose that is more than sufficient to induce tumors.  Rather, Desjardins et al. only reported immunological suppression in mice at 10-20 ppm NDMA in drinking water,

which the authors note also resulted in the development of ascites, hepatotoxicity, and dose-related mortality as early as 45 days after initiating treatment. These facts, and others, contradict Dr. Panigrahy's suggestion that the carcinogenic effects of NDMA and/or NDEA in animals are mediated by the (hypothesized) ability of these agents to induce immunosuppression, since these effects predominantly occur at toxic doses far higher than those causing tumors in animals.

218.    Additional observations corroborate the conclusion that Dr. Panigrahy is, inappropriately, relying upon effects of NDMA and/or NDEA that principally occur at toxic doses of these agents that are far higher than those that cause cancer in animals, and many orders of magnitude higher than levels of NDMA and/or NDEA to which Plaintiffs in this litigation could conceivably have been exposed. For example, from a clinical perspective immunosuppression is typically associated with an increased incidence of cancer only in situations in which immunosuppression is pronounced, if not profound (*e.g.*, pharmacologic immunosuppression post-organ transplantation, advance HIV-AIDS, etc.). Moreover, profound immunosuppression in patients is only associated with certain types of cancers, and these are generally not the common epithelial cancers that Plaintiffs claim were caused by ingestion of NDMA-containing valsartan products. In addition, immunosuppressed patients frequently have clinical symptoms, such as opportunistic infections. I am aware of no body of scientific or medical evidence that patients taking valsartan products containing NDMA or NDEA experienced any biologically meaningful level of immunosuppression.

**Oxidative Stress**

219.    Dr. Panigrahy claims that NDEA induces oxidative stress, and that this "key characteristic" contributes to the ability of NDEA to cause cancer. As with his claims regarding effects of NDMA and/or NDEA on inflammation and immunosuppression, his claims regarding oxidative stress inappropriately rely upon effects of NDMA and/or NDEA that principally occur at toxic doses of these agents that are far higher than those that cause cancer in animals, and many orders of magnitude higher than levels of NDMA and/or NDEA to which Plaintiffs in this litigation could conceivably have been exposed.[131-133] For example, Dr. Panigrahy cites Ajiboye et al.[131] and Bansal et al.[132] as evidence supporting his opinion that NDEA causes oxidative stress. In fact, these studies administered NDEA at doses of either 100 mg/kg or 200 mg/kg to rats. Similarly, Dr. Panigrahy relies upon Bansai et al. to inform his opinion that NDEA creates oxidative stress. This study administered NDEA at a dose of 200 mg/kg to rats. These doses are 10,000 – 20,000-times higher than the lowest NDEA daily dose shown to induce liver tumors in rats, and are 10 – 20 *million* times higher than the highest conceivable dose of NDEA to which Plaintiffs in this litigation could conceivably have been exposed. That Dr. Panigrahy's opinions rely upon studies that use what are quite clearly highly toxic doses of NDEA, millions of times higher than the exposures at issue in this litigation, is scientifically unfounded and inappropriate.

**Epigenetics**

220.    Dr. Panigrahy claims that NDMA induces epigenetic alterations, which he equates (inappropriately) with DNA methylation, and that this "key characteristic" contributes to the

ability of NDMA to cause cancer. The fact that NDMA can methylate DNA bases to generate $O^6$-methylguanine, $N^7$-methylguanine, and $N^3$-methyladenine does not qualify as epigenetic regulation. Rather, epigenetic regulation via DNA methylation typically involves methylation to generate 5-methylcytosine residues, most commonly at CpG dinucleotides. To my knowledge, neither NDMA nor NDEA generate 5-methylcytosine. Thus, these agents do not qualify as epigenetic regulators via an ability to methylate DNA. Furthermore, it bears noting that epigenetic regulation is a normal physiological process. Many epigenetic changes that are believed to play a causal role in cancer are actually mutations in epigenetic regulators. In this way, epigenetic regulators are no different than other oncogenes or tumor suppressor genes in which mutations accumulate in a step-wise manner to result in the development of a cancer cell.

**Promotion**

221.    Dr. Panigrahy claims that exposure to NDMA and/or NDEA at levels present in valsartan products can "critically promote cancer growth". If by "promote cancer growth", Dr. Panigrahy means that NDMA and/or NDEA can cause existing cancers to grow/proliferate more rapidly, I am not aware of any body of medical or scientific evidence that exposure to NDMA or NDEA at levels to which Plaintiffs in this litigation could conceivably have been exposed as a consequence of ingesting valsartan products accelerates the growth of existing cancers. Nor do I find evidence to support this claim provided in Dr. Panigrahy's report.

222.    Contrary to Dr. Panigrahy's claim that "continued exposure to NDMA and/or NDEA can cause an existing cancer to grow, metastasize and otherwise interfere with cancer therapy", I am not aware of any body of medical or scientific evidence that exposure of an existing cancer to NDMA and/or NDEA at levels to which Plaintiffs in this litigation could conceivably have been exposed as a consequence of ingesting valsartan products alters the growth rate, metastatic behavior, or response to therapy of existing cancers. Nor do I find evidence to support this claim provided in Dr. Panigrahy's report.

**Microenvironment**

223.    Dr. Panigrahy claims that NDMA and NDEA stimulate tumor progression by acting on the tumor microenvironment. Developing tumors cause changes in their microenvironment that are driven by the same mutant oncogenes and tumor suppressor genes that drive the formation of the cancer. That is, the developing cancer cells cause changes in their microenvironment that are driven by mutations within cancer cells. While the microenvironment can affect existing cancers, affecting a cancer that already exists is not the same as saying that the microenvironment causes the cancer to form. The presumptive carcinogenic mechanism of action of NDMA and NDEA in animals is genotoxicity-induced mutation. These mutations occur in the cells that go on to become tumor cells – not in the stromal cells that compose the microenvironment.

**Bradford Hill Analysis**

153.    First, it must be noted that the evaluation of Bradford Hill criteria cannot be equated with a causal assessment for cancer.  This follows from the fact that Bradford Hill criteria principally rely upon epidemiology.  While observational epidemiology studies permit inferences regarding causation, they cannot probe cause-and-effect directly.  More importantly, this is not 1965 when Sir Austin Bradford Hill outlined his criteria for the inference of causation from epidemiological studies.[134]  Our molecular understanding of what causes cancer has dramatically advanced over the past 55 years.

224.    These points notwithstanding, Dr. Panigrahy's evaluation of Bradford Hill criteria is fundamentally flawed.

225.    Strength: Dr. Hill's criterion of strength of association refers to the strength of association observed in epidemiological studies.  Remarkably, Dr. Panigrahy chooses to ignore the only two epidemiological studies[123,124] that precisely correspond to the question at hand – namely, the risk of cancer in patients who took NDMA and/or NDEA-containing valsartan products.  If Dr. Panigrahy had included these studies in his evaluation, he would have been forced to conclude that the criterion of "strength" is not met, since neither of these studies identified any significant overall association with cancer.  Moreover, the sole finding of a slight increase in liver cancer incidence in one of the studies[123] had an adjusted hazard ratio of only 1.16, which is undeniably weak by any reasonable epidemiological standard.  Moreover, no cases of liver cancer in exposed individuals were identified in the second study.[124]  Instead of evaluating these studies, Dr. Panigrahy instead chooses to focus on a cohort study of rubber industry workers[125] with occupational levels of exposure to a mixture of agents via inhalation, which would appear to be only tangentially related to question at hand.  However, even the subdistribution hazard ratios for this occupationally exposed group of workers were only on the order of 2.0, and many of these were not replicated in other cohort studies of rubber industry workers.  In contrast, the examples of risk factors that Dr. Hill provided to illustrate 'strength' were on the order of 200-times (mortality from scrotal cancer in chimney sweeps), 20-30-times (mortality from lung cancer in heavy cigarette smokers), and 14-times (cholera in those drinking polluted water).  Moreover, Dr. Hill contrasted these "strong" epidemiological effects with the much weaker death rate from coronary thrombosis in smokers ("no more than twice, possibly less, the death rate in non-smokers").  In discussing coronary thrombosis in smokers, he stated: "Though there is good evidence to support causation, it is surely much easier in this case to think of some features of life that may go hand-in-hand with smoking – features that might conceivably be the real underlying cause or, at the least, an important contributor."  Thus, I conclude, based on Dr. Hill's own characterization of strength of association, that NDMA and NDEA fail to meet this criterion.

226.    Consistency: Dr. Hill's criterion of consistency refers to the consistency of association observed across epidemiological studies.  Dr. Panigrahy first correctly notes that there is a "lack of RCTs and incidental human exposure studies that quantify the exposure to NDMA".  However, rather than conclude (as would have been appropriate) that the criterion of consistency is not met, Dr. Panigrahy chooses to evaluate the consistency of the association



between NDMA exposure and cancer in experimental *animal* studies. This criterion refers to epidemiological studies, which Dr. Panigrahy admits are lacking, not animal studies. Thus, I conclude that NDMA and NDEA fail to meet this criterion.

227.    Specificity: This criterion refers to whether the association of an agent with cancer is limited to specific workers and/or to particular sites and type of disease. This clearly is not the case for NDMA or NDEA, neither of which has been convincingly demonstrated to be associated with any type of cancer in humans. Moreover, even Dr. Panigrahy admits that he "gave this factor little weight in my causal analysis". Thus, I conclude the NDMA and NDEA fail to meet this criterion.

228.    Temporality: Dr. Panigrahy concludes that, since the exposure of patients to NDMA and/or NDEA-containing valsartan occurred prior to cancer development, then this criterion is met. In contrast to his evaluation, since no human cancer has been reliably demonstrated to be associated with NDMA and/or NDEA exposure, temporality cannot possibly be met. Moreover, even in the case of patients consuming NDMA and/or NDEA-containing valsartan products, the time elapsed from first exposure to cancer diagnosis, as claimed by Plaintiffs, is far too short to have satisfied this criterion.

229.    Biological gradient: This criterion refers to the presence of a dose-response in epidemiological studies. Dr. Panigrahy concludes that animal studies, and the Hidajat occupational cohort study of rubber industry workers, show a dose-response. Of course, Dr. Hill's criterion refers to epidemiology studies, not animal studies. Moreover, as above, since no human cancer has been reliably demonstrated to be associated with NDMA and/or NDEA exposure, the dose-response criterion cannot be met. Indeed, even the one isolated, albeit weak, finding of an association between ingestion of valsartan containing NDMA and liver cancer was noted to <u>not</u> have a dose-response.[123] Thus, I conclude that this criterion is not met.

230.    Plausibility: As Dr. Hill notes, "what is biologically plausible depends upon the biological knowledge of the day." In this regard, Dr. Panigrahy's theory that short-term exposure to NDMA and/or NDEA containing valsartan products can cause the development of cancers in human beings within a period of months, or a few years, violates basic, well-established, universally accepted facts regarding cancer biology and the natural history of human cancer. It is worth noting that in evaluating biological plausibility, existing scientific and medical knowledge are used to evaluate the likelihood that a new hypothesis is true, particularly as it relates to evaluating whether a cause-and-effect relationship exists between a biological factor of interest and a particular disease. Consequently, for a proposed causal relationship to be biologically plausible, not only must a hypothesized mechanistic link between two factors be deemed to be conceivably true, there must also be coherent evidence that the proposed mechanism is true, as well as an absence of a significant body of evidence suggesting that it is not true. Consequently, although the mechanism of action of NDMA and NDEA as alkylating agents is a plausible mechanism, if exposed at a sufficiently high dose, the notion that NDMA and/or NDEA cause cancer at doses that are orders of magnitude lower than the lowest dose observed to cause cancer in experimental animals is decidedly implausible. Moreover, as

discussed in this report, beyond the lack of evidence that NDMA and/or NDEA are human carcinogens, even more so at the extremely low doses to which Plaintiffs could conceivably have been exposed as a consequence of ingesting valsartan products, the claim that NDMA and/or NDEA cause the development of cancers in human beings within months or a few years is clearly biologically implausible. Thus, based on the weight of evidence, I conclude that this criterion is not met.

231.    Coherence: Dr. Hill explains that this criterion is predicated on the axiom that "the cause-and-effect interpretation of our data should not seriously conflict with the generally known facts of the natural history and biology of the disease." The ability of NDMA and NDEA to cause cancer in experimental animals when administered at sufficiently high doses can be taken as some evidence of coherence. However, other evidence cited above, particularly with respect to temporality, dose and biological plausibility, argue against coherence.

232.    Experiment: This criterion asks whether a preventive action taken has a protective effect. I agree with Dr. Panigrahy that there is no such evidence that would satisfy this criterion for NDMA or NDEA.

233.    Bradford Hill's summary of his criteria is that "none of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*. What they can do, with greater or less strength, is to help us to make up our minds on the fundamental question – is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?" In fact, in my opinion, the answer to this summary question for NDMA and NDEA is 'yes'. Namely, that there are other more straightforward ways of explaining the set of facts. And these are that the cancers in question that were diagnosed in Plaintiffs were already present at the time of exposure to NDMA and/or NDEA-containing valsartan products and that these cancers are simply common human cancers that arise as a consequence of aging and other factors unrelated to exogenous NDMA and/or NDEA exposures. Moreover, the doses and durations of NDMA and/or NDEA to which Plaintiffs could conceivably have been exposed are far too low and for far too short a duration to have plausibly caused cancer. Additionally, the time frame within which these cancers were diagnosed relative to any exposures related to NDMA and/or NDEA-containing valsartan is far too short to be plausibly related to these exposures.

**Response to Report of Dr. Stephen Lagana[135]**

234.    I strongly disagree with Dr. Lagana's claim, unsupported by any citation to evidence, that "it is probable that individuals who are predisposed to cancer for any reason (genetic or environmental) have an even greater likelihood of developing cancer following and in part as a result of ingestion of NDMA or NDEA at the levels established for the contaminated valsartan." I am not aware of any body of evidence whatsoever that would support Dr. Lagana's contention that individuals who are predisposed to cancer for any reason have a greater likelihood of developing cancer as a result of exposure to NDMA or NDEA at the levels to which Plaintiffs in this litigation could conceivably have been exposed.

235.    In responding to his specific claim that NDMA and NDEA-induced carcinogenesis in human beings is amplified in individuals who are predisposed to cancer, we must start with the observation that NDMA and NDEA have not been demonstrated to be human carcinogens, nor are they considered so by any regulatory agency that I am aware of, nor has oral exposure to these agents been reproducibly associated with any type of human cancer, much less at the extremely low levels to which Plaintiffs in this litigation could conceivably have been exposed. Consequently, if there is a lack of clear evidence that NDMA and NDEA are human carcinogens, how can there be evidence of a synergistic interaction between their hypothesized carcinogenic effects in humans with genetic susceptibility?  Indeed, there is not.  In fact, there is evidence to the contrary to Dr. Lagana's unsupported, proposition that inherited susceptibility to cancer amplifies the effects of hypothesized carcinogenic agents.  As a general matter, inherited mutations in tumor suppressor genes that are associated with a major increase in risk of a particular type of cancer do not necessarily modify the effect (termed an "interaction") of environmental or behavioral risk factors that are observed in the general population for that same type of cancer.  For example, although inherited mutations in *BRCA1* are associated with a major increase in the risk of developing breast cancer, and although long-term use of hormone replacement therapy has been reported by some to be associated with an increase in the risk of being diagnosed with breast cancer, available evidence suggests that women with inherited mutations in *BRCA1* who are treated with hormone replacement therapy are not at an increased risk of developing breast cancer compared to *BRCA1* mutation carriers who are not treated with hormone replacement therapy.[136]  Further, Dr. Lagana's claim that this imagined amplifying effect of NDMA and NDEA exposure extends to people who have increased susceptibility to cancer "for any reason" is particularly surprising and so broad as to border on the bizarre.  There are numerous inherited cancer susceptibility syndromes.  To my knowledge, there is not a single one of these for which any body of evidence exists demonstrating that people with that inherited susceptibility have an increased risk of developing cancer in response to NDMA and/or NDEA exposure.  Nor does Dr. Lagana provide any such evidence. For these reasons, Dr. Lagana's claim that people with any inherited susceptibility to cancer are more susceptible to carcinogenic effects of NDMA and/or NDEA is scientifically unfounded.

236.    I disagree with Dr. Lagana's contention that cancer risk in human beings associated with mutagenic effects of NDMA and NDEA "is likely greater in organs in which the cells replicate frequently (e.g. gastrointestinal tract)."  Indeed, there is substantial evidence to the contrary. As discussed in this report, current scientific thinking does not support the notion that the more rapid the rate of proliferation in a tissue, the greater the likelihood of that tissue developing cancer.  For example, cell proliferation rates in bone marrow are amongst the highest in the human body, but cancers of bone marrow cells are quite rare compared to cancers of tissues with far lower proliferation rates, such as the lung and breast.  While it is true that DNA damage cannot be 'fixed' (*i.e.*, become permanent) as a mutation until DNA replication has occurred, this in no way implies that the faster the rate of proliferation in a tissue, the more susceptible it is to mutagens.  Indeed, as noted elsewhere in this report, the same factors that stimulate cells to proliferate also turn on the expression of DNA damage sensing and repair proteins, as well as a host of other proteins that regulate cell cycle progression in the context of DNA damage (thereby giving cells with DNA damage more time to repair it).  Thus, there is no compelling

body of evidence to support Dr. Lagana's hypothesis that increased rates of proliferation necessarily decreases the overall efficiency of DNA repair. Similarly, Dr. Lagana's claim that the effects of mutagens are greatest in rapidly proliferating tissues is also scientifically unfounded. Indeed, one need only look as far as the present case. If Dr. Lagana's hypothesis was true, we would expect the effects of NDMA and NDEA in experimental animals to be greatest in those tissues with the highest rates of proliferation. This is obviously not the case. The liver is clearly the most sensitive site for tumorigenesis in experimental animal models treated with NDMA or NDEA. Yet the liver is most certainly not a tissue with a high proliferation rate and has far lower proliferation rates than other tissues that do not reproducibly give rise to cancers in NDMA- or NDEA-treated experimental animals. Given the fact that liver cells are considered to be long-lived, quiescent cells with extremely low rates of proliferation,[137] Dr. Lagana's proposition is, on its face, untenable. Moreover, a variety of other evidence exists indicating that proliferation is not intrinsically linked to cancer risk, even in the presence of mutations. One example of this is the observation that pregnancy – which is associated with an enormous increase in cellular proliferation in the breast – nevertheless protects against breast cancer even in women who have been exposed to a mutagenic agent, such as was the case with women exposed to ionizing radiation during the atomic bomb blasts at Hiroshima and Nagasaki. For these and other reasons, Dr. Lagana's claim is contradicted by a wealth of scientific and medical literature.

