## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates to All Actions** | MDL No. 2875<br><br>Honorable Renée Marie Bumb, District Court Judge |

## DEFENDANT ZHEJIANG HUAHAI PHARMACEUTICAL CO., LTD.'S MEMORANDUM IN SUPPORT OF OBJECTIONS TO AND MOTION TO REVERSE SPECIAL MASTER ORDER 98 GRANTING PLAINTIFFS' MOTION FOR RULE 37 SANCTIONS

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

BACKGROUND ..........................................................................................5

    A.    The Deposition of Baohua Chen .......................................................5

    B.    Production of Documents..................................................................9

    C.    Jinsheng Lin's July 27, 2017 Email .................................................11

    D.    Special Master's Ruling And Proposed Sanctions............................13

ARGUMENT.............................................................................................15

I.    ZHP DID NOT ENGAGE IN SANCTIONABLE CONDUCT. .................16

    A.    ZHP Acted In Good Faith And With Reasonable Diligence To Secure Mr. Chen's Presence For His Deposition..............................16

    B.    ZHP Produced The Documents That The Special Master Found Remain Outstanding. .......................................................................25

II.    THE SEVERE SANCTIONS APPROVED BY THE SPECIAL MASTER ARE DISPROPORTIONATE AND UNCONNECTED TO THE ALLEGED VIOLATIONS.............................................................27

    A.    The Special Master's Proposed "Adverse Inference" Sanction Is Excessive And Unjust.......................................................................28

    B.    Plaintiffs Are Not Entitled To Monetary Sanctions Beyond Their Fees And Costs In Seeking Discovery. ...................................34

CONCLUSION .........................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barkouras v. Hecker*,
No. CIV.A. 06-366 (AET), 2007 WL 777664 (D.N.J. Mar. 12, 2007) ........35

*Bloom v. Illinois*,
391 U.S. 194 (1968) ...................................................................................36

*Cassady v. Owens*,
No. CV408-250, 2010 WL 6268440 (S.D. Ga. Dec. 7, 2010) ....................36

*Castellani v. City of Atlantic City*,
No. CV 13-5848 (JBS/AMD), 2016 WL 7131576
(D.N.J. June 30, 2016) ...............................................................................25

*Consolidated Aluminum Corp. v. Alcoa, Inc.*,
244 F.R.D. 335 (M.D. La. 2006) ...............................................................32

*Egyptian Chamois Co. v. Evergreen Marine Corp.*,
No. CV 99-5080, 2001 WL 1737458 (C.D. Cal. Jan. 25, 2001) .................20

*Emerson v. Wetherill*,
No. CIV. 92-4082, 1994 WL 249769 (E.D. Pa. June 1, 1994)....................32

*Estate of Boyles*,
2021 WL 3292727 (M.D.N.C. Aug. 2, 2021).............................................20

*FS2 Capital Partners, LLC v. Church*,
No. CIV.A. 14-4933, 2015 WL 246339 (E.D. Pa. Jan. 16, 2015)...............29

*Gertcher v. Therrian*,
No. 2:20-cv-240, 2022 WL 842655 (W.D. Mich. Mar. 22, 2022) ..............29

*Givaudan Fragrances Corp. v. Krivda*,
No. CV 08-4409 (PGS), 2012 WL 12917268 (D.N.J. May 8, 2012) ..........25

*Harris v. Philadelphia*,
  47 F.3d 1311 (3d Cir. 1995) .......................................................................36

*Hicks ex rel. Feiock v. Feiock*,
  485 U.S. 624 (1988) ...................................................................................36

*Hildebrand v. Allegheny County*,
  923 F.3d 128 (3d Cir. 2019) .......................................................................28

*International Union, United Mine Workers of America v. Bagwell*,
  512 U.S. 821 (1994) ...................................................................................35

*In re Kendall*,
  712 F.3d 814 (3d Cir. 2013) .......................................................................38

*In re Lands' End Leasing, Inc.*,
  220 B.R. 226 (Bankr. D.N.J. 1998) ............................................................29

*Lasky v. Continental Products Corp.*,
  569 F. Supp. 1227 (E.D. Pa. 1983) ............................................................17

*Lawson v. Praxair, Inc.*,
  No. 16-2435(BRM)(DEA), 2023 U.S. Dist. LEXIS 198253
  (D.N.J. Apr. 28, 2023) ...............................................................................15

*Lithuanian Commerce Corp. v. Sara Lee Hosiery*,
  177 F.R.D. 205 (D.N.J. 1997) ....................................................................35

*Marshall v. Segona*,
  621 F.2d 763 (5th Cir. 1980) ......................................................................29

*Martin v. Brown*,
  63 F.3d 1252 (3d Cir. 1995) .......................................................................35

*Poulis v. State Farm Fire & Casualty Co.*,
  747 F.2d 863 (3d Cir. 1984) .......................................................................28

*RetPet, Inc. v. Zhao*,
  No. ED CV 15-2315-VAP (SPx), 2018 WL 9802098
  (C.D. Cal. Jan. 16, 2018) ......................................................................20, 21

*Societe Interationale Pour Participations Industrielles et Commerciales S. A. v. Rogers*,
  357 U.S. 197 (1958)..........................................................................2, 17, 19

*Sovulj v. United States*,
  No. 98 CV 5550FBRML, 2005 WL 2290495
  (E.D.N.Y. Sept. 20, 2005).................................................................32, 33

*Tower Manufacturing Corp. v. Shanghai Ele Manufacturing Corp.*,
  244 F.R.D. 125 (D.R.I. 2007)..................................................................23

*United States v. Twentieth Century Fox Film Corp.*,
  882 F.2d 656 (2d Cir. 1989)...................................................................36

*Valeant Pharmaceuticals International, Inc. v. AIG Insurance Co.*,
  No. 18-493 (MAS)(LHG), 2020 U.S. Dist. LEXIS 244479
  (D.N.J. Dec. 30, 2020) ..........................................................................16

*In re Westinghouse Electric Corp. Uranium Contracts Litigation*,
  563 F.2d 992 (10th Cir. 1977)...........................................................passim

## RULES

Fed. R. Civ. P. 53(f)(3) .........................................................................15

Fed. R. Civ. P. 53(f)(4) .........................................................................15

Fed. R. Crim. P. 42(a)(1)(B) ..................................................................36

Fed. R. Crim. P. 42(b)............................................................................36

Defendant Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP"), by and through its undersigned counsel, hereby objects to Special Master Order 98 ("SMO 98") (ECF No. 2715) granting in part Plaintiffs' motion for sanctions under Rule 37.

In December 2021, Plaintiffs filed a motion seeking trial sanctions based on: (1) ZHP's President Baohua Chen's inability to be deposed in this case after being denied permission by the People's Republic of China (the "Chinese government") to travel out of the country for such a deposition; and (2) ZHP's initial concerns about producing a relatively small number of documents subject to Chinese data privacy statutes, all of which were produced in 2022.  For more than two years, the motion for sanctions sat dormant as the parties spent significant time and resources addressing general causation, the admissibility of experts and the propriety of class certification, and eventually preparing to defend against a class action trial involving the claims of essentially every third-party payor in the United States that paid for valsartan prescriptions.  It was only after that massive class trial was canceled due to Judge Kugler's unanticipated retirement that the Special Master suddenly ruled on the long-dormant motion, essentially granting a directed verdict in favor of Plaintiffs on liability issues for any and all valsartan trials based on this alleged discovery misconduct from years ago.

SMO 98 (1) authorizes an "adverse" jury instruction in Plaintiffs' favor on the central substantive issue in the case: whether ZHP was aware of the presence of

nitrosamines in its valsartan active pharmaceutical ingredient ("API") and failed to disclose it; and (2) approves "significant" monetary sanctions that would go far beyond compensating Plaintiffs for their costs and fees in seeking the discovery at issue.  These draconian sanctions are unauthorized under Third Circuit law and should not be adopted by the Court for multiple reasons.

