Exhibit 40

Confidential Information: Subject to Protective Order

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2                   CAMDEN VICINAGE
 3
       ******************************
 4
       IN RE:  VALSARTAN, LOSARTAN,  MDL No. 2875
 5     AND IRBESARTAN PRODUCTS
       LIABILITY LITIGATION          Civil No.
 6                                    19-2875
       ***************************   (RBK/JS)
 7
       THIS DOCUMENT APPLIES TO ALL  HON ROBERT B.
 8     CASES                         KUGLER
 9     ***************************
10            - CONFIDENTIAL INFORMATION -
              SUBJECT TO PROTECTIVE ORDER
11
12
13            Continued Remote Videotaped via
14     Zoom Deposition of MIN LI, Ph.D., commencing at
15     7:08 a.m. China Standard Time, on the 22nd of
16     April, 2021, before Maureen O'Connor Pollard,
17     Registered Diplomate Reporter, Realtime
18     Systems Administrator, Certified Shorthand
19     Reporter.
20
21                    - - -
22
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

Confidential Information - Subject to Protective Order

1       Calls for speculation.

2       A.      You can ask him, okay?

3   BY MR. SLATER:

4       Q.      Did you ever speak to the

5   chairman of your company, Mr. Chen, regarding

6   any of your interactions with Charles Wang

7   and what he was telling you?

8       A.      No.

9       Q.      Did you ever speak to Baohua

10  Chen at all about the nitrosamine

11  contamination of valsartan sold by ZHP?  Did

12  you ever discuss that with him?

13      A.      We discussed the matter, you

14  know, in meetings.

15      Q.      Meetings in person?

16      A.      No, not in person.

17      Q.      How were those meetings held?

18      A.      I mean, like, you know, when

19  this event basically occurred, you know, you

20  know, it become the top priority of the

21  company.

22          So as the CEO of the company,

23  you know, you know, he organized, you know,

24  quite a few meetings, basically just to

Confidential Information - Subject to Protective Order

1    ensure, you know, the investigation being

2    conducted, you know, as soon as possible,

3    and, you know, basically just ask us, you

4    know, what kind of resources that we need,

5    basically.

6         Q.    Were those meetings that you

7    talked about held in person?  Well, rephrase.

8              You said the meetings were not

9    held in person.  So how were they held?

10        A.    You know, with a group, like,

11   you know, with a group of peoples.

12        Q.    Was it over the telephone?  Was

13   it by videoconference?  How did you

14   communicate with one another in those

15   meetings?

16        A.    Sir, as I said, there are

17   different meetings, okay?  Some meetings, I

18   don't -- you know, I don't remember, you

19   know, you know, all the details.  But some

20   meetings, you know, all the participants, you

21   know, were attending in person, some meetings

22   probably, you know, involving some

23   telecommunications.

24        Q.    So you did have meetings in

Confidential Information: Subject to Protective Order

1    person with Mr. Chen about the nitrosamine

2    contamination of the valsartan?

3        A.    Well, in person, okay, I

4    thought you mean like, like, just, you know,

5    like one-on-one meeting, you know.  But,

6    yeah, like a -- when -- a group of meeting,

7    yeah, both Mr. Chen and I as well as other

8    members of the management, yeah.  Yeah, at

9    least, you know, yeah, we were attending some

10   of the meeting, you know, when both Mr. Chen

11   and myself were physically, you know,

12   attending the meetings.

13       Q.    So you said meetings took place

14   in person, right?

15       A.    Some meeting, yeah, some

16   meeting, yeah, were attended in person, yes.

17       Q.    Were some of the meetings by

18   videoconference?

19       A.    Yeah, uh-huh.  Not

20   videoconference.  I don't think you -- you

21   know, you -- we don't have videoconference,

22   usually just teleconference.

23       Q.    You said usually

24   teleconference.  Did at least one of the

Confidential Information Subject to Protective Order

1    meetings involving Mr. Chen regarding the

2    nitrosamine contamination of the valsartan

3    take place over videoconference?

4         A.    I don't remember that ever

5    happened.

6              MR. GALLAGHER:  Adam, we've --

7         you can finish -- we've been going

8         about an hour and 20 minutes.  When

9         you get to a natural --

10   BY MR. SLATER:

11        Q.    Did any of the meetings take

12   place by telephone?

13        A.    As I said, some of the meeting

14   may, you know, may be held, you know, with

15   some attendants, okay, joining by

16   teleconference.

