**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

―――――――――――――――――――――――――  :  CIVIL ACTION NUMBER:
                                      :  **19-md-02875**
IN RE:  VALSARTAN PRODUCTS            :
LIABILITY LITIGATION                  :
                                      :  **TEAMS CONFERENCE**
―――――――――――――――――――――――――  :

        Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
        Camden, New Jersey 08101
        June 25, 2024
        Commencing at 1:02 p.m.


**B E F O R E**:         **THOMAS I. VANASKIE (RET.)**
                         **SPECIAL MASTER**


**A P P E A R A N C E S**:


        MAZIE SLATER KATZ & FREEMAN, LLC
        BY:  ADAM M. SLATER, ESQUIRE
        103 EISENHOWER PARKWAY
        ROSELAND, NEW JERSEY  07068
        FOR THE PLAINTIFFS


        NIGH GOLDENBERG RASO & VAUGHN PLLC
        BY:  MARLENE J. GOLDENBERG, ESQUIRE
        14 RIDGE SQUARE NW, THIRD FLOOR
        WASHINGTON, DC 20016
        FOR THE PLAINTIFFS




        SHARON RICCI, CRR, RMR, OFFICIAL COURT REPORTER
            SHARON.RICCI.USDCNJ@GMAIL.COM
                 (267) 249-8780

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
        PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

1    **A P P E A R A N C E S (CONTINUED):**

2

3        HILL WALLACK
         BY:  WILLIAM MURTHA, ESQUIRE
4        21 ROSZEL ROAD
         PRINCETON, NEW JERSEY 08543
5        FOR THE DEFENDANT HETERO

6

         GREENBERG TRAURIG LLP
7        BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
         3333 PIEDMONT ROAD, NE, SUITE 2500
8        ATLANTA, GEORGIA  30305

9

         BY:  GREGORY E. OSTFELD,  ESQUIRE
10       77 WEST WACKER DRIVE, SUITE 3100
         CHICAGO, ILLINOIS 60601
11       FOR THE DEFENDANTS TEVA PHARMACEUTICAL INDUSTRIES LTD.,
         TEVA PHARMACEUTICALS USA, INC., ACTAVIS LLC,
12       AND ACTAVIS PHARMA, INC.

13

         ULMER & BERNE LLP
14       BY:  JEFFREY D. GEOPPINGER, ESQUIRE
         600 VINE STREET, SUITE 2800
15       CINCINNATI, OHIO 445202
         FOR THE WHOLESALER DEFENDANTS AND AMERISOURCEBERGEN
16

17       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         BY:  RICHARD T. BERNARDO, ESQUIRE
18       ONE MANHATTAN WEST, SUITE 42-128
         NEW YORK, NEW YORK 10001
19

20    **ALSO PRESENT:**

21

22       LORETTA SMITH, ESQUIRE, JUDICIAL LAW CLERK

23       LARRY MACSTRAVIC, COURTROOM DEPUTY

24

25

1          (Proceedings held via Teams conference before Special

2  Master Thomas I. Vanaskie at 1:02 p.m.)

3          SPECIAL MASTER VANASKIE:  All right.  I think we can

4  probably get started.

5          We have several items to go over.  I wanted to go over

6  matters of a discovery nature, discovery dispute, and then hear

7  argument on a couple of the matters that are pending with

8  respect to the sanctions decision.

9          And so the first item I wanted to talk about was the

10  discovery with respect to Irbesartan and Losartan.

11          And who will be addressing that issue for the

12  plaintiffs?

13          MS. GOLDENBERG:  Marlene Goldenberg.  Nice to see you

14  again.

15          THE COURT:  Good to see you again.  It's been some

16  time.

17          And Mr. Goeppinger, will you be addressing this issue

18  or will somebody else?

19          MR. GEOPPINGER:  Yes.  That expertise is not mine, but

20  I think it's covered in our letter.

21          SPECIAL MASTER VANASKIE:  All right.  Marlene, you

22  want to go first?

23          MS. GOLDENBERG:  Sure.  We'll keep this real short.

24          So you know we've been doing discovery for a long time

25  now and we have mostly complete productions, we believe, from

1   most defendants, but at this point what we think would be very

2   helpful would be if the Court would enter a deadline for

3   substantial completion of discovery, just like we had last

4   time, so that we get a document from each defendant saying, you

5   know, we think we're done here.

6          And then we've asked in our letter for two deadlines

7   also for discovery to just keep moving.  So on June 30th,

8   that's the date we would like the defendants to certify that

9   they've completed any document productions, and then also to

10  give us the identity and topics covered and available dates for

11  each of their 30(b)(6) witnesses.  We served those notices

12  about a year ago, so hopefully that gives everybody enough time

13  to figure that out.

14         And then September 30th is the date that we'd like to

15  have as our deadline to complete depositions of the 30(b)(6)s.

16         I am sorry, I should say that that's completion of

17  document productions, not just substantial completion.

18         SPECIAL MASTER VANASKIE:  All right.  I'm a little

19  confused here.

20         So the June 30th deadline that you're proposing is for

21  what?

22         MS. GOLDENBERG:  Oh, that's going to be completion of

23  document productions and then -- and again, I think most of the

24  defendants are done, but we're aware that there's at least one,

25  if not a few others, that may have some documents left to

```
 1   produce.

 2          And the second part of the June 30th deadline is we'd

 3   like the defendants to tell us who their 30(b)(6) deponents are

 4   going to be, when they're available, and which topics they're

 5   covering.

 6          SPECIAL MASTER VANASKIE:  Okay.  And completion of

 7   those 30(b)(6) depositions by September 30th, is that what

 8   you're saying?

 9          MS. GOLDENBERG:  Right.

10          SPECIAL MASTER VANASKIE:  All right.

11          Mr. Goeppinger, are you prepared to talk about this or

12   is this somebody else's --

13          MR. GEOPPINGER:  Well, I think Ms. Goldenberg was

14   referring to some deadlines with respect to manufacturer

15   defendants, so I'm going to let Ms. Lockard address those

16   since --

17          SPECIAL MASTER VANASKIE:  Okay.

18          MS. LOCKARD:  Hi, Judge Vanaskie.

19          SPECIAL MASTER VANASKIE:  Hello.  How are you?

20          MS. LOCKARD:  I'm great.  Good to see you again.

21          Let me -- if I could just provide some context.  I do

22   think that we are making progress on negotiating this.  We had

23   a meet and confer on Friday where we discussed these issues,

24   and I don't think we're too far off.  From the defendant's

25   perspective, I think we would be in a position by the end of
```

1    July to have provided all dates and the names for our 30(b)(6)

2    witnesses.

3            The caveat to that is that back in December of 2023,

4    we had -- when we initiated meet and confers -- and there's

5    been several meet-and-confer calls among the plaintiffs and the

6    defendants.  So just to be clear, discussions have been going

7    on, somewhat solve out recently so because of the TTP trial

8    issues.

9            But in any event, when we spoke in December, the

10   defendants asked that the plaintiffs provide names for any

11   individual, personal information fact witnesses that they want

12   to depose from the defendants so that we could schedule those

13   at the same time.  And those names should not be dependent on

14   who we put forth as 30(b)(6) witnesses, however, we may choose

15   -- if there is a fact witness that plaintiffs know they want to

16   depose no matter what because the name is in the documents,

17   it's somebody they want to get their personal knowledge from,

18   then we may choose to make that person a 30(b)(6) witness and

19   do it all at once.  That's how we did it in the Valsartan phase

20   and that's the most reasonable approach.

