1

1    **UNITED STATES DISTRICT COURT**
     **FOR THE DISTRICT OF NEW JERSEY**
2    _____

3    **IN RE:  VALSARTAN, LOSARTAN,**          **CIVIL ACTION NUMBER:**

4    **and IRBESARTAN PRODUCTS**               **1:19-md-02875-RMB-SAK**

5    **LIABILITY LITIGATION**                  **Daubert Hearing**

6    _____

7    Mitchell H. Cohen Building & U.S. Courthouse
     4th and Cooper Streets
8    Camden, New Jersey 08101
     Tuesday, September 10, 2024
9    Commencing at 9:35 a.m.

10   **B E F O R E:**         **THE HONORABLE RENÉE MARIE BUMB,**
                              **CHIEF UNITED STATES DISTRICT JUDGE**
11

12   **A P P E A R A N C E S:**

13   HONIK LLC
     BY:  RUBEN HONIK, ESQUIRE
14        DAVID J. STANOCH, ESQUIRE
     1515 Market Street, Suite 1100
15   Philadelphia, Pennsylvania 19102
     Co-Lead Counsel for MDL Plaintiffs
16

17   MAZIE SLATER KATZ & FREEMAN, LLC
     BY:  ADAM M. SLATER, ESQUIRE
18        CHRISTOPHER J. GEDDIS, ESQUIRE
     103 Eisenhower Parkway, Suite 207
19   Roseland, New Jersey 07068
     Co-Lead Counsel for MDL Plaintiffs
20

21   KANNER & WHITELEY, LLC
     BY:  CONLEE S. WHITELEY, ESQUIRE
22   701 Camp Street
     New Orleans, Louisiana 70130
     Co-Lead Class Counsel for Third-Party Payor Economic Loss

23            John J. Kurz, Official Court Reporter
                   John_Kurz@njd.uscourts.gov
24                      (856)576-7094

25      Proceedings recorded by mechanical stenography; transcript
              produced by computer-aided transcription.

**A P P E A R A N C E S:** (Continued)

NIGH GOLDENBERG RASO & VAUGHN, PLLC
BY:  C. BRETT VAUGHN, ESQUIRE
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Co-Lead Class Counsel for Third-Party Payor Economic Loss

RUEB STOLLER DANIEL, LLP
BY:  BEHRAM V. PAREKH, ESQUIRE
515 S. Figueroa Street, Suite 1550
Los Angeles, California 90071
Counsel for Plaintiffs' Executive Committee and all Plaintiffs

SLACK & DAVIS LLP
BY:  JOHN RANDOLPH DAVIS, ESQUIRE
6001 Bold Ruler Way, Suite 100
Austin, TX 78746
Counsel for Plaintiffs

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY:  JESSICA DAVIDSON, ESQUIRE
     ALLISON M. BROWN, ESQUIRE
     JOSEPH CARUSO, ESQUIRE
     JORDAN EINSTEIN, ESQUIRE
One Manhattan West, Suites 42-128
New York, New York 10001
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
Solco Healthcare U.S., LLC (collectively ZHP)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY:  NINA R. ROSE, ESQUIRE
1440 New York Avenue, N.W.
Washington, D.C. 20005
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
Solco Healthcare U.S., LLC (collectively ZHP)

KIRKLAND & ELLIS LLP
BY:  DEVORA W. ALLON, P.C.
     ALEXIA R. BRANCATO, ESQUIRE
601 Lexington Avenue
New York, New York 10022
Counsel for Defendants Torrent Pharma, Inc. and
Torrent Pharmaceuticals Ltd. (collectively Torrent)

(Appearances continued onto next page)

```
 1   A P P E A R A N C E S:  (Continued)

 2   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
     BY:  CLEM C. TRISCHLER, ESQUIRE
 3        JASON M. REEFER, ESQUIRE
     One Oxford Centre, 38th Floor
 4   Pittsburgh, Pennsylvania 15219
     Counsel for Defendant Mylan Pharmaceuticals, Inc.
 5
     GREENBERG TRAURIG LLP
 6   BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
     3333 Piedmont Road, NE, Suite 2500
 7   Atlanta, Georgia 30305
     Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
 8   Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
     Inc. (collectively Teva)
 9
     GREENBERG TRAURIG LLP
10   BY:  GREGORY E. OSTFELD, ESQUIRE
     77 West Wacker Drive, Suite 3100
11   Chicago, Illinois 60601
     Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
12   Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
     Inc. (collectively Teva)
13
     WALSH PIZZI O'REILLY FALANGA LLP
14   BY:  LIZA M. WALSH, ESQUIRE
     Three Gateway Center, 100 Mulberry Street, 15th Floor
15   Newark, New Jersey 07102
     Counsel for Defendant Teva
16
     ARCHER & GREINER, P.C.
17   BY:  MAUREEN THERESA COGHLAN, ESQUIRE
     1025 Laurel Oak Road
18   Voorhees, NJ 08043
     Counsel for the Mylan defendants
19
     CROWELL & MORING LLP
20   BY:  ANDREW KAPLAN, ESQUIRE
     1001 Pennsylvania Avenue, NW
21   Washington, DC 20004
     Counsel for Defendant Cardinal Health
22
     BARNES & THORNBURG, LLP
23   BY:  KARA KAPKE, ESQUIRE
     11 South Meridian Street
24   Indianapolis, IN 46204
     Counsel for Retailer Defendants and CVS Pharmacy, Inc., and
25   Walmart, Walgreens
```

*United States District Court*
*District of New Jersey*

1    **A P P E A R A N C E S:** **(Continued)**

2    FALKENBERG IVES LLP
     BY:  KIRSTIN B. IVES, ESQUIRE
3    230 W Monroe Street, Suite 2220
     Chicago, Illinois 60606
4    Counsel for Defendant Humana

5    NORTON ROSE FULBRIGHT US LLP
     BY:  D'LESLI DAVIS, ESQUIRE
6    2200 Ross Avenue
     Suite 3600
7    Dallas, Texas 75201
     Counsel for Defendant Mckesson Corp.

8

9    **Also present:**

10   Arthur Roney, The Courtroom Deputy

11   Loretta Smith, Esquire, Judicial Law Clerk to the Honorable
     Robert B. Kugler (Ret.)

12
     Terry Henry, Esquire, Camber, Hetero
13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **<u>INDEX</u>**

2    **<u>WITNESSES</u>:**                                              **<u>PAGE</u>**

3    **<u>FOR THE DEFENDANTS</u>:**

4    LAUREN STIROH, Ph.D.

5       Direct Examination By Ms. Brancato              8

6       Cross-Examination By Mr. Stanoch               46

7       Redirect Examination By Ms. Brancato           86

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

1          (PROCEEDINGS held in open court before the Honorable

2    Renée Marie Bumb, Chief U.S. District Judge, at 9:35 a.m. as

3    follows:)

4          THE COURTROOM DEPUTY:  All rise.

5          CHIEF JUDGE BUMB:  Good morning.  Good to see you

6    all.  Thank you.

7          MR. STANOCH:  Good morning, Your Honor.

8          MS. ALLON:  Good morning.

9          CHIEF JUDGE BUMB:  Okay.  I thought about express

10   warranty all night.  Woke up this morning thinking about

11   express warranty.

12          (Laughter.)

13          MR. STANOCH:  Sorry to hear, Your Honor.

14          CHIEF JUDGE BUMB:  Oh, so I took -- I don't want to

15   delay the expert, but I did take a look at the complaint.  I

16   think a part of the confusion, and, you know, you all are going

17   to clarify it with the submissions, but I think part of the

18   confusion is, is that the complaint lays out several different

19   warranties that were allegedly breached, express warranties

20   that were allegedly breached, which I think then calls into,

21   well, what is the damages for those.  I think.  I don't know,

22   that's what you all are going to brief on.

23          So I'm looking at, for example, paragraph 622 of the

24   complaint, 623 and 624.  As I read the complaint, those are all

25   separate express warranties.

1          It seems to me the jury would then have to make a

2    finding as to each of those express warranties.  And then the

3    question becomes, which is what you folks are going to brief,

4    is, does the law say there are divergent damages depending upon

5    what the warranty being alleged to have been breached is.

6          Does anybody have any questions about what's bugging

7    me and what I need briefing on?

8                MR. HONIK:  I think we get it, Judge.

9                MR. STANOCH:  Yeah.

10               CHIEF JUDGE BUMB:  How about over here?

11               MS. ALLON:  Good, Your Honor.

12               MR. OSTFELD:  Understood, Your Honor.

13               CHIEF JUDGE BUMB:  Yes.  Okay.

14               So is Dr. Stiroh here?

15               MS. BRANCATO:  She is, Your Honor.

16               CHIEF JUDGE BUMB:  Okay.  We'll get started.

17               (Witness took the stand.)

18               THE COURTROOM DEPUTY:  Raise your right hand.

19          Do you solemnly swear the testimony you're about to

20    give in the case now before this Court will be the truth, the

21    whole truth, and nothing but the truth, so help you God?

22               THE WITNESS:  I do.

23          *LAUREN STIROH, Ph.D., called as a witness for the*

24    *Defendants, having been first duly sworn by the Deputy, was*

25    *examined and testified as follows:*

1          THE COURTROOM DEPUTY:  Can you please state and spell

2   your full name for the record.

3          THE WITNESS:  Yes.  My name is Lauren Stiroh,

4   L-A-U-R-E-N.  Stiroh is S-T-I-R-O-H.

5          THE COURTROOM DEPUTY:  Thank you.

6          CHIEF JUDGE BUMB:  Good morning.  How would you like

7   me to address you?

8          THE WITNESS:  Dr. Stiroh is fine.

9          CHIEF JUDGE BUMB:  Okay.  Welcome.  Please keep your

10  voice up.  If you could bring the microphone close to you.  And

11  there's water in the pitcher if you should need it.

12         Okay.

13         MS. BRANCATO:  Your Honor, may I proceed?

14         CHIEF JUDGE BUMB:  You may.

15         MS. BRANCATO:  Thank you.

16                    <u>DEFENDANTS' EVIDENCE</u>

17                    <u>DIRECT EXAMINATION</u>

18  BY MS. BRANCATO:

19  Q.   Good morning, Dr. Stiroh.

20  A.   Good morning.

21  Q.   Can you please introduce yourself to the Court when you're

22  ready.

23  A.   Yes.  I am Dr. Lauren Stiroh.  I'm an economist.

24  Q.   And, Dr. Stiroh, did you prepare any slides today to

25  assist with your testimony?

1    A.   I did, yes.

2              MS. BRANCATO:  Your Honor, may I approach?

3              CHIEF JUDGE BUMB:  You may.

4              MS. BRANCATO:  I tried to do this electronically, but

5    it didn't work out, so I thought paper might be most efficient

6    at this point.

7    BY MS. BRANCATO:

8    Q.   Dr. Stiroh, these are the slides you prepared to testify

9    or aid your testimony today?

10   A.   They are, yes.

11   Q.   Let's look at slide 2 titled:  Education and Experience.

12   Can you start by telling us how long you've been an economist?

13   A.   Yes.  I have been an economist for about 30 years.

14   Q.   And can you please tell the Court about your educational

15   background?

16   A.   Yes.  I have a BA in economics from the University of

17   Western Ontario; a master's in economics from the University of

18   British Columbia; and a Ph.D. in economics from Harvard

19   University.

20   Q.   Where do you currently work?

21   A.   I work in White Plains, New York.  My office is there, and

22   the company I work for is called NERA Economic Consulting.

23   Q.   What's your title at NERA?

24   A.   It is Senior Managing Director.

25   Q.   And how long have you been with NERA now?

Stiroh – Direct – Brancato                    10

1    A.    Almost 30 years.  I started there after finishing my Ph.D.

2    in 1996.

3    Q.    Over the course of your 30-, 35-year career, have you ever

4    served as an expert witness in a lawsuit?

5    A.    I have.

6    Q.    In approximately how many cases?

7    A.    I think it is probably close to a hundred by now.

8    Q.    And of those 100, how many would you say approximately

9    were as a damages expert?

10   A.    I think probably half of them.  I haven't counted

11   specifically, but I think about half of them may be damages

12   cases.

13   Q.    Let's look at Slide No. 3.

14         Dr. Stiroh, can you tell us what your assignment was

15   in this case?

16   A.    Yes.  I was asked to evaluate Dr. Conti's opinions

17   specifically with respect to her opinion that the drugs were

18   worthless and that also to evaluate her damages calculations

19   and opinions.

20   Q.    At a high level, what is your understanding of Dr. Conti's

21   opinion regarding damages?

22   A.    At a high level, her opinion is that the drugs at issue

23   were worthless, and her damage calculation intends to sum up

24   all of the payments that were made for the drugs from 2012

25   through the time of the recall.

*Stiroh - Direct - Brancato*                                    *11*

1   Q.   And in responding or evaluating Dr. Conti's damages

2   opinion, did you do your own calculation of the TPPs' damages

3   in this case?

4   A.   I did not.

5   Q.   Why did you not do that calculation?

6   A.   It was not part of my assignment.  I was asked to evaluate

7   Dr. Conti's calculations, methodologies and opinions, and

8   that's what I did.

9   Q.   Dr. Stiroh, we're going to talk a lot today about a

10  counterfactual world or a but-for world.

11           Can you just tell us what that means at the outset?

12  A.   Yes.

13           To an economist, it's the world that didn't happen.

14  It is a way to evaluate economic impact from some sort of

15  conduct that's alleged to be improper.  The but-for world is

16  what does the world look like if that conduct had never

17  occurred, what would economic outcomes have been, what would

18  economic relationships have been, but essentially a fully

19  constructed world that looks like the current world except for

20  the conduct at issue.

21  Q.   Does Dr. Conti construct a but-for or counterfactual world

22  to arrive at her opinion?

23  A.   She does.

24  Q.   And what is that but-for, counterfactual world she

25  constructs?

*Stiroh - Direct - Brancato*                                                    12

1    A.    Her counterfactual world is to take away the defendants'

2    supply of valsartan-containing drugs.  So the difference

3    between the actual world and the but-for world is there's no

4    supply of defendant manufacturer VCDs.

5    Q.    And in the real world, there was supply up until the

6    recall; is that right?

7    A.    Yes.

8    Q.    Let's turn to slide 4, please.

9          Dr. Stiroh, can you please tell us about your first

10   opinion?

11   A.    Yes.

12         So with respect to Dr. Conti's opinion that the drugs

13   were worthless, in my view that's not supported by economic

14   reasoning.  It's that she has a world where she has taken away

15   supply but then not considered what economic factors come out

16   of that, how do economic relationships change, and what would

17   happen in a world where we took away supply from the defendant

18   manufacturers.

19   Q.    And can you please tell us what your second opinion is?

20   A.    My second opinion is that one of the things that happens

21   in that but-for world, if we were to just take away the supply

22   from the defendant manufacturers, the people that took the

23   drugs got a benefit from taking the drugs.  They're not

24   worthless.  They were -- they had some therapeutic value.  So

25   in the but-for world that she constructs, we have people

*Stiroh – Direct – Brancato*                    13

1  getting a therapeutic value from the drug without having ever

2  paid for it for all of the years up until the recall.  And what

3  that does is it puts more money back for the TPPs that are at

4  issue, I understand from this hearing today, and makes them

5  better off than they would have been had the drugs, the

6  adulterated drugs never been in the system, if the adulteration

7  had never occurred in the first place.

8         CHIEF JUDGE BUMB:  Can you try that again?  Can you

9  say what you just said again?

10        THE WITNESS:  Yes.

11        So the -- let me just reorient myself.

12        So in the but-for world that Dr. Conti has, we take

13  away the supply from the defendant manufacturers.  In my view,

14  it's not a properly constructed but-for world because the end

15  result is not supported by economics.  The end results that we

16  have there is from 2012 through 2018, consumers were taking

17  valsartan, receiving the therapeutic benefit.  But if we give

18  them and the TPPs back all of the money they ever paid, the

19  TPPs end up in a situation where their covered patients

20  received a therapeutic value and nobody paid for it.  So they

21  get back all of the money, they still get a value, and that is

22  not an economic outcome.  It's not a proper measure of economic

23  loss.

24  BY MS. BRANCATO:

25  Q.   In that situation where the TPPs get back all of the

*Stiroh - Direct - Brancato*                                    14

```
 1   value, would that be a windfall?

 2   A.    That is a windfall.  It makes them better off than they

 3   would have been had the contaminants never been added to the

 4   product.

 5   Q.    Dr. Stiroh, in prepping for today, did you review the

 6   TPPs' *Daubert* motion to exclude part of your damages opinion?

 7   A.    I did.

 8   Q.    And do you understand that the *Daubert* motion is the

 9   subject of today's hearing?

10   A.    I do.

11   Q.    Which of your opinions do you understand the TPPs to be

12   challenging today?

13   A.    I understand they are challenging the aspect of the second

14   opinion where I'm considering the damage methodology, testing

15   the reasonableness, and I consider the price of alternative

16   drugs in looking at the reasonableness of that outcome.

17          I don't understand them to be challenging my opinions

18   that the drugs were not worthless.

19   Q.    Let's turn to slide 5, please, and focus a little bit more

20   on the second opinion.

21          What's the first -- sorry, the printout is a little

22   unclear, but it would have been clear on the screen.  What's

23   the first ground for your second opinion that the TPPs -- or

24   that Dr. Conti hasn't demonstrated that the TPPs suffered any

25   economic loss?
```

*Stiroh - Direct - Brancato*                                    15

1    A.    Yes.  It's faded out a little bit on the printout so you

2    can't see what it is that I'm about to say, but that there is

3    value.  There is value in the valsartan-containing drugs.  They

4    have a risk that was not disclosed at the time that they were

5    taken.  But from the TPPs' perspective, there is value in those

6    drugs.  And so that isn't something -- that is not considered.

7    It's not incorporated into Dr. Conti's opinion.

8    Q.    And what exactly is the value that the TPPs receive from

9    the VCDs?

10   A.    So the TPPs' role is, essentially, it's a business role.

11   They have a business relationship in the supply chain.  They

12   don't of course take the drugs themselves.  They facilitate

13   payments for the drugs.  They facilitated those payments.  The

14   drugs were manufactured.  Prescriptions were written by

15   doctors.  When the prescription was filled, the amount that is

16   paid, the agreed upon amount is covered by TPPs.  So that role

17   was still fulfilled in the supply chain.

18   Q.    And what is the second ground for your second opinion?

19   A.    It is related to what we said before about in Dr. Conti's

20   world there's a windfall.  If we were to take away the

21   defendant manufacturers' supply of valsartan-containing drugs,

22   the TPPs would not have been better off.  Two things could

23   happen.  We take away that supply and either the patients don't

24   take something to replace it, if it did nothing for them, if

25   there was no value and they took nothing to replace it, then

1    those payments never occur.  But if they have to take something

2    to replace it, the role of the TPP is to cover what the

3    prescription is that the doctor writes.

