# APPENDIX A
# RESPONSE TO PLAINTIFFS' APPENDIX PART VI
# COURT DECISIONS PURPORTEDLY "UPHOLDING CLASS DAMAGES CALCULATIONS USING IQVIA DATA"

| Plaintiffs' Claim | Defendants' Response |
|---|---|
| *In re Actos Antitrust Litig.*, No. 1:13-cv-09244 (RA) (SDA), 2024 U.S. Dist. LEXIS 142236, at *74 (S.D.N.Y. Aug. 9, 2024) (finding that Dr. Conti's economic damages model using IQVIA Xponent pricing data of retail sales is sufficiently reliable) | Prof. Conti used IQVIA Xponent data in *Actos* to measure the **relative** pricing difference both before and after generic entry to the market and then compared it to actual sales data. There is no indication that she used the IQVIA Xponent pricing data as she did here—i.e., to establish the specific amount paid by consumers or TPPs at the point of sale without reference to any real-world data benchmark.<br><br>As a result, this case, at best, supports what both Dr. Stiroh and Mr. Gibson identified as an appropriate use of IQVIA data—for relative comparisons of trends and patterns within the IQVIA data set itself. It does not support the notion that IQVIA Xponent data are sufficient on their own to establish specific payments without reference to real-world transaction-level data.<br><br>Additionally, the court did not find the IQVIA Xponent "pricing data of retail sales" to be "sufficiently reliable," as plaintiffs claim. Rather, in response to defendant's argument that IQVIA Xponent data "reflects only the State of the prescriber but not the location where a prescription was filled," the court found that Prof. Conti "has demonstrated that the IQVIA data can be used to reliably identify class purchases on a classwide basis." *Id*. at *73. |
| *FTC v. Shkreli*, 581 F. Supp. 3d 579, 601 (S.D.N.Y. 2022) (discussing the IQVIA pricing data that was presented by the Federal Trade Commission during a bench trial in the Court's findings of fact and rulings of law) | This decision only discusses the use of IQVIA data to estimate relative declines of market size, which both Dr. Stiroh and Mr. Gibson agree is an appropriate use of the IQVIA data and is consistent with IQVIA's own disclaimers. The court's post-trial findings of fact and rulings of law referenced IQVIA (without specifying which data set) to show that "market size" for the drug at issue declined in a single-supplier market in response to exploitative hikes to the list price. *Id.* at 601. In an earlier ruling (cited below), the court noted that the FTC's damages expert analyzed the drug's "pricing and sales data ***from [Defendant's] records*** and data compiled by IQVIA" to show "the change in the average net price of Daraprim before and after Vyera's August 2015 acquisition, the rate of decrease in Daraprim's price upon generic entry into the market in March 2020, changes in quantities of |

| Plaintiffs' Claim | Defendants' Response |
|---|---|
| | Daraprim sold over time[.]" *FTC v. Vyera Pharm., LLC*, 2021 U.S. Dist. LEXIS 219493, at *5 (S.D.N.Y. Nov. 12, 2021) (emphasis added).<br><br>The use of real-world sales data in conjunction with IQVIA was essential to this case, as the court's findings also included a finding that ***the IQVIA pricing data for this drug was inaccurate***, because part of the fraudulent scheme was to prohibit distributors from reporting sales information to IQVIA in order to deprive potential market entrants from gaining reliable information about the market for that drug. *Shkreli*, 581 F. Supp. 3d at 629 n.35. This reinforces Mr. Gibson's point that survey-based IQVIA data cannot be deemed reliable without verifying these data against actual sales data. |
| *In re In re HIV Antitrust Litig.*, No. 19-cv-02573-EMC, 2022 U.S. Dist. LEXIS 250035, at *109 n.16 (N.D. Cal. Sept. 27, 2022) (relying on plaintiff's expert using IQVIA retail sales data to ascertain damages and finding that "IQVIA . . . is a leading third-party provider of pharmaceutical sales data in the U.S. and globally; IQVIA data are commonly used in academic research, litigation, and strategic analysis conducted by firms such as Gilead, and is sometimes referred to as the 'gold standard' for pharmaceutical data.") | The court in this case found that the IQVIA Xponent data set was a "better proxy for purposes of assessing the likelihood of whether individual consumers would have purchased generic drugs over brand once the generics are available." *Id*. at *109-10, *152. That is not the purpose for which Prof. Conti used the IQVIA Xponent data set in this case.<br><br>The court also took note of the fact that the IQVIA Xponent data set contains "retail price data," and "retail prices are not the same thing as prices paid by the TPPs," but found it did not make the damages methodology unreliable at the class certification stage in an antitrust class action, because the magnitude of the "overcharge" was such that "using retail prices" would not make a price calculation based on the relative pricing difference before and after generic entry unreliable. *Id*. at *155. The analysis is different here because Prof. Conti is not using the IQVIA Xponent pricing data to calculate relative pricing differences, but rather as the specific measure of prices paid by TPPs at the point of sale. The court also approved the use of a different IQVIA data set, the IQVIA NSP data set (used by Dr. Stiroh but not by Prof. Conti) to calculate the ***relative*** pricing difference between the but-for price for each HIV drug at issue and actual prices. *Id*. at *195. Again, this is a relative comparison, rather than an improper use of the data set to determine specific prices paid. |
| *FTC v. Vyera Pharms., LLC*, No. 20cv706 (DLC), 2021 U.S. Dist. LEXIS 219493, at *5 (S.D.N.Y. Nov. 12, 2021) (finding that the | As described above, the FTC's damages expert analyzed the drug's "pricing and sales data ***from [Defendant's] records*** and data compiled by IQVIA" to show "the change in the average net price of Daraprim before and after Vyera's August 2015 acquisition, the rate of decrease in Daraprim's price upon generic entry into the market in March 2020, and |

