1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

1

2 ─────────────────────────

3  IN RE:  VALSARTAN, LOSARTAN,        CIVIL ACTION NUMBER:

4  and IRBESARTAN PRODUCTS             1:19-md-02875-RMB-SAK

5  LIABILITY LITIGATION                Rule 702 Hearing

6 ─────────────────────────

7  Mitchell H. Cohen Building & U.S. Courthouse
   4th and Cooper Streets
8  Camden, New Jersey 08101
   Wednesday, September 18, 2024
9  Commencing at 1:39 p.m.

10  B E F O R E:          THE HONORABLE RENÉE MARIE BUMB,
                          CHIEF UNITED STATES DISTRICT JUDGE

11

12  A P P E A R A N C E S:

13  HONIK LLC
    BY:  DAVID J. STANOCH, ESQUIRE
14  1515 Market Street, Suite 1100
    Philadelphia, Pennsylvania 19102
15  Co-Lead Counsel for MDL Plaintiffs

16  MAZIE SLATER KATZ & FREEMAN, LLC
    BY:  ADAM M. SLATER, ESQUIRE
17       CHRISTOPHER J. GEDDIS, ESQUIRE
    103 Eisenhower Parkway, Suite 207
18  Roseland, New Jersey 07068
    Co-Lead Counsel for MDL Plaintiffs

19

    MARTIN, HARDING & MAZZOTTI, LLP
20  BY:  ROSEMARIE RIDDELL BOGDAN, ESQUIRE
    1 Wall Street
21  Albany, New York 12205
    Counsel for Plaintiffs' Steering Committee

22

            John J. Kurz, Official Court Reporter
23             John_Kurz@njd.uscourts.gov
                   (856)576-7094

24

      Proceedings recorded by mechanical stenography; transcript
25          produced by computer-aided transcription.

**A P P E A R A N C E S:** (Continued)

NIGH GOLDENBERG RASO & VAUGHN, PLLC
BY:  C. BRETT VAUGHN, ESQUIRE
     DANIEL A. NIGH, ESQUIRE
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Co-Lead Class Counsel for Third-Party Payor Economic Loss

PRETI FLAHERTY BELIVEAU & PACHIOS, CHARTERED LLP
BY:  ELIZABETH FLETCHER QUINBY, ESQUIRE
One City Center, PO Box 9546
Portland, Maine 04112
Co-Lead Class Counsel for Third-Party Payor Economic Loss

SLACK & DAVIS LLP
BY:  JOHN RANDOLPH DAVIS, ESQUIRE
6001 Bold Ruler Way, Suite 100
Austin, TX 78746
Counsel for Plaintiffs

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY:  JESSICA DAVIDSON, ESQUIRE
     ALLISON M. BROWN, ESQUIRE
One Manhattan West, Suites 42-128
New York, New York 10001
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
Solco Healthcare U.S., LLC (collectively ZHP)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY:  NINA R. ROSE, ESQUIRE
1440 New York Avenue, N.W.
Washington, D.C. 20005
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
Solco Healthcare U.S., LLC (collectively ZHP)

KIRKLAND & ELLIS LLP
BY:  DEVORA W. ALLON, P.C.
     ALEXIA R. BRANCATO, ESQUIRE
601 Lexington Avenue
New York, New York 10022
Counsel for Defendants Torrent Pharma, Inc. and
Torrent Pharmaceuticals Ltd. (collectively Torrent)

(Appearances continued onto next page)

1    **A P P E A R A N C E S:** (Continued)

2    PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
     BY:  CLEM C. TRISCHLER, ESQUIRE
3         FRANK STOY, ESQUIRE
     One Oxford Centre, 38th Floor
4    Pittsburgh, Pennsylvania 15219
     Counsel for Defendant Mylan Pharmaceuticals, Inc.
5
     GREENBERG TRAURIG LLP
6    BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
     3333 Piedmont Road, NE, Suite 2500
7    Atlanta, Georgia 30305
     Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
8    Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
     Inc. (collectively Teva)
9
     GREENBERG TRAURIG LLP
10   BY:  GREGORY E. OSTFELD, ESQUIRE
     77 West Wacker Drive, Suite 3100
11   Chicago, Illinois 60601
     Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
12   Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
     Inc. (collectively Teva)
13
     WALSH PIZZI O'REILLY FALANGA LLP
14   BY:  LIZA M. WALSH, ESQUIRE
     Three Gateway Center, 100 Mulberry Street, 15th Floor
15   Newark, New Jersey 07102
     Counsel for Defendant Teva
16
     ARCHER & GREINER, P.C.
17   BY:  MAUREEN THERESA COGHLAN, ESQUIRE
     1025 Laurel Oak Road
18   Voorhees, NJ 08043
     Counsel for the Mylan defendants
19
     CROWELL & MORING LLP
20   BY:  ANDREW KAPLAN, ESQUIRE
     1001 Pennsylvania Avenue, NW
21   Washington, DC 20004
     Counsel for Defendant Cardinal Health
22
     BARNES & THORNBURG, LLP
23   BY:  KARA KAPKE, ESQUIRE
     11 South Meridian Street
24   Indianapolis, IN 46204
     Counsel for Retailer Defendants and CVS Pharmacy, Inc., and
25   Walmart, Walgreens

4

```
1    A P P E A R A N C E S:  (Continued)

2    FALKENBERG IVES LLP
     BY:  KIRSTIN B. IVES, ESQUIRE
3    230 W Monroe Street, Suite 2220
     Chicago, Illinois 60606
4    Counsel for Defendant Humana

5    NORTON ROSE FULBRIGHT US LLP
     BY:  D'LESLI DAVIS, ESQUIRE
6    2200 Ross Avenue
     Suite 3600
7    Dallas, Texas 75201
     Counsel for Defendant Mckesson Corp.

8

9    Also present:

10   Arthur Roney, The Courtroom Deputy

11   Loretta Smith, Esquire, Judicial Law Clerk to the Honorable
     Robert B. Kugler (Ret.)
12
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
13   BY:  ALEXANDER KASPARIE, ESQUIRE
     320 S. Canal St., 47th Floor
14   Chicago, IL 60606-5707
     Counsel for ZHP
15

16

17

18

19

20

21

22

23

24

25
```

1                            **INDEX**

2    **WITNESSES:**                                        **PAGE**

3    **FOR THE DEFENDANT:**

4    ALI AFNAN, Ph.D.

5       Direct Examination By Ms. Brown                    8

6       Cross-Examination By Mr. Slater                   63

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS held in open court before the Honorable

2    Renée Marie Bumb, Chief United States District Judge, at

3    1:39 p.m. as follows:)

4          THE COURTROOM DEPUTY:  All rise.

5          THE COURT:  Okay.  Afternoon.

6          MR. SLATER:  Afternoon, Your Honor.

7          MS. BROWN:  Afternoon, Your Honor.

8          THE COURT:  You can all have a seat.  Thank you.

9          Okay.  Are the witnesses ready?

10          MS. BROWN:  Yes, Your Honor.

11          THE COURT:  Okay.

12          MS. BROWN:  We have today Dr. Ali Afnan for ZHP's

13    cGMP witness.

14          THE COURT:  Okay.

15          MS. BROWN:  Dr. Afnan, should he come up, Your Honor?

16          THE COURT:  Yes.  Come forward, please.  Thank you.

17          Are there any additional appearances I need to have

18    on the record that weren't put on the record yesterday?  I

19    think you're all the same.

20          MS. BROWN:  Not for us, Your Honor.

21          THE COURT:  Yeah.  Okay.  Come forward.

22          MR. SLATER:  Just my associate, Chris Geddis, is up

23    here today.  He wasn't here yesterday at the front.

24          MR. GEDDIS:  Christopher Geddis, yes.  Thank you.

25          THE COURT:  Okay.

```
1               (Witness took the stand.)

2               THE COURTROOM DEPUTY:  Good afternoon, Doctor.  If

3     you could please place your left hand on the Bible; raise your

4     right hand.

5               Do you solemnly swear the testimony you're about to

6     give in the case now before this Court will be the truth, the

7     whole truth, and nothing but the truth, so help you God?

8               THE WITNESS:  I do.

9               THE COURTROOM DEPUTY:  Can you please state and spell

10    your full name for the record.

11              THE WITNESS:  Ali Mohammad Afnan.

12              THE COURTROOM DEPUTY:  Can you please spell it.

13              THE WITNESS:  A-L-I, M-O-H-A-M-M-A-D, A-F-N-A-N.

14              THE COURTROOM DEPUTY:  Thank you.

15              THE COURT:  Welcome.  Have a seat.

16              THE WITNESS:  Thank you.

17              THE COURT:  Make yourself comfortable.  If you could

18    be careful with the chair.  There's water there if you want it.

19              THE WITNESS:  Thank you.

20              THE COURT:  And you can bring the microphone closer

21    to you.

22              THE WITNESS:  Yes.

23              THE COURT:  And keep your voice up.  I am hard of

24    hearing, so if you can keep your voice up, I would appreciate

25    it.
```

*Afnan – Direct – Brown*                                    8

```
 1              THE WITNESS:  Does this help, Your Honor?

 2              THE COURT:  Oh, good.  Okay.

 3              You may proceed.

 4              MS. BROWN:  Thank you, Your Honor.

 5              Good afternoon.  Alli Brown for ZHP.  And I apologize

 6    to the Court and counsel, we do have copies of this

 7    presentation, and our colleague who is bringing them is stuck

 8    in traffic and should be here any moment.  So as soon as she

 9    walks in, I will hand them to both.  But with the Court's

10    permission, we'll just get started.

11              THE COURT:  Okay.

12              MS. BROWN:  All right.  Thank you.

13         ALI AFNAN, Ph.D., called as a witness for the Defendant,

14    having been first duly sworn by the Deputy, was examined and

15    testified as follows:

16                        DEFENDANT'S EVIDENCE

17                        DIRECT EXAMINATION

18    BY MS. BROWN:

19    Q.   Good afternoon, Dr. Afnan.  How are you?

20    A.   Good afternoon.  Thank you.

21    Q.   Would you introduce yourself to the Court, please.

22    A.   Yes.  My name is Ali Afnan.  I am the regulatory expert

23    assigned to this project by Skadden.

24    Q.   All right.  Let's start by talking a little bit about your

25    education and experience, okay, Dr. Afnan?
```

*Afnan - Direct - Brown*                                                    9

```
 1   A.    Yes.

 2              So I studied chemistry in England, in University of

 3   Wales.  And after my Bachelor of Science in chemistry, I went

 4   to University of Manchester to do a Master's in Science and a

 5   Ph.D., also in chemistry and process control.

 6   Q.    Okay.  You said your Ph.D. is in chemistry and process

 7   control.  Explain to us, what is process control?

 8   A.    So process control is the methodology and the science of

 9   how to control -- how to manage a chemical reaction to ensure

10   that the materials that they are putting in are used up

11   appropriately and that the product -- the end product is

12   meeting specifications and is correct.

13   Q.    And when you say "product," do you mean a pharmaceutical

14   product like valsartan?

15   A.    Absolutely.

16   Q.    All right.

17              MS. BROWN:  Your Honor, I do have a copy.  Could I

18   approach?

19              THE COURT:  Yes.

20              MS. BROWN:  Okay.

21              THE COURT:  And one for the witness.

22              MS. BROWN:  Yes.  Thank you, Your Honor.

23              Dr. Afnan, here you go.

24              (Handing out documents.)

25              THE WITNESS:  Yes.  Thank you.
```

*Afnan - Direct - Brown*                                          10

```
 1    BY MS. BROWN:

 2    Q.    All right.  Let's talk a little bit about your experience.

 3    Tell us, do you have experience in the pharmaceutical industry?

 4    A.    Yes.  Collectively I have about 35 years of experience in

 5    the pharmaceutical industry.  I started in ICI Pharmaceuticals

 6    where we were -- or the company at that time was developing

 7    products for hypertension, oncology, and some inhalation

 8    product.  That firm or that organization became AstraZeneca,

 9    which is a better known name today in the U.S.

10           The work continued there, again, oncology,

11    cholesterol, that the portfolio of drugs expanded.  And then I

12    left to join the FDA.  And then I left the FDA to go into my

13    consulting business, which is Step Change Pharma.

14           (Court reporter clarification.)

15    BY MS. BROWN:

16    Q.    Let's talk a little bit, Dr. Afnan, about the work that

17    you did at the FDA.

18           What part of the FDA did you work in?

19    A.    So I was actually recruited by FDA to join their Center

20    for Drug Evaluation and Research.  The reason for joining was

21    effectively in 2002, FDA had an initiative which was called the

22    Drug Product Quality Initiative for 21st Century.  I was

23    recruited, brought over, and we moved over.  And the job was to

24    effectively look at the way FDA reviewed, inspected, and

25    enforced policies related to drug manufacturing.
```

Afnan - Direct - Brown                              11

```
 1              My job was to effectively look at the way FDA
 2    reviewed all applications in the Center for Devices, but as
 3    well as Center for Devices, some cross-sections into Center for
 4    Biologics Evaluation and Center for Veterinary Medicine and
 5    Office of Regulatory Affairs where the inspectors are.
 6    Q.   Dr. Afnan, we asked you to look at certain regulatory
 7    documents in this case; is that right?
 8    A.   Yes.
 9    Q.   Did you work with and look at those type of documents when
10    you worked at the FDA?
11    A.   Yes.  That was the bread and butter of FDA.  That is what
12    FDA does.
13    Q.   And in terms of the center of the FDA where you worked, is
14    that the center that has oversight for pharmaceutical medicines
15    like valsartan?
16    A.   Yes.  CDER manages all what we call small molecules, so
17    all the drugs like valsartan, as well as some proteins, not
18    vaccines effectively, but, yes.
19    Q.   Okay.  I don't want to spend too much time on it or
20    embarrass you, but you did receive a number of awards for your
21    work at the FDA; is that right?
22    A.   Yes.
23    Q.   And maybe just tell us about one or two that have the most
24    significance to you.
25    A.   So I'm really honored to have received the commissioner's
```

*Afnan – Direct – Brown*                                    12

1  special citation for both inter and intra-center activities.

2  So I worked across multiple centers of FDA.  And then the other

3  one is the IPS medal is given to one person a year, and it's

4  for recognition of their contribution to the pharmaceutical

5  industry.

6  Q.   And you received that in 2012?

7  A.   I received that, yes.

8  Q.   When you say the commissioner's award, is that the

9  commissioner of the FDA?

10 A.   Yes.

11 Q.   What about publications?  Do you have -- as it relates to

12 what we asked you to do in this case, do you have any relevant

13 publications?

14 A.   So when in industry, I published some documents which

15 were, you know, I have more than 30 documents, 30 publications.

16 If you look at my list of presentations, public presentations,

17 it would be hundreds probably.

18        In Pharma Manufacturing, I had a monthly article that

19 I would write, and it was all about FDA oversight, FDA

20 enforcement, and industry's response to those in Pharma

21 Manufacturing.  And ever since then, I have been an editor of

22 the Contract Pharma Magazine, which looks at contract

23 manufacturers.

24 Q.   When did you leave the FDA, Dr. Afnan?

25 A.   March 2010.

1    Q.    And you mentioned you've been doing some consulting work

2    since that time; is that right?

3    A.    Yes.

4    Q.    And just describe to us briefly what you've been doing

5    since 2010 in your consulting world.

6    A.    So in my consulting world, I have been looking at or

7    working with pharma, looking at developing manufacturing

8    processes, but mostly regulatory.  You know, how do you --

9    particularly if there is a novel method of manufacture, how do

10   you document that and present to FDA for approval.  I have also

11   been working with firms who get into trouble with FDA with 483s

12   and warning letters, and effectively looking at --

13             THE COURT:  In trouble with FDA with what?  Oh,

14   warning letters.

15             THE WITNESS:  Warning letters, yes.  They get into

16   trouble for whatever reason.  So it's compliance and process

17   improvement and registration with FDA.

18   BY MS. BROWN:

19   Q.    All right.  Let's talk, Dr. Afnan, about what we asked you

20   to do in this case.

21             Would you describe to the Court what your assignment

22   was as it relates to your expert role here?

23   A.    I was asked to effectively respond and opine to plaintiff

24   experts Dr. Najafi, Dr. Plunkett, Dr. Hecht, and Ms. Bain.

25   Q.    All right.  And as it relates to your opinion and response

1    to the plaintiffs' experts, did we work together to put

2    together sort of a summary of those opinions?

3    A.    Yes.

4    Q.    All right.  Explain to us, at a high level, what is your

5    key opinion in this case?

6    A.    So the plaintiff experts opined that ZHP violated the

7    cGMPs.  At high --

8    Q.    Can I stop you right there?

9    A.    Yes.

10   Q.    Because a lot of what you're going to talk about uses a

11   lot of letters for abbreviations, right?

12   A.    I apologize.

13   Q.    Okay.  So can you just -- what is a cGMP?

14   A.    So GMP stands for good manufacturing practice.

15   Q.    Uh-huh.

16   A.    And good manufacturing practice is about 47 pages.  It's

17   not that bad.  It's actually 47 pages in the published Code of

18   Federal Regulations.  The C stands for "current" good

19   manufacturing practice.  And so the plaintiff experts say --

20   and this is about, you know, effectively that if you were to

21   distill the GMPs into two sentences, it would be:  "Follow

22   written procedures and have written procedures."

23           So plaintiff experts opined that ZHP violated cGMPs.

24   In my review and analysis of their findings, their reports, and

25   analysis of the regulations and the regulatory record, I

1    disagree with them, because ZHP did conduct a risk assessment.

2    It was appropriate.  They did appropriate testing, the testing

3    that they have committed to FDA that they would do.  And

4    valsartan was not adulterated prior to 2018 warning letter.

5          And when they did find NDMA in their products, they

6    swiftly responded and reacted, informed the FDA into action.

7          (Court reporter clarification.)

8    BY MS. BROWN:

9    Q.   Dr. Afnan, have you had the opportunity to review some of

10   the motions that have been filed by the plaintiffs' counsel

11   regarding your proposed testimony?

12   A.   Yes.  In March of -- in March there was a motion to

13   exclude those statements, paragraphs of mine, that are

14   potentially legal definitions, right.

15   Q.   What was your understanding about -- we have it on the

16   slide -- this sort of first motion to exclude, what was your

17   understanding of the result there?

18   A.   So the result was that the Court effectively agreed with

19   five paragraphs to be excluded.

20   Q.   Okay.  And your report is approximately how many

21   paragraphs?

22   A.   It's 212.  It's over 200.

23   Q.   All right.  Did you come to learn about a second motion

24   that plaintiffs filed regarding your proposed testimony?

25   A.   Yes.

```
 1    Q.   And what do you understand to be the subject of that

 2    motion?

 3    A.   So I understand that the motion is that all of my

 4    testimony should be excluded because it relies on Dr. Xue.

 5    Q.   Who is Dr. Xue?

 6    A.   Dr. Xue is a synthetic organic chemist who is a university

 7    professor at University of Maryland, native Chinese speaking,

 8    and he was also the defense expert as an organic chemist.

 9    Q.   Okay.  Do you understand Dr. Xue to have written a report,

10    an expert report in this case?

11    A.   Yes.

12    Q.   Did you review it?

13    A.   I looked at it the night before I submitted my report.

14    Q.   Okay.

15    A.   That's when I received it.

16    Q.   Was that the first time you received Dr. Xue's report?

17    A.   Yes.

18    Q.   Okay.  Had you already formed your opinions by the time

19    you received Dr. Xue's report?

20    A.   Yes.

21    Q.   Did you cite Dr. Xue's report in your own expert report?

22    A.   Yes.  I had developed my own opinion about -- all my

23    opinions in the 212 statements were there.  When I read his

24    report that evening, it was a case of, wow, he has the same

25    understanding and the same opinion on a certain issue, and so I
```

*Afnan - Direct - Brown*                                          17

```
 1    referenced to him in two paragraphs.

 2    Q.   Okay.  Do your opinions in this case rely or depend

 3    exclusively on anything Dr. Xue said in his report?

 4    A.   No.  I had no interaction with Dr. Xue, and everything in

 5    my report is my work.

 6    Q.   Okay.  If you did not rely on Dr. Xue, then, Dr. Afnan, I

 7    want to talk a little bit now about what you did do and what

 8    you did rely on, okay?

 9              THE COURT:  Could you just tell me what you said in

10    your report?  Did you use the word -- what is the basis of the

11    motion?

12              Can I see the report?

13              MS. BROWN:  Yes, Your Honor.  We have a copy right

14    here.

15              May I approach?

16              THE COURT:  Yes.

17              Can you direct me to where it's at?

18              MS. BROWN:  Yes.  There are two paragraphs -- the

19    paragraphs that cited Dr. Xue, Your Honor?  Is that what you're

20    asking?

21              THE COURT:  Yep.  Yes.

22              MS. BROWN:  Yes.  We'll grab them right now.

23              I believe it's one...

24              (Counsel conferring.)

25              MS. BROWN:  It's 141, Your Honor.  And --
```

*Afnan - Direct - Brown*                                    18

```
1              THE COURT:  Can I keep this?

2              MS. BROWN:  Yes.  And 190.

3              THE COURT:  Okay.  Just give me one second.

4              MS. BROWN:  Of course.

5              (Pause.)

6              THE COURT:  Okay.  All right.  Thank you.

7              MS. BROWN:  Sure.  May I proceed?

8              THE COURT:  Yes.

9    BY MS. BROWN:

10   Q.   And as the Court pointed out, Dr. Afnan, there are two

11   places in your expert report, paragraphs 141 and 190, where you

12   cite Dr. Xue.

13   A.   Yes.

14   Q.   Correct?

15          All right.  And I want to talk about what you are

16   relying on, if not Dr. Xue, for the bases of your opinions,

17   okay?

18   A.   Sure.

19   Q.   Tell us a little bit about your methodology, how you

20   approached your assignment and what you looked at and are

21   relying on here.

22   A.   So my assignment -- upon getting my assignment, I received

23   the plaintiff experts' reports.  I also received their

24   testimonies as well as ZHP's employees' depositions,

25   testimonies.  I reviewed the plaintiff experts' reports,
```

1    analyzed them, then looked at the regulatory requirements,

2    which I was familiar with, but it was a case of let's go back

3    to the written record, the regulatory record, compare the two

4    together, and effectively developed my understanding based on

5    what the regulation and the requirements as stipulated by FDA

6    are and what ZHP had done and what the plaintiff experts were

7    saying.  So it was analyze what was stated by the plaintiff

8    experts, analyze what is in the regulation, and look at what

9    had taken place.

