```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2   _____
                                      :  CIVIL ACTION NUMBER:
 3                                    :  19-md-02875
     IN RE:  VALSARTAN PRODUCTS       :
 4   LIABILITY LITIGATION             :  DEPOSITION DESIGNATION
                                      :  HEARING VIA TEAMS
 5   _____ :

 6        Mitchell H. Cohen Building & U.S. Courthouse
          4th & Cooper Streets
 7        Camden, New Jersey 08101
          September 24, 2024
 8        Commencing at 9:35 a.m.

 9   B E F O R E:        THOMAS I. VANASKIE (RET.)
                         SPECIAL MASTER
10
     A P P E A R A N C E S:
11

12        KANNER & WHITELEY, LLC
          BY:  DAVID J. STANOCH, ESQUIRE
13        701 Camp Street
          New Orleans, Louisiana  70130
14        For the Plaintiffs

15
          NIGH GOLDENBERG RASO & VAUGHN
16        BY:  DANIEL A. NIGH, ESQUIRE
          1333 College Parkway, #1049
17        Gulf Breeze, Florida 32563
          For the Plaintiffs

18

19

20

21
       Ann Marie Mitchell, CRR, RDR, CCR, Official Court Reporter
22               AnnMarie_Mitchell@njd.uscourts.gov
                       (856) 576-7018
23
       Proceedings recorded by mechanical stenography; transcript
24           produced by computer-aided transcription.

25
```

1   **A P P E A R A N C E S (Continued)**:

2

3       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        BY:  NINA R. ROSE, ESQUIRE

4       1440 New York Avenue, N.W.
        Washington, DC 20005

5       For the Defendants Prinston Pharmaceuticals,
        Solco Healthcare U.S. LLC, and  Zhejiang Huahai

6       Pharmaceuticals Ltd.

7       GREENBERG TRAURIG LLP
        BY:  VICTORIA DAVIS LOCKARD, ESQUIRE

8       BY:  STEVEN M. HARKINS, ESQUIRE
        3333 Piedmont Road, NE, Suite 2500

9       Atlanta, Georgia  30305
        For the Defendants Teva Pharmaceutical Industries Ltd.,

10      Teva Pharmaceuticals USA, Inc., Actavis LLC,
        and Actavis Pharma, Inc.

11

12      KIRKLAND & ELLIS LLP
        BY:  JACOB M. RAE, ESQUIRE

13      601 Lexington Avenue
        New York, New York  10022

14      For the Defendants Torrent Pharma, Inc.
        and Torrent Pharmaceuticals Ltd.

15

16  **ALSO PRESENT**:

17

18      LARRY MACSTRAVIC, Courtroom Deputy

19

20

21

22

23

24

25

*United States District Court*

```
 1              (PROCEEDINGS held via Teams before SPECIAL MASTER
 2    THOMAS I. VANASKIE at 9:35 a.m.)
 3              SPECIAL MASTER VANASKIE:  We're going to get started
 4    on reviewing deposition excerpt designations and ruling on
 5    objections.
 6              We're going to get as far as we can today.  We won't
 7    get through everything, so you understand going in that I'm
 8    not prepared to complete everything today.  But we'll get as
 9    far as we can, and then we have scheduled time later during
10    the week, and we'll resume then, if that's all right.
11              We'll proceed as I did with the ZHP -- the
12    designations of ZHP witnesses.  I'll entertain brief argument
13    and make rulings.
14              It seems to me, and correct me if I'm wrong -- and I
15    will ask for guidance on this -- that I've got to go excerpt
16    by excerpt.
17              Does anybody disagree with that?
18              MR. STANOCH:  Your Honor, David Stanoch for
19    plaintiffs.
20              I think that's generally correct, but I am hopeful
21    that once we get into some of these witnesses and you address
22    the larger subject matter or issue or document that's being
23    discussed, that may move along very similar subsequent
24    objections.
25              SPECIAL MASTER VANASKIE:  That's what I'm hoping.
```

*United States District Court*

1    And I wanted to ask at the outset whether you all have met and

2    conferred with respect to each of the challenged designations.

3         MR. STANOCH:  Your Honor, David Stanoch for

4    plaintiffs again.

5         Yes.  I believe that's true for all of them for Teva

6    and Torrent.  And what we've provided you are of the ones that

7    remain in dispute.  There are a number of others which we

8    simply excised where we've reached agreement.

9         SPECIAL MASTER VANASKIE:  All right.

10        Now, the first witness I wanted to take up is

11   Elisabeth Gray.

12        That seemed to be pretty straightforward.  And I got,

13   as I noted earlier, some counter-designations today.  And I

14   don't think we'll be addressing them, as they did -- were just

15   brought to me.

16        But let me -- I have the spreadsheet with the

17   objections, my tentative rulings, and let me pull up the

18   transcript itself.  Okay.  I'm going to do this.  I only have

19   two screens, I don't have three screens.  So I have the

20   transcript in front of me, and I have the spreadsheet on

21   another screen.

22        I don't have -- I won't be looking at you.  You'll be

23   able to see me, of course.  And we'll go -- as I said, I

24   intended to go excerpt by excerpt, at least at the outset.

25        So the first excerpt from the deposition of Elisabeth

1  Gray on February 26, 2021, the plaintiffs' affirmative

2  designation is at page 49, line 22, to page 50, line 9.

3      Then I have a counter-designation at page 51, line 5,

4  to page 53, line 1.

5      MS. LOCKARD:  That's correct, Judge.

6      SPECIAL MASTER VANASKIE:  Go ahead.

7      MS. LOCKARD:  So Victoria Lockard for Teva.  I think

8  the issue on a few of these, and you'll see throughout, is the

9  ongoing disagreement between the parties about the rule of

10 completeness.

11     And we actually briefed this in standalone briefing

12 as to how much of this completeness rule applies.

13     Plaintiffs' position has been almost essentially that

14 the only thing you can play in a completeness counter is just

15 to complete the sentence.

16     And that's not actually the law.  Under Evidence

17 Rule 106, if a party introduces all or part of a writing or a

18 statement, including a deposition, the adverse party may

19 require the introduction at that time of any other part or any

20 other writing that in fairness ought to be considered.

21     And in our briefing, I won't go through all of it,

22 but we go through case law, including Supreme Court precedent

23 that specifically says that we are entitled to play more than

24 just the rest of the sentence, that we are entitled to play

25 additional testimony if it would provide an accurate

1  representation of the statement and avoid prejudice and

2  confusion.  And so that's what we have endeavored to do.

3      And with Judge Bumb's ruling, she had said repeatedly

4  that the defendants will be allowed to play their clips from

5  the deposition at the same time as plaintiffs.  She wants the

6  videos played just once.

7      So that's the preliminary ground on which we make

8  these completeness counters.  And so you're going to hear from

9  plaintiffs that it introduces additional information not

10  within the underlying question.

11      But in fairness and under Judge Bumb's rulings, we

12  think we ought to be able to provide these counters to provide

13  context and clarity for the deponent's statement.

14      SPECIAL MASTER VANASKIE:  All right.

15      David?

16      MR. STANOCH:  Thank you, Your Honor.  I'll be brief.

17      We disagree that Judge Bumb has issued any ruling

18  whatsoever on completeness.  Your Honor addressed completeness

19  designations for hours on Friday with ZHP.

20      I think it's suffice to say that the purpose of

21  completeness is to address something that is specifically out

22  of context or misleading.  It's not for defendants, or any

23  party, for that matter, to inject page upon page and line upon

24  line of additional testimony to dilute that which we are

25  allowed to designate from a party opponent admission.

```
 1              And I'll just leave it at that, Your Honor.
 2              SPECIAL MASTER VANASKIE:  All right.  Well, the first
 3      three excerpts for which there are objections -- let me just
 4      make sure -- dealt with this completeness question.  And as I
 5      said, we are at page 51, line 5, to page 53, line 1.
 6              I am going to allow those counter-designations.  The
 7      counter-designation at page 51, lines 5, to page 53, line 1.
 8              I also looked at the completeness question with
 9      respect to the excerpt at page 76, lines 1 to 4, and the
10      counter and affirmative designation at page 103, lines 4 to
11      14, and page 106, lines 14 to 18.
12              And I think they all come in.  So to the extent there
13      are objections, they're overruled.  The testimony may come in.
14      That's the guidance I'll give you on that.
15              MR. STANOCH:  Your Honor, plaintiffs understand your
16      ruling.  I'm not going to argue every single time here on a
17      rule against us.
18              SPECIAL MASTER VANASKIE:  Right.
19              MR. STANOCH:  Obviously, I appreciate that to move
20      this along.
21              And obviously, to the extent after this we decide to
22      remove our designation in light of the completeness ruling,
23      that would take away both the designation and the completeness
24      designation.  Teva may want to affirmatively designate it, but
25      that's a different issue.
```

```
 1            SPECIAL MASTER VANASKIE:  That's a different issue.

 2            MR. STANOCH:  I would only look at page 103, line 4,

 3    question and answer, Your Honor.

 4            SPECIAL MASTER VANASKIE:  Let me get to it.

 5            All right.  I'm looking at it.

 6            MR. STANOCH:  You'll see here, the question is simply

 7    about the exhibit itself that we're talking about.  And then

 8    she says, "there is not," but then goes on and on about what

 9    the FDA may or may not do.  She's speculating about what they

10    may have done.

11            We think that's not -- not appropriate completeness

12    and would not be, frankly, appropriate testimony for Teva to

13    elicit on their own direct.

14            SPECIAL MASTER VANASKIE:  All right.  Victoria?

15            MS. LOCKARD:  Well, Your Honor, our position on this

16    is the question is asking this witness, well, in the

17    submission to FDA, did you include any mention of testing?

18    And the witness is saying there's not, but if the FDA wanted

19    additional testing, they could ask for it.  And I think that's

20    fair for the jury to understand.

21            SPECIAL MASTER VANASKIE:  Yeah.  I agree.  My

22    inclination was to allow the testimony, overrule the

23    objections.  And I'll adhere to that determination.

24            All right.  The next excerpt I have deals with the

25    question -- deals with testimony at page 110, line 15, to 111,
```

*United States District Court*

1  line 12.

2          MS. LOCKARD:  So, Your Honor, if I may, so this is a

3  regulatory witness.  She was a 30(b)(6) corporate rep.  She

4  was designated to discuss communications between Teva and the

5  FDA.

6          What she's being asked about here is outside of the

7  scope of the 30(b)(6) notice topics.  It's also outside of her

8  personal knowledge, in violation of Rule 602, which requires

9  the witness to have personal knowledge.

10          So she either has to be testifying within the scope

11  of the 30(b)(6) topic or she has to have personal knowledge.

12          She doesn't.  She's not a quality testing person.

13  Teva has another witness, we'll discuss it on another date,

14  who was designated to talk about what testing Teva did.  It's

15  Tony Binsol.  And there's plenty of testimony about that

16  testing.  Dan Barreto will also address that.

17          This witness is in the regulatory department.  She

18  takes the information that's provided and she prepares the

19  submissions and submits them to FDA.

20          And so plaintiff is asking her, well, you know, you

21  don't know what testing was done, you don't know what testing

22  was done.  And she's trying to explain in here, no, you know,

23  that's a quality function.  And I think it's misleading

24  because it leads the jury to believe that testing wasn't done

25  when, in fact, it was.  And that will be explained by other

1  witnesses.

2       So we drew a line here.  So where she's asked

3  questions about, well, is there any reference of testing in

4  the submission to FDA, and she can say no, that's not in the

5  submission.  But when the question goes farther and says,

6  well, you don't even know if Teva did any testing, I think

7  that violates 602 and it's outside the scope of her topic.

8       And that's why we have a few objections on that

9  ground, that this is one of them.

10      SPECIAL MASTER VANASKIE:  All right.  David?

11      MR. STANOCH:  Your Honor, we're asking this witness

12  about the regulatory communications with the FDA about what

13  testing was done and the representations made in that

14  communication to the FDA.  We just heard on Your Honor's prior

15  rulings that what Teva or FDA did or did not do or did not say

16  about testing is fair game.

17      So if Teva is going to make a statement in the letter

18  to the FDA about what testing it did or did not do, I can

19  certainly ask and did ask that witness what other testing may

20  be out there as to the veracity of the statements made in

21  those letters to the FDA.

22      MS. LOCKARD:  The other thing I'll mention about

23  this, Your Honor, is that she's actually asked the same

24  question twice.  And so in the full designation, you know,

25  she's asked at line 15, she gives a response, and then she's

1    asked again on page 111, line 7.  "Again, you don't know one

2    way or another?"

3         And in our meet and confers, according to my notes, I

4    said, we would withdraw the objection to the first question if

5    the second time the question was asked is taken out.

6         So I think as a -- you know, as a resolution of this,

7    if -- we would agree to the first part, the first question and

8    answer ending at 111, line 6, if he takes out the remainder of

9    that designation and the answer in the following designation.

10        MR. STANOCH:  Your Honor, I don't want to belabor it.

11   The first question, she says, "Oh, perhaps it doesn't specify

12   everything."  I'm quoting.  So I follow up then on that

13   because she opened the door.  Right?

14        "Well, you don't actually know, Ms. Gray, one way or

15   the other, do you, if it doesn't specify everything or not?

16   Perhaps there's something else."

17        She injected that in her answer, and Ms. Lockard

18   wants to take away my cleaning that up and following up on the

19   witness's answer, implying, wrongly, that perhaps there is

20   something else out there.  I just don't know.

21        I don't think it's appropriate to cut it off.  It's

22   not cumulative.

23        MS. LOCKARD:  That's why it's inappropriate testimony

24   to reach the jury, because she doesn't know.  And it's outside

25   of her personal knowledge, and it violates Rule 602.

1          SPECIAL MASTER VANASKIE:  I agree.  The testimony

2     that follows the question at page 110, line 15, through page

3     110, line 20 should be stricken.  In other words, I sustain

4     the objection and disallow that exchange in its entirety.

5          MR. STANOCH:  I'm sorry, you said 110, 15 through

6     110, 20.

7          Do you mean the entire designate- -- the designation

8     was 110, 15, through 111, 12.

9          SPECIAL MASTER VANASKIE:  That is out, as well as the

10    designation that's out at 111, line 17 to 20.

11         MR. STANOCH:  Okay.  So both of those are out.  Got

12    it.

13         SPECIAL MASTER VANASKIE:  Both of those are out.

14         That will take us to page 113, line 22.

15         MS. LOCKARD:  So on this one, Your Honor, the only

16    part of this that we object to are lines 115, 3 to 7.

17         SPECIAL MASTER VANASKIE:  Page 115, lines 3 to 7?

18         MS. LOCKARD:  Yes.  So we only object to 115, lines 3

19    to 7.

20         MR. STANOCH:  Your Honor, based on your last ruling,

21    I agree that lines -- 115:3 to 7 should come out under the

22    same logic, as well as the answer in the ensuing designation.

23         SPECIAL MASTER VANASKIE:  Right.  So that would be

24    page 115, lines 15 through 21.

25         MR. STANOCH:  Correct.  So 115, 3 through 7, the

1   question, out.  115, 15 to 21, the answer, out.

2           SPECIAL MASTER VANASKIE:  Are you with us on that,

3   Victoria?

4           MS. LOCKARD:  Yes.  I think we understand.  So that's

5   correct.  And I believe that's it for Liz Gray.

6           MR. STANOCH:  Yep.

7           SPECIAL MASTER VANASKIE:  Yes.  I think that is.

8   That's why I chose that one.

9           MR. STANOCH:  One down, Your Honor.  Very nice.

10          SPECIAL MASTER VANASKIE:  It's not going to go as

11  well.

12          The next witness I had is a Torrent witness, I

13  believe.  And that would be Kelly Gegenheimer.

14          MR. NIGH:  Yes, Your Honor.

15          MR. RAE:  Yes, Your Honor.

16          SPECIAL MASTER VANASKIE:  This gets hard for me to

17  follow here.

18          I'll tell you where I'm at, and then you can

19  straighten me out.  I'm at line 21 of the spreadsheet, page

20  73.  See, that's where I have trouble with this.

21          I guess it would be page 97 of the transcript, lines

22  23; page 98, line 3.

23          MR. RAE:  Your Honor, I believe Torrent withdrew that

24  designation.

25          So the first area that I have where there is an

```
 1   objection apparently is that plaintiffs object to our

 2   counter-designation from -- on lines 101:4 to 101:17.

 3           SPECIAL MASTER VANASKIE:  On what page?

 4           MR. RAE:  Our page 101, line 4 to page 101, line 17.

 5           SPECIAL MASTER VANASKIE:  Let me get there.

 6           MR. NIGH:  It's line 24 on the spreadsheet.

 7           SPECIAL MASTER VANASKIE:  Thank you.

 8           Daniel, do you want to respond to the objection?

 9           MR. NIGH:  Yes, very briefly.

10           We believe that it's nonresponsive.  This is

11   Torrent's counter-designation to our designation pages 100,

12   line 10 to pages 101, line 3.  And then they want to counter

13   for 101 to -- or line -- page 101, line 4 to line 17.  And we

14   believe it's nonresponsive, primarily.

15           MR. RAE:  Your Honor, this is Jacob Rae for Torrent.

16           Our position is that, as Ms. Lockard have discussed

17   earlier, counter-designations reflect information and in

18   fairness should be considered with the testimony surrounding

19   it.

20           Here Mr. Gegenheimer is clarifying that this line of

21   questioning about inquiries from finished dose customers is

22   generally consistent across all of the finished dose

23   customers.  We think that's fair content for the jury in

24   understanding this line of questioning and to the extent that

25   there's, I think, any relevance to these questions from
```

1   pharmacy customers being directed to Torrent, which, frankly,

2   I'm not sure there is, this context is relevant to that issue.

3        So if Mr. Nigh wants to say that this whole line of

4   questioning is irrelevant, I'm not sure I'm going to disagree

5   with him about that.  But this counter is fairly tied to the

6   testimony that it relates to and should be played along with

7   it.

8        SPECIAL MASTER VANASKIE:  I agree.  I'll overrule the

9   objection and allow that testimony to come in.

10       Now, the next one I have is at page 177 of the

11  transcript.

12       MR. RAE:  Yes.

13       SPECIAL MASTER VANASKIE:  This is line 29 of the

14  spreadsheet.

15       MR. NIGH:  Yes.

16       SPECIAL MASTER VANASKIE:  My inclination is to

17  sustain the objection.

18       MR. RAE:  Your Honor, if I may.

19       SPECIAL MASTER VANASKIE:  Yes, Jacob.

20       MR. RAE:  This is a question that plaintiffs are

21  asking, where the witness, Mr. Gegenheimer here, I think

22  begins to answer the question before the question is finished.

23  So the question begins at line 17: "Okay.  And does it

24  reference impurities? " The witness answers that question and

25  then begins to answer, there's cross-chatter with counsel.

```
 1   And the answer that follows that we've counter-designated is

 2   the full context that the witness is providing to explain why

 3   this document doesn't reference impurities on it.

 4         That context is important because this case obviously

 5   is about impurities, but it's not about packaging

 6   instructions, and there's no reason why packaging instructions

 7   being provided to pharmacies, who are also not the plaintiffs

 8   in this case and don't have any claims in this case, would

 9   contain information about impurities.

10         This is blister stability data.  Blister stability,

11   that's for the blister packs that products are packaged in to

12   provide them to the pharmacies.  It's not about impurities.

13   And there's no allegation in this complaint that the

14   impurities come from the way in which products were packaged

15   or stored.  It's uncontested in this case that the impurities

16   arose as a process issue with the way in which ZHP was

17   manufacturing the API.

18         And so the full context of this answer is really

19   important here to explain to the jury fairly why this sort of

20   information about impurities wouldn't be in this blister

21   stability data that is being provided to pharmacies.

22         SPECIAL MASTER VANASKIE:  Daniel?

23         MR. NIGH:  Your Honor, the question is simply:  "In

24   this blister stability data, does it reference impurities in

25   the document?"
```

1          The answer is:  No.

2          The rest of this is not responsive to whether or not

3    impurities are listed to the question, "Does it reference

4    impurities?"

5          The rest of it is a long, drawn-out response that

6    simply is explaining why it doesn't list it.  That's not the

7    question.

8          SPECIAL MASTER VANASKIE:  Yeah.  No, I agree.  I

9    sustain the objection and disallow that testimony.

10          MR. NIGH:  Okay.

11          SPECIAL MASTER VANASKIE:  The next one I have -- and

12    you can correct me on this if I'm wrong.  I'm just trying to

13    follow these notes on the spreadsheet.  It's at line 33 of the

14    spreadsheet.  It deals with testimony at page 181, line 6 to

15    181, line 21.

16          MR. RAE:  Yes, Your Honor.  And that's our objection.

17          The objection here is this is testimony that's being

18    designated about how Torrent deals with sales to pharmacy

19    customers of product that's been sitting in the inventory for

20    a long time.  It's extremely irrelevant to this case.  It's a

21    question about kind of -- nothing about this case has to do

22    with how product -- Torrent manages its inventory with respect

23    to products that have been sitting on the shelf for a while.

24          It's prejudicial because the implication of this

25    question is that Torrent is engaged in some sort of process to

1    kind of provide some sort of extreme discounting or the

2    discussion of destroying product that comes up in the answer

3    to this question, all of which is irrelevant, and plaintiffs,

4    I assume, want to play this to get in front of the jury sound

5    bites about destruction of product that are, frankly,

6    irrelevant to this case.

7              SPECIAL MASTER VANASKIE:  Daniel?

8              MR. NIGH:  Your Honor, that's not the reason at all.

9              The defendants have put great length to try to state

10   that the drug has some efficacy and, therefore, it has some

11   value, even though it's been contaminated with a carcinogen

12   that's, you know, 300 times the acceptable level.

13             So here, we actually get to see another similar sort

14   of alternative, a drug that's getting close to its expiry, and

15   Torrent admits that a drug that gets close to its expiry,

16   takes an extreme discount on that product.  And that actually

17   gives the jury some sort of guidance, whereas Torrent and the

18   other defendants have given very little guidance as to how to

19   value a product that may have some efficacy but is

20   contaminated with a carcinogen 300 times the safe level that

21   the FDA set.

22             SPECIAL MASTER VANASKIE:  Yeah, I think it's tied in

23   closely enough.  I'll sustain the objection and disallow the

24   testimony on page -- this is hard -- 181, lines 6 to 21.

25             All right.  I just want the record to be clear.

 1          MR. NIGH:  Sure.

 2          SPECIAL MASTER VANASKIE:  It might be easier if I

 3     look at the screen.

 4          I think the next excerpt to address is dealt with at

 5     line 39 of the spreadsheet.  The testimony is at page 191,

 6     line 13, to page 193, line 1.

 7          MR. RAE:  Yes, Your Honor.  The objection here is a

 8     completeness objection with respect to our counter.  So I

 9     think it's probably primarily plaintiffs' objection to our

10     counter that we would be addressing here, but I'm happy to go

11     first if that would be helpful.

12          SPECIAL MASTER VANASKIE:  No.  Let's hear from

13     Daniel.

14          MR. NIGH:  Yeah, I would just say it's -- you know,

15     again, it's not responsive to the question, their

16     counter-designation.

17          MR. RAE:  And, Your Honor, I think this is just --

18     this is another example of we just want the witness's full

19     answer to get played for the jury.  It's the complete answer

20     to the witness explaining the context of the first paragraph

21     of his answer as to -- the question is about who these sheets

22     are sent to.  He explains who they're sent to, and he explains

23     why they would be sent to customers and in what context they

24     would be sent to customers.  It's closely tied to the

25     question.

1          SPECIAL MASTER VANASKIE:  You would cut it off at

2    page 193, line 1?

3          MR. RAE:  I don't want to speak for Mr. Nigh, but

4    that, I believe, is where they want to cut it off.  That's

5    what their designation was.

6          MR. NIGH:  That's correct, Your Honor.

7          SPECIAL MASTER VANASKIE:  You want to take it from

8    line -- page 193, line 2 to line 12?

9          MR. RAE:  That's correct, Your Honor.

10         MR. NIGH:  Your Honor, I would just point out, again,

11   that:  "Who at Torrent, besides you, sent out these HDMA

12   sheets?"  That's the question.

13         So the rest of that is not responsible (sic) to who

14   is sending out those sheets.

15         MR. RAE:  Your Honor, it's -- as Ms. Lockard

16   mentioned earlier, it's not simply a question of whether or

17   not it's responsive to the question.  It's whether or not our

18   counter-designation is something -- this wasn't objected to at

19   the time.  There was no, like -- and independent of that, the

20   question is whether or not this is, in fairness, something

21   that should be played alongside the designation of plaintiffs,

22   whether or not it provides context to the jury for the

23   questions that they're asking, not whether or not it conforms

24   precisely to the exact question that they asked.

25         MR. NIGH:  Your Honor, just one thing there, which

 1    is -- I think Your Honor knows this, obviously, but, you know,

 2    we were asked not to move to strike, so that's why there's not

 3    an objection there at the time.

 4              SPECIAL MASTER VANASKIE:  Right.

 5              I will sustain the objection and disallow the

 6    testimony from lines 2 through 12 on page 193.

