**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
_____   :   CIVIL ACTION NUMBER:
                                  :   19-md-02875
IN RE:  VALSARTAN PRODUCTS        :
LIABILITY LITIGATION              :
                                  :   DEPOSITION DESIGNATION
                                  :   HEARING VIA TEAMS
_____   :
```

        Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
        Camden, New Jersey 08101
        September 26, 2024
        Commencing at 9:37 a.m.

**B E F O R E**:        **THOMAS I. VANASKIE (RET.)**
                        **SPECIAL MASTER**

**A P P E A R A N C E S**:

        MAZIE SLATER KATZ & FREEMAN, LLC
        BY:  ADAM M. SLATER, ESQUIRE
        103 Eisenhower Parkway
        Roseland, New Jersey  07068
        For the Plaintiffs

        KANNER & WHITELEY, LLC
        BY:  DAVID J. STANOCH, ESQUIRE
        701 Camp Street
        New Orleans, Louisiana  70130
        For the Plaintiffs

        Sharon Ricci, CRR, RMR, Official Court Reporter
                sharon.ricci.usdcnj@gmail.com
                        (267) 249-8780

    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1

**A P P E A R A N C E S (Continued):**

2

3      NIGH GOLDENBERG RASO & VAUGHN
       BY:  DANIEL A. NIGH, ESQUIRE
4      1333 College Parkway, #1049
       Gulf Breeze, Florida 32563
5      For the Plaintiffs

6

       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
7      BY:  NINA ROSE, ESQUIRE
       1440 New York Avenue, N.W.
8      Washington, DC 20005
       For the Defendants Prinston Pharmaceuticals,
9      Solco Healthcare U.S. LLC, and  Zhejiang Huahai
       Pharmaceuticals Ltd.

10

11      GREENBERG TRAURIG LLP
        BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
12      3333 Piedmont Road, NE, Suite 2500
        Atlanta, Georgia  30305
13      Counsel for the Defendant, Teva Pharmaceutical Industries
        Ltd., Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis
14      Pharma, Inc. (Collectively Teva)

15

16      KIRKLAND & ELLIS, LLP
        By:  JACOB M. RAE, ESQUIRE
17      601 Lexington Avenue
        New York, New York 10022
18      For the Defendants Torrent Pharma, Inc.
        and Torrent Pharmaceuticals Ltd.

19

20      **ALSO PRESENT:**

21

22      Loretta Smith, Judicial Law Clerk

23      Larry Macstravic, Courtroom Deputy

24

25

```
 1              (PROCEEDINGS held via Teams Conference before Special
 2    Master Thomas I. Vanaskie at 9:37 a.m.)
 3              SPECIAL MASTER VANASKIE:  So we're on the record.
 4    We're going to first address the objections to the designations
 5    of the deposition testimony of Claire Lyons.  And there are
 6    both objections with respect to plaintiffs' designations and
 7    defendant's counter-designations and we'll proceed sequentially
 8    through those objections, I hope.
 9              Let me tell you what I have and then we can see if we
10    are all on the same page.
11              I'm going to -- so the first objections I have with
12    respect to plaintiffs' affirmative designations starts at
13    page 48, line 2, and continues over to 48, line 16.
14              Are we all on the same page with respect to that?
15              MR. STANOCH:  Correct, Your Honor, for plaintiff.
16              MS. LOCKARD:  I apologize.  I just cannot even get an
17    Excel to open.  I've got the transcript, though.  Okay.  48-2
18    to 48-6.  That's right, that's the first line.
19              SPECIAL MASTER VANASKIE:  And that's the question and
20    then the answer goes from lines 9 to 16.
21              MS. LOCKARD:  Correct.  Okay.
22              So the issue with this, essentially, Your Honor, is
23    that the question itself, he's asking about the purpose of the
24    GMP requirements to ensure manufacturing facility, and to
25    decrease the likelihood that the facility may release a
```

1  defective product.

2          We objected to this because we think it's irrelevant

3  and it's confusing and misleading to the jury.  This is not a

4  product defect case.  There are no allegations in the case of a

5  defective product.  This is an express warranty case, a fraud,

6  and consumer protection case.  And so there's no testimony by

7  any expert in this case about whether the product was defective

8  or not.

9          So I think this question and the answer are misplaced,

10 confusing, and it's really irrelevant to the issues that we're

11 trying in this TPP case.

12         SPECIAL MASTER VANASKIE:  All right.  David?

13         MR. STANOCH:  Thank you, Your Honor.

14         First, with Ms. Lyons, just so Your Honor knows,

15 there's very little testimony we even designate, there's only

16 maybe two -- maybe three clips that we want to play of her.  So

17 this is just one of the two or three.  Right?

18         SPECIAL MASTER VANASKIE:  Right.

19         MR. STANOCH:  So I just wanted to give that context of

20 how focused our designations are because Your Honor only sees

21 the disputed one.

22         The question obviously is asking a Teva quality

23 executive, who's been at Teva's quality department her entire

24 career, about the purpose of GMP requirements regarding

25 manufacturing facilities, and that's exactly what we're

1    presenting to the jury in a month.

2            She answers the question, she explains what the

3    purpose of the GMP requirements are to her, and she has no

4    difficulty in answering it.

5            Ms. Lockard seems to think there's some issue with the

6    word "defective" being use in the question.

7            First of all, Ms. Lyons doesn't say anything about

8    defective in her answer.  So any confusion that she thinks may

9    arise is not arising of this, number one.

10            Number two, we're not using this as a term of art as a

11    product defect/product liability claim, Your Honor.  The FDA

12    regulations and FDA documents, which both sides will be

13    submitting into evidence for the jury, are rife with references

14    to quote/unquote defective or possibly defective or possibly

15    flawed product, right, just to describe something that's not

16    made in compliance.

17            I mean, the FDA website, for example, talks

18    about recalls about -- recalls happening because a drug is

19    defective or flawed, could be hazardous to health.  We're not

20    trying to prove, quote, defective, but in the ordinary laymen's

21    way of understanding it, this was a product that had an actual

22    defect in it, the nitrosamines, and the GMP requirements are

23    supposed to decrease the likelihood of them having defects in

24    them.

25            SPECIAL MASTER VANASKIE:  Yes, I understand your

1    arguments.  I've -- I hope you all don't take this the wrong

2    way, but I think, you know, when you have the opportunity to

3    look at a cold transcript and dissect each word, it all of a

4    sudden becomes problematic.

5            I don't view this question as problematic.  I don't

6    think it calls for speculation.  I don't think it's vague.  So

7    the objection is overruled.  I think it's a proper question.

8            MR. STANOCH:  Thank you, Judge.

9            SPECIAL MASTER VANASKIE:  All right.

10           MS. LOCKARD:  Thank you, Judge.  I think that was the

11   only issue for her.

12           SPECIAL MASTER VANASKIE:  I think so, except for the

13   counter-designations, defendant's affirmative designations.

14   Let me pull up my spreadsheet because the printout didn't help

15   me out at all.

16           So this now deals with defendant's affirmative

17   designations.  The first one starting on page 15 of Claire

18   Lyons' testimony at lines 21 going to page 16, line 12; then

19   18, line 17 to page 19, line 11; page 22, lines 3 to 14.

20           The objection is unavailability.  I don't know what --

21   you also have issue of when and how to play.  I'm not sure what

22   this means, David.

23           MR. STANOCH:  Yes, Judge.

24           And, essentially, plaintiffs believe that there's

25   still an open issue with Judge Bumb about when and whether and

1  in what chronology defendants may play their affirmative

2  designations.  I don't think you need to address these, Your

3  Honor.  I think when we put that in, that's a placeholder for

4  that issue.

5         For example, I assume Ms. Lockard wants -- if I play

6  page 14 of Ms. Lyons, she wants her counter, or her affirmative

7  on page 15 to come right next, right, when the jury sees it,

8  versus my clips playing, then her clips playing.

9         And I think there's a little uncertainty on that for

10 all parties.  So this is just sort of a placeholder objection.

11 I don't think there's anything substantive for Your Honor to

12 rule at this point.

13        SPECIAL MASTER VANASKIE:  Seems to be the trial judge

14 prerogative on that.

15        Let me ask you just one quick question on the

16 unavailability issue.  Are you asking me to decide that or is

17 that being deferred to Judge Bumb?

18        MR. STANOCH:  Unless someone on my side disagrees with

19 me, I think that's for Judge Bumb.  I think defendant's view is

20 if Judge Bumb said plaintiffs can play videos, they can

21 designate affirmatively from the same transcript video.  I

22 think we have a technical objection that it's their witness and

23 they haven't proven that the witness can't show up in their

24 case so the normal rule is we can play a party opponent

25 admission and then in their case, they can call their witness.

1          But I think that's for Judge Bumb at this point.

2          SPECIAL MASTER VANASKIE:  Yes, I think so.  The

3    unavailability issue I believe is also for Judge Bumb, so we

4    won't address that.

5          Looking at the spreadsheet with the objections, the

6    objections that I believe I should be able to handle deal with

7    testimony at page 76, lines 9 to 23 of Claire Lyons' testimony.

8    Let me pull that up.

9          So the question is:  Were you suggesting here that

10   Teva should have an NDMA impurity testing method for incoming

11   valsartan API?

12         And the objection is relevance, misleading, lack of

13   foundation, lacks personal knowledge, speculation.

14         MR. STANOCH:  Yes, Your Honor.  I'm happy to go first

15   here on this one, unless you otherwise --

16         SPECIAL MASTER VANASKIE:  Yes, it's your objection.

17         MR. STANOCH:  The testimony is about a specific

18   document, and this testimony comes in in the middle of a long

19   line of questioning about a specific document.

20         So in one sense it's simply jumping into something

21   that we didn't put in in our case or have a designation on

22   about the testing method, so it just sort of injects now for

23   the first time, oh, were you suggesting that Teva should have a

24   method, based on the reading of the document, and she said, no,

25   that's not what I meant in the document, right?

1          So without the context, it has no relevance, it's

2     confusing, it's misleading, et cetera.  That's number one.

3          Number two is, there's a number of times where the

4     witness gratuitously adds information that she has no personal

5     knowledge or speculation on.  For example, right below on that

6     page, she answered the question, yes, that's correct, but then

7     throws in, nobody -- no pharmaceutical company had a testing

8     method at the time.

9          And if you read down some more in this questioning, in

10    our counters, if Your Honor would let this in, she actually

11    says on page 78, yeah, okay, so it's fair to say that that's

12    speculation on my part.  I don't know for a fact and I can't

13    confirm the fact.

14         So she herself is saying she doesn't know about what

15    she's talking about here in these questions and answers, which

16    we think, you know, makes it inadmissible from the get-go.

17         But if Your Honor is going to let it in, we think the

18    other context of our completeness designations around that very

19    precise line that makes clear she's speculating should, in

20    fairness, come in.

21         SPECIAL MASTER VANASKIE:  All right.  Victoria?

22         MS. LOCKARD:  Well, on the speculation part, Your

23    Honor, she does clarify, and if the counter comes in, she

24    clarifies that it was knowledge within the industry that there

25    wasn't a testing method.  And while -- when you take this clip

1    itself as if there has been no foundation throughout the

2    case -- which by the time this is played, these issues will

3    have already been presented through the evidence -- it is

4    directly on point to the issues in this case, it is something

5    that is not out of context in the whole of the evidence that

6    will be presented.

7          And if we were to bring this witness live, which

8    initially Judge Bumb had said that plaintiffs needed to bring

9    all the witnesses live and then said that, you know, they could

10   play video testimony in the interest of moving the case along

11   more efficiently, in order to keep the case cut down in a

12   manner so we could actually get it tried in the allotted time,

13   we want to play these affirmatives.

14         This is information that we would pull out if the

15   witness were brought live and plaintiffs and defendants were

16   questioning the witness on the stand.

17         I mean, this is a core question in the case itself as

18   to whether or not Teva should have had a testing method, and if

19   they didn't, which they didn't, why they didn't.  And the

20   reason they didn't was because the industry hadn't developed

21   one yet.  And she is an important quality witness who addresses

22   this point in her deposition.

23         So I don't have a problem with the counter if they

24   want to play that, but, you know, they initially had included

25   all of this in plaintiffs' own affirmatives and then they took

1    it out.

2            And so we're simply trying to put back in some of the

3    affirmative testimony on the issues that she was designated on,

4    that she testified on, and that are directly relevant to the

5    case, which is, why weren't the industry defendants testing for

6    these drugs?

7            So there will be a foundation laid, it will clearly be

8    presented by the time this witness testifies.  It's not taken

9    out of context and it's directly on point.

10            SPECIAL MASTER VANASKIE:  All right.  My preliminary

11    determination is now going to be my final determination, and

12    that is to allow the counter to come in.  So the defendant's

13    affirmative designation would come in as well as the

14    plaintiffs' counter-designation.  This deals with -- so I guess

15    the record is clear on this, this deals with the testimony --

16    questioning and testimony from page 76, line 9 to 76, line 23.

17            You would also have the counters which come in at

18    page 73, line 11 to 75, line 2; 75, line 13 to 19.

19            MR. STANOCH:  3 to 19, I think, Your Honor.

20            SPECIAL MASTER VANASKIE:  What's that?

21            MR. STANOCH:  3 to 19.  You said 13, Your Honor.  I'm

22    sorry.

23            SPECIAL MASTER VANASKIE:  You're straining my eyes

24    here.

25            Yes, 3 to 19.  75, line 23 to 76, line 8; 76, line 24

1    to 77, line 1; 77, line 4 to 78, line 4; and 79, lines 22 to

2    24.

3            Also coming in would be the defendant's affirmative

4    designation at 79, lines 15 to 21.

5            MR. STANOCH:  Understood, Judge.  Thank you.

6            SPECIAL MASTER VANASKIE:  All right.  That takes care

7    of that.

8            Let's go to the next series beginning on page 80,

9    line 1 -- this is the defendant's designation.  And the

10   question is:  And as of the date of this email, June 29, 2018,

11   had Teva placed a hold on the distribution of any finished dose

12   product with valsartan API yet?

13           The objection is on relevance grounds.  There's a

14   counter that would extend that designation to 89 -- plaintiffs'

15   designation would be 89, lines 1 to 18.

16           My inclination is to allow both, allow the counter.

17   Why would that be wrong?

18           MR. STANOCH:  Plaintiffs are fine with that, Your

19   Honor.

20           SPECIAL MASTER VANASKIE:  I don't see any objection to

21   the counter, so I take it you're all right with that, Victoria?

22           MS. LOCKARD:  Well, Your Honor, the first time I saw

23   the objections to our affirmatives are when he emailed you the

24   spreadsheet.

25           SPECIAL MASTER VANASKIE:  Okay.

1       MS. LOCKARD:  So I saw the objections to the

2   counters -- or to our affirmatives yesterday.  And I can tell

3   you I still can't even open up the spreadsheet right now to see

4   what they are.  I looked at them yesterday, last night,

5   obviously, but I don't know what's wrong with my system, so...

6       SPECIAL MASTER VANASKIE:  I think maybe the best way

7   to handle this would be to give you the opportunity to seek

8   reconsideration of rulings that I'm making.

9       As I said, I don't see objections to the counter.  But

10  you may not have had an opportunity to articulate those

11  objections, so we'll give you that opportunity.  But right now

12  I would allow the testimony from page 80, lines 1 through 7,

13  and on page 89, lines 1 through 18.

14      MR. STANOCH:  Plaintiffs are fine to proceed that way,

15  Judge.

16      MS. LOCKARD:  Your Honor, I would ask that we just --

17  I need an opportunity to be able to look at what we're ruling

18  on and discussing.  And I apologize that I have a technical

19  issue where I cannot pull these up, but I would like to ask

20  that you give me an opportunity to pull up these objections and

21  respond to them.

22      In fact, I -- we -- in the prior witness for Teva, we

23  did not discuss Teva's affirmatives because we were waiting on

24  this issue as to whether or not plaintiffs are even going to

25  be -- were even going to be able to play our affirmatives in

1   their case.

2          So, frankly, I was not anticipating addressing our

3   affirmatives for her today.  I can't pull them up because of

4   technical difficulties and I haven't had a chance to even

5   provide any counters on paper because Mr. Stanoch

6   submitted this before he even showed me what his counters

7   were.

8          SPECIAL MASTER VANASKIE:  All right.  We'll defer

9   consideration of these --

10         MS. LOCKARD:  I'll get you our objections to the

11   affirmatives by the end of today, Judge, and then we can -- if

12   this is all right with you, we can knock this out for Ms. Lyons

13   tomorrow.

14         SPECIAL MASTER VANASKIE:  Yes, we'll give it a shot

15   tomorrow.

16         I will tell you now so you -- I think this is

17   appropriate -- that my inclination was to allow the Teva

18   designations and the affirmative counter-designations.  So you

19   can look at it with that understanding in mind.

20         But no ruling will be made until you've had a chance

21   to articulate your position, especially with respect to the

22   counters.

23         All right?

24         MS. LOCKARD:  I appreciate it.  Thank you, Judge.  And

25   I apologize for the technical issues.

 1          SPECIAL MASTER VANASKIE:  All right.  Should we

 2    continue on to the next Teva witness or is Mr. Slater here with

 3    respect to the ZHP witnesses?  I don't see him on my screen.

 4          MR. STANOCH:  I'm fine to go to a Teva witness,

 5    Your Honor, provided Ms. Lockard has her tech issues under

 6    control.

 7          MS. LOCKARD:  I do have for Mr. Vadsola and Pan Lin,

 8    and I should be able to proceed.

 9          SPECIAL MASTER VANASKIE:  Okay.  Let's proceed to

10    Mr. Vadsola.  Give me a second to pull up the spreadsheet.

11          We'll start with plaintiffs' disputed designations,

12    and we have counter-designations from the defendant with

13    plaintiffs' response to counter-designations.

14          I believe we start at page 52, line 12 and proceed to

15    page 53, line 3 on the plaintiffs' affirmative designations,

16    and then we have counter-designations at 53, lines 4 to 7 and

17    53, line 12 to 54, line 7.

18          So let me get the testimony in front of me.

19          So I didn't see any objection to the plaintiffs'

20    affirmative designation but I did see plaintiffs disputing the

21    counter-designations.

22          MS. LOCKARD:  I think that's correct.

23          MR. STANOCH:  I agree.

24          SPECIAL MASTER VANASKIE:  And your objection or

25    response is that the counter-designations are not necessary for

1  completeness?

2         MR. STANOCH:  That's right, Your Honor.  Simply put,

3  this is just a background section of who this witness is.

4  Right?  We want to get in, we designate just sort of the key

5  points of his background, when he was testifying early, and

6  then want to get right into the testimony.

7         And the counters add, you know, another page or more

8  of testimony about his background that we don't think is really

9  pertinent or not necessary for completeness.

10        SPECIAL MASTER VANASKIE:  Victoria, do you want to

11 respond?

12        MS. LOCKARD:  Yes, Your Honor.

13        We think -- so this is a witness who's limited to

14 speaking on the audits that Teva did at the ZHP facility.  And

15 without providing background as to what Mr. Vadsola's role is

16 and what he does at Teva, it is going to be difficult for the

17 jury to take in this witness's testimony.  It's going to be

18 confusing.  They're going to wonder who is he and how does this

19 fit in?

20        So there's nothing really controversial about it, but

21 we think that they should be provided a little bit more

22 information about Mr. Vadsola and his group before they start

23 talking about the actual audit details.

24        I mean, they don't know if this is related to FDA, is

25 this -- you know, how does this work?  And so this is just

1    non-controversial background information to help the jury

2    understand the testimony that's flowing from it.

3            SPECIAL MASTER VANASKIE:  All right.  I will allow the

4    counter-designation.  So the testimony at page 53, lines 4

5    to -- lines 4 to 7 and 53, line 12 to 54, line 7 will come in.

6            Let's go to the next designation.  Again, there's no

7    objection to the plaintiffs' affirmative designation.  There is

8    an objection on completeness grounds with respect to the

9    testimony at page 55, lines 15 to 20, and page 56, lines 13 to

10   20.

11           MS. LOCKARD:  Your Honor, I -- we actually withdrew

12   these counters already.  I think that maybe got lost somewhere

13   in the Excel transmissions, but we did withdraw those so --

14           SPECIAL MASTER VANASKIE:  Oh, good, because I was

15   going to disallow them so --

16           (Laughter.)

17           MS. LOCKARD:  I would not fight you on that ruling,

18   Your Honor, so we can move on.

19           SPECIAL MASTER VANASKIE:  All right.  Where is -- does

20   that take us now to page 63, lines 7 to 13?

21           MS. LOCKARD:  Yes.

22           SPECIAL MASTER VANASKIE:  And your counter-designation

23   is page 71, line 18 to 72, line 11.

24           MS. LOCKARD:  That's correct.

25           SPECIAL MASTER VANASKIE:  I take it you didn't

```
 1   withdraw that one?

 2            MS. LOCKARD:  We did not, Your Honor.

 3            SPECIAL MASTER VANASKIE:  All right.

 4            MR. STANOCH:  Your Honor, I guess because it's our

 5   objection to the completeness counter, you'll see the actual

 6   designations and questions is a series of back and forth with

 7   the witness about a particular Teva SOP regarding audits,

 8   right?  And then it stops at 67-13.

 9            And then what Teva wants to designate for completeness

10   jumps pages later about what CAPA, C-A-P-A, stands for, and

11   what CAPA means, and it has nothing to do with the SOP sections

12   that we were asking about pages earlier.

13            SPECIAL MASTER VANASKIE:  Yes, why do we need to have

14   this come in, Victoria?

15            MS. LOCKARD:  Essentially, Your Honor, plaintiff is

16   asking about the policy that relates to the audit process.  The

17   completeness counter explains what the response by the audited

18   company is.

19            So it does flow from the initial -- from the

20   designation because they're asking about the audit policy.  And

21   part of the process is that the audited company provides a

22   response, which is the CAPA.  So we feel that in fairness, it

23   provides -- (Audio interruption.)

24            MR. STANOCH:  I lost Ms. Lockard.

25            MS. LOCKARD:  Can you hear me?
```

```
 1          MR. STANOCH:  Yes.

 2          SPECIAL MASTER VANASKIE:  Yes.

 3          MS. LOCKARD:  Did you hear my response?  It was

 4   amazing.

 5          (Laughter.)

 6          SPECIAL MASTER VANASKIE:  I heard your response.  I

 7   was persuaded by it.

 8          Do you want to say anything else, Mr. Stanoch?

 9          MR. STANOCH:  I would.

10          Your Honor, CAPA does not appear at all in this

11   transcript until the counter-designation for completeness that

12   they're talking about.  They just jump in and now want -- the

13   only designation they have is what does CAPA stand for and what

14   a CAPA is.

15          There's no discussion about that at all.  The phrase

16   doesn't appear at all.

17          In fact, Teva's skipping over the part immediately

18   before their completeness designation on that same page where

19   CAPA finally does come up.

20          So Ms. Lockard likes to say it's going to be confusing

21   for the jury to understand what's going on, I think it's going

22   to be confusing for a jury to hear about an SOP about audits

23   and then all of a sudden hear:  CAPA stands for corrective

24   preventive action.  It's not tethered to anything.

25          MS. LOCKARD:  And we actually -- we did not designate
```

1    the response about what CAPA actually stands for.  We simply

2    designated the question, Mr. Stanoch's question and the

3    witness's response, about the response by the audited entity

4    being a CAPA.

5         And that is important because plaintiff is asking

6    about the policy, the auditing policy, and then there's no

7    follow-up in terms of, well, the response by the ZHP audited

8    entity.

9         So it does make sense and it flows from that and it

10   was Mr. Stanoch's question right after that segment.  So it

11   certainly is a completion to the initial questions about the

12   audit policy.

13        MR. STANOCH:  Everything is completeness, Your Honor.

14   If there's something where I question at another point

15   immediately before it, then the whole transcript is going to

16   come in if that's the rule, and it's not.

17        (Simultaneous speakers.)

18        SPECIAL MASTER VANASKIE:  You get to make your

19   designations, they get to make counters, and they can argue

20   completeness.  And in this instance I am persuaded that it

21   would be necessary for completeness.

22        So the objection, to the extent there is an objection,

23   on the grounds that it's not necessary for completeness, is

24   overruled.  The testimony at page 71, line 18 to 72, line 11

25   will come in.

1          According to -- I think we now move to page 105, lines

2     5 to 12.  This is an objection to the plaintiffs' designation.

3     Let me get the testimony in front of me.

4          I know I needed a third monitor and I don't have a

5     third monitor.

6          MS. LOCKARD:  That would be helpful.

7          So, Your Honor, just to orient you on the issues that

8     pertain to the next couple of designations.  So Mr. Vadsola is

9     an auditing manager at Teva and what he's testifying primarily

10    about are various audits that Teva did of its supplier, ZHP.

11    And some of these audits are relevant to this case, some of

12    them are not.

13         And so what you're going to see in the disputes

14    over Mr. Vadsola -- and also Pan Lin's deposition, because he

15    was also on the audit team -- is which of these audits come in

16    and which do not.  And so there were audits predating even --

17    and this is one, predating Teva even using ZHP's valsartan

18    API.

19         So this is regarding a September 2011 audit that is a

20    for-cause audit that relates to other issues.  Teva wasn't even

21    using ZHP's API when this audit was done, and so how could it

22    be relevant?

23         Judge Bumb in her motion in limine rulings made very

24    clear that audits of regulatory activities that relate to

25    valsartan and relate to the process at issue and relate to the

1    facilities that made that valsartan that is at issue in this

2    case are relevant.  But if there's anything else, you can't

3    just throw in audits and regulatory activities, what she called

4    essentially being a character assassination, those were her

5    words.

6         And so plaintiffs can't bring up every audit that was

7    done or every regulatory inspection to say look at all of these

8    bad things and bad observations at the ZHP facility that Teva

9    or somebody else saw.

10        So we have to be particular in which of those are let

11   in and which aren't, because it's going to be highly

12   prejudicial.  It is going to be confusing and misleading to the

13   jury to hear about all of these audits about issues that are

14   not relevant to this case.

15        The testimony that you're looking at is regarding the

16   2011 September audit, and it falls under that heading of not

17   relevant because it doesn't relate to the API valsartan at

18   issue.

19        SPECIAL MASTER VANASKIE:  All right.

20        David?

21        MR. STANOCH:  Your Honor, we're not trying to lob in

22   information about audits of facilities in Africa that made

23   band-aids, not drugs.  We're not talking about someone dropped

24   some glass in a batch of opioids in a factory in Greenland.

25   None of that is happening with Mr. Vadsola.

1          The audit hub manager of Teva for the Asia region, all

2    right, overseeing auditors who audited facilities in Asia,

3    including China, including ZHP, this audit is highly relevant.

4    It specifically has to do about a for-cause urgent audit, their

5    words, urgent audit regarding valsartan API.

6          And the issue in the cover email -- and I know Your

7    Honor doesn't have it, is the Teva personnel saying there's a

8    serious failure about ZHP at the Chuannan site, which, by the

9    way, is the exact site at issue in this case that made the

10   valsartan API, right, for the Teva product that's at issue and

11   for ZHP's own product that's at issue, right, that says there

12   was serious failure for their change control procedure.

13         One of the things that Your Honor has heard in the

14   context of ZHP is that the FDA noted eventually that ZHP's

15   change control procedures and processes were insufficient when

16   they changed the manufacturing process.

17         So here we have as early as 2011, right, when Teva is

18   buying product, by the way, valsartan, from this facility,

19   albeit not for a certain other factory of it, but Teva is using

20   this valsartan.  And it sent its auditors in, and they say, we

21   have an issue with ZHP Chuannan site's change control

22   procedures as to valsartan.

23         I cannot see how this is -- this is not a character

24   assassination.  This is core evidence, Judge.

25         And Ms. Lockard herself says you have to connect that

```
 1   -- Judge Bumb said that you need to connect the dots to

 2   valsartan or the facility at issue.  This does both.

 3         MS. LOCKARD:  And we disagree.  The issue in this

 4   audit related to a particle size issue, which has nothing to do

 5   with the allegations in this case.  And it doesn't have to do

 6   with the valsartan API that was being purchased and sold that

 7   is the subject of this case.

 8         So just because you point to a process change, which

 9   has nothing to do with the process change that's at issue in

10   this lawsuit, and just because that facility was making

11   valsartan for other purposes, not for the purposes of the drugs

12   that were sold at issue in this lawsuit, does not connect the

13   dots sufficiently.  That's our position.

14         SPECIAL MASTER VANASKIE:  Yes, I -- my initial

15   inclination was to allow this.  I believe my initial

16   inclination was correct.  I think it is sufficiently tied, the

17   dots are sufficiently connected to allow this testimony to come

18   in.

19         MS. LOCKARD:  Okay.  I appreciate that, Judge.  I

20   understand your ruling.  I am looking at what that may impact

21   because it may impact some of the additional designations.

22         SPECIAL MASTER VANASKIE:  Yes, that's what I'm trying

23   to do too.

24         MR. STANOCH:  And I'm not rushing Ms. Lockard, Your

25   Honor.  She can obviously take the time that you need.
```

1          But I think this line of questioning that's disputed

2    about this audit in 2011 looks like it runs through 110-5 to

3    110-8.

4          SPECIAL MASTER VANASKIE:  So --

5          MS. LOCKARD:  I agree with that.  I agree with

6    Mr. Stanoch.

7          SPECIAL MASTER VANASKIE:  Yes.  And my notes indicated

8    to allow all of that, so I guess to be clear on this, I would

9    allow the testimony from page 105, line 5 to 106, line 12;

10   page 107, line 5 to page 107, line 13; page 108, line 2 to

11   page 110, line 2; page 110, line 5 to page 110, line 8.

12          So that takes us now to page 112, line 22 and the

13   counter-designation at page 113, line 14 to 21.

14          So really what's at issue here is that -- I guess it's

15   both, there was an objection that the questioning called for

16   speculation and then there was an objection that the counter

17   was not necessary for completeness.

18          MS. LOCKARD:  Right.  And I think our position on this

19   one, Your Honor, was that we would withdraw the objection if

20   plaintiffs would agree to the counter of lines 14 to 21, and

21   they did not agree.

22          MR. STANOCH:  One moment, Your Honor.

23          SPECIAL MASTER VANASKIE:  Yep.

24          MR. STANOCH:  113-14 is in the middle of an answer, I

25   think, Ms. Lockard?

```
 1              MS. LOCKARD:  That should have been 112-14 to 21.

