**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ──────────────────────────── | : CIVIL ACTION NUMBER: |
| | : 19-md-02875 |
| IN RE:  VALSARTAN PRODUCTS | : |
| LIABILITY LITIGATION | : |
| | : DEPOSITION DESIGNATION |
| | : HEARING VIA TEAMS |
| ──────────────────────────── | |

Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey 08101
September 27, 2024
Commencing at 9:32 a.m.

**B E F O R E:**          **THOMAS I. VANASKIE (RET.)**
                         **SPECIAL MASTER**

**A P P E A R A N C E S:**

MAZIE SLATER KATZ & FREEMAN, LLC
BY:  ADAM M. SLATER, ESQUIRE
103 Eisenhower Parkway
Roseland, New Jersey  07068
For the Plaintiffs

KANNER & WHITELEY, LLC
BY:  DAVID J. STANOCH, ESQUIRE
701 Camp Street
New Orleans, Louisiana  70130
For the Plaintiffs

Sharon Ricci, CRR, RMR, Official Court Reporter
sharon.ricci.usdcnj@gmail.com
(267) 249-8780

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1
2
**A P P E A R A N C E S (Continued):**

3
    NIGH GOLDENBERG RASO & VAUGHN
4
    BY:  DANIEL A. NIGH, ESQUIRE
    1333 College Parkway, #1049
    Gulf Breeze, Florida 32563
5
    For the Plaintiffs

6
7
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    BY:  NINA ROSE, ESQUIRE
    1440 New York Avenue, N.W.
8
    Washington, DC 20005
    For the Defendants Prinston Pharmaceuticals,
9
    Solco Healthcare U.S. LLC, and  Zhejiang Huahai
    Pharmaceuticals Ltd.
10

11
    GREENBERG TRAURIG LLP
    BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
12
    3333 Piedmont Road, NE, Suite 2500
    Atlanta, Georgia  30305
13
    Counsel for the Defendant, Teva Pharmaceutical Industries
    Ltd., Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis
14
    Pharma, Inc. (Collectively Teva)

15
16
    KIRKLAND & ELLIS, LLP
    By:  JACOB M. RAE, ESQUIRE
    601 Lexington Avenue
17
    New York, New York 10022
    For the Defendants Torrent Pharma, Inc.
18
    and Torrent Pharmaceuticals Ltd.

19
20
**ALSO PRESENT:**
21
22
    Loretta Smith, Judicial Law Clerk
23
    Larry Macstravic, Courtroom Deputy
24
25

```
 1            (PROCEEDINGS held via Teams Conference before Special

 2    Master Thomas I. Vanaskie at 9:32 a.m.)

 3            SPECIAL MASTER VANASKIE:  All right.  We're going to

 4    review the designations of deposition testimony for some of the

 5    Torrent witnesses this morning.

 6            I did receive last night more designations, but I'm

 7    not prepared to address them today, the ones that came in last

 8    night.  And I thought we'd start with Bernadette Attinger.

 9            How do you pronounce her name?

10            MR. RAE:  I believe it is Bernadette Attinger, but I

11    was not at her deposition or involved in it, so I'm not

12    personally familiar with the correct pronunciation of her name.

13    I'm not sure if plaintiffs' counsel here is more familiar with

14    that than I am.

15            MR. NIGH:  I think it's Attinger as well, but again, I

16    wasn't at the deposition.  But that's my best guess.

17            SPECIAL MASTER VANASKIE:  All right.  We're going with

18    Ms. Attinger, and we'll -- let me pull up the spreadsheet that

19    lists the objections, and I'll have on another monitor the

20    actual testimony.

21            Now, as I'm looking at this, it seems like we start at

22    page 59 of her transcript.  Is that correct?

23            MR. RAE:  Yes, Your Honor, I believe that's correct.

24            SPECIAL MASTER VANASKIE:  And it's just lines 1 and 2,

25    and it says, "Not a question."
```

1          MR. RAE:  Yes, Your Honor.  Our objection here is this

2    is an introduction of an exhibit, which is Ms. Attinger's CV at

3    the time of her deposition.  There's no questioning that

4    follows using that document.  There's no foundation being laid

5    for that document.  We don't think it's proper to be

6    designating the introduction of an exhibit where there's no

7    questions asked about that exhibit subsequently.

8          SPECIAL MASTER VANASKIE:  Daniel?

9          MR. NIGH:  Your Honor, I think we can attach the

10   exhibit without having to have a question to it.  I think it

11   can come in as evidence.  It's her CV.

12         SPECIAL MASTER VANASKIE:  Well, I'm not sure you can.

13   You don't have a question and an answer.

14         We'll sustain the objection.

15         MR. NIGH:  Okay.  I guess, if that's the case, I guess

16   we should designate lines 4 to 9 and then line 13.

17         SPECIAL MASTER VANASKIE:  Yeah.  Why didn't you

18   initially do that?

19         MR. NIGH:  Because I thought we could attach it.  I

20   mean, it was provided by the defense.

21         SPECIAL MASTER VANASKIE:  Well, I will allow you to

22   designate lines 4 to 13.  I mean, there shouldn't be a dispute

23   over this, but there is, so --

24         MR. RAE:  Your Honor, if I could interject.

25         We'll need to consider whether or not we have other

1    objections to this exhibit coming in, although we can deal with

2    that from -- but if we're going to be designating testimony to

3    introduce this exhibit, I would suggest that they need to

4    include lines 14 to 16 as well because that actually lays the

5    foundation for the exhibit.

6              SPECIAL MASTER VANASKIE:  Yeah, that looks good to me

7    too.

8              MR. NIGH:  That's fine.

9              SPECIAL MASTER VANASKIE:  So we'll include lines 14 to

10   16.

11             MR. RAE:  And --

12             SPECIAL MASTER VANASKIE:  Go ahead.

13             MR. RAE:  Your Honor, just to be clear, we're not --

14   our position would be that we still don't understand the

15   relevance of this document.  It's a CV of Ms. Attinger.

16   Ms. Attinger is a regulatory affairs employee who worked at

17   Torrent from September 2018 to July of 2019.  That's in -- the

18   testimony is in the first counter-designation that we have,

19   which plaintiffs accepted.

20             I'm not sure why her -- so this is an employee who

21   joined Torrent only after the recall was already in effect that

22   relates to the add issue of the valsartan product.  She worked

23   in the regulatory affairs department.  We're going to be

24   talking about the extent to which any of her testimony is

25   relevant throughout today, but I think that's important context

1  for -- I'm not sure what relevance the resume of someone who

2  didn't join Torrent until after all of the conduct that's

3  actually at issue in this trial is -- or why it should be

4  coming in front of the jury.

5          SPECIAL MASTER VANASKIE:  Daniel?

6          MR. NIGH:  Well, Your Honor, she is actually -- she is

7  employed during some of the recalls and while some of the

8  product is on the market because -- just to give some

9  background, there are multiple recalls that Torrent has.  There

10 are recalls that Torrent has that are related to NDMA, but

11 later there are recalls that Torrent has that are related to

12 NDEA.  And she's involved in those responses.  She's one of the

13 key people involved in the responses to the recall.

14         SPECIAL MASTER VANASKIE:  Yeah, I just --

15         (Simultaneous speakers.)

16         MR. NIGH:  But to say she is not here at the time --

17 you know, she is.  I mean, there's a span of when these recalls

18 occur, and there's a span -- even though the first recall

19 occurs September 19th, there's still a lot of product that has

20 nitrosamines that's on the market for sometime thereafter.

21         SPECIAL MASTER VANASKIE:  Yeah, I see it as background

22 information.  I don't see any prejudice to Torrent from

23 providing the CV of a witness.

24         I'll overrule the objection.

25         MR. RAE:  All right.  Understood, Your Honor.

1          And just very briefly, and I know this is getting

2     pretty far afield, so I don't want to get bogged down in it.

3     But just to correct the record here, Torrent began to recall

4     its valsartan products on August 17th.

5          I believe by -- somewhere around August 22nd or 23rd,

6     as a result of the NDMA issues, every valsartan product that

7     Torrent sold had been recalled.  The recall had been expanded

8     to cover all of its products.  That recall was complete

9     within -- in terms of its issuance, before Ms. Attinger became

10    employed at Torrent.

11         There -- I don't recall whether or not there would

12    have been subsequent recalls issued with respect to NDEA

13    specifically, but they would have been additional recalls

14    covering the same product that had already been recalled to the

15    extent that such a thing exists.

16         MR. NIGH:  Yeah, I think to the extent that, you know,

17    she's there at a key time frame when NDEA is found in -- I

18    don't think the numbers are -- approximately half the product,

19    but she's there at that time where they are investigating the

20    NDEA.  She's handling the recall response, and she's one of the

21    people that's involved in the recall response to that part of

22    the problem.

23         I think we can move to the next objections.

24         SPECIAL MASTER VANASKIE:  Yeah, I think so too.

25         Hold on.  Just let me get my bearings straight here.

1    I'm trying to...

2            MR. NIGH:  And yes, I did misspeak on September.  It

3    is August.  That was my mistake.

4            SPECIAL MASTER VANASKIE:  So I have us now on

5    counter-designations, page 63, line 12 to 24.

6            And you are objecting, Daniel, to this

7    counter-designation?

8            MR. NIGH:  Yeah.  I just don't know what it's in

9    response to.

10           MR. RAE:  And, Your Honor, given that I think this is

11   clearly tied to the designation of testimony on page 64, line 9

12   to 18, as well as the testimony on page 65, line 6 to 12, we

13   would agree that we have a number of counters tied to those two

14   pieces of testimony.  And to be clear, our position is our

15   counters will fall away if our objections to that testimony is

16   sustained.

17           But the testimony here is asking Ms. Attinger, who has

18   no background as a chemist -- she did have -- before she was a

19   regulatory affairs employee, she did have some background as a

20   biologist but not as a chemist.  She's being asked questions

21   about the term "ghost peak," and Your Honor has probably heard

22   some discussions about ghost peak so far because it's a term

23   that ZHP used to refer to unknown peaks that are at issue in

24   this litigation related to the discovery of nitrosamines.

25           Torrent never used the term "ghost peak."  There is no

1    Torrent witness who will testify, there's no Torrent document

2    that indicates that this term was ever used at Torrent.  And

3    our first counter here is showing that the way in which the

4    plaintiffs establish knowledge of Ms. Attinger with respect to

5    the term "ghost peak" ties to employment at a prior employer;

6    that she heard this term once at a company.  She's not even

7    sure where it was, but she thinks it might have been a

8    different pharmaceutical company that she had previously worked

9    at called Avet.

10           She testifies that she doesn't actually know what this

11   term means, and then there's some speculation by her about what

12   it means that is both irrelevant, since it's not relevant to

13   Torrent.  It's calling for her to testify as an expert on an

14   area that she's not an expert, and she should be precluded

15   under Rule 701 because she's not a chemist.  And it would be

16   very prejudicial to Torrent to have the plaintiffs play

17   testimony about a Torrent witness talking about ghost peaks

18   when there is no indication in the record that Torrent ever

19   discussed the term or used the phrase "ghost peak,"

20   particularly without the context showing that that witness's

21   only knowledge of the term "ghost peak" comes from employment

22   that has nothing to do with Torrent.

23           SPECIAL MASTER VANASKIE:  No, I think it's a relevant

24   question, and I will allow the designation and

25   counter-designation to be presented to the jury.

```
 1              So that would cover the testimony, I take it, at pages
 2    63, lines 12 to 24; 64, lines 9 to 18; 64, lines 19 to page 65,
 3    line 5; and page 65, line 6 to 12; and page 65, lines 13 to 16.
 4              The jury is going to be hearing about ghost peaks and
 5    I don't see any problem and it doesn't tie it to Torrent.  And
 6    I think she distinguishes it from Torrent.  But it's part of
 7    the case.
 8              All right.  I think we're now moving to page 82,
 9    line 24.  Correct me if I'm wrong.
10              MR. NIGH:  Are there any objections to 82, line 24?  I
11    don't think I have that.
12              MR. RAE:  I --
13              SPECIAL MASTER VANASKIE:  No, there aren't any.
14              (Simultaneous speakers.)
15              SPECIAL MASTER VANASKIE:  No, there aren't.  That's
16    correct.
17              I think we're now at page 116, line 13.  Again,
18    correct me if I'm wrong.
19              MR. NIGH:  I think that's right.
20              MR. RAE:  That's right, Your Honor.
21              And, Your Honor, this -- our objection here, which is,
22    again, a 401, 403 and 701 objection, goes back to
23    Ms. Attinger's role in this case.
24              The question -- the first question here and the
25    questions that follow are asking Ms. Attinger about
```

1    hypotheticals regarding a theoretical audit problem with an API

2    supplier that a company has been using for a finished dose

3    product.

4         There's no establishment of an actual audit problem

5    with that API supplier.  This is extracted from context, and

6    it's extracted from context because the thing -- like, because

7    they're not asking Ms. Attinger questions about her personal

8    knowledge about any issues with ZHP audits.  They're just

9    asking her a general question of, if there's an issue with an

10   audit, what happens next?

11        That's improper testimony.  It's not relevant.  And in

12   particular, it's prejudicial because the question precedes from

13   the premise that there was a problem with an audit and goes on

14   to ask a series of questions that precedes from that

15   hypothetical that we would dispute whether or not there's any

16   foundation in the record for.

17        SPECIAL MASTER VANASKIE:  All right.  Daniel?

18        MR. NIGH:  There's two things.  First, this isn't

19   wholly absent of any evidence.  That's one of the key

20   cornerstones of our allegations against Torrent, and that is,

21   that they conducted inappropriate or incomplete audits.  And

22   that's their duty, is to oversee their API supplier.

23        And so we are asking her, in her role -- she was

24   partially involved in the response to the FDA and the -- and as

25   they're inspecting -- or as they're trying to figure out what

1   happened from Torrent's viewpoint in this recall, she's

2   responding to the FDA with questions they have.  So we believe

3   that, in her role, it's appropriate to ask her these questions

4   because it's forming part of the basis of the FDA's response.

5           MR. RAE:  Your Honor, if I may briefly.

6           SPECIAL MASTER VANASKIE:  Yes.

7           MR. RAE:  Thank you, Your Honor.

8           The cornerstone of Rule 701 is that non-expert

9   witnesses can provide opinion testimony only where they have

10  specialized knowledge and training, but also where they have

11  personal knowledge of the facts that are at issue for that

12  opinion testimony.

13          These are opinion questions, and there's no grounding

14  in personal knowledge.  The hypothetical audit that plaintiffs

15  are speculating about here could only be audits that Torrent

16  conducted years before Ms. Attinger's employment at Torrent,

17  they don't establish personal knowledge for.

18          MR. NIGH:  Your Honor, the personal knowledge is her

19  education and experience.  That's the personal knowledge.  This

20  is what she's employed to do, and so she can respond to what

21  would happen in this sort of situation, how she had been

22  trained by the company to respond.

23          You know, there's numerous ways that she would possess

24  this information.  So it's not seeking an expert opinion.  It's

25  seeking her, in her role as a regulatory person hired by

1    Torrent, what would she do if this situation occurred.

2            SPECIAL MASTER VANASKIE:  Yes, I will overrule the

3    objection and allow the testimony on page 116, from line 13

4    through line 24 -- I am sorry, line 22.  That's what's been

5    designated.

6            You're cutting off the answer, Daniel, on 116 -- no,

7    it's through 24.  I'm going back and forth in my head here.

8    But it's through 24.

9            Now we're up to 126, line 14.

10           MR. RAE:  And, Your Honor, I'm happy to make the same

11   arguments I just made, but I think this is the same issue as

12   the one you just ruled on.

13           SPECIAL MASTER VANASKIE:  Yes, I think it is.  And I

14   appreciate, Jacob, when we do that so we could move forward a

15   little quicker.

16           So it would be the same ruling.  I'll allow that

17   testimony from 126, line 14 to 126, line 22.

18           I'm trying to understand my notes.  But we're moving

19   now to page 129, line 9.

20           MR. RAE:  And we had a counter-designation from

21   lines 2 to 8.  The plaintiffs --

22           SPECIAL MASTER VANASKIE:  Yes.

23           MR. RAE:  -- have an objection to that.

24           SPECIAL MASTER VANASKIE:  The counter-designation is

25   in --

```
1              MR. NIGH:  We withdraw, yeah.

2              MR. RAE:  So for our objection here, I think this ties

3    to some of the issues that we've already talked about, but this

4    is a kind of more -- there's a foundation problem that starts

5    to come in here too that hasn't been present in our prior

6    objections, which is that, again, Ms. Attinger took over in

7    September of 2018.  That's after Torrent was no longer using

8    ZHP as a supplier.  That's after all of the relevant conduct

9    related to Torrent's quality department's supervision of ZHP as

10   an API supplier would have taken place.

11             And plaintiffs are asking the witness a series of

12   questions about what she knows about things that happen with

13   respect to that historic conduct of Torrent, and she doesn't

14   know the answers to those things.  And so we think there's a

15   foundation problem with this line of questioning precisely

16   because the audit that's being asked about is something that

17   she doesn't have personal knowledge of and that preceded her

18   employment at Torrent.

19             And we also think that there's a 403 problem because

20   it will be confusing to the jury to hear a regulatory affairs

21   witness, Ms. Attinger, who's taking over for Ms. Chitty, who

22   will testify to having some amount of knowledge of these

23   issues, testifying that she doesn't know about them.

24             The jury may get confused about the time frame of the

25   transition between Ms. Chitty and Ms. Attinger.  They may infer
```

1  from this line of questioning that there's some issue with the

2  scope of awareness of what Torrent was doing with respect to

3  its auditing and supervision of ZHP, that -- and that confusion

4  can be avoided by simply not asking this question about her

5  knowledge of things that predated her employment.

6          There's really no reason she should have known about

7  it because why would you need to know about your past audits of

8  a supplier when you're no longer using that supplier?

9          SPECIAL MASTER VANASKIE:  It's a part of -- go ahead,

10  Daniel.

11          MR. NIGH:  No, I'll let you go ahead.

12          SPECIAL MASTER VANASKIE:  Yes, I'm going to allow the

13  testimony to come in.  And I've gone through -- and it's

14  basically the same objection with respect to the testimony

15  through page 131.

16          MR. RAE:  Your Honor, I generally agree with that, but

17  there are some subtle differences with a few of these questions

18  and answers that I would like the opportunity to speak to.

19          SPECIAL MASTER VANASKIE:  Yes, let's address them

20  then.  Because my inclination, so you understand, Jacob, is to

21  allow the testimony through page 131 --

22          MR. RAE:  Understood.

23          SPECIAL MASTER VANASKIE:  -- line 20.

24          So go ahead.  Give me the subtle nuances that I need

25  to consider.

1          MR. RAE:  I'll try to stick to the targeted areas

2     where there are nuances for this.

3          So at page 130, the question begins at line 10 through

4     the answer at line 18.  Part of the question asks:  Would you

5     have expected Torrent to conduct quality control testing of the

6     API that was contained in the products?

7          And frankly, we don't have a concern with the answer

8     here, but we -- like, actually -- sorry, I'm going to -- that's

9     not the area where I was concerned about that.  We'll -- the

10    question that I'm concerned about -- I apologize, Your Honor.

11    I'm just trying to make sure that I'm organized here, and I

12    knew there was a question in here that was different.

13         SPECIAL MASTER VANASKIE:  Just take your time.  No

14    problem.

15         MR. RAE:  At 131, line 19 through 24, there's a

16    question:  Would you be surprised if Torrent never did that?

17         And this is in reference to that testimony that I was

18    just reading about conducting quality control testing.  We

19    think that this question is different from the other questions

20    that Your Honor is overruling our objection to.

21         This question is incredibly prejudicial.  It lacks

22    foundation in the record.  Torrent did testing.  Torrent tested

23    every batch of API that it received from ZHP.  There's

24    testimony in the record from Dr. Jaiswal to that effect.  The

25    jury is going to hear that from Dr. Jaiswal again at trial.

```
 1              The documents -- the certificates of analysis that

 2     show that Torrent did that testing are in the record, and

 3     they're going to come into evidence at trial.  There is no

 4     basis for there to be a question asking a witness, would you be

 5     surprised if Torrent never did that when all of the evidence

 6     shows that Torrent did, in fact, did that thing.

 7              SPECIAL MASTER VANASKIE:  Daniel?

 8              MR. NIGH:  Your Honor, it's unclear on what the -- I

 9     don't think the idea of the testing was supposed to be general

10     quality, but for that reason, we would withdraw this testimony.

11              So where did you say it started, Jacob?

12              MR. RAE:  It's the question at 131, 19 to 24.  And I

13     think that would logically pull out the testimony that we've

14     objected to at the top of 132 because it will just be confusing

15     without that first question.

16              MR. NIGH:  Right.  What part do you think it goes to?

17              SPECIAL MASTER VANASKIE:  132, line 8.

18              MR. RAE:  Yes.

19              MR. NIGH:  That's fine.  We withdraw that testimony,

20     Your Honor.

21              SPECIAL MASTER VANASKIE:  Very well.  Good.

22              I think that takes us to 132, lines 14 to 18, or is

23     that already -- 132, 14 to 18, I think.  I'm confused now

24     myself.

25              There's no objection there.  132 -- that's why I have
```

1   nothing in my notes.

2          Okay.  I think we're up to page 143, line 12.  Correct

3   me if I'm wrong.

4          MR. RAE:  That's what I have, Your Honor.

5          SPECIAL MASTER VANASKIE:  Okay.  So we pick up the

6   question at page 143, line 12, and that continues to -- the

7   question continues to line 16.  The answer comes in at lines 18

8   and 19.

9          So do you want to elaborate on your objection, Jacob?

10          MR. RAE:  Yes, Your Honor.  So I think there is a few

11   issues with the testimony here.  The first one is that there's

12   a lack of foundation for this testimony in terms of the kind of

13   size and scope of the issue.  There's concern related to kind

14   of the tying of and the use of the word "carcinogen," although

15   I understand that's still an issue that is largely going to be

16   resolved by Judge Bumb.

17          I don't think that this usage kind of falls outside of

18   that scope in terms of being a more heightened or acute issue

19   from an objection perspective.  But I think the big issue here

20   is the questioning is targeting this idea of what Torrent did

21   on a going-forward basis to prevent this sort of problem from

22   happening again, and that's not appropriate testimony for this

23   trial.

24          This trial is about what led to the nitrosamines, the

25   NDMA and NDEA being in valsartan API.  It's about the presence

1    of that API in products.  It's about the warranties that were

2    given.  It's about whether or not there was any fraud committed

3    with respect to communications to third-party purchasers with

4    respect to the contents of these products when they were on the

5    market.

6         It's not about what Torrent did on a going-forward

7    basis with respect to other products after this recall.  And I

8    know there's other products at issue in this case and kind of

9    there may be other reasons why plaintiffs would have asked this

10   question that they may -- like, that may come back at future

11   points in this case or in losartan issues, but with respect to

12   valsartan, with respect to this trial, this question is

13   irrelevant, and it would be deeply prejudicial to put in front

14   of the jury what happened after the issues that the jury is

15   being asked to weigh and decide upon.

