**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                        :   CIVIL ACTION NUMBER:
                                        :   **19-md-02875**
IN RE:  VALSARTAN PRODUCTS              :
LIABILITY LITIGATION                    :   **DEPOSITION DESIGNATION**
                                        :   **HEARING VIA TEAMS**
_____       :

        Mitchell H. Cohen Building & U.S. Courthouse
        4th & Cooper Streets
        Camden, New Jersey 08101
        October 3, 2024
        Commencing at 10:31 a.m.

**B E F O R E**:        **THOMAS I. VANASKIE (RET.)**
                        **SPECIAL MASTER**

**A P P E A R A N C E S**:

        KANNER & WHITELEY, LLC
        BY:  DAVID J. STANOCH, ESQUIRE
        701 Camp Street
        New Orleans, Louisiana  70130
        For the Plaintiffs


        NIGH GOLDENBERG RASO & VAUGHN
        BY:  DANIEL A. NIGH, ESQUIRE
        1333 College Parkway, #1049
        Gulf Breeze, Florida 32563
        For the Plaintiffs

     Ann Marie Mitchell, CRR, RDR, CCR, Official Court Reporter
            AnnMarie_Mitchell@njd.uscourts.gov
                    (856) 576-7018

     Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

_United States District Court_

1   **A P P E A R A N C E S (Continued)**:

2

3        GREENBERG TRAURIG LLP
         BY:  VICTORIA DAVIS LOCKARD, ESQUIRE

4        BY:  STEVEN M. HARKINS, ESQUIRE
         3333 Piedmont Road, NE, Suite 2500

5        Atlanta, Georgia  30305
         For the Defendants Teva Pharmaceutical Industries Ltd.,

6        Teva Pharmaceuticals USA, Inc., Actavis LLC,
         and Actavis Pharma, Inc.

7

8        KIRKLAND & ELLIS LLP
         BY:   JACOB M. RAE, ESQUIRE

9        601 Lexington Avenue
         New York, New York  10022

10       For the Defendants Torrent Pharma, Inc.
         and Torrent Pharmaceuticals Ltd.

11

12   **ALSO PRESENT**:

13

14       LORETTA SMITH, ESQUIRE
         Judicial Law Clerk

15
         LARRY MACSTRAVIC, Courtroom Deputy

16

17

18

19

20

21

22

23

24

25

*United States District Court*

```
 1              (PROCEEDINGS held in open court before SPECIAL
 2    MASTER THOMAS I. VANASKIE at 10:31 a.m.)
 3              SPECIAL MASTER VANASKIE:  Where did you want to
 4    start?  Because maybe we're not on the same page there.  I see
 5    I've got Jacob and Daniel.
 6              And where did you want to start?
 7              MR. NIGH:  Your Honor, we can leave it up to you, but
 8    we've got Jaiswal and we've got the four witnesses.  So we've
 9    got about 60 pages of Jaiswal.
10              I did want to say to Your Honor that I also have a
11    medical appointment that I have to leave for at 12:20 Eastern.
12              SPECIAL MASTER VANASKIE:  Okay.
13              MR. NIGH:  It's not -- it's something that I just
14    kind of got last -- you know, short notice.
15              SPECIAL MASTER VANASKIE:  Well, we want to have that
16    taken care of.
17              But who are the four witnesses?
18              Is Jaiswal the 40-page excerpt?
19              MR. NIGH:  Yes.
20              MR. RAE:  Yes.
21              MR. NIGH:  46 pages.
22              MR. RAE:  And just, you know, a few scattered
23    segments of those 40 pages, so...
24              THE COURT:  I think that's what we'll need to focus
25    on.
```

1          We can do Jaiswal first and then move to some of the

2   others.

3          But let me pull up his transcript.  And that's from

4   June 25th.  Right?

5          MR. NIGH:  Yes.

6          SPECIAL MASTER VANASKIE:  It's just loading now.

7          So I'm at page 831 of that transcript over here.

8          I really didn't have -- maybe I have it and I just

9   didn't see it -- pages from his -- specific pages.  I just

10  knew it was that page range.

11         MR. NIGH:  Your Honor, these were supplied in the

12  original that we had sent back on --

13         SPECIAL MASTER VANASKIE:  Let me pull that up then.

14  That'll be helpful.

15         MR. NIGH:  I will forward it again to Your Honor as

16  well so you have it top of inbox.

17         SPECIAL MASTER VANASKIE:  Yeah, if you could forward

18  that to me again, Daniel.

19         MR. NIGH:  Okay.  I just sent it.

20         SPECIAL MASTER VANASKIE:  Just waiting for it to come

21  through.

22         MR. NIGH:  No problem.

23         SPECIAL MASTER VANASKIE:  All right.  I have it now.

24         MR. RAE:  Okay.  And, Your Honor, this is --

25         SPECIAL MASTER VANASKIE:  I'll make sure I'm on the

     1  right page.

     2          We should be at page 831 of his transcript.

     3          MR. NIGH:  Yes, Your Honor.

     4          SPECIAL MASTER VANASKIE:  Lines 14 to page 832,

     5  line 8.

     6          MR. RAE:  Yes, Your Honor.

     7          Our first objection had been at 832, lines 6 to 12.

     8          But to help speed things along here, I think we're

     9  willing to withdraw our objections on -- starting on 832,

    10  lines 6 through 833, line 7.

    11          And so the first objection that I think it makes

    12  sense for us to address is our objection to the question and

    13  answer at 813, line 14 to 18.

    14          SPECIAL MASTER VANASKIE:  So we're on to page 833,

    15  line 14.

    16          Question:  So in May of 2017, this is about a year

    17  before Torrent learned its valsartan API was contaminated with

    18  NDMA.  Right?

    19          That question and answer?

    20          MR. RAE:  Yes, Your Honor.

    21          SPECIAL MASTER VANASKIE:  And what's the basis for

    22  the objection?

    23          MR. RAE:  This question misstates the record in a

    24  prejudicial way.  The "about a year" is not factually

    25  accurate.  Torrent didn't learn that its API was

```
 1   contaminated -- like -- or that its API contained an NDMA
 2   impurity until August of 2017, which is a meaningful amount
 3   longer than a year after May of 2017.  And so this question
 4   kind of improperly implies that Torrent learned of the NDMA
 5   impurity in the valsartan API that Torrent was purchasing
 6   earlier than it actually did.
 7            SPECIAL MASTER VANASKIE:  You're saying they learned
 8   in August of 2018, and that's --
 9            MR. RAE:  Right.  This is a critical issue in the
10   case.  This distinction between what was learned in June of
11   2018 about new process API and what was learned in August of
12   2018 about old process API.
13            SPECIAL MASTER VANASKIE:  All right.  Daniel?
14            MR. NIGH:  Your Honor, this is, again, it's about a
15   year.  I think they're drawing too much of a distinction here.
16   Any kind of confusion that this might mislead.  Remember we
17   had a timeline that we're submitting?  So they can all see the
18   timeline.  I think that would have made it even clearer,
19   especially once we cleaned up that one misstatement.  But on
20   top of that, there's been many questions and answers on the
21   time frame here, so I don't think that "about a year" misleads
22   anybody.
23            SPECIAL MASTER VANASKIE:  Yeah.  I don't really find
24   that misleading, so I'll overrule the objection.
25            What is next?
```

1          MR. RAE:  It's the question that begins at the bottom

2    of this page on 833, line 23 and then runs through 834,

3    line 5.

4          SPECIAL MASTER VANASKIE:  All right.  So the question

5    is:  And also that -- in May of 2017 that Torrent's valsartan

6    is contaminated with NDMA?

7          And the answer is:  Yeah.  They notified us regarding

8    this.

9          What's the basis for the objection?

10         MR. RAE:  The objection here is largely the fact that

11   this, again, is confusing timelines by asking -- the way that

12   the question is phrased, it could imply that Torrent knew that

13   there was NDMA in its valsartan in May of 2017, which is not

14   the case.  And so we think there's a significant risk of juror

15   confusion in the way this question is phrased.

16         SPECIAL MASTER VANASKIE:  All right.  Daniel?

17         MR. NIGH:  The question actually doesn't speak to

18   knowledge in May of 2017.  It's actually just, again, this is

19   sort of that understanding that the product that has been made

20   in 2017 is actually contaminated with NDMA, which is true.

21   There's nothing in the question that says that they knew about

22   it in 2017.  It's talking about the product made in 2017 was

23   contaminated with NDMA.

24         MR. RAE:  Your Honor --

25         SPECIAL MASTER VANASKIE:  -- the answer, that

1  confuses the issue, because the witness answers:  Yeah.  They

2  notified us regarding this.

3       Go ahead, Jacob.

4       MR. RAE:  I was going to agree that there's nothing

5  in this question that makes it clear that this is about --

6  that makes it clear what time frame or whether or not this is

7  about knowledge.  And that's why there was a form objection

8  made to the question at the time and why there's a problem

9  with this question.

10      If the question was clearly oriented in one direction

11 or the other, it would be a perfectly fine question.  The

12 problem is that the question is unclear.  The witness's answer

13 doesn't provide clarity as to exactly what is being spoken

14 about and that creates the risk of confusion is the basis of

15 our objection.

16      SPECIAL MASTER VANASKIE:  I agree.  I'll sustain the

17 objection.

18      MR. NIGH:  Your Honor, just to make it clear, the

19 question above I think is already switched from knowledge.  We

20 know -- and that's why the next question makes sense, because

21 the question above says:  And in May of 2017, we know that

22 Torrent is manufacturing valsartan with ZHP API.  Right?

23      And then the next question is:  And now -- and that

24 in May of 2017 that Torrent's valsartan is contaminated with

25 NDMA.

```
 1            So that's what makes it clear.  The question above

 2   makes it clear that we're not switching gears here

 3   immediately.

 4            SPECIAL MASTER VANASKIE:  I know.  It is a little bit

 5   confusing.  I'll sustain the objection.

 6            Are we proceeding to page 843 now?

 7            MR. NIGH:  Yes.

 8            MR. RAE:  Yes, Your Honor.

 9            SPECIAL MASTER VANASKIE:  And this is starting at

10   line 21.

11            MR. RAE:  Yes, Your Honor.  Our primary objection

12   here is a 602 objection to foundation.

13            The issue here is this is -- as Your Honor will

14   recall, this deposition was of Dr. Jaiswal in his personal

15   capacity and is following on the heels of a deposition of him

16   in his 30(b)(6) capacity, where he was shown certain documents

17   related to these inspection -- these EIRs that were conducted

18   of ZHP that at -- during his 30(b)(6) deposition he testified

19   he had never seen before.

20            And he's now being asked personal knowledge questions

21   about comparing these documents that his basis for knowing the

22   answers to these questions is because plaintiffs' counsel

23   showed them to him during his 30(b)(6) deposition.

24            SPECIAL MASTER VANASKIE:  All right.  Daniel --

25            MR. RAE:  And so --
```

*United States District Court*

```
 1              SPECIAL MASTER VANASKIE:  Go ahead.  Continue, Jacob.
 2              MR. RAE:  No.  I can wrap up there, Your Honor.
 3   Thank you.
 4              MR. NIGH:  Your Honor, I don't agree with how that's
 5   positioned in terms of he doesn't have any knowledge of these
 6   issues.
 7              But, nonetheless, even if that were true, this
 8   deposition takes place 20 days later.  And even if he were
 9   shown documents, he could still compare the information and
10   then in the citations and then between 2017 and 2018 and see
11   that there are similar citations between them.
12              So whether or not he had seen those two documents or
13   not would be irrelevant.  But, nonetheless, he had seen them
14   20 days prior at least.  And the question is:  Did you know
15   that?
16              And he says:  I'm aware of that.  That's --
17              SPECIAL MASTER VANASKIE:  I think it's proper.  This
18   objection I will overrule.
19              What's the next one, Jacob?
20              MR. RAE:  It is page 848 -- or, actually, the next is
21   we have a counter at page 846, line 10 through the 847,
22   line 24.
23              MR. NIGH:  Your Honor, we don't have -- we're
24   withdrawing our objection to that counter.
25              SPECIAL MASTER VANASKIE:  All right.  Then what's
```

 1   next?

 2          MR. RAE:  We have an objection at 848, line 2 to

 3   line 10.

 4          SPECIAL MASTER VANASKIE:  So the question at 848,

 5   line 2 is:  So as head of quality of Torrent, after seeing

 6   this report or learning these citations, Torrent never

 7   followed up with ZHP to conclude whether or not this was

 8   accurate.  It continued to manufacture API from ZHP.

 9          MR. RAE:  Yes, Your Honor.  And in light of

10   plaintiffs' counsel withdrawing their objection to our

11   counter, which we think provides the context to avoid

12   confusion in this designation, we'll withdraw our objection

13   here.

14          SPECIAL MASTER VANASKIE:  Very well.  Good.

15          Are we now up to page 853?

16          MR. NIGH:  We are withdrawing our objections to each

17   of the counters -- the three counters made at page 846,

18   line 10 to 846, line 22; 846, line 23 to 847, line 4; and 847,

19   line 7 to page 848, line 1.

20          SPECIAL MASTER VANASKIE:  All right.

21          MR. NIGH:  The three counters there, we're

22   withdrawing all objections to those.

23          MR. RAE:  Yes, Your Honor.  There's an objection on

24   page 851, lines 16 to 17, which I think is similar to some of

25   the other objections we've talked about before, where

1  plaintiffs are designating attorney commentary that doesn't

2  follow up into the form of a question or designate an answer

3  to it.

4        MR. NIGH:  This is just directing to where on the

5  page the witness --

6        SPECIAL MASTER VANASKIE:  Yeah.  I'll overrule the

7  objection.  That introductory language is all right.

8        MR. RAE:  Just for clarity, is -- the only scope of

9  the designation here, does it stop at page 14 and not include

10 the "okay, we're just going to highlight" portion of that

11 line?

12       MR. NIGH:  Page 9, no.  We're looking at page 14.  I

13 think that that's fair, we'd stop there.

14       MR. RAE:  Okay.  Understood then.

15       I think we would not have objected to that without

16 the rest of the line.

17       MR. NIGH:  Okay.

18       SPECIAL MASTER VANASKIE:  So you're stopping at --

19 we're looking at page 14?

20       MR. NIGH:  Yes.

21       SPECIAL MASTER VANASKIE:  Okay.

22       MR. RAE:  Our next objection is page 854, line 12

23 to -- and then it runs through 855, line 1.

24       And we have a couple of objections here.  The first

25 is a form objection that we made at the time.  This is a

1    compound question.  There's two different questions being

2    asked here, and it's unclear which one the witness is

3    answering.  There's kind of a preamble of:  Now I understand.

4    You said this is meant to be corrected after an inspection,

5    but do you also understand that ZHP was further inspected by

6    the FDA again in 2018 and the same conclusions were found

7    about your API manufacturer?

8            There's then a form and foundation objection made.  A

9    subsequent question is asked, which is just:  You're aware of

10   that?  Which does nothing to clarify and maybe introduces

11   further confusion to the prior questions.

12           The same objections are made, and the witness simply

13   answers:  You're correct.

14           And I think it's unclear what the witness is

15   answering "you're correct" to, whether or not it's the

16   prefatory material that counsel provided to the question or

17   the question about understanding the similarities that -- like

18   there was a similar inspection.

19           SPECIAL MASTER VANASKIE:  Daniel?

20           MR. NIGH:  I think, you know, if there are a number

21   of things on a question when you say, and then you're aware of

22   that, and the witness says, yes, I am, that implies he's aware

23   of each of the things that's in the question.

24           So that's not a -- that ends up not being a compound

25   question or misleading as soon as he responds that, yes, I'm

1    aware of that.

2         SPECIAL MASTER VANASKIE:  I think it is confusing and

3    misleading.  I think it is definitely compound.

4         I'll sustain the objection.

5         MR. NIGH:  What specifically is sustained?  Is it

6    just 854:12 to 17?

7         SPECIAL MASTER VANASKIE:  854:12 to 17 and then the

8    answer that starts at the bottom of page 854, line 24 going

9    over to 855, line 1.  All right?

10        I think we go to page 860, line 19 now.

11        MR. RAE:  And, Your Honor, we have -- our objection

12   here is a mix of compound question issue or, you know, an

13   issue with the argumentative form of the question, attorney

14   narrative as well as a 403 objection.  So there's a couple of

15   different issues that I want to unpack here.

16        The first is this question begins with counsel

17   reading a long paragraph from this EIR report that was issued

18   by the FDA to ZHP and then proceeds to ask a question that's

19   somewhat disconnected from the material that was just read

20   that is:  Now, let me ask you, are you aware that ZHP

21   referenced these just as ghost peaks and ignored them?

22        There's a couple of issues with that.  Like, one is

23   the layering in of -- I think the passage that's read to the

24   witness includes the FDA describing how an employee at ZHP

25   referred to certain test results as ghost peaks, but it does

1    not establish any information about them being ignored.  So

2    there's a huge prejudice problem with this question, that it

3    layers in an assumption in the question that doesn't have a

4    foundation in the document, that there's no reason why this

5    witness would have any knowledge of whether or not ZHP did or

6    did not ignore ghost peaks and asks a Torrent witness to

7    confirm conduct by ZHP that he has no personal knowledge of,

8    he doesn't have awareness of.

9         And his answer of, no, I'm not aware, carries an

10   extreme risk of prejudice, frankly, to ZHP in this case due to

11   the fact that plaintiffs are asking him a question about what

12   ZHP ignored that he doesn't have any personal knowledge of and

13   he's simply answering that he doesn't have personal knowledge

14   of that.

15        SPECIAL MASTER VANASKIE:  Daniel?

16        MR. NIGH:  Your Honor, we specifically point to the

17   issue that's being raised in the question, those specific

18   paragraphs, and then ask him if he's aware of these issues.

19   So at this point, you know, he says he's not aware.  I mean,

20   he could have clarified the question in any way he would --

21   the answer in any way he wanted to.

22        SPECIAL MASTER VANASKIE:  I know it gets a little

23   confusing, especially when you read parts of a report and then

24   follow up with a question, but I think -- I certainly

25   understood it at the time, and I have to confess that I

1    understood his answer as saying he's not aware that ZHP

2    referenced these peaks as ghost peaks, not that they ignored

3    them.

4              That, to me, is more the problem, because the answer

5    could be interpreted as he was not aware that they ignored the

6    peaks or that they referred to it as ghost peaks.

7              So I've talked myself into sustaining this objection.

8              MR. NIGH:  Okay.

9              SPECIAL MASTER VANASKIE:  All right.  What's next,

10   Jacob?

11             MR. RAE:  We are now at 876, line 18 through 877,

12   line 6.

13             And this is the last one for Dr. Jaiswal as well.

14             And I think the issue here is the way in which this

15   question is phrased, it really mischaracterizes the nature of

16   these observations that the FDA makes in EIRs and 483 warning

17   letters.

18             The way in which these work is there's a high level

19   categorization of the observation that kind of fits CGMP

20   categories in a general way, and then the FDA elaborates in

21   detail on what specifically was the problem.

22             And the issue here -- and it kind of is also an issue

23   in earlier lines of questioning, but it's highlighted, like,

24   here, is plaintiffs are asking questions just about those high

25   level categorizations and the fact that those remain similar

1   across different documents and across different inspections,

2   which, of course, they do because they're the high level

3   categorizations that observations are always framed under.

4   They're not asking whether or not the actual observations that

5   are being made in these different EIRs or 483 warning letters

6   are actually the same, whether or not the actual issues that

7   the FDA is observing remain the same over time, only whether

8   or not the broad group that they're being categorized under is

9   remaining the same.

10          And it's similar to --

11          SPECIAL MASTER VANASKIE:  You lost me on this one,

12   Jacob.

13          MR. RAE:  So, Your Honor, the issue is, this is

14   asking for a comparison of observations that are being made

15   about ZHP's manufacturing facilities for valsartan API and

16   comparing those to Torrent's manufacturing facilities for

17   finished dose valsartan.

18          The problem is, it's implying that similar

19   observations were being made across those two facilities.

20   That's only true at an extremely high level of comparing the

21   kind of categorization that the FDA is using to describe these

22   reports.  The actual content of the observations are about

23   completely different things.

24          MR. NIGH:  Your Honor, I would just say that this is

25   highly probative at the outset of this.  483 obviously takes

1    into account the probative value.  And whatever the -- you

2    know, the misunderstanding -- in fact, it's not even what it's

3    saying.  It says:  For failing to use scientific justification

4    to invalidate its lab specification reports.

5        It goes specifically to what the issue was.  And then

6    it says:  For Torrent, failing to establish scientifically

7    sound and appropriate test measures.

8        So those are the specific findings in each of those,

9    and it shows the timing is happening at the same time.  It's

10   highly probative.

11       SPECIAL MASTER VANASKIE:  Jacob, what specifically

12   are you objecting to?  Give me the page and line numbers.

13       MR. RAE:  The question at 876, line 18 to -- that

14   runs through the answer on 877, line 6.

15       And, Your Honor, another issue that kind of exists in

16   this designation ties back to joint defense motion in

17   limine 2, which is the citation of Torrent for failing to

18   establish scientifically sound and appropriate test measures.

19       Mr. Nigh can correct me if I'm misspeaking on this,

20   but I do not believe that that is related to Torrent's

21   manufacturing of valsartan.

22       And so this question runs afoul of that motion in

23   limine ruling, because this is not actually tied to

24   observations being made about Torrent's manufacturing of

25   finished dose valsartan.  It's observations that relate

1    generally to Torrent's manufacturing at the Indrad facility,

2    which manufactures dozens, probably hundreds of different

3    products.  I'm, frankly, not sure of the exact number of

4    products that are manufactured there.

5              MR. NIGH:  Your Honor, it's 2017.  It's the Indrad

6    facility that's manufacturing valsartan.  There's a reason we

7    haven't withdrawn our objections related to the 2017 Torrent

8    inspection report, because some of those findings are

9    specifically related to even the valsartan.  They cite

10   valsartan out-of-spec testing.

11             So, no, I think that it's -- I think it's highly

12   probative.  I believe that -- and on top of that, keep in mind

13   this is the head person on quality at the company who is

14   responding to this.  And he says:  I understand that.

15             SPECIAL MASTER VANASKIE:  This is -- go ahead, Jacob.

16   This is a 403 objection, though.  Right?

17             MR. RAE:  Yes, Your Honor.  I just want to correct

18   the record on one thing.  The 2017 EIR mentions valsartan in

19   exactly two places.  It mentions that the 2016 FDA EIR that

20   had been conducted had specifically looked into valsartan.  So

21   it mentioned it retrospectively in describing the last

22   inspection that the FDA had done of the Indrad facility.

23             And it mentions it with respect to one set of test

24   results that the FDA was looking at where it looked at test

25   results that related to several products, including valsartan,

 1    and finds that there are no discrepancies with those test

 2    results.

 3            So the only specific reference to valsartan in the

 4    2017 EIR, other than kind of retrospective discussion of the

 5    correction of observations that had been made in 2016, is to

 6    note that there was no issue with the one instance in which

 7    the FDA looked into something that's specifically related to

 8    valsartan.

 9            SPECIAL MASTER VANASKIE:  Well, the question before

10    me, as I understand it, is whether this question and the

11    answer that follows, the prejudice from it substantially

12    outweighs its probative value.

13            And I don't see it.  So I'll overrule the objection.

14    All right?

15            Is that it for this witness, for Mr. Jaiswal?

16            MR. RAE:  Yes, Your Honor.  That's it for

17    Dr. Jaiswal.

18            SPECIAL MASTER VANASKIE:  Okay.  What other Torrent

19    witnesses do we have?

20            MR. RAE:  We have four more Torrent witnesses.

21    They're all relatively small witnesses in terms of the -- both

22    volume of designations and objections.  They're Reddy

23    Neravetla, Kalpesh Patel, Susan Perry and Paras Sheth.

24            SPECIAL MASTER VANASKIE:  All right.  I am ready for

25    them.  That's what I want to make sure.

```
 1              Let's go to Reddy.

 2              MR. RAE:  Your Honor, our first objection is at

 3    page 100, line 2 to 13.

 4              SPECIAL MASTER VANASKIE:  Give me a second to get

 5    everything up in front of me again.

 6              What page is that, Jacob?

 7              MR. RAE:  Page 100, lines 2 to 13.

 8              SPECIAL MASTER VANASKIE:  All right.  I'm with you.

 9              What's the basis for the objection?

10              MR. RAE:  So Mr. Neravetla is testifying as a

11    30(b)(6) witness on a single topic, which was tracing of

12    batches and lots of Torrent's valsartan finished dose sold

13    downstream and ultimately intended for use by consumers in the

14    United States.

15              And this is well outside the scope of that topic.

16              It's also testimony that is cumulative and

17    unnecessary at this point.  Your Honor has already seen

18    designations from I believe every other Torrent witness that

19    we've looked at with Your Honor where plaintiffs are

20    designating questioning of witnesses about whether or not NDMA

21    is carcinogenic, whether or not it's genotoxic, the same line

22    of questioning.  There's no need for that line of questioning

23    to be presented to every witness, particularly a witness like

24    Mr. Neravetla whose role at Torrent, as it was relevant here,

25    related to overseeing administrative aspects of the recall of
```

1  these products rather than kind of quality issues.

2        SPECIAL MASTER VANASKIE:  Daniel?

3        MR. NIGH:  Your Honor, Reddy Neravetla is the quality

4  assurance complaint investigator.  The 30(b)(6) topic is

5  specifically -- and I'll read it in full.

6        Torrent's product recall for valsartan finished dose,

7  including who Torrent communicated with, how, about what, and

8  the retention of the sequestered valsartan finished dose.

9        So that second part in the retention of recalled or

10 sequestered valsartan finished dose, I don't know that we've

11 even designated anything for that.

12       But who Torrent communicated with, how, about what,

13 all that goes into -- you know, this would be highly relevant

14 in terms of those communications, what he knows.

15       MR. RAE:  Your Honor, this is not about who Torrent

16 communicated with, how or about what.  This is about the

17 witness's personal knowledge of information that's being --

18 that's already kind of being asked about through other

19 witnesses.  That's really something that's an appropriate

20 topic for expert testimony, not for fact witness testimony,

21 and certainly not for fact witness testimony by someone who

22 doesn't have kind of specific personal knowledge related to

23 toxicology or chemistry or the other issues that would impact

24 kind of understanding of whether or not a given substance is

25 carcinogenic or capable of causing cancer.

1          MR. NIGH:  And just to be clear, there is also a 403,

2    and I just want to make this clear so that it's understood,

3    because I saw some submissions.

4          We have held aside the objections related to how much

5    we're going to speak about on carcinogen and does it cause

6    cancer in humans.

7          We understand that the Court needs to rule on those

8    issues.

9          On the plaintiffs' side, we actually believe it

10   should be more limited in what comes in, and so that's been

11   understood.  But we have to see where the judge makes a

12   ruling, and then we would de-designate all these issues based

13   on that ruling, so where the line is drawn.

14         So I just want to make that very clear.  That doesn't

15   mean that we're a proponent of making the line wider in scope

16   in terms of what comes in on cancer and causation.  But until

17   we know the line, we have had these designated, getting

18   rulings from Your Honor, then we would see where the judge

19   draws the line.

20         SPECIAL MASTER VANASKIE:  Why do you need to ask this

21   witness the question -- those questions?

22         MR. NIGH:  It's foundational to -- you know, the

23   question is -- again, the 30(b)(6) topic is Torrent's product

24   recall for valsartan finished dose, including who Torrent

25   communicated with, how, and about what.  And I underline how

1    and about what.  It's foundational on those issues.

2            SPECIAL MASTER VANASKIE:  Well, it seems to me that

3    this is not going to be a controversial matter overall, that

4    is, that NDMA is a carcinogen.  Maybe I'm wrong on that.  But

5    my inclination is to allow it, just because it's going to be

6    in anyway.  And whether -- is it Dr. Neravetla?  I'll give up

7    trying to pronounce it.  Dr. Reddy?

8            MR. RAE:  I do not know off the top of my head

9    Mr. Neravetla's educational background.  I do know that his

10   role at Torrent is not one of being a scientist, that he has

11   two roles at Torrent:  That he oversees contract

12   manufacturers, which Your Honor will recall are the people --

13   like, where Torrent contracts out the creation of its finished

14   doses product.  He oversees that department at Torrent.  And

15   then he oversees recall-related issues in a role of kind of

16   administering the recall process and handling the

17   communications with retailers and other people when notices

18   have to get sent out and the logistics of managing kind of --

19   as you know, like a recall involves a lot of logistical

20   issues.  His role is to oversee the department that handles

21   that sort of thing.

22           MR. NIGH:  Yeah.  And I would just come back to, Your

23   Honor, on our side, we have -- we take on connecting it up

24   from the information that's known -- because that's the way in

25   which Torrent has presented this as how they operate.  So we

1    connect up what does Torrent know from the scientists that are

2    in the center, what are the scientists passing on to the

3    people who communicate to the consumers, what are the -- or

4    the customers.  And what are the communications to the

5    customers.  So what's been on passed on to the communication

6    person and then what that person passes on to customers

7    becomes highly relevant.

