1          **UNITED STATES DISTRICT COURT**
            **FOR THE DISTRICT OF NEW JERSEY**
2    _____

3    IN RE:  VALSARTAN, LOSARTAN,          CIVIL ACTION NUMBER:

4    and IRBESARTAN PRODUCTS               1:19-md-02875-RMB-SAK

5    LIABILITY LITIGATION                  **Case Management Conference/**
                                           **Status Conference**
6    _____

7    Mitchell H. Cohen Building & U.S. Courthouse
     4th and Cooper Streets
8    Camden, New Jersey 08101
     Thursday, October 10, 2024
9    Commencing at 1:02 p.m.

10   **B E F O R E:**          **THE HONORABLE RENÉE MARIE BUMB, CHIEF**
                               **UNITED STATES DISTRICT JUDGE, and THE**
11                             **HONORABLE THOMAS I. VANASKIE (RET.)**
                               **SPECIAL MASTER**
12
     **A P P E A R A N C E S:**
13
     HONIK LLC
14   BY:  RUBEN HONIK, ESQUIRE
          DAVID J. STANOCH, ESQUIRE
15   1515 Market Street, Suite 1100
     Philadelphia, Pennsylvania 19102
16   Co-Lead Counsel for MDL Plaintiffs

17   MAZIE SLATER KATZ & FREEMAN, LLC
     BY:  ADAM M. SLATER, ESQUIRE
18        CHRISTOPHER J. GEDDIS, ESQUIRE
     103 Eisenhower Parkway, Suite 207
19   Roseland, New Jersey 07068
     Co-Lead Counsel for MDL Plaintiffs
20
     KANNER & WHITELEY, LLC
21   BY:  CONLEE S. WHITELEY, ESQUIRE
     701 Camp Street
22   New Orleans, Louisiana 70130
     Co-Lead Class Counsel for Third-Party Payor Economic Loss
23
                John J. Kurz, Official Court Reporter
24          John_Kurz@njd.uscourts.gov (856)576-7094

25      Proceedings recorded by mechanical stenography; transcript
                produced by computer-aided transcription.

1  **A P P E A R A N C E S:** (Continued)

2  NIGH GOLDENBERG RASO & VAUGHN, PLLC
   BY:  DANIEL A. NIGH, ESQUIRE
3       MARLENE J. GOLDENBERG, ESQUIRE
   14 Ridge Square NW, Third Floor
4  Washington, D.C. 20016
   Co-Lead Class Counsel for Third-Party Payor Economic Loss
5

   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
6  BY:  JESSICA DAVIDSON, ESQUIRE
   One Manhattan West, Suites 42-128
7  New York, New York 10001
   Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
8  Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
   Solco Healthcare U.S., LLC (collectively ZHP)
9

   KIRKLAND & ELLIS LLP
10 BY:  DEVORA W. ALLON, P.C.
        ALEXIA R. BRANCATO, ESQUIRE
11 601 Lexington Avenue
   New York, New York 10022
12 Counsel for Defendants Torrent Pharma, Inc. and
   Torrent Pharmaceuticals Ltd. (collectively Torrent)
13

   PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
14 BY:  JASON M. REEFER, ESQUIRE
   One Oxford Centre, 38th Floor
15 Pittsburgh, Pennsylvania 15219
   Counsel for Defendant Mylan Pharmaceuticals, Inc.
16

   GREENBERG TRAURIG LLP
17 BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
        STEVEN M. HARKINS, ESQUIRE
18 3333 Piedmont Road, NE, Suite 2500
   Atlanta, Georgia 30305
19 Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
   Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
20 Inc. (collectively Teva)

21 GREENBERG TRAURIG LLP
   BY:  GREGORY E. OSTFELD, ESQUIRE
22 77 West Wacker Drive, Suite 3100
   Chicago, Illinois 60601
23 Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
   Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
24 Inc. (collectively Teva)

25              (Appearances continued onto next page)

**A P P E A R A N C E S:** (Continued)

WALSH PIZZI O'REILLY FALANGA LLP
BY:  LIZA M. WALSH, ESQUIRE
Three Gateway Center, 100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Counsel for Defendant Teva

BARNES & THORNBURG, LLP
BY:  PAUL QUINCY, ESQUIRE
555 12th Street N.W., Suite 1200
Washington, D.C. 20004
Counsel for Retailer Defendants and CVS Pharmacy, Inc., and
Walmart, Walgreens

CROWELL & MORING LLP
BY:  EMILY TUCKER, ESQUIRE
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Counsel for Defendant Cardinal Health

NORTON ROSE FULBRIGHT US LLP
BY:  D'LESLI DAVIS, ESQUIRE
2200 Ross Avenue
Suite 3600
Dallas, Texas 75201
Counsel for Defendant Mckesson Corp.

HUSCH BLACKWELL, LLP
BY:  MATTHEW D. KNEPPER, ESQUIRE
8001 Forsyth Boulevard, Suite 1500
St. Louis, Missouri 63105
For the Defendant Cigna Corp.

**Also present:**

Arthur Roney, The Courtroom Deputy

Loretta Smith, Esquire, Judicial Law Clerk to the Honorable
Robert B. Kugler (Ret.)

Rosemarie Bogdan, Esquire

```
 1              (PROCEEDINGS held in open court before the Honorable
 2    Renée Marie Bumb, Chief U.S. District Judge, and The Honorable
 3    Thomas I. Vanaskie (Ret.) Special Master, at 1:02 p.m. as
 4    follows:)
 5              THE COURTROOM DEPUTY:  All rise.
 6              CHIEF JUDGE BUMB:  Good afternoon.
 7              MR. SLATER:  Good afternoon, Judge.
 8              MS. ALLON:  Good afternoon.
 9              MS. LOCKARD:  Good afternoon.
10              JUDGE VANASKIE:  Good afternoon.
11              CHIEF JUDGE BUMB:  You can all have a seat.  Thank
12    you.
13              Okay.  Good to have you all here.  Thank you all for
14    being here.  So let me start with appearances.  We're in the
15    valsartan matter.  We'll start with the appearances.
16              MR. SLATER:  Good afternoon, Your Honor.  Adam Slater
17    on behalf of the plaintiffs.
18              CHIEF JUDGE BUMB:  Good afternoon.
19              MR. HONIK:  Good afternoon, Your Honor.  Ruben Honik
20    for plaintiff.
21              CHIEF JUDGE BUMB:  Afternoon.
22              MR. NIGH:  Good afternoon, Your Honor.  Daniel Nigh
23    for the plaintiffs.
24              MS. WHITELEY:  Good afternoon, Your Honor.  Conlee
25    Whiteley on behalf of plaintiffs.
```

1            CHIEF JUDGE BUMB:  Okay.  That's it for the

2    plaintiffs; good afternoon.

3            Okay.  For the defendants.

4            MS. ALLON:  Good afternoon, Your Honor.  Devora Allon

5    from Kirkland & Ellis for Torrent.

6            CHIEF JUDGE BUMB:  Afternoon.

7            MS. BRANCATO:  Good afternoon.  Alexia Brancato from

8    Kirkland, also for Torrent.

9            MR. OSTFELD:  Greg Ostfeld from Greenberg Traurig for

10   Teva.

11           MS. LOCKARD:  Victoria Lockard, Greenberg Traurig,

12   for Teva.

13           MS. DAVIDSON:  Jessica Davidson, Skadden, Arps, for

14   the ZHP Defendants.

15           CHIEF JUDGE BUMB:  Okay.  All right.  Good afternoon.

16           All right.  So I'm happy to see you all here.  To be

17   honest, I'm not sure where I want to start so we're just going

18   to have a conversation about it.

19           I have spent a significant amount of time really

20   trying to get a handle on the case.  And what I keep coming

21   back to is, I think the plaintiffs and the defendants are

22   trying two different cases.  And I keep coming back to that.

23   The more I ask for submissions, the more I become convinced of

24   it, because I just think there's a lot of argument that's

25   getting mixed in with evidence.  And so I'm hoping that we can

1    have a really robust conversation so I can figure it out and be

2    comfortable with moving forward.  Because if I don't have that

3    comfort level, I'm not moving forward; I mean, I just can't.

4        So I guess I'm going to start with you, Mr. Slater,

5    and Mr. Honik, or whoever wants to answer my question.  And I

6    will say that I have read and reread Judge Rosenberg's Opinion

7    in the *Zantac* matter, which I have found to be very

8    instructive.  I've read it many times.  I sort of feel a little

9    bit like she felt, like she continued to flesh out the case and

10   flesh out the case.

11       So I guess my first question is, Mr. Slater, are you

12   trying a worthless, one word, or a worth less, two word, case?

13   That's my first question.

14       MR. SLATER:  Our position is that -- and I think

15   we're focusing on the warranty claim.  We talked about that.

16       CHIEF JUDGE BUMB:  I only want to focus on the

17   warranty claim, because that has what's consumed all of our

18   energies right now, but, yes.

19       MR. SLATER:  Okay.  Because the warranty claim values

20   the product at the time of sale, our position is that because

21   of the status of the product being contaminated as it was, that

22   there was no value to that product because nobody would buy it

23   knowing the contamination existed, and it was not sellable in

24   that form.

25       CHIEF JUDGE BUMB:  Okay.

1          MR. SLATER:  And the defendants have agreed that it
2   should not have been sold like that.  I think -- so our
3   position is there was no value.
4          Taking your rulings into account, however, my
5   understanding is that your ruling is, that may be so.  And we
6   are not arguing another world.  We're saying in the world where
7   they were actually sold, our position is they shouldn't have
8   been and they didn't have value for the reasons I said; but
9   your ruling is, that may be so, but they were sold.  And in the
10  real world people bought them and it helped them from a medical
11  standpoint.  Shouldn't that be factored in?  Shouldn't the
12  defendant be allowed to say, it may be that we shouldn't have
13  sold it, but we did and you got value anyway?
14         And in terms of valuing the drug, even though the
15  risk may not have been acceptable to sell it, it was sold and
16  you got value, so the defendants are allowed to say, well, the
17  plaintiffs didn't get no value, they got some value, because
18  they got efficacy.
19         CHIEF JUDGE BUMB:  And your response to that is?
20         MR. SLATER:  Our response is that it's a jury
21  question.  Your Honor has framed it as a jury question.  So our
22  response is, we understand that that's where the trial is going
23  so, therefore, we'll make our arguments.
24         CHIEF JUDGE BUMB:  What's your argument?
25         MR. SLATER:  In terms of why there's no value?

```
 1                CHIEF JUDGE BUMB:  Yes.
 2                MR. SLATER:  Again, because the product was
 3      contaminated in such a way with what we know was in it.
 4      Everybody agrees it could not have been sold or should not have
 5      been sold.  So, therefore, based on the warranty law, there was
 6      no value to that, because --
 7                CHIEF JUDGE BUMB:  You can't make that argument.
 8      That's argument.  That's what I'm -- this is what I'm
 9      struggling with.
10                MR. SLATER:  Well -- oh, I'm sorry.
11                CHIEF JUDGE BUMB:  That's argument.  That is an
12      argument.  You can't argue to the jury let's pretend the facts
13      don't apply in this case and let's just pretend that these
14      should never have been sold from the first place.  You can't
15      make that argument.
16                MR. SLATER:  I'm glad you asked me that, because
17      we're not -- we're not saying it didn't happen.
18                CHIEF JUDGE BUMB:  Right.
19                MR. SLATER:  What we're saying is it shouldn't have
20      happened, okay.  And we're saying that as a matter of how the
21      law applies to these drugs, it never should have been sold.
22      And we also argue that it may -- this is not an argument.  This
23      is the evidence.  And our regulatory expert, Dr. Plunkett, can
24      frame this.
25                CHIEF JUDGE BUMB:  What's the -- tell me the
```

1    evidence, because this is what I hear the plaintiff saying, and
2    I don't think it's a permissible argument.
3          I keep hearing the -- this is how I hear the
4    plaintiff presenting it to the jury:  It's so because we say
5    it's so.  It's so because once the FDA recalled the drug, it is
6    *ipse dixit* evidence that it shouldn't have been sold from day
7    one and, therefore, since it shouldn't have been sold from day
8    one, it doesn't have any value.  And Judge Rosenberg rejected
9    that position.  And I think that her reasoning is very solid.
10          And so there had to be some value at the time of sale
11    because it was sold.  The plaintiffs benefited from it for a
12    period of years until there was a recall.
13          And the other thing that I think has not been focused
14    on is that there is a big disconnect between the cases that
15    talk about sales post-recall versus sales pre-recall.  And I
16    think that -- and, again, Judge Rosenberg talked about it, the
17    cases talked about it, I brought it up in my letter order to
18    the parties.  I think we have to be very careful that when we
19    argue to a jury that the drug had no value, those cases are the
20    drug in post-recall.
21          I see your colleague shaking his head, but tell me a
22    case where it's not.
23          MR. SLATER:  Okay.  I think the *Debernardis*, I think
24    that's the name of the case, the Eleventh Circuit Court of
25    Appeals case --

1          CHIEF JUDGE BUMB:  Unique on its facts, very unique

2     on its facts.

3          MR. SLATER:  Similar to our facts, though.

4          CHIEF JUDGE BUMB:  No, not at all.

5          MR. SLATER:  Because it was a later finding for

6     products that had been sold and provided value to people for

7     years.

8          CHIEF JUDGE BUMB:  And there was a recall, and they

9     should not have sold them post-recall.

10          MR. SLATER:  But they were given damages, and they

11    were allowed to ask for the refund going back to the beginning.

12          CHIEF JUDGE BUMB:  But they didn't argue to the jury

13    that they had no value because they should never have been

14    sold.

15          MR. SLATER:  I think that is what they argued, Your

16    Honor.

17          CHIEF JUDGE BUMB:  No.  And not to mention that that

18    was on a motion to dismiss on top of it.  So I think you got a

19    problem there.

20          MR. SLATER:  Well, I mean --

21          CHIEF JUDGE BUMB:  That's a motion to dismiss.

22          So let me tell you why that's important, because on a

23    motion to dismiss, I think it's very -- here's the thing, is

24    that, again, I keep going back to sugar pills.  If at the end

25    of the day the recall was because these were sugar pills which

1    had no value, then I think it's a plausible argument because I

2    think it can be supported by evidence that they had no value,

3    zero value because they were sugar pills.

4             That's why the facts matter here.  And, you know, as

5    I've thought about the plaintiffs' argument over and over

6    again, would you be standing before me making the same

7    argument, let's pretend, if at the time of the sale the

8    warranty was we are going to be providing red valsartan pills

9    and they turn out they're green?

10            MR. SLATER:  No, we wouldn't, because that --

11            CHIEF JUDGE BUMB:  Because?

12            MR. SLATER:  Because that would not be, from our

13   perspective, material enough to support the argument that we're

14   going to make.

15            CHIEF JUDGE BUMB:  Exactly.

16            MR. SLATER:  But the materiality here is patent.  And

17   you asked about the facts that we are going to establish, so I

18   think it's very important to --

19            CHIEF JUDGE BUMB:  How do you -- let's stick with

20   materiality because I think that's an important word.  How do

21   you get to material or materiality without causation?

22            MR. SLATER:  The materiality is established by the

23   fact that the pills -- that the contamination with these

24   impurities --

25            CHIEF JUDGE BUMB:  Yes.

1          MR. SLATER:  -- rendered the products, in terms of

2    what was supposed to happen, as not what they were said to be.

3    What they were sold as was valsartan USP, the approved, valid,

4    consistent with the compendium valsartan.

5          CHIEF JUDGE BUMB:  Let me change the facts.

6          There's a little speck of flour in them, FDA recalls

7    them later because, you know, drugs shouldn't have a little

8    speck of flour in them.  Your argument?

9          MR. SLATER:  I wouldn't be bringing that case.

10          CHIEF JUDGE BUMB:  Your argument?

11          MR. SLATER:  My argument is that the materiality of

12    that is -- we're not talking about a health risk, I assume, in

13    your hypothetical.  There's no risk to health.  That's not

14    something that you have years of regulatory guidances

15    precluding it, where there's analysis by the ICH Guidelines and

16    the FDA saying genotoxic probable human carcinogens are treated

17    differently than all other impurities and there's special

18    regulations for those.  Flour doesn't fall into that category.

19    So the --

20          CHIEF JUDGE BUMB:  So I think you're talking yourself

21    into the issue that I'm very concerned about.

22          I think that what the plaintiff is trying to do is to

23    have it both ways, is to stand up before this jury and say:

24    "These drugs should never have been sold, period.  They have no

25    value."

```
1              The plaintiffs want to phrase it in terms of a
2    regulatory risk.  I see no difference between a regulatory risk
3    and a biological risk, but we'll get there.  Because I think it
4    then leaves a jury, you know, this elephant in the room with
5    risk of what, without mentioning the word "cancer," and then
6    tying the defendants' hands by not being allowed to prove that
7    it does not cause cancer.
8              MR. SLATER:  Well --
9              CHIEF JUDGE BUMB:  And I don't think -- I think that
10   deprives the defendants of their day in court.
11             MR. SLATER:  I don't agree, and I'll tell you why.
12   First of all, there's a lot that you're obviously putting
13   out --
14             CHIEF JUDGE BUMB:  Been thinking about, yes.
15             MR. SLATER:  It seems like for a few minutes, so...
16             CHIEF JUDGE BUMB:  I don't see this case much
17   different than the Zantac case; I don't.
18             MR. SLATER:  It's a very different case than Zantac.
19             CHIEF JUDGE BUMB:  I don't see it.
20             MR. SLATER:  And I'll tell you why.
21             CHIEF JUDGE BUMB:  Well, it's a standing issue and
22   all of that, but I don't see this much different.
23             MR. SLATER:  It's very different, because in this
24   case -- I mean, if we want to get down into why this is
25   different, in our case, and it's very important to remember,
```

1     originally these drugs were a branded drug called Diovan

2     manufactured by what's called the tributyltin process.  That

3     was the branded approved, FDA-approved manufacturing process.

4     When it came off patent, ZHP said, okay, we're going to copy

5     that and we're going to now manufacture it and sell it a lot

6     cheaper.

7          And then what they did is they changed the process in

8     2011 and 2012, and that is the watershed moment in this case.

9     They changed the process so they could make more money than

10     they could make by using the FDA-approved process that went

11     through clinical studies and was evaluated through the clinical

12     studies.

13          And what they failed to do is they failed to do

14     proper change control and proper risk assessment before they

15     ever started selling the zinc chloride or TEA with sodium

16     nitrite quenching pills.

17          You don't have any of that in the *Zantac* case.  What

18     you have in *Zantac* is it turned out that because of the way the

19     product was manufactured after it went out the door --

20          CHIEF JUDGE BUMB:  No; because it sat on the shelf

21     for a while or whatever, it produced, you know, NDMA.

22          MR. SLATER:  NDMA.

23          CHIEF JUDGE BUMB:  Yeah.

24          MR. SLATER:  It's a completely different situation.

25          CHIEF JUDGE BUMB:  No.

1          MR. SLATER:  Because this is a process impurity that

2   was created in the factory on the manufacturing line when it

3   was actually manufactured.  And that's how it was sold with

4   this impurity in it.

5          And, again, it was from the very beginning, because

6   of their decision to change the manufacturing process in a way

7   that violated the rules that say you have to do the proper risk

8   assessment and change control process.  So it's very different

9   factually from *Zantac*.

10         And then what happens is, you're asking what are the

11  facts that get us to say there's no value, again, we're talking

12  the warranty claim here.  A person walks up to the cash

13  register and says I'd like valsartan, here's my prescription.

14  They then -- the formulary list for this person on their

15  insurance company looks and says, okay, they can have this,

16  this and this.  And every one of them says valsartan USP.

17  That's the warranty.  If that warranty isn't there, it never

18  gets sold by -- nobody -- the retailers have said they wouldn't

19  have sold it.

20         CHIEF JUDGE BUMB:  It's valsartan with a contaminant.

21         MR. SLATER:  Well, it is.

22         CHIEF JUDGE BUMB:  Why do you keep trying to dress it

23  up as something that it wasn't?  It was valsartan but with a

24  contaminant.

25         MR. SLATER:  But what's more important is -- or maybe

```
 1    it's just the flip-side, but I think it's important to say it
 2    this way, it wasn't what they said it was.
 3               CHIEF JUDGE BUMB:  I know.  I understand all of that.
 4    But that doesn't give you the right, you, the plaintiffs, the
 5    right to say to the jury that just because it wasn't what they
 6    said it was, we get -- we get a full refund because of the
 7    recall.  It should never have been sold, period.
 8               MR. SLATER:  Well, that's what --
 9               CHIEF JUDGE BUMB:  No.  And I --
10               MR. SLATER:  That's the law of -- that's the law of
11    express warranty, Judge.
12               CHIEF JUDGE BUMB:  No.  It's --
13               MR. SLATER:  That is the law.
14               CHIEF JUDGE BUMB:  Okay.
15               MR. SLATER:  I mean, and I just want to say, I
16    understand that you want this to be fair, but the defendants
17    sold these drugs, misrepresented that they were USP Orange Book
18    compliant valsartan.
19               CHIEF JUDGE BUMB:  So then prove to the jury that you
20    didn't get the "benefit of the bargain."  But do not stand up
21    before the jury and say:  "FDA recalled them so we should have
22    gotten -- we should have gotten a full refund."
23               MR. SLATER:  Well, I mean, there's --
24               CHIEF JUDGE BUMB:  You've got to be able to -- this
25    is what the "benefit of the bargain" is.  You've got to be able
```

1     to introduce evidence to the jury as to what the value of these

2     drugs was, i.e., were they efficacious or weren't they, and the

3     defendants will do differently.

4            And, you know, I think the other thing that we have

5     to be very careful about is, we can't conflate liability with

6     damages, okay.  And that's what I think the plaintiff is

7     continuing to conflate, which is the plaintiff will get up and

8     say, "Were these drugs adulterated?"  You'll prove they were

9     adulterated, whether they were adulterated or they weren't.

10    You'll then prove damages.  What are the amount of the damages?

11    But what you can't argue to the jury is:  "They had no value

12    because the FDA recalled them."

13            MR. SLATER:  We're saying --

14            CHIEF JUDGE BUMB:  You can't prove -- you can't argue

15    that to the jury, just like Conti, whose testimony I found to

16    be unreliable.

17            MR. SLATER:  We're not saying that that is all there

18    is to it.  What we're saying is we're -- we are not -- again,

19    we're in the real world where when people went to the cash

20    register and they bought this, a warranty was made.  And if

21    that warranty had not been made, they would not have been

22    purchased.  Nobody would have purchased those drugs because

23    they couldn't, as a matter of law.

24            CHIEF JUDGE BUMB:  You can't make that argument to

25    the jury.

```
 1              MR. SLATER:  But that's the law, Judge.

 2              CHIEF JUDGE BUMB:  No, it's not.

 3              MR. SLATER:  And -- and the other --

 4              CHIEF JUDGE BUMB:  That's argument.

 5              MR. SLATER:  That's the evidence and the admissions

 6    from every defense witness who was asked the question; that

 7    once they knew there was NDMA in it, they knew this could never

 8    be sold.

 9              CHIEF JUDGE BUMB:  But that's a different case.

10    These are not the facts of this case.  You want --

11              MR. SLATER:  So they get a pass?

12              CHIEF JUDGE BUMB:  I don't know.

13              MR. SLATER:  Because they got away with selling

14    the -- this is my problem, Judge:  They sold the pills and

15    they're saying, well, nobody caught on so, you know what --

16              CHIEF JUDGE BUMB:  That may go -- that may go to your

17    fraud claim.  But I don't see how it goes to your express

18    warranty claim.

19              MR. SLATER:  And then they say -- and it turns out in

20    hindsight, even though we measure the damages at the cash

21    register, and that's the law, we've established that, our brief

22    I think was very compelling on that, that's when you measure

23    damages on the warranty claim is when the person buys it, do

24    they get the benefit of their bargain at the time of purchase.

25              CHIEF JUDGE BUMB:  That's liability.  Talk about
```

1    damages.

2              MR. SLATER:  It's also damages, because if you don't

3    get the benefit of the bargain, under warranty law you're

4    allowed -- you are entitled to get your money back.

5              What you're letting them do --

6              CHIEF JUDGE BUMB:  No.  But you just told me a few

7    moments ago that if it had flour in it, you're not getting the

8    benefit of your warranty because nobody would go to the

9    counter, presumably, and say, oh, can you give me some pills

10   with a little speck of flour in them.

11             MR. SLATER:  Those hypotheticals don't apply to this

12   case.

13             CHIEF JUDGE BUMB:  Why?

14             MR. SLATER:  Because it's not this case.  You're

15   taking our case and you're watering it down with a hypothetical

16   that doesn't apply, Judge.

17             CHIEF JUDGE BUMB:  No.  I'm just trying to show you

18   why the plaintiffs are wrong on the law.

19             MR. SLATER:  We have -- we're -- under warranty law,

20   this is -- and let me finish what I'm saying here.  You're

21   saying to us, okay, how can you say there's no value.  We have

22   the law that says this could not have been sold if they didn't

23   give this false warranty.

24             If they said it's valsartan but it's not USP, it

25   doesn't get on the formulary, it's, therefore, not approved by

1    the TPP, by the insurance company, and the retailer will not

2    sell it.  That is the law.  That is the facts.  It's agreed by

3    everybody.

4              CHIEF JUDGE BUMB:  I know.  I know, but Mr. Slater --

5              MR. SLATER:  So what they're doing -- I want to

6    finish with the efficacy issue, Your Honor, because I know that

7    that's what you're concerned about.

8              We're allowed to make our argument that there's no

9    value because they should never have sold it; no one would ever

10   have bought it if they knew.

11             CHIEF JUDGE BUMB:  I disagree.

12             MR. SLATER:  So they then have -- you're letting

13   them, though, say even though you valued the product at the

14   time of sale, you're saying they can go back, though, years

15   later and say, you know what, even though we shouldn't have

16   sold it, they got some benefit from the therapeutic value so

17   there's value so it shouldn't be -- you can't take away all of

18   the -- you can't give a full refund because there was value.

19   And they're going to make that argument to the jury.  And

20   that's where the horserace will be with the jury.

21             And Judge Kugler always said that -- and I know you

22   know that -- this case is about the value.  The jury has to

23   decide what was the value.

24             We don't agree that they should be allowed to make

25   that argument, but they're doing it, and we're not griping

1    about it, we're ready to deal with it, and the jury will decide

2    who's right and who's wrong based on the facts.  This is not an

3    argument.  This is the facts and the evidence, which is their

4    admissions.  They could not sell it.  They could not sell this

5    product.

6                CHIEF JUDGE BUMB:  Had they known that it contained a

7    contaminant.

8                MR. SLATER:  Well --

9                CHIEF JUDGE BUMB:  They're not disputing that.  But

10   what evidence are you going to introduce to a jury that this

11   should never have been sold in the first place and, therefore,

12   it's a zero value?

13               MR. SLATER:  Well, in terms of its --

14               CHIEF JUDGE BUMB:  That's strict liability to me.

15               MR. SLATER:  And we gave you the law; that warranty

16   law is akin to strict liability.

17               CHIEF JUDGE BUMB:  And I didn't -- and I don't think

18   that that was --

19               MR. SLATER:  And they've given you no cases that say

20   to the contrary because that's what it is.  Warranty law is

21   very straightforward and very simple.  They represented this

22   was approved by the FDA to be sold, and it wasn't.

23               And the fact that they didn't know about it doesn't

24   give them a break.  You're not allowed to be ignorant of what's

25   in your pills.

```
 1          CHIEF JUDGE BUMB:  Let me read from Judge Rosenberg's
 2   Opinion the following and then I'll have you respond to it.
 3          So this is what -- gearing up to the adulteration
 4   theory, she writes:  "The plaintiffs' adulteration theory of
 5   standing is not viable because it improperly relies on the
 6   FDA's ADI.  The FDA established the ADI for NDMA in ranitidine
 7   around 2019.  The plaintiffs' claim that ranitidine was
 8   adulterated as determined by Congress because it was sold with
 9   amounts of NDMA higher than level permitted by Congress," et
10   cetera.
11          "In other words, it [sic] was adulterated because it
12   contained levels exceeding the FDA's ADI; since it was
13   adulterated, it was worthless; and since ranitidine was
14   worthless, the plaintiffs suffered an economic injury-in-fact
15   when they purchased it for a value greater than zero, without
16   knowing that it contained NDMA."
17          She then goes on to rule -- she contrasts the
18   Debernardis case and says, "a plaintiff does not have standing
19   to sue a defendant merely because of buyer's remorse.  The
20   Third Circuit concluded that a plaintiff lacked standing to sue
21   L'Oreal for its failure to disclose that there were trace
22   amounts of lead found in its lipstick in part because the
23   plaintiff's subjective allegation that the trace amounts of
24   lead in the lipstick are unacceptable to her did not constitute
25   injury-in-fact."
```

1              Here is the key language, I believe.

2              "Without evidence that a product was illegal to

3    sell" -- that doesn't apply here -- "harmful, or overpriced, a

4    plaintiff does not suffer injury from purchasing a product and

5    later wishing that he or she had not done so."

6              And she goes on and finds that the plaintiffs were

7    unable to put forward reliable evidence to prove that

8    ranitidine was unsafe.

9              So I don't -- I don't see a significant distinction

10   here; I just simply don't.

11             MR. SLATER:  Your Honor, my response is this:  First

12   of all, I'm told -- I'm asking my team for the cite.

13             CHIEF JUDGE BUMB:  Yeah.

14             MR. SLATER:  That she was reversed on standing by the

15   Eleventh Circuit, so we'll have to see if that's correct.

16             CHIEF JUDGE BUMB:  Okay.

17             MR. SLATER:  I'm telling you this is what I'm

18   hearing, but I'm asking my team to find the citation to the

19   case from the Eleventh Circuit.

20             Number two, that -- she said if it was illegal to

21   sell, it was illegal to sell it.

22             CHIEF JUDGE BUMB:  It's illegal to sell lead in

23   lipstick.

24             MR. SLATER:  Ah.  No.  But there's not genotoxic

25   carcinogen guidelines that were applicable that during the time

1    this was sold -- see, we're not relying on the FDA limits that

2    came after the fact, because we're relying on the fact that

3    when this was being sold, none of the NDMA or NDEA was allowed,

4    zero was allowed unless they actually have identified it,

5    evaluated it and controlled for it and then went to the FDA and

6    said, look, this is how much is in here, we think it's safe,

7    we've done the risk assessment, let us sell it up to this

8    level.

9            During the time it was sold, none of that happened,

10   and during that time zero was allowed.  And you're not going to

11   hear anybody say to the contrary in -- I mean, I guess anyone

12   can say whatever they want, but that was the law.  And the law

13   said you couldn't sell it.  So, A, it was illegal to sell.

14           The unacceptable risk was an unacceptable health

15   risk.  We can talk about the general causation issue.  I would

16   hope that our brief on Dr. Chodosh was compelling because he

17   made the argument more eloquently than I can ever --

18           CHIEF JUDGE BUMB:  No.  It raised more questions than

19   answers, quite frankly, it did.

