**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**IN RE: VALSARTAN, LOSARTAN, and IRBESARTAN PRODUCTS LIABILITY LITIGATION**

**CIVIL ACTION NUMBER: 1:19-md-02875-RMB-SAK**

**Case Management Conference via Teams videoconferencing**

Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets
Camden, New Jersey 08101
Monday, March 3, 2025
Commencing at 10:06 a.m.

**B E F O R E:** **THE HONORABLE RENÉE MARIE BUMB, CHIEF UNITED STATES DISTRICT JUDGE, and THE HONORABLE THOMAS I. VANASKIE (RET.), SPECIAL MASTER**

**A P P E A R A N C E S:**

MAZIE SLATER KATZ & FREEMAN, LLC
BY: ADAM M. SLATER, ESQUIRE
103 Eisenhower Parkway, Suite 207
Roseland, New Jersey 07068
Co-Lead Counsel for MDL Plaintiffs

KANNER & WHITELEY, LLC
BY: CONLEE S. WHITELEY, ESQUIRE
DAVID J. STANOCH, ESQUIRE
701 Camp Street
New Orleans, Louisiana 70130
Co-Lead Class Counsel for Third-Party Payor Economic Loss

John J. Kurz, Official Court Reporter
John_Kurz@njd.uscourts.gov
(856)576-7094

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**A P P E A R A N C E S: (Continued)**

NIGH GOLDENBERG RASO & VAUGHN, PLLC
BY: DANIEL A. NIGH, ESQUIRE
MARLENE J. GOLDENBERG, ESQUIRE
14 Ridge Square NW, Third Floor
Washington, D.C. 20016
Co-Lead Class Counsel for Third-Party Payor Economic Loss

FARR, FARR, EMERICH, HACKETT, CARR & HOLMES
BY: GEORGE T. WILLIAMSON, ESQUIRE
99 Nesbit Street
Punta Gorda, Florida 33950
Counsel for Plaintiffs

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY: RICHARD BERNARDO, ESQUIRE
One Manhattan West, Suites 42-128
New York, New York 10001
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and Solco Healthcare U.S., LLC (collectively ZHP)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY: ALEXANDER KASPARIE, ESQUIRE
320 S. Canal Street, 47th Floor
Chicago, Illinois 60606
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and Solco Healthcare U.S., LLC (collectively ZHP)

KIRKLAND & ELLIS, LLP
BY: NINA R. ROSE, ESQUIRE
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and Solco Healthcare U.S., LLC (collectively ZHP)

KIRKLAND & ELLIS LLP
BY: ALEXIA R. BRANCATO, ESQUIRE
601 Lexington Avenue
New York, New York 10022
Counsel for Defendants Torrent Pharma, Inc. and Torrent Pharmaceuticals Ltd. (collectively Torrent)

(Appearances continued onto next page.)

**A P P E A R A N C E S: (Continued)**

ARCHER & GREINER, P.C.
BY: MAUREEN THERESA COGHLAN, ESQUIRE
1025 Laurel Oak Road
Voorhees, NJ 08043
Counsel for the Mylan Defendants

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
BY: JASON M. REEFER, ESQUIRE
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
Counsel for Defendant Mylan Pharmaceuticals, Inc.

GREENBERG TRAURIG LLP
BY: VICTORIA DAVIS LOCKARD, ESQUIRE
STEVEN HARKINS, ESQUIRE
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Counsel For Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma, Inc. (collectively Teva)

GREENBERG TRAURIG LLP
BY: GREGORY E. OSTFELD, ESQUIRE
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Counsel For Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma, Inc. (collectively Teva)

WALSH PIZZI O'REILLY FALANGA LLP
BY: CHRISTINE I. GANNON, ESQUIRE
Three Gateway Center, 100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Counsel for Defendants Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma, Inc. (collectively Teva)

BARNES & THORNBURG, LLP
BY: KARA KAPKE, ESQUIRE
11 South Meridian Street
Indianapolis, IN 46204
Counsel for Retailer Defendants and CVS Pharmacy, Inc., and Walmart, Walgreens

(Appearances continued onto next page.)

**A P P E A R A N C E S: (Continued)**

ULMER & BERNE LLP
BY: JEFFREY D. GEOPPINGER, ESQUIRE
600 Vine Street
Suite 2800
Cincinnati, Ohio 45202
Counsel for Wholesaler Defendants and AmerisourceBergen

CROWELL & MORING LLP
BY: ANDREW KAPLAN, ESQUIRE
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Counsel for Defendant Cardinal Health

NORTON ROSE FULBRIGHT US LLP
BY: D'LESLI DAVIS, ESQUIRE
ELIZABETH NORRIS, ESQUIRE
2200 Ross Avenue
Suite 3600
Dallas, Texas 75201
Counsel for Defendant Mckesson Corp.

MORGAN, LEWIS & BOCKIUS, LLP
BY: STEVEN HUNCHUCK, ESQUIRE
One Oxford Centre, 301 Grant Street, 32nd Floor
Pittsburgh, Pennsylvania 15219
Counsel for Defendants Aurolife Pharma LLC
and Aurobindo Pharma USA, Inc.

FALKENBERG IVES LLP
BY: KIRSTIN B. IVES, ESQUIRE
230 W Monroe Street, Suite 2220
Chicago, Illinois 60606
Counsel for Defendant Humana

WILEY REIN, LLP
BY: COREY WEINSTEIN, ESQUIRE
2050 M Street, NW
Washington, DC 20036
For the Defendant Macleods Pharma USA, Inc.

**Also present:**

Larry MacStravic, The Courtroom Deputy
Clarissa Lintner, Esquire, Career Law Clerk to the Honorable Renée Marie Bumb, Chief Judge

Kathryn Avila, Esquire

(PROCEEDINGS held via Teams videoconferencing before the Honorable Renée Marie Bumb, Chief United States District Judge, and the Honorable Thomas I. Vanaskie (Ret.), Special Master, at 10:06 a.m. as follows:)

JUDGE VANASKIE: I take it, Adam, you'll be addressing these matters for the plaintiffs.

MR. SLATER: Some of the matters, Your Honor. I think George Williamson and Daniel Nigh will also be addressing some of the issues.

JUDGE VANASKIE: Okay. Very well.

And Steve Harkins, you jumped up on my screen. Are you a spokesperson here today?

MR. HARKINS: Yes, Your Honor. I will be for the non-ZHP issues. And I know someone from ZHP will be on handling some of the discovery deficiency issues that are on the agenda for them.

JUDGE VANASKIE: All right. Thank you.

And who will be addressing the issues for ZHP?

MS. ROSE: Apologies. I was on mute. That will be me, Your Honor, Nina Rose.

JUDGE VANASKIE: Okay. Very well. Thanks. Thanks, Nina.

All right. Well, let's get moving with this case management conference. Looks like we're back into more contested matters than we've had in a while, and let's see what

we can resolve today.

I thought I'd go through the order of issues listed in the defendants' agenda letter, and the first item to address -- and we have Judge Bumb on the call -- that is the deficiencies, fact sheet deficiencies.

Now, there is a dispute as to one of the parties, Anderson, concerning what is a fact sheet deficiency and the dispute as to whether the matter with respect to Anderson should be raised by a fact sheet deficiency as opposed to a dispositive motion.

Did you want to address that first, Nina? Or if that's not you --

MR. HARKINS: Your Honor, I can handle that on at least a preliminary basis.

As the Court will remember, often when these issues are listed on the agenda, they pretty quickly resolve themselves. I believe that is the case with Anderson. And the parties who are involved in that are currently discussing a potential stipulation with regard to the short form complaint that I believe would resolve this deficiency. So defendants are not seeking any action on that case at this time. To the extent it's not resolved, we'll revisit that at the next case management conference.

JUDGE VANASKIE: All right. Good. That's great.

And then with respect to the other matters that you

raised in your agenda letter, I take it we're at the stage where there should be show-cause orders issued.

MR. HARKINS: We are not quite there, Your Honor. And just to walk through and kind of remind everyone the way that we have presented these, and happy to adjust that if the Court prefers. The first listing for the Samocha matter, just informing the Court that there was a pending order to show cause in that matter issued the last time that we addressed deficiencies at the case management conference. That has been resolved. Defendants would now like to withdraw that order to show cause. So nothing to do other than formalizing that withdrawal.

JUDGE VANASKIE: Okay.

MR. HARKINS: With the resolution of the Anderson matter, defendants are not requesting orders to show cause in any cases returnable at the next case management conference.

JUDGE VANASKIE: Okay.

MR. HARKINS: And the listing of core deficiency cases beginning on page 2 and extending onto page 3 and subsequent pages of our letter, this is the first time each of those cases has been listed on the agenda. I do have two updates for the defendants. Case No. 8, Kursat Saatci, and Case No. 24, Darren Daniels, the issues in both of those cases have been resolved, and they will be removed from the subsequent agenda listing.

JUDGE VANASKIE: All right.

MR. HARKINS: And with respect to the other 22 cases on that list, Defendants would simply continue to meet and confer. We will have another meet-and-confer with Plaintiffs on a global basis before the next case management conference. To the extent the issues in those cases are not withdrawn, we would potentially list them for the agenda at the next case management conference.

JUDGE VANASKIE: Okay. So ordered forward. No other action needed from the Court at this time.

MR. HARKINS: That's correct, Your Honor.

JUDGE VANASKIE: All right. Great.

CHIEF JUDGE BUMB: Can I just clarify? Except I need to do a withdrawal of the Samocha order to show cause; is that all you need from me?

MR. HARKINS: That's correct, Your Honor.

CHIEF JUDGE BUMB: Okay. We'll do that.

JUDGE VANASKIE: Anything from the plaintiffs' side with respect to the fact deficiencies?

MS. GOLDENBERG: No, Your Honor. We've had a productive global meet-and-confer. And thanks to that, we were able to resolve all of the issues that would have been on your agenda for today, so...

JUDGE VANASKIE: Okay. Great. Thanks, Marlene.

MS. GOLDENBERG: Yeah.

JUDGE VANASKIE: Now, we have the next item on the defendants' agenda was product identification deficiencies.

Where does that stand?

MR. SLATER: Your Honor, I can --

MR. HARKINS: Your Honor.

MR. SLATER: Oh, go ahead. I'm sorry.

MR. HARKINS: No. Apologies. I believe -- and the one thing I did want to clarify for the Court at the outset is that we did submit a proposed order as an attachment to the agenda statement. That order would require some modification based on ongoing meet-and-confers we have had with Plaintiffs before it is entered.

I do not think the parties are far apart with respect to starting this process. It's Defendants' position that this doesn't need to wait any longer, particularly given the time that is built into that process. And for the list of cases that we have already exchanged with Plaintiffs, we think it's perfectly reasonable for the parties to finalize and submit a joint proposed order this week so that the process can begin at the next case management conference, whenever that's set.

JUDGE VANASKIE: All right.

MR. SLATER: Judge, that's acceptable to the plaintiffs.

JUDGE VANASKIE: Okay. All right. So you're going to submit a proposed order and it can get issued.

Very well.

All right. The next item on the agenda deals with Wave 2 trial process. And letters were sent on February 14th dealing with that. And this one might be a little more difficult to resolve.

Who's addressing this issue for the plaintiffs?

MR. SLATER: It should be Daniel Nigh, who I assume is on.

MR. NIGH: Your Honor, it will be me, Your Honor. Thank you.

JUDGE VANASKIE: All right, Daniel.

All right. And who will be addressing this issue for the defense?

MR. HARKINS: Your Honor, myself and counsel for ZHP may also contribute.

JUDGE VANASKIE: All right.

Daniel, as I understand it, you're proposing a multi-plaintiff bellwether trial. Is that right?

MR. NIGH: Actually, Adam Slater is going to speak to that issue.

MR. SLATER: Sorry, Judge. I was just going to address just the multi-plaintiff part and Daniel is going to handle the schedule. So I can address that question.

JUDGE VANASKIE: Okay. Yes, let's address the multi-plaintiff question first because that impacts schedule,

too.

MR. SLATER: Yes. We're proposing a multi-plaintiff trial in Wave 2. We think it's more efficient and we can get more information out of a trial and more efficiency.

JUDGE VANASKIE: Does it serve the proper purpose to have a multi-plaintiff trial in terms of these are bellwether trials to see how the jury reacts to the evidence that's presented?

MR. SLATER: We think so because, first of all, the first trial is obviously a single-plaintiff trial, and we didn't push for a multi-plaintiff trial in the first one so the Court could have a single-plaintiff trial start.

From our perspective, if you have two plaintiffs, which will have obviously different facts, you get more information out of the trial, if that's the goal. And the defense has been very clear that they think that their defense is very strong to these cases, so I'm not sure that they would have much of a concern.

But we think you just get more information. If you have more than one plaintiff, you get more information than you would from just one plaintiff.

JUDGE VANASKIE: All right. Steve.

MR. HARKINS: Your Honor, there are a couple issues with this proposal, some of them are practical. Practically, the parties have spent months trying to negotiate and identify

cases with the understanding and following the Court's instruction that it would be a single-plaintiff trial to enable the Court to have another case ready to try in this calendar year or shortly thereafter. This was, we believe, preliminarily decided by Your Honor back in October. We don't think there's any reason to revisit that and toss out the months of negotiation that the Court has already undergone.

Second, there are any number of other procedural steps that would need to take place, as we had flagged, including briefing on whether it's proper to join these individual plaintiffs into a single trial. That would need to be built into the schedule that is already, as I'm sure you're aware from looking at our position, becoming very difficult to fit in before November. That is setting aside all of the due process procedural issues, whether this would serve the goal, as Your Honor identified, of finding out information about these cases for purposes of the broader litigation. These cases are not identical.

One of the thorniest and trickiest issues in each of these bellwether trials is going to be the specific exposure of an individual party to a very specific type of cancer and the timeline within which they developed cancer with respect to taking medications. Those are not issues that should be easily lumped together. They are going to make any multi-plaintiff trial in any setting very difficult and something that

Defendants would oppose.

And specifically, for purposes of a bellwether trial, we are looking to present the cleanest, if you will, and simplest-to-present-to-a-jury and gain-information case. It's going to be nearly impossible.

JUDGE VANASKIE: All right. Any response, Adam?

MR. SLATER: The only other thing I would add is we obviously think that there are efficiencies. And I think all the issues that counsel listed are routinely handled by courts that try multi-plaintiff trials as part of their bellwether processes and other MDLs.

The other benefit is that if you have more than one case prepared for trial, if one settles, at least you have a better chance to be able to still use that trial date. So we think that's also a benefit.

JUDGE VANASKIE: You --

MR. HARKINS: Your Honor, the only other thing I would note is --

JUDGE VANASKIE: Go ahead, Steve.

MR. HARKINS: And, again, we've not really considered this because we have been operating under the assumption that we are dealing with a single-plaintiff trial; not all these plaintiffs are from the same state. They are not all proceeding with claims under the same state laws. Many of the same issues that took up extensive briefing and complicated the

preparation of the TPP trial, which was attempted multiple times last year, are suddenly raised if we are not talking about a single plaintiff proceeding on a single set of claims under a single state's laws.

JUDGE VANASKIE: Yeah. I think we had made a determination to go with single plaintiff. I don't think we had really discussed proceeding with a multi-plaintiff bellwether trial. I think it's appropriate to stay with the single-plaintiff bellwether trials, at least for the first few trials. So I'm not inclined to recommend that there be multi-plaintiff bellwether trials.

All right. So we should --

CHIEF JUDGE BUMB: Can I just interject, Judge Vanaskie?

JUDGE VANASKIE: Sure.

CHIEF JUDGE BUMB: Something Mr. Slater said. Is there any potential that this case would settle?

MR. SLATER: I -- there is nothing concrete that I'm aware of that's happening. I'm just talking in the abstract, Your Honor, because obviously that's common for cases to resolve close to the trial date. I'm not saying there's any -- I can't speak to any talks that are happening right now. I was just projecting forward in case that happens.

CHIEF JUDGE BUMB: Well, I'm just going to caution the parties, if this case settles on the eve of trial, that's

not something that I would look too favorably on. I'm setting aside my trial calendar, reserving the time. So if this case is going to settle, it should settle sooner than later so that the second trial I can move up.

So, you know, if it settles on the eve of trial, it's my practice to figure out, you know, who was the errant party and why didn't it settle earlier, particularly if I've already impaneled a jury. So it's just a word of caution to the parties, okay?

MR. SLATER: Yes.

MR. HARKINS: Understood, Your Honor.

JUDGE VANASKIE: All right. So in terms of setting up the trial date for the -- we'll call it a second trial, Wave 2 trial, it's a question of looking at the dates you propose and coming up with deciding which dates would be appropriate, or is there anything else you want to say on that?

MR. HARKINS: Your Honor, the one other issue that I -- and apologies if this is sort of encompassed by your prior ruling, is we understood that Plaintiffs were also requesting to narrow the set of cases to be worked up earlier in the process as opposed to later.

The schedule the defendants have proposed requires the parties to conduct the initial fact and expert discovery and then brief motions in each of the bellwether cases, and then after those motions are briefed, any other issues with a

case proceeding or resolved, the Court will have a set of potentially available cases to choose from in setting trial. That's consistent with how we understand the bellwether process to work in most litigations of this size and how we think the schedule should be set out here.

If the Court agrees with that, I think the parties are probably a lot closer in simply trying to work within the parameters the Court gives us to identify what dates make sense for getting a case ready along that timeline. But that's the only other preliminary issue that I just wanted to flag for the Court and see if it is still outstanding. That would give us a lot of guidance.

JUDGE VANASKIE: All right. Daniel? Or is this an Adam issue?

MR. NIGH: Your Honor, without the multi -- I think our purpose of the narrowing was to get to the two cases that would be part of the multi-plaintiff trial. So at this point, without the narrowing to the multi-plaintiff trial, we agree that we work up the four cases and we agree with the time frame that the defendants have set out on narrowing thereafter.

JUDGE VANASKIE: All right. So are you saying, Daniel, we can issue an order that has the deadlines proposed by the defendants?

MR. NIGH: No, Your Honor. We still disagree with the deadlines by the defendants. There's -- the key difference

between the plaintiffs' proposal and the defendants' proposal is that the plaintiffs believe that we need more time to work up the factual issues with treater depositions. We've got four cases here, so that's going to take some time. And one counsel represents two of the four cases, so they need additional time for that issue.

And on top of that, we have expert opinions that are going to be -- this is a new cancer -- new cancer types that are not in the Roberts' case. So we believe that's where the new time is needed, where our schedule has a condensed briefing schedule for the 702 and SJ motions because we believe that the law -- a lot of the law is going to overlap with what we've already seen in the Roberts' issue.

We also believe that there are some things in the defendants' proposals that are unfair for the plaintiffs. And that is, one of the things that would be unfair is that under the defendants' proposal -- under the plaintiffs' proposed dates, it would give the Wave 2 plaintiffs and the defendants the benefit of the Roberts full expert depositions, whereas under the defendants' proposal, only the defense counsel would get the benefit of the expert depositions in Roberts before their expert reports would be due.

And like I said, under our proposal both parties would get the benefit of the Roberts depositions, expert depositions before their expert reports are due in the Wave 2

cases.

The other thing that we believe would just be more efficient would be under our proposal, the plaintiffs' proposed dates would give Wave 2 parties the benefit of the Roberts full 702 and SJ briefing that would happen in the Roberts case. And we would have that benefit for the briefing for the Wave 2 cases.

JUDGE VANASKIE: All right. Anything else on this issue?

MR. HARKINS: Your Honor, just briefly, and really only to respond on the fairness point. I can assure you as the individual who cobbled together our initial proposal on these deadlines, the idea of one party having further access to expert briefing certainly didn't factor in. We were simply trying to work off of the deadlines that Your Honor had already approved in Roberts, backdating them from the target of a November trial, and fitting everything in with the understanding that the parties have slightly less time to complete discovery, which has now been exacerbated a little bit because we don't have a schedule to begin fact discovery, and attempting to build in some time while the Court is trying the Roberts case. But we're not bothering the Court with additional submissions related to the Wave 2 workup to the extent possible.

Happy to see any guidance that you have on the

deadlines, but I largely think that this is something the parties will ultimately be able to work out.

The only other point I'll make is, we do feel that one of the most important issues and one of the most important pieces of information that the Court is going to get out of working up these multiple bellwether trials is seeing how the individualized expert and summary judgment issues, particularly related to cancer causation in individual plaintiffs, plays out during motion practice.

We are very opposed to anything particularly where we are now going to be preparing and responding to motions in four cases as opposed to one. That further condenses the time the parties have to complete that briefing. If there needs to be some small condensation on a reply or some other proficiency elsewhere, I think we would prefer that, just to make sure that prior to the Court having to select a case to set for the second Wave 2 bellwether trial, they have the full benefit of that briefing and the parties have been able to fully present those issues to the Court.

JUDGE VANASKIE: Would it be productive if I were to give the plaintiffs and defendants additional time to see if you can come up with an agreed-upon schedule, or is that not likely to happen?

MR. HARKINS: I think that would be helpful. And if there's any other guidance on some of the more global issues, I

guess, that you can provide. We're going to have a difficult time given the time constraints that are already in place with preparing this by November. But if the Court has any suggestion as to where Your Honor feels the schedule could be condensed or should be condensed, that would probably be helpful.

And I would just also ask, you know, we are already into what was sort of our proposed fact discovery period by a few weeks, so I think any deadline for us to submit something to the Court should be very short.

JUDGE VANASKIE: Daniel.

MR. NIGH: I agree with that. I think if we're going to have additional time, that we try to meet and confer and work this out. I believe it shouldn't be any more than a week to try to reach a resolution on this.

But I do think that the parties can kick off fact discovery already. I don't think we need the order, the specific date. We know it's coming.

JUDGE VANASKIE: Yeah. There's no reason why you shouldn't be pursuing that anyway.

MR. NIGH: Right.

JUDGE VANASKIE: But why don't I -- I'm going to ask that you meet and confer and get a proposal by Friday of this week.

MR. NIGH: Thank you, Your Honor.

MR. HARKINS: Thank you.

JUDGE VANASKIE: And if you can't and it has to be decided, then it will be decided. The schedule will be issued by early next week with deadlines to move this process forward.

All right. Anything else on the Wave 2 schedule?

MR. HARKINS: Nothing from the defendants, Your Honor.

MR. NIGH: No, Your Honor.

JUDGE VANASKIE: All right. The next issue I have deals with the certificates of analysis, the production on that, and plaintiffs' desire to move forward with a motion for sanctions.

I will tell you, I'm inclined to require production of certificates of analyses to go forward, and I don't know who's addressing this issue for the defense. But my understanding from reading Jessica Davidson's letter is that it's cumbersome, it's burdensome, but it can be done.

And, Nina, if you're addressing this, please let me know.

MS. ROSE: I am, Your Honor.

Yes, that is our proposal. We have started with the client. Once it became clear the stipulation was not going to work out, started the process of getting these thousands of COAs scanned and produced. We think -- we talked to the client this morning -- that we can have production of those materials

by the end of the month. It requires a vendor to go to the site and scan each individual COA, and there are thousands of them.

JUDGE VANASKIE: They have equipment now that can scan thousands in a matter of minutes. I'm surprised that it would take that long.

MS. ROSE: I think the actual scanning itself is not that cumbersome. It's getting the vendor to the site in China. The scanning, I think, just scanning all the COAs should not be an issue, and then getting the scans processed for production. I think by the end of the month is reasonable.

We will try our best to get it done, I think we can do it within three weeks. It's just logistics, it's just the logistical burden of having it done, which is, you know, why we were trying to negotiate through a stipulation.

JUDGE VANASKIE: The plaintiffs say this is basic information that should have been supplied a long time ago. And then there's a concern with respect to the absence of records before 2016. I think it's before 2016. Do you want to address those issues, please?

MS. ROSE: Sure, of course.

So with respect to the initial production, obviously my firm, the current counsel for Skadden, we were not involved in the initial production. It's my understanding there was some question -- I think there was a lot of back-and-forth

about what discovery response is required and what ended up being produced. So the COAs -- and I don't know the specifics of that, of the COAs being produced. I know that there's some discussion about the language of the request. But they weren't produced when Plaintiffs -- Plaintiffs didn't raise this issue of them being produced until I believe the end of last year. And as soon as they raised that issue, ZHP looked into it, discovered, you know, how many there were and how cumbersome it would be and started discussing with Plaintiffs.

