# Exhibit 1

3/10/25

John A. Russo, M.D.
South Mountain Medical Associates
1500 Pleasant Valley Way, Suite 206
West Orange, N.J., 07052
Tele- 973-736-8339
Fax -973-736-8119

Adam Slater, Esq.
Mazie Slater Katz & Freeman, LLC
103 Eisenhower Parkway
Roseland, New Jersey 07068

Dear Mr. Slater:

I am a Physician licensed in the State of New Jersey, and I am board certified in Internal Medicine. I am the Section Chief in the Department of Medicine at Cooperman Barnabas Medical Center, in Livingston, New Jersey. My professional background and experience is set forth in more detail in my curriculum vitae, which is attached as Exhibit A.

I have been retained as an expert witness and will be compensated for my time spent in the preparation of my report and preparing for and providing testimony. I have no financial interest in the outcome of this matter. All of my opinions are stated to a reasonable degree of medical certainty.

I have been asked to provide my opinions with regard to the question of whether Zhejiang Huahai Pharmaceuticals ("ZHP"), and its United States subsidiaries Solco Healthcare, Prinston Pharmaceuticals, and Huahai U.S., adequately warned physicians and patients of the risks of using ZHP's Valsartan products contaminated with nitrosamines including NDMA.

My opinions are based on my education, knowledge, background, and experience, including my experience as a prescribing physician of Valsartan and other treatments for high blood pressure, during the relevant time period. I have also considered the materials discussed and referenced in this report, and the list of materials reviewed is attached as Exhibit B.

1

As a regular part of my medical practice, I treat patients for high blood pressure and related medical conditions.  This includes the prescription of medications, including the generic blood pressure medication Valsartan, and the brand name product Diovan, as well as numerous alternatives.  I am familiar with the indications, contraindications, risks, and benefits of Valsartan, as well as alternative treatments.  I am also familiar with the notifications in 2018 that Valsartan manufactured by some but not all manufacturers was found to contain nitrosamine impurities including NDMA and NDEA, as I had patients who were taking the contaminated Valsartan and I transitioned them to replacement medications.

In summary, and as discussed in more detail below, it is my opinion that ZHP and its subsidiaries failed to adequately warn physicians and patients of the risks of the nitrosamine-contaminated Valsartan they manufactured, marketed, and sold in the United States. This is based on their failure to disclose: (1) that the Valsartan contained NDMA, and (2) that NDMA was classified as a known animal carcinogen and probable human carcinogen.  All opinions set forth are held to a reasonable degree of medical certainty.

## Background

Stated simply, hypertension, or high blood pressure, is a chronic medical condition in which the force or pressure of the blood that is flowing through the vessels in one's body is too high.  This condition may or may not be accompanied by symptoms, and if uncontrolled increases the risk that a person will develop cardiovascular disease, renal disease, or cerebrovascular disease resulting in stroke.

Hypertension can be treated in various ways. Alterations in diet, weight reduction, and exercise can improve blood pressure. Treatment options include medication to reduce blood pressure.  There are various classes of medications indicated for the treatment of hypertension. Valsartan is a generic drug that belongs to the class of medications known as angiotensin receptor blockers ("ARBs"), which are prescribed primarily for hypertension, and also for heart failure and related indications.  ARBs exert their effect by allowing blood vessels to relax and widen reducing blood pressure, and can be paired with other medications in the same pill or via a separate pill,

2

including hydrochlorothiazide which is a diuretic, and amlodipine which is a calcium channel blocker. During the relevant time period, there were many brand and generic drugs available to be prescribed in this class. For example, Valsartan is the generic version of the brand name drug Diovan. In addition, there was non-contaminated Valsartan, Losartan (Cozaar), Irbesartan (Avapro), Olmesartan (Benicar), Candesartan (Atacand), and Telmisartan (Micardis).

At no time was there a need for any patient to take Valsartan in general, or ZHP's contaminated Valsartan in particular, to the exclusion of all other treatments, including the numerous safe and effective non-contaminated alternatives in the ARB class.

Other medications and treatments for hypertension include angiotensin-converting enzyme inhibitors which work by relaxing blood vessels ("ACE inhibitors"), beta blockers which slow down one's heart rate, calcium channel blockers which relax blood vessels, and diuretics that work by stimulating the kidneys to release excess salt and water into the urine. These treatments can be prescribed in isolation, and some may be prescribed in combination. In addition, as stated above, hypertension can be effectively treated in some patients with lifestyle modifications (i.e., avoidance of smoking and alcohol, reduced salt in the diet, proper sleep hygiene, weight reduction, and regular exercise.

In summary, during the relevant time period, there were numerous alternative safe and effective treatments available for the treatment of hypertension, which I prescribed for various patients. These medications and treatments, including the ARBs listed above, are expected to be prescribed and utilized by patients on a long-term and in most cases permanent basis.

The determination of what treatment to recommend in each instance is guided by the physician's clinical judgment in assessing the benefits and risks for each individual patient based on his or her clinical presentation, medical history, and other relevant factors. The primary source of information for physicians as to the risks of a medication is the label and the package insert. The adequacy of the warning is measured by determining whether the disclosed list of risks includes risks that a reasonable physician would need to know to conduct a reasonable risk-benefit analysis as part of a prescribing recommendation. The physician weighs the benefits of the medication against the risks and discloses this information to the patient. This is the

process followed by any reasonable physician treating a patient with hypertension. The ultimate decision as to whether to provide informed consent and accept a physician's recommendation, is the patient's.

In evaluating the question of the adequacy of the warnings for the sale of Valsartan contaminated with NDMA (here, no warning was provided), I have relied on my training and clinical experience with regard to the use and consideration of drug information and warnings as part of the prescribing decision. This is a fundamental part of a physician's training and as a teacher of medical students and residents, I have also taught the use and consideration of the information provided by the manufacturer of a prescription medication. I have also considered the FDA standards for manufacturers to provide safety and risk information. FDA, *Guidance for Industry: Labeling for Human Prescription Drug and Biological Products – Implementing the PLR Content and Format Requirements*, at 13 (Feb. 2013) (including the cited regulation 21 C.F.R. § 201.57(a)(10), and (c) (6) referenced in (a)(10)), https://www.fda.gov/media/71836/download; and the Field Alert regulation, 21 C.F.R. § 314.81(b)(1). In part, 21 C.F.R. 201.57(a)(10) provides that a warning "must include a concise summary of the most clinically significant safety concerns from the [label] that affect decisions about whether to prescribe the drug," and references and requires the warning to comply with 21 C.F.R. 201.57(c)(6), which requires warnings of "potential safety hazards." This standard is fully consistent with the standard I have applied in forming my opinions here, and the expectations of reasonable physicians in clinical practice.

It is important to remember that in this instance the question is not whether a warning was adequate to inform physicians and patients of the risk of an approved drug with an approved risk. Instead, the issue arises from the complete lack of any disclosure or warning of the presence of NDMA as an impurity, which was not known or approved by the FDA. It is my understanding that disclosing the contamination to the FDA was required, and we know that once that occurred the recall occurred due to the "unacceptable carcinogenic risk to the intended patient population," per the press releases. Physicians and patients directly benefitted from that disclosure and knew to switch their treatment once the FDA provided that information.

The contamination with NDMA is the most fundamental information that was required to be provided to clinicians, who had no reason to suspect

that it was present and needed that information in order to make an informed prescribing recommendation. That information alone would have been sufficient to cause reasonable physicians to ensure that patients were not taking the contaminated pills. In addition, the status of NDMA as a probable human carcinogen should also have been disclosed to make clear why the presence of the NDMA created a safety risk, defined by ZHP as "an unacceptable carcinogenic risk to the intended patient population." This could have been done in the labeling, the package insert, and/or a Dear Doctor letter, at the very least (again putting aside my understanding that the recall would have been triggered when this information was provided to the FDA, as occurred here).

The failure by ZHP and its subsidiaries to make any disclosure of the NDMA contamination rendered the warnings for the contaminated Valsartan inadequate by definition. This is especially true where the Valsartan was marketed as the approved formulation of Valsartan despite the NDMA contamination—which was contrary to the understanding and expectations of physicians and patients who were misled into believing they were prescribing/using the approved formulation.

ZHP's Valsartan

ZHP was the manufacturer of Valsartan active pharmaceutical ingredient ("API") that was contaminated with the nitrosamine impurity NDMA. The creation of the NDMA due to ZHP's change in the manufacturing process for Valsartan is described in the reports of Stephen Hecht, Ph.D and Laura Plunkett, Ph.D., as well as at least one FDA communication. The contaminated API was incorporated into Valsartan finished-dose pills by ZHP. The finished-dose pill bottles sold by ZHP and its subsidiaries were labeled by ZHP with the Solco label in China, and then distributed and sold in the United States via ZHP's United States subsidiaries Solco Healthcare, Prinston Pharmaceuticals, Inc., and Huahai, US, Inc.[1]

---

[1] Hai Wang 3/10/21 Dep. Tr. 31:16-33:1. Hai Wang was the Senior Vice President of Huahai, US, Inc., Senior Vice President of Prinston Pharmaceutical, Inc., and President of Solco Healthcare. PRINSTON00206868; PRINSTON00031140; PRINSTON00031938; PRINSTON00124391; PRINSTON000285200; PRINSTON00463676, p. 13-14; PRINSTON00463638, p. 13-14; ZHP01890025, p. 13-14; PRINSTON00019546; PRINSTON00177054; PRINSTON000169288, at p.

5

In addition to Valsartan, ZHP also sold the combination medication Valsartan Hydrochlorothiazide ("Valsartan HCTZ").[2]  For purposes of this report regarding the adequacy of the warnings, references to Valsartan include both the Valsartan and Valsartan HCTZ manufactured and sold by ZHP and its subsidiaries in the United States during the relevant time period.

According to ZHP, the contaminated Valsartan and Valsartan HCTZ sold by ZHP through its subsidiaries in the United States would have first been available for purchase in or about October 2015.[3]

I have reviewed the labels and package inserts for ZHP's Valsartan, including in particular from October 2015 through July 2018 when the recall occurred, and none disclose the actual or even potential presence of NDMA contamination, or the status of NDMA as a known animal carcinogen and probable human carcinogen.

I have also reviewed the compendial descriptions from the United States Pharmacopeia ("USP") and the Orange Book with regard to ZHP's Valsartan.[4]  None suggest that NDMA was a known or approved ingredient or impurity in the Valsartan.

Based on the complete lack of disclosure, no physician or patient would have had any reason to know or suspect that ZHP's Valsartan was contaminated with NDMA at any time before public disclosure occurred in 2018.

On or about July 13, 2018, Prinston and Solco issued press releases that indicated in part: "This product recall is due to the detection of a trace amount of an unexpected impurity, NDMA, made by the manufacturer, ZHP, that is used in the manufacture of the subject product lots…This impurity has

---

5-6, 10, 17; ZHP02457852, p. 7-8, 16, 33, 133, 135; ZHP00692101, p. 6, 8, 16, 32-33, 126-27;  ZHP01343365, p. 6, 8, 16, 32-33; ZHP01582493, p. 6, 9, 17, 33-35, 147-48.

[2] PRINSTON00037537; PRINSTON00063347; PRINSTON000248351; PRINSTON00065582; PRINSTON00065545.

[3] Hai Wang 3/10/21 Dep. Tr. 96:15-20.

[4] PRINSTON00141349; ZHP02614594; ZHP01303141; FDA Orange Book (2012-2018); FDA Cumulative Orange Book Supplements (2012-2018).

been classified as a probable human carcinogen as per International Agency for Research on Cancer (IARC) classification…The exposure to the impurity NDMA that was detected in the valsartan product line presents an unacceptable carcinogenic risk to the intended patient population."[5]  Blood pressure pills contaminated with an impurity that presents an unacceptable carcinogenic risk to the intended patient population had an unacceptable risk-benefit analysis, and would not be knowingly prescribed by any reasonable physician, especially in light of the many available alternatives.

I have been provided excerpts of depositions of ZHP employees in which they agreed that NDMA is a probable human carcinogen and that the Valsartan could not be sold with the NDMA contamination.  This includes:

Min Li:  stating that NDMA "is a … probable human carcinogen."[6]  (Min Li. 4/22/21 Dep. Tr.  633:9).  In addition, Min Li agreed that "NDMA is considered a probable human carcinogen based on projection from the animal studies." (*Id.* at 663:14).

In addition, Min Li testified that due to the carcinogenic risk, it would be unethical to knowingly give NDMA to humans for study purposes, including at the levels found in ZHP's Valsartan.[7] (*Id.* at 686:12).

Eric Gu stated with regard to the NDMA formed during the valsartan API manufacturing, "It's a probable human carcinogen."  (Eric Gu 4/6/2021 Dep. Tr. 366:16).

Hai Wang testified that patients, regular people "might not want to take valsartan with NDMA impurity in it."  (Hai Wang 3/10/2021 Dep. Tr. 299:2).

"[I]f I know there's NDMA exceeding the limit, yeah, of course I would not purchase it."  (*Id.* at 299:19-21).  It "[c]ould not be sold because it's not meeting spec, period."  (*Id.* at 301:12-13).  "No one wants to have NDMA."  (*Id.* at 326:1).

---

[5]  Hai Wang 3/10/21 Dep. Tr. 272:10-283:19; SOLCO00024231; SOLCO00024226.

[6] Min Li. 4/22/21 Dep. Tr. 633:8-9.

[7] *Id.* at 685:11-687:4.

On or about July 13, 2018, the FDA issued its first notification to the medical community and patients that the Valsartan manufactured and sold by ZHP in the United States contained NDMA.[8]   The July 13, 2018 announcement stated in part that: the impurity NDMA had been discovered in the Valsartan sold by ZHP, NDMA is a "probable human carcinogen," as a result the drugs did not meet the FDA's "safety standards," and patients should continue to take their Valsartan medications until a replacement therapy could be prescribed.

The FDA's recommendation that patients continue to take the contaminated pills until their physicians could prescribe replacement therapy was not an endorsement of the safety of the contaminated pills.  Instead, it was the product of a straightforward risk-benefit analysis comparing the short-term risk of a disabling or fatal cardiac or vascular event due to abrupt cessation of hypertension therapy as against the longer-term risk of cancer. The FDA made the reasonable determination that the immediate risk had to be prioritized, with the expectation per the announcement that patients would promptly seek and be directed to safe alternative therapies, of which there were many.

The FDA issued several additional public notifications regarding the contamination and recall.[9]

---

[8] FDA, *FDA announces voluntary recall of several medicines containing valsartan following detection of an impurity* (July 13. 2018), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity.

[9] FDA, *FDA Statement on FDA's ongoing investigation into valsartan impurities and recalls and an update on FDA's current findings* (Aug. 30, 2018), https://www.fda.gov/news-events/press-announcements/fda-statement-fdas-ongoing-investigation-valsartan-impurities-and-recalls-and-update-fdas-current; FDA, *FDA provides update on its ongoing investigation into valsartan products; and reports on the finding of an additional impurity identified in one firm's already recalled products* (Sept. 13, 2018), https://www.fda.gov/news-events/press-announcements/fda-provides-update-its-ongoing-investigation-valsartan-products-and-reports-finding-additional; FDA, *FDA Statement on the FDA's ongoing investigation into valsartan and ARB class impurities and the agency's steps to address the root causes of the safety issues* (Jan. 25, 2019), https://www.fda.gov/news-

On or about February 28, 2019, the FDA announced the maximum permitted levels of NDMA (0.3 ppm/96 ng in a 320 mg pill).[10]  It is my understanding that all of the ZHP Valsartan sold by and through ZHP, Solco, Prinston, and Huahai, US, in the United States contained NDMA in excess of the stated NDMA levels.[11] Prior to the establishment of those limits, it is my understanding that no level of NDMA in Valsartan had been deemed acceptable by the FDA.

Opinions

As a generic drug, specifically as the generic version of the branded drug Diovan, ZHP's Valsartan was required to be the equivalent of Diovan in all material respects.  Every manufacturer's generic Valsartan was expected by physicians and patients to have equivalent safety, purity, quality, identity, and strength to the branded product. Physicians rely on this expectation in

_____

events/press-announcements/fda-statement-fdas-ongoing-investigation-valsartan-and-arb-class-impurities-and-agencys-steps; FDA, *FDA provides update on its ongoing investigation into ARB drug products; reports on finding of a new nitrosamine impurity in certain lots of losartan and product recall* (Mar. 1, 2019), https://www.fda.gov/news-events/press-announcements/fda-provides-update-its-ongoing-investigation-arb-drug-products-reports-finding-new-nitrosamine; FDA, *FDA Statement on the agency's list of known nitrosamine-free valsartan and ARB class medicines, as part of agency's ongoing eff orts to resolve ongoing safety issue* (Apr. 4, 2019), https://www.fda.gov/news-events/press-announcements/fda-statement-agencys-list-known-nitrosamine-free-valsartan-and-arb-class-medicines-part-agencys; FDA, *Statement on the agency's ongoing eff orts to resolve safety issue with ARB medications* (Aug. 28, 2019), https://www.fda.gov/news-events/press-announcements/statement-agencys-ongoing-efforts-resolve-safety-issue-arb-medications; FDA, *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)* (Nov. 13, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

[10] *Id.*; FDA, *Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry* (Sept. 2024), https://www.fda.gov/media/141720/download.

[11] Hai Wang Dep. Tr. 154:3-11, 158:23-159:6.

conducting their risk-benefit analysis and giving their prescribing recommendation to their patient. That is the reason why physicians are willing to prescribe the generic form of a branded drug. Without that mandated equivalence, the generic drug would not be prescribed by a reasonable physician. For example, Dr. Robichaux, who prescribed the Valsartan to Mr. Roberts, confirmed in his deposition that he would not have prescribed contaminated Valsartan to Mr. Roberts, and if he had known of the contamination, he would have prescribed a different medication.

There was no health benefit to the inclusion of NDMA in ZHP's Valsartan. Thus, the presence of the NDMA only added risk, with no benefit. I agree with ZHP's own description of the risk-benefit analysis when factoring in the risk presented by the contamination: an "unacceptable carcinogenic risk to the intended patient population." Even if one were to retroactively apply the acceptable limits established by the FDA after the recall, the same would hold true since the contamination of ZHP's Valsartan exceeded those levels. (Dr. Stephen S. Hecht 7/6/2021 Report, p. 21-23; 25-26; Dr. Stephen S. Hecht 10/31/2022 Report, p. 9-11).

ZHP, Solco, Prinston, and Huahai, US failed to disclose the NDMA contamination to the FDA, and failed to adequately warn physicians and patients of the risks of ZHP's contaminated Valsartan, due to their failure to disclose that the Valsartan contained the nitrosamine impurity NDMA. Warning that that NDMA was classified as probable human carcinogen and presented an "unacceptable carcinogenic risk to the intended patient population," should also have been included. This was material information with regard to a "potential safety hazard," the unreasonable safety risk that should have been disclosed to physicians and patients, who needed that information to conduct a reasonable risk-benefit analysis, and make a reasonable prescribing decision and recommendation.

In short, injecting an unapproved, known carcinogen/probable human carcinogen into the pills introduced a material risk that had to be disclosed, whether via the label, the package insert, a Dear Doctor letter, or otherwise, to enable reasonable physicians and patients to make informed decisions. This was the same information that, once disclosed, resulted in the recall of ZHP's Valsartan, and ZHP's statement that the contamination presented an "unreasonable carcinogenic risk to the intended patient population." If ZHP had disclosed the contamination earlier, the contaminated Valsartan would not have been recommended or prescribed by any reasonable physician,

10

and it is my understanding and opinion that it would not have been sold and would not have been available to be prescribed. My opinions address the fact that ZHP did, in fact, market its contaminated Valsartan, without any disclosure or warning of the existence of the contamination or the accompanying risk, and that physicians (including me) unknowingly prescribed contaminated Valsartan, which was then unknowingly sold to patients by retail pharmacies.

In addition to the lack of disclosure/failure to adequately warn, the representation that the drugs were Valsartan on the labels and package inserts was an affirmatively misleading representation to physicians and patients, that the drug was the FDA-approved formulation of generic Valsartan. Without that representation, ZHP's Valsartan would not have been prescribed or recommended by a reasonable physician, and in fact could not have been sold, as evidenced by the recall.

The FDA announcement that informed patients not to cease use of the contaminated Valsartan until they could consult their physician and receive a prescription for a replacement medication or therapy, does not change this opinion. This was not an endorsement of the safety of the drugs at issue despite the presence of the NDMA. Rather, it was a weighing of the risks and benefits as between the risks of cardiac and other potentially fatal consequences of abruptly ceasing the use of a blood pressure medication in the very short term, as compared to the longer-term increased risk of cancer. I was one of the physicians who was called upon to prescribe new medications or therapies for patients who were taking contaminated Valsartan, and the same risk-benefit applied to my prescribing decisions, and to those of other prescribing physicians. Once informed of the contamination, it was required to promptly replace the Valsartan with another efficacious medication or treatment.

John A. Russo, M.D.

# Exhibit A

CURRICULUM VITAE     2025

John A. Russo, M.D.
South Mountain Medical Associates
1500 Pleasant Valley Way, Suite 206
West Orange, N.J., 07052
Tele- 973-736-8339
Fax -973-736-8119

Section Chief Department of Medicine
Clinical Instructor of Medicine
Cooperman Barnabas Medical Center
Livingston, N.J. 07039
2007- present

Past President of Medical Staff of Cooperman Barnabas Medical
Center 2019-2021,
Medical Staff Officer Cooperman Barnabas Medical Center ( since
2011) Livingston, N.J. 07039

Clinical Instructor of Medicine
Department of Family Medicine
Rutgers New Jersey Medical School
Newark, New Jersey
2002 – present

Nursing Home Medical Director 2002-2005, 2019-2023
Attending Medical Staff Member 2002- present
Care One Rehabilitation Care Center at Livingston
68 Passaic Ave ,Livingston , N.J. , 07039

Nursing Home Medical Director 2015-2016
Care One Rehabilitation Care Center at Hanover
101 Whippany Road
Whippany, N.J. , 07981


Attending Medical Staff Member
Inglemoor Rehabilitation & Care Center
311 South Livingston Ave
Livingston , N.J., 07039
2005- present


EDUCATION
Internship- Residency
University of Medicine and Dentistry of New Jersey
Rutgers New Jersey Medical School
Newark, N.J.
Graduation – 6/87


Clinical Fifth Pathway Program
Rutgers Medical School
Newark Beth Israel Medical Center
Graduation – 6/83


UAG School of Medicine
Guadalajara, Mexico
Graduation – 12/81


Rutgers College / Rutgers University
New Brunswick, N.J.,Graduation 6/77

LICENSURE

Board Certified American Board of Internal Medicine
9/88
New Jersey Medical License 1986( active)


AWARDS
Top Doctors: New York Metro Area (book series): 10th Edition, 11th
Edition, 12th Edition, 13th Edition, 14th Edition, 15th Edition, 16th
Edition, 17th Edition, 18th Edition, 8th Edition, 9th Edition
Jersey's Best Magazine Top Doctors: 2010, 2011, 2012, 2013, 2014,
2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024
Top Doctors New York Metro Area (digital guide): 2016, 2017, 2018,
2019, 2020, 2021, 2022, 2023
New York Magazine: Top Doctors: 2021, 2022, 2023, 2024

# Exhibit B

## Dr. John Russo's List of Materials Reviewed

ZHP Documents:

1. ZHP00692101

2. ZHP01582493

3. PRINSTON00169288

4. ZHP01343365

5. PRINSTON00037537

6. PRINSTON00063347

7. PRINSTON00065582

8. PRINSTON00248351

9. ZHP02457852

10.     PRINSTON00177013

11.     PRINSTON00019518

12.     ZHP01890025

13.     PRINSTON00463638

14.     PRINSTON00463676

15.     SOLCO00024226

16.     SOLC000024231

17.     PRINSTON00141349

18.     PRINSTON00065545

19.    PRINSTON00035229

20.    ZHP02614594

21.    ZHP01303141

22.    PRINSTON00206868

23.    PRINSTON00031140

24.    PRINSTON00031938

25.    PRINSTON00124391

26.    PRINSTON00285200

FDA Materials:

1. FDA, *FDA announces voluntary recall of several medicines containing valsartan following detection of an impurity* (July 13. 2018), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity.

2. FDA, *FDA Statement on FDA's ongoing investigation into valsartan impurities and recalls and an update on FDA's current findings* (Aug. 30, 2018), https://www.fda.gov/news-events/press-announcements/fda-statement-fdas-ongoing-investigation-valsartan-impurities-and-recalls-and-update-fdas-current.

3. FDA, *FDA provides update on its ongoing investigation into valsartan products; and reports on the finding of an additional impurity identified in one firm's already recalled products* (Sept. 13, 2018), https://www.fda.gov/news-events/press-announcements/fda-provides-update-its-ongoing-investigation-valsartan-products-and-reports-finding-additional.

4. FDA, *FDA Statement on the FDA's ongoing investigation into valsartan and ARB class impurities and the agency's steps to address the root causes of the safety issues* (Jan. 25, 2019), https://www.fda.gov/news-events/press-announcements/fda-statement-fdas-ongoing-investigation-valsartan-and-arb-class-impurities-and-agencys-steps.

5. FDA, *FDA provides update on its ongoing investigation into ARB drug products; reports on finding of a new nitrosamine impurity in certain lots of losartan and product recall* (Mar. 1, 2019), https://www.fda.gov/news-events/press-announcements/fda-provides-update-its-ongoing-investigation-arb-drug-products-reports-finding-new-nitrosamine.

6. FDA, *FDA Statement on the agency's list of known nitrosamine-free valsartan and ARB class medicines, as part of agency's ongoing efforts to resolve ongoing safety issue* (Apr. 4, 2019),

3

https://www.fda.gov/news-events/press-announcements/fda-statement-agencys-list-known-nitrosamine-free-valsartan-and-arb-class-medicines-part-agencys.

7. FDA, *Statement on the agency's ongoing eff orts to resolve safety issue with ARB medications* (Aug. 28, 2019), https://www.fda.gov/news-events/press-announcements/statement-agencys-ongoing-efforts-resolve-safety-issue-arb-medications.

8. FDA, *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)* (Nov. 13, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

9. FDA, *Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry* (Sept. 2024), https://www.fda.gov/media/141720/download.

10. FDA Orange Book (2012-2018).

11. FDA Cumulative Orange Book Supplements (2012-2018).

12. FDA, *Guidance for Industry: Labeling for Human Prescription Drug and Biological Products – Implementing the PLR Content and Format Requirements* (Feb. 2013), https://www.fda.gov/media/71836/download.

13.     21 C.F.R. 201.57

14.     21 C.F.R. 201.56

15.     21 C.F.R. § 314.81

Depositions:

1. Hai Wang 3/10/2021 Dep. Tr.

2. Eric Gu 4/5-6/2021 Dep. Tr.

3. Min Li. 4/22/21 Dep. Tr.

4. Dr. Robert O. Robichaux 12/2/2025 Dep. Tr., with exhibits

Expert Reports:

1. Dr. Stephen S. Hecht's July 6, 2021 Report

2. Dr. Stephen S. Hecht's October 31, 2022 Supplemental Report

3. Dr. Laura M. Plunkett's October 31, 2022 Report

Other Materials:

1. IARC, *Overall Evaluations of Carcinogenicity: An Updating of* IARC
   Monographs *Volumes 1 to 42* (1987),
   https://publications.iarc.fr/_publications/media/download/3283/b2fe29
   5e10e63fd88e772d2ab60ae9a1e3ddd446.pdf.