# Exhibit 2

Page 1

1           UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW JERSEY
2                 CAMDEN VICINAGE
                MDL No. 2875
3

4

    X---------------------------X
5   IN RE:  VALSARTAN,         : CIVIL ACTION
    LOSARTAN, AND IRBESARTAN   : DEPOSITION OF:
6   PRODUCTS LIABILITY         :
    LITIGATION,                :
7                              :
    THIS DOCUMENT RELATES TO:  :
8   Gaston Roberts et al. v.   : JOHN A. RUSSO,
    Zhejiang Huahai            :    M.D.
9   Pharmaceutical Co. Ltd.,   :
    et al,                     :
10                             :
    Case No.                   :
11  1:20-cv-00946-RBK-JS       :
    X---------------------------X
12

13  C O M P U T E R I Z E D   T R A N S C R I P T
    of the stenographic notes of the proceedings in
14  the above-entitled matter as taken by and before
    MELISSA J. LUMI, a Certified Court Reporter, No.
15  30X100237000, and Notary Public of the State of
    New Jersey, taken remotely, on May 13, 2025
16  commencing at 10:00 in the forenoon.
17

18

19

20

21

22

23

24

25

```
                                                  Page 2
 1    A P P E A R A N C E S:
 2
 3    MAZIE SLATER KATZ & FREEMAN
      BY:   ADAM M. SLATER, ESQ.
 4          MICHAEL R. GRIFFITH, ESQ.
            103 Eisenhower Parkway - 2nd Floor
 5          Roseland, New Jersey  07068
            Aslater@mazieslater.com
 6    Attorneys for the Plaintiff.
 7
      KIRKLAND & ELLIS, LLP
 8    BY:   ASHER TRANGLE, ESQ.
            NOAH EPSTEIN, ESQ.
 9          1301 Pennsylvania Avenue
            Washington, D.C.  20004
10          Asher.trangle@kirkland.com
            Noah.epstein@kirkland.com
11    Attorneys for the Defendants - Zheijian Huahai
      Pharmaceutical Co., Ltd., Huahai US Inc., Solco
12    Healthcare, U.S. LLC, and Prinston
      Pharmaceutical, Inc.
13
14    GREENBERG TRAURIG, LLP
      BY:   STEVEN M. HARKINS, ESQ.
15          Terminus 200
            3333 Piedmont Road, NE, Suite 2500
16          Atlanta, Georgia  30305
            Harkinss@gtlaw.com
17    Attorneys for the Teva Pharmaceuticals USA, Inc.,
      Teva Pharmaceutical Industries Ltd., Actavis LLC,
18    and Actavis Pharma, Inc.
19
      ALSO PRESENT:
20          Tyler Rahner - Videotape Specialist
21
22
23
24
25
```

Page 3

1                    I N D E X

2  Witness                        Page No.

3  JOHN A. RUSSO, M.D.

4  Examination by Mr. Trangle:      5, 265

5  Examination by Mr. Slater:       246

6

7

8

9                  E X H I B I T S

10  No.              Description          Page No.

11  Exhibit 1    Testimony List           17

12  Exhibit 2    Notice of Filing         26

13  Exhibit 3    Invoice                  37

14  Exhibit 4    Final Report             44

15  Exhibit 5    Deposition Transcript    56

16               Summary

17  Exhibit 6    July 13, 2018 FDA News   158

18               Release

19  Exhibit 7    FDA Statement            159

20  Exhibit 8    British Journal of Cancer  213

21               Review Article

22

23

24

25

Page 4

1          VIDEOTAPE OPERATOR:  All right.

2    We are on the record at 10:18 a.m. on May 13,

3    2025.  Please note that this deposition is being

4    conducted virtually.  Quality of recording

5    depends on the quality of camera and internet

6    connection of participants.  What is seen from

7    the witness and heard on screen is what will be

8    recorded.  Audio and video recording will

9    continue to take place unless all parties agree

10   to go off the record.

11          This will begin the video-recorded

12   testimony of John Russo, M.D., taken for a matter

13   in regards to the Valsartan, Losartan and

14   Irbesartan Products Liability Litigation as it

15   relates to Gaston Roberts, et al, versus

16   Zheijiang Huahai Pharmaceutical Co., et al, filed

17   in the United States District Court for the

18   District of New Jersey, Cam- -- Camden Vicinage,

19   Case Number 1:20-cv-00946-RBK-JS.

20          The deposition is being conducted

21   remotely using virtual technology.  My name is

22   Tyler Rahner representing Veritext Legal

23   Solutions, and I'm the videographer.  The court

24   reporter is Melissa Lumi also representing

25   Veritext Legal Solutions.

```
                                           Page 5
  1              All present counsels' appearances
  2     will be reflected on the stenographic record, and
  3     the court reporter will now swear in the witness.
  4                        * * *
  5          J O H N    R U S S O,  M. D.,
  6              having been duly sworn,
  7              according to law, upon his
  8              oath, testifies as follows:
  9
 10                     EXAMINATION
 11     BY MR. TRANGLE:
 12          Q.    All right.  Doctor, can you please
 13     state your full name for the record.
 14          A.    John, J-O-H-N, Russo, R-U-S-S-O.
 15          Q.    Okay.  And I know you've been
 16     deposed before, so I won't belabor the rules, but
 17     let's just try not to talk over each other today,
 18     if that works for you.  Yes?
 19          A.    Yes, I understand.
 20          Q.    Okay.  Is there anything
 21     preventing you from giving complete and accurate
 22     testimony today?
 23          A.    What's that?
 24          Q.    Is there anything preventing you
 25     from giving complete and accurate testimony
```

Page 6

1    today?

2            A.     No.

3            Q.     Can anyone other than the

4    participants in this Zoom hear your testimony

5    today?

6            A.     No.

7            Q.     Okay.  Do you have any programs

8    open on your computer other than Zoom?

9            A.     No.

10           Q.     Okay.  You understand that we're

11   here to discuss opinions you're offering as an

12   expert for a plaintiff involved in the In Re:

13   Valsartan Litigation.  Right?

14           A.     Yes.

15           Q.     What's the name of the Plaintiff?

16           A.     What is the name of the Plaintiff?

17           Q.     Yes.

18           A.     Well, we refer to it ZHP, and I

19   may mispronounce this, Zheijiang Huahai

20   Pharmaceuticals, a subsidiary of Solco

21   Healthcare, Prinston Pharmaceuticals and Huahai

22   U.S.

23           Q.     That's the name of the Plaintiff,

24   Dr. Russo?

25           A.     Well, those are the -- my

Page 7

1    understanding, from the materials I reviewed,

2    those are the names of these different entities

3    that were producing -- that -- that this

4    litigation is concerning, producing the generic

5    form of Valsartan.

6            Q.    Right.  And are those entities the

7    plaintiffs in this case?

8            A.    Yes, my understanding is those are

9    the plaintiffs in this case.

10           Q.    Okay.  What's your understanding

11   of your role in this litigation?

12           A.    I was asked to review various

13   records that were forwarded to me, I think I list

14   them as one of the exhibits, and give information

15   or my perspective as a physician actively in

16   practice concerning that time period of when this

17   drug was deemed to contain these possible --

18   probable carcinogenic agents and the period of

19   time where it was apparent and -- and then the

20   time period that passed where formally the FDA

21   took it off the market and all of the risks that

22   were posed to the patients that were on this drug

23   and physicians in the community that were using

24   that drug unknowingly that were subjecting their

25   patients to this risk of -- of possible -- a

Page 8

```
 1    possible carcinogenic agent.
 2            Q.     What's the name of that possible
 3    carcinogenic agent?
 4            A.     It's a nitrosamine.
 5            Q.     Okay.  Which nitrosamine?
 6            A.     NDMA.
 7            Q.     Okay.  What does that stand for?
 8    Could you hear me?  Sorry.  You froze for a
 9    second.  Do you want me to repeat the question?
10            A.     It -- it's a nitrosamine, I have
11    to -- the exact chemical -- it's a nitrosamine
12    impurity, the exact -- I have it in my report
13    here.  Forgive me because I don't want to again
14    mispronounce that.
15            Q.     Okay.
16            A.     It's nitrosamine dimethylamine.
17            Q.     Doctor, how did you prepare for
18    today's deposition?
19            A.     I reviewed my report, which I
20    rendered in March of 2025, and I reviewed the
21    records that were forwarded to me to refresh my
22    memory, you know, when I did render this report
23    in preparation for today's deposition.
24            Q.     Okay.  Those -- that's the
25    totality of the materials that you reviewed for
```

Page 9

```
1    preparing for today's deposition?
2            A.     Yes.  I don't believe -- I have to
3    think for a moment.  I don't believe I received,
4    since my report, any further information.
5    That's -- that's where I was focusing my
6    preparation.
7            Q.     Okay.  So no new materials that
8    are not listed on your reliance list in your
9    report?
10           A.     Correct.
11           Q.     Did you meet with Plaintiffs'
12   lawyers to prepare for today's deposition?
13           A.     We spoke today briefly just before
14   this morning.
15           Q.     For how long?
16           A.     A half hour or so.
17           Q.     Did you meet with him before today
18   in preparation for your deposition?
19           A.     I don't remember if we -- we may
20   have briefly spoken to make a schedule, you know,
21   preparation, this date was open, this is
22   acceptable, something like that, but I don't
23   remember having an in depth, face-to-face
24   meeting.
25           Q.     How about a virtual or phone
```

Page 10

1    meeting?

2           A.      I don't remember.  We may have

3    had, as I said, a discussion over the phone or --

4    you know, give me one second.  I think there's --

5    the door may be ajar here.  I'm just hearing

6    something in the background.

7           Q.      Okay.

8           A.      Yes, I don't remember an in depth

9    teleconference.  Like I said, I believe we did

10   speak or have tele Zoom conferences leading up to

11   this to schedule, to make sure it -- you know, I

12   cleared my schedule for today's deposition.

13          Q.      Did you -- were you shown any

14   documents this morning before the deposition?

15          A.      Nothing that is new or different.

16          Q.      Okay.  Doctor, is it true that all

17   materials you reviewed in connection with this

18   case are cited in your expert report?

19          A.      Yes.

20          Q.      Okay.  So there's nothing that's

21   not listed in that report or the exhibit thereto

22   that you're relying on for your opinions in this

23   case?

24          A.      Correct.

25          Q.      Okay.  And you've been deposed

Page 11

1   before.  Right?

2           A.     Yes.

3           Q.     Several hundred times?

4           A.     Yes.

5           Q.     Approximately how many times?

6           A.     Again, I don't keep an exact

7   record, but it's 2, 3 -- at least 2- to 300

8   case -- times I've been deposed.

9           Q.     Okay.  And I think you provided us

10  a list dated May 7th, 2025, of cases in the last

11  four years where you served as an expert witness

12  in litigation.  Is that right?

13          A.     Yes.  Again, I don't keep an exact

14  copy of those cases, and this was a -- I tried to

15  recollect cases over that period of time that I

16  did serve as an expert.

17          Q.     So you don't know whether or not

18  this list is accurate.  Is that what you're

19  saying?

20          A.     No, I -- I -- I don't keep an

21  exact list.  There -- there may very well be

22  other cases during that time period that I just

23  don't remember.  This was my -- I think it's an

24  accurate list, but I -- again, I don't keep a

25  very detailed listing of cases I have or

Page 12

1    depositions I've served on.

2         Q.    How did you go about assembling

3    this list?

4         A.    I just tried to remember names of

5    cases in the past that I have given depositions

6    and/or trial testimony.

7         Q.    And was that just based on your

8    own head, or did you look at any materials,

9    perform any searches, e-mails, anything?

10        A.    I just tried to remember the cases

11   that I have, as I said, served depositions and

12   testimonies, just from my -- my recollection.

13        Q.    If you had worked as an expert

14   witness before, would you have charged and served

15   invoices related to that work?

16        A.    Yes.

17        Q.    And you don't have any accounting

18   of invoices that you were -- you provided in

19   those cases?

20             MR. SLATER:  Objection.

21   Argumentative.  You can answer.

22        A.    After I have served as an expert,

23   I shred everything.  I don't keep anything.  So I

24   don't have those records.

25        Q.    You don't keep how -- you don't

Page 13

1    keep records of how much you've been paid?

2                    MR. SLATER:  One second, Doctor.

3    Objection.  Argumentative.  You can answer.

4         A.    I -- as I said, after a case has

5    been completed, I will dispose of -- I will shred

6    those records.  I will not keep those records.

7         Q.    How long after the case has been

8    disposed of do you shred those records?

9         A.    It would be several months after,

10   it could be as early as a week, you know, that

11   week.  It varies, but it's -- I don't keep those

12   records or keep a list of the records that I

13   have -- I've served as an expert.

14        Q.    You don't need those records to

15   pay taxes?

16                    MR. SLATER:  Objection.

17   Argumentative.  Do you have questions, or are you

18   going to keep badgering him with argumentative

19   comments?

20        Q.    Feel free to answer, Doctor.

21                    MR. SLATER:  Feel free to not ask

22   every single question as an argumentative quip

23   and just please just ask questions.  You -- every

24   question is argumentative at this point.

25                    MR. TRANGLE:  As you know,

Page 14

```
 1    objections are to form.
 2              MR. SLATER:  And that is a form
 3    question.  I'm telling you, you're being
 4    argumentative and -- and it's harassing, so I'm
 5    asking you to not act like that.
 6         Q.    Do you need me to repeat the
 7    question, Dr. Russo?
 8         A.    Yes.
 9         Q.    Okay.  No problem.  So you don't
10    use the invoices that you have produced for your
11    past expert work in any preparation for your
12    taxes?
13              MR. SLATER:  Objection.  You want
14    to -- go ahead and answer, Doctor, and then I'll
15    go question by question, because we're not going
16    to start asking how he interacts with his
17    accountant.
18         A.    The actual case, the list of cases
19    has nothing to do with what my accountant uses to
20    pay taxes on.  I mean, I -- part of my income is
21    derived from expert work, in addition to my
22    office practice, and it goes into one bank
23    account.  And my -- my accountant -- I report
24    that to my accountant, and he advises me of what
25    I'm responsible for, and that's what I've done.
```

Page 15

1    Or I've always -- he's never asked for the

2    details of cases I have served on.

3            Q.    Okay.  And expert reports or

4    declarations or affidavits, you shred those also

5    after you're done with them?

6            A.    Yes.

7            Q.    Okay.  Do you ever receive copies

8    of the testimony you provided from counsel that

9    you're working for as an expert?

10           A.    Copies -- I'm sorry, of what?

11           Q.    I'm sorry, copies of testimony.

12   So testimony that you've provided in those other

13   cases, do you ever have -- are you ever sent

14   copies of those from counsel for those cases that

15   you worked on?

16           A.    When the case is active, yes, I

17   receive -- I guess -- I think you're referring to

18   deposition transcripts or something of that

19   nature?

20           Q.    Uh-huh.  Yeah.  Exactly.

21           A.    Yes, I have received that, you

22   know, while the case is going on.

23           Q.    And you -- you shred those after

24   the case is over also?

25           A.    Yes.

Page 16

```
 1          Q.      Okay.  So you don't preserve any
 2   record from your past expert work as a matter of
 3   course?
 4          A.      I don't keep a record, and I don't
 5   keep those -- I don't store those records, no.
 6          Q.      Okay.  Do you also delete e-mails
 7   related to your expert work?
 8          A.      Well, e-mails are -- there's a lot
 9   of correspondence that'll go through e-mails, but
10   I don't preserve those e-mails.
11          Q.      So they might still exist, I
12   guess?  I'm just -- is that right?
13          A.      I don't know.  I've never looked
14   into my e-mails in the past.
15          Q.      So safe to say you didn't go and
16   look at your e-mails for this case to see when
17   you had served as an expert in the last four
18   years?
19          A.      For this case, I -- no, I did not
20   go in and look at e-mails over the last four
21   years for this case.  Right.
22          Q.      When I say "this case," I mean to
23   prepare the list that you provided us of cases
24   that you worked on in the last four years.
25   Right?
```

Page 17

1          A.     No, I did not go into old e-mails

2     regarding the past four years of cases.

3          Q.     Okay.  And this list -- let's go

4     ahead and mark this as the first exhibit.

5               (Testimony List is received and

6     marked as Exhibit 1 for identification.)

7               MR. TRANGLE:  And then, Noah, can

8     you share Tab 13.

9               MR. EPSTEIN:  Yeah, one second.

10         Q.     Okay.  So we're just going to

11    share it on the screen, Doctor.  It should just

12    pop up in the Zoom for you.

13         A.     Uh-huh.

14         Q.     All right.  Can you see this,

15    Dr. Russo?

16         A.     Yes.

17         Q.     Okay.  This is the list of

18    testimony you provided us -- you provided counsel

19    to provide to us.  Right?

20         A.     Yes.

21         Q.     Okay.  And this first case that

22    you list involves a plaintiff named Janet Gamble.

23    Is that right?

24         A.     Yes.

25         Q.     What were the Plaintiffs alleging

Page 18

1   in that case?

2         A.    I believe it was a -- a -- I don't

3   remember exactly, but I believe it was a

4   pressure -- pressure injury case that this

5   patient received that treatment led to.

6         Q.    Was it a medical malpractice case?

7         A.    Yes.

8         Q.    Okay.  What was your opinion in

9   that case?

10         A.    I believe I rendered an opinion

11  that there were deviations in the treatment of

12  this patient that led to injuries, this pressure

13  ulcer that developed while this patient was

14  hospitalized.

15         Q.    Okay.  It didn't involve cancer at

16  all, did it?

17         A.    I don't believe it involved

18  cancer.

19         Q.    Did it involve FDA warning and

20  labeling requirements?

21         A.    No.

22         Q.    Did it involve NDMA?

23         A.    No.

24         Q.    Did it involve liver cancer?

25         A.    No.

Page 19

```
 1          Q.     Okay.  If we go to the second
 2    page, there's a case here, once we scroll down,
 3    that involves a plaintiff named Debra Furphy.  Do
 4    you see that --
 5          A.     Yes.
 6          Q.     -- second from the bottom?
 7          A.     Yes, I see that.
 8          Q.     Also a medical malpractice case.
 9    Is that right?
10          A.     Yes.
11          Q.     And in that case, did you offer an
12    opinion that Defendants did not reach the
13    standard of care as medical providers?
14          A.     Yes.
15          Q.     Okay.  Did that case involve
16    cancer?
17          A.     No, my recollection is it was not
18    cancer.
19          Q.     Did it involve regulatory warning
20    and labeling requirements?
21          A.     No.
22          Q.     Did it involve NDMA?
23          A.     No.
24          Q.     In that case, did you review the
25    Complaint?
```

```
                                                      Page 20

 1              A.      Yes.

 2              Q.      Is that typical for you as an

 3     expert?

 4              A.      Yes.  The Complaint is usually

 5     included in records.

 6              Q.      What about Answers to

 7     Interrogatories?  Did you review any of those in

 8     this case, Furphy?

 9              A.      I believe I did.  Usually these

10     cases involve, you know, those types of

11     documents.

12              Q.      And medical records?  Did you

13     review medical records in the Furphy case?

14              A.      Yes.

15              Q.      Is that also typical for you in

16     your role as an expert?

17              A.      Yes.

18              Q.      What about radiology reports?

19     Did you review any of those in that case?

20              A.      I don't remember the specifics,

21     but there may very well have been radiology

22     reports.

23              Q.      Okay.  Is that something that

24     you've reviewed in cases where it's part of the

25     medical records?
```

Page 21

```
 1              A.     Yes.
 2              Q.     Okay.  Is that typical for you
 3     when you're an expert?
 4              A.     In many cases, radiology records
 5     are part of the medical record, yes.
 6              Q.     What about pharmacy records?
 7              A.     Yes, they often are part of a -- a
 8     medical record.
 9              Q.     Okay.  Did all of the cases on
10     this list that you provided involve medical
11     malpractice or standard of care for physicians or
12     nursing or nursing facilities?
13              A.     Yes, I believe so.
14              Q.     Okay.  Did you offer an opinion
15     about the cause of someone's hepatocellular
16     carcinoma in any of those cases?
17              A.     I don't believe so.
18              Q.     The cause of anyone's cancer in
19     anyone of these cases?
20              A.     I don't believe so.
21              Q.     Did you offer an opinion about the
22     adequacy of a manufacturer's warning label for a
23     generic medication in any of the cases listed
24     here?
25              A.     No, I don't believe so.
```

Page 22

1          Q.     Did you offer an opinion about the

2     FDA and regulatory requirements in any of these

3     cases that are listed here?

4          A.     No, I don't believe so.

5          Q.     Did you offer any opinions about

6     the regulatory framework for generic drugs in any

7     of these cases?

8          A.     No, I don't believe in these cases

9     I did.

10         Q.     Did you offer an opinion about

11    NDMA in any of these cases?

12         A.     No.

13         Q.     Did you offer an opinion about any

14    potential carcinogens in any of these cases?

15         A.     No.

16         Q.     Have you ever served as an expert

17    previously where you offered an opinion on a

18    pharmaceutical company's failure to warn?

19         A.     No.

20         Q.     Have you ever served as an expert

21    previously where you offered an opinion about the

22    adequacy of a generic medication label?

23         A.     No.

24         Q.     Have you ever before offered

25    opinions about decisions and decisionmaking from

Page 23

1    regulatory bodies of any kind related to public

2    health, like the FDA?

3            A.    Which -- repeat that question

4    again, please.

5            Q.    Yeah, no problem.  Have you ever

6    before offered opinions about the decision or

7    decisionmaking of regulatory bodies related to

8    public health, like the FDA?

9            A.    No.

10           Q.    Have you ever before offered an

11   opinion about the carcinogenicity of certain

12   chemical compounds or exposures as an expert?

13           A.    No.

14           Q.    Have you ever before offered an

15   expert opinion about the cause of someone's

16   hepatocellular carcinoma?

17           A.    No.

18           Q.    Have you ever before offered an

19   opinion about NDMA?

20           A.    No.

21           Q.    Have you ever offered an opinion

22   about Nitrosamines?

23           A.    No.

24           Q.    Have you ever before offered an

25   opinion about impurities in pharmaceutical

Page 24

1    products and the regulatory framework governing

2    such issues?

3            A.      No.

4            Q.      When did you first serve as an

5    expert witness in litigation?

6            A.      Approximately 20, 25 years ago.

7            Q.      Okay.  What percent of your time

8    is spent working on litigation consulting work?

9            A.      It -- it -- it varies from time to

10   time, but it's 20 to 25 percent of my time.

11           Q.      Okay.  How many days of the week

12   do you see and treat patients on average?

13           A.      I am in my office four to five

14   times a week, or seeing patients for -- it's not

15   in my office.  I see patients in the hospital.  I

16   see patients in the nursing home.  I see patients

17   in my private office four to five days a week.

18           Q.      How many days during the week on

19   average do you perform any kind of expert work

20   related to litigation?

21           A.      As -- well, it -- the time, as I

22   mentioned before, is between 20 to 25 percent of

23   my time.  It varies on -- oftentimes on weekends

24   when I'm not in my office.

25           Q.      Would you say you do a little bit

Page 25

```
 1   every day, or is it more chunks of time?
 2          A.    It depends on my schedule.  For
 3   example, you know, when I'm teaching, I have
 4   medical students, it's a little -- my schedule is
 5   a little bit tighter so it kind of various from
 6   time to time.
 7          Q.    Okay.  So in the last month, on
 8   average, how many days in a week were you doing
 9   some kind of expert work related to litigation?
10          A.    I would say three to five days a
11   week would be -- would be an estimate.
12          Q.    Would that be the same
13   approximately for 2025 as a whole?
14          A.    To my recollection, yes.  Yes.
15          Q.    Okay.  Are you familiar with a
16   case involving a plaintiff named Mary Peterson or
17   Coell Peterson?
18          A.    It -- I do remember that name.  I
19   just don't remember the details.
20          Q.    Well, do you recall anything about
21   it?
22          A.    I don't remember.  I believe it
23   was a -- I -- you know, I just -- I know that
24   name, but I just don't remember the details of
25   that case.
```

Page 26

1              Q.      Do you recall if you worked as an
2      expert on that case?
3              A.      Yes, I think I was an expert.  I
4      just don't remember the details of the case.
5              Q.      Do you recall authoring a report
6      in that case?
7              A.      I could have.  I just don't
8      remember those details.
9              Q.      Do you recall being deposed in
10     that case?
11             A.      I don't -- I -- I don't remember
12     the details of -- of a report and/or deposition.
13                     MR. TRANGLE:  Let's mark as
14     Exhibit 2, Tab 15.  So let's take this down,
15     Noah.
16                     (Notice of Filing is received and
17     marked as Exhibit 2 for identification.)
18             Q.      All right.  So since you're on the
19     first page, this is a case brought by the Estate
20     of Mary Peterson by and through Coell Peterson.
21     Is that right?
22                     MR. SLATER:  You're asking if
23     that's what the document says?
24                     MR. TRANGLE:  Yes.
25             Q.      Doctor?

Page 27

1          A.     Yes.  I can see that in front of

2     me, yes.

3          Q.     And it's a case against Gandy

4     SNF, LLC, d/b/a, Gandy Crossing Center.  Right?

5          A.     Yes.

6          Q.     Underneath it says, "Notice of

7     Filing."  Do you see that?

8          A.     Yes.

9          Q.     And this states that the

10    "Plaintiff is giving notice of filing the

11    deposition of John A. Russo, MD."  Right?

12         A.     Yes.

13         Q.     Does this refresh your

14    recollection as to whether or not you were

15    deposed in a case involving Mary Peterson and

16    Coell Peterson?

17         A.     Yes.

18         Q.     If we go over to the next page,

19    this is a transcript of your deposition in that

20    case.  Right?

21         A.     Yes.

22         Q.     And the date of your deposition

23    was December 8th, 2023?

24         A.     Yes.  Yes.

25         Q.     That was less than four years ago?

Page 28

```
 1            A.     Yes.
 2            Q.     You didn't list this work on your
 3     list of cases of previous testimony in the last
 4     four years.  Right?
 5            A.     I did not list this.
 6            Q.     Okay.  Is that because this was an
 7     oversight or something else?
 8            A.     As I said, I don't remember each
 9     and every case.  The list I created by trying to
10     remember the names of certain cases.  I -- I did
11     not remember this case until you've actually
12     formally submitted this information.
13            Q.     Okay.
14                   MR. TRANGLE:  Let's take this
15     exhibit down.
16                   MR. SLATER:  Can I just make sure
17     that we're getting all these exhibits?
18                   MR. TRANGLE:  Yeah.
19                   MR. SLATER:  In real time.
20                   MR. TRANGLE:  Sure.  It's not --
21     just one second.  Let's go off the record so we
22     can just talk for one second, because I think
23     that the sharing is not working in the chat.  So
24     let's go off the record for one second.
25                   VIDEOTAPE OPERATOR:  We're going
```

Page 29

1    off the record.  The time is 10:50.

2              (Whereupon, a discussion is held

3    off the record, and the proceedings then

4    continued as follows:)

5              VIDEOTAPE OPERATOR:  Going back on

6    the record.  Time is 11:02 a.m.

7    BY MR. TRANGLE:

8         Q.    All right.  When did you first

9    speak with somebody about potentially being

10   retained as an expert in this litigation?

11        A.    I don't remember the exact date.

12   I would say it's probably at least a year ago.

13        Q.    Who did you speak with?

14        A.    Mr. Slater.

15        Q.    What was the -- how long did you

16   speak?

17        A.    It was initially a brief

18   conversation.  I don't think it was a lengthy --

19   outlined some of the issues of the case.

20        Q.    Did you reach out to him or did he

21   reach out to you?

22        A.    I believe he reached out to me.

23        Q.    Do you know how he found you?

24        A.    He -- we have done -- his office

25   has had cases that I have been an expert I've

```
                                                    Page 30

 1   served on.  I know him from a professional

 2   perspective.

 3              Q.    So you've worked with him before

 4   on other cases?

 5              A.    Yes.  I believe so.  That may not

 6   be accurate.  There are other members of his firm

 7   that I've worked with.  I don't remember if we

 8   have actually had a case, he and I, but I am

 9   familiar with his firm.  I have reviewed other

10   cases.

11              Q.    How many cases have you worked on

12   for his firm?

13              A.    I would estimate it's -- maybe

14   over the last four or five years it's maybe three

15   or four cases.

16              Q.    What about in total?

17              A.    Maybe five or six.

18              Q.    When was the first time you worked

19   on a case for his firm?

20              A.    Again, I don't remember these

21   details.

22              Q.    When was the first time you met in

23   a professional capacity?

24              A.    Well, his firm I believe -- he may

25   have been part of another firm at that point, I
```

Page 31

1    don't remember, but this probably goes back ten

2    or even 15 years.  Again, I don't remember the

3    exact details of that initial meeting or that

4    case initially that I reviewed for the firm.

5            Q.      Who was that person that you're

6    talking about from 10 or 15 years ago, if not Mr.

7    Slater?

8            A.      Mr. Mazie, his partner.

9            Q.      When was the first time you worked

10   on a case for Mr. Mazie?

11           A.      Again, it could be 10 to 15 years

12   ago.  I don't remember those detail --

13           Q.      I'm sorry.  When was the first

14   time you worked on a case for anybody at Mazie's

15   firm?

16           A.      It probably would be 10 to

17   15 years ago.  Again, that's an estimate.  I

18   don't remember exactly.

19                   COURT REPORTER:  Mr. Trangle, the

20   support guy is on the line if you want to take a

21   break and get that fixed.

22                   MR. TRANGLE:  Let's keep going for

23   a minute.  Well let's go off the record for a

24   minute if they're here.

25                   VIDEOTAPE OPERATOR:  Going off the

Page 32

1    record.  The time is 11:06.

2                    (Whereupon, a discussion is held

3    off the record, and the proceedings then

4    continued as follows:)

5                    VIDEOTAPE OPERATOR:  We are going

6    back on the record.  The time is 11:16.

7    BY MR. TRANGLE:

8          Q.    Dr. Russo, did you know any of the

9    Plaintiff's lawyers involved in this litigation

10   prior to your work as -- oh, sorry, I wasn't

11   quite done.  Prior to your work on the first case

12   as an expert for any of the Plaintiff's lawyers?

13         A.    No.

14         Q.    Okay.  So you didn't know any of

15   them in a personal capacity prior to working on

16   any cases with them in any capacity as a witness?

17                    MR. SLATER:  Objection to the form

18   of the question based on prior testimony, your

19   use of the word "plaintiff" may be confusing.

20                    MR. TRANGLE:  Okay.

21         Q.    Did you know any of the lawyers at

22   the Mazie firm or Mr. Slater's firm personally

23   before you worked with them in a professional

24   capacity?

25         A.    No.

Page 33

1           Q.      Okay.  And were you contacted by

2      someone at the Mazie firm the first time you

3      worked with them, or did you contact them?

4           A.      I -- I wouldn't have contacted

5      them, but I don't remember who from the firm

6      initially contacted me.

7           Q.      And do you have an ongoing

8      relationship with Mr. Slater's firm?

9                   MR. SLATER:  Objection.  You can

10     answer.

11          A.      I'm not sure what you mean by

12     "relationship."

13          Q.      Well, you've been working with

14     them on multiple cases over the past years.

15          A.      I've been asked periodically to

16     review cases, yes, I have.

17          Q.      Okay.  When you first were

18     contacted by Mr. Slater, what did he tell you

19     about this litigation?

20                  MR. SLATER:  Are we going to get

21     into work product now?

22                  MR. TRANGLE:  No, no.

23                  MR. SLATER:  Because I'd really

24     rather not have to start objecting to work

25     product.

Page 34

1           Q.      How long after speaking with Mr.
2   Slater did you agree to serve as an expert in
3   this litigation?
4           A.      I'm sorry.  Would you repeat that?
5   I missed the first part.
6           Q.      How long after speaking with Mr.
7   Slater did you agree to serve as an expert in
8   this litigation?
9           A.      Well, it was predicated on the
10  materials that I reviewed whether I would serve
11  as an expert.  I don't remember the time period
12  from when we very first spoke and then I received
13  the records to review.
14          Q.      So you only agreed to serve as an
15  expert after reading the materials?
16          A.      After I had -- yes, after I had
17  the opportunity to review the records.
18          Q.      Okay.  How many times have you had
19  discussions with Plaintiff's lawyers about this
20  case since you agreed to serve as an expert?
21          A.      I don't remember the amount of
22  times, but again, there -- there may have been --
23  many of it was making sure I received all the
24  documents and making the arrangements for today's
25  deposition, that I had the time blocked off

Page 35

1   properly.

2           Q.      Did you have any substantive

3   discussions, don't tell me the content, but did

4   you have any substantive discussions with counsel

5   about this case before today and since agreeing

6   to serve as an expert?

7           A.      Yes.

8           Q.      How many?

9           A.      Again, I don't remember a specific

10  number of discussions, but yes, there were -- it

11  may very -- it may have been one to two

12  discussions before serving -- before today's

13  deposition subsequent to the opinions I expressed

14  in my letter.

15          Q.      Okay.  In your report, you mean?

16          A.      Excuse me.  In my report of

17  3/10/25.

18          Q.      So one to two times between the

19  report and today.  Is that right?

20          A.      Again, it is an estimate.  I don't

21  remember the details, but I would say several

22  occasions we did have discussions.

23          Q.      Okay.  What about before serving

24  your expert report?  How many substantive

25  discussions with counsel did you have?

Page 36

```
 1              A.      Again, I don't remember exactly
 2      the details, but there were probably several.  It
 3      could be two, two cases.
 4              Q.      Okay.  Would you say -- would you
 5      say you had spoken with them for over an hour?
 6              A.      It could have been.  I don't
 7      remember the time exactly.
 8              Q.      In total between the time you were
 9      retained and when you served your expert report,
10      how many hours did you spend having conversations
11      with counsel?
12              A.      I don't remember the details of
13      that -- the amount of time that I spent.
14              Q.      Would it have been more than one
15      hour in total?
16              A.      It would likely be more than one
17      hour.
18              Q.      Okay.  Prior to your first
19      conversation with Mr. Slater, had you reviewed
20      any materials about this case?
21              A.      No.
22              COURT REPORTER:  I'm sorry, I
23      missed the last sec- -- the word.  He said no?
24              Q.      Could you repeat your answer,
25      Doctor?  She couldn't hear you.  You broke up.
```

Page 37

1              A.     I said no.  That's all I said.

2              Q.     You produced one invoice to us.

3    Is that right?

4              A.     Yes.

5              Q.     Okay.  Let's mark as Exhibit 3 tab

6    17.  So, Doctor, if you go to that website and

7    refresh --

8                    MR. SLATER:  Wait.  The invoice I

9    would assume you guys can just share on the

10   screen?

11                   MR. TRANGLE:  Sure.  I just want

12   to make sure that you guys have it, but we can --

13   Noah can definitely just share it.

14                   MR. SLATER:  Okay.  Let's try

15   that.

16                   MR. TRANGLE:  Okay.  Noah, can you

17   just share tab 17 when you have a second.

18                   (Invoice is received and marked as

19   Exhibit 3 for identification.)

20             Q.     All right.  This is your invoice

21   that you produced.  Right, Dr. Russo?

22             A.     You know, I'm trying to be good

23   about this.  I'm trying to down- -- it's not

24   downloading.

25             Q.     Just go back to Zoom.  It's on the

Page 38

```
 1   screen.
 2           A.     And I see, you know --
 3           Q.     If you go back to Zoom, do you see
 4   it on the screen?
 5           A.     I'm going to try again.
 6                  (Overtalking.)
 7                  MR. SLATER:  Dr. Russo, you can
 8   just go back to Zoom.  They put it on the screen.
 9   It's a one-page document, so it's fine.
10           A.     Yeah, I thought I could just open
11   it up.  Okay.  Got it.  Got it right there.  On
12   the Zoom.  I can see it.
13           Q.     Right.  So this is the invoice
14   that you produced to us dated March 10, 2025?
15           A.     Yes.
16           Q.     Okay.  Down towards the bottom,
17   your hourly rate is listed as $475 per hour.  Is
18   that right?
19           A.     Yes.
20           Q.     Do you charge the same rate for
21   deposition testimony as you do for record review,
22   draft report?
23           A.     Yes.
24           Q.     Do you charge the same hourly rate
25   for trial testimony?
```

Page 39

1              A.      No.

2              Q.      What is that rate?

3              A.      I have to block off an entire day.

4    My rate is $6,000, and that's for the entire day

5    to be available.

6              Q.      The first date listed on this

7    invoice is January 25, 2025.  Is that right?

8              A.      Yes.

9              Q.      And was that when you started to

10   work on this case?

11             A.      Yes.

12             Q.      Did you do any work on this case

13   prior to that date?

14             A.      There may have been some

15   organization of the records, but that -- I

16   formally started to work on that date.

17             Q.      Okay.  And the last date it says

18   on the bottom March 2, 2025.  Is that right?

19             A.      Yes.

20             Q.      So in total, between January 25,

21   2025 and March 10, 2025, the date of this

22   invoice, you spent 17.5 hours total working on

23   this case?

24             A.      Yes.

25             Q.      For a total of $8,312.50 that you

```
                                                      Page 40
 1    billed?
 2            A.      Yes.
 3            Q.      Is this all of the work you did
 4    until March 10, 2025, the date of the invoice?
 5            A.      Yes.
 6            Q.      You didn't do any work between
 7    March 2, 2025 and March 10, 2025, the date of
 8    your report?
 9            A.      When you say not do any work, I
10    did -- I completed my report.  There may have
11    been some, you know, clerical clarification of
12    the report, something like that, but these are
13    the hours that I was concentrating on reviewing
14    the records and producing this report.
15            Q.      So you did do work between
16    March 2nd and March 10th?
17            A.      Again, your definition of work --
18    I billed for the time that I was gathering
19    information, formulating the report.  There may
20    have been some clerical things that, even after
21    that last date, that -- that were completed.
22            Q.      And 100 percent of the time you
23    billed went towards reviewing documents or
24    drafting your report?
25            A.      You know, you -- I'm sorry, you
```

Page 41

1    broke up somewhat.  Could you repeat that?

2        Q.    Sure.  100 percent of the time

3    that you billed went towards reviewing documents

4    or drafting your report?

5        A.    Yes.

6        Q.    What percent of that time was

7    spent reviewing records?

8        A.    You know, I don't remember that

9    specific breakdown.

10        Q.    What percent was spent writing the

11    report?

12        A.    You know, I don't remember that

13    percentage or that breakdown.

14        Q.    What percent of your time was

15    spent talking with lawyers?

16        A.    That may have been included in --

17    in these various time periods.

18        Q.    Sorry.  Are you charging for the

19    time of these conversations that you had with

20    lawyers?

21        A.    When you say "conversations with

22    lawyers," I'm not sure I understand what you're

23    referring to.

24        Q.    Well, you told us that you spent

25    time talking with counsel substantively about

Page 42

1   this case.  Right?

2           A.     Yes.

3           Q.     Are you charging for that time

4   that you spent talking with counsel substantively

5   about this case?

6           A.     No.

7           Q.     You're not charging for any of the

8   time you spent meeting with lawyers?

9                  MR. SLATER:  Objection.  You can

10  answer.

11          A.     It depends on how long a meeting

12  has gone.  If it is a lengthy meeting, yes, I

13  will block off my schedule and will include a

14  bill, but if it's a -- just a telephone call for

15  some other issue or question, I may not keep

16  track of that or formally bill for that.

17          Q.     You previously said that you had

18  spent more than one hour substantively talking

19  with lawyers.  Is that an insufficient amount of

20  time for you to bill?

21          A.     I don't remember that detail.

22  That's -- that's an estimate.

23          Q.     Did you charge a retainer fee?

24          A.     I don't believe so, no.

25          Q.     Okay.  We haven't received an

Page 43

1    invoice for any work done since March 10th.  Have

2    you done any work since March 10th on this case?

3              A.     No.

4              Q.     All right.  Let's take this down

5    and -- okay.

6                     When you serve as an expert

7    witness, Doctor, do you typically review records?

8              A.     Well, depends on the case, but

9    yes, records are part of often information I'm

10   reviewing.

11             Q.     Medical records for the Plaintiff?

12             A.     Or whatever the case involves.

13   Medical records are often included and are

14   reviewed.

15             Q.     What percent of cases prior to

16   this case have you reviewed medical records where

17   you served as an expert in litigation?

18             A.     I'm sorry.  What was the question?

19             Q.     The question is in the cases where

20   you were an expert in litigation prior to this

21   case, what percent of the time have you reviewed

22   medical records?

23             A.     Almost all of them I can think

24   would involve medical records.  When you say what

25   percentage of medical records, it's hard for me

Page 44

1  to answer that.  As opposed to hospital records?

2  Are you differentiating?   I'm really not sure I

3  understand the question.

4         Q.    No, any -- any kind.  I'm just

5  wondering, so before this case, every single time

6  you've served as an expert you reviewed some kind

7  of medical records?

8         A.    Again, to my recollection, most of

9  the cases I'm asked to serve as an expert,

10  medical records are part of the materials that I

11  base my opinions on, or, you know, create a

12  narrative of what took place.

13         Q.    Can you recall a single time where

14  you served as an expert and did not review

15  medical records?

16         A.    I don't remember a case of having

17  no medical records, asking to give an opinion.

18         Q.    Okay.  Let's mark as Exhibit 4

19  your report.  Do you have that with you?

20         A.    I have it, yes, right here.

21         Q.    Okay.  Much easier.  So let's just

22  share your report on the screen.

23               MR. TRANGLE:  Noah, if you can.

24               (Final Report is received and

25  marked as Exhibit 4 for identification.)

Page 45

1                    MR. EPSTEIN:  One second.

2                    MR. SLATER:  Doctor, you can look

3     at the copy of the report you have just to save

4     us from you having to search through chats and

5     everything.

6                    THE WITNESS:  Yeah, I have it in

7     front of me.

8                    MR. TRANGLE:  Okay.

9                    THE WITNESS:  To read off it.

10         Q.    So let's go all the way down to

11    page 17.  It's not listed as page 17, but it's

12    the start of your list of "Materials Reviewed

13    List."  Do you see that?

14         A.    Yes.  When you say 17, I guess --

15         Q.    Yeah, it's the PDF page 17, but

16    for you it's just the start of the list of the

17    materials you reviewed.

18         A.    Yes, I have it in front of me, the

19    start of the --

20         Q.    Right.

21         A.    The records that were reviewed.

22         Q.    Okay.  I just want to confirm

23    there's no additions to this list to make it

24    complete.

25         A.    Correct.

Page 46

```
 1            Q.     You've read each and every one of
 2      the documents listed on this list?
 3            A.     I did review the documents.  Some
 4      of them were rather extensive, the RED BOOK, I
 5      mean, there were thousands of pages, I just
 6      looked at the relevant aspects.  So it's -- there
 7      were -- there were a great deal of records that I
 8      reviewed.  These were part of the materials that
 9      I reviewed to render my opinions.
10            Q.     How did you go about identifying
11      what evidence you wanted to review in forming
12      your opinions in this case?
13            A.     I reviewed -- I reviewed the
14      materials provided that were the -- my
15      understanding of the events that took place
16      during this time period, this 2015 to 2018.  Many
17      of the documents were essentially redundant
18      regarding the events that took place.  I knew of
19      what took place because of my experience in the
20      internal medicine world of this recall of this
21      drug, and many of these records were reaffirming
22      the events that took place.
23            Q.     So all of the records that are on
24      this list, were they provided by counsel?
25                   MR. SLATER:  Objection.  You can
```

Page 47

1   answer.

2          A.      I believe they were supplied by

3   counsel, yes.

4          Q.      Okay.  So all of the materials

5   that you reviewed for this case were provided by

6   counsel?

7          A.      I believe all this was sent to me

8   by Mr. Slater's office.

9          Q.      Did you put this list together?

10          MR. SLATER:  Objection.  We're not

11   going to ask any questions about how his report

12   was drafted.  That's work product.  I'm not going

13   to -- you know that that's off limits.

14          Q.      Did you ask for any documents

15   other than those that are on this list to be

16   provided to you to form your opinions in this

17   case?

18          A.      No.

19          Q.      Okay.  Let's scroll down in this

20   document to the section on depositions.  So there

21   were four depositions that you reviewed.  Right?

22          A.      Yes.

23          Q.      No other transcripts that you read

24   that are not listed here?

25          A.      Correct.  This is what I read.

Page 48

```
 1          Q.    Okay.  Did you review all these
 2   depositions in full?
 3          A.    Yes.  I did read through them.
 4   Some of them, they were lengthy, but I did read
 5   through the depositions.
 6          Q.    Did you ask to see additional
 7   testimony by other witnesses in this case?
 8          A.    No.
 9          Q.    Did you ask to speak with any of
10   the individuals who were deposed in this case?
11          A.    No.
12          Q.    For Dr. Robichaux's deposition, it
13   says "With exhibits."  Did you review the
14   exhibits attached or included in his deposition?
15          A.    I don't remember that -- I
16   believe -- if I did, yes, I believe they were
17   included.
18          Q.    Why did you review the exhibits
19   for his deposition but not for the others?
20          A.    I believe they were included in
21   his deposition.
22          Q.    Sorry.  So you just weren't
23   provided exhibits for the others?   Is that what
24   you're saying?
25          A.    I don't remember that detail.  I
```

Page 49

1    don't believe I had exhibits for the other -- the

2    other depositions.

3              Q.     Are there usually exhibits in

4    depositions?

5                     MR. SLATER:  Objection.  You can

6    answer.

7              A.     It varies.  Sometimes they're

8    included, sometimes they are not.

9              Q.     Have you ever had a deposition

10   where you were deposed where there were no

11   exhibits?

12             A.     I don't think so.  I don't

13   remember exactly, but usually, if I'm deposed,

14   they do create exhibits.

15             Q.     Did you ask to see the exhibits

16   for the depositions one, two and three listed

17   here?

18             A.     No.

19             Q.     Why not?

20             A.     In the information, I did not see

21   any critical information that I needed to see a

22   exhibit.

23             Q.     There's also three expert reports

24   listed here.

25                    MR. SLATER:  Is that a question?

```
                                                      Page 50

 1              A.     Yes.

 2              Q.     Right?   How did you decide which

 3     reports to review?

 4              A.     I reviewed the reports that were

 5     submitted, the three of them.

 6              Q.     Are there any other reports that

 7     were submitted in this litigation to your

 8     knowledge?

 9              A.     No.

10              Q.     Did you ask?

11              A.     No.

12              Q.     Did Plaintiff's lawyers send you

13     these reports?

14              A.     Yes.

15              Q.     You didn't review any reports from

16     any defense experts in this case?

17              A.     No.

18              Q.     You didn't review an expert report

19     by a Dr. Sawyer in this case?

20              A.     No.

21              Q.     Nor one by Dr. Paniography?

22              A.     Nope.

23              Q.     Nor one by Dr. Siddiqui?

24              A.     No.

25              Q.     Let's go to the section on FDA
```

```
                                              Page 51
 1   materials.  This list that you have here, is it
 2   the complete list of regulatory records you're
 3   relying on for your opinions in this case?
 4                 MR. SLATER:  Objection.  You can
 5   answer.
 6          A.     These are several communications
 7   from the FDA that I used in formulating my
 8   opinions.
 9          Q.     Is this the complete list of
10   regulatory documents that you're relying on for
11   your opinions, though?
12                 MR. SLATER:  Objection to the
13   characterization.  You can answer.
14          A.     Again, these were provided and I
15   reviewed them and used them in com- -- in
16   rendering my report.
17          Q.     Did you review any other FDA
18   regulatory documents other than those listed in
19   here?
20                 MR. SLATER:  Objection.  You can
21   answer, Doctor.
22          A.     No.
23          Q.     Okay.  How much time did you spend
24   reviewing regulatory documents?
25          A.     I don't remember that exact
```

Page 52

```
 1   amount, but it -- the time that I spent is
 2   included in the bill that I submitted.
 3            Q.    Did you review 21 C.F.R. Part 314?
 4            A.    I don't remember each individual
 5   document.  I'd have to look in here to accurately
 6   say that that was part of my review.
 7            Q.    Well, let's scroll down.   Not
 8   listed -- sorry.  Keep scrolling.  Do you see
 9   Number 15?
10            A.    Yes.
11            Q.    Did you review the entirety of
12   Part 314 of this C.F.R. document?
13            A.    I don't remember the exact
14   numerical amount of pages.  Again, some of these
15   were very voluminous.  I did review, with
16   reference to the circumstances, and used
17   information in that as well as other parts of
18   these records to formulate my opinions.
19            Q.    Okay.  If we go to the
20   accompanying records section, it looks like at
21   the bottom there --
22                 MR. TRANGLE:  It's towards the
23   top, Noah.
24            Q.    At the bottom, there's 26
25   documents.  Is that right?
```

Page 53

1           A.     Yes, I have 26.  Yup.

2           Q.     How did you decide these records

3    were necessary for you to offer your opinions in

4    this case?

5           A.     They were documents provided, and

6    again, I used information that were in multiple

7    places.  Some of the documents had information

8    that wasn't exactly pertinent, but I used

9    these -- this -- there was a great deal of

10   information that I used in formulating my

11   opinions.

12          Q.     Did you ask for any accompanying

13   records to review?

14          A.     No.

15          Q.     It wasn't important for you to

16   form your opinions?

17                 MR. SLATER:  Objection.

18   Argumentative.

19          A.     I -- I don't know what your

20   comment is.  All of the information was important

21   and was used to formulate my opinions.  I did

22   not -- I don't know what term you used there

23   before, but I used information that was available

24   to formulate my opinions.

25          Q.     And was it necessary for you to

Page 54

1   ask for additional accompanying records to form

2   your opinions in this case?

3                  MR. SLATER:  Objection.  Counsel,

4   that's another argumentative question.  Answer,

5   Doctor.

6          A.    Yes, I used the information

7   provided, gathered, all that factual data, and I

8   formulated my opinions with the information that

9   was provided.

10         Q.    Did you ask to see investigatory

11  documents internal to any of the companies

12  involved in this case?

13         A.    No.

14         Q.    Are you aware of whether any

15  exists or not?

16         A.    I don't know about that.  I don't

17  have documents with reference to that.

18         Q.    Okay.  The complaint in this case

19  is not listed on this list of materials.  Is that

20  right?

21         A.    I don't believe so.

22         Q.    You didn't review any medical

23  records for Mr. Roberts?

24         A.    No.

25         Q.    Didn't review any peer-reviewed

Page 55

1    scientific articles?

2              A.      No.

3              Q.      Didn't review any deposition

4    testimony from any of the fact witnesses other

5    than Dr. Robichaux in this case?

6              A.      Nope, I did not.

7              Q.      Didn't review any deposition

8    testimony -- sorry.  Let me try a better

9    question.

10                     All right, Dr. Russo, are you

11   familiar with the term smart summary?

12             A.      No.

13             Q.      Have you ever read deposition

14   summaries in your work as an expert?

15             A.      No.  I usually review the

16   depositions myself to understand what -- what

17   issue or what information is being provided.

18             Q.      Have you ever provided deposition

19   summaries?

20             A.      There have been cases where

21   somewhat of an outline is provided, but I

22   usually -- I usually will read the deposition.

23             Q.      Were you provided any deposition

24   summaries in this case?

25             A.      I don't believe so in this case.

Page 56

```
 1          Q.     Okay.

 2          A.     I don't remember that detail, but

 3     I don't believe so.

 4                 MR. TRANGLE:  Let's mark as, I

 5     think it's Exhibit 5, and share tab 18 on the

 6     screen.

 7                 (Deposition Transcript Summary is

 8     received and marked as Exhibit 5 for

 9     identification.)

10          Q.     Okay.  It says here this is a

11     Deposition Transcript Summary of Robert P.

12     Robichaux, M.D.  Is that right?

13                 MR. SLATER:  You're asking if

14     that's what the document says on it?

15                 MR. TRANGLE:  I am.

16          A.     Yes.  That's what's listed on this

17     document.

18          Q.     Have you seen this before?

19          A.     I don't remember this particular

20     document.

21          Q.     Do you know if this was provided

22     to you by counsel?

23          A.     I don't remember.  I'd have to

24     look into all of the records that were -- I just

25     don't remember this specific document.
```

```
                                                      Page 57

 1          Q.    Was it something that you reviewed

 2    in connection with offering your opinions in this

 3    case?

 4                MR. SLATER:  Counsel, didn't you

 5    just ask him the same question?  You asked him

 6    if he saw it, so I don't understand.  Were you

 7    just going to ask the same question five

 8    different ways?

 9          Q.    Doctor?

10          A.    I don't remember this.  It could

11    be in the records, I just don't remember this.

12          Q.    Did you read the transcript of Dr.

13    Robichaux's deposition in full?

14          A.    Yes.

15          Q.    Did you review any other summaries

16    in this case?

17                MR. SLATER:  Objection to the form

18    of the question.  Lack of foundation.  You can

19    answer.

20          A.    I don't remember the summaries in

21    the other depositions.

22          Q.    Is it typical for you to rely on

23    deposition summaries in forming your opinions?

24          A.    No.

25          Q.    Okay.  What about AI summaries of
```

Page 58

1    depositions?

2          A.    I don't understand what you mean.

3    What do you mean -- you mean artificial

4    intelligence?

5          Q.    Well, let's back up.  Here it

6    says, in this first box, under A, "This summary

7    was AI-generated."  Do you see that?

8          A.    Oh, I see that.  I didn't even

9    notice that.  Okay.

10         Q.    Have you ever before relied on an

11   AI summary of a deposition?

12         A.    No.

13         Q.    Okay.  Let's take that down.

14               Dr. Russo, you're an internal

15   medicine doctor.  Right?

16         A.    Yes.

17         Q.    And I think in your report you

18   noted that you're board certified in internal

19   medicine?

20         A.    Yes.

21         Q.    The first time you took the board

22   exam in internal medicine, you failed?

23         A.    Correct.

24         Q.    And before that, you tried to take

25   the pediatric board exam?

Page 59

1          A.     Yes.

2          Q.     And you failed that as well?

3          A.     Yes.

4          Q.     Prior to all of this, you attended

5    medical school.  Right?

6          A.     Yes.

7          Q.     And you attended medical school in

8    Mexico?

9          A.     Yes.

10         Q.     That was because you were not

11   accepted into any medical schools in the United

12   States.  Right?

13         A.     Yes.

14         Q.     Have you ever been named as a

15   defendant in a malpractice action?

16         A.     There were three cases, I -- this

17   is very -- this is probably 20 years ago, I was

18   named -- these were hospital cases, my name was

19   on the chart, and I had to answer to these.  They

20   were all dismissed, I was not deposed, I did not

21   pay anything, but I was -- I don't remember the

22   names of the cases, but it was on three

23   occasions.

24         Q.     Okay.  So on three occasions, you

25   were named as a defendant in a malpractice

```
                                                      Page 60

 1    action.

 2             A.      Yes.

 3             Q.      Have you ever been disciplined or

 4    the subject of an inquiry by a medical board or

 5    medical authority?

 6             A.      No.

 7             Q.      Ever been disciplined or the

 8    subject of an investigation by a hospital or

 9    employer?

10             A.      No.

11             Q.      Okay.  Your CV notes that you're a

12    clinical instructor.  Is that right?

13             A.      Yes.

14             Q.      As a clinical instructor, is that

15    different than a professor?

16             A.      I believe so, yes.

17             Q.      Okay.  Do you have in-person

18    lectures that students sign up for as an

19    instructor?

20             A.      I have students that I lecture on

21    different subjects in different settings; in the

22    hospital, in the office setting, depends on the

23    clinical circumstance.

24             Q.      So you have lectures in lecture

25    halls that are classes that students sign up for?
```

Page 61

1          A.      No.  Most of this is bedside

2    instruction, residents and -- medical students

3    and residents.

4          Q.      So as a clinical instructor, you

5    have residents who follow you around in a

6    hospital or clinic and you teach them through

7    hands-on experience?

8          A.      The medical students, most of them

9    are in the office setting, but residents,

10   internal medicine residents, it's -- most of that

11   is in the hospital setting, exactly, at the

12   bedside.

13         Q.      What percentage of your

14   instruction time is with residents as opposed to

15   medical students?

16         A.      I would say -- it depends on the

17   time of year, but for instructional, I would say

18   probably 40 to 50 -- it's about equal, about 40

19   to 50 percent.

20         Q.      Do you have tenure anywhere?

21         A.      No.

22         Q.      Are you listed in any departments

23   of medicine at universities as a professor?

24         A.      No.

25         Q.      Okay.  And you're not an

Page 62

1    oncologist.  Right?

2            A.      Correct.

3            Q.      Not boarded in clinical oncology?

4            A.      Correct.

5            Q.      No residency program in medical

6    oncology or clinical oncology?

7            A.      Correct.

8            Q.      No fellowship in oncology?

9            A.      Correct.

10           Q.      Have you ever taught any courses

11   specific to oncology?

12           A.      No.

13           Q.      Have you ever published an article

14   on oncology in a peer-reviewed scientific

15   journal?

16           A.      No.

17           Q.      Are you a member of the American

18   Society of Clinical Oncology?

19           A.      No.

20           Q.      You're not a hematologist or a

21   gastroenterologist.  Right?

22           A.      Correct.

23           Q.      Not board certified in either of

24   those disciplines?

25           A.      Correct.

Page 63

1          Q.     No fellowship in hematology or

2    gastroenterology?

3          A.     Correct.

4          Q.     Never taught any courses to

5    medical students or residents specific to

6    hematology?

7          A.     Correct.

8          Q.     Have you ever published an article

9    in hepatology in a peer-reviewed scientific

10   journal?

11         A.     No.

12         Q.     Are you a member of the American

13   Association for the Study of Liver Diseases?

14         A.     No.

15         Q.     Have you ever published a

16   peer-reviewed article in a scientific journal?

17         A.     No.

18         Q.     How many patients have you

19   diagnosed with hepatocellular carcinoma?

20         A.     In my entire career, you're

21   asking?

22         Q.     Yes.  Where you were the

23   diagnostician, yes.

24         A.     Probably in my entire career of

25   had, I would estimate, 50 cases of hepatocellular

Page 64

1    carcinoma.

2              Q.    Were you the diagnosing physician

3    in those cases?

4              A.    I'm not sure I understand what you

5    mean "the diagnosing physician."  I -- these were

6    patients that I was part of the medical team that

7    established a diagnosis.  It may have been --

8    this is over my entire career, it may have been

9    in the hospital, it may have been in the office

10   setting.

11             Q.    Right.  Does it require a

12   diagnosis by a pathologist or radiologist for

13   someone to be diagnosed with hepatocellular

14   carcinoma?

15             A.    It often is a tissue diagnosis and

16   that's obtained by often a biopsy.  It sometimes

17   is done by a radiologist under a guided CT or

18   ultrasound, but that's usually the diagnosis is

19   obtained by a pathologic sample that can be

20   assessed.

21             Q.    Have you ever performed that

22   yourself?

23             A.    No.  I don't do those procedures.

24             Q.    Okay.  How many -- so you said

25   50 percent of patients you've treated for

Page 65

1    hepatocellular carcinoma in your career.  Is that

2    right?

3              A.     No, I think you -- you got a

4    little tripped up.  You said 50 percent.  Of

5    course that --

6              Q.     All right.  Fifty cases.  I

7    apologize.

8              A.     That's okay.  No, I stumbled

9    myself.  I said 50 cases in my entire career were

10   patients that unfortunately were diagnosed with

11   hepatocellular carcinoma.

12             Q.     How many patients in your career

13   have you treated for hepatocellular carcinoma?

14             A.     I would not be the -- the person

15   actively treating those patients.  That's usually

16   done by an oncologist.

17             Q.     And oncologists have specialized

18   training that you don't have.  Right?

19             A.     Yes.

20             Q.     Same for hematologists?

21             A.     Yes.

22             Q.     Is diagnosing someone with

23   cirrhosis also done by radiology or pathology?

24             A.     The diagnosis of cirrhosis is

25   often arrived at by multiple historical data.

Page 66

1   There are blood tests, there are physical

2   findings that are consistent with that, and

3   oftentimes a tissue diagnosis of cirrhotic

4   changes of liver tissue are part of that.

5               So it's a -- it's a diagnosis that

6   often is based on multiple avenues of diagnostic

7   testing and historical data.

8         Q.    Have you ever done that?

9         A.    Yes, I've been involved in the

10  evaluation and treatment of patients with

11  cirrhosis.

12        Q.    How many times have you performed

13  that assessment to diagnose one with cirrhosis?

14        A.    In my entire career, it's probably

15  on the base -- I'd say patients with cirrhosis

16  that I have diagnosed or been involved in

17  managing, probably in my entire career, 200.

18        Q.    Have you ever worked on clinical

19  guidelines for diagnosing cirrhosis?

20        A.    I've not drafted clinical

21  guidelines.

22        Q.    Okay.  What are some risk factors

23  for cirrhosis?

24              MR. SLATER:  Counsel, look, one

25  second.  I'm not going to stop you from asking

Page 67

1    these questions because it's your time, but I'm

2    not really understanding why you're asking these

3    questions that are not things that are addressed

4    in the expert report by this doctor.

5           Q.    Dr. Russo, what are some risk

6    factors for --

7                 MR. SLATER:  I just would

8    appreciate if you just wouldn't ignore me when I

9    ask a question.  I don't do that to people.

10   Please, I'm just trying to understand what we're

11   doing.

12                MR. TRANGLE:  Okay.

13                MR. SLATER:  I'm vested in about

14   whether he ever, you know, was involved in flying

15   to the moon or building a rocket ship.

16                MR. TRANGLE:  I think you just

17   said, respectfully, it's my deposition, I'm going

18   to ask the question.

19           Q.    So Dr. Russo, can you --

20                MR. SLATER:  There's going to come

21   a point where if you keep asking questions about

22   things that are completely not addressed in the

23   report, I'm going to have to take action.

24           Q.    Okay.  Dr. Russo, could you answer

25   the question?   I can repeat it if you need.

```
                                                    Page 68

 1          A.      Yeah, why don't you ask that

 2    again.

 3          Q.      Sure.  So what are some risk

 4    factors for --

 5          A.      Yes.  If you could.

 6          Q.      All right.  What are some risk

 7    factors --

 8                  (Overtalking.)

 9          A.      I think your question was risk

10    factors for the development of cirrhosis?

11          Q.      Right.

12                  MR. SLATER:  Just for the record,

13    object to this whole line of questioning.  You

14    can ask all this if you want.  You know it's not

15    even addressed in the report, but you go ahead.

16    You ask all these questions.

17                  It's just really -- it's

18    harassment, and I'm going to reserve my rights at

19    some point to end the deposition if you're not

20    going to focus on what he actually opined on in

21    his report, and then you can ask Judge Vanaskie

22    to restart it, and I'm going to ask that he not

23    let you continue the deposition if this goes on

24    much longer.

25          Q.      Okay.  Doctor, can you please
```

Page 69

1    answer the question?

2                MR. SLATER:  You can ignore me if

3    you want on that, but I'm actually deadly serious

4    on that.  It's going to happen soon.

5            A.      Yeah, so a risk factor

6    unfortunately probably at the top of the list,

7    alcohol use.  There are different viruses,

8    specifically hepatitis B, hepatitis C that, over

9    time, can develop -- cause damage to the liver

10   and the liver can then degenerate into cirrhosis.

11               A condition that's unfortunately

12   not uncommon is fatty liver, both from alcohol

13   use and we'll call it non-alcohol use, obesity,

14   and there are even -- these are unusual cases.

15   There are hereditary disturbances of iron storage

16   disease or something called hemachromatosis.

17   There's another condition called Alpha-1

18   antitrypsin deficiency, and these are things that

19   can unfortunately be passed on through family

20   members.  We look for this.  These are treatable

21   conditions.

22               So these are just some of the risk

23   factors in patients developing cirrhosis.

24           Q.      Okay.  Have you ever told a

25   patient their cancer was caused by NDMA?

Page 70

```
 1            A.    I don't remember a case where -- a
 2    case that I had of a patient of mine that it was
 3    deemed to be directly related to a nitrosamine,
 4    NDMA.
 5            Q.    So you've never told a patient
 6    their cancer was called by NDMA in Valsartan?
 7            A.    I'm sorry, in Valsartan?   I'm
 8    sorry.  Repeat that again.
 9            Q.    Yes.  So you've never told a
10    patient their cancer was caused by NDMA in
11    Valsartan?
12            A.    I have not -- I don't remember a
13    case of the NDMA tainted Valsartan causing cancer
14    in a patient.
15            Q.    Have you ever consulted in
16    connection with a product that contained NDMA?
17            A.    I'm not sure I understand what
18    you're -- "consulted."  Maybe you can define what
19    you're asking.
20            Q.    Not in an expert witness role, but
21    as a physician, have you ever consulted
22    companies, pharmaceutical companies, about
23    products that contain NDMA?
24            A.    I have not -- when you say
25    "consulted," I have not been asked by drug
```

Page 71

1    companies.  Is that what you're getting at?
2    Because I don't really understand what your
3    question is.
4              Q.     Yeah.  You've never been asked,
5    you never asked to work on that?
6              A.     I've never -- excuse me -- been
7    requested from a drug company regarding the
8    potential of NDMA in a process that they're
9    using.  No, I have not been asked to be involved
10   in any kind of evaluation like that.
11             Q.     Have you ever advised the company
12   on risks related to nitrosamine or Valsartan?
13             A.     I've never contacted a drug
14   company to advise them about the dangers of NDMA
15   posed to patients.  I've not contacted
16   pharmaceutical people about that.
17             Q.     Have you ever done any consulting
18   work as a professional physician for any
19   pharmaceutical company of any kind?
20             A.     I don't remember -- very early in
21   my career, I did.  I was a participant in some of
22   the initial studies of smoking cessation.  The
23   Nicoderm patches, we had a clinical study at St.
24   Barnabas, but that was many years ago.  That was
25   a pharmaceutical involvement.

Page 72

1         Q.     But your role there was like as a
2     clinical physician, not anything else, like
3     somebody who worked on the clinical trial as a
4     physician?
5                 MR. SLATER:  Objection.  You can
6     answer.
7         A.     Yeah, I was a clinician -- these
8     are patients of mine that -- that qualified for
9     the study, and I would periodically see them and
10    gather information and then that was shared with
11    the pharmaceutical company.
12        Q.     You did not work on the design of
13    that product.  Right?
14        A.     No, I did not.
15        Q.     Have you ever done any work on
16    NDMA or nitrosamines outside of litigation?
17        A.     No.
18        Q.     Before you were contacted to work
19    on this litigation where you were serving as an
20    expert, did you do anything to warn the public
21    about Valsartan use?
22                MR. SLATER:  Objection.  You can
23    answer.
24        A.     Yes, I did.  I very much was
25    involved in, when this FDA announcement was made

Page 73

```
 1    that this Valsartan generic version contained
 2    these impurities, I was counseling not just my
 3    own patients, I am the section chief in the
 4    department of internal medicine.  This is at
 5    Cooperman Barnabas Medical Center.  As a result
 6    of that, we very rapidly changed our formulary
 7    regarding this drug with substitutes.
 8                    As the section chief, I am
 9    interacting with -- it's a medical staff of close
10    to 2 to 3,000 physicians.  In the section of
11    internal medicine, we did have meetings to make
12    sure that this information was promulgated out to
13    our clinicians.
14                    I was interacting with just the
15    medical community to safely assure that patients
16    that were on this drug were stop -- substitutions
17    safely were being made under their doctor's
18    supervision.
19            Q.    Besides your work in communicating
20    internally at your employer, who else did you
21    reach out to?
22            A.    My -- you said my employer.  Um --
23            Q.    Right.  Or at the hospital that
24    you were --
25            A.    Okay.  You meant at the hospital.
```

Page 74

1          Q.     Right.

2          A.     I was communicating with private

3     physicians in the community, internal medicine,

4     as well as all of my other colleagues that would

5     be other doctors that were using this drug,

6     specifically in the cardiology sector.  Many

7     cardiologists very much were -- this was a part

8     of their formulary of their patients, as well as

9     the nephrologists.

10               So all of these people, they had

11     outside practices, they would be involved in the

12     hospital as well as managing patients there, and

13     all of this information, when it was made public,

14     was communicated so that patient safety could be

15     assured.

16          Q.     How many of those individuals were

17     you the first person to alert them of this issue?

18               MR. SLATER:  Objection.

19          A.     I'm sorry.  Could you repeat that?

20     It was just --

21          Q.     Right.  How many of those

22     individuals were you the first person to alert

23     them of this issue?

24          A.     You have to be a little more

25     specific.

Page 75

```
 1                MR. SLATER:  He needs to know
 2    whether he was the first person to ever tell
 3    someone else about this?
 4         A.    I -- I have no idea about this.  I
 5    don't.  This was July -- what was it, July of
 6    2018.  I don't know the very first person that
 7    got on the phone with a patient.  I wouldn't know
 8    that exact information.
 9         Q.    Okay.  You're not an
10    epidemiologist.  Right?
11         A.    No.
12         Q.    Not your area of expertise?
13         A.    Correct.
14         Q.    Do you know what Bradford Hill is?
15         A.    No.
16         Q.    Okay.  You're not a toxicologist.
17    Are you, Doctor?
18         A.    No.
19         Q.    Not a chemist?
20         A.    I am not a chemist.
21         Q.    Had you heard of NDMA prior to May
22    2018?
23         A.    I knew of the class of
24    medications, nitrosamines, yes, I was aware of
25    that.
```

Page 76

1          Q.      When did you first become aware of

2     the class of medications of nitrosamines?

3          A.      In my medical training, medical

4     school, medical training, my residency, clinical

5     practice, these were -- these materials,

6     nitrosamines, unfortunately always had a

7     suspicion of being a probable carcinogen in

8     certain products, sometimes even food products,

9     and I was aware of there being a concern about

10    these.

11         Q.      When you became aware at that

12    time, what were the exposures that you were aware

13    of in terms of how people became exposed to NDMA?

14         A.      It often would -- if there was the

15    possibility that there was some occupational

16    exposure at a work site, you know, in

17    circumstances where there was something that was

18    being produced and someone was exposed to a

19    nitrosamine, or this specific agent, if -- in

20    other words, some employment occupational

21    exposure, that would be -- and there has always

22    been a -- we have always been taught the

23    possibility of a link of this to -- actually

24    using it to induce cancer in certain types of

25    animals.   I am aware and we've always been aware

Page 77

```
 1    of that, and it's something that if there's any

 2    detection of it in some clinical public health

 3    setting, precautions are always taken to avoid

 4    that.

 5            Q.      Had you ever worked on NDMA as

 6    part of your professional work as a physician?

 7                    MR. SLATER:  Objection.  You can

 8    answer.

 9            A.      Yeah, I don't know what you mean

10    worked on it.

11            Q.      Well, did you ever research or

12    publish or teach about it?

13            A.      No.

14            Q.      Are you relying on other experts

15    to speak to the toxicological effects of NDMA?

16            A.      When you say rely upon, I

17    collaborate with many different groups when

18    you're treating patients.  Some of them can be

19    toxicologists, certainly you rely upon the FDA

20    with all of their ability to gather information

21    and communicate, make decisions for patient care,

22    specifically for the use of medications based on

23    all of the sources of information.

24                    So, yes, I do use and I do, on a

25    daily basis to this day, continually gather
```

Page 78

1    information from these trusted sites to guide us

2    in the proper management of patients.

3            Q.    You wouldn't consider yourself an

4    expert on pharmaceutical product regulations,

5    would you?

6                  MR. SLATER:  Objection.  You can

7    answer.

8            A.    I'm -- I'm not an expert in

9    regulations.  No.  I'm a clinician that gathered

10   information from regulatory sources that assured

11   the safety of patients.

12           Q.    Right.  So you're not an expert on

13   the requirements of the FDCA or CGMP?

14           A.    I am not.  I don't recognize

15   those, no.

16           Q.    Never worked at the FDA.  Right?

17           A.    No.

18           Q.    Do you know what CGMP stands for?

19           A.    I don't.

20           Q.    Okay.  Have you ever worked at any

21   public health regulatory body?

22           A.    Let me think about that.  No.

23           Q.    Have you ever served in an FDA

24   committee assessing drug labels?

25           A.    No.

Page 79

```
 1              Q.     Have you ever drafted language
 2      used on a drug's warning label?
 3              A.     No.
 4              Q.     Have you ever consulted or advised
 5      about the language to be used on drug warnings?
 6              A.     No.
 7              Q.     How many times prior to the work
 8      on this case have you offered an opinion about
 9      the adequacy of a warning label as an expert?
10              A.     I don't believe I've been involved
11      in that type of question.
12              Q.     Have you ever provided expert
13      testimony to the FDA?
14              A.     No.
15              Q.     Have you ever drafted a "dear
16      doctor" letter?
17              A.     No.
18              Q.     Have you ever worked on drafting
19      FDA guidance materials?
20              A.     No.
21              Q.     Have you ever taught a class on
22      the regulatory procedures of the FDA?
23              A.     No.
24              Q.     Have you ever worked at the Office
25      of Pharmaceutical Science?
```

Page 80

1          A.     No.

2          Q.     Do you know what the Office of

3    Pharmaceutical Science is and where it's located?

4          A.     No, I'm not familiar with that.

5          Q.     Have you ever worked at the Center

6    for Drug Evaluation and Research?

7          A.     No.

8          Q.     Do you know what that is?

9          A.     I'm not familiar with that.

10         Q.     What about have you ever worked at

11   the Center for Biologics Evaluation and Research?

12         A.     No.

13         Q.     Do you know what that is?

14         A.     I'm not familiar with that.

15         Q.     Does the FDA have a chemistry

16   division?

17         A.     I don't know these specific

18   details about the FDA.

19         Q.     Have you ever been involved in a

20   decision by the FDA to recall a drug?

21         A.     No.

22         Q.     Have you ever worked on a recall

23   in any capacity other than as a regular

24   physician?

25         A.     I have not been involved other

```
                                              Page 81
 1   than a practicing clinician, active clinician.
 2            Q.     Is it your opinion that all
 3   internal medicine physicians are qualified to
 4   offer opinions about the adequacy of a drug's
 5   warning label?
 6                   MR. SLATER:  Objection.  You can
 7   answer.
 8            A.     It's difficult to answer that
 9   because I don't know what the exact
10   qualifications of all internal medicine
11   physicians.
12                   MR. SLATER:  Counselor, are we at
13   a good point to stop?   We're -- I'm assuming
14   you're not going to finish within the next hour.
15   Right?
16                   MR. TRANGLE:  No, I'm not, but --
17                   MR. SLATER:  So we're going to
18   need to order lunch so we can eat, and we need to
19   order lunch so it can be delivered here in about
20   an hour.
21                   MR. TRANGLE:  Do you want to take
22   a --
23                   MR. SLATER:  Yeah, I want to take
24   a break for five or ten minutes so we can order
25   lunch.
```

Page 82

```
 1                    COURT REPORTER:  Let's go off the
 2      record.
 3                    MR. TRANGLE:  Okay.  Let's go off
 4      the record.
 5                    VIDEOTAPE OPERATOR:  Let's go off
 6      the record.  Time is 12:14 p.m.
 7                    (Whereupon a short recess was
 8      taken and the proceedings then continued as
 9      follows:)
10                    VIDEOTAPE OPERATOR:  We are going
11      back on the record.  The time is 12:28.
12      BY MR. TRANGLE:
13            Q.    Dr. Russo, what's the difference
14      between an adulteration and an impurity?
15                    MR. SLATER:  Objection.  You can
16      answer.
17            A.    Yeah, you know what, you broke up.
18      Adulteration, and what's the other?
19            Q.    Impurity.
20            A.    Impurity?  I don't remember those
21      specific details of -- of that.
22            Q.    Okay.  Under CGMP, are
23      manufacturers of Valsartan products required to
24      test for nitrosamines?
25                    COURT REPORTER:  I'm sorry, can
```

Page 83

1    you repeat that again?

2              Q.     Yeah.   Under CGMP, are

3    manufacturers of Valsartan products required to

4    test for nitrosamines?

5                      MR. SLATER:   Objection.   You can

6    answer.

7              A.     I don't remember the detail of

8    that.

9              Q.     Are manufacturers of

10   pharmaceutical products required to test for any

11   and all possible impurities that can form in

12   their API manufacturing processes?

13                     MR. SLATER:   Objection.   You can

14   answer.

15             A.     I don't remember that specific

16   detail being outlined.

17             Q.     Is there a threshold that must be

18   met before an impurity becomes significant enough

19   to require identification in pharmaceutical

20   products?

21                     MR. SLATER:   Objection.   You can

22   answer.

23             A.     I don't remember that detail of

24   what that amount is.

25             Q.     Don't -- you don't know that

Page 84

1    threshold?

2            A.    No, I don't know.

3                  MR. SLATER:  Do you, Counsel?

4            Q.    Does the current pharmaceutical

5    regulatory scheme strictly forbid all impurities

6    in all pharmaceutical products?

7                  MR. SLATER:  You can answer the

8    question.  Objection.

9            A.    I don't know the details of what's

10   outlined in that specific -- the policy.

11                 COURT REPORTER:  I'm sorry,

12   specific what policy?

13                 THE WITNESS:  Policies, I said.

14                 MR. TRANGLE:  Did you get that,

15   Court Reporter?

16                 COURT REPORTER:  Yes.  Policies.

17           Q.    Okay.  Is it relevant to your

18   opinion whether or not pharmaceutical regulatory

19   schemes strictly forbids all impurities in all

20   pharmaceutical products?

21                 MR. SLATER:  Objection.  You can

22   answer.

23           A.    I don't know exactly what you're

24   referencing.  I certainly do know, and it's well,

25   I think, contained in my report, that the FDA

Page 85

1    guidance for the industry in label prescriptions

2    and warning physicians and clinicians that you

3    certainly do not want a potential carcinogenic

4    NDMA in a commonly prescribed antihypertensive.

5    I do know that.

6                      I don't know if you're asking the

7    specifics of other policies regarding the amount

8    that it is, but certainly a -- a clinician like

9    myself in the community or in the hospital

10   setting or nephrologist or cardiologist, that

11   entire industry, that entire medical complex is

12   reliant upon the FDA of providing safe products

13   and they never allowed a carcinogenic product to

14   be in a medication unknowingly that is being

15   given to patients.

16             Q.    Is NDMA a known human carcinogen?

17             A.    It's a probable carcinogen.  It

18   certainly is not something that is going to

19   benefit patients and certainly it would not be

20   something that any clinician, as I mentioned not

21   just me, but in the medical community that's

22   using these drugs on a regular basis,

23   specifically this Losartan, would want patients

24   unknowingly exposed to.

25             Q.    Is it relevant to your opinion

Page 86

```
 1   whether manufacturers are required to test for
 2   all possible impurities?
 3          A.     As I said before, you're using
 4   terms "relevant."  I know from my experience from
 5   serving on formulary boards in the hospital
 6   setting, some patients' clinical concerns,
 7   collaborating with experts in the field of
 8   cardiology, in nephrology that use these drugs on
 9   an everyday basis, that it absolutely is
10   unacceptable for containing carcinogens.  There
11   is absolutely, positively --
12                 (Audio/video interruption.)
13                 COURT REPORTER:  I'm sorry.  He's
14   breaking up.  I'm not sure what to do about that.
15          Q.     Okay.  Dr. Russo --
16          A.     I can hear you.
17          Q.     Okay.  Can Valsartan be sold with
18   NDMA under a certain limit per FDA guidance?
19          A.     My understanding is there -- there
20   was a analysis of a parts per million in -- that
21   they would consider, but universally, all
22   clinicians would not want -- there's no benefit
23   whatsoever, want that in a drug that potentially
24   or that is a probable carcinogen.  There is
25   absolutely no benefit when there are so many
```

Page 87

1    other alternatives that are safe and effective.

2           Q.      Have you ever prescribed a drug

3    that has a known or potential carcinogen in any

4    amount ever to a patient?

5                   MR. SLATER:  Objection.  You can

6    answer the question.

7           A.      There -- of course -- as a

8    clinician, I would never, and all colleagues, all

9    of people that interact with, no one would

10   knowingly give someone a drug that has a probable

11   carcinogenic effect when other alternatives, safe

12   forms of that drug, are available.  Some drugs,

13   unfortunately, that are used, and there's a

14   risk-benefit that goes on, especially with the

15   chemotherapy agents that that drug that could

16   save someone's life may have the potential of

17   some harm elsewhere, could be kidney failure, God

18   forbid, it could be a terrible Stevens-Johnson

19   rash systemically.  There are many of these

20   things that we must -- we make very difficult

21   decisions.

22                  But certainly a carcinogen, a

23   probable carcinogen, when alternate, safe,

24   effective medications are available would never

25   have been a consideration of a practicing

Page 88

1    physician.

2        Q.    Have you ever prescribed any

3    patient a medication that has a potential

4    probable or known human carcinogen in any amount?

5            MR. SLATER:  Objection to the form

6    of the question.  You can answer.

7        A.    I'll repeat again, there are known

8    side effects of medications and there are

9    difficult decisions when it's the only medication

10   that may reverse -- it may be an infection, it

11   may be some systemic inflammatory vasculitis

12   or -- and that difficult decision is made when

13   it's known that there is a possibility of some

14   side effect when there's no other alternative

15   available.  So completely different than this

16   circumstance.

17            There are clinic -- difficult

18   clinical decisions that drugs unfortunately have

19   side effects.

20       Q.    Okay.  My question is about you.

21   Have you ever prescribed a drug in a circumstance

22   that you just described that has a carcinogenic

23   side effect because you thought it was going to

24   be more beneficial than harmful to the patient.

25       A.    I don't remember the carcinogenic

Page 89

1    effect that I've used a drug.  I'd have to think.

2    There's certainly many other side effects, but

3    specifically its known or probable carcinogenic

4    effect, I don't remember -- again, different than

5    this case, some other potentially life

6    threatening when there are no other alternatives,

7    but I don't remember a detail like that.

8            Q.    Okay.  What is ICH?   What does it

9    stand for?

10           A.    I don't know offhand.  ICH?

11   Intercranial hemorrhage you're referring to.

12           Q.    What is a drug master file?

13           A.    What is -- what?

14           Q.    A drug master file.

15           A.    I'm just not familiar with that

16   term.

17           Q.    What does ANDA stand for?

18           A.    ANDA stand for?  I don't remember

19   the mnemonic ANDA.  I have to think.  It doesn't

20   come to mind immediately.

21           Q.    Is a drug master file an

22   appropriate vehicle for a pharmaceutical subs- --

23   a pharmaceutical substance manufacturer to inform

24   the FDA of a change to its manufacturing

25   processes?

Page 90

```
 1              MR. SLATER:  Objection.  You can
 2    answer.
 3         A.     I'm not familiar with this, you
 4    know, technical aspect of, you know, reporting.
 5    I'm not familiar with that process.
 6         Q.     Does the FDA review drug master
 7    files?
 8         A.     Again, it certainly -- it could be
 9    doing that for public safety.  I don't know the
10    details of exactly what their responsibilities
11    are.
12         Q.     What is the definition of
13    bioequivalence?
14         A.     Bioequivalence is --
15              MR. SLATER:  One second.
16    Objection to the form of the question.  Lack of
17    foundation.  You can answer.
18         A.     Is the -- okay.  Yeah.
19    Bioequivalence in general principal is that, and
20    it could be a biologic agent, it could be an
21    intravenous antibiotic, some medication often
22    that exerts some beneficial effect, it may be
23    lowering blood pressure, it may be lowering blood
24    sugar, it may be treating infection, that an
25    alternative that's produced has the same
```

Page 91

1  efficacious, meaning successful ability, to,

2  again, control blood pressure, control blood

3  sugar, whatever that exertion -- or whatever that

4  intended effect is.

5          Q.    Is there a specific FDA definition

6  of bioequivalence?

7                MR. SLATER:  Objection.  You can

8  answer.

9          Q.    Sorry.  What did you say?

10         A.    There was an objection.  I'm just

11  waiting.

12                The FDA may certainly have a more

13  exacting definition.  I don't know that off the

14  top of my head.

15         Q.    And I think you testified that

16  it's where there's the same efficacious effect.

17  Is that right?

18                MR. SLATER:  Objection.  You can

19  answer.

20         A.    Yeah, I'll wait.  In general

21  principle, the equivalents, whatever that -- and

22  there are many parameters, I imagine, they use,

23  that the same effect is -- can be demonstrated

24  with an alternative form of that medicine.

25         Q.    You're not a pharm- -- a marketing

Page 92

1    expert.  Right?

2            A.      Correct.

3            Q.      No degree in marketing?

4            A.      No.

5            Q.      Not an expert in how marketing

6    impacts consumers?

7            A.      No.

8            Q.      Not an expert on how marketing

9    impacts physicians?

10                   MR. SLATER:  Objection.  You can

11   answer.

12           A.      No.

13           Q.      You didn't conduct any objective

14   analyses like surveys to assess the impact or

15   outcomes from marketing related to Valsartan

16   products on physicians in this case?

17           A.      No.

18           Q.      Are you an expert on the adequacy

19   of labels?

20                   MR. SLATER:  Objection.  You can

21   answer.

22           A.      No.

23           Q.      Okay.  Who is the Ralph Buckley?

24           A.      I don't remember that name.

25           Q.      So you didn't read a deposition of

Page 93

1    Ralph Buckley for your opinions in this case?

2                    MR. SLATER:   Objection.

3            A.    I will look in my records.   I

4    could -- I'd have to -- there are extensive

5    records.   I think my deposition was listed.   No,

6    I don't believe I had or read a deposition of

7    Ralph Buckley.

8            Q.    What about Daryl Bullard?

9            A.    No.

10           Q.    So the deposition of Daryl Bullard

11   wasn't something you reviewed for your opinions

12   in this case?

13           A.    You know, you broke up.   Can I

14   hear that again?

15           Q.    Sorry.   The deposition of Daryl

16   Bullard wasn't something that you reviewed for

17   your opinions in this case?

18           A.    Correct.   I did not review that.

19           Q.    Same for Christopher Wise?

20           A.    Correct.

21           Q.    And the same for Samuel Hooks?

22           A.    Correct.

23           Q.    Did you speak with any family

24   members of the Plaintiff in this case?

25           A.    No.

Page 94

1          Q.      Any of the treating physicians for

2    the Plaintiff?

3          A.      No.

4          Q.      Do you know what risk factors the

5    Plaintiff had for hepatocellular carcinoma?

6          A.      No.

7          Q.      Do you know why Mr. Roberts was

8    prescribed Valsartan as opposed to alternative

9    treatments for high blood pressure?

10         A.      I don't know those details.

11         Q.      Okay.  Did you ask to see medical

12   records to understand that?

13         A.      No.

14         Q.      Did you ask to see deposition

15   testimony to understand that prescribing

16   decision?

17         A.      No.

18         Q.      Do you have any basis to disagree

19   with the decision of his treating physicians to

20   prescribe Valsartan?

21              MR. SLATER:  Objection.  You can

22   answer.

23         A.      I don't remember the details or I

24   did not have those medical records.  It's hard

25   for me to comment on that.

Page 95

1          Q.    So without that basis, you
2     wouldn't have a reason to disagree with those
3     decisions.  Right?
4          A.    Again, I don't have an opinion --
5     I don't have the records.  It's hard for me to
6     render an opinion.
7          Q.    Okay.  Are you offering the
8     opinion that ZHP knew about Valsartan having NDMA
9     prior to May 2018?
10          A.    Yes.  You said 2018 is what you
11     said.
12          Q.    Correct.
13          A.    Yes.
14          Q.    Do you have an opinion about when,
15     exactly, ZHP knew or should have known about the
16     presence of NDMA in Valsartan?
17          A.    I think, yes, I -- it was first
18     available for -- in my report on page six, I'm
19     looking at the second paragraph, that ZHP would
20     have first been available for purchase about
21     October 2015.
22          Q.    It's your testimony that as of
23     October 2015, ZHP knew or should have known there
24     was NDMA in its Valsartan?
25          A.    Just according to the records,

Page 96

1    sometime after that date, they -- that process

2    was known and that information should have been

3    forwarded to the FDA which is for the safety of

4    patients.  I don't know the exact date of when

5    that took place, but certainly in that time

6    period.

7             Q.    So as of October 2015, you're not

8    offering the opinion that ZHP knew or should have

9    known there was NDMA in Valsartan.

10              MR. SLATER:  Objection.  You can

11   answer.

12            A.    As I said, I don't -- I can't -- I

13   don't know exactly the date.  I just know in that

14   time period it was being produced and when

15   formally it was taken down by the -- it was

16   recalled by the FDA.  I don't know of those exact

17   details.

18            Q.    When, in your opinion, was there

19   sufficient information for ZHP to know there was

20   NDMA in Valsartan?

21            A.    I don't have that specific

22   information.

23            Q.    Can you give me an approximate

24   year?

25            A.    Again, I don't want to be

Page 97

1    inaccurate.  I would defer to some of the other

2    experts in this to answer that specific question,

3    but I did not look at that specific -- to answer

4    that exactly, that specific date or time.

5              Q.    Which experts?

6              A.    There were various experts in this

7    case.  I don't know exactly which one, but I --

8    that information you're asking me, I did not

9    look, and I don't have specific details to

10   identify exactly when, during that period, that

11   information should -- was available, but

12   certainly in that time period, as I've testified

13   to, that should have been made available to the

14   FDA.

15             Q.    So are you saying that you don't

16   have an independent expert opinion about when ZHP

17   should have known there was NDMA in Valsartan?

18             A.    I don't --

19             MR. SLATER:  Objection.  You can

20   answer.

21             A.    I did not look at that -- okay.  I

22   did not look at that specific question to be

23   answered, so it's hard for me to answer that.  I

24   would leave that to other experts in this case

25   that could give a more specific answer to that.

Page 98

 1          Q.     So you didn't look to understand
 2    when ZHP knew or should have known there was NDMA
 3    in its Valsartan?
 4                 MR. SLATER:  Objection.  You can
 5    answer.
 6          A.     As I said, there were other
 7    experts in this case that would be able to answer
 8    your question.  I did not look at that specific
 9    question.
10          Q.     What documents are informing your
11    opinion that ZHP should have known there was NDMA
12    in its Valsartan prior to May 2018?
13          A.     There's no one specific document
14    that -- to answer your question, but my
15    understanding and my experience of reacting and
16    mitigating the risk to patients in 2018 when this
17    was formally sort of FDA notified to clinicians,
18    hospitals, medical centers, my experience as well
19    as my colleagues as well as interacting with the
20    hospital administration, all of us reacted to
21    assure safety of the patients.
22                 The exact time when this was made
23    available, I did not look at that specific
24    person, time, document.  I don't remember that
25    specific detail.

Page 99

1          Q.      So are you able to tell me with

2     any degree of scientific certainty when ZHP

3     should have known there was NDMA in its

4     Valsartan?

5                  MR. SLATER:  Objection.  You can

6     answer.

7          A.      As I've answered before, I did not

8     look at that detail.  I know, specifically, that

9     as of when the FDA fully approved it -- fully

10    recalled it because of the danger to patients,

11    that I am very familiar, that's something that I

12    personally had to act upon.

13                 The exact time of when the

14    information or those records were available and

15    should have been acted upon, again, I don't know

16    this exact, but those, I will leave that to other

17    experts in that specific field.  That's not

18    something I looked at in this case.

19         Q.      Are you able to identify a single

20    record or document that should have apprised ZHP

21    of the fact of NDMA in its Valsartan prior to May

22    2018?

23         A.      Again, I -- I can't -- I did not

24    look to be able to share with you one specific

25    document as to when that information was

Page 100

1    discovered.  I don't remember that particular

2    detail.

3            Q.    That wasn't part of the inquiry

4    you undertook as an expert in this case?

5            A.    I did not look at that specific

6    detail of exactly a document or exactly a time

7    period of when this contamination was available

8    to -- or should have been made available to the

9    FDA, short of when I'm aware of, certainly when

10   it was formally taken off the market.  I don't

11   remember those specific details.

12           Q.    Okay.  Are you offering the

13   opinion that ZHP misled the FDA?

14                 MR. SLATER:  Objection.  You can

15   answer.

16           A.    My opinion is expressed in my

17   let- -- my report that this dangerous material

18   that was in this drug would never -- it is

19   unacceptable for it to be allowed in that drug

20   and that it -- it posed a danger to patients and

21   no clinician would accept that because of the

22   alternative to the other medication, alternatives

23   that were present.

24           Q.    My question is whether you're

25   offering an opinion as to whether ZHP defrauded

Page 101

1    the FDA.

2                    MR. SLATER:  Objection.  You can

3    answer.

4            A.    I don't have -- yeah, I don't have

5    information.  I can't say yes or no.  I just

6    don't have information to make that assessment.

7            Q.    Are you offering the opinion that

8    ZHP lied to the FDA?

9                    MR. SLATER:  Objection.  You can

10   answer.

11           A.    Again, I don't have information to

12   make a statement that, I guess you said lied,

13   fraud, any of those kinds of things took place.

14           Q.    Okay.  Same for withholding

15   information to the FDA?  From the FDA?

16           A.    I did not look at that.  I don't

17   have information to be able to say definitively

18   that something like that took place.

19           Q.    Are you offering the opinion that

20   ZHP was required to directly tell patients about

21   NDMA?

22                   MR. SLATER:  Can I hear that

23   question read back again, please?

24           Q.    Yeah.  Are you offering the

25   opinion that ZHP was required to directly tell

Page 102

1    patients about NDMA in Valsartan?

2           A.      As listed in my report, my

3    understanding is the FDA disseminates information

4    that, in this case, clearly poses a danger to

5    patients in that process is -- goes through the

6    FDA.

7                  I don't know the exact policies

8    that would have forbid ZHP to directly send it to

9    patients.  I don't -- or pharmacists directly,

10   when they were allowed to do that.

11                 So I don't know the answer to the

12   way you're posing the question.  Certainly, as

13   soon as they learned of this, because of this

14   tremendous danger that was posed, they would --

15   they would certainly be obligated to contact the

16   FDA or other national organizations to assure

17   safety of patients.

18         Q.      If your opinion is that ZHP should

19   have known of NDMA in Valsartan prior to 2018, is

20   it your opinion they withheld that information

21   from the FDA?

22         A.      I think I've answered your

23   question before.

24                 (Audio/video interruption.)

25         A.      Asked and answered.

Page 103

1          Q.     That's a little bit of a different

2    question.  My question is, because you've

3    testified ZHP should have known of NDMA in

4    Valsartan prior to 2018, is it your opinion that

5    they -- that ZHP withheld that information from

6    the FDA specifically.

7          A.     I don't have specific information

8    to be able to say that definitively.

9          Q.     Okay.  And are you offering an

10   opinion that ZHP needed to apprise physicians

11   directly about NDMA in Valsartan?

12         A.     I think I answered this before,

13   that as soon as ZHP knew of this contaminant,

14   this probable carcinogen, I don't know that exact

15   date, but in that time period from 2015 to 2018,

16   they should have notified certainly prescribers.

17                I don't know the exact policy, if

18   they had to go through the FDA initially, but

19   certainly, to assure safety, if this was known to

20   be a carcinogen, gathering, or using all of those

21   avenues of drug labeling, information that's

22   updated about this danger, direct "dear doctor"

23   letters, just press releases, in all of those to

24   assure patient safety would be within the

25   standard of care.

Page 104

1          Q.     When, in that time period, from
2    2015 to 2018, was ZHP under a duty to inform
3    prescribers about NDMA in Valsartan?
4                 MR. SLATER:  Objection.  You can
5    answer.
6          A.     I believe I've answered this
7    before, in that time period from 2015 to 2018,
8    when they -- ZHP was aware of this contaminant
9    probable carcinogen, immediately they should have
10   notified certainly the FDA, any of these
11   regulatory public health forums to assure patient
12   safety.  Physicians may have been part of that,
13   but that certainly would -- would have been
14   within the standard of care.
15         Q.     And when was ZHP aware of the
16   contaminant, in your opinion?
17         A.     I believe I answered this before,
18   I don't know that, I don't have a specific
19   recollection or a specific day or time or
20   document that would define exactly when that was.
21         Q.     If ZHP was not aware prior to May
22   2018, would you agree they were not under a duty
23   to disseminate this information to prescribers,
24   patients or the FDA?
25                MR. SLATER:  Objection.  You can

Page 105

1    answer.

2           A.      You know, you broke up there.

3    Maybe we'll try that one more time.

4           Q.      If ZHP was not aware prior to May

5    2018 that NDMA could form in its Valsartan, would

6    you agree that they were not under a duty to

7    disseminate this information to prescribers,

8    patients or the FDA?

9                   MR. SLATER:  Objection.  You can

10   answer.

11          A.      Again, I don't know when it took

12   place, so it's hard for me to answer that

13   question, but if they had no idea of this danger,

14   or the presence of this, I wouldn't be critical

15   if they had no -- no information available.

16          Q.      Are you offering the opinion in

17   this case that ZHP failed to comply with

18   regulatory requirements?

19                  MR. SLATER:  Objection.  You can

20   answer.  Actually, withdraw the objection.

21          A.      With regard -- with regard to

22   specific regulatory requirements, I would leave

23   that to other experts in this case.  I don't -- I

24   did not focus and I don't remember those very

25   specific details of regulatory requirements.

Page 106

1          Q.     Can pharmaceutical products be

2    recalled without it being the fault of the

3    manufacturer, producer or seller of that product?

4                    MR. SLATER:  Objection.  You can

5    answer.

6          A.     Like, I don't -- I don't know how

7    to answer that question.  There's so many

8    specifics that we would have to include.

9                    If someone is providing,

10   especially a drug to the public, the important --

11   the necessity of the safety of the production of

12   that -- of that certainly is the responsibility

13   of that drug company.  You know, I don't know

14   other specifics, if you were going to --

15                    (Audio/video interruption.)

16                    COURT REPORTER:  He's frozen.  We

17   should go off the record.

18                    VIDEOTAPE OPERATOR:  Let's go off

19   the record.  Time is 1:02.

20                    (Whereupon, a discussion is held

21   off the record, and the proceedings then

22   continued as follows:)

23                    VIDEOTAPE OPERATOR:  We are going

24   back on the record.  The time is 1:08.

25   BY MR. TRANGLE:

Page 107

1           Q.     Dr. Russo, are you offering the

2    opinion that there should have been a warning on

3    Valsartan's label that was not there?

4           A.     I guess, you want to be a little

5    more specific about that?   When are you talking

6    about?   What time period are you talking about?

7           Q.     Prior to 2018.

8           A.     Well, the -- the production of

9    Valsartan by the ZHP people, during that period

10   of time, they should have known of this potential

11   danger of improperly synthesizing and the -- the

12   potential of these probable carcinogenic agents.

13   That really would be their responsibility.

14                 To answer it specifically, at what

15   time period, I think we've reviewed this, I --

16   the time period and exactly the labeling, I'm

17   going to leave that to these other experts that

18   are -- I don't do labeling, so it's going to be

19   difficult for me to answer that question.

20          Q.     Okay.  Are you offering the

21   opinion that ZHP could have changed the label

22   without any FDA involvement?

23                 MR. SLATER:  Objection.  You can

24   answer.

25          A.     Yeah, that -- I -- I would leave

Page 108

```
 1    that to these other experts, the people that deal

 2    with these labeling policies, requirements, all

 3    of those kinds of things.

 4           Q.    Okay.  You're not offering a

 5    general causation opinion in this case, are you?

 6                 MR. SLATER:  Do you want to tell

 7    him what that means, Counsel?

 8           Q.    Sure.  Are you familiar with the

 9    term general causation?

10                 MR. SLATER:  Counsel, he's not

11    offering a causation opinion.  Let me save some

12    time.  There's no such opinion in his report.  I

13    can represent, Dr. Russo is not going to be a

14    general causation expert in this case.

15                 MR. TRANGLE:  All right.

16           Q.    And you're not offering the

17    opinion that Mr. Roberts' liver cancer

18    specifically was caused by Valsartan with NDMA,

19    are you?

20           A.    No --

21                 MR. SLATER:  He's not offering a

22    specific causation opinion either.

23                 MR. TRANGLE:  Adam, you can object

24    to form or --

25                 MR. SLATER:  Well, would you
```

Page 109

1  rather me tell you -- I just told you he's not

2  giving the opinion, so what do you need to do?

3  There's no such opinion in his report.

4           Counsel, you've been doing this

5  all day.  You keep asking about things that

6  aren't even touched on in the report.

7           MR. TRANGLE:  It's my prerogative

8  to understand the scope and basis of his --

9           MR. SLATER:  Okay.  Have your

10  prerogative.  I think it's harassing to ask

11  questions -- why don't you -- I mean, you can ask

12  him just as well do you have an opinion on

13  whether or not the lunar module actually made it

14  to the moon.  It's not in his report, he's not

15  giving that opinion.  Normally a lawyer would say

16  thank you and move on to something else when

17  counsel says that's not an opinion he's going to

18  give.

19           Q.    Okay.  Can you please just answer

20  the question, Dr. Russo, and then we'll move on

21  from this topic?

22           A.    I forgot.  I'm not giving an

23  opinion on causation or a link.  I don't have

24  (inaudible) the question.

25           Q.    Okay.  That's fine.  Are you

Page 110

1   offering any opinions about the FDA's knowledge

2   of the potential for NDMA impurities to form in

3   Valsartan products prior to May of 2018?

4        A.    No, that's not in my report, and I

5   would, you know, defer that to other experts.

6        Q.    Are you offering opinions about

7   when and what kinds of information must be

8   reported to the FDA from pharmaceutical

9   manufacturers?

10             MR. SLATER:  Objection to the form

11   of the question.  You can answer.

12        Q.    My opinion is outlined in my --

13   with reference to this, in my report on page

14   four, outlines the FDA standards of providing

15   safety and risk information, and that listed in

16   my report, there must be, and I'll use the quote

17   that I used in my report, there must include a

18   concise summary of the most clinically

19   significant safety concerns from the label that

20   affect decisions about whether to prescribe

21   drugs.  And that is what goes on each and every

22   day.

23             So with regard to what the FDA

24   expects of safety, this is the expectation of --

25   of any reasonable clinical, practicing clinical

Page 111

1    physician to assure safety, that the FDA is --

2                    (Audio/video interruption.)

3         A.       -- and can make a statement that

4    physicians can promulgate amongst themselves to

5    assure safety.

6         Q.       Do you know of any other

7    medication besides Valsartan that have had NDMA?

8         A.       To my recollection, there have

9    been instances with some other medications, forms

10   of Metformin, that's a diabetic medication.  That

11   there are certain lots, you know, certain --

12                    (Audio/video interruption.)

13                    COURT REPORTER:  I'm not -- I'm

14   going to miss the middle of that, so --

15        Q.       Doctor, your internet is not

16   working, so we'll need you to repeat your answer.

17                    (Audio/video interruption.)

18                    COURT REPORTER:  I'm not sure what

19   you guys want to do.

20                    VIDEOTAPE OPERATOR:  It sounds

21   like his audio is still trying to catch up.

22   So -- so, I don't know.  I don't know if counsel

23   just wants to go off the record.  Okay.

24                    MR. TRANGLE:  No, let's just wait.

25                    VIDEOTAPE OPERATOR:  Okay.

Page 112

1    Because he did get booted again.

2                    MR. TRANGLE:  Yeah.  Okay.  Let's

3    go off the record until he gets back on.

4                    VIDEOTAPE OPERATOR:  Okay.  Going

5    off the record.  The time is 1:15.

6                    (Whereupon, a lunch recess was

7    taken and the proceedings then continued as

8    follows:)

9                    VIDEOTAPE OPERATOR:  All right.

10   We are going back on the record.  The time is

11   2:03 p.m.

12   BY MR. TRANGLE:

13         Q.    All right.  Doctor, in your expert

14   report, you relied upon three reports of other

15   experts in this litigation.  Is that right?

16         A.    Yes.  Let me take a peek.  Let me

17   just make sure that's correct.  Hold on.

18   Exhibits.  Okay.

19         Q.    Yeah.  Page five of your material

20   reviewed list, it looks like.

21         A.    Yes.  I see the three reports,

22   yes.

23         Q.    Right.  You were relying on one

24   report from Dr. Hecht in 2021, one report from

25   Dr. Hecht in 2022, and one report from Dr.

Page 113

1    Plunkett in 2022?

2            A.      Correct.

3            Q.      Okay.  For each of these three

4    reports, did you independently analyze and verify

5    the findings and conclusions contained in the

6    reports?

7            A.      I'm not sure I understand that

8    question.  I reviewed the reports and what they

9    reviewed and what they described in the report.

10           Q.      Did you review the citations cited

11   to see if they were accurate in the reports?

12           A.      I did note that there were

13   citations in their report.

14           Q.      Or did you go to look at those

15   citations yourself?

16           A.      I did each and every citation.

17   Some of the citations were -- and I don't

18   remember those details, were -- was information

19   that may have been in other parts of the -- of

20   the records.  So I don't know exactly -- I don't

21   remember that exact detail of exactly their

22   sources of information, and I would have -- you

23   know, I wasn't there speaking with them, so it's

24   hard for me to answer any of these questions

25   exactly of those sources.

Page 114

1          Q.      So you didn't speak with any of

2     these experts about their conclusions or

3     methodologies in this case?

4          A.      No.

5          Q.      And you didn't look at every

6     citation.  Right?   In all of their reports?

7          A.      Well, there were -- it was a

8     rather extensive list of previous -- when you say

9     citations, of things that, for example, Dr. Hecht

10    is a, you know, a very -- a very experienced,

11    internationally recognized expert, and I know

12    there was an enormous amount of information.  I

13    did not go to each and every one of those

14    articles because it was rather extensive.

15         Q.      So did you look at any of the

16    articles that he cited in his report, the

17    scientific literature articles?

18         A.      You know, I don't remember if I

19    did.  I may have pulled up several, but I don't

20    remember the details of exactly within his report

21    which of those citations I actually looked into

22    myself.

23         Q.      Well, none of those are listed on

24    your reliance list.  Right?

25         A.      Correct.

Page 115

1          Q.      But you may have gone to look at

2     them and just not listed them on your reliance

3     list?

4                    MR. SLATER:   Objection.

5     Argumentative.

6          A.      I don't remember a detail of

7     exactly if I did review.  I don't remember that

8     detail, and I did not include it in my report.

9          Q.      Can you tell me with any degree of

10    certainty whether you looked at any scientific

11    purity articulates cited by Dr. Hecht in either

12    of his reports?

13         A.      I just -- I don't remember that

14    detail.

15         Q.      What about for Dr. Plunkett?

16         A.      I don't remember that detail

17    either.

18         Q.      Did you look at all of the company

19    documents that are cited in their reports?

20         A.      Within the report, they were --

21    again, there was information that they, in their

22    narrative, they included, and I read the report

23    which included all of that information.  That was

24    included in my review.

25         Q.      But what work did you do to ensure

Page 116

1    that their narrative on those documents was

2    accurate?

3              A.    I don't remember if I had looked

4    at any very specific articles that they cited in

5    their reports.  As I said before, I didn't note

6    this in my report, but I don't remember that

7    detail.

8              Q.    I'm asking about company

9    documents, not articles.  Did you do any work to

10   independently verify whether the narrative

11   summaries presented in the expert reports you're

12   relying on are accurate and faithful to the

13   company documents that are cited in those

14   reports?

15             A.    I don't remember the detail, if I

16   did actually go into those documents.

17             Q.    So you can't tell me today whether

18   you went to look at those documents that are

19   cited in their reports?

20             A.    Again, I don't remember that

21   detail.

22             Q.    Okay.  What about deposition

23   testimony?  Did you review all of the deposition

24   testimony that they did in forming their opinions

25   in their reports?

Page 117

```
 1          A.      I reviewed the depositions that I
 2    listed.
 3          Q.      So if it wasn't one that you
 4    listed but was included in their reports, it was
 5    not one that you reviewed.
 6          A.      Correct.  I did not review those.
 7          Q.      So you weren't able to confirm
 8    whether or not the statements in those reports
 9    were accurate in terms of representing statements
10    or testimony in depositions?
11          A.      I didn't review those, so I -- I
12    can't comment on that.
13          Q.      Do you have the credentials that
14    Dr. Hecht has?
15          A.      No.  He's a different specialty
16    than myself.
17          Q.      Are you credentialed to be able to
18    assess whether his report was done reliably?
19                  MR. SLATER:  Objection.  You can
20    answer.
21          A.      I am -- again, he is of a
22    different specialty than I am, and when you say
23    credentials, it's difficult for me to comment on
24    exactly if there is a correlation of his
25    credentials exactly matching mine.  My
```

Page 118

1    understanding is he is -- he's an expert in his
2    field but not an internist.
3              Q.    Same for Dr. Plunkett.  Does she
4    have qualifications and credentials that you
5    don't have?
6              A.    Yes.
7              Q.    Do you have the qualifications of
8    a toxicologist to assess whether a toxicological
9    opinion or regulatory opinions are reliable?
10             A.    Toxicol- -- I am not a
11   toxicologist.
12             Q.    What about her regulatory
13   opinions?  Do you have the expertise to assess
14   whether her regulatory opinions are reliable?
15                   MR. SLATER:  Objection.  You can
16   answer.
17             A.    That's a rather nonspecific
18   question.  When you say "regulatory opinions" --
19             Q.    Are you aware that she offers
20   regulatory opinions in her report?
21             A.    Yes, I am.
22             Q.    Do you believe that you have the
23   expertise and qualifications to assess whether
24   her opinions are reliable or adequately supported
25   by evidence?

Page 119

```
 1              MR. SLATER:  Objection.  You can
 2    answer.
 3         A.     Her opinions concern- -- we're
 4    talking about Dr. Plunkett as well as Dr. Hecht,
 5    their comments about the regulatory labeling and
 6    warnings that went on with the production of this
 7    drug in 2005 -- excuse me, 2015, and that were
 8    not formally put on a recall or stopped selling
 9    in 2018, that regulatory labeling, all of that is
10    well within my expertise as a practicing
11    physician in charge not only of seeing patients
12    in the clinical setting, but seeing patients in
13    the hospital, interacting with cardiologists,
14    with nephrologists, all of these clinicians that
15    manage and ensure the safety in my expertise does
16    allow me to understand and to gain -- and to
17    render opinions about the need of this drug
18    production in 2015, the need of properly warning
19    everyone in the medical community about the
20    danger and the unacceptable amount of this my
21    nitros- -- these NDMA contaminants that had a
22    probable risk of developing cancer.
23              My expertise in knowing of this or
24    knowing of this information that this company,
25    this company in the production of this, and this
```

Page 120

1    ZHP company that should have known at that time

2    to -- if they're selling the drug, their

3    obligation was to be certain that this was not

4    present and that clinicians, practicing

5    physicians, cardiologists, nephrologists,

6    everyone could be assured that this was safe.  As

7    outlined in my report, as the FDA makes clear,

8    that you must provide labeling, you must provide

9    warning, it could be in the form of letters,

10   "dear doctors," it could be in the form of --

11   actually in the insert, the package insert, it

12   could be on the labeling of the drug.  All of

13   this was paramount at that time, in 2015, to

14   ensure the safety of patients.

15          Q.    So I believe you just said your

16   expertise in knowing or knowing of this

17   information that this company -- this company in

18   the production of -- this ZHP company should have

19   known at that time they were selling the drug.

20   Are you now offering an opinion about when ZHP

21   should have known about the risk of NDMA in

22   Valsartan products?

23          A.    I said this all along, that these

24   products that were sold, the obligation was to be

25   certain that these drugs did not pose a risk of

Page 121

1    potential cancer causing affects of patients,

2    that, yes, if they're selling that drug, they

3    should have been certain about ensuring the

4    safety of that drug and not misrepresenting it,

5    that this was a safe drug when, in fact, this was

6    not the case.

7         Q.    Is it your opinion that ZHP was

8    under a duty to warn of risks that were

9    unforeseeable?

10         MR. SLATER:  Objection.  You can

11    answer.

12         A.    You used the term "unforeseeable."

13    If someone is -- if the company, as they were, is

14    selling the drug and they are making it available

15    to the public, their obligation is to make sure

16    it is safe, and to suggest that it's

17    unforeseeable, it is their obligation to -- from

18    every possibility of analyzing, that this was not

19    present in this drug.  That's their obligation,

20    to be assured, if they're going to sell it, that

21    responsibility of ensuring safety falls upon

22    them.

23         Q.    What's your basis for that

24    statement?

25         A.    My experience as a clinician,

Page 122

```
 1    having to make decisions of patients with the
 2    use -- the safety, the risk and -- the risk and
 3    the benefit, my experience as a clinician in the
 4    setting of an outpatient, in an office setting,
 5    in teaching residents, medical students, in
 6    collaborating with other clinicians that use this
 7    drug, this class of drug, this Valsartan
 8    specifically, that -- my experience is that in
 9    that setting, the standard of care requires that
10    if a drug like Losartan, back in 2015, was sold,
11    the obligation and the necessity of the company
12    selling that drug, it is their responsibility to
13    make certain that it is safe.  That is not
14    just -- it is certainly the standard of care, but
15    that's reflected in the FDA policies, that
16    information must be made available to clinicians
17    to ensure patient safety.
18            Q.    How does your experience as a
19    clinician allow you to have a basis to understand
20    when manufacturers have a duty to warn of
21    unforeseeable risks?
22                  MR. SLATER:  Objection.  You can
23    answer.
24            A.    As a practicing clinician having
25    experience with literally thousands of patients
```

                                                  Page 123

1    on this drug, in thousands of clinical

2    circumstances, where the drug is indicated, and

3    interacting with all of the other subspecialties

4    that use these drugs, my experience is such that

5    all of us, I say us in the communal sense of all

6    these experts that use these drugs that assess

7    patients as far as risk and benefit, all of these

8    drugs must be made in a safe manufacturing way

9    and are offered to the public with the

10   reassurance that any possible impurities are not

11   present in the drug, and that's our -- that's how

12   all of us function.  It's -- safety is the

13   priority in all of this.

14               As a clinician, as someone who has

15   used these drugs, as someone who has regulated in

16   even the policy of hospital's formulary policies

17   in my administrative roles, these are all

18   conditions -- these are all circumstances that

19   we, as the community, must be certain that a drug

20   is safe, and if that drug is being produced and

21   being sold by a company, it is imperative that

22   that company, in their process, is assuring that

23   that drug is safe and without possible, as in

24   this case, contaminants that have a probable

25   carcinogenic effect.

Page 124

1          Q.      Is it your opinion that a drug

2    cannot be safe if it has any amount of NDMA

3    impurities, of potential carcinogens?

4                    MR. SLATER:  Objection.  You can

5    answer.

6          A.      Yes.  Can you be a little more

7    specific with that?   Are you referring to in

8    this case, the nitrosamine?

9          Q.      Well, you had said that it's not

10   safe if it has impurities.  So my question is is

11   it your opinion that a drug cannot be safe if it

12   has any amount of impurities.

13                   MR. SLATER:  Objection.  You can

14   answer.

15         A.      I think you have to be a little

16   more specific.  Impurities, certainly it is

17   unacceptable, universally unacceptable, that a

18   cancer causing probable carcinogen agent is

19   present in the production of that drug.  That is

20   unacceptable.

21                   My experience is such, and my

22   colleagues in my role as an educator, in my role

23   as a section chief, that is an unacceptable risk.

24   No physician with -- especially when there are

25   safe, many safe alternative agents that were

Page 125

1    present, what would be completely unacceptable.

2             Q.    Is it your opinion that FDA

3    prohibits any amount of impurities in

4    pharmaceutical products including Valsartan?

5                    MR. SLATER:  Objection.  You can

6    answer.

7             A.    My understanding, and I don't

8    remember the exact parts per million, is that

9    there was a further assessment, and the FDA, I

10   won't say approved, but the FDA came up with a

11   level of a -- I'll use the term a trace amount

12   of, in this particular case, we're talking about

13   nitrosamine.  That in no way authorized or gave a

14   safety rating of allowing that to be present in

15   Valsartan, even though that was all analyses or

16   all information that was made available after it

17   was taken -- Valsartan we're talking about, was

18   taken off the market in that case.

19                  So they're -- again, I am aware of

20   that in this particular case, but in my expertise

21   and my experience and my clinical interaction

22   with all parts of putting patients on drugs and

23   making judgments about the safety of a drug, and

24   I'm going to be consistent with the FDA's

25   position, no, in this particular case, no amounts

Page 126

1    would -- of a nitrogenous carcin- -- carcinogenic

2    agent would be acceptable in patients in the

3    treatment of this -- this ARB, especially when

4    all of those other alternatives are available.

5            Q.    Are you offering an opinion in

6    this case that the warnings provided with

7    Valsartan were inadequate?

8            A.    You know, I don't really -- that's

9    a very broad question.  I guess I'm going to have

10   to ask you when -- if you could give me a time of

11   exactly what you're talking about, when -- what

12   warnings and exactly what time period.

13           Q.    Are you offering the opinion that

14   warnings with Valsartan from 2015 to 2018 were

15   inadequate?

16           A.    Yes.  Consistent with my -- my

17   testimony just before, that in that period of

18   time where it was not made known to clinicians

19   like myself that this dangerous material was in

20   the production -- was in these pills, and that

21   would -- that's just unacceptable.

22                 Again, I think I've made my

23   opinions known to -- to the standard of care was

24   to any practicing physician that was using that

25   drug.  That's unacceptable.

Page 127

1          Q.     What is the language of the

2    warning that you believe would be adequate?

3          A.     They did not warn patients about

4    this danger of a probable carcinogen.  That was

5    not made known to clinicians like myself or

6    anyone else.

7          Q.     Well I'm asking what is the

8    language of the warning that you believe had to

9    be conveyed?

10         A.     What should have been done is --

11   and when you say "the language," is that this

12   product contains a nitro -- an NDM component, it

13   is known to be carcinogenic, and a probable --

14   specifically it's an agent that's used to

15   purposefully do studies on animals of

16   carcinogenic effect, and it is a probable

17   carcinogen in physicians.

18                That wording of a probable

19   carcinogen should have been put in the labeling

20   and put -- let me say this.  If we're going to

21   say what should have been the warning, if there

22   was a carcinogenic agent like this -- let me go

23   back.  Let me be very clear.

24                In 2015, that information should

25   have been immediately brought to the attention of

Page 128

1    the FDA, information should have been sent out

2    because of the danger -- now, the FDA does -- I'm

3    sure they do as quickly a job as possible, but

4    because of the -- the alarming presence of this,

5    that information should have been disseminated to

6    all of the physicians that were using this agent

7    so they can -- that would be -- they could be

8    "dear doctor" letters, it could be, as I just

9    eluded to, structuring in the labeling, in the

10   prescribing information, all of those avenues,

11   certainly to the FDA and to make sure that this

12   information gets out as quickly as possible,

13   because none of the physicians -- the standard of

14   care of ensuring patient safety and what is

15   consistent with the FDA's position would allow

16   this agent to be marketed, to be sold to

17   patients.  No patients.  And again, with the --

18   all of the safe alternatives that at that time

19   were available.

20        Q.    Is it your opinion that ZHP should

21   have added this suggested warning language

22   without involvement of the FDA?

23        A.    Is that my opinion, you said, that

24   they shouldn't tell the FDA?

25        Q.    That they should add this warning,

Page 129

1    this warning that you suggested, without any

2    involvement of the FDA?

3            A.    I'll just repeat myself.  They

4    would have -- the obligation is for the -- let's

5    start, the obligation is for the safety of

6    patients, and my expertise, my experience, my

7    interaction with all of these experts that use

8    this drug, none of them -- none of them would

9    accept a possible risk of a nitrogenous cancer

10   causing agent as NDMA, none of them, and they

11   would want to be immediately notified, even if it

12   took a day or a week or whatever you want to say,

13   a month to get a hold of the people at the FDA.

14   That information was so critical because of this

15   possible danger of the patient, and there were so

16   many safe alternatives available that they would

17   have wanted to know of this immediately.

18           Q.    So it's your opinion that ZHP can

19   change the label to adopt your preferred language

20   without involvement of the FDA?

21           A.    That's not what I said.  I said

22   that --

23           Q.    Is it your opinion, though.  My

24   question is is that your opinion?

25           A.    No, I'm going to give you my

```
                                              Page 130

 1    opinion.  You -- you're not listening to what I'm

 2    responding to.

 3             Q.     Is it your opinion --

 4                    MR. SLATER:  Hang on.  You're

 5    going to let him finish his answer now.  You keep

 6    interrupting him.  Let the doctor talk.

 7             A.     Yes, the premise -- the most

 8    important aspect of even your question is

 9    ensuring the safety of patients, and my

10    experience, in my interaction with colleagues in

11    the hospital setting, even in the formulary of a

12    600 bed medical center, Cooperman Barnabas

13    Medical Center, is that no one, no clinician,

14    would allow their patient to be on a drug, and

15    there are many other alternatives, a drug that

16    had this probable carcinogen in it.

17                    The process of -- your question,

18    would you -- would you want to be notified before

19    the FDA or would you want them to somehow

20    supersede, it's all about the patient safety.  It

21    is paramount that this information had to be,

22    even -- any way possible, to assure that patients

23    would safely be able to be assessed and changes

24    made to those patients.

25                    So that's the most important
```

Page 131

1   aspect of all of this.  And the FDA clearly

2   would -- and as I eluded to or documented in my

3   report, their position is exactly what my

4   position is, they're consistent -- they are

5   con- -- they are concerned with the safety of

6   patients.  They want information to clearly be

7   stated on warning labels.  All of that

8   information is what the FDA is -- their intent of

9   patient safety and physicians, clinicians in the

10  community as myself would want immediately to be

11  notified of this condition back when this was

12  sold to the public.

13          Q.    Is ZHP able to unilaterally change

14  the warning on the label given to Valsartan in

15  2015 without involvement of the FDA?

16          A.    Again, I'll repeat --

17          Q.    I'm not asking -- I'm asking you a

18  different question.  I'm asking is ZHP able to

19  change the label, the warning on the label, to

20  adopt your preferred language without involvement

21  of the FDA?

22              MR. SLATER:  Objection.  You can

23  answer.

24          A.    Yeah, I don't know the

25  government -- you know, what form has to be

Page 132

1    filled out, and it must be approved by the FDA.

2                   What is paramount is that -- and I

3    know because of my experience, because of my many

4    years of using the drugs, I know of my

5    interaction with colleagues, that all clinicians

6    would want to know about this immediately,

7    immediately, to ensure safety and to make

8    changes.

9                   Now, to your question, do I know

10   of exactly how the FDA is to be notified, by

11   mail, by, you know, document, I don't have -- I

12   don't know that exact mechanism but what I do

13   know clearly and what is consistent with the

14   FDA's policy as eluded is that they want

15   information to ensure safety, and if there's any

16   possibility of a cancer causing agent, they, like

17   all of the clinicians, they want to know that

18   information immediately.

19        Q.    But you don't know the regulatory

20   scheme that governs the updating of warnings?

21        A.    I know that the intent, in my

22   experience, to ensure patient safety, one of the

23   avenues is the -- it can be the labeling of that

24   product, it can be the prescribing information,

25   it can be releases, news releases, there can be

Page 133

```
 1    other sources of information, and I know that
 2    clinicians like myself would -- it would be
 3    completely contrary and con- -- as we say, a
 4    contraindication.  Under no circumstances would
 5    we want our patients on a drug that contains this
 6    agent.  That that is such a -- that is such a
 7    danger that is posed with all of the risk and no
 8    benefit.  There are other agents that effectively
 9    could be used.
10              Now, I just know from my
11    experience that that is exactly what any -- all
12    of my colleagues and the standard of care would
13    have required that physicians using this drug
14    would be immediately notified of this -- this
15    danger.
16         Q.    Are you offering opinions about
17    the intent of the FDA in making decisions about
18    Valsartan and NDMA?
19         A.    You know, I guess I'm having a
20    hard time, intent.  I don't know exactly --
21         Q.    Well that's the word that you
22    used, so that's why I'm asking.
23         A.    I'll be very clear, the FDA is a
24    government agency that myself and colleagues and
25    all of practicing physicians, cardiologists, all
```

Page 134

1    of the people that use this drug is looked upon

2    to guide the -- drugs are available, to guide us

3    to be certain that these drugs are safe.  I know

4    that.  I've been practicing for 25, 30 years.  I

5    have used their services or the information that

6    they make known to us, and it's -- if I used the

7    word intent, I know exactly what their -- the

8    creation of their body and what their purpose is,

9    and that is to assure, as I've listed again in my

10   report, and I believe on page four, to assure

11   that patient safety, and that information is made

12   available to practicing physicians.

13           Q.    Is it your opinion that if there

14   was a warning about NDMA that accompanied

15   Valsartan, it could be sold?

16                 MR. SLATER:  Can I hear that

17   question again?

18           Q.    Is it your opinion that if there

19   was a warning about NDMA that accompanied

20   Valsartan, it could be sold?

21                 MR. SLATER:  When are we talking

22   about?  Objection.

23           A.    Yeah, I -- I'm rather confused.

24   So I guess we should first put it in a time

25   period.  So this question --

Page 135

1          Q.     I'm asking abstractly.  When --

2                 MR. SLATER:  I'm going to object

3      to the question.

4          Q.     Is it your opinion that if there

5      was a warning label about NDMA that accompanied

6      Valsartan, it could have been sold at any time

7      between 2015 and 2018?

8          A.     No.  If there was a warning that

9      this product contained a, as is listed in all of

10     my report as well, a probable carcinogen, and

11     specifically a material that has no clinical

12     benefit, and there are many other alternatives to

13     this, this Valsartan, I disagree that it would

14     have been a safe practice to allow this product

15     to be sold.

16         Q.     If it couldn't be sold, why would

17     you require a warning?

18         A.     And again, I'm going to ask you to

19     be a little more specific.  If --

20         Q.     I honestly can't be.  If it

21     couldn't be sold, which is what you just said,

22     why would you require a warning?

23         A.     I didn't -- you're misperceiving.

24     It couldn't be sold, couldn't be available.  The

25     product --

Page 136

1          Q.    My question was about sold, not
2     availability, Doctor.
3                     Is it your testimony that it could
4     be sold if it contained NDMA as long as it had a
5     warning?
6                     MR. SLATER:  Objection.  You can
7     answer.
8          A.    No, it absolutely could not be
9     sold with a warning that suggested that it had a
10    carcinogenic effect when multiple other agents
11    were available.  There's --
12         Q.    Then why -- so then why do you
13    need a warning if it can't be sold?
14                    MR. SLATER:  Objection.
15    Argumentative, and the underlying foundation is
16    lacking.  You can answer.
17         A.    I'll be clear.  I mean, you're
18    twisting, I believe -- there may be some
19    confusion.  To say there is -- if -- in 2015,
20    when this drug was produced by this generic --
21    was produced by the ZHP people, their obligation
22    was to make certain that this was a safe drug, to
23    make certain that there -- that this was a choice
24    that the -- that the medical community at large
25    could be assured that this was not containing any

Page 137

1    possible carcinogenic agents, and that was not

2    the case.

3            And if this information was

4    available to clinicians during that period of

5    time, before the FDA formally stopped any sale

6    and identified this, clinicians would not have

7    produced -- would not have prescribed it because

8    of this paramount danger to patients without any

9    benefit.

10       Q.    Do you agree that if ZHP did not

11   know, in 2015, there was NDMA in its Valsartan,

12   it could not have warned prescribers or patients?

13       A.    No.  I just want to clarify, I

14   think that the fact that they produced this in

15   2000 and was selling this during that time

16   period, 2015 to 2018, it was their obligation,

17   their -- in the production, in the testing, to

18   make certain, before they certainly would sell

19   this, to make certain that this agent, this

20   dangerous carcinogenic agent, was not in those

21   pills that they were selling, as -- and make that

22   information -- to make certain that that was not

23   present and that that would not pose a danger, a

24   potential danger to patients that were given the

25   drug.

Page 138

1          Q.     Was ZHP under a duty to test for

2     any and all potential impurities of any kind that

3     could be carcinogenic?

4                    MR. SLATER:  Objection.  You can

5     answer.

6          A.     Their obligation, if they're going

7     to sell it and they're going to offer this as a

8     safe agent, is to make certain that the

9     production of the drug is proper, that there are

10    not impurities, especially known impurities that

11    are known to be carcinogenic, to be sure that

12    patients are not exposed to some danger.  That's

13    absolutely necessary and is their responsibility.

14         Q.     Are you familiar with benzene?

15         A.     Pardon?

16         Q.     Are you familiar with the chemical

17    benzene?

18         A.     I remember from biochemistry, yes.

19    It's a -- yes.

20         Q.     Is that a carcinogen?

21         A.     There have been associations, bone

22    marrow disorders, you know.  Yes.

23         Q.     Was ZHP under an obligation to

24    test for benzene in its Valsartan?

25                    MR. SLATER:  Objection.  You can

Page 139

1    answer.

2          A.    Their -- the production, in their

3    production of this drug, their obligation is to

4    be certain that impurities were not present that

5    posed a risk to the patient, a risk -- we're

6    talking about ZHP.  Benzene, I mean, there are

7    many -- it's a hydrocarbon that -- so that -- the

8    presence of any agent, especially that is known

9    to cause a -- a probable carcinogen, that is the

10    obligation of that company in their production

11    and in their analysis to make sure it's safe for

12    patients.

13          Q.    Is ZHP under an obligation to test

14    its Valsartan for carcinogens even if they are

15    not expected to form during the manufacturing

16    process?

17              MR. SLATER:  Objection.  You can

18    answer.

19          A.    They're obligated -- again, in my

20    expertise and my experience with my colleagues in

21    the hospital setting, in the outpatient setting,

22    in the educational setting, when a drug is

23    produced by a company, the obligation is that

24    there are no materials, especially materials that

25    have a carcinogenic risk to that patient, and

Page 140

1    that certainly is what all of us, when we make

2    choices of risk and benefit, want to be assured

3    of.

4           Q.    What FDA regulation, statute or

5    authority creates this obligation that you're

6    talking about?

7           A.    You're looking for a statute?   My

8    experience, I don't know exactly the numerical

9    statute, but I do know of the -- and I will --

10   let me just use my report here for a moment.

11                I'm reading from my report.  It is

12   on page four where I am quoting part of the Code

13   of Federal Regulations, 21 C.F.R., I'm just about

14   three quarters of the way down, and I just will

15   read this into the record.  This is a federal,

16   you know, warning, regulation, alert regulation

17   that provides that, quote, "A warning must

18   include a concise summary of the most clinically

19   significant safety concerns from the label that

20   affect decisions about whether to prescribe the

21   drug and references and requires the warning to

22   comply with" -- this is the 21 Federal Code

23   Regulation -- "which requires warnings of

24   potential safety hazards.  This standard is fully

25   consistent with the expect" -- "with the

Page 141

1    standard" -- I have -- in forming my opinions,

2    this is my statement, "and the expectations of a

3    reasonable physician in clinical practice."  This

4    is exactly --

5            Q.      Is it your testimony that --

6                    MR. SLATER:  Do not interrupt him,

7    please, and let him finish talking.

8            A.      This is my -- I'm sorry.  I just

9    want to finish.  This is directly taken from my

10   report, which is consistent with a clinical

11   practice of physicians assuring patient safety,

12   this is -- the verbiage is from the federal

13   regulations, which is consistent with patient

14   safety.

15                   I'm sure there are other statutes,

16   but you can see very clearly that the perspective

17   of be it a formal regulation, state or federal,

18   is to assure patient safety, and my expertise

19   says that to be able to practice medicine, to be

20   able to assure that our patients are safe in

21   choices that we make, this is paramount, that

22   this safety, this assurance that these products

23   in this case this drug, is being produced and

24   there are -- it is free of any potential, quote,

25   safety hazards that may pose a risk to a patient,

```
                                              Page 142
 1    and especially, particular in this case, where

 2    there are alternatives without this danger.

 3               Q.     Is it your testimony that the

 4    C.F.R. you just cited requires manufacturers to

 5    test for all potential unexpected carcinogens?

 6               MR. SLATER:   Objection.  You can

 7    answer.

 8               A.     Yes, I would -- it's saying, in

 9    this, they don't use your verbs, potential

10    carcinogens, but they're saying that the

11    obligation, and that's my expectation and my

12    colleagues and everyone that chooses to write a

13    prescription with this drug, that everyone is

14    assured that the production of that drug --

15    excuse me, yes, of that agent, that hypertensive

16    agent, is safely produced without there being, in

17    the process, a dangerous substance that poses a

18    risk to patients.

19               Q.     If it turns out there is not an

20    association between NDMA and Valsartan and cancer

21    in humans in epidemiological studies, would it

22    still be your opinion that ZHP failed to warn of

23    the risk of cancer?

24               MR. SLATER:   Objection.  You can

25    answer.
```

Page 143

```
 1          A.     We're talking about this case,
 2   we're talking about the -- I think you're
 3   referencing, during this time period, it was well
 4   known that nitrosamine agents were a danger --
 5   this goes back to the seventies, I believe it was
 6   referenced in -- I think it was Dr. Hecht
 7   referenced it in some of the studies actually he
 8   performed.  So this has been known of this
 9   danger.  And this was unacceptable, that this was
10   present.
11          Q.     Are you familiar with Diovan?
12          A.     Diovan you said?
13          Q.     Yes.
14          A.     Yes.  That's the brand name.
15          Q.     If there's NDMA that has been
16   found in Diovan, would you have the opinion that
17   Valsartan is bioequivalent to Diovan?
18                 MR. SLATER:  Objection.  Lack of
19   foundation.  You can answer, Doctor.
20          A.     Yeah, I -- I don't know the amount
21   you're talking about.  So it's kind of hard for
22   me to answer that question.
23          Q.     If NDMA was found in Diovan, would
24   the manufacturers of Diovan be required to warn?
25          A.     Yes, if there -- if there was --
```

Page 144

1    again, I guess I'm going to ask you, if there --

2    to answer that accurately, I would need more

3    information to look at.  I don't -- I don't

4    remember seeing anything in the Diovan brand to

5    answer your question accurately.

6            Q.    Did you ask whether there's

7    documents about testing of Diovan for NDMA?

8                 MR. SLATER:  Objection.  Lack of

9    foundation.  You can answer.

10           A.    I'm sorry.  I didn't -- I didn't

11   hear the question.  Did I --

12           Q.    Did you not --

13                MR. SLATER:  We're having a hard

14   time hearing you, Asher, because your mouth is on

15   top of your fist, so it's starting to mumble

16   words and so we're having a hard time

17   understanding you.

18           Q.    Did you ask whether there's

19   documents available showing testing of Diovan for

20   NDMA?

21           A.    I didn't ask for the documents

22   regarding that condition.

23           Q.    How can a manufacturer warn of a

24   risk of which they're not aware?

25                MR. SLATER:  Objection.  You can

Page 145

1    answer.

2           A.    And I guess I'm going to ask you

3    to be a little more specific.  You're talking

4    about during the period of 2015, when the -- the

5    ZHP people didn't warn about this nitrosamine?

6           Q.    No, I'm asking in general, as an

7    expert in this case, how can a manufacturer warn

8    of a risk of which they're not aware?

9           A.    And I guess you have to be a

10   little more specific.  A manufacturer of --

11          Q.    Of a pharmaceutical product.

12          A.    Of a pharmaceutical product.

13   Okay.  Can you be a little more specific?   A

14   pacemaker?   A hip joint?   I mean --

15          Q.    No.

16          A.    It's -- my answer is that -- you

17   know, you're a little bit vague about what you're

18   referencing, but in the process of any medical --

19   it could be medication, of course we've been

20   talking about in this case, the obligation is

21   that the process of manufacturing that drug,

22   we're going to reference this case, involves

23   safely testing for the potential of materials,

24   and in this particular case, the presence of

25   materials that, since the 1970s, have been known

Page 146

1    to have a cancer risk.  That is an unacceptable

2    risk.

3              Many -- are there other agents

4    that -- well, in this case particularly, that is

5    an unacceptable risk that no clinicians, myself

6    and colleagues and the FDA as well, would accept

7    to pass on to patients.

8         Q.    In 2015, was there any reason ZHP

9    should have known NDMA could form in their

10   manufacturing process?

11        A.    Yes, their process of producing

12   this agent, this drug, part of the assurance of

13   safely bringing it, quote, to market and selling

14   it, is such that they should have tested for the

15   presence or made known the presence of this drug,

16   and that is their responsibility.

17             They -- they are responsible to --

18   assuring that if this is being sold, that this is

19   free of a carcinogenic agent, as unfortunately

20   this NDMA was.

21        Q.    Are you opining on the adequacy of

22   ZHP's testing?

23        A.    I'm opining that they, at that

24   time, as part of their production, or a part of

25   their process of creating this drug and making it

Page 147

1  available and selling it to the public, part of

2  that process required that they make certain that

3  there are no contaminant, in this case NDM

4  remnants or particles or concentrations, that

5  posed a risk to patients.

6          Q.    What method was ZHP using to test

7  for impurities in 2015?

8          A.    The exact solvents or testing, I'm

9  going to leave that to the experts, Dr. Hecht,

10  who could I think elaborate more clearly.  But

11  clearly my opinion remains that that is something

12  that had -- that was required to assure safely

13  that a product that's -- that is made available

14  to the public is free of these dangerous agents.

15          Q.    Have you ever designed testing for

16  impurities in pharmaceutical products?

17          A.    I have not designed the process,

18  the biochemical process or steps, but I have

19  experience and I have had to make judgments about

20  what is the safest product for a patient, and

21  specifically in this case, this is a drug that I

22  still use a great deal, because my patients in

23  internal medicine require this drug, and as well

24  as my experience with approving this drug in many

25  different settings for the formulary of the

Page 148

1    hospital.  If a colleague calls up and wants to

2    put a patient on this drug, I will share the

3    kidney function test or liver function test to

4    make sure it's safe, or I will share

5    information -- all of that is part of my

6    expertise in making assessments of risk and

7    benefit of a drug, when a drug has to be used or

8    used.  And clearly the production of this drug by

9    these people at H -- ZHP, back in 2015, required

10   that that process of production and required an

11   analysis of what that product was to be sure it

12   did not contain this carcinogenic agent.

13              That -- you know, my experience is

14   that I -- that is imperative to assure safety,

15   and that is clearly consistent with the FDA's

16   position of making safe products available to the

17   public.

18        Q.    My question was about your

19   qualifications, but that's okay, we can -- we

20   can -- you don't have to answer that I guess.

21              So let's pull up your report.  Do

22   you have your report in front of you?

23        A.    I think.

24        Q.    Okay.

25              MR. TRANGLE:  Noah, can you share

Page 149

1   tab two?

2              MR. EPSTEIN:  Yeah, one second.

3              MR. SLATER:  Do I need to pull up

4   the report or is there something else?

5              MR. TRANGLE:  There's going to be

6   something else, but right now we're looking at

7   his materials considered list.

8              MR. SLATER:  Okay.

9              MR. TRANGLE:  Let's go down to

10  page five, Exhibit B.  All the way down.  Yeah.

11       Q.     You reviewed the deposition

12  testimony of Min Li on April 22, 2021?

13       A.     Yes.

14       Q.     Okay.  Are you aware there are

15  additional transcripts of testimony from Min Li?

16       A.     No.

17       Q.     You're not aware that Min Li also

18  was deposed on April 21, 2021?

19       A.     No.

20       Q.     And also on April 20, 2021?

21       A.     I'm no, no.

22       Q.     Have you reviewed -- so you

23  haven't reviewed transcripts from these two other

24  days of deposition from Min Li.  Right?

25       A.     I have not.

Page 150

```
 1          Q.    Would it be important to your
 2     opinions to have reviewed the full testimony of
 3     Min Li before offering opinions in this case?
 4          A.    Again, I would welcome any further
 5     information that's provided.  It's hard for me to
 6     comment without looking at that, but I think the
 7     information was clear that all of those people,
 8     all of those depositions, I think in my report I
 9     mentioned, they acknowledged what a -- that this
10     would -- this is an unacceptable risk.  No one
11     would want to be on a drug that has the risk of
12     cancer.
13          Q.    Okay.  So it wasn't relevant to
14     have reviewed the full testimony of Min Li for
15     your opinions in this case?
16                MR. SLATER:  Objection.
17          A.    I didn't say that.  If you want to
18     repeat it, but I think I answered the question.
19     You said something different.
20          Q.    Did you ask to review the full
21     testimony of Min Li?
22          A.    You're talking about the -- the
23     additional depositions?
24          Q.    Yes.
25          A.    Yeah, I did not know of those.
```

Page 151

1          Q.      Okay.  Let's take this down.

2                  Are you aware that Min Li

3      testified that before June of 2018, the whole

4      industry, as well as the regulator, did not have

5      knowledge that Valsartan manufacturing processes

6      could cause nitrosamines to be formed?

7          A.      If that's what he said.  I --

8      that's what he said.

9          Q.      Do you have any basis to believe

10     that that is not what Min Li testified?

11         A.      When he says "the whole industry,"

12     I know -- I'll repeat, I know, back in 2015, that

13     clinicians, myself included in my role as a

14     private physician, as a section chief, as an

15     educator, was such that the presence of

16     nitrosamine and NDM agents in Valsartan are --

17     was completely unacceptable and it was the

18     responsibility of the -- of these ZHP people to

19     assure that that was not present.  That's what

20     I -- that doesn't change at all.

21         Q.      So it doesn't change at all your

22     opinions seeing testimony that the whole industry

23     was unaware nitrosamines could form prior to

24     2018?

25                 MR. SLATER:  Objection.  You can

Page 152

```
 1   answer.
 2          A.     Again, I -- that's his, you know,
 3   his opinion.  That's what he spoke to.  I -- I
 4   don't know what he based that on, so it's hard
 5   for me to comment of his comments.
 6          Q.     You've never worked in the
 7   Valsartan industry, have you?
 8                 MR. SLATER:  Did you say he never
 9   worked in the Valsartan industry?
10                 MR. TRANGLE:  Correct.
11                 MR. SLATER:  Objection to the
12   form.  You can answer.
13          A.     I'm -- could you clarify that?
14          Q.     Have you ever worked at a
15   Valsartan manufacturing entity?
16          A.     No, I -- you know, specifically I
17   have not worked in the production end of
18   Valsartan.
19          Q.     Has Min Li?
20          A.     I don't remember his -- his role.
21          Q.     So you're telling me that you
22   disagree with Min Li's opinion, but you don't
23   know whether or not Min Li worked in the
24   industry?
25                 MR. SLATER:  Objection.  You can
```

Page 153

1   answer.  Argumentative.  Let's not argue with the

2   witness.  Let's just ask questions.

3          A.     That's clearly not what I said.

4   If you want to respond again, I just said he made

5   a comment, and he made a comment.  I don't know

6   what he based it on, but that's his testimony.  I

7   have nothing more to say about that.

8          Q.     Do you have any basis with which

9   to disagree with the statement by Min Li?

10         A.     I don't -- I don't know what he --

11  the premise of what he stated, what he was using.

12  I just -- again, I'll repeat my position, and

13  that is that it was unacceptable in 2015 to sell,

14  produce this drug, Valsartan, under this

15  production under the supervision of the ZHP

16  people, it was unacceptable to have that

17  distributed and not assure that -- or not educate

18  everyone, the public, physicians, the FDA, that

19  this NDMA was present in these -- in those drugs.

20         Q.     How many times has NDMA been found

21  in any pharmaceutical product prior to 2015?

22         A.     I think we eluded to -- when you

23  say how many times, how many pills was it in --

24         Q.     No, how many instances.  How many

25  instances has NDMA been found in pharmaceutical

Page 154

1    products prior to 2015?

2                    MR. SLATER:  Objection.  You can

3    answer.

4           A.     We eluded to this before, there --

5    there were some other agents where it was found

6    and the FDA put warnings out and it was -- I

7    don't remember how many times that was.  It's

8    just I am aware that it had been found be in

9    warnings, of course consistent with my testimony,

10   unacceptable, any amount.

11                    So those were -- clinicians were

12   warned, patients were warned, pharmacists were

13   warned, and that was addressed.

14          Q.     What pharmaceutical product are

15   you referring to?

16          A.     I believe the two we spoke of,

17   Metformin as well as Zantac.

18          Q.     And it's your testimony that NDMA

19   was found in those products prior to 2015?

20          A.     I don't remember the details.  I

21   do know there was some concern about safety of

22   the production.  I don't know exactly -- I just

23   don't remember those details.

24          Q.     Details like the timing of when

25   those were found?

Page 155

1          A.     You know, I don't remember.  I

2    don't want to say something that's untrue.  I

3    know that there were some contaminants, but I

4    don't know -- I don't remember the details of

5    when they were found, over what period, exactly

6    what the material was that was of concern.  I

7    just don't remember those details.

8          Q.     Can you tell me or remember or

9    recall a single time NDMA had been found in any

10   pharmaceutical product prior to 2015?

11         A.     No, I don't remember that detail.

12         Q.     Okay.  Are you offering opinions

13   about what the FDA knew about the potential for

14   NDMA impurities to form in Valsartan products

15   prior to May 2018?

16         A.     My opinions are such that prior to

17   2018, the -- just consistent with what I've

18   testified before, the stan- -- it is within the

19   standard of care that clinicians would rely upon

20   the production of that drug to be without

21   carcinogenic agents.  And that was a

22   responsibility back then, if they were selling

23   that drug to the public, that was a necessity

24   that was required that was -- that this was safe.

25                Exactly when, the day, the FDA,

Page 156

1    prior to -- in my report I think I mentioned --

2    what is the day?   In 2018, I don't remember the

3    exact date, but prior to that, I don't know

4    exactly, and I don't remember those exact details

5    of when that information was brought to their

6    attention, the FDA, and when, exactly, they acted

7    upon or formally made an announcement.

8            Q.    Did the expectations of physicians

9    like yourself displace the regulatory scheme

10   applicable to manufacturers of pharmaceutical

11   products?

12               MR. SLATER:  Objection.  You can

13   answer.

14           A.    The standard of care of clinicians

15   like myself is patient safety.  That is of

16   paramount importance.

17               Certainly the regulatory policy,

18   government, most of those are done with good

19   intent, but it is paramount that clinicians,

20   physicians that are using these products and --

21   and have to make decisions with patient use of

22   these products have to be assured that these

23   products are safe.

24               So, again, the exact policy, those

25   kinds of things, I would have to look in -- I

Page 157

1   don't memorize these things, but they are

2   consistent with patient safety.  It is absolutely

3   necessary to be certain that patient safety is

4   assured.

5         Q.    Is the physician professional

6   standard of care that you're talking about the

7   guiding principle of the FDA as you understand

8   it?

9         A.    The physician responsibility to

10  their patient, to their patient's safety, is

11  paramount.  It is certainly consistent with the

12  intent of the FDA or even other regulatory

13  agencies to provide valid information about

14  helping make the best decision for a patient's

15  health or choice of medication.

16              So that -- yes, that -- I think

17  that the physician is not in any way opposed, and

18  I believe very much so from -- even from my

19  reference where I specifically reference the

20  FDA's comments that this is -- this is all done

21  for assurance that patients are safely treated,

22  that choices for physicians are provided, and in

23  this case making certain that medications that

24  are provided are safe for patients.

25        Q.    You stated a number of FDA alerts

Page 158

1    regarding Valsartan recall.  Do you recall that,

2    in your report?

3            A.    Yes.

4            Q.    Okay.  The earliest one cited in

5    your report is from July 13, 2018.  Does that

6    sound right?

7            A.    Yes.

8            Q.    All right.  Let's pull that up.

9    Tab five.  And we are going to mark this as --

10   what is it?   Exhibit 6?

11               (July 13, 2018 FDA News Release is

12   received and marked as Exhibit 6 for

13   identification.)

14           Q.    Do you see that on your screen,

15   Doctor?

16           A.    Can you make that a little bigger?

17           Q.    Noah can zoom in.  Yeah, Noah can

18   zoom in.  I feel you.

19               MR. TRANGLE:  Can you zoom in a

20   little bit?   Oh.

21           Q.    So this is the -- this is what you

22   cited in your report.  Right?   A statement from

23   July 13, 2018?

24           A.    Yes.

25           Q.    In the bottom of this first

Page 159

1  paragraph, the FDA statement says, "The presence

2  of NDMA was unexpected."  Do you see that?

3          A.      You know what?  Forgive me.  Do

4  you have your marker on it?  Let's see.  Last

5  paragraph, FDA -- "the presence of NDMA was

6  unexpected."  Okay.  I see that.

7          Q.      That statement is not listed or

8  discussed in your report.  Right?

9          A.      I don't think I -- I don't think I

10  used that in my report.

11          Q.      Do you disagree with the FDA's

12  statement here that the presence of NDMA was

13  unexpected?

14          A.      No, that's what they wrote.

15          Q.      Okay.  Let's take that down and

16  mark as Exhibit 7 tab six, which is another press

17  release from the FDA, this time dated August 30,

18  2018.

19                  (FDA Statement is received and

20  marked as Exhibit 7 for identification.)

21          Q.      Do you see that?

22          A.      Yes, I do.

23          Q.      All right.  I'm just trying to

24  direct you to the correct page.  Just one second.

25                  Okay.  If we go to page four, the

Page 160

1    top of page four.

2              A.     It's not labeled.  This is six --

3              Q.     There we go.  Do you see here the

4    FDA wrote, "We believe that these risks are

5    introduced through a specific sequence of steps

6    in the manufacturing process, where certain

7    chemical reactions are needed to form the active

8    ingredient."  Do you see that?

9              A.     Yes.

10             Q.     The next sentence, it says,

11   "Before we undertook this analysis, neither

12   regulators nor industry fully understood how NDMA

13   could form during this process."  Do you see

14   that?

15             A.     Yes.

16             Q.     And then the FDA wrote, "We are

17   still not 100 percent sure that this is the root

18   cause of the problem."  Is that right?

19             A.     That's what's written by them.

20             Q.     You didn't include any of these

21   statements in your report, did you?

22             A.     No.

23             Q.     Do you disagree with the FDA that

24   before they undertook this analysis, neither

25   regulators nor industry understood how NDMA could

Page 161

```
 1   form during this process?
 2           A.    No.  You -- you didn't cite in all
 3   these records I'm reading from right out of
 4   that -- another version, and I'll share with you,
 5   that, quote, this is an urgent recall, it's dated
 6   July 13, 2018 from the Solco Health, and it says,
 7   quote, "This impurity has been classified as a
 8   probable human carcinogen as per the
 9   International Agency For Research and Cancer
10   classification."
11                 So there -- there's information in
12   this, you're citing one, but certainly it's all
13   consistent with the alarming presence of this
14   cancer causing agent.
15           Q.    My question is not about some
16   other document that you're reading, it's about
17   the document on the screen.  Okay?
18                 And my question is do you have a
19   basis to disagree with the FDA that before they
20   undertook this analysis, neither regulators nor
21   industry understood how NDMA could form during
22   the manufacturing process.
23                 MR. SLATER:  Objection.  You can
24   answer.
25           A.    That's what's written in this
```

Page 162

1    document, but clearly, in the correspondence,

2    they recognize the -- the danger of this human,

3    probable human carcinogen.  I just want to be

4    consistent with what was brought to everyone's

5    attention at that time.

6              Q.    Right.  But your testimony is

7    about whether or not it's dangerous and my

8    question is about whether or not it is known.  Do

9    you understand the difference?

10             MR. SLATER:  Objection.  You're

11   really confusing.  You can answer if you can

12   understand the question.

13             A.    I'm trying my best to answer your

14   question, but I think the most important aspect

15   is the safety of this.  The fact that you're --

16   you know, they wrote something here that they

17   weren't sure of the -- these different -- I'll

18   quote it, different processes with various

19   process steps, that's what they wrote here, but

20   that certainly doesn't excuse the presence of

21   this or the danger as is cited in their

22   announcement of this being a probable human

23   carcinogen that is completely unacceptable.

24             Q.    Is there a difference between the

25   amount of risk posed by something and whether

Page 163

```
 1   that -- the presence of that impurity is known to

 2   a manufacturer?

 3               MR. SLATER:  Objection.  You can

 4   answer.

 5        A.     I think you're -- you know, I want

 6   to make sure we're talking about the same aspect.

 7               In this particular case of the

 8   presence of this NDMA, it, as I mentioned before

 9   and I believe Dr. Hecht went through some more --

10   in more detail, that the pre- -- that this

11   materials, these nitrosamines, have been known to

12   have this risk of causing cancer that goes back

13   to the seventies, and that is the amount that

14   causes cancer exactly.  He -- I -- you know, much

15   of these, this information, is such that they use

16   this term that it is a probable human carcinogen.

17   It is not clear about exactly what amount,

18   exactly what concentration, but any risk, and

19   this is where I would -- my expertise is such

20   that I have to make these decisions all the time,

21   in this particular case, with this particular

22   agent that was found in these blood pressure

23   medicines, that is unacceptable and that you

24   would never, ever put a patient on this

25   medication when all of these other safe
```

Page 164

1    alternatives were available.

2            Q.      Doctor, conceptually speaking, is

3    knowledge of the amount of danger posed by NDMA

4    different than knowledge it can form chemically

5    in a manufacturing process?

6            A.      Knowledge of the presence of this,

7    and you can -- you know, a precursor of this in a

8    certain concentration, knowledge of the presence

9    of this and subjecting a patient to this is

10   unacceptable.  There is no justification,

11   risk-benefit, clinicians with alternatives.

12              So this is unacceptable, this

13   impurity, this -- this probable carcinogen is

14   unacceptable.  No clinician would want their

15   patient on this agent when -- when there are

16   alternatives that can safely treat them.

17           Q.      Can you tell me what it means for

18   there to be knowledge of the presence of a

19   carcinogen in a product?

20              MR. SLATER:  Objection.  You can

21   answer.

22           A.      Knowledge is knowledge of the

23   presence, that it is present, and if that's

24   known, knowledge of the presence or whatever term

25   we want to use, discovery of that presence, that

Page 165

1   poses a risk to patients, and we are obligated to

2   protect our patients, and that is -- whatever

3   term you want, knowledge of that presence is

4   unacceptable.  Unacceptable.

5           Q.     So knowledge of the presence of

6   NDMA would be required.  Right?

7                  MR. SLATER:  Objection.  You can

8   answer.

9           A.     That may be a -- re-answer that --

10  re-ask that question.

11          Q.     Honestly, I don't think I'm able

12  to.

13                 Is knowledge of the presence of

14  NDMA that it can form in manufacturing processes

15  required?

16                 MR. SLATER:  Objection.  You can

17  answer.

18          A.     I think you're referencing when

19  this was produced in 2015 and sold as a safe

20  product, it was their obligation at the ZHP

21  processing of this to test for any presence of

22  this, and the presence of this, they should --

23  they should have tested for this at that time,

24  they should have made certain that this was not

25  present before they sold this, and as soon as it

Page 166

1    was made available, or as soon as that was

2    discovered, to warn the FDA and all of the other

3    warning -- as we spoke of before, through "dear

4    doctor" letters, through package inserts,

5    labeling, all of those are communication avenues

6    to safely assure that patients could be

7    transitioned to a different agent.

8             Q.    Right.  So as soon as it was

9    discovered, they should have warned the FDA?

10            A.    They should have warned the FDA,

11   got this out to the FDA and directly notified

12   physicians and other people that were using this,

13   or that were -- that had been under the -- had

14   been assured that this was a safe drug.

15            Q.    Right.  And that should have

16   happened as soon as it was discovered?

17            A.    As -- as soon as possible to -- to

18   assure safety to patients that may have been --

19   or physicians that were still using the drug.

20            Q.    When was it possible?

21            A.    I don't remember that exact time,

22   but --

23                  MR. SLATER:  Objection.  You can

24   answer.

25                  COURT REPORTER:  I'm sorry, what

Page 167

1   was that?

2                MR. SLATER:  I tried to say

3   objection, you can answer.  He just went before I

4   could object.

5                THE WITNESS:  Sorry.  I don't know

6   the exact day that that information was available

7   and should have been distributed to all of these

8   different people.

9        Q.     Going back to this document, do

10  you have any basis to disagree with the FDA when

11  they stated that "neither regulators nor industry

12  fully understood how NDMA could form during the

13  manufacturing process?"

14       A.     No.

15       Q.     Okay.

16                MR. TRANGLE:  Let's take this

17  down.  Let's pull up as Exhibit 8 -- actually,

18  I'm so sorry.  Let's pull that back up.  I have a

19  couple of questions about it.  Sorry, Noah.

20       Q.     If we go down to page five, do you

21  see here where the sentence starts with

22  "However?"

23       A.     I'm sorry, one, two, three --

24  there we go.  I can see it.

25       Q.     However -- the FDA wrote that,

Page 168

1    "the review of records depends on appropriate

2    tests to detect the impurity."  Right?

3            A.    Yes, that's what's written there.

4            Q.    And the FDA said that "tests are

5    selected based on assessments of what impurities

6    may develop based on the manufacturing process."

7    Right?

8            A.    Yes, uh-huh.

9            Q.    And the FDA wrote, "In other

10   words, it needs to be recognized that the risk of

11   an impurity can occur in order to know that it

12   should be tested for."  Right?

13           A.    Well, I don't know what -- you're

14   interpreting --

15                 MR. SLATER:  There's no question.

16   Are you just asking him to confirm that's what it

17   say?

18                 MR. TRANGLE:  The objection is to

19   form.

20                 MR. SLATER:  No, actually --

21   please, you know, we can be friendly or we could

22   not, but are you asking if that's what the

23   document says?  Is that --

24           Q.    Dr. Russo, does this FDA statement

25   that you cite in your report state that, "In

Page 169

1    other words, it needs to be recognized that the

2    rick of an impurity can occur in order to know

3    that it should be tested for?"

4              A.    That's what it says, yes.

5              Q.    Do you disagree with the FDA's

6    statement?

7              A.    No.

8              Q.    Okay.  Further down in the next

9    paragraph, it says, "Recognizing these risks is

10   based on a deep understanding of the chemistry

11   involved in drug manufacturing, and the

12   theoretical risk that an impurity could be a

13   by-product of an essential step used in the

14   manufacture of an active ingredient."  Do you see

15   that?

16             A.    Yes.

17             Q.    Do you have a deep understanding

18   of the chemistry involved in drug manufacturing?

19             A.    That's not my area of expertise.

20   Dr. Hecht, I would refer to his -- his expertise

21   in review- -- in answering the technical aspect

22   of that.

23             Q.    Do you disagree with the FDA that

24   recognizing these risks requires a deep

25   understanding of the chemistry involved in drug

Page 170

1  manufacturing?

2          A.      I don't disagree.

3          Q.      Do you disagree with the FDA the

4  theoretical risk an impurity could be a

5  by-product of an essential step used in the

6  manufacturing of an active ingredient also

7  requires an understanding of the chemistry

8  involved in drug manufacturing?

9          A.      That's what they wrote.  I don't

10 disagree with that.

11         Q.      Okay.

12             MR. SLATER:  Is this a good time

13 for a break?  It's been a while.

14             MR. TRANGLE:  No, I want to get

15 through all of these, and then we can have a

16 break.

17             MR. SLATER:  What do you mean you

18 want to get through all of these?  It's --

19 he's -- Dr. Russo is exhausted.  He's rubbing his

20 eyes.  I'd like to take a break.  If you don't

21 have a question pending, we'd like to take a

22 break.

23             MR. TRANGLE:  I only have a couple

24 of questions.

25             MR. SLATER:  I don't know what

Page 171

1    that means.  You said you want to go through all

2    these.  I assume you have a whole bunch of other

3    things you want to go through.

4                    I'd like to take a break.  It's

5    been over an hour.  You may not be aware of it,

6    but your firm has been breaking every hour in

7    depositions for -- for a long time.  So we'd like

8    to take a break.

9                    MR. TRANGLE:  We're going to

10   finish with this document and then we can take a

11   break.

12                   MR. SLATER:  You know what?

13   We're taking a break, because I -- I think that

14   was rude.  So we'll take a break.  There's no

15   question pending.  We'll be back.  We'll see you

16   in a few minutes.

17                   MR. TRANGLE:  Okay.  Will you be

18   back in five minutes?

19                   MR. SLATER:  We'll be back in five

20   to ten minutes.

21                   Please, be friendly.  It helps.

22   It's a good thing to do.

23                   MR. TRANGLE:  Respectfully, you

24   have been so unfriendly this entire time, and I'm

25   glad we're on the record for that.  Thanks.  Now

Page 172

```
 1    we can go off.
 2                   VIDEOTAPE OPERATOR:  Okay.  Going
 3    off the record.  The time is 3:24 p.m.
 4                   (Whereupon, a short recess was
 5    taken, and the proceedings then continued as
 6    follows:)
 7                   VIDEOTAPE OPERATOR:  Going back on
 8    the record.  The time is 3:36.
 9    BY MR. TRANGLE:
10          Q.    Before we went on break, Doctor,
11    we were discussing an FDA press release that you
12    cite in your report.  Right?
13          A.    Yes.
14          Q.    And if you look at this document,
15    which is an FDA press release that you cited, the
16    FDA wrote that, "Because it was" --
17          A.    Forgive me.  I don't have it here.
18          Q.    It's on the screen.
19          A.    Is there another place that it
20    should be?  I have -- it's not on my screen.  I
21    can't see it.  Is there another button to press?
22    I mean, I'm on -- unfortunately is it below my
23    thing here?  No.  I don't --
24          Q.    Do you have the Zoom as your full
25    screen?
```

Page 173

```
 1          A.     I have -- yeah, I have the -- it's
 2    my, you know, just me, the full -- I'm looking,
 3    is there another area that I would click on to
 4    pull the document up?
 5                 VIDEOTAPE OPERATOR:  Noah, if you
 6    reshare maybe, that way it will just pop up for
 7    Mr. Russo.
 8                 MR. SLATER:  Dr. Russo.
 9                 VIDEOTAPE OPERATOR:  Dr. Russo.
10    My mistake.  I'm sorry.
11          A.     Is there me or someone else?
12          Q.     Wait a second.  Do you see that
13    now?
14          A.     Oh, you know, it just has your
15    name.  It says Noah.  Okay.  Now I can see it.
16    Got it.
17          Q.     So this is the FDA press release
18    that you cited that we were talking about.
19    Right?
20          A.     Yeah.  You know what?  I just
21    want to make sure I familiarize myself.  Let me
22    just take a look.  Can we go to the -- because I
23    don't remember.  The top of this, I want to get
24    the -- orient the date and all that stuff.
25          Q.     Sure.  So this is an FDA statement
```

Page 174

1    that you cited dated August --

2                    MR. SLATER:  He's trying to read

3    it, is actually what he's trying to do.

4                    THE WITNESS:  Yeah, I just want to

5    read this.  Just give me a second.

6                    COURT REPORTER:  If you could just

7    read to yourself, only because I have to type

8    down what you're saying.

9                    THE WITNESS:  Okay.  I'll read

10   this, I'll just can, can you move it up a little

11   bit?

12                    MR. SLATER:  You're not able to

13   find the document in the link that they sent you?

14   Because then you could control it.

15                    THE WITNESS:  Oh, boy.  The

16   link --

17                    MR. TRANGLE:  Do you want to go

18   off the record so he can figure this out, so he

19   can view it?

20        Q.    Or, Doctor, can I just ask the one

21   question with this or --

22        A.    You know what?  If I could, I'd

23   like to read the whole document, if I could.

24        Q.    Unfortunately, it's seven pages.

25   So, you know, this is something that you cited.

Page 175

1   If you're not able to answer questions about it,

2   that's okay.

3                   MR. SLATER:  Well that's actually

4   not really fair.  Your witnesses have been

5   reading documents through deposition after

6   deposition when they feel the need to.

7          Q.    Are you familiar with the document

8   that's on the screen, Doctor?

9                   MR. SLATER:  He just asked to read

10  it.  I'm not sure what you're doing.  Are you

11  cutting him off?  He's not allowed to read it

12  now?

13         A.    I recognized it, but I was asking

14  if I could --

15         Q.    We can go off the record if you

16  want to read it, but we just were off the record

17  for ten minutes.  Did you read it then?

18         A.    No.

19         Q.    Do you want to go off the record

20  so you can read it?

21                  MR. SLATER:  He doesn't want to go

22  off the record.

23                  MR. TRANGLE:  We're not wasting

24  ten minutes for him to read a document that he's

25  cited in his report in full.

Page 176

```
 1              MR. SLATER:  Look, at the rate
 2    we're going, we're going until 10:00 tonight
 3    anyway.  So whatever.
 4         Q.    Okay.  We can go off the record if
 5    you want to read the whole thing, Doctor.
 6         A.    I guess I'll -- I'll -- I can dig
 7    it out of my records if I can.  I'm going to try
 8    to match this.  Is this August 30th?  FDA?  Let
 9    me see if I can dig it out of my records.
10              I guess we'll go off the record
11    and I'll try to dig it out from my -- from my
12    records.
13              MR. TRANGLE:  Okay.  Let's go off
14    the record.
15              VIDEOTAPE OPERATOR:  Okay.  We're
16    going off the record.  The time is 3:40 p.m.
17              (Whereupon, a discussion is held
18    off the record, and the proceedings then
19    continued as follows:)
20              VIDEOTAPE OPERATOR:  We are going
21    back on the record.  The time is 3:49.
22    BY MR. TRANGLE:
23         Q.    All right, let's go to page five.
24    This is a document that you cited in your report.
25    Correct?
```

```
                                          Page 177

 1          A.     Yes.

 2          Q.     The FDA stated in this document,

 3    in the middle of the paragraph on the screen,

 4    that "Because it was not anticipated that NDMA

 5    would occur at these levels in the manufacturing

 6    of the Valsartan API, manufacturers would not

 7    have been testing for it."  Correct?

 8          A.     That's what they say in the

 9    statement.

10          Q.     Do you have any basis with which

11    to disagree with the FDA's statement that you

12    just read?

13          A.     No.  That's just a statement they

14    made.

15          Q.     The FDA also wrote, "This

16    particular risk would not have been identified on

17    an inspection."  Right?

18                 MR. SLATER:  Is that what the

19    sentence says, Counsel?

20          Q.     Doctor, is that what the sentence

21    says?

22          A.     I think the sentence you just

23    read, yes, "So this particular risk would not

24    have been identified on an inspection."

25          Q.     Right?  That's what the FDA wrote
```

Page 178

1    in this statement that you cited?

2           A.    Yes.

3           Q.    Do you have any basis with which

4    to disagree with the FDA's statement that we just

5    discussed right here?

6           A.    No.

7           Q.    Okay.  Did you discuss either of

8    the two statements that we just mentioned in your

9    report?

10          A.    No.

11                MR. TRANGLE:  Let's take this

12   down.

13          Q.    Is it your opinion that generic

14   Valsartan was required to be the equivalent of

15   Diovan in all material respects?

16          A.    That would be the expectation,

17   that the -- the efficacy of that drug was

18   equivalent to the brand Diovan.

19          Q.    Okay.  Just the efficacy?

20          A.    The safety, the efficacy, yes,

21   that it would be equivalent to the brand name.

22          Q.    And what's the basis for your

23   opinion?

24          A.    My experience as a clinician in

25   the setting of many medications, drugs, that do

Page 179

1    have a generic alternative.

2              Again, in my experience as a

3    clinician practicing, as a section chief in a

4    hospital setting, as a faculty member at the

5    medical school teaching residents, that generics,

6    excuse me, that are produced are the expectation

7    is they are -- they be safe and equivalent in

8    that process that is offered to be certain that

9    they are -- that it is safe to put those patients

10   on those medications.

11             VIDEOTAPE OPERATOR:  Doctor, if

12   you're able to move your camera down a little

13   bit, it's just cutting off the bottom of your

14   face.  Thank you.

15        Q.    Does the requirement that generic

16   drugs be equivalent in all material respects

17   prohibit the presence of impurities in generics?

18             MR. SLATER:  Objection.  You can

19   answer.

20        A.    Again, my expertise in using or

21   making risk-benefit decisions of generics is such

22   that that generic, for the indications of a

23   particular patient, be a safe alternative that is

24   just as effective and does not contain

25   impurities; i.e., potential cancer causing

Page 180

1    agents.

2              All physicians, that -- certainly

3    under standard of care is such that physicians

4    that are offered these, whatever the insurance

5    plan offers or all those different options, would

6    or are obligated to prioritize the safety of the

7    patients, and that's something that all of us

8    make decisions each and every day.

9         Q.    When was the first time that you

10   prescribed Valsartan to a patient?

11        A.    I don't remember the date, but my

12   recollection is the drug --

13              (Audio/video interruption.)

14              COURT REPORTER:  Yeah, I didn't

15   get that.

16        Q.    Yeah.  Okay.  We're going to need

17   you to repeat that.  Unfortunately, you're

18   frozen.

19        A.    Hello.  Are you there?

20              MR. SLATER:  You're frozen.  We're

21   not really getting what you're saying, Dr. Russo.

22        A.    Okay.  You asked me a question

23   about --

24        Q.    Just wait a sec.  Just wait until

25   it catches up.

Page 181

1          A.    I guess refresh, I'll try?

2          Q.    Just wait.  All right.  I think

3     it's working.

4               My question is when was the first

5     time that you prescribed Valsartan to a patient?

6          A.    And I'm going to ask you to be

7     specific.  Valsartan the generic, not the brand

8     Diovan?

9          Q.    Sure.

10         A.    I believe, I don't remember the

11    exact date, but the drug, I believe, in the late

12    '90s, something -- I'm going to say something of

13    that nature.  I be- -- and I could be wrong, I

14    don't remember the exact date, but in the late

15    '90s or early 2000s.

16         Q.    Why did you prescribe that patient

17    Valsartan?

18         A.    It likely was for hypertension.

19         Q.    At the time, was it your opinion

20    that Valsartan effectively treated high blood

21    pressure?

22         A.    It was a effective medication in

23    controlling hypertension.  Again, it would very

24    much depend on the profile of that patient, what

25    other medications that patient was on, but it was

Page 182

1    a -- oftentimes a choice that was effective.

2         Q.    Is Valsartan still effective at

3    treating high blood pressure?

4         A.    Yes.

5         Q.    Is it your opinion that the

6    presence of FDA -- of NDMA, I apologize,

7    decreases the efficacy of Valsartan's ability to

8    treat hypertension or high blood pressure?

9         A.    I don't know of that.  I knowingly

10   would never put a patient -- use Valsartan that

11   had contained NDMA.

12              (Audio/video interruption.)

13        A.    Excuse me.

14        Q.    Yeah, sorry.  You're frozen again.

15   So just one second.

16        A.    I -- I don't -- it's difficult

17   that I knew contained that --

18              (Audio/video interruption.)

19              MR. SLATER:  Doctor, we're not

20   catching -- we didn't catch what you said.  For

21   some reason all of a sudden, we're having this --

22        Q.    Yeah, your internet is freezing

23   again.  I'm going to ask -- it looks like you're

24   back.

25              Doctor, is it your opinion that

Page 183

1    the presence of NDMA decreases the efficacy or

2    ability of Valsartan to treat high blood

3    pressure?

4            A.    It is difficult for me to answer

5    that question because I have never used

6    Valsartan, as far as I know, that contained the

7    nitrogenous NDMA that I observed it was not as

8    effective.  I don't -- it's hard for me, because

9    I would not knowingly have used that preparation.

10           Q.    Did you prescribe Valsartan from

11   2015 to 2018 to your patients?

12           A.    Yes.

13           Q.    Did it work for their high blood

14   pressure?

15           A.    There were many cases that it was

16   very, very effective, as with all the agents.

17   Sometimes other adjustments had to be made.  It

18   depended on the dose and the underlying condition

19   of the patient.

20           Q.    I want to talk about your report

21   for a second.  On page two of your report -- do

22   you have your report in front of you?

23           A.    Yes, I do.  I have it right here,

24   yes.

25           Q.    Okay.  I'm going to Exhibit Share

```
                                          Page 184

1    myself.  Exhibit 4.  And you wrote here that

2    you're familiar with the notifications in 2018

3    that Valsartan manufactured by some but not all

4    manufacturers was found to contain nitrosamine

5    impurities including NDMA and NDEA, as you had

6    patients who were taking the contaminated

7    Valsartan and you transitioned them to

8    replacements medications.  Right?

9            A.    Yes.

10           Q.    When you used the word

11   "transition" here, what do you mean?

12           A.    A substitution was made to a form

13   of a blood pressure medication that certainly did

14   not contain this NDMA.

15           Q.    Did you tell your patients to

16   immediately throw away their Valsartan and stop

17   using it?

18           A.    Yes.  Yes.  That they were warned

19   to -- to not -- certainly not stop the

20   medication, but to con- -- they were notified by

21   our offices, sometimes it was the pharmacies that

22   got to them, but we didn't want patients without

23   any medication.  That was even potentially -- a

24   very dangerous circumstance.

25                   So they were educated about --
```

Page 185

1    some of them came into the office, some of them

2    couldn't get in, and an alternative was called in

3    and then they came in to make sure it was

4    working.  All of those were conditions that took

5    place.

6         Q.    Why was it dangerous for them not

7    to take any medication?

8         A.    Especially patients with high

9    blood pressure, if they suddenly stop their high

10   blood pressure medication, there can be a sudden

11   acceleration of the level of their blood pressure

12   and that can be a dangerous condition.  That can

13   increase the risk of some damaging effect, a

14   stroke, a heart attack, things of that nature.

15        Q.    Immediate cessation of blood

16   pressure medication like Valsartan could lead to

17   increased risk of heart attack?   Is that what

18   you said?

19        A.    Unfortunately, yes, that could --

20   that could take place.

21        Q.    So you told your patients to

22   continue using it until they had a replacement?

23        A.    Correct.

24        Q.    You believed, at least for some of

25   your patients, that the risks associated with

Page 186

1   forgoing Valsartan with NDMA outweighed the risks

2   associated with taking it in the short term?

3                    MR. SLATER:  Objection.  You can

4   answer.

5          A.     Would you -- I'm sorry, if you

6   could repeat that question.

7          Q.     You believed, at least for some of

8   your patients, that the risks associated with

9   forgoing Valsartan with NDMA outweighed the risks

10  associated with taking it in the short term?

11                   MR. SLATER:  Objection.

12         A.     It's a little hard for me to

13  get -- to answer what you're saying.  Let me just

14  make the statement as before; again, patient

15  safety is paramount, and in a circumstance like

16  this with a drug that's generic form from ZHP

17  that contains nitrosamines, the communication

18  from our office, from pharmacies, from the FDA

19  was don't stop suddenly the medication, get in

20  touch with your primary care physician as soon as

21  possible and make a decision to a safe

22  alternative, and that's exactly what we did, and

23  that -- that's what the standard of care was to

24  assure safety of patients.

25         Q.     Right.  So for that interim

Page 187

1    period, you believed that for some patients,

2    risks of not taking Valsartan with NDMA would be

3    higher than risks associated with taking it in

4    the short term.

5            A.     Yes, the risk --

6                   MR. SLATER:  Objection.  Asked and

7    answered.

8            A.     I want to be clear -- I want to be

9    clear that the risk of stopping, the term is cold

10   turkey, and having nothing, that risk -- that

11   potential risk was -- was significant, and there

12   were cases of patients that remained on that

13   medication, even though it was tainted with the

14   NDMA, until they could either come to the office

15   or have a communication to have some change

16   transition.

17           Q.     Did you tell your patients to stop

18   taking Valsartan before they had a replacement?

19           A.     No, I would tell them to -- here's

20   the alternative, and I want you to stop the

21   medication, I'm going to stop the Valsartan, and

22   I want you to take this specific medication

23   instead, or as a substitute.

24           Q.     So at times, physicians would

25   knowingly prescribe NDMA containing Valsartan --

```
                                              Page 188

 1                    MR. SLATER:  Objection.  Lack of

 2     foundation.  Mischaracterizes the testimony.

 3                    MR. TRANGLE:  Can I finish my

 4     question?  I'm sorry.  I'm not done.

 5            Q.     So, Dr. Russo, at times physicians

 6     would knowingly prescribe Valsartan that contains

 7     NDMA and you would consider that to be

 8     reasonable?

 9                    MR. SLATER:  Objection.  Lack of

10     foundation.  Mischaracterizes the testimony.  You

11     can answer.

12            A.     Yes.  No physician, at any time,

13     would prescribe -- continue the use of the

14     medication, as in this case, Valsartan, that's

15     known to have NDMA in it.  That would be

16     unacceptable.  The danger of potential

17     carcinogenic effects certainly would not be

18     acceptable.

19                    There are circumstances, and this

20     was one of them, where it's known, it's --

21     information is such that NDA was discovered, and

22     instead of subjecting that patient to the risk of

23     stroke, until that patient could be changed to a

24     safer medication, again, the premise or the most

25     important aspect is patient safety, that you
```

Page 189

1   would ask that that patient not stop their

2   medication, but to transition it.

3           So there is -- it's a -- there's

4   no endorsement to say there's some benefit of the

5   NDMA in any way, shape or form.  It's universally

6   recognized by all clinicians, like myself, all of

7   these people that use these drugs, that stopping

8   a medication, like in this case, potentially

9   there's more, as was eluded to or stated by the

10  FDA who had the same position, that patient

11  safety is paramount.

12          Q.    But it's your opinion that

13  Valsartan, even with NDMA, at times was less of a

14  risk than forgoing medication use?

15          MR. SLATER:  Objection.  Lack of

16  foundation.  Mischaracterization.

17          You can answer again, Doctor.  If

18  he wants to keep asking, you can keep answering.

19          A.    Yes.  You have to be very

20  specific.  If a patient is on -- no one would

21  start a -- with Valsartan that's tainted with

22  NDMA, would start a patient on that medication.

23  That's very clear.

24          If a patient is already on some

25  form of medication, one of them may be this

Page 190

1    tainted Valsartan, in that circumstance, there

2    may be a period of time where, before that

3    patient can come in, can be transitioned, that

4    even though that is still a concern, you would

5    not want that patient on that for a long period

6    of time certainly, that you -- and it's in no way

7    endorsing -- the FDA did not endorse a safe usage

8    of Valsartan with NDMA.

9              It's just that you would not want

10   a patient that is on a blood pressure medicine,

11   like NDA, to stop it suddenly.  You'd want a

12   transition to take place.

13        Q.    And I think you just talked about

14   the FDA statement and it not being an

15   endorsement.  Right?

16        A.    Yes.  The wording was just exactly

17   what we all were doing at the time, was that we

18   want -- we don't want something adversely to

19   affect patients that potentially would panic and

20   would stop the medication without seeing a

21   physician or without being instructed about the

22   safe alternatives.  That was -- that was --

23   that's exactly what took place.

24        Q.    Right.  And that's your opinion

25   about the thinking that the FDA was doing at the

Page 191

1    time?

2           A.    It's not just my thinking, it's

3    the standard of care, that -- to assure safety,

4    that's something that I, myself, abided by, my

5    colleagues in the hospital setting making

6    choices, and the FDA clearly recognized this,

7    that this was within the standard of care to deal

8    with this very difficult situation.

9           Q.    Right.  My question wasn't about

10   your thinking.  It was you're offering opinions

11   about the FDA's thinking about continuing to

12   prescribe at this time.  Right?

13          A.    They -- their statement was

14   essentially warning patients not to stop it

15   suddenly, but to have -- have -- a -- an

16   assessment --

17                (Audio/video interruption.)

18                COURT REPORTER:  An assessment of

19   what?   I didn't get the end of that.

20                THE WITNESS:  Oh, to -- maybe if

21   you read it back, I'll remember it.  I don't

22   remember what I --

23          Q.    I'll just ask again.  So basically

24   my question is you're offering opinions about how

25   the FDA was thinking about when and how much and

Page 192

1    whether to prescribe Valsartan with NDMA?

2         A.    I'm offering my expertise.  I was

3    making these decisions at that time when this

4    announcement was made, and the clinical

5    experience that I had as well as my colleagues as

6    well as all those circumstances where that

7    decision had to be made that the primary concern

8    was patient safety, and the FDA announcement was

9    consistent with do no harm, don't panic, don't

10   allow these patients to panic and stop the

11   medication.

12              So all of that was very much

13   consistent with what took place at the time.  I

14   remember it very well.

15        Q.    All right.  Let's pull up tab two,

16   which is your expert report, and go to page

17   eight.

18        A.    I'm on page eight.

19        Q.    Okay.  In the second paragraph

20   you're offering the opinion that, "The FDA's

21   recommendation that patients continue to take the

22   contaminated pills until their physicians could

23   prescribe replacement therapy was not an

24   endorsement of the safety of the contaminated

25   pills."  Correct?

Page 193

1          A.     Yes.

2          Q.     Okay.  How did the FDA come to

3    decide it was best to recommend patients continue

4    taking their Valsartan pills?

5          A.     The FDA has experience and

6    understands the principles of properly treating

7    patients with hypertension, and very clearly

8    understands that this was a difficult

9    circumstance, that this information had to be

10   shared for the safety of patients, but there was

11   possibly an adverse side of this that potentially

12   could have resulted in injuring patients with

13   patients panicking and just stopping it, and they

14   recognized this, as myself, as my colleagues, as

15   all of us at that time recognized, that this --

16   this statement was consistent with what all of us

17   did to mitigate this risk to protect these

18   patients that were subjected to this -- to this

19   dangerous preparation of the drug.

20         Q.     Did you look at any internal FDA

21   documents discussing how they came to their

22   decision and their risk-benefit analysis during

23   the time of the recall?

24              MR. SLATER:  Objection.  Lack of

25   foundation.

Page 194

```
 1            A.     I don't remember that detail or
 2    that document exactly.
 3            Q.     Well, are you aware that you --
 4    have you reviewed any documents, internal FDA
 5    documents, in forming your opinions in this case?
 6            A.     The documents that I listed in my
 7    exhibits is what I reviewed in this case.
 8            Q.     Did you speak to anybody at the
 9    FDA about how they came to decide that it was
10    safe for it to continue recommending Valsartan
11    with NDMA?
12            A.     No, I did not.
13            Q.     Did you look at any FDA committee
14    documents related to the recall?
15            A.     At that time, I did --
16                   MR. SLATER:  Objection.  Lack of
17    foundation.  You can answer.
18            A.     Yes, at that time, I don't
19    remember.  I remember receiving several "dear
20    doctor" letters, I remember reading this in the
21    press, in the news, I remember at our hospital
22    formulary committees dealing with this.  So there
23    were a lot of sources of information.
24                   I don't exactly remember looking
25    at internal, as you're requesting, FDA documents
```

Page 195

```
 1    that may have been available.
 2           Q.    Do you disagree with the FDA's
 3    risk-benefit analysis?
 4           A.    No.
 5           Q.    Okay.  Let's pull up tab six,
 6    which is that first FDA announcement that we
 7    talked about already.  If you look at Exhibit 6
 8    in Exhibit Share, it should pop up for you.
 9           A.    Exhibit 6, I think it is?
10           Q.    Yes.
11           A.    Is -- yes.  Let me just take a
12    look at this.
13           Q.    Is it on the screen?  Do you see
14    it there?
15           A.    Yeah.  It's on the screen.  I
16    guess it says, "FDA Announces Voluntary Recall?"
17    Is that what it is?
18           Q.    Yes, it's the document that we
19    already discussed.
20           A.    I lost track.  Did we already
21    discuss number six here?
22           Q.    Yes.  We did.  This is the press
23    release, the first one, from July 13, 2018 it
24    says.  Right?
25           A.    Yes.
```

Page 196

 1          Q.     Okay.  On page one, if we look at

 2     "Information for Patients and Health Care

 3     Professionals," the FDA wrote, "Because Valsartan

 4     is used in medicines to treat serious medical

 5     conditions, patients taking the recalled

 6     Valsartan-containing medicines should continue

 7     taking their medicines until they have a

 8     replacement product."  Right?

 9          A.     Yes.  That's what's written.

10          Q.     Do you disagree with the FDA's

11     statement that you just read?

12          A.     No.

13          Q.     Okay.  Let's take that down.

14                 I want to bring up tab six, which

15     is -- this is the one that you reviewed in full

16     off the record.  Do you recall?   It's the

17     August 30, 2018 FDA document.

18          A.     Let me pull it up here.  August --

19     no, I have July 13th.  You said --

20          Q.     Exhibit 7.

21          A.     I'm sorry, seven?

22          Q.     Yes.

23          A.     This is the August -- yes, I have

24     that up right now.

25          Q.     Okay.  Let's go to page two.

Page 197

1          A.     All right.  Page two.

2          Q.      In this first full paragraph, the

3    FDA wrote, "Although the risk to patients taking

4    the affected products is extremely low."  Do you

5    see that?

6          A.     Yes.

7          Q.     Did you cite that in your report,

8    that statement specifically?

9          A.     No.

10          Q.     Did you discuss that statement in

11    your report?

12          A.     I don't believe I used this

13    statement in my report.

14          Q.     Do you disagree with the FDA that

15    the risk to patients taking the affected products

16    is extremely low?

17          A.      I wouldn't say I disagree, but I

18    don't subject my patients, even if there's a low

19    risk, and it's unacceptable to have a product

20    with this contaminant in it, especially when

21    there are other alternatives, safe alternatives

22    available.

23          Q.      If we go to page three, do you see

24    where it says, "CDER toxicologists and chemists

25    evaluated the risk to the public?"

Page 198

1           A.      Yes, I see that.

2           Q.      And the FDA wrote here that their

3    scientists were able to estimate the theoretical

4    risk that the impurity could pose to patients.

5    Do you see that?

6           A.      Yes, I do.

7           Q.      Do you have any reason to disagree

8    with the estimate of the theoretical risk that

9    the FDA calculated?

10          A.      No.

11          Q.      The FDA stated that their estimate

12   was that if 8,000 people took the highest

13   Valsartan dose, 320 milligrams from NDMA affected

14   medicines daily for four years, the amount of

15   time we believed the affected products had been

16   on the U.S. market, there may be one additional

17   case of cancer over the lifetimes of these 8,000

18   people beyond the average cancer rate among

19   Americans?   Do you see that?

20          A.      Yes, I do.

21          Q.      Do you disagree with the FDA's

22   estimate?

23          A.      I don't disagree with their

24   theoretical estimates, but again, we, in clinical

25   medicine, patient safety is the primary concern,

Page 199

1    and we would never suggest or allow a patient

2    knowingly to be on a medication like this

3    Valsartan that contains a potential carcinogen, a

4    probable human carcinogen.

5           Q.    And the FDA wrote that this

6    estimate represented the highest possible level

7    of NDMA exposure.  Correct?

8           A.    Yes.  This -- again, theoretical

9    risk, they're making a theoretical risk, but

10   again, we -- we don't put patients that have a

11   risk of cancer, we don't put patients on those

12   drugs, especially when there are safer

13   alternatives available.

14          Q.    Do you have the expertise to

15   calculate your own theoretical risk the impurity

16   could pose based your toxicological and

17   epidemiological expertise?

18                MR. SLATER:  Objection to the form

19   of the question.  You can answer.

20          A.    Yes, I don't perform -- I don't

21   ever put my patients on medications that have a

22   probable risk of carcinogens when there is an

23   alternative available.  I don't --

24          Q.    My question is about the --

25                MR. SLATER:  I'm sorry.  Please

Page 200

1    don't interrupt him in the middle of an answer.

2              A.    That -- that scenario of allowing

3    a patient to be on a medication that has a

4    probable human carcinogen when there are

5    alternatives available is a completely

6    unacceptable risk.  No clinician would agree to

7    that.

8              So that's -- that's just the

9    way -- not just I practice that, it's the

10   standard of care of clinicians that manage these

11   patients in all of the settings, as I've

12   mentioned that I have great experience with, that

13   being in the clinical office setting, in the

14   hospital setting, educating residents, in all of

15   those, even in the administrative role as a

16   section chief, none of us, in any of those

17   circumstances, would allow a patient to be put on

18   a patient that contains this human carcin- --

19   probable human carcinogen.  That just is

20   unacceptable to any of us.

21             Q.    Do you understand that the FDA

22   expert toxicologists and chemists conducted an

23   assessment of risk based on the highest possible

24   dose?

25             MR. SLATER:  So are you arguing

Page 201

1    with the witness now, Counsel?   I object.

2    You've asked this question multiple times.

3    You've established the point.  Now you're just

4    basically arguing with the witness because you

5    want him to just say something.

6                    I would appreciate it if you could

7    move on to a new line of questioning and not

8    argue with the witness.

9                    MR. TRANGLE:  Just object to form.

10                   MR. SLATER:  No, if you harass the

11   witness, I'm allowed to tell you you're harassing

12   him and being argumentative.  You're -- you're

13   bashing him with the same issue over and over

14   again.  At some point, please move to something

15   else.

16        Q.     Doctor, do you want me to repeat

17   the question?

18        A.     Sure.

19        Q.     Okay.  You understand that the FDA

20   expert toxicologists and chemists conducted an

21   assessment of risk based on the possible highest

22   dose.  Right?

23                MR. SLATER:  Objection.

24        A.     Theoretical risk of, let's make

25   this clear so you don't get confused, of chemists

Page 202

1    and toxicologists, not people that prescribe

2    these drugs and make these risks assessments.

3    It's saying right there, it's a theoretical risk

4    that they're performing.  Yes, I'm aware of this.

5            Q.    The FDA also employs physicians,

6    clinicians.  Right?

7            A.    I don't see any physicians in this

8    statement here.  I see scientists, "our

9    scientists."  I don't see any -- at least in this

10   statement, maybe you'll share some more

11   information, but I'm just saying what you're

12   showing me and just trying to understand to

13   answer your question as best I can.

14           Q.    Is it your testimony that no

15   physicians or clinicians were involved in the FDA

16   risk assessment and recall of Valsartan with

17   NDMA?

18           A.    No, that's not what I said, and

19   I'm just repeating the statement, or the -- right

20   here, what you're sharing with me, as best I can

21   interpret this, and they make the statement that

22   these toxicologists and chemists and scientists,

23   and it's a theoretical risk, and I acknowledge

24   this is what they wrote.

25           Q.    Does the FDA employ physicians or

Page 203

```
 1    clinicians?
 2            A.     I don't know the estimate of the
 3    makeup of the FDA, but I'm just repeating or
 4    citing what you're having me look at.
 5            Q.     Do you know if FDA-employed
 6    physicians or clinicians were involved in the
 7    risk-benefit assessment regarding Valsartan?
 8            A.     I don't.  There's nothing about
 9    the risk-benefit assessment here.  I think
10    you're -- I mean, you gotta be a little more
11    specific.  The statement here is what the -- what
12    their theoretical and their risk of 8,000
13    patients, but I don't see a risk -- risk -- in
14    this particular paragraph.  Maybe I missed
15    something, but go ahead, you can ask me.
16            Q.     Did the FDA publish any statements
17    about a risk-benefit analysis relating to
18    Valsartan with NDMA?
19            A.     Yes.
20            Q.     Do you know whether or not any
21    FDA-employed physicians or clinicians were
22    involved in that risk-benefit assessment?
23            A.     I don't know the makeup of exactly
24    who was part of the decision process.
25            Q.     Do you know how that decision
```

Page 204

1    process happened, what went into it?

2         A.    I don't know exactly how many

3    people were physically in the room or gathered

4    that information.  I don't have those very

5    specific.  I know the statements that the FDA

6    made, but I don't know the specifics.

7         Q.    Do you know whether Mr. Roberts'

8    exposure would have been less than the FDA's

9    worst case scenario that we just discussed in

10   this document?

11        A.    You know, I don't know those

12   specifics.  I did not review specific medical

13   records of his case.  So it's hard for me to

14   answer that question.

15        Q.    Okay.  If it was less than the

16   highest possible dose worst case scenario, would

17   you agree that the risks would be low according

18   to the FDA?

19        A.    Again, I did not have his medical

20   records to be able to answer that accurately.

21        Q.    Okay.  Doctor, is it true that all

22   medications contain risks and benefits?

23        A.    Yes.

24        Q.    Does the decision to forego

25   medication as a possible treatment for a disease

Page 205

1   also entail its own risks?

2                   MR. SLATER:  Objection.  You can

3   answer.

4          A.     That's a hard question to ask,

5   because it -- it really does depend on a

6   circumstance of what, you know, what's going --

7   what condition and exactly what medication and if

8   the patient had a poor reaction or couldn't

9   tolerate.  So that's a very, very difficult thing

10  to answer accurately.

11         Q.     Can you say whether there are any

12  circumstances where not using a medication to

13  treat a condition would contain risks?

14                  MR. SLATER:  Objection.  You can

15  answer.

16         A.     You know, to give you an accurate

17  answer of the risk and benefit of -- I think

18  you're asking if some patient chose not to use a

19  medication or not to undergo a treatment.  It

20  really would very much depend on the

21  circumstances of that case.

22         Q.     If you had a patient who had high

23  blood pressure, would the decision not to

24  prescribe them any medication entail possible

25  risks?

Page 206

 1              MR. SLATER:  Objection.  You can
 2    answer.
 3         A.      Again, many patients with high
 4    blood pressure can successfully be treated with
 5    conservative issues, with no medicine,
 6    specifically.  They may -- weight loss may be
 7    very effective, restrictions in salt and in their
 8    diet may be very, very effective.  Initiating an
 9    exercise program.
10              So there are many, many different
11    choices of treatment of high blood pressure,
12    patients that have high blood pressure, that --
13    that choose not to go on medicine and
14    successfully they are able to control that with
15    other means.
16              So there -- there's -- it's very
17    specific to what's going on with that patient and
18    that risk-benefit of medication, as well as
19    other, as we say, conservative supportive
20    treatments.
21         Q.      In your report you wrote that
22    "There are numerous alternative safe and
23    effective treatments available for the treatment
24    of hypertension."  Right?
25         A.      Yes, I did.

Page 207

1          Q.     And the first category you

2     mentioned are ACE inhibitors.  Is that right?

3          A.     Yes.

4          Q.     What risks do you disclose to

5     patients who you recommend take ACE inhibitors?

6               MR. SLATER:  Objection.  You can

7     answer.

8          A.     ACE inhibitors, they're oral

9     medications.  Some patients -- they're selected

10    for patients that would benefit most from an ACE

11    inhibitor, meaning patients that don't have

12    underlying renal insufficiency, patients that

13    don't have a condition that's called renal artery

14    stenosis.  These are conditions that, they

15    actually -- it can adversely affect them.

16    Patients, in some cases, you have to warn them

17    of -- if their -- an analysis has to be done

18    looking at their blood work to make sure that

19    their potassium level is normal.  We -- in some

20    cases, patients on ACE inhibitors can develop a

21    cough.

22               So there are risks and benefits,

23    and you're always finding or trying to find the

24    medication, the safest medication that is

25    effective and can be tolerated in -- in a

Page 208

```
 1    circumstance where you're choosing treatment of
 2    some type.
 3           Q.    So when you're prescribing ACE
 4    inhibitors to a patient, do you tell them those
 5    possible risks?
 6           A.    Yes.
 7           Q.    What risks do you tell them?
 8                 MR. SLATER:  Objection.  You can
 9    answer.
10           A.    I will outline that this is a
11    med- -- medication that is very -- it depends on
12    the dose, that this is a medication that's
13    intended to reduce your blood pressure.  As in
14    all of these medicines, in some cases, some
15    patients have adverse effects, and that is it
16    sometimes works a little too much, and it can
17    drop your pressure and make you dizzy.  I don't
18    want you to be frightened, and if you're not
19    feeling well, we'll make an adjustment or an
20    alternative.
21                 I mentioned before about the
22    potential of a cough developing.  That can happen
23    with ACE inhibitors.  I will go through, as I
24    said, an analysis even before we put them on the
25    medication and often perform a comprehensive
```

Page 209

1    evaluation, an examination to make sure there's

2    no presence of circulatory disturbances,

3    specifically a renal artery stenosis.  I'll look

4    at their labs for all of their electrolytes to

5    make sure there's no underlying renal

6    insufficiency.

7             And many cases we'll require,

8    after the initiation of that, even though we

9    expect them to do well and have no adverse

10   effects, to do repeat blood work to make sure

11   there's no alteration.  So these are some of the

12   things, the discussion of when -- of medication

13   like an ACE inhibitor is suggested.

14        Q.    So for patients that do have renal

15   artery stenosis, I think you called it, are those

16   patients -- it's not suitable to take ACE

17   inhibitors?

18        A.    Yes, we'll often look to other

19   alternatives.

20        Q.    Okay.  What about patients who

21   develop ACE cough?

22        A.    Thankfully, many cases it's not

23   very serious.  It's annoying, but we'll

24   transition them to a different medication and

25   have them, you know, give us a very detailed

Page 210

1    diary to say did it get better, you know, here

2    you are off the medication.  I mean, there are

3    other causes of a cough, of course, but sometimes

4    if someone is put on an ACE and they develop a

5    cough, that's usually first on the list.

6           Q.    For patients that do have renal

7    artery stenosis, would you say that ACE

8    inhibitors are more or less risky than NDMA in

9    Valsartan, Valsartan with NDMA?

10          A.    Again, this is difficult to answer

11   because I would never knowingly put a patient on

12   Valsartan that is known to contain NDMA because

13   of the danger that there are many other

14   alternative blood pressure -- and specifically

15   blood pressure medications that can be used.  So

16   it's hard for me to answer to start comparing it

17   to underlying comorbid conditions.

18          Q.    As a general matter, is it your

19   opinion that ACE inhibitors are safer than

20   Valsartan potentially contaminated with NDMA?

21          A.    I'm sorry, the tail end of that,

22   could you repeat that?

23          Q.    Yes.  As a general matter, is it

24   your opinion that ACE inhibitors are safer than

25   Valsartan potentially contaminated with NDMA?

Page 211

1          A.     All blood pressure medications are

2    much safer than Valsartan that's contaminated

3    with NDMA.  We would not chose those medications.

4          Q.     That's because there's no risk of

5    cancer associated with ACE inhibitors?

6               MR. SLATER:  Objection.  You can

7    answer.

8          A.     The risk is, if you will, the

9    other way around, that the -- the risk that is

10   known of that NDMA and the probable human

11   carcinogen risk is something that prohibits all

12   of us from choosing the Valsartan.  The risk of

13   other conditions or adverse effects with the risk

14   by screening those patients and matching them

15   with the best dose of that medication and making

16   sure they don't have any of these underlying

17   conditions that can be worse.  So those are the

18   kinds of assessments that are made for the

19   patient's safety.

20          Q.     Does the use of ACE inhibitors

21   carry a risk of cancer?

22          A.     I am not aware of any significance

23   risk of cancer with a proper dosing of an ACE

24   inhibitor.  There can be -- I don't know if

25   you're referencing -- in some cases, ACE

Page 212

1    inhibitors can reduce a patient's white blood

2    cell count called leukopenia.  It usually is

3    reversible.  But as far as a clear association of

4    a malignancy, it certainly doesn't begin to

5    approach that danger posed by the NDMA of the

6    probable human carcinogen risk.

7         Q.    Have you conducted a review of

8    literature to see if there are risks of cancer

9    associated with ACE inhibitors?

10        A.    I have not recently conducted a

11   literature search, but my clinical experience of

12   the medication is such that, you know, I still

13   use it.  It's a safe medicine and I try to, as

14   with all medication choices, assure that this is

15   the safest choice for whatever that condition is

16   that I'm choosing to put my patient on the

17   medication.

18        Q.    Did you look at any studies on ACE

19   inhibitors and cancer?

20        A.    I have not recently looked at ACE

21   inhibitors and the likelihood of developing

22   cancer.

23        Q.    Okay.  I would like to show you an

24   article called "Wu, et al, 2023."  This is

25   Tab 10.  And we'll mark this as Exhibit 8.

Page 213

1          (British Journal of Cancer Review

2     Article is received and marked as Exhibit 8 for

3     identification.)

4          A.    All right.  Are you going to send

5     that to me because I only have seven exhibits.

6          Q.    Yeah, if you just refresh the page

7     in a minute, it will be there in a second.  Yup,

8     now it's there.

9          A.    Okay.

10         Q.    Is it showing up for you?

11         A.    Yes.

12         Q.    Okay.  The title of this article

13    is, "Association Between Angiotensin-Converting

14    Enzyme Inhibitors and the Lung Cancer - A

15    Systematic Review and Meta-Analysis."  Right?

16         A.    Yes.

17         Q.    The first author is, last name Wu?

18         A.    Yes, I see that.

19         Q.    Angiotensin-converting enzyme

20    inhibitors, is that ACE inhibitors?

21         A.    Yes, the -- let's see here.

22    Association between angiotensin in- -- inhibitors

23    and the risk of lung cancer.  Okay.

24         Q.    Okay.  The authors wrote in this

25    abstract that, "Pooled results show that ACEIs

Page 214

1    use was linked to increased lung cancer risk (OR

2    1.19, 95 percent CI, 1.05 to 1.36, P equals

3    0.008.)"  Do you see that sentence?

4           A.    Yes.

5           Q.    Are you familiar with the concept

6    of "statistical significance"?

7           A.    Yes.

8           Q.    Are you familiar with an "OR"?

9           A.    Where is that?  I don't remember

10   that aspect of it.  I don't remember that

11   specific aspect.

12          Q.    Are you familiar be with the term

13   "odds ratio"?

14          A.    Okay.  That recollect -- that

15   refreshes my -- I didn't remember these

16   abbreviations.

17          Q.    Yeah.  OR, or odds ratio, is

18   generally an estimate of risk in studies on

19   epidemiology.  Is that right?

20          A.    Yes.

21          Q.    Okay.  And here these authors

22   reported a 1.19 statistically significant

23   increased risk between use of ACE inhibitors and

24   lung cancer?

25          A.    Well, that's not the conclusion.

Page 215

1    I think if you go down to the conclusion, they're

2    describing the ACE usage is a greater risk factor

3    for lung carcinogenesis than angio receptor

4    blocker use, especially in Asian patients.  So

5    they're -- they're making some observations, and

6    that's what they are stating here.

7         Q.    Do you know whether or not the

8    risk level identified here is higher than that in

9    studies between Valsartan containing NDMA and the

10   risk of liver cancer?

11            MR. SLATER:  Objection.  You can

12   answer.

13        A.    But I don't believe there's -- let

14   me just look at the method.  You're asking about

15   comparing this to the NDMA, and I don't see

16   anything like that in this study as a comparison.

17        Q.    Are you aware of whether or not

18   there is epidemiological evidence on the

19   association between cancer and NDMA in Valsartan?

20        A.    I don't -- those specific details

21   of risk I am -- I'd have to look through the

22   literature.  I don't -- even this article, I did

23   not know of this exact article, and I'd have to

24   read through that.  So it's difficult for me to

25   answer those without looking at even further

Page 216

1    research, further articles.

2          Q.      Right.  But my question is about

3    NDMA and Valsartan, not ACE inhibitors.

4                 So my question is, are you aware

5    of whether or not there's epidemiological

6    evidence on the association between cancer and

7    NDMA in Valsartan?

8          A.      I am aware, as we referenced, from

9    multiple sources, and even in these FDA

10   statements, of this -- of the fact that NDMA is a

11   probable human carcinogen.  I'm aware of that.

12   And I'm aware of, I think in the expert report of

13   Dr. Hecht, of that association, I think I

14   mentioned before, of that material, the NDMA

15   being associated with an increased cancer risk as

16   early as the 1970s.

17         Q.      Are you aware that there have been

18   studies published since 2018 recall of

19   associations between cancer and NDMA in Valsartan

20   in humans?

21         A.      I'm not aware of those specifics.

22         Q.      Okay.  Are you aware of the

23   generals, the idea that there are studies that

24   have done that?

25         A.      As I said, I'm not aware of the

Page 217

1    specifics.  I know that all of these are

2    considerations, but I do know, and we've

3    referenced it multiple times, that it has been,

4    since the 1970s, the case that the NDMA or

5    nitrosamines have been associated with an

6    increased cancer risk.

7            Q.    So you're not aware that studies

8    have been published since the recall that examine

9    associations between cancer and patients who took

10   Valsartan with NDMA and risks of cancer?

11            MR. SLATER:  Objection to the form

12   of the question.  You can answer.

13            A.    Yeah, that's not what I said.

14   I -- I said before, I am not aware of the

15   specifics of further study of the specifics of

16   the association NDMA.  I am aware that, as all of

17   us are in the clinical world, that there are

18   ongoing studies of multiple agents in

19   associations of cancer to help guide clinicians

20   like myself to make safe assessments of the best

21   treatments for our patients.

22            Q.    Do you think that manufacturers of

23   the ACE inhibitors should warn physicians of the

24   FDA or patients about the risk of lung cancer?

25            MR. SLATER:  Objection.  You can

Page 218

1    answer.

2           A.      I did not look into that to answer

3    that specific question.  I did not look into the

4    literature to be specific about that -- that

5    question you've posed.

6           Q.      If the risk is higher in studies

7    on ACE inhibitors and lung cancer than the risks

8    identified between NDMA in Valsartan and cancer,

9    would you believe or opine that there should be a

10   warning on ACE inhibitors for lung cancer?

11                 MR. SLATER:  Objection.  You can

12   answer.

13          A.      Again, you're conflating.  You

14   know, there's liver cancer, there is lung cancer,

15   there are thousands of different cancers.  I did

16   not look, and I can't answer factually the

17   details of the ACE inhibitors risk.  I would -- I

18   would have to do a much more in depth, and I

19   didn't focus my attention on that specific

20   aspect.

21          Q.      Without performing an assessment

22   of whether or not ACE inhibitors carry a risk of

23   cancer, how are you offering the opinion that

24   it's a safer alternative to Valsartan with NDMA?

25                 MR. SLATER:  Objection.  You can

Page 219

1    answer.

2            A.    Again, I'll repeat it.  I did

3    not -- I know of the details and the literature

4    that I did focus on and the FDA's citing of this

5    probable human carcinogen risk associated with

6    NDMA.  Those were contained in the -- in the

7    reference that I did review and a part of my

8    opinions.  To suggest four other conditions or

9    other drugs, I did not look at those.  I don't

10   think they're relevant in this particular

11   circumstance.

12           Q.    It's not relevant whether ACE

13   inhibitors carry a risk of cancer to the question

14   of whether or not ACE inhibitors are a safe

15   alternative?

16                 MR. SLATER:  Objection.

17   Argumentative and repetitious.

18           A.    I -- yeah, I did not review those

19   records so it's hard for me to answer this

20   question of the likelihood or exactly how those

21   studies were performed.

22           Q.    My question is about whether it's

23   relevant to the question of whether or not it's a

24   safe alternative.

25                 MR. SLATER:  Objection.  Lack of

Page 220

1    foundation.  Asked and answered.  You can answer

2    again.

3            A.    Yeah, I don't -- I just did not

4    see in these records of the details of this

5    particular production of this drug that there

6    was, as you're eluding to, a correlation with the

7    use of an ACE inhibitor.  I don't -- I did not --

8    I did not review those ACE inhibitors that you're

9    referencing or suggesting so it's hard for me to

10   answer these questions that you continue to ask

11   me.

12           Q.    When you were offering your

13   opinions and forming your opinions that there are

14   safe alternatives to NDMA with -- to Valsartan

15   with NDMA, was it not important to analyze the

16   risks of cancer associated with these

17   alternatives?

18               MR. SLATER:  Objection.  You can

19   answer.  So it -- once again, argumentative.  I'm

20   not really sure what -- you can answer.

21               Counsel can argue with you all he

22   wants.  I'm just objecting.  So you can go ahead

23   because I think he wants to ask the question

24   again.

25           A.    To answer your question, in my

Page 221

1    report, I did list alternative medications,

2    specifically hypertensive -- hypertensive agents.

3    I did not look into each one of those choices as

4    to the similar risk of being contaminated with a

5    known carcinogen of some type.  I did not include

6    that, and we don't, in clinical practice, in my

7    experience, that's not part of a -- an analysis

8    of putting a patient on the -- in type -- those

9    types of medications.  That's my experience of

10   using those agents.

11          Q.    Do you agree that a risk benefit

12   analysis of using NDMA contaminated Valsartan for

13   a given patient turns on the availability of safe

14   alternatives?

15          A.    No.  As I've stated multiple

16   times, there is -- the primary concern is for

17   patient safety.  And the -- the presence of this

18   NDMA, this known probable human carcinogen in the

19   formulations at the -- by the ZHP people, that

20   was unacceptable and would never be chosen, and

21   there would be no risk assessment in any way

22   because of that risk, because there are multiple

23   alternatives that have been used successfully and

24   safely.

25                    So I don't believe that that is a

Page 222

1    risk benefit.  It's that we would eliminate and

2    make sure that the drug that we were offering our

3    patients is safe and not a potential human

4    carcinogen.

5           Q.    Okay.  And your opinion is that it

6    doesn't matter what risks there are for the

7    alternative medications?

8                 MR. SLATER:  Objection.  You can

9    answer.

10          A.    That's not what I said.  And the

11   assessment of alternatives to -- if a patient has

12   to be or it's discovered that the patient had

13   been on the Valsartan with the NDMA, that

14   assessment of another alternative that would be

15   safe would be based on the characteristics of

16   that patient, of their kidney, their liver

17   function, of their previous use or effectiveness,

18   the other -- that's a very, very specific risk

19   benefit.  But there is no risk benefit that's

20   done with Valsartan that's contaminated.  That --

21   that would -- that's completely unacceptable.

22   That's out.

23          Q.    Right.  So you're saying it

24   depends on the risks, characteristics of the

25   individual person.  Right?  It would also depend

Page 223

1    on risks associated with the alternative that

2    you're considering giving them.

3             A.    No, that's not at all what I said.

4             Q.    Well, is that true?

5                   MR. SLATER:  Objection.

6             A.    I'll answer the question if you

7    wish me to.  I said that the usage -- there is no

8    acceptable usefulness or indications or even, as

9    you wanted to phrase it, risk benefit of

10   Valsartan with NDMA.  That is not something

11   anyone would have, at that time, as soon as it

12   was discovered, would allow a patient to be on.

13   There's far too much of a risk.

14                  The alternatives, and there are

15   multiple alternatives, would -- would be a risk

16   benefit of the specifics of that patient, of

17   what's been most likely that they're going to

18   tolerate well, that's going to be effective, lots

19   of different parameters.

20            Q.    Is your opinion about warning in

21   this case dependent on the fact that NDMA

22   actually does cause cancer in humans?

23            A.    I stated, and I'll continue to

24   state, that the risk, as cited in the FDA

25   multiple communications, and as cited as -- and

Page 224

```
 1    has been known since the '70s, that nitrosamines

 2    and specifically this agent, is a probable human

 3    carcinogen and that is an unacceptable risk that

 4    would never be considered by a practicing

 5    physician.

 6              Q.    If the amounts of NDMA contained

 7    in Valsartan cannot, as a general matter, cause

 8    cancer in humans who took them, would ZHP still

 9    be required to warn?

10                   MR. SLATER:  Objection.  You can

11    answer.

12              A.    The responsibility of the ZHP

13    organization was such that any amount of this

14    carcinogen, the probable carcinogen agent that

15    was known -- was discovered or was known to be

16    present, posed an unacceptable risk and that

17    patients, doctors, hospitals, pharmacies, had to

18    be warned of this risk.  It was unacceptable for

19    that risk.

20                   To suggest that the amount, if it

21    was below or above a certain amount would be

22    acceptable, I -- no physician would accept,

23    because there are so many other safe

24    alternatives, even -- you know, I think I -- that

25    would just be an unacceptable risk.
```

Page 225

```
 1                    THE COURT REPORTER:  Can we take a
 2    break when it's a good time for you.  I'm sorry.
 3                    MR. TRANGLE:  Yes, let me -- I
 4    just have a couple of questions on this.
 5    Hopefully like five minutes.  Is that -- is that
 6    too long?
 7                    COURT REPORTER:  No.
 8                    MR. SLATER:  Could you give us any
 9    sort of an idea of how long you think you're
10    going to go for?
11                    MR. TRANGLE:  I don't have much
12    more after that.  Probably -- yeah, probably,
13    like, 30 minutes after that, maybe 45.
14         Q.    Okay.  Do you agree that the dose
15    makes the poison, as a principle?
16                    MR. SLATER:  Objection.  You can
17    answer.
18         A.    I -- I don't think that's well
19    established.  There are many different
20    circumstances where it's not just the presence
21    of, unfortunately, can injure a patient or a
22    circumstance.
23         Q.    If a patient received .0001 UG of
24    NDMA, is it your opinion that they would have a
25    meaningful increased risk of cancer?
```

Page 226

```
 1              MR. SLATER:  Objection.  You can
 2    answer.
 3         A.     As a practicing clinician, I do
 4    not make the decision based on a measurement.  If
 5    there is an association and -- which is -- and
 6    it's brought to my attention, and I depend on the
 7    FDA to guide us that there is a probable human
 8    carcinogen risk, that's unacceptable, and that
 9    patient would -- especially when there are
10    alternatives available, I would not put a patient
11    on an agent like that, especially when there are
12    safe alternatives.
13         Q.     Is it your opinion that
14    manufacturers of bacon have to warn of the risk
15    of cancer based on the amount of NDMA in bacon?
16              MR. SLATER:  Objection.  You can
17    answer.
18         A.     I did not look into the specifics
19    of bacon and the risk that's associated with
20    bacon.  I did not -- I don't have anything to
21    answer accurately.
22         Q.     Do you know how many other sources
23    people are exposed to NDMA from, on a daily
24    basis?
25         A.     I don't have literature, I did not
```

Page 227

1   review literature to accurately answer your

2   question.

3           Q.    Do you know if they're exposed to

4   greater or lesser amounts of NDMA from none

5   Valsartan sources compared to Valsartan sources?

6           A.    Again, I don't have data to answer

7   that exactly, of what that amount is or what

8   people are exposed to.

9           Q.    Is it your opinion that everybody

10  should stop eating bacon because of the amount of

11  NDMA in bacon?

12                MR. SLATER:  Objection to this

13  whole line of questioning.  You can answer.

14          A.    I -- that's not my opinion, and as

15  I stated before, I did not look into the

16  association of bacon.  I just did not -- that's

17  not something I looked into.  So I can't answer

18  that accurately.

19          Q.    Okay.  Let's take a break.

20                VIDEOTAPE OPERATOR:  Going off the

21  record.  Time is 4:58.

22                (Whereupon a short recess was

23  taken and the proceedings then continued as

24  follows:)

25                VIDEOTAPE OPERATOR:  Back on the

Page 228

1    record.  The time is 5:09.  Go ahead, Counselor.

2    BY MR. TRANGLE:

3         Q.    Let's go back to your report on

4    pages three to four.

5         A.    Yes.

6         Q.    On the last paragraph of page

7    three of your report, you wrote, "The

8    determination of what treatment to recommend in

9    each instance is guided by the physician's

10   clinical judgment in assessing the benefits and

11   risks for each individual patient based on his or

12   her clinical presentation, medical history and

13   other relevant factors."  Is that right?

14        A.    Yes.

15        Q.    So it's your opinion that the

16   risk-benefit assessment for each individual

17   patient is specific to that patient?

18        A.    Yes.

19        Q.    And it depends on that patient's

20   clinical presentation?

21        A.    Yes.

22        Q.    Depends on that patient's medical

23   history?

24        A.    Yes.

25        Q.    And other relevant factors and

Page 229

1    conditions?

2           A.    Yes.

3           Q.    Does a physician's background,

4    education or training play a role in which

5    particular treatment regiment or prescribing

6    decision they may make?

7           A.    Yes.

8           Q.    So, for example, which medication

9    was considered first line treatment might differ

10   at different points in time based on when a

11   physician went to school?

12                 MR. SLATER:    Objection.    You can

13   answer.

14          A.    When you say "went to school," I'm

15   not sure -- you know, training, where they

16   trained -- it -- I don't know if I can really

17   assess it or make an assessment as to where they

18   went to school, to what the choice of medication

19   or the clinical information of that patient and

20   the circumstances.

21          Q.    Right.   I guess I'm just saying

22   each -- each physician might have gone to school

23   at a different point in time when some

24   medications were considered first line versus

25   others?

Page 230

```
 1          A.    They don't -- I mean, we're
 2   always, myself included, I finished my residency
 3   years ago, but we're all constantly being updated
 4   by the information of the latest studies, they
 5   be, or the latest forms of medication that are
 6   available, and certainly our experience of what
 7   has worked and very much so personalizing,
 8   depending on that patient that we've known for
 9   20 years, what they tolerate.
10          So there's -- there's many, many
11   different factors.  You know, going to school
12   might be a factor in that, but we put all of this
13   information and we try -- and we assess the risk
14   benefit and come up with the safest medication
15   that is likely to be the most efficacious in --
16   in a patient.
17          Q.    I think you said sometimes it
18   might depend on what that physician's experience
19   has been with the medication.  Is that true?
20          A.    Well, I don't -- it -- I'd
21   rephrase that.  I'd say what that physician
22   that -- especially if they've had the benefit of
23   taking care of the patient for a number of years
24   and understand, have very, very personal
25   information about what that patient maybe has
```

Page 231

1    tried and had an adverse reaction to or what was

2    very effective in the past but had to stop for

3    some other reason, or was transitioned.

4              So there's a lot of personal

5    information that, especially internists, that

6    have, in their -- you know, in their records at

7    their office or even the hospital records that

8    they've had interactions, and they -- we all come

9    up with the safest medication that we believe is

10   going to be the most effective for the

11   circumstance in the patient's treatment.

12        Q.    And just setting aside Valsartan,

13   it's true that physicians could come to different

14   reasonable decisions to prescribe blood pressure

15   medication.  Right?  One might offer an ACE

16   inhibitor and one might offer a beta-blocker?

17              MR. SLATER:  Objection.  You can

18   answer.

19        A.    Yes.  Yes.

20        Q.    Right?  It's not like every

21   physician is going to prescribe the same

22   medication for a given condition.

23        A.    Correct.

24        Q.    Okay.  And that can be reasonable.

25   Right?  Physicians that differ based on what

Page 232

1    medication they prescribe?

2            A.      Yes.

3            Q.      And it's not your opinion that

4    every physician goes through the exact same

5    risk-benefit calculation when prescribing a drug.

6    Right?

7                    MR. SLATER:  Objection.  You can

8    answer.

9            A.      Yeah, I think I answered this,

10   that it's so dependent on all those

11   characteristics, the clinical -- the lab results,

12   the previous experience, the medical history,

13   that all plays a role.  It's not, you know, one

14   size fits all.

15           Q.      Right.  And some of that is also

16   the specific clinician?

17           A.      It may -- yes, the clinician's

18   experience with treating that patient or having

19   some further inside information about that

20   patient.

21           Q.      Are you offering opinions as to

22   how all physicians would react to news of

23   potential low level contamination of Valsartan

24   with NDMA?

25           A.      Yes.  My experience and my

Page 233

1   expertise of the various positions that I

2   actively hold or I have been involved with, that,

3   and the outpatient setting, the office setting,

4   collaborating with specialists in the hospital

5   settings, seeing hospitalized patients as well as

6   advising as the section chief in the department

7   of internal medicine at the hospital, many

8   medication choices or formulary choices, all of

9   that allows me to have experience and understand

10  what the standard of care is for practicing

11  physicians.

12          Q.     Are you basing that opinion on

13  anything other than your personal experience?

14          A.     As I said, it's not my personal

15  experience.  Certainly that's a part of it, but

16  it's based on my training.  I trained in the

17  university program, it's based on my having

18  assumed the position of president of the medical

19  staff, this was several years ago, and having to

20  interact with thousands of physicians during that

21  time, serving on the medical executive committee

22  at our hospital, interacting with all of the

23  different department chairs, pulmonary,

24  cardiology, nephrology, all of the medicine

25  chairs, of new medications that are offered to --

Page 234

1    offered to patients, new procedures, even new

2    medications that are available on the formulary.

3    All of that.

4                And then, of course, teaching, my

5    residents and medical students, of how to risk

6    assess, how to make choices safely of information

7    that's provided, where that information is

8    available, and of course incorporating all of

9    that information into assuring that patients

10   are -- when the decision for treatment,

11   specifically medication wise, is arrived at, that

12   that is the safest medication that the patient

13   can -- that there's information that this is the

14   best choice for that circumstance.

15           Q.    Have you conducted a poll of other

16   prescribing physicians about this question?

17           A.    I don't remember conducting a

18   poll.  I certainly interact on a daily basis with

19   my colleagues in all of those settings for

20   various specific recommendations of the latest

21   treatments, I am looking into the literature for

22   the latest forms of medical treatment, be they

23   surgical interventions, and we're constantly

24   interfacing with one another in these different,

25   some of the sub -- surgical subspecialties as

Page 235

1    well as for the medical side, what are the best

2    choices for patients for the multiple conditions

3    that we assess and treat.

4         Q.    Have you performed a survey that's

5    asking prescribers how they come to decide which

6    medications to treat for high blood pressure?

7         A.    I'm not involved in, as you put

8    it, surveys.  I certainly, as I said with my

9    experience in all of these different roles,

10   understand the -- and trained new physicians as

11   well as colleagues of what are the best choices

12   or the safest treatments that can be offered to

13   our patients.

14        Q.    Right.  My question is getting at

15   what objective data are you relying on for your

16   opinion that all other physicians would react the

17   same way as you?

18        A.    I'm looking at, obviously, in

19   certainly FDA announcements of different drugs

20   that are available, I'm looking on a regular

21   basis in various journals, the New England

22   Journal of Medicine, the Annals of Internal

23   Medicine, the Medical Letter is a popular --

24   these are all now online, of course.  I'm often

25   looking objectively into articles that are

Page 236

1    published within the context of UptoDate, this is

2    a site that all of us use to gather whatever

3    subject it is that we want the latest treatments,

4    the latest diagnostic available testing.  All of

5    that, all in the literature, that objective

6    information is available.

7              Now, of course, clinically

8    assessing patients at the bedside, be it in my

9    office examining them, in the hospital examining

10   them, reviewing studies that have been performed,

11   be they X-rays, CAT scans, MRIs, reviewing

12   laboratory data that's available or compared to

13   previous studies.  All of that objective data, as

14   you said, is taken into account to assess

15   patients accurately and then decide what is the

16   best treatment or even best analysis for that

17   patient.

18        Q.    What scientific, peer-reviewed

19   articles have you read and relied on about how

20   physicians conduct their own personalized

21   risk-benefit prescribing assessment?

22        A.    As I mentioned before, there are

23   multiple sources in the literature in the

24   internal medicine world, and those I just

25   mentioned.  The New England Journal of Medicine

Page 237

1    is a common source of information.  The Annals

2    of --

3            Q.    Respectfully, Doctor, I'm asking

4    you a question about specific objective data that

5    shows or explains how physicians conduct their

6    own risk assessment based on information they are

7    provided.

8                    MR. SLATER:  Objection.  You can

9    answer it.

10           A.    You're asking -- I don't think

11   there is a specific article that explains the

12   risk and benefit.  That risk and benefit is the

13   sum total of those, and in my case, physicians

14   that are practicing in that subspecialty.

15   Internal medicine, greatly much of my patients

16   and population has hypertension and requires

17   treatment and analysis.

18           Q.    Right.  But you're offering

19   opinions --

20                   MR. SLATER:  Please don't

21   interrupt him.

22           A.    That risk benefit is a -- a

23   compilation of my multiple years of experience,

24   multiple patients, multiple studies I've

25   reviewed, multiple meetings I've attended.  All

Page 238

1    of that is factored into the risk benefit of that

2    one, we'll use as an example, of that patient

3    that I am physically across from in my office, at

4    the bedside, all of those considerations are

5    taken into and that risk assessment is based on

6    that compilation of all those sources as well as

7    the experience over those years that I have done

8    this on a regular basis.

9            Q.    Are you offering opinions about

10   how other physicians conduct their own assessment

11   and whether all physicians would conduct the same

12   assessment that you do?

13               MR. SLATER:   Objection.   You can

14   answer.

15           A.    I'm offering my expertise in

16   having the experience of multiple years of

17   functioning as a clinician, an internal medicine

18   clinician, in the various role, which I'll repeat

19   again, in the outpatient, office setting, in the

20   hospital setting, as the section chief in the

21   department of internal medicine teaching medical

22   students, I am offering my expertise in how

23   physicians, internal medicine physicians, go

24   about analyzing, making decisions to safely

25   assure that patients are treated appropriately.

Page 239

1                  I'm not suggesting that every

2      single physician does exactly what I do, but as a

3      result of -- and the standard of care such that

4      patients -- or physicians that are equally

5      trained, similar in my specialty, that have

6      practice -- that have experience in seeing -- in

7      the setting of where I am and the community, what

8      a reasonable, as the standard of care often says,

9      what a reasonable physician would be expected

10     to -- how they would interpret data, how they

11     would formulate a treatment plan, how they would

12     analyze.  That is what the standard of care is

13     and that's what I'm commenting about.  Not that

14     every single physician has to do exactly what I

15     do.

16           Q.    Is it your opinion that every

17     internal medicine physician looks at the label

18     before prescribing a hypertension medication?

19           A.    No, I don't remember saying that.

20     Before any physician, within the standard of

21     care, is going to use some medication, especially

22     one that they're not familiar with, they're going

23     to make sure that they are familiar -- they may

24     it could be the label on the -- on that

25     medication, it could be the package insert, it

Page 240

1    could be some computer-based site where all of

2    this information is available, it could be

3    contacting the pharmacy to get more details.

4    There are many different sources now of

5    information, and we -- all of us periodically get

6    these notices from the FDA.  Sometimes they're

7    mailed to our office, many times we'll get it

8    through a hospital site where some announcement

9    is made of some condition.

10                  So there are various sources of

11   information and physicians act upon that to again

12   assess the safest treatment for their patient.

13        Q.      Right.  So there's all these

14   different sources, so some physicians might see

15   information from one source and not another and

16   vice-versa?

17        A.      Yes.

18        Q.      Okay.  It's not your opinion that

19   ever physician looks at the label every time they

20   prescribe a hypertension medication?

21        A.      Well, you say "look at the label."

22   That's a very generic -- quite frankly, much of

23   this information is, you know, computer-based,

24   even on your phone, it's in the medical record

25   now, it's in the -- all of these, that -- all

Page 241

```
 1    that information.  You know, when you say "look
 2    at the label," I think the standard of care, what
 3    a reasonable physician is expected to do and does
 4    is gather all these sites, gather as much
 5    information that's germane to the question that's
 6    asked, and if they -- if they don't have the
 7    information, there are plenty of places to look
 8    or to ask.  We have so -- we have a great support
 9    system, especially at our hospital.
10                 So it's not so much not looking at
11    the label, it's physicians take all this
12    information into account when they make that
13    risk-benefit choice.
14         Q.    Just because it's within your
15    personal consideration of standard of care, it
16    doesn't mean every physician does it.  Correct?
17                 MR. SLATER:  Objection.
18    Mischaracterizes the testimony.
19         A.    Yeah, I didn't say that.  My -- my
20    expertise is in this, my specialty, and the --
21    functioning in the community.  Outside
22    physicians, not all of them come to the hospital,
23    but the appropriateness of their analyzing
24    patients, their -- their -- the expectation is
25    what a reasonable physician would do with this
```

Page 242

1    clinical information that's -- question that's

2    being asked and come up with the safest treatment

3    plan for that -- that patient, whatever that

4    circumstance may be.

5            Q.    Right.  But not every physician

6    does the standard of care, as you've defined it

7    or as you consider it?

8                MR. SLATER:  Objection.  You can

9    answer.  It's arguing with the witness, Counsel.

10   You've asked this over and over.  You're just

11   arguing with him.

12           A.    Physicians are -- there is a

13   standard of care.  Physicians are -- the

14   expectation is what a reasonable physician

15   equally trained in that specialty, in that

16   circumstance, what would that reasonable

17   physician would be expected to arrive at, or

18   information, treatment and -- evaluation and

19   treatment, values within the standard of care,

20   and physicians are -- we all are held to that

21   standard, of what the standard of care is.

22           Q.    Have you ever designed

23   pharmaceutical inserts or marketing materials,

24   either one?

25           A.    No.

Page 243

```
 1          Q.     Do you have any expertise on the
 2     effective pharmaceutical labels on physician
 3     decisions?
 4          A.     I'm sorry, you're asking me did I
 5     design labels that go on the bottles?   Is that
 6     what you're saying?
 7          Q.     No.  My question is do you have
 8     any expertise on the effect of pharmaceutical
 9     labels on physician decisions?
10          A.     I have an expertise in
11     understanding all of the information that is
12     important to properly assess a patient, to
13     properly interpret data, to properly form a
14     treatment, an evaluation and treatment of a
15     patient.  This -- and to incorporate in that
16     assessment, as you put it, labels, but
17     information about a drug specifically, and I am
18     very familiar with using that information, where
19     to access that information.  That's part of
20     treating patients and that's something I do on a
21     regular basis.
22          Q.     What was your methodology in
23     forming your opinions in this case?
24          A.     My methodology was to review,
25     which is listed in my report, all of the
```

Page 244

1    information that was available concerning the

2    circumstances.  Using that information, and using

3    my experience and my expertise as my role in the

4    clinical setting of a patient or patients that

5    are being evaluated in these various roles, in

6    the outpatient role, in the hospital role, in my

7    role as a section chief, my teaching

8    responsibilities, using all of those, all of that

9    experience, as well as looking at the narrative

10   of the events that took place, the data, the

11   announcements, the depositions, and arriving at

12   my opinions, which I have listed in my report, as

13   to the circumstances of what took place in this

14   case.

15          Q.    If you had a patient with NASH

16   cirrhosis, would you consider them a high --

17                COURT REPORTER:  I'm sorry, can

18   you repeat the question again?

19          Q.    If you had a patient with NASH

20   cirrhosis, would you consider them a high risk

21   for HCC?

22                MR. SLATER:  Counsel, he's not

23   giving causation opinions.

24                MR. TRANGLE:  This is just a

25   question about his experience as a treating

Page 245

1    physician.

2                MR. SLATER:  Okay.  I'm not going

3    to stop him from answering.  I object to it, but

4    you can ask him anything you want.

5                A.      Yeah, I mean, we see NASH, you

6    know, non-alcoholic hepatitis, these are

7    conditions that we do see that I'm -- again, that

8    I assess and treat these conditions.  The

9    decision of the risk benefit, we are aware in the

10   medical community of a -- of a potential

11   increased risk of liver decompensation, even in

12   the development of malignancy.  You know, all of

13   these factors I think we spoke of before.

14   Hepatitis.  And I, myself, see these patients in

15   general practice, and I'm very much collaborating

16   with my GI colleagues of assessing, at various

17   times, that risk, and, you know, mitigating this

18   with the patients, the things, especially if

19   there are known aggravating alcohol or

20   potentially even toxic drug exposure, looking

21   carefully at all of these things to try to

22   minimize that risk, but yes, this is a part of

23   the general practice.

24               Q.      Right.  But my question is if you

25   had a patient with cirrhosis, would you consider

Page 246

1   them at high risk for developing HCC?

2          A.    It's a -- when you say "high

3   risk," it is a consideration and we screen for

4   that.  We involve GI specialists, and, yes, it's

5   a consideration.

6          Q.    All right.  That's all that I have

7   for now.

8                MR. SLATER:  All right.  Let's

9   take a couple of minutes and then I'll figure out

10  what I have to ask, if anything.

11               MR. TRANGLE:  Okay.

12               VIDEOTAPE OPERATOR:  Going off the

13  record.  Time is 5:34.

14               (Whereupon a short recess was

15  taken and the proceedings then continued as

16  follow:)

17               VIDEOTAPE OPERATOR:  Okay.  We're

18  going back on the record.  Time is 5:50 p.m.

19

20                    EXAMINATION

21  BY MR. SLATER:

22          Q.    Dr. Russo, I just have a few

23  follow-up questions for a few minutes.  Okay?

24          A.    Sure.

25          Q.    Okay.  During the course of the

Page 247

1    deposition, you were answering some questions and

2    referred to nitrosamines as a, quote unquote,

3    class of medications.  Did you mean to say

4    substances or something to that effect?

5              A.    Yes.  I'm sorry.  I don't know if

6    I -- yes, I misspoke.

7              Q.    I assume your -- well, rephrase.

8    I'm going to skip that one.

9                    You were asked some questions

10   about your expertise with regard to evaluating

11   the adequacy of the warnings in the labels.  Do

12   you recall you were asked a series of questions

13   about that?

14                   COURT REPORTER:  I'm sorry, could

15   you repeat the question again?  I missed the

16   beginning of it.

17             Q.    You were asked a series of

18   questions regarding your expertise on the

19   adequacy of the risk information in the warnings

20   and the labels in the course of the deposition.

21                   Do you recall you were asked

22   questions about that issue?

23             A.    Yes.

24             Q.    I'm going to ask it a little

25   differently.  In terms of evaluating the

Page 248

1    sufficiency of the risk information that was

2    available to physicians prescribing Valsartan,

3    while the Valsartan pills sold by ZHP were

4    contaminated with NDMA, do you feel that you are

5    an expert with regard to that subject matter?

6            A.    Yes.

7            Q.    The fact that there was no

8    information provided by ZHP until June of 2018

9    with regard to the presence of NDMA in its

10   Valsartan pills, was that a significant factor to

11   you?

12           A.    Yes.

13           Q.    And let me understand this, you,

14   as a clinician, and other clinicians treating a

15   patient within the standard of care, is the

16   information provided with regard to the

17   medications they prescribe of significance?

18           A.    Yes.

19           Q.    Is that information taken into

20   account in evaluating a patient's needs and

21   establishing a risk benefit?

22           A.    Yes, it is.

23           Q.    Is that information taken into

24   account in obtaining informed consent from a

25   patient?

Page 249

1          A.     Yes, it is.

2          Q.     And in terms of your opinions in

3    this case with regard to the adequacy or

4    inadequacy, as you've opined, of the information

5    provided by ZHP, was the lack of that

6    information, specifically that there was NDMA in

7    the pills, a significant fact to you in

8    determining what was needed by doctors treating

9    patients within the standard of care?

10               MR. TRANGLE:  Object to the form.

11         A.     Yes, it was.

12         Q.     Why -- why so?

13         A.     That's a critical piece of

14   information that physicians, as soon as they

15   would be advised of this presence in that drug,

16   they would have taken immediate action to protect

17   those patients and to transition them to an

18   alternative hypertensive medication.

19               It's clear from the behavior or

20   the correspondence of the FDA that they, as well,

21   identified this dangerous condition and

22   immediately advised clinicians like myself,

23   colleagues, all of the medical community, of the

24   need to not stop the medicine, and not panic the

25   patients, but get that word out that they must

Page 250

1   come off of that medicine because of that cancer

2   risk that was being -- unfortunately that these

3   patients were being subjected to.

4           Q.      When you were asked by counsel

5   about the methodology you followed in forming

6   your opinions, were those FDA statements of

7   significance to you in forming your opinions?

8           A.      Yes, they were.

9           Q.      Is that something you took into

10  account and relied on in forming your opinions as

11  to whether the information you provided before

12  that time was adequate?

13          A.      Yes.  Those correspondences, those

14  announcements, those -- from the FDA, were

15  critical to physicians like myself at the time

16  and were very important in the opinions that I

17  formulated in my report.

18          Q.      And do you have your report in

19  front of you?

20          A.      I do.

21          Q.      Can you look at page four, please?

22          A.      Yes.  I'm there.

23          Q.      In page -- on page four, toward

24  the bottom of the first full paragraph, you cite

25  to a few C.F.R. provisions, and one in

Page 251

1    particular, you say that "C.F.R. 201.57 (a)(10)

2    provides that a warning 'must include a concise

3    summary of the most clinically significant safety

4    concerns from the label that affect decisions

5    about whether to prescribe the drug', and

6    references and requires the warning to comply

7    with 21 C.F.R. 201.57 (c)(6) which requires

8    warnings of potential safety hazards."

9                    Do you see what I just read?

10            A.      Yes.

11            Q.      In terms of your methodology, did

12    you take that labeling standard from the Code of

13    Federal Regulations into account and rely on

14    that?

15            A.      Yes, I did.

16            Q.      And in terms of warning of

17    potential safety hazards, is that basically what

18    the FDA did when it put out the statements about

19    the fact that there was NDMA in ZHP's Valsartan?

20            A.      Yes.  That's exactly what they

21    did.

22            Q.      And in terms of that standard

23    requiring warning of potential safety hazards,

24    you say, in the next sentence, "This standard is

25    fully consistent with the standard I have applied

Page 252

1    in forming my opinions here and the expectations

2    of reasonable physicians in clinical practice."

3    Do you see that?

4            A.    Yes.

5            Q.    So in terms of your understanding

6    in your own practice, was your understanding

7    consistent with what the actual standard from the

8    Code of Federal Regulations required?

9            A.    Yes.

10           Q.    And when you refer to "reasonable

11   physicians in clinical practice and their

12   expectations," does that coincide with what

13   you've talked about multiple times in this

14   deposition regarding the need to treat patients

15   within the standard of care?

16           A.    Yes.  Exactly.

17           Q.    And in your opinion, a reasonable

18   physician treating patients within the standard

19   of care, would they have needed the information,

20   specifically knowing that NDMA was in the

21   Valsartan, in order to fairly make a risk-benefit

22   analysis and make recommendations to their

23   patients?

24           A.    Yes.  That was critically

25   important.

Page 253

1          Q.    You were asked some questions by

2     counsel about whether ZHP needed to provide

3     information about the NDMA contamination if that

4     information was not available to them, or

5     questions to that effect.  Do you remember you

6     were asked some questions like that?

7          A.    Yes.

8          Q.    Okay.  You read Dr. Hecht's

9     report?

10         A.    Yes, I did.

11         Q.    And did you see that he talked

12    about his opinion that the information, in order

13    to identify the risk of nitrosamine formation,

14    was available to ZHP and simply needed to be

15    applied?

16              MR. TRANGLE:  Object to the form.

17         A.    Yes.  I did see that in his

18    report.

19         Q.    If Dr. Hecht is correct, that ZHP

20    could have and should have identified the

21    nitrosamine risk and should have tested to

22    identify the NDMA, in your opinion, should ZHP

23    have not only followed through with that but also

24    provided that information to the FDA, and however

25    they needed to get it out to clinicians, whether

Page 254

1    through the FDA or others, should they have done

2    so in your opinion?

3            A.    Yes, they should have done that.

4            Q.    You made a statement during your

5    deposition about that you don't, quote unquote,

6    do the labeling in this case or have labeling

7    opinions and you rely on others.  Were you

8    referring to the -- essentially the regulatory

9    background on how labels are regulated by the

10   FDA, the nuts and bolts of that?

11           A.    Yes.

12           Q.    In terms of your opinion about

13   whether the information provided by ZHP was

14   adequate, your opinions focused on the failure to

15   disclose the NDMA.  Correct?

16           A.    Yes.

17           Q.    And the risk of NDMA known as a

18   known animal carcinogen, probable human

19   carcinogen.  Is that correct?

20           A.    Yes.

21                 MR. SLATER:  I'm sorry, whoever is

22   talking, can they mute, please?  Steve.  Thanks a

23   lot.  Mystery solved.

24           Q.    You also said, with regard to

25   their obligation to warn as you've opined, that,

Page 255

1    from your perspective, if they're going to sell

2    the drug and they're going to identify it as

3    Valsartan, they have to make sure that they tell

4    the risks to physicians.  And that's -- is that

5    your opinion?

6              A.     Yes.

7              Q.     And it's my understanding you have

8    experience in having actually prescribed

9    Valsartan during this time period and had

10   patients who were actually taking the

11   contaminated pills.  Do I understand that

12   correctly?

13             A.     Yes.

14             Q.     And when you learned of this NDMA

15   contamination, you took certain steps to get your

16   patients transitioned to other medications and

17   treatments.  Is that what you testified to?

18             A.     Yes.

19             Q.     When you give your opinions as to

20   what reasonable physicians needed to know and

21   what they did, are you limiting that just to what

22   you did or are you basing that also on your

23   knowledge and experience of what hundreds or

24   thousands of other physicians in your hospital

25   system and in others in the community also were

Page 256

1    doing per the FDA statements?

2                    MR. TRANGLE:  Object to form.

3            A.      Yes, I'm basing that not just on

4    my individual experience, but on my experience

5    collaborating with all of those different

6    settings, that is in a private office setting,

7    gathering information in the hospital setting,

8    gathering information from colleagues in

9    subspecialties that use this drug, as I said, for

10   example, cardiologists, nephrologists commonly

11   were using this drug, their experience, their

12   need of changing the medication, teaching my

13   residents and medical students about this change

14   that we -- or this knowledge of this medication

15   and the changes that we have to put patients

16   through, being in my role as the section chief in

17   the department of internal medicine within our

18   department making certain that formulary choices,

19   medication choices in the hospital setting was

20   available in alternative forms and that this

21   specific type of Valsartan was no longer being

22   given to a patient.

23                    So those are all of the -- the

24   different areas and my experience of having to --

25   having been in the position not just as an

Page 257

1    individual physician but collaborating with all

2    of my colleagues and serving as an educator as

3    well as a section chief.

4          Q.     In terms of your methodology and

5    your qualifications to provide these opinions, I

6    want to go through a few things.

7                Did you rely on your experience

8    utilizing warning and risk information from

9    pharmaceutical companies with regard to the

10   medications that you have prescribed over the

11   years?

12         A.     Yes.

13         Q.     And were you trained in how to do

14   so?

15         A.     Yes.  My training in all of those

16   settings is such that I have -- I was trained and

17   I continued to gather information from these

18   different sources and use all of that information

19   as well as share it with my colleagues and in all

20   those different settings in and out of the

21   hospital with students to assure that that

22   information is acted upon, especially in a

23   circumstance where it has to be acted on quickly

24   and make sure that all of the patients that

25   potentially will be impacted by some type of

Page 258

1    information like this are educated and are safely

2    put on alternative medications, as in this case.

3              Q.    And I think you mentioned that you

4    teach residents and medical students as well.

5    Have you taught residents and medical students

6    over the years how to utilize the information

7    from the manufacturers regarding safe

8    prescription, risks, warnings, drug interactions,

9    all that information?  Have you consistently

10   taught medical students and residents how to use

11   that information in the clinical treatment of

12   patients on a day-to-day basis?

13                  MR. TRANGLE:  Object to form.

14             A.    Yes, I have.

15             Q.    You mentioned that you're a

16   section chief at St. Barnabas, at Cooper St.

17   Barnabas.  Maybe I'm misstating the name of the

18   hospital system.  Let me ask you the question.

19                  You mentioned you're section

20   chief.  Can you tell us -- or have been.  Can you

21   tell us what that means and for what hospital

22   system.

23             A.    Yes.  It was traditionally St.

24   Barnabas Medical Center.  It is now called

25   Cooperman Barnabas Medical Center.  It's a little

Page 259

1  bit of a mouthful, but it's a -- we're now a

2  major teaching affiliate of the medical school

3  down at Rutgers, we have over 600 beds.  I have

4  been serving as the section chief in the

5  department of internal medicine, and that

6  involves my interaction with all of the different

7  department chairs, all of the -- section of

8  cardiology, nephrology, gynecology, radiology,

9  physiatry, all of these, and for surgery,

10  urology, transplant, all of these different

11  departments in the hospital setting as well as in

12  my private practice as well as interacting with

13  all of the community physicians that are in

14  internal medicine, and that involves not only

15  gathering information but communicating amongst

16  all of these colleagues as well as within the

17  hospital of changes, potentially, that are going

18  on, new treatments that are available, new

19  information that's available about new drugs or

20  in --

21          (Audio/video interruption.)

22      A.      -- case information that's now

23  come to pass about essentially older drugs.  All

24  of that is part of my responsibility both on the

25  outpatient as well as a section chief and as well

Page 260

1    as educating students and residents.  This is all

2    part of my responsibility of assuring that

3    patients are safely assessed, and more

4    importantly that treatments are safe that are

5    offered to them.

6              Q.     You mentioned the formulary

7    committee.  What's that?

8              A.     The hospital has a formulary,

9    meaning there are different medications that are

10   physically on sight in the pharmacy and are

11   provided to patients when they became inpatients

12   or of course in the emergency room, and there are

13   different choices that are made.  They can't have

14   every single drug on the planet.  There are

15   choices that are made as new drugs become

16   available, or even as older drugs are, if there's

17   some problem with them.  So these are different

18   choices that are made, and many different

19   disciplines are participating.  They do have the

20   input of the medicine people like myself,

21   oftentimes it will be the pharmacology people, we

22   have a pharm M.D., pharm Ph.D.s that guide us

23   with this.  Many times it is -- the infectious

24   disease people are very involved with certain

25   types of antibiotics and we're very carefully

Page 261

1  looking at infection rates, which antibiotics,

2  for example, are resistant, we're going to choose

3  another one.

4            So these are many, many different,

5  if you will, disciplines that are part of the

6  hospital system, and the formulary is looking at

7  all of this data to make certain that we have the

8  safest and the latest versions of all of these

9  medication choices for our medical staff.

10           Q.    And does that work on the

11 formulary committee include understanding the

12 prescribing and the risk information and the

13 other information provided either in the label or

14 the package insert and the online information

15 about the drugs, is that also part of what's

16 taken into account by that committee that

17 you've -- that you're a part of?

18           A.    Yes.  Very much so.  All of the

19 latest information about these different choices

20 of medications of what is the most -- what is the

21 safest, what is the most effective.  These are

22 all taken into account.

23           Q.    And in terms of your practice in

24 terms of -- one second.  Let me withdraw that and

25 ask it differently.

Page 262

1              You were asked some questions

2    about the magnitude of the risk.  Counsel asked

3    you about whether or not the risk was really --

4    and I'm paraphrasing -- whether it was a

5    significant risk, whether or not you could prove

6    someone actually would get cancer from -- from

7    the contamination levels.  Remember you were

8    asked some questions about that?

9         A.    Yes.

10        Q.    In terms of the risk-benefit for

11   the use of the Valsartan pills sold by ZHP that

12   were contaminated with NDMA, did the FDA's own

13   statement instructing that patients be

14   transitioned right away off of those pills onto

15   other treatments provide you the FDA's

16   risk-benefit?

17             MR. TRANGLE:  Object to form.

18        A.    It made it very clear that this

19   was a danger that was posed to patients, and that

20   the essentially only choice, the safest choice,

21   was to get to these patients, information wise,

22   don't have them panic, but have them transition

23   to a safe alternative.  That was very clear from

24   the statement from the FDA.

25        Q.    And in terms of the FDA statement

Page 263

1    which you told us you relied on as part of your

2    methodology, was the FDA's statement that

3    patients should be transitioned to other

4    medications in a safe way also a statement that

5    the risk benefit was unacceptable and that that's

6    why the patients had to get onto other

7    medications and other treatments?

8         A.    Yes.  I think that was very clear.

9         Q.    So if I ask it a different way, in

10   terms of the information that you've opined

11   needed to be provided, when that information was

12   provided by ZHP, the result was the recall and

13   transitioning of patients per FDA statements onto

14   other medications.  That's what ended up

15   happening as a result.  Right?

16              MR. TRANGLE:  Objection.

17        A.    Correct.

18        Q.    Just bear with me.  I'm checking

19   my notes to see if I can cut through this a

20   little bit.  I have no other questions.

21              MR. TRANGLE:  I think I have one

22   or two.  I'm just going to confer with Noah for

23   one minute.  Can we go off the record?

24              VIDEOTAPE OPERATOR:  I'm sorry.  I

25   didn't hear.

                                              Page 264

1              MR. TRANGLE:  Let's go off the

2    record for a minute.

3              VIDEOTAPE OPERATOR:  Okay.  Going

4    off the record.  The time is 6:12 p.m.

5              (Whereupon, a discussion is held

6    off the record, and the proceedings then

7    continued as follows:)

8              VIDEOTAPE OPERATOR:  We're going

9    back on the record.  The time is 6:18.

10

11                    EXAMINATION

12   BY MR. TRANGLE:

13        Q.    Doctor, you just testified that

14   your methodology involved the application of 21

15   C.F.R 201.57.  Right?

16        A.    Yes.

17        Q.    When was the first time you ever

18   reviewed that regulation?

19        A.    Meaning before this particular

20   case?  I'm familiar with the aspect of those

21   federal regulations in -- in protecting patients.

22   I don't remember exactly when -- when I saw or

23   formally reviewed that before this particular

24   occasion.

25        Q.    Had you ever reviewed that

Page 265

1    regulation prior to working on this case?

2            A.    I don't remember exactly.  As I

3    said, it's a regulation that's very much

4    consistent with medical practice in assuring the

5    safety of patients, but I don't remember exactly

6    when it was that I reviewed this before formally

7    incorporating -- looking and incorporating it

8    into my report.

9            Q.    Was it something you considered or

10   reviewed in any of your prior expert work in

11   litigation?

12           A.    You know, I don't remember that

13   detail.

14           Q.    Well, you don't remember it or it

15   was not something that you considered in any

16   prior work to your knowledge?

17           A.    I just don't remember specifically

18   if it was part of a previous case that I had

19   reviewed.

20           Q.    Prior to your work on this case,

21   did you regularly go to look up the Code of

22   Federal Regulations as a clinician?

23           A.    When you say "regularly go to," I

24   guess I -- you have to be a little more specific.

25                 As I said, I am familiar with

Page 266

1  this, I have in the past.  I don't remember the

2  previous time that I did review this specific

3  aspect.

4        Q.    How many times had you gone to

5  look at the Code of Federal Regulations prior to

6  working on this case as a clinician as part of

7  your regular clinical practice?

8        A.    I don't remember how many prior

9  times.  I have -- I'm familiar with this, I have

10  looked it in the past, but I don't remember

11  exactly how many times that was.

12        Q.    Can you tell me with any degree of

13  certainty whether you've looked at any Code of

14  Federal Regulations pertaining to pharmaceutical

15  regulation prior to working on this case?

16        A.    Again, I don't remember exactly

17  when that would have taken place.

18        Q.    Okay.  And you testified that you

19  read and relied on the opinions of Dr. Hecht.

20  Right?

21        A.    Yes.

22        Q.    Did you independently assess

23  whether Dr. Hecht was correct regarding the

24  possibility that NDMA formation was known to ZHP

25  in 2015?

Page 267

1          A.     When you say -- the term used is

2    independently?   Is that what you --

3          Q.     Right.  What work did you do to

4    assess whether or not his opinion was reliable

5    and based on facts?

6          A.     I did not -- I don't remember

7    going through, as you put it, independent, when

8    the expert gives opinions.  I looked at all of

9    the information that he cited, and I understand

10   in the literature what these issues are, and I --

11   his -- all of his explaining of the narrative

12   events, all of that I found to be reliable, but I

13   did not go, to answer your question, go to a

14   independent source to check on all of this.

15         Q.     Did you go to an independent

16   source to check any of it?

17         A.     I did not perform an independent

18   source of the information that he was providing

19   in his report.

20         Q.     Okay.  And I think that you had

21   said, and this might have just been -- sorry.

22              Is it your testimony that you

23   interviewed, personally, thousands of physicians

24   about their opinions regarding NDMA in Valsartan?

25         A.     You used the term "interviewed."

Page 268

1    I did not say that, or that would be

2    misinterpreted.  I think my testimony, and I'll

3    say it again, that in my various roles as the

4    section chief, as a practicing physician in the

5    community, I have interacted with thousands of

6    physicians for various roles, and certainly some

7    of those interactions involved assuring patient

8    safety for various treatments that are offered.

9    That would -- that's always been part of my

10   practice.

11         Q.    Right.  You might interact with

12   thousands of physicians, but it's not the case

13   that you asked them or interviewed thousands of

14   other physicians about Valsartan and NDMA.

15         A.    I don't know how to answer your

16   question.  When you say interviewed them about

17   this, you know, the -- the importance of assuring

18   the safety of patients involved many different

19   practitioners over that period of time when it

20   was discovered.  In the hospital setting, it's a

21   big hospital, and we have meetings with many,

22   many different physicians, even the residents.  I

23   don't know exactly the amount of people I spoke

24   to ind- -- to my recollection about the events

25   in -- when this was finally released in 2018, but

Page 269

1    my testimony, which I said before, and I'll

2    continue, is my experience over the years is

3    interacting with all of these different aspects

4    of the inpatient population, physicians in the

5    community, multiple internal medicine people, all

6    of that allows me to disseminate as much, and

7    collect as much information to assure that

8    patients from all different sources, FDA reports,

9    online articles, all of it is taken into account

10   for all of us in the medical community to assure

11   safety in the treatment of our patients.

12            Q.      Have you ever been consulted by

13   any government agency or company on the adequacy

14   of warnings?

15            MR. SLATER:  Counsel, didn't you

16   ask this question like six hours ago?

17            A.      No, I don't believe so.

18            Q.      Have you ever told students to go

19   to look at the FDA's website to assess for

20   themselves whether warnings provided accompanying

21   medication are adequate?

22            A.      I educate the residents of various

23   sources to gather information in the assessment,

24   the proper assessment of patients.

25            Q.      And as part of that education of

Page 270

1    the residents, do you tell them to go look at the

2    FDA website every time they're thinking about

3    prescribing a medication to assess whether the

4    warnings provided are adequate?

5          A.    I don't know if it's every time

6    they're going to use a medication.  They are --

7    it's -- I'll repeat what I said before, I educate

8    the residents, medical students about the

9    different sources of information regarding

10   medication prescriptions, about assessing

11   patients.  All of these are available, and

12   they're educated about where they can gather this

13   information and incorporate it into a decision

14   process to assure safety of patients.

15          Q.    How many other times in your

16   professional work have you concluded a warning

17   was inadequate?

18                MR. SLATER:  Are you talking about

19   as an expert witness?

20                MR. TRANGLE:  No.  As a clinician.

21                MR. SLATER:  Objection to the

22   form.  You can answer.

23          A.    I'm trying to think of

24   circumstances where information was brought to

25   light that we all, in the medical community,

Page 271

1    acted upon immediately.  I -- the two drugs we

2    spoke of, but that, I believe, was after this,

3    where the other drugs, the Zantac and the

4    Metformin, but I don't remember the dates of all

5    of these that that would be something where

6    information came to light, and of course we all

7    acted upon that and in a very similar manner

8    educated our patients.

9                    I don't remember another case.

10   There may have been, but I don't -- it doesn't

11   come to mind right now.

12        Q.    Okay.  That's all that I have.

13                    MR. SLATER:  I have no other

14   questions.

15                    VIDEOTAPE OPERATOR:  Okay.  This

16   will conclude today's testimony.  The time is

17   6:28 p.m.  Thank you very much.

18                    (Whereupon deposition was

19   concluded.)

20                    _____

21                         JOHN A. RUSSO, M.D.

22   Subscribed and sworn to before me

23   this ___ day of _____, 2025.

24   _____

25        NOTARY PUBLIC

Page 272

1                    C E R T I F I C A T E

2

3

4              I, MELISSA LUMI, a Certified Court

5    Reporter and Notary Public of the State of New

6    Jersey certify that the foregoing is a true and

7    accurate Computerized Transcript of the

8    Deposition of John A. Russo, M.D., who was first

9    duly sworn by me.

10

11             I further certify that I am

12   neither attorney, of counsel for, nor related to

13   or employed by any of the parties to the action

14   in which the Depositions are taken, and further

15   that I am not a relative or employee of any

16   attorney or counsel employed in this case, nor am

17   I financially interested in the action.

18

19

20

21

             MELISSA LUMI, C.C.R.

22

23

24

25

Page 273

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Valsartan v. Zhejiang Huahai Pharmaceutical
DATE OF DEPOSITION: 5/13/2025
WITNESSES' NAME: John A Russo , MD

PAGE   LINE (S)        CHANGE                    REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                    _____
                                    John A Russo , MD
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____            _____
(NOTARY PUBLIC)                  MY COMMISSION EXPIRES:

[& - 3/10/25]                                                                                     Page 1

| & | | | |
|---|---|---|---|
| **&** 2:3,7 | | | |

| **0** | | | |
|---|---|---|---|
| **0.008.** 214:3 | | | |
| **0001** 225:23 | | | |
| **00946** 1:11 4:19 | | | |
| **07068** 2:5 | | | |

| **1** | | | |
|---|---|---|---|
| **1** 3:11 17:6 69:17 | | | |
| **1.05** 214:2 | | | |
| **1.19** 214:2,22 | | | |
| **1.36** 214:2 | | | |
| **10** 31:6,11,16 38:14 39:21 40:4,7 212:25 251:1 | | | |
| **100** 40:22 41:2 160:17 | | | |
| **103** 2:4 | | | |
| **10:00** 1:16 176:2 | | | |
| **10:18** 4:2 | | | |
| **10:50** 29:1 | | | |
| **10th** 40:16 43:1 43:2 | | | |
| **11:02** 29:6 | | | |
| **11:06** 32:1 | | | |
| **11:16** 32:6 | | | |
| **12:14** 82:6 | | | |
| **12:28** 82:11 | | | |

**13** 1:15 3:17 4:2 17:8 158:5 158:11,23 161:6 195:23
**1301** 2:9
**13396** 272:21
**13th** 196:19
**15** 26:14 31:2,6 31:11,17 52:9
**158** 3:17
**159** 3:19
**17** 3:11 37:6,17 45:11,11,14,15
**17.5** 39:22
**18** 56:5
**1970s** 145:25 216:16 217:4
**1:02** 106:19
**1:08** 106:24
**1:15** 112:5
**1:20** 1:11 4:19

| **2** | | | |
|---|---|---|---|
| **2** 3:12 11:7,7 26:14,17 39:18 40:7 73:10 | | | |
| **20** 24:6,10,22 59:17 149:20 230:9 273:22 | | | |
| **200** 2:15 66:17 | | | |
| **2000** 137:15 | | | |
| **20004** 2:9 | | | |
| **2000s** 181:15 | | | |

**2005** 119:7
**201.57** 251:1,7
**201.57.** 264:15
**2015** 46:16 95:21,23 96:7 103:15 104:2,7 119:7,18 120:13 122:10 126:14 127:24 131:15 135:7 136:19 137:11 137:16 145:4 146:8 147:7 148:9 151:12 153:13,21 154:1,19 155:10 165:19 183:11 266:25
**2018** 3:17 46:16 75:6,22 95:9,10 98:12,16 99:22 102:19 103:4 103:15 104:2,7 104:22 105:5 107:7 110:3 119:9 126:14 135:7 137:16 151:3,24 155:15,17 156:2 158:5,11 158:23 159:18 161:6 183:11 184:2 195:23 196:17 216:18

**248:8** 268:25
**2021** 112:24 149:12,18,20
**2022** 112:25 113:1
**2023** 27:23 212:24
**2025** 1:15 4:3 8:20 11:10 25:13 38:14 39:7,18,21,21 40:4,7,7 271:23
**21** 52:3 140:13 140:22 149:18 251:7 264:14
**213** 3:20
**22** 149:12
**246** 3:5
**25** 24:6,10,22 39:7,20 134:4
**2500** 2:15
**26** 3:12 52:24 53:1
**265** 3:4
**2875** 1:2
**2:03** 112:11
**2nd** 2:4 40:16

| **3** | | | |
|---|---|---|---|
| **3** 3:13 11:7 37:5,19 | | | |
| **3,000** 73:10 | | | |
| **3/10/25** 35:17 | | | |

**30**  134:4 159:17
  196:17 225:13
**300**  11:7
**30305**  2:16
**30th**  176:8
**30x100237000**
  1:15
**314**  52:3,12
**320**  198:13
**3333**  2:15
**37**  3:13
**3:24**  172:3
**3:36**  172:8
**3:40**  176:16
**3:49**  176:21

**4**

**4**  3:14 44:18,25
  184:1
**40**  61:18,18
**44**  3:14
**45**  225:13
**475**  38:17
**4:58**  227:21

**5**

**5**  3:4,15 56:5,8
**5/13/2025**  273:3
**50**  61:18,19
  63:25 64:25
  65:4,9
**56**  3:15
**5:09**  228:1
**5:34**  246:13

**5:50**  246:18

**6**

**6**  3:17 158:10
  158:12 195:7,9
  251:7
**6,000**  39:4
**600**  130:12
  259:3
**6:12**  264:4
**6:18**  264:9
**6:28**  271:17

**7**

**7**  3:19 159:16
  159:20 196:20
**70s**  224:1
**7th**  11:10

**8**

**8**  3:20 167:17
  212:25 213:2
**8,000**  198:12,17
  203:12
**8,312.50**  39:25
**8th**  27:23

**9**

**90s**  181:12,15
**95**  214:2

**a**

**a.m.**  4:2 29:6
**abbreviations**
  214:16
**abided**  191:4

**ability**  77:20
  91:1 182:7
  183:2
**able**  98:7 99:1
  99:19,24
  101:17 103:8
  117:7,17
  130:23 131:13
  131:18 141:19
  141:20 165:11
  174:12 175:1
  179:12 198:3
  204:20 206:14
**above**  1:14
  224:21
**absolutely**  86:9
  86:11,25 136:8
  138:13 157:2
**abstract**  213:25
**abstractly**
  135:1
**acceleration**
  185:11
**accept**  100:21
  129:9 146:6
  224:22
**acceptable**  9:22
  126:2 188:18
  223:8 224:22
**accepted**  59:11
**access**  243:19
**accompanied**
  134:14,19
  135:5

**accompanying**
  52:20 53:12
  54:1 269:20
**account**  14:23
  236:14 241:12
  248:20,24
  250:10 251:13
  261:16,22
  269:9
**accountant**
  14:17,19,23,24
**accounting**
  12:17
**accurate**  5:21
  5:25 11:18,24
  30:6 113:11
  116:2,12 117:9
  205:16 272:7
**accurately**  52:5
  144:2,5 204:20
  205:10 226:21
  227:1,18
  236:15
**ace**  207:2,5,8
  207:10,20
  208:3,23
  209:13,16,21
  210:4,7,19,24
  211:5,20,23,25
  212:9,18,20
  213:20 214:23
  215:2 216:3
  217:23 218:7
  218:10,17,22

[ace - ahead]                                                                    Page 3

219:12,14
220:7,8 231:15
**aceis** 213:25
**acknowledge**
202:23
**acknowledged**
150:9
**act** 14:5 99:12
240:11
**actavis** 2:17,18
**acted** 99:15
156:6 257:22
257:23 271:1,7
**action** 1:5
59:15 60:1
67:23 249:16
272:13,17
**active** 15:16
81:1 160:7
169:14 170:6
**actively** 7:15
65:15 233:2
**actual** 14:18
252:7
**actually** 28:11
30:8 68:20
69:3 76:23
105:20 109:13
114:21 116:16
120:11 143:7
167:17 168:20
174:3 175:3
207:15 223:22
255:8,10 262:6

**adam** 2:3
108:23
**add** 128:25
**added** 128:21
**addition** 14:21
**additional** 48:6
54:1 149:15
150:23 198:16
**additions** 45:23
**addressed** 67:3
67:22 68:15
154:13
**adequacy**
21:22 22:22
79:9 81:4
92:18 146:21
247:11,19
249:3 269:13
**adequate** 127:2
250:12 254:14
269:21 270:4
**adequately**
118:24
**adjustment**
208:19
**adjustments**
183:17
**administration**
98:20
**administrative**
123:17 200:15
**adopt** 129:19
131:20

**adulteration**
82:14,18
**adverse** 193:11
208:15 209:9
211:13 231:1
**adversely**
190:18 207:15
**advise** 71:14
**advised** 71:11
79:4 249:15,22
**advises** 14:24
**advising** 233:6
**affect** 110:20
140:20 190:19
207:15 251:4
**affected** 197:4
197:15 198:13
198:15
**affects** 121:1
**affidavits** 15:4
**affiliate** 259:2
**agencies** 157:13
**agency** 133:24
161:9 269:13
**agent** 8:1,3
76:19 90:20
124:18 126:2
127:14,22
128:6,16
129:10 132:16
133:6 137:19
137:20 138:8
139:8 142:15
142:16 146:12

146:19 148:12
161:14 163:22
164:15 166:7
224:2,14
226:11
**agents** 7:18
87:15 107:12
124:25 133:8
136:10 137:1
143:4 146:3
147:14 151:16
154:5 155:21
180:1 183:16
217:18 221:2
221:10
**aggravating**
245:19
**ago** 24:6 27:25
29:12 31:6,12
31:17 59:17
71:24 230:3
233:19 269:16
**agree** 4:9 34:2
34:7 104:22
105:6 137:10
200:6 204:17
221:11 225:14
**agreed** 34:14
34:20
**agreeing** 35:5
**ahead** 14:14
17:4 68:15
203:15 220:22
228:1

[ai - answer]                                                                 Page 4

**ai**  57:25 58:7
  58:11
**ajar**  10:5
**al**  1:8,9 4:15,16
  212:24
**alarming**  128:4
  161:13
**alcohol**  69:7,12
  69:13 245:19
**alcoholic**  245:6
**alert**  74:17,22
  140:16
**alerts**  157:25
**alleging**  17:25
**allow**  119:16
  122:19 128:15
  130:14 135:14
  192:10 199:1
  200:17 223:12
**allowed**  85:13
  100:19 102:10
  175:11 201:11
**allowing**
  125:14 200:2
**allows**  233:9
  269:6
**alpha**  69:17
**alteration**
  209:11
**alternate**  87:23
**alternative**
  88:14 90:25
  91:24 94:8
  100:22 124:25

179:1,23 185:2
186:22 187:20
199:23 206:22
208:20 210:14
218:24 219:15
219:24 221:1
222:7,14 223:1
249:18 256:20
258:2 262:23
**alternatives**
  87:1,11 89:6
  100:22 126:4
  128:18 129:16
  130:15 135:12
  142:2 164:1,11
  164:16 190:22
  197:21,21
  199:13 200:5
  209:19 220:14
  220:17 221:14
  221:23 222:11
  223:14,15
  224:24 226:10
  226:12
**american**  62:17
  63:12
**americans**
  198:19
**amount**  34:21
  36:13 42:19
  52:1,14 83:24
  85:7 87:4 88:4
  114:12 119:20
  124:2,12 125:3

125:11 143:20
154:10 162:25
163:13,17
164:3 198:14
224:13,20,21
226:15 227:7
227:10 268:23
**amounts**
  125:25 224:6
  227:4
**analyses**  92:14
  125:15
**analysis**  86:20
  139:11 148:11
  160:11,24
  161:20 193:22
  195:3 203:17
  207:17 208:24
  213:15 221:7
  221:12 236:16
  237:17 252:22
**analyze**  113:4
  220:15 239:12
**analyzing**
  121:18 238:24
  241:23
**anda**  89:17,18
  89:19
**angio**  215:3
**angiotensin**
  213:13,19,22
**animal**  254:18
**animals**  76:25
  127:15

**annals**  235:22
  237:1
**announcement**
  72:25 156:7
  162:22 192:4,8
  195:6 240:8
**announcements**
  235:19 244:11
  250:14
**announces**
  195:16
**annoying**
  209:23
**answer**  12:21
  13:3,20 14:14
  33:10 36:24
  42:10 44:1
  47:1 49:6 51:5
  51:13,21 54:4
  57:19 59:19
  67:24 69:1
  72:6,23 77:8
  78:7 81:7,8
  82:16 83:6,14
  83:22 84:7,22
  87:6 88:6 90:2
  90:17 91:8,19
  92:11,21 94:22
  96:11 97:2,3,20
  97:23,25 98:5,7
  98:14 99:6
  100:15 101:3
  101:10 102:11
  104:5 105:1,10

[answer - article]                                                                    Page 5

| | | | |
|---|---|---|---|
| 105:12,20 | 217:12 218:1,2 | **anybody** 31:14 | **approximately** |
| 106:5,7 107:14 | 218:12,16 | 194:8 | 11:5 24:6 |
| 107:19,24 | 219:1,19 220:1 | **anyone's** 21:18 | 25:13 |
| 109:19 110:11 | 220:10,19,20 | **anyway** 176:3 | **april** 149:12,18 |
| 111:16 113:24 | 220:25 222:9 | **api** 83:12 177:6 | 149:20 |
| 117:20 118:16 | 223:6 224:11 | **apologize** 65:7 | **arb** 126:3 |
| 119:2 121:11 | 225:17 226:2 | 182:6 | **area** 75:12 |
| 122:23 124:5 | 226:17,21 | **apparent** 7:19 | 169:19 173:3 |
| 124:14 125:6 | 227:1,6,13,17 | **appearances** | **areas** 256:24 |
| 130:5 131:23 | 229:13 231:18 | 5:1 | **argue** 153:1 |
| 136:7,16 138:5 | 232:8 237:9 | **applicable** | 201:8 220:21 |
| 139:1,18 142:7 | 238:14 242:9 | 156:10 | **arguing** 200:25 |
| 142:25 143:19 | 267:13 268:15 | **application** | 201:4 242:9,11 |
| 143:22 144:2,5 | 270:22 | 264:14 | **argumentative** |
| 144:9 145:1,16 | **answered** | **applied** 251:25 | 12:21 13:3,17 |
| 148:20 152:1 | 97:23 99:7 | 253:15 | 13:18,22,24 |
| 152:12 153:1 | 102:22,25 | **appreciate** 67:8 | 14:4 53:18 |
| 154:3 156:13 | 103:12 104:6 | 201:6 | 54:4 115:5 |
| 161:24 162:11 | 104:17 150:18 | **apprise** 103:10 | 136:15 153:1 |
| 162:13 163:4 | 187:7 220:1 | **apprised** 99:20 | 201:12 219:17 |
| 164:21 165:8,9 | 232:9 | **approach** | 220:19 |
| 165:17 166:24 | **answering** | 212:5 | **arrangements** |
| 167:3 175:1 | 169:21 189:18 | **appropriate** | 34:24 |
| 179:19 183:4 | 245:3 247:1 | 89:22 168:1 | **arrive** 242:17 |
| 186:4,13 | **answers** 20:6 | **appropriately** | **arrived** 65:25 |
| 188:11 189:17 | **antibiotic** 90:21 | 238:25 | 234:11 |
| 194:17 199:19 | **antibiotics** | **appropriaten...** | **arriving** 244:11 |
| 200:1 202:13 | 260:25 261:1 | 241:23 | **artery** 207:13 |
| 204:14,20 | **anticipated** | **approved** 99:9 | 209:3,15 210:7 |
| 205:3,10,15,17 | 177:4 | 125:10 132:1 | **article** 3:21 |
| 206:2 207:7 | **antihypertens...** | **approving** | 62:13 63:8,16 |
| 208:9 210:10 | 85:4 | 147:24 | 212:24 213:2 |
| 210:16 211:7 | **antitrypsin** | **approximate** | 213:12 215:22 |
| 215:12,25 | 69:18 | 96:23 | 215:23 237:11 |

[articles - assuring]                                                          Page 6

| | | | |
|---|---|---|---|
| **articles** 55:1 | 133:22 135:1 | **assessment** | **assume** 37:9 |
| 114:14,16,17 | 145:6 168:16 | 66:13 101:6 | 171:2 247:7 |
| 116:4,9 216:1 | 168:22 175:13 | 125:9 191:16 | **assumed** |
| 235:25 236:19 | 189:18 205:18 | 191:18 200:23 | 233:18 |
| 269:9 | 215:14 235:5 | 201:21 202:16 | **assuming** 81:13 |
| **articulates** | 237:3,10 243:4 | 203:7,9,22 | **assurance** |
| 115:11 | **aslater** 2:5 | 218:21 221:21 | 141:22 146:12 |
| **artificial** 58:3 | **aspect** 90:4 | 222:11,14 | 157:21 |
| **asher** 2:8 | 130:8 131:1 | 228:16 229:17 | **assure** 73:15 |
| 144:14 | 162:14 163:6 | 236:21 237:6 | 98:21 102:16 |
| **asher.trangle** | 169:21 188:25 | 238:5,10,12 | 103:19,24 |
| 2:10 | 214:10,11 | 243:16 269:23 | 104:11 111:1,5 |
| **asian** 215:4 | 218:20 264:20 | 269:24 | 130:22 134:9 |
| **aside** 231:12 | 266:3 | **assessments** | 134:10 141:18 |
| **asked** 7:12 15:1 | **aspects** 46:6 | 148:6 168:5 | 141:20 147:12 |
| 33:15 44:9 | 269:3 | 202:2 211:18 | 148:14 151:19 |
| 57:5 70:25 | **assembling** | 217:20 | 153:17 166:6 |
| 71:4,5,9 102:25 | 12:2 | **associated** | 166:18 186:24 |
| 175:9 180:22 | **assess** 92:14 | 185:25 186:2,8 | 191:3 212:14 |
| 187:6 201:2 | 117:18 118:8 | 186:10 187:3 | 238:25 257:21 |
| 220:1 241:6 | 118:13,23 | 211:5 212:9 | 269:7,10 |
| 242:2,10 247:9 | 123:6 229:17 | 216:15 217:5 | 270:14 |
| 247:12,17,21 | 230:13 234:6 | 219:5 220:16 | **assured** 74:15 |
| 250:4 253:1,6 | 235:3 236:14 | 223:1 226:19 | 78:10 120:6 |
| 262:1,2,8 | 240:12 243:12 | **association** | 121:20 136:25 |
| 268:13 | 245:8 266:22 | 63:13 142:20 | 140:2 142:14 |
| **asking** 14:5,16 | 267:4 269:19 | 212:3 213:13 | 156:22 157:4 |
| 26:22 44:17 | 270:3 | 213:22 215:19 | 166:14 |
| 56:13 63:21 | **assessed** 64:20 | 216:6,13 | **assuring** |
| 66:25 67:2,21 | 130:23 260:3 | 217:16 226:5 | 123:22 141:11 |
| 70:19 85:6 | **assessing** 78:24 | 227:16 | 146:18 234:9 |
| 97:8 109:5 | 228:10 236:8 | **associations** | 260:2 265:4 |
| 116:8 127:7 | 245:16 270:10 | 138:21 216:19 | 268:7,17 |
| 131:17,17,18 | | 217:9,19 | |

| | | | |
|---|---|---|---|
| **atlanta** 2:16 | **available** 39:5 | **avoid** 77:3 | 182:24 191:21 |
| **attached** 48:14 | 53:23 87:12,24 | **aware** 54:14 | 227:25 228:3 |
| **attack** 185:14 | 88:15 95:18,20 | 75:24 76:1,9,11 | 246:18 264:9 |
| 185:17 | 97:11,13 98:23 | 76:12,25,25 | **background** |
| **attended** 59:4,7 | 99:14 100:7,8 | 100:9 104:8,15 | 10:6 229:3 |
| 237:25 | 105:15 121:14 | 104:21 105:4 | 254:9 |
| **attention** | 122:16 125:16 | 118:19 125:19 | **bacon** 226:14 |
| 127:25 156:6 | 126:4 128:19 | 144:24 145:8 | 226:15,19,20 |
| 162:5 218:19 | 129:16 134:2 | 149:14,17 | 227:10,11,16 |
| 226:6 | 134:12 135:24 | 151:2 154:8 | **badgering** |
| **attorney** | 136:11 137:4 | 171:5 194:3 | 13:18 |
| 272:12,16 | 144:19 147:1 | 202:4 211:22 | **bank** 14:22 |
| **attorneys** 2:6 | 147:13 148:16 | 215:17 216:4,8 | **barnabas** 71:24 |
| 2:11,17 | 164:1 166:1 | 216:11,12,17 | 73:5 130:12 |
| **audio** 4:8 86:12 | 167:6 195:1 | 216:21,22,25 | 258:16,17,24 |
| 102:24 106:15 | 197:22 199:13 | 217:7,14,16 | 258:25 |
| 111:2,12,17,21 | 199:23 200:5 | 245:9 | **base** 44:11 |
| 180:13 182:12 | 206:23 226:10 | **b** | 66:15 |
| 182:18 191:17 | 230:6 234:2,8 | **b** 3:9 27:4 69:8 | **based** 12:7 |
| 259:21 | 235:20 236:4,6 | 149:10 | 32:18 66:6 |
| **august** 159:17 | 236:12 240:2 | **back** 29:5 31:1 | 77:22 152:4 |
| 174:1 176:8 | 244:1 248:2 | 32:6 37:25 | 153:6 168:5,6 |
| 196:17,18,23 | 253:4,14 | 38:3,8 58:5 | 169:10 199:16 |
| **author** 213:17 | 256:20 259:18 | 82:11 101:23 | 200:23 201:21 |
| **authoring** 26:5 | 259:19 260:16 | 106:24 112:3 | 222:15 226:4 |
| **authority** 60:5 | 270:11 | 112:10 122:10 | 226:15 228:11 |
| 140:5 | **avenue** 2:9 | 127:23 131:11 | 229:10 231:25 |
| **authorized** | **avenues** 66:6 | 143:5 148:9 | 233:16,17 |
| 125:13 | 103:21 128:10 | 151:12 155:22 | 237:6 238:5 |
| **authors** 213:24 | 132:23 166:5 | 163:12 167:9 | 240:1,23 267:5 |
| 214:21 | **average** 24:12 | 167:18 171:15 | **bashing** 201:13 |
| **availability** | 24:19 25:8 | 171:18,19 | **basically** |
| 136:2 221:13 | 198:18 | 172:7 176:21 | 191:23 201:4 |
| | | | 251:17 |

[basing - bodies]                                                    Page 8

**basing**  233:12
255:22 256:3
**basis**  77:25
85:22 86:9
94:18 95:1
109:8 121:23
122:19 151:9
153:8 161:19
167:10 177:10
178:3,22
226:24 234:18
235:21 238:8
243:21 258:12
**bear**  263:18
**bed**  130:12
**beds**  259:3
**bedside**  61:1,12
236:8 238:4
**beginning**
247:16
**behavior**
249:19
**belabor**  5:16
**believe**  9:2,3
10:9 18:2,3,10
18:17 20:9
21:13,17,20,25
22:4,8 25:22
29:22 30:5,24
42:24 47:2,7
48:16,16,20
49:1 54:21
55:25 56:3
60:16 79:10

93:6 104:6,17
118:22 120:15
127:2,8 134:10
136:18 143:5
151:9 154:16
157:18 160:4
163:9 181:10
181:11 197:12
215:13 218:9
221:25 231:9
269:17 271:2
**believed**  185:24
186:7 187:1
198:15
**beneficial**
88:24 90:22
**benefit**  85:19
86:22,25 87:14
122:3 123:7
133:8 135:12
137:9 140:2
148:7 164:11
179:21 189:4
193:22 195:3
203:7,9,17,22
205:17 206:18
207:10 221:11
222:1,19,19
223:9,16
228:16 230:14
230:22 232:5
236:21 237:12
237:12,22
238:1 241:13

245:9 248:21
252:21 262:10
262:16 263:5
**benefits**  204:22
207:22 228:10
**benzene**  138:14
138:17,24
139:6
**best**  157:14
162:13 193:3
202:13,20
211:15 217:20
234:14 235:1
235:11 236:16
236:16
**beta**  231:16
**better**  55:8
210:1
**beyond**  198:18
**big**  268:21
**bigger**  158:16
**bill**  42:14,16,20
52:2
**billed**  40:1,18
40:23 41:3
**biochemical**
147:18
**biochemistry**
138:18
**bioequivalence**
90:13,14,19
91:6
**bioequivalent**
143:17

**biologic**  90:20
**biologics**  80:11
**biopsy**  64:16
**bit**  24:25 25:5
103:1 145:17
158:20 174:11
179:13 259:1
263:20
**block**  39:3
42:13
**blocked**  34:25
**blocker**  215:4
231:16
**blood**  66:1
90:23,23 91:2,2
94:9 163:22
181:20 182:3,8
183:2,13
184:13 185:9
185:10,11,15
190:10 205:23
206:4,11,12
207:18 208:13
209:10 210:14
210:15 211:1
212:1 231:14
235:6
**board**  58:18,21
58:25 60:4
62:23
**boarded**  62:3
**boards**  86:5
**bodies**  23:1,7

**body**  78:21
  134:8
**bolts**  254:10
**bone**  138:21
**book**  46:4
**booted**  112:1
**bottles**  243:5
**bottom**  19:6
  38:16 39:18
  52:21,24
  158:25 179:13
  250:24
**box**  58:6
**boy**  174:15
**bradford**  75:14
**brand**  143:14
  144:4 178:18
  178:21 181:7
**break**  31:21
  81:24 170:13
  170:16,20,22
  171:4,8,11,13
  171:14 172:10
  225:2 227:19
**breakdown**
  41:9,13
**breaking**  86:14
  171:6
**brief**  29:17
**briefly**  9:13,20
**bring**  196:14
**bringing**
  146:13

**british**  3:20
  213:1
**broad**  126:9
**broke**  36:25
  41:1 82:17
  93:13 105:2
**brought**  26:19
  127:25 156:5
  162:4 226:6
  270:24
**buckley**  92:23
  93:1,7
**building**  67:15
**bullard**  93:8,10
  93:16
**bunch**  171:2
**button**  172:21

**c**

**c**  1:13,13 2:1
  69:8 251:7
  272:1,1
**c.c.r.**  272:21
**c.f.r**  264:15
**c.f.r.**  52:3,12
  140:13 142:4
  250:25 251:1,7
**calculate**
  199:15
**calculated**
  198:9
**calculation**
  232:5

**call**  42:14 69:13
**called**  69:16,17
  70:6 185:2
  207:13 209:15
  212:2,24
  258:24
**calls**  148:1
**cam**  4:18
**camden**  1:2
  4:18
**camera**  4:5
  179:12
**cancer**  3:20
  18:15,18,24
  19:16,18 21:18
  69:25 70:6,10
  70:13 76:24
  108:17 119:22
  121:1 124:18
  129:9 132:16
  142:20,23
  146:1 150:12
  161:9,14
  163:12,14
  179:25 198:17
  198:18 199:11
  211:5,21,23
  212:8,19,22
  213:1,14,23
  214:1,24
  215:10,19
  216:6,15,19
  217:6,9,10,19
  217:24 218:7,8

  218:10,14,14
  218:23 219:13
  220:16 223:22
  224:8 225:25
  226:15 250:1
  262:6
**cancers**  218:15
**capacity**  30:23
  32:15,16,24
  80:23
**carcin**  126:1
  200:18
**carcinogen**
  76:7 85:16,17
  86:24 87:3,22
  87:23 88:4
  103:14,20
  104:9 124:18
  127:4,17,19
  130:16 135:10
  138:20 139:9
  161:8 162:3,23
  163:16 164:13
  164:19 199:3,4
  200:4,19
  211:11 212:6
  216:11 219:5
  221:5,18 222:4
  224:3,14,14
  226:8 254:18
  254:19
**carcinogenesis**
  215:3

[carcinogenic - catch]                                    Page 10

| | | | |
|---|---|---|---|
| **carcinogenic** | 103:25 104:14 | 30:8,19 31:4,10 | 205:21 217:4 |
| 7:18 8:1,3 85:3 | 122:9,14 | 31:14 32:11 | 223:21 237:13 |
| 85:13 87:11 | 126:23 128:14 | 34:20 35:5 | 243:23 244:14 |
| 88:22,25 89:3 | 133:12 155:19 | 36:20 39:10,12 | 249:3 254:6 |
| 107:12 123:25 | 156:14 157:6 | 39:23 42:1,5 | 258:2 259:22 |
| 126:1 127:13 | 180:3 186:20 | 43:2,8,12,16,21 | 264:20 265:1 |
| 127:16,22 | 186:23 191:3,7 | 44:5,16 46:12 | 265:18,20 |
| 136:10 137:1 | 196:2 200:10 | 47:5,17 48:7,10 | 266:6,15 |
| 137:20 138:3 | 230:23 233:10 | 50:16,19 51:3 | 268:12 271:9 |
| 138:11 139:25 | 239:3,8,12,21 | 53:4 54:2,12,18 | 272:16 273:2 |
| 146:19 148:12 | 241:2,15 242:6 | 55:5,24,25 57:3 | **cases**  11:10,14 |
| 155:21 188:17 | 242:13,19,21 | 57:16 70:1,2,13 | 11:15,22,25 |
| **carcinogenicity** | 248:15 249:9 | 79:8 89:5 | 12:5,10,19 |
| 23:11 | 252:15,19 | 92:16 93:1,12 | 14:18 15:2,13 |
| **carcinogens** | **career**  63:20,24 | 93:17,24 97:7 | 15:14 16:23 |
| 22:14 86:10 | 64:8 65:1,9,12 | 97:24 98:7 | 17:2 20:10,24 |
| 124:3 139:14 | 66:14,17 71:21 | 99:18 100:4 | 21:4,9,16,19,23 |
| 142:5,10 | **carefully** | 102:4 105:17 | 22:3,7,8,11,14 |
| 199:22 | 245:21 260:25 | 105:23 108:5 | 28:3,10 29:25 |
| **carcinoma** | **carry**  211:21 | 108:14 114:3 | 30:4,10,11,15 |
| 21:16 23:16 | 218:22 219:13 | 121:6 123:24 | 32:16 33:14,16 |
| 63:19 64:1,14 | **case**  1:10 4:19 | 124:8 125:12 | 36:3 43:15,19 |
| 65:1,11,13 94:5 | 7:7,9 10:18,23 | 125:18,20,25 | 44:9 55:20 |
| **cardiologist** | 11:8 13:4,7 | 126:6 137:2 | 59:16,18,22 |
| 85:10 | 14:18 15:16,22 | 141:23 142:1 | 63:25 64:3 |
| **cardiologists** | 15:24 16:16,19 | 143:1 145:7,20 | 65:6,9 69:14 |
| 74:7 119:13 | 16:21,22 17:21 | 145:22,24 | 183:15 187:12 |
| 120:5 133:25 | 18:1,4,6,9 19:2 | 146:4 147:3,21 | 207:16,20 |
| 256:10 | 19:8,11,15,24 | 150:3,15 | 208:14 209:7 |
| **cardiology**  74:6 | 20:8,13,19 | 157:23 163:7 | 209:22 211:25 |
| 86:8 233:24 | 25:16,25 26:2,4 | 163:21 188:14 | **cat**  236:11 |
| 259:8 | 26:6,10,19 27:3 | 189:8 194:5,7 | **catch**  111:21 |
| **care**  19:13 | 27:15,20 28:9 | 198:17 204:9 | 182:20 |
| 21:11 77:21 | 28:11 29:19 | 204:13,16 | |

[catches - choice]                                                        Page 11

| | | | |
|---|---|---|---|
| **catches** 180:25 | 134:3 136:22 | 272:4 | **chats** 45:4 |
| **catching** | 136:23 137:18 | **certify** 272:6,11 | **check** 267:14 |
| 182:20 | 137:19,22 | **cessation** 71:22 | 267:16 |
| **category** 207:1 | 138:8 139:4 | 185:15 | **checking** |
| **causation** 108:5 | 147:2 157:3,23 | **cgmp** 78:13,18 | 263:18 |
| 108:9,11,14,22 | 160:6 164:8 | 82:22 83:2 | **chemical** 8:11 |
| 109:23 244:23 | 165:24 179:8 | **chairs** 233:23 | 23:12 138:16 |
| **cause** 21:15,18 | 224:21 255:15 | 233:25 259:7 | 160:7 |
| 23:15 69:9 | 256:18 260:24 | **change** 89:24 | **chemically** |
| 139:9 151:6 | 261:7 | 129:19 131:13 | 164:4 |
| 160:18 223:22 | **certainly** 77:19 | 131:19 151:20 | **chemist** 75:19 |
| 224:7 | 84:24 85:3,8,18 | 151:21 187:15 | 75:20 |
| **caused** 69:25 | 85:19 87:22 | 256:13 273:5 | **chemistry** |
| 70:10 108:18 | 89:2 90:8 | **changed** 73:6 | 80:15 169:10 |
| **causes** 163:14 | 91:12 96:5 | 107:21 188:23 | 169:18,25 |
| 210:3 | 97:12 100:9 | **changes** 66:4 | 170:7 |
| **causing** 70:13 | 102:12,15 | 130:23 132:8 | **chemists** |
| 121:1 124:18 | 103:16,19 | 256:15 259:17 | 197:24 200:22 |
| 129:10 132:16 | 104:10,13 | **changing** | 201:20,25 |
| 161:14 163:12 | 106:12 122:14 | 256:12 | 202:22 |
| 179:25 | 124:16 128:11 | **characteristics** | **chemotherapy** |
| **cder** 197:24 | 137:18 140:1 | 222:15,24 | 87:15 |
| **cell** 212:2 | 156:17 157:11 | 232:11 | **chief** 73:3,8 |
| **center** 27:4 | 161:12 162:20 | **characterizati...** | 124:23 151:14 |
| 73:5 80:5,11 | 180:2 184:13 | 51:13 | 179:3 200:16 |
| 130:12,13 | 184:19 188:17 | **charge** 38:20 | 233:6 238:20 |
| 258:24,25 | 190:6 212:4 | 38:24 42:23 | 244:7 256:16 |
| **centers** 98:18 | 230:6 233:15 | 119:11 | 257:3 258:16 |
| **certain** 23:11 | 234:18 235:8 | **charged** 12:14 | 258:20 259:4 |
| 28:10 76:8,24 | 235:19 268:6 | **charging** 41:18 | 259:25 268:4 |
| 86:18 111:11 | **certainty** 99:2 | 42:3,7 | **choice** 136:23 |
| 111:11 120:3 | 115:10 266:13 | **chart** 59:19 | 157:15 182:1 |
| 120:25 121:3 | **certified** 1:14 | **chat** 28:23 | 212:15 229:18 |
| 122:13 123:19 | 58:18 62:23 | | 234:14 241:13 |

[choice - clinician]                                                    Page 12

| | | | |
|---|---|---|---|
| 262:20,20 | **circumstances** | 267:9 | **click**  173:3 |
| **choices**  140:2 | 52:16 76:17 | **citing**  161:12 | **clinic**  61:6 |
| 141:21 157:22 | 123:2,18 133:4 | 203:4 219:4 | 88:17 |
| 191:6 206:11 | 188:19 192:6 | **civil**  1:5 | **clinical**  60:12 |
| 212:14 221:3 | 200:17 205:12 | **clarification** | 60:14,23 61:4 |
| 233:8,8 234:6 | 205:21 225:20 | 40:11 | 62:3,6,18 66:18 |
| 235:2,11 | 229:20 244:2 | **clarify**  137:13 | 66:20 71:23 |
| 256:18,19 | 244:13 270:24 | 152:13 | 72:2,3 76:4 |
| 260:13,15,18 | **cirrhosis**  65:23 | **class**  75:23 76:2 | 77:2 86:6 |
| 261:9,19 | 65:24 66:11,13 | 79:21 122:7 | 88:18 110:25 |
| **choose**  206:13 | 66:15,19,23 | 247:3 | 110:25 119:12 |
| 261:2 | 68:10 69:10,23 | **classes**  60:25 | 123:1 125:21 |
| **chooses**  142:12 | 244:16,20 | **classification** | 135:11 141:3 |
| **choosing**  208:1 | 245:25 | 161:10 | 141:10 192:4 |
| 211:12 212:16 | **cirrhotic**  66:3 | **classified**  161:7 | 198:24 200:13 |
| **chose**  205:18 | **citation**  113:16 | **clear**  120:7 | 212:11 217:17 |
| 211:3 | 114:6 | 127:23 133:23 | 221:6 228:10 |
| **chosen**  221:20 | **citations** | 136:17 150:7 | 228:12,20 |
| **christopher** | 113:10,13,15 | 163:17 187:8,9 | 229:19 232:11 |
| 93:19 | 113:17 114:9 | 189:23 201:25 | 242:1 244:4 |
| **chunks**  25:1 | 114:21 | 212:3 249:19 | 252:2,11 |
| **ci**  214:2 | **cite**  161:2 | 262:18,23 | 258:11 266:7 |
| **circulatory** | 168:25 172:12 | 263:8 | **clinically** |
| 209:2 | 197:7 250:24 | **cleared**  10:12 | 110:18 140:18 |
| **circumstance** | **cited**  10:18 | **clearly**  102:4 | 236:7 251:3 |
| 60:23 88:16,21 | 113:10 114:16 | 131:1,6 132:13 | **clinician**  72:7 |
| 184:24 186:15 | 115:11,19 | 141:16 147:10 | 78:9 81:1,1 |
| 190:1 193:9 | 116:4,13,19 | 147:11 148:8 | 85:8,20 87:8 |
| 205:6 208:1 | 142:4 158:4,22 | 148:15 153:3 | 100:21 121:25 |
| 219:11 225:22 | 162:21 172:15 | 162:1 191:6 | 122:3,19,24 |
| 231:11 234:14 | 173:18 174:1 | 193:7 | 123:14 130:13 |
| 242:4,16 | 174:25 175:25 | **clerical**  40:11 | 164:14 178:24 |
| 257:23 | 176:24 178:1 | 40:20 | 179:3 200:6 |
| | 223:24,25 | | 226:3 232:16 |

[clinician - complaint]                                              Page 13

| | | | |
|---|---|---|---|
| 238:17,18 | 233:4 245:15 | **comments** | 245:10 249:23 |
| 248:14 265:22 | 256:5 257:1 | 13:19 119:5 | 255:25 259:13 |
| 266:6 270:20 | **colleague** 148:1 | 152:5 157:20 | 268:5 269:5,10 |
| **clinician's** | **colleagues** 74:4 | **commission** | 270:25 |
| 232:17 | 87:8 98:19 | 273:25 | **comorbid** |
| **clinicians** 73:13 | 124:22 130:10 | **committee** | 210:17 |
| 85:2 86:22 | 132:5 133:12 | 78:24 194:13 | **companies** |
| 98:17 119:14 | 133:24 139:20 | 233:21 260:7 | 54:11 70:22,22 |
| 120:4 122:6,16 | 142:12 146:6 | 261:11,16 | 71:1 257:9 |
| 126:18 127:5 | 191:5 192:5 | **committees** | **company** 71:7 |
| 131:9 132:5,17 | 193:14 234:19 | 194:22 | 71:11,14,19 |
| 133:2 137:4,6 | 235:11 245:16 | **common** 237:1 | 72:11 106:13 |
| 146:5 151:13 | 249:23 256:8 | **commonly** 85:4 | 115:18 116:8 |
| 154:11 155:19 | 257:2,19 | 256:10 | 116:13 119:24 |
| 156:14,19 | 259:16 | **communal** | 119:25 120:1 |
| 164:11 189:6 | **collect** 269:7 | 123:5 | 120:17,17,18 |
| 200:10 202:6 | **com** 51:15 | **communicate** | 121:13 122:11 |
| 202:15 203:1,6 | **come** 67:20 | 77:21 | 123:21,22 |
| 203:21 217:19 | 89:20 187:14 | **communicated** | 139:10,23 |
| 248:14 249:22 | 190:3 193:2 | 74:14 | 269:13 |
| 253:25 | 230:14 231:8 | **communicating** | **company's** |
| **close** 73:9 | 231:13 235:5 | 73:19 74:2 | 22:18 |
| **code** 140:12,22 | 241:22 242:2 | 259:15 | **compared** |
| 251:12 252:8 | 250:1 259:23 | **communication** | 227:5 236:12 |
| 265:21 266:5 | 271:11 | 166:5 186:17 | **comparing** |
| 266:13 | **commencing** | 187:15 | 210:16 215:15 |
| **coell** 25:17 | 1:16 | **communicati...** | **comparison** |
| 26:20 27:16 | **comment** 53:20 | 51:6 223:25 | 215:16 |
| **coincide** 252:12 | 94:25 117:12 | **community** | **compilation** |
| **cold** 187:9 | 117:23 150:6 | 7:23 73:15 | 237:23 238:6 |
| **collaborate** | 152:5 153:5,5 | 74:3 85:9,21 | **complaint** |
| 77:17 | **commenting** | 119:19 123:19 | 19:25 20:4 |
| **collaborating** | 239:13 | 131:10 136:24 | 54:18 |
| 86:7 122:6 | | 239:7 241:21 | |

**complete**  5:21
  5:25 45:24
  51:2,9
**completed**  13:5
  40:10,21
**completely**
  67:22 88:15
  125:1 133:3
  151:17 162:23
  200:5 222:21
**complex**  85:11
**comply**  105:17
  140:22 251:6
**component**
  127:12
**compounds**
  23:12
**comprehensive**
  208:25
**computer**  6:8
  240:1,23
**computerized**
  272:7
**con**  131:5 133:3
  184:20
**concentrating**
  40:13
**concentration**
  163:18 164:8
**concentrations**
  147:4
**concept**  214:5
**conceptually**
  164:2

**concern**  76:9
  119:3 154:21
  155:6 190:4
  192:7 198:25
  221:16
**concerned**
  131:5
**concerning**  7:4
  7:16 244:1
**concerns**  86:6
  110:19 140:19
  251:4
**concise**  110:18
  140:18 251:2
**conclude**
  271:16
**concluded**
  270:16 271:19
**conclusion**
  214:25 215:1
**conclusions**
  113:5 114:2
**condition**  69:11
  69:17 131:11
  144:22 183:18
  185:12 205:7
  205:13 207:13
  212:15 231:22
  240:9 249:21
**conditions**
  69:21 123:18
  185:4 196:5
  207:14 210:17
  211:13,17

  219:8 229:1
  235:2 245:7,8
**conduct**  92:13
  236:20 237:5
  238:10,11
**conducted**  4:4
  4:20 200:22
  201:20 212:7
  212:10 234:15
**conducting**
  234:17
**confer**  263:22
**conferences**
  10:10
**confirm**  45:22
  117:7 168:16
**conflating**
  218:13
**confused**
  134:23 201:25
**confusing**
  32:19 162:11
**confusion**
  136:19
**connection**  4:6
  10:17 57:2
  70:16
**consent**  248:24
**conservative**
  206:5,19
**consider**  78:3
  86:21 188:7
  242:7 244:16
  244:20 245:25

**consideration**
  87:25 241:15
  246:3,5
**considerations**
  217:2 238:4
**considered**
  149:7 224:4
  229:9,24 265:9
  265:15
**considering**
  223:2
**consistent**  66:2
  125:24 126:16
  128:15 131:4
  132:13 140:25
  141:10,13
  148:15 154:9
  155:17 157:2
  157:11 161:13
  162:4 192:9,13
  193:16 251:25
  252:7 265:4
**consistently**
  258:9
**constantly**
  230:3 234:23
**consulted**  70:15
  70:18,21,25
  79:4 269:12
**consulting**  24:8
  71:17
**consumers**  92:6
**contact**  33:3
  102:15

**contacted**  33:1
33:4,6,18 71:13
71:15 72:18
**contacting**
240:3
**contain**  7:17
70:23 148:12
179:24 184:4
184:14 204:22
205:13 210:12
**contained**
70:16 73:1
84:25 113:5
135:9 136:4
182:11,17
183:6 219:6
224:6
**containing**
86:10 136:25
187:25 196:6
215:9
**contains**  127:12
133:5 186:17
188:6 199:3
200:18
**contaminant**
103:13 104:8
104:16 147:3
197:20
**contaminants**
119:21 123:24
155:3
**contaminated**
184:6 192:22

192:24 210:20
210:25 211:2
221:4,12
222:20 248:4
255:11 262:12
**contamination**
100:7 232:23
253:3 255:15
262:7
**content**  35:3
**context**  236:1
**continually**
77:25
**continue**  4:9
68:23 185:22
188:13 192:21
193:3 194:10
196:6 220:10
223:23 269:2
**continued**  29:4
32:4 82:8
106:22 112:7
172:5 176:19
227:23 246:15
257:17 264:7
**continuing**
191:11
**contraindicat...**
133:4
**contrary**  133:3
**control**  91:2,2
174:14 206:14
**controlling**
181:23

**conversation**
29:18 36:19
**conversations**
36:10 41:19,21
**converting**
213:13,19
**conveyed**  127:9
**cooper**  258:16
**cooperman**
73:5 130:12
258:25
**copies**  15:7,10
15:11,14
**copy**  11:14 45:3
**correct**  9:10
10:24 45:25
47:25 58:23
62:2,4,7,9,22
62:25 63:3,7
75:13 92:2
93:18,20,22
95:12 112:17
113:2 114:25
117:6 152:10
159:24 176:25
177:7 185:23
192:25 199:7
231:23 241:16
253:19 254:15
254:19 263:17
266:23
**correctly**
255:12

**correlation**
117:24 220:6
**corresponden...**
16:9 162:1
249:20
**corresponden...**
250:13
**cough**  207:21
208:22 209:21
210:3,5
**counsel**  15:8,14
17:18 35:4,25
36:11 41:25
42:4 46:24
47:3,6 54:3
56:22 57:4
66:24 84:3
108:7,10 109:4
109:17 111:22
177:19 201:1
220:21 242:9
244:22 250:4
253:2 262:2
269:15 272:12
272:16
**counseling**  73:2
**counselor**
81:12 228:1
**counsels**  5:1
**count**  212:2
**couple**  167:19
170:23 225:4
246:9

[course - decisionmaking]                                    Page 16

**course** 16:3
  65:5 87:7
  145:19 154:9
  210:3 234:4,8
  235:24 236:7
  246:25 247:20
  260:12 271:6
**courses** 62:10
  63:4
**court** 1:1,14
  4:17,23 5:3
  31:19 36:22
  82:1,25 84:11
  84:15,16 86:13
  106:16 111:13
  111:18 166:25
  174:6 180:14
  191:18 225:1,7
  244:17 247:14
  272:4
**create** 44:11
  49:14
**created** 28:9
**creates** 140:5
**creating** 146:25
**creation** 134:8
**credentialed**
  117:17
**credentials**
  117:13,23,25
  118:4
**critical** 49:21
  105:14 129:14
  249:13 250:15

**critically**
  252:24
**crossing** 27:4
**ct** 64:17
**current** 84:4
**cut** 263:19
**cutting** 175:11
  179:13
**cv** 1:11 4:19
  60:11

**d**

**d** 1:13 3:1 5:5
  27:4
**d.c.** 2:9
**daily** 77:25
  198:14 226:23
  234:18
**damage** 69:9
**damaging**
  185:13
**danger** 99:10
  100:20 102:4
  102:14 103:22
  105:13 107:11
  119:20 127:4
  128:2 129:15
  133:7,15 137:8
  137:23,24
  138:12 142:2
  143:4,9 162:2
  162:21 164:3
  188:16 210:13
  212:5 262:19

**dangerous**
  100:17 126:19
  137:20 142:17
  147:14 162:7
  184:24 185:6
  185:12 193:19
  249:21
**dangers** 71:14
**daryl** 93:8,10
  93:15
**data** 54:7 65:25
  66:7 227:6
  235:15 236:12
  236:13 237:4
  239:10 243:13
  244:10 261:7
**date** 9:21 27:22
  29:11 39:6,13
  39:16,17,21
  40:4,7,21 96:1
  96:4,13 97:4
  103:15 156:3
  173:24 180:11
  181:11,14
  273:3
**dated** 11:10
  38:14 159:17
  161:5 174:1
**dates** 271:4
**day** 25:1 39:3,4
  77:25 104:19
  109:5 110:22
  129:12 155:25
  156:2 167:6

  180:8 258:12
  258:12 271:23
  273:22
**days** 24:11,17
  24:18 25:8,10
  149:24
**deadly** 69:3
**deal** 46:7 53:9
  108:1 147:22
  191:7
**dealing** 194:22
**dear** 79:15
  103:22 120:10
  128:8 166:3
  194:19
**debra** 19:3
**december**
  27:23
**decide** 50:2
  53:2 193:3
  194:9 235:5
  236:15
**decision** 23:6
  80:20 88:12
  94:16,19
  157:14 186:21
  192:7 193:22
  203:24,25
  204:24 205:23
  226:4 229:6
  234:10 245:9
  270:13
**decisionmaki...**
  22:25 23:7

| | | | |
|---|---|---|---|
| **decisions** 22:25 | **definition** | 43:8 60:22 | 57:21 58:1 |
| 77:21 87:21 | 40:17 90:12 | 61:16 168:1 | 117:1,10 150:8 |
| 88:9,18 95:3 | 91:5,13 | 208:11 222:24 | 150:23 171:7 |
| 110:20 122:1 | **definitively** | 228:19,22 | 244:11 272:14 |
| 133:17 140:20 | 101:17 103:8 | **deposed** 5:16 | **depth** 9:23 10:8 |
| 156:21 163:20 | **defrauded** | 10:25 11:8 | 218:18 |
| 179:21 180:8 | 100:25 | 26:9 27:15 | **derived** 14:21 |
| 192:3 231:14 | **degenerate** | 48:10 49:10,13 | **described** |
| 238:24 243:3,9 | 69:10 | 59:20 149:18 | 88:22 113:9 |
| 251:4 | **degree** 92:3 | **deposition** 1:5 | **describing** |
| **declarations** | 99:2 115:9 | 3:15 4:3,20 | 215:2 |
| 15:4 | 266:12 | 8:18,23 9:1,12 | **description** |
| **decompensat...** | **delete** 16:6 | 9:18 10:12,14 | 3:10 |
| 245:11 | **delivered** 81:19 | 15:18 26:12 | **design** 72:12 |
| **decreases** 182:7 | **demonstrated** | 27:11,19,22 | 243:5 |
| 183:1 | 91:23 | 34:25 35:13 | **designed** |
| **deemed** 7:17 | **department** | 38:21 48:12,14 | 147:15,17 |
| 70:3 | 73:4 233:6,23 | 48:19,21 49:9 | 242:22 |
| **deep** 169:10,17 | 238:21 256:17 | 55:3,7,13,18,22 | **detail** 31:12 |
| 169:24 | 256:18 259:5,7 | 55:23 56:7,11 | 42:21 48:25 |
| **defendant** | **departments** | 57:13,23 58:11 | 56:2 83:7,16,23 |
| 59:15,25 | 61:22 259:11 | 67:17 68:19,23 | 89:7 98:25 |
| **defendants** | **depend** 181:24 | 92:25 93:5,6,10 | 99:8 100:2,6 |
| 2:11 19:12 | 205:5,20 | 93:15 94:14 | 113:21 115:6,8 |
| **defense** 50:16 | 222:25 226:6 | 116:22,23 | 115:14,16 |
| **defer** 97:1 | 230:18 | 149:11,24 | 116:7,15,21 |
| 110:5 | **depended** | 175:5,6 247:1 | 155:11 163:10 |
| **deficiency** | 183:18 | 247:20 252:14 | 194:1 265:13 |
| 69:18 | **dependent** | 254:5 271:18 | **detailed** 11:25 |
| **define** 70:18 | 223:21 232:10 | 272:8 273:3 | 209:25 |
| 104:20 | **depending** | **depositions** | **details** 15:2 |
| **defined** 242:6 | 230:8 | 12:1,5,11 47:20 | 25:19,24 26:4,8 |
| **definitely** 37:13 | **depends** 4:5 | 47:21 48:2,5 | 26:12 30:21 |
| | 25:2 42:11 | 49:2,4,16 55:16 | 31:3 35:21 |

[details - discussing]                                                Page 18

| | | | |
|---|---|---|---|
| 36:2,12 80:18 | 65:10 66:16 | 235:19 240:4 | 141:9 166:11 |
| 82:21 84:9 | **diagnosing** | 240:14 256:5 | **disagree** 94:18 |
| 90:10 94:10,23 | 64:2,5 65:22 | 256:24 257:18 | 95:2 135:13 |
| 96:17 97:9 | 66:19 | 257:20 259:6 | 152:22 153:9 |
| 100:11 105:25 | **diagnosis** 64:7 | 259:10 260:9 | 159:11 160:23 |
| 113:18 114:20 | 64:12,15,18 | 260:13,17,18 | 161:19 167:10 |
| 154:20,23,24 | 65:24 66:3,5 | 261:4,19 263:9 | 169:5,23 170:2 |
| 155:4,7 156:4 | **diagnostic** 66:6 | 268:18,22 | 170:3,10 |
| 215:20 218:17 | 236:4 | 269:3,8 270:9 | 177:11 178:4 |
| 219:3 220:4 | **diagnostician** | **differentiating** | 195:2 196:10 |
| 240:3 | 63:23 | 44:2 | 197:14,17 |
| **detect** 168:2 | **diary** 210:1 | **differently** | 198:7,21,23 |
| **detection** 77:2 | **diet** 206:8 | 247:25 261:25 | **disciplined** |
| **determination** | **differ** 229:9 | **difficult** 81:8 | 60:3,7 |
| 228:8 | 231:25 | 87:20 88:9,12 | **disciplines** |
| **determining** | **difference** | 88:17 107:19 | 62:24 260:19 |
| 249:8 | 82:13 162:9,24 | 117:23 182:16 | 261:5 |
| **develop** 69:9 | **different** 7:2 | 183:4 191:8 | **disclose** 207:4 |
| 168:6 207:20 | 10:15 57:8 | 193:8 205:9 | 254:15 |
| 209:21 210:4 | 60:15,21,21 | 210:10 215:24 | **discovered** |
| **developed** | 69:7 77:17 | **dig** 176:6,9,11 | 100:1 166:2,9 |
| 18:13 | 88:15 89:4 | **dimethylamine** | 166:16 188:21 |
| **developing** | 103:1 117:15 | 8:16 | 222:12 223:12 |
| 69:23 119:22 | 117:22 131:18 | **diovan** 143:11 | 224:15 268:20 |
| 208:22 212:21 | 147:25 150:19 | 143:12,16,17 | **discovery** |
| 246:1 | 162:17,18 | 143:23,24 | 164:25 |
| **development** | 164:4 166:7 | 144:4,7,19 | **discuss** 6:11 |
| 68:10 245:12 | 167:8 180:5 | 178:15,18 | 178:7 195:21 |
| **deviations** | 206:10 209:24 | 181:8 | 197:10 |
| 18:11 | 218:15 223:19 | **direct** 103:22 | **discussed** 159:8 |
| **diabetic** 111:10 | 225:19 229:10 | 159:24 | 178:5 195:19 |
| **diagnose** 66:13 | 229:23 230:11 | **directly** 70:3 | 204:9 |
| **diagnosed** | 231:13 233:23 | 101:20,25 | **discussing** |
| 63:19 64:13 | 234:24 235:9 | 102:8,9 103:11 | 172:11 193:21 |

[discussion - drug]                                                    Page 19

| | | | |
|---|---|---|---|
| **discussion** 10:3 | 13:2,20 14:14 | 172:14 173:4 | **downloading** |
| 29:2 32:2 | 17:11 26:25 | 174:13,23 | 37:24 |
| 106:20 176:17 | 36:25 37:6 | 175:7,24 | **dr** 6:24 14:7 |
| 209:12 264:5 | 43:7 45:2 | 176:24 177:2 | 17:15 32:8 |
| **discussions** | 51:21 54:5 | 194:2 195:18 | 37:21 38:7 |
| 34:19 35:3,4,10 | 57:9 58:15 | 196:17 204:10 | 48:12 50:19,21 |
| 35:12,22,25 | 67:4 68:25 | **documented** | 50:23 55:5,10 |
| **disease** 69:16 | 75:17 79:16 | 131:2 | 57:12 58:14 |
| 204:25 260:24 | 103:22 111:15 | **documents** | 67:5,19,24 |
| **diseases** 63:13 | 112:13 128:8 | 10:14 20:11 | 82:13 86:15 |
| **dismissed** | 130:6 136:2 | 34:24 40:23 | 107:1 108:13 |
| 59:20 | 143:19 158:15 | 41:3 46:2,3,17 | 109:20 112:24 |
| **disorders** | 164:2 166:4 | 47:14 51:10,18 | 112:25,25 |
| 138:22 | 172:10 174:20 | 51:24 52:25 | 114:9 115:11 |
| **displace** 156:9 | 175:8 176:5 | 53:5,7 54:11,17 | 115:15 117:14 |
| **dispose** 13:5 | 177:20 179:11 | 98:10 115:19 | 118:3 119:4,4 |
| **disposed** 13:8 | 182:19,25 | 116:1,9,13,16 | 143:6 147:9 |
| **disseminate** | 189:17 194:20 | 116:18 144:7 | 163:9 168:24 |
| 104:23 105:7 | 201:16 204:21 | 144:19,21 | 169:20 170:19 |
| 269:6 | 237:3 264:13 | 175:5 193:21 | 173:8,9 180:21 |
| **disseminated** | **doctor's** 73:17 | 194:4,5,6,14,25 | 188:5 216:13 |
| 128:5 | **doctors** 74:5 | **doing** 25:8 | 246:22 253:8 |
| **disseminates** | 120:10 224:17 | 67:11 90:9 | 253:19 266:19 |
| 102:3 | 249:8 | 109:4 175:10 | 266:23 |
| **distributed** | **document** 1:7 | 190:17,25 | **draft** 38:22 |
| 153:17 167:7 | 26:23 38:9 | 256:1 | **drafted** 47:12 |
| **district** 1:1,1 | 47:20 52:5,12 | **door** 10:5 | 66:20 79:1,15 |
| 4:17,18 | 56:14,17,20,25 | **dose** 183:18 | **drafting** 40:24 |
| **disturbances** | 98:13,24 99:20 | 198:13 200:24 | 41:4 79:18 |
| 69:15 209:2 | 99:25 100:6 | 201:22 204:16 | **drop** 208:17 |
| **division** 80:16 | 104:20 132:11 | 208:12 211:15 | **drug** 7:17,22 |
| **dizzy** 208:17 | 161:16,17 | 225:14 | 7:24 46:21 |
| **doctor** 5:12 | 162:1 167:9 | **dosing** 211:23 | 70:25 71:7,13 |
| 8:17 10:16 | 168:23 171:10 | | 73:7,16 74:5 |

**[drug - eluding]**                                                   Page 20

| | | | |
|---|---|---|---|
| 78:24 79:5 | 186:16 193:19 | **earliest** 158:4 | 231:2,10 243:2 |
| 80:6,20 86:23 | 220:5 222:2 | **early** 13:10 | 261:21 |
| 87:2,10,12,15 | 232:5 243:17 | 71:20 181:15 | **effectively** |
| 88:21 89:1,12 | 245:20 249:15 | 216:16 | 133:8 181:20 |
| 89:14,21 90:6 | 251:5 255:2 | **easier** 44:21 | **effectiveness** |
| 100:18,19 | 256:9,11 258:8 | **eat** 81:18 | 222:17 |
| 103:21 106:10 | 260:14 | **eating** 227:10 | **effects** 77:15 |
| 106:13 119:7 | **drug's** 79:2 | **educate** 153:17 | 88:8,19 89:2 |
| 119:17 120:2 | 81:4 | 269:22 270:7 | 188:17 208:15 |
| 120:12,19 | **drugs** 22:6 | **educated** | 209:10 211:13 |
| 121:2,4,5,14,19 | 85:22 86:8 | 184:25 258:1 | **efficacious** 91:1 |
| 122:7,7,10,12 | 87:12 88:18 | 270:12 271:8 | 91:16 230:15 |
| 123:1,2,11,19 | 110:21 120:25 | **educating** | **efficacy** 178:17 |
| 123:20,23 | 123:4,6,8,15 | 200:14 260:1 | 178:19,20 |
| 124:1,11,19 | 125:22 132:4 | **education** | 182:7 183:1 |
| 125:23 126:25 | 134:2,3 153:19 | 229:4 269:25 | **eight** 192:17,18 |
| 129:8 130:14 | 178:25 179:16 | **educational** | **eisenhower** 2:4 |
| 130:15 133:5 | 189:7 199:12 | 139:22 | **either** 62:23 |
| 133:13 134:1 | 202:2 219:9 | **educator** | 108:22 115:11 |
| 136:20,22 | 235:19 259:19 | 124:22 151:15 | 115:17 178:7 |
| 137:25 138:9 | 259:23 260:15 | 257:2 | 187:14 242:24 |
| 139:3,22 | 260:16 261:15 | **effect** 87:11 | 261:13 |
| 140:21 141:23 | 271:1,3 | 88:14,23 89:1,4 | **elaborate** |
| 142:13,14 | **duly** 5:6 272:9 | 90:22 91:4,16 | 147:10 |
| 145:21 146:12 | **duty** 104:2,22 | 91:23 123:25 | **electrolytes** |
| 146:15,25 | 105:6 121:8 | 127:16 136:10 | 209:4 |
| 147:21,23,24 | 122:20 138:1 | 185:13 243:8 | **eliminate** 222:1 |
| 148:2,7,7,8 | | 247:4 253:5 | **ellis** 2:7 |
| 150:11 153:14 | **e** | **effective** 87:1 | **eluded** 128:9 |
| 155:20,23 | | 87:24 179:24 | 131:2 132:14 |
| 166:14,19 | **e** 1:13,13 2:1,1 | 181:22 182:1,2 | 153:22 154:4 |
| 169:11,18,25 | 3:1,9 12:9 16:6 | 183:8,16 206:7 | 189:9 |
| 170:8 178:17 | 16:8,9,10,14,16 | 206:8,23 | **eluding** 220:6 |
| 180:12 181:11 | 16:20 17:1 | 207:25 223:18 | |
| | 272:1,1 | | |

[emergency - exactly]    Page 21

| | | | |
|---|---|---|---|
| **emergency** | 65:9 66:14,17 | 199:12 215:4 | **evaluation** |
| 260:12 | 85:11,11 | 226:9,11 | 66:10 71:10 |
| **employ** 202:25 | 171:24 | 230:22 231:5 | 80:6,11 209:1 |
| **employed** | **entirety** 52:11 | 239:21 241:9 | 242:18 243:14 |
| 203:5,21 | **entities** 7:2,6 | 245:18 257:22 | **events** 46:15,18 |
| 272:13,16 | **entitled** 1:14 | **esq** 2:3,4,8,8,14 | 46:22 244:10 |
| **employee** | **entity** 152:15 | **essential** | 267:12 268:24 |
| 272:15 | **enzyme** 213:14 | 169:13 170:5 | **everybody** |
| **employer** 60:9 | 213:19 | **essentially** | 227:9 |
| 73:20,22 | **epidemiologi...** | 46:17 191:14 | **everyday** 86:9 |
| **employment** | 142:21 199:17 | 254:8 259:23 | **everyone's** |
| 76:20 | 215:18 216:5 | 262:20 | 162:4 |
| **employs** 202:5 | **epidemiologist** | **established** | **evidence** 46:11 |
| **ended** 263:14 | 75:10 | 64:7 201:3 | 118:25 215:18 |
| **endorse** 190:7 | **epidemiology** | 225:19 | 216:6 |
| **endorsement** | 214:19 | **establishing** | **exact** 8:11,12 |
| 189:4 190:15 | **epstein** 2:8 17:9 | 248:21 | 11:6,13,21 |
| 192:24 | 45:1 149:2 | **estate** 26:19 | 29:11 31:3 |
| **endorsing** | **equal** 61:18 | **estimate** 25:11 | 51:25 52:13 |
| 190:7 | **equally** 239:4 | 30:13 31:17 | 75:8 81:9 96:4 |
| **england** 235:21 | 242:15 | 35:20 42:22 | 96:16 98:22 |
| 236:25 | **equals** 214:2 | 63:25 198:3,8 | 99:13,16 102:7 |
| **enormous** | **equivalent** | 198:11,22 | 103:14,17 |
| 114:12 | 178:14,18,21 | 199:6 203:2 | 113:21 125:8 |
| **ensure** 115:25 | 179:7,16 | 214:18 | 132:12 147:8 |
| 119:15 120:14 | **equivalents** | **estimates** | 156:3,4,24 |
| 122:17 132:7 | 91:21 | 198:24 | 166:21 167:6 |
| 132:15,22 | **errata** 273:1 | **et** 1:8,9 4:15,16 | 181:11,14 |
| **ensuring** 121:3 | **especially** | 212:24 | 215:23 232:4 |
| 121:21 128:14 | 87:14 106:10 | **evaluated** | **exacting** 91:13 |
| 130:9 | 124:24 126:3 | 197:25 244:5 | **exactly** 15:20 |
| **entail** 205:1,24 | 138:10 139:8 | **evaluating** | 18:3 31:18 |
| **entire** 39:3,4 | 139:24 142:1 | 247:10,25 | 36:1,7 49:13 |
| 63:20,24 64:8 | 185:8 197:20 | 248:20 | 53:8 61:11 |

84:23 90:10
95:15 96:13
97:4,7,10 100:6
100:6 104:20
107:16 113:20
113:21,25
114:20 115:7
117:24,25
126:11,12
131:3 132:10
133:11,20
134:7 140:8
141:4 154:22
155:5,25 156:4
156:6 163:14
163:17,18
186:22 190:16
190:23 194:2
194:24 203:23
204:2 205:7
219:20 227:7
239:2,14
251:20 252:16
264:22 265:2,5
266:11,16
268:23
**exam**  58:22,25
**examination**
  3:4,5 5:10
  209:1 246:20
  264:11
**examine**  217:8
**examining**
  236:9,9

**example**  25:3
  114:9 229:8
  238:2 256:10
  261:2
**excuse**  35:16
  71:6 119:7
  142:15 162:20
  179:6 182:13
**executive**
  233:21
**exercise**  206:9
**exertion**  91:3
**exerts**  90:22
**exhausted**
  170:19
**exhibit**  3:11,12
  3:13,14,15,17
  3:19,20 10:21
  17:4,6 26:14,17
  28:15 37:5,19
  44:18,25 49:22
  56:5,8 149:10
  158:10,12
  159:16,20
  167:17 183:25
  184:1 195:7,8,9
  196:20 212:25
  213:2
**exhibits**  7:14
  28:17 48:13,14
  48:18,23 49:1,3
  49:11,14,15
  112:18 194:7
  213:5

**exist**  16:11
**exists**  54:15
**expect**  140:25
  209:9
**expectation**
  110:24 142:11
  178:16 179:6
  241:24 242:14
**expectations**
  141:2 156:8
  252:1,12
**expected**
  139:15 239:9
  241:3 242:17
**expects**  110:24
**experience**
  46:19 61:7
  86:4 98:15,18
  121:25 122:3,8
  122:18,25
  123:4 124:21
  125:21 129:6
  130:10 132:3
  132:22 133:11
  139:20 140:8
  147:19,24
  148:13 178:24
  179:2 192:5
  193:5 200:12
  212:11 221:7,9
  230:6,18
  232:12,18,25
  233:9,13,15
  235:9 237:23

238:7,16 239:6
244:3,9,25
255:8,23 256:4
256:4,11,24
257:7 269:2
**experienced**
  114:10
**expert**  6:12
  10:18 11:11,16
  12:13,22 13:13
  14:11,21 15:3,9
  16:2,7,17 20:3
  20:16 21:3
  22:16,20 23:12
  23:15 24:5,19
  25:9 26:2,3
  29:10,25 32:12
  34:2,7,11,15,20
  35:6,24 36:9
  43:6,17,20 44:6
  44:9,14 49:23
  50:18 55:14
  67:4 70:20
  72:20 78:4,8,12
  79:9,12 92:1,5
  92:8,18 97:16
  100:4 108:14
  112:13 114:11
  116:11 118:1
  145:7 192:16
  200:22 201:20
  216:12 248:5
  265:10 267:8
  270:19

**expertise** 75:12
  118:13,23
  119:10,15,23
  120:16 125:20
  129:6 139:20
  141:18 148:6
  163:19 169:19
  169:20 179:20
  192:2 199:14
  199:17 233:1
  238:15,22
  241:20 243:1,8
  243:10 244:3
  247:10,18
**experts** 50:16
  77:14 86:7
  97:2,5,6,24
  98:7 99:17
  105:23 107:17
  108:1 110:5
  112:15 114:2
  123:6 129:7
  147:9
**expires** 273:25
**explaining**
  267:11
**explains** 237:5
  237:11
**exposed** 76:13
  76:18 85:24
  138:12 226:23
  227:3,8
**exposure** 76:16
  76:21 199:7

  204:8 245:20
**exposures**
  23:12 76:12
**expressed**
  35:13 100:16
**extensive** 46:4
  93:4 114:8,14
**extremely**
  197:4,16
**eyes** 170:20

**f**

**f** 272:1
**face** 9:23,23
  179:14
**facilities** 21:12
**fact** 55:4 99:21
  121:5 137:14
  162:15 216:10
  223:21 248:7
  249:7 251:19
**factor** 69:5
  215:2 230:12
  248:10
**factored** 238:1
**factors** 66:22
  67:6 68:4,7,10
  69:23 94:4
  228:13,25
  230:11 245:13
**facts** 267:5
**factual** 54:7
**factually**
  218:16

**faculty** 179:4
**failed** 58:22
  59:2 105:17
  142:22
**failure** 22:18
  87:17 254:14
**fair** 175:4
**fairly** 252:21
**faithful** 116:12
**falls** 121:21
**familiar** 25:15
  30:9 55:11
  80:4,9,14 89:15
  90:3,5 99:11
  108:8 138:14
  138:16 143:11
  175:7 184:2
  214:5,8,12
  239:22,23
  243:18 264:20
  265:25 266:9
**familiarize**
  173:21
**family** 69:19
  93:23
**far** 123:7 183:6
  212:3 223:13
**fatty** 69:12
**fault** 106:2
**fda** 3:17,19
  7:20 18:19
  22:2 23:2,8
  50:25 51:7,17
  72:25 77:19

  78:16,23 79:13
  79:19,22 80:15
  80:18,20 84:25
  85:12 86:18
  89:24 90:6
  91:5,12 96:3,16
  97:14 98:17
  99:9 100:9,13
  101:1,8,15,15
  102:3,6,16,21
  103:6,18
  104:10,24
  105:8 107:22
  110:8,14,23
  111:1 120:7
  122:15 125:2,9
  125:10 128:1,2
  128:11,22,24
  129:2,13,20
  130:19 131:1,8
  131:15,21
  132:1,10
  133:17,23
  137:5 140:4
  146:6 153:18
  154:6 155:13
  155:25 156:6
  157:7,12,25
  158:11 159:1,5
  159:17,19
  160:4,16,23
  161:19 166:2,9
  166:10,11
  167:10,25

168:4,9,24
169:23 170:3
172:11,15,16
173:17,25
176:8 177:2,15
177:25 182:6
186:18 189:10
190:7,14,25
191:6,25 192:8
193:2,5,20
194:4,9,13,25
195:6,16 196:3
196:17 197:3
197:14 198:2,9
198:11 199:5
200:21 201:19
202:5,15,25
203:3,5,16,21
204:5,18 216:9
217:24 223:24
226:7 235:19
240:6 249:20
250:6,14
251:18 253:24
254:1,10 256:1
262:24,25
263:13 269:8
270:2
**fda's** 110:1
125:24 128:15
132:14 148:15
157:20 159:11
169:5 177:11
178:4 191:11

192:20 195:2
196:10 198:21
204:8 219:4
262:12,15
263:2 269:19
**fdca** 78:13
**federal** 140:13
140:15,22
141:12,17
251:13 252:8
264:21 265:22
266:5,14
**fee** 42:23
**feel** 13:20,21
158:18 175:6
248:4
**feeling** 208:19
**fellowship** 62:8
63:1
**field** 86:7 99:17
118:2
**fifty** 65:6
**figure** 174:18
246:9
**file** 89:12,14,21
**filed** 4:16
**files** 90:7
**filing** 3:12
26:16 27:7,10
**filled** 132:1
**final** 3:14 44:24
**finally** 268:25
**financially**
272:17

**find** 174:13
207:23
**finding** 207:23
**findings** 66:2
113:5
**fine** 38:9
109:25
**finish** 81:14
130:5 141:7,9
171:10 188:3
**finished** 230:2
**firm** 30:6,9,12
30:19,24,25
31:4,15 32:22
32:22 33:2,5,8
171:6
**first** 17:4,21
24:4 26:19
29:8 30:18,22
31:9,13 32:11
33:2,17 34:5,12
36:18 39:6
58:6,21 74:17
74:22 75:2,6
76:1 95:17,20
134:24 158:25
180:9 181:4
195:6,23 197:2
207:1 210:5
213:17 229:9
229:24 250:24
264:17 272:8
**fist** 144:15

**fits** 232:14
**five** 24:13,17
25:10 30:14,17
57:7 81:24
112:19 149:10
158:9 167:20
171:18,19
176:23 225:5
**fixed** 31:21
**floor** 2:4
**flying** 67:14
**focus** 68:20
105:24 218:19
219:4
**focused** 254:14
**focusing** 9:5
**follow** 61:5
246:16,23
**followed** 250:5
253:23
**follows** 5:8 29:4
32:4 82:9
106:22 112:8
172:6 176:19
227:24 264:7
**food** 76:8
**forbid** 84:5
87:18 102:8
**forbids** 84:19
**forego** 204:24
**foregoing** 272:6
**forenoon** 1:16
**forgive** 8:13
159:3 172:17

[forgoing - gandy]                                             Page 25

| | | | |
|---|---|---|---|
| **forgoing** 186:1 | **formation** | 153:20,25 | **front** 27:1 45:7 |
| 186:9 189:14 | 253:13 266:24 | 154:5,8,19,25 | 45:18 148:22 |
| **forgot** 109:22 | **formed** 151:6 | 155:5,9 163:22 | 183:22 250:19 |
| **form** 7:5 14:1,2 | **forming** 46:11 | 184:4 267:12 | **froze** 8:8 |
| 32:17 47:16 | 57:23 116:24 | **foundation** | **frozen** 106:16 |
| 53:16 54:1 | 141:1 194:5 | 57:18 90:17 | 180:18,20 |
| 57:17 83:11 | 220:13 243:23 | 136:15 143:19 | 182:14 |
| 88:5 90:16 | 250:5,7,10 | 144:9 188:2,10 | **full** 5:13 48:2 |
| 91:24 105:5 | 252:1 | 189:16 193:25 | 57:13 150:2,14 |
| 108:24 110:2 | **forms** 87:12 | 194:17 220:1 | 150:20 172:24 |
| 110:10 120:9 | 111:9 230:5 | **four** 11:11 | 173:2 175:25 |
| 120:10 131:25 | 234:22 256:20 | 16:17,20,24 | 196:15 197:2 |
| 139:15 146:9 | **formulary** 73:6 | 17:2 24:13,17 | 250:24 |
| 151:23 152:12 | 74:8 86:5 | 27:25 28:4 | **fully** 99:9,9 |
| 155:14 160:7 | 123:16 130:11 | 30:14,15 47:21 | 140:24 160:12 |
| 160:13 161:1 | 147:25 194:22 | 110:14 134:10 | 167:12 251:25 |
| 161:21 164:4 | 233:8 234:2 | 140:12 159:25 | **function** 123:12 |
| 165:14 167:12 | 256:18 260:6,8 | 160:1 198:14 | 148:3,3 222:17 |
| 168:19 184:12 | 261:6,11 | 219:8 228:4 | **functioning** |
| 186:16 189:5 | **formulate** | 250:21,23 | 238:17 241:21 |
| 189:25 199:18 | 52:18 53:21,24 | **framework** | **furphy** 19:3 |
| 201:9 217:11 | 239:11 | 22:6 24:1 | 20:8,13 |
| 243:13 249:10 | **formulated** | **frankly** 240:22 | **further** 9:4 |
| 253:16 256:2 | 54:8 250:17 | **fraud** 101:13 | 125:9 150:4 |
| 258:13 262:17 | **formulating** | **free** 13:20,21 | 169:8 215:25 |
| 270:22 | 40:19 51:7 | 141:24 146:19 | 216:1 217:15 |
| **formal** 141:17 | 53:10 | 147:14 | 232:19 272:11 |
| **formally** 7:20 | **formulations** | **freeman** 2:3 | 272:14 |
| 28:12 39:16 | 221:19 | **freezing** 182:22 | |
| 42:16 96:15 | **forums** 104:11 | **friendly** 168:21 | **g** |
| 98:17 100:10 | **forwarded** 7:13 | 171:21 | **gain** 119:16 |
| 119:8 137:5 | 8:21 96:3 | **frightened** | **gamble** 17:22 |
| 156:7 264:23 | **found** 29:23 | 208:18 | **gandy** 27:3,4 |
| 265:6 | 143:16,23 | | |

**gaston** 1:8 4:15

**gastroenterol...**
62:21

**gastroenterol...**
63:2

**gather** 72:10
77:20,25 236:2
241:4,4 257:17
269:23 270:12

**gathered** 54:7
78:9 204:3

**gathering**
40:18 103:20
256:7,8 259:15

**general** 90:19
91:20 108:5,9
108:14 145:6
210:18,23
224:7 245:15
245:23

**generally**
214:18

**generals** 216:23

**generated** 58:7

**generic** 7:4
21:23 22:6,22
73:1 136:20
178:13 179:1
179:15,22
181:7 186:16
240:22

**generics** 179:5
179:17,21

**georgia** 2:16

**germane** 241:5

**getting** 28:17
71:1 180:21
235:14

**gi** 245:16 246:4

**give** 7:14 10:4
44:17 87:10
96:23 97:25
109:18 126:10
129:25 174:5
205:16 209:25
225:8 255:19

**given** 12:5
85:15 131:14
137:24 221:13
231:22 256:22

**gives** 267:8

**giving** 5:21,25
27:10 109:2,15
109:22 223:2
244:23

**glad** 171:25

**go** 4:10 12:2
14:14,15 16:9
16:15,20 17:1,3
19:1 27:18
28:21,24 31:23
37:6,25 38:3,8
45:10 46:10
50:25 52:19
68:15 82:1,3,5
103:18 106:17
106:18 111:23

112:3 113:14
114:13 116:16
127:22 149:9
159:25 160:3
167:20,24
171:1,3 172:1
173:22 174:17
175:15,19,21
176:4,10,13,23
192:16 196:25
197:23 203:15
206:13 208:23
215:1 220:22
225:10 228:1,3
238:23 243:5
257:6 263:23
264:1 265:21
265:23 267:13
267:13,15
269:18 270:1

**god** 87:17

**goes** 14:22 31:1
68:23 87:14
102:5 110:21
143:5 163:12
232:4

**going** 13:18
14:15 15:22
17:10 28:25
29:5 31:22,25
32:5 33:20
38:5 47:11,12
57:7 66:25
67:17,20,23

68:18,20,22
69:4 81:14,17
82:10 85:18
88:23 106:14
106:23 107:17
107:18 108:13
109:17 111:14
112:4,10
121:20 125:24
126:9 127:20
129:25 130:5
135:2,18 138:6
138:7 144:1
145:2,22 147:9
149:5 158:9
167:9 171:9
172:2,7 176:2,2
176:7,16,20
180:16 181:6
181:12 182:23
183:25 187:21
205:6 206:17
213:4 223:17
223:18 225:10
227:20 230:11
231:10,21
239:21,22
245:2 246:12
246:18 247:8
247:24 255:1,2
259:17 261:2
263:22 264:3,8
267:7 270:6

[good - hereditary]                                                    Page 27

| | | | |
|---|---|---|---|
| **good**  37:22 | **guided**  64:17 | 144:16 150:5 | 115:11 117:14 |
| 81:13 156:18 | 228:9 | 152:4 183:8 | 119:4 143:6 |
| 170:12 171:22 | **guidelines** | 186:12 204:13 | 147:9 163:9 |
| 225:2 | 66:19,21 | 205:4 210:16 | 169:20 216:13 |
| **gotta**  203:10 | **guiding**  157:7 | 219:19 220:9 | 253:19 266:19 |
| **governing**  24:1 | **guy**  31:20 | **harkins**  2:14 | 266:23 |
| **government** | **guys**  37:9,12 | **harkinss**  2:16 | **hecht's**  253:8 |
| 131:25 133:24 | 111:19 | **harm**  87:17 | **held**  29:2 32:2 |
| 156:18 269:13 | **gynecology** | 192:9 | 106:20 176:17 |
| **governs**  132:20 | 259:8 | **harmful**  88:24 | 242:20 264:5 |
| **great**  46:7 53:9 | | **hazards**  140:24 | **hello**  180:19 |
| 147:22 200:12 | **h** | 141:25 251:8 | **help**  217:19 |
| 241:8 | | 251:17,23 | **helping**  157:14 |
| **greater**  215:2 | **h**  3:9 5:5,14 | **hcc**  244:21 | **helps**  171:21 |
| 227:4 | 148:9 | 246:1 | **hemachromat...** |
| **greatly**  237:15 | **half**  9:16 | **head**  12:8 | 69:16 |
| **greenberg**  2:14 | **halls**  60:25 | 91:14 | **hematologist** |
| **griffith**  2:4 | **hands**  61:7 | **health**  23:2,8 | 62:20 |
| **groups**  77:17 | **hang**  130:4 | 77:2 78:21 | **hematologists** |
| **gtlaw.com**  2:16 | **happen**  69:4 | 104:11 157:15 | 65:20 |
| **guess**  15:17 | 208:22 | 161:6 196:2 | **hematology** |
| 16:12 45:14 | **happened** | **healthcare**  2:12 | 63:1,6 |
| 101:12 107:4 | 166:16 204:1 | 6:21 | **hemorrhage** |
| 126:9 133:19 | **happening** | **hear**  6:4 8:8 | 89:11 |
| 134:24 144:1 | 263:15 | 36:25 86:16 | **hepatitis**  69:8,8 |
| 145:2,9 148:20 | **harass**  201:10 | 93:14 101:22 | 245:6,14 |
| 176:6,10 181:1 | **harassing**  14:4 | 134:16 144:11 | **hepatocellular** |
| 195:16 229:21 | 109:10 201:11 | 263:25 | 21:15 23:16 |
| 265:24 | **harassment** | **heard**  4:7 75:21 | 63:19,25 64:13 |
| **guidance**  79:19 | 68:18 | **hearing**  10:5 | 65:1,11,13 94:5 |
| 85:1 86:18 | **hard**  43:25 | 144:14 | **hepatology** |
| **guide**  78:1 | 94:24 95:5 | **heart**  185:14,17 | 63:9 |
| 134:2,2 217:19 | 97:23 105:12 | **hecht**  112:24 | **hereditary** |
| 226:7 260:22 | 113:24 133:20 | 112:25 114:9 | 69:15 |
| | 143:21 144:13 | | |

**high**  94:9
  181:20 182:3,8
  183:2,13 185:8
  185:9 205:22
  206:3,11,12
  235:6 244:16
  244:20 246:1,2
**higher**  187:3
  215:8 218:6
**highest**  198:12
  199:6 200:23
  201:21 204:16
**hill**  75:14
**hip**  145:14
**historical**  65:25
  66:7
**history**  228:12
  228:23 232:12
**hold**  112:17
  129:13 233:2
**home**  24:16
**honestly**  135:20
  165:11
**hooks**  93:21
**hopefully**  225:5
**hospital**  24:15
  44:1 59:18
  60:8,22 61:6,11
  64:9 73:23,25
  74:12 85:9
  86:5 98:20
  119:13 130:11
  139:21 148:1
  179:4 191:5

194:21 200:14
  231:7 233:4,7
  233:22 236:9
  238:20 240:8
  241:9,22 244:6
  255:24 256:7
  256:19 257:21
  258:18,21
  259:11,17
  260:8 261:6
  268:20,21
**hospital's**
  123:16
**hospitalized**
  18:14 233:5
**hospitals**  98:18
  224:17
**hour**  9:16 36:5
  36:15,17 38:17
  42:18 81:14,20
  171:5,6
**hourly**  38:17
  38:24
**hours**  36:10
  39:22 40:13
  269:16
**huahai**  1:8 2:11
  2:11 4:16 6:19
  6:21 273:2
**huh**  15:20
  17:13 168:8
**human**  85:16
  88:4 161:8
  162:2,3,22

163:16 199:4
  200:4,18,19
  211:10 212:6
  216:11 219:5
  221:18 222:3
  224:2 226:7
  254:18
**humans**  142:21
  216:20 223:22
  224:8
**hundred**  11:3
**hundreds**
  255:23
**hydrocarbon**
  139:7
**hypertension**
  181:18,23
  182:8 193:7
  206:24 237:16
  239:18 240:20
**hypertensive**
  142:15 221:2,2
  249:18

|       i       |
|---|

**i.e.**  179:25
**ich**  89:8,10
**idea**  75:4
  105:13 216:23
  225:9
**identification**
  17:6 26:17
  37:19 44:25
  56:9 83:19

158:13 159:20
  213:3
**identified**  137:6
  177:16,24
  215:8 218:8
  249:21 253:20
**identify**  97:10
  99:19 253:13
  253:22 255:2
**identifying**
  46:10
**ignore**  67:8
  69:2
**imagine**  91:22
**immediate**
  185:15 249:16
**immediately**
  89:20 104:9
  127:25 129:11
  129:17 131:10
  132:6,7,18
  133:14 184:16
  249:22 271:1
**impact**  92:14
**impacted**
  257:25
**impacts**  92:6,9
**imperative**
  123:21 148:14
**importance**
  156:16 268:17
**important**
  53:15,20
  106:10 130:8

[important - information]                                                          Page 29

| | | | |
|---|---|---|---|
| 130:25 150:1 | **inaudible** | **indicated** 123:2 | 78:10 96:2,19 |
| 162:14 188:25 | 109:24 | **indications** | 96:22 97:8,11 |
| 220:15 243:12 | **include** 42:13 | 179:22 223:8 | 99:14,25 101:5 |
| 250:16 252:25 | 106:8 110:17 | **individual** 52:4 | 101:6,11,15,17 |
| **importantly** | 115:8 140:18 | 222:25 228:11 | 102:3,20 103:5 |
| 260:4 | 160:20 221:5 | 228:16 256:4 | 103:7,21 |
| **improperly** | 251:2 261:11 | 257:1 | 104:23 105:7 |
| 107:11 | **included** 20:5 | **individuals** | 105:15 110:7 |
| **impurities** | 41:16 43:13 | 48:10 74:16,22 | 110:15 113:18 |
| 23:25 73:2 | 48:14,17,20 | **induce** 76:24 | 113:22 114:12 |
| 83:11 84:5,19 | 49:8 52:2 | **industries** 2:17 | 115:21,23 |
| 86:2 110:2 | 115:22,23,24 | **industry** 85:1 | 119:24 120:17 |
| 123:10 124:3 | 117:4 151:13 | 85:11 151:4,11 | 122:16 125:16 |
| 124:10,12,16 | 230:2 | 151:22 152:7,9 | 127:24 128:1,5 |
| 125:3 138:2,10 | **including** 125:4 | 152:24 160:12 | 128:10,12 |
| 138:10 139:4 | 184:5 | 160:25 161:21 | 129:14 130:21 |
| 147:7,16 | **income** 14:20 | 167:11 | 131:6,8 132:15 |
| 155:14 168:5 | **incorporate** | **infection** 88:10 | 132:18,24 |
| 179:17,25 | 243:15 270:13 | 90:24 261:1 | 133:1 134:5,11 |
| 184:5 | **incorporating** | **infectious** | 137:3,22 144:3 |
| **impurity** 8:12 | 234:8 265:7,7 | 260:23 | 148:5 150:5,7 |
| 82:14,19,20 | **increase** 185:13 | **inflammatory** | 156:5 157:13 |
| 83:18 161:7 | **increased** | 88:11 | 161:11 163:15 |
| 163:1 164:13 | 185:17 214:1 | **inform** 89:23 | 167:6 188:21 |
| 168:2,11 169:2 | 214:23 216:15 | 104:2 | 193:9 194:23 |
| 169:12 170:4 | 217:6 225:25 | **information** | 196:2 202:11 |
| 198:4 199:15 | 245:11 | 7:14 9:4 28:12 | 204:4 229:19 |
| **inaccurate** 97:1 | **ind** 268:24 | 40:19 43:9 | 230:4,13,25 |
| **inadequacy** | **independent** | 49:20,21 52:17 | 231:5 232:19 |
| 249:4 | 97:16 267:7,14 | 53:6,7,10,20,23 | 234:6,7,9,13 |
| **inadequate** | 267:15,17 | 54:6,8 55:17 | 236:6 237:1,6 |
| 126:7,15 | **independently** | 72:10 73:12 | 240:2,5,11,15 |
| 270:17 | 113:4 116:10 | 74:13 75:8 | 240:23 241:1,5 |
| | 266:22 267:2 | 77:20,23 78:1 | 241:7,12 242:1 |

242:18 243:11
243:17,18,19
244:1,2 247:19
248:1,8,16,19
248:23 249:4,6
249:14 250:11
252:19 253:3,4
253:12,24
254:13 256:7,8
257:8,17,18,22
258:1,6,9,11
259:15,19,22
261:12,13,14
261:19 262:21
263:10,11
267:9,18 269:7
269:23 270:9
270:13,24
271:6
**informed**
248:24
**informing**
98:10
**ingredient**
160:8 169:14
170:6
**inhibitor**
207:11 209:13
211:24 220:7
231:16
**inhibitors**
207:2,5,8,20
208:4,23
209:17 210:8

210:19,24
211:5,20 212:1
212:9,19,21
213:14,20,20
213:22 214:23
216:3 217:23
218:7,10,17,22
219:13,14
220:8
**initial** 31:3
71:22
**initially** 29:17
31:4 33:6
103:18
**initiating** 206:8
**initiation** 209:8
**injure** 225:21
**injuries** 18:12
**injuring** 193:12
**injury** 18:4
**inpatient** 269:4
**inpatients**
260:11
**input** 260:20
**inquiry** 60:4
100:3
**insert** 120:11
120:11 239:25
261:14
**inserts** 166:4
242:23
**inside** 232:19
**inspection**
177:17,24

**instance** 228:9
**instances** 111:9
153:24,25
**instructed**
190:21
**instructing**
262:13
**instruction**
61:2,14
**instructional**
61:17
**instructor**
60:12,14,19
61:4
**insufficiency**
207:12 209:6
**insufficient**
42:19
**insurance**
180:4
**intelligence**
58:4
**intended** 91:4
208:13
**intent** 131:8
132:21 133:17
133:20 134:7
156:19 157:12
**interact** 87:9
233:20 234:18
268:11
**interacted**
268:5

**interacting**
73:9,14 98:19
119:13 123:3
233:22 259:12
269:3
**interaction**
125:21 129:7
130:10 132:5
259:6
**interactions**
231:8 258:8
268:7
**interacts** 14:16
**intercranial**
89:11
**interested**
272:17
**interfacing**
234:24
**interim** 186:25
**internal** 46:20
54:11 58:14,18
58:22 61:10
73:4,11 74:3
81:3,10 147:23
193:20 194:4
194:25 233:7
235:22 236:24
237:15 238:17
238:21,23
239:17 256:17
259:5,14 269:5
**internally**
73:20

**international**
161:9
**internationally**
114:11
**internet** 4:5
111:15 182:22
**internist** 118:2
**internists** 231:5
**interpret**
202:21 239:10
243:13
**interpreting**
168:14
**interrogatories**
20:7
**interrupt** 141:6
200:1 237:21
**interrupting**
130:6
**interruption**
86:12 102:24
106:15 111:2
111:12,17
180:13 182:12
182:18 191:17
259:21
**interventions**
234:23
**interviewed**
267:23,25
268:13,16
**intravenous**
90:21

**introduced**
160:5
**investigation**
60:8
**investigatory**
54:10
**invoice** 3:13
37:2,8,18,20
38:13 39:7,22
40:4 43:1
**invoices** 12:15
12:18 14:10
**involve** 18:15
18:19,22,24
19:15,19,22
20:10 21:10
43:24 246:4
**involved** 6:12
18:17 32:9
54:12 66:9,16
67:14 71:9
72:25 74:11
79:10 80:19,25
169:11,18,25
170:8 202:15
203:6,22 233:2
235:7 260:24
264:14 268:7
268:18
**involvement**
71:25 107:22
128:22 129:2
129:20 131:15
131:20

**involves** 17:22
19:3 43:12
145:22 259:6
259:14
**involving** 25:16
27:15
**irbesartan** 1:5
4:14
**iron** 69:15
**issue** 42:15
55:17 74:17,23
201:13 247:22
**issues** 24:2
29:19 206:5
267:10

| j |
|---|
**j** 1:14 5:5,14
**janet** 17:22
**january** 39:7
39:20
**jersey** 1:1,15
2:5 4:18 272:6
**job** 128:3
**john** 1:8 3:3
4:12 5:14
27:11 271:21
272:8 273:3,21
**johnson** 87:18
**joint** 145:14
**journal** 3:20
62:15 63:10,16
213:1 235:22
236:25

**journals** 235:21
**js** 1:11 4:19
**judge** 68:21
**judgment**
228:10
**judgments**
125:23 147:19
**july** 3:17 75:5,5
158:5,11,23
161:6 195:23
196:19
**june** 151:3
248:8
**justification**
164:10

| k |
|---|
**katz** 2:3
**keep** 11:6,13,20
11:24 12:23,25
13:1,6,11,12,18
16:4,5 31:22
42:15 52:8
67:21 109:5
130:5 189:18
189:18
**kidney** 87:17
148:3 222:16
**kind** 23:1 24:19
25:5,9 44:4,6
71:10,19 138:2
143:21
**kinds** 101:13
108:3 110:7

**[kinds - label]**                                                Page 32

| | | | |
|---|---|---|---|
| 156:25 211:18 | 102:7,11 | 203:2,5,20,23 | **known** 85:16 |
| **kirkland** 2:7 | 103:14,17 | 203:25 204:2,5 | 87:3 88:4,7,13 |
| **kirkland.com** | 104:18 105:2 | 204:6,7,11,11 | 89:3 95:15,23 |
| 2:10,10 | 105:11 106:6 | 205:6,16 | 96:2,9 97:17 |
| **knew** 46:18 | 106:13,13 | 209:25 210:1 | 98:2,11 99:3 |
| 75:23 95:8,15 | 110:5 111:6,11 | 211:24 212:12 | 102:19 103:3 |
| 95:23 96:8 | 111:22,22 | 215:7,23 217:1 | 103:19 107:10 |
| 98:2 103:13 | 113:20,23 | 217:2 218:14 | 120:1,19,21 |
| 155:13 182:17 | 114:10,11,18 | 219:3 224:24 | 126:18,23 |
| **know** 5:15 8:22 | 126:8 129:17 | 226:22 227:3 | 127:5,13 134:6 |
| 9:20 10:4,11 | 131:24,25 | 229:15,16 | 138:10,11 |
| 11:17 13:10,25 | 132:3,4,6,9,11 | 230:11 231:6 | 139:8 143:4,8 |
| 15:22 16:13 | 132:12,13,17 | 232:13 240:23 | 145:25 146:9 |
| 20:10 25:3,23 | 132:19,21 | 241:1 245:6,12 | 146:15 162:8 |
| 25:23 29:23 | 133:1,10,19,20 | 245:17 247:5 | 163:1,11 |
| 30:1 32:8,14,21 | 134:3,7 137:11 | 255:20 265:12 | 164:24 188:15 |
| 37:22 38:2 | 138:22 140:8,9 | 268:15,17,23 | 188:20 210:12 |
| 40:11,25 41:8 | 140:16 143:20 | 270:5 | 211:10 221:5 |
| 41:12 44:11 | 145:17 148:13 | **knowing** | 221:18 224:1 |
| 47:13 53:19,22 | 150:25 151:12 | 119:23,24 | 224:15,15 |
| 54:16 56:21 | 151:12 152:2,4 | 120:16,16 | 230:8 245:19 |
| 67:14 68:14 | 152:16,23 | 252:20 | 254:17,18 |
| 75:1,6,7,14 | 153:5,10 | **knowingly** | 266:24 |
| 76:16 77:9 | 154:21,22 | 87:10 182:9 | |
| 78:18 80:2,8,13 | 155:1,3,4 156:3 | 183:9 187:25 | **l** |
| 80:17 81:9 | 159:3 162:16 | 188:6 199:2 | **lab** 232:11 |
| 82:17 83:25 | 163:5,14 164:7 | 210:11 | **label** 21:22 |
| 84:2,9,23,24 | 167:5 168:11 | **knowledge** | 22:22 79:2,9 |
| 85:5,6 86:4 | 168:13,21 | 50:8 110:1 | 81:5 85:1 |
| 89:10 90:4,4,9 | 169:2 170:25 | 151:5 164:3,4,6 | 107:3,21 |
| 91:13 93:13 | 171:12 173:2 | 164:8,18,22,22 | 110:19 129:19 |
| 94:4,7,10 96:4 | 173:14,20 | 164:24 165:3,5 | 131:14,19,19 |
| 96:13,13,16,19 | 174:22,25 | 165:13 255:23 | 135:5 140:19 |
| 97:7 99:8,15 | 182:9 183:6 | 256:14 265:16 | 239:17,24 |

**[label - listed]**                                                    Page 33

240:19,21
241:2,11 251:4
261:13
**labeled** 160:2
**labeling** 18:20
19:20 103:21
107:16,18
108:2 119:5,9
120:8,12
127:19 128:9
132:23 166:5
251:12 254:6,6
**labels** 78:24
92:19 131:7
243:2,5,9,16
247:11,20
254:9
**laboratory**
236:12
**labs** 209:4
**lack** 57:18
90:16 143:18
144:8 188:1,9
189:15 193:24
194:16 219:25
249:5
**lacking** 136:16
**language** 79:1
79:5 127:1,8,11
128:21 129:19
131:20
**large** 136:24
**late** 181:11,14

**latest** 230:4,5
234:20,22
236:3,4 261:8
261:19
**law** 5:7
**lawyer** 109:15
**lawyers** 9:12
32:9,12,21
34:19 41:15,20
41:22 42:8,19
50:12
**lead** 185:16
**leading** 10:10
**learned** 102:13
255:14
**leave** 97:24
99:16 105:22
107:17,25
147:9
**lecture** 60:20
60:24
**lectures** 60:18
60:24
**led** 18:5,12
**legal** 4:22,25
**lengthy** 29:18
42:12 48:4
**lesser** 227:4
**letter** 35:14
79:16 235:23
**letters** 103:23
120:9 128:8
166:4 194:20

**leukopenia**
212:2
**level** 125:11
185:11 199:6
207:19 215:8
232:23
**levels** 177:5
262:7
**li** 149:12,15,17
149:24 150:3
150:14,21
151:2,10
152:19,23
153:9
**li's** 152:22
**liability** 1:6
4:14
**lied** 101:8,12
**life** 87:16 89:5
**lifetimes**
198:17
**light** 270:25
271:6
**likelihood**
212:21 219:20
**likely** 36:16
181:18 223:17
230:15
**limit** 86:18
**limiting** 255:21
**limits** 47:13
**line** 31:20
68:13 201:7
227:13 229:9

229:24 273:5
**link** 76:23
109:23 174:13
174:16
**linked** 214:1
**list** 3:11 7:13
9:8 11:10,18,21
11:24 12:3
13:12 14:18
16:23 17:3,5,17
17:22 21:10
28:2,3,5,9
45:12,13,16,23
46:2,24 47:9,15
51:1,2,9 54:19
69:6 112:20
114:8,24 115:3
149:7 210:5
221:1
**listed** 9:8 10:21
21:23 22:3
38:17 39:6
45:11 46:2
47:24 49:16,24
51:18 52:8
54:19 56:16
61:22 93:5
102:2 110:15
114:23 115:2
117:2,4 134:9
135:9 159:7
194:6 243:25
244:12

[listening - made]                                                     Page 34

| | | | |
|---|---|---|---|
| **listening** 130:1 | 108:17 148:3 | 227:15 240:21 | **lowering** 90:23 |
| **listing** 11:25 | 215:10 218:14 | 241:1,7 250:21 | 90:23 |
| **literally** 122:25 | 222:16 245:11 | 265:21 266:5 | **lumi** 1:14 4:24 |
| **literature** | **llc** 2:12,17 27:4 | 269:19 270:1 | 272:4,21 |
| 114:17 212:8 | 273:1 | **looked** 16:13 | **lunar** 109:13 |
| 212:11 215:22 | **llp** 2:7,14 | 46:6 99:18 | **lunch** 81:18,19 |
| 218:4 219:3 | **located** 80:3 | 114:21 115:10 | 81:25 112:6 |
| 226:25 227:1 | **long** 9:15 13:7 | 116:3 134:1 | **lung** 213:14,23 |
| 234:21 236:5 | 29:15 34:1,6 | 212:20 227:17 | 214:1,24 215:3 |
| 236:23 267:10 | 42:11 136:4 | 266:10,13 | 217:24 218:7 |
| **litigation** 1:6 | 171:7 190:5 | 267:8 | 218:10,14 |
| 4:14 6:13 7:4 | 225:6,9 | **looking** 95:19 | **m** |
| 7:11 11:12 | **longer** 68:24 | 140:7 149:6 | |
| 24:5,8,20 25:9 | 256:21 | 150:6 173:2 | **m** 1:13 2:3,14 |
| 29:10 32:9 | **look** 12:8 16:16 | 194:24 207:18 | 5:5 |
| 33:19 34:3,8 | 16:20 45:2 | 215:25 234:21 | **m.d.** 1:8 3:3 |
| 43:17,20 50:7 | 52:5 56:24 | 235:18,20,25 | 4:12 56:12 |
| 72:16,19 | 66:24 69:20 | 241:10 244:9 | 260:22 271:21 |
| 112:15 265:11 | 93:3 97:3,9,21 | 245:20 261:1,6 | 272:8 |
| **little** 24:25 25:4 | 97:22 98:1,8,23 | 265:7 | **made** 72:25 |
| 25:5 65:4 | 99:8,24 100:5 | **looks** 52:20 | 73:17 74:13 |
| 74:24 103:1 | 101:16 113:14 | 112:20 182:23 | 88:12 97:13 |
| 107:4 124:6,15 | 114:5,15 115:1 | 239:17 240:19 | 98:22 100:8 |
| 135:19 145:3 | 115:18 116:18 | **losartan** 1:5 | 109:13 122:16 |
| 145:10,13,17 | 144:3 156:25 | 4:13 85:23 | 123:8 125:16 |
| 158:16,20 | 172:14 173:22 | 122:10 | 126:18,22 |
| 174:10 179:12 | 176:1 193:20 | **loss** 206:6 | 127:5 130:24 |
| 186:12 203:10 | 194:13 195:7 | **lost** 195:20 | 134:11 146:15 |
| 208:16 247:24 | 195:12 196:1 | **lot** 16:8 194:23 | 147:13 153:4,5 |
| 258:25 263:20 | 203:4 209:3,18 | 231:4 254:23 | 156:7 165:24 |
| 265:24 | 212:18 215:14 | **lots** 111:11 | 166:1 177:14 |
| **liver** 18:24 | 215:21 218:2,3 | 223:18 | 183:17 184:12 |
| 63:13 66:4 | 218:16 219:9 | **low** 197:4,16,18 | 192:4,7 204:6 |
| 69:9,10,12 | 221:3 226:18 | 204:17 232:23 | 211:18 240:9 |

| | | | |
|---|---|---|---|
| 254:4 260:13 | 209:1,5,10 | **manufactured** | 212:25 |
| 260:15,18 | 217:20 222:2 | 184:3 | **marked**  17:6 |
| 262:18 | 226:4 229:6,17 | **manufacturer** | 26:17 37:18 |
| **magnitude** | 234:6 239:23 | 89:23 106:3 | 44:25 56:8 |
| 262:2 | 241:12 252:21 | 144:23 145:7 | 158:12 159:20 |
| **mail**  132:11 | 252:22 255:3 | 145:10 163:2 | 213:2 |
| **mailed**  240:7 | 257:24 261:7 | **manufacturer's** | **marker**  159:4 |
| **mails**  12:9 16:6 | **makes**  120:7 | 21:22 | **market**  7:21 |
| 16:8,9,10,14,16 | 225:15 | **manufacturers** | 100:10 125:18 |
| 16:20 17:1 | **makeup**  203:3 | 82:23 83:3,9 | 146:13 198:16 |
| **major**  259:2 | 203:23 | 86:1 110:9 | **marketed** |
| **make**  9:20 | **making**  34:23 | 122:20 142:4 | 128:16 |
| 10:11 28:16 | 34:24 121:14 | 143:24 156:10 | **marketing** |
| 37:12 45:23 | 125:23 133:17 | 177:6 184:4 | 91:25 92:3,5,8 |
| 73:11 77:21 | 146:25 148:6 | 217:22 226:14 | 92:15 242:23 |
| 87:20 101:6,12 | 148:16 157:23 | 258:7 | **marrow**  138:22 |
| 111:3 112:17 | 179:21 191:5 | **manufacturing** | **mary**  25:16 |
| 121:15 122:1 | 192:3 199:9 | 83:12 89:24 | 26:20 27:15 |
| 122:13 128:11 | 211:15 215:5 | 123:8 139:15 | **master**  89:12 |
| 132:7 134:6 | 238:24 256:18 | 145:21 146:10 | 89:14,21 90:6 |
| 136:22,23 | **malignancy** | 151:5 152:15 | **match**  176:8 |
| 137:18,19,21 | 212:4 245:12 | 160:6 161:22 | **matching** |
| 137:22 138:8 | **malpractice** | 164:5 165:14 | 117:25 211:14 |
| 139:11 140:1 | 18:6 19:8 | 167:13 168:6 | **material** |
| 141:21 147:2 | 21:11 59:15,25 | 169:11,18 | 100:17 112:19 |
| 147:19 148:4 | **manage**  119:15 | 170:1,6,8 177:5 | 126:19 135:11 |
| 156:21 157:14 | 200:10 | **march**  8:20 | 155:6 178:15 |
| 158:16 163:6 | **management** | 38:14 39:18,21 | 179:16 216:14 |
| 163:20 173:21 | 78:2 | 40:4,7,7,16,16 | **materials**  7:1 |
| 180:8 185:3 | **managing** | 43:1,2 | 8:25 9:7 10:17 |
| 186:14,21 | 66:17 74:12 | **mark**  17:4 | 12:8 34:10,15 |
| 201:24 202:2 | **manner**  271:7 | 26:13 37:5 | 36:20 44:10 |
| 202:21 207:18 | **manufacture** | 44:18 56:4 | 45:12,17 46:8 |
| 208:17,19 | 169:14 | 158:9 159:16 | 46:14 47:4 |

**[materials - medicine]**                                                    Page 36

| | | | |
|---|---|---|---|
| 51:1 54:19 | **meaningful** | 235:23 238:21 | 232:1 233:8 |
| 76:5 79:19 | 225:25 | 240:24 245:10 | 234:11,12 |
| 139:24,24 | **means** 108:7 | 249:23 256:13 | 239:18,21,25 |
| 145:23,25 | 164:17 171:1 | 258:4,5,10,24 | 240:20 249:18 |
| 149:7 163:11 | 206:15 258:21 | 258:25 259:2 | 256:12,14,19 |
| 242:23 | **meant** 73:25 | 261:9 265:4 | 261:9 269:21 |
| **matter** 1:14 | **measurement** | 269:10 270:8 | 270:3,6,10 |
| 4:12 16:2 | 226:4 | 270:25 | **medications** |
| 210:18,23 | **mechanism** | **medication** | 75:24 76:2 |
| 222:6 224:7 | 132:12 | 21:23 22:22 | 77:22 87:24 |
| 248:5 | **med** 208:11 | 85:14 88:3,9 | 88:8 111:9 |
| **mazie** 2:3 31:8 | **medical** 18:6 | 90:21 100:22 | 157:23 178:25 |
| 31:10 32:22 | 19:8,13 20:12 | 111:7,10 | 179:10 181:25 |
| 33:2 | 20:13,25 21:5,8 | 145:19 157:15 | 184:8 199:21 |
| **mazie's** 31:14 | 21:10 25:4 | 163:25 181:22 | 204:22 207:9 |
| **mazieslater.c...** | 43:11,13,16,22 | 184:13,20,23 | 210:15 211:1,3 |
| 2:5 | 43:24,25 44:7 | 185:7,10,16 | 221:1,9 222:7 |
| **md** 27:11 273:3 | 44:10,15,17 | 186:19 187:13 | 229:24 233:25 |
| 273:21 | 54:22 59:5,7,11 | 187:21,22 | 234:2 235:6 |
| **mdl** 1:2 | 60:4,5 61:2,8 | 188:14,24 | 247:3 248:17 |
| **mean** 14:20 | 61:15 62:5 | 189:2,8,14,22 | 255:16 257:10 |
| 16:22 33:11 | 63:5 64:6 73:5 | 189:25 190:20 | 258:2 260:9 |
| 35:15 46:5 | 73:9,15 76:3,3 | 192:11 199:2 | 261:20 263:4,7 |
| 58:2,3,3 64:5 | 76:4 85:11,21 | 200:3 204:25 | 263:14 |
| 77:9 109:11 | 94:11,24 98:18 | 205:7,12,19,24 | **medicine** 46:20 |
| 136:17 139:6 | 119:19 122:5 | 206:18 207:24 | 58:15,19,22 |
| 145:14 170:17 | 130:12,13 | 207:24 208:11 | 61:10,23 73:4 |
| 172:22 184:11 | 136:24 145:18 | 208:12,25 | 73:11 74:3 |
| 203:10 210:2 | 179:5 196:4 | 209:12,24 | 81:3,10 91:24 |
| 230:1 241:16 | 204:12,19 | 210:2 211:15 | 141:19 147:23 |
| 245:5 247:3 | 228:12,22 | 212:12,14,17 | 190:10 198:25 |
| **meaning** 91:1 | 232:12 233:18 | 229:8,18 230:5 | 206:5,13 |
| 207:11 260:9 | 233:21 234:5 | 230:14,19 | 212:13 233:7 |
| 264:19 | 234:22 235:1 | 231:9,15,22 | 233:24 235:22 |

235:23 236:24
236:25 237:15
238:17,21,23
239:17 249:24
250:1 256:17
259:5,14
260:20 269:5
**medicines**
163:23 196:4,6
196:7 198:14
208:14
**meet** 9:11,17
**meeting** 9:24
10:1 31:3 42:8
42:11,12
**meetings** 73:11
237:25 268:21
**melissa** 1:14
4:24 272:4,21
**member** 62:17
63:12 179:4
**members** 30:6
69:20 93:24
**memorize**
157:1
**memory** 8:22
**mentioned**
24:22 85:20
150:9 156:1
163:8 178:8
200:12 207:2
208:21 216:14
236:22,25
258:3,15,19

260:6
**met** 30:22
83:18
**meta** 213:15
**metformin**
111:10 154:17
271:4
**method** 147:6
215:14
**methodologies**
114:3
**methodology**
243:22,24
250:5 251:11
257:4 263:2
264:14
**mexico** 59:8
**michael** 2:4
**middle** 111:14
177:3 200:1
**milligrams**
198:13
**million** 86:20
125:8
**min** 149:12,15
149:17,24
150:3,14,21
151:2,10
152:19,22,23
153:9
**mind** 89:20
271:11
**mine** 70:2 72:8
117:25

**minimize**
245:22
**minute** 31:23
31:24 213:7
263:23 264:2
**minutes** 81:24
171:16,18,20
175:17,24
225:5,13 246:9
246:23
**mischaracteri...**
189:16
**mischaracteri...**
188:2,10
241:18
**misinterpreted**
268:2
**misled** 100:13
**misperceiving**
135:23
**mispronounce**
6:19 8:14
**misrepresenti...**
121:4
**missed** 34:5
36:23 203:14
247:15
**misspoke** 247:6
**misstating**
258:17
**mistake** 173:10
**mitigate** 193:17
**mitigating**
98:16 245:17

**mnemonic**
89:19
**module** 109:13
**moment** 9:3
140:10
**month** 25:7
129:13
**months** 13:9
**moon** 67:15
109:14
**morning** 9:14
10:14
**mouth** 144:14
**mouthful** 259:1
**move** 109:16,20
174:10 179:12
201:7,14
**mris** 236:11
**multiple** 33:14
53:6 65:25
66:6 136:10
201:2 216:9
217:3,18
221:15,22
223:15,25
235:2 236:23
237:23,24,24
237:25 238:16
252:13 269:5
**mumble** 144:15
**mute** 254:22
**mystery** 254:23

[n - never]                                                                Page 38

| n | | | need   13:14 14:6 |
|---|---|---|---|
| **n**   1:13 2:1 3:1 | 70:23 71:8,14 | 189:13,22 | 67:25 81:18,18 |
| 5:5,14 | 72:16 75:21 | 190:8 192:1 | 109:2 111:16 |
| **name**   4:21 5:13 | 76:13 77:5,15 | 194:11 198:13 | 119:17,18 |
| 6:15,16,23 8:2 | 85:4,16 86:18 | 199:7 202:17 | 136:13 144:2 |
| 25:18,24 59:18 | 95:8,16,24 96:9 | 203:18 210:8,9 | 149:3 175:6 |
| 92:24 143:14 | 96:20 97:17 | 210:12,20,25 | 180:16 249:24 |
| 173:15 178:21 | 98:2,11 99:3,21 | 211:3,10 212:5 | 252:14 256:12 |
| 213:17 258:17 | 101:21 102:1 | 215:9,15,19 | **needed**   49:21 |
| 273:2,3 | 102:19 103:3 | 216:3,7,10,14 | 103:10 160:7 |
| **named**   17:22 | 103:11 104:3 | 216:19 217:4 | 249:8 252:19 |
| 19:3 25:16 | 105:5 108:18 | 217:10,16 | 253:2,14,25 |
| 59:14,18,25 | 110:2 111:7 | 218:8,24 219:6 | 255:20 263:11 |
| **names**   7:2 12:4 | 119:21 120:21 | 220:14,15 | **needs**   75:1 |
| 28:10 59:22 | 124:2 129:10 | 221:12,18 | 168:10 169:1 |
| **narrative**   44:12 | 133:18 134:14 | 222:13 223:10 | 248:20 |
| 115:22 116:1 | 134:19 135:5 | 223:21 224:6 | **neither**   160:11 |
| 116:10 244:9 | 136:4 137:11 | 225:24 226:15 | 160:24 161:20 |
| 267:11 | 142:20 143:15 | 226:23 227:4 | 167:11 272:12 |
| **nash**   244:15,19 | 143:23 144:7 | 227:11 232:24 | **nephrologist** |
| 245:5 | 144:20 146:9 | 248:4,9 249:6 | 85:10 |
| **national**   102:16 | 146:20 153:19 | 251:19 252:20 | **nephrologists** |
| **nature**   15:19 | 153:20,25 | 253:3,22 | 74:9 119:14 |
| 181:13 185:14 | 154:18 155:9 | 254:15,17 | 120:5 256:10 |
| **nda**   188:21 | 155:14 159:2,5 | 255:14 262:12 | **nephrology** |
| 190:11 | 159:12 160:12 | 266:24 267:24 | 86:8 233:24 |
| **ndea**   184:5 | 160:25 161:21 | 268:14 | 259:8 |
| **ndm**   127:12 | 163:8 164:3 | **ne**   2:15 | **never**   15:1 |
| 147:3 151:16 | 165:6,14 | **necessary**   53:3 | 16:13 63:4 |
| **ndma**   8:6 18:22 | 167:12 177:4 | 53:25 138:13 | 70:5,9 71:4,5,6 |
| 19:22 22:11 | 182:6,11 183:1 | 157:3 | 71:13 78:16 |
| 23:19 69:25 | 183:7 184:5,14 | **necessity** | 85:13 87:8,24 |
| 70:4,6,10,13,16 | 186:1,9 187:2 | 106:11 122:11 | 100:18 152:6,8 |
| | 187:14,25 | 155:23 | 163:24 182:10 |
| | 188:7,15 189:5 | | |

183:5 199:1
210:11 221:20
224:4
**new** 1:1,15 2:5
4:18 9:7 10:15
201:7 233:25
234:1,1 235:10
235:21 236:25
259:18,18,19
260:15 272:5
273:1
**news** 3:17
132:25 158:11
194:21 232:22
**nicoderm** 71:23
**nitro** 127:12
**nitrogenous**
126:1 129:9
183:7
**nitros** 119:21
**nitrosamine**
8:4,5,10,11,16
70:3 71:12
76:19 124:8
125:13 143:4
145:5 151:16
184:4 253:13
253:21
**nitrosamines**
23:22 72:16
75:24 76:2,6
82:24 83:4
151:6,23
163:11 186:17

217:5 224:1
247:2
**noah** 2:8 17:7
26:15 37:13,16
44:23 52:23
148:25 158:17
158:17 167:19
173:5,15
263:22
**noah.epstein**
2:10
**non** 69:13
245:6
**nonspecific**
118:17
**nope** 50:22
55:6
**normal** 207:19
**normally**
109:15
**notary** 1:15
271:25 272:5
273:25
**note** 4:3 113:12
116:5
**noted** 58:18
**notes** 1:13
60:11 263:19
**notice** 3:12
26:16 27:6,10
58:9
**notices** 240:6
**notifications**
184:2

**notified** 98:17
103:16 104:10
129:11 130:18
131:11 132:10
133:14 166:11
184:20
**number** 4:19
35:10 52:9
157:25 195:21
230:23
**numerical**
52:14 140:8
**numerous**
206:22
**nursing** 21:12
21:12 24:16
**nuts** 254:10

**o**

**o** 1:13 5:5,5,14
5:14
**oath** 5:8
**obesity** 69:13
**object** 68:13
108:23 135:2
167:4 201:1,9
245:3 249:10
253:16 256:2
258:13 262:17
**objecting** 33:24
220:22
**objection** 12:20
13:3,16 14:13
32:17 33:9

42:9 46:25
47:10 49:5
51:4,12,20
53:17 54:3
57:17 72:5,22
74:18 77:7
78:6 81:6
82:15 83:5,13
83:21 84:8,21
87:5 88:5 90:1
90:16 91:7,10
91:18 92:10,20
93:2 94:21
96:10 97:19
98:4 99:5
100:14 101:2,9
104:4,25 105:9
105:19,20
106:4 107:23
110:10 115:4
117:19 118:15
119:1 121:10
122:22 124:4
124:13 125:5
131:22 134:22
136:6,14 138:4
138:25 139:17
142:6,24
143:18 144:8
144:25 150:16
151:25 152:11
152:25 154:2
156:12 161:23
162:10 163:3

[objection - okay]    Page 40

| | | | |
|---|---|---|---|
| 164:20 165:7 | 121:15,17,19 | **offered** 22:17 | 187:14 200:13 |
| 165:16 166:23 | 122:11 129:4,5 | 22:21,24 23:6 | 231:7 233:3 |
| 167:3 168:18 | 136:21 137:16 | 23:10,14,18,21 | 236:9 238:3,19 |
| 179:18 186:3 | 138:6,23 139:3 | 23:24 79:8 | 240:7 256:6 |
| 186:11 187:6 | 139:10,13,23 | 123:9 179:8 | **offices** 184:21 |
| 188:1,9 189:15 | 140:5 142:11 | 180:4 233:25 | **oftentimes** |
| 193:24 194:16 | 145:20 165:20 | 234:1 235:12 | 24:23 66:3 |
| 199:18 201:23 | 254:25 | 260:5 268:8 | 182:1 260:21 |
| 205:2,14 206:1 | **observations** | **offering** 6:11 | **oh** 32:10 58:8 |
| 207:6 208:8 | 215:5 | 57:2 95:7 96:8 | 158:20 173:14 |
| 211:6 215:11 | **observed** 183:7 | 100:12,25 | 174:15 191:20 |
| 217:11,25 | **obtained** 64:16 | 101:7,19,24 | **okay** 5:15,20 |
| 218:11,25 | 64:19 | 103:9 105:16 | 6:7,10 7:10 8:5 |
| 219:16,25 | **obtaining** | 107:1,20 108:4 | 8:7,15,24 9:7 |
| 220:18 222:8 | 248:24 | 108:11,16,21 | 10:7,16,20,25 |
| 223:5 224:10 | **obviously** | 110:1,6 120:20 | 11:9 14:9 15:3 |
| 225:16 226:1 | 235:18 | 126:5,13 | 15:7 16:1,6 |
| 226:16 227:12 | **occasion** | 133:16 150:3 | 17:3,10,17,21 |
| 229:12 231:17 | 264:24 | 155:12 191:10 | 18:8,15 19:1,15 |
| 232:7 237:8 | **occasions** 35:22 | 191:24 192:2 | 20:23 21:2,9,14 |
| 238:13 241:17 | 59:23,24 | 192:20 218:23 | 24:7,11 25:7,15 |
| 242:8 263:16 | **occupational** | 220:12 222:2 | 28:6,13 32:14 |
| 270:21 | 76:15,20 | 232:21 237:18 | 32:20 33:1,17 |
| **objections** 14:1 | **occur** 168:11 | 238:9,15,22 | 34:18 35:15,23 |
| **objective** 92:13 | 169:2 177:5 | **offers** 118:19 | 36:4,18 37:5,14 |
| 235:15 236:5 | **october** 95:21 | 180:5 | 37:16 38:11,16 |
| 236:13 237:4 | 95:23 96:7 | **offhand** 89:10 | 39:17 42:25 |
| **objectively** | **odds** 214:13,17 | **office** 14:22 | 43:5 44:18,21 |
| 235:25 | **offer** 19:11 | 24:13,15,17,24 | 45:8,22 47:4,19 |
| **obligated** | 21:14,21 22:1,5 | 29:24 47:8 | 48:1 51:23 |
| 102:15 139:19 | 22:10,13 53:3 | 60:22 61:9 | 52:19 54:18 |
| 165:1 180:6 | 81:4 138:7 | 64:9 79:24 | 56:1,10 57:25 |
| **obligation** | 231:15,16 | 80:2 122:4 | 58:9,13 59:24 |
| 120:3,24 | | 185:1 186:18 | 60:11,17 61:25 |

[okay - opinions]                                                    Page 41

| | | | |
|---|---|---|---|
| 64:24 65:8 | 212:23 213:9 | 172:2,7 173:5,9 | 125:2 126:5,13 |
| 66:22 67:12,24 | 213:12,23,24 | 176:15,20 | 128:20,23 |
| 68:25 69:24 | 214:14,21 | 179:11 227:20 | 129:18,23,24 |
| 73:25 75:9,16 | 216:22 222:5 | 227:25 246:12 | 130:1,3 134:13 |
| 78:20 82:3,22 | 225:14 227:19 | 246:17 263:24 | 134:18 135:4 |
| 84:17 86:15,17 | 231:24 240:18 | 264:3,8 271:15 | 142:22 143:16 |
| 88:20 89:8 | 245:2 246:11 | **opine** 218:9 | 147:11 152:3 |
| 90:18 92:23 | 246:17,23,25 | **opined** 68:20 | 152:22 178:13 |
| 94:11 95:7 | 253:8 264:3 | 249:4 254:25 | 178:23 181:19 |
| 97:21 100:12 | 266:18 267:20 | 263:10 | 182:5,25 |
| 101:14 103:9 | 271:12,15 | **opining** 146:21 | 189:12 190:24 |
| 107:20 108:4 | **old** 17:1 | 146:23 | 192:20 210:19 |
| 109:9,19,25 | **older** 259:23 | **opinion** 18:8,10 | 210:24 218:23 |
| 111:23,25 | 260:16 | 19:12 21:14,21 | 222:5 223:20 |
| 112:2,4,18 | **once** 19:2 | 22:1,10,13,17 | 225:24 226:13 |
| 113:3 116:22 | 220:19 | 22:21 23:11,15 | 227:9,14 |
| 145:13 148:19 | **oncologist** 62:1 | 23:19,21,25 | 228:15 232:3 |
| 148:24 149:8 | 65:16 | 44:17 79:8 | 233:12 235:16 |
| 149:14 150:13 | **oncologists** | 81:2 84:18 | 239:16 240:18 |
| 151:1 155:12 | 65:17 | 85:25 95:4,6,8 | 252:17 253:12 |
| 158:4 159:6,15 | **oncology** 62:3,6 | 95:14 96:8,18 | 253:22 254:2 |
| 159:25 161:17 | 62:6,8,11,14,18 | 97:16 98:11 | 254:12 255:5 |
| 167:15 169:8 | **ongoing** 33:7 | 100:13,16,25 | 267:4 |
| 170:11 171:17 | 217:18 | 101:7,19,25 | **opinions** 6:11 |
| 172:2 173:15 | **online** 235:24 | 102:18,20 | 10:22 22:5,25 |
| 174:9 175:2 | 261:14 269:9 | 103:4,10 | 23:6 35:13 |
| 176:4,13,15 | **open** 6:8 9:21 | 104:16 105:16 | 44:11 46:9,12 |
| 178:7,19 | 38:10 | 107:2,21 108:5 | 47:16 51:3,8,11 |
| 180:16,22 | **operator** 4:1 | 108:11,12,17 | 52:18 53:3,11 |
| 183:25 192:19 | 28:25 29:5 | 108:22 109:2,3 | 53:16,21,24 |
| 193:2 195:5 | 31:25 32:5 | 109:12,15,17 | 54:2,8 57:2,23 |
| 196:1,13,25 | 82:5,10 106:18 | 109:23 110:12 | 81:4 93:1,11,17 |
| 201:19 204:15 | 106:23 111:20 | 118:9 120:20 | 110:1,6 116:24 |
| 204:21 209:20 | 111:25 112:4,9 | 121:7 124:1,11 | 118:9,13,14,18 |

[opinions - participant]                                                    Page 42

| | | | |
|---|---|---|---|
| 118:20,24 | **orient** 173:24 | **package** 120:11 | 203:14 228:6 |
| 119:3,17 | **outcomes** 92:15 | 166:4 239:25 | 250:24 |
| 126:23 133:16 | **outline** 55:21 | 261:14 | **parameters** |
| 141:1 150:2,3 | 208:10 | **page** 3:2,10 | 91:22 223:19 |
| 150:15 151:22 | **outlined** 29:19 | 19:2 26:19 | **paramount** |
| 155:12,16 | 83:16 84:10 | 27:18 38:9 | 120:13 130:21 |
| 191:10,24 | 110:12 120:7 | 45:11,11,15 | 132:2 137:8 |
| 194:5 219:8 | **outlines** 110:14 | 95:18 110:13 | 141:21 156:16 |
| 220:13,13 | **outpatient** | 112:19 134:10 | 156:19 157:11 |
| 232:21 237:19 | 122:4 139:21 | 140:12 149:10 | 186:15 189:11 |
| 238:9 243:23 | 233:3 238:19 | 159:24,25 | **paraphrasing** |
| 244:12,23 | 244:6 259:25 | 160:1 167:20 | 262:4 |
| 249:2 250:6,7 | **outside** 72:16 | 176:23 183:21 | **pardon** 138:15 |
| 250:10,16 | 74:11 241:21 | 192:16,18 | **parkway** 2:4 |
| 252:1 254:7,14 | **outweighed** | 196:1,25 197:1 | **part** 14:20 |
| 255:19 257:5 | 186:1,9 | 197:23 213:6 | 20:24 21:5,7 |
| 266:19 267:8 | **oversight** 28:7 | 228:6 250:21 | 30:25 34:5 |
| 267:24 | **overtalking** | 250:23,23 | 43:9 44:10 |
| **opportunity** | 38:6 68:8 | 273:5 | 46:8 52:3,6,12 |
| 34:17 | **own** 12:8 73:3 | **pages** 46:5 | 64:6 66:4 74:7 |
| **opposed** 44:1 | 199:15 205:1 | 52:14 174:24 | 77:6 100:3 |
| 61:14 94:8 | 236:20 237:6 | 228:4 | 104:12 140:12 |
| 157:17 | 238:10 252:6 | **paid** 13:1 | 146:12,24,24 |
| **options** 180:5 | 262:12 | **panic** 190:19 | 147:1 148:5 |
| **oral** 207:8 | | 192:9,10 | 203:24 219:7 |
| **order** 81:18,19 | **p** | 249:24 262:22 | 221:7 233:15 |
| 81:24 168:11 | **p** 1:13,13 2:1,1 | **panicking** | 243:19 245:22 |
| 169:2 252:21 | 56:11 214:2 | 193:13 | 259:24 260:2 |
| 253:12 | **p.m.** 82:6 | **paniography** | 261:5,15,17 |
| **organization** | 112:11 172:3 | 50:21 | 263:1 265:18 |
| 39:15 224:13 | 176:16 246:18 | **paragraph** | 266:6 268:9 |
| **organizations** | 264:4 271:17 | 95:19 159:1,5 | 269:25 |
| 102:16 | **pacemaker** | 169:9 177:3 | **participant** |
| | 145:14 | 192:19 197:2 | 71:21 |

**participants**
4:6 6:4
**participating**
260:19
**particles**  147:4
**particular**
56:19 100:1
125:12,20,25
142:1 145:24
163:7,21,21
177:16,23
179:23 203:14
219:10 220:5
229:5 251:1
264:19,23
**particularly**
146:4
**parties**  4:9
272:13
**partner**  31:8
**parts**  52:17
86:20 113:19
125:8,22
**pass**  146:7
259:23
**passed**  7:20
69:19
**past**  12:5 14:11
16:2,14 17:2
33:14 231:2
266:1,10
**patches**  71:23
**pathologic**
64:19

**pathologist**
64:12
**pathology**
65:23
**patient**  18:5,12
18:13 69:25
70:2,5,10,14
74:14 75:7
77:21 87:4
88:3,24 103:24
104:11 122:17
128:14 129:15
130:14,20
131:9 132:22
134:11 139:5
139:25 141:11
141:13,18,25
147:20 148:2
156:15,21
157:2,3,10
163:24 164:9
164:15 179:23
180:10 181:5
181:16,24,25
182:10 183:19
186:14 188:22
188:23,25
189:1,10,20,22
189:24 190:3,5
190:10 192:8
198:25 199:1
200:3,17,18
205:8,18,22
206:17 208:4

210:11 212:16
221:8,13,17
222:11,12,16
223:12,16
225:21,23
226:9,10
228:11,17,17
229:19 230:8
230:16,23,25
232:18,20
234:12 236:17
238:2 240:12
242:3 243:12
243:15 244:4
244:15,19
245:25 248:15
248:25 256:22
268:7
**patient's**
157:10,14
211:19 212:1
228:19,22
231:11 248:20
**patients**  7:22
7:25 24:12,14
24:15,16,16
63:18 64:6,25
65:10,12,15
66:10,15 69:23
71:15 72:8
73:3,15 74:8,12
77:18 78:2,11
85:15,19,23
86:6 96:4

98:16,21 99:10
100:20 101:20
102:1,5,9,17
104:24 105:8
119:11,12
120:14 121:1
122:1,25 123:7
125:22 126:2
127:3 128:17
128:17 129:6
130:9,22,24
131:6 133:5
137:8,12,24
138:12 139:12
141:20 142:18
146:7 147:5,22
154:12 157:21
157:24 165:1,2
166:6,18 179:9
180:7 183:11
184:6,15,22
185:8,21,25
186:8,24 187:1
187:12,17
190:19 191:14
192:10,21
193:3,7,10,12
193:13,18
196:2,5 197:3
197:15,18
198:4 199:10
199:11,21
200:11 203:13
206:3,12 207:5

[patients - pharmaceutical]                                      Page 44

| | | | |
|---|---|---|---|
| 207:9,10,11,12 | **peek** 112:16 | 208:25 267:17 | **personalizing** |
| 207:16,20 | **peer** 54:25 | **performed** | 230:7 |
| 208:15 209:14 | 62:14 63:9,16 | 64:21 66:12 | **personally** |
| 209:16,20 | 236:18 | 143:8 219:21 | 32:22 99:12 |
| 210:6 211:14 | **pending** 170:21 | 235:4 236:10 | 267:23 |
| 215:4 217:9,21 | 171:15 | **performing** | **perspective** |
| 217:24 222:3 | **pennsylvania** | 202:4 218:21 | 7:15 30:2 |
| 224:17 233:5 | 2:9 | **period** 7:16,18 | 141:16 255:1 |
| 234:1,9 235:2 | **people** 67:9 | 7:20 11:15,22 | **pertaining** |
| 235:13 236:8 | 71:16 74:10 | 34:11 46:16 | 266:14 |
| 236:15 237:15 | 76:13 87:9 | 96:6,14 97:10 | **pertinent** 53:8 |
| 237:24 238:25 | 107:9 108:1 | 97:12 100:7 | **peterson** 25:16 |
| 239:4 241:24 | 129:13 134:1 | 103:15 104:1,7 | 25:17 26:20,20 |
| 243:20 244:4 | 136:21 145:5 | 107:6,9,15,16 | 27:15,16 |
| 245:14,18 | 148:9 150:7 | 126:12,17 | **ph.d.s** 260:22 |
| 249:9,17,25 | 151:18 153:16 | 134:25 137:4 | **pharm** 91:25 |
| 250:3 252:14 | 166:12 167:8 | 137:16 143:3 | 260:22,22 |
| 252:18,23 | 189:7 198:12 | 145:4 155:5 | **pharma** 2:18 |
| 255:10,16 | 198:18 202:1 | 187:1 190:2,5 | **pharmaceutical** |
| 256:15 257:24 | 204:3 221:19 | 255:9 268:19 | 1:9 2:11,12,17 |
| 258:12 260:3 | 226:23 227:8 | **periodically** | 4:16 22:18 |
| 260:11 262:13 | 260:20,21,24 | 33:15 72:9 | 23:25 70:22 |
| 262:19,21 | 268:23 269:5 | 240:5 | 71:16,19,25 |
| 263:3,6,13 | **percent** 24:7,10 | **periods** 41:17 | 72:11 78:4 |
| 264:21 265:5 | 24:22 40:22 | **person** 31:5 | 79:25 80:3 |
| 268:18 269:8 | 41:2,6,10,14 | 60:17 65:14 | 83:10,19 84:4,6 |
| 269:11,24 | 43:15,21 61:19 | 74:17,22 75:2,6 | 84:18,20 89:22 |
| 270:11,14 | 64:25 65:4 | 98:24 222:25 | 89:23 106:1 |
| 271:8 | 160:17 214:2 | **personal** 32:15 | 110:8 125:4 |
| **pay** 13:15 | **percentage** | 230:24 231:4 | 145:11,12 |
| 14:20 59:21 | 41:13 43:25 | 233:13,14 | 147:16 153:21 |
| **pdf** 45:15 | 61:13 | 241:15 | 153:25 154:14 |
| **pediatric** 58:25 | **perform** 12:9 | **personalized** | 155:10 156:10 |
| | 24:19 199:20 | 236:20 | 242:23 243:2,8 |

[pharmaceutical - policies]                                        Page 45

257:9 266:14
273:2
**pharmaceutic...**
2:17 6:20,21
**pharmacies**
184:21 186:18
224:17
**pharmacists**
102:9 154:12
**pharmacology**
260:21
**pharmacy** 21:6
240:3 260:10
**phone** 9:25
10:3 75:7
240:24
**phrase** 223:9
**physiatry** 259:9
**physical** 66:1
**physically**
204:3 238:3
260:10
**physician** 7:15
64:2,5 70:21
71:18 72:2,4
77:6 80:24
88:1 111:1
119:11 124:24
126:24 141:3
151:14 157:5,9
157:17 186:20
188:12 190:21
224:5,22
229:11,22

230:21 231:21
232:4 239:2,9
239:14,17,20
240:19 241:3
241:16,25
242:5,14,17
243:2,9 245:1
252:18 257:1
268:4
**physician's**
228:9 229:3
230:18
**physicians** 7:23
21:11 73:10
74:3 81:3,11
85:2 92:9,16
94:1,19 103:10
104:12 111:4
120:5 127:17
128:6,13 131:9
133:13,25
134:12 141:11
153:18 156:8
156:20 157:22
166:12,19
180:2,3 187:24
188:5 192:22
202:5,7,15,25
203:6,21
217:23 231:13
231:25 232:22
233:11,20
234:16 235:10
235:16 236:20

237:5,13
238:10,11,23
238:23 239:4
240:11,14
241:11,22
242:12,13,20
248:2 249:14
250:15 252:2
252:11 255:4
255:20,24
259:13 267:23
268:6,12,14,22
269:4
**piece** 249:13
**piedmont** 2:15
**pills** 126:20
137:21 153:23
192:22,25
193:4 248:3,10
249:7 255:11
262:11,14
**place** 4:9 44:12
46:15,18,19,22
96:5 101:13,18
105:12 172:19
185:5,20
190:12,23
192:13 244:10
244:13 266:17
**places** 53:7
241:7
**plaintiff** 2:6
6:12,15,16,23
17:22 19:3

25:16 27:10
32:19 43:11
93:24 94:2,5
**plaintiff's** 32:9
32:12 34:19
50:12
**plaintiffs** 7:7,9
9:11 17:25
**plan** 180:5
239:11 242:3
**planet** 260:14
**play** 229:4
**plays** 232:13
**please** 4:3 5:12
13:23 23:4
67:10 68:25
101:23 109:19
141:7 168:21
171:21 199:25
201:14 237:20
250:21 254:22
**plenty** 241:7
**plunkett** 113:1
115:15 118:3
119:4
**point** 13:24
30:25 67:21
68:19 81:13
201:3,14
229:23
**points** 229:10
**poison** 225:15
**policies** 84:13
84:16 85:7

[policies - prescribers]                                        Page 46

| | | | |
|---|---|---|---|
| 102:7 108:2 | **positively** 86:11 | **potentially** 29:9 | **predicated** 34:9 |
| 122:15 123:16 | **possibility** | 86:23 89:5 | **preferred** |
| **policy** 84:10,12 | 76:15,23 88:13 | 184:23 189:8 | 129:19 131:20 |
| 103:17 123:16 | 121:18 132:16 | 190:19 193:11 | **premise** 130:7 |
| 132:14 156:17 | 266:24 | 210:20,25 | 153:11 188:24 |
| 156:24 | **possible** 7:17 | 245:20 257:25 | **preparation** |
| **poll** 234:15,18 | 7:25 8:1,2 | 259:17 | 8:23 9:6,18,21 |
| **pooled** 213:25 | 83:11 86:2 | **practice** 7:16 | 14:11 183:9 |
| **poor** 205:8 | 123:10,23 | 14:22 76:5 | 193:19 |
| **pop** 17:12 | 128:3,12 129:9 | 135:14 141:3 | **prepare** 8:17 |
| 173:6 195:8 | 129:15 130:22 | 141:11,19 | 9:12 16:23 |
| **popular** 235:23 | 137:1 166:17 | 200:9 221:6 | **preparing** 9:1 |
| **population** | 166:20 186:21 | 239:6 245:15 | **prerogative** |
| 237:16 269:4 | 199:6 200:23 | 245:23 252:2,6 | 109:7,10 |
| **pose** 120:25 | 201:21 204:16 | 252:11 259:12 | **prescribe** 94:20 |
| 137:23 141:25 | 204:25 205:24 | 261:23 265:4 | 110:20 140:20 |
| 198:4 199:16 | 208:5 | 266:7 268:10 | 181:16 183:10 |
| **posed** 7:22 | **possibly** 193:11 | **practices** 74:11 | 187:25 188:6 |
| 71:15 100:20 | **potassium** | **practicing** 81:1 | 188:13 191:12 |
| 102:14 133:7 | 207:19 | 87:25 110:25 | 192:1,23 202:1 |
| 139:5 147:5 | **potential** 22:14 | 119:10 120:4 | 205:24 231:14 |
| 162:25 164:3 | 71:8 85:3 87:3 | 122:24 126:24 | 231:21 232:1 |
| 212:5 218:5 | 87:16 88:3 | 133:25 134:4 | 240:20 248:17 |
| 224:16 262:19 | 107:10,12 | 134:12 179:3 | 251:5 |
| **poses** 102:4 | 110:2 121:1 | 224:4 226:3 | **prescribed** 85:4 |
| 142:17 165:1 | 124:3 137:24 | 233:10 237:14 | 87:2 88:2,21 |
| **posing** 102:12 | 138:2 140:24 | 268:4 | 94:8 137:7 |
| **position** 125:25 | 141:24 142:5,9 | **practitioners** | 180:10 181:5 |
| 128:15 131:3,4 | 145:23 155:13 | 268:19 | 255:8 257:10 |
| 148:16 153:12 | 179:25 187:11 | **pre** 163:10 | **prescribers** |
| 189:10 233:18 | 188:16 199:3 | **precautions** | 103:16 104:3 |
| 256:25 | 208:22 222:3 | 77:3 | 104:23 105:7 |
| **positions** 233:1 | 232:23 245:10 | **precursor** | 137:12 235:5 |
| | 251:8,17,23 | 164:7 | |

**[prescribing - proceedings]** Page 47

**prescribing**
94:15 128:10
132:24 208:3
229:5 232:5
234:16 236:21
239:18 248:2
261:12 270:3
**prescription**
142:13 258:8
**prescriptions**
85:1 270:10
**presence** 95:16
105:14 128:4
139:8 145:24
146:15,15
151:15 159:1,5
159:12 161:13
162:20 163:1,8
164:6,8,18,23
164:24,25
165:3,5,13,21
165:22 179:17
182:6 183:1
209:2 221:17
225:20 248:9
249:15
**present** 2:19
5:1 100:23
120:4 121:19
123:11 124:19
125:1,14
137:23 139:4
143:10 151:19
153:19 164:23

165:25 224:16
**presentation**
228:12,20
**presented**
116:11
**preserve** 16:1
16:10
**president**
233:18
**press** 103:23
159:16 172:11
172:15,21
173:17 194:21
195:22
**pressure** 18:4,4
18:12 90:23
91:2 94:9
163:22 181:21
182:3,8 183:3
183:14 184:13
185:9,10,11,16
190:10 205:23
206:4,11,12
208:13,17
210:14,15
211:1 231:14
235:6
**preventing**
5:21,24
**previous** 28:3
114:8 222:17
232:12 236:13
265:18 266:2

**previously**
22:17,21 42:17
**primary** 186:20
192:7 198:25
221:16
**principal** 90:19
**principle** 91:21
157:7 225:15
**principles**
193:6
**prinston** 2:12
6:21
**prior** 32:10,11
32:15,18 36:18
39:13 43:15,20
59:4 75:21
79:7 95:9
98:12 99:21
102:19 103:4
104:21 105:4
107:7 110:3
151:23 153:21
154:1,19
155:10,15,16
156:1,3 265:1
265:10,16,20
266:5,8,15
**prioritize** 180:6
**priority** 123:13
**private** 24:17
74:2 151:14
256:6 259:12
**probable** 7:18
76:7 85:17

86:24 87:10,23
88:4 89:3
103:14 104:9
107:12 119:22
123:24 124:18
127:4,13,16,18
130:16 135:10
139:9 161:8
162:3,22
163:16 164:13
199:4,22 200:4
200:19 211:10
212:6 216:11
219:5 221:18
224:2,14 226:7
254:18
**probably** 29:12
31:1,16 36:2
59:17 61:18
63:24 66:14,17
69:6 225:12,12
**problem** 14:9
23:5 160:18
260:17
**procedures**
64:23 79:22
234:1
**proceedings**
1:13 29:3 32:3
82:8 106:21
112:7 172:5
176:18 227:23
246:15 264:6

**[process - provisions]**                                          Page 48

| | | | |
|---|---|---|---|
| **process** 71:8 | **product** 33:21 | 147:16 148:16 | **protecting** |
| 90:5 96:1 | 33:25 47:12 | 154:1,19 | 264:21 |
| 102:5 123:22 | 70:16 72:13 | 155:14 156:11 | **prove** 262:5 |
| 130:17 139:16 | 78:4 85:13 | 156:20,22,23 | **provide** 17:19 |
| 142:17 145:18 | 106:3 127:12 | 197:4,15 | 120:8,8 157:13 |
| 145:21 146:10 | 132:24 135:9 | 198:15 | 253:2 257:5 |
| 146:11,25 | 135:14,25 | **professional** | 262:15 |
| 147:2,17,18 | 145:11,12 | 30:1,23 32:23 | **provided** 11:9 |
| 148:10 160:6 | 147:13,20 | 71:18 77:6 | 12:18 15:8,12 |
| 160:13 161:1 | 148:11 153:21 | 157:5 270:16 | 16:23 17:18,18 |
| 161:22 162:19 | 154:14 155:10 | **professionals** | 21:10 46:14,24 |
| 164:5 167:13 | 164:19 165:20 | 196:3 | 47:5,16 48:23 |
| 168:6 179:8 | 169:13 170:5 | **professor** 60:15 | 51:14 53:5 |
| 203:24 204:1 | 196:8 197:19 | 61:23 | 54:7,9 55:17,18 |
| 270:14 | **production** | **profile** 181:24 | 55:21,23 56:21 |
| **processes** 83:12 | 106:11 107:8 | **program** 62:5 | 79:12 126:6 |
| 89:25 151:5 | 119:6,18,25 | 206:9 233:17 | 150:5 157:22 |
| 162:18 165:14 | 120:18 124:19 | **programs** 6:7 | 157:24 234:7 |
| **processing** | 126:20 137:17 | **prohibit** 179:17 | 237:7 248:8,16 |
| 165:21 | 138:9 139:2,3 | **prohibits** 125:3 | 249:5 250:11 |
| **produce** 153:14 | 139:10 142:14 | 211:11 | 253:24 254:13 |
| **produced** | 146:24 148:8 | **promulgate** | 260:11 261:13 |
| 14:10 37:2,21 | 148:10 152:17 | 111:4 | 263:11,12 |
| 38:14 76:18 | 153:15 154:22 | **promulgated** | 269:20 270:4 |
| 90:25 96:14 | 155:20 220:5 | 73:12 | **providers** |
| 123:20 136:20 | **products** 1:6 | **proper** 78:2 | 19:13 |
| 136:21 137:7 | 4:14 24:1 | 138:9 211:23 | **provides** |
| 137:14 139:23 | 70:23 76:8,8 | 269:24 | 140:17 251:2 |
| 141:23 142:16 | 82:23 83:3,10 | **properly** 35:1 | **providing** |
| 165:19 179:6 | 83:20 84:6,20 | 119:18 193:6 | 85:12 106:9 |
| **producer** 106:3 | 85:12 92:16 | 243:12,13,13 | 110:14 267:18 |
| **producing** 7:3 | 106:1 110:3 | **protect** 165:2 | **provisions** |
| 7:4 40:14 | 120:22,24 | 193:17 249:16 | 250:25 |
| 146:11 | 125:4 141:22 | | |

**public** 1:15
23:1,8 72:20
74:13 77:2
78:21 90:9
104:11 106:10
121:15 123:9
131:12 147:1
147:14 148:17
153:18 155:23
197:25 271:25
272:5 273:25
**publish** 77:12
203:16
**published**
62:13 63:8,15
216:18 217:8
236:1
**pull** 148:21
149:3 158:8
167:17,18
173:4 192:15
195:5 196:18
**pulled** 114:19
**pulmonary**
233:23
**purchase** 95:20
**purity** 115:11
**purpose** 134:8
**purposefully**
127:15
**put** 38:8 47:9
119:8 127:19
127:20 134:24
148:2 154:6

163:24 179:9
182:10 199:10
199:11,21
200:17 208:24
210:4,11
212:16 226:10
230:12 235:7
243:16 251:18
256:15 258:2
267:7
**putting** 125:22
221:8

**q**

**qualifications**
81:10 118:4,7
118:23 148:19
257:5
**qualified** 72:8
81:3
**quality** 4:4,5
**quarters**
140:14
**question** 8:9
13:22,24 14:3,7
14:15,15 23:3
32:18 42:15
43:18,19 44:3
49:25 54:4
55:9 57:5,7,18
67:9,18,25 68:9
69:1 71:3
79:11 84:8
87:6 88:6,20

90:16 97:2,22
98:8,9,14
100:24 101:23
102:12,23
103:2,2 105:13
106:7 107:19
109:20,24
110:11 113:8
118:18 124:10
126:9 129:24
130:8,17
131:18 132:9
134:17,25
135:3 136:1
143:22 144:5
144:11 148:18
150:18 161:15
161:18 162:8
162:12,14
165:10 168:15
170:21 171:15
174:21 180:22
181:4 183:5
186:6 188:4
191:9,24
199:19,24
201:2,17
202:13 204:14
205:4 216:2,4
217:12 218:3,5
219:13,20,22
219:23 220:23
220:25 223:6
227:2 234:16

235:14 237:4
241:5 242:1
243:7 244:18
244:25 245:24
247:15 258:18
267:13 268:16
269:16
**questioning**
68:13 201:7
227:13
**questions** 13:17
13:23 47:11
67:1,3,21 68:16
109:11 113:24
153:2 167:19
170:24 175:1
220:10 225:4
246:23 247:1,9
247:12,18,22
253:1,5,6 262:1
262:8 263:20
271:14
**quickly** 128:3
128:12 257:23
**quip** 13:22
**quite** 32:11
240:22
**quote** 110:16
140:17 141:24
146:13 161:5,7
162:18 247:2
254:5
**quoting** 140:12

**[r - recommendations]**                                        Page 50

| r | | | |
|---|---|---|---|
| **r** 1:13,13,13 2:1 | **reacted** 98:20 | **reason** 95:2 | 159:19 213:2 |
| 2:4 5:5,14 | **reacting** 98:15 | 146:8 182:21 | 225:23 |
| 272:1 | **reaction** 205:8 | 198:7 231:3 | **receiving** |
| **radiologist** | 231:1 | 273:5 | 194:19 |
| 64:12,17 | **reactions** 160:7 | **reasonable** | **recently** 212:10 |
| **radiology** 20:18 | **read** 45:9 46:1 | 110:25 141:3 | 212:20 |
| 20:21 21:4 | 47:23,25 48:3,4 | 188:8 231:14 | **receptor** 215:3 |
| 65:23 259:8 | 55:13,22 57:12 | 231:24 239:8,9 | **recess** 82:7 |
| **rahner** 2:20 | 92:25 93:6 | 241:3,25 | 112:6 172:4 |
| 4:22 | 101:23 115:22 | 242:14,16 | 227:22 246:14 |
| **ralph** 92:23 | 140:15 174:2,5 | 252:2,10,17 | **recognize** 78:14 |
| 93:1,7 | 174:7,9,23 | 255:20 | 162:2 |
| **rapidly** 73:6 | 175:9,11,16,17 | **reassurance** | **recognized** |
| **rash** 87:19 | 175:20,24 | 123:10 | 114:11 168:10 |
| **rate** 38:17,20 | 176:5 177:12 | **recall** 25:20 | 169:1 175:13 |
| 38:24 39:2,4 | 177:23 191:21 | 26:1,5,9 44:13 | 189:6 191:6 |
| 176:1 198:18 | 196:11 215:24 | 46:20 80:20,22 | 193:14,15 |
| **rates** 261:1 | 236:19 251:9 | 119:8 155:9 | **recognizing** |
| **rather** 33:24 | 253:8 266:19 | 158:1,1 161:5 | 169:9,24 |
| 46:4 109:1 | **reading** 34:15 | 193:23 194:14 | **recollect** 11:15 |
| 114:8,14 | 140:11 161:3 | 195:16 196:16 | 214:14 |
| 118:17 134:23 | 161:16 175:5 | 202:16 216:18 | **recollection** |
| **rating** 125:14 | 194:20 | 217:8 247:12 | 12:12 19:17 |
| **ratio** 214:13,17 | **reaffirming** | 247:21 263:12 | 25:14 27:14 |
| **rays** 236:11 | 46:21 | **recalled** 96:16 | 44:8 104:19 |
| **rbk** 1:11 4:19 | **real** 28:19 | 99:10 106:2 | 111:8 180:12 |
| **reach** 19:12 | **really** 33:23 | 196:5 | 268:24 |
| 29:20,21 73:21 | 44:2 67:2 | **receive** 15:7,17 | **recommend** |
| **reached** 29:22 | 68:17 71:2 | **received** 9:3 | 193:3 207:5 |
| **react** 232:22 | 107:13 126:8 | 15:21 17:5 | 228:8 |
| 235:16 | 162:11 175:4 | 18:5 26:16 | **recommendat...** |
| | 180:21 205:5 | 34:12,23 37:18 | 192:21 |
| | 205:20 220:20 | 42:25 44:24 | **recommendat...** |
| | 229:16 262:3 | 56:8 158:12 | 234:20 252:22 |

[recommending - related] Page 51

| | | | |
|---|---|---|---|
| **recommending** 194:10 | 41:7 43:7,9,11 43:13,16,22,24 | 211:25 220:9 **referred** 247:2 | **regulated** 123:15 254:9 |
| **record** 4:2,10 | 43:25 44:1,7,10 | **referring** 15:17 | **regulation** |
| 5:2,13 11:7 | 44:15,17 45:21 | 41:23 89:11 | 140:4,16,16,23 |
| 16:2,4 21:5,8 | 46:7,21,23 51:2 | 124:7 154:15 | 141:17 264:18 |
| 28:21,24 29:1,3 | 52:18,20 53:2 | 254:8 | 265:1,3 266:15 |
| 29:6 31:23 | 53:13 54:1,23 | **reflected** 5:2 | **regulations** |
| 32:1,3,6 38:21 | 56:24 57:11 | 122:15 | 78:4,9 140:13 |
| 68:12 82:2,4,6 | 93:3,5 94:12,24 | **refresh** 8:21 | 141:13 251:13 |
| 82:11 99:20 | 95:5,25 99:14 | 27:13 37:7 | 252:8 264:21 |
| 106:17,19,21 | 113:20 161:3 | 181:1 213:6 | 265:22 266:5 |
| 106:24 111:23 | 168:1 176:7,9 | **refreshes** | 266:14 |
| 112:3,5,10 | 176:12 204:13 | 214:15 | **regulator** 151:4 |
| 140:15 171:25 | 204:20 219:19 | **regard** 105:21 | **regulators** |
| 172:3,8 174:18 | 220:4 231:6,7 | 105:21 110:23 | 160:12,25 |
| 175:15,16,19 | **red** 46:4 | 247:10 248:5,9 | 161:20 167:11 |
| 175:22 176:4 | **reduce** 208:13 | 248:16 249:3 | **regulatory** |
| 176:10,14,16 | 212:1 | 254:24 257:9 | 19:19 22:2,6 |
| 176:18,21 | **redundant** | **regarding** 17:2 | 23:1,7 24:1 |
| 196:16 227:21 | 46:17 | 46:18 71:7 | 51:2,10,18,24 |
| 228:1 240:24 | **refer** 6:18 | 73:7 85:7 | 78:10,21 79:22 |
| 246:13,18 | 169:20 252:10 | 144:22 158:1 | 84:5,18 104:11 |
| 263:23 264:2,4 | **reference** 52:16 | 203:7 247:18 | 105:18,22,25 |
| 264:6,9 | 54:17 110:13 | 252:14 258:7 | 118:9,12,14,18 |
| **recorded** 4:8 | 145:22 157:19 | 266:23 267:24 | 118:20 119:5,9 |
| 4:11 | 157:19 219:7 | 270:9 | 132:19 156:9 |
| **recording** 4:4,8 | **referenced** | **regards** 4:13 | 156:17 157:12 |
| **records** 7:13 | 143:6,7 216:8 | **regiment** 229:5 | 254:8 |
| 8:21 12:24 | 217:3 | **regular** 80:23 | **related** 12:15 |
| 13:1,6,6,8,12 | **references** | 85:22 235:20 | 16:7 23:1,7 |
| 13:12,14 16:5 | 140:21 251:6 | 238:8 243:21 | 24:20 25:9 |
| 20:5,12,13,25 | **referencing** | 266:7 | 70:3 71:12 |
| 21:4,6 34:13,17 | 84:24 143:3 | **regularly** | 92:15 194:14 |
| 39:15 40:14 | 145:18 165:18 | 265:21,23 | 272:12 |

**[relates - report]**                                                    Page 52

| | | | |
|---|---|---|---|
| **relates** 1:7 4:15 | 112:23 116:12 | 144:4 152:20 | 74:19 83:1 |
| **relating** 203:17 | 235:15 | 154:7,20,23 | 88:7 111:16 |
| **relationship** | **remained** | 155:1,4,7,8,11 | 129:3 131:16 |
| 33:8,12 | 187:12 | 156:2,4 166:21 | 150:18 151:12 |
| **relative** 272:15 | **remains** 147:11 | 173:23 180:11 | 153:12 180:17 |
| **release** 3:18 | **remember** 9:19 | 181:10,14 | 186:6 201:16 |
| 158:11 159:17 | 9:23 10:2,8 | 191:21,22 | 209:10 210:22 |
| 172:11,15 | 11:23 12:4,10 | 192:14 194:1 | 219:2 238:18 |
| 173:17 195:23 | 18:3 20:20 | 194:19,19,20 | 244:18 247:15 |
| **released** 268:25 | 25:18,19,22,24 | 194:21,24 | 270:7 |
| **releases** 103:23 | 26:4,8,11 28:8 | 214:9,10,15 | **repeating** |
| 132:25,25 | 28:10,11 29:11 | 234:17 239:19 | 202:19 203:3 |
| **relevant** 46:6 | 30:7,20 31:1,2 | 253:5 262:7 | **repetitious** |
| 84:17 85:25 | 31:12,18 33:5 | 264:22 265:2,5 | 219:17 |
| 86:4 150:13 | 34:11,21 35:9 | 265:12,14,17 | **rephrase** |
| 219:10,12,23 | 35:21 36:1,7,12 | 266:1,8,10,16 | 230:21 247:7 |
| 228:13,25 | 41:8,12 42:21 | 267:6 271:4,9 | **replacement** |
| **reliable** 118:9 | 44:16 48:15,25 | **remnants** 147:4 | 185:22 187:18 |
| 118:14,24 | 49:13 51:25 | **remotely** 1:15 | 192:23 196:8 |
| 267:4,12 | 52:4,13 56:2,19 | 4:21 | **replacements** |
| **reliably** 117:18 | 56:23,25 57:10 | **renal** 207:12,13 | 184:8 |
| **reliance** 9:8 | 57:11,20 59:21 | 209:3,5,14 | **report** 3:14 |
| 114:24 115:2 | 70:1,12 71:20 | 210:6 | 8:12,19,22 9:4 |
| **reliant** 85:12 | 82:20 83:7,15 | **render** 8:22 | 9:9 10:18,21 |
| **relied** 58:10 | 83:23 88:25 | 46:9 95:6 | 14:23 26:5,12 |
| 112:14 236:19 | 89:4,7,18 92:24 | 119:17 | 35:15,16,19,24 |
| 250:10 263:1 | 94:23 98:24 | **rendered** 8:20 | 36:9 38:22 |
| 266:19 | 100:1,11 | 18:10 | 40:8,10,12,14 |
| **rely** 57:22 | 105:24 113:18 | **rendering** | 40:19,24 41:4 |
| 77:16,19 | 113:21 114:18 | 51:16 | 41:11 44:19,22 |
| 155:19 251:13 | 114:20 115:6,7 | **repeat** 8:9 14:6 | 44:24 45:3 |
| 254:7 257:7 | 115:13,16 | 23:3 34:4 | 47:11 50:18 |
| **relying** 10:22 | 116:3,6,15,20 | 36:24 41:1 | 51:16 58:17 |
| 51:3,10 77:14 | 125:8 138:18 | 67:25 70:8 | 67:4,23 68:15 |

| | | | |
|---|---|---|---|
| 68:21 84:25 | **reporter** 1:14 | 209:7 | 179:5 200:14 |
| 95:18 100:17 | 4:24 5:3 31:19 | **required** 82:23 | 234:5 256:13 |
| 102:2 108:12 | 36:22 82:1,25 | 83:3,10 86:1 | 258:4,5,10 |
| 109:3,6,14 | 84:11,15,16 | 101:20,25 | 260:1 268:22 |
| 110:4,13,16,17 | 86:13 106:16 | 133:13 143:24 | 269:22 270:1,8 |
| 112:14,24,24 | 111:13,18 | 147:2,12 148:9 | **resistant** 261:2 |
| 112:25 113:9 | 166:25 174:6 | 148:10 155:24 | **respectfully** |
| 113:13 114:16 | 180:14 191:18 | 165:6,15 | 67:17 171:23 |
| 114:20 115:8 | 225:1,7 244:17 | 178:14 224:9 | 237:3 |
| 115:20,22 | 247:14 272:5 | 252:8 | **respects** 178:15 |
| 116:6 117:18 | **reporting** 90:4 | **requirement** | 179:16 |
| 118:20 120:7 | 273:1 | 179:15 | **respond** 153:4 |
| 131:3 134:10 | **reports** 15:3 | **requirements** | **responding** |
| 135:10 140:10 | 20:18,22 49:23 | 18:20 19:20 | 130:2 |
| 140:11 141:10 | 50:3,4,6,13,15 | 22:2 78:13 | **responsibilities** |
| 148:21,22 | 112:14,21 | 105:18,22,25 | 90:10 244:8 |
| 149:4 150:8 | 113:4,6,8,11 | 108:2 | **responsibility** |
| 156:1 158:2,5 | 114:6 115:12 | **requires** 122:9 | 106:12 107:13 |
| 158:22 159:8 | 115:19 116:5 | 140:21,23 | 121:21 122:12 |
| 159:10 160:21 | 116:11,14,19 | 142:4 169:24 | 138:13 146:16 |
| 168:25 172:12 | 116:25 117:4,8 | 170:7 237:16 | 151:18 155:22 |
| 175:25 176:24 | 269:8 | 251:6,7 | 157:9 224:12 |
| 178:9 183:20 | **represent** | **requiring** | 259:24 260:2 |
| 183:21,22 | 108:13 | 251:23 | **responsible** |
| 192:16 197:7 | **represented** | **research** 77:11 | 14:25 146:17 |
| 197:11,13 | 199:6 | 80:6,11 161:9 | **restart** 68:22 |
| 206:21 216:12 | **representing** | 216:1 | **restrictions** |
| 221:1 228:3,7 | 4:22,24 117:9 | **reserve** 68:18 | 206:7 |
| 243:25 244:12 | **requested** 71:7 | **reshare** 173:6 | **result** 73:5 |
| 250:17,18 | **requesting** | **residency** 62:5 | 239:3 263:12 |
| 253:9,18 265:8 | 194:25 | 76:4 230:2 | 263:15 |
| 267:19 | **require** 64:11 | **residents** 61:2 | **resulted** 193:12 |
| **reported** 110:8 | 83:19 135:17 | 61:3,5,9,10,14 | **results** 213:25 |
| 214:22 | 135:22 147:23 | 63:5 122:5 | 232:11 |

**retained**  29:10
  36:9
**retainer**  42:23
**reverse**  88:10
**reversible**
  212:3
**review**  3:21
  7:12 19:24
  20:7,13,19
  33:16 34:13,17
  38:21 43:7
  44:14 46:3,11
  48:1,13,18 50:3
  50:15,18 51:17
  52:3,6,11,15
  53:13 54:22,25
  55:3,7,15 57:15
  90:6 93:18
  113:10 115:7
  115:24 116:23
  117:6,11
  150:20 168:1
  169:21 204:12
  212:7 213:1,15
  219:7,18 220:8
  227:1 243:24
  266:2
**reviewed**  7:1
  8:19,20,25
  10:17 20:24
  30:9 31:4
  34:10 36:19
  43:14,16,21
  44:6 45:12,17

  45:21 46:8,9,13
  46:13 47:5,21
  50:4 51:15
  54:25 57:1
  62:14 63:9,16
  93:11,16
  107:15 112:20
  113:8,9 117:1,5
  149:11,22,23
  150:2,14 194:4
  194:7 196:15
  236:18 237:25
  264:18,23,25
  265:6,10,19
**reviewing**
  40:13,23 41:3,7
  43:10 51:24
  236:10,11
**rick**  169:2
**right**  4:1 5:12
  6:13 7:6 11:1
  11:12 16:12,21
  16:25 17:14,19
  17:23 19:9
  26:18,21 27:4
  27:11,20 28:4
  29:8 35:19
  37:3,20,21
  38:11,13,18
  39:7,18 42:1
  43:4 44:20
  45:20 47:21
  50:2 52:25
  54:20 55:10

  56:12 58:15
  59:5,12 60:12
  62:1,21 64:11
  65:2,6,18 68:6
  68:11 72:13
  73:23 74:1,21
  75:10 78:12,16
  81:15 91:17
  92:1 95:3
  108:15 112:9
  112:13,15,23
  114:6,24 149:6
  149:24 158:6,8
  158:22 159:8
  159:23 160:18
  161:3 162:6
  165:6 166:8,15
  168:2,7,12
  172:12 173:19
  176:23 177:17
  177:25 178:5
  181:2 183:23
  184:8 186:25
  190:15,24
  191:9,12
  192:15 195:24
  196:8,24 197:1
  201:22 202:3,6
  202:19 206:24
  207:2 213:4,15
  214:19 216:2
  222:23,25
  228:13 229:21
  231:15,20,25

  232:6,15
  235:14 237:18
  240:13 242:5
  245:24 246:6,8
  262:14 263:15
  264:15 266:20
  267:3 268:11
  271:11
**rights**  68:18
**risk**  7:25 66:22
  67:5 68:3,6,9
  69:5,22 87:14
  94:4 98:16
  110:15 119:22
  120:21,25
  122:2,2 123:7
  124:23 129:9
  133:7 139:5,5
  139:25 140:2
  141:25 142:18
  142:23 144:24
  145:8 146:1,2,5
  147:5 148:6
  150:10,11
  162:25 163:12
  163:18 164:11
  165:1 168:10
  169:12 170:4
  177:16,23
  179:21 185:13
  185:17 187:5,9
  187:10,11
  188:22 189:14
  193:17,22

**[risk - safe]**                                                                 Page 55

| | | | |
|---|---|---|---|
| 195:3 197:3,15 | 252:21 253:13 | role  7:11 20:16 | rutgers  259:3 |
| 197:19,25 | 253:21 254:17 | 70:20 72:1 | **s** |
| 198:4,8 199:9,9 | 257:8 261:12 | 124:22,22 | **s**  1:13 2:1 3:9 |
| 199:11,15,22 | 262:2,3,5,10,16 | 151:13 152:20 | 5:5,5,14,14 |
| 200:6,23 | 263:5 | 200:15 229:4 | 273:5 |
| 201:21,24 | **risks**  7:21 | 232:13 238:18 | **safe**  16:15 |
| 202:3,16,23 | 71:12 121:8 | 244:3,6,6,7 | 85:12 87:1,11 |
| 203:7,9,12,13 | 122:21 160:4 | 256:16 | 87:23 120:6 |
| 203:13,17,22 | 169:9,24 | **roles**  123:17 | 121:5,16 |
| 205:17 206:18 | 185:25 186:1,8 | 235:9 244:5 | 122:13 123:8 |
| 211:4,8,9,11,12 | 186:9 187:2,3 | 268:3,6 | 123:20,23 |
| 211:13,21,23 | 202:2 204:17 | **room**  204:3 | 124:2,10,11,25 |
| 212:6 213:23 | 204:22 205:1 | 260:12 | 124:25 128:18 |
| 214:1,18,23 | 205:13,25 | **root**  160:17 | 129:16 134:3 |
| 215:2,8,10,21 | 207:4,22 208:5 | **roseland**  2:5 | 135:14 136:22 |
| 216:15 217:6 | 208:7 212:8 | **rubbing**  170:19 | 138:8 139:11 |
| 217:24 218:6 | 217:10 218:7 | **rude**  171:14 | 141:20 148:4 |
| 218:17,22 | 220:16 222:6 | **rules**  5:16 | 148:16 155:24 |
| 219:5,13 221:4 | 222:24 223:1 | **russo**  1:8 3:3 | 156:23 157:24 |
| 221:11,21,22 | 228:11 255:4 | 4:12 5:14 6:24 | 163:25 165:19 |
| 222:1,18,19 | 258:8 | 14:7 17:15 | 166:14 179:7,9 |
| 223:9,13,15,24 | **risky**  210:8 | 27:11 32:8 | 179:23 186:21 |
| 224:3,16,18,19 | **road**  2:15 | 37:21 38:7 | 190:7,22 |
| 224:25 225:25 | **robert**  56:11 | 55:10 58:14 | 194:10 197:21 |
| 226:8,14,19 | **roberts**  1:8 | 67:5,19,24 | 206:22 212:13 |
| 228:16 230:13 | 4:15 54:23 | 82:13 86:15 | 217:20 219:14 |
| 232:5 234:5 | 94:7 108:17 | 107:1 108:13 | 219:24 220:14 |
| 236:21 237:6 | 204:7 | 109:20 168:24 | 221:13 222:3 |
| 237:12,12,22 | **robichaux**  55:5 | 170:19 173:7,8 | 222:15 224:23 |
| 238:1,5 241:13 | 56:12 | 173:9 180:21 | 226:12 258:7 |
| 244:20 245:9 | **robichaux's** | 188:5 246:22 | 260:4 262:23 |
| 245:11,17,22 | 48:12 57:13 | 271:21 272:8 | 263:4 |
| 246:1,3 247:19 | **rocket**  67:15 | 273:3,21 | |
| 248:1,21 250:2 | | | |

**[safely - section]**                                                        Page 56

| | | | |
|---|---|---|---|
| **safely** 73:15,17 | 132:22 134:11 | **says** 26:23 27:6 | **scope** 109:8 |
| 130:23 142:16 | 140:19,24 | 39:17 48:13 | **screen** 4:7 |
| 145:23 146:13 | 141:11,14,18 | 56:10,14 58:6 | 17:11 37:10 |
| 147:12 157:21 | 141:22,25 | 109:17 141:19 | 38:1,4,8 44:22 |
| 164:16 166:6 | 148:14 154:21 | 151:11 159:1 | 56:6 158:14 |
| 221:24 234:6 | 156:15 157:2,3 | 160:10 161:6 | 161:17 172:18 |
| 238:24 258:1 | 157:10 162:15 | 168:23 169:4,9 | 172:20,25 |
| 260:3 | 166:18 178:20 | 173:15 177:19 | 175:8 177:3 |
| **safer** 188:24 | 180:6 186:15 | 177:21 195:16 | 195:13,15 |
| 199:12 210:19 | 186:24 188:25 | 195:24 197:24 | 246:3 |
| 210:24 211:2 | 189:11 191:3 | 239:8 | **screening** |
| 218:24 | 192:8,24 | **scans** 236:11 | 211:14 |
| **safest** 147:20 | 193:10 198:25 | **scenario** 200:2 | **scroll** 19:2 |
| 207:24 212:15 | 211:19 221:17 | 204:9,16 | 47:19 52:7 |
| 230:14 231:9 | 251:3,8,17,23 | **schedule** 9:20 | **scrolling** 52:8 |
| 234:12 235:12 | 265:5 268:8,18 | 10:11,12 25:2,4 | **search** 45:4 |
| 240:12 242:2 | 269:11 270:14 | 42:13 | 212:11 |
| 261:8,21 | **sale** 137:5 | **scheme** 84:5 | **searches** 12:9 |
| 262:20 | **salt** 206:7 | 132:20 156:9 | **sec** 36:23 |
| **safety** 74:14 | **sample** 64:19 | **schemes** 84:19 | 180:24 |
| 78:11 90:9 | **samuel** 93:21 | **school** 59:5,7 | **second** 8:9 10:4 |
| 96:3 98:21 | **save** 45:3 87:16 | 76:4 179:5 | 13:2 17:9 19:1 |
| 102:17 103:19 | 108:11 | 229:11,14,18 | 19:6 28:21,22 |
| 103:24 104:12 | **saw** 57:6 | 229:22 230:11 | 28:24 37:17 |
| 106:11 110:15 | 264:22 | 259:2 | 45:1 66:25 |
| 110:19,24 | **sawyer** 50:19 | **schools** 59:11 | 90:15 95:19 |
| 111:1,5 119:15 | **saying** 11:19 | **science** 79:25 | 149:2 159:24 |
| 120:14 121:4 | 48:24 97:15 | 80:3 | 173:12 174:5 |
| 121:21 122:2 | 142:8,10 174:8 | **scientific** 55:1 | 182:15 183:21 |
| 122:17 123:12 | 180:21 186:13 | 62:14 63:9,16 | 192:19 213:7 |
| 125:14,23 | 202:3,11 | 99:2 114:17 | 261:24 |
| 128:14 129:5 | 222:23 229:21 | 115:10 236:18 | **section** 47:20 |
| 130:9,20 131:5 | 239:19 243:6 | **scientists** 198:3 | 50:25 52:20 |
| 131:9 132:7,15 | | 202:8,9,22 | 73:3,8,10 |

[section - showing]                                                    Page 57

| | | | |
|---|---|---|---|
| 124:23 151:14 | 253:17 263:19 | **serve**  11:16 | 256:6 257:16 |
| 179:3 200:16 | **seeing**  24:14 | 24:4 34:2,7,10 | 257:20 |
| 233:6 238:20 | 119:11,12 | 34:14,20 35:6 | **seven**  174:24 |
| 244:7 256:16 | 144:4 151:22 | 43:6 44:9 | 196:21 213:5 |
| 257:3 258:16 | 190:20 233:5 | **served**  11:11 | **seventies**  143:5 |
| 258:19 259:4,7 | 239:6 | 12:1,11,14,22 | 163:13 |
| 259:25 268:4 | **seen**  4:6 56:18 | 13:13 15:2 | **several**  11:3 |
| **sector**  74:6 | **selected**  168:5 | 16:17 22:16,20 | 13:9 35:21 |
| **see**  16:16 17:14 | 207:9 | 30:1 36:9 | 36:2 51:6 |
| 19:4,7 24:12,15 | **sell**  121:20 | 43:17 44:6,14 | 114:19 194:19 |
| 24:16,16 27:1,7 | 137:18 138:7 | 78:23 | 233:19 |
| 38:2,3,12 45:13 | 153:13 255:1 | **services**  134:5 | **shape**  189:5 |
| 48:6 49:15,20 | **seller**  106:3 | **serving**  35:12 | **share**  17:8,11 |
| 49:21 52:8 | **selling**  119:8 | 35:23 72:19 | 37:9,13,17 |
| 54:10 58:7,8 | 120:2,19 121:2 | 86:5 233:21 | 44:22 56:5 |
| 72:9 94:11,14 | 121:14 122:12 | 257:2 259:4 | 99:24 148:2,4 |
| 112:21 113:11 | 137:15,21 | **setting**  60:22 | 148:25 161:4 |
| 141:16 158:14 | 146:13 147:1 | 61:9,11 64:10 | 183:25 195:8 |
| 159:2,4,6,21 | 155:22 | 77:3 85:10 | 202:10 257:19 |
| 160:3,8,13 | **send**  50:12 | 86:6 119:12 | **shared**  72:10 |
| 167:21,24 | 102:8 213:4 | 122:4,4,9 | 193:10 |
| 169:14 171:15 | **sense**  123:5 | 130:11 139:21 | **sharing**  28:23 |
| 172:21 173:12 | **sent**  15:13 47:7 | 139:21,22 | 202:20 |
| 173:15 176:9 | 128:1 174:13 | 178:25 179:4 | **sheet**  273:1 |
| 195:13 197:5 | **sentence** | 191:5 200:13 | **ship**  67:15 |
| 197:23 198:1,5 | 160:10 167:21 | 200:14 231:12 | **short**  82:7 |
| 198:19 202:7,8 | 177:19,20,22 | 233:3,3 238:19 | 100:9 172:4 |
| 202:9 203:13 | 214:3 251:24 | 238:20 239:7 | 186:2,10 187:4 |
| 212:8 213:18 | **sequence**  160:5 | 244:4 256:6,7 | 227:22 246:14 |
| 213:21 214:3 | **series**  247:12 | 256:19 259:11 | **show**  212:23 |
| 215:15 220:4 | 247:17 | 268:20 | 213:25 |
| 240:14 245:5,7 | **serious**  69:3 | **settings**  60:21 | **showing**  144:19 |
| 245:14 251:9 | 196:4 209:23 | 147:25 200:11 | 202:12 213:10 |
| 252:3 253:11 | | 233:5 234:19 | |

**[shown - sold]**                                                                Page 58

**shown**  10:13
**shows**  237:5
**shred**  12:23
  13:5,8 15:4,23
**siddiqui**  50:23
**side**  88:8,14,19
  88:23 89:2
  193:11 235:1
**sight**  260:10
**sign**  60:18,25
**signature**
  272:21
**significance**
  211:22 214:6
  248:17 250:7
**significant**
  83:18 110:19
  140:19 187:11
  214:22 248:10
  249:7 251:3
  262:5
**similar**  221:4
  239:5 271:7
**simply**  253:14
**single**  13:22
  44:5,13 99:19
  155:9 239:2,14
  260:14
**site**  76:16 236:2
  240:1,8
**sites**  78:1 241:4
**situation**  191:8
**six**  30:17 95:18
  159:16 160:2

195:5,21
196:14 269:16
**size**  232:14
**skip**  247:8
**slater**  2:3,3 3:5
  12:20 13:2,16
  13:21 14:2,13
  26:22 28:16,19
  29:14 31:7
  32:17 33:9,18
  33:20,23 34:2,7
  36:19 37:8,14
  38:7 42:9 45:2
  46:25 47:10
  49:5,25 51:4,12
  51:20 53:17
  54:3 56:13
  57:4,17 66:24
  67:7,13,20
  68:12 69:2
  72:5,22 74:18
  75:1 77:7 78:6
  81:6,12,17,23
  82:15 83:5,13
  83:21 84:3,7,21
  87:5 88:5 90:1
  90:15 91:7,18
  92:10,20 93:2
  94:21 96:10
  97:19 98:4
  99:5 100:14
  101:2,9,22
  104:4,25 105:9
  105:19 106:4

107:23 108:6
108:10,21,25
109:9 110:10
115:4 117:19
118:15 119:1
121:10 122:22
124:4,13 125:5
130:4 131:22
134:16,21
135:2 136:6,14
138:4,25
139:17 141:6
142:6,24
143:18 144:8
144:13,25
149:3,8 150:16
151:25 152:8
152:11,25
154:2 156:12
161:23 162:10
163:3 164:20
165:7,16
166:23 167:2
168:15,20
170:12,17,25
171:12,19
173:8 174:2,12
175:3,9,21
176:1 177:18
179:18 180:20
182:19 186:3
186:11 187:6
188:1,9 189:15
193:24 194:16

199:18,25
200:25 201:10
201:23 205:2
205:14 206:1
207:6 208:8
211:6 215:11
217:11,25
218:11,25
219:16,25
220:18 222:8
223:5 224:10
225:8,16 226:1
226:16 227:12
229:12 231:17
232:7 237:8,20
238:13 241:17
242:8 244:22
245:2 246:8,21
254:21 269:15
270:18,21
271:13
**slater's**  32:22
  33:8 47:8
**smart**  55:11
**smoking**  71:22
**snf**  27:4
**society**  62:18
**solco**  2:11 6:20
  161:6
**sold**  86:17
  120:24 122:10
  123:21 128:16
  131:12 134:15
  134:20 135:6

[sold - spoke]                                                      Page 59

| | | | |
|---|---|---|---|
| 135:15,16,21 | 166:25 167:5 | **specialists** | 237:4,11 |
| 135:24 136:1,4 | 167:18,19,23 | 233:4 246:4 | 256:21 265:24 |
| 136:9,13 | 173:10 182:14 | **specialized** | 266:2 |
| 146:18 165:19 | 186:5 188:4 | 65:17 | **specifically** |
| 165:25 248:3 | 196:21 199:25 | **specialty** | 69:8 74:6 |
| 262:11 | 210:21 225:2 | 117:15,22 | 77:22 85:23 |
| **solutions** 4:23 | 243:4 244:17 | 239:5 241:20 | 89:3 99:8 |
| 4:25 | 247:5,14 | 242:15 | 103:6 107:14 |
| **solved** 254:23 | 254:21 263:24 | **specific** 35:9 | 108:18 122:8 |
| **solvents** 147:8 | 267:21 | 41:9 56:25 | 127:14 135:11 |
| **somebody** 29:9 | **sort** 98:17 | 62:11 63:5 | 147:21 152:16 |
| 72:3 | 225:9 | 74:25 76:19 | 157:19 197:8 |
| **someone's** | **sound** 158:6 | 80:17 82:21 | 206:6 209:3 |
| 21:15 23:15 | **sounds** 111:20 | 83:15 84:10,12 | 210:14 221:2 |
| 87:16 | **source** 237:1 | 91:5 96:21 | 224:2 234:11 |
| **somewhat** 41:1 | 240:15 267:14 | 97:2,3,4,9,22 | 243:17 249:6 |
| 55:21 | 267:16,18 | 97:25 98:8,13 | 252:20 265:17 |
| **soon** 69:4 | **sources** 77:23 | 98:23,25 99:17 | **specifics** 20:20 |
| 102:13 103:13 | 78:10 113:22 | 99:24 100:5,11 | 85:7 106:8,14 |
| 165:25 166:1,8 | 113:25 133:1 | 103:7 104:18 | 204:6,12 |
| 166:16,17 | 194:23 216:9 | 104:19 105:22 | 216:21 217:1 |
| 186:20 223:11 | 226:22 227:5,5 | 105:25 107:5 | 217:15,15 |
| 249:14 | 236:23 238:6 | 108:22 116:4 | 223:16 226:18 |
| **sorry** 8:8 15:10 | 240:4,10,14 | 124:7,16 | **spend** 36:10 |
| 15:11 31:13 | 257:18 269:8 | 135:19 145:3 | 51:23 |
| 32:10 34:4 | 269:23 270:9 | 145:10,13 | **spent** 24:8 |
| 36:22 40:25 | **speak** 10:10 | 160:5 181:7 | 36:13 39:22 |
| 41:18 43:18 | 29:9,13,16 48:9 | 187:22 189:20 | 41:7,10,15,24 |
| 48:22 52:8 | 77:15 93:23 | 203:11 204:5 | 42:4,8,18 52:1 |
| 55:8 70:7,8 | 114:1 194:8 | 204:12 206:17 | **spoke** 9:13 |
| 74:19 82:25 | **speaking** 34:1,6 | 214:11 215:20 | 34:12 152:3 |
| 84:11 86:13 | 113:23 164:2 | 218:3,4,19 | 154:16 166:3 |
| 91:9 93:15 | **specialist** 2:20 | 222:18 228:17 | 245:13 268:23 |
| 141:8 144:10 | | 232:16 234:20 | 271:2 |

[spoken - subject]                                                              Page 60

| | | | |
|---|---|---|---|
| **spoken**  9:20 | **started**  39:9,16 | **states**  1:1 4:17 | **stopping**  187:9 |
| 36:5 | **starting**  144:15 | 27:9 59:12 | 189:7 193:13 |
| **st**  71:23 258:16 | **starts**  167:21 | **stating**  215:6 | **storage**  69:15 |
| 258:16,23 | **state**  1:15 5:13 | **statistical**  214:6 | **store**  16:5 |
| **staff**  73:9 | 141:17 168:25 | **statistically** | **strictly**  84:5,19 |
| 233:19 261:9 | 223:24 272:5 | 214:22 | **stroke**  185:14 |
| **stan**  155:18 | **stated**  131:7 | **statute**  140:4,7 | 188:23 |
| **stand**  8:7 89:9 | 153:11 157:25 | 140:9 | **structuring** |
| 89:17,18 | 167:11 177:2 | **statutes**  141:15 | 128:9 |
| **standard**  19:13 | 189:9 198:11 | **stenographic** | **students**  25:4 |
| 21:11 103:25 | 221:15 223:23 | 1:13 5:2 | 60:18,20,25 |
| 104:14 122:9 | 227:15 | **stenosis**  207:14 | 61:2,8,15 63:5 |
| 122:14 126:23 | **statement**  3:19 | 209:3,15 210:7 | 122:5 234:5 |
| 128:13 133:12 | 101:12 111:3 | **step**  169:13 | 238:22 256:13 |
| 140:24 141:1 | 121:24 141:2 | 170:5 | 257:21 258:4,5 |
| 155:19 156:14 | 153:9 158:22 | **steps**  147:18 | 258:10 260:1 |
| 157:6 180:3 | 159:1,7,12,19 | 160:5 162:19 | 269:18 270:8 |
| 186:23 191:3,7 | 168:24 169:6 | 255:15 | **studies**  71:22 |
| 200:10 233:10 | 173:25 177:9 | **steve**  254:22 | 127:15 142:21 |
| 239:3,8,12,20 | 177:11,13 | **steven**  2:14 | 143:7 212:18 |
| 241:2,15 242:6 | 178:1,4 186:14 | **stevens**  87:18 | 214:18 215:9 |
| 242:13,19,21 | 190:14 191:13 | **stop**  66:25 | 216:18,23 |
| 242:21 248:15 | 193:16 196:11 | 73:16 81:13 | 217:7,18 218:6 |
| 249:9 251:12 | 197:8,10,13 | 184:16,19 | 219:21 230:4 |
| 251:22,24,25 | 202:8,10,19,21 | 185:9 186:19 | 236:10,13 |
| 252:7,15,18 | 203:11 254:4 | 187:17,20,21 | 237:24 |
| **standards** | 262:13,24,25 | 189:1 190:11 | **study**  63:13 |
| 110:14 | 263:2,4 | 190:20 191:14 | 71:23 72:9 |
| **stands**  78:18 | **statements** | 192:10 227:10 | 215:16 217:15 |
| **start**  14:16 | 117:8,9 160:21 | 231:2 245:3 | **stuff**  173:24 |
| 33:24 45:12,16 | 178:8 203:16 | 249:24 | **stumbled**  65:8 |
| 45:19 129:5 | 204:5 216:10 | **stopped**  119:8 | **sub**  234:25 |
| 189:21,22 | 250:6 251:18 | 137:5 | **subject**  60:4,8 |
| 210:16 | 256:1 263:13 | | 197:18 236:3 |

[subject - tail]                                                        Page 61

248:5
**subjected**
  193:18 250:3
**subjecting**   7:24
  164:9 188:22
**subjects**   60:21
**submitted**
  28:12 50:5,7
  52:2
**subs**   89:22
**subscribed**
  271:22 273:22
**subsequent**
  35:13
**subsidiary**   6:20
**subspecialties**
  123:3 234:25
  256:9
**subspecialty**
  237:14
**substance**
  89:23 142:17
**substances**
  247:4
**substantive**
  35:2,4,24
**substantively**
  41:25 42:4,18
**substitute**
  187:23
**substitutes**   73:7
**substitution**
  184:12

**substitutions**
  73:16
**successful**   91:1
**successfully**
  206:4,14
  221:23
**sudden**   182:21
  185:10
**suddenly**   185:9
  186:19 190:11
  191:15
**sufficiency**
  248:1
**sufficient**   96:19
**sugar**   90:24
  91:3
**suggest**   121:16
  199:1 219:8
  224:20
**suggested**
  128:21 129:1
  136:9 209:13
**suggesting**
  220:9 239:1
**suitable**   209:16
**suite**   2:15
**sum**   237:13
**summaries**
  55:14,19,24
  57:15,20,23,25
  116:11
**summary**   3:16
  55:11 56:7,11
  58:6,11 110:18

140:18 251:3
**supersede**
  130:20
**supervision**
  73:18 153:15
**supplied**   47:2
**support**   31:20
  241:8
**supported**
  118:24
**supportive**
  206:19
**sure**   10:11
  28:16,20 33:11
  34:23 37:11,12
  41:2,22 44:2
  64:4 68:3
  70:17 73:12
  86:14 108:8
  111:18 112:17
  113:7 121:15
  128:3,11
  138:11 139:11
  141:15 148:4
  148:11 160:17
  162:17 163:6
  173:21,25
  175:10 181:9
  185:3 201:18
  207:18 209:1,5
  209:10 211:16
  220:20 222:2
  229:15 239:23
  246:24 255:3

257:24
**surgery**   259:9
**surgical**   234:23
  234:25
**survey**   235:4
**surveys**   92:14
  235:8
**suspicion**   76:7
**swear**   5:3
**sworn**   5:6
  271:22 272:9
  273:22
**synthesizing**
  107:11
**system**   241:9
  255:25 258:18
  258:22 261:6
**systematic**
  213:15
**systemic**   88:11
**systemically**
  87:19

**t**

**t**   1:13,13,13 3:9
  272:1,1
**tab**   17:8 26:14
  37:5,17 56:5
  149:1 158:9
  159:16 192:15
  195:5 196:14
  212:25
**tail**   210:21

[tainted - testimony]                                                    Page 62

| | | | |
|---|---|---|---|
| **tainted** 70:13 | **talked** 190:13 | **teleconference** | 251:11,16,22 |
| 187:13 189:21 | 195:7 252:13 | 10:9 | 252:5 254:12 |
| 190:1 | 253:11 | **telephone** | 257:4 261:23 |
| **take** 4:9 26:14 | **talking** 31:6 | 42:14 | 261:24 262:10 |
| 28:14 31:20 | 41:15,25 42:4 | **tell** 33:18 35:3 | 262:25 263:10 |
| 43:4 58:13,24 | 42:18 107:5,6 | 75:2 99:1 | **terrible** 87:18 |
| 67:23 81:21,23 | 119:4 125:12 | 101:20,25 | **test** 82:24 83:4 |
| 112:16 151:1 | 125:17 126:11 | 108:6 109:1 | 83:10 86:1 |
| 159:15 167:16 | 134:21 139:6 | 115:9 116:17 | 138:1,24 |
| 170:20,21 | 140:6 141:7 | 128:24 155:8 | 139:13 142:5 |
| 171:4,8,10,14 | 143:1,2,21 | 164:17 184:15 | 147:6 148:3,3 |
| 173:22 178:11 | 145:3,20 | 187:17,19 | 165:21 |
| 185:7,20 | 150:22 157:6 | 201:11 208:4,7 | **tested** 146:14 |
| 187:22 190:12 | 163:6 173:18 | 255:3 258:20 | 165:23 168:12 |
| 192:21 195:11 | 254:22 270:18 | 258:21 266:12 | 169:3 253:21 |
| 196:13 207:5 | **taught** 62:10 | 270:1 | **testified** 91:15 |
| 209:16 225:1 | 63:4 76:22 | **telling** 14:3 | 97:12 103:3 |
| 227:19 241:11 | 79:21 258:5,10 | 152:21 | 151:3,10 |
| 246:9 251:12 | **taxes** 13:15 | **ten** 31:1 81:24 | 155:18 255:17 |
| **taken** 1:14,15 | 14:12,20 | 171:20 175:17 | 264:13 266:18 |
| 4:12 77:3 82:8 | **teach** 61:6 | 175:24 | **testifies** 5:8 |
| 96:15 100:10 | 77:12 258:4 | **tenure** 61:20 | **testimonies** |
| 112:7 125:17 | **teaching** 25:3 | **term** 53:22 | 12:12 |
| 125:18 141:9 | 122:5 179:5 | 55:11 89:16 | **testimony** 3:11 |
| 172:5 227:23 | 234:4 238:21 | 108:9 121:12 | 4:12 5:22,25 |
| 236:14 238:5 | 244:7 256:12 | 125:11 163:16 | 6:4 12:6 15:8 |
| 246:15 248:19 | 259:2 | 164:24 165:3 | 15:11,12 17:5 |
| 248:23 249:16 | **team** 64:6 | 186:2,10 187:4 | 17:18 28:3 |
| 261:16,22 | **technical** 90:4 | 187:9 214:12 | 32:18 38:21,25 |
| 266:17 269:9 | 169:21 | 267:1,25 | 48:7 55:4,8 |
| 272:14 | **technology** | **terminus** 2:15 | 79:13 94:15 |
| **talk** 5:17 28:22 | 4:21 | **terms** 76:13 | 95:22 116:23 |
| 130:6 183:20 | **tele** 10:10 | 86:4 117:9 | 116:24 117:10 |
| | | 247:25 249:2 | 126:17 136:3 |

141:5 142:3
149:12,15
150:2,14,21
151:22 153:6
154:9,18 162:6
188:2,10
202:14 241:18
267:22 268:2
269:1 271:16
**testing** 66:7
137:17 144:7
144:19 145:23
146:22 147:8
147:15 177:7
236:4
**tests** 66:1 168:2
168:4
**teva** 2:17,17
**thank** 109:16
179:14 271:17
**thankfully**
209:22
**thanks** 171:25
254:22
**theoretical**
169:12 170:4
198:3,8,24
199:8,9,15
201:24 202:3
202:23 203:12
**therapy** 192:23
**thereto** 10:21
**thing** 171:22
172:23 176:5

205:9
**things** 40:20
67:3,22 69:18
87:20 101:13
108:3 109:5
114:9 156:25
157:1 171:3
185:14 209:12
245:18,21
257:6
**think** 7:13 9:3
10:4 11:9,23
15:17 26:3
28:22 29:18
43:23 49:12
56:5 58:17
65:3 67:16
68:9 78:22
84:25 89:1,19
91:15 93:5
95:17 102:22
103:12 107:15
109:10 124:15
126:22 137:14
143:2,6 147:10
148:23 150:6,8
150:18 153:22
156:1 157:16
159:9,9 162:14
163:5 165:11
165:18 171:13
177:22 181:2
190:13 195:9
203:9 205:17

209:15 215:1
216:12,13
217:22 219:10
220:23 224:24
225:9,18
230:17 232:9
237:10 241:2
245:13 258:3
263:8,21
267:20 268:2
270:23
**thinking**
190:25 191:2
191:10,11,25
270:2
**thought** 38:10
88:23
**thousands** 46:5
122:25 123:1
218:15 233:20
255:24 267:23
268:5,12,13
**threatening**
89:6
**three** 25:10
30:14 49:16,23
50:5 59:16,22
59:24 112:14
112:21 113:3
140:14 167:23
197:23 228:4,7
**threshold** 83:17
84:1

**throw** 184:16
**tighter** 25:5
**time** 7:16,19,20
11:15,22 24:7,9
24:10,10,21,23
25:1,6,6 28:19
29:1,6 30:18,22
31:9,14 32:1,6
33:2 34:11,25
36:7,8,13 40:18
40:22 41:2,6,14
41:17,19,25
42:3,8,20 43:21
44:5,13 46:16
51:23 52:1
58:21 61:14,17
67:1 69:9
76:12 82:6,11
96:5,14 97:4,12
98:22,24 99:13
100:6 103:15
104:1,7,19
105:3 106:19
106:24 107:6
107:10,15,16
108:12 112:5
112:10 120:1
120:13,19
126:10,12,18
128:18 133:20
134:24 135:6
137:5,15 143:3
144:14,16
146:24 155:9

**[time - transcript]**

159:17 162:5
163:20 165:23
166:21 170:12
171:7,24 172:3
172:8 176:16
176:21 180:9
181:5,19
188:12 190:2,6
190:17 191:1
191:12 192:3
192:13 193:15
193:23 194:15
194:18 198:15
223:11 225:2
227:21 228:1
229:10,23
233:21 240:19
246:13,18
250:12,15
255:9 264:4,9
264:17 266:2
268:19 270:2,5
271:16
**times**   11:3,5,8
24:14 34:18,22
35:18 66:12
79:7 153:20,23
154:7 187:24
188:5 189:13
201:2 217:3
221:16 240:7
245:17 252:13
260:23 266:4,9
266:11 270:15

**timing**   154:24
**tissue**   64:15
66:3,4
**title**   213:12
**today**   5:17,22
6:1,5 9:13,17
35:5,19 116:17
**today's**   8:18,23
9:1,12 10:12
34:24 35:12
271:16
**together**   47:9
**told**   41:24
69:24 70:5,9
109:1 185:21
263:1 269:18
**tolerate**   205:9
223:18 230:9
**tolerated**
207:25
**tonight**   176:2
**took**   7:21 44:12
46:15,18,19,22
58:21 96:5
101:13,18
105:11 129:12
185:4 190:23
192:13 198:12
217:9 224:8
244:10,13
250:9 255:15
**top**   52:23 69:6
91:14 144:15
160:1 173:23

**topic**   109:21
**total**   30:16 36:8
36:15 39:20,22
39:25 237:13
**totality**   8:25
**touch**   186:20
**touched**   109:6
**toward**   250:23
**towards**   38:16
40:23 41:3
52:22
**toxic**   245:20
**toxicol**   118:10
**toxicological**
77:15 118:8
199:16
**toxicologist**
75:16 118:8,11
**toxicologists**
77:19 197:24
200:22 201:20
202:1,22
**trace**   125:11
**track**   42:16
195:20
**traditionally**
258:23
**trained**   229:16
233:16 235:10
239:5 242:15
257:13,16
**training**   65:18
76:3,4 229:4,15
233:16 257:15

**trangle**   2:8 3:4
5:11 13:25
17:7 26:13,24
28:14,18,20
29:7 31:19,22
32:7,20 33:22
37:11,16 44:23
45:8 52:22
56:4,15 67:12
67:16 81:16,21
82:3,12 84:14
106:25 108:15
108:23 109:7
111:24 112:2
112:12 148:25
149:5,9 152:10
158:19 167:16
168:18 170:14
170:23 171:9
171:17,23
172:9 174:17
175:23 176:13
176:22 178:11
188:3 201:9
225:3,11 228:2
244:24 246:11
249:10 253:16
256:2 258:13
262:17 263:16
263:21 264:1
264:12 270:20
**transcript**   3:15
27:19 56:7,11
57:12 272:7

[transcripts - uncommon]                                    Page 65

**transcripts**
  15:18 47:23
  149:15,23
**transition**
  184:11 187:16
  189:2 190:12
  209:24 249:17
  262:22
**transitioned**
  166:7 184:7
  190:3 231:3
  255:16 262:14
  263:3
**transitioning**
  263:13
**transplant**
  259:10
**traurig** 2:14
**treat** 24:12
  164:16 182:8
  183:2 196:4
  205:13 235:3,6
  245:8 252:14
**treatable** 69:20
**treated** 64:25
  65:13 157:21
  181:20 206:4
  238:25
**treating** 65:15
  77:18 90:24
  94:1,19 182:3
  193:6 232:18
  243:20 244:25
  248:14 249:8

  252:18
**treatment** 18:5
  18:11 66:10
  126:3 204:25
  205:19 206:11
  206:23 208:1
  228:8 229:5,9
  231:11 234:10
  234:22 236:16
  237:17 239:11
  240:12 242:2
  242:18,19
  243:14,14
  258:11 269:11
**treatments**
  94:9 206:20,23
  217:21 234:21
  235:12 236:3
  255:17 259:18
  260:4 262:15
  263:7 268:8
**tremendous**
  102:14
**trial** 12:6 38:25
  72:3
**tried** 11:14
  12:4,10 58:24
  167:2 231:1
**tripped** 65:4
**true** 10:16
  204:21 223:4
  230:19 231:13
  272:6

**trusted** 78:1
**try** 5:17 37:14
  38:5 55:8
  105:3 176:7,11
  181:1 212:13
  230:13 245:21
**trying** 28:9
  37:22,23 67:10
  111:21 159:23
  162:13 174:2,3
  202:12 207:23
  270:23
**turkey** 187:10
**turns** 142:19
  221:13
**twisting** 136:18
**two** 35:11,18
  36:3,3 49:16
  149:1,23
  154:16 167:23
  178:8 183:21
  192:15 196:25
  197:1 263:22
  271:1
**tyler** 2:20 4:22
**type** 79:11
  174:7 208:2
  221:5,8 256:21
  257:25
**types** 20:10
  76:24 221:9
  260:25
**typical** 20:2,15
  21:2 57:22

**typically** 43:7

**u**

**u** 1:13 5:5,14
**u.s.** 2:12 6:22
  198:16
**ug** 225:23
**uh** 15:20 17:13
  168:8
**ulcer** 18:13
**ultrasound**
  64:18
**um** 73:22
**unacceptable**
  86:10 100:19
  119:20 124:17
  124:17,20,23
  125:1 126:21
  126:25 143:9
  146:1,5 150:10
  151:17 153:13
  153:16 154:10
  162:23 163:23
  164:10,12,14
  165:4,4 188:16
  197:19 200:6
  200:20 221:20
  222:21 224:3
  224:16,18,25
  226:8 263:5
**unaware**
  151:23
**uncommon**
  69:12

**under**  58:6
  64:17 73:17
  82:22 83:2
  86:18 104:2,22
  105:6 121:8
  133:4 138:1,23
  139:13 153:14
  153:15 166:13
  180:3
**undergo**
  205:19
**underlying**
  136:15 183:18
  207:12 209:5
  210:17 211:16
**underneath**
  27:6
**understand**
  5:19 6:10
  41:22 44:3
  55:16 57:6
  58:2 64:4
  67:10 70:17
  71:2 94:12,15
  98:1 109:8
  113:7 119:16
  122:19 157:7
  162:9,12
  200:21 201:19
  202:12 230:24
  233:9 235:10
  248:13 255:11
  267:9

**understanding**
  7:1,8,10 46:15
  67:2 86:19
  98:15 102:3
  118:1 125:7
  144:17 169:10
  169:17,25
  170:7 243:11
  252:5,6 255:7
  261:11
**understands**
  193:6,8
**understood**
  160:12,25
  161:21 167:12
**undertook**
  100:4 160:11
  160:24 161:20
**unexpected**
  142:5 159:2,6
  159:13
**unforeseeable**
  121:9,12,17
  122:21
**unfortunately**
  65:10 69:6,11
  69:19 76:6
  87:13 88:18
  146:19 172:22
  174:24 180:17
  185:19 225:21
  250:2
**unfriendly**
  171:24

**unilaterally**
  131:13
**united**  1:1 4:17
  59:11
**universally**
  86:21 124:17
  189:5
**universities**
  61:23
**university**
  233:17
**unknowingly**
  7:24 85:14,24
**unquote**  247:2
  254:5
**untrue**  155:2
**unusual**  69:14
**updated**  103:22
  230:3
**updating**
  132:20
**uptodate**  236:1
**urgent**  161:5
**urology**  259:10
**usa**  2:17
**usage**  190:7
  215:2 223:7
**use**  14:10 32:19
  69:7,13,13
  72:21 77:22,24
  86:8 91:22
  110:16 122:2,6
  123:4,6 125:11
  129:7 134:1

  140:10 142:9
  147:22 156:21
  163:15 164:25
  182:10 188:13
  189:7,14
  205:18 211:20
  212:13 214:1
  214:23 215:4
  220:7 222:17
  236:2 238:2
  239:21 256:9
  257:18 258:10
  262:11 270:6
**used**  51:7,15
  52:16 53:6,8,10
  53:21,22,23
  54:6 79:2,5
  87:13 89:1
  110:17 121:12
  123:15 127:14
  133:9,22 134:5
  134:6 148:7,8
  159:10 169:13
  170:5 183:5,9
  184:10 196:4
  197:12 210:15
  221:23 267:1
  267:25
**usefulness**
  223:8
**uses**  14:19
**using**  4:21 7:23
  71:9 74:5
  76:24 85:22

[using - virtual]                                                           Page 67

| | | | |
|---|---|---|---|
| 86:3 103:20 | 103:11 104:3 | 218:8,24 | **versa**  240:16 |
| 126:24 128:6 | 105:5 107:9 | 220:14 221:12 | **version**  73:1 |
| 132:4 133:13 | 108:18 110:3 | 222:13,20 | 161:4 |
| 147:6 153:11 | 111:7 120:22 | 223:10 224:7 | **versions**  261:8 |
| 156:20 166:12 | 122:7 125:4,15 | 227:5,5 231:12 | **versus**  4:15 |
| 166:19 179:20 | 125:17 126:7 | 232:23 248:2,3 | 229:24 |
| 184:17 185:22 | 126:14 131:14 | 248:10 251:19 | **vested**  67:13 |
| 205:12 221:10 | 133:18 134:15 | 252:21 255:3,9 | **vice**  240:16 |
| 221:12 243:18 | 134:20 135:6 | 256:21 262:11 | **vicinage**  1:2 |
| 244:2,2,8 | 135:13 137:11 | 267:24 268:14 | 4:18 |
| 256:11 | 138:24 139:14 | 273:2 | **video**  4:8,11 |
| **usually**  20:4,9 | 142:20 143:17 | **valsartan's** | 86:12 102:24 |
| 49:3,13 55:15 | 151:5,16 152:7 | 107:3 182:7 | 106:15 111:2 |
| 55:22,22 64:18 | 152:9,15,18 | **values**  242:19 | 111:12,17 |
| 65:15 210:5 | 153:14 155:14 | **vanaskie**  68:21 | 180:13 182:12 |
| 212:2 | 158:1 177:6 | **varies**  13:11 | 182:18 191:17 |
| **utilize**  258:6 | 178:14 180:10 | 24:9,23 49:7 | 259:21 |
| **utilizing**  257:8 | 181:5,7,17,20 | **various**  7:12 | **videographer** |
| | 182:2,10 183:2 | 25:5 41:17 | 4:23 |
| **v** | 183:6,10 184:3 | 97:6 162:18 | **videotape**  2:20 |
| **v**  1:8 273:2 | 184:7,16 | 233:1 234:20 | 4:1 28:25 29:5 |
| **vague**  145:17 | 185:16 186:1,9 | 235:21 238:18 | 31:25 32:5 |
| **valid**  157:13 | 187:2,18,21,25 | 240:10 244:5 | 82:5,10 106:18 |
| **valsartan**  1:5 | 188:6,14 | 245:16 268:3,6 | 106:23 111:20 |
| 4:13 6:13 7:5 | 189:13,21 | 268:8 269:22 | 111:25 112:4,9 |
| 70:6,7,11,13 | 190:1,8 192:1 | **vasculitis**  88:11 | 172:2,7 173:5,9 |
| 71:12 72:21 | 193:4 194:10 | **vehicle**  89:22 | 176:15,20 |
| 73:1 82:23 | 196:3,6 198:13 | **verbiage** | 179:11 227:20 |
| 83:3 86:17 | 199:3 202:16 | 141:12 | 227:25 246:12 |
| 92:15 94:8,20 | 203:7,18 210:9 | **verbs**  142:9 | 246:17 263:24 |
| 95:8,16,24 96:9 | 210:9,12,20,25 | **verify**  113:4 | 264:3,8 271:15 |
| 96:20 97:17 | 211:2,12 215:9 | 116:10 | **view**  174:19 |
| 98:3,12 99:4,21 | 215:19 216:3,7 | **veritext**  4:22,25 | **virtual**  4:21 |
| 102:1,19 103:4 | 216:19 217:10 | 273:1 | 9:25 |

**[virtually - witness]**                                    Page 68

| | | | |
|---|---|---|---|
| **virtually** 4:4 | 174:4,17 | 129:1 131:7,14 | **website** 37:6 |
| **viruses** 69:7 | 175:16,19,21 | 131:19 134:14 | 269:19 270:2 |
| **voluminous** | 176:5 183:20 | 134:19 135:5,8 | **week** 13:10,11 |
| 52:15 | 184:22 187:8,8 | 135:17,22 | 24:11,14,17,18 |
| **voluntary** | 187:20,22 | 136:5,9,13 | 25:8,11 129:12 |
| 195:16 | 190:5,9,11,18 | 140:16,17,21 | **weekends** |

**w**

| | | | |
|---|---|---|---|
| **wait** 37:8 91:20 | 190:18 196:14 | 166:3 191:14 | 24:23 |
| 111:24 173:12 | 201:5,16 | 218:10 223:20 | **weight** 206:6 |
| 180:24,24 | 208:18 236:3 | 251:2,6,16,23 | **welcome** 150:4 |
| 181:2 | 245:4 257:6 | 257:8 270:16 | **went** 40:23 |
| **waiting** 91:11 | **wanted** 46:11 | **warnings** 79:5 | 41:3 116:18 |
| **want** 8:9,13 | 129:17 223:9 | 119:6 126:6,12 | 119:6 163:9 |
| 14:13 31:20 | **wants** 111:23 | 126:14 132:20 | 167:3 172:10 |
| 37:11 45:22 | 148:1 189:18 | 140:23 154:6,9 | 204:1 229:11 |
| 68:14 69:3 | 220:22,23 | 247:11,19 | 229:14,18 |
| 81:21,23 85:3 | **warn** 22:18 | 251:8 258:8 | **whatsoever** |
| 85:23 86:22,23 | 72:20 121:8 | 269:14,20 | 86:23 |
| 96:25 107:4 | 122:20 127:3 | 270:4 | **white** 212:1 |
| 108:6 111:19 | 142:22 143:24 | **washington** 2:9 | **wise** 93:19 |
| 129:11,12 | 144:23 145:5,7 | **wasting** 175:23 | 234:11 262:21 |
| 130:18,19 | 166:2 207:16 | **way** 45:10 | **wish** 223:7 |
| 131:6,10 132:6 | 217:23 224:9 | 102:12 123:8 | **withdraw** |
| 132:14,17 | 226:14 254:25 | 125:13 130:22 | 105:20 261:24 |
| 133:5 137:13 | **warned** 137:12 | 140:14 149:10 | **withheld** |
| 140:2 141:9 | 154:12,12,13 | 157:17 173:6 | 102:20 103:5 |
| 150:11,17 | 166:9,10 | 189:5 190:6 | **withholding** |
| 153:4 155:2 | 184:18 224:18 | 200:9 211:9 | 101:14 |
| 162:3 163:5 | **warning** 18:19 | 221:21 235:17 | **witness** 3:2 4:7 |
| 164:14,25 | 19:19 21:22 | 263:4,9 | 5:3 11:11 |
| 165:3 170:14 | 79:2,9 81:5 | **ways** 57:8 | 12:14 24:5 |
| 170:18 171:1,3 | 85:2 107:2 | **we've** 76:25 | 32:16 43:7 |
| 173:21,23 | 119:18 120:9 | 107:15 145:19 | 45:6,9 70:20 |
| | 127:2,8,21 | 217:2 230:8 | 84:13 153:2 |
| | 128:21,25 | | 167:5 174:4,9 |

174:15 191:20
201:1,4,8,11
242:9 270:19
**witnesses** 48:7
55:4 175:4
**witnesses'**
273:3
**wondering**
44:5
**word** 32:19
36:23 133:21
134:7 184:10
249:25
**wording**
127:18 190:16
**words** 76:20
144:16 168:10
169:1
**work** 12:15
14:11,21 16:2,7
24:8,19 25:9
28:2 32:10,11
33:21,24 39:10
39:12,16 40:3,6
40:9,15,17 43:1
43:2 47:12
55:14 71:5,18
72:12,15,18
73:19 76:16
77:6 79:7
115:25 116:9
183:13 207:18
209:10 261:10
265:10,16,20

267:3 270:16
**worked** 12:13
15:15 16:24
26:1 30:3,7,11
30:18 31:9,14
32:23 33:3
66:18 72:3
77:5,10 78:16
78:20 79:18,24
80:5,10,22
152:6,9,14,17
152:23 230:7
**working** 15:9
24:8 28:23
32:15 33:13
39:22 111:16
181:3 185:4
265:1 266:6,15
**works** 5:18
208:16
**world** 46:20
217:17 236:24
**worse** 211:17
**worst** 204:9,16
**write** 142:12
**writing** 41:10
**written** 160:19
161:25 168:3
196:9
**wrong** 181:13
**wrote** 159:14
160:4,16
162:16,19
167:25 168:9

170:9 172:16
177:15,25
184:1 196:3
197:3 198:2
199:5 202:24
206:21 213:24
228:7
**wu** 212:24
213:17

**x**

**x** 1:4,4,11,11
3:1,9 236:11

**y**

**yeah** 15:20 17:9
23:5 28:18
38:10 45:6,15
68:1 69:5 71:4
72:7 77:9
81:23 82:17
83:2 90:18
91:20 101:4,24
107:25 112:2
112:19 131:24
134:23 143:20
149:2,10
150:25 158:17
173:1,20 174:4
180:14,16
182:14,22
195:15 213:6
214:17 217:13
219:18 220:3
225:12 232:9

241:19 245:5
**year** 29:12
61:17 96:24
**years** 11:11
16:18,21,24
17:2 24:6
27:25 28:4
30:14 31:2,6,11
31:17 33:14
59:17 71:24
132:4 134:4
198:14 230:3,9
230:23 233:19
237:23 238:7
238:16 257:11
258:6 269:2
**york** 273:1
**yup** 53:1 213:7

**z**

**z** 1:13
**zantac** 154:17
271:3
**zheijian** 2:11
**zheijiang** 4:16
6:19
**zhejiang** 1:8
273:2
**zhp** 6:18 95:8
95:15,19,23
96:8,19 97:16
98:2,11 99:2,20
100:13,25
101:8,20,25

**[zhp - zoom]**                                                    Page 70

102:8,18 103:3
103:5,10,13
104:2,8,15,21
105:4,17 107:9
107:21 120:1
120:18,20
121:7 128:20
129:18 131:13
131:18 136:21
137:10 138:1
138:23 139:6
139:13 142:22
145:5 146:8
147:6 148:9
151:18 153:15
165:20 186:16
221:19 224:8
224:12 248:3,8
249:5 253:2,14
253:19,22
254:13 262:11
263:12 266:24
**zhp's**   146:22
251:19
**zoom**   6:4,8
10:10 17:12
37:25 38:3,8,12
158:17,18,19
172:24

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.