237.   I disagree with, and am puzzled by, Dr. Lagana's statement that: "the crucial point is that we start from the assumption that exposure to a human carcinogen contributed to carcinogenesis in a patient with a cancer unless there is convincing evidence to the contrary." Proving that NDMA and/or NDEA exposure associated with ingestion of valsartan products contributed to carcinogenesis in a human being, cannot logically begin with an assumption that it did. That is, in my opinion, as circular as an argument can be. Moreover, Dr. Lagana's added caveat (*i.e.,* "unless convincing evidence to the contrary is available") quite literally indicates his opinion that his assumption is true unless definitively proven otherwise. This approach flies in the face of the scientific method. It simply does not comport with the scientific method to assume that an exposure caused cancer in a patient, unless proven otherwise. Rather, the scientific method dictates that the focus of inquiry must be on whether there is, or is not, proof that the agent is carcinogenic in human beings. Irrespective of this basic tenet, Dr. Lagana's reasoning is illogical. As discussed elsewhere in this report, we are all exposed to many known human carcinogens every day, including ionizing radiation, asbestos and a variety of chemicals present at low levels in our water, food, and the air we breathe. By Dr. Lagana's reasoning ("we start from the assumption that exposure to a human carcinogen contributed to carcinogenesis in a patient with a cancer"), we should consider most, if not all, of these carcinogens to have contributed to any individual cancer. Indeed, Dr. Lagana would have us extend this to agents that have not even been demonstrated to be known human carcinogens. In my opinion, this is a logically untenable proposition that is unsupported by any reliable medical or scientific method.

238.   I disagree with Dr. Lagana's statement that: "in medicine, a 46% increased risk is a strong association, thus fulfilling the first of Bradford Hill's criteria (strength of association)." 46% (*i.e.,* RR 1.46) is not a "strong" association. As a comparison, tobacco smoking is associated with a 2,000%-10,000% increase in lung cancer risk, as Dr. Lagana himself notes. By

comparison, 46% increase in risk is weak; indeed, a RR of 1.46 would mean that, for any patient diagnosed with a cancer, the odds would be only 1 in 3 that the cancer was related to such a risk factor – even if we were to assume that a risk factor is a cause, which it is not. As discussed elsewhere in this report, the examples of risk factors that Dr. Hill provided to illustrate 'strength' were on the order of 200-times (mortality from scrotal cancer in chimney sweeps), 20-30-times (mortality from lung cancer in heavy cigarette smokers), and 14-times (cholera in those drinking polluted water). Moreover, Dr. Hill contrasted these "strong" epidemiological effects with the much weaker death rate from coronary thrombosis in smokers, which he characterized as "no more than twice". Thus, Dr. Hill himself directly refutes Dr. Lagana's contention that a relative risk of only 1.46 is "strong" and fulfills the Bradford Hill criterion for strength of association.

239.    I strongly disagree with Dr. Lagana's statement: "it is worth noting that once a carcinogen has entered the bloodstream, it is likely that it can cause cancers in nearly any organ. It would be difficult for one to scientifically exclude the potential for a bloodborne carcinogen to cause cancer in any organ to a reasonable degree of medical certainty." There is no scientific or medical basis for this statement that I can discern, and it is flatly contradicted by 50 years of observations. The tissue-specificity for effects of carcinogens, and of genetic alterations, is well known, whereby each known chemical carcinogen is preferentially associated with an increase in cancer risk in one or more tissues. As a case in point, the carcinogenic effects of NDMA and NDEA in experimental animal models are largely confined to the liver, with some evidence for increases in cancer in lung, kidney and esophagus. These agents clearly enter the bloodstream, and therefore contradict Dr. Lagana's claim that these agents somehow cause cancer in all tissues. Indeed, the tissue-specificity of carcinogenic effects of NDMA in experimental animals has been recognized for decades. But one example of this can be found in the 1989 ATSDR review of NDMA:

> "The carcinogenic properties of NDMA, and nitrosamines in general, have been extensively studied. It is of considerable interest that, despite its ubiquitous distribution, NDMA induces tumors in a limited number of organs and tissues...."[16]

240.    There are numerous other examples – beyond NDMA and NDEA – of the fallacy of Dr. Lagana's simplistic claim that access to an organ or tissue by a carcinogen (i.e., by entering the bloodstream) is tantamount to the ability of that carcinogen to cause cancer in that tissue. Cigarette smoking is associated with entry into the bloodstream of multiple carcinogens. Yet even cigarette smoking is accepted as a cause of only a relatively small set of cancer types. As another example, a variety of chemotherapeutic agents are mutagenic and are given intravenously to cancer patients. In some cases, these agents are associated with an increase in the subsequent risk of a "secondary" cancer in one or a few tissues, but I am not aware of any chemotherapeutic agent that is believed to cause cancers in every tissue in human beings when administered intravenously. Indeed, I do not know of any carcinogen that could reasonably be considered to be "universal" (i.e., causes cancer in all tissues). The tissue specificity of carcinogens is mirrored by the tissue specific effects of genetic mutations. For example, inherited mutations in critical tumor suppressor genes, like TP53, RB, BRCA1 and BRCA2, give rise to increased risks of cancer that are restricted to only a few specific tissues. For example,

people who inherit mutations in the RB tumor suppressor are at a markedly increased risk of developing retinoblastoma, pinealoma, osteosarcoma and melanoma, but not other cancer types. That is, despite the fact that these tumor suppressors are expressed in, and play a critical regulatory role in, virtually every cell type in the body, their mutation in every cell in the body results in very limited sets of cancers that are restricted to certain tissues. While the molecular basis for this tissue specificity is often not known, what is clear is that there is no such thing as a chemical agent, or even a gene mutation, that causes cancer in all tissues, as Dr. Lagana contends.

## Summary of Conclusions

- Human cancers are a heterogeneous collection of distinct, multifactorial diseases with many etiologies and numerous associated risk factors.

- Cancers arise from an accumulation of mutations in the DNA sequence of multiple critical regulatory genes within the same cell. It is typically not possible to determine the cause of a person's cancer, beyond the mutations contained within it, and it is impossible to rule out endogenous processes as the cause of those mutations.

- Before a normal cell can become "cancerous", it must accumulate a set of mutations in critical regulatory genes that is sufficient to overcome its normal physiological regulation and drive uncontrolled cell proliferation and cell survival, induce the formation of new blood vessels, and confer the abilities to proliferate indefinitely and to invade tissue and metastasize to distant sites in the body. This is generally understood to require mutations in at least six different critical genes.

- Mutations most commonly occur in the absence of any environmental exposure to a carcinogen, because our DNA is constantly being damaged as a consequence of the normal functioning of our cells. Critically, however, DNA damage does not necessarily result in mutations, because mutations do not occur until a cell replicates its damaged DNA. Fortunately, our cells have DNA repair mechanisms that can remove DNA damage and restore its DNA sequence to an error-free state before the cell replicates its DNA. In particular, DNA repair enzymes exist in our cells that are able repair the precise type of DNA damage caused by NDMA and NDEA. In addition, our cells have still other safeguard mechanisms that can delay or halt a damaged cell's progression through the cell cycle to allow time for DNA repair to occur prior to DNA replication, or that can initiate a self-destruct mechanism to eliminate an irretrievably DNA-damaged cell from the body. Together, these physiological mechanisms prevent mutations from occurring following DNA damage.

- Because of the DNA repair and cell safeguard mechanisms discussed herein, there is often a threshold of low-level DNA damage below which mutations do not occur, because that level

of DNA damage can be repaired.  In particular, it is almost certainly the case that a threshold exists below which NDMA and/or NDEA exposure do not result in mutations.

- The process of acquiring sufficient mutations for a normal cell to transform into a cancerous cell is generally understood to take decades, which is why cancer is overwhelmingly a disease of older persons.  Further, there is no reliable scientific method for determining precisely when a first cancer cell arose in an individual patient.

- NDMA and NDEA are N-nitroso (nitrosamine) compounds, which are found in food, tobacco, air, drinking water, soil, and as a byproduct of industrial process.  Accordingly, they are ubiquitous in our environment.  Even more importantly, our bodies produce large quantities of nitrosamines every day, including NDMA.  Endogenously formed nitrosamines are increasingly understood to be a major — if not the major — source of human nitrosamine exposure.  Endogenous daily NDMA exposure is estimated to be approximately 1,875-times higher than the highest estimate of exogenous daily exposure to NDMA in food, water and air, and nearly 11,000-times higher than the FDA ADI of 0.096 ug/d.

- Although NDMA and NDEA are known carcinogens in laboratory animals, they are not known carcinogens in humans.  No cancers in humans have been conclusively demonstrated to result from exposure to NDMA or NDEA and there is no reliable scientific basis to conclude that either NDMA or NDEA is a human carcinogen.

- Linear low-dose extrapolation models from animal studies, such as those employed by FDA in setting its ADI levels for NDMA/NDEA, are not supported by direct evidence for human carcinogenicity, and ignore background exposures, endogenous exposures, error-free DNA repair mechanisms, and other rate-limiting events.

- The maximum theoretical total amount of NDMA to which any Plaintiff might conceivably have been exposed through valsartan is approximately 1,000-times lower than the amounts of NDMA produced endogenously.  Moreover, the maximum theoretical total amounts of NDMA and NDEA to which any Plaintiff might conceivably have been exposed through valsartan are approximately 2,000- and 9,000-times lower, respectively, than the lowest doses shown to cause cancer in animal studies.

- As such, it is my conclusion, to a reasonable degree of medical and scientific certainty, that exposure to NDMA and/or NDEA in valsartan, at the doses to which Plaintiffs were potentially exposed, and for the durations to which Plaintiffs were potentially exposed, would not cause cancer in human beings.

- The only existing epidemiological data to examine human exposure to valsartan containing the NDMA/NDEA impurity support this conclusion.  Gomm et al. and Pottegard et al. showed no increase in the risk of bladder cancer, breast cancer, colorectal cancer, kidney cancer, lung cancer, melanoma, prostate cancer, or uterine cancer.  Gomm found a statistically significant association between exposure to valsartan containing the impurity and liver cancer, but no dose-dependent effect was observed, the study did not control for

other risk factors for liver cancer, and it did not correct for multiple testing (*i.e.*, testing for an association for multiple types of cancer, one type at a time), which most likely would have rendered the result statistically insignificant. Most importantly, the authors themselves concluded from their study that: "Causality cannot be inferred."

- The known latency periods associated with the cancers claimed by Plaintiffs in this litigation are also too long for Plaintiffs to have developed the claimed cancers within 3-4 years of exposure to NDMA or NDEA, as they necessarily claim.

- The expert reports offered by Drs. Panigrahy and Lagana put forth numerous claims that are unsupported by citation to reliable evidence, are flatly contradicted by available scientific and medical evidence and by our current understanding of the biology of cancer development, and are logically and scientifically flawed.

These are my opinions concerning this matter, and I have a sufficient factual basis and good grounds for my conclusions. They are given to a reasonable degree of scientific and medical certainty, and are based on my training and experience and review of the materials included on Exhibit B. I reserve the right to modify this report as additional information is provided to me, including but not limited to additional medical records and the depositions of Plaintiff's experts which are ongoing.

I may use at trial any exhibits as a summary or in support of all of my opinions including: (1) any of the materials, or excerpts identified in this report and attachments, including the materials considered list; (2) excerpts from scientific articles or learned treatises; (3) demonstrative models; (4) exhibits used by Plaintiffs' experts, or other witnesses; (5) any exhibit used in or identified at any deposition taken in this litigation. If further data becomes available, I will review it and consider whether to modify any portion of these opinions.

**References Cited**

1. Hanahan D, Weinberg RA. The hallmarks of cancer. *Cell.* 2000;100(1):57-70.

2. Hanahan D, Weinberg RA. Hallmarks of cancer: the next generation. *Cell.* 2011;144(5):646-674.

3. Weinberg RA. *The Biology of Cancer.* 2nd ed: Garland Science; 2014.

4. Nadler DL, Zurbenko IG. Estimating Cancer Latency Times Using a Weibull Model. *Advances in Epidemiology.* 2014;2014:1-8.

5. Friberg S, Mattson S. On the growth rates of human malignant tumors: implications for medical decision making. *Journal of Surgical oncology.* 1997;65(4):284-297.

6. Sender R, Fuchs S, Milo R. Revised Estimates for the Number of Human and Bacteria Cells in the Body. *PLoS Biol.* 2016;14(8):e1002533.

7. Kandoth C, McLellan MD, Vandin F, et al. Mutational landscape and significance across 12 major cancer types. *Nature.* 2013;502(7471):333-339.

8. FDA. Valsartan package insert. https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/021283s033lbl.pdf. Published 2021. Accessed 8/1/2021.

9. Boice JD, Jr. Radiation and breast carcinogenesis. *Med Pediatr Oncol.* 2001;36(5):508-513.

10. Land CE. Studies of cancer and radiation dose among atomic bomb survivors. The example of breast cancer. *JAMA.* 1995;274(5):402-407.

11. Land CE, Tokunaga M, Koyama K, et al. Incidence of female breast cancer among atomic bomb survivors, Hiroshima and Nagasaki, 1950-1990. *Radiat Res.* 2003;160(6):707-717.

12. Tokunaga M, Land CE, Tokuoka S, Nishimori I, Soda M, Akiba S. Incidence of female breast cancer among atomic bomb survivors, 1950-1985. *Radiat Res.* 1994;138(2):209-223.

13. Tokunaga M, Land CE, Yamamoto T, et al. Incidence of female breast cancer among atomic bomb survivors, Hiroshima and Nagasaki, 1950-1980. *Radiat Res.* 1987;112(2):243-272.

14. Lindahl T. Instability and decay of the primary structure of DNA. *Nature.* 1993;362(6422):709-715.

15. Preston DL, Mattsson A, Holmberg E, Shore R, Hildreth NG, Boice JD, Jr. Radiation effects on breast cancer risk: a pooled analysis of eight cohorts. *Radiat Res.* 2002;158(2):220-235.

16. ATSDR AfTSaDR. Toxicological profile for N-nitrosodimethylamine. 1989.

17. Liteplo RG, Meek ME. Concise International Chemical Assessment Document 38: N-nitrosodimethylamine. World Health Organization; 2002.

18. EPA. Technical Fact Sheet N-Nitroso-dimethylamine (NDMA). 2014 (EPA 505-F -14-005).

19. Canada H. Guidelines for Canadian Drinking Water Quality: Guideline Technical Document N-Nitrosodimethylamine (NDMA). Minister of Health; 2011.

20. Mitch WA, Sedlak DL. Formation of N-nitrosodimethylamine (NDMA) from dimethylamine during chlorination. *Environ Sci Technol.* 2002;36(4):588-595.

21. Amin S, Desai D, Hecht SS, Hoffmann D. Synthesis of tobacco-specific N-nitrosamines and their metabolites and results of related bioassays. *Crit Rev Toxicol.* 1996;26(2):139-147.

22. Hecht SS. Lung carcinogenesis by tobacco smoke. *Int J Cancer.* 2012;131(12):2724-2732.

23. Pool-Zobel BL, Klein RG, Liegibel UM, Kuchenmeister F, Weber S, Schmezer P. Systemic genotoxic effects of tobacco-related nitrosamines following oral and inhalational administration to Sprague-Dawley rats. *Clin Investig.* 1992;70(3-4):299-306.

24. Kataoka H, Kurisu M, Shindoh S. Determination of volatile N-nitrosamines in combustion smoke samples. *Bull Environ Contam Toxicol.* 1997;59(4):570-576.

25. Mahanama KRRD, Joan M. Volatile N -Nitrosamines in Environmental Tobacco Smoke: Sampling, Analysis, Emission Factors, and Indoor Air Exposures. *Environmental Science & Technology.* 1996;30:1477-1484.

26. Adams JD, O'Mara-Adams KJ, Hoffmann D. Toxic and carcinogenic agents in undiluted mainstream smoke and sidestream smoke of different types of cigarettes. *Carcinogenesis.* 1987;8(5):729-731.

27. Massey R, Dennis MJ, Pointer M, Key PE. An investigation of the levels of N-nitrosodimethylamine, apparent total N-nitroso compounds and nitrate in beer. *Food Addit Contam.* 1990;7(5):605-615.

28. Park JE, Seo JE, Lee JY, Kwon H. Distribution of Seven N-Nitrosamines in Food. *Toxicol Res.* 2015;31(3):279-288.

29. Prentice RL. Dietary Assessment and Opportunities to Enhance Nutritional Epidemiology Evidence. *Ann Intern Med.* 2020;172(5):354-355.

30. Hrudey SE, Bull RJ, Cotruvo JA, Paoli G, Wilson M. Drinking water as a proportion of total human exposure to volatile N-nitrosamines. *Risk Anal.* 2013;33(12):2179-2208.

31. Tricker AR, Pfundstein B, Theobald E, Preussmann R, Spiegelhalder B. Mean daily intake of volatile N-nitrosamines from foods and beverages in West Germany in 1989-1990. *Food Chem Toxicol.* 1991;29(11):729-732.

32. Biaudet H, Mavelle T, Debry G. Mean daily intake of N-nitrosodimethylamine from foods and beverages in France in 1987-1992. *Food Chem Toxicol.* 1994;32(5):417-421.

33. Dich J, Jarvinen R, Knekt P, Penttila PL. Dietary intakes of nitrate, nitrite and NDMA in the Finnish Mobile Clinic Health Examination Survey. *Food Addit Contam.* 1996;13(5):541-552.

34. Jaksyzn P, Ibanez R, Pera G, et al. Food Content of Potential Carcinogens. *Barcelona: Catalan Institute of Oncology,*. 2004.

35. Schafer AI, Mitch W, Walewijk S, Munoz A, Teuten E, Reinhard M. Micropollutants in WaterRecycling: A Case Study of N-Nitrosodimethylamine(NDMA) Exposure from Water versus Food. In: *Sustainability Science and Engineering.* Vol 2.2010.

36. Fristachi A, Rice G. Estimation of the total daily oral intake of NDMA attributable to drinking water. *Journal of Water and Health.* 2007;5(3):341-355.

37. Sen NP, Baddoo PA. Trends in the levels of residual nitrite in Canadian cured meat products over the past 25 years. *Journal of Agricultural and Food chemistry,*. 1997;45:4714-4718.

38. Adamson RH, Chabner BA. The Finding of N-Nitrosodimethylamine in Common Medicines. *Oncologist.* 2020;25(6):460-462.

39. Tricker AR. N-nitroso compounds and man: sources of exposure, endogenous formation and occurrence in body fluids. *Eur J Cancer Prev.* 1997;6(3):226-268.

40. Tricker AR, Mostafa MH, Spiegelhalder B, Preussmann R. Urinary excretion of nitrate, nitrite and N-nitroso compounds in Schistosomiasis and bilharzia bladder cancer patients. *Carcinogenesis.* 1989;10(3):547-552.

41. Jaksyzn P, Bingham S, Pera G, et al. Endogenous versus exogenous exposure to N-nitroso compounds and gastric cancer risk in the European Prospective Investigation into Cancer and Nutrition (EPIC-EURGAST) study. *Carcinogenesis.* 2006;27(7):1497-1501.

42. Vermeer IT, Pachen DM, Dallinga JW, Kleinjans JC, van Maanen JM. Volatile N-nitrosamine formation after intake of nitrate at the ADI level in combination with an amine-rich diet. *Environ Health Perspect.* 1998;106(8):459-463.

43. Holtrop G, Johnstone AM, Fyfe C, Gratz SW. Diet composition is associated with endogenous formation of N-nitroso compounds in obese men. *J Nutr.* 2012;142(9):1652-1658.

44. Hord NG, Tang Y, Bryan NS. Food sources of nitrates and nitrites: the physiologic context for potential health benefits. *Am J Clin Nutr.* 2009;90(1):1-10.

45. van Maanen JM, Pachen DM, Dallinga JW, Kleinjans JC. Formation of nitrosamines during consumption of nitrate- and amine-rich foods, and the influence of the use of mouthwashes. *Cancer Detect Prev.* 1998;22(3):204-212.

46. Hughes R, Cross AJ, Pollock JR, Bingham S. Dose-dependent effect of dietary meat on endogenous colonic N-nitrosation. *Carcinogenesis.* 2001;22(1):199-202.

47. Bingham SA, Hughes R, Cross AJ. Effect of white versus red meat on endogenous N-nitrosation in the human colon and further evidence of a dose response. *J Nutr.* 2002;132(11 Suppl):3522S-3525S.

48. Jakszyn P, Gonzalez CA, Lujan-Barroso L, et al. Red meat, dietary nitrosamines, and heme iron and risk of bladder cancer in the European Prospective Investigation into Cancer and Nutrition (EPIC). *Cancer Epidemiol Biomarkers Prev.* 2011;20(3):555-559.

49. Lewin MH, Bailey N, Bandaletova T, et al. Red meat enhances the colonic formation of the DNA adduct O6-carboxymethyl guanine: implications for colorectal cancer risk. *Cancer Res.* 2006;66(3):1859-1865.

50. Cross AJ, Pollock JR, Bingham SA. Haem, not protein or inorganic iron, is responsible for endogenous intestinal N-nitrosation arising from red meat. *Cancer Res.* 2003;63(10):2358-2360.

51. Florian J, Matta MK, DePalma R, et al. Effect of Oral Ranitidine on Urinary Excretion of N-Nitrosodimethylamine (NDMA): A Randomized Clinical Trial. *JAMA.* 2021;326(3):240-249.

52. Mirvish SS. Formation of N-nitroso compounds: chemistry, kinetics, and in vivo occurrence. *Toxicol Appl Pharmacol.* 1975;31(3):325-351.

53. Mirvish SS. Role of N-nitroso compounds (NOC) and N-nitrosation in etiology of gastric, esophageal, nasopharyngeal and bladder cancer and contribution to cancer of known exposures to NOC. *Cancer Lett.* 1995;93(1):17-48.

54. Siddiqi M, Tricker AR, Preussmann R. Formation of N-nitroso compounds under simulated gastric conditions from Kashmir foodstuffs. *Cancer Lett.* 1988;39(3):259-265.

55. Zeilmaker MJ, Bakker MI, Schothorst R, Slob W. Risk assessment of N-nitrosodimethylamine formed endogenously after fish-with-vegetable meals. *Toxicol Sci.* 2010;116(1):323-335.

56. Bryan NS, Rassaf T, Maloney RE, et al. Cellular targets and mechanisms of nitros(yl)ation: an insight into their nature and kinetics in vivo. *Proc Natl Acad Sci U S A.* 2004;101(12):4308-4313.

57. Ohshima H, Bandaletova TY, Brouet I, et al. Increased nitrosamine and nitrate biosynthesis mediated by nitric oxide synthase induced in hamsters infected with liver fluke (Opisthorchis viverrini). *Carcinogenesis.* 1994;15(2):271-275.

58. Suksawat M, Techasen A, Namwat N, et al. Upregulation of endothelial nitric oxide synthase (eNOS) and its upstream regulators in Opisthorchis viverrini associated cholangiocarcinoma and its clinical significance. *Parasitol Int.* 2017;66(4):486-493.

59. Kyrtopoulos SA. DNA adducts in humans after exposure to methylating agents. *Mutat Res.* 1998;405(2):135-143.

60. Swenberg JA, Lu K, Moeller BC, et al. Endogenous versus exogenous DNA adducts: their role in carcinogenesis, epidemiology, and risk assessment. *Toxicol Sci.* 2011;120 Suppl 1:S130-145.

61. Georgiadis P, Samoli E, Kaila S, Katsouyanni K, Kyrtopoulos SA. Ubiquitous presence of O6-methylguanine in human peripheral and cord blood DNA. *Cancer Epidemiol Biomarkers Prev.* 2000;9(3):299-305.

62. Tannenbaum SR. A model for estimation of human exposure to endogenous N-nitrosodimethylamine. *Oncology.* 1980;37(4):232-235.

63. Spiegelhalder B, Eisenbrand G, Preussmann R. Urinary excretion of N-nitrosamines in rats and humans. *IARC Sci Publ.* 1982(41):443-449.

64. ATSDR. Tox/FAQ n-nitrosodimethylamine CAS #62-75-9. In:1999.

65. Pegg AE. Metabolism of N-nitrosodimethylamine. *IARC Sci Publ.* 1980(27):3-22.

66. Anderson LM, Souliotis VL, Chhabra SK, Moskal TJ, Harbaugh SD, Kyrtopoulos SA. N-nitrosodimethylamine-derived O(6)-methylguanine in DNA of monkey gastrointestinal and urogenital organs and enhancement by ethanol. *Int J Cancer.* 1996;66(1):130-134.

67. Aiub CA, Gadermaier G, Silva IO, et al. N-nitrosodiethylamine genotoxicity evaluation: a cytochrome P450 induction study in rat hepatocytes. *Genet Mol Res.* 2011;10(4):2340-2348.

68. Aiub CA, Pinto LF, Felzenszwalb I. N-Nitrosodiethylamine mutagenicity at low concentrations. *Toxicol Lett.* 2003;145(1):36-45.

69. Kang JS, Wanibuchi H, Morimura K, Gonzalez FJ, Fukushima S. Role of CYP2E1 in diethylnitrosamine-induced hepatocarcinogenesis in vivo. *Cancer Res.* 2007;67(23):11141-11146.

70. Arimoto-Kobayashi S, Kaji K, Sweetman GM, Hayatsu H. Mutation and formation of methyl- and hydroxylguanine adducts in DNA caused by N-nitrosodimethylamine and N-nitrosodiethylamine with UVA irradiation. *Carcinogenesis.* 1997;18(12):2429-2433.

71. Fahrer J, Frisch J, Nagel G, et al. DNA repair by MGMT, but not AAG, causes a threshold in alkylation-induced colorectal carcinogenesis. *Carcinogenesis.* 2015;36(10):1235-1244.

72. Fahrer J, Kaina B. O6-methylguanine-DNA methyltransferase in the defense against N-nitroso compounds and colorectal cancer. *Carcinogenesis.* 2013;34(11):2435-2442.

73. Povey AC, Badawi AF, Cooper DP, et al. DNA alkylation and repair in the large bowel: animal and human studies. *J Nutr.* 2002;132(11 Suppl):3518S-3521S.

74. Souliotis VL, van Delft JH, Steenwinkel MJ, Baan RA, Kyrtopoulos SA. DNA adducts, mutant frequencies and mutation spectra in lambda lacZ transgenic mice treated with N-nitrosodimethylamine. *Carcinogenesis.* 1998;19(5):731-739.

75. Povey AC. DNA adducts: endogenous and induced. *Toxicol Pathol.* 2000;28(3):405-414.

76. Souliotis VL, Chhabra S, Anderson LM, Kyrtopoulos SA. Dosimetry of O6-methylguanine in rat DNA after low-dose, chronic exposure to N-nitrosodimethylamine (NDMA). Implications

for the mechanism of NDMA hepatocarcinogenesis. *Carcinogenesis.* 1995;16(10):2381-2387.

77. Pegg AE. Formation and subsequent repair of alkylation lesions in tissues of rodents treated with nitrosamines. *Arch Toxicol Suppl.* 1980;3:55-68.

78. Arai M, Aoki Y, Nakanishi K, Miyata Y, Mori T, Ito N. Long-term experiment of maximal non-carcinogenic dose of dimethylnitrosamine for carcinogenesis in rats. *Gan.* 1979;70(4):549-558.

79. Johnson GE, Dobo K, Gollapudi B, et al. Permitted daily exposure limits for noteworthy N-nitrosamines. *Environ Mol Mutagen.* 2021;62(5):293-305.

80. Gocke E, Muller L. In vivo studies in the mouse to define a threshold for the genotoxicity of EMS and ENU. *Mutat Res.* 2009;678(2):101-107.

81. Guerard M, Baum M, Bitsch A, et al. Assessment of mechanisms driving non-linear dose-response relationships in genotoxicity testing. *Mutat Res Rev Mutat Res.* 2015;763:181-201.

82. Kirsch-Volders M, Aardema M, Elhajouji A. Concepts of threshold in mutagenesis and carcinogenesis. *Mutat Res.* 2000;464(1):3-11.

83. Kobets T, Williams GM. Review of the evidence for thresholds for DNA-Reactive and epigenetic experimental chemical carcinogens. *Chem Biol Interact.* 2019;301:88-111.

84. Nohmi T, Matsumoto K. Effects of DNA polymerase kappa and mismatch repair on dose-responses of chromosome aberrations induced by three oxidative genotoxins in human cells. *Environ Mol Mutagen.* 2020;61(1):193-199.

85. Thomas AD, Jenkins GJ, Kaina B, et al. Influence of DNA repair on nonlinear dose-responses for mutation. *Toxicol Sci.* 2013;132(1):87-95.

86. Verna L, Whysner J, Williams GM. N-nitrosodiethylamine mechanistic data and risk assessment: bioactivation, DNA-adduct formation, mutagenicity, and tumor initiation. *Pharmacol Ther.* 1996;71(1-2):57-81.

87. Waddell WJ. Comparisons of thresholds for carcinogenicity on linear and logarithmic dosage scales. *Hum Exp Toxicol.* 2005;24(6):325-332.

88. Waddell WJ, Fukushima S, Williams GM. Concordance of thresholds for carcinogenicity of N-nitrosodiethylamine. *Arch Toxicol.* 2006;80(6):305-309.

89. White PA, Long AS, Johnson GE. Quantitative Interpretation of Genetic Toxicity Dose-Response Data for Risk Assessment and Regulatory Decision-Making: Current Status and Emerging Priorities. *Environ Mol Mutagen.* 2020;61(1):66-83.

90. Gollapudi BB, Jackson KM, Stott WT. Hepatic lacI and cII mutation in transgenic (lambdaLIZ) rats treated with dimethylnitrosamine. *Mutat Res.* 1998;419(1-3):131-135.



91. Magee PN, Barnes JM. The production of malignant primary hepatic tumours in the rat by feeding dimethylnitrosamine. *Br J Cancer.* 1956;10(1):114-122.

92. Magee PN, Barnes JM. Induction of kidney tumours in the rat with dimethylnitrosamine (N-nitrosodimethylamine). *J Pathol Bacteriol.* 1962;84:19-31.

93. IARC. Evaluation of the carcinogenic risk of chemical to humans: Some *N*-Nitroso compounds, 1978; Vol. 17.

94. Arcos JC, Argus MF, Mathison JB. Hepatic carcinogenesis threshold and biphasic mitochondrial swelling response in the guinea-pig during diethylnitrosamine administration. *Experientia.* 1969;25(3):296-298.

95. Thorgeirsson UP, Dalgard DW, Reeves J, Adamson RH. Tumor incidence in a chemical carcinogenesis study of nonhuman primates. *Regul Toxicol Pharmacol.* 1994;19(2):130-151.

96. Peto R, Gray R, Brantom P, Grasso P. Dose and time relationships for tumor induction in the liver and esophagus of 4080 inbred rats by chronic ingestion of N-nitrosodiethylamine or N-nitrosodimethylamine. *Cancer Res.* 1991;51(23 Pt 2):6452-6469.

97. Peto R, Gray R, Brantom P, Grasso P. Effects on 4080 rats of chronic ingestion of N-nitrosodiethylamine or N-nitrosodimethylamine: a detailed dose-response study. *Cancer Res.* 1991;51(23 Pt 2):6415-6451.

98. EPA. N-Nitrosodimethylamine. 2000.

99. Albanes D. Vitamin supplements and cancer prevention: where do randomized controlled trials stand? *J Natl Cancer Inst.* 2009;101(1):2-4.

100. Bolland MJ, Grey A, Reid IR. Vitamin and mineral supplements in the primary prevention of cardiovascular disease and cancer. *Ann Intern Med.* 2014;160(9):655-656.

101. Chang YJ, Myung SK, Chung ST, et al. Effects of vitamin treatment or supplements with purported antioxidant properties on skin cancer prevention: a meta-analysis of randomized controlled trials. *Dermatology.* 2011;223(1):36-44.

102. Dror Y, Stern F. Vitamin and mineral supplements in the primary prevention of cardiovascular disease and cancer. *Ann Intern Med.* 2014;160(9):654.

103. Fortmann SP, Burda BU, Senger CA, Lin JS, Whitlock EP. Vitamin and mineral supplements in the primary prevention of cardiovascular disease and cancer: An updated systematic evidence review for the U.S. Preventive Services Task Force. *Ann Intern Med.* 2013;159(12):824-834.

104. Hemila H. Vitamin and mineral supplements in the primary prevention of cardiovascular disease and cancer. *Ann Intern Med.* 2014;160(9):655.

105.    Moyer VA, Force USPST. Vitamin, mineral, and multivitamin supplements for the primary prevention of cardiovascular disease and cancer: U.S. Preventive services Task Force recommendation statement. *Ann Intern Med.* 2014;160(8):558-564.

106.    Myung SK, Yang HJ. Efficacy of Vitamin and Antioxidant Supplements in Prevention of Esophageal Cancer: Meta-analysis of Randomized Controlled Trials. *J Cancer Prev.* 2013;18(2):135-143.

107.    Padayatty SJ, Levine M. Vitamin and mineral supplements in the primary prevention of cardiovascular disease and cancer. *Ann Intern Med.* 2014;160(9):654.

108.    EPA EPA. Prioritized chronic dose-response values. https://www.epa.gov/sites/default/files/2014-05/documents/table1.pdf. Published 2018. Accessed 8/1/2021.

109.    NTP. Report on carcinogens, Fourteen edition. 2016; DHHS.

110.    ACGIH. *TLVs and BEIs.* 2019.

111.    IARC. IARC Revised Preamble and Eliminates Group 4 Classification. https://www.iarc.fr/news-events/2019-revisedpreamble-to-the-iarc-monographs/. Published 2019. Accessed.

112.    European Medicines Ageny. Nitrosamine impurities in human medicinal products. Article 5(3) of Regulation EC (No) 726/2004. 2004. https://www.ema.europa.eu/en/human-regulatory/post-authorisation/referral-procedures/article-53-opinions

113.    European Medicines Ageny. Lessons Learnt from Presence of N-nitrosamine Impurities in Sartan Medicines.  Published 2020. Accessed.

114.    Health Canada. Health Canada updates Canadians on estimates of health risks for recalled valsartan drugs containing NDMA. 2018. https://www.canada.ca/en/services/health.html

115.    FDA. Laboratory analysis of valsartan products. https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products. Published 2021. Accessed.

116.    Defense  counsel. FDA laboratory analysiis of valsartan products with date ranges. 2021.

117.    FDA. Control of Nitrosamine Impurities in Human Drugs. 2020; Center for Drug Evaluation Research. https://www.fda.gov/regulatory-information/search-fda-guidance-documents/control-nitrosamine-impurities-human-drugs

118.    Preussmann R. Dose-response studies and 'no-effect-levels' of N-nitroso compounds: some general aspects. *Oncology.* 1980;37(4):243-250.

119.    Siegel JA, Pennington CW, Sacks B, Welsh JS. The Birth of the Illegitimate Linear No-Threshold Model: An Invalid Paradigm for Estimating Risk Following Low-dose Radiation Exposure. *Am J Clin Oncol.* 2018;41(2):173-177.

120.    Panigrahy D. Report of Dr. Dipak Panigrahy. 2021.

121.    Hrudey SE, Krewski D. Is there a safe level of exposure to a carcinogen? *Environ Sci Technol.* 1995;29(8):370A-375A.

122.    IARC. A review of human carcinogens: Arsenic, metals, fibres, and dusts. 2012; Vol. 100 C.

123.    Gomm W, Rothlein C, Schussel K, et al. N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer-A Longitudinal Cohort Study Based on German Health Insurance Data. *Dtsch Arztebl Int.* 2021;118(Forthcoming).

124.    Pottegard A, Kristensen KB, Ernst MT, Johansen NB, Quartarolo P, Hallas J. Use of N-nitrosodimethylamine (NDMA) contaminated valsartan products and risk of cancer: Danish nationwide cohort study. *BMJ.* 2018;362:k3851.

125.    Hidajat M, McElvenny DM, Ritchie P, et al. Lifetime exposure to rubber dusts, fumes and N-nitrosamines and cancer mortality in a cohort of British rubber workers with 49 years follow-up. *Occup Environ Med.* 2019;76(4):250-258.

126.    Madigan D. Report of Dr. David Madigan. 2021.

127.    NTP. National Toxicology Program organ sites with neoplasia. https://cebs.niehs.nih.gov/organsites/search. Published 2021. Accessed.

128.    Ahotupa M, Bussacchini-Griot V, Bereziat JC, Camus AM, Bartsch H. Rapid oxidative stress induced by N-nitrosamines. *Biochem Biophys Res Commun.* 1987;146(3):1047-1054.

129.    Haggerty HG, Holsapple MP. Role of metabolism in dimethylnitrosamine-induced immunosuppression: a review. *Toxicology.* 1990;63(1):1-23.

130.    Desjardins R, Fournier M, Denizeau F, Krzystyniak K. Immunosuppression by chronic exposure to N-nitrosodimethylamine (NDMA) in mice. *J Toxicol Environ Health.* 1992;37(3):351-361.

131.    Ajiboye TO, Abdussalam FA, Adeleye AO, et al. Bridelia ferruginea promotes reactive oxygen species detoxification in N-nitrosodiethylamine-treated rats. *J Diet Suppl.* 2013;10(3):210-228.

132.    Bansal AK, Bansal M, Soni G, Bhatnagar D. Protective role of Vitamin E pre-treatment on N-nitrosodiethylamine induced oxidative stress in rat liver. *Chem Biol Interact.* 2005;156(2-3):101-111.

133.    Kiziltas H, Ekin S, Bayramoglu M, et al. Antioxidant properties of Ferulago angulata and its hepatoprotective effect against N-nitrosodimethylamine-induced oxidative stress in rats. *Pharm Biol.* 2017;55(1):888-897.

134.    Hill AB. The Environment and Disease: Association or Causation? *Proc R Soc Med.* 1965;58:295-300.

135.    Lagana S. Report of Dr. Stephen Lagana. 2021.

136.    Rebbeck TR, Friebel T, Wagner T, et al. Effect of short-term hormone replacement therapy on breast cancer risk reduction after bilateral prophylactic oophorectomy in BRCA1 and BRCA2 mutation carriers: the PROSE Study Group. *J Clin Oncol.* 2005;23(31):7804-7810.

137.    Rose S, Ezan F, Cuvellier M, et al. Generation of proliferating human adult hepatocytes using optimized 3D culture conditions. *Sci Rep.* 2021;11(1):515.

**Date:** September 24, 2021

Lewis A. Chodosh, M.D., Ph.D.

# EXHIBIT 2

**RESEARCH**

BMJ: first published as 10.1136/bmj.k3851 on 12 September 2018. Downloaded from http://www.bmj.com/ on 25 February 2024 by guest. Protected by copyright.



OPEN ACCESS

*FAST TRACK*

# Use of N-nitrosodimethylamine (NDMA) contaminated valsartan products and risk of cancer: Danish nationwide cohort study

Anton Pottegård,[1] Kasper Bruun Kristensen,[1] Martin Thomsen Ernst,[1] Nanna Borup Johansen,[2] Pierre Quartarolo,[3] Jesper Hallas[1]

[1]Clinical Pharmacology and Pharmacy, Department of Public Health, University of Southern Denmark, JB Winsløwsvej 19, 2, 5000 Odense C, Denmark

[2]Medical Evaluation and Biostatistics, Danish Medicines Agency, Copenhagen, Denmark

[3]Pharmacovigilance and Medical Devices, Danish Medicines Agency, Copenhagen, Denmark

Correspondence to: A Pottegård
apottegaard@health.sdu.dk

Additional material is published online only. To view please visit the journal online.

Cite this as: *BMJ* 2018;362:k3851
http://dx.doi.org/10.1136/bmj.k3851

Accepted: 09 September 2018

## ABSTRACT

### OBJECTIVE
To perform an expedited assessment of cancer risk associated with exposure to N-nitrosodimethylamine (NDMA) through contaminated valsartan products.

### DESIGN
Nationwide cohort study.

### SETTING
Danish health registries on individual level prescription drug use, cancer occurrence, and hospital diagnoses.

### PARTICIPANTS
5150 Danish patients with no history of cancer, aged 40 years or older, and using valsartan at 1 January 2012 or initiating use between 1 January 2012 and 30 June 2017. Participants were followed from one year after cohort entry (lag time period) until experiencing a cancer outcome, death, migration, or end of study period (30 June 2018). Each participant's exposure to NDMA (ever exposure and predefined categories of cumulative valsartan exposure) was mapped out as a time varying variable while also applying a one year lag.

### MAIN OUTCOME MEASURES
Association between NDMA exposure and a primary composite endpoint comprising all cancers except non-melanoma skin cancer, estimated using Cox regression. In supplementary analyses, the risk of individual cancers was determined.

### RESULTS
The final cohort comprised 5150 people followed for a median of 4.6 years. In total, 3625 cohort participants contributed 7344 person years classified as unexposed to NDMA, and 3450 participants contributed 11920 person years classified as ever exposed to NDMA. With 104 cancer outcomes among NDMA unexposed participants and 198 among exposed participants, the adjusted hazard ratio for overall cancer was 1.09 (95% confidence interval 0.85 to 1.41), with no evidence of a dose-response relation (P=0.70). For single cancer outcomes, increases in risk were observed for colorectal cancer (hazard ratio 1.46, 95% confidence interval 0.79 to 2.73) and for uterine cancer (1.81, 0.55 to 5.90), although with wide confidence intervals that included the null.

### CONCLUSIONS
The results do not imply a markedly increased short term overall risk of cancer in users of valsartan contaminated with NDMA. However, uncertainty persists about single cancer outcomes, and studies with longer follow-up are needed to assess long term cancer risk.

## Introduction

Valsartan is an angiotensin II receptor antagonist used to treat hypertension and heart failure.[1][2] In July 2018, some valsartan products were discovered to have been contaminated with N-nitrosodimethylamine (NDMA).[3] This contamination, which far exceeded regulatory exposure limits, was specific to drug products manufactured by Zhejiang Huahai Pharmaceuticals, a company in Linhai, China, and seems to be related to a change in the manufacturing process that was implemented in 2012. Consequently, medical agencies across Europe as well as the US Food and Drug Administration have withdrawn all affected valsartan products from the market as of July 2018.[3]

NDMA is the simplest dialkylnitrosamine and is known to be a by-product in various industries—for example, the manufacture of pesticides, rubber tyres, alkylamines, and dyes.[4] NDMA is one of the most well characterised and most potent animal carcinogens known and has been shown to be a potent carcinogen across all species that have been investigated, both as single doses and with long term exposure to lower quantities.[5] Although no in vivo data are available for humans, NDMA seems to be metabolised similarly in human tissue and rodent tissue.[6] The International Agency for Research on Cancer (IARC) has on this basis classified NDMA as "probably carcinogenic to humans" (group 2A), emphasising that NDMA "should be regarded for practical purposes as if it were carcinogenic to humans."[7]

We accessed the nationwide Danish healthcare registries and conducted an expedited observational cohort study of the association between use of potentially NDMA contaminated valsartan products and risk of cancer. Our aim was to quantify the potential consequences of NDMA contaminated drug products entering the market and to provide timely information for regulatory bodies evaluating this potential public health issue.

---

**WHAT IS ALREADY KNOWN ON THIS TOPIC**

Some valsartan products are suspected of having been contaminated with N-nitrosodimethylamine (NDMA), which is classified as carcinogenic to humans

After the discovery, European medical agencies and the US Food and Drug Administration withdrew affected valsartan products from the market

**WHAT THIS STUDY ADDS**

Among Danish valsartan users, exposure to NDMA contaminated valsartan was not associated with a markedly increased risk of overall cancer (adjusted hazard ratio 1.09, 95% confidence interval 0.85 to 1.41)

Future studies are, however, required to evaluate the risks for single cancer outcomes as well as long term effects

---

1

## Methods

We conducted a cohort study comparing cancer outcomes in users of potentially NDMA contaminated valsartan products with users of valsartan products assumed free from this contaminant.

### Data sources and linkage

We obtained data from four Danish nationwide registries: the Danish Cancer Registry,[8 9] the National Prescription Registry,[10] the National Patient Register,[11] and the Civil Registration System.[12] Supplementary appendix A describes the data sources in detail and appendix B provides the codes for cancer diagnoses, drug exposures, and covariates. Data were linked by the personal identification number, a unique identifier assigned to all Danish residents since 1968.[13] Virtually all medical care in Denmark is provided by the national health authorities, allowing population based register linkage studies covering all legal residents of Denmark.

### Study cohort

The study cohort comprised all Danish patients filling a valsartan prescription during the study period of 1 January 2012 to 30 June 2017. Prevalent users of valsartan at the start of the study period—defined as individuals having filled a valsartan prescription in September to the end of December 2011, entered the study cohort at 1 January 2012, whereas incident users entered the study cohort at the day of filling their first valsartan prescription during the study period. As patients contributed risk time from one year after entering the study cohort, we excluded those with less than one year of follow-up, as they did not contribute to any of the analyses reported. For the same reason, we excluded incident users filling their first prescription after 30 June 2017. We further excluded patients with a record of a previous cancer except non-melanoma skin cancer; those with a recent migration before cohort entry (within two years) to ensure enough baseline data on all study participants; and those aged less than 40 years at cohort entry as both use of valsartan and cancer occurrence is rare among children and younger adults. Participants were followed until a cancer outcome, death, migration, or end of the study period (30 June 2018), whichever occurred first.

### Ascertainment of NDMA exposure

Within the study cohort we mapped out each participant's exposure to NDMA contamination using the unique drug ID (Nordic article number) as recorded in the National Prescription Registry to identify the single valsartan product and its manufacturer. From the 128 unique valsartan drug products used during 2012-18 within our study population, we identified 18 drug products (which constituted 18% of all prescriptions filled) that were manufactured using an active pharmaceutical ingredient from Zhejiang Huahai Pharmaceuticals. These drug products were classified as probably contaminated with NDMA. An additional 36 drug products (26% of all prescriptions) were classified as possibly contaminated with NDMA,

as they contained an active pharmaceutical ingredient both from Zhejiang Huahai Pharmaceuticals and from other companies. Seventy four drug products (55% of all prescriptions) were classified as unlikely to be contaminated with NDMA as they did not contain an active pharmaceutical ingredient from Zhejiang Huahai Pharmaceuticals. In the main analysis we pooled together valsartan prescriptions classified as probably and possibly contaminated with NDMA, classifying those filling such prescriptions as ever exposed to NDMA from their first occurrence of such a prescription. We further stratified NDMA exposed person time by cumulative dose from filled prescriptions of potentially NDMA containing valsartan tablets (applying preplanned stratums of <20 000, 20 000-49 999, and ≥50 000 mg). The use of milligrams of valsartan as a scale for the dose-response analysis was based on the observation that the NDMA content for each tablet seems to correlate with the strength of the tablet.[14] With an estimated daily use of 80-160 mg (the defined daily dose of valsartan is 80 mg[15]), these cut-offs corresponded roughly to <200, 200-499, and ≥500 tablets. Of note, individuals classified as exposed to NDMA contributed follow-up to the non-exposed cohort until filling their first prescription for a potentially NDMA contaminated product. This ensured that the estimates were not affected by immortal time bias.[16]

Throughout all assessments of potential exposure to NDMA, we applied a one year lag time—that is, persons contributed NDMA exposed person time from one year after having filled their first prescription for a potentially NDMA containing valsartan product and onwards. This was done as very recent NDMA exposure (<1 year) is considered unlikely to materially affect an individual's risk of receiving a cancer diagnosis.[17] The length of the lag time was subjected to sensitivity analyses.

### Cancer outcomes

We obtained cancer outcomes from the Danish Cancer Registry.[8 9] However, as data in this registry is currently only updated to 2016, we used the Danish National Patient Registry[11] to ascertain outcomes from 1 January 2017 to 30 June 2018. The primary outcome was a composite endpoint comprising all cancers (except non-melanoma skin cancer), as NDMA exposure is suspected to increase the risk of several different cancers. In supplementary analyses, we determined the risk of individual cancers, grouping cancers by organ system (ie, using codes from the international classification of diseases, 10th revision).

### Covariates

The study cohort was described according to several characteristics that were also incorporated as covariates in the analyses: use of drugs (prescription fill <120 days before cohort entry) known or suspected to affect cancer risk, including low dose aspirin, non-aspirin non-steroidal anti-inflammatory drugs, 5-α reductase inhibitors, statins, spironolactone, oral

BMJ: first published as 10.1136/bmj.k3851 on 12 September 2018. Downloaded from http://www.bmj.com/ on 25 February 2024 by guest. Protected by copyright.

doi: 10.1136/bmj.k3851 | *BMJ* 2018;362:k3851 | the**bmj**

steroids, hormone replacement therapy, and selective serotonin reuptake inhibitors[18]; prior diagnoses (within five years from cohort entry) of diabetes, chronic obstructive pulmonary disease, heart failure, and alcohol related disease; Charlson comorbidity index scores (0, low; 1-2, medium; or ≥3, high; based on diagnoses established within the past five years before cohort entry)[19 20]; and whether the participant was a prevalent valsartan user at the beginning of the study period or initiated valsartan during the study period.

### Main analysis
The primary analysis comprised a comparison of cancer occurrence during follow-up exposed to NDMA versus follow-up not exposed to NDMA. We used Cox regression to estimate the hazard ratio with 95% confidence intervals for cancer associated with NDMA exposure, both for ever use and for the predefined categories of cumulative use. The proportional hazards assumption was tested using Schoenfeld residuals. We carried out a formal dose-response test by categorising cumulative exposure to NDMA contaminated valsartan in categories of 10000 mg as a time varying exposure and obtaining the P value for this variable as a continuous predictor of cancer risk in a Cox regression. As all comparisons were performed within users of valsartan, the exposure to NDMA can reasonably be expected to be a random event, and confounding is thus expected to be limited. Analyses were, however, performed as crude comparisons adjusted only for sex and age (age at cohort entry as continuous variable) as well as adjusted for sex, age, and the potential confounding factors. All analyses were performed using STATA Release 15.2.

### Sensitivity and supplementary analyses
We carried out several sensitivity and supplementary analyses. Firstly, we performed analyses stratifying all participants by sex and age (40-69 years and ≥70 years at cohort entry). Secondly, we restricted the cohort to prevalent valsartan users at the start of the study and to incident users during the study period. Thirdly, we restricted the ascertainment of NDMA exposure to prescriptions classified as probably contaminated with NDMA, while censoring individuals filling a prescription for a possibly NDMA contaminated drug product from the reference cohort (although allowing them to later enter the NDMA exposed cohort). Lastly, we varied the one year lag time period applied in the main analysis to six months and two years.

### Patient and public involvement
No patients were involved in setting the research question or the outcome measures, nor were they involved in developing plans for design or implementation of the study. No patients were asked to advise on interpretation or writing of results. There are no plans to disseminate the results of the research directly to the patient community. However, the results will be included in the ongoing review of the potential impact of NDMA contaminated valsartan on patients by the European Medicines Agency.

## Results
In initial descriptive analyses, we identified 7068 unique individuals filling a total of 95 650 valsartan prescriptions from January 2012 to June 2018, the period where NDMA contaminated products were on the Danish market. The overall use of valsartan increased slightly during this period, in particular in 2017 and 2018 (fig 1), and the use of valsartan products possibly or probably contaminated with NDMA constituted about half of the total valsartan use, although this proportion dropped slightly during 2017-18.

For the selection of the study cohort, we identified 6406 individuals filling a valsartan prescription between September 2011 and June 2017. Of these, 5150 unique individuals met our inclusion criteria and entered the final cohort (fig 2), contributing a median of 4.6 years (interquartile range 2.0-5.5 years) of follow-up to the analysis, after the application of a one year lag period. Table 1 includes the baseline characteristics of valsartan users entering the study. A total of 3625 participants contributed 7344 person years of follow-up classified as unexposed to NDMA, and 3450 participants contributed 11 920 person years classified as ever exposed to NDMA (fig 2). The distribution of potentially NDMA contaminated and non-contaminated prescriptions were similar between the study cohort and all valsartan users (see supplementary figure 1).

Overall, exposure to potentially (probably or possibly) NDMA contaminated valsartan products showed no association with cancer compared with exposure to valsartan products unlikely to be contaminated with NDMA (adjusted hazard ratio 1.09, 95% confidence interval 0.85 to 1.41) and no evidence of a dose-response relation (P=0.70, table 2).



Fig 1 | Use of valsartan in kilograms of active substance, specified by drug products classified as probably, possibly, or unlikely to be contaminated with N-nitrosodimethylamine (NDMA). The drop in 2018 results from data only being available to June 2018

BMJ: first published as 10.1136/bmj.k3851 on 12 September 2018. Downloaded from http://www.bmj.com/ on 25 February 2024 by guest. Protected by copyright.

**RESEARCH**



**Fig 2 | Flowchart of cohort selection of Danish users of valsartan, January 2012 to June 2018. NDMA=N-nitrosodimethylamine**

In analyses of single cancer outcomes, increased risks were seen for colorectal cancer (hazard ratio 1.46, 95% confidence interval 0.79 to 2.73) and for uterine cancer (1.81, 0.55 to 5.90), although neither these nor other single cancer outcomes reached statistical significance (fig 3). Analyses of other cancer outcomes were not possible owing to low numbers—that is, no cancer outcomes outside those included in figure 3 showed any associations with NDMA use.

Results comparable to the main analyses were found when we stratified by sex and age, whereas a

stronger association was seen when we restricted to incident users during the study period (hazard ratio 1.58, 95% confidence interval 0.99 to 2.52) compared with prevalent users at the beginning of the study period (0.91, 0.66 to 1.25) (fig 4). A test for interaction between being an incident valsartan user and the effect of exposure to NDMA yielded a p value of 0.059.

The sensitivity analysis censoring individuals filling a prescription for a possibly NDMA contaminated valsartan product from the reference category yielded results comparable to those of the main analyses, both for overall cancer (see supplementary table 1) and for single cancers (see supplementary figure 2).

Varying the lag time from one year used in the main analyses to six months or two years yielded slightly higher risk estimates with increasing lag time, with the hazard ratio for ever exposure increasing to 1.17 (95% confidence interval 0.88 to 1.55) when a two year lag time was applied, although this did not reach statistical significance (see supplementary table 2).

### Discussion
In this nationwide cohort study of Danish valsartan users, we did not see an increased short term overall risk of cancer associated with the use of valsartan products potentially contaminated with N-nitrosodimethylamine (NDMA).

**Table 1 | Baseline characteristics of valsartan users entering study and among those potentially exposed and not exposed to N-nitrosodimethylamine (NDMA)**

| Characteristics | All (n=5150) | NDMA exposure | |
|---|---|---|---|
| | | Exposed* (n=3450) | Not exposed* (n=3625) |
| Sex: | | | |
| Men | 2531 (49.1) | 1630 (46.9) | 1745 (43.6) |
| Women | 2619 (50.9) | 1820 (53.1) | 1880 (56.4) |
| Age (years): | | | |
| Median (interquartile range) | 66 (58-74) | - | - |
| 40-69 | 3195 (62.0) | 2197 (65.0) | 2164 (61.2) |
| ≥70 | 1955 (38.0) | 1253 (35.0) | 1461 (38.8) |
| Prevalent valsartan users†: | | | |
| No | 2870 (55.7) | 2012 (51.2) | 1353 (25.7) |
| Yes | 2280 (44.3) | 1438 (48.8) | 2272 (74.3) |
| Charlson comorbidity score: | | | |
| 0 (low) | 3864 (75.0) | 2697 (79.0) | 2635 (74.9) |
| 1 | 884 (17.2) | 541 (15.3) | 670 (17.1) |
| 2 | 217 (4.2) | 117 (3.2) | 168 (4.5) |
| ≥3 (high) | 185 (3.6) | 95 (2.5) | 152 (3.4) |
| Drugs: | | | |
| Low dose aspirin | 1388 (27.0) | 842 (25.2) | 1092 (29.2) |
| Non-aspirin NSAID | 772 (15.0) | 533 (15.5) | 513 (16.0) |
| Statins | 1924 (37.4) | 1185 (35.1) | 1457 (37.4) |
| Spironolactone | 405 (7.9) | 117 (3.2) | 362 (4.9) |
| Glucocorticoids for systemic use | 244 (4.7) | 166 (4.5) | 171 (4.3) |
| 5-α reductase inhibitors | 64 (1.2) | 41 (1.2) | 47 (0.9) |
| SSRIs | 299 (5.8) | 196 (5.7) | 223 (6.0) |
| Hormone replacement therapy | 454 (8.8) | 319 (9.8) | 338 (9.9) |
| Diagnoses: | | | |
| Diabetes type 1 and 2 | 899 (17.5) | 559 (16.1) | 667 (18.0) |
| Chronic obstructive pulmonary disease | 247 (4.8) | 131 (3.5) | 200 (4.3) |
| Congestive heart failure | 535 (10.4) | 117 (2.9) | 497 (5.3) |
| Alcohol related disease | 48 (0.9) | 28 (0.7) | 34 (0.7) |

NSAID=non-steroidal anti-inflammatory drug; SSRIs=selective serotonin reuptake inhibitors.
*Characteristics weighted by proportion of total time exposed or not exposed that individuals contributed, thereby providing the distribution of covariates in the main analysis comparison.
†Defined as being included in the study at 1 January 2012 by having filled a valsartan prescription between September and December 2011.

BMJ: first published as 10.1136/bmj.k3851 on 12 September 2018. Downloaded from http://www.bmj.com/ on 25 February 2024 by guest. Protected by copyright.

RESEARCH

**Table 2 | Estimates for association between use of valsartan products potentially contaminated with N-nitrosodimethylamine (NDMA) and cancer risk compared with non-contaminated valsartan products**

| NDMA exposure | Follow-up (person years) | Cancer outcomes | Incidence rate (/1000 person years) | Adjusted hazard ratio* (95% CI) | Fully adjusted hazard ratio† (95% CI) |
|---|---|---|---|---|---|
| Never use | 7344 | 104 | 14.2 | 1.00 (ref) | 1.00 (ref) |
| Ever exposure | 11 920 | 198 | 16.6 | 1.16 (0.91 to 1.49) | 1.09 (0.85 to 1.41) |
| Cumulative exposure (mg)‡: | | | | | |
| <20 000 | 3776 | 67 | 17.7 | 1.26 (0.92 to 1.72) | 1.15 (0.83 to 1.59) |
| 20 000-49 999 | 2836 | 44 | 15.5 | 1.07 (0.75 to 1.53) | 0.99 (0.69 to 1.43) |
| ≥50 000 | 5308 | 87 | 16.4 | 1.14 (0.84 to 1.54) | 1.11 (0.82 to 1.50) |
| Test for trend§ | | | | P=0.65 | P=0.70 |

*Adjusted for age and sex.
†Adjusted for sex, age, use of low dose aspirin, non-aspirin non-steroidal anti-inflammatory drugs, statins, spironolactone, oral steroids, hormone replacement therapy, or selective serotonin reuptake inhibitors, history of diabetes, chronic obstructive pulmonary disease, heart failure, or alcohol related disease, Charlson comorbidity index score, and being a prevalent valsartan user.
‡Defined by total amount of NDMA contaminated valsartan filled.
§Estimated using Cox regression across 10 000 mg stratums of NDMA contaminated valsartan filled.

### Strengths and limitations of this study

The principal strength of this study is the use of high quality nationwide registries,[9 10 11] leaving little potential for selection bias.[12] Furthermore, the use of dispensing data, instead of data on prescribed drugs, as a proxy for NDMA exposure reduces the risk of misclassification due to primary non-adherence.[21] The principal weakness of the study is the limited median follow-up. Our findings only pertain to early cancer risk after exposure to NDMA whereas future studies are needed to elucidate the total cancer risk, which requires a substantially longer follow-up for the individual than what is currently available. Additionally, the limited follow-up combined with the low use of valsartan in Denmark leads to limited precision. Lastly, our exposure ascertainment is based on assumptions about NDMA content. Reassuringly, our sensitivity analysis disregarding less certain sources of NDMA returned estimates comparable to those of the main analysis. However, future studies should utilise data on the actual NDMA content of individual valsartan tablets once such information becomes available.

### Biological rationale

The International Agency for Research on Cancer (IARC) has classified NDMA as "probably carcinogenic to humans" owing to limited evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animal studies.[7] NDMA is suspected to have both localised and systemic carcinogenic effects due to the induction of DNA-damaging metabolites in the gastrointestinal tract and liver.[6 22] Specifically, in the liver, NDMA is metabolised by CYP2E1 to methyldiazonium, which causes mutations by methylation.[23] Also, N-nitroso compounds such as NDMA activate *ras* oncogenes, which are thought to play a role in the development of colon cancer.[6] As such, tumours in the gastrointestinal tract, lungs, kidneys, and liver have been seen in animal studies.[5 23 24] Evidence of carcinogenicity in rats was found at doses of about 10 μg/kg/day.[23] With concentrations of up to 22 μg NDMA in 320 mg valsartan tablets and 10 μg NDMA in 160 mg tablets,[14] the daily exposure for a 70 kg person ranges from 0.14 to 0.31 μg/kg/day. Even though it is not possible to extrapolate directly from animals to humans, the daily exposure in humans is thus roughly 30 times lower than the lowest dose leading to liver cancer in rats. Owing to the known carcinogenic effect of NDMA in animals,



**Fig 3 | Estimates for association between use of potentially N-nitrosodimethylamine (NDMA) contaminated valsartan products and risk of single cancer outcomes compared with users of non-contaminated valsartan products. Number of events are total number of events among valsartan users**



**Fig 4 | Estimates for association between use of potentially N-nitrosodimethylamine (NDMA) contaminated valsartan products and cancer risk compared with users of non-contaminated valsartan products, specified by patient subgroups. Number of events are total number of events among valsartan users**

BMJ: first published as 10.1136/bmj.k3851 on 12 September 2018. Downloaded from http://www.bmj.com/ on 25 February 2024 by guest. Protected by copyright.

no experimental studies in humans exist. However, as some dietary products (eg, processed meat) are known to contain small amounts of NDMA, epidemiological studies based on food frequency questionnaire data have been performed. Even though such studies are highly prone to confounding, three found an increased risk of gastrointestinal cancer with exposure to NDMA, predominantly colorectal cancer.[25] [26] [27] This finding, together with that from the animal studies, provides some support for the increased although statistically non-significant risk for this particular cancer observed in our study. Only one previous paper has reported on uterine cancer, finding no association between exposure to NDMA and uterine cancer in rats.[28] Lastly, no estimates could be obtained for liver cancer in our study owing to the absence of liver cancer events among those exposed to NDMA. A markedly increased risk of liver cancer associated with NDMA exposure thus seems unlikely.

### Principal findings

Our estimates pertain to early cancer risk associated with exposure to NDMA through contaminated valsartan products and should not be interpreted as evidence against NDMA being carcinogenic to humans in general. At most, our findings suggest that the levels of NDMA exposure achieved through valsartan products do not translate into a substantially increased short term cancer risk. Furthermore, the fact that our study evaluates a potential safety concern holds some implications about how to interpret the results. While the estimate for our primary outcome suggests a negligible and statistically non-significant increase in cancer risk of 9%, it might be argued that a more cautious interpretation, reflecting the nature of the study question, would be to consider the upper limit of the confidence interval. Doing so leads to the different, although related, conclusion that we can reasonably exclude a more than 40% increased short term risk of cancer from exposure to NDMA contaminated valsartan products. A similar interpretation of the estimates obtained for the single cancer outcomes—in particular colorectal and uterine cancer—clearly highlights that our study cannot confidently rule out an increased risk from exposure to NDMA.

The finding that exposure to NDMA was associated with an increased risk of cancer specifically among users initiating valsartan treatment during the study period, as opposed to among valsartan users prevalent at the beginning of the study period, was a surprising finding that we cannot explain. The duration of follow-up was on average longer for prevalent users, as they were followed from the beginning of the study period (1 January 2012), and a late effect of exposure to NDMA therefore cannot explain this finding, as it would have led to an increased risk specifically among prevalent and not incident valsartan users. Considering the uncertainty about the actual NDMA content of valsartan products, it could be speculated that those using valsartan later in the study period might have been exposed to NDMA more often. However, no data

are available that can be used to test this hypothesis. Lastly, our subgroup analyses had limited power and therefore the possibility of our results being a chance finding should also be considered.

### Policy implications

Our findings can support regulators in their evaluation of the potential public health impact of exposure to NDMA through valsartan products. The Danish nationwide health registries and the strong research infrastructure hosted by Statistics Denmark and the Danish Health Data Authority, the latter of which was used in this study, gives researchers and regulators a unique possibility to provide answers to such emerging public health concerns in a timely manner. The present analysis was completed and submitted for publication within seven weeks after the finding of NDMA in valsartan products was announced publicly, and the paper published in *The BMJ* after a fast track peer review process spanning only three weeks from submission to publication. We previously performed a similar expedited assessment of a putative bleeding risk associated with use of generic warfarin,[29] [30] although its publication was delayed by the peer review process for several months. Besides rapid peer review assessment, a close collaboration between researchers and regulators is a key element in ensuring both speed and relevance of such research projects. In addition to knowledge about the risks associated with exposure to NDMA, the present study provides proof-of-concept for such processes, which hold great promise for the use of pharmacoepidemiological input in the regulatory assessment of future public health crises.

### Conclusion

We have assessed the potential cancer risk associated with exposure to NDMA through contaminated valsartan products and found no evidence of a markedly increased short term overall risk of cancer. However, we cannot exclude a modest association. Furthermore, owing to the limited follow-up, assessment of long term effects was not possible, and the low number of events makes interpretation of estimates for single cancer outcomes difficult. Therefore, further studies are needed to fully elucidate the health effects of NDMA contaminated valsartan products.

We thank the Danish Health Data Authority, in particular Anna Birkmose Andersen and Anders Schierup, for providing expedited access to the registry data used in the study; Nicolai C Brun (Danish Medicines Agency) for valuable comments on the interpretation of the findings; and Camilla Ætebjerg Bæk (Danish Medicines Agency) for providing toxicological input.

**Contributors:** AP, JH, PQ, and NBJ conceived and designed the study. AP, KBK, and MTE performed the statistical analyses and data management. AP and KBK drafted the initial manuscript. All authors interpreted the data and revised the manuscript critically. AP is the guarantor. The corresponding author attests that all listed authors meet authorship criteria and that no others meeting the criteria have been omitted.

**Funding:** None.

**Competing interests:** All authors have completed the ICMJE uniform disclosure form at www.icmje.org/coi_disclosure.pdf and declare: no support from any organisation for the submitted work; no financial

BMJ: first published as 10.1136/bmj.k3851 on 12 September 2018. Downloaded from http://www.bmj.com/ on 25 February 2024 by guest. Protected by copyright.

relationships with any organisations that might have an interest in the submitted work in the previous three years; no other relationships or activities that could appear to have influenced the submitted work.

**Ethical approval:** Not required.

**Data sharing:** Statistical code is available from AP upon request. No additional data are available as Danish legislation does not allow disclosure of individual level data.

**Transparency:** The lead author (AP) affirms that this manuscript is an honest, accurate, and transparent account of the study being reported; that no important aspects of the study have been omitted; and that any discrepancies from the study as planned have been explained.

This is an Open Access article distributed in accordance with the Creative Commons Attribution Non Commercial (CC BY-NC 4.0) license, which permits others to distribute, remix, adapt, build upon this work non-commercially, and license their derivative works on different terms, provided the original work is properly cited and the use is non-commercial. See: http://creativecommons.org/licenses/by-nc/4.0/.

1   Mancia G, Fagard R, Narkiewicz K, et al, Task Force Members. 2013 ESH/ESC Guidelines for the management of arterial hypertension: the Task Force for the management of arterial hypertension of the European Society of Hypertension (ESH) and of the European Society of Cardiology (ESC). *J Hypertens* 2013;31:1281-357. doi:10.1097/01.hjh.0000431740.32696.cc

2   Ponikowski P, Voors AA, Anker SD, et al, ESC Scientific Document Group. 2016 ESC Guidelines for the diagnosis and treatment of acute and chronic heart failure: The Task Force for the diagnosis and treatment of acute and chronic heart failure of the European Society of Cardiology (ESC)Developed with the special contribution of the Heart Failure Association (HFA) of the ESC. *Eur Heart J* 2016;37:2129-200. doi:10.1093/eurheartj/ehw128

3   European Medicines Agency. EMA reviewing medicines containing valsartan from Zhejiang Huahai following detection of an impurity. 2018. http://www.ema.europa.eu/ema/index.jsp?curl=pages/news_and_events/news/2018/07/news_detail_002984.jsp&mid=WC0b01ac058004d5c1. Last accessed 24/08/2018.

4   Priority Substances List Assessment Report for N-Nitrosodimethylamine (NDMA) Canadian Environmental Protection Act, 1999.

5   Agency for Toxic Substances and Disease Registry U.S. Public Health Service. Toxicological profile for N-nitrosodimethylamine. 1989. https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf. Last accessed: 24/08/2018.

6   Tricker AR, Preussmann R. Carcinogenic N-nitrosamines in the diet: occurrence, formation, mechanisms and carcinogenic potential. *Mutat Res* 1991;259:277-89. doi:10.1016/0165-1218(91)90123-4

7   International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans. Overall evaluations of carcinogenicity: an updating of IARC Monographs Volumes 1-42. Lyon, France, 1987 supplement no 7.

8   Storm HH, Michelsen EV, Clemmensen IH, Pihl J. The Danish Cancer Registry--history, content, quality and use. *Dan Med Bull* 1997;44:535-9.

9   Gjerstorff ML. The Danish Cancer Registry. *Scand J Public Health* 2011;39(Suppl):42-5. doi:10.1177/1403494810393562

10  Pottegård A, Schmidt SAJ, Wallach-Kildemoes H, Sørensen HT, Hallas J, Schmidt M. Data Resource Profile: The Danish National Prescription Registry. *Int J Epidemiol* 2017;46:798-798f. doi:10.1093/ije/dyw213

11  Schmidt M, Schmidt SAJ, Sandegaard JL, Ehrenstein V, Pedersen L, Sørensen HT. The Danish National Patient Registry: a review of content, data quality, and research potential. *Clin Epidemiol* 2015;7:449-90. doi:10.2147/CLEP.S91125

12  Schmidt M, Pedersen L, Sørensen HT. The Danish Civil Registration System as a tool in epidemiology. *Eur J Epidemiol* 2014;29:541-9. doi:10.1007/s10654-014-9930-3

13  Pedersen CB. The Danish Civil Registration System. *Scand J Public Health* 2011;39(Suppl):22-5. doi:10.1177/1403494810387965

14  Abdel-Tawab M, Gröner R, Kopp T, Meins J, Wübert J. ZL findet NDMA in Tabletten. *PZ Pharm Ztg* 2018;30. https://www.pharmazeutische-zeitung.de/index.php?id=77660

15  WHO Collaborating Centre for Drug Statistics Methodology. Guidelines for ATC classification and DDD assignment 2016. Oslo, 2016.

16  Weberpals J, Jansen L, van Herk-Sukel MPP, et al. Immortal time bias in pharmacoepidemiological studies on cancer patient survival: empirical illustration for beta-blocker use in four cancers with different prognosis. *Eur J Epidemiol* 2017;32:1019-31. doi:10.1007/s10654-017-0304-5

17  Pottegård A, Friis S, Stürmer T, Hallas J, Bahmanyar S. Considerations for Pharmacoepidemiological Studies of Drug-Cancer Associations. *Basic Clin Pharmacol Toxicol* 2018;122:451-9. doi:10.1111/bcpt.12946

18  Friis S, Kesminiene A, Espina C, Auvinen A, Straif K, Schüz J. European Code against Cancer 4th Edition: Medical exposures, including hormone therapy, and cancer. *Cancer Epidemiol* 2015;39(Suppl 1):S107-19. doi:10.1016/j.canep.2015.08.003

19  Charlson ME, Pompei P, Ales KL, MacKenzie CR. A new method of classifying prognostic comorbidity in longitudinal studies: development and validation. *J Chronic Dis* 1987;40:373-83. doi:10.1016/0021-9681(87)90171-8

20  Thygesen SK, Christiansen CF, Christensen S, Lash TL, Sørensen HT. The predictive value of ICD-10 diagnostic coding used to assess Charlson comorbidity index conditions in the population-based Danish National Registry of Patients. *BMC Med Res Methodol* 2011;11:83. doi:10.1186/1471-2288-11-83

21  Pottegård A, Christensen Rd, Houji A, et al. Primary non-adherence in general practice: a Danish register study. *Eur J Clin Pharmacol* 2014;70:757-63. doi:10.1007/s00228-014-1677-y

22  Bartsch H, K O'Neill I. Ninth International Meeting on N-Nitroso Compounds: Exposures, Mechanisms, and Relevance to Human Cancer. *Cancer Res* 1988;48:4711-4.

23  Peto R, Gray R, Brantom P, Grasso P. Nitrosamine carcinogenesis in 5120 rodents: chronic administration of sixteen different concentrations of NDEA, NDMA, NPYR and NPIP in the water of 4440 inbred rats, with parallel studies on NDEA alone of the effect of age of starting (3, 6 or 20 weeks) and of species (rats, mice or hamsters). *IARC Sci Publ* 1984;(57):627-65.

24  Lijinsky W, Reuber MD. Carcinogenesis in rats by nitrosodimethylamine and other nitrosomethylalkylamines at low doses. *Cancer Lett* 1984;22:83-8. doi:10.1016/0304-3835(84)90047-8

25  Loh YH, Jakszyn P, Luben RN, Mulligan AA, Mitrou PN, Khaw K-T. N-Nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)-Norfolk Study. *Am J Clin Nutr* 2011;93:1053-61. doi:10.3945/ajcn.111.012377

26  Zhu Y, Wang PP, Zhao J, et al. Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada. *Br J Nutr* 2014;111:1109-17. doi:10.1017/S0007114513003462

27  Knekt P, Järvinen R, Dich J, Hakulinen T. Risk of colorectal and other gastro-intestinal cancers after exposure to nitrate, nitrite and N-nitroso compounds: a follow-up study. *Int J Cancer* 1999;80:852-6. doi:10.1002/(SICI)1097-0215(19990319)80:6<852::AID-IJC9>3.0.CO;2-S

28  Peto R, Gray R, Brantom P, Grasso P. Effects on 4080 rats of chronic ingestion of N-nitrosodiethylamine or N-nitrosodimethylamine: a detailed dose-response study. *Cancer Res* 1991;51:6415-51.

29  Hellfritzsch M, Rathe J, Stage TB, et al. Generic switching of warfarin and risk of excessive anticoagulation: a Danish nationwide cohort study. *Pharmacoepidemiol Drug Saf* 2016;25:336-43. doi:10.1002/pds.3942

30  Heisterberg J. Automatic generic switching of warfarin: to do or not to do? *Pharmacoepidemiol Drug Saf* 2016;25:344-5. doi:10.1002/pds.3969

**Supplementary information:** appendices A and B

BMJ: first published as 10.1136/bmj.k3851 on 12 September 2018. Downloaded from http://www.bmj.com/ on 25 February 2024 by guest. Protected by copyright.

# EXHIBIT 3

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** *et al.,* , <br><br> Plaintiffs, <br><br> v. <br><br> **JANSSEN PRODUCTS, L.P.,** <br><br> Defendant. | Civil Action No. 12-7758 (ZNQ) (JBD) <br><br> **OPINION** <br><br> **(TO BE FILED UNDER TEMPORARY SEAL)** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon two omnibus Motions in Limine (the "Motions") filed by Defendant Janssen Products, LP ("Janssen") ("Janssen Motion", ECF No. 319) and Relators Jessica Penelow and Christine Brancaccio ("Relators") ("Relators Motion", ECF No. 318).

Janssen filed a brief in support of its Motion ("Janssen Moving Br.", ECF No. 319-1) and Relators opposed ("Relators Opp'n Br.", ECF No. 320). Janssen filed a reply. ("Janssen Reply Br.", ECF No. 323.) Relators filed a brief in support of their Motion ("Relators Moving Br.", ECF No. 318-1) and Janssen opposed ("Janssen Opp'n Br.", ECF No. 321). Relators filed a reply. ("Relators Reply Br.", ECF No. 322.)

Having reviewed the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Plaintiff's Motion in Limine will be GRANTED IN

1

PART and DENIED IN PART and Defendants Motion in Limine will be GRANTED IN PART
and DENIED IN PART.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Relators filed the instant action on behalf of the Government, twenty-seven states, and the
District of Columbia against Defendants, alleging fifty-eight counts under the Federal False Claims
Act ("FCA"), Federal Anti-Kickback Statute ("AKS"), and the false claims acts of various states.
The claims arise from Defendants' purported misconduct in connection with its sales and
marketing of two HIV/AIDS drugs: Prezista and Intelence. (*See* Am. Compl. ¶¶ 107-61, ECF No.
41.)

## II.    JURISDICTION

The Court exercises subject matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a)
and (b). Venue is appropriate under 31 U.S.C. § 3732(a) because Janssen transacts business in this
judicial district.

## III.    LEGAL STANDARD

A motion in limine is filed pre-trial and requests that the Court "prohibit opposing counsel
from referring to or offering evidence on matters prejudicial to the moving party." *Laufen Int'l,
Inc. v. Larry J. Lint Floor & Wall Covering*, *Co.,* Civ. No. 10-199, 2012 WL 1458209, at *1 (W.D.
Pa. Apr. 27, 2012). The purpose of a motion in limine is to bar "irrelevant, inadmissible, and
prejudicial" issues from being introduced at trial, thus "narrow[ing] the evidentiary issues for
trial[.]" *Id.* Evidence should not be excluded pursuant to a motion in limine, unless it is clearly
inadmissible on all potential grounds. *Leonard v. Stemtech Health Sciences, Inc.*, 981 F. Supp.2d
273, 276 (D. Del. 2013) (citing *Laws v. Stevens Transport, Inc.*, No. 2:12–cv–544, 2013 WL
4858653, at *1 (S.D. Ohio Sept. 11, 2013)). The movant bears the burden of demonstrating that
the evidence is inadmissible on any relevant ground, and the court may deny a motion in limine

2

when it lacks the necessary specificity with respect to the evidence to be excluded. *Id.* (citing *Berry v. Mission Grp. Kan., Inc.*, Civ. No. 08-2439, 2010 WL 2160897, at *1 (D. Kan. May 28, 2010)). Evidentiary rulings, especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context. *Id.* (citing *Looney Ricks Kiss Architects*, Civ. No. 07-572, 2010 WL 5393864, at *1 (W. D. La. Dec. 22, 2010); *Diehl v. Blaw–Knox*, Civ. No. 01-0770, 2002 WL 34371510, at *1 (M.D. Pa. July 15, 2002)).

## IV. DISCUSSION

### A. JANSSEN'S MOTIONS

#### 1. Whether the Court Should Preclude Relators and Various Fact Witnesses from Offering Lay Opinions About the Supposed Effect of Janssen's Promotional Activities on Doctors' Prescribing Decisions

Janssen's first motion seeks to preclude trial testimony by Relators and other former Janssen employees about the effects of Janssen's promotional activities under Rule 701(c). (Janssen Moving Br. at 1.) Janssen argues that Relators and their proposed witnesses do not possess any specialized experience, knowledge, or credentials to opine on pharmaceutical marketing. (*Id.* at 3.) Janssen contends that the proposed testimony is also inadmissible under Rule 701 because it is not rationally based on any of the witnesses' perceptions. (*Id.*) Janssen maintains that the proposed witnesses' opinions are based on pure speculation. (*Id.* at 3–4.) Janssen claims that even if the proposed testimony were based on common sense, it would not be helpful to the jurors in determining a fact issue. (*Id.* at 5.) Further, Janssen argues that the witnesses' testimony will not be helpful to the jury to determine a fact issue. (*Id.*)

In opposition, Relators maintain that the seven witnesses are former Janssen sales representatives and regional managers who personally promoted the drugs and who witnessed

first-hand the effects of Janssen's unlawful marketing. (Relators Opp'n Br. at 1.) Relators argue that the proposed testimony does not require scientific or specialized knowledge. (*Id*. at 2.) Relators contend that the witnesses at issue are sales representatives and managers who personally engaged in or oversaw the promotion of Janssen products to doctors. (*Id*. at 2–3.) Relators argue that all seven proposed witnesses have direct, first-hand knowledge about the issues and is not pure speculation as Janssen suggests. (*Id*. at 5.) Relators further argue that the witnesses' testimony will help the jury determine causation. (Id.)

In reply, Janssen reiterates that the proposed witnesses do not have the qualifications to opine on the effects of the pharmaceutical marketing and such testimony would be speculative. (Janssen Reply Br. at 1.)

Federal Rule of Evidence[1] 701(c) states that a lay witness's testimony may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). "Subsection (c) was added to address the risk that parties may try to evade the requirements of Rule 702 by 'proffering an expert in lay witness clothing.'" *Campmor, Inc. v. Brulant, LLC*, Civ. No. 09-5465, 2013 WL 12147616, at *5 (D.N.J. April 30, 2013) (quoting *Hirst v. Inverness Hotel Corp*., 544 F.3d 221, 227 (3d Cir. 2008) (internal citations and quotation marks omitted). The Third Circuit, however, recognizes that an expert witness is not always necessary when the testimony is of a specialized or technical nature:

> When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.

---

[1] For the sake of brevity, all references herein to "Rule" will be to the Federal Rules of Evidence.

*Donlin v. Philips Lighting North American Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) (citations omitted); *see also United States v. DeMuro*, 677 F.3d 550, 562 (3d Cir. 2012) ("we have allowed professionals to give lay opinions when opinions are based on personal knowledge of the issues, along with specialized experiences") (citation omitted); *United States v. Thompson*, 393 F. App'x 852, 857–59 (3d Cir. 2010) (the district court did not err in permitting a company employee to testify as lay witness about GPS tracking device).

Janssen's first Motion in Limine seeks to preclude testimony on the effects of Janssen's promotional activities had on doctors. Janssen argues that the proposed testimony is based on pure speculation. (Janssen Moving Br. at 3.) Specifically, Janssen asserts that while the witnesses have testified that their opinions are generally based on increased sales following the alleged off-label promotion, "the truth is that their opinions are based on pure speculation." (Id. at 3–4.) Janssen, however, was afforded the opportunity to question and cross examine these witnesses at their depositions a to whether they did, in fact, have personal knowledge of the effect of the promotional activities. To preclude such evidence in this case based on the fact that the witnesses' personal knowledge and perceptions were not fully explored in their pre-trial deposition is an "extreme and unreasonable measure." *United Linen Wholesale, L.L.C. v. Northwest Co.*, Civ. No. 06-5934, 2010 WL 3724519, at *2 (D.N.J. Sept. 13, 2010). Had Janssen wished to question these proposed witnesses at their depositions concerning their personal knowledge, it was free to do so. If, as Janssen claims, the witnesses lack sufficient knowledge to offer a lay opinion as to promotional marketing effects, that will be explored before they are permitted to testify at trial. *See id.* The witness's personal knowledge and perceptions will need to satisfy the Court pursuant to Rule 701 at that time. Accordingly, the Court will not preclude this evidence based on this argument at this juncture.

Janssen's first Motion in Limine will therefore be denied without prejudice.

**2. Whether the Court Should Exclude Evidence or Argument Referring to Prezista or Intelence Prescription as "Misbranded" or Otherwise "Illegal"**

Janssen seeks to exclude Relators from referencing Prezista or Intelence prescriptions as "misbranded" or "illegal." (Janssen Moving Br. at 5.) Janssen argues that because this is not a "misbranding" case, Relators' use of these terms would suggest that Janssen violated the Food, Drug, and Cosmetic Act ("FDCA") and confuse the jury. (*Id.* at 6.) Janssen argues that any evidence or argument using the terms "misbranded" or "illegal" should be excluded under Rules 401 and 403. (*Id.*) Whether Prezista and Intelence were "misbranded" is not relevant to any claims or defenses because a purported marketing-based violation of the FDCA's misbranding provisions is not actionable under the False Claims Act ("FCA"). (*Id.*) The term "illegal" brings the same references because of the clear import of such an argument would be that Janssen is engaged in misbranding, which is no pertinent to any issue. (*Id.* at 8) Further, Janssen argues that even if the terms "misbranded" or "illegal" had probative value in an FCA case, it would be outweighed by the danger of confusing the issues where the jury must decide. (*Id.*) Relying on Rule 403, evidence that could confuse the dispositive issue in the case should be properly excluded. (*Id.* at 9.) Since the FDCA has nothing to do with what Relators must prove, referencing Prezista or Intelence prescriptions as "misbranded" or "illegal" will confuse the jury. (*Id.*)

In opposition, Relators argue that they should be permitted to introduce evidence and argument referring to Prezista and Intelence Prescriptions and "misbranded" or otherwise "illegal" because the court has already upheld their misbranding theory. (Relators Opp'n Br. at 12.) Relators maintain that the Court has already rejected Janssen's challenges to Relators' misbranding theory in its decision on Janssen's Motion to Dismiss. (*Id.* at 13.) Relators argue that the Court has already recognized that their misbranding theory is viable under the FCA. (*Id.* at 15.) Further,

Relators assert that there is nothing unduly prejudicial or confusing about a party offering evidence and argument about a theory of the case. (*Id*. at 16.)

In reply, Janssen claims that they are moving to narrow the evidence presented to the jury to questions that are actually at issue. (Janssen Reply Br. at 3.) Janssen asserts that Relators must prove that their claim that Prezista and Intelence prescriptions were false and referring to the prescriptions as "misbranded" has no relevance to the falsity theories. (*Id*.)

Under Rule 401, "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence." Fed. R. Evid. 401. Relators' theory under Count One is specifically that Janssen violated the FCA by misbranding and off-labeling Prezista and Intelence. (Am. Compl. ¶ 222.) In deciding Janssen's Motion to Dismiss, the Court found that Relators adequately pled that Prezista[2] was not reasonable and necessary for certain patients to sustain their "misbranded and off-label prescriptions" theory under the FCA. (*See* ECF No. 86 at 9.) Accordingly, Relators referring to Prezista and Intelence as "misbranded" is relevant to their theory of FCA violations.

While the Court finds this relevant, Rule 403 permits a district court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice[.]" Fed R. Evid. 403. "A district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Rule 403." *United States v. Balter*, 91 F.3d 427, 442 (3d Cir. 1996). Rule 403 is a balancing test, and "[l]ike any balancing test, the Rule 403 standard is inexact, requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference on the part of the reviewing court to the hands-on judgment

---

[2] Janssen conceded that Realtors adequately pled the off-label use of Intelence. (*See* ECF No. 86 at 8 n.6.)

7

of the trial judge." *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986). Here, Janssen argues that referencing Prezista and Intelence as "misbranded" and "illegal" will be unduly prejudicial and confuse the jury under Rule 403.

The relevant provisions of the FCA prohibit any person from: (1) "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval"; and (2) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). Here, nothing within Relators' Complaint indicates their theories would require them to refer to the prescriptions as "illegal" or "misbranded" to bring a successful FCA claim against Janssen. A jury finding that the prescriptions were in fact, illegal or misbranded, under the FCA is the ultimate finding Relators seek to receive in Count One. (*See* generally, Am. Compl.) Accordingly, referring to the prescriptions as "illegal" or "misbranded" is unduly prejudicial and confusing to the jury. The Court will therefore preclude Relators from referring to the prescriptions as "illegal" and "misbranded."

Janssen's Motion to Exclude Evidence or Argument to Prezista or Intelence Prescription as "Misbranded" or Otherwise "Illegal" will therefore be granted.

### 3. Whether the Court Should Exclude Testimony or Argument Referring to Janssen's Promotion of Prezista's Lipid Profile, Prezista Prescriptions Written for Patients with Lipid Conditions, or Claims Submitted for Prezista Prescriptions Written for Patients with Lipid Conditions as "Off-Label."

Janssen contends that the vast majority of prescriptions Relators claim were fraudulent were *on-label* prescriptions. (Janssen Moving Br. at 10.) Janssen argues that Relators should be precluded from referring to this case as an "off-label" case and referring to Prezista prescriptions written for patients with lipid conditions as "off-label." (*Id*. at 11.) Further, Janssen argues that describing this as an "off-label" case is confusing and misleading to the jury. (Id. at 12.) Janssen

claims that Relators must prove a different theory of falsity for on-label prescriptions than for off-label prescriptions. (*Id*.) Janssen argues that Relators should be precluded from using the term "off-label" to describe on-label prescriptions under Rule 403. (Id. at 13.) In opposition, Relators argue that Janssen's attempt to preclude them from referring to their conduct as "off-label" is a transparent attempt to relitigate an issue Janssen already lost on its Motion to Dismiss and Motion for Summary Judgment. (Relators Opp'n Br. at 17.) Relators contend that Janssen has twice tried to dismiss Relators' Prezista lipid claim, and twice has been denied. (*Id*.) Relators additionally argue that there is "no merit to Janssen's contention that relator's lipid claim is somehow 'on-label' as opposed to 'off-label[.]'" (*Id*. at 19.)

In reply, Janssen argues that its Motion seeks to exclude the "off-label" language rather than relitigate the viability of Relators' Prezista lipid theory of liability. (Janssen Reply Br. at 6.) Janssen contends that "while Relators are free to present their Prezista lipid claims to the jury, they must do so correctly and precisely, and any evidence or argument referring to such Prezista promotion or prescriptions as 'off-label' must be excluded." (*Id*. at 8.)

In denying Janssen's Motion for Summary Judgment, the Court rejected Janssen's argument that this is not an off-label case and recognized that whether Prezista's label warned about any lipid-related side effects constituted a genuine issue of material fact for the jury to determine. (*See* ECF No. 291 at 18.) The Court accepted Relators' legal theories as to proving the elements of FCA and Anti-Kickback Statute violations. (*Id*. at 18–19.) Specifically, the Court held that whether Prezista's label warned about any lipid-related side effects "constitute[d] a genuine issue of material fact as to Relators' FCA claims concerning Prezista's lipid profile." (*Id*. at 18.) The Court additionally held that "[u]nder either the OL promotion theory or the AKS violation theory, . . . Relators have raised sufficient questions of material fact to preclude summary

9

judgment as to whether Prezista claims for benefits made by patients with lipid conditions were false within the meaning of the FCA." (*Id*. at 18–19.) Accordingly, because the Court has already determined that the jury will decide the scope of Prezista's label as to lipids, Relators are entitled to present their theory—that Janssen's promotion of Prezista was off-label—to the jury.

Further, the Court finds that referencing off-label prescriptions is not unduly prejudicial pursuant to Rule 403. Janssen argues that describing this as an off-label case would confuse the jury and mislead them regarding fundamental issues and Relators' burden of proof. (Janssen Moving Br. at 12.) The Court will, however, properly instruct the jury that Relators bear the burden of proof to establish the elements of an FCA action. Any prejudicial effect the evidence may have will therefore not substantially outweigh its probative value.

Accordingly, Relators will not be precluded from referencing off-label prescriptions based on this argument. Janssen's third Motion in Limine will therefore be denied without prejduice.

### 4. Whether the Court Should Exclude Any Evidence or Argument Referencing Anthony Dolisi's Assertion of his Fifth Amendment Right to Refuse to Answer Questions in Response to a Civil Investigative Demand for Oral Testimony

Janssen seeks to preclude Relators from offering evidence or argument referencing Anthony Dolisi's ("Dolisi") invocation of his Fifth Amendment right during his June 2016 Civil Investigative Demand deposition under Rule 403. (Janssen Moving Br. at 13.) Specifically, Dolisi was deposed on June 20, 2016 by an Assistant United States Attorney in relation to a Civil Investigation Demand. (*Id*. at 14.) At that deposition, Dolisi asserted his Fifth Amendment right to not testify as to matters within the scope of his employment with Janssen. (*Id*.)

Dolisi, however, later revoked his Fifth Amendment invocations and sat for a full deposition with Relators' counsel and answered all of their questions on key issues of this case. (*Id*. at 16.)

Relators now seek to introduce his previously revoked Fifth Amendment invocations as impeachment evidence against Dolisi.  (Relators Opp'n Br. at 24.)

The Court will grant Janssen's motion. Any "potential probative value of [Dolisi's] invocation of the Fifth Amendment is . . . reduced by the fact that [he] subsequently answered all of the questions," and "the potential prejudice . . . is high," such that it substantially outweighs any probative value.  *In re Urethane Antitrust Litigation*, Civ. No. 08-5169, 2016 WL 475339, at *5 (D.N.J. Feb. 8, 2016) (quoting *Harrell v. DCS Equipment Leasing Corp.*, 951 F.2d 1453, 1464-65 (5th Cir. 1992)) (internal citations omitted); *see also* Rule 403 (court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice).  Relators will therefore be precluded from referencing Dolisi's prior invocation.

### 5. Whether the Court Should Exclude Evidence or Argument Referencing Regulatory or Other Government Guidance on Speaker Programs Or Other Promotional Activities After 2014

Janssen indicates that Relators' claims challenge Janssen's conduct with respect to speaker programs and promotional events between the years 2006 and 2014.  (Janssen Moving Br. at 18–19.)  Janssen seeks to preclude evidence and testimony regarding government guidance on these topics that was issued after 2014.  (*Id*. at 19.)  Janssen argues that post-2014 guidance and related testimony are not relevant because the regulatory changes that post-date the challenged conduct are not probative of whether that behavior was unlawful at the time it occurred.  (*Id*. at 19–20.)  Janssen maintains that introduction of post-2014 guidance would distract jurors from considering what Janssen actually knew when it engaged in the behavior at issue here.  (*Id*. at 20–21.)

Here, Relators concede that reference to post-2014 guidance is irrelevant to Janssen's scienter.  (Relators Opp'n Br. at 29.)  Rather, Relators seek to introduce this evidence to demonstrate materiality.  (Id.)  Relators rely on *United Health Servs. Inc. v. Escobar*, 579 U.S. 176

(2016) for its position that the government has always—before, during, and after the relevant time period—considered Anti-Kickback Statute violations and false and misleading marketing, misbranding, and off-label marketing to be material. (*Id*. at 29–30.) Relators indicate that Janssen points to HHS-OIG guidance from 2020 and that guidance is also relevant to materiality. (*Id*. at 31.)

In reply, Janssen reiterates that the government guidance issued after 2014 should be excluded because it is not relevant to the conduct at issue and would be unfairly prejudicial and confusing to the jury. (Janssen Reply Br. at 11.) Janssen argues that Realtors' reliance on *Escobar*, 579 U.S. 176, is misplaced, claiming that "[n]owhere in *Escobar* does the Supreme Court say that the government can issue guidance that retroactively applies to claims that are more than a decade old." (*Id*. at 11.)

Here, the Court finds that post-2014 guidance—guidance issued after the Relevant Time Period—is not relevant. Regulatory changes made after the Relevant Time Period are irrelevant as to whether the behavior was unlawful at the time it occurred. *See United States v. Allergan Inc*., 746 F. App'x 101, 109 (3d Cir. 2018). Accordingly, the Court will preclude Realtors from introducing any evidence of guidance on speaker programs or other promotional activities after 2014 as part of their case in chief.

The Court will, however, not preclude Realtors from introducing such evidence in rebuttal or on cross-examination should Janssen raise post-2014 regulatory guidance at trial.

### 6. Whether the Court Should Preclude Any Evidence Or Argument Referencing Other Investigations, Litigation, or Settlements Involving Janssen Or Any Other Pharmaceutical Company and the Federal Government

Janssen seeks to preclude evidence of other government investigations, litigation and settlements including: (1) a 2013 settlement by Johnson & Johnson and Janssen related to the

marketing of anti-psychotic and heart failure drugs, (2) a 2010 settlement by Ortho-McNeil-Janssen Pharmaceuticals related to that company's marketing of anti-epileptic drug, and (3) investigations related to prescription medications manufactured by Allergan, Wyeth Pharmaceuticals, and Merck. (Janssen Moving Br. at 21.) Janssen argues that evidence of other government investigations, litigation, and settlements is not relevant. (*Id*. at 22.) Janssen contends that the 2013 settlement by Johnson & Johnson and Janssen related to the marketing of anti-psychotic and heart failure drugs and has no bearing on whether Relators can prevail on their FCA claims. (*Id*.) Further, Janssen asserts that the 2010 settlement with Ortho-McNiel-Janssen Pharmaceuticals is also irrelevant to the instant matter because it involved other medications, and it was based on alleged conduct by a company that is not a part of this lawsuit. (*Id*. at 23.) Janssen argues that this evidence is not material to the government's reimbursement decision in this case because it is based on the marketing of different medications for non-FDA approved conditions. (*Id*.) Janssen additionally argues that even if this evidence is relevant, it would still be inadmissible under Rule 403 because it would mislead the jury into thinking Janssen or unrelated non-parties acted improperly in prior cases. (*Id*. at 24.)

Janssen further contends that evidence related to prior government investigations, settlements, and litigation is also barred by Rule 404 because it would unfairly suggest that Janssen and other pharmaceutical companies have a propensity to engage in bad conduct. (*Id*. at 25.)

In opposition, Relators argue the evidence Janssen seeks to preclude bears directly on materiality. (Relators Opp'n Br. at 33.) Relators contend that within the same time period of Janssen's alleged unlawful off-label and kickback schemes, Janssen and/or its affiliates entered into two settlements with the federal government and two Corporate Integrity Agreements ("CIAs") with the United States Department of Health and Human Services. (*Id*.) Relators claim

that both settlements and CIAs from 2010 and 2013 required extensive actions by Janssen and/or its affiliated entities aimed at improving Janssen's compliance with federal healthcare laws when promoting its drugs. (*Id*. at 34.) Relators argue that the steps Janssen took or did not take before, during, or after the 2010 CIA with Otho-McNeil-Janssen Pharmaceuticals, are directly relevant to materiality and scienter. (*Id*. at 35.) Further, Relators assert that the 2013 settlement and CIA involved the unlawful promotion of drugs and that it implemented strict requirements to ensure compliance with federal healthcare requirements. (*Id*. at 37.) Relators argue that these provisions of the 2013 CIA included provisions related directly to preventing off-label marketing of all of Janssen's drugs. (*Id*.) Relators additionally contend that the 2013 CIA entitled "Speaker Program Controls," which required Janssen to implement specific controls on speaker venues. (*Id*. at 38.)

As to Janssen's Rule 404 argument, Relators maintain that the disputed evidence here falls outside the scope of Rule 404(a)(1) because they seek to introduce this evidence to establish their burden of proof on key elements. (*Id*. at 40.) Relators additionally argue that to the extent this evidence is considered Rule 404 material, it falls within the permitted use set forth in Rule 404(b)(2). (*Id*.) Further, Relators assert that this evidence is not unduly prejudicial because it demonstrates "Janssen's inadequate compliance oversight of its speaker program and OL marketing by its sales personnel, and establishes materiality under the FCA." (*Id*. at 41.)

In reply, Janssen reiterates that other government investigations, litigation, and settlements involving Janssen, affiliated companies or other pharmaceutical companies is inadmissible under Rules 401 and 403. (Janssen Reply Br. at 13.) Janssen argues that Relators have failed to explain the relevance of the 2010 and 2013 investigations because they fail to "attempt to establish that either the 2010 or 2013 investigations involved conduct that had any similarity to Janssen's alleged conduct in this litigation." (*Id*. at 14.)

14

Here, the evidence Janssen seeks to preclude is relevant and probative to Relators' FCA claims. The 2010 CIA (Relators Opp'n Br. at Ex. K, ECF No. 320-11) required improved policies and procedures to address compliance with Anti-Kickback Statutes, training obligations related to promotional functions, investigations of potential off-label promotion, and an internal monitoring program to evaluate and monitor interactions with physicians. (*See* ECF No. 320-11.) Further, the 2013 CIA included a section entitled "Speaker Program Controls," which required Janssen to implement specific controls on speaker programs. (See Relators Opp'n Br. at Ex. L, ECF No. 320-12 at 35.) Evidence of whether Janssen complied with such settlements and CIAs is therefore probative to its scienter and materiality in the instant matter. The compliance steps Janssen took or did not take before, during, and after the execution of both the 2010 and 2013 settlements and CIAs are directly relevant to scienter and materiality, both of which are essential elements to Relators' claims. *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

Additionally, such evidence is not barred under Rule 404. While character evidence is generally barred, Rule 404 permits evidence of prior acts if it is being used to prove another purpose "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2). Here, evidence of the 2010 and 2013 settlements and CIAs are permitted as long as Relators introduce such evidence for a purpose other than showing that Janssen acted in accordance with his character or a particular character trait in the past.

Further, Janssen's concern that admission of materials related to other government investigations and settlements would confuse the jury can be cured by issuing a limited instruction. Limiting instructions are an appropriate way to ensure that a jury understands the purpose for

15

which evidence of prior acts may be considered, and such instructions are generally sufficient "to cure any risk of prejudice[.]" *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *see United States v. Universal Rehabilitation Servs. (PA) Inc.*, 205 F.3d 657, 668 (3d Cir. 2000) ("we have also consistently held that this prejudicial effect is typically cured through a curative instruction to the jury" (discussing the prejudicial effect of a witness's guilty plea)); *United States v. Scarfo*, 41 F.4th 136, 180–81 (3d Cir. 2022). Accordingly, Janssen's motion as it relates to the evidence of other government investigations, settlements, and CIAs will be denied based on this argument. The Parties will, however, be permitted the opportunity to meet and confer to submit a proposed limiting instruction on the issue.

### 7. Whether the Court Should Bar Relators and Certain Lay Witnesses from Testifying About Why Doctors Were Selected to be Speakers for Janssen, and Janssen's Purpose or Intent in Paying These Doctors for their Professional Services

Janssen claims that Relators and certain of their witnesses, Mark Wilhelm, Donna Graham, Joseph Holshoe, Sara Strand, and Matthew Grooms intend to testify regarding Janssen's alleged "improper implementation of the Speaker Program." (Janssen Moving Br. at 26.) Janssen seeks to preclude such testimony because these witnesses have no personal knowledge of decisions regarding Janssen's speaker program. (*Id.* at 26–27.) Janssen argues that deposition testimony from Relators' witnesses confirms that they have no personal knowledge of the selection process. (*Id.* at 29.)

In opposition, Relators argue that Janssen "has contorted the testimony of these witnesses in an attempt to downplay their actual knowledge of the issues." (Relators Opp'n Br. at 42.) Relators assert that these witnesses all have direct personal knowledge of these matters. (*Id.*)

In reply, Janssen clarifies that it only moves to preclude Relators and their witnesses from testifying on two specific topics; it does not move to preclude testimony about all aspects of

Janssen's speaker programs as Relators suggest. (Janssen Reply Br. at 18.) Janssen argues that Relators and their witnesses should be precluded from testifying about why doctors were selected to be speakers for Janssen because the witnesses were not involved in the ultimate selection decision. (*Id*. at 19.) Janssen next contends that "Relators and their witnesses should be precluded from testifying that the purpose of Janssen's payments to speakers was to induce the speakers to prescribe Prezista and Intelence because, as sales employees, they were not involved in determining the amounts the speakers were paid, or in preparing any analytics whatsoever regarding speaker payments or prescriptions". (*Id*.)

Rule 602 demands that a witnesses have "personal knowledge" of a matter about which they are testifying. Fed. R. Evid. 602. Janssen seeks to preclude testimony from Relators' witnesses concerning the decision-making process in the speaker engagements because it claims the witnesses lack personal knowledge on the matter to testify pursuant to Rule 602.

Janssen seeks to preclude Relators' witnesses from testifying as to why doctors were selected for speaking events and whether the purpose of Janssen's payments to speakers was to induce them to prescribe Intelence. Sara Strand's deposition testimony ("Strand Dep.", ECF No. 320-2) indicates that the marketing department ultimately made the decision as to who would be selected for the speakers. (Strand Dep. 85:4–8.) Jessica Penelow additionally testified ("Penelow Dep.", ECF No. 320-5) that she was not privy to the information as to why a speaker would be denied. The witnesses, however, were able to testify as to the criteria. (Penelow Dep. 66:2–8.) When asked who was involved in selecting doctors to be on the speakers bureau, Joseph Marion Holshoe testified ("Holshoe Dep.", ECF No. 324-7) that he "[couldn't] say exactly" and he did not have any role in selecting speakers. (Holshoe Dep. 81:11–24.)

Relators cite testimony from sales representatives indicating their involvement with planning and running the speaker program, but the testimony demonstrates that the sales representatives did not have personal knowledge as to how the speakers were ultimately selected. The Court declines to bar the sales representatives' testimony at this time because its admissibility may depend on the exact nature of the witnesses' testimony and the extent to which Relators can rehabilitate their knowledge at trial. This denial is without prejudice to Janssen's right to raise this objection at trial (presumably under Rule 602) at which time the Court will address it. Janssen's seventh Motion in Limine will therefore be denied without prejudice.

### 8. Whether the Court Should Exclude Evidence or Argument Regarding the Amount of Funds Janssen May Have Set Aside to Litigate this Case

Janssen seeks to exclude evidence that a financial reserve maintained hundreds of millions of dollars for litigation costs for the possibility of the instant litigation. Relators do not oppose this argument. Accordingly, the Court will grant Janssen's eighth Motion in Limine.

## B. RELATORS' MOTIONS

### 1. Whether the Court Should Exclude Any Comment, Reference, or Evidence Concerning the Government's Decision Not to Intervene in This Case

Relators first seek to exclude any evidence or argument regarding the Government's non-intervention under Rules 402 and 403. (Relators Moving Br. at 2.) Relators argue that the Government's non-intervention is not relevant to the merits of the instant action. (Id. at 2–3.) Relators contend that courts consistently find that the Government's decision not to intervene is irrelevant, citing to several extra-jurisdictional cases. (*Id*. at 3.) Relators assert that not only is it not relevant, but evidence of the Government's non-intervention is highly prejudicial because it undermines the FCA's *qui tam* provisions. (Id. at 4.)

In opposition, Janssen argues that the Government's inaction is highly relevant to materiality. (Janssen Opp'n Br. at 1.) Janssen asserts that the Government's non-intervention supports a conclusion that it does not consider the regulatory violation to be material. (*Id.*) Janssen contends that the Government's decision not to intervene in this matter strongly "strongly supports a finding that materiality is absent and is therefore highly relevant and admissible. (Id. at 4.) Janssen argues that in the alternative, if the Court decides to exclude evidence of the Government's non-intervention, then the Court should revisit the issue at trial should Relators "open the door" to suggesting that Relators represent the Government or that this is the Government's lawsuit. (*Id.* at 6.)

In reply, Relators argue that the Government's non-intervention in a *qui tam* case is inherent in the statutory design of the FCA. (Relators Reply Br. at 1.) Relators contend that Janssen's response brief fails to cite a case in which the court has permitted evidence of the Government's non-intervention decision at trial. (Id.) Specifically, Relators argue that the cases Janssen cites are both factually and procedurally inapposite. (Id. at 2.)

Rule 401 of the Federal Rules of Evidence defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401. Here, evidence of the Government's non-intervention is not relevant. Presently, the Court has not been presented with any evidence nor testimony "linking the Government's non-intervention with its actual motivation for doing so." *See U.S. ex rel. El-Amin v. George Washington University*, 533 F. Supp.2d 12, 20 (D.C. Cir. 2008). Evidence of the Government's non-intervention is not probative of how it determined the merits of the instant case. Accordingly, the Court finds that evidence of the Government's non-intervention will be precluded. The Court will grant Relators' first Motion

in Limine, but it will revisit this issue at trial should Relators present evidence or argument at trial that "opens the door" as to the Government's involvement or lack thereof.

**2. Whether the Court Should Preclude Any Comments, References, or Evidence Related to the Imposition of Treble Damages and Statutory Penalties.**

Relators next seek to preclude any comment, reference, or evidence related to the imposition of treble damages or statutory penalties because such evidence is irrelevant and highly prejudicial. (Relators Moving Br. at 4.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 37.) Janssen, however, argues that it is entitled to cross-examine Relators about their significant financial interest in the outcome of this case. (*Id*. at 38.) On this issue, the Court will make a determination should the issue arise at trial.

The Court therefore will preclude any evidence related to the imposition of treble damages or statutory penalties as prejudicial under Rule 403. *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 131-32. Relators' second Motion in Limine will therefore be granted.

**3. Whether the Court Should Preclude Any Comment, Reference, or Evidence to the Collateral Consequences of Finding Janssen Liable**

Relators next seek to preclude Janssen from arguing or presenting evidence that a judgment or verdict adverse to Janssen in this case would result in collateral consequences. (Relators Moving Br. at 6.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 39.) The Court therefore finds that evidence of collateral consequences of an adverse verdict against Janssen is prejudicial under Rule 403 and will be precluded. *See Shannon v. United States*, 512 U.S. 573, 579 (1994). Relators' third Motion in Limine will therefore be granted.

**4. Whether the Court Should Preclude Any Comment, Reference, or Evidence Related to Janssen's Alleged Good Character or Reputation**

Relators argue that Janssen should not be permitted to introduce evidence of Janssen's good character or reputation. (Relators Moving Br. at 8.) Relators contend that such evidence is

20

inadmissible character evidence under Rule 404(b).  Janssen does not oppose this Motion.  The Court therefore finds that evidence of Janssen's good character or reputation, such as evidence of good corporate citizenship, socially valuable research and development efforts, etc., is inadmissible character evidence under Rule 404(b).  *See In re Tylenol (Acetaminophen) Marketing*, Civ. No. 12-7263, 2016 WL 3125428, at *11 (E.D. Pa. June 3, 2016).  The Court will therefore preclude such evidence and grant Relators' fourth Motion in Limine.

### 5. Whether the Court Should Exclude Any Comment, Reference, or Evidence Related to Comparing Janssen's Speaker Program with Other Companies' Speaker Programs

Relators seek to exclude evidence of other companies' speaker programs under Rules 401 and 403.  (Relators Moving Br. at 10.)  Relators argue that any suggestion by Janssen that speaker programs were common in the industry would mislead the jury , "potentially leading the jury to believe that the 'everyone was doing it' defense is viable."  (*Id*. at 11.)  Relators contend that this evidence would lead to "mini trials" about programs that are not at issue in this case, which would distract and confuse the jury.  (*Id*. at 12.)

In opposition, Janssen argues that evidence regarding similar speaker programs and industry custom is highly relevant.  (Janssen Opp'n Br. at 8.)  Janssen contends that the Court has already recognized that evidence that Janssen promoted its prescription medications through similar speaker programs to those employed by other pharmaceutical companies is "pertinent" to this case.  (Id.)  Janssen maintains that courts considering the scienter requirement of a FCA claim "routinely consider evidence of industry custom or practice to be relevant because it speaks directly to whether there is a 'common misunderstanding' of government regulations and whether the defendant 'acted according to that understanding.'" (*Id*.) (citing *Skibo el rel. United States v. Greer Labs., Inc*., 841 F. App'x 527, 533–34 (4th Cir. 2021).  Janssen argues that other pharmaceutical

21

companies' speaker programs reflect industry-wide practices regarding the government regulations at issue here. (*Id*. at 9.) Further, Janssen contends that this evidence will not confuse the issues or mislead the jury because jurors are "more than capable of evaluating evidence of industry-wide speaker programs and the extent to which Janssen comported itself in accordance with those practices without using that evidence for an improper use." (*Id*. at 11–12.) Janssen argues that the cases Relators cite to support their position do not involve FCA or Anti-Kickback claims.

In reply, Relators argue that if Janssen's knowledge of other companies' speaker programs is relevant, "then so to is its knowledge of enforcement actions and settlements related to other speaker programs. (Relators Reply Br. at 6.)

To succeed on Anti-Kickback and FCA claims, Relators must prove defendants acted knowingly and willfully. 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)(2). Other pharmaceutical companies' speaker programs reflect industry wide practices regarding the government regulations that Relators contend Janssen knowingly and willfully violated. Accordingly, evidence regarding other companies' speaking programs is therefore relevant.

The Court additionally finds that the prejudicial effect of this evidence does not substantially outweigh its probative value. Evidence of industry standards is highly probative and any concern of misleading the jury can be cured with a limiting instruction. *See Axiall Corp. v. Descote S.A.S.*, Civ. No. 15-250, 2017 WL 9487085, at *5 (W.D. Pa. Oct. 27, 2017).

Further, the Court has already determined that evidence of prior settlements and litigation was relevant for the Relators' to prove scienter and materiality. The Court will therefore permit evidence of other speaking engagements based on this argument. Accordingly, Relators request

22

to exclude evidence of other companies' speaker programs under Rules 401 and 403 will be denied without prejudice.

### 6. Whether the Court Should Preclude Any Comment, Reference, or Evidence Relating to Relators' Fee Agreement With Counsel or Relators' Ability to Recover Attorneys Fees, Costs, and Expenses Under the FCA

Relators next seek preclusion of evidence relating to Relators' fee agreements with counsel or Relators' ability to recover attorney fees, costs, or expenses under the FCA. (Relators Moving Br. at 12.) Relators argue that the existence and terms of their fee arrangement are irrelevant and prejudicial. (*Id.* at 13.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 37.) Relators' sixth Motion in Limine will therefore be granted.

### 7. Whether the Court Should Preclude Any Comment, Reference, or Other Evidence Related to Relators Not Having Been Damaged by Janssen's Conduct

Relators claim their operative complaint alleges that Janssen's conduct has caused harm to the United States as well as to several States. (Relators Moving Br. at 15.) Relators contend that whether or not they suffered any injuries as a result of Janssen's conduct is irrelevant and only serves to confuse the jury. (*Id.*) Relators argue that because this case is about harm suffered by the Government, whether Relators individually suffered damages would be "irrelevant, confusing, prejudicial, and a waste of time." (*Id.* at 16.)

In opposition, Janssen argues that this Motion should be denied because the evidence is relevant to Relators' allegations that they were injured by Janssen and it bears on their credibility. (Janssen Opp'n Br. at 14.) Janssen contends that Relator Jessica Penelow ("Penelow") claims she was denied certain promotions or positions because she supposedly refused to improperly promote Prezista or Intelence. (*Id.* at 15.) Janssen claims it should have the opportunity to question Penelow and the other Relator in front of the jury about this and similar allegations because

Relators have placed the question of injury at issue through their statements and testimony. (*Id*.) Further, Janssen argues that this evidence is relevant to Relators' credibility. (*Id*. at 15–16.)

In reply, Relators assert that they are not intending to prevent Janssen from cross-examining Relators regarding their allegations in this case. (Relators Reply Br. at 8.) Relators argue that Janssen should not be permitted to argue or suggest that Relators must suffer harm or damages to prevail. (*Id*. at 9.)

The instant matter involved FCA and Anti-Kickback Statute claims, neither of which require Relators to prove individual damages or harm. Evidence concerning lack of harm or damages is therefore irrelevant to Relators' claims. The Court will therefore preclude any reference to Realtors' lack of harm. Relators' seventh Motion in Limine will therefore be granted.

### 8. Whether the Court Should Preclude Any Comment, Reference, or Evidence Regarding Earlier Versions of the Complaint or the Fact that the Complaint was Amended

Relators next seek to preclude evidence regarding previous versions of the complaint. (Relators Moving Br. at 16.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 39.) The Court will therefore preclude such evidence and grant Relators' eighth Motion in Limine.

### 9. Whether the Court Should Preclude Any Comment, Reference, or Evidence Regarding the Public Policy Behind HIV Drugs and Patient Accessibility

Relators seek to preclude Janssen from making the argument that it is the United States' policy to pay for HIV medications because it is "calculated to mislead the jury into believing that the government will pay for HIV medications even when the underlying claims are known to be false." (Relators Moving Br. at 18.) Relators contend that the relevant issue is not whether HIV patients should have access to Prezista and Intelence, or whether governmental policy favors improving access to HIV drugs, but rather, "whether the Government would reimburse for claims

24

that resulted from Janssen's specific promotional activity and payment of alleged kickbacks." (*Id.* at 19.) Relators contend that such evidence will confuse the jury. (*Id.*)

In opposition, Janssen argues that the evidence at issue is directly relevant to the question of materiality, or, why the Government payors paid for Prezista and Intelence. (Janssen Opp'n Br. at 18.) Janssen contends that Government policies concerning the coverage of HIV treatment are relevant to whether the alleged falsity of the claims for reimbursement for Prezista and Intelence was material to the Government payors' decision to pay those claims. (*Id.*)

In reply, Relators argue that Janssen "should not be permitted to argue for jury nullification based on HIV policy or the importance of treating the disease." (Relators Reply Br. at 9.)

The materiality inquiry focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," which is always the Government payors in the FCA context. *Petratos*, 855 F.3d at 491. Further, the FCA's materiality standard is "demanding" and "rigorous," requiring more than a showing that the government payor "designates compliance with a particular . . .requirement as a condition of payment. *Id.* at 489–90. To prevail, Relators materiality element hinges on the Government payor's perspective. Janssen is entitled to rebut Relators' materiality evidence by presenting evidence of Government payment policy. The Court will therefore deny Relators' ninth Motion in Limine based on this argument. To avoid jury confusion, the Court will permit parties to meet and confer and propose a limiting instruction on this issue.

### 10. Whether the Court Should Exclude Evidence Regarding Documents that Janssen Did Not Produce During Discovery

Relators claim that Janssen's trial exhibit list contains numerous documents that Janssen failed to produce during discovery, despite the fact that these documents were responsive to Relators' requests for production. (Relators Moving Br. at 20.) Relators argue that because

Janssen failed to disclose the responsive documents, the admission of these documents would unfairly prejudice Relators. (*Id.*) Relators contend that this evidence would cause prejudice and surprise to them because Janssen did not provide any indication that these documents existed or that it might rely on these documents at trial. (*Id.* at 23.) Relators assert that they were deprived of the opportunity to depose Janssen's witnesses about these documents as a result of their non-disclosure. (*Id.*) Relators argue that the prejudice caused by the non-disclosure cannot be cured at this late date, considering it is now several years after discovery and the case is ready for trial. (*Id.* at 24.) To cure the prejudice, Relators maintain that they would have to be given the opportunity to depose Janssen's witnesses and "submit new expert reports regarding the newly identified studied and compliance policies produced by Janssen, which might require additional expert discovery regarding new opinions." (*Id.*) Such a process, Relators contend, would be costly and timely. (*Id.*) Further, Relators argue that the admission of the newly discovered evidence would prevent the trial from going forward. (*Id.*) Relators additionally claim that Janssen's failure to disclose these documents suggests bad faith or willful failure to comply with its discovery obligations. (*Id.* at 25.) Finally, Relators assert that while these documents are important, they are "not so important that excluding them would deprive Janssen of its ability to put on its defense." (*Id.*)

In opposition, Janssen argues that it should deny Relators' Motion because it did not violate its discovery obligations as to any of the disputed documents. (Janssen Opp'n Br. at 24.) Janssen argues that Relators cannot establish a violation of Federal Rules of Civil Procedure 37 because Janssen either timely produced the challenged evidence or had no obligation to do so. (*Id.* at 25.) Janssen contends that it produced "exact or near-duplicates of all four of the [scientific] studies published within the 'Relevant Time Period' applicable to Relators' document requests[.]" (*Id.*)

26

Janssen asserts that the two remaining articles identified by Relators were published outside the Relevant Time Period and were not produced. (*Id*. at 26.) Janssen further maintains that the 13 performance reviews of Relators and their witnesses are not subject to pretrial disclosure rules because they are only intended for impeachment purposes. (*Id*.) Specifically, Janssen contends that Relators' Third Request for Production Nos. 12 and 31 sought documentation of Janssen's compliance with its GCC program and Healthcare Compliance Program. (*Id*. at 27–28.) Janssen argues that Relators Third set of Requests for Production do not seek all documents related to Janssen's compliance efforts generally. (*Id*. at 28.) As a result, Janssen contend that these three exhibits were not responsive to the discovery requests, and it was under no obligation to produce them. (*Id*.) Furthermore, Janssen contends that any purported discovery violation was substantially justified or harmless. (*Id*.)

In reply, Relators argue that as to the "scientific studies" (exhibits DX1075, DX1089, DX1098, and DX1102), if the produced versions are equivalent to the unproduced ones, then there should be no prejudice to Janssen to be required to use the produced versions. (Relators Reply Br. at 10.) As to DX6073-74, DX6079-83, and DX6085-88, the exhibits Janssen categorizes as "performance reviews," Relators claim they do not intend to exclude Janssen from using those exhibits for impeachment purposes and they only seek a ruling from the Court on whether Janssen can use them as part of its case in chief. (*Id*. at 11.) Finally, Relators contend that the "compliance documents" (DX2293-94 and DX2333) are responsive to Relators' Third Requests for Production Nos. 12 and/or 31 because "these documents reflect Janssen's efforts to comply with its obligations under its April 28, 2013 Corporate Integrity Agreement." (*Id*.)

In determining whether to exclude non-disclosed evidence, district courts must consider four factors: "(1) the prejudice or surprise of the party against whom the excluded evidence would

have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000). In addition, the Court should also consider the party's explanation for failing to disclose as well as the importance of the excluded evidence, the latter of which is often the most significant factor. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012)

First, as to the six scientific studies, Relators, in reply, indicate that they do not seek to exclude DX1080 and DX1105 from trial because they were published after the Relevant Time Period. (Relators Reply Br. at 10 n 2.) As to the remaining four studies, Janssen contends that it produced exact or near-duplicates of the same. (Janssen Opp'n Br. at 25.) Accordingly, if the produced versions are equivalent to the unproduced ones, then there should be no prejudice to Janssen in being required to use the produced versions. Permitting introduction of these exhibits, should they not be "near duplicates" or "exact," would result in prejudice to Relators. The Court will therefore exclude DX1075, DX1089, DX1098, and DX1102 on the basis that they were not produced in discovery.

As to the performance reviews, Janssen indicates that these documents "are only intended for impeachment purposes[.]" (Janssen Opp'n Br. at 26.) Relators submit that they "do not seek to exclude Janssen from using those exhibits for impeachment purposes." (Relators Reply Br. at 11.) Relators "only seek a ruling from the Court that Janssen cannot use these exhibits as trial exhibits in its case in chief. (*Id.*) Admission of this evidence into Janssen's case in chief will cause prejudice and surprise to Relators. Relators were deprived of the opportunity to depose Janssen's witnesses about these documents. To cure this prejudice would require the Court to

28

permit additional depositions which would delay the trial. Further, this case was filed almost ten years ago, having conducted several years of discovery. The Court will therefore exclude DX6073-74, DX6076, DX6079-83, and DX6085-88 from Janssen's case in chief but will permit the evidence as impeachment evidence only.

Finally, exhibits DX2293-94 and DX2333 will be excluded. These documents reflect Janssen's effort to comply with the April 28, 2013 CIA, and as set forth above, Janssen's compliance efforts are probative. Relators and their experts were not able to review and assess these documents. For Relators to cure this nondisclosure would require the Court to delay trial for Relators to fully review this evidence. The Court finds that is unfair and prejudicial to Relators for Janssen to have waited over three years to disclose these documents. Janssen will therefore be precluded from using DX2293-94 and DX2333 in its case in chief.

### 11. Whether Janssen Should Be Precluded from Taking Any "Trial Depositions" and/or From Presenting Trial Depositions or Remote Testimony at Trial

Finally, Relators contend Janssen seeks to present testimony from doctors and other witnesses through "trial deposition" or remotely. (Relators Moving Br. at 26.) Relators claim that Janssen's reasoning to excuse these witnesses from live testimony is because they live outside of New Jersey and have busy schedules. (*Id*.) In their Moving brief, Relators indicate that this issue is contemplated as a motion in limine in the Final Pretrial Order (ECF No. 315). Relators additionally contend that "the parties met and conferred on these issues on November 10 and will submit a joint five-page letter to the Court in due course." (*Id*. at 26 n.9.) The Court however, is not yet in receipt of such letter. The Court will therefore reserve on deciding this Motion until the parties have submitted their joint letter.

## V.    **CONCLUSION**

Accordingly, for the reasons stated herein, the Court will GRANT IN PART and DENY

IN PART the Motions.[3]  An appropriate Order will follow.


Date: **June 28, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

---

[3] As a final, housekeeping matter, the Court notes that portions of this Opinion refer to certain documents and information that was placed under seal at the request of the parties. The Court has therefore instructed the Clerk's Office to place this Opinion under temporary seal, and will order the parties to meet and confer and advise as to whether they will be filing an appropriate motion to seal under Local Civil Rule 5.1 to permanently seal this Opinion,