***First***, the evidence does not establish that ZHP engaged in sanctionable conduct.  Even before Judge Kugler affirmed the Special Master's ruling compelling Mr. Chen's deposition in August 2021 (ECF No. 1475), ZHP had initiated the process of seeking permission from the Chinese government to allow Mr. Chen to travel out of mainland China for his deposition, establishing ZHP's reasonable and good-faith attempts to comply with the order.  The fact that the Chinese government ultimately barred Mr. Chen from leaving the country demonstrates that any non-compliance with Judge Kugler's discovery order was entirely the result of foreign law, which is a "weighty" reason for declining to impose sanctions.  *See Societe Interationale Pour Participations Industrielles et Commerciales S. A. v. Rogers*, 357 U.S. 197, 211-13 (1958) (reversing imposition of sanctions).  The Special Master justified his ruling on the asserted ground that ZHP should have included more details in the application for Mr. Chen's visa and should have pursued a "formal" appeal, but the Special Master is not an expert on Chinese law and thus had no basis to believe that such steps would have been appropriate or fruitful, and he refused to

2

consider a declaration from a Chinese law expert explaining that ZHP did take the proper procedural steps to obtain permission for Mr. Chen to travel.  The Special Master also appeared to suggest that Mr. Chen could have somehow pulled strings to obtain a travel visa, but this was pure speculation.  (*See* SMO No. 98, at 20 ("Nor is there any indication that Mr. Chen himself was involved in the efforts to obtain permission to travel for his deposition.").)

The Special Master also misunderstood the relevant discovery record in finding that ZHP improperly failed to produce documents, primarily from the custodial file of Mr. Chen's chief of staff, Maggie Kong.  ZHP produced the documents at issue to Plaintiffs by October 2022, 18 months before the sanctions order.  While ZHP initially objected to producing a number of the documents, primarily because they were subject to protection under Chinese data privacy laws, it produced the documents ***at the risk of penalty under those foreign laws*** and represented as much in a sworn certification provided to Plaintiffs in 2022 at the Special Master's direction.  As a result, any complaint regarding the production of this relatively small number of documents has been moot for more than a year and a half.

***Second***, the sanctions ordered by the Special Master would be unjust, even if ZHP had engaged in sanctionable conduct, because of their severity and because they are not tied in any way to the alleged misconduct.  The Special Master

effectively directed a verdict in favor of Plaintiffs on key elements of their claims by authorizing a jury instruction that ZHP had "knowledge of the [nitrosamine] contamination" as of July 27, 2017 (the date of an email written by a ZHP scientist about a different drug molecule known as irbesartan) and that ZHP "cover[ed] up" this information.  (SMO No. 98, at 38.)

But Plaintiffs did not even allege the sort of bad faith required for the harsh sanction of an adverse inference.  And the adverse inference would not "restore" Plaintiffs to the position they would have been in if Mr. Chen had been deposed because he would not have been able to provide any evidence related to the 2017 email.  Mr. Chen and Ms. Kong were not recipients of the email, and there is no evidence that anyone told them about it.  In other words, the Special Master proposes to punish ZHP and reward Plaintiffs by telling the jury that one of Plaintiffs' central contentions is true, even though that contention has nothing to do with the alleged discovery violations.

The Special Master's finding that ZHP should be ordered to pay a "substantial" monetary sanction as punishment for its alleged discovery misconduct should also be overturned.  Such a punitive fine may only be imposed upon a finding of criminal contempt, which requires a jury finding after an evidentiary proceeding.

For all of these reasons, elaborated in greater detail below, the Court should sustain ZHP's objections to the Special Master's ruling and overrule it.

## BACKGROUND

Throughout this multi-year MDL proceeding, Plaintiffs have obtained voluminous discovery from ZHP and its affiliates, including depositions of ten corporate representatives and seven fact witnesses. (*See* ECF No. 1900, at 11.) In addition, ZHP and its affiliates have produced almost 400,000 documents totaling more than 3.5 million pages, which were collected from more than 90 custodians using more than 400 search terms identified by Plaintiffs. (*Id.* at 14 n.7.) Nonetheless, on December 30, 2021, Plaintiffs moved for sanctions under Rule 37, arguing that ZHP should be punished because: (1) the Chinese government refused to allow Mr. Chen to leave mainland China to provide a deposition in this litigation; and (2) ZHP allegedly failed to produce a relatively small number of documents that have now long been produced. (*See generally* ECF No. 1838-1.)

### A.     **The Deposition of Baohua Chen**

From the outset of this litigation, Plaintiffs knew that deposing Chinese citizens who reside in China would likely require permission from the Chinese government through certain procedures established under the Hague Convention and China's Civil Procedure Law. (*See* ECF No. 86 16:3-6; ECF No. 579 14:2, 21:11 (Court recognizing the "very sticky" and "amazingly complex" issues in securing depositions of Chinese nationals); ECF No. 565 25:21-26:4 (ZHP counsel explaining that "Hague Convention protocols would apply").) Plaintiffs, however, never

invoked the Hague Convention or sought approval from the Chinese government to depose ZHP witnesses living in China.  (*See* ECF No. 610, at 37-38 ("Plaintiffs can—they certainly are permitted, they haven't made any attempt and, in fact, have outright refused to make an attempt to obtain a letter of request to depose a witness in China").)   Nonetheless, to accommodate Plaintiffs' request for corporate representative and individual fact witness depositions, ZHP facilitated the travel of 12 witnesses to Macao to provide remote deposition testimony, an arduous process that was further complicated by logistical and bureaucratic hurdles relating to the Covid-19 pandemic.  (*See* ECF No. 1900, at 5 n.3.)  These witnesses addressed close to 60 different topics, including, *inter alia*, testing of valsartan, quality assurance, communications with regulatory bodies and compliance with regulatory standards.  (*See* ECF No. 703-1.)

On the heels of this substantial discovery, ZHP objected to Plaintiffs' demand to depose its President, Mr. Chen, under the "apex" doctrine, explaining that Mr. Chen "***had no material involvement*** in the valsartan manufacturing, testing, analytical, quality control, quality assurance, research and development, recall, regulatory and sales functions at issue in this litigation."  (ECF No. 1247-2, at 2-3 (emphasis added); *see also* ECF No. 1900-5 364:5-14 (ZHP party witness testifying: "I don't think [Mr. Chen] has any time for that").)  The Special Master rejected that argument and Judge Kugler affirmed his decision on June 22, 2021, holding that

"plaintiffs cannot know what Mr. Chen will say specifically about the API contamination and his role in it until he is deposed."  (ECF No. 1475, at 2.)

Even prior to Judge Kugler's ruling, ZHP diligently began the process to secure permission for Mr. Chen to exit the Chinese border and travel to Macao so that he could be deposed if Judge Kugler affirmed the Special Master's holding.  (*See* ECF No. 1900-1 ("Lu Declaration") ¶ 3.)  Unlike the 12 other ZHP witnesses, Mr. Chen has various roles in the Chinese government and therefore is not permitted to travel outside of mainland China absent express approval from ZHP's Communist Party Committee, the Taizhou Federation of Industry and Commerce, and the Taizhou Exit-Entry Administration of the Public Security Bureau.  (*Id.* ¶ 14.)  ZHP employee Sihan Lu took the following steps to secure the requisite government approval:

- Ms. Lu had "preliminary" discussions with the Taizhou Federation of Industry and Commerce regarding Mr. Chen's application in early June 2021.  (*Id.* ¶ 3.)

- Ms. Lu completed and submitted the required Approval Form for Leading Cadres to Leave China (border) for Private Purposes to ZHP's Communist Party Committee on June 9, 2021.  (*Id.* ¶¶ 4, 6.)  That Committee granted Mr. Chen's request the following day.  (*Id.* ¶ 7.)

- On June 14, 2021, Ms. Lu submitted Mr. Chen's application to the Taizhou Federation of Industry and Commerce.  (*Id.* ¶ 8.)

- Ms. Lu subsequently followed up "from time to time on the application status."  (*Id.* ¶ 9.)

- On October 21, 2021, the Taizhou Federation of Industry and

7

Commerce verbally notified ZHP that Mr. Chen's request would not be granted.  (*Id.* ¶ 10.)

- Ms. Lu held further discussions with the Taizhou Federation of Industry and Commerce "to determine if the restriction on Mr. Chen's travel could be lifted or modified."  (*Id.* ¶ 11.)  Those conversations were unsuccessful, with a written denial being delivered to ZHP on November 12, 2021.  (*Id.* ¶ 12.)

- On January 19, 2022, Ms. Lu sought permission to publicly disclose the written denial, which was denied.  (*Id.* ¶ 13.)

Despite ZHP's efforts to facilitate Mr. Chen's deposition—and without first attempting to meet and confer with ZHP—Plaintiffs moved for sanctions, accusing ZHP of bad faith and speculating that Mr. Chen could have somehow forced the government to approve his travel request if he had wanted to attend the deposition.  (*See* ECF No. 1838-1, at 16; ECF No. 2182 ("Sept. 8, 2022 Hr'g Tr.") 28:14-16, 52:9-25.)  While ZHP strongly disputed these claims (*see, e.g.*, Sept. 8, 2022 Hr'g Tr. 41:3-23), the Special Master stated that there "[s]hould . . . be a declaration of a witness, or something that is evidentiary in nature" addressing these points.  (*Id.* 41:24-42:6.)  Accordingly, on October 13, 2022, ZHP submitted a declaration from Professor Jacques deLisle—Co-Director of the Center for Asian Law at the University of Pennsylvania (ECF No. 2175-2 ("deLisle Decl."))—explaining why "[t]he efforts described in the Lu Declaration are consistent with known patterns of efforts by applicants seeking government approvals of various types in China." (deLisle Decl. ¶ 27.)  Professor deLisle further explained that "[t]he choice of

wording on the Application Form, the non-inclusion of the Special Master's ruling, and the rejection of the application are also consistent with, and may reflect, broader concerns that party and state authorities in China have expressed and embedded in policies and rules." (*Id.* ¶ 28.)  For example, Professor deLisle noted that ZHP's decision not to attach the Court order compelling Mr. Chen's deposition to the application is consistent with the fact that a "request to exit mainland China to be deposed in litigation in a foreign court proceeding raises particular concerns about which a relatively sophisticated applicant might well worry (and, in turn, such an applicant would seek to avoid drawing attention to this purpose in a request for permission to travel)." (*Id.* ¶ 29.)  In other words, including that information could have precisely the opposite effect of that intended:  i.e., it could lead to denial of the application.

On May 4, 2023—nearly seven months after ZHP provided the declaration at the Special Master's recommendation—the Special Master struck the declaration as untimely.  (ECF No. 2371, at 5.)

### B.    Production of Documents

On April 27, 2021, Plaintiffs notified the Court that the parties had reached an impasse with respect to four narrow categories of documents that the Special Master ultimately ordered be produced: (1) the custodial file of Maggie Kong, Mr. Chen's chief of staff; (2) an investigative report regarding alleged contamination of

irbesartan, a **different** drug molecule from the valsartan API that is the basis of Plaintiffs' claims; (3) all documents referencing "TC-201729," the project name for a lab-scale study of irbesartan; and (4) all documents relating to the batch testing for nitrosamines referenced in a document bearing Bates Number PRINSTON0075797. (*See generally* ECF No. 1753.)  While ZHP initially could not produce the requested documents due to technical difficulties and/or the passage of China's Data Security Law, ZHP "agreed to produce the Documents—at the risk of penalty under Chinese law" in February 2022.  (ECF No. 1900, at 3; *see also id.* at 16 (ZHP informing Plaintiffs that it would produce all of the remaining requested documents despite failing to obtain permission to do so from the Chinese government).)

Plaintiffs nonetheless insisted eight months later at oral argument that ZHP had still not met its production obligations.  At that point, the Special Master stated that "it would be appropriate" for ZHP to "certify that [it has] complied with Special Master Order 54" and that the "record should reflect" such a "certification"—i.e., that ZHP's counsel "conducted a diligen[t] search and produced everything that [was] ordered to be produced that [ZHP] could find."  (Sept. 8, 2022 Hr'g Tr. 39:3-8.)  On October 21, 2022, ZHP's counsel provided Plaintiffs with such a certification that included, *inter alia*: (1) an attestation that counsel had personally investigated the steps taken to identify the whereabouts of the four categories of documents discussed in SMO 54; (2) a representation that counsel had confirmed that the searches were

10

conducted in a manner consistent with the Rules; (3) identification by bates number of additional documents produced as a result of those searches; and (4) confirmation that no more additional responsive documents were available. (*See generally* Certification of Richard T. Bernardo (Oct. 21, 2022), attached to Oct. 21, 2022 Email from R. Bernardo to A. Slater & C. Geddis (attached collectively as Ex. 1).)

## C.   Jinsheng Lin's July 27, 2017 Email

Throughout this litigation, Plaintiffs have claimed that the four categories of documents discussed above are relevant because they may shed light on a July 27, 2017 email sent by ZHP chemist Dr. Jinsheng Lin to some of his ZHP colleagues.

Dr. Lin's email—which was written in his native language of Chinese—addresses a hypothetical impurity in the lab-scale production of irbesartan, which (as previously noted), is a different drug molecule from the valsartan API at issue in this litigation.  (*See* ECF No. 2604, at 4.)  Different translations of this document exist, and Plaintiffs have taken the position that some of those translations show that Dr. Lin compared the hypothetical impurity in irbesartan to nitrosamine impurities found in valsartan.  As a result, Plaintiffs assert that the email shows that "ZHP knew that its valsartan was contaminated with NDMA" as of 2017.  (*See, e.g.*, ECF No. 2569-2, at 1.)  By contrast, ZHP's corporate representative, Jucai Ge, who was an original recipient of the email, has testified that Dr. Lin's email references a patent, which is attached to his email, that notes the potential for the formation of "Valsartan

Impurity K," a different nitrosated impurity that can form when deacylated valsartan (yet another drug molecule) is quenched with sodium nitrite.  (*See* ECF No. 2569-5 at Ex. 30 110:6-22; ECF No. 2569-5 at Ex. 109.)  As ZHP's witnesses have noted, it was this substance—Valsartan Impurity K formed by the quenching of deacylated valsartan—that Dr. Lin was suggesting the irbesartan impurity resembled, not NDMA formed during the manufacture of the valsartan API at issue in this litigation. (*See* ECF No. 2569-5 at Ex. 30 110:18-22.)  (Plaintiffs have never sought Dr. Lin's deposition.)  Judge Kugler expressly recognized, in denying Plaintiffs' motion for partial summary judgment against ZHP on their fraud claims, that the meaning and import of the July 27, 2017 email are factual questions for the jury to decide in resolving Plaintiffs' allegations.  (*See* ECF No. 2694, at 52 & n.53.)

Neither Mr. Chen nor Ms. Kong were recipients of Dr. Lin's email.  In addition, the individuals at ZHP who ***did*** receive the email made clear in their depositions that because the email pertained to science issues, it would not have been discussed with Mr. Chen in his role as President.  (*See, e.g.*, ECF No. 2663-27 at Ex. 1 96:5-21 (ZHP employee testifying that she did not inform Mr. Chen of Dr. Lin's July 27 email and that it would be her expectation that the issues discussed "would not be reported to Mr. Baohua Chen"); ECF No. 2663-12 598:9-610:7 (ZHP employee testifying that he believes Mr. Chen was not informed of the July 27

email).)[1]  Finally, the Special Master noted that there was "no testimony . . . that there was a failure to follow litigation hold advice," nor "evidence of the loss of any particular data," including with regard to the July 27, 2017 email.[2]  (*See* ECF No. 1753, at 4.)  For that reason, among others, the Special Master denied Plaintiffs' motion to compel ZHP to continue looking for additional versions of the document. (*Id.*)

## D.   Special Master's Ruling And Proposed Sanctions

The Special Master's Order on Plaintiffs' motion for sanctions was issued in May 2024, ***more than two years*** after briefing on the motion was completed by the parties.  In the Order, the Special Master adopted Plaintiffs' argument that ZHP did not do enough to secure authorization for Mr. Chen to travel for his deposition and therefore violated SMO 28, as well as Plaintiffs' baseless assertion that Mr. Chen or ZHP could have done something to force the Chinese government to grant Mr. Chen's visa application.  In particular, the Court faulted Mr. Chen and ZHP for not

---

[1]  Plaintiffs have suggested that because the July 27, 2017 email was not found in Dr. Lin's custodial file at the time documents were produced in 2020-2021, ZHP must have "intended to conceal the email and any surrounding documents and communications."  (ECF No. 2682, at 6 n.1.)  This unsupported accusation was previously rejected by Judge Vanaskie.  (*See* ECF No. 1573 43:21-24.)  And while Plaintiffs have also suggested that ZHP is withholding the "native" version of the July 27, 2017 email, ZHP only located a PDF version of the document.

[2]  The Special Master also noted that ZHP had "provided a credible explanation for [a] date-created anomaly on the July 27, 2017 email" given it was located in data recovered from a damaged hard drive.  (ECF No. 1753, at 4.)

expressly stating in the application that "Mr. Chen [had been] ordered by a federal court in the United States to appear for a deposition . . . ."  (SMO No. 98, at 19.)  The Special Master also accepted that "ZHP ha[d] not shown that it attempted to appeal the denial [of Mr. Chen's travel visa] via more formal measures," which the Special Master failed to identify.  (*Id.* at 20.)

The Special Master also appears to have determined that ZHP failed to comply with SMO No. 54, stating that while "ZHP has produced additional documents … at risk of prosecution under the [Chinese government's] Data Security Law, these documents do not contain the breadth of information Plaintiffs are due."  (SMO No. 98, at 24.)  But ZHP certified in 2022 that it had produced all the documents and information that it had for the four categories of documents at issue in SMO No. 54, including those from Ms. Kong's files. (*See generally* Bernardo Certification.)

Based on these purported discovery violations, the Special Master concluded that Plaintiffs were entitled to an adverse inference "as to i) the fact that ZHP knew of the contamination at least by July of 2017 and did not disclose that fact until its customer informed it of the contamination; and ii) Mr. Chen's role in the cover up of the contamination."  (SMO No. 98, at 39.)  Plaintiffs have now proposed a series of sweeping findings of fact against ZHP, including not only that ZHP "violated" the Court's discovery orders but also that the July 2017 email is evidence of "ZHP's knowledge that its Valsartan was contaminated with NDMA" and that "ZHP, at

Baohua Chen's direction, covered up and prevented the disclosure" of such knowledge.  (ECF No. 2721-1 ¶¶ 2-8.)

Finally, the Special Master ordered Plaintiffs to propose a "substantial monetary penalty" that "[they] believe[] is appropriate under the circumstances" and that goes beyond Plaintiffs' fees and costs in seeking the discovery at issue.  (SMO No. 98 at 38, 40.)  Plaintiffs have proposed that ZHP pay over $350,000 in fees and costs (including counsel's fees in preparing draft jury instructions essentially directing a verdict in their favor), as well as a separate monetary sanction of "at least $1,000.00 per day" from December 15, 2021 until "full payment of the monetary sanctions to be ordered."  (ECF No. 2731-1, at 15-16.)  Plaintiffs estimate that such a monetary penalty would total $877,000 as of the day the Special Master's Order was issued and would increase every day since.  (*Id.*)  All told, Plaintiffs are seeking over $1.2 million in fees, costs and monetary penalties.

## **ARGUMENT**

This Court's review of decisions issued by the Special Master is governed by Rule 53.  Fed. R. Civ. P. 53(f)(3)-(4).  Objections to the Special Master's findings of fact and conclusions of law are subject to de novo review, unless the parties stipulate otherwise, which they have not done here.  *See, e.g.*, *Lawson v. Praxair, Inc.*, No. 16-2435(BRM)(DEA), 2023 U.S. Dist. LEXIS 198253, at *15-17 (D.N.J. Apr. 28, 2023) (reversing discovery ruling by special master and stressing that the

15

court "is obliged to review issues *de novo*"); (*see, e.g.*, ECF No. 1994, at 5 (applying de novo standard of review to order on motion to amend answer to complaint).)  "The phrase 'de novo determination' . . . means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *Valeant Pharms. Int'l, Inc. v. AIG Ins. Co.*, No. 18-493 (MAS)(LHG), 2020 U.S. Dist. LEXIS 244479, at *14-15 (D.N.J. Dec. 30, 2020) (citation omitted).

The Court should sustain ZHP's objections and reverse the entry of sanctions because:  (1) ZHP did not engage in any sanctionable conduct; and (2) the imposition of an adverse inference and significant monetary sanctions is contrary to law, grossly excessive and disproportionate to the alleged violation.

## I. ZHP DID NOT ENGAGE IN SANCTIONABLE CONDUCT.

ZHP undertook reasonable, good-faith efforts to comply with SMO 28 and has produced all existing responsive, non-privileged documents under SMO 54.  As a result, the Company did not engage in conduct warranting sanctions.

### A. ZHP Acted In Good Faith And With Reasonable Diligence To Secure Mr. Chen's Presence For His Deposition.

ZHP should not be sanctioned for the Chinese government's refusal to allow Mr. Chen to travel outside mainland China for a deposition.

The Supreme Court has made it clear that a party's "*inability* to comply" with discovery orders "because of foreign law" is "a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those

of a foreign sovereign." *Societe Internationale*, 357 U.S. at 211-12.  Indeed, a district court "abuse[s] its discretion" in imposing sanctions for purported discovery violations where the foreign party has acted "in the best of faith" by, for example, requesting that the foreign government permit it to comply with local discovery order. *See In re Westinghouse Elec. Corp. Uranium Conts. Litig.*, 563 F.2d 992, 997 (10th Cir. 1977); *accord Societe Internationale*, 357 U.S. at 208 (reversing imposition of sanctions where party did not collude with Swiss authorities to "block inspection" of the records, "and had in good faith made diligent efforts to execute the production order" by attempting to secure a waiver from the foreign government); *see also Lasky v. Cont'l Prod. Corp.*, 569 F. Supp. 1227, 1228-29 (E.D. Pa. 1983) (a court considering whether to impose any sanctions "must weigh considerations of international comity").

In *Westinghouse*, the district court denied non-party Rio Algom's motion to quash, rejecting its argument that producing its Canadian-based President for a deposition and related documents relevant to a party's defense would violate Canadian Uranium Information Security Regulations. *See* 563 F.2d at 994-95.  After unsuccessful efforts by the defendant to convince the Canadian Supreme Court to permit the production, Rio Algom subsequently requested the consent of the Canadian government to release the company's records so that it could comply with the discovery order. *See id.* at 995.  When the Canadian government rejected that

17

request (rendering compliance with the discovery order impossible under foreign law), the district court held Ario Algom in contempt and imposed a $10,000 monetary penalty on it for each day it failed to comply. *See id.* The U.S. Court of Appeals for the Tenth Circuit reversed, reasoning that "the fact of foreign illegally" "prevent[ed] the imposition of sanctions" because Rio Algom "made diligent effort to produce materials not subject to the Canadian regulation" and "sought a waiver from the Canadian authorities." *Id.* at 997-98. In so reasoning, the Tenth Circuit rejected the notion that "the timing" of the request (made after the entry of the discovery order) demonstrated a "lack of good faith" because the "[t]he letter speaks for itself." *Id.* at 998. Similarly, the Court of Appeals rejected the unsupported "suggestion by Westinghouse" that Rio Algom somehow "caused the non-disclosure regulation to be promulgated in Canada in order to cover up for its activities or that Rio Algom and the Canadian government acted in collusion." *Id.*

ZHP acted more diligently here. Even while ZHP's motion to quash the deposition of Mr. Chen was pending—and despite zero efforts by Plaintiffs to secure the discovery through foreign channels (e.g., the Hague Convention) [3] —ZHP

---

[3]     The Special Master noted that "resort to the Hague Convention protocols" is not a prerequisite to obtaining foreign discovery. (SMO No. 98, at 15.) That, however, is a separate question from whether the requesting party's failure to even attempt such procedures bears on the propriety of ***sanctions***, which the Special Master previously recognized it does. (*See* ECF No. 1828 10:1-3 ("And, yes, there is this other matter, other route of a – the route under the Hague [C]onvention, and
*(cont'd)*

initiated the process of obtaining the Chinese government government's permission for Mr. Chen to travel out of China for his deposition.   (*See* Lu Decl. ¶ 3.) Nonetheless, in late October, ZHP was informed that the Taizhou Exit-Entry Administration of the Public Security Bureau, and the Taizhou Federation of Industry and Commerce would not grant Mr. Chen's request.  (*Id.* ¶¶ 7, 10.)  Even after the two agencies denied Mr. Chen's travel permit, ZHP continued to work with the Chinese authorities to determine whether the government's decision could be reversed or modified.  (*See* ECF No. 1673, at 1-2; *see also* Lu Decl. ¶ 11.)  Although these efforts proved unsuccessful, they demonstrate ZHP's diligence and good faith in attempting to facilitate Mr. Chen's deposition and that any "'*inability* to comply'" with Judge Kugler's order was "'because of foreign law.'"  *Westinghouse*, 563 F.2d at 997 (quoting *Societe*, 357 U.S. at 212).

The Special Master nonetheless reasoned that ZHP's efforts were inadequate because it did not take *every* conceivable step for persuading the Chinese government to grant Mr. Chen's visa permit.  (*See* SMO No. 98, at 19.)  This reasoning fails both as a matter of law and fact.

*First*, the applicable standard is whether ZHP acted in "good faith"—not whether it exhausted every possibility.  *See Westinghouse*, 563 F.2d at 208.  The

that might preclude imposition of sanctions.").)

handful of cases cited by the Special Master are not to the contrary. Rather, they merely hold that a corporate defendant in a foreign country cannot avoid sanctions by simply "refus[ing] to take" *any* steps to comply with a discovery order in the U.S. (e.g., requesting that the foreign government permit the action), *Estate of Boyles*, 2021 WL 3292727, at *7 (M.D.N.C. Aug. 2, 2021) (cited in SMO No. 98, at 17)[4], or "prompt[ing]" the foreign government decision that "prevent[s]" compliance with the discovery order in the first place. *See Egyptian Chamois Co. v. Evergreen Marine Corp.*, No. CV 99-5080, 2001 WL 1737458, at *6 (C.D. Cal. Jan. 25, 2001) (cited in SMO No. 98, at 17) (imposing sanctions on plaintiff for failing to make its officer available for a deposition where the officer's "conduct prompted the travel ban and thereby prevented him from traveling to California").[5] Because ZHP has

---

[4]     *Boyle*s is doubly inapposite because the foreign defendants did not produce a single 30(b)(6) witness; here, by contrast, Plaintiffs deposed 12 different ZHP corporate representatives who were not subject to the same degree of travel restrictions as Mr. Chen. *See Boyles*, 2021 WL 3292727, at *7 (Foreign defendants refused to produce a single 30(b)(6) witness and "basically threw up their hands" when confronted with obstacles to producing a witness "instead of seeking a workable solution").

[5]     *RetPet, Inc. v. Zhao*, does not support the Special Master's ruling because the court there merely denied a foreign party's motion to quash the deposition of its executive; it did not address—much less adjudicate—any question regarding sanctions. No. ED CV 15-2315-VAP (SPx), 2018 WL 9802098 (C.D. Cal. Jan. 16, 2018) (cited in SMO No. 98, at 18). Moreover, the court's reasoning turned on the fact that the party "initiated the consolidated lawsuit" in the district court "and thus effectively consented to be subjected to discovery in th[at] forum"; it failed to demonstrate that it had "taken *any* steps to confirm [the executive was] presently unable to travel"; and the record indicated that any impossibility in traveling to the

*(cont'd)*

done neither, the Special Master's authorities only confirm that ZHP's conduct with regard to Mr. Chen does not warrant the imposition of any sanctions.

**Second**, the Special Master's finding that ZHP did not undertake "all reasonable" steps to comply with the Court's order has no factual basis.

*Sufficiency of the permit application*.  The Special Master adopted Plaintiffs' theory that "Mr. Chen's visa application did not reflect the importance of Mr. Chen's deposition in this litigation" because it did not specify that his appearance had been "ordered by a federal court in the United States."  (SMO No. 98, at 19.)  But Plaintiffs and the Special Master are not experts in completing the travel application form. Nor have they even attempted to cite anything suggesting that the application required this information, much less that including it would have improved the likelihood that the Chinese government would approve a travel permit for Mr. Chen. By contrast, ZHP *did* submit a declaration from an expert on Chinese law explaining why attaching the Special Master's ruling or indicating that the deposition had been ordered by a U.S. court would not have been prudent because it would have drawn even greater "scrutiny"—which would have been "all the greater for an applicant" such as Mr. Chen, "who holds [a] cluster of prominent and partly political posts." (deLisle Decl. ¶ 25.)   As Professor deLisle further explains, including that

_____

U.S. was the result of the officer's "own fault."  *Id.* at *4-6 (emphasis added).  That is the opposite of the circumstances here.

information would have raised serious concerns about potential circumvention of the "procedures set forth in the Hague Convention" and thus made it more likely that the permit would be denied.  (*Id.* ¶ 29 ("Attempting to take a deposition of a Chinese national in China without going through this cumbersome process is unlawful and extremely ill-advised . . . .").)[6]

*Third-party assistance*.  The Special Master also faulted ZHP for not "seeking the help of a third-party organization specializing in assisting travelers in obtaining permits or gathering supporting documents to appeal the denial."  (SMO No. 98, at 20; *see also id.* at 18.)  But the Special Master did not identify any such third-party organization in China (or explain why he believes such organizations exist).  Needless to say, China has different travel procedures from those that exist in the United States, and there is no basis to believe (other than sheer speculation) that ZHP failed to take all steps in its power to attempt to secure the necessary permissions.  Moreover, the only authority cited by the Special Master for this line of reasoning

---

[6]     The Special Master struck the declaration on the ground that it was submitted after the briefing on Plaintiffs' motion had been completed and was therefore untimely.  (*See* ECF No. 2371.)  However, the Special Master effectively invited the declaration when he questioned why ZHP had not previously submitted an affidavit or declaration explaining the nature of Chinese government procedures with respect to the evaluation of requests for permits to travel.  (*See, e.g.*, Sept. 8, 2022 Hr'g Tr. 41:3-42:11.)  ZHP did not believe that the applicable legal standard required it to submit such evidence.  *See Westinghouse*, 563 F.2d at 995-96.  Nonetheless, if the Court chooses to consider the sufficiency of Mr. Chen's visa application, the deLisle declaration is relevant to any such consideration.

*refused* to impose any sanctions on a defendant that had waited a month after being ordered to produce a 30(b)(6) witness before applying for a permit to travel out of China.  *See Tower Mfg. Corp. v. Shanghai Elec. Mfg. Corp.*, 244 F.R.D. 125, 129 (D.R.I. 2007) (cited in SMO No. 98, at 18).  While that court noted that the witness (a private citizen) "had s[ought] assistance . . . from an intermediary organization which specializes in helping travelers obtain 'business' travel visas to Hong Kong," *id.*, it did not purport to impose such a requirement on foreign parties seeking to demonstrate reasonable efforts in complying with local discovery orders.

*Post-denial efforts*.  The Special Master also took issue with ZHP's failure to "appeal" the Chinese government's decision.  (SMO No. 98, at 20.)  But ZHP did engage in "'further discussions with . . . Taizhou Federation of Industry and Commerce to determine if the restriction on Mr. Chen's travel could be lifted or modified.'"  (*Id.* at 19-20 (quoting Lu Decl. ¶ 11.)  While the Special Master rejected those efforts as "conclusory" (*id.*), the Lu Declaration specifies the steps ZHP took, including following up with the Taizhou Federation of Industry and Commerce upon submitting Mr. Chen's application, conducting further discussions with the Federation after receipt of an oral notice that the request would be denied and seeking reconsideration, and ultimately requesting permission to publicly disclose the Chinese government's denial (which was rejected).  (*See* Lu Decl. ¶¶ 8-13.)  As explained by Professor deLisle, such "[i]nformal contacts and informal requests for

reconsideration are commonplace" in China and "are consistent with known patterns of efforts by applicants seeking government approvals" for travel.  (deLisle Decl. ¶ 27.)  Plaintiffs—and the Special Master—appear to assume that Mr. Chen or ZHP had some special power to persuade the Chinese government to reverse its decision, but there is no evidence to support this speculation either.

*Timing/alternative discovery*.  Finally, the Special Master also faulted ZHP for failing to "express its concerns regarding Mr. Chen's ability to obtain a travel permit earlier in this proceeding [or] suggest alternative discovery tools . . . ."  (SMO No. 98, at 20.)  But the parties in this litigation have known from the outset that depositions of Chinese citizens residing in China would require the permission of the Chinese government.  (*See* ECF No. 565 25:20-26:3 (counsel for ZHP explaining to the Court that "Hague Convention protocols would apply").)  And contrary to the Special Master's claim, ZHP did propose alternative discovery—i.e., "a written declaration" from Mr. Chen responding to specific questions propounded by Plaintiffs.  (*See* ECF No. 1900, at 21 n.9.)

In short, the evidence in the record makes clear that ZHP's attempt to comply with the Court's order regarding Mr. Chen "was made in the best of faith," that the Chinese government "considered" but ultimately "denied" Mr. Chen's application, and that the Special Master "abused his discretion" in imposing sanctions on ZHP for any purported non-compliance with SMO 28.  *Westinghouse*, 563 F.2d at 998.

24

**B.**     <u>**ZHP Produced The Documents That The Special Master Found Remain Outstanding.**</u>

The Special Master's second ground for imposing sanctions is ZHP's supposed non-compliance with SMO 54, which required the production of documents from the following four categories: (1) the custodial file of Mr. Chen's chief of staff, Ms. Kong; (2) an investigative report regarding alleged contamination of irbesartan; (3) all documents referencing "TC-201729," the project name for a lab-scale study of irbesartan; and (4) all documents relating to the batch testing for nitrosamines referenced in PRINSTON0075797. (SMO No. 98, at 5.) This basis is even more erroneous than the first because ZHP produced all non-privileged documents in its possession that fall within each of these categories more than a year and a half ago. (*See, e.g.*, Bernardo Cert. ¶ 3 ("ZHP conducted reasonable and duly diligent searches to identify documents responsive to SMO 54 and produced responsive, non-privileged documents identified.").) As a result, ZHP has complied with the document-related discovery order, effectively mooting this portion of Plaintiffs' motion. *See, e.g.*, *Castellani v. City of Atl. City*, No. CV 13-5848 (JBS/AMD), 2016 WL 7131576, at *5 (D.N.J. June 30, 2016) (sanctions "not warranted" where defendant made a production, "albeit after the deadline imposed by the court's . . . [o]rder," in a form that defendant believed to be sufficient); *Givaudan Fragrances Corp. v. Krivda*, No. CV 08-4409 (PGS), 2012 WL 12917268, at *16 (D.N.J. May 8, 2012) (denying plaintiffs' motion for sanctions as

"moot" where plaintiffs conceded that by the date of the sanctions hearing, defendants' production was adequate).

While the Special Master claims that ZHP produced "only four documents" from Ms. Kong's custodial file. (SMO No. 98, at 22; *see also id.* at 9), he appears to have relied solely on Plaintiffs' representation made in 2018—ignoring ZHP's robust discovery efforts over the next few years and counsel's certification to Judge Kugler. (*See id.* at 9 (citing ECF No. 2182 31:13-32:17).) In truth, ZHP has produced a significantly greater number of documents from Ms. Kong's file, ***spanning more than 1,000 rows of Bates numbers***. (*See* Ex. 1 to Bernardo Cert.) Similarly, the Special Master's suggestion that ZHP is continuing to withhold native versions of documents (e.g., the native file for the July 27, 2017 email) (*see* SMO No. 98, at 22; *see also id.* at 36), is erroneous since ZHP was only able to find the document in PDF format. (*See* Bernardo Cert. ¶ 9.) With regard to the third category of documents (those bearing the designation "TC-201729"), ZHP produced all such non-privileged documents by 2022. (*See id.* ¶ 12; Ex. 2 to Bernardo Cert.) And finally, ZHP also produced all responsive and non-privileged documents related to the batch testing referenced in PRINSTON00075797 by 2022 (*id.* ¶ 13), satisfying any obligation with respect to the fourth category covered by SMO 54.

Notably, ZHP produced these documents, even though doing so risked subjecting it to penalties under China's Data Security Law. (*See* ECF No. 1550-3

("Yang Decl.") ¶¶ 14-18.)  Indeed, ZHP made repeated unsuccessful efforts to seek permission from the Chinese government to produce a number of the documents at issue in Plaintiffs' motion.  (*See id.* ¶ 26 (noting that one regulator stated that it could not "make the decision on disclosure in U.S. litigation proceedings on its own," while another advised that ZHP "consult the opinion of the specific department from which the documents concern").)  These efforts further highlight ZHP's diligence and reasonableness in complying with SMO 54 and foreclose any sanctions related to that order.[7]  Accordingly, ZHP has not only fully complied with any document-related discovery obligations ordered by the Court but also did so under pain of possible punishment by the Chinese government.

In sum, neither of the two bases underlying the Special Master's ruling is a legal predicate for the imposition of sanctions.  For this reason alone, the Court should reverse the Special Master's ruling.

## II.   THE SEVERE SANCTIONS APPROVED BY THE SPECIAL MASTER ARE DISPROPORTIONATE AND UNCONNECTED TO THE ALLEGED VIOLATIONS.

Even if there were a valid basis to conclude that ZHP engaged in sanctionable conduct, the extreme sanctions proposed by the Special Master would be highly

---

[7]    The Special Master observes that courts "have repeatedly rejected attempts to use foreign blocking statutes as shields to protect against U.S. discovery."  (SMO No. 98, at 22.)  But that misses the point, which is that ZHP ultimately *complied* with its discovery obligations, as ordered by SMO 54, notwithstanding those laws.

improper.  For one thing, the "adverse inference" sanction proposed by the Special Master—which essentially amounts to a directed verdict for plaintiffs on the issue of liability by directing a jury to assume that ZHP knew of (and actively hid) the presence of nitrosamines at the time the July 27, 2017 email about irbesartan was written—should be rejected because it: (1) is wildly disproportionate to the wrongdoing alleged and therefore not a "just" punishment; and (2) lacks the required connection to the discovery at issue.  Further, the Special Master's finding that plaintiffs are entitled to monetary damages in addition to their legal fees and costs in pursuing the discovery—which has prompted plaintiffs to seek more than $877,000 in punitive monetary sanctions—is barred under Third Circuit law.

### A.   The Special Master's Proposed "Adverse Inference" Sanction Is Excessive And Unjust.

The "adverse inference" instruction proposed by the Special Master and drafted by Plaintiffs would be unjust both because of its severity and because it is not in any way related to the alleged discovery violations.

*First*, the adverse inference instruction, which would essentially direct a liability finding in Plaintiffs' favor, is far too drastic to be considered just.  The Third Circuit has recognized that "drastic sanctions" such as dismissals or defaults to address discovery violations are strongly disfavored.  *See Hildebrand v. Allegheny Cnty.*, 923 F.3d 128, 138 (3d Cir. 2019) (citing *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 867 (3d Cir. 1984)) (district court abusing its discretion by dismissing

action for lack of prosecution "in light of our clear and repeated instruction to resolve doubt in favor of a decision on the merits").  As courts have noted, a sanction that essentially robs a party of asserting or contesting a required element of a claim at issue is akin to the extreme sanction of a default judgment.  *See FS2 Cap. Partners, LLC v. Church*, No. CIV.A. 14-4933, 2015 WL 246339, at *4-5 (E.D. Pa. Jan. 16, 2015) (declining to issue court order stating that an element of the plaintiff's claim was met as a sanction for the defendant's failure to sit for a deposition because such a finding would be "equivalent to default judgment"); *Marshall v. Segona*, 621 F.2d 763, 767 & n.4 (5th Cir. 1980) (reversing district court's imposition of sanctions for discovery violations; an "order[] . . . that claims or defenses be unopposed . . . will sometimes have the same effect as dismissal").  For this reason, courts in the Third Circuit and elsewhere routinely reject the imposition of adverse inferences as discovery sanctions where they would have the practical effect of instructing the jury that an element of the claims against a defendant has been established.  *See, e.g.*, *Gertcher v. Therrian*, No. 2:20-cv-240, 2022 WL 842655, at *6 (W.D. Mich. Mar. 22, 2022) (denying motion for adverse inference concerning the content of destroyed evidence because "a mandatory adverse inference instruction would have much the same effect as a default judgment"); *In re Lands' End Leasing, Inc.*, 220 B.R. 226, 233 (Bankr. D.N.J. 1998) (refusing to issue sanctions order deeming the facts in the complaint established based on party's refusal to appropriately respond to sanctions

order; "the Third Circuit . . . guard[s] the right to one's day in court so zealously" that failing to adhere to a sanction order is not "sufficiently egregious to forfeit that right").

The Special Master went far beyond simply endorsing an instruction that the jury could assume that Mr. Chen's testimony—or any unproduced documents from Ms. Kong's custodial file—would be "adverse" to ZHP. Instead, the Special Master directed Plaintiffs to craft a proposed "adverse" instruction to the effect that: (1) "ZHP knew of the contamination at least by July of 2017" when Dr. Lin's email about impurities in the drug substance irbesartan was written, but "did not disclose that fact until its customer informed it of the contamination;" and (2) "Mr. Chen's role in the cover up of the contamination."  (SMO No. 98, at 39.)

In response, Plaintiffs submitted a proposed instruction directing the jury that "[t]he Court has made the following findings of fact with regard to ZHP that *you are required to accept as true in evaluating the evidence and reaching your verdict*" (ECF No. 2721-1, at 1 (emphasis added)), including:

- "[T]he July 27, 2017 email written by Jinsheng Lin . . . references ZHP's knowledge that its Valsartan was contaminated with NDMA, in discussing the problems presented by the finding of another nitrosamine impurity in Irbesartan, a similar drug substance manufactured by ZHP with a similar process as used to manufacture Valsartan."  (*Id.* ¶ 5.)

- "The Court has determined that Baohua Chen's deposition testimony and the documents ZHP failed to produce as required would have provided information that would have been adverse to ZHP, and would

30

have favored the Plaintiffs."  (*Id*. ¶ 6.)

- "The Court has determined that ZHP, at Baohua Chen's direction, covered up and prevented the disclosure of ZHP's actual knowledge of the nitrosamine contamination of ZHP's Valsartan from at least July 27, 2017 until ZHP's customer Novartis discovered the contamination and informed ZHP of its discovery in June, 2018."  (*Id*. ¶ 7.)

- "ZHP violated its Court ordered legal obligations to produce Baohua Chen for his deposition and produce documents as required because ZHP and Mr. Chen knew of the nitrosamine contamination of ZHP's Valsartan at least as of July 27, 2017, and at Mr. Chen's direction covered up and prevented disclosure of the nitrosamine contamination until ZHP's customer Novartis discovered the contamination and informed ZHP of its discovery in June, 2018."  (*Id*. ¶ 8.)

These "findings" by the Court would essentially instruct the jury to find in favor of Plaintiffs as to major substantive elements of their claims by directing them to accept that ZHP was aware its valsartan API contained nitrosamines at least a year before the product recall and that ZHP and its President engaged in deceptive conduct by hiding that information from valsartan users, consumers and third-party payors.  Such an extreme sanction, which would make it virtually impossible for ZHP to defend itself at trial, is not an appropriate discovery sanction under Third Circuit law, especially absent any evidence of bad faith on the part of ZHP, as discussed extensively above.

***Second***, the Special Master's proposed adverse inference that ZHP knew, as of the date of the July 27, 2017 email, that its API contained nitrosamines and "cover[ed that information] up" for over a year is especially inappropriate because

it has no factual or logical link to the discovery that plaintiffs are purportedly missing.

It is well recognized that "[b]efore drawing an adverse inference, courts typically require some showing, by circumstantial evidence or otherwise, of the content of the destroyed evidence," as well as a showing that a "a reasonable jury could infer that the [missing discovery] contained" the information the jury is instructed to infer. *Emerson v. Wetherill*, No. CIV. 92-4082, 1994 WL 249769, at *3 (E.D. Pa. June 1, 1994) (rejecting adverse inference that a party "committed prior acts of misconduct" as a sanction for the loss of documents because "no reasonable jury could infer that the destroyed documents contained such information"); *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 346 (M.D. La. 2006) (rejecting adverse inference sanction because, "before an adverse inference may be drawn, there must be some showing that there is in fact a nexus between the proposed inference and the information contained in the lost evidence," and there was no "extrinsic evidence establishing that the lost evidence would have supported" the proposed adverse inferences).

For example, in *Sovulj v. United States*, No. 98 CV 5550FBRML, 2005 WL 2290495, at *5 (E.D.N.Y. Sept. 20, 2005), *on reconsideration*, No. 98-CV-5550 (FB), 2008 WL 11449125 (E.D.N.Y. May 14, 2008), the court refused to issue an adverse inference that an x-ray film of the plaintiff's deceased husband's lung, which was not produced despite several requests, would have shown a tumor. *Id.* at *3, *6.

According to the court, the purpose of an adverse inference is to "restor[e] the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* at *5 (alteration in original) (citation omitted). The court held that the adverse inference sought "would not have the effect of restoring the plaintiff to her position absent the destruction of the x-ray, but rather would prejudice the defendant by allowing plaintiff to profit from the destruction of the x-ray when no evidence has been presented to support such an inference of its contents." *Id.*

The adverse inference proposed by plaintiffs at the Special Master's direction would similarly "not have the effect of restoring the plaintiff[s]" to the position they would have been in if ZHP's President could have been deposed. There is no evidence that Mr. Chen, who was not an addressee on the July 27, 2017 email, ever received it or otherwise was informed about its contents. And even if there were, Plaintiffs would not need his testimony to present their arguments about the email's contents to the jury. After all, Plaintiffs have the July 27, 2017 email in their possession. They also have deposition testimony about the email's content and meaning from multiple ZHP witnesses who did receive it.

The only purported connection between the alleged discovery misconduct cited by the Special Master and the July 2017 email—which dealt with an investigation of an impurity in irbesartan—is the Special Master's finding that ZHP

33

supposedly failed to produce four categories of documents identified by plaintiffs as potentially including information about the irbesartan investigation.  (*See* SMO No. 98, at 4-5 ("investigative reports" related to irbesartan and "other related documents").)  But, as explained in detail above, ZHP's counsel searched for these documents and issued a certification in 2022 that, to the extent such documents existed, they had been produced.  Thus, the record demonstrates that there is no "missing" evidence pertaining to the July 27, 2017 email in ZHP's control.

In short, instructing the jury that it can assume that any missing evidence would have proved that Dr. Lin's July 27, 2017 email indicated that ZHP's valsartan API contained nitrosamines, or established that ZHP knew about valsartan contamination at that time, in nothing less than a fabrication of evidence.

For this reason, too, the Special Master's "adverse inference" sanction should be overturned.

### B.   Plaintiffs Are Not Entitled To Monetary Sanctions Beyond Their Fees And Costs In Seeking Discovery.

Finally, the Special Master also directed Plaintiffs to "propose a monetary penalty [they] believe[] is appropriate under the circumstances." (SMO No. 98, at 40.)  Specifically, the Special Master indicated that a "substantial monetary penalty is warranted" to punish ZHP for its alleged discovery violations.  (*Id.* at 38.)

Consistent with the Special Master's order, Plaintiffs have proposed that—in addition to paying plaintiffs' fees and costs, which purportedly exceed $350,000—

ZHP should also pay Plaintiffs an additional $877,000 as a distinct monetary penalty. (*See* ECF 2731-1, at 15-16.)   Third Circuit law, however, is clear that monetary sanctions for discovery violations are limited to "reasonable expenses," i.e., reasonable expenses and attorneys' fees, absent an express finding of contempt, which has not been made here (and would not be appropriate). *Martin v. Brown*, 63 F.3d 1252, 1263 (3d Cir. 1995) ("Absent contempt, the only monetary sanctions Rule 37 authorizes are "reasonable expenses" resulting from the failure to comply with discovery"); *see also Barkouras v. Hecker*, No. CIV.A. 06-366 (AET), 2007 WL 777664, at *7 (D.N.J. Mar. 12, 2007) ("The Third Circuit has instructed that monetary sanctions should relate directly to the expenses incurred due to the non-complying party's violation."); *Lithuanian Com. Corp. v. Sara Lee Hosiery*, 177 F.R.D. 205, 214 (D.N.J. 1997) (finding that "when imposing monetary sanctions pursuant to Rule 16 or Rule 37, a court may only award reasonable expenses and attorneys' fees").

Moreover, because the monetary fine proposed by the Special Master is neither intended to compensate the Plaintiffs for any injury, nor to coerce ZHP to comply with any outstanding discovery, it could only be assessed based on a finding of ***criminal*** contempt.  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) ("*Bagwell*") (noting that a fine "totaling even as little as $50" is considered "criminal if the contemnor has no subsequent opportunity to reduce or

avoid the fine through compliance"); *see also Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 635-36 (1988) (explaining that whether a sanction for contempt is criminal or civil depends on the character of the sanction imposed, not on the subjective intent of the Court). Criminal contempt "is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201 (1968), and therefore can be imposed only after "procedural protections" akin to ordinary criminal proceedings, *Harris v. Philadelphia*, 47 F.3d 1311, 1329 (3d Cir. 1995). Among those are the right to a trial after notice and "a reasonable time to prepare a defense." Fed. R. Crim. P. 42(a)(1)(B).[8] Unless the offense and punishment can be classified as petty, "the requisite procedural protections" include "a jury trial." *Harris*, 47 F.3d at 1329 (reversing contempt sanction that was criminal in nature and imposed without a jury trial); *see also United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 665 (2d Cir. 1989) ("the jury right is available for a criminal contempt whenever the fine imposed on an organization exceeds $100,000"); *Cassady v. Owens*, No. CV408-250, 2010 WL 6268440, at *2 (S.D. Ga. Dec. 7, 2010), *report and recommendation adopted*, No. CV408-250, 2011 WL 1042711 (Mar. 22, 2011) (A "criminal contempt proceeding

---

[8]    The Rule provides for summary punishment by an Article III judge of one "who commits a criminal contempt in the presence of the judge." Fed. R. Crim. P. 42(b). That power does not extend to "a magistrate judge," much less to a special master, and, in any event, any alleged contempt here was not done in the presence of the Court, but rather on the other side of the world.

is an independent criminal action requiring the protections provided by the federal criminal rules: A person prosecuted for a contempt (committed out of the court's presence) must be given notice of 'the essential facts constituting the charged criminal contempt' and informed of the criminal nature of the proceeding, the prosecution must be handled by a prosecutor appointed by the court for that purpose, and the alleged contemnor must be afforded the right to a jury trial (unless the court treats the contempt as merely a petty offense).") (citation omitted).

The proposed fine here would clearly be criminal in nature because it is not intended to: (1) compensate the Plaintiffs for any injury; or (2) coerce ZHP's compliance with the discovery orders at issue.[9]

For one thing, Plaintiffs do not contend that they have suffered any monetary injury beyond their fees and costs—which have been assessed separately.  (*See generally* ECF No. 2731-1.)  Further, such an exorbitant fine would not, and could not, encourage compliance with the discovery orders at issue at this point.  As noted above, the sanctions order is based in part on ZHP's alleged failure to provide document discovery ordered in SMO No. 54—but ZHP has already certified that it fully complied with that Order by 2022.  In addition, to the extent the sanctions are

---

[9]     The amount proposed by Plaintiffs, at the Special Master's behest, which is based on a daily fine since Mr. Chen's deposition notice expired and would total more than $877,000, is particularly egregious in light of the Special Master's two-year delay in deciding the sanctions motion.

based on Mr. Chen's inability to sit for a deposition during the discovery period, the imposition of a monetary penalty cannot change that.  Discovery in valsartan cases has been closed for almost three years.  (*See* ECF No. 863, at 1 (setting the deadline for the completion of the "first phase of fact discovery" at June 1, 2021).)  And it is the Chinese government, not ZHP, that precluded Mr. Chen from providing deposition testimony.  Thus, the fine clearly is not intended to induce ZHP's compliance with discovery.  Instead, the Special Master has proposed a criminal sanction that is available only upon a jury finding of criminal contempt beyond a reasonable doubt, which has not and could not be made here given ZHP's good-faith attempts to comply with the Court's discovery orders.  *See In re Kendall*, 712 F.3d 814, 831 (3d Cir. 2013) (vacating convictions for criminal contempt and noting "good-faith compliance is a defense to criminal contempt but not civil contempt").

For this reason, too, the Special Master's Order is legally unsupportable and should be reversed.

## CONCLUSION

For the foregoing reasons, the Court should sustain ZHP's objections to the Special Master's Order, reverse the Special Master's ruling in SMO 98, and deny the Plaintiffs' motion for Rule 37 sanctions.

Dated: May 31, 2024                    Respectfully submitted,

                                        By: */s/ Jessica Davidson*
                                        SKADDEN, ARPS, SLATE, MEAGHER &

FLOM LLP
Jessica Davidson (NY Bar No. 6034748)
Allison M. Brown (NJ Bar No. 044992012)
One Manhattan West
New York, New York 10001
Phone: (212) 735-3222
Fax: (917) 777-3222
jessica.davidson@skadden.com
allison.brown@skadden.com

Nina R. Rose (DC Bar No. 975927)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Facsimile: (202) 661-0525
nina.rose@skadden.com

*Attorneys for Zhejiang Huahai
Pharmaceutical Co., Ltd.*

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on May 31, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants in this matter.

/s/ *Jessica Davidson*

Jessica Davidson (NY Bar No. 6034748)

40