17        Q.    Teleconference means by

18   telephone?

19        A.    Yeah, by telephone, yes.

20        Q.    Did you attend every meeting

21   that Mr. Chen organized and attended

22   regarding the nitrosamine contamination of

23   ZHP's valsartan?

24        A.    I don't think so, like did I

Confidential Information - Subject to Protective Order

1    attended every meeting, because there's a

2    different, you know, you know, you know,

3    aspects dealing with this issue, right.

4              And, for example, the issue

5    regarding like recall, you know, because I --

6    you know, as I said, I'm a technical person,

7    those meetings, you know, I never attended,

8    you know, those kind of meetings because it's

9    outside of my scope, outside of my

10   responsibility.

11        Q.    You said --

12        A.    Yeah.

13        Q.    You said that Mr. Chen

14   organized meetings because he was the CEO.

15   So you don't know how many meetings took

16   place or who attended all those meetings?

17              MR. GALLAGHER:  Objection.

18        Calls for speculation.

19              Go ahead.

20        A.    As I said, you know, I -- those

21   information I'm not, you know, within my

22   responsibility, okay.

23   BY MR. SLATER:

24        Q.    Well, I'm not asking for your

Confidential Information - Subject to Protective Order

1    responsibility.  I'm asking if you know how

2    many meetings took place and who attended

3    each of them.

4         A.    I don't --

5              MR. GALLAGHER:  Objection.

6         Calls for speculation.

7         A.    I don't remember.

8    BY MR. SLATER:

9         Q.    How many meetings did you

10   attend with Mr. Chen regarding the

11   nitrosamine contamination of ZHP's valsartan?

12        A.    Again, I don't have accurate

13   numbers.

14        Q.    Was it 10 meetings, was it 20

15   meetings?  Can you estimate, please?

16        A.    I just cannot.

17        Q.    You have no idea how many

18   meetings you attended with Mr. Chen?

19        A.    I don't keep, you know, you

20   know, you know, those things.

21        Q.    I'm just asking if you can

22   recall how many meetings.  You said this was

23   top priority of the company at the time.  I

24   would think you could recall roughly how many

Confidential Information - Subject to Protective Order

1    meetings you attended with the chairman of

2    the company about this crisis.

3                    MR. GALLAGHER:  Objection.

4            Argumentative, and asked and answered.

5    BY MR. SLATER:

6            Q.    Can you recall?

7            A.    No, I cannot recall the

8    accurate number.

9            Q.    Can you give me an estimate?

10                   MR. GALLAGHER:  Objection.

11           Asked and answered.

12           A.    As I said, you know, I don't

13   want to provide -- you know, you know,

14   because I don't have this memory, so I don't

15   want to, you know, provide any specific

16   number, okay?

17   BY MR. SLATER:

18           Q.    Well, can you tell me your best

19   estimate, please, or are you unwilling to do

20   so?

21                   MR. GALLAGHER:  Objection.

22           Argumentative, and asked and answered.

23           A.    So if you want to say, you

24   know, the best estimate by now, you know, you

Confidential Information - Subject to Protective Order

1    know, at this time I would say probably, you

2    know, maybe single digit or maybe up single

3    digit.

4    BY MR. SLATER:

5        Q.     What does that mean, "single

6    digit or maybe up single digit"?

7        A.     Like, you know, anywhere like

8    maybe between five or nine or something like

9    that.

10       Q.     Do you recall what was

11   discussed in those meetings?

12       A.     As I said, I don't, you know,

13   recall all the exact, you know, you know, you

14   know, contents.  Basically, you know, you

15   know, the instruction was, you know, we need

16   to, you know, put all the efforts -- you

17   know, the company will support utilizing all

18   the resources, you know, to push this forward

19   as soon as possible.

20       Q.     Using all the resources -- I'm

21   sorry.

22              When you say using all the

23   resources, did that include making sure that

24   there wouldn't be any "red tape" like you

Confidential Information - Subject to Protective Order

1    said before if you needed to hire an expert

2    consultant to advise the company, for

3    example, on toxicology?

4              MR. GALLAGHER:  Objection.

5         Lack of foundation.

6         A.     This topic was not discussed,

7    okay.  So in terms of the resources, from my

8    perspective, okay, it was, you know, you

9    know, we need to -- we need to purchase

10   additional, you know, high-end instrument,

11   okay, particularly like a mass spectrometry,

12   a GC-MS, GC-MS/MS, you know, stuff like that.

13   So he indicated he will give the full

14   support, like, you know, as long as, you

15   know, yeah, like how many, whatever, you

16   know, whenever that I, you know, propose he

17   will, you know, approve the purchase of these

18   instrument.

19   BY MR. SLATER:

20        Q.     Were notes or minutes taken of

21   these meetings with Mr. Chen?

22        A.     I don't remember.

23        Q.     Did you take notes of these

24   meetings?

Confidential Information - Subject to Protective Order

1      A.      No.

2      Q.      Did you see anybody else taking

3   notes during these meetings?

4      A.      I didn't pay attention to that.

5      Q.      So you would go to meetings

6   with the chairman of the company about a

7   situation that was the top priority of the

8   company, and you wouldn't take any notes

9   during those meetings at all?

10             MR. GALLAGHER:  Objection.

11         Argumentative.

12             And we're getting close to --

13         towards an hour and a half, if you get

14         close to a breaking point.

15         A.    I didn't take note.

16   BY MR. SLATER:

17      Q.      Is that your typical practice,

18   you go to important meetings and you take no

19   notes at all?

20             MR. GALLAGHER:  Objection.

21         Vague, and argumentative.

22         A.    Because those meetings, you

23   know, you know, from my perspective, as I

24   said, you know, it's very specific, okay.

Confidential Information - Subject to Protective Order

1    Because for me, I just need to have the

2    funding to purchase these instrument, so, you

3    know, for these simple things I don't think

4    it's necessary, you know, for me to take

5    note.  You know, he just, yes, you know, then

6    go ahead.

7    BY MR. SLATER:

8           Q.     Are you saying that you had

9    five to nine meetings, which is your

10   estimate, and at every one you discussed

11   buying equipment to do testing, and that was

12   the whole meeting every time?  You're not

13   saying that, are you?

14          A.     No, I'm not saying that.

15                 MR. GALLAGHER:  Objection.

16   BY MR. SLATER:

17          Q.     Do you remember what else was

18   discussed in those meetings with Mr. Chen,

19   the chairman of the company?

20          A.     Look, you know, as I said, I

21   don't remember, you know, exactly, you know,

22   you know, all the other things, okay.

23                 The most obvious things is, or

24   the most clear thing is that Mr. Chen was

Confidential Information - Subject to Protective Order

1    fully support, okay, in terms of, you know,

2    allocating funding, you know, for the

3    instrument, you know, that I need.

4              The other meeting, it's most

5    likely he was asking, you know, for our

6    progress, for example, how the method

7    development was ongoing, you know, stuff like

8    that.

9        Q.    Okay.  Did Mr. Chen say any --

10   well, rephrase.

11             Did Mr. Chen ever tell you or

12   the people in your meetings -- rephrase.

13             During the meetings you

14   attended with Mr. Chen, did he take notes?

15   Did you ever see him taking notes?

16       A.    No.

17       Q.    Did anybody take notes in these

18   meetings that you ever observed?

19       A.    I just pay attention mostly to

20   Mr. Chen when I spoke, you know, to him.

21       Q.    When you were in these

22   meetings, did you ever notice anybody in the

23   meetings taking notes?

24       A.    I don't re --

Confidential Information - Subject to Protective Order

```
 1                  MR. GALLAGHER:  Objection.

 2                  Go ahead.

 3        A.     I don't recall, okay?

 4   BY MR. SLATER:

 5        Q.     So a roomful of people meeting

 6   with the chairman of the company about a

 7   situation that's the top priority of the

 8   company multiple times, in all those meetings

 9   you never took notes, Mr. Chen never took

10   notes, and you never saw anyone else take

11   notes.

12                  That's your best recollection,

13   is that what you're testifying?

14                  MR. GALLAGHER:  Objection.

15          Argumentative, asked and answered,

16          vague, and compound.

17        A.     That's not what exactly what I

18   told you.  Okay.  What I can tell you is

19   Mr. Chen, he didn't take notes, okay?  And I

20   didn't take note.  Who else, I don't

21   remember, okay?

22   BY MR. SLATER:

23        Q.     Were there ever agendas

24   circulated for these meetings; for example,
```

Confidential Information - Subject to Protective Order

1    by e-mail?

2          A.     I don't know.  I don't

3    remember.

4          Q.     When these meetings were

5    scheduled, were e-mails sent out or any sort

6    of calendar sent out so everybody would know

7    the date and time and place of the meetings?

8          A.     I don't remember.  I mean, but

9    one thing is, you know, usually, okay, I can

10   tell you my -- you know, like for Mr. -- you

11   know, for meetings with Mr. Chen, usually,

12   you know, his, you know, secretary, you know,

13   would make phone calls.

14               And one of the reason probably

15   was he was quite busy, so we just -- you

16   know, a lot of times we just stand by.  And

17   so once he had time, his secretary would

18   call, call us, you know, to go to meeting

19   rooms, you know, with him.

20         Q.     Who was his secretary?  What's

21   her name?

22         A.     There is a --

23         Q.     Who is Mr. Chen's secretary?

24         A.     There are a group, you know, of

Confidential Information - Subject to Protective Order

1   people, okay.  I don't know exactly, you

2   know, who would be designated.

3           I think the best, you know,

4   answer, if you can, you know, maybe you can

5   also go through my counsel, you know, making

6   a formal request, they can provide it, you

7   know, from the staff of Mr. Chen.  You know,

8   they probably can give you, you know, a much

9   more accurate, you know, because I don't want

10  to, you know, you know, guess.

11      Q.    You know who works for

12  Mr. Chen.  Tell us the names of the people

13  that work for him as his secretaries and

14  assistants.

15          MR. GALLAGHER:  Objection.

16      Asked and answered.

17          And, Adam, we've been going

18      over an hour and a half now.

19          MR. SLATER:  I'm in the middle

20      of a line of questioning.  I don't

21      want to break this deposition now.  I

22      don't think it would be appropriate.

23          MR. GALLAGHER:  I'm not sure

24      where you're going, but okay.

Confidential Information - Subject to Protective Order

1    A.    His chief of staff, okay, is

2    Ms. Maggie Kong, as I mentioned the other

3    day.

4    BY MR. SLATER:

5    Q.    Is she the person who would

6    call you to tell you meetings were being

7    scheduled?

8    A.    Sometimes she called me;

9    sometimes, you know, her staff.

10    Q.    Who are the staff members that

11    worked for her who would contact you?

12    A.    You know, there would be

13    different, you know, people, okay, so I don't

14    remember, you know, you know, very

15    specifically for, you know, exactly, you

16    know, who under her, you know, called me,

17    okay?

18    Q.    Can you remember anybody else's

19    name that contacted you, other than Maggie

20    Kong?

21    A.    I mean, you know, this is for

22    so long, so I couldn't, you know, give you an

23    accurate.  You know, I don't want to provide,

24    you know, you know, you know, anything, you

Confidential Information - Subject to Protective Order

1    know, inaccurate, okay.

2              So only thing for sure, you

3    know, yeah, it would be somebody -- you know,

4    yeah, sometimes could be her; sometimes, you

5    know, could be someone, you know, you know,

6    of her staff.

7        Q.    After these meetings would take

8    place, what would Mr. Chen do in terms of

9    taking action based on the meetings?

10             MR. GALLAGHER:  Objection.

11       Lack of foundation, and calls for

12       speculation.

13       A.    I don't pay attention to, you

14   know, other things, as I said, you know,

15   because my, you know, main function or my

16   main responsibility was to ensure the

17   technical investigation, you know, move

18   forward as soon as possible.

19   BY MR. SLATER:

20       Q.    Did Mr. Chen give any

21   instructions at these meetings?  Other than

22   you said he said, okay, you can buy that

23   machine that you were asking about, did he

24   ever give any other instructions?

Confidential Information - Subject to Protective Order

```
 1          A.      As I said, I don't --

 2                  MR. GALLAGHER:  Objection.

 3          Lacks foundation.

 4          A.      As I said, you know, my only

 5     focus, you know, was, you know, you know, for

 6     the part of the responsibility, you know,

 7     from my perspective.

 8     BY MR. SLATER:

 9          Q.      Was Mr. Chen aware that at

10     least as of July 27, 2017 there were people

11     in your company that knew that NDMA was in

12     valsartan that your company was selling?

13          A.      He had no idea.

14                  MR. GALLAGHER:  Objection.  No

15          foundation.

16     BY MR. SLATER:

17          Q.      How do you know he had no idea?

18          A.      Because I told you, you know,

19     as I told you before already, okay.

20          Q.      Did anybody who either sent or

21     received that e-mail ever tell Mr. Chen or

22     tell someone else who told Mr. Chen about

23     that?

24                  MR. GALLAGHER:  Objection.
```

Confidential Information - Subject to Protective Order

```
 1    BY MR. SLATER:

 2         Q.    Do you know?

 3              MR. GALLAGHER:  Objection.

 4         Vague, and lacks foundation.

 5         A.    As I said, I -- you know, I

 6    don't remember, or I don't know, you know,

 7    who else on that e-mail list, you know, what

 8    they did afterwards.

 9    BY MR. SLATER:

10         Q.    You don't know if Mr. Chen was

11    aware that your company knew about the NDMA

12    in the valsartan as of July 2017?

13              MR. GALLAGHER:  Objection.

14         Vague, lacks foundation, and

15         mischaracterizes the documents and

16         testimony.

17         A.    I'm pretty sure he -- you know,

18    he didn't know.  Otherwise, you know, he

19    probably, you know, will talk to me.

20    BY MR. SLATER:

21         Q.    Why do you say that?

22         A.    Well, because, you know, if

23    it's really, you know, you know, you know,

24    you know, a big issue, you know, yeah,
```

Confidential Information - Subject to Protective Order

1    he will.  You know, particularly, you know,

2    this is, you know, right, related to an

3    investigation of an impurity, right?

4              Mr. Chen, you know, you know,

5    he is just at the very top.  He wouldn't, you

6    know, have those details, information,

7    unless, you know, you know, you know, I

8    became aware, and then I, you know, will

9    report that to him, or somebody like from QA

10   or whatever.

11             But as I said, you know, if

12   people on that list, you know, they -- you

13   know, they feel or whatever, you know, this

14   is an issue, or they may not.  As I said, you

15   know, they may -- they may not, you know, or

16   they think, you know, Mr. Lin's claim may be,

17   you know, way exaggerated.

18        Q.   Well, his claim wasn't

19   exaggerated.  He was 100 percent accurate

20   about valsartan containing NDMA, correct?

21             MR. GALLAGHER:  Objection.

22             Wait, Min.

23             THE WITNESS:  Sorry.

24             MR. GALLAGHER:  Objection.

1          Vague, lacks foundation, calls for

2          speculation, and mischaracterizes

3          documents and testimony.

4     A.     I think I answered this

5  question, you know, several times, okay.

6  BY MR. SLATER:

7     Q.     Did you tell Mr. Chen that in

8  April of 2018 you told Mr. Lin, who worked

9  for you, not to complete or not to issue --

10 rephrase.

11          Did you tell Mr. Chen at any

12 time that in April 2018 you told Mr. --

13 rephrase.

14          Did you tell Mr. Chen at any

15 time that in April 2018 you directed that a

16 report that had been written regarding

17 concern about nitrosamines in irbesartan, and

18 you had instructed that that report not be

19 issued because of the fact that the impurity

20 was sensitive?

21          Did you tell Mr. Chen that?

22     A.     No.

23          MR. GALLAGHER:  Objection.

24          THE WITNESS:  Sorry.

Confidential Information - Subject to Protective Order

1        MR. GALLAGHER:  Objection.

2     Outside the scope, vague, compound,

3     and lacks foundation.

4        A.    The answer is no.

5  BY MR. SLATER:

6        Q.    You said that Mr. Chen was

7  organizing these meetings.  Based on your

8  understanding and what you observed, was he

9  very actively interested in what was

10  happening with the contamination of valsartan

11  with nitrosamines?

12        A.    As I've said, that he is on top

13  of the progress, okay?  He didn't know, you

14  know, all those technical details.  It's not

15  his job.

16            I just want to make sure --

17  yeah.

18        Q.    I'm sorry.

19            How do you know he didn't know

20  the technical details?

21        MR. GALLAGHER:  Objection.

22     Vague, and calls for speculation.

23        A.    He is the CEO of the company.

24  So if you talk to head -- like a CEO of

Confidential Information - Subject to Protective Order

1    Novartis, you know, he would -- would that

2    person know the technical details of NDMA?

3    BY MR. SLATER:

4          Q.    I don't know if -- I don't

5    know, if it turned out that NDMA was

6    contaminating one of their drug substances

7    and that substance -- and the NDMA was

8    carcinogenic, yeah, I would think the

9    Novartis CEO would want to know everything

10   about it, if you're asking me.

11               MR. GALLAGHER:  Objection.

12               Wait.  Wait, Min.

13               Objection.  Vague,

14        hypothetical, calls for speculation.

15   BY MR. SLATER:

16         Q.    Do you know that --

17               MR. GALLAGHER:  Just for the

18   record, we've been going for an hour and

19   40 minutes now, and I'm sure the court

20   reporter would love a break, but --

21   BY MR. SLATER:

22         Q.    Do you know that Mr. Chen --

23               MR. GALLAGHER:  -- your

24        deposition.

Confidential Information - Subject to Protective Order

```
1    BY MR. SLATER:
2          Q.    Do you know that Mr. Chen has a
3    master's in chemical engineering?
4          A.    That I --
5                MR. GALLAGHER:  Objection.
6          A.    Sorry.
7    BY MR. SLATER:
8          Q.    Do you know that Mr. Chen has a
9    background in chemistry or chemical
10   engineering?  Are you aware of that?
11               MR. GALLAGHER:  Objection.
12         Outside the scope.
13         A.    I know he at least had a
14   college degree, okay, but everything else I
15   really didn't pay attention.
16               MR. SLATER:  You can take a
17         break now.  Go off the record.
18               THE VIDEOGRAPHER:  The time
19         right now is 8:47 a.m.  We're now off
20         the record.
21               (Whereupon, a recess was taken)
22               THE VIDEOGRAPHER:  The time
23         right now is 9:05 a.m.  We're back on
24         the record.
```

Confidential Information - Subject to Protective Order

1    BY MR. SLATER:

2        Q.    Do you know -- well, wait a

3    second.

4             Do you know whether any record

5    was made of Mr. Chen's interactions with

6    other people in the company about the

7    valsartan contamination?

8        A.    I have no idea.

9             MR. GALLAGHER:  Objection.

10        Calls for speculation, and

11        foundation -- lack of foundation.

12   BY MR. SLATER:

13        Q.    Can you recall, other than

14   discussing the equipment that you needed,

15   anything else that you told Mr. Chen

16   connected to the valsartan contamination with

17   nitrosamines?

18        A.    I'm sorry, say that again?

19        Q.    Sure.

20             Do you remember anything you

21   told Mr. Chen regarding the nitrosamine

22   contamination of valsartan?

23             Earlier you told us you

24   discussed some equipment you needed.

Confidential Information - Subject to Protective Order

1    Anything else?

2         A.    As far as I can remember, you

3    know, those are the items that I -- was

4    the -- you know, was the main topic.

5    Everything else I really, you know, do not

6    recall.

7              But instrument, you know, was

8    really an urgent needs because we need to,

9    you know, have those instruments to be in

10   place.

11        Q.    What instrument --

12        A.    Sorry --

13        Q.    What instrument or instruments

14   did you discuss the need for?

15        A.    GC-MS, and also GC-MS/MS in

16   particular, at least initially.  And then

17   later on there's also -- I think, you know,

18   we discussed like some LC-MS equipment.

19        Q.    Didn't you already have a GC-MS

20   machine?

21        A.    That --

22              MR. GALLAGHER:  Objection.

23        A.    Sorry, go ahead.  I'm sorry.

24              You know, we were facing with

Confidential Information - Subject to Protective Order

1    thousands, you know, batches of valsartan

2    need to be tested, okay, so a single, you

3    know, GC-MS, you know, would not be

4    sufficient, right.

5              And also that, you know,

6    particular GC-MS also was needed, you know,

7    to develop and optimize, you know, analytical

8    methods.  So we need to place the GC-MS also

9    in the QC.  Because in QC, in Chuannan CC

10   there had been no GC-MS instrument, so we

11   need to put these, you know, instrument into

12   Chuannan QC site, right.

13             So eventually, you know,

14   Chuannan QC site became the, you know, the

15   main testing site for those, you know,

16   thousands batches of commercial, you know,

17   batches of the valsartan.

18   BY MR. SLATER:

19        Q.    Was Mr. Chen told during these

20   meetings that multiple customers of ZHP had

21   since 2014 been complaining that there was

22   unknown peaks and interference on

23   chromatograms, and they were concerned about

24   what impurities might be there, and that they

Confidential Information - Subject to Protective Order

1    kept asking for an answer from ZHP and

2    couldn't get an answer?

3              MR. GALLAGHER:  Objection.

4         Lacks foundation, and mischaracterizes

5         documents and testimony.

6         A.    Such detail, you know, such

7    technical details were never discussed, you

8    know, at, you know, Mr. Chen's level.

9    BY MR. SLATER:

10        Q.    Was there discussion about how

11   your company should -- rephrase.

12              In these meetings with

13   Mr. Chen, was there discussion about how your

14   company should interact with the FDA?

15              MR. GALLAGHER:  Objection.

16        Outside the scope.

17              THE WITNESS:  Pardon.  Go

18        ahead.

19              MR. GALLAGHER:  Objection.

20        Outside the scope.

21              To the extent you know

22        personally, Mr. Li, you should answer.

23        A.    Anything as far as I know,

24   anything, you know, relating to interacting

Confidential Information - Subject to Protective Order

1    with regulatory agencies was taken care of by

2    the RA department.  Mr. Chen would not have,

3    you know, such detailed knowledge, you know,

4    how to interact.

5    BY MR. SLATER:

6         Q.    How do you know that?  Do

7    you -- did you attend the meetings with the

8    regulatory people that he attended?

9         A.    I don't remember.  But as I

10   said, based upon my, you know, my

11   observation, okay, he just would not be

12   involved in too much, you know, operational

13   details, okay.  He's only pay attention to

14   high levels, okay, like every --

15        Q.    One of your very profitable

16   drugs was contaminated with something that

17   caused cancer.  That's about as high level as

18   it gets, right?

19             MR. GALLAGHER:  Objection.

20        Argumentative.

21        A.    I don't want to comment on

22   that, okay.

23   BY MR. SLATER:

24        Q.    Do you know whether or not

Confidential Information - Subject to Protective Order

1    Mr. Chen ever discussed with anybody how your

2    company should interact with the FDA?

3         A.    I don't remember -- sorry.

4              MR. GALLAGHER:  Objection.

5         Outside the scope, and asked and

6         answered.

7         A.    I don't remember.

8    BY MR. SLATER:

9         Q.    At any of these meetings that

10   you attended, did Mr. Chen ever ask you, how

11   did this happen, and ask for an explanation

12   for how this could happen?

13             MR. GALLAGHER:  Objection.

14        Vague.

15   BY MR. SLATER:

16        Q.    Time out.  I'm going to ask the

17   question again because counsel said it's

18   vague, so in case, in case, you know, that

19   objection will be sustained I'm going to ask

20   the question again.

21             Did Mr. Chen ever ask you, how

22   was it that our valsartan could be

23   contaminated with a nitrosamine and we didn't

24   know about it?  Did he ever ask that

Confidential Information - Subject to Protective Order

1    question?

2         A.    I don't remember specifically,

3    okay, he -- like he specifically asked that

4    question, okay.  But I can tell you at least

5    in one of those meetings like, like I

6    explained to everyone, you know, you know,

7    the root cause analysis as we put into this

8    deviation report.

9         Q.    When you say the deviation

10   report, you mean the deviation investigation

11   reports that were provided to the FDA?

12        A.    Yes.

13             MR. GALLAGHER:  Objection.

14        Lacks foundation.

15        A.    The deviation report actually,

16   you know, you and I, we just went through,

17   you know, an early draft version.  Yeah, I

18   think that -- that's the deviation, you know,

19   investigation report.

20             But what you presented, you

21   know, was only -- you know, looks like an

22   early version.  It's not the final, finalized

23   version.

24             ///

Confidential Information - Subject to Protective Order

1    BY MR. SLATER:

2         Q.    Did you tell Mr. Chen that in

3    multiple drafts the deviation investigation

4    report stated that your company had

5    insufficiently researched and studied the

6    chemical processes, and then somebody made

7    the decision to take that language out of the

8    report before the report was finalized?  Did

9    you or anyone tell them that, to your

10   knowledge?

11             MR. GALLAGHER:  Objection.

12        Vague, and argumentative.

13        A.    I don't remember those details.

14   But my guess is, you know, such details would

15   not be discussed during those meetings

16   usually.

17   BY MR. SLATER:

18        Q.    Did you or anybody else in your

19   presence tell Mr. Chen that your company

20   failed to sufficiently research or study the

21   chemical processes, and that's why your

22   company didn't know that NDMA was a potential

23   contaminant from the beginning?

24             MR. GALLAGHER:  Objection.