21           At a minimum, we should be getting names from the

22   plaintiff as to who they want to depose on a personal fact

23   witness level at the same time we're providing dates and

24   depositions for a 30(b)(6), and it should be a process where we

25   work together to try to fit those into a reasonable schedule.

```
 1            But what we don't want to happen is we don't want to
 2   provide our 30(b)(6) names in depositions and promise to do it
 3   by a certain end point, and then plaintiffs come back and say,
 4   oh, well, but we want to take these five or six additional fact
 5   witness, corporate folks.  So we think -- and we left that ball
 6   in their court in December, and they did not get back to us
 7   with any individual names.
 8            That's what we're waiting for so we could do this all
 9   at once in an organized, reasonable fashion.  That's our
10   request, they give us the fact witness names, we'll work on
11   getting them scheduled along with 30(b)(6) witnesses.
12            In terms of the end point, we had proposed on Friday
13   that defendants have until the end of October to make the -- to
14   complete these depositions with the idea that we will be
15   rolling them out well before then.  You know, certainly
16   depending on what happens at Judge Bumb's conference and what
17   she wants to proceed with this fall.  You know, it may be in
18   our interest, in some of the defendants' interest to get these
19   depositions done in August and be done with them.
20            So it's not that we're trying to drag our feet on
21   that, but I do think we need to go about it in an organized
22   fashion.  They need to give us the names of the folks they want
23   to depose, we'll get them scheduled, at the same time we do the
24   30(b)(6) depos, we could get it done by the end of October with
25   no problem.  So that's our position on that.
```

1        With respect to the document production, Teva has

2    completed its document production.  I believe all of the

3    manufacturer defendants have completed with the exception of

4    one, and I'll let the individual manufacturers speak to that if

5    they have a response there.  But I believe that all, except for

6    one, of the document productions are completed, and I can say

7    with respect to Teva, ours is.  Thank you.

8        SPECIAL MASTER VANASKIE:  All right.

9        Let's hear first from you, Ms. Goldenberg.

10        MS. GOLDENBERG:  Sure.  So, you know, we don't need to

11    make this a whole prolonged process, but we did serve these

12    30(b)(6) notices a whole year ago.  I'm not really sure what is

13    happening, where this is a difficult thing for the defendants

14    to tell us who their 30(b)(6) witnesses are, and certainly many

15    of them has told us it's going to be the same people anyway, so

16    I'm not sure why they're not willing to provide that

17    information before we give fact witness names.

18        But we -- what we're trying to do is to short circuit

19    this.  You know, we went through a lot of depositions last

20    time.  And if there's a 30(b)(6) witness that they're going to

21    put up, you know, maybe we don't need to depose other people,

22    but it certainly would inform our list of individuals that we

23    want to depose if we could get their 30(b)(6) name first.

24        And as far as the schedule is concerned, I'll just

25    say, you know, we've been ready to take these depositions for a

1  long time.  My understanding is that it was made clear during

2  the Hetero settlement conference that discovery should be

3  moving.  We're still ready.  But we don't want to give anybody

4  an incentive to drag their feet at this point.  We think these

5  depositions need to move.  And if there is going to be a trial

6  date set, we'd like to use our time productively now and get

7  these done.

8        SPECIAL MASTER VANASKIE:  Why wouldn't it be

9  appropriate to require that plaintiffs identify the fact

10  witnesses that they want to depose and then receive the

11  identity of the 30(b)(6) deponents?

12        MS. GOLDENBERG:  We're in the process of trying to do

13  that, but at the same time, if we know that there's going to be

14  a 30(b)(6) witness who's going to be identified by the

15  defendants, you know, we may be able to take that deposition

16  and cut down on the number of depositions that we're taking.

17  We actually think this benefits them.

18        THE COURT:  But here's what I think.  I think you

19  should identify those witnesses that you want to depose, those

20  that you know, and we set a deadline for the identification of

21  30(b)(6) deponents.  I would not preclude plaintiffs from

22  identifying other deponents after their initial list is

23  provided and after they receive the identification of the

24  30(b)(6) deponents, but we need to move this matter forward,

25  and this dispute about who should go first doesn't help.

1          So what I would like to suggest is that by July 15th

2    plaintiff identify the persons they want to depose as fact

3    witnesses; and that by July 31st -- I'm not looking at a

4    calendar, I don't know if that falls on a weekend or not -- the

5    defendants identify their 30(b)(6) deponents.  And to the

6    extent there's some overlap there, that eliminates one

7    deposition.

8          MS. GOLDENBERG:  Understood.  And neither of those are

9    weekends, so you're good.

10          SPECIAL MASTER VANASKIE:  Okay.  All right.  So that's

11   what we'll require with respect to the depositions.

12          With respect to deadline for completion of a document

13   discovery, you indicated, I think, Ms. Lockard, that there's

14   one manufacturing defendant that has not yet completed the

15   document production?

16          MS. LOCKARD:  Yes, Judge.  And Mr. Murtha is popping

17   on any time we mention that, so I'll let him address that.

18          SPECIAL MASTER VANASKIE:  All right.

19          Mr. Murtha?

20          MR. MURTHA:  Good afternoon, Your Honor.

21          As you know, the Hetero defendants have been heavily

22   involved in acquiring documents and working on our settlement

23   agreements and term sheets, so production has slowed for us.  I

24   do have 3,500 documents to get through essentially myself.  So

25   I believe that can be done by the end of July, beginning to mid

1    August.

2          But in five days, there's no chance I'm going to be

3    able to go through all of those documents and make the relative

4    designations for that.  But I've spoken with counsel and we're

5    collecting documents from our client in India and working

6    actively to get that completed.

7          SPECIAL MASTER VANASKIE:  How about if we give you

8    until the end of July?

9          MR. MURTHA:  I believe that will work, Your Honor.

10          SPECIAL MASTER VANASKIE:  All right.  So we'll set the

11    end of July for completion of the document production by all

12    the defendants, including Hetero.

13          MR. MURTHA:  Thank you, Your Honor.

14          SPECIAL MASTER VANASKIE:  Anything else,

15    Ms. Goldenberg?

16          MS. GOLDENBERG:  No.  As long as the deadline for

17    identifying the 30(b)(6) witnesses, we're on the same page that

18    that also includes the topics they're going to cover and the

19    dates that they're available, I think we're good.

20          SPECIAL MASTER VANASKIE:  Yeah, it will include both

21    the topics and the dates that they're available.  All right?

22          MS. GOLDENBERG:  We're all set.  Thank you.

23          SPECIAL MASTER VANASKIE:  Okay.  Anything else on

24    Losartan/Irbesartan?

25          (No response.)

```
 1            SPECIAL MASTER VANASKIE:  All right.

 2            Now let's move to discovery and issues in the

 3   Valsartan matter.  We have an issue with respect --

 4            MS. GOLDENBERG:  Your Honor, you know what, I spoke

 5   too soon.  I'm so sorry.  We didn't get a deadline for the

 6   depositions to be done.

 7            SPECIAL MASTER VANASKIE:  And I think October 31st

 8   should be that deadline.

 9            MS. GOLDENBERG:  Okay.  Thank you.

10            SPECIAL MASTER VANASKIE:  On the matters that are

11   ready for trial, I suppose, or for Bellwether trials, the

12   question of discovery with respect to evidence relevant to

13   punitive damages has been addressed in letter briefs by

14   counsel.

15            And who will be addressing this issue for the

16   plaintiffs?

17            MR. SLATER:  I will, Your Honor.  Adam Slater.

18            SPECIAL MASTER VANASKIE:  All right.  And why isn't

19   this discovery untimely?

20            MR. SLATER:  The reason is because in order to try the

21   case, we need up-to-date data information, and the only time to

22   get that is close to trial.  The defense is acting as if they

23   want to make one production of punitive damage discovery and

24   they should have done it a long time ago and they're acting as

25   if that would be the only production, but that's not
```

1   reasonable.

2          And I can narrow the issues for Your Honor.  What we

3   need to do is we need confirmation of the gross revenues in the

4   prior year or the current year, if they're able to have that,

5   and the net worth of the company.  I think for the defendants

6   that are going to trial now, that's public, but we need them to

7   confirm it.

8          But this would have to be done before every trial.

9   For example, if there's a personal injury trial in two years,

10  the defendants wouldn't want us, the plaintiffs, to rely on the

11  net worth and gross revenue data from two years earlier.  For

12  example, they've hit hard times and the company is worth less

13  money.  So it has to be updated before each trial.

14         The normal practice is what we laid out in our briefs.

15  Normally this information is provided at or during trial

16  because defendants don't like to produce their financial

17  information before they're found to actually need to pay a

18  punitive damage verdict or -- not pay, but actually have to

19  defend against the verdict at trial when the amount becomes

20  relevant.

21         We followed the normal procedure and the defendants

22  said, well, you should have gotten this a long time ago, but

23  the bottom line is we still would have needed it updated at the

24  time of trial because it's an ongoing, changing set of facts.

25  And if we are trying cases for the next five years in this MDL,

1    we're going to need that production updated before each trial

2    because, again, the defendants and their financial situations

3    can change day by day, week by week, year by year, but you

4    always have to have the most up-to-date information confirmed

5    before the specific trial.

6              SPECIAL MASTER VANASKIE:  All right.  Who will be

7    addressing this issue for the defense?

8              I think you're muted, Mr. Ostfeld.

9              MR. OSTFELD:  Thank you, Judge.  Good afternoon, Judge

10   Vanaskie.  Greg Ostfeld.

11             SPECIAL MASTER VANASKIE:  Good afternoon.

12             MR. OSTFELD:  I'll be addressing this on behalf of the

13   defendants.

14             Your Honor, I think I should have known at the outset

15   that this same issue is currently pending and fully briefed

16   before Judge Bumb as part of the parties' trial briefs for the

17   TPP trial, and Judge Bumb has not said how or if she plans to

18   proceed with the TPP trial or how she's going to deal with the

19   issues in the trial brief.  So to that extent, this discussion

20   may be premature and should perhaps wait outcome of the

21   July 23rd case management conference when we'll get some

22   guidance from Judge Bumb as to how she sees dividing these

23   issues up between herself and Your Honor.

24             That said, I'm certainly happy to share our position.

25   I don't think it's going to change much whether you're deciding

1    it or Judge Bumb is deciding it.  I'm at the Special Master's

2    leisure on that.

3              SPECIAL MASTER VANASKIE:  Well, having heard from you,

4    it does seem to me that this is a trial-related issue and that

5    it would be appropriate to defer, at least in the first

6    instance, to Judge Bumb to see what her preference would be and

7    seek her guidance at the conference coming up on -- I guess

8    it's July 23rd.

9              You know, I think plaintiffs are entitled to this

10   discovery aside from the fact that, you know, I don't view it

11   as untimely, I'll put it that way.  That's my view.  But it

12   seems to me it's something that will come up trial by trial,

13   and why don't we defer to the trial judge on this matter at

14   this time.

15             So I won't make a decision now and we'll leave it go

16   until July 23rd.

17             MR. OSTFELD:  All right.  Thank you, Your Honor.

18             SPECIAL MASTER VANASKIE:  All right.  Thank you.

19   Anything else in terms of discovery?

20             MR. SLATER:  I don't believe so from plaintiffs.

21             MR. GOEPPINGER:  Your Honor, Jeff Goeppinger very

22   quickly on discovery, Losartan and Irbesartan, before we move

23   on to something else.

24             SPECIAL MASTER VANASKIE:  Sure.

25             MR. GOEPPINGER:  On the agenda --

1          (Simultaneous speakers.)

2          MR. GOEPPINGER:  -- I think, you know, one was a

3   stipulation.  We're just giving you notice that there's a

4   stipulation, the parties agree to on the motion to dismiss, and

5   we'll get it on file with Judge Bumb at her convenience.

6          The others were fact sheet issues.  One that you

7   already resolved by entering that fact sheet; and another,

8   there was one issue hanging out there on the other fact sheet

9   that I think we have to look for, is my understanding, but

10  we're going to have a resolution on that.  If we agree on that

11  and will be submitting, I anticipate, another fact sheet for

12  your approval.

13         SPECIAL MASTER VANASKIE:  All right.  Is there

14  anything else then?

15         MR. GOEPPINGER:  That was all I had from the

16  Losartan/Irbesartan discovery.

17         SPECIAL MASTER VANASKIE:  If there's nothing else,

18  then we'll move on.

19         MR. GOEPPINGER:  Thank you.

20         SPECIAL MASTER VANASKIE:  All right.  Thank you.

21         All right.  The other item I had on my agenda for

22  today was to hear argument with respect to the post-decision,

23  post-sanctions decision order that was issued that required --

24  required, and plaintiffs complied with, submission of proposed

25  findings of fact to support an adverse inference instruction

1   that has been ordered, and then to discuss the matter of

2   monetary sanctions.

3           And so I was hoping that I could hear some argument on

4   that this afternoon.  And let me give you my thinking on this.

5   I want to issue the decision that -- to the extent that I can,

6   on monetary award and the adverse inference instruction so that

7   Judge Bumb has everything in front of her and decides

8   everything just once.  Whether -- you know, both whether their

9   sanctions are appropriate, and if so, are these the appropriate

10  sanctions.

11          Rather than going up piecemeal -- this is the

12  appellate judge talking now -- and having to take this up in,

13  you know, bits of pieces.  Let's get a final decision up there,

14  let Judge Bumb decide, and move the matter forward in a -- in

15  my judgement, at least, my flawed judgement, a more logical

16  sequence.

17          And that's what I was hoping to accomplish.  So I will

18  tell you right now, I will give a decision out to Judge Bumb on

19  these issues that are outstanding so that when you present your

20  argument, you'll be presenting argument just once.  That's my

21  intention.

22          All right.  So Mr. Bernardo, you're speaking on behalf

23  of ZHP today?

24          MR. BERNARDO:  I am.  Good to see you, Your Honor.

25          SPECIAL MASTER VANASKIE:  Good to see you.  Thank you

1    for that.

2         Let me ask you a question.  Are you the -- you know,

3    you certified that ZHP complied with discovery orders, but how

4    can you make that certification?

5         Are you -- in other words, do you have the ability to

6    go through Chinese documents in the Chinese language or

7    Mandarin and --

8         MR. BERNARDO:  Well, I'm glad you asked, Your Honor,

9    because I was actually planning to raise that.  Because while I

10   understand that the time to argue this anew is in front of

11   Judge Bumb and not here, and I don't want to sort of cover old

12   ground, but you may recall that at the outset of the hearing

13   Mr. Slater read that ZHP had not complied with CMO 54, and I

14   had expressed my understanding at the time from prior counsel

15   that they, in fact, had.

16        And we went back and forth, and I undertook at that

17   hearing to work with Mr. Slater and to go back and to be in a

18   position to certify that, and that's what you asked me to do.

19        SPECIAL MASTER VANASKIE:  Right.

20        MR. BERNARDO:  And I spent considerable, considerable

21   time doing that.  And I am and have done this for other cases

22   and there are people who can translate documents and look at

23   those.  And what I literally did, Your Honor, was spent weeks

24   personally retracing the steps, working with our vendor both in

25   China and the United States, working with my team at Skadden

1    and the team at the vendor to make sure we had people

2    translating documents and looking at them.

3            And for example, with respect to Ms. Kong, I went back

4    personally and asked for a collection, an audit, an evaluation

5    of what she had, what was made available.  And to be very, very

6    clear, Your Honor, there were not four documents that were

7    produced from that period, there were dozens of documents that

8    were produced from that period.

9            And I explained to Mr. Slater that apparently what had

10   happened was that there was some issue with respect to the

11   deduplication or the duplicate custodial overlay provided by

12   the vendors, so documents that were from Ms. Kong's files that

13   were also from other people's files weren't, I'll use the word

14   "credited," so to speak, to Ms. Kong.

15           So I went back and did that.  And I feel very

16   comfortable -- I mean, I managed e-discovery as national

17   coordinator for many, many MDLs and I've had to be in the

18   position to do this and certify this before.

19           With respect to the Jinsheng Lin memo, I similarly

20   went back and I worked with the vendor.  We went back and we

21   looked to collect and double check.  And I took all these steps

22   with respect to all of them.  I actually spoke with the

23   individuals again and I confirmed that the only copy that still

24   exists of that document was one that happened to be on

25   Mr. Li's computer where I think you may recall there was some

1    computer problem and his computer had been changed or restored.

2    I won't go into the whole thing.

3              SPECIAL MASTER VANASKIE:  Right.

4              MR. BERNARDO:  So I walked through that and confirmed

5    that.

6              Similarly, with respect to the nitrosamine testing, I

7    actually spoke to the individuals who went through; I had my

8    own team go and audit and take a look.

9              So, no, Your Honor, I don't speak Chinese and I don't

10   expect to learn that any time soon, nor did I actually go to

11   China, but there are ways that a lawyer who has responsibility

12   for this can ensure to the best of his ability that appropriate

13   steps have been taken and that nothing suspicious appears.

14             And to the contrary, what I received in our client was

15   nothing but transparency and openness and nothing but

16   willingness to cooperate.  I mean, we were on hours-long phone

17   calls at 6:00 and 7:00 in the morning on multiple days and

18   11:00, 12:00 and 1:00 at night.  I don't take my certification

19   lightly.  I swore to it under penalty of perjury and I stand by

20   that.

21             And I'm going into that, Your Honor -- and had you not

22   even asked, I would have raised it -- because the claim that

23   ZHP had not complied with its discovery was not only a part of

24   the basis of Your Honor's opinion -- and we can address that

25   with Judge Bumb -- but it certainly, I would expect, to be

1    relevant to you in consideration of the nature and type of

2    adverse inference and monetary fines.

3           So I really wanted to make sure that that's clear that

4    there's no basis to believe that there's any issue other than

5    Mr. Chen's failure to appear at his deposition for the reasons

6    that we stated.

7           I hope that addresses Your Honor.  I'm sorry I went on

8    long, but since it's my name, I feel very personally

9    responsible and my credibility is on the line, so I wanted to

10   make sure I explain that fully.

11          SPECIAL MASTER VANASKIE:  Very well.  Thank you.

12          Mr. Slater, you want to respond?

13          MR. SLATER:  Sure.  I'll limit it to that issue, I

14   assume?

15          SPECIAL MASTER VANASKIE:  Sure, yes.

16          MR. SLATER:  Mr. Bernardo's certification, when you

17   read it cover to cover, number one, it's not based on personal

18   knowledge, as it's supposed to be.  We are now hearing that

19   there was some sort of an audit process and review done by

20   other people who would be better situated to tell us what was

21   produced or not produced.

22          If you look at the certification, there's literally

23   nothing in there of substance or detail.  Every paragraph is

24   basically based on my investigation, ZHP did everything right;

25   based on my investigation, I believe the steps taken were

1  appropriate.  There's absolutely no detail whatsoever aside

2  from what was done to try to establish where information is or

3  why it couldn't be found.

4      You get into the specifics -- for example, paragraph

5  10 of Mr. Bernardo's certification says they looked for an

6  electronic version of the report and electronic version was not

7  located.  If this was a full, transparent certification, it

8  would explain why.  It would say we looked here, we looked

9  here, we looked here, this is what we found, this is what we

10 didn't find.

11     We're basically being asked to take it at face value

12 that, sorry, based on physics or metaphysics, some of these

13 documents just didn't exist.  Mr. Bernardo brought up the

14 July 27th, 2017, email and talked about Min Li's testimony that

15 some issue happened with his computer and the document was

16 copied off his computer and that's why we got it as a PDF.

17 That's not helpful to ZHP.  That's enormously problematic for

18 ZHP, because again, that's why -- and Your Honor has lived this

19 with us -- that's why it's been very clear to anyone who

20 understands electronic discovery that we were never supposed to

21 see that email.  That's why it wasn't produced in the other ten

22 custodians' -- or however many other custodians' files.  Nobody

23 was listed as a duplicate custodian.

24     Mr. Bernardo has a very upset look on his face, he's

25 nodding his head, but Mr. Lin, who wrote the email, was not

1  even listed as a custodian when ZHP -- before Skadden Arps was

2  even hired -- came to the court and said we've given you

3  everybody that matters.  And they had no lid hold for him,

4  never listed him as a custodian, and the document wasn't even

5  found in his custodial file.

6      So they're not helping themselves with this

7  explanation, they're making it worse because it's very clear

8  the only reason we ever saw that email is because somebody

9  copied it from his laptop and a new date created came up and it

10  must have been outside the realm that they were sweeping

11  documents for.

12     I mean, this doesn't take a rocket scientist to figure

13  out what happened.  Otherwise, the document would have been on

14  everybody else's computer and everyone else's custodial files

15  and it would have been freely produced with duplications.

16     So this certification, which was never supplied to the

17  Court, basically says nothing other than believe us, we did the

18  best we could, we're not going to tell you what we did, we're

19  not going to tell you why the electronic documents couldn't be

20  found, we're not going to explain why that July 27 email was

21  only found in that one form, in that one way, and so on and so

22  forth.

23     And Mr. Bernardo, who says he handles document

24  production issues in MDLs, this would never be adequate to

25  explain missing documents if it was a spoliation situation.

1  This is a Rule 37 sanctions situation, I realize that we see

2  similar concepts, but this could never be acceptable.  And

3  Mr. Bernardo putting things on the record now to say, well, you

4  know, we really tried hard and we audited; we don't know who,

5  when, why, how, none of those people have certified to

6  anything.

7         This is so little so late that, in our view, the

8  certification should be disregarded because it doesn't answer

9  any of the Court's questions.  Unless the question is, hey, do

10  you want us to believe what you say?  And obviously, we're at a

11  much more rigorous level, especially when your documents of

12  such significance tying to such an important factual issue.

13         And I'll leave it with this.  What you're not --

14  Mr. Bernardo said, well, you know, it wasn't just four

15  documents for Maggie Kong, there were some other documents that

16  we turned up later.  Well, they represented that was all that

17  there was and that's all that was produced.  So we got a

18  trickle of some dedup documents where they found that other

19  custodians had them.  There was nothing of significance they're

20  pointing to.

21         And what they don't have is any documents during that

22  critical period of May 21, 2018, to June 15, 2018, when the

23  back and forth with Novartis was going on and when ZHP -- and

24  all you have to do is read those emails -- was hanging on to

25  this story that everything was fine and kept telling Novartis

1   there's nothing, everything meets quality specs, everything

2   meets quality specs.  And eventually Novartis says, look, we

3   have figured this out.  You're using sodium nitrate, right?

4   This is NDMA.

5        And then ZHP says, let us look into it.  And then they

6   come back and say there's still nothing we could find.  And

7   Novartis says, we're going to go to the authorities and your

8   customers if you don't, and finally they have to admit it.

9   That period of time there are no documents for Maggie Kong or

10  Baohua Chen.

11       So that gap is not filled by this certification, nor

12  is it explained.  And Your Honor was completely in the right to

13  draw the inferences that you did when you put everything

14  together because the evidence supports the inference.

15       I'm happy to answer any other points, but I think that

16  I've addressed this certification, which is really no more than

17  a red herring.

18       SPECIAL MASTER VANASKIE:  Mr. Bernardo?

19       MR. BERNARDO:  Your Honor, may I address that?

20       SPECIAL MASTER VANASKIE:  Absolutely.

21       MR. BERNARDO:  First, Your Honor required a

22  certification.  That's what I provided.  I provided similar

23  certifications, having done similar extensive searches and work

24  in other litigation without question.

25       I note that this certification is dated October 21st,

1    2022, almost two years ago, and today is the first day that I

2    heard even anything from Mr. Slater suggesting that this was

3    inadequate.  Had that been suggested, I would have been happy

4    to provide additional information.

5          But I would also note it wasn't just a certification,

6    the certification followed two lengthy pieces of correspondence

7    that had multiple attachments.  Your Honor, there are many,

8    many, many people who are involved in e-discovery, obviously.

9    It's not a matter of you can have the person who reviewed the

10    documents.  There are dozens of people who are involved in

11    that, there are dozens of people who are involved in the

12    vendor.

13          My role is to synthesize what I've done and what I've

14    seen and to take my experience in working with clients and

15    working with discovery to state with certainty that appropriate

16    steps under Rule 34 were provided.

17          Mr. Slater may wish that there were more documents

18    that existed.  There have been extensive discussions back in

19    this court and I've read transcripts and records going back

20    into legal holds and going back into the company's ordinary

21    record retention practices.  The fact of the matter is the

22    absence of fewer than 74 documents from this period is not

23    inconsistent with the absence of Ms. Kong's involvement in that

24    period.  She became involved and was involved after June of

25    2018 and there's much more documentation.

1    So again, I disagree that this is inappropriate, this

2  is the first time we're hearing of it, but the more important

3  thing is there still is no basis other than pure conjecture to

4  believe that CMO 54 has not been complied with.  And to the

5  contrary, Your Honor has a basis to believe, in fact, it was

6  complied with.

7    Now, I'm not asking Your Honor to change your ruling,

8  we will deal with that with Judge Bumb, but I'm asking Your

9  Honor that as we're considering the appropriateness of

10 particular sanctions, that the fact that this effort was taken

11 and that this was provided certainly meets at least an

12 appropriate showing that the company took its discovery

13 obligations seriously.

14    I mean, as you know, Your Honor, they put up 17 other

15 people for deposition, they produced hundreds of thousands of

16 documents.  If they didn't take their discovery obligations

17 seriously, it would have been clearer through those other

18 materials.

19    SPECIAL MASTER VANASKIE:  I have to note that I'm

20 troubled by the absence of documents surrounding the disclosure

21 of the contamination and the Novartis communication with ZHP

22 concerning its understanding that there has been this

23 nitrosamine contamination and the serious consequences that

24 flow from that.

25    It would certainly have seemed to me that there would

1   be more documentation than has been disclosed, but there's

2   nothing -- you know, all I can do is listen to what you have to

3   say and say, well, I am sorry, that just doesn't sit well.  And

4   that's where I'm at right now, it doesn't sit well with me.

5        I note that on the Maggie Kong production we've

6   counted up the number of pages and it's close to 10,000 pages

7   of documents.  I don't know how many documents that translates

8   into.  I could easily figure that out, I know that, but all we

9   did is took the Bates numbers and added them all up.

10       And so it wasn't an insignificant production, but it's

11  just troubling that this email sort of tumbles out and comes

12  out as a PDF and it's the only version of it that's available.

13  It just doesn't -- it doesn't make sense, frankly.

14       MR. BERNARDO:  With all due respect, Your Honor, what

15  you're raising is a different issue in terms -- it's not an

16  issue as to whether or not ZHP complied with an order and went

17  and provided and conducted appropriate searches.

18       You're making a different question as to it sounds odd

19  to you that there wouldn't have been more documents, but

20  there's already been a review of the legal hold and when that

21  was implemented, there's already been discussions of company's

22  ordinary course retention due to email and other limitations.

23       So again, I think the issue you're raising is a very

24  different issue but is not suggestive of the fact that somehow

25  ZHP derogated its responsibility in compliance with CMO 54.

 1          SPECIAL MASTER VANASKIE:  Mr. Slater, did you want to

 2   be heard?

 3          MR. SLATER:  Sure, I'll do it briefly.

 4          First of all, on the last point, the Irbesartan

 5   investigation that that email related to and actually discussed

 6   continued well into 2018, when in April of 2018 Min Li directed

 7   that the investigation be halted, the report not be

 8   disseminated because of the -- and I'm quoting him -- sensitive

 9   impurity.  So I'm not sure what this litigation hold argument

10   is from ZHP.

11          I'll also say that Your Honor didn't actually request

12   the certification.  What happens, as you well know, is counsel

13   started making representations.  And you said I think something

14   to the effect of, wouldn't it have been good if you put a

15   certification on this that actually complied with the rules

16   before the hearing, and it was left at that.

17          Then counsel later sends a certification to us,

18   doesn't send it to Your Honor.  It's way out of time.  We

19   looked at it, it was completely inadequate on its face.  And we

20   said, okay, we're going to keep going here because we have

21   orders and we're going to rely on the others.  And counsel

22   never came back to the Court and said, hey, we have this great

23   certification, look at it.  From our perspective, it was a

24   nothing.  And counsel didn't just hear today that it was

25   inadequate.  We have been saying that in our papers since they

 1 | first raised it in this briefing.

 2 |         So I don't -- again, this is really a straw man, this

 3 | whole entire certification, and -- most of these arguments,

 4 | frankly, are straw man in terms of trying to set up something

 5 | that was really not the issue.  These documents that were

 6 | produced were not adequate, they didn't comply with the order.

 7 | And ultimately, just because the defense lawyer says, well,

 8 | Judge, you know, we gave you everything we had so we complied

 9 | with the order, as Your Honor said, the Court is allowed to

10 | look at that in light of the entire circumstances and say,

11 | well, that doesn't make sense, it doesn't add up.  And the

12 | Court has the absolute power to do what Your Honor did.

13 |         And I'm looking forward to talking through the

14 | specific sanctions that Your Honor ordered so that we can go

15 | through those as well.

16 |         SPECIAL MASTER VANASKIE:  All right.

17 |         Anything else on this, Mr. Bernardo, before we talk

18 | about specific sanctions?

19 |         MR. BERNARDO:  Since my name keeps being bandy about,

20 | I want to be very accurate.  Mr. Slater is correct, he did

21 | raise it in the papers.  When I meant I hadn't heard, I meant I

22 | hadn't heard for almost two years.  He raised it a week ago.

23 | He's accurate about that.

24 |         And then the other point is, I just disagree with the

25 | characterization of what transpired at that hearing, but it's

1  transcribed and we can all read it and see it, so I just want

2  to note my record.

3          SPECIAL MASTER VANASKIE:  Okay.  Let's talk about the

4  question of monetary sanctions.

5          Now, Mr. Slater, ZHP has argued that sanctions that

6  would be -- sanctions of X number of dollars per day, for

7  example, are -- cannot be awarded because they would

8  essentially constitute sanctions for criminal contempt.  And

9  it's not a civil contempt, it's not a monetary sanction

10 intended to force compliance or compel compliance with the

11 discovery order; it's a sanction for having violated a

12 discovery order.

13         What's your response to that?  I have to say that it

14 does seem to me that maybe I went a little bit too far in

15 saying that I could impose a monetary sanction of X dollars per

16 day for every day they were late in producing documents, for

17 example, or Mr. Chen not showing up for his deposition ever.

18         So what's your response to that?

19         MR. SLATER:  My response is the point is well taken

20 and I think that -- I think the law supports -- there's cases

21 that support their position.  I think there's cases that go the

22 other way.

23         I think that the most important reason why we're here

24 is that -- it's really two big things.  One, anybody who looks

25 at this without first reading every single case that's been out

1  there would look at this and say of course you could sanction a

2  party for just not complying with an order under these

3  circumstances; it makes perfect sense, it makes perfect

4  equitable sense.

5        The bigger issue, I think, for ZHP is not the general

6  law that's out there.  I think the biggest issue for ZHP is the

7  concept of judicial estoppel.  Because I don't think that this

8  decision is going to be -- or should be determined based on the

9  overall analysis of the law.  And I am not agreeing with you

10 that there are certain issues potentially with awarding a

11 strict monetary sanction apart from our fees and expenses,

12 which is a different sanction.  But they led in opposing our

13 request for sanctions and said, don't enter a default, enter a

14 daily sanction, here's the case law that says you can award

15 daily sanctions against us, and actually led with a case where

16 a $50,000 a day sanction was awarded.

17       So I think that's the biggest hurdle for ZHP, is that

18 they took a position, prevailed on it in part because Your

19 Honor did not issue a sanction of a default, which is what we

20 were seeking, and I think that they have a real problem with

21 the concept, judicial estoppel.

22       But I am not going to stand here and tell you that the

23 law is for square 100 percent out outside of the fact that they

24 asked you to do what you did.

25       So I think that gets my point across to you and our

1  position.  I want to be as candid as I can and as

2  straightforward as I can, and I think that's really where this

3  needs to turn, is on the specific situation here where ZHP

4  actually argued for the daily sanction to try to avoid the

5  default.

6         SPECIAL MASTER VANASKIE:  All right.

7         Mr. Bernardo, do you want to respond to that?  You're

8  muted, I'm afraid.

9         MR. BERNARDO:  I apologize.  There was a barking dog

10 in the background.  I didn't want to unmute.

11        I'm not quite sure how to respond to an argument that

12 says that we shouldn't look at the law or be driven by the law

13 because that's why we're here.  We're all lawyers and --

14        SPECIAL MASTER VANASKIE:  I would like to hear your

15 argument on judicial estoppel.  There was an argument to me

16 that don't default us, impose a monetary sanction.

17        MR. BERNARDO:  Your Honor, I think that is a very

18 tortured interpretation of the position that was taken in a

19 prior brief.  And the case that's being referred to is the *In

20 Re: Sealed* case.  I looked at the papers.  What was clearly

21 being argued was that a sort of trial ending, which any adverse

22 inference, even the mildest, everybody knows, is frequently

23 litigation ending.  And it was saying you shouldn't be doing

24 that; if anything, you should award a monetary sanction.  I may

25 even have said a similar thing with respect to the argument, I

1    don't recall.

2          But by citing to a case here where they're essentially

3    saying that plaintiffs waived their opportunity to seek a

4    monetary sanction, number one; and to number two, that if the

5    Judge is going to do anything, if Your Honor is going to do

6    anything, it's a monetary sanction, does not stand for the

7    proposition that the kind of sanction that was awarded in that

8    case was appropriate because that is a complete deviation from

9    the law and it is, frankly, a very tortured interpretation of

10    the argument that was made.  And there's not an estoppel by

11    saying, Judge, please don't issue an adverse inference, we

12    really don't want that; if you're going to do something, issue

13    a monetary sanction, which implicitly would mean consistent

14    with the requirements of the law, Rule 37 and the Third

15    Circuit, which is abundantly clear.

16          And Your Honor made it very clear.  It's you're trying

17    to compel somebody to do something.  If you don't do this by X

18    date, I'm going to fine you, you know, for every day you don't

19    do it, a certain amount of money.  It's something I should be

20    doing with my contractor at the moment.

21          But there's that and then there's also the notion of,

22    you know, costs or expenses.  And you know, fees are a

23    different thing, but there could be other costs that were

24    somehow associated with this.  But there's just no room for the

25    kind of sanction.

1          Moreover, even if there were, with all respect, Your

2     Honor, the fact that it took the Court the time it did to rule

3     on this motion should not be something that provides the basis

4     for the per diem.  It was not within ZHP's control to have the

5     Court decide sooner.  And in fact, that's sort of the very

6     reason why these kinds of fines are prospective, not

7     retrospective, because they can force a company.

8          In one of the cases we looked at or cited to, it was

9     like forcing a bank to produce discovery.  If you didn't do

10    this, you know, for every day you're not doing this, we're

11    going to fine you.

12         So that's -- I don't think there's a waiver, I don't

13    think that we're estopped.  I think that's a tortured

14    interpretation of the position that counsel took and doesn't

15    really even make sense that counsel would argue, you know, give

16    me a $50,000 per diem day fine.  They'll say, fine, we'll pay

17    for your appropriate costs and fees for having to bring this

18    and for whatever else was incurred as a result of it.

19         SPECIAL MASTER VANASKIE:  Mr. Slater, it looks like

20    the delay that it took to issue the decision was me and why

21    should I penalize ZHP for my delay?

22         MR. SLATER:  Well, first of all, in federal court

23    we're all realistic, sometimes it takes some time to get a

24    decision out, so we understand that.  At worst, you could

25    shorten the time period if that's -- if they're arguing that it

1   shouldn't have taken as long, the time period could be

2   shortened.

3          But let's remember that during that entire time

4   period -- and they now have said in their papers, well, you

5   know, discovery was closed so there was nothing left to do.

6   But they never made an effort to close these last holes, so it

7   was ongoing.  That's all I really would have to say on that.  I

8   think that -- I think you could shorten the period if that

9   becomes the issue.

10         SPECIAL MASTER VANASKIE:  All right.  Yeah, I think

11   that -- you know, if I were to award a monetary sanction on a

12   per diem basis, I would shorten the period of time.

13         All right.  Let's talk about the attorney's fees.

14   Now, ZHP has argued in its papers that they want to wait to

15   respond on the fees issue until after Judge Bumb rules on their

16   appeal from the sanctions decision itself, but I don't

17   understand why you're unable to respond at this time, for

18   example, on the reasonableness of the hourly rates being

19   requested for Mr. Slater, Mr. Geddis, and the other associate

20   that was involved.

21         MR. BERNARDO:  Your Honor, and we didn't specifically

22   focus on the particular point you're raising and the

23   reasonableness of the rates, but as to the whole thing with

24   respect to attorney's fees, with all respect, it's sort of like

25   a Rubik's Cube that's not going together when you look at the

 1   various different pieces and components at issue here.

 2          And if the Court, for example, were to determine that

 3   they fully complied with the, you know, discovery and that

 4   there shouldn't be any sanction related to that, the discovery

 5   being CMO 54, then certainly we would have to look at and

 6   evaluate the fees and dissect them to determine what was spent

 7   versus that.

 8          Similarly, if the Court makes a ruling with respect to

 9   Mr. Chen's deposition that has -- you know, you acted

10   unreasonably by doing X, but reasonably in doing Y, or you

11   didn't act unreasonably at all.  I mean, the fact of the matter

12   is to evaluate the reasonableness of them takes an analysis of

13   understanding what's being ordered.

14          And I do appreciate Your Honor's preliminary comments

15   that you want to sort of send this all up having been

16   adjudicated so the Court can respond, but I really do think

17   that once the Court makes a final ruling, the task of dealing

18   with the reasonableness or lack of reasonableness of the

19   various pieces of plaintiff counsel's fees will be much more

20   straightforward and would not sort of burden the Court with

21   various "if then" scenarios.

22          SPECIAL MASTER VANASKIE:  You want to say anything in

23   response, Mr. Slater?

24          MR. SLATER:  I do just a little bit.  This argument is

25   astounding.  ZHP and their counsel, Skadden Arps, apparently

1  thinks that they can look at an order from a federal special

2  master, not agree with the fact that it was entered and not

3  agree with the timing and say, well, we're not going to do that

4  so that's the end of it, we're not going to actually do what we

5  were told to do by an order.

6          From my perspective, that's an absolute waiver.  If

7  they wanted to try to ask for a different process, they needed

8  to file a motion before their papers were due and ask the

9  Court to modify the approach, but they didn't, so they've now

10  waived that.  They should not be given another opportunity

11  later to do what Your Honor ordered them to do within a

12  particular period of time.  I don't see how they can be allowed

13  that.

14          And I'm going to just -- I'm not leaving, but I'm

15  plugging my laptop into another plug because it says low

16  battery and it's about to go to sleep, and I don't understand

17  why.

18          (Laughter.)

19          (Brief pause.)

20          MR. SLATER:  Okay.

21          SPECIAL MASTER VANASKIE:  You have it plugged

22  in?

23          MR. SLATER:  It says it's working now, so I'm going to

24  trust the electronics.

25          (Laughter.)

1              (Discussion held off the record.)

2              SPECIAL MASTER VANASKIE:  I am troubled by the

3    response on the attorney's fees issue.  You know, I didn't give

4    you enough time or you could have asked for more time in terms

5    of the specifics, in terms of the time entries.

6              And on the reasonableness of the hourly rates, well, I

7    see no reason why you couldn't have responded with respect to

8    that.

9              I need to put this in a position for Judge Bumb to

10   make decisions.  And it's not satisfactory to say, well, we'll

11   come back after we appeal -- I know you're confident in your

12   appeal, but if you lose, it's just compounding things.  And I

13   think it's better to get something before Judge Bumb so that

14   she has the full decision.

15             As I said, as a -- with my appellate experience,

16   we reviewed your appeal as interlocutory, let's get a final

17   decision and then appeal.  You chose now to appeal, that's

18   fine, but I'm going to go ahead and do what I'm going to do.

19   I'm not going to wait for that process, but I'm going to try to

20   put it in a process that Judge Bumb has before her

21   everything she needs to make the decisions she has to

22   make.

23             Is there anything else on this that -- well, let's

24   talk about the adverse inference instruction or the proposed

25   findings of fact that the plaintiffs had submitted to me.

1          MR. BERNARDO:  Who would you like to hear from on
2    that, Your Honor?
3          SPECIAL MASTER VANASKIE:  Well, let's hear from your
4    side first.
5          MR. BERNARDO:  Sure.
6          Your Honor made it very clear with your ruling that
7    even with an understanding and belief that ZHP had not complied
8    with CMO 54, which we believe that we did, that the
9    circumstances -- I'm getting a note saying there's one minute
10   left to our meeting that just popped up on the screen.
11         SPECIAL MASTER VANASKIE:  Yeah, someone had said five
12   minutes.  I don't know.
13         (Laughter.)
14         MR. BERNARDO:  Okay.
15         SPECIAL MASTER VANASKIE:  If it goes away, we'll try
16   and --
17         MR. BERNARDO:  I won't take it personally.  Got it.
18   I'll be very brief.  I'm talk quickly.
19         You made it very clear that you did not believe that
20   deeming plaintiffs' allegation admitted or precluding ZHP from
21   defending plaintiffs' claims was appropriate.  You made it very
22   clear and you used the phrase "lesser sanction" multiple times
23   throughout your decision.
24         But plaintiffs' proposed findings of fact and adverse
25   inference went the exact opposite direction.  They proposed the

1  absolute harshest possible adverse inference in finding of

2  fact.  They essentially seek to end the litigation and they,

3  themselves, would like a directed verdict.

4       The supposed findings of fact are not fact at all.

5  They're what plaintiffs want the facts to be, and I understand

6  why they want them to be that.  But many of them are just made

7  up with no basis, many of them are directly contrary to the

8  only evidence that is in the record.

9       We put in a very detailed submission, and I'm not

10  going to take your time, Your Honor, to rehash that whole

11  thing, but simply to point out -- you know, I gave one example,

12  which was the whole CMO 54.  The findings of fact are

13  completely inconsistent with what I just described.  The

14  other -- another example is Finding of Fact Number 7, that the

15  Court has determined that ZHP, at Baohua Chen's direction,

16  covered up and prevented the disclosure of ZHP's actual

17  knowledge.

18       There's not an iota of evidence, Your Honor, to

19  support that.  I understand that that's plaintiffs' argument

20  and it is a great closing argument, but it is not a finding of

21  fact.  It is not an adverse inference along the lines of what

22  Your Honor suggested.

23       And we cited to a case that gives us sort of three

24  tiers of adverse inference and we gave you -- and I refer you

25  to, I believe it's on pages 2 and 6 of our submission, what we

1   think -- sorry, pages 6 and 12, what we think an appropriate

2   adverse inference would be.

3          But we strongly believe that our objection should be

4   sustained with respect to the findings of fact that are in

5   plaintiffs' submission.

6          SPECIAL MASTER VANASKIE:  All right.  Thank you.

7          Anything else on that, Mr. Slater?

8          MR. SLATER:  Yes, Your Honor.

9          First of all, one broad statement I'm going to make to

10  match another broad statement is I believe that there's a lot

11  of mischaracterizations of your order, Special Master Order

12  Number 98, that we're just hearing.  And I think what's being

13  argued is that I think what counsel said is you did what you

14  said you weren't doing, but you didn't.

15         You didn't give the terminating sanctions that we

16  asked for and that we thought were appropriate and that we

17  thought could be justified.  Your Honor made -- and you cited

18  persuasive law.  The restatement is directly on point in this

19  and says, number one, adverse findings of fact can be made by

20  the Court and that's a reasonable way to address the sanction

21  here.

22         Your Honor didn't direct a verdict on anything.  We

23  have multiple claims in this case.  And all Your Honor has done

24  is made a finding or is going to make findings of certain facts

25  that the jury is going to have to take as true.

1    When I went through the opposition to our findings of

2    fact, it ran the gamut from you don't need to make this finding

3    because the documents already stand for this proposition.  For

4    example, with Baohua Chen's place in the company.  I was very

5    surprised to see that there's objection to that, but it fits

6    with what's been going on in the litigation where counsel for

7    ZHP will tell us -- I mean, they're stipulating to virtually

8    nothing and they're saying, you know, you have documents, go

9    prove it.

10    Probably not the most efficient way to try a case in

11    federal court where everybody knows something is true.  But

12    you're going to have to take time to prove facts that everyone

13    should stipulate to, but that's not a legitimate objection to

14    the finding of fact.  That's part of what the jury needs to

15    understand for the context.

16    Now, instead of going through all the findings, which

17    we're very confident come directly from your order -- we gave

18    you citations to the pages of your order.  We copied the

19    language.  We literally copied the same findings, some of the

20    findings that Judge Kugler affirmed having to do with Baohua

21    Chen's place in the company.  They appealed that to Judge

22    Kugler, and you were affirmed on that, so that motion was

23    denied.

24    I think the problem that ZHP is having, is getting

25    their arm around, is that the facts are very bad, they're very

1  incriminating, they fully support these adverse inferences.

2  And two small -- maybe not small points, but two more points of

3  that.

4        One, when you read their brief and they argue, well,

5  the email doesn't say anything about there being NDMA in

6  Valsartan.  I mean, we understand the words are in the

7  document, but that's not what it says -- I mean, this is -- and

8  then they supply to you reams of evidence, quote/unquote

9  evidence, of witnesses who say, well, that doesn't mean what it

10  says.

11        Well, that's the story they gave, which Your Honor is

12  making an adverse inference against them based on the plain

13  language, based on them not producing the chairman of the

14  company for his deposition, and the few important things that

15  are missing still that we can focus to that even ZHP doesn't

16  claim that we have.

17        Now, why is Baohua Chen so important on this and why

18  are your findings correct?  Min Li and Linda Lin, who is the

19  head of regulatory, and Min Li was the head of the CMAT

20  facility and analytical testing that Jinsheng Lin worked under

21  them, those are the people that got that email.  The idea that

22  it is a leap to say they wouldn't have said to the chairman of

23  the company, hey, there's an email that shows that there's NDMA

24  in the Valsartan up through Novartis, going back and forth, and

25  that they wouldn't tell the chairman of the company, hey, we're

 1   on the verge of it being outed that we've been selling

 2   Valsartan containing NDMA, the idea that he was not aware of

 3   that, in light of all the other findings Your Honor has made,

 4   which are more than adequately supported by record.

 5           The record is heavy on Baohua Chen's involvement

 6   with Valsartan.  Nobody can reasonably believe he wouldn't

 7   have known.  And making that finding based on the

 8   interrelationship of him not being produced, the lack of

 9   production of the July 27 email, et cetera, it all ties

10   together.

11           The last point I want to make is counsel said,

12   number seven, how can you say there was a cover-up?

13   Where does that come from?  That language is right in SMO 98,

14   it's on, I believe, page 38 of the decision, and that's exactly

15   what the evidence -- certainly the reasonable inferences

16   from the evidence show.  And for Your Honor to draw those

17   inferences is by far a small step.  It's not a giant leap, it's

18   not a terminating sanction, it's factual findings.

19           ZHP still intends to fully defend this case.  They

20   have all sorts of arguments they have on the law, all sorts of

21   arguments on class certification.  They've been letting us know

22   for a long time that they think some of the decisions are going

23   to get wiped, that we can't recover under this theory or that

24   theory.  So they have plenty of defenses and plenty of

25   arguments that they're making, and making these findings is not

1    the end of the road.  They just happen to be the findings that

2    make perfect sense in light of the record.

3            And I'll just say lastly, the reason counsel can go so

4    fast through the findings is because in their brief, again,

5    it's just believe our witnesses, just believe what our

6    witnesses said, the ones who said nobody knew this, when

7    everything is to the contrary.

8            So, Your Honor, we believe that our findings of fact

9    hew to your decision, your decision is well supported, and we

10   ask that our findings be implemented.

11           SPECIAL MASTER VANASKIE:  Anything else, Mr.

12   Bernardo?

13           MR. BERNARDO:  Just briefly.

14           That was a terrific closing argument and that's

15   exactly what the whole problem here is, Your Honor, is that an

16   adverse inference isn't that.  It's not let me tie up ends and

17   speculate and come up with things.  It's the opportunity for a

18   jury to consider that the absence of Mr. Chen's deposition, he

19   would have said something that would have been unhelpful to the

20   company.  While we disagree that that's warranted, that's an

21   appropriate adverse inference.

22           What has been provided to Your Honor for consideration

23   is literally a closing argument.  And I understand that ZHP

24   certainly still has legal arguments and will make those, but

25   Mr. Slater can't say with a straight face that ZHP can fully

1    defend itself at trial.

2          This adverse inference would essentially almost make

3    it impossible for ZHP to defend itself and have a fair trial

4    and to be able to tell its side of the story.

5          SPECIAL MASTER VANASKIE:  Well, a fair trial requires

6    that there be full and complete discovery and disclosure during

7    discovery.  And when a judge is -- or now a special master, is

8    presented with concerns that there has not been full and

9    complete disclosure, that's where the adverse inference is the

10   remedy.

11         We'll take a look at it, but I do want to have before

12   Judge Bumb what I think the adverse inference or inferences

13   should be, and then she can make a decision whether that's

14   appropriate or not.  She is the trial judge.  All right?

15         Is there anything else?

16         MR. BERNARDO:  Not from me, Your Honor.

17         Thank you very much.  I appreciate your hearing us.

18         SPECIAL MASTER VANASKIE:  Mr. Slater?

19         MR. SLATER:  Nothing from me, Your Honor.

20         Thank you so much for your patience through this

21   argument.

22         SPECIAL MASTER VANASKIE:  All right.  Thank you

23   all.

24         All right.  I think that's it for today then.  We'll

25   adjourn the call and you'll be receiving an order from me, and

```
1     I guess I'll see you in July now.  All right.

2               MR. BERNARDO:  Thank you, Your Honor.

3               MR. SLATER:  Thank you, Your Honor.

4               (Matter adjourned at 2:05 p.m.)

5

6          -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -

7

8          I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10

11    /S/ Sharon Ricci, RMR, CRR
      Official Court Reporter
12

13    June 25, 2024
           Date
14

15

16

17

18

19

20

21

22

23

24

25
```