4            So when there is value in managing hypertension and

5    some drug is going to be taken, from the TPPs' perspective, as

6    an economic matter, they don't get better off if we take away

7    the supply.  Their payments would be at best the same, at worst

8    higher.

9    Q.   And just to be clear, do you understand the TPPs to be

10   challenging both of these bases for your second opinion or one

11   or another?

12   A.   I understand that they are not challenging my opinion

13   regarding worthlessness; that they are not challenging that the

14   drugs had some value.  I understand them to be challenging when

15   I look at the prices of alternative drugs in evaluating the

16   reasonableness of the outcomes.

17   Q.   Let's talk about the methodology you used to reach your

18   conclusion that the TPPs would not be better off due to paying

19   for more expensive alternatives.

20           Let's look at slide 6, please.

21           Dr. Stiroh, can you please explain the methodology

22   you used to reach the conclusion that the TPPs would have paid

23   for more expensive alternatives in the but-for world?

24   A.   Yes.

25           So first, I consider the ways in which a third-party

1    payor, a TPP, could be harmed in this situation.  I look at --

2    I consider what their economic outcomes are and how the

3    economic outcomes would be different but for the wrongful

4    conduct, so but for the contaminated products, and I consider

5    is there an economic difference to say that there is an

6    economic loss.

7            So the first step is considering the ways in which a

8    third-party payor could be injured and then evaluating did

9    Dr. Conti look at whether there was injury that accrues to the

10   third-party payor.

11   Q.   Let's talk about each of these steps one by one just so

12   we're clear.  Starting with the first step, and we can go to

13   slide 8, please.

14           Dr. Stiroh, can you please explain what we're seeing

15   on the slide?

16   A.   Sure.

17           So this is one of the references in my report that I

18   point to that an approach to economic damages is to construct a

19   but-for world and compare the but-for world to the actual

20   world, and differences in economic outcomes are the measure of

21   economic loss.  And it is an approach to evaluate from an

22   economic point of view what's the money that comes from the

23   conduct at issue.

24   Q.   Is this analysis you're doing also sometimes called a

25   "make-whole" approach?

*Stiroh - Direct - Brancato*                                    18

1    A.    Yes.   It comes by different names.   One is "make whole,"

2    and that is make the plaintiff whole in money terms for the

3    harm that was done to them.   Another is compensatory damages,

4    what compensates the plaintiff for the money damages that they

5    incurred, and but-for damages.   You see all of those phrases

6    generally to mean the same approach.

7    Q.    Let's look at slide 9, please.

8          Dr. Stiroh, focusing on the TPPs specifically, how

9    can they be damaged?

10   A.    So, as I said, the TPPs' role, they're a business entity,

11   and they conduct business and earn profits through the

12   business.

13         The way a business gets harmed is a reduction in

14   profits compared to what they otherwise would have earned

15   absent some wrongdoing.   And so on this slide it's showing the

16   distinction between the ways in which somebody that took a

17   contaminated product can be harmed, which would include in it

18   some sort of medical implication, and the way a business could

19   be harmed.   And that has to do with differences in economic

20   outcomes, because that is the -- the measure of benefit to a

21   business is additional profit.   A measure of harm is reduced

22   profit.

23   Q.    Can we turn to slide 10, please.

24         Dr. Stiroh, 10 and 11 are an attempt to illustrate

25   what the but-for world might look like in simpler terms.   Let's

1    start with slide 10.  Can you describe what we see on slide 10?

2    A.    Yes.

3          So this is an illustration of the way a damage

4    calculation typically proceeds.  You look at -- for a business,

5    you look at what are the costs or, alternatively, what are the

6    profits that they earn in the actual world and then compare

7    that to the but-for world and consider what their economic

8    outcomes are in the but-for world.  And if there is a

9    difference, if they would have been better off in the but-for

10   world, that measure of difference is the economic loss damages.

11   Q.    And turning to slide 11.

12         CHIEF JUDGE BUMB:  Have you ever done any such

13   analysis in a case similar to this, in a pharmaceutical case

14   similar to this where the allegation was that they were

15   contaminated drugs?

16         THE WITNESS:  I have not done this analysis for

17   contaminated drugs.  I've done economic loss damages, and those

18   types of considerations are similar.  So it is thinking about

19   the business entity of a third-party payor separate from what's

20   the impact to a consumer that took the product.

21         CHIEF JUDGE BUMB:  And have you done any analysis in

22   any cases where the allegation is, is that warranties were made

23   that turned out to not be true?

24         THE WITNESS:  Yes.  I have worked on other contract

25   cases and warranty cases where the difference is what is the

*Stiroh – Direct – Brancato*                                    20

1    value received versus the value bargained for.  And as I

2    described in my report, it's the similar type of analysis of

3    what's the diminution of value, by how much is the value

4    reduced by the conduct.  That would go to the worthlessness

5    theory that we were talking about earlier.  They're not

6    worthless.  There's some value there.  And what was never

7    measured was what is the amount by which the value has come

8    down.

9             CHIEF JUDGE BUMB:  Have you ever done an analysis in

10   a case where the allegation is, is that there were warranties

11   made and the injured party took the position and/or prevailed

12   in the position that the product was worthless?

13            THE WITNESS:  I have not been in a matter where there

14   was a position that the product was worthless.  I have given

15   testimony in a matter where there were representations of the

16   mileage an automobile would get and the actual mileage was

17   different from the mileage.  The allegation I don't think

18   included worthlessness in there.  But the same consideration of

19   what was known at the time that the price was struck and what

20   would have happened had more information been available at that

21   time.

22            CHIEF JUDGE BUMB:  What case was that?

23            THE WITNESS:  I expect you want it by the caption.

24   The company that I worked for was Ford Automobile.  And I would

25   have to look that up for you.  Oh, I think it's in my CV.

```
 1              CHIEF JUDGE BUMB:  Was it a recent case?

 2              THE WITNESS:  It's a case in Canada.

 3              CHIEF JUDGE BUMB:  So it wouldn't have applied

 4   American law?

 5              THE WITNESS:  It would not have applied to American

 6   law.

 7              CHIEF JUDGE BUMB:  U.S. law.

 8              THE WITNESS:  It's the same type of consideration.

 9              CHIEF JUDGE BUMB:  Okay.

10   BY MS. BRANCATO:

11   Q.   Dr. Stiroh, looking at slide 11, can you tell us what we

12   see on this slide and how that's different from what we saw in

13   slide 10?

14   A.   Yes.  So slide 10 shows the typical case of economic loss

15   where a plaintiff is economically worse off than they would

16   have been absent the wrongdoing.  And here we have a

17   complication that in the actual world, they bargained for

18   valsartan-containing drugs.  They had the value of those drugs.

19   Had that supply been taken away, then economics tells you price

20   would go up; costs of alternatives are higher.  They are not --

21   the TPPs would not be better off in an economic sense if we

22   took away the supply for valsartan-containing drugs.  So there

23   is not a money damages amount.  If we just take that away --

24   sorry, take away the supply and give back all the money, we've

25   given a windfall.  We've made the defendant better off.
```

1    And my understanding of compensatory damages is you

2    put them back in a position they would have been had the

3    wrongdoing never occurred, not put them in a position that

4    makes them better off for the wrongdoing having had occurred.

5    CHIEF JUDGE BUMB:  So you're familiar with all of

6    the -- I just want to know if you've worked on any such types

7    of these cases.

8    So there have been many cases over the years where

9    there is, let's say, a recall of lettuce for -- what is it?

10    Salmonella or whatever.

11    THE WITNESS:  Yeah.

12    CHIEF JUDGE BUMB:  Have you ever worked on those

13    kinds of cases?

14    THE WITNESS:  I have not.  I am, you know, familiar

15    with the situation and can talk about the economics involved.

16    The recent recall, I think of deli meat.  And I think the

17    comparable situation is what if you ate your sandwich already

18    and you didn't get sick?  You had your sandwich, you didn't

19    have to buy a second lunch.  The economic damages would be did

20    you have to buy a second lunch.  If you took what was in your

21    refrigerator and you threw it away and now you have to go

22    grocery shopping again, that is the economic impact; what are

23    the additional costs.

24    CHIEF JUDGE BUMB:  That's the same analysis you're

25    doing here?

1        THE WITNESS:  Yes, the same analysis that I'm doing

2   here.

3        CHIEF JUDGE BUMB:  Okay.

4   BY MS. BRANCATO:

5   Q.   Dr. Stiroh, just to be clear, is slide 11 what you think

6   is happening in this case in your opinion?

7   A.   Under Dr. Conti's theory of damages, yes, there is a

8   windfall.

9   Q.   Dr. Stiroh, we're going to talk more about the methodology

10  here.  But I want to ask you:  Could there be a world where the

11  TPPs do have damages under your methodology in a different set

12  of facts?

13  A.   Yes.  Similar to what I just explained with the ham

14  sandwich, that at the time of the recall, if there's patients

15  that have valsartan in their cabinets, they just went and got a

16  90-day supply, now they throw it away and get something else,

17  if the TPPs had to cover that additional prescription and they

18  wouldn't have had to cover that, if there had never been any

19  contaminants being added, that's that additional costs, what

20  are the additional costs that get imposed on them because of

21  the recall.

22       So if there were patients that didn't fill the end of

23  their prescription and instead went out and got something new

24  and the TPP had to cover that, that would be the type of

25  economic damages where there is a difference between the

*Stiroh – Direct – Brancato*                                           24

```
 1   economic position they're in and the economic position they
 2   would have been in but for the wrongdoing.
 3   Q.   That's not the analysis that Dr. Conti did; is that right?
 4   A.   That is not the analysis, correct.
 5   Q.   Does Dr. Conti's approach to damages allow for any
 6   alternative possibilities where the TPPs could have had
 7   damages?
 8   A.   In my view, she only calculates one.  And it is the giving
 9   back all of the amount of money that was ever spent on
10   valsartan-containing drugs and doesn't look, for TPPs, at what
11   is the impact on them and is there an avenue where their costs
12   were higher where they did suffer a financial penalty because
13   of the contamination.
14           CHIEF JUDGE BUMB:  And so you're saying that the TPPs
15   get a windfall under her analysis?
16           THE WITNESS:  That's correct, yes.
17   BY MS. BRANCATO:
18   Q.   Dr. Stiroh, let's look at slide 12, please.
19           After you analyzed the type of harm or the economic
20   loss that the TPPs could suffer, can you please remind us what
21   the next step of your methodology is?
22   A.   Yes.
23           To do that, you have to think about what is the
24   but-for world, what happens in the actual world, what happens
25   in the but-for world.
```

*Stiroh - Direct - Brancato* 25

1        So the example we just talked about, if in the actual

2   world they had to pay twice for prescriptions, in the but-for

3   world they would not, that's the economic damages.

4        In Dr. Conti's world, the but-for world she takes

5   away the supply of VCDs from the defendant manufacturers and

6   then does not consider what happens logically next after doing

7   that.  But the construction of the but-for world is you make a

8   world that's economically rational.

9   Q.   Turn to slide 13, please.

10       Dr. Stiroh, in your experience, is considering a

11  but-for or a counterfactual world relevant only in antitrust

12  cases?

13  A.   It is not.  This slide, the excerpt that you see on slide

14  13, that's from the same reference manual that I showed the

15  initial quote about what the but-for world is, and this one is

16  an application to fraud specifically, where it is the same --

17  from an economic perspective, it is the same type of analysis

18  of but for the fraud what happens.  And the example given is

19  considering, well, but for fraud what would the parties have

20  done?  In this example, would they have purchased a different

21  property, and then that difference tells you what the economic

22  impact is.

23       But the reason for this slide is to just demonstrate

24  that that type of analysis is not specific to one type of law.

25  It is common in economics for different types of wrongdoing

*Stiroh - Direct - Brancato*                    26

1    where we would try to measure what an economic loss is or

2    compensatory damages or make-whole damages.

3              CHIEF JUDGE BUMB:  And to be clear, you're only

4    opining on compensatory damages.  You're not opining on

5    punitive damages or fraud induced penalties; you're limiting

6    your analysis to compensatory?

7              THE WITNESS:  A hundred percent.  The economics tells

8    you compensatory damages, and I think that an analysis where it

9    is intended to be punitive takes us away from economics.  The

10   economics tells you what is the economic impact on the

11   plaintiffs.

12   BY MS. BRANCATO:

13   Q.   Let's turn to slide 14, please, Dr. Stiroh.  I want to ask

14   you a few questions about Dr. Conti's but-for or counterfactual

15   world.

16              Can you tell us what we're looking at on slide 14?

17   A.   Yes.  The two figures that are labeled Figure 1 and

18   Figure 2, these come from Dr. Conti's report.  And, you know,

19   we've mentioned them a few times today and I think yesterday as

20   well.

21              So the figure on the left-hand side is a typical

22   supply and demand chart that you see in economics textbooks.

23   And Figure 2 is Dr. Conti's but-for world that I'm evaluating,

24   where she has taken away the supply but left a demand curve,

25   left the demand for the products at issue.

Stiroh - Direct - Brancato                    27

1    Q.    And is that the but-for, counterfactual world you heard

2    Dr. -- or Professor Conti testifying about yesterday?

3    A.    Yes.

4    Q.    How does Dr. Conti calculate damages in this but-for world

5    where there's no supply?

6    A.    As she said yesterday, she adds up the amounts that were

7    spent on the valsartan-containing drugs manufactured by

8    defendants.

9    Q.    Did Dr. Conti consider any alternative actions that the

10   TPPs may have taken in the but-for or counterfactual world?

11   A.    She did not.  That's part of my critique of the analysis

12   where I say that is not an economic outcome.  That amount of

13   money, if you just take it away, you end up with a windfall.

14   If the patients that took the valsartan-containing drugs had

15   their hypertension managed, the TPPs fulfilled their

16   obligations of covering the prescriptions that were written by

17   doctors.  And if we take away that supply, we haven't

18   considered what else happens, and it matters to economic

19   damages.

20          The example I gave earlier, you could imagine two

21   very different outcomes.  One, the drug is actually worthless

22   and doesn't need to be replaced, or, two, the drug has some

23   therapeutic value and needs to be replaced, and that gives you

24   the chain of reasoning to what's the economic position of the

25   third-party payors.  In this but-for world, if we were to take

*Stiroh - Direct - Brancato*                                    28

1    away supply because it had value, it has to be replaced.

2            CHIEF JUDGE BUMB:  So were you in the courtroom

3    yesterday?

4            THE WITNESS:  I was, yes.

5            CHIEF JUDGE BUMB:  Okay.  So I gave a hypothetical

6    yesterday.  If you could just opine on this.

7            What if it turned out, and of course these aren't the

8    facts, but what if it turned out that over the course of these

9    years the defendants were supplying placebos, turned out they

10   just -- they were worthless, tell me about your analysis there.

11           THE WITNESS:  I think that what happens there, but

12   it's not what actually did happen.

13           CHIEF JUDGE BUMB:  No, I understand.

14           THE WITNESS:  So if they are actually worthless, and

15   the doctor agrees this is worthless, this doesn't do anything,

16   I should never have prescribed it, in that situation where they

17   are worthless, then there's no windfall.  There's a windfall

18   when you've got a benefit and you never had to pay for it.

19           CHIEF JUDGE BUMB:  Okay.  What's the windfall?

20           THE WITNESS:  The windfall is it's the -- if you give

21   them back the money --

22           CHIEF JUDGE BUMB:  Oh, because they didn't have to

23   go -- well, no.  I interrupted you.

24           THE WITNESS:  No; you're right.  If they didn't have

25   to pay for something else -- let me start again with that.

Stiroh – Direct – Brancato                    29

1          The windfall is that the people that took the drug

2     and the people that covered the prescriptions for the drug --

3               CHIEF JUDGE BUMB:  For the placebo.

4               THE WITNESS:  For the -- well, there's a windfall in

5     the real world where the drug has a benefit.

6               CHIEF JUDGE BUMB:  No.  Talk to me about my

7     hypothetical about the placebo.

8               THE WITNESS:  Yes.  Sorry.

9               CHIEF JUDGE BUMB:  Yeah.

10              THE WITNESS:  When it's a placebo, when it really is

11    literally zero?

12              CHIEF JUDGE BUMB:  Truly.

13              THE WITNESS:  There's no windfall because there

14    wasn't a benefit.  There wasn't a benefit of taking the

15    product.

16              CHIEF JUDGE BUMB:  There's no windfall because there

17    wasn't a benefit.

18              THE WITNESS:  It's when there's a benefit so that the

19    patients took it, they received a medical benefit for the six

20    years up to the recall and now they get all of the money back

21    as well.  They got a benefit that they didn't pay for to get

22    their money back.  That's the windfall.

23              If there was no benefit, there's no windfall.

24              CHIEF JUDGE BUMB:  What about the argument that,

25    well, you know, we didn't know it was a placebo, but had we

*Stiroh - Direct - Brancato*                                    30

1    known, you would have gone, you, the TPPs, would have had to

2    have gone out and buy more, the real deal?  What about that

3    analysis?

4              THE WITNESS:  We didn't know it was a placebo?  So

5    that if there was no value to it at all?

6              CHIEF JUDGE BUMB:  But had they known earlier, they

7    would have had -- they would have gone out and bought -- paid

8    for a legitimate drug.

9              THE WITNESS:  Yes.  So then --

10             CHIEF JUDGE BUMB:  What's your analysis?  What's your

11   analysis say?

12             THE WITNESS:  In that case then, they would have paid

13   for the alternative drugs but gotten an additional benefit from

14   the working product as well.  Does that make sense?  So there's

15   the money payment and the therapeutic value, and I'm comparing

16   the actual world to the but-for world.

17             So I think in your scenario, no value to the actual

18   drug.  But-for world you paid for something else but you also

19   get a benefit.  That's a difference between where you would

20   have been and where you are, and that it would be the value of

21   the benefit is what is missing from the current world.

22             CHIEF JUDGE BUMB:  Okay.

23   BY MS. BRANCATO:

24   Q.  And in that situation, there would be damages?

25   A.  Yes.

*Stiroh - Direct - Brancato*                    31

 1    Q.   Dr. Stiroh, in rebutting Dr. Conti's opinion, what but-for

 2    world or counterfactual world did you consider?

 3    A.   Well, for purposes of today's testimony, I considered the

 4    one that she puts forward where we take away the supply of

 5    valsartan-containing drugs from the defendant manufacturers.

 6    Q.   Let's look at slide 15, please.

 7         In evaluating Dr. Conti's but-for or counterfactual

 8    world, what evidence did you consider?

 9    A.   I looked at a variety of things that were in the record.

10    I looked to see, you know, first what happens if we take away

11    that supply.  And so I looked at the testimony from the TPPs.

12    I looked at testimony from the covered patients.  As an

13    economist, I looked at economic literature.  I looked at the

14    various datasets that were produced in this matter and

15    considered the reasonableness of her opinion.

16    Q.   After considering all this evidence, did you find

17    Dr. Conti's methodology and opinion to be economically

18    reasonable?

19    A.   I did not.

20    Q.   And why not?

21    A.   Well, first, there is testimony that the drugs had value;

22    that they were not worthless; that they provided a benefit to

23    the people that took them.

24         CHIEF JUDGE BUMB:  And your analysis would have

25    changed if -- if -- going back to my placebo example, if the

1    testimony is that they were worthless?

2              THE WITNESS:  Yes.  I would say the outcomes would

3    have changed.  So the results of my analysis would have

4    changed, but the approach of considering --

5              CHIEF JUDGE BUMB:  Stay the same.

6              THE WITNESS:  Yeah, the approach stays the same, and

7    the outcome would be different.

8              CHIEF JUDGE BUMB:  Yes.  Understood.

9    BY MS. BRANCATO:

10   Q.   Dr. Stiroh, let's look at slide 16, please.

11             Is this the TPP testimony you've been mentioning?

12   A.   Yes.  This is an excerpt from the deposition of one of the

13   representatives from Emblem, and that's the name of one of the

14   third-party payors in this case.  And what's being highlighted

15   is just where she is acknowledging that they would have covered

16   some other drug to treat hypertension.

17   Q.   And why is the fact that they would have covered something

18   else relevant to your methodology?

19   A.   It tells me that there's value to covering hypertension

20   for patients, obviously something we know anyway, but that it

21   is relevant for this case that in considering what happens when

22   you take away the supply and now I'm going to look at the

23   position of the third-party payor, what position are they in.

24   I'm looking at the evidence.  It's not saying, well, these

25   drugs are placebos, we never would have covered anything at

1   all.  They're saying they would have covered something else.

2   Q.   Turn to slide 17, please.  And we're up to step three of

3   the methodology.

4        Can you summarize for us what the analysis in this

5   step entails?

6   A.   Yes.

7        This is one of the things that I'm looking at to

8   evaluate the reasonableness of the opinions, what happens if

9   you take away supply and something else gets covered.  Through

10  that chain of reasoning, which is the chain of reasoning in

11  Dr. Conti's but-for world, the TPPs aren't better off.  The

12  prices of alternatives were higher, or if we take away supply,

13  then the price of the remaining manufacturers of

14  valsartan-containing drugs that weren't recalled, that price

15  would be expected to go up.

16       So the chain of events that lead you to the but-for

17  world in Dr. Conti's damage assessment doesn't tell you an

18  economic harm to TPPs.  They would not have been economically

19  better off if we were to take away that supply if the

20  wrongdoing had never happened through that avenue.

21  Q.   Let's look at slide 18 briefly because you just summarized

22  this.

23       I just want to be clear, number one is inflated

24  prices for VCDs from other manufacturers whose drugs weren't

25  recalled.  That's one of the bases you were just talking to

Stiroh - Direct - Brancato                    34

1    Judge Bumb about; is that right?

2    A.   Yes, that's right.  They're two different things that I'm

3    considering.  One is just the valsartan if they had switched to

4    a different valsartan that's not recalled, and another is if

5    they switched to a different product altogether.  I considered

6    both of those.  And both of them would be higher prices,

7    leaving the TPP no better off if the supply had been taken

8    away.

9    Q.   Let's start with the fact that prices for VCDs that

10   weren't recalled would increase.

11            Looking at slide 19, can you tell us what you see on

12   this slide?

13   A.   Yes.  This is an example of some of the economic

14   literature that I reviewed.  It's probably generally familiar

15   to you or expected anyway.  There are lots of studies that show

16   what's the impact of generic competition.  And so the authors

17   of this study are showing that the more generic competitors

18   there are, generally the more and more the price comes down

19   relative to the brand.

20            So one of the things I start with was just looking at

21   economic literature generally and then I see what's the supply

22   to valsartan as well.

23   Q.   Looking at slide 20, can you tell us where this chart is

24   from and what's it showing?

25   A.   Yes.  Where you see it says Figure 1, that's -- it's drawn

Stiroh - Direct - Brancato                    35

1    right from my report.  It was Figure 1 in my report.  So

2    just -- it's the outcome of what I just explained.  I looked at

3    the economic literature, what did those authors do for drugs

4    generally, and then verifying that that same relationship holds

5    for valsartan.  And so it is showing you the discount off the

6    brand; and when there are few generic manufacturers, it's a

7    pretty small discount.  As more and more enter, there comes a

8    bigger and bigger discount off the brand.  And so that's

9    verifying that same relationship in economic literature holds

10   for these drugs.

11   Q.   So if the defendant manufacturers had not entered the

12   market in the but-for world or the counterfactual world, what

13   would have been the impact on the price of VCDs?

14   A.   My expectation as an economist, we have fewer generic

15   manufacturers competing, the drug prices wouldn't have fallen

16   as much as they did in the actual world.

17   Q.   Let's look at slide 21, please.

18        Dr. Stiroh, can you explain what we're looking at on

19   this slide?

20   A.   Yes.  This is another one of the analyses that I did.

21   It's essentially a lot in the same vein; that the black line

22   that you see starting up at 40 cents and dropping down, that's

23   the average price of the valsartan-containing drugs.  And I'm

24   just mapping that on to how much of the supply comes from the

25   defendant manufacturers.  And I'm considering that just, you

*Stiroh - Direct - Brancato*                                      36

1    know, was it a trivial amount of supply?  We're taking it away.

2    You wouldn't expect it to have much of an economic impact.

3    It's not a trivial change.  It is a pretty significant change.

4    The defendants account for about 88 percent of the

5    valsartan-containing drugs by 2018.  So taking away that supply

6    would be expected, as an economic matter, to have a pretty big

7    impact.

8    Q.   And when you say pretty big impact, you mean increase the

9    price of other VCDs?

10   A.   That would be my expectation, yes.

11   Q.   If defendants had not sold VCDs in the but-for,

12   counterfactual world and the price of VCDs from other

13   manufacturers had increased, what would have been the financial

14   impact on the TPPs?

15   A.   Well, as we talked about before, that makes them better

16   off -- I mean worse off in a counterfactual world where there

17   is no supply from defendants.  They would have higher costs in

18   that world than they actually have had.

19   Q.   Did Dr. Conti consider how much the TPPs would have paid

20   for VCDs from other nondefendant manufacturers?

21   A.   She does not.  She basically just gives back the money

22   that they actually spent without thinking, you know, what

23   happens now, what happens now that we've taken away that

24   supply.

25   Q.   I want to talk now about the prices of other hypertension

Stiroh – Direct – Brancato                    37

1    drugs.  Let's look at slide 22, please.

2              Dr. Stiroh, based on your analysis, what would have

3    happened if the TPPs' members did not take a VCD in the but-for

4    world?

5    A.   So this, what's being shown on slide 22 is essentially,

6    it's an illustration of the one of the things that I did to

7    look at exactly that question.  And here instead of, you know,

8    having a theory of what would have happened, I looked at what

9    did happen.  So there was one of the TPPs produced data that

10   showed for patients what they were paying to cover VCDs prior

11   to the recall and then for the same patient, what they paid for

12   that patient and the product that they switched to.  And so I

13   calculated what the differences were.  And I'm seeing that

14   almost 80 percent switched to another ARB product, so a similar

15   class of products to manage hypertension.  That's what's being

16   reflected on page 22 here.

17             But the analysis generally, I'm looking at the data

18   to see what did they spend their money on, how much did they

19   spend for the same set of patients.

20   Q.   And just to be clear, the data you're looking at from

21   slide 22, this is from one of the TPPs; is that right?

22   A.   It is.  The TPP is called SummaCare, and it is rolled up

23   into MSP.

24   Q.   Let's look at slide 23, please.

25             And talk a little bit about the prices of these other

*Stiroh – Direct – Brancato*                                            38

1    ARBs.

2              Dr. Stiroh, what did your analysis show about the

3    price of the other ARBs that the TPPs' members would have

4    switched to?

5    A.    Generally, that they are higher; that they -- this is part

6    of my overall analysis considering if they didn't take the

7    product at issue, what would they take.  So I've seen in the

8    data most of them switched to a different ARB, and I look at

9    the prices of the other ARBs.  And for most of the ones that

10   the patients switched to, the prices were higher.

11             CHIEF JUDGE BUMB:  Can I say the following, because

12   I'm trying to absorb this and see if you -- I think -- can you

13   just respond to this?  Because it seems to me that what is

14   integrated into your analysis is the fact that the product had

15   some value.

16             (Witness nodding.)

17             CHIEF JUDGE BUMB:  It may not have been as it was

18   represented but it had some value.

19             (Witness nodding.)

20             CHIEF JUDGE BUMB:  And then from there you then do

21   the but-for world look and say, okay, well, this is what they

22   would have bought.

23             (Witness nodding.)

24             CHIEF JUDGE BUMB:  But if the analysis is that there

25   was no value, you still do the but-for world but you start with

Stiroh - Direct - Brancato                    39

1    zero?

2              THE WITNESS:  The -- you still do the but-for world,

3    yes.

4              CHIEF JUDGE BUMB:  Yes.

5              THE WITNESS:  The difference is, in the but-for

6    world, you pay an amount of money and you get a value for that

7    money that you didn't actually get, and the difference would

8    be --

9              CHIEF JUDGE BUMB:  Say that again.

10             THE WITNESS:  In the but-for world, you're going to

11   pay some money and so let's say you get the brand, you get

12   Diovan and it's going to treat your hypertension, in that world

13   you get a product that treats your hypertension.

14             Here from the TPPs' perspective, remember they don't

15   actually take the drug, and I am comparing for them these two

16   worlds where they're going to cover the VCDs by manufacturers

17   or something else to see through this particular but-for world

18   whether there's economic evidence of cost savings.  So --

19             CHIEF JUDGE BUMB:  Yeah.  But do the analysis for me,

20   please, assume that they were -- they just were worthless from

21   the beginning, just assume that.

22             THE WITNESS:  Yeah.

23             CHIEF JUDGE BUMB:  You still do a but-for analysis.

24             THE WITNESS:  Yeah.

25             CHIEF JUDGE BUMB:  Okay.  And walk me through that.

Stiroh - Direct - Brancato                    40

1              THE WITNESS:  Okay.  You would still do the but-for

2     analysis.  There needs to be the extra step of how do you value

3     the product received.  It's got -- how would you value

4     something that actually does manage hypertension compared to a

5     sugar pill.  And we actually know that as a matter of

6     economics.  We know the value of managing hypertension, because

7     we see the payments for all of these other products that aren't

8     contaminated that do manage hypertension.  There's a

9     willingness to pay for products to manage hypertension.  That's

10    the value of a product that works.

11             What we don't know is what's the value of the risk.

12    That's the thing that has changed, and it is not part of

13    Dr. Conti's but-for world.  So in these analyses I'm

14    considering her but-for world and not a but-for world where

15    okay, well, the difference is the revelation of a risk that

16    wasn't known before.  From having reviewed the information,

17    it's my opinion that it's not supported to say the value goes

18    to zero; that we reveal a risk and we wipe out all the value.

19             CHIEF JUDGE BUMB:  But I want you to assume it.  I

20    want to you assume it now.

21             THE WITNESS:  Okay.

22             CHIEF JUDGE BUMB:  I want you to assume that they had

23    no value.

24             THE WITNESS:  I think if they have no value, then

25    it's appropriate to take away all of the payments for a product

*Stiroh – Direct – Brancato*                                    *41*

1   that had zero value.

2           CHIEF JUDGE BUMB:  Okay.  Because there would be no

3   windfall to the TPPs in that situation?

4           THE WITNESS:  There would -- yes, because --

5           CHIEF JUDGE BUMB:  Because you can't go back in time

6   and say, hey, pretend like you took the drug ten years ago.

7           THE WITNESS:  Yes.  They wouldn't -- yeah, exactly,

8   that they would have not managed their hypertension for the

9   last -- yeah.

10          CHIEF JUDGE BUMB:  Yeah.  Got it.  Okay.  Thank you.

11  BY MS. BRANCATO:

12  Q.   Dr. Stiroh, to do the analysis on slide 23, what kind of

13  data do you look at?

14  A.   For slide 23, I looked at an IQVIA dataset that is

15  called -- it's the NSP dataset, and that is tracking prices at

16  the wholesale or manufacturer level.

17          (Court reporter clarification.)

18  BY MS. BRANCATO:

19  Q.   I think -- so MSP is the plaintiff.  NSP is the dataset.

20  A.   Oh, I'm sorry.  Yes, NSP.  So I have said both.

21  Q.   Dr. Stiroh, remind me, what did the IQVIA data show about

22  the alternative ARBs that would have been taken in the but-for

23  world?

24  A.   That the price of the alternative ARBs was generally

25  higher in the N, as in Nancy, SP data.

1    Q.    Let's look at slide 24, please.

2          Dr. Stiroh, can you please explain this chart for us

3    and what we see here?

4    A.    Yes, I can.  I've kind of jumped ahead to this analysis in

5    an answer earlier.

6          So one of the things that I look at is in a TPP

7    dataset, I looked at the actual amount that the TPP called

8    SummaCare spent on patients that were covered by

9    valsartan-containing drugs in the days leading up to the recall

10   and then how much did they spend after the recall.  And it's

11   essentially, again, validating this is the outcome.  They are

12   not economically better off.  Once we get past the recall,

13   they're not economically better off when the products are taken

14   away.

15         So it's the difference in daily spend.  So you

16   imagine a patient gets a 30-day supply of valsartan, there's

17   the recall, they get something else, and I can see in the data

18   what else they got, and then I can see how much did the TPPs

19   spend.  And the daily spend was about three times higher after

20   the recall than it had been before the recall.

21         CHIEF JUDGE BUMB:  Can we go back to your prior

22   slide?

23         You are relying on the IQVIA data.  Do you rely on

24   that in the course of rendering opinions?

25         THE WITNESS:  Yes, for specific purposes.  So one of

*Stiroh – Direct – Brancato*                                    43

1    the things that I think is known where researchers rely on the

2    IQVIA data is for relative prices and price trends.  And I know

3    there will be some testimony that I think you'll hear next week

4    about when it gets to a specific price, whether that is

5    accurate.  But there are researchers that have looked at, well,

6    do prices come down when generics enter.  They use the NSP

7    data, and I'm using that same data to show the phenomenon

8    happens with valsartan-containing drugs.

9              So I think about it as one higher than the next, than

10   the next.  That is true.  Whether at 322 and then 281 is

11   precisely the right number, that I think is questionable.

12   BY MS. BRANCATO:

13   Q.   Dr. Stiroh, going back to slide 24, am I understanding the

14   chart right that based on the TPPs' own claims data produced in

15   this case, you saw cost increases of three times higher after

16   the recall; is that right?

17   A.   Yes.

18   Q.   And how does the fact that the TPPs' costs incurred after

19   the recall were higher impact what would have happened in the

20   but-for or counterfactual world?

21   A.   It is another piece of economic evidence that I look at in

22   evaluating the reasonableness of the damage methodology to see

23   if giving back all of the money makes the plaintiffs whole.  In

24   a world where you had taken away the supply of

25   valsartan-containing drugs, the economic outlays, that's the

Stiroh - Direct - Brancato                    44

1  amount that they would spend, would actually be higher.  From

2  an economic sense, the TPPs are not better off in that world.

3  Q.   And if the TPP members had switched to less expensive or

4  cheaper alternative drugs, would you have seen that in their

5  claims data?

6  A.   Yes.

7  Q.   And did you see that in what you saw, in what you looked

8  at?

9  A.   Not on average.  There's, I mean, different outcomes for

10  different individuals and I'm summing up.  So in general,

11  overall, that the cost was three times higher.  There may be

12  individuals where the cost was lower, but overall for the whole

13  dataset, the cost was three times higher.

14  Q.   Turn to slide 25, please.

15        I want to wrap up today by talking about the key

16  takeaways from your testimony.

17        Can you please explain to us what the first takeaway

18  is?

19  A.   Sure.

20        So generally, my understanding of what's being

21  challenged is my consideration of the but-for world analysis.

22  And in my view, that's an economically sound approach to assess

23  the reasonableness of Dr. Conti's opinions, and that was part

24  of my assignment in this case.

25  Q.   And the second takeaway from today?

*Stiroh - Direct - Brancato*                                    45

1    A.   The world that I'm looking at where this testimony applies

2    is the world where we imagine the taking away of a supply and

3    what else happens in that world.  It's different from

4    considering was there some additional cost because they had to

5    pay for a prescription twice.

6    Q.   And the world in which you're considering is the same one

7    that Dr. Conti considers; is that right?

8    A.   It is the same one with the exception that you'll see in

9    the third bullet that I think hers is incomplete.  But it

10   doesn't have assumptions that are consistent with economic

11   principles.  If you take away the supply of a product, the

12   price for the remaining product is going to be higher.  Or if

13   you switch to an alternative, the price was higher.  And that I

14   think was a consideration missing from Dr. Conti's analysis.

15   Q.   And the final takeaway for us, please.

16   A.   The -- in this but-for world, there is not an economic

17   loss to TPPs where the economic loss is the difference in the

18   payments that they would have made.

19        There has been no showing that there is a difference

20   in financial outcomes for the third-party payors.  That's the

21   same as saying that there's not an economic loss or economic

22   injury.

23        CHIEF JUDGE BUMB:  As long as there was value?

24        THE WITNESS:  As long as there was value, yes.

25   BY MS. BRANCATO:

Stiroh - Cross - Stanoch                                46

1    Q.   Dr. Stiroh, under the analysis or the critique you've done

2    of Dr. Conti's damages opinion, do you think that there would

3    be a windfall if the TPPs were awarded damages in this case?

4    A.   Yes.

5             MS. BRANCATO:  Thank you.

6             Thank you, Your Honor.  No further questions right

7    now.

8             CHIEF JUDGE BUMB:  Cross.

9             MR. STANOCH:  Yes.  Thanks.

10                          CROSS-EXAMINATION

11   BY MR. STANOCH:

12   Q.   Good morning, Dr. Stiroh.

13   A.   Good morning.

14   Q.   I've David Stanoch.  I'll be asking you the questions this

15   morning.

16             I want to go back to the slides.  We were just

17   looking at your last slide here, right?  TPPs were not injured

18   because they saved money by purchasing at-issue VCDs.  Do you

19   have that?  You with me, right?

20   A.   Yes.

21   Q.   So you're saying that TPPs were better off with the

22   presence of adulterated valsartan drugs in the market?

23   A.   I am not.  I am saying there is no appropriate measure of

24   economic loss to the TPPs in this case.  The analysis that was

25   put forward makes them better off than they would have been if

Stiroh - Cross - Stanoch                                    47

```
 1   those drugs had never been supplied, when in reality, if you
 2   take away -- what economics tells you -- if you take away
 3   supply, then the payments by TPPs would have been higher.
 4   Q.   Well, we'll get back to the takeaway supply, because you
 5   said that a number of times, right, as what you think Dr. Conti
 6   did, right?  That's not what she did, is it?
 7   A.   I showed the chart from her report.  I heard her testify
 8   yesterday.  I have read her reports.  She has taken away -- in
 9   her but-for world, she has taken away supply of the
10   valsartan-containing drugs.
11          CHIEF JUDGE BUMB:  She didn't even consider it
12   though, did she?
13          THE WITNESS:  I'm not --
14          CHIEF JUDGE BUMB:  She didn't even consider that
15   there was an alternative supply, did she?
16          THE WITNESS:  There I don't know what she considered.
17   She doesn't put forward an analysis of what happens.  But the
18   side-by-side charts that I showed where she's got supply and
19   demand in the actual world and then the but-for world, she's
20   taken away supply.  She's taking away that supply curve.
21          CHIEF JUDGE BUMB:  Right.
22          THE WITNESS:  So then I'm then analyzing what happens
23   when you take away that supply curve.
24   BY MR. STANOCH:
25   Q.   And, again, in terms of you saying the TPPs were not
```

1   injured and saved money, right, this graph of yours, right --

2          CHIEF JUDGE BUMB:  Page number.

3          MR. STANOCH:  I'm sorry, page 24, right.

4   BY MR. STANOCH:

5   Q.   This is you saying that TPPs, right, spent less money for

6   contaminated drugs than they did once the contaminated drugs

7   were known, right?

8   A.   It is factually true.  It's not me saying that.  I looked

9   at the data from SummaCare.  SummaCare spent less on a daily

10  basis prior to the recall than it spent after the recall.

11  Q.   Uh-huh.  Right.  So you're saying they're better off.  The

12  TPPs are better off because they're able to buy what you say

13  are low-cost contaminated adulterated drugs?

14  A.   That from the TPPs' perspective, the amount of money that

15  they spent would not be lower in the but-for world.  So my

16  opinion, there is no economic showing that they would be better

17  off in a financial sense.  I'm looking at economic losses,

18  economic outcomes.  There is no showing that the economics to

19  TPPs would be better but for the recall.  And I consider a

20  variety of things, including the amount that they actually

21  spent post recall.

22  Q.   The Judge asked you earlier to assume a world in which a

23  drug product is in fact worthless.  Do you recall that from a

24  few minutes ago?

25  A.   I do.

Stiroh - Cross - Stanoch                                      49

1   Q.   And if worthless drugs are sold, I believe you said then

2   the value would be zero, right?

3   A.   If a worthless drug -- it's a tautology, but, yes, a

4   worthless drug has value zero.

5   Q.   So the tautology of the Judge's hypothetical nonetheless

6   is zero.

7           But isn't it true that if worthless drugs are sold

8   for any period of time, Doctor, the prices paid for those drugs

9   would be a windfall to the manufacturers who sold them?

10  A.   In that situation, if the drug is worthless and the

11  hypertension is not being managed, there are other outcomes

12  that could occur, and the approach, the but-for approach is

13  still applicable where you would consider what are those

14  economic outcomes.

15          So imagine the covered patients don't have their

16  hypertension controlled and they have more heart attacks, the

17  TPP has to cover those.  The cost to the TPP could be different

18  in one world to the other world.

19          That was not part of the consideration that Dr. Conti

20  did, so I'm considering for the testimony today in that

21  particular vein.

22          In the world at large, if the product was worthless

23  and for six, eight years hypertension hasn't been managed, the

24  economic impact on the TPPs would include are they having to

25  have different economic outlays because of health outcomes for

1  their patients that would not have occurred had their

2  hypertension been managed.

3  Q.   Well, now you're getting a little into your diminution of

4  value opinion.  But before we move on to that, Doctor, and I'm

5  happy to, so the takeaway from my question was that in the

6  event worthless drugs are sold for any period of time, the

7  prices paid on those would be a windfall to the manufacturers,

8  correct?

9  A.   I don't think you've said it quite correctly.  It's got

10  the -- part of the opinion is that there is some value, there's

11  a therapeutic value, and I keep repeating that because there is

12  testimony on that.  The therapeutic value and getting the money

13  back, that's where the windfall comes in.

14      If you took away the therapeutic value, then you

15  would also have to think how do you replace that therapeutic

16  value.

17  Q.   Well, let's take that first step.

18      You don't -- you said at the very beginning, I

19  believe, you didn't calculate or quantify the value for the

20  drugs actually received by the TPPs' insureds, right?

21  A.   I'm not sure what I said specifically.  I was asked did I

22  do a calculation of damages that is different from Dr. Conti's,

23  and I did not.

24  Q.   Right, you did not.  Exactly.

25      And you've testified before at deposition that you

Stiroh - Cross - Stanoch                    51

1   define economic loss as the difference between the price paid

2   and the value received, correct?

3   A.   Yes.

4   Q.   Right.

5        And so in that sense what you're doing is you're

6   comparing the prices paid for the valsartan on the one hand,

7   right?  Yes?

8   A.   Well, I need the whole of it.  I was nodding.

9   Q.   Well, that's part one.

10  A.   Okay.

11  Q.   Is you need the prices paid for the valsartan that's at

12  issue, right?

13  A.   Okay.

14  Q.   You agree?

15  A.   I'm not sure.  Sorry.  I'm not -- I don't mean to argue on

16  this.

17  Q.   I'm not trying to trip you up, Doctor.

18  A.   Okay.

19  Q.   So what you need -- your own definition of economic loss

20  is the difference between the prices paid and the value

21  received, right?

22  A.   Yes.

23  Q.   So then you need two things in that situation, correct?

24  That's what you're saying.

25  A.   At least two things.

1   Q.   Sure.

2   A.   You might do an analysis to figure those out, but you need

3   those elements, yes.

4   Q.   Right.  And those elements, right, the prices paid, that's

5   the actual money paid for the drugs versus what you actually

6   got in fact, correct?

7   A.   Yes.  The value of what you actually got, yes.

8   Q.   Right.  And that's really expectation damages, right?

9   That's what we're talking about here?

10  A.   It could have a number of different names.  I think it

11  could be expectation damages.  I'm not sure actually if I as an

12  economist would have the same understanding as you as a lawyer

13  on that.

14  Q.   Right.  But, I mean, your slides talk about the Reference

15  Manual on Scientific Evidence, Third Edition.  And you've cited

16  the portion I saw about the make-whole approach, right?  You

17  remember that in your slides?

18  A.   I do, yes.

19  Q.   Sure.

20          And you know if you turn the page of that same manual

21  that they talk about expectation damages as being, quote, are

22  an amount sufficient to give the plaintiff the same economic

23  value the plaintiff would have received if the defendants had

24  fulfilled the promise or bargain.

25          Do you agree with that?

1   A.    I do agree with that, yes.

2   Q.    Right.

3           So let's go back then to looking at economic loss as

4   we've already said it is, which is the difference between the

5   price paid and the value received, right?

6           So to find out what value is received, we're talking,

7   right, a drug that was contaminated, adulterated with NDMA,

8   what have you, right, we have to determine what the demand and

9   supply is for that product, correct?  What are customers

10  willing to pay and what are suppliers willing to sell that,

11  right?

12  A.    You have to determine the willingness to pay for that

13  product; or another way to say that is you would have to value

14  the risk, what would people pay to avoid a risk.

15  Q.    Right.  Well, what we'd have to determine for the value

16  that was actually received, we'd have to know what was the

17  willingness to pay, at what price point would someone say I

18  want that contaminated valsartan drug, right?

19  A.    I think it is a slightly different consideration.  That

20  the difference between in your view -- what I think we're

21  talking about is diminution of value.

22  Q.    Right.

23  A.    Where there's an allegation that the value received was

24  less than the value that was bargained for, and there are

25  economic tools to determine a diminution of value.  And I

1   discuss that in my report.  I'm under the impression that

2   that's related to worthlessness and not part of today's

3   hearing.  But there are economic tools to value risk, and they

4   were not employed by Dr. Conti in this case.

5   Q.   Well, they were not employed by you either, were they,

6   Doctor?

7   A.   I point out the economic ways to value risk and note that

8   there are still consumers willing to save money to incorporate

9   a risk.  And so it's not an appropriate economic assumption to

10  assume worthlessness because of the revelation of a previously

11  unknown risk.  You would have to consider other things, such as

12  the magnitude of the risk to the consumer and what they could

13  do to avoid the risk.

14  Q.   Right.  And you didn't actually --

15            CHIEF JUDGE BUMB:  Unless -- unless the notice was

16  they're all placebos.

17            THE WITNESS:  Yes.  If there's no value of it at all.

18  So I agree, I'm kind of stepping one step past that

19  understanding that the valsartan actually worked.

20  BY MR. STANOCH:

21  Q.   So, again, willingness to pay is one factor, and then

22  obviously there's the supply side of that, too, right?  We have

23  a willingness of a supplier to sell the contaminated drug we're

24  talking about as well we have to determine, right?

25  A.   I don't think that is the right concept.  You're

*Stiroh - Cross - Stanoch*                                        55

 1    considering in the actual world what was the value received.

 2    We've got the supply.  We see how much was sold.  The missing

 3    piece is what is the value now to consumers.  Was it zero?

 4             And so my testimony in my report is that there are

 5    economic methods, if that is the approach, there are economic

 6    methods to consider that, and it wasn't taken by Dr. Conti.

 7    Q.    And you didn't do anything to quantify that yourself

 8    either?

 9    A.    That is correct.

10    Q.    Right.

11             So assume for me we're in trial, if you will, and

12    assume that there's been a finding of a breach of warranty,

13    however defined, that the TPPs here did not receive the benefit

14    of their bargain for these VCDs, okay?

15    A.    I have the assumption in mind.

16    Q.    Very good.

17             So what's a jury supposed to do to valuate the

18    quantum of damage that was absorbed by the TPPs?  How do they

19    valuate then, oh, they got these pills that had NDMA in them?

20    A.    I --

21    Q.    From your analysis that you offered here.

22    A.    I am not offering that analysis.  What I anticipate my

23    testimony would be is that the value -- the measure of damages

24    that Dr. Conti will have by that time testified to is

25    incorrect; that she has not valued the risk.  She hasn't

1    determined a diminution of value.  I will explain that there

2    are ways that she could have done that but didn't do.  I'm not

3    offering them the alternative, and I don't understand it to be

4    a necessary part of my testimony.

5    Q.    Right.  So you're asking the jury to speculate then that

6    the value of the VCDs actually received, which is part of the

7    expectation damages measure, is some number between 100 percent

8    and zero, but you offer no quantification whatsoever to help

9    them make that decision?

10   A.    I offer them the considerations that matter to evaluate

11   whether Dr. Conti's opinion is reasonable.

12   Q.    But your opinion is not going to help the jury put a

13   dollar value on the drugs that were actually received, correct?

14   A.    I don't know if that is true or not.  I am not going to

15   tell them the diminution of value.  I am going to tell them

16   that it is not 100 percent and that there are methods to

17   evaluate it and that they were not performed and the measure

18   that Dr. Conti is offering is incorrect.

19   Q.    Right.

20         So nothing you're going to tell the jury based on the

21   opinions we have before us now going back two years is going to

22   help the jury determine how much the VCDs were actually worth?

23   A.    I don't think that is true.  I am not giving them a

24   different damage number, that is correct.  But the testimony

25   that I will give the jury will help them evaluate the

1    reasonableness of Dr. Conti's analysis.  And whatever else they

2    consider I think depends on what other testimony is offered in

3    the trial.

4    Q.   You don't have any facts, do you, that any purchaser of

5    any kind would have willingly paid money for these contaminated

6    VCDs had they known, correct?

7    A.   I do.  There is testimony that I refer to, I think it was

8    mentioned yesterday as well, at the time of the recalls, the

9    FDA recommended that patients stay on their VCDs.  And there is

10   testimony from the Named Consumer Plaintiffs in this case that

11   they did so.  They took the VCDs after the revelation of the

12   recall.

13   Q.   Well, you're talking ingestion of a drug, right?  That's

14   what you just said.

15           CHIEF JUDGE BUMB:  Isn't that what you asked her?

16           MR. STANOCH:  I agree, Judge.

17           We're talking -- I asked her about evidence of

18   someone -- about --

19           CHIEF JUDGE BUMB:  Any purchasers.

20           MR. STANOCH:  -- about willingness to pay and would

21   pay for a contaminated drug, not if they would ingest it.  Put

22   that aside, right.

23   BY MR. STANOCH:

24   Q.   I'm asking you, do you have any evidence of anyone, TPP,

25   consumer, anyone, who says, yes, I would have paid money for a

Stiroh - Cross - Stanoch                    58

1    contaminated valsartan drug had I known?

2    A.    I hear you now.

3    Q.    And I apologize if I was unclear.

4    A.    I have evidence that they did ingest the drug.  So they

5    chose to continue to take it after the information was known.

6    I have other discussion in my report about how you can value

7    risks.  And one of the things that I note are studies of

8    American consumers who purchase prescription drugs outside of

9    the U.S., and they do that to save money.  Outside of the U.S.,

10   it doesn't have FDA approval.  The risks are unknown.

11          There was one study by Kaiser Family Foundation that

12   found tens of millions of adult Americans purchasing

13   prescription drugs outside of the U.S. to save money.

14          Part of that is economic evidence that consumers can

15   value risk and they can determine if there is a risk that they

16   are willing to accept for the right price.

17          So what that tells me, it is not correct to just go

18   from 100 percent to zero.  There are tools for evaluating what

19   cost, what risk did this put on consumers, what risk did it put

20   on the TPPs, and what is the cost of that risk.

21   Q.    Well, you're talking --

22          CHIEF JUDGE BUMB:  So can I ask a similar question

23   that Mr. Stanoch asked?

24          Is there any evidence in the record that you saw that

25   after the recall a patient went to the pharmacy, had the drug

*Stiroh - Cross - Stanoch*                               59

1    prescribed, and the TPP paid for it?

2              THE WITNESS:  I think after the recall it is not

3    prescribed anymore.  So I don't think there is that scenario.

4    I do think in the IQVIA data you do see some lingering sales,

5    so that's a bit of a mystery.

6              My understanding is that there was not prescribing

7    after that fact, and it wasn't available through a pharmacy

8    after the recall.

9              CHIEF JUDGE BUMB:  Okay.

10   BY MR. STANOCH:

11   Q.   And when you're talking about evaluating risk, Doctor,

12   right, that presupposes that the person doing the risk

13   evaluation would in fact be able to buy the drug at the price

14   they think is worth discounting for the risk, right?

15   A.   It does not, actually.  When you think about valuing the

16   risk or what is the difference between the value received and

17   the price paid, that is essentially an academic exercise.  You

18   are considering what was the value received.  It's different

19   from did you go out to the store to buy it.  It's what is that

20   diminution of value, by how much did a value go down because of

21   the presence of an unknown risk.  And that can be valued.

22   Q.   You don't have -- strike that.

23             Not a single TPP that you know of reimbursed for a

24   valsartan drug after the revelations of the contamination, to

25   your knowledge, right?

Stiroh - Cross - Stanoch                    60

```
 1              CHIEF JUDGE BUMB:  Right.  She said they weren't
 2   allowed to write prescriptions anymore.
 3              MR. STANOCH:  Right.  Thank you, Judge.
 4              CHIEF JUDGE BUMB:  That's what she said.
 5   BY MR. STANOCH:
 6   Q.   Correct?
 7   A.   Yes.
 8   Q.   Right.  And you're not aware of any consumer either,
 9   right, because they weren't allowed to write prescriptions,
10   right?
11   A.   I'm not sure what the end of your question was.  Sorry.
12   Q.   That's okay.  And you're not aware of any --
13              CHIEF JUDGE BUMB:  Consumers don't write
14   prescriptions.
15              MR. STANOCH:  I'm sorry, Judge.
16   BY MR. STANOCH:
17   Q.   You're not aware of any consumers, right, who paid for a
18   drug that was contaminated knowingly because prescriptions
19   weren't written anymore after the revelations, right?
20   A.   Correct, we know of the consumers that took the drugs
21   knowingly.
22   Q.   Right.
23   A.   But I don't think there was a route by which they could
24   have requested a prescription and had it filled.
25   Q.   Exactly.  Because we all know, and you heard it probably
```

Stiroh - Cross - Stanoch                  61

1    yesterday, that no one knowingly sells adulterated drugs in the

2    U.S., right?

3    A.   That is my expectation, yes.

4    Q.   Right.  And I can't walk into the pharmacy and say give me

5    the valsartan, a dollar off for some nitrosamines in it.  It

6    just can't happen, right?

7    A.   You cannot do that.  You could walk into a pharmacy in a

8    different country and buy products that are not FDA approved.

9    Q.   Right.  And we're -- but this case is about sales in the

10   United States about drugs, whether or not they were FDA

11   approved, right?

12   A.   Uh, I don't --

13   Q.   Do I have any claim -- withdrawn.

14        Do I have any claim under Canadian law in this case,

15   to your knowledge?

16   A.   You're asking me a legal question, and I -- the economics

17   doesn't really have borders that way, the economic principles

18   apply, and so information from different countries is relevant

19   in evaluating economic outcomes.

20   Q.   Even for a class that's defined as payments for drugs in

21   the United States?

22   A.   I think it matters what's the question you're evaluating.

23   And if the question is, can a diminution of risk be valued,

24   then there could be different ways of valuing that risk; that

25   putting a price on risk, economists do it all the time.  It was

1    not done in Dr. Conti's report.  But the information one might

2    look at to do that could come from a wide variety of sources.

3    Q.    Let's assume that somebody in your counterfactual world

4    would want to pay a discounted price for a contaminated

5    valsartan drug, right?  You with me?

6    A.    Yes.

7    Q.    Okay.  And so even assuming you have consumer or purchaser

8    willingness, you still have to look at the availability of that

9    supply, correct?

10   A.    Sorry, so the hypothetical is someone wants to pay less

11   for a valsartan-containing drug and doesn't care if it has

12   contaminants in it?

13   Q.    Correct.

14   A.    Then my understanding is their only option to do that

15   would be to buy it somewhere outside of the United States.

16   Q.    Right.  Because you understand that there is no company or

17   firm in the United States who even if a consumer really, really

18   wanted it for some odd reason or a TPP said go ahead, it's the

19   cheapest thing, go ahead, no one was selling a contaminated

20   drug with nitrosamines, right, once it was known?

21   A.    The -- my understanding the defendants did not sell it

22   once it was recalled.

23   Q.    Right.  And did you look at the testimony of ZHP's

24   30(b)(6) witness Eric Gu?  Do you recall whether or not you

25   looked at that?

Stiroh - Cross - Stanoch                           63

1    A.   Well, many years ago.  I'm sorry, I don't recall now.

2    You'll have to remind me.

3    Q.   That's fine.  Whether you did or didn't, are you aware

4    that the question to him was:  "Having looked at those NDMA

5    contamination levels, you would agree that ZHP would never have

6    knowingly sold valsartan with those levels of NDMA impurity,

7    correct?"

8             Answer, the 30(b)(6) witness for ZHP:  "If we knew,

9    okay, there is NDMA in the valsartan, you know, ZHP wouldn't

10   sell that.  That's why it's also -- as soon as we learned there

11   are NDMA in the valsartan, ZHP recall all the products from the

12   market."

13            Do you recall that testimony?

14   A.   I have to say I don't have a recollection of it, but I

15   don't have any reason to dispute you.

16            CHIEF JUDGE BUMB:  Excuse me.  Do either one of you

17   need a break?

18            Do you need a break, Doctor?

19            THE WITNESS:  I'm fine to keep going.

20            CHIEF JUDGE BUMB:  Okay.  If you do, let me know.

21            Go ahead.

22   BY MR. STANOCH:

23   Q.   So, again, in terms of trying to do a diminution of value

24   and saying how much is the value of the contaminated VCD

25   actually received and paid for by TPPs, right, we'd have to

1    look at, you know, if there would be an availability of it from

2    suppliers.  And we know ZHP, for instance, is saying we never

3    would have sold it, right?

4    A.    That hypothetical doesn't make sense to me as an economist

5    to say you cannot value risk because it wouldn't have been

6    sold.  The way to value risk is you consider -- a willingness

7    to pay for risk is you consider the consumer's perspective.

8    That's what we're trying to value.  What value did they put on

9    it?

10              And in your hypothetical you have a consumer that is

11   willing to take on that risk at a lower price, and we would

12   want to measure what is the price that they would be willing to

13   pay to take on that risk, and I'm telling you there are

14   techniques to do that if the consideration doesn't have a

15   market sale.

16   Q.    And so what I think I heard you say is only consumer

17   willingness to pay would be pertinent to you if you had

18   undertaken an analysis to determine how much someone would pay

19   for contaminated valsartan drugs?

20   A.    In the hypothetical that you gave me, you had a consumer

21   that was willing to take on the risk and you were then

22   questioning whether they could actually go and buy it.  And in

23   that scenario, the willingness to pay of that consumer tells

24   you -- the difference between what they would be willing to pay

25   and what they had to pay not knowing the risk tells you what

Stiroh - Cross - Stanoch                    65

1    the value is or the willingness to pay for risk.

2    Q.    Without any regard to the supply?

3    A.    Yes, for that analysis, we're looking at the diminution of

4    value from the perspective of the consumer, and we would look

5    at how they would price the risk.

6    Q.    And are you aware that at least Defendant ZHP had defined

7    the risk as unacceptable for these contaminated drugs?

8    A.    Same answer.  You're asking me to remember specific

9    testimony.

10   Q.    That's fine.  I'd like to show you a recall announcement

11   from ZHP.

12              MR. STANOCH:  If I may approach, Judge.

13              CHIEF JUDGE BUMB:  Yes.

14              MR. STANOCH:  Thank you, Your Honor.

15   BY MR. STANOCH:

16   Q.    Tell me when you have a moment to look at that, Doctor.

17   A.    Yes, thank you.

18   Q.    Are you good to go, Doctor?

19   A.    Oh, sorry.  Just I --

20   Q.    Oh, please, take your time and let me know when you're

21   done.

22   A.    I have taken a look at it.  I may need to look at it a

23   little more closely to answer your question.

24   Q.    No, of course, no.  Yes.  I just wanted you to have it

25   generally.

Stiroh – Cross – Stanoch                    66

1      Have you seen it before, if you remember?

2   A.    I think I have seen notices like this.  Whether this one

3   specifically, I don't, but, yes.

4   Q.    Very fair.  It's a press release from ZHP entities about

5   the recall of their valsartan, right?

6   A.    Yes.

7   Q.    And you see there there's a table on the first page?

8   A.    I see the table, yes.

9   Q.    Right.  And do you see above it there's some italicized

10  language, right?

11  A.    Yes.

12  Q.    It begins "the exposure," you see that?

13  A.    I do, yeah.

14  Q.    Could you read that?

15  A.    The italicized portion reads:  "The exposure to the

16  impurity N" -- thank you very much.

17  Q.    "NDMA" is fine.

18  A.    Can I say it?  Yes.  "NDMA that was detected in valsartan

19  product line presents an unacceptable carcinogenic risk to the

20  intended patient population."

21        I'll continue?

22  Q.    Please.

23  A.    "To date, Prinston Pharmaceutical, Inc., has not received

24  any reports of adverse events related to this recall."

25  Q.    Thank you.

1          So we were talking about a consumer valuing the risk

2    of contaminant valsartan.  This is ZHP saying itself that that

3    risk is unacceptable, right?

4    A.    That is the word that is in the press release, yes.

5    Q.    Right.  And, in fact, the risk of selling these valsartan

6    drugs is unacceptable notwithstanding the fact that there might

7    not even have been some adverse event report yet, correct?

8    A.    I'm only able to read the words, obviously.  But that is

9    what they say.

10   Q.    Based on the words, you would agree?

11   A.    Yes.

12   Q.    Right.

13          So in your but-for world, you'd have to consider a

14   consumer willingness to pay for a contaminated drug which the

15   manufacturers of the drugs themselves have said we would never

16   have sold because it presented an unacceptable risk; is that

17   right?

18   A.    No.  The consideration is can you value the -- can you

19   price the diminution of value, and that can be done but was not

20   done.  And that is a different consideration from the

21   hypothetical that you're putting before me of is it sold in a

22   store.

23   Q.    And that was a consideration like we've said a number of

24   times you haven't calculated at all yourself, right?

25   A.    I have not calculated that, correct.

Stiroh - Cross - Stanoch                              68

```
 1              MR. STANOCH:  Judge, I'm happy to keep going, but I
 2   might shift focus so if you'd like a break.  If not, I'm happy
 3   to keep going.
 4              CHIEF JUDGE BUMB:  Anybody need a break?
 5              I'm good.
 6   BY MR. STANOCH:
 7   Q.   You okay, Doctor?
 8   A.   I'm okay.  Thank you.
 9              CHIEF JUDGE BUMB:  How much longer do you have?
10              MR. STANOCH:  We'll move through it.
11              CHIEF JUDGE BUMB:  May I ask a clarification?  Is
12   this witness being proffered as a witness to rebut Professor
13   Conti, or is this witness also being offered as in the
14   defendants' case?
15              MS. ALLON:  Rebuttal, right?
16              MS. BRANCATO:  Dr. Stiroh is a rebuttal to Professor
17   Conti, Your Honor.
18              CHIEF JUDGE BUMB:  So if Professor Conti's testimony
19   is excluded, she's not a witness?
20              MS. BRANCATO:  It depends on which part of
21   Dr. Conti's testimony would be excluded.
22              CHIEF JUDGE BUMB:  Oh, okay.  Understood.
23              (Discussion was held off the record in open court.)
24   BY MR. STANOCH:
25   Q.   Doctor, you also talk about -- we heard about alternative
```

Stiroh - Cross - Stanoch

1    drugs, correct?

2    A.   I did, yes.

3    Q.   Right.  And your takeaway seems to be that oh, well, if

4    they didn't pay for these drugs, the valsartan drugs, they

5    would have paid for something else, right?

6    A.   My takeaway is that that is not -- the amount that they

7    paid is not the measure of the economic loss because the

8    economic scenario would be that they would have paid more with

9    the expectation that they get a value, that their patients got

10   a value from the valsartan actually consumed.

11   Q.   So you'd look at alternate drugs, even though we've said

12   today earlier that you define economic loss as the difference

13   between the price paid and the value received?

14   A.   I do.  In the entirety of my report, I consider different

15   things with respect to Dr. Conti's analysis.  I consider what

16   was said in the complaint about the loss.  My understanding is

17   what the plaintiffs were pursuing was compensatory damages or

18   make-whole damages, damages that put the plaintiff back to the

19   economic position they would have been in but for the

20   wrongdoing.  And with that framework, then I look at a variety

21   of things.

22   Q.   But you don't know if your, as you call it, make-whole

23   damages are the same as expectation damages, right?  You don't

24   know?

25   A.   I just don't feel maybe comfortable saying that right now.

*Stiroh - Cross - Stanoch*                                    70

```
 1   I'd want to review what the expectation damages, how they are
 2   defined.
 3          I think it is in fact the same, but I would rather
 4   have something in front of me that explains to what the -- how
 5   the Court views expectation damages.
 6   Q.   Well, how do you view it?  You say that you use the
 7   approach of make-whole damages, right?  Make-whole approach,
 8   right?
 9   A.   I have used a make-whole approach, yes.
10   Q.   Right.  And you've said it, and you said it puts the
11   person in the same position they would have been, right?
12   A.   Yes.
13   Q.   Right.  But you don't know if that's a different theory
14   than expectation damages, do you?
15   A.   As I sit here, I think it is the same, what value did you
16   expect to get and what value did you receive.  I'm just not
17   wholly comfortable telling the Court that that is identically
18   the same without reviewing if there is a different legal
19   interpretation.
20   Q.   Right.  And whatever the legal interpretation is would
21   control, not your take on what make-whole versus expectation
22   damages may mean, right?
23   A.   My understanding is that, yes, the Court decides
24   ultimately that I can offer my economic opinion of what the
25   economics says and then there are other considerations that
```

1      come into play.

2      Q.   For your alternate drugs theory, you didn't actually --

3      you didn't actually do a full relevant market analysis, did

4      you?

5      A.   I did not, correct.

6      Q.   Right.  Because usually when you're looking at different

7      drugs that are considered substitutes, right, you would have to

8      look at -- you would do a full market analysis of looking at

9      the product and geographic dimensions of a market, correct?

10     A.   I disagree with that.  You would look at a relevant

11     market, typically in a competition matter, an antitrust matter.

12     Q.   Uh-huh.

13     A.   Where you're considering is there a price increase for a

14     market, you would need to define that market.

15     Q.   Right.

16     A.   Now, one of the steps in defining the market is looking at

17     substitutes.

18          In this case I have direct evidence as to what those

19     substitutes are because SummaCare produced data showing what

20     the patients, a patient taking valsartan prior to the recall,

21     what they were switched to after the recall.  I can see what

22     those substitutes are.  And that's why in the slides there was

23     a slide that said 79 percent switched to another ARB, and so I

24     looked at the prices of ARBs.

25     Q.   Well, you agree that defining a market by reference to a

Stiroh - Cross - Stanoch                    72

1  customer of one is not appropriate, right?

2  A.  Sorry, by reference?

3  Q.  To a customer of one, right?  You said you looked at

4  SummaCare, right?

5  A.  Oh.

6  Q.  Right?  A single purchaser is not a market, right?

7  A.  I agree, a single purchaser is not a market.  The single

8  purchaser is a plaintiff in this case, and they were the only

9  one that produced that sort of data.  So I looked at all of the

10  produced data in this case that allowed me to do that analysis.

11  But I also understand, I mean if the class has been certified,

12  it's essentially diminishing differences between class members.

13  But, yes, I agree with you, SummaCare is one of the class

14  members.

15  Q.  Right.

16        And to look at products that are reasonably

17  interchangeable substitutes, right, you'd have to consider what

18  products are out there, right?

19  A.  I -- from your phrasing, I think you're asking me if you

20  did a relevant market analysis, which I agree I did not do in

21  this case.  I looked at for SummaCare what did their patients

22  actually switch to and what were the costs of those

23  alternatives.

24  Q.  Right.  So you didn't actually do any analysis to decide

25  what drugs are substitutes for valsartan?

1   A.   I don't think that's true.  I did an analysis to see what

2   drugs were substituted for valsartan.  And it sounds like

3   you're asking me didn't I layer on some hypotheticals of what

4   could have been taken.

5        I do consider what could have been taken, other blood

6   pressure-managing drugs, including vitamin C.  There are things

7   that you can take that are in the wide world of potential

8   alternatives.  In my analysis, I look at what actually was

9   taken.

10  Q.   Uh-huh.  Right.  You didn't actually get pricing data from

11  IQVIA, for example, to look at how much vitamin C was during

12  the relevant time period, right?

13  A.   I did not.  That analysis doesn't play a role in the

14  calculations that I'm doing.  It is more relevant what happened

15  within a TPP, what did their covered patients actually do, and

16  so I looked at that data.

17  Q.   And you didn't look at a number of other drugs that are

18  approved to treat high blood pressure.  You didn't look at the

19  national sales data for that either, right?

20  A.   Again, no.  I looked at what was in the SummaCare data.

21  SummaCare produced information on valsartan -- on, sorry, ARBs

22  and other blood pressure medications, and I looked at what

23  patients were switched to and what the costs were.

24  Q.   Right.

25       And then in your chart here on slide 20, right, you

Stiroh - Cross - Stanoch                              74

1    look at -- well, you're using IQVIA data here, NSP data?

2    A.    Yes.  I am looking at NSP data on slide 20.

3    Q.    Right.  So you're relying on IQVIA data for, you know, at

4    least for this graph of yours, right?

5    A.    To evaluate whether pricing patterns for valsartan are

6    consistent with pricing patterns observed by other researchers.

7    I am using the NSP data that's similar to the data that other

8    researchers used to look at that same question.

9    Q.    Right.  And you've looked at IQVIA data before.  We talked

10   about that earlier, I think, right?

11   A.    I have, yes.

12   Q.    Right.  And you understand that defendants themselves in

13   this case have looked at IQVIA data for a variety of purposes,

14   right?

15   A.    You're testing my memory there.  I don't remember specific

16   testimony about that.

17   Q.    Are you aware that ZHP testified that they use IQVIA data

18   for sales and marketing trends?

19   A.    I don't have a basis to question whether that's right or

20   wrong.  I just don't remember what was said in depositions.

21   Q.    Sure.  Are you aware that Teva used IQVIA data during the

22   relevant time period to report sales of valsartan in the U.S.

23   market?

24   A.    I -- I just don't know the answer one way or the other.

25   Q.    Sure.

1          We'll go back to this chart here on page 20, right.

2          So basically your point here is that the price drops

3     when more product is available in the market, right?

4     A.    On slide 20, that is not true.  It's the price dropping as

5     more generics enter the market.

6     Q.    And you cut this chart off at December 2015, don't you?

7     A.    I do, yes.

8     Q.    Right.  So don't you think it would be important for a

9     jury to know what would have happened in the real world after

10    2015, including after the recalls?

11    A.    That depends on the question.  I don't know what data I

12    have after the recalls.  I'm not remembering from what else is

13    in the analysis.

14    Q.    And you're trying to imply here that TPPs actually paid

15    less because there was the contaminated drugs on the market in

16    2014 and 2015, right?

17    A.    I'm not at all trying to imply that.

18    Q.    No?

19    A.    I am showing the economic outcome of generic competition,

20    which I think is a pretty well-established fact.  More generic

21    competition generally reduces price.  And other researchers

22    have shown that for other products that the more generics there

23    are for a drug indication, the lower the price.  And I am

24    saying same thing happens to valsartan using the same data

25    source that other academic researchers use.

1    Q.    Right.  And the number of entrants, though, you have cuts

2    off at 2015, right?

3    A.    Yes.

4    Q.    Right.  So in a but-for world what you say is if the

5    valsartan from these defendants was not in the market,

6    shouldn't we also look at what happened in the real world after

7    the FDA learned about the contamination?

8    A.    I did look at that.  I did not use IQVIA data to look at

9    that.  I used the claims data produced by plaintiffs to look at

10   that.

11   Q.    Well, are you aware that the FDA approved more generic

12   valsartan in the immediate wake of the recalls?

13   A.    I don't have those facts in front of me right now.  The

14   general fact and what I'm doing this analysis for is to show

15   the price comes down with generic competition.  The expectation

16   is that if there is less supply and fewer manufacturers, fewer

17   price invoices, the expectation is the price would go up.  I

18   look at a variety of things.

19            But to analyze what actually happened to prices, I'm

20   looking at for the TPPs that have produced data what happened

21   to their actual costs.

22   Q.    Right.  Well, the point though is, Doctor, that if the FDA

23   approved another five valsartan drugs in the immediate wake of

24   the recalls, right, in a but-for world where the supply was

25   removed for these defendants, those approvals probably would

Stiroh – Cross – Stanoch

1    have happened sooner, right?

2    A.    I don't know the answer to that.  If there is a generic

3    manufacturer that could enter, I think it's an inquiry, why

4    didn't they enter sooner.

5    Q.    Uh-huh.  Well, that would be something we'd have to kind

6    of tease out a little bit, huh?

7    A.    I disagree.  I think it depends on what the question is

8    that you're trying to answer.  And if you're evaluating whether

9    the recognized phenomenon of more generic competition leading

10   to lower prices holds for valsartan.  The analysis that I did

11   shows that.

12   Q.    In terms of alternative drugs that are more expensive,

13   right, on slide 23; you there?

14   A.    I have it, yes.

15   Q.    Great.  So you're only looking at other sartan drugs here,

16   right?

17   A.    On slide 23, that is correct, yes.

18   Q.    Right.  And you're not looking at the other how many dozen

19   of other drugs were approved to treat hypertension, right?

20   A.    On slide 23, that is correct.  You'll note it follows the

21   slide where I showed that for the TPP data that was produced,

22   the claims data, you can see in the claims data that 79 percent

23   switched to another ARB.  And so that is the relevant

24   population that I'm looking at then for slide 23.

25   Q.    You're showing here you're trying to say that certain

Stiroh - Cross - Stanoch

1    sartan drugs cost more, right?

2    A.    I am showing, yes, that alternative drugs, other sartans

3    had higher prices than VCDs.

4    Q.    Well, if in the but-for world you're constructing that

5    somebody would have bought another drug, would it be important

6    to know whether any of these prices were artificially inflated?

7    A.    If your theory is that in a but-for world the prices would

8    have been lower, that could be part of the analysis.  I am

9    considering for my analysis whether Dr. Conti's damages are

10   supported.  And part of that consideration is, is there any

11   support for an assumption that they would have been

12   economically better off in a but-for world where we have taken

13   away supply of valsartan-containing drugs.

14          If you were doing a different analysis of imagining

15   that there would have been different entry or different

16   products available, that is not what is being represented on my

17   slide.

18   Q.    Right.  If we wanted to really get at the validity of all

19   these numbers for all these different drugs, we would have to

20   explain to the jury at trial whether or not these drugs were

21   the appropriate substitutes.  We'd have to explain whether

22   these prices were artificially inflated or not, such as by a

23   U.S. Department of Justice price-fixing investigation that

24   covers some of these drugs.  We'd have to look at all the other

25   factors that may be affecting the prices of these other drugs

Stiroh - Cross - Stanoch                    79

```
 1   out there, wouldn't we?
 2   A.   I don't think you would, for the analysis that we're
 3   talking about today.  These are the facts that the other drugs
 4   in 2012 through 2018 had the prices that they had.  So consider
 5   if the supply of valsartan were not available, what happens
 6   next, not rewrite all of history.
 7            The way that you do a but-for analysis, you take away
 8   the wrongful act that's being challenged in this case and
 9   consider whether there is a route by which economic outcomes
10   would have been better for the TPPs.  And through this
11   analysis, I am seeing in the IQVIA data the prices of other
12   sartans were higher.  I'm seeing in the MSP claims data that
13   patients were switched to other sartans, and I see the outcomes
14   that payments were higher for TPPs.
15   Q.   And you said a number of times Dr. Conti is assuming to
16   take the supply out of the market.  Isn't she really positing
17   the value, though, of the drugs that were actually purchased
18   that were received by the TPPs?
19            CHIEF JUDGE BUMB:  That they were worthless?
20            MR. STANOCH:  Yes.
21            CHIEF JUDGE BUMB:  Yeah.  That's what she's
22   rebutting.
23            MR. STANOCH:  Right.  But nowhere does Doctor -- the
24   point, Judge, is, and I may have asked it inartfully, nowhere
25   is Dr. Conti positing a but-for alternative world where the
```

*Stiroh - Cross - Stanoch*                                      *80*

1    supply was unavailable.  She's looking at the products that

2    were received in real life.

3                CHIEF JUDGE BUMB:  Right.

4                MR. STANOCH:  She's not --

5                CHIEF JUDGE BUMB:  This witness --

6                MR. STANOCH:  And Dr. Stiroh, I thought -- I could be

7    wrong, you can correct me, either of you -- said a number of

8    times earlier, right, that Dr. Conti's assuming that these

9    defendants would not have had their supply of drugs in the

10   market, right?  And I'm saying that's not something that

11   Dr. Conti does.  She's looking --

12               CHIEF JUDGE BUMB:  That's right.  And that's one of

13   the criticisms this witness has.

14               MR. STANOCH:  Right.  As long as we're clear on that,

15   that's fine.  If you're clear on that, Judge, we're clear.

16               CHIEF JUDGE BUMB:  Correct, right?  Am I correct?

17               THE WITNESS:  Yes.

18   BY MR. STANOCH:

19   Q.   And you're offering no opinion about payments TPPs may

20   have received from Medicaid, Medicare, CMS or the federal

21   government, correct?

22   A.   In what regard am I offering no opinions there?

23   Q.   Well, are you opining -- tell me, are you offering any

24   opinions about payments made to TPPs from Medicaid, Medicare,

25   CMS and the federal government?

1    A.   I have Medicare and non-Medicare patients in my analysis

2    of the amounts paid post recall by SummaCare.  They are

3    included in that analysis.

4    Q.   Other than that, you're not offering any opinions that

5    that money should be some sort of offset to the damages that

6    are being alleged, right?

7    A.   I'm not offering those opinions.  To the extent that there

8    is a statement made that it's not an offset but it is

9    economically rational, I may have opinions on that, but I

10   cannot recall as I sit here what Dr. Conti has said on that

11   topic.

12   Q.   Well, I'm just talking about you, and I'm not trying to

13   play games, Doctor.  You had said at your last deposition, the

14   question was:  "And you offer no opinion about payments made to

15   TPPs from Medicaid, Medicare, CMS, the federal government,

16   correct?

17          "Answer:  I believe that's correct."

18   A.   I'll stay with that answer.

19          MR. STANOCH:  A moment, Your Honor.

20          CHIEF JUDGE BUMB:  Yes.

21   BY MR. STANOCH:

22   Q.   Doctor, anywhere in your reports did you quantify the cost

23   of any non-sartan replacement drugs that you say would have

24   been prescribed but for the conduct at issue?

25   A.   I quantify the cost of other blood pressure medications

1    that are in the SummaCare claims data.  As I sit here, that's

2    the only place that I can think of that I've got an analysis of

3    those payments.

4    Q.   Right.  But other than seeing what SummaCare may have paid

5    post recall for a different drug, you didn't look at how much

6    other replacement drugs would have cost during the pre-recall

7    period, did you?

8    A.   I don't think I have a chart of those -- of other -- other

9    than sartans, other blood pressure medications.  That's

10   correct.

11   Q.   And to recap, Doctor, do you have any evidence that a TPP

12   would be willing to pay any amount of money for a contaminated

13   drug?

14          CHIEF JUDGE BUMB:  Knowingly?

15          MR. STANOCH:  Knowingly.

16          THE WITNESS:  I have heard the testimony from

17   yesterday and what you have read to me today, and that's my

18   understanding, that there would not be knowingly -- knowing

19   payments for contaminated drugs.

20   BY MR. STANOCH:

21   Q.   And in fact, a TPP could not pay any amount of money for a

22   contaminated drug knowingly because that would be illegal,

23   right?  Correct?

24   A.   That's a legal determination, not an economic --

25          MS. BRANCATO:  Your Honor.

1          MR. STANOCH:  I can rephrase.  Wrap up.  I can

2    rephrase and wrap up.

3          CHIEF JUDGE BUMB:  Well, we're a little far afield of

4    702.

5    BY MR. STANOCH:

6    Q.   And a TPP, Dr. Stiroh, cannot pay any amount of money for

7    a contaminated drug in order to get a lower price; is that

8    right?

9          MS. BRANCATO:  Same objection, Your Honor.

10          CHIEF JUDGE BUMB:  I'll allow it.

11          THE WITNESS:  My understanding is that knowingly

12    those drugs would not be available.

13          CHIEF JUDGE BUMB:  I have a question.

14          Could you answer this question:  If Professor Conti

15    was instructed to assume they had no value, do you fault her

16    analysis?

17          THE WITNESS:  I would fault the assumption and say it

18    is not economically reasonable given the testimony in this

19    case.  So I hear your question economists may be asked to make

20    certain assumptions and show if that assumption bears out what

21    the outcomes are.  But what we have seen in this case is that

22    there is still therapeutic value.  And I thought that is not

23    being challenged so I would say it's not a valid assumption.

24          CHIEF JUDGE BUMB:  Understood.

25          MR. STANOCH:  And, Judge, it's been said a number of

1    times by the witness and opposing counsel.

2              CHIEF JUDGE BUMB:  Yes.

3              MR. STANOCH:  And I think our papers will speak for

4    itself that we are challenging the but-for worlds that

5    Dr. Stiroh posits, both the diminution of value and alternate

6    product, drug, right?

7              CHIEF JUDGE BUMB:  Okay.

8              MR. STANOCH:  I'm not going to belabor it, you have

9    the papers and you can see it, but if you read past the

10   sentence that the defendants talked about yesterday, in our

11   reply brief we're very clear that we are challenging both the

12   but-for world of Dr. Stiroh that someone -- that there's any

13   facts supporting the proposition that someone would willingly

14   pay knowingly for a contaminated drug and if they could do

15   that, because there's no facts supporting that.

16             CHIEF JUDGE BUMB:  Right.  But why are we going into

17   that?  We are not in that.  That's just not the record of the

18   case.  Those are just hypotheticals that don't really apply to

19   this case.  Why are we going down that road?

20             There's not going to be any evidence that the TPPs

21   knowingly paid for these contaminated drugs or drugs that they

22   knew to be contaminated, right?

23             MR. STANOCH:  That --

24             CHIEF JUDGE BUMB:  So why are we going down that

25   road?

1          MR. STANOCH:  We're going down that road because

2    we're talking about when you're doing -- to determine the

3    value --

4          CHIEF JUDGE BUMB:  Are you done with this witness?

5          MR. STANOCH:  I think, yes.

6          MR. SLATER:  Wait.

7          CHIEF JUDGE BUMB:  Okay.

8          MR. STANOCH:  Or no, no, I'm not.  Two questions.

9          CHIEF JUDGE BUMB:  Okay.

10          (Counsel conferring.)

11    BY MR. STANOCH:

12    Q.   And I think you agreed earlier, Doctor, but you can

13    correct me if I'm wrong, that you agree that firms cannot sell

14    adulterated valsartan in the market, correct, U.S. market?

15    A.   I don't think that's for me to agree or disagree.  Again,

16    I think that's a legal question.  My understanding from the

17    testimony --

18          CHIEF JUDGE BUMB:  You can agree.

19          THE WITNESS:  Okay.  I'll agree.  Thank you.  I'm

20    informed.

21    BY MR. STANOCH:

22    Q.   And do you agree that there's no legitimate supply curve

23    for contaminant valsartan?

24          CHIEF JUDGE BUMB:  You can agree.

25          THE WITNESS:  I can agree.

1          CHIEF JUDGE BUMB:  You just can't hold either of

2    those answers against her because I told her to say that.

3          (Laughter.)

4          MR. STANOCH:  Worry about that later.  I think I'm

5    good now with the witness, Judge.

6          CHIEF JUDGE BUMB:  Okay.

7          MR. STANOCH:  We'll answer some of your questions.

8          CHIEF JUDGE BUMB:  No.  We're going to have a

9    conversation, but let's finish with the witness.

10          MR. STANOCH:  Okay.  Yeah.  Thank you.

11          MS. BRANCATO:  Just a few follow-up questions, Your

12    Honor.

13          CHIEF JUDGE BUMB:  Yeah.

14                    REDIRECT EXAMINATION

15    BY MS. BRANCATO:

16    Q.    Dr. Stiroh, I just want to be clear for the record, does

17    Dr. Conti use a but-for world in reaching her damages

18    conclusions?

19    A.    She does.

20    Q.    And what does that but-for world that Dr. Conti uses

21    assume about supply for VCDs?

22    A.    She imagines a world with no supply from defendant

23    manufacturers.

24    Q.    And does your analysis start with that same but-for world

25    and build on top of that to critique Dr. Conti's conclusions?

1    A.    For what I discussed here today, yes.

2              MS. BRANCATO:  Thank you, Dr. Stiroh, and Your Honor.

3    No further questions.

4              CHIEF JUDGE BUMB:  You can step down.  Thank you.

5              THE WITNESS:  Thank you.

6              (Witness left the stand.)

7              CHIEF JUDGE BUMB:  Let's take a five-minute break and

8    then I have some questions.  You all know that Judge Vanaskie

9    is coming back at 1:30 to meet with him.

10             MR. STANOCH:  1:30, yes, Your Honor.

11             CHIEF JUDGE BUMB:  So don't go away when we're done.

12   All right.  Let's just take a five-minute break.

13             (Recess was taken at 11:22 a.m. until 11:31 a.m.)

14             THE COURTROOM DEPUTY:  All rise.

15             CHIEF JUDGE BUMB:  Okay.  Thank you.

16             You can have a seat.

17             Okay.  So I asked this earlier, so Dr. Stiroh is

18   not -- is she just a rebuttal witness to Professor Conti?  Help

19   me understand.  Because if I exclude the testimony of Professor

20   Conti, do you need a ruling on Dr. Stiroh?

21             MS. ALLON:  So with respect --

22             CHIEF JUDGE BUMB:  Stiroh.  I'm sorry.  I forgot how

23   she pronounced it.

24             MS. ALLON:  Stiroh.

25             With respect to the opinion that's the subject of the

```
 1    Daubert, she is a rebuttal witness to Dr. Conti.

 2              CHIEF JUDGE BUMB:  Okay.

 3              MS. ALLON:  Does that answer your question?

 4              CHIEF JUDGE BUMB:  Oh, I see.

 5              MS. ALLON:  She has other opinions that aren't being

 6    challenged.  I just need to think more about --

 7              CHIEF JUDGE BUMB:  Got it.  I understand.

 8              MS. ALLON:  But I think there may be some of those

 9    that are not purely rebuttal.

10              CHIEF JUDGE BUMB:  Okay.  All right.  Do you want to

11    be heard on your motion?

12              MR. STANOCH:  Yes, Your Honor.  Thank you.

13              Your Honor, Dr. Stiroh said a number of times

14    comments about Dr. Conti's but-for world.  Dr. Conti, you

15    didn't hear her say one time yesterday, and you won't see it in

16    her four reports, you won't see it in the five days of

17    deposition transcripts of her saying that she constructed a

18    but-for world of taking the supply out and say, oh, it was

19    never sold.  That's not what she does.

20              Dr. Stiroh has a whole bunch of but-for worlds, which

21    we heard about and she goes on and on about, which the net

22    upshot is TPPs made money, they're not harmed, right?  That not

23    only was there no harm, there's a windfall to these plaintiffs

24    for buying contaminated drugs that these defendants made

25    millions or more selling that they shouldn't have been able to
```

1    sell in the first place.

2            Dr. Stiroh -- so I just want to say that Dr. Conti

3    was looking at the benefit-of-the-bargain and the value

4    received and applies the economic principles of how she will

5    tell a jury to do that.  So there's no -- this idea that she

6    has another but-for world out there, that's not this case.

7    That's not our theory.  They can put forth what they want, but

8    they can't recharacterize our theory.

9            CHIEF JUDGE BUMB:  What is your theory?

10            MR. STANOCH:  Our theory is that she measures the

11    value of what was, right, the benefit-of-the-bargain, value

12    given --

13            CHIEF JUDGE BUMB:  She assumed they had no value.

14            MR. STANOCH:  Value given, value received.  And she

15    uses economic principles in the literature and the FDA

16    regulatory market to say how she comes to a value of zero for

17    it.  We talked about this a lot yesterday.  I don't want to

18    retread that.  We'll focus on Dr. Stiroh.

19            CHIEF JUDGE BUMB:  No.  But it's important.

20            Okay.  So if her assumption is -- now I'm talking

21    about Professor Conti.  If her assumption is not a valid

22    assumption -- and that's what I ruled yesterday, and I'm going

23    to continue to rule, and I'll give some rulings more

24    precisely -- if her assumption is wrong, then her analysis

25    falls.  Doesn't it?

```
 1          MR. STANOCH:  I don't -- I don't think --

 2          CHIEF JUDGE BUMB:  Unless, unless I permit the

 3    plaintiffs to present testimony, and I don't know what the

 4    defense response to this would be, is that she was told to

 5    assume.

 6          But I asked her that yesterday, I think I asked her

 7    that yesterday and she disputed that; that she wasn't told to

 8    assume that the value was zero; that she opined that the value

 9    was zero.  And I don't think that she qualifies under 702 to

10    make that opinion.  So that part of her opinion I will exclude.

11          The question is -- and the reason I'll do so, since

12    we're talking about Conti, is that I don't believe that under a

13    702 analysis that her opinion reflects a reliable application

14    of the principles and methods.  I don't think that it's a

15    product of reliable principles and methods.

16          When I've reviewed her testimony, I've reviewed her

17    report, what she discusses, and she's an economist, when I

18    reviewed her report she opines such things as that the product

19    at issue must have a zero value.  It must be applied because

20    otherwise to do so would be to incentivize and legitimize

21    cheating and noncompliance by manufacturers.

22          That simply is, the way the Court thinks about it is,

23    but that is what the measure of damages addresses.  That's what

24    the consumer fraud statutes address.

25          It is not for -- and I don't find that she's
```

1    qualified to render such an opinion to assess a zero value on

2    that simply because she thinks it's better policy.

3           And she goes on and attempts to bolster her opinion

4    by saying that manufacturers would have no economic incentive

5    otherwise if it weren't the case.

6           So I can go through it more if the parties wish for

7    me to. And, you know, she talks about federal law and how

8    federal law establishes nonsafety and quality compliant and

9    what the federal law establishes, and that they are -- and that

10   they cannot be lawfully sold. That's not disputed here.

11          The question, you know, there is no dispute about

12   that. So I don't find that her opinion with respect to that

13   these drugs had no value, I don't find that it's supported by

14   the data and the reliable application of the principles, and I

15   do not think that it would be helpful to a trier of fact.

16          So having ruled that, the question then becomes:

17   Should I permit her to testify that she was assumed to give a

18   zero value?

19          And the question is: Should I allow that because it

20   seems to me the trial is going to be about did they have any

21   value, and we're going to get to that in a second.

22          My problem is, is when I asked her did she assume it,

23   and she said no. So would I be giving the plaintiffs a second

24   bite at the apple in permitting that testimony? I'll hear from

25   the defendants about what their view is. Or should I permit

1    her to go back and do an analysis with that assumption?

2           But to be very clear, I will not permit her to

3    testify that in her opinion they had zero value, I don't think,

4    under Rule 702.  And I've given you my reasons.  I'll reserve

5    the right to amend the transcript if ordered or in a

6    supplemental opinion.

7           So having ruled that, what does that mean for

8    Dr. Stiroh, who I found to be eminently qualified, who I found

9    that the principles that she applied were supported by reliable

10   principles and methods, and that she engaged in what I found to

11   be a reliable application of the principles?

12          MR. STANOCH:  Well --

13          CHIEF JUDGE BUMB:  But is it even relevant at this

14   point if this portion of the testimony that we heard today is

15   strictly to rebut Professor Conti's opinion?  It seems not.

16          MR. STANOCH:  I think it -- I think it's still a

17   relevant and germane inquiry, Your Honor.

18          CHIEF JUDGE BUMB:  It's still a what?

19          MR. STANOCH:  It's still a relevant inquiry, I think.

20   I think it's not mooted by what you're suggesting.  Just a few

21   things.  I just for the record --

22          CHIEF JUDGE BUMB:  You preserve your right to appeal.

23          MR. STANOCH:  We reserve, yeah, of course.  We

24   reserve our rights and understand your ruling.

25          CHIEF JUDGE BUMB:  Noted.

1          MR. STANOCH:  But reserve our rights on it.  And to

2    your other question --

3          MR. DAVIS:  Reserve the right to change your opinion

4    as well because, you know, I think you had instructed us to do

5    some briefing on this yesterday.  And just this morning I was

6    finding cases where courts allowed under a 702 analysis full

7    refund damages models; for example, the *Fisher-Price Rock 'n*

8    *Play* baby toy.

9          CHIEF JUDGE BUMB:  Well, we're going to talk about

10   that, but what I'm precluding is that she is not -- and that's

11   my second question -- that she's not qualified to render that

12   opinion for reasons I've articulated.  So it's not a question

13   of whether or not courts allow full refund.  That's not the

14   issue.  I mean, that's the issue I want the parties to brief.

15         The issue is, is what admissible evidence are the

16   plaintiffs intending to introduce besides Professor Conti's

17   that these drugs were worthless?

18         MR. STANOCH:  And I think, again, reserving all of

19   our rights, Your Honor, we understand.  But I think Dr. Conti

20   could still testify within the four corners of her reports

21   about obviously the amount of sales during the relevant period,

22   the class period, obviously.  I think she can also testify,

23   because she does opine on this in her report, about what

24   happened to the drugs once the revelations became known and the

25   FDA and the price dropped to zero.  And I think --

```
 1          CHIEF JUDGE BUMB:  And I'm reserving on that part of
 2   her opinion, because Ms. Allon has told me or represented to
 3   me -- I thought it was she -- that there will be testimony that
 4   calls into question her reliance on the IQVIA data.  And so I
 5   have reserved on that.
 6          I'm only ruling on the portion of her testimony that
 7   the plaintiffs wish to introduce that the drugs were worthless.
 8          MR. STANOCH:  Right.  And I think the basis --
 9   there's one thing where Dr. Conti is saying I think as an
10   economist they're worthless and then showing based on the
11   actual data what happened in the real world as to the value
12   once the revelations were made known.  And I think she can do
13   that latter, even --
14          CHIEF JUDGE BUMB:  I think she can do that, but I
15   think that's such a small part of the case.  I don't think that
16   anyone is really quarreling with, yeah, the sales went down as
17   soon as there was a recall.  I don't know that that really adds
18   much to the case, but, you know, it's your case.  You'll try it
19   the way you want.
20          MR. STANOCH:  Right.  And then that would be a way to
21   show the jury to say what happens when the truth is known in
22   terms of the pricing and economic value of the drug, and then
23   Dr. Conti would say that she has aggregated all of the point of
24   sale, POP damages.
25          CHIEF JUDGE BUMB:  I'll have to hear the testimony.
```

```
 1   I'll have to revisit it and see exactly what it is that she
 2   would be proffered for.  I'm going to reserve on that, yeah.
 3            MR. SLATER:  Judge, can I --
 4            CHIEF JUDGE BUMB:  Go ahead.
 5            MR. SLATER:  -- be heard briefly?
 6            Wow, I never stand at these because no one could ever
 7   see me.
 8            I'm a little concerned.  I just would like the chance
 9   to talk this out with you a little because obviously it's an
10   important decision.
11            CHIEF JUDGE BUMB:  Uh-huh.
12            MR. SLATER:  Your Honor stated that you don't find
13   that Dr. Conti is qualified to give the opinion.  It would seem
14   to me that she as an economist would be qualified to give
15   opinions on value just as Dr. Stiroh I think you're finding is
16   qualified to give opinions on value.
17            CHIEF JUDGE BUMB:  If she assumes that they are
18   worthless, and that's the question, if she assumes that they
19   are worthless.  But I asked her yesterday, it was my
20   recollection, are you assuming that these are worthless, she
21   said no --
22            MR. SLATER:  Right.
23            CHIEF JUDGE BUMB:  -- they are worthless.
24            Now, maybe in fairness to the plaintiffs I should
25   permit her to assume it and maybe perhaps exclude her from
```

1    opining that they are in fact worthless, because she's not

2    qualified to render that opinion.

3         MR. SLATER:  And my concern with that is that it

4    seems to me that the qualification would be she's an economist

5    and she has a background to be able to value pharmaceutical

6    drugs and determine what, if any, value they have and what they

7    would be.

8         CHIEF JUDGE BUMB:  Right.  But it was such a faulty

9    analysis.  Her analysis goes something like this, and I don't

10   want to take up too much time, because if I have to write on

11   it, I will, her analysis was so faulty.  Her analysis was:

12   Adulterated drugs have no value.

13        As a general proposition, most people would agree

14   with that if they knew they were adulterated, okay.

15        She is inserting into that that supposition that does

16   not exist in this case.  And so, to my understanding, there is

17   no dispute in this case and there's no quarrel that you're

18   getting with your adversaries that defendants, once they knew

19   that they were adulterated, they took them off the market,

20   okay.

21        But for your expert to say that adulterated drugs

22   have no value, they have a value unless it is known that they

23   are contaminated.  And that is the critical piece of evidence

24   that she conveniently ignored.

25        She then went on into her policy statements, which

1    really is the role of the FDA and other policymakers.  Why does

2    the FDA impose these types of requirements?  Why does the FDA

3    impose these compliance requirements?  Because we want

4    manufacturers to manufacture noncontaminated drugs.

5              And so we have to send a message to these -- this is

6    what's in her report -- we have to send a message to these

7    manufacturers that you can't do that.  And the only way to do

8    that is to ascribe a zero value.  That sounds legislative to

9    me.

10             My whole point is, is that I think the analysis was

11   flawed.  I can lay it out in a greater opinion if the parties

12   wish.

13             So that's the part that I'm precluding.  She cannot

14   opine that they are worthless.

15             MR. SLATER:  My concern is that --

16             CHIEF JUDGE BUMB:  Yes.

17             MR. SLATER:  -- my concern is that Your Honor may be

18   making a little bit of a leap to the idea that she can't give

19   this opinion.  I don't think that it was a policy-based

20   opinion.  I think that she was saying the reason why you can't

21   sell these drugs, the reason why it's illegal to sell these

22   drugs, there's policy reasons.  I don't think that was the

23   grounding of her opinion.

24             I think her opinion was actually -- I think it got

25   lost in the hearing a little bit because there was some

```
 1    questioning that kind of took us off focus.  But I think that
 2    her opinion was, because as everybody has admitted, there is no
 3    legitimate market for contaminated -- adulterated might be
 4    pulling us a little bit out of the focus.  And I think it sort
 5    of confused things a little bit on what's the warranty claim.
 6    The bottom line here, the warranty was these drugs are
 7    valsartan as approved.  I'm simplifying it, but USP drugs.
 8                CHIEF JUDGE BUMB:  Right.
 9                MR. SLATER:  They weren't.
10                CHIEF JUDGE BUMB:  Okay.
11                MR. SLATER:  So the warranty was breached.  And
12    that's our theory.  That's very straightforward.
13                CHIEF JUDGE BUMB:  Okay.
14                MR. SLATER:  I don't think you need adulteration to
15    get there.
16                CHIEF JUDGE BUMB:  Okay.
17                MR. SLATER:  But what Dr. Conti's opinion was, is
18    because there's no legitimate supply curve, and this is an
19    economic methodological issue, I really think that it's not --
20                CHIEF JUDGE BUMB:  There's no supply curve when?
21                MR. SLATER:  There's no legitimate supply curve ever
22    for contaminated pills that are not the approved pill that was
23    legally approved by the FDA.
24                CHIEF JUDGE BUMB:  Okay.  But that's --
25                MR. SLATER:  And that's a legal concept that nobody
```

1    can argue with.  And I think as an economist, her methodology

2    is absolutely sound, because she took that principle and said,

3    look, as admitted by the defendants, there is no legitimate

4    supply curve.  So as a matter of economics, if you can't sell

5    it, there's no value to it.

6              CHIEF JUDGE BUMB:  But her opinion has to be helpful

7    to the jurors.  Her opinion has to be reliably sound and apply

8    to the facts of the case.

9              What you are asking your expert to do is to rewrite

10   the history of this case.  You are asking the jury to assume

11   the defendants knew from day one or day two or day five.

12             Now, if the evidence is at some point they knew, okay

13   then.  But that's not what she's saying.

14             MR. SLATER:  Well, I think that, and this was

15   something we talked about briefly yesterday, we are not asking,

16   and I don't think we need to ask or even establish the

17   defendants knew.  As we talked about yesterday in the

18   regulatory framework that applies here, knowledge is not

19   necessary.  What's necessary is that they didn't do the risk

20   assessment that would have gotten them the knowledge.  And

21   that's what the FDA --

22             CHIEF JUDGE BUMB:  Right.

23             MR. SLATER:  -- stopped them from selling drugs for

24   three or four years into the U.S. for.

25             CHIEF JUDGE BUMB:  Right.

1            MR. SLATER:  So knowledge is not an element of the

2    claims or the regulatory acts.  And I think that's kind of

3    tying us up.  And I thought about this last night, because I

4    think it's clear Your Honor is concerned about the materiality

5    of the warranty breach and making sure that it's material

6    enough that it could matter enough that there could be a

7    recovery.  That was my feeling of maybe what was going on.  And

8    I think that you were in that place July 23rd, and I think that

9    was the right place when Your Honor said the unacceptable risk,

10   because that's the regulatory law that's applying, that's the

11   regulatory rules, that is the key.

12           And as Your Honor heard today, and I can tell you the

13   language in that press release was mandated by the FDA.  That's

14   the testimony from the 30(b)(6) witness.  The FDA made ZHP say

15   in that press release that it had to be recalled because of the

16   unacceptable carcinogenic risk.  That unacceptable carcinogenic

17   risk existed from day one whether ZHP knew about it or not.

18   And --

19           CHIEF JUDGE BUMB:  But I think you're ignoring the

20   record.  And I think that to present that in a vacuum will

21   confuse the jury.  I think it will mislead the jury.

22           Yes, contaminated drugs should not have a marketable

23   value because the evidence will be undisputed that no

24   manufacturer -- no pharmacy will buy them.  No one will use

25   them --

```
 1            MR. SLATER:  It's illegal.

 2            CHIEF JUDGE BUMB:  -- once they're contaminated

 3    because it's illegal.

 4            MR. SLATER:  It's against the law.

 5            CHIEF JUDGE BUMB:  Okay.  But that ignores the facts

 6    of this case.

 7            They were sold here.  They were ingested.  They did

 8    have a therapeutic value.  And on what basis does Professor

 9    Conti say they had no value?  She's not qualified to render

10    that opinion.

11            MR. SLATER:  I think that -- I'm sorry.  I didn't

12    mean to interrupt.

13            MR. HONIK:  Adam, just --

14            MR. SLATER:  Can I -- I need to finish talking,

15    Ruben, please.

16            MR. HONIK:  Go ahead.

17            MR. SLATER:  Please.  And I'm sorry, I didn't want to

18    interrupt you.

19            CHIEF JUDGE BUMB:  Go ahead.  The point is --

20            MR. SLATER:  Oh, what I was going to say is this,

21    Judge.

22            CHIEF JUDGE BUMB:  Go ahead.

23            MR. SLATER:  Yesterday I accepted that Your Honor has

24    framed a jury issue on whether or not the therapeutic value

25    actually takes it from zero to some number.  And that is -- so
```

1    we're not saying at this point, understanding where Your Honor

2    is, that it's worthless and they can't argue that there was

3    value.  We understand that's never going to happen in this

4    courtroom.  So your concern, Your Honor, I think the leap

5    you're making is that you're making the decision that because

6    they sold it and you're making the assumption they didn't know

7    whereas we have evidence they knew, and how far that goes back

8    is something the jury is going to decide.  It wouldn't be for

9    us to decide.  So there may have been knowledge from day one

10   according to the jury.

11          There's definitely a violation of the risk assessment

12   obligation, which is they should have known, to the extent

13   knowledge is a concern for Your Honor.  But it's not -- the

14   fact that they sold it is not a problem for Dr. Conti's

15   analysis.  She's looking at it and saying they sold it, but it

16   was a product which was not deemed legally sold because it

17   was -- we know it was contaminated, and the defendants agree,

18   we couldn't sell it if -- we weren't supposed to knowingly sell

19   it.  In fact, they said it would be unethical to knowingly

20   sell.  So we have all that evidence.  So the fact that they

21   sold it can't be the basis on which to exclude the opinion.

22          Dr. Conti's contending with the fact that they sold

23   it and saying what they sold based on economic principles

24   actually did not have value because you're not allowed to sell

25   that product legally.

```
 1              CHIEF JUDGE BUMB:  But had she opined something along
 2   the lines of should have been rendered worthless.  But whether
 3   or not they had a therapeutic value is a jury question.  Had
 4   she framed it in that way, that may have been a permissible
 5   opinion.  But you are asking to have her say to the jury that
 6   they have absolutely no value and they're worthless, when there
 7   was no recall.
 8              Unless you're going to tie up somehow that the
 9   defendants knowingly sold, and on that basis I may revisit it,
10   but if they knowingly sold drugs they knew to be contaminated,
11   then does she then come forward and say knowingly selling
12   contaminated drugs are worthless?
13              MR. SLATER:  Well --
14              CHIEF JUDGE BUMB:  Because it's just -- she --
15   it's --
16              MR. SLATER:  I --
17              CHIEF JUDGE BUMB:  Go ahead.
18              MR. SLATER:  I think -- I'm sorry, Judge.  I think
19   what we're doing is we're mixing liability with a damages
20   model.  And I think that that's not what we should be doing.
21              The knowledge component of whether or not they knew
22   does not go to whether or not value was received.
23              CHIEF JUDGE BUMB:  But that's why --
24              MR. SLATER:  And she can be cross-examined on that.
25              CHIEF JUDGE BUMB:  But that's why I asked her, I said
```

1    are you assuming they are worthless.

2          MR. SLATER:  I thought the answer was better and more

3    acceptable to the Court when she said no, what I did was I

4    assumed that they were not -- that they were adulterated.  She

5    assumed they were adulterated which the FDA found, so that's a

6    sound assumption.  Your Honor has left it for the jury to

7    decide whether they met the definition of adulteration from day

8    one.  We --

9          CHIEF JUDGE BUMB:  She never -- unless I'm wrong, I

10    don't recall her saying I will assume that they are

11    adulterated.

12          MR. SLATER:  She drew that assumption very clearly,

13    Your Honor.

14          CHIEF JUDGE BUMB:  To my way of thinking, I'll hear

15    from the defendants, to my way of thinking, there is a material

16    distinction to say to the jury I assumed they were worthless

17    versus they were worthless.

18          MR. SLATER:  What --

19          CHIEF JUDGE BUMB:  Because they weren't worthless at

20    the time.  That's what the evidence will show, the jury will

21    decide, because no one knew of this contaminant.

22          MR. SLATER:  Well, your Coach bag example was

23    actually the perfect example to show that it was worthless.

24    And the fact is, as a matter of law, if you sell something

25    illegally, the jury --

```
 1              CHIEF JUDGE BUMB:  Now we're --
 2              MR. SLATER:  It's for the jury.  I think where you
 3   were before yesterday was it's going to be a jury question to
 4   take what Dr. Conti says and to take -- this is an adulterated
 5   drug.  That was the basis of her opinion.  She assumed it was
 6   adulterated and then said based on that, adulterated drugs have
 7   no value because they can't legally be sold in the United
 8   States, and there's no legitimate supply curve for those.  End
 9   of -- I mean, that is a legitimate methodology.  She's
10   certainly qualified to give that opinion.
11              CHIEF JUDGE BUMB:  It just has no application to the
12   facts in this case.  That's my issue.  It has no application to
13   the facts in this case.
14              MR. SLATER:  Well --
15              CHIEF JUDGE BUMB:  Because there is no quarrel that
16   you will get from the defendants that contaminated drugs cannot
17   be sold, okay.
18              And so for the plaintiffs to come forward and pretend
19   as if they couldn't have been sold back then, if they knew then
20   what they know now injects speculation, conjecture, and isn't
21   what the record will reflect.  And that's the concern I have,
22   is that we are injecting -- we are asking the jury to pretend
23   that what happened here didn't really happen.
24              MR. SLATER:  I don't --
25              CHIEF JUDGE BUMB:  Pretend the FDA recalled it five
```

```
 1    years ago.

 2              MR. SLATER:  We're not saying that, though, Your

 3    Honor.

 4              CHIEF JUDGE BUMB:  I don't know.  That's how I see

 5    it.

 6              MR. SLATER:  I can assure you, we're not saying

 7    pretend -- we're saying this is what happened.  And that's sort

 8    of what happened today where Dr. Stiroh was saying, well, she

 9    has a but-for world.  She really doesn't.  She's saying in this

10    world you sold these for those -- for that period of time.  I

11    don't believe that for her damages model that the knowledge of

12    the defendant matters.  What matters is whether she thinks

13    there's a value or not.  It's a liability question whether

14    knowledge matters.  And it doesn't.  We know it doesn't.  So

15    we're mixing the two things.

16              And certainly Dr. Conti -- because I know you're

17    wondering if you stay where you are, which I'm hoping I could

18    convince you to not and to let her give the opinion because I

19    think it's very valid -- she certainly can give the opinion

20    there's no legitimate economic supply curve for drugs that are

21    adulterated.

22              CHIEF JUDGE BUMB:  But nobody disputes that.  That's

23    what I'm trying to --

24              MR. SLATER:  But if the jury finds --

25              CHIEF JUDGE BUMB:  That is just not disputed.
```

1          MR. SLATER:  But if the jury finds, which we're going

2     to ask the jury to find, that from day one the drugs met the

3     definition of adulteration, it was just later when the FDA

4     found out that they were going to say, oh, yeah, these drugs

5     are adulterated, the conditions that led to the adulteration

6     finding didn't change.  It was the same from day one to that

7     point.

8          CHIEF JUDGE BUMB:  Okay.

9          MR. SLATER:  So if doctor -- so you're going to -- so

10    we already know the jury is going to decide whether -- and

11    maybe that's a question on the verdict sheet -- do you find

12    that they met the definition of adulteration as of for the

13    entire time they were sold?  And if they say that, the jury

14    says that, then Dr. Conti's assumption has been proven out by

15    the jury, and then the jury could consider whether or not she's

16    correct.

17         And she certainly could give the opinion -- even if

18    Your Honor says she can't give the ultimate opinion they were

19    worthless, she certainly could give the economic analysis of

20    there's no legitimate market for that.  Value is determined by

21    the supply and demand curve, and here's the numbers if you find

22    that there was -- if you, the jury, find the value was zero,

23    here's the numbers.

24         CHIEF JUDGE BUMB:  And on that ground, I will review

25    the transcript.

1          Okay.  Everyone is standing up.  Yes, quickly.

2          MS. ALLON:  Okay.  So I want to just address the

3    Court, what's happening with Dr. Stiroh, right?  We need to

4    address -- I want to come back to that question.

5          CHIEF JUDGE BUMB:  No; her testimony is permissible.

6    I found it to satisfy Rule 702 in its entirety.

7          MS. ALLON:  Okay.

8          MS. BROWN:  Perfect.  And Your Honor --

9          CHIEF JUDGE BUMB:  But I don't know that it's going

10   to be useful if I exclude the opinion.  That's the only part --

11         MS. BROWN:  Yes, Your Honor.

12         MS. ALLON:  Okay.

13         MS. BROWN:  Correct.  Sorry.  Go ahead.

14         MS. ALLON:  Yeah.  I was going to make the point that

15   if she's going to present any numbers, right, then Dr. Stiroh

16   is going to be permitted to respond.  If Dr. Conti is going to

17   present any damages numbers to the jury --

18         CHIEF JUDGE BUMB:  Yes.

19         MS. ALLON:  -- then Dr. Stiroh can respond to that.

20         CHIEF JUDGE BUMB:  Yes.

21         MS. BROWN:  And, Your Honor, I just rise to sort of

22   echo the totality of Dr. Conti's testimony, which I think the

23   Court hit the nail on the head to say she has come before this

24   Court to offer an opinion, she told the Court yesterday she

25   made an independent determination of worthlessness.  And as the

1    Court says, that is based on something that are not the facts

2    of the case.  It is based on an assumption that back in 2012,

3    the FDA made a finding that they didn't, that the facts do not

4    support; that there was no testing to test for it; that nobody

5    knew this was there; that the FDA says in their press release:

6    American public, you might be wondering how come we didn't

7    catch this?  Because we didn't know, because we couldn't test

8    for it, because nobody knew to look for this.

9             And so I think Your Honor hits the nail on the head

10   to say the problem with this opinion, the 702 problem with the

11   opinion is it will not assist the jury because it's not

12   reliable, because it belies the facts of the case where we have

13   a product that was sold for a period of time where the

14   testimony in this case was that it provided value, therapeutic

15   value.

16            And whether it was an assumption or an independent

17   finding, Your Honor, it doesn't survive 702 either way, because

18   it's not based on the facts of this case.  And whether they

19   told her to assume that or whether, as she told the Court

20   yesterday, she made that independent finding, either way, it's

21   not reliable.  And the Court is spot on in finding it does not

22   survive *Daubert* or 702.

23            CHIEF JUDGE BUMB:  Let me review the transcript.

24            MR. SLATER:  Thank you.  I assume we shouldn't say

25   much more on this.

1          CHIEF JUDGE BUMB:  All right.

2          MR. SLATER:  I appreciate it, Your Honor.  Thanks for

3     hearing me.

4          MR. HONIK:  Your Honor, I merely wanted to add that

5     you wisely asked us for legal briefing.

6          CHIEF JUDGE BUMB:  Yeah.

7          MR. HONIK:  What I think really at the end of the day

8     may control this.  If plaintiffs, as we strongly believe, and

9     I've now seen the better part of a dozen or more cases, are

10    entitled to a full refund theory, which is a legally cognizable

11    theory that we have advanced, an economist is entitled to

12    measure that.  And if nothing else, and I think everything

13    Mr. Slater said --

14         CHIEF JUDGE BUMB:  And if she assumes -- if she

15    assumes that they were worthless, if she assumes that the Coach

16    bag had no value or the fake coat, whatever.  But that's a lot

17    of assumptions.  But I, you know, I'm going to reread the

18    transcript.  But as it stands now, I'm not going to permit her

19    to opine independently that they had no value.  I don't -- I

20    think it distorts -- I think it would confuse the jury, but

21    I'll read the transcript.

22         Here's what I want to say, because, you know, I've

23    gone round and round about this whole damages issue, and I

24    think that the issue of -- I think what it boils down to, and

25    Dr. Stiroh's testimony sort of helped the lightbulb go off, so

1    to speak, that what we're really arguing about is compensatory

2    damages and not punitive or fraud damages.

3            And so I am going to share with you just a treatise

4    that I was reading.  And basically what it says, and you all

5    can go look at it, and perhaps this is the source of the

6    confusion, which is there are jurisdictions that support

7    benefit-of-the-bargain and then there are jurisdictions that

8    support out-of-pocket.  And the treatise goes on to say that it

9    depends upon the jurisdiction.  So then of course I say, oh,

10   now what?  Do we have all kinds of, you know, jury charges?

11           Ultimately, it seems that -- what this treatise seems

12   to suggest is that ultimately the ends -- how is justice best

13   served by the conduct is what the jurisdictions seem to be

14   motivated by.  And that's somewhat what Dr. Stiroh was talking

15   about today, which is, you know, parties just shouldn't be

16   getting windfalls.

17           And so I found this very helpful.  And so when you

18   folks respond to me, you know, if the jurisdictions are

19   different, you'll let me know.  But it does seem to me that the

20   benefit-of-the-bargain, which says to me that the defendants

21   should be permitted to introduce evidence that the drugs had

22   value, is the right way to go.  I haven't veered from that.

23   But --

24           MR. DAVIS:  May I speak to that, Your Honor, for a

25   second?

|      |                                                                      |
|------|----------------------------------------------------------------------|
| 1    | CHIEF JUDGE BUMB:  Yes.                                               |
| 2    | MR. DAVIS:  Because this is subject to past briefing,                |
| 3    | and the defendants themselves have agreed that                       |
| 4    | benefit-of-the-bargain is what applies to all the claims in          |
| 5    | this case.                                                            |
| 6    | There are certain jurisdictions that do apply                        |
| 7    | out-of-pocket, but there's no meaningful distinction in this         |
| 8    | case in the sense that the only difference between those two         |
| 9    | theories is that under a benefit-of-the-bargain, the plaintiff       |
| 10   | can in addition to getting the difference between the amount         |
| 11   | paid and the value received, they can get lost upside damages.       |
| 12   | And that's not what TPPs are seeking in this case at all.            |
| 13   | We're merely seeking the difference between amount paid and the      |
| 14   | value received.  And so there is no legal --                         |
| 15   | CHIEF JUDGE BUMB:  I thought the TPPs -- I thought in                |
| 16   | some of your briefing you were seeking a full refund, full           |
| 17   | stop.                                                                 |
| 18   | MR. DAVIS:  Well, we are.  But that is the difference                |
| 19   | between value --                                                     |
| 20   | CHIEF JUDGE BUMB:  And there was no                                  |
| 21   | benefit-of-the-bargain.                                               |
| 22   | MR. DAVIS:  Right.  The lost upside potential is,                    |
| 23   | like, say that you had a warranty case and the defendant            |
| 24   | breached the warranty and that caused not only the plaintiff to     |
| 25   | suffer a difference for the product but maybe they were going       |

1    to go use the product to like fulfill their own obligations and

2    lost that opportunity to go do that, like, say it's a piece of

3    heavy machinery or something and they had a contract to go use

4    it.  That's what the benefit-of-the-bargain entitlement in

5    addition to out-of-pocket gives you.  But that's not what TPPs

6    are seeking here.  So there is no meaningful distinction

7    between those two theories of economic loss as applied to this

8    case.

9              MR. OSTFELD:  Your Honor, Greg Ostfeld.  This is

10   certainly an issue that was briefed at the class certification

11   stage.  I would respectfully disagree with Mr. Davis's

12   characterization that there's no dispute that

13   benefit-of-the-bargain is the measure of damages across all

14   jurisdictions and all claims.  In fact, attached to the class

15   certification opinion there is a table that lays out a number

16   of the differences that were argued in connection --

17             CHIEF JUDGE BUMB:  Where will I find that?

18             MR. OSTFELD:  Your Honor, it is the appendices to ECF

19   2261.  And, for example, there was briefing on which

20   jurisdictions acknowledge zero value theories of damages and

21   which do not.  There was briefing about benefit-of-the-bargain.

22   There was briefing on out-of-pocket.

23             I would agree that plaintiffs have presented only one

24   theory of damages across all states and all theories and all

25   claims.  And we have certainly argued that there is variability

```
 1    in state law as to those.  And what Judge Kugler found at the
 2    class certification stage was those legal variances don't
 3    prevent class certification, but he did not find that there was
 4    a uniform measure of damages across all jurisdictions.  That's
 5    an issue that was left for trial.  I'm sorry.
 6              CHIEF JUDGE BUMB:  But what Mr. Davis is saying is
 7    that even if it's out-of-pocket versus benefit-of-the-bargain,
 8    you get to the same place; that you don't get full
 9    out-of-pocket because you then have to subtract from that the
10    value.  That's what I heard him to be saying; that there's no
11    real material distinction.  I mean, instructing the jury is
12    another issue, but that's how I hear him to be saying.
13              So --
14              MR. OSTFELD:  So I think the way we would frame the
15    issue is that there are no out-of-pocket damages here because
16    at least the plaintiffs have put forward no evidence of
17    out-of-pocket costs that were incurred by the TPPs.  I think
18    Professor --
19              CHIEF JUDGE BUMB:  Well, no.
20              MR. OSTFELD:  I'm sorry.
21              CHIEF JUDGE BUMB:  Well, no, that's not true.
22    They're arguing, which is what Professor Conti presented --
23              MR. OSTFELD:  Right.
24              CHIEF JUDGE BUMB:  -- which is we paid for sugar
25    pills, we want all our money back.  That's their position.
```

1   Your position is -- that's how I see out-of-pocket.  And your

2   position is, no, they weren't, they were effective.  They did

3   what they were supposed to do.

4        And I am not going to prevent the defendants from

5   putting on that evidence, so it does seem to me that you both

6   get to the same place even though it's called something

7   different.

8        MR. OSTFELD:  I think through the lens of Professor

9   Conti's opinion, it comes down to a similar evaluation.  I do

10  still think there are important legal differences, because

11  there are jurisdictions that have not acknowledged Professor

12  Conti's theory, essentially not acknowledging that there could

13  be a zero value theory of damages.  And we can certainly brief

14  this and I think --

15       CHIEF JUDGE BUMB:  But really, that can't really be

16  true.  Like go with my placebo.  That really can't be true.

17  What jurisdiction --

18       MR. DAVIS:  It depends on the facts of the case.

19       CHIEF JUDGE BUMB:  Yeah.  What's your --

20       MR. DAVIS:  It's not a hardline law in any

21  jurisdiction.

22       CHIEF JUDGE BUMB:  Yeah.  I think you're overstating

23  it.

24       MR. OSTFELD:  I -- perhaps I've stated it inartfully.

25  But I think what the jurisdictions say is you cannot assume

1    zero value as the result of a --

2              CHIEF JUDGE BUMB:  Oh.

3              MR. OSTFELD:  They essentially reject the theory that

4    Professor Conti has put forward here, which is an assumption of

5    zero value based on the violation, based on the breach.

6    Essentially a per se or strict liability zero value theory is

7    what they reject.

8              CHIEF JUDGE BUMB:  I see.  I think we still -- you

9    still get to the same place under both causes -- under both

10   theories, though.  So maybe it isn't as -- I mean, instructing

11   the jury is going to be a challenge, but maybe it isn't as

12   significant.

13             Okay.  Did you want to say something else?

14             MR. OSTFELD:  No, Your Honor.

15             CHIEF JUDGE BUMB:  Okay.

16             So you're welcome, if anyone wants to see what I've

17   been reading, you're welcome to.

18             MS. LOCKARD:  Would you mind sharing the treatise

19   that you're referencing?

20             CHIEF JUDGE BUMB:  I took it back to chambers.  Is it

21   on the copies?  I had my law clerk make copies.

22             I think it's the Fischer treatise on remedies.

23             MS. LOCKARD:  Thank you.

24             CHIEF JUDGE BUMB:  Yeah.  That would be helpful,

25   wouldn't it?

```
 1              Let me just ask my law clerk.
 2              I was warned it was a little outdated, so... but it
 3    was something.
 4              Okay.  When do I see you all next?
 5              MR. DAVIS:  Your Honor, did you want to address
 6    Motion in Limine 16?
 7              CHIEF JUDGE BUMB:  Which one is that one?
 8              MR. DAVIS:  That's the alternative drugs motion in
 9    limine.  I think Your Honor may have ruled on it yesterday, and
10    it --
11              CHIEF JUDGE BUMB:  Doesn't that dovetail into
12    everything we were just talking about today?
13              MR. DAVIS:  It does.  We were scheduled to argue it
14    today.  It relates to, among other things, Dr. Stiroh's
15    evaluation of alternative drugs, and that it rewrites the
16    damages analysis in this case.
17              As we've talked about many, many, many times, the
18    analysis looks at what was received versus the value of what
19    was received, not parenthetically or what you would have bought
20    in replacement thereof.
21              CHIEF JUDGE BUMB:  James Fischer on remedies, Second
22    Edition.
23              MR. DAVIS:  Your observation yesterday that would
24    create a law of no damages is correct.  I mean, take
25    Dr. Stiroh's ham sandwich example today, contaminated deli
```

```
 1   meat.  Well, she would say you would have gone and bought a
 2   different lunch and you wouldn't be entitled to damages.
 3            CHIEF JUDGE BUMB:  And that's why I want briefing on
 4   it.  Because to give you the benefit of my thinking, it just
 5   seems to me that the purpose of compensatory damages is to make
 6   the party whole.  And the purpose of punitive damages or
 7   fraud-related damages such as fraud protection acts is to
 8   punish or make the party pay for his or her conduct.
 9            So it does seem to me that to make the party whole,
10   the jury should look to see in its analysis of damages is had
11   this been -- and the jury has to find it, when did the
12   defendants know, when did the defendants know, and did they
13   conceal it?  And if they find that they didn't conceal it, they
14   find that they didn't know, then they engage in a compensatory
15   analysis, which I think is similar to what Dr. Stiroh was
16   saying.
17            If they find that they did know and they concealed
18   it, then those damages, they don't get a reward by looking to,
19   well, you would have had to buy it from a third party anyway.
20   That's where punitives come into.  That's where fraud damages
21   come into.  And that becomes not relevant in a compensatory
22   analysis.  And so the jury is going to be asked, as I see it,
23   the jury is going to be asked to do those separate inquiries,
24   what are the compensatory damages, what are the punitive
25   damages, et cetera.
```

```
 1          And so that's why this briefing is going to be very
 2     helpful to me so that I can figure out in context why any of
 3     this matters.
 4          MR. DAVIS:  Well, we're happy to brief this further,
 5     Your Honor.
 6          MS. ALLON:  Yeah.  I mean, I can argue it after the
 7     briefing.  MIL 16 arguments are duplicative of the 702
 8     arguments.  The plaintiffs make the same set of arguments in
 9     both briefs.
10          CHIEF JUDGE BUMB:  Yeah.
11          MS. ALLON:  I think Dr. Stiroh in her testimony today
12     outlined a number of situations where under her analysis there
13     would be damages.
14          CHIEF JUDGE BUMB:  Right.
15          MS. ALLON:  So it's not true that it creates a rule
16     of no damages.  But I agree, she also testified that it is
17     purely limited to compensatory damages.
18          CHIEF JUDGE BUMB:  Compensatory.  And that was very
19     helpful, because it got me to focus in on what I need to be
20     focusing on in how I instruct the jury as to what the damages
21     are.
22          MR. DAVIS:  Respectfully, her answer was inconsistent
23     with other opinions she's given in this case.  She said that --
24     I think in that example you gave of a placebo, Dr. Stiroh
25     testified that TPPs got a benefit of supplying a drug that was
```

1    safe and effective.  Well, that's contrary to all the opinions

2    she's given in this litigation that their only expectation is

3    to meet -- is to supply a low cost drug, as Ms. Allon said.

4         So I don't think that was a very intellectually

5    honest response.

6         CHIEF JUDGE BUMB:  Wait.  I'm not following you.

7    What are you saying?

8         MR. DAVIS:  You gave Dr. Stiroh the example of a

9    placebo.

10         CHIEF JUDGE BUMB:  Yeah.

11         MR. DAVIS:  And if her alternative drugs theory would

12    preclude recovery on that.  And she said that the TPPs -- I

13    think this was -- I think she struggled with the question for a

14    moment and then she said that the TPPs --

15         CHIEF JUDGE BUMB:  It was probably my question she

16    struggled with, but okay.

17         MR. DAVIS:  Yeah -- got a benefit from supplying a

18    drug that was safe and effective, and that was the benefit they

19    received, but that's inconsistent with --

20         CHIEF JUDGE BUMB:  No.  And I asked her about the

21    placebo, and I did it a couple of times because, you know,

22    look, I'm trying to get my head around this; but what her

23    answer was is that in that case, the TPP wouldn't get a

24    windfall because they didn't get anything, there was no benefit

25    to begin with.

1          MS. ALLON:  Right.  She testified --

2          CHIEF JUDGE BUMB:  And they should get the full

3    refund.  She didn't use those words, but -- and so that's

4    consistent with what it seems to be the purpose of compensatory

5    is.  And so that's why I go round and round about I think that

6    it does become relevant to a jury to make a finding of what

7    value did these drugs have.

8          How you folks -- how you folks prove that I haven't a

9    clue, but it does become relevant.

10          MR. DAVIS:  We absolutely agree that's a jury finding

11    as to the value.

12          CHIEF JUDGE BUMB:  Yeah.

13          Ms. Allon?  Yes?

14          MS. ALLON:  Yeah; no, I'm agreeing, Your Honor.

15          CHIEF JUDGE BUMB:  Okay.  All right.  So we'll

16    adjourn.  And when are you folks back?

17          THE COURTROOM DEPUTY:  Next Tuesday.

18          CHIEF JUDGE BUMB:  Next Tuesday.

19          MS. BRANCATO:  Tuesday.

20          CHIEF JUDGE BUMB:  We'll be together again, yay.

21          You know, I'm just going to go off the record for a

22    second.

23          (Discussion was held off the record in open court.)

24          CHIEF JUDGE BUMB:  Okay.  Thank you, all.

25          MR. SLATER:  Thank you, Your Honor.

1          MS. ALLON:  Thank you, Your Honor.

2          MS. BRANCATO:  Thank you, Your Honor.

3          MR. STANOCH:  Thank you, Judge.

4          THE COURTROOM DEPUTY:  All rise.

5          (Proceedings concluded at 12:17 p.m.)

6          - - - - - - - - - - - - - - - - - - - - -
       **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
7          - - - - - - - - - - - - - - - - - - - - -

8          I certify that the foregoing is a correct transcript

9      from the record of proceedings in the above-entitled matter.

10

11

12     /S/John J. Kurz, RDR-RMR-CRR-CRC          September 12, 2024

13     Court Reporter/Transcriber

14

15

16

17

18

19

20

21

22

23

24

25