2

| **Plaintiffs' Claim** | **Defendants' Response** |
|---|---|
| government's economist, who used IQVIA sales and pricing data "to opine on Vyera's market power and monopoly power" over drug prices, was sufficiently reliable to be presented before the jury) | changes in quantities of Daraprim sold over time[.]" *Id*. at *5. Thus, this was another instance in which IQVIA data were used in conjunction with the defendant's own pricing and sales data, not in isolation to determine the total price paid for a drug. |
| *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, MDL No. 2785, 2021 U.S. Dist. LEXIS 116919, at *53 (D. Kan. June 23, 2021) (both plaintiff's and defendant's experts used IQVIA retail sales data to calculate damages; defendant was Mylan, which is another manufacturer defendant here) | Plaintiffs' assertion that both experts in this case used IQVIA Xponent "retail sales data" is misleading. Plaintiffs' expert used IQVIA data to determine relative pricing differences between the actual and "but-for" worlds to calculate an average. *Id*. at *53. The defense expert used the same data in order to rebut the plaintiffs' expert. In addition, the defense expert compared the IQVIA Xponent data to actual transactions for the named plaintiffs to show that the conclusions drawn by plaintiffs' expert from the IQVIA Xponent data were flawed. |
| *UCB, Inc. v. Teva Pharms. USA, Inc.*, No. 1:12-CV-4420-CAP, 2015 U.S. Dist. LEXIS 189386, at *23 (N.D. Ga. Mar. 18, 2015) (holding that the IQVIA retail sales and pricing data used in the expert's analysis "is considered reliable and accurate and commonly used") | Plaintiffs' description of this decision is misleading. In this patent infringement action, the expert used an unspecified data set from IMS Health (the predecessor to IQVIA), to estimate the **quantity of capsules** of the brand-name drug that the patent holder would have sold during the at-issue time period if the generic defendant had not entered the market, and "also used internal data as part of his analysis." *Id*. at *23. The measure of damages and the methodology employed to calculate damages are thus completely distinct from Prof. Conti's methodology here, which used IQVIA Xponent data to tally the specific amount supposedly paid by TPPs at the point of sale. |
| *In re Actiq Sales & Mktg. Practices Litig.*, No. 07-4492, 2014 U.S. Dist. LEXIS 98441, at *38 (E.D. Pa. July 21, 2014) (recognizing IQVIA | Plaintiffs' assertion that the court found that IQVIA's retail sales and pricing data are "gold standard for purposes of calculating damages on behalf of TPPs" is misleading. This case involved claims arising out of the alleged off-label marketing of a prescription drug, and sought a profit-disgorgement remedy, which required a showing of the defendant's product- |

3

| Plaintiffs' Claim | Defendants' Response |
|---|---|
| (formerly referred to as IMS) retail sales and pricing data as "gold standard for purposes of calculating damages on behalf of TPPs") | level profits for the drug. *Id*. at *11. But the plaintiffs' expert **did not use the IQVIA Xponent data set** for calculating this distinct measure of damages. Instead, the expert used the IMS Health National Disease and Therapeutic Index ("NDTI") data set solely for the purpose of calculating the **percentage** of off-label prescriptions for the at-issue drug. *Id*. at *18. The court referred to the NDTI data set as the "gold standard" for the specific purpose for which it was used by plaintiff's expert, i.e., "for the estimation of the number of prescriptions linked to specific diagnoses in the United States." *Id*. at *11, *37-38. Prof. Conti did not use the NDTI data set at all, much less for this specific purpose.<br><br>The court also indicated that "other courts" had "recognized IMS data to be the 'gold standard' for purposes of calculating damages on behalf of TPPs." *Id*. at *38. But the three cited cases do not contain any such recognition.<br><br>The first case, *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 248 F.R.D. 363, 370 (D. Mass. 2008) (discussed further below), noted that plaintiffs "tout" the IMS National Prescription Audit ("NPA") database—which is different from the Xponent dataset—as the "gold standard." In addition, the court explained that plaintiffs' expert had "compared IMS [NPA] data to **actual** TPP reimbursement figures," which Prof. Conti failed to do here.<br><br>The second case, *In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 110 (D. Mass. 2007), *vacated by* 712 F.3d 60 (1st Cir. 2013), did not say that any data set was the "gold standard" for calculating TPP damages. The court merely noted, in vacating a decision denying class certification, that plaintiff's expert would rely on defendants' own "sales and promotional data," as well as "information from various other sources, including independent pharmaceutical data and consulting companies like IMS Health and Verispan" to establish proximate causation.<br><br>The third case, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 538 (E.D. Mich. 2003), similarly says nothing about IQVIA data being the "gold standard" for purposes of calculating TPP damages. Instead, the court noted for purposes of calculating attorneys' fees as part of final approval of an antitrust class settlement, that State Attorneys General spent $241,000 to obtain data from IMS Health, which the court referred to as a "recognized leader in data collection for the pharmaceutical industry." None of these statements supports |

4

| Plaintiffs' Claim | Defendants' Response |
|---|---|
| | Professor Conti's use of IQVIA Xponent data as a standalone data source to determine the specific amounts paid by TPPs for drug purchases. |
| *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. & Sales Practices Litig.)*, 748 F. Supp. 2d 34, 68 (D. Mass. 2010) (at trial, plaintiff's pharmaceutical expert testified about IMS (the predecessor of IQVIA) retail pricing data at trial, which court referred to as the "gold standard") | Plaintiffs' description of this ruling is misleading. In this RICO class action involving alleged off-label marketing of a prescription drug, plaintiffs' expert linked "national data on Pfizer's promotional spending with sales." What the court referred to as "gold standard national data" was "national data" on prescriptions of "Neurontin and other anti-epileptic drugs from IMS Health and Verispan." *Id*. Again, this case is not talking about using IQVIA data to calculate specific dollars spent. To the contrary, the expert who calculated damages used the real-world "total dollar amount that Kaiser spent on Neurontin," in contrast to Prof. Conti. *Id*. at 69. |
| *New Eng. Carpenters Health Benefits Fund v. First Databank, Inc.*, 248 F.R.D. 363, 371 (D. Mass. 2008) (finding that, after a "rigorous review," IQVIA predecessor IMS retail sales and pricing data is a "reasonable proxy for what TPPs paid at retail" during the class period) | This case involved a class alleging antitrust and RICO claims based on the defendants' alleged scheme to misstate the average wholesale price for drugs. The specific issue the court was considering was whether the TPP plaintiffs had mitigated their damages through renegotiation of their contracts with pharmacy benefit managers. *Id*. at 367. Plaintiffs' expert used the IMS NPA database to determine aggregate TPP damages, and asserted that any individual TPP's mitigation of damages "would be captured by the IMS data, and thus aggregated damages will not be overstated." *Id*. at 369. Importantly, plaintiffs' expert also "compared IMS [NPA] data to *actual* TPP reimbursement figures" and "found a close relationship between the IMS data and the TPP data," precisely the kind of benchmarking analysis Mr. Gibson performed in this case but Prof. Conti did not. *Id*. at 370. In light of this, the court found that the IMS NPA data were a "reasonable proxy of what TPPs paid at retail." *Id.* at 371 (citation omitted). Moreover, the court explained that, in the context of RICO and antitrust claims, "damages need not be demonstrated with precision." That is not the case in the instant suit involving state-law warranty and fraud-based claims. In short, the case does not endorse the reliability of the pricing data in the IQVIA Xponent data set, nor approve its use as an absolute indicator of TPP expenditures. |

5

| **Plaintiffs' Claim** | **Defendants' Response** |
|---|---|
| *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 389 & n.29 (D.R.I. 2019) (noting, in certifying class and accepting plaintiff's expert's use of IQVIA data to estimate price impact of alleged conduct on drug products, that "IQVIA is a data vendor for pharmaceutical products, and its data is 'considered the industry standard source of pharmaceutical data used by researchers and academics.' French Reply Report ¶ 23.") | Plaintiffs mischaracterize this ruling. This is another antitrust class action in which an expert used a different IQVIA data set to perform ***relative comparisons of volume and market share***, not to calculate the total amount paid for the at-issue drug.<br><br>Specifically, at the class certification stage in this antitrust class action, plaintiffs' expert used IQVIA's NPA data set and "Insights" data to evaluate the ***relative*** impact on market share and prices following generic market entry. *Id.* at 389-90. The footnote cited by Plaintiffs quotes, but does not endorse, the expert's own characterization of IQVIA as "the industry standard source of pharmaceutical data used by researchers and academics." *Id.* at 389 n.29. |