10   Q.   And when you say "what had taken place," did you look at

11   the regulatory record as it relates to submissions ZHP and some

12   of the other manufacturers submitted to the FDA?

13   A.   Yes.  And included in that were the inspections and also

14   the inspection records.

15   Q.   Okay.  And did you also consider deposition testimony that

16   was relevant to the issue you were analyzing?

17   A.   Yes.

18   Q.   Okay.  Let's talk about some of your findings based on the

19   regulatory record, because I want to explore with you briefly

20   what support you have for these findings, if not Dr. Xue, okay?

21   A.   Yes.

22   Q.   Help us understand what the regulatory records show when

23   you reviewed it in furtherance of your assignment.

24   A.   So the regulations require that when a firm is

25   manufacturing an active pharmaceutical ingredient, API, or we

Afnan – Direct – Brown                    20

```
1   call it alternate drug substance, the firm needs to consider
2   reasonable consideration to the potential of formation of
3   impurities.  But it's not a case of go and look at every
4   impurity which is formed.  The regulations allow a little
5   freedom in the sense of saying if you are not expecting
6   anything untoward, look for impurities, and effectively your
7   impurities should be below a certain limit.  If they're above,
8   you need to identify them.  So every product has known and
9   unknown impurities.
10          So what I found was that ZHP did --
11          THE COURT:  Wait.  Can you say that again, please?
12          THE WITNESS:  So there are -- the regulatory
13   requirements are that you should look at -- or the firm should
14   look at impurities in a drug substance.  But they're not
15   expecting the firm to look for all the unknowns or even things
16   they're not expecting.  The impurities that come and the
17   impurities that are there, Your Honor, they come at different
18   concentrations, and the regulations require that you can
19   actually not identify those below .1 percent concentration.
20   But the sum of all the unknowns cannot be greater than
21   2 percent.
22          And ZHP looked at this information and did the
23   evaluation, and their product was within those specifications
24   and requirements.
25          THE COURT:  Got it.
```

1              THE WITNESS:  Okay.

2              The second was that as ZHP did these changes to their

3      process, they documented it, and they submitted it to FDA for

4      FDA review.  In fact, no firm is allowed to ship product unless

5      it has approval for that product.  And the drug product

6      manufacturers, the finished-dose manufacturers, would not have

7      accepted the consignment of active ingredient from ZHP unless

8      it was approved by FDA.

9              So ZHP find all these changes with FDA which got its

10     review, was reviewed.  There were even a couple of times

11     interactions between FDA and ZHP, and then FDA inspected the

12     facility I think three times, which was full inspection, and

13     I'll come to what inspection is, what's full, what's

14     abbreviated.

15             ZHP then actually informed the drug product

16     manufacturers that I have done these changes and here is the

17     approval by FDA.  And that's -- the firms also audited ZHP.

18             One of the requirements of GMPs is that the drug, the

19     finished-dose manufacturers have a contract with the supplier

20     and that they audit them on a frequency of maybe once a year or

21     twice a year to see that the firm -- in this case ZHP -- is

22     still compliant with GMPs.

23             And over the years I think there were, I don't know,

24     there were 50 clients, so that would be about minimum 25, 30

25     audits per year, in addition to FDA inspections.

```
 1              And then lastly, the regulatory record where the FDA
 2   statements, which effectively said industry didn't know about
 3   the formation of NDMAs or the method for detection of NDMAs.
 4   FDA didn't know about the formation of NDMAs or the detection
 5   of NDMAs.
 6   BY MS. BROWN:
 7   Q.   I want to follow up on a couple of things you said --
 8   A.   Yes.
 9   Q.   -- before we talk briefly about what the record shows on
10   each one of these points.
11   A.   Yeah.
12   Q.   One of the things you spoke a bit about there, Dr. Afnan,
13   are changes to the manufacturing process that ZHP put in place.
14   Do you recall that testimony?
15   A.   Yes.
16   Q.   Was it the case that ultimately those changes were found
17   to have been what led to the formation of NDMA and NDEA?
18   A.   Yes.  Once -- the answer is yes.
19              Once ZHP knew that NDMA was in its product, which was
20   in June of 2018, they quickly went back and looked at the
21   process and discovered where NDMA was produced.  And, yes, it
22   was due to those changes.
23   Q.   Okay.  And are those the very changes that the record
24   shows were submitted to the FDA in real time?
25   A.   Yes.  They were submitted -- they were -- they developed
```

1    those processes in-house.  They test it.  They then submit it

2    to the FDA and got approval from FDA.

3    Q.    Okay.  Thanks, Dr. Afnan.

4          I want to talk -- I want to quickly move through each

5    one of these so we can just understand your methodology and the

6    basis for these opinions.

7          So the first opinion you had listed was that ZHP was

8    required to and did evaluate expected risks.

9          First of all, is this opinion of yours based any way

10   on anything Dr. Xue said or wrote in his report?

11   A.    No.  I don't think even Dr. Xue would know about these

12   regulations.

13   Q.    Okay.  The Judge asked some questions about following up

14   on the concept of impurities in a medicine.  Do you recall

15   those questions?

16   A.    Yeah.

17   Q.    Do all medicines have impurities?

18   A.    Yes.

19   Q.    And are there regulations that govern those impurities?

20   A.    Yes.

21   Q.    Are there regulations that govern a manufacturer's

22   responsibility to evaluate whether there will be impurities and

23   what they are?

24   A.    So a chemical reaction will always have impurities.  So

25   the expectation is to -- to look for unknown impurities, but

*Afnan – Direct – Brown*                                          24

1    there is also an expectation to look if there is likely to be

2    any bad impurities.  But it's all based on C in the GMPs, the

3    current knowledge at the time.

4    Q.    Is there a guidance that applies to a manufacturer's cGMP

5    responsibilities as it relates to evaluating expected risks?

6    A.    Yes; another set of acronyms.

7    Q.    Okay.  Tell us what they are.

8    A.    There is ICH Q3A.

9          ICH is International Committee for Harmonisation.

10   It's a committee set up by FDA, European Medicine's Agency, so

11   FDA, Europeans and Japan.  And all the other regulatory

12   agencies worldwide also follow this.

13         This is set up, and industry is an observer at ICH.

14   So they have a say, they have an input.  So ICH has four

15   classes of guidances.  And one of them are all to do with

16   quality.  So Quality No. 3, that's when they issued it, is

17   ICH Q3.  There is an A, a B, a C.  And so A is for drug

18   substances, which is the subject of this case.

19         So Q3A very specifically says:  "The applicant should

20   summarize the actual and potential impurities most likely to

21   arise."  And then it says the discussion can be limited to the

22   impurities that might reasonably be expected based on the

23   knowledge of the chemical reaction and conditions involved.

24   Q.    And now how does that guidance inform your evaluation of

25   the opinions of plaintiffs' experts in the case?

1    A.    So ZHP actually did adhere to Q3A.  In fact, FDA requires

2    that firms be compliant to Q3A.  And, you know, finished-dose

3    manufacturers need to be compliant to Q3B as well as A.  A for

4    receipt of materials.  B for making their drug product.

5              So, yes, they did.  And if you look at what this

6    requires is to look to identify -- not identify, to actually

7    find impurities.  The ones which are above a certain limit need

8    to be identified.  And the ones which are below a certain limit

9    can be ignored, but the totality of the unknowns that are being

10   ignored cannot go above 2 percent.

11   Q.    Okay.  And is this another citation to the ICH guidance

12   regarding the percentages you were just discussing?

13   A.    Yes.

14   Q.    Okay.  And based on your review of the regulatory record,

15   did ZHP comply with this requirement of an identification of an

16   impurity above .1 percent?

17   A.    Yes.  They -- so there are known impurities in valsartan

18   which is effectively defined that you need to look for these.

19   You know, so if I decided to make valsartan API tomorrow, there

20   are certain impurities that I know I have to look for, okay.

21   So today actually I would have to look for nitrosamines as

22   well.

23              THE COURT:  And how do you know that?

24              THE WITNESS:  It's all listed, Your Honor, in a

25   monograph which is issued by United States Pharmacopeia, USP.

1    And that lists the test methods as well as the actual impurity,

2    the known impurities would be in USP.

3             THE COURT:  So at the time of this, nitrosamine was

4    not listed in the USP?

5             THE WITNESS:  No, no.

6             THE COURT:  It would be today is what you're saying?

7             THE WITNESS:  It actually still is not in the

8    monograph for valsartan.  So now what the USP says is you

9    should look for nitrosamines.  So both FDA and USP changed some

10   of their guidances upon the finding of nitrosamine in

11   valsartan.

12            THE COURT:  So it is listed in USP now?

13            THE WITNESS:  It is listed not in the monograph.

14   It's listed separately.

15            THE COURT:  Oh, okay.  I got it.  Okay.

16   BY MS. BROWN:

17   Q.   And just to follow up on that, Dr. Afnan, today does FDA

18   and USP recognize the need to look for nitrosamines?

19   A.   Oh, yes, very much.  In fact, at the beginning of this

20   month, FDA issued -- revised, not had issued, it revised its

21   guidance on nitrosamines which were issued in I think 2019

22   about what to look for, what the levels are, what you should do

23   with each batch, yes.

24   Q.   And prior to 2018, was there such a guidance?

25   A.   No.

1    Q.   Let's talk about number 2 on your list, FDA reviewed,

2    approved, and inspected ZHP's processes and facilities.

3            Let me ask you first:  Is there anything about this

4    opinion you have that is based on Dr. Xue?

5    A.   No.  This is entirely based on my nearly ten years

6    experience of FDA and about 20 more years in industry working

7    with firms and indirectly engaging FDA.

8    Q.   We spoke a little bit earlier about manufacturers like ZHP

9    submitting information to the FDA.  Do you remember that?

10   A.   Yes.

11   Q.   As it relates to the opinions about process changes that

12   you have, help us understand what information was provided to

13   the FDA and how that informs your opinion.

14   A.   Okay.  So when a firm, so an API manufacturer, a drug

15   substance manufacturer, you know, like ZHP --

16   Q.   And API is active pharmaceutical ingredient?

17   A.   Active pharmaceutical ingredient.

18   Q.   Okay.

19   A.   When an active pharmaceutical ingredient manufacturer,

20   particularly in the generic world, wants to sell a drug

21   substance, they prefer to document it in a Drug Master File, a

22   DMF.  They file the Drug Master File with FDA.  FDA receives

23   it, lists it, but doesn't do anything with it.  Then when the

24   firm tries to sell that drug substance to a drug product

25   manufacturer, a finished-dose manufacturer, they refer to it in

*Afnan - Direct - Brown*                                                28

1   their application ANDA or NDA, and then FDA reviews the DMF.

2   So this work, the entire process in 2010, was submitted to FDA

3   which said exactly how ZHP was going to manufacture.  So that

4   was approved.  So the DMF was approved.

5           Every change that is done to the process needs to be

6   submitted to FDA.  Even if there are no changes done annually,

7   there has to be a report to FDA that I have not made any

8   changes to my process.

9   Q.   And who at FDA, to your knowledge, would have been

10  reviewing these changes and these submissions?

11  A.   So the DMF would have been received by the group at FDA.

12  I personally know some of them.  They would have reviewed it,

13  and then every time a new drug product manufacturer, a

14  finished-dose manufacturer would submit it, the DMF would be

15  referenced by some of those reviewers.  In fact, in some of the

16  documents that we have, I know the people who are still in FDA.

17  I used to work with them.

18  Q.   Does FDA employ chemists and other scientists who review

19  these submissions?

20  A.   Yes.  Actually, to be in the review divisions and the

21  biggest office within Center for Drugs are reviewers.  The job

22  title of everyone is chemist.  And they are chemists, and they

23  are organic chemists.  In fact, Dr. Gottlieb, the commissioner

24  also when he put out the press release did say that our organic

25  chemist did look at this process and didn't identify it.  So,

```
 1    yes, they are.

 2    Q.    Did you review, as part of your expert work in this case,

 3    the relevant submission ZHP made to the FDA regarding the

 4    processes that ultimately were discovered to have led to the

 5    formation of NDMA and NDEA?

 6    A.    Yes.

 7    Q.    Okay.  And how does this inform your opinions here?

 8    A.    So as -- so looking at it, FDA -- ZHP did not hold

 9    anything back from FDA at any time.  Everything was

10    submitted -- everything was submitted with evidence, right.  So

11    it wasn't a case of I'm changing this process.  It was

12    submitted with we have done these studies and based on these

13    studies and based on these effectively controls, we are

14    bringing about a process change.

15              If -- may I take a minute to explain something?

16              THE COURT:  Please.

17              THE WITNESS:  So within a firm, according to the

18    cGMPs, you have to have a process called "change control."  And

19    change controls are reviewed every time investigators are on

20    site.

21              So here what we see is effectively the review

22    process.  So I submit a document, or ZHP submitted a document

23    to the reviewers at FDA who are all -- if you're a reviewer,

24    you're a Ph.D.  You're not a -- you don't have a degree, you

25    have a Ph.D.  They then get verified by investigators who come
```

*Afnan – Direct – Brown*                    30

 1  on site to make sure that what you're doing is correct.  And

 2  one of those oversight activities is to look at the change

 3  control procedure.  And a change control says you can't change

 4  anything unless it has been reviewed and effectively the change

 5  is controlled.

 6          So all of those submissions to the FDA would have

 7  resulted, because they can't change till the FDA says you can

 8  change, they would have resulted in a change control internally

 9  which would have been approved by quality before implemented.

10  BY MS. BROWN:

11  Q.   Okay.  Did the FDA inspect ZHP's facilities?

12  A.   Yes.

13          So FDA inspected Chuannan, which is where this active

14  ingredient was manufactured.  And on the screen you see PAI

15  and, you know, surveillance.  So PAI stands for pre-approval

16  inspection.  Pre-approval inspection is when you have submitted

17  a document which we saw on the previous screen to the FDA and

18  you say I would like to do these changes.  So FDA reviewers

19  would review this.  They will then request the investigators to

20  go and verify certain things.  And those certain things are the

21  analytical methodology, the quality system, and also the

22  specific changes which have been stated by the firm.  Those

23  changes will not have happened yet, but they would be ready,

24  ready to go.

25          So these are pre-approval inspections.  And

1    surveillance means I'm coming to see what you're doing.  So

2    these would have been week-long inspections.  And as you can

3    see, it says "no action indicated."  NAI is a classification by

4    FDA which says, I did not find any objectionable incident of

5    anything.  There is nothing.

6    Q.   Now -- and we do see by August of 2018 there is official

7    action indicated.  What was the cause of that?

8    A.   This was it says for-cause, which means FDA was there for

9    a specific purpose and reason, and that is post finding of

10   NDMA.

11          So ZHP identified -- you know, NDMA was identified.

12   ZHP informed the FDA.  FDA then came for an inspection.  This

13   is two months after they informed the FDA that we have NDMA.

14   Q.   Okay.  And did you also review inspections of a different

15   facility where finished doses were being made?

16   A.   Yes.  It's again exactly the same, and the official action

17   indicated, 2019.  Again, this is post NDMA finding.

18          By the way, voluntary action indicated means I have

19   some observations, but it's really voluntary whether you handle

20   it or not, however industry deals with it.

21   Q.   And based on your review of the record and the regulations

22   and your experience, what is the purpose of these inspections?

23   What is FDA doing when it comes into ZHP's facilities?

24   A.   So FDA, you know, surveillance inspections that was on the

25   screen, for example, FDA defines it's a system-based oversight.

Afnan - Direct - Brown                           32

1    So they expect a system to be in place at the pharma company to

2    assure quality.  And this system has six subsystems, and those

3    are effectively the quality, the QA organization, the quality

4    assurance organization; the facilities and equipment, how do

5    you clean it, how do you maintain it, how do you install it,

6    how do you remove it, so on and so forth; materials;

7    production, packaging and labeling, you know, how do you ship

8    it, who has control; and lab controls and testing.

9           And what FDA does in surveillance inspections is at

10   least four of those, two of which have to be -- two of the four

11   have to be quality and lab are inspected.

12          Most of these, in fact, I think most of the

13   inspections all six were hit.  All six were reviewed.

14          The purpose of these is to --

15          THE COURT:  How can you know that?

16          THE WITNESS:  So looking at the inspection report and

17   looking at --

18          THE COURT:  Is there a box they check off or

19   something?

20          THE WITNESS:  So what they do, the investigators have

21   a software on their computer which actually tells them look at

22   this, look at this, look at this.  And any observations it

23   automatically populates it to a Code of Federal Regulation

24   citation.

25          So if they don't like, for example, the way they have

1    investigated a complaint, when they say investigations, it

2    automatically populates that line.  And that's what you see,

3    Your Honor, in the warning letter, the bold lettering is coming

4    from there.

5    BY MS. BROWN:

6    Q.   So does that mean, Dr. Afnan --

7            MS. BROWN:  I'm sorry, Judge, did you have a

8    follow-up?

9    BY MS. BROWN:

10   Q.   Does that mean when you look at the documents from these

11   inspections, you can tell which of these categories they were

12   looking at?

13   A.   So when you look at it and, you know, the name of the

14   inspector is there, the duration is there.  The way FDA

15   inspections work is FDA says look at the procedure, look at the

16   facility, look at the actual room where an event takes place

17   and then look at the evidence.  The evidence is show me the

18   documents that is there.  And they're there.  I mean, the last

19   establishment inspection report is very detailed as to what

20   they looked at.

21           They don't -- they don't say, for example, I looked

22   at materials and, in fact, in the establishment inspection

23   report they say I looked at materials and I have no objections.

24   In the 483s, they don't say I have no objections.  And really,

25   the inspections are designed to make sure the firm, all firms,

Afnan – Direct – Brown                              34

1    any firm, their feet are held to the fire of you need to be

2    compliant with GMPs.

3    Q.    So when the FDA is inspecting, they're inspecting with

4    conformance with cGMP in mind?

5    A.    Yes.  And it's very easy -- I do this, I've been doing

6    this now for many years -- it's very easy to actually very

7    quickly, within the first two days, know which section -- which

8    one of those subsystems has a problem.  And the way you do this

9    is you ask for certain documents, one of which are

10   investigations, deviations, market complaints, out of

11   specifications, and immediately they will pull everything out.

12   Q.    Let's move quickly through the other two observations or

13   findings from the regulatory record.

14         Your list included that ZHP disclosed these processes

15   not just to the FDA but also to the finished-dose manufacturers

16   or the companies that took ZHP's API and made it into medicine

17   tablets.  What is that opinion based -- first of all, is that

18   based on Dr. Xue?

19   A.    No.  Again, I'm -- you know, I didn't look the evening I

20   received the report to see what his reliance list was.  And

21   anyway, it wouldn't have made sense to me because it would have

22   just been a page after page of numbers.  No, it's not.  No,

23   it's not based on that.

24   Q.    Did you review documents that support your opinion that

25   ZHP disclosed these process changes to finished-dose

1    manufacturers?

2    A.    Yes.  So there were change controls or change requests

3    which were sent to drug product manufacturers.  In addition to

4    that, because this was tied to a Drug Master File, they would

5    have had to inform them that there was a change to the Drug

6    Master File.  And if I look online at the Drug Master File and

7    I have no authority to dig into the master file, I would have

8    seen that there was a change to the process.  So, yes, it was

9    conveyed.

10   Q.    All right.  Do finished-dose manufacturers, and did you

11   see evidence of this in the regulatory record, do they inspect

12   and audit ZHP?

13   A.    Yes.  I mean, this was -- this is a -- this is a cGMP

14   requirement on the drug product manufacturers to audit their

15   suppliers.  So there would be hundreds.  You know, in eight

16   years, there would have been hundreds of audits performed by

17   the customers.

18   Q.    And did you review those generally in terms of their

19   findings?

20   A.    So they -- the statements are that there was no issue, no

21   finding.  I mean, if there was an issue and it was a serious

22   issue, the drug product manufacturers would have moved -- you

23   know, would have looked for an alternative source.  They

24   didn't.

25   Q.    Finally, Dr. Afnan, your opinion that ZHP complied with

*Afnan - Direct - Brown*                                          36

1    cGMP was supported by the FDA's statements; is that correct?

2    A.   Yes.

3    Q.   Is there anything about these FDA statements for which you

4    are relying on Dr. Xue?

5    A.   No.

6    Q.   Okay.  We have some of them that we called out in the next

7    couple of slides.

8          Tell us what these statements are and how they inform

9    your opinion.

10   A.   So FDA press releases or particularly these two issued by

11   the commissioner, this is not the, you know, this is not the

12   commissioner sitting in his office and deciding I'm going to do

13   a press release.  So these press releases, and I was part of

14   issuing a press release when Dr. Gottlieb was a deputy

15   commissioner, it's very rigorous, very detailed, and it truly

16   is from a broad spectrum of FDA offices and employees.  So it

17   goes through many iterations and reviews and making sure

18   everything is correct, so on and so forth.

19          These -- both of these effectively FDA says the

20   presence of NDMA was unexpected.  Neither industry nor FDA knew

21   about the formation of NDMAs or how to even detect them.

22          In fact, in one of the --

23          THE COURT:  That's how you interpret -- that's --

24          THE WITNESS:  Yes.

25          THE COURT:  That's what you're saying by unexpected,

Afnan - Direct - Brown                          37

1    right?

2                   THE WITNESS:  Yes.

3                   THE COURT:  Okay.

4                   THE WITNESS:  That's -- the highlighted text is

5    actually from the press release.

6                   THE COURT:  Okay.

7    BY MS. BROWN:

8    Q.   So this, we're looking at a press release from the FDA

9    from July of 2018 that says, "The presence of NDMA was

10   unexpected" and thought to be related to what we're talking

11   about, changes in the process, correct?

12   A.   Yes.

13   Q.   And we have another one here from just about a month

14   later; is that right?

15   A.   Correct.

16   Q.   And this one again says that "it was not indicated that

17   NDMA would occur," correct?

18   A.   Correct.

19   Q.   And this also talks about NDMA's properties making it

20   difficult to find, correct?

21   A.   Yes.

22   Q.   Okay.  We have another one here.  This, I guess, is more

23   from that August press release, correct?

24   A.   (Witness nodding.)

25   Q.   And it says:  "Before we undertook this analysis, neither

Afnan - Direct - Brown                                    38

1    regulators nor industry fully understood how NDMA could form

2    during this process."

3                How did that inform your opinions about whether or

4    not ZHP was complying with its current good manufacturing

5    practice's responsibilities?

6    A.    I -- I mean, that's in black and white.  This is the FDA

7    commissioner representing the FDA saying neither regulators nor

8    industry fully understood how NDMA could form during this

9    process.  They didn't know that.  The organic chemists at FDA

10   had reviewed the process.  The drug product manufacturers had

11   exposure to the process.  ZHP's scientists, chemists had looked

12   at this.  They didn't expect NDMA.

13   Q.    And this is more -- this is now several months later,

14   another release from January of 2019, and it reiterates some of

15   the same language; is that right, Dr. Afnan?

16   A.    Yes.  Yes.

17   Q.    Before we undertook this investigation, again, they say

18   neither regulators nor industry understood how this could

19   happen, correct?

20   A.    Correct.  They -- yes.

21   Q.    As far as --

22                THE COURT:  Can you just talk to me about -- so going

23   back to the beginning of your testimony, you were talking about

24   the industry practice, if I understood you correctly.  The

25   industry practice is that you test for what might be a

*Afnan – Direct – Brown*                                    39

1    reasonable risk.  I mean, you don't test for the unknown.  You

2    don't test for, you know, things you can make up in your mind

3    or whatever, but you test for what might be known.  That's an

4    industry standard?  Talk to me about that more.

5              THE WITNESS:  That's, yes, Your Honor, that's an

6    industry standard as well as an FDA standard.  So FDA says look

7    for potentially what's likely to form.  So that comes from

8    understanding your manufacturing process of what is likely to

9    happen.  And --

10             THE COURT:  And where is that?  Is it in the regs?

11   Where is that?

12             THE WITNESS:  So this is --

13             THE COURT:  Or is it just understood that that's in

14   the industry?

15             THE WITNESS:  No.

16             THE COURT:  Where is that?

17             THE WITNESS:  It --

18             THE COURT:  Because as I'm understanding it, the FDA

19   doesn't require, as I'm understanding it, manufacturers to go

20   looking for something that no one would expect.

21             THE WITNESS:  Correct.

22             It's in ICH Q3A and in ICH Q3B.  3A is for drug

23   substance.  It says, "actual and potential impurities most

24   likely to arise."

25             THE COURT:  Oh, "reasonably be expected."

*Afnan – Direct – Brown*                                    40

```
 1                    THE WITNESS:  Yeah.

 2                    THE COURT:  Okay.  That's the standard?

 3                    THE WITNESS:  Yes.

 4                    THE COURT:  Okay.

 5                    MS. BROWN:  And, Your Honor, I think you found it,

 6      it's slide 13.  We just went back to it if that's --

 7                    THE COURT:  Yeah.  I just found it.  Thank you.

 8                    MS. BROWN:  Okay.  Okay.  Great.  Sure.

 9                    THE COURT:  Okay.  Go ahead.

10                    MS. BROWN:  Okay.  Thank you, Your Honor.  I'll just

11      go back to where we were.

12      BY MS. BROWN:

13      Q.   And I guess just to follow up on what the Judge just

14      asked, when you evaluate these statements from the FDA that say

15      publically regulators, industry didn't know, how do you

16      evaluate that in context with the ICH obligations to test for

17      what is reasonably expected?

18      A.   Can you ask that again?

19      Q.   Bad question?  Yeah.

20      A.   Yeah.

21      Q.   I'll try again.

22      A.   It went around my head.

23      Q.   Yeah; no.  It was too wordy.

24                    I guess what I'm asking is just to follow up on what

25      the Judge was asking is sort of how were these statements from
```

1    the FDA, how does that fit into your opinion that ZHP was

2    complying with the ICH obligations?

3    A.    Thank you.

4              THE COURT:  May I ask a different question?

5              MS. BROWN:  Maybe better, please, Judge, yes.

6              THE COURT:  Who determines what is reasonably to be

7    expected?

8              THE WITNESS:  So who determines what's reasonably

9    expected is --

10             THE COURT:  To be expected.

11             THE WITNESS:  To be expected, it's a case of it comes

12   from the experience of the chemists who are developing the

13   process and what is the current understanding of the science at

14   the time when they're doing this.

15             You know, we have been through multiple different

16   types of drugs where post approval we come to realize that this

17   is not a good practice or it is a good practice.

18             So effectively there is a -- if I go back to Q3A and

19   look at that, this is a case of saying look at what is

20   "reasonably," and you say what is reasonable, and that goes

21   back to the knowledge and understanding of the chemistry.

22             So how that works in reality is that if you are

23   making a vaccine, for example, like the COVID vaccine, you will

24   not be, you know, you'll be a Ph.D. biochemist, but you will

25   not be looking at the valsartan process.  And if you're a

1    valsartan chemist, Ph.D. chemist, you wouldn't be looking at

2    the COVID vaccine because they are two different, very

3    different types of processes that have very different methods

4    of manufacturing.  So it goes based on, effectively,

5    experience.

6              The other way this gets addressed, the reasonable, is

7    the number of different people who get to review an application

8    or a process before it's even presented to the regulator.  So

9    to do, for example, this particular process, the change, there

10   was a nine-month study carried out at ZHP to see if we do this

11   change, what would happen.  So there was a nine-month study

12   done by a multitude of people reviewed by multitude of

13   chemists, and it's literally, you know, different people have

14   different opinions, different ways of looking at the problem,

15   and that's how you come to the point of saying should I be

16   looking at this unknown or not.

17             THE COURT:  But who is the final arbiter of what is

18   reasonably to be expected or what is reasonable to look for?

19   Is it those, you know, on the ground in the industry doing it,

20   or is it in consultation with the FDA, or is it just the FDA

21   and their chemist?  Who's the arbiter of that?

22             THE WITNESS:  It's both.  So industry would look and

23   would eventually come up with an answer which is then presented

24   to FDA.

25             Now, the way FDA would review this process is that

Afnan – Direct – Brown                                    43

```
 1   they would also, you know, again, when it goes to a reviewer,

 2   it's not only one reviewer who reviews.  So the reviewer would

 3   review that, and they have the option to go outside of FDA or

 4   outside of their immediate office.  You know, they could go to,

 5   for example, somebody else in Center for Biologics or even any

 6   university.  Or --

 7             THE COURT:  The FDA has that option?

 8             THE WITNESS:  Yes, the FDA has that option.

 9             And FDA also has access to the entire published

10   world, you know, they've got access to the libraries worldwide.

11   But FDA also can go back and ask questions from the industry

12   saying did you look at that, did you look at that, what is

13   this, what's that, what's the other?

14             THE COURT:  And once they're satisfied, is that it?

15             THE WITNESS:  They would approve.  But you have to

16   continuously look at, effectively, market complaints, what's

17   the response coming back from the market.  And those need to be

18   taken into consideration.  And they may result in changes based

19   on, you know, a patient goes and says I take this and my heart

20   palpitates and goes up.  That has to be addressed.

21             THE COURT:  Thank you.  Okay.

22             MS. BROWN:  Thank you, Your Honor.

23             THE COURT:  Sorry, Ms. Brown, go ahead.

24             MS. BROWN:  We're almost done.

25   BY MS. BROWN:
```

*Afnan – Direct – Brown*                                      44

1    Q.    Two more things I want to ask you about whether you

2    considered in forming your opinions.

3              Are you familiar with a warning letter ZHP received

4    after the discovery of nitrosamines in November of 2018?

5    A.    Yes.

6    Q.    Did this warning letter find cGMP violations?

7    A.    Yes.

8    Q.    Do you agree with the FDA's finding in November of 2018?

9    A.    Yes.

10   Q.    Okay.  How do you square this warning letter with your

11   opinion that prior to this time period ZHP was in compliance

12   with cGMP?

13   A.    So this warning letter was issued in November of 2018,

14   after ZHP had informed the FDA that there is nitrosamine in the

15   product.  It is after the product was recalled and, you know,

16   theoretically, there shouldn't have been any active

17   pharmaceutical ingredient in any market.  And this is a finding

18   of November 2018, after FDA had inspected them, issued

19   Form 483, effectively, inspection observations, had received a

20   response and had now issued this warning letter.  So it's the

21   moment -- it's an event in time.

22   Q.    In your opinion, based on your review of the record and

23   your experience, does this warning letter and these findings in

24   November of 2018, do they negate or change the FDA's findings

25   years earlier when they inspected for cGMP and when they

1    approved the DMF and when they had other correspondence with

2    ZHP?

3    A.    No, it does not negate.  The FDA has the option to do that

4    if FDA wanted to.  They would withdraw the approval.  FDA did

5    not.

6    Q.    Okay.  Are you familiar, Dr. Afnan, with plaintiffs'

7    experts' opinions in this case about a July 2017 email written

8    by a ZHP scientist, Dr. Jinsheng Lin?

9    A.    Yes.

10   Q.    And what is, based on your review of the record,

11   plaintiffs' experts' opinion about this email?

12   A.    So the expert opinion, the plaintiff expert opinion is

13   that this email identified in July 2017 presence of NDMA in

14   valsartan and informed the management.

15   Q.    Okay.  Based on your review of the totality of the record,

16   do you believe the record supports that opinion?

17   A.    No.

18   Q.    Why not?

19   A.    So this is a -- this is a difficult-to-read English

20   translation of a Chinese email.  So I don't read any Chinese.

21   The English is difficult to read.  And there are different --

22   there are different translations of this.

23         This email with an attachment is referring -- and

24   I've extensively looked at the attachment.  The attachment is a

25   patent, and this email is talking about the potential formation

*Afnan – Direct – Brown*                                    46

1    of a nitroso compound similar to Impurity K in a different

2    drug, irbesartan.

3              Now, if I may explain what Impurity K is.

4    Q.   Yes, please.

5    A.   Impurity K is one of the known impurities that valsartan

6    manufacturing needs to look for.  It's a nitroso compound.  And

7    they've known about it or we've known about it for many years

8    and therefore it's on the USP monograph.  So the nitroso

9    referred to in the email is similar to Impurity K, and it says

10   that it can form in production of irbesartan.

11   Q.   Okay.  Is there anything else you're relying on in

12   relation to evaluating plaintiffs' opinion that this email

13   shows that ZHP was aware of NDMA?

14   A.   No.  I actually spoke to Ms. Jucai Ge.

15   Q.   Who, as it relates to this email, who's Ms. Jucai Ge?

16   A.   She is the recipient.  She is the person to whom this

17   email was sent in Chinese.

18   Q.   Uh-huh.

19   A.   And I spoke to her, and I asked her whether this email

20   states that, you know, did it inform her that there is

21   nitrosamines present.  And she said, no, I've spoken to the

22   gentleman who wrote it as well, no, it doesn't.  And I read it,

23   and it doesn't.  And then I've read her sworn testimony where

24   she was asked if this relates to it, and the answer was no.

25   Q.   Okay.  When we started out, Doctor, we identified the two

1    paragraphs of your report that referenced Dr. Xue.  Do you

2    recall that?

3    A.   Yes.

4    Q.   And one of the paragraphs, paragraph 190, actually talks

5    about this email, correct?

6    A.   Yes.

7    Q.   And in this paragraph 190, you do refer to Dr. Xue's

8    report.

9    A.   Yes.

10   Q.   Is your opinion about whether or not plaintiffs' experts'

11   interpretation of this email is supported by the evidence or

12   not, is that opinion based on Dr. Xue?

13   A.   No.  And it cannot be because I spoke to Jucai Ge about

14   this email, and I could not have arranged to talk to her that

15   night and then change my report and so on and so forth.  So,

16   no, it doesn't.

17   Q.   Had you formed your opinions about this email prior to

18   reading Dr. Xue's report?

19   A.   Yes.  I had formed my opinion.  I saw his report, and I

20   thought, wow, he has -- he supports my opinion, and that's the

21   reference.

22   Q.   If you cannot rely on the testimony of Dr. Xue, a native

23   Chinese speaker, do you feel that you have sufficient evidence

24   in the record aside from Dr. Xue to support your opinions?

25   A.   Yes.

```
1              THE COURT:  Can you ask that question again?

2              MS. BROWN:  Sure.

3   BY MS. BROWN:

4   Q.   I want you to assume you can't rely on Dr. Xue's opinion

5   as a native Chinese speaker and as an organic chemist about

6   this email, okay.

7              Does that change or affect your ability to opine or

8   evaluate plaintiffs' experts' opinion about this email?

9   A.   No.  I have spoken to Jucai Ge who said, no, it's not

10  about that.

11  Q.   Okay.  And finally, Dr. Afnan, we started with a review of

12  your sort of overall key opinion, the plaintiffs' experts'

13  opinions that ZHP violated cGMP are not supported by the

14  regulatory record.

15             We are here today because plaintiffs have filed a

16  motion saying all of your opinions are based on Dr. Xue.

17             Is that the case?

18  A.   No.  None of my opinions are based on Dr. Xue.

19  Q.   All right.

20             MS. BROWN:  Thank you very much, Your Honor.  I have

21  no further questions.

22             THE COURT:  I have a question for you.

23             MS. BROWN:  Yes.

24             THE COURT:  Are you also seeking a ruling on the

25  paragraphs that Judge Kugler had precluded?
```

*Afnan – Direct – Brown*                    49

```
 1            MS. BROWN:  And, Your Honor --

 2            THE COURT:  Or has that already been ruled on or is

 3    that withdrawn, or tell me?

 4            MS. BROWN:  I understand, Your Honor, based on the

 5    motion in limine arguments and the Court's rulings that it

 6    perhaps has already been resolved.

 7            As I understand that motion, Judge Kugler had allowed

 8    plaintiffs' experts to say that these products were adulterated

 9    the entire time.

10            I understand what is not permitted is for anyone,

11    including Dr. Afnan, to say, as a matter of law, adulteration

12    cannot be applied retroactively, right?  That's a legal

13    opinion.  That is not excluded.

14            But what I understood, and please correct me if I'm

15    wrong, is that just as plaintiffs' experts can say it was

16    adulterated all along based on my regulatory opinion, Dr. Afnan

17    can similarly say it was not adulterated and there was no cGMP

18    violation in the past, prior to 2018.

19            THE COURT:  And that is -- I mean, I believe that

20    that's how it should be.  But I wasn't clear whether or not I

21    had given you a ruling on your motion to, I think, amend the

22    Order.

23            MS. BROWN:  We had not officially, Your Honor.  As I

24    read the July transcript --

25            THE COURT:  Okay.
```

1          MS. BROWN:  -- it was deferred to this hearing.  I

2    thought there were other statements that may have resolved it.

3    But that would be our view of the state of affairs as it

4    relates to that testimony.

5          THE COURT:  Well, so what are you saying to me?  You

6    need a ruling or you don't need a ruling?

7          MS. BROWN:  Well, yes, I think probably we should be

8    clear.  If the Court would confirm, as I understand it, that

9    plaintiffs' experts can say, based on a regulatory, not a legal

10   opinion, that they believe it was adulterated all along and

11   Dr. Afnan, pursuant to the Court's approval, could say, based

12   on a review of the regulatory record, it was not adulterated

13   until the FDA said it was in November of 2018, I think that

14   resolves the issue of the inconsistencies that was briefed that

15   led to this cross-motion.

16         MR. SLATER:  Your Honor, I don't think that resolves

17   it.  I think it's a quick way to try to get around the fact

18   that his opinion was barred, because what Dr. Afnan did was

19   very different from what the plaintiffs' experts did.  They're

20   not in the same -- they have different credentials.  They have

21   different qualifications and backgrounds.  They didn't take the

22   opinion, which if you boil it down as well, you can't say it

23   was adulterated retrospectively, which was a legal conclusion,

24   which was properly barred by the Court.

25         And I don't think that this argument can suddenly

1    cure that because that's what Dr. Afnan's opinion was.  He made
2    a legal conclusion that you can't say it was adulterated until
3    the FDA says it's adulterated.  And that was a legal conclusion
4    that was barred.  And it's also inconsistent with Your Honor's
5    ruling, which is that nobody can say that.  The jury will
6    decide from day one, based on the evidence and the opinions
7    they hear, whether it was adulterated, based on the facts and
8    the regulatory standard for what adulteration is.  That's where
9    we were when we walked in.  And nothing has happened in this
10   courtroom to change that.
11           And my sense is that what counsel has done -- I have
12   a whole cross on adulteration because I thought there was going
13   to be time spent on this to try to --
14           THE COURT:  Well, that's why I'm asking the question.
15           MR. SLATER:  Yeah.
16           THE COURT:  Because I understood the motion to be
17   that -- I hadn't -- I didn't think I had ruled on it -- that
18   Judge Kugler was -- you know, he employed one standard for the
19   plaintiffs and one standard for the defendants.  And so I may
20   have called it a goose/gander, which I like to call.  And I
21   don't recall that I had ruled on it, which is why I was asking
22   counsel.
23           MR. SLATER:  No.
24           THE COURT:  But when I read through the brief, it did
25   seem -- when I read through the defendants' brief, it did seem

1    that Dr. Afnan should not have been precluded in some of these

2    areas.  And so if you folks haven't worked it out, then we'll

3    just -- we'll plod through it.

4            MR. SLATER:  Yeah.  I mean, I assumed that he was

5    going to go through.  When there was no testimony, I thought

6    they were withdrawing that opinion from him so I wasn't going

7    to cross.  I was going to ask for a few minutes to move these

8    notes off the table.  But, I mean, I have --

9            THE COURT:  Well, I'm looking at the motion, there's

10   only, let's see, six -- let's see.

11           Well, I guess I'll start by saying I'm looking at

12   Judge Kugler's Order.  So it's one, two, three, four, five,

13   six -- six paragraphs I think that are at issue, at least.

14           MR. SLATER:  Right.

15           THE COURT:  I don't have the docket number of the

16   defendants' motion, but Judge Kugler's order was 2581.  Docket

17   2581.  And I thought that's what was being challenged.

18           MR. SLATER:  Your Honor actually clarified, and

19   counsel told us at one of the prior hearings when you started

20   to look at this and then declared we have a *Daubert* hearing

21   that they withdrew their motion as to three of the paragraphs.

22           THE COURT:  Okay.

23           MR. SLATER:  And they were only pursuing it as to two

24   of the paragraphs, which are 24 and 138.

25           THE COURT:  Yeah.

1        MR. SLATER:  Which are identical.  It's exactly the

2   same language.  It's just in two places.  And then there was

3   another paragraph which had been barred, which was an opinion

4   that the drugs continue to be therapeutically equivalent, which

5   I don't really understand what that -- the import of that is or

6   what that would mean at the present time.  I don't really

7   understand that.

8        THE COURT:  The relevance of it?

9        MR. SLATER:  I'm sorry?

10       THE COURT:  The relevance.

11       MR. SLATER:  Yeah.  I don't see any relevance to it.

12  I don't see how that fits the case.  They're not selling NDMA

13  tainted.  They're not even selling valsartan in the United

14  States anymore at ZHP.  So that shouldn't be in.

15       So if they want to try to put him up on adulteration,

16  his opinion has like five different parts to it, and I'm ready

17  to go through every single part of it and take it apart piece

18  by piece, because the legs are going to fall apart as I go.  So

19  I don't know if they really want to pursue this.  But I

20  certainly don't want to concede that just through a quick

21  argument he can suddenly give that opinion.

22       THE COURT:  Well, I don't know that you need to pick

23  it apart.  That sounds like you're attacking -- that sounds

24  like a weight of the evidence kind of --

25       MR. SLATER:  I mean from a methodology and the

1    standpoint of whether or not he can actually say the things

2    that he wants to say.  Because he relies on things like, for

3    example, Valisure, who filed a citizen petition, said, well, we

4    think that we found NDMA in Diovan.  And he relies on that for

5    the opinion to say, well, how can it be adulterated if Diovan

6    has it.  So there's a whole cross on that, including the fact

7    that he never investigated the reliability of those results.

8    No one ever did a *Daubert*.  No one deposed anybody.  The FDA

9    found very significant analytical violations to cGMPs in the

10   testing that was used for this.

11              And Diovan was tested by Health Canada, and it was

12   found not to have NDMA, as the FDA confirmed.  I mean, I can go

13   on and on.  That's just one of the bases.

14              THE COURT:  All right.

15              MS. BROWN:  May I be heard, Your Honor?

16              THE COURT:  Yes.

17              MS. BROWN:  Thank you.

18              So I think there's two separate issues here.  And

19   here's where I think it has been resolved.  No one, neither

20   side, can opine as to what adulteration means as a matter of

21   law, as a legal matter, right?  We understand that that's off

22   limits for their experts and our experts.

23              THE COURT:  True.

24              MS. BROWN:  What I believe is the goose/gander

25   argument is if, from a regulatory perspective, their experts

1    are going to be able to say I looked at the regulatory record,

2    my interpretation of the warning letter and the documents says

3    that this was adulterated during the entire time period, then

4    Dr. Afnan, who is actually the only expert who worked in CDER,

5    should be allowed to say absolutely not, I disagree.  Based on

6    my expert review of the regulatory record, not as a legal

7    matter, I believe they were not adulterated until the FDA made

8    that determination in November of 2018.

9         So the goose/gander issue is just not as a matter of

10   law, but as a matter of an interpretation of the regulatory

11   record, both sides' experts either have no opinion on this or

12   should be allowed to offer conflicting opinions.

13        MR. SLATER:  The problem being, the experts are not

14   the same.  Dr. Afnan is countering Dr. Najafi, who also is a

15   chemist and qualified as a chemist in this case, which

16   Dr. Afnan, as I'm going to get to, is not put forward as a

17   chemist.  And when I tried to ask questions in his deposition,

18   I was blocked and they said beyond the scope of his expertise.

19        And Dr. Plunkett also is a toxicologist.  They have

20   different backgrounds.  They have very different methodologies,

21   because they were reasoning, in addition to certain other

22   things, they used the statutory definition of adulteration,

23   which Judge Kugler said with Dr. Najafi in particular, he needs

24   to stay within that definition and talk about how that

25   definition is met or not.  That was a very important part.

```
 1              And the analysis of what they did is very different.
 2     They actually also used the FDA finding of adulteration whereas
 3     Dr. Afnan is saying, well, the FDA is -- you can't apply it as
 4     a legal matter.  And that is a legal conclusion.  So they're
 5     not -- the defense used the word "goose/gander," but it's not
 6     apples to apples.  It's very different.  And that's why Judge
 7     Kugler treated the experts differently, as they should have
 8     been.
 9              So if they want to pursue this, I'm ready to cross
10     Dr. Afnan on this if they really want to and lay it out, and
11     I'm fine doing it.
12              THE COURT:  Okay.
13              MR. SLATER:  I'm happy to do it.  I'm ready to go.  I
14     just thought they were -- I don't agree that somehow everyone
15     has to be treated the same because they're not the same.
16              MS. BROWN:  It seems like a --
17              THE COURT:  Well --
18              MS. BROWN:  I apologize, Your Honor.
19              THE COURT:  Go ahead.
20              MS. BROWN:  It just seems like a very easy issue,
21     Your Honor.  We are not talking about as a legal matter.  We
22     are talking about competing regulatory experts.
23              And counsel suggests somehow Dr. Afnan is not
24     qualified.  His experts never worked in CDER.  They don't have
25     the FDA experience.  They are --
```

1           THE COURT:  Well, I don't have a handle on who is

2    who.

3           MS. BROWN:  Understood.

4           THE COURT:  But if you have a regulatory witness who

5    is similarly situated as this witness and your witness can say

6    that they were adulterated, it seems to me that given his

7    expertise, which parallels your witness's expertise, he can say

8    the opposite if his basis says it.

9           MR. SLATER:  That's not the case.  I'm sorry, Judge.

10          THE COURT:  But you're telling me that your experts

11   are toxicologists and not regulatory experts.

12          MR. SLATER:  One is a toxicologist and a regulatory

13   expert, Dr. Plunkett.  One is a chemist and has regulatory

14   background, and cGMP background.  The matchup to Dr. Afnan was

15   our expert, Dr. Bain, who got eviscerated on *Daubert*.  And I

16   think that if I wanted to start making goose/gander arguments,

17   I would start doing that.  But I don't think that's a

18   legitimate argument.

19          THE COURT:  Who's the regulatory expert that is

20   similarly situated as this witness, your expert?

21          MR. SLATER:  It was Dr. Bain, who got cut back very

22   significantly.  That's the matchup with Dr. Afnan, because he

23   told us, he's here to give opinions on cGMPs.  That's what he

24   said his expertise was.  That's what he said he was put forward

25   for.  Now he wants to give the opinion, well, I worked at the

1    FDA so I can sweep aside an FDA finding and not grapple with it

2    and say, well, looking back, it's not legitimate to call it

3    "adulterated."  That's his opinion.  That's the sum and

4    substance of his opinion, which is a legal conclusion.

5           THE COURT:  Who are Najafi and Plunkett?  Are they

6    toxicologists?

7           MR. SLATER:  Najafi is the chemist and regulatory

8    expert, also has cGMP experience.  He actually runs a lab.

9    Dr. Plunkett is a toxicologist and a regulatory expert.

10          THE COURT:  I can -- I won't quarrel with your

11   argument with respect to Plunkett, but I would seem to have a

12   quarrel with Najafi.

13          MR. SLATER:  If he --

14          THE COURT:  Because I don't see a distinction between

15   that witness and this witness.

16          MR. SLATER:  In Judge Kugler's decision, what he said

17   was he's going to let Najafi say it, but he has to adhere --

18   and I'm paraphrasing -- to the language of the statute.

19          Dr. Afnan's opinion is not -- Doctor, right?

20          (Witness nodding.)

21          MR. SLATER:  Dr. Afnan's opinion is not grounded in

22   the definition of adulteration.  It's grounded in, well, you

23   can't call it adulterated retrospectively.  And that is

24   absolutely a legal conclusion which Your Honor has already

25   precluded on the MILs.  They're not -- even though counsel is

1    saying, well, they're similar so you should let them all do the

2    same thing, their methodologies were different, how they

3    approached it were different.  They're not the same.  Even if

4    they had exactly the same credentials, if they had a different

5    methodology, he's disagreeing with an FDA finding.  He has a

6    different uphill climb, and he's trying to do it by saying,

7    well, I just can tell you, you can't say it was adulterated

8    from day one.

9          He has no basis for that.  He has nothing he's

10   looking at other than that's just my opinion.  It is a legal

11   conclusion that Your Honor's already precluded any witness from

12   giving in this case on the MILs.  You said that you can't say

13   that a retrospective analysis can't be done and you can't say

14   in retrospect it was adulterated.  That's already been

15   precluded from anybody saying it.  So he's now trying to say

16   what Your Honor has already barred anybody from saying.

17         MS. BROWN:  That's not true at all, Your Honor.  This

18   is very -- what the Court has barred is somebody saying that

19   this adulteration finding cannot legally be applied

20   retroactively.  Nobody should be doing that.  It's a legal

21   opinion.  It is not coming into the case.  We understand that.

22         What counsel is proposing is taking multiple experts

23   and having them, under the guise of regulatory expertise, opine

24   on their expert view of the regulatory history, the regulatory

25   documents, the regulatory experience, if they have any, what

1    that means for when these drugs became adulterated.  That is a

2    regulatory opinion.  That is untethered to a legal opinion.  It

3    stands alone.  And if permitted to come in through Najafi and

4    Hecht and Laura Plunkett, none of whom ever worked and stepped

5    foot in the FDA, then certainly Dr. Afnan who has firsthand

6    experience --

7            THE COURT:  If the plaintiffs' witnesses are

8    testifying in their regulatory capacity and they, given their

9    regulatory expertise, opine that these drugs were adulterated

10   before the FDA declared them adulterated, this witness will be

11   permitted, given his expertise, to counter that.  That's my

12   ruling.

13           MS. BROWN:  Thank you, Your Honor.

14           MR. SLATER:  Will I have an opportunity to cross him

15   on this though as part of the hearing so Your Honor can hear

16   what the bases for his opinion are and see if they fall away?

17           THE COURT:  Are you challenging the bases of his

18   opinion?

19           MR. SLATER:  Oh, yes.

20           THE COURT:  Then go ahead.

21           MR. SLATER:  I think that his methodology, and I gave

22   you the example of relying on Valisure, I don't think that he

23   should be allowed to talk about Valisure.

24           THE COURT:  Then go ahead.  Go ahead.  That's a 702

25   issue.

```
 1              MR. SLATER:  Yes.

 2              THE COURT:  But generally speaking, I would permit

 3    it, assuming I find that it meets the 702 gatekeeping mission.

 4              So I won't go through the paragraphs that the

 5    defendants have asked me to reconsider that Judge Kugler

 6    precluded.  You understand the general parameters of my ruling.

 7              MS. BROWN:  I do.  Absolutely.  Thank you, Your

 8    Honor.

 9              THE COURT:  Okay.

10              MR. SLATER:  My only question before I cross him,

11    Your Honor, so I don't want to do it if you don't want me, I

12    assume he cannot say it wasn't adulterated because you can't

13    retrospectively say it was adulterated.  Because Your Honor

14    already ruled on that.  I assume he can't give that

15    information.

16              THE COURT:  As a matter of law, that's right.

17              MR. SLATER:  Okay.

18              THE COURT:  In his regulatory experience, he can.

19              MR. SLATER:  Okay.

20              MS. BROWN:  Thank you, Your Honor.

21              MR. SLATER:  And I'll question him on whether his

22    methodology is credible to give that opinion.

23              THE COURT:  Right.  Let's take a five-minute break.

24              MR. SLATER:  Thank you.

25              MS. BROWN:  Thanks.
```

```
1              THE COURTROOM DEPUTY:  All rise.

2              (Recess was taken from 2:58 p.m. until 3:07 p.m.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Please resume the stand, please.  Thank

5    you.

6              MR. SLATER:  Your Honor, if you don't mind I cross

7    from counsel table, is that acceptable to the Court?

8              THE COURT:  Yes.  Can you just keep your voice up?

9              MR. SLATER:  I will.

10             THE COURT:  I am hard of hearing.

11             Okay.  You can have a seat.  Thank you, all.

12             (Witness whispering to the Court.)

13             THE COURT:  Pardon me?

14             No worries.

15             MR. SLATER:  If I sound like I'm yelling, please give

16   me a --

17             THE COURT:  You sound like you're yelling.

18             (Laughter.)

19             THE COURT:  You're always yelling at me, Mr. Slater.

20             MS. BROWN:  All the time.

21             MR. SLATER:  Never.  Never.

22             (Laughter.)

23             THE COURT:  Okay.

24             Go ahead.

25             MR. SLATER:  Thank you.
```

*Afnan - Cross - Slater*                                      *63*

1                         CROSS-EXAMINATION

2    BY MR. SLATER:

3    Q.    Good afternoon, Dr. Afnan.

4    A.    Good afternoon.

5    Q.    I just want to see if we can agree on a couple basic

6    things.  In your report on page 4, paragraph 16, you said that

7    your role here was to respond to four of the plaintiff experts,

8    right?

9    A.    Yes.

10   Q.    Regarding ZHP's compliance with FDA requirements,

11   including cGMPs, in connection with the manufacture of the

12   valsartan API.  That was the scope of what you were retained

13   for in this case, correct?

14   A.    Yes.

15   Q.    One thing you did not do is you did not evaluate the

16   manufacture of the finished dose by ZHP at the -- I think it's

17   pronounced Xunqiao plant.  You did not look at that at all.  It

18   was not something you considered, correct?

19   A.    It was not in the scope of my assignment.

20   Q.    So you only looked at the manufacture of the API, correct?

21   A.    Correct.

22   Q.    Okay.  Now, I think you mentioned earlier that you are not

23   a synthetic organic chemist.

24   A.    Correct.

25   Q.    Dr. Xue is, correct?

Afnan - Cross - Slater                                    64

1   A.    Correct.

2   Q.    And you told me when we met previously that your role was

3   to look at the plaintiffs' GMP experts and assess only GMP

4   issues, correct?

5   A.    Can you refer me to that?  My role was --

6   Q.    Well, let me ask you the question now.

7         Am I correct that your role was to look at the

8   plaintiff GMP experts and assess GMP issues?  Can we agree with

9   that basic proposition, which I thought you agreed with a

10  moment ago?

11  A.    My role was to read the reports and respond to those

12  reports and specifically four of the experts.

13  Q.    Can you look at your deposition, page 170, line 23,

14  please?

15        MR. SLATER:  Your Honor, I handed a transcript up to

16  you --

17        THE COURT:  Yes.  Thank you.

18        MR. SLATER:  -- earlier.

19        THE WITNESS:  Page 170.

20        Page 170, line 23.

21        THE COURT:  Twenty-three.

22  BY MR. SLATER:

23  Q.    Line 23.  I just want to go right to your answer where you

24  said:  "My role, my remit, was to look at the plaintiff experts

25  and assess GMP -- GMP statements.  I was not here on this

Afnan - Cross - Slater                                    65

1   project to assess the chemistry.  For that, there was Professor

2   Xue."

3              That is correct, right?

4   A.    That is what I said there.  I was not to look at

5   chemistry, but I was to look at everything that had been

6   submitted by your experts, yes.

7   Q.    Okay.  I -- I'm surprised we're going to go back and forth

8   on this.

9   A.    Okay.

10  Q.    But I want to be very clear.  You said --

11             THE COURT:  I think you're saying the same thing.  He

12  responded to the experts' reports.

13             THE WITNESS:  Yeah.

14             THE COURT:  But with respect to the chemistry part of

15  it, he did not.

16             THE WITNESS:  Correct.

17  BY MR. SLATER:

18  Q.    And for the chemistry part, what you told me under oath in

19  the deposition was that for that, Dr. Xue addressed the

20  chemistry, correct?

21  A.    Correct.

22             THE WITNESS:  Thank you, Your Honor.

23  BY MR. SLATER:

24  Q.    And I want to go through a couple of examples, because

25  there were things that you talked about that I just want to

Afnan - Cross - Slater                          66

1   make sure we're on the same page and the Court understands how

2   you drew that line in drawing your opinions, okay?

3   A.    Okay.

4   Q.    For example, when I asked you during the deposition how

5   did the NDMA form, the chemical reactions that occurred, do you

6   recall that your counsel or the counsel that retained you

7   objected and said that was outside the scope of your opinions?

8   A.    I do not remember.

9   Q.    You --

10  A.    But if you say it did, then it did.

11  Q.    You'll agree with me that a simple question of how did the

12  NDMA form is beyond the scope of your opinions, as your counsel

13  said at the deposition?  You do agree with that, right?

14  A.    So as a chemist, that's beyond the scope.  As a regulatory

15  expert looking at exchanges with the Food and Drug

16  Administration, it is not beyond the scope.  So if I look at it

17  and say what was the cause of formation of NDMA, yes, it was a

18  process change.

19  Q.    Okay.  In terms of what actually led to the NDMA forming,

20  you understand you may know things outside of this courtroom,

21  but you were put forward as an expert for a specific purpose.

22  You agree from a chemistry perspective, you don't know how that

23  happened.  That's what you told me in the deposition, right?

24  A.    I do not know.  However, again, if I look at --

25  Q.    I'm sorry.

1    A.    Okay.

2              MR. SLATER:  I was just going to ask, Your Honor, if

3    I could get just a direct answer if I ask a direct question.

4              THE WITNESS:  Okay.

5              THE COURT:  I think we're quarreling over something

6    we don't need to quarrel.

7              He's explaining on what bases he's testifying.  He is

8    not a chemist, and he's not going to testify as to, you know,

9    how the chemicals formed NDMA.

10   BY MR. SLATER:

11   Q.    And I'll give another -- and I want to ask you another

12   question.  When I asked you if you evaluated the temperatures

13   reached in the zinc chloride process and their impact on the

14   dimethylformamide, the DMF, you said, "Again, my remit here was

15   not chemistry."

16             So, again, another aspect of the chemistry that was

17   significant to how this occurred, you said that's not what you

18   looked at.  And, again, that's what Dr. Xue covered, correct?

19   A.    Correct.

20             MS. BROWN:  And, Your Honor, if it's helpful, we're

21   not putting him up on the specific chemistry --

22             THE COURT:  Well, I think that's why I said we are

23   unnecessarily quarreling over something we don't need to

24   quarrel about.

25             MS. BROWN:  Thank you.

1          MR. SLATER:  And this will now go, I think, a little

2    bit more into -- it starts to transition us to the knowledge

3    issue, which I think is an important issue here that we did

4    hear some opinions on.

5          THE COURT:  Okay.  Hopefully.

6    BY MR. SLATER:

7    Q.   You have no opinion whether ZHP should have been aware of

8    the potential for dimethylamine to be an impurity of the DMF it

9    used in the zinc chloride process.  You have no opinion on that

10   question, right?

11   A.   I have regulatory opinion, not chemistry opinion.

12   Q.   Well, let's go to page 201, please.

13   A.   201.  Yes.

14   Q.   I asked you on page 201, line 15:  "Doctor, do you, yes or

15   no, have an opinion -- I just want to know if you have an

16   opinion.  I don't want to know what it is -- as to whether or

17   not ZHP should have been aware of the potential for

18   dimethylamine to be an impurity of the DMF it was using in the

19   zinc chloride process?  Yes or no?  Do you have an opinion?"

20          And if we flip to the next page, on page 202, line 3,

21   you said:  "I can't answer that.  I genuinely can't [sic]

22   answer that," correct?

23   A.   Yes; because I'm a regulatory --

24   Q.   Is that what your answer was, sir?

25   A.   Yes.  It's on the page.

Afnan - Cross - Slater                    69

```
 1    Q.    Okay.  And you would agree with me that the
 2    dimethylamine -- well, maybe you don't know.  The dimethylamine
 3    was an impurity and/or a degradation product of the DMF and
 4    that then combined with the nitrous acid during the quenching
 5    phase to cause the NDMA to form, do you know that now as you
 6    sit here or do you not even know that?
 7    A.    Now that I sit here, where it's all public domain, I have
 8    some awareness of it.  But I'm not here as an organic chemist.
 9    I'm here as a regulatory expert.
10    Q.    Now, you said that you didn't rely on Dr. Xue at all to
11    form any of the opinions, and you just happened to see his
12    report the night before you signed your report.  Is that -- did
13    I hear you correctly?
14    A.    (No response.)
15    Q.    Is that what you said on direct, that you wrote your
16    entire report, formed all of your opinions --
17    A.    Yes.
18    Q.    -- independent of ever knowing what Dr. Xue's opinion was?
19    A.    I --
20    Q.    And then the night before you wrote your report or signed
21    your report, I should say, you happened to see his report and
22    then that was it?
23    A.    That's what I have sworn to have done, sir.
24    Q.    Okay.  Just want to make sure I understand it.
25    A.    Okay.
```

1    Q.    Let's look at paragraph -- you have your report in front

2    of you, right?

3    A.    I do.

4    Q.    Let's look at paragraph 141, which is on page 55.

5    A.    Yeah.

6    Q.    Now, I'm not going to read the entire paragraph, but I'm

7    going to paraphrase it as I go.  And if I skip something or do

8    something that's not accurate, you can stop me and say, hey,

9    you missed something important.

10   A.    Uh-huh.

11   Q.    You said, "As an initial matter, the FDA and ICH

12   regulations and guidance in place prior to the discovery of

13   NDMA in valsartan API in May 2018 did not require ZHP to test

14   its products for NDMA or NDEA specifically."

15         You then go through some other language, and then

16   ultimately you say:  "As explained in detail, in the report of

17   Dr. Xue, ZHP's scientists did not have a reasonable scientific

18   basis to expect that NDMA or NDEA could form during either the

19   TEA with quenching or zinc chloride processes; thus, ZHP did

20   not have a reason to investigate nitrosamines at the time the

21   company was performing its risk assessments for these

22   processes."  And you cited Dr. Xue's report, correct?

23   A.    Yes.

24   Q.    And you, again, since you're not holding yourself out as

25   an expert in chemistry, you had no opinion and you don't have

Afnan – Cross – Slater                                  71

1   the ability to form an opinion as to what a scientist

2   reasonably should or shouldn't have known as to whether or not

3   they should have thought of the possibility of nitrosamine

4   formation and evaluated that as part of the risk assessment?

5   You have no opinion on that subject --

6   A.    I do.

7   Q.    -- because you're not a chemistry expert in this case,

8   right?

9   A.    I do, sir.  I do.

10         If I can go back to 141 and read the rest of the

11  section that you missed out.  "As an initial matter, the FDA

12  and ICH regulations and guidance in place prior to the

13  discovery of NDMA in valsartan API in May 2018 did not require

14  ZHP to test its products for NDMA or NDEA specifically.

15  Instead, as described in Section IV above, relevant guidance

16  and regulations relevant to cGMP for API manufacturers required

17  investigation of impurities that were reasonably expected to

18  occur in the manufacture of a drug substance."

19         "Indeed, the FDA has expressly stated that it

20  generally needs to be recognized that there is a risk of an

21  impurity occurring as a result of a manufacturing process to

22  know the impurity should be tested for."

23         Do I ignore that and just stick to the sentence about

24  Dr. Xue?

25  Q.    Well, what you just read is the regulatory standard which

1    is just the general standard.

2           In terms of how to apply that standard as a matter of

3    methodology, you had to rely on Dr. Xue's opinions as to

4    whether or not that risk should have been recognized and

5    evaluated as part of the risk assessment.  That's what you said

6    right there in your report, that you relied on Dr. Xue for that

7    point?

8    A.   For that point.

9           However, my conclusion of did ZHP test for valsartan,

10   NDMA in valsartan, no.  Did they do any testing to identify

11   impurities?  Yes.  Did they adhere to regulations?  Yes.

12   Q.   Well, let's come back to this.  I really just want to make

13   sure that we can just get a clean record on this one question.

14          Your methodology, if I understand it, for cGMP is

15   there are certain regulatory guidances that are binding and

16   needed to be followed by ZHP here, right?

17   A.   Yes.

18   Q.   And if those were violated, they violated cGMPs, right?

19   A.   Yes.

20   Q.   And you just told us a little while ago you actually agree

21   with the FDA that ZHP violated cGMPs in the risk assessment and

22   manufacture of the valsartan as described in the warning

23   letter.  You just told the counsel that retained you that you

24   don't disagree with the FDA findings in the warning letter.

25   Did I hear that correctly?

Afnan - Cross - Slater

1    A.    I think you heard that.  I didn't qualify it by saying in

2    terms of risk assessment.

3              What that --

4    Q.    Sir, I just want to know if that's what you said and that

5    was your opinion.  It's really -- it will go much quicker if we

6    can go with my questions instead of -- and I promise you, your

7    counsel can ask you follow-up.  But you conceded --

8              MS. BROWN:  I'm sorry, Your Honor, could he just be

9    permitted to finish his answer?

10             THE COURT:  So here's what I'm going to say --

11             MR. SLATER:  Okay.

12             THE COURT:  -- if you want your witness to answer

13   with a yes or no, you will tell your witness to please answer

14   with a yes or no, to which I will say to your witness, or a

15   witness:  If you can't answer with a yes or no, you'll tell

16   counsel that you can't answer it with a yes or no, and you will

17   be permitted to explain it.  Okay?

18             THE WITNESS:  Thank you.

19             MS. BROWN:  Thank you.

20             THE COURT:  So we understand the ground rules.

21             MR. SLATER:  I do, Your Honor.

22             MS. BROWN:  Thank you, Your Honor.

23             THE COURT:  Ask your question.

24   BY MR. SLATER:

25   Q.    Yes or no, you just conceded, when counsel for ZHP was

Afnan - Cross - Slater

1    questioning you, that you don't disagree with the FDA findings

2    of GMP violations as set out in the warning letter?  That's

3    what you told us on the direct exam, correct?

4    A.   Yes.

5    Q.   And the warning letter has various violations.  And one of

6    them included that the risk assessment was a deviant risk

7    assessment because it didn't comply with good manufacturing

8    practices.  That was not an artful question.  Let me ask it

9    again.

10           One of the findings by the FDA was that ZHP failed to

11   evaluate the potential effect that changes in the manufacturing

12   process may have on the quality of your API, and that would be

13   the risk assessment, correct?

14   A.   That's what is in the warning letter, yes.

15   Q.   And you don't disagree with it as you just told us, right?

16   A.   Correct.

17   Q.   Okay.  And let's just, as we start to jump ahead now into

18   certain other areas, that risk assessment they're talking about

19   occurred before one pill got sold in the United States.  The

20   risk assessment happened at the very start before they even

21   started selling the API to be put into finished dose and sold

22   in this country, right?

23   A.   I don't have that evidence.  Perhaps you can show me that.

24   Q.   Are you telling this Court you don't know when the risk

25   assessment was performed?

Afnan - Cross - Slater

1    A.    The risk assessment was performed.  You did not ask me if

2    a risk assessment was performed.  You said that risk assessment

3    that did not find NDMA was done and completed before one pill

4    was sold.

5    Q.    The risk assessment that the FDA is talking about in the

6    warning letter is the risk assessment that was done on the

7    manufacturing process for ZHP to then say, okay, we can check

8    all the boxes and we can start selling this stuff.  That's the

9    risk assessment the FDA is talking about, correct?

10    A.    That there was a risk assessment.

11    Q.    Am I correct, yes or no, that that's the risk assessment

12    before they ever started manufacturing for commercial sale?

13    A.    They were in commercial sale when they changed the

14    process.  The risk assessment that was performed, which took

15    over nine months, is there.  The challenge that FDA gave them

16    through the observation was that they had not looked at

17    formation of NDMAs.  The lacking in the risk assessment is

18    because ZHP did not test for NDMA.  You need to read the 483

19    observations to see that.

20    Q.    Okay.  Let's just --

21            THE COURT:  The question is, the risk assessment

22    that's referred to in the warning letter, when was that risk

23    assessment to have been done?

24            THE WITNESS:  That was done, Your Honor, when the

25    change -- or before the change was implemented.

1    BY MR. SLATER:

2    Q.   And, again, before the change could be implemented, a cGMP

3    compliant risk assessment had to be performed, correct?  That's

4    what the law says, right?

5            Before you can implement a change to a manufacturing

6    process, you have to evaluate it with a risk assessment and a

7    change control process that complies with cGMPs, correct?

8    A.   In a roundabout way, yes.

9    Q.   And if that risk assessment and that change control

10   process deviates from GMPs, as you've agreed on the stand

11   occurred, every pill that would be sold after that GMP deviant

12   analysis was done would technically be adulterated under the

13   definition under the United States Code, correct?  Under the

14   words of the Code, it would be adulterated, correct?

15   A.   I can't give a yes-or-no answer.

16   Q.   Why not?

17   A.   Because it's not as simple as yes or no.

18   Q.   Okay.  Well --

19           THE WITNESS:  Can I explain, Your Honor?

20           THE COURT:  Could you, please.

21           THE WITNESS:  Yes.

22           So the risk assessment was done.  Your statement,

23   your premise was that if the risk assessment is not compliant

24   to cGMPs, there is no written rules of how to do a risk

25   assessment to be compliant with cGMPs.  The requirement is to

```
1    do a risk assessment to see whether impurities would form.  ZHP
2    did that.  Was it good enough, based on the warning letter date
3    of November 2018?  And the investigator in June 2018 said, no,
4    you could have done better.  But there isn't a black and white
5    your risk assessment is compliant or your risk assessment is
6    not compliant.
7    BY MR. SLATER:
8    Q.   Well, in this case ZHP did a risk assessment, right?
9    A.   Yes.
10   Q.   And the FDA looked at that risk assessment and said it did
11   not meet cGMPs.  That's what the warning letter found, right?
12   That is the conclusion, isn't it?  Here, let me do this.
13   A.   Can I get --
14   Q.   So we don't have to talk -- I'm going to --
15            MR. SLATER:  Your Honor, can I approach and hand the
16   warning letter to the witness and to Your Honor, if you would
17   like it?
18            THE COURT:  Okay.
19            MR. SLATER:  Thank you.
20            THE COURT:  I think he has it in his binder.
21            MR. SLATER:  Do you have the warning letter with you?
22            THE WITNESS:  I don't think so.
23            THE COURT:  Isn't it in here?  Maybe it's hard to
24   read.
25            THE WITNESS:  No.  It's --
```

*Afnan – Cross – Slater*                    78

```
 1              MR. SLATER:  I think it's just like a snapshot of --
 2              THE WITNESS:  It's the first page.
 3              THE COURT:  Okay.
 4              MR. SLATER:  Your Honor, may I?
 5              THE COURT:  Okay.
 6              MR. SLATER:  Thank you.
 7              THE WITNESS:  Where is it, Mr. Slater?
 8              MR. SLATER:  I'm getting to it.  But I got papers
 9     stuck.  Here you go.
10              MS. BROWN:  Thank you.
11              MR. SLATER:  You're welcome.
12     BY MR. SLATER:
13     Q.  So let's look where we were just talking at the fourth
14     page of this warning letter.
15     A.  Yeah.
16     Q.  And it's Deviation No. 2 titled:  "Failure to evaluate the
17     potential effect that changes in the manufacturing process may
18     have on the quality of your API."
19              Do you see that?
20     A.  Yes.
21     Q.  And let's go through it.  I think it's important to go
22     through, isn't it?
23     A.  Yes.
24     Q.  I mean, this is what you're here for, cGMP.
25     A.  Yes.
```

Afnan - Cross - Slater                    79

```
 1    Q.   And these are admitted violations now, right?
 2              THE COURT:  Does this go to 702, your 702 challenge?
 3              MR. SLATER:  Absolutely, Your Honor.
 4              THE COURT:  All right.
 5              MR. SLATER:  Because if the witness is going to say
 6    that the drugs were not adulterated, if they violated cGMPs in
 7    the manufacture, by definition under the statute they were
 8    adulterated.
 9              MS. BROWN:  But, Your Honor --
10              MR. SLATER:  And I think his methodology would be
11    faulty because he's essentially drawing a conclusion that is
12    contrary to what the law is.  And I think Your Honor, as a
13    methodological matter, can say I'm not letting a witness give
14    an opinion that's not consistent with the law.
15              MS. BROWN:  And, Your Honor, but that's his legal
16    interpretation of this legal regulation.  And that's not the
17    opinion he's being offered for pursuant to the Court's rulings.
18              THE COURT:  Okay.  I -- I see.  But let me hear it so
19    I can be better informed, and you can make your record.
20              Okay.  Go ahead.
21    BY MR. SLATER:
22    Q.   So let's look at what the FDA said, because I think this
23    is going to be important for the whole questioning that I'm
24    going to do with you today.
25    A.   Yeah.
```

*Afnan - Cross - Slater*                                   *80*

1    Q.   They start out, "in November 2011" -- so now that orients

2    us on when this occurred, right?

3              -- "you approved a valsartan API process change," and

4    it gives the number of it, right?  That's how those things are

5    coded, right?

6    A.   Yes.

7    Q.   "That included the use of the solvent DMF.  Your intention

8    was to improve the manufacturing process, increase product

9    yield, and lower production costs.  However, you failed to

10   adequately assess the potential formation of mutagenic

11   impurities when you implemented the new process."

12             Now, I'm going to stop there.  When they talk about

13   "failing to adequately assess the potential formation of

14   mutagenic impurities," they're talking about what you said that

15   Dr. Xue had given an opinion on, that you relied on that, well,

16   they didn't need to know about it, and therefore, there's

17   nothing -- nothing was done wrong, no harm because it wasn't

18   reasonably knowable.  But the FDA actually thought they should

19   have more adequately addressed it.  That's what we're talking

20   about, right?

21   A.   2018 -- 2019 FDA Commissioner also stated that nobody knew

22   about the formation of NDMAs.

23   Q.   We're going to get to those statements, okay.

24   A.   Okay.

25   Q.   I'm looking forward to asking you about that.  I know you

*Afnan - Cross - Slater*                                  *81*

1    want to talk about it.  There's language we haven't talked

2    about yet in those statements, right?

3    A.   I don't know --

4    Q.   There's some language we didn't talk about in there,

5    right?

6    A.   I don't know what you wish to bring up.

7    Q.   Okay.  Well, we'll get to it.

8              And then it says -- this is the FDA describing a GMP

9    violation you agree occurred in 2011.

10             "Specifically, you did not consider the potential for

11   mutagenic or other toxic impurities to form from DMF

12   degradants, including the primary DMF degradant,

13   dimethylamine."

14             Do you see that?

15   A.   Yes.

16   Q.   So the FDA said to ZHP back in 2011-2012, you failed to

17   adequately assess these risks in your process.  That's what

18   this is saying, right?

19   A.   In 2018, with --

20   Q.   Is that what this says?

21   A.   In 2018, with hindsight, FDA is making a statement after

22   FDA knows that this is the process and this is the cause of

23   formation of NDMAs.  FDA had been on site.  FDA had seen what's

24   going on.  FDA was not asleep.  FDA was doing its job.

25   Formation of NDMAs from DMF was not generally known.

Afnan - Cross - Slater                    82

1   Q.   When the FDA thinks that a manufacturer did everything it

2   could and complied with all the cGMPs but just happened to just

3   run into a situation nobody could have ever known, they don't

4   give a warning letter to them.  They don't punish them with an

5   import ban and preclude them from selling drugs into the United

6   States for four years.  Do they do that when they don't think

7   someone did anything wrong?  Is that what happens?  Because you

8   worked there for a long time.  Is that what the FDA does?

9   A.   Can you rephrase your question, please?

10  Q.   Sure.

11  A.   It's multiple statements.

12  Q.   You're saying to us basically, well, they're looking back

13  at hindsight and, you know, no harm, no foul, and it's just,

14  you know, whatever, it didn't really mean anything.  But the

15  FDA wouldn't send an official warning letter finding cGMP

16  violations and imposing an import ban, as they talk about a few

17  pages later, precluding the company from selling drugs into the

18  United States if they didn't think it was significant, would

19  they?

20  A.   So --

21  Q.   Yes or no, would they?

22  A.   I can't give a yes-or-no answer.

23  Q.   Fine.

24  A.   Because --

25  Q.   You can't answer that with a yes or no.

1          And that, based on your methodology and your

2    understanding of the facts and the law and the regulatory

3    guidances that control, you're not able to answer that question

4    with a yes or no; am I correct?  Yes or no?

5    A.    Can I explain?

6               THE COURT:  Yeah.  Would you, please.

7               THE WITNESS:  So the reason I can't answer is because

8    you put multiple questions which are related, but actually the

9    desire is for me to say yes.  It's not going to work with me.

10              So the issue that I see here is that FDA is telling

11   ZHP you did not look at NDMA formation because of DMF.  DMF is

12   a very common solvent which has been used by industry

13   throughout, and that was an unknown.  Again, going back to

14   regulations which says reasonable expectation of formation of

15   mutagenic impurities.  That's not there.  That was not there at

16   that time.

17              Now, we come to the import alert.  Import alert which

18   was implemented on ZHP at that time.

19              THE COURT:  What are you saying?  You come to what?

20   What are you saying?

21              THE WITNESS:  Oh, the import, import alert.

22              THE COURT:  Okay.

23              THE WITNESS:  The import alert specifically was there

24   to prevent drug product manufacturers bringing product in.  At

25   the time of the warning letter and the import alert, there was

*Afnan - Cross - Slater*                                    84

```
 1   no drug product in the market.  There was no API in the market.
 2   The API was not being marketed.  So effectively the import
 3   alert is well post event.
 4   BY MR. SLATER:
 5   Q.   The import alert, if you want to go two pages later, was
 6   imposed on September 28, 2018, right?
 7   A.   Yes.
 8   Q.   Okay.  So let's go back to my question.
 9        Would the FDA serve a warning letter on ZHP and say
10   you violated cGMPs if the FDA didn't think that they actually
11   did violate cGMPs?
12   A.   No.
13   Q.   And would the FDA --
14        THE COURT:  This question has been -- it's maybe more
15   curiosity, does the FDA -- you worked at the FDA.
16        THE WITNESS:  Yes.
17        THE COURT:  Does the FDA ever take responsibility for
18   its own falling down on the job?
19        THE WITNESS:  So I think the press releases where FDA
20   says we didn't know and they didn't know is there.  FDA does go
21   back to industry and say that was an issue that needs to be
22   resolved and let's resolve it together.  FDA does have those
23   conversations with industry.  They're not public about it, but
24   they do go to industry.
25        THE COURT:  And so similar question, when they issue
```

*Afnan - Cross - Slater*                              *85*

```
 1   warning letters, do they ever do a mea culpa or --
 2              THE WITNESS:  No.
 3              THE COURT:  -- they always blame the manufacturer?
 4              THE WITNESS:  It's the manufacturer.  In fact, there
 5   are many firms with warning letters whose products are
 6   currently today on the market and the warning letters stand.
 7              THE COURT:  Okay.
 8   BY MR. SLATER:
 9   Q.   You're not sitting on this witness stand and saying that
10   the NDMA contamination is the FDA's fault?
11   A.   No.
12   Q.   That's not your opinion, right?
13   A.   No.
14              THE COURT:  That's not what I asked him.
15              MR. SLATER:  I understand.  I'm just trying to take
16   it to the next step.
17   BY MR. SLATER:
18   Q.   And, in fact, you agree that ZHP was responsible for the
19   quality and purity of the valsartan API at manufacture,
20   correct?
21   A.   According to current good manufacturing practices and
22   according to the rules and regulations current at the time of
23   manufacture and release, yes.  ZHP was responsible and acted
24   accordingly.
25   Q.   Was ZHP responsible for the quality of its drugs?
```

Afnan - Cross - Slater                    86

```
 1   A.    I said yes.

 2   Q.    Okay.  The FDA wasn't responsible for the quality of the

 3   drugs that were being manufactured by ZHP.  It was ZHP's

 4   responsibility, right?

 5               THE COURT:  He said "yes."

 6               THE WITNESS:  I did say "yes."

 7               MR. SLATER:  Okay.  Good.

 8   BY MR. SLATER:

 9   Q.    Now -- and you know what, I'm going to give you something

10   a little bit out of my -- out of order here.

11               MR. SLATER:  If I could, Your Honor, I have the

12   January -- I know I have it here.  The January 25, 2019 FDA

13   statement that Dr. Afnan has referenced a few times.  May I

14   hand it?

15               THE COURT:  Okay.

16               THE WITNESS:  Thank you.

17               MR. SLATER:  You're welcome.

18               (Handing out documents.)

19   BY MR. SLATER:

20   Q.    Okay.  So this is one of the FDA's statements that you

21   talked about quite a bit earlier today, right?

22   A.    Yes.

23   Q.    And let's look at page 2.  And I'm sorry for the weird

24   stapling and the sideways thing.  I don't know how that

25   happened, but it wasn't meant to throw you off.
```

*Afnan - Cross - Slater*                                87

```
 1            So if you go down to the fourth full paragraph, let's
 2    look at what it says.
 3            "We've placed a ZHP facility on import alert to stop
 4    all its API and finished drugs made using ZHP's API from
 5    legally entering the United States."
 6            Do you see that?
 7    A.   Wait.  In --
 8    Q.   The fourth paragraph.
 9    A.   The fourth paragraph which begins with "we've also
10    worked"?
11    Q.   It starts with the words "since then."
12    A.   Page 2?
13    Q.   It's the second page.  I'm sorry.
14            THE COURT:  Yes.
15    BY MR. SLATER:
16    Q.   Do you see that?  It's the second page.
17    A.   Oh, fourth paragraph.  Yes.  Sorry.  I was looking at the
18    fifth.
19    Q.   Sure.  And I'll start from the beginning.
20    A.   Yeah.
21    Q.   It says, "since then," this is now since the summer of
22    2018.
23    A.   Yeah.
24    Q.   "The FDA and additional manufacturers of other ARB
25    medicines have identified more cases of NDMA impurities, as
```

Afnan - Cross - Slater                                    88

1    well as NDEA impurities."

2         You with me?

3    A.   Yes.

4    Q.   Now I'm going to go through the part I wanted to read with

5    you.  "We've placed a ZHP facility," and that's the Chuannan

6    facility, correct?

7    A.   Yes.

8    Q.   "On import alert to stop all its API and finished drugs

9    made using ZHP's API from legally entering the United States.

10   We also issued them a warning letter outlining several

11   manufacturing violations, including impurity control, change

12   control, and cross-contamination from one manufacturing process

13   line to another.  It's unlikely" -- well, let me stop there for

14   a second.

15        So that's one we didn't hear about on the direct that

16   actually ZHP also identified that not only was its risk

17   assessment faulty and not only didn't they realize there was a

18   chance for these nitrosamines to form just from the

19   manufacturing process, but they also found out -- and it's in

20   their deviation investigation report -- that they weren't

21   cleaning their production lines adequately.  So when they were

22   running one set, one batch together, it was getting

23   contaminated with the nitrosamines from the prior batch, right?

24   They figured that out, ZHP?

25   A.   Correct.

```
 1    Q.    Right?

 2    A.    Can I answer more than yes or no?

 3    Q.    First start with a yes or no.  Would you agree that the

 4    deviation investigation report shows that ZHP identified

 5    cross-contamination?

 6    A.    So, yes.  And here's the explanation.

 7    Q.    I really just want --

 8              THE COURT:  Let him explain it.

 9              MR. SLATER:  I will, Your Honor.

10              THE WITNESS:  So, yes.  Again, this is a common

11    practice in industry to work in campaigns of production and to

12    minimize cleaning from one batch to the next.  This is common

13    practice.  This has been going on for many years and goes on

14    even today.  So if you're making the same product and you make

15    it, you do very minor cleaning and you move to the next batch.

16    BY MR. SLATER:

17    Q.    Well, so you're not excusing the cross-contamination,

18    you're just saying it happens sometimes, right?

19    A.    No, I did not say that, Mr. Slater.

20    Q.    Okay.

21    A.    What I said was, you quoted me or you've told me that, you

22    know, they went multiple batches and there was

23    cross-contamination from one to the other.  My response was,

24    they were following -- actually they were following industry

25    practice which said minimal cleaning from one batch to the
```

1    next.

2    Q.    Well, did you read the deviation investigation report,

3    that really thick report --

4    A.    Yes.

5    Q.    -- ZHP did?

6    A.    Yes.  I also read the 483 observations issued by the FDA

7    investigator and the establishment inspection report.

8    Q.    Great.  And in the deviation investigation report by ZHP,

9    they pointed out that they actually didn't adequately clean the

10   machinery and that's how the cross-contamination occurred, not

11   just between zinc chloride batches with one another, but also

12   between zinc chloride process batches and TEA process batches,

13   they also cross-contaminated, correct?

14   A.    Yes.  Again, I'll go back to it's the campaign of the same

15   product.

16   Q.    And you're saying it happens in the industry.  It's a

17   violation of cGMP to fail to adequately clean the production

18   line and allow contamination of one drug product to get into

19   another drug product.  That's not allowed under good

20   manufacturing practices?  Yes or no?

21   A.    From one product to another product, yes.

22   Q.    You're actually -- all right.  That's fine.  I'll take

23   that, because that's what happened here.

24         So that's another GMP violation by ZHP, right?

25         THE COURT:  What is the purpose of this cross?  It

```
 1    needs to go to 702.  This sounds like you're trying the case.

 2              MR. SLATER:  These are -- the whole point is that

 3    this expert wants to tell this jury that the drugs were not

 4    adulterated, and what I want to do is explain how his opinion

 5    is not going to be methodologically sound because he didn't

 6    take into account certain things.

 7              And when you look at this, because he's now conceded,

 8    and I'm going to keep going, he's conceding cGMP violations

 9    before the pills ever were marketed from these new processes,

10    he can't as a matter of law say it wasn't adulterated, because

11    I have the statutory definition, which I'm going to get to, it

12    meets the statutory definition of adulteration from day one.

13              THE COURT:  Why is it that your witnesses can say

14    that they failed to comply with cGMP and therefore they were

15    adulterated and their witnesses can't say, well, they complied

16    with cGMP, to the extent that there were compliance issues,

17    they could not have known and therefore they weren't

18    adulterated?  Why -- why is that?

19              MR. SLATER:  Because that's not what happened.  The

20    whole argument that we couldn't have known was rejected by the

21    FDA.

22              THE COURT:  But that's a weight argument.

23              MR. SLATER:  But I think, respectfully --

24              THE COURT:  That's a weight argument.

25              MR. SLATER:  -- Your Honor, it's not a weight
```

*Afnan - Cross - Slater*                    92

```
 1   argument because, as a matter of law, the FDA found that they
 2   violated the cGMPs.
 3              THE COURT:  Right.
 4              MR. SLATER:  This witness has agreed that they
 5   violated them.  Knowledge is not a factor.  It's the failure to
 6   do the adequate assessment.  And that's why they violated
 7   cGMPs, and therefore, they are responsible -- those cGMP
 8   violations occurred, and by definition, as the FDA found in its
 9   warning letter, that meets the statutory definition of
10   adulteration.
11              THE COURT:  Do they have to live and die by the FDA's
12   declaration?  Can't they dispute that?
13              MR. SLATER:  Well, he's already agreed with it, Your
14   Honor.  He agreed there was a cGMP violation; that the
15   violations occurred.
16              MS. BROWN:  But, Your Honor --
17              MR. SLATER:  He's not disputing it.  He's agreed.
18              MS. BROWN:  I need to object to this
19   mischaracterization of the testimony.
20              The witness testified that in November of 2018, after
21   this had been discovered, he agrees with the then findings.
22              What counsel is doing and what is really amounting to
23   his closing argument is imputing that back to 2011, which this
24   witness was clear is not how regulations work.
25              MR. SLATER:  That's --
```

1          THE COURT:  Well, it does seem that we're -- it does

2   seem that you are unfairly asking this witness in his answers

3   to you to assume then what is known now.  And that is why this

4   witness is struggling to answer -- not struggling, but is

5   pausing.

6          MS. BROWN:  Clarifying.

7          THE COURT:  Pausing to answer the questions, because

8   of the way that you are phrasing the questions I think can

9   be -- might be unfair.  Because it is easy in hindsight for the

10  FDA to make these findings.  But this witness has opined,

11  whether the jury accepts his opinion or not, is that you've got

12  to deal with it in real time.  You've got to deal with it in

13  industry standard, what the industry knew then, what they were

14  looking for, whether or not they knew whether even this NDMA

15  was even anything that anybody imagined.

16         It's easy now in 2018 and 2019 for the FDA to say,

17  aha.  That goes to the weight of the argument.  But I think

18  you've got to be careful in your questioning that you're not

19  confusing this witness in terms of what we now know versus what

20  we knew then.  And that's the difficulty that I'm having in

21  following this line of questioning.

22         MR. SLATER:  I'll try to attack that issue.

23  BY MR. SLATER:

24  Q.   The FDA doesn't issue warning letters -- and this is going

25  to sound like a very simple and obvious question, but I want to

*Afnan - Cross - Slater*                                        *94*

1    get this on the record.

2         The FDA doesn't issue a warning letter for violations

3    before the FDA knows about the violations.  That would be

4    impossible, right?

5    A.    Correct.

6    Q.    In every warning letter you've ever seen, the conduct that

7    led to the warning letter occurred and that the FDA looked back

8    and said what you did violated GMPs in situations like this.

9    It's always a look-back in 100 percent of the cases, right?

10   Because they don't have a crystal ball warning letter process.

11   A.    FDA sends -- I can't answer yes or no.

12        Can I explain?

13        THE COURT:  Yes; could you?

14        THE WITNESS:  So FDA sends investigators to the

15   facility.  Investigators usually come every two years.

16   Investigators look at what is happening on that day in the

17   facility.  They look at the records going over the past two

18   years of what are the market complaints, what are the

19   deviations, what are the investigations, and then FDA

20   investigators make an assessment that, you know, what is going

21   on today or what was going on is not acceptable.  But

22   generally, they're not actually saying based on what you did

23   last year, I'm issuing 483 observations.

24        So 483 observations are issued, Your Honor, just

25   after an inspection is complete.  They issue the 483

1    observations, and industry then responds, the firm responds, as

2    ZHP responded here.

3            FDA looks at that response and then determines that

4    if the firm has not actually grasped the issue, they issue a

5    warning letter.  They don't issue a warning letter because of

6    there are cGMP noncompliances.  CGMP noncompliances are

7    recorded in the Form 483.

8            MR. SLATER:  Okay.

9            THE COURT:  So a warning letter is not issued for

10   cGMP noncompliance issues?

11           THE WITNESS:  No.

12   BY MR. SLATER:

13   Q.   In this case -- okay.  Let me continue because I don't

14   want to get bogged down with that.

15           Let's look -- I'm going to try to finish with this

16   document, then we're going to go back to the warning letter and

17   I think have some really good answers for some of the questions

18   that Her Honor just asked.  So let's first finish up this

19   paragraph in the January 25, 2019 FDA statement.

20   A.   Yeah.

21   Q.   The next line, I had left off with the cross-contamination

22   point.  Do you see where I left off?  Cross-contamination.

23   A.   Change control and cross-contamination from one

24   manufacturing process line to another, yes.

25   Q.   Correct.  Let's look at the next sentence.

Afnan - Cross - Slater                                    96

```
 1    A.   Yes.

 2    Q.   Because we've had a lot of questions here about, well,

 3    should the FDA have caught this or not.  Let's see what the FDA

 4    said about what happened here.

 5              "It's unlikely that the subtle problems causing these

 6    impurities could have been found on a routine current good

 7    manufacturing practice, cGMP, inspection."

 8              Do you see that sentence?

 9    A.   Yes.

10    Q.   And what you had on the board before was a whole series of

11    inspections.  Those were routine cGMP inspections, right?

12    A.   Yes.

13    Q.   And the FDA made very clear that what happened at ZHP

14    would not be expected to be found on those routine inspections.

15    That's what this says, correct?

16    A.   Again, yes.

17    Q.   Is that what this says, yes or no?  Sir, I'm not sure why

18    it's so hard.  Does it say yes or no?  Is that what it says?

19    A.   It's very different --

20              THE COURT:  It says what it says.

21              THE WITNESS:  Yes.

22              THE COURT:  I mean, we have to quarrel about what it

23    says.

24              THE WITNESS:  Yes, it does say that.

25              MS. BROWN:  Your Honor, I object.  Respectfully, this
```

Afnan - Cross - Slater

```
 1   goes to weight.  I mean, counsel is --
 2             THE COURT:  I know, it does.  I know, but -- it does.
 3             MR. SLATER:  And --
 4             THE COURT:  It does.
 5   BY MR. SLATER:
 6   Q.   Well, and then they say, to finish this, "Nonetheless, our
 7   inspections did reveal systemic problems of supervision that
 8   could have created the conditions for quality issues to arise."
 9   That's the conclusion to this paragraph, right?  Correct?
10   A.   That's the conclusion to the paragraph.
11   Q.   Okay.  So you had talked a lot about the FDA's role.  The
12   FDA did not say that, well, you know, we missed it.  They said
13   we wouldn't have been expected to catch this.  That's what they
14   said.  That's a fair paraphrase of this, right?  Is that a fair
15   paraphrase?
16             THE COURT:  On the warning letter?  What are you
17   talking about?
18   BY MR. SLATER:
19   Q.   On the sentence I just read, you would agree that the
20   FDA's position was, we wouldn't be expected to have caught this
21   on our routine inspections?  We just went through that, right?
22   A.   So FDA is saying -- yes, that's what the language is.  But
23   I think, if I may be bold enough to say, you're taking one
24   sentence out of four pages.  So, yes.
25   Q.   Let me -- but you did say before -- and there's no opinion
```

*Afnan - Cross - Slater*                                        98

```
 1   in your report I've ever seen, and you just agreed, you're not
 2   saying the FDA is at fault, missed this, should have caught it,
 3   you didn't ever give that opinion, right?  Am I correct?  Yes
 4   or no?
 5          Am I correct?
 6   A.   Yes, you're correct.
 7   Q.   Okay.
 8   A.   And I disagree with my "yes, correct" answer because it
 9   needs an explanation.
10   Q.   Okay.  Let's go back now to the warning letter, please.
11   A.   Okay.
12          MS. BROWN:  May he be allowed to explain, Your Honor?
13          THE COURT:  Is there a dispute among the parties that
14   the FDA perhaps was not doing its job?  Is that disputed?
15          THE WITNESS:  No.
16          MR. SLATER:  We're not --
17          MS. BROWN:  As I understand it actually, Your Honor,
18   they moved in limine to prevent us from blaming the FDA, and
19   nobody's blaming the FDA.  I mean, the facts are the facts.
20   There are statements that they made about knowledge.
21          THE COURT:  Well, okay, so then why are we talking
22   about this?
23          MS. BROWN:  I don't know.
24          MR. SLATER:  Well --
25          THE COURT:  I would just make a, I suppose, a note,
```

```
 1    it seems from an objective bystander that, you know, the FDA

 2    probably was a little not doing its job.  But, you know, if

 3    it's not an issue, then let's move on.

 4              MR. SLATER:  That's why I moved in limine, because I

 5    didn't want them to try to suggest to the jury, well, don't

 6    blame us, the FDA let this happen.

 7              THE COURT:  I'm not so sure that anybody has to

 8    suggest it to the jury.

 9    BY MR. SLATER:

10    Q.   Now, let's go back to the warning letter, if we could,

11    sir.

12    A.   Yes.

13    Q.   We're back on page 4 under Deviation No. 2, the second

14    paragraph under that.

15              "You also failed to evaluate" -- failed to

16    evaluate -- "the need for additional analytical methods to

17    ensure that unanticipated impurities were appropriately

18    detected and controlled in your valsartan API before you

19    approved the process change."

20              You see what I just read?

21    A.   Yes.

22    Q.   So, again, they're saying you should have evaluated it but

23    you didn't.  That's what this means, right?

24    A.   Sure.  Yes.

25    Q.   And then they said, "you" -- meaning ZHP -- "are
```

*Afnan – Cross – Slater*                    *100*

1    responsible for developing and using suitable methods to detect

2    impurities when developing and making changes to your

3    manufacturing processes."

4            Do you see that?

5    A.    Yep.

6    Q.    And you agree with that, right?

7    A.    I do.

8    Q.    Okay.  And, in fact, let's make sure that we all

9    understand this, and for the Court's benefit, ZHP did not

10   create the manufacturing process for Diovan.  They copied it

11   with the TIN process, right?

12   A.    Yes.

13   Q.    And that TIN process, based on the chemicals used, it

14   would have been impossible to create NDMA because there was no

15   chemicals in that process that could combine to create any

16   nitrosamines.  You're aware of that, right?

17   A.    I'm the regulatory expert.  You're asking me a chemistry

18   question.  So --

19   Q.    So you don't know?

20   A.    As a regulatory, I believe if there was no NDMA in the

21   other process, then it wouldn't have been here.  There was no

22   NDMA found in the original process at ZHP, so...

23   Q.    Right, which was a copy of the Diovan process.

24   A.    Yes.

25   Q.    So then what ZHP did is they said, well, we're going to

*Afnan - Cross - Slater*                                    *101*

```
 1   change the process because we want to make a lot more a lot

 2   cheaper so we can sell it cheaper, that's good for market share

 3   and that's good for business.  That's what happened here,

 4   right?

 5          THE COURT:  Mr. Slater, either you're making your

 6   opening or your closing argument.  What is the 702 objection?

 7          MR. SLATER:  The 702 objection is that my sense was

 8   that there was a -- my sense was that the Court may have had

 9   the feeling that, well, even though they violated cGMPs, it may

10   not be the type of violation that would rise to the level of

11   adulteration.  So what I'm trying to do is make an ironclad

12   record that that's actually not the law.  The law is if you

13   violated cGMPs, it's absolutely adulterated by definition.  And

14   what I'm trying to do is also answer a lot of the points this

15   witness made on direct where he was trying to be allowed to

16   testify.  And these next couple paragraphs answer a lot of the

17   Court's questions.

18          THE COURT:  Well, assume for a moment that you are

19   correct, that is -- because this case involves issues of

20   knowledge, issues of fraud, what ZHP knew, didn't know, what

21   ZHP did, didn't do, this witness's testimony goes to that.

22   That's perfectly permissible.

23          Whether or not his testimony somehow is erroneous as

24   a matter of law because a drug is adulterated if there are

25   noncompliance issues is easily resolved by a jury instruction.
```

*Afnan - Cross - Slater*                                    102

```
 1              But he should be permitted to testify what ZHP did,
 2     what ZHP didn't do, whether they followed the proper protocols,
 3     et cetera, because you have a fraud claim.
 4              MR. SLATER:  And we have -- and I agree.  And I think
 5     ultimately what this witness should be allowed to do is talk
 6     about what ZHP did.
 7              THE COURT:  Of course.
 8              MR. SLATER:  I don't think he should be allowed to --
 9     well, I don't -- well, now he's not giving the opinion.  When I
10     walked into the courtroom, I thought he was going to say they
11     didn't --
12              THE COURT:  I know you did.  And I'm not so sure that
13     he is.
14              But what I am ruling on is that you can't have it one
15     way, okay, and you want to brief the issue, brief the issue, so
16     that the jury is not misled.  But I can't have a plaintiff's
17     expert opining as to a matter that the defendant's expert is
18     not permitted to opine as to.
19              If that creates, as a matter of law, error, you'll
20     tell me.  But I will instruct the jury if the law is that if
21     it's a noncompliant, if there's a breach of cGMP, then by
22     definition it's adulterated, period, end of story.  That's the
23     law.
24              But I'm not going to let, you know, your witness say
25     one thing and not the other witness.
```

*Afnan - Cross - Slater*                    *103*

```
 1              MR. SLATER:  Well --

 2              THE COURT:  If the facts are disputed.

 3              MR. SLATER:  I think -- and I was -- I think what's

 4   happened, and, again, I didn't anticipate it, is that I thought

 5   there was going to be a dispute as to whether there was a

 6   violation of GMPs.  Now I found out there's not.  There's been

 7   a concession that GMPs were violated.

 8              I get he's trying to say, well, looking back I agree,

 9   but that's a meaningless qualifier.

10              THE COURT:  No, it's not, because you have a fraud

11   claim.

12              MS. BROWN:  Right.  Exactly.

13              MR. SLATER:  Well, then I'm making --

14              THE COURT:  ZHP is entitled to defend itself.  You

15   can't just stand before the jury and say, aha, they violated

16   cGMPs so case over.

17              MR. SLATER:  Oh, I'm not basing -- our fraud claim is

18   not based solely -- just on the mere violation of cGMPs.

19              THE COURT:  I understand that.

20              MR. SLATER:  Yeah; it's different.

21              THE COURT:  But it's all part of the -- what they

22   did, what they didn't do, and it's all part of what they knew,

23   what they didn't know.  That's all relevant to me.

24              MR. SLATER:  This is what I suggest I'll do.  I want

25   to go through the next paragraph because it directly addresses
```

*Afnan - Cross - Slater*                              *104*

1    the issue of whether they should have known or not to look at

2    this.  I'm going to clean that up and then I'm going to move

3    right to the email.

4              THE COURT:  Well, I'm going to shortcut it.  I think

5    that he's more than qualified to opine in terms of a regulatory

6    context about what the standard is, about what would have been

7    reasonably expected to have been found.

8              And so you can cross-examine him on, you know, why

9    they did or why they didn't, but that goes to the weight.  That

10   goes to weight.

11             Did you want to say something?

12             MS. BROWN:  Yes, Your Honor.  And I did just want to

13   say, counsel continues to characterize the warning letter as

14   having this retroactive implication; that because they say in

15   November 2018 we have now, knowing what we know, found

16   violations, somehow that means back in 2011 --

17             THE COURT:  I don't know.  This witness testified

18   that a warning letter doesn't go to compliance issues.  It's a

19   jury question.

20             MS. BROWN:  That's what I would just suggest, Your

21   Honor.

22             THE COURT:  It is.

23             MS. BROWN:  This is an issue of fact for the jury

24   that his folks can get up and say, sure does, look at the

25   warning letter, and we can have the opposite.

Afnan - Cross - Slater                                105

```
 1              THE COURT:  He just said that.  So it will go to the
 2    jury.
 3              MS. BROWN:  Thank you, Your Honor.  I appreciate it.
 4              MR. SLATER:  I have to be honest, I don't understand
 5    that distinction, but I'll keep going through.  I don't
 6    understand the distinction.  The warning letter went to what
 7    they did here, and that's what renders the drugs adulterated.
 8              MS. BROWN:  The interpretation of that letter is an
 9    issue for the jury that will come in through two different
10    parties' regulatory experts.
11              THE COURT:  Right.
12              MS. BROWN:  Thank you, Your Honor.
13    BY MR. SLATER:
14    Q.   Let's look at the next paragraph.
15              "Your response states that predicting NDMA formation
16    during the valsartan manufacturing process required an extra
17    dimension over current industry practice, and that your process
18    development study was adequate.  We disagree.  We remind you
19    that common industry practice may not always be consistent with
20    cGMP requirements and that you are responsible for the quality
21    of drugs you produce."
22              You agree that that's an accurate statement of the
23    regulatory law, correct?
24    A.   That is a statement made by FDA in its warning letter,
25    sure.
```

*Afnan - Cross - Slater*                                      *106*

```
 1   Q.   It's accurate, right?

 2   A.   It's accurate.  May I give you --

 3            THE COURT:  Yes.

 4            THE WITNESS:  Yeah, it is accurate.  It is what it

 5   says there.

 6            At the time of the formation, of the creation of the

 7   process, the regulatory requirements were very different than

 8   at the time when this observation was made, and therefore, this

 9   warning letter was issued.

10   BY MR. SLATER:

11   Q.   So let's talk about your methodology on knowledge --

12   A.   Yeah.

13   Q.   -- what we just talked about.

14            Your methodology is, I looked at everything and I

15   don't see anything indicating that ZHP ever actually knew that

16   NDMA was or could be created by its zinc chloride manufacturing

17   process before June of -- May of 2018?  That's what you said,

18   right?

19   A.   Yes.

20   Q.   Okay.  And implicit in that is ZHP didn't know, according

21   to your methodology of reviewing everything you saw, that the

22   chemical reactions that led to the creation, they didn't know

23   about those chemical reactions yet because, and you explained

24   why they didn't know it, but your methodology is I'm assuming

25   they didn't know, even that, for example, DMF could degrade to
```

Afnan – Cross – Slater                    107

1    give off dimethylamine.  They didn't know that either.  That's
2    what you're assuming, right?
3    A.    That's what I'm stating based on the regulatory statements
4    from FDA.
5    Q.    Okay.  And as part of your methodology, did you expect
6    that the lawyers who hired you would give you any ZHP documents
7    that showed, if they actually existed, that ZHP did know before
8    May of 2018 that DMF could degrade and give off dimethylamine?
9    Did you assume that they would have given you those documents
10   so you would have been aware of that?
11   A.    I --
12            THE COURT:  Can you rephrase the question so that
13   you're not casting aspersions toward counsel?
14            MR. SLATER:  Sure.
15   BY MR. SLATER:
16   Q.    Did you assume -- well, rephrase.
17            Did you expect that if there were any internal
18   documents from ZHP that showed that they knew before May 2018
19   of these potential chemical reactions like the DMF degrading to
20   give off dimethylamine that you would have been provided those
21   so you could incorporate those in your opinion?
22   A.    I -- yes.
23   Q.    But you didn't see anything like that other than
24   potentially the email, but we'll talk about that, you don't
25   agree that that means they knew, right?

*Afnan - Cross - Slater*                                    *108*

```
 1   A.    Correct.

 2   Q.    Okay.

 3             MR. SLATER:  May I approach, Your Honor?

 4             THE COURT:  Okay.

 5             (Handing out documents.)

 6             THE WITNESS:  Thank you.

 7             THE COURT:  Thank you.

 8   BY MR. SLATER:

 9   Q.    What I've just handed you is a document titled:  "Report

10   on the Investigation of an Unknown Impurity at RRT 0.34 in

11   Related Substances Testing of Losartan Potassium."  And the

12   Bates number is ZHP02908569.

13             Do you see that?

14   A.    Yes.

15   Q.    And do you see who it was prepared by?

16   A.    Yes.

17   Q.    Who was it prepared by?

18   A.    It was prepared by Jinsheng Lin.

19   Q.    The same person who wrote the email in July of 2017 we've

20   talked so much about today, right?

21   A.    Correct.

22             May I add something, Your Honor?

23             THE COURT:  Well, you can do that on redirect.

24             THE WITNESS:  Okay.

25             THE COURT:  Go ahead.
```

*Afnan - Cross - Slater*                              *109*

1    BY MR. SLATER:

2    Q.   And now let's look at page -- I'm going to use the Bates

3    number.  It's page -- it doesn't say of 9.  Go to the Bates

4    number where the last two digits, please, are 74.

5    A.   Yeah.

6    Q.   So it's about eight pages or so in.

7    A.   Yeah.

8    Q.   And he's talking about this impurity that he's seeing in a

9    losartan study he's doing, and he says the following:  "The

10   possible generation pathway of this RRT 0.34 impurity is as

11   follows:  First, DMF is used as a solvent in the condensation

12   process and potassium carbonate is used as the acid binding

13   agent in the reaction."

14          "Under heating conditions, DMF will decompose to

15   produce dimethylamine."  And then, "dimethylamine reacts with

16   protective group bromide," et cetera.

17          Do you see what I just read?

18   A.   Yes.

19   Q.   So this shows that in a report written by Jinsheng Lin in

20   November of 2017, he actually talks about the fact that DMF

21   under heating conditions will decompose to produce

22   dimethylamine.  That's what the words say on the page, correct?

23   A.   Yes.

24   Q.   You've never seen this before, right?

25   A.   I saw this last week.

Afnan - Cross - Slater                            110

```
 1   Q.    You saw this last week?

 2   A.    I saw this last week.

 3   Q.    Did you supplement your reliance list to tell us you saw

 4   this document?  I didn't see a supplemental reliance list.

 5   A.    So --

 6   Q.    I'm just asking, did you do a supplemental reliance list?

 7   Yes or no?

 8   A.    No, because --

 9   Q.    Okay.  I just asked you if you did, sir.  I may not even

10   go to the place you think I'm going.  I may not be that clever,

11   so.

12   A.    No, no, no.  No, I didn't update it because my report

13   which has been submitted is not relying on this.

14   Q.    Well, I wouldn't think it would be.

15              THE COURT:  Okay.  What's the question?

16   BY MR. SLATER:

17   Q.    So you actually saw this document a week ago?

18   A.    Sorry, sorry.  Allow me.  Allow me.  Maybe I need to

19   correct myself.  Let me see.

20              No, I have seen this report.  I have seen this

21   report.  I have seen this report.  That was a mistake that I

22   said I saw this last week.  No, I've seen this report before,

23   yes.

24   Q.    You've seen it even before last week?

25   A.    Yes.
```

*Afnan - Cross - Slater*                                 111

1    Q.    When did you see this report for the first time?

2    A.    I don't remember when I saw it first time, but it would

3    have been in my documents, which I reviewed.

4    Q.    Did you see this document when you wrote your report?

5    A.    Yes.

6                MR. SLATER:  I have another one, Your Honor.  Only

7    two of them.

8                MS. BROWN:  Your Honor, I'm just going to object to

9    no 702 --

10               THE COURT:  Yeah, this is -- I'm going to -- I'll

11   probably put an end to this, Mr. Slater, because this is

12   sounding like a weight --

13               MR. SLATER:  I think -- well, what I'm trying to get

14   at is that his methodology is completely faulty, and I want to

15   see what --

16               THE WITNESS:  No.

17               MR. SLATER:  And I want to understand how he

18   reconciles the fact that we now know he had this document when

19   he wrote his report and never mentioned it and didn't talk

20   about it and never expressed how this factors in.

21               THE COURT:  Wait.  He wants to correct the record.

22   What do you want to say?

23               THE WITNESS:  I don't believe I saw this till last

24   week, either of these documents.

25               MS. BROWN:  Here's what happened, Your Honor.  He

*Afnan - Cross - Slater*                                            112

```
 1   responded to plaintiffs' experts.  Plaintiffs' experts did not

 2   rely on these documents.  A week ago they produced translations

 3   to us about these documents.  We gave them to Dr. Afnan and

 4   said does it change your opinion.

 5            He's not relying on them because he's -- his job is

 6   to critique plaintiffs' experts.  They didn't --

 7            THE COURT:  Why are you just now getting these a week

 8   ago?

 9            MS. BROWN:  These are losartan documents that have to

10   do with a totally different medicine.  And so we asked him does

11   it change your opinion, he said no.  The original experts he's

12   responding to don't rely on it.  He's had -- this is all cross,

13   in any event.

14            MR. SLATER:  Well, actually it's not, because I

15   wasn't given these documents till this year.  They were --

16   this -- the documents --

17            THE COURT:  This is losartan, though.

18            MS. BROWN:  Correct.

19            THE COURT:  So what are we doing here?

20            MR. SLATER:  This is showing that the company and

21   Jinsheng Lin who wrote that email knew about these chemical

22   processes that led to the formation, which their position is no

23   one knew it till May of 2018, his email couldn't mean what it

24   says.  And this is showing that that's not true.  And his

25   methodology is completely faulty, because the fact that he knew
```

Afnan - Cross - Slater                    113

1    about this and didn't grapple with it in his report --

2              THE WITNESS:  No, no, no.

3              THE COURT:  So you're trying -- hang on.

4              MR. SLATER:  And this goes to the knowledge issue

5    that Your Honor was concerned about.

6              THE WITNESS:  Sorry, Your Honor.  I didn't see this

7    until last week, so how can I put this in my report if I didn't

8    see it until last week?

9              MR. SLATER:  That's okay.  But you didn't talk about

10   it on direct when you were questioned today, right?

11             THE COURT:  Mr. Slater, would you mind if I said a

12   few words?

13             MR. SLATER:  I'm sorry, Your Honor.  I didn't

14   really -- I certainly don't mean to interrupt you.  I'm sorry.

15             THE COURT:  It seems to me you are taking these

16   documents and you are attempting to impeach this witness on his

17   reliance on a document that you intend to impeach through

18   another witness.  So this is impeachment three times removed,

19   something like that.

20             So you want to impeach the email that he relied upon

21   and the translation that he gave -- this is how I'm

22   understanding it -- through these documents.

23             These documents go to another witness.

24             MR. SLATER:  I --

25             THE COURT:  Okay.  If his reliance on an email, his

1    reliance on a document falters by another means, so be it.  But

2    you can't circumvent the process and try to impeach that

3    witness through this witness.

4               MR. SLATER:  If you could just give me about a couple

5    more minutes to finish this, I would think --

6               THE COURT:  I think my patience has run thin.

7               MR. SLATER:  I -- the question that I'm building up

8    to, I would expect that his answer would be that he's going to

9    withdraw his opinion if he has a credible methodology.  And if

10   he doesn't withdraw his opinion based on the questions that are

11   coming, I think his methodology would be faulty on his

12   assumptions about what the company knew and didn't know.  He

13   made assumptions knowing this and ignored it.

14              THE COURT:  He just --

15              MR. SLATER:  And I don't think --

16              THE COURT:  He just said that he became aware of this

17   a week ago; it does not change his opinion.

18              MR. SLATER:  Now can I show him the second one and

19   see maybe if he sees a second document that --

20              MS. BROWN:  It's exactly the same, Your Honor.

21              MR. SLATER:  If there's a second document that helps

22   him to reconsider his testimony.

23              THE COURT:  Give it a try.

24              MS. BROWN:  But, Your Honor, it's exactly the same.

25              THE COURT:  Let's just give it a try.  Sometimes it's

*Afnan – Cross – Slater*                    115

```
 1   just easier to just give it a try.

 2              MS. BROWN:  Okay.  Same objection for the record,

 3   Your Honor.

 4              THE COURT:  I know.  And I'm about ready to make my

 5   ruling.  So ask your question, give your answer, and I'll give

 6   you my ruling.

 7   BY MR. SLATER:

 8   Q.   So looking at the next document, it's a report on an

 9   impurity at RT 16.9 minutes.  Do you see that?

10   A.   Which page am I looking at?

11   Q.   I'm just looking at the cover right now.  Do you see that

12   document?

13   A.   This one?

14   Q.   And it's dated January 15, 2018?

15   A.   Yeah.

16   Q.   And you see who reviewed it, at the last signature?

17   A.   The last signature, Jinsheng Lin, yes.

18   Q.   Okay.  And if we go now to page 6 of 21, the page numbers

19   are in the top right.  And the Bates numbers, for the record,

20   of the first page was ZHP02929237.

21              If you go to that page and you work your way down

22   about two-thirds of the way down, right just above where you

23   see in bold, it says "Scheme 2."  You see the word "Scheme 2"

24   in bold?

25   A.   Yes.
```

Afnan - Cross - Slater                                    116

1    Q.   Just above that to the right of it, it says "we."

2            "We checked the production process flow chart of

3    losartan potassium API in which DMF is used."

4            DMF is the same solvent that led to the NDMA

5    formation in the valsartan that we're talking about today,

6    right?  Correct?

7    A.   Yes.

8    Q.   And it says, "And DMF is likely to be hydrolyzed to

9    produce dimethylamine."

10           Hydrolyzed means when water reacts with it, it will

11   give off the dimethylamine, right?

12   A.   Yes.

13   Q.   So this shows that well before May 2018 -- and you don't

14   know how far back it goes -- ZHP did know about the chemical

15   processes and impurities that could come off of DMF,

16   specifically the dimethylamine could be formed.  They knew that

17   long before you have told the Court and you ever said in your

18   report, they knew that, correct?

19   A.   Are you asking me to opine on your opinion on this?

20   Q.   I'm asking factually.

21           Will you acknowledge that they knew before May 2018

22   that these chemical processes could occur with DMF?

23   A.   I -- Mr. Slater, I have not seen this.  I got this on

24   Thursday of last week, right?

25           THE COURT:  Okay.  I'm going to sustain the

Afnan - Cross - Slater                                117

1    objection.

2            I think it goes to the weight of the evidence.  I

3    think it's circuitous.  I think you're trying to -- here's how

4    I see it, and this is how I see it.  This witness is

5    testifying -- let's say this witness testified.  I'm trying to

6    write the syllogism down as I'm thinking it.

7            He relies upon a document in his expert report.  That

8    document says it was raining on the day in question.  There are

9    other documents out there that somehow show that it was sunny

10   that day.  He has rendered his report based on the fact that he

11   believed it was raining.  If the jury discredits that

12   assumption by whatever means, so be it.  The jury may discredit

13   that assumption or they may credit his assumption, but that's a

14   jury call.  And this is a weight cross-examination.

15           So simply because the plaintiff believes that these

16   are aha documents will show that that email that the witness

17   relied upon, that's going to be a jury question.  You're not

18   going to -- he's already said he hasn't seen them, he saw them

19   a week ago and it hasn't changed his mind.  I think it stops

20   there.

21           MR. SLATER:  Obviously I'll stop there.  If Your

22   Honor's instructing me --

23           THE COURT:  Yeah.

24           MR. SLATER:  -- I'm certainly not going to keep

25   asking the questions.

```
1    BY MR. SLATER:

2    Q.   Do you agree the contaminated valsartan pills should not

3    have been sold?

4    A.   Absolutely.

5    Q.   Okay.  You'd agree from day one they never should have

6    been put on the market, right?

7    A.   So any firm who finds its product is contaminated with

8    something as nasty as a mutagenic product should stop release,

9    and ZHP did that.

10   Q.   Well, you opined in your report that they did it as soon

11   as they knew about the contamination.  In May of 2018 you said

12   they knew.

13   A.   June.  June 2018.

14   Q.   Your report says in about six different places they first

15   knew about the risk of NDMA in May, right?

16   A.   May is when Novartis wrote to them and said please give us

17   explanation of this peak.

18            (Court reporter clarification.)

19            THE WITNESS:  A peak of impurity.

20   BY MR. SLATER:

21   Q.   And, by the way, all the regulatory guidances that

22   governed here, ICH Q3A, ICH Q7, the FDA 2008 guidance, all of

23   those were in effect before ZHP was actually manufacturing the

24   valsartan at issue here for sale.  Those were already in place,

25   right?
```

*Afnan - Cross - Slater*                              119

```
 1    A.   Correct.

 2    Q.   So there was no change to the regulatory scheme later?

 3    A.   No.

 4    Q.   So that the rules got changed.  The rules were the same

 5    then as they are now, right?

 6    A.   Correct.

 7              MR. SLATER:  Your Honor, just bear with me.  What I'm

 8    trying to do is pick through a little and try to find things

 9    that there still may be some patience for.

10              THE COURT:  There what?

11              MR. SLATER:  That there still may be some patience

12    for.

13              Much as I love to try to become --

14              THE COURT:  I don't know, Mr. Slater.

15              MS. BROWN:  Just leave all the stuff that goes to

16    weight.

17              MR. SLATER:  Okay.  I will.

18    BY MR. SLATER:

19    Q.   The July 27, 2017 email, just to be clear --

20    A.   Yes.

21    Q.   -- everything that Jinsheng Lin said in there is accurate.

22    There was NDMA in valsartan.  It was formed by the sodium

23    nitrite quenching, and it was a cGMP problem, and it was a

24    problem with sartans across the board, right?  Those are all

25    true statements, correct?
```

*Afnan - Cross - Slater*                                         *120*

```
 1              THE WITNESS:  Sorry, Your Honor, I can't give a

 2    yes-or-no answer.

 3              THE COURT:  Okay.

 4              THE WITNESS:  So the answer is no.  That is an email

 5    in Chinese which has been translated several times.  It also

 6    talks about, as I read it, it refers to a patent.  The patent

 7    is about formation of nitroso products in irbesartan, a

 8    different product, and that it says these are similar to

 9    Impurity K.

10    BY MR. SLATER:

11    Q.   Did you read Min Li's deposition testimony talking about

12    the email?

13    A.   Yes.

14    Q.   Do you know who Min Li is?

15    A.   I don't remember exactly what his title is, but, yes.

16    Q.   He's Jinsheng Lin's boss.  He ran CEMAT, the technical

17    division that did all the analysis of impurities at ZHP.

18    A.   Okay.

19    Q.   Does that refresh your recollection?

20    A.   No.  But carry on, please.

21    Q.   He's a Ph.D. chemist from Johns Hopkins who's bilingual.

22    Do you know that?  Did you read that in his deposition?

23    A.   Yes.

24    Q.   And did you see in his deposition that I actually went

25    through the email with him and he told us what it said?  And,
```

*Afnan - Cross - Slater*                                                    *121*

1    by the way, did you see that?

2    A.   I --

3    Q.   Did you see in the deposition I went through it with him?

4    A.   I do not remember.

5             THE COURT:  See, this goes to weight.  Okay.  He can

6    assume, he can assume whatever he assumes.  He can assume the

7    letter said this, he can assume the letter said that.  That's

8    what he relied upon.  It's then your job on cross -- it doesn't

9    mean that his methodology is wrong.  It doesn't mean that what

10   he -- that he doesn't have the expertise.  You are then

11   permitted on cross.  It goes to the weight of the evidence that

12   the jury gives it.

13            MR. SLATER:  Except if he's relying on inadmissible

14   evidence.  So let's talk about what you rely on.

15            THE COURT:  You don't intend to introduce that email?

16            MR. SLATER:  No, no, I'm talking about the basis for

17   his opinion that it doesn't say what it says.

18            THE COURT:  Well, that's how he interpreted it.

19            MR. SLATER:  But let's talk about how he reached that

20   interpretation, because I don't think he has a valid reliable

21   basis on which to give that opinion.  I think he's just saying

22   it and it's just ipse dixit conclusory, I just want to say it.

23   And let's talk about that.

24   BY MR. SLATER:

25   Q.   Number one, Dr. Xue --

Afnan - Cross - Slater                                122

```
 1   A.   Yes.

 2   Q.   -- you're not relying on him?

 3   A.   I'm not.

 4   Q.   And you know his opinions on what the email said have been

 5   precluded at trial.  Do you know that?

 6   A.   Yes.

 7   Q.   Okay.  So you can't rely on that.

 8             You relied on your conversation with Jucai Ge who

 9   told you what Jinsheng Lin told her, right?

10   A.   No.  The email is addressed to her, so --

11   Q.   It was -- go ahead.  I'm sorry.  I didn't mean to

12   interrupt you.

13   A.   So the email is addressed to her.  She read the email.  I

14   said, does the email say this?  This isn't any hearsay of what

15   was your conversation.  My question to her was, does this email

16   say that there was NDMA in valsartan?

17   Q.   Did you see her deposition, her sworn deposition as a

18   30(b)(6) witness where she said, yes, that's what the words

19   say, it says there's NDMA in valsartan?  Did you see when she

20   testified under oath to that?

21             MS. BROWN:  I object.  That's a mischaracterization

22   of her testimony.

23             THE WITNESS:  No.  No, I did not, because I did

24   see -- sorry.

25             MS. BROWN:  No.
```

*Afnan - Cross - Slater*                    *123*

```
1              THE COURT:  No.  Go ahead.

2              THE WITNESS:  Sorry, Your Honor.

3              THE COURT:  Go ahead.

4              THE WITNESS:  I did see also that you asked her a

5   question does this -- is this correct, and she said, no, it's

6   not.  We did not know about NDMA in valsartan.

7   BY MR. SLATER:

8   Q.   Right.  She said the email says there's NDMA in valsartan,

9   and then she also said, but we didn't know about it, because

10  she said that nobody paid attention to the email.  Did you see

11  that part?

12             MS. BROWN:  Your Honor, I object to all of this.  It

13  goes to weight.

14             THE COURT:  Sustained.

15             MR. SLATER:  Well -- okay.

16             THE COURT:  So this is all weight, all, all weight.

17  All weight.

18  BY MR. SLATER:

19  Q.   So you're relying on Jucai Ge's reading of the email as to

20  what it says?

21  A.   Yes.

22             MS. BROWN:  He's asking the same question.

23             THE COURT:  Sustained.  We've been around about it.

24             MR. SLATER:  I just want to make sure I understand,

25  because I'm going to have an issue, Your Honor, if she's going
```

Afnan - Cross - Slater                    124

```
 1   to now --
 2              MS. BROWN:  But it was sustained.
 3              MR. SLATER:  I guess we're going to have to lay it
 4   out for Your Honor before the evidence comes in, but Min Li was
 5   the 30(b)(6) witness --
 6              THE COURT:  Yeah.
 7              MR. SLATER:  -- who I asked about it and said what it
 8   said.  So are we now going to have two different 30(b)(6)
 9   witnesses come in and contradict each other about the meaning
10   of this?  I don't think that would be permissible.
11              THE COURT:  What do you mean two 30(b)(6) witnesses
12   come in?
13              MR. SLATER:  Jucai Ge --
14              THE WITNESS:  Says no.
15              MR. SLATER:  -- he wants her to come in and say it
16   didn't say this when Min Li already said it does say this.
17              THE COURT:  Well, then that's not -- that's their
18   issue, not yours.
19              MR. SLATER:  All right.  So I understand --
20              THE COURT:  But this witness -- Mr. Slater, this
21   witness relied upon the email.  He spoke to the recipient of
22   the e-mail.  He asked the recipient how did you interpret this.
23   And based upon that, he came to the conclusions he came to.
24              You may cross-examine him.  You may cross-examine him
25   to show that his reliance was ill-conceived.  But it doesn't
```

*Afnan - Cross - Slater*                                                    *125*

```
 1    mean that he couldn't rely on it.
 2    BY MR. SLATER:
 3    Q.   Are you solely relying on what Jucai Ge told you the email
 4    said?
 5    A.   As I said earlier today, I looked -- I spoke to her.  I
 6    read her testimony.  I studied the patent which is attached to
 7    that email, and I read the email as well, so -- and there are
 8    other translations of the email.  So there were a number of
 9    activities that went on.  No, I read the email.  I read the
10    patent which is attached to the email.
11    Q.   Did you read the translation that ZHP provided in
12    discovery?
13    A.   I've looked at multiple translations.
14    Q.   Did you see that the translation ZHP provided said there's
15    NDMA in valsartan and it's caused by the sodium nitrite
16    quenching?
17    A.   I don't know who had provided that translation.
18              THE COURT:  You considered differing translations; is
19    that what you're saying?
20              THE WITNESS:  Yes.  But they're very different, Your
21    Honor.
22              THE COURT:  Okay.
23              MR. SLATER:  Sorry, Your Honor.  I'm having a paper
24    overload issue.
25              THE COURT:  Join the crowd.
```

*Afnan - Cross - Slater*                        *126*

```
 1              MR. SLATER:  Ah.

 2              (Handing out documents.)

 3              MR. SLATER:  This is the ZHP translation attached to

 4    former counsel for ZHP's certification.

 5              THE WITNESS:  Thank you.

 6              MS. BROWN:  Your Honor, I object.  This goes to

 7    weight.

 8              THE COURT:  Okay.  Mr. Slater, you can show him 25

 9    different translations, okay.  He relied upon varying

10    translations.  He then rendered his opinion based upon the

11    translations he chose to rely upon.  You can show him different

12    ones.  They all go to weight.  It is not -- it is not

13    impermissible for an expert to rely upon certain documents and

14    to disregard others.  That goes to weight.  There's nothing

15    under the law that says an expert has to consider everything --

16    everything possible.  Those go to weight.

17              But I find his testimony was -- that he had the

18    specialized knowledge.  His testimony was the product of

19    sufficient facts.  He relied upon various documents that were

20    given to him through the course of the litigation.  I find that

21    his testimony has been reliable.  But all of the

22    cross-examination thus far has gone to weight.

23              MR. SLATER:  My concern, Your Honor, is that Your

24    Honor has talked about your role as a gatekeeper under 702.

25              THE COURT:  Yes.
```

*Afnan - Cross - Slater*                                127

```
 1              MR. SLATER:  That if the witness wants to say,
 2    well -- there's only two translations, by the way.
 3              THE COURT:  Okay.
 4              MR. SLATER:  There's ours and ZHP's, and they both
 5    say the same thing on these points.
 6              THE COURT:  Well, I don't think that's the case.  I
 7    don't think this witness --
 8              MR. SLATER:  Well, I can show them to Your Honor,
 9    because my concern is that I don't think the witness can say --
10    even if the sentence says exactly what it says, for him to say,
11    well, I don't agree that it says what you can see it says.
12              THE COURT:  But then he spoke with the recipient of
13    it as well.  And so what do you want me to do about it,
14    Mr. Slater?  I mean, that all goes to weight.
15              You can show that he was -- his testimony should be
16    given no credibility because he relied -- you know, that he
17    called the recipient and it's black and white, it says what it
18    says.  Or why did he bother looking at the patent that was
19    attached to it?  That was a side event.  He should never --
20    whatever it is the cross you want to do.  But that goes to the
21    weight of his testimony.
22              MR. SLATER:  I hear Your Honor.
23              So you know, Min Li also received it.  It was sent to
24    multiple people.  He explained what it said.  My concern is, as
25    you understand, is that the witness is going to come in and
```

*Afnan - Cross - Slater*                                    128

1  even though every -- everybody said it says this.  For the

2  witness to come in, who doesn't speak Chinese, he can't read it

3  himself, and to say, well, you know what, I just interpret

4  these words differently, I don't think the Court can let him go

5  that far when it's black and white, every single person said it

6  said this.  Their only explanation is, well, he didn't really

7  mean it or he was guessing.

8          THE COURT:  Are you not turning me into a fact

9  finder?

10          MR. SLATER:  I don't -- I -- it's interesting because

11  the defense was arguing in the *Daubert* hearings a week or two

12  ago that 702 has been amended, so you now have to actually look

13  into this and see if there's a reliability factor to a

14  conclusion.  So I was just following through with that.  That

15  was what I was doing.

16          THE COURT:  And I'm finding that it's reliable.

17  Whether the jury finds it or not is up to you, Mr. Slater, to

18  attack on cross-examination, as you've been attempting to do.

19          Yes.

20          MR. SLATER:  I understand.

21          MS. BROWN:  And, Your Honor, your role as the

22  gatekeeper is to say did you rely on reliable information.  Did

23  you call someone?  Did you look at something?  The Court has

24  fulfilled that.  All of these questions are --

25          THE COURT:  Yeah.

*Afnan - Cross - Slater*                                    129

```
 1              MS. BROWN:  -- you looked at this, you didn't look at
 2    this, everybody said this, what about this, it's all weight.
 3              THE COURT:  They go to the weight.
 4              MR. SLATER:  I got it.
 5              THE COURT:  If this witness were testifying that he
 6    relied upon an email that his sixth grade teacher wrote --
 7              MS. BROWN:  Correct.
 8              THE COURT:  -- I mean, then we would have an issue.
 9              MS. BROWN:  Correct.
10              THE COURT:  But this is a document that was produced
11    in the ordinary course of the litigation, in the ordinary
12    course of ZHP's business and he has interpreted it as such.
13              MR. SLATER:  Fair enough.  I understand, Your Honor.
14    I'm not going to ask any more questions about this subject.
15              THE COURT:  Okay.  Does that mean you're done?
16              MR. SLATER:  No.  Now I have to go to the last part
17    which I think is very significant, but --
18              THE COURT:  His reliance on Xue?
19              MR. SLATER:  His reliance on Xue.  It's all over.  I
20    can walk through paragraph after paragraph to show you that
21    what he said he did not form an opinion on, which is what could
22    have reasonably been known --
23              THE COURT:  I find his testimony credible that he
24    didn't know it until the night before.
25              MR. SLATER:  Oh, no, no, no.  I'm not talking about
```

*Afnan - Cross - Slater*                    *130*

1    that issue.

2              THE COURT:  What are you talking about?

3              MR. SLATER:  Oh, no, I get that.  What I'm saying

4    is --

5              THE COURT:  And so to the extent that you want to

6    strike paragraphs 140 and 191, those two paragraphs, you know,

7    I'm not going to, no.  He's permitted to testify to those.  141

8    and 190.

9              MR. SLATER:  But Dr. Xue has been precluded.  Those

10   opinions that he's relying on have been barred.

11             THE COURT:  Well, he doesn't -- that doesn't mean

12   that he -- it doesn't mean that he necessarily can get on the

13   stand and say, oh, and by the way, Dr. Xue said that.

14             MR. SLATER:  But his reliance, if you go through

15   this, what I think permeates these paragraphs, I think we're

16   probably at the argument part on this point, because I could go

17   through it with him, and I think I can go show Your Honor if I

18   walk through it that every one of these opinions relies on the

19   fundamental opinion of Dr. Xue that nobody could have

20   reasonably known this so there was no reason to look for it.

21             THE COURT:  He testified that he didn't even review

22   Xue's report until the night before he wrote his report.

23             MR. SLATER:  But with --

24             THE COURT:  And so that -- that ends it.

25             MR. SLATER:  But without Xue, he can't give the

1    opinion because he's not a chemistry expert.

2            THE COURT:  He can't give what opinion?

3            MR. SLATER:  He can't give the opinions -- any

4    opinion that's based on what ZHP should or shouldn't have known

5    or could have known from a scientific chemistry standpoint,

6    because he's not an expert in chemistry, all these opinions we

7    listed here are bottomed on the opinion that this was not

8    reasonably knowable.  And he's not qualified to give that

9    opinion.

10           THE COURT:  But you don't need to be a chemist to

11   make that --

12           MS. BROWN:  Right.  The FDA --

13           THE COURT:  You don't need to be a chemist to make

14   that opinion.

15           When I read these two paragraphs, you can easily

16   strike out "as explained in detail in the report of Xue."  I

17   mean, it was not necessary for him to write that.  He made an

18   independent determination based upon his regulatory experience.

19   He didn't need to write it.  Why he did, I don't know.  But he

20   probably felt like, oh, I have someone who's bolstering my

21   argument.  Xue's been precluded so he's not going to be

22   permitted to say to the jury, oh, by the way, you should know

23   Xue said the same thing to me.

24           MR. SLATER:  Except he didn't do the analysis, Your

25   Honor.

*Afnan - Cross - Slater*                                    132

```
 1              THE COURT:  I find that he did.
 2              MR. SLATER:  But he didn't look at the science --
 3    I'll ask.
 4    BY MR. SLATER:
 5    Q.   Did you do an analysis of scientific chemistry literature
 6    and talk about it in your report as to what was known at the
 7    time?  I didn't see it in your report.  Is it there?  Yes or
 8    no?
 9    A.   My --
10    Q.   It's simple, did you do an analysis in your report --
11    A.   I was --
12    Q.   -- on the state of the scientific organic chemistry
13    literature that was available to be known to ZHP when they were
14    developing this process?  Yes or no?
15    A.   I was the regulatory expert responding to your experts.
16              MR. SLATER:  So how can he give an opinion on what
17    could have been known in the chemistry literature among the
18    chemistry community if he's not an expert in that field?  He
19    didn't do the analysis, and the witness that his report says he
20    relied on for it has been precluded on that opinion.  He has no
21    basis for the opinion.
22              MS. BROWN:  May I be heard, Your Honor?  He is
23    offering the regulatory opinion, what does the regulatory
24    records say.  And the FDA told the American public and the
25    world:  We didn't know.  Industry didn't know.  Nobody knew.
```

1          His opinion is based on an analysis of the regulatory

2   statements, FDA's actions, FDA's inspections.  He's not going

3   to say:  All organic chemists knew this, didn't know this, look

4   at this article, look at that.

5          He's saying from a regulatory perspective, this is

6   the knowledge, these were the conclusions, these were the

7   responsibilities, and these were the actions.  It's a total

8   disconnect between what he's arguing.

9          THE COURT:  What she said.

10         MR. SLATER:  For the record, I object.  But I

11  understand your ruling.  And based on where we are now, I have

12  no further questions.

13         THE COURT:  There was one question you wanted.  I

14  said you could do it on redirect.  Do you wish to do it?

15         THE WITNESS:  No.  Thank you.  Thank you, Your Honor.

16         THE COURT:  You may step down.

17         MS. BROWN:  Excellent.

18         THE WITNESS:  Thank you.

19         THE COURT:  All right.

20         MS. BROWN:  Thank you, Your Honor.

21         THE COURT:  All right.  Just please watch your step

22  stepping down.  And please collect the exhibits, counsel.

23         MS. BROWN:  Of course.  May I approach, Your Honor?

24         THE COURT:  Yes.

25         (Witness left the stand.)

```
 1              THE COURT:  Mr. Slater, you have things up there,
 2   too.
 3              (Discussion was held off the record in open court.)
 4              MR. SLATER:  Your Honor, I don't know if this needs
 5   to be on the record.  I realized that I did not mark any
 6   exhibits yesterday, and I didn't do it again.  I realized it in
 7   the shower this morning.  And I'm sorry.  That's why --
 8              THE COURT:  Yeah.  We should have, yeah.
 9              MR. SLATER:  We might be able to do that.
10              THE COURT:  The Bates number.  Or you can just
11   stipulate to it.
12              MR. SLATER:  We can stipulate to exhibit numbers,
13   just to clean up the record, that's fine.
14              THE COURT:  Yes.  Okay.
15              MR. SLATER:  I'm sorry about that.
16              THE COURT:  All right.  No worries.
17              MR. SLATER:  My bad.
18              THE COURT:  Okay.  So where are we?
19              So you have my ruling.  I think that this testimony
20   comes in.
21              I'm still mulling over Conti.  I think -- do I owe
22   you any other rulings?  I'm going to talk about a trial date.
23              MS. BROWN:  No, thank you, Your Honor.  I think we're
24   caught up on the rulings.  Thank you.
25              THE COURT:  Okay.
```

135

```
 1                    So your brief is in tomorrow?  Today?  What's today?
 2      Wednesday.
 3                    MR. SLATER:  I'm sorry.  Today, I think.  Is today
 4      Wednesday?  I lost track.  Yes.  We said Wednesday.  So are we
 5      ready to file it tonight or do we need another day?
 6                    MR. STANOCH:  I'd have to check, Your Honor.  Today
 7      or tomorrow.
 8                    MR. SLATER:  We have a team of people pulling cases,
 9      doing a massive survey, and they worked very late last night.
10      So --
11                    THE COURT:  Okay.
12                    MR. SLATER:  We're trying to get you what you need.
13                    THE COURT:  Appreciate it.  And then you'll respond
14      on Friday.
15                    MR. OSTFELD:  Your Honor, if we're going to be
16      responding to a massive survey, I would ask that we have until
17      Monday.
18                    THE COURT:  No, I'm not going to give it to you.
19      You've got to read it first and then tell me.  Because you know
20      what the issues are, okay?
21                    MR. OSTFELD:  Understood, Your Honor.
22                    THE COURT:  All right.  And if I get an email from
23      you folks or something on the docket that you all can't agree,
24      I'm going to like do another sigh; I know I am.  All right.
25                    MR. SLATER:  Nobody wants a sigh.
```

```
 1              THE COURT:  Okay.  So the trial, I think I'll start
 2    picking the jury the end of October.
 3              There's one day that's problematic for me, but I'm
 4    going to see if I can reschedule a bunch of things.
 5              So I'm going to pick the jury on the 28th, because I
 6    have to send out this form to the jury pool and then they
 7    complete it, so I have to prequalify.
 8              So I think if I give you folks -- if I start on the
 9    28th, we definitely will get the jury by that week.  If not,
10    and then if we have the jury, we're going to go right into
11    openings.  We're going make use of the time.  So the 28th,
12    29th, 30th, 31st, and the 1st.
13              There is one date, let me look at my calendar here,
14    that's a little iffy.
15              Yeah.  The 29th is a little iffy, but right now I
16    want you to assume that we're going to sit that day, okay?
17              So where are we with the questionnaire?  Oh, you all
18    went back to take another look.
19              MR. SLATER:  I'm waiting to hear back.  I think
20    counsel for the defense was going to modify it or -- if there's
21    anything to talk about, obviously we're available.
22              THE COURT:  Okay.
23              MS. LOCKARD:  Yeah.  We'll work it out, Your Honor.
24              MR. SLATER:  I have plenty of time.
25              MS. LOCKARD:  Is there a date by which you need that?
```

```
 1   We will obviously get to it.  But --
 2              THE COURT:  Well, no, I'm fine.  I mean, just not,
 3   you know, I need a bunch of copies and all of that, so I'm
 4   fine.  And I don't think there was too many questions I had
 5   issues with, so...
 6              MR. SLATER:  You ruled on a couple of them, too.
 7              THE COURT:  Yeah.  It would be helpful if there were
 8   any -- just show me the ones that I need to rule on, if you
 9   can't agree.
10              MS. LOCKARD:  I think you ruled pretty clearly.  And
11   I think we know where we need to go on that.  We just need to,
12   I think, finesse the language in a way -- I think Mr. Slater
13   and I can reach an agreement on that.
14              THE COURT:  Okay.  Yeah.  It would be great if you
15   don't have any other disagreements on the voir dire.
16              MS. ALLON:  Your Honor, I'm sorry, just on
17   availability on that week.
18              THE COURT:  Yeah.
19              MS. ALLON:  When we originally set the dates I think
20   I mentioned to this Court I have a conflict on October 31st.
21   We were going to do jury selection, I was going to miss that
22   day.  It's my brother's wedding.  Like, I'm going to be
23   disowned by my family.
24              MR. SLATER:  Congratulations.
25              MS. ALLON:  Thank you.
```

138

1              So I understand things can go on without me, but I

2    just can't open on that day.

3              THE COURT:  Oh, openings.

4              MS. ALLON:  Yeah.  I just -- so that's why, you know,

5    if it takes us three days to pick a jury and then that's the

6    day that we're at openings, that's going to be a problem for

7    me.

8              THE COURT:  Okay.  You're not here on the 31st and

9    the 1st?

10             MS. ALLON:  I'm going to come back for the 1st.  I'm

11   going to make it back.

12             THE COURT:  On the 1st?

13             MS. ALLON:  Yes.

14             THE COURT:  Oh.  So maybe we'll do openings on the

15   1st.

16             MS. ALLON:  Okay.

17             MR. SLATER:  You'll leave your family for this?

18   Don't do that.

19             MS. ALLON:  I will leave my family, yes.  It's okay.

20   I will be back on the 1st.  I would prefer not to --

21             THE COURT:  Or you can all just settle and we would

22   just allow her to go to the wedding and enjoy herself.

23             Okay.  So what else did I want to say?  Oh, we're

24   going to try the case in my other courtroom.  I've decided.  So

25   I have a courtroom over in 3D.  I think it's just going to be

1    more accommodating, particularly to the attorneys.  There's

2    conference rooms that we can use outside the courtroom.  And I

3    just -- I think it's probably better suited for a trial of this

4    size.

5              So I think I told you, I'm going to equip it with

6    iPads.  We're working on that.  And I'm going to equip it with

7    phones.  That's where we'll do our sidebars, at tables, at the

8    tables.  So that's going to take some time to set up, so I

9    wanted to mention that, that we'll be in 3D.

10             I probably will have you folks back for argument

11   again on just, you know, I'm fussing with, you know, the claims

12   and the theories and the damages and trying to put it all

13   together in a comprehensive format to get my head around it.

14             Jury charges, where are you all with those?

15             MR. SLATER:  I think --

16             THE COURT:  I think that some of that will then

17   depend upon my rulings and how I see the case.

18             MR. OSTFELD:  Your Honor, I believe that the

19   supplemental letters or briefing on the issue of the Esperanto

20   jury instruction and whether it can be one instruction or it

21   has to be jurisdiction-specific, we've submitted that.

22             THE COURT:  Yeah.

23             MR. OSTFELD:  If Your Honor would like to hear

24   argument on that, we can certainly schedule that.

25             THE COURT:  Yeah.  I've looked at the issue.  I have

```
 1    in my head I think what I'm going to do, but I'll look at it
 2    more closely.
 3              MR. OSTFELD:  Okay.
 4              THE COURT:  Yeah.  But where are you on the jury
 5    charges?  You starting to work on them?
 6              MR. SLATER:  They were prepared and then I --
 7              MR. OSTFELD:  They were submitted, I believe --
 8              MR. SLATER:  They were submitted, but they're being
 9    reworked heavily.
10              MR. OSTFELD:  -- with the original final pretrial
11    order.  I know that we'll be revising the final pretrial order.
12              THE COURT:  Yeah.
13              MR. SLATER:  I think --
14              MR. OSTFELD:  If Your Honor provides guidance on the
15    Esperanto issue, we may then be able to -- I mean, right now we
16    have two completely different sets of jury instructions because
17    one of them is sort of an omnibus set of instructions, and the
18    defense side is a state-specific set of instructions for each
19    state.
20              MR. SLATER:  Right.  Question for Your Honor.
21              MR. STANOCH:  Your Honor, just on the instructions, I
22    agree with what Mr. Ostfeld said.  I just add that they, and I
23    don't mean this pejoratively, their position is every state,
24    every element needs a separate instruction.  We didn't do an
25    Esperanto.  We grouped them based on the similarity of the
```

1    states, right?  We didn't just merge everything into one.  We

2    said state A and B say the same thing under the law.  So we

3    said that's one charge.  And we did that in groups.  So that's

4    really the difference.  And if Your Honor gives us guidance

5    that that's okay in some respects or others, I think we can

6    work through the instructions.

7              THE COURT:  Okay.  I will, either through my law

8    clerk or a text order, I'll do it.  Or I'll have my law clerk

9    reach out to you and let you know which one I prefer, and then

10   I can rule on the record when we next meet.

11             But I do think I'm going to want oral argument on

12   this whole, you know, the issue that's been, you know,

13   gnawing --

14             MR. SLATER:  The warranty issue?

15             THE COURT:  -- gnawing at me, the damages and, you

16   know, what the plaintiff can and can't argue to the jury.  That

17   will depend upon the briefing that I get from you all.

18             Because I do think that that will -- I think it

19   really will form the complexion of the case and how it's

20   presented to the jury, because I think you both are at such

21   different ends of the spectrum on that.

22             Okay.  So once I get the briefing, you'll hear from

23   me.

24             MS. BROWN:  Great.  Thank you.

25             THE COURT:  And I'll probably have you all back.

```
 1                    MS. BROWN:  Thank you.
 2                    THE COURT:  Okay.
 3                    MS. BROWN:  Thanks, Your Honor.
 4                    MR. SLATER:  I have a question.
 5               Did Your Honor have any issue with us using paper
 6      exhibits or is it expected to be electronic?
 7                    THE COURT:  I want everything electronic.
 8                    MR. SLATER:  Okay.  That's -- because Judge Kugler
 9      had the same approach, so I just wanted --
10                    THE COURT:  Paper or electronic?
11                    MR. SLATER:  Electronic.
12                    THE COURT:  Electronic, yeah.  That's why I want the
13      jurors to have iPads.
14                    MR. SLATER:  Okay.
15                    THE COURT:  And we'll figure out.  I have not done it
16      ever that way.
17                    MS. BROWN:  Me either.
18                    MR. SLATER:  I have not either.
19                    MS. BROWN:  I haven't either.
20                    THE COURT:  My colleagues have, and they really say
21      great -- it works really well.  And I think a case like this,
22      it's --
23                    MR. SLATER:  I'm scared to death of it.
24                    THE COURT:  I know.  But it's required.  You can't
25      have a jury swimming in paper like this.
```

1           MS. BROWN:  Yeah.

2           THE COURT:  So, yeah.  Did you want to say something?

3           MS. BROWN:  No.  No.  I was rising to say thank you.

4           THE COURT:  All right.  Good to see you all.

5           MR. SLATER:  Thank you, Your Honor.  Have a nice

6    night.

7           MS. BROWN:  Thanks, Judge.

8           (Proceedings concluded at 4:35 p.m.)

9           - - - - - - - - - - - - - - - - - - - - - -

     **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

10          - - - - - - - - - - - - - - - - - - - - - -

11        I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14

15   /S/John J. Kurz, RDR-RMR-CRR-CRC            September 21, 2024

16   Court Reporter/Transcriber

17

18

19

20

21

22

23

24

25