 7              The next one I have is page 196, line 17 to page 197,

 8    line 2.

 9              MR. NIGH:  Was there an objection to 195:9 to 24?

10              SPECIAL MASTER VANASKIE:  There is.  Thank you.

11              MR. RAE:  There is.

12              And, Your Honor, the objections here -- it may make

13    sense to talk about both the objection on page 195 and the

14    one -- the question on 196 together is -- these are questions

15    about a material safety data sheet.  These are safe handling

16    instructions that are provided to pharmacy customers about

17    environmental risks with products, handling risks, employee

18    safety.

19              The line of questioning here is focused on whether or

20    not there was disclosure of toxicological issues or

21    carcinogenic issues with valsartan product in the context of

22    these material safety data sheets.  And this case isn't

23    about -- again, these aren't -- this case is a breach of

24    warranty case, a consumer fraud case and a fraud upon

25    third-party purchaser insurance companies.

*United States District Court*

1          These are communications that are being made to

2    pharmacies and to wholesalers about how to handle this

3    product.  They aren't representations or warranties that are

4    being made to any of the plaintiffs or class members in this

5    case.  They are not relevant to the issues about which those

6    folks claim to have been misled, and it's extremely

7    prejudicial to allow a line of questioning about whether or

8    not carcinogenic risks that Torrent didn't even know about at

9    the time were being disclosed to pharmacy customers or about

10   whether -- or to allow questioning that implies that these

11   customers somehow changed the way they approached asking

12   routine questions about material safety data sheet content

13   after the recall took place, which there's no evidence

14   happened and which the answer here makes clear is not

15   something that happened.

16          But the jury hearing the question, there's no way to

17   reverse the impact of even being asked that question and the

18   suggestion that there was a change in Torrent's conduct that

19   took place.  That question in and of itself is going to

20   prejudice to the jury.  It's going to put ideas in their mind,

21   this didn't matter for the way in which these material safety

22   data sheet questions were asked by pharmacists.

23          MR. NIGH:  Your Honor, there's a lot to unpack there,

24   but if I can.

25          SPECIAL MASTER VANASKIE:  Go ahead.

1          MR. NIGH:  This information goes to the heart of our

2    case.  It is -- in fact, the 30(b)(6) notice says:  Torrent's

3    oral and written communications with its valsartan finished

4    dose customers or other downstream defendants -- which

5    includes the wholesalers, retailers, consumers, TPPs --

6    regarding quality, purity or contamination issues regarding

7    the Torrent finished dose.

8          Then we can look through multiple of these where

9    that's exactly the sorts of information that Kelly Gegenheimer

10   was put up to ask.  That's her -- in her role as 30(b)(6), she

11   is responding to those statements and other ones, Torrent's

12   oral and written statement to finished dose manufacturers,

13   wholesalers, retailers and consumers, with regard to the

14   contents and purity of Torrent's finished dose.

15         So this goes to -- you know, one of the main issues

16   is that there is a representation and a warranty here that

17   this product is free of these contamination and it includes

18   genotoxins.

19         So it doesn't have to be a warranty specifically

20   under many of the different state laws.  It doesn't have to be

21   a warranty specifically handed down from Torrent that makes

22   its way to the pharmacy.  It could be a warranty from Torrent

23   to a wholesaler that makes its way to a pharmacy.

24         And this is proving up one of the chinks to the chain

25   that shows -- or one of the pieces of the chain that shows a

```
 1  warranty that ZHP first made to Torrent and that Torrent is
 2  passing along to its customers.
 3           MR. RAE:  Your Honor, if I may.  Mr. Nigh --
 4           SPECIAL MASTER VANASKIE:  You may, Jacob.  Go ahead.
 5           MR. RAE:  Thank you, Your Honor.
 6           Mr. Nigh spoke about warranties to pharmacies and
 7  questions to retailers and pharmacies.  And undeniably that's
 8  one of the topics that Ms. Gegenheimer was asked about in
 9  connection with her deposition here, which relates to all of
10  the valsartan cases in this MDL.
11           But for this trial, this trial is about
12  representations and warranties that were made to the
13  third-party purchasers.  Mr. Nigh did not say that anything in
14  this line of questioning relates to representations or
15  warranties or information that was passed along to third-party
16  purchasers.
17           So introducing it in this trial is unfairly
18  prejudicial.  It will be confusing to the jury because the
19  jury is not going to understand how this connects back to any
20  of the allegations, any of the elements of any of the issues
21  that they're expected to rule upon.
22           MR. NIGH:  Your Honor, again, if I can comment,
23  that's actually not the law for many of the states.  The
24  warranty doesn't actually have to be specifically made from
25  Torrent to a third-party payor.  The law can be a warranty is
```

1   made from Torrent to an entity such as a wholesaler, which is

2   what this warranty is.  It's a warranty from Torrent to the

3   wholesaler.

4        There are multiple states that do not say the

5   warranty has to be made specifically to the third-party payor.

6        SPECIAL MASTER VANASKIE:  All right.  I will allow

7   the testimony at page 195, line 9 to line 24.

8        Now we're on 196, line 17 to 197, line 2.

9        MR. NIGH:  Your Honor, I think this is sort of the

10  same -- this is the same issue.  It's just explaining that

11  prior to 2018 would this same sort of warranty be made to

12  these customers.

13       MR. RAE:  Your Honor, I would agree that this is

14  essentially the same issue.  I would note that this issue and

15  this question specifically asks about toxicological issues and

16  carcinogenic issues and that that -- that discussion of

17  carcinogenicity and -- like specifically ties to issues that

18  the parties are still disputing with respect to the scope of

19  risk-benefit or general causation testimony that might be

20  coming and that Judge Bumb has not yet ruled upon exactly

21  what's going to be permissible at the trial on those sorts of

22  topics.

23       SPECIAL MASTER VANASKIE:  So I think what I'd like to

24  do is reserve ruling until I understand what Judge Bumb is

25  going to allow with respect to general causation and

```
 1  carcinogenic issues.
 2          MR. NIGH:  Yes, Your Honor.  I would agree with Jacob
 3  that in terms of -- there's even been mention of not using the
 4  word "carcinogenic."
 5          SPECIAL MASTER VANASKIE:  Right.
 6          MR. NIGH:  We have to see how that plays out.  But
 7  other than that reservation, we believe that this testimony is
 8  admissible.
 9          SPECIAL MASTER VANASKIE:  Well, we'll reserve on it.
10  And you can come back to me once you have more guidance from
11  Judge Bumb with respect to, for example, the use of the term
12  "carcinogenic."  All right?
13          MR. NIGH:  Yes, Your Honor.
14          MR. RAE:  Thank you, Your Honor.
15          SPECIAL MASTER VANASKIE:  The next objection I have
16  is on page 205.  You have something different than that?
17          MR. RAE:  That's what I have next, Your Honor, as
18  well.  And in fairness, I think that the testimony here runs
19  through -- it's -- the next three lines of the spreadsheet is
20  all kind of a set of testimony that runs together.
21          SPECIAL MASTER VANASKIE:  Okay.
22          MR. RAE:  The objection here is that -- the
23  questioning here, this kind of ties back to the same issue
24  of -- to a large degree it's a relevance issue, and it's just
25  a confusing issue of why we're talking about particular retail
```

1  pharmacy customers who are purchased and what customers

2  Ms. Gegenheimer highlighted in this spreadsheet.

3        I'm -- I don't want to kind of spend a lot of time

4  discussing -- I don't have a lot to say about this objection,

5  and I'm happy to defer to Your Honor's decision and instincts

6  as to what to do with this one.

7        SPECIAL MASTER VANASKIE:  Go ahead, Daniel.

8        MR. NIGH:  Just briefly, this is just to establish

9  that customers -- again, we need to establish the -- to the

10  degree that we need to establish the chain of supply and the

11  chain of communication and the ability as to which Torrent has

12  the ability to communicate.  That's precisely what this does.

13        SPECIAL MASTER VANASKIE:  All right.  I would allow

14  the testimony.

15        This is at page 205, line 8, to 205, line 23.

16        And then page 206, line 4, to 206, 24.

17        MR. NIGH:  And then I think it's 207:4 to 207:6 as

18  well.

19        MR. RAE:  I would agree with Mr. Nigh's statement,

20  Your Honor.

21        We also have a counter-designation at 207:1 to 207:3,

22  which is --

23        SPECIAL MASTER VANASKIE:  Go ahead, Daniel.

24        MR. NIGH:  I really don't understand why that's being

25  counter-designated other than to try to take up time.  Because

*United States District Court*

```
 1  it's Kelly Gegenheimer's stream of thought that it doesn't

 2  even complete.  He doesn't actually answer anything there.

 3          And he says, "And I think I was basically

 4  highlighting at this time that those were not -- what was I

 5  highlighting here?"

 6          There's no response there.

 7          SPECIAL MASTER VANASKIE:  It's a stream of

 8  consciousness, but it's all part of the answer.  I would allow

 9  it.  And it's not taking up much time.

10          MR. NIGH:  Okay.

11          SPECIAL MASTER VANASKIE:  The next one I have is line

12  47 of the spreadsheet, page 210, line 10, to page 211, line

13  13.

14          MR. RAE:  Your Honor, we had withdrawn that objection

15  as well.  I think maybe -- I know I had sent -- I apologize

16  for this.  I think I had sent plaintiffs a copy that had some

17  of our objections withdrawn, and it seems like maybe the copy

18  that was transmitted to Your Honor doesn't reflect those.

19          But we've withdrawn that objection as well as the

20  next two objections in the counter in your -- that are on the

21  spreadsheet that were sent to Your Honor, I think.

22          So the next objection that I have is the one that

23  begins on page 395, line 10 of the transcript.

24          SPECIAL MASTER VANASKIE:  Is that what you have as

25  well, Daniel?
```

1          MR. NIGH:  I'm working off an outdated one, but yes,

2     that sounds correct.

3          SPECIAL MASTER VANASKIE:  The one I'm working on is

4     certainly outdated.

5          MR. NIGH:  I think you and I have the same one.  I

6     apologize if we made that mix-up.

7          SPECIAL MASTER VANASKIE:  It's a lot of work, and I

8     understand that.  And it's hard to keep track of everything.

9          So we're going to page 395, line 10, to page 395,

10    line 14.

11         MR. RAE:  Correct, Your Honor.  So this is Torrent's

12    objection.

13         This is an issue that we think, as we noted to Your

14    Honor, was decided in one of our motions in limine that Judge

15    Bumb already addressed.  The motion in limine related to the

16    use of this email.  And the email refers to the purchase of

17    cheaper Chinese API.  And the motion in limine that we filed

18    was that plaintiffs cannot pursue lines of questioning or use

19    this document and mischaracterize it as if it's cheap Chinese

20    API instead of cheaper Chinese API, with there being an

21    important distinction between cheap and cheaper, as to the one

22    meaning inexpensive and the other meaning relatively less

23    expensive.

24         The question here is built off of a chain of

25    questioning where plaintiffs' counsel implies to the witness

1    that this email uses the term "cheap" and then asks a question

2    about Torrent's use of "inexpensive Chinese API for its

3    valsartan production."

4         We think this is squarely barred by Judge Bumb's

5    sustaining of our motion in limine on this topic.

6         MR. NIGH:  Judge, the motion in limine ruling was

7    very -- very specific and very narrowed.  And it simply is

8    that we not misquote the document from cheap to cheaper.

9         What's been designated here doesn't even use the word

10   "cheap" the entire time.  The questions above may use the word

11   "cheap," but that's not the issue.

12        And the issue is also not that we can't use the word

13   "cheap."  It's just that we can't misquote the document as

14   saying cheap as compared to cheaper.

15        And so this is like the highlight of what would be

16   admissible, especially through the -- as we saw in the

17   argument, what the judge is saying, that it's not excluded to

18   be able to talk about that the Chinese API was inexpensive.

19        And that's the question we posed in this.  And the

20   witness agrees that he understood that as of January 5, 2015

21   they were using an inexpensive Chinese API.

22        SPECIAL MASTER VANASKIE:  This is just lines 10 to

23   14?

24        MR. NIGH:  Yes.

25        SPECIAL MASTER VANASKIE:  On page 395, at least for

*United States District Court*

1   now.

2        Yeah.  I would overrule the objection and allow the

3   testimony.

4        MR. RAE:  Your Honor, can I be heard briefly?

5        SPECIAL MASTER VANASKIE:  You may be heard.  Sure,

6   Jacob.

7        MR. RAE:  If you go back up to the prior page, this

8   line of questioning begins with questioning about the

9   document.  It's established that what the language in the

10  document says is that uses the phrase "cheaper Chinese API."

11       Plaintiffs' counsel then goes on to ask a question

12  about cheap Chinese API and what the word "cheap" means.  The

13  witness testifies that they have no idea what cheap means in

14  the context of this email.

15       Plaintiffs' counsel then asks, "Do you know what

16  cheap means in the ordinary world?"

17       The witness answers, "Cheap means would be

18  inexpensive in terms of cost."

19       That question, that phrasing of what cheap means in

20  the ordinary world is then what fuels the next question of, "I

21  agree with you.  So you understood on January 5, 2015 that

22  Torrent was using inexpensive Chinese API for its valsartan

23  production.  Correct?"

24       "Correct."

25       The inexpensive is just a substitute for the prior

*United States District Court*

1   question of "what does cheap mean."  The question is literally

2   just asking -- counsel is saying that Torrent was using cheap

3   Chinese API for its valsartan production.  That's exactly what

4   Judge Bumb ruled cannot come into evidence in this case.

5        These are not the witness's own words.  The witness

6   did not inject the word "cheap" into this line of questioning.

7   The witness did not inject the word "inexpensive" into this

8   line of questioning, except through being asked what the word

9   "cheap" means.

10        MR. NIGH:  Judge, this is way afar what Judge Bumb

11  ruled, and it's actually way afar even what the defendants

12  argued in front of Judge Bumb.

13        This was our concern the whole time, was that they

14  would try to use some difference between cheaper and cheap in

15  the questions and then go along this tangential road that

16  somehow everything is barred to ask any questions about this

17  document.  It's absurd.

18        The ultimate question of what we designated simply is

19  even just asking him as of this date, was he aware that they

20  were using inexpensive Chinese API, period.  We didn't

21  designate all the rest that he's pointing to.  That one

22  question is all we designated, and he said "correct."

23        SPECIAL MASTER VANASKIE:  No.  I understand the

24  objection.

25        I will allow this testimony and overrule the

```
 1   objection.

 2              MR. RAE:  Your Honor, I recognize the Court's ruing.

 3         I want to make sure -- if I can point Your Honor to

 4   Judge Bumb's ruling itself in the July 23rd hearing transcript

 5   in our motion in limine, because I think it's important -- I

 6   think Mr. Nigh has mischaracterized her ruling, and I think

 7   it's important to look back at what Judge Bumb actually ruled,

 8   if I can have your indulgence to do that.

 9              SPECIAL MASTER VANASKIE:  Sure.  Absolutely.

10              MR. RAE:  So on page 19 of the July 23rd transcript,

11   when this issue comes up, Judge Bumb begins by stating:

12   "References to 'cheap' versus 'cheaper.'

13         "Well, it is what it is.  I mean, whatever the email

14   used is what should be said."

15         In response to that, Devora Allon, also counsel for

16   Torrent, responds:  "Right.  And I think that's the

17   distinction.  The email says 'cheaper.'  The plaintiffs

18   routinely say 'cheap.'  Those two things are not the same."

19         Judge Bumb says:  "Okay.  So the evidence will be

20   'cheaper.' "

21         Okay.  That's exactly the issue here.  The issue here

22   is that this is not a question about cheaper.  If this was a

23   question about using relatively less expensive Chinese API, we

24   may not be making this objection here.

25         But the question before this makes clear that the
```

*United States District Court*

1    "inexpensive" in this question is just a stand-in for the

2    cheap statement that Judge Bumb has ruled cannot come into

3    evidence in this case.  It has to be what that email actually

4    said.

5            MR. NIGH:  Your Honor, that's not the ruling.  In

6    fact, they actually -- he didn't read out what I clarified

7    later, which was, I asked the Judge:  Judge, this is simply

8    limited to misquoting the email from cheap or cheaper.

9    Because witness has answered all sorts of questions about this

10   issue.  And the Judge said:  You just can't misquote the email

11   as saying cheap when it says cheaper.

12           That was left off.  I know Jacob probably doesn't

13   like that part of the ruling, but that's what the Judge ruled.

14           And then in the order that Torrent even submitted,

15   the order is very clear.  We just can't misquote and use the

16   word "cheap."  That's it.

17           MR. RAE:  Your Honor, that's exactly what they're

18   doing here.  They misquote the email.  They lead the witness

19   down a line of questioning based on their misquoting of the

20   email, and then they are designating testimony that's premised

21   on their misquoting of the email.

22           SPECIAL MASTER VANASKIE:  I understand your point,

23   Jacob, but the point of this limited five lines here, from

24   line 10 to line 14, just says:  Using inexpensive Chinese API.

25           I know up above, the witness says cheap means

```
 1   inexpensive in terms of cost.  But they're not using the word
 2   "cheap" here.  They're using "inexpensive."
 3           I think it's permissible.  I'll allow that testimony
 4   to come in.
 5           MR. RAE:  Thank you, Your Honor.
 6           MR. NIGH:  Thank you, Your Honor.
 7           SPECIAL MASTER VANASKIE:  I think now we go to --
 8           MR. NIGH:  Is it 684, line 8 to 685, line 22?
 9           SPECIAL MASTER VANASKIE:  Yeah.  Line 60 of the
10   spreadsheet.
11           MR. NIGH:  And that's day 2 of the transcripts, just
12   so Your Honor knows as well.
13           SPECIAL MASTER VANASKIE:  Let me get there.
14           MR. RAE:  Your Honor, I'm just going to interject
15   again.
16           SPECIAL MASTER VANASKIE:  Go ahead.
17           MR. RAE:  We actually withdrew these objections on --
18   from pages 684 to 687.
19           SPECIAL MASTER VANASKIE:  Okay.
20           MR. RAE:  So the next objection begins on page 695,
21   line 18.
22           SPECIAL MASTER VANASKIE:  Okay.  Let me get there.
23           (Court reporter clarification.)
24           SPECIAL MASTER VANASKIE:  And Jacob was correcting
25   me, I think, to say that the next objection is what, Jacob?
```

1          MR. RAE:  It is page 696, lines 10 to 13 is the

2   question, and line 18 to 22 is the answer.

3          SPECIAL MASTER VANASKIE:  All right.  And the

4   question at 696, line 10 is:  "And would that safety data

5   sheet talk about potential -- that there is no potential

6   impurities or carcinogens?"

7          And the answer is at lines 18 to 22:  "That's my

8   understanding that material safety data sheets are related to

9   hazardous material, environmental handling of the product."

10         MR. RAE:  And, Your Honor, I think this is a similar

11  issue to the objection that we talked about earlier about

12  material safety data sheets.  I think there's an additional

13  issue here of there being a lack of foundation for this

14  question.  There's no grounding in kind of this actually being

15  content that's present in material safety data sheets.  And

16  this also kind of ties back to the cancer, general causation,

17  carcinogenic, carcinogens issues that are still being cited by

18  Judge Bumb.

19         SPECIAL MASTER VANASKIE:  Daniel?

20         MR. NIGH:  Your Honor, the foundation was laid

21  previously in the deposition.  In fact, we even saw some of

22  those foundations.  So I don't know where the argument is

23  there.

24         We don't take these -- each of these lines in and of

25  itself as the foundation.  So, you know, we talk all about

1  these requirements and the toxicological information,

2  including carcinogenic and all of those issues.  Now we're

3  just further clarifying specifically what's to be in there.

4  And the witness clearly has the understanding.  He responds --

5  he responds to the question.

6         I would say, I did notice that -- one hiccup, and I

7  don't know if you've got the same thing there.  I think 696,

8  lines 10 to 13, do need to be included, because that's the

9  question.  And then the answer would be 18 to 22.

10         SPECIAL MASTER VANASKIE:  Correct.

11         MR. NIGH:  So that's the rest of my response.

12         SPECIAL MASTER VANASKIE:  It seems to me to fall

13  within the same area that I reserved on, and I'll reserve

14  ruling on this one.

15         I expect what happens is you'll bring it back to me.

16  All right?

17         MR. NIGH:  Yes, Your Honor.

18         SPECIAL MASTER VANASKIE:  Once you've received

19  further guidance from Judge Bumb.

20         MR. RAE:  And, Your Honor, I think that same issue is

21  going to apply to the next -- or, frankly, the last couple of

22  objections, which are in the same line of questioning of

23  Kelly Gegenheimer.

24         If Mr. Nigh will agree, we can potentially move on to

25  the next witness.

         1          SPECIAL MASTER VANASKIE:  This would be at page 696,

         2   line 18 to page 697, line 22?

         3          MR. RAE:  Yes.  And the objection there is from --

         4   just to the question at 696, line -- sorry, yeah.  And then

         5   there's another one on 697, line 16 to 698, line 3.

         6          SPECIAL MASTER VANASKIE:  So we'll reserve ruling on

         7   that.

         8          MR. NIGH:  Yes.

         9          And then, Your Honor, I don't know if there's any

        10   objection to the rest of -- after 698:4 to 698:22.  It doesn't

        11   appear from the sheet, but none of that says carcinogenic in

        12   it.

        13          MR. RAE:  To clarify, we do not have an objection to

        14   the rest of that testimony.

        15          SPECIAL MASTER VANASKIE:  So the testimony at page

        16   698 -- I better get this right -- 698, line 2, to 698, line 22

        17   comes in?

        18          MR. NIGH:  698:4 to 698:22.

        19          SPECIAL MASTER VANASKIE:  Okay.

        20          MR. NIGH:  Do you agree, Jacob?

        21          MR. RAE:  Yes, I agree.

        22          SPECIAL MASTER VANASKIE:  698:4 to 698:22 will come

        23   in.

        24          And that's it for Kelly Gegenheimer?

        25          MR. NIGH:  Yes, Your Honor.

```
 1            MR. RAE:  Yes, Your Honor.

 2            SPECIAL MASTER VANASKIE:  What I'd like to do now is

 3    proceed to Sushil Jaiswal.

 4            Tell me how you pronounce that.

 5            MR. RAE:  Your Honor, I think you -- you got

 6    Dr. Jaiswal's last name correct.  His first name is Sushil.

 7    Sushil Jaiswal.

 8            SPECIAL MASTER VANASKIE:  Okay, thank you.

 9            MR. NIGH:  Your Honor, is it possible to take a brief

10    break?

11            SPECIAL MASTER VANASKIE:  Yes.  Let's take a

12    ten-minute break.

13            MR. NIGH:  Okay.  Thank you, Your Honor.

14            MR. RAE:  Thank you, Your Honor.

15            (Recess at 10:40 a.m.  until 10:49 a.m.)

16            SPECIAL MASTER VANASKIE:  So we're on

17    Sushil Jaiswal's deposition.

18            And where are we starting here?

19            Go ahead, Jacob.

20            MR. RAE:  I think our first objection is to the

21    testimony at lines -- page 35, line 10 to page 35, line 17.

22            MR. NIGH:  I have the same.

23            SPECIAL MASTER VANASKIE:  All right.

24            MR. RAE:  And, Your Honor, I think the 403 objection

25    primarily relates to the kind of cancer issues that we've been
```

```
 1   discussing.  So unless Your Honor wants me to address that,

 2   I'm going to focus on the foundation objection.

 3          The foundation objection is -- these are questions

 4   about a document.  And if Your Honor looks at page 34, line 8

 5   to 10 of this transcript, just a page earlier, counsel asks

 6   the witness:  "Okay.  Have you ever seen this document

 7   before?"

 8          Answer:  "No."

 9          And so our foundation question is to the questions

10   that proceed to ask this witness about the content of this

11   document that the witness has already testified they've never

12   seen before.

13          SPECIAL MASTER VANASKIE:  All right.  Daniel?

14          MR. NIGH:  Your Honor, the first two days of this

15   transcript are -- he's being put up in his capacity as a

16   30(b)(6) witness.  And just to make that clear, like, he's not

17   just, you know, here on a couple of the topics.  He is here

18   for nearly every single topic that we addressed in our

19   30(b)(6) notice.  There's a couple other witnesses that have a

20   few topics, like Gegenheimer had a few on communication.  But

21   he is here for testing of valsartan API and finished dose, and

22   there's all sorts of questions in there.  He's here on quality

23   assurance and quality control activities, which, clearly, in

24   the quality control, we can see lots of information about --

25   including genotoxic impurities and what do you do about
```

1    genotoxic impurities, how do you evaluate those.  He's in

2    there for process development.  And there's all sorts of

3    information there on NDMA, NDEA, what's your knowledge, what's

4    your evaluation, what did you do in terms of doing a risk

5    assessment related to these issues.  You know, all sorts of

6    information here.

7         So, to me, actually, the very purpose that Jacob is

8    pointing out is the very purpose that we would go into this,

9    because he's put up to speak on behalf of the company in

10   regards to these topics.  And the fact that he's never seen

11   this document when he's put up to speak on behalf of the

12   company on their risk assessment is troubling.

13        He hasn't seen the document that talks about NDMA.

14   You know, one of the key documents, WHO, 2002 on NDMA, and he

15   hasn't seen it.  And so now we are going to ask him questions

16   that are related to issues within it to see if he's understood

17   the content within there, which is fair game as well, to see

18   if he knows those answers, because maybe he hasn't seen the

19   document, but maybe he's learned some other way about

20   information that's in the document.  And so we're asking that

21   information as well.

22        And this -- again, this is on behalf as a 30(b)(6)

23   witness, you know, in these first couple of days.

24        Now, I would say, Jaiswal is also the head of quality

25   and control at Torrent.  He is their lead analytical chemist.

He's the one responsible for finding -- for detecting

impurities, identifying those impurities.  So he would be --

the buck stops here; he's the guy.  And that's why there's so

much designated from Jaiswal.

SPECIAL MASTER VANASKIE:  Because he's a 30(b)(6)

witness, I don't think the lack of foundation objection is

well taken.  So I would overrule that objection on page 35,

lines 10 to 17.

And the same would hold true with respect to page 36,

line 16 to page 37, line 6.

MR. RAE:  Understood, Your Honor.  And I just want to

be -- make sure that it's clear.  My understanding is that we

are not dealing with our objections as they relate to the

discussion of cancer and carcinogenicity.

SPECIAL MASTER VANASKIE:  Correct.

I'm sorry to interrupt you, Jacob.  That is correct.

We're not dealing with that objection.  We'll reserve ruling

on that aspect of it pending Judge Bumb's clarification.  All

right?

MR. RAE:  Thank you, Your Honor.

SPECIAL MASTER VANASKIE:  Now, is the next excerpt at

issue on page 49, line 20?  Or what do you have?

MR. RAE:  We have an objection at page 41, line 11 to

17.

And I think -- but I think that we can put this in

1  the same category as what we just discussed.  My understanding

2  is that Your Honor's foundation ruling would apply equally to

3  our -- prior ruling would apply equally to our foundation

4  objection here, and our 403 objection is one that we're

5  reserving.

6          SPECIAL MASTER VANASKIE:  Correct.

7          MR. NIGH:  I agree, Your Honor.

8          MR. RAE:  So then, yes, the next one would be the

9  objection on page 49, line 20 to 50, line 4.

10          SPECIAL MASTER VANASKIE:  Let me get to that.

11          MR. RAE:  And, Your Honor, this is -- I think, again,

12  this also -- this testimony also kind of falls into the same

13  bucket of kind of discussion of genotoxicity, which is going

14  to relate to issues that Judge Bumb is going to decide.

15          But the objection that we made as well is a 701

16  objection, which is -- the question here is asking Dr. Jaiswal

17  to provide kind of an abstract opinion testimony about what

18  the term "genotoxicity" or the phrase "genotoxicity in the

19  body" means.  And we don't think that that's an appropriate

20  usage of Dr. Jaiswal either as a fact witness or as a 30(b)(6)

21  witness.

22          SPECIAL MASTER VANASKIE:  Any response, Daniel?

23          MR. NIGH:  Yes, two things.  One, when he's defining

24  what genotoxic means, he says genotoxicity in the body.  He's

25  the one that uses those terms.  So it's not an expert opinion,

1   it's just his knowledge.  He is an analytical chemist.  He's

2   the head analytical chemist for the company.  He possesses

3   this knowledge.  Clearly, he's the one speaking in these terms

4   if you just look at the questions right above.  And so for him

5   to be able to define his own terms, that's not seeking an

6   expert opinion.

7           SPECIAL MASTER VANASKIE:  I'll overrule the objection

8   and allow the testimony at page 49, line 20, to page 50, line

9   4.

10          And now are we on page 51, lines 1 to 4?  Is this the

11  same --

12          MR. NIGH:  The next objection I have is page 55, line

13  2 to page 55, line 8.

14          Is that right, Jacob?

15          MR. RAE:  Yes, I agree.

16          SPECIAL MASTER VANASKIE:  Okay.  We're there then.

17          MR. RAE:  To be clear, I think the objection here

18  really relates to the kind of both introduction to the exhibit

19  and then the questioning which is from 55, line 12 to 23.

20          The objection here is this is a document about

21  European regulatory standards from 2006.  This case is about

22  US, the sale of products in the United States.  It's about

23  United States regulatory standards.

24          The defendants had a motion in limine on this issue,

25  which Judge Bumb ruled on and ruled that foreign regulatory

1    standards are not going to come into evidence in this case.

2    And we think that if our 401 and 403 objections parallel the

3    arguments that we made in that motion in limine, and we think

4    that Judge Bumb's ruling on that issue squarely applies to

5    this testimony.

6         And I can point Your Honor to where that argument

7    happened in front of Judge Bumb and her ruling, if that would

8    be helpful.

9         SPECIAL MASTER VANASKIE:  Let's hear from Daniel

10   first.

11        MR. NIGH:  Yes, Your Honor.  First off, I think that

12   that doesn't give the full meaning of the ruling.  Keep in

13   mind that these are guidelines that guide -- that these are

14   regulatory statements that guide Torrent in what they're

15   supposed to be doing, and they're making representations based

16   on those regulatory guidelines as well.

17        And the other thing is, I think it's important to

18   also note that the defendants have multiple times, including

19   the *Daubert* hearing, have continued to throw up the ICH

20   guidelines.

21        And these guidelines here are the ancestor, the

22   predecessor to those guidelines.  And they speak in detail in

23   terms of NDMA genotoxicity and what a company is supposed to

24   do in terms of detecting them, what are the limits that you

25   can detect them, what are you supposed to do in terms of a

1    threshold, all sorts of issues.  And it's the predecessor to

2    the ICH Q3A guidelines that they're pointing to.

3         So we think for all those reasons -- again, he's put

4    up as the 30(b)(6) witness precisely on these topics.  He's

5    also the lead analytical chemist.  So this is precisely within

6    his wheelhouse.

7         SPECIAL MASTER VANASKIE:  What about the argument

8    that Jacob made with respect to non-US standards?

9         MR. NIGH:  Yeah.  So, again, you know, I think he

10   has -- he has drawn that ruling and widened it much further

11   than it was.  These standards, again, are the predecessor to

12   the ICH guidelines.

13        The ICH guidelines, in fact, you know, have a

14   footnote and in multiple places cite these guidelines.  So to

15   say that this is just foreign, I mean, the ICH isn't based in

16   the US, but we all recognize that the ICH has to be followed

17   by US as well as this in terms of that it's incorporated,

18   cited, and the predecessor to the ICH guidelines.

19        MR. RAE:  Your Honor, if I may, I think Mr. Nigh is

20   mischaracterizing what Judge Bumb ruled here.  And if I can

21   point you -- I'm happy to point Your Honor to both the

22   argument that Ms. Lockard made on this issue, which

23   specifically references the EMA standards, the ones they're

24   being asked about here from the European Medicines Agency, and

25   where Judge Bumb rules that this evidence of these documents

1    can only come in if our witnesses say that we relied upon

2    these documents and these guidelines.

3        And this questioning does not involve reliance --

4    Dr. Jaiswal is going to appear live.  I don't anticipate that

5    he's going to say that we relied upon this document or that

6    Torrent relied upon this document.  But if that somehow comes

7    in, plaintiffs would have an opportunity to cross-examine him

8    on that issue when he appears live to testify.

9        But they can't just put in evidence on this document

10   unless it's to counter reliance testimony that doesn't exist

11   in this case, and frankly, isn't going to exist in this case.

12   And if it does happen to exist, they will have the opportunity

13   to counter it.

14       MR. NIGH:  Your Honor, may I respond?

15       SPECIAL MASTER VANASKIE:  You may respond.

16       MR. NIGH:  It's very clear that they reply on the ICH

17   Q3A guidelines.  Their expert talked all about them in the

18   *Daubert* hearing, Afnan did.  On top of that, Jaiswal speaks to

19   it numerous times.  This is cited in the ICH Q3A guidelines.

20   This is the predecessor to those guidelines.  And so this

21   gives all sorts of information that talks about how you're

22   supposed to test for NDMA, dating back to 2006.

23       At the time that they were developing these drugs,

24   2011, 2010, you know, these would be the guidelines that --

25   that -- that they have to follow in terms of, you know,

1    genotoxic risk, compounds, how to test for them, you know, and

2    they're cited in the ICH Q3A guidelines that they're speaking

3    to.

4         MR. RAE:  Your Honor, the ICH guidelines are

5    international guidelines.  The reason why they are relevant to

6    this case is because they apply internationally.  These are

7    European Medicines Agency guidelines.  They apply to Europe,

8    not to the United States.  And I think there's a very clear

9    line there, and it's a line that Judge Bumb recognized, and

10   it's a line that, frankly, has already been determined by

11   Judge Bumb for this case.

12        MR. NIGH:  Your Honor, I disagrees.

13        SPECIAL MASTER VANASKIE:  You say Dr. Jaiswal is

14   going to testify live?

15        MR. RAE:  We are bringing Dr. Jaiswal live to testify

16   during our case.

17        SPECIAL MASTER VANASKIE:  Go ahead, Daniel.

18        MR. NIGH:  Your Honor, I would disagree yet again.

19   And I think this is a perversion of how ICH guidelines work.

20        The ICH is located in Europe.  So when they say

21   they're international guidelines, oftentimes the ICH

22   guidelines cite other guidelines, which includes EMA, because

23   EMA has already fleshed out the issues in detail.

24        So to the extent that the ICH guidelines that they're

25   relying upon cite the EMA guidelines and discuss, you know,

1  definitions or how to look for these things, that's very clear

2  here, and they're relying on that document.

3        So this goes far afield of what they were asking

4  Judge Bumb.  Here our argument is, this is square in line with

5  guidelines that regulate the international community because

6  it has been incorporated in the ICH guidelines.

7        SPECIAL MASTER VANASKIE:  Jacob, you're going to

8  point me to or read from Judge Bumb's ruling?

9        MR. RAE:  Yes, Your Honor.  So this is in the July

10  23, 2024 transcript.  Starting on page 274 is Ms. Lockard's

11  presentation of the issue here.

12        And you can -- you'll see in the transcript here,

13  Ms. Lockard -- let me get my bearings for a second.

14        Ms. Lockard discusses foreign regulatory standards or

15  guidance and indicates that kind of plaintiffs are going to

16  say that assuming defendants relied upon those, that that is

17  fair game.

18        "If there is something and they can establish that

19  one of the defendants relied on something from the EMA" -- the

20  European Medicines Agency, that's my clarification there --

21  "in formulating its response to the nitrosamine issue in the

22  US, then that's fair game.  But just to bring in here what's

23  happening around the world or with Teva's facilities in other

24  countries not involving nitrosamine being sold in the US, I

25  think that should be excluded."

 1          And Judge Bumb, on page 275, line 5 to 6, rules:  "If
 2     they rely on it, then you can -- then it opens the door for
 3     you."
 4          And then subsequently, on lines 14 to 15 of the same
 5     page, reiterates, "If the witnesses say that they relied on
 6     them, then it's relevant."
 7          I can kind of keep going through -- she doesn't
 8     have -- there's not a kind of clear single sentence
 9     explanation here, but the clear import of this ruling is that
10     European Medicines Agency materials come in to the extent that
11     defendants relied upon them.
12          For example, in this argument, Mr. Slater on behalf
13     of plaintiffs made an argument that ZHP relied on certain
14     European Medicines Agency documents in its DMF.  I'm not
15     counsel for ZHP, I am not opining on kind of that issue
16     specifically or what should be happening with ZHP's documents
17     and discussion of these guidelines or other guidelines with
18     respect to ZHP, but the ruling is very clear that reliance on
19     European Medicines Agency documents or use of European
20     Medicines Agency documents is limited to circumstances where
21     one of the defendants relied upon that document.
22          And that's not the case for this testimony.  It's
23     certainly not the case that plaintiffs have established that
24     reliance.  And I think there's potentially a different issue
25     when Dr. Jaiswal is testifying live at trial as to whether or

1   not there's some way that plaintiffs can establish reliance

2   such that they might be able to ask him questions about this.

3   I don't think they will be able to, but I think for purposes

4   of this deposition designation, it should not be coming in.

5           MR. NIGH:  Your Honor, there's a huge difference

6   between what was argued at the hearing in terms of EMA

7   guidelines and their response to the nitrosamine recall.

8   That's post-2018.  Here we're talking about guidelines that

9   were in place in 2006 that are cited by the ICH Q3A that they

10  rely on that defines in 2006, you know, what are the duties.

11          I mean, in this sort of scenario if Jaiswal were to

12  say, I don't rely on 2006, that would be more, you know,

13  problematic than anything else, because those are the

14  guidelines that regulate the international community at this

15  time.

16          They're cited by the ICH Q3A guidelines.  So to say

17  that this has no -- this is just foreign, it's international.

18          MR. RAE:  Your Honor, plaintiffs made exactly this

19  argument to Judge Bumb.  Mr. Slater argued that -- and there's

20  also statements and information from the European, for

21  example, regulatory agency that talked about the dangers of

22  these drugs.  That's all admissible for notice.

23          All the witnesses admitted that they were following

24  all of those guidelines.  They all applied to the same drugs,

25  because the manufacturing facility was manufacturing for the

 1    US and other places.  That's the same argument that Mr. Nigh

 2    is making here.

 3          And Judge Bumb's response was not to accept that

 4    notice argument and to refer back to, if the witnesses say

 5    they relied upon them, then it's relevant.  Implicit in that

 6    statement is that notice argument doesn't work.  They don't

 7    get to come in for notice.  They come in only if there is

 8    reliance established.

 9          SPECIAL MASTER VANASKIE:  Anything else, Daniel?

10          MR. NIGH:  Yeah.  I would say that it's completely

11    different.  We're talking about, you know -- the document that

12    he's talking about is not a document -- is not a -- hold on

13    one second.

14          Yeah.  My point, again, Your Honor, the document he's

15    talking about is a document -- we're not talking about every

16    single regulatory document, you know, internationally that

17    might somehow have some bearing on what might put a defendant

18    on notice.  These are the rules governing how to look for

19    genotoxic impurities that is cited by the ICH Q3A guidelines

20    on how to look for genotoxic impurities, you know, what are

21    the levels, what are the thresholds, all that sort of

22    information.

23          And this is the key of the dispute in the case, Your

24    Honor.

25          To say that somehow this is similar to some other

1   document that puts them on notice of one specific issue,

2   that's not what this document is.  This document is the -- one

3   of the quintessential documents as to how the defendants are

4   supposed to test for genotoxic impurities, what are the

5   limits, including carcinogens like NDMA.

6           SPECIAL MASTER VANASKIE:  All right.  I've heard

7   enough.  I'm going to rule and allow this testimony to be

8   presented.

9           I want to be clear for the record what we're talking

10  about, and that is from page 55, line 2 to page 55, line 8;

11  page 55, line 12 to page 55, line 23; and page 58, line 16 to

12  page 59, line 2.

13          Am I missing anything?

14          MR. RAE:  No, Your Honor.  And I understand your

15  ruling, and I just -- if I may be heard briefly.

16          I think Mr. Nigh has said that -- talked about other

17  documents.  And I just want to be clear that the language that

18  I read from Mr. Slater a second ago from the hearing was a

19  reference -- I don't want to pretend to be able to read

20  Mr. Slater's mind, but he's clearly talking about European

21  guidelines from the EMA they want to submit for notice about

22  the risks of nitrosamines.

23          That is a reference to this exact document, that --

24  Judge Bumb has already addressed this exact issue and the

25  admissibility of testimony on this issue.  And I want to make

 1  sure that Your Honor is aware of that, because I think your

 2  ruling is inconsistent with the prior ruling on the motion in

 3  limine that Judge Bumb already made.

 4        MR. NIGH:  Judge, just to put a little bit more

 5  flavor, because I think the record should be complete here.

 6        You know, Judge Bumb -- what wasn't cited was

 7  page 275, lines 21 to 25 of her ruling.  And she said:  "What

 8  I said is if the witnesses say that they relied on them, then

 9  it's relevant, right?"

10        Mr. Slater said:  "If they --"

11        And she says:  "They have to know about them."

12        That's her wording.

13        Well, Jaiswal clearly says he knows about this

14  document.  That's what we asked him.  It's page 59, line 9.

15  And he says:  "But yes, I'm aware of this document."

16        Before that, it says:  "Have you ever reviewed this

17  document as it pertains to your job? "

18        And he says:  "Yes, I am aware of this document."

19        So clearly, in terms of the definition that even

20  Judge Bumb gives for reliance, you have to be -- they have to

21  be aware of the document.  He clearly knows about the

22  document.

23        SPECIAL MASTER VANASKIE:  I don't know that that gets

24  you far enough on the reliance question, but I do think it's

25  relevant.  I do think it's admissible.  I don't think there's

1    a conflict with Judge Bumb's decision.  There may be.  But I'm

2    deciding this issue on the basis of what is presented to me.

3    And I believe it's admissible and should come in.  All right?

4            MR. RAE:  Understood, Your Honor.

5            SPECIAL MASTER VANASKIE:  It's very well argued.  But

6    it seems to me that -- and maybe it's a disagreement with what

7    reliance means.  It seems to me that's too narrow a test --

8    too narrow a standard to meet, that you have to rely on

9    something to be able to use it.

10            Now, I have the next area at issue starting at

11    page 70.  Correct me if I am wrong on that.

12            See, I am having a little bit of trouble here.  I

13    have the designations, and then I have objections on this

14    spreadsheet.

15            And I have objections to the testimony at page 70,

16    line 19 to 70, line 20.  But maybe there's more at issue

17    there.

18            MR. NIGH:  That's right, Your Honor.  This is a

19    counter-objection.  And we're objecting to their counters for

20    the next two.

21            So that starts with 70 to -- they want to add in

22    page 70, line 19 and 20 into it.

23            SPECIAL MASTER VANASKIE:  Which is just a question.

24    Right?

25            MR. NIGH:  Which is the question, but then they want

1    to also add in the answer.

2            But that's right.  And so it's just a question.  I

3    see no response, which is why I don't see why that would be

4    added.

5            MR. RAE:  Your Honor, just to be clear, I think the

6    formatting of the spreadsheet may be creating a little bit of

7    confusion here.  We're countering with the question and the

8    answer with the objection omitted.

9            And the question and the answer have -- fall between

10   a question that plaintiffs are asking about FDA limits -- the

11   interim limits that the FDA had established.

12           And they also -- they go on to ask subsequent

13   questions about these limits.  And the question/answer that

14   we're designating as a counter, which we believe in fairness

15   needs to be played alongside that, is a question about how

16   those limits relate to what is permitted to be present in the

17   valsartan API that Torrent is purchasing from ZHP and that is

18   at issue in this case.

19           So the question before is if the FDA has a limit for

20   API only.  The answer is that there's a limit for the finished

21   dose form.

22           The next question is -- that we want to counter with

23   is:  "How much NDMA is allowed to be in the API?"

24           And we think that the witness's answer explaining

25   that issue should come in.

 1          And then there's subsequent questions about the

 2    relationship between the API and the finished dose product.

 3          And we think that this context, frankly, will help

 4    the jury understand that subsequent line of questioning about

 5    the relationship between the finished dose product and the API

 6    and kind of how these limits apply with respect to both forms

 7    of the valsartan.

 8          MR. NIGH:  Your Honor, I guess to clarify this, the

 9    information that they're looking to add is not responsive to

10    any of the questions that we designated.  The questions we've

11    designated are actually very simple.  They have other spots

12    they're going to add this same information in, which is they

13    want to constantly inject that they didn't know about the

14    carcinogen at the time, so there's no limit.

15          All we're asking at this point is:  Well, what is the

16    FDA limit for the API?  He responds back:  It's .3 for the

17    finished dose form.  So now we're going to go into this .3,

18    and we are going to show that all the products is over .3.

19          None of this has to do with, well, what was -- you

20    know, at sometime prior.  That's not the questions here.  In

21    fact, they get to answer that in other places, but it doesn't

22    need to be injected again here because it's irrelevant to this

23    line of questions.

24          MR. RAE:  Your Honor, this is extremely relevant,

25    because the questions that they've designated, which we're not

1   objecting to, are vague as to the time frame in which we're

2   talking about these limits.

3        The question and answer that we're

4   counter-designating is clarifying the limits that we're

5   talking about don't apply at the time in which these products

6   were actually being produced and sold by Torrent.  And that's

7   extremely relevant for the jury to understand when it's

8   listening to testimony about the fact that the API has NDMA

9   levels that are above this limit that came into existence in

10  the summer of 2018 and didn't previously exist.

11       SPECIAL MASTER VANASKIE:  I will allow -- I will

12  allow the testimony at page 70, line 19 to page 70, line 20;

13  and 71, line 1 to 71, line 6.

14       Does that cover it?

15       MR. NIGH:  Yes, Your Honor.

16       MR. RAE:  Yes, Your Honor.

17       SPECIAL MASTER VANASKIE:  The next one I have is

18  page 81, line 18 to page 82, line 2.

19       MR. RAE:  Your Honor, this is our objection.  And

20  this is primarily an issue of the evidence that's being

21  presented here being cumulative.  The presence of NDMI and the

22  levels of NDMI in these products are not in dispute in this

23  case.  The parties all agree that there was NDMA and NDEA at

24  least in some batches of the valsartan API -- with respect to

25  NDEA in some batches and NDMA in all batches of the valsartan

1  API that Torrent was using, and there's no dispute about the

2  levels.

3        We haven't objected to the testimony at lines -- on

4  page 79 that begins this line of questioning and establishes a

5  batch that was above the levels that plaintiffs want to point

6  to.

7        But we think that the testimony that runs for the

8  next five or six pages, beginning on line 82, that kind of

9  just walks through the math with respect to batch after batch

10  after batch is cumulative.  It's prejudicial to have kind of

11  that process of just kind of walking through batches, an issue

12  that's not in dispute in the case, and presenting to the jury

13  over and over again the level of NDMA in those batches.  And

14  that's the basis for our objection.

15        SPECIAL MASTER VANASKIE:  All right.  Daniel?

16        MR. NIGH:  Your Honor, Torrent sold a lot of drugs.

17  They sold a lot of batches.

18        We lay out for each batch that it's, you know,

19  approximately 300 times over the threshold.  And some aren't

20  quite 300 times.  Some are a little bit less.

21        But for us to be able to lay out -- when we're --

22  we're talking about what takes up all of two or three minutes,

23  so it's not cumulative in that regard.

24        But we lay out.  We calculate.  He agrees it's -- you

25  know, for each batch, here's the amount that it's over the

1   threshold limit.

2          And that absolutely goes to one of the quintessential

3   issues here, especially in terms of when the defendants want

4   to raise that these drugs have some value, that being 300

5   times over the threshold is going to also make its way into

6   this case as well, because if there's going to be some sort of

7   evaluation on efficacy, there obviously has to be some sort of

8   value on how far over they went from the threshold level in

9   terms of safety.

10         SPECIAL MASTER VANASKIE:  These objections are based

11  on Rule 403 of the Federal Rules of Evidence.

12         I don't think it's unduly prejudicial and not going

13  to confuse the jury.

14         So I'm looking at a series of objections on pages 82,

15  83, 84, 85, 86, 87 and 88.

16         I think it all comes in.  The objection is overruled.

17         MR. RAE:  Your Honor, understood on that.

18         And I think our next -- the next counter we have on

19  page 88:8 to 88:12, I'll let Mr. Nigh explain his objection,

20  but I think our position would be that in fairness, if all of

21  this testimony about these comparisons of levels to limits is

22  coming in, that our counter explaining that these limits did

23  not exist at that moment of time is necessary to come before

24  the jury in fairness as well.

25         SPECIAL MASTER VANASKIE:  I agree with you, Jacob but

```
 1    I think this does come in.  So --

 2            Go ahead, Daniel.

 3            MR. NIGH:  I was going to say, we think this is

 4    similar to your prior ruling.  We understand.

 5            SPECIAL MASTER VANASKIE:  All right.  So 88, line 8

 6    to line 12 is in.

 7            Am I at page 89 now?

 8            MR. RAE:  Yes, Your Honor.  And I think I would be

 9    willing to stipulate that your prior ruling is going to govern

10    this objection.

11            SPECIAL MASTER VANASKIE:  Covers this.  Okay.

12            That's helpful, because I can't move ahead and put it

13    in context.  But looking at this now, I'd say yes, that it

14    applies.

15            MR. RAE:  So if it's helpful, the next objection I

16    have noted is on page 98, line 11 to 14, and our objection

17    here is that this simply isn't a question.  There's no -- the

18    designated testimony doesn't include the question.  It's just

19    attorney commentary.

20            MR. NIGH:  Your Honor, to clear this up, I think it's

21    another typo.  It should include 15 -- 98:11 through 98:15,

22    which the question is:  "Do you see that one?"  And below, you

23    can see the question where he answers "yeah," which is

24    designated in the designation below, 98:20 to 98:24.  So the

25    answer is designated as part of that.
```

```
 1          The next question is "Okay.  And we see that number
 2   again in the API stocks available chart."
 3          And he says "okay."
 4          So that's all -- you know, that's all part of that
 5   information that should be included.  But it should be 98:11
 6   to 98:15.
 7          MR. RAE:  Your Honor, based on that alteration to
 8   their designation, we'll withdraw our objection.
 9          SPECIAL MASTER VANASKIE:  Very well.  Thank you.
10          MR. RAE:  I think this is another place I can
11   short-cut things a little bit.
12          I'm not sure what we sent to you shows there being an
13   objection on page 98:1 to page 108:18.  I know that's one that
14   we withdrew as well.
15          SPECIAL MASTER VANASKIE:  Say that again.
16          MR. RAE:  Actually, sorry.  I'm getting ahead of
17   myself.
18          So what's the next objection you have that we should
19   be discussing?
20          SPECIAL MASTER VANASKIE:  I think it's page 99, line
21   1 to 100, page 18.
22          MR. RAE:  Yes.  So I was saying that this and the
23   objection on page 100, line 21 is the same issue as before
24   with kind of the version of what was submitted to Your Honor,
25   and we've withdrawn that objection.
```

```
 1              SPECIAL MASTER VANASKIE:  All right.  Very well.  So

 2      all of that is coming in?

 3              MR. RAE:  Correct.

 4              SPECIAL MASTER VANASKIE:  So are we moving now to

 5      page 140, line 16, or are there objections to take up before

 6      that?

 7              MR. NIGH:  I might have 114, line 13 to 17.

 8              Is that right, Jacob?

 9              MR. RAE:  I think that objection was just with

10      respect to completeness and for a counter.  My understanding

11      is that you guys are not objecting to our counters in that

12      section, so the 106 objection wouldn't need to be resolved.

13              MR. NIGH:  That's right.

14              SPECIAL MASTER VANASKIE:  That was my understanding.

15              MR. NIGH:  Right.  114, line 18 to 114, line 19, we

16      had no objections to that counter.

17              SPECIAL MASTER VANASKIE:  That comes in.

18              Page 115, line 9 to page 115, line 18, there's no

19      objection?

20              MR. NIGH:  No objection.

21              SPECIAL MASTER VANASKIE:  So that comes in.

22              MR. RAE:  And the objection on page 140, lines 16 to

23      22, I think that there was a prior -- this is kind of just

24      like a transcription issue with kind of exchanges of

25      designations that we had had in the past.  And I think we had
```

*United States District Court*

 1   the 106 objection at one point in time, but it's been resolved

 2   and we have withdrawn the objection.

 3              SPECIAL MASTER VANASKIE:  All right.  Very well.  Are

 4   you up to page 142, line 12 to 142, line 15?

 5              MR. RAE:  Sorry.  I spoke over you there.  I

 6   apologize to Ann Marie.

 7              We are at that point.  And our objection here is,

 8   again, this is the cheap versus cheaper issue that we

 9   discussed before and upon which Judge Bumb granted our motion

10   in limine.

11              The question here is, "So you are aware that when

12   Torrent first developed valsartan, they wanted to find a cheap

13   API supplier, right?."

14              And that question is, again, kind of -- the witness

15   isn't sure what email it's referencing in his answer, but that

16   question is misquoting the email in exactly the way that Judge

17   Bumb ruled is not permissible.

18              MR. NIGH:  Your Honor, I think that the 142:12 to

19   142:15, we would withdraw that.

20              I just want to make sure as we go forward, because

21   there's not really actually an answer from the witness there.

22              SPECIAL MASTER VANASKIE:  I couldn't find the answer.

23              MR. NIGH:  In addition to the actual -- you know, so

24   I think that that piece isn't actually important.  It's going

25   to be as we go forward.

1          So the one at line 47 we withdraw.

2          SPECIAL MASTER VANASKIE:  That's the spreadsheet line

3   47, that objection is withdrawn.

4          MR. NIGH:  The testimony withdrawn from pages line

5   142 to 12 to page -- or page 142, lines 12 to 15.

6          SPECIAL MASTER VANASKIE:  So now we're to page 142,

7       line 23 to 143, line 3.

8          MR. RAE:  Your Honor, this is the answer to the prior

9   question following an objection that was interposed.  So I

10  assume that plaintiffs are withdrawing this as well.

11         MR. NIGH:  We would be withdrawing page 142 to

12  page -- 142, lines 23 and 24, to page 143, line 1.

13         Line 2 and 3 would be introducing the document.

14         MR. RAE:  And I think it's probably helpful to

15  discuss that document in the context of our objections to the

16  testimony about it on page 144.

17         SPECIAL MASTER VANASKIE:  Okay.

18         MR. RAE:  So we -- our objections here kind of are --

19  this is outside of the scope of the 30(b)(6) testimony, and

20  it's a document from 2006 that this witness doesn't have

21  personal knowledge of.

22         Mr. Nigh laid out a bunch of topics upon which

23  Dr. Jaiswal was designated to testify.  Those relate to

24  Torrent's testing of valsartan API.  They relate to Torrent's

25  quality unit, to some aspects of regulatory compliance issues.

1   But they do not relate to procurement issues from 2006.  And

2   specifically this email is about procurement for -- if you go

3   back and look at the email itself, for domestic production of

4   valsartan, meaning Torrent is an Indian company.  Domestic

5   production is discussed in the email.  It's for production for

6   the Indian market of valsartan.

7          So not only is this outside the scope of the dep --

8   like, of the 30(b)(6) testimony and a document that

9   Dr. Jaiswal lacks personal knowledge of, but it's -- and long

10  predates his employment at Torrent, it's also irrelevant and

11  prejudicial to be talking about this document in the context

12  of this case, which is about Torrent's use of valsartan API

13  within the US market.

14         MR. NIGH:  Your Honor, two issues.  One, the India

15  thing is a nonissue.  It's the same API that they utilized

16  throughout.  And obviously the strategy as to whether or not

17  they were using it for India or the US, it becomes the same

18  issue.  They want to secure this API that's 60 percent less

19  expensive to use in their finished products.  And ultimately,

20  that's what occurs, and they use that, you know, for all of

21  the products that they market.  So to say that it's just the

22  India market is just not true.

23         The second piece is, Jaiswal is offered up, like I

24  said, for nearly every single topic.  And one of those topics

25  is their API supplier.

```
 1            And, you know, not just procurement, but, you know,
 2    to the -- in terms of looking at the adequacy of the API, you
 3    know, all -- he governs -- you know, he is oversight, he is
 4    the last stop when it comes to API supplier.
 5            And obviously the API supply is what leads to the
 6    quality control purity in the finished dose products.  And
 7    that's one of his main functions is oversight of the API
 8    supply.  In fact, he's in charge of the people who that's
 9    their job, is to go and -- who's to go and secure API supply
10    and to do the audits and things of that nature.
11            That all runs right up to him in his personal
12    capacity.  But also there's numerous topics that would speak
13    to his oversight of the API supplier in this 30(b)(6) notice.
14            MR. RAE:  Your Honor, we don't dispute that
15    Dr. Jaiswal was -- like, Dr. Jaiswal's department and
16    Dr. Jaiswal's 30(b)(6) topics include Dr. Jaiswal covering
17    what the quality department that he oversees at Torrent does
18    with respect to qualification of the API suppliers, with
19    respect to other API suppliers, with respect to supervision of
20    API suppliers.
21            This email is not and this line of questioning is not
22    about any of those issues.  This is about the procurement side
23    of Torrent discussing strategy for how to go out and source
24    API, again, for the Indian market at the stage that falls
25    before the quality department getting in and vetting the API
```

1  supplier and making sure that they can actually supply the API

2  in a quality way, auditing them, all of the things that

3  Dr. Jaiswal was designated as a 30(b)(6) witness to testify

4  about.

5          This is a precursor issue that's about procurement,

6  not about quality.  And it's outside of the scope of his

7  30(b)(6) topic, and it's not something that he has personal

8  knowledge of.

9          MR. NIGH:  Your Honor, while the defendant may like

10  to inject that being 60 percent less expensive as a bold

11  statement, we need to find API that's 60 percent less

12  expensive, as they would like to inject and say that has

13  nothing to do with safety.  Of course it does.  It has an

14  implied reason to do with safety.  And we establish that

15  through much of the testimony later thereon.

16          Jaiswal's duty is to oversee and manage API

17  suppliers.

18          One of the things that we also point in terms of the

19  30(b)(6) is to oversee and manage API suppliers.

20          If he's being handcuffed with an extra statement that

21  it has to be 60 percent less expensive but still oversee the

22  API supply, that handcuff -- in terms of his safety, making

23  sure that it's secure, it's adequate, that handcuff needs to

24  be explained through him and through the 30(b)(6) witness on

25  those topics.  They go hand in hand.

1          MR. RAE:  Your Honor, none of the testimony

2    plaintiffs have designated does what Mr. Nigh suggests.

3    Dr. Jaiswal was consistent throughout his testimony that on

4    quality issues, cost factors have no role on what the quality

5    department does, his responsibility to Torrent, the

6    supervision overseeing of API suppliers.

7          Plaintiffs are trying to inject this idea of, as

8    Mr. Nigh said, handcuffs into the case through implications

9    from documents that -- again, there may be other ways that

10   they can get this document in front of the jury in this case,

11   I'm not foreclosing that possibility, but Dr. Jaiswal, both in

12   his personal capacity and his 30(b)(6) capacity, is not the

13   witness for that.

14          Dr. Jaiswal was not testifying about procurement.

15   The witnesses to get this document in through would be

16   witnesses who are testifying about Torrent's procurement

17   process.

18          MR. NIGH:  And, Judge, if the statement is you can

19   only use API supply that is 60 percent more inexpensive, which

20   is exactly what this statement is saying, and what we're going

21   to see in documents later, that they needed to use inexpensive

22   API, we saw it with Kelly Gegenheimer already and the ruling

23   before.  If that's their statement, then obviously that limits

24   the API that they're able to select from, which in and of

25   itself would limit quality control, all those issues.

1          That's something that goes to the jury.  They can

2     look at that and say, inexplicably, if you have, you know, 100

3     APIs that you have access to, but you can only take the ones

4     that are 60 percent cheaper, so that gives you access to just

5     five out of the 100, of course that's going to limit your

6     options in terms of quality, strength and purity.

7          MR. RAE:  Your Honor, I think what Mr. Nigh has said

8     is exactly why this is unduly prejudicial and should not come

9     in.

10          Mr. Nigh suggested that this email indicates that

11     there was a requirement for a second source of API to be

12     60 percent cheaper.  That's not what this email says.  What

13     this email says is quoted in the question at the top of page

14     145 of the transcript, which we have also objected to, which

15     references "developing a second source with a 60 percent price

16     reduction."

17          It's not a statement that this is a requirement.

18     It's not a statement that this is necessary.  What plaintiffs

19     want to use this for and the reason why they want this to come

20     into the case is so that they can make the arguments that

21     Mr. Nigh is making which have no relationship to the facts in

22     evidence in this case.

23          And, again, I want to come back to, there may be a

24     way for them to get this in.  We may end up talking about that

25     again later on.  But Dr. Jaiswal is not a witness.  We don't

1    establish a foundation with him.  It's outside the scope of

2    his 30(b)(6) topics.  It's outside the scope of his personal

3    knowledge.  This is an improper -- this entire line of

4    testimony about this document is improper.

5              MR. NIGH:  Your Honor, just because I heard some

6    relevancy arguments there as well, if I can address, because

7    we find this to be highly relevant, and it is connected later

8    up in documents as well.

9              Essentially what happened with Torrent is they were

10   precisely handcuffed.  They only used one API supplier.  And

11   later we are going to show that it is cheaper Chinese API, in

12   their own words.  And what we have is we have Dr. Russ, our

13   expert, who says that's precisely the problem, was that they

14   were limited to just this one API.  They didn't have an

15   alternative source.

16             And so they were -- obviously what ended up happening

17   thereafter is it allowed ZHP to call the shots.  They had

18   nobody else to go to.

19             So when it comes to this cheaper/inexpensive, that

20   all lays its way out all the way through to our own expert who

21   ultimately looks at this and reflects on the same thing, that

22   they only had one API supplier when it was all said and done.

23   I understand this email says an alternative, but what we

24   actually see later thereafter, one API supplier for the entire

25   international market, and it just so happens to be the one

```
 1   that would be more than 60 percent inexpensive.
 2            MR. RAE:  Your Honor, I think you've heard our
 3   arguments at this point.
 4            SPECIAL MASTER VANASKIE:  I have.  And I'll give you
 5   my ruling.  And that is that the objections are overruled.
 6   The testimony is admissible.
 7            I want the record to be clear that I'm talking about
 8   the testimony that covers pages 146, starting at line 8, down
 9   to page 175, line 7, I believe.
10            MR. RAE:  Your Honor, if I may, I think what we were
11   just discussing was the deposition designations that we had
12   objected to from page 144 -- or, actually, I think it starts
13   earlier than that, from 142 --
14            SPECIAL MASTER VANASKIE:  You are right.
15            MR. RAE:  -- where the document is introduced -- I'm
16   sorry, 143, line 2 to 146, line 17.
17            And then on page 147, plaintiffs transition to asking
18   about a different document, which Your Honor may have a
19   similar ruling on.  We have similar objections to this, again,
20   being an email about procurement that doesn't have to do with
21   quality control.
22            And I may be understanding Your Honor to say that
23   you're going to be ruling in the same way about these issues,
24   but --
25            SPECIAL MASTER VANASKIE:  Yes, I am going to rule in
```

*United States District Court*

1    a similar way.  It seemed to me to be a continuation of that

2    line of questioning dealing with sourcing the API and using a

3    supplier that was less expensive.

4         And I guess to make that clear, I find that to be

5    highly relevant and not barred under Rule 403 principles.  In

6    terms of this witness's foundation, he's a 30(b)(6) deponent.

7    And it seems to me he's an appropriate person to pose these

8    questions to.

9         So we can go excerpt by excerpt, but I thought I'd

10   short-circuit that a little bit by treating them all together.

11        MR. RAE:  No, Your Honor.  Understood.

12        I think with respect to the testimony from lines

13   166 -- I'm not going to kind of -- just the broad range, like,

14   beginning on page 166, line 8 through 175, line 17, there's a

15   number of lines of testimony that we objected to on the basis

16   of foundation there.

17        Those relate to other than we don't have the same

18   scope objections that I discussed before.  That's clearly

19   within the scope of the 30(b)(6) topics.

20        We also are not making kind of the 401 and 403

21   objections, but we still have a foundation objection, because

22   the witness testified that he had never seen that email

23   before.

24        I think it's -- we would request -- I don't think

25   actually --

1           SPECIAL MASTER VANASKIE:  Let's go through this.

2    This is different.

3           MR. RAE:  All right.

4           MR. NIGH:  Yeah, Your Honor, if I can, I just want to

5    clean up exactly what the prior ruling is for.

6           My understanding is it's 143, line 2 -- all of the

7    designated testimony from line 143 -- or page 143, line 2.

8           And where did it end?  That's what I'm trying to find

9    here.

10          Is it 152, line 23?  I don't think that there's any

11   objection --

12          SPECIAL MASTER VANASKIE:  That's what I had:  152,

13   line 23.

14          MR. NIGH:  Is that right, Jacob, in your belief?

15          MR. RAE:  Yes.

16          MR. NIGH:  Okay.

17          MR. RAE:  Then I think the next batch of testimony

18   which relates to the next document is from 166, line 8 to 175,

19   line 17.

20          As I said, our primary objection is a foundation

21   objection.

22          The counter that we designated from 173, line 17 to

23   174, line 9, identifying kind of the witness indicating that

24   he had not seen this email before is -- shows the basis for

25   that objection and I think would also -- in fairness should be

```
 1   coming in front of the jury to the extent Your Honor is going

 2   to let in this testimony.

 3           SPECIAL MASTER VANASKIE:  Okay.  So this is 166, line

 4   8?

 5           MR. NIGH:  Your Honor --

 6           SPECIAL MASTER VANASKIE:  Go ahead.  Help me out

 7   here.

 8           MR. NIGH:  Yeah, if I can.

 9           This is one of the more puzzling objections to me,

10   because, as we established before, the role of oversight of

11   the API supplier, you know, it runs right up to Jaiswal.  He's

12   being put up as the 30(b)(6) witness.

13           And so for him to have not seen an email where --

14   Jenny Yang is the inspector who goes to ZHP's facility and

15   comes back after that -- having that inspection and lays out

16   in an email, very summary, stating that they don't

17   understand -- if I can get the quote here real quick.

18           In other words, he comes back from the audit.  He

19   says all sorts of problems in his summary email.  The people

20   from this manufacturer is too much protective of their system

21   is one of the statements.  Another one says something like

22   they don't understand safety.  They don't understand

23   degradation.

24           So -- and I can find those here.  But they're very

25   troubling statements from Jenny Yang coming right back, fresh
```

1  off of the inspection.

2          So for the person who is being put up as the

3  oversight of API supplier to not have ever seen that email in

4  and of itself is very odd, because he should have had a duty

5  to look at all the information related to oversight of API

6  before he even took the deposition.  But he didn't, and so

7  maybe he's speaking on behalf of Torrent.  But nobody saw that

8  email.

9          But on top of that, he also is the supervisor of the

10 API supplies.  And quintessential to that is that Torrent has

11 a duty to inspect.  It's not just check off the boxes that

12 they did an inspection, it is that they actually follow up on

13 the problems that they see in the inspection.

14         And so what we're going to see is that this email is

15 sent, and it drops off the face of the planet after that.  It

16 doesn't show up in the formal CAPA.  And obviously, it didn't

17 even -- you know, for whatever reason, Jaiswal doesn't even

18 know about it.  It's extremely relevant.

19         MR. RAE:  Your Honor, I don't think it's relevant to

20 kind of the deposition objections we have here, but what

21 Mr. Nigh said is not true as a matter of the record.  There is

22 follow-up correspondence from Dr. Yang indicating that she

23 followed up with ZHP, that ZHP had closed out the issues, that

24 they had satisfied CAPA and that her audit was complete.

25         This is kind of a normal back-and-forth process of

1  audits:  Identify issues.  Those issues get resolved.  Things

2  move on.

3         But, again, I don't think that's something that we

4  have to be hashing out here.  This is not a trial on the

5  merits of the case here.  This is about our foundation

6  objection to this line of testimony.

7         And as I said, I think Your Honor has essentially

8  already ruled that you are going to let this in was my

9  understanding.

10        SPECIAL MASTER VANASKIE:  Yes.

11        MR. RAE:  So our main ask was that our

12  counter-designation also come in.

13        SPECIAL MASTER VANASKIE:  Your counter-designation at

14  page 173, line 17 to 174, line 9?

15        MR. RAE:  Correct.

16        MR. NIGH:  Your Honor, if I could have one second to

17  look at those real quick.

18        MR. RAE:  Just to correct it, it probably should be

19  173, line 20, because the beginning of that -- and I'm going

20  to modify it now on the fly because the beginning of that

21  looks like it is Ms. Brancato's foundation objection, which

22  should not be getting designated.

23        SPECIAL MASTER VANASKIE:  Right.

24        MR. NIGH:  Your Honor, we have no objection to that

25  counter.  I will withdraw it.  I think it's actually good for

1  us.

2         SPECIAL MASTER VANASKIE:  Okay.  So the counter will

3  come in from page 173, line 20 to 174, line 9.

4         Correct, Jacob?

5         MR. RAE:  Correct.

6         SPECIAL MASTER VANASKIE:  What's our next contested

7  designation?

8         MR. NIGH:  I guess I want to be clear that Your

9  Honor's prior ruling, Jacob understood his objections to be

10  overruled, runs from page 166, line 8, all the way through

11  page 175, line 17.

12         MR. RAE:  That was my understanding, yes.

13         MR. NIGH:  Okay.

14         SPECIAL MASTER VANASKIE:  Yes, that is correct.

15         MR. NIGH:  I think the next one is a counter at

16  182 -- or, sorry, it's -- counter to page 182:12 to 18.  And

17  they're trying to include pages 191, seven pages later, 11 to

18  15, which we don't see as responsive.  But on top of that,

19  it's not a response to any question, even at 191.  It's just a

20  talking point.

21         MR. RAE:  Your Honor, again, the counter here runs

22  from 191:11 to 193:4.  It's the question and answer in that

23  segment with just kind of a brief cutout from 16 -- 191, lines

24  16 to 19, where there was an interposed objection and kind of

25  a brief cutoff of the beginning of the witness's answer that

1  got cut off by that objection before the witness began to

2  answer the question in earnest.

3         MR. NIGH:  I guess I can't even tell what it's

4  responsive to, anything that we've designated.

5         It looks like they should just do an affirmative

6  designation for this one.

7         MR. RAE:  So, Your Honor, this is a line of

8  questioning running from page 184 through -- certainly through

9  at least page 193, where plaintiffs are asking questions about

10 the genotoxic declarations that came from ZHP to Torrent.

11        That line -- the counter that we have is directly

12 relevant to that line of questioning about genotoxic

13 declarations and genotoxic impurity questions.  It's a

14 question that plaintiffs themselves thought was relevant to

15 kind of the general topics that they were asking about, which

16 is why they asked it in their deposition.

17        We think that in fairness it needs to be read along

18 with these questions, because the -- particularly the question

19 on line -- on page 193, line 17 to 21, about how Torrent, as a

20 finished dose manufacturer, has a duty to follow industry

21 standards regarding genotoxic impurities.

22        The counter-designation that we have explains what

23 those industry standards are with respect to genotoxic

24 impurity testing.

25        SPECIAL MASTER VANASKIE:  Yeah, I think the

1    counter-designation does come in.

2            MR. RAE:  Thank you, Your Honor.

3            MR. NIGH:  Your Honor, if I may, I don't see how

4    that's responsive to 17 to 21.  I think they are just -- at

5    193.  I didn't even know what it was responsive to.

6            But the information here is not responsive to that

7    Torrent has a duty to follow industry standards regarding

8    genotoxic impurities.  This is talking about, you know, DMF,

9    ANDA.

10           You know, to the extent they want to try to fit it in

11   to say that is their duty -- that's not what it says.  It's a

12   broad, long, run-on statement that isn't even responsive to

13   197, line -- or 193, line 17 to 21.

14           SPECIAL MASTER VANASKIE:  I do think it's permissible

15   for Torrent to designate this part of the testimony.  And I

16   don't see how you're prejudiced by it.

17           MR. NIGH:  Yes, Your Honor.

18           SPECIAL MASTER VANASKIE:  Go ahead.

19           MR. RAE:  I'm going to jump in, because I think we

20   have a couple more objections that we withdrew that I can kind

21   of short-cut us.

22           You're probably looking at -- there's no current

23   objection on page 210, lines 3 to 9.  And there's no objection

24   on page 251, line 9 to 22.

25           The next objection is page 252, line 4 to 17.

 1            And, Your Honor, our objection here is that it's both

 2      a foundation question and a form and argumentative nature of

 3      the question objection.  There's an outside the scope

 4      objection, but I'm going to assume that Your Honor is going to

 5      rule in line with your previous rulings with respect to the

 6      scope issues, so I want to focus on the prejudice,

 7      argumentative nature of the question, 602 issue.

 8            SPECIAL MASTER VANASKIE:  Okay.

 9            MR. RAE:  The issue here is -- the question is:  "So

10      the decision to put the product back on the market had nothing

11      to do with the money y'all would lose in the meantime?"

12            And that question implies that there is evidence

13      indicating that the decision had to do with Torrent losing

14      money.  And that's not testimony that's been established.

15      That's not evidence in the record.  In fact, the testimony

16      that plaintiffs themselves have designated on page 252, just

17      before this question, says:  The decision-making process sits

18      with Dr. Jaiswal.  Dr. Jaiswal says, "I'm holding those

19      decisions.  I never see -- and I have indicated every time we

20      have this discussion, I was not knowing that," and that he was

21      not knowing that there was any discussion about supplier

22      issues or price at the time that he was personally responsible

23      for making the decisions about what Torrent could do from a

24      quality perspective during, at this point, the summer of --

25      June and July of 2018.

1          Dr. Jaiswal goes on, "But this is a purely technical

2    call based upon the assessment of the database, based on the

3    assessment of the DMF holder, what declaration they have

4    given."

5          The question implies that the jury should be thinking

6    something entirely different from what the evidence should

7    show, something that's not supported in the record, and it

8    would be incredibly prejudicial to let the jury hear this

9    question that lacks a foundation and is argumentative.

10          SPECIAL MASTER VANASKIE:  Daniel?

11          MR. NIGH:  Your Honor, to suggest that this isn't

12    supported in the record -- I think it's important to do the

13    back of what has been displayed thus far and what we're also

14    going to lay with other witnesses as well, but it's also in

15    this deposition transcript.

16          Essentially what occurred is Dawn Chitty -- who is a

17    subordinate to Jaiswal; she reports to Jaiswal.  And she's the

18    person in -- one of the people in charge of quality, who is

19    constantly ringing the drum that we've got to test this

20    product to see if our own product has NDMA.  We can't just

21    rely on ZHP's statement that there is no genotoxins in it, and

22    for likely good reasons, because ZHP has been wrong for them

23    before, which is that they sold new process in Europe.  They

24    relied on that note, genotoxic statement.  And of course they

25    found out that their new process clearly had genotoxins.  They

1    knew at the time that this was happening.

2          So to put all that in respect, she's saying, we've

3    got to test, we've got to test, we've got to make sure there's

4    no genotoxins in this.  And the very next day, or actually the

5    same day that she says we've got to test -- and I say "same

6    day" because there's a difference in the time zones, she's in

7    the US and India.

8          But the same day it's happening, their CEO goes

9    around, takes her off the list, and shows how much do we have

10   in supply, what are we going to lose in terms of if we fail to

11   supply product on time, what are going to be the penalties

12   that happen because of that.  That's all in the emails that

13   we're presenting to him.

14         So we're asking him, this decision to put the product

15   back on the market, was that driven in any way due to finances

16   as far as you're concerned?

17         And that's the question.  It's a fair question to the

18   person in charge of quality and safety.

19         SPECIAL MASTER VANASKIE:  I'm not sure it's a fair

20   question of that person.

21         MR. RAE:  Your Honor, just to be clear, the question

22   that Mr. Nigh just asked, that's the question that's at 251,

23   lines 20 to 22 of the transcript.  We haven't objected to that

24   question.  That question and the answer to it is coming in.

25         We're objecting to the subsequent question that

1  follows it, that implies that the witness's answer, that it's

2  an argumentative question that's framed in a way that implies

3  to the jury that counsel thinks that the witness is lying.

4  There's no foundation for that assumption.

5          This witness was not on that email chain, and he's

6  testifying to the process that he engaged in in overseeing

7  Torrent's quality control process.

8          So again, like, the facts here are coming in.  The

9  testimony from 251:20 to 22, 252:4 to 13, that's coming in.

10 It's the next question that we're objecting to.

11         SPECIAL MASTER VANASKIE:  You're objecting to the

12 question, "So the decision to put the product back on the

13 market had nothing to do with the money y'all would lose in

14 the meantime?"

15         MR. RAE:  Correct.  And we are not objecting to

16 "Torrent was ready to put its product back on the market so it

17 didn't continue to lose money, correct?"

18         I think the difference between those two questions is

19 obvious.  And the reasons why we're objecting to one but not

20 the other is also, I would think, obvious.

21         MR. NIGH:  Judge, one brief statement, Your Honor, is

22 that -- and I don't think your ruling will change on this, but

23 just to keep in mind, obviously it's a 30(b)(6) witness who is

24 in charge of quality and safety.  So the fact of whether or

25 not he was personally on the email is irrelevant to that

1    issue.

2            SPECIAL MASTER VANASKIE:  And I'm going to sustain

3    this objection.

4            MR. NIGH:  Okay.

5            MR. RAE:  Thank you, Your Honor.

6            SPECIAL MASTER VANASKIE:  What do we have next?

7    We're going to go for about 15 more minutes and then take a

8    break.

9            MR. RAE:  I think the next objection I have is on

10   page 257, line 9 to 17.

11           MR. NIGH:  Is there a counter to 254:3 to 6?

12           MR. RAE:  I believe we had agreed -- was it yesterday

13   when we spoke that you guys were going to designate 254:3 to

14   11, that we were going to drop our counter, that you were

15   going to drop the next question, and then we were going to

16   pick up at 252, line 2 to 6, and that that had resolved

17   everything in this section.

18           MR. NIGH:  We agree with that.  That's right.

19           SPECIAL MASTER VANASKIE:  All right.

20           MR. NIGH:  So yes, 257, line 9 through 17.

21           MR. RAE:  And, Your Honor, I think this one is pretty

22   straightforward.  There's a question here.  There's no

23   designated answer.  It's just attorney commentary that's being

24   apparently kind of designated and being put in front of the

25   jury as part of the record.

1        MR. NIGH:  Your Honor, it actually goes through --

2   this is another one of those sort of -- you got to read them

3   together.  It goes through to the next one and then the next

4   one after that, you know.  So it's all together as one.

5        Because his answer to it later is well, did I see,

6   blah, blah, blah.  And then ultimately we point him to where

7   it really is, and then he starts to answer.

8        So the 9 to 17 is the beginning of the question and

9   answers that go back in terms of the next ones following,

10  258:4 to 258:19.

11       MR. RAE:  I think the only thing I would say then is

12  that the question on 258:4 to 5 seems unnecessary to me, if

13  the position you're taking is that the answer beginning at

14  258:6 is an answer to the question, 257:9 to 17.

15       MR. NIGH:  I think it's -- it just flows from there.

16  And in terms of the flow, I think it makes more sense to have

17  that designation that way.

18       SPECIAL MASTER VANASKIE:  Yeah.  It just seems to

19  flow better that way as well, so we'll leave that in.

20       MR. RAE:  Okay.

21       MR. NIGH:  And I am not really sure where objections

22  happen after that, because we've got lacks foundation, and

23  these obviously -- I don't know where the next objection is

24  after that.  So maybe I'll leave that to Jacob.

25       MR. RAE:  So the next objection is to the question

1    and answer that kind of -- leaving aside kind of omitted

2    portions for objections is 258:16 to the end of the page, to

3    line 24 on that page.

4            And I think this is a similar objection to the one

5    that Your Honor sustained a moment ago.  We're not objecting

6    to the questions about the content of the email.  We're not

7    objecting to kind of the questions about the decision-making

8    process, but we're objecting to this question as argumentative

9    and prejudicial and lacking foundation in kind of implying

10   that and suggesting that Torrent --

11           MR. NIGH:  Your Honor, I don't think it's related at

12   all.

13           SPECIAL MASTER VANASKIE:  The question is --

14           MR. NIGH:  I could see some relation, but

15   essentially, he's part of this email -- he remembers this

16   conversation.  He's part of it.

17           So the fact that the failure to supply and pay

18   penalties, pay supply penalties, he's part of this decision

19   now.  It's not like he's been left off of it.  And he

20   remembers it, he's answering it, he knows about it.

21   Obviously, this all factored into even as his role in charge

22   of quality and safety.

23           SPECIAL MASTER VANASKIE:  Well, his answer is,

24   "Maybe.  I'm not really sure.  But yes, it's been written in

25   the mail."

1          MR. NIGH:  And then further down you can see he

2    remembers the conversation.  "This is the assessment of the

3    market situation they have given."

4          Yes, it's true.  It was given to him.

5          MR. RAE:  And, again, we're not objecting to the

6    question about the content of the email.  We're not objecting

7    to the questioning on line 259 about whether or not

8    Dr. Jaiswal remembers the conversation or kind of him

9    affirming it.  We're only objecting to this question from 16

10   to 24 on page 258.

11         SPECIAL MASTER VANASKIE:  It's not all that clear.

12   But I will sustain the objection, primarily because the

13   objection is foundation.  The witness says, "I'm not really

14   sure.  But yes, it's been written in the mail."  You get down,

15   you get the testimony in about remembering the conversation.

16         But I will sustain the objection.

17         MR. NIGH:  So 259:2 through 15 comes in but 258:16 to

18   24 is out?

19         SPECIAL MASTER VANASKIE:  Correct.

20         MR. NIGH:  I understand, Your Honor.

21         SPECIAL MASTER VANASKIE:  What do we have next?

22         MR. RAE:  Next is 261, line 19 to 262, line 5 is the

23   question and answer that our objection is to.

24         And I think this is, again, the same issue that we

25   were just discussing, and, again, kind of there's a foundation

 1    here.  The witness's answer demonstrates that the witness is

 2    being confused by this.  And similarly to the other issues as

 3    this kind of comes back in 262, lines 7 kind of forward, we're

 4    not objecting to that testimony about where the witness

 5    actually does remember things he's grounded and where there

 6    are kind of answers to the questions.

 7            MR. NIGH:  I guess I don't know where the objection

 8    starts and ends on this one.

 9            MR. RAE:  The objection is just the first question at

10    the bottom of 261 in this kind of set of designations.  So

11    261, line 19 to 262, line 5.

12            MR. NIGH:  Yes.

13            SPECIAL MASTER VANASKIE:  I'll sustain the objection.

14            Go ahead.

15            MR. NIGH:  Your Honor, the relevancy in part is

16    because he is an employee in India.  This actually ties up

17    that it's going back on the market on the same day.  It ties

18    up that it is the same day from the day that -- that Chitty is

19    raising the issues.  He's in India, and so it helps to

20    establish this time difference that we just talked about.  And

21    that's why it's important to have that same day it happened.

22            And he answers both of those questions later.  But he

23    doesn't say same day.  He answers the day and then he answers

24    the other.  But the importance is the date is the same day.

25            SPECIAL MASTER VANASKIE:  Well, why isn't it

1   sufficient, Daniel, to just start at page 262, line 7 and go

2   on from there?

3          "I remember on which date FDA has given me clearance

4   to go back on the market.

5          "What day was that?

6          "That date, I think it was -- it is on the 18th of

7   July."

8          Why isn't that sufficient?

9          MR. NIGH:  I see.  I hadn't seen down to 262:24, and

10  we did designate that which does say "Same day y'all get the

11  drugs put back on the market?"  I think that is sufficient.

12         SPECIAL MASTER VANASKIE:  Okay.  So to be clear, I've

13  sustained the objection at page 262, lines 2 and 3 and the

14  answer that would have come after that at lines 4 and 5.  All

15  right?

16         MR. NIGH:  And Judge, I think it's pages 261, line 19

17  to 262, line 5.

18         SPECIAL MASTER VANASKIE:  Line 5, yeah.  I think so

19  too.

20         MR. NIGH:  That's taken out.

21         SPECIAL MASTER VANASKIE:  That's taken out.

22         MR. NIGH:  But then 262, line 7, to page 263, line 3

23  comes in.

24         SPECIAL MASTER VANASKIE:  Yeah.

25         MR. NIGH:  Okay.

1          SPECIAL MASTER VANASKIE:  All right.  What do we have

2   next?

3          MR. RAE:  Next I think there's a plaintiffs'

4   objection to our counter-designation at -- beginning at 264,

5   line 17.  And then the counter-designation runs again with a

6   little bit of material that's been left out because it's kind

7   of cross-chatter to 266, line 5.

8          SPECIAL MASTER VANASKIE:  Okay.

9          MR. RAE:  I don't know if the best way to proceed is

10  for me to explain kind of the reasoning behind our counter or

11  for Mr. Nigh to explain his objection to it.

12         SPECIAL MASTER VANASKIE:  Let me just make sure I'm

13  on the right question and objection.

14         The question starts on page 264, line 17.  "Okay.  So

15  Dawn Chitty -- Dawn Chitty thinks you guys need to figure out

16  the testing method to head off potential liability, right?"

17         And there's objection to foundation.

18         Is that where we're at?

19         MR. RAE:  Yes.

20         MR. NIGH:  Just looking at it, it's actually just

21  things that, you know, they'd like to interject that aren't

22  responsive to any of the questions.  So we would say that any

23  of this should be designated either in an affirmative or they

24  should put Jaiswal on the stand.  These aren't the questions

25  being asked.

1       MR. RAE:  Your Honor, frankly, the question that

2   immediately precedes this is about what Dawn Chitty wrote in

3   this email.  And the counter-designation is the questions and

4   answers that explain what Dr. Jaiswal understood Dawn Chitty

5   to be communicating in the language that she wrote, that they

6   ask Dr. Jaiswal to acknowledge she wrote in the prior

7   question.  And from 264, line 6 to 264, line 16.

8       And so we think that this is just a straightforward

9   issue of fairness and completeness, to have the testimony from

10  Dr. Jaiswal explaining the language in this email and what he

11  understood from it, alongside the designation from plaintiffs

12  asking Dr. Jaiswal to confirm that that's what Dawn Chitty

13  wrote to him.

14      SPECIAL MASTER VANASKIE:  Yeah.  I think this comes

15  in.  I can't find a reason to exclude it.

16      MR. NIGH:  Your Honor, if that's going to come in, we

17  would ask that it runs all the way to line 12 of page 266.

18      SPECIAL MASTER VANASKIE:  Yes.  I agree.

19      MR. RAE:  I'm not going to bog us down with any

20  objections to that.

21      SPECIAL MASTER VANASKIE:  Okay.  All right.  Why

22  don't we take a break now.

23      Ann Marie, is it all right if we take an hour break?

24      Okay.  So we'll take a break until 1:15.  We'll see

25  you back then.

1          MR. NIGH:  Thank you, Your Honor.

2          MR. RAE:  Thank you, Your Honor.

3          (Recess at 12:15 p.m.  until 1:20 p.m.)

4          SPECIAL MASTER VANASKIE:  We're continuing our

5    conference on deposition designations.  We're still working on

6    Dr. Jaiswal.

7          And where are we picking up?

8          MR. RAE:  We're picking up at the question and answer

9    on page 305, line 15 and then running through page 306, line

10   9.  There's sort of two blocks of testimony designated for the

11   question and the answer.

12         SPECIAL MASTER VANASKIE:  All right.  Let me pull

13   that up.

14         So what's the argument on this?

15         MR. RAE:  Your Honor, the argument here is -- there's

16   two issues here.  One is that Dr. Jaiswal -- this is a

17   question about the regulatory process for submitting -- for US

18   regulatory submissions.  And Dr. Jaiswal was not designated as

19   a 30(b)(6) on that topic, so this is outside the scope of his

20   30(b)(6) testimony.

21         And then the second issue is really with the premise

22   of this question, the "when you become aware of some quality

23   implication," that that hypothetical formation of the question

24   imply -- will imply to the jury that Torrent did become aware

25   of some quality implication at some point in time.  And that

 1    premise lacks foundation, and it's unfairly prejudicial to ask

 2    a question framed in that way.

 3            SPECIAL MASTER VANASKIE:  Daniel?

 4            MR. NIGH:  First off, I'm kind of stunned by the

 5    30(b)(6).  I don't know how far I need to go into that.

 6            But he's the head of -- he's the main analytical

 7    chemist in the company.  He's the head of testing, you know.

 8    And it's almost like the defendant wants to be able to put

 9    everything in a box and say, oh, this is the regulatory box.

10    He knows no idea -- he doesn't know how to deal with

11    regulatory.

12            Of course he does.  He knows that if he needs to get

13    testing done, this is the way he goes about it, and he sends

14    off and says I need to have this certain test to find this

15    certain thing, add this to the ANDA, get this done.

16            And his answer is precisely that, he knows that it

17    doesn't -- he knows the regulatory actions that have to occur

18    downstream for him to be able to do his job.  And so that's

19    clear.

20            Second, the idea of the sort of questions on -- of

21    course there's a foundation for that.  What we see is the

22    finished dose manufacturer, Novartis, when they find that

23    there is an unknown peak, they figure out how to test for the

24    unknown peak, and then they ultimately find out that there's

25    NDMA.

1          And one of the defenses here by the other side is,

2   well, we didn't have it in our ANDA, it didn't allow us to

3   test this certain way, so we couldn't find it.

4          Well, this just clearly knocks that out.  Of course

5   you can.  You go ahead and you ask for this testing and you

6   can get it approved.

7          MR. RAE:  Your Honor, just to respond briefly on the

8   30(b)(6) issue.  I think that's actually an important issue

9   here, because I heard Mr. Nigh respond to the lot of ways in

10  which this witness has personal knowledge on -- like,

11  potentially has personal knowledge here.  That's not the basis

12  of our objection.

13         But I think it's also important to remember that this

14  is a witness that plaintiffs are being allowed to play

15  deposition designations from this witness as part of their

16  case-in-chief, even though he's going to be available live to

17  testify at trial.

18         And the primary reason that they argue that they

19  should be able to do that is because 30(b)(6) testimony

20  qualifies as an admission under the Federal Rules of Evidence,

21  but testimony that's being given by a witness in his personal

22  capacity doesn't.  And Dr. Jaiswal is going to be appearing

23  live at trial.  He's been available live.  He was never

24  unavailable to plaintiffs.  We offered to make him available

25  during plaintiffs' case-in-chief.

1          And so the elaboration on how Dr. Jaiswal has

2   personal knowledge on this issue is very different from this

3   being outside scope of his 30(b)(6) testimony and therefore

4   being testimony that should be getting presented to the jury

5   live.

6          MR. NIGH:  Your Honor, briefly --

7          SPECIAL MASTER VANASKIE:  What are you trying to

8   establish here, Daniel?

9          MR. NIGH:  Your Honor, briefly, I'm looking at the

10  30(b)(6) notice.  And it's kind of appalling to me that's

11  still the objection, because there are at least 20 topics that

12  this would be relevant towards.

13         The idea that the -- they're not limited in terms of

14  the testing that can be performed, because all they have to do

15  is be able to ask for this sort of testing, and they will get

16  it.

17         And so numerous topics speak to this, from testing of

18  valsartan API in finished dose that's in the product and it's

19  talking about chromatograms, mass spectometry.  It's all

20  throughout.  That's what we're suggesting.

21         You didn't have the actual -- you may not have had

22  the actual test that was in the ANDA approved at the time, but

23  you could have just asked for it.

24         And so he's going to pair his knowledge of the test

25  that he needs with the -- and I don't just mean his knowledge.

```
1    I mean the 30(b)(6) topics knowledge along with the way in
2    which to ask for it.
3             SPECIAL MASTER VANASKIE:  So to the extent the
4    objection is that this is outside the scope of the 30(b)(6)
5    notice, I would overrule that.
6             Is there any other basis for objecting to this
7    testimony, Jacob?
8             MR. RAE:  Yeah, Your Honor.  As I said at the
9    beginning, the premise of this question, when you become aware
10   of some quality implication, will imply to the jury in asking
11   this question that Torrent became aware of some quality
12   implication, and there's no foundation laid for that premise
13   as a hypothetical to found this question on.
14            SPECIAL MASTER VANASKIE:  I'll overrule that
15   objection as well.
16            Anything else on this?
17            MR. RAE:  No, Your Honor.
18            SPECIAL MASTER VANASKIE:  All right.  What's our next
19   one?
20            MR. NIGH:  I believe it's defendant's counter 314:5
21   to 315:6 and then 316:9 to 317:21.  And they both kind of fall
22   under the same bucket.
23            Is that right, are those the next two, Jacob?
24            MR. RAE:  Yes.  I would agree that they fall under
25   the same bucket as well.
```

1           MR. NIGH:  So essentially let me explain this a

2    little bit further, which is we had a similar issue already in

3    191:11 to 193:4, where the defendants want to -- it's one of

4    their talking points.  Every time they ask a question, you

5    know, at some point they want to stick in and say, well,

6    there's an open part of the DMF where we're able to see

7    certain activity of what's going on in the DMF and then

8    there's a closed part of the DMF that we can't see certain

9    things.

10          And so that's exactly what's happened here.  You will

11   notice, just as it was in 191, it's interjected pages later

12   from anything that we designate, but at least 191 had some

13   semblance of what it went to.  Here, we're just -- I mean,

14   it's almost getting to the point where I could ask him what he

15   had for breakfast and he would say, well, you know, there's an

16   open part of the DMF, and the open part of the DMF allows me

17   to do blah, blah, blah, but the closed part of the DMF doesn't

18   allow me to blah, blah, blah.

19          And that's what we're going to see, this running

20   theme all throughout where they just want to stick in -- and

21   there's a way they should do this.  And that is, they said

22   they're going to call Jaiswal live.  When they call Jaiswal

23   live, he can say everything he wants to his heart's desire

24   about the open part of the DMF, the closed part of the DMF.

25   And I will tell you and assure you, at that time we will come

1    prepared with a cross-examination for that piece.  But that

2    has nothing to do with anything that I questioned before and

3    after that we've designated.

4         The other part of this question, as we've said

5    multiple times, that if we de-designate, then the counter

6    should go away; but I don't even know what we would

7    de-designate for this counter to go away because it's not

8    responsive to anything we've designated even remotely within

9    its pages.  It's like eight pages later, either before or

10   after our questions.

11        MR. RAE:  Your Honor, my apologies.

12        SPECIAL MASTER VANASKIE:  Go ahead.

13        MR. RAE:  To clarify, there's a lengthy line of

14   questioning beginning at page 325 of Dr. Jaiswal about the

15   contents of ZHP's DMF.  The chemistry -- the synthetic

16   chemistry, the chemistry on paper that one could do if one had

17   access to that full DMF, and the conclusions that one could

18   potentially draw from having that access, knowing the

19   information in that DMF, the full information in that DMF and

20   conducting synthetic chemistry based on that.

21        Our counter directly relates to -- and in fairness,

22   it needs to be played alongside that to make it clear to the

23   jury that this line of questioning that we're not objecting to

24   about what Dr. Jaiswal is testifying you could know based on

25   the contents of the DMF is information that Torrent did not

1    have.

2           And that's -- from a fairness perspective, I hear

3    Mr. Nigh saying Dr. Jaiswal can come on direct weeks after

4    this video is played when the case turns over to defendants

5    and we're presenting our defense case, we'll be able to

6    provide that context.  But, frankly, Your Honor, that's not

7    sufficient, because if the jury sits with the implication that

8    this line of questioning relates to information that Torrent

9    would have had at the time, they're going to be sitting for

10   days, if not weeks, without the context of the fact that

11   Torrent didn't actually have this information.  So we think

12   it's critical that that testimony be played at the same time

13   so that the jury can hear the full context of the testimony

14   that plaintiffs are designating.

15          MR. NIGH:  And, Your Honor, if I can respond briefly,

16   which is -- you know, a big part of this problem is we're not

17   asking him in any of those questions -- none of them, it's

18   pains -- it's obvious that I purposely am not asking him in

19   any of those questions, did Torrent have access to the open

20   part or the closed part of the DMF.  That's not asked.

21          It's simply asked if you had the full chemical

22   process, could you do X, Y and Z.  That's it.  It's not asked,

23   did you have the open part, did you have the closed part,

24   what's your analysis on open and closed; because I can

25   guarantee the defendants, we have a lengthy cross-examination

 1    on that topic as to what they had access to and did not.

 2         But for them to be able to interject that in here and

 3    keep saying we didn't have access when that's not my

 4    questions, because they do have access to a lot of things

 5    they're not talking about.  But I am not asking about that

 6    here.

 7         MR. RAE:  Your Honor, if I may.

 8         SPECIAL MASTER VANASKIE:  Go ahead, Jacob.

 9         MR. RAE:  This comes back to the fairness issue,

10    which is I hear Mr. Nigh saying they're not asking these

11    questions, but the questions were asked in Dr. Jaiswal's

12    deposition.  The questions were answered in his deposition.

13         And the issue here is that they're using video

14    designations for a witness who is available to them live to

15    cut up the testimony that they're going to play for the

16    witness and to deprive us of the ability to cross-examine

17    Dr. Jaiswal directly following that examination.

18         And because we're being deprived of that opportunity

19    to redirect or cross or whatever term we want to use for their

20    presentation of their witness, it's imperative that we have

21    the fair opportunity to play fairly limited

22    counter-designations that correct the record on areas where

23    plaintiffs aren't asking the questions that would provide the

24    necessary context to the jury about what they're hearing from

25    the testimony the plaintiffs have designated.

 1          SPECIAL MASTER VANASKIE:  Please tell me the specific

 2    page and lines of testimony that you want to play, Jacob.

 3          MR. RAE:  The pages and lines that we want to play

 4    are starting at page 314, line 5 to 315, line 6.  And that's

 5    primarily discussing the fact that this synthetic chemistry

 6    assessment that plaintiffs are later going to ask about is

 7    something that's conducted by the DMF holder, not by Torrent.

 8          And then from 316, line 9 to 317, line 21, which I

 9    think covers generally kind of the same sort of issues and

10    also just -- generally covers kind of the same sort of issues

11    and further contextualizes that information.

12          MR. NIGH:  Your Honor, if I may, just to go a little

13    bit further.

14          First off, the purpose of direct examination in their

15    case, if they really, truly want to say to correct the record,

16    that's the purpose.

17          But second, they've already gotten to inject this

18    information into page 191, line 11 to 193, line 4.  And what

19    we're going to see is over and over again -- like I said, we

20    can ask him what he had for breakfast, and they're going to

21    start injecting, well, there's an open part of the DMF and a

22    closed part of DMF, or any way that they can kind of remotely

23    make it related to the question.  And it's going to happen

24    over and over and over again.  To be fair to us, it's not what

25    we're asking.

         1              MR. RAE:  Your Honor, I think the issue is that they

         2    come back to similar lines of questioning over and over and

         3    over again.  And so in fairness, the jury should be hearing

         4    the context related to that as it comes up, not kind of in --

         5    and that's kind of the purpose of our counters.

         6              And, again, if this testimony were happening live,

         7    plaintiffs would obviously be entitled to present their

         8    questions to limit the scope, and then we would come back

         9    following that and present our testimony, ask our questions.

        10              That's not the way that plaintiffs are choosing to

        11    pursue their case.  They're choosing to present their case via

        12    video testimony.  And I think it's clear on the record of our

        13    counter-designations here that we're not asking to play two

        14    hours of counter-designations here.  I haven't added them up,

        15    but my guess would be the total length of our

        16    counter-designations to their over two hours of designations

        17    of testimony is probably somewhere in the range of ten

        18    minutes.

        19              SPECIAL MASTER VANASKIE:  I think in fairness to you,

        20    you should be able to ask those questions to be considered at

        21    the time that the testimony designated by plaintiffs is

        22    presented, so I will allow that to happen.

        23              We're talking about the testimony on page 314, from

        24    line 5 through page 315, line 6; and page 316, line 9 through

        25    page 317, line 21.

1          MR. NIGH:  Your Honor, if I may, what is that a

2    counter to?  Because we should be able to examine that and see

3    whether or not we even want that original testimony in the

4    first place.

5          The spreadsheet doesn't show what it's a counter to,

6    because the questions on the spreadsheet don't reflect what

7    was just argued here today.

8          MR. RAE:  Your Honor, as I said before, I think

9    these -- these counters are -- I will acknowledge that the

10   spreadsheet is unclear.  Kind of the spreadsheet format makes

11   it a little bit difficult to identify kind of fairness

12   counters that apply to larger blocks of testimony.

13          But the testimony that this relates to is the

14   testimony that's been designated from -- beginning on page 325

15   through I believe the end of page 328.

16          SPECIAL MASTER VANASKIE:  Let me get there.

17          MR. RAE:  The discussion of kind of the synthetic

18   chemical scheme that's discernible from the DMF carries over

19   for a number of pages in plaintiffs' questioning.

20          And I think if plaintiffs want to consider

21   withdrawing testimony to remove our counter, that's probably

22   something that we can kind of discuss and see if we can work

23   out what the breakdowns for that would be on our own.

24          SPECIAL MASTER VANASKIE:  I just think -- I know this

25   is a simplistic response, but you're going to be playing

 1  excerpts of the deposition.  Both sides should have the

 2  opportunity, in fairness, to designate parts of that testimony

 3  that they think this jury should be able to hear.

 4        And I think it's better if the jury hears it just

 5  once in one method, in this case video testimony.  I guess

 6  Dr. Jaiswal will be here live, but you can then object as

 7  duplicative if he testifies.  And I assume he'll testify after

 8  you present the plaintiffs' case.  So you can avoid the

 9  duplication.

10        But we'll allow it to come in here.

11        MR. NIGH:  I think that's fair, as long as Torrent's

12  counsel understands the duplicative potential of Jaiswal

13  coming in and saying there's an open part of DMF and a closed

14  part of DMF and then we object, well, that's duplicative of

15  what you've already shown in the video.

16        SPECIAL MASTER VANASKIE:  I just said that they

17  should be precluded from doing that.  And obviously it's an

18  objection that you can make.  And at the time of trial, you

19  can have the transcript from today's proceeding available to

20  you to say, the special master said that in the unique

21  circumstance of playing a video deposition and then having the

22  witness appear live and giving Torrent the full opportunity to

23  make designations from the video testimony, duplicative

24  testimony should not come in.  All right?

25        MR. RAE:  Your Honor, I understand your ruling.  And

1    we will definitely take that under consideration.

2           I think that the scope of what's going to be

3    permissible to come in live is going to be decided by Judge

4    Bumb at trial ultimately, obviously.

5           And I think this issue that we're going back and

6    forth on kind of highlights why Torrent's position from the

7    outset has been that we offered to make Dr. Jaiswal available

8    to plaintiffs live during their case-in-chief, that we had a

9    preference for live testimony.

10          But Judge Bumb expressed a preference for live

11    testimony and for this to all happen in one go, and we're

12    being hamstrung here by plaintiffs' insistence on presenting

13    this witness who is going to be available live via video as

14    well.

15          But, again, I think those are trial management issues

16    for Judge Bumb and us to deal with at a later time.

17          SPECIAL MASTER VANASKIE:  I think so as well.  By the

18    way, I am also sensitive to the fact that the plaintiffs

19    should be able to present its case -- plaintiffs should be

20    able to present their case in the manner they believe is most

21    persuasive, and not having gone through this process of taking

22    depositions and deposition testimony can be presented to the

23    jury, they should be able to do so.  So I'm trying to balance

24    those concerns.

25          One thing I know, the jury is going to get all the

```
 1   information.  I'm confident of that.  All right?
 2          Let's go to the next one.
 3          MR. NIGH:  Thank you, Your Honor.
 4          MR. RAE:  Thank you, Your Honor.
 5          So our next objection is at page 333, line 24 to
 6   334:4 and then continuing into the answer on line 7 to 10 of
 7   page 334.
 8          And I didn't --
 9          SPECIAL MASTER VANASKIE:  Hold on a second.
10          We're starting at page 334?
11          MR. RAE:  333, line 24, the question that begins at
12   the very bottom of that page.
13          SPECIAL MASTER VANASKIE:  All right.  The question
14   that starts, "Now, if you knew that those materials were being
15   used, then you could do a complete synthetic chemistry
16   analysis" --
17          MR. RAE:  And I think Your Honor may have addressed a
18   similar issue already, but our objection here is that this is
19   an improper hypothetical that's not grounded in any facts,
20   that it's -- it's asking a fact witness, well, what if this
21   counter-factual was true.  And that's opinion testimony, it's
22   not fact testimony.
23          SPECIAL MASTER VANASKIE:  No.  I will allow it.  You
24   know, I think this is proper examination of a witness.  I
25   don't think you need to tie this into any particular matter.
```

 1    It's a question that says, can you do this?  And he says yes,

 2    if this complete scheme is available for the chemistry

 3    scientist, it is possible.  I think that's all right.

 4            MR. RAE:  Your Honor, I'm going to assume that that

 5    ruling is going to apply to our next objection on 334:12 to 23

 6    as well; is that correct?

 7            SPECIAL MASTER VANASKIE:  That's correct.

 8            MR. NIGH:  I think you have a counter here too, 335:1

 9    to 16?

10            MR. RAE:  Yes, we do.  And I think this is the same

11    issue that we were just discussing about it's directly

12    responsive to the hypotheticals that we just addressed, which

13    is -- I think this questioning actually acknowledging that

14    their prior hypotheticals were based on information that

15    Torrent didn't have available to it, and Dr. Jaiswal agreeing

16    with that.

17            THE COURT:  All right.  I will allow it, the

18    counter-designation as well.

19            MR. NIGH:  Okay.

20            SPECIAL MASTER VANASKIE:  What do we have next?

21            MR. RAE:  We have -- we're on to day 2 of Dr. Jaiswal

22    now.  I'm sure everyone will breathe a sigh of relief that

23    we've at least gotten into the second day.

24            And then the next objection is at page 374.  It's

25    the -- the question is from lines 12 to 18.

```
 1          And our objection here -- actually, Your Honor, are
 2   you there?
 3          SPECIAL MASTER VANASKIE:  I'm there now.
 4          MR. RAE:  Our objection here is that this is just a
 5   question that really is attorney argument masquerading as a
 6   question.  They haven't even designated the answer to this
 7   question.  And then there's kind of a follow-on question that
 8   begins on 375 and runs through to 376 that we haven't objected
 9   to, but we think that this kind of testimony in the form of
10   a -- attorney commentary in the form of a question should not
11   be coming in.
12          MR. NIGH:  Your Honor, just to clear it up, I think
13   it should also have 374, lines 21 and 22.  That was missed.
14   That should be designated as well.
15          MR. RAE:  And I think --
16          SPECIAL MASTER VANASKIE:  I think this comes out.
17          The question here says, "'The focus of this guidance
18   is on DNA-reactive substances that have a potential to
19   directly cause DNA damage when present at low levels, leading
20   to mutations and therefore potentially causing cancer.'
21          "Do you see that?"
22          He answers:  "Yeah, I read that."
23          I don't know what that does.
24          It just -- the question is, "did you see it?"
25   "Yeah."
```

1              MR. NIGH:  It's going to the questions later, but to

2      the extent that, you know, that's your ruling, I understand.

3              SPECIAL MASTER VANASKIE:  So that comes out.

4              What's the next one, Jacob?

5              MR. RAE:  The next one is at page 400, line 12 to 19.

6      And then the answer which follows on line 22 of page 400 to

7      line 1 of page 401.

8              And this is an issue that's going to kind of carry

9      over to the next couple of objections, I think, but this is --

10     our objection here is that this is really attorney argument in

11     the form of a question.  They're asking Dr. Jaiswal to comment

12     on ZHP's knowledge and actions.

13             And he's consistent in this answer and in other

14     answers that he can't comment about what ZHP did, whether or

15     not ZHP was right or wrong.  Frankly, plaintiffs should be

16     asking ZHP witnesses those questions, not Torrent witnesses

17     those questions.

18             MR. NIGH:  Your Honor, may I?

19             SPECIAL MASTER VANASKIE:  Yes.

20             MR. NIGH:  This is really surprising to me, because,

21     you know, frankly, that that's the argument.  Torrent

22     exclusively -- and it's established all throughout this

23     deposition that Torrent exclusively relies on this statement

24     from ZHP when -- to state that the valsartan is free of

25     genotoxic risk.  And they rely on that statement even when

1    they -- remember that discussion we were talking about where

2    the product was on hold and they put the product back on the

3    market?  They're continuing to rely on the same statement.

4    When they know that they also have this same statement for

5    their new process drug from ZHP that was wrong, and that

6    product had NDMA and NDEA.  So he gets to evaluate whether or

7    not the statement supplied by ZHP for their API supplier is

8    accurate or inaccurate.

9         I get to ask him those questions, because, frankly,

10   it was inaccurate.  So they should have recognized that it was

11   inaccurate for the statement that was given to them for new

12   process, and, therefore, there's a real possibility it's

13   inaccurate for the old process as well.

14        MS. ROSE:  Your Honor, may I be heard?

15        SPECIAL MASTER VANASKIE:  Yes, certainly.

16        MS. ROSE:  Hi.  Thank you.  Sorry.  Nina Rose for

17   ZHP.  I just wanted to weigh in on this issue because it

18   relates to my client.

19        I just want to clarify, because I don't have the

20   designations as they stand.

21        Is page 300 -- sorry, 399:9 through -- let's see, 19,

22   is that designated?

23        MR. RAE:  9 through 16 is designated on page 399

24   currently.  And then lines 2 through 16 are designated on page

25   399, and then the rest of that page is not designated, and the

1   designation picks up again at page 400, line 12.

2           MS. ROSE:  Okay.  Thank you for clarifying that.

3           So ZHP's issue with this question is that they're

4   reading from a document that states that the vendor is

5   providing a declaration that in their drugs -- drug substance,

6   either genotoxic impurities are absent or controlled under the

7   unknown impurity at a control limit of .1 percent.

8           And then from there counsel is suggesting that this

9   was incorrect, that they were incorrect because there's NDMA

10  in the product.

11          But there's never been an allegation that the NDMA in

12  the product was above the 1 percent limit.  So that is what

13  was represented, that they are absent or controlled under the

14  unknown impurity control limit of .1 percent.

15          So this is a very confusing and misleading question

16  by counsel, suggesting that they were wrong because NDMA and

17  NDEA were in the product, because they were not above

18  the .1 percent control limit.

19          That's our issue.  It misleadingly suggests this to a

20  Torrent witness who would have no -- as he says, can't comment

21  on the ZHP documents.  That statement is just hanging out

22  there.  That's a misrepresentation of what ZHP said and

23  suggesting that it was false when it wasn't.

24          SPECIAL MASTER VANASKIE:  All right.  Daniel?

25          MR. NIGH:  Your Honor, there's two issues here.  One,

```
 1   we're going to see a further genotoxic declaration that does

 2   not include the .1 percent.  But on top of that, that

 3   genotoxic declaration is obviously tracking the language from

 4   the guidelines.  In the 2000 -- those guidelines that we

 5   talked about in the 2006 EMA document, it's tracking that

 6   language.  And that's the purpose of the -- of the

 7   declaration.  And if we look at that language, the way in

 8   which it's tracking that language, it's not .1 percent.  It's

 9   "genotoxic risk or .1 percent for another unknown impurity."

10   Very clear.

11         And so we think that that language obviously tracks

12   the language that's coming from the EMA guidelines and

13   ultimately implemented into the ICH Q3A, and, therefore, it is

14   a misrepresentation.

15         MS. ROSE:  Your Honor, may I respond to that very

16   quickly?

17         SPECIAL MASTER VANASKIE:  You may.

18         MS. ROSE:  I appreciate it.  Thank you.

19         So I think what Mr. Nigh is saying here is that you

20   shouldn't look at the question that was asked, you should look

21   at an EMA document that this tracks.

22         But the question relates to that there was a

23   warranty, and it quotes what the warranty allegedly was, which

24   says "either genotoxic impurities are absent or controlled

25   under an unknown impurity limit."
```

 1            That's what this testimony is.  If Mr. Nigh is

 2    referring to other testimony that doesn't include that

 3    language, then that's a different question and we can look at

 4    that.  But for this particular question and this particular

 5    warranty, it is misleading to suggest that this was not true.

 6    Because there's expert testimony that the impurities were

 7    below .1 percent, and I don't believe plaintiffs have any

 8    evidence that the impurities were above .1 percent.

 9            So just looking at this testimony, this is

10    misleading.

11            SPECIAL MASTER VANASKIE:  All right.  I am persuaded

12    to exclude this testimony.  Sustain the objection to it.

13            Let's make clear what's being excluded.  Page 399

14    from lines 9 through 19 and then from lines 23 on page 399

15    through all of page 400 to page 401, line 1; is that correct?

16            MR. NIGH:  Your Honor, I do think there are two

17    separate issues here.

18            And one is a strict reading as argued by Nina Rose of

19    "The vendor provided declaration on October 9, 2009, that in

20    their drug substance, either genotoxic impurities are absent

21    or controlled under unknown impurity at a control limit

22    of .1 percent."

23            So that exclusion may make sense all the way to page

24    400, line 10.

25            But there's another statement as well.  "They further

1    declared that there is no genotoxic risk."  That's page 400,

2    line 12.

3              And then the questions go from there to discuss, is

4    there a genotoxic risk?  That's a different statement than the

5    one proposed further above.

6              SPECIAL MASTER VANASKIE:  I agree with you.

7              MS. ROSE:  Your Honor, could I be heard on that?

8              SPECIAL MASTER VANASKIE:  Sure.

9              MS. ROSE:  But the beginning of that question on

10   page -- I believe it's 400, line 12, it's saying they were

11   wrong with that statement.  There it's still referring to the

12   statement that is referenced on page 399.  And that's not what

13   the statement says.  It doesn't say that they warranted that

14   it was not genotoxic.  They said it was -- "that genotoxic

15   impurities are absent or controlled under unknown impurity at

16   a control limit of .1 percent."

17             It's simply not true that they said that they were

18   not -- that there was no genotoxic risk.  That's not anywhere

19   in that statement.  That again is a misleading statement by

20   plaintiffs to a Torrent witness about a ZHP document and an

21   alleged ZHP warranty.

22             The witness wouldn't have the ability to answer that

23   question or dispute it, so it's unfair to be asking these

24   questions misrepresenting a ZHP document to a witness.

25             MR. NIGH:  Your Honor, the word "further" makes it

*United States District Court*

 1   clear that this is not the language above that's quoted, "the

 2   vendor provided declaration."  The word "further" makes it

 3   clear that they further declared there is no genotoxic risk.

 4   That's different than declaring that it's under a certain

 5   percentage.

 6          MS. ROSE:  Your Honor, in all respect to Mr. Nigh,

 7   there's no representation -- there's no reference to a

 8   different representation.  This is all one line of

 9   questioning.  Their declaration is that it wouldn't be in

10   their drug substance.  That was wrong.  That's on page 400,

11   line 2.  And the witness says, "I'm not able to say that."

12          And then Mr. Nigh says, "They further declared there

13   is no genotoxic risk.

14          "Let's look at that.

15          "They were wrong with that statement, correct?"

16          He's talking about the same document and the same

17   statement.  This isn't like a new document that he's

18   introduced where he said that there was no genotoxic risk.

19   That's just not -- that's not what was stated in the document.

20   This is counsel representing the document that was discussed

21   on page 399.

22          MR. NIGH:  Your Honor, that is just wholly

23   inaccurate.  The document says "there is no genotoxic risk" in

24   the document.  I don't know what we're arguing here.  I

25   recognize that the first one has quotes around it, but the

```
 1   document further states there is no genotoxic risk, that's in

 2   the document.

 3             SPECIAL MASTER VANASKIE:  I don't have the document

 4   in front of me, so that's part of the problem.

 5             If the document has that statement that there's no

 6   genotoxic risk, then the questions on page 400 from line 12 --

 7   that question from page 400, line 12 through line 19 would be

 8   not objectionable and should be answered, and the answers

 9   would go to page 401, line 13, I take it.

10             So I think that it can come in, as long as the

11   document, this declaration, says there's no genotoxic risk.

12             MR. RAE:  And just to clarify for the record, the

13   page 401, line 3 to 13 has not been designated by plaintiffs.

14             So any ruling here I think would end at page 401,

15   line 1, which is the end of plaintiffs' designation, to my

16   understanding.

17             SPECIAL MASTER VANASKIE:  Thank you for that.  That's

18   true.

19             All right.  Anything else on this?

20             (No response.)

21             SPECIAL MASTER VANASKIE:  What's our next objection?

22             MR. RAE:  The next objection is on page 412, line --

23   the question at the bottom, line 22, that carries over with

24   the answer to page 413, line 9.

25             And the objection from the Torrent perspective is the
```

```
 1   same objection as the one that we were just discussing.
 2            MR. NIGH:  I'm sorry, Jacob, are you on page 411,
 3   line 18 to page 412:24?
 4            MR. RAE:  Yes.  But as is noted in our objections,
 5   the objection only applies to the question that begins at
 6   412:22 and the answer to that question on the next page.
 7            MR. NIGH:  Judge, I think we should just include it,
 8   because now it's becoming even more clear that we should
 9   include just -- I mean, it's included, it's designated, but if
10   you look right up there, it's quoted that their API is free
11   from genotoxic impurity.
12            And then I even ask, "Let's underline 'free from
13   genotoxic impurity.'"
14            So this is different.  This is not a .1 percent.
15   None of that is in here.
16            SPECIAL MASTER VANASKIE:  Well, I have the same
17   ruling, this should come in.  To the extent there's an
18   objection, it's overruled.
19            MR. RAE:  Thank you, Your Honor.
20            My previewing that I thought it was the same issue
21   was intended to hopefully shortcut rehashing the same
22   arguments again.
23            SPECIAL MASTER VANASKIE:  Yes.
24            MR. RAE:  Our next objection is at 425, lines 17 to
25   19.  And I'll pause for a second to make sure everyone is
```

 1  there.

 2       MR. NIGH:  Was the one at 413:5 through 9 withdrawn?

 3       MR. RAE:  That's the same, it's the objection to the

 4  question and the answer.  It falls under the ruling we just

 5  discussed.

 6       MR. NIGH:  Okay.

 7       SPECIAL MASTER VANASKIE:  So where are we at now,

 8  Jacob?

 9       MR. RAE:  425, lines 17 to 19.

10       SPECIAL MASTER VANASKIE:  What's the basis for the

11  objection?

12       MR. RAE:  This is -- Mr. Nigh asked a question here,

13  and Ms. Brancato objected to that question on then -- on a

14  form basis, and Mr. Nigh asked a reframed version of the same

15  question that we're not objecting to.

16       Mr. Nigh's decision to reframe and reask his question

17  implicitly acknowledges that the objection was being accepted

18  at that point in time, and he shouldn't be able to designate

19  the objected question that was never answered.

20       SPECIAL MASTER VANASKIE:  So you're seeking to strike

21  what's at page 425 from line 17 through line 22?

22       MR. RAE:  No, Your Honor.  Just 17 to 19.  We're --

23  yes, through -- they didn't designate 20 to 22, but yes.

24       SPECIAL MASTER VANASKIE:  So we pick up at 425, line

25  23?

1          MR. RAE:  Yes.

2          MR. NIGH:  And, Your Honor, without seeing the

3    testimony that's designated above, that kind of makes sense,

4    but we actually went through and calculated 4.7.  Easy to

5    calculate.  He did it.  He agreed.  That's what the ICH M7

6    guidelines are showing.

7          And just to be clear, ZHP is making a genotoxic

8    statement now that says it's manufactured in accordance with

9    the ICH M7 guideline, with the guideline.  And so that we go

10   through, we do the math, and we show that would be 4.7 ppm.

11   He agrees.

12         And so this isn't just -- this is comparing the

13   calculation to what we see here.  It's not compound.  It's

14   compare the calculation to what we see here.

15         And the objection comes in the middle of the

16   question.

17         SPECIAL MASTER VANASKIE:  Well, the point is the

18   question that starts on line 17 is never answered.

19         MR. NIGH:  It's just a comparison, what we calculated

20   to what we're seeing here.  And he says, "Yeah, I seen that."

21         SPECIAL MASTER VANASKIE:  You can pick that up at

22   line 23.

23         MR. NIGH:  But the line 23 doesn't actually refer

24   back to the calculation saying it's the same as what we see

25   here.

```
 1              SPECIAL MASTER VANASKIE:  What's the -- where's the
 2    answer?
 3              MR. NIGH:  426:1.
 4              SPECIAL MASTER VANASKIE:  The question that starts on
 5    line 17.
 6              MR. NIGH:  It's answered at 426:1 and then reiterated
 7    at 426:4.
 8              SPECIAL MASTER VANASKIE:  "Yeah, I seen that."  He's
 9    answering the earlier question.
10              MR. RAE:  Your Honor, I think -- the way depositions
11    work is, as everyone here knows, sometimes a question gets
12    asked, there's an objection, and the question gets reframed.
13    And when that happens, the witness doesn't answer the prior
14    question that was reframed, the witness answers the new
15    question that follows the objection.
16              That's what's happening here.  They asked a question,
17    there was an objection, then they asked a different question.
18    That's exactly what they show here.
19              The witness says, "Yeah, I seen that."  That's a
20    response to the question on 425, line 23 to 24, not a response
21    to the different question that was objected to and --
22              SPECIAL MASTER VANASKIE:  I agree.  I agree.  So
23    we're going to strike from -- on page 425, lines 17 to 22.
24    All right?
25              MR. RAE:  Thank you, Your Honor.
```

 1           SPECIAL MASTER VANASKIE:  What's next?

 2           MR. RAE:  Next is page 428, lines 14 to 20.  And then

 3    the answer from line 23 to 429:1.

 4           And I think this goes back to the prior discussion

 5    about asking Torrent witnesses to comment on what ZHP knew, so

 6    I think your prior rulings address our objection here, unless

 7    someone has a different view.

 8           MR. NIGH:  Yeah.  I think it's the same sort of prior

 9    ruling that they're making representations about genotoxic

10    impurities, and we agree that that information comes in.

11           SPECIAL MASTER VANASKIE:  ZHP has a different view.

12           MS. ROSE:  No, no.  I wanted to make sure I was on

13    the right page so I can just take a look at the testimony.

14           SPECIAL MASTER VANASKIE:  Okay.

15           MS. ROSE:  Are we on 429?

16           MR. RAE:  It's the last question that begins at

17    428:14 and then stretches to the top of 429, just 429:1.

18           And if it's helpful, there's no other questions or

19    answers designated on those pages.  It's just this one

20    question and answer.

21           MS. ROSE:  Okay.  Thank you.

22           SPECIAL MASTER VANASKIE:  And I will allow it.

23           Are we up to page 435 now?

24           MR. NIGH:  Your Honor, I think just in light of kind

25    of some of the rulings before, we would ask that 428:9 to 13

 1   also be included, because I think that's making this more

 2   clear now, since we removed it once before.

 3          SPECIAL MASTER VANASKIE:  So you want to include 429,

 4   lines 3 --

 5          MR. NIGH:  No, I'm sorry.  I meant we want to include

 6   428:9 to 13.

 7          SPECIAL MASTER VANASKIE:  That's fine.

 8          Where are we going to now?

 9          MR. RAE:  Our next objection is 439:5 to 440:8.

10          And, Your Honor, the objection here is -- I think

11   it's most helpful if you go up to page 438.  This is

12   questioning about an inspection investigation report by the

13   FDA that was conducted of ZHP's facility.

14          I think the most helpful question here is at 438:5 to

15   9.

16          Question:  "Now, before today, have you ever seen

17   this EIR, this inspection report of ZHP's facility that was

18   done in 2017?"

19          Answer:  "No, I have not seen it."

20          And then plaintiffs go on to ask Dr. Jaiswal about

21   this ZHP document, about an inspection of a ZHP facility by

22   the FDA.  Inspection investigation reports are not available

23   publicly.  And that he has testified that he's never seen

24   before.  And they ask him a number of questions about those

25   documents.

```
 1            And our objection is that there's no foundation for

 2    asking Dr. Jaiswal about an inspection of a ZHP facility

 3    conducted by the FDA and the report about it that he never saw

 4    and that Torrent never received.

 5            MR. NIGH:  Your Honor, may I respond?

 6            SPECIAL MASTER VANASKIE:  You may respond.

 7            MR. NIGH:  There's numerous ways that this is

 8    relevant, but in terms of getting into the information that's

 9    found in the EIR report, we're able to -- because these are

10    the activities with what's going on at ZHP and specifically

11    relevant to what's going on with ZHP related to the valsartan

12    product that the -- the API that they've manufactured and sent

13    to Torrent for years.  And so we can ask them if they ever

14    were aware of information similar to this or did they even

15    know about this information.

16            And the reason it's -- this is a 2017 inspection

17    report.  It's not like this came out of nowhere.  So to say

18    that it's not available publicly, well, yes, it is.  Yes, it

19    is.  There are many places that you can just look up FDA

20    inspection reports online, and you can just get them online,

21    let alone -- in other words, you can just order them and you

22    can get inspection reports.  Yes, there may be some

23    redactions, but you can get them.

24            Second, they can obviously get them via an audit or

25    even just asking their API supplier, hey, if you ever get an
```

1  FDA report, you can send that to us.  I mean, please send that

2  to us immediately about -- regarding any inspections.

3          So our experts have said that that's available to

4  them.  There's no evidence that says it's not, that they can't

5  do that.

6          So there's many different ways that they could have

7  found out the information that's in this report.  And we want

8  to look at it and see, okay, this is the information that the

9  FDA is citing that they found, were you ever aware of these

10  issues?  Because Torrent has their own independent duty to

11  audit.  They don't just get to rely on the FDA.  They have

12  their own independent duty, many other ways to audit.  And so

13  we get to then be able to explore, were you aware of these

14  issues that the FDA found were problems, and specifically

15  relating to the valsartan API.

16          MR. RAE:  Your Honor, if I may, we're not objecting

17  to the question that establishes that Dr. Jaiswal never had

18  seen this document before, which is the question that goes to

19  this line of questioning that Mr. Nigh is now positing that

20  wasn't the line of questioning that was conducted at the

21  deposition about they're allowed to ask if Torrent received

22  this report.  They might even be allowed to -- they didn't, so

23  we're not talking about this right now.  I don't want to get

24  ahead of myself and kind of say that they would be allowed to

25  ask.

 1              But it would be a very different question if they had

 2      been asked a series of questions about whether or not Torrent

 3      was aware of information -- factual information that the FDA

 4      may have discovered in this inspection.  But the questions

 5      that they actually asked are -- they just read from the EIR

 6      and say, do you see that?

 7              So 439:5 to 16 is a series of quotes from the EIR

 8      followed with the question, "Do you see that?"

 9              The next question, line 19 to 6 on 439, line 19 to

10      446 is again is a long quote read by counsel with a question,

11      "Do you see that?"

12              Those are not fair questions to ask.  There's no

13      foundation for those questions.  The witness hasn't seen this

14      document before.  Using him to read into the record the

15      contents of the document, which whether or not it can come in

16      as evidence, our objection isn't even a relevance objection

17      here.  It's simply a foundation objection.  This is the wrong

18      witness and the wrong questions.

19              MR. NIGH:  Your Honor, as the 30(b)(6) on oversight

20      of API suppliers, this is precisely the witness for this

21      information.

22              But I will say, in reading -- to get to the bottom,

23      we had designated 442:14 to 20.  And along with that, sort of

24      inside on the objection to form that we looked at earlier and

25      the rephrasing of the question, I think that actually our

1  designation -- recognizing that ruling should exclude 442:14

2  to 20 and, rather, include 442:24 to 5, which is the ultimate

3  end result.

4       We read off all these specific violations, were you

5  aware of any -- was that information ever conveyed to you.

6  Again, these happened in 2017.  So this is while they're still

7  selling the drug before the recall, so this is extremely

8  relevant.

9       "Were you ever aware of these issues?"  And keeping

10  in mind, Torrent has an independent duty to audit.  And he

11  finishes -- the ultimate exclamation point on all this

12  information that makes it relevant through Jaiswal is the

13  answer on 443, 4 and 5, "I'm not really aware of this

14  information."

15       The fact that he has no idea is what makes it

16  relevant.

17       SPECIAL MASTER VANASKIE:  So were you suggesting,

18  Daniel, then that you be allowed to -- ask what question?

19       MR. NIGH:  All the questions preceding that go to the

20  insight of that specifically what was found.  We would

21  withdraw 442, question 14, since there was an objection to

22  form on that one.

23       SPECIAL MASTER VANASKIE:  Okay.

24       MR. NIGH:  But then we have line 442:24 through to

25  443:5, where the witness ties it together and says, "I'm not

1    really aware of this information."

2         SPECIAL MASTER VANASKIE:  Jacob?

3         MR. RAE:  I think if we skipped all of the reading

4    out from the document and just asked, has he seen this

5    inspection report before, no, I have not seen it, and then cut

6    to the question that Mr. Nigh just highlighted of was this

7    information ever communicated to you and he says no, that's

8    all appropriate questioning.

9         But the intervening reading from the document and

10   asking the witness, did you see that, this is just -- this is

11   plaintiffs presenting their case against -- frankly, they're

12   presenting their case against ZHP through a Torrent witness

13   who is incapable of addressing these issues because he doesn't

14   know anything about this document.  He's never seen it before.

15        And I'm confident that plaintiffs are going to

16   present this document through ZHP witnesses.  They're going to

17   ask about the contents of these documents.  Those witnesses

18   will provide the answers that ZHP has to offer explanations or

19   context where it's appropriate to the contents of this

20   inspection report.

21        And doing it through a Torrent witness is improper.

22   Establishing that Torrent didn't know this about this document

23   and its contents, we have no objection to that.

24        MR. NIGH:  Your Honor, if I may, just to go a little

25   bit further.  This is not about ZHP.  This is precisely about

1  Torrent and Torrent's independent duty to be aware of this

2  information, their independent duty to oversee their API

3  supplier.

4       This information came out in 2017, and they never --

5  and in his answer, "I'm not really aware of this information,"

6  is the exclamation point.  That's what makes it relevant.

7       SPECIAL MASTER VANASKIE:  What I have a problem with,

8  Daniel, is you reading from the report.

9       MR. NIGH:  The -- sorry.

10      SPECIAL MASTER VANASKIE:  And saying, did you see

11  this?

12      MR. NIGH:  To be clear, my question is not did you

13  see this and did this.  My question is, were you aware of this

14  information.  It goes a little bit further than just saying,

15  have you ever seen this report.

16      Because a lot of times in business, that's not how

17  information gets communicated.  It may not be that they saw

18  the precise report, but it may have gotten back to Jaiswal one

19  of a number -- a hundred different ways than just actually

20  seeing the report.

21      So I read to him the specific statement found by the

22  FDA and were you aware of this information.  It's not based on

23  did you just get it from the report, did you get it from

24  anywhere.  Did ZHP ever call you up and say, hey, we've got

25  this problem?  Did Jenny Yang ever go to the inspection

1  facility and find out, oh, there's this information, or

2  anybody conveying that information in any way up its way all

3  the way to Jaiswal?  And it's not even just to Jaiswal,

4  Torrent in its capacity as a 30(b)(6) witness.

5          So I'm not really aware of this information.  And was

6  this information ever conveyed to you is much, much more

7  broader than just the were -- did you ever see this document.

8  That's why you have to read the -- the specific allegation and

9  then say, were you ever aware of this information or was it

10  ever --

11         MR. RAE:  Your Honor, if I may, as I said before, I

12  think the testimony that Mr. Nigh is referencing now that he

13  didn't previously designate of "was that information ever

14  conveyed to you" and Dr. Jaiswal saying that he's "not really

15  aware of this information," I'm not objecting to his desire to

16  add that to the testimony.

17         The problem is that everything that comes before that

18  is Mr. Nigh reading from a document and asking, do you see

19  that, for a document that there's no foundation for.

20         And I think Mr. Nigh has articulated a line of

21  questioning that may or may not have been something that he

22  could have reasonably pursued with this witness during his

23  deposition, but it's not the line of questioning that he

24  actually pursued in this deposition.

25         He doesn't get to designate testimony simply because

1  if he had asked a different set of questions that got at the

2  same issue, those questions might have been appropriate.

3        Here, he reads from a document the witness has never

4  seen before and says, "Do you see that?"  He doesn't get to

5  use Dr. Jaiswal as a backboard to read from a document that's

6  not a Torrent document that Dr. Jaiswal and Torrent don't

7  have.

8        MR. NIGH:  Your Honor, if I may, if I were to try to

9  do this in some conclusory way, then the defendants would be

10 objecting and saying that mischaracterizes the evidence.  So

11 it's not done in a conclusory way.  It's done precisely with

12 the statement that FDA made and then asking, were you ever --

13 was this information ever conveyed to you.  That's the most

14 direct way that information can be asked.

15       And he is the leader of quality and safety,

16 overseeing API supply and designated specifically on these

17 topics for 30(b)(6).

18       SPECIAL MASTER VANASKIE:  I will allow the testimony.

19       It's clear to me this information should be presented

20 to the jury.  It's clear to me that it should come in in some

21 manner.  This is a little unusual way to present the

22 information in my experience, but I don't think it's improper.

23       MR. RAE:  Your Honor, if I may, because we've been

24 mostly focused on our 602 objection, but we also have a 403

25 objection here.  And I think Your Honor is absolutely correct

1   that this is an unusual way to get this document in.

2          I don't think Mr. Nigh can sit here and tell you that

3   the contents of this document aren't going to come in through

4   the case against ZHP and the examination of ZHP's witnesses.

5   So I don't think there's a concern here about the document or

6   questions about this document excluded.

7          But it's unfairly prejudicial to Torrent to have this

8   document get read to a Torrent witness, because it's going to

9   imply to the jury and it's going to confuse the jury about --

10  they're going to hear these long questions about things that

11  the FDA found about ZHP, do you see that, yes, it's here.  And

12  what the jury is going to take away from that is that this is

13  stuff that Torrent knew.  And Torrent didn't know that.

14         SPECIAL MASTER VANASKIE:  Excuse me for interrupting

15  you, but the answer to the question is, I'm not aware of this.

16  That's what he says repeatedly.

17         Yeah, I am not aware of this, what we are seeing

18  here.

19         MR. RAE:  Your Honor, that's absolutely right, but

20  that doesn't cure the prejudice of the kind of prolonged

21  questioning about the document that he hasn't seen before.

22         There needs to be a foundation to ask the witness

23  about a document.  There's no foundation for these questions

24  with Dr. Jaiswal, and they're prejudicial because of that lack

25  of foundation.

```
 1          MR. NIGH:  Your Honor, the foundation is laid in the
 2   prior testimony.
 3          SPECIAL MASTER VANASKIE:  Yeah, I think the
 4   foundation is laid.
 5          We need to move on here.  I would allow this
 6   examination.
 7          MR. NIGH:  Jacob, where do you believe this goes
 8   through to?
 9          MR. RAE:  I think this goes through your designation
10   at 445:24, would be the end of -- beginning 439:5 to 445:24.
11   To the extent we have objections to testimony in there, I
12   think Judge Vanaskie has just addressed all of those.
13          MR. NIGH:  Okay.  So I think our next one is page
14   463:14; is that right?
15          MR. RAE:  Yeah.  And just to clarify for our sake,
16   and for the record, and we can work this out afterwards too,
17   but I think you withdrew one question within that set at
18   442:14 to 20 and replaced it with the question at 442:24 to
19   443:5, leaving aside the interposed objection that will
20   obviously come out.  Is that right?
21          MR. NIGH:  Because I had gone further down.
22          Yes.  Withdrawing 442, lines 14 to 20, because that
23   had an objection to form, then was reworded and including
24   442:24 to 443:5.
25          MR. RAE:  Okay.  Great.  I just wanted to make sure
```

 1    that we had that clear for the record.

 2            SPECIAL MASTER VANASKIE:  Very well.  Good.

 3            MR. RAE:  So I think the next one is -- it's really

 4    your objection to our counter from 464:20 to 465:14.

 5            MR. NIGH:  Okay.  So I guess to the extent you've got

 6    106, 464:11 to 164:19, you would simply be arguing that in

 7    order to be complete, it needs to have 464:20 to 465:14?

 8            MR. RAE:  Correct.  And this is a straightforward

 9    completeness.  The question "Okay" is interjecting and cutting

10    off the answer, and then the next one, "I understand that.

11    Sorry.  Go ahead," is the same.  We simply want to have the

12    full answer from Dr. Jaiswal come in to this question.

13            MR. NIGH:  Yeah.  I don't have any -- I've understood

14    the prior rulings, and I think that that comes in now.

15            SPECIAL MASTER VANASKIE:  Yeah, I think it's fine.

16            What's next?

17            MR. RAE:  I think I may have had an objection at

18    469:19, but I'm withdrawing that.

19            SPECIAL MASTER VANASKIE:  All right.

20            MR. RAE:  So the next is 470:24 to 471:2.  And then

21    the kind of sequence of questioning and answering kind of

22    proceeds over the course of the next page.  I think these are

23    all going to be the same issue.

24            MR. NIGH:  Your Honor, essentially what's happening

25    in this question -- and there's a decent amount of questioning

1    here that's going to be related, I think, almost all the way

2    probably to 474:10, each of those questions.

3            ZHP provided chromatograms to Torrent as part of the

4    validation process before they even started selling valsartan

5    into the market.  And those chromatograms essentially will

6    show the various impurities that you're going to see in the

7    drug.  And one of those is specifically on residual solvent.

8    So we looked at the residual solvent chromatograms, we point

9    them out.  And what we see is we see, okay, there's a few of

10   the peaks that are labeled and then there are peaks that are

11   not labeled.

12           And this is troubling, obviously, to the plaintiffs'

13   case, because not knowing what those unknown peaks are is

14   problematic.  And this is precisely how Novartis discovered

15   there was NDMA in the product.  Novartis was also a finished

16   dose manufacturer who received chromatograms.  And when they

17   had unknown peaks, they went a step further.  They sent it to

18   a lab to figure out and label what those peaks were.  And

19   that's how they ended up finding out that an unknown peak was

20   NDMA.  And precisely the location of where these unknown peaks

21   is precisely the problem, because the location of the unknown

22   peak is right where you would expect NDMA and NDEA to dilute.

23           And so that's why this is all being pointed out,

24   here's this unknown peak, it's right, it's here, here, here,

25   and showing it time and time again.

1           And it builds up to that -- what I just said in terms

2    of that commentary on, hey, this is how Novartis found the

3    problem.  Torrent could have done the same thing.

4           MR. RAE:  Your Honor, if I may, I think what Mr. Nigh

5    said highlights the problem here.  Plaintiffs want to use this

6    line of questioning about not unknown but unlabeled peaks on

7    chromatograms.  And the peaks that they're asking about are

8    extremely large peaks.  They're the peaks that respond to

9    diluent, to the material that's being used to -- like to help

10   identify the solvent.  It's basically the control for the

11   chromatogram.  And they're pointing to that material and

12   saying this doesn't have a label.  Dr. Jaiswal, you sitting

13   here today, from this ZHP document about their chromatography

14   results, can't tell me exactly what this peak corresponds to.

15          But we all know plaintiffs' expert, Dr. Hecht, in

16   this case testified that you wouldn't be able to identify NDMA

17   or NDEA peaks on these chromatograms because they would be so

18   tiny you wouldn't notice them unless you knew to look for

19   them.

20          The peaks that they're asking about here are gigantic

21   peaks.  And the questioning is designed to mislead the jury

22   into thinking that these peaks have something to do with NDMA

23   or NDEA, when, as a factual matter, every lawyer in this case

24   and the experts in this case know that they do not.

25          MR. NIGH:  Your Honor, may I respond?

```
 1                SPECIAL MASTER VANASKIE:  Yeah.

 2           MR. NIGH:  It's precisely incorrect.

 3           The size of these peaks is not the large peak that

 4   would be typically diluent.

 5           This witness, if he wants to, he can respond to that.

 6   He does.  But we can point out and see if he has an answer for

 7   that, and he does.  On some of them he says he thinks it's

 8   diluent.

 9           I think it's kind of funny that the defendants are

10   trying to change the terminology from "unknown peak" to

11   "unlabeled peak."  Because "unknown peak" is the terminology

12   all throughout the FDA's documents, it's all throughout

13   Torrent's documents, it's all throughout ZHP's documents.

14           I mean, this is the first time we're hearing

15   "unlabeled peak."  And I think there's a reason, because they

16   don't like the terminology "unknown peak."  So now we're

17   seeing this sort of interjection of some odd labeling.

18           But to make my point clear, they refer to some

19   statements from Dr. Hecht that are taken out of context.  What

20   they don't do is they don't refer you to the statements made

21   by Dr. Najafi, who is the analytical chemist who does

22   precisely this, and states that had they looked at these

23   unknown peaks, they could have labeled these peaks and they

24   would have been able to do precisely what Novartis did.

25           MR. RAE:  Your Honor, I think the fundamental issue
```

*United States District Court*

1    here is that none of their experts are going to get up on the

2    stand and say that these peaks that they are asking about here

3    are NDMA or NDEA because they're not.  And if they were, this

4    would very well be a different conversation that we would be

5    having.  I think it would be a very different, like, potential

6    objection or maybe no objection at all.  But they're not.

7          And asking these questions in the context of this

8    case where the jury is going to hear all about unknown peaks,

9    all about what Novartis did, all about how this impurity was

10   discovered and the presence of it was discovered, and they're

11   going to pursue this misleading line of questioning that

12   implies that Torrent had access to information that would have

13   revealed that by reference to documents that have nothing to

14   do and questions that have nothing to do with peaks that would

15   have corresponded to NDEA and NDEA.

16         MR. NIGH:  Judge, I think there's selective hearing

17   here because I think that the defendants like to take the

18   information -- the answer, the sound bite they got from

19   Dr. Hecht and just completely close their ears off to

20   everything Najafi said.

21         This is discussed extensively in his report,

22   extensively.  So to say nobody is going to get on the stand,

23   of course they are.

24         SPECIAL MASTER VANASKIE:  Listen, fellows, I'm trying

25   to figure out what testimony gets presented to this jury by

 1  way of these video depositions.  You're not helping me out,

 2  respectfully, in getting to that bottom line.

 3         I know you've got arguments that you're going to

 4  make.  I just want to find out what's not admissible about

 5  this testimony or why is it inadmissible.  Is it because they

 6  can suggest something that's not true?  And why isn't your

 7  ability to counter that sufficient to say, it still comes in

 8  and you can point out that those large peaks are not NDMA or

 9  NDEA?

10         You can say what they are, but the jury gets to

11  evaluate the evidence.  That's what it seems to me should

12  happen.

13         MR. RAE:  Your Honor, I think our position here is

14  that it would be unfairly prejudicial, confusing and

15  misleading to the jury and that Rule 403 should bar this

16  evidence, but I think I understand Your Honor to be saying you

17  disagree with that position.  So if that's the case, I am not

18  going to belabor the point on this one, but that's the basis

19  for our objection here.

20         SPECIAL MASTER VANASKIE:  Yeah, that is the point.

21  And you have the ability to explain to the jury, no, that

22  these peaks are not NDEA or NDMA, and that's that.

23         But plaintiffs should be able to present their case

24  as they -- as they intend to.  So I am not sure where that

25  leaves us in terms of do I have page and line numbers that I

*United States District Court*

 1    can make clear come in?

 2          MR. NIGH:  I think that that's relevant to everything

 3    from page 470, line 24, all the way through to page 474, line

 4    10.

 5          MR. RAE:  I would agree with that.  We can treat all

 6    of those as a group.

 7          SPECIAL MASTER VANASKIE:  All right.  So what are we

 8    up to now, page 475, line 23?

 9          MR. RAE:  I think our next --

10          MR. NIGH:  Sorry.  Go ahead, Jacob.

11          MR. RAE:  I think our next objection is page 555,

12    line 7 to page 556, line 1.

13          MR. NIGH:  We skipped forward almost a hundred pages

14    there.

15          MR. RAE:  Yes, we did.

16          SPECIAL MASTER VANASKIE:  Page 555, line 7?

17          MR. RAE:  Sorry.  Actually, the objection is only

18    to -- I misread that -- 555, line 18 to 556, line 1.

19          And, Your Honor, this is a similar issue to the other

20    objection that you sustained earlier, which is that there's a

21    question here.  There is an objection.  There's then some

22    cross-chatter amongst the attorneys.  There's then another

23    kind of statement by Mr. Nigh that's directing what's going to

24    happen.  And then at 557, line 8, there's a new question

25    that's being asked.

1          And again, we're not -- there's a line of questioning
2     there that we have no objection to.  So we simply want this
3     unanswered question to be out.
4          SPECIAL MASTER VANASKIE:  Yes.  I think from page
5     555, line 18 through page 557, line 6 is out.
6          MR. NIGH:  That's right.  I agree, Your Honor.
7     We would withdraw -- we only made the designation of -- we
8     would withdraw 555, line 18 to 555:6, one, because I go on to
9     rephrase the question later anyways.
10          SPECIAL MASTER VANASKIE:  But I think we strike the
11     colloquy that occurs on page 556 between you and Ms. Brancato.
12          MR. NIGH:  That's right.  We didn't designate any of
13     that.  So the next designation is 557:8, yes.
14          SPECIAL MASTER VANASKIE:  So what's our next page
15     number for objections?
16          MR. RAE:  Our next objection is page 560, line 11 to
17     18.
18          SPECIAL MASTER VANASKIE:  That question is, "So that
19     email is dating all the way back to May 24, 2018, where they
20     are talking about proceeding the investigation on unidentified
21     peaks, right?"
22          And you have an objection to that?
23          MR. RAE:  Correct, Your Honor.  And our objection
24     here is similar to the other objection that you overruled
25     earlier, which is this question, and there's going to be

 1   several questions that follow this that are going to be a

 2   similar issue.

 3          But plaintiffs are asking Dr. Jaiswal about

 4   correspondence between Novartis and ZHP.  This is not Torrent

 5   correspondence.  It's not correspondence that Dr. Jaiswal had

 6   seen before.  It's not correspondence that Torrent possessed.

 7          And we've tried to be limited in our objections, so

 8   we've let in some of the foundational kind of questions about

 9   what this document is without objecting to them.

10          But when they start asking questions that start to

11   kind of call for Dr. Jaiswal to comment on the content of this

12   document, we think it's inappropriate, there's no foundation

13   to ask him about this, and that it's prejudicial to Torrent,

14   again, to allow plaintiffs to ask questions about ZHP's

15   correspondence with Novartis of a Torrent witness.

16          And to be clear, again, as we've discussed before,

17   this is not an issue of whether or not this document or this

18   correspondence is going to come before the jury.  This is a

19   part of plaintiffs' case.  They're going to present it through

20   ZHP witnesses who would know something about this.  And the

21   objection here is that it's prejudicial to let them present

22   ZHP's correspondence with Novartis through a Torrent witness.

23          MR. NIGH:  And, Your Honor, the questions are

24   actually related.  As we get down to the end, we will see,

25   were you aware of any information similar to this.  He has to

 1  be able to see what the information is to see if he's ever

 2  been aware of any information that's been given to him or

 3  conveyed to him that's similar to any of this information.  So

 4  his lack of knowledge, just like his lack of knowledge with

 5  the 2017 EIR, is the problem.

 6          SPECIAL MASTER VANASKIE:  Yeah, I will allow this.

 7          MR. NIGH:  And where does this end, do you recall,

 8  Jacob?

 9          MR. RAE:  I think this would apply to our same

10  objections and I assume the same ruling are going to apply to

11  the testimony designated from 561:9 through 565:12.

12          MR. NIGH:  I think that's correct.

13          SPECIAL MASTER VANASKIE:  Yeah.  And you'd get the

14  same ruling from me.

15          MR. NIGH:  Okay.

16          MR. RAE:  I think we have similar objections and I'm

17  guessing we're going to get a similar result to the testimony

18  that we've objected to on page 575, which is -- this is a

19  little bit different.  This is asking about the report that

20  Novartis commissioned from Solvias with respect to its

21  investigation.

22          So kind of we're even a step further removed from

23  Torrent here, because they're asking about Torrent --

24  Novartis's communications and the report Novartis received

25  from its consultant Solvias about the investigation that

 1    Novartis did.

 2         Again, the first question here is asking what

 3    Novartis did, the witness testifying that he's not aware of

 4    it.

 5         The next question is about what Novartis did.  The

 6    witness is testifying that he doesn't know about it.

 7         It's -- there's -- it's prejudicial to permit them to

 8    ask these questions about something that there's no reason

 9    this witness would know about.

10         MR. NIGH:  Your Honor, if I may, this was discovered

11    in May of 2018.  I think the issue that they're not aware of

12    this is precisely the problem.  Yet again.  I mean, he's

13    supposed to have --

14         SPECIAL MASTER VANASKIE:  Yeah, I ruled on this.  I

15    ruled on this.

16         Where does that take us to?

17         MR. RAE:  We're going to skip ahead another 100 pages

18    now.

19         So our next objection is page 690, lines 15 to 18 and

20    22 to 23.

21         And there's -- we have kind of form and outside the

22    scope objections here which I think are appropriate, but the

23    core of all of our objections, including the 403 and the 701

24    objection here, is that Dr. Jaiswal is being asked to

25    speculate about customer states of mind.  And that wouldn't

 1   even be an appropriate topic for expert testimony, and it's

 2   certainly not an appropriate topic for Dr. Jaiswal to be asked

 3   to speculate on.

 4          MR. NIGH:  Your Honor, the question is, "It's not

 5   unreasonable for a customer to expect that their drug is safe,

 6   effective, and free of contamination?"

 7          And he responds, "Yeah, it's not unreasonable."

 8          So he -- again, he's offered up as the person in

 9   charge of quality and safety.  And the other thing is, like we

10   have gone into all these different warranties.  And there are

11   warranties made from Torrent even on their website about their

12   quality of drugs.  And that website is clearly there for a

13   reason.  Customers can see their website information.  They

14   can see information numerous ways.

15          So for us to be able to ask the head of quality and

16   safety, is it unreasonable for customers to expect this, and

17   he says yeah, it's not unreasonable, that's relevant.  Highly

18   relevant.

19          SPECIAL MASTER VANASKIE:  Yeah, I think this is a

20   proper examination and would overrule the objection.

21          Where are we up to now?

22          MR. RAE:  Page 739, line 22 to 24, and then the

23   answer is at page 740, line 3.

24          MR. NIGH:  Just to be clear, there was a counter,

25   734:21 to 735:3, we didn't have an objection.

```
 1            SPECIAL MASTER VANASKIE:  Okay.

 2            MR. NIGH:  So that led us to - the next objection is

 3    740, line 3.

 4            SPECIAL MASTER VANASKIE:  So is it an objection to

 5    the question whether Torrent has the final say of approval or

 6    rejection of components of the valsartan drug pill?

 7            MR. RAE:  So that's the question that we're objecting

 8    to.

 9            The basis of the objection is a mix of this is a

10    mischaracterization of the documents and the regulations that

11    Dr. Jaiswal is being presented with.

12            And the broader objection here is -- and the

13    reason -- the basis of our 403 objection is the questions here

14    are about regulations that relate to a drug manufacturer's

15    management of contractors.  And plaintiffs want to ask Torrent

16    about those regulations to imply that Torrent should have been

17    applying those regulatory standards to ZHP.

18            There are different FDA regulations that govern the

19    relationship between a drug -- a finished dose manufacturer

20    and suppliers of components, which is the relationship between

21    Torrent and ZHP.  These are simply the wrong regulations.

22            And so this entire line of questioning is unduly

23    prejudicial, because ZHP is not a contractor in the sense that

24    the regulations speak of.  And the witness even addresses this

25    in his answers.  ZHP is a supplier.  And the regulations as to
```

1    suppliers are different from the regulations that relate to

2    contractors.  And we shouldn't be presenting confusing

3    testimony to the jury that implies that they should be

4    considering the regulations that relate to the management of

5    contractors.

6           And just to explain that a little bit, this is kind

7    of the difference between stepping out of the pharmaceutical

8    context, say, like a cell phone manufacturer who hires someone

9    else to put all the pieces together and make a finished cell

10   phone and then ships that cell phone under their name versus

11   buying the screen from one place and the modem from another

12   place and then combining those pieces together themselves at

13   the end.

14          And the regulations for those two pieces in the

15   pharmaceutical industry are different.  If you hire someone to

16   do the finished dose assembly yourself, that's one set of

17   regulations.  And if you buy components, the regulations and

18   the responsibilities are different for the oversight of

19   suppliers.

20          SPECIAL MASTER VANASKIE:  Daniel?

21          MR. NIGH:  Judge, this is spot on.  And that might be

22   their theory.  They're happy to present it when their time

23   comes.  But to try to inject that as to why this information

24   should be overruled or sustained, I mean, part 211, the title

25   is:  Current Good Manufacturing Practice for Finished Dose

1   Manufacturers.  Torrent is a finished dose manufacturer.

2         And then when you read below that:  There shall be a

3   quality control unit that shall have the responsibility and

4   authority to approve or reject all components of drug product

5   containers.

6         So they have that.  And then "Torrent has the final

7   say of approval or rejection of components of the valsartan

8   drug pill."  It makes it even more clear.

9         And the witness responds, "Right."  And the witness

10  is here testifying in a 30(b)(6) capacity at this point.

11        So I just -- I can't see any way that this isn't

12  admissible.  The rest of that statement really didn't make any

13  sense to me, but this is spot on in terms of, you know, what

14  would be relevant.  And our experts don't look at this the

15  same way, obviously, as the way their experts do.

16        MR. RAE:  And to be clear, I think Mr. Nigh actually

17  made a good point there, and I'm going to withdraw our

18  objection to 739:22 to 743, because I think he is right that

19  that question relates to components of drug product containers

20  and is a reasonable question.

21        But then if you look at 740 -- you don't need to go

22  to the document itself because they read it into the record

23  here.  740:5 through 15 is clear that this shifts to "the

24  quality control unit shall be responsible for approving," and

25  then he skips down a little bit, "for approving or rejecting

1    drug products manufactured, processed, packaged, or held under

2    contract by another company."

3          And the objections that we're going to have on page

4    741 and 745 relate to questioning about that.

5          And I have kind of gotten a little bit ahead of

6    myself, but my explanation of the difference between

7    contractors and suppliers applies to those later objections.

8          But we're withdrawing the objection for the testimony

9    on 739:22 to 740:3.

10          MR. NIGH:  Okay.  I'm sorry, but I couldn't follow.

11    I just know that the next statement -- if we're moving on from

12    740, line 3, the next statement is 740:22 to 741:12.  And

13    there's an objection, it looks like, to 741, lines 6 to 12.

14          Is that the next one you're on?

15          MR. RAE:  Correct.  And the answer from 15 to 24 on

16    page 741 as well.

17          This is exactly what I was talking about.  The

18    question before that is, "Do you understand that Torrent is

19    required to accept or reject drug products...processed or held

20    under contract by another company?"

21          And Dr. Jaiswal clarifies, "Yeah, if we give like a

22    portion of our activity as a -- to the contractor to do that,

23    it's it is a contracted out activity."

24          And there's then a question that follows that that

25    kind of proceeds from the premise that ZHP was a contractor,

 1  that this was a contracted out activity.  But ZHP is not a

 2  contractor, ZHP is a supplier.

 3       SPECIAL MASTER VANASKIE:  So you're objecting to that

 4  question on page 741, line 6, and to the answer that starts on

 5  line 15 of page 741?

 6       MR. RAE:  Right.  Yes, Your Honor.  And I think

 7  Dr. Jaiswal answers these questions accurately, but the line

 8  of questioning is going to be confusing and misleading to the

 9  jury.  It's going to involve this big detour into the

10  distinction between contractors and suppliers, that there's

11  really just no reason to be getting into in this case.

12       And Judge Bumb has expressed concern about making

13  sure that we're streamlining the presentation of evidence for

14  trial, making sure that we're not presenting confusing

15  information to the jury.  And really this objection is about

16  making sure that we're not confusing the jury, that we're not

17  wasting time and that we're not going down detours that aren't

18  relevant to the issues in this case.

19       MR. NIGH:  Judge, I'm reading 741:6 to 741:24, and I

20  just don't see how it's objectionable.  If we're reading it,

21  we're not even talking about a document at this point.  We're

22  just talking about, you understand that means that it's a CGMP

23  violation for a manufacturer like Torrent to contract out

24  prescription drug manufacturing without sufficiently ensuring

25  continuing quality of the drug and the subcontractors it

1    relies on.

2            And then we're going to see 15 to 24, and it's just

3    he gives his answer to that.

4            MR. RAE:  Your Honor, the problem here is that

5    Torrent didn't contract out prescription drug manufacturing.

6    Torrent manufactured the finished dose products in Torrent's

7    own Indrad facility.

8            And so the entire line of questioning is confusing

9    because the jury is just going to be confused, why is a

10   Torrent witness getting asked about contracting out

11   prescription drug manufacturing and the CGMP requirements that

12   go with that when Torrent didn't do that.

13           SPECIAL MASTER VANASKIE:  Yeah.  I will sustain the

14   objection.

15           MR. RAE:  Thank you, Your Honor.

16           SPECIAL MASTER VANASKIE:  What's next?

17           MR. RAE:  Next is we have an objection at 745, lines

18   2 to 4 and 7 to 12.

19           And I think prior rulings from Your Honor are

20   probably going to lead to overruling this objection, so --

21           SPECIAL MASTER VANASKIE:  Yes.  Looking at the line

22   of questioning, I think the objection is not well taken and is

23   overruled.

24           MR. RAE:  And then we're going to be on to Volume 3

25   at this point.

 1          And for the record, Your Honor, I think that all of

 2   the rest of our objections are going to -- actually, I'm

 3   sorry.  I'm getting ahead of myself.  We're not quite to that

 4   point yet.

 5          SPECIAL MASTER VANASKIE:  All right.  So what's our

 6   next objection?  Go ahead.

 7          MR. NIGH:  I think what he was going to say is when

 8   we get to 935, I think we have a lot of just reserving.  I

 9   struck a lot of the testimony too.

10          So we only have about 100 pages to go.

11          The next objection is page 831, line 14 to 832, line

12   8, I believe.

13          MR. RAE:  Right.

14          MR. NIGH:  And it's specifically for 832:6 to 8.

15          If I can, I'm going to pull up the day 3 transcript

16   here.

17          MR. RAE:  Your Honor, we have a number of objections

18   here that are going to span kind of the testimony beginning on

19   831.  Our objections running through I believe 87 -- the

20   testimony on page 877, this may all apply to that.  And we

21   have kind of Torrent-specific objections here, but I think

22   there's a bigger picture issue, which is the defendant moved

23   in limine to exclude regulatory inspection reports and other

24   investigation reports that don't relate to valsartan as a drug

25   product itself.

1          And as the testimony establishes here, this is an EIR

2    from -- it's another ZHP EIR.  So I think Your Honor's prior

3    rulings about the appropriateness of examining a Torrent

4    witness on that document, while we disagree with them, would

5    likely apply to the majority of our objections here.  And it

6    may be best if we're in that space, for us to go back and kind

7    of try to hash that out with plaintiffs to see if there's any

8    objections in this category that would need further resolution

9    from you versus working through them here.

10          There's a bigger issue, which is that this EIR report

11    relates to the FDA's inspection of ZHP's manufacture of a

12    different drug substance -- I think it's pronounced

13    tadalafil -- and that Judge Bumb has ruled that inspection and

14    investigation reports and consultant materials and other

15    things like that in response to joint defendants' motion in

16    limine 2 do not come into this case unless they either relate

17    to valsartan or plaintiffs are able to -- I think she also

18    ruled could clearly connect the dots back to there being some

19    connectivity to valsartan.

20          And I think our position would be -- and I suspect

21    that counsel for ZHP would agree with us on this, although I

22    haven't discussed it with Ms. Rose -- is that this testimony

23    should all be excluded under that motion in limine because it

24    all relates to a report that ties to ZHP's manufacture of a

25    different API.

```
 1              And I recognize that that may be an issue that's best
 2     suited for either of the parties to work amongst themselves to
 3     resolve or go back to Judge Bumb for clarification on the
 4     scope of her motion in limine ruling, although our position
 5     would be that her motion in limine ruling is incredibly clear
 6     on this issue.
 7              MR. NIGH:  Jacob, I just want to, what lines -- where
 8     do you think this starts and ends for your objections on what
 9     you're speaking to?
10              MR. RAE:  I think this -- the issue that I'm
11     describing with respect to the EIR relates to the questioning
12     on the May 2017 EIR, the ZHP EIR.
13              SPECIAL MASTER VANASKIE:  So can you give us a page
14     and line?
15              MR. NIGH:  Yes.  And how far, where does this end?
16              MR. RAE:  This begins on -- I think it begins really
17     on probably page 830 or 831.  There's a discussion of kind of
18     a ZHP document.  And then our objections that we had
19     originally framed on this begin on page 832, line 6.
20              MR. NIGH:  And where does it end, do you know?
21              MR. RAE:  I believe that this issue would run
22     through -- at a certain point, this questioning transitions to
23     the 483 warning letter on the same issue.
24              I think we would take the same position, that the
25     FDA's 483 warning letter, our kind of 403 and 602 objections
```

1  are going to become a little bit different there, but Judge

2  Vanaskie has already addressed those.  So, again, I think we

3  would be able to work out a stipulation as to the application

4  of those prior rulings there.

5         But it would run through, I believe, 877:6, where

6  there's kind of ongoing discussion of both the EIR and FDA 483

7  warning letter related to this inspection that was to ZHP's

8  production of tadalafil.

9         MR. NIGH:  Your Honor, it may be -- I think that this

10 range may be best if we just go back and meet and confer on

11 it.

12        I was -- as I'm looking at this, I'm under the

13 impression this is the EIR inspection report that has to do

14 specifically with valsartan, so -- but what's being conveyed

15 here does not sound like that, and so I think it might be best

16 for us to meet and confer and see where the disconnect is.  It

17 could be on our side, it could be on Torrent's side.

18        I mean, I just -- I think if we go back and look at

19 it, we may reach an agreement here based on the rulings you've

20 given thus far.

21        SPECIAL MASTER VANASKIE:  All right.  Why don't you

22 meet and confer taking into account rulings made thus far.

23        Can you get me a letter report by Monday of next week

24 where this stands?

25        MR. NIGH:  I believe so.  We can probably even get on

1   the next call and tell you, you know, where this stands.

2          SPECIAL MASTER VANASKIE:  Okay.  That would be

3   helpful.

4          MR. RAE:  I would agree with that.

5          And again, just to -- I think that we also have a few

6   counter-objections in there, so there may be kind of a need to

7   discuss those, although maybe the prior guidance from Your

8   Honor would also address our counter-designations to the

9   extent this does come in.

10          SPECIAL MASTER VANASKIE:  Okay.  So where does that

11   take us to now?

12          MR. RAE:  So we are now -- we're now at 896, line 16.

13          SPECIAL MASTER VANASKIE:  All right.  Let's take a

14   15-minute break at this time.

15          MR. RAE:  Okay.  Thank you, Your Honor.

16          SPECIAL MASTER VANASKIE:  Thanks.

17          MR. NIGH:  Thank you.

18          (Recess at 3:01 p.m. until 3:17 p.m.)

19          SPECIAL MASTER VANASKIE:  All right.  So where are we

20   picking up, Jacob?

21          MR. RAE:  I think we are picking up at 896:16 to 18.

22          SPECIAL MASTER VANASKIE:  Give me a second here.

23          MR. NIGH:  And, Judge, if I may, I think I have a way

24   to clear this up that may be amenable to both sides.

25          I would agree that the "I just want to make sure that

1  this is absolutely clear for the jury" is just attorney

2  commentary, so that would be stricken.

3           SPECIAL MASTER VANASKIE:  Okay.

4           MR. NIGH:  Which would just be 16, 17 and -- for that

5  one.

6           And then the next one is 897:11 and 12.

7           SPECIAL MASTER VANASKIE:  Hold on a second.  Let me

8  catch up to you.

9           896, you would leave in 16 to 18?

10          MR. NIGH:  We would strike just 16 and the word

11  "quick" on 17 and strike "I just want to make sure that this

12  is absolutely clear for the jury."

13          SPECIAL MASTER VANASKIE:  Oh, I got you.  I got you.

14  Okay.

15          MR. RAE:  Agreed.  I was going to clarify that that

16  was really the heart of our objection, so I think we're on the

17  exact same page there.

18          MR. NIGH:  Uh-huh.

19          SPECIAL MASTER VANASKIE:  Good.

20          MR. NIGH:  And then on 897:11 and 12, the only

21  thing we need -- it's actually 897:11, 12 and the one number

22  on 13, "It should be marked as Torrent 79.  That's LP 1218,"

23  that just helps keep track of the documentation.  So it lays

24  the foundation of this document.

25          SPECIAL MASTER VANASKIE:  Okay.  All right.

```
 1              MR. RAE:  I'm happy with that compromise.  We can...

 2              SPECIAL MASTER VANASKIE:  What else do we have?

 3              MR. RAE:  The next objection is at 915:6 to 15.

 4              Sorry.  It's actually 915 -- our objection is only at

 5    915:13 to 15.  I misspoke.  And then we also have an objection

 6    to lines 19 and 20 on that page.

 7              And this is -- from our perspective, this is just an

 8    issue of this is attorney commentary.  There's no -- it's --

 9    you have to go to page 917 before you get to the next question

10    and answer.  And there's no answer designated to either of

11    these questions.

12              MR. NIGH:  And, Judge, I haven't been able to let

13    Jacob know this, but 915 all the way to -- it looks like it

14    goes all the way to 932.  You know, we're touching back on

15    this July ZHP 2018 report.  And we may very well be amenable

16    to withdrawing this whole section based on what's already come

17    in, you know, as long as the counters are also withdrawn.

18              MR. RAE:  Your Honor, that's -- I'm hearing that for

19    the first time.  We're going to have to kind of consider that,

20    although I think this also is going to be tied up in the

21    motion in limine issue that we may kind of either need to

22    resolve or seek clarification from Judge Bumb on.  So I think

23    that that probably is not something that we should be

24    addressing today in light of what Mr. Nigh just said.

25              MR. NIGH:  Yeah.  And to go --
```

1    SPECIAL MASTER VANASKIE:  I just don't want there to

2    be unaddressed loose ends.

3    So what I'd ask you to do is to get a letter report

4    to me by Monday of next week on this and the other matters we

5    talked about earlier.

6    It looks to me like you'll resolve this.  I just

7    don't want it to fall through the cracks.

8    MR. NIGH:  And, Your Honor, if we're able to get it

9    on the record at one of the next meetings, that would be

10   Thursday or Friday, that would be okay too.  Right?

11   SPECIAL MASTER VANASKIE:  Yes.  Absolutely.  I should

12   say by Monday of next week.  So if you can get it on the

13   record before then, Thursday or Friday of this week, that

14   would be great.

15   MR. NIGH:  So I do think they're two different

16   issues, 915 and 932.  Everything that we designated there, we

17   may just see as somewhat akin to something we've already

18   designated, so we would take that out if that includes the

19   counters.

20   And then 935 to 951, we've had some discussion on

21   this already.  And I think we both agree that it's better to

22   see how Judge Bumb's rulings come in on, you know, other EIR

23   inspections and things of that nature, specifically how it

24   comes in before we argue 935 to 951.

25   SPECIAL MASTER VANASKIE:  All right.

 1          MR. RAE:  And I agree with the general thrust of what

 2    Mr. Nigh said.  I think just for the record, our position is

 3    that Judge Bumb has already been incredibly clear in ruling

 4    that the -- this EIR and kind of other issues as I spoke to

 5    earlier are not admissible evidence in this trial, but it

 6    sounds like we have a disagreement with plaintiffs about the

 7    scope of that motion in limine ruling.  And that the right

 8    next step is for us and I think probably the defendants

 9    collectively to discuss this with the plaintiffs collectively

10    to figure out if we can reach an agreement there or if we need

11    to go back to Judge Bumb on that.

12          SPECIAL MASTER VANASKIE:  All right.  Very well.

13          MR. RAE:  And I think that takes us -- that wraps up

14    Dr. Jaiswal, unless I'm missing something.

15          MR. NIGH:  It does.

16          Your Honor might have 952 designations, but we

17    removed everything from 952 forward.  So we -- the plaintiffs

18    agreed to strike all the rest of the testimony.

19          SPECIAL MASTER VANASKIE:  Yeah.  The spreadsheet I

20    have stops at 947.

21          MR. NIGH:  Okay.  Great.

22          SPECIAL MASTER VANASKIE:  All right.

23          MR. NIGH:  And that is it for Jaiswal.

24          SPECIAL MASTER VANASKIE:  Well, we did Kelly

25    Gegenheimer and Sushil Jaiswal, so that's some progress.

```
 1              What else can we accomplish today?

 2              MR. NIGH:  That's a lot of progress for us, Your

 3     Honor.  That's about half of our Torrent-designated testimony.

 4              MR. RAE:  And I think that's probably material -- my

 5     guess is that's materially more than half of the objections

 6     and counter-designations, that it's half of the testimony but

 7     that it's a bigger chunk of the objections.

 8              SPECIAL MASTER VANASKIE:  Right.

 9              MR. NIGH:  Yes.

10              SPECIAL MASTER VANASKIE:  You know, I think it would

11     be helpful for me if you would let me know which witnesses and

12     if there's an order that makes sense, witnesses I should

13     prepare for for our next get-together.

14              I have not -- on Gegenheimer and Jaiswal, I had

15     looked at their testimony.  I haven't looked at the testimony

16     of the other witnesses.  So I'm thinking it might make better

17     sense if you can give me some direction where to focus my

18     attention so Thursday we can hit the ground running, so to

19     speak.

20              As I did with the ZHP witnesses and with some of the

21     witnesses, including witnesses today, I've previewed it and

22     made initial determinations, and I intend to do the same for

23     the remaining witnesses.

24              MR. NIGH:  Do we have Thursday and Friday?  I just

25     wanted to be clear.
```

```
 1              SPECIAL MASTER VANASKIE:  We have Thursday and

 2    Friday.

 3              MR. NIGH:  So my suggestion might be, you know, we

 4    handled so much more of Torrent, and I think Jacob will agree.

 5    I think for us that it might make sense for our next ones that

 6    we put on the balance of the witnesses on Friday.

 7              It sounds like there are a few witnesses that Teva

 8    has sent ready to tee up that may be ready on Thursday, and I

 9    suspect there are also some ZHP witnesses for Thursday as

10    well.

11              So Thursday is probably Teva/ZHP, and then we come

12    back to Friday on the balance of the Torrent witnesses.

13              SPECIAL MASTER VANASKIE:  All right.  David, do you

14    agree?

15              MR. STANOCH:  That makes sense for me, Your Honor, in

16    terms of Teva for Thursday with at least the two that we --

17    Pan Lin and Vadsola that you have.

18              SPECIAL MASTER VANASKIE:  Right.

19              MR. STANOCH:  And we're trying to get you on a

20    rolling basis anything else.

21              SPECIAL MASTER VANASKIE:  Nina, is that all right

22    with you?

23              MS. ROSE:  That's fine, Your Honor.  I was just

24    wondering if you had a sense of how much time you had

25    available on Thursday.  We will be ready to go.  I believe
```

 1    we've already sent you several charts for our witnesses.

 2            SPECIAL MASTER VANASKIE:  You have.

 3            MS. ROSE:  But I just want to kind of get a sense for

 4    my schedule for other meetings on Thursday how long you would

 5    be available.

 6            MR. HARKINS:  That's the same question for Teva, Your

 7    Honor.  Victoria unfortunately had to drop, but we're happy to

 8    talk scheduling.  I do think it would be helpful to know if we

 9    think we might get to any witnesses beyond the two that have

10    been submitted already.

11            SPECIAL MASTER VANASKIE:  It was scheduled to start

12    at 10:00 a.m. on Thursday, and we'll go till 5:00 if that's

13    all right.  And the same thing Friday.

14            I don't have a start time for Friday.  We could start

15    at 10:00 a.m. on Friday.  We can start earlier if you'd like.

16            MR. NIGH:  And, Your Honor, I think 10:00 a.m. Friday

17    is just fine.  I don't mind starting earlier if you want to as

18    well.

19            But I think on Friday, I think at a minimum we should

20    try to tackle Dawn Chitty, who if I were to say the next

21    percentage is probably, you know, like 25 -- like Jaiswal is

22    almost 50 percent of the objections, and Chitty is probably

23    another 25 percent.  So that's probably next big chunk.

24            SPECIAL MASTER VANASKIE:  Okay.

25            MR. NIGHT:  So I think we tee up Chitty as our first

1    one on Friday.

2           Would you agree, Jacob?

3           MR. RAE:  I'm happy -- I agree with your

4    representation as to the volume.  I think it's probably a

5    little bit less than 25 percent, but I haven't gone back and

6    measured them entirely.

7           And then I'm happy to proceed in the order that you

8    guys think makes sense for working through these.  I don't

9    have any real preference on order of witnesses that we

10   discuss.

11          MR. NIGH:  Okay.

12          MR. STANOCH:  Your Honor, for Thursday, at least as

13   to plaintiffs' designations of Teva, we're happy to start as

14   early as you and Ms. Mitchell would like to start.  Any time

15   that day we're good.

16          SPECIAL MASTER VANASKIE:  How about 9:30?  Let's

17   start at 9:30.

18          MR. HARKINS:  Judge, I don't think that will be any

19   issue.  I just do want to confirm with Ms. Lockard when she

20   gets back on.  We'll certainly send you something, but I think

21   preliminarily that should probably work for us.

22          SPECIAL MASTER VANASKIE:  All right.  And if she

23   needs to start later, that would be fine as well.  All right?

24          I think then we can be concluded for today.

25          Ann Marie, you're going to have a lot of transcribing

1    to do.  And thank you for your patience with us today.

2            We'll see you all on Thursday.

3            RESPONSE:  Thank you, Your Honor.

4            (Proceedings concluded at 3:30 p.m.)

5            - - - - - - - - - - - - - - - - - - - - - - -

6            **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

7            - - - - - - - - - - - - - - - - - - - - - - -

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   */S/ Ann Marie Mitchell*          *25th day of September, 2024*
     *CCR-RDR-RMR-CRR*
12   *Court Reporter/Transcriber*

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*