 2              MR. STANOCH:  112 to 21?

 3              MS. LOCKARD:  Right.

 4              MR. STANOCH:  That's an answer, not a question then.

 5    I mean, if you want the -- you want the question at 113-9

 6    through 21, is that -- oh, that's not right either.  I guess

 7    I'm not lighting up, Ms. Lockard.  I'm sorry.

 8              MS. LOCKARD:  The counter was page 112, line 14 to 21.

 9              MR. STANOCH:  Oh, I see.

10              MS. LOCKARD:  And I guess that became 113 somehow.  I

11    think that's just a --

12              SPECIAL MASTER VANASKIE:  A typo?

13              MS. LOCKARD:  -- a typo error.  But the point is, you

14    know, we objected because he's being asked about an audit that

15    he wasn't involved in.  The counter simply makes clear, look,

16    you weren't involved in this audit.  So --

17              MR. STANOCH:  Your Honor, that's fine.  With the

18    objection withdrawn, we will withdraw our objection to the

19    counter.

20              SPECIAL MASTER VANASKIE:  Okay.

21              MR. STANOCH:  So I think everything comes in.

22              MS. LOCKARD:  Okay.

23              SPECIAL MASTER VANASKIE:  So by everything, we mean

24    the testimony at page 112, lines 14 to 21; page 112, lines 22

25    to page 113, line 8.  All right?
```

1          MS. LOCKARD:  Yes.

2          SPECIAL MASTER VANASKIE:  So this takes us now to

3    page 131, line 12.  My notes say it starts with line 5.

4          MR. STANOCH:  You're right, Your Honor.  That

5    should -- the question would be at 131-5 through 9, so I think

6    for sure that would be part of what we would need to designate

7    as well.  Apologies.

8          SPECIAL MASTER VANASKIE:  Okay.  Are you with us,

9    Victoria?

10         MS. LOCKARD:  Yes.  So we added back in the answer at

11   line 5, which is one issue --

12         MR. STANOCH:  The question, sorry.

13         MS. LOCKARD:  Excuse me, the question, yes.  And then

14   that resolves, I think, our objection.

15         But then we had a counter of 132, line 8 to 22.  This

16   is a continuation essentially of his answer.  And if necessary,

17   we could add in Mr. Stanoch's question here, but this is a

18   completion and continuation of the answer.

19         SPECIAL MASTER VANASKIE:  Yes.  So the record is

20   clear, what will come in is the testimony starting on page 131,

21   line 5 through 132, line 22.

22         Does everybody agree?  You can take out the

23   objections.

24         MR. STANOCH:  Of course.  I think that's right, Your

25   Honor.

 1          MS. LOCKARD:  Yes.

 2          SPECIAL MASTER VANASKIE:  All right.  So I believe

 3   we're now to page 135, line 15.

 4          MR. STANOCH:  135, 2 through to -- I think it begins

 5   at 2 through 5 there, Judge.

 6          SPECIAL MASTER VANASKIE:  135, 2 through 5, that is

 7   correct.

 8          MR. STANOCH:  And then the ensuing lines are questions

 9   about another Teva audit report of ZHP dated August 2016, yes,

10   that's correct.

11          MS. LOCKARD:  All right.  This involves another audit

12   report, Your Honor, from 2016.  And unlike the prior audit --

13   and I understand your rulings and you're setting some

14   parameters here, but this particular audit does not involve

15   valsartan at all.  Not just the valsartan in the case, it

16   doesn't involve valsartan at all.

17          It is an audit of the facility where the valsartan was

18   made, true, but it's not an audit that involves these products.

19          And Judge Bumb's ruling on that motion in limine

20   specifically said if it doesn't involve these products, it's

21   out.  So we maintain that any testimony related to that 2016

22   audit should come out.

23          SPECIAL MASTER VANASKIE:  David?

24          MR. STANOCH:  Your Honor, we heard at the 2011 audit

25   from Ms. Lockard -- and the record will correct me if I'm

1  wrong -- that information of audits relating to valsartan or

2  the facilities at which the valsartan was made are fair game,

3  and otherwise plaintiffs can connect the dots.

4         And Ms. Lockard concedes, rightly so, that this audit

5  by Teva of ZHP is, again, of the Chuannan site facility of ZHP,

6  the one that made the valsartan.

7         So facially it satisfies even what Ms. Lockard says

8  Judge Bumb says.

9         Number two, the testimony designated is very narrow.

10  We're not looking through this report and asking questions and

11  trying to say, oh, you didn't keep a reserve sample of generic

12  aspirin or something like that.  It's focused specifically on

13  quality control and analytical equipment issues, and more

14  specifically, of findings by Teva that there were no

15  appropriate -- I'm paraphrasing -- there were no appropriate

16  records for integration of HPLC/GC chromatograms and other

17  issues regarding the chromatograms and data integrity use of

18  testing generally.

19         That's one of the core issues in this case, later

20  found that the evidence we think will show, right, that ZHP's

21  quality systems, specifically those regarding its quality

22  control and analytical assessments, are relevant, that they

23  could have caught the issue sooner.  Or at the very least,

24  Teva, in knowing that ZHP, at the very facility making the

25  valsartan, was having quality issues with its systems regarding

1    the handling of chromatograms, that that should have raised the

2    antenna of Teva to probe and ask more questions and look a

3    little deeper and they could have discovered -- a jury could

4    certainly find, discovered some of the issues earlier about

5    ZHP's valsartan, just like Novartis did when they looked at the

6    chromatograms that ZHP gave them and said, hey, wait a minute,

7    there's something here.

8           So we think this is highly relevant, falls within the

9    scope of even what Ms. Lockard says Judge Bumb says.  And the

10   testimony is all narrowly focused on those issues.

11          SPECIAL MASTER VANASKIE:  Victoria.

12          MS. LOCKARD:  Your Honor, I think Mr. Stanoch

13   misunderstood what I said.  And maybe the transcript -- if I

14   misspoke, then I will own that.  But it has to be -- this is

15   from Judge Bumb.  It has to be from the facility that's at

16   issue, the Chuannan facility, and it has to be related to

17   valsartan.

18          I'm not conceding that anything in all audits and

19   issues at that facility in Chuannan are relevant.  We made this

20   exact argument to Judge Bumb at the motion in limine hearing.

21   Judge Bumb specifically said -- and I mean, I'm quoting her --

22   she said:  If it's the same facility, it still has to be a

23   connection to valsartan more directly.  It can't be an entire

24   sort of a character assassination.

25          And this was the exact argument you're hearing from

 1    Mr. Stanoch that he made to Judge Bumb at the motion in limine

 2    hearing, and it was shot down by Judge Bumb.  So --

 3            MR. STANOCH:  I disagree it was shot down, Your

 4    Honor.

 5            If Ms. Lockard reads the rest of the transcript, I

 6    jumped up and said, Your Honor, it can't be limited to just

 7    valsartan because the way these companies do GMP oversight,

 8    right, there's systemic and systematic issues.

 9            And, Judge, I don't have it in front of me, but Judge

10    Bumb says, well, that's different.  That could be more

11    probative, connect your dots.

12            Again, we're talking about a systemic issue at the

13    very facility that made this valsartan API about its quality

14    control, more specifically about analytics, more specifically

15    about chromatograms.

16            So I think that certainly satisfies whatever

17    Ms. Lockard characterizes Judge Bumb as saying, and I'm sure

18    Judge Bumb at the time, on the very first time she heard us all

19    in person about this case, was not thinking at this particular

20    level of detail when she might have made statements that, in

21    part, only Ms. Lockard read to you.

22            MS. LOCKARD:  So what Mr. Stanoch is saying is that if

23    the audit relates to quality control issues, then it's

24    relevant.  Every audit relates to quality control issues.

25    That's what an audit is.

1          So it has to be a systemic issue that is relevant to

2    the problems that led to the nitrosamine impurity.  You can't

3    just say, well, they had a quality control issue related to

4    their equipment or related to their testing if you don't show

5    that that exact problem that Teva was complaining of in the

6    audit is relevant or would have prevented or had anything to do

7    with what ultimately led to nitrosamines.

8          MR. STANOCH:  Your Honor, I'm not using "quality

9    control" generally.  I'm using the words on Teva's own audit

10   report.  It has multiple specific sections, and this is the

11   section, it's only two pages, that says 5.0 quality control,

12   talking about observing in 2016 that ZHP was not handling

13   chromatogram data and chromatogram testing properly.

14         I'm not saying quality oversight writ large and I'm

15   not asking questions or designating something about, later in

16   the report, 50 pages later, about Section 6.9, Customer

17   Complaints or some other issue -- Section 5.8, Microbial Labs,

18   sure, all of that is "quality," but I'm using Teva's own words

19   about this specific -- specific quality issue regarding ZHP's

20   chromatogram handling failures on a systematic basis.

21         SPECIAL MASTER VANASKIE:  Yes, I believe that the dots

22   have been sufficiently connected and so would overrule the

23   objection and allow the testimony to be presented.  That's the

24   testimony on page 135, line 15 to 136, line 6.

25         MS. LOCKARD:  I understand your ruling, Your Honor.  I

1    just -- if I could just complete for the record on this issue.

2           SPECIAL MASTER VANASKIE:  Sure, absolutely.

3           MS. LOCKARD:  Even plaintiffs' experts acknowledge

4    that you would not have seen this issue on a chromatogram.  And

5    so the issues that are described in this report are not

6    connected to the issues in our lawsuit.  There are just simply

7    too many dots.

8           The other thing I would point out for the record is

9    that this audit is heavily, heavily redacted because it relates

10   to other products, not valsartan.  And the witness was being

11   asked questions about a document which is so heavily redacted,

12   you know, his answers are somewhat vague and speculative

13   because he doesn't have information because the document was

14   redacted.  The document was redacted because in the discovery

15   orders, documents related to other products were not even

16   relevant to discovery and were not even part of the discovery

17   order.

18          So it is, in addition to being not relevant, it is

19   confusing, it is vague, and it is speculative because the

20   witness doesn't even have the information needed to answer the

21   questions.  But I understand your ruling.

22          SPECIAL MASTER VANASKIE:  Well, my ruling is not final

23   right now, it's just based upon what you had to say.

24          MR. STANOCH:  Your Honor, there's nothing redacted on

25   the two pages, the two pages of this report that I ask and

 1   designate Mr. Vadsola, absolutely nothing.

 2           SPECIAL MASTER VANASKIE:  But how is it connected to

 3   the contamination of -- or alleged contamination of valsartan?

 4           MR. STANOCH:  Because the FDA said, Your Honor -- and

 5   Teva's own review of this in 2018, 2019 is that ZHP, at this

 6   very facility, right, that its quality control regarding

 7   analytical testing and equipment as to chromatograms was

 8   insufficient and that they should have looked deeper,

 9   essentially, my words.

10           And this is saying that Teva, in August of 2016, in

11   unredacted pages -- by the way, they did the redactions, not

12   me, right?  So I only have what they gave me and this is what

13   they gave me, which is prima facie relevant because they didn't

14   redact it, right?  Rightly so.

15           That's saying, hey, look, we're seeing issues at this

16   facility from a quality control system standpoint that they're

17   not handling chromatograms correctly.  And that's being -- I am

18   sorry, someone is trying to speak.

19           MR. NIGH:  Yes, Your Honor, it's Daniel Nigh.  I've

20   got to correct the record on one thing.  Daniel Nigh for the

21   plaintiffs.  I'm sorry I am not on video.  I've got storm bands

22   from Helene going right on top of me.  So that's happening

23   right now.

24           But one thing to correct the record, this same

25   argument came up for Torrent and I need to correct the record

1  again here because it's come up again, this idea that we have

2  no experts who speak to the chromatogram.  This is taken

3  completely out of -- it's one expert where the plaintiffs say

4  you couldn't have discovered on the chromatograms, it's taken

5  out of context, it's Dr. Hecht.

6      We absolutely have an expert, Dr. Najafi.  There are

7  numerous pages of an expert report, the defendants

8  cross-examined him, I don't know why they continue to omit

9  that.  Of course we can connect the dots up through that

10  expert.

11      MR. STANOCH:  That's right, Your Honor.  I would add

12  that Dr. Najafi successfully survived the *Daubert* challenge and

13  our other GMP audit expert, Mr. Russ, who completely survived

14  the *Daubert* challenge as well, looks at all of these audits,

15  too, and opines -- and Judge Kugler said he can opine -- on

16  what these audits, including this one we're looking at in this

17  testimony, should have alerted Teva to do and ask more

18  questions and dive into these issues, and they didn't.  So we

19  -- this idea that even we don't have expert evidence is a

20  complete fallacy.

21      MS. LOCKARD:  Well, we disagree.  This is getting far

22  afield.  But Najafi did not testify that it would be

23  observable, nor did Russ, who was the expert against Teva.

24      But, Your Honor, what we I would suggest is that you

25  look at the transcript where Judge Bumb addressed this

1    specifically about connecting the dots and it can't just be

2    audits of the facility that do not directly relate to the

3    quality control issue that led to this problem.

4         SPECIAL MASTER VANASKIE:  All right.  I will -- you've

5    given me enough information to chew on that I'll reserve ruling

6    on the excerpt from page 135, line 15 to 136, line 6.  I'll ask

7    that you provide me, Victoria, with the transcript of the

8    motion in limine hearing and rulings of Judge Bumb that concern

9    this particular excerpt.  All right?

10        MS. LOCKARD:  We'll be happy to do that.  I think that

11   includes the issues on page 135, 137, 141, and 142?  If

12   Mr. Stanoch agrees.

13        SPECIAL MASTER VANASKIE:  That's from 137, line 10 to

14   140, line 4.

15        MS. LOCKARD:  And also continuing on the next two

16   designations at page 142 and -- 141 and 142.

17        MR. STANOCH:  That's probably right.

18        SPECIAL MASTER VANASKIE:  And I had a note that the

19   question at page 139, lines 2 to 4 -- no, it's all right.

20        I think we go to page 140, line 4, correct?  And then

21   also page 141, lines 23 to 142, line 11.

22        Do I have that right?

23        MS. LOCKARD:  I show that we go from -- that there's a

24   dispute on page 137 that relates to this audit and there's a

25   dispute on page 141-23 to 142, line 11.  So I think the second

```
 1   one is correct, but I didn't see anything at page 140.
 2             (Simultaneous speakers.)
 3             MR. STANOCH:  I think the judge had it right.
 4             MS. LOCKARD:  You're right, so 137 to 140, line 4,
 5   correct.  Okay.
 6             SPECIAL MASTER VANASKIE:  And so we'll reserve ruling
 7   on that until I get the transcript from the in limine hearing.
 8             MR. STANOCH:  And, Your Honor, just for the record,
 9   after you've had a chance to review, we would like an
10   opportunity again to argue or discuss it because --
11             SPECIAL MASTER VANASKIE:  Correct.  This is important.
12             MR. STANOCH:  Yes, it's very important and we
13   disagree, obviously, with defendant's reading, which would
14   essentially gut all of -- if it's only an audit about something
15   ultra-specific as to NDMA, that's unduly prejudicial of a
16   reading, but we can readdress it later.
17             SPECIAL MASTER VANASKIE:  All right.
18             MS. LOCKARD:  So I think that takes us to page 142,
19   line 24.
20             SPECIAL MASTER VANASKIE:  All right.
21             MS. LOCKARD:  So this is a line of testimony
22   addressing another audit, and this relates to -- the audits
23   we've been talking about so far have been at the Chuannan
24   facility, which is the ZHP facility where Teva's valsartan API
25   was made.
```

1          We are now looking at audits related to the Zhengzhou

2     facility, which is a different facility and Teva's API was not

3     made there.  And so none of these audits at this facility are

4     relevant because Teva's API was not made there and Teva was

5     auditing that facility for other purposes related to other

6     drugs.

7          Now, what you're going to hear from plaintiffs'

8     counsel is that --

9          MR. STANOCH:  Can I say what I'm going to say, not

10    you, Ms. Lockard?  I am sorry.

11         MS. LOCKARD:  May I finish?

12         I belief based on our meet and confers, what I was

13    told was that plaintiffs believe it's relevant because that's

14    the facility where ZHP was making its finished dose valsartan.

15    And that may be true, I don't know.

16         But the audit that Teva was doing did not relate to

17    Teva's API valsartan and it didn't relate to ZHP's finished

18    dose.  So it may be a facility where ZHP is making some

19    valsartan for itself, but it doesn't mean that it's relevant

20    and it doesn't mean that Teva's witness, Teva's audit witness,

21    should be testifying in court about this.

22         If they want to ask ZHP about the audits at that

23    facility related to ZHP's own finished dose, they have plenty

24    of other witnesses who can do that.  It's not appropriate for

25    Teva's witness and it's not appropriate to talk about Teva's

1  audit of that facility because it doesn't relate to Teva's

2  drugs.

3          SPECIAL MASTER VANASKIE:  All right.  David?

4          MR. STANOCH:  Thank you, Your Honor.

5          This is the facility, as Ms. Lockard correctly said,

6  is where ZHP made finished dose valsartan at issue in this

7  case.  And it's relevant for us to present evidence that's

8  probative of any fact that's important for the jury to hear

9  that when Teva went into this facility, which is admittedly a

10  facility that made valsartan finished dose, and conducted an

11  audit, it specifically found that they were ignoring unknown

12  impurity peaks found in gas chromatography.  Right?

13          That's the very issue, Your Honor has heard before

14  over and over, that is the issue that led Novartis to see

15  unknown peaks in chromatograms, right?

16          Ms. Lockard says this isn't about the valsartan API

17  that Teva was buying.  It's certainly relevant as to the

18  facility that ZHP was making finished dose valsartan, which is

19  the subject of this trial, and I could certainly use evidence

20  of one party opponent that looked at the facility and said,

21  hey, you're ignoring unknown peaks, right, in your

22  chromatograms, to use that evidence in the trial against them,

23  including ZHP.  That's fair game.

24          I'd also add, Your Honor, that although this

25  particular document, version of the audit report, and the scope

1    of products -- I know you don't have it, right, it's redacted.

2    Well, before today we went and found another version of this

3    which Teva produced with less redactions, and lo and behold,

4    the scope of the products include three different valsartan

5    products and says valsartan.

6            So to imply that this audit had nothing to do with

7    valsartan is completely wrong and we take issue, you know, with

8    redactions generally, but for purposes of this dispute we think

9    we've certainly shown the threshold of this is relevant,

10   relates to a relevant facility with a relevant issue that

11   relates -- right, the issue that would have been a problem with

12   valsartan.

13           MS. LOCKARD:  Your Honor, they can certainly ask ZHP

14   and ZHP's witnesses about audits of the ZHP facility where

15   ZHP's valsartan was made, but it is a stretch to ask questions

16   and present testimony from Teva's auditor about an audit that

17   did not relate to Teva's products.  And the reason that this

18   was redacted was because it did not relate to the Teva products

19   at issue in this case.

20           So --

21           SPECIAL MASTER VANASKIE:  Well, it does seem to me

22   that it is relevant to the issues in the case.  It may not be

23   relevant insofar as claims against Teva are concerned, but it's

24   certainly relevant insofar as the claims presented against ZHP.

25   It doesn't have to be a ZHP witness for the evidence to come

1    in.

2            So I will allow this testimony.  I just want to make

3    clear what is covered by this ruling.

4            MR. STANOCH:  Judge, I don't want to cut you off but

5    to help us on this administrative thing, maybe we could use the

6    row numbers on the spreadsheet.  For example, I think it's rows

7    16 through 19, maybe that will save us some effort with page

8    and line quotes, but I'm happy to do whatever you and Ms.

9    Lockard --

10           SPECIAL MASTER VANASKIE:  Yes, that's fine.  That's

11   helpful, too.

12           I'm looking at row 16, that deals with simply an

13   answer:  I don't know.  So that's -- I think it picks up with

14   142, line 24.

15           MS. LOCKARD:  That's what I show, Your Honor, which

16   should be row 17 --

17           SPECIAL MASTER VANASKIE:  Row 17, row 18, row 19 --

18   17, 18 and 19, that's admissible.

19           MR. STANOCH:  Understood.

20           SPECIAL MASTER VANASKIE:  Is that clear enough for

21   everybody?

22           MS. LOCKARD:  That's clear, Your Honor.

23           SPECIAL MASTER VANASKIE:  All right.

24           MR. STANOCH:  It is for the plaintiff.  Just trying to

25   help us all try to move through it, Judge.

```
 1              (Discussion held off the record.)

 2              SPECIAL MASTER VANASKIE:  And I think we're now at

 3   row 20.

 4              MR. STANOCH:  I agree.

 5              SPECIAL MASTER VANASKIE:  And this picks up at

 6   page 170.  We're going to go until 11:00 and take a break then.

 7              MS. LOCKARD:  So on 170, there's no objection, but we

 8   had proposed a counter because otherwise it's confusing, it's

 9   misleading.  They've gone from the prior designation talking

10   about one observation in the report to a new observation.

11              SPECIAL MASTER VANASKIE:  And you want to put in the

12   169, line 23, to page 170, line 3?

13              MR. STANOCH:  I agree, Judge.

14              SPECIAL MASTER VANASKIE:  What's that?

15              MR. STANOCH:  I agree, Judge and withdraw the

16   objection.

17              SPECIAL MASTER VANASKIE:  Yes, that comes in.

18              So row 20, the page numbers and lines, that's

19   admissible, row 20.

20              MR. STANOCH:  Understood.

21              SPECIAL MASTER VANASKIE:  For both parties.

22              MR. STANOCH:  Understood.

23              SPECIAL MASTER VANASKIE:  I think that takes us to

24   row 21.

25              MR. STANOCH:  Yes.
```

 1          SPECIAL MASTER VANASKIE:  And this is just an

 2    objection to the plaintiffs' designation starting at page 172,

 3    line 6.

 4          MS. LOCKARD:  So our objection on this -- so we have

 5    been talking about observations that Teva made in the

 6    testimony, and this next designation is highly confusing and

 7    misleading because then it goes to, well, you understand that

 8    it was made known in June of 2018 that ZHP had found unknown

 9    peak in its valsartan API.

10          And so this is talking not about the audits that this

11    witness was there to testify about; this is talking about the

12    Novartis issue where Novartis identified an unknown peak and

13    raised that as a concern with ZHP.

14          And so this is taken totally out of context.  It's

15    vague the way that it's asked.  And there's no foundation for

16    it because we're switching gears from Teva's audits to suddenly

17    now we're asking about something that Novartis found.  And it

18    will lead the jury to think or believe that Teva determined

19    this in its audits when it was actually another party.

20          MR. STANOCH:  Judge, I'm allowed to shift gears in

21    questioning.  I don't think that there's anything improper or

22    misleading of what happened here, especially when you look up

23    immediately prior on the page where we were having some

24    technical issues with this witness who I was deposing remotely

25    who was sitting in India.

1          A foundation, this is exactly what the question is,

2    I'm asking him:  You understand when the unknown peak was found

3    purportedly in June 2018?

4          Yeah, that's correct.  Right?

5          And then the ensuing questions go on about his

6    personal knowledge about it.  I don't see -- if the issue is

7    foundation, I don't think that's appropriate because the

8    question itself is laying the foundation for his testimony and

9    I don't see how it's confusing.

10         All of these clips -- that's the whole point of

11    playing designations, there's nothing confusing about, quote,

12    switching gears from one topic to the other.  If that was the

13    touch zone, then we're -- all of our clips could be

14    quote/unquote misleading, which I strongly disagree with.

15    Especially since they'll have their chance to put in

16    affirmative designations in some form in some way if there

17    really is an issue, but I just don't see it here, Judge.

18         MS. LOCKARD:  Well, that's the problem with doing

19    deposition designations instead of calling live witnesses

20    because it doesn't allow the ability to build the foundation

21    and it makes some questions inappropriate and inadmissible.

22    And so this is one of those.

23         It is out of context.  There is no foundation for it

24    even in the prior testimony.  It just sort of throws this

25    question in and it is misleading to the jury.  The question

1    itself is vague.  We objected to the question at the time in

2    the deposition.

3          So we don't think it's appropriate.  I mean, there

4    will be other witnesses to talk about the Novartis findings.

5          SPECIAL MASTER VANASKIE:  You had a

6    counter-designation here, I believe.  Do I have that right?  At

7    172, line 17 to 174, line 11?

8          MS. LOCKARD:  Right.  That was a counter-designation

9    with the understanding that if this comes in, then we would

10   want the counter-designation to help explain this sort of

11   errant question.

12         SPECIAL MASTER VANASKIE:  And what's your position,

13   David, on that counter-designation?

14         MR. STANOCH:  It's inappropriate, not necessary, and

15   frankly, not responsive.

16         Your Honor, I don't understand what Ms. Lockard is

17   saying here about vagueness in that question:  You understand

18   that it was made known in June 2018 that ZHP had found unknown

19   peak in its valsartan API, correct?

20         Yeah, that's correct.

21         That's it.  That's all we're designating right there.

22         If I had him live, as Ms. Lockard mentions, right, I

23   could have certainly asked him questions about the audit

24   report, drop it on the table, and then turn around and ask that

25   next question and it wouldn't be sustained because it's

 1  disjointed.  I would be allowed to do that, number one.  Right?

 2         Number two, if you look at -- if Your Honor is

 3  considering allowing in the completeness designation, right, I

 4  ask a simple follow-up, right, about there was an unknown peak

 5  in its chromatogram was the issue, right, and then look what he

 6  does for over a page and a half.

 7         I want you to take back to exactly what -- to

 8  understand exactly what happened.

 9         And he goes on and on and on, which honestly is very

10  different from a lot of this witness's other answers which were

11  much more succinct and forthright in answering questions.

12  Nothing he says there has anything to do, right, with his

13  understanding of, just to set the scene, that June 8, 2018, was

14  sort of this unknown peak that led to the recalls, right?  And

15  then number two, the issue was an unknown peak in a

16  chromatogram, right?

17         All these things that go on and on and on about

18  investigations and other elements and other materials, I don't

19  see -- what does that have to do with the foundation that's

20  being laid here about his understanding of the issue that we're

21  here for?

22         MS. LOCKARD:  The question asks for speculation

23  because it basically -- it doesn't say who found the unknown

24  peak.  It suggests that it was Teva when it wasn't.  And

25  they're suggesting that Teva found this unknown peak, they

1  don't say who.  If the question had been worded, well, you

2  understand that Novartis discovered an unknown peak and made

3  ZHP aware, or something to that effect, that would not be an

4  objectionable question, but that's not what was asked.

5          MR. STANOCH:  I don't say anything about Teva.  It

6  says that ZHP had found an unknown peak in its valsartan API.

7  Nowhere do I say Teva found an unknown peak.

8          MS. LOCKARD:  And, Your Honor, if this was a live

9  testimony, the witness would be able to explain and follow up

10  on the answer.  Yes, an unknown peak was found.  Let me tell

11  you what the significance of that is.

12          Ultimately, his answer, what he gets to in the answer

13  at page 174, line 6, is where he says that the unknown impurity

14  in the report, you can't conclude from this unknown impure --

15  excuse me -- you can't conclude that this peak relates to the

16  nitrosamine impurity, that's what he's saying.

17          MR. STANOCH:  He didn't say the word "peak" once in

18  his two-page answer.

19          MS. LOCKARD:  Well, he is an Indian witness with

20  English as his second language, but what he says is --

21          (Simultaneous speakers.)

22          MS. LOCKARD:  Excuse me, I'm still speaking.

23          SPECIAL MASTER VANASKIE:  Don't interrupt, David.

24          MR. STANOCH:  I apologize, Judge.

25          MS. LOCKARD:  He says:  Any unknown impurity in any of

1    the report or in any of the chromatogram, it cannot conclude

2    that as on the nitrosamine impurity.

3           So I understand his -- it's a little bit broken in the

4    way that he answers it, but the message that he is conveying,

5    which I think the jury will understand, is that you cannot

6    conclude from the report of the unknown peak, from the report,

7    the Novartis report, that it's the nitrosamine impurity.

8           So you're -- so Mr. Stanoch is saying, yeah, but, you

9    know, there was an unknown peak that was discovered.  And

10   Mr. Vadsola is saying, well, yes, but let me tell you why

11   that's not significant because you can't conclude that that

12   unknown peak was the nitrosamine impurity.

13          So he's entitled to explain his answer, whether it's

14   live or if it's in the deposition.

15          SPECIAL MASTER VANASKIE:  All right.  So we're dealing

16   with row 22 of the spreadsheet.  I will allow both the

17   designation and the counter-designation.  So the testimony from

18   page 172, line 12 through 174 -- I'm sorry, page 172, line 12

19   to line 13; and 172, line 17 through 174, line 11 will come in.

20          And let's take a 15-minute break now.  Thank you.

21          MS. LOCKARD:  Thanks, Judge.

22          (Brief recess taken from 10:56 a.m. to 11:14 a.m.)

23          SPECIAL MASTER VANASKIE:  All right.  Do we have

24   everybody back?

25          MR. STANOCH:  I'm ready for plaintiffs, Your Honor.

```
 1            MS. LOCKARD:  I'm ready for Teva.

 2            SPECIAL MASTER VANASKIE:  All right.  I'm just trying

 3   to see where we're at now.

 4            What row are we on?  Are we on row 24?

 5            MS. LOCKARD:  23.

 6            MR. STANOCH:  I agree.

 7            SPECIAL MASTER VANASKIE:  Row 23?

 8            MR. STANOCH:  Yes.

 9            SPECIAL MASTER VANASKIE:  And that's testimony at page

10   176, line 4 to 177, line 5.  There's an objection as to 177,

11   lines 3 to 5.

12            MS. LOCKARD:  So, Your Honor, I don't --

13            SPECIAL MASTER VANASKIE:  Go ahead.

14            MS. LOCKARD:  So, you know, we went back and we looked

15   at this and I believe we would withdraw our objection to this

16   section and as well as to rows 24 and 25 if we're able to play

17   our affirmative designation which is listed in row 7.

18            And so the portion that we objected to essentially was

19   Mr. Stanoch asking about Teva -- about what Teva missed in its

20   audit.

21            SPECIAL MASTER VANASKIE:  Right.

22            MS. LOCKARD:  And so in looking at that, you know, we

23   do believe that the question is vague and misleading, but I

24   tend to think Your Honor is probably going to rule against us

25   on that.
```

 1          But I think we resolve our objection if we're able to

 2     then give Mr. Vadsola's answer at 196-14, the question; and his

 3     answer at 196-19, where the question is asked again and he

 4     says:  I don't agree with that because I want to give you some

 5     explanation on this part.  And then he provides his example for

 6     why he does not agree that Teva missed the issue.

 7          SPECIAL MASTER VANASKIE:  All right.  David?

 8          MR. STANOCH:  Your Honor, I'm having a little trouble

 9     following.  It sounds like we're not going to have an issue or

10     objection from 176-4 forward for the next few designations but

11     that Ms. Lockard would condition that on her counter of 196-14,

12     the question, and then the ensuing answer.

13          SPECIAL MASTER VANASKIE:  Right.

14          MR. STANOCH:  I don't agree with that, Your Honor.  I

15     think, you know, the designations and objections prior to that

16     at 176, 177, 179, 185, I think they're appropriate questions

17     and appropriate answers.

18          And then to jump down more than ten pages where

19     Mr. Vadsola goes on again with a very long statement that talks

20     about regulatory agencies, which talks about chemists, which

21     talks about the DMF process for multiple pages, I would have

22     objections to this, and I do, if they're making an affirmative

23     designation which we can address; but I don't see how any of

24     this 20 pages later is an appropriate completeness objection.

25          He talks about preapproval inspection, he talks about

 1   what ZHP submitted, he talks about what documents went to a

 2   regulatory agency.  I can go on and on and on on this counter

 3   that they have here around 196 through 199 for three pages of

 4   him just talking -- not responsive, I might add -- that's just

 5   littered with speculation and things outside of his foundation

 6   and so forth.  And it certainly has nothing to do for

 7   completeness 20 pages earlier.

 8           MS. LOCKARD:  So it is a completeness designation

 9   because it pertains to his answer to the same question that we

10   objected to.  The question we objected to was:  But Teva missed

11   this issue about the genotoxic impurity in the valsartan API,

12   didn't it?

13           And he says:  I defer here because I don't know where

14   they write this observation.

15           And in our completeness designation, which even though

16   it's pages later, Mr. Stanoch asks the same question where he

17   says:  Right.  And Teva missed this NDMA nitrosamine

18   contamination issue in the valsartan API, didn't it?

19           So he asked the question a second time, and the

20   witness said:  I don't agree that because I want to give you

21   some explanation.  So then he explains why he doesn't agree.

22           And Mr. Stanoch wants to cut off and stop with the

23   first question and answer where Mr. Vadsola says, you know, I

24   don't know, I defer.

25           And then Mr. Stanoch went on pages later and came back

1    to the exact same question and then gave an answer which

2    Mr. Stanoch and plaintiffs don't like, but it is the complete

3    answer.

4            And if Mr. Vadsola were on the stand testifying live

5    and Mr. Stanoch questioned him as he did on lines 177, and if

6    he tried to impeach him with page 177, Mr. Vadsola would say

7    yes, but Mr. Stanoch, remember, later in the deposition you

8    asked me the same question, and I told you I don't agree and

9    gave his explanation.

10           So I think in the designation, the same rules apply,

11   so he should be able to give that affirmative -- or excuse me,

12   that counter.

13           MR. STANOCH:  If I withdraw 177-8 through 177-10,

14   which Ms. Lockard says is the Q and A that preceded her counter

15   20 pages later, then the issue goes away.  I'll do that.

16           MS. LOCKARD:  So you withdraw 177-8 to 10 and the

17   answer to that question?

18           MR. STANOCH:  177-3 is the question.

19           SPECIAL MASTER VANASKIE:  177, line 3 is the question.

20           MS. LOCKARD:  Okay.  177, line 3 to 177-5.

21           MR. STANOCH:  Is the question.

22           MS. LOCKARD:  And that's what's gone?

23           MR. STANOCH:  And then the answer is 177-8 through 10.

24   That was the one -- all right.  So if we remove that, then I'm

25   hearing there's no completeness issue, because this is the one

```
 1   question and answer Ms. Lockard identified as justifying her

 2   completeness designation from 20 pages later.

 3            SPECIAL MASTER VANASKIE:  And you agree, Victoria?

 4            MR. STANOCH:  Again, I'm not saying she cannot

 5   affirmatively try to put that in, we'll fight about that later;

 6   but for purposes of this, I'll do that.

 7            MS. LOCKARD:  Hold on.  I'm looking at this.

 8            Yes, I will agree with that.

 9            SPECIAL MASTER VANASKIE:  All right.  So we will not

10   be playing page 176, lines 3 through 5 and 176, lines 8 through

11   10.

12            MR. STANOCH:  I'm sorry, Judge, it's 177.

13            SPECIAL MASTER VANASKIE:  177.  The page numbers are

14   at the bottom of the page.

15            MR. STANOCH:  I know, they're hard to see.

16            SPECIAL MASTER VANASKIE:  And I see 176 when I'm

17   looking at the -- so 177, you're absolutely right, lines 3

18   through 5 and 177, lines 8 through 10 will not be played, nor

19   will we play 196, lines 14 through 16 and 196, line 19 through

20   page 199, line 8.  Correct?

21            MR. STANOCH:  That's what I have.

22            MS. LOCKARD:  That's right.

23            SPECIAL MASTER VANASKIE:  Okay.  So now are we on

24   row 27?

25            MS. LOCKARD:  We're on row 26.
```

1            SPECIAL MASTER VANASKIE:  Row 26.  185 -- let me get

2    there -- line 19 to 186-23.

3            MS. LOCKARD:  So we did not have an objection, we

4    withdrew it.

5            SPECIAL MASTER VANASKIE:  Right.

6            MS. LOCKARD:  But there was an affirmative that

7    plaintiff objected to.

8            SPECIAL MASTER VANASKIE:  And that's at 184, line 14

9    through 185, line 18.

10           MS. LOCKARD:  Correct.  And our counter is the

11   question that's being asked is:  As hub manager, did you tell

12   the auditors that went to ZHP that they should look at the

13   chromatograms?

14           And he says:  I don't remember -- he gives his answer.

15           SPECIAL MASTER VANASKIE:  Right.

16           MS. LOCKARD:  But the counter I think is necessary for

17   completeness, because in that question Mr. Stanoch had asked:

18   Did you give them any direction whatsoever as to what they

19   should look at?

20           And then the answer by Mr. Vadsola is explaining, I

21   don't tell them what to look at.  You know, in a routine GMP --

22   I mean, in a routine audit, they go in and they decide what to

23   look at.

24           So without that counter, it's misleading because it

25   makes it seem as if Vadsola is instructing them what to look

1  at.

2          SPECIAL MASTER VANASKIE:  David?

3          MR. STANOCH:  I don't think the extra background is

4  necessary for completeness.  It's simply asking, you know, did

5  he tell something specific to the auditors he oversees when

6  they went on this May 2018 audit of ZHP, and he says no.

7          SPECIAL MASTER VANASKIE:  Yes, I think the designation

8  by Teva is appropriate for completeness purposes and would

9  allow the testimony from line 14 on page 184 to line 18 on

10  page 185.  So all of row 26 would come in.

11          MR. STANOCH:  Understood, Judge.

12          SPECIAL MASTER VANASKIE:  All right.  Now we're to

13  row 27, part of which has been resolved, I think.

14          MR. STANOCH:  I thought it was resolved, but I'm not

15  sure.

16          SPECIAL MASTER VANASKIE:  Yes, I'm just looking at

17  page 201 to see if that's all resolved.

18          MS. LOCKARD:  So this is a slightly different issue.

19  So we had an objection as to lines 21 to 23.

20          SPECIAL MASTER VANASKIE:  Yes.

21          MS. LOCKARD:  And so this is -- the objection here is

22  in addition to the others, but there's a lack of personal

23  knowledge problem with this and relevance, because he's asking

24  about a different customer of ZHP who found the contamination

25  on its first look at that API.  And the witness says he doesn't

1  know, he doesn't know if Novartis found this on its first look.

2          MR. STANOCH:  Your Honor, that's the question.  I'm

3  probing his personal knowledge; he gives me his answer based on

4  personal knowledge.

5          I don't see what the issue is.  He's not speculating.

6  I'm not -- no one is putting any words in his mouth.  I said,

7  did you know X?  He says, no, I can't comment, I don't know.

8          MS. LOCKARD:  But under the rules, the witness has to

9  have personal knowledge, and he doesn't.  And if he doesn't

10 have personal knowledge, then it's irrelevant and it's a waste

11 of time just to ask the witness, you know, and he says I don't

12 know.

13         MR. STANOCH:  Now I'm hearing 403, which is not any of

14 the many objections that were listed.  They said vague; I don't

15 think it's vague, I'm asking a very specific question.  They

16 said misstates evidence; I haven't heard a thing about that.

17 And calls for speculation; I'm asking him what he knows.  And

18 it's probative of what the Teva audit hub manager knew or

19 didn't.  It's not -- now I'm hearing it's a waste of time.  If

20 he was on the stand, I would simply ask him, did you know X,

21 I'm not sure, and we move on.

22         MS. LOCKARD:  We talked about this objection in the

23 meet-and-confer conversation, but he's a Teva audit hub

24 manager.  That doesn't mean that he knows what another company

25 customer of ZHP found, if it was their first look, second or

1    third.

2          So you're asking him a question he doesn't have an

3    answer to, he doesn't know the answer to, and it implies that

4    he should know the answer to, but he shouldn't.

5          MR. STANOCH:  Your Honor, that's a jury question.

6    Should the audit hub manager who oversaw Teva's for-cause audit

7    after the recalls know about what the issue was at ZHP?  They

8    sent people in to audit ZHP again to say, oh, my gosh, what

9    happened.  We're going to deal with that in a few rows, right?

10   And he's like, I don't know.

11         This isn't this sort of, oh, did you know at that

12   time?  Even as of now and everything that was happening, did

13   you know that?  No.  This guy has no idea of what the sequence

14   of events was for the nitrosamine contamination that led to

15   worldwide recalls?  I still don't even know what the objection

16   is on this, Your Honor.

17         MS. LOCKARD:  This does not -- this is not a witness

18   saying he has no idea about the sequence of events.  This is

19   Mr. Stanoch asking an audit manager at Teva, well, didn't

20   Novartis find this on their first look?  On their first look.

21   He doesn't know this.

22         It's not appropriate, he doesn't have the foundation,

23   and he doesn't have the personal knowledge to know if Novartis

24   found this on his first look.

25         So they can get that in by other witnesses perhaps who

1  have the personal knowledge and the foundation, but this

2  witness, just to ask him, well, hey, Novartis found this on the

3  first look, didn't it?

4         And the witness says, I don't know.

5         I mean, that is exactly what the personal knowledge

6  objection goes to.

7         MR. STANOCH:  Well, they didn't state personal

8  knowledge in their objection, so, again, it's sort of a moving

9  target.  And I'm not trying to hold Ms. Lockard to her

10  spreadsheet.  I'm flexible on that.  But --

11         MS. LOCKARD:  Well, we did meet and confer.

12         MR. STANOCH:  I certainly tried to over the last two

13  weekends.  But I'm just saying, Your Honor, I ask him a

14  question, does he know something.  Part of the Teva team

15  investigating the root cause analysis of what happened with

16  this, right, getting -- what happened, ZHP, come up, blah,

17  blah, blah.  He says, oh, I don't know if it was a different

18  customer or not.  That -- it's probative.  I don't hear how

19  it's prejudicial or not.

20         He doesn't know the story, fine; but a jury can say,

21  well, maybe the audit hub manager who was in charge of helping

22  to put together the for-cause audit and root cause analysis

23  should have known that, should have been like, hey, how did

24  this happen, and maybe he should have some recollection.

25         MS. LOCKARD:  So I think it's prejudicial because they

1   can't sneak in this first look language.  That's the point.

2   He -- everybody knows that Novartis found this.  Nobody knows

3   if it was a first look or what.

4         And this is not the witness who's in charge of the

5   investigation.  His limited role is in doing audits of the

6   company.  So he's not privy to all of the full investigation at

7   Teva.  He wasn't a 30(b)(6) on that.  He was a personal

8   knowledge witness.  He's not a 30(b)(6); he's a personal

9   knowledge witness.  And he doesn't know about all of the

10  workings of the Novartis notification and what they found or

11  how quickly they found it.

12        I mean, he goes on in the deposition to say -- he's

13  asked, well, do you understand the customer was Novartis, and

14  he says no.  I know the company Novartis, but I cannot say that

15  what they've done with nitrosamine impurity in valsartan API.

16  I mean, that just wasn't his role at Teva.

17        MR. STANOCH:  Your Honor --

18        SPECIAL MASTER VANASKIE:  Go ahead, Mr. Stanoch.

19        MR. STANOCH:  I'm sorry, Judge, I hate to belabor it

20  for two lines.

21        Two pages later I ask:  I'm just asking, you know,

22  that it was a different customer that found the nitrosamine

23  impurity in the ZHP valsartan API, right?

24        Answer:  Maybe.  Yes, to say that's another customer,

25  I would say yes, that's true, because the same thing is

1    published in newspaper and journal.

2            So, yes, fair enough to say that another customer

3    found.  That's true.

4            MS. LOCKARD:  Right.  And we objected to that

5    testimony as well because he's saying, well, that's what I saw

6    in the newspaper.  I mean, it's just not an appropriate -- this

7    guy does not have the personal knowledge on the Novartis notice

8    issue.  There's lots of other witnesses to testify about that.

9            MR. STANOCH:  Again, Your Honor, I could put in

10   witnesses I ask, percipient witnesses investigating the root

11   cause.  This idea that, oh, somebody else can come in and say

12   that.

13           I can establish and show the jury what people on the

14   ground at the time involved in the investigation say they knew

15   or didn't know.

16           SPECIAL MASTER VANASKIE:  But he didn't --

17           MS. LOCKARD:  He wasn't --

18           (Simultaneous speakers.)

19           SPECIAL MASTER VANASKIE:  -- the testimony, he doesn't

20   acknowledge that it was Novartis that found the contamination.

21           MS. LOCKARD:  Right, because he doesn't know.  He

22   wasn't in charge of the root cause investigation.  We put up

23   30(b)(6) witnesses on that.  Dan Barreto testified about that.

24   We had other witnesses to talk about the investigation.  This

25   witness was there to talk about his personal knowledge of the

1   audit that Teva did at the ZHP Chuannan facility.  He's not

2   there to talk about the overall investigation or what Novartis

3   did or knew or how quickly they found it.

4           MR. STANOCH:  What I'm hearing, Judge, is any time we

5   ask a witness did you know X and they say "I don't know," that

6   that's -- somehow that's prima facie inadmissible.  I disagree

7   that that's the rule.

8           MS. LOCKARD:  That is not the position we are taking.

9   If it's a witness who is testifying about his personal

10  knowledge of a subject or is a 30(b)(6) who's designated on a

11  subject and they say they don't know, then yes, there's no

12  objection to that.

13          But you can't just bring in a witness from Teva who's

14  there to testify about what personal knowledge he has involving

15  one aspect of the case and then start asking him questions

16  about, you know, other facts that he has no involvement, no

17  personal experience or knowledge of.  That's why there's a rule

18  on it.

19          MR. STANOCH:  How would I know that, Judge, without

20  asking him this question?

21          SPECIAL MASTER VANASKIE:  No, I think the question is

22  all right, but the problem I'm having with it, David, is that

23  the question is:  But, in fact, a different customer of ZHP

24  found the contamination on its first look at the API, right?

25          And his answer is:  I don't know.  I cannot comment

1    about other customers, what they find.

2            And so the question includes an assertion that doesn't

3    get confirmed by the witness.

4            MR. STANOCH:  So that's information that he says he

5    doesn't possess, that's what's been established.  I don't

6    understand how that's prejudicial or confusing or misleading

7    when I'm trying to establish foundation and knowledge of what

8    this witness knows or doesn't, then when he says he doesn't,

9    how that then is irrelevant or not probative.

10           MS. LOCKARD:  So Rule 602 says:  A witness may testify

11   to a matter only if evidence is introduced sufficient to

12   support a finding that the witness has personal knowledge of

13   the matter.

14           So, yes, you have to ask the question to establish the

15   foundation that this witness has personal knowledge.  If he

16   does have personal knowledge, then you can go on to ask the

17   questions about that issue.

18           Here, Mr. Stanoch was trying to establish the

19   foundation, and he could not because the witness confirmed he

20   did not have personal knowledge.  So under Rule 602, it should

21   not come in to admissible testimony before the jury.

22           SPECIAL MASTER VANASKIE:  I will sustain the

23   objection.

24           MS. LOCKARD:  Okay.  Thank you, Judge.

25           I think the next one is the same --

1          SPECIAL MASTER VANASKIE:  Is this one row 27, this

2    one?

3          MR. STANOCH:  Yes, and 28.

4          MS. LOCKARD:  Right, 27 and 28.

5          SPECIAL MASTER VANASKIE:  All right.  27 and 28, I

6    just sustained the objection.

7          We're now to row 29.  I think this is out as well.

8          MS. LOCKARD:  Right.  I think that's the same issue.

9          MR. STANOCH:  For the record, I'll note we think it's

10   permissible to ask a witness what's within their personal

11   knowledge, and if they say they don't know or it's not, that's

12   permissible, but I understand your ruling.

13         Certainly when he's acknowledging what he's read about

14   what happened, which is his personal knowledge, is saying yes.

15         MS. LOCKARD:  That he read it in the newspaper?  I

16   mean --

17         MR. STANOCH:  So now that I ask him what his personal

18   knowledge is, and he says, yes, I do have knowledge and states

19   the basis for that knowledge, now that's out too?

20         MS. LOCKARD:  I think we're just getting afield on

21   this, but, yes, we would object if the witness is testifying

22   based on what he read in the newspaper because that would also

23   be hearsay, but I don't think we need to go down that track.

24         SPECIAL MASTER VANASKIE:  I -- yes.  And let me just

25   explain too, my rulings here are influenced by my understanding

1  that there's going to be other evidence that comes in on this

2  point.  It's just that this witness wouldn't be the appropriate

3  witness.

4          MR. STANOCH:  Understood, Your Honor.

5          SPECIAL MASTER VANASKIE:  So does that take us to

6  row 30 now?

7          MR. STANOCH:  Yes.

8          MS. LOCKARD:  Yes.

9          SPECIAL MASTER VANASKIE:  Page 210.

10          MS. LOCKARD:  This was a plaintiffs' objection to our

11  counter.

12          MR. STANOCH:  Right.  The only issue is whether Teva's

13  counter of 211-11 to 212-2 come in.

14          SPECIAL MASTER VANASKIE:  Okay.

15          MS. LOCKARD:  And our counter -- initially plaintiff

16  had designated that portion of the testimony in their

17  affirmatives, they revised it to take it out, and so we added

18  it to our counter.

19          SPECIAL MASTER VANASKIE:  And I will allow the

20  counter.

21          MR. STANOCH:  Understood.

22          SPECIAL MASTER VANASKIE:  All right.  Now row 31.

23          MS. LOCKARD:  So we had an objection to this based on

24  foundation and Rule 402 and 403.  And, I mean, this is

25  questioning about from an OTBN being skipped and not reviewed.

 1   It sort of lacks foundation here as well.

 2           SPECIAL MASTER VANASKIE:  What's this all about,

 3   David?

 4           MR. STANOCH:  This is just audit practices about what

 5   is or is not put down.  You know what, Judge, I'll withdraw

 6   this designation.

 7           SPECIAL MASTER VANASKIE:  Okay, it's withdrawn.

 8           MR. STANOCH:  216-5 through 8 and the answer --

 9           SPECIAL MASTER VANASKIE:  5 through 8 and the answer

10   at 11-12.

11           MR. STANOCH:  Agreed.

12           SPECIAL MASTER VANASKIE:  All right.  That takes us to

13   row 32.

14           MR. STANOCH:  Yes, sir.

15           SPECIAL MASTER VANASKIE:  This is at page 218, lines

16   14 to 219, line 11.  And it seems to me the objection here is

17   to the counter that starts at 219, line 12 to line 16, and 219,

18   line 19 to 219, line 22.

19           But there is an objection to the testimony at 216,

20   lines 5 through 8.  Let me take a look at that.

21           MR. STANOCH:  Oh, I just withdrew that, Your Honor.

22           SPECIAL MASTER VANASKIE:  Okay.

23           MR. STANOCH:  216-5 through 8 withdrawn.

24           SPECIAL MASTER VANASKIE:  Yes.

25           MR. STANOCH:  So I think the only issue is row 32,

 1    it's the completeness issue.

 2            SPECIAL MASTER VANASKIE:  Right.

 3            MR. STANOCH:  And I think to move it along, I would be

 4    inclined to just withdraw our objection on completeness, but I

 5    want to add after -- their completeness objection ends at

 6    219-22, I want to go to the next question at 219-24 to 220-13

 7    just to finish that block of questioning.

 8            SPECIAL MASTER VANASKIE:  So you would add in the

 9    question at 219 -- 220, line 22 and the answer --

10            MS. LOCKARD:  So -- I am sorry, but I think you do

11    have that already designated, Mr. Stanoch, but it's not just on

12    that spreadsheet because we did not dispute that designation.

13            MR. STANOCH:  Oh, that's why -- oh, look at that.

14    Well, you know what, in that case, I'll withdraw the objection

15    to the counters.

16            MS. LOCKARD:  Yeah, so you've got all that next page

17    and half designated.

18            MR. STANOCH:  So, Judge, I am sorry.  We withdraw it.

19            SPECIAL MASTER VANASKIE:  Okay, good.  As to row 32 of

20    this spreadsheet, all of that testimony designated there will

21    come in.

22            MR. STANOCH:  Yes, sir.  You see, Your Honor, we took

23    out things that were not disputed, so that's why it was

24    confusing me.  Sorry.

25            SPECIAL MASTER VANASKIE:  Gotcha.  So we are at row 33

```
 1  now, I take it?
 2          MR. STANOCH:  I believe so.  Correct.
 3          SPECIAL MASTER VANASKIE:  This is a designation at
 4  page 221, line 23 to 222, line 8.
 5          MS. LOCKARD:  Yeah.  And our objection to this, Your
 6  Honor, is there's -- I mean, there's really no question.  He's
 7  just telling the witness to read the paragraphs, and then
 8  Mr. Stanoch is saying, you know, read these paragraphs, they're
 9  similar to what we saw before, just take a moment and scan
10  these couple of paragraphs, let me know when you're done; and
11  the witness says okay.
12          So I don't know why we need that.
13          SPECIAL MASTER VANASKIE:  Yes, I had trouble with
14  that, David.
15          MR. STANOCH:  Because that was sort of the leadup then
16  to the next designation where we talk about what we talked
17  about earlier.  Right?  I was orienting the witness and trying
18  to shortcut the deposition, you know, at midnight, say, right,
19  this is talking about X, we saw some of that before, do you see
20  that?  He says yes.  And I say right.  And then I jumped to --
21  we had talked earlier about the fact that there was a finding,
22  blah, blah, blah, and he says, yes, yes, yes.
23          MS. LOCKARD:  I mean, I don't have a real problem with
24  that.  If you think you need it to set up the next question,
25  then I'll withdraw that objection.
```

```
 1          SPECIAL MASTER VANASKIE:  All right.  So I'm confused
 2   by row 34.  Page 222, line 23 to 225 --
 3          MR. STANOCH:  I think the only issue is Ms. Lockard
 4   wants to add just a single question and answer at the end of
 5   this back and forth --
 6          (Simultaneous speakers.)
 7          SPECIAL MASTER VANASKIE:  Yes, I see that now.
 8          MR. STANOCH:  I think that's the only issue.
 9   Honestly, if she wants it in, you know what?  I'll agree to the
10   completeness.
11          SPECIAL MASTER VANASKIE:  All right.  So for row 33,
12   it all comes in.
13          MR. STANOCH:  Yes, sir.
14          SPECIAL MASTER VANASKIE:  And for row 34, it all comes
15   in.
16          MR. STANOCH:  Yes, sir.
17          SPECIAL MASTER VANASKIE:  Okay.  So that is all in.
18   That takes us to row 35.  We're really moving now.
19          MR. STANOCH:  We're trying, Judge.
20          (Laughter.)
21          MS. LOCKARD:  So the issue here is that this line of
22   questions relating to this observation discusses a different
23   drug, irbesartan, not valsartan at issue in this case.  And so
24   it's not relevant.  And other drugs were not even part of the
25   discovery order, and so we would ask that the testimony related
```

```
 1   to observations that pertain to other drugs be excluded.
 2            MR. STANOCH:  Your Honor, the discovery order was not
 3   so limited.  In fact, it allowed for discovery regarding other
 4   nitrosamine issues or testing issues that may -- I don't have
 5   the wording in front of me, but when Magistrate Judge Schneider
 6   entered it years ago, other testing issues that could have
 7   related to those that were at issue with valsartan.  Right?
 8   This is no different than the ZHP email that we all know of
 9   talking about irbesartan and then crossing it over connecting
10   dots to valsartan.  This is the same type of issue that here
11   we --
12            SPECIAL MASTER VANASKIE:  Yes.
13            MR. STANOCH:  Right?
14            SPECIAL MASTER VANASKIE:  I will overrule the
15   objection.
16            MS. LOCKARD:  Okay.  I understand your ruling.  This,
17   by the way, for the record, is nothing like the infamous ZHP
18   email.
19            (Laughter.)
20            MS. LOCKARD:  But I understand it's an observation in
21   the report where we looked at valsartan.  We think irbesartan
22   issues should be out, but I understand the Court's ruling, so
23   we can move on.
24            SPECIAL MASTER VANASKIE:  Okay.  Thank you.
25            MR. STANOCH:  I think the same rationale would apply
```

1    for the next few, but I'm not trying to jump the gun.

2            SPECIAL MASTER VANASKIE:  No, I think so, too.  I'm

3    just trying to...

4            MS. LOCKARD:  Yeah, I believe our objection was on the

5    same grounds.

6            MR. STANOCH:  Yes.

7            SPECIAL MASTER VANASKIE:  So where does that take us

8    to now, what row?

9            MS. LOCKARD:  To row 37.

10           SPECIAL MASTER VANASKIE:  Okay.

11           MS. LOCKARD:  Page 229.

12           SPECIAL MASTER VANASKIE:  229, line 21.

13           MS. LOCKARD:  So we did have an objection based on it

14   being a non-valsartan product, but I think that is covered.

15   However, the lines at 230-19 to 231-3 are cumulative of prior

16   testimony where this was discussed.

17           SPECIAL MASTER VANASKIE:  David?

18           MR. STANOCH:  I don't see how it's cumulative,

19   especially since if we were talking about completeness, this

20   really eases the flow of this whole particular Q and A talking

21   about specific observations by Teva auditors and specific

22   issues in their audit report.

23           SPECIAL MASTER VANASKIE:  Yes, I'll overrule the

24   objection.

25           Are we up to row 39 now?

```
 1            MR. STANOCH:  I think so.

 2            MS. LOCKARD:  Yes.  Wait.  38.

 3            SPECIAL MASTER VANASKIE:  38.  Okay.  Sorry.  231-6 to

 4    231-22.

 5            MR. STANOCH:  Your Honor, I'd say this is the same

 6    type of issue.

 7            MS. LOCKARD:  I think it is.  I think our objection

 8    was as to the Irbesartan being a different drug.

 9            SPECIAL MASTER VANASKIE:  Okay.  I'll overrule the

10    objection.

11            MS. LOCKARD:  So line 30, row 39.

12            My only objection was as to the answer, so I think

13    that's covered.  I did not have an objection as to the

14    remainder of that designation starting with the questions.

15            SPECIAL MASTER VANASKIE:  So the question starts at

16    line 16.

17            MR. STANOCH:  I think what she's saying, Judge, is

18    even though we designated about a page, the very first line,

19    232-14 is actually the answer to the prior designation.  So I

20    think your overruling of the objection to the question would

21    apply to the only objection here, which is the answer.

22            SPECIAL MASTER VANASKIE:  Okay.

23            MS. LOCKARD:  Right.  So it all comes in.

24            SPECIAL MASTER VANASKIE:  It comes in.

25            MS. LOCKARD:  Based on your ruling.
```

1          SPECIAL MASTER VANASKIE:  Yes.  Are we up to row 40

2    now or still on to row 39 actually?

3          MS. LOCKARD:  Row 40.

4          MR. STANOCH:  I agree.

5          MS. LOCKARD:  So our objection to this, and I think

6    this has permeated through some of the other witnesses as well,

7    so it's a lack-of-personal-knowledge objection primarily.

8    Mr. Stanoch is asking this witness about ZHP's responses to the

9    FDA in their Form 83, which Mr. Vadsola had nothing to do with

10   ZHP and their responses to the FDA.  And so Mr. Stanoch is

11   basically just walking through ZHP response to FDA and asking

12   Mr. Vadsola about what's on the paper.  And so I don't think

13   it's appropriate for this witness to be testifying about that.

14   That lacks personal knowledge on the part of this audit

15   witness.

16          MR. STANOCH:  Your Honor, may I?

17          SPECIAL MASTER VANASKIE:  David?

18          MR. STANOCH:  Your Honor, that's not what's happening

19   here.  The document -- and I know you probably don't have it in

20   front of you --

21          SPECIAL MASTER VANASKIE:  I don't.

22          MR. STANOCH:  The document is a Teva document which is

23   a Teva audit report of the ZHP Chuannan site about the ZHP

24   issues, and it's the Teva's auditors, including Mr. Pan Lin,

25   who we'll get to today or tomorrow, right, talking about what

1    their views -- Teva's thoughts on ZHP's responses to the FDA

2    Form 483.  This isn't Mr. Vadsola speculating.  This is him,

3    the audit hub manager, testifying about a Teva audit report of

4    ZHP, written by Teva auditors, about the explanations that ZHP

5    is trying to give the FDA, which it's sharing with Teva.

6    That's highly probative and relevant.  It's certainly not

7    misleading.  It's certainly within the personal knowledge of

8    this audit hub manager overseeing this very audit that the

9    audit report is about.  And, in fact, the answers to the

10   questions, he's very straightforward, he agrees what the

11   document is, and he answers what he remembers.

12            SPECIAL MASTER VANASKIE:  The one that I had concern

13   on was the last question in this exchange that appears at

14   line 8 of page 236:  Prior to the FDA's Form 483, was Teva

15   itself aware that ZHP did not always conduct a formal risk

16   assessment for critical changes, et cetera?  And the answer is:

17   I don't know.  Why shouldn't I strike that last question and

18   answer?

19            MR. STANOCH:  I would say, Judge, that this is a

20   little different than the issue we addressed before about

21   Mr. Vadsola's knowledge because here, the audit and the CGMP

22   issues, right, are talking about the failures that -- that the

23   FDA said and that Teva is talking about at ZHP, right, and this

24   is the audit hub manager, and he's saying I don't know about

25   what Teva did or did not know about whether ZHP did formal risk

1  assessments.  I think it's probative for a jury to hear that

2  the person who is in charge of the auditors who are supposed to

3  go to ZHP and see if they're doing things like formal risk

4  assessments knows or remembers one way or the other whether

5  that was happening.

6      MS. LOCKARD:  Well, we objected to this in part

7  because he's not a 30(b)(6) witness and you're not asking him

8  if he was aware of this.  You're asking him if Teva is and

9  you're asking him to speak on behalf of the company when he's

10 not a 30(b)(6).  So that's why we made an objection to this

11 part.

12     You know, as to the full sequence of that designation,

13 Mr. Vadsola was not on the document that's being asked about.

14 Mr. Pan Lin was on that document, he was asked about it, and I

15 think Mr. Lin would have personal knowledge to discuss the

16 document but Mr. Vadsola was not on this document.

17     MR. STANOCH:  I would just say it was in his custodial

18 file.

19     SPECIAL MASTER VANASKIE:  I will sustain the objection

20 in view of the fact that Vadsola was not a 30(b)(6) witness and

21 you're asking him to testify as to what Teva itself was aware

22 of.

23     MR. STANOCH:  Understood, Your Honor.

24     SPECIAL MASTER VANASKIE:  So I think that takes care

25 of rows 40 and 41.

```
 1            MR. STANOCH:  I agree.

 2            SPECIAL MASTER VANASKIE:  So row 42.

 3            MR. STANOCH:  I would just volunteer, Your Honor, that

 4    that's slightly different because here he's saying from my

 5    knowledge, I don't think so.

 6            SPECIAL MASTER VANASKIE:  Yes.  And we have a

 7    counter-designation at 237-15 to 238-10.

 8            MS. LOCKARD:  And we would maintain that the same

 9    rationale for excluding the prior designation applies here.

10            SPECIAL MASTER VANASKIE:  They did qualify it --

11            MS. LOCKARD:  True.

12            SPECIAL MASTER VANASKIE:  -- as per my knowledge, so

13    I'll allow that.  And I was inclined to allow the

14    counter-designation.

15            MS. LOCKARD:  Okay.  We can live with that.

16            SPECIAL MASTER VANASKIE:  All right.  So they'll come

17    in.  That brings us to row 43.

18            MR. STANOCH:  43 I think was just the answer, so I

19    think it just continues.

20            SPECIAL MASTER VANASKIE:  Yes.

21            MR. STANOCH:  Sorry.

22            SPECIAL MASTER VANASKIE:  It is.

23            MR. STANOCH:  And then I think row 44, beginning on

24    page 238-18.  I guess we needed the question.  It looks like we

25    cut that off, I'll be honest.
```

1          SPECIAL MASTER VANASKIE:  Yes.

2          MR. STANOCH:  Oh, that's probably because she didn't

3     dispute it.  I think, Judge, what I'm seeing is I believe

4     Ms. Lockard only has on objection to 242-17 through 23, and

5     then the ensuing answer to that.

6          SPECIAL MASTER VANASKIE:  Oh, okay.

7          MS. LOCKARD:  Yeah.

8          MR. STANOCH:  And I'll even short circuit it, Your

9     Honor.  Based on the last couple that we did, I think your same

10    rationale would probably apply here, in terms of what he knew.

11         SPECIAL MASTER VANASKIE:  Right.

12         MR. STANOCH:  In fairness.

13         MS. LOCKARD:  So 242-17 to 23 is out, right?  And the

14    answer to the question in the next row, 45?

15         MR. STANOCH:  Yes.

16         SPECIAL MASTER VANASKIE:  Correct, they're out.

17         MR. STANOCH:  I then go to row 46, beginning at

18    page 243-18.  I would just say this one's a little different,

19    maybe I got this one right, Judge, that I qualify it to his

20    knowledge.

21         SPECIAL MASTER VANASKIE:  Yes.

22         MS. LOCKARD:  We maintain the objection, but I won't

23    argue it.

24         SPECIAL MASTER VANASKIE:  Yes, I'll overrule the

25    objection and allow in 243-18 to 23.

1          So does this take us to row 47?

2          MR. STANOCH:  Yes, Your Honor.

3          I think the objection is only to the question at 245,

4    7 through 14.

5          I think here I'm just asking an audit hub manager what

6    his personal expectation would be of his auditors and he

7    answers it.

8          SPECIAL MASTER VANASKIE:  Yes.  The objection is

9    overruled.  That comes in.

10          MR. STANOCH:  I think that applies to the next one as

11   well because it picks up -- the next clip picks up the answer

12   to that question --

13          SPECIAL MASTER VANASKIE:  Yes.

14          MR. STANOCH:  And then it's another question,

15   personally.

16          MS. LOCKARD:  Hold on a sec.

17          MR. STANOCH:  Sure.  Sorry.

18          MS. LOCKARD:  Okay.

19          SPECIAL MASTER VANASKIE:  I think that comes in as

20   well.

21          MR. STANOCH:  Okay.

22          SPECIAL MASTER VANASKIE:  That gets us to row 49.

23          MR. STANOCH:  Agreed.  The objection is speculation,

24   and I think 402 and 407.  Again, Ms. Lockard can speak first,

25   if she'd like.  I'll just preview my views, Judge.  On these

1    ensuing questions -- well, number one, they're asking about a

2    for-cause audit that Teva conducted of ZHP in the fall of 2018,

3    right?  So the recalls happened.  This is the for-cause audit.

4    Teva is going in to see what happened with the actual NDMA

5    issues.  Right?  So, number one, there's no speculation in this

6    because he was the audit hub manager at the time overseeing the

7    auditors who were going in and working on the audit report

8    itself.

9           The 407 objection, which you'll see here on line, I

10   believe -- I don't want to put words in her mouth, but I

11   believe Teva's position is that because this audit took place

12   after the recalls, right, a month or so after, that it's a

13   subsequent remedial measure, and we strongly disagree with

14   that.  This isn't some issue of doing something after an

15   accident so the accident doesn't happen again.  This is

16   literally the same instance, right, the actual recall on the

17   NDMA issues to figure out what was the cause and identifying

18   what the cause was.  There's literally no subsequent remedial

19   measure being taken, let alone by Teva.  Right?  This is them

20   saying what the heck happened here, and that doesn't fall

21   within the ambit of 407.  And there's other issues, but I can

22   respond after you hear more from Ms. Lockard.

23           SPECIAL MASTER VANASKIE:  Victoria?

24           MS. LOCKARD:  Right.  Your Honor, we have a strenuous

25   objection to the audit from September 2018, the for-cause audit

1  of ZHP.  We are not saying that Teva's internal investigation

2  into this issue itself is subsequent remedial measures.  We are

3  saying that this audit where Teva went into ZHP to do a

4  for-cause audit to correct measures, they issued

5  recommendations and corrections to ZHP to ensure that this did

6  not happen again.  It is exactly like going in after an

7  accident and making corrective measures.  It's exactly like,

8  throughout the law, if an employer sanctions or reprimands or

9  terminates an employee after an event because of something that

10  was subject to a lawsuit or an injury.  It's exactly like that.

11  It is ZHP going in, essentially reprimanding their supplier for

12  what was done which caused or contributed to this exact

13  incident.

14          So it is squarely within 407 and subsequent remedial

15  measures.  So it's the exact same policy reason that applies.

16  That's why we have subsequent remedial measures, so that people

17  in Teva's shoes will not be fearful of going in and doing a

18  thorough, comprehensive for-cause audit to identify all the

19  mistakes and require and recommend corrections.

20          So we think it is directly analogous to the case law

21  that says that subsequent remedial measures are excluded.

22          We also discussed this similarly with some emails

23  related to our witness Mr. Karlsson who we argued that this

24  sort of, you know, Monday-morning questioning of what ZHP did

25  and how they should be corrected going forward, and Judge Bumb

1    excluded those Karlsson emails on the same ground.

2           So we feel very strongly that this for-cause audit and

3    request for corrections is squarely within a subsequent

4    remedial measures objection.

5           MR. STANOCH:  Your Honor, I can respond unless you

6    want to ask any questions or make a statement.

7           SPECIAL MASTER VANASKIE:  No, go ahead and respond.

8           MR. STANOCH:  Thank you, Judge.

9           Number one is I'm not arguing anything about

10   Mr. Karlsson.  We'll address his designations once I ever get

11   the final counters and objections back from Ms. Lockard.

12          Number two is, a root-cause analysis, right, by

13   definition, is backward-looking.  We're looking at what were

14   the issues in the past that was the reason for this

15   contamination.  There's nothing about actions being taken in

16   the future, let alone what Teva is taking.  If Ms. Lockard's

17   rationale were correct, the FDA Form 483 and warning letter to

18   ZHP would be inadmissible because it was issued in the fall of

19   2018 as well, which says, hey, ZHP, this is what you did wrong,

20   this is why your product was adulterated.  You didn't do this,

21   you didn't do that, you didn't do that.  This is the same type

22   of thing.  There's no subsequent remedial measure actually

23   being taken here.  This is looking back at the conditions in

24   the past that led to the contamination.

25          And furthermore, it also goes to our case against Teva

1    in terms of its quality oversight, that they had a

2    responsibility as the finished dose manufacturer buying this

3    API, right, to -- all that time they should have been looking

4    at these things, right, and whether or not Teva believed they

5    were -- ZHP was complying with GMP and whether they were

6    acceptable or unacceptable.  And we'll get into later, you'll

7    see emails from Teva where the auditors, the actual people on

8    the ground who did this audit, said because of these CGMP

9    failures at ZHP which caused this contamination and recalls,

10   ZHP, it's an unacceptable supplier.  Right?  That's highly

11   probative and pertinent and relevant for sure and it has

12   nothing to do about, oh, in the future, years from now, what we

13   should do so it doesn't happen again, that's a completely

14   different issue.

15        SPECIAL MASTER VANASKIE:  Yes, go ahead, Victoria.

16        MS. LOCKARD:  We have objected to those emails and

17   you'll hear that when we get to Mr. Vadsola.

18        SPECIAL MASTER VANASKIE:  Right.

19        MS. LOCKARD:  The regulatory issue -- the argument

20   that Mr. Stanoch makes about 483s and FDA activity, that is

21   expressly excluded in the case law that addresses the

22   subsequent remedial measures rule, Rule 407.  The case law says

23   that does not apply to regulatory reports and FDA evaluations

24   post-fact, so it's not analogous at all.

25        The issue here is exactly what subsequent remedial

1   measures, the policy and the rule, is for.  It's what it

2   applies to.  It is Teva going in, essentially, and questioning

3   and reprimanding retrospectively their supplier, and that's

4   exactly what subsequent remedial measures is for.  And

5   plaintiff can come out and they can bring up our risk documents

6   and they could say, well, Teva should have found this earlier

7   and Teva's earlier audits were ineffective and incomplete, they

8   can make that.  But they can't take a subsequent audit to argue

9   liability, which is exactly what they're trying to say.

10  They're saying, okay, so you looked at this after the fact and

11  you said, well, ZHP, they should have done all of this stuff

12  and they didn't, they got to do it going forward.  Teva, we

13  should have seen this before or, you know, we erred, and

14  they're evaluating that in an audit report and that is exactly

15  a subsequent remedial measure.  So it is inadmissible.

16          SPECIAL MASTER VANASKIE:  Well, respectfully, I

17  disagree.  It's an investigation into what happened and I think

18  the results of that investigation, you can call it an audit,

19  are admissible or probative.  What they did as a result of the

20  investigative report may be a remedial measure, but that's not

21  the issue here.

22          So to that extent, I overrule the objections.

23          MS. LOCKARD:  Okay.  I understand.  And just for the

24  record, we are not saying that Teva's investigation of this

25  issue was a subsequent remedial measure.  We're saying going in

1    and doing a for-cause audit and the documents associated with

2    that for-cause audit is the remedial measure.  That's the

3    activity that's being undertaken.  That's the corrected

4    activity in and of itself is just performing this for-cause

5    audit.  They would not have done that but for the issue.  But I

6    understand Your Honor's ruling.

7            SPECIAL MASTER VANASKIE:  Okay.  Thank you.

8            Where does that leave us now?

9            MR. STANOCH:  Your Honor -- and Ms. Lockard, I'm not

10   trying to cut her off -- frankly, I think Your Honor's ruling

11   just now would apply straight through to the end because I

12   think that's the primary issue.  And I'm not trying to cut off

13   Ms. Lockard, and she can certainly disagree, but I think that

14   was sort of the overarching issue because I think the remaining

15   designations are really about this for-cause audit Teva did in

16   the fall and sort of the finalization of it internally at Teva.

17           SPECIAL MASTER VANASKIE:  Well, I will say this, and

18   then I want to hear from Victoria, but I had preliminarily

19   determined that the objections from here, where we are now,

20   through the end of the deposition should be overruled.  But

21   there's a couple of limited exceptions.  Let me get to the

22   exceptions and then, Victoria, we'll hear from you.

23           I have in my notes:  Overrule except at page 270 lines

24   8 to 11.  So let me look and see what that is.

25           And the question at 8 to 11 is:  Why is Mr. Barreto

1  asking David Hatt and Linda Hoover to take the first shot at

2  fixing the contents of the report?  The answer was:  I don't

3  know.  But I don't think that's appropriate at all.  I think it

4  did call for speculation.

5          MR. STANOCH:  I won't belabor it, Your Honor, but if I

6  may for 30 seconds?

7          SPECIAL MASTER VANASKIE:  Go ahead.

8          MR. STANOCH:  You'll recall from the questioning

9  immediately prior and after this that Mr. Vadsola is a

10 percipient witness on all the emails and had conversations with

11 all these people about the preparation of the report and we

12 asked, oh, do these people usually get involved?  No.  Right?

13 And so the question is, okay, you, as the audit hub manager,

14 who's, you know, supposed to be working with the auditors to

15 oversee that, you know, why do you think that these other two

16 people are getting involved?  He doesn't know.  He said he had

17 conversations with Mr. Barreto before about the preparation of

18 this.  I think it's fair to sort of ask him what he recalls, if

19 anything, and counsel's objection prompting him, frankly, with

20 an answer, if you know.  I'm allowed to ask him, okay, this is

21 happening right now, you're preparing these documents, do you

22 know why?  He could have said, yes, because X, because Dan

23 Barreto told me this on the phone.  He could have said, no, he

24 doesn't remember, he doesn't know.  I think that's fair given

25 all the context that's happening of these conversations and

1    emails that are happening.

2         MS. LOCKARD:  Well, we did not object to the lines

3    prior to that about who was there and why they were there.  I

4    think he is entitled to answer that.  But we do object and

5    maintain our objection to this section that you've flagged,

6    Judge Vanaskie, for the reasons that you've said.  It is

7    speculation.  Mr. Barreto will be testifying and he was asked

8    about this and he can be asked about it again.

9         SPECIAL MASTER VANASKIE:  Yes.  No, I will sustain the

10   objection with respect to the matters at page 270, lines 8 to

11   11.

12        Another one I have --

13        MR. STANOCH:  And the answer at 14.  I'm just stating

14   that for the record.

15        SPECIAL MASTER VANASKIE:  And the answer at 14,

16   correct.

17        MR. STANOCH:  Yes, sir.  Thank you.

18        SPECIAL MASTER VANASKIE:  And then I have sustained

19   the objection at page 254, lines 4 to 7 and page 254, line 10

20   to 21, which is the answer.

21        MR. STANOCH:  I'm not going to argue that, Judge.  I

22   agree that page 254, 4 through 7, question, and answer at 254,

23   10 through 14 are out.

24        SPECIAL MASTER VANASKIE:  All right.  Now, Victoria, I

25   said that I had gone through the transcript, I made preliminary

```
1   determinations to overrule the objections through the balance

2   of the transcript.  Maybe I should give you the opportunity to

3   go over that to see if there's anything in particular you want

4   to argue, but I think it was basically the same subsequent

5   remedial measure issue.

6        MS. LOCKARD:  By and large, I think that's correct.

7   There may be one or two other small things, and maybe we can

8   look at those over lunch or I can kind of confirm if there's

9   anything else.  But I agree, the vast majority of the remainder

10  would be covered by your prior rulings.

11       SPECIAL MASTER VANASKIE:  Okay.  So why don't we break

12  for lunch.  You can go over these other designations to which

13  objections were asserted and which I've preliminarily

14  overruled, or I'll say I have, in fact, overruled, and you can

15  argue for reconsideration.  But we'll break now for lunch and

16  we'll resume at 1:30, if that's all right.

17       MR. STANOCH:  Your Honor, just, much like Ms. Lockard

18  had a medical appointment to go to on Tuesday, I need to slip

19  away for 20 minutes around 1:45 to 2:15.  So I'm happy to come

20  back at 1:30 and address sort of this issue, but if it's

21  possible, maybe for everyone's benefit if we can focus -- shift

22  to maybe a ZHP or Torrent person and then I'll be back no later

23  than 2:20.

24       SPECIAL MASTER VANASKIE:  We certainly can switch to

25  the ZHP persons because I'm ready for them if you all are ready
```

1   for --

2           MR. SLATER:  Yes, we are, Judge.

3           MS. LOCKARD:  And the other thing I would add, Judge

4   Vanaskie, is given your rulings today on Mr. Vadsola, I think

5   we may be able to eliminate a number of them from Pan Lin

6   because some of the objections were the same with respect to

7   which audits were in and out.

8           SPECIAL MASTER VANASKIE:  Okay.

9           MS. LOCKARD:  So we can work on that this afternoon

10  and maybe reduce those so that we could get to Pan Lin maybe

11  tomorrow.

12          SPECIAL MASTER VANASKIE:  Okay.

13          MR. STANOCH:  I agree with that.

14          SPECIAL MASTER VANASKIE:  Let's break now until 1:30.

15          David, if you need to go for your medical appointment,

16  go.

17          We'll pick up with the ZHP witnesses.  I don't think

18  they're going to take very long, but you never know.  And then

19  we'll come back to -- that will give you a little extra time,

20  Victoria, to see if there's anything in this balance of

21  Mr. Vadsola's testimony that you want to seek reconsideration

22  of.

23          MS. LOCKARD:  Sounds good.

24          SPECIAL MASTER VANASKIE:  Okay.  Thank you all.  See

25  you at 1:30.

```
 1              (Luncheon recess taken from 12:21 p.m. to 1:33 p.m.)

 2              SPECIAL MASTER VANASKIE:  We're going to resume now

 3    with designations from ZHP witnesses.  I'd like to start with

 4    John Iozzia, I-O-Z-Z-I-A, if I'm pronouncing that right.

 5              MS. ROSE:  Yes.

 6              SPECIAL MASTER VANASKIE:  If I'm pronouncing that

 7    incorrectly, correct me.

 8              MS. ROSE:  It's John Iozzia, Your Honor.

 9              SPECIAL MASTER VANASKIE:  Iozzia, okay.  All right.

10    And the first -- if we can, I'll just jump right in, but I did

11    want to ask Mr. Slater a question.

12              I received last night a motion, I guess it's a motion

13    to strike objections with respect to witnesses.  I'm getting

14    that wrong.  A motion to strike objections to wholesaler

15    defendants asking questions of witnesses.  That's close to it,

16    anyway.

17              And how soon can you have a response to that motion?

18              MR. SLATER:  I'll have to ask the people that are

19    working on that.  I can't imagine it would take very long.  I

20    would think by the end of next week.

21              SPECIAL MASTER VANASKIE:  Okay.  Find out for me.  I

22    might want to accelerate that even more.

23              MR. SLATER:  Okay.  And for everybody on the Zoom, if

24    you are involved in that, please email me on our side and tell

25    me what you guys need so I can let the judge know.
```

```
 1            MS. LOCKARD:  I'll just speak up for a moment.  I
 2   think this relates -- it's crossfire involving our witness,
 3   Teva's witness, but this is in the losartan depositions that
 4   are ongoing.
 5            SPECIAL MASTER VANASKIE:  Yes, that's right, so that
 6   doesn't have time emergency.
 7            MS. LOCKARD:  Yes.  I mean, I'm not saying it's not
 8   important, but I just --
 9            SPECIAL MASTER VANASKIE:  I didn't read it carefully.
10            MS. LOCKARD:  I want you to know that it does not
11   relate to the TPP trial.
12            SPECIAL MASTER VANASKIE:  Okay.  So don't worry about
13   getting me a response quickly on that.  We'll set a deadline
14   for that.
15            MS. LOCKARD:  Maybe I shouldn't have spoken up.
16            SPECIAL MASTER VANASKIE:  No, I'm glad you did.
17            All right.  So we're dealing with John Iozzia, the
18   deposition designations.  The first one concerns a
19   counter-designation, the first excerpt at issue, and that's the
20   counter-designation at page 76, line 9 to page 77, line 7.
21            MR. SLATER:  Yeah.  We've been emailing during the
22   first part of the hearing.  I was hoping that maybe we worked
23   it out.  I don't know if Nina thinks we worked it out or not.
24            MS. ROSE:  I think we're very, very close.  I think
25   we're down to maybe one line as to whether -- or two lines as
```

1    to whether they should come in.  So I believe we've narrowed it

2    just to lines 76 through -- 15 through 16.

3         And do you want to just talk the judge through what we

4    agreed to and then just discuss those two lines?

5         MR. SLATER:  Sure.  Would that help, Judge?

6         SPECIAL MASTER VANASKIE:  Yes, absolutely.

7         MR. SLATER:  Okay.  So what I proposed is to allow

8    them the following counters:  75-15 to 22.  I realize it wasn't

9    listed on the chart, but I was trying to address their concern

10   and give them more than what they asked for on certain things

11   and less on others.  So 75-15 to 22 would be a counter.

12        SPECIAL MASTER VANASKIE:  Hold on for one second,

13   please, for me, while I find that transcript.

14        MR. SLATER:  Yes, no problem, Judge.

15        SPECIAL MASTER VANASKIE:  Okay.  Now I have the

16   transcript.  And what page and line?

17        MR. SLATER:  Okay, Judge.  So what we have agreed to

18   is that they can have a counter at 75-15 to 22.  Also, which I

19   realized was not on the spreadsheet, but as I was saying, we

20   offered that to try to give them what they were essentially

21   trying to attain.  So we've agreed to give 75-15 to 22 as a

22   counter.  Also, 76-9 to 15 through the word "experience," not

23   including "the years of FDA track record," and then to pick up

24   again on 76, line 20 with "and you know" and take that to the

25   end.  So the only dispute is whether on line 15 and 16 "the

1    years of FDA track record" would come in.

2              MS. ROSE:  Your Honor, can I be heard?

3              MR. SLATER:  I think I got that right.  Correct?  I

4    think I got it right, Nina, right?

5              MS. ROSE:  Generally.  So I just wanted to clarify.

6         So ZHP did not ask for the counter at 15 through 22.

7    We have no issue with it coming in.  But I just want to clarify

8    that they've designating a different section that really isn't

9    our counter, which is fine, fine by me.

10             But on page 76, the question starting at 9 and going

11   through to page 77-7, that's a question and a complete answer.

12   I think our issue with how plaintiffs are trying to cut up this

13   answer is they're trying to take out relevant parts of the

14   answer.  We were willing to compromise and take out lines 17

15   through 20 to the word "recall" because plaintiffs had stated

16   that they had a concern that that statement indicated that

17   Mr. Iozzia was talking about the track record of the company

18   prior to the valsartan at issue being manufactured in 2011,

19   which is when Mr. Iozzia had joined the company.  So we were

20   willing to take that out.  We don't think that's the case, but

21   we were willing to compromise with plaintiffs.

22             But now with this issue of trying to cut up the answer

23   even further to take out the years of FDA track record, there's

24   just no basis for that.  The FDA track record with respect to

25   valsartan is an issue in the case that's going to be talked

1    about by both sides.  We have experts.  They have experts.  I

2    don't think there's any argument that that's not allowed.

3    That's part of the regulatory history of this case.

4           SPECIAL MASTER VANASKIE:  Adam?

5           MR. SLATER:  Sure.  First of all, I had thought we had

6    worked something out on part of this.  So 75-15 to 22, I'm not

7    going to designate that.  I was offering to give that to the

8    defendant because they said they wanted a more fulsome answer.

9    If you don't want to include that as a counter, Nina, please

10   drop it.  I'm not going to include it for me.  That was for

11   your benefit.  I thought I was giving you a great deal of

12   testimony to try to address your concern about defining

13   quality.  So if you don't want that, don't take it.  It's there

14   for the taking, but it's your counter.  If you don't want it,

15   we're not going to designate it.  That's 75-15 to 22.

16          Now, getting to the years of FDA track record, that is

17   so imprecise and so general that -- what does that mean?  Years

18   of FDA track record across the entire company having nothing to

19   do with -- look, counsel is nodding her head.  I think we're

20   going do better if we just focus this.

21          The witness doesn't say anything about valsartan.  He

22   says that he -- the company's quality goes to their years of an

23   FDA track record.  So there was an MIL that was granted in the

24   defendant's favor that we couldn't get into parts of

25   inspections and regulatory background that wasn't specifically

1  linked to the valsartan or the facilities where the valsartan

2  was manufactured.

3          This testimony is completely untethered to anything

4  other than a general statement of we had a great FDA track

5  record, which we dispute.  We have issues with some of the

6  inspections that were done over the years leading up to 2018.

7  They were criticized.  They got dinged by the FDA.  We weren't

8  planning to put any of that in.  So it shouldn't go in because

9  it has nothing to do with anything.  It's just a wide-open,

10  untethered phrase that the witness threw in about this great

11  track record, and it shouldn't come in.

12          That's my argument.  And I'm going to try to keep my

13  arguments brief and maybe counsel can too because I think we'll

14  get through this a lot quicker if we both agree to do that.

15          MS. ROSE:  I'm happy to, Adam.  I would just like to

16  respond.

17          SPECIAL MASTER VANASKIE:  Nina.

18          MS. ROSE:  Thank you very much.  I will keep it brief.

19          So I think this issue of FDA track record, as Your

20  Honor has recognized in ruling on the Teva designations, there

21  were objections by Teva on talking about certain inspections

22  and things that have happened with the FDA.  And Your Honor

23  said that those can generally come in.

24          So this -- the fact that there was a very broad

25  question asked about what does quality mean, and he answered

1    that quality has to do with the years of -- has to do with the

2    track record with the FDA, that is an issue that's definitely

3    coming in by both sides, what happened with the FDA.  I don't

4    think plaintiffs can object that it's too broad of a statement

5    or not and precise enough of a statement.  If counsel had

6    wanted to at the time, could have asked the question, when you

7    say FDA track record, what are you referring to?  And he

8    didn't.  So I -- it's just not fair to cut up a witness's

9    answer.  I do not think that FDA track record would have been

10   stricken if this witness were testifying live.

11          MR. SLATER:  It's fine if it comes in.  I just want

12   counsel to know what's good for the goose is good for the

13   gander.  I keep hearing that.  So if ZHP wants to put in a

14   witness saying that they had this phenomenal FDA track record,

15   we're going to assume -- and counsel just said that was a Teva

16   issue, not a ZHP issue, we'll be ready to cross their witnesses

17   with all of the bad inspection findings over the years, because

18   it can't go only one way.  I'm willing to keep that out and not

19   get into that area, and I thought the judge ordered us not to.

20   But if ZHP is willing to open the floodgates over this one

21   phrase, I just want to make it clear for the record, we are

22   going to bring whatever we have to cross-examine their

23   witnesses.

24          MS. ROSE:  Your Honor, in light of what Adam has said,

25   I think this goes further.  I don't think it -- I do not think

1    that this opens the door by saying in response to what does

2    quality mean, talking about the FDA track record with respect

3    to valsartan, I don't think that that opens the door to them

4    talking about unrelated FDA inspections or FDA issues related

5    to other products and other facilities.  I think that's unfair.

6    So I think this opens up a whole bigger issue if plaintiffs are

7    going to say that this opens the door.  And maybe this is

8    something that Judge Bumb has to clarify a motion in limine on.

9              MR. SLATER:  Judge, let's be very clear.  This

10   question is based on a language in a marketing document from

11   the company that has nothing to do with valsartan.  It's

12   generally about the -- not nothing to do with it.  It's not

13   limited to valsartan.  It's about the company in general.  And

14   I asked about a phrase on page 74-22 where it says "quality is

15   our lifeline."  And I asked, what does that mean as used in

16   that brochure.  He couldn't answer the question limited to

17   that, so he wanted to give a broad answer.  So to say that this

18   is limited to valsartan, it's not limited to valsartan.  That's

19   just not true.

20             SPECIAL MASTER VANASKIE:  Let me ask a question of

21   clarification.

22             Nina, you're willing to strike the answer at lines 17

23   to 20, "You know, I joined the company because they had an

24   exceptional track record up until the point of the recall"?

25             MS. ROSE:  Yes, Your Honor.  As a compromise, I'm

1   willing to take that out to avoid any suggestion by plaintiffs

2   that we are opening up issues prior to the valsartan track

3   record.

4          SPECIAL MASTER VANASKIE:  But you want to keep in the

5   years of the FDA track record?

6          MS. ROSE:  I don't see that there's a reason to take

7   it out.  I'm very concerned by Mr. Slater using this to reargue

8   motions in limine.  And if there's -- I think that we would

9   need to have Judge Bumb clarify her motion in limine in ruling.

10  I would not want this one phrase to be, as Mr. Slater

11  suggested, opening up the whole motion in limine on unrelated

12  regulatory documents.

13         So I'm not really sure what to say because I think

14  that there's no reason to exclude that phrase, but at the same

15  time I would not want to take a position that there is some

16  chance that -- if there's some chance that Judge Bumb's motion

17  in limine ruling is going to be overruled.  So I think that's

18  something we would have to clarify with Judge Bumb before we

19  could go into this.

20         MS. LOCKARD:  Your Honor, if I may speak up because I

21  heard something I didn't want to hear.  But, you know, we're

22  not in this, I don't want to interject, but to the extent that

23  there's an argument that this opens the door to getting into

24  Teva's regulatory history, we're going to have to get involved

25  in this.  So --

```
 1          MR. SLATER:  I didn't say anything about Teva.

 2          MS. LOCKARD:  You did.  You said --

 3          MR. SLATER:  I didn't know anything -- what I said is

 4   ZHP.  I said if ZHP wants to say they have this great track

 5   record with the FDA in general across the board and have a

 6   witness say that, then I think at that point we're allowed to

 7   put in evidence that refutes it.

 8          I can't believe we're fighting over these six words

 9   this much, but I guess that's what we're going to do today.  I

10   mean, it's just -- it's such an easy call here, but okay.

11          MS. LOCKARD:  I just didn't want to be accused of

12   sitting silent.  If your position is that this is not opening

13   the door to anything to do with Teva, then I'll step back down.

14          MR. SLATER:  I don't want to start to be the expert on

15   Teva right now.  You guys have been arguing for days.  You know

16   what the MIL ruling was.  There's a transcript.  I'm just

17   limiting it to these six words.  I can't believe we're fighting

18   over this this much.  It's unbelievable.

19          MR. RAE:  Your Honor, Jacob Rae on behalf of Torrent.

20   Can I be heard briefly?

21          SPECIAL MASTER VANASKIE:  Go ahead.

22          MR. RAE:  I don't want to get into this specific issue

23   here either, much like Ms. Lockard, but I do have concerns

24   about the fact that Mr. Slater I think just took a position on

25   the scope of Judge Bumb's MIL ruling with respect to
```

1   defendants' MIL 2 where -- that is consistent with arguments

2   that we have been making that plaintiffs have been disagreeing

3   with both in front of Your Honor and in our meet-and-confers as

4   to the fact that as I think Mr. Slater acknowledged right now,

5   EIR reports and other materials at facilities that are not

6   related to valsartan have been excluded from this case.  And I

7   just want to make it clear that, I hear Mr. Slater saying that

8   he agrees with that position, but kind of the counsel who are

9   handling Torrent witnesses and I think the counsel who are

10  handling Teva witnesses appear to disagree with that position.

11  And I want to make sure that we all are on the same page there.

12          MR. SLATER:  Look, I know what the judge ruled.  If

13  you want to say the years of FDA track record, it's not limited

14  to anything, it's across the board, so I think it would open

15  the door.  That's it.  That's my position.

16          MR. NIGH:  And just to be clear -- it's Daniel Nigh

17  now -- with Torrent.  It came up before with Teva.  Judge, to

18  say there was -- it's obviously clarified that if there's

19  evidence of a systemic failure, that could also be admissible.

20  Judge Bumb was very clear in her wording when she said that.

21  So to take one thing out of context and say this is the full

22  ruling, that actually doesn't apply to this argument that's

23  happening right now.  But they are different issues.

24          MS. ROSE:  Your Honor, may I be heard?  I think I can

25  short-cut this.

 1          SPECIAL MASTER VANASKIE:  Yes.

 2          MS. ROSE:  Thank you.  I am willing to take out the

 3  years of FDA track record.  I strongly and ZHP strongly

 4  disagrees that a witness, when asked a question when responding

 5  to that question about quality with respect to valsartan,

 6  cannot mention the FDA track record.

 7          But there's so many people jumping in now, I think we

 8  can short-cut this, I'm happy to take out those five words

 9  because I really don't think in the context of this deposition

10  it's going to affect ZHP's position.

11          SPECIAL MASTER VANASKIE:  All right.  Those six words

12  are stricken.

13          MR. SLATER:  Thank you.  I'll send you flowers later,

14  Nina.

15          (Laughter.)

16          SPECIAL MASTER VANASKIE:  All right.  The next area I

17  have in dispute starts on page 146 of Mr. Iozzia's deposition.

18  This is at line 16 to 23 with the answer to follow at 147-2 to

19  147-4.

20          Do you want to say anything more on this, Adam?

21          MR. SLATER:  I would just say that this is the head of

22  marketing for them in the United States for their API, and I

23  asked -- this is talking about the -- I believe it's talking

24  about the DMF or the change control -- let me just see.

25          It's the change notification when they notified their

1    customers that there was no change to the impurity profile, no

2    adverse change.  That's what everybody was told who was buying

3    this stuff.

4           And I asked him:  If there was an adverse change,

5    would you expect that you would then be selling the API to

6    customers with an adverse change to the impurity profile?

7           And he very logically said what any normal, rationale

8    human being on the planet earth would say is:  We would not be

9    selling a product that had an issue with the process.

10          I don't understand how they say that this is something

11   that's outside of the scope.  This goes directly to the core

12   issue of the value.  The defense is arguing, well, the fact

13   that there was an impurity didn't change the value.  Their head

14   of marketing in the United States is saying we wouldn't be

15   selling it if there was an adverse change.

16          I don't see how it could be more central.  And he's

17   not speculating; this is what he does for a living.  He runs

18   the department.

19          MS. ROSE:  Your Honor, may I be heard?

20          SPECIAL MASTER VANASKIE:  Yes.

21          MS. ROSE:  Thank you.

22          So I think this issue is Adam is talking about a

23   marketing executive who made very clear that he's not a

24   scientist and he did -- the term "impurity profile" and the

25   specific meaning of that term is not within his area of

1   expertise.  It's not something that he can talk about.  But

2   that's not even the issue.

3        The issue here is that this is an incomplete

4   hypothetical, where it's discussing, one, a change to the

5   impurity profile, what that means and what specifically, like,

6   the impurity profile is.  And then the other thing is that it

7   doesn't indicate whether the -- ZHP in this hypothetical knew

8   about an -- that there was an adverse change or not.  So if --

9        MR. SLATER:  If I asked all those questions, it would

10  be compound.

11       SPECIAL MASTER VANASKIE:  All right.  Please don't

12  interrupt.

13       MR. SLATER:  I am sorry, Judge, I won't do that again.

14  I apologize.

15       SPECIAL MASTER VANASKIE:  Here's how we're going to

16  handle this.  I'll hear from each side once and then I'm going

17  to rule.  And, you know, we're not going to go on interminably

18  back and forth.

19       So, Nina, please complete your statement and we'll

20  move on.

21       MS. ROSE:  I think I had completed my statement, Your

22  Honor.

23       SPECIAL MASTER VANASKIE:  I'm going to allow this

24  exchange to be played for the jury.  I think the hypothetical

25  is sufficiently complete for this witness to provide the answer

1  that he did provide.  And I think that's it for Mr. Iozzia.

2          MR. SLATER:  That's it, Judge.

3          MS. ROSE:  Yes, Judge.

4          SPECIAL MASTER VANASKIE:  I'd like to next go to Jie

5  Wang.

6          And this is from his deposition on May 18, 2021.  The

7  first area of dispute begins on page 42, line 9.  The question

8  is:  Are you aware that one of the problems that the FDA had

9  with your company's operations after it was determined that

10  NDMA was in your company's valsartan was an inadequate customer

11  complaint handling system?  Were you aware of that?

12          What's the basis for the objection, Nina?

13          MS. ROSE:  Your Honor, the basis for the objection is

14  that this witness is not a regulatory witness, and as

15  designated, it suggests that the witness should have known

16  about this communication with the FDA and was somehow -- the

17  company was -- acted wrongly.  And because this witness's

18  answer was that was not specifically aware of the FDA's

19  communication, I think that is prejudicial and it's suggestive

20  of some sort of negligence on the part of the party that

21  doesn't exist because this is not a company witness who

22  interacts with the FDA.

23          SPECIAL MASTER VANASKIE:  All right.

24          Adam?

25          MR. SLATER:  Thank you, Judge.

1          His designation was on ZHP's oral and written

2    communications with their customers.  The backdrop to this is

3    questioning that permeates this deposition where he's taken

4    through a series of complaints from customers going back to

5    2014 who are buying valsartan API from ZHP, and every one of

6    them was saying, we're seeing all these unidentified peaks on

7    the gas chromatography and we don't know what this is and we

8    don't know what these impurities are and you need to tell us.

9          And our position is, based on the evidence, that ZHP

10   was putting them off and giving them inadequate and false

11   explanations.  And all the while, ZHP knew what was going on

12   and they knew that there were problems with this impurity

13   profile but weren't telling anybody.

14         So that was the back and forth that he's asked about

15   throughout the deposition.

16         The FDA looked at the -- how they handled these

17   complaints about these unidentified peaks begins in 2014 and

18   said that they had an inadequate customer complaint system and

19   they didn't adequately address these complaints.

20         So it's literally his topic, and I'm asking him, are

21   you aware that what your company did in communicating with your

22   customers was found by the FDA to be inadequate?  Because he's

23   explaining what they did and didn't do, so it's exactly what

24   the topic is.

25         The fact that he's not designated on FDA

1    communications doesn't mean that I can't ask him about the fact

2    that his topic the FDA spoke to because it speaks directly to

3    what his topic is.  He is the only witness that was the

4    appropriate person to ask about that, both of those issues.

5    That's why we got into it with him, because he was designated

6    on the topic of those communications.

7           So the idea that this is beyond his designation, it's

8    unreasonable.

9           And you'll see on the next designation, the European

10   authority made the same finding on their lack of addressing

11   these complaints.  So we think it's squarely within his

12   designation.  And if he knew about it, he could have said yes.

13   He chose to say he didn't know.  I find it hard to believe

14   that's true, which will be a credibility issue for the jury to

15   decide.

16          But that's our argument, Your Honor.

17          SPECIAL MASTER VANASKIE:  All right.  I'm going to

18   overrule the objection and allow this answer to come in.

19          That takes us to 47-2, line 19.

20          MR. SLATER:  This really is the same issue, I think.

21   I don't want to jump in, but I think it's the same issue.

22          MS. ROSE:  I disagree with that.

23          SPECIAL MASTER VANASKIE:  Go ahead, Nina.

24          MS. ROSE:  Thank you.

25          Your Honor, this testimony is very different from the

 1    last designation.  This is -- as Adam just said, this is a

 2    designation that talks about EDQM, so a European regulator and

 3    interactions with the European regulator.  Judge Bumb expressly

 4    held in response to the motion in limine on foreign regulatory

 5    issues that foreign regulatory standards, foreign regulatory

 6    inspections, what a foreign regulator held is not admissible

 7    unless there is some evidence that a defendant, or ZHP

 8    specifically in this case, relied on the foreign regulator's

 9    statements in some way.  And that's not the case here.

10          In other instances we have agreed that foreign

11    regulatory statements have been included in documents that were

12    filed by ZHP.  There is just no evidence of that here.  This is

13    exactly what that motion in limine precludes.

14          SPECIAL MASTER VANASKIE:  All right.  I will sustain

15    the objection.

16          MR. SLATER:  Your Honor, I don't think I got to argue

17    this one.

18          SPECIAL MASTER VANASKIE:  All right.  Convince me I'm

19    wrong.

20          MR. SLATER:  I don't want to waste your time, but --

21          SPECIAL MASTER VANASKIE:  You're not wasting my time

22    at all.

23          MR. SLATER:  Okay.  So the drug master file amendment

24    in 2013 cites and relies on the European regulations regarding

25    genotoxic impurities.  And so we know that the company was

1    bound to comply with their regulations, number one.  Judge Bumb

2    ruled that ZHP would have to have been shown to have relied on

3    or known of what the foreign regulatory action or statements

4    were.

5           Here, it's an actual investigation of ZHP's own plant.

6    And if you go into the following section, which is also

7    objected to, 49, line 2 forward, I go through with them the

8    specific deficiencies that were found by the European

9    authority, the company's approach to handling complaints was

10   considered insufficient.  That's on line 49, line 7 to 9.

11          And then on 47, line 19 to 23, the system does not

12   record all notifications from customers that deserve

13   investigation as being related to a quality issue, some of the

14   complaints are redefined as inquiries.  And then it goes on on

15   the next page to talk about the fact that their records don't

16   reflect all of the complaints that they said they were getting

17   and there's no records of a complaint until May of 2018.

18          So this is an authority that ZHP's own witness last

19   week, their CGMP expert said all of the entities worked

20   together to come up with the common ICH guidelines, they all

21   govern with the same rules.

22          And this goes directly, again, to an authority that

23   they say they were bound to comply with their rules and they

24   relied on their rules and they didn't do so.  And, therefore, I

25   think that it would be not barred by any foreign regulatory

1    ruling based on the circumstances.

2            Thank you for listening, Your Honor.

3            SPECIAL MASTER VANASKIE:  All right.

4            Nina, I'll give you an opportunity for rebuttal.

5            MS. ROSE:  Thank you very much, Your Honor.

6            So there were some misstatements in there.  Mr. Slater

7    referred to ZHP referring to a European regulatory statements

8    on genotoxic impurities.  This is a foreign regulatory

9    inspection with respect to -- and the findings with respect to

10   customer complaints that has nothing to do with European

11   regulatory guidance on genotoxic impurities.

12           If this comes in, then the motion in limine on foreign

13   regulatories interactions and materials has no meaning because,

14   obviously, ZHP or any other defendant was aware if a foreign

15   regulatory agency inspected them, but the point that the Court

16   was making is that the foreign regulatory standards are not

17   what's at issue in this case.  It's FDA standards and what the

18   FDA said.  And that is exactly why the Court granted the motion

19   in limine.

20           So if this comes in, then I think it's throwing out

21   the entire ruling on the motion in limine, which I do not

22   believe that is what Judge Bumb intended.

23           SPECIAL MASTER VANASKIE:  All right.  I'll sustain the

24   objection, as I said before.

25           I think we now go to page 85, line 13, and correct me

 1 │ if I'm wrong.

 2 │         MR. SLATER:  You are correct, Your Honor.  And I'm

 3 │ going to agree to their counter.

 4 │         SPECIAL MASTER VANASKIE:  All right.

 5 │         MS. ROSE:  Can I just look at that for one second,

 6 │ Your Honor?

 7 │         SPECIAL MASTER VANASKIE:  Sure.

 8 │         MS. ROSE:  Thank you.

 9 │         MR. SLATER:  I did say I agreed.

10 │         MS. ROSE:  Yeah, I know, but let me look at what

11 │ you're agreeing to.  I just want to make sure.  I like to do my

12 │ due diligence.

13 │         MR. SLATER:  I'll be very transparent, I'm trying to

14 │ foresee Judge Vanaskie's rulings.  I went back through this

15 │ during the morning hearing and I'm trying to just shorten the

16 │ hearing.  I assumed I was going to lose this one so I --

17 │         SPECIAL MASTER VANASKIE:  I appreciate that.

18 │         MR. SLATER:  No problem.

19 │         MS. ROSE:  Thank you, Your Honor.  I just wanted to

20 │ take a look at it.

21 │         SPECIAL MASTER VANASKIE:  All right.  So the

22 │ counter-designation is in.  This is on page 85, line 15 to

23 │ page 86, line 19.

24 │         MR. SLATER:  And I'm agreeing to the next one as well.

25 │         SPECIAL MASTER VANASKIE:  Okay.

1          MR. SLATER:  The one that's tethered to 91-24 to

2     92-20.  I'm agreeing to 92-23 to 93-24.

3          SPECIAL MASTER VANASKIE:  You've correctly observed

4     the tendency on my part to allow the explanation to come in.

5          MR. SLATER:  I have a good career as a defensive

6     coordinator ahead of me.

7          (Laughter.)

8          SPECIAL MASTER VANASKIE:  Are you up with us, Nina?

9          MS. ROSE:  Yes.  Thank you, Your Honor.

10          SPECIAL MASTER VANASKIE:  So the testimony at page 92,

11     line 23 to page 93, line 24 will come in.

12          We're now to page 98 and the counter at page 102,

13     line 6 to 103, line 16.  Let me get there.

14          So Adam, perhaps you could first let me know where

15     this counter-designation begins and the basis for your

16     objection.

17          MR. SLATER:  Okay.  So I'm going to start with the

18     testimony that was designated because it literally is a

19     question of answering -- at page 98, line 9, all we asked is

20     that Glenmark Pharmaceuticals, which is one of the string of

21     companies that reported unknown peaks in ZHP's valsartan, all

22     we ask is they're at least the fourth customer to report that

23     information.  He says it's another -- yes, they're another

24     customer.

25          And then we ask:  To be fair -- and he goes through

1    the email chains.  And the question, with Amerigen, Ranbaxy,

2    Vertex, and now we're looking at Glenmark, and the witness

3    confirms, yes, that's what we looked at.

4          That's all the question was, was essentially saying

5    you've been getting complaints about unknown peaks, in general,

6    unknown peaks from all these companies, and he says yes.

7          Then the defense wants to designate part of an answer

8    three pages later without the question and it doesn't even have

9    anything to do with what was asked in the prior question.  If

10   you look at the question that was actually asked is -- it's now

11   a new document, not even the subject of the same -- the email

12   that was being asked about on page 98 and 99, we now switch to

13   another document with a different customer and he's about that

14   at the bottom of page 101 in this other email -- I mean, from a

15   different client and they're asked about that they're reporting

16   interference of the toluene peak.

17         We didn't even designate that question.  It's

18   completely a different document, a different question, and the

19   defense designates only part of the answer that starts at

20   page 102, line 6 through part of the answer that ends on 103,

21   line 16, this long rambling answer to a completely different

22   question about a different document.

23         It's wholly confusing.  Under no interpretation of the

24   completeness doctrine could this ever be remotely considered to

25   be necessary for completeness to show that the answer that was

 1   given is incomplete or somehow misleading.  The witness

 2   simply admitted, yes, those are the customers that we've talked

 3   about so far in the deposition.

 4           So to inject part of the answer where he's giving all

 5   sorts of explanations about different things and then throws in

 6   on page 103 a comparison to Glenmark, which is not even

 7   something that he was even asked about in that question, it's

 8   completely non-responsive to that question.  He's being asked

 9   in that question about a Sun Pharma email, a completely

10   different thing, and he goes back and starts talking about

11   Glenmark, which isn't even the subject of the question.

12           So for all those reasons, it would be very prejudicial

13   and confusing to insert this testimony in as if it's needed to

14   explain anything when all we asked him to do was confirm the

15   customers we had gone through so far who inquired about unknown

16   peaks as of that point.

17           SPECIAL MASTER VANASKIE:  All right.

18           Nina?

19           MS. ROSE:  Thanks, Your Honor.

20           So Adam's point he just made about Glenmark is exactly

21   why we designated this as a counter.  So there was a question

22   on page 98 about Glenmark being a customer to report an issue

23   of an unknown peak.  And the answer was:  They're another

24   customer who was asking about the impurity issue with ZHP.

25           As Adam says, they go through the different inquiries

1   and then the question comes up with respect to Sun Pharma on

2   101.

3           It's very clear that on page 102 -- and this is why I

4   designated part of the answer, I'm happy to designate the

5   question too and designate this whole string.  I was trying to

6   keep it as brief as possible because plaintiffs have said they

7   don't want to have a lot of additional testimony to increase

8   their times, but I'm happy to be more fulsome.

9           The witness is clearly going back to the question

10  about Glenmark.  It's that -- he said:  Counsel, you asked the

11  question is somehow related all these -- that somehow relate to

12  all these impurities and group them into the same inquiry; for

13  example, that all of these -- he's trying to clarify that all

14  of these different peaks -- when he said "the impurity" or "the

15  issue," he wasn't trying to say that all of these complaints

16  were about the same peak, and that's what he's trying to

17  clarify:  But like I said, I do not recall whether they're the

18  same inquiry, not even of the same nature, that's one thing.

19          That's really the key point is that he's just trying

20  to clarify that when earlier he said that all these companies

21  complained about the impurity, it is not one impurity.  I mean,

22  that's just demonstrated by the record.  It's multiple

23  impurities.

24          I'm happy to designate the question that starts on

25  101-21, just for clarity, and then goes through 102 -- even

1   if -- I would be happy to stop it at 102-12.  All I care about

2   is the witness was trying to go back in time, was trying to

3   say, wait a second, I said something earlier and I want to

4   clarify it.  I don't know that these were the same impurities,

5   that this was the same inquiry that was being made by multiple

6   companies.

7            And I don't think there's any dispute about the fact

8   that different companies made different inquiries about

9   different peaks, that they weren't all just the exact same peak

10  that every company was inquiring about.  I think that's what

11  the witness is trying to clarify.

12           So I'm not trying to add anything.  I'm happy to be as

13  concise as possible with it just to make that point.

14           SPECIAL MASTER VANASKIE:  All right.  I don't think

15  the designation -- the counter-designation is necessary for

16  purposes of completing the witness's answer.  I'll sustain

17  plaintiffs' objection.

18           Next one begins on page 120, line 23.  And this really

19  goes to the counter, I take it.  Well, there's a defendant

20  objection as well.

21           MR. SLATER:  I'll let them have the counter here.

22           SPECIAL MASTER VANASKIE:  All right.

23           MR. SLATER:  We're going to drop our objection to the

24  counter.  They can have that counter.

25           SPECIAL MASTER VANASKIE:  Okay.  So 121, lines 1 to 10

1    is in.

2              MS. ROSE:  Your Honor, can I clarify with Mr. Slater?

3              SPECIAL MASTER VANASKIE:  Sure.

4              MS. ROSE:  So I had our designations starting at 121-1

5    because your designations stopped at 124 -- sorry.

6              MR. SLATER:  Yes, I agree, you can have the rest of

7    the sentence.

8              MS. ROSE:  Okay.  Great.  I just wanted to --

9              SPECIAL MASTER VANASKIE:  All right.  Good.

10             MS. ROSE:  So all of 120, line 24 would come in and

11   then all of 121, line 1 through line 10 would come in.

12             SPECIAL MASTER VANASKIE:  Correct.

13             MS. ROSE:  That is correct?

14             MR. SLATER:  Correct.

15             MS. ROSE:  Thanks.

16             SPECIAL MASTER VANASKIE:  All right.  Next we are up

17   to page 140, line 18.

18             MS. ROSE:  Your Honor, I can maybe shortcut this.

19             I understand from prior rulings, and we noted this in

20   our chart, that the Special Master has indicated he's inclined

21   to allow such questioning, but I wanted to make our objection

22   for the record on that.

23             So I just wanted to note that we recognize that this

24   is probably something the Special Master would let in, but we

25   would like to preserve the objection.

1          SPECIAL MASTER VANASKIE:  Yes, I will allow this

2   testimony to be presented.  So the record is clear, from 140,

3   line 18 to 140, line 21, is in.  That's the question.  And the

4   answer is at line 24.

5          MR. SLATER:  And I think that covers the next two on

6   the list, too.  That's just the same issue, right?  It's the

7   same set of questions, Nina?

8          MS. ROSE:  Yes, I agree that would apply to our

9   objections through line -- sorry, through page 141, line 10.

10          SPECIAL MASTER VANASKIE:  So where are we at now?  I'm

11   confused.

12          MR. SLATER:  We're at 152, line 19, Judge.  I know,

13   it's hard to deal with when we start agreeing to things.  It's

14   going to throw off your whole mojo.

15          (Laughter.)

16          SPECIAL MASTER VANASKIE:  152, line 19.  So this is

17   dealing with mischaracterization or alleged mischaracterization

18   of an email, I take it?

19          MS. ROSE:  Yes, Your Honor.

20          SPECIAL MASTER VANASKIE:  Yes, I will overrule the

21   objection and allow this testimony from 152, line 19 to 153,

22   line 5 to be presented.

23          We're now at 153, line 11 --

24          MR. SLATER:  This is all the same line of questions so

25   I think it would cover everything through page 153, line 24,

1  but I'll ask Nina to confirm.

2          MS. ROSE:  I agree that they are the same issue, the

3  question and the answer.

4          SPECIAL MASTER VANASKIE:  Okay.  I have the same

5  ruling.

6          MR. SLATER:  And I think 159, 4 to 9 and 12 to 13 is

7  the same issue as well.

8          MS. ROSE:  Let me take a look, Your Honor.

9          SPECIAL MASTER VANASKIE:  Yes, absolutely.

10          MS. ROSE:  Your Honor, it is the same issue, but I

11  just want to raise the fact that here, again, it's an express

12  representation about what the email says and that is contrary

13  to the text of the email.  I respect your ruling, I just want

14  to make that clear that our objection is that this states that

15  the email says something that it does not say.

16          SPECIAL MASTER VANASKIE:  All right.  I'll have the

17  same ruling and this will come in.

18          MR. SLATER:  And I hate to steal your thunder, Judge,

19  but I'm going to agree to their counter at 272, line 2 to 8;

20  their counter is 270, line 22 to 271, line 5.  And I'm agreeing

21  to that.  We're going to drop our objection to that.

22          SPECIAL MASTER VANASKIE:  All right.  So the testimony

23  from 270, line 22 to 271, line 5 will come in.  And that

24  completes Mr. Jie Wang's deposition.

25          And then I have as the final ZHP witness, and correct

1   me if I'm wrong, but it would be -- is it Lijie Wang?

2           MS. ROSE:  It's Lijie Wang, Your Honor.  Thank you.

3           SPECIAL MASTER VANASKIE:  Lijie Wang, thank you.  Let

4   me find her testimony.

5           So we're at the Lijie Wang deposition of January 26th,

6   2021.  And the first area in dispute begins at page 78.

7           MS. ROSE:  Your Honor, this may be something we can

8   shortcut because our objection relates to the issue of general

9   causation and its role in the trial giving references to

10  genotoxicity and cancer.  So I don't think that's something --

11  I think we've agreed that that's something that Judge Bumb has

12  before her and is going to need to weigh in on, but for

13  purposes of preserving the record, we wanted to include that

14  here.

15          SPECIAL MASTER VANASKIE:  All right.  Do you agree,

16  Mr. Slater, we defer this to Judge Bumb?

17          MR. SLATER:  I agree that it should be admitted and I

18  agree that the defense has submitted something to Judge Bumb

19  and I just got a chance to see it actually this morning.  But I

20  do believe she's going to address that question.  I don't agree

21  that this implicates general causation, but I'm fine with

22  waiting -- I mean, Judge Bumb is going to definitely address

23  this question that's been put in front of her.  So, yeah, I

24  think the testimony should be in, subject to whatever Judge

25  Bumb does.

1           SPECIAL MASTER VANASKIE:  All right.  We'll say the

2    testimony is in, subject to Judge Bumb's ultimate

3    determination.

4           All right.  So I've moved now to page 80, line 3.  The

5    question goes to line 8.  I have a conditional

6    counter-designation.  It also carries over to 80, line 11 to

7    16, which is the answer.

8           MR. SLATER:  I will agree to their counter.

9           SPECIAL MASTER VANASKIE:  And this is the counter at

10   79, lines 12 to 16?  Do I have that right?

11          MR. SLATER:  You're right, Judge, 79, lines 12 to 16,

12   and 79-19 to 24.  That's their counter and I'm agreeing to it.

13          SPECIAL MASTER VANASKIE:  All right.  Anything else on

14   this, Nina?

15          MS. ROSE:  Yes, Your Honor.

16          We also have an objection to the testimony as

17   designated first for the reasons we just discussed, the

18   references to genotoxic impurities that pose a risk to human

19   health and injecting general causation into the trial, which we

20   will discuss with Judge Bumb.

21          And then also on the point that this question of

22   whether Prinston is not allowed to sell and never been allowed

23   to sell drugs in the United States that have impurities, that

24   is a question that goes to expert regulatory testimony as to

25   whether impurities are permitted in drugs at certain levels;

 1    and at the time that valsartan was being sold, whether that was

 2    permissible.

 3            SPECIAL MASTER VANASKIE:  Go ahead, Mr. Slater.

 4            MR. SLATER:  Thank you, Judge.

 5            The question actually was not asked as imprecisely as

 6    stated by counsel.  I know you were paraphrasing, I'm not

 7    accusing you of anything.

 8            The question was directly within her topics -- one of

 9    her topics under the heading of Process Development was ZHP's

10    evaluation and knowledge of the health risks of nitrosamines,

11    including NDMA and NDEA, including, but not limited to, as a

12    contaminate of ZHP's valsartan API and ZHP's valsartan finished

13    dose.  This falls directly within her designation.

14            The question is, does she agree that Prinston isn't

15    allowed to sell and never has been allowed to sell drugs in the

16    United States that have genotoxic impurities -- NDMA and NDEA

17    are genotoxic impurities, I don't think anyone is going to

18    dispute that -- that pose a risk to human health?  That's

19    literally the language in the regulatory guidances that ZHP

20    agrees applied to their conduct, that's what the guidances say.

21    They say that genotoxic impurities should not be in these

22    drugs.  I'm paraphrasing those guidances but that is the core

23    of why this was never allowed.  And I don't see how that

24    question could be inappropriate.

25            The witness answers:  We want to ensure our product

 1   meets the guidance on the risk assessment based on FDA

 2   guidance, including the topic impurities.

 3           I mean, she's saying to me, yes, we have to follow the

 4   guidances.

 5           So I'm not really sure how it can be that this is

 6   expert opinion when this is a court-approved, court-ordered

 7   designation topic for a corporate representative for a company

 8   that is required by law to understand the risks of genotoxic

 9   impurities and is deemed to be an expert in its field and needs

10   to understand it and they had to designate someone to speak for

11   their company about their understanding of what they were

12   supposed to do in addressing genotoxic impurities,

13   nitrosamines, et cetera.

14           SPECIAL MASTER VANASKIE:  Nina, any response?

15           MS. ROSE:  Yes.  So I think Mr. Slater just raised

16   another issue.

17           So I think he's focusing on the fact that the witness

18   was designated to talk about Prinston's knowledge of health

19   risks.  So that for reasons we've discussed, that's the general

20   causation issue, but the witness is not designated to talk

21   about what the regulatory guidances say with respect to whether

22   a manufacturer is ever allowed to sell a medication that may

23   have a genotoxic impurity in it.  We know because the FDA does

24   allow NDMA and NDEA up to some limits even today.

25           So this -- the question is just false.  It's a

1    misleading question on its face and it's being posed to an

2    expert -- I'm sorry, being posed to a fact witness who is not

3    an expert in what is required and was not designated to testify

4    about what is required under the FDA regulations.

5         SPECIAL MASTER VANASKIE:  And you had a conditional

6    counter at page 79, line 12 to 16?

7         MS. ROSE:  I believe that -- did we just address that

8    counter?

9         MR. SLATER:  12 to 16 and 19 to 24.  And I've agreed

10   to those counters.

11        SPECIAL MASTER VANASKIE:  Subject to Judge Bumb's

12   ruling on general causation, I will allow this question and

13   answer to be presented.

14        Now we go to page 145.

15        MS. ROSE:  Just for the record to be clear, Your

16   Honor, there was an objection to 80, lines 11 through 16.  I

17   believe that would be encompassed within Your Honor's ruling

18   with respect to the previous designation.

19        SPECIAL MASTER VANASKIE:  Yes, it is encompassed

20   within that.  All right?

21        So there's an objection to the testimony that appears

22   on pages 145 and 146 based upon Federal Rule of Evidence 407 as

23   a subsequent remedial measure.  I have a note here that says

24   "needs further discussion for context."

25        So Nina, maybe you can elaborate on your objection.

1          MS. ROSE:  Sure, Your Honor.  So this is an email that

2    was sent in September of 2018, after the recall, after the

3    discovery of NDMA.  There's no product on the shelves at this

4    point.  It's from someone at Prinston who is explaining that

5    there is going to be a training seminar and the training topic

6    will be genotoxic impurities, regulatory requirements,

7    qualifications, and control strategy; and that is a remedial

8    measure taken in direct response to the finding of NDMA and the

9    recall.

10         Here, the company is trying to make sure that everyone

11   is educated on what's going on.  So this is the issue.

12         Introducing this and introducing this to the jury, it

13   seems like some sort of admission or what it's going for is

14   that there's some sort of admission that was something was done

15   wrong that needed to be corrected through additional training.

16         It seems to me that this email is just being

17   introduced to lay the foundation to the attachments to the

18   email and I think that can be done without discussing the

19   contents of the email.

20         SPECIAL MASTER VANASKIE:  Adam?

21         MR. SLATER:  Yes, Judge.  A subsequent remedial

22   measure can never include a situation where the party that's

23   invoking Rule 407 was already under an obligation to do

24   something or was coerced by the regulatory regime or by an

25   outside actor to do what they were doing.

1           And in this case, they were always required by the

2   regulations that controlled their conduct from day one all the

3   way through the end to understand what they're supposed to do

4   with genotoxic impurities, what the regulatory requirements

5   are, the qualifications, the control strategies.  This was

6   always something that they were required to do.

7           The fact that they had a seminar doesn't change that

8   they were obligated to do it by law, not that they, out of the

9   goodness of their hearts, went to the movie theater and said,

10  hey, somebody tripped, let's go check the carpet there and

11  let's fix the carpet and actually take steps to fix the carpet.

12  And Your Honor reminded me of that in the arguments that were

13  happening with Teva, that the question is what are they

14  actually doing.

15          The fact that they're training people on what the

16  requirements are is not -- I remember the movie theater example

17  because I think I learned that one in law school -- that the

18  subsequent remedial measure is we want to encourage people to

19  actually fix the carpet so somebody doesn't trip over it in the

20  next movie.

21          This is something they were required to do all along

22  by the regulatory laws.  There's nothing remedial about it.

23  All it says is that there's a seminar and then it does kick in

24  to the attachments where we look at some of the things that

25  people were being told factually to show that these were true

1    statements and these were the things that they were governed

2    by.

3         But it's certainly not a subsequent remedial measure

4    that they are having a meeting to talk about what they always

5    needed to do.

6         SPECIAL MASTER VANASKIE:  So I will allow the

7    testimony at page 152 -- I am sorry, page 145, line 6 to 14.

8         Now I think we go to page 152.

9         MR. SLATER:  Yes.

10        SPECIAL MASTER VANASKIE:  Lines 19 and 20.

11        152, line 23, 153, line 9.

12        MS. ROSE:  Your Honor, if it helps, our objection is

13   based on the general causation outstanding question.

14        SPECIAL MASTER VANASKIE:  Yes, and I think until that

15   issue is resolved by Judge Bumb, this would not come in.  In

16   other words, however she decides it will determine whether it's

17   admissible.

18        MR. SLATER:  But it's admissible subject to her

19   ruling?  It's admitted subject to her ruling?

20        SPECIAL MASTER VANASKIE:  Yes, subject to her ruling

21   it's admissible.

22        MR. SLATER:  Okay.

23        And I can tell you on the next one, which I think is

24   the answer, 152-23 to 153-9, they have a counter at 12 to 14 on

25   page 153.  I agree to that counter.

```
 1            SPECIAL MASTER VANASKIE:  All right.

 2            MS. ROSE:  And Your Honor, for the record, there was

 3    also an objection on the general causation issue there.

 4            SPECIAL MASTER VANASKIE:  Yes.  Again, dependent upon

 5    Judge Bumb's ruling.

 6            MS. ROSE:  Thank you, Your Honor.

 7            SPECIAL MASTER VANASKIE:  We're now to page 166, lines

 8    11 to 16.  And this deals with the carcinogenic risk posed by

 9    NDMA.  Is this also now subject to Judge Bumb's ruling?

10            MS. ROSE:  Yes, Your Honor.  And for clarity, because

11    it might just be easier, the subsequent designation I believe

12    picks up right after this.  166, line 11 to 16 is designated.

13            SPECIAL MASTER VANASKIE:  Right.

14            MS. ROSE:  And then 166, 19 to 23.  Maybe I'm confused

15    about -- oh, it starts at the "acceptable."  Sorry.  I just

16    want to orient myself.

17            Adam?

18            MR. SLATER:  Yes, I'm orienting as well.

19            MS. ROSE:  Okay.  No, I just wanted to know what -- it

20    looks like you cut part of the answer or part of the question.

21    I just wanted to be clear on what that was.

22            MR. SLATER:  Yeah.  I mean, I had taken out what the

23    EMA criteria was.  I think that where we are now, I'll let you

24    choose.  If you don't want it in, it won't go in.  If you want

25    it in, those three lines can go in.  It's dealer -- you're the
```

1    dealer.  You're in charge.  I don't really care.  I'm happy to

2    use the entire answer.  I think it's appropriate, but if you

3    want it as designated, it's fine also.

4         MS. ROSE:  I don't think taking out those three lines

5    resolves our objection to it, so I --

6         MR. SLATER:  I would agree.

7         MS. ROSE:  That would be part of our objection.  So

8    that's fine, we can leave it as is.

9         So in addition --

10        MR. SLATER:  So we'll make it the entire answer.

11   We're not going to cut out those two lines.  That's what you

12   just said, right?

13        MS. ROSE:  Sure.  I think -- yes, I think that the

14   objection, if it includes those lines, it just makes -- we

15   object to those lines for the same reasons.

16        MR. SLATER:  Yep.

17        MS. ROSE:  So in addition to the general causation

18   issue, Your Honor, our objection is also that this is referring

19   to a post-recall document that talks about post-recall

20   standards and, as designated, it misleadingly suggests that the

21   limits -- the FDA limits for NDMA and valsartan existed at the

22   time that the API was manufactured.  These are standards

23   adopted after the recall and that are referenced only in a

24   post-recall document.

25        SPECIAL MASTER VANASKIE:  And so your position would

 1    be that none of this comes in?

 2            MS. ROSE:  Our position would be that this reference

 3    here to this document, which is a post-recall document, and

 4    talking about the standards that exist for NDMA, is

 5    unnecessarily confusing because it is unclear to the jury,

 6    who's not oriented at the time of this document or the date of

 7    this document, suggesting that there were standards in place

 8    for the acceptable limit of NDMA as 0.3 parts per million prior

 9    to the discovery crime of NDMA in 2018.

10            SPECIAL MASTER VANASKIE:  Adam, your response?

11            MR. SLATER:  Yes.  Thank you, Judge.

12            This argument -- which I think it's a new argument

13    that something that's a post-recall document somehow is

14    problematic -- I don't understand what evidentiary rule would

15    actually say that.  There's a whole host of post-recall

16    documents, including the Deviation Investigation reports, et

17    cetera, et cetera, et cetera, are all admissible because these

18    are the documents that are analyzing what occurred.

19            I'm not really sure what the substance of the argument

20    would be.  They cited Rule 403.  This is their document and the

21    document is identified on page 163, Judge.  It's introduced.

22    It's Exhibit 60, the Valsartan Risk Evaluation for its

23    Optimized Process.  Because what ZHP did is when they found out

24    that the limits for how much you could put into these drugs of

25    NDMA and NDEA were going to be much higher than what they

1    hoped -- I mean, much lower than what they hoped, they then

2    immediately said we got to figure out a way for our business

3    purposes to get the NDMA out so we could go to the FDA and say,

4    hey, we could do this.  And they came up with a process where

5    they quenched the solution basically outside the presence of

6    the drug product so that when they quenched the sodium azide,

7    it wouldn't cause the contamination of the product with the

8    NDMA.  They basically were pulling out part of it, do it over

9    here.  That's what their optimized process -- they did this on

10   their own.  This wasn't to remediate anything.  It was so that

11   they could keep selling the drug.  It wasn't to fix a problem

12   for the world, and there's no witness that ever suggested it

13   was a remedial measure.  So -- and by the way, they were

14   already obligated under the federal regulations to have done

15   that to begin with.  So again, it can't be a subsequent

16   remedial measure because they were always required to identify

17   and control any genotoxic impurities and if they found them, to

18   then go to the FDA and say we want to propose a level that we

19   can allow to be in here.  Without doing that, no level was

20   allowed before this happened because you had to actually ask

21   for permission and justify how much you were going to allow to

22   be there.  They never did that.

23           So they cited Rule 403.  There's no way that this is

24   unconfusing or anything.  It's their document, the language of

25   their document.  If they want to bring in a witness to come and

1    talk about that document and say, Well, let me tell you what

2    the significance of that document is, they can do it.  But

3    we're literally working with their own document that

4    specifically speaks to the NDMA and the fact that it's a

5    carcinogenic risk substance, which we obviously don't agree

6    that implicates general causation.  But that's really the issue

7    that counsel is looking to hold.  I don't think there's any

8    valid reason to keep this out.

9            SPECIAL MASTER VANASKIE:  Nina, any response?

10           MS. ROSE:  Yes.  Thank you, Your Honor.  So just very

11   quickly, Mr. Slater's response didn't have anything to do with

12   our objection.  That was just a long colloquy of trying to

13   inject their theory of the case on -- with respect to ZHP's

14   actions following the recall.

15           But our objection is a 403 objection because this is

16   misleading and confusing to the jury.  Mr. Slater just said

17   that this email chain, that was a meeting to address the issue

18   of NDMA in valsartan after it was discovered, after the product

19   was off the shelves, and this is a document that was created

20   after 2018.  And so Mr. Slater said earlier that the documents

21   that were discussed were documents that predated the recall.

22   This is a document that postdates the recall and he is quoting

23   it to say that there were standards in NDMA that did not exist

24   during the time where ZHP's conduct is at issue.  And so I

25   think it is confusing to the jury as to whether these limits

 1  existed at the time or did not.

 2          SPECIAL MASTER VANASKIE:  All right.  I'm just trying

 3  to see where this starts and where it ends.  Let me see if I

 4  have this right.

 5          Adam, you've designated 166, line 19 to 166-23.

 6          MR. SLATER:  Line 11 to 23, Your Honor.

 7          SPECIAL MASTER VANASKIE:  Line 11 to 23.  Well, that

 8  makes sense.  That's where the question begins, line 11.

 9          MR. SLATER:  It goes from 11 to 23, Your Honor, and

10  then the answer is 167, line 2.

11          SPECIAL MASTER VANASKIE:  And the answer is simply:

12  Yes, I see it.

13          MR. SLATER:  Correct.  And then I go from there to ask

14  him questions on the next page that are not objected to, I

15  don't believe.

16          SPECIAL MASTER VANASKIE:  So what is being --

17          MR. SLATER:  Oh, no, they are objected to.  So you'll

18  see it on 168 when I ask questions of her about this, which was

19  one of her topics, the contamination levels and their

20  evaluation and knowledge of the risks of those levels.

21          SPECIAL MASTER VANASKIE:  Yes.  I really -- I know

22  I'm -- I'm really having trouble because the witness -- the

23  answer that comes in at 168, line 13 to 15 is:  Yeah, I

24  remember the document that you showed me a table.  I don't see

25  anything substantive there.

1          MR. SLATER:  Well, the question is at 168, line 5 to

2    10.  This is a few objections down.  This is another entry.

3    But the question is 168, line 5 to 10 going through -- this is

4    all a line of testimony -- because what we anticipated, Your

5    Honor, was that the defense might argue, well, there were no

6    levels at the time that were set by the FDA at the time --

7          SPECIAL MASTER VANASKIE:  Right.

8          MR. SLATER:  And you remember we talked about that the

9    other day, there was a counter that defense wanted that said

10   there were no limits before 2018 and I was concerned that that

11   was too ambiguous and I was overruled on that and that counter

12   came in.

13          So now I'm asking them about their analysis.  Even if

14   those new levels were applicable, they were massively exceeded

15   by the levels of contamination.  So we get it both ways.  It

16   was never allowed.  But even if those levels existed, you still

17   far exceeded those levels.  And that's what I'm establishing

18   here with this witness, which goes to, obviously, the value of

19   the product because if it's over the levels, you can't sell it,

20   our position is.

21          MS. ROSE:  Your Honor, may I respond to that?

22          SPECIAL MASTER VANASKIE:  Yes, you may.

23          MS. ROSE:  I don't want to break your rules about the

24   number of responses.

25          So I think what Mr. Slater said just clarifies what

1    our concern is here, which is that plaintiffs continue to

2    insist that there were -- that there was a limit or a level

3    prior to 2018 when the FDA set a limit, and here they're asking

4    about a post-2018 or post-recall document and talking about the

5    limits and walking a witness through the limits that were set

6    in 2018.  But there's no dispute that there were limits set in

7    2018 and there's also no dispute that the levels were above the

8    limits set in 2018.  That's why the product was recalled.  So

9    the only reason to bring this in is to suggest to the jury that

10   these limits were in place prior to the recall.  I don't

11   believe that there's a reason to set the standard -- I mean,

12   this document says what the document says.  And walking a

13   witness through it, the only reason to do it is to suggest that

14   these were limits that were in place prior to 2018.

15           MR. SLATER:  I'm raising my hand.

16           SPECIAL MASTER VANASKIE:  You may be heard.

17           MR. SLATER:  You know, Judge, I've heard this several

18   times now, this suggestion that we're going to try to trick the

19   jury into thinking there were levels in place before the

20   recall.  We're on the record now.  We are never going to try to

21   do that.  Why would we when the levels -- when no levels were

22   allowed before that?  Of course we're not going to do that.

23   And there's no juror in the world that's going to not

24   understand -- because we're all going to explain it, there were

25   no levels before 2018 that were allowed, it was only after that

```
 1   levels were set.  And guess what?  Even when those levels were

 2   set, the levels of contamination far exceeded what the FDA said

 3   was acceptable even after the fact.

 4         So that's what we're doing here.  We're quantifying

 5   the level of contamination.  Nobody is trying to mislead the

 6   jury.  Nobody could ever succeed at misleading the jury.

 7   Nobody in the world could believe that at the end of the

 8   opening statements the jury is not going to understand what

 9   occurred because we're all going to adhere to the facts of what

10   occurred and that's not the only interpretation that we're

11   trying to trick the jury into thinking those levels existed

12   because that's not what we're doing.  We're literally asking

13   questions about the actual language in the document where they

14   evaluated the levels and the risk.

15         Thank you, Judge.

16         MS. ROSE:  Your Honor, apologies.  Can I just have one

17   minute?

18         So I don't -- there is no intent requirement in 403.

19   I don't think our argument is that plaintiffs are intentionally

20   trying to trick the jury.  We're dealing with a canned video

21   that is going to be cut up and sliced together and put before a

22   jury and also the plaintiffs have taken the position that

23   defendants would have to bring this witness live from China,

24   even though they are playing the tape, if we wanted to have a

25   chance to clarify any of this and then, presumably, I assume
```

1    plaintiffs are arguing they would then have another chance at

2    cross-examination.

3            MR. SLATER:  She's in New Jersey, Nina.

4            MS. ROSE:  Okay.  I apologize.  But the point remains

5    is that we would have to bring a witness that -- if she's in

6    New Jersey, you could call her to testify if she's within the

7    subpoena power of the Court.  The Court has said you don't have

8    to do that and that you could play testimony because we're

9    trying to limit the length of this trial.

10           But we have to understand the repercussions of that,

11   which is that when you put up all this testimony cut up

12   together, not as it was presented, there is a risk that the

13   jury is going to going to be completely confused by this

14   document when presented in a long string of other documents

15   that you're saying are pre-2018.  So that's the issue.

16           It's not -- I'm not saying that plaintiffs are

17   affirmatively trying to trick anyone.  It's that you have to

18   look at whether this is confusing as presented, and these are

19   clipped-up questions and answers that when put together I think

20   there's confusion that could come before the jury.  And

21   plaintiffs have experts who can talk about this, who can

22   explain the levels and say that they were above it.  I don't

23   think anyone's going to disagree with what the facts are on

24   what the levels were in 2018.  So that's my concern.  I'm not

25   trying to accuse plaintiffs' counsel of misleading anyone or

1  trying to mislead anyone.  I'm just dealing with the fact that

2  we are dealing with a transcript that is going to be cut up

3  instead of a live witness.

4       SPECIAL MASTER VANASKIE:  I think the problem here is

5  just that we're dealing with a transcript that's going to be

6  cut up and that gives you all the opportunity to dissect each

7  and every word and say, oh, this is going to become the

8  centerpiece of the trial when it's not the case.  It just is

9  part of the evidence that's being presented.  It's just a

10  question of whether it's unduly prejudicial or causes confusion

11  for the jury.  And I don't see it.  So I will allow this to

12  come in.

13       Going forward, I'm going to read the excerpts out loud

14  because maybe that will help, but I just don't see this as

15  meriting as much attention as it's receiving today.

16       MS. ROSE:  Understood, Your Honor.  ZHP defendants

17  just wanted to make the record that we have issues with the

18  designations as they were cut and being used in lieu of live

19  testimony for a witness who's available to be called.  But I

20  appreciate your ruling and I think that actually will resolve

21  many of the remaining designations.

22       SPECIAL MASTER VANASKIE:  Okay.  The next one I have

23  begins on -- and correct me if I'm wrong.  If I miss something,

24  you have to tell me.  But I have it beginning on 169, lines 19

25  to 22.

1      MR. SLATER:  There's just one page before that -- or a

2  couple pages before that, unless they're being -- but I

3  think -- I'm going to go out on a big limb -- I think that

4  everything on 168 and 169 is encompassed by what Your Honor

5  just ruled.

6      MS. ROSE:  I would agree, but I -- and also I'm glad

7  you raised that because I want to clarify.

8      So the objections that we had to this testimony

9  starting on 169, there was an evidentiary objection --

10      MR. SLATER:  Don't forget 168.

11      MS. ROSE:  Oh, apologies.

12      MR. SLATER:  Or maybe that was addressed by Your

13  Honor's ruling before because we did talk about it.  I

14  apologize if I'm jumping the gun on that.

15      MS. ROSE:  I just wanted to note that our objection

16  included the -- some of our objections here include the

17  genotoxic impurity and the general causation issue.  I just

18  wanted to make sure that that's preserved.

19      SPECIAL MASTER VANASKIE:  That is preserved.  I want

20  to make that clear.  I haven't ruled on that issue and I have

21  not done so because I believe that's a matter for Judge Bumb.

22      MS. ROSE:  Thank you, Your Honor.

23      MR. SLATER:  I think that covers all of the objections

24  through page 170; is that correct?

25      MS. ROSE:  Let me take a look.  I believe that's

```
 1   correct.

 2           SPECIAL MASTER VANASKIE:  So are we up to page 239

 3   now?

 4           MR. SLATER:  Yes.

 5           SPECIAL MASTER VANASKIE:  So on page 239, beginning at

 6   line 21 and going to page 240, line 8 --

 7           MR. SLATER:  We're going to drop that.  We're going to

 8   drop that designation.

 9           SPECIAL MASTER VANASKIE:  Okay.

10           MR. SLATER:  And I'll tell you why, Judge, and for the

11   record, because even though I think it's still a matter of

12   risk, because it says at the top of page 240 "May likely have

13   adverse effect over long-term exposure," I'm going to be

14   exceedingly cautious and I'm going to drop that designation.

15           SPECIAL MASTER VANASKIE:  All right.  So that takes us

16   through 240, line 14.

17           MR. SLATER:  And that's the answer then, so I'm

18   dropping that as well, Your Honor.

19           SPECIAL MASTER VANASKIE:  All right.  Then I have

20   counter-designations.  I don't know if we've addressed them or

21   not.

22           MS. ROSE:  Your Honor, I would like to raise that --

23           MR. SLATER:  I don't think there's any counters to

24   those.

25           MS. ROSE:  Oh, no, there's no counters, no.
```

1    Mr. Slater is correct, there's no counter-designations for the

2    designations at 239 and 240.

3         So I think that takes us to the end of the ZHP

4    witnesses, but I just wanted to raise one point before we move

5    on, if that's allowed?

6         SPECIAL MASTER VANASKIE:  Sure.

7         MS. ROSE:  Thank you, Your Honor.

8         We have not -- and I believe we addressed this on last

9    Friday's hearing but, again, I just want to continue to make

10   the record.  We have not discussed whether -- we've not

11   discussed any affirmative designations from deposition

12   testimony by ZHP witnesses.  This has been an ongoing issue and

13   I think other defendants might also have the issue.

14        It's our understanding that plaintiffs are taking the

15   position that ZHP is not allowed to affirmatively designate

16   anything from ZHP witnesses.  If that's not the case, please

17   correct me, Mr. Slater.

18        MR. SLATER:  First of all, I'm not really sure what

19   affirmative designations counsel is talking about because we've

20   only been served with affirmative designations for one ZHP

21   witness, that was Jucai Ge, who they are bringing in live.  So

22   because she's coming live, they would not be playing her

23   testimony and I think we all agree to that.  So I don't think

24   there are any affirmative designations for ZHP.  And I

25   certainly assume that counsel is not suggesting that they're

1  going to go back to the drawing board and start serving

2  affirmative designations on us a month before trial.  So I'm

3  assuming that's not what they're planning to do.

4         As far as the general rule for how affirmative

5  designations are handled across the board for trials, and we've

6  submitted the brief and we sent a copy of it to Your Honor, the

7  briefs that were filed by both sides, in fairness, if the

8  defense wants to present testimony of witnesses that they have

9  under their, quote/unquote, control and the case law explains

10  what that means, such that they're available, then they have to

11  bring the witness live.  It's their witness.  So if they want

12  to put their witness before the jury, they're not allowed to

13  shield the witness from cross-examination.  They would have to

14  bring the witness live.

15         If the witness is unavailable and they could actually

16  meet the standard that the case law lays out, then they could

17  play affirmative designations if they had done them already in

18  their case in lieu of bringing the witness live because that's

19  their case, their presentation and if the Court is satisfied

20  the witness is truly unavailable, then they would be allowed to

21  do that.  They would not be allowed to put their own case into

22  our case.  That's our position.

23         I don't think we have that issue with ZHP because

24  there are no affirmative designations from ZHP.  And, again, we

25  would have a very serious problem if parties were to start to

1    serve new designations on us to try to give us new testimony to

2    grapple with now a month before trial.

3            So I don't know if that answers what counsel was

4    raising, but I don't think it's a ZHP issue because there are

5    no affirmative designations at issue.

6            SPECIAL MASTER VANASKIE:  Nina?

7            MS. ROSE:  Just to respond to that, there are, because

8    we had affirmatively designated Jucai Ge's redirect, which you

9    acknowledged earlier that we let you know that we were

10   addressing that.  I was just noting that we had not addressed

11   those designations yet and so that -- I was noting those for

12   the record.

13           In addition, there are a couple of other witnesses who

14   do have redirect testimony on -- very brief in their -- I raise

15   this because Jie Wang is one of them, as I was just looking at,

16   very limited redirect testimony that was made at their

17   deposition.  And there's no time limit that has passed if we

18   wanted to designate affirmatively anything.  I just wanted to

19   discuss that point.

20           I believe that the Court said that designations need

21   to be served like -- or resolved two weeks prior to trial.  So

22   I don't -- I think if we submitted -- and I'm not sure yet if

23   we need to, it was really depending on what came in from

24   plaintiffs' affirmative designations and whether we had

25   something to respond to and based on what the Court allowed.

1        So I don't think it's fair to say that we are not

2   allowed to designate affirmative testimony that takes into

3   account the Court's rulings and plaintiffs' designations which

4   they've significantly cut in the last month.

5        MR. SLATER:  I guess if they want to raise something,

6   we'll deal with it at that time.  Right now there's nothing in

7   front of us.  And Jucai Ge is coming to Court, so I'm not sure

8   why counsel thinks they can play a video for the witness

9   affirmatively and put the witness on the stand affirmatively in

10  their own case.  The case law clearly says that if the witness

11  is available to the party that wants to bring the witness in,

12  they have to bring the person live, if they're available.

13       MS. ROSE:  Your Honor, I disagree with that.  I think

14  we are in a different world now.  Judge Bumb had initially said

15  she wanted people brought live when -- in plaintiffs' case,

16  that plaintiffs should bring witnesses live.  And plaintiffs

17  then argued and convinced Judge Bumb that it would be easier in

18  this case for them to present videotape testimony despite the

19  fact that we had offered to bring Jucai Ge live.

20       Now what they are saying is because we offered to make

21  witnesses in China available to them, they are allowed to play

22  their deposition testimony.  But if we want to have any

23  response from that witness, we need to fly the witness from

24  China to the United States and testify live.  And then

25  presumably plaintiffs are going to argue that they get another

1    bite at the apple and get to cross-examine that witness, which

2    is only going to lengthen the trial.

3         I think that this -- across the board, that a witness

4    that has been offered to plaintiffs as a live witness and they

5    have rejected and want to use deposition testimony, that we

6    can't also use deposition testimony to limit the length of the

7    trial.

8         MR. SLATER:  I thought we --

9         (Simultaneous speakers.)

10        SPECIAL MASTER VANASKIE:  You can use deposition

11   testimony, but you've got to make your designations soon.  You

12   know, you can't drag this out.

13        MS. ROSE:  We did not intend to, Your Honor.  We've

14   already made the designations for Jucai Ge, which is the

15   witness who had the longest redirect.  The only -- I don't know

16   that we have any other designations.  Once Your Honor ruled on

17   their affirmative designations, I just need to look very

18   quickly to see if there are any affirmatives that respond to

19   things that Your Honor said could come in.

20        SPECIAL MASTER VANASKIE:  All right.  Very well.

21        MS. ROSE:  Thank you, Your Honor.

22        MR. SLATER:  I guess I'll reserve all my rights.  I

23   don't know what I'm dealing with right now.  We filed our brief

24   long before the first trial date.  This isn't some kind of a

25   change in position.  This is just, unfortunately, what the

```
 1   federal rules require and the case law, so we're just following

 2   that.

 3           SPECIAL MASTER VANASKIE:  All right.  Anything else on

 4   the Chinese witnesses?

 5           MR. SLATER:  Not for today, Your Honor.

 6           SPECIAL MASTER VANASKIE:  Or ZHP witnesses?

 7           MR. SLATER:  And we have some others that I think will

 8   be coming to you.  And it's -- I think we have another hearing

 9   tomorrow, if you have time for us, we have a few more witnesses

10   that should be ready for you tomorrow.

11           SPECIAL MASTER VANASKIE:  Well, get it to me as soon

12   as you can.  I'll see what I can do in terms of being ready for

13   it.

14           We'll go back to the Teva witnesses now.

15           MR. SLATER:  And if not, Judge, you can just let us

16   know that you want to do it a different time.  Maybe we'll

17   email it to you and you can maybe let us know tonight whether

18   or not you want us tomorrow or if you have enough on your plate

19   and then we can just figure out another date.  Is that fair?

20           SPECIAL MASTER VANASKIE:  That's fair.  Assuming that

21   I go through these excerpts with the objections, make tentative

22   rulings, and then you confuse me with your arguments.

23           (Laughter.)

24           SPECIAL MASTER VANASKIE:  So if I didn't have to

25   listen to your arguments, this would be done pretty quickly.
```

```
 1   But it's well argued and it makes me reconsider tentative

 2   decisions.  All right.

 3           MR. SLATER:  I think what you did today, Judge, really

 4   helped, by the way, that each party gets one chance.  I

 5   think everybody --

 6           SPECIAL MASTER VANASKIE:  Yes, we'll have to do that.

 7           MR. SLATER:  I think it's a great way to handle it.

 8           SPECIAL MASTER VANASKIE:  And with all due respect

 9   to -- you know, you're all tremendous lawyers, but sometimes

10   you are making a mountain out of a mole hill.  I know

11   that's not going to be well received, but that's the

12   observation that I have.

13           What I'd like to do is take a 15-minute recess and

14   then we'll pick back up with the Teva designations.

15           So, Victoria, are you still there?  She'll be back.

16           MS. LOCKARD:  Yes, I'm still here.

17           SPECIAL MASTER VANASKIE:  Okay.  And David, you're

18   still there?  We'll --

19           MR. SLATER:  I'll shoot him a text to let him know

20   you're ready and find out if he's back yet.

21           SPECIAL MASTER VANASKIE:  Yes.

22           (Simultaneous speakers.)

23           THE LAW CLERK:  Excuse me, Judge.  This is Loretta.

24           SPECIAL MASTER VANASKIE:  Yes, Loretta.

25           THE LAW CLERK:  I just want to have you clarify what
```

```
 1   time the hearing will start tomorrow.  We weren't sure whether

 2   it was 9:30 or 10:00.

 3           SPECIAL MASTER VANASKIE:  We'll start tomorrow at

 4   9:30.

 5           THE LAW CLERK:  Okay.  Thanks.

 6           SPECIAL MASTER VANASKIE:  Thanks, Loretta.  And we are

 7   going to take a break now to 3:25.

 8           MR. SLATER:  Thank you, Judge.

 9           MS. ROSE:  Thank you, Your Honor.

10           (Brief recess taken from 3:09 p.m. to 3:31 p.m.)

11           SPECIAL MASTER VANASKIE:  Hello.

12           MR. STANOCH:  Good afternoon, Your Honor.

13           SPECIAL MASTER VANASKIE:  Good afternoon.  Victoria,

14   are you ready to proceed?

15           MS. LOCKARD:  I am.  I am here, Your Honor.

16           SPECIAL MASTER VANASKIE:  All right.  Where did we

17   leave off or where are we picking up?

18           MR. STANOCH:  I believe --

19           (Simultaneous speakers.)

20           MS. LOCKARD:  Go ahead.

21           MR. STANOCH:  I was just going to say I believe we

22   finished Vadsola, subject to a couple issues, and then I think

23   we would be ready to move to Pan Lin, I think.

24           MS. LOCKARD:  Well, we -- I went back through -- I

25   wanted to finish Vadsola because I went back through the last
```

1    section and while a lot of it is subject to the Court's ruling

2    on subsequent remedial measures, there were some individual

3    objections that I wanted to make sure I get heard on.  Not

4    every one.  Some of them I've passed on.

5            SPECIAL MASTER VANASKIE:  All right.  So why don't we

6    pick up, so we could complete Mr. Vadsola, with the objections

7    that you would like to pursue, Victoria.

8            MS. LOCKARD:  Okay.  If we go back to where we

9    stopped, which I believe was -- we started with -- so row 49

10   comes in, row 50 comes in.

11           SPECIAL MASTER VANASKIE:  Thank you for that.

12           MS. LOCKARD:  And I just wanted to clarify on row 51,

13   I believe the answer continues -- hold on a second.  I am

14   sorry.

15           Yeah.  So on 52, row 52 is the row that you ruled in

16   Teva's favor on and said it comes out based on lack of personal

17   knowledge.

18           SPECIAL MASTER VANASKIE:  Correct.

19           MS. LOCKARD:  So I wanted to --

20           MR. STANOCH:  I am sorry.  Row 52?  I thought it was

21   54 we had.

22           MS. LOCKARD:  It's page 254, but row 52.

23           SPECIAL MASTER VANASKIE:  Row 52 on the spreadsheet,

24   page 254, lines 10 to 21.

25           MS. ROSE:  Right.  That's where I believe your ruling

1   was that that is out, that you sustained the objection.

2          MR. STANOCH:  Yes, I agree.

3          SPECIAL MASTER VANASKIE:  Correct.

4          MS. LOCKARD:  So the prior row -- the question begins

5   in the prior row, in row 51, so I just wanted to make sure that

6   sustaining the objection applies to the question in row 51 as

7   well.

8          MR. STANOCH:  I agree.  The answer is out.  The

9   question is out.  I agree.

10         MS. LOCKARD:  All right.  Then that covers that.

11         Row 53 as well, same issue.  I think the answer just

12  continues on to page 255, line 1, so I assume that's out as

13  well?

14         SPECIAL MASTER VANASKIE:  Hold on.  And what's your

15  question, Victoria?

16         MS. LOCKARD:  So the answer -- because the prior

17  designation was excluded, the answer to the question in the

18  prior designation continues on to line 1 and 2 of page 255.  So

19  I think that should come out as well.

20         MR. STANOCH:  I thought it was only 254, 4 to 7, the

21  question, I agree, is out per this morning.  254, 10 to 14, the

22  answer is out.  I didn't have down that the next question

23  beginning at 254-16 was out.  It's a different question.

24         MS. LOCKARD:  Okay.  Well, that's one I need to

25  clarify because I thought that the Judge ruled that that was

1    out, that that entire designation was out.

2           SPECIAL MASTER VANASKIE:  No, I had only ruled up to

3    line 14.

4           So let me look at this:  Are you aware of any

5    situation, in your experience as audit hub manager for the APAC

6    region on Teva, ever purchasing product from a vendor that

7    Teva's own audits have found to be not acceptable?

8           The answer was:  I don't --

9           (Interruption of transmission.)

10          MS. LOCKARD:  ...and the decisions are made, at that

11   point he would have no basis or knowledge for.  So it's the

12   same position as the preceding questions, he just doesn't have

13   any personal knowledge.  And simply because he prefaced the

14   question with, you know, in your experience as an audit hub

15   manager, it doesn't resolve it because it -- the question

16   implies that as an audit hub manager he should know about

17   vendors, and that misstates the evidence because he doesn't.

18   Vendors and vendor approval is a completely separate department

19   and other witnesses are addressing that.

20          MR. STANOCH:  Your Honor, I disagree with that.  I

21   disagree with all of the, quote, evidence that Ms. Lockard says

22   what's going to come in and what an audit hub manager should or

23   should not know.  If a site's found to be not acceptable, that

24   has a written definition per Teva's own audit reports and

25   guidelines about what that means.  And I can certainly ask the

```
 1   audit hub manager what the implication is of an audit finding
 2   of not acceptable.
 3            SPECIAL MASTER VANASKIE:  But his answer is, I don't
 4   know.
 5            MR. STANOCH:  Then, Your Honor, that goes to his
 6   credibility that Teva's own audit hub manager, right, who is
 7   preparing these audits, right, which it's on -- every one of
 8   these audits has a legend about what they're supposed to be in
 9   terms of acceptable, conditionally acceptable and not
10   acceptable.  And he's telling me and the jury, right, that he
11   doesn't know.  I think that's probative of obviously Teva's
12   quality oversight if this person who's supposed to be managing
13   these issues that are supposed to be in black and white, per
14   their SOPs, that he has no idea.  That's what he says, if
15   that's even credible.
16            MS. LOCKARD:  But the question isn't asking him based
17   on the SOPs, which he is familiar with, should Teva be
18   purchasing a product from a vendor.  That I think is a fair
19   question.  He can answer based on what he knows from the SOPs
20   or not.  This question is asking, in fact, do you know if Teva
21   has ever purchased from a vendor that is not acceptable.  And
22   he doesn't know those facts because -- he knows what the policy
23   says but he doesn't know if that's ever happened because he's
24   not in that department.
25            SPECIAL MASTER VANASKIE:  Yes, I'll sustain the
```

 1   objection and we won't have that testimony from page 254,

 2   line 16 through 255, line 6.

 3           MS. LOCKARD:  Okay.  Thank you.

 4           I think the next one -- and I tried to select ones

 5   that I thought were worth talking about.  If you look --

 6           MR. STANOCH:  And Your Honor, in the meantime, I'd

 7   like a proffer when Ms. Lockard says the evidence is going to

 8   show other people are going to talk about that, I'm not aware

 9   of any Teva witness who say anything about purchases from

10   vendors who are found to be not acceptable.  I'm just putting

11   that on the record.  I don't want to fight about it.

12           MS. LOCKARD:  Well, I'm saying there are other

13   witnesses who were 30(b)(6) witnesses who were designated on

14   the vendor relations and purchasing, and I'm saying there are

15   other witnesses and you designated their testimony and they

16   were designated as 30(b)(6) witnesses on those topics.  So I am

17   not representing that you asked them this exact question, that

18   you did have the opportunity to.

19           SPECIAL MASTER VANASKIE:  All right.  Let's move on.

20           MS. LOCKARD:  Okay.  Moving on.  So this is a bit of a

21   different issue.  If you go down to line 60.

22           SPECIAL MASTER VANASKIE:  What page are we on?

23           MS. LOCKARD:  Page 266 of the deposition, line 23.

24   I'm sorry, I mean row 60 of the spreadsheet.

25           SPECIAL MASTER VANASKIE:  Gotcha.  Okay.  That helps.

 1          MS. LOCKARD:  Yeah, sorry.  I'm confusing things I

 2    realize.

 3          SPECIAL MASTER VANASKIE:  All right.

 4          MS. LOCKARD:  Okay.  So this is all okay until we get

 5    to page 268, line 1.

 6          SPECIAL MASTER VANASKIE:  Right, okay.

 7          MS. LOCKARD:  It's referencing Dan Barreto, who's the

 8    head of quality, directing that the report should be labeled as

 9    privileged and confidential and prepared at the direction of

10    counsel.  And then there are questions which I would say are

11    argumentative about well, is he a lawyer, you're not a lawyer,

12    you know.  And I think this line of questioning is

13    inappropriate.  You know, whether -- we don't know if he was

14    told specifically by an attorney to direct that it was marked

15    privileged and confidential.  It wasn't withheld as being such.

16    And it's just argumentative and prejudicial and irrelevant, and

17    the jury just doesn't need to be -- they don't need to be --

18    this testimony does not need to be presented to them.  So

19    that's our objection on 268, line 1 forward.

20          SPECIAL MASTER VANASKIE:  David?

21          MR. STANOCH:  Your Honor, I don't say this lightly.

22    I'm not sure where to begin.  Not appropriate for the jury is

23    not a permissible objection.  Nothing that Ms. Lockard just

24    said is actually in any of the objections that they had given

25    us in terms of foundation and Rule 407 and calls for a legal

1    conclusion.

2          But putting that aside, putting all of that aside,

3    this is absolutely permissible testimony going to credibility,

4    going to percipient facts of a percipient witness who received

5    the email, who answered all of the questions straightforwardly

6    at the time with no intervening objections at all from counsel,

7    and I don't want to get too far into it, but the judge has not

8    bifurcated liability and punitive damages.

9          I asked this witness, here's an email you're on,

10   yes --

11         SPECIAL MASTER VANASKIE:  I understand your argument.

12   I will allow the testimony as it's presented here on page 268

13   of the transcript.

14         MR. STANOCH:  Thank you, Judge.

15         SPECIAL MASTER VANASKIE:  What's next, Victoria?

16         MS. LOCKARD:  All right.  Moving on to row 65,

17   page 275, and starting at line 10.  It's a similar issue.  We

18   did raise relevance.  I don't know that this -- well, I know

19   it's not relevant and that's our position.  But again, it's

20   asking about, you know, the litigation and did Mr. Barreto ever

21   express to you concern with this report and its impact on

22   litigation, and there's no testimony that it was.  The witness

23   just says no, no, no.

24         So a discussion bringing up litigation, similar to our

25   position on the attorney-client privilege instruction, is that

1   it's not relevant.  That's the bottom-line objection.  It is

2   prejudicial, it is not relevant to the issues, it's not

3   probative of anything in this case, and it's not probative of

4   punitive damages and whether there was egregious conduct here

5   either.

6           SPECIAL MASTER VANASKIE:  David?

7           MR. STANOCH:  Your Honor, you read this part of the

8   testimony in full, right?  It's certainly permissible for us to

9   argue before a jury that Mr. Barreto, of quality, came in

10  after -- this is the gist of what it is.  Teva's auditors found

11  ZHP not acceptable for CGMP violations.  Mr. Barreto then came

12  in -- and he's never done this before, Mr. Vadsola testifies to

13  that -- told him to change the results from not acceptable to

14  conditionally acceptable.  Right?  We're entitled to probe why

15  that substantive change about CGMP violations was made.  And

16  this is what I'm asking about.  But they're saying --

17          SPECIAL MASTER VANASKIE:  I agree.  I will allow this.

18          MS. LOCKARD:  Okay.  I assume you're limiting us to

19  one argument per side, same as ZHP right now?

20          SPECIAL MASTER VANASKIE:  Yes.

21          MS. LOCKARD:  All right.  Okay.  So moving on to

22  row 66, page 276, line 8, and our objection here is as to 602

23  as well as relevance, 402, and prejudicial, 403.  The issue is

24  he's saying -- you know, he's asking about Mr. Barreto's

25  feelings about the report and what did he mean when he said he

1  wasn't pleased, and I think that's outside of Rule 602 because

2  it's really asking him what Mr. Barreto thought or felt.  And

3  Mr. Barreto will testify and I'm sure he'll be asked about this

4  as well.

5          SPECIAL MASTER VANASKIE:  All right.  David?

6          MR. STANOCH:  It's the same issue as the last one,

7  Judge.  Asking a percipient witness about changes that were

8  made about audit reports and CGMP violations, I asked him how

9  he took an email that he received.  That's square within his

10 personal knowledge.

11         If he was on the stand in person, I would be able to

12 ask him these questions.  I don't see what the issue is now

13 with the designation.

14         SPECIAL MASTER VANASKIE:  I view this one differently,

15 and maybe I was influenced by the witness's answer.

16         The question was:  How did you, the witness, take the

17 comment that he was not pleased with the report?

18         And the answer is:  I don't know, so I am not prepared

19 on what he meant that he is not pleased with that.

20         I think that's confusing.  I'm going to sustain the

21 objection.

22         MS. LOCKARD:  The next issue -- and we are getting to

23 the end quickly.  But the next one is similar at page 277.  The

24 designation starts on line 2.  But our objection is at

25 page 278, line 23.  And that's where Mr. Stanoch is asking him,

1  and he's reading from the document and he says:  He's saying

2  he's starting to wonder if I should classify the audit and its

3  report as unsuitable.

4         That means he's going to do what?  Invalidate the

5  audit and the report and make everyone start over?

6         And Mr. Vadsola says:  I don't know.  He doesn't know

7  what Dan Barreto means.

8         SPECIAL MASTER VANASKIE:  Right.

9         MR. STANOCH:  Judge, again, Your Honor, he's the audit

10 hub manager in charge of this audit and audit report, he's

11 getting an email saying the audit report may be unsuitable.

12 I'm asking for his personal views and his impression of when he

13 received this email, what that means from an audit hub manager

14 standpoint.  He says, I don't know.

15        Just because he says I don't know, I think that's not

16 credible, I think I can present that to a jury.  I think if I

17 have an email that he received from his boss where his boss is

18 saying this audit is unsuitable, and I looked at him and said,

19 Mr. Vadsola, what does unsuitable mean, and he goes, I don't

20 know, I think that's permissible testimony.

21        Otherwise, under Ms. Lockard's --

22        SPECIAL MASTER VANASKIE:  Yes, the objection is

23 overruled.

24        MS. LOCKARD:  Okay.  Moving on to page 285, line 9.

25        SPECIAL MASTER VANASKIE:  This is row 72.

 1          MS. LOCKARD:  And again, just for the record, Judge, I

 2    haven't objected every time Mr. Vadsola said he doesn't know.

 3          SPECIAL MASTER VANASKIE:  Right.

 4          MS. LOCKARD:  So, I mean, there are plenty of examples

 5    throughout where there are questions that I think are fairly

 6    asked of Mr. Vadsola that is within his realm of core personal

 7    knowledge and he says he doesn't know.  So I've tried to be

 8    selective.

 9          But on 285, it's line 11 to 14, as to why Mr. Barreto

10    wanted the audit report to have its conclusion changed.  And

11    the witness said:  I don't know.  He doesn't know why Dan

12    Barreto wanted the conclusion changed.  Dan Barreto testified

13    about that in his deposition.  Again, I'm sure he's going to

14    testify at trial.

15          SPECIAL MASTER VANASKIE:  Yes, it just seems to me,

16    David, that you could have asked the question did Barreto tell

17    you why he changed the conclusion.  The question, do you know

18    why, that does call for speculation.

19          MR. STANOCH:  He either knows or he doesn't, Judge,

20    respectfully.  And he testified earlier in this whole area, and

21    obviously Ms. Lockard doesn't like the sizzley bits here that

22    we have of Mr. Barreto changing what his own audit team did,

23    and I understand that, why they're coming back to all of these

24    questions.  Mr. Vadsola, a few pages earlier, testified that he

25    had conversations with Mr. Barreto and he couldn't quite

1  remember what they talked about, about this very audit report

2  and instance.  So I'm coming back here and saying, did he tell

3  you or did you know?  That's distinguishing without difference.

4  Because if he was told, he'd know or not.  Right?  Yes or no?

5  Does he know, yes.

6          SPECIAL MASTER VANASKIE:  We could find out different

7  ways.

8          MR. STANOCH:  Because --

9          SPECIAL MASTER VANASKIE:  I will sustain the

10  objection.

11          What's the next one, Victoria?

12          MS. LOCKARD:  Okay.  Let's go to page 288, line 4.

13  And we had objected to this based on 402, 407, and our

14  objection was overruled.  So if that's coming in, we want to

15  add the counter of 287-16 to 188-3.

16          SPECIAL MASTER VANASKIE:  All right.  Let me look at

17  it.

18          All right.  And your position, David?

19          MR. STANOCH:  It's the first I'm hearing of this

20  counter, Your Honor.  So in looking at it, I don't see what the

21  completeness is for the surrounding testimony.  The actual

22  designation was, right, that Mr. Barreto and Mr. Hatt were not

23  part of the audit team that actually audited ZHP, correct; they

24  did not make observation, correct; et cetera.  So I'm not sure

25  what the completeness claim is here.

1          MS. LOCKARD:  Well, they cut out part of the answer

2     clarifying why Barreto and Hatt are part of the audit group.

3     And I think that it needs to be made clear because the way that

4     it's clipped it suggests that they're not part of the audit

5     team at all.  And we simply want to include benign testimony

6     that says, well, they are part of the audit team.  And then

7     Mr. Stanoch can say, yeah --

8          SPECIAL MASTER VANASKIE:  I will allow it.

9          MS. LOCKARD:  So I think the very last two are at

10    row 84 and 85, page 301 and 302.

11         SPECIAL MASTER VANASKIE:  Say that again.

12         MS. LOCKARD:  It's row 84, page 301 --

13         SPECIAL MASTER VANASKIE:  Okay.  I'm with you now.

14         MS. LOCKARD:  So I just -- and your ruling may be the

15    same.  But this is a different audit, okay, starting with this

16    designation on page 301.  Now we're talking about the audit of

17    the facility a year later.  This is in 2019.  This is after

18    Teva stopped manufacturing any valsartan, it's after all of the

19    Teva's internal discussions about what to do with the ongoing

20    ZHP issues.  And this, aside from being -- you know, it's not a

21    subsequent remedial measure based on your prior ruling, but

22    it's still irrelevant because it's so far off in time, it's

23    related to an audit -- and this facility is not even producing

24    valsartan API for Teva any more, and we think there has to be a

25    line drawn somewhere.  I mean, based on the judge's ruling, it

 1  was clear not every audit is going to be relevant and there has

 2  to be some that aren't.  This is not one of those that is

 3  relevant, it's far past the time of the relevant time period

 4  here, and it's going to be introduced to suggest that Teva, you

 5  know, shouldn't have rated ZHP conditionally accessible.  And,

 6  you know, it's basically criticizing Teva over a facility

 7  rating for a facility they're not even purchasing any product

 8  from.

 9          So the argument there applies to this designation as

10  well as the designation following on page 302.  Hold on.  Let

11  me get there.

12          But anything to do with the 2019 audit, we have a

13  separate independent relevance objection to that audit as well.

14          SPECIAL MASTER VANASKIE:  So the question here is, as

15  of May 2020 -- am I on the right spot, page 301, line 22?  I

16  think as of May 2020, Teva's recording audits of ZHP have found

17  the site acceptable, but the FDA import ban on ZHP was still in

18  effect.  Does that sound right to you?

19          He says:  Correct.

20          And then:  Okay.  So even though Teva's own auditing

21  of ZHP ultimately resulted in Teva believing the site was

22  acceptable, the FDA was still not letting companies use ZHP

23  product in their pharmaceutical drugs sold in the U.S.?

24          The witness answered:  I don't know.

25          Then you go on:  Well, if there's an FDA import ban in

1    place on ZHP, could Teva use ZHP API in its products that were

2    being sold in the United States?

3         Answer:  In general, if any supplier receives the

4    import alert, they're not able to supply any material to USA.

5    During the whole process, the end user of the API material and

6    the vendor, they need to notify them and they need to ensure

7    that they are not supplying this material to U.S. market.

8    That's correct.

9         So what's the issue here?

10    MS. LOCKARD:  Well, the one issue relates -- just

11    prior to this in the deposition testimony, he's saying -- he's

12    asking the witness about this 2019 audit and he's questioning

13    the witness about the 2019 audit.  So we have a couple of

14    objections.

15         The one is that testimony about the 2019 audit -- and

16    he's sort of comparing what the conclusions of the 2019 audit

17    were versus the import ban.  And we think any discussion about

18    the findings of the 2019 audit should be excluded because

19    they're irrelevant.  That's one argument.

20         The second argument, which we've also included 602 as

21    to personal knowledge, is that Mr. Vadsola doesn't know what

22    FDA is doing with the import ban.  And so there are these

23    questions asking him as well about the import ban and what FDA

24    is doing, he doesn't know.

25         He says on line 6, this is bleeding towards the end,

1   that even though Teva's on auditing of ZHP -- meaning in

2   2019 -- ultimately resulting in Teva believing the site was

3   acceptable, the FDA was still not letting companies use the ZHP

4   product in their pharmaceutical drugs.

5           And he says:  I don't know.

6           Because he doesn't know what FDA is doing vis-a-vis

7   ZHP and the import ban.

8           So the audit, the discussion of the audit in 2019 is

9   irrelevant.  He doesn't have personal knowledge about the

10  import ban.  So --

11          SPECIAL MASTER VANASKIE:  All right.

12          MS. LOCKARD:  -- those are the objections.

13          SPECIAL MASTER VANASKIE:  David?

14          MR. STANOCH:  Thank you, Your Honor.

15          In terms of relevance, I think we've addressed this ad

16  nauseam.  We're not even going into detail here on this

17  specific audit.  Right?  Clearly we're showing with this line

18  of questioning, Judge, that Teva's ratings of acceptable, all

19  right, are very loose, and are done improperly and that they're

20  saying a supplier is acceptable even though there's situations

21  when, for example, the FDA says you can't sell the product.

22  And that undermines the credibility and the robustness of when

23  Teva witnesses, when they put their own witnesses on say, oh,

24  well, we do audits and we find them acceptable.

25          And then I want to cross, and I'm allowed to put on

1  evidence to countervail that, to say your acceptable ratings

2  are not up to snuff and are a sham, and I mean that

3  colloquially.

4          In terms of the other issue of 602, I must be reading

5  something different, Judge.  He says -- I ask the question that

6  he says "correct" to my first question.  He knows.  It's within

7  his personal knowledge.  And then --

8          SPECIAL MASTER VANASKIE:  No, I will allow this

9  testimony.  The objection is overruled.

10         MR. STANOCH:  Thank you, Judge.

11         SPECIAL MASTER VANASKIE:  Is that it, Victoria?

12         MS. LOCKARD:  That's it for Vadsola for plaintiffs'

13  designations.

14         SPECIAL MASTER VANASKIE:  All right.  Can we go to Pan

15  Lin now?

16         MS. LOCKARD:  Yes.  I'll pull that up.

17         SPECIAL MASTER VANASKIE:  I'll pull up the

18  spreadsheet.

19         MS. LOCKARD:  And this witness was two days, so there

20  is a tab for each day, I believe.

21         SPECIAL MASTER VANASKIE:  Yes, I believe that's true.

22  And we're starting on May 26th, the first day of the

23  deposition.

24         MS. LOCKARD:  Correct.  Okay.  I have it in front of

25  me.

1          SPECIAL MASTER VANASKIE:  All right.

2          MS. LOCKARD:  The objection here related to the 2015

3    audit.  So this is concerning the Zhengzhou facility.  And if

4    your ruling stands for Vadsola, I think that would apply for

5    this first one.

6          MR. STANOCH:  Yes, I agree.

7          SPECIAL MASTER VANASKIE:  All right.

8          MS. LOCKARD:  Second, next row --

9          SPECIAL MASTER VANASKIE:  Page 57 of the deposition.

10         MS. LOCKARD:  Right, page 57.

11         SPECIAL MASTER VANASKIE:  Line 20.

12         MS. LOCKARD:  So this is one where I had said -- you

13    know, we were standing on the objection, but if this comes in

14    we also wanted to add a counter of 56-8 to 56-14 and 59-20 to

15    61, where Mr. Lin essentially explains that this is a different

16    facility.

17         SPECIAL MASTER VANASKIE:  All right.  And your

18    position, David?

19         MR. STANOCH:  I'm hearing these counters for the first

20    time, Your Honor, so I'm trying to look through it.  Mr. Lin, I

21    think, it's not necessary for completeness.  He's not even

22    sure.

23         If we go back to this "I don't know" or if someone

24    lacks personal knowledge, it shouldn't come in standard.  He

25    says, I'm not entirely sure, I'm not entirely sure whether

1  they're the same or not.  So he begins by saying they're a

2  different facility in this counter that Ms. Lockard is

3  proposing.

4           But then in that very same answer he goes on, right,

5  at 56-10, 11, 12, 13, 14:  So they're different; and maybe

6  they're different products, I'm not sure; I'm not entirely sure

7  whether they're the same or not.  Right?  So he doesn't even

8  know.

9           So I would say that anything they're trying to -- they

10  have other witnesses, Judge, who can say that this is a

11  different facility that was making different valsartan finished

12  dose versus API.  Either way, Teva was auditing it and we went

13  through the audit report earlier today.  So I would say that

14  that counter is not necessary for that reason.

15           And I didn't quite catch the other counter that she

16  mentioned.

17           MS. LOCKARD:  So the other counter -- and if I may

18  just be heard a second on this?

19           MR. STANOCH:  Are we going back and forth again?

20           MS. LOCKARD:  No.  This is important, though.

21           Because the first counter I included for plaintiffs'

22  benefit.  I'm happy not to include that one.  But for fairness,

23  I included it, because the second counter is where he says,

24  Okay, I would like to make a supplement here regarding the

25  previous questions."  And he says, That report was concerning

 1   another ZHP facility.  That was separate from the Chuannan

 2   facility.  I want to make that supplement.

 3            So I'm fine leaving in the second counter, but I

 4   thought plaintiffs would complain if we didn't include the

 5   first one where he said he didn't know.

 6            So does that make sense, Judge?

 7            SPECIAL MASTER VANASKIE:  Somewhat.  I certainly would

 8   allow in the counter-designation on page 59 from line 18

 9   through 24, which makes clear that the report he was being

10   asked about concerned a different ZHP facility.  And I think in

11   fairness, the other counter-designation you made should come in

12   as well.

13            MS. LOCKARD:  So it was 56-8 to 56-14 that we asked

14   for and 59-20 to 61.  So those should both come in.

15            SPECIAL MASTER VANASKIE:  Those should both come in.

16   All right?

17            MS. LOCKARD:  All right.  That takes us to page 60,

18   line 13.  And this -- the objection was based on relevance to

19   the Zhengzhou facility audit, so I think we have a ruling on

20   that.

21            The next one would be --

22            SPECIAL MASTER VANASKIE:  Hold on.  Let me make sure

23   we're all on the same page here.

24            So on page 60, lines 13 to 16, it's just a preliminary

25   question:  I'd like to ask you some questions about your

1    preparation for the May 2018 audit of ZHP you conducted.  Okay?

2         Okay.

3         Then what?

4         MR. STANOCH:  Your Honor, I think Ms. Lockard was

5    saying that even though they had objected to that, because Your

6    Honor ruled this morning with Mr. Vadsola about this same fall

7    2018 audit report, that there's no longer an issue.  She can

8    correct me if I'm wrong.

9         SPECIAL MASTER VANASKIE:  Okay.

10        Is that right, Victoria?

11        MS. LOCKARD:  That was what's in my notes, but it is

12   confusing that it talks about -- it's directing him to the

13   May 2018 audit, which is not the one that we objected to.  So I

14   think that is okay.

15        SPECIAL MASTER VANASKIE:  All right.  Let's assume for

16   now that it is okay.  If you go back and look at it again and

17   want to reassert the matter, you're certainly free to do so.

18   So you're not prejudiced.

19        MS. LOCKARD:  Okay.

20        SPECIAL MASTER VANASKIE:  So does this take us now to

21   page 62, line 18?

22        MS. LOCKARD:  Yes, 62-18 to 21.

23        SPECIAL MASTER VANASKIE:  Then we go, for completeness

24   purposes, to 63, line 13?

25        MS. LOCKARD:  Right.  So plaintiff objected to our

```
 1    counters.  I think he is up first.

 2              SPECIAL MASTER VANASKIE:  Yes.

 3              MR. STANOCH:  Quite simply, Your Honor, the actual

 4    designation, page 62, 18 to 21, is simply by reference of the

 5    document.

 6              It looks like you, you, were communicating with ZHP in

 7    the fall of 2017 in preparation for the May 2018 audit, right?

 8              Yes.

 9              Thank you.  You can put that aside -- that exhibit.

10              Right?  So that was finishing the questioning about

11    that exhibit.  Right?

12              Then the proposed counters comes in with some muddled

13    testimony about him saying about who was communicating with

14    ZHP.

15              He says:  There's many products, I'm not sure whether

16    my colleagues were communicating.  It involves many products,

17    maybe more than ten products.  Which doesn't really speak to

18    who's communicating.

19              So I don't see how -- and this might be a translation

20    issue because this witness, even though he writes and speaks in

21    English, he had a translator.  I don't know if that was part of

22    the problem with these counters at 63, 13-18 and 64, 4

23    through 11, but I just don't see how that has anything to do

24    with, quote, completeness when I was asking him about what he

25    was doing in the fall of 2017 with a reference to a document.
```

 1          MS. LOCKARD:  So the first, the question designated by

 2  the plaintiffs was saying:  Were you the one communicating with

 3  ZHP in the fall of 2017 in preparation for the May 2018 audit,

 4  in preparation for, and he says "yes."

 5          And then the question we want to include is simply:

 6  Who was responsible for communicating with ZHP for the May 2018

 7  audit?

 8          SPECIAL MASTER VANASKIE:  Yes, I think it's allowable.

 9          MS. LOCKARD:  It's just a time reference?

10          SPECIAL MASTER VANASKIE:  Yeah.  So 63, line 13 to 63,

11  line 18; 64, line 4 to 64, line 11, that all comes in.

12          MS. LOCKARD:  Okay.  So going to page 66, line 13, I

13  think is the next dispute.

14          SPECIAL MASTER VANASKIE:  Yes.

15          MS. LOCKARD:  And we had objections, but withdrew

16  them, and then counsel is objecting to our completeness

17  counters.

18          SPECIAL MASTER VANASKIE:  And they're at 68, line 10

19  to line 12?

20          68, line 10 to 12:  Question:  Do you recall auditing

21  valsartan?

22          Answer:  I don't think I did that.

23          And then 68-20:  Do you recall if you wrote any

24  sections of this audit report that related to valsartan?

25          Answer:  I want to get a clarification from you

1  regarding your question.  Are you asking me whether I audited

2  this report or what exactly are you asking me?

3          I was asking, sir, whether you were responsible for

4  writing any part of this report that related to valsartan.

5          Answer:  I don't think I wrote anything related to

6  valsartan here.  However, after the May 2018 audit, I did audit

7  matters related to valsartan later on and I do remember that

8  clearly.

9          And that's what you want to put in, Victoria?

10         MS. LOCKARD:  Correct, Your Honor, because he's asking

11  Mr. Lin were you on site at the ZHP facility for the entirety

12  of the audit and he's asking about the scope of the products

13  and it says valsartan is listed within the scope.

14         So then we wanted to just clarify that Mr. Pan Lin did

15  not audit valsartan and that he did not write any sections of

16  the audit report related to valsartan.  So I think it's just a

17  clarification to provide some context for this jury as to what

18  Mr. Lin was doing and what his relationship with this audit

19  report is.

20         SPECIAL MASTER VANASKIE:  Yes.  I think that's

21  permissible.  I'll allow it.

22         MS. LOCKARD:  I think the next is we go to page 72.

23         SPECIAL MASTER VANASKIE:  You want to put in --

24  there's no objection to what has been designated by the

25  plaintiff, but the plaintiff has objected to your

 1   counter-designation on page 72, lines 1 to 8.

 2          MR. STANOCH:  That's right, Your Honor, because 72, 1

 3   through 8 is not relating to my designation beginning at 72-9.

 4   Right?  72-9 is talking about the Workshop 12 --

 5          SPECIAL MASTER VANASKIE:  No, but I think it's --

 6          MR. STANOCH:  And then right before that he's saying

 7   he didn't -- I am sorry.

 8          If you look at 71, it's saying:  Do you see a

 9   reference to USDMF grade?

10          And he says:  I can't say so.  When it's written US,

11   I'm not entirely sure what that means.

12          And then I say:  You didn't write that section, did

13   you?

14          And he says:  I don't think I did.

15          Stop.

16          And then I move on to another reference about Workshop

17   12.

18          So when he's saying "I didn't write this section,"

19   he's talking about the section that I did not designate about

20   USDMF, right?  He's not talking about what they're trying to

21   throw in.  That would be misleading.  He's saying he didn't

22   write the section about USDMF grade on page 71, not on what I

23   asked him later about the maintenance on page 72.

24          MS. LOCKARD:  So I think we can -- I think this was a

25   holdover from where the designation was broader and then was

1    cut back, so I think we can drop lines 1 to 4 about "you didn't

2    write this section" because I think Mr. Stanoch is right that

3    that's referencing a section of testimony that was taken out.

4            SPECIAL MASTER VANASKIE:  Okay.

5            MR. STANOCH:  1 through 8, right?  Because then the

6    next question is -- I'm clarifying what he just said in 1

7    through 4 and he says "yes."

8            So the entire counter I think would come out, 72, 1

9    through 8.

10           MS. LOCKARD:  Well, but he did not -- the second part

11   of that designation is broader because he did not do the audit

12   of the valsartan product.  So he did not do the audit of the

13   valsartan product, which is important.  He was not the one --

14           MR. STANOCH:  Oh, you already got that in.  Judge

15   Vanaskie allowed that a moment ago.  And now that was a

16   clarifying question to a completeness designation, which you've

17   agreed should not come in, so I don't think that should come

18   in.  Otherwise, then it should come in because now it's

19   cumulative testimony about he didn't -- he doesn't think he

20   audited the valsartan product.

21           MS. LOCKARD:  He said he didn't recall -- he did not

22   write any of the sections of the audit report that relate to

23   valsartan.

24           He said:  Do you recall auditing valsartan?

25           MR. STANOCH:  This is a completeness objection, Judge.

1    They want -- I have a question designated right below talking

2    about Workshop 12 and they want to put in --

3             MS. LOCKARD:  I'll withdraw all of it.

4             SPECIAL MASTER VANASKIE:  All right.

5             MS. LOCKARD:  I'll withdraw all of it.  I think we

6    have in earlier that he did not do the audit of valsartan.

7    Okay.  That's fair.

8             SPECIAL MASTER VANASKIE:  All right.  It's out.

9             MS. LOCKARD:  98.

10            SPECIAL MASTER VANASKIE:  You're up to 98 or 72?

11            MS. LOCKARD:  Oh, did I skip one?

12            SPECIAL MASTER VANASKIE:  No, I don't think so.  I

13   think you're right.  We're up to 98.

14            MS. LOCKARD:  I just want to make sure --

15            SPECIAL MASTER VANASKIE:  Yes, you can take your time.

16            MS. LOCKARD:  It's getting late and my contacts are

17   glued to my eyeballs right now.

18            Okay.  So 98, yeah, we had objections to this as based

19   on relevance and prejudicial.  This seems to be ZHP's reply

20   that he's reading from.  This is not a Teva conclusion or

21   showing Teva's knowledge.  He's asking an interpretation of

22   what ZHP wrote.

23            So we object to its misleading, it's -- you know, 602,

24   it lacks personal knowledge.  And it's prejudicial on top

25   because it's using the term "highly toxic," which is not

1    language that Teva used.

2            MR. STANOCH:  May I, Your Honor?

3            SPECIAL MASTER VANASKIE:  Yes, you may, David.

4            MR. STANOCH:  Again, I'm not faulting her, this is a

5    fluid process, but, again, the only objection we had here was

6    speculation.  So I'm hearing a laundry list, so I'll try to

7    deal with it all.

8            This isn't a ZHP document.  I'm asking this witness,

9    the Teva auditor who went to ZHP on May 2018 about the Teva

10   audit report which has a discussion in it back and forth in

11   writing with ZHP about certain issues.  So he's not speculating

12   about anything.  He was an audit member who was there, I'm

13   asking about the audit report that he's named on, about

14   information that they wrote down in their own audit report

15   about when they were auditing ZHP.

16           So this is -- there's nothing prejudicial or

17   misleading and the document, you know, shows that.  This is the

18   back and forth that Teva recorded in its own documents about

19   what it was finding at ZHP and what ZHP was telling it.  That's

20   permissible testimony and evidence, Judge.

21           SPECIAL MASTER VANASKIE:  Yes, I will allow it.  That

22   takes us down to page 100, line 1, which is a continuation.

23   This is a counter-designation at page 100, lines 4 to 7.

24           MS. LOCKARD:  Okay.  So we were at 98-12.

25           SPECIAL MASTER VANASKIE:  Right.

1           MS. LOCKARD:  And then there was 98-20.

2           SPECIAL MASTER VANASKIE:  Right.

3           MS. LOCKARD:  And I guess that's the answer because

4  he's saying this section was written by ZHP, not Teva.

5           SPECIAL MASTER VANASKIE:  Right.

6           MS. LOCKARD:  But that goes to the same.  Okay.  And

7  then 99-1 --

8           SPECIAL MASTER VANASKIE:  Through 24.  I'm saying all

9  of that comes in.

10          MS. LOCKARD:  All of that, okay.

11          SPECIAL MASTER VANASKIE:  Yes.

12          MS. LOCKARD:  Okay.  So then 100, you're right, at 1

13  through 3, then we wanted the completeness counter for 100, 4

14  to 7, and they objected.

15          SPECIAL MASTER VANASKIE:  Yes.  And I think it's

16  appropriate, I think it is continuation of the examination and

17  we'll allow it.

18          MR. STANOCH:  Understood, Judge.

19          SPECIAL MASTER VANASKIE:  Then you have page 103,

20  line 8 to 14; and then 103, 17 to 18 as for completeness

21  purposes, and I will allow it.

22          MR. STANOCH:  Your Honor, understood.  But if 17 and

23  18 is coming in, I'd ask that 103, 19 through 104 come in as

24  well because it's all talking about clarification.  Right?  I

25  first asked him a question, the report says -- did it say

1   anything was incomplete?  He said no.

2          They're not having in -- he adds here, he does not

3   specifically clarify.

4          And then I asked:  Does it indicate any item was

5   complete?

6          He says:  I can't put it that way.

7          And I say:  Right, because it says "reviewed," not

8   complete.

9          Yes, it was how it was written.

10          I think all of that should come in then.

11          MS. LOCKARD:  I'm fine with that.  I don't think it

12   really answers the question, but I have no objection to that.

13          SPECIAL MASTER VANASKIE:  Yes, I think it all comes

14   in.

15          MR. STANOCH:  Thank you.

16          MS. LOCKARD:  105-5?

17          SPECIAL MASTER VANASKIE:  That's what I have.

18          MR. STANOCH:  Same.

19          SPECIAL MASTER VANASKIE:  They designated 105-13 to

20   16.

21          MR. STANOCH:  Right.  And, Your Honor, the point is,

22   I'm just establishing what the document is and then move on to

23   have questions for him.  Right?  And they want to throw in that

24   he wasn't part of the audit team for the specific 2015 audit.

25          I don't see how that's really complete because, you

1  know, the SOPs are going to say that auditors should look at

2  the issues when they do go to audit, which he admits he did in

3  May of 2018, should look at the issues from the last audit.

4          So I know they want to put in how he wasn't part of

5  the team, but I don't think that's really pertinent to be left

6  to --

7          SPECIAL MASTER VANASKIE:  I think it is pertinent.

8  You could be left with the wrong impression that he was part of

9  the team in 2015, so --

10         MR. STANOCH:  Understood.

11         SPECIAL MASTER VANASKIE:  -- I will allow it.

12         Are we up to page 118 now or --

13         MS. LOCKARD:  Yes.

14         MR. STANOCH:  I think so.

15         SPECIAL MASTER VANASKIE:  Row 14 of the spreadsheet.

16         MS. LOCKARD:  Right.

17         MR. STANOCH:  And this is a Teva completeness issue, I

18  believe, Judge?

19         SPECIAL MASTER VANASKIE:  Yes.

20         MR. STANOCH:  And here again, I'm asking Mr. Pan Lin

21  if he recalled any conversations about potential nitrosamine

22  impurities when he was on the ground at ZHP's facility in

23  May 2018, just a few weeks before all the recalls broke.  And

24  he says, no, we didn't talk about that.

25         I don't see for completeness purposes -- I don't see

1    what's misleading about that.  They either did or they didn't,

2    and he clearly says, no, we did not.

3         And then what he tries to inject and the question they

4    want to include is, well, because at the time no one really

5    knew about NDMA, so we wouldn't talk about it because nobody

6    really knew about it.  It's simply, did you talk about

7    something, yes, no.  He says no.  There's no need for him to --

8    again, personal knowledge -- I don't know his personal

9    knowledge about what he starts talking about the timing and who

10   knew what and when and I just don't think it's necessary.

11        MS. LOCKARD:  So, Your Honor, this is -- it is

12   misleading and prejudicial because the question is asking at

13   the time in May, did you talk about nitrosamines.  Well, the

14   whole underlying defense or part of it is that nobody was

15   talking about nitrosamines at that time except Novartis, I

16   guess, which we weren't -- Teva wasn't told about.

17        But it suggests that somehow they just omitted it or

18   they were sloppy and they didn't bring it up.  Nobody at Teva

19   had seen the word "nitrosamine" in relationship to this

20   valsartan API at that time.  So he should be entitled to give

21   an explanation for that answer.  Because if he were on the

22   stand and he was asked this question, he would absolutely

23   include that explanation.  No, we didn't because, and here's

24   why.  Nobody --

25        SPECIAL MASTER VANASKIE:  Yes, I will allow it.

 1              MS. LOCKARD:  Sorry, I think I just got a little extra

 2       kick from my coffee -- my lunchtime coffee, if I'm getting

 3       loud.

 4              (Laughter.)

 5              SPECIAL MASTER VANASKIE:  Now are we up to page 120,

 6       row 15?

 7              MR. STANOCH:  Yes.

 8              SPECIAL MASTER VANASKIE:  And the objection is to the

 9       designation, 120, lines 3 to 7.

10              MR. STANOCH:  Again, I'm asking him if he knows if ZHP

11       ever told Teva something.  Counsel says he can answer if he

12       knows.  He asks me for clarification about -- the witness says,

13       are you talking about 2017?

14              I say, yes.

15              He says, I don't know.

16              MS. LOCKARD:  So this is -- again, this is another --

17       we made the speculation argument, it's a personal knowledge

18       argument because he's not a 30(b)(6) witness and to ask him

19       what did Teva as a whole know or did anybody at Teva get told

20       about this is unfair when this witness doesn't have personal

21       knowledge and he wasn't designated as 30(b)(6) on this.

22              And our testimony from other witnesses who are

23       knowledgeable will clearly be no, we did not know about that

24       beforehand.  But this witness, it leaves open the possibility

25       that maybe we did because he doesn't know.  But he only sees a

1  small slice of the audit piece.  So again, it's outside his

2  personal knowledge.

3          SPECIAL MASTER VANASKIE:  I'm having trouble following

4  this.

5          MR. STANOCH:  Your Honor, every question to a witness

6  is going to be obviously to the extent of his personal

7  knowledge.  This -- and I'm not going back rearguing things

8  from this morning, earlier today, but this suggestion that I

9  have to preface every question "to your knowledge do you know

10  if ZHP ever did something" or "to your knowledge do you know if

11  the sky is blue" or "to your knowledge do you know if your

12  employer received any information from ZHP."  Right?  I don't

13  have to preface every question like that.  Right?

14          I'm able to ask him a question, which his counsel at

15  the time said "answer if you know."  Right?  If he knows

16  something.  He either does or he doesn't.  And he said he

17  didn't.  And it's pertinent because this person has been an

18  auditor of ZHP for something like ten years, a Teva auditor

19  who's been going to ZHP repeatedly over and over again.

20          MS. LOCKARD:  You don't have to preface it with that

21  kind of language every time, but you do have to ask questions

22  that are within the personal knowledge.  And you can establish

23  that by seeking a foundational question, which wasn't asked.

24          Here it is prejudicial and unfair because the

25  discussions about the disclosure of the nitrosamines didn't

1    come through the audit function.  It came through other

2    channels.  So this witness would not have known what other

3    departments or channels at Teva knew or what they were told

4    about ZHP and their nitrosamine.

5           MR. STANOCH:  Even if he would.  And he said he

6    didn't.  He could have said yes, and then I'm entitled to get

7    that information.  And prejudicial, that's not an --

8           (Simultaneous speakers.)

9           SPECIAL MASTER VANASKIE:  Here's what I'm having

10   trouble with.  We have questions and then objections and then

11   clarifications.  So let's focus in on what is the question and

12   what is the answer at issue here.

13          I'm looking at page 120, lines 3 to line 7.  The

14   objection is it's not necessary for completeness -- no,

15   speculation.  120, lines 3 to line 7.

16          Question:  Did ZHP ever tell Teva that ZHP had

17   discovered, as early as July 2017, that nitrosamine impurities

18   could form from the sodium as a quenching during the

19   manufacture of valsartan API?

20          Answer:  Are you talking about 2017?

21          Question:  Yes.

22          Answer:  I don't know.

23          Is that what you're trying to present here?

24          MS. LOCKARD:  That's what plaintiffs are trying to

25   present and that's what we're objecting to.  And the

1    speculation objection is the same as -- it is a personal

2    knowledge objection.

3         Because again, if this were a 30(b)(6) witness, this

4    would be a perfectly appropriate question.  But he's asking

5    what Teva broadly as a company knew, and that is outside of

6    this witness's personal knowledge.

7         So he can ask -- you know, he can certainly ask if he

8    was ever privy to any disclosure of that.  And even the way

9    it's asked, if the witness had said, oh, yes, I do know, then

10   he has an argument that he's laid the foundation for some

11   personal knowledge because the witness has admitted he has

12   personal knowledge.

13        But he's saying he doesn't know because he doesn't

14   have any personal knowledge.  He can't tell you whether or not

15   Teva heard about this before or after because he's not a

16   30(b)(6) witness and he doesn't have that knowledge as somebody

17   in China just dealing with the local audit.

18        So that's why we think it's an unfair question,

19   inappropriate, and he doesn't have the personal knowledge to be

20   able to answer it or to be able to respond on behalf of Teva as

21   a whole.

22        SPECIAL MASTER VANASKIE:  All right.  So looking at

23   row 15 of the spreadsheet, I will sustain the objection.  I

24   will also sustain the objection at row 16.

25        And, therefore, the counter-designation at 119,

 1   line 23 to 120, line 1 should come out as well.  All right?

 2          MR. STANOCH:  Understood, Judge.

 3          MS. LOCKARD:  I'm with you.

 4          SPECIAL MASTER VANASKIE:  So that takes us to row 17.

 5          MS. LOCKARD:  And there was no objection, but

 6   plaintiffs objected to our counter.

 7          SPECIAL MASTER VANASKIE:  That's at 123, line 22.  And

 8   I will allow the counter to come in.

 9          MR. STANOCH:  Understood, Judge.

10          SPECIAL MASTER VANASKIE:  Next we're at row 18.

11   Page 126, lines 18 to 22.

12          MS. LOCKARD:  We actually withdrew our objection to

13   this one.

14          SPECIAL MASTER VANASKIE:  Okay.  Good.  So that's it.

15   The spreadsheet I have in front of me doesn't show that.

16          MR. STANOCH:  Sorry, Judge, I guess --

17          SPECIAL MASTER VANASKIE:  That's okay.

18          So now we're at row 19, deposition page 128, lines 6

19   to 17.

20          MS. LOCKARD:  Again, this is -- we withdrew our

21   objection from this.  I think we were contemplating adding in

22   the subsequent remedial measures to this, but we understand

23   your rulings.  I don't think there's anything to --

24          SPECIAL MASTER VANASKIE:  Okay.  Good.  Let's go to

25   row 20 then.  The testimony at page 129, lines 5 to 20.

1          MS. LOCKARD:  I'm looking at my notes.

2          SPECIAL MASTER VANASKIE:  All right.

3          MS. LOCKARD:  Yes, I think we -- so we had objected to

4    this because we believe it misstates the testimony, it's

5    argumentative, and it's not relevant.  It's really kind of

6    confusing and unhelpful to the jury.  I really -- I don't think

7    the two witnesses were really communicating.

8          SPECIAL MASTER VANASKIE:  Let me look at the

9    contingent counter on the next page.

10         MR. STANOCH:  Judge, if she withdraws the objections,

11   I'll agree to the contingent counter.

12         SPECIAL MASTER VANASKIE:  So let me see if I

13   understand this.

14         Okay.  So you're saying have admitted the testimony

15   and questioning from 129, line 5 through 20; and then 129-23

16   and 24; and 130, lines 2 to 5; and 130, lines 8 to 11?

17         MR. STANOCH:  Yes.

18         SPECIAL MASTER VANASKIE:  Victoria?

19         MS. LOCKARD:  That's agreeable.

20         SPECIAL MASTER VANASKIE:  Okay.  Yes, I think that

21   makes it clearer.

22         So now we're up to row 22.  131, lines 5 to 8.

23         MS. LOCKARD:  Okay.  Let me get there.  I think I said

24   I withdraw that objection to that question and answer if you

25   would take out the last question and answer which we just

1    agreed could come in.

2            SPECIAL MASTER VANASKIE:  You're losing me, Victoria.

3            MR. STANOCH:  You're losing me too.

4            MS. LOCKARD:  Yeah.

5            SPECIAL MASTER VANASKIE:  I know this is hard thought.

6            MS. LOCKARD:  We had proposed in negotiation where we

7    would withdraw our objection if they took out the prior

8    question and answer, and you just ruled on that.  I think this

9    is okay.  Let me just look very quickly.

10           So we're talking about would it be acceptable for an

11   API supplier such as ZHP to withhold information.

12           And he says:  Yes, I cannot speculate on that when I

13   received a notification or, in fact, I did not receive a

14   notification directly.  Rather, I received a notification from

15   my superior department.

16           And so that part I was okay with, but it's the -- the

17   objection about "Why, Mr. Pan, are you trying to protect ZHP?"

18   That's what I really had an objection to.  The rest of it was

19   fine.

20           SPECIAL MASTER VANASKIE:  Yes, I'll sustain that.

21           MS. LOCKARD:  Okay.  So that takes us to --

22           MR. STANOCH:  That's it.

23           SPECIAL MASTER VANASKIE:  That's it, right?

24           MR. STANOCH:  It was the question and answer --

25           MS. LOCKARD:  Okay.  That's it for that page.  So that

1   takes us to page second, I think -- second day.

2          SPECIAL MASTER VANASKIE:  Second day.

3          MR. STANOCH:  There's only eight rows, Judge.

4          MS. LOCKARD:  Yes, there's only eight, so we could get

5   through this, I think.

6          SPECIAL MASTER VANASKIE:  Okay.

7          MS. LOCKARD:  Then we'll be done.

8          SPECIAL MASTER VANASKIE:  That would be good.

9          MR. STANOCH:  Thank you, Judge.

10         And I think the first two are completeness.  And I'll

11  just allow Your Honor to reacclimate with these pages of the

12  Day 2 transcript and then --

13         SPECIAL MASTER VANASKIE:  Let me get the Day 2

14  transcript in front of me.  I have it now.

15         Okay.  So plaintiff has a designation on 152, line 10

16  to 152, line 21.

17         MR. STANOCH:  Correct.  And the question is simply

18  about audits and said -- right, about -- yes, about the purpose

19  of the Teva audit is to ensure that an API of the supplier is

20  complying.  And he says "yes" and he explains.  That's it.

21         And then the next -- all the other questions for

22  pages, it looks like, the defendants want for quote/unquote

23  completeness, are about other things.  They're about what else

24  they might do besides audits.  But then he answers, oh, well,

25  we place a high value on audits, which is not even responsive.

 1          And then he talks about official regulatory audits,

 2   which was nothing about the purpose of the Teva audit.  And

 3   then they want more and more pages -- and Your Honor can read

 4   it.  I just don't think the next five pages of

 5   counter-designations are a fair and balanced way of completing

 6   the simple question and answer, which was simply what do you do

 7   a Teva audit of an API supplier for, and he fully answers it.

 8          MS. LOCKARD:  Well, Your Honor, it's not five pages

 9   worth.  I mean, there are five --

10          MR. STANOCH:  Five separate counters.  I apologize.

11          MS. LOCKARD:  Five separate counters.  And we think

12   that they are -- they do provide completeness to the question,

13   which is he's asking how does Teva ensure that an API supplier

14   is compliant with CGMPs.

15          So he is talking about regulatory activity and

16   regulatory audits.  That is one of the ways that they ensure

17   that their supplier is compliant.  I mean, they do their own

18   audits, yes.  But an important part of that, he would explain

19   at trial on the stand, is that also the FDA does their audits,

20   and ZHP is supposed to provide that information back to Teva.

21          So it's artificially limiting the answer.  I mean, his

22   answer to the question is broader than just, oh, yeah, we --

23   you know, we do audits.

24          SPECIAL MASTER VANASKIE:  I will allow it.  I will

25   allow it.

```
 1              Now we go to --
 2              MS. LOCKARD:  172.
 3              SPECIAL MASTER VANASKIE:  -- 172.  And the objection
 4  is to the counter-designation.  And I will allow the
 5  counter-designation.
 6              MS. LOCKARD:  Okay.  Thank you, Judge.
 7              172, 18 to 21 is next.
 8              SPECIAL MASTER VANASKIE:  Yes.  And you have an
 9  objection.
10              MS. LOCKARD:  Oh, I object because there was no answer
11  designated.
12              MR. STANOCH:  I will agree to add the answer at
13  178-24.  You can feel free to tell me that any time,
14  Ms. Lockard.
15              MS. LOCKARD:  Okay, yeah.
16              SPECIAL MASTER VANASKIE:  178-24?
17              MR. STANOCH:  Yes, sir.
18              SPECIAL MASTER VANASKIE:  So we've got to go from 172,
19  line 21 to 178-24?
20              MR. STANOCH:  Correct.  With the intervening objection
21  will be removed, yes.
22              And, Judge, I know you know this.  I am sorry.
23  Sometimes that's why a question and answer is broken up,
24  because when you're preparing clips, you have to tell the video
25  people.  I am sorry it reads that way.
```

 1          SPECIAL MASTER VANASKIE:  I'm still having trouble

 2   following this.

 3          MS. LOCKARD:  Yeah.  The objection was at 172, 18 to

 4   21, so the answer should be at line 24.

 5          MR. STANOCH:  I agree.

 6          SPECIAL MASTER VANASKIE:  And the answer is:  I cannot

 7   remember clearly.

 8          Is that right?

 9          MS. LOCKARD:  That's right.

10          MR. STANOCH:  Yes.

11          MS. LOCKARD:  Yes.  It sounded like you said page 178,

12   David, so I think that's why --

13          (Simultaneous speakers.)

14          MR. STANOCH:  I'm so sorry, Judge.

15          SPECIAL MASTER VANASKIE:  That's all right.  It's in,

16   okay?  We'll allow that.

17          MR. STANOCH:  Yes, sir.

18          MS. LOCKARD:  Okay.  185-13.

19          SPECIAL MASTER VANASKIE:  185-13.

20          MS. LOCKARD:  And on the same line was 185-18.  And

21   our objection was only starting at 185-22.  Sorry, was -- let

22   me rephrase that.

23          Our objection was up to 185-22.  So only up to 185-22.

24          MR. STANOCH:  And just so I'm clear, the objection is,

25   Victoria, to the question, "in your experience as a Teva

1    auditor," is that the one?

2          MS. LOCKARD:  Yes.

3          MR. STANOCH:  Okay.  Sorry.  I just wanted to make

4    sure I was on the same page.

5          MS. LOCKARD:  And so he's asking, you know, "In your

6    experience as a Teva auditor, is it appropriate to invalidate

7    out-of-specification results without a scientific

8    justification?"

9          He is asking Mr. Lin about the FDA's finding.  And so

10   he's basically saying, you know, well -- I mean, in essence, do

11   you agree with FDA that this is appropriate, and it's not

12   appropriate to invalidate out-of-spec results.

13         And Mr. Lin is saying, look, regarding this situation,

14   I don't know the specifics, you know, however, on the FDA

15   website, you know, sometimes they will publish 483 reports

16   concerning similar issues.

17         But he's admitting that he's speculating because he

18   doesn't know under this circumstance with ZHP and what the FDA

19   findings are, he can't really speak to that situation.  It's

20   the FDA --

21         SPECIAL MASTER VANASKIE:  Your response, David?

22         MS. LOCKARD:  Okay.  I'll be --

23         MR. STANOCH:  I will say, Your Honor, I specifically

24   asked him what he knew or thought based on his own personal

25   experience as a Teva auditor about a GMP issue that he would

 1  encounter, that would be encountered, about invalidating

 2  out-of-specification results.  His answer is what it is.  I'm

 3  not sure what --

 4          SPECIAL MASTER VANASKIE:  I'll sustain the objection.

 5          Let's go to 190, line 7 to 192, line 17.

 6          MS. LOCKARD:  I know this was a long designation.

 7          SPECIAL MASTER VANASKIE:  Yes.

 8          MS. LOCKARD:  Yeah, we'll withdraw that objection,

 9  Your Honor.

10          SPECIAL MASTER VANASKIE:  Okay.  So that comes in.

11          MS. LOCKARD:  That comes in.

12          MR. STANOCH:  Two to go, Judge.

13          SPECIAL MASTER VANASKIE:  Two to go.

14          And now we're up to page 229, lines 6 to 15.

15          MR. STANOCH:  Yes, sir.

16          MS. LOCKARD:  Okay.  This is the for-cause audit in

17  2018, where we had discussed earlier about whether this was a

18  subsequent remedial measure, and you said it was not, you're

19  going to let it in.

20          SPECIAL MASTER VANASKIE:  Right.

21          MS. LOCKARD:  So I think -- I mean, we had relevance

22  based on 407, so --

23          SPECIAL MASTER VANASKIE:  Yes, I think it comes in

24  then.

25          MS. LOCKARD:  Yeah.  So I was okay with that.

 1          MR. STANOCH:  Okay.  So we're at the last -- so it

 2     sounds like the last two, 229, 6 through 15; and 230, 7

 3     through 23 are in.

 4          MS. LOCKARD:  No, we haven't dealt with the last one.

 5          MR. STANOCH:  Oh, I am sorry.  I wasn't trying to pull

 6     a fast one.  I apologize.

 7          SPECIAL MASTER VANASKIE:  We haven't talked about

 8     that, no.

 9          MS. LOCKARD:  So we object to 230, line 7 through 23.

10     So putting aside our argument about the audit itself,

11     Mr. Stanoch is asking this audit witness about a statement made

12     in a company document by Mr. Kumar, who is quoting from some

13     unidentified piece of literature.  So we also have a hearsay

14     objection to this.  Mr. Lin -- and a personal knowledge

15     objection.

16          Mr. Lin has not seen that piece of literature, it

17     doesn't meet the learned treatise exception, he's not an

18     expert, it hasn't been established as reliable authority.  We

19     don't even know what this is.  Mr. Lin doesn't know what this

20     is.  He's testified he's never seen it.  He says I'm not sure,

21     I'm not sure because I did not review this document.

22          And so all he can say is, well, that's what's listed

23     in the statement by Mr. Kumar in a company document about some

24     random piece of literature.

25          So I feel like this is very tenuous, it's misleading,

1    it calls for speculation on the part of this witness and

2    there's a hearsay objection.

3              SPECIAL MASTER VANASKIE:  David?

4              MR. STANOCH:  Thank you, Judge.

5              Mr. Lin is testifying about a document, an email and

6    attachment which he received in the ordinary course of

7    business.  Right?  That's what this is.  This is not some

8    stranger document.

9              This is about the audit report that he's working on

10   for the audit that he went to on the ground with other audit

11   members in an email string that he's on and replying back and

12   forth to.  Right?  And this is an attachment to that email.

13             And it's simply confirming his receipt of this

14   document, and what it says in the audit report that he and his

15   team were putting together at the time.  It's literally -- the

16   document at issue is an attachment called The Business Report

17   of Huahai -- right? -- about the nitrosamines.  He was the one

18   who did the visit.  He's already testified over a day and a

19   half that he was part of the group who went to the audit and

20   looked -- and did the for-cause audit, and he's confirming what

21   he received.

22             In terms of the hearsay objection, there's no hearsay

23   objection, Your Honor.  We're not trying to put the article --

24   first of all, it's not just some strange document.  It's cited.

25   There's a specific citation to a specific journal from 1983

1 about n-nitrosodimethylamine and it's formed by a reaction with

2 dimethylamine with a nitrosating agent.

3         He's citing a 1983 article, notice -- right? --

4 whether -- there is an article from 40 years ago talking about

5 this very reaction, which a colleague is sending to Mr. Lin and

6 others about their for-cause audit of ZHP about the formation

7 of nitrosamines.

8         MS. LOCKARD:  But this is not something that was

9 discussed by Mr. Lin when he was on site doing his part of the

10 audit.  This is when Mr. Kumar was pulling together information

11 to include in the audit summary, he pulled literature from

12 somewhere.  And the literature isn't part of what Mr. Lin

13 relied on, it's this --

14         MR. STANOCH:  That's not right.

15         MS. LOCKARD:  Plaintiffs are using this to try to

16 argue for the truth of the matter that -- you know, what it

17 says, that it's formed by the reaction of dimethylamine.  And

18 it's not -- I mean, nobody has shown that this piece of

19 literature meets the learned treatise exception.  It's not been

20 established as reliable authority, no expert has talked about

21 this being a reliable authority.  This is not even an expert.

22 So they shouldn't be using, you know, literature with a fact

23 witness.

24         SPECIAL MASTER VANASKIE:  Yeah, I will sustain the

25 objection.  And so --

1          MR. STANOCH:  Judge, I'd like the opportunity to send

2     you the exhibit so you can see it, and potentially I can try to

3     argue to change your mind.

4          SPECIAL MASTER VANASKIE:  You can send it to me and

5     try to change my mind, but I do think the hearsay objection is

6     well taken, so bear that in mind.  I don't know what this

7     literature is, I don't know whether it would fall under the

8     learned treatise exception to the hearsay rule.

9          So at the present time, the objection is sustained

10    subject to being reconsidered after you send me the article or

11    whatever it is that's being relied upon.

12         MR. STANOCH:  Very well, Your Honor.  Thank you.

13         SPECIAL MASTER VANASKIE:  All right.  So that

14    concludes Mr. Pan Lin.  I assume it's a mister.

15         MR. STANOCH:  Yes.

16         MS. LOCKARD:  Mister.

17         SPECIAL MASTER VANASKIE:  Anything else for today?

18         MR. STANOCH:  Yes.

19         SPECIAL MASTER VANASKIE:  But we can't get to it.

20    We've gone long enough.  I'm going to let our court reporter

21    go.

22         Thank you for your hard work today on this matter.

23         And I'll see you all tomorrow morning at 9:30, I

24    guess.

25         MR. STANOCH:  Yes, Judge, some of us.

```
1              MS. LOCKARD:  Thank you.

2              SPECIAL MASTER VANASKIE:  All right.  Thank you.

3              (Matter adjourned at 5:03 p.m.)

4              - - - - - - - - - - - - - - - -

5

6              I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8

9     /S/ Sharon Ricci, RMR, CRR
      Official Court Reporter
10

11    September 26, 2024
          Date
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```