16        SPECIAL MASTER VANASKIE:  Daniel?

17        MR. NIGH:  Your Honor, just keep in mind that she came

18   into the company in September of 2018, and the NDEA problem is

19   discovered thereafter, so it is still relevant even to the NDEA

20   in valsartan.

21        MR. RAE:  Your Honor, if I may respond briefly to

22   that?

23        SPECIAL MASTER VANASKIE:  Yes, you may.

24        MR. RAE:  As Mr. Nigh admitted earlier, the recall was

25   completed with respect to NDMA, in fact, I believe before NDEA

1   was discovered.  So there was a discovery that in addition to

2   the NDMA that led to the recall of the product, there was also

3   NDEA in some of the batches of API that Torrent used, and there

4   were retrospective investigations of that.  We're not disputing

5   the existence of NDEA in the batches that contained NDEA.  But

6   the NDEA itself was not kind of a separate and distinct problem

7   that required action by Torrent because the action that would

8   have been necessary, recalling the product, had already taken

9   place with respect to the NDMA discovery.

10          MR. NIGH:  Your Honor, the NDEA wasn't even being

11  discovered until 2018.  The first one to discover it in

12  September of 2018 was the FDA.  Torrent didn't take action to

13  recall the product that had NDEA until after that.

14          SPECIAL MASTER VANASKIE:  I don't know what that has

15  to do with the questions presented here, but I will sustain the

16  objection.

17          The witness says:  I don't know.

18          MR. NIGH:  Well, she says, yes.

19          She says:  In general, I -- so I guess, yes, in

20  general.

21          Do you have a -- do you have a recall -- so you have a

22  recall of the size and scope you've never seen involving

23  carcinogen in the pill that your company distributed, don't you

24  want to know how that happens so it won't happen again?

25          I guess so, yes, in general.

1          SPECIAL MASTER VANASKIE:  Yes.

2          MR. NIGH:  So she still has some role in the

3    investigatory response, you know, after -- even just for the

4    NDEA, let alone whatever her responses are and communications

5    are with the FDA with NDMA, it's still important because she's

6    still part of that investigative response.  But for NDEA, she's

7    there when it's happening.

8          (Simultaneous speakers.)

9          SPECIAL MASTER VANASKIE:  And the question:  What

10   steps did Torrent take to make sure it wouldn't happen again?

11         And she says:  For valsartan, I don't know.

12         MR. NIGH:  Right.  And that's why it's important,

13   because she's involved in the steps that are being taken and

14   she doesn't know.

15         MR. RAE:  And, Your Honor, it's not important because

16   before Ms. Attinger started at Torrent, Torrent had recalled

17   all of its valsartan product.  Torrent never started selling

18   valsartan product again.  There was no point during

19   Ms. Attinger's employment at Torrent or since then where

20   Torrent has sold valsartan product.

21         SPECIAL MASTER VANASKIE:  Yes, I will sustain the

22   objection.  The testimony and questions from line 12 through --

23   lines 12 through 23 of page 143 will not come in, and the

24   answer at lines 2 through 3 of page 144 will not come in.

25         MR. RAE:  Thank you, Your Honor.

1          SPECIAL MASTER VANASKIE:  I think that takes us now to

2   page 177.  And this is on a counter-designation and it concerns

3   attorney commentary.  Lines 1 through 7 of 177.

4          You just want to take out that introductory

5   information?

6          MR. NIGH:  Your Honor, just re-looking at it, I will

7   withdraw the objection.  I think it's fine the way it is.

8          SPECIAL MASTER VANASKIE:  Okay.  And then 178, lines

9   23 through 179, line 2.

10          MR. NIGH:  That, we'll withdraw.

11          SPECIAL MASTER VANASKIE:  All right.  I think now we

12   are at page 181, line 11.

13          MR. RAE:  Your Honor --

14          SPECIAL MASTER VANASKIE:  Go ahead, Jacob.

15          MR. RAE:  This is a similar issue to before but

16   there's a foundation issue -- there's going to be -- this is

17   not an issue that the witness actually has personal knowledge

18   of who.  We've seen that earlier in this deposition already.

19   And so they're asking questions of the witness about things

20   that she doesn't know and they're drawing "I don't know"

21   answers, and we think it's prejudicial to present that type of

22   testimony to the jury, particularly in a repetitive way,

23   because it will start -- it starts to create an impression in

24   the jury that these are things that aren't known as opposed to

25   just things that this individual witness doesn't know because

```
 1    she didn't work on these issues.  And I think this also kind of
 2    ties back to the use of video testimony generally and I don't
 3    want to relitigate those issues, but this type of --
 4            SPECIAL MASTER VANASKIE:  We're not going down that
 5    road again.
 6            (Simultaneous speakers.)
 7            MR. RAE:  Right.  This type of questioning might be
 8    less prejudicial in the context of live testimony where there
 9    would be kind of a clear opportunity to come back in redirect
10    and kind of clarify why she doesn't know some of these things,
11    but that opportunity doesn't exist with the video testimony.
12            We think that makes it more important for the Court to
13    kind of play a gatekeeping role in potentially prejudicial
14    testimony that's pushing a witness on issues that they don't
15    know about.
16            MR. NIGH:  Your Honor, we have Jaiswal's 30(b)(6)
17    testimony on this, so we will withdraw these questions.
18            SPECIAL MASTER VANASKIE:  All right.  So removed from
19    the transcript is the information at lines 11 through --
20            MR. NIGH:  16.
21            SPECIAL MASTER VANASKIE:  -- 16.  Yes, 11 through 16
22    on page 181.  All right?
23            Now are we up to 187, line 15?
24            MR. NIGH:  Yes.
25            MR. RAE:  We are, Your Honor, yes.
```

1           And I -- if I should jump in, I think our main

2      objection here is the 407 objection that relates to the

3      document and it relates to the testimony that follows relating

4      to it, that this is -- line of questioning is an

5      after-the-fact -- like, it was about an after-the-fact

6      investigation that Torrent hire the consultant to conduct

7      regarding the existence of NDMA and NDEA in its products and

8      how that came to be.  That's a subsequent remedial measure that

9      shouldn't be coming into evidence before the jury.

10           Rule 407 exists to encourage companies like Torrent,

11      when there's a problem, to go out and do these sorts of

12      investigations to figure out what happened, to figure out how

13      they can fix what happened without having the fear of those

14      investigations coming into evidence related to the problem that

15      was previously existing.  And letting this evidence in is

16      contrary to the purpose of Rule 407, which is, again, to

17      encourage the exact kind of conduct that Torrent engaged in

18      here in conducting this investigation.

19           SPECIAL MASTER VANASKIE:  Daniel?

20           MR. NIGH:  Your Honor, an assessment by a consultant

21      of what went wrong after the fact is not the same as

22      introducing evidence of a subsequent remedial measure.

23           In addition to that, this formulated Torrent's -- this

24      formulated the basis of Torrent's response to FDA's

25      investigation as to what went wrong in this issue.

```
 1          So an assessment of what went wrong is not the same as
 2   a subsequent remedial measure.
 3          SPECIAL MASTER VANASKIE:  Yes, I agree.  I think it's
 4   a creative argument to say this is a subsequent remedial
 5   measure; but in doing an investigation to determine what went
 6   wrong I think broadens Rule 407 way beyond what it was intended
 7   to cover.  And, therefore, we'll allow the testimony at pages
 8   181, lines 11 to 13; 181, line 16.  I think this also covers
 9   187, line 15 to 18; page 190, lines 20 to page 191, line 5.
10          And so that takes us to page -- correct me if I'm
11   wrong on this -- 193, line 23.
12          MR. NIGH:  I think that's the same issue but I will --
13   181, lines 11 to 16, we addressed that separately.  That was
14   the one that we lost on.
15          SPECIAL MASTER VANASKIE:  Right.  Okay.  Thank you for
16   that.
17          MR. NIGH:  Yes.  I think this issue goes all the way
18   through from 187, line 15, to our designations in page 197,
19   line 10.
20          MR. RAE:  I would agree with that, and I think we have
21   some different objections to the nature of the questions that
22   are being asked about this document that don't relate to the
23   issue that we've already discussed about why we think kind of
24   the line of questioning with respect to the subsequent remedial
25   measure, Rule 407 issue, should apply.
```

1          And if I may speak to those briefly, Your Honor?

2          SPECIAL MASTER VANASKIE:  Yes, you certainly may.

3          MR. RAE:  So I understand Your Honor's ruling that

4     kind of the investigation of what -- to the extent the

5     investigation relates to what went wrong, that is a fair area

6     for plaintiffs to be inquiring into.  I think the way

7     plaintiffs are using this document and the testimony they're

8     designating is different from that.  And if you look at the

9     first of the questions that they ask about, on page 190,

10    starting on line 20 --

11         SPECIAL MASTER VANASKIE:  Let me get there.  Okay.

12    I'm there.

13         MR. RAE:  -- this is -- the question here is

14    ultimately kind of reading from the scope of the investigation

15    as it relates to acceptable daily intake levels for NDMA and

16    NDEA, and we think kind of that question I think probably

17    actually is covered by the ruling that you've already

18    established because it relates to low levels of the product.

19         Even if we jump down to 193-23 to 194-4, the question

20    there is:  Is there something different between the NDMA that

21    was found in Torrent's product and the NDMA that was used to be

22    used as rocket fuel?

23         And that's content that's within the document that

24    there's some history of kind of the use of NDMA that exists

25    within the document that refers to other uses of NDMA; but we

1    think it's extremely prejudicial for plaintiffs to be asking a

2    question about those historic uses that are not tied to the

3    issues in this case, the allegations in this case, the concerns

4    that -- this isn't even tied to kind of the dispute about

5    carcinogenicity issues in this case.

6            This is an entirely different usage of NDMA that

7    plaintiffs are asking a question about presumably because the

8    idea that this product was used in connection with rocket fuel

9    will stir some emotional reaction from the jury to that fact,

10   even though it has no relevance to this case.  And so we think

11   there's a huge 403 issue with this question.

12           MR. NIGH:  Your Honor, we think --

13           SPECIAL MASTER VANASKIE:  Daniel?

14           MR. NIGH:  -- the NDMA is the central -- is very

15   central to this case.  So giving the jury context of what NDMA

16   is used for is key.  I mean, the only uses of NDMA were to be

17   used in rocket fuel and to inject laboratory animals to test

18   for tumors, to give them a tumor so you could test for cancer

19   treatment or to study cancer.  Those are the two uses of NDMA

20   in the last 40, 50 years.  So sure we can discuss here's what

21   NDMA is.

22           SPECIAL MASTER VANASKIE:  Yes, I think it's not unduly

23   prejudicial and I don't think it outweighs its probative value

24   and I'll allow the question.

25           (Simultaneous speakers.)

```
 1            SPECIAL MASTER VANASKIE:  That's page 193, line 23 to
 2   page 194, line 4.
 3            What else do you have, Jacob?
 4            MR. RAE:  I think our next objections are going to
 5   fall into kind of issues of the scope of general causation and
 6   the carcinogenicity risk-benefit issues that would come in to
 7   the extent they depart from issues that we've already
 8   discussed, and so I just want to note that for the testimony
 9   from 196, line 6 to 16 and -- I think, actually, to some
10   degree, 197, line 8 to 10, only because it's kind of echoing
11   and referring back to that prior testimony as I read it, those
12   would tie into that issue.  But I think Your Honor's rulings so
13   far would otherwise resolve our objections to that testimony.
14            SPECIAL MASTER VANASKIE:  All right.  So there's no
15   need to address that issue further here, I take it?
16            MR. RAE:  Correct, Your Honor.
17            SPECIAL MASTER VANASKIE:  Okay.  So where do we pick
18   up now?  Are we up to page 235?
19            MR. RAE:  We are on -- I believe we're on -- did you
20   guys -- Mr. Nigh, did you drop your other designation at 203-6
21   to 11?
22            MR. NIGH:  No, it's just marking the exhibit.
23            MR. RAE:  So, Your Honor, our position is similar to
24   the one we discussed earlier.  This is -- there's no question
25   about this document.
```

```
 1          SPECIAL MASTER VANASKIE:  So you want to strike lines
 2   6 to 11 on page 203?
 3          MR. RAE:  Correct, Your Honor.
 4          SPECIAL MASTER VANASKIE:  That seems to me to be
 5   appropriate, since there's no ensuing question.  So I'll
 6   sustain your objection to that.
 7          And lines 6 to 11 on 203 will be stricken, will not be
 8   played for the jury.
 9          And I think now we go to -- is it page 235?
10          MR. RAE:  Yes, Your Honor.
11          MR. NIGH:  And, Your Honor, I just -- I'm not seeing
12   anywhere where we actually do ask questions about that
13   document, but just in case we do, then we would need to
14   introduce the document.  But I don't see it in the questions
15   ensuing so...
16          SPECIAL MASTER VANASKIE:  Yes, I didn't see it.  So,
17   obviously, if you come back and say, well, no, we did ask
18   questions, we can revisit the issue, but for now it's out.
19          MR. RAE:  And we've been -- I think we started --
20   Mr. Nigh will recall -- we started with a lot of these
21   objections and we've, over time, been trying to winnow them to
22   areas where we, in good faith, do not believe that there is a
23   question being asked about the document.  So I'm not
24   foreclosing that we may have, inadvertently still have an
25   objection that doesn't apply in that context.
```

```
 1            In fact, I think our next one would kind of -- is
 2   slightly different in that the objection applies to the usage
 3   of the document generally as well, but kind of as a general
 4   matter, we've tried to avoid these unless we're objecting to
 5   the document coming in or there actually is no subsequent
 6   question about the document.
 7            SPECIAL MASTER VANASKIE:  So we're up to 235, lines 2
 8   to 7.  This deals with Torrent Exhibit 181.
 9            MR. NIGH:  And this is just introducing the document
10   and we do ask questions about it later, I believe.  It's right
11   below.
12            MR. RAE:  Yes.  And we believe that Judge Bumb has
13   excluded the questions that are being asked about this
14   document.
15            This is an FDA -- these questions are about a 483
16   warning letter that was written to Torrent in 2019 relating to
17   an FDA inspection that took place in 2019 of Torrent's
18   production facilities that has -- the inspection did not have
19   to do with valsartan, and Torrent wasn't even making valsartan
20   finished dose products anymore at the time that the inspection
21   took place.
22            Judge Bumb ruled generally that in response to joint
23   defendant's motion in limine 2 that these types of reports and
24   questions about them, if they don't have a tieback to
25   valsartan, are irrelevant.  They would be confusing to the
```

1  jury, they would result in a minitrial within a trial about

2  whether or not there was any connectivity back to valsartan and

3  Torrent's production of valsartan about this and that it would

4  be a distraction and shouldn't come into trial.

5          She also addressed that she believes that this

6  would -- that introducing testimony like this and documents

7  like this is concerning to her from the perspective of whether

8  or not it's a character assassination.  Those are her words,

9  not mine.

10          And this specific one is at the heart of -- to the

11  extent there's any disputes about the scope of that ruling,

12  Judge Bumb also explicitly ruled out the Meridan report, which

13  was the consulting investigation that Torrent did in response

14  to this 483 warning letter, and when she got to the joint

15  defendant MIL 2, which she ruled on after ruling that the

16  Meridan report was excluded, she recognized that the issue that

17  she was ruling on was the same issue as with respect to the

18  Meridan report.

19          And there's no closer or cleaner example of how it's

20  the same issue than this document and the 483 -- the 2019

21  inspection report and 483 warning letter for Torrent's

22  facilities that led to the Meridan report that she also

23  excluded.

24          MR. NIGH:  Jacob, how far does this go down into?  Is

25  this objection all the way to 258, line 4 from 235, line 2 to

1    258, line 4?

2            MR. RAE:  I believe it does.  And then I think some of

3    the objections that follow it there may be areas where it kind

4    of ties back in through page 265, line 24.

5            MR. NIGH:  Okay.  Your Honor, here's my suggestion.  I

6    think we're getting into a point where we're going to be

7    arguing an MIL that the judge ruled on.  I think you've heard

8    some of this back and forth.  I don't think it's --

9            (Simultaneous speakers.)

10           SPECIAL MASTER VANASKIE:  Yes.

11           MR. NIGH:  -- a surprise that we believe that the

12   judge later spoke up, they're citing from the first part, and

13   the judge spoke up after that.  But if it's evidence of a

14   systemic problem that we could point to it, we do believe that

15   we have evidence of a systemic problem from the 2017

16   inspection, the 2019 inspection and so forth that would cover

17   the time frames that they were selling valsartan in this plant.

18           But if I could, I would just ask -- I think we should

19   just reserve this until Monday, like we did with some for

20   Jaiswal.  You know, we may revisit this and say this isn't --

21   we don't want to bring this in in this way.  So we could hold

22   off on ruling on this, but we had some meet and confer, and I

23   already agreed on Jaiswal to pull this testimony.  So I may

24   look at this here and do the same thing.

25           SPECIAL MASTER VANASKIE:  All right.  Is that fine by

```
 1   you, Jacob?

 2           MR. RAE:  That's -- yeah, I'm not going to dispute the

 3   proffer that they're going to -- that Mr. Nigh is going to take

 4   a second look at this and that he may be pulling this, so we

 5   may not have to bother Your Honor with making a ruling on this

 6   issue.

 7           For clarity, I just want to note that when Judge Bumb

 8   spoke of the possibility of a systemic -- of use of documents

 9   to show something that's systemic being potentially

10   permissible, she very clearly put the burden on plaintiffs to

11   go back to Judge Bumb and explain to her how any document that

12   would fall into this category would support use to show a

13   systemic violation before it could come into evidence.

14           And so we think in the absence of them having done

15   that, her motion in limine rulings bind the parties and Your

16   Honor that this testimony would not be admissible.  But, again,

17   I don't think we need to address that now because it sounds

18   like there may be a possibility that this dispute won't need to

19   be resolved by Your Honor.

20           SPECIAL MASTER VANASKIE:  All right.  Very well.  So

21   let's be clear on what's being reserved.  So we're talking

22   about -- let me see, I have to go back and look at the

23   transcript -- the testimony, objections and questions, answers

24   from page 235 through 265.

25           Do I have that right?
```

1              MR. NIGH:  I think it's 258, line 4.

2              SPECIAL MASTER VANASKIE:  Okay.

3              MR. NIGH:  And then there may be one or two other

4    questions that Jacob said this still ties to.

5              MR. RAE:  Yes, I would agree with that, Your Honor.  I

6    think the rest of the questions through the end are kind of

7    grounded in the same examination, but some of them do ask

8    questions that are not kind of fully grounded in the document

9    such that they might be able to stand up on their own, and we

10   have objections to those questions too.

11             But depending on the approach that plaintiffs want to

12   take here, we're okay kind of addressing those as objections to

13   testimony that doesn't require use of the document and,

14   therefore, may be outside the scope of the motion in limine

15   ruling.

16             SPECIAL MASTER VANASKIE:  So let me ask counsel, what

17   is each of your understandings as to what we are reserving?

18             MR. NIGH:  Actually, Your Honor, I would probably just

19   ask to go through to 265, line 11 because I think it is closely

20   tied to this document.

21             SPECIAL MASTER VANASKIE:  Okay.  So -- and it starts

22   at where?

23             MR. NIGH:  235, line 2.

24             SPECIAL MASTER VANASKIE:  Okay.

25             MR. NIGH:  Yeah, I mean, if we're going to make the

```
 1  decision to pull the other, I don't think we would leave these
 2  questions in between there anyways.
 3          SPECIAL MASTER VANASKIE:  Okay.  And is that
 4  acceptable to you, Jacob, in terms of what we're reserving on?
 5          MR. RAE:  Yes, it is, Your Honor.  And I didn't want
 6  to kind of force Mr. Nigh into that position, because I know
 7  kind of the testimony becomes a little bit different in a few
 8  spots.  But I think that's an appropriate way to approach it
 9  for now and --
10          SPECIAL MASTER VANASKIE:  Okay.
11          MR. NIGH:  In fact, just to clear it up, it actually
12  goes through all the rest of what we have for Bernadette
13  Attinger, I believe it's through to 265, line 24.
14          SPECIAL MASTER VANASKIE:  That would be it, right?
15  265, line 24 is the end?
16          MR. NIGH:  Yes.
17          SPECIAL MASTER VANASKIE:  So we've reserved ruling on
18  that.  You have the rulings with the other parts of
19  Ms. Attinger's testimony.  And we'll proceed to Dawn Chitty.
20          I would like to take a ten-minute break at this time.
21          MR. NIGH:  Thank you, Your Honor.
22          SPECIAL MASTER VANASKIE:  All right.  We'll resume at
23  10:35.
24          (Brief recess taken from 10:25 a.m. to 10:37 a.m.)
25          SPECIAL MASTER VANASKIE:  All right.  I'm back.
```

1          Daniel, are you there?

2          MR. NIGH:  Yes, Your Honor.

3          (Discussion held off the record.)

4          SPECIAL MASTER VANASKIE:  All right.  So I think we

5  can resume then.  We're going to pick up with Dawn Chitty.  And

6  I have -- I guess the first area of concern is with the

7  counter-designation and whether the response at lines 4 to 7 on

8  page 25 -- lines 4 to 7 is the question.

9          MR. NIGH:  Your Honor, if I may?

10          SPECIAL MASTER VANASKIE:  Yes, go ahead.

11          MR. NIGH:  Your Honor, if I may, we're going to

12  withdraw 25, line 4 to 7, and 25, line 10 to 16.

13          SPECIAL MASTER VANASKIE:  Okay.  Good.

14          MR. NIGH:  We're going to withdraw our objection, I

15  mean.

16          SPECIAL MASTER VANASKIE:  All right.  So do we pick up

17  now on page 26, lines 10 through page 27, line 8, Jacob?

18          MR. RAE:  Yes, Your Honor, I think that's correct.

19  And our objection here is in the initial instance kind of

20  starting at line 10 and then we have some additional objections

21  that get layered in.  But this is just a document for which

22  there's no foundation to be asking this witness, who is not a

23  30(b)(6) witness, she's testifying based on her own personal

24  knowledge.

25          The question starting at 26-5 to 9, plaintiffs

```
 1    introduce the document, they ask her:  Have you seen this
 2    before?
 3             She answers:  Not that I recall.
 4             That should be the end of the questioning of this
 5    witness about this document.
 6             And the questioning goes on.  The next question is a
 7    question about the content of the document.
 8             And the witness answers, "I'm not sure," because she
 9    doesn't have any personal knowledge of this document.  And
10    we're going to see that throughout kind of the upcoming line of
11    questioning, that -- Rule 602 does not permit asking witnesses
12    who are testifying in their personal capacity about documents
13    that they have no personal knowledge of.
14             SPECIAL MASTER VANASKIE:  Daniel?
15             MR. NIGH:  Your Honor, I believe that that's a little
16    truncated on that rule, frankly, because there's a lot of other
17    purposes as to how documents come in.  The very fact that she
18    doesn't have knowledge of this document and the statements that
19    are within it are what make it relevant.  Dawn Chitty is one of
20    the quintessential people in the corporation that's interfacing
21    both with the FDA, interfacing with the company, she's asking
22    all sorts of safety questions, she's involved in the safety of
23    the drug clearly, and we can -- and she's in numerous documents
24    that are the most important documents that we are using in this
25    case.  And she's one of the people who over and over and over
```

1  again is asking why they haven't developed a test to actually

2  test for whether or not there's NDMA in the product.  So to get

3  a true understanding of her knowledge is very important.

4          But then I would also point above, which is what we

5  just allowed in the -- the defendants wanted to add 25, lines 4

6  to 7 and then 25, lines 10 to 16.  You know, the question there

7  was -- and it's up to the manufacturers to -- she said -- her

8  answer -- sorry -- she says:  "I think the timing of this

9  information is somewhat -- somewhat critical.  That web page is

10 dated from 2011, not at the time we were initially making

11 decisions related to the recalls," as if there's, you know --

12 at that point, you know, that's related to what are the

13 regulations regarding nitrosamines.

14         And, you know, here she's saying, well, those were

15 regulations later, not at the time of the recall, not at the

16 time that the product is on the market.

17         So then we get to really get into her knowledge, what

18 is her knowledge of what's allowed at the time these products

19 are on the market.  And part of that is understanding NDMA and

20 understanding what has been known about this carcinogen,

21 because in order to tie in genotoxic statements that are the

22 regulatory requirements, you needed to understand the genotoxic

23 substance.

24         MR. RAE:  And, Your Honor, if I may briefly?

25         SPECIAL MASTER VANASKIE:  You may.

```
 1          MR. RAE:  To be clear, we're not objecting and we
 2   haven't objected to the testimony to establish that the witness
 3   doesn't know about this document.  And Your Honor previously
 4   overruled objections to Dr. Jaiswal, who is testifying in a
 5   30(b)(6) capacity, about -- I'm not sure if it was this
 6   specific document but about similar lines of questioning with
 7   respect to Torrent's knowledge.
 8          We think it's very different -- and plaintiffs are
 9   obviously free to make arguments to the extent this document
10   comes -- otherwise comes into evidence through someone who can
11   put it into evidence -- about what Ms. Chitty should have known
12   from this document that she does not have personal knowledge
13   of.  That's a different issue.  But questioning her about the
14   document that she lacks personal knowledge of is improper.
15          MR. NIGH:  I think what we will see is that we are
16   questioning her about information within the document, and then
17   when we are asking her thereafter is she aware of that
18   information.  And some of it, she is aware of it.  Even though
19   she's not aware of the document itself, she's aware of the
20   information that's contained within the document.
21          MR. RAE:  Your Honor, we're happy to talk about -- if
22   there are examples of that, I think that may be a different
23   type of testimony.  And we've tried to kind of draw reasonable
24   lines in our objections precisely to accommodate issues like
25   this.
```

```
 1            But the question that we're looking at here is about
 2    what the document says.  The answer following the witness
 3    saying that she can't recall ever seeing this document before
 4    is that she's not sure.  And then she testifies that she
 5    believes that's what the content of the document stands for,
 6    again kind of reinforcing that she doesn't actually know the
 7    content of this document that she's being asked to testify
 8    about.
 9            SPECIAL MASTER VANASKIE:  I'm sorry.  I'm looking back
10    at the testimony.
11            So if we go to page 30, lines 5 really through 19,
12    she's asked, the last sentence says:  NDMA is a genotoxic
13    carcinogenic, and exposure will be reduced to the extent
14    possible.  Do you see that?
15            Yes.
16            So exposure should be reduced to the extent possible,
17    that means try to expose people to it as little as possible?
18    Right?
19            There's an objection to form, and an answer:  It means
20    what it says, reduce to the extent possible.
21            So I don't think it requires -- that excerpt that I
22    just read would require great familiarity with this document as
23    a whole.  It seems to me that question could be asked and
24    answered.
25            So I'm going to overrule the objections that are --
```

 1  unless you point out one that requires separate treatment,

 2  Jacob, I would allow the testimony from page 26, lines 10

 3  through page 27, line 8; the testimony at page 27, line 17 to

 4  line 24; 28, line 3 to 28, line 9; 28, line 12 to line 15; 30,

 5  line 5 to 30, line 14; and 30, lines 17 to 19.

 6          Now can we go to page 42, picking up on line 24, so

 7  the very bottom of page 42.

 8          MR. RAE:  Yes, Your Honor.  And I believe our

 9  objection in this section begins -- is just to the question at

10  43, 19 to 20.

11          SPECIAL MASTER VANASKIE:  Okay.  And this is just

12  they've gone through and pulled out information in terms of the

13  levels that have been detected and making the point that it's

14  multiples of the allowable limit, I take it?

15          MR. RAE:  Correct.  And to be clear, Your Honor, we're

16  not objecting to the testimony that establishes what the levels

17  of NDMA were in this document, we're not objecting to the

18  testimony about what the subsequently established FDA limit for

19  those levels were, but I think the question of "63.4 is

20  significantly more than .3, right," is an unfairly prejudicial

21  question, and it's an improper, abstracted, vague question,

22  because significantly more is a context-dependent inquiry.

23  There needs to be a source of measurement for whether or not

24  something is significantly more.

25          And just to use the numbers here -- like, if you're

1  measuring -- if the kind of -- if you're talking about

2  something, like, where the reasonable framework is in millions,

3  then 63.4 isn't necessarily that much more than 0.3.  If you're

4  talking -- like, depending on context, the relationship between

5  numbers and whether or not it's significantly more or a small

6  amount more is different in, like, that's really the province

7  of the jury to decide the relationship of these things.

8         And that's why this question -- obviously the witness

9  answers 63.4 is higher than 0.3, because that's the scope of

10  what is a reasonable thing for this witness to be commenting on

11  from her personal knowledge as someone who is not a chemist or

12  a toxicologist.  But even this testimony is cumulative to the

13  extent it kind of just stands for the witness's answer there,

14  because we've already established 63.4 is the level, we've

15  already established 0.3 is the limit.  And, frankly, the jury

16  doesn't need to hear someone tell them that 63.4 is higher than

17  0.3.

18         MR. NIGH:  If the objection is only to page 43, lines

19  19 to 24, we would withdraw that.  I think the questions that

20  are designated after are fine.

21         SPECIAL MASTER VANASKIE:  All right.  So 63, lines 19

22  to 24, the testimony at page 63, lines 19 to 24 is out.

23         MR. NIGH:  And then, Your Honor, I think then we would

24  designate page 44, lines 5 to 7, because it sounds like he

25  wanted a mathematical as opposed to significantly more.

1          And that's more than a hundred times the limit, right?

2          And the answer is:  Yes.

3          SPECIAL MASTER VANASKIE:  Jacob?

4          MR. RAE:  I think that testimony is going to be

5    cumulative of other issues later on, and we're going to have

6    some cumulative objections related to these types of questions.

7    But in this specific instance, I have no objection to that.

8          SPECIAL MASTER VANASKIE:  Yes, I will allow it.  So

9    lines 5 through 7 on page 44 are in.

10          Where does that take us now?

11          MR. RAE:  I think we have an objection on 46-12 to

12    46-20, but I'm willing to stipulate that you're going to

13    overrule that objection to have things move on.

14          SPECIAL MASTER VANASKIE:  Yes, yes.  I've looked at

15    this, and I would allow that testimony.

16          So the objections on page 46 are overruled, and lines

17    12 through page 67, line 2 -- I'm sorry.  46, lines 12 through

18    20 are in.  All right?

19          MR. RAE:  Yes, Your Honor.  And then our next

20    objection, which is one of these ones that comes into a block

21    of testimony, to be clear, starts at page 60, line 24 and then

22    runs through the questioning on 61, line 18.

23          SPECIAL MASTER VANASKIE:  So you have the witness use

24    a calculator and provide numbers.

25          Go ahead, Daniel.

1          MR. NIGH:  Just to be clear, what we were looking at

2  before was NDMA, now we switched attention to NDEA, just so

3  Your Honor understands --

4          SPECIAL MASTER VANASKIE:  Yes, NDEA.

5          MR. RAE:  And, Your Honor, our objection here --

6  sorry, I didn't mean to interrupt Mr. Nigh.

7          SPECIAL MASTER VANASKIE:  Go ahead.

8          MR. RAE:  Our objection here is really a

9  cumulativeness objection that we do not object, as I pointed

10  out, to the initial line of this questioning from page 60,

11  line 3 to 60, line 23 where plaintiffs go through one example,

12  do the math with Dawn Chitty, show the amount that the levels

13  are higher; but I don't think there's any reason why the jury

14  needs to see Ms. Chitty be a human calculator for -- after

15  seeing that 14.13 divided by .083 is, I guess, 170 times --

16  comes to 170, to also do that with 15.29, with 13.93, with

17  16.93, with 15.29.  Like, those are all pretty similar numbers.

18  The jury doesn't need to hear the math done over and over and

19  over again.

20          SPECIAL MASTER VANASKIE:  No, I will allow it.  So the

21  objection is overruled.

22          And the testimony -- just trying to be precise here --

23  on page 60, line 15 to page 61, line 18; and page 62, line 1 to

24  62, line 16 will be in, is admissible.

25          And I think now we're at page 69, line 22.  Do you

1  agree?

2          MR. RAE:  Yes, Your Honor, I agree.

3          SPECIAL MASTER VANASKIE:  All right.

4          MR. RAE:  And, Your Honor, the objection that we have

5  stated here is there's a foundation objection, there's also a

6  401 and a 403 objection, and this kind of has a form problem in

7  that it assumes facts not in evidence.  And they all tie to the

8  same thing, which is an issue that Judge Bumb already decided

9  in a motion in limine, which is -- and we talked about this

10 before.

11         There's an email in this case from, I believe, 2015

12 where someone at Torrent, someone who's not Ms. Chitty, refers

13 to the sourcing of cheaper Chinese API in respect to some

14 Torrent communications about their ability to kind of compete

15 on pricing for a Walmart contract.  And this -- Judge Bumb

16 ruled that references to cheaper Chinese API are admissible but

17 discussion of cheap Chinese API, which plaintiffs asked many of

18 our witnesses about and has a different connotation and

19 meaning, is not permissible.  And that's what's going on here.

20         The question is:  We can agree that Torrent wanted to

21 find a cheap API product.

22         There's no foundation for that assumption, for that

23 question.  It's irrelevant and unduly prejudicial in the exact

24 same ways that Judge Bumb addressed with respect to the email

25 itself.  And it also, on top of that, lacks foundation, because

1   there's nothing to support Torrent wanting to find a cheap API

2   product.

3          To the extent that email stands for anything, it's in

4   reference to the existence of a cheaper API product, which is a

5   different meaning and statement.

6          MR. NIGH:  So, Judge, I would -- this is the

7   quintessential example of giving an inch, take a mile.  That

8   ruling is very clear.  It's very limited.  And Judge Bumb made

9   it very clear at the very end when I asked a clarification

10  question, and she said, you cannot misquote the email.  That's

11  it.

12         So now we're not -- the email is not even brought up

13  here.  It's just asking, you're trying to find cheap Chinese

14  API.  That's it.  There's no quote of anything.  The email is

15  not here.  And so to try to say this has been ruled upon, it

16  has not.  There's no quoting of an email.  It's just a question

17  to her, and she answers it in a way that provides context to

18  the question.

19         MR. RAE:  Your Honor, respectfully, what Judge Bumb

20  said is if the email says cheaper, cheaper is what comes in in

21  front of the jury.  And this is not cheaper, this is cheap, and

22  that's what she excluded.

23         MR. NIGH:  And, Your Honor, right after she said that,

24  I asked, Judge -- and she came back and she said, no, I mean

25  you can't misquote the email.  We're not even quoting an email

1   here.

2          SPECIAL MASTER VANASKIE:  You're characterizing the

3   email, though, are you not?

4          MR. NIGH:  No.  There's no email.

5          SPECIAL MASTER VANASKIE:  So the question is:  We can

6   agree that Torrent wanted to find a cheap API product, right?

7          The answer is:  We're always looking for multiple

8   sources of API prices, not necessarily always the main driver.

9          And then you talk about an email from December of

10  2006.

11         MR. RAE:  And to be clear, Your Honor, our objection

12  to the testimony beginning on line 9 of page 70 is a different

13  objection because it's transitioning to a different topic

14  there.  So currently we're, I think, just discussing the

15  objection on 69-22 to 70-7.

16         SPECIAL MASTER VANASKIE:  70, line 7.  Yes, I'll

17  overrule the objection and allow this to come in.  I don't

18  think it runs afoul of Judge Bumb's ruling.

19         Now, you have an objection to the question starting at

20  line 9.  I'm getting confused here.

21         MR. RAE:  Yes, Your Honor.  So it's 70, line 9 to 70,

22  line 16.  This is an email from 2006 that Ms. Chitty is being

23  asked about, and no foundation is laid for asking Ms. Chitty

24  about this email.  The reality is that Ms. Chitty wasn't a

25  recipient or a sender on this email.  There's no tie to

1    Ms. Chitty.  And plaintiffs' questioning kind of skips over the

2    necessary laying of foundation here and just starts to ask her

3    about the content of the email.

4         And, again, we don't think that it's appropriate for a

5    witness to be asked about the content of emails that the

6    witness has never seen before, that there's no foundation

7    indicating that the witness has personal knowledge of.

8         SPECIAL MASTER VANASKIE:  Daniel?

9         MR. NIGH:  Your Honor, she even mentions it, and

10   page 72, as we skip ahead -- I am sorry, her testimony, as we

11   skip ahead, she's going to see -- you're going to see that she

12   is involved in this, and her role is involved in securing a

13   second source, which is precisely what happens here.  It is the

14   second source of API that's procured, ultimately becomes the

15   only source to choose for the API that's sold in the U.S., so

16   she's involved in this issue.

17        MR. RAE:  And, Your Honor, we'd agree that there is

18   testimony later on that this witness had involvement in things

19   other than this email related to developing potential

20   additional sources for valsartan API.  She gave answers that

21   indicated that.  That presented an opening for plaintiffs, if

22   they wanted to, to ask her questions about the foundation that

23   she had laid for inquiring into her role in that.

24        That's not the testimony that they're designating

25   here.  I'm not sure that they actually have that testimony that

1    would have a foundation because they didn't ask those questions

2    for the most part.  But if they had established foundation --

3    if they established personal knowledge and then pursued the

4    line of questioning based on that, we wouldn't be making this

5    objection.

6         And to point to later areas where she talks about

7    general involvement in an area adjacent to the topic of this

8    email, that doesn't establish personal knowledge of the email

9    itself.

10         SPECIAL MASTER VANASKIE:  Yes.  This is dated 2006,

11    long before she's ever on the scene, I take it, right?

12         MR. NIGH:  She is working there in 2006.

13         MR. RAE:  I would agree with that.  I think --

14         SPECIAL MASTER VANASKIE:  All right.  Those years

15    before Torrent put valsartan on the market, that's what the

16    testimony is?

17         MR. NIGH:  It is, but keep in mind, this is the

18    beginning of how they get the API, that becomes the API that's

19    in the product that Torrent's putting on the market.

20         MR. RAE:  And to be clear, Your Honor, this is in

21    2006.  Torrent began qualifying ZHP as an API supplier in 2009

22    and first began selling valsartan product using ZHP's API in

23    2015.

24         MR. NIGH:  And just to be clear, Your Honor, I think

25    we've established this both -- through Jaiswal's testimony.

1    We'll establish it multiple other ways.  These things do take

2    time.  So when you're putting a product on the market, you're

3    securing your suppliers, and you're strategizing and doing your

4    business development as to how you're going to do this.

5           It does start from something like 2006, which is

6    precisely what we're seeing here.  2009, now all of a sudden

7    they're qualifying the supplier, and then -- a time frame

8    thereafter, and then they're putting it on the market

9    thereafter.

10          So this is the beginning of that.  If the defendants

11   wanted to come back and say, oh, no, this has nothing to do

12   with it, they've had their ability to put that evidence on, but

13   we have connected the dots.

14          SPECIAL MASTER VANASKIE:  Yes, but I'm not sure if

15   you're using the right witness to connect the dots here.

16          MR. NIGH:  She's --

17          MR. RAE:  Your Honor, I would --

18          MR. NIGH:  My point to that is she's -- one of her

19   roles was to secure the second source of API, and so -- and

20   we've established that in the questions here too.  So this is

21   the second source of API that ultimately becomes the only

22   source of API in the U.S.

23          So her role, while it's not the most of the major

24   roles in the whole chain, her role does connect one link in the

25   chain, and that's why it's important in terms of showing this

```
 1    email to her.

 2            MR. RAE:  Your Honor --

 3            SPECIAL MASTER VANASKIE:  Go ahead.  You can try to

 4    dissuade me.

 5            MR. RAE:  Again, there's questioning of Ms. Chitty

 6    about her role in securing -- she testifies that she had -- "My

 7    interaction with this team mostly focuses" -- this is at

 8    line 72, lines 3 to 10, her answer to a question implying

 9    that -- based on the content of the email, that this sourcing

10    decision related to cost reduction.

11            And Ms. Chitty answers -- and this is not designated

12    by plaintiffs -- "my interaction with this team mostly focused

13    more around developing a second source, which was a risk

14    minimization step in manufacturing; in case something happens

15    to one of your sources, that you have a second source."

16            And so undeniably, Ms. Chitty had an involvement in

17    issues related to developing a second source of valsartan API

18    supply that she has testified to on the record at her

19    deposition, but she doesn't have personal knowledge of this

20    email.  The questions are not about her personal knowledge or

21    her involvement.  They're simply questions of here is what this

22    email that you are not -- that you didn't receive, that you

23    didn't send, that there's no establishment that you've ever

24    seen before this deposition, what does it say?

25            And if plaintiffs -- I think Your Honor has overruled
```

1    our objections to this email coming in through Dr. Jaiswal.

2    This email's going to be in evidence.  I think presumably we'll

3    be able to talk about this email.  But putting it in through a

4    witness who doesn't know about it, who has no opportunity to

5    contextualize it is not proper.

6         SPECIAL MASTER VANASKIE:  Well, I disagree, and I will

7    allow the testimony at pages -- page 70 -- we've already talked

8    about page 70 -- page 71, lines 12 through 16.

9         What are we up to now?

10        MR. RAE:  We are at 74, lines 10 to 19, and then lines

11   20 to 23, I believe.  But there's a couple of different

12   questions and answers that have slightly different issues.

13        So 74, line 10 to 17 is the next question and answer.

14        SPECIAL MASTER VANASKIE:  Okay.

15        MR. RAE:  And, Your Honor, our objection here is it's

16   a similar foundation issue.  If you look at line 74, 4 to 9,

17   plaintiffs' counsel introduces this email as:  "Okay.  You're

18   not on this email, but have you ever -- we can zoom out and

19   show her the whole thing.  Have you ever seen this before?"

20        And Ms. Chitty answers:  "I don't recall."

21        And then the question proceeds to ask her about the

22   content of that email.  And I think we also made 401 and 403

23   objections, but we would concede that, in light of Judge Bumb's

24   ruling on our motion in limine with respect to cheaper Chinese

25   API, that this question and answer here does not run afoul of

1  that ruling.

2          And so our objection here is truly a foundation

3  objection of, again, it is not proper to present a witness with

4  a document that they've never seen before, that they could not

5  themselves bring into evidence and to ask them to read the

6  content -- and to have plaintiffs' counsel read the content of

7  that document into the record and say, "Do you see that?"

8          There's no knowledge or useful testimony being

9  provided to the jury there.  It's simply plaintiffs' counsel

10  reading the document and the witness confirming what the

11  content of the document is, content that the witness doesn't

12  independently know about.

13          SPECIAL MASTER VANASKIE:  So you're asking to preclude

14  the information on page 75, from lines 10 through 16?

15          MR. RAE:  I think we're at page 74, line 10

16  through 17.  Really the rest of the testimony on 74, because

17  the next question and answer is similar but is asking the

18  plaintiff(Sic) to comment on what this email that she has never

19  seen before references, and she's saying that she's not sure

20  and then speculates that she believes it may be referencing

21  ZHP.

22          And, again, this highlights the problem with having a

23  witness get asked questions about a document for which there's

24  not foundation.  Now, I don't think there's ultimately going to

25  be an issue of fact here about whether or not this document is

1    referencing -- like, what Chinese API supplier this document is

2    referencing, but Ms. Chitty's speculation should not be the

3    source of that information to the jury.

4              SPECIAL MASTER VANASKIE:  Yes, I agree.  I'll sustain

5    the objection.

6              So I preclude the questions and testimony from

7    page 73, line 24 through 74, line 24.

8              MR. RAE:  Thank you, Your Honor.

9              And I think we would withdraw our objection on page 75

10   to lines 2 to 4.  I think --

11             SPECIAL MASTER VANASKIE:  All right.

12             MR. RAE:  I think once you get past that, the rest of

13   the objections on this page are similar, that it's asking the

14   witness to comment on and speculate as to the contents of this

15   email where she wasn't a recipient of it.  It's kind of asking

16   what the U.S. CEO is telling his salespeople in this email.

17             Again, she doesn't know, and she kind of is answering

18   purely based on the content of the email.  The objection at 75,

19   2 to 4 is different because Ms. Chitty obviously is more than

20   capable of answering the question, who is Sanjay Gupta, and

21   testifying that he's the CEO of the U.S. company at that time,

22   and that question does not require the use of the email.

23             SPECIAL MASTER VANASKIE:  All right.  So to be

24   consistent, I'm precluding the questioning and answer on

25   page 75 from lines 10 through 16.

1          Now we pick up with the question at line 17.  And what

2     is your objection there?

3          MR. RAE:  The objection there is that this is

4     argumentative and is a Rule 403 issue that -- "you're familiar

5     with the idea that you get what you pay for?  Have you ever

6     heard that before?" -- that's not fact testimony.  It doesn't

7     tie back to the issues in this case.  It's trying to use a

8     common phrase to imply that the use --

9          (Audio interruption.)

10          (Court reporter interruption.)

11          MR. RAE:  The question here is:  Ms. Chitty, you're

12     familiar with the idea that you get what you pay for?  Have you

13     ever heard that before?

14          And our position is that that question is unduly

15     prejudicial and argumentative, and the prejudice comes from the

16     idea of importing this phrase in this question that implies

17     that using and sourcing a cheaper product necessarily should

18     mean that it is lower quality, and that's a fact issue that the

19     jury is going to be asked about in this case.  It's a fact

20     question that's legitimate to put in front of the jury.

21          But asking the jury to draw conclusions on it based on

22     an aphorism rather than actual facts is improper and

23     prejudicial.

24          SPECIAL MASTER VANASKIE:  All right.  Daniel?

25          MR. NIGH:  I believe that's totally fair game.  And I

 1    don't think I want to belabor the argument because I think the

 2    words are pretty clear.  Your Honor will probably have an

 3    impression one way or the other.

 4              SPECIAL MASTER VANASKIE:  Yes, I'll sustain the

 5    objection.  Certainly it's an argument you can make to the

 6    jury.  I just don't think it's proper examination of this

 7    witness.

 8              And so I will preclude the questions and answers from

 9    page 75, line 17 through 76, line 7.

10              And now I think we're to page 83, starting at line 9.

11              MR. RAE:  Agreed, Your Honor.

12              So we objected on 403, 602, 701 grounds and also the

13    lack of foundation, and this is a different foundation issue

14    from the one we've been discussing.

15              This issue is -- taking a step back.  Dawn Chitty is a

16    VP of regulatory affairs at Torrent.  Regulatory affairs

17    departments handle -- and this is true of -- essentially all

18    pharmaceutical companies are structured this way, although I'm

19    speaking specifically about Torrent here.

20              The regulatory affairs department handles

21    communication with the regulators, communicates with the FDA.

22    It acts as a liaison for other departments in the company in

23    respect to its communications with the FDA.

24              And then there are other departments -- like at

25    Torrent, the quality department, which contains both the

1    quality control and the quality assurance subgroups that

2    handles the actual managing of quality issues, which includes

3    auditing and inspecting of API suppliers.

4            And so the questioning here is asking Ms. Chitty about

5    what is involved in conducting an inspection and what's

6    important to do when conducting an inspection of an API

7    supplier.  And that's a question that's outside of the personal

8    knowledge and information, the experience, the training, all of

9    those things of Ms. Chitty.  And her answer reflects that.

10           Her answer is:  I would assume so.

11           She would assume so because she doesn't actually know.

12   And these questions -- again, Dr. Jaiswal, who we talked about

13   at length on Tuesday, is the director of quality at Torrent.

14   Plaintiffs have opportunities to present testimony about what

15   quality requirements are.  There's also going to be CGMP

16   experts in this case on both sides that will testify to these

17   issues and what goes into conducting an inspection or an audit.

18           Ms. Chitty is not an expert in this space, she doesn't

19   have the ability to be opining on what the requirements are in

20   this space, and it's improper to be putting testimony from her

21   about these issues in front of the jury.  It should be coming

22   in through other sources.

23           SPECIAL MASTER VANASKIE:  Daniel?

24           MR. NIGH:  Your Honor, I think it kind of shortcuts a

25   little bit of Dawn Chitty's role specifically.  You know, she

1   even states previously that she's involved with safety and

2   compliance.  You know, she's asking all sorts of questions that

3   have to do with quality of the drug, safety of the drug.  You

4   know, she's not just a mouthpiece for the company that echos

5   what other people are telling her.  She carries a higher role

6   than that.

7          So to the extent that, you know, yes, she was replaced

8   by Bernadette Attinger, which is the one we just had who -- I

9   think they had more arguments to this degree.  But Dawn Chitty

10  has been at the company for a very long time and doesn't just

11  wear the hat of mouthpiece for the company to convey

12  information to the FDA.  She wears more hats than that, and

13  that's established through this testimony.

14         SPECIAL MASTER VANASKIE:  Yes, this is just basic

15  information, though, that I think you could establish through

16  almost any witness, so I'll sustain the objection.

17         And excluded is the question that starts on page 83,

18  line 19 and the testimony that concludes on page 84 at line 10.

19         MR. NIGH:  I am sorry, Your Honor, I don't know why it

20  would be sustained if it can be established through any witness

21  including this one?

22         SPECIAL MASTER VANASKIE:  Well, I understand your

23  point, but she's saying I assume so.  She's not testifying...

24         MR. NIGH:  I guess I think of that as a distinction

25  that doesn't exist between "I assume so" and "yes."

1        "I assume so" is taking all of her background and

2   experience in the company, and as a result, she assumes the

3   answer is yes.  And the jury gets to weigh that and see -- if

4   they view it some other way, they can.  But I think it's

5   definitely credible to look at it and say, I assume so means

6   yes.

7        SPECIAL MASTER VANASKIE:  Well, I'll reverse myself

8   then.  I think this is much ado about very little.  I don't

9   know that this deserves this much controversy around it,

10  whether it comes in through Ms. Chitty or somebody else, but

11  I'll -- I will overrule the objection.  I'll allow the

12  testimony.

13       So the question on page 83, line 19, and finish --

14  completing with the -- concluding with the answer at page 84,

15  line 10 will be in.

16       MR. NIGH:  Okay.  And I think part of the issue is we

17  did choose to do this through her.  It really isn't a lot of

18  cumulative.  This is the witness that we chose to do this with.

19       SPECIAL MASTER VANASKIE:  All right.

20       MR. RAE:  And, Your Honor, just to be clear, whether

21  or not plaintiffs made the choice to pursue a line of

22  questioning with a witness who doesn't have knowledge of it and

23  therefore lack testimony to support their case is a problem of

24  plaintiffs' own making.

25       They deposed Dr. Jaiswal, Torrent's director of

1  quality, for three days.  Dr. Jaiswal is showing up live at

2  trial as well.  So the idea that they wouldn't be able to ask

3  questions about this issue, which is at the core of

4  Dr. Jaiswal's job responsibilities, and that they would be

5  prejudiced if it doesn't come in, is unreasonable.

6          SPECIAL MASTER VANASKIE:  I've made my ruling.  I'm

7  not going to replow this ground yet again.  It seems to me to

8  be a fairly non-controversial matter, and it can come in

9  through Ms. Chitty.

10         MR. RAE:  Agreed, Your Honor.  And I wasn't trying to

11 revisit the ruling.  I just wanted to make sure I was

12 responding to what I think is an improper insinuation by

13 plaintiffs that if they chose to try to make their case through

14 a witness that can't testify to it, that that somehow absolves

15 them of the lack of foundation for their questions.

16         MR. NIGH:  And that wasn't my --

17         SPECIAL MASTER VANASKIE:  Let's move on.

18         Is the next area page 92, line 4 -- sorry, 91,

19 line 22?

20         MR. NIGH:  I believe so.

21         MR. RAE:  I think we have a counter to the testimony

22 just before that.  I'm not sure if plaintiffs --

23         (Simultaneous speakers.)

24         SPECIAL MASTER VANASKIE:  91, line 8 to 19.

25         MR. NIGH:  I suppose -- you know, our biggest issue

1  was on that question, she even says she doesn't have any

2  background on that specific situation, so that's why we

3  withdrew it.  But if the defendants want to -- if Torrent wants

4  to have it back in, we really don't have much quarrel on this.

5         We just look at this as a -- if we're going to talk

6  about what this witness can and can't testify to, that seemed

7  to be quintessential of what she can't testify to.

8         MR. RAE:  And, Your Honor, I agree fully with Mr. Nigh

9  that this is illustrating that this is quintessentially

10  something that she can't testify to, and that's a perfect segue

11  to our objection to the question at 91-22 to 92, line 12.

12         MR. NIGH:  But it's not because she's very specific to

13  this one question where she answers in that way.  The rest of

14  it, she does not.  We start to draw upon her experience and

15  being in this role for a long period of time.

16         MR. RAE:  Your Honor, the distinction is just they

17  shifted from asking about Torrent's actual factual training

18  experience -- like, past procedures, which she says this isn't

19  something I was involved in from a decision-making perspective

20  or on a day-to-day standpoint, so I don't really have any

21  background on the specific situation.

22         The next question just abstracted that to -- from a

23  common sense standpoint.  And so the reason she's able to

24  answer that question is precisely the reason why it's improper.

25  It's no longer a fact question.  It's asking her to opine, in

1   violation of Rule 701, on an area that she doesn't have

2   personal knowledge of that's not something that was part of her

3   regular job responsibilities.

4           And I think our position is this testimony should not

5   come in, our counter should come out, their subsequent

6   designation should come out because it is correct that both of

7   these illustrate and are in areas where Ms. Chitty is not the

8   right witness to be testifying.  But if their designation comes

9   in, our counter should surely come in to explain to the jury

10  and contextualize that she doesn't actually know about this

11  issue.

12          And that's -- in contrast, the questions that lead

13  into this are about things that the FDA observed in an

14  inspection report and a 483 warning letter.  I think in this

15  case, the inspection report with respect to Torrent.  Those are

16  FDA communications that's within the scope of Dawn Chitty's job

17  responsibilities and are perfectly appropriate questions, which

18  is why we didn't object to them.

19          MR. NIGH:  And, Your Honor, if I may, just one last

20  thing.

21          SPECIAL MASTER VANASKIE:  Go ahead.

22          MR. NIGH:  The question that the defendants are trying

23  to designate is much different than the questions we ask later,

24  after that.  And so the one question is talking about one

25  specific issue, and she says, "I don't know.  I didn't know

1    that specific issue."

2         So then we go to her broad pad of her experience and

3    training, and she answers the question.  She knows the answers.

4    And she answers them in the way that would even be the speak of

5    the Torrent company as to what they should be doing.

6         She even modifies the question to some degree and

7    says, Well, I wouldn't call it that, but I would say this,

8    this, this, this.  So clearly, she has information that is

9    relevant to the question.

10        SPECIAL MASTER VANASKIE:  I think the only thing I can

11   do here is to allow both, the counter-designation and the -- so

12   in will be the questions and answers on page 91, from line 8 to

13   page 92, line 10.

14        MR. NIGH:  And I think that the next two are under the

15   same guise, the 93-9 to 11 and 93-14 to 95-2.

16        MR. RAE:  And --

17        SPECIAL MASTER VANASKIE:  Go ahead, Jacob.

18        MR. RAE:  Your Honor, I just want to explain our

19   objection here because I think it ties to what we were talking

20   about before, and I agree that much of what we were talking

21   about but there's a subtle difference here in that this

22   question implies that Torrent doesn't properly train their

23   auditors, and that's not true.  And that's not what the

24   document that this whole line of questioning started with shows

25   what Torrent didn't -- what the FDA found that Torrent didn't

1    properly do is it didn't properly train its auditors on

2    Torrent's standard operating procedure with respect to how to

3    conduct an audit according to Torrent's individual policies.

4           Now, those policies arise from the same regulatory

5    guidance as the regulatory guidance that the independent

6    third-party auditor was specialized in.  She has a Ph.D. in

7    organic chemistry, she teaches courses on how to properly

8    conduct audits under these regulatory guidelines.  She, at this

9    time, conducted dozens, if not more, audits of Chinese API

10   suppliers.  She was thoroughly familiar with the regulations,

11   had been trained specifically on those regulations.  And what

12   the FDA is commenting on in 2017 is a very technical issue as

13   to whether or not Torrent's training of this auditor on

14   qualification includes reference to Torrent's own standard

15   operating procedures, not whether the audit is -- or was

16   generally properly trained to conduct an audit.

17          And so the implication of these questions lacks

18   foundation and is unduly prejudicial because it implies that

19   the auditors weren't properly trained in a general sense rather

20   than properly trained with respect to the specific procedures

21   that the FDA is commenting on.

22          MR. NIGH:  That's a lot, but I will just say that

23   whatever adverse feeling they think the jury may get from this

24   question, they can certainly establish their own testimony on

25   those issues, but the question is clear in terms of verifying

 1    its procedure on how can Torrent ensure that the inspection was

 2    accurate.  That's the beginning of it.

 3         The purpose is precisely what the FDA said that this

 4    auditor was not trained on, and that is verifying Torrent's

 5    procedures and policies.

 6         MR. RAE:  And, again, Your Honor, I just want to

 7    emphasize that the witness's answer speaks to assumptions that

 8    she's making, which kind of goes back to why our position has

 9    been that this question and answer and the prior one that we

10    were discussing before should not be coming in front of the

11    jury.  We shouldn't be having a regulatory affairs witness

12    speculate and assume to the jury what was going on with

13    Torrent's training of its auditors.  We should have people who

14    work in a department that's responsible for training and

15    supervising auditors testify to those issues.

16         MR. NIGH:  Your Honor, for -- I can't disagree more

17    and I think the evidence shows that numerous times -- there are

18    times where even Dawn Chitty's on the phone with the FDA

19    herself.  But numerous times it's the FDA and Dawn Chitty or

20    the FDA and Dawn Chitty and someone else.  You know, Dawn

21    Chitty is the highest person in the U.S. that's speaking to the

22    FDA.

23         So when the FDA is asking these questions, the FDA is

24    making findings, and one of them is that the inspector is not

25    adequately trained.  You know, that is -- her mouthpiece and

1  responses and the experience that she knows are highly relevant

2  in that situation because she is the mouthpiece between Torrent

3  and the FDA, and many times she is even the only person on

4  those phone calls, if not her and one other person.

5          SPECIAL MASTER VANASKIE:  All right.  This has been

6  argued at great length and both sides have presented persuasive

7  points, but I think the jury should hear this testimony.

8          So I will overrule the objections and allow the

9  questions and answers from page 93, line 9 through page 95,

10 line 2.

11         MR. RAE:  And, Your Honor, just to make sure that the

12 record is clear, we had not objected to the testimony from

13 page 94, line 1 to page 95, line 2.  I don't think that -- that

14 doesn't change anything about your ruling, I just wanted to

15 make sure that's clear for the record.

16         SPECIAL MASTER VANASKIE:  Thank you for that.  Yes.

17 Because it's easy for me to miss that.

18         But I did have on the spreadsheet objections from 93,

19 lines 14 to 95, line 2.  But it doesn't matter.  The issue has

20 been ruled on and we're ready to proceed now.

21         There's a counter-designation at page 97, line 5 to

22 page 97, line 9.

23         MR. NIGH:  No objection, Your Honor.

24         SPECIAL MASTER VANASKIE:  No objection.  It's noted

25 then no objection.

 1           All right.  The next objection I have then, I think,

 2    is page 107, lines 2 to 10.

 3           MR. RAE:  Yes, Your Honor.  And the objection is only

 4    107, line 7 to 10, and it's a pure relevance objection.

 5           The question is:  Torrent sells drugs in other

 6    countries besides the U.S. and India, correct?

 7           And the answer is:  Correct.

 8           And we think Torrent's sale of products outside of the

 9    United States isn't relevant to this case.

10           SPECIAL MASTER VANASKIE:  Daniel?

11           MR. NIGH:  Well, Your Honor, it is -- there's one

12    issue as to which it's highly relevant, and that is they

13    receive API from ZHP in -- for old process and for new process.

14    But according to their testimony, these witnesses' testimony,

15    they only received API for old process.  And there's this whole

16    thing that ensues from there, which is, they get the same

17    genotoxic statement from ZHP that says that their product is

18    free of genotoxic risk.  And we saw a lot of that with Jaiswal.

19    But they get that same genotoxic statement.

20           And what they -- lo and behold, they find out, ZHP

21    confirms to them that their old process product that they're

22    selling in -- or new process product that they're selling in

23    other countries clearly is not free of genotoxic risk, but they

24    continue to rely on the continued assurances from the same API

25    supplier, that's just a piece of paper that looks identical to

1  the other piece of paper, that it's free of genotoxic risk for

2  their old process.

3          So this idea of whether or not they sell drugs in

4  other countries is highly relevant to that issue.  It all goes

5  to their assurances that they've been given from their API

6  supplier that they used for both products even though they know

7  the assurance is patently false for one of their products and

8  doesn't continue to investigate the other assurance.

9          SPECIAL MASTER VANASKIE:  You're drawing a lot from

10 that, Daniel.  I don't know.

11         MR. NIGH:  Oh, it's extremely relevant.  It's the same

12 API supplier.  So if their one -- and it's the same genotoxic

13 assurance that they've gotten.  And then later they continue to

14 rely on the no genotoxic in their old process that they say is

15 only sold in the U.S., they continue to rely on that same

16 statement they got from the same supplier that they ultimately

17 know is patently false.  And --

18         SPECIAL MASTER VANASKIE:  I don't know how you're

19 drawing that connection from the question:  Torrent sells drugs

20 in other countries aside from the U.S. and India, right?

21         MR. NIGH:  Because they sell products in other

22 countries.  I mean, that's one way in which the information is

23 relevant.

24         MR. RAE:  Your Honor, I don't know that this is the

25 question and answer to be going down this tangent about kind of

1  plaintiffs' theories about kind of why sales of products in

2  other countries are relevant, but I would note that what

3  Mr. Nigh has just said is -- if plaintiffs are going to pursue

4  that line of theory, it is going to create an enormous amount

5  of trial management issues because we're going to have to have

6  minitrials on the ties between Torrent's sale of valsartan

7  products in other countries to its sale of valsartan products

8  in the United States.  It's going to open up a huge can of

9  worms, it's going to create a huge trial management problem.

10       And I think throughout the preparation for this trial,

11  it's been consistent that this is a trial about Torrent's sale

12  of products in the U.S. and specifically kind of -- valsartan

13  products in the U.S. and valsartan products that were

14  manufactured using ZHP's old process for manufacturing

15  valsartan API.

16       MR. NIGH:  Your Honor, it's not a can of worms.  Same

17  API supplier, same assurances given for both products.  They

18  know that one of their assurances from the same API supplier is

19  patently false, but they continue to rely on the second

20  assurance, it's the same assurance, without questioning it at

21  all, and they continue to forward that information to everybody

22  who asks, that it's free of genotoxic risk, because of this

23  assurance.  They don't tell them, oh, the same API supplier was

24  patently wrong on other product that we already sell.

25       And to be clear, this has already -- this is --

1    there's an extensive cross-examination on this issue already.

2    So it's not the first time it's being raised.

3            SPECIAL MASTER VANASKIE:  All right.  I'll overrule

4    the objection.  I don't understand how you -- the significance

5    you assign to the acknowledgment that they sell drugs in other

6    countries besides the U.S. and India, but I think you've

7    persuaded me that I better err on the side of caution in

8    letting it in.  I don't see how Torrent is prejudiced by having

9    this fact acknowledged.  So the objection is overruled.

10            MR. RAE:  Understood, Your Honor.  And we -- to be

11    clear, we didn't make a prejudice argument here because I would

12    agree that this testimony is not prejudicial and I also am

13    confused as to the lines that plaintiffs' counsel are trying to

14    draw from it.  But your ruling is understood and I think we can

15    move on.

16            SPECIAL MASTER VANASKIE:  All right.  Are we now on

17    page 112, line 8?

18            MR. RAE:  Yes, we are.

19            And, Your Honor, this ties back to Judge Bumb's motion

20    in limine ruling with respect to the necessity for there to be

21    ties between the observations that the FDA is making in these

22    inspection reports to valsartan and for us to be getting into

23    the details of the observations that the FDA is making.  And

24    this testimony does not tie to the warehouses or facilities at

25    which valsartan's API was being manufactured.  It does tie to

1    the broader -- I misspoke.  It does tie to the broader Indrad

2    facility, but it does not apply to the specific buildings or

3    production lines that relate to the manufacturing of valsartan.

4    And, therefore, we think that it is irrelevant and unduly

5    prejudicial to be letting in testimony about the content of

6    this investigation report when it doesn't connect -- there's no

7    connection of the dots back to valsartan.

8            I think you can see plainly on the face of this

9    testimony there is no connection of the dots back to valsartan

10   here.

11           SPECIAL MASTER VANASKIE:  Daniel?

12           MR. NIGH:  There is a connection of dots but we don't

13   have to connect it necessarily on the face of this testimony.

14   But I will say I think that this is another question that we

15   should reserve and in my -- just like the other issue that we

16   had with Attinger because we may decide to just withdraw it

17   from this place, if defendant's assurances are that there was

18   no valsartan manufactured at this facility.

19           We should revisit on Monday.

20           SPECIAL MASTER VANASKIE:  Let's revisit this on

21   Monday.

22           So are we at page 133, line 13?

23           MR. NIGH:  I think we have some counters before that

24   at 118.

25           SPECIAL MASTER VANASKIE:  I don't see a counter to

```
 1   your -- I don't see an objection to your counter at page 118.
 2            MR. NIGH:  Oh, I see.  There is no objections to those
 3   two counters.
 4            MR. RAE:  And, Your Honor, I would suggest that I
 5   think it ties to -- obviously, the testimony on line 133 is the
 6   introduction of the document and so it probably makes sense to
 7   talk about this through the testimony about that document or
 8   objections to that testimony --
 9            SPECIAL MASTER VANASKIE:  Yes.
10            MR. NIGH:  Can I take a step back before we get there,
11   though, because my spreadsheet might be wrong, but there are no
12   objections on 127 and 129?
13            MR. RAE:  Correct.  We withdrew those objections.
14            MR. NIGH:  All right.  No problem.  Sorry about that.
15   130.
16            SPECIAL MASTER VANASKIE:  No objections on 130.  We're
17   up to 133 and 134.
18            MR. NIGH:  Got it.
19            SPECIAL MASTER VANASKIE:  And this is dealing with an
20   email string.
21            MR. RAE:  Yes.  And, Your Honor, I think this is one
22   of those situations where it probably makes sense to take a
23   step back because our objection is more conceptual than it is
24   to the specific questions that are being presented --
25            SPECIAL MASTER VANASKIE:  Okay.
```

1          MR. RAE:  -- which is, this is the issue that we were

2    just talking about a moment ago about plaintiffs' theory that

3    Torrent's production of valsartan for European and other

4    international markets that use new process API is something

5    that should be coming before the jury in this case, and the

6    pretrial order that we have been on the verge of finalizing,

7    had agreed to back in March, is very clear that both parties

8    agree that for purposes of this trial, Torrent did not use

9    ZHP's new process API for its production in the United States.

10   It only used old process API.

11          And this email and the questions about it reflect

12   questions that Sue Perry, who is also a regulatory affairs

13   employee at Torrent, was asking about amendments that ZHP made

14   with respect to its DMF for new process API.  And we think it's

15   irrelevant to the case against Torrent to be asking questions

16   about Torrent's reactions to that amendment that relate to

17   Torrent's, again, use of that API not in the United States but

18   in other places around the world and that it's unfairly

19   prejudicial because it's going to lead to confusion of the

20   jury.  The jury is going to hear that this case is only

21   about -- that for Torrent purposes, Torrent only used old

22   process API.  That's what the jury is going to hear this case

23   is about, but then they're going to hear this confusing

24   testimony about Torrent emails discussing the DMF amendment

25   with respect to new process API.

1          And we think it's necessary to avoid confusion and

2     prejudice to Torrent, of the jury potentially confusing what

3     Torrent knew or could have known about the old process API

4     that's at issue in this case with things about new process API,

5     the jury not be hearing lines of questioning and seeing

6     documents about what Torrent was reviewing with respect to the

7     new process DMF amendment by ZHP that don't relate to the

8     products at issue in this case for Torrent.

9          SPECIAL MASTER VANASKIE:  All right.  Daniel?

10         MR. NIGH:  Where is this objection, and what are the

11    pages, lines and where does it end?  Do you know, Jacob?

12         SPECIAL MASTER VANASKIE:  I think it ends at page 137,

13    line 8.

14         MR. RAE:  I believe that's right.

15         SPECIAL MASTER VANASKIE:  And starts at page 134,

16    line 6.

17         MR. RAE:  It may also extend then on page 138 to some

18    degree.

19         MR. NIGH:  That's what I'm asking.  So I'm just trying

20    to see where this overall ends.

21         Do you think it ends at 139-9?

22         MR. RAE:  I think that's fair.  I think the question

23    on 140 is sufficiently general that it kind of -- our objection

24    is to the document wouldn't necessarily affect that question.

25    And I think it's kind of -- we have objections there to it

1  being cumulative of some of the questions on 139, but we agree

2  that it is fair to establish that the United States foreign

3  entity did not do testing itself of products, but that it would

4  have to go to the Indian facility where quality was handled for

5  testing.  So --

6          MR. NIGH:  Okay.

7          MR. RAE:  I think the questions from 193-3 to 9 are

8  certainly -- and particularly if we script out that in this

9  email those are the topics, yes, like, prefaced, we still would

10  continue to have no objection to that question.

11         MR. NIGH:  Right.  And, Your Honor, the reason I'm

12  asking is because I do think we will withdraw this.  I just

13  need to find the spot that we're withdrawing to make it clear

14  for the record.  I'm persuaded by their argument.

15         130 is not what was intended when we were -- to go

16  into how the API is made and things of that nature, so I think

17  we will, recognizing this, withdraw this.  I'm just trying to

18  figure out where the withdraw is.

19         It would be 133 -- I think there are questions about

20  the exhibit, so -- that are asked later just on the testing; am

21  it right?

22         MR. RAE:  Yes.  So if I could -- I think one solution

23  here might be if you changed your -- if you designated 139-3 to

24  9, that questioning on its own -- you don't have -- we haven't

25  previously objected to the prior question or answer to -- I

1   don't know that you need it for what's established in 3 to 9

2   and may be confusing if you're withdrawing the rest of the

3   testimony, but --

4           MR. NIGH:  Okay.

5           MR. RAE:  But I think 139-3 to 9 kind of would

6   probably stand up on its own and stand for the proposition that

7   you might want to establish there.  I don't want to speak for

8   you, but that might be the right way to draw the line here.

9           MR. NIGH:  I agree with you.

10          So, Your Honor, we will withdraw 133-13 to 133-20,

11  134-2 to 137-8, and then 138-10 to 139-2, but we would still

12  continue to keep 139, lines 3 through 9.

13          SPECIAL MASTER VANASKIE:  All right.  Any objection to

14  that?

15          MR. RAE:  No, Your Honor.

16          SPECIAL MASTER VANASKIE:  All right.  Good.  So the

17  next one I have is 143, line 11 to 144, line 17.

18          MS. LOCKARD:  Actually, just to back up, Your Honor, I

19  think we have an objection at 140-2 to 7.  It's a

20  cumulativeness objection.  I'm not going to expend a lot of

21  energy arguing that objection, and we'll defer to your ruling

22  or Mr. Nigh's view of whether or not they actually need to have

23  a kind of second set of testimony that establishes where

24  testing capacity existed.

25          SPECIAL MASTER VANASKIE:  So this is the exchange on

1    page 140, lines 2 to 7, I take it?

2            MR. RAE:  Right.  And our objection is basically we

3    think that that question establishes the exact same thing as

4    130-3 to 9, and so it's cumulative.  But again --

5            SPECIAL MASTER VANASKIE:  I'll overrule the objection.

6    I'll overrule the objection.  That's it.

7            So are we up to 143 now?

8            MR. RAE:  Yes.  And our objection here -- I think I'm

9    willing to withdraw our objections.

10           SPECIAL MASTER VANASKIE:  Okay.

11           MR. RAE:  143.  I don't remember if we had before...

12           MR. NIGH:  Honestly, we will withdraw 143-11 to 143-18

13   because they're coming in back to back now.  We don't need to

14   re-establish that they can't test in the U.S. from the prior

15   testimony that's already given.

16           SPECIAL MASTER VANASKIE:  All right.  So 143, line 11

17   to 143, line 18 is out?

18           MR. NIGH:  Yes.  Otherwise, the jury's hearing the

19   same question back to back.

20           SPECIAL MASTER VANASKIE:  And is the balance of the

21   testimony on 143, line 19 to page 144, line 17, is that in now,

22   or are you objecting to --

23           MR. RAE:  Yes.

24           SPECIAL MASTER VANASKIE:  That's in.  All right.

25           MR. RAE:  Yeah.  We had had -- there had been a prior

1   version of the designations that had cut some, like, small

2   portions of that.  And we had a 106 objection there, and I

3   think we've resolved that by filling in the gaps.

4           MR. NIGH:  Yes, I think so.

5           SPECIAL MASTER VANASKIE:  Okay.  So are we up to

6   page 147?

7           MR. NIGH:  And we have a completion designation, 146

8   to -- or counter-designation, 146-12 to 146-17.

9           MR. RAE:  And I believe we withdrew that

10  counter-designation.

11          MR. NIGH:  Okay.

12          SPECIAL MASTER VANASKIE:  Yes.  It's not on my

13  spreadsheet.

14          MR. NIGH:  Sorry.

15          SPECIAL MASTER VANASKIE:  So I have us at page 147, it

16  says line 16.

17          MR. RAE:  Yes.  And, Your Honor, this is another one

18  of those areas where there's kind of a large block of testimony

19  designated in a row, and our objection isn't to the whole

20  thing.  So our objection begins at page 148, line 6.

21          SPECIAL MASTER VANASKIE:  I see that now.  Okay.

22          MR. RAE:  And this is a similar objection to some of

23  the other ones that we've been discussing before, where, again,

24  we're not disputing relevance or other issues here.  This is a

25  foundation objection based on the fact that this witness

1    testifies at 148-2 to 5:  So prior to today, have you ever seen

2    this email?

3         She doesn't recall ever having seen this email before.

4    She's not on this email.  She's -- and the line of questioning

5    that follows lacks foundation.

6         MR. NIGH:  And, Your Honor, we find this to be very

7    different.  Just to put this in context, the same day of this

8    email, Dawn Chitty is saying we need to test our product, we

9    need to test our product, we need to test our product, we need

10   to ensure that our old process doesn't have NDMA in it.  And

11   right after she's saying that, they drop her off of the email

12   chain and they have all this communication that takes place

13   without her knowledge.

14        And she's the mouthpiece to the FDA.  So her being

15   dropped off all this information and then her saying, oh, that

16   information was actually never conveyed to me is highly

17   relevant because how could she convey it to the FDA?

18        MR. RAE:  And again, Your Honor, this kind of gets

19   back to the foundation issue that we've talked about before.

20   We're not contesting their ability to establish that Dawn

21   Chitty has testified that she's not familiar with this

22   document.  Our position is just that's the end of the story

23   with respect to the testimony that they should be able to

24   elicit about the document from Dawn Chitty about the document.

25        That doesn't stop them from making arguments about the

1    implications of Dawn Chitty not having seen this document, it's

2    simply improper to do it by asking her subsequent questions

3    about what the content of that document that she's not familiar

4    with are.

5         MR. NIGH:  And again, Your Honor, we can go further

6    than that because the information that's specific in the

7    document, it might not be conveyed to her just by seeing the

8    email later on, somebody shows her that specific email.  It

9    might be that afterwards Sanjay Gupta picks up the phone and

10   calls her, hey, I just want to let you know, we had all these

11   conversations.

12        There are many different ways that information is

13   conveyed in the business world other than seeing this specific

14   document.  So we can read the information that's given in this

15   document and then see if she's aware of that information.

16        MR. RAE:  Your Honor, that --

17        SPECIAL MASTER VANASKIE:  Go ahead, Jacob.

18        MR. RAE:  To the extent that that's true, that's not

19   what they're doing here.  The questions are -- just running

20   through the questions at line 148-6 to 11.  There's a question

21   where counsel reads the contents of the document and asks --

22   he's referencing valsartan, right?  It's just a quote from the

23   document and asking the witness about what the document says.

24        The next question on 14 to 17 of page 148, again, they

25   quote from a document.

1          He says:  The quote is read, right?

2          And the answer is:  That is what he has written.

3          Next question:  So in this email, like I said, you're

4     not even on it.  He's asking India why could we not find this

5     out, right?

6          And that's -- again, it's just asking the witness what

7     the document says.

8          The next question asks about testing -- about kind of

9     India's responsibility to test the product.  That question is

10    potentially different, and I would be willing to kind of agree

11    that that question stands on its own outside of the email and

12    is not one for which there is a lack of foundation.

13         And then kind of picking up at 149-3 to 11, again,

14    it's another quote from a document and then asking Ms. Chitty

15    to confirm that that's what the document says.

16         These are not questions asking Dawn Chitty about what

17    she knew about this issue independent from this document.  That

18    line of questioning may be proper; it's not the line of

19    questioning plaintiffs pursued here.  And so there's a

20    foundation line of questioning -- foundation issue with the

21    line of questioning that they pursued.

22         And the fact that Mr. Nigh can stand here and tell you

23    about other ways that they could have approached this

24    questioning that may have complied with the rules of evidence

25    does not make this line of questioning that they're designating

1    compliant with the Federal Rules of Evidence.

2            SPECIAL MASTER VANASKIE:  Well, the fact that she is

3    not included in this email seems to me to have independent

4    significance.

5            MR. RAE:  And, Your Honor, we're not protesting that,

6    and we're not protesting -- we're not objecting to plaintiffs'

7    establishment of that fact.

8            SPECIAL MASTER VANASKIE:  But I am inclined to agree

9    with Jacob that it's not appropriate examination of this

10   witness to ask what the email says.  That's basically what

11   you're doing.

12           MR. NIGH:  I understand, Your Honor.

13           SPECIAL MASTER VANASKIE:  So I'll sustain the

14   objection.  And I just want to be clear what's excluded.  And

15   in my mind it's from page 147, line 15 through page 149,

16   line 13.  There's a counter at page 149, line 20 to page 150,

17   line 10.

18           And I know you view some of the information as not

19   responsive, but I think it all comes in, so I will allow that.

20           MR. NIGH:  I guess at this point, though, we just

21   sustain the information that it would be counter to.

22           SPECIAL MASTER VANASKIE:  That's true.

23           MR. RAE:  And, Your Honor, just to be clear, I think

24   this counter is also relevant to the testimony on 151, lines 9

25   to 24, where plaintiffs are asking Ms. Chitty about Torrent's

```
 1   use of independent labs, and this counter is discussing

 2   Torrent's ability to hire an independent lab to do testing.

 3   And so it really ties more to that next set of testimony.

 4         I would agree that if you sustained our objection at

 5   151-9 to 24, then our counter would definitely fall out.

 6         MR. NIGH:  I do agree that it could be a

 7   counter-designation to 151-9 to 151-24.  I guess we should

 8   probably deal with that objection first.

 9         SPECIAL MASTER VANASKIE:  Yes, let's deal with the

10   objection on page 151.

11         What's the basis for that objection, Jacob?

12         MR. RAE:  I think this is a relevance issue and also a

13   confusing the jury issue.  This is -- the issue of whether or

14   not Torrent has used independent labs in the past for testing

15   assignments is, at least as framed here, where it's kind of an

16   abstracted issue of just that basic kind of fact that Torrent

17   has at times used independent labs for testing, lacks

18   connectivity back to the facts of this case, which are really

19   about what Torrent was doing with respect to valsartan itself.

20         I do think if Mr. Nigh is -- I think a lot of kind of

21   that confusion and prejudice would be cleared up by our

22   counter-designation the page before.  And so I think kind of

23   these kind of coming together, fall out together and --

24         SPECIAL MASTER VANASKIE:  Right.

25         MR. NIGH:  But I was going to suggest one more thing,
```

1    that if the counter comes in, then pages 150, lines 11 to 22

2    should come in as well, the counter to the counter.  Because

3    it's the only way to make that counter complete.

4            SPECIAL MASTER VANASKIE:  All right.  I agree.  So

5    coming in -- let me see where this starts.  Page 149, line 20

6    through 150, line 22 comes in; 151, line 9 through 24 comes in.

7    All right?

8            MR. NIGH:  And we would obviously remove the

9    objections.

10            SPECIAL MASTER VANASKIE:  Yes, obviously.

11            MR. NIGH:  Okay.

12            SPECIAL MASTER VANASKIE:  Are we now up to page 160?

13            MR. RAE:  Yes, we are, Your Honor.

14            And, Your Honor, this is a similar issue.  Our

15    counter-designation sort of highlights the source of our

16    objection, which is counsel, in the question itself,

17    acknowledges on page 160, lines 9 to 11, "You're not on this

18    email, so I'll walk you through a little bit slower," and then

19    proceeds to, as we just discussed and as Your Honor sustained

20    our objection, ask the witness questions about the content of

21    this email and asked the witness to confirm that's what the

22    email says.  So we --

23            MR. NIGH:  We don't have an objection to the counter

24    if the information comes in.  So we'll withdraw that.

25            MR. RAE:  And again, Your Honor, I think our objection

1    here -- I was highlighting the counter to highlight the

2    foundation objection that we're making, which is that this is

3    an email that the witness isn't on, that counsel is even

4    acknowledging in their question, doesn't know what this email

5    is about because they weren't on it, and then proceeds to

6    ask -- read the email into the record and ask the witness to

7    confirm that that's what the email says.

8         SPECIAL MASTER VANASKIE:  Yes, I'll sustain the

9    objection.  So to be clear, 160, lines 8 through 20 are out.

10        Let's go to page 161.

11        MR. RAE:  Your Honor, I don't want to bog us down

12   here, but if I can --

13        SPECIAL MASTER VANASKIE:  Did I miss something?

14        MR. RAE:  No.  I was just going to ask Mr. Nigh if

15   they're going to keep in 160, 2 to 7, and he can decide that

16   later.  But we obviously haven't objected to that, so we don't

17   need to waste time on it here either.

18        SPECIAL MASTER VANASKIE:  All right.

19        MR. NIGH:  We wouldn't keep that in based on Your

20   Honor's ruling.  We would strike that as well.

21        SPECIAL MASTER VANASKIE:  All right.  So 160, lines 2

22   to 7 is out.

23        MR. NIGH:  Yes.  I was just trying to verify -- that's

24   what I was looking at just now, is to see whether or not there

25   was any more information asked of this document.  Because it's

1    just introducing the document.

2              SPECIAL MASTER VANASKIE:  Yes.

3              MR. NIGH:  So if there is, then we would obviously

4    need it, but I don't see that there is.

5              MR. RAE:  Your Honor, our objections on page 161 to

6    163 are all related to the same issue.  I think we do have some

7    cumulativeness objections under Rule 403 here as well, but if

8    the same ruling on the foundation objection that you just made

9    with respect to the other question about this document stands

10   up, then we don't need to get into our other reasons for

11   objecting to this.

12             MR. NIGH:  I agree.  It would be a similar issue.

13             SPECIAL MASTER VANASKIE:  So we could exclude --

14   that's what I'm trying to see.

15             Well, let me ask you, Jacob, what's your understanding

16   of what gets excluded?

17             MR. RAE:  My understanding is it would be page 160,

18   line 11 to 160, line 20; page 161, line 15 to page 161,

19   line 17; page 162, line 1 to page 162, line 6; page 162,

20   line 10 to page 162, line 22; and page 163, line 2 to page 163,

21   line 10.

22             SPECIAL MASTER VANASKIE:  That's what I show as well,

23   and that's what we will do.  They're excluded.

24             MR. RAE:  Thank you, Your Honor.

25             MR. NIGH:  Your Honor, if I may, going back to this, I

1    do want to provide at least one for all of this -- I think all

2    of it is on the same topic, and that is, even though she's not

3    on this email, these are just providing test results to the

4    products that ultimately she's responsible for the response to

5    the recall in the U.S.  So this is the type of information she

6    would typically rely upon.

7              SPECIAL MASTER VANASKIE:  I've made my ruling, and

8    we'll stick with that.

9              MR. NIGH:  Okay.

10             MR. RAE:  And I think as Your Honor has seen, there's

11   other documents in the record that they ask about that relate

12   to these similar test results that have come in already.

13             I don't think there's any prejudice to plaintiffs'

14   ability to present their case from this either.

15             MR. NIGH:  I'm just not sure that they're the same, so

16   that's the only reason I raise that.  I'm not sure they're the

17   same batches.

18             MR. RAE:  And also to be clear, I think there's no

19   contest in this case or a dispute about the actual test results

20   that exist here.

21             MR. NIGH:  Okay.

22             SPECIAL MASTER VANASKIE:  So are we up to page 170

23   now --

24             MR. RAE:  Yes.

25             SPECIAL MASTER VANASKIE:  -- line 16 to page 171,

1    line 16?

2            MR. RAE:  Correct.  And just to clarify, we're not

3    objecting to the answer at 170, 16 to 18.  Our objection begins

4    at page 170, line 20, which is there's a transition in the

5    questioning to a new document and a new line of questioning

6    that begins there.

7            SPECIAL MASTER VANASKIE:  Yes.

8            MR. RAE:  And I think this is an issue that we

9    addressed before with respect to questions of Ms. Chitty about

10   the DMF amendment with respect to the new process API change.

11           I think we've -- I explained our reasoning for

12   objecting to that before, and I can -- I don't need to repeat

13   that unless it would be helpful for Your Honor.

14           SPECIAL MASTER VANASKIE:  No, no need to repeat it.

15   Thank you, though.

16           MR. NIGH:  Your Honor, we'll withdraw this testimony

17   too.

18           SPECIAL MASTER VANASKIE:  All right.  Very well.

19   Withdrawn.

20           MR. NIGH:  170-16 to 171 -- sorry.  I don't even know

21   if we need 170-16.

22           Give me one second here.

23           Oh, no, I am sorry.  It goes from 170, line 20 to 171,

24   line 16, we withdraw that.

25           SPECIAL MASTER VANASKIE:  Very well.

1          And why don't we take a break now for lunch.  Resume
2     at 1:15.
3          Is that all right?
4          MR. NIGH:  Yes.
5          MR. RAE:  Yes.  Yes, Your Honor.
6          SPECIAL MASTER VANASKIE:  I'll see you at 1:15.
7          Thank you.
8          (Luncheon recess taken from 12:09 p.m. to 1:17 p.m.)
9          SPECIAL MASTER VANASKIE:  So let's resume.  And where
10    are we picking up?
11         MR. RAE:  I believe we are at our counter at 189, 20
12    to 21.
13         SPECIAL MASTER VANASKIE:  Right.  Okay.
14         MR. NIGH:  Sorry, one second, Your Honor.  I'm in a
15    different spot in the transcript.
16         SPECIAL MASTER VANASKIE:  Take your time.
17         MR. NIGH:  Your Honor, we don't have any objection to
18    that coming in.
19         SPECIAL MASTER VANASKIE:  And the question is at
20    line 20 of page 189:  Do you remember this email?
21         And the answer is:  Not specifically, no.
22         All right.  That comes in.
23         Does that take us now to page 193, line 3?
24         MR. RAE:  Yes, Your Honor, it does.  This is our
25    objection.  It's a form and 403 objection, and I think the

1    primary issue -- and it's the 403 objection as well -- is the

2    vagueness of the question, and -- "You would want to know if

3    there's a quality issue with a drug before it actually becomes

4    a problem in the market" is the question that's being asked,

5    and I think that's a very abstract and vague question that

6    doesn't define the type or the nature of the potential quality

7    issue.

8             SPECIAL MASTER VANASKIE:  I think the question is

9    understandable on its face, and overrule the objection.

10            MR. RAE:  Understood, Your Honor.

11            SPECIAL MASTER VANASKIE:  Next one is 193, line 12.

12   That's the objection to the answer.

13            So to be clear, 193-6 through 193-13 comes in.

14   There's an objection to 193-15.

15            Are you just objecting to the introductory statement:

16   Okay.  With that in mind, let's take a look at this email?

17            Or are you objecting to the entire question?

18            MR. RAE:  We're objecting to the entire question.  The

19   question, I think, continues on to the next page, and really

20   the core of what we're objecting to is this question is asking

21   about a European recall of valsartan products.

22            Judge Bumb has already granted a motion in limine with

23   respect to international processes, recalls, international

24   notices, all of those things.  This is a similar issue to the

25   ones that we've been discussing earlier today of this case is

1  about United States valsartan and what happened with the

2  valsartan that was being marketed by the defendants here and

3  sold in the United States and the recalls that took place in

4  the United States, not about what happened in Europe.

5          MR. NIGH:  And, Your Honor, I don't think it comes a

6  surprise that I completely disagree with that.  This case is

7  not just about what happens with Torrent U.S. product because

8  there's a global issue that's happening here.  And this

9  highlights another one of the issues why this is so important.

10  You've got -- and again, some of the statements that were made

11  about Dawn Chitty only being a regulatory person, that's just

12  not true.

13          Why would a Torrent salesperson be forwarding an

14  article that talks about the recall that's happening in Europe

15  with ZHP API?  Because it's not her only role.  And she

16  described it earlier.  She also sees herself as safety and

17  compliance, and we're going to see all sorts of information

18  that is sent to her.  She's replying.  She's responding.  She

19  is giving information.

20          She is later telling Torrent India that they need to

21  be developing a test to test this product because her only role

22  is not just regulatory.  She's very much safety and compliance.

23  She's very different than the person who takes over for her,

24  Bernadette Attinger.

25          And so to start off on this one, specifically to this

1   issue, what raises this issue is because this Torrent

2   salesperson knows they're using the same API supplier.  It's

3   ZHP API that's being recalled in Europe, and they see this

4   article and they see, oh, there's a carcinogen in the product,

5   you know, have you seen this.  And there's all sorts of

6   questions that are going to talk about this issue, and this

7   goes to sort of the alarm that should be raised for

8   Dawn Chitty.

9        Some of the information she's not aware of.  She says

10  she doesn't know some of it, but she should.  It's the same API

11  supplier, ZHP, that they're discussing in this article -- and

12  she recognizes that -- that's also supplying their API for

13  their Torrent valsartan API.

14       And I should say, it's the API supplier that's

15  supplying valsartan API in China, that's also -- for Europe,

16  that's also supplying this valsartan API in the U.S.

17       MR. RAE:  Your Honor, if I may briefly, because I

18  think what Mr. Nigh said highlights why this is going to be

19  confusing to the jury and why Judge Bumb has already ruled

20  these sorts of things come out, but there's some particular

21  aspects of that for Torrent that I would like to address

22  briefly.

23       SPECIAL MASTER VANASKIE:  Go ahead.

24       MR. RAE:  So this is an email that -- I think the

25  exact date is higher up in this chain, but I believe it was

1    sent on July 6th.  And a critical piece of context here is the

2    recall that's happening in Europe that this email is about,

3    that Mr. Nigh is saying that -- like, that's relevant to this

4    issue for here, is about the NDMA that exists in ZHP's new

5    process API.  It's the same issue that was being notified to

6    customers on June 20th and June 26th, and like in -- early in

7    June that Torrent knows about already with respect to the new

8    process API.  There's no notice issue here with respect to

9    Torrent.  There's no new information here.

10           It's just a confusing interjection of something that's

11   happening in Europe regarding the recall in Europe of new

12   process valsartan API that doesn't even tie back to the old

13   process API that Torrent is using and is an issue in this case

14   with respect to Torrent's sales of valsartan in the United

15   States.

16           MR. NIGH:  And, Your Honor, this goes back to why I

17   introduced that connection earlier.  Same API supplier that

18   Torrent uses for its product in the U.S. and its product in

19   Europe, and they get a free-of-genotoxic statement for their

20   products in Europe and they find out ZHP was patently false and

21   they recognized that, they were wrong.  But they continue to

22   rely on the free-of-genotoxic risk guarantee from ZHP on their

23   old process.  I believe that the jury should be able to examine

24   that.

25           SPECIAL MASTER VANASKIE:  The objection is overruled.

1          MR. RAE:  Your Honor --

2          SPECIAL MASTER VANASKIE:  The objection is overruled.

3   Let's move on to the next one.

4          MR. RAE:  Thank you, Your Honor.

5          SPECIAL MASTER VANASKIE:  Are we on page 195 now?

6          MR. RAE:  I believe so.

7          MR. NIGH:  I believe that that covers -- the

8   objections are all similar between 193 to 191, line 1 -- or

9   198, line 1.

10          MR. RAE:  I would disagree.  I think the -- these all

11  relate to the same document, but I think the question at 195-2

12  through the answer on page 195, line 11 has a different nature

13  of the objection.

14          SPECIAL MASTER VANASKIE:  You can argue it, Jacob.

15          MR. RAE:  So I think there are -- obviously, the

16  objections that we previously made that Your Honor has

17  overruled we believe would apply here, but this question of

18  claiming that valsartan is being associated with the word

19  "cancer" and that that's information that we would want to

20  have, we think that that's a highly prejudicial question to be

21  presenting to the jury here, particularly when everyone

22  acknowledges that this case is not about whether or not

23  valsartan causes cancer, it's, at most, about -- most issues of

24  cancer come into play here with respect to risk issues that

25  impact the value of the product.

1          SPECIAL MASTER VANASKIE:  Daniel?

2          MR. NIGH:  Your Honor, I would agree that depending on

3     how the judge rules, this question, in and of itself, would be

4     depending on how the judge rules on that issue.

5          So I think we should reserve because -- you know,

6     while Jacob says everybody agrees, I'm not so sure that

7     everybody is agreeing.

8          SPECIAL MASTER VANASKIE:  Well, if I had to rule

9     today, I would sustain the objection, but we'll reserve ruling

10    on it subject to Judge Bumb's determination.

11         MR. RAE:  And then, Your Honor -- I'm just jumping

12    ahead but I would agree that our objections from line --

13    leaving out some of the objection pieces but starting on

14    page 196, line 22 and extending through page 198, line 1 are

15    covered by the prior rulings.

16         MR. NIGH:  I agree.  I think just to make that clear,

17    the prior rulings that allow the testimony in.

18         SPECIAL MASTER VANASKIE:  Yes, so this all comes in.

19         MR. NIGH:  Yes, Your Honor.

20         SPECIAL MASTER VANASKIE:  So the record is clear.

21         Are we now up to page 201?

22         MR. NIGH:  Yes.

23         MR. RAE:  Yes, Your Honor.

24         SPECIAL MASTER VANASKIE:  So the very bottom of the

25    page, so 201, line 24.

1          MR. RAE:  And, Your Honor, I think this question is

2    improper because it asks our witness to offer her -- Ms. Chitty

3    to offer her own opinions as to what customers who would be

4    purchasing this product would want to ingest or not ingest.

5    That's really an ultimate issue in this case that's for the

6    jury and this question is invading the province of the jury.

7          We have a variety of objections here, but the 403 and

8    701 objections at their heart are this is an improper question

9    asking Ms. Chitty to comment on what customers of this product

10   would want.  That's not even something that a traditional

11   Rule 702 expert would be allowed to opine upon.  That's an

12   issue for the jury to decide based on the facts related to the

13   risks and benefits associated with this product.

14         SPECIAL MASTER VANASKIE:  Daniel?

15         MR. NIGH:  That's a creative argument, but there's

16   obviously a lot of ways that this question and answer could be

17   interpreted as probative and doesn't have this unfair

18   prejudice.  Jake was taking a very narrow view.

19         She's the head of regulatory, she said this -- she's

20   in the U.S., she set this bar, you know, she's safety and

21   compliance.  We're going to see further that people are asking

22   her how she should be -- how they should be communicating in

23   the U.S. with clients and customers.  So --

24         SPECIAL MASTER VANASKIE:  Yes, I think this question

25   is fine.  I'll overrule the objection.

```
 1              MR. NIGH:  Okay.

 2              MR. RAE:  And I think next is our objection to the

 3     question from 202-16 to page 202, line 22.

 4              MR. NIGH:  Your Honor --

 5              SPECIAL MASTER VANASKIE:  Yes.

 6              MR. NIGH:  Sorry, I didn't mean to -- just before

 7     Jacob goes, I think it's important to say I would agree that

 8     this gets withdrawn if there is no evidence submitted by the

 9     plaintiff that -- before this video is submitted -- that NDMA's

10     only use is to induce tumors in rats, in animals.  But we

11     suspect that by the time this video is played, that evidence

12     will have been introduced by the plaintiffs.

13              MR. RAE:  And, Your Honor, I think that --

14              SPECIAL MASTER VANASKIE:  You may want to introduce

15     that evidence, but I still think the question is objectionable.

16              MR. NIGH:  I should say the reason it would become

17     relevant now, once that is introduced, is the very fact that

18     she's not aware of it and she's the one who is being asked to

19     communicate with clients, she's the one -- customers, she's the

20     one who's being sent the notice from the salesperson.  All

21     sorts of information she doesn't even know what the use of NDMA

22     is.

23              MR. RAE:  And, Your Honor --

24              SPECIAL MASTER VANASKIE:  Can you clarify?

25              MR. RAE:  Yes.  This is a question that's being framed
```

1    in terms of what Ms. Chitty knew on June 20th of 2018.  That's

2    the date where Torrent received a notification from ZHP

3    indicating that there was a previously unknown impurity that

4    had been identified with genotoxic potential in ZHP's valsartan

5    API.  That notification did not identify which type of API it

6    related to and it did not, importantly, identify what the

7    impurity was.

8         So I don't understand why there would be any relevance

9    to Ms. Chitty's knowledge on June 20th, 2018, of what NDMA

10   could be used for when Ms. Chitty had no reason to know

11   anything about NDMA as of June 20th, 2018, including from the

12   notice that had been given by ZHP that did not name NDMA.

13   But --

14        SPECIAL MASTER VANASKIE:  Yes, I agree.  I sustain the

15   objection.

16        MR. NIGH:  Judge, if I may, this is actually -- this

17   goes to our whole point, though, Judge.  Just because they

18   didn't actually -- Torrent didn't actually know what the

19   genotoxic impurity was at the time that ZHP sends them a notice

20   of what is the genotoxic impurity, that doesn't mean that

21   Torrent gets to cover its ears and be like no, no, no, we don't

22   know, we don't know.  Of course there should be a step further.

23        What they should have done is just ask -- ask them

24   right at that moment what is the genotoxic impurity, so they

25   should have known as of June 20th when they gave this statement

1    to them.  They can't just cover their ears, which is what they

2    did.

3         But our point is they should have known, as of the

4    date they got that statement from ZHP, because the reasonable

5    inquiry would be immediately to ask, well, what is the

6    genotoxic impurity?

7         SPECIAL MASTER VANASKIE:  I still think the question

8    as posed is objectionable and I sustain the objection.

9         Are we now to page 209?

10        MR. RAE:  I think plaintiffs had an objection to our

11   counter on page 205, lines 11 to 18.

12        SPECIAL MASTER VANASKIE:  Correct.

13        MR. RAE:  And if it's helpful, I can just jump in.

14        The counter here is really just there is questions

15   later on that name Mr. Patel.  On page 207, line 14 to 19,

16   there's a question about Mr. Patel himself and what he is

17   writing and so we just think that this is helpful context to

18   the jury to understand who's writing this email.  That's what

19   they're going to be asked about in questions that we have not

20   objected to.

21        MR. NIGH:  We withdraw our objection, Your Honor.

22        SPECIAL MASTER VANASKIE:  All right.  Very well.  So

23   withdrawn.  That comes in.

24        Now I think we're at page 209.

25        MR. RAE:  Correct.  And, Your Honor, our objection

1    here is only to the last question and answer designated here on

2    page 210, line 5 to 7:  So you're just following orders at this

3    point, question?

4              That's an argumentative question.  We think it's

5    clearly unfairly prejudicial and, frankly, the facts that that

6    question is drawn -- the question is drawn upon the facts that

7    are being established in the prior testimony that we have no

8    objection to.  There's facts here that the ultimate decision

9    here in the prior question is not being made by Torrent USA,

10   it's being made by the quality department in Torrent India.

11   That comes in, that's relevant, that's proper.  "You're just

12   following orders" is not an appropriate question.

13             MR. NIGH:  Your Honor, we think it's appropriate.

14   It's following the testimony, obviously, that "you're just

15   following orders," pertains to the question right above.  And

16   it's colloquial terms because, keep in mind, not every juror

17   has the same amount of education.  So to boil down the answer

18   right from above and say, well, you're just following orders?

19   Yes.  And she admits that it's true.

20             SPECIAL MASTER VANASKIE:  Yes, I'll overrule the

21   objection.

22             Now are we to page 214?

23             MR. NIGH:  I believe so.

24             MR. RAE:  I believe so as well.

25             And, Your Honor, our objection here is I think framed

1  by Ms. Chitty's answer to the first question that's asked here.

2  It's a question about -- the question is framed -- I'm going to

3  skip some of the preamble to it but it's:  I mean, working in

4  regulatory, you know how important it is to communicate with

5  customers, right?

6        And Ms. Chitty explains that's not really a regulatory

7  concern for her, communicating with customers.  I was

8  communicating with FDA primarily.

9        And the next question then asks her about things about

10  the importance of communicating issues with customers again,

11  and I think maybe that kind of -- I think there's some

12  prejudicial and unfair and misleading and kind of layered in

13  assumptions to the initial question that makes it improper, and

14  the follow-up question is certainly improper in that it's

15  following up on the witness saying, that's not a thing that I

16  know about, to ask her a subsequent question about the thing

17  that she just said that she doesn't know about.

18        SPECIAL MASTER VANASKIE:  No, I think this question is

19  appropriate and she can answer from her perspective a question

20  concerning the importance of communicating quality issues to

21  customers.

22        So I'll overrule the objection.

23        MR. RAE:  And for the sake of the record, Your Honor,

24  I think that applies to our objections between page 214,

25  line 15 through page 215, line 19.

1          Is that right?

2          SPECIAL MASTER VANASKIE:  Correct.

3          And now I think we're to page 218, line 23.

4          MR. RAE:  Correct, Your Honor.  And our objection here

5    is only to the question and answer at page 219, line 6 to 219,

6    line 13.

7          SPECIAL MASTER VANASKIE:  Okay.

8          MR. RAE:  And the objection is the plaintiffs' counsel

9    reads a portion of this email that's being asked about where

10   there's a reference to validating our assumption that the ROD

11   does not have an issue, and then the question is:  Assumption

12   means guess.

13         And that question lacks foundation, it's frankly

14   inconsistent with typical English language.  Assumption does

15   not mean guess.  Assumption has a very different meaning from

16   guess.  And, again, they're just kind of -- an additional layer

17   to this, which is Ms. Chitty is being asked to opine on what

18   someone else meant when they wrote something.  It probably

19   would be appropriate to ask Ms. Chitty what her understanding

20   of that message was.  But to ask her what the other person who

21   is writing this email intended to communicate in their choice

22   of word "assumption" is asking her to speculate as to someone

23   else's state of mind and that's not proper.

24         SPECIAL MASTER VANASKIE:  Daniel?

25         MR. NIGH:  Your Honor, she's the recipient of the

1 email, so obviously the questions are based in her capacity as

2 the recipient of the email when it's asked assumption means

3 guess.  And then she answers it.  She actually corrects and

4 says, the email says to validate our assumption.

5         SPECIAL MASTER VANASKIE:  I will overrule the

6 objection.  She was clear in her answers to the questions and

7 made it clear on page 220 that assumption does not mean guess.

8 It says that they're assuming that the only root of synthesis

9 does not have an issue.

10        MR. NIGH:  Right.

11        SPECIAL MASTER VANASKIE:  I think we go to page 221,

12 line 19.

13        MR. RAE:  Correct, Your Honor.

14        And our objection here is we -- we aren't objecting to

15 the first question and answer designated on page 221.  Our

16 objection is to the question beginning at page 221, line 24

17 through to the answer on page 222, line 8.

18        And the objection is -- and there was a form objection

19 made on the record at this point that there's a lack of

20 foundation for this question and there's also a vagueness to

21 the question that's a problem in that the question is about

22 Torrent verifying that there's no NDMA in their drug valsartan,

23 and this is a particularly problematic question in light of the

24 time period that this testimony is situated in, which is, this

25 is on July 11.  This is after ZHP has notified Torrent that

1   there is no -- or that the issue that ZHP had previously

2   identified with the NDMA impurity is confined to new process

3   API, meaning there is no known issue with old process API at

4   this time that Torrent has been notified of.  And --

5            (Interruption in transmission.)

6            (Off-the-record discussion.)

7            (The court reporter read back.)

8            SPECIAL MASTER VANASKIE:  Are you able to reconstruct

9   your thoughts, Jacob?

10           MR. RAE:  I'll just briefly summarize my thoughts,

11   which were, that given the time period in which this is

12   situated, we think that framing this question in terms of

13   verification is unfairly prejudicial and will be confusing to

14   the jury.

15           MR. NIGH:  And, Your Honor, my point yet again is that

16   just because ZHP has declared to Torrent that their old process

17   is free of genotoxins does not mean Torrent shouldn't

18   independently verify.

19           And it's interesting, too, because even Dawn Chitty

20   herself, we're going the see more emails where she's saying we

21   need to independently verify this information.  So --

22           SPECIAL MASTER VANASKIE:  Yes, I'll overrule the

23   objection.

24           (Simultaneous speakers.)

25           SPECIAL MASTER VANASKIE:  I think that takes us to

1    page 225 now.  Hold on.  There's a counter at page 224, but

2    that's not objected -- yes, it is objected to.

3         224, line 21 to 225, line 12.

4         MR. NIGH:  Your Honor, I think this is actually with

5    all -- I don't see that this is responsive to any of the other

6    questions that we've designated here.

7         SPECIAL MASTER VANASKIE:  Jacob?

8         MR. RAE:  Your Honor, this is a critical

9    clarification.  Plaintiffs are asking questions about the

10   historic existence of GCMS as a testing methodology -- as a

11   test method, generally, and it's important to understand that

12   GCMS stands for gas chromatography/mass spectrometry.  It's

13   basically a combination of two different forms of testing.  And

14   what Ms. Chitty is explaining here is this isn't some

15   monolithic thing where you just send material out to these two

16   machines and you get back an answer.  You have to have a test

17   method calibrated to the result that you want to get and the

18   thing that you're trying to investigate.

19        And if we're going to have questions about the

20   existence of GCMS testing and its use to test for nitrosamines

21   in products other than valsartan, it's important for the jury

22   to be understanding that it's -- what GCMS is and what it is

23   not.

24        MR. NIGH:  Your Honor, I will withdraw the objection,

25   with the understand that here, yet again, we can even see in

1  this answer, that she is not just a regulatory mouthpiece but

2  now she's obviously weighing into analytical chemistry as well.

3  But we'll allow it in.

4          SPECIAL MASTER VANASKIE:  All right.  It does come in,

5  would come in without the withdraw, but there is no objection

6  here, so the information on page 224, line 21 to page 225,

7  line 12 comes in.

8          Now I think that takes us to 225, line 14.  Oh,

9  there's a question that starts at 225, line 14.

10          MR. RAE:  Correct, Your Honor.  And --

11          SPECIAL MASTER VANASKIE:  17 -- go ahead.

12          MR. RAE:  This is related to the reasons why we think

13  that the counter is important but the -- we think that the

14  question is confusing and risks misleading the jury in the idea

15  that GCMS testing is used for nitrosamines without

16  clarification as to the scope of what is -- like, the nature of

17  GCMS testing and the fact that using it to identify

18  nitrosamines in one drug substance or kind of chemical

19  substance does not equate to using it to identify nitrosamines

20  in all drug substances.

21          SPECIAL MASTER VANASKIE:  Daniel?

22          MR. NIGH:  And, Your Honor, we can see, even from the

23  counter-designation the defendants wanted, how important this

24  is because it shows her knowledge that she believes at the time

25  there actually wasn't any methods to be able to test for NDMA.

1   And if that were true, how in the world did Novartis, who

2   discovered this issue, find NDMA in the valsartan?  Why?

3   Because we know it's not true.

4           Novartis sent it to a lab and they were able to test

5   and see that there is NDMA in valsartan.  And that happened

6   months before any of these issues occurred.  So that's why we

7   think this is important.  It goes to show --

8           SPECIAL MASTER VANASKIE:  I will overrule the

9   objection and allow this to come in.

10          I think that takes us to page 228, line 19.

11          MR. RAE:  Yes, Your Honor.

12          And our objection here is it's a 403 issue but also a

13  foundation issue and the context here is this is questioning

14  about an email chain that, you know, as the question

15  establishes, Dawn Chitty is not on this email.  So the question

16  is -- so there's a preface about what the email is and it says,

17  we've got supply chain people and procurement people as well as

18  you in the regulatory department.

19          Now, the following email they cut all those people

20  out, right?  And what we're talking about, you can see who is

21  in this email chain, and then they go on to identify and

22  discuss the content of the portion of the email chain that

23  Ms. Chitty was not on and did not receive.  And as you've

24  discussed several times before, Your Honor, establishing that

25  Ms. Chitty didn't see the subsequent portion of this email

 1   chain is perfectly within the scope of a reasonable question;

 2   but then asking her about what the content of that subsequent

 3   email chain is, reading that content into the record and asking

 4   her if she sees that content as it's being presented to her, is

 5   improper.

 6           SPECIAL MASTER VANASKIE:  All right.  Daniel?

 7           MR. NIGH:  Well, I guess in terms of that objection,

 8   first off, to talk about who all was left off of this email and

 9   her to say, yes, these are all the people left off the email,

10   that's, obviously, relevant -- I don't know if Jacob -- if

11   Mr. Rae is objecting to that now, just to be clear.

12           SPECIAL MASTER VANASKIE:  Are you objecting to that?

13           MR. RAE:  I think that asking her specifically about

14   who is on or is not on the email, rather than whether or not

15   she received or didn't receive the email is outside the scope

16   but I would be willing to kind of concede that the first

17   question and answer can come in here in the interest of trying

18   to find a place of compromise.

19           MR. NIGH:  Well, it's not a compromise for me, though,

20   Your Honor, because I do think that part is relevant.  But then

21   on top of that, obviously the information that's contained in

22   the email when everybody else is dropped off, when they're

23   talking about safety issues related to this product -- it's all

24   in the same email chain -- and then they drop everybody off the

25   email chain, other than the supply of the salespeople, the

1    people who are going to have a financial impact from the safety

2    decision, they drop off all the safety people and the business

3    people start discussing --

4            SPECIAL MASTER VANASKIE:  Yes, I will overrule the

5    objection and allow it.

6            MR. RAE:  And understanding your ruling, Your Honor, I

7    just want to kind of repeat something that I think we talked

8    about before, but Mr. Nigh is articulating arguments that

9    plaintiffs want to make, and plaintiffs will be able to make

10   those arguments at the places where lawyers are permitted to

11   make argument, but they shouldn't be able to make their

12   argument through questioning a witness about information that

13   the witness doesn't have personal knowledge of.

14           SPECIAL MASTER VANASKIE:  No, I think this was an

15   appropriate question, and you need to establish a foundation

16   for your argument.  So I think it's appropriate to say, hey,

17   all of a sudden the only one on this email chain are the

18   business people.  I think that's appropriate.

19           MR. RAE:  Yes, Your Honor, I agree, and that's why we

20   withdrew our objection here to page 228, line 19 to 229,

21   line 8, but then the next question is not establishing who's on

22   this email.  It's asking -- it's reading the content of that

23   email to Ms. Chitty and asking, do you see that, about an email

24   that she wasn't on, and I think that's a different issue.

25           SPECIAL MASTER VANASKIE:  I think that's just

1  prefatory to the question, and I will allow it.

2        MR. RAE:  Understood, Your Honor.

3        SPECIAL MASTER VANASKIE:  Are we now moving to

4  page 237?

5        MR. RAE:  Yes, Your Honor.  And, Your Honor, the

6  objection here is similar to the one before that -- the

7  question is framed as:  This is almost a month after your

8  company learned that ZHP valsartan was, in fact, contaminated?

9        And that question is prejudicial because it doesn't

10  distinguish between the two types of valsartan API.

11        There's not one monolithic valsartan that was

12  discovered was contaminated in June of 2018.  In late June of

13  2018, it was discovered that new process valsartan API was

14  contaminated.  It was not discovered until August of 2018 that

15  old process valsartan API was contaminated.

16        And if plaintiffs are going to ask questions about the

17  timing at which discoveries were made about the impurity, they

18  need to be precise with respect to which process that relates

19  to.

20        MR. NIGH:  Your Honor, the defendants are going to

21  have ample opportunity time and time again -- Torrent, I'm sure

22  it's going to be in their opening argument.  They're going to

23  have many times to clarify when old process they believe was

24  discovered to be contaminated, when new process was discovered

25  to be contaminated.  This isn't misleading.

                                                                    *111*

1          SPECIAL MASTER VANASKIE:  Yes, I will overrule the

2    objection.

3          Now I think we're on page 239.

4          MR. RAE:  Actually, our objection here is only to the

5    question at page 240, lines 8 to 18.

6          SPECIAL MASTER VANASKIE:  Okay.

7          MR. RAE:  And the question here, our objection is a

8    form objection, a 403 objection, primarily about the fact that

9    this question, which is framed as an ultimate duty, calls for a

10   legal conclusion and invades the province of the judge and the

11   jury.

12         SPECIAL MASTER VANASKIE:  Daniel?

13         MR. NIGH:  Your Honor, I think the answer cures any

14   sort of concern that there might be with "ultimate duty" in the

15   question because she says we have the duty to confirm that it

16   is meeting specifications that are in place at the time.

17         SPECIAL MASTER VANASKIE:  I think the question is

18   proper.  I understand the objection, but I think a jury of

19   laypersons listening to this won't be dissecting it as tightly

20   as you are perhaps, Jacob.

21         So I will allow the question and the answer on

22   page 240.

23         Now are we up to page 262?

24         MR. NIGH:  I believe so.

25         MR. RAE:  We had a counter on page 259.

1          SPECIAL MASTER VANASKIE:  On 259, yes, I see that.

2     Lines 5 to 16.

3          MR. NIGH:  Your Honor, we have no -- we're fine

4     letting this come in.  We'll withdraw the objection.

5          SPECIAL MASTER VANASKIE:  All right.  Objection is

6     withdrawn.

7          259 lines 5 through 16 will be admitted -- will be

8     played for the jury, I should say.

9          So that takes us now to page 262, lines 2 to 6 and

10    lines 9 to 11.

11         MR. RAE:  Yes, Your Honor.  And our objection here is

12    that this is unfairly prejudicial and confusing, and that it --

13    the question itself mischaracterizes the record.  The question

14    asks and is predicated on the idea that Torrent was telling the

15    FDA and its customers that there's no NDMA in Torrent's

16    product.

17         And the issue here is that -- as you can see in the

18    counter that we have on page 259, what Torrent actually

19    communicated to its customers is there are no Torrent products

20    in the U.S. that use this route of synthesis with -- where the

21    impurity is identified.

22         Those are very different things.  What Torrent said is

23    there's -- had communicated to customers is there's a known

24    impurity that's process-related in new process valsartan API,

25    and we don't use new process valsartan API.  That's not an

1  affirmative statement that there is no impurity existing in old

2  process API.  It's statement of fact as to what was known at

3  the time about new process API.

4          MR. NIGH:  Your Honor, the point is that statement is

5  misleading because of its omission.  That's the whole very

6  point of it.

7          And then when we're asking Dawn Chitty herself, she

8  recognizes those communications happen on the same day.

9          SPECIAL MASTER VANASKIE:  I will overrule the

10  objection.  So 262, lines 2 through 6 and 9 through 11 are in.

11          I think we now are up to page 290.

12          MR. RAE:  Yes, Your Honor.  And our objection here

13  is -- the question here is not actually -- the first statement

14  is a statement by the attorney -- attorney commentary that's

15  inconsistent with the record.

16          So it begins:  Okay, August 3rd you learned NDMA is in

17  Torrent's product.

18          And that's not true.  What Torrent learned on

19  August 3rd is that the process-related -- that there was a

20  process-related impurity that had been identified in old

21  process API, but Torrent did not know at that time whether or

22  not that impurity that existed in the old process API was in

23  batches -- was in every batch of old process, was only in some

24  batches, whether or not it was in the batches that Torrent had

25  actually used in its process.  None of that information was

1    known at that time.

2              SPECIAL MASTER VANASKIE:  Daniel?

3              MR. NIGH:  Your Honor, looking at the answer, I don't

4    think that the question is improper.  I will correct the

5    record, though.  Torrent is notified on August 3rd that they

6    have NDMA in old process.  The only part of that that I would

7    agree with is potentially they didn't know which products; if

8    it's in all of it or some of it.  But they know there's NDMA in

9    old process at that time.

10             MR. RAE:  I would agree.  And if the question were --

11   if the attorney commentary at the beginning of this question

12   was, okay, August 3rd, you learned NDMA is in old process API,

13   that would not be objectionable.

14             And I think the simple way to cure this prejudice here

15   and to resolve our objection would just be to begin the

16   question with, "on August 3rd, does Torrent pull that product

17   off the market," which I think is not an objectionable

18   question.  That's a fact question that Dawn Chitty can

19   perfectly reasonably answer.

20             MR. NIGH:  Well, I disagree because it needs to be

21   hand in hand with them learning about the NDMA, and then she

22   answers the question the way in which she felt that it should

23   be answered.

24             MR. RAE:  And, Your Honor, I just want to observe,

25   there is a form objection that was made on the record during

1   this deposition.  Counsel was notified of the problem with

2   their question.  They could have rephrased to fix the language

3   to add an accurate preface to their question, and they chose

4   not to.

5            SPECIAL MASTER VANASKIE:  Yes, I will sustain the

6   objection or ask that you limit the question to, "On August 3,

7   does Torrent pull that product off the market," and let the

8   answer come in after that.

9            MR. NIGH:  Okay.  We agree, Your Honor, would strike:

10  "19, okay, August 3rd, you learned NDMA is in Torrent's

11  product?"

12           SPECIAL MASTER VANASKIE:  Right.  Okay.

13           Now 291.

14           MR. RAE:  So I think our objection here is that this

15  is a confusing question because it collapses time frames in a

16  way that's misleading, confusing, and unfairly prejudicial to

17  us, that trace amounts at that time was not something that

18  Torrent had any knowledge or awareness of exactly what it

19  meant.

20           Whether or not it was later discovered that those

21  trace amounts were -- had a certain relationship with interim

22  FDA thresholds that I believe had been established by this

23  point in time is kind of a different question.

24           And again, there's a bunch of facts leading into this

25  question that are not problematic to come in in front of the

1    jury, and we haven't objected to them in other contexts in

2    which they've come in front of the jury.  But the way that this

3    particular question is phrased is highly prejudicial because of

4    the time period situation in which it is framed in and the

5    knowledge that Torrent had at that point in time.

6          MR. NIGH:  Your Honor, it's obvious that Torrent and

7    other defendants have taken the tack to try to inject the

8    terminology "trace amounts" in all of these answers, and we can

9    see that.

10          And so here when she says "trace amounts," she's the

11    one who supplied trace amounts in her answer right above.

12          SPECIAL MASTER VANASKIE:  Right.

13          MR. NIGH:  We get to qualify what that means in the

14    very next question and answer.

15          SPECIAL MASTER VANASKIE:  I will overrule the

16    objection and allow the question.

17          So 291, lines 11 through 14 and lines 17 through 22

18    are in.

19          I think now we go to page 295.

20          MR. RAE:  And, Your Honor, I think the issue here is

21    this is an argumentative question.  It's also not accurate with

22    the record and the evidence that's going to come in in front of

23    the jury.

24          Torrent wasn't doing nothing at this point in time.

25    Torrent was doing a wide variety of things at this point in

1    time, some of which Ms. Chitty testifies to and some of which

2    other Torrent witnesses have -- like Dr. Jaiswal have testified

3    to.

4            MR. NIGH:  Your Honor, colloquially the question is

5    perfectly valid to this jury, and then there's an answer that

6    is given that the jury can take away and look at and say it's

7    nothing.  Because essentially the steps that you're going to

8    hear that occurred, I could absolutely see a jury looking at

9    that and saying that is nothing.  Because what occurred between

10   August 3rd to when they had to pull the product off the shelf

11   was the FDA testing the product themselves and telling them

12   they needed to pull it off the shelves.

13           That's what occurred.  So what did Torrent effectively

14   do when they learned about this information?  Effectively

15   nothing.  And we asked it to her that way, and she can answer

16   it the way that she did.

17           MR. RAE:  That's an attorney argument.  Plaintiffs

18   will have an opportunity at trial to make their argument.

19   We're not saying they're not allowed to make that argument,

20   whether or not facts support it, but that doesn't permit them

21   to ask argumentative questions of witnesses.  And the issue

22   here is the argumentative nature of the question, the fact that

23   the question is being used to present their argument instead of

24   to identify facts.

25           SPECIAL MASTER VANASKIE:  Well, I don't find the

1   question on its face to be unduly argumentative, and the

2   witness was able to answer the question and the follow-up

3   questions that come after it, so I'll overrule the objection.

4          To be clear, what will come in is 295, lines 7 through

5   9, lines 12 through 21, lines 23 through 24; and then page 296,

6   lines 1 through 9.

7          And so are we now up to page 340?

8          MR. RAE:  I think that's correct, Your Honor.  And

9   Your Honor, this is, I think, a pretty simple objection.  I

10  believe Ms. Papantonio, who is taking this deposition, just

11  misspoke here, and that makes this question, the question at

12  340, lines 2 to 7, objectionable.

13         Earlier in this deposition -- I can point you to the

14  testimony -- there was testimony that establishes that there

15  was NDMA being measured at around 63.4 ppm and that 63.4 ppm,

16  if you divide it by 0.3 gets you to 200 times --

17         MR. NIGH:  Can I stop you there because I agree.

18  We'll withdraw the objection to the question.

19         SPECIAL MASTER VANASKIE:  Okay.  So the question on

20  page 340, lines 2, and the answer that ends on line 7 of that

21  page are out.

22         MR. NIGH:  Yes, Your Honor.

23         SPECIAL MASTER VANASKIE:  Now, I have a

24  counter-designation, and maybe that's out now too at page 340,

25  lines 8 to 11, and then the answer's 14 to 20.

1          MR. RAE:  Your Honor, I think that counter-designation

2     is still relevant to the testimony designated on page 339, and

3     the testimony on page 339 is what the FDA is telling Torrent

4     on -- I think this is on August 16th, but it might be on

5     August 17th.  I could be mixing up those two days.

6          And this is kind of Ms. Chitty clarifying and being

7     asked and then clarifying that this is the first time that

8     Torrent has seen any test results showing that Torrent's

9     valsartan product or the API that Torrent was using in its

10    valsartan product, as opposed to some batch of old process API,

11    contained NDMA.

12         MR. NIGH:  Your Honor, we withdraw our objection.  I

13    think that this counter is fine.

14         SPECIAL MASTER VANASKIE:  All right.  So the record is

15    clear, the question at lines 8 through 11 on page 340, and the

16    answer at lines 14 through 20 are in.

17         MR. NIGH:  That's right.

18         SPECIAL MASTER VANASKIE:  And now I think we're up to

19    page 354.

20         MR. RAE:  Yes, Your Honor.  And as you can see, this

21    is a bit of a weird objection.

22         SPECIAL MASTER VANASKIE:  Yes.

23         MR. RAE:  The objection here is that the document that

24    gets introduced here, Torrent 94, is essentially a

25    demonstrative created by plaintiffs' counsel that has their

1    articulation of the timeline of events as phrased and framed by

2    plaintiffs' counsel, and our position is not, to be clear, that

3    one can't use a demonstrative in an appropriate fashion in a

4    deposition, just like you could at trial, to record testimony

5    the witness is giving and then you can present that in a visual

6    or recorded form.  But that's not what this document is.

7              It gets put in front of Ms. Chitty.  There's then

8    questions asked about the way in which things are phrased in

9    the document itself and the chronology that plaintiffs' counsel

10   prepared, and Ms. Chitty explains that that framing of those

11   issues is inaccurate.  And so the entire use of this document

12   is inappropriate because it works backwards.  It works from

13   plaintiffs' counsel version of events and then asks Ms. Chitty

14   about it and it's also improper because it doesn't actually

15   reflect the testimony that Ms. Chitty has given.

16             MR. NIGH:  Your Honor, I'm reading the questions and

17   answers below, though.  It looks to be an aid in the questions

18   on the timeline, and she gives answers that are informative.

19             MR. RAE:  And, Your Honor, just to be clear, I think

20   our objection here, as noted in the objection, is really

21   primarily about the document itself, which plaintiffs have

22   designated themselves.

23             And page 354, line 15 is something that it seems they

24   want to use as an exhibit to present to the jury, and certainly

25   that introduction of the document -- I have to go back and look

1    at whether or not the video of this deposition includes putting

2    the document up on the screen, but we certainly would object to

3    any display of that document in connection with this line of

4    questioning.

5            The line of questioning itself, as you can see, we

6    don't have any objections to the actual questions and their

7    answers here.

8            SPECIAL MASTER VANASKIE:  What's wrong with the

9    document itself as a demonstrative?

10           MR. RAE:  As I said, the document itself -- and I can

11   pull it up and show it to Your Honor.  I would just need a

12   second to get it up on the screen.

13           Can I have that?

14           SPECIAL MASTER VANASKIE:  Yes, you can.

15           MR. RAE:  Do I have the ability to share my screen?

16   I'm not a Teams novice, so --

17           SPECIAL MASTER VANASKIE:  I'm a Teams novice too.  Is

18   it a document you could email to me?

19           MR. NIGH:  Your Honor, if I can --

20           SPECIAL MASTER VANASKIE:  I have a document up in

21   front of me now.

22           Go ahead, Daniel.

23           MR. NIGH:  You know, to the extent, it sounds like

24   Torrent's argument here is that there may be some factual -- in

25   their view, some things that are factually incorrect, but we go

1   through this document throughout the testimony, as you'll see

2   following the next pages, and she gets to remark from her

3   viewpoint if the information is accurate or not, and then

4   there's questions that the timeline itself is also used to be

5   able to ask questions of this document.

6          So I think the document is fair.  It's a timeline, a

7   visual aid that assists in the questioning of the witness.  And

8   to the extent that she has disputes about some of the data that

9   are in it, she can -- she raises those in the testimony.

10          MR. RAE:  Your Honor --

11          SPECIAL MASTER VANASKIE:  Jacob, what's your problem

12   with the document?

13          MR. RAE:  This is an attorney-created document that

14   was created prior to the deposition.  It's being shown to

15   Ms. Chitty at her deposition.  It misstates aspects of the

16   record.

17          For example, the first entry here indicates that on

18   June 20th, 2018, ZHP notified Torrent of NDMA in valsartan API.

19   That's not true.

20          On June 20th of 2018, ZHP notified Torrent that there

21   was a previously unknown impurity with genotoxic potential that

22   existed in valsartan API that had been discovered in valsartan

23   API.  Those are different things, and the jury should not be

24   seeing an attorney-created document that misstates the factual

25   record in connection with this questioning of Ms. Chitty or at

1    all.

2        SPECIAL MASTER VANASKIE:  All right.  Well, I think

3    that's a matter that can be cleaned up by the time of the

4    trial.  I don't think there's anything improper about her

5    testimony.

6        MR. RAE:  Correct, Your Honor.  Our objection here is

7    to the designation line that relates to this document

8    specifically and to any use of this document on the screen or

9    the showing of this document to the jury, not to the

10   substantive questions and answers, as plaintiffs' counsel went

11   through the document with Ms. Chitty.

12       MR. NIGH:  But, Your Honor, they need the document.

13   And while I would agree with defense counsel that June 20th is

14   not ZHP notifies Torrent NDMA in valsartan API, you could see

15   in the questions that are designated that the witness makes

16   that clear and the understanding is made clear between the two

17   on the record.

18       SPECIAL MASTER VANASKIE:  Yes, the testimony comes in.

19   The objection is overruled.  As far as this demonstrative

20   exhibit, I think you need to meet and confer and clean it up.

21       MR. NIGH:  Yes.

22       SPECIAL MASTER VANASKIE:  But I don't see anything

23   improper about the questions and answers.

24       MR. NIGH:  There may be some ways to clean it up, but

25   the key is that, you know, they can actually see this

1    demonstrative, and it's cleaned up by the witness on the

2    record.  That's what I'm saying.

3          I don't know that necessarily the demonstrative has to

4    be cleaned up because it's all read out to the witness, and the

5    witness has every opportunity to clean it up.

6          SPECIAL MASTER VANASKIE:  Yes.  I understand that.

7          MR. NIGH:  I mean, I guess one option could be we

8    could even put next to it "witness says," and we could put on

9    there -- if that's what we really need in the demonstrative.

10   But otherwise, the witness is cleaning it up in the questions.

11         MR. RAE:  Your Honor, I don't think that -- and again,

12   to be clear, our objection is to the document itself, not to

13   the questions and answers.

14         SPECIAL MASTER VANASKIE:  Right.

15         MR. RAE:  I don't think there's any way to cure the

16   problems with this document retrospectively because it's the

17   document that was used during the deposition.  And, you know,

18   this is -- again, if we were doing this live -- and Ms. Chitty

19   will be testifying live at trial, plaintiffs can ask her

20   questions, they can create a demonstrative during that

21   questioning.  If they write down something inaccurate, we would

22   then object to it and, like, that issue would get sussed out

23   live.

24         And the problem here is plaintiffs don't get to create

25   their own version of events that's not consistent with the

1  factual record or with Ms. Chitty's testimony and place that in

2  front of the jury.  And they certainly don't get to place that

3  in front of the jury as if it's a factual recitation of the

4  timeline.

5         MR. NIGH:  Your Honor --

6         SPECIAL MASTER VANASKIE:  So your objection is to the

7  jury seeing this exhibit while also hearing Dawn Chitty's

8  testimony?

9         MR. RAE:  Correct.  And I think if there's a little --

10  like, I think the prejudice here is much less significant if

11  the document is simply not shown, maybe we have to cut video

12  for three questions if the video is going to be on the screen

13  instead and this document was showing up on it, that the jury

14  can still hear the testimony, the jury can hear the questions,

15  they can hear the answers, maybe the questions will be a tiny

16  bit artificial and confusing because they'll be referencing a

17  document that the jury is not seeing, but I think that's a much

18  smaller problem than the jury seeing this document.  And it

19  gets all of the questions that Mr. Nigh wants to designate in

20  front of the jury in front of the jury, all of the testimony

21  comes in, the document doesn't.

22         MR. NIGH:  And, Your Honor, obviously the purpose of

23  the testimony is the timeline.  It's to make this simple and

24  concise where a jury can see the timeline.  And so that's

25  what's happened here at the end.

1        Now, the only thing is, is that even in a

2   demonstrable, if the defendants take notice or issue with the

3   demonstrable, they have multiple options they could have done

4   in this.  They could have re-questioned and if they felt they

5   needed to go further, they could have had their own

6   demonstrative with substituting this out.  But it's not

7   misleading because the witness answers the question and

8   clarifies it.

9        So the reason I say it's not misleading is this

10  information is read out to the witness.  And the jury can see

11  this information at the same time.  They'll see exactly what's

12  being read off.  And the jury is going to hear the witness's

13  answer and say, well, it doesn't actually say -- I don't know

14  that that's when we discovered Torrent NDMA in valsartan.  And

15  then you can see the next -- oh, okay, well, that's when the

16  impurities -- they know that the impurity - they get notified

17  of a potential impurity.

18       It's clear in the record.  So just because the

19  demonstrative might have that one little piece that they don't

20  like the information, the demonstrative goes along with the

21  witness's testimony, and it doesn't mislead the jury.

22       SPECIAL MASTER VANASKIE:  Well, I think the answer to

23  this is you can come up with a curative -- or an instruction to

24  the jury at the time this is played that points out the

25  inaccuracies of the exhibit, but otherwise the testimony comes

1   in.  Or tells the jury -- when it says NDMA was in the product,

2   no, an impurity was found in the product.  Whatever the

3   terminology is.

4           MR. NIGH:  Yes.

5           SPECIAL MASTER VANASKIE:  Potentially genotoxic

6   impurity.  And the witness cleared that up.  I think there are

7   ways to handle this.

8           MR. NIGH:  I agree, Your Honor.  If we could meet and

9   confer as to how to handle the document.

10          SPECIAL MASTER VANASKIE:  Yes.  All right?

11          Could we move -- I think the next one is a

12  counter-designation at page 377, line 21.  And this is your

13  objection, Daniel.

14          MR. NIGH:  Yeah, we found it to be -- it's cumulative.

15  We've asked witnesses before and they've gotten this answer in

16  before.  That's why we removed it.

17          MR. RAE:  Your Honor, I'm not sure of where Mr. Nigh

18  thinks that this -- what Mr. Nigh thinks this is cumulative of,

19  but I don't think this question has come up before in this

20  deposition.

21          SPECIAL MASTER VANASKIE:  I will overrule the

22  objection.  I think it's proper.

23          MR. NIGH:  And just to be clear, it did come in as a

24  counter earlier to this, the same idea that we have -- and so

25  that's why we took it out of the designation already too.  I

1    could get the line, the page and the --

2           SPECIAL MASTER VANASKIE:  No, that's all right.

3           MR. NIGH:  -- line if you think that's important, but

4    I understand your ruling.

5           SPECIAL MASTER VANASKIE:  And now we have 378, line 20

6    to 22.  And the answer is on 379, lines 1 through 5.  And this

7    is your objection, Jacob.

8           MR. RAE:  Yes, Your Honor.  I think this question is

9    likely to be unfairly prejudicial and confusing to the jury in

10   the -- the framing of this is other organizations were able to

11   significantly faster than Torrent to develop a test method to

12   identify nitrosamine impurities in valsartan API.  And I think

13   that the issue here is no other organization that was in a

14   similar position to Torrent, no finished dose manufacturer that

15   I'm aware of or that there's record evidence of developed a

16   test to identify nitrosamine impurities faster than Torrent

17   did.

18          It is true that ZHP and the FDA and Novartis, all of

19   whom are either people who make valsartan API themselves, or

20   the FDA with all of the knowledge and resources that are

21   available to the FDA, including as to how both ZHP and

22   Novartis, as well as other valsartan API producers,

23   manufactured their valsartan API developed tests faster than

24   Torrent did.

25          But kind of framing this as an abstract is going to

1  confuse the jury into thinking that there might be folks out

2  there who were in a position similar to Torrent that were able

3  to do that.

4          MR. NIGH:  Judge, this is not being offered to say

5  that Teva developed a method or that Prinston -- although

6  Prinston is a finished dose manufacturer, they would have been

7  -- that's not the reason it's being offered.  I don't think

8  it's misleading.

9          We've already established in this testimony other

10  organizations -- independent lab, Solvias, was able to do it.

11  Novartis, when they detected an unknown peak, they sent it to

12  Novartis.  Novartis tested it, they found -- that's how the

13  whole thing gets discovered.  Then ZHP is able to do it.  Then

14  the FDA is able to do it.  And there's multiple organizations

15  that are able to do it.

16          And so the question now is, are you aware that all

17  these other organizations are able to do it; but she just --

18  that counter-designation that just came in, we get to counter

19  that.  It's already --

20          SPECIAL MASTER VANASKIE:  Yes, I will overrule the

21  objection.  So 378, lines 20 through 22 and 379, lines 1

22  through 5 are admissible.

23          Now, I think we're to the counter on 381, line 8?

24          MR. RAE:  That's right, Your Honor.  And I think we're

25  also, I'm sure everyone will be pleased to know, getting very

1  close to the end of Ms. Chitty.

2          SPECIAL MASTER VANASKIE:  Yes.

3          MR. NIGH:  We have no issue.  We'll withdraw our

4  objection on that counter.

5          SPECIAL MASTER VANASKIE:  All right.  So the testimony

6  at page 381, lines 8 through 13 is coming in.

7          Now I think we're up to page 382, line 23 to page 383,

8  line 17.

9          MR. RAE:  Your Honor, I think -- our objection is

10 on -- we have an objection on page 383, line 15 to 23, to the

11 question and answer there.

12          SPECIAL MASTER VANASKIE:  Okay.

13          MR. RAE:  And this is a familiar topic for Your Honor

14 at this point.  This is the cheap versus cheaper issue where,

15 again, Judge Bumb sustained -- or granted our motion in limine

16 with respect to referring to the ZHP API as cheap rather than

17 cheaper.

18          And this is another instance of plaintiffs asking a

19 question framed in terms of the API being cheap rather than it

20 being cheaper.  And that testimony, Judge Bumb has already

21 ruled is, unfairly prejudicial and should not be part of this

22 case.

23          SPECIAL MASTER VANASKIE:  Yes, I'll sustain the

24 objection.

25          MR. NIGH:  Your Honor, if I may, we're not actually

1  quoting the document here.

2        SPECIAL MASTER VANASKIE:  Well, that's all right.

3  You're doing the same thing.

4        MR. NIGH:  We're quoting prior testimony, and then the

5  witness even clears up the answer and says I remember

6  discussing that we were buying API from ZHP that was less

7  costly than our other supplier.

8        So whatever sort of unfair prejudice may have happened

9  from the word "cheap" versus "cheaper," which I completely

10 disagree with how the defendant Torrent has contextualized the

11 judge's ruling here.  It's a very, very specific minute ruling.

12 Misquoting the email.  It's not -- and then the witness even

13 clears up whatever unfair prejudice may have actually possibly

14 occurred.

15       SPECIAL MASTER VANASKIE:  Well, the witness does clear

16 it up, that's for sure.  All right.  I'll reverse my ruling and

17 allow this to come in.  That use of the word "cheap" is

18 problematic.

19       MR. RAE:  Your Honor, I agree that Ms. Chitty's answer

20 accurately states the email, but I don't think that fully cures

21 the prejudice of plaintiffs being able to misquote the email

22 and misuse the email.  And like -- I don't think that there's

23 any appropriate usage for this question, I don't think it needs

24 to be coming in front of the jury, and I think that Judge Bumb

25 has already addressed this issue and ruled that plaintiffs

1  cannot ask questions like this.

2          And it doesn't matter if the witness is aware enough

3  of the context of the email that she was shown in the morning

4  of the same day to correct the misquoted question or not.  The

5  question isn't allowed to be asked in the first place.

6          MR. NIGH:  Again, I think --

7          SPECIAL MASTER VANASKIE:  You know what, Jacob, I

8  think you're right.  I will strike the question.

9          MR. RAE:  Thank you, Your Honor.

10          MR. NIGH:  Your Honor, does the testimony come in?

11  Because that's the issue.  This sets the foundation for what's

12  happening next.  It realerts that -- reorients to what's

13  happening next.

14          SPECIAL MASTER VANASKIE:  We'll let the answer come

15  in.  So --

16          MR. NIGH:  Okay.

17          SPECIAL MASTER VANASKIE:  -- it will start at line 11

18  or continuation at line 11:  And at this time, May of 2017, ZHP

19  is supplying valsartan API to Torrent, right?

20          Yeah, I believe so.

21          And then just continue:  I remember discussing that we

22  were buying API from ZHP that was less costly than our other

23  supplier.

24          I think that gives you both --

25          MR. NIGH:  Thank you, Your Honor.

```
1              SPECIAL MASTER VANASKIE:  All right?

2              MR. RAE:  I'm not going to push back against that --

3              SPECIAL MASTER VANASKIE:  All right.  Thank you.

4              MR. RAE:  -- suggestion, Your Honor.

5              SPECIAL MASTER VANASKIE:  Now, are we at page 382,

6    line 23?  No, moving on --

7              MR. RAE:  I think we're at page 387, line 16 to

8    page 388, line 4.

9              SPECIAL MASTER VANASKIE:  Okay.

10             MR. NIGH:  And, Your Honor, I believe -- and I don't

11   want to speak for Mr. Rae, but I believe that a lot of these

12   lacks foundation are going to be, you know, an argument that

13   she's not qualified to vet -- you know, to speak to ZHP's -- or

14   to the FDA investigation report.

15             But I will just say that even though the witness

16   states it's not her job to vet suppliers and contractors, she,

17   you know, numerous time testified she's hired, she's the head

18   of the regulatory and compliance, she testified earlier that it

19   was their duty to ensure their API suppliers were in compliance

20   as well.  There's multiple different ways in which this

21   reflects in her role as compliance.

22             SPECIAL MASTER VANASKIE:  Yes, we have a series of

23   lacks foundation objections starting at page 387, the question

24   at line 16.  And we have some counter-designations too.  I

25   mean, my initial reaction to all of this was that it all comes
```

1    in.

2          MR. RAE:  Your Honor, I think to start with -- because

3    I think there may be some different issues here, but starting

4    just with this first question and answer, you can see in the

5    answer -- this is a question about an FDA inspection report

6    that was issued to ZHP, not to Torrent, about ZHP's

7    manufacturing facilities.

8          And Ms. Chitty's answer is, again, because she's said

9    this earlier in testimony that wasn't designated:  I don't know

10   if I've specifically seen this report since it wasn't part of

11   my job to vet suppliers and contractors.

12         Ms. Chitty is testifying to the fact that she lacks

13   personal knowledge of the information that's being presented to

14   her that she's asking -- that's being read into the record that

15   she's asking to affirm the content of.  And whether or not

16   plaintiffs could get this information from another source,

17   whether or not they could ask different questions of Ms. Chitty

18   is not the issue in this objection.

19         The issue is, you can't take a document that you

20   haven't laid a foundation for asking a fact witness about and

21   ask them what's in that document if there is no personal

22   knowledge of it.

23         MR. NIGH:  And I believe that that scope on foundation

24   for a document is not the scope of the rule itself.  There are

25   many ways you could lay a foundation when they haven't seen a

1    document, and one of them would be in her role, which we've

2    discussed all these various ways -- she's the mouthpiece to the

3    FDA.  She talks about she's safety and compliance, she's been

4    involved in communication, she's getting, you know, emailed

5    about how do we communicate things to clients.  I mean, there's

6    all these different facets of her job that this is attached to.

7         So the very fact that she hasn't seen this document

8    itself doesn't obscure the questions that are coming later,

9    where here, again, I come back, there was that one document we

10   didn't ask some questions and say, were you aware of this

11   information, when we are asking those questions, was this

12   information ever conveyed to you.

13        MR. RAE:  And, Your Honor, again, I heard a lot of "we

14   could lay a foundation other ways" there, but I didn't hear a

15   "we did lay a foundation for this line of questioning"

16   statement by Mr. Nigh.  I don't see it in the designations, and

17   I certainly don't see it in the question and answer that we're

18   looking at right now.

19        MR. NIGH:  Judge, just to be clear, that foundation

20   that I'm talking about when I said "could," that foundation was

21   laid.  We've gone through this whole transcript.  We've talked

22   about how she's safety and compliance, we saw how she's

23   receiving emails, we saw how she's the one person that's

24   communicating with the FDA on some calls, some calls she's only

25   got one other person.  I mean, all of that has been laid

1    throughout this whole deposition.

2         MR. RAE:  Your Honor, this -- I'm not sure that this

3    holds true for every question that gets asked about this

4    document, but this first question, I know for the next couple

5    because I just looked down at them, the questions, again, are,

6    "here's what the document says, do you see that?"

7         To ask that question of a fact witness, you need to

8    establish the fact witness knows what that document says, that

9    they have personal knowledge of the document.

10        MR. NIGH:  Yeah.  Again, "here's what the document

11   says, do you see that?"

12        Yes.

13        It's orienting her through.

14        And then later it's asked, "Were you aware of any of

15   that information?"

16        Page 387:  When was the first time you learned that

17   ZHP could not ensure integrity of its analytical system?

18        That's lines 21 to 24.  There's many of these that are

19   all throughout here.

20        SPECIAL MASTER VANASKIE:  Yes.  As I said, when I went

21   through this line of inquiry, that I was not persuaded by the

22   lacks foundation objections.  Unless you have some other

23   objection, I would overrule the foundation objection and allow

24   these questions and answers to be played for the jury unless

25   I'm persuaded there's some other problem with the line of

1    inquiry.

2            MR. RAE:  No, Your Honor.  I think the foundation

3    objection was the objection that we were making here.

4            SPECIAL MASTER VANASKIE:  All right.  And the counters

5    all come in as well.

6            MR. NIGH:  Yes, Your Honor.  I believe that goes

7    through to 408, line 24, but I don't want to speak for Mr. Rae.

8            SPECIAL MASTER VANASKIE:  That's what I have.

9            MR. RAE:  I'm just -- my pause is just to make sure

10   that I agree with that position, so if you could give me a

11   second to --

12           SPECIAL MASTER VANASKIE:  Yes, absolutely.

13           MR. NIGH:  And just to clarify, page 387, line 16

14   through to page 408, line 24.

15           SPECIAL MASTER VANASKIE:  Correct.  There are some

16   other objections at 408, 413 we'll talk about.

17           MR. RAE:  Your Honor, I agree that your overruling of

18   our objection applies through page 408, line 24.

19           SPECIAL MASTER VANASKIE:  All right.  So now we have

20   an objection at page 413, line 21.

21           MR. RAE:  Yes, Your Honor.  And this is a similar

22   objection to the one that we made before, which is that this is

23   a prejudicial question that invades the province of the judge

24   and the jury by asking about ultimate jobs and

25   responsibilities.

1          SPECIAL MASTER VANASKIE:  And the same ruling, I'll

2     overrule the objection.

3          And coming in will be the testimony -- the question at

4     lines 21 through 24 of page 413 and the answer at lines 3

5     through 6 of page 414.

6          And I think that concludes the issues with respect to

7     Dawn Chitty's deposition.

8          MR. RAE:  Yes.  And Your Honor, I just want to make

9     one line of cleanup from a record perspective.  I should have

10    done this before we started talking about Ms. Chitty's

11    deposition, but I just want to make it clear that Torrent has

12    objected to the playing of Dawn Chitty's deposition and

13    Dr. Jaiswal's deposition by video due the fact that they're

14    going to be appearing live at trial.

15         I think that's an issue that Judge Bumb has gone back

16    and forth on at this point, and it's not entirely clear where

17    we're going to end up on that.  And I'm just speaking here to

18    preserve the fact that we continue to have that objection, not

19    asking Your Honor to address it here.

20         And obviously we've gone through this process to make

21    sure that we're prepared regardless of how Judge Bumb

22    ultimately chooses to approach this.

23         SPECIAL MASTER VANASKIE:  Understood.

24         MR. NIGH:  And Your Honor, we believe that her ruling

25    has been made.  Thank you.

1          SPECIAL MASTER VANASKIE:  All right.  We'll take a

2     15-minute recess at this time and pick up with Jocelyn Rivera.

3          (Brief recess taken from 2:39 p.m. to 2:54 p.m.)

4          MR. NIGH:  I think this one might be another good one

5     to revisit on Monday.  I'm going to take a look based on the

6     rulings that Your Honor has already made and we're going to

7     likely, you know, cut, you know, many designations here for

8     Rivera based on those rulings.

9          So rather than spend the time going through each one

10    that lacks foundation and issues like that, we have some of

11    this testimony already for other witnesses that's ruled

12    admissible and we may look at this and say, we'll just

13    dedesignate, you know, a decent amount of information on this

14    one.

15         SPECIAL MASTER VANASKIE:  Yes, there's not a whole lot

16    there in this one.

17         MR. NIGH:  There's not a lot, there's not.  We

18    recognize and understand that, Your Honor.

19         SPECIAL MASTER VANASKIE:  This is a first-time

20    deponent who didn't want to say anything.

21         MR. NIGH:  Right.

22         MR. RAE:  And, Your Honor, I would frame it more --

23    and I know we're not going to necessarily get into this today

24    so I'm not going to spend a lot of time on it, but I think it's

25    less didn't want to say anything and more was being asked about

1   questions that relate to responsibilities of other job

2   departments at Torrent that she just didn't know how to answer.

3            SPECIAL MASTER VANASKIE:  All right.  Well, like he

4   said, there's not a lot there, it wouldn't take long to go

5   through, we can defer it to Monday if you're both in agreement

6   on it.

7            MR. RAE:  I'm certainly not going to push back the

8   idea that Mr. Nigh may be withdrawing a significant portion of

9   the testimony or some portion of the testimony that we're

10  objecting to, and that that could avoid us bothering Your Honor

11  with making unnecessary decision on that testimony.

12           SPECIAL MASTER VANASKIE:  You're not bothering me, but

13  there's no need -- I really don't want to rule on matters that

14  are going to be withdrawn.  So take a look at it over the

15  weekend.

16           I have to say, I don't see how all of this helps

17  plaintiffs much, other than to create an embarrassment for

18  Torrent.

19           MR. NIGH:  Understood, Your Honor.

20           SPECIAL MASTER VANASKIE:  Is that it then for today?

21           MR. SLATER:  Hello, Judge.  Adam Slater.  How are you?

22           SPECIAL MASTER VANASKIE:  I'm well.  How are you?

23           MR. SLATER:  I'm good.  I think that is because I

24  think we wrote to you yesterday and offered you some times, and

25  you just need to let us know, to finish the ZHP witnesses.  I

1  think if we haven't gotten them over to you yet, they're all

2  going to be to you I think today, the last of it.

3       SPECIAL MASTER VANASKIE:  I got that one last night,

4  but I don't know what I received yet today.  I haven't looked

5  at my email.

6       MR. SLATER:  I think it's a total of three witnesses

7  that remain and we thought it made sense not to cram them in

8  today when we thought we would get to you very late in the day,

9  but at least give you a chance to look at them and then if you

10  can do it next week, to choose when you would like to hear us

11  to finish those.

12       SPECIAL MASTER VANASKIE:  Yes.  Let me -- we're

13  scheduled for Monday, Daniel; is that true?

14       MR. NIGH:  I only said Monday -- I actually haven't

15  independently seen something of Monday.  I remember in our

16  meet-and-confer Mr. Rae said that we were scheduled for Monday,

17  I believe.  I may have misquoted this.

18       THE LAW CLERK:  And, Judge, this is Loretta.  I just

19  hadn't heard about Monday being scheduled so I was asking a

20  procedural question, should we get a text order out about

21  Monday with the time and the parties' deposition designations?

22       SPECIAL MASTER VANASKIE:  Jacob, I had you scheduled

23  for Monday?

24       MR. RAE:  I have something in my calendar indicating

25  there was something scheduled for Monday, but maybe it got

1  inadvertently added there and that was -- the confusion may

2  have originated from me having something in my calendar that I

3  have no idea how it got there.  So --

4          SPECIAL MASTER VANASKIE:  Well, I'd like to push

5  forward.  I have time on Monday.  I have nothing scheduled.

6          You're right, Loretta, it's not on the calendar, not

7  on my calendar, but I would like to, you know, keep this

8  process going.  I cannot do it Tuesday or Wednesday.  So let's

9  shoot for Monday at 10:00 a.m.  All right?

10         MR. NIGH:  Yes, Your Honor.

11         MR. SLATER:  That works for us.  And I see Nina is on.

12         Nina, I don't remember if that worked for you, Monday.

13 It works for us.  If that's when the Judge has time, we'll make

14 ourselves available.

15         MS. ROSE:  Yeah, I had a conflict on Monday morning,

16 but I can shift some things around if that's the plan.

17         SPECIAL MASTER VANASKIE:  Are you sure?

18         MS. ROSE:  Yes, I'm good.

19         SPECIAL MASTER VANASKIE:  All right.  And how about --

20         MS. LOCKARD:  Hey, Judge?

21         SPECIAL MASTER VANASKIE:  Yes.

22         MS. LOCKARD:  For Teva, Mr. Stanoch and I need to

23 coordinate.  I have three additional designations we need to

24 convey to him which they will get to him -- I have one almost

25 ready to go this afternoon and the other two I'll get out

1   hopefully over the weekend.

2          I heard you say you're not available on Tuesday or

3   Wednesday.  Does that mean we might be looking at the end of

4   next week or when would we plan to hear the remainder of Teva?

5          SPECIAL MASTER VANASKIE:  Let me see.  Let me look at

6   my calendar again.

7          MR. SLATER:  I'm not available Thursday or Friday.

8   That's Rosh Hashanah, so --

9          SPECIAL MASTER VANASKIE:  Okay.

10         MR. STANOCH:  I'm a gentile so that's completely fine

11  we do Teva on Thursday or Friday.

12         MR. SLATER:  My congratulations to you, Dave.

13         (Laughter.)

14         MS. LOCKARD:  I only worship the law, so I'm at your

15  disposal.

16         MR. NIGH:  Are we on the record?

17         SPECIAL MASTER VANASKIE:  I think so.

18         MR. SLATER:  We can be ready Monday with the ZHP --

19         SPECIAL MASTER VANASKIE:  Let me pull up my calendar.

20         We can be ready Monday for ZHP.

21         MR. RAE:  Your Honor, for Torrent I think we had a

22  couple of things that we kind of pushed forward from today and

23  then we also owed you an update on some of the things with

24  Dr. Jaiswal's testimony by Monday, and I think Mr. Nigh and I

25  are going to try and work that out over the weekend.  But to

1    the extent that there remain any parts of Dr. Jaiswal's

2    testimony that we need to be addressing in front of you, we

3    would be expecting to be prepared to do that on Monday.

4             SPECIAL MASTER VANASKIE:  All right.

5             MR. RAE:  If that works.

6             MR. NIGH:  There's not a lot.

7             SPECIAL MASTER VANASKIE:  What do we have left on

8    Teva?

9             MR. STANOCH:  I'm waiting for Ms. Lockard to get me

10   Mr. Karlsson, Mr. Nassall, Mr. Barreto, but she says that she

11   wants to call him live so I can't play the testimony.

12   Mr. Nudelman, but she says -- the toxicologist, so that's the

13   general causation issue.  There may be one other person --

14            MS. LOCKARD:  Binsol.

15            MR. STANOCH:  Oh, Mr. Binsol.

16            MS. LOCKARD:  Tony Binsol.

17            So we have three that we think we can put before Your

18   Honor.  And then we have pending disputes requiring

19   clarification from Judge Bumb on the general cause issue which

20   I think would be more efficient to get that before we go

21   through Dr. Nudelman.  Dr. Nudelman is a toxicologist, so

22   there's just a lot that hinges on Judge Bumb's clarification of

23   that.

24            And then Mr. Barreto, you know, I know there is

25   certainly a dispute -- Mr. Rae and Mr. Nigh mentioned this

1  earlier -- about the situation with whether or not we can --

2  plaintiffs can play the designation of a witness who is coming

3  live, whether we can play our affirmatives and so forth.

4          So Mr. Barreto is an important witness, he's going to

5  be here live testifying, and so our position is that they

6  should not be able to play designations, they should have to

7  cross-examine him.  And if they do play designations, then they

8  should not be allowed to then get a second bite at the apple.

9  I know there's a vehement dispute on that.

10          So I just don't think it makes sense to go through it

11  because if we win on this, then there will be no designations

12  played and we all would have wasted our time on him.

13          SPECIAL MASTER VANASKIE:  All right.  In terms of my

14  schedule -- go ahead, Adam, I didn't hear you.

15          MR. SLATER:  I said plaintiffs, obviously, don't agree

16  with that position at all.  I understand Ms. Lockard doesn't

17  like it.  Unfortunately, that's just basic black-letter law

18  about how this is normally done.

19          I don't think we need to argue it with Your Honor

20  right now.  I just wanted to --

21          SPECIAL MASTER VANASKIE:  We're not going to argue it.

22          MR. SLATER:  I just wanted to not leave it as if we

23  agree, because we don't.

24          SPECIAL MASTER VANASKIE:  All right.  I have Monday

25  available.  I'd like to take care of the ZHP witnesses that

1    are -- that have already been sent to me or will be sent to me

2    by Sunday so we can be prepared to discuss them.

3          I'd like to take care of Jocelyn Rivera.  I don't

4    think that will take much time regardless of what Daniel does

5    over the weekend in terms of pairing it down.

6          And the Teva witnesses, I don't have yet, I take it?

7          MS. LOCKARD:  That's correct.

8          MR. STANOCH:  No.  I'm still waiting for Ms. Lockard

9    to flip them back to me.

10          And just for planning purposes, Your Honor, the three

11    that are not the ones that she said are in dispute, they're all

12    half or less than half time-wise of Mr. Vadsola.  So you

13    already did the big ones is my only point.

14          SPECIAL MASTER VANASKIE:  Okay.  Well, I am available

15    next Thursday and Friday, so now I have open days for --

16          MR. NIGH:  And, Your Honor, to the extent that there's

17    time on Monday, we still have four more witnesses for Torrent

18    that we haven't covered yet, but they are much, much smaller.

19    In other words --

20          SPECIAL MASTER VANASKIE:  Do I have them, Daniel?

21          MR. NIGH:  Not yet.  We may get those to you over the

22    weekend so --

23          SPECIAL MASTER VANASKIE:  If you get them to me by

24    Sunday, we may be able to address them on Monday.

25          MR. NIGH:  Okay.

```
 1            MR. RAE:  And I don't know about Mr. Nigh's

 2   availability late next week, but I'm happy to be available

 3   Thursday or Friday if we need to be deal with anything --

 4            SPECIAL MASTER VANASKIE:  Are you available, Daniel?

 5            MR. NIGH:  Yes, I am, Your Honor, I'm available

 6   Thursday.  Friday I have some unavailability.

 7            SPECIAL MASTER VANASKIE:  So we'll take up whatever's

 8   left for Torrent on Thursday.

 9            MR. NIGH:  Very good.

10            SPECIAL MASTER VANASKIE:  And hopefully we can finish

11   ZHP up on Monday.

12            THE LAW CLERK:  Again, Your Honor, this is Loretta.

13   May I ask the parties to directly also send me your information

14   -- the information -- sorry, I'm having work done at my

15   house -- to send the information directly to me as well as to

16   Judge Vanaskie so he doesn't have to, you know, send it to me.

17   Thank you.

18            SPECIAL MASTER VANASKIE:  The designations and the

19   transcripts, please.  So just copy Loretta on the email to me.

20            Is there anything else for today then?

21            MR. SLATER:  I don't believe so.

22            SPECIAL MASTER VANASKIE:  Let me just say how

23   impressed I was by the arguments that have been presented this

24   far.  This is tedious work, to go through these deposition

25   transcripts.  The objections are well articulated and the
```

1    responses have been very helpful from all sides.  So it's clear

2    to me that you've given this tremendous amount of thought, as

3    it deserves.  But I didn't want the day to go out without -- go

4    away without letting you know that certainly from where I sit,

5    I'm very impressed.

6         All right.  Anything else?

7         MR. SLATER:  No.  Thank you very much, Your Honor.

8         MR. NIGH:  Thank you, Your Honor.

9         MR. RAE:  Thank you, Your Honor.

10        MS. LOCKARD:  Thank you.

11        SPECIAL MASTER VANASKIE:  Take care.  Bye-bye.

12        (Matter adjourned at 3:06 p.m.)

13

14

15              - - - - - - - - - - - - - - - -

16

17        I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19

20   /S/ Sharon Ricci, RMR, CRR
     Official Court Reporter

21

22   September 27, 2024
          Date

23

24

25