8         MR. RAE:  And, Your Honor, just to weigh in here,

9    you're not going to see any objections to Mr. Neravetla's

10   testimony as it relates to communications to consumers about

11   the recalls.  I don't think we've objected to any designations

12   on that front.  And that's not what we're objecting to here.

13        MR. NIGH:  Yeah.  But my point is, it's not just the

14   communication to customers; it's communication from the

15   scientists to the communication person.

16        MR. RAE:  Again, this testimony is not asking about

17   communications from scientists to Mr. Neravetla.  It's asking

18   about his present day understanding as he's sitting for this

19   deposition in I believe 2021.

20        MR. NIGH:  And he has the knowledge, which is what --

21   whether he gets it from the communication from the internal

22   scientists or he possesses it himself, he's still passing it

23   on.

24        SPECIAL MASTER VANASKIE:  Ultimately, I believe this

25   is much ado about nothing.  I'm sorry, I know you're arguing

1    it at great length, but this information is going to be before

2    the jury in any event.

3         I'll overrule the objection and allow this question

4    and answer from Mr. Neravetla to come in.

5         MR. NIGH:  I would just cite, too, that obviously if

6    the line is drawn, you know, at a -- in terms of what is

7    allowed to be presented on carcinogen and causing cancer, you

8    know, we understand that then, if that line is drawn, we're

9    not going to present this testimony.  We've been operating

10   that way for the entire time for all of our designations.

11        SPECIAL MASTER VANASKIE:  Exactly.  If Judge Bumb

12   draws that line, then this is out.  But until that line is

13   drawn, it's in.

14        MR. NIGH:  Right.

15        SPECIAL MASTER VANASKIE:  I've lost my place.

16        MR. RAE:  Your Honor, our next objection begins at

17   page 128, line 23.

18        SPECIAL MASTER VANASKIE:  Let me get there.  128?

19        MR. RAE:  Correct, Your Honor.

20        SPECIAL MASTER VANASKIE:  I've got my notes here.

21   128, line 23, and goes to 130, line 9, according to my notes.

22        MR. RAE:  Yes, Your Honor.

23        And the fundamental issue here is that the document

24   that's being asked about here is a consumer -- it's a

25   demand -- it's a notice letter being -- notice and demand

1    letter being sent on behalf of consumers, not third-party

2    purchasers or health insurers of valsartan, notifying Torrent

3    of the potential that those consumers will pursue economic

4    loss claims against Torrent with respect to similar issues to

5    the ones that are being litigated in this trial.

6        And we think introduction of the claims that may or

7    may not exist about consumers is well outside of the scope of

8    what this trial is about.  It would be extremely -- it's not

9    relevant and it would be extremely prejudicial to bring before

10   the jury the idea that there may be consumer claims in

11   addition to these third-party claims.  And, frankly, I thought

12   that was something that both us and plaintiffs have agreed was

13   not going to be part of this trial.

14       SPECIAL MASTER VANASKIE:  Daniel?

15       MR. NIGH:  Your Honor, I would agree as long as any

16   sort of argument that there wasn't proper notice given before

17   the claim in terms of some states, it doesn't actually have to

18   be notice given from that specific party to the defendant,

19   just notice of a claim and the facts underlying that claim.

20       So to the extent that we don't have a disagreement

21   that the information can be used for those purposes, we would

22   agree that this would not be designated and shown to the jury.

23   It's more of a legal question.

24       SPECIAL MASTER VANASKIE:  Jacob?

25       MR. RAE:  Your Honor, notice of claims by consumers

*United States District Court*

1   is different from notice of claims by health insurers and

2   third-party purchasers.  And so even -- like, I'm not sure

3   kind of what agreement Mr. Nigh is looking for here, because

4   this notice would not provide notice of claims by third-party

5   purchasers against Torrent.

6          MR. NIGH:  Yeah.  In situations where you don't

7   actually have to have the specific -- where it has to be on

8   behalf of a third-party payor, but rather notice that there

9   are potential claims surrounding the substance of this issue,

10  which would be, you know, NDMA in the product and NDEA in the

11  product.

12         You know, I do agree that this shouldn't necessarily

13  be shown to the jury, but we don't want to come back and later

14  the defendants say, well, you didn't designate this so you

15  can't use this for any purpose.  That's all.

16         To the extent that we need it to be able to show the

17  judge to establish some sort of dispute that the defendants

18  still have, we would still say that we could show this to the

19  judge.

20         SPECIAL MASTER VANASKIE:  If that becomes an issue,

21  you can show that to the judge; but it shouldn't be presented

22  to the jury, at least without more context.

23         So I will sustain the objection.

24         What's your next -- go ahead, Jacob.

25         MR. RAE:  Your Honor, I was going to say, I think

1   that's the same issue for 130, line 15 to 23.  I just wanted

2   to confirm.  This is just another question about the content

3   of that notice letter.

4           SPECIAL MASTER VANASKIE:  It is the same issue, and

5   it will be the same ruling.

6           MR. NIGH:  Agreed.

7           MR. RAE:  And then our only remaining objections for

8   Mr. Neravetla relate to questions on line 140, lines 15 to 23,

9   and then page 141, line 8 to 10.

10          And this is essentially the same issue, just related

11  to a subsequent complaint on behalf of consumers.

12          SPECIAL MASTER VANASKIE:  Yeah.  Dealt with service

13  of process, et cetera.

14          And this is being introduced for purposes of showing

15  notice, Daniel?

16          MR. NIGH:  Hold on one second.

17          Are we talking about 9 to 23?

18          SPECIAL MASTER VANASKIE:  Page 140.

19          MR. RAE:  Yes, Mr. Nigh, that's what we're looking

20  at.

21          MR. NIGH:  Yes.  This is the same issue as the

22  previous one.

23          SPECIAL MASTER VANASKIE:  Yeah.  And it's the same

24  ruling.  I'll sustain the objection.

25          And this continues over to page 141, line 10.

```
 1              All right.  Are there any other objections for
 2   Mr. Neravetla's testimony?
 3              MR. RAE:  No, Your Honor.  That was it for
 4   Mr. Neravetla.
 5              MR. NIGH:  Correct.
 6              SPECIAL MASTER VANASKIE:  We go to Susan Perry next?
 7              MR. NIGH:  Yes.
 8              MR. RAE:  Yes.
 9              SPECIAL MASTER VANASKIE:  Give me a second.  I have
10   her testimony in front of me.  I'm looking for her
11   spreadsheet.  I have it.
12              MR. NIGH:  It's right underneath the one you were
13   just looking at.  Kalpesh Patel is in between.
14              SPECIAL MASTER VANASKIE:  I see.  Okay.
15              MS. SMITH:  Excuse me, Judge, this is Loretta.
16              May I intrude for just a second?
17              SPECIAL MASTER VANASKIE:  Certainly.
18              MS. SMITH:  I have the transcripts of the deponents,
19   but I do not have the Excel spreadsheets.
20              Could someone please send them to me?
21              And just the ones that we are looking at going
22   forward.  Thank you.
23              SPECIAL MASTER VANASKIE:  Thanks.
24              And this will be on the same spreadsheet as the last
25   one we looked at, Neravetla?
```

```
 1          MR. NIGH:  Yes.  Kathryn is sending those right now.
 2          SPECIAL MASTER VANASKIE:  Thank you.
 3          Okay.  I'm finally there.
 4          I have the first objection for Susan Perry occurring
 5   at -- and I could be wrong on this -- page 151.  There's also
 6   an objection at page 100.
 7          Is that still being pursued?
 8          MR. RAE:  Your Honor, the objection at page 100 was
 9   only tied into the counter.  And since plaintiffs have
10   withdrawn their objection to the counter, there's no longer a
11   relevant objection there.
12          SPECIAL MASTER VANASKIE:  Okay.  So am I correct --
13   probably not -- page 151, the first objection, do we need to
14   discuss?
15          MR. RAE:  Yes, Your Honor.  But we've actually
16   withdrawn our objection to that first question in this
17   segment.  So our objection currently begins at 152, line 8 and
18   runs through the two questions and answers through the 153,
19   line 3.
20          SPECIAL MASTER VANASKIE:  So the question I have at
21   152, line 8 reads:  So your testimony today as a quality
22   assurance personnel for Torrent in the United States, that you
23   did not oversee the quality of the API or the finished dose
24   that were purchased or completed in the India plant.
25          Is that it?
```

```
 1              MR. RAE:  That's the question, Your Honor, yes.
 2              SPECIAL MASTER VANASKIE:  What's the basis for the
 3    objection?
 4              MR. RAE:  This -- it's a form objection.  This
 5    mischaracterizes the testimony that the witness had already
 6    given.  And it's also an unnecessarily argumentative question.
 7    And, frankly, Your Honor, the testimony that we haven't
 8    objected to at page 153, line 4 to 154, line 7 provides the
 9    substantive content that plaintiffs are asking about here
10    without objectionable questioning.
11              SPECIAL MASTER VANASKIE:  All right.  Daniel?
12              MR. NIGH:  It's just foundational information.  I
13    think --
14              SPECIAL MASTER VANASKIE:  Yeah.  It appears to me
15    foundation.  I'll overrule the objection.
16              What is your next objection, Jacob?
17              MR. RAE:  The next objection is -- it's at page 175.
18    And on page 175, it's questions introducing the document, but
19    we object generally to the use of this document and the
20    questioning about it.
21              And the issue here -- and this is actually
22    testimony -- this relates to an issue where plaintiffs have
23    withdrawn other testimony after we kind of explained our
24    objection when it related to other witnesses, like Dawn Chitty
25    and I think possibly Bernadette Attinger as well.
```

 1          The underlying document in the kind of email that's

 2  being raised involves Ms. Perry asking questions about ZHP's

 3  amendment with respect to its DMF changes to institute the

 4  zinc chloride process, the new process for its API

 5  manufacturing.

 6          And Ms. Perry asks some questions in the designated

 7  testimony -- that's asked about in the designated testimony

 8  related to whether or not Torrent has seen results -- there's

 9  evidence that ZHP has done additional residual solvent testing

10  with respect to that process change.

11          We think that this line of questioning is irrelevant

12  to the case against Torrent in that Torrent -- everyone agrees

13  Torrent did not use new process API in the United States.

14  This case is not about Torrent's use of new process API, which

15  only took place in other countries.  It used old process API.

16          So questions that Ms. Perry is asking about the DMF

17  amendment for new process API are simply irrelevant to this

18  case.  And it's going to be very confusing to the jury to see

19  a line of questioning in an email where Torrent is asking

20  questions about ZHP's new process when the case that they're

21  going to hear is about how Torrent used old process and that

22  Torrent did not use new process.

23          SPECIAL MASTER VANASKIE:  Daniel?

24          MR. NIGH:  Yes, Your Honor.  And I apologize.  We're

25  going to withdraw -- and I believe it starts at 175, line 5

*United States District Court*

1  and goes through to line -- or 192, line 22.

2       Is that correct, Jacob?

3       MR. RAE:  That is correct, yes.

4       MR. NIGH:  Okay.  We're withdrawing --

5       SPECIAL MASTER VANASKIE:  So withdrawn is 175,

6  lines 5 through page 192, line 22.

7       MR. NIGH:  Yes.

8       SPECIAL MASTER VANASKIE:  All right.  The next I have

9  is page 297, but correct me if I'm wrong on that, Jacob.

10      MR. RAE:  That's correct.  And it's actually the

11  objection is at 298, line 11 to 23.

12      SPECIAL MASTER VANASKIE:  Okay.  So tell me, please,

13  the basis for your objection.

14      MR. RAE:  Your Honor, the objection here is largely a

15  403 objection that I personally find this line of questioning

16  confusing.  I'm not, you know, sure what the relevance of it

17  is or kind of what it's supposed to be conveying to the jury.

18  And I think the jury -- given that I'm confused by it, I would

19  think that the jury would also be confused by it.

20      SPECIAL MASTER VANASKIE:  All right.  Daniel?

21      MR. NIGH:  Hold on.  I'm sorry, my computer is

22  freezing as it's loading this.  This is through to line 23?

23      SPECIAL MASTER VANASKIE:  Yeah.  On page 298.

24      MR. RAE:  And --

25      MR. NIGH:  Yeah.  Your Honor, it's a question from a

1    consumer in the US who is asking whether or not the products

2    that Torrent is taking are affected by this recall because

3    they're seeing issues.  And this shows that it's not --

4    Torrent is communicating to customers that their product is

5    not affected by this recall.

6          And it's on August 27, 2018, which we find to be

7    highly probative because at this time ZHP has notified Torrent

8    that there is NDMA in their product.

9          So for them to only say, no, your product is not

10   affected by this recall and not supply the full, complete

11   information, which is, well, we actually have received some

12   information that there's NDMA in this product.  They leave

13   that out.

14         MR. RAE:  Your Honor, we'll withdraw our objection on

15   this line of testimony.  Not accepting kind of some of the

16   things that Mr. Nigh is saying about the facts here, but I'm

17   willing to withdraw the objection.

18         SPECIAL MASTER VANASKIE:  All right.  The objection

19   is withdrawn.

20         And so to be clear, what will come in is page 297,

21   lines 7 through 298, line 23.

22         The next one I have is page 347.

23         MR. RAE:  Yes, Your Honor.  So our objection here, I

24   think the 403 objection is largely going to be tied to the

25   general causation issues that are in front of Judge Bumb and

1    the scope of discussion of NDMA being a carcinogen that's

2    going to come into this trial.  But in addition to that, we

3    think this question is unnecessarily argumentative and

4    mischaracterizes the prior testimony of the witness.

5            And in particular is unnecessarily argumentative,

6    like, in light of the fact that the prior line of questioning

7    where like -- the question kind of implies that the witness

8    has been obstructive in the answers that had come before, and

9    that's simply not the case.  And there's prior questions and

10   answers, like the one that comes just before this, where --

11   and two before, that where there's a question about the

12   witness's understanding of the risk associated with

13   nitrosamines.  The witness testifies that she's not a

14   physician and doesn't have the medical background to make

15   those decisions.

16           The next question is about whether or not she's aware

17   that it's a potential carcinogen, a genotoxic impurity, does

18   she understand that.  And she answers that she understands

19   that above a certain dosage it could be.

20           And then she's asked this argumentative question

21   about essentially the same issue of where kind of this -- the

22   answer is yes, you understand that component, that, again,

23   makes it seem as if she's been obstructive or hasn't been

24   answering the question, when in fact she has been.

25           SPECIAL MASTER VANASKIE:  I think you're reading too

1    much into it, Jacob.  I will allow this question and answer to

2    be presented.

3            Next I have page 363.

4            MR. RAE:  Your Honor, this is -- page 363, there's

5    simply no answer -- there's no question here.  They didn't

6    designate the rest of the line of questioning that includes

7    the question.  And they didn't designate the answer.

8            SPECIAL MASTER VANASKIE:  Daniel, I didn't see a

9    question here.

10           MR. NIGH:  There might be a typo.  Sorry.

11           SPECIAL MASTER VANASKIE:  Oh, okay.

12           MR. NIGH:  Let me see if it makes sense later -- 14

13   to 18.

14           Your Honor, we'll withdraw 363:14 through 18.

15           SPECIAL MASTER VANASKIE:  Okay.  I think this takes

16   us to page 364, line 17 to page 366, line 9.

17           MR. RAE:  Correct, Your Honor.

18           And our objection here begins at page 365, line 13.

19   I think we erroneously indicated that it began at line 12 on

20   the spreadsheet, but it begins at 365, line 13 and then runs

21   through the end of this designation at page 366, line 16.

22           SPECIAL MASTER VANASKIE:  Okay.

23           MR. RAE:  And our objection here is that this is a

24   confusing line of questioning because the line of questioning

25   doesn't establish or explain what a field alert report is.

1    And so the plaintiffs are kind of -- there are a couple of

2    different steps in a recall process, and this line of

3    questioning kind of skips over the recall steps and jumps to

4    the field alert steps, and because of that, makes it seem like

5    the recall is happening later than it actually happened.

6              SPECIAL MASTER VANASKIE:  Daniel?

7              MR. NIGH:  Well, I think that the purpose of it is

8    that it's actually the field alert isn't happening until

9    later, so it's the inverse of what Jacob just described.  You

10   know, we can see that -- so any sort of field alert isn't

11   happening here until August 24, even though they're made aware

12   of impurities prior to when the FDA found them on August 16th.

13   It's relevant for that --

14             SPECIAL MASTER VANASKIE:  Any response, Jacob?

15             MR. RAE:  Again, I think that -- with absent any

16   explanation or questioning of this witness about the

17   difference between field alerts and recall timing, this line

18   of questioning is going to be confusing to the jury.

19             SPECIAL MASTER VANASKIE:  I think that can be

20   clarified through other evidence.  I'll overrule the

21   objection.

22             MR. RAE:  Your Honor, I have one other very, very

23   small objection --

24             SPECIAL MASTER VANASKIE:  Okay.

25             MR. RAE:  -- on a 403 basis and foundation basis

1  within this line of questioning, which is on page 366, line 4.

2          The question that begins on line 3 is:  Okay.  But

3  Torrent was actually aware prior to or on October 16 --

4          SPECIAL MASTER VANASKIE:  August 16.

5          MR. RAE:  -- on August 16th -- thank you, Your

6  Honor -- that the FDA found impurities in the Torrent

7  valsartan.  Correct?

8          And our objection here is just to the three words

9  "prior to or," where the witness -- where the counsel begins

10  to ask the question from a "prior to" framing and then pivots

11  to "on August 16th."

12          And if kind of "prior to" and "or" were excised from

13  this question in the clip that's played, so that it would read

14  and be presented to the jury as "but Torrent was actually

15  aware on August 16th," we don't think that there would be any

16  confusion.  I think that's the question that the witness is

17  answering and understood themselves to be answering.

18          And so kind of that would alleviate any prejudice and

19  compound issues or confusion issues from the way in which this

20  question was originally phrased and the correction that took

21  place in the middle of it.

22          SPECIAL MASTER VANASKIE:  So it would read:  But

23  Torrent was actually aware on August 16th?

24          MR. RAE:  Correct, Your Honor.  That's what we would

25  be asking for.

```
 1              MR. NIGH:  I believe we can splice that and we can do
 2    that.  To the extent we can, we agree.
 3              SPECIAL MASTER VANASKIE:  All right.
 4              MR. NIGH:  We would take out "prior to or."
 5              SPECIAL MASTER VANASKIE:  Very well.
 6              Does that conclude Ms. Perry?
 7              MR. RAE:  Yes, Your Honor, it does.
 8              SPECIAL MASTER VANASKIE:  And we now move to Kalpesh
 9    Patel?
10              MR. NIGH:  Yes, Your Honor.
11              SPECIAL MASTER VANASKIE:  Give me a second.
12              Let's take a five-minute break while I pull up these
13    documents, just till 11:45.  All right?
14              MR. NIGH:  Okay.
15              SPECIAL MASTER VANASKIE:  Thank you.
16              (Recess at 11:39 a.m. until 11:45 a.m.)
17              SPECIAL MASTER VANASKIE:  Okay.  I am back.
18              We're picking up with Kalpesh Patel.  And I have the
19    first area at page 38, line 21.
20              Is that accurate?
21              MR. RAE:  That's correct, Your Honor.
22              SPECIAL MASTER VANASKIE:  So at page 38, line 21, the
23    question is:  Okay.  So you've had some regulatory affairs
24    experience with the US regulatory agency, which is commonly
25    known as the FDA.
```

1          And you're objecting to that question, Jacob?

2          MR. RAE:  Your Honor, I think our objections here --

3    yes, but there's kind of a broader context to our objection

4    here, which is the purpose of this line of questioning appears

5    to be plaintiffs trying to kind of qualify Mr. Patel as some

6    form of regulatory affairs or FDA communication or FDA

7    regulatory requirement expert so that they can then ask him

8    questions about the regulatory process as it relates to

9    valsartan.

10          And so we think that this line of questioning is

11    unfairly prejudicial in the context in which they're going to

12    be using it later in the deposition, and also because, as is

13    clear in our counter-designation, which I understand

14    plaintiffs are not objecting to, Mr. Patel's experience does

15    not relate to these issues with respect to valsartan.

16          SPECIAL MASTER VANASKIE:  Daniel?

17          MR. NIGH:  Your Honor, I think just to kind of set

18    the stage, Kalpesh Patel is one of the senior management folks

19    at Torrent.  So this idea that once we start getting into

20    objections relating to his qualifications, we're going to keep

21    coming back over and over.

22          And this just shows one of the facets as which he is

23    involved in many assets or many different issues at the

24    company.  He's the general manager of quality.  He has a PhD

25    for the general requirement of GMP for pharmaceutical

1    excipients and API, where his focus is to compile the various

2    GMP guidelines and maintain compliance.  That's further --

3              SPECIAL MASTER VANASKIE:  Slow down a little bit,

4    Daniel.  Slow down a little bit.

5              MR. NIGH:  Sure.  Sorry.

6              SPECIAL MASTER VANASKIE:  Okay.

7              MR. NIGH:  At Torrent he's responsible for research

8    and development, quality assurance and support to quality

9    functions of subsidiaries.  I mean, he has -- he's very

10   multifunctional in the company, and he has a wider range of

11   knowledge.

12             The fact that he possesses that knowledge is

13   certainly, you know, something we can speak to, because this

14   is the sort of person who has multifacet -- or multifunction

15   knowledge, you know, which ultimately, it's obvious in his

16   capacity as -- you know, he uses that in his day to day at

17   Torrent.

18             SPECIAL MASTER VANASKIE:  Jacob?

19             MR. RAE:  Your Honor, I think I've explained the

20   basis for our objection here.  It's mostly about if the

21   relevance of his experience communicating with the FDA and

22   dealing with regulatory issues regarding other products.  And

23   that's not relevant to the issues in this case, which are

24   about valsartan.

25             SPECIAL MASTER VANASKIE:  I think it's relevant to

1  assessing this witness's credibility, his background, so I

2  will allow it.

3          I think that takes us now to page 46.

4          MR. RAE:  Yes, Your Honor.

5          SPECIAL MASTER VANASKIE:  And you have a counter on

6  page 46 as well.

7          MR. RAE:  Correct.  And I believe there was no

8  objection to our counter, which just completes the question

9  asked.

10          SPECIAL MASTER VANASKIE:  Completes the question,

11 yes.

12          So what's the objection to the question at page 46,

13 starting at line 21, and then the answer on page 47 at line 7?

14          MR. RAE:  So our objection here gets back to the fact

15 that Mr. Patel is not in fact an expert or qualified to give

16 opinion testimony on these issues and that this -- they're

17 asking him to provide essentially a lay witness opinion on the

18 general question of what is required from a testing

19 perspective for finished dose manufacturers after a product is

20 on the market.

21          And this question and its answer are particularly

22 problematic, because plaintiffs' own CGMP expert provides

23 opinions that are in conflict with the question that's being

24 asked here and the testimony that's being given, which is that

25 Mr. Russ testifies in his report -- opines in his report, and

1    I assume will testify, to the fact that finished dose

2    manufacturers do not have an ongoing obligation to conduct

3    full testing of their products.

4          Now, that's not really relevant here, because Torrent

5    in fact did fully test all of the API it was getting from ZHP

6    with respect to the valsartan API.

7          But it highlights why it's a problem to ask this

8    witness to provide this sort of expert opinion testimony,

9    where his opinions are speaking to a higher standard than what

10   plaintiffs' own expert is going to articulate applies here,

11   and, therefore, is prejudicial to Torrent and is likely to

12   confuse the jury because they're going to hear different

13   articulations of what the regulatory standards here are,

14   despite the fact that on this issue of the scope of testing

15   that's required under CGMP, I think both plaintiffs' expert

16   Mr. Russ and Torrent's expert Dr. Nagaich generally agree on

17   the scope of what is required from a testing perspective.

18         And this is just an issue that should come in through

19   the experts, not through lay witness testimony being elicited

20   through Mr. Patel.

21         SPECIAL MASTER VANASKIE:  Daniel?

22         MR. NIGH:  Your Honor, I think a lay witness is

23   really something else.  But here we asked him ongoing duty of

24   Torrent to continue to test the batches of that product to

25   ensure quality.  Kalpesh Patel is the general manager of

1  quality.  So for him to be able to answer that -- I mean,

2  general manager is the highest person, you know.  You've got

3  Kalpesh Patel and you've Sushil Jaiswal have both held that

4  position.

5          On top of that, his PhD is general requirement of GMP

6  for pharmaceutical excipients and API.  I mean, there's not a

7  better person to ask this question.

8          So whether or not what -- whatever the experts are

9  going to do with this testimony really is irrelevant, because

10 the first question is, can he testify to this information.

11 Yes, he can.

12         What happens with the experts thereafter is -- there

13 are multiple things that could occur with them.  And we get

14 this -- how we want to present that information.

15         SPECIAL MASTER VANASKIE:  I think this is proper.

16 I'll overrule the objection.

17         The next area I have is on page 67.

18         MR. RAE:  I think -- unless Mr. Nigh is going to

19 correct me, I think we've kind of agreed that the -- any

20 testimony on 67 is coming in and that the next place where

21 there is an objection is on page 130.

22         SPECIAL MASTER VANASKIE:  Okay.  Good.

23         MR. NIGH:  I agree.

24         SPECIAL MASTER VANASKIE:  Let's go to 130.

25         And this then goes to Mr. Patel's background with

 1   respect to FDA regulations.

 2          MR. RAE:  Yes.  And, Your Honor, I assume your prior

 3   rulings are going to apply here and you're going to overrule

 4   the objection.

 5          SPECIAL MASTER VANASKIE:  I am going to overrule the

 6   objections.  I think this is -- I don't see a basis for

 7   disallowing it.

 8          Do we go to page 151 now?

 9          MR. NIGH:  Yes, Your Honor.

10          SPECIAL MASTER VANASKIE:  A counter-designation and a

11   designation.

12          Does allowing the counter-designation inobviate a

13   ruling on the designation itself?

14          MR. RAE:  Your Honor, for our objection at 151,

15   line 2 to 9, allowing the counter-designation would obviate

16   the need for a ruling, yes.

17          We would still have an objection on page 152, line 8

18   to 153, line 13.

19          MR. NIGH:  Your Honor, we did have a counter to the

20   counter on this one, which is 151:21 to 152:7.

21          SPECIAL MASTER VANASKIE:  Right.

22          MR. RAE:  Your Honor, we have no objection to that

23   testimony coming in.

24          SPECIAL MASTER VANASKIE:  So can we make it clear on

25   the record what is in dispute here?

1          MR. RAE:  Your Honor, my understanding is that 151:2

2   to 152:7 the parties have just now agreed will come in in its

3   entirety.

4          SPECIAL MASTER VANASKIE:  All right.

5          MR. NIGH:  I agree.

6          SPECIAL MASTER VANASKIE:  So what is in dispute on

7   page 152?  Anything?

8          MR. RAE:  Yes, Your Honor.  We have a foundation and

9   701 objection to the testimony at 152:8 to -- 152, line 8 to

10  152, line 21.

11         SPECIAL MASTER VANASKIE:  153, line 21.  No, 152 line

12  21.  Okay.

13         MR. RAE:  And then we also have an objection to the

14  next question and answer from 152, line 22 to 153, line 13,

15  which would be the same objections but also a 403 objection.

16         I think the foundation objection, because it would

17  apply to everything, and the 701 objection are the places to

18  start.

19         I think your prior rulings on our 701 objections are

20  likely to apply here as well, so I just want to focus on the

21  602 foundation objection, which is the witness in our

22  counter-designation at 152, line 18 to 20, testifies that for

23  this particular guidance, he's not sure that he's seen it

24  before.  And so we think that following up and asking him --

25  leaving out the content of that guidance from the FDA and

1   asking did I read that correctly is improper, that this is --

2   you can't kind of establish the witness does not know or have

3   personal knowledge or familiarity with the document and then

4   ask them to read that document into the record.

5           THE COURT:  So why do you need that, Daniel?  You're

6   asking whether the witness -- whether you read correctly from

7   a certain document.  The witness says:  Yeah, you read it

8   correctly.  I don't understand why that's appropriate

9   examination.

10          MR. NIGH:  Well, the next question is we asked him

11  about the information contained within that document, and he

12  agrees with the information contained within that document.

13          So you know, he says he's aware with good

14  manufacturing practice that the FDA issues generally, he

15  reviews these in his position as head of quality -- sorry,

16  general manager of quality.  You know, these are all sorts of

17  things that he should be aware of, and so we can use that

18  document for that purpose in his role in that capacity.

19          And then on top of that, we ask him the information

20  contained within that, and he gives a full explanation, you

21  know, that shows -- do you agree that consumers, once a drug

22  is commercialized, expect the product that's being distributed

23  to both safe and effective."

24          And he gives a full answer on that topic as well.  We

25  don't think that there's anything that can't be discussed

1    there.

2         The foundation is merely the fact of his job, he's --

3    his title, what he does, and the fact that he's aware of these

4    guidances generally.

5         SPECIAL MASTER VANASKIE:  Why isn't it sufficient,

6    Daniel, to simply ask the question that starts on line 22 of

7    page 152 and then the answer --

8         MR. NIGH:  I do agree that that gives most of the

9    information, but I also believe that we're allowed to ask the

10   information -- we're allowed to read the document itself,

11   based on his capacity, you know, that these are the sorts of

12   documents that he should be aware of.

13        So foundationally, which I think is the question

14   here, he has the capacity or he should have the ability to be

15   able to speak to these issues based on his job function at the

16   company.

17        SPECIAL MASTER VANASKIE:  Jacob?

18        MR. RAE:  Your Honor, I think Your Honor is correct

19   that there's no need for the reading of the document to ask

20   the second question.

21        For record purposes, I want to preserve that we have

22   an objection to that second question because we think it's

23   asking Mr. Patel to provide an opinion on what consumer

24   expectations are, which is not an opinion that he's in a

25   position to apply.  He shouldn't be asked to speculate about

1    the state of mind of consumers.

2         However, I think Your Honor has previously addressed

3    similar objections that we had and overruled them, so I don't

4    know that we have to go through that discussion again.  I just

5    want to make it -- articulate what our additional objection

6    was to that testimony.

7         SPECIAL MASTER VANASKIE:  Yeah.  I'm going to sustain

8    the objection at 152, lines 8 through -- and the answer

9    continues -- let me start all over again.

10        Page 152, line 8 through line 21 are out.

11        I just -- I have trouble with reading something and

12   the question is, did I read that correctly?  I'm not sure

13   there's anything substantive there.  I understand it can be

14   foundational, but I don't think -- or introductory, but I

15   don't think it's necessary.

16        But I'll overrule the objection to the question that

17   begins on page 152, line 22 and allow the answer at page 153,

18   lines 5 through 13.

19        MR. NIGH:  Thank you, Your Honor.

20        SPECIAL MASTER VANASKIE:  Now, the next one I have in

21   my notes is page 162.

22        MR. RAE:  I think this is in -- from 169, line 19 to

23   page 162, line 23 is a counter that plaintiffs are objecting

24   to.

25        SPECIAL MASTER VANASKIE:  Is a counter.

 1              Are you objecting to that counter, Daniel?

 2              MR. NIGH:  Yes, Your Honor.  First off, it's not --

 3    this is one of the few that's not responsive to the

 4    information that we've designated.  And it's actually not even

 5    responsive to the question.  When he starts going to open part

 6    of the DMF and closed part of the DMF, we didn't ask anything

 7    related to any of that.

 8              SPECIAL MASTER VANASKIE:  Go ahead, Jacob.

 9              MR. RAE:  Your Honor, this is -- the questioning both

10    before and after our counter-designation is asking Torrent

11    about the requirements and its obligations to oversee and make

12    sure that its API supplier is complying with CGMP.

13              So I think the most pertinent question here is the

14    one at page 156, line 8 to 17, where the question is:  Right.

15    And these are the same GMPs that we discussed before that

16    you've been involved in the course of your career with Torrent

17    to make sure that both the API supplier and Torrent are

18    compliant with?

19              And so the counter here goes to the issue of what

20    Torrent is capable of doing with respect to ensuring

21    compliance by an API supplier and what the limits and bounds

22    of that capacity are.

23              It's necessary context so that the jury isn't just

24    hearing kind of a curtailed version of Torrent generally

25    having an obligation to oversee its API supplier without

```
 1    hearing that there are certain limits that exist as a

 2    practical matter that everyone in the industry acknowledges,

 3    including the FDA, as to what a finished dose manufacturer is

 4    supposed to be doing with respect to an API supplier and that

 5    there -- the lack of access to certain parts of the DMF means

 6    that the responsibilities with respect to CGMP compliance for

 7    those parts of the process that the finished dose manufacturer

 8    isn't aware of falls on the API supplier.

 9              MR. NIGH:  Yeah, but -- you know, first off, I don't

10    think that that's responsive.  But on top of that, the

11    question that he interjects this into, it's not even

12    responsive to that question.  Like, we didn't designate that

13    question.  They designated it just to try to get this

14    information in.  It's not even responsive to that question.

15              SPECIAL MASTER VANASKIE:  How is this responsive to

16    the matters to which he was testifying?

17              MR. RAE:  Your Honor, the question right after our

18    counter-designation is:  Part of your validating or qualifying

19    of an API supplier is making sure they're complying with the

20    good manufacturing processes, true?

21              And the answer is:  Yes.

22              And the context for that question and answer is the

23    explanation that Mr. Patel just gave about the limitations

24    that exist on the knowledge that Torrent has of the

25    manufacturing process and the route of synthesis for API and
```

1  how that plays into the scope of supervision and

2  responsibilities that Torrent has with respect to that

3  process, which is the very process that is at issue in this

4  case.

5          So it's extremely relevant to this case for the jury

6  to understand that there were parts of ZHP's DMF, information

7  about its route of synthesis that Torrent did not have and

8  that finished dose manufacturers, as a general matter, do not

9  have.

10         MR. NIGH:  Your Honor, I would say the -- I guess the

11 one part that just looks somewhat responsive is the word

12 "but."  "All right, but."

13         So, you know, in terms of that, if that's the

14 argument, then we would just withdraw 162, line 24 to 163,

15 line 4, because I think it's repetitive.

16         But I think at that point, we're not responsive to

17 anything on this counter.

18         SPECIAL MASTER VANASKIE:  So are you withdrawing

19 162:24 to 163:4?

20         MR. NIGH:  Right.  If that takes care of the counter,

21 we are.

22         SPECIAL MASTER VANASKIE:  Does that take care of the

23 counter, Jacob?

24         MR. RAE:  As I said at the beginning, I think that

25 this counter is also relevant to the questioning at 155, line

 1   19 to 156:17.

 2         But we will -- we'll abide by any ruling Your Honor

 3   makes on this issue, obviously.

 4         SPECIAL MASTER VANASKIE:  Obviously.  I don't want to

 5   force the ruling.

 6         When I went through this, my notes were allow both

 7   the designation on 163, line 24 to 164, line 4 and the counter

 8   at 161, lines 19 to 162, line 23.

 9         I'm going to stick with that ruling and allow both.

10         MR. NIGH:  Your Honor, just to make it clear, it's

11   162, line 24 to 163, line 4.

12         But if we're withdrawing that, does that withdraw the

13   counter?

14         SPECIAL MASTER VANASKIE:  Well, that's up to Jacob.

15   I'm not -- are you withdrawing the counter?

16         MR. NIGH:  Otherwise -- the reason I say that is,

17   otherwise I don't see anything in 24 other than the words "all

18   right, but" that make that information responsive to anything.

19   And it's just -- the only reason it's responsive in that

20   question is because the next statement he's saying "but" and

21   pivoting to another topic.  That's all that makes it

22   responsive.

23         And that information that's just thrown in there

24   isn't responsive even to the question that's asked that they

25   want to designate.

```
 1          SPECIAL MASTER VANASKIE:  All right.  Let me reverse
 2   myself then.
 3          So if you withdraw 162, lines 24 to 163, line 4, I
 4   will sustain your objection to the counter-designation at 161,
 5   line 19 to 162, line 23.
 6          MR. NIGH:  Okay.
 7          SPECIAL MASTER VANASKIE:  So are you withdrawing
 8   that?
 9          MR. NIGH:  Yes, Your Honor.
10          SPECIAL MASTER VANASKIE:  All right.  So the
11   objection is sustained and nothing is coming in from page 162,
12   line 19 through 163, line 4.  161, line 19 --
13          MR. NIGH:  Yes.
14          SPECIAL MASTER VANASKIE:  -- through 163, line 4.
15          MR. NIGH:  Yes.
16          MR. RAE:  Yes.
17          SPECIAL MASTER VANASKIE:  I think that takes us to
18   211, unless I'm missing something.
19          MR. RAE:  That's right, Your Honor.  And our
20   objection here is I think a familiar one by now, which is this
21   is attorney commentary that doesn't designate an actual
22   question or an answer.
23          MR. NIGH:  The first part is introducing the
24   document, so pulling up 0357.  The second part is -- which I
25   think is 211:11 to 23 --
```

```
 1                SPECIAL MASTER VANASKIE:  Yes.
 2           MR. NIGH:  Your Honor, we'll withdraw these two.
 3                SPECIAL MASTER VANASKIE:  Okay.  They're withdrawn.
 4           That will take us to 228 now.
 5           MR. NIGH:  Yeah.  I should say we may still need the
 6      document itself, the 211:5 to 7, but I just need to make sure
 7      if they're the same document.
 8           MR. RAE:  I'm going to ask Mr. Nigh if you're aware
 9      if the question on page 237 is asking about the same document;
10      because if it is, then we will withdrawn our objection to the
11      introduction of the document.
12           MR. NIGH:  I think it is.  So we need to keep the
13      211:5 to 7, but we withdraw 211, lines 11 to 23.
14                SPECIAL MASTER VANASKIE:  All right.
15           MR. NIGH:  And to the extent that is not the
16      questions we find aren't responsive, we would then just
17      withdraw that, obviously, because we don't want to mislead
18      with the wrong document, but I'm pretty sure it is.
19                SPECIAL MASTER VANASKIE:  Okay.  Does that take us
20      now to page 228?
21           MR. RAE:  Yes, Your Honor.  And our objection here is
22      that this is confusing and a potentially prejudicial line of
23      questioning in that kind of we jump straight to questions
24      about what is done with genotoxic evaluations, but no one is
25      telling the jury what a genotoxic evaluation here is.
```

1   Plaintiffs haven't designated any testimony explaining what a

2   genotoxic evaluation is, even though this witness did testify

3   to that.  And I don't believe that there's any other testimony

4   that they've designated from any other Torrent witness

5   regarding genotoxic evaluations.

6          So in that context, I think this is an incredibly

7   confusing line of questioning, to talk about what's being done

8   with genotoxic evaluations when it's not established what they

9   are or what their purpose in the process is, when they're

10  used, when they're not used.

11         MR. NIGH:  Your Honor, the only relevance of this

12  question is the genotoxic evaluation goes to the quality

13  assurance department.  And that's really all we need.  We can

14  have other experts who, you know, testify on this issue, on

15  these are the people who have should have done X, Y, and Z

16  within the company.

17         SPECIAL MASTER VANASKIE:  Yes, I don't see this as

18  being unduly prejudicial.  I'll overrule the objection.

19         That should take us to 237.

20         MR. RAE:  Yes, Your Honor.

21         And I think our objection at 237:8 to 17 is very

22  similar to the prior one, that plaintiffs are not asking any

23  questions or designating any testimony that provides the jury

24  with any context about what a genotoxic evaluation is, and

25  that makes this entire line of questioning confusing.  And

```
 1   it's less -- I think the potential for that confusion creates

 2   potential prejudice -- unfair prejudice to Torrent because

 3   it's hard to -- because what a genotoxic evaluation is, is not

 4   being established.

 5          SPECIAL MASTER VANASKIE:  And your response, Daniel?

 6          MR. NIGH:  It doesn't have to be established with

 7   this witness.  As we've seen, you know, the underlying what is

 8   a genotoxic evaluation, you know, that's the sort of issues

 9   that can be established through other witnesses, other

10   experts.

11          He had spoken to he is the person responsible for

12   genotoxic evaluations, and now we're showing him a document

13   pertaining to genotoxic evaluations.

14          SPECIAL MASTER VANASKIE:  Yes, I think it can be

15   established through other witnesses as well.  So I will allow

16   it, overrule the objection.

17          MR. RAE:  Your Honor, just because we're dealing with

18   these issues in advance of trial, obviously, kind of, I just

19   want to confirm and ask Mr. Nigh like -- he may not be willing

20   to answer this question, but what other witness is going to

21   establish what a genotoxic evaluation is?  Because I'm not

22   aware of where else that would come in except through the

23   testimony that Mr. Patel has given on that topic that you guys

24   are not designating.

25          MR. NIGH:  In case-in-chief, the other witnesses that
```

1  could talk about a genotoxic evaluation would be Dr. Najafi,

2  it would be Dr. Russ, Dr. Plunkett and Dr. Hecht.

3  　　　　　SPECIAL MASTER VANASKIE:  All right.  Now I have us

4  up to page 328, line 14 to 24.

5  　　　　　MR. RAE:  Yes, Your Honor.

6  　　　　　SPECIAL MASTER VANASKIE:  What's the basis here?

7  　　　　　MR. RAE:  Your Honor, I think this is the same issue

8  that Your Honor has already addressed with respect to

9  genotoxic evaluations.

10  　　　　　SPECIAL MASTER VANASKIE:  So the objection is

11  overruled, and it will come in.

12  　　　　　Does that complete this witness then, Kalpesh Patel?

13  　　　　　MR. NIGH:  Yes, Your Honor.

14  　　　　　MR. RAE:  Yes, Your Honor.

15  　　　　　MR. NIGH:  Your Honor, that leaves us with Paras

16  Sheth.

17  　　　　　SPECIAL MASTER VANASKIE:  Right.

18  　　　　　MR. NIGH:  There's not much, but I don't think we can

19  get it done in five minutes.

20  　　　　　SPECIAL MASTER VANASKIE:  Let me find it first.

21  　　　　　MR. NIGH:  Okay.

22  　　　　　MR. RAE:  Your Honor, I would agree with Mr. Nigh

23  that if we had 15 minutes, that might be sufficient, but five

24  minutes is probably cutting things a little bit too close for

25  this witness.

```
 1            SPECIAL MASTER VANASKIE:  Ann Marie, are you able to

 2    go for another 15 minutes?

 3            MR. RAE:  Your Honor --

 4            SPECIAL MASTER VANASKIE:  Are you all okay?  You have

 5    to go, you have a doctor's appointment.

 6            MR. NIGH:  I have to go.  I have a doctor's

 7    appointment is the problem.

 8            SPECIAL MASTER VANASKIE:  Yeah.  I'm sorry about

 9    that.

10            MR. NIGH:  It's cutting it so close.

11            SPECIAL MASTER VANASKIE:  Will you be back?

12            MR. NIGH:  I will be.  Do we have other witnesses?

13    Because, you know, the only problem is doctor's appointments

14    are sometimes --

15            SPECIAL MASTER VANASKIE:  I had it this morning.

16            MR. NIGH:  You never know exactly how long they might

17    go.  That's part of the problem.

18            SPECIAL MASTER VANASKIE:  We do have other witnesses,

19    but not Torrent witnesses.

20            Am I right on that?

21            MR. RAE:  Yes.  I think -- my understanding is that

22    there are several -- I don't know the exact number, but I

23    think like three to four Teva witnesses --

24            SPECIAL MASTER VANASKIE:  Correct.

25            MR. RAE:  -- that we need to work through.
```

1          So I wonder if the best plan is for us to make kind

2   of a tentative plan now for when we would come back to this if

3   Mr. Nigh is not back by the time the Teva process is done.

4          And if he is back, then we will get it done today and

5   we'll be done.

6          SPECIAL MASTER VANASKIE:  Yes.  Do we have anybody on

7   for Teva?  I don't see anybody.

8          MR. STANOCH:  Yes, Your Honor.  For plaintiff, David

9   Stanoch.  I think Ms. Lockard and Mr. Harkins have been on.

10          SPECIAL MASTER VANASKIE:  They're here as well?

11          MS. LOCKARD:  Yes.

12          SPECIAL MASTER VANASKIE:  Okay.  I'm only seeing one

13   page.  Thank you.

14          So why don't we -- would it be all right if we took a

15   break for lunch right now?  We'll pick up at 1:00 Eastern

16   time, if that's okay.  That's only 45 minutes.

17          Is that all right?

18          MR. STANOCH:  Fine for plaintiffs.

19          MS. LOCKARD:  Sure.

20          SPECIAL MASTER VANASKIE:  Okay.  And so we'll pick up

21   at 1:00 with -- yes, I'm sorry, go ahead.

22          MR. NIGH:  I should say, if I were estimating, I

23   would think it would be about 2:30 to 3:00 Eastern that I

24   would be back.  But again, there's some uncertainty in that.

25          SPECIAL MASTER VANASKIE:  All right.  Well, we did

```
 1   set aside time for tomorrow as well --

 2           MR. NIGH:  I may be wrong.

 3           SPECIAL MASTER VANASKIE:  -- so if it doesn't work

 4   out today --

 5           MR. NIGH:  Jacob may have had a conflict with that.

 6           If Teva has enough witness and taking an hour break,

 7   we might -- ours will probably only last 10 to 15 minutes.  I

 8   think Jacob is right.

 9           SPECIAL MASTER VANASKIE:  All right.  Let's hope we

10   can get them all in today.

11           Go ahead, Jacob.

12           MR. RAE:  I was just going to say, if we end up

13   needing to address Torrent witnesses tomorrow, I think we

14   reserved time starting at 10:00 a.m.  And I have a medical

15   appointment that might cause 10:00 a.m. to be a little bit

16   tight for me in the morning, so if we could start at -- if we

17   need to do Torrent tomorrow, if we can start at 10:30 instead

18   of 10:00 a.m., that would alleviate any conflict on my end.

19           SPECIAL MASTER VANASKIE:  I think we can on our end.

20   So tomorrow we wouldn't start any earlier than 10:30, if we

21   need tomorrow.  Hopefully, we won't need it.  All right?

22           MR. NIGH:  Okay.  Thank you, Your Honor.

23           SPECIAL MASTER VANASKIE:  Let's take a break until

24   1:00.

25           MS. LOCKARD:  Your Honor, may I ask, just to make
```

```
 1   sure I have my tech lined up, do you have any preferred order

 2   in how we present the Teva witnesses?

 3            SPECIAL MASTER VANASKIE:  Let me ask, do you have a

 4   preferred order?

 5            MS. LOCKARD:  Not necessarily.  There's one that's

 6   very short, it's just six rows, and then the other two are

 7   maybe 30 and 60 rows roughly.

 8            SPECIAL MASTER VANASKIE:  Let's take the short

 9   witness first.

10            MS. LOCKARD:  Okay.

11            SPECIAL MASTER VANASKIE:  And then we'll go from

12   there.  All right?

13            MS. LOCKARD:  All right.  Sounds good.  See you at

14   1:00.

15            SPECIAL MASTER VANASKIE:  All right.  See you at

16   1:00.  Bye-bye.

17            (Recess at 12:21 p.m. until 1:00 p.m.)

18            SPECIAL MASTER VANASKIE:  We are starting right on

19   time, so that's a little unusual for me.

20            Let's take care of Michelle Osmian.  That's what our

21   intention was all along.

22            So the first objection as I understand it or first

23   area that we have to address is on page 98, line 21 to page

24   101, line 2.

25            MR. HARKINS:  Your Honor, the objection here is
```

1    pretty specific and it is similar to the limited objection

2    that I think we're making for the next several designations.

3            SPECIAL MASTER VANASKIE:  Correct.

4            MR. HARKINS:  We are objecting only to the question

5    and response at 100, line 2 to 9.  And to put that in context,

6    the discussion beginning on page 98:21, where counsel is

7    asking about the content of the generic products purchase

8    agreement and then is asking the witness to confirm statements

9    that are made within and under which sections of that

10   agreement we don't think are objectionable and we think are

11   within the scope of this witness's testimony and what she's

12   been designated to provide.

13           It's the question where rather than confirming the

14   content of the agreement at this question beginning at line 2

15   on page 100, the question now is saying, it states that Teva

16   is representing and warranting to the customer that the

17   product will not be adulterated and misbranded rather than

18   confirming the warranties therein.

19           We don't have any issue with the content of the

20   document coming in through this witness's testimony.  It's a

21   few examples throughout the next couple of pages of

22   designations where we think it strays too close to asking this

23   witness to provide a legal conclusion.  And that's our

24   objection to that testimony.

25           SPECIAL MASTER VANASKIE:  All right.  David?

```
 1            MR. STANOCH:  Thank you, Judge.

 2            Ms. Osmian was a designated 30(b)(6) witness, Your

 3    Honor, on topics including oral and written communications

 4    with customers and downstream entities regarding quality,

 5    purity, et cetera, and also specifically on Teva's oral and

 6    written statements defined to include representations and

 7    warranties to finished dose manufacturers, wholesalers,

 8    resalers and consumers with regards to the contents and purity

 9    of Teva's finished dose.

10            So it's right within the scope of these unobjected-to

11    negotiated topics.  There's no objection at the time.  To ask

12    this witness, who was prepped on these very questions, to

13    speak on behalf of Teva of what representations and warranties

14    or statements were being conveyed to Teva's customers, in this

15    instance, a retail pharmacy that's purchasing valsartan, we

16    think it's an appropriate question -- line of questioning, and

17    we can certainly ask that prepared corporate witness more than

18    just could you confirm the words on this written agreement

19    page.  In fact, she had no problem, Your Honor will see, in

20    answering the question that Mr. Harkins is objecting to, and

21    it was asked and answered without any objection whatsoever.

22            MR. HARKINS:  Your Honor, I don't know if you want my

23    full responses.  I'm certainly happy to limit it, as you

24    please.

25            SPECIAL MASTER VANASKIE:  Go ahead.
```

 1             MR. HARKINS:  We think that there's a clear

 2    difference in the question beginning at line 2 to 9 as

 3    compared to the other unobjectionable statements where this

 4    witness is being asked, are these representations and

 5    warranties contained in the contract, we've not objected.  But

 6    where counsel is sort of implying a legal conclusion with

 7    their question by saying, Teva is representing and warranting

 8    to the customer that the product will not be adulterated, and

 9    the witness's answer is a little unclear, because it's saying

10    this is essentially what it says here, yes, but she is clearly

11    not qualified to opine on or provide testimony about whether

12    this is Teva representing and warranting to the customer.

13    Those are very central issues in the case.

14             The factual record of what these documents say is

15    appropriate.  It's already been brought in through this

16    witness in her other testimony, which we don't think is

17    objectionable, but there are a few questions in here where we

18    think it strays over the line and is asking this witness for a

19    legal conclusion.

20             MR. STANOCH:  May I, Your Honor?

21             SPECIAL MASTER VANASKIE:  David, what was the witness

22    designated for?  What was the topic?

23             MR. STANOCH:  Your Honor, I think the topic goes

24    exactly to Mr. Harkins -- what I am hearing now is really a

25    legal conclusion, which I disagree with.

1          This witness was designated on a number of topics

2     including, and I will quote, Teva's oral and written

3     statements, defined to include representations and warranties

4     to finished dose manufacturers, wholesalers, retailers and

5     consumers with regard to the contents and purity of Teva's

6     finished dose, end quote.

7          The actual topic that was agreed to and entered by

8     Judge Schneider that she was designated on, Judge, is defined

9     specifically as representation and warranties.  And we're not

10    trying to get into some legal conclusion or anything else, but

11    that was literally the topic.  And I used those exact words in

12    my question.  And she was obviously prepared, because she

13    answered.  And I think I even shared these documents with Teva

14    ahead of time just to make sure this questioning was as

15    concise as possible.

16         So I don't think we're asking for a legal conclusion.

17    I don't think the jury will be confused.  There's been no

18    argument by any defendant that the words "representation" and

19    "warranty" and "statements" is going to be prejudicial or

20    misleading.  In fact, it would be the other way to us

21    prejudicial, Judge, because this was the very topic we agreed

22    upon that she'd be able to talk about, and I used those exact

23    words.

24         SPECIAL MASTER VANASKIE:  All right.  I will overrule

25    the objection.  Although I agree with you, Steve, that it's a

```
 1  bit unclear, the answer does muddle it, because the answer to

 2  the question is "that is essentially what it says or yes."

 3          But I will overrule the objection and allow it to

 4  come in.

 5          MR. HARKINS:  Your Honor, I think that will

 6  probably -- that may very well inform the next objection at

 7  101, line 12 to 101:18 --

 8          SPECIAL MASTER VANASKIE:  Yes.

 9          MR. HARKINS:  -- which, again, while we don't object

10  to this, but simply to maintain it for the record, our concern

11  with these are that rather than this witness demonstrating and

12  being presented to document what the representations and

13  warranties are, we feel that this, like a few other questions,

14  could be presented to the jury as this witness providing a

15  legal conclusion that these are representations and warranties

16  which they are going to be asked to decide on as the ultimate

17  issue in this case with respect to plaintiffs' express

18  warranty claim.

19          But, again, I understand Your Honor's ruling with the

20  prior objection as well.

21          SPECIAL MASTER VANASKIE:  Same ruling.

22          So the testimony at page 101, lines 12 through 18 can

23  come in.

24          Now we're at page 125.

25          MR. HARKINS:  I --
```

1          MR. STANOCH:  I won't interrupt Mr. Harkins, Judge,

2     but this is the same type of issues on just one different type

3     of contract between Teva and a different downstream customer.

4          MR. HARKINS:  Your Honor, just so we're clear for the

5     record, I believe our objection here to this segment of

6     testimony, again, is not to basic background about the

7     agreement but where we have questions at 126:13 to 127:1 where

8     this, again, is a very similar objection and the way it's

9     being phrased is that this witness is stating what Teva is

10    warranting.  But, again, we understand your ruling on the

11    prior objection.

12         SPECIAL MASTER VANASKIE:  Same ruling.  The objection

13    is overruled, and that testimony can be presented.

14         Now we go to page 136, line 9.

15         Go ahead, Steve.

16         MR. HARKINS:  Sure.  And I believe there are two

17    objections, 136:9 to 12 and then also to the answer at 136:15,

18    which can all be kind of taken together.

19         Your Honor, our objection here is different.  It's a

20    relevance objection.  This is a question about what Teva

21    informs consumers about the contents of the generic drugs

22    through the approved product labeling.  There are no consumers

23    and -- warranties or representations that are made to

24    consumers through the product labeling are not at issue here.

25    We think it's, you know, unnecessarily confusing and not

 1    directly relevant to any of the issues in the case.

 2          SPECIAL MASTER VANASKIE:  David?

 3          MR. STANOCH:  Thank you, Your Honor.

 4          I won't reread them again, but there were topics that

 5    Ms. Osmian was specifically designated on on oral and written

 6    communications and statements to a number of downstream

 7    entities, which include -- I am quoting now -- i.e.,

 8    wholesalers, retailers, consumers, TPPs, end quote, you know,

 9    regarding the product.  And this is literally -- she was

10    designated about, statements made about the product

11    downstream.  Labeling is a statement made downstream.

12    Consumers are the insureds of the TPPs, and they're basing

13    their reimbursement decisions on the statements that's in the

14    labeling.  And I think this question still goes to the -- goes

15    directly to the heart of the matter.

16          It's certainly probative for the jury to understand

17    that the ingredients and the statements in the labeling are

18    what's being presented in the product that's being purchased

19    and at issue in this case.  And she was the witness on this

20    topic.

21          SPECIAL MASTER VANASKIE:  Go ahead, Steve.

22          MR. HARKINS:  Your Honor, just to clarify, our

23    objection is not that this is not discoverable information and

24    that information about consumers is not a proper subject of

25    discovery or something that Ms. Osmian was prepared to testify

1    about.  But for purposes of this trial, we don't think that

2    representations or pieces of the labeling that were provided

3    to consumers and the content thereof are relevant.  It is

4    confusing.  And even the way that it was just described by

5    counsel as somehow being relevant for the jury to know about

6    representations made to the ultimate beneficiaries who are not

7    part of the trial further downstream from the TPPs, none of

8    this is probative.

9         Again, the content of the labeling and what is

10   included generally is appropriate, but whether or not anything

11   was provided to consumers, the content of what was provided to

12   consumers or what they would have done with that information,

13   for purposes of this trial, is not relevant.

14        SPECIAL MASTER VANASKIE:  How is this relevant,

15   David, for purposes of this trial?

16        MR. STANOCH:  Because it's informing -- the purchase

17   wouldn't happen but for healthcare providers prescribing the

18   drugs and consumers going to the pharmacy counter to fill the

19   prescription, Your Honor.  And TPPs would not have reimbursed

20   absent those two first steps.

21        And this is showing that for those things to happen

22   to trigger the TPPs' reliance on the purchase and payment,

23   right, to be in this situation to have to reimburse and pay

24   money for these products, that those contents are being

25   consumed -- are being conveyed by Teva.  Right?

*United States District Court*

1          A TPP is not the one ingesting it.  They're not the

2     one getting the prescription.  This is just the basic facts of

3     the pharmaceutical industry.

4          MR. HARKINS:  And, Your Honor, questions about what

5     the TPPs saw with the labeling or reviewed or relied on with

6     the labeling, it's just not what's being asked here.  This is

7     about what reaches a consumer as far as the labeling.  That's

8     not at issue in the trial.  Those individuals are not here to

9     talk about it.

10         And, again, the specific line of questioning that

11    we've objected to, beginning at 136:9 to 12 and then 136:15 to

12    137:12 is not about anything that TPPs reviewed or what they

13    relied on.  It's about consumers whose claims are not at issue

14    in the trial and are not going to be present at this trial.

15         MR. STANOCH:  And we'll have other witnesses

16    testifying about what TPPs relied on, Judge, but this is

17    foundational to what that testimony and evidence is going to

18    be in terms of how prescription drugs actually work and in

19    terms of what is represented in the label.  Right?

20         I mean, some of these questions, you know, any

21    information in the label concerning the contents and purity of

22    the drug will be reflected in the label, right?  And she

23    answers that.

24         That's completely different.  That's completely

25    divorced from anything about a consumer or a healthcare

1  provider or anything like that.  But, again, this is

2  foundational testimony that the jury can and should hear about

3  the process of how prescription drugs and reimbursements

4  actually work.

5          MR. HARKINS:  Your Honor, those just aren't the

6  questions that were asked.

7          SPECIAL MASTER VANASKIE:  Yes, I understand that, but

8  I do think it is foundational.  And so I will overrule the

9  objection and allow this testimony to come in.  And that's

10 also to be consistent.

11         I know it's a little different, Steve, than the other

12 questions, but it's in the same ballpark.

13         MR. HARKINS:  I think that finishes us for

14 Ms. Osmian, and I see Ms. Lockard has rejoined as well.

15         SPECIAL MASTER VANASKIE:  Yes.  All right.  So we

16 have, as I understand it, two other Teva witnesses for today.

17         MR. STANOCH:  Yes, sir.

18         MS. LOCKARD:  It's Stefan Karlsson and Jens Nassall.

19         SPECIAL MASTER VANASKIE:  Yes.  I think we're going

20 to go to Jens Nassall next, if that's all right.

21         MR. STANOCH:  Sure.

22         SPECIAL MASTER VANASKIE:  Is that all right with you,

23 Victoria?

24         MS. LOCKARD:  Sure.  Let me pull them up here.  Okay.

25         So the first line item was actually an opposition to

1    our counter.  And the issue really for the counter, it just --

2    it simply provides his title.  And the plaintiffs' designation

3    begins with, you know, this is -- you've been at Teva.  It

4    just sort of goes into when he's been at Teva and what his

5    role is, but he never really introduces what Mr. Nassall's

6    title is at Teva.  So that's simply all those lines represent.

7            SPECIAL MASTER VANASKIE:  Where are we at?

8            MS. LOCKARD:  So it would be at lines -- our proposed

9    counter would be page 32, lines 2 to 13.

10           SPECIAL MASTER VANASKIE:  I have that.  Okay.

11           Why is this objectionable, David?

12           MR. STANOCH:  Sure, Judge.  And I'm not going to

13   belabor some background, but there's really two issues here.

14           One is presentation-wise, this idea that we don't

15   show a clip of someone saying, hello, my name is Jens Nassall.

16   I'm currently the blah, blah, blah manager for Teva, I don't

17   think we need to do that.  We can just do that by agreement

18   and putting that language in text on a -- on a video clip when

19   we're about to play it.  Right?  So I don't see that as an

20   issue, frankly.

21           And then this designation jumps sort of right in,

22   this counter.  There's pages leading up to this, and they just

23   want to throw in, oh, since approximately March 2020, you have

24   another position about this.

25           I don't really see how that -- that's really helping

1    anything, especially given that we can just say, you know, on

2    the title when we play the video, current -- name, current

3    title.

4           SPECIAL MASTER VANASKIE:  No, I think the question

5    and answer are fine.  I'll overrule the objection.

6           MS. LOCKARD:  So that takes us to page 97.

7           SPECIAL MASTER VANASKIE:  All right.  Let me get

8    there.

9           And this is your relevance objection?

10          MS. LOCKARD:  Correct.  This is a relevance objection

11   and a foundation.

12          So this is -- again, you know, previously, we had

13   talked about the 2011 audit of ZHP, which we talked about with

14   another witness.  And I know you said you were going to look

15   again at that, and we actually sent Judge Bumb's discussion on

16   the record at the motion in limine hearing.  I don't know if

17   you've had an opportunity to review that, but it really goes

18   into the details of, you know, what she ruled with respect to

19   other audits, other regulatory action, and this notion that

20   the plaintiffs have to connect the dots.  It either has to be

21   connected to the valsartan at issue or it has to be probative

22   of a systemic problem that relates to the valsartan at issue.

23          And so, again, if it's just a -- you know, one

24   comment in an audit or one issue in an audit, then it doesn't

25   sufficiently connect the dots.  And this line of discussion

1    here is discussing an email about a 2011 audit, and -- that

2    Mr. Pan Lin performed back in 2011, unrelated to the valsartan

3    at issue in this case, involving Teva's API.

4          So we renew that argument with respect to anything

5    that relates to this unrelated 2011 audit.  And we think that

6    this discussion about emails about the audit likewise should

7    be excluded.

8          SPECIAL MASTER VANASKIE:  All right.  David?

9          MR. STANOCH:  Your Honor, in the context of Mr. Pan

10   Lin's designations, Your Honor has already allowed the

11   testimony by Mr. Pan Lin about this audit he undertook.  And

12   this is the exact same audit.  And nothing that Ms. Lockard

13   has provided you since changes any of the same arguments that

14   I raised back then.

15          This audit was Teva auditing ZHP.  It was auditing

16   ZHP, the specific Chuannan site at which the valsartan API at

17   issue in this case was made.  It was regarding the quality

18   systems -- this is the audit scope, I am quoting.  "Quality

19   system CGMP level," and it was specifically about the CGMP

20   issues regarding valsartan.

21          So we could not have more dots connected at this

22   point, Your Honor.  We argued it before.  I'm happy to talk

23   more about it.

24          But given Your Honor's prior ruling, I'll stand on my

25   prior arguments as to Mr. Pan Lin when you allowed testimony

 1    about this audit.

 2            SPECIAL MASTER VANASKIE:  What about Judge Bumb's

 3    ruling, doesn't that change the result here?

 4            MR. STANOCH:  No, Your Honor.  No, Your Honor.  We

 5    addressed that -- we had that ruling in hand before, and we

 6    argued it to Your Honor.  And Ms. Lockard strenuously argued

 7    it to Your Honor in the context of Mr. Pan Lin, because he was

 8    the Teva auditor who went to ZHP multiple times over multiple

 9    years.

10            Judge Bumb's ruling essentially -- which, again,

11    we've discussed and Your Honor has made rulings on as to

12    Mr. Pan Lin and these exact same audits, she basically said --

13    you can look at the verbiage.  She basically said --

14            SPECIAL MASTER VANASKIE:  I have looked at it.

15            MR. STANOCH:  -- it would relate to valsartan or the

16    facilities at which it was made or systemic issues --

17    right? -- that would affect the various products at those

18    facilities.

19            This checks every single box, as Your Honor

20    recognized before.  This is about ZHP.  It's about the actual

21    ZHP facility, which is the exact same facility that makes the

22    same valsartan API at issue in this case.  And it's regarding

23    a CGMP issue that Teva's auditors are identifying and

24    complaining about regarding ZHP's quality oversight and

25    manufacture of valsartan.

1              We're not trying to say, oh, there's a facility in

2    Greenland that makes generic aspirin and someone dropped some

3    rat poison into a vat of that aspirin, Teva is a bad actor.

4    It's nothing like that.  This is tied by product, it's tied by

5    facility.  And we've already -- and both sides' experts have

6    already been found reliable in part to testify about the

7    audits conducted by Teva, including this audit, which is an

8    ipso facto ruling that it's helpful to the jury.

9              MS. LOCKARD:  Well, we disagree with some of the

10   representations made about that.  It's not about Teva's

11   product at issue.  Teva was not even getting API from ZHP at

12   this time period.

13             So it's not in the right time period, it's not the

14   right product at issue, and it's not systemic because it's

15   just a single observation.  And so what the Court had said,

16   and the reason for Judge Bumb's ruling, is that we don't want

17   to have mini trials over all of these additional audits that

18   don't directly relate.

19             One of the issues in this 2011 audit -- and this goes

20   to the next -- this is relevant to the next objection we have

21   in the next line, but the discussion they're having is about a

22   PSD issue, which is a particle size distribution issue.  It

23   has nothing -- that issue -- that violation has nothing to do

24   with valsartan whatsoever in this case.  In this case there's

25   no -- there is no allegation anywhere that particle size

1    distribution is what contributed to the nitrosamine issue.

2         The essence of the judge's ruling is you can't --

3    just because you have some bad finding, you can't throw it all

4    in as a character assassination.  It's going to extend the

5    trial.  We're going to have mini trials on all of these

6    issues.

7         If Mr. Stanoch's rationale is applicable, then every

8    audit would come in because you can find some dot.

9         MR. STANOCH:  That's not what we're asking for,

10   Counsel.  We're not asking for every audit.

11        MS. LOCKARD:  Well, so far you have.

12        SPECIAL MASTER VANASKIE:  You're asking for this

13   audit, and I'm not sure how this audit is connected.

14        MR. STANOCH:  Judge, again, we argued this already,

15   and you, Judge, allowed this in, and Ms. Lockard made the

16   exact same arguments before.

17        And this isn't just a particle size issue.  If you

18   look at the actual document, the cover email and the audit,

19   right, it's Teva person -- audit personnel saying that there's

20   a serious failure at ZHP about not following their own change

21   control procedures as to valsartan.  That's the exact same

22   quality failing when they switch the manufacturing process

23   from the TEA to the zinc chloride process.  That's the same

24   issue, quality issue.

25        They also say in this that ZHP failed to investigate

1    out-of-specification results about the valsartan.

2            These are the exact same type of quality issues.

3    These aren't saying, oh, you know, there's pink specks on the

4    pill or that the bottle cap doesn't fit right.  We're talking

5    about CGMP deficiencies that Teva found at ZHP in 2011

6    regarding specific regulations about change controls and

7    out-of-specification handling -- all right -- and that they

8    didn't handle it correctly as to valsartan.

9            MS. LOCKARD:  I mean, we're happy to show you the

10   audits, Judge, so you can see that this is not related to the

11   same valsartan at issue in this case, it is not related to the

12   same issues found in this case, and it's before the time

13   period where ZHP was even supplying Teva.

14           MR. STANOCH:  Your Honor, on that last point, that's

15   misleading, because at this time period Actavis was a separate

16   standalone company purchasing the same valsartan API from the

17   ZHP facility, right, and this is Teva looking at it separately

18   at the same time.  Just because, quote, Teva wasn't purchasing

19   it at the time, well, a Teva subsidiary, right, that's in this

20   case, the Malta facility, was purchasing from this very ZHP

21   facility the very valsartan API that at this time Teva folks

22   looked at and said, oh, my gosh, they have serious risk

23   assessment investigation issues, failure to follow their own

24   change control procedures, and failed to conduct an adequate

25   investigation of valsartan out-of-specification results.  At

1    the same time, Actavis is buying from this facility this exact

2    same product.  That's highly probative.

3           And again, we've already allowed the testimony on

4    this from Mr. Lin, who is the auditor who actually went here.

5           MS. LOCKARD:  Well, Your Honor, you said you would

6    talk a look at that issue as well after looking at the ruling

7    by Judge Bumb, so I don't think we can chew on that.

8           MR. STANOCH:  Ms. Lockard, I hate to interrupt, but

9    your --

10          SPECIAL MASTER VANASKIE:  David, you're interrupting.

11   Not your turn yet.

12          MR. STANOCH:  I apologize.

13          MS. LOCKARD:  I mean, the issue -- the fact that

14   we're having such discussion about this right now just shows

15   our point, that we're going to have to get into this, it's

16   going to turn into a mini trial.  They have the 2012 audit

17   that post-dates this that addresses all the valsartan issues.

18          So far they've tried to bring out every Teva audit of

19   ZHP.  And if we spend this amount of time on every audit that

20   has some theoretical, arguable dot connected to valsartan,

21   it's going to be contrary to the judge's intention in her

22   motion in limine ruling.

23          SPECIAL MASTER VANASKIE:  I know you disagree, David.

24          MR. STANOCH:  Yes.  This is not every audit, Judge.

25   This is a five-page double-spaced audit.  This isn't going to

1    be a mini trial.  The objections here, by the way, are

2    relevance and foundation.  Right?

3          And relevance is any tendency -- right? -- to be

4    probative of a fact or dispute in issue.  It's regarding, the

5    case against Teva, its quality oversight of its supplier.

6    This relates to quality oversight of its supplier ZHP at the

7    facility at issue about the valsartan product at issue.  So I

8    think we've certainly established relevance and foundation

9    that are being made here.

10         SPECIAL MASTER VANASKIE:  All right.  I'm going to

11   reserve ruling on this particular issue.  I'm going to pull

12   the determination I made on Pan Lin's testimony and also look

13   again at Judge Bumb's ruling and make a final determination.

14   And I'll have that final determination for you by tomorrow.

15         But I do want to study it.  It's obviously struck a

16   nerve on both parties, and I just want to look at it a little

17   more carefully.

18         MS. LOCKARD:  Okay.  Thank you, Judge.

19         I think that covers the next objection as well at

20   line 100.

21         SPECIAL MASTER VANASKIE:  Page 100, line 16?

22         MS. LOCKARD:  Excuse me.  Yes, page 100, line 16.

23         SPECIAL MASTER VANASKIE:  All right.

24         MS. LOCKARD:  So then that takes us to page 101.  I

25   think that -- actually, that's the same questioning on the

1    same email.

2          And page 101, line 14.

3          MR. STANOCH:  I disagree, Ms. Lockard, on 101.  This

4    is about Mr. Nassall, an email talking about the

5    qualifications of Mr. Pan to conduct audits, I think.

6          SPECIAL MASTER VANASKIE:  Yeah.  That's the exchange

7    at lines 9 through 16 on page 101.

8          MR. STANOCH:  Yes, Judge.

9          MS. LOCKARD:  Right.  I mean, I can address this, but

10   it is part of the email where the discussion is about -- the

11   reason they're asking about Mr. Pan's qualifications is

12   they're asking about his qualifications with respect to the

13   2011 audit.

14         MR. STANOCH:  Your Honor, you know Mr. Pan Lin --

15   again, this is a huge issue in the case about Teva's own CGMP

16   obligations is to audit every two or three years its

17   suppliers, including ZHP.  And Mr. Pan Lin was there multiple

18   times at ZHP between 2011 and 2018, a month before the

19   recalls.

20         So the fact that there are Teva personnel from audit

21   and procurement talking about whether Pan Lin was qualified to

22   be doing those audits we think is highly probative of issues

23   that the jury should be able to hear.

24         MS. LOCKARD:  So let me just respond to that.

25         So Mr. Wang -- so this is an email where Mr. Wang,

 1   who is in procurement, and Mr. Nassall, who is in procurement.

 2   They are not part of the audit team.  They don't supervise the

 3   audit team.  They don't supervise Pan Lin.  They're in the

 4   procurement department.  They negotiate the deal with the

 5   supplier.

 6         The audit department comes under the quality

 7   department.  They go in and they do the audits.  They're

 8   totally separate.

 9         So Mr. Wang and Mr. Pan Lin -- excuse me, Mr. Wang,

10   Mr. Nassall are not part of the audit team.

11         So eventually --

12         MR. STANOCH:  That's incorrect.

13         MS. LOCKARD:  -- he's got two procurement people who

14   are talking about Mr. Pan Lin and his qualifications.  And

15   there is a comment in the email by Mr. Wang where he makes a

16   statement about Mr. Pan's qualifications, and in somewhat

17   disparagingly.

18         But that's why counsel is asking Mr. Nassall, well,

19   did you ever share concerns about Mr. Pan's qualifications to

20   anyone at Teva.

21         Well, for one thing, this is misleading because

22   Nassall -- Mr. Nassall didn't have any concerns about Pan

23   Lin's qualifications, and he goes on to explain that in the

24   next designation.

25         But this question makes it seem as if -- he's

1    essentially misleading the jury to think Mr. Nassall had

2    concerns, and he doesn't.

3         And secondly, it's improper character evidence as to

4    Mr. Pan Lin.  It's one person in procurement, Mr. Wang, who is

5    making some offhand comment about Mr. Pan Lin's

6    qualifications.

7         It's not appropriate character evidence.  There's no

8    reputation or -- you know, issues that were noted at Teva.

9    There's no, you know, documents to indicate Mr. Lin was

10   somehow unqualified to do this.  It's just simply Mr. Wang's

11   offhanded comment that he had some concerns about Mr. Lin

12   doing this, because, frankly, he was in China and this was an

13   inspection in a facility in a different country.

14        So it is misleading.  It's impermissible character

15   evidence.  I think it's prejudicial more than it is probative.

16        SPECIAL MASTER VANASKIE:  I will reserve ruling on

17   this as well.

18        MR. STANOCH:  Thank you, Judge.

19        And, Judge, at the end of this, if you want copies of

20   documents that are the subject of these designations, I can't

21   recall if we provided those.  I think we did.  But if Your

22   Honor needs --

23        SPECIAL MASTER VANASKIE:  There are some, yes.

24        MR. STANOCH:  Whatever you'd like, we're happy to

25   provide it to you.

1          MS. LOCKARD:  And I'm in agreement, David, with that,

2     if we want to just give him the couple of documents that

3     relate to these counters.

4          SPECIAL MASTER VANASKIE:  Why don't you confer and

5     agree on what those documents are and get them to me, please.

6          MS. LOCKARD:  Sure.

7          SPECIAL MASTER VANASKIE:  Are we up to page 110 now

8     or no?  I guess not.

9          MS. LOCKARD:  So if we go back to 104.

10         SPECIAL MASTER VANASKIE:  Right.

11         MS. LOCKARD:  I think we can address 104, line 19.

12         I am trying to get there.

13         So I think this is a different email.  So I don't

14    have a -- you know, a strict objection -- I mean, other than

15    these discussions about what was happening in 2011, which, you

16    know, I do think this line, this row also applies to that in

17    your consideration of that.

18         But this goes a little further.  Because even aside

19    from the ruling on whether the 2011 audit discussions come in,

20    at page 104, counsel pulls up an email.  And these are some

21    preliminary questions, which is not really an issue.  But the

22    meat of the questioning is then at page 106.

23         And in this email, they're discussing -- Mr. Nassall

24    had written this email where basically he was saying:  After I

25    heard there were some QA issues with Huahai's valsartan in

1    Goa, and after I heard, we probably should avoid Huahai in the

2    future, and then he goes on to question about this.

3         And I do have a problem about generally with a

4    hearsay objection of this, because this is talking about

5    without attribution to what specifically he heard, who he

6    heard it from.  We don't know if he heard it from somebody at

7    Teva, we don't know if he heard it from somebody at ZHP or a

8    third party, but he's just talking generally about something

9    that he had heard.

10        So I have a hearsay objection to this in addition to

11   all the additional objections related to the relevance

12   argument.

13        And he's even asked in this at line 7, page 107:  And

14   do you recall who you heard that from?

15        And he says:  I can't recall.

16        SPECIAL MASTER VANASKIE:  David?

17        MR. STANOCH:  Your Honor, it's difficult to respond

18   because I'm hearing lots of different vague -- I don't mean

19   this pejoratively -- bases for the objections.  I hear

20   hearsay, I hear something prejudice.  I'm having a hard time

21   responding.

22        But I'll start with relevance.  That Mr. Nassall both

23   in a -- he wrote this email.  So it's a business record.  I'm

24   asking a 30(b)(6) witness, right, both in his individual and

25   corporate capacity, about a Teva business record, an email,

1    that he wrote in which he said, essentially, we've been

2    experiencing problems with Huahai's valsartan and there's

3    issues there and we should avoid them in the future.

4            I'm not sure how that's not relevant.  Right?  That

5    certainly goes to Teva's, if not Mr. Nassall's, state of mind

6    in terms of whether they found Huahai, ZHP, to be a reliable

7    or good API supplier, specifically as to valsartan, and that

8    it was experiencing issues.

9            But he goes on this email to say, well, Huahai is

10   still one of the biggest exporters of API to the US and we

11   can't avoid this opportunity to work with them.  Right?

12           This all goes to Teva's and Mr. Nassall's state of

13   mind and motivations and knowledge about ZHP's approach to its

14   production and quality handling of valsartan.

15           And if I missed something that Ms. Lockard said,

16   Judge, I'm happy to address it, if you think I missed

17   something, but I'm trying to address the smorgasbord of things

18   I think I heard.

19           MS. LOCKARD:  So we've been very selective and

20   surgical with the hearsay objections.  You'll find very few of

21   those.  And I -- you know, I agree, there are certain business

22   record exceptions that apply to emails and to business

23   records.

24           But this goes beyond that.  This is essentially

25   hearsay within hearsay because he's talking about something

1     that he heard about Huahai.

2          If you read the transcript, this is not Mr. Nassall's

3     impression.  In fact, his impression is the opposite.  He's

4     saying to his colleagues, look, I have heard this stuff about

5     Huahai and its problems, but let me tell you, we've looked

6     into this before, and every time we've looked into it, it has

7     been an issue that wasn't with Huahai, it was with --

8     something that was going on at the Goa plant with respect to

9     differences in -- he goes on to this sort of differences in

10    their machinery or how they're calibrating.

11         But the point is, Mr. Nassall saying to his

12    colleague, look, I have heard these rumors that there are

13    concerns about Huahai, I'm telling you, those are false, you

14    know, concerns.  We've looked at it.  We feel like they are --

15    they are fine suppliers.  And he does say, yeah, they're an

16    important supplier, but he's never -- Mr. Nassall is never

17    saying in this that he thinks there's a problem with Huahai.

18         And so to allow this hearsay to come in, where

19    somebody is saying that Huahai is a problem but we don't know

20    who said it, we don't know when or where, we have no basis for

21    that, it's compounded by the fact that it's prejudicial and

22    it's hearsay.

23         SPECIAL MASTER VANASKIE:  It certainly seems to me to

24    be hearsay.

25         MR. STANOCH:  Your Honor, the QA issues that he's

1    referring to in this email come right on the heels of the last

2    exhibit and audit report, right, about Huahai and ZHP, where

3    those folks were talking about the same QA issues that he's

4    talking about now.

5            And even -- and even if it is hearsay -- which now I

6    feel like we're arguing documents and not testimony, and I

7    think that's a different analysis.  And Your Honor should

8    reserve if that's the way we're going because you should have

9    the document in front of you versus what either counsel say

10   testimony says about the documents.

11           I think that at least it's certainly a non-hearsay

12   purpose, at a minimum, in this admitted business record about

13   its notice and effect on the listener, Mr. Nassall.

14           MS. LOCKARD:  Well, I don't know how we can argue

15   designations without getting into the documents because a lot

16   of the testimony is about the documents.

17           I mean, this one falls within the issue, the general

18   issue of us moving to exclude the 2011 discussions about the

19   audit.

20           I mean, if we want to pull this email and include it

21   with the couple of others we're sending, I'm fine with that.

22           But we do maintain our objection.  I mean, we just

23   don't have -- we don't have enough information, you know, to

24   be able to say that this rumor about the quality issues is

25   something that's reliable or, you know, who said it.  So I do

 1    feel that it falls squarely within the hearsay objection.

 2            MR. STANOCH:  Again --

 3            SPECIAL MASTER VANASKIE:  As I listen to your

 4    arguments and as I read through this testimony, it occurred to

 5    me that this is really a fight over the admissibility of the

 6    email or the document as opposed to somebody's interpretation

 7    of it in a deposition.

 8            MR. STANOCH:  That may be right, Your Honor.

 9            SPECIAL MASTER VANASKIE:  Yeah.  Illuminate me on

10    this point.

11            If this is a breach of warranty claim being

12    presented, why is all of this so hotly contested?

13            MR. STANOCH:  If that's to me, Your Honor, I think

14    the answer is that this is not just a breach of warranty.

15    There's consumer protection law and fraud claims, which go --

16    which touch on the deception or unfairness and, frankly,

17    knowledge of issues that we're complaining about.  Here, it's

18    knowledge of quality over -- CGMP deviations and quality

19    oversight lapses at ZHP on the part of Teva.

20            And of course, you know, punitive damages, Judge Bumb

21    hasn't bifurcated.  I mean, this would all go to the state of

22    mind of Teva in that it's identifying early on issues at

23    Huahai about ZHP and keeps buying for another seven years

24    anyway.

25            MS. LOCKARD:  I don't see how that's relevant to

1    fraud.  I mean, the issue with respect to fraud, the claim

2    with respect to fraud and consumer protection is that somehow

3    we hid what was going on with the nitrosamine issue.  And none

4    of this 2011 stuff or these extraneous audits relate to that.

5    It doesn't tend to suggest that Teva knew about the

6    nitrosamine problem or that it hid it in any way or that it

7    was deceptive with respect to that.

8            I mean, if anything, you know, plaintiffs' argument

9    is, well, we should have done better audits, but that has no

10   bearing on the fraud claim.

11           MR. STANOCH:  I would just strongly disagree, Your

12   Honor.  This is not just about NDMA qua NDMA.  Among our

13   allegations and things which we will show to the jury at trial

14   is that these products were represented to have certain

15   characteristics and manufactured in a CGMP-compliant manner.

16   This is percipient evidence from percipient witnesses of Teva,

17   who is obligated to oversee CGMP issues at ZHP, saying that

18   there were CGMP deviations; meaning that the products were not

19   what they were supposed to be, products made in the

20   CGMP-compliant manner.

21           It's not just -- this is not a case about blinders of

22   did Teva know that nitrosamines were in there before 2019.

23   It's more than that.  It always has been more than that.

24   There's been numerous orders by Judge Kugler for the last six

25   years to that effect.

1          MS. LOCKARD:  The CGMP deviations have to have some

2     relevance to the nitrosamine issue.  You have to be able to

3     connect whatever the CGMP violation was to the cause of the

4     nitrosamine issue.  And that is where the disconnect is.

5          You know, plaintiffs -- you know, they want to throw

6     in any CGMP violation that came up in an audit to say, well,

7     you know, they were sloppy.  And that's just not what Judge

8     Bumb held, and it is a problem, because it doesn't have

9     direct -- I mean, if there was a CGMP violation that was some

10    sort of a smoking gun, I mean, they would have something.  But

11    they just want to throw up all -- every violation and

12    deviation they can find and say, you know, this was a bad

13    company, and that's inappropriate character assassination.

14         MR. STANOCH:  I just disagree that that's what we're

15    doing, Judge.  We argued this with Mr. Pan Lin.

16         MS. LOCKARD:  Sorry.  I keep hitting my video of

17    Mr. Nassall chiming in.

18         SPECIAL MASTER VANASKIE:  Does this all relate to the

19    issues I've reserved on?

20         MS. LOCKARD:  It does.

21         MR. STANOCH:  I would say in part but not completely,

22    Your Honor.  And that's why -- unfortunately, when you say it

23    may be about the document, that may be true, because part of

24    the document talks about "QA issues at Huahai's valsartan,"

25    and others separately talk about purchasing from Huahai and we

1    can't afford not to have them as our supplier, blah, blah,

2    blah.  So I would say it doesn't completely overlap with what

3    we talked about before.

4        SPECIAL MASTER VANASKIE:  What documents will you be

5    sending me?

6        MR. STANOCH:  My suggestion, Your Honor, would be for

7    whatever excerpts you say you're reserving ruling on, we will

8    send you specifically those exhibits.

9        So, for example, if we're looking at 104:19 through

10   105:11, we will send you the email that is the subject of that

11   question.  That would be my proposal.

12       I'm also happy to send you every exhibit for every

13   transcript, but --

14       SPECIAL MASTER VANASKIE:  No.

15       MR. STANOCH:  -- I'm happy to focus it.

16       SPECIAL MASTER VANASKIE:  No.  Stay focused.

17       MS. LOCKARD:  I think we have enough to do.

18       I would propose we send the emails that are the

19   exhibits, but also the audit which --

20       MR. STANOCH:  That's from what was reserved earlier.

21   Right.  Yes.  Whenever he says -- the Judge says this excerpt

22   I'm reserving, whatever was the subject of the testimony,

23   we'll send him.

24       SPECIAL MASTER VANASKIE:  So I've reserved ruling so

25   far on objections that cover pages 97 through 107.

```
 1              MR. STANOCH:  I think so.

 2              MS. LOCKARD:  That's what I show.

 3              MR. STANOCH:  Yes.  I agree.

 4         And we will send you the two exhibits which I believe

 5    are encompassed by those seven or so designations, if that's

 6    okay, Judge.

 7              SPECIAL MASTER VANASKIE:  That would be fine.

 8              MS. LOCKARD:  So that takes us to page 131.

 9         So this gets into a line of questioning where

10    Mr. Stanoch asked the witness -- this particular designation

11    here that we've objected to, it -- our objection is that,

12    number one, it's argumentative, it lacks foundation, and it

13    misstates his testimony.

14         We also think it's -- we have a relevance objection,

15    and we think it's prejudicial, confusing, and misleading.

16         So the issue is that he sort of jumps into this, oh,

17    so you never said that price is the only issue for valsartan

18    API.

19         And he says:  I would not say that right now.

20         Have you ever said that?

21         Not that I can recall.

22         I think that alone lacks foundation, and it is also

23    misleading and is argumentative because it suggests to the

24    jury that he has said that.

25         This ties very closely into the next designation at
```

1   page 132 --

2          SPECIAL MASTER VANASKIE:  Before you go to 132,

3   Victoria, you have a counter-designation at page 130, lines 15

4   to 24.

5          MS. LOCKARD:  Right.  And that was my -- so that's

6   somewhat contingent, that, you know, at a minimum, if this

7   testimony comes in, I think we should have the opportunity to

8   present our counter.

9          MR. STANOCH:  Your Honor, I received the counter

10  before this even went in.

11         If -- we'll agree to the counter if they withdraw the

12  objection, because obviously the question we designated at

13  131:1 was the follow-up to the Q and A immediately before it.

14         SPECIAL MASTER VANASKIE:  All right.  So I will allow

15  the counter and the designation.  So the jury will be

16  presented with evidence from line 15 through 24 on page 130

17  and lines 1 through 6 on page 131.

18         MR. STANOCH:  Understood.

19         MS. LOCKARD:  Understood.  Okay.

20         SPECIAL MASTER VANASKIE:  I think we go to page 132

21  now, lines 4 to 8 -- line 4 to page 133 line 8.

22         MS. LOCKARD:  So we object to this designation based

23  on relevance, prejudice, it's confusing and misleading.

24         This is an email discussion that he's being

25  questioned about with respect to another supplier,

1   Dr. Reddy's.  Dr. Reddy's was an API supplier.  They were not

2   providing API supply in the US for valsartan, first of all.

3          And so there is an email -- the email discussion is

4   talking about some issues with Dr. Reddy and we cannot use

5   Dr. Reddy.  Okay?

6          So they're talking about, well, then we need to

7   figure out who are replacement suppliers.

8          And Dr. Reddy is essentially emailing back and

9   saying, well, you know, we're not getting the business, why

10  aren't we getting the business.

11         And within that email -- and it's very -- it is

12  difficult to do this without having the email, you know,

13  because --

14         SPECIAL MASTER VANASKIE:  Yeah, it is.

15         MS. LOCKARD:  -- it makes it just -- I mean, it makes

16  it very misleading to be able to look at this just in a silo.

17         SPECIAL MASTER VANASKIE:  Why is this being

18  designated, David?

19         MR. STANOCH:  Your Honor, this is a procurement

20  executive at Teva telling his boss, Jens Nassall, the

21  deponent, who is also a 30(b)(6) on procurement issues,

22  that -- and I quote -- valsartan US, price is the only issue

23  as you said, end quote.

24         So this is -- this is Teva's procurement people,

25  right, saying that it's simply cost is the only factor, price

1    is the only issue when you're buying valsartan US grade.

2          And then it goes on, the email says:  What about

3    Huahai?  It certainly is probative of what -- of Teva -- and

4    we heard a lot of this from Torrent about cheaper Chinese API.

5    It's a similar type of issue, that they're trying to get the

6    jury can hear that the only issue to Teva, per their

7    procurement department, is price.

8          SPECIAL MASTER VANASKIE:  Then we'll go to the

9    counter-designation, page 133 at lines 20 to 24.

10          And he says --

11          MS. LOCKARD:  It goes on -- oh, I'm sorry.

12          SPECIAL MASTER VANASKIE:  -- Right.  So, I mean, you

13    can see my email below that I did not say anything like that,

14    that the price is the only issue.

15          MS. LOCKARD:  Right.  And that's because what he

16    actually said in the email when he's being asked, well, what

17    do we tell Dr. Reddy about why we're not going to use them?

18    And he said:  There are much better options with lower prices.

19          That's what Nassall said, there are better options

20    with lower prices.  He never said price is the only issue.

21          So Inbal Kan-Tor, who's responding -- and she's

22    basically saying, well, here's what I'll tell Dr. Reddy.  She

23    says just:  Valsartan US price is the only issue, as you said.

24          So she's representing what Nassall said.  And the

25    counter goes on to explain that reason, I never said that.

1  Because not only did he not say it, it's also a misleading

2  suggestion that that's even what he meant.  Because he

3  specifically said there are better options with lower prices.

4  So price isn't the only issue.

5          So it's confusing, it's misleading, and it's very

6  prejudicial.  I mean, this isn't even in respect to ZHP or --

7  you know, this is about Dr. Reddy's, which is a product that

8  wasn't even used.

9          MR. STANOCH:  Your Honor, again, it's a laundry list

10  of things I'm hearing there.  There's nothing in this email

11  about the better product at all.  This is classic impeachment

12  evidence.  Right?

13          This is Mr. Nassall if he's in the chair.  Right?

14          I can put an email in front of him, especially as a

15  30(b)(6), to say, here's your report to, saying you said, sir,

16  that for valsartan US grade, price is the only issue.

17          And then he can say, oh, well, I didn't say that.

18  And he can try to, you know -- but a jury can evaluate that.

19  Absolutely they can.

20          MS. LOCKARD:  I mean, I'm trying to share my screen,

21  but this is --  can you see the document?

22          SPECIAL MASTER VANASKIE:  Yes.

23          MS. LOCKARD:  This may be helpful.

24          So this is from Mr. Nassall where he says:  Clear

25  answer is that we have better options with much lower prices.

```
 1          That's what he said.  Better options, meaning -- you
 2   know, presumably -- I don't know, you know, better quality,
 3   better suppliers.
 4          But he just said with much lower prices.  He never
 5   said price is the only issue.
 6          What plaintiffs have latched onto is Inbal Kan-Tor's
 7   response where she puts:  Valsartan US, price is the only
 8   issue, as you said.
 9          And Mr. Nassall, in the counter that I provided, goes
10   on to say, That's not what I said.  Read the email.
11          And so, you know, certainly we can make that argument
12   to the jury, but it's just a diversion.  It's a waste of time.
13   It's confusing and prejudicial.  And, I mean --
14          MR. STANOCH:  Your Honor --
15          SPECIAL MASTER VANASKIE:  We need to move on.  We're
16   spending a lot of time on this.
17          MR. STANOCH:  Yes.
18          SPECIAL MASTER VANASKIE:  My ruling is they both come
19   in, both the designation and the counter.
20          MR. STANOCH:  Understood.  I don't want to spend any
21   more time, but, Judge, because we got the counter the other
22   night, I'd ask that on the next page after the counter, the
23   134:1 through 4 come in, my follow-up after what he said.
24          MS. LOCKARD:  So you're talking about:  Well, she
25   doesn't say what you wrote below.  She's just saying as you've
```

 1   said, right?

 2           And he says:  That's what she said there.

 3           MR. STANOCH:  Yes.

 4           MS. LOCKARD:  Okay.  That's fine.

 5           SPECIAL MASTER VANASKIE:  All right.  That's in.

 6           MR. STANOCH:  Thank you.

 7           MS. LOCKARD:  So we go to page 135.

 8           SPECIAL MASTER VANASKIE:  Yes.

 9           MS. LOCKARD:  Okay.  So this is foundation,

10   relevance, 402 and 404, as well as prejudice.

11           So this is -- the issue with this is Mr. Nassall --

12   there's, again, an email talking about -- there's a reference

13   to sensitivities with respect to Huahai previously.  And

14   Mr. Stanoch asked the witness what he meant by that.

15           And he goes on to talk about, well, there's issues

16   with doing business in China, cultural background.  You know,

17   he says cultural background of Chinese manufacturers versus

18   what is ours.  And that's what I believe I was referring to as

19   a delicate situation.

20           And I think this comes close to there is a motion in

21   limine on this about, you know, not sending the jury a message

22   that would be disparaging of the Chinese manufacturer,

23   suggesting that somehow because they're non-US, Chinese, that

24   they are -- you know, to disparage them.

25           So that's an issue with respect to references to

*United States District Court*

1  China.

2          SPECIAL MASTER VANASKIE:  David?

3          MR. STANOCH:  Your Honor, this is -- this is the same

4  email we were just talking about, just a different section of

5  it.  Right?  And a subordinate was referencing a delicate

6  situation with Huahai.  And I'm asking Mr. Nassall, the one

7  who is on this email and in his 30(b)(6) capacity, what is the

8  delicate situation with Huahai.  Totally fair question.

9          And then he explains what it is.  He says that

10 there's cultural issues.  That's his answer.

11         Otherwise, this email is going to go up and it's --

12 frankly, without it -- I'm surprised you would think that it's

13 going to leave a misimpression with the jury that there's some

14 other secret, nefarious, delicate situation.

15         I don't say a single thing in this questioning, nor

16 would I at trial, trying to disparage Chinese companies.  This

17 is the witness giving his answer of what he meant about

18 something that's mentioned in an email with his subordinate.

19         So, again, I am hearing the MIL ruling for the first

20 time, because it was really -- the only objection I think I

21 can see here was relevance.  And it's, again, someone

22 explaining, right, something that he's a percipient witness of

23 about the delicate situation with Huahai.

24         I'm not sure -- I'm not sure what prejudice there is

25 to Teva for its own witness to clarify what was meant by that.

*United States District Court*

```
 1            SPECIAL MASTER VANASKIE:  Victoria?

 2            MS. LOCKARD:  Well, we do have the objection based on

 3    404, character evidence, and that's what the MIL, the motion

 4    in limine was based on.

 5            So my objection is to the whole line of questioning

 6    where he's asking about the delicate situation and then the

 7    only answer is to talk about, you know, the Chinese

 8    businesses.

 9            So I don't think it's relevant.  I don't think this

10    is appropriate for the jury to get into.  And it's, you know,

11    a side diversion.

12            SPECIAL MASTER VANASKIE:  Yes, I agree.  I'll sustain

13    the objection.

14            My initial inclination was to disallow this inquiry

15    as irrelevant.  I understand that the comment is in the email,

16    but I don't want to get into a whole inquiry about what the

17    cultural differences are.  And I think that for that reason,

18    doing the balancing under Rule 403, it should be excluded.

19            I think the next one is page 150?

20            MS. LOCKARD:  Correct.

21            MR. STANOCH:  Yes, sir.

22            MS. LOCKARD:  So page 150, we object based on 408 and

23    offered a compromise and settlement.  We also object based on

24    relevance and prejudice.

25            The discussion here is counsel is asking the witness
```

 1    essentially, well, you know, you get a very competitive price

 2    for ZHP to this day, meaning now.

 3          The witness goes on to say, well, you know, that's

 4    true.

 5          And then Mr. Stanoch says:  Isn't that part of the

 6    agreement that Teva entered with ZHP, requiring it to offer

 7    lower prices?

 8          And he's right.  This was a settlement agreement

 9    between ZHP and Teva where they have not set -- reached

10    agreement on any liability damages related to the trial or

11    costs and expenses of defending against a trial.  That's still

12    out there.

13          But with respect to the recall costs, Teva and ZHP

14    entered into an agreement where there were various business

15    negotiations and terms and prices were reduced, because

16    obviously Teva had to, you know, expend a lot of money to deal

17    with this recall situation.  And so as a result, ZHP dropped

18    its prices.  And that was part of the settlement agreement.

19    And so now, you know, at least at the time of this deposition,

20    Teva was paying less for ZHP's API.

21          The issues with this, one, obviously, it should be

22    excluded because it's part of a settlement agreement.  And,

23    secondly, the prices that Teva is paying now for API has no

24    bearing or relevance to the case.  If there's anything to be

25    said about pricing, it should be narrowed to whatever price

1    Teva was paying for the valsartan API that was at issue that

2    was recalled.  What they were paying and the competitive

3    negotiations or agreements surrounding that arguably would be

4    relevant.

5            But negotiations post-recall, where they're dropping

6    their price based on a settlement agreement, that's entirely

7    not relevant and inappropriate under 408.

8            SPECIAL MASTER VANASKIE:  Yeah.  I'm going to cut it

9    off and say yes, I think this is barred under Rule 404 -- or

10   is it 408?  In any event, I think it's not relevant and it

11   shouldn't come in.

12           MR. STANOCH:  Understood.

13           MS. LOCKARD:  So moving to 152, our objection is that

14   it's argumentative, we made a foundation argument that it's

15   misleading, and also under 602, the witness himself said he

16   didn't understand the question.

17           So the question was:  In your view, it would hurt

18   Teva's bottom line if it stopped sourcing API from ZHP.

19           In this particular answer he says no, and then he

20   goes on to say:  And I also didn't understand, sorry.

21           So counsel rephrases the question and asks it again.

22           So I think just based on procedure, the witness

23   didn't answer it, said he didn't understand it, it should be

24   stricken.

25           My additional objection is that this witness doesn't

1  know what Teva's bottom line is or how it would be impacted

2  based on one API supplier.  I mean, Teva's bottom line as a

3  global company is, you know, beyond the scope of this

4  witness's 30(b)(6) topics or his personal knowledge.

5          SPECIAL MASTER VANASKIE:  Anything else on this,

6  David?

7          MR. STANOCH:  I'd just simply say, Judge, if he was

8  live there, I'd ask the first question.  He answered no.  And

9  then he pauses and says, I also didn't understand, sorry.  And

10  then I rephrase and reask.

11          I think that would be perfectly allowable in a live

12  situation.  The jury can certainly evaluate a witness who

13  first answers forthrightly "no," stops, and then hedges a

14  little bit.  That's all part of the Q and A on the subject.

15          And in terms of the 602 issue, Judge, both

16  individually and 30(b)(6), he's the procurement guy for Teva

17  about purchasing API, including for valsartan.

18          MS. LOCKARD:  So he -- counsel -- I mean, he's right.

19  He could ask the question again, and he did ask the question

20  again in the deposition.

21          I had an objection to it, I said it's vague.  Witness

22  says:  Yeah, sorry, I didn't understand it.

23          So then Mr. Stanoch, as he appropriately did, asked

24  another question, and that is the next designation.  So --

25          SPECIAL MASTER VANASKIE:  Yes, I'm going to sustain

 1   the objection here and exclude the testimony from page 150,

 2   line 5 through -- really extends into -- up to page 152 -- up

 3   to page 153, line 1.

 4           And then there's a counter-designation at 158, lines

 5   8 to 11.  And that should come out as well, I believe.

 6   Looking at 158, lines 8 to 11, it makes no sense to me, so...

 7           MR. STANOCH:  We'll withdraw 153:8 through 11 then.

 8           MS. LOCKARD:  I think that takes us to 167, page.

 9           SPECIAL MASTER VANASKIE:  That's what I have.

10           MS. LOCKARD:  So this just seems -- he jumps to:  Did

11   you discuss valsartan with anyone at ZHP at the event prior to

12   the June 20th dinner?

13           And it just -- it seems out of place, like there's no

14   foundation for it.  We don't know, what dinner are you talking

15   about.  Like this just seems -- I almost wondered if this

16   was...

17           MR. STANOCH:  It's ZHP.  He's talking about he went

18   to dinner with ZHP, Ms. Lockard.

19           MS. LOCKARD:  But those -- you didn't designate

20   anything about the dinner before this.

21           I mean, if it's important to you to say this dinner,

22   but it's just sort of out of nowhere, because the designations

23   prior to this did not include anything about a dinner.

24           SPECIAL MASTER VANASKIE:  My inclination was to

25   sustain it, because I didn't see how it fit in.

```
 1            MS. LOCKARD:  I don't know why it's relevant.
 2            SPECIAL MASTER VANASKIE:  Maybe you can explain
 3   how -- David, I'll give you a chance to explain how it is, but
 4   I don't see it.
 5            MR. STANOCH:  Sure.  I mean, he was -- step back,
 6   Judge.
 7            He was in China at the time, at a conference, right,
 8   and then went to dinner with ZHP.  And then ZHP on June the
 9   20th or thereabouts, right, informed Teva about genotoxic
10   impurity.  Right?
11            So if we did a cut and paste there that we didn't
12   mention that he was at a dinner with them in China, I
13   apologize and would add it.  But he was a percipient witness
14   who essentially was in China, right, went to dinner with ZHP,
15   and then next day they get news about the genotoxic impurity.
16   Right?
17            So this is just percipient evidence of what was
18   happening and what --
19            SPECIAL MASTER VANASKIE:  But it's not tied in
20   anywhere.  You're filling in all the blanks with your
21   narrative there, but it's not filled in looking at the
22   deposition designations.
23            MS. LOCKARD:  Right.  And there is one designation
24   before this which was not objected to, but it doesn't talk
25   about the conference or the dinner.  It just talks about this
```

1    is the first time you were aware of the nitrosamine issues.

2    And --

3            SPECIAL MASTER VANASKIE:  What page are you reading

4    from?

5            MS. LOCKARD:  The prior designation, it was at 159,

6    page 7 to 21.  And again, it wasn't disputed, so it's not on

7    your chart.

8            SPECIAL MASTER VANASKIE:  Right.

9            MS. LOCKARD:  I mean, I will say later on in the

10   deposition there is testimony designated about being at a

11   conference, but there's not really anything to tie in this

12   dinner and it's just sort of out of -- it seems irrelevant.  I

13   don't see what that has to do with any of the claims.

14           MR. STANOCH:  Your Honor, if this was an

15   administrative error and in the rush to get all of these to

16   you, Your Honor, which we thought would be done last month, if

17   we made one mistake in this spreadsheet and cut something out,

18   I apologize.

19           The whole point of this is simply that there was a

20   percipient event of Teva personnel in China with ZHP personnel

21   at almost the exact same time of the news of the NDMA was

22   breaking, and it provides very probative information about who

23   met with whom when and what they did or did not discuss.

24           And if the night before there was a dinner and ZHP

25   didn't tell Teva, right, that's something the jury can

```
 1  certainly consider as to either defendant.

 2          And I apologize if we cut something out.  I'm happy

 3  to address it separately with counsel or right now if you want

 4  to give me a moment.  I apologize.

 5          SPECIAL MASTER VANASKIE:  Let's take ten minutes.

 6  You can address it right now.

 7          MR. STANOCH:  I apologize.

 8          SPECIAL MASTER VANASKIE:  We can take a ten-minute

 9  break.

10          (Recess at 2:16 p.m. until 2:26 p.m.)

11          SPECIAL MASTER VANASKIE:  We're back on the record.

12          David, over the break, the ten-minute break, did you

13  have a chance to look at this testimony and the testimony in

14  this area?

15          MR. STANOCH:  I did, Your Honor.  And thank you for

16  that.

17          Ms. Lockard was correct that there is a designation

18  not before Your Honor because there was no objection, which is

19  at 159:7 through 21.  And that simply orients the questioning

20  we're about to talk about.  It's just an email from June 20,

21  2018 about the notification from ZHP.  So that's already in at

22  159.  So that's just a framing statement.

23          And I think we had an error in our chart.  I think --

24  and I apologize and thank you for the time.  I think we would

25  want to begin the designation we were looking at 162:4, which
```

1    picks up with "and you mentioned CPI China."

2         And then there's the discussion about that.

3         And then he explains that he was there in China on

4    June 20th for the conference, and he had dinner with ZHP.  And

5    that leads through the testimony that we were just looking at.

6         So I think it should be -- and in thinking of

7    completeness -- 162:4 through 167:15.  And then I know there's

8    a separate objection, I think, but I'd want to do the

9    continuing on to 168:24.

10        That's all this -- so I guess I'd say 162:4 through

11   168:24.

12        MS. LOCKARD:  Okay.  Let me take a look at this.

13        MR. STANOCH:  Of course.  I understand.

14        I apologize to do this on the fly, but I was trying

15   to capture all of the questioning and answers about this

16   subject to avoid any other disputes.

17        MS. LOCKARD:  So I read from 164:2 --

18        MR. STANOCH:  I'm sorry, 162:4.

19        MS. LOCKARD:  Excuse me.  Yes.  162:4 through the

20   designation we were dealing with before the break, 167:12.

21        I don't have an objection to that -- all of that, so

22   I don't think we need to fight about anything.

23        But I do think there's kind of some extraneous stuff.

24   So I would ask that you take a look at it, if you could trim

25   some of that down.  I mean, it seems a little bit cumulative.

1    Like he tells you the story and then you repeat it back.

2            But I don't have a strong feeling.  If that's what

3    you want to spend your time on, I don't have a legal objection

4    to -- an evidentiary objection to that testimony up to 167.

5            MR. STANOCH:  I am fine to work with you separately

6    without bothering the special master on that, Ms. Lockard.

7            SPECIAL MASTER VANASKIE:  Fine.

8            MS. LOCKARD:  Okay.  And so was there something

9    designated after -- and with that in mind then, I would

10   withdraw the objection to 167:12.

11           SPECIAL MASTER VANASKIE:  All right.  So that

12   objection is withdrawn.  There will be at issue I guess a

13   continuing -- your designation, David, went to 168:24, I

14   thought.

15           MR. STANOCH:  That's what I said, Your Honor.  I was

16   just, for completeness, looking at the whole back-and-forth,

17   but I'll work with Ms. Lockard on that.

18           SPECIAL MASTER VANASKIE:  Okay.  You could end it at

19   167, line 15.

20           MR. STANOCH:  Yes, sir.

21           SPECIAL MASTER VANASKIE:  Okay.  Are we now at 169,

22   line 15?

23           MR. STANOCH:  I think so.

24           MS. LOCKARD:  I think so.

25           Okay.  So we have a hearsay objection to this part of

1  the testimony and this designation.

2          MR. STANOCH:  We'll withdraw it.

3          SPECIAL MASTER VANASKIE:  All right.  It's withdrawn.

4          MS. LOCKARD:  Okay.  So 169:15 to 170:6 is withdrawn.

5          SPECIAL MASTER VANASKIE:  Is withdrawn, yes.

6          MS. LOCKARD:  Okay.  Moving on.

7          Okay.  That takes us to page 185, line 5 to 8.

8          So this, our objection is Rule 602, lacks personal

9  knowledge and outside the scope of the 30(b)(6) topics,

10 because he does not -- he's not, as I said, part of the audit

11 team and he doesn't know -- he's not going to know what audits

12 were conducted of ZHP.  So I don't believe that he has the

13 personal knowledge to answer this question, so we object.

14         SPECIAL MASTER VANASKIE:  David?

15         MR. STANOCH:  This is simply a situation, Your Honor,

16 where the answer that they -- he doesn't know is the probative

17 point, that the procurement officer in charge of buying

18 valsartan API and 30(b)(6) procurement person doesn't know

19 what the audit team is doing of ZHP.  They should be working

20 hand in hand.  That's what we're trying to show here.

21         SPECIAL MASTER VANASKIE:  All right.  I will allow

22 it.

23         MS. LOCKARD:  So that takes us to 193.

24         So we object to this designation based on relevance,

25 prejudice and calls for speculation.

1          So the issue with this is -- so this is a discussion

2    after -- hold on a second.  Let me get my document.

3          This is a discussion after the recall.  And what is

4    being discussed in the document is, okay, well, if we can't

5    use ZHP, we need to find a new API supplier.  And they

6    reference what's known as a BI index, which lists current

7    prices at the time.

8          So at the time of this email, which was post-recall

9    in 2018, they're quoting what the current pricing is

10   post-recall in 2018.

11         And I find that to be prejudicial and not relevant

12   because it has no bearing on what the prices were or the

13   competitiveness of the prices for the drugs that are actually

14   at issue that were sold prior to recall and recalled.  So just

15   finding prices, a document that lists prices of what's

16   available later in 2018 is not relevant, is misleading and is

17   prejudicial.

18         SPECIAL MASTER VANASKIE:  All right.  David?

19         MR. STANOCH:  Your Honor, that timeline is incorrect.

20   Teva did not initiate its recalls till I believe July 27th of

21   2018.  The emails are all dated June 28, 2018.

22         While they may have put a hold on product that they

23   were selling themselves, Teva product remained in the market

24   and was being sold at this time.  And in fact, the email

25   string begins all the way down earlier in June as well.

 1          So the fact -- even assuming that Ms. Lockard is

 2     correct that post-recall pricing is not relevant, which I

 3     disagree with, this is all happening in June, when -- before

 4     Teva has announced its recalls.  And it's showing that -- and

 5     it's also showing almost contemporaneously, you know, before

 6     the issues, that ZHP product was markedly cheaper than what

 7     else was in the market pre-recalls.

 8          MS. LOCKARD:  So June 28th -- maybe I should restate.

 9          The recall had not happened on June 28th, and counsel

10     is correct about that, so I stand corrected.  But the issue

11     had been discovered, the hold had been put on.

12          The point is not when was it recalled, when did they

13     know.  But the point is that this is just far later in time

14     than when the pricing negotiations took place for the API.

15          So it doesn't suggest what they want it to suggest,

16     which is they're trying to argue that Teva was using the

17     lowest cost API supplier.  And that doesn't show this.  It

18     shows that ZHP was the lowest cost provider on -- in June of

19     2018 when the events were coming to light.  But what's

20     relevant is what was the competitive pricing at the time that

21     ZHP and Teva struck its deal.

22          So this -- this 2018 pricing, whether it's June 1st

23     or June 28th, it just doesn't have any bearing on what they

24     actually paid for the API at issue and whether it was in fact

25     then the cheapest supplier.

```
 1            MR. STANOCH:  And, Your Honor --

 2            SPECIAL MASTER VANASKIE:  I think it's relevant.  You

 3    know, you can disprove that point, but I think it's relevant

 4    to prove the plaintiffs' point, and so I will allow it.

 5            MS. LOCKARD:  Okay.

 6            SPECIAL MASTER VANASKIE:  Are we at page 207 now?

 7            MS. LOCKARD:  Correct.

 8            Okay.  So 207, so the objection primarily is

 9    cumulative.  This question was asked again in the next

10    section, and it's a series of questions.  It's repetitive.

11            And so if he -- if counsel wants to designate 209 --

12    I think 207 should come out, because it's entirely cumulative

13    and repetitive.

14            MR. STANOCH:  Your Honor, I'll simply say I'm asking

15    this witness about an email, right, that he was writing about

16    the ZHP valsartan.  And the questioning for this designation

17    and the next one go back and forth based on the witness's

18    answers.  And it's not cumulative in that he's sort of

19    shuffling around about what he does or does not focus on the

20    email.  So naturally I refocus him when we have to.

21            There's nothing -- and if you read it, I don't think

22    it's -- certainly not unreasonably cumulative.  We're talking

23    about, you know, a few more lines.  And I disagree that it's

24    cumulative.

25            SPECIAL MASTER VANASKIE:  Yeah.  I will allow it and
```

1    overrule the objection.

2            Now we go to page 209, line 4.  And it goes down to

3    212, line 3.

4            MS. LOCKARD:  So -- yeah.  So we made another

5    cumulative objection here because they do ask the same --

6    almost the exact same question again.  And what he's sort of

7    going over again and again is this question number 2 in the

8    email.

9            But I think, you know, if Your Honor thinks it's not

10   harmful to have him repeat that question, then the cumulative

11   objection I think is going to be overruled.

12           There is an objection, I'd ask that my objection on

13   the record be taken out of this designation, lines 20 to 21.

14           SPECIAL MASTER VANASKIE:  Asked and answered, yeah.

15   That should be removed.

16           MR. STANOCH:  Of course.

17           Counsel, can you tell me that line so I can write

18   that down?

19           MS. LOCKARD:  It's line 20 to 21.

20           MR. STANOCH:  Of page?

21           SPECIAL MASTER VANASKIE:  On page 209.

22           MS. LOCKARD:  Yeah, on page 209.

23           MR. STANOCH:  Will do.  Apologies, everyone.

24           MS. LOCKARD:  I'm sure it was just an oversight.

25           Okay.  So that brings us to 212.

```
 1              So I had an objection as to cumulative on the chart,
 2    but I'll withdraw that.  I think that was my mix-up, that was
 3    supposed to be on the prior line.
 4              But my objection is as to page 215, lines 11 to 17.
 5    And it's a Rule 602 objection, personal knowledge and
 6    speculation.
 7              SPECIAL MASTER VANASKIE:  Yes.  I'm inclined to
 8    sustain that objection.
 9              MR. STANOCH:  This is, I'm sorry, 215:11 --
10              SPECIAL MASTER VANASKIE:  215, I think it would be
11    lines 10 through 17.
12              MR. STANOCH:  I mean, the -- it's funny, Your Honor,
13    because this is the witness simply going on in his answer.
14    Right?  I mean, there is no real question prior to that.  It's
15    an "mm-hmm" which was picked up from me, and it's really his
16    answer to the prior question.
17              You know, we've heard any number of designation
18    battles where our side was being chastised for trying to cut
19    off an answer, and now Ms. Lockard is cutting off her own
20    witness's answer halfway through.
21              And it really gives the entire -- again, recall, Your
22    Honor, this also goes to demeanor and presentation.  And the
23    jury can -- should be able to see the entire answer and
24    vacillation of this witness when he's answering the question
25    from the prior page.
```

1          MS. LOCKARD:  So I don't agree that he's vacillating.

2     I think he's just rambling.

3          SPECIAL MASTER VANASKIE:  He's rambling and he's

4     speculating.  And that's the point.

5          MR. STANOCH:  But that's his answer.

6          I mean, there's plenty of times I think they're

7     speculating other ways when they say things like, oh, nobody

8     in the industry knew, but that's the answer that's been

9     allowed most of the time in this process, Your Honor.

10          And here he is fidgeting through an answer and trying

11     to sugarcoat something that he just said.  I think it's

12     appropriate.  I mean, it's not -- it's not prejudicial.  It's

13     his answer.  It was unobjected to.

14          I'm not sure even what the objection is.

15          MS. LOCKARD:  Well, there wasn't a question on the

16     record, and that's why I didn't object to it.  But I don't

17     know that this is really part of his answer other than just

18     kind of thinking out loud about -- speculating on what ZHP was

19     thinking or why they would or would not do something.  This is

20     not helpful to the jury, and it's confusing as well.

21          SPECIAL MASTER VANASKIE:  Yeah.  I don't see this as

22     helpful at all, so I'll sustain the objection.

23          Lines 10 through 17 on page 215 will be out.

24          I think we're up to page 238 now.

25          MR. STANOCH:  Yes, sir.

```
 1            MS. LOCKARD:  Right.

 2            SPECIAL MASTER VANASKIE:  This is a

 3   counter-designation, 238:4 to 13?

 4            MS. LOCKARD:  That is not, I don't believe.  I

 5   believe that's plaintiffs' designation.

 6            So I don't have a strict objection to this

 7   introduction of the email, these couple of questions about

 8   this is an email to you and others and how it starts.  So

 9   maybe we don't even need to spend time on that.

10            But my objection really pertains to the subject of

11   the email and the testimony about that, which starts on

12   page 239, line 15.

13            SPECIAL MASTER VANASKIE:  All right.  So page 238,

14   lines 4 through 13 stay in.

15            MS. LOCKARD:  Okay.

16            SPECIAL MASTER VANASKIE:  Unless I sustain the

17   objection on page 239.  So let's talk about that.

18            MS. LOCKARD:  Yeah.  Because it won't be needed if

19   you sustain the objection.

20            So this is discussion about an email where -- just to

21   lay the framework on the timeline, so initially ZHP had told

22   Teva that the issue with the nitrosamines was due to the

23   process change and that prior to the process change, that the

24   old ZHP API was not impacted by the nitrosamine issue.

25            All of the product in the US at issue in this lawsuit
```

1    for Teva was made under the new process.

2         But Teva globally was getting supply from ZHP in

3    other countries, in Belarus, in Liberia, Lithuania.

4         And so this email and part of the discussion, the

5    email is Teva realizes, well, now the old API is also

6    impacted, do we have product on the market involving the old

7    API.  And the emails say, yes, we actually still have some

8    from Lithuania, Belarus and these other countries.

9         And there is an MIL on this with regard to non-US

10   Teva product.  And the Court has ruled that Teva product

11   involving API and valsartan sold in other countries is not

12   admissible in this case.

13        So we think this falls within it, within that motion

14   in limine.  We think it's irrelevant and it's prejudicial.

15   And that's our objection.

16        SPECIAL MASTER VANASKIE:  All right.  David?

17        MR. STANOCH:  Your Honor, this is about what ZHP is

18   telling Teva.  Right?  It's saying that ZHP told Teva the

19   issue is only with the new process and then it turns out that

20   that's wrong.  It's also the old process.

21        And Teva initially had its ANDA approved for the old

22   process API.  We're not trying to -- we're not trying to argue

23   anything about what's going on in Belarus or Russia.  If you

24   read it, read what this testimony is, it's what ZHP, a party

25   opponent, told Teva, another party opponent.

1          MS. LOCKARD:  But it's misleading because it suggests

2     that we do have product in the US that was still on the market

3     that was impacted.  And the email -- and the subsequent

4     discussion in the deposition makes clear that it's not.

5          So it's totally irrelevant.  And it's a side track

6     from what was actually going on.

7          I don't have a problem with testimony or evidence

8     that ZHP had told Teva initially that the old process wasn't

9     involved, and I think there may be some designations on that.

10         I don't have a problem with what ZHP told, but I have

11    a problem with testimony that suggests that Teva still has

12    impacted product on the market in the US, because they didn't.

13    And that's going to lead the jury to think that we did.  And

14    that's a very important factor when you're talking about

15    claims like fraud or consumer protection.

16         SPECIAL MASTER VANASKIE:  All right.  I'm going to

17    sustain the objection at page 239, line 13 and exclude that

18    which appears on lines 15 through 24 on page 239 and lines 1

19    through 5 on page 240.

20         MR. STANOCH:  That's fine.  I understand, Your Honor.

21         SPECIAL MASTER VANASKIE:  And I believe that then

22    requires the elimination of the counter-designation at

23    page 238, lines 4 through 13.  All right?

24         MR. STANOCH:  Okay.

25         MS. LOCKARD:  That takes us to 249, line 17.  And I

 1  have a relevance objection to everything after line --

 2  page 252, line 6.

 3         Wait.  That doesn't match up, does it?

 4         MR. STANOCH:  No, it doesn't.  No.

 5         SPECIAL MASTER VANASKIE:  No.  It's 249, line 17, to

 6  page 250, line 14, I think.

 7         MS. LOCKARD:  Sorry.  I think that what I was trying

 8  to say, not very well, is that I thought everything after

 9  page 250, line 6 should be struck.  And I made a relevance

10  objection, but it's just sort of like off the record, I need a

11  break.

12         SPECIAL MASTER VANASKIE:  Yeah.  That should be

13  stricken.

14         MS. LOCKARD:  Hopefully that's not an issue.

15         MR. STANOCH:  Okay.  No, yeah.  That's of course

16  fine.

17         So 250:7 through 10, yes, that's agreed, out.

18         MS. LOCKARD:  Okay.  So then we get to page 257,

19  line 19.

20         So we have a hearsay objection as to the Bloomberg

21  article and the references and quotations from the Bloomberg

22  article, as well as a relevance and prejudice objection.

23         Essentially what he's doing right here is Mr. Nassall

24  said that the way that he found out about the FDA inspection

25  and adverse findings at ZHP was that he saw sort of a

1    damning Bloomberg press article.  And then counsel is asking

2    him about that.  And there's quotations in the Bloomberg

3    article which may or may not be quoting from the FDA report.

4    It's hard to tell.

5         But I don't think that counsel should be -- or excuse

6    me -- that the witness should be testifying about what's in a

7    Bloomberg news article.

8         SPECIAL MASTER VANASKIE:  David?

9         MR. STANOCH:  Your Honor, this is classic

10   non-hearsay.  We're not trying to prove the truth of the

11   matter asserted for the Bloomberg article to establish that a

12   FDA May 2017 inspection happened.  The effect on the listener

13   is that Mr. Nassall had a present sense impression of reading

14   it, and then what was the effect on him?  He turned around and

15   followed up with ZHP.  That's all this is showing.

16        SPECIAL MASTER VANASKIE:  Yeah.  But it's showing

17   much more than that.  I mean, my initial read of it was it was

18   classic hearsay.  It's -- you're quoting the article.

19        MR. STANOCH:  We're not seeking to admit the article,

20   Judge.

21        SPECIAL MASTER VANASKIE:  And the finding that ZHP

22   ignored quality testing that showed unnamed drugs didn't meet

23   US standards according to an agency report posted online on

24   Thursday.  And then it further says:  The company didn't look

25   into the failures and instead passing results were recorded,

1    according to the report.

2            I find all of that highly prejudicial.  It seems to

3    me to be classic hearsay.  Maybe you're not admitting it to

4    prove the truth of the matter asserted.

5            For what purpose are you using it?

6            MR. STANOCH:  It was showing the -- if Your Honor

7    wants us to take out the portions of the testimony where I

8    read part of the article to him, which would be 258:8 to 23, I

9    am happy to do that.

10           Before and after that, it's simply, again, the effect

11   on the listener, right, the reader, Mr. Nassall, he read

12   something.  Whether or not it was true or not, it caused him

13   to react and reach out to ZHP.

14           And it's important to show that he didn't know about

15   this inspection.  And it was a public news story -- whether

16   true or false, it spurred him to do this, it spurred him to do

17   that.

18           And I'm happy to take out, like I said, 258:8 through

19   23 where I quote in part the article.

20           SPECIAL MASTER VANASKIE:  Victoria?

21           MS. LOCKARD:  Well, my response is the question from

22   the get-go, it asks about -- this is you emailing ZHP a cutout

23   from a Bloomberg press release.  So I don't know how we excise

24   that.

25           But the point of introducing this is not to show

*United States District Court*

 1   present state of mind of Mr. Nassall.  I mean, there's -- I
 2   don't know what relevance that has, that he learned of this
 3   FDA inspection.  I mean, there's no question that Teva did
 4   learn after the fact when it hit the press that there was an
 5   FDA inspection.  I mean, that's just not disputed.
 6          So what's really going on here is they want to get
 7   reference to that there was some bad news in the press about
 8   ZHP, kind of blasting them on this issue.
 9          SPECIAL MASTER VANASKIE:  I'm going to sustain the
10   objection, and we'll exclude page 257, lines 19 through 258,
11   line 23.
12          And that takes us to 259, line 20.
13          MS. LOCKARD:  So 259, line 20, our objection is a
14   602, personal knowledge, speculation objection.  This is
15   really asking about the responsibilities of Teva quality,
16   which is outside of this witness's role in procurement.
17          And he doesn't know if Teva quality keeps track of
18   regulatory inspections.  I mean, the fact of the matter is
19   Teva quality, they ask ZHP when they do audits for their
20   regulatory history.  But this is suggesting that quality is
21   supposed to, you know, independently keep track somehow.  I'm
22   not really sure what the point is.
23          But he doesn't know this.  He doesn't know what Teva
24   quality does to, quote, keep track of the inspections.  This
25   was asked of Mr. Vadsola and Pan Lin in the audit designations

1    about what they knew or didn't know.  It was asked about Dan

2    Barreto, who we're bringing live.  So I don't think this is

3    within his purview in procurement.

4            MR. STANOCH:  Your Honor, may I?

5            SPECIAL MASTER VANASKIE:  Yes.  Absolutely, David.

6            MR. STANOCH:  Your Honor, he answers the question.

7    He doesn't say I don't know.  Right?  He says, the quality

8    department should be the one, yes.

9            And the whole point of this questioning is Teva --

10   and other evidence will come in, but this is a piece of what

11   we need to show, Your Honor.

12           Teva didn't know and never asked ZHP prior to after

13   the recall about a 2017 FDA inspection.  And quality -- and no

14   one in quality is going to be able to say they knew about it

15   or did anything about it.  Right?

16           We saw this with Pan Lin, where, you know, he said he

17   didn't have the report.  He didn't have it with him when he

18   did the audit a few months later.

19           And now this is establishing that the only way anyone

20   at Teva knew about it was this person, Mr. Nassall in

21   procurement, asked ZHP directly and said, could you give us an

22   unredacted copy, that the first time Teva said we want an

23   unredacted copy of a 2017 FDA inspection report is when he,

24   Mr. Nassall, in August 2018 asked for it.

25           And I think it's certainly probative and important

1    for us to be able to show that the quality people didn't have

2    it and didn't ask about it.  The procurement people

3    acknowledge -- he says, unqualifiably, they should be the one,

4    yes.  And then he says, well, I actually was the one who asked

5    for the unredacted report finally in August 2018.

6         MS. LOCKARD:  That is -- that is an argument that

7    plaintiffs intend to make which we say is belied by the actual

8    evidence in the case to say quality didn't know about this,

9    didn't ask about it.  That -- we'll address that later.

10        None of that goes to this designation.  This

11   designation is asking about whether quality keeps track or

12   kept track or do you believe that they should keep track.

13        And then his response is, quality department should

14   be the one to do it.

15        I mean, he doesn't know.  He's not in quality.  He

16   doesn't know what quality does.

17        They made their point with Pan Lin about Pan Lin,

18   whether he knew about it or not.  This doesn't even talk about

19   what quality didn't know about this or quality didn't ask for

20   it, or we're the only ones in procurement who did.  That's an

21   argument.

22        But this question and answer is not appropriate.  If

23   they want to challenge quality for not doing the right thing

24   or asking about it, then they need to ask quality, which they

25   did.

```
 1            MR. STANOCH:  Again, Ms. Lockard -- I'm sorry, Judge,
 2   I don't want to go back and forth too much.
 3            Ms. Lockard is having a counterfactual world of what
 4   Mr. Nassall knew or didn't know.  He answers the question, he
 5   knows.  He says quality is the one who is supposed to be doing
 6   this.  I'm doing this now, though.
 7            How can this be outside of personal knowledge or,
 8   frankly, the 30(b)(6) about Teva procurement, right?  He's
 9   saying quality should be asking about these things.  He knows
10   that.  He works with these people.  It's part of the process
11   and procedures of what's going on, of who does what, and he's
12   doing something that some other person should have done a year
13   earlier.  That's relevant.
14            MS. LOCKARD:  Well, there's a pause, which leads me
15   to believe I have to spin up all of my time.
16            But I would just say that that's not what the witness
17   says.  He's not saying that quality didn't do it and they
18   should have and that I was the first one to do it, so --
19            SPECIAL MASTER VANASKIE:  Yeah.  I will allow it just
20   for the content of the testimony.
21            I think each side reads something into the testimony
22   that may not be there.  But I think it's relevant and will
23   allow it.
24            MS. LOCKARD:  That brings us to 260 --
25            SPECIAL MASTER VANASKIE:  I think that covers us
```

 1  through 260:2 to 21.

 2          MR. STANOCH:  I would agree.

 3          MS. LOCKARD:  Yeah.  I'm just looking through that.

 4  I think you're correct.

 5          SPECIAL MASTER VANASKIE:  Okay.  So I have us now at

 6  266, line 20 through 267, line 4.

 7          MS. LOCKARD:  So we had an objection as to 602,

 8  personal knowledge and what the audit team saw.  I think to

 9  move this along, if you're letting in the prior, I think your

10  rationale probably applies to this as well.

11          SPECIAL MASTER VANASKIE:  It does.  And so that's

12  overruled and that comes in.

13          Now I have us at page 312, lines 21 to 313, line 7.

14          MS. LOCKARD:  Yes.  So this is, again, the 408

15  argument, our 408 objection related to the offer of settlement

16  and resolution of the indemnity claims.

17          SPECIAL MASTER VANASKIE:  Yeah.  I think it's covered

18  by that, and I would sustain the objection.

19          MR. STANOCH:  I was going to say, Judge, based on

20  your prior objection, certainly the -- I'll stand on my

21  position, but I understand for the last two designations, I

22  think the one designation at 312:21 through 7 is ever so

23  slightly different because it's simply that ZHP was giving a

24  refund to Teva for unused valsartan API.  That goes to damages

25  and the value and worthlessness of the product, but I'm

1  understanding a sustain for the ensuing --

2          SPECIAL MASTER VANASKIE:  As part of the settlement

3  agreement.

4          MS. LOCKARD:  Yeah.  I mean, his answer specifically

5  says I'd have to take a look at the settlement agreement.  So

6  I don't think you can get the question in without the answer,

7  which --

8          MR. STANOCH:  Well, he says yes, but -- right?  He

9  says, if I recall correctly, then yes.  This is what they

10 offered.  And probably it would make any further questions

11 easier if we look at the settlement.

12         I mean, if you want to say stop at "yes."

13         MS. LOCKARD:  Yeah.  I mean, our objection would

14 stand, because I think that's the off -- I mean, it's the

15 offer to compromise, which is also excluded.

16         SPECIAL MASTER VANASKIE:  Yeah, no.  I'll sustain the

17 objection.

18         MS. LOCKARD:  So that covers the 312:21 to 313:6 and

19 the 314:17.

20         MR. STANOCH:  I have the same thing, Counsel.

21         SPECIAL MASTER VANASKIE:  Yeah.

22         MS. LOCKARD:  Okay.  So that's it.

23         SPECIAL MASTER VANASKIE:  So this concludes

24 Mr. Nassall?

25         MR. STANOCH:  Yes, Judge.

```
 1            SPECIAL MASTER VANASKIE:  Let's see.

 2            Go ahead, Victoria.

 3            MS. LOCKARD:  Oh.  I was just going to say, you know,

 4   the only caveat is that we're trying to -- we had sent

 5   affirmatives on our witnesses to plaintiffs, and our

 6   affirmatives really will be cut down based on what your

 7   rulings are on these.  So my next objective is to get through

 8   finalizing those.  And if we have disputes, we may have to

 9   bring those up with the Court.

10            But given that we have the benefit of your rulings,

11   I'm hoping we can apply your logic and rationale and reach

12   agreement on most of those.

13            But that does conclude for today Nassall.

14            So we have Stefan Karlsson.

15            SPECIAL MASTER VANASKIE:  Right.  And I see, Daniel,

16   you're back now.

17            And we have just a few designations I believe,

18   Daniel, for Torrent witnesses.

19            MR. NIGH:  That's right.  I don't think we have more

20   than 10, 15 minutes.

21            SPECIAL MASTER VANASKIE:  So we'll give Victoria and

22   David a 15-minute break here, and we'll take up -- are you

23   okay to continue, Ann Marie?

24            COURT REPORTER:  Yes.

25            SPECIAL MASTER VANASKIE:  We'll take up the Torrent
```

1   witness -- I'm going to get to it here in a second.

2         Paras Sheth, is that who it is?  Or do I have the

3   names backwards?

4         MR. NIGH:  That's correct, Your Honor.

5         SPECIAL MASTER VANASKIE:  All right.  And my notes

6   indicate that the first objection is at page 125.

7         MR. RAE:  Yeah.  That's what I have too.

8         SPECIAL MASTER VANASKIE:  Yeah.  And I have to say,

9   this was one of those witnesses who didn't know anything, it

10  appears.

11        MR. RAE:  And, Your Honor, that's exactly right.  And

12  that's -- well, with respect to this topic that he is being

13  asked about, that is exactly right.  And that's really the

14  basis of our objection, that this is a witness, Paras Sheth,

15  who works in procurement for Torrent.  He's responsible for

16  things like handling the relationship with the vendor,

17  handling the logistics, handling kind of pricing and

18  coordination of deliveries, stuff like that.

19        He's not the person who is responsible for the

20  quality department tasks that relate to supervising an API

21  vendor from a quality perspective, validating them, auditing

22  them, all of those things.  There are people who are

23  responsible for that.  We've seen testimony from these people.

24        Mr. Sheth is not one of those people.  And so asking

25  him questions about his understanding of Torrent's

```
 1    responsibilities with relation to things like validation of

 2    vendors for API is more prejudicial than probative, because

 3    his lack of knowledge doesn't prove anything.  There are other

 4    people -- that's not his responsibility.  There are other

 5    people at Torrent who are responsible for it who are witnesses

 6    in this case.

 7            SPECIAL MASTER VANASKIE:  Daniel?

 8            MR. NIGH:  Your Honor, I actually think this one's

 9    relevant.  I think it's relevant for a number of reasons.

10    This is -- he is the general manager of procurement.  So his

11    role is, when it comes to procurement, he is the person

12    responsible.  And we lay it out at the end.  It's laid out at

13    the end too.  He talks about it at the very end of the

14    deposition as well.

15            He's responsible for obtaining the supplies that they

16    need in order to make their finished dose product.  And so

17    that includes procuring the API from ZHP.  Specifically he is

18    the contact person with ZHP, and he is the person who is also

19    handling negotiations with ZHP.

20            So when we talk about logistics, well, one of those

21    things is price.  And there's going to be a lot of information

22    here in this trial that's going to be related to price.  And

23    so to the extent that the defendants have put in pricing and

24    value and what sort of value there might be, that goes to this

25    issue.
```

 1              And so the other part of it is there are certain

 2    questions that are asked about validation and things of that

 3    nature that nobody can speak to.  I wish that we had some more

 4    answers from somebody like Jaiswal, but he doesn't know some

 5    of these issues either.  So because of that, that's why we

 6    have to have multiple parts of the chain, because they say the

 7    quality people are supposed to be the people that know, but

 8    there are some of these questions that Jaiswal didn't know

 9    either.  And so we have to show that Jaiswal doesn't know and

10    the person who is having the direct contact with the customer

11    or the direct contact with the API supplier also doesn't know.

12              MR. RAE:  Your Honor, just two brief responses there.

13              I don't think it's accurate to say that Dr. Jaiswal

14    doesn't know about vendor validation processes or what was

15    done with respect to validation of ZHP as an API supplier.  I

16    don't think that testimony exists, and I don't think --

17    frankly, I don't even think these questions were asked of

18    Dr. Jaiswal, who is the person they should have been asked of,

19    both in his 30(b)(6) capacity and in his personal capacity.

20              But separate from that, Mr. Nigh wove in discussions

21    of pricing issues into the conversation about our objections

22    to questions about validation.

23              I'm pretty sure we do not object to any questions

24    that may have been asked or any testimony that may have been

25    designating asking Mr. Sheth about pricing issues related to

 1    procurement.

 2         There's no disagreement here that that would be

 3    within the scope of Mr. Sheth's responsibilities and that it

 4    would be appropriate to ask him those questions.  But that's

 5    not the objection that we're talking about here.  That's not

 6    the questioning we're talking about here.

 7         We're not making a blanket objection to Mr. Sheth's

 8    relevance as a witness, although I think it's pretty limited.

 9    We're making an objection to a handful of questions that have

10    been asked of him about areas of responsibility that are

11    outside the scope of his job responsibilities and outside the

12    scope of his personal knowledge, where plaintiffs want to

13    prejudicially play testimony to the jury showing that someone

14    at Torrent doesn't know about those things to create the

15    misimpression that these are things that no one at Torrent

16    knows about when that's simply not the case --

17         MR. NIGH:  Your Honor, if I may, because there's a

18    big difference between what -- I'm not saying Jaiswal doesn't

19    understand a validation process.  Okay.  And he doesn't

20    understand USP Pharmacopeia guidelines.

21         But there are specifics within these questions that

22    Jaiswal doesn't know about a ZHP API supplier.  There are

23    things that he doesn't know that are related to the 2017 audit

24    that happened of ZHP.  There are things that he doesn't know

25    related to ZHP in the 2018 inspection that happened on

1    August 3rd where they could and should have known, but he

2    doesn't know.  So we need to make sure that the person that

3    has contact with ZHP doesn't know these various issues as

4    well.

5            And that's why the questions are broad at first,

6    because the answer is broadly he doesn't have any idea.  So

7    he's not going to know the specifics either.  But that's why

8    it becomes relevant.

9            SPECIAL MASTER VANASKIE:  Well, I think they're

10    relevant inquiries.  The answers don't reveal anything, but

11    that's the point, I take it.  So I will overrule the

12    objections and allow the testimony to be played for the jury.

13            And I think that covers everything for Mr. Sheth.

14            MR. RAE:  Your Honor, if I can look through briefly.

15            I think we have some objections at page 145 and 146

16    that are not fully covered by that ruling you just made.

17            SPECIAL MASTER VANASKIE:  Okay.  Let's look at them.

18            There are objections from 143, line 24, to 146:6.  So

19    there may be some particular questions that we need to drill

20    into.

21            MR. RAE:  Your Honor, this question at 145:24 to

22    146:6 I think really drills into the impropriety and the

23    prejudicial nature of this line of questioning in general, but

24    it's also very clearly an improper opinion question being

25    asked of Mr. Sheth given the scope of his knowledge.

1          The question is whether or not he believes a certain

2     annual quality review provision of the quality agreement would

3     be beneficial to Torrent.

4          And, again, the quality oversight of ZHP is not part

5     of Mr. Sheth's job description.  It's not part of his

6     responsibilities.  He testifies clearly to that fact in his

7     deposition.

8          The quality department at Torrent oversees the

9     implementation of the quality agreement and the supervision of

10    an API vendor.  And so Mr. Sheth properly answers that he has

11    no idea about this, but that testimony is both improper

12    opinion -- it's an improper opinion question of a witness who

13    has no specialization or expertise in answering this sort of

14    question to provide an opinion on this.  And it's unduly

15    prejudicial, because, again, it's leaving the jury with the

16    impression that Torrent doesn't have any idea of these issues

17    when it's just that the person at Torrent who is not

18    responsible for this doesn't have any idea.

19          SPECIAL MASTER VANASKIE:  Daniel?

20          MR. NIGH:  Your Honor, this is still this same broad

21    objection.  There's a lot of ways in which, you know,

22    something like this can be relevant.  One is, you know, the

23    person who is having the direct contact, who is negotiating

24    the pricing, who is procuring the API, doesn't have any idea

25    about any of these issues?  That in and of itself is a

1  problem, because, you know, to the extent that he's the front

2  person having these conversations with ZHP on negotiation of

3  pricing and various issues, you know, that's one issue.

4        The other thing is he's copied.  He's cc'd on all

5  these emails.  Like, we showed that earlier in the testimony.

6  So it's like you're being given this information, but you have

7  no idea what any of it means.  What's the point of being cc'd

8  on all the emails?

9        So there's a lot of reasons as to why this could be,

10  you know -- and we didn't drill in to -- we didn't ask a ton

11  of questions to try to make this prejudicial because

12  we just -- in fact, there's questions above that that list all

13  the different things that would be in there.  We left that

14  part out because broadly he doesn't know about it.

15        So we just cut to the chase, and that's what this is.

16  It's a cut to the chase and he just doesn't know.

17        MR. RAE:  And, Your Honor, again --

18        SPECIAL MASTER VANASKIE:  Go ahead.

19        MR. RAE:  -- I think this is different because it's

20  asking an opinion question.  But I think everything that

21  Mr. Nigh said is kind of highlighting why this entire line of

22  testimony and questioning is unduly prejudicial.  And there

23  are other aspects of Mr. Sheth's deposition that were

24  designated that we're not objecting to.

25        There's lots of question and answer in this that

1    they've designated that we have no objection to because they

2    relate to topics that Mr. Sheth actually performed at his job,

3    but this kind of why would someone be copied on an email if

4    it's not relevant, I mean, that's the nature of email

5    communication in the modern business world.  All the time

6    people are copied on emails that are tangentially related to

7    their job responsibilities, they don't actually relate to

8    things that they know.  And there's no reason -- whether or

9    not these lines of questioning are relevant, there's no reason

10   to be proclaiming this to the jury except to create a

11   misimpression about the overall state of knowledge at Torrent.

12          And if plaintiffs want to probe into whether or not

13   the people who were responsible for validating API suppliers,

14   the people who were responsible for reviewing quality

15   agreements and implementing them and knew or were doing their

16   jobs, that's part of what this case is about.  But asking

17   these questions about a -- from a procurement person whose job

18   was not to do this is not appropriate.  And it's simply

19   designed to confuse and mislead the jury by making the jury

20   think that someone who doesn't know anything about this issue

21   answering they don't know is somehow information that should

22   be weighing into the jury's consideration of the ultimate

23   questions in this case.  It's not.

24          MR. NIGH:  Your Honor, it's highly, highly probative

25   because just the fact of the matter itself that the person who

1    is the front man, the only thing that he can talk to with this

2    API supplier -- this is the general manager of procurement.

3    This is the person who's been at the company for a long, long

4    time, that that person can only speak in business terms and

5    cannot speak in safety issues at all.

6         And so that already becomes a problem, because the

7    only person that can speak to safety issues, he has to go back

8    to somebody like Jaiswal to get the information and pass it on

9    to the API supplier.  That in and of itself is relevant.

10        MR. RAE:  Your Honor, frankly, it's not, but it's

11   actually -- to the extent it is relevant, it's probative of

12   the reasons why plaintiffs' argument ultimately shouldn't

13   succeed in this case, which is maintaining those sorts of

14   clean lines between business decision-making and

15   businesspeople and quality review and quality decisions is a

16   core function of the pharmaceutical industry.  You don't want

17   your businesspeople considering quality issues, and you don't

18   want your quality people considering business issues.  You

19   want to maintain separation, because quality decisions should

20   not be made in light of business concerns.

21        SPECIAL MASTER VANASKIE:  All right.  I've heard

22   enough.  I've heard enough.  I've heard enough.

23        I'm going to sustain the objection to the question at

24   page 145, line 24 through 146, line 6 because it's asking this

25   witness for an opinion, you know, why do you believe that this

1    information would be beneficial.

2         I'm objecting -- I'm finding fault with the question

3    itself but not with the lines of inquiry otherwise covered

4    during our discussion today.

5         So that will come out, but everything else stays in.

6    All right?

7         And that concludes Mr. Sheth, I believe. ]

8         MR. RAE:  Yes.  Just to be clear for Your Honor, Your

9    Honor is saying that the same decision as to the general

10   propriety of this line of questioning is going to hold for the

11   testimony from 154:11 to 156:11?

12        SPECIAL MASTER VANASKIE:  Let me take a look at that,

13   because I didn't have that down.

14        154 -- so 154, line 13 are you saying?

15        MR. RAE:  There's a question at 154:17 to 154:22, and

16   then there's two questions that run from page 155:19 to

17   156:11.

18        MR. NIGH:  These seem to be -- they're not asking an

19   opinion.

20        SPECIAL MASTER VANASKIE:  These are not opinion

21   questions.

22        So the question -- I'm sorry, I missed these.

23        The question at 154, line 17, have you seen other

24   documents like this related to quality or risk for the

25   manufacturer of drugs?

1            And the answer was no.

2            There's an objection.

3            And what's the basis for the objection?

4            MR. RAE:  Your Honor, I think the question here is

5    vague, but I'd be willing to withdraw our objection to this

6    question.

7            SPECIAL MASTER VANASKIE:  All right.  That's

8    withdrawn.

9            What's your next objection?

10           MR. RAE:  At 155:19 to -- there's two questions and

11   answers here, but through 156:11.

12           SPECIAL MASTER VANASKIE:  This was, did you have a

13   particular strategy that you utilized?

14           MR. RAE:  Yes.  And, Your Honor, I think the issue

15   here is, in part, a vagueness issue with respect to the way

16   the question is framed, which is why there's a form objection,

17   which is "particular strategy" is an incredibly vague

18   question, and I think it's why the witness struggles to answer

19   the question.

20           And in fact -- and this is an affirmative designation

21   which we're not getting into right now.

22           But the question and answer that immediately follows

23   this line of questioning on page 156, there's a question that

24   is a little bit more grounded and is not vague.  And the

25   witness does provide an answer about the approach to

1    procurement of API that's used, which is that in the witness's

2    words, if the product is made for the United States, we have

3    to buy the API from valid DMF holders.  So basically it's US

4    DMF holders and site has to be approved by the US FDA.  That's

5    kind of the process and the predicate.  That's the real answer

6    to these questions.

7        The vague questions that precede it that we're

8    objecting to, we're objecting to because they're eliciting no

9    answers I think because the questions are vague and confusing

10   and the witness doesn't really understand what he's being

11   asked to provide testimony on.

12       MR. NIGH:  Your Honor, his answers aren't vague.

13   They're definitive.  Do you have a strategy?  No.  I mean,

14   that's not vague.  If he said, I don't know, I'm not sure what

15   you mean by that, you know, maybe we did, maybe we didn't,

16   those would be vague answers.  His answer is definitive:  No.

17       MR. RAE:  Your Honor, that's why the focus needs to

18   be on the vagueness of the question.  Because witnesses all

19   the time give answers that, like, aren't perfectly framed from

20   the perspective of saying I don't understand the question or

21   the question is unclear, can you clarify it.  A perfect

22   witness would do that.  But sometimes witnesses answer kind of

23   "I don't know" or "no" when they get a vague or confusing

24   question.

25       SPECIAL MASTER VANASKIE:  I will sustain the

1    objection to the question on page 155, starting at line 19.

2    And that carries over to 156, line 3.

3            MR. NIGH:  And then the second question is in?

4            SPECIAL MASTER VANASKIE:  I'll sustain the objection

5    to the second question as well on page 156.

6            MR. NIGH:  Your Honor, it's the last one -- I'm

7    sorry, I didn't mean to interrupt you.

8            SPECIAL MASTER VANASKIE:  Go ahead.

9            MR. NIGH:  The first one I thought maybe there's, in

10   the form itself, a particular strategy, but that's why the

11   second question is a better question than the first one.  It's

12   objected to form, that's why it's reasked, and says, is there

13   any general strategy, any strategy?  And he says:  No.

14           So that covers the broad array of strategies.  There

15   are absolutely strategies for purchasing things.  He could

16   have said, we do this, we do that, we look for this, we want

17   to make sure that we're purchasing product that's the highest

18   quality, you know.  A lot of different -- strategy is a

19   keyword in marketing function.  And he comes back and he says

20   no.

21           So generally they have no strategy.  I think that's

22   relevant, and it's probative.

23           SPECIAL MASTER VANASKIE:  How is it relevant?

24           MR. NIGH:  It's relevant in terms of the API that

25   they're purchasing, you know, that -- that ultimately in this

1    case, that's what's contaminated.

2            So if you have a strategy as to how you're going to

3    go out in terms of your purchase and procurement of API.  So,

4    for example, we want to purchase the quality -- we want to

5    purchase API that's -- or use the ingredients that are of the

6    utmost quality, and that's your strategy.  Okay?  Well, then,

7    if that's the case, you're going to have a lower likelihood of

8    having problems like we had here.

9            Do they have a strategy to do anything of that

10   nature?  No.

11           MR. RAE:  Your Honor, I think that explanation is

12   precisely why we also have a 403 objection here, because as

13   you can see in the next question and answer that I referred to

14   earlier, there is an approach.

15           It does have concern -- like, it is necessary and

16   Torrent is aware of its obligations and Torrent is fulfilling

17   its obligations to make sure that its API suppliers have gone

18   through the proper FDA process, have a DMF that the FDA has

19   accepted, have been inspected by the FDA, and then they have

20   subsequent processes after they identify someone to verify

21   that they meet Torrent's quality standards.

22           SPECIAL MASTER VANASKIE:  I'm going to sustain the

23   objection to the question as unduly vague.

24           I think you do cover the matter in your next question

25   starting on page 156, line 13.

 1          I take it's that's been designated.

 2          MR. NIGH:  It has not.

 3          SPECIAL MASTER VANASKIE:  It has not been?

 4          MR. NIGH:  No.

 5          MR. RAE:  It's been designated by Torrent

 6   affirmatively.  It has not been designated by plaintiffs.

 7          SPECIAL MASTER VANASKIE:  Are there any other issues

 8   with respect to Mr. Sheth's testimony?

 9          MR. NIGH:  No, that's all.  But just to be clear, the

10   designation affirmative means that that would be something

11   that the defendants would --

12          SPECIAL MASTER VANASKIE:  I understand.  I understand

13   what it means.  I understand what it means.

14          MR. RAE:  For the record, if plaintiffs want to

15   designate that question, Torrent would have no objection to

16   designating that question and answer as a replacement for the

17   ones where Your Honor has sustained our objection.

18          SPECIAL MASTER VANASKIE:  Yes.  And let me make it

19   clear that I have sustained the objection to the form.  I do

20   think it is unduly vague.  Had you followed up with a question

21   like that which appears on page 156, line 13, that would have

22   been fine.

23          But that concludes Mr. Sheth's deposition.

24          MR. NIGH:  Thank you, Your Honor.

25          SPECIAL MASTER VANASKIE:  Let's give Ann Marie a

 1    break.  We'll resume at 3:45.

 2           (Recess at 3:28 p.m.  until 3:45 p.m.)

 3           SPECIAL MASTER VANASKIE:  Mr. Karlsson we're talking

 4    about now, right?

 5           MS. LOCKARD:  Karlsson.

 6           SPECIAL MASTER VANASKIE:  Let me get up his testimony

 7    and designations.

 8           Okay.  I think we're ready to go.

 9           MS. LOCKARD:  Okay.  So first --

10           SPECIAL MASTER VANASKIE:  Hold on.  We're back on the

11    record, and we're going to be addressing the designations for

12    Stefan Karlsson.

13           And Victoria, go ahead.

14           MS. LOCKARD:  Okay.  I'm trying to get us through it.

15    Thank you, Judge.

16           So the first one is page 84, line 9.  And so our

17    objection is foundation, relevance and 403, because it's

18    misleading and confusing.

19           Just to lay the groundwork for this, so this is a

20    witness who was in procurement, like our last witness, but the

21    difference is this particular witness works in the research

22    and development procurement for the European side of things.

23    So he was not directly involved in procurement with ZHP for

24    procuring the API at issue in the US, which is at issue in

25    this case.

 1              He did have interactions with ZHP based on

 2    discussions related to procurement for products that were in

 3    development, not marketed, in the European sector.

 4              So the way this starts off, we believe it's

 5    confusing, because it just launches into when did you first

 6    interact with ZHP, and it leads the jury to believe that this

 7    is in relation to the API at issue in this case when it isn't.

 8              So we propose --

 9              SPECIAL MASTER VANASKIE:  You have

10    counter-designations?

11              MS. LOCKARD:  Yes, yes.  We had proposed some

12    counter-designations to kind of line that up so it makes clear

13    what his role was and why he was communicating with ZHP.

14              SPECIAL MASTER VANASKIE:  What is improper about the

15    counter-designations, David?

16              MR. STANOCH:  First of all, Your Honor, none of the

17    four or so pages they want to counter-designate has anything

18    to do with the question.  The question is, when did you first

19    start interacting with ZHP as a potential API supplier?

20    That's it.  Did he know ZHP from a certain time.

21              There's other issues where it comes up later and they

22    want to inject that he only did certain things for certain

23    departments with Europe, which we will disagree with, and

24    we'll get to that.  But adding in all these other things gives

25    the counter-misimpression, right, that he has no idea about

```
 1   anything going on with ZHP when we're talking about the same

 2   API that was going to the Europe and from the Teva Malta

 3   facility to the US.  I don't want to argue that now.  But we

 4   don't think it's necessary to have page upon page about him

 5   talking about R&D or Iceland when the question simply is, when

 6   did you know ZHP.

 7          And, frankly, if that's the issue, I'll just take

 8   out -- I'll just withdraw it.

 9          SPECIAL MASTER VANASKIE:  All right.  You'll withdraw

10   84:9 to 84:19?

11          MR. STANOCH:  Yes.

12          SPECIAL MASTER VANASKIE:  And then we can withdraw

13   your counter-designation, I take it, Victoria; is that

14   correct?

15          MS. LOCKARD:  Yes, that's correct.

16          SPECIAL MASTER VANASKIE:  All right.  So they're out.

17          Let's go to page 125, line 17 to 126, line 21.

18          And you have an objection based on speculation,

19   foundation?

20          MS. LOCKARD:  Yes.  So this --

21          SPECIAL MASTER VANASKIE:  Go ahead.

22          MS. LOCKARD:  This one cuts off before the end of the

23   question and doesn't include the following answer.

24          MR. STANOCH:  I think it does, Counsel.  The

25   spreadsheet says 125:17, which is a question beginning:  Okay.
```

1    Let's talk a little bit about.

2            And then it goes through 126:21, which is the end of

3    the answer on the following page.

4            SPECIAL MASTER VANASKIE:  Yes.

5            MS. LOCKARD:  See, I think that this was a holdover

6    objection from the prior spreadsheet before it was updated.

7    Let me look real quick, make sure.

8            MR. STANOCH:  Sure.

9            MS. LOCKARD:  Yes.  Okay.  So we can withdraw that

10   objection.

11           SPECIAL MASTER VANASKIE:  Okay.  So that's in.

12           MS. LOCKARD:  Okay.  So the next page, 128.

13           So this objection, this gets into a line of questions

14   about the timing of when he discovered or heard about the

15   issue with nitrosamines.  And we have a counter here to make

16   clear the first notice that was provided about the issue did

17   not mention nitrosamines.  It said an unknown genotoxic

18   impurity.

19           And so our counter at 134 just clarifies that the

20   first notice did not include the identification of the

21   chemical compound or nitrosamine.

22           SPECIAL MASTER VANASKIE:  David?

23           MR. STANOCH:  I don't think the counter is really

24   necessary.  The designation simply is orienting the witness,

25   right, to the email, which is the 22nd.  Right?  Which

```
 1   actually is the date of the second notice, I believe, that was

 2   sent.  Right?

 3          And he says, yeah, it's around that time about the

 4   nitrosamine contamination.

 5          And then pages later, the counter is talking -- he

 6   says, the first time it might have been just -- the initial

 7   notification was genotoxic impurity.  That's not the question.

 8   I'm asking about a document from June 22nd that talks about

 9   the second notification when it said nitrosamine.

10          So I'm not sure how it's clarifying to add something

11   about a different notice that wasn't part of the question.

12          MS. LOCKARD:  But it's misleading, and it's factually

13   inaccurate.  The first notice was on the 20th, and it did not

14   mention nitrosamines.  The second notice on the 22nd did

15   disclose nitrosamines.

16          MR. STANOCH:  Right.  And the question is:  The first

17   time you heard about nitrosamine contamination, right?

18          MS. LOCKARD:  Was on -- sorry.

19          MR. STANOCH:  No, go ahead.

20          Judge, I don't want to fight about counters.  If you

21   want to add the counter, I'll not fight the counter.

22          MS. LOCKARD:  Yeah, I mean, because it says June

23   20th, so it's accurate just to include.

24          MR. STANOCH:  I'm happy to move it along.

25          SPECIAL MASTER VANASKIE:  You're putting in your
```

1    counter to the counter?

2            MS. LOCKARD:  No.  Our counter to his.

3            SPECIAL MASTER VANASKIE:  The response would be 135:8

4    to 13.

5            MS. LOCKARD:  I don't -- no.  I think he's just

6    saying that he will agree to our counter of 134:23 to 135:7;

7    is that correct?

8            MR. STANOCH:  That's right.  But what the judge is

9    referring to is the spreadsheet said that we would have a

10   contingent counter then of 135:8 through 13.  I think that's

11   what the judge is looking at.

12           SPECIAL MASTER VANASKIE:  That's what I'm trying to

13   get to.

14           MS. LOCKARD:  I see, okay.

15           MR. STANOCH:  And in fact, maybe it should in

16   fairness go through 135:18, just to round it out.

17           MS. LOCKARD:  So it would be 135:8 --

18           SPECIAL MASTER VANASKIE:  8 to 18.

19           MR. STANOCH:  8 to 18.  That's probably fairer,

20   honestly.  Just because he kind of says I'm not sure, and then

21   I clarify, and he says yeah later, yeah.  So that way it's

22   clear.

23           MS. LOCKARD:  Okay.

24           SPECIAL MASTER VANASKIE:  So that will come in

25   through 135, line 18.

*United States District Court*

```
 1              MR. STANOCH:  Yes, Judge.

 2              SPECIAL MASTER VANASKIE:  Now we're at page 139.

 3              MS. LOCKARD:  So 139:8 -- so this is a discussion

 4    that I think bears on the general causation issue before Judge

 5    Bumb.

 6              But essentially the next few designations relate to

 7    Mr. Stanoch asking the witness about his knowledge of, you

 8    know, the toxicology, the carcinogenicity of NDMA.

 9              And Mr. Karlsson's only knowledge, remembering he's

10    in procurement, he's not on the toxicology side.  But his only

11    knowledge is that he looked all of this up on a Wikipedia

12    page.  And so these questions, I think, you know, it's going

13    to be governed by what Judge Bumb says.

14              But as a general objection, I don't think this is

15    within his personal knowledge.  He's not a toxicologist, he

16    wasn't a 30(b)(6) witness, and he wasn't disclosed on these

17    issues.  So his understanding about the toxicology of NDMA

18    that he got off of Wikipedia I don't think should be the

19    subject of jury evidence.

20              MR. STANOCH:  May I?

21              SPECIAL MASTER VANASKIE:  You may.

22              MR. STANOCH:  Thank you, Judge.

23              Putting aside whatever Judge Bumb does next week for

24    sure, I think it's perfectly permissible for me to ask a

25    witness who said in a business record email, I looked up NDMA,
```

*United States District Court*

1  here's the link to the page I read.  And then I say, did you

2  gather from the link X.  And he says, I can't remember.  And

3  then I follow up and I say, well, do you remember if NDMA can

4  do Y.  He goes, oh, I'm not a toxicologist, I don't remember.

5       Again, my questions aren't about expert testimony.

6  I'm saying what did you learn or remember doing, because you

7  said, I looked at this and shared it with my colleagues.  And

8  I'm saying, okay.  So what did you -- what did you learn when

9  you looked at it.  That's it.  He says, I don't remember, I

10 don't remember, I don't know, I don't remember.

11      Which those are his answers, Judge.  But we're

12 allowed to play that to a jury, that -- nothing against

13 Mr. Karlsson, maybe he was worried, maybe he was coached and

14 prepared very well.  He was very, very, very nervous the

15 entire time of the questioning, procurement guy maybe, when

16 I'm asking about these contemporaneous emails that he wrote.

17 And I'm simply asking him, what do you personally remember.

18 He goes, oh, I'm not sure, I don't remember, I don't remember.

19      SPECIAL MASTER VANASKIE:  He didn't remember

20 anything.

21      MR. STANOCH:  That's right.  And I think it's

22 certainly allowable for the jury to hear that someone who is

23 on the ground level of this issue -- and this will come out

24 later.  Even though he's procurement, he was being asked by

25 bosses to look into this issue.  And he himself took it upon

1   himself and figured things out on the internet in five minutes

2   that Teva quality didn't do for another week-and-a-half.  And

3   we think that's probative.

4          And then to have that same witness who did all these

5   things very quickly -- and I even say at some point, you were

6   diligent, Mr. Karlsson, right, to try to help put him at ease.

7   For him then to say, oh, I don't know, I don't remember, I

8   don't remember, I don't remember, that's something the jury

9   can consider and weigh in terms of the credibility when they

10  look at a document and say, here's somebody who acted really

11  fast at the time.  He was a crackerjack doing all this stuff,

12  and now all of a sudden he doesn't remember a single thing.

13         That would be permissible in any trial.  That's not

14  outside his personal knowledge.  I'm trying to establish his

15  personal knowledge.  If he remembered something, he could

16  testify to it.  He says he doesn't remember.  Just because

17  that's his answer does not mean it's inadmissible.

18         SPECIAL MASTER VANASKIE:  I will allow it.

19         I think that takes us through 141:11.

20         MR. STANOCH:  I think that's right, Judge.

21         SPECIAL MASTER VANASKIE:  And now we go to 146.

22         MS. LOCKARD:  I mean, I just -- before we get there,

23  I mean, there are certain references in some of these that

24  are -- aside from him not having personal knowledge, I mean,

25  there are questions that are inflammatory and prejudicial in

 1   here.

 2          And this may go to Judge Bumb, but, I mean, for

 3   example, at line -- at page 140:17.

 4          SPECIAL MASTER VANASKIE:  I'm there.

 5          MS. LOCKARD:  And he's asking him, can you recollect

 6   whether you learned that NDMA can be used as a poison?

 7          I mean, that's just prejudicial, inflammatory.

 8   There's no reference -- there's no discussion of poison.  I

 9   mean, it just comes out of nowhere.  It --

10          SPECIAL MASTER VANASKIE:  That's a good point.  What

11   about that?

12          MR. STANOCH:  Judge, none of this is coming out of

13   nowhere.  This is coming out of the link that he said he

14   looked at and adopted in his email business record, and he's

15   saying he didn't remember all these things.

16          MS. LOCKARD:  But if you're getting into what's in

17   the Wikipedia -- and I don't know if Wikipedia says it's

18   poison -- but that would be hearsay.

19          MR. STANOCH:  Again, I'm not trying to prove it's a

20   poison or not.  He looked at something and then he did

21   something based on what he looked at, whether it was true or

22   not.

23          SPECIAL MASTER VANASKIE:  I'm going to sustain the

24   objection to the question on page 140, line 20 through 22 and

25   the answer on page 141, lines 1 and 2.  And I'm doing it on

1    the basis of Rule 403.  The danger of unfair prejudice

2    substantially outweighs its probative value.

3           Are we up to page 146 now?

4           MS. LOCKARD:  Yes.  I just -- the only other thing I

5    just want to make sure --

6           SPECIAL MASTER VANASKIE:  Go ahead.

7           MS. LOCKARD:  -- that we're all in agreement that

8    this is also subject to Judge Bumb's ruling with respect to

9    these questions like, you know, you understand that it could

10   be toxic to certain human organs, things like that.

11          THE COURT:  Yes, it's subject to that ruling.

12          MS. LOCKARD:  Okay.  Human carcinogen and that kind

13   of language.

14          SPECIAL MASTER VANASKIE:  Yes.

15          MS. LOCKARD:  I think that brings us to page --

16          SPECIAL MASTER VANASKIE:  I have it at 146.

17          MS. LOCKARD:  That's where I am.  Okay.

18          So our objection starts at 146, line 17 through 147,

19   line 3.

20          I guess, again, this is a toxic and known carcinogen

21   issue.

22          SPECIAL MASTER VANASKIE:  David?

23          MR. STANOCH:  I'm sorry, we're looking at 146:23?

24          MS. LOCKARD:  I think 146:10 -- page 146, line 10,

25   that designation I think falls into the same bucket of Judge

 1   Bumb, so I think we can move on to 147.

 2           MR. STANOCH:  So there's nothing else other than

 3   Judge Bumb on 146:10 through 147:3?

 4           MS. LOCKARD:  Correct.

 5           MR. STANOCH:  Okay.  What about your counter?

 6           SPECIAL MASTER VANASKIE:  This is the counter at page

 7   150?

 8           MR. STANOCH:  That's what I was referring to, Judge.

 9           MS. LOCKARD:  Yeah, I think that is going to be

10   contingent on whether or not -- well, if it comes in, then we

11   want the counter.  So I think it's contingent on Judge Bumb's

12   ruling, because it's him basically explaining, well, I'm not a

13   toxicologist, this was an early stage, so forth.  So...

14           MR. STANOCH:  If you want to defer, Judge, that's

15   fine.

16           SPECIAL MASTER VANASKIE:  No.  I mean, I would allow

17   the counter as well.

18           But if the original designation doesn't come in, the

19   counter doesn't come in.

20           MS. LOCKARD:  Okay.

21           SPECIAL MASTER VANASKIE:  Hold on.

22           Now we have a counter -- contingent counter --

23           MR. STANOCH:  Yes, sir.

24           SPECIAL MASTER VANASKIE:  -- at 153:24.

25           MR. STANOCH:  Correct, through 156:9 minus

 1    intervening objections.

 2           MS. LOCKARD:  So I believe 153:24 is already

 3    designated.

 4           SPECIAL MASTER VANASKIE:  Let me look down there.

 5           MS. LOCKARD:  I mean, on the one we didn't have an

 6    objection to it.

 7           MR. STANOCH:  If that's true, then I apologize.

 8           SPECIAL MASTER VANASKIE:  Yes, that's already

 9    designated.

10           MR. STANOCH:  Okay.  My apologies.

11           MS. LOCKARD:  Yes.  So I think that's not an issue.

12    Okay.

13           MR. STANOCH:  So I guess 147:6 is where we go,

14    everyone?

15           SPECIAL MASTER VANASKIE:  That's what I have.

16           MS. LOCKARD:  It's late in the day.

17           I think it's the same issue with respect to our

18    objection on personal knowledge and then the general causation

19    issue.  Because it's getting to the research and you

20    discovered that it was toxic and a known human carcinogen.  So

21    I think this falls into the same bucket.

22           MR. STANOCH:  I would agree it is subject to whatever

23    is going to happen on general causation.  I don't think any

24    other objections are well taken.

25           But I don't want to bicker about it if the Judge

 1    doesn't want to focus on it right now.

 2            SPECIAL MASTER VANASKIE:  Yes, let's wait on the

 3    general causation issue, and we may have to address it later.

 4            MS. LOCKARD:  Yeah.

 5            SPECIAL MASTER VANASKIE:  I was just going to say for

 6    now it's deferred.

 7            MS. LOCKARD:  We don't waive any of the objections.

 8    I mean, the issues all pretty much relate to general

 9    causation.  I mean, we also said it was cumulative.  But

10    assuming we get some guidance from the Court on general

11    causation, I think we'll be able to work that out.

12            So 147:19.

13            MR. STANOCH:  I think we go to 152.  I don't want to

14    rush anyone, but I think we get to 152:9.

15            MS. LOCKARD:  Let me make sure.

16            Yep.  148.

17            148:22 we had an objection as it's argumentative.

18            "Do you make a habit of sending inaccurate emails?"

19    We would object to that as harassing and argumentative.

20            MR. STANOCH:  Should I address, Your Honor?

21            SPECIAL MASTER VANASKIE:  Go ahead.

22            MR. STANOCH:  The prior questions were all about an

23    email Mr. Karlsson wrote.

24            And then I simply asked him:  At the time you wrote

25    it, did you believe it was accurate?

```
 1              He says he can't remember.  He can't remember if what
 2    he wrote was true or false.
 3              So I follow up:  Sir, do you make a habit of sending
 4    inaccurate emails?
 5              I don't think so.
 6              I'm simply following up on his fact that he's saying
 7    he can't remember whether he tells the truth or not.
 8              SPECIAL MASTER VANASKIE:  If that happened at trial,
 9    I'd sustain the objection.  I'll sustain it as argumentative.
10              MS. LOCKARD:  And that would go to his answer at
11    149:5 as well, I believe.
12              MR. STANOCH:  Uh-huh.
13              SPECIAL MASTER VANASKIE:  149 through line 6.
14              MR. STANOCH:  I agree.
15              MS. LOCKARD:  Okay.  So 152.  We had an objection
16    starting at 152:16.
17              So our position is the whole line of questioning is
18    wholly irrelevant.  The first question is about a product that
19    was in the development phase.  It wasn't cleared to market.
20    It wasn't intended for the US.  And it's not at issue in this
21    litigation.  So 152:16 to 20 we believe is irrelevant,
22    prejudicial and should come out.
23              We have an ongoing objection to the general cause
24    issues and the references to toxic and carcinogenic.
25              And then I have the question about met with ZHP in
```

 1  China about it is misleading and confusing and prejudicial.

 2  He did not have a meeting with -- in China with ZHP about this

 3  issue.  He had a five-minute conversation at a conference he

 4  was incidentally attending where this was discussed.  So

 5  there's no testimony, no foundation that there was a meeting

 6  about this issue, and that's what it leads to believe -- leads

 7  the jury to believe.  He was at the same conference as the

 8  prior witness where they're there among the industry, and he

 9  asked a few questions about it, but it wasn't a meeting.

10        I also have an objection based on 602, personal

11  knowledge, regarding when Teva reported to FDA, which covers

12  lines 155:15 to 21 and his next objection.

13        MR. STANOCH:  Judge, confess, I can't follow what

14  Ms. Lockard is doing.  She's rattling off different objections

15  to different questions and different answers.  I'm having a

16  very hard time following what just happened.

17        SPECIAL MASTER VANASKIE:  I know.  Let's slow down.

18        We're only going to go to 5:00 today, probably 5 of

19  5:00.  We won't go beyond that.  If we don't finish today, we

20  don't finish today.  That's the way it is.

21        I don't want you to rush.  And I want to try to get

22  this as correctly as possible.

23        So let's back up.  We're on page 152, lines 9 to 21.

24        MS. LOCKARD:  Okay.  So we can take this one at a

25  time.  And I don't mean to rattle, but -- I mean, this is a

 1   very long designation.  It wasn't clipped into short pieces.

 2   It goes for three pages.

 3           SPECIAL MASTER VANASKIE:  Right.

 4           MS. LOCKARD:  So that's why there's numerous

 5   objections.

 6           SPECIAL MASTER VANASKIE:  Gotcha.

 7           MS. LOCKARD:  We'll take one at a time.

 8           The first objection starts at page 152, line 16, and

 9   that's a relevance objection.

10           And the basis for the objection is that he's talking

11   about unrelated products, products that were in the

12   development phase, that were not marketed, that were not

13   cleared to market, that were intended for the European market

14   and is not at issue in this case.

15           And Judge Bumb has ruled with our motion in limine

16   that products that are meant in other markets, not in the US,

17   not at issue in this case, that testimony or evidence should

18   be excluded.

19           SPECIAL MASTER VANASKIE:  All right.  David?

20           MR. STANOCH:  Your Honor, this ruling about other

21   products has been so contorted.

22           If you look just from the prior -- the prior page,

23   and what this is talking about is he's saying he shared

24   information about NDMA or a potential impurity with his R&D

25   colleagues, right, because they're developing a triple combo

1    valsartan product potentially with the ZHP API that ZHP is

2    saying is contaminated.

3            And all I'm asking him here, right, is that it would

4    be important for his R&D colleagues, who is developing a

5    valsartan product, to know that the valsartan API from ZHP

6    that they're talking about using for that is contaminated.

7    Right?  That is the product at issue.

8            The valsartan API is what we're talking about.  He's

9    saying this valsartan API has an issue.  I, Stefan Karlsson,

10   think it's important.  I better tell everyone who is looking

11   at the valsartan API.  Why?  Because it has significant

12   quality and use impacts.

13           I'm not trying to prove something about, oh, and yes,

14   this triple combo product sold in the Czech Republic actually

15   tested for NDMA.  That's nothing about this at all.  This is

16   all about his understanding that the valsartan API had an

17   issue and he's talking internally and going -- trying to do

18   everything he can to alert his colleagues who might be

19   involved with it that this valsartan API from ZHP has an

20   issue.

21           And all this question is, if it's contaminated,

22   that's important.

23           And he says:  I shared the information we had at the

24   time.  People were working through the issue.  Et cetera, et

25   cetera.

1          MS. LOCKARD:  So he's in R&D in Europe talking about

2     a product that's not at issue in this litigation.  And we're

3     going to have to spend time to explain what was this whole

4     other product, what was going on in Europe, and it doesn't

5     have anything to do with the investigation that quality is

6     conducting involving the product at issue in this case.

7          So, of course, this was a huge issue industry-wide,

8     industry-wide.  This was a big deal, so of course other people

9     in the company were talking about it, whether it impacted them

10    or not; but that doesn't mean that it's relevant to the issues

11    in this case.  It's not probative of anything.

12         I mean, he was looking into it for R&D purposes.

13    Quality was looking into it for quality purposes related to

14    the actual product at issue in the litigation.

15         So it's just confusing.

16         MR. STANOCH:  The only thing I would say, Your Honor,

17    is that he is being quicker and more diligent, we will argue

18    and show with evidence, about this issue from his perspective

19    than his counterparts in quality.  And that's probative to

20    Teva's quality oversight and handling of the news about the

21    NDMA contamination.

22         MS. LOCKARD:  Well, we disagree.  We don't think it's

23    probative of the quality.

24         MR. STANOCH:  We know -- you disagree with every

25    designation I have, I understand.

*United States District Court*

 1              MS. LOCKARD:  That's not true.  In fact, I withdrew

 2    several, several objections.  And there were many that I

 3    didn't object to.  So let's be fair about this.  I don't think

 4    anything --

 5              SPECIAL MASTER VANASKIE:  There's no objection to

 6    153, line 12 to 154, line 8?

 7              MS. LOCKARD:  No objection to that, correct.

 8              SPECIAL MASTER VANASKIE:  I'm trying to parse this.

 9              So I would allow the question at 152, line 16, along

10    with the answer that concludes at 153, line 10.

11              MR. STANOCH:  Okay.

12              SPECIAL MASTER VANASKIE:  I would allow the question

13    at 153, line 12 with the answer that concludes at line 23 of

14    that page.

15              And that goes to 154, line 8.  There's no objection

16    to that.

17              MS. LOCKARD:  Agree.

18              MR. STANOCH:  Understand.

19              SPECIAL MASTER VANASKIE:  Now, you do have an

20    objection to the question at 154, line 9.

21              MS. LOCKARD:  Correct.  I think it's inaccurate and

22    misstates the prior testimony.

23              MR. STANOCH:  Your Honor, before I heard -- I think

24    this was when Ms. Lockard was trying to argue what the word

25    "meeting" means, and that's obviously -- you know, it's

1   qualitative and for a jury to decide whether he had a meeting

2   or not.  And that's not even what this says.  Right?

3          At 154:9, you met with ZHP in person, albeit

4   briefly -- I qualify it -- as you said, in China about it.

5   Right?

6          Answer:  Yeah.

7          I don't see what is misleading about that exchange.

8          MS. LOCKARD:  You know, just to show that I can be

9   agreeable, I'll withdraw that objection to that part.

10         SPECIAL MASTER VANASKIE:  All right.

11         MS. LOCKARD:  I don't think it's critical.

12         So the remainder objection, the remaining objection

13  is to the section at page 155, lines 15 through 156:1.

14         And the objection there is lack of personal

15  knowledge.  He's not -- as I said, he's in procurement.  He's

16  not in the regulatory department that knows anything about

17  reporting to FDA.  He doesn't even sit in the United States.

18  He's not involved in regulatory.  He's not on the quality

19  team.  He's in R&D procurement.  This is far beyond his

20  personal knowledge as to when Teva reported to the FDA or why

21  they reported what they did or why they didn't report earlier.

22         SPECIAL MASTER VANASKIE:  David?

23         MR. STANOCH:  I will simply say, Your Honor, that

24  we've seen up until this point that he was personally

25  responsible in multiple direct communications with ZHP and

1    Teva about the issues cross-functionally, not just from an R&D

2    perspective, not just from a procurement perspective.  There's

3    other emails that are not objected to and other testimony with

4    all manner of folks throughout the company.  He's talking

5    about this.  So someone who just talked about a timeline of

6    what's happening June 20, 21, 22, right.  And then I simply --

7    and we saw the emails.  And I simply ask him, do you know

8    something.  And he goes, I can't comment on it.

9          That is his personal knowledge, he can't comment.

10   And then I follow up, because you weren't responsible for

11   telling the FDA.  And he says, no, that's right.

12         So, again, this goes to he was able to do a number of

13   things quickly and arguably diligently that others at Teva

14   were not doing, and we should be permitted to juxtapose that

15   against what this person is doing at Teva when the other

16   quality people who should be doing it are not.

17         SPECIAL MASTER VANASKIE:  I will allow it.

18         MS. LOCKARD:  Okay.  The only remaining objection to

19   that section or that long designation relates to the general

20   cause issue and references to toxicity, so I think we're done

21   with that designation.

22         SPECIAL MASTER VANASKIE:  Okay.

23         MS. LOCKARD:  I mean, the next -- so the next -- the

24   very next designation is the next question, which Mr. Stanoch

25   just raised.

 1          I mean, I will just say that I heard Mr. Stanoch, and
 2   it's a wild misrepresentation about what this witness's role
 3   was.  You know, he did get involved from an R&D perspective
 4   and started asking questions, but it was not his
 5   responsibility to deal with the FDA or to be involved in the
 6   quality investigation on this issue.  So we would stand by our
 7   objection on this one as well.
 8          SPECIAL MASTER VANASKIE:  All right.  Very well.
 9          MR. STANOCH:  And I think it's the same issue.  And
10   I'll just state for the record, I vehemently disagree that I'm
11   wildly misrepresenting anything.
12          In fact, the testimony makes clear later that the
13   global head of -- executive vice president of R&D specifically
14   taxed Mr. Karlsson to follow up on issues about NDMA.
15          So I'll leave it at that.
16          MS. LOCKARD:  So 157, line 6, again, do you know why
17   if the ZHP API impurity was known as early as June 20th, why
18   FDA's field alert -- Teva's field alert wasn't submitted until
19   July 3rd?
20          Again, I mean, this is -- plaintiffs deposed the
21   people, and they had a 30(b)(6) witness on regulatory
22   communications with the FDA.  That's the witness who should be
23   addressing this.  Asking an R&D European procurement person
24   about why US regulatory functions were not reporting or when
25   they were reporting should not be the subject of this

1  witness's testimony.

2          SPECIAL MASTER VANASKIE:  That's what the witness

3  testified to, right?

4          MS. LOCKARD:  Yeah.  He lacks personal knowledge.  He

5  says he has nothing to do with this, he doesn't know anything

6  about this.  So it's 602.

7          SPECIAL MASTER VANASKIE:  David?

8          Did we lose David?

9          MR. STANOCH:  How about now?

10          SPECIAL MASTER VANASKIE:  Yes, now we can hear you.

11          MR. STANOCH:  My apologies to the madam court

12  reporter and the Court.

13          I was simply saying this is just like the last

14  designation which Your Honor allowed.  I'm asking this

15  witness, a percipient knowledge, doing all these things in

16  realtime, about informing various people in the company about

17  the issues, asking him what his personal knowledge is.  And he

18  answers it.  And we should be allowed to present the evidence

19  of what this person, who is doing a lot of things on the

20  ground in realtime about it was doing, and what other people

21  at Teva were -- who should have been doing something were not

22  at the same time.

23          SPECIAL MASTER VANASKIE:  I agree.  I'll allow it.

24          MS. LOCKARD:  Okay.  I mean, just for the record, he

25  answers that he can't comment on it, that it would be handled

1  by the quality team, so...

2          SPECIAL MASTER VANASKIE:  Exactly, exactly.  That's

3  why I'm allowing it.

4          MS. LOCKARD:  I understand.  So he's made his point,

5  I guess.

6          SPECIAL MASTER VANASKIE:  I know you don't want the

7  question to be out there.  I understand that.  But I think

8  he's entitled to ask the question, and the witness gave an

9  answer.

10         MS. LOCKARD:  Okay.  Understood.  We can live with

11 that.  It's not detrimental.

12         Okay.  So 157:13.  Again, I mean, it's the same

13 issues, but now it's really getting to be argumentative and

14 cumulative.  So how many times is he going to ask about

15 reporting to FDA?  I mean, he's really beating the horse on

16 this one.  So it's -- in addition to the standing objections,

17 it's also cumulative and argumentative.

18         MR. STANOCH:  Again, Your Honor, this is direct --

19 direct follow-up on the question we just had.  And we're

20 asking him for his personal knowledge, and he answers and

21 that's it.  I don't see how this is -- I'm not badgering him.

22 I'm asking slightly different questions based on what he's

23 answering.  I don't see how it's different.

24         SPECIAL MASTER VANASKIE:  I will allow it.  It's

25 slightly different.  And it's consistent with the approach of

1  ask a question a million times, but I will allow it.

2      MS. LOCKARD:  So the next line is at page 158:7.  And

3  again, this is badgering, argumentative, harassing.  I mean,

4  he's established -- I think he's gotten on, you know, in the

5  evidence that Mr. Karlsson doesn't know, and now he's just

6  beating him up over it, which is unnecessary, and 403.

7      SPECIAL MASTER VANASKIE:  This is at 158:7 through --

8  10 through 12?

9      MS. LOCKARD:  Correct.

10     SPECIAL MASTER VANASKIE:  Yes, I'll sustain the

11  objection.  So that comes out.

12     MR. STANOCH:  I'm just putting down that that excerpt

13  except 158:10 through 12 is allowed.  So the question at

14  158:10 and 11 and the answer at 158:12 is out.

15     SPECIAL MASTER VANASKIE:  Right.  Correct.

16     MR. STANOCH:  Thank you.

17     I'm sorry to be so plodding with it, Judge, but I

18  just want to make sure our notes are right.

19     SPECIAL MASTER VANASKIE:  We want to make sure we get

20  it right.

21     MR. STANOCH:  Yes, sir.

22     SPECIAL MASTER VANASKIE:  158:20 to 22 is what I have

23  next.

24     MS. LOCKARD:  And I had in my notes that I had

25  actually withdrawn that one.  I didn't see that noted on your

1   spreadsheet, but we withdraw whatever objection is there.

2          MR. STANOCH:  If that was our typo in putting it

3   together for the Judge, we apologize.

4          MS. LOCKARD:  Could have been mine, I don't know, but

5   it's a non-issue, so...

6          Okay.  So 160 -- so this is a 407 and 403 objection,

7   and we also believe it should be excluded per the rationale of

8   Judge Bumb's ruling at the hearing on July 23rd.  This relates

9   to subsequent remedial measures, things that -- when

10  Mr. Karlsson just sort of for the record -- I mean, you

11  probably have picked this up.

12         So Mr. Karlsson is, you know, sort of taking this on

13  from his perspective, and he's -- you know, plaintiffs'

14  argument is going to be he's digging in but quality isn't.

15         But he is digging in, and to the point where he

16  starts suggesting things that Teva might do or should be doing

17  or should be changing as they move forward.

18         And we had a motion in limine on the issue of

19  subsequent remedial measures, and particularly some of

20  Mr. Karlsson's emails where he goes through a list of things

21  that he thinks should be changed, and the judge ruled that the

22  items, the measures that he recommended, were subsequent

23  remedial measures and should be excluded.

24         And that was at -- I'll just for the record state,

25  that was at page 45 --

1          SPECIAL MASTER VANASKIE:  Of the July 23rd

2    transcript, yep.

3          MS. LOCKARD:  Correct.  Right.

4          So we believe that the sections of this testimony

5    that are reading back what Mr. Karlsson's recommendations were

6    should be excluded based on the judge's ruling.

7          And that would include these questions like "might

8    also need to add a method to test the new impurity."

9          SPECIAL MASTER VANASKIE:  Yes, I agree.  This should

10   be sustained.

11         MS. LOCKARD:  So the next was similar at page 162,

12   line 1.

13         SPECIAL MASTER VANASKIE:  And for the same reason,

14   that would be sustained.

15         MS. LOCKARD:  And then 163 --

16         MR. STANOCH:  I'm sorry, can I catch up for a second

17   here, Judge?

18         SPECIAL MASTER VANASKIE:  Yes.  Sure.

19         MR. STANOCH:  Give me one second.

20         MS. LOCKARD:  Sorry, Dave.

21         MR. STANOCH:  No.  You're on a roll, Victoria, I

22   understand.

23         I'm not going to go backwards at this point, but,

24   Judge, the email that he's testifying to around 162, right, is

25   from ZHP regarding identification and explanation of the root

1    cause of the NDMA contamination.  So this is different than

2    the one email which is at the end of the transcript, which

3    we'll get to, which Teva did move on and there's a ruling from

4    Judge Bumb on.

5         This is a little different in that it's ZHP

6    responding to questions for a capital action plan to Teva

7    about what's actually going on.  And this is all from June of

8    2018.  Right?  So this is all happening at the same time about

9    the NDMA discoveries in June.  This is not, you know, three

10   years after the fact Mr. Karlsson saying, yeah, we should

11   start testing for X, we should start testing for Y.  This is

12   part and parcel of identifying what is wrong with the product

13   at issue.

14        It's not -- I think it's different in scope than the

15   email at the end of this transcript.

16        MS. LOCKARD:  We would disagree.  I don't think

17   there's any time requirement for subsequent remedial measures.

18   If there is a remedial measure that is recommended or adopted

19   in response to an incident, that's what the rule is for.  And

20   that's exactly what he's talking about here.

21        MR. STANOCH:  They're also not doing something, Your

22   Honor.  They're not testing something.  They're not doing

23   something.

24        And this might be an area where it may help us to

25   have the document.  I'm not trying to bombard Your Honor with

1   another document in addition to the two we talked about this

2   morning with Mr. Nassall.  But this is very targeted

3   questioning about a specific document from a specific time

4   period.  And it may be worthwhile for us to get that in front

5   of you.

6           SPECIAL MASTER VANASKIE:  Well, I'll make a ruling

7   now, and then you can get the document to me and we can see

8   whether that changes my ruling.

9           But right now I'll sustain the objection.  And this

10  goes through 160:4 through line 13.  And actually 160:4

11  through -- go all the way through 160:4?

12          MS. LOCKARD:  It goes through 160:4 --

13          SPECIAL MASTER VANASKIE:  I have 165, line 13.

14          MS. LOCKARD:  165:13.

15          MR. STANOCH:  I think that's right.

16          MS. LOCKARD:  I think that's right.

17          (Court reporter clarification.)

18          SPECIAL MASTER VANASKIE:  It's 160, line 4 through

19  165, line 13.

20          Anybody disagree with that?

21          MR. STANOCH:  I believe you're correct.

22          MS. LOCKARD:  I don't disagree.

23          SPECIAL MASTER VANASKIE:  All right.  Now we're going

24  to page 255?

25          MS. LOCKARD:  That's what I show.

 1          Okay.  So the objection as to this is based on

 2    relevance, 402 and 403.  And we also believe it's subject to a

 3    motion in limine related to motion in limine 11 related to the

 4    other products.

 5          This is the discussion between Mr. Karlsson and

 6    someone else in R&D, and she's asking in the first part of

 7    this designation, has someone looked into the formation of the

 8    carcinogen in other sartans' ROS or route of synthesis.

 9          So she's basically saying, okay, we've got this issue

10    with valsartan, has anybody looked at the other products.

11          And we think other products is off limits, it's

12    prejudicial, it's not relevant.  And that was similar to what

13    we were discussing before.

14          The issue here, though, is this is going to open up a

15    huge door to other products, because, keep in mind, the

16    nitrosamine issue impacted not just valsartan, not just other

17    sartans but the whole industry and other products that were

18    recalled subsequent to this.  I mean, defense's position is

19    the valsartan issue sort of turned on the light to this

20    impurity issue and nitrosamines.

21          So the line Judge Bumb has drawn is that we need to

22    stay focused on the valsartan at issue in this case.  And

23    there are other sartans, losartan, irbesartan, we also have a

24    stipulated agreement on a motion in limine in this case with

25    plaintiffs that we will not get into irbesartan and losartan.

 1          So the other products she's talking about here, we

 2    have stipulated agreement on that motion in limine.  And the

 3    only exception to it was the ZHP email related to irbesartan,

 4    which has been the subject of lots of motions and sanctions

 5    motions and so forth.  But that was the only carveout.

 6          And so they stipulated they wouldn't get into the

 7    other sartans, and here we are with the testimony asking about

 8    what's being done with other sartans.

 9          SPECIAL MASTER VANASKIE:  All right.  David?

10          MR. STANOCH:  No one is trying to prove anything

11    about olmesartan, candesartan, losartan, irbesartan, Judge.

12          This testimony is relevant as to two things.  One is

13    it goes back to my point earlier where Ms. Lockard is arguing,

14    oh, this is just an R&D guy from Iceland, he's not involved,

15    he doesn't know what he's talking about.  I'm paraphrasing.  I

16    don't mean that pejoratively.  But he's talking out of school.

17    He doesn't know what he's doing.

18          This is probative to the credibility of his earlier

19    testimony where he was a crackerjack doing all this research

20    and figuring things out himself very quickly, and this is now

21    the global head, right, of R&D for the entire Teva worldwide

22    is telling him, this man, Karlsson, who defendants are arguing

23    doesn't know what he's talking about, to follow up on all

24    these sartan issues and examine the routes of synthesis for

25    the formation of NDMA.  Right?

```
 1           So, number one, it's supportive and probative of the

 2  credibility of his earlier testimony which we designated.

 3  That's number one.

 4           Number two, at this same time, this is July of 2018,

 5  right, and they -- Teva tried to keep this out with Bumb, and

 6  she let it in for -- she let it in over their motion in

 7  limine, right, that Teva had released its hold of valsartan it

 8  was selling in the US for products that did not have valsartan

 9  API -- ZHP API.  Right?

10           And this -- so at this very time, they're selling

11  other valsartan in the US into the market.  And this is

12  showing that they released that hold and started doing it

13  again without having any real route of synthesis analysis.

14           And I know this doesn't prove that in itself, but it

15  goes with other evidence we have, which we're allowed to show,

16  that in terms of Teva's culpability and actions, not to prove

17  other valsartan was contaminated or losartan was contaminated,

18  but that its handling of this incident, that it put a hold on

19  everything but then it said, okay, all the other stuff is

20  fine, we're just going to recall the ZHP stuff, that that was

21  an inappropriate response to a quality issue, that they should

22  have taken the existing steps per their own SOPs, and this is

23  showing that.

24           SPECIAL MASTER VANASKIE:  So you're saying it goes to

25  punitive damages?
```

```
 1              MR. STANOCH:  It does.

 2              MS. LOCKARD:  So let me -- so let me address that, a

 3    couple of points there.

 4              One is Judge Bumb saying that we can -- that

 5    plaintiffs can offer the timeline that we released the hold

 6    doesn't have anything to do with this.  This is talking about

 7    investigation into products that are not at issue.  And just

 8    like Judge Bumb would not let plaintiffs ask questions of our

 9    quality witnesses about their investigation into irbesartan

10    and losartan, she would not let that.  Her rulings preclude

11    that.  The stipulation that we entered with plaintiffs

12    precludes getting into that.  The fact that they released hold

13    on other products, that's a totally separate issue.

14              So the fact that quality people can't be asked about

15    what investigation they were doing related to other products,

16    then the procurement guy in Iceland certainly should not be

17    allowed to get into that.  That's the first thing.

18              The second thing is, is this can't possibly go to

19    punitive damages, because the law on punitive damages is that

20    it needs to -- whatever the egregious culpable conduct is, it

21    has to relate to the injury to the plaintiffs.

22              Whether the R&D person in Europe is looking into

23    other sartans or not after the fact, after the recall has even

24    happened or after the disclosure has happened, that doesn't

25    have anything to do with the egregiousness of the conduct by
```

1    Teva prior to this that would have led to any injury to

2    plaintiff.

3         So we dispute the idea that this has anything to do

4    with punitive damages.  We believe that it is in violation of

5    Judge Bumb's orders.  We believe it violates the stipulation

6    among the parties.  And it is, again, going to be confusing,

7    and it's going to mislead the jury.

8         Again, we're not saying he doesn't know what he's

9    talking about.  He's a very good R&D person in Europe.  But

10   we're not -- he's not some crackerjack investigator because he

11   looked something up on Wikipedia and started asking some

12   questions.  That's not our position at all.

13        But what he's doing related to other products in

14   Europe that doesn't have anything to do with this case -- and

15   this is really expanding the points that this witness should

16   be talking about that are within his personal knowledge and

17   that he's qualified to talk about and that have anything to do

18   with this case.

19        SPECIAL MASTER VANASKIE:  Well, I agree with you,

20   Victoria.  And I think the objection should be sustained.

21        The problem I'm having is where do I draw the line,

22   or -- I had a note in my notes that said consider objecting to

23   entire inquiry through page 260, line 14.

24        But it goes beyond that, I take it.  I know it's hard

25   to follow.

```
 1            MS. LOCKARD:  Yes.  I'm just looking -- that's
 2   exactly -- yeah.  My notes say same as above.
 3            So I think I would agree that that -- our objections
 4   are consistent throughout all of those designations through
 5   260, line 14.
 6            SPECIAL MASTER VANASKIE:  So I will sustain the
 7   objections up to that point.  And I think then we'll pick up
 8   at page 261, line 6.
 9            MS. LOCKARD:  So actually, part of this also -- the
10   second part of the designation at 261, line 6 -- hold on a
11   second.
12            So Mr. Karlsson's answer implicates the same concern,
13   where he says at line 12:  I can see what she's written where
14   she's asking if someone has looked through the routes for
15   other sartans.
16            So that is a follow-up from the prior discussion that
17   you just sustained our objection on.
18            SPECIAL MASTER VANASKIE:  Yes.
19            MS. LOCKARD:  The issue with the -- the other issue
20   with this is basically the questioning is misleading, because
21   counsel is asking questions about an email and saying, well,
22   Ms. Frederickson -- Fridriksdottir is suggesting that it's
23   important that Teva does its own.
24            And he's -- Mr. Stanoch is I guess paraphrasing, or
25   I'm not sure, but that does not appear anywhere in that email.
```

 1          And so Mr. Karlsson's only response is basically --

 2   what he should have said is, well, that's not what the email

 3   says, but what he says is, I can see what she's written here

 4   is that she's asking if someone has looked into the routes of

 5   other sartans.

 6          So I think it implicates the prior ruling, but it

 7   also just -- it's a mischaracterization of the evidence and,

 8   therefore, misleading and prejudicial.

 9          MR. STANOCH:  May I, Judge?

10          SPECIAL MASTER VANASKIE:  Go ahead.

11          MR. STANOCH:  These next few designations are

12   different from the ones above, because it's showing that

13   there's people realtime in Teva that are saying that Teva can

14   and should do its own analysis of routes of synthesis.  And

15   other evidence will show that Teva did not do an appropriate

16   route of synthesis analysis of the valsartan API.

17          So when they say things like we can't do an analysis

18   of the route of synthesis or we don't have the route of

19   synthesis, this is showing -- this is contradicting that and

20   saying, look, no, no, no, people, important people in the

21   company think you should do your own route of synthesis

22   analysis.

23          And I'm not going to dicker about misleading or this

24   or that, but when I read a document, it's objected that I

25   shouldn't be reading a document.  And when I orient the

 1  witness to it and then ask a question, then it's misleading.

 2  I feel I am in a damned if I do, damned if I don't situation.

 3          MS. LOCKARD:  Well, if the argument is that you want

 4  this to show that it's something that Teva should be doing,

 5  then that's a subsequent remedial measure, because --

 6          MR. STANOCH:  That wasn't -- it's not what I said.

 7          MS. LOCKARD:  -- you're saying they weren't doing it

 8  before.

 9          MR. STANOCH:  That's not what I said.

10          MS. LOCKARD:  Judge, his argument does fall within

11  the subsequent remedial measure objection as well, because

12  he's saying, okay, well, Teva -- Ms. Fridriksdottir is saying,

13  well, Teva needs to be doing its own analysis of the route of

14  synthesis.  I mean, that's a recommendation for changing their

15  process based on the incident that happened.

16          I mean, this is all talking about recommendations

17  post-recall, post-notice.

18          MR. STANOCH:  That's not true.

19          SPECIAL MASTER VANASKIE:  Well, see, that's where you

20  lose me, Victoria, because if it's to find out what happened,

21  I don't think that's a subsequent remedial measure.  If it's

22  to change your process so it doesn't happen again, that's a

23  subsequent remedial measure.

24          MS. LOCKARD:  Right.  But the investigation -- she's

25  in European R&D.  She's not doing the investigation into what

 1   happened for the US.  She's concerned about what they're doing

 2   for their development, that -- the developing products in R&D.

 3   And she's saying, well, we need to start doing this process.

 4        I mean, she's not looking back to evaluate.  She's

 5   not having conversations with quality and Tony Binsol in

 6   testing to say, well, what were you doing to evaluate the

 7   route of -- I mean, she's not investigating what happened

 8   here.  She's saying, let's make sure this doesn't happen

 9   again.  We need to make sure on the development side that for

10   our products, that we're making sure there's a route of

11   synthesis analysis.  They have nothing to do with the quality

12   investigation that was being done in the US.

13        MR. STANOCH:  There's no remedial measure here, Your

14   Honor.  The question builds up to the pivot about the

15   appropriateness about taking a supplier's word for it that

16   there's no genotoxic impurity in the product.  There's no

17   subsequent remedial measure.

18        And I'll also state for the record that I think that

19   subsequent remedial measure, it's not such a simple temporal

20   analysis that if something is written or said, you know, after

21   an event, then it's -- ipso facto, it's a subsequent remedial

22   measure.  I think the rule requires a lot more than that.  And

23   Teva has not satisfied the conditions for 408.

24        MS. LOCKARD:  Plaintiffs are using this to show that

25   this should have been done before.  I mean, that's exactly

1    what 408 goes to.

2            SPECIAL MASTER VANASKIE:  I'm not sure.

3            We're going to break today at this time.

4            There's lots of objections here that have to be

5    handled yet for this witness.

6            This is our last witness, isn't it?

7            MR. STANOCH:  Yes.  Of the ones -- of the ones we

8    have.

9            MS. LOCKARD:  I know.  Mr. Stanoch isn't happy with

10   me because I haven't gotten him Tony Binsol's yet.  And I

11   apologize to the Court and everybody here for that.  I'm

12   trying to get through that.  I will get that to Mr. Stanoch

13   tonight.  We'll have to get it to Your Honor.  And if you have

14   time to go through that, we could cover that one tomorrow.

15   We'll have the rest of Stefan Karlsson.

16           There are also a couple of short designations that

17   are in dispute between the defendants, the pharmacy counsel

18   and plaintiffs.  And in the background we've been trying to

19   get some agreement on that, and we haven't been able to.  And

20   we need to submit those to Your Honor as well, which could

21   probably be submitted this evening.  Again, those are very

22   short, and that could be addressed tomorrow.

23           SPECIAL MASTER VANASKIE:  Yeah.  Let's adjourn for

24   today.  I think we're all a little bit tired.  Or I am anyway.

25   And --

 1            MR. STANOCH:  I join in the tired objection, Judge.

 2            SPECIAL MASTER VANASKIE:  What I'd like to do

 3    tomorrow when we resume -- and I think we're resuming --

 4    Larry, are you still there?  At 10:00 a.m. tomorrow?  Or is it

 5    10:30?

 6            MS. LOCKARD:  I think you said 10:30.  I don't mean

 7    to speak for --

 8            SPECIAL MASTER VANASKIE:  That's fine.

 9            MS. LOCKARD:  -- for Mr. MacStravic, but I thought

10    this morning you said not starting earlier than 10:30, but I

11    can't remember the reason, though.

12            SPECIAL MASTER VANASKIE:  Yes, Ann Marie.

13            (A discussion off the record occurred.)

14            SPECIAL MASTER VANASKIE:  How about we start at 10:30

15    tomorrow?

16            MR. RAE:  I was going to say that to the extent that

17    there is a need to start earlier, if I'm not able to join at

18    the beginning of the hearing, that's not a problem.

19            SPECIAL MASTER VANASKIE:  Okay.  We're going to start

20    tomorrow at 10:30.  All right?

21            It would be helpful if when we get together tomorrow

22    at 10:30, we can put beginning and endpoints to lines of

23    inquiry so, you know, we're dealing with -- I know you're

24    dealing with this on a question-by-question basis, but they do

25    have topics.  And if we could address it on a topic-by-topic

1  basis as opposed to a question-by-question basis, it might

2  move faster.

3       I don't want to prejudice anybody, so if within a

4  particular topic there's a question that you would like to

5  have treated specially, you can identify that for me.  But I'm

6  just looking for a way to streamline this a little bit.

7       We've made a lot of progress, and I'd like to

8  conclude the deposition designations to the extent we can

9  tomorrow.  If we can't, well, it will have to continue.

10      But we'll start tomorrow at 10:30 and go from there.

11 All right?

12      Any questions?

13      MR. STANOCH:  No, Your Honor.  That makes sense.

14      MS. LOCKARD:  Not from me.  Thank you.

15      SPECIAL MASTER VANASKIE:  We'll see you tomorrow.

16 Thank you.  Thanks, Ann Marie.

17      (Proceedings concluded at 4:53 p.m.)

18      - - - - - - - - - - - - - - - - - - - - - - -

19      **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

20      - - - - - - - - - - - - - - - - - - - - - - -

21      I certify that the foregoing is a correct transcript

22 from the record of proceedings in the above-entitled matter.

23

24 _/S/ Ann Marie Mitchell_          _3rd day of October, 2024_
   _CCR-RDR-RMR-CRR_
25 _Court Reporter/Transcriber_