20           MR. SLATER:  Well, it raises --

21           CHIEF JUDGE BUMB:  Was the case reversed on appeal?

22   That's not what I believe it was.  I don't believe -- I don't

23   think that it --

24           MR. SLATER:  I'm waiting to be told, but --

25           CHIEF JUDGE BUMB:  I don't think it was.

1          MR. SLATER:  So it was illegal to sell it.  We have

2     that.  And we don't rely on the later standards.  And, by the

3     way, the later standards it still exceeded those levels that

4     came in in 2018 when the FDA --

5          CHIEF JUDGE BUMB:  When you say it was illegal to

6     sell --

7          MR. SLATER:  The FDA does not allow you to sell a

8     drug that's not in the approved form.

9          CHIEF JUDGE BUMB:  I think we're talking in circles.

10    Can I hear from your adversaries?  Because I don't want to have

11    you do all the...

12          MR. OSTFELD:  Thank you, Your Honor.

13          Your Honor, I think you asked a very salient question

14    at the beginning, which is the distinction between a

15    worthlessness theory, one word, and a worth-less theory, two

16    words.

17          I think the challenge here is plaintiffs are very

18    clearly asserting a worthlessness theory.

19          CHIEF JUDGE BUMB:  One word?

20          MR. OSTFELD:  One word.  And they have no evidence of

21    a worth-less theory.  And that's not inherently disqualifying.

22    It's possible to have a worthlessness theory, one word, that

23    comports with the "benefit of the bargain" measure of damages.

24    But --

25          CHIEF JUDGE BUMB:  How?  But how do you get -- how

1    without going to the issue of causation?

2            MR. OSTFELD:  With admissible evidence which does

3    have to go to the issue of causation, and it has to go to the

4    issue of efficacy.  You have to show the value as received.

5            I think the parties, with all the case law we've put

6    out there, I actually don't think there's that much distance

7    between our respective cases on the question of what "benefit

8    of the bargain" means.  It means the difference between the

9    value as warranted and the value as received.

10           CHIEF JUDGE BUMB:  Right.  And so but -- and I agree

11   with that, but it seems to me that the only thing that's left

12   is for the plaintiff to argue it should never have been sold,

13   therefore, there's zero value.  And that's argument to me.

14           MR. OSTFELD:  I agree, Your Honor.  And I think

15   you've put your finger on the exact problem here.  They're not

16   positing admissible evidence of the value as received.  What

17   they are positing is an argument of the value as if it should

18   never have been sold.

19           CHIEF JUDGE BUMB:  And that's not evidence.

20           MR. OSTFELD:  That is not evidence.  And, that is,

21   the essence of Professor Conti's approach, which you have

22   excluded, is essentially a policy argument and a moral argument

23   that it should be deemed valueless, because if we knew then

24   what we know now, it would not have been sold or could not have

25   been sold.  But that's not evidence of the value received.

1          In the real world, as Mr. Slater indicated, value was
2     received.  Patients received effective hypertension medication.
3     They took it for years.  They received the antihypertensive
4     benefits.  The third-party payor plaintiffs received the
5     benefit of their members receiving effective hypertension
6     medication.
7          So that, I think, is the problem.  There isn't
8     admissible evidence on the worthlessness -- one word -- theory.
9          So what I think Mr. Slater is postulating as a backup
10    is, okay, we let the jury decide.  The defendants will come in
11    and put in their evidence that the product was efficacious.  He
12    still doesn't want general causation to come in.  As
13    Ms. Lockard will discuss, if you come to the general causation
14    issue, we think it has to come in because you have to get into
15    whether the product was safe or not.
16          I'm sorry.
17          CHIEF JUDGE BUMB:  Just wait one second because I'm
18    too distracted.
19          MR. OSTFELD:  Okay.  Meanwhile, Your Honor, I did --
20          CHIEF JUDGE BUMB:  Go ahead.  I'll let you talk,
21    confer.
22          MR. SLATER:  I'm sorry, Judge.
23          CHIEF JUDGE BUMB:  That's okay.  If you want to
24    confer, go ahead; I just can't --
25          MR. SLATER:  No, no.  We won't do that again.

1          CHIEF JUDGE BUMB:  That's okay.  I'm just -- I'm hard

2     of hearing, so no worries.

3          MR. SLATER:  I apologize.  I have the same issue.

4     Sorry.

5          CHIEF JUDGE BUMB:  Yeah.  Mr. Ostfeld, go ahead.

6          MR. OSTFELD:  So apologies, Your Honor.  So where we

7     are is we have a case that the product was efficacious.  We

8     have a case that the product was not dangerous, notwithstanding

9     the presence of NDMA impurities.

10          Plaintiffs would have their own general causation

11     evidence.  There would certainly be a dispute to put in front

12     of the jury as to whether or not the NDMA impurity made

13     valsartan dangerous.  I'm not aware of any evidence on the

14     plaintiffs' side that it was not efficacious.

15          So, regardless, what plaintiffs don't have is

16     admissible testimony on damages.  And I think you drew a very

17     critical distinction between liability and damages.  If --

18          CHIEF JUDGE BUMB:  Well, and that was going to be my

19     question, then aren't we in summary judgment land?  Because if

20     it's just strictly argument, shouldn't have been sold, zero

21     value, that's strictly argument.

22          And that's the -- you know, I remember when I first

23     was assigned to this case, and I posited the question to you

24     all, I don't know -- I don't know of anyone on this side of the

25     room that would stand up before the jury and say, yeah, it

1    should have been sold knowing what we know now.  I don't -- I
2    can't imagine that they would be making that argument to the
3    jury.  The fight is going to be when did they know it, et
4    cetera, et cetera, and that's the fight.
5           But I can't imagine the defendants standing before
6    the jury and saying, yeah, don't pay attention to what
7    Mr. Slater just told you because it was fine that we sold it
8    knowing what we know now.  That's just not going to happen.
9           And so, I mean, so that's why it shows to me that
10   this is strictly argument, ladies and gentlemen, let's just
11   pretend that we are living a different case and you go back and
12   you decide and you give -- you give the drug zero value because
13   it should never have been sold, when for years it did what it
14   was supposed to do.  And then it just raises the question of,
15   well, why shouldn't it have been sold?  Well, it shouldn't have
16   been sold because there's this thing called -- which we really
17   can't tell you -- carcinogen.
18          And then they, the defendants, can't come forward and
19   say, well, don't worry about this carcinogen because it's not
20   really what you think it is.
21          I mean, it just -- the whole causation thing is
22   another problem.
23               MR. SLATER:  Well --
24               CHIEF JUDGE BUMB:  But let Mr. Ostfeld finish first.
25               MR. OSTFELD:  Yes, Your Honor.

1    And I think you've also hit on an important

2    differentiation between what's going on in the Eleventh Circuit

3    with the *Debernardis* case, as well as the ongoing appeals of

4    the *Zantac* standing order.  We're not at the standing stage

5    here.  We're not at the motion-to-dismiss stage.

6    And the concurrence in the *Debernardis* case, Judge

7    Sutton's concurrence is very compelling and very significant on

8    this point, because Judge Sutton draws that exact distinction.

9    He says, "Saying that an allegation is sufficient to cross the

10    very low threshold for Article III standing is not the same

11    thing as saying even that you have liability, much less proving

12    up damages."

13    And he specifically drew the differentiator between

14    sufficient injury to plead standing and sufficient injury to

15    prove up damages at trial.  And he said -- and in his case he

16    was talking about the summary judgment stage, at the summary

17    judgment stage, the plaintiffs are going to have to come

18    forward with evidence to show why it was worthless and how it

19    was worthless.

20    CHIEF JUDGE BUMB:  And from what I can gather from

21    the record here, I think if I, you know, were to assess what

22    Judge Kugler was thinking at the time, this was at the

23    motion-to-dismiss stage.  And so at summary judgment stage,

24    what he ruled was the plaintiffs will have to come forward and

25    show through admissible evidence that it had zero value.

```
 1              And saying it had zero value because it should never
 2    have been sold is strictly -- it's just argument revising
 3    history.  That's where I keep coming around.  So I just don't
 4    know how -- and that's what -- that's the problem I had with
 5    Conti.
 6              Conti was rendering an expert opinion about something
 7    that I thought was very common sense, yeah, drugs that
 8    shouldn't have been sold have no value.  But that's because if
 9    there's a recall, you shouldn't sell them and you should get no
10    value for them.  They have no value if you're selling them.
11    And that was, I think, the Blue Cross Blue Shield case.  I know
12    plaintiffs are disagreeing with my analysis of that.  But --
13              MS. ALLON:  Your Honor, could I just add one thing
14    before we go back to the -- or are you --
15              MR. OSTFELD:  Please.
16              MS. ALLON:  Before we go to the plaintiffs, just
17    about Judge Rosenberg, since I represent GSK in that case, she
18    has not been reversed, just so we're clear.
19              CHIEF JUDGE BUMB:  Is it on appeal?
20              MS. ALLON:  Yes.
21              CHIEF JUDGE BUMB:  But it may never get -- didn't
22    they just settle yesterday?
23              MS. ALLON:  They settled the state cases.
24              CHIEF JUDGE BUMB:  Oh.
25              MS. ALLON:  But not the MDL.  And so that decision,
```

1    along with her 280-page decision finding that NDMA does not, in

2    fact, cause cancer, are up on appeal to the Eleventh Circuit.

3    The briefing is not even completed.

4            CHIEF JUDGE BUMB:  Oh.

5            MS. ALLON:  So there's been no reversal.  And we

6    don't expect there to be a reversal.

7            CHIEF JUDGE BUMB:  Yeah.  I didn't -- I thought for

8    sure that it was still good law.  But, okay, thank you.

9            MR. OSTFELD:  Your Honor, I guess the final point

10   that I would like to make goes to Professor Conti.  I agree

11   with Your Honor.  I think what Professor Conti did,

12   essentially, was assign herself a regulator's role and say not

13   here is the value of these drugs as received, as received they

14   were worthless, she says we should treat them as worthless,

15   because in an alternative reality, knowing then what we know

16   now, they would not have been sold or could not have been sold.

17           CHIEF JUDGE BUMB:  Yeah.  And that's how I -- that's

18   how her testimony was.  And I said, well, that's just -- those

19   facts do not fit my case.

20           MR. OSTFELD:  So I do think the exclusion of

21   Professor Conti's opinion on that point does move us at least

22   closer to summary judgment territory.  Certainly I can envision

23   a world where at the conclusion of plaintiffs' case we bring a

24   directed verdict because there is not evidence to put in front

25   of the jury on the quantification of plaintiffs' damages.  I

1    don't want to predict what their case will be.

2          I will say as I stand here today, I do not know what

3    their evidence is that demonstrates that the product is worth

4    less, two words.  They only had the worthless theory, and it

5    was only due to Professor Conti's excluded opinion.  So I do

6    think this presents a challenge for plaintiffs at trial, but I

7    don't want to speak for what their evidence would be.

8          Your Honor, just to kind of lay the framework for the

9    other issues that Your Honor noted in your letter, Ms. Lockard

10   will be covering adulteration and general causation.  Ms. Allon

11   will be covering the alternative drugs analysis, the Motion in

12   Limine 16.  I'm here to speak to you about worthlessness and

13   the benefit-of-the-bargain theory.  Unless you have other

14   questions for me, I think I've concluded what I wanted to say

15   on --

16         CHIEF JUDGE BUMB:  Well, is it your position that as

17   to the -- well, "worthless" was Conti.  But even if there were

18   a claim for worth less, two words, there's no evidence that the

19   plaintiffs have introduced?

20         MR. OSTFELD:  So, Your Honor, it is our position that

21   there is no evidence -- there is no damages evidence on worth

22   less.  I think they could put in evidence that on -- there

23   could be a clash on general cause if that were brought in as

24   part of the worth less inquiry.  But they do not have a witness

25   who has "value," the diminution in value.

1          CHIEF JUDGE BUMB:  What do you mean by "general

2     cause"?

3          MR. OSTFELD:  So let me pose my own hypothetical if

4     it doesn't offend Your Honor.

5          In a world where plaintiffs had presented the type of

6     damages that courts accept on a worth less, two words, frame,

7     the analysis would be, the value as received was less than the

8     value as warranted because the safety characteristics were this

9     much less safe, or the efficacy characteristics were this much

10    less efficacious and, therefore, based on a -- perhaps a survey

11    design or some other study, we have determined that consumers

12    would pay X dollars less for the product.

13         So general cause certainly becomes part of the

14    analysis there because you have to know how much less safe the

15    product is.

16         I think they could put on a case on they believe the

17    product is less safe.  We believe the product is not less safe.

18    There could be a clash on that.  I'm not aware of any clash on

19    efficacy.  But what's missing from their case, they do not have

20    anybody who can say, therefore, the product is worth X dollars

21    less.

22         The jury can't just be put out in the wilderness and

23    told you've heard the evidence on safety, you've heard the

24    evidence on efficacy, now you go figure out what it was worth.

25    There has to be testimony, admissible evidence from an expert

1     that tells them, gives them the ability to quantify damages
2     under the two-word "worth less" scenario.  And it doesn't exist
3     in this case because plaintiffs made a strategic decision to go
4     all in on worthlessness, one word.
5          MS. ALLON:  Right.  I was just going to say, I think
6     Mr. Ostfeld got there.  There's nothing to go to a jury on that
7     point, because Dr. Conti did one damage calculation, which is
8     full refund.  And so if the plaintiffs are going to change
9     their theory of damages to diminution in value, there is
10    nothing to try in front of this jury.  There is no evidence
11    that they have as to what their damages are in a
12    diminution-in-value theory.  Dr. Conti didn't do it, and they
13    have no other expert to do it.
14         CHIEF JUDGE BUMB:  Well, she tried to do it, but I --
15         MS. ALLON:  No.  She just did the full value.  She
16    did worthless, not worth less.
17         CHIEF JUDGE BUMB:  But she's not a biologist.  She
18    wouldn't have been qualified to do that anyway.
19         MS. ALLON:  Well, they would have had to have a
20    survey expert, and then she would have calculated -- my point
21    is, there's no damages numbers to put before a jury.  So were
22    we here on summary judgment on diminution of value, worth less,
23    we would have to prevail because there is no evidence from the
24    plaintiffs in the record as to what their damages are under
25    that theory.  We don't have to wait for a directed verdict.

1    There's no evidence.  There's nothing to put in front of a jury

2    because they don't -- aren't pursuing that theory.

3            CHIEF JUDGE BUMB:  Okay.  Ms. Lockard, did you want

4    to say something?  Or Ms. Davidson, I'm sorry.  No?

5            MS. DAVIDSON:  No.  I think everything was said.

6            MR. SLATER:  Okay.  I want to take a little bit of a

7    step back to what's happening now.

8            We've been proceeding based on the rulings that have

9    been made in this case for five years.  And Judge Kugler ruled

10   on the decisions that got us here.  On the motion to dismiss he

11   actually ruled there is no value when you sell an adulterated

12   drug.  I understand that was the motion to dismiss.  On the

13   summary judgment motions, he denied our motion, and both sides'

14   motions.  And he said the value is somewhere between zero and a

15   hundred percent, and that's going to be for the jury to decide.

16           CHIEF JUDGE BUMB:  Based on admissible evidence,

17   that's true.

18           MR. SLATER:  So --

19           CHIEF JUDGE BUMB:  Based on admissible evidence, not

20   argument.  That's true.

21           MR. SLATER:  And he ruled that we had evidence that

22   was sufficient to go to the jury on that question.

23           So to now say we're going to change the rules on the

24   two-yard line or something and say, well, now -- I suppose Your

25   Honor could rule, look, I'm not going to let you say no value,

1    and you're going to have to say that it's less value, and we

2    would not be happy about that, we would preserve our rights,

3    but we would have to try the case under that basis.

4         How would we prove it?  We would put in the same

5    evidence that we already were going to put in.  We would put in

6    this is what was paid.  If you find no -- if you found no

7    value, it would be this.  But the Court has told you, you have

8    to find some value, so you can use these numbers, and you can

9    listen to what the defense said.

10        Remember, they have an unquantified value argument on

11   the defense side.  They have Dr. Stiroh who says, well, there

12   is value because I'm relying on the people who say there was

13   efficacy, but I never calculated what it was and I don't have a

14   number for that.  So she doesn't give any guidance to the jury

15   on that at all.

16        But the jury then looks at this and says, okay, this

17   is what was paid, this is what the plaintiffs say, this is what

18   the defense says, and the jury says we're going to -- and they

19   decide where they think in reason, based on the instructions of

20   how value is established, what the value was.  That -- if Your

21   Honor wants to --

22        CHIEF JUDGE BUMB:  Tell me the evidence the jury is

23   going to look at to determine value.

24        MR. SLATER:  They're going to hear all the evidence

25   on our side of the fact that at the cash register --

1          CHIEF JUDGE BUMB:  Yeah.

2          MR. SLATER:  -- on the warranty claim, there was

3    no -- that you were not allowed to sell this, and it was

4    illegal to sell.

5          CHIEF JUDGE BUMB:  They're not going to hear that.

6          MR. SLATER:  Well, Judge --

7          CHIEF JUDGE BUMB:  I'm not going to permit that.

8    That's argument.

9          MR. SLATER:  It's not.  It's the law.

10          CHIEF JUDGE BUMB:  That is argument.

11          MR. SLATER:  The law is that it was illegal to sell

12    these products.

13          And these -- you know, it's amazing that we're on the

14    defensive with these lawyers on the defense side putting us on

15    the defensive when these companies sold blood pressure pills

16    contaminated with genotoxins, and we're sitting here having to

17    explain why we should be allowed to recover in a warranty

18    case --

19          CHIEF JUDGE BUMB:  Because --

20          MR. SLATER:  -- where their own witnesses admit that

21    at the cash register if they hadn't represented it was

22    valsartan, falsely represented, it was valsartan USP, that was

23    a false representation, they could never have sold it.  And

24    there's not one person in this room that's going to stand up

25    and say, yeah, we could have sold it.

1        And Your Honor asked, are they arguing it was okay to

2   sell it; nobody on the defense side is going to say it.  That's

3   exactly what they want to argue.  They want to say put aside

4   that the FDA found the risk was unacceptable and every pill

5   that was out there that people were ready to sell or take --

6   that were ready to sell had to be recalled, and nothing else

7   was ever sold after that moment when the FDA found out.  They

8   put it in place, nobody could sell it.  They want to relitigate

9   that.  Your Honor ruled in July they could not relitigate the

10  FDA findings.  And they now want to say don't worry about what

11  the FDA said.  The risk really wasn't bad and it shouldn't have

12  been found unacceptable because it didn't hurt anybody.

13       And, by the way, let's just parenthetically put aside

14  the fact that there's been three studies done on valsartan

15  pills taken by people based on large insurance databases.  The

16  Gomm study, the most recent study they came up with both found

17  increased risk of liver cancer statistically significant.

18       And the last study that they were arguing about to

19  Your Honor, they haven't mentioned it in a while, also found

20  melanoma.

21       The Pottegard study, we have all sorts of arguments

22  about why it didn't get to statistical significance, very

23  compelling.

24       So they're standing here acting like there's no

25  evidence it caused cancer.  The only studies actually done on

1  valsartan pills found it causes cancer in people, liver cancer,

2  in two of the three studies.  So --

3           CHIEF JUDGE BUMB:  And that's the elephant in the

4  room you don't want the jury to hear about.

5           MR. SLATER:  I don't know.  I -- we filed a brief to

6  Your Honor.  I'm starting to get a little exercise.  I drank

7  coffee.  No, I didn't actually.  I'm joking.

8           What the defense wants to do is they want to say -- I

9  lost my train of thought trying to be funny.  I'm sorry.

10          CHIEF JUDGE BUMB:  Well, it's the elephant in the

11 room.

12          MR. SLATER:  Oh, I know where, okay.  So we've

13 submitted to Your Honor the way that courts deal with

14 situations like this, with an instruction.  That instruction

15 that we've submitted hits the issue head on and tells the jury

16 what they're to consider and what they're not to consider.

17          The fact that there's an unreasonable carcinogenic

18 risk is a matter of fact and a matter of law.  This is

19 evidence.  It's not argument.  It's the evidence and the facts

20 in the real world.  And the defense wants to argue, well, you

21 know what, let's put that aside and let's put on Dr. Chodosh

22 who parenthetically said I'm not an expert on regulatory

23 standards, which are protective and more conservative to

24 protect the safety of people.  I didn't even analyze that.  I

25 analyzed biological causation of cancer, which is not an issue

1    in an economic loss case.

2            So they want to bring in an expert who admitted I

3    don't fit that case at all, I'm not qualified and I didn't even

4    evaluate that question.  And they want to bring him in to say

5    well, you know what, the risk wasn't really that bad.  Nobody's

6    actually going to get cancer from this.  So putting that --

7    it's not an elephant in the room.  It would be putting a wild

8    tiger in the room to start eating everybody.  It doesn't

9    belong.

10           And the easy way to deal with it, the way the courts

11   do this every day, as Your Honor knows, is you give a limiting

12   instructions.  You say you're going to hear all sorts of words

13   like "genotoxin," and you're going to hear about "probable

14   human carcinogen," and you're going to hear all this language

15   from the regulations, and that's the question.  And those are

16   the standards that applied to whether you could sell this drug

17   because that's what NDMA and NDEA are.

18           What you're not deciding in this trial is whether

19   those pills with those amounts actually caused cancer in

20   anybody.  Because the law and the facts are you weren't

21   supposed to sell it with that stuff in at all.  And the defense

22   cannot dispute that.  Nobody is going to dispute that.  They

23   want to dispute it through the back door of general causation

24   where, as we pointed out in our brief, they already won a

25   motion to say we're not allowed to bring in the fact that

1    there's a whole bunch of people that are claiming they got

2    cancer from this and that we have strong evidence on.  They

3    kept out cancer causation already, but now they want it to come

4    in also, so they want it both ways.  We're not trying to have

5    it both ways.  We want to live in the world of this is the law,

6    this is what they were allowed to do.

7             And at the cash register the fact that there was

8    efficacy, we are able to say in opening statement, you know,

9    the defense is going to tell you that at the cash register

10   there was value because this was going to control blood

11   pressure.

12            Well, in the real world, if they didn't represent

13   that it was what it was supposed to be but actually told the

14   truth and said, look, it's supposed to have five attributes,

15   but the thing about safety, purity and quality, it doesn't have

16   that, but it's still going to help you, what do you want to pay

17   for it?

18            Judge Kugler already precluded the expert.  I think

19   it was Dr. Keller who wanted to say that, and that expert is

20   not allowed to testify.  So they tried to back-door in through

21   Dr. Stiroh now.  That's their argument.  If Your Honor wants to

22   let them make that argument, let the jury decide well, all

23   right, you know what, we could say it had these two attributes,

24   it had the right ingredients, for the most part, and it had the

25   right strength to control blood pressure.  It didn't have the

1    purity and the safety and the quality, and we're going to say

2    all right, it had 60 percent -- it had 40 percent of what it

3    was supposed to have but not the other 60 percent, so they can

4    value it based on that because that's what -- if they're

5    allowed to argue the efficacy, that's essentially on the

6    warranty claim, which, again, is the only claim we're arguing

7    about here, that is what the jury is going to decide, at the

8    cash register what were the facts.

9           The facts were it had two out of the five things it

10   was supposed to have.  And the jury can put that together and

11   decide, well, where is the value for it.  Our expert says this

12   is the full value and if you give a full refund, it would be

13   this.  If you didn't give a full refund, you figure out where

14   it falls.  And the jury makes that call, like they do in cases

15   all the time where they decide how much does a person get for

16   getting run over by a truck, for getting broken bones.  And

17   there's no guidance in New Jersey on how to value that, and

18   juries do it every single day.  There's nothing that's so

19   esoteric about this that a jury can't decide it.

20          So, again -- I'm sorry, Your Honor.

21          CHIEF JUDGE BUMB:  How do you get to zero value?

22          MR. SLATER:  Well, I was actually arguing in the

23   sense that, I could repeat it again, that if Your Honor says I

24   am not going to let you -- I thought you were going to --

25   you've decided there's no way I'm letting you argue zero value,

```
 1   so --

 2              CHIEF JUDGE BUMB:  How do you get to zero value?

 3              MR. SLATER:  How do we get there?

 4              CHIEF JUDGE BUMB:  Yeah.

 5              MR. SLATER:  We say at the cash register, you're not

 6   allowed as a matter of law, this is the evidence, this is the

 7   law, to sell because it's got three -- it's got two out of the

 8   five attributes.  You can't do it.  If it doesn't have all five

 9   attributes, it's illegal to sell it because it's not the

10   approved form the FDA lets you sell.  And, therefore, and we

11   obviously talk about why that happens and that their witnesses

12   admit that they could not sell it.  They were not supposed to

13   sell it.

14              And then they argue, well, you know, there was

15   efficacy so even though it slipped through, they got some

16   value.  But that's for the jury to decide at worst.

17              CHIEF JUDGE BUMB:  But then you have to come forward

18   and say it had zero value, not simply because it had a

19   contaminant, but because it had zero value, it didn't do what

20   it said it was supposed to do, addressing those five factors

21   that you want to talk about.

22              You can argue that it had a fundamental defect, it

23   didn't lower blood pressure, maybe it did, maybe it didn't.

24   But the fact that it caused cancer was, you know, overrode

25   everything and, therefore, it has zero value.  That's how the
```

"benefit of the bargain" goes.  We've got to make sure that
we're talking about liability versus damages.

            But this is how -- I keep going back to it, the
plaintiffs want to stand up and say, ladies and gentlemen of
the jury, here's my case, here's our case.  It turns out that
when we paid for these drugs at the counter they had
contaminants in them.  They weren't supposed to have
contaminants in them.  It was illegal to have contaminants in
them, give us a full refund, sit down.  The trial will take
five minutes, sit down.

            MR. SLATER:  And --

            CHIEF JUDGE BUMB:  That's not --

            MR. SLATER:  But that's not --

            CHIEF JUDGE BUMB:  That's --

            MR. SLATER:  We're not going to be that simple
though, Judge.  And we're not --

            CHIEF JUDGE BUMB:  But that's your case.  No.  But
that's your case in a nutshell.  And --

            MR. SLATER:  But it's not, it's not, because you left
out a very important part of our argument.  And your
hypotheticals were like what if it was some kind of
nonmaterial -- there could be cGMP violations, the label was
smudged.  There's a million examples you can come up with.

            CHIEF JUDGE BUMB:  Right.

            MR. SLATER:  But we're not walking in and saying, you

1    know, the law actually says that if there were rampant cGMP

2    violations in the facility, every pill, every drug that goes

3    out of there is technically contaminated, is technically

4    adulterated.  We're not arguing that.  We're not going for some

5    de minimis technical win.  We're not just saying because it was

6    contaminated.

7          We're saying because it was contaminated with

8    genotoxic impurities that are in the cohort of concern, that

9    were barred from being in these drugs, and it was not

10   manufactured, A, in conformance with cGMPs, which is one

11   independent basis to establish adulteration, and, two, did not

12   meet the compendial specifications that they represented it did

13   which is a second basis for adulteration, both of which we are

14   arguing and both of which we have evidence for, and our expert

15   will address and explain, because it was such a significant --

16   because the contamination was so significant in terms of what

17   it's rated as and what its potential impact was, its risk,

18   because of that significance, and that's where we think the

19   materiality prong goes in.

20         And Judge Kugler had the same concern.  You got to

21   show that it matters.  But in a regulatory case, as Dr. Chodosh

22   testified under oath, it's the risk level from a regulatory

23   standpoint, which is protective and conservative towards

24   safety, and that's why we're saying it didn't have value,

25   because what they said was not true and you could not legally

1    sell it.

2              Those pills were not legally sold.  They were sold

3    and it slipped through, but that doesn't give them the excuse

4    to say, well, no harm, no foul, we did it, and it helped.

5              They're going to argue, well, you know what, it turns

6    out, ladies and gentlemen, yeah, we probably shouldn't have

7    sold it, we figured it out eventually, but it did help them, so

8    they should get some value.  Their expert is going to be

9    allowed to say that.  Your Honor's letting Dr. Stiroh say it.

10   She has no methodology to value the efficacy.  So we're in the

11   position, I think, of looking at what are the attributes of the

12   pill.  What are the things that you have to have in order to

13   get approved to meet the USP criteria, and the jury decides it.

14             General causation does not belong because that's not

15   a factor at all.

16             CHIEF JUDGE BUMB:  I don't know.  I sit here, because

17   when I was first assigned the case, I recall reading the

18   parties' submissions.  And one of the concerns that I had, as I

19   read what the defendants had written, that proceeding in this

20   fashion was novel.  The way that Judge Kugler had decided to

21   proceed was novel; that this Court would create reversible

22   error if it did proceed in this way.  I considered it all.  I

23   saw the wisdom in it at the time.  But what has happened since

24   then is despite my efforts to drill down, drill down and talk

25   about evidence, I keep getting argument.

1          Now, what you've just said to me, Mr. Slater, says to
2    me -- you say things like the jury's going to hear that it had
3    a genotoxic contaminant; that it was unsafe; that the plaintiff
4    has to show that that matters, that all says to me what the
5    defendants have been quarreling about, which is how can they
6    try this case without causation.

7          And I get right back to it and I don't know.  I don't
8    know how the plaintiff can stand up before -- and I know you
9    folks have been arguing about, you know, the depositions and
10   these really ugly words that are being used, and I don't know
11   how the plaintiffs can get up and say all of these really --
12   genotoxic and mutants and really, really scary words without
13   addressing the elephant in the room.  And that is, well, are we
14   talking about, you know, a little speck of flour in these
15   things or are we talking about cancer that kills?

16         And I don't know how the plaintiffs walk that fine
17   line.  I've remained concerned about it under 403 for a long
18   time.  I just don't see how the case can be tried without
19   causation, I don't; I just simply don't.

20         MR. SLATER:  The --

21         CHIEF JUDGE BUMB:  You have tried to persuade me.  I
22   keep coming back and saying why would I try a five-week trial,
23   a four-week trial knowing that it's coming back.  And I'm not
24   going to try a four- or five-week trial if I don't have the
25   comfort that I am -- that this is -- that I'm comporting -- I

1   think I'm comporting with the rules of evidence and I'm
2   comporting with the law.  I just -- I think it's -- there's two
3   problems, maybe three.
4          It's argument versus evidence.  It's liability versus
5   damages.  There's a lot of conflating going forward.
6   There's -- now the other issue is, are we talking about it has
7   zero value because it's like a sugar pill or are we talking
8   about it's a fundamental defect because it is a genotoxic
9   contaminant?  And if that's the case and it causes cancer, then
10  we should get a full refund.  Or are we talking about it's a
11  sugar pill and we should get a full refund because it's
12  completely inefficacious?  Or is the jury going to weigh both
13  of those and say, well, there was a therapeutic value, the
14  chance of getting cancer was so nil and the FDA said sell it
15  anyway even after the recall.  So that is where I think the
16  robust discussion in the jury box is going to happen, which is
17  what is the value.
18         Plaintiffs keep wanting to come back and saying it
19  should never have been sold, period, it was illegal to sell it,
20  we get our full refund.  And then we get into another argument
21  that I haven't even gotten to, which is the defendants'
22  argument, which is, well, if they're going to make that
23  argument, they don't just get a free ride here, particularly in
24  the absence of fraud, because we didn't know it contained
25  nitrosamine.

1        And that appeals to me, because I think if the jury

2    finds that they didn't know, I mean, does that mean that the

3    plaintiffs get a full windfall?

4        These are all questions that, you know, what, three

5    weeks before trial continue to swirl around, and I still don't

6    have clarity on.  I'm not going to try a case unless I have

7    clarity on it.  And siting here today, as you can tell, I don't

8    have clarity; I just don't.

9        And part of the problem is I think the motion to

10   dismiss was somewhat far broader than the motion for summary

11   judgment.  I think there were -- I think perhaps there -- you

12   know, I can reconcile those two documents because of the

13   pleadings stage.  One was a pleadings stage and one was summary

14   judgment stage.  But -- I don't know.

15       MR. SLATER:  You know, Judge, it's interesting

16   because you haven't heard from the defense where they've

17   actually pointed to the law or what actually happened here in

18   terms of the warranty claim, in terms of the fact that these

19   shouldn't have been sold, where they haven't -- they've never

20   pointed to you and said, well, you know, the FDA or the law in

21   general says that if it actually caused cancer, that's a

22   touchstone to whether the drugs could or could not be sold

23   because that's not the law.  The law --

24       CHIEF JUDGE BUMB:  Well, they -- I don't -- what --

25   they are not disputing that once the contaminant -- we have to

```
 1    deal in what the facts are.

 2              MR. SLATER:  That's what --

 3              CHIEF JUDGE BUMB:  Their evidence, presumably,

 4    they're going to -- well, if they're going to put in evidence

 5    that, you know, yeah, we knew from day one it contained this

 6    and we sold it anyway, well, then that's their issue, and I'm

 7    sure you're happy about it.

 8              But they're not -- the evidence is going to be, I

 9    presume, that at the time that they found that it contained the

10    contaminant, they advised the FDA and the FDA issued the

11    recall.  That's why I'm saying we have to deal in what the

12    facts are.

13              Plaintiff is going to come forward and say, well, no,

14    it was adulterated from day one because this is what the

15    evidence shows; that given the process that they used, it

16    produced this contaminant from day one, and we should get -- we

17    should get our money back, not because it was illegal to sell,

18    but because it was not the "benefit of the bargain."  It was

19    more harm than it was efficacious, number one.

20              And number two, you know, dealing with the fraud,

21    well, we get a full refund plus some because they knew and they

22    hid it from the FDA.  But we're not even dealing with the

23    fraud.  We keep focusing on the express warranty.

24              MR. SLATER:  Well, the --

25              CHIEF JUDGE BUMB:  I feel like I keep talking in
```

*52*

| | |
|---|---|
| 1 | circles up here; I really do. |
| 2 | MR. SLATER:  Well, when you talk about why we are |
| 3 | entitled to recover, you asked why are you entitled, why are |
| 4 | you entitled to recover, it's a breach of warranty claim.  The |
| 5 | reasons that they breached the warranty matter. |
| 6 | CHIEF JUDGE BUMB:  Exactly.  You keep saying that. |
| 7 | And that's why causation matters. |
| 8 | MR. SLATER:  But there is no causation prong in a |
| 9 | warranty claim. |
| 10 | CHIEF JUDGE BUMB:  That -- |
| 11 | MR. SLATER:  It's not an element of the claim, Your |
| 12 | Honor. |
| 13 | CHIEF JUDGE BUMB:  It's an element of damages. |
| 14 | Focus, liability.  Focus on liability and then focus on |
| 15 | damages.  Focus on the elements of showing a breach of |
| 16 | warranty.  That goes to liability.  Now we've got to deal with |
| 17 | damages. |
| 18 | Is it an element of liability?  No. |
| 19 | MR. SLATER:  Of course. |
| 20 | CHIEF JUDGE BUMB:  Is it an element of damages?  Yes. |
| 21 | MR. SLATER:  The only causation, quote-unquote |
| 22 | causation for a warranty claim is did it -- if it didn't comply |
| 23 | with the warranty, you're entitled to get your money back. |
| 24 | To the extent that Your Honor -- and I know I've said |
| 25 | this before and I know I've just said it a few minutes ago -- |

1    to the extent the Court has a concern that you don't want some

2    de minimis technical violation to be the basis for our

3    argument, we are not arguing that.

4              CHIEF JUDGE BUMB:  No; I know.  I think you're

5    arguing -- I think you're arguing what is called a fundamental

6    defect in the product.

7              MR. SLATER:  It clearly is a fundamental defect.

8              CHIEF JUDGE BUMB:  Okay.  And so that to me says what

9    makes it a fundamental defect, because it doesn't do what it's

10   supposed to do, it actually is more harmful than what it's

11   supposed to do.  To me that sounds like causation.

12             MR. SLATER:  Well --

13             CHIEF JUDGE BUMB:  "Materiality," "fundamental,"

14   those are all words that to me say causation.  They all say to

15   me -- I now see the wisdom of what the defendants are saying to

16   me why maybe perhaps personal injury cases are tried first,

17   because they make more sense.

18             MR. SLATER:  Can I ask a question, Judge?

19             One option you have is to say to us, I'm letting

20   causation in.  I'm going to let the defendants argue that

21   there's no evidence that this could have ever caused cancer in

22   the amounts that was in there.

23             CHIEF JUDGE BUMB:  Uh-huh.

24             MR. SLATER:  We wouldn't be happy about it.  We'd

25   have to add a bunch of testimony back into our designations,

1  because we have devastating admissions from the witnesses; for

2  example, admitting that the treatise they cited in their

3  submissions to the FDA from the World Health Organization says

4  it's likely to cause cancer in humans, for example.  We took

5  that out of our designations.  We have a lot of evidence on

6  that.  We bring in our -- one of our experts or two of our

7  experts to -- and honestly, Your Honor, I don't think you've

8  already -- if you were to let it in, I assume it wouldn't be a

9  full-blown causation trial.  They'd have Dr. Chodosh.  We'd

10 bring an expert in.

11         I'm previewing it for the defense.  I don't know how

12 they get around the only studies that have ever been done on

13 the pills that show it actually does have a significant -- an

14 increased risk of cancer that's statistically significant.

15         So I guess Your Honor could say, look, if we're going

16 to trial, I'm going to let them argue causation.  We put

17 guardrails around it.  We put our evidence back in.  We won't

18 be happy about it.  The case is going to take longer because

19 there's going to be more witnesses and more testimony, but

20 we'll have to deal with that.  And there's no way that we --

21 and there's nothing that we can do about that.  And --

22         CHIEF JUDGE BUMB:  And that is your worth less, two

23 words, case.

24         MR. SLATER:  Well, I think it's our no worth or our

25 worth less case because in that case we're going to be

1    allowed --

2              CHIEF JUDGE BUMB:  It could be.

3              MR. SLATER:  Because remember, they blocked us from

4    proving it causes cancer.  That was their in-limine motion to

5    block us.  So now that in-limine motion, you'd have to change

6    your ruling, because obviously you'd have to vacate it because

7    they've changed their position, and then we would put in

8    evidence that it does cause cancer, and then all this would

9    come in.  And now, you know what, maybe it's better for us on

10   appeal if they do that.

11             CHIEF JUDGE BUMB:  No.  I think --

12             MR. SLATER:  Because --

13             CHIEF JUDGE BUMB:  To be fair, I think that the

14   confusion came from a ruling from Judge Kugler that causation

15   was not to be a part of this trial.  And so that's my

16   recollection, though someone will correct me if I'm wrong.  And

17   as a result, there was a motion that since it wasn't going to

18   be part of this trial, that it needed to be kept out by the

19   plaintiffs.  And based upon that, with those parameters, I

20   ruled that.  But as I've said, I've gone back and forth and

21   back and forth.  And I don't know how it doesn't become part of

22   this trial.

23             MR. SLATER:  I don't --

24             CHIEF JUDGE BUMB:  Does anyone agree with me on this

25   side?

1          MR. SLATER:  I don't think that's correct, Your

2     Honor, because they also in the motions, the same motions, they

3     argue general causation is a part of the case.  Remember --

4          CHIEF JUDGE BUMB:  A part of the case.

5          MR. SLATER:  Yeah.  They wanted general -- we briefed

6     the in-limine motions.  One of their motions was we should not

7     be allowed to tell the jury that this caused cancer in people,

8     we shouldn't be able to argue it, suggest it, or anything else.

9     They also argued general causation should come in, and we

10    argued it shouldn't.  And that was an issue that Your Honor

11    addressed on July 23rd.

12         So I think that, really, what I'm saying to you is if

13    that's the only way we're going to try the warranty claim,

14    because, again, I don't think it's an issue with the other two

15    claims.  The other two claims are it was deceptive conduct and

16    outright fraud.  Those two claims are different because that's

17    where we're actually saying you actively deceived.  The

18    warranty claim is the warranty -- there's an element of

19    deception in that, but the warranty claim is you said it was

20    this; it wasn't.  And you said it has to matter, though.  I'm

21    paraphrasing.  And we agree with that.  It has to matter.  And

22    that's materiality under the regulatory law that applies here.

23         Dr. Chodosh said exactly the same thing Judge Kugler

24    said.  He said it's two different standards.  We're not

25    applying biological causation in this case because that's not

1    what the law is.  That's not the reason they pulled this off

2    the market.  No one ever studied this to say in these amounts,

3    in these pills it causes cancer so that's why there's a recall.

4    No.  It's because they're genotoxic probable human carcinogens

5    that have been looked at for many, many years.  There's

6    regulations going back to the early 2000s and before, but

7    certainly by 2008 the FDA said you can't have these in the

8    drugs.  These are very dangerous substances.  It can't be in

9    there.  And if you want to have it in there, you have to

10   analyze it up front, you have to come to us and we'll make a

11   decision.  And they never did that so it wasn't allowed.

12           So the causation is not part of this case as a matter

13   of law and as a matter of fact because it was never looked at.

14   When you look at why these drugs were pulled off the market,

15   Judge, that's just what it is, though.  The reason the drugs

16   were pulled off the market is because it had NDMA in it, not

17   because the FDA found it's going to cause cancer.

18           CHIEF JUDGE BUMB:  No; I know that.

19           MR. SLATER:  And, by the way, they eventually did do

20   an analysis and said we think 1 in 8,000 people would have an

21   increased risk of cancer, and they did these analyses and they

22   did their whatever.  But they said, yes, more people are going

23   to -- because people are going to get cancer.

24           But, you know, if the answer is, I'm not letting you

25   try the warranty claim without the causation, then we have to

1    live with that.  And maybe that's good for us, because then we

2    don't have to worry about it being tried without it.  They have

3    nothing to argue about on appeal.  And then maybe it helps the

4    Court to feel more comfortable.

5            CHIEF JUDGE BUMB:  All right.  Let me just hear from

6    them.

7            And the other thing, I just want to say it while it's

8    on top-of-mind, which is I think it's incorrect to say to the

9    jury that it's illegal -- it was illegal for the defendants to

10   sell these drugs in 2012, because illegal says that they

11   violated the law.

12           It is true that as a matter of law adulterated drugs

13   can't be sold, that is true.

14           MR. SLATER:  So we say it that way.

15           CHIEF JUDGE BUMB:  Well, yeah, but words matter.

16           MR. SLATER:  They matter.  But here's the problem:  I

17   think one of the big things the Court might be wrestling with

18   in the abstract --

19           CHIEF JUDGE BUMB:  What I'm wrestling with is that

20   the plaintiffs just keep making arguments and not backing it up

21   with evidence.  And I'm very frustrated by it.  Can you see?

22           MR. SLATER:  The evidence is that the condition of

23   these pills, based on how they were manufactured and what ended

24   up in them, violated the specifications, violated cGMPs,

25   rendered them contaminated, et cetera.  And as a matter of law,

```
 1   because we argue that they met the statutory definition -- this
 2   is not argument, this is evidence.  Our experts are going to
 3   say it met the statutory definition of adulteration.
 4            CHIEF JUDGE BUMB:  They are not -- they are not
 5   permitted to be sold.  But unless and until you prove that they
 6   knew what they were selling was contaminated, it is not proper
 7   argument to say that they illegally sold them.
 8            MR. SLATER:  But it's not an element of the claim,
 9   Judge.  I mean, I get that you --
10            CHIEF JUDGE BUMB:  But it's a 403 issue.
11            MR. SLATER:  We're going to now create more hurdles
12   for us to get over --
13            CHIEF JUDGE BUMB:  No.  You've got to --
14            MR. SLATER:  -- on a claim where knowledge is not an
15   element of an express warranty claim.  It's an element of --
16            CHIEF JUDGE BUMB:  I'm talking --
17            MR. SLATER:  -- the fraud claim, but it is not an
18   element of this claim.  I'm sorry, Judge.  I don't mean to
19   interrupt you.
20            CHIEF JUDGE BUMB:  I'm talking about how -- the
21   arguments that you're presenting to the jury.  You've got to be
22   very careful.
23            I mean, you've just got to be very careful and
24   precise on what your arguments are.
25            Let me hear from Ms. Lockard.
```

```
 1            MS. LOCKARD:  Thank you.  Thank you, Judge.  I've
 2    been listening very patiently for my opportunity.
 3            Just to clarify a couple of points that Your Honor
 4    has picked up on.  We absolutely disagree with the contention
 5    that we think we did anything illegal in selling these drugs.
 6            The FDA itself, if you want to talk about evidence,
 7    we have a statement from the FDA that explains it, which
 8    basically says from Commissioner Gottlieb at the FDA that it
 9    needs to be recognized that there is a risk of an impurity
10    occurring to know that it should be tested for.  Before we
11    undertook this analysis, meaning FDA, neither regulators nor
12    industry fully understood how the nitrosamines could form
13    during the manufacturing process.  That's evidence.  That's
14    from the FDA.  That will come in.
15            So --
16            CHIEF JUDGE BUMB:  Right.  And then they'll respond
17    with the warning letter and then your expert's admission.  I
18    mean, I understand that's the back and forth.
19            MS. LOCKARD:  Correct.
20            CHIEF JUDGE BUMB:  And that's a jury question.
21            MS. LOCKARD:  So then we'll fight about whether there
22    was a cGMP violation, whether the products were adulterated.
23    Both sides have their position on that.
24            The issue, though, is on the general causation -- and
25    by the way, the motion in limine that Mr. Slater is referring
```

1    to, it's Motion in Limine No. 10 by the defendants.  And it was

2    to exclude evidence or reference to individuals, individuals,

3    who used valsartan and developed cancer.  So we didn't want

4    them to come in and say, oh, we've got all these other clients

5    who are suing has cancer.  That's what that motion was about.

6    It wasn't about general causation.

7          So, you know, obviously our position is set forth in

8    the papers.  And as you recognize, Judge, you said it is the

9    elephant in the room.  And we agree we don't need to get into a

10   full epidemiology trial and spend days talking about this.  And

11   the literature that Mr. Slater has referred to, we absolutely

12   have responses to that, as to why it's not reliable, why it

13   doesn't matter, why it doesn't prove that these drugs cause

14   cancer.  Dr. Chodosh can speak to that as well as other experts

15   we have.  We have epidemiology and toxicologists if we blow it

16   up that much.

17         But the important thing is plaintiff wants to be able

18   to come in and say, well, it was an unacceptable risk.  That's

19   what the FDA said.  And that's the regulatory risk.

20         And Your Honor asked about the difference between

21   biological risk and regulatory risk.  The issue is that the

22   FDA's obligation is to make sure there are safe drugs on the

23   market.  The way they do that is they want to ensure that the

24   drugs that are being marketed are free from unreasonable risk.

25         So the FDA never undertook to determine if these

1    drugs caused cancer.  They never did.  At the time when all of

2    this came to light, the FDA was acting very fast and furiously

3    to get this resolved because there are, you know, millions of

4    patients taking these drugs.  And FDA, as you know,

5    Commissioner Gottlieb said this is a new issue.  They sprang

6    into action and they said we've got to do something.  We've got

7    to get some guidance, so we're going to come up with some sort

8    of limits and standards that can be easily and quickly applied.

9    And so what they did -- and in our submission with, as we've

10   described, Dr. Chodosh's testimony, the FDA came up with these

11   limitations based on a linear low dose extrapolation from

12   animal studies.

13          Now, that presumes that extremely low doses of the

14   substance are potentially carcinogenic over the course of the

15   lifetime, based on an assumption that they drew from studies

16   where these massive amounts were given.  And so all they did is

17   they did a straight-line extrapolation and said, well, we know

18   if this amount causes cancer in rats, you know, let's

19   straight-line extrapolate it down to a limit that we can be

20   assured is safe.

21          They didn't say anything below that level is unsafe

22   or causes cancer.  They just said, look, let's stop it here.

23   We know if we stop it here and we apply these limits that

24   everything on the market will be free of unreasonable risk.

25          That raises the question, though, it's unanswered

1    through that, it's unanswered through the FDA levels as to

2    whether what was actually on the market causes cancer.

3                CHIEF JUDGE BUMB:  Well, the concern I have is that

4    once the jury hears that it's free from an unreasonable risk,

5    it raises the question risk from what?

6                MS. LOCKARD:  Exactly.

7                CHIEF JUDGE BUMB:  And now we're back to causation;

8    that there is this potential that it could cause cancer, et

9    cetera.

10               And I think to somehow water it down and argue to the

11   jury that, well, the FDA determined that this poses an

12   unacceptable risk when they recalled it and, therefore, on day

13   one it posed an unacceptable risk, it still leaves open the

14   question of risk from what?

15               MS. LOCKARD:  And it has to be said, in the

16   unacceptable -- our position and our -- this is our argument to

17   the jury would be that it's an unacceptable risk to have the

18   drug on the market.  That's all the FDA was saying.  It's an

19   unacceptable risk, because we don't know at present what level

20   would actually cause cancer, if any.  But we know that if we

21   keep it at this level and we let anything that's below this

22   level on the market, we know it's safe.  But safe from what?

23   What is the risk?

24               So you have to be able to explain, well, we're

25   talking about carcinogenicity.  So the next question to the

1  jury is, well, what is the real risk?  You know, does anyone

2  get cancer?  What do we -- nobody has presented that.  And if

3  defense is not able to present the biological risk and the real

4  evidence from the scientists and the biologists and the cancer

5  researchers, the jury is left with concluding that oh, well,

6  defense must concede this; that the drugs that were on the

7  market did cause cancer.  And that, we feel, that is the root

8  of the error in proceeding in this way.

9         CHIEF JUDGE BUMB:  And so the breach of warranty is

10  the difference at the time and place of acceptance between the

11  value of the goods accepted and the value they would have had

12  if they had been as warranted.

13         And so to say to the jury that they had no value

14  because they posed an unacceptable risk deprives the jury of

15  knowing what that risk is and deprives the jury of any evidence

16  in determining what that value might be, because -- I -- I --

17  yeah.

18         MR. SLATER:  Your Honor.

19         CHIEF JUDGE BUMB:  Yeah.

20         MR. SLATER:  We don't want to deprive the jury of

21  evidence.

22         CHIEF JUDGE BUMB:  What?

23         MR. SLATER:  We don't want to -- I'm sorry.  We don't

24  want to deprive the jury of evidence.

25         We want to say exactly what defense counsel just

conceded.  It was an unacceptable risk to have the drug on the market.  What was the unacceptable risk?  It was unacceptable carcinogenic risk from a regulatory standpoint.  And we've submitted to Your Honor a limiting instruction that explains to the jury exactly what that means, exactly what they will decide and what they won't decide.

They agree that having that NDMA in those pills was unacceptable and you can't sell it.  That's the law that applies to this claim.

Now -- so we're not saying don't tell the jury what the risk is.  We're going to put in the guidelines from ICH and the FDA.  And their own -- ZHP had an internal standard operating procedure that went back to 2011 that said they had to identify every genotoxic carcinogen or genotoxic impurity because they knew that this was unacceptable.  This is a regulatory safety issue, as counsel just argued.  That's what Dr. Chodosh said.

I think a big part of the problem is, the facts and the law are very one-sided in this case.  I mean, I think that -- and I'm trying to be a psychologist here a little bit, because I think Judge Kugler had the same concern you have, which is this is so one-sided, how do they have a defense?  And he said I'm going to let the jury decide some of these questions.

The law and the facts -- because the facts are so

1    one-sided and so disturbing and because the law is so clear, it

2    is a very, very one-sided case.  And they're saying, well, let

3    us argue things that don't apply in this context.  Let us apply

4    general causation.  And you know what, Judge, we're saying,

5    over our objection, if you say it has to come in, then let's

6    try the case with general causation in it.  We'll do it.  We're

7    not going to run away from it.  We'll have to do it.  And it

8    may be great for us on appeal that if we had to try it, they

9    have nothing to complain about.  But we don't want to hide from

10   the jury what's being tried.  We don't want to hide what the

11   risk is.  They need to know that.  That's why it mattered at

12   the cash register because it wasn't a smudged label.  It wasn't

13   a piece of flour.  It was something that was real and

14   dangerous, and as they say, as counsel just argued, the FDA

15   looked at this and said we're not analyzing whether it causes

16   cancer in these amounts.  This is something that we've known

17   for many, many years.  We can't have these impurities.  They're

18   a cohort of concern.  They're very toxic.

19          I mean, we know what NDMA is used for.  It's

20   deliberately used to give cancer to lab animals.  That's how

21   it's used in the laboratory.  It's a very dangerous substance.

22          If they really want to join this and counsel really

23   wants to stand up and say, you know what, ladies and gentlemen,

24   yeah, we shouldn't have sold it and we weren't supposed to sell

25   it, I don't know, I guess you'd have to fashion some

1    instruction to tell them why you're letting them argue general

2    causation.  Maybe you say, well, this goes to damages but not

3    liability, because the liability didn't factor in general

4    causation, but however the Court would do it.  And they argue

5    you know what, yeah, we sold this stuff and, yeah, we didn't

6    know it was there, but you know what, it turns out we've got

7    Dr. Chodosh who's going to tell you it doesn't cause cancer in

8    those amounts.

9         You know what, maybe the jury after they hear our

10   evidence there says, you know what, how dare these people, how

11   dare they come in here after they've put this into our drug

12   supply and say, well, you know what, it's no harm, no foul

13   because it was too little to cause you cancer.

14        You know what, maybe with punitive claims, maybe

15   that's the best thing they could ever argue for us.  And we'll

16   live with it, Judge.  I mean, at this point we just want to try

17   this case.  I'm not agreeing that it would be the right

18   outcome, but reasonable minds can differ.  And your mind is

19   much more important than my mind.  So if that's what you rule,

20   then we'll try the case like that.  We'll have no choice and

21   we'll do it.

22             CHIEF JUDGE BUMB:  Let me take a break.  I'll be

23   back.

24             THE COURTROOM DEPUTY:  All rise.

25             (Recess was taken at 2:22 p.m. until 2:48 p.m.)

```
 1              THE COURTROOM DEPUTY:  All rise.

 2              CHIEF JUDGE BUMB:  Okay.  You can have a seat.

 3              Where did we leave off?  Somebody wanted to say

 4    something to me.

 5              MR. OSTFELD:  Your Honor, there was just one point

 6    that I wanted to raise that I neglected to raise during the

 7    initial conversation about the diminished value, the worth

 8    less, two words, theory, which is that Judge Kugler actually

 9    dismissed that theory on standing grounds in his Motion to

10    Dismiss Opinion No. 2.  It's document 728 at pages 11 and again

11    at page 13.

12              What he essentially says --

13              CHIEF JUDGE BUMB:  Wait.  Let me get to it.  Hang on.

14              MR. OSTFELD:  I'm sorry, Your Honor.

15              CHIEF JUDGE BUMB:  What page?

16              MR. OSTFELD:  So it's at page 11 is kind of the

17    introduction to that, at the bottom of the first full

18    paragraph, and then the substantive discussion of it is on

19    page 13.

20              Where Judge Kugler writes, the second theory of

21    economic loss, the receipt of a less valuable product would

22    have sufficed --

23              CHIEF JUDGE BUMB:  Wait.  I'm sorry.  I don't see it.

24              MR. OSTFELD:  Oh, I'm so sorry, Your Honor.

25              CHIEF JUDGE BUMB:  That's all right.  Motion to
```

1    dismiss opinion.

2              MR. OSTFELD:  Opinion No. 2, document 728.

3              CHIEF JUDGE BUMB:  Oh.  Okay.  I'm on the wrong

4    opinion.  Hang on.

5              Well, maybe I don't have it.  I have the 775 opinion.

6              MR. OSTFELD:  Okay.

7              CHIEF JUDGE BUMB:  Let me hear it.

8              MR. OSTFELD:  Okay.  So I'll read both sections,

9    then, Your Honor.

10              CHIEF JUDGE BUMB:  Okay.

11              MR. OSTFELD:  Beginning on page 11 of document 728,

12   Judge Kugler first identified plaintiffs' three theories of

13   economic injury.  He identified them.  The first theory was

14   receipt of a worthless, one word, product because of the

15   failure to receive the "benefit of the bargain."  The second

16   was receipt of a less valuable product because of the failure

17   to receive the "benefit of the bargain."  The third was

18   economic loss from having to purchase replacement medication

19   due to the voluntary recalls.

20              CHIEF JUDGE BUMB:  Okay.

21              MR. OSTFELD:  What he found at the --

22              CHIEF JUDGE BUMB:  Wait.  Hang on one second.  Let me

23   just...

24              MR. OSTFELD:  I'm sorry.

25              CHIEF JUDGE BUMB:  Let me just read it.

1    Okay.

2    MR. OSTFELD:  All right.  And he found the first and

3    third theories satisfied standing.  He found the second theory,

4    the worth less, two word, theory, "fails to allege facts which

5    would permit a fact finder to value the purported injury

6    with" -- I think he meant without, but it says "with resorting

7    to mere conjecture."

8    The analysis for that then comes on page 13.  On the

9    second full paragraph, Judge Kugler writes:  "The second theory

10    of economic loss, the receipt of a less valuable product would

11    have sufficed to establish an injury in fact if plaintiffs had

12    provided a theory for the fact finder to value it, but they do

13    not.  Instead, they would have the fact finder resort to mere

14    conjecture to value their purported injury.  This second theory

15    is insufficient to confer standing."

16    CHIEF JUDGE BUMB:  That's the *Zantac* ruling.

17    MR. OSTFELD:  That is the *Zantac* Opinion.  And it

18    applies equally here.  And it also applies -- of course,

19    standing is reevaluated at each stage.  And here we are at the

20    trial stage, and it applies with equal force here.

21    Plaintiffs still do not have any evidence, economic

22    survey, otherwise, that would allow the fact finder without

23    resorting to mere conjecture to value the purported injury for

24    diminution of value.

25    So we can certainly have a trial where general

1    causation comes in, but it's binary.  It's worthless, that's

2    the theory they've gone all in on.  If they can't prove that

3    it's worthless, it doesn't go to the jury.

4              CHIEF JUDGE BUMB:  You have to -- you have to say

5    that again because the record's not going to reflect what

6    you -- you have to say one word and two words.

7              MR. OSTFELD:  Okay.  I'm sorry, Your Honor.

8              It's their theory, the plaintiffs have strategically

9    gone all in on, one word, worthless as their theory of damages.

10   That is the only evidence they were prepared to present to the

11   jury through Professor Conti, and that opinion has been

12   excluded.

13             So where we are now, they do not have economic

14   damages evidence for their worthless, one word, theory.  They

15   have never had and do not have economic damages for their worth

16   less, two words, theory, which was dismissed for lack of

17   standing at the motion-to-dismiss stage.

18             So I think we're back to Your Honor's suggestion,

19   which is this is now a summary judgment matter.  There is no

20   evidence to present on damages at trial.  There is no evidence

21   to take this to a jury.  Therefore, I can make an oral motion,

22   we can make a written motion, but we believe this case is now a

23   summary judgment case.

24             CHIEF JUDGE BUMB:  You want to respond.

25             MR. SLATER:  I didn't understand that Your Honor

1   actually ruled that we cannot put in the no-value theory,

2   number one.

3          Number two, I'd have to look again at these rulings.

4   I obviously have not looked at them in a long time.  But we

5   certainly believe, before even getting to that issue, and,

6   again, I would want to look at the decision -- and as counsel

7   just said, standing gets reevaluated at various stages of the

8   case.  I've made arguments here as to how it would be valued,

9   arguments that were never presented at that time because it was

10  a much more flat record.  We hadn't done the -- we hadn't

11  developed the case.  So if the standing issue is now going to

12  be challenged on worth less, then we would obviously be able to

13  present arguments such as we made here today.

14         CHIEF JUDGE BUMB:  Well, no.  I think the issue that

15  Judge Kugler had from what's being presented is that the

16  plaintiff alleged no facts to support a value worth less, two

17  words, and so that claim was out.

18         And it reminds me of what Judge Rosenberg ruled:  "In

19  this MDL, the plaintiffs attempted, but were unable, to put

20  forward reliable evidence to prove that ranitidine was unsafe,

21  which now changes the Court's standing analysis."

22         It says, "During the motion-to-dismiss stage, the

23  standing theory on which the plaintiffs relied for their

24  economic loss claim had some similarities to *Debernardis* and

25  *Aqua Dots* because the Court found that the plaintiffs plausibly

1    alleged that the drug was unsafe and should not have been

2    sold."

3           It's a little different, because then the Court --

4    because she did preclude the testimony under *Daubert*.  The

5    plaintiffs could no longer claim that the drug was unsafe or

6    should not have been sold because of its cancer-causing

7    propensity.

8           And I'm understanding from Judge Kugler's Opinion

9    that the complaint here -- the operative complaint here never

10   alleged that the drugs should never have been sold because of

11   its cancer-causing propensity.  I don't know.

12          MR. SLATER:  I mean, that's been a fundamental

13   allegation in the case all along that --

14          CHIEF JUDGE BUMB:  I don't know.  From what was read

15   to me, of course I didn't have the Opinion in front of me.

16          MR. SLATER:  In our case.  I don't know --

17          CHIEF JUDGE BUMB:  The Judge seemed to find that you

18   were not making that allegation and, therefore, the claim was

19   out.

20          And, you know, as Mr. Ostfeld says, you made the

21   strategic choice to go, you know, all in with the worthless,

22   one word, theory.  It shouldn't have been sold, therefore,

23   they're worthless.

24          MR. SLATER:  Well, I think if we're going to talk

25   about what Judge Kugler did, he said that it's a jury question

1    about whether there was any value or not.

2            And I want to add something to what we talked about

3    before, because you're asking what is the evidence.

4            CHIEF JUDGE BUMB:  That's true.  I mean, it does

5    sound as if they're -- how can I put this?  It does sound as if

6    there's -- I'd have to look to see how I can reconcile the

7    motion to dismiss with the summary judgment opinion.

8            Yes?

9            MR. SLATER:  I think one of the other things that's

10   important in terms of you're asking us what is our evidence

11   about the value not being -- having no value, the evidence of

12   no value.

13           One of the other things that's important to remember

14   here is, unlike in *Zantac* where all Zantac was contaminated, in

15   this case all valsartan and all sartans and all blood pressure

16   pills were not contaminated, number one.

17           So if we look at the warranty claim, a person walks

18   up to the cash register and now they're presented with, in

19   their version of the case, which Your Honor's allowing them to

20   argue, well, there was efficacy so there's value.  So

21   essentially the argument is, well, if a consumer had a choice

22   they still would have paid less but they wouldn't have had to

23   pay nothing, okay.

24           CHIEF JUDGE BUMB:  Uh-huh.  Yes.

25           MR. SLATER:  But that could never have happened.  Our

1  evidence is, because we have the evidence, the TPP

2  representatives are going to testify that the way the formulary

3  works is the TPP cannot buy a drug that does not comply with

4  the compendium.

5          CHIEF JUDGE BUMB:  Right.

6          MR. SLATER:  So --

7          CHIEF JUDGE BUMB:  But they did.

8          MR. SLATER:  But if they were told this is a drug

9  that has efficacy but doesn't have safety, quality, and purity,

10 it could not have been sold.  So in terms of what the evidence

11 is about the value at the time of the register from the TPPs'

12 standpoint, they would not have paid anything for the pills

13 that were not in compliance because they can't.  They're not

14 allowed to.  They --

15         CHIEF JUDGE BUMB:  I know.  But --

16         MR. SLATER:  And number two, the retailers have

17 confirmed they would not have sold it.

18         CHIEF JUDGE BUMB:  I know.  But those aren't the

19 facts of the case.

20         MR. SLATER:  No; but it is the facts of the case.

21         CHIEF JUDGE BUMB:  No, they're not.

22         MR. SLATER:  Because those are the rules that

23 applied.  So under the warranty law, if we're going to value at

24 the register and we're going to value what the drug is worth

25 and they're going to say, well, there's going to be efficacy,

1    it's okay that there was not going to be quality, purity,

2    safety because the efficacy gives it value, the evidence is,

3    well, what would the TPPs have paid for at that time.

4              CHIEF JUDGE BUMB:  Right.

5              MR. SLATER:  So if they want to introduce that, and

6    the TPPs, our evidence is going to be, wouldn't have paid for

7    it.  Their argument is, well, you know what, you did pay for it

8    and you shouldn't get all your money back because it still

9    helped your customers.  And the jury makes the decision.  And

10   the jury makes the call on that.  They decide what's the value.

11   And, again --

12             CHIEF JUDGE BUMB:  I think it just -- this all

13   highlights to me why it is that it's an impermissible argument

14   to the jury, it seems to me, that a plaintiff can't just get up

15   and say we get a full refund because they should never have

16   sold it.

17             MR. SLATER:  But we're not --

18             CHIEF JUDGE BUMB:  Why?  Because you have to, under

19   the categories that Judge Rosenberg was talking about, you have

20   to either allege that it was unsafe and, therefore, it had no

21   value, that there was such a fundamental defect and, therefore,

22   it had no value or, you know, you have to dispute that it had

23   any therapeutic value.

24             It just seems incongruous to me that the third-party

25   payors can recover under the plaintiffs' theory here, you know,

1    millions of dollars or whatever it is that they're seeking and

2    the personal injury plaintiffs may recover zero.  That just

3    seems so incongruous to me that it's hard for me to -- which is

4    why I say to myself:  Shouldn't causation be front and center

5    here?

6         And plaintiffs keep coming back and saying, well,

7    they should never have sold them so we get a full refund, never

8    should have sold them.  But why shouldn't they have sold them?

9    Yes, they were adulterated.  Yes, they were non-cGMP compliant,

10   plaintiffs will prove.  But plaintiffs also have to prove that

11   they had no value.  They had no value either because they were

12   sugar pills.  They had no value because there was such a

13   fundamental defect, they caused cancer.  But to say that they

14   had no value because they should never have sold them full stop

15   is a betrayal of the record.

16         MR. SLATER:  The fundamental defect is the

17   unacceptable risk that has been conceded from a regulatory

18   standpoint.

19         CHIEF JUDGE BUMB:  And that's causation.  I see no --

20         MR. SLATER:  But it's material --

21         CHIEF JUDGE BUMB:  I see --

22         MR. SLATER:  Well, whatever you want to call it, we

23   have the evidence to supply that.  We have, among other things,

24   we meet the statutory definitions.  We have admissions from the

25   30(b)(6) witnesses of the companies.  We have the FDA saying

```
 1   this can't be sold, that it has to be recalled and pulled off
 2   the market.  We have all of that evidence.
 3            CHIEF JUDGE BUMB:  And that's giving a value.  That's
 4   giving a value to the jury which is the risk was so
 5   unacceptable.  Call it a biological risk, whatever you want to
 6   call it.  Because for me I understand there's a distinction.  I
 7   don't think it's that salient of a one, but it does bespeak of
 8   causation.
 9            And, you know, and now the other issue that's being
10   raised is are you precluded, you, the plaintiffs, precluded
11   from now making this worth less, two words, argument because
12   Judge Kugler ruled that you were not making these allegations
13   before that the risks were so material, therefore, the benefits
14   did not outweigh the risk.  I don't know.  I'll have to go back
15   and look at that.
16            MR. SLATER:  Well, if we're going to follow what
17   Judge Kugler did on the summary judgment motions, he said
18   there's enough here, you're going to a jury with this question.
19            CHIEF JUDGE BUMB:  Right.  And that's why I said, I
20   have to kind of somewhat reconcile the motion to dismiss with
21   the summary judgment.
22            MR. SLATER:  Right.
23            CHIEF JUDGE BUMB:  And perhaps somewhere along the
24   line the pleadings changed.  I don't know.  There were a couple
25   of different motion to dismiss orders.
```

1          MR. SLATER:  The other thing is, and I think just to

2     relate this to -- because I know Your Honor's focused on the

3     *Zantac* decision, I think one of the real problems that Judge

4     Rosenberg wrestled with in *Zantac* that we don't have here is

5     she found that the plaintiffs' experts I believe could not

6     reliably tell you how much was there actually in the pills

7     because of the way that the NDMA was formed at different times.

8     And she said if you can't figure that out, you can't go

9     anywhere, because you can't tell them how much it was.  We

10    don't have that problem in this case.

11         In this case we have their testing showing massive,

12    hundreds of times the levels the FDA ultimately applied.  And

13    at the time it was sold the level that was allowed was zero.

14    So it's a very different case.

15         And, look, we think that this case should go to trial

16    on all the claims.  We think that we should go to trial.  The

17    summary judgment motions and rulings said we can go to trial

18    with, which is the warranty claim can go forward.  They can

19    make their argument on efficacy.  The jury can let the

20    horserace be played and they can decide which horse wins or by

21    how much.

22         CHIEF JUDGE BUMB:  Why shouldn't I try the personal

23    injury cases first?

24         MR. SLATER:  Well, because we've had this litigation

25    going for over five years.

```
1              CHIEF JUDGE BUMB:  Right.

2              MR. SLATER:  We have no -- I will say, we have no

3    problem with getting the personal injury cases -- and we're

4    ready to have that conversation -- going and get onto a track

5    to get them prepared.  But we need to start trying cases here.

6    We need to start to bring things to a head.  And, look, if Your

7    Honor is --

8              CHIEF JUDGE BUMB:  No one is working harder,

9    respectfully, to make that happen.

10             MR. SLATER:  I know that, Judge.  I was not

11   suggesting you weren't.  You're just asking from our

12   perspective.

13             Maybe one way to handle it, if Your Honor decides

14   that the warranty claim is too problematic from your

15   perspective, you can always decide to try the other two claims.

16             CHIEF JUDGE BUMB:  I'm not trying more trials than I

17   need to.

18             MR. SLATER:  We're ready to go to trial in --

19             CHIEF JUDGE BUMB:  I don't think you are.  I don't

20   think the parties are.  There is such a huge disconnect.  I

21   don't even know how I do the jury charges.

22             MR. SLATER:  That's --

23             CHIEF JUDGE BUMB:  There's such a disconnect to me.

24   I'm going to go back, I'll take a look at the jury charges.  I

25   want to confer with Judge Vanaskie.
```

```
 1              But I -- I don't think you are.

 2              MR. SLATER:  Well, let me --

 3              CHIEF JUDGE BUMB:  I don't think -- there is such a

 4   disconnect between the parties.

 5              I mean, you folks can't even agree on the words

 6   you're going to use to the jury.  You can't even agree on the

 7   fact that genotoxic really doesn't mean genotoxic.

 8              MR. SLATER:  We'll, we're not saying that.

 9              CHIEF JUDGE BUMB:  Well, I'm exaggerating a little

10   bit.

11              MR. SLATER:  Look, Judge, respectfully, I think that

12   a lot of what's happening here is the defendants are not being

13   reasonable, and they're fighting over every single issue.  I

14   think I've just heard when I was making some notes before, if I

15   misheard, I can be corrected, I think that they just argued

16   that their expert didn't concede that the cGMPs were violated

17   by ZHP and they want to make that a fact question.  He conceded

18   it on the stand, Dr. Afnan.  They want to now try the issue

19   that their only expert conceded?

20              CHIEF JUDGE BUMB:  Well --

21              MR. SLATER:  I mean, that's unreasonable.  And I

22   think the Court is going to need to step in, and we have that

23   issue for the PTO.  That's been -- their expert has conceded --

24              CHIEF JUDGE BUMB:  Are you talking about Dr. Afnan?

25              MR. SLATER:  Yeah.  He conceded that they violated
```

1    cGMPs.  He conceded he agrees with the FDA.  But they still
2    want to try the issue of whether or not they violated cGMPs.  I
3    mean, they won't agree to anything.
4         CHIEF JUDGE BUMB:  Well, I do recall he made a
5    concession, but I thought that he wanted to explain his answer
6    or something like that.  But, you know, I don't need to get
7    into that.  I'm not going to -- look, I can't make them
8    stipulate to it.
9         MR. SLATER:  I understand.  Well, maybe what we have
10   to do is enter a directed verdict then, because when Judge
11   Kugler decided the summary judgment motions, their expert
12   hadn't changed his position and admitted that cGMPs were
13   violated when we moved for summary judgment on cGMPs.  Now he's
14   conceded it.  So they have no expert to dispute it.
15        CHIEF JUDGE BUMB:  Didn't you ask him the question,
16   though, did the FDA find that the cGMPs had been violated?
17        MR. SLATER:  What I said is -- well, first of all, he
18   said --
19        CHIEF JUDGE BUMB:  Well, you know what, it doesn't
20   matter.
21        MR. SLATER:  It doesn't.  Look, I was using it as an
22   example for I think that you're being put in a situation where
23   the defendants are fighting on every single issue, and they're
24   not being reasonable, frankly, and that's why we can't agree on
25   things.  And I was giving you that example which I just heard.

```
 1   So that was the reason for that.  I'm not trying to pull the
 2   Court into a rabbit hole.
 3            CHIEF JUDGE BUMB:  Well, I'm going to give Judge
 4   Vanaskie all the props that he deserves for handling all of
 5   these issues.
 6            I'll just circle back to where I kind of started,
 7   which is, you know, the defendants very vigorously, when I was
 8   assigned this case, argued that this is not the case to try
 9   first.  They had reasons there.  I considered them.  And I
10   thought that they were -- the problems that they discussed, I
11   thought that they were surmountable, and I thought that the
12   case could move forward.
13            But I have to admit, every time we get together, it
14   becomes -- I become less convinced that this is the right way
15   to proceed, because I just -- there's such a disconnect between
16   the parties.
17            I do think it's not been wasted time.  I think we've
18   come a long way in funneling things and distilling things and
19   getting a better understanding of the case.  So I would like to
20   believe that none of this time has been wasted.  I think it's
21   been productive.
22            MR. SLATER:  Judge, we're not going to be any more
23   agreeable if you shift to the personal injury cases.  It's
24   going to be the same show.
25            CHIEF JUDGE BUMB:  No.  But I'm going to have clarity
```

1    and I'm going to have time and I'm going to lay out within four

2    corners of an opinion as to what's in, what's out, what the

3    claims are and what the claims aren't.  And that will be our

4    roadmap.

5            Because right now, I don't know how to say this,

6    right now I think there's a lot of "this" going on.  And --

7            MR. SLATER:  Your Honor, if the issue is the warranty

8    claim, counsel just asked you to grant summary judgment on our

9    warranty claim, because that's where this issue comes in.  It's

10   not an issue with the consumer protection or the fraud where

11   there's active misconduct.  Your Honor said that before.

12           So you know what, let them make the motion.  If Your

13   Honor thinks that our warranty claim should be bounced, you'll

14   dismiss it and we can try the other two claims and we'll have

15   our rights and we'll move forward.  If you want to let it go

16   forward with -- I mean, I think that would be the wrong outcome

17   because we think that Judge Kugler was correct to say that the

18   value question is for the jury and that we're allowed to put

19   Dr. Conti on to say there was no value and here's why, based on

20   my assumptions.  I think that should go forward like that.

21           If Your Honor wants to listen to their argument and

22   say you know what, you guys want general causation so badly and

23   you think that's what's needed to balance, then we have to try

24   general causation.  They can't complain about it because they

25   asked for it over our objection.

```
 1              So, you know --

 2              CHIEF JUDGE BUMB:  Right.

 3              MR. SLATER:  -- however it goes, I think that

 4    we're -- we want to try this case.  We have -- this litigation

 5    has been going on for five years.  At some point we need to

 6    bring it to the point where we get to trials, because we're

 7    never going to get to the end unless we have trials.  And if

 8    this trial gets put off and we go on to a new track, the

 9    defendants are going to exhale, and that's going to be the end

10    of anything bringing us to any conclusion.  And they're going

11    to say, great, we can bill for this thing for the next five

12    years while we try personal injury cases, and it will go on

13    forever, and the companies can hold their money in their bank

14    accounts and not worry about it because it's going to go on

15    forever.

16              And that's the practical reality of what it is.

17    That's why we want to get to trial.

18              COVID destroyed this litigation.  It put us on such a

19    slow track.  It's the reality.  We had to deal with it.  We

20    lost over two years.  And it just -- it just -- it put a giant

21    crimp in it.  But we want to try the case.  And I think that

22    the suggestions I'm making which is, A, follow Judge Kugler's

23    decision, let us try the case, let them argue efficacy, let the

24    jury make the call.  If you want to let in general causation,

25    we have to live with it, we'll try it.  If you want to put
```

1    guardrails around that how much can come in, fine.  Your Honor

2    has the right to do that.

3         I think you should give a limiting instruction.  If

4    there's no general causation, you explain it.  Even if there is

5    general causation, you explain how it factors in.  If it

6    factors in on value but not on liability, then we live with it.

7    But we are ready to try this case.

8         Judge Vanaskie has been busting his butt -- I think I

9    can say that in the court -- on these designations.  The

10   testimony is basically set for most of the witnesses in the

11   trial.  We've done an enormous amount of work.  We've already

12   gotten ready for trial now twice with a massive investment of

13   time and money.  We're sitting here holding off hotels right

14   now because they want contracts signed and we're telling them

15   we're not signing anything because we're not sure what's

16   happening right now.  We want to try this case.  We want to go

17   to a verdict.  We want to live with the outcome.  And we want

18   to get it done.

19        And there's nothing about this -- I understand that

20   there's frustration that we're not agreeing.  We're not going

21   to agree.  This is high-stakes litigation with three of the

22   biggest law firms in the world, and they're not going to agree.

23   These are big companies overseas that don't seem to really

24   care.  And they don't seem to care what they did.  That's why

25   they're minimizing what they sold into this market.  That's why

```
 1    they keep saying "no harm, no foul."  I mean, I'm just calling
 2    it like it is.  And we need to go to trial.  We need to move
 3    this, and that's why -- I'm not saying it's unreasonable to say
 4    we got to get these personal injury cases going, too.  We're
 5    ready to do that.  We're ready.  We have bellwethers from years
 6    ago that were picked.
 7              And we have a way that we can present to Your Honor
 8    in short term to say, look, on another track, let's get these
 9    personal injury cases going.  I'm dying to try a personal
10    injury case in this, especially with ZHP's massively
11    contaminated pills.  Let's go.  Let's do it.  Let's start with
12    the liver -- they already think those cases have no value,
13    they're all garbage.  Let's try the liver cancer cases.  Let's
14    line them up and let's start trying them soon.  We'll get
15    specific causation experts.  We'll do what we need to do to
16    work them up, but we shouldn't put that ahead of this because
17    this gets thrown off after all the work we've done when there
18    is a way to try this case.  And I think, Your Honor, we can
19    definitely do it.  We've talked through this stuff.
20              I don't think any of this time has been wasted.  We
21    have learned a lot about our case.  Your Honor has learned a
22    lot.  The defense has learned a lot just through this process.
23    I think a lot has been refined.
24              CHIEF JUDGE BUMB:  Yeah.  I don't think the time has
25    been wasted.
```

```
1              MR. SLATER:  No.

2              CHIEF JUDGE BUMB:  And I'm glad you agree with that,

3    but --

4              MR. SLATER:  The testimony has been worked on.  I

5    mean, we'd have to put a little more testimony back in or

6    whatever it is on general cause that we've pulled out.  It's

7    not going to be a big deal.  Judge Vanaskie is the fastest

8    decider in the West on this stuff.

9              But we adamantly don't want this case kicked.  We

10   really need to go to trial.  If you talk about maybe we need to

11   move it a month or so, nobody's going to cry about that because

12   that's life and it happens.  But putting it off indefinitely

13   with all the work we've done, all the money we've spent, all

14   the time we've put into it, that would be very, very

15   prejudicial to us.

16             CHIEF JUDGE BUMB:  It does seem, though, that the

17   case has been somewhat of a moving target.  I think the parties

18   have to agree with that.  I think that there has been a

19   fine-tuning of the case.  I think that there has been greater

20   clarity that's been, you know, by just having these arguments,

21   I think.  And so it hasn't been time that's been wasted.

22             And I'm certainly grateful that they're happening now

23   and not over, you know, all these sidebars while the jury sits

24   waiting.

25             Does anybody want to respond to what Mr. Slater is
```

1    proposing?

2          MS. ALLON:  I -- I could start.  So, I think there's

3    a problem with the warranty claim, as Mr. Ostfeld said.

4          If the proposal is we're going to put general cause

5    in the case, which is what I understand Mr. Slater to be

6    saying -- leaving aside the fact that right now he says he has

7    85 hours of video without general cause, so I don't even know

8    how long the trial would be with general cause, but let's leave

9    the timing aside.

10          Where I think we are is, he has one theory that is in

11   this case, and it is worthless, one word.  That is the only

12   theory that survived the motion to dismiss.  But more

13   importantly, it's the only theory that has any evidence, expert

14   evidence, assuming that some version of Dr. Conti is allowed in

15   by this Court.

16          And so in that version of the trial, he will argue

17   that the pills were worth zero because they cause cancer.  And

18   the defendants will get to say, number one, they didn't cause

19   cancer.

20          Number two, they had therapeutic value.

21          And number three, had you not bought these pills, you

22   would have had to buy more expensive alternatives.

23          He cannot then come back and say to the jury, well,

24   if it's not zero, just pick a number.  That would be diminution

25   in value.  That's been dismissed by Judge Kugler, but he

1    doesn't have a witness, he doesn't have evidence of if it's not

2    zero, what is the value.

3            As Mr. Ostfeld said, he would have had to have done a

4    survey or other economic evidence that would have shown

5    diminution in value, and he didn't do that.

6            So if we're going to go all or nothing on

7    worthlessness, one word, then that's the confines of the trial.

8    So I don't think we can do it in four weeks, obviously.  But

9    that is the confines.

10            In terms of personal injury versus economic loss, we

11    were always of the view that it made sense to start with

12    personal injury.  In my experience in these cases, *Zantac* is a

13    good example, personal injury always goes first for this

14    reason.  Judge Kugler disagreed.  You know, this Court said it

15    didn't -- it wasn't originally going to revisit Judge Kugler's

16    ruling, so we find ourselves where we find ourselves.  I don't

17    think any of us has changed our view that if we were on a clean

18    slate, we would start with personal injury, for all of the

19    reasons that we discussed this morning.

20            To your point, it just -- the issue of causation is

21    much more focused.  It's the only thing you're dealing with.

22    You don't have any of these ancillary issues.  We try the

23    personal injury case.  So we would have been happy to do that,

24    and I think we are happy to do that.  So the view of that has

25    not changed.

1          But if we're going to do economic loss, it has to be

2     with those clear confines.  It cannot now become a

3     diminution-in-value case, because that would be a new case that

4     has a claim that was dismissed by Judge Kugler, but also has a

5     claim that has not been developed or tested through any

6     discovery.

7          MS. LOCKARD:  Your Honor, on behalf of Teva, we would

8     agree with that.  As Ms. Allon has said, we've always

9     maintained that the quickest, the best, the easiest path is the

10    personal injury case.

11         I agree that all the work we've done, including Judge

12    Vanaskie, thank you, can be applied to those PI cases.  I think

13    I heard Mr. Slater say that the Court could grant directed

14    verdict on the express warranty claim.  That goes up.

15    Meanwhile, we shift gears, we pivot, we get the PI case ready

16    to go.

17         CHIEF JUDGE BUMB:  Well, no, I don't think he said

18    that.  He said I could grant summary judgment, but then he

19    would appeal that.  So why would I do that without

20    consideration?  If he wants to dismiss his claim, that's a

21    different story.

22         MS. LOCKARD:  Understood.

23         I think the same logic holds, though, with respect to

24    moving forward on the PI.  We get general cause issues decided

25    by the jury.  We get the meat of the liability decided by the

```
1    jury.  I mean, not to hold out hope for settlement, but if
2    there is any way to move the parties closer together is to get
3    some resolution of some of these issues through a jury.
4            MS. DAVIDSON:  Your Honor, I don't want to repeat
5    what the other two defendants just said, but obviously the
6    typical process in a mass tort is bellwether trials of personal
7    injury claims.  We've obviously pleaded very hard for that.  It
8    didn't happen.  But we obviously agree that is a simpler,
9    clearer approach.  This is a huge behemoth.  There is also
10   clearly at this point not a reasonable way to try this in the
11   time allotted in November and, therefore, we would strongly
12   support pivoting to something that's actually doable and is not
13   sort of this -- this Frankenstein type of a situation.
14           CHIEF JUDGE BUMB:  Okay.
15           I'm going to mull it over.  I want to talk to Judge
16   Vanaskie.  I want to think about it some more.
17           (Court conferring with Judge Vanaskie.)
18           JUDGE VANASKIE:  I have a conference tomorrow.
19           CHIEF JUDGE BUMB:  Yeah.  So you'll hear from me by
20   the early evening.
21           Yeah.
22           MR. OSTFELD:  Your Honor, on that point, Judge
23   Vanaskie very kindly gave us until 5:00 p.m. today for a
24   redline of the final pretrial order.
25           CHIEF JUDGE BUMB:  Everything's on hold until I
```

1    decide.

2                MR. OSTFELD:  Thank you, Your Honor.

3                CHIEF JUDGE BUMB:  Right, Judge Vanaskie?

4                JUDGE VANASKIE:  Yes.

5                CHIEF JUDGE BUMB:  Yes.

6                MR. SLATER:  That's fine.  Because we have been

7    exchanging anyway.

8                CHIEF JUDGE BUMB:  Just put everything on hold for

9    the next three or four hours.  I have to think about this.  I

10   want to think about it.  I'll issue a text order; you'll know

11   where I stand, okay?

12               MR. SLATER:  Thank you, Your Honor.

13               MS. ALLON:  Thank you, Your Honor.

14               CHIEF JUDGE BUMB:  Good to see you all.  Thank you.

15               MR. OSTFELD:  Thank you, Your Honor.

16               MS. DAVIDSON:  Thank you, Your Honor.

17               MS. LOCKARD:  Thank you, Your Honor.

18               THE COURTROOM DEPUTY:  All rise.

19               (Proceedings concluded at 3:20 p.m.)

20               - - - - - - - - - - - - - - - - - - - - -
                 **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
21               - - - - - - - - - - - - - - - - - - - - -

22        I certify that the foregoing is a correct transcript

23   from the record of proceedings in the above-entitled matter.

24

25

| | |
|---|---|
| 1 | /S/John J. Kurz, RDR-RMR-CRR-CRC          October 11, 2024 |
| 2 | Court Reporter/Transcriber |

**CHIEF JUDGE BUMB:**
**[207]**
**JUDGE VANASKIE:**
**[3]** 4/10 92/18 93/4
**MR. HONIK: [1]** 4/19
**MR. NIGH: [1]** 4/22
**MR. OSTFELD: [30]**
5/9 25/12 25/20 26/2
26/14 26/20 27/19 28/6
29/25 31/15 32/9 32/20
33/20 34/3 68/5 68/14
68/16 68/24 69/2 69/6
69/8 69/11 69/21 69/24
70/2 70/17 71/7 92/22
93/2 93/15
**MR. SLATER: [158]**
**MS. ALLON: [13]** 4/8
5/4 31/13 31/16 31/20
31/23 31/25 32/5 35/5
35/15 35/19 89/2 93/13
**MS. BRANCATO: [1]**
5/7
**MS. DAVIDSON: [4]**
5/13 36/5 92/4 93/16
**MS. LOCKART: [10]**
4/9 5/11 60/1 60/19 60/21
63/6 63/15 91/7 91/22
93/17
**MS. WHITELEY: [1]**
4/24
**THE COURTROOM**
**DEPUTY: [4]** 4/5 67/24
68/1 93/18

**/**

**/S/John [1]** 94/1

**0**

**07068 [1]** 1/19
**07102 [1]** 3/3
**08101 [1]** 1/8

**1**

**10 [2]** 1/8 61/1
**100 [1]** 3/3
**10001 [1]** 2/7
**1001 [1]** 3/9
**10022 [1]** 2/11
**103 [1]** 1/18
**11 [4]** 68/10 68/16 69/11
94/1
**1100 [1]** 1/15
**1200 [1]** 3/6
**128 [1]** 2/9
**12th [1]** 3/6
**13 [3]** 68/11 68/19 70/8
**14 [1]** 2/3
**1500 [1]** 3/16
**1515 [1]** 1/15
**15219 [1]** 2/15
**15th [1]** 3/3
**16 [1]** 33/12
**19102 [1]** 1/15
**1:02 [1]** 1/9
**1:02 p.m [1]** 4/3
**1:19-md-02875-RMB-SA**
**K [1]** 1/4

**2**

**20004 [2]** 3/6 3/10
**2000s [1]** 57/6
**20016 [1]** 2/4
**2008 [1]** 57/7
**2011 [2]** 14/8 65/13
**2012 [2]** 14/8 58/10
**2018 [1]** 25/4
**2019 [1]** 22/7
**2024 [2]** 1/18 94/1
**207 [1]** 1/18
**2200 [1]** 3/12
**23rd [1]** 56/11
**2500 [1]** 2/18
**280-page decision [1]**
32/1
**2:22 [1]** 67/25
**2:48 [1]** 67/25

**3**

**30 [1]** 77/25
**30305 [1]** 2/18
**3100 [1]** 2/22
**3333 [1]** 2/18
**3600 [1]** 3/13
**38th [1]** 2/14
**3:20 p.m [1]** 93/19

**4**

**40 percent [1]** 43/2
**403 [2]** 48/17 59/10
**42-128 [1]** 2/6
**4th [1]** 1/7

**5**

**555 [1]** 3/6
**576-7094 [1]** 1/24
**5:00 p.m [1]** 92/23

**6**

**60 [1]** 43/2
**60 percent [1]** 43/3
**601 [1]** 2/11
**60601 [1]** 2/22
**63105 [1]** 3/16

**7**

**701 [1]** 1/21
**70130 [1]** 1/22
**7094 [1]** 1/24
**728 [3]** 68/10 69/2 69/11
**75201 [1]** 3/13
**77 [1]** 2/22
**775 [1]** 69/5

**8**

**8,000 [1]** 57/20
**8001 [1]** 3/16
**85 [1]** 89/7
**856 [1]** 1/24

**A**

**ability [1]** 35/1
**able [8]** 16/24 16/25 42/8
56/8 61/17 63/24 64/3
72/12
**above [1]** 93/23

**above-entitled [1]** 93/23
**absence [1]** 49/24
**absolutely [2]** 60/4 61/11
**abstract [1]** 58/18
**accept [1]** 34/6
**acceptable [1]** 71/15
**acceptance [1]** 64/10
**accepted [1]** 64/11
**account [1]** 7/4
**accounts [1]** 85/14
**Actavis [4]** 2/19 2/19
2/23 2/23
**acting [2]** 39/24 62/2
**action [2]** 1/3 62/6
**active [1]** 84/11
**actively [1]** 56/17
**actually [24]** 7/7 15/3
24/4 26/6 36/11 39/25
40/7 41/6 41/19 42/13
43/22 46/1 50/17 50/17
50/21 53/10 54/16 56/17
63/2 63/20 68/8 72/1 79/6
92/12
**ADAM [2]** 1/17 4/16
**adamantly [1]** 88/9
**add [3]** 31/13 53/25 74/2
**address [1]** 46/15
**addressed [1]** 56/11
**addressing [2]** 44/20
48/13
**ADI [3]** 22/6 22/6 22/12
**admissible [8]** 26/2 26/16
27/8 28/16 30/25 34/25
36/16 36/19
**admission [1]** 60/17
**admissions [4]** 18/5 21/4
54/1 77/24
**admit [3]** 38/20 44/12
83/13
**admitted [2]** 41/2 82/12
**admitting [1]** 54/2
**adulterated [12]** 17/8
17/9 17/9 22/8 22/11
22/13 36/11 46/4 51/14
58/12 60/22 77/9
**adulteration [6]** 22/3
22/4 33/10 46/11 46/13
59/3
**adversaries [1]** 25/10
**advised [1]** 51/10
**Afnan [2]** 81/18 81/24
**after [7]** 14/19 24/2 39/7
49/15 67/9 67/11 87/17
**afternoon [16]** 4/6 4/7
4/8 4/9 4/10 4/16 4/18
4/19 4/21 4/22 4/24 5/2
5/4 5/6 5/7 5/15
**again [17]** 8/2 9/16 10/24
11/6 15/5 15/11 17/18
27/25 43/6 43/20 43/23
56/14 68/10 71/5 72/3
72/6 76/11
**ago [3]** 19/7 52/25 87/6
**agree [20]** 13/11 20/24
26/10 26/14 32/10 55/24
56/21 61/9 65/7 81/5 81/6
82/3 82/24 86/21 86/22

**88/2 88/18 91/8 91/11**
92/8
**agreeable [1]** 83/23
**agreed [2]** 7/1 20/2
**agreeing [2]** 67/17 86/20
**agrees [2]** 8/4 82/1
**Ah [1]** 23/24
**ahead [4]** 27/20 27/24
28/5 87/16
**aided [1]** 1/25
**akin [1]** 21/16
**ALEXIA [2]** 2/10 5/7
**ALFANO [1]** 2/13
**all [74]** 4/5 4/11 4/13
4/13 5/15 5/16 5/16 6/17
10/4 12/17 13/12 13/22
16/3 17/17 20/17 23/12
25/11 26/5 28/24 35/4
37/15 37/24 39/21 41/3
41/12 41/14 41/21 42/22
43/2 43/15 44/8 47/15
47/22 48/4 48/11 50/4
53/14 53/14 55/8 58/5
61/4 62/1 62/16 63/18
67/24 68/1 68/25 70/2
71/2 71/9 73/13 73/21
74/14 74/15 74/15 74/15
76/8 76/12 78/2 79/16
82/17 83/4 83/4 87/13
87/17 88/13 88/13 88/13
88/23 90/6 90/18 91/11
93/14 93/18
**allegation [4]** 22/23 30/9
73/13 73/18
**allegations [1]** 78/12
**allege [2]** 70/4 76/20
**alleged [3]** 72/16 73/1
73/10
**ALLON [4]** 2/10 5/4
33/10 91/8
**allotted [1]** 92/11
**allow [2]** 25/7 70/22
**allowed [26]** 7/12 7/16
10/11 13/6 19/4 20/8
20/24 21/24 24/3 24/4
24/10 38/3 38/17 41/25
42/6 42/20 43/5 44/6 47/9
55/1 56/7 57/11 75/14
79/13 84/18 89/14
**allowing [1]** 74/10
**along [3]** 32/1 73/13
78/23
**already [7]** 37/5 41/24
42/3 42/18 54/8 86/11
87/12
**also [13]** 3/18 5/8 8/22
19/2 30/1 39/19 42/4 56/2
56/9 70/18 77/10 91/4
92/9
**alternative [2]** 32/15
33/11
**alternatives [1]** 89/22
**always [5]** 20/21 80/15
90/11 90/13 91/8
**am [2]** 43/24 48/25
**amazing [1]** 38/13
**among [1]** 77/23

**amount [4]** 5/19 17/10
62/18 86/11
**amounts [9]** 22/9 22/22
22/23 41/19 53/22 57/2
62/16 66/16 67/8
**analyses [1]** 57/21
**analysis [9]** 12/15 31/12
33/11 34/7 34/14 57/20
60/11 70/8 72/21
**analyze [2]** 40/24 57/10
**analyzed [1]** 40/25
**analyzing [1]** 66/15
**ancillary [1]** 90/22
**animal [1]** 62/12
**animals [1]** 66/20
**another [4]** 7/6 29/22
49/20 87/8
**answer [3]** 6/5 57/24
82/5
**answers [1]** 24/19
**antihypertensive [1]** 27/3
**any [18]** 9/8 14/17 28/13
34/18 37/14 63/20 64/15
70/21 74/1 76/23 83/22
85/10 87/20 89/13 90/17
90/22 91/15 92/2
**anybody [5]** 24/11 34/20
39/12 41/20 88/25
**anyone [4]** 24/11 28/24
55/24 64/1
**anything [8]** 56/8 60/5
62/21 63/21 75/12 82/3
85/10 86/15
**anyway [5]** 7/13 35/18
49/15 51/6 93/7
**anywhere [1]** 79/9
**apologies [1]** 28/6
**apologize [1]** 28/3
**appeal [7]** 24/21 31/19
32/2 55/10 58/3 66/8
91/19
**appeals [3]** 9/25 30/3
50/1
**appearances [3]** 2/25
4/14 4/15
**applicable [1]** 23/25
**applied [5]** 41/16 62/8
75/23 79/12 91/12
**applies [6]** 8/21 56/22
65/9 70/18 70/18 70/20
**apply [7]** 8/13 19/11
19/16 23/3 62/23 66/3
66/3
**applying [1]** 56/25
**approach [2]** 26/21 92/9
**approved [9]** 12/3 14/3
14/3 14/10 19/25 21/22
25/8 44/10 47/13
**Aqua [1]** 72/25
**are [89]** 5/21 6/11 7/6
7/16 9/19 11/8 11/17
12/16 15/10 17/10 17/18
18/10 19/4 19/18 21/10
22/24 25/17 26/17 28/7
29/11 30/17 31/12 31/14
32/2 35/8 35/11 35/24
39/1 40/23 41/15 41/17

**A**

are... **[58]** 41/20 42/1 42/8 46/8 46/13 47/11 47/12 48/10 48/13 48/15 49/6 49/7 49/10 50/4 50/25 51/1 51/12 52/2 52/3 52/3 53/3 53/14 53/15 53/16 56/15 56/16 57/8 57/22 57/23 59/2 59/4 59/4 59/24 61/5 61/22 61/24 61/24 62/3 62/14 65/19 65/25 70/19 71/13 75/2 75/22 78/10 80/19 80/20 81/1 81/12 81/24 82/23 84/3 85/9 86/7 86/23 89/10 90/24
aren't **[4]** 28/19 36/2 75/18 84/3
argue **[28]** 8/12 8/22 9/19 10/12 17/11 17/14 26/12 39/3 40/20 43/5 43/25 44/14 44/22 47/5 53/20 54/16 56/3 56/8 58/3 59/1 63/10 66/3 67/1 67/4 67/15 74/20 85/23 89/16
argued **[7]** 10/15 56/9 56/10 65/16 66/14 81/15 83/8
arguing **[11]** 7/6 39/1 39/18 43/6 43/22 46/4 46/14 48/9 53/3 53/5 53/5
argument **[55]** 5/24 7/24 8/7 8/8 8/11 8/12 8/15 8/22 9/2 11/1 11/5 11/7 11/13 12/8 12/10 12/11 17/24 18/4 20/8 20/19 20/25 21/3 24/17 26/13 26/17 26/22 26/22 28/20 28/21 29/2 29/10 31/2 36/20 37/10 38/8 38/10 40/19 42/21 42/22 45/20 47/25 49/4 49/20 49/22 49/23 53/3 59/2 59/7 63/16 74/21 76/7 76/13 78/11 79/19 84/21
arguments **[9]** 7/23 39/21 58/20 59/21 59/24 72/8 72/9 72/13 88/20
around **[6]** 22/7 31/3 50/5 54/12 54/17 86/1
ARPS **[2]** 2/5 5/13
Arthur **[1]** 3/19
Article **[1]** 30/10
aside **[5]** 39/3 39/13 40/21 89/6 89/9
ask **[4]** 5/23 10/11 53/18 82/15
asked **[9]** 8/16 11/17 18/6 25/13 39/1 52/3 61/20 84/8 84/25
asking **[6]** 15/10 23/12 23/18 74/3 74/10 80/11
asserting **[25]** 15/18
assess **[1]** 30/21
assessment **[3]** 14/14 15/8 24/7
assign **[1]** 32/12

assigned **[3]** 28/23 47/17 83/8
assume **[2]** 12/12 54/8
assuming **[1]** 89/14
assumption **[1]** 62/15
assumptions **[1]** 84/20
assured **[1]** 62/20
Atlanta **[1]** 2/18
attempted **[1]** 72/19
attention **[1]** 29/6
attributes **[5]** 42/14 42/23 44/8 44/9 47/11
Avenue **[3]** 2/11 3/9 3/12
aware **[2]** 28/13 34/18
away **[3]** 18/13 20/17 66/7

**B**

back **[35]** 5/21 5/22 10/11 10/24 19/4 20/14 29/11 31/14 36/7 41/23 42/20 45/3 48/7 48/22 48/23 49/18 51/17 52/23 53/25 54/17 55/20 55/21 57/6 60/18 63/7 65/13 67/23 71/18 76/8 77/6 78/14 80/24 83/6 88/5 89/23
back-door **[1]** 42/20
backing **[1]** 58/20
backup **[1]** 27/9
bad **[2]** 39/11 41/5
badly **[1]** 84/22
balance **[1]** 84/23
bank **[1]** 85/13
bargain **[11]** 16/20 16/25 18/24 19/3 25/23 26/8 33/13 45/1 51/18 69/15 69/17
BARNES **[1]** 3/5
barred **[1]** 46/9
based **[14]** 8/5 21/2 34/10 36/8 36/16 36/19 37/19 39/15 43/4 55/19 58/23 62/11 62/15 84/19
basically **[2]** 60/8 86/10
basis **[4]** 37/3 46/11 46/13 53/2
because **[175]**
become **[4]** 5/23 55/21 83/14 91/2
becomes **[2]** 34/13 83/14
been **[76]** 7/2 7/8 7/15 8/4 8/5 8/14 8/21 9/6 9/7 9/13 10/6 10/13 12/24 13/14 16/7 17/21 17/21 19/22 21/11 26/12 26/18 26/24 26/25 28/20 29/1 29/13 29/15 29/16 31/2 31/8 31/18 32/5 32/16 32/16 35/18 36/8 36/9 39/12 39/14 48/5 48/9 49/19 50/19 54/12 57/5 60/2 64/12 71/11 73/1 73/6 73/10 73/12 73/22 75/10 77/17 81/23 82/16 83/17 83/20 83/21 85/5 86/8 87/20 87/23 87/25 88/4

88/17 88/18 88/19 88/20 88/21 88/21 89/25 90/23 91/5 93/6
before **[20]** 4/1 11/6 12/23 14/14 16/21 28/25 29/5 31/14 31/16 35/21 48/8 50/5 52/25 57/6 60/10 72/5 74/3 78/13 81/14 84/11
beginning **[4]** 10/11 15/5 25/14 69/11
behalf **[3]** 4/17 4/25 91/7
behemoth **[1]** 92/9
being **[5]** 4/14 6/21 13/6 24/3 46/9 48/10 58/2 61/24 66/10 72/15 74/11 78/9 81/12 82/22 82/24
believe **[9]** 23/1 24/22 24/22 34/16 34/17 71/22 72/5 79/5 83/20
bellwether **[1]** 92/6
bellwethers **[1]** 87/5
belong **[2]** 41/9 47/14
below **[2]** 62/21 63/21
benefit **[14]** 16/20 16/25 18/24 19/3 19/8 20/16 20/25/23 26/7 27/5 33/13 45/1 51/18 69/15 69/17
benefited **[1]** 9/11
benefits **[2]** 27/4 78/13
bespeak **[1]** 78/7
best **[2]** 67/15 91/9
betrayal **[1]** 77/15
better **[2]** 55/9 83/19
between **[13]** 9/14 13/2 25/14 26/7 26/8 28/17 30/2 30/13 36/14 61/20 62/10 81/4 83/15
big **[5]** 9/14 58/17 65/18 86/23 88/7
biggest **[1]** 86/22
bill **[1]** 85/11
binary **[1]** 71/1
biological **[6]** 13/3 40/25 56/25 61/21 64/3 78/5
biologist **[1]** 35/17
biologists **[1]** 64/4
bit **[4]** 6/9 36/6 65/20 81/10
BLACKWELL **[1]** 3/15
block **[1]** 55/5
blocked **[1]** 55/3
blood **[5]** 38/15 42/10 42/25 44/23 74/15
blow **[1]** 61/15
blown **[1]** 54/9
Blue **[2]** 31/11 31/11
Bogdan **[1]** 3/21
bones **[1]** 43/16
Book **[1]** 16/17
BOSICK **[1]** 2/13
both **[10]** 12/23 36/13 39/16 42/4 42/5 46/13 46/14 49/12 60/23 69/8
bottom **[1]** 68/17
bought **[4]** 7/10 17/20 20/10 89/21

Boulevard **[1]** 3/16
bounced **[1]** 84/13
box **[1]** 49/16
BRANCATO **[2]** 2/10 5/7
branded **[2]** 14/1 14/3
breach **[3]** 52/4 52/15 64/9
breached **[1]** 52/5
break **[2]** 21/24 67/22
brief **[4]** 18/21 24/16 40/5 41/24
briefed **[1]** 56/5
briefing **[1]** 32/3
bring **[8]** 32/23 41/2 41/4 41/25 54/6 54/10 80/6 85/6
bringing **[2]** 12/9 85/10
broader **[1]** 50/10
broken **[1]** 43/16
brought **[2]** 9/17 33/23
Building **[1]** 1/7
BUMB **[2]** 1/10 4/2
bunch **[2]** 42/1 53/25
busting **[1]** 86/8
butt **[1]** 86/8
buy **[3]** 6/22 75/3 89/22
buyer's **[1]** 22/19
buys **[1]** 18/23

**C**

calculated **[2]** 35/20 37/13
calculation **[1]** 35/7
call **[6]** 43/14 76/10 77/22 78/5 78/6 85/24
called **[4]** 14/1 14/2 29/16 53/5
calling **[1]** 87/1
Camden **[1]** 1/8
came **[7]** 14/4 24/2 25/4 39/16 55/14 62/2 62/10
Camp **[1]** 1/21
can **[58]** 4/11 5/25 6/1 8/23 11/2 15/15 19/9 19/21 20/14 24/12 24/15 24/17 25/10 30/20 32/22 34/20 37/8 37/8 43/3 43/10 44/22 45/23 48/5 48/8 48/11 48/18 50/7 50/12 53/18 54/21 58/21 61/14 62/8 62/19 67/18 68/2 70/25 71/21 71/22 74/5 74/6 76/25 79/17 79/18 79/18 79/19 79/20 80/15 81/15 84/14 85/11 85/13 86/1 86/9 87/7 87/18 90/8 91/12
can't **[36]** 6/3 8/7 8/12 8/14 17/5 17/11 17/14 17/14 17/24 20/17 20/18 27/24 29/2 29/5 29/17 29/18 34/22 43/19 44/8 57/7 57/8 58/13 65/8 66/17 71/2 75/13 76/14 78/1 79/8 79/8 79/9 81/5 81/6 82/7 82/24 84/24

cancer **[49]** 13/5 13/7 32/2 39/17 39/25 40/1 40/1 40/25 41/6 41/19 42/2 42/3 44/24 48/15 49/9 49/14 50/21 53/21 54/4 54/14 55/4 55/8 56/7 57/3 57/17 57/21 57/23 61/3 61/5 61/14 62/1 62/18 62/22 63/8 63/23 63/20 64/2 64/4 64/7 66/16 66/20 67/7 67/13 73/6 73/11 77/13 87/13 89/17 89/19
cancer-causing **[2]** 73/6 73/11
cannot **[5]** 41/22 72/1 75/3 89/23 91/2
carcinogen **[5]** 23/25 29/17 29/19 41/14 65/14
carcinogenic **[3]** 40/17 62/14 65/3
carcinogenicity **[1]** 63/25
carcinogens **[2]** 12/16 57/4
Cardinal **[1]** 3/10
care **[2]** 86/24 86/24
careful **[4]** 9/18 17/5 59/22 59/23
case **[106]**
cases **[20]** 5/22 9/14 9/17 9/19 21/19 26/7 31/23 31/14 53/16 79/23 80/3 80/5 83/23 85/12 87/4 87/9 87/12 87/13 90/12 91/12
cash **[11]** 15/12 17/19 18/20 37/25 38/21 42/7 42/9 43/8 44/5 66/12 74/18
categories **[1]** 76/19
category **[1]** 12/18
caught **[1]** 18/15
causation **[48]** 11/21 24/15 26/1 26/3 27/12 27/13 28/10 29/21 33/10 40/25 41/23 42/3 47/14 48/6 48/19 52/7 52/8 52/21 52/22 53/11 53/14 53/20 54/9 54/16 55/14 56/3 56/9 56/25 57/25 60/24 61/6 63/7 66/4 66/6 67/2 67/4 71/1 77/4 77/19 78/8 84/22 84/24 85/24 86/4 86/5 87/15 90/20
caused **[8]** 39/25 41/19 44/24 50/21 53/21 56/7 62/1 77/13
causes **[8]** 40/1 49/9 55/4 57/3 62/18 62/22 63/2 66/15

**C**

causing [2]  73/6 73/11
center [2]  3/3 77/4
Centre [1]  2/14
certainly [7]  28/11 32/22
34/13 57/7 70/25 72/5
88/22
CERTIFICATE [1]
93/20
certify [1]  93/22
cetera [5]  22/10 29/4
29/4 58/25 63/9
cGMP [4]  45/22 46/1
60/22 77/9
cGMPs [8]  46/10 58/24
81/16 82/1 82/2 82/12
82/13 82/16
challenge [2]  25/17 33/6
challenged [1]  72/12
chance [1]  49/14
change [7]  12/5 14/14
15/6 15/8 35/8 36/23 55/5
changed [7]  14/7 14/9
55/7 78/24 82/12 90/17
90/25
changes [1]  72/21
characteristics [2]  34/8
34/9
charges [2]  80/21 80/24
cheaper [1]  14/6
Chicago [1]  2/22
CHIEF [2]  1/10 4/2
chloride [1]  14/15
Chodosh [8]  24/16 40/21
46/21 54/9 56/23 61/14
65/17 67/7
Chodosh's [1]  62/10
choice [3]  67/20 73/21
74/21
CHRISTOPHER [1]
1/18
Cigna [1]  3/17
circle [1]  83/6
circles [2]  25/9 52/1
Circuit [6]  9/24 22/20
23/15 23/19 30/2 32/2
citation [1]  23/18
cite [1]  23/12
cited [1]  54/2
CIVIL [1]  1/3
claim [42]  6/15 6/17 6/19
15/12 18/17 18/18 18/23
22/7 33/18 38/2 43/6 43/6
50/18 52/4 52/9 52/11
52/22 56/13 56/18 56/19
57/25 59/8 59/14 59/15
59/17 59/18 65/9 72/17
72/24 73/5 73/18 74/17
79/18 80/14 84/8 84/9
84/13 89/3 91/4 91/5
91/14 91/20
claiming [1]  42/1
claims [10]  56/15 56/15
56/16 67/14 79/16 80/15
84/3 84/3 84/14 92/7
clarify [1]  60/3
clarity [5]  50/6 50/7 50/8

83/25 88/20
clash [3]  33/23 34/18
34/18
Class [2]  1/22 2/4
clean [1]  90/17
clear [3]  31/18 66/1 91/2
clearer [1]  92/9
clearly [3]  25/18 53/7
92/10
Clerk [1]  3/20
clients [1]  61/4
clinical [2]  14/11 14/11
closer [2]  32/22 92/2
Co [5]  1/16 1/19 1/22 2/4
2/7
Co-Lead [4]  1/16 1/19
1/22 2/4
coffee [1]  40/7
Cohen [1]  1/7
cohort [2]  46/8 66/18
colleague [1]  9/21
collectively [4]  2/8 2/12
2/20 2/24
come [24]  27/10 27/12
27/13 27/14 29/18 30/7
30/24 42/3 44/17 45/23
49/18 51/13 55/9 56/9
57/10 60/14 61/4 61/18
62/7 66/5 67/11 83/18
86/1 89/23
comes [3]  70/8 71/1 84/9
comfort [2]  6/3 48/25
comfortable [2]  6/2 58/4
coming [6]  5/20 5/22
31/3 48/22 48/23 77/6
Commencing [1]  1/9
Commissioner [2]  60/8
62/5
common [1]  31/7
companies [4]  38/15
77/25 85/13 86/23
company [2]  15/15 20/1
compelling [4]  18/22
24/16 30/7 39/23
compendial [1]  46/12
compendium [2]  12/4
75/4
complain [2]  66/9 84/24
complaint [2]  73/9 73/9
completed [1]  32/3
completely [2]  14/24
49/12
compliance [1]  75/13
compliant [2]  16/18 77/9
comply [2]  52/22 75/3
comporting [3]  48/25
49/1 49/2
comports [1]  25/23
computer [1]  1/25
computer-aided [1]  1/25
concede [2]  64/6 81/16
conceded [8]  65/17 71/17
81/17 81/19 81/23 81/25
82/1 82/14
concern [6]  46/8 46/20
53/1 63/3 65/21 66/18
concerned [3]  12/21 20/7

48/17
concerns [1]  47/18
concession [1]  82/5
concluded [2]  22/20
33/14 93/19
concluding [1]  64/5
conclusion [2]  32/23
85/10
concurrence [2]  30/6
30/7
condition [1]  58/22
conduct [1]  56/15
confer [4]  27/21 27/24
70/15 80/25
conference [3]  1/5 1/5
92/18
conferring [1]  92/17
confines [3]  90/7 90/9
91/2
confirmed [1]  75/17
conflate [2]  17/5 17/7
conflating [1]  49/5
conformance [1]  46/10
confusion [1]  55/14
Congress [2]  22/8 22/9
conjecture [3]  70/7 70/14
70/23
CONLEE [2]  1/21 4/24
conservative [2]  40/23
46/23
consider [2]  40/16 40/16
consideration [1]  91/20
considered [2]  47/22
83/9
consistent [1]  12/4
constitute [1]  22/24
consumed [1]  6/17
consumer [2]  74/21
84/10
consumers [1]  31/14
contained [6]  21/6 22/12
22/16 49/24 51/5 51/9
contaminant [9]  15/20
15/24 21/7 44/19 48/3
49/9 50/25 51/10 51/16
contaminants [3]  45/7
45/8 45/8
contaminated [11]  6/21
8/3 38/16 46/3 46/6 46/7
58/25 59/6 74/14 74/16
87/11
contamination [3]  6/23
11/23 46/16
contention [1]  60/4
context [1]  66/3
Conti [11]  17/15 31/5
31/6 32/10 32/11 33/17
35/7 35/12 71/11 84/19
89/14
Conti's [3]  26/21 32/21
33/5
continue [1]  50/5
continued [4]  2/1 2/25
3/1 6/9
continuing [1]  17/7
contracts [1]  86/14
contrary [2]  21/20 24/11

contrasts [1]  22/17
control [4]  14/14 15/8
42/10 42/25
controlled [1]  24/5
conversation [4]  5/18 6/1
68/7 80/4
convinced [2]  5/23 83/14
Cooper [1]  1/7
copy [1]  14/4
corners [1]  84/2
Corp [2]  3/14 3/17
correct [6]  23/15 55/16
56/1 60/19 84/17 93/22
corrected [1]  81/15
could [41]  8/4 14/9 14/10
18/7 19/22 21/4 21/4
26/24 31/13 32/16 33/22
33/23 34/16 34/18 36/25
38/23 38/25 39/8 39/9
41/16 42/23 43/23 44/12
45/22 46/25 50/22 50/22
53/21 54/15 55/2 60/12
63/8 67/15 73/5 74/25
75/10 79/5 83/12 89/2
91/13 91/18
couldn't [2]  17/23 24/13
counsel [19]  1/16 1/19
1/22 2/4 2/7 2/12 2/15
2/19 2/23 3/4 3/7 3/10
3/14 64/25 65/16 66/14
66/22 72/6 84/8
counter [2]  19/9 45/6
couple [2]  60/3 78/24
course [4]  52/19 62/14
70/18 73/15
court [22]  1/1 1/23 4/1
9/24 13/10 37/7 47/21
53/1 58/4 58/17 67/4
72/25 73/3 81/22 83/2
86/9 89/15 90/14 91/13
92/17 93/20 94/2
Court's [1]  72/21
Courthouse [1]  1/7
Courtroom [1]  3/19
courts [3]  34/6 40/13
41/10
covering [2]  33/10 33/11
COVID [1]  85/18
CRC [1]  94/1
create [2]  47/21 59/11
created [1]  15/2
crimp [1]  85/21
criteria [1]  47/13
critical [1]  28/17
cross [2]  30/9 31/11
CROWELL [1]  1/8
CRR [1]  94/1
cry [1]  88/11
customers [1]  76/9
CVS [1]  3/7

**D**

D'LESLI [1]  3/12
D.C [3]  2/4 3/6 3/10
Dallas [1]  3/13
damage [1]  35/7
damages [32]  10/10 17/6

17/10 17/10 18/20 18/23
19/1 19/2 25/23 28/16
28/17 30/12 30/15 32/25
33/21 34/6 35/1 35/9
35/11 35/21 35/24 45/2
49/5 52/13 52/15 52/17
52/20 67/2 71/9 71/14
71/15 71/20
dangerous [5]  28/8 28/13
57/8 66/14 66/21
DANIEL [2]  2/2 4/22
dare [2]  67/10 67/11
databases [1]  39/15
Daubert [1]  73/4
DAVID [1]  1/14
DAVIDSON [3]  2/6 5/13
36/4
DAVIS [2]  2/17 3/12
day [10]  9/6 9/7 10/25
13/10 41/11 43/18 51/5
51/14 51/16 63/12
days [1]  61/10
de [2]  46/5 53/2
deal [9]  21/1 40/13 41/10
51/1 51/11 52/16 54/20
85/19 88/7
dealing [3]  51/20 51/22
90/21
Debernardis [5]  9/23
22/18 30/3 30/6 72/24
deceived [1]  56/17
deception [1]  56/19
deceptive [1]  56/15
decide [19]  20/23 21/1
27/10 29/12 36/15 37/19
42/22 43/7 43/11 43/15
43/19 44/16 65/5 65/6
65/23 76/10 79/20 80/15
93/1
decided [5]  43/25 47/20
82/11 91/24 91/25
decider [1]  88/8
decides [2]  47/13 80/13
deciding [1]  41/18
decision [9]  15/6 31/25
32/1 35/3 57/11 72/6 76/9
79/3 85/23
decisions [1]  36/10
deemed [1]  26/23
defect [8]  44/22 49/8
53/6 53/7 53/9 76/21
77/13 77/16
defendant [7]  2/15 3/4
3/10 3/14 3/17 7/12 22/19
defendants [28]  2/7 2/12
2/19 2/23 3/7 5/3 5/14
5/21 7/1 7/16 13/10 16/16
17/3 27/10 29/5 29/18
47/19 48/5 53/15 53/20
58/9 61/1 81/12 82/23
83/7 85/9 89/18 92/5
defendants' [2]  13/6
49/21
defense [7]  18/6 37/9
37/11 37/18 38/14 39/2
40/8 40/20 41/21 42/9
50/16 54/11 64/3 64/6

**D**

**defense... [3]** 64/25 65/22 87/22

**defensive [2]** 38/14 38/15

**definitely [1]** 87/19

**definition [2]** 59/1 59/3

**definitions [1]** 77/24

**deliberately [1]** 66/20

**demonstrates [1]** 33/3

**denied [1]** 36/13

**depositions [1]** 48/9

**deprive [2]** 64/20 64/24

**deprives [3]** 13/10 64/14 64/15

**Deputy [1]** 3/19

**described [1]** 62/10

**deserves [1]** 83/4

**design [1]** 34/11

**designations [3]** 53/25 54/5 86/9

**despite [1]** 47/24

**destroyed [1]** 85/18

**determine [2]** 37/23 61/25

**determined [3]** 22/8 34/11 63/11

**determining [1]** 64/16

**devastating [1]** 54/1

**developed [3]** 61/3 72/11 91/5

**DEVORA [2]** 2/10 5/4

**did [38]** 7/13 14/7 22/24 24/19 27/19 29/3 29/13 32/11 35/7 35/15 35/16 36/3 44/23 46/11 46/12 47/4 47/7 47/22 52/22 57/11 57/19 57/21 57/22 60/5 62/1 62/9 62/16 62/17 64/7 68/3 73/4 73/25 75/7 76/7 78/14 78/17 82/16 86/24

**didn't [38]** 7/8 7/17 8/17 10/12 16/20 19/22 21/17 21/23 31/21 32/7 35/12 39/12 39/22 40/7 40/24 41/3 42/12 42/25 43/13 44/19 44/23 44/23 46/24 49/24 50/2 52/22 61/3 62/21 67/3 67/5 71/25 73/15 81/16 82/15 89/18 90/5 90/15 92/8

**differ [1]** 67/18

**difference [4]** 13/2 26/8 61/20 64/10

**different [17]** 5/22 13/17 13/18 13/22 13/23 13/25 14/24 15/8 18/9 29/11 56/16 56/24 73/3 78/25 79/7 79/14 91/21

**differentiation [1]** 30/2

**differentiator [1]** 30/13

**differently [2]** 12/17 17/3

**diminished [1]** 68/7

**diminution [8]** 33/25 35/9 35/12 35/22 70/24 89/24 90/5 91/3

**Diovan [1]** 14/1

**directed [4]** 32/24 35/25 82/10 91/13

**disagree [2]** 20/11 60/4

**disagreed [1]** 90/14

**disagreeing [1]** 31/12

**disclose [1]** 22/21

**disconnect [5]** 9/14 80/20 80/23 81/4 83/15

**discovery [1]** 91/6

**discuss [1]** 27/13

**discussed [2]** 83/10 90/19

**discussion [2]** 49/16 68/18

**dismiss [18]** 10/18 10/21 10/23 30/5 30/23 36/10 36/12 50/10 68/10 69/1 71/17 72/22 74/7 78/20 78/25 84/14 89/12 91/20

**dismissed [4]** 68/9 71/16 89/25 91/4

**dispute [6]** 28/11 41/22 41/22 41/23 76/22 82/14

**disputing [2]** 21/9 50/25

**disqualifying [1]** 25/21

**distance [1]** 26/6

**distilling [1]** 83/18

**distinction [5]** 23/9 25/14 28/17 30/8 78/6

**distracted [1]** 27/18

**DISTRICT [4]** 1/1 1/1 1/10 4/2

**disturbing [1]** 66/1

**dixit [1]** 9/6

**doable [1]** 92/12

**document [3]** 68/10 69/2 69/11

**documents [1]** 50/12

**does [20]** 13/7 22/18 23/4 25/7 26/2 32/1 32/21 43/15 47/14 50/2 54/13 55/8 55/24 64/1 74/4 74/5 75/3 78/7 88/16 88/25

**doesn't [27]** 9/8 12/18 16/4 19/16 19/25 21/23 23/3 27/12 34/4 35/2 37/14 41/8 42/15 44/8 47/3 53/9 55/21 61/13 61/13 67/7 71/3 75/9 81/7 82/19 82/21 90/1 90/1

**doing [2]** 20/5 20/25

**dollars [3]** 34/12 34/20 77/1

**done [12]** 23/5 24/7 39/14 39/25 54/12 72/10 86/11 86/18 87/17 88/13 90/3 91/11

**door [3]** 14/19 41/23 42/20

**dose [1]** 62/11

**doses [1]** 62/13

**Dots [1]** 72/25

**down [8]** 13/24 19/15 45/9 45/10 47/24 47/24 62/19 63/10

**Dr [1]** 61/14

**Dr. [19]** 8/23 24/16 35/7 35/12 37/11 40/21 42/19

42/21 46/21 47/9 54/9 56/23 62/10 65/17 67/7 81/18 81/24 84/19 89/14

**disagree [2]** Dr. Afnan [2] 81/18 81/24

**Dr. Chodosh [7]** 24/16 40/21 46/21 54/9 56/23 65/17 67/7

**Dr. Chodosh's [1]** 62/10

**Dr. Conti [2]** 35/7 35/12 84/19 89/14

**Dr. Keller [1]** 42/19

**Dr. Plunkett [1]** 8/23

**Dr. Stiroh [3]** 37/11 42/21 47/9

**drank [1]** 40/6

**draws [1]** 30/8

**dress [1]** 15/22

**drew [3]** 28/16 30/13 62/15

**drill [2]** 47/24 47/24

**Drive [1]** 2/22

**drug [18]** 7/14 9/5 9/19 9/20 14/1 25/8 29/12 36/12 41/16 46/2 63/18 65/1 67/11 73/1 73/5 75/3 75/8 75/24

**drugs [27]** 8/21 12/7 12/24 14/1 16/17 17/2 17/8 17/22 31/7 32/13 33/11 45/6 46/9 50/22 57/8 57/14 57/15 58/10 58/12 60/5 61/13 61/22 61/24 62/1 62/4 64/6 73/10

**due [2]** 33/5 69/19

**during [6]** 23/25 24/9 24/10 60/13 68/6 72/22

**dying [1]** 87/9

**E**

**each [1]** 70/19

**early [2]** 57/6 92/20

**easiest [1]** 91/9

**easily [1]** 62/8

**easy [1]** 41/10

**eating [1]** 41/8

**economic [15]** 1/22 2/4 22/14 41/1 68/21 69/13 69/18 70/10 70/21 71/13 71/15 72/24 90/4 90/10 91/1

**effective [2]** 27/2 27/5

**efficacious [6]** 17/2 27/11 28/7 28/14 34/10 51/9

**efficacy [17]** 7/18 20/6 26/4 34/9 34/19 34/24 37/13 42/8 43/5 44/15 47/10 74/20 75/9 75/25 76/2 79/19 85/23

**efforts [1]** 47/24

**Eisenhower [1]** 1/18

**either [2]** 76/20 77/11

**element [9]** 52/11 52/13 52/18 52/20 56/18 59/8 59/15 59/15 59/18

**elements [1]** 52/15

**elephant [6]** 13/4 40/3 40/10 41/7 48/13 61/9

**Eleventh [5]** 9/24 23/15 23/19 30/2 32/2

**ELLIS [2]** 2/9 5/5

**eloquently [1]** 24/17

**else [2]** 39/6 56/8

**EMILY [1]** 3/9

**end [3]** 10/24 85/7 85/9

**ended [1]** 58/23

**energies [1]** 6/18

**enormous [1]** 86/11

**enough [2]** 11/13 78/18

**ensure [1]** 61/23

**enter [1]** 82/10

**entitled [6]** 19/4 52/3 52/3 52/4 52/23 93/23

**envision [1]** 32/22

**epidemiology [2]** 61/10 61/15

**equal [1]** 70/20

**equally [1]** 70/18

**error [2]** 47/22 64/8

**esoteric [1]** 43/19

**especially [1]** 87/10

**ESQUIRE [20]** 1/14 1/14 1/17 1/18 1/21 2/2 2/3 2/6 2/10 2/14 2/17 2/17 2/21 3/2 3/5 3/9 3/12 3/15 3/20 3/21

**essence [1]** 26/21

**essentially [5]** 26/22 32/12 43/5 68/12 74/21

**establish [3]** 11/17 46/11 70/11

**established [4]** 11/22 18/21 22/6 37/20

**et [5]** 22/9 29/3 29/4 58/25 63/8

**evaluate [1]** 41/4

**evaluated [2]** 14/11 24/5

**even [19]** 7/14 18/20 20/13 20/15 30/11 32/3 33/17 40/24 41/3 44/15 49/15 49/21 51/22 72/5 80/21 81/5 81/6 86/4 89/7

**evening [1]** 92/20

**eventually [2]** 47/7 57/19

**ever [8]** 14/15 20/9 24/17 39/7 53/21 54/12 57/2 67/15

**every [11]** 15/16 18/6 39/4 41/11 43/18 46/2 46/2 65/14 81/3 82/23 83/13

**everybody [3]** 8/4 20/3 41/8

**everything [4]** 36/5 44/25 62/24 93/8

**Everything's [1]** 92/25

**evidence [90]** 5/25 8/23 9/1 9/6 11/2 17/1 18/5 21/3 21/10 23/2 23/7 25/20 26/2 26/16 26/19 26/20 26/25 27/8 27/11 28/11 28/13 30/18 30/25 32/24 33/3 33/7 33/18

33/21 33/21 33/22 34/23 34/24 34/25 35/10 35/23 36/1 36/16 36/19 36/21 37/5 37/22 37/24 39/25 40/19 40/19 42/2 44/6 46/14 47/25 49/1 49/4 51/3 51/4 51/8 51/15 53/21 54/5 54/17 55/8 58/21 58/22 59/2 60/6 60/13 61/2 64/4 64/15 64/21 64/24 67/10 70/21 71/10 71/14 71/20 71/20 72/20 74/3 74/10 74/11 75/1 75/1 75/10 76/2 76/6 77/23 78/2 89/13 89/14 90/1 90/4

**exact [2]** 26/15 30/8

**exactly [8]** 11/15 39/3 52/6 56/23 63/6 64/25 65/5 65/5

**exaggerating [1]** 81/9

**example [5]** 54/2 54/4 82/22 82/25 90/13

**examples [1]** 45/23

**exceeded [1]** 25/3

**exceeding [1]** 22/12

**exchanging [1]** 93/7

**exclude [1]** 61/2

**excluded [3]** 26/22 33/5 71/12

**exclusion [1]** 32/20

**excuse [1]** 47/3

**exercise [1]** 40/6

**exhale [1]** 85/9

**exist [1]** 35/2

**existed [1]** 6/23

**expect [1]** 32/6

**expensive [1]** 89/22

**experience [1]** 90/12

**expert [19]** 8/23 31/6 34/25 35/13 35/20 40/22 41/2 42/18 42/19 43/11 46/14 47/8 54/10 81/16 81/19 81/23 82/11 82/14 89/13

**expert's [1]** 60/17

**experts [6]** 54/6 54/7 59/2 61/14 79/7 87/15

**explain [6]** 38/17 46/15 63/24 82/5 86/4 86/5

**explains [2]** 60/7 65/4

**express [5]** 16/11 18/17 51/23 59/15 91/14

**extent [2]** 52/24 53/1

**extrapolate [1]** 62/19

**extrapolation [2]** 62/11 62/17

**extremely [1]** 62/13

**F**

**facility [1]** 46/2

**fact [24]** 11/21 21/23 22/14 22/25 24/2 24/2 32/2 37/25 39/14 40/17 40/18 41/25 42/7 44/24 50/18 57/13 70/5 70/11 70/12 70/13 70/22 81/7

**F**

fact... [2] 81/17 89/6
factor [2] 47/15 67/3
factored [1] 7/11
factors [3] 44/20 86/5 86/6
factory [1] 15/2
facts [26] 8/12 10/1 10/2 10/3 11/4 11/17 12/5 15/11 18/10 20/2 21/2 21/3 32/19 40/19 41/20 43/8 43/9 51/1 51/12 65/18 65/25 65/25 70/4 72/16 75/19 75/20
factually [1] 15/9
failed [2] 14/13 14/13
fails [1] 70/4
failure [3] 22/21 69/15 69/16
fair [2] 16/16 55/13
FALANGA [1] 3/2
fall [1] 12/18
falls [1] 43/14
false [2] 19/23 38/23
falsely [1] 38/22
far [1] 50/10
fashion [2] 47/20 66/25
fast [1] 62/2
fastest [1] 88/7
FDA [45] 9/5 12/6 12/16 14/3 14/10 16/21 17/12 21/22 22/6 24/1 24/5 25/4 25/7 39/4 39/7 39/10 39/11 44/10 49/14 50/20 51/10 51/10 51/22 54/3 57/7 57/17 60/6 60/7 60/8 60/11 60/14 61/19 61/25 62/2 62/4 62/10 63/1 63/11 63/18 65/12 66/14 77/25 79/12 82/1 82/16
FDA's [3] 22/6 22/12 61/22
FDA-approved [2] 14/3 14/10
FEDERAL [1] 93/20
feel [4] 6/8 51/25 58/4 64/7
felt [1] 6/9
few [3] 13/15 19/6 52/25
fight [3] 29/3 29/4 60/21
fighting [2] 81/13 82/23
figure [4] 6/1 34/24 43/13 79/8
figured [1] 47/7
filed [1] 40/5
final [2] 32/9 92/24
find [7] 23/18 37/6 37/8 73/17 82/16 90/16 90/16
finder [4] 70/5 70/12 70/13 70/22
finding [1] 10/5 32/1
findings [1] 39/10
finds [2] 23/6 50/2
fine [5] 29/7 48/16 86/1 88/19 93/6
fine-tuning [1] 88/19
finger [1] 26/15

finish [3] 19/20 20/6 29/24
firms [1] 86/22
first [18] 6/11 6/13 8/14 13/12 21/11 23/11 28/22 29/24 47/17 53/16 68/17 69/12 69/13 70/2 79/23 82/17 83/9 90/13
fit [2] 32/19 41/3
five [12] 36/9 42/14 43/9 44/8 44/8 44/20 45/10 48/22 48/24 79/25 85/5 85/11
five-week [2] 48/22 48/24
flat [1] 72/10
flesh [2] 6/9 6/10
flip [1] 16/1
flip-side [1] 16/1
FLOM [1] 2/5
Floor [3] 2/3 2/14 3/3
flour [7] 12/6 12/8 12/18 19/7 19/10 48/14 66/13
focus [5] 6/16 52/14 52/14 52/14 52/15
focused [3] 9/13 79/2 90/21
focusing [2] 6/15 51/23
folks [2] 48/9 81/5
follow [2] 78/16 85/22
following [1] 22/2
follows [1] 4/4
force [1] 70/20
foregoing [1] 93/22
forever [2] 85/13 85/15
form [6] 6/24 25/8 44/10 60/12
formed [1] 79/7
formulary [3] 15/14 19/25 75/2
Forsyth [1] 3/16
forth [4] 55/20 55/21 60/18 61/7
forward [16] 6/2 6/3 23/7 29/18 30/18 30/24 44/17 49/5 51/13 72/20 79/18 83/12 84/15 84/16 84/20 91/24
foul [3] 47/4 67/12 87/1
found [17] 6/17 17/15 22/22 37/6 39/4 39/7 39/12 39/16 39/19 40/1 51/9 57/17 69/21 70/2 70/3 72/25 79/5
four [5] 48/23 48/24 84/1 90/8 93/9
four-week [1] 48/23
frame [2] 8/24 34/6
framed [1] 7/21
framework [1] 33/8
Frankenstein [1] 92/13
frankly [2] 24/19 82/24
fraud [7] 18/17 49/24 51/20 51/23 56/16 59/17 84/10
free [4] 49/23 61/24 62/24 63/4
FREEMAN [1] 1/17

front [7] 28/11 32/24 35/10 36/1 57/10 73/15 77/4
frustrated [1] 58/21
frustration [1] 86/20
FULBRIGHT [1] 3/11
full [21] 16/6 16/22 20/18 35/8 35/15 43/12 43/12 43/13 45/9 49/10 49/11 49/20 50/3 51/21 54/9 61/10 68/17 70/9 76/15 77/7 77/14
full-blown [1] 54/9
fully [1] 60/12
fundamental [10] 44/22 49/8 53/5 53/7 53/9 53/13 73/12 76/21 77/13 77/16
funneling [1] 83/18
funny [1] 40/9
furiously [1] 62/2

**G**

garbage [1] 87/13
Gateway [1] 3/3
gather [1] 30/20
gave [2] 21/15 92/23
gearing [1] 22/3
gears [1] 91/15
GEDDIS [1] 1/18
general [31] 24/15 27/12 27/13 28/10 33/10 33/23 34/1 34/13 41/23 47/14 50/21 56/3 56/5 56/9 60/24 61/6 66/4 66/6 67/1 67/3 70/25 84/22 84/24 85/24 86/4 86/5 88/6 89/4 89/7 89/8 91/24
genotoxic [11] 12/16 23/24 46/8 48/3 48/12 49/8 57/4 65/14 65/14 81/7 81/7
genotoxin [1] 41/13
genotoxins [1] 38/16
gentlemen [4] 29/10 45/4 47/6 66/23
Georgia [1] 2/18
gets [4] 15/18 72/7 85/8 87/17
getting [9] 5/25 19/7 43/16 43/16 47/25 49/14 72/5 80/3 83/19
giant [1] 85/20
give [16] 16/4 19/9 19/23 20/18 21/24 29/12 29/12 37/14 41/11 43/12 43/13 45/9 47/3 66/20 83/3 86/3
given [4] 10/10 21/19 51/15 62/16
gives [2] 35/1 76/2
giving [3] 78/3 78/4 82/25
glad [2] 8/16 88/2
goes [12] 18/17 22/17 23/6 32/10 45/1 46/2 46/19 52/16 67/2 85/3 90/13 91/14
GOLDENBERG [2] 2/2

2/3
Gomm [1] 39/16
gone [3] 55/20 71/2 71/9
good [19] 4/6 4/7 4/8 4/9 4/10 4/13 4/16 4/18 4/19 4/22 4/24 5/2 5/4 5/7 5/15 32/8 58/1 90/13 93/14
goods [1] 64/11
GORDON [1] 2/13
got [26] 7/13 7/16 7/17 7/18 10/18 16/24 16/25 18/13 20/16 35/6 36/10 42/1 44/7 44/7 44/15 45/1 46/20 52/16 59/13 59/21 59/23 61/4 62/6 62/6 67/6 87/4
gotten [4] 16/22 16/22 49/21 86/12
Gottlieb [2] 60/8 62/5
grant [3] 84/8 91/13 91/18
grateful [1] 88/22
great [2] 66/8 85/11
greater [2] 22/15 88/19
green [1] 11/9
GREENBERG [4] 2/16 2/21 5/9 5/11
Greg [1] 5/9
GREGORY [1] 2/21
griping [1] 20/25
grounds [1] 68/9
GSK [1] 31/17
guardrails [2] 54/17 86/1
guess [6] 6/4 6/11 24/11 32/9 54/15 66/25
guidance [3] 37/14 43/17 62/7
guidances [1] 12/14
guidelines [3] 12/15 23/25 65/11
guys [1] 84/22

**H**

hadn't [4] 38/21 72/10 72/10 82/12
handle [5] 5/20 80/13
handling [1] 83/4
hands [1] 13/6
Hang [3] 68/13 69/4 69/22
happen [6] 8/17 12/2 29/8 49/16 80/9 92/8
happened [5] 8/20 24/9 47/23 50/17 74/25
happening [4] 36/7 81/12 86/16 88/22
happens [3] 15/10 44/11 88/12
happy [7] 5/16 37/2 51/7 53/24 54/18 90/23 90/24
hard [3] 28/1 77/3 92/7
harder [1] 80/8
HARKINS [1] 2/17
harm [4] 47/4 51/19 67/12 87/1
harmful [2] 23/3 53/10
has [52] 6/17 7/21 9/13

20/22 26/3 27/14 31/18 33/25 34/25 37/7 44/25 47/10 47/23 48/4 49/6 53/1 56/20 56/21 60/4 61/5 61/11 63/15 64/2 66/5 71/11 75/9 77/17 78/1 81/23 83/20 85/5 86/2 86/8 87/20 87/21 87/22 87/23 87/24 88/4 88/17 88/18 89/19 89/6 89/10 89/13 90/17 90/24 91/1 91/4 91/4 91/5 91/8
hasn't [1] 88/21
have [259]
haven't [4] 39/19 49/21 50/16 50/19
having [5] 38/16 65/7 64/11 84/11 88/20
he [43] 23/5 24/16 27/11 30/9 30/13 30/15 30/15 30/24 36/10 36/13 36/14 36/21 56/24 65/23 68/12 69/13 69/21 70/2 70/3 70/6 73/25 78/17 81/17 81/25 82/1 82/1 82/4 82/5 82/17 83/4 89/6 89/6 89/10 89/16 89/23 89/25 90/1 90/3 90/5 91/17 91/18 91/18 91/20
he's [1] 82/13
head [3] 9/21 40/15 80/6
health [5] 3/10 12/12 12/13 24/14 54/3
Healthcare [1] 2/8
hear [16] 9/1 9/3 24/11 25/10 37/24 38/5 40/4 41/12 41/13 41/14 48/2 58/5 59/25 67/9 69/7 92/19
heard [6] 34/23 34/23 50/16 81/14 82/25 91/13
hearing [3] 9/3 23/18 28/2
hears [1] 63/4
held [1] 4/1
help [2] 42/16 47/7
helped [3] 7/10 47/4 76/9
helps [1] 58/3
her [4] 9/9 22/24 32/1 32/18
here [48] 4/13 4/14 5/16 11/4 11/16 15/12 19/20 23/1 23/3 23/10 24/6 25/17 26/15 30/5 30/21 32/13 33/2 33/12 35/22 36/10 38/16 39/24 43/7 47/16 49/23 50/7 50/17 52/1 56/22 62/22 62/23 65/20 67/11 70/18 70/19 70/20 72/8 72/13 73/9 73/9 74/14 76/25 77/5 78/18 79/4 80/5 81/12 86/13
here's [6] 10/23 15/13 45/5 45/5 58/16 84/19
herself [1] 32/12
hid [1] 51/22

**H**

hide [2] 66/9 66/10
high [1] 86/21
high-stakes [1] 86/21
higher [1] 22/9
highlights [1] 76/13
him [2] 41/4 82/15
hindsight [1] 18/20
his [7] 9/21 30/15 68/9 82/5 82/12 86/8 91/20
history [1] 31/3
hit [1] 30/1
hits [1] 40/15
hold [4] 85/13 92/1 92/25 93/8
holding [1] 86/13
holds [1] 91/23
hole [1] 83/2
honest [1] 5/17
honestly [1] 54/7
HONIK [4] 1/13 1/14 4/19 6/5
Honor [68] 4/16 4/19 4/22 4/24 5/4 7/21 10/16 20/6 23/11 25/12 25/13 26/14 27/19 28/6 29/25 31/13 32/9 32/11 33/8 33/9 33/20 34/4 36/25 37/21 39/1 39/9 39/19 40/6 40/13 41/11 42/21 43/20 43/23 52/12 52/24 54/7 54/15 56/2 56/10 60/3 61/20 64/18 65/4 68/5 68/14 68/24 69/9 71/7 71/25 80/7 80/13 84/7 84/11 84/13 84/21 86/1 87/7 87/18 87/21 91/7 92/4 92/22 93/2 93/12 93/13 93/15 93/16 93/17
Honor's [4] 47/9 71/18 74/19 79/2
HONORABLE [5] 1/10 1/11 3/20 4/1 4/2
hope [2] 24/16 92/1
hoping [1] 5/25
horse [1] 79/20
horserace [2] 20/20 79/20
hotels [1] 86/13
hours [2] 89/7 93/9
however [3] 7/4 67/4 85/3
Huahai [2] 2/7 2/8
huge [2] 80/20 92/9
huh [2] 53/23 74/24
human [3] 12/16 41/14 57/4
humans [1] 54/4
hundred [1] 36/15
hundreds [1] 79/12
hurdles [1] 59/11
hurt [1] 39/12
HUSCH [1] 3/15
hypertension [2] 27/2 27/5
hypothetical [3] 12/13

19/15 34/3
hypotheticals [2] 19/11 45/21

**I**

I'd [3] 15/13 72/3 74/6
I'll [10] 13/11 13/20 22/2 27/20 67/22 69/8 78/14 80/24 83/6 93/10
I'm [84] 5/16 5/17 5/25 6/3 6/4 8/8 8/8 8/10 8/16 12/21 19/17 19/20 23/12 23/12 23/17 23/17 23/18 24/24 27/16 27/17 27/22 28/1 28/1 28/13 33/12 34/18 36/4 36/25 37/12 38/7 40/6 40/7 40/9 40/22 41/3 43/20 43/25 48/23 48/25 49/1 49/1 50/6 51/6 51/11 53/19 53/20 54/11 54/16 55/16 56/12 56/20 57/24 58/19 58/21 59/16 59/18 59/20 64/23 65/20 65/23 67/17 68/14 68/23 68/24 69/3 69/24 71/7 73/8 80/16 80/24 81/9 82/7 83/1 83/3 83/25 84/1 84/1 85/22 87/1 87/3 87/9 88/2 88/22 92/15
I've [11] 6/8 11/5 33/14 48/17 52/24 52/25 55/20 55/20 60/1 72/8 81/14
i.e [1] 17/2
ICH [2] 12/15 65/11
identified [3] 24/4 69/12 69/13
identify [1] 65/14
ignorant [1] 21/24
III [1] 30/10
illegal [17] 23/2 23/20 23/21 23/22 24/13 25/1 25/5 38/4 38/11 44/9 45/8 49/19 51/17 58/9 58/9 58/10 60/5
illegally [1] 59/7
Illinois [1] 2/22
imagine [2] 29/2 29/5
impact [1] 46/17
impermissible [1] 76/13
important [12] 10/22 11/18 11/20 13/25 15/25 16/1 30/1 45/20 61/17 67/19 74/10 74/13
importantly [1] 89/13
improperly [1] 22/5
impurities [5] 11/24 12/17 28/9 46/8 66/17
impurity [5] 15/1 15/4 28/12 60/9 65/14
Inc [9] 2/8 2/8 2/12 2/15 2/19 2/20 2/23 2/24 3/7
including [1] 91/11
incongruous [2] 76/24 77/3
incorrect [1] 58/8
increased [3] 39/17 54/14 57/21

indefinitely [1] 88/12
independent [1] 46/11
indicated [1] 27/1
individuals [2] 61/2 61/2
Industries [2] 2/19 2/23
industry [1] 60/12
inefficacious [1] 49/12
ingredients [1] 42/24
inherently [1] 25/21
initial [1] 68/7
injury [26] 22/14 22/25 23/4 30/14 30/14 53/16 69/13 70/5 70/11 70/14 70/23 77/2 79/23 80/3 83/23 85/12 87/4 87/9 87/10 90/10 90/12 90/13 90/18 90/23 91/10 92/7
inquiry [1] 33/24
Instead [1] 70/13
instruction [5] 40/14 40/14 65/4 67/1 86/3
instructions [2] 37/19 41/12
instructive [1] 6/8
insufficient [1] 70/15
insurance [3] 15/15 20/1 39/15
interesting [1] 50/15
internal [1] 65/12
interrupt [1] 59/19
introduce [3] 17/1 21/10 76/5
introduced [1] 33/19
introduction [1] 68/17
investment [1] 86/12
ipse [1] 9/6
IRBESARTAN [1] 1/4
isn't [2] 15/17 27/7
issue [34] 12/21 13/21 20/6 24/15 26/1 26/3 26/4 27/14 28/3 40/15 40/25 49/6 51/6 56/10 56/14 59/10 60/24 61/21 62/5 65/16 72/5 72/11 72/14 78/9 81/13 81/18 81/23 82/2 82/23 84/7 84/9 84/10 90/20 93/10
issued [1] 51/10
issues [5] 33/9 83/5 90/22 91/24 92/3
its [9] 10/1 10/2 21/13 22/21 22/22 46/17 46/17 73/6 73/11
itself [1] 60/6

**J**

JASON [1] 2/14
JERSEY [5] 1/1 1/8 1/19 3/3 43/17
JESSICA [2] 2/6 5/13
John [3] 1/23 1/24 94/1
join [1] 66/22
joking [1] 40/7
JUDGE [67] 1/10 4/2 4/7 6/6 9/8 9/16 16/11 18/1 18/14 19/16 20/21 22/1 27/22 30/6 30/8 30/22

31/17 36/9 38/6 42/18 45/16 46/20 47/20 50/15 53/18 55/14 56/23 57/15 59/9 59/18 60/1 61/8 65/21 66/4 67/16 68/8 68/20 69/12 70/9 72/15 72/18 73/8 73/17 73/25 76/19 78/12 78/17 79/3 80/10 80/25 81/11 82/10 83/3 83/22 84/17 85/22 86/8 88/7 89/25 90/14 90/15 91/4 91/11 92/15 92/17 92/22 93/3
judgment [19] 28/19 30/16 30/17 30/23 32/22 35/22 36/13 50/11 50/14 71/19 71/23 74/7 78/17 78/21 79/17 82/11 82/13 84/8 91/18
Judicial [1] 3/20
July [2] 39/9 56/11
juries [1] 43/18
jury [89] 7/20 7/21 8/12 9/4 9/19 10/12 12/23 13/4 16/5 16/19 16/21 17/1 17/11 17/15 17/25 20/19 20/20 20/22 21/1 21/10 27/10 28/12 28/25 29/3 29/6 32/25 34/22 35/6 35/10 35/21 36/1 36/15 36/22 37/14 37/16 37/18 37/22 40/4 40/15 42/22 43/7 43/10 43/14 43/19 44/16 45/5 47/13 49/12 49/16 50/1 56/7 58/9 59/21 60/20 63/4 63/11 63/17 64/1 64/5 64/13 64/14 64/15 64/20 64/24 65/5 65/10 65/23 66/10 67/9 71/3 71/11 71/21 73/25 76/9 76/10 76/14 78/4 78/18 79/19 80/21 80/24 81/6 84/18 85/24 88/23 89/23 91/25 92/1 92/3
jury's [1] 48/2
just [76] 5/17 5/24 6/3 8/13 16/1 16/5 16/15 17/15 19/6 19/17 23/10 27/17 27/24 28/1 28/20 29/7 29/8 29/10 29/14 29/21 31/2 31/3 31/13 31/16 31/18 31/22 32/18 33/8 34/22 35/5 35/15 39/13 46/5 48/1 48/18 48/19 49/2 49/23 50/8 52/25 57/15 58/5 58/7 58/20 59/23 60/3 62/22 64/25 65/16 66/14 67/16 68/5 69/23 69/25 72/7 76/12 76/14 76/24 77/2 79/1 80/11 81/14 81/15 82/25 83/6 83/15 84/8 85/20 85/20 87/1 87/22 88/20 89/24 90/20 92/5 93/8

**K**

KANNER [1] 1/20
KATZ [1] 1/17
keep [17] 5/20 5/22 9/3 10/24 15/22 31/3 45/3 47/25 48/22 49/18 51/23 51/25 52/6 58/20 63/21 77/6 87/1
Keller [1] 42/19
kept [2] 42/3 55/18
key [1] 23/1
kicked [1] 88/9
kills [1] 48/15
kind [5] 33/8 45/21 68/16 78/20 83/6
kindly [1] 92/23
KIRKLAND [3] 2/9 5/5 5/8
KNEPPER [1] 3/15
knew [8] 18/7 18/7 20/10 26/23 51/5 51/21 59/6 65/15
know [116]
knowing [7] 6/23 22/16 29/1 29/8 32/15 48/23 64/15
knowledge [1] 59/14
known [2] 21/6 66/16
knows [1] 41/11
Kugler [23] 3/20 20/21 30/22 36/9 42/18 46/20 47/20 55/14 56/23 65/21 68/8 68/20 69/12 70/9 72/15 73/25 78/12 78/17 82/11 84/17 89/25 90/14 91/4
Kugler's [3] 73/8 85/22 90/15
Kurz [3] 1/23 1/24 94/1

**L**

L'Oreal [1] 22/21
lab [1] 66/20
label [2] 45/22 66/12
laboratory [1] 66/21
lack [1] 71/16
lacked [1] 22/20
ladies [4] 29/10 45/4 47/6 66/23
land [1] 28/19
language [2] 23/1 41/14
large [1] 39/15
last [1] 39/18
later [6] 10/5 12/7 20/15 23/5 25/2 25/3
law [46] 3/20 8/5 8/21 16/10 16/10 16/13 17/23 18/1 18/21 19/3 19/18 19/19 19/22 20/2 21/15 21/16 21/20 24/12 24/12 26/5 32/8 38/9 38/11 40/18 41/20 42/5 44/6 44/7 46/1 49/2 50/17 50/20 50/23 50/23 56/22 57/1 57/13 58/11 58/12 58/25 65/8 65/19 65/25 66/1 75/23 86/22

**L**

**lawyers [1]** 38/14
**lay [2]** 33/8 84/1
**lead [7]** 1/16 1/19 1/22 2/4 22/22 22/24 23/22
**learned [3]** 87/21 87/21 87/22
**least [1]** 32/21
**leave [2]** 68/3 89/8
**leaves [2]** 13/4 63/13
**leaving [1]** 89/6
**left [3]** 26/11 45/19 64/5
**legally [2]** 46/25 47/2
**less [34]** 6/12 25/15 25/21 30/11 33/4 33/18 33/22 33/24 34/6 34/7 34/9 34/10 34/12 34/14 34/17 34/17 34/21 35/2 35/16 35/22 37/1 54/22 54/25 68/8 68/21 69/16 70/4 70/10 71/16 72/12 72/16 74/22 78/11 83/14
**let [36]** 4/14 10/22 12/5 19/20 22/1 24/7 27/10 27/20 29/24 34/3 36/25 42/22 42/22 43/24 53/20 54/8 54/16 58/5 59/25 63/21 65/23 66/2 66/3 67/22 68/13 69/7 69/22 69/25 79/19 81/2 84/12 84/15 85/23 85/23 85/23 85/24
**let's [19]** 8/12 8/13 11/7 11/19 29/10 39/13 40/21 40/21 62/18 62/22 66/5 87/8 87/11 87/11 87/11 87/13 87/13 87/14 89/8
**lets [1]** 44/10
**letter [3]** 9/17 33/9 60/17
**letting [7]** 19/5 20/12 43/25 47/9 53/19 57/24 67/1
**level [9]** 6/3 22/9 24/8 46/22 62/21 63/19 63/21 63/22 79/13
**levels [4]** 22/12 25/3 63/1 79/12
**Lexington [1]** 2/11
**liability [17]** 1/5 17/5 18/25 21/14 21/16 28/17 30/11 45/2 49/4 52/14 52/14 52/16 52/18 67/3 67/3 86/6 91/25
**life [1]** 88/12
**lifetime [1]** 62/15
**light [1]** 62/2
**like [21]** 6/9 6/9 7/2 13/15 15/13 17/15 32/10 39/24 40/14 41/13 43/14 45/21 48/2 49/7 51/25 53/11 67/20 82/6 83/19 84/20 87/2
**likely [1]** 54/4
**limine [6]** 33/12 55/4 55/5 56/6 60/25 61/1
**limit [1]** 62/19
**limitations [1]** 62/11

**limiting [1]** 41/11 65/4 86/3
**limits [3]** 24/1 62/8 62/23
**line [7]** 15/2 36/24 48/17 62/17 62/19 78/24 87/14
**linear [1]** 62/11
**lipstick [3]** 22/22 22/24 23/23
**list [1]** 15/14
**listen [2]** 37/9 84/21
**listening [1]** 60/2
**literature [1]** 61/11
**litigation [5]** 1/5 79/24 85/4 85/18 86/21
**little [12]** 6/8 12/6 12/7 19/10 36/6 40/6 48/14 65/20 67/13 73/3 81/9 88/5
**live [6]** 42/5 58/1 67/16 85/25 86/6 86/17
**liver [4]** 39/17 40/1 87/12 87/13
**living [1]** 29/11
**LIZA [1]** 3/2
**LLC [6]** 1/13 1/17 1/20 2/8 2/19 2/23
**LLP [10]** 2/5 2/9 2/13 2/16 2/21 3/2 3/5 3/8 3/11 3/15
**LOCKARD [6]** 2/17 5/11 27/13 33/9 36/3 59/25
**logic [1]** 91/23
**long [4]** 48/17 72/4 83/18 89/8
**longer [2]** 54/18 73/5
**look [19]** 24/6 36/25 37/23 42/14 54/15 57/14 62/22 72/3 72/6 74/6 74/17 78/15 79/15 80/6 80/24 81/11 82/7 82/21 87/8
**looked [4]** 57/5 57/13 66/15 72/4
**looking [1]** 47/11
**looks [2]** 15/15 37/16
**Loretta [1]** 3/20
**LOSARTAN [1]** 1/3
**loss [9]** 1/22 2/4 41/1 68/21 69/18 70/10 72/24 90/10 91/1
**lost [2]** 40/9 85/20
**lot [11]** 5/24 13/12 14/5 49/5 54/5 81/12 84/6 87/21 87/22 87/22 87/23
**Louis [1]** 3/16
**Louisiana [1]** 1/22
**low [3]** 30/10 62/11 62/13
**lower [1]** 44/23
**Ltd [4]** 2/8 2/12 2/19 2/23

**M**

**made [11]** 17/20 17/21 24/17 28/12 35/3 36/9 72/8 72/13 73/20 82/4 90/11

**maintained [1]** 91/9
**make [25]** 7/23 8/7 8/15 11/14 14/9 14/10 17/24 20/8 20/19 20/24 32/10 42/22 45/1 49/22 53/17 57/10 61/22 71/21 71/22 79/19 80/9 81/17 82/7 84/12 85/24
**makes [4]** 43/14 53/9 76/9 76/10
**making [8]** 11/6 29/2 58/20 73/18 78/11 78/12 81/14 85/22
**Management [1]** 1/5
**Manhattan [1]** 2/6
**manufacture [1]** 14/5
**manufactured [5]** 14/2 14/19 15/3 46/10 58/23
**manufacturing [4]** 14/3 15/2 15/6 60/13
**many [5]** 6/8 57/5 57/5 66/17 66/17
**MARIE [2]** 1/10 4/2
**market [13]** 1/15 57/2 57/14 57/16 61/23 62/24 63/2 63/18 63/22 64/7 65/2 78/2 86/25
**marketed [1]** 61/24
**MARLENE [1]** 2/3
**mass [1]** 92/6
**massive [3]** 62/16 79/11 86/12
**massively [1]** 87/10
**MASTER [2]** 1/11 4/3
**material [4]** 11/13 11/21 77/20 78/13
**materiality [8]** 11/16 11/20 11/21 11/22 12/11 46/19 53/13 56/22
**matter [21]** 4/15 6/7 8/20 11/4 17/23 40/18 40/18 44/6 52/5 56/20 56/21 57/12 57/13 58/12 58/15 58/16 58/25 61/13 71/19 82/20 93/23
**mattered [1]** 66/11
**matters [3]** 46/21 48/4 52/7
**MATTHEW [1]** 3/15
**may [10]** 7/5 7/9 7/12 7/15 8/22 18/16 18/16 31/21 66/8 77/2
**maybe [16]** 15/25 44/23 44/23 49/3 53/16 55/9 58/1 58/3 67/2 67/9 67/14 67/14 69/5 80/13 82/9 88/10
**MAZIE [1]** 1/17
**Mckesson [1]** 3/14
**md [1]** 1/4
**MDL [4]** 1/16 1/19 31/25 72/19
**me [50]** 4/14 8/16 8/25 9/21 10/22 11/6 12/5 19/6 19/9 19/20 21/14 22/1 26/11 26/13 29/9 33/14 34/3 37/22 48/1 48/2 48/4

**48/21 50/1 53/8 53/11 53/14 53/15 53/16 55/16 55/24 58/5 59/25 67/22 68/4 68/13 69/7 69/22 69/25 72/18 73/15 73/15 76/13 76/14 76/24 77/3 77/3 78/6 80/23 81/2 92/19
**MEAGHER [1]** 2/5
**mean [28]** 6/3 10/20 13/24 16/15 16/23 24/11 29/9 29/21 34/1 50/2 50/2 59/9 59/18 59/23 60/18 65/19 66/19 67/16 73/12 74/4 81/5 81/7 81/21 82/3 84/16 87/1 88/5 92/1
**meaning [1]** 60/11
**means [3]** 26/8 26/8 65/5
**meant [1]** 70/6
**Meanwhile [2]** 27/19 91/15
**measure [3]** 18/20 18/22 25/23
**meat [1]** 91/25
**mechanical [1]** 1/25
**medical [1]** 7/10
**medication [1]** 27/2 27/6 69/18
**meet [3]** 46/12 47/13 77/24
**melanoma [1]** 39/20
**members [1]** 27/5
**mention [1]** 10/17
**mentioned [1]** 39/19
**mentioning [1]** 13/5
**mere [3]** 70/7 70/13 70/23
**merely [1]** 22/19
**met [2]** 59/1 59/3
**methodology [1]** 47/10
**might [2]** 58/17 64/16
**million [1]** 45/23
**millions [2]** 62/3 77/1
**mind [3]** 58/8 67/18 67/19
**minds [1]** 67/18
**minimis [2]** 46/5 53/2
**minimizing [1]** 86/25
**minutes [3]** 13/15 45/10 52/25
**misconduct [1]** 84/11
**misheard [1]** 81/15
**misrepresented [1]** 16/17
**missing [1]** 34/19
**Missouri [1]** 3/16
**Mitchell [1]** 1/7
**mixed [1]** 5/25
**moment [2]** 14/8 39/7
**moments [1]** 19/7
**money [8]** 14/9 19/4 51/17 52/23 76/8 85/13 86/13 88/13
**month [1]** 88/11
**moral [1]** 26/22
**more [24]** 5/23 5/23 14/9 15/25 24/17 24/18 40/23 51/19 53/10 53/17 54/19

**54/19 57/22 58/4 59/11 67/19 72/10 80/16 83/22 88/5 89/12 89/22 90/21 92/16
**MORING [1]** 3/8
**morning [1]** 39/9
**most [3]** 39/16 42/24 86/10
**motion [29]** 10/18 10/21 10/23 30/5 30/23 33/11 36/10 36/12 36/13 41/25 50/9 50/10 55/4 55/5 55/17 60/25 61/1 61/5 68/9 68/25 71/17 71/21 71/22 72/22 74/7 78/20 78/25 84/12 89/12
**motions [9]** 36/13 36/14 56/2 56/2 56/6 56/6 78/17 79/17 82/11
**move [6]** 32/21 83/12 84/15 87/2 88/11 92/2
**moved [2]** 82/13
**moving [4]** 6/2 6/3 88/17 91/24
**Mr. [19]** 6/4 6/5 6/11 20/4 27/11 27/9 29/7 29/24 35/6 48/1 60/25 61/11 73/20 88/25 89/3 89/5 90/3 91/13
**Mr. Honik [1]** 6/5
**Mr. Ostfeld [6]** 28/5 29/24 35/6 73/20 89/3 90/3
**Mr. Slater [12]** 6/4 6/11 20/4 27/11 27/9 29/7 48/1 60/25 61/11 88/25 89/5 91/13
**Ms [1]** 91/8
**Ms. [6]** 27/13 33/9 33/10 36/3 36/4 59/25
**Ms. Allon [1]** 33/10
**Ms. Davidson [1]** 36/4
**Ms. Lockard [4]** 27/13 33/9 36/3 59/25
**much [17]** 13/16 13/22 24/6 26/6 30/11 34/9 34/9 34/14 43/15 61/16 67/19 72/10 79/6 79/9 79/21 86/1 90/21
**Mulberry [1]** 3/3
**mull [1]** 92/15
**must [1]** 64/6
**mutants [1]** 48/12
**my [24]** 6/5 6/11 6/13 7/4 9/17 12/11 15/13 18/14 23/11 23/12 23/18 28/18 31/12 32/19 34/3 35/20 40/9 45/5 47/24 55/15 60/2 67/19 84/20 90/12
**Mylan [1]** 2/15
**myself [1]** 77/4

**N**

**N.W [1]** 3/6
**name [1]** 9/24
**NDEA [2]** 24/3 41/17
**NDMA [15]** 14/21 14/22

**N**

**NDMA... [13]** 18/7 22/6 22/9 22/16 24/3 28/9 28/12 32/1 41/17 57/16 65/7 66/19 79/7
**NE [1]** 2/18
**need [13]** 61/9 66/11 80/5 80/6 80/17 81/22 82/6 85/5 87/2 87/2 87/15 88/10 88/10
**needed [2]** 55/18 84/23
**needs [1]** 60/9
**neglected [1]** 68/6
**neither [1]** 60/11
**never [32]** 8/14 8/21 10/13 12/24 15/17 16/7 18/7 20/9 21/11 26/12 26/18 29/13 31/1 31/21 37/13 38/23 49/19 50/19 57/11 57/13 61/25 62/1 71/15 72/9 73/9 73/10 74/25 76/15 77/7 77/7 77/14 85/7
**new [13]** 1/1 1/8 1/19 1/22 2/7 2/7 2/11 2/11 3/3 43/17 62/5 85/8 91/3
**Newark [1]** 3/3
**next [4]** 2/25 63/25 85/11 93/9
**NIGH [3]** 2/2 2/2 4/22
**nil [1]** 49/14
**nitrite [1]** 14/16
**nitrosamine [1]** 49/25
**nitrosamines [1]** 60/12
**njd.uscourts.gov [1]** 1/24
**no [110]**
**no-value [1]** 72/1
**nobody [9]** 6/22 15/18 17/22 18/15 19/8 39/2 39/8 41/22 64/2
**nobody's [2]** 41/5 88/11
**non [1]** 77/9
**non-cGMP [1]** 77/9
**none [3]** 24/3 24/9 83/6
**nonmaterial [1]** 45/22
**NORTON [1]** 3/11
**not [216]**
**noted [1]** 33/9
**notes [1]** 81/14
**nothing [11]** 35/6 35/10 36/1 39/6 43/18 54/21 58/3 66/9 74/23 86/19 90/6
**notwithstanding [1]** 28/8
**novel [2]** 47/20 47/21
**November [1]** 92/11
**now [41]** 6/18 14/5 26/24 29/1 29/8 32/16 34/24 36/7 36/23 36/24 39/10 42/3 42/21 48/1 49/6 52/16 53/15 55/5 55/9 59/11 62/13 63/7 65/10 71/13 71/19 71/22 72/11 72/21 74/18 78/9 78/11 81/18 82/13 84/5 84/6 86/12 86/14 86/16 88/22 89/6 91/2

**O**

**O'REILLY [1]** 3/2
**oath [1]** 46/22
**objection [2]** 66/5 84/25
**obligation [1]** 61/22
**obviously [10]** 13/12 44/11 55/6 61/7 72/4 72/12 90/8 92/5 92/7 92/8
**occurring [1]** 60/10
**October [2]** 1/8 94/1
**off [10]** 14/4 57/1 57/14 57/16 68/3 78/1 85/8 86/13 87/17 88/12
**offend [1]** 34/4
**Official [2]** 1/23 93/20
**oh [9]** 8/10 19/9 31/24 32/4 40/12 61/4 64/5 68/24 69/3
**okay [37]** 4/13 5/1 5/3 5/15 6/19 6/25 8/20 9/23 14/4 15/15 16/14 17/6 19/21 23/16 27/10 27/19 27/23 28/1 32/8 36/3 36/6 37/16 39/1 40/12 53/8 68/2 69/3 69/6 69/8 69/10 69/20 70/1 71/7 74/23 76/1 92/14 93/11
**once [4]** 9/5 18/7 50/25 63/4
**one [54]** 2/6 2/14 6/12 9/7 9/8 15/16 20/9 25/15 25/19 25/20 25/22 27/8 27/17 31/13 34/5 35/7 38/24 46/10 47/18 50/13 50/13 51/5 51/14 51/16 51/19 53/19 54/6 56/6 57/2 58/17 63/13 65/19 65/22 66/1 66/2 68/5 69/14 69/22 71/6 71/9 71/14 72/2 73/22 74/9 74/13 74/16 78/7 79/3 80/8 80/13 89/10 89/11 89/18 90/7
**one-sided [4]** 65/19 65/22 66/1 66/2
**ongoing [1]** 30/3
**only [14]** 6/16 26/11 33/4 33/5 39/25 43/6 52/21 54/12 56/13 71/10 81/19 89/11 89/13 90/21
**open [2]** 4/1 63/13
**opening [1]** 42/8
**operating [1]** 65/13
**operative [1]** 73/9
**opinion [16]** 6/6 22/2 31/6 32/21 33/5 68/10 69/1 69/2 69/4 69/5 70/17 71/11 73/8 73/15 74/7 84/2

**opportunity [1]** 60/2
**option [1]** 53/19
**oral [1]** 71/21
**Orange [1]** 16/17
**order [5]** 9/17 30/4 47/12 92/24 93/10
**orders [1]** 78/25
**Organization [1]** 54/3
**originally [2]** 14/1 90/15
**Orleans [1]** 1/22
**OSTFELD [8]** 2/21 5/9 28/5 29/24 35/6 73/20 89/3 90/3
**other [25]** 9/13 12/17 17/4 18/3 22/11 33/9 33/13 34/11 35/13 43/3 49/6 56/14 56/15 58/7 61/4 61/14 74/9 74/13 77/23 78/9 79/1 80/15 84/14 90/4 92/5
**otherwise [1]** 70/22
**our [58]** 6/14 6/17 6/20 7/2 7/7 7/20 7/21 7/23 8/23 10/3 11/12 13/25 18/21 19/15 20/8 24/16 26/7 33/20 36/13 37/2 37/25 41/24 43/11 45/5 45/20 46/14 49/20 51/17 53/2 53/25 54/5 54/6 54/6 54/6 54/17 54/24 54/24 59/2 61/7 62/9 63/16 63/16 63/16 66/5 67/9 67/11 73/16 74/10 74/25 76/6 80/11 84/3 84/8 84/13 84/15 84/25 87/21 90/17
**ourselves [2]** 90/16 90/16
**out [33]** 6/1 6/9 6/10 11/9 13/13 14/18 14/19 18/19 26/6 34/22 34/24 39/5 39/7 41/24 42/3 43/9 43/13 44/7 45/5 45/20 46/3 47/6 47/7 54/5 55/18 67/6 72/17 73/19 79/8 84/1 84/2 88/6 92/1
**outcome [3]** 67/18 84/16 86/17
**outright [1]** 56/16
**outweigh [1]** 78/14
**over [12]** 11/5 11/5 43/16 59/12 62/14 66/5 79/25 81/13 84/25 85/20 88/23 92/15
**overpriced [1]** 23/3
**overrode [1]** 44/24
**overseas [1]** 86/23
**own [4]** 28/10 34/3 38/20 65/12
**Oxford [1]** 2/14

**P**

**P.C [1]** 2/10
**p.m [6]** 1/9 4/3 67/25 67/25 92/23 93/19
**page [8]** 2/25 32/1 68/11 68/15 68/16 68/19 69/11 70/8

**page 11 [2]** 68/16 69/11
**page 13 [3]** 68/11 68/19 70/8
**pages [1]** 68/10
**paid [7]** 37/6 37/17 45/6 74/22 75/12 76/3 76/6
**papers [1]** 61/8
**paragraph [2]** 68/18 70/9
**parameters [1]** 55/19
**paraphrasing [1]** 56/21
**parenthetically [2]** 39/13 40/22
**Parkway [1]** 1/18
**part [13]** 22/22 33/24 34/13 42/24 45/20 50/9 55/15 55/18 55/21 56/3 56/4 57/12 65/18
**particularly [1]** 49/23
**parties [7]** 9/18 26/5 80/20 81/4 83/16 88/17 92/2
**parties' [1]** 47/18
**party [4]** 1/22 2/4 27/4 76/24
**pass [1]** 18/11
**patent [2]** 11/16 14/4
**path [1]** 91/9
**patiently [1]** 60/2
**patients [2]** 27/2 62/4
**PAUL [1]** 3/5
**pay [5]** 29/6 34/12 42/16 74/23 76/7
**payor [3]** 1/22 2/4 27/4
**payors [1]** 76/25
**Pennsylvania [3]** 1/15 2/15 3/9
**people [14]** 7/10 10/6 17/19 37/12 39/5 39/15 40/1 40/24 42/1 56/7 57/20 57/22 57/23 67/10
**percent [4]** 36/15 43/2 43/2 43/3
**perhaps [4]** 34/10 50/11 53/16 78/23
**period [4]** 9/12 12/24 16/7 49/19
**permissible [1]** 9/2
**permit [2]** 38/7 70/5
**permitted [2]** 22/9 59/5
**person [16]** 15/12 15/14 18/23 38/24 43/15 74/17 79/2 79/22 80/3 83/23 85/12 87/4 87/9 87/9 90/10 90/12 90/13 90/18 90/23 91/10 92/6
**perspective [3]** 11/13 80/12 80/15
**persuade [1]** 48/21
**Pharma [3]** 2/12 2/19 2/23
**Pharmaceutical [4]** 2/7 2/8 2/19 2/23
**Pharmaceuticals [4]** 2/12 2/15 2/19 2/23
**Pharmacy [1]** 3/7
**Philadelphia [1]** 1/15

**phrase [1]** 13/1
**PI [3]** 91/12 91/15 91/24
**pick [1]** 89/24
**picked [2]** 60/4 87/6
**piece [1]** 66/13
**Piedmont [2]** 2/18
**PIETRAGALLO [1]** 2/13
**pill [5]** 39/4 46/2 47/12 49/7 49/11
**pills [25]** 10/24 10/25 11/3 11/8 11/23 14/16 18/14 19/9 21/25 38/15 39/15 40/1 41/19 47/2 54/13 57/3 58/23 65/7 74/16 75/12 77/12 79/6 87/11 89/17 89/21
**Pittsburgh [1]** 2/15
**pivot [1]** 91/15
**pivoting [1]** 92/12
**PIZZI [1]** 3/2
**place [4]** 8/14 21/11 39/8 64/10
**plaintiff [16]** 4/20 9/1 9/4 12/22 17/6 17/7 22/18 22/20 23/4 26/12 48/3 48/8 51/13 61/17 72/16 76/14
**plaintiff's [1]** 22/23
**plaintiffs [48]** 1/16 1/19 4/17 4/23 4/25 5/2 5/21 7/17 9/11 13/1 16/4 19/18 22/14 23/6 25/17 27/4 28/10 28/15 30/17 30/24 31/12 31/16 33/6 33/19 34/5 35/3 35/8 35/24 37/17 45/4 48/11 48/16 49/18 50/3 55/19 58/20 70/11 70/21 71/8 72/19 72/23 72/25 73/5 77/2 77/6 77/10 77/10 78/10
**plaintiffs' [9]** 11/5 22/4 22/7 28/14 32/23 32/25 69/12 76/25 79/5
**plausible [1]** 11/1
**plausibly [1]** 72/25
**played [1]** 79/20
**plead [1]** 30/14
**pleaded [1]** 92/7
**pleadings [3]** 50/13 50/13 78/24
**Please [1]** 31/15
**PLLC [1]** 2/2
**Plunkett [1]** 8/23
**plus [1]** 51/21
**point [12]** 30/8 32/9 32/21 35/7 35/20 67/16 68/5 85/5 85/6 90/20 92/10 92/22
**pointed [3]** 41/24 50/17 50/20
**points [1]** 60/3
**policy [1]** 26/22
**pose [1]** 34/3
**posed [2]** 63/13 64/14
**poses [1]** 63/11
**posited [1]** 28/23

**P**

positing [2] 26/16 26/17
position [13] 6/14 6/20 7/3 7/7 9/9 33/16 33/20 47/11 55/7 60/23 61/7 63/16 82/12
possible [1] 25/22
post [3] 9/15 9/20 10/9
post-recall [1] 9/15 9/20 10/9
postulating [1] 27/9
potential [2] 46/17 63/8
potentially [1] 62/14
Pottegard [1] 39/21
practical [1] 85/16
pre [1] 9/15
pre-recall [1] 9/15
precise [1] 59/24
preclude [1] 73/4
precluded [3] 42/18 78/10 78/10
precluding [1] 12/15
predict [1] 33/1
prejudicial [1] 88/15
prepared [2] 71/10 80/5
prescription [1] 15/13
presence [1] 28/9
present [7] 3/18 63/19 64/3 71/10 71/20 72/13 87/7
presented [5] 34/5 64/2 72/9 72/15 74/18
presenting [2] 9/4 59/21
presents [1] 33/6
preserve [1] 37/2
pressure [5] 38/15 42/11 42/25 44/23 74/15
presumably [1] 19/9 51/3
presume [1] 51/9
presumes [1] 62/13
pretend [4] 8/12 8/13 11/7 29/11
pretrial [1] 92/24
prevail [1] 35/23
previewing [1] 54/11
Prinston [1] 2/8
probable [3] 12/16 41/13 57/4
probably [1] 47/6
problem [12] 10/19 18/14 26/15 27/7 29/22 31/4 50/9 58/16 65/18 79/10 80/3 89/3
problematic [1] 80/14
problems [3] 49/3 79/3 83/10
procedure [1] 65/13
proceed [3] 47/21 47/22 83/15
proceeding [3] 36/8 47/19 64/8
proceedings [4] 1/25 4/1 93/19 93/23
process [12] 14/2 14/3 14/7 14/9 14/10 15/1 15/6 15/8 51/15 60/13 87/22 92/6

produced [3] 1/25 14/21 51/16
product [24] 6/20 6/21 6/22 8/2 14/19 20/13 21/5 23/2 23/4 27/11 27/15 28/7 28/8 33/3 34/12 34/15 34/17 34/17 34/20 53/6 68/21 69/14 69/16 70/10
productive [1] 83/21
products [5] 1/4 10/6 12/1 38/12 60/22
Professor [6] 26/21 32/10 32/11 32/21 33/5 71/11
prong [2] 46/19 52/8
propensity [2] 73/7 73/11
proper [4] 14/14 14/14 15/7 59/6
proposal [1] 89/4
proposing [1] 89/1
props [1] 83/4
protect [1] 40/24
protection [1] 84/10
protective [2] 40/23 46/23
prove [14] 13/6 16/19 17/8 17/10 17/14 23/7 30/15 37/4 59/5 61/13 71/2 72/20 77/10 77/10
provided [2] 10/6 70/12
providing [1] 11/8
proving [2] 30/11 55/4
psychologist [1] 65/20
PTO [1] 81/23
pull [1] 83/1
pulled [5] 57/1 57/14 57/16 78/1 88/6
punitive [1] 67/14
purchase [2] 18/24 69/18
purchased [3] 17/22 17/22 22/15
purchasing [1] 23/4
purity [4] 42/15 43/1 75/9 76/1
purported [3] 70/5 70/14 70/23
pursuing [1] 36/2
put [40] 23/7 26/5 26/15 27/11 28/11 32/24 33/22 34/16 34/22 35/21 36/1 37/4 37/5 37/5 39/3 39/8 39/13 40/21 40/21 43/10 51/4 54/16 54/17 55/7 65/11 67/11 72/1 72/19 74/5 82/22 84/18 85/8 85/18 85/20 85/25 87/16 88/5 88/14 89/4 93/8
putting [5] 13/12 38/14 41/6 41/7 88/12

**Q**

qualified [2] 35/18 41/3
quality [4] 42/15 43/1 75/9 76/1
quantification [1] 32/25
quantify [1] 35/1
quarreling [1] 48/5

quenching [1] 14/16
question [25] 6/5 6/11 6/13 7/21 7/21 18/6 25/13 26/7 28/19 28/23 29/14 36/22 41/4 41/15 53/18 60/20 62/25 63/5 63/14 63/25 73/25 78/18 81/17 82/15 84/18
questions [4] 24/18 33/14 50/4 65/24
quickest [1] 91/9
quickly [1] 62/8
QUINCY [1] 3/5
quite [1] 24/19
quote [1] 52/21
quote-unquote [1] 52/21

**R**

rabbit [1] 83/2
raise [2] 68/6 68/6
raised [2] 24/18 78/10
raises [4] 24/20 29/14 62/25 63/5
rampant [1] 46/1
ranitidine [5] 22/6 22/7 22/13 23/8 72/20
RASO [1] 2/2
RASPANTI [1] 2/13
rated [1] 46/17
rats [1] 62/18
RDR [1] 94/1
RDR-RMR-CRR-CRC [1] 94/1
RE [1] 1/3
read [7] 6/6 6/8 22/1 47/19 69/8 69/25 73/14
reading [1] 47/17
ready [10] 21/1 39/5 39/6 80/4 80/18 86/7 86/12 87/5 87/5 91/15
real [9] 7/10 17/19 27/1 40/20 42/12 64/1 64/3 66/13 79/3
reality [3] 32/15 85/16 85/19
really [17] 5/19 6/1 29/16 29/20 39/11 41/5 48/10 48/11 48/12 48/12 52/1 56/12 66/22 66/22 81/7 86/23 88/10
reason [5] 37/19 57/1 57/15 83/1 90/14
reasonable [4] 67/18 81/13 82/24 92/10
reasoning [1] 9/9
reasons [4] 7/8 52/5 83/9 90/19
recall [14] 9/12 9/15 9/15 9/20 10/8 10/9 10/25 16/7 31/9 47/17 49/15 51/11 57/3 82/4
recalled [6] 9/5 16/21 17/12 39/6 63/12 78/1
recalls [2] 12/6 69/19
receipt [2] 68/21 69/14 69/16 70/10
receive [2] 69/15 69/17

received [11] 26/4 26/9 26/16 26/25 27/2 27/2 27/3 27/4 32/13 32/13 34/7
receiving [1] 27/5
recent [1] 39/16
Recess [1] 67/25
recognize [1] 61/8
recognized [1] 60/9
recollection [1] 55/16
reconcile [3] 50/12 74/6 78/20
record [5] 30/21 35/24 72/10 77/15 93/23
record's [1] 71/5
recorded [1] 1/25
recover [5] 38/17 52/3 52/4 76/25 77/2
red [1] 11/8
redline [1] 92/24
REEFER [1] 2/14
reevaluated [2] 70/19 72/7
reference [1] 61/2
referred [1] 61/11
referring [1] 60/25
refined [1] 87/23
reflect [1] 71/5
refund [14] 10/11 16/6 16/22 20/18 35/8 43/12 43/13 45/9 49/10 49/11 49/20 51/21 76/15 77/7
regardless [1] 28/15
register [13] 15/13 17/20 18/21 37/25 38/21 42/7 42/9 43/8 44/5 66/12 74/18 75/11 75/24
regulations [3] 12/18 41/15 57/6
regulator's [1] 32/12
regulators [1] 60/11
regulatory [13] 8/23 12/14 13/2 13/2 40/22 46/21 46/22 56/22 61/19 61/21 65/3 65/16 77/17
rejected [1] 9/8
relate [1] 79/2
reliable [3] 23/7 61/12 72/20
reliably [1] 79/6
relied [1] 72/23
relies [1] 22/5
relitigate [2] 39/8 39/9
rely [1] 25/2
relying [3] 24/1 24/2 37/12
remained [1] 48/17
remember [6] 13/25 28/22 37/10 55/3 56/3 74/13
reminds [1] 72/18
remorse [1] 22/19
rendered [2] 12/1 58/25
rendering [1] 31/6
RENÉE [2] 1/10 4/2
repeat [2] 43/23 92/4
replacement [1] 69/18

Reporter [2] 1/23 94/2
REPORTER'S [1] 93/20
Reporter/Transcriber [1] 94/2
represent [2] 31/17 42/12
representation [1] 38/23
representatives [1] 75/2
represented [4] 21/21 38/21 38/22 46/12
reread [1] 6/6
researchers [1] 64/5
resolution [1] 92/3
resolved [1] 62/3
resort [1] 70/13
resorting [2] 70/6 70/23
respect [1] 91/23
respectfully [2] 80/9 81/11
respective [1] 26/7
respond [4] 22/2 60/16 71/24 88/25
response [4] 7/19 7/20 7/22 23/11
responses [1] 61/12
result [1] 55/17
RET [3] 1/11 3/20 4/3
retailer [2] 3/7 20/1
retailers [2] 15/18 75/16
reversal [2] 32/5 32/6
reversed [3] 23/14 24/21 31/18
reversible [1] 47/21
revising [1] 31/2
revisit [1] 90/15
ride [1] 49/23
Ridge [1] 2/3
right [34] 5/15 5/16 6/18 8/18 16/4 16/5 21/2 26/10 35/5 42/23 42/24 42/25 43/2 45/24 48/7 58/5 60/16 67/17 68/25 70/2 75/5 76/4 78/19 78/22 80/1 83/14 84/5 84/6 85/2 86/2 86/13 86/16 89/6 93/3
rights [2] 37/2 84/15
rise [4] 4/5 67/24 68/1 93/18
risk [49] 7/15 12/12 12/13 13/2 13/2 13/3 13/5 14/14 15/7 24/7 24/14 24/15 39/4 39/11 39/17 40/18 41/5 46/17 46/22 54/14 57/21 60/9 61/18 61/19 61/21 61/21 61/24 62/24 63/4 63/5 63/12 63/13 63/14 63/17 63/19 63/23 64/1 64/3 64/14 64/15 65/1 65/2 65/3 65/11 66/11 77/17 78/4 78/5 78/14
risks [1] 78/13
RMB [1] 1/4
RMR [1] 94/1
Road [1] 2/18
roadmap [1] 84/4
Robert [1] 3/20

**R**

**robust [2]** 6/1 49/16
**role [1]** 32/12
**Roney [1]** 3/19
**room [9]** 13/4 28/25 38/24 40/4 40/11 41/7 41/8 48/13 61/9
**root [1]** 64/7
**ROSE [1]** 3/11
**Roseland [1]** 1/19
**Rosemarie [1]** 3/21
**Rosenberg [6]** 9/8 9/16 31/17 72/18 76/19 79/4
**Rosenberg's [2]** 6/6 22/1
**Ross [1]** 3/12
**RUBEN [2]** 1/14 4/19
**rule [3]** 22/17 36/25 67/19
**ruled [9]** 30/24 36/9 36/11 36/21 39/9 55/20 72/1 72/18 78/12
**rules [4]** 15/7 36/23 49/1 75/22
**ruling [6]** 7/5 7/9 55/6 55/14 70/16 90/16
**rulings [4]** 7/4 36/8 72/3 79/17
**run [2]** 43/16 66/7

**S**

**safe [10]** 24/6 27/15 34/9 34/14 34/17 34/17 61/22 62/20 63/22 63/22
**safety [9]** 34/8 34/23 40/24 42/15 43/1 46/24 65/16 75/9 76/2
**said [62]** 7/8 12/2 14/4 15/18 16/2 16/16 19/24 20/21 23/20 24/6 24/13 30/15 32/18 36/5 36/14 37/9 39/11 40/22 42/14 44/20 46/25 48/1 49/14 50/20 52/24 52/25 55/20 56/19 56/20 56/23 56/24 56/24 57/7 57/20 57/22 61/8 61/19 62/5 62/6 62/17 62/22 63/15 65/13 65/17 65/23 66/15 72/7 73/25 78/17 78/19 79/8 79/17 82/17 82/18 84/11 89/3 90/3 90/14 91/8 91/17 91/18 92/5
**SAK [1]** 1/4
**sale [4]** 6/20 9/10 11/7 20/14
**sales [2]** 9/15 9/15
**salient [2]** 25/13 78/7
**same [10]** 11/6 28/3 30/10 37/4 46/20 56/2 56/23 65/21 83/24 91/23
**sartans [1]** 74/15
**sat [1]** 14/20
**satisfied [1]** 70/3
**saw [1]** 47/23
**say [96]**
**saying [38]** 7/6 8/17 8/19 8/20 9/1 12/16 17/13

17/17 17/18 18/15 19/20 19/21 20/14 29/6 30/9 30/11 31/1 45/25 46/5 46/7 46/24 48/22 49/18 51/11 52/6 53/15 56/12 56/17 63/18 65/10 66/2 66/4 77/6 77/25 81/8 87/1 87/3 89/6
**says [27]** 15/13 15/15 15/16 19/22 22/18 30/9 32/14 37/11 37/16 37/18 37/18 43/11 43/23 46/1 48/1 48/4 50/21 53/8 54/3 58/10 60/8 67/10 68/12 70/6 72/22 73/20 89/6
**scary [1]** 48/12
**scenario [1]** 35/2
**scientists [1]** 64/4
**seat [2]** 4/11 68/2
**second [9]** 27/17 46/13 68/20 69/15 69/22 70/3 70/9 70/9 70/14
**sections [1]** 69/8
**see [18]** 5/16 9/21 13/2 13/16 13/19 13/22 18/17 23/9 23/15 24/1 48/18 53/15 58/21 68/23 74/6 77/19 77/21 93/14
**seeking [1]** 77/1
**seem [3]** 86/23 86/24 88/16
**seemed [1]** 73/17
**seems [5]** 13/15 26/11 76/14 76/24 77/3
**sell [38]** 7/15 14/5 20/2 21/4 21/4 23/3 23/21 23/21 23/22 24/7 24/13 24/13 25/1 25/6 25/7 31/9 36/11 38/3 38/4 38/11 39/2 39/5 39/6 39/8 41/16 41/21 44/7 44/9 44/10 44/12 44/13 47/1 49/14 49/19 51/17 58/10 65/8 66/24
**sellable [1]** 6/23
**selling [5]** 14/15 18/13 31/10 59/6 60/5
**sense [4]** 31/7 43/23 53/17 90/11
**set [2]** 61/7 86/10
**settle [1]** 31/22
**settled [1]** 31/23
**settlement [1]** 92/1
**shaking [1]** 9/21
**she [21]** 6/9 6/9 22/4 22/17 22/17 23/5 23/6 23/14 23/20 31/17 32/14 35/14 35/15 35/15 35/17 35/20 37/14 47/10 73/4 79/5 79/8
**she's [1]** 35/17
**shelf [1]** 14/20
**Shield [1]** 31/11
**shift [2]** 83/23 91/15
**short [1]** 87/8
**should [43]** 7/2 8/4 8/14 8/21 10/9 10/13 12/24

16/7 16/21 16/22 20/9 20/24 21/11 26/12 26/17 26/23 29/1 29/13 31/1 31/9 32/14 38/17 47/8 49/10 49/11 49/19 51/16 51/17 56/6 56/9 60/10 73/1 73/6 73/10 76/15 79/16 84/13 84/20 86/3
**shouldn't [27]** 7/7 7/11 7/11 7/12 8/19 9/6 9/7 12/7 20/15 20/17 28/20 29/15 29/15 31/8 31/9 39/11 47/6 50/19 56/8 56/10 66/24 73/22 76/8 77/4 77/8 79/22 87/16
**show [8]** 19/17 26/4 30/18 30/25 46/21 48/4 54/13 83/24
**showing [2]** 52/15 79/11
**shown [1]** 90/4
**shows [2]** 29/9 51/15
**sic [1]** 22/11
**side [8]** 16/1 28/14 28/24 37/11 37/25 38/14 39/2 55/25
**sidebars [1]** 88/23
**sided [4]** 65/19 65/22 66/1 66/2
**sides [1]** 60/23
**sides' [1]** 36/13
**signed [1]** 86/14
**significance [2]** 39/22 46/18
**significant [8]** 5/19 23/9 30/7 39/17 46/15 46/16 54/13 54/14
**signing [1]** 86/15
**Similar [1]** 10/3
**similarities [1]** 72/24
**simple [2]** 21/21 45/15
**simpler [1]** 92/8
**simply [3]** 23/10 44/18 48/19
**since [6]** 9/7 22/12 22/13 31/17 47/23 55/17
**single [3]** 43/18 81/13 82/23
**sit [3]** 45/9 45/10 47/16
**siting [1]** 50/7
**sits [1]** 88/23
**sitting [2]** 38/16 86/13
**situation [3]** 14/24 82/22 92/13
**situations [1]** 40/14
**SKADDEN [2]** 2/5 5/13
**slate [2]** 2/5 90/18
**SLATER [15]** 1/17 1/17 4/16 6/4 6/11 20/4 27/1 27/9 29/7 48/1 60/25 61/11 88/25 89/5 91/13
**slipped [2]** 44/15 47/3
**slow [1]** 85/19
**Smith [1]** 3/20
**smudged [2]** 45/23 66/12
**so [147]**
**sodium [1]** 14/15

**Solco [1]** 2/8
**sold [77]** 7/2 7/7 7/9 7/13 7/15 8/4 8/5 8/14 8/21 9/6 9/7 9/11 10/6 10/9 10/14 12/3 12/24 15/3 15/18 15/19 16/7 16/17 18/8 18/14 19/22 20/9 20/16 21/11 21/22 22/8 24/1 24/3 24/9 26/12 26/18 26/24 26/25 28/20 29/1 29/7 29/13 29/15 29/16 31/2 31/8 32/16 32/16 38/15 38/23 38/25 39/7 47/2 47/2 47/7 49/19 50/19 50/22 51/6 58/13 59/5 59/7 66/24 67/5 73/2 73/6 73/10 73/22 75/10 75/17 76/16 77/7 77/8 77/8 77/14 78/1 79/13 86/25
**solid [1]** 9/9
**some [23]** 7/17 9/10 19/9 20/16 34/11 37/8 44/15 45/21 46/4 47/8 51/21 53/1 62/7 62/7 65/23 66/25 72/24 81/14 85/5 89/14 92/3 92/3 92/16
**Somebody [1]** 68/3
**somehow [1]** 63/10
**someone [1]** 55/16
**something [12]** 14/15 15/23 31/6 36/4 36/24 62/6 66/13 66/16 68/4 74/2 82/6 92/12
**somewhat [3]** 50/10 78/20 88/17
**somewhere [2]** 36/14 78/23
**soon [1]** 87/14
**sorry [14]** 8/10 27/16 27/22 28/4 36/4 40/9 43/20 59/18 64/23 68/14 68/23 68/24 69/24 71/7
**sort [3]** 6/8 62/7 92/13
**sorts [2]** 39/21 41/12
**sound [2]** 74/5 74/5
**sounds [1]** 53/11
**speak [3]** 33/7 33/12 61/14
**special [3]** 1/11 4/3 12/17
**specific [1]** 87/15
**specifically [1]** 30/13
**specifications [2]** 46/12 58/24
**speck [4]** 12/6 12/8 19/10 48/14
**spend [1]** 61/10
**spent [2]** 5/19 88/13
**sprang [1]** 62/5
**Square [1]** 2/3
**St [1]** 3/16
**stage [13]** 30/4 30/5 30/16 30/17 30/23 30/23 50/13 50/13 50/14 70/19 70/20 71/17 72/22
**stages [1]** 72/7
**stakes [1]** 86/21

**stand [10]** 12/23 16/20 28/25 33/2 38/24 45/4 48/8 66/23 81/18 93/11
**standard [1]** 65/12
**standards [6]** 25/2 25/3 40/23 41/16 56/24 62/8
**standing [21]** 11/6 13/21 22/5 22/18 22/20 23/14 29/5 30/4 30/4 30/10 30/14 39/24 68/9 70/3 70/15 70/19 71/17 72/7 72/11 72/21 72/23
**standpoint [5]** 7/11 46/23 65/3 75/12 77/18
**STANOCH [1]** 1/14
**start [12]** 4/14 4/15 5/17 6/4 41/8 80/5 80/6 87/11 87/14 89/2 90/11 90/18
**started [2]** 14/15 83/6
**starting [1]** 40/6
**state [1]** 31/23
**statement [2]** 42/8 60/7
**STATES [2]** 1/1 1/10
**statistical [1]** 39/22
**statistically [2]** 39/17 54/14
**status [2]** 1/5 6/21
**statutory [3]** 59/1 59/3 77/24
**stenography [1]** 1/25
**step [2]** 36/7 81/22
**STEVEN [1]** 2/17
**stick [1]** 11/19
**still [10]** 25/3 27/12 32/8 42/16 50/5 63/13 70/21 74/22 76/8 82/1
**stipulate [1]** 82/8
**Stiroh [3]** 37/11 42/21 47/9
**stop [3]** 62/22 62/23 77/14
**story [1]** 91/21
**straight [2]** 62/17 62/19
**straight-line [2]** 62/17 62/19
**straightforward [1]** 21/21
**strategic [2]** 35/3 73/21
**strategically [1]** 71/8
**Street [4]** 1/15 1/21 3/3 3/6
**Streets [1]** 1/7
**strength [1]** 42/25
**strict [2]** 21/14 21/16
**strictly [4]** 28/20 28/21 29/10 31/2
**strong [1]** 42/2
**strongly [1]** 92/11
**struggling [1]** 8/9
**studied [1]** 57/2
**studies [8]** 14/11 14/12 39/14 39/25 40/2 54/12 62/12 62/15
**study [5]** 34/11 39/16 39/16 39/18 39/21
**stuff [4]** 41/21 67/5 87/19 88/8

**S**

**subjective [1]** 22/23
**submission [1]** 62/9
**submissions [3]** 5/23 47/18 54/3
**submitted [3]** 40/13 40/15 65/4
**substance [2]** 62/14 66/21
**substances [1]** 57/8
**substantive [1]** 68/18
**such [10]** 8/3 46/15 72/13 76/21 77/12 80/20 80/23 81/3 83/15 85/18
**sue [2]** 22/19 22/20
**suffer [1]** 23/4
**suffered [1]** 22/14
**sufficed [2]** 68/22 70/11
**sufficient [4]** 30/9 30/14 30/14 36/22
**sugar [6]** 10/24 10/25 11/3 49/7 49/11 77/12
**suggest [1]** 56/8
**suggesting [1]** 80/11
**suggestion [1]** 71/18
**suggestions [1]** 85/22
**suing [1]** 61/5
**Suite [7]** 1/15 1/18 2/18 2/22 3/6 3/13 3/16
**Suites [1]** 2/6
**summary [19]** 28/19 30/16 30/16 30/23 32/22 35/22 36/13 50/10 50/13 71/19 71/23 74/7 78/17 78/21 79/17 82/11 82/13 84/8 91/18
**supply [2]** 67/12 77/23
**support [3]** 11/13 72/16 92/12
**supported [1]** 11/2
**suppose [1]** 36/24
**supposed [13]** 12/2 29/14 41/21 42/13 42/14 43/3 43/10 44/12 44/20 45/7 53/10 53/11 66/24
**sure [6]** 5/17 32/8 45/1 51/7 61/22 86/15
**surmountable [1]** 83/11
**survey [4]** 34/10 35/20 70/22 90/4
**survived [1]** 89/12
**Sutton [1]** 30/8
**Sutton's [1]** 30/7
**swirl [1]** 50/5

**T**

**take [8]** 20/17 36/6 39/5 45/9 54/18 67/22 71/21 80/24
**taken [2]** 39/15 67/25
**taking [3]** 7/4 19/15 62/4
**talk [12]** 9/15 18/25 24/15 27/20 44/11 44/21 47/24 52/2 60/6 73/24 88/10 92/15
**talked [5]** 6/15 9/16 9/17 74/2 87/19

**talking [18]** 12/12 12/20 15/11 25/9 30/16 45/2 48/14 48/15 49/6 49/7 49/10 51/25 59/16 59/20 61/10 63/25 76/19 81/24
**target [1]** 88/17
**TEA [1]** 14/15
**team [2]** 23/12 23/18
**technical [2]** 46/5 53/2
**technically [2]** 46/3 46/3
**tell [15]** 8/25 9/21 10/22 13/11 13/20 29/17 37/22 42/9 50/7 56/7 65/10 67/1 67/7 79/6 79/9
**telling [2]** 23/17 86/14
**tells [2]** 35/1 40/15
**term [1]** 87/8
**terms [11]** 7/14 7/25 12/1 13/1 21/13 46/16 50/18 50/18 74/10 75/10 90/10
**territory [1]** 32/22
**tested [2]** 60/10 91/5
**testified [1]** 46/22
**testify [2]** 42/20 75/2
**testimony [11]** 17/15 28/16 32/18 34/25 53/25 54/19 62/10 73/4 86/10 88/4 88/5
**testing [1]** 79/11
**Teva [10]** 2/19 2/19 2/20 2/23 2/23 2/24 3/4 5/10 5/12 91/7
**Texas [1]** 3/13
**text [1]** 93/10
**thank [14]** 4/11 4/13 25/12 32/8 60/1 60/1 91/12 93/2 93/12 93/13 93/14 93/15 93/16 93/17
**them [50]** 7/10 7/10 10/9 12/6 12/7 12/8 15/16 16/21 17/12 19/5 19/10 20/13 21/24 31/9 31/10 31/10 32/14 35/1 35/1 42/22 45/7 45/8 45/9 47/3 47/7 54/16 58/6 58/24 58/25 59/7 61/4 67/1 67/1 69/13 72/4 74/19 77/7 77/8 77/8 77/14 79/9 80/5 82/7 83/9 84/12 85/23 86/14 87/14 87/14 87/16
**theories [2]** 69/12 70/3
**theory [35]** 22/4 22/4 25/15 25/15 25/18 25/21 25/22 27/8 33/4 33/13 35/9 35/12 35/25 36/2 68/8 68/9 68/20 69/13 70/3 70/4 70/9 70/12 70/14 71/2 71/8 71/9 71/14 71/16 72/1 72/23 73/22 76/25 89/10 89/12 89/13
**therapeutic [4]** 20/16 49/13 76/23 89/20
**therefore [18]** 7/23 8/5 9/7 19/25 21/11 26/13 34/10 34/20 44/10 44/25 63/12 71/21 73/18 73/22

**76/20 76/21 78/13 92/11
**these [57]** 8/13 8/21 10/25 11/23 12/24 14/1 16/17 17/11 17/8 18/10 32/13 37/8 38/12 38/13 38/14 38/15 42/23 45/6 46/9 48/10 48/11 48/14 50/4 50/18 57/2 57/3 57/7 57/8 57/14 57/21 58/10 58/23 60/5 61/4 61/13 61/25 62/4 62/10 62/16 62/23 65/23 66/16 66/17 67/10 72/3 78/12 83/5 86/9 86/23 87/4 87/8 88/20 88/23 89/21 90/12 90/22 92/3
**They'd [1]** 54/9
**they'll [1]** 60/16
**they're [36]** 11/9 18/15 20/5 20/19 20/25 21/9 26/15 37/24 38/5 39/24 40/16 40/16 43/4 47/5 49/22 51/4 51/4 51/8 57/4 66/2 66/17 66/18 73/23 74/5 74/18 75/13 75/21 75/25 77/11 81/13 82/23 85/10 86/22 86/25 87/13 88/22
**they've [6]** 21/19 50/16 50/19 55/7 67/11 71/2
**thing [6]** 9/13 10/23 17/4 26/11 29/16 29/21 30/11 31/13 42/15 56/23 58/7 61/17 67/15 79/1 85/11 90/21
**things [13]** 43/9 47/12 48/2 48/15 58/17 66/3 74/9 74/13 77/23 80/6 82/25 83/18 83/18
**think [133]**
**thinking [2]** 13/14 30/22
**thinks [1]** 84/13
**third [8]** 1/22 2/3 2/4 22/20 27/4 69/17 70/3 76/24
**third-party [4]** 1/22 2/4 27/4 76/24
**this [189]**
**THOMAS [2]** 1/11 4/3
**THORNBURG [1]** 3/5
**though [17]** 7/14 10/3 18/20 20/13 20/13 20/14 20/15 44/15 45/16 55/16 56/20 57/15 60/24 62/25 82/16 88/16 91/23
**thought [9]** 11/5 31/7 32/7 40/9 43/24 82/5 83/10 83/11 83/11
**three [10]** 3/3 39/14 40/2 44/7 49/3 50/4 69/12 86/21 89/21 93/9
**threshold [1]** 30/10
**through [14]** 14/11 14/11 30/25 41/23 42/20 44/15 47/3 63/1 63/1 71/11 87/19 87/22 91/5 92/3
**thrown [1]** 87/17

**Thursday [1]** 1/8
**tiger [1]** 41/8
**time [31]** 5/19 6/20 9/10 11/7 18/24 20/14 23/25 24/9 24/10 30/22 43/15 47/23 48/18 51/9 62/1 64/10 72/4 72/9 75/11 76/3 79/13 83/13 83/17 83/20 84/1 86/13 87/20 87/24 88/14 88/21 92/11
**times [2]** 6/8 79/7 79/12
**timing [1]** 89/9
**today [4]** 33/2 50/7 72/13 92/23
**together [3]** 43/10 83/13 92/2
**told [8]** 19/6 23/12 24/24 29/7 34/23 37/7 42/13 75/8
**tomorrow [1]** 92/18
**too [4]** 27/18 67/13 80/14 87/4
**took [2]** 27/3 54/4
**top [2]** 10/18 58/8
**Torrent [5]** 2/12 2/12 2/12 5/5 5/8
**tort [1]** 92/6
**touchstone [1]** 50/22
**towards [1]** 46/23
**toxic [1]** 66/18
**toxicologists [1]** 61/15
**TPP [3]** 20/1 75/1 75/3
**TPPs [2]** 76/3 76/6
**TPPs' [1]** 75/11
**trace [2]** 22/21 22/23
**track [4]** 80/4 85/8 85/19 87/8
**train [1]** 40/9
**Transcriber [1]** 94/2
**transcript [2]** 1/25 93/22
**transcription [1]** 1/25
**TRAURIG [4]** 2/16 2/21 5/9 5/11
**treat [1]** 32/14
**treated [1]** 12/16
**treatise [1]** 54/2
**trial [31]** 7/22 30/15 33/6 41/18 45/9 48/22 48/23 48/24 50/5 54/9 54/16 55/15 55/18 55/22 61/10 70/20 70/25 71/20 79/15 79/16 79/17 80/18 85/8 85/17 86/11 86/12 87/2 88/10 89/8 89/16 90/7
**trials [4]** 80/16 85/6 85/7 92/6
**tributyltin [1]** 14/2
**tried [7]** 35/14 42/20 48/18 48/21 53/16 58/2 66/10
**truck [1]** 43/16
**true [6]** 36/17 36/20 46/25 58/12 58/13 74/4
**truth [1]** 42/14
**try [31]** 35/10 37/3 48/6 48/22 48/24 50/6 56/13 57/25 66/6 66/8 67/16

**67/20 79/22 80/15 81/18 82/2 83/8 84/14 84/23 85/4 85/12 85/21 85/23 85/25 86/7 86/16 87/9 87/13 87/18 90/22 92/10
**trying [13]** 5/20 5/22 6/12 12/22 15/22 19/17 40/9 42/4 65/20 80/5 80/16 83/1 87/14
**TUCKER [1]** 3/9
**tuning [1]** 88/19
**turn [1]** 11/9
**turned [1]** 14/18
**turns [4]** 18/19 45/5 47/5 67/6
**twice [1]** 86/12
**two [36]** 5/22 6/12 23/20 25/15 33/4 33/8 34/6 35/2 36/24 40/2 42/23 43/9 44/7 46/11 49/2 50/12 51/20 54/6 54/22 56/14 56/15 56/16 56/24 68/8 70/4 71/6 71/16 72/3 72/16 75/16 78/11 80/15 84/14 85/20 89/20 92/5
**two-word [1]** 35/2
**two-yard [1]** 36/24
**tying [1]** 13/6
**type [2]** 34/5 92/13
**typical [1]** 92/6

**U**

**U.S [4]** 1/7 2/8 2/8 4/2
**ugly [1]** 48/10
**Uh [2]** 53/23 74/24
**Uh-huh [2]** 53/23 74/24
**ultimately [1]** 79/12
**unable [2]** 23/7 72/19
**unacceptable [19]** 22/24 24/14 24/14 39/4 39/12 61/18 63/12 63/13 63/16 63/17 63/19 64/14 65/1 65/2 65/2 65/8 65/15 77/17 78/5
**unanswered [2]** 62/25 63/1
**under [12]** 19/3 19/19 35/2 35/24 37/3 46/22 48/17 56/22 73/4 75/23 76/18 76/25
**understand [10]** 7/22 16/3 16/16 36/12 60/18 71/25 78/6 82/9 86/19 89/5
**understanding [3]** 7/5 73/8 83/19
**understood [2]** 60/12 91/22
**undertook [2]** 60/11 61/25
**unique [2]** 10/1 10/1
**UNITED [2]** 1/1 1/10
**unless [5]** 24/4 33/13 50/6 59/5 85/7
**unlike [1]** 74/14
**unquantified [1]** 37/10
**unquote [1]** 52/21

**U**

**unreasonable [6]** 40/17 61/24 62/24 63/4 81/21 87/3

**unreliable [1]** 17/16

**unsafe [7]** 23/8 48/3 62/21 72/20 73/1 73/5 76/20

**until [5]** 9/12 59/5 67/25 92/23 92/25

**up [32]** 9/17 12/23 15/12 15/23 16/20 17/7 22/3 24/7 28/25 30/12 30/15 32/2 38/24 39/16 45/4 45/23 48/8 48/11 52/1 57/10 58/20 58/24 60/4 61/16 62/7 62/10 66/23 74/18 76/14 87/14 87/16 91/14

**upon [1]** 55/19

**us [26]** 3/11 15/11 19/21 24/7 32/21 36/10 38/14 45/9 53/19 55/3 55/5 55/9 57/10 58/1 59/12 66/3 66/3 66/8 67/15 74/10 85/10 85/18 85/23 88/15 90/17 92/23

**USA [2]** 2/19 2/23

**use [2]** 37/8 81/6

**used [6]** 48/10 51/15 61/3 66/19 66/20 66/21

**using [2]** 14/10 82/21

**USP [6]** 12/3 15/16 16/17 19/24 38/22 47/13

**V**

**vacate [1]** 55/6

**valid [1]** 12/3

**valsartan [18]** 1/3 4/15 11/8 12/3 12/4 15/13 15/16 15/20 15/23 16/18 19/24 28/13 38/22 38/22 39/14 40/1 61/3 74/15

**valuable [3]** 68/21 69/16 70/10

**value [123]**

**valued [2]** 20/13 72/8

**valueless [1]** 26/23

**values [1]** 6/19

**valuing [1]** 7/14

**VANASKIE [11]** 1/11 4/3 80/25 83/4 86/8 88/7 91/12 92/16 92/17 92/23 93/3

**various [1]** 72/7

**VAUGHN [1]** 2/2

**verdict [5]** 32/24 35/25 82/10 86/17 91/14

**version [3]** 74/19 89/14 89/16

**versus [5]** 9/15 45/2 49/4 49/4 90/10

**very [42]** 6/7 9/9 9/18 10/1 10/23 11/18 12/21 13/18 13/23 13/25 15/5 15/8 17/5 18/22 21/21 21/21 25/13 25/17 28/16

30/7 30/7 30/10 31/7 39/22 45/20 57/8 58/21 59/22 59/23 60/2 62/2 65/19 66/2 66/2 66/18 66/21 79/14 83/7 88/14 88/14 92/7 92/23

**viable [1]** 22/5

**VICTORIA [2]** 2/17 5/11

**video [1]** 89/7

**view [3]** 90/11 90/17 90/24

**vigorously [1]** 83/7

**violated [9]** 15/7 58/11 58/24 58/24 81/16 81/25 82/2 82/13 82/16

**violation [2]** 53/2 60/22

**violations [2]** 45/22 46/2

**voluntary [1]** 69/19

**W**

**Wacker [1]** 2/22

**wait [5]** 27/17 35/25 68/13 68/23 69/22

**waiting [2]** 24/24 88/24

**Walgreens [1]** 3/7

**walk [1]** 48/16

**walking [1]** 45/25

**walks [2]** 15/12 74/17

**Walmart [1]** 3/7

**WALSH [2]** 3/2 3/2

**want [73]** 5/17 6/16 13/1 13/24 16/15 16/16 18/10 20/5 24/12 25/10 27/12 27/23 33/1 33/7 36/3 36/6 39/3 39/3 39/8 39/10 40/4 40/8 41/2 41/4 41/23 42/3 42/4 42/5 42/16 44/21 45/4 53/1 57/9 58/7 60/6 61/3 61/23 64/20 64/23 64/24 64/25 66/6 66/10 66/22 67/16 71/24 72/6 74/2 76/5 77/22 78/5 80/25 81/17 81/18 82/2 84/15 84/22 85/4 85/17 85/21 85/24 85/25 86/14 86/16 86/16 86/17 86/17 88/9 88/25 92/4 92/15 92/16 93/10

**wanted [6]** 33/14 42/19 56/5 68/3 68/6 82/5

**wanting [1]** 49/18

**wants [9]** 6/5 37/21 40/8 40/20 42/21 61/17 66/23 84/21 91/20

**warning [1]** 60/17

**warranted [3]** 26/9 34/8 64/12

**warranty [46]** 6/15 6/17 6/19 8/5 11/8 15/12 15/17 15/17 16/11 17/20 17/21 18/18 18/23 19/3 19/8 19/19 19/23 21/15 21/20 38/2 38/17 43/6 50/18 51/23 52/4 52/5 52/9 52/16 52/22 52/23 56/13 56/18 56/18 56/19 57/25 59/15 64/9 74/17 75/23

79/18 80/14 84/7 84/9 84/13 89/3 91/14

**Washington [3]** 2/4 3/6 3/10

**wasn't [13]** 15/23 16/2 16/5 21/22 39/11 41/5 55/17 56/20 57/11 61/6 66/12 66/12 90/15

**wasted [5]** 83/17 83/20 87/20 87/25 88/21

**water [1]** 63/10

**watering [1]** 19/15

**watershed [1]** 14/8

**way [28]** 8/3 14/18 15/6 16/2 25/3 39/13 40/13 41/10 41/10 43/25 47/20 47/22 54/20 56/13 57/19 58/14 60/25 61/23 64/8 75/2 79/7 80/13 83/14 83/18 87/7 87/18 92/2 92/10

**ways [3]** 12/23 42/4 42/5

**we'd [3]** 53/24 54/9 88/5

**we'll [19]** 4/15 7/23 13/3 23/15 54/20 57/10 60/21 66/6 66/7 67/15 67/20 67/20 67/21 81/8 84/14 84/15 85/25 87/14 87/15

**we've [28]** 18/21 24/7 26/5 36/8 40/12 40/15 45/1 52/16 61/4 62/6 62/6 62/9 65/3 66/16 67/6 79/24 83/17 86/11 86/11 87/17 87/19 88/6 88/13 88/13 88/14 91/8 91/11 92/7

**week [3]** 48/22 48/23 48/24

**weeks [2]** 50/5 90/8

**weigh [1]** 49/12

**went [5]** 14/10 14/19 17/19 24/5 65/13

**weren't [6]** 17/2 17/9 41/20 45/7 66/24 80/11

**West [3]** 2/6 2/22 88/8

**whatever [7]** 14/21 24/12 57/22 77/1 77/22 78/5 88/6

**whether [12]** 17/9 27/15 28/12 41/16 41/18 50/22 60/21 60/22 63/2 66/15 74/1 82/2

**while [5]** 14/21 39/19 58/7 85/12 88/23

**WHITELEY [3]** 1/20 1/21 4/25

**who's [3]** 21/2 21/2 67/7

**whoever [1]** 6/5

**whole [2]** 29/21 42/1

**whose [1]** 17/15

**why [43]** 7/25 10/22 11/4 13/11 13/20 13/24 15/22 19/13 19/18 29/9 29/15 30/18 38/17 39/22 44/11 46/24 48/22 51/11 52/2 52/3 52/3 52/7 53/16 57/3 57/14 61/12 61/12 61/13

66/11 67/1 76/13 76/18 77/4 77/8 78/19 79/22 82/24 84/19 85/17 86/24 86/25 87/3 91/19

**wild [1]** 41/7

**wilderness [1]** 34/22

**will [25]** 6/6 17/3 17/7 20/1 20/20 21/1 27/10 27/13 30/24 33/1 33/2 33/10 33/11 45/9 46/15 55/16 60/14 62/24 65/5 77/10 80/2 84/3 85/12 89/16 89/18

**win [1]** 46/5

**windfall [1]** 50/3

**wins [1]** 79/20

**wisdom [2]** 47/23 53/15

**wishing [1]** 23/5

**within [1]** 84/1

**without [14]** 11/21 13/5 22/15 23/22 26/1 48/6 48/12 48/18 57/25 58/2 70/6 70/22 89/7 90/15

**witness [3]** 18/6 33/24 90/1

**witnesses [6]** 38/20 44/11 54/1 54/19 77/25 86/10

**won [1]** 41/24

**won't [4]** 27/25 54/17 65/6 82/3

**word [19]** 6/12 6/12 11/20 13/5 25/15 25/19 25/20 25/22 27/8 35/2 35/4 69/14 70/4 71/6 71/9 71/14 73/22 89/11 90/7

**words [17]** 22/11 25/16 33/4 33/18 34/6 41/12 48/10 48/12 53/14 54/23 58/15 68/8 71/6 71/16 72/17 78/11 81/5

**work [5]** 86/11 87/16 87/17 88/13 91/11

**worked [1]** 88/4

**working [1]** 80/8

**works [1]** 75/3

**world [12]** 7/6 7/6 7/10 17/19 27/1 32/23 34/5 40/20 42/5 42/12 54/3 86/22

**worries [1]** 87/18

**worry [4]** 29/19 39/10 58/2 85/14

**worst [1]** 44/16

**worth [24]** 6/12 25/15 25/21 33/3 33/18 33/21 33/24 34/6 34/20 34/24 35/2 35/16 35/22 54/22 54/24 54/25 68/7 70/4 71/15 72/12 72/16 75/24 78/11 89/17

**worth-less [2]** 25/15 25/21

**worthless [18]** 6/12 22/13 22/14 30/18 30/19 32/14 32/14 33/4 33/17 35/16 69/14 71/1 71/3 71/9 71/14 73/21 73/23 89/11

**worthlessness [7]** 25/15 25/18 25/22 27/8 33/12 35/4 90/7

**wouldn't [8]** 11/10 12/9 15/18 35/18 53/24 54/8 74/22 76/6

**wrestled [1]** 79/4

**wrestling [2]** 58/17 58/19

**writes [3]** 22/4 68/20 70/9

**written [2]** 47/19 71/22

**wrong [5]** 19/18 21/2 55/16 69/3 84/16

**Y**

**yard [1]** 36/24

**yeah [24]** 14/23 23/13 28/5 28/25 29/6 31/7 32/7 32/17 38/1 38/25 44/4 47/6 51/5 56/5 58/15 64/17 64/19 66/24 67/5 67/5 81/25 87/24 92/19 92/21

**years [14]** 9/12 10/7 12/14 20/14 27/3 29/13 36/9 57/5 66/17 79/25 85/5 85/12 85/20 87/5

**yes [14]** 6/18 8/1 11/25 13/14 29/25 31/20 52/20 57/22 74/8 74/24 77/9 77/9 93/4 93/5

**yesterday [1]** 31/22

**York [4]** 2/7 2/7 2/11 2/11

**you [271]**

**you'd [3]** 55/5 55/6 66/25

**you'll [5]** 17/8 17/10 26/15 30/1 34/23 34/23 43/25 48/1 54/7 59/13 59/21 59/23

**you've [12]** 16/24 16/25 26/15 30/1 34/23 34/23 43/25 48/1 54/7 59/13 59/21 59/23

**yourself [1]** 12/20

**Z**

**Zantac [14]** 6/7 13/17 13/18 14/17 14/18 15/9 30/4 70/16 70/17 74/14 74/14 79/3 79/4 90/12

**zero [23]** 11/3 21/12 22/15 24/4 24/10 26/13 28/20 29/12 30/25 31/1 36/14 43/21 43/25 44/2 44/18 44/19 44/25 49/7 77/2 79/13 89/17 89/24 90/2

**Zhejiang [1]** 2/7

**ZHP [5]** 2/8 5/14 14/4 65/12 81/17

**ZHP's [1]** 87/10

**zinc [1]** 14/15