We produced an exemplar batch of the COAs which are MSDSs as well, which are all identical. They're all consistent with the Chinese national standard, particularly with respect to the COAs. And we offered to stipulate that all of the other thousands of documents in our possession would be the same. So I think we're at a point now, like, Plaintiffs not having them. They have them now. They've had them since January. They know what the content is. Their expert reports are not yet due. They can give those to their experts. They can use them for the coming trial, which is the first trial that's going to be held. So we're just trying to move forward to make sure Plaintiffs have the information, and we believe they do. But if they want us to produce, you know, the many thousands of them, we are willing to, and we're in the process of doing that.

And then on the second point for COAs, it's actually

I think -- I believe it's prior to 2015. It's our understanding, based on talking to the company, that it's very unlikely that there are COAs predating 2015 just due to normal document retention. Obviously we're in the process of going through all of the COAs now.

If there are some that happened to be maintained, we will certainly produce those. We don't have any reason to believe that there will be.

But as we said, there's zero evidence that any of those pre-2015 COAs would be different in any way from the thousands we have from post-2015 because, again, the COAs are consistent with the Chinese national standard, which we can produce to the Court, that states what should be in the COAs for raw materials going to Chinese companies.

So there is no reason to believe that there's any different information in the pre-2015 COAs.

JUDGE VANASKIE: All right. Are you addressing this issue, Adam?

MR. SLATER: I am, Judge.

JUDGE VANASKIE: Okay.

MR. SLATER: Just to kind of knock off each of those points, counsel's talking about "many" thousands. Perhaps they can tell us what they actually intend to produce, because I'm surprised to hear that there's many thousands based on our long discussions going back and forth, number one.

Number two, these absolutely should have been produced. We were under the impression that they didn't even get them. And we just accepted that because we thought, okay, they didn't get them. We didn't understand it. And that's why we went -- when we were deposing their experts and found on the Internet certificates of analysis from their actual suppliers going back to 2011, 2012 and used them, and nobody from ZHP said why are you using these? We have them. Nobody said a word. And it was only when we started to talk through some other discovery issues, like Jinsheng Lin, that we went back to them and said, you know, you really -- you need to explain to us why you didn't get these.

And then what we were told, to our complete surprise and frustration, was, well, of course we have them, but they were paper documents and they were burdensome to produce and that's why they weren't produced to you, which is obviously not a legitimate basis to not produce something that's so fundamental.

We then engaged in this lengthy process, and we thought we were close to a deal, otherwise we wouldn't have gone along so long. And then from our perspective, there was big steps back in the last few weeks. When counsel says, "well, plaintiffs have them, they can work with them," well, the "them" is we have whatever they have told us they can find and what they've been trickling out to us. But what they've

told us is they don't have anything, now they're saying, before 2015.

Either way, these processes were developed beginning 2010, 2011. That's when the risk assessments were being performed. That's when all this work was done, when ZHP has already stipulated that they did not evaluate the constituent chemicals that were being introduced to the product by these solvents. They've already stipulated to that.

So to say, well, we can work with what we have, we don't have what they were given during the relevant time period, the most important part of the relevant time period, I should say. So we're always going to be at a significant disadvantage.

And I'm sure you can understand our reluctance to accept what we're being told by ZHP after all of the other issues we've been through with them in discovery for years to just accept what they're saying.

Perhaps maybe they'll come back to us and try to revisit that stipulation because we thought we were being very, very reasonable. And we're willing to avoid this motion practice if we got a stipulation that didn't give us everything we wanted but got us enough that we could actually not be prejudiced at trial by what we don't have and don't have the ability to see. So our view of the significance of this and what we haven't been given is different from ZHP's.

And from our perspective, you're right, Judge, they should produce what they have, but they should tell us what they're giving us, because I don't know where many thousands of these documents are coming from, but maybe they can explain it to us. And then we do think we need to brief this because of what's happened and what we're never going to get based on what they've disclosed to us now in the recent months.

JUDGE VANASKIE: All right. Nina.

MS. ROSE: Thank you, Your Honor.

So I'll try to take those one by one. Just on the issue of many thousands, which I don't think I said "many" thousands, I said "thousands," and we have said that to Plaintiffs. We have let them know that that is the extent of what we have for COAs.

And just to clarify, these are, and I'm focusing on the COAs right now, these are certificates of analysis that come with every batch of raw material that ZHP receives to use in its manufacturing processes. They're written by the supplier as they come. Again, as I said, they're submitted and consistent with the Chinese national standard for COAs. So there are many of them, because every time they get raw materials, they get another COA. They're identical. They're the same thing. They state information about the product that ZHP is receiving. So that's why there are so many of them. They just come in the ordinary course of business.

And we've said that to Plaintiffs, and that's why they're -- you know, they're in storage, and there's a bunch of them, but they're not materially different from one another. They just -- that's what were sent by the suppliers. So that's the issue. I don't think there's ever been any disagreement with respect to how many we have. It was precisely the amount that we had which made it so cumbersome and burdensome to produce them, which is why we talked about the stipulation.

And then to talk about the stipulation a little bit more, I know Adam, Mr. Slater, has said that, you know, they're willing to reconsider the stipulation, but there was a fundamental disagreement between the parties with respect to the stipulation. ZHP proposed the stipulation for logistical reasons to say here are the COAs that we have, we have a lot more, they're materially the same, we're going to stipulate that all of them would have said the same thing.

Plaintiffs, as we went through the negotiation, Plaintiffs wanted ZHP to say more than that. They didn't want to just talk about the content of what was in the COAs. They wanted ZHP to stipulate about how those COAs and the language used therein could be interpreted. And ZHP continued to go back and forth with Plaintiffs and proposed language to make clear that they did not agree with Plaintiffs' interpretation. But every time Plaintiffs wanted to put more limitations on whether ZHP could explain their interpretation of the COAs at

trial and restrict them from doing so, and that's really where the impasse was.

ZHP is uncomfortable with that. They do not believe that's accurate, and they can't stipulate to something that they believe is false, which is that these documents can be interpreted in a specific way. And that's an issue for trial. That's a fact issue to be discussed at trial.

So we really did work in good faith with Plaintiffs. As Adam has said, we worked for a long time. But that fundamental disagreement about what -- how these COAs can be interpreted and what the language in them means, that's just a factual dispute that has to be resolved at trial. We can't stipulate to something that, you know, ZHP does not believe is accurate.

JUDGE VANASKIE: Adam.

MR. SLATER: Sure.

Just to maybe put the final -- a finer point on that last piece, the issue is this: Counsel for ZHP was asking us to stipulate that the documents they give us say what they say and that's what they have and then let our experts argue about the significance of that information when we're not being given years of those documents to actually have all the information in front of us. So we couldn't agree to that. And we were being asked to drop this discovery issue, where we're going to be obviously asking for a significant sanction for documents

like this to have been knowingly withheld based on an internal feeling that it would be burdensome to produce paper documents, which they produced a lot of paper documents because they were required to.

We can't agree to something that puts us no better in terms of our ability to litigate the issue, but strips away any responsibility for what we think is a big discovery issue that fundamentally prejudiced us throughout this case.

Remember, we've been litigating this case for years under the assumption that they never got these COAs. And our experts wrote their reports. We took all the depositions of the defendants, all the expert depositions, tons of motion practice, prepared for trial twice and then found out, oh, yeah, we had them, we just didn't want to give them to you.

So what we were proposing was something that literally said they were on notice from the content of these documents of the potential for dimethylamine and diethylamine to be present as impurities with the solvents.

There's three solvents at issue really. We're not focused on anything else. And they did not want to agree to that. They wanted to make this into a fight at trial, and we just felt that would be fundamentally unfair when we don't have the full set of documents. And, I mean, they have their argument about what they would have gotten prior to 2015, but they don't -- or 2016, whenever it is, but they don't have

those documents. We are not inclined to accept that based on the history of how this case has gone. And I don't think anyone would expect us to. And it's their most favorable view of the world. The fact that those documents are gone is a big problem. The fact that they were held back is a very serious problem that's prejudiced us for years.

So the ball's in their court to give us what they have. And if they won't agree to what we thought was a very reasonable compromise asking for language in a stipulation that's much less strong and dispositive than the language we would ask for in the motion, they don't have to agree to it. Obviously everybody is entitled to their position. But we're not going to be able to just whitewash this and say, okay, fine, we'll be no better off. We'll accept that we had this information held back and we'll just go argue about it at trial, which I don't think that that's efficient. I don't think it's going to help the trial, to be helpful to the Court to learn, for the jury to understand things. It's just going to be a sideshow now. So we want to get this disposed of in advance, if we can. And we think that the facts and circumstances allow it to be done by a motion if ZHP won't revisit its position.

JUDGE VANASKIE: Okay.

MS. ROSE: Your Honor, may I respond? Oh, sorry. It's all right if you --

JUDGE VANASKIE: Let me ask a question and then you can respond.

The certificates of analysis that we're talking about, they're generated by the producer of the ingredient?

MR. SLATER: Yes, the supplier.

MS. ROSE: The -- I'm sorry.

MR. SLATER: The supplier to the manufacturer provides a certificate of analysis of what the contents of the substances are and what impurities may be found and the characteristics. And along with that is the material safety data sheets that they've also been discussing with us, which also provide information about risks of the chemicals and what constituents may be in those chemicals.

JUDGE VANASKIE: Now, during the discovery period, did you pursue third-party discovery with respect to these certificates of analyses and MSDS?

MR. SLATER: We did not formally try to serve subpoenas on suppliers in China. It would have been a Hague process.

JUDGE VANASKIE: Okay.

MR. SLATER: And we didn't do it. We assumed that ZHP would give us what they had and what they got and that they would be truthful in their discovery and produce what they were supposed to.

It never occurred to us that they just didn't produce

to us something because they felt that it would be burdensome and they didn't want to go through producing it. It never -- honestly, it just didn't occur to us in this context. We just thought we had just hit a point that unfortunately they don't have them and we have to live with that. And we tried to figure out a way to deal with it, which is we went on the Internet and found the certificates of analysis from those exact suppliers during that time period and used them in expert depositions.

MS. ROSE: Your Honor, can I respond on that point?

JUDGE VANASKIE: You can respond on all the points, sure.

MS. ROSE: Oh, sure. Thank you.

So with respect to the certificate of analysis that Mr. Slater is referring to that was found on the Internet, that was a sample, I guess, certificate of analysis that pertained to a Japanese company. It is not consistent with the Chinese national standard. There is no evidence that ZHP ever would have received that COA.

So Plaintiffs have used a COA from a different country that they found on the Internet and are suggesting that that is evidence that the COAs that were received by ZHP earlier than 2015 would have been different from the ones received after 2015. But there's just no evidence of that.

And given the Chinese national standard for COAs, the

evidence is to the contrary; that the COAs that were received by ZHP over time were consistent with that standard and said what all the COAs we've already produced said and all the COAs that we are about to produce are going to say.

And with respect to the issue of prejudice, I just -- Plaintiffs have said that they've gone through all of the litigation without the COAs. I do not believe, and my understanding, there was never any representation by ZHP that we don't have any COAs or that there was some statement that ZHP said we don't have these, they don't exist.

The question, I think, goes back to historically what the agreements were between the parties and what was going to be produced. And I was not involved in those discussions. All we can say is that moving forward when they asked specifically for the certificates of analysis, we told them we have them, here are the exemplars, here's what you have. You can use them with your experts. Your experts can use them for the Roberts trial. We have a whole new slate of experts that are coming in for Roberts. So there's been no trial. No one has been prejudiced by the fact that Plaintiffs just specifically asked for these and have them now. They can use them in the trial going forward.

So I'm a little confused as to where the prejudice is to Plaintiffs. They've had these since January and their experts have had them.

MR. SLATER: Well, I'm not really sure what that means. The experts that addressed this are our general liability experts, like Dr. Hecht and Dr. Najafi who wrote the reports years ago and went through general causation and went through an entire process of being prepared to testify at trial. So I'm not really sure what -- I'm not -- that doesn't -- that's not a response to what I'm talking about, with all due respect.

This -- to try to shift the burden, the fault to us, we don't accept that. We certainly asked about what --

CHIEF JUDGE BUMB: Can I --

MR. SLATER: Go ahead, Judge. I'm sorry.

CHIEF JUDGE BUMB: Can I jump in?

MR. SLATER: Oh, of course.

JUDGE VANASKIE: Sure.

CHIEF JUDGE BUMB: It sounds like there's just a disconnect. When did you ask for the -- Mr. Slater, when did you ask for these documents? And when were you told they don't exist?

MR. SLATER: Well, they were initially requested in our initial document request. They're encompassed by our request years and years ago, which I don't have the date of that, but that was the initial request.

CHIEF JUDGE BUMB: Right. But when were you told they do not exist?

MR. SLATER: I'd have to go back and I'd have to go through everything. I know that it was our understanding when we went through the expert depositions that they didn't have them.

CHIEF JUDGE BUMB: Right. But I think that it's going to be very -- because you know, look, Judge Vanaskie doesn't need another motion for sanctions because however he rules, then there's going to be another appeal. So let's just cut to the chase here.

It seems to me that the critical issue is that if the plaintiffs were told in no uncertain terms these documents don't exist, which I'm not hearing, what I'm hearing is that the defendants were saying these are cumbersome, they're burdensome, let's work it out. But if you have evidence that you were told these documents do not exist, putting aside the issue of whether you should have subpoenaed the vendors or not, if you don't have that evidence and you proceeded in using something from the Internet, which is not reliable apparently because it's a Japanese study or a Japanese document, then it seems to me the plaintiff kind of, you know, proceeded at its own peril.

So it seems to me that if you were told in no uncertain terms they don't exist, that's a fact that's clearly relevant. But if there was this back-and-forth that preceded Ms. Rose's involvement and it just for whatever reason didn't

get worked out, then I don't see why Judge Vanaskie should have to deal with a motion for sanctions.

MR. SLATER: Judge --

CHIEF JUDGE BUMB: It sounds to me that there was a big disconnect between the parties and it just never got fleshed out, number one.

Number two, I understand you want every single document, but if you're disputing the fact that the pre-2015 is materially different from the post-2015, then maybe it's worthy of a discussion. But if ZHP's representing that these are all the same, they're all the same. So, again, I think that's an issue that I would want to hear about, where's the prejudice?

I'm just hearing and then I'll be quiet and let Judge Vanaskie take over, but I'm just hearing that this was an issue that should have been fleshed out much earlier and now here we are once again dealing with something that shouldn't -- that, you know, you want to throw into Judge Vanaskie's lap and then ultimately mine. That's just how I'm hearing it. I'll be quiet.

MR. SLATER: Well, Judge, that's not what happened. There was not a back-and-forth for years. They represented what they had. The document requests are very specific and very broad, both. They're all encompassing. Nobody's going to argue they're not encompassed by those. They produced what they had. That's a representation that we don't have something

else. And it's not our job to go to them and say, you know, we didn't get all these other things, what else didn't we get and why? But we'll look for whether and when they made specific representations.

The idea that they didn't produce it to us because it was too burdensome, that only came out very recently when we again went back to them and said, you know, we're getting ready for this deposition now and we don't understand why you didn't produce COAs. Can you confirm to us you never got them? Because we don't understand this. And that's when they said, oh, no, no, we got them, we just didn't -- we didn't tell you we had them. We didn't produce them because it was burdensome, which is an absolute violation.

So it's not that we spent years accepting or arguing about whether it was burdensome. That's the argument they made to us, and we immediately said, well, that's totally inappropriate, and we said we're going to press a motion. And they suggested a stipulation, and we went into the negotiation on the stipulations. So we didn't sit on our hands at all. And we were so sure that they didn't have them that we went to find samples from the exact same suppliers of what they were telling the manufacturers they were selling to, to use them with their experts, because we were firmly understanding that they didn't have them. We couldn't find them anywhere in the production, so we assumed they didn't exist and they didn't

have anything. And that's why we proceeded as we did because we had no other way to go.

It would not have been feasible or reasonable for us to think we could subpoena manufacturers through the Hague Convention in China. That's just not something that we would have ever considered to be fruitful, and we didn't think that we needed to because we assumed ZHP would give us what they had.

Now they're saying, well, you should have done this, you should have done that. The problem is that's a "what about." They had an obligation to produce them. And what existed before 2015, we don't accept what they say because they haven't produced them. And unfortunately, we have a history of ZHP not giving us things we're supposed to get. So I don't think that they're in a position to be getting the benefit of the doubt on something as fundamental as this.

MS. ROSE: Your Honor --

MR. STANOCH: Your Honor, David Stanoch for Plaintiff. Just one point for a little bit of context as well. This was not a usual discovery case years ago where we propounded the requests, they propounded objections and then the parties dicker about them and then potentially go to the Court.

In 2019, Your Honor, the parties had extensive negotiations of written discovery, including document requests,

before Magistrate Judge Schneider. And Magistrate Judge Schneider issued an order on December 23, 2019, Document 328, which entered the agreed-upon negotiated document requests.

So Magistrate Judge Schneider wisely decided to cut through months of the back-and-forth of the written objections and letters, disputes with the parties, and got everybody together and hatched things out and said, okay, here's the set of document requests, defendants, and other sets, plaintiffs, here are the sets defendants are going to answer. And in those requests, among other things, were requests for obviously the certificates -- well, not obviously. It says, "Certificates of Analysis."

So it wasn't as if -- my only point, Your Honor, just for context, is it wasn't as if we asked for something, the defendants objected and said, no, it's burdensome, and then we dropped the ball or we didn't negotiate it because there was so many things going on.

There was an affirmative agreed upon set of requests. No objection that said we will produce these per Magistrate Judge Schneider's order, period.

CHIEF JUDGE BUMB: Well, I don't know. I said I'd be quiet, but I'm not. It's just astounding to me that we're having this conversation this late in the game. And from what I'm hearing is that the defendants intend to argue that the expert's opinions are not reliable because they rely upon a

Japanese standard, which totally upsets the cart. And if that's an argument that is procured by the defendants' own misdeeds, then that's something I think that Judge Vanaskie and I have to take into consideration. But we are so late in the game to be arguing about this after expert depositions have been done.

MS. ROSE: Your Honor, can I raise a point? I'm so sorry. I just want to clarify.

So with respect to the experts and the 2017 -- I apologize. With respect to the Japanese COA, I do not believe that that was even cited by any of Plaintiffs' experts. I think it was used in depositions of the defense experts. I don't think that any of their experts even relied upon that COA or -- so there was no attack on their experts on the ground that they had relied upon a Japanese COA and not our COAs.

CHIEF JUDGE BUMB: And that's not an argument you'll be making?

MS. ROSE: No. That's not an argument. Those documents were something used by Plaintiffs in deposing our experts.

CHIEF JUDGE BUMB: All right. So tell me --

MS. ROSE: And he raised the point -- oh, go ahead.

CHIEF JUDGE BUMB: I'm sorry, Judge Vanaskie. Do you mind if I have this colloquy?

JUDGE VANASKIE: No; go ahead.

CHIEF JUDGE BUMB: So where's the prejudice, Mr. Slater?

MR. SLATER: If I can get granular on it. The certificate -- one of the main things that ZHP is using to defend itself is they're saying we never could have known that -- and I'm going to start with the zinc chloride manufacturing process which was used to manufacture every pill sold in the United States by ZHP through its wholly-owned distributor, Solco.

The zinc chloride process was the result of a modification to the branded manufacturing process where they did a few things. One of the things that ZHP did is they substituted a solvent called dimethylformamide, DMF, for other solvents that had been in the process before.

And what happened -- and this is what ZHP acknowledges happened -- is the DMF, probably through two avenues, as an impurity of the DMF there was something known as dimethylamine. Also, the DMF, when it's placed under the conditions of the manufacturing process, can degrade to give off dimethylamine. The dimethylamine is what combined with the nitrous acid that was already in the process to form the NDMA. That's how it happened.

So a big focus of our depositions of the corporate witnesses was their, at ZHP, knowledge or the fact that they should have learned or been aware that they were introducing

the potential for placing the DMA, the dimethylamine, which is called a secondary amine, into the process which created the risk of producing NDMA, because they already knew they had put in sodium nitrate and hydrochloride which would create -- or hydrochloric acid that would create the nitrous acid.

So they've said over and over again in the depositions: We never had any reason to know that dimethylamine could be introduced to this process. We just never had any reason to know that. And they've already stipulated they did no research at all into DMF and what impurities could be introduced to the process by DMF, which is already a very damaging stipulation. And they entered into that to avoid certain depositions per a sanction order by Judge Vanaskie years ago. So --

CHIEF JUDGE BUMB: But if you already have the certificates and you already have some certificates of analysis that show the DMF or the DMA --

MR. SLATER: No.

CHIEF JUDGE BUMB: -- what is the prejudice?

You don't?

MR. SLATER: We don't have that. What they're -- well, the prejudice was until very recently we had nothing from ZHP.

What they've given us is a cherry-picked representative sample, is what they told us, of what they do

have, which is all postdating 2015. And they don't lay out the way that the -- the certificates of analysis we found are from the same Chinese suppliers. They're saying, well, those were two Japanese companies, not the Chinese companies. That's argument, and we'll see if they can actually support that if we get to that point.

But what they've given us so far isn't fully elucidating. It mentions "dimethylamine" in a few of the documents in context of something called "alkalinity," which may be enough. Because the point is they were on notice of the potential for dimethylamine and should have done something about it, and they've already stipulated they did nothing to research this.

But our expectation is that if we got the full set, which they've already told us they're never going to be able to give us now, that it would have been much more -- provided much more information and probably had more damaging information in the documents that they had, and that's the prejudice, is we went through all of discovery with their witnesses telling us we had no reason to know dimethylamine could be introduced.

And I will say, our experts, for example, Dr. Hecht said it could be introduced in two ways: As an impurity of the actual DMF or as a degradation product of the DMF during the process. So that issue was in the case. We didn't have certificates of analysis from them because they represented by

giving us what they had that they didn't have it because they didn't produce it.

Again, I can look to see if there were specific back-and-forth that we can see documented in writing. That would be better for us. But we still were allowed to rely on what they gave us, as Mr. Stanoch pointed out. They made their disclosures. They produced their documents and we were stuck with what they gave us.

Then when we brought it up again, they said, oh, yeah, of course we had those, we just thought it was too burdensome to give it to us. And that was unbelievable to us. And then it was also, we don't even have all of them, but we'll give you a sample, rely on us for the accuracy of the sample and you can go your merry way. And I think you can understand why we're not comfortable doing that as I explained the whole context.

MS. ROSE: Your Honor, may I respond? I will be brief; I promise.

CHIEF JUDGE BUMB: Yes.

MS. ROSE: I just wanted to talk -- several points. One is that I think Adam's explanation of what he thinks the prejudice is -- Mr. Slater, I apologize -- shows why there is no prejudice. Your Honor was right, they have the COAs. They have a representative sample. We are now going to produce to them all of them, everything we have. They're going to have

all of the COAs.

And as Adam, Mr. Slater, I apologize, just said that the COAs that we are producing to them, that we've already produced, do not say there's DMA in the DMF solvent. There is a reference to "DMA" in some of them in the context of alkalinity.

So what that means, whether or not that should have put ZHP on notice that there was DMA in the DMF solvent, that is a fact question. That's a question for experts.

They mentioned that Dr. Hecht already talked about this. Dr. Hecht could very easily put in a supplemental report saying my opinions are further supported by the fact that there are these COAs that contain the word "dimethylamine." And that's fine. That's not -- there is no prejudice there because they're still able to address these to the extent that they believe these COAs support their position.

And the continued claim that because ZHP would not in the ordinary course have kept thousands of COAs, all the COAs that are received dating back over a decade, that somehow that's evidence that the COAs were different and said something more damaging prior to 2015, that's just speculation. And we have a Chinese national standard that the COAs are consistent with. So there's really no reason to believe that the suppliers would have suddenly changed the wording in 2015. There's just no -- there's no basis for that. So they have --

they have documents. They're going to have tons of documents. And they can use them with their experts however they want.

But I agree, there is no prejudice here because they have all of the information.

CHIEF JUDGE BUMB: What do you want to do, Judge Vanaskie?

JUDGE VANASKIE: Well, I want to accelerate the process of producing these certificates of analysis. I think the end of the month is ridiculous, frankly. This issue has been teed up now for a few weeks, and the process should be underway. I'd like to have them produced by the 17th of March, two weeks from today.

MS. ROSE: Understood, Your Honor.

JUDGE VANASKIE: As far as documents predating 2016, I guess the question I have is, what did the document retention policy require? Were they destroyed before this whole issue arose, or were they destroyed after this lawsuit was filed? That would be very problematic obviously. But I'd like to know what the document retention policy is.

MS. ROSE: Understood, Your Honor. There are colleagues representing ZHP with me have a better understanding of the document retention policies, and I know that's something that we've been talking to Plaintiffs about as well. So we can provide a submission to Your Honor, unless one of my colleagues would like to discuss now.

MR. BERNARDO: No; I was going to actually suggest the same thing, Nina.

Your Honor, we can certainly provide something on that. My understanding is the ordinary course of retention wouldn't retain this volume of information. As you can appreciate, as Ms. Rose said, these are like things they get in with every single batch of every single ingredient that they make.

JUDGE VANASKIE: Right.

MR. BERNARDO: They wouldn't be expected to keep these things in perpetuity. And I think the company's legal hold was looked at by Judge Schneider prior to my involvement.

And I think everybody agreed that there were no bases for any motions that those were violated. But I can get a little bit more specific as to what are the details of the reason for them not having them prior to 2015.

JUDGE VANASKIE: All right. Please do.

CHIEF JUDGE BUMB: I just have one more last question because I'll be thinking about this, you know, until this all gets resolved.

What is the basis to believe that the documents that haven't been produced, the certificate of analyses that will not be produced because for whatever reason they don't exist, would have been different from the ones that are being produced, Mr. Slater?

MR. SLATER: In part --

CHIEF JUDGE BUMB: And just other than ZHP's been bad before and they're probably bad now.

MR. SLATER: Well, in part, it's based on what we were able to find on the Internet from the exact same suppliers listing dimethylamine as a known impurity and actually quantifying it in the product.

We've never seen these quote-unquote Chinese standards that are being quoted. I'd be happy to look at those. I'm guessing they probably aren't; that this is just going to be somebody saying, well, this is a custom or something like that. I don't know that there's actually a document. We've never seen such a thing, and it's never been produced to us. So that's one major point is that we actually have COAs from these exact suppliers.

And also --

CHIEF JUDGE BUMB: And so you may get some in the batch that's coming, the same.

MR. SLATER: We hope so.

CHIEF JUDGE BUMB: Okay.

MR. SLATER: But so far we haven't seen anything like that.

And I can also tell you that when we deposed Dr. Afnan, the cGMP expert for ZHP, we asked him about this, and he said they would have been required to evaluate those

COAs and take it into account. And I asked him, Do you have any documentation that ever happened? He couldn't point to anything, but he said, I'm assuming they did it because they're supposed to do it so I'm assuming they did it.

But I can tell you, we have never seen a document that shows ZHP was actually doing a full evaluation of those COAs as he said they were supposed to do. But, again, we'll look at what's produced and what ZHP represents those documents are.

So far everything we've been provided as part of the meet-and-confer has been in Mandarin. So we're not talking about English language documents so far, but maybe we'll get some and maybe that will be helpful as well.

MR. BERNARDO: May I suggest, to move this along, and I'm sorry to interject at the last minute, but we are going to produce them. And, Judge Vanaskie, just to address the reason you raised, the reason they take so long is, my understanding, they're not individual pieces of paper, they're in books. So each one has to be like one by one scanned. But we will produce them. We will provide the Chinese standard to Mr. Slater. And maybe it makes sense after that to determine whether or not any kind of briefing is in order and address it then, because at least then we can do it with a little bit of factual knowledge about what exists, whether they are in fact different, and what the Chinese standard was.

JUDGE VANASKIE: Yeah, I think that would be fine.

MR. BERNARDO: Thank you, Your Honor.

JUDGE VANASKIE: Anything else on this issue?

MR. SLATER: No. Thank you very much, Your Honor.

MS. ROSE: Thank you, Your Honor.

JUDGE VANASKIE: All right.

MR. BERNARDO: Thank you.

JUDGE VANASKIE: Daniel, are you still on? Daniel Nigh.

MR. NIGH: Yes, Your Honor.

JUDGE VANASKIE: I wanted to find out where we stand with respect to the dismissal of downstream defendants with respect to the Wave 2 bellwether pool matters.

MR. NIGH: I believe they've all been dismissed. There was one issue raised in Garcia, but I know we filed that dismissal last week.

JUDGE VANASKIE: All right.

MR. HARKINS: And I believe that's consistent for Defendants, Your Honor.

JUDGE VANASKIE: Okay. So good. That matter is resolved.

Is there any other outstanding issue with respect to the Roberts matter?

MR. NIGH: Not at this time, Your Honor.

MR. WILLIAMSON: Well, Your Honor, I believe --

MR. NIGH: Go ahead, George.

MR. WILLIAMSON: This is George Williamson on behalf of the plaintiffs. I believe the only other issue outstanding I think is more of just an update for Your Honor.

We have been discussing the NDMA contamination levels with respect to the pills that Mr. Roberts may have ingested, and we have been in very productive meet-and-confer sessions with the defendants. I think there's one sort of issue that's still outstanding with respect to the average levels of contamination between the pills. We provided the ZHP Defendants with our proposed calculations. We are asking that they verify those.

They have stated in their position letter that they are in the process of doing that. And so, you know, we hope that that process can conclude soon. I believe our expert reports are due -- and maybe Daniel can chime in. They might be the end of this week, or the first of next week. So we're hopeful that those calculations can be confirmed because that's information that our experts will rely on.

MR. NIGH: Yes. They're due March 10th, on Monday.

JUDGE VANASKIE: Okay.

MS. ROSE: Your Honor, may I respond?

JUDGE VANASKIE: Yes, please.

MS. ROSE: Thank you so much.

So I do have a bit of an update on this and haven't

had the chance to talk to Plaintiffs about it yet. We were in discussions over the weekend with our client and with our experts and also the other defendants.

I think the issue that we have here is that Plaintiffs have asked for the information that we -- that ZHP has in its possession regarding the lots of API, the active pharmaceutical ingredient, that could have been used in Mr. Roberts' valsartan prescriptions and the amounts of NDMA identified in those lots based on testing. And this is all in documents that Plaintiffs have received. We've been working with Plaintiffs. We created a spreadsheet for Plaintiffs that identified each lot, testing levels for each lot and, you know, the percentage of each lot that might have been used in different prescriptions. So we gave them all of that information.

What Plaintiffs came back with was a -- I can only describe it as, I guess, a mathematical calculation of how to convert the information we had about the NDMA levels in the valsartan API into proposed ranges of what NDMA levels would have been in the finished dose that may have been received by Mr. Roberts and may have been used, and they've proposed ranges.

And I assume that one of their experts worked on this calculation to come up with how that conversion was done. We think that this really is an issue for expert testimony; that

whoever that expert was should just include their calculation of how they determined the dose, and then our experts will look at it and determine if there's any issue with it. There might not be. But this doesn't seem to be something for the lawyers to stipulate to, like to math and how dose is being calculated. That's an element of their claims. They have to establish the dose. We've given them all the information we have. We've put it in a nice chart. But we don't understand the "ask" of us to confirm Plaintiffs or their expert's math before we even see those expert reports.

So I'm not trying to create an issue where there is none, but I know the other Defendants who just learned about this when Plaintiffs submitted their CMC statement have views on it, too, because Plaintiffs have said that they want to use whatever calculation gets used in the Roberts trial in subsequent trials. And other Defendants also, you know, they have a view. They want their experts, to the extent they're involved in subsequent trials, to look at it.

It's really not -- it's not -- ZHP is not in the position to agree on behalf of all Defendants that this mathematical calculation that Plaintiffs are using is accurate. That's really something for the experts to look at. So that's our position.

MR. SLATER: George, let me jump in for a second.

MR. WILLIAMSON: Yeah, sure.

MR. SLATER: Ms. Rose wasn't involved in the early negotiation. She's just become involved in this negotiation directly recently. It was very clear at the very start of this process that what we proposed and what ZHP agreed is let's figure out, because it's objective mathematical calculations based on objective data, what the actual contamination levels were or what we can agree to a reasonable estimate of what they were in the actual pills taken by the plaintiff, which is obviously an important issue in this case.

And the people from ZHP's counsel, from Skadden that we were dealing with, agreed that's a good thing to do. And we've updated the Court on this several times. And nobody from the other side was saying, no, we don't want to do that. They've been agreeing. We've been updating the Court on this process. And there was never a mystery that we were working to try to come up with, first of all, what are the contamination levels in the API lots that were used to manufacture the finished dose lots and then what are the contamination levels in the finished dose lots that were then mixed together in the larger bottles that were then sent to the United States and then put under the NDC codes.

And the last step is the step that we actually got to, and we think we figured out where we were able to do a weighted average of what the contamination levels were in the finished dose lots that went into each NDC code so we could

actually say, okay, well, this finished dose lot is -- and I'm making this up -- 10 percent and the level was 50 parts per million. This one was 20 percent, it was 70 parts per million, whatever it is, to do a weighted average analysis so we could then say, okay, this is the best calculation for what the contamination levels were in the actual pills taken by the plaintiff.

The idea that this should be thrown to experts and be fought about at trial when it is literally a factual mathematical question that the parties should be able to stipulate to in each case, it's just -- unfortunately, it's a suggestion by counsel now after we thought, based on the tenor of our negotiations all along, we were working to get to the point we got to. And now we're hearing from ZHP, well, we don't really think that we need to do that, let's just leave it uncertain and have our experts argue about it.

It's a much better process to do it because it's something the parties should be able to stipulate to based on calculating the math and say this is what it is, and then both sides' experts can rely on those numbers moving forward as opposed to just creating another area of dispute where one side's experts can undercut the other one's calculations. We said here's the final spreadsheet. Mr. Williamson did the spreadsheet, sent it to them last week and said based on everything, this is the weighted averages for each of the

different codes, for each of the fills. Please just confirm our math is right. If you don't think it's right, tell us where you think we've missed something, let's figure it out, and then both sides will have an agreed amount of contamination that that plaintiff was exposed to.

Yes, we do think we should do this for every case. We really busted our tails doing it in this case to figure out what is needed and how can it be done. Now we have a framework so the Court doesn't have to sit and watch people arguing over math at a trial whereas the parties should be able to just work this out.

And what I'm hearing now is ZHP is saying, well, we got to the one yard line, we just don't want to talk about this anymore. But they said they would check the numbers. If they agree the numbers are right, I'm not really sure what the argument would be, and that's what we should do. They have our spreadsheet. They can tell us do they agree with those numbers or not and then we're done.

MR. BERNARDO: Your Honor, this is Rich Bernardo. If I may, since I think I'm the person that Mr. Slater may have been referring to as being participant in these discussions, when this issue was raised -- Mr. Slater is correct. When this issue was raised some time ago, it was in connection with the defendant fact sheet, and there were certain information that was sought there. And we said we will undertake to try and

identify that information, and agree, it makes zero sense for the parties to bicker about information that's in documents. It's just a matter of pulling them together.

We also pointed out that certain of that information ZHP may not have. But we endeavored to collect what it did. We identified a spreadsheet. We reduced a couple of spreadsheets to writing on another spreadsheet that fully responded to the outstanding questions in the defendant fact sheet.

Where we are now, and this is where I disagree with Mr. Slater, is really slightly different, because we're no longer talking about information or numbers the company has in its own records. And in fact, as I think Your Honor may be aware, some of these lots, you know, there may be many, many lots that are possibly relevant to what Mr. Roberts used, and we listed them all out. But we're now at a standpoint of trying to do -- and I disagree that it's really just math. It's a little bit of math and science -- trying to weight averages, trying to determine, okay, well, here's your PPM for the API. So if you take this number and you multiply this out and you average this, we think that's a good estimate of what the API -- what the number would be in a particular pill. That's not just math. That's not straightforward. And maybe I'm just being dumb here, but it's not something I even understand, that I spend time trying to understand it with my

client.

So I feel like we did what we undertook to do. We gave the undisputed factual information that our client has. We laid it out on a spreadsheet so it wasn't a matter of the Court having to pull together things that are in various documents. And we're now at that point, just like Ms. Rose raised with respect to the COAs, where the various parties are interpreting that and we may just disagree, and the experts have to determine what all of that means.

MR. HARKINS: And, Your Honor, if I might, just briefly for the defendants who are not directly involved in the Roberts trial, because it sounds like this is at some risk of becoming -- or is being requested as a standard that would then apply to other cases. I can say we were not aware of this issue at all prior to seeing Plaintiffs' submission on Thursday and have only become aware of some of the calculations that they're performing over the weekend. We have not met and conferred on this. We have not been able to consider it in the context of any of the other cases set for the Wave 2 bellwethers or any other cases implicating any number of other defendants, who many of whom are likely learning about this for the first time on this call that might be involved in subsequent trials.

Our understanding and our expectation has always been that while a lot of this information may very well be

noncontroversial, it will be proven as a fact and shown through admissible testimony likely by an expert in the individual case. And if it's not controversial in that individual case, it will not occupy a great deal of the parties' time, but we would certainly reserve our right to have our experts in any individual matter look at that calculation, evaluate it, respond to it, and examine, if necessary, their expert's calculation and testimony on it before that specific case proceeds to trial.

Again, we have not been involved in these discussions directly, but I just caution that a number of parties who might be implicated if this is adopted as something that is being taken off the table going forward need to be looped in.

MR. SLATER: I would think, Your Honor, the easiest thing to do now is just ask ZHP to please just respond to us as to whether they agree to those calculations. So at least -- we've had a long meet-and-confer process to get to this point.

If they agree to those weighted average calculations, then we're where we need to be and we're on about the one yard line on that. So we're hoping that they can be asked to meet and confer with us today or tomorrow, finish this process, tell us if they have any questions about the calculations.

I get Mr. Harkins has a concern about what's going to happen when he's involved in a case with this. We'll cross that bridge when we get to them. We're dealing with Roberts

right now, and we're basically there. So we'd like to finish that process and hopefully get cooperation from ZHP.

JUDGE VANASKIE: But as I understood, it was just a question of can you verify these calculations or not. And maybe that's oversimplifying the issue, but --

MR. SLATER: No, that's the issue, Judge. That's where we are at this point. Because they've confirmed with us that all of the inputs to the calculations are accurate based on the long meet-and-confer we've had. They've confirmed that all the numbers we've put into the calculations are correct. So now it's just a question of how those were added together or multiplied together.

JUDGE VANASKIE: All right. Ms. Rose.

MS. ROSE: Sure. So, Your Honor, I'm not a science or math expert. And Plaintiffs are asking us -- asking the lawyers to confirm a dose calculation that they've created or their expert has created before we even get to an expert report.

I'm not saying that necessarily our expert would disagree. I don't know. But it seems odd to me that instead of Plaintiffs just putting this in their expert report and having their calculation and what their methodology is, if we don't have an issue with it, we don't have an issue with it. There's not going to be a problem that goes before the Court. Sometimes their experts say things that our experts don't, you

know, end up agreeing with.

But I don't really see why it makes sense for the lawyers to agree to what is essentially a methodology for calculating dose, which is the subject of expert testimony.

I'm not really, truly not trying to be difficult. We are -- I'm -- we are just at a point where we're not really sure why lawyers are agreeing to what is essentially an expert opinion on dose. Putting it --

MR. SLATER: Well, it's not dose. To say that it's dose, the word "dose" doesn't -- that's not what this is. What it is, is the contamination levels in the pills that were taken.

And I'm sorry that counsel doesn't understand why we're doing it, but this is what we spent a long time working through to get to this point. And it's just -- it's a little frustrating that when we have to serve specific causation reports where this issue now became a clear issue in the context of specific causation as part of the bellwether process, that we don't really think it makes sense for us to be doing this in a vacuum without knowing if ZHP agrees. And Ms. Rose may not be aware, again, Mr. Bernardo is on this, we agreed early on it would be advantageous to both sides to work this out, come up with numbers that both sides can agree to, and not fight over what the contamination levels were in those pills, which is something we obviously need to establish in

each case.

So now we know this is an issue. We'd work through it. We've figured out a method to do it. We're down to literally just asking ZHP: Confirm the calculations.

If we could do them, they can do them. We've explained how we did it. Mr. Williamson has explained it multiple times, and it would be just a little -- it would be nice if ZHP would say, okay, you know what, we'll do it, as opposed to saying we can't, because they can.

JUDGE VANASKIE: Mr. Bernardo, do you want to respond?

MR. BERNARDO: Sure. Again, I agree in part and disagree in part. I fully agree we set out to see if we can work this out. And to me working this out means if ZHP has documents that indicate what the amount is in a pill, I mean, happy to put that in there. Disagree if it means that they don't have that information, but now, to Ms. Rose's point, the lawyers are going to get together and decide whether -- how Plaintiffs propose calculating it makes scientific sense.

Again, to highlight something Ms. Rose said a couple of times which is really key, we may not have an issue here. It's simply that it's not a lawyer issue. It's an expert issue. It's almost like saying, you know, Bernardo, Rose, would you agree that the pathology shows A, B, C? Well, I mean, that's something that an expert is going to do. Our

expert may agree, but that's not something that I'm going to do or Ms. Rose is going to do or that any other attorney is going to do. So I think that's where the disconnect is.

Always agreed that if we have that information and it was available, we would provide it. We would put it in a table. We would make it so it's easy. Never agreed that if we didn't have it we would engage in some exercise to figure out how you would calculate it.

Maybe I'm just being dumb here, Your Honor, but that's beyond my skill set to do. I would have to go to my expert to deal with that.

MR. SLATER: They just need to confirm whether they agree to the calculations. If they don't want to agree as to the scientific significance of that, it's fine, they can not agree to that. But we just need to know that they agree to the calculations, because that's not something that should be experts. That's something that now that we know this is a fundamental issue for every case, it's most efficient for the parties to work through those calculations this way as opposed to having a bunch of bombs set along the way, ticking time bombs for experts to be picked off because one side says, well, you know, I would have done the calculation differently, when this is objective numbers, objective data that's in the possession of the parties that the defendants have and that they can work with us, like we did here in a meet-and-confer

cooperatively to get to this point, which is far more efficient.

JUDGE VANASKIE: Well, it would be more efficient, but if it's objective numbers, and I know you can always find a way to dispute anything, I think you just have to be satisfied that you've used objective numbers, here's what it is. This is what our experts are going to say, and you're going to be at risk of their experts saying oh, no, no, no, that's not the right calculation.

I don't know enough about this to weigh in deeper on this issue. I'd love if you could agree on something. But what I'm seeing is right now you agree on nothing. And that's unfortunate, but that's where we're at right now.

MR. BERNARDO: Well, Your Honor, if I may, and I'm kind of where you are in my inability to address it, but we've agreed on a lot. We've agreed on what the raw data are that the company has that relates to each of these lots. We've laid it all out for them in a nice, neat spreadsheet. We just are being asked to -- really to agree upon a methodology, and that's not something that I as a lawyer am comfortable in doing. That's why we have experts, because an expert may say, yeah, Ms. Rose, that's exactly the right methodology, in which case like this is super easy, or he or she may say, yeah, no, that doesn't work particularly because of like how you have to convert a, you know, API calculation from PPM to something from

a lot to a pill. It's just beyond my and Ms. Rose's skill set.

MR. SLATER: Well, one of the alternatives is that -- what we were trying to avoid is having to take -- because we don't believe this is an expert quote-unquote issue. We don't need again a time bomb ticking on a methodology issue, because we've been through this with ZHP and we've worked through how to do this and we've gotten to this point.

What we told them is if we can't work this out, we're going to ask for a 30(b)(6) deposition and put your witness on the stand and walk through the numbers and have them agree this is what you would do to figure out the contamination levels in the contaminated pills that you sold that were taken by this plaintiff. And this is not going to be efficient if we say for the rest of this litigation there's going to be some guesswork or there can't be cooperation.

So the way it's going to need to be done is if they don't want to agree, to just agree to those calculations, then we're asking for a 30(b)(6) deposition of an appropriate witness from ZHP, run through these numbers with that person and establish how would you calculate the contamination in an actual finished dose pill under an NDC code that was actually sold and taken by this plaintiff. It's obviously fundamental information we need. So if they don't want to work with us, we don't want to leave this as a hanging chad for an expert to deal with.

JUDGE VANASKIE: Right.

MR. SLATER: We're going to want a 30(b)(6), put someone under oath and force them to walk through the calculations we did, all the different levels, the levels from API, the finished dose to NDC, how we calculated it and have them factually agree to that so that our expert can rely on a witness factually for those factual calculations.

JUDGE VANASKIE: All right. Well, if you think that's what you need to do, then go ahead and proceed along those lines.

MR. SLATER: Thank you, Judge. It's unfortunate, but we will.

JUDGE VANASKIE: Take the 30(b)(6) deposition. Yeah, it's unfortunate, but I'm hearing from the defense that they believe this is an issue for experts or knowledgeable people at least, and you're going to have to deal with it in that manner. They're not going to stipulate. And I can't force them to stipulate.

MR. BERNARDO: Your Honor --

MR. SLATER: Very well, Your Honor. We'll notice the deposition.

MR. BERNARDO: And, Your Honor, I would just put a marker on ZHP's objection to a 30(b)(6) deposition four years after multiple 30(b)(6) depositions, all of which included individuals who -- I mean, this is not a new issue as far as we

can see.

In any event, we will deal with Mr. Slater directly on that, and we may be back, depending upon what it says, before Your Honor on that.

JUDGE VANASKIE: Understood.

MR. BERNARDO: Thank you.

JUDGE VANASKIE: Do you want to say anything, Mr. Harkins?

MR. HARKINS: Your Honor, I hesitate because I do feel like this is being discussed as an issue specific to Roberts. Just to the suggestion that --

JUDGE VANASKIE: It is.

MR. HARKINS: -- in the course of this workup there might be additional 30(b)(6) depositions, Defendants provided 30(b)(6) witnesses, and I can say for Teva specifically witnesses to confirm the numbers that were available and to confirm that as far as the company is aware, those are the accurate testing numbers, that is the data that I understand Defendants are comfortable confirming. And that is all that a 30(b)(6) or a repeat 30(b)(6) witness would be able to do.

We have already confirmed what the level of impurity in the product as tested is to the knowledge of our clients. I don't know how a 30(b)(6) witness to provide mathematical calculations, again, beyond the calculation that they have already done to confirm and determine the level of the impurity

present in the product, is necessary.

I'm just thinking about it from the standpoint of trying to propose a schedule for the other Wave 2 bellwether cases. That seems like repetitive and, again, very likely unnecessary to the potential dispute that we might have.

MR. SLATER: Just to be clear about one thing, the 30(b)(6) depositions that we took were not -- were specific to each case to establish a specific calculation.

I mean, if we ever asked for that, the defense would have looked at us and said are you insane, you don't even know if any of these cases are going to go to trial and it would have been a huge waste of resources. Now that we have a case that is selected, it makes sense.

Counsel says they don't understand what the deposition is. It's going to be a witness who's most knowledgeable who can go through with us to establish the contamination levels in the pills taken by Mr. Roberts based on the documents they exchanged with us and went through with us for, what, the last month or two, to establish these numbers.

So there's no secret. We never could have done these depositions before now. The issue only became paramount when we got into specific causation.

JUDGE VANASKIE: Right. Well, it's a shame that you weren't able to reach agreement on this. It's a shame that this is another hoop that you're being forced to jump through.

But I can't do anything about that.

MR. SLATER: And we understand, Judge. We appreciate you letting us notice the deposition. We'll do what we have to do.

JUDGE VANASKIE: You've done your calculations. Your experts have done their calculations. You've asked them to verify it. They say they cannot verify it, from what I'm hearing. And so you'll have to do it that way. You know, there's an easy way and there's a hard way, and it looks like you got to do it the hard way.

MR. SLATER: Understood.

JUDGE VANASKIE: I think the last item I had, and then you can let me know if there's anything else, deals with the Jinsheng Lin custodial file.

Where does that stand?

MR. SLATER: My understanding is ZHP is going to get back to us on the proposed stipulation that we served on them.

MR. BERNARDO: Yeah, that's right, Your Honor. We have some proposed changes to it. We gave it to the client and had a preliminary conversation with them this morning, and they're going to follow up, and I'll follow up with Mr. Slater.

JUDGE VANASKIE: All right. And I would like you to follow up with a report to me by next Monday.

MR. BERNARDO: Of course. We'll do that, Your Honor.

JUDGE VANASKIE: On where that stands, okay?

MR. BERNARDO: Yes.

JUDGE VANASKIE: Is there anything else for today?

(No response.)

JUDGE VANASKIE: I'm hearing nothing.

And so, Judge Bumb, anything else on your end?

CHIEF JUDGE BUMB: Nope. Nice to see you all.

JUDGE VANASKIE: All right. We'll be seeing you. Thank you.

Oh, our next conference, our next CMC.

CHIEF JUDGE BUMB: Yeah. When is that?

JUDGE VANASKIE: They talked about doing the last Friday of the month. I couldn't do this Friday. Is that still where we're at? Which would make it March...

CHIEF JUDGE BUMB: 28th?

MR. SLATER: That works for us.

JUDGE VANASKIE: 10:00 a.m. all right? 10:00 a.m. eastern time?

CHIEF JUDGE BUMB: Let me just turn to my law clerk for a second. Does that look good on my calendar, Clarissa?

THE LAW CLERK: Judge, you have a notice that there's magistrate judge interviews that morning. I don't know if you're a part of that.

CHIEF JUDGE BUMB: Oh, can we do it a little earlier?

Well, you know what, we can do -- can we do 9:30? If there's anything involving my role, we can dispose of it then

at 9:30, because that's right, I do have a conflict that day at 10:00. Can we do 9:30?

MR. SLATER: Yes.

JUDGE VANASKIE: Any objection?

MR. SLATER: No. That's great for the plaintiffs.

JUDGE VANASKIE: Okay.

CHIEF JUDGE BUMB: Thank you.

JUDGE VANASKIE: So it will be March 28th at 9:30.

And, Larry MacStravic, you could send out a notice to that effect?

THE COURTROOM DEPUTY: Yes, Judge.

JUDGE VANASKIE: All right. Thank you.

All right. I think that's it for today then. Thank you all very much.

MS. ROSE: Thank you, Your Honor.

MR. HARKINS: Thank you.

MR. SLATER: Thank you, Your Honor.

CHIEF JUDGE BUMB: Thank you, Judge.

JUDGE VANASKIE: Thanks. Bye-bye.

(Proceedings concluded at 11:39 a.m.)

- - - - - - - - - - - - - - - - - - - - -

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

- - - - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/John J. Kurz, RDR-RMR-CRR-CRC March 5, 2025

Court Reporter/Transcriber

**CHIEF JUDGE BUMB: [31]** 8/13 8/17 14/13 14/16 14/24 35/11 35/13 35/16 35/24 36/5 37/4 40/21 41/16 41/21 41/23 42/1 43/15 43/19 45/19 47/5 48/18 49/2 49/17 49/20 71/6 71/10 71/14 71/18 71/23 72/7 72/18
**JUDGE VANASKIE: [86]**
**MR. BERNARDO: [14]** 48/1 48/10 50/14 51/2 51/7 57/19 63/12 65/14 67/19 67/22 68/6 70/18 70/24 71/1
**MR. HARKINS: [25]** 5/13 6/13 7/3 7/14 7/18 8/2 8/11 8/16 9/5 9/7 10/14 11/23 13/17 13/20 15/11 15/17 18/10 19/24 21/1 21/6 51/18 59/10 68/9 68/13 72/16
**MR. NIGH: [13]** 10/9 10/19 16/15 16/24 20/12 20/21 20/25 21/8 51/10 51/14 51/24 52/1 52/20
**MR. SLATER: [51]** 5/7 9/4 9/6 9/22 10/7 10/21 11/2 11/9 13/7 14/18 15/10 24/19 24/21 29/16 32/5 32/7 32/17 32/21 35/1 35/12 35/14 35/20 36/1 37/3 37/20 42/3 43/18 43/21 49/1 49/4 49/19 49/21 51/4 54/24 55/1 60/14 61/6 62/9 64/12 66/2 67/2 67/11 67/20 69/6 70/2 70/11 70/16 71/15 72/3 72/5 72/17
**MR. STANOCH: [1]** 39/18
**MR. WILLIAMSON: [3]** 51/25 52/2 54/25
**MS. GOLDENBERG: [2]** 8/20 8/25
**MS. ROSE: [22]** 5/19 21/20 22/7 22/21 27/9 31/24 32/6 33/10 33/13 39/17 41/7 41/18 41/22 45/17 45/20 47/13 47/20 51/5 52/22 52/24 61/14 72/15
**THE COURTROOM DEPUTY: [1]** 72/11
**THE LAW CLERK: [1]** 71/20

**/**

**/S/John [1]** 73/2

**0**

**07068 [1]** 1/15
**07102 [1]** 3/18
**08043 [1]** 3/3
**08101 [1]** 1/8

**1**

**10 percent [1]** 56/2
**100 [1]** 3/17
**10001 [1]** 2/10
**1001 [1]** 4/6
**10022 [1]** 2/22
**1025 [1]** 3/3
**103 [1]** 1/15
**10:00 [1]** 72/2
**10:00 a.m [2]** 71/16 71/16
**10:06 [1]** 1/9
**10:06 a.m [1]** 5/4
**10th [1]** 52/20
**11 [1]** 3/21
**11:39 a.m [1]** 72/20
**128 [1]** 2/9
**1301 [1]** 2/17
**14 [1]** 2/3
**15219 [2]** 3/6 4/14
**15th [1]** 3/17
**17th of [1]** 47/11
**1:19-md-02875-RMB-SAK [1]** 1/4

**2**

**20 percent [1]** 56/3
**20004 [2]** 2/18 4/7
**20016 [1]** 2/4
**20036 [1]** 4/20
**2010 [1]** 26/4
**2011 [2]** 25/7 26/4
**2012 [1]** 25/7
**2015 [16]** 24/1 24/3 24/10 24/11 24/16 26/2 30/24 33/23 33/24 37/8 37/9 39/12 44/1 46/21 46/24 48/16
**2016 [4]** 22/19 22/19 30/25 47/14
**2017 [1]** 41/9
**2019 [2]** 39/24 40/2
**2025 [2]** 1/8 73/2
**2050 [1]** 4/20
**207 [1]** 1/15
**22 [1]** 8/2
**2200 [1]** 4/10
**2220 [1]** 4/17
**23 [1]** 40/2
**230 [1]** 4/17
**24 [1]** 7/23
**2500 [1]** 3/9
**2800 [1]** 4/3
**28th [1]** 71/14

**3**

**30 [12]** 66/9 66/18 67/2 67/13 67/23 67/24 68/14 68/15 68/20 68/20 68/23 69/7
**301 [1]** 4/13
**30305 [1]** 3/10
**3100 [1]** 3/13
**320 [1]** 2/13
**328 [1]** 40/2
**32nd [1]** 4/13
**3333 [1]** 3/9
**33950 [1]** 2/7
**3600 [1]** 4/10
**38th [1]** 3/6

**4**

**42-128 [1]** 2/9
**45202 [1]** 4/4
**46204 [1]** 3/22
**47th [1]** 2/13
**4th [1]** 1/7

**5**

**50 [1]** 56/2
**576-7094 [1]** 1/22

**6**

**600 [1]** 4/3
**601 [1]** 2/21
**60601 [1]** 3/14
**60606 [2]** 2/14 4/17

**7**

**70 [1]** 56/3
**701 [1]** 1/18
**70130 [1]** 1/19
**702 [2]** 17/11 18/5
**7094 [1]** 1/22
**75201 [1]** 4/11
**77 [1]** 3/13

**8**

**856 [1]** 1/22

**9**

**99 [1]** 2/6
**9:30 [4]** 71/24 72/1 72/2 72/8

**A**

**a.m [5]** 1/9 5/4 71/16 71/16 72/20
**ability [2]** 26/24 30/6
**able [15]** 8/22 13/14 19/2 19/18 31/13 44/15 46/15 49/5 55/23 56/10 56/18 57/10 59/18 68/20 69/24
**above [1]** 72/24
**above-entitled [1]** 72/24
**absence [1]** 22/18
**absolute [1]** 38/13
**absolutely [1]** 25/1
**abstract [1]** 14/19
**accelerate [1]** 47/7
**accept [6]** 26/15 26/17 31/1 31/14 35/10 39/12
**acceptable [1]** 9/22
**accepted [1]** 25/3
**accepting [1]** 38/14
**access [1]** 18/13
**account [1]** 50/1
**accuracy [1]** 45/13
**accurate [5]** 29/4 29/14 54/21 61/8 68/18
**acid [3]** 42/21 43/5 43/5
**acknowledges [1]** 42/16
**Actavis [6]** 3/11 3/11 3/15 3/15 3/19 3/19
**action [3]** 1/3 6/21 8/10
**active [1]** 53/6
**actual [7]** 22/7 25/6 44/23 55/6 55/8 56/6 66/21
**actually [14]** 10/19 23/25 24/23 26/22 29/22 44/5 48/1 49/6 49/12 49/14 50/6 55/22 56/1 66/21
**ADAM [10]** 1/14 5/5 10/19 13/6 16/14 24/18 28/10 29/9 29/15 46/2
**Adam's [1]** 45/21
**add [1]** 13/7
**added [1]** 61/11
**additional [5]** 17/5 18/23 19/21 20/13 68/14
**address [10]** 6/4 6/11 10/22 10/23 10/24 22/20 46/15 50/16 50/22 65/15
**addressed [2]** 7/8 35/2
**addressing [8]** 5/6 5/8 5/18 10/6 10/12 21/15 21/18 24/17
**adjust [1]** 7/5
**admissible [1]** 60/2
**adopted [1]** 60/12
**advance [1]** 31/20
**advantageous [1]** 62/22
**affirmative [1]** 40/18
**Afnan [1]** 49/24
**after [8]** 15/25 26/15 33/24 41/5 47/17 50/21 56/12 67/24
**again [17]** 13/20 24/11 27/19 37/11 37/16 38/7 43/6 45/3 45/9 50/7 60/10 62/21 63/12 63/20 66/5 68/24 69/4
**agenda [11]** 5/16 6/3 6/16 7/1 7/21 7/25 8/7 8/23 9/2 9/10 10/2
**ago [6]** 22/17 35/4 35/22 39/20 43/14 57/23
**agree [34]** 16/18 16/19 20/12 28/23 29/23 30/5 30/20 31/8 31/11 47/3 54/20 55/7 57/15 57/17 58/1 60/16 60/18 62/3 62/23 63/12 63/13 63/24 64/1 64/13 64/13 64/15 64/15 65/11 65/12 65/19 66/10 66/17 66/17 67/6
**agreed [12]** 19/22 40/3 40/18 48/13 55/4 55/11 57/4 62/22 64/4 64/6 65/16 65/16
**agreed-upon [2]** 19/22 40/3
**agreeing [3]** 55/14 62/1 62/7
**agreement [1]** 69/24
**agreements [1]** 34/12
**agrees [2]** 16/6 62/20
**ahead [7]** 9/6 13/19 35/12 41/22 41/25 52/1 67/9
**aided [1]** 1/24
**ALEXANDER [1]** 2/13
**ALEXIA [1]** 2/21
**ALFANO [1]** 3/5
**alkalinity [2]** 44/9 46/6
**all [90]**
**allow [1]** 31/21
**allowed [1]** 45/5
**almost [1]** 63/23
**along [7]** 16/9 25/21 32/10 50/14 56/13 64/20 67/9
**already [24]** 9/17 12/7 12/12 15/7 17/13 18/15 20/2 20/7 20/17 26/6 26/8 34/3 42/21 43/3 43/9 43/12 43/15 43/16 44/12 44/15 46/3 46/10 68/21 68/25
**also [16]** 4/22 5/8 10/15 13/15 15/19 17/14 20/7 32/11 32/12 42/18 45/12 49/16 49/23 53/3 54/16 58/4
**alternatives [1]** 66/2
**always [4]** 26/12 59/24 64/4 65/4
**am [3]** 21/20 24/19 65/20
**AmerisourceBergen [1]** 4/4
**amine [1]** 43/2
**among [1]** 40/10
**amount [3]** 28/6 57/4 63/15
**amounts [1]** 53/8
**analyses [3]** 21/14 32/16 48/22
**analysis [15]** 21/10 25/6 27/16 32/3 32/8 33/7 33/14 33/16 34/15 40/12 43/16 44/2 44/25 47/8 56/4
**Anderson [4]** 6/7 6/8 6/17 7/14
**ANDREW [1]** 4/6
**another [9]** 8/4 12/3 27/22 28/3 36/7 36/8 56/21 58/7 69/25
**answer [1]** 40/9
**any [43]** 6/21 7/16 9/15 12/6 12/8 12/24 12/25 13/6 14/17 14/21 14/22 15/25 18/25 19/25 20/3 20/9 20/14 24/7 24/9 24/10 24/15 28/5 30/6 34/8 34/9 41/11 41/13 43/7 43/9 48/14 50/2 50/22 51/22 54/3 59/19 59/20 59/20 60/5 60/22 64/2 68/2 69/11 72/4
**anymore [1]** 57/14
**anyone [1]** 31/3
**anything [18]** 8/18 15/16 18/8 19/10 21/5 26/1 30/20 39/1 49/21 50/3 51/3 65/5 68/7 70/1 70/13

**A**

**anything... [3]** 71/2 71/5 71/25
**anyway [1]** 20/20
**anywhere [1]** 38/24
**apart [1]** 9/13
**API [7]** 53/6 53/19 55/17 58/20 58/22 65/25 67/5
**apologies [3]** 5/19 9/7 15/18
**apologize [3]** 41/10 45/22 46/2
**apparently [1]** 36/18
**appeal [1]** 36/8
**Appearances [2]** 2/24 3/25
**apply [1]** 59/14
**appreciate [2]** 48/6 70/2
**appropriate [3]** 14/8 15/16 66/18
**approved [1]** 18/16
**ARCHER [1]** 3/2
**are [116]**
**area [1]** 56/21
**aren't [1]** 49/10
**argue [5]** 29/20 31/15 37/24 40/24 56/16
**arguing [3]** 38/14 41/5 57/9
**argument [7]** 30/24 38/15 41/2 41/16 41/18 44/5 57/16
**arose [1]** 47/17
**ARPS [2]** 2/8 2/12
**aside [3]** 12/14 15/2 36/15
**ask [9]** 20/7 20/22 31/11 32/1 35/17 35/18 54/8 60/15 66/9
**asked [12]** 29/24 34/14 34/20 35/10 40/14 49/24 50/1 53/5 60/20 65/19 69/9 70/6
**asking [8]** 29/18 29/25 31/9 52/11 61/15 61/15 63/4 66/18
**assessments [1]** 26/4
**assume [2]** 10/7 53/23
**assumed [3]** 32/21 38/25 39/7
**assuming [2]** 50/3 50/4
**assumption [2]** 13/21 30/10
**assure [1]** 18/11
**astounding [1]** 40/22
**Atlanta [1]** 3/10
**attachment [1]** 9/9
**attack [1]** 41/14
**attempted [1]** 14/1
**attempting [1]** 18/21
**attorney [1]** 64/2
**Aurobindo [1]** 4/15
**Aurolife [1]** 4/14
**available [3]** 16/2 64/5 68/16
**Avenue [4]** 2/17 2/21 4/6 4/10
**avenues [1]** 42/17
**average [5]** 52/9 55/24 56/4 58/21 60/18
**averages [2]** 56/25 58/19
**Avila [1]** 4/25
**avoid [3]** 26/20 43/13 66/3
**aware [8]** 12/13 14/19 42/25 58/14 59/14 59/16 62/21 68/17
**away [1]** 30/6

**B**

**back [22]** 5/24 12/5 22/25 24/25 25/7 25/10 25/22 26/18 28/22 31/5 31/15 34/11 36/1 36/24 37/21 38/7 40/5 45/4 46/19 53/16 68/3 70/17
**backdating [1]** 18/16
**bad [2]** 49/2 49/3
**ball [1]** 40/16
**ball's [1]** 31/7
**BARNES [1]** 3/20
**based [14]** 9/11 24/2 24/24 27/6 30/1 31/1 49/4 53/9 55/6 56/12 56/18 56/24 61/8 69/17
**bases [1]** 48/13
**basic [1]** 22/16
**basically [1]** 61/1
**basis [5]** 6/14 8/5 25/17 46/25 48/21
**batch [4]** 23/10 27/17 48/7 49/18
**became [3]** 21/22 62/17 69/21
**because [54]** 10/25 11/9 13/21 14/20 17/11 18/20 24/11 24/23 25/3 26/19 27/3 27/5 27/21 30/3 33/1 36/6 36/7 36/19 38/5 38/10 38/12 38/23 39/1 39/7 39/12 40/16 40/25 43/3 44/10 44/25 45/1 46/14 46/17 47/3 48/19 48/23 50/3 50/23 52/18 54/14 55/5 56/17 58/11 59/12 61/7 63/9 64/16 64/21 65/21 65/24 66/3 66/5 68/9 72/1
**become [2]** 55/2 59/16
**becoming [2]** 12/13 59/13
**been [53]** 7/9 7/21 7/24 8/22 11/16 13/21 18/19 19/18 22/17 25/1 25/25 26/16 26/25 28/5 30/1 30/9 32/11 32/18 33/23 34/19 34/19 37/15 39/3 41/6 42/14 42/25 44/16 47/10 47/23 48/22 48/24 49/2 49/13 49/25 50/10 50/11 51/14 52/5 52/7 53/7 53/10 53/13 53/20 53/20 53/21 55/14 55/14 57/21 59/18 59/24 60/10 66/6 69/12
**before [20]** 5/1 8/5 9/12 12/14 17/21 17/25 22/19 22/19 26/1 39/12 40/1 42/14 47/16 49/3 54/9 60/8 61/17 61/24 68/4 69/21
**begin [2]** 9/19 18/20
**beginning [2]** 7/19 26/3
**behalf [2]** 52/2 54/20
**being [21]** 23/2 23/3 23/6 26/4 26/7 26/15 26/19 29/21 29/24 35/5 48/24 49/9 54/5 57/21 58/24 59/13 60/12 64/9 65/19 68/10 69/25
**believe [30]** 6/17 6/20 9/7 12/4 17/2 17/9 17/11 17/14 18/2 20/14 23/6 23/21 24/1 24/8 24/15 29/3 29/5 29/13 34/7 41/10 46/16 46/23 48/21 51/14 51/18 51/25 52/3 52/15 66/4 67/15
**bellwether [15]** 10/18 11/6 12/20 13/2 13/10 14/8 14/9 14/11 15/24 16/3 19/6 19/17 51/13 62/18 69/3
**bellwethers [1]** 59/20
**benefit [9]** 13/12 13/15 17/19 17/21 17/24 18/4 18/6 19/17 39/15
**BERNARDO [5]** 2/9 57/19 62/21 63/10 63/23
**BERNE [1]** 4/2
**best [2]** 22/12 56/5
**better [6]** 13/14 30/5 31/14 45/5 47/21 56/17
**between [5]** 17/1 28/12 34/12 37/5 52/10
**beyond [3]** 64/10 66/1 68/24
**bicker [1]** 58/2
**big [5]** 25/22 30/7 31/4 37/5 42/23
**bit [7]** 18/19 28/9 39/19 48/15 50/23 52/25 58/18
**BOCKIUS [1]** 4/12
**bomb [1]** 66/5
**bombs [2]** 64/20 64/21
**books [1]** 50/18
**BOSICK [1]** 3/5
**both [7]** 7/23 17/23 37/23 56/19 57/4 62/22 62/23
**bothering [1]** 18/22
**bottles [1]** 55/20
**BRANCATO [1]** 2/21
**branded [1]** 42/11
**bridge [1]** 60/25
**brief [3]** 15/24 27/5 45/18
**briefed [1]** 15/25
**briefing [9]** 12/10 13/25 17/10 18/5 18/6 18/14 19/13 19/18 50/22
**briefly [2]** 18/10 59/11
**broad [1]** 37/23
**broader [1]** 12/17
**brought [1]** 45/9
**build [1]** 18/21
**Building [1]** 1/7
**built [2]** 9/16 12/12
**BUMB [5]** 1/10 4/24 5/2 6/4 71/5
**bunch [2]** 28/2 64/20
**burden [2]** 22/14 35/9
**burdensome [11]** 21/17 25/15 28/7 30/2 33/1 36/14 38/6 38/12 38/15 40/15 45/11
**business [1]** 27/25
**busted [1]** 57/7
**bye [2]** 72/19 72/19
**Bye-bye [1]** 72/19

**C**

**calculate [2]** 64/8 66/20
**calculated [2]** 54/5 67/5
**calculating [3]** 56/19 62/4 63/19
**calculation [15]** 53/17 53/24 54/1 54/15 54/21 56/5 60/6 60/8 61/16 61/22 64/22 65/9 65/25 68/24 69/8
**calculations [21]** 52/11 52/18 55/5 56/22 59/16 60/16 60/18 60/22 61/4 61/8 61/10 63/4 64/13 64/16 64/19 66/17 67/4 67/7 68/24 70/5 70/6
**calendar [3]** 12/3 15/2 71/19
**call [3]** 6/4 15/13 59/22
**called [3]** 42/13 43/2 44/9
**Camden [1]** 1/8
**came [2]** 38/6 53/16
**Camp [1]** 1/18
**can [86]**
**can't [10]** 14/22 21/2 29/4 29/12 30/5 63/9 66/8 66/15 67/17 70/1
**Canal [1]** 2/13
**cancer [5]** 12/21 12/22 17/8 17/8 19/8
**cannot [1]** 70/7
**Cardinal [1]** 4/7
**Career [1]** 4/23
**CARR [1]** 2/5
**cart [1]** 41/1
**case [43]** 1/5 5/23 6/17 6/21 6/22 7/9 7/16 7/22 7/23 8/5 8/7 9/20 12/3 13/4 13/13 14/17 14/23 14/25 15/2 16/1 16/9 17/9 18/5 18/22 19/16 30/8 30/9 31/2 39/20 44/24 55/9 56/11 57/6 57/7 60/3 60/3 60/8 60/24 63/1 64/18 65/23 69/8 69/12
**cases [27]** 7/16 7/19 7/21 7/23 8/2 8/6 9/16 11/17 12/1 12/17 12/18 14/20 15/20 15/24 16/2 16/16 16/19 17/4 17/5 18/1 18/7 19/12 59/14 59/19 59/20 69/4 69/11
**causation [5]** 19/8 35/4 62/16 62/18 69/22
**cause [5]** 7/2 7/8 7/11 7/15 8/14
**caution [3]** 14/24 15/8 60/11
**Center [1]** 3/17
**Centre [2]** 3/6 4/13
**certain [3]** 43/13 57/24 58/4
**certainly [5]** 18/14 24/7 35/10 48/3 60/5
**certificate [6]** 32/8 33/14 33/16 42/4 48/22 72/21
**certificates [15]** 21/10 21/14 25/6 27/16 32/3 32/16 33/7 34/15 40/11 40/11 43/16 43/16 44/2 44/25 47/8
**certify [1]** 72/23
**cGMP [1]** 49/24
**chad [1]** 66/24
**chance [2]** 13/14 53/1
**changed [1]** 46/24
**changes [1]** 70/19
**characteristics [1]** 32/10
**chart [1]** 54/8
**chase [1]** 36/9
**check [1]** 57/14
**chemicals [3]** 26/7 32/12 32/13
**cherry [1]** 43/24
**cherry-picked [1]** 43/24
**Chicago [3]** 2/14 3/14 4/17
**CHIEF [3]** 1/10 4/24 5/2
**chime [1]** 52/16
**China [3]** 22/8 32/18 39/5
**Chinese [12]** 23/12 24/12 24/14 27/20 33/17 33/25 44/3 44/4 46/22 49/8 50/20 50/25
**chloride [2]** 42/6 42/10
**choose [1]** 16/2
**CHRISTINE [1]** 3/17
**Cincinnati [1]** 4/4
**circumstances [1]** 31/21
**cited [1]** 41/11
**CIVIL [1]** 1/3
**claim [1]** 46/17
**claims [3]** 13/24 14/3 54/6
**clarify [4]** 8/13 9/8 27/15 41/8
**Clarissa [2]** 4/23 71/19
**Class [2]** 1/19 2/4
**cleanest [1]** 13/3
**clear [6]** 11/16 21/22 28/23 55/3 62/17 69/6
**clearly [1]** 36/23
**clerk [2]** 4/23 71/18
**client [6]** 21/22 21/24 53/2 59/1 59/3 70/19

C

**clients [1]** 68/22
**close [2]** 14/21 25/20
**closer [1]** 16/7
**CMC [2]** 54/13 71/9
**Co [6]** 1/16 1/19 2/4 2/10 2/14 2/18
**Co-Lead [3]** 1/16 1/19 2/4
**COA [7]** 22/2 27/22 33/19 33/20 41/10 41/13 41/15
**COAs [44]** 21/24 22/9 23/2 23/3 23/10 23/13 23/25 24/3 24/5 24/10 24/11 24/13 24/16 27/14 27/16 27/20 28/14 28/19 28/20 28/25 29/10 30/10 33/22 33/25 34/1 34/3 34/3 34/7 34/9 38/9 41/15 45/23 46/1 46/3 46/13 46/16 46/18 46/18 46/20 46/22 49/15 50/1 50/7 59/7
**cobbled [1]** 18/12
**code [2]** 55/25 66/21
**codes [2]** 55/21 57/1
**COGHLAN [1]** 3/2
**Cohen [1]** 1/7
**colleagues [2]** 47/21 47/24
**collect [1]** 58/5
**collectively [7]** 2/11 2/15 2/19 2/23 3/11 3/15 3/19
**colloquy [1]** 41/24
**combined [1]** 42/20
**come [8]** 19/22 26/18 27/17 27/19 27/25 53/24 55/16 62/23
**comfortable [3]** 45/15 65/20 68/19
**coming [6]** 15/15 20/18 23/19 27/4 34/18 49/18
**Commencing [1]** 1/9
**common [1]** 14/20
**companies [3]** 24/14 44/4 44/4
**company [5]** 24/2 33/17 58/12 65/17 68/17
**company's [1]** 48/11
**complaint [1]** 6/19
**complete [3]** 18/19 19/13 25/13
**complicated [1]** 13/25
**compromise [1]** 31/9
**computer [1]** 1/24
**computer-aided [1]** 1/24
**concern [3]** 11/18 22/18 60/23
**concerning [1]** 6/7
**conclude [1]** 52/15
**concluded [1]** 72/20
**concrete [1]** 14/18
**condensation [1]** 19/14
**condensed [3]** 17/10 20/5 20/5
**condenses [1]** 19/12
**conditions [1]** 42/19
**conduct [1]** 15/23
**confer [11]** 8/4 8/4 8/21 20/13 20/23 50/11 52/7 60/17 60/21 61/9 64/25
**conference [9]** 1/5 5/24 6/23 7/9 7/16 8/5 8/8 9/20 71/9
**conferred [1]** 59/18
**confers [1]** 9/11
**confirm [9]** 38/9 54/9 57/1 61/16 63/4 64/12 68/16 68/17 68/25
**confirmed [4]** 52/18 61/7 61/9 68/21
**confirming [1]** 68/19
**conflict [1]** 72/1
**confused [1]** 34/23
**CONLEE [1]** 1/17
**connection [1]** 57/23
**consider [1]** 59/18
**consideration [1]** 41/4
**considered [2]** 13/20 39/6
**consistent [8]** 16/3 23/11 24/12 27/20 33/17 34/2 46/22 51/18
**constituent [1]** 26/6
**constituents [1]** 32/13
**constraints [1]** 20/2
**contain [1]** 46/13
**contaminated [1]** 66/12
**contamination [13]** 52/5 52/10 55/6 55/16 55/18 55/24 56/6 57/4 62/11 62/24 66/11 66/20 69/17
**content [3]** 23/17 28/19 30/16
**contents [1]** 32/8
**contested [1]** 5/25
**context [8]** 33/3 39/19 40/14 44/9 45/16 46/5 59/19 62/18
**continue [1]** 8/3
**continued [7]** 2/1 2/24 3/1 3/25 4/1 28/21 46/17
**contrary [1]** 34/1
**contribute [1]** 10/15
**controversial [1]** 60/3
**Convention [1]** 39/5
**conversation [2]** 40/23 70/20
**conversion [1]** 53/24
**convert [2]** 53/18 65/25
**Cooper [1]** 1/7
**cooperation [2]** 61/2 66/15
**cooperatively [1]** 65/1
**core [1]** 7/18
**COREY [1]** 4/19
**Corp [1]** 4/11
**corporate [1]** 42/23
**correct [5]** 8/11 8/16 57/22 61/10 72/23
**could [19]** 11/12 20/4 26/22 28/21 28/25 39/4 42/5 43/8 43/11 44/20 44/22 46/11 53/7 55/25 56/4 63/5 65/11 69/20 72/9
**couldn't [4]** 29/23 38/24 50/2 71/12
**counsel [30]** 1/16 1/19 2/4 2/7 2/10 2/14 2/18 2/22 3/4 3/7 3/10 3/14 3/18 3/22 4/4 4/7 4/11 4/14 4/18 10/14 13/9 17/4 17/20 22/23 25/22 29/18 55/10 56/12 62/13 69/14
**counsel's [1]** 24/22
**country [1]** 33/21
**couple [3]** 11/23 58/6 63/20
**course [9]** 22/21 25/14 27/25 35/14 45/10 46/18 48/4 68/13 70/24
**court [32]** 1/1 1/21 6/15 7/6 7/7 8/10 9/8 11/12 12/3 12/7 16/1 16/6 16/8 16/11 18/21 18/22 19/5 19/16 19/19 20/3 20/10 24/13 31/7 31/17 39/23 55/12 55/14 57/9 59/5 61/24 72/21 73/3
**Court's [1]** 12/1
**Courthouse [1]** 1/7
**Courtroom [1]** 4/23
**courts [1]** 13/9
**CRC [1]** 73/2
**create [3]** 43/4 43/5 54/11
**created [4]** 43/2 53/11 61/16 61/17
**creating [1]** 56/21
**critical [1]** 36/10
**cross [1]** 60/24
**CROWELL [1]** 4/5
**CRR [1]** 73/2
**cumbersome [5]** 21/17 22/8 23/8 28/7 36/13
**current [1]** 22/23
**currently [1]** 6/18
**custodial [1]** 70/14
**custom [1]** 49/11
**cut [2]** 36/9 40/4
**CVS [1]** 3/22

D

**D'LESLI [1]** 4/9
**D.C [2]** 2/4 2/18
**Dallas [1]** 4/11
**damaging [3]** 43/12 44/17 46/21
**DANIEL [12]** 2/2 5/8 10/7 10/11 10/17 10/22 16/13 16/22 20/11 51/8 51/8 52/16
**Daniels [1]** 7/23
**Darren [1]** 7/23
**data [5]** 32/11 55/6 64/23 65/16 68/18
**date [5]** 13/14 14/21 15/13 20/18 35/22
**dates [5]** 15/14 15/15 16/8 17/18 18/4
**dating [1]** 46/19
**DAVID [2]** 1/18 39/18
**Davidson's [1]** 21/16
**DAVIS [2]** 3/8 4/9
**day [1]** 72/1
**DC [2]** 4/7 4/20
**deadline [1]** 20/9
**deadlines [6]** 16/22 16/25 18/13 18/15 19/1 21/4
**deal [8]** 25/20 33/6 37/2 60/4 64/11 66/25 67/16 68/2
**dealing [5]** 10/4 13/22 37/16 55/11 60/25
**deals [3]** 10/2 21/10 70/13
**decade [1]** 46/19
**December [1]** 40/2
**December 23 [1]** 40/2
**decide [1]** 63/18
**decided [4]** 12/5 21/3 21/3 40/4
**deciding [1]** 15/15
**deeper [1]** 65/10
**defend [1]** 42/5
**defendant [7]** 3/7 4/7 4/11 4/18 4/21 57/24 58/8
**defendants [43]** 2/10 2/14 2/18 2/22 3/4 3/10 3/14 3/18 3/22 4/4 4/14 6/20 7/10 7/15 7/22 8/3 13/1 15/22 16/20 16/23 16/25 17/18 19/21 21/6 30/12 36/13 40/8 40/9 40/15 40/24 51/12 51/19 52/8 52/11 53/3 54/12 54/16 54/20 59/11 59/21 64/24 68/14 68/19
**defendants' [8]** 6/3 9/2 9/14 17/1 17/15 17/17 17/20 41/2
**defense [8]** 10/13 11/16 11/16 17/20 21/15 41/12 67/14 69/9
**deficiencies [5]** 6/5 6/5 7/9 8/19 9/2
**deficiency [5]** 5/15 6/7 6/9 6/20 7/18
**degradation [1]** 44/23
**degrade [1]** 42/19
**depending [1]** 68/3
**deposed [1]** 49/23
**deposing [2]** 25/5 41/19
**deposition [8]** 38/8 66/9 66/18 67/13 67/21 67/23 69/15 70/3
**depositions [18]** 17/3 17/19 17/21 17/24 17/25 30/11 30/12 33/9 36/3 41/5 41/12 42/23 43/7 43/13 67/24 68/14 69/7 69/21
**Deputy [1]** 4/23
**describe [1]** 53/17
**desire [1]** 21/11
**destroyed [2]** 47/16 47/17
**details [1]** 48/15
**determination [1]** 14/6
**determine [5]** 50/21 54/3 58/19 59/9 68/25
**determined [1]** 54/2
**developed [2]** 12/22 26/3
**dicker [1]** 39/22
**did [25]** 6/11 9/8 9/9 26/6 28/23 29/8 30/20 32/15 32/17 35/17 35/17 39/1 42/12 42/12 43/10 44/12 47/15 50/3 50/4 56/23 58/5 59/2 63/6 64/25 67/4
**didn't [35]** 11/11 15/7 18/14 23/5 25/2 25/4 25/4 25/12 26/21 28/18 30/14 32/21 32/25 33/2 33/3 36/3 36/25 38/2 38/2 38/5 38/8 38/11 38/11 38/12 38/19 38/20 38/24 38/25 38/25 39/6 40/16 44/24 45/1 45/2 64/7
**diethylamine [1]** 30/17
**difference [1]** 16/25
**different [15]** 11/14 24/10 24/16 26/25 28/3 33/20 33/23 37/9 46/20 48/24 50/25 53/14 57/1 58/11 67/4
**differently [1]** 64/22
**difficult [5]** 10/5 12/13 12/25 20/1 62/5
**dimethylamine [11]** 30/17 42/18 42/20 42/20 43/1 43/8 44/8 44/11 44/20 46/13 49/6
**dimethylformamide [1]** 42/13
**directly [4]** 55/3 59/11 60/11 68/2
**disadvantage [1]** 26/13
**disagree [7]** 16/24 58/10 58/17 59/8 61/20 63/13 63/16
**disagreement [3]** 28/5 28/12 29/10
**disclosed [1]** 27/7
**disclosures [1]** 45/7
**disconnect [3]** 35/17 37/5 64/3
**discovered [1]** 23/8
**discovery [17]** 5/15 15/23 18/19 18/20 20/8 20/17 23/1 25/10 26/16 29/24 30/7 32/14 32/15 32/23 39/20 39/25 44/19
**discuss [1]** 47/25
**discussed [3]** 14/7 29/7 68/10
**discussing [4]** 6/18 23/9 32/11 52/5
**discussion [2]** 23/4 37/10
**discussions [5]** 24/25 34/13 53/2 57/21 60/10
**dismissal [2]** 51/12 51/16
**dismissed [1]** 51/14

**D**

**dispose [1]** 71/25
**disposed [1]** 31/19
**dispositive [2]** 6/10 31/10
**dispute [6]** 6/6 6/8 29/12 56/21 65/5 69/5
**disputes [1]** 40/6
**disputing [1]** 37/8
**distributor [1]** 42/9
**DISTRICT [4]** 1/1 1/1 1/10 5/2
**DMA [5]** 43/1 43/17 46/4 46/5 46/8
**DMF [11]** 42/13 42/16 42/17 42/18 43/10 43/11 43/17 44/23 44/23 46/4 46/8
**document [14]** 24/4 35/21 36/19 37/8 37/22 39/25 40/2 40/3 40/8 47/15 47/19 47/22 49/13 50/5
**documentation [1]** 50/2
**documented [1]** 45/4
**documents [31]** 23/14 25/15 27/4 29/5 29/19 29/22 29/25 30/2 30/3 30/17 30/23 31/1 31/4 35/18 36/11 36/15 41/19 44/9 44/18 45/7 47/1 47/1 47/14 48/21 50/8 50/12 53/10 58/2 59/6 63/15 69/18
**does [5]** 9/3 11/5 29/13 70/15 71/19
**doesn't [8]** 9/15 35/7 36/7 54/4 57/9 62/10 62/13 65/24
**doing [10]** 23/23 29/1 45/15 50/6 52/14 57/7 62/14 62/20 65/21 71/11
**done [18]** 21/17 22/12 22/14 26/5 31/21 39/9 39/10 41/6 44/11 53/24 57/8 57/18 64/22 66/16 68/25 69/20 70/5 70/6
**dose [16]** 53/20 54/2 54/5 54/7 55/18 55/19 55/25 56/1 61/16 62/4 62/8 62/9 62/10 62/10 66/21 67/5
**doubt [1]** 39/16
**down [1]** 63/3
**downstream [1]** 51/12
**Dr. [6]** 35/3 35/3 44/21 46/10 46/11 49/24
**Dr. Afnan [1]** 49/24
**Dr. Hecht [4]** 35/3 44/21 46/10 46/11
**Dr. Najafi [1]** 35/3
**Drive [1]** 3/13
**drop [1]** 29/24
**dropped [1]** 40/16
**due [8]** 12/14 17/22 17/25 23/17 24/3 35/8 52/16 52/20
**dumb [2]** 58/24 64/9
**during [5]** 19/9 26/10 32/14 33/8 44/23

**E**

**each [16]** 7/20 12/19 15/24 22/2 24/21 50/19 53/12 53/12 53/13 55/25 56/11 56/25 57/1 63/1 65/17 69/8
**earlier [5]** 15/7 15/20 33/23 37/15 71/23
**early [3]** 21/4 55/1 62/22
**easiest [1]** 60/14
**easily [2]** 12/23 46/11
**eastern [1]** 71/17
**easy [3]** 64/6 65/23 70/9
**Economic [2]** 1/19 2/4
**effect [1]** 72/10
**efficiencies [1]** 13/8
**efficiency [1]** 11/4
**efficient [7]** 11/3 18/3 31/16 64/18 65/2 65/3 66/13
**Eisenhower [1]** 1/15
**Either [1]** 26/3
**element [1]** 54/6
**ELIZABETH [1]** 4/9
**ELLIS [2]** 2/16 2/20
**else [10]** 15/16 18/8 21/5 30/20 38/1 38/2 51/3 70/13 71/2 71/5
**elsewhere [1]** 19/15
**elucidating [1]** 44/8
**EMERICH [1]** 2/5
**enable [1]** 12/2
**encompassed [3]** 15/18 35/21 37/24
**encompassing [1]** 37/23
**end [7]** 22/1 22/11 23/6 47/9 52/17 62/1 71/5
**endeavored [1]** 58/5
**ended [1]** 23/1
**engage [1]** 64/7
**engaged [1]** 25/19
**English [1]** 50/12
**enough [3]** 26/22 44/10 65/10
**entered [3]** 9/12 40/3 43/12
**entire [1]** 35/5
**entitled [2]** 31/12 72/24
**equipment [1]** 22/4
**errant [1]** 15/6
**ESQUIRE [26]** 1/14 1/17 1/18 2/2 2/3 2/6 2/9 2/13 2/17 2/21 3/2 3/5 3/8 3/9 3/13 3/17 3/21 4/2 4/6 4/9 4/9 4/13 4/16 4/19 4/23 4/25
**essentially [2]** 62/3 62/7
**establish [6]** 54/6 62/25 66/20 69/8 69/16 69/19
**estimate [2]** 55/7 58/21
**evaluate [3]** 26/6 49/25 60/6
**evaluation [1]** 50/6
**eve [2]** 14/25 15/5
**even [8]** 25/2 41/11 41/13 45/12 54/9 58/24 61/17 69/10
**event [1]** 68/2
**ever [5]** 28/5 33/18 39/6 50/2 69/9
**every [9]** 27/17 27/21 28/24 37/7 42/7 48/7 48/7 57/6 64/18
**everybody [3]** 31/12 40/6 48/13
**everyone [1]** 7/4
**everything [6]** 18/17 26/21 36/2 45/25 50/10 56/25
**evidence [9]** 11/7 24/9 33/18 33/22 33/24 34/1 36/14 36/17 46/20
**exacerbated [1]** 18/19
**exact [4]** 33/8 38/21 49/5 49/15
**exactly [1]** 65/22
**examine [1]** 60/7
**example [1]** 44/21
**Except [1]** 8/13
**exchanged [2]** 9/17 69/18
**exemplar [1]** 23/10
**exemplars [1]** 34/16
**exercise [1]** 64/7
**exist [8]** 34/10 35/19 35/25 36/12 36/15 36/23 38/25 48/23
**existed [1]** 39/12
**exists [1]** 50/24
**expect [1]** 31/3
**expectation [2]** 44/14 59/24
**expected [1]** 48/10
**expert [35]** 15/23 17/7 17/19 17/21 17/22 17/24 17/25 18/14 19/7 23/17 30/12 33/8 36/3 41/5 49/24 52/15 53/25 54/1 54/10 60/2 61/15 61/17 61/17 61/19 61/21 62/4 62/7 63/22 63/25 64/1 64/11 65/21 66/4 66/24 67/6
**expert's [3]** 40/25 54/9 60/7
**experts [41]** 23/18 25/5 29/20 30/11 34/17 34/17 34/18 34/25 35/2 35/3 38/23 41/9 41/11 41/12 41/13 41/14 41/20 44/21 46/9 47/2 52/19 53/3 53/23 54/2 54/17 54/22 56/8 56/16 56/20 56/22 59/8 60/5 61/25 61/25 64/17 64/21 65/7 65/8 65/21 67/15 70/6
**explain [3]** 25/11 27/4 28/25
**explained [3]** 45/15 63/6 63/6
**explanation [1]** 45/21
**exposed [1]** 57/5
**exposure [1]** 12/20
**extending [1]** 7/19
**extensive [2]** 13/25 39/24
**extent [6]** 6/22 8/6 18/24 27/13 46/15 54/17

**F**

**fact [22]** 6/5 6/7 6/9 8/19 15/23 18/20 20/8 20/16 29/7 31/4 31/5 34/20 36/23 37/8 42/24 46/9 46/12 50/24 57/24 58/8 58/13 60/1
**factor [1]** 18/14
**facts [2]** 11/14 31/20
**factual [6]** 17/3 29/12 50/24 56/9 59/3 67/7
**factually [2]** 67/6 67/7
**fairness [1]** 18/11
**faith [1]** 29/8
**FALANGA [1]** 3/16
**FALKENBERG [1]** 4/16
**false [1]** 29/5
**far [9]** 9/13 44/7 47/14 49/21 50/10 50/12 65/1 67/25 68/17
**FARR [2]** 2/5 2/5
**fault [1]** 35/9
**favorable [1]** 31/3
**favorably [1]** 15/1
**feasible [1]** 39/3
**February [1]** 10/4
**February 14th dealing [1]** 10/4
**FEDERAL [1]** 72/21
**feel [3]** 19/3 59/2 68/10
**feeling [1]** 30/2
**feels [1]** 20/4
**felt [2]** 30/22 33/1
**few [6]** 14/9 20/9 25/22 42/12 44/8 47/10
**fight [2]** 30/21 62/24
**figure [7]** 15/6 33/6 55/5 57/3 57/7 64/7 66/11
**figured [2]** 55/23 63/3
**file [1]** 70/14
**filed [2]** 47/17 51/15
**fills [1]** 57/1
**final [2]** 29/17 56/23
**finalize [1]** 9/18
**find [6]** 25/24 38/21 38/24 49/5 51/11 65/4
**finding [1]** 12/16
**fine [4]** 31/14 46/14 51/1 64/14
**finer [1]** 29/17
**finish [2]** 60/21 61/1
**finished [7]** 53/20 55/18 55/19 55/25 56/1 66/21 67/5
**firm [1]** 22/23
**firmly [1]** 38/23
**first [13]** 6/3 6/11 7/6 7/20 10/25 11/9 11/10 11/11 14/9 23/19 52/17 55/16 59/22
**fit [1]** 12/14
**fitting [1]** 18/17
**flag [1]** 16/10
**flagged [1]** 12/9
**fleshed [2]** 37/6 37/15
**FLOM [2]** 2/8 2/12
**Floor [5]** 2/3 2/13 3/6 3/17 4/13
**Florida [1]** 2/7
**focus [1]** 42/23
**focused [1]** 30/20
**focusing [1]** 27/15
**follow [3]** 70/21 70/21 70/23
**following [1]** 12/1
**follows [1]** 5/4
**force [2]** 67/3 67/17
**forced [1]** 69/25
**foregoing [1]** 72/23
**form [2]** 6/19 42/21
**formalizing [1]** 7/11
**formally [1]** 32/17
**forth [7]** 22/25 24/25 28/22 36/24 37/21 40/5 45/4
**forward [10]** 8/9 14/23 21/4 21/11 21/14 23/20 34/14 34/22 56/20 60/13
**fought [1]** 56/9
**found [7]** 25/5 30/13 32/9 33/7 33/15 33/21 44/2
**four [5]** 16/19 17/3 17/5 19/11 67/23
**frame [1]** 16/19
**framework [1]** 57/8
**frankly [1]** 47/9
**FREEMAN [1]** 1/14
**Friday [3]** 20/23 71/12 71/12
**front [1]** 29/23
**fruitful [1]** 39/6
**frustrating [1]** 62/16
**frustration [1]** 25/14
**FULBRIGHT [1]** 4/8
**full [6]** 17/19 18/4 19/17 30/23 44/14 50/6
**fully [4]** 19/18 44/7 58/7 63/13
**fundamental [6]** 25/18 28/12 29/10 39/16 64/18 66/22
**fundamentally [2]** 30/8 30/22
**further [3]** 18/13 19/12 46/12

**G**

**gain [1]** 13/4
**gain-information [1]** 13/4
**game [2]** 40/23 41/5
**GANNON [1]** 3/17
**Garcia [1]** 51/15
**Gateway [1]** 3/17
**gave [5]** 45/6 45/8 53/14 59/3 70/19
**general [2]** 35/2 35/4
**generated [1]** 32/4
**GEOPPINGER [1]** 4/2

**G**

**GEORGE [5]** 2/6 5/8 52/1 52/2 54/24
**Georgia [1]** 3/10
**gets [2]** 48/20 54/15
**getting [6]** 16/9 21/23 22/8 22/10 38/7 39/15
**give [15]** 16/11 17/18 18/4 19/21 23/18 26/21 29/19 30/14 31/7 32/22 39/7 42/19 44/16 45/11 45/13
**given [9]** 9/15 20/2 26/10 26/25 29/21 33/25 43/24 44/7 54/7
**gives [1]** 16/8
**giving [3]** 27/3 39/14 45/1
**global [3]** 8/5 8/21 19/25
**goal [2]** 11/15 12/15
**goes [2]** 34/11 61/24
**GOLDENBERG [2]** 2/2 2/3
**gone [4]** 25/21 31/2 31/4 34/6
**good [6]** 6/24 29/8 51/20 55/11 58/21 71/19
**Gorda [1]** 2/7
**GORDON [1]** 3/5
**got [15]** 17/3 26/21 26/22 30/10 32/22 37/5 38/9 38/11 40/6 44/14 55/22 56/14 57/13 69/22 70/10
**gotten [2]** 30/24 66/7
**Grant [1]** 4/13
**granular [1]** 42/3
**great [5]** 6/24 8/12 8/24 60/4 72/5
**GREENBERG [2]** 3/8 3/12
**GREGORY [1]** 3/13
**GREINER [1]** 3/2
**ground [1]** 41/14
**guess [4]** 20/1 33/16 47/15 53/17
**guessing [1]** 49/10
**guesswork [1]** 66/14
**guidance [3]** 16/12 18/25 19/25

**H**

**HACKETT [1]** 2/5
**Hague [2]** 32/18 39/4
**handle [2]** 6/13 10/23
**handled [1]** 13/9
**handling [1]** 5/15
**hands [1]** 38/19
**hanging [1]** 66/24
**happen [3]** 18/5 19/23 60/24
**happened [7]** 24/6 27/6 37/20 42/15 42/16 42/22 50/2
**happening [2]** 14/19 14/22
**happens [1]** 14/23
**happy [4]** 7/5 18/25 49/9 63/16
**hard [2]** 70/9 70/10
**HARKINS [4]** 3/9 5/11 60/23 68/8
**has [27]** 7/9 7/21 11/16 12/7 16/22 17/10 18/19 20/3 21/2 26/5 28/10 29/9 29/12 31/2 34/19 47/9 50/11 50/19 53/6 58/12 59/3 59/24 60/23 61/17 63/6 63/14 65/17
**hatched [1]** 40/7
**have [199]**
**haven't [5]** 26/25 39/13 48/22 49/21 52/25
**having [10]** 18/13 19/16 22/14 23/15 40/23 48/16 59/5 61/22 64/20 66/3
**he [8]** 36/7 41/22 45/21 49/25 50/2 50/3 50/7 65/23
**he's [1]** 60/24
**Health [1]** 4/7
**Healthcare [3]** 2/11 2/15 2/19
**hear [2]** 24/24 37/12
**hearing [11]** 36/12 36/12 37/13 37/14 37/18 40/24 56/14 57/12 67/14 70/8 71/4
**Hecht [4]** 35/3 44/21 46/10 46/11
**held [4]** 5/1 23/20 31/5 31/15
**help [1]** 31/17
**helpful [4]** 19/24 20/6 31/17 50/13
**here [14]** 5/12 16/5 17/4 28/14 34/16 36/9 37/15 40/9 47/3 53/4 58/24 63/21 64/9 64/25
**here's [5]** 34/16 40/7 56/23 58/19 65/6
**hesitate [1]** 68/9
**highlight [1]** 63/20
**him [2]** 49/24 50/1
**historically [1]** 34/11
**history [2]** 31/2 39/13
**hit [1]** 33/4
**hold [1]** 48/12
**HOLMES [1]** 2/5
**honestly [1]** 33/3
**Honor [68]** 5/7 5/13 5/20 6/13 7/3 8/11 8/16 8/20 9/4 9/5 10/9 10/9 10/14 11/23 12/5 12/16 13/17 14/20 15/11 15/17 16/15 16/24 18/10 18/15 20/4 20/25 21/7 21/8 21/20 27/9 31/24 33/10 39/17 39/18 39/24 40/13 41/7 45/17 45/23 47/13 47/20 47/24 48/3 51/2 51/4 51/5 51/10 51/19 51/24 51/25 52/4 52/22 57/19 58/13 59/10 60/14 61/14 64/9 65/14 67/19 67/20 67/22 68/4 68/9 70/18 70/24 72/15 72/17
**HONORABLE [5]** 1/10 1/11 4/23 5/2 5/3
**hoop [1]** 69/25
**hope [2]** 49/19 52/14
**hopeful [1]** 52/18
**hopefully [1]** 61/2
**hoping [1]** 60/20
**however [2]** 36/7 47/2
**Huahai [6]** 2/10 2/11 2/14 2/15 2/18 2/19
**huge [1]** 69/12
**Humana [1]** 4/18
**HUNCHUCK [1]** 4/13
**hydrochloric [1]** 43/5
**hydrochloride [1]** 43/4

**I**

**I'd [8]** 6/2 36/1 36/1 40/21 47/11 47/18 49/9 65/11
**I'll [6]** 19/3 27/10 37/13 37/18 48/19 70/21
**I'm [55]** 9/6 11/17 12/12 14/10 14/18 14/19 14/21 14/24 15/1 20/22 21/13 22/5 24/23 26/14 27/15 32/6 34/23 35/1 35/6 35/6 35/7 35/12 36/12 36/12 37/13 37/14 37/18 40/22 40/24 41/7 41/23 42/6 49/10 50/3 50/4 50/15 54/11 56/1 57/12 57/15 57/20 58/24 61/14 61/19 62/5 62/6 62/13 64/1 64/9 65/12 65/14 67/14 69/2 70/7 71/4
**I've [1]** 15/7
**idea [3]** 18/13 38/5 56/8
**identical [3]** 12/18 23/11 27/22
**identification [1]** 9/2
**identified [4]** 12/16 53/9 53/12 58/6
**identify [3]** 11/25 16/8 58/1
**Illinois [3]** 2/14 3/14 4/17
**immediately [1]** 38/16
**impacts [1]** 10/25
**impaneled [1]** 15/8
**impasse [1]** 29/2
**implicated [1]** 60/12
**implicating [1]** 59/20
**important [4]** 19/4 19/4 26/11 55/9
**impossible [1]** 13/5
**impression [1]** 25/2
**impurities [3]** 30/18 32/9 43/11
**impurity [5]** 42/17 44/22 49/6 68/21 68/25
**inability [1]** 65/15
**inappropriate [1]** 38/17
**Inc [17]** 2/11 2/11 2/15 2/15 2/19 2/19 2/22 3/7 3/11 3/11 3/15 3/15 3/19 3/19 3/22 4/15 4/21
**inclined [3]** 14/10 21/13 31/1
**include [1]** 54/1
**included [1]** 67/24
**including [2]** 12/10 39/25
**Indianapolis [1]** 3/22
**indicate [1]** 63/15
**individual [9]** 12/11 12/21 18/12 19/8 22/2 50/18 60/2 60/3 60/6
**individualized [1]** 19/7
**individuals [1]** 67/25
**Industries [3]** 3/10 3/14 3/18
**information [34]** 11/4 11/15 11/19 11/20 12/16 13/4 19/5 22/17 23/21 24/16 27/23 29/21 29/22 31/15 32/12 44/17 44/17 47/4 48/5 52/19 53/5 53/15 53/18 54/7 57/24 58/1 58/2 58/4 58/12 59/3 59/25 63/17 64/4 66/23
**informing [1]** 7/7
**ingested [1]** 52/6
**ingredient [3]** 32/4 48/7 53/7
**initial [6]** 15/23 18/12 22/22 22/24 35/21 35/23
**initially [1]** 35/20
**inputs [1]** 61/8
**insane [1]** 69/10
**instead [1]** 61/20
**instruction [1]** 12/2
**intend [2]** 24/23 40/24
**interject [2]** 14/13 50/15
**internal [1]** 30/1
**Internet [6]** 25/6 33/7 33/15 33/21 36/18 49/5
**interpretation [2]** 28/23 28/25
**interpreted [3]** 28/21 29/6 29/11
**interpreting [1]** 59/8
**interviews [1]** 71/21
**introduced [5]** 26/7 43/8 43/11 44/20 44/22
**introducing [1]** 42/25
**involved [10]** 6/18 22/23 34/13 54/18 55/1 55/2 59/11 59/22 60/10 60/24
**involvement [2]** 36/25 48/12
**involving [1]** 71/25
**IRBESARTAN [1]** 1/4
**isn't [1]** 44/7
**issue [64]** 10/6 10/12 10/20 15/17 16/10 16/14 16/22 17/6 17/13 18/9 21/9 21/15 22/10 23/5 23/7 24/18 27/11 28/5 29/6 29/7 29/18 29/24 30/6 30/7 30/19 34/5 36/10 36/16 37/12 37/14 44/24 47/9 47/16 51/3 51/15 51/22 52/3 52/8 53/4 53/25 54/3 54/11 55/9 57/22 57/23 59/15 61/5 61/6 61/23 61/23 62/17 62/17 63/2 63/21 63/22 63/23 64/18 65/11 66/4 66/5 67/15 67/25 68/10 69/21
**issued [5]** 7/2 7/8 9/25 21/3 40/2
**issues [24]** 5/9 5/14 5/15 5/18 6/2 6/15 7/23 8/6 8/22 11/23 12/15 12/19 12/23 13/9 13/25 15/25 17/3 19/4 19/7 19/19 19/25 22/20 25/10 26/16
**item [4]** 6/3 9/1 10/2 70/12
**its [6]** 27/18 31/22 36/20 42/8 53/6 58/13
**itself [2]** 22/7 42/5
**IVES [2]** 4/16 4/16

**J**

**January [2]** 23/16 34/24
**Japanese [7]** 33/17 36/19 36/19 41/1 41/10 41/15 44/4
**JASON [1]** 3/5
**JEFFREY [1]** 4/2
**JERSEY [4]** 1/1 1/8 1/15 3/18
**Jessica [1]** 21/16
**Jinsheng [2]** 25/10 70/14
**job [1]** 38/1
**John [3]** 1/21 1/22 73/2
**join [1]** 12/10
**joint [1]** 9/19
**judge [34]** 1/10 4/24 5/3 6/4 9/22 10/21 14/13 24/19 27/1 35/12 36/6 37/1 37/3 37/13 37/17 37/20 40/1 40/1 40/4 40/20 41/3 41/23 43/13 47/5 48/12 50/16 61/6 67/11 70/2 71/5 71/20 71/21 72/11 72/18
**judgment [1]** 19/7
**jump [3]** 35/13 54/24 69/25
**jumped [1]** 5/11
**jury [4]** 11/7 13/4 15/8 31/18
**just [106]**

**K**

**KANNER [1]** 1/17
**KAPKE [1]** 3/21
**KAPLAN [1]** 4/6
**KARA [1]** 3/21
**KASPARIE [1]** 2/13
**Kathryn [1]** 4/25
**KATZ [1]** 1/14
**keep [1]** 48/10
**kept [1]** 46/18
**key [2]** 16/25 63/21
**kick [1]** 20/16
**kind [5]** 7/4 24/21 36/20

## K

**kind... [2]** 50/22 65/15
**KIRKLAND [2]** 2/16 2/20
**KIRSTIN [1]** 4/16
**knew [1]** 43/3
**knock [1]** 24/21
**know [57]** 5/14 15/5 15/6 20/7 20/18 21/14 21/19 22/14 23/2 23/3 23/8 23/16 23/22 25/11 27/3 27/13 28/2 28/10 28/10 29/13 36/2 36/6 36/20 37/17 38/1 38/7 40/21 43/7 43/9 44/20 47/18 47/22 48/19 49/12 51/15 52/14 53/12 54/12 54/16 58/14 61/20 62/1 63/2 63/8 63/23 64/15 64/17 64/22 65/4 65/10 65/25 68/23 69/10 70/8 70/13 71/21 71/24
**knowing [1]** 62/20
**knowingly [1]** 30/1
**knowledge [3]** 42/24 50/24 68/22
**knowledgeable [2]** 67/15 69/16
**known [3]** 42/5 42/17 49/6
**Kursat [1]** 7/22
**Kurz [3]** 1/21 1/22 73/2

## L

**laid [2]** 59/4 65/17
**language [7]** 23/4 28/20 28/22 29/11 31/9 31/10 50/12
**lap [1]** 37/17
**largely [1]** 19/1
**larger [1]** 55/20
**Larry [2]** 4/23 72/9
**last [13]** 7/8 14/2 23/6 25/22 29/18 48/18 50/15 51/16 55/22 56/24 69/19 70/12 71/11
**late [2]** 40/23 41/4
**later [2]** 15/3 15/21
**Laurel [1]** 3/3
**law [4]** 4/23 17/12 17/12 71/18
**laws [2]** 13/24 14/4
**lawsuit [1]** 47/17
**lawyer [2]** 63/22 65/20
**lawyers [5]** 54/4 61/16 62/3 62/7 63/18
**lay [1]** 44/1
**Lead [3]** 1/16 1/19 2/4
**learn [1]** 31/18
**learned [2]** 42/25 54/12
**learning [1]** 59/21
**least [6]** 6/14 13/13 14/9 50/23 60/16 67/16
**leave [2]** 56/15 66/24
**legal [1]** 48/11
**legitimate [1]** 25/17
**lengthy [1]** 25/19
**less [2]** 18/18 31/10
**let [8]** 21/18 27/13 29/20 32/1 37/13 54/24 70/13 71/18
**let's [8]** 5/23 5/25 10/24 36/8 36/14 55/4 56/15 57/3
**letter [5]** 6/3 7/1 7/20 21/16 52/13
**letters [2]** 10/3 40/6
**letting [1]** 70/3
**level [3]** 56/2 68/21 68/25
**levels [16]** 52/5 52/9 53/12 53/18 53/19 55/6 55/17 55/18 55/24 56/6 62/11 62/24 66/11 67/4 67/4 69/17
**LEWIS [1]** 4/12
**Lexington [1]** 2/21
**liability [2]** 1/5 35/3
**like [28]** 5/24 7/10 17/23 23/15 25/10 30/1 35/3 35/16 47/11 47/18 47/25 48/6 49/12 49/21 50/19 54/5 59/2 59/6 59/12 61/1 63/23 64/25 65/23 65/24 68/10 69/4 70/9 70/22
**likely [4]** 19/23 59/21 60/2 69/4
**limitations [1]** 28/24
**Lin [2]** 25/10 70/14
**line [2]** 57/13 60/20
**lines [1]** 67/10
**Lintner [1]** 4/23
**list [3]** 8/3 8/7 9/16
**listed [5]** 6/2 6/16 7/21 13/9 58/16
**listing [4]** 7/6 7/18 7/25 49/6
**literally [3]** 30/16 56/9 63/4
**litigate [1]** 30/6
**litigating [1]** 30/9
**litigation [4]** 1/5 12/17 34/7 66/14
**litigations [1]** 16/4
**little [11]** 10/5 18/19 28/9 34/23 39/19 48/15 50/23 58/18 62/15 63/7 71/23
**live [1]** 33/5
**LLC [9]** 1/14 1/17 2/11 2/15 2/19 3/11 3/15 3/19 4/14
**LLP [15]** 2/8 2/12 2/16 2/20 3/5 3/8 3/12 3/16 3/20 4/2 4/5 4/8 4/12 4/16 4/19
**LOCKARD [1]** 3/8
**logistical [2]** 22/14 28/13
**logistics [1]** 22/13
**long [9]** 22/6 22/17 24/24 25/21 29/9 50/17 60/17 61/9 62/14
**longer [2]** 9/15 58/12
**look [11]** 15/1 36/6 38/3 45/3 49/9 50/8 54/2 54/18 54/22 60/6 71/19
**looked [3]** 23/7 48/12 69/10
**looking [3]** 12/13 13/3 15/14
**looks [2]** 5/24 70/9
**looped [1]** 60/13
**LOSARTAN [1]** 1/3
**Loss [2]** 1/19 2/4
**lot [13]** 16/7 16/12 17/12 22/25 28/14 30/3 53/12 53/12 53/13 56/1 59/25 65/16 66/1
**lots [9]** 53/6 53/9 55/17 55/18 55/19 55/25 58/14 58/15 65/17
**Louisiana [1]** 1/19
**love [1]** 65/11
**Ltd [7]** 2/11 2/15 2/19 2/23 3/10 3/14 3/18
**lumped [1]** 12/24

## M

**Macleods [1]** 4/21
**MacStravic [2]** 4/23 72/9
**made [5]** 14/5 28/7 38/3 38/15 45/6
**magistrate [5]** 40/1 40/1 40/4 40/19 71/21
**main [1]** 42/4
**maintained [1]** 24/6
**major [1]** 49/14
**make [10]** 12/24 16/8 19/3 19/15 23/20 28/22 30/21 48/8 64/6 71/13
**makes [6]** 50/21 58/1 62/2 62/19 63/19 69/13
**making [2]** 41/17 56/2
**management [8]** 1/5 5/24 6/23 7/9 7/16 8/5 8/8 9/20
**Mandarin [1]** 50/11
**Manhattan [1]** 2/9
**manner [1]** 67/16
**manufacture [2]** 42/7 55/17
**manufacturer [1]** 32/7
**manufacturers [2]** 38/22 39/4
**manufacturing [4]** 27/18 42/7 42/11 42/19
**many [15]** 13/24 23/8 23/22 24/22 24/24 27/3 27/11 27/11 27/21 27/24 28/6 40/17 58/14 58/14 59/21
**March [6]** 1/8 47/11 52/20 71/13 72/8 73/2
**March 10th [1]** 52/20
**March 28th at [1]** 72/8
**MARIE [3]** 1/10 4/24 5/2
**marker [1]** 67/23
**MARLENE [2]** 2/3 8/24
**MASTER [2]** 1/11 5/4
**material [2]** 27/17 32/10
**materially [3]** 28/3 28/15 37/9
**materials [3]** 21/25 24/14 27/22
**math [9]** 54/5 54/9 56/19 57/2 57/10 58/17 58/18 58/23 61/15
**mathematical [5]** 53/17 54/21 55/5 56/10 68/23
**matter [11]** 6/8 7/6 7/8 7/15 22/5 51/20 51/23 58/3 59/4 60/6 72/24
**matters [5]** 5/6 5/7 5/25 6/25 51/13
**MAUREEN [1]** 3/2
**may [26]** 10/15 31/24 32/9 32/13 44/10 45/17 49/17 50/14 52/6 52/22 53/20 53/21 57/20 57/20 58/5 58/13 58/14 59/8 59/25 62/21 63/21 64/1 65/14 65/21 65/23 68/3
**maybe [11]** 26/18 27/4 29/17 37/9 50/12 50/13 50/21 52/16 58/23 61/5 64/9
**MAZIE [1]** 1/14
**Mckesson [1]** 4/11
**md [1]** 1/4
**MDL [1]** 1/16
**MDLs [1]** 13/11
**me [18]** 5/20 8/15 10/9 21/18 32/1 36/10 36/20 36/22 37/4 40/22 41/21 47/21 54/24 61/20 63/14 70/13 70/23 71/18
**MEAGHER [2]** 2/8 2/12
**mean [5]** 30/23 63/15 63/25 67/25 69/9
**means [6]** 29/11 35/2 46/7 59/9 63/14 63/16
**mechanical [1]** 1/23
**medications [1]** 12/23
**meet [12]** 8/3 8/4 8/21 9/11 20/13 20/23 50/11 52/7 60/17 60/20 61/9 64/25
**mentioned [1]** 46/10
**mentions [1]** 44/8
**Meridian [1]** 3/21
**merry [1]** 45/14
**met [1]** 59/17
**method [1]** 63/3
**methodology [5]** 61/22 62/3 65/19 65/22 66/5
**might [9]** 10/4 52/16 53/13 54/3 59/10 59/22 60/11 68/14 69/5
**million [2]** 56/3 56/3
**mind [1]** 41/24
**mine [1]** 37/18
**minute [1]** 50/15
**minutes [1]** 22/5
**misdeeds [1]** 41/3
**missed [1]** 57/3
**Mitchell [1]** 1/7
**mixed [1]** 55/19
**modification [2]** 9/10 42/11
**Monday [3]** 1/8 52/20 70/23
**Monroe [1]** 4/17
**month [5]** 22/1 22/11 47/9 69/19 71/12
**months [4]** 11/25 12/7 27/7 40/5
**more [27]** 5/24 10/5 11/3 11/4 11/4 11/14 11/19 11/20 11/20 13/12 17/2 18/2 19/25 20/14 28/10 28/15 28/18 28/24 44/16 44/17 44/17 46/21 48/15 48/18 52/4 65/1 65/3
**MORGAN [1]** 4/12
**MORING [1]** 4/5
**morning [3]** 21/25 70/20 71/21
**most [7]** 16/4 19/4 19/4 26/11 31/3 64/18 69/15
**motion [10]** 6/10 19/9 21/11 26/20 30/12 31/11 31/21 36/7 37/2 38/17
**motions [5]** 15/24 15/25 17/11 19/11 48/14
**move [5]** 15/4 21/4 21/11 23/20 50/14
**moving [3]** 5/23 34/14 56/20
**Mr. [26]** 14/16 28/10 33/15 35/17 42/2 45/6 45/22 46/2 48/25 50/21 52/6 53/8 53/21 56/23 57/20 57/22 58/11 58/15 60/23 62/21 63/6 63/10 68/2 68/8 69/17 70/21
**Mr. Bernardo [2]** 62/21 63/10
**Mr. Harkins [2]** 60/23 68/8
**Mr. Roberts [4]** 52/6 53/21 58/15 69/17
**Mr. Roberts' [1]** 53/8
**Mr. Slater [14]** 14/16 28/10 33/15 35/17 42/2 45/22 46/2 48/25 50/21 57/20 57/22 58/11 68/2 70/21
**Mr. Stanoch [1]** 45/6
**Mr. Williamson [2]** 56/23 63/6
**Ms [1]** 61/13
**Ms. [10]** 36/25 48/6 55/1 59/6 62/21 63/17 63/20 64/2 65/22 66/1
**Ms. Rose [7]** 48/6 55/1 59/6 62/21 63/20 64/2 65/22
**Ms. Rose's [3]** 36/25 63/17 66/1
**MSDS [1]** 32/16
**MSDSs [1]** 23/11
**much [9]** 11/18 31/10 37/15 44/16 44/16 51/4 52/24 56/17 72/14
**Mulberry [1]** 3/17
**multi [13]** 10/18 10/22 10/25 11/2 11/6 11/11 12/24 13/10 14/7 14/11

**M**

**multi... [3]** 16/15 16/17 16/18
**multi-plaintiff [12]** 10/18 10/22 10/25 11/2 11/6 11/11 12/24 13/10 14/7 14/11 16/17 16/18
**multiple [4]** 14/1 19/6 63/7 67/24
**multiplied [1]** 61/12
**multiply [1]** 58/20
**mute [1]** 5/19
**my [22]** 5/11 15/2 15/6 21/15 22/23 22/24 34/7 40/13 46/12 47/24 48/4 48/12 50/17 58/25 64/10 64/10 65/15 66/1 70/16 71/18 71/19 71/25
**Mylan [2]** 3/4 3/7
**myself [1]** 10/14
**mystery [1]** 55/15

**N**

**N.W [1]** 2/17
**Najafi [1]** 35/3
**narrow [1]** 15/20
**narrowing [3]** 16/16 16/18 16/20
**national [6]** 23/12 24/12 27/20 33/18 33/25 46/22
**NDC [4]** 55/21 55/25 66/21 67/5
**NDMA [6]** 42/21 43/3 52/5 53/8 53/18 53/19
**NE [1]** 3/9
**nearly [1]** 13/5
**neat [1]** 65/18
**necessarily [1]** 61/19
**necessary [2]** 60/7 69/1
**need [21]** 8/13 8/15 9/15 12/9 12/11 17/2 17/5 20/17 25/11 27/5 36/7 56/15 60/13 60/19 62/25 64/12 64/15 66/5 66/16 66/23 67/9
**needed [4]** 8/10 17/10 39/7 57/8
**needs [1]** 19/13
**negotiate [3]** 11/25 22/15 40/16
**negotiated [1]** 40/3
**negotiation [5]** 12/7 28/17 38/18 55/2 55/2
**negotiations [2]** 39/25 56/13
**Nesbit [1]** 2/6
**never [18]** 27/6 30/10 32/25 33/2 34/8 37/5 38/9 42/5 43/7 43/9 44/15 49/8 49/13 49/13 50/5 55/15 64/6 69/20
**new [14]** 1/1 1/8 1/15 1/19 2/10 2/10 2/22 2/22 3/18 17/8 17/8 17/10 34/18 67/25
**Newark [1]** 3/18
**next [15]** 2/24 3/25 6/22 7/16 8/5 8/7 9/1 9/20 10/2 21/4 21/9 52/17 70/23 71/9 71/9
**nice [4]** 54/8 63/8 65/18 71/6
**NIGH [5]** 2/2 2/2 5/8 10/7 51/9
**NINA [7]** 2/17 5/20 5/22 6/11 21/18 27/8 48/2
**nitrate [1]** 43/4
**nitrous [2]** 42/21 43/5
**NJ [1]** 3/3
**njd.uscourts.gov [1]** 1/22
**no [47]** 7/22 7/23 8/9 8/20 9/7 16/24 20/19 21/8 24/15 30/5 31/14 33/18 33/24 34/19 34/19 36/11 36/22 38/11 38/11 39/2 40/15 40/19 41/14 41/18 41/25 43/10 43/18 44/20 45/23 46/14 46/23 46/25 46/25 47/3 48/1 48/13 51/4 55/13 58/11 61/6 65/8 65/8 65/8 65/23 69/20 71/3 72/5
**nobody [3]** 25/7 25/8 55/12
**Nobody's [1]** 37/23
**non [1]** 5/14
**non-ZHP [1]** 5/14
**noncontroversial [1]** 60/1
**none [1]** 54/12
**Nope [1]** 71/6
**normal [1]** 24/3
**NORRIS [1]** 4/9
**NORTON [1]** 4/8
**not [120]**
**note [1]** 13/18
**nothing [7]** 7/11 14/18 21/6 43/22 44/12 65/12 71/4
**notice [7]** 30/16 44/10 46/8 67/20 70/3 71/20 72/9
**November [3]** 12/14 18/17 20/3
**now [42]** 6/6 7/10 9/1 14/22 18/19 19/11 22/4 23/15 23/16 24/5 26/1 27/7 27/16 31/19 32/14 34/21 37/15 38/8 39/9 44/16 45/24 47/10 47/25 49/3 56/12 56/14 57/8 57/12 58/10 58/16 59/6 60/15 61/1 61/11 62/17 63/2 63/17 64/17 65/12 65/13 69/12 69/21
**number [10]** 1/3 12/8 24/25 25/1 37/6 37/7 58/20 58/22 59/20 60/11
**numbers [15]** 56/20 57/14 57/15 57/17 58/12 61/10 62/23 64/23 65/4 65/6 66/10 66/19 68/16 68/18 69/19
**NW [3]** 2/3 4/6 4/20

**O**

**O'REILLY [1]** 3/16
**Oak [1]** 3/3
**oath [1]** 67/3
**objected [1]** 40/15
**objection [3]** 40/19 67/23 72/4
**objections [2]** 39/21 40/5
**objective [6]** 55/5 55/6 64/23 64/23 65/4 65/6
**obligation [1]** 39/11
**obviously [15]** 11/10 11/14 13/8 14/20 22/22 24/4 25/16 29/25 31/12 40/10 40/11 47/18 55/9 62/25 66/22
**occupy [1]** 60/4
**occur [1]** 33/3
**occurred [1]** 32/25
**October [1]** 12/5
**odd [1]** 61/20
**off [7]** 18/15 20/16 24/21 31/14 42/20 60/13 64/21
**offered [1]** 23/13
**Official [2]** 1/21 72/21
**often [1]** 6/15
**oh [11]** 9/6 30/13 31/24 33/13 35/14 38/11 41/22 45/9 65/8 71/9 71/23
**Ohio [1]** 4/4
**okay [25]** 5/10 5/21 7/13 7/17 8/9 8/17 8/24 9/24 10/24 15/9 24/20 25/3 31/13 31/23 32/20 40/7 49/20 51/20 52/21 56/1 56/5 58/19 63/8 70/25 72/6
**once [2]** 21/22 37/16
**one [45]** 2/9 3/6 4/13 6/6 9/8 10/4 11/11 11/20 11/21 12/19 13/12 13/13 15/17 17/4 17/16 18/13 19/4 19/4 19/12 24/25 27/10 27/10 28/3 34/19 37/6 39/19 42/4 42/12 45/21 47/24 48/18 49/14 50/19 50/19 50/19 51/15 52/8 53/23 56/3 56/21 57/13 60/19 64/21 66/2 69/6
**one's [1]** 56/22
**ones [2]** 33/23 48/24
**ongoing [1]** 9/11
**only [13]** 13/7 13/17 16/10 17/20 18/11 19/3 25/9 38/6 40/13 52/3 53/16 59/16 69/21
**operating [1]** 13/21
**opinion [1]** 62/8
**opinions [3]** 17/7 40/25 46/12
**oppose [1]** 13/1
**opposed [7]** 6/9 15/21 19/10 19/12 56/21 63/9 64/19
**order [14]** 6/2 7/7 7/10 8/14 9/9 9/10 9/19 9/25 16/22 20/17 40/2 40/20 43/13 50/22
**ordered [1]** 8/9
**orders [2]** 7/2 7/15
**ordinary [3]** 27/25 46/18 48/4
**Orleans [1]** 1/19
**OSTFELD [1]** 3/13
**other [38]** 6/25 7/11 8/2 8/9 12/8 13/7 13/11 13/12 13/17 15/17 15/25 16/10 18/2 19/3 19/14 19/25 23/13 25/10 26/15 38/2 39/2 40/8 40/10 42/13 49/2 51/22 52/3 53/3 54/12 54/16 55/13 56/22 59/14 59/19 59/20 59/20 64/2 69/3
**otherwise [1]** 25/20
**our [58]** 7/20 11/13 12/13 16/16 17/10 17/23 18/3 18/12 20/8 21/21 22/12 23/14 24/1 24/24 25/13 25/21 26/14 26/24 27/1 29/20 30/6 30/10 35/2 35/21 35/21 36/2 38/1 38/19 41/15 41/19 42/23 44/14 44/21 52/11 52/15 52/19 53/2 53/2 54/2 54/23 56/13 56/16 57/2 57/7 57/16 59/3 59/24 59/24 60/5 60/5 61/19 61/25 63/25 65/7 67/6 68/22 71/9 71/9
**out [43]** 11/4 11/15 12/6 12/16 15/6 16/5 16/20 19/2 19/5 19/8 20/14 21/23 25/25 30/13 33/6 36/14 37/1 37/6 37/15 38/6 40/7 44/1 45/6 51/11 55/5 55/23 57/3 57/7 57/11 58/4 58/16 58/20 59/4 62/23 63/3 63/13 63/14 63/14 64/7 65/18 66/8 66/11 72/9
**outset [1]** 9/8
**outstanding [5]** 16/11 51/22 52/3 52/9 58/8
**over [9]** 34/2 37/14 43/6 43/6 46/19 53/2 57/9 59/17 62/24
**overlap [1]** 17/12
**oversimplifying [1]** 61/5
**own [3]** 36/21 41/2 58/13
**owned [1]** 42/8
**Oxford [2]** 3/6 4/13

**P**

**P.C [1]** 3/2
**page [4]** 2/24 3/25 7/19 7/19
**page 2 [1]** 7/19
**page 3 [1]** 7/19
**pages [1]** 7/20
**paper [4]** 25/15 30/2 30/3 50/18
**parameters [1]** 16/8
**paramount [1]** 69/21
**Parkway [1]** 1/15
**part [11]** 10/22 13/10 16/17 26/11 49/1 49/4 50/10 62/18 63/12 63/13 71/22
**participant [1]** 57/21
**particular [1]** 58/22
**particularly [6]** 9/15 15/7 19/7 19/10 23/12 65/24
**parties [30]** 6/6 6/18 9/13 9/18 11/25 14/25 15/9 15/23 16/6 17/23 18/4 18/18 19/2 19/13 19/18 20/16 28/12 34/12 37/5 39/22 39/24 40/6 56/10 56/18 57/10 58/2 59/7 60/11 64/19 64/24
**parties' [1]** 60/4
**parts [2]** 56/2 56/3
**party [6]** 1/19 2/4 12/21 15/6 18/13 32/15
**pathology [1]** 63/24
**Payor [2]** 1/19 2/4
**pending [1]** 7/7
**Pennsylvania [4]** 2/17 3/6 4/6 4/14
**people [3]** 55/10 57/9 67/15
**per [4]** 40/19 43/13 56/2 56/3
**percent [2]** 56/2 56/3
**percentage [1]** 53/13
**perfectly [1]** 9/18
**performed [1]** 26/5
**performing [1]** 59/17
**Perhaps [2]** 24/22 26/18
**peril [1]** 36/21
**period [6]** 20/8 26/11 26/11 32/14 33/8 40/20
**perpetuity [1]** 48/11
**person [2]** 57/20 66/19
**perspective [3]** 11/13 25/21 27/1
**pertained [1]** 33/16
**Pharma [7]** 2/22 3/11 3/15 3/19 4/14 4/15 4/21
**pharmaceutical [10]** 2/10 2/11 2/14 2/15 2/18 2/19 3/10 3/14 3/18 53/7
**Pharmaceuticals [5]** 2/23 3/7 3/11 3/15 3/19
**Pharmacy [1]** 3/22
**picked [2]** 43/24 64/21
**piece [1]** 29/18
**pieces [2]** 19/5 50/18
**Piedmont [1]** 3/9
**PIETRAGALLO [1]** 3/5
**pill [5]** 42/7 58/22 63/15 66/1 66/21
**pills [8]** 52/6 52/10 55/8 56/6 62/11 62/25 66/12 69/17
**Pittsburgh [2]** 3/6 4/14
**PIZZI [1]** 3/16
**place [2]** 12/9 20/2

**P**

**placed [1]** 42/18
**placing [1]** 43/1
**plaintiff [28]** 10/18 10/22 10/25 11/2 11/6 11/10 11/11 11/12 11/20 11/21 12/2 12/24 13/10 13/22 14/3 14/6 14/7 14/9 14/11 16/17 16/18 36/20 39/19 55/8 56/7 57/5 66/13 66/22
**plaintiffs [54]** 1/16 2/7 5/6 8/4 9/11 9/17 9/23 10/6 11/13 12/11 13/23 15/19 17/2 17/15 17/18 19/8 19/21 22/16 23/5 23/5 23/9 23/15 23/21 25/23 27/13 28/1 28/17 28/18 28/22 28/24 29/8 33/20 34/6 34/20 34/24 36/11 40/8 41/19 47/23 52/3 53/1 53/5 53/10 53/11 53/11 53/16 54/9 54/13 54/14 54/21 61/15 61/21 63/19 72/5
**plaintiffs' [8]** 8/18 17/1 17/17 18/3 21/11 28/23 41/11 59/15
**plays [1]** 19/8
**please [6]** 21/18 22/20 48/17 52/23 57/1 60/15
**PLLC [1]** 2/2
**point [25]** 16/17 18/11 19/3 23/15 23/25 29/17 33/4 33/10 39/19 40/13 41/7 41/22 44/6 44/10 49/14 50/2 56/14 59/6 60/17 61/7 62/6 62/15 63/17 65/1 66/7
**pointed [2]** 45/6 58/4
**points [3]** 24/22 33/11 45/20
**policies [1]** 47/22
**policy [2]** 47/16 47/19
**pool [1]** 51/13
**position [9]** 9/14 12/13 31/12 31/22 39/15 46/16 52/13 54/20 54/23
**possession [3]** 23/14 53/6 64/24
**possible [1]** 18/24
**possibly [1]** 58/15
**post [2]** 24/11 37/9
**post-2015 [2]** 24/11 37/9
**postdating [1]** 44/1
**potential [6]** 6/19 14/17 30/17 43/1 44/11 69/5
**potentially [3]** 8/7 16/2 39/22
**PPM [2]** 58/19 65/25
**practical [1]** 11/24
**Practically [1]** 11/24
**practice [4]** 15/6 19/9 26/21 30/13
**pre [3]** 24/10 24/16 37/8
**pre-2015 [3]** 24/10 24/16 37/8
**preceded [1]** 36/24
**precisely [1]** 28/6
**predating [2]** 24/3 47/14
**prefer [1]** 19/15
**prefers [1]** 7/6
**prejudice [11]** 34/5 34/23 37/12 42/1 43/19 43/22 44/18 45/22 45/23 46/14 47/3
**prejudiced [4]** 26/23 30/8 31/6 34/20
**preliminarily [1]** 12/5
**preliminary [3]** 6/14 16/10 70/20
**preparation [1]** 14/1
**prepared [3]** 13/13 30/13 35/5
**preparing [2]** 19/11 20/3
**prescriptions [2]** 53/8 53/14
**present [6]** 4/22 13/3 13/4 19/18 30/18 69/1
**presented [2]** 7/5 11/8
**press [1]** 38/17
**pretty [1]** 6/16
**Prinston [3]** 2/11 2/15 2/19
**prior [8]** 15/18 19/16 24/1 30/24 46/21 48/12 48/16 59/15
**probably [6]** 16/7 20/5 42/16 44/17 49/3 49/10
**problem [4]** 31/5 31/6 39/10 61/24
**problematic [1]** 47/18
**procedural [2]** 12/8 12/15
**proceed [1]** 67/9
**proceeded [3]** 36/17 36/20 39/1
**proceeding [4]** 13/24 14/3 14/7 16/1
**proceedings [4]** 1/23 5/1 72/20 72/24
**proceeds [1]** 60/9
**process [35]** 9/14 9/16 9/19 10/3 12/15 15/21 16/3 21/4 21/23 23/23 24/4 25/19 32/19 35/5 42/7 42/10 42/11 42/14 42/19 42/21 43/2 43/8 43/11 44/24 47/8 47/10 52/14 52/15 55/4 55/15 56/17 60/17 60/21 61/2 62/19
**processed [1]** 22/10
**processes [3]** 13/11 26/3 27/18
**procured [1]** 41/2
**produce [21]** 23/22 24/7 24/13 24/23 25/15 25/17 27/2 28/8 30/2 32/23 32/25 34/4 38/5 38/9 38/12 39/11 40/19 45/2 45/24 50/16 50/20
**produced [22]** 1/24 21/24 23/2 23/3 23/5 23/6 23/10 25/2 25/16 30/3 34/3 34/13 37/24 39/13 45/7 46/4 47/11 48/22 48/23 48/25 49/14 50/8
**producer [1]** 32/4
**producing [4]** 33/2 43/3 46/3 47/8
**product [7]** 9/2 26/7 27/23 44/23 49/7 68/22 69/1
**production [7]** 21/10 21/13 21/25 22/10 22/22 22/24 38/25
**productive [3]** 8/21 19/20 52/7
**PRODUCTS [1]** 1/4
**proficiency [1]** 19/14
**projecting [1]** 14/23
**promise [1]** 45/18
**proper [2]** 11/5 12/10
**proposal [10]** 11/24 17/1 17/1 17/17 17/20 17/23 18/3 18/12 20/23 21/21
**proposals [1]** 17/15
**propose [3]** 15/15 63/19 69/3
**proposed [16]** 9/9 9/19 9/25 15/22 16/22 17/17 18/3 20/8 28/13 28/22 52/11 53/19 53/21 55/4 70/17 70/19
**proposing [3]** 10/17 11/2 30/15
**propounded [2]** 39/21 39/21
**proven [1]** 60/1
**provide [7]** 20/1 32/12 47/24 48/3 50/20 64/5 68/23
**provided [4]** 44/16 50/10 52/10 68/14
**provides [1]** 32/8
**pull [1]** 59/5
**pulling [1]** 58/3
**Punta [1]** 2/7
**purpose [2]** 11/5 16/16
**purposes [2]** 12/17 13/2
**pursue [1]** 32/15
**pursuing [1]** 20/20
**push [1]** 11/11
**put [13]** 28/24 29/17 43/3 46/8 46/11 54/7 55/21 61/10 63/16 64/5 66/9 67/2 67/22
**puts [1]** 30/5
**putting [3]** 36/15 61/21 62/8

**Q**

**quantifying [1]** 49/7
**question [13]** 10/23 10/25 15/14 22/25 32/1 34/11 46/9 46/9 47/15 48/18 56/10 61/4 61/11
**questions [2]** 58/8 60/22
**quickly [1]** 6/16
**quiet [3]** 37/13 37/19 40/22
**quite [1]** 7/3
**quote [2]** 49/8 66/4
**quote-unquote [2]** 49/8 66/4
**quoted [1]** 49/9

**R**

**raise [2]** 23/5 41/7
**raised [10]** 6/9 7/1 14/2 23/7 41/22 50/17 51/15 57/22 57/23 59/7
**ranges [2]** 53/19 53/22
**RASO [1]** 2/2
**RASPANTI [1]** 3/5
**raw [4]** 24/14 27/17 27/21 65/16
**RDR [1]** 73/2
**RDR-RMR-CRR-CRC [1]** 73/2
**RE [1]** 1/3
**reach [2]** 20/15 69/24
**reacts [1]** 11/7
**reading [1]** 21/16
**ready [3]** 12/3 16/9 38/7
**really [24]** 13/20 14/7 18/10 25/11 29/1 29/8 30/19 35/1 35/6 46/23 53/25 54/19 54/22 56/15 57/7 57/15 58/11 58/17 62/2 62/5 62/6 62/19 63/21 65/19
**reason [13]** 12/6 20/19 24/7 24/15 36/25 43/7 43/9 44/20 46/23 48/16 48/23 50/16 50/17
**reasonable [6]** 9/18 22/11 26/20 31/9 39/3 55/7
**reasons [1]** 28/14
**received [7]** 33/19 33/22 33/24 34/1 46/19 53/10 53/20
**receives [1]** 27/17
**receiving [1]** 27/24
**recent [1]** 27/7
**recently [3]** 38/6 43/22 55/3
**recommend [1]** 14/10
**reconsider [1]** 28/11
**record [1]** 72/24
**recorded [1]** 1/23
**records [2]** 22/19 58/13
**reduced [1]** 58/6
**REEFER [1]** 3/5
**reference [1]** 46/5
**referring [2]** 33/15 57/21
**regard [1]** 6/19
**regarding [1]** 53/6
**REIN [1]** 4/19
**related [2]** 18/23 19/8
**relates [1]** 65/17
**relevant [4]** 26/10 26/11 36/24 58/15
**reliable [2]** 36/18 40/25
**relied [2]** 41/13 41/15
**reluctance [1]** 26/14
**rely [6]** 40/25 45/5 45/13 52/19 56/20 67/6
**remember [2]** 6/15 30/9
**remind [1]** 7/4
**removed [1]** 7/24
**RENÉE [3]** 1/10 4/24 5/2
**repeat [1]** 68/20
**repetitive [1]** 69/4
**reply [1]** 19/14
**report [4]** 46/11 61/18 61/21 70/23
**Reporter [2]** 1/21 73/3
**REPORTER'S [1]** 72/21
**Reporter/Transcriber [1]** 73/3
**reports [8]** 17/22 17/25 23/17 30/11 35/4 52/16 54/10 62/17
**representation [2]** 34/8 37/25
**representations [1]** 38/4
**representative [2]** 43/25 45/24
**represented [2]** 37/21 44/25
**representing [2]** 37/10 47/21
**represents [2]** 17/5 50/8
**request [4]** 23/4 35/21 35/22 35/23
**requested [2]** 35/20 59/13
**requesting [2]** 7/15 15/19
**requests [8]** 37/22 39/21 39/25 40/3 40/8 40/10 40/10 40/18
**require [3]** 9/10 21/13 47/16
**required [3]** 23/1 30/4 49/25
**requires [2]** 15/22 22/1
**research [2]** 43/10 44/13
**reserve [1]** 60/5
**reserving [1]** 15/2
**resolution [2]** 7/14 20/15
**resolve [6]** 6/1 6/16 6/20 8/22 10/5 14/21
**resolved [7]** 6/22 7/10 7/24 16/1 29/12 48/20 51/21
**resources [1]** 69/12
**respect [23]** 6/8 6/25 8/2 8/19 9/13 12/22 22/18 22/22 23/12 28/6 28/12 32/15 33/14 34/5 35/8 41/9 41/10 51/12 51/13 51/22 52/6 52/9 59/7
**respond [10]** 18/11 31/24 32/2 33/10 33/11 45/17 52/22 60/7 60/15 63/11
**responded [1]** 58/8
**responding [1]** 19/11
**response [4]** 13/6 23/1 35/7 71/3
**responsibility [1]** 30/7
**rest [1]** 66/14
**restrict [1]** 29/1

**R**

**result [1]** 42/10
**RET [2]** 1/11 5/3
**Retailer [1]** 3/22
**retain [1]** 48/5
**retention [5]** 24/4 47/15 47/19 47/22 48/4
**returnable [1]** 7/16
**revisit [4]** 6/22 12/6 26/19 31/22
**Rich [1]** 57/19
**RICHARD [1]** 2/9
**Ridge [1]** 2/3
**ridiculous [1]** 47/9
**right [56]** 5/17 5/23 6/24 8/1 8/12 9/21 9/24 10/2 10/11 10/12 10/16 10/18 11/22 13/6 14/12 14/22 15/12 16/13 16/21 18/8 20/21 21/5 21/9 24/17 27/1 27/8 27/16 31/25 35/24 36/5 41/21 45/23 48/9 48/17 51/6 51/17 57/2 57/2 57/15 60/5 61/1 61/13 65/9 65/12 65/13 65/22 67/1 67/8 69/23 70/18 70/22 71/7 71/16 72/1 72/12 72/13
**risk [4]** 26/4 43/3 59/12 65/8
**risks [1]** 32/12
**RMB [1]** 1/4
**RMR [1]** 73/2
**Road [2]** 3/3 3/9
**Roberts [18]** 17/19 17/21 17/24 18/4 18/5 18/16 18/22 34/17 34/19 51/23 52/6 53/21 54/15 58/15 59/12 60/25 68/11 69/17
**Roberts' [3]** 17/9 17/13 53/8
**role [1]** 71/25
**ROSE [12]** 2/17 4/8 5/20 48/6 55/1 59/6 61/13 62/21 63/20 63/23 64/2 65/22
**Rose's [3]** 36/25 63/17 66/1
**Roseland [1]** 1/15
**Ross [1]** 4/10
**routinely [1]** 13/9
**rules [1]** 36/8
**ruling [1]** 15/19
**run [1]** 66/19

**S**

**Saatci [1]** 7/22
**safety [1]** 32/10
**said [43]** 14/16 17/23 24/9 25/8 25/8 25/11 27/11 27/12 27/12 27/19 28/1 28/10 28/16 29/9 30/16 34/2 34/3 34/6 34/10 38/7 38/10 38/16 38/17 40/7 40/15 40/19 40/21 43/6 44/22 45/9 46/2 46/20 48/6 49/25 50/3 50/7 54/14 56/23 56/24 57/14 57/25 63/20 69/10
**SAK [1]** 1/4
**same [14]** 13/23 13/24 13/25 23/14 27/23 28/15 28/16 37/11 37/11 38/21 44/3 48/2 49/5 49/18
**Samocha [2]** 7/6 8/14
**sample [5]** 33/16 43/25 45/13 45/13 45/24
**samples [1]** 38/21
**sanction [2]** 29/25 43/13
**sanctions [3]** 21/12 36/7 37/2
**satisfied [1]** 65/5
**say [29]** 15/16 22/16 26/9 26/12 28/14 28/18 29/19 29/19 31/13 34/4 34/14 38/1 39/12 44/21 46/4 56/1 56/5 56/19 59/14 61/25 62/9 63/8 65/7 65/21 65/23 66/13 68/7 68/15 70/7
**saying [16]** 14/21 16/21 26/1 26/17 36/13 39/9 42/5 44/3 46/12 49/11 55/13 57/12 61/19 63/9 63/23 65/8
**says [5]** 25/22 40/11 64/21 68/3 69/14
**scan [2]** 22/2 22/5
**scanned [2]** 21/24 50/19
**scanning [3]** 22/7 22/9 22/9
**scans [1]** 22/10
**schedule [13]** 10/23 10/25 12/12 15/22 16/5 17/10 17/11 18/20 19/22 20/4 21/3 21/5 69/3
**Schneider [4]** 40/1 40/2 40/4 48/12
**Schneider's [1]** 40/20
**science [2]** 58/18 61/14
**scientific [2]** 63/19 64/14
**screen [1]** 5/11
**second [7]** 12/8 15/4 15/13 19/17 23/25 54/24 71/19
**secondary [1]** 43/2
**secret [1]** 69/20
**see [15]** 5/25 11/7 16/11 18/25 19/21 26/24 37/1 44/5 45/3 45/4 54/9 62/2 63/13 68/1 71/6
**seeing [4]** 19/6 59/15 65/12 71/7
**seeking [1]** 6/21
**seem [1]** 54/4
**seems [5]** 36/10 36/20 36/22 61/20 69/4
**seen [5]** 17/13 49/8 49/13 49/21 50/5
**select [1]** 19/16
**selected [1]** 69/13
**selling [1]** 38/22
**send [1]** 72/9
**sense [7]** 16/8 50/21 58/1 62/2 62/19 63/19 69/13
**sent [4]** 10/3 28/4 55/20 56/24
**serious [1]** 31/5
**serve [4]** 11/5 12/15 32/17 62/16
**served [1]** 70/17
**sessions [1]** 52/7
**set [16]** 9/20 14/3 15/20 16/1 16/5 16/20 19/16 30/23 40/7 40/18 44/14 59/19 63/13 64/10 64/20 66/1
**sets [2]** 40/8 40/9
**setting [5]** 12/14 12/25 15/1 15/12 16/2
**settle [4]** 14/17 15/3 15/3 15/7
**settles [3]** 13/13 14/25 15/5
**several [2]** 45/20 55/12
**shame [2]** 69/23 69/24
**she [1]** 65/23
**She's [1]** 55/2
**sheet [5]** 6/5 6/7 6/9 57/24 58/9
**sheets [1]** 32/11
**shift [1]** 35/9
**short [2]** 6/19 20/10
**shortly [1]** 12/4
**should [33]** 6/9 7/2 10/7 12/23 14/12 15/3 16/5 20/5 20/10 22/9 22/17 24/13 25/1 26/12 27/2 27/2 36/16 37/1 37/15 39/9 39/10 42/25 44/11 46/7 47/10 54/1 56/8 56/10 56/18 57/6 57/10 57/16 64/16
**shouldn't [3]** 20/14 20/20 37/16
**show [6]** 7/2 7/7 7/11 7/15 8/14 43/17
**show-cause [1]** 7/2
**shown [1]** 60/1
**shows [3]** 45/22 50/6 63/24
**side [3]** 8/18 55/13 64/21
**side's [1]** 56/22
**sides [3]** 57/4 62/22 62/23
**sides' [1]** 56/20
**sideshow [1]** 31/19
**significance [3]** 26/24 29/21 64/14
**significant [2]** 26/12 29/25
**simplest [1]** 13/4
**simply [4]** 8/3 16/7 18/14 63/22
**since [3]** 23/16 34/24 57/20
**single [13]** 11/10 11/12 11/12 12/2 13/22 14/9 12/2 12/11 13/22 14/3 14/3 14/4 14/6 14/9 37/7 48/7 48/7
**single-plaintiff [5]** 11/10 11/12 12/2 13/22 14/9
**sit [2]** 38/19 57/9
**site [2]** 22/2 22/8
**size [1]** 16/4
**SJ [2]** 17/11 18/5
**SKADDEN [4]** 2/8 2/12 22/23 55/10
**skill [2]** 64/10 66/1
**slate [3]** 2/8 2/12 34/18
**SLATER [17]** 1/14 1/14 10/19 14/16 28/10 33/15 35/17 42/2 45/22 46/2 48/25 50/21 57/20 57/22 58/11 68/2 70/21
**slightly [2]** 18/18 58/11
**small [1]** 19/14
**so [116]**
**sodium [1]** 43/4
**Solco [4]** 2/11 2/15 2/19 42/9
**sold [3]** 42/8 66/12 66/22
**solvent [3]** 42/13 46/4 46/8
**solvents [4]** 26/8 30/18 30/19 42/14
**some [27]** 5/7 5/9 5/15 9/10 11/24 17/4 17/14 18/21 19/14 19/14 19/25 22/25 23/3 24/6 25/9 34/9 43/16 46/5 49/17 50/13 57/23 58/14 59/12 59/16 64/7 66/14 70/19
**somebody [1]** 49/11
**somehow [1]** 46/19
**someone [2]** 5/14 67/3
**something [41]** 12/25 14/16 15/1 19/1 20/9 25/17 29/4 29/13 30/5 30/15 33/1 36/18 37/16 37/25 39/5 39/16 40/14 41/3 41/19 42/17 44/9 44/11 46/20 47/22 48/3 49/12 54/4 54/22 56/18 57/3 58/24 60/12 62/25 63/20 63/25 64/1 64/16 64/17 65/11 65/20 65/25
**Sometimes [1]** 61/25
**soon [2]** 23/7 52/15
**sooner [1]** 15/3
**sorry [9]** 9/6 10/21 31/24 32/6 35/12 41/8 41/23 50/15 62/13
**sort [3]** 15/18 20/8 52/8
**sought [1]** 57/25
**sounds [3]** 35/16 37/4 59/12
**South [1]** 3/21
**speak [2]** 10/19 14/22
**SPECIAL [2]** 1/11 5/3
**specific [15]** 12/20 12/21 20/18 29/6 37/22 38/3 45/3 48/15 60/8 62/16 62/18 68/10 69/7 69/8 69/22
**specifically [4]** 13/2 34/14 34/20 68/15
**specifics [1]** 23/2
**speculation [1]** 46/21
**spend [1]** 58/25
**spent [3]** 11/25 38/14 62/14
**spokesperson [1]** 5/12
**spreadsheet [8]** 53/11 56/23 56/24 57/17 58/6 58/7 59/4 65/18
**spreadsheets [1]** 58/7
**Square [1]** 2/3
**stage [1]** 7/1
**stand [4]** 9/3 51/11 66/10 70/15
**standard [11]** 23/12 24/12 27/20 33/18 33/25 34/2 41/1 46/22 50/20 50/25 59/13
**standards [1]** 49/9
**standpoint [2]** 58/16 69/2
**stands [1]** 70/25
**STANOCH [3]** 1/18 39/18 45/6
**start [3]** 11/12 42/6 55/3
**started [4]** 21/21 21/23 23/9 25/9
**starting [1]** 9/14
**state [3]** 13/23 13/24 27/23
**state's [1]** 14/4
**stated [1]** 52/13
**statement [3]** 9/10 34/9 54/13
**states [6]** 1/1 1/10 5/2 24/13 42/8 55/20
**stay [1]** 14/8
**stenography [1]** 1/23
**step [2]** 55/22 55/22
**steps [2]** 12/9 25/22
**Steve [3]** 5/11 11/22 13/19
**STEVEN [2]** 3/9 4/13
**still [8]** 13/14 16/11 16/24 45/5 46/15 51/8 52/9 71/12
**stipulate [11]** 23/13 28/15 28/20 29/4 29/13 29/19 54/5 56/11 56/18 67/17 67/18
**stipulated [4]** 26/6 26/8 43/10 44/12
**stipulation [14]** 6/19 21/22 22/15 26/19 26/21 28/8 28/9 28/11 28/13 28/13 31/9 38/18 43/12 70/17
**stipulations [1]** 38/19
**storage [1]** 28/2
**straightforward [1]** 58/23
**Street [9]** 1/18 2/6 2/13 3/17 3/21 4/3 4/13 4/17 4/20
**Streets [1]** 1/7
**strips [1]** 30/6
**strong [2]** 11/17 31/10
**stuck [1]** 45/7
**study [1]** 36/19

## S

**subject [1]** 62/4
**submission [2]** 47/24 59/15
**submissions [1]** 18/23
**submit [4]** 9/9 9/18 9/25 20/9
**submitted [2]** 27/19 54/13
**subpoena [1]** 39/4
**subpoenaed [1]** 36/16
**subpoenas [1]** 32/18
**subsequent [5]** 7/20 7/25 54/16 54/18 59/23
**substances [1]** 32/9
**substituted [1]** 42/13
**such [1]** 49/13
**suddenly [2]** 14/2 46/24
**suggest [2]** 48/1 50/14
**suggested [1]** 38/18
**suggesting [1]** 33/21
**suggestion [3]** 20/4 56/12 68/11
**Suite [6]** 1/15 3/9 3/13 4/3 4/10 4/17
**Suites [1]** 2/9
**summary [1]** 19/7
**super [1]** 65/23
**supplemental [1]** 46/11
**supplied [1]** 22/17
**supplier [3]** 27/19 32/5 32/7
**suppliers [9]** 25/6 28/4 32/18 33/8 38/21 44/3 46/24 49/5 49/15
**support [2]** 44/5 46/16
**supported [1]** 46/12
**supposed [4]** 32/24 39/14 50/4 50/7
**sure [19]** 11/17 12/12 14/15 19/15 22/21 23/20 26/14 29/16 33/12 33/13 35/1 35/6 35/15 38/20 54/25 57/15 61/14 62/7 63/12
**surprise [1]** 25/13
**surprised [2]** 22/5 24/24

## T

**table [2]** 60/13 64/6
**tails [1]** 57/7
**take [13]** 5/5 7/1 12/9 17/4 22/6 27/10 37/14 41/4 50/1 50/17 58/20 66/3 67/13
**taken [7]** 55/8 56/6 60/13 62/12 66/12 66/22 69/17
**taking [1]** 12/23
**talk [6]** 25/9 28/9 28/19 45/20 53/1 57/13
**talked [4]** 21/24 28/8 46/10 71/11
**talking [9]** 14/2 14/19 24/2 24/22 32/3 35/7 47/23 50/11 58/12
**talks [1]** 14/22
**target [1]** 18/16
**Teams [2]** 1/6 5/1
**teed [1]** 47/10
**tell [10]** 21/13 24/23 27/2 38/11 41/21 49/23 50/5 57/2 57/17 60/21
**telling [2]** 38/22 44/19
**tenor [1]** 56/12
**terms [5]** 11/6 15/12 30/6 36/11 36/23
**tested [1]** 68/22
**testify [1]** 35/5
**testimony [4]** 53/25 60/2 60/8 62/4
**testing [3]** 53/9 53/12 68/18
**Teva [10]** 3/10 3/11 3/11 3/14 3/15 3/15 3/18 3/19 3/19 68/15
**Texas [1]** 4/11
**Thank [21]** 5/17 10/10 20/25 21/1 27/9 33/13 51/2 51/4 51/5 51/7 52/24 67/11 68/6 71/8 72/7 72/12 72/13 72/15 72/16 72/17 72/18
**thanks [5]** 5/21 5/21 8/21 8/24 72/19
**them [83]**
**themselves [1]** 6/17
**thereafter [2]** 12/4 16/20
**therein [1]** 28/21
**THERESA [1]** 3/2
**these [53]** 5/6 6/15 7/5 11/6 11/17 12/10 12/17 12/17 12/20 13/22 18/12 19/6 21/23 25/1 25/8 25/12 26/3 26/7 27/4 27/15 27/16 29/5 29/10 30/10 30/16 32/15 34/10 34/21 34/24 35/18 36/11 36/13 36/15 37/10 38/2 40/19 46/13 46/15 46/16 47/8 48/6 48/11 49/8 49/15 57/21 58/14 60/10 61/4 65/17 66/19 69/11 69/19 69/20
**they'll [1]** 26/18
**they're [37]** 23/11 26/1 26/17 27/3 27/18 27/19 27/22 27/22 28/2 28/2 28/3 28/10 28/15 32/4 35/21 36/13 37/11 37/23 37/24 39/9 39/15 42/5 43/21 44/3 44/15 45/25 46/15 47/1 49/3 50/3 50/18 50/18 52/20 54/17 59/17 67/17 70/21
**they've [20]** 23/16 25/25 25/25 26/8 27/7 32/11 34/6 34/24 43/6 43/9 43/24 44/7 44/12 44/15 51/14 53/21 55/14 61/7 61/9 61/16
**thing [11]** 9/8 13/7 13/17 18/2 27/23 28/16 48/2 49/13 55/11 60/15 69/6
**things [15]** 17/14 17/16 31/18 38/2 39/14 40/7 40/10 40/17 42/4 42/12 42/12 48/6 48/11 59/5 61/25
**think [75]**
**thinking [2]** 48/19 69/2
**thinks [1]** 45/21
**third [4]** 1/19 2/3 2/4 32/15
**third-party [3]** 1/19 2/4 32/15
**this [163]**
**THOMAS [2]** 1/11 5/3
**THORNBURG [1]** 3/20
**thorniest [1]** 12/19
**thought [8]** 6/2 25/3 25/20 26/19 31/8 33/4 45/10 56/12
**thousands [13]** 21/23 22/2 22/5 23/14 23/22 24/11 24/22 24/24 27/3 27/11 27/12 27/12 46/18
**three [3]** 3/17 22/13 30/19
**through [30]** 6/2 7/4 22/15 24/5 25/9 26/16 28/17 33/2 34/6 35/4 35/5 36/2 36/3 39/4 40/5 42/8 42/16 44/19 60/1 62/15 63/2 64/19 66/6 66/6 66/10 66/19 67/3 69/16 69/18 69/25
**throughout [1]** 30/8
**throw [1]** 37/17
**thrown [1]** 56/8
**Thursday [1]** 59/15
**ticking [2]** 64/20 66/5
**time [35]** 6/21 7/8 7/20 8/10 9/15 15/2 16/19 17/2 17/4 17/5 17/10 18/18 18/21 19/12 19/21 20/2 20/2 20/13 22/17 26/10 26/11 27/21 28/24 29/9 33/8 34/2 51/24 57/23 58/25 59/22 60/4 62/14 64/20 66/5 71/17
**timeline [2]** 12/22 16/9
**times [4]** 14/2 55/12 63/7 63/21
**today [7]** 5/12 6/1 8/23 47/12 60/21 71/2 72/13
**together [9]** 12/24 18/12 40/7 55/19 58/3 59/5 61/11 61/12 63/18
**told [13]** 25/13 25/24 26/1 26/15 34/15 35/18 35/24 36/11 36/15 36/22 43/25 44/15 66/8
**tomorrow [1]** 60/21
**tons [2]** 30/12 47/1
**too [5]** 11/1 15/1 38/6 45/10 54/14
**took [3]** 13/25 30/11 69/7
**top [1]** 17/7
**Torrent [3]** 2/22 2/23 2/23
**toss [1]** 12/6
**totally [2]** 38/16 41/1
**TPP [1]** 14/1
**Transcriber [1]** 73/3
**transcript [2]** 1/23 72/23
**transcription [1]** 1/24
**TRAURIG [2]** 3/8 3/12
**treater [1]** 17/3
**trial [53]** 10/3 10/18 11/3 11/4 11/6 11/10 11/10 11/11 11/12 11/15 12/2 12/11 12/25 13/2 13/13 13/14 13/22 14/1 14/8 14/21 14/25 15/2 15/4 15/5 15/13 15/13 15/14 16/2 16/17 16/18 18/17 19/17 23/19 23/19 26/23 29/1 29/6 29/7 29/12 30/13 30/21 31/16 31/17 34/18 34/19 34/21 35/6 54/15 56/9 57/10 59/12 60/9 69/11
**trials [10]** 11/7 12/20 13/10 14/9 14/10 14/11 19/6 54/16 54/18 59/23
**trickiest [1]** 12/19
**trickling [1]** 25/25
**tried [1]** 33/5
**truly [1]** 62/5
**truthful [1]** 32/23
**try [11]** 12/3 13/10 20/13 20/15 22/12 26/18 27/10 32/17 35/9 55/16 57/25
**trying [14]** 11/25 16/7 18/15 18/21 22/15 23/20 54/11 58/17 58/18 58/19 58/25 62/5 66/3 69/3
**turn [1]** 71/18
**twice [1]** 30/13
**two [11]** 7/21 11/13 16/16 17/5 25/1 37/7 42/16 44/4 44/22 47/12 69/19
**type [1]** 12/21
**types [1]** 17/8

## U

**U.S [7]** 1/7 2/11 2/11 2/15 2/15 2/19 2/19
**ULMER [1]** 4/2
**ultimately [2]** 19/2 37/18
**unbelievable [1]** 45/11
**uncertain [3]** 36/11 36/23 56/16
**uncomfortable [1]** 29/3
**under [14]** 13/21 13/24 14/4 17/16 17/17 17/20 17/23 18/3 25/2 30/10 42/18 55/21 66/21 67/3
**undercut [1]** 56/22
**undergone [1]** 12/7
**understand [16]** 10/17 16/3 25/4 26/14 31/18 37/7 38/8 38/10 45/14 54/8 58/25 58/25 62/13 68/18 69/14 70/2
**understanding [13]** 12/1 18/18 21/16 22/24 24/2 34/8 36/2 38/23 47/21 48/4 50/17 59/24 70/16
**understood [7]** 15/11 15/19 47/13 47/20 61/3 68/5 70/11
**undertake [1]** 57/25
**undertook [1]** 59/2
**underway [1]** 47/11
**undisputed [1]** 59/3
**unfair [3]** 17/15 17/16 30/22
**unfortunate [3]** 65/13 67/11 67/14
**unfortunately [3]** 33/4 39/13 56/11
**UNITED [5]** 1/1 1/10 5/2 42/8 55/20
**unless [1]** 47/24
**unlikely [1]** 24/3
**unnecessary [1]** 69/5
**unquote [2]** 49/8 66/4
**until [3]** 23/6 43/22 48/19
**up [21]** 5/11 13/25 15/4 15/13 15/15 15/20 16/19 17/3 19/6 19/22 23/1 45/9 47/10 53/24 55/16 56/2 62/1 62/23 70/21 70/21 70/23
**update [2]** 52/4 52/25
**updated [1]** 55/12
**updates [1]** 7/22
**updating [1]** 55/14
**upon [8]** 19/22 40/3 40/18 40/25 41/13 41/15 65/19 68/3
**upsets [1]** 41/1
**us [69]** 4/8 16/8 16/11 20/9 23/22 24/23 25/12 25/24 25/25 26/1 26/18 26/21 26/22 27/2 27/3 27/5 27/7 29/18 29/19 29/23 30/5 30/8 31/3 31/6 31/7 32/11 32/22 32/25 33/1 33/3 35/9 38/5 38/9 38/16 39/3 39/7 39/14 43/24 43/25 44/7 44/15 44/16 44/19 45/1 45/5 45/6 45/8 45/11 45/11 45/13 49/14 54/8 57/2 57/17 60/15 60/21 60/22 61/7 61/15 62/19 64/25 66/23 69/10 69/16 69/18 69/18 70/3 70/17 71/15
**USA [5]** 3/11 3/15 3/19 4/15 4/21
**use [9]** 13/14 23/18 27/17 34/16 34/17 34/21 38/22 47/2 54/14
**used [14]** 25/7 28/21 33/8 33/20 41/12 41/19 42/7 53/7 53/13 53/21 54/15 55/17 58/15 65/6
**using [4]** 25/8 36/17 42/4 54/21
**usual [1]** 39/20

## V

**valsartan [3]** 1/3 53/8 53/19
**VANASKIE [11]** 1/11 5/3 14/14 36/6 37/1 37/14 41/3 41/23 43/14 47/6 50/16
**Vanaskie's [1]** 37/17
**various [2]** 59/5 59/7
**VAUGHN [1]** 2/2
**vendor [2]** 22/1 22/8
**vendors [1]** 36/16
**verify [4]** 52/12 61/4 70/7 70/7
**very [31]** 5/10 5/21 10/1 11/16 11/17 12/13 12/21 12/25 19/10 20/10 24/2 26/19 26/20 31/5 31/8 36/6 37/22 37/23 38/6 43/12 43/22 46/11 47/18 51/4 52/7 55/3 55/3 59/25 67/20 69/4 72/14
**via [2]** 1/6 5/1
**VICTORIA [1]** 3/8
**videoconferencing [2]** 1/6 5/1
**view [3]** 26/24 31/3 54/17
**views [1]** 54/13
**Vine [1]** 4/3
**violated [1]** 48/14
**violation [1]** 38/13
**volume [1]** 48/5
**Voorhees [1]** 3/3

## W

**Wacker [1]** 3/13
**wait [1]** 9/15
**Walgreens [1]** 3/23
**walk [3]** 7/4 66/10 67/3
**Walmart [1]** 3/23
**WALSH [1]** 3/16
**want [28]** 6/11 9/8 15/16 22/19 23/22 28/18 30/14 30/20 31/19 33/2 37/7 37/12 37/17 41/8 47/2 47/5 47/7 54/14 54/17 55/13 57/13 63/10 64/13 66/17 66/23 66/24 67/2 68/7
**wanted [8]** 16/10 26/22 28/18 28/20 28/24 30/21 45/20 51/11
**Washington [4]** 2/4 2/18 4/7 4/20
**wasn't [4]** 40/13 40/14 55/1 59/4
**waste [1]** 69/12
**watch [1]** 57/9
**Wave [13]** 10/3 11/3 15/14 17/18 17/25 18/4 18/6 18/23 19/17 21/5 51/13 59/19 69/3
**Wave 2 [1]** 15/14
**way [16]** 7/4 24/10 26/3 29/6 33/6 39/2 44/2 45/14 64/19 64/20 65/5 66/16 70/8 70/9 70/9 70/10
**ways [1]** 44/22
**we'd [2]** 61/1 63/2
**we'll [17]** 6/22 8/17 15/13 31/14 31/14 31/15 38/3 44/5 45/12 50/7 50/12 60/24 63/8 67/20 70/3 70/24 71/7
**we've [31]** 5/25 8/20 13/20 17/3 17/12 26/16 28/1 30/9 34/3 46/3 47/23 49/8 49/13 50/10 53/10 54/7 54/7 55/12 55/14 57/3 60/17 61/9 61/10 63/3 63/5 65/15 65/16 65/17 66/6 66/6 66/7
**week [8]** 9/19 20/14 20/24 21/4 51/16 52/17 52/17 56/24
**weekend [2]** 53/2 59/17
**weeks [5]** 20/9 22/13 25/22 47/10 47/12
**weigh [1]** 65/10
**weight [1]** 58/18
**weighted [4]** 55/24 56/4 56/25 60/18
**WEINSTEIN [1]** 4/19
**went [13]** 25/5 25/10 28/17 33/6 35/4 35/4 36/3 38/7 38/18 38/20 44/19 55/25 69/18
**weren't [3]** 23/4 25/16 69/24
**West [2]** 2/9 3/13
**whatever [5]** 25/24 36/25 48/23 54/15 56/4
**whenever [2]** 9/20 30/25
**where's [2]** 37/12 42/1
**whereas [2]** 17/19 57/10
**whether [13]** 6/8 12/10 12/15 28/25 36/16 38/3 38/15 46/7 50/22 50/24 60/16 63/18 64/12
**while [3]** 5/25 18/21 59/25
**WHITELEY [2]** 1/17 1/17
**whitewash [1]** 31/13
**who's [3]** 10/6 21/15 69/15
**whoever [1]** 54/1
**whole [3]** 34/18 45/15 47/16
**Wholesaler [1]** 4/4
**wholly [1]** 42/8
**wholly-owned [1]** 42/8
**whom [1]** 59/21
**why [21]** 15/7 20/19 20/22 22/14 25/4 25/8 25/12 25/16 27/24 28/1 28/8 37/1 38/3 38/8 39/1 45/15 45/22 62/2 62/7 62/13 65/21
**WILEY [1]** 4/19
**will [36]** 5/8 5/13 5/14 5/18 5/19 6/15 7/24 8/4 10/9 10/12 11/14 13/3 16/1 19/2 21/3 21/3 21/13 22/12 24/7 24/8 40/19 44/21 45/17 48/22 50/13 50/19 50/20 52/19 54/2 57/4 57/25 60/1 60/4 67/12 68/2 72/8
**WILLIAMSON [5]** 2/6 5/8 52/2 56/23 63/6
**willing [3]** 23/23 26/20 28/11
**wisely [1]** 40/4
**withdraw [1]** 7/10
**withdrawal [2]** 7/12 8/14
**withdrawn [1]** 8/6
**withheld [1]** 30/1
**within [3]** 12/22 16/7 22/13
**without [4]** 16/15 16/18 34/7 62/20
**witness [6]** 66/9 66/19 67/7 68/20 68/23 69/15
**witnesses [4]** 42/24 44/19 68/15 68/16
**won't [2]** 31/8 31/21
**word [4]** 15/8 25/9 46/13 62/10
**wording [1]** 46/24
**work [22]** 16/4 16/7 16/19 17/2 18/15 19/2 20/14 21/23 25/23 26/5 26/9 29/8 36/14 57/10 62/22 63/2 63/14 64/19 64/25 65/24 66/8 66/23
**worked [5]** 15/20 29/9 37/1 53/23 66/6
**working [6]** 19/6 53/10 55/15 56/13 62/14 63/14
**works [1]** 71/15
**workup [2]** 18/23 68/13
**world [1]** 31/4
**worthy [1]** 37/9
**wouldn't [3]** 25/20 48/5 48/10
**writing [2]** 45/4 58/7
**written [3]** 27/18 39/25 40/5
**wrote [2]** 30/11 35/3

## Y

**yard [2]** 57/13 60/19
**yeah [12]** 8/25 14/5 20/19 30/14 45/10 51/1 54/25 65/22 65/23 67/13 70/18 71/10
**year [3]** 12/4 14/2 23/6
**years [12]** 26/16 29/22 30/9 31/6 35/4 35/22 35/22 37/21 38/14 39/20 43/14 67/23
**Yes [14]** 5/13 10/24 11/2 15/10 21/21 32/5 45/19 51/10 52/20 52/23 57/6 71/1 72/3 72/11
**yet [2]** 23/17 53/1
**York [4]** 2/10 2/10 2/22 2/22
**you [155]**
**you'll [3]** 5/5 41/16 70/8
**you've [3]** 65/6 70/5 70/6

## Z

**zero [2]** 24/9 58/1
**Zhejiang [3]** 2/10 2/14 2/18
**ZHP [58]** 2/11 2/15 2/19 5/14 5/14 5/18 10/14 23/7 25/7 26/5 26/15 27/17 27/24 28/13 28/18 28/20 28/21 28/25 29/3 29/13 29/18 31/21 32/22 33/18 33/22 34/2 34/8 34/10 39/7 39/14 42/4 42/8 42/12 42/15 42/24 43/23 46/8 46/17 47/21 49/24 50/6 50/8 52/10 53/5 54/19 55/4 56/14 57/12 58/5 60/15 61/2 62/20 63/4 63/8 63/14 66/6 66/19 70/16
**ZHP's [5]** 26/25 37/10 49/2 55/10 67/23
**zinc [2]** 42/6 42/10