# Exhibit 6

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

MDL NO. 2875


IN RE:

VALSARTAN, LOSARTAN, and

IRBESARTAN PRODUCTS LIABILITY

LITIGATION

---------------------------------------------------


DEPOSITION OF DR. WILLIAM SAWYER, Ph.D.

THURSDAY, MAY 1, 2025


Deposition of DR. WILLIAM SAWYER,

Ph.D. in the above-mentioned matter before Jomanna

DeRosa, a Certified Court Reporter (License No.

30XI00188500), and Notary Public of the State of New

Jersey, taken via Zoom on Thursday, May 1, 2025,

commencing at 1:07 p.m. Eastern Standard Time.






DAY 1, VOLUME I

```
                                        Page 2
 1      A P P E A R A N C E S

 2

 3      KIRKLAND & ELLIS

 4      BY:  ASHER TRANGLE, ESQ.

 5           JESSICA DAVIDSON, ESQ.

 6      601 Lexington Avenue, Floor 50

 7      New York, New York 10022

 8      (212)446-4723 (JD)

 9      (212)341-7597 (AB)

10      (713)836-3531 (AC)

11      asher.trangle@kirkland.com

12      jessica.davidson@kirkland.com

13

14      KIRKLAND & ELLIS LLP

15      BY:  AUDREY ASPEGREN, ESQ.

16      1301 Pennsylvania Avenue Northwest

17      Washington, DC 20004

18      (646)444-9164

19      audrey.aspegren@kirkland.com

20

21

22

23

24

25
```

```
                                                    Page 3
 1     APPEARANCES (CONT.)

 2

 3     NIGH GOLDENBERG RASO & VAUGHN

 4     BY:  DANIEL NIGH, ESQ.

 5          KATHRYN AVILA, ESQ.

 6          STEPHANIE IKEN, ESQ.

 7     14 Ridge Square Northwest, 3rd Floor

 8     Washington, DC 20016

 9     (850)600-8090 (DN)

10     (771)210-5557 (KA)

11     (202)978-1188 (SI)

12     dnigh@nighgoldenberg.com

13     kavila@nighgoldenberg.com

14     siken@nighgoldenberg.com

15

16     GREENBERG TRAURIG

17     BY:  VICTORIA "TORI" LANGTON, ESQ.

18     Terminus 200

19     3333 Piedmont Road Northeast, Suite 2500

20     Atlanta, Georgia 30305

21     (678)553-7392 (VL)

22     langtont@gtlaw.com

23

24

25
```

```
                                                    Page 4

1      A P P E A R A N C E S (CONT'D)

2

3      PIETRAGALLO GORDON ALFANO BOSICK & RASPNATI LLP

4      BY:  FRANK H. STOY, ESQ.

5      One Oxford Centre

6      301 Grant Street, 38th Floor

7      Pittsburgh, Pennsylvania 15219

8      (412)263-4397 (FHS)

9

10

11

12     ALSO PRESENT:  PETER COOPER, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                           I N D E X

2

3      WITNESS:  Dr. Sawyer, Ph.D.

4       TYPE OF      EXAMINATION BY                    PAGE

5       EXAMINATION

6       Direct       Mr. Trangle                        8

7

8

9                         E X H I B I T S

10

11      EXHIBIT         DESCRIPTION                    PAGE

12      DX-1            List of Testimony              14

13      DX-2            Invoice For This Case,         26

14                      Roberts

15      DX-3            Report                         66

16      DX-4            World Trade Center Minimum     78

17                      Latency and Types Or

18                      Categories of Cancer Document

19      DX-5            Report Dated June 24th, 2021   82

20      DX-6            Report From March 23rd, 2018   86

21      DX-7            "Developing a Liable Model     88

22                      Extension to Estimate Cancer

23                      Latency" by Nadler & Zurbenko

24      DX-8            Toxicological Profile          95

25

Page 6

1                       E X H I B I T S (CONT'D)

2

3      DX-9              Article                        109

4

5      DX-10             Boniol Study                   139

6      DX-11             Zhang Study                    155

7

8

9      REQUESTS

10     Page 137, Line 19

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1            THE VIDEOGRAPHER:  Good afternoon.  We

2      are going on the record at 1:07 p.m. on Thursday,

3      May 1st, 2025.  Please note that the deposition is

4      being conducted virtually.  Quality of recording

5      depends on the quality of camera and Internet

6      connection of participants.  Audio and video

7      recording will continue to take place unless all

8      parties agree to go off the record.  This is media

9      one of the video recorded deposition of William

10     Sawyer Ph.D. taken in the matter of In Re Valsartan,

11     Losartan, and Irbesartan Products Liability

12     Litigation filed in the United States District Court

13     for the District of New Jersey, Camden vicinage MDL

14     Docket No. 2875, today, relating to Case Number

15     120-CV-00946.

16            My name is Pete Cooper, representing

17     Veritext, and I am the videographer.  The court

18     reporter is Jomanna DeRosa from the firm Veritext.

19            If there are any objections to

20     proceeding, please state them at the time of your

21     appearance.  Counsel and all present will now state

22     their appearance and affiliations for the record

23     beginning with the noticing attorney.

24            MR. TRANGLE:  Asher Trangle for ZHP.

25            MR. NIGH:  Daniel Nigh on behalf of Jan

Page 8

1    Roberts, the wife of the deceased, Gaston Roberts,

2    and also from my office is Kathryn Avila and

3    Stephanie Iken.

4

5              DR. WILLIAM SAWYER, Ph.D., residing at

6    6450 Pine Avenue, Sanibel, Florida 33957, having

7    first been duly sworn by the Notary, then testified

8    as follows:

9

10   DIRECT EXAMINATION

11   BY MR. TRANGLE:

12        Q.    Good afternoon, Dr. Sawyer.  Can you do

13   me a favor and just state your full name for the

14   record, very quick?

15        A.    William Robert Sawyer.

16        Q.    And this deposition is being conducted

17   remotely via Zoom, so I want to ask if there's anyone

18   in the room with you where you're testifying?

19        A.    Just Bella, the golden retriever.

20        Q.    Perfect.  So, just can any humans, other

21   than you, hear your testimony today?

22        A.    No.

23        Q.    Thanks.  Do you have any other programs

24   open on your computer today, besides Zoom?

25        A.    Yeah, I have my report, PDF, and --

Page 9

1          Q.      I'm sorry, continue.

2          A.      And some specific PDF studies, which I

3    referenced.

4          Q.      Okay.  Which studies are those?  Did you

5    hear me, Dr. Sawyer?

6          A.      Yeah.  I'm just trying to get some of

7    these windows out of the way, so I can see what I

8    have here.  Okay.  I have the MCL list open.

9          Q.      Okay.

10         A.      And the number of studies, dietary

11    studies.

12         Q.      Okay.

13         A.      And as well as Gombar 1990.

14         Q.      Other than those PDFs, are there any

15    programs that are open on your computer, besides

16    Zoom?

17         A.      My e-mail -- well, let's see if the

18    e-mail -- my e-mail is open.

19         Q.      Can you please close anything that's not

20    a reference material or Zoom?

21         A.      Yes, I closed it.  I'm going to shut off

22    my cell phone because that is a real nuisance.  I

23    didn't shut it off.  I shut the ringer off.

24         Q.      Perfect.  So we'll be looking at

25    documents from the Zoom today.  Have you done that

Page 10

```
 1      before in previous depositions?
 2           A.      Yes.
 3           Q.      So instead of looking at, sort of, paper
 4      files or electronic files, let's try to focus on the
 5      materials that are presented via Zoom.  Okay?
 6           A.      Yes.  Actually, everything I have is
 7      electronic.
 8           Q.      And you understand we're here today in
 9      connection with a lawsuit filed by Mr. Roberts
10      against ZHP?
11           A.      Yes.
12           Q.      Is there anything that's preventing you
13      from giving complete and accurate testimony today?
14           A.      No.
15           Q.      Dr. Sawyer, you are chief toxicologist
16      at Toxicology Consultants and Assessment Specialists
17      LLC.  Right?
18           A.      Yes.
19           Q.      Is that a consulting company that you
20      own?
21           A.      Yes, I started it in 1990.
22           Q.      Okay.  And I think you previously have
23      testified that you started working as a full-time
24      expert witness in litigation sometime between 2004
25      and 2009.  Is that right?
```

Page 11

1        A.      Yes, I gave up the -- a couple of

2    positions that I had.

3        Q.      Okay.

4        A.      I think, during that time, the

5    laboratory directorships I gave up, as well as, in

6    later years, my adjunct assistant professor

7    appointment, which I had for 22 or 24 years.

8        Q.      Okay.  And so you've been serving as a

9    full-time expert witness or consultant litigation for

10   the past 15 years?

11       A.      Yes, I'm a forensic toxicologist.

12   That's what I was trained to do.

13       Q.      Okay.  Is it fair to say that the last

14   time you had a full job outside of expert consulting

15   work was before 2010?

16       A.      I'm sorry, I didn't hear all of the

17   question.

18       Q.      Oh, I'll say it a little louder,

19   apologies.

20               Is it fair to say the last time that you

21   had a job outside of expert consulting work was prior

22   to 2010?

23       A.      Yes, but I have contracted with, during

24   that era, a company called Document Reprocessors,

25   which handle documents from floods, industry where

Page 12

```
 1      fires occurred, and conducted safety assessments of
 2      documents.  You know, we even had some documents from
 3      the Titanic, which was pretty interesting to look at,
 4      but there was no safety concern there.
 5           Q.     I guess, was that work related at all to
 6      litigation or potential litigation?
 7           A.     None of that was litigation.
 8           Q.     In the last 15 years, what percent of
 9      your work was spent working on this document
10      processing company as opposed to your normal
11      consulting job?
12           A.     Ah, percent-wise, during that era,
13      probably 20 percent.
14           Q.     And what was the era that you were
15      working for that company?
16           A.     Oh, reviewing safety for documents that
17      came in and then were processed and sent out.
18           Q.     Sorry, when were you working -- what was
19      the time period that you were working at that
20      company?
21           A.     Mid 2000.
22           Q.     For one year?
23           A.     No, no, no, starting in about 1984.
24           Q.     And when was the last year you were
25      working with that consulting -- or the, sorry, the
```

Page 13

1    document processing company?

2            A.    Mid 2000s, I don't know exactly what

3    year, but middle of 2000s.

4            Q.    So did that end before 2010?

5            A.    Yes.

6            Q.    I think the first time that you worked

7    as an expert in litigation, would you say, is about

8    1988?

9            A.    Yes.

10           Q.    So, I guess, by my math, you've been a

11   litigation consultant for over 35 years?

12           A.    Approximately, yes.

13           Q.    Dr. Sawyer, you provided us with a CV as

14   part of your report.  Right?

15           A.    Yes.

16           Q.    According to your CV, you've only

17   published once since 2000.  Is that right?

18           A.    That's correct.

19           Q.    And the one time that you published was

20   in 2023.  Right?

21           A.    Yes.

22           Q.    And that was an article on glyphosate, a

23   topic in which you've been paid by experts -- by

24   plaintiffs to offer expert testimony?

25           A.    Kind of a twofold question.  Could you

Page 14

1    repeat that, please?

2         Q.    Sure.  So that paper was on glyphosate,

3    which is a topic that you have been paid to offer

4    expert testimony on behalf of plaintiffs?

5         A.    Yes.

6         Q.    In the past 25 years, you've only

7    published once and it was on a topic on which you

8    provided expert testimony in litigation for

9    plaintiffs.  Right?

10        A.    Yes.

11        Q.    And you've never published an NDMA

12   before.  Right?

13        A.    No.

14        Q.    And you referenced this before, but you

15   provided a list of trials or depositions where you

16   served as an expert witness in the past four years.

17             Do you recall?

18        A.    Yes.

19             MR. TRANGLE:  I'd like to mark as the

20   first exhibit, Tab 3, Audrey.

21

22             (Whereupon, Exhibit DX-1 was marked for

23   identification.)

24

25             MR. NIGH:  Can we go off the record?

Page 15

```
 1      It's, I believe, that this should be -- let's go off
 2      the record, real quick.
 3                   MR. TRANGLE:  Okay, sure.
 4                   THE VIDEOGRAPHER:  Time is 1:18 p.m.
 5      We're going off the record.
 6
 7                   (Whereupon, a brief recess was taken off
 8      the record.)
 9
10                   THE VIDEOGRAPHER:  Time is 1:20 p.m. and
11      we are back on the record.
12
13      BY MR. TRANGLE:
14           Q.     All right.  Dr. Sawyer, can you see
15      Exhibit 1?
16           A.     Yes.
17           Q.     This is a list of the testimony that
18      you've given in the past four years, as of
19      March 10th, 2025.  Is that right?
20           A.     Yes.
21           Q.     And according to this list, it looks
22      like you've testified as an expert witness nearly 100
23      times in the past four years.  Is that fair?
24           A.     Yes, the bulk of that is the same case.
25           Q.     Okay.  It looks like 84 times total.
```

Page 16

1    Right?

2          A.    Yes.

3          Q.    Okay.  And how many times have you

4    testified since February 15th, 2025, which is the

5    last date?

6          A.    I think once.

7          Q.    Once, was that for a plaintiff or for a

8    defendant?

9          A.    Plaintiff case.

10          Q.    Okay.  Doctor, so would you agree the

11    vast majority of your litigation work has been for

12    plaintiffs in the last four years?

13              MR. NIGH:  Form objection.

14              THE WITNESS:  Yes.  However, prior to

15    the work I did on Monsanto glyphosate,

16    G-L-Y-P-H-O-S-A-T-E, prior to that, over many years,

17    it was typically about 60 percent plaintiff,

18    40 percent defendant and --

19              MR. TRANGLE:  Okay.

20              THE WITNESS:  -- if you were to erase

21    out the Monsanto work, out of this list of 84, it

22    would look very different.

23

24    BY MR. TRANGLE:

25          Q.    Okay.  So, but just looking at this

Page 17

 1    list, I counted 14 times out of 84 for defendants,

 2    which would mean that 80 percent of the work you've

 3    done in the last four years has been for plaintiffs?

 4              MR. NIGH:  Form objection.

 5              THE WITNESS:  Correct.  But if you were

 6    to count the Monsanto work as a single case, you

 7    would see that it would be similar to what I just

 8    referenced.

 9

10    BY MR. TRANGLE:

11         Q.    Okay.  As a percentage of your work in

12    the last four years, how much was for Monsanto cases?

13         A.    Well, I started working on that project

14    a year or two before the first trial, so that would

15    have been 2016 or 2017.

16         Q.    Right.  But my question was:  How much,

17    as a percentage of your time, have you dedicated to

18    Monsanto cases in the last four years?

19         A.    I don't know.  I have never made any

20    calculations.

21         Q.    Well, do you think that it's greater

22    than 50 percent of your expert work in the last four

23    years has been on Monsanto cases?

24         A.    Probably.

25         Q.    Greater than 60 percent?

Page 18

1          A.      I don't know.

2          Q.      Okay.  Do you know what percent of the

3    cases listed here are Monsanto cases?

4          A.      No.  I haven't counted up and divided,

5    but it could readily be performed.

6          Q.      Okay.  Well, I actually just searched.

7    It looks like 53.  Would that surprise you if 53 out

8    of 84 times that you've testified in the last four

9    years were for Monsanto?

10                 MR. NIGH:  Form objection.

11                 THE WITNESS:  I think that's possible.

12                 MR. TRANGLE:  Okay.

13

14   BY MR. TRANGLE:

15         Q.      And in general, how many times have you

16   been deposed before, not just the last four years?

17         A.      I have no record of that.  I don't know.

18         Q.      Would you say it's greater than 300?

19         A.      Yes.

20         Q.      Greater than 350 times?

21         A.      I'm not sure.

22         Q.      Okay.  And I know we've talked about

23   this, but you have served as an expert in litigation

24   against Monsanto alleging that exposure to glyphosate

25   caused non-Hodgkin's lymphoma or NHL.  Right?

Page 19

1          A.     Yes.  My primary duties were to consider

2    confounding factors, perform dose response --

3          Q.     Okay.

4          A.     -- measurements.  Let me get the

5    microphone a little closer.

6          Q.     Are you still serving as an expert for

7    plaintiffs in litigation against Monsanto related to

8    glyphosate?

9          A.     Yeah.  Unfortunately, yes.  They just

10   don't seem to stop.

11         Q.     In the last four years, how much of your

12   income, percentage-wise, came from expert consulting

13   work?

14         A.     Primarily, all of it, I believe.  I

15   mean, that's what I'm trained to do.

16         Q.     So 100 percent?

17         A.     Probably close to it, yeah.  I don't

18   know what else there would have been.

19         Q.     Would you say, in the last ten years,

20   100 percent of your income came from expert

21   litigation consulting work?

22         A.     No.  And I think I need to reconsider my

23   answer to the second question.

24              The -- I do consulting work, which is

25   litigation related, but as a confidential consultant,

Page 20

1      in which I never testify in.
2              Q.      Right.
3              A.      So that 100 percent wouldn't be 100.
4      It's going to be something just under that, but for
5      accuracy, it's not 100 percent.
6              Q.      Okay.  But is it 100 percent for work
7      that relates to litigation?
8              A.      Could you repeat that, please?
9              Q.      Sure.  So whether you're a consulting
10     expert or a testifying expert, would you agree that
11     100 percent is related to litigation?
12             A.      Yes.
13             Q.      Okay.  And would you agree, then, that
14     in the last ten years, 100 percent of your income
15     came from litigation-related expert work?
16             A.      For consulting.
17             Q.      Sure.  So, yes?
18             A.      Yes.
19             Q.      In the last 15 years, so since 2010,
20     would you say 100 percent of your income has come
21     from expert work as a consultant or a testifying
22     expert related to litigation?
23             A.      No.  I did some work on herbal products
24     to be submitted to the DEA and FDA during that time
25     period that was not litigation related.  So it

Page 21

1    wouldn't be 100.  It would be something just under.

2        Q.    Just under, so like 95, 96 percent?

3        A.    Yes.

4        Q.    How much money have you earned in the

5    last 15 years related to litigation work?

6        A.    I personally --

7        MR. NIGH:  Form objection.  Hold on.

8    Form objection.  I actually think that's an improper

9    question.  You can't ask about the amount of money

10   that the expert is making.

11       MR. TRANGLE:  I think I'm entitled to

12   ask about how much he has made while serving as an

13   expert.

14       MR. NIGH:  I don't believe so.  If you

15   want to -- if you want to take -- if you want to ask

16   that later on at a break and show me something that

17   says that you're allowed to find out the total amount

18   of money an expert is making.  If you want to ask

19   based on this case, that's fair game.  But I don't

20   think you can ask an expert the total amount of money

21   they've made.

22       MR. TRANGLE:  Okay.  I completely

23   disagree, so we'll talk about that later.  I'll come

24   back to it.

25       MR. NIGH:  Yes.

```
                                              Page 22
 1                 THE WITNESS:  I should point out I don't
 2      see what the business earns.  I have --
 3                 MR. NIGH:  Well, Doctor, you might want
 4      to -- after he has a question, you can point that
 5      out.  But right now, there's not a question pending.
 6                 THE WITNESS:  Okay.  All right.
 7                 MR. NIGH:  Okay.
 8
 9      BY MR. TRANGLE:
10           Q.    And you previously testified that you
11      earn, about, between $300,000 to $800,000 a year from
12      litigation consulting work.  Do you recall that?
13           A.    Yes, that was not the question.  That
14      question was not asked this past year.  On the
15      average, it's, I would say, around $400,000 for the
16      business.
17           Q.    Okay.
18           A.    Which I only receive about a third of
19      that.
20           Q.    Sure.  So $400,000 that are earned for
21      litigation consulting work based on testimony and
22      consulting that you have done?
23           A.    Could you repeat that?  I just want to
24      make sure I understand the question.
25           Q.    Right.  So you're saying, on average,
```

Page 23

1   you have earned for the company $400,000 based on

2   your litigation consulting work.  Correct?

3          A.     Yes.

4          Q.     Okay.  And that would be the same for

5   the last 15 years.  Right?

6          A.     It goes up and down considerably

7   year-to-year.

8          Q.     Well, I think you previously testified

9   the lowest amount you earned was $300,000.  Right?

10                MR. NIGH:  Objection.

11                THE WITNESS:  I don't recall that.  In

12  what time frame are you referring to?

13

14  BY MR. TRANGLE:

15         Q.     Do you recall being deposed in the

16  Zantac case in September of 2023?

17         A.     Yes.

18         Q.     Do you recall testifying that you said

19  the lowest you made was $300,000 and the highest was

20  $800,000, on your average per year?

21         A.     Yes.

22         Q.     Was that inaccurate when you said that

23  before?

24         A.     Well, again, it depends on the years

25  we're referring to.

Page 24

1          Q.     Since 2010, have you ever earned less

2     than $300,000 from litigation consulting work?

3          A.     Yes, in the year 2015.

4          Q.     Okay.  Besides 2015?

5          A.     Probably not.

6          Q.     So, at a minimum, for the last 15 years,

7     discounting 2015, you have earned $4.2 billion from

8     litigation consulting work?

9          A.     I have not.  The company may have

10    received that.  If you ask me what the expenses are,

11    I'll explain it.

12         Q.     Your counsel can ask you all about the

13    expenses.  But that's the amount of income that you

14    generated from your litigation consulting work.

15    Right?

16         A.     No, that's what the company received,

17    which pays --

18         Q.     How many -- okay.

19                MR. NIGH:  You've got to let him finish.

20    Hold on.  We got to let him finish.  You can't

21    interrupt him.  You've got to let him finish the

22    answer.

23                THE WITNESS:  Which includes payments to

24    my employees and I had an assistant toxicologist who,

25    unfortunately, died of colon cancer at age 23.  I no

Page 25

```
 1    longer have him.  But I also provide a very healthy
 2    SEP IRA to my employees and other benefits, plus
 3    office rental.
 4              MR. TRANGLE:  Right.  Sorry,
 5    respectfully, that's not -- we just talked about your
 6    counsel can ask you those questions.
 7
 8    BY MR. TRANGLE:
 9         Q.    So what I want to know is:  Is there
10    anybody else, any other income generated other than
11    work that you do as a litigation consultant for your
12    company?
13         A.    No.  But the point is, I don't
14    separately charge my employees.  My hourly rate
15    includes my employees' costs and overhead, et cetera.
16         Q.    Okay.
17         A.    I think it's inaccurate to pose this to
18    a jury that that's what I make.  I don't see that
19    amount.
20         Q.    How many people work at your consulting
21    company today?
22         A.    Currently, two and a bookkeeper.
23    Historically, it was three and a bookkeeper.
24         Q.    And who are those people?
25         A.    My office manager is Jennifer Clark.
```

Page 26

1        Q.      Okay.

2        A.      And my chemist is Bonnie Serling, like

3    Rod Serling, that's actually her husband's uncle.

4        Q.      Now, I want to talk a little more about

5    this case.  So you produced one invoice for this

6    case.  Right?

7        A.      Yes.

8               MR. TRANGLE:  Let's mark as Exhibit 2,

9    Tab 4.

10

11              (Whereupon, Exhibit DX-2 was marked for

12    identification.)

13

14    BY MR. TRANGLE:

15        Q.      And we can go to the Exhibit Share

16    platform and look at Exhibit 2, which will be the

17    invoice for this case, Roberts.

18              If you refresh, it comes up faster.

19              Do you see it?

20        A.      Yeah, now I see it.

21

22              (Whereupon, a discussion takes place off

23    the record.)

24

25    BY MR. TRANGLE:

Page 27

1      Q.    So Dr. Sawyer, this is the invoice that
2    you produced for work done on the Roberts case?
3      A.    Yes.
4      Q.    Does this invoice indicate all the hours
5    you have worked since starting on this case through
6    March 10th, 2025?
7      A.    Yes.
8      Q.    I calculated, it looks like 80.7 total
9    hours where you worked for plaintiff's lawyers on
10   this case so far?
11     A.    I'd have to get my calculator out to
12   answer that.
13     Q.    Okay.  Do you have any reason to doubt
14   my math?
15           MR. NIGH:  Form objection.
16           THE WITNESS:  I don't know how to answer
17   that.
18           MR. TRANGLE:  Okay.
19           THE WITNESS:  If it's -- without an
20   adding machine or a hand calculator that saves each
21   function and value, it's possible you made an error.
22   I don't want to be judgmental.
23           MR. TRANGLE:  That's okay.
24
25   BY MR. TRANGLE:

Page 28

1          Q.    So, under the assumption that my math is

2    correct, it would be 80.7 total hours.  How much time

3    did you spend reviewing records related to

4    Mr. Roberts of that 80.7 hours?

5                    MR. NIGH:  Form objection.

6                    THE WITNESS:  I don't recall.

7

8    BY MR. TRANGLE:

9          Q.    Did you spend two hours looking at

10   records for Mr. Roberts?

11         A.    Certainly.

12                   MR. NIGH:  Form objection.

13

14   BY MR. TRANGLE:

15         Q.    Ten hours?

16         A.    Certainly.

17         Q.    Okay.  Half the time, you spent

18   reviewing records for Mr. Roberts?

19                   MR. NIGH:  Form objection.

20                   THE WITNESS:  No, not that much, but

21   considerable because of the Excel data, the

22   calculations of the FDA data, and so on.  It's part

23   of -- I think, you know, what I'm answering to is

24   beyond that of just the medical records.

25

Page 29

1    BY MR. TRANGLE:
2         Q.    Okay.  So then, for the medical records,
3    how much time did you spend?
4                   MR. NIGH:  Form objection.
5                   THE WITNESS:  I don't recall and I also
6    reviewed, obviously, it was -- I think it was his
7    wife's deposition.
8                   MR. TRANGLE:  Okay.
9
10    BY MR. TRANGLE:
11         Q.    How much of the time was spent towards
12    doing a literature review?
13                   MR. NIGH:  Form objection.
14                   THE WITNESS:  Well, I would have to
15    approximate.
16                   MR. TRANGLE:  That's fine.
17                   THE WITNESS:  Probably, gosh, 30, 30
18    hours.
19
20    BY MR. TRANGLE:
21         Q.    How much time of this 80.7 was spent
22    meeting with counsel?
23                   MR. NIGH:  Form objection.
24                   THE WITNESS:  We haven't met
25    face-to-face.

Page 30

1

2      BY MR. TRANGLE:

3          Q.    Okay.  Meeting virtually or over the

4      phone or face-to-face about this case?

5          A.    I don't have any record of that.  I

6      don't know.

7          Q.    You don't have any record of that, but

8      you have an invoice right here?

9          A.    Right.  But if I'm working on

10     researching and reviewing studies and medical records

11     and I have a phone call with the client, that's just

12     grouped in for that specific date.  I'm not itemizing

13     all of that.

14         Q.    So you have no idea what proportion of

15     this time was spent meeting with counsel?

16         A.    That's right.

17             MR. NIGH:  Form objection.

18

19     BY MR. TRANGLE:

20         Q.    And so far, as of March 10, 2025, you've

21     charged $63,349.50 to give opinions in this case, so

22     far?

23         A.    Hypothetically, if your math is correct.

24         Q.    I mean, that's actually printed on this

25     invoice, right, so it'd be your math?

```
                                              Page 31
 1          A.     Oh, yeah, it is.  Okay, so I agree.
 2          Q.     Okay.  And this is the total amount
 3     you've charged as of March 10th, 2025?
 4          A.     Yes.
 5          Q.     How many hours have you spent, since
 6     March 10th, 2025, working on this case in any
 7     capacity?
 8          A.     I haven't added it up, but probably in
 9     the range of -- probably in the range of 25 to 35
10     hours.
11          Q.     Okay.  25 to 35 hours until today,
12     right, the deposition day?
13          A.     Yes.
14          Q.     Okay.  Did you meet with counsel this
15     morning?
16          A.     No.
17          Q.     Okay.
18          A.     Well, I called just to --
19               MR. TRANGLE:  You don't have to tell me
20     what you talked about.
21               THE WITNESS:  I called to request the
22     Veritext.
23               MR. TRANGLE:  Got it.  I see.
24
25     BY MR. TRANGLE:
```

Page 32

1          Q.     Of the 25 to 35 hours that you've spent
2    since March 10th, how many of those hours were spent
3    preparing for your testimony today?
4          A.     I don't know.  Most of my work was
5    reviewing expert reports, including Dr. Pruitt's
6    report, reviewing studies.
7          Q.     Okay.  How much time was spent talking
8    with or meeting with counsel about this case?
9          A.     I have no idea.
10         Q.     Okay.  And is your rate still $785 per
11   hour from March 10th, 2025 to today?
12         A.     Yes.
13         Q.     Dr. Sawyer, you're not a board certified
14   toxicologist.  Right?
15         A.     No.  I have the certification of the New
16   York State Department of Health in toxicology,
17   forensic toxicology dating back to 1988 or 1989.
18         Q.     You are not board certified by the
19   American Board of Toxicology.  Right?
20         A.     Correct.
21         Q.     You were unable to obtain board
22   certification from the American Board of Toxicology
23   after twice failing sections of the exam?
24         A.     Yes, that was in my second year of work
25   full-time.  I was working 80 hours a week and my wife

Page 33

1    had a baby and I never opened a book to prepare for

2    it.  My own fault.

3             Q.    You often declined to study for tests?

4             MR. NIGH:  Form objection.

5             THE WITNESS:  Yes.  And, in fact,

6    there's a course offered for preparation of the test.

7

8    BY MR. TRANGLE:

9             Q.    Okay.  And have you ever represented on

10   your website or in any marketing materials that you

11   were a board certified toxicologist?

12            A.    No.  I had a board certification in

13   forensic medicine.  However, the certifying

14   organization went belly up due to corrupt activity of

15   the, whatever he was, president or vice president.

16            Q.    Do you still maintain --

17            MR. NIGH:  Hold on.  Form objection to

18   the prior question.

19            MR. TRANGLE:  Okay.

20

21   BY MR. TRANGLE:

22            Q.    You're not a medical doctor, right,

23   Dr. Sawyer?

24            A.    Correct.

25            Q.    Never went to medical school?

Page 34

1           A.    I did.  As part of my training, I was

2      required to take all of the medical school courses,

3      through pathology, at the same time that I was in

4      training for toxicology.  That was how our department

5      worked.

6           Q.    So you were enrolled in a medical school

7      program to obtain an MD?

8           A.    No, but I was --

9                 MR. NIGH:  Objection.

10                THE WITNESS:  I was involved in the

11     course work required for an M.D.  After the -- about

12     two and a half years in, most of the students branch

13     off into specific medical activities rather than the

14     basic medical sciences.

15

16     BY MR. TRANGLE:

17          Q.    Is it your testimony that you fulfilled

18     the requirements to obtain an MD?

19          A.    No.

20          Q.    So you're not licensed to practice

21     medicine anywhere?

22          A.    No, but I think you're missing the

23     point.

24          Q.    That's fine.  Not able to see patients

25     or treat patients?

Page 35

1          A.      I'm not a physician and I was not
2      trained as a physician, of course not.
3          Q.      Okay.  So that would include for high
4      blood pressure, for liver disease or liver cancer?
5          A.      I don't understand the question.
6          Q.      Okay.  Well, the fact -- because you are
7      not a licensed physician, you were not able to see or
8      treat patients with high blood pressure, liver
9      disease or liver cancer?
10              MR. NIGH:  Form objection.  Asked and
11      answered.
12              THE WITNESS:  Only if they're dead, as I
13      routinely am involved in sending tissues out for
14      analysis at MMS labs and other facilities.  But, no,
15      I don't treat patients, no.
16
17      BY MR. TRANGLE:
18          Q.      Right.  So you're not an oncologist
19      either, then.  Right?
20          A.      No.  I think you're well aware of that.
21          Q.      Not a hematologist?
22          A.      Again, you're familiar with my
23      certifications.  That's not what I was trained in.
24          Q.      Okay.  Never told a patient that their
25      cancer was caused by NDMA?

```
                                              Page 36
 1          A.    I've never had a patient, so the answer
 2    is no.
 3          Q.    Okay.  Never performed a differential
 4    diagnosis to determine the cause of a patient's
 5    disease?
 6          A.    I rely on differential diagnosis made by
 7    oncologists all the time.  And many times we've
 8    reviewed such a case, but I don't form or perform the
 9    differential diagnosis myself.
10          Q.    Dr. Sawyer, you don't have a degree in
11    epidemiology, do you?
12          A.    No, but I have training in epidemiology
13    and bio statistics and I use epidemiology as a
14    toxicologist nearly every day.
15          Q.    Okay.  Have you ever been a professor in
16    Epidemiology Department at any university?
17          A.    I was an assistant professor in the --
18    at the medical school and I taught a portion of the
19    medical epidemiology class for students.
20          Q.    When you say "a portion", what do you
21    mean?
22          A.    Excuse me, and I carried out that
23    function for nearly 20 years.
24          Q.    Sorry, when you say a portion, what do
25    you mean; like, one class?
```

Page 37

1          A.     No.  But different classes per semester.

2          Q.     How many classes in a course did you

3     teach that related to epidemiology?

4               MR. NIGH:  Form objection.

5               THE WITNESS:  You mean in a single

6     trimester or per year?  What?

7               MR. TRANGLE:  Yes, in a trimester.

8               THE WITNESS:  I would say, on the

9     average, three per semester.

10               MR. TRANGLE:  Okay.

11

12     BY MR. TRANGLE:

13          Q.     Would you agree that people who have

14     Ph.D.s in epidemiology have skill and training that

15     you do not have?

16          A.     Absolutely.  I defer the internal design

17     and analyses and then analyses and stratification and

18     so forth to epidemiologists.  I use and rely on the

19     results as a toxicologist.

20          Q.     Okay.

21          A.     But I don't hold myself out to be, you

22     know, a Ph.D. epidemiologist.

23          Q.     Right.

24               MR. NIGH:  Mr. -- can I just stop one

25     second?  Mr. Trangle, if you can please let him

Page 38

1    finish the question.  You're interrupting him, maybe
2    one out of three or one out of four questions and I
3    think the video's going to show that, including, you
4    know, saying okay during his answers and things of
5    that nature.  So please let the witness finish the
6    answer before asking the next question.
7              MR. TRANGLE:  Okay, thanks.  Let's move
8    on.
9
10   BY MR. TRANGLE:
11        Q.    So would that apply to assessing the
12   limits of an epidemiological study?
13        A.    No, not necessarily.  I rely on
14   statistically significant findings and significant
15   trends, et cetera.  Now, if it were a question of the
16   internal design of the study or meta-analysis, I
17   would defer that to the epidemiologist.
18        Q.    Okay.  But my question is:  You
19   understand that epidemiological studies might be
20   subject to different limitations.  Right?
21        A.    Well, of course.  No study is perfect.
22   That's why we look at many studies, not just a single
23   study.
24        Q.    Okay.  And my question is:  Would you
25   defer to an epidemiologist, a Ph.D. in epidemiology,

Page 39

1    to assess the relative importance of limitations in a
2    epidemiological study?
3                    MR. NIGH:  Form objection.
4                    THE WITNESS:  In part.
5
6    BY MR. TRANGLE:
7         Q.    Which parts would you defer to them on?
8         A.    As I said, internal design of the study.
9         Q.    Dr. Sawyer, you're not a chemist; are
10   you?
11        A.    No, but I have, I think, 32 hours of
12   chemistry, including biochemistry and medical
13   biochemistry.
14        Q.    Are you an expert on Valsartan's
15   chemical make up?
16        A.    No.
17        Q.    Have you ever designed a drug before?
18        A.    I assisted Lily Corporation in
19   Indianapolis with the initial Phase II and Phase III
20   analyses of Fluoxetine, which became a number one
21   seller back in the 1980s and 1990s.  Other than that,
22   no.
23        Q.    Okay.  Have you ever designed a
24   manufacturing process for a pharmaceutical product?
25        A.    No.

Page 40

1         Q.     Have you ever worked at a pharmaceutical
2    company as a full-time employee?
3         A.     No.
4         Q.     Have you ever worked at the FDA?
5         A.     Did you say FDA?
6         Q.     I did.
7         A.     No.
8         Q.     Would you consider yourself an expert in
9    FDA guidance regarding warning labels for medication?
10        A.     No, I'd defer that to other experts.
11        Q.     Would you consider yourself an expert in
12   the risk benefit analysis, in terms of prescribing
13   Valsartan?
14        A.     No.
15        Q.     What about for prescribing Valsartan
16   that contains NDMA?
17        A.     Well, what about it?
18        Q.     Would you consider yourself an expert in
19   the risk benefit analysis of whether to prescribe or
20   take medication, Valsartan, with NDMA?
21                MR. NIGH:  Form objection.
22                THE WITNESS:  I don't know.  I'm not
23   sure.
24                MR. TRANGLE:  Yeah, that's fine.
25

```
                                              Page 41

 1     BY MR. TRANGLE:
 2          Q.    Dr. Sawyer, when did you first form the
 3     opinion that exposure to NDMA from Valsartan causes
 4     liver cancer?
 5                    MR. NIGH:  Form objection.
 6                    THE WITNESS:  I don't fully understand
 7     the question.
 8
 9     BY MR. TRANGLE:
10          Q.    Well, when did you come to the
11     conclusion that NDMA from Valsartan causes liver
12     cancer in humans?
13          A.    I think, for probably 36 or 37 years,
14     I've been well aware of NDMA as a multipoint
15     carcinogen in animals and humans.  With respect to,
16     specifically, liver cancer, I don't recall.  I'm not
17     sure.
18          Q.    Would it be before the last six years?
19          A.    Probably.
20                    MR. NIGH:  Form objection.
21
22     BY MR. TRANGLE:
23          Q.    What literature had you reviewed on NDMA
24     and Valsartan and liver cancer when you formed the
25     opinion that NDMA causes liver cancer in humans?
```

Page 42

1                 MR. NIGH:  Form objection.

2                 THE WITNESS:  Well, certainly the two

3      Valsartan studies, as well as oral ingestion NDMA

4      dietary studies, as well as the quantitative liver

5      cancer animal studies that reveal statistically

6      significant findings from the inhalation of NDMA as

7      low as .07 parts per million.

8

9      BY MR. TRANGLE:

10          Q.     Did you review those studies prior to

11     being retained in this case?

12          A.     Most, but not all.

13          Q.     Which ones had you not reviewed?

14          A.     I was familiar with some of the dietary

15     studies.

16          Q.     How were you familiar?  How did you

17     become familiar with the dietary studies?

18          A.     Research and review of the literature.

19          Q.     Was that related to litigation work?

20          A.     I don't think so.

21          Q.     When did you review the dietary studies

22     for the first time?

23          A.     Throughout my career, actually.  I had

24     specific training in toxicology regarding NDMA and

25     other N-nitroso compounds.

Page 43

1          Q.    So at the time you were hired to offer

2     expert opinions in this case, you already believed

3     that NDMA causes liver cancer in humans?

4               MR. NIGH:  Form objection.

5               THE WITNESS:  I suspected it did, but

6     did not confirm that until I reviewed the full body

7     of studies available.

8

9     BY MR. TRANGLE:

10         Q.    So what had you reviewed, specific to

11    Valsartan, that led you to suspect that there was a

12    causal connection between NDMA and Valsartan and

13    liver cancer?

14              MR. NIGH:  Form objection.

15              THE WITNESS:  The studies listed in my

16    report.

17

18    BY MR. TRANGLE:

19         Q.    You testified that you hadn't reviewed

20    all the studies in your report at the time you formed

21    your opinions and were retained in this case?

22              MR. NIGH:  Hold on.  Hold on.  Form

23    objection.

24              THE WITNESS:  I think I misunderstood

25    the question.  If you wish to repeat it or clarify

Page 44

1    it.

2

3    BY MR. TRANGLE:

4        Q.    When was the first time that you read

5    the study Mansouri 2022?

6        A.    Not until I was involved in the

7    litigation that we're working with today.

8        Q.    And when was the first time that you

9    read Gomm 2021?

10        A.    I think, early on in this litigation.

11        Q.    Okay.  When was the first time that you

12    read Pottegârd 2018?  P-O-T-T-E-G-A-R-D.

13        A.    Yes, and most of these spellings are in

14    my report, if that helps any.

15        Q.    When was the first time that you

16    reviewed that study?

17        A.    Same, same answer.

18        Q.    So the three studies on NDMA and

19    Valsartan that you rely on, you reviewed after being

20    retained for litigation?

21        A.    Yes.  They're fairly recent studies and

22    I don't recall coming across those until after I was

23    involved in the litigation.

24        Q.    Prior to being involved in this

25    litigation, did you already believe that NDMA had a

Page 45

1    dose response relationship with liver cancer when

2    taken in Valsartan?

3         A.    I don't recall.

4         Q.    Dr. Sawyer, do you strive to always

5    follow the same methodological approach in all your

6    work when you're giving expert opinions on causation?

7         A.    I follow the fundamental toxicological

8    methodology, yes.

9         Q.    Okay.  But you strive to follow the same

10   principles.  Right?

11             MR. NIGH:  Form objection.

12             THE WITNESS:  Your question is not clear

13   as there are different methodologies for different

14   purposes.

15

16   BY MR. TRANGLE:

17        Q.    Do you change your specific causation

18   methodology based on what kind of case you're working

19   on?

20        A.    No.

21             MR. NIGH:  Form objection.

22             THE WITNESS:  No.  With respect to

23   specific methodology, I refer you to Bradford Hill

24   and weight of the evidence methodology, which I

25   specifically follow.

Page 46

1

2      BY MR. TRANGLE:

3           Q.      Did you follow those in this case?

4           A.      Absolutely.

5           Q.      And you follow the same principles in

6      every case, when you're doing that?

7                   MR. NIGH:  Form objection.

8                   THE WITNESS:  Yes.  However, in some

9      toxicological assessments, the window is very narrow

10     and some of the prongs of Bradford Hill would not

11     apply.

12

13     BY MR. TRANGLE:

14          Q.      What do you mean the window is very

15     narrow?

16          A.      Well, rather than a specific causation

17     opinion, I could be asked to assess a dermal -- a

18     dermal absorption question.

19          Q.      Okay.

20          A.      Focused only on dermal absorption that

21     may not include temporality, for example, or some of

22     the other prongs of Bradford Hill.

23          Q.      I guess my point is more you wouldn't

24     change your methodology to serve the interest of a

25     particular client.  Right?

Page 47

1           A.      Of course not.

2           Q.      Okay.  Are there different types of

3    liver cancer, Dr. Sawyer?

4           A.      Yes, there are.  There's angiosarcoma,

5    hepato, a number of different forms of liver cancer,

6    yes.

7           Q.      Is it your opinion that NDMA from

8    Valsartan causes all or just some subtypes of liver

9    cancer?

10                  MR. NIGH:  Form objection.

11                  THE WITNESS:  I believe, from the mode

12   of action pharmacodynamics methodology and published

13   studies, that the metabolites that are formed, such

14   as diazonium formaldehyde, and other direct genotoxic

15   agents, the potential for any form of liver cancer is

16   probable.  That doesn't mean that there's a rank

17   order of which one is most probable.  But certainly,

18   based on the mechanistic data that's very well

19   established in the toxicological literature, any form

20   of liver cancer is certainly possible.

21

22   BY MR. TRANGLE:

23          Q.      Right.  But I'm asking -- so do you

24   have, within a degree of scientific certainty, an

25   opinion that NDMA in Valsartan causes all kinds of

Page 48

1    liver cancer or only some?

2                    MR. NIGH:  Form objection.

3                    THE WITNESS:  Same answer.  Angiosarcoma

4    or hepatocarcinoma, there are so many different

5    possibilities, depending on how the genome is

6    disrupted.

7

8    BY MR. TRANGLE:

9         Q.    So you don't have a -- oh, sorry.

10        A.    Hepatocellular carcinoma is more common,

11   for example, than an angiosarcoma that's fairly rare,

12   but this is taken into account in the statistical

13   analyses in terms of what the background rate is

14   versus the exposure dose in each quartile.

15

16   BY MR. TRANGLE:

17        Q.    So you aren't able to tell us whether

18   you have concluded that NDMA in Valsartan causes

19   every or only some kinds of liver cancer, is what I'm

20   hearing?

21                   MR. NIGH:  Form objection.

22   Mischaracterizes testimony.

23                   THE WITNESS:  No, that's not what I

24   stated.  I stated that the mechanism potential of the

25   genotoxic metabolites generated in the liver and at

Page 49

```
 1    extra hepatocytes as well.  These particular
 2    metabolites are very potent genotoxic agents that
 3    have been shown to be mechanistically involved in the
 4    induction of various carcinomas.  And to try to state
 5    that there's only a single type of liver cancer that
 6    could occur would be erroneous, based on the
 7    mechanistic data.
 8
 9    BY MR. TRANGLE:
10         Q.    But you offer the opinion that NDMA
11    causes all kinds of liver cancer when someone is
12    exposed to NDMA from Valsartan?
13              MR. NIGH:  Form objection.
14              THE WITNESS:  No, that's not what I
15    said.
16              MR. TRANGLE:  Okay.
17
18    BY MR. TRANGLE:
19         Q.    Tell me, do you believe NDMA in
20    Valsartan causes all kinds of liver cancer in humans?
21    Yes or no.
22              MR. NIGH:  Form objection.
23              THE WITNESS:  That's not a question I
24    can answer.  I could explain that the potential is
25    certainly present for any form of liver cancer based
```

Page 50

1    on the mechanistic data of the toxic metabolites

2    form, such as diazonium ion, formaldehyde, et cetera.

3

4    BY MR. TRANGLE:

5         Q.    Do you agree that different kinds of

6    liver cancer have different causes and ideologies?

7         A.    Certainly.  For example --

8         Q.    That's fine.

9         A.    No, I'm going to finish the question.

10   For example, angiosarcoma is known to be induced by

11   vinyl chloride.

12        Q.    Okay.  So my question is --

13        A.    I didn't finish, sir.  Please listen.

14        Q.    To formulate your opinions in this case,

15   you conducted a literature review?

16             MR. NIGH:  Hold on.  Hold on.  You

17   interrupted twice during the answer and then he says,

18   "please let me finish", and then you're going to just

19   keep going on to another question?  No, no, no.

20   There has been so many interruptions.  You have to

21   let him finish the answer.  I don't know if you know

22   about the orders that have taken place in this

23   litigation, but Vanaskie has given you very harsh

24   warning for this type of behavior.  And I've asked

25   earlier to stop.  And here we had it, you interrupted

Page 51

1    him twice, he asked to finish, and then you try to

2    just go on with the next question.  That makes for a

3    very messy transcript.  I think this court would like

4    to be able to rely on a court transcript as opposed

5    to have to look at a video.

6                    MR. TRANGLE:  Yeah.  Thank you for your

7    four-minute monologue.  So Dr. Sawyer --

8                    MR. NIGH:  It was not four minutes and

9    please don't be disrespectful.  That is completely

10   absurd.  That's not a four-minute monologue.  I took

11   less than a minute to tell you about that and it's

12   important.  If you're not going to reflect on what

13   I'm telling you that Judge Vanaskie has ruled here

14   and interrupting my witness over and over and over

15   and over, I think we're going to have to just go to

16   the court.

17

18   BY MR. TRANGLE:

19        Q.    Dr. Sawyer, could you please look back.

20   Do you need it read back to you, the question?

21        A.    You snowplowed my last response and I

22   didn't finish answering the question.

23                    MR. TRANGLE:  Do you want to finish?  Or

24   do you want me to read the question again?

25                    MR. NIGH:  He wants to finish the answer

Page 52

1    to his prior question; the more prior question.

2                THE WITNESS:  And the answer is that the

3    incident rate varies with what chemical we're dealing

4    with.  For example, the hepatocellular carcinoma in

5    NDMA versus vinyl chloride in angiosarcoma, so

6    different chemicals do vary the incident rate of

7    different types of cancer.  But any of the liver

8    cancers have potential to form from NDMA exposures

9    based on the metabolite pattern of the

10   pharmacodynamic studies.

11

12   BY MR. TRANGLE:

13        Q.     To formulate your opinions in this case,

14   Dr. Sawyer, you conducted a literature review of all

15   the relevant existing epidemiological evidence.

16   Right?

17        A.     Yes.

18        Q.     Why did you conduct a literature review?

19        A.     Because that is part of the methodology

20   that toxicologists use to assess dose response and

21   other areas of assessment.

22        Q.     When you say other areas, do you mean it

23   helped you reach and form your causal opinions?

24        A.     My causal opinion, in this case, is

25   simply a dose response opinion with respect to

Page 53

1    specific causation of the specific malignancy of this

2    specific client that is being opined on by the

3    oncologist.

4        Q.    Okay.  Are you not offering an opinion

5    on general causation in this case?

6        A.    If asked, I could.  But I don't believe

7    that is the assignment I was given.

8        Q.    Okay.  So you're not offering the

9    opinion that exposure to NDMA in Valsartan causes

10   liver cancer in humans as a general matter?

11              MR. NIGH:  Form objection.

12              THE WITNESS:  In a general matter, I

13   have to consider that, because I can't effectively

14   and accurately assess a dose response without --

15   without that knowledge.

16

17   BY MR. TRANGLE:

18       Q.    It's your opinion that in order to

19   conduct a dose response analysis, you have to already

20   form an opinion about a general causation?

21              MR. NIGH:  Form objection.

22              THE WITNESS:  I would word that as an

23   understanding of the general causation in terms of

24   the various animal, human epidemiological studies.

25

Page 54

1    BY MR. TRANGLE:

2         Q.    So at trial, are you intending to offer

3    the opinion that exposure to NDMA in Valsartan causes

4    liver cancer as a general causation matter?

5                   MR. NIGH:  Form objection.

6                   THE WITNESS:  I don't believe that's my

7    assignment.  I think I was asked to assess dose

8    response and whether or not there was a significant

9    and substantial risk of hepatocellular carcinoma.

10

11   BY MR. TRANGLE:

12        Q.    Did you personally identify and pull all

13   the studies that you reviewed?

14        A.    I think largely, if not all of them,

15   yes.

16        Q.    Did plaintiff's lawyers --

17        A.    I don't recall any studies being --

18   well, it's possible there might have been a couple of

19   studies sent to me.  But largely, studies that I've

20   researched and pulled.  Of course, some of those are,

21   in some cases, just abstracts, but primarily, full

22   studies.

23        Q.    If the study was relevant to your

24   analysis, did you include it on the materials

25   considered list?

Page 55

1          A.     Yes.

2          Q.     So can we consider that list to be

3     comprehensive as to the studies that you relied on in

4     forming your opinions in this case?

5          A.     No.  I think there are many studies

6     within my report that are not on the MCL list.

7          Q.     Okay.  And when there are studies in

8     your report, those are what you're relying on,

9     primarily, for forming your opinions?

10          A.     Yes.

11                MR. NIGH:  Form objection.

12

13   BY MR. TRANGLE:

14          Q.     As a general matter, Dr. Sawyer, would

15     you agree that it's important to identify the entire

16     relevant universe of studies to reach a reliable dose

17     response conclusion?

18          A.     Yes.  That's why I've spent so many

19     hours researching and reviewing all available

20     studies.

21          Q.     And the same for a reliable conclusion

22     on latency?

23          A.     Yes.

24          Q.     A good scientist reads all the findings

25     in a study, not just the abstract.  Right?

Page 56

1                    MR. NIGH:  Form objection.

2                    THE WITNESS:  Yes.

3

4        BY MR. TRANGLE:

5             Q.    A good epidemiologist looks at all the

6        data in the study, including match found and

7        supplemental data?

8                    MR. NIGH:  Form objection.

9                    THE WITNESS:  I don't want to speak on

10       behalf of the epidemiologist, but that's what I did

11       in this case.

12

13       BY MR. TRANGLE:

14            Q.    Would you agree it's important not to

15       cherry pick data from a study?

16                   MR. NIGH:  Form objection.

17                   THE WITNESS:  Yes.

18

19       BY MR. TRANGLE:

20            Q.    Would you also agree it's important not

21       to go beyond the limitations stated by the study's

22       authors?

23                   MR. NIGH:  Form objection.

24                   THE WITNESS:  Could you give an example

25       of that, so I understand the question?

Page 57

1              MR. TRANGLE:  Sure.

2

3    BY MR. TRANGLE:

4         Q.    Would it be important not to

5    overinterpret and reach a conclusion different than

6    that of the authors?

7              MR. NIGH:  Form objection.

8              THE WITNESS:  The question is not a good

9    one.  The reason I'm having trouble answering is that

10   we have to evaluate all of this literature, all the

11   strengths and weaknesses, the statistical power, the

12   Type II error, that is the lack of sufficient time or

13   number of subjects to actually produce a result.  I

14   identified a study like that in my report that had

15   too few cases to even determine if the background had

16   been met.  So the question you asked is not complete

17   enough for me to specifically answer.

18

19   BY MR. TRANGLE:

20        Q.    Are you familiar that authors of studies

21   list limitations frequently at the end of their

22   study?

23        A.    Of course.  It's a hallmark of an

24   epidemiologist.

25        Q.    So would it be important to recognize

Page 58

1    and not go beyond the limitations in analyzing a

2    specific study?

3                MR. NIGH:  Form objection.

4                THE WITNESS:  Again, that coincides to

5    my last answer that one has to consider the body of

6    science, not just a single study.  And if a single

7    study had a particular weakness with respect to

8    Type II error and did not even have the powers to

9    detect a change, then it would be advisable to put

10   very little weight on that study as opposed to a more

11   robust study.  And this is the basic methodology

12   under Bradford Hill.

13

14   BY MR. TRANGLE:

15       Q.    How much weight do you give to studies

16   on NDMA and cancer that do not report on liver

17   cancer?

18       A.    It depends whether liver cancer was

19   included in the analysis or not.

20       Q.    So if liver cancer was not included in

21   the analysis, would it be important to your opinions?

22       A.    Yes.

23       Q.    Would you give it less weight?

24                MR. NIGH:  Form objection.

25                THE WITNESS:  Certainly, if liver was

Page 59

1    not an organ that was tested in the study, yes, I
2    would give very little weight.
3
4    BY MR. TRANGLE:
5        Q.    Do you agree that studies reporting on
6    NDMA exposure from Valsartan are more relevant than
7    studies reporting on dietary intake of NDMA in this
8    case?
9              MR. NIGH:  Form objection.
10             THE WITNESS:  In theory, yes.  However,
11   the duration of study periods of the Valsartan
12   studies is very narrow and to reach the peak of the
13   bell curve of latency, the current Valsartan studies
14   are limited in time and, most likely, have not
15   reached the peak levels.  So that is a statistical
16   consideration that I have made.
17
18   BY MR. TRANGLE:
19       Q.    Do you give more weight to studies that
20   have more robust assessment of potential confounding?
21             MR. NIGH:  Form objection.
22             THE WITNESS:  Certainly multifactorial
23   analyses is something that I rely on as a
24   toxicologist as it's part of the methodology I
25   follow.

Page 60

1

2      BY MR. TRANGLE:

3           Q.     Is it your opinion that there is no

4      threshold dose below which NDMA from Valsartan cannot

5      cause liver cancer in humans?

6           A.     I have thoroughly assessed dose response

7      and have observed, in the literature studies, that --

8      in animal studies that show statistically significant

9      rates of liver cancer at the lowest doses tested.

10     Now, beyond those lowest doses, it's not reasonable

11     to form a dose response opinion.  I can tell you what

12     the -- in animals, what the no observable effect

13     level would be versus the lowest observable effect or

14     the cancer effect level.  Those have all been studied

15     and published.  At the 100 -- at the higher dose

16     animal studies, 100 percent of the test animals

17     developed liver cancer.

18              So the question you posed is problematic

19     since even the lowest dose studies that produced the

20     significantly increased rates of liver cancer in

21     animals.  So to speculate, you know, below that dose

22     is not reasonable.

23

24     BY MR. TRANGLE:

25           Q.     My question was about humans and my

Page 61

1    question was whether you believe there's a threshold
2    dose that must be met in order for there to be an
3    increase in risk of liver cancer in humans?
4          A.    Well, again, I follow the Bradford Hill
5    --
6                MR. NIGH:  Hold on.  Hold on.  Let me,
7    Doctor, sorry, let me -- give me just a couple of
8    seconds to lodge my objection.
9                THE WITNESS:  I'm sorry.
10               MR. NIGH:  Form objection.  Asked and
11   answered.
12               THE WITNESS:  I follow the Bradford Hill
13   methodology and weight of evidence.
14
15   BY MR. TRANGLE:
16         Q.    So is there an -- is there an amount of
17   NDMA from Valsartan that you think would not cause
18   someone's liver cancer when ingested?
19               MR. NIGH:  Form objection.
20               THE WITNESS:  You interrupted my answer,
21   but I will continue the answer.  The answer is yes,
22   as a toxicologist assessing dose assessment and its
23   dose response, I review and rely on studies that are
24   statistically significant at the 95 percent level of
25   certainty.  And I also assess dose response.  I also

Page 62

1    assess the epidemiological data in terms of

2    confounding factors analyses and other duties that

3    are part of the methodology.  So again, I base my

4    dose response on statistically significant data.

5

6    BY MR. TRANGLE:

7         Q.    So are you able to offer an opinion here

8    today about a threshold dose of an amount of NDMA, in

9    terms of UG from Valsartan, that you think would not

10   cause someone's liver cancer when ingested?

11              MR. NIGH:  Form objection.

12              THE WITNESS:  No.  I can only answer the

13   inverse, that I can provide a statistically

14   significant threshold in which liver cancer does

15   occur.

16

17   BY MR. TRANGLE:

18        Q.    So what is that in humans, in UG, for

19   NDMA -- so what is the inverse, is my question?  So

20   what is the amount, the threshold amount of NDMA from

21   Valsartan, in terms of UG, that you think causes or

22   can be causally related to somebody's liver cancer in

23   humans?

24              MR. NIGH:  Form objection.

25              THE WITNESS:  Well, I refer you to my

Page 63

1    report.  It's specifically in my report.

2

3    BY MR. TRANGLE:

4           Q.    So if there is not --

5           A.    You interrupted.

6           Q.    Sorry.  Are you done?

7           A.    No.  I refer you to the table in my

8    report, which provides the cumulative microgram

9    amount of NDMA at various quartiles, from the Hidajat

10   study, that were statistically significant.

11          Q.    Is it your opinion that those are the

12   threshold amounts of NDMA necessary to cause liver

13   cancer in humans?

14                MR. NIGH:  Form objection.

15                THE WITNESS:  Yes, based on

16   statistically significant data, not theoretical data.

17

18   BY MR. TRANGLE:

19          Q.    Okay.  Dr. Sawyer, a latency period

20   refers to the time between an initial exposure to

21   potential toxin and the time of diagnosis of a

22   disease like cancer.  Right?

23          A.    That's correct.  From the initiation of

24   the exposure to the time of official diagnosis, yes.

25          Q.    Do you agree there must be a sufficient

Page 64

1    amount of time that elapses between exposure to a

2    potential carcinogen and cancer that can be

3    clinically detected?

4                    MR. NIGH:  Form objection.

5                    THE WITNESS:  Yes.

6

7    BY MR. TRANGLE:

8        Q.    Would you agree that latency is an

9    important consideration that must be assessed every

10   time a toxicologist is looking at specific causation?

11                   MR. NIGH:  Form objection.

12                   THE WITNESS:  Yes.  As part of Bradford

13   Hill and weight of evidence, absolutely.

14

15   BY MR. TRANGLE:

16       Q.    So whenever you were assessing specific

17   causation for a plaintiff, you considered latency

18   period between exposure and diagnosis?

19       A.    Yes.

20       Q.    And you agree the time frame of the

21   exposure must be consistent with the range of latency

22   periods associated with the disease to be able to

23   conclude that something would be a substantial factor

24   in causing an individual's cancer?

25       A.    I don't understand the question.

```
                                                    Page 65
```

1          Q.     Do you agree that the time frame of the

2     exposure must be consistent with the range of the

3     periods of time associated with the disease?  When I

4     say periods of time, I mean the latency period

5     identified in the literature in order to be able to

6     conclude that something is a substantial factor in

7     causing someone's cancer?

8                     MR. NIGH:  Form objection.

9                     THE WITNESS:  Rather than me trying to

10    reword your question, I'm going to ask you to clarify

11    it.

12                    MR. TRANGLE:  Okay.

13

14    BY MR. TRANGLE:

15         Q.     Do you agree that to be able to say that

16    someone's exposure was a substantial factor in

17    causing their cancer, the latency period must be

18    consistent with data and studies that are on the

19    latency period for that cancer?

20         A.     Yes.

21         Q.     Do you believe there is sufficient

22    latency between Mr. Roberts's exposure to NDMA and

23    his development of HCC?

24         A.     Yes.  I refer you to my report, Page 8,

25    Paragraph 7, two Valsartan epidemiologic studies

Page 66

1    measured the maximum latency interval at three and

2    five years as to Roberts's latency interval of

3    1.86 years and fell into the overall range of the

4    Valsartan studies that had a one year minimum period.

5            Q.    Okay.  So just so I understand, it's a

6    1.86 year latency period for Mr. Roberts.  Right?

7                    MR. NIGH:  Form objection.

8                    THE WITNESS:  Yes.

9

10   BY MR. TRANGLE:

11           Q.    And your opinions about Mr. Roberts's

12   dose and risk of liver cancer are based on his

13   cumulative exposure.  Right?

14           A.    Yes.

15           Q.    The cumulative dose exposure that you

16   calculated for his NDMA from Valsartan goes through

17   August 1, 2018, the date of his diagnosis.  Is that

18   right?

19           A.    I'm checking the report.

20                    MR. TRANGLE:  Well, let's mark as

21   Exhibit 3, your report.

22

23                    (Whereupon, Exhibit DX-3 was marked for

24   identification.)

25

Page 67

1    BY MR. TRANGLE:

2          Q.     And then, we can go to Page 74?  Just

3    let me know when you're there.

4          A.     Yes, I'm on Page 74.

5          Q.     Great.  So this Table 5 is where you

6    calculated Mr. Roberts's cumulative dose.  Is that

7    right?

8          A.     Yes.

9          Q.     And it looks like the last date is

10   August 1, 2018?

11         A.     Correct.

12         Q.     Would you agree that this means the

13   latency period for the cumulative dose that you

14   calculated is exactly zero as that is the date of his

15   diagnosis?

16         A.     Up to the time of his -- no.  Up to the

17   time of his diagnosis, the NDMA also served as a very

18   powerful promoter, which would have increased the

19   aggressiveness and degree of latency.  So even though

20   he was taking contaminated Valsartan in June of 2018,

21   even if that liver tumor had already formed, it's

22   still being promoted by the NDMA.

23         Q.     Is it your opinion that he had liver

24   cancer prior to ingesting NDMA in Valsartan?

25         A.     No.

Page 68

1          Q.     The latency period of 1.86 years would

2     apply only to the very first exposure to NDMA from

3     Valsartan from the pill that he took on

4     September 19th, 2016.  Correct?

5                    MR. NIGH:  Form objection.

6                    THE WITNESS:  Hypothetically, if that

7     was when the first contaminated pill occurred.

8

9     BY MR. TRANGLE:

10         Q.     So you would agree that there's not a

11    1.86 year latency period for the cumulative dose that

12    you calculated for Mr. Roberts?

13                   MR. NIGH:  Form objection.

14                   THE WITNESS:  I disagree.  It's

15    1.86 years.

16

17    BY MR. TRANGLE:

18         Q.     It's 1.86 years, but that is not the

19    time period that he was exposed to the cumulative

20    doses that you calculated on Page 74 of your report.

21    Right?

22                   MR. NIGH:  Form objection.

23                   THE WITNESS:  Well, he started the

24    Valsartan in the year 2014.  As far as the

25    quantitation of Valsartan, I have data starting on

Page 69

1      9/19/2016.

2

3      BY MR. TRANGLE:

4           Q.      Right.  So your cumulative dose is all

5      the Valsartan and NDMA that he ingested from

6      9/19/2016 to 8/1/18.  Right?

7           A.      Could you repeat the question, please?

8           Q.      Sure.  So the cumulative dose that you

9      calculated for Mr. Roberts, all the NDMA from

10     Valsartan that he ingested would be from 9/19/2016 to

11     8/1/18?

12          A.      Yes.  With respect to quantitative data,

13     yes.

14          Q.      Do you agree that with each day

15     his cumulative dose to NDMA increases, the latency

16     period decreases?  I'll repeat it, no problem.

17               Do you agree that with each day that

18     Mr. Roberts's cumulative NDMA exposure increased, the

19     latency period decreased?

20          A.      Did you ask me about the dose

21     increasing?  I'm not really clear on what you asked

22     me.

23          Q.      It's your understanding that Mr. Roberts

24     took Valsartan with NDMA every day.  Right?

25          A.      Yes.

Page 70

1          Q.     So each day --

2                 MR. NIGH:  Form objection.

3

4    BY MR. TRANGLE:

5          Q.     So each day his NDMA exposure cumulative

6    increased.  Right?

7          A.     You broke up.

8          Q.     Each day his NDMA exposure cumulatively

9    would increase?

10                MR. NIGH:  Form objection.

11                THE WITNESS:  Each day his cumulative

12   dose would have increased, correct.

13

14   BY MR. TRANGLE:

15         Q.     And at the same time, we get closer to

16   the dates of his diagnosis, meaning the latency

17   period decreases?

18                MR. NIGH:  Form objection.

19                THE WITNESS:  No, I disagree.

20

21   BY MR. TRANGLE:

22         Q.     Is it your opinion that liver cancer can

23   develop from exposure to a carcinogen with a latency

24   period of only 1.86 years?

25         A.     Yes.

Page 71

```
 1          Q.    What was the methodology you used to
 2    reach that opinion?
 3          A.    Review of the latent period in the human
 4    studies.
 5          Q.    Did you search for articles reporting on
 6    or examining latency periods for liver cancer after
 7    exposure to carcinogens?
 8          A.    Yes, and I cited those in my report.
 9          Q.    Okay.
10          A.    They're, primarily, the two Valsartan
11    studies that are statistically significant.
12          Q.    Did you look for other studies beyond
13    the human studies that you just referenced?
14          A.    Yes.
15          Q.    What did you look for?
16          A.    Dietary studies of NDMA.
17          Q.    Outside of NDMA, did you look for
18    studies about latency period for liver cancer?
19                MR. NIGH:  Form objection.
20                THE WITNESS:  I've reviewed such
21    studies.  However, they're not correctly applicable
22    to NDMA, which releases a multitude -- well, I
23    wouldn't say a multitude, but multiple highly
24    genotoxic metabolites.  So comparing, for example,
25    2,3,7,8-TCDD, I don't want to say the name because it
```

Page 72

1    will be too hard to spell for everyone, but the

2    mechanism of TCDD is very different than the

3    mechanism of the diazonium ions, formaldehyde, and

4    other highly genotoxic agents in NDMA.  So, generally

5    looking at other carcinogens that operate under

6    different pharmacodynamic and pharmacokinetic

7    mechanisms would be like comparing strawberries to

8    bananas.  So I relied on the actual NDMA studies,

9    which is the correct methodology, because it takes

10   into account the same metabolic pathways and

11   mechanistic data.

12

13   BY MR. TRANGLE:

14        Q.    So you're telling me that you didn't

15   look for or you didn't rely on general guidance, not

16   specific to any carcinogen, that looks at the

17   estimated latency period for liver cancer?

18              MR. NIGH:  Form objection.

19              THE WITNESS:  Again, based on my

20   training and experience, I have thoroughly reviewed,

21   in the past, liver cancer, dating back all the way to

22   such events as the 9/11 disaster in New York City and

23   the latency periods of other known exposure points,

24   such as the latency in the vinyl chloride industry,

25   which is a very long latency in fact, but it's a

Page 73

1    completely different mechanism.  So, yes, I've made

2    such reviews, but reliance on other chemical

3    latencies would be an inappropriate methodology.  The

4    appropriate methodology is to rely on NDMA studies,

5    either dietary or direct Valsartan consumption.

6                    THE VIDEOGRAPHER:  Time is 2:35 p.m.

7    This is the end of media one and we're going off the

8    record.

9

10                   (Whereupon, a brief recess was taken off

11   the record.)

12

13                   THE VIDEOGRAPHER:  The time is 2:52 p.m.

14   This is the beginning of media two and we are on the

15   record.

16

17   BY MR. TRANGLE:

18        Q.    Dr. Sawyer, can you point to a single

19   peer-reviewed scientific article stating that liver

20   cancer can develop after a 1.86 year latency period?

21                   MR. NIGH:  Form objection.

22                   THE WITNESS:  Yes.  The Valsartan

23   studies I referenced.

24

25   BY MR. TRANGLE:

Page 74

1          Q.    Can you point to any medical or

2     governmental association that has concluded

3     1.86 years is a sufficient latency period for liver

4     cancer to develop after exposure to NDMA?

5                MR. NIGH:  Form objection.

6                THE WITNESS:  As I stated, it is

7     chemical dependent if the time varies with the

8     mechanistic and underlying genotoxic metabolites

9     formed by each chemical, so it's not reasonable to

10    look at studies of other chemicals and assume that it

11    would have the same latency as that caused by NDMA.

12    That would be an erroneous methodology.

13

14    BY MR. TRANGLE:

15         Q.    Okay.  So, but even if it's erroneous,

16    are you aware of any medical or governmental

17    organization that has concluded 1.86 years is a

18    sufficient latency period for liver cancer to develop

19    after any carcinogen or potential carcinogen?

20                MR. NIGH:  Form objection.

21                THE WITNESS:  I'm not aware of any other

22    studies specific to hepatocellular carcinoma, as in

23    this case, and NDMA or the actual toxic metabolites.

24    I am aware of the studies on formaldehyde, which have

25    a fairly short latency for hematopoietic malignancies

Page 75

```
 1    and upper airway malignancies.

 2

 3    BY MR. TRANGLE:

 4         Q.    And those are different malignancies

 5    than hepatocellular carcinoma.  Right?

 6                   MR. NIGH:  Form objection.

 7                   THE WITNESS:  I point out formaldehyde

 8    since that's one of the metabolites formed, one of

 9    several.

10

11    BY MR. TRANGLE:

12         Q.    If an individual is exposed to sunlight

13    or UV radiation on Day 1 and is diagnosed with

14    melanoma on Day 2, would you say that the UV

15    radiation from Day 1 caused that person's melanoma?

16                   MR. NIGH:  Form objection.

17                   THE WITNESS:  Just to be clear, could

18    you be more precise with your question?  Because I'm

19    confused whether you're referring to a one-day

20    latency period or some other scenario.

21

22    BY MR. TRANGLE:

23         Q.    A one day latency period, right.

24         A.    No.

25         Q.    If an individual took 320 milligrams of
```

Page 76

1      Valsartan with NDMA daily for one month and developed

2      liver cancer the first day after that one month of

3      use, would you attribute the liver cancer to the use

4      of NDMA with Valsartan?

5                     MR. NIGH:  Form objection.

6                     THE WITNESS:  I don't understand the

7      question.

8                     MR. TRANGLE:  Okay.

9

10     BY MR. TRANGLE:

11          Q.     So I think you said that you're familiar

12     with the World Trade Center Health Program guidance

13     document from HHS?

14          A.     I am.  Yes, I think that refers to a

15     25-year latency.

16          Q.     I was still asking a question, sorry.

17     That guidance document has the minimum latency

18     periods for different types of cancers.  Right?

19                     MR. NIGH:  Form objection.

20                     THE WITNESS:  Yes, I'm familiar with it

21     and I believe latency in that document for liver

22     cancer, I think, is 25 years.

23

24     BY MR. TRANGLE:

25          Q.     Okay.  Do you consider that guidance

Page 77

1    document to be a reliable source of latency periods

2    for cancer?

3           A.    I considered it, but it was an entirely

4    different chemical.  In fact, the chemical in World

5    Trade Center is primarily TCDD,

6    tetrachlorodibenzo-p-dioxin.

7           Q.    And so the reason that you're --

8                 MR. NIGH:  Hold on.  The court reporter

9    had asked to slow down.  Dr. Sawyer, did you have

10   more to your answer there?

11                THE WITNESS:  I believe so, but I kind

12   of forgot where we were after the spelling of TCDD.

13                MR. TRANGLE:  All right.  I'll re-ask,

14   then.

15

16   BY MR. TRANGLE:

17          Q.    So is the reason that you're not

18   considering this document because it doesn't contain

19   data on the same exposure, even if it contains data

20   on the same cancer outcome?

21                MR. NIGH:  Form objection.

22   Mischaracterizes his testimony.

23                THE WITNESS:  And the question is

24   inappropriate as it assumes hepatocellular carcinoma,

25   when, in fact, that particular report is for liver

Page 78

1    cancer in general.

2

3    BY MR. TRANGLE:

4        Q.    So is the reason that you're not

5    considering this document because it doesn't contain

6    data on the same exposure, even if it contains data

7    on the same liver cancer?

8              MR. NIGH:  Form objection.

9              THE WITNESS:  I did consider it and I

10   think you're mischaracterizing and putting words in

11   that don't belong.  I certainly did consider it along

12   with other documents.

13             MR. TRANGLE:  Okay.  Let's mark as, I

14   think, what is it, Exhibit 4, Tab 42.

15             MS. IKEN:  Yeah.

16

17             (Whereupon, Exhibit DX-4 was marked for

18   identification.)

19

20   BY MR. TRANGLE:

21       Q.    And this is the World Trade Center

22   minimum latency and types or categories of cancer

23   document that we've been discussing.

24             Do you see it?

25       A.    I wanted to do a refresh, but I'm having

Page 79

1    difficulty finding the -- I'm not sure what button to

2    push.

3                    MR. TRANGLE:  Maybe go off the record

4    and refresh.

5

6                    (Whereupon, a discussion takes place off

7    the record.)

8

9                    THE VIDEOGRAPHER:  The time is 3:00 p.m.

10    We're going off the record.

11

12                    (Whereupon, a brief recess was taken off

13    the record.)

14

15                    THE VIDEOGRAPHER:  Time is 3:02 p.m. and

16    we are back on the record.

17

18    BY MR. TRANGLE:

19        Q.    So on Page 1, sorry, on Page 1, it says

20    here that:  "The World Trade Center Health Program

21    has determined that the minimum latencies are the

22    following five types or categories of cancer."

23    Right?  And it says here under Number 2 that:  "All

24    solid cancers, other than mesothelioma,

25    lymphoproliferative, thyroid, and childhood cancers

```
                                                    Page 80

 1      are four years."

 2                   Do you see that?

 3           A.      Yes.

 4           Q.      We go to the next page, Page 2.  It says

 5      here in the first paragraph, the last sentence:

 6      "With regard to the temporal sequence of symptoms,

 7      cancers do not occur immediately after exposure to a

 8      causative agent and they usually take many years, up

 9      to several decades, to manifest clinically."  Right?

10           A.      I see that.

11           Q.      And if we move to Page 6, this first

12      paragraph:  "The WTC guidance document states, based

13      on the best available scientific evidence, that a

14      minimum of four years is required for all types and

15      categories of solid cancers, other than mesothelioma,

16      lymphoproliferative, thyroid, and childhood cancers."

17           A.      Yes, you've read that correctly.

18           Q.      Dr. Sawyer, you haven't cited or

19      referred to this guidance document in your report for

20      Mr. Roberts; have you?

21                   MR. NIGH:  Form objection.

22                   THE WITNESS:  I have not cited it in my

23      report because it's a different chemical exposure

24      than that of NDMA.

25                   MR. TRANGLE:  Okay.
```

Page 81

1

2      BY MR. TRANGLE:

3            Q.     If we move up to Page 5, just moving up

4      one page, there is data here that says:  "The minimum

5      latency of 12 years has been reported for liver

6      cancer associated with vinyl chloride exposure."

7      Right?

8            A.     Yes.

9            Q.     Okay.  Sorry, just one more question

10     about this.  This category of solid cancers as a

11     group where the minimum latency is four years, that

12     would include hepatocellular carcinoma.  Correct?

13                  MR. NIGH:  Form objection.

14                  THE WITNESS:  The document is not

15     specific, so the answer is no.

16                  MR. TRANGLE:  Okay.

17

18     BY MR. TRANGLE:

19           Q.     So if we go on Page 5, the header for

20     Section B says "Solid Cancers Other Than

21     Mesothelioma, Lymphoproliferative, Thyroid, and

22     Childhood Cancers".  Right?

23           A.     You've read that correctly, yes.

24           Q.     Is hepatocellular carcinoma a solid

25     cancer?

Page 82

1        A.    Yes.

2        Q.    Okay.  And, Dr. Sawyer, this document,

3    does it assess glyphosate anywhere?

4        A.    No.  Well, it does in terms of being a

5    hematopoietic malignancy, yes.

6        Q.    Dr. Sawyer, do you recall authoring an

7    expert report in 2021 in a case concerning Round-Up

8    and glyphosates called "Vosburg versus Monsanto"?

9        A.    Yes.

10             MR. TRANGLE:  Okay.  Let's mark as

11   Exhibit 5, Tab 41.

12

13             (Whereupon, Exhibit DX-5 was marked for

14   identification.)

15

16   BY MR. TRANGLE:

17       Q.    So, Doctor, I think you have to go back

18   and refresh the same tab in your window.  So just let

19   me know when the report pops up for you.  Are you

20   seeing it?

21       A.    Exhibit 5 is the newest.  Let me try

22   refreshing again.

23       Q.    It's supposed to be Exhibit 5.  That's

24   right.

25       A.    Oh, it is five, okay.

Page 83

1    Q.    Yeah, right.  So this -- right.  This is
2    a report dated June 24th, 2021.  Right?
3    A.    It is.  This report contains
4    confidential medical records.  Do you have permission
5    to use this from the plaintiff?
6    Q.    Yeah.  So this is actually filed in
7    court, right here, the document.
8    A.    Does that mean it can be publicly
9    released?
10    Q.    It's accessible publicly, yes.  I got
11    this from a publicly accessible website.
12    A.    All right.  I just don't want to comment
13    on an illegal document.
14    MR. TRANGLE:  Okay.  That's noted.
15    THE WITNESS:  But you assured me that
16    this is legal that you're looking at this document.
17
18    BY MR. TRANGLE:
19    Q.    Are you familiar with West Law, Doctor?
20    A.    No.  I mean, I know the name, but I'm
21    not an attorney and I have no legal opinions.
22    Q.    Okay.  This came from West Law, but
23    that's okay.
24    So, Doctor, is this your report in the
25    case?

Page 84

1          A.      I'd have to review the entire document,

2     but the front page appears correct.

3          Q.      Okay.  And in your past reports, you

4     wouldn't cite something that you considered to be

5     unreliable.  Right?

6          A.      Correct.

7          Q.      Let's move all the way down to Page 178

8     of this report.  Let me know when you have that page

9     up.

10          A.      All right.

11          Q.      Great.  On Page 178 of this report, you

12     conclude the minimum latency for NHL ranged from two

13     to 25 years.  Is that right?

14          A.      Yes.

15          Q.      And the basis for your latency

16     determination in this case says it was a compilation

17     of peer-reviewed latency estimates in Table 21?

18          A.      That's right.

19          Q.      Okay.  And that determination of the

20     minute two-year latency period fell within the

21     general estimates of the studies that you cited in

22     Table 21?

23          A.      Yes.

24          Q.      And in your opinion, this range offers

25     an acceptable degree of objective scientific evidence

Page 85

1    to support your latency opinions in this Monsanto

2    case?

3            A.    Yes, it did.  Three of my references are

4    specific to glyphosate.

5            Q.    Okay.  So let's go down here to the next

6    page, Page 179.

7            A.    Yes.

8            Q.    The last entry in this table is the

9    World Trade Center document that we just discussed.

10   Right?

11           A.    Yes.  That's the fourth reference in

12   Table 21, which is not specific to glyphosate.

13           Q.    And the minimum in that document was two

14   years, right, according to your table here?

15           A.    Yes.

16           Q.    And in this Monsanto report, you cited

17   this as evidence to support your opinion that two

18   years was a sufficient minimum latency for glyphosate

19   to cause NHL?

20                 MR. NIGH:  Form objection.

21                 THE WITNESS:  Yes, it was consistent

22   with the glyphosate specific data, which I've

23   included in Table 21, first three paragraphs.

24

25   BY MR. TRANGLE:

Page 86

1          Q.    Dr. Sawyer, you've also relied upon this

2     WTC document in a report you authored in 2018 in a

3     case called Pinares versus United Technologies.

4                Does that ring a bell?

5          A.    Yes.  I think it was a radiological

6     case.

7          Q.    Okay.  But you have no, I guess, dispute

8     with the fact that you relied on the WTC Health

9     Program document in that case?

10               MR. NIGH:  Form objection.

11               THE WITNESS:  I did because the data in

12     the 9/11 monitoring and World Trade Center Health

13     Program, I believe that that two year minimum was

14     based on radiological exposure, not diazonium ions or

15     NDMA.

16               MR. TRANGLE:  Let's mark as Exhibit 6,

17     Tab 45.

18

19               (Whereupon, Exhibit DX-6 was marked for

20     identification.)

21

22               MR. TRANGLE:  I'll refresh, so let me

23     know.  Just for your benefit this is from the same

24     publicly available database.

25

Page 87

1    BY MR. TRANGLE:

2            Q.    Do you see Exhibit 6?

3            A.    Yes.

4            Q.    So this is the report from March 23rd,

5    2018 in the -- this seems to be the wrong tab.  Let's

6    come back to that.

7                  Let's go back to tab -- sorry, to

8    Exhibit 5.

9            A.    Right.  The June 24th report?

10           Q.    Right.  And I want to go back again to

11   Page 176 -- sorry, 179, this table, the table that

12   you have on Page 179.

13           A.    Yes, I'm on that.

14           Q.    Okay.  So in this entry for the World

15   Trade Center document in your report, it says here,

16   you wrote a citation to Nadler & Zurbenko 2013.

17                 Do you see that?

18           A.    No, which paragraph are you looking at?

19           Q.    It's in the last entry for the 9/11

20   entry of the table on Page 179.

21           A.    Yes, I see that.

22           Q.    Okay.  Have you read that article

23   before?

24           A.    I don't recall, probably.  I wouldn't

25   put it in the report if I hadn't.

                                                            Page 88

1                    MR. TRANGLE:  Okay.  Let's mark as
2         Exhibit 7, Nadler 2013, which should be Tab 43.
3
4                    (Whereupon, Exhibit DX-7 was marked for
5         identification.)
6
7                    THE WITNESS:  Tab 6?
8                    MR. TRANGLE:  Sorry, tab -- no, it
9         should be Exhibit 7.
10                    THE WITNESS:  All right.  Now it's
11        there.
12
13        BY MR. TRANGLE:
14             Q.    So this is an article called "Developing
15        a Liable Model Extension to Estimate Cancer Latency"
16        by Nadler & Zurbenko?
17             A.    Right.
18             Q.    And this is an article that, according
19        to the authors, develops a model to estimate cancer
20        latency periods for different cancers?
21             A.    Yes.
22             Q.    If we go down to Page 4.
23             A.    I see Page 3 about liver and lung
24        cancers have relatively short latency periods, and
25        gives a range, yeah.

Page 89

```
 1              Q.     Do you see Figure 4 on Page 5?

 2              A.     Figure 4, okay.

 3              Q.     Do you see Figure 4?

 4              A.     Yes.

 5              Q.     And Figure 4 states that:  "The length

 6      of latency and years by cancer type".  Right?  That's

 7      the title of this chart?

 8              A.     I'm changing the magnification, it's cut

 9      off, so hold on.  All right.  I see it.

10              Q.     And it says here that:  "The liver

11      cancer latency period in this study is 10.81 years."?

12              A.     Yes.  I see that and, of course, that is

13      to the peak of the bell curve.  It doesn't mean that

14      you have to have 10.8 years to develop cancer.  You

15      can develop it in a much earlier time.  But this is a

16      bell curve-type phenomenon and that is at the peak.

17              Q.     On Table 1, this is an estimated lag

18      time in another study they're referencing, Manton, et

19      al.

20                     Do you see that in Table 1?

21              A.     Yes.

22              Q.     And it says here the lag time in years

23      for liver is 21.2 plus or minus 2.3 years?

24              A.     I see that.

25              Q.     You didn't cite or refer to this
```

Page 90

1    document anywhere in your report for Mr. Roberts; did
2    you?
3         A.    No.  It's not chemical specific and it's
4    not clear whether this is involving a carcinogen with
5    strong promotion, such as NDMA.  This is a general
6    document that's not specific to the mode of action
7    and pharmacodynamics that we are experiencing within
8    NDMA.
9         Q.    10.81 would be over five times the
10   latency period for Mr. Roberts.  Right?
11              MR. NIGH:  Form objection.
12              THE WITNESS:  The peak of the bell curve
13   would be that, yes.  That does not indicate that
14   there wouldn't be cases before or after that value.
15   That would be a misinterpretation of the latency
16   incident curve.
17
18   BY MR. TRANGLE:
19        Q.    Are you aware of any data on or studies
20   that attempt to estimate, like the WTC or another
21   article, the latency period for liver cancer from
22   NDMA exposure?
23        A.    Yes.  The best sources are that of the
24   actual Valsartan studies as well as dietary NDMA
25   studies that are chemical and mechanistic specific

Page 91

1     and recognize that NDMA metabolites are also

2     promoters of the malignant process.

3            Q.    So it's your testimony that those

4     studies have estimated how long, in terms of latency,

5     one needs for liver cancer to develop from NDMA?

6            A.    I didn't understand the question.

7            Q.    My question is:  It's your testimony

8     that the studies that you just referenced have

9     constructed estimates for how long they think it

10    takes for liver cancer to develop after exposure to

11    NDMA?

12                 MR. NIGH:  Form objection.

13                 THE WITNESS:  I still don't understand

14    the question.

15                 MR. TRANGLE:  Okay.

16

17    BY MR. TRANGLE:

18            Q.    Dr. Sawyer, MDEA is not at issue in this

19    case.  Right?

20                 MR. NIGH:  Form objection.

21                 THE WITNESS:  Only in the -- it is, only

22    in the manner that I reported it in this case, in

23    terms of it sharing metabolite profiles resulting in

24    similar carcinogenesis.  In other words, it's a very

25    close cousin and it operates in the same fashion.

Page 92

1

2       BY MR. TRANGLE:

3            Q.     But Mr. Roberts has not alleged that he

4       has been exposed to MDEA in Valsartan.  Right?

5            A.     Correct.  Nowhere in my report did I

6       allege or consider that he was exposed to MDEA.  I

7       used it in the proper sense of comparing it to its

8       cousin, NDMA.

9            Q.     Let's go back to Exhibit 3, which is

10      your report.  And I want to turn your attention to

11      Page 7.  So it should be Exhibit 3 in the exhibit

12      sharing document.

13           A.     I have the report open on Page 7.

14           Q.     And you have a paragraph here called

15      "Promotion".  And my question is:  You wrote that:

16      "NDMA is both an initiator and promoter of the

17      malignant process and is a complete carcinogen."

18      Correct?

19           A.     Yes.

20           Q.     There is not a single reference or a

21      citation in this paragraph on Page 7 of your report.

22      Is that right?

23           A.     Yes.

24           Q.     If we move to Page 9, you seem to have

25      another discussion here about initiation and

Page 93

1    promotion?

2              A.      Yes.

3              Q.      And again, on Page 10, you wrote here

4    that:  "NDMA is a tumor initiator and a tumor

5    promoter."  Is that what you wrote here?

6              A.      Which paragraph?

7              Q.      The second paragraph on Page 10 starting

8    with "most carcinogenic substances".  You wrote that

9    "NDMA is a tumor initiator and a tumor promoter"?

10             A.      Yes, so what is the question?

11             Q.      My question is you also state:  "It has

12   been labeled a complete carcinogen"?

13             A.      That's correct.

14             Q.      Are you aware of a single medical or

15   scientific organization that has labeled NDMA a

16   complete carcinogen?

17                     MR. NIGH:  Form objection.

18                     THE WITNESS:  Yes, I referenced ATSDR.

19

20   BY MR. TRANGLE:

21             Q.      And you wrote here that:  "This fact has

22   been identified by U.S. ATSDR."  Right?

23             A.      Yes.

24             Q.      Is it your testimony that ATSDR has

25   labeled NDMA a complete carcinogen?

Page 94

1          A.     No.  I think U.S. ATSDR uses a different
2     name for the same concept.
3          Q.     What is the name that you think they
4     use?
5          A.     Let me go to the document and look,
6     Page 141.
7          Q.     Before you go there, I have a different
8     question.  Are you relying on anything other than the
9     U.S. ATSDR to support your opinion that NDMA is
10    established tumor promoter for complete carcinogen?
11                    MR. NIGH:  Form objection.
12                    THE WITNESS:  Yes, my 38 years of
13    training and experience.
14                    MR. TRANGLE:  Let's go off the record
15    for a short break.  Is that okay with you?
16                    THE VIDEOGRAPHER:  Time is 3:25 p.m.
17    This is the end of media two.  We're going off the
18    record.
19
20                    (Whereupon, a brief recess was taken off
21    the record.)
22
23                    THE VIDEOGRAPHER:  The time is 3:38 p.m.
24    This is the beginning of media three and we are on
25    the record.

Page 95

```
 1
 2     BY MR. TRANGLE:
 3          Q.     So just before the break, Dr. Sawyer,
 4     you were referencing the U.S. ATSDR toxicological
 5     profile for NDMA?
 6          A.     Yes.
 7                 MR. TRANGLE:  Let's mark that as
 8     Exhibit 8.
 9
10                 (Whereupon, Exhibit DX-8 was marked for
11     identification.)
12
13                 MR. TRANGLE:  Let me know, do you have
14     that up on your screen?
15                 THE WITNESS:  I have my report open.
16                 MR. TRANGLE:  Okay.  And your report --
17                 MS. IKEN:  Which tab, Asher?
18                 MR. TRANGLE:  Sorry, the tab will be
19     Tab 9 for you.
20
21     BY MR. TRANGLE:
22          Q.     In your report, Dr. Sawyer, you were on
23     Page 10.  Right?
24          A.     Yes, you were.  Yeah.
25          Q.     Okay.  And the citation that you have
```

Page 96

1      here for Footnote 16 is the toxicological profile.

2      Right?

3              A.      Yes.

4              Q.      And it looks like you're pointing to

5      Page 68.  Is that right, in the footnote?

6              A.      I seem to have lost the page number now.

7      Is it Page 15?  What page?

8              Q.      Of your report, it's Page 10.

9              A.      Okay.  Yes, so I've referenced --

10             Q.      Page 68, it looks like?

11                     It's Footnote 16, if that makes it

12     easier to look at?

13             A.      Yeah, Page 141, I believe.

14             Q.      Before that, it says Page 68.  Right?

15             A.      Yeah, there we go, Page 68.

16             Q.      Okay.  So that's what you're citing

17     there?

18             A.      Yes.

19             Q.      So let's go now to Exhibit 8, which is

20     the profile, and let's go to Page 68.

21             A.      I have Exhibit 7 open.

22             Q.      So we want Exhibit 8.

23             A.      Yeah, I'll try to reload again.

24

25                     (Whereupon, a discussion takes place off

Page 97

1     the record.)

2

3     BY MR. TRANGLE:

4          Q.    So if you go to Page 68, which I think

5     is Page 78 of the PDF?

6                    MR. NIGH:  Dr. Sawyer, is yours loading,

7     your ATSDR, the Exhibit 8?

8                    THE WITNESS:  It looks like it's all

9     loaded.

10                   MR. NIGH:  Okay, good.  It just takes a

11    while.

12                   MR. TRANGLE:  Yeah, it's a large

13    document.

14                   THE WITNESS:  Yes.

15

16    BY MR. TRANGLE:

17         Q.    So are you on Page 68 where it starts

18    with N7-methylguanine?

19         A.    Yes.

20         Q.    Okay.  It's your testimony that this

21    page states that NDMA is a complete carcinogen?

22         A.    I don't see that.  Let me try Page 78.

23    That may be it.

24         Q.    Sorry, Doctor, just before you move on,

25    so it doesn't say that on this page.  Right?

Page 98

1           A.     Not on that page, no.

2           Q.     And so you're saying that it's somewhere

3     else in this document?

4           A.     Well, I'm looking at Page 78 of the

5     document to see if that, which is a different PDF

6     page.

7           Q.     Okay.  Let's look at Page 78.  I don't

8     -- is there something -- there's one paragraph, it

9     looks like.  Right?

10          A.     Yes.

11          Q.     Is there something in that paragraph

12    that states that NDMA is a complete carcinogen?

13          A.     No.

14          Q.     Is it still your testimony that

15    somewhere in this document U.S. ATSDR is concluded

16    NDMA is a complete carcinogen?  Doctor, there is a

17    question pending.  Do you see that question?

18          A.     Yes, I need more time to answer it.

19          Q.     Are you reading the document right now?

20          A.     I'm looking at a list.

21          Q.     What list is that?  Sorry, we're talking

22    about -- I'm not asking you about a specific document

23    right now.  I'm asking you a question about

24    Exhibit 8.  Doctor, what list are you looking at?

25          A.     It's like a word search.

Page 99

1          Q.     Sorry, you're searching the document
2     right now?
3          A.     Yes.
4          Q.     Okay.  But I have a question pending.
5          A.     All right.
6          Q.     So without having to search the document
7     through a selective word search, can you answer the
8     question that's pending?
9          A.     Go ahead.
10         Q.     That is the question.
11         A.     Go ahead and ask the question.
12                MR. TRANGLE:  Just for the record,
13     Dr. Sawyer is searching the document with a text
14     search tool right now.
15
16     BY MR. TRANGLE:
17         Q.     Doctor, my question is:  Without --
18     without searching through this document, are you able
19     to tell me the answer to my question as to whether
20     somewhere in this document U.S. ATSDR has labeled
21     NDMA a complete carcinogen?
22         A.     No.  It appears that I made an error in
23     my footnote.
24         Q.     Okay.  We're going to put that exhibit
25     away for now.  Did you conduct a Bradford Hill

Page 100

1     analysis on NDMA in Valsartan and liver cancer in

2     this case?

3              A.      Yes.

4              Q.      When did you perform that analysis?

5              A.      Prior to the date of this report.

6              Q.      Had you done a Bradford Hill analysis on

7     NDMA cancer prior to this case?

8                      MR. NIGH:  Form objection.

9                      THE WITNESS:  Not formally.

10

11    BY MR. TRANGLE:

12             Q.      How many studies are needed to be able

13    to have a sufficiently robust body of evidence to

14    reach a causal opinion using Bradford Hill?

15                     MR. NIGH:  Form objection.

16                     THE WITNESS:  It really varies depending

17    upon the strength of the association, the

18    consistency, coherence, number of subjects is a

19    biggy, and other factors; so there is no magic

20    number.  That would be something that an attorney

21    would make up.

22

23    BY MR. TRANGLE:

24             Q.      So if there's one study with a very

25    large sample size, would you be able to perform a

Page 101

1    Bradford Hill analysis with just that evidence?

2           A.    No.   Another prong in the Bradford Hill

3    are animal studies as well as mechanistic studies and

4    the combined data from other human studies.   There

5    are other human studies I've looked at that show

6    liver cancer with NDMA.   However, not quantitatively

7    that I could use in my dose response assessment.

8           Q.    That actually gets to my next question,

9    which is:   Are you planning to testify about Bradford

10   Hill at trial?

11          A.    Certainly.

12                MR. NIGH:   Form objection.

13

14   BY MR. TRANGLE:

15          Q.    So you're planning to testify about

16   Bradford Hill, but you're not planning to testify

17   about general causation?

18                MR. NIGH:   Form objection.

19                THE WITNESS:   As my prior answer, if

20   asked, but that's not my assignment.   I'm assessing

21   dose response.

22                MR. TRANGLE:   Okay.

23                THE WITNESS:   However, I have to

24   understand the specifics of general causation,

25   especially the pharmacokinetics as well as the mode

Page 102

1    of action.

2                    MR. TRANGLE:  Okay.

3                    THE WITNESS:  And other factors that

4    relate to causation.

5

6    BY MR. TRANGLE:

7        Q.    How many epidemiological studies that

8    focus on NDMA contaminated Valsartan and cancer in

9    humans are you relying on to form your causal

10   opinions?

11                   MR. NIGH:  Form objection.

12                   THE WITNESS:  The combined animal and

13   human studies.

14

15   BY MR. TRANGLE:

16       Q.    How many human studies are you relying

17   on that deal with Valsartan with NDMA and cancer in

18   humans?

19                   MR. NIGH:  Form objection.

20                   THE WITNESS:  If I'm understanding you

21   correctly, you only are interested in Valsartan

22   studies, so there are three.

23                   MR. TRANGLE:  Okay.

24                   THE WITNESS:  Now, obviously, I've

25   relied on more than that.  I've relied on

                                              Page 103

1     occupational human as well as dietary studies.

2

3     BY MR. TRANGLE:

4          Q.    Did you rely on studies looking at

5     Ranitidine and NDMA and cancer in humans?

6                    MR. NIGH:  Form objection.

7                    THE WITNESS:  Yes.

8

9     BY MR. TRANGLE:

10         Q.    Is that anywhere in your report?

11         A.    It's on my MCOs.

12         Q.    Okay.  But there's no textual analysis

13    analyzing those studies in your report?

14         A.    Let me check the report.

15         Q.    No, if you can answer without searching

16    the report, that would be great.

17                    MR. NIGH:  You know he's allowed to look

18    at his report at any time he wants to look at his

19    report to answer questions.

20                    MR. TRANGLE:  I'll retract the question.

21

22    BY MR. TRANGLE:

23         Q.    I have a new question for you,

24    Dr. Sawyer.  It's in your Bradford Hill analysis.

25    Without looking at your report, are you able to know

Page 104

1    without looking whether or not you've cited or relied

2    on Ranitidine studies?

3                    MR. NIGH:  Again, that's an improper

4    instruction.  He's allowed to look at his report.

5                    MR. TRANGLE:  If you can't answer

6    without looking at your report, that's also fine as

7    an answer.

8                    MR. NIGH:  He doesn't have to have a

9    memory test or instruction on answering questions

10   without looking at his report.

11

12   BY MR. TRANGLE:

13        Q.    Dr. Sawyer, are you able to answer the

14   question without looking at your report?

15                    MR. NIGH:  Yet again, he's -- it's an

16   improper question.  He's allowed to look at his

17   report for any question.

18

19   BY MR. TRANGLE:

20        Q.    Are you text searching your report right

21   now, Dr. Sawyer?

22        A.    Yes, I'm looking at it now.

23        Q.    And you're performing a text search for

24   Ranitidine studies in your report?

25        A.    Yes.

Page 105

1        Q.    You say that you're basing your opinions

2    here on the Bradford Hill methodology.   Right?

3        A.    Yes.

4        Q.    I think you write in your report that:

5    "Individual doctors are giving weight according to

6    their merits and relevance to the matter at hand."

7    Right?

8        A.    Yes.

9        Q.    What do you mean when you say:   "Each

10   factor is weighted according to its merits."?

11       A.    The robustness of the study, whether it

12   provided quantitative data and statistics, whether or

13   not the study was peer-reviewed.

14       Q.    Okay.

15       A.    As well as several other factors,

16   including whether an agency has adopted it.   That is,

17   a generally recognized agency.

18       Q.    What do you mean when you say "each

19   factor is weighted according to its relevance"?

20       A.    Well, a good example would be when you

21   were questioning me regarding non-NDMA liver cancer

22   latencies, that would hold far less relevance than a

23   study on cancer latency from NDMA and dietary and

24   Valsartan studies.

25       Q.    Okay.  Is it your testimony that certain

Page 106

1    Bradford Hill considerations are only sometimes

2    relevant?

3                    MR. NIGH:  Form objection.

4                    THE WITNESS:  Yes.  Again, if I were

5    doing a dermal absorption analysis of NDMA, I would

6    not be concerned about temporality.  I wouldn't be

7    really interested in experimental animal data because

8    it really wouldn't be relevant if I were doing a

9    human skin absorption study.  So it depends on what

10   area of toxicology you're looking at.  If you're

11   performing an inhalation toxicology analysis for

12   particle size, for example, it would be irrelevant

13   whether it caused cancer or not.  The study is

14   focusing on particle size distribution and

15   absorption.  So there are areas in toxicology where

16   all of these prongs wouldn't be relevant.

17

18   BY MR. TRANGLE:

19        Q.    In this case, which factor has been

20   given the greatest weight by you?

21        A.    The greatest weight?  They all carry

22   great weight.  I mean, the strength of the

23   association is important, whether it's statistically

24   significant and by what degree.  The consistency of

25   the associations are important and carry a fair

Page 107

```
 1      amount of weight.  The dose response analysis is very
 2      important.  And in this -- with respect to NDMA, it's
 3      a very conclusive dose response analyses through four
 4      quartiles in Hidajat, H-I-D-J-A-T, (sic Hidajat)
 5      studies.  As well as even in dietary studies, there's
 6      very good dose response analyses that were
 7      statistically significant and valid.  Also,
 8      biological plausibility is important.  Understanding
 9      the mechanism and how this drug or chemical acts is
10      very well documented.  Even the physiologically based
11      pharmacokinetics have been established in recent
12      studies.  The bond of distribution throughout the
13      body, its solubility, its half life in primates have
14      been studied and show statistically significant
15      measurements with a known rate of error.  So the dose
16      response analysis and biological plausibility are
17      very important and very well established with NDMA.
18      Other factors, such as coherence, that has been
19      assessed, and we know that liver cancer can occur
20      from the inhalation of NDMA.  It can be -- occur from
21      oral ingestion in a diet and even in Valsartan pills.
22      So there's certainly coherence of the association.
23           Q.     So would you agree that animal studies,
24      in themselves, are not really adequate to determine
25      if the substance is a carcinogen in humans?
```

Page 108

1              MR. NIGH:  Form objection.

2              THE WITNESS:  Well, of course, that's

3    very basic toxicology, yeah.  Yeah.  The animal

4    studies are a relevant prong in the Bradford Hill,

5    but I'm not making any determination solely on animal

6    studies.  That's ridiculous.  I wouldn't do that.

7

8    BY MR. TRANGLE:

9         Q.    Yesterday, counsel sent over an article

10   by Shimanovich, et al. 2020.  It's part of the

11   production of materials that you relied on in forming

12   your opinions in this case.  Are you familiar with

13   this article?

14             MR. NIGH:  Form objection.

15             MR. TRANGLE:  Let's mark, in the

16   meantime, as Exhibit --

17

18   BY MR. TRANGLE:

19        Q.    Dr. Sawyer, are you familiar with the

20   article?

21             MR. NIGH:  Form objection.

22             THE WITNESS:  Are you referring to

23   Schroeder?

24             MR. TRANGLE:  No.  Shimanovich 2020, it

25   was in the production that we received.

Page 109

1              MR. NIGH:  Form objection.

2              THE WITNESS:  Yes, assessing causality

3     and epidemiology, yes.

4              MR. TRANGLE:  Okay.  Let's mark that as

5     Exhibit 9.

6

7              (Whereupon, Exhibit DX-9 was marked for

8     identification.)

9

10    BY MR. TRANGLE:

11         Q.    So this is an article that you're

12    relying on in forming your causation analysis in

13    Bradford Hill in this case?

14              MR. NIGH:  Form objection.

15              THE WITNESS:  Yes.

16

17    BY MR. TRANGLE:

18         Q.    You found it to be a reliable article?

19    When you reviewed it, did you find it to be reliable,

20    Dr. Sawyer?

21         A.    Well, it's not the type of study you

22    could actually quantitatively look at the statistics

23    and, you know, say it's reliable at the 95 percent

24    level.  Certainly, I can't reach an opinion of that

25    sort with this type of study.

Page 110

1          Q.      Is this something that you used?  You
2     said that you used this in forming your opinions.
3     Why did you use it?
4          A.      Simply, the study points out some of the
5     erroneous conclusions that can be drawn by
6     overemphasizing or underemphasizing the use of
7     certain prongs of Bradford Hill.
8          Q.      This article uses and describes the
9     grade methodology.  Right?
10         A.      Yes.  Yes, on Table 4, I believe.
11         Q.      According to this article, on Page 875:
12    "The grade methodology is the most widely adopted
13    approach for assessing certainty of evidence in
14    systematic reviews guideline development and evidence
15    informed recommendations?"
16                 Do you see that?
17         A.      Under grade methodology?
18         Q.      Right.
19         A.      I see that, but, again, I can't provide
20    you with a quantitative assessment.  This is a study
21    that offers opinions defined by the grade working
22    group and it's helpful in looking through each of the
23    prongs of Bradford Hill and considering how they
24    worked together.  I think it's a helpful paper, but,
25    I mean, it's -- your question regarding its

Page 111

1    reliability, I really can't answer that.

2            Q.    Okay.  On Page 877, at the very bottom,

3    it says:  "According to grade working group, a strong

4    association is indicated by a risk ratio of 2:5."

5                    Do you see that?

6            A.    No, but I -- I remember it.  You're

7    looking at Table 3?

8            Q.    This is actually in text on Page 877.

9    The last full sentence of 877, above the table?

10           A.    Oh, yeah, okay.

11           Q.    Okay.  So you agree that the grade

12   working group considers a strong association

13   something where the risk ratio is 2:5?

14           A.    Yeah.  I mean, it's similar to what I

15   learned in epidemiology and bio statistics.

16           Q.    So it's your opinion that a strong

17   association is indicated by an RR effect of somewhere

18   2:5 or higher?

19           A.    Yes.

20           Q.    What is a weak association?

21           A.    Well, a moderate association is,

22   generally, less than two.  A weak association, I

23   don't recall the cut offs, I think around 1.5.

24           Q.    Do you believe the strength

25   consideration should be given less weight in a

Page 112

1    Bradford Hill analysis if the associations found in
2    the literature are low?
3                  MR. NIGH:  Form objection.
4                  THE WITNESS:  Well, the answer is it
5    depends on several factors.  A big factor is the
6    number of participants and the power to see a change,
7    if it exists.  For example, in the -- let's say a
8    Valsartan study, where there's a very large number of
9    subjects, statistically significant changes can be
10   detected that would be missed in a smaller Valsartan
11   study of liver cancer.
12
13   BY MR. TRANGLE:
14        Q.    Do you agree that the higher the
15   relative risk found, the greater likelihood of
16   causality in terms of the strength factor?
17        A.    Not necessarily.  Again, it depends on
18   the individual studies and, as I said, the power that
19   is Type II error versus Type I error, which is the
20   95 percent exceedance of the confidence interval.
21        Q.    What is the -- oh, sorry.
22        A.    I'm done.
23        Q.    What is the association level or risk
24   effect estimate level between Valsartan contaminated
25   with NDMA and cancer overall, in your opinion?

Page 113

1              MR. NIGH:  Form objection.

2              THE WITNESS:  In animals or humans?

3              MR. TRANGLE:  In humans.  I'm not aware

4    of any animal studies that looked at NDMA and

5    Valsartan.

6              MR. NIGH:  Form objection.

7              THE WITNESS:  I'm sorry.  I didn't hear

8    the word Valsartan.  Okay.  You'll have to repeat the

9    question, because I don't want to...

10             MR. TRANGLE:  No, that's fair.

11

12   BY MR. TRANGLE:

13        Q.    What is the association between

14   Valsartan contaminated with NDMA and cancer overall

15   in humans, in your opinion?

16        A.    Well, I know the lowest range that was

17   statistically significant was around -- maybe around

18   1.6, which is low.  However, we're only at the

19   beginning of the bell curve of latency and that

20   number is going to grow at the peak of the latent

21   period, which we don't know what it is yet.  If the

22   latent period peak was at 10.1 years, there is going

23   to be a much larger risk ratio at that point in time

24   as opposed to early on in the temporality curve.

25        Q.    So it's your opinion the magnitude

Page 114

1  associations found between NDMA and liver cancer in

2  humans where the NDMA comes from Valsartan is low?

3              MR. NIGH:  Form objection.

4              THE WITNESS:  No, that's not what I

5  said.  I said the lowest value of this from the

6  Valsartan studies was about 1.16, which is low.

7  However, the number of subjects was very high and

8  that minimizes Type II error.  It allows the

9  measurement to be better assessed statistically

10  because of the large number of individuals in the

11  study.  And, more importantly, that in the early

12  latency, there's going to be far less -- a lower RR

13  than there would be at the peak.  And as we

14  discussed, the peak has not occurred yet.  The peak

15  could be at four years.  It could be ten years.  We

16  don't know yet until the studies are carried out

17  longer.  But we do know for certain that the rate of

18  liver cancer in the Valsartan, two of the studies,

19  was statistically significant and in the weak to

20  moderate range.

21

22  BY MR. TRANGLE:

23       Q.    Do you agree that the highest reported

24  statistically significant association in humans for

25  better exposure to Valsartan with NDMA and liver

Page 115

1    cancer is 1.16?

2                MR. NIGH:  Form objection.

3                THE WITNESS:  I don't believe that's

4    correct.

5

6    BY MR. TRANGLE:

7         Q.    Doctor, you said that part of the reason

8    the associations found are low is because the latency

9    period is insufficient in these studies?

10               MR. NIGH:  Form objection.

11               THE WITNESS:  Not what I said at all.

12

13   BY MR. TRANGLE:

14        Q.    Is it your opinion that these studies

15   have insufficient latency time to be able to

16   understand the risk of cancer, liver cancer from NDMA

17   in Valsartan?

18               MR. NIGH:  Form objection.

19               THE WITNESS:  I can't answer that

20   because you twisted my earlier conclusions.  I didn't

21   say that the latency was insufficient.  I said that

22   it's early on in the latency and that the number of

23   subjects developing liver cancer will markedly

24   increase at the peak of the latency.

25

Page 116

1    BY MR. TRANGLE:
2         Q.    What is the peak of the latency?
3         A.    I just answered that in the prior
4    question.
5                MR. NIGH:  Yeah, form objection.  Asked
6    and answered.
7                MR. TRANGLE:  Sorry.
8
9    BY MR. TRANGLE:
10        Q.    Quantitatively, what was the year that
11   you believe is the peak of the latency?
12               MR. NIGH:  Form objection.  Asked and
13   answered.
14               THE WITNESS:  I never said that I had an
15   opinion as to exactly what year it would be.  I used
16   an example and said, hypothetically, it could be four
17   years.  It could be ten years.  We don't know yet.
18   And I remember saying "we don't know yet because the
19   studies haven't been run long enough to touch the
20   peak."
21
22   BY MR. TRANGLE:
23        Q.    Is it your opinion that the strength of
24   association consideration under Bradford Hill has
25   been satisfied and met when it comes to NDMA

Page 117

1    contaminated Valsartan and liver cancer in humans?

2                MR. NIGH:  Form objection.

3                THE WITNESS:  Based on only two studies,

4    no.  But I'm not relying just on two Valsartan

5    studies.  You're kind of misinterpreting what I said

6    earlier.

7

8    BY MR. TRANGLE:

9         Q.    Do you agree that the confidence

10   interval is what informs epidemiologists about

11   whether an association found is statistically

12   significant or not?

13        A.    Of course.

14        Q.    The confidence interval does not tell

15   you the magnitude of the effect estimate found; does

16   it?

17        A.    No, but it tells whether or not the

18   association was statistically significant, if it is

19   greater than the 95th RR in the interval.  In other

20   words, if the interval exceeds one, the RR exceeds

21   one within that interval, it is statistically

22   significant.

23        Q.    The fact of statistical significance

24   does not tell you the magnitude or strength of the

25   association?

Page 118

1          A.     Of course not.

2          Q.     The next thing I want to ask about is

3     specificity.  Do you think that specificity is met

4     because epidemiological studies have control over

5     confounding in the literature on Valsartan with NDMA

6     and liver cancer?

7                 MR. NIGH:  Form objection.

8                 THE WITNESS:  Yes.

9

10    BY MR. TRANGLE:

11         Q.     Would you agree that association between

12    the exposure and multiple endpoints suggest a higher

13    likelihood to be observed association is due to

14    confounding?

15         A.     No.  For example, the Hidajat study

16    tested for sensitivity analyses in its multifactorial

17    analyses and the results did not find any interaction

18    between rubber dust, rubber fumes, and nitroso.  I

19    mean, some or N-nitromorpholine --

20         Q.     Dr. Sawyer --

21         A.     Let me finish, please.

22         Q.     Oh, I'm sorry, I didn't realize you

23    weren't done.

24         A.     And it is also well established, and I

25    reference you to ATSDR in this one, as many other

Page 119

1    documents that I've referenced, that NDMA is a

2    multiple site carcinogen and it's not restricted to

3    only the liver.  And the prevalence of -- in the

4    Hidajat study, the prevalence of these other

5    co-contaminants, for example, rubber dust and rubber

6    fumes, were found throughout the facility.  And the

7    statistics on those particular co-contaminants did

8    not reveal a statistically significant trend.  It is

9    a dose response.

10        Q.    Dr. Sawyer --

11        A.    I'm answering your question.  You asked

12   me specifically what I'm relying on and I'm not

13   relying on just the Valsartan studies.  I'm relying

14   on a multitude of other studies.

15        Q.    Respectfully, I did not ask you the

16   basis in my question.  I can read it back to you, but

17   I did not ask for the basis of an opinion that you

18   are offering.  Would you like me to read it back to

19   you?

20        A.    Sure.

21              MR. TRANGLE:  I'll remove the question.

22

23   BY MR. TRANGLE:

24        Q.    Dr. Sawyer, is it your opinion that the

25   evidentiary value from Hidajat is greater than the

Page 120

1    evidentiary value from the studies on NDMA and

2    Valsartan or assessing Bradford Hill in this case?

3                    MR. NIGH:  Form objection.

4                    THE WITNESS:  I'd have to rank them

5    about equal.

6                    MR. TRANGLE:  Okay.

7                    THE WITNESS:  The Hidajat study has a

8    great deal of power and accuracy due to the large

9    number of subjects and also is broken down to dose

10   response trends into four quartiles and there are

11   many other factors in Hidajat that are very

12   important.  And yet, Valsartan is important.  One of

13   the studies was quite large and it's clearly real

14   world exposure, you know, that the studying the

15   actual drug itself with the contaminant in it, which

16   is a plus.  But there are certain weaknesses in the

17   Valsartan study that are not weak or problematic in

18   the Hidajat studies.

19           Q.    So, Dr. Sawyer --

20                    MR. NIGH:  Hold on.  Were you finished

21   with that answer, Doctor?

22                    THE WITNESS:  Yes.  That's okay.

23

24   BY MR. TRANGLE:

25           Q.    In your analysis in Bradford Hill, did

Page 121

1    you give more weight to the Hidajat study then you

2    did to studies on Ranitidine and NDMA and cancer in

3    humans?

4                    MR. NIGH:  Form objection.

5                    THE WITNESS:  I'm trying to understand

6    your question.  Rather than me repeating it, I'll let

7    you reformulate it.

8

9    BY MR. TRANGLE:

10        Q.        Reformulate it, right.

11                  So when you're doing your weight of

12    evidence analysis and you're looking to see which

13    pieces are most informative to that analysis, did you

14    consider the Hidajat study more relevant to your

15    analysis than studies on Ranitidine and NDMA and

16    cancer in humans?

17                    MR. NIGH:  Form objection.

18                    THE WITNESS:  It's the Bradford Hill

19    prongs of evidence vary greatly in both of those

20    studies.  For example, specificity is covered in both

21    studies.  Consistency is probably equally covered.

22    Strength of the associations are very different and,

23    as I said, that is largely in part to the short

24    interval of study in the Valsartan studies compared

25    to the long interval of study data in Hidajat, which

Page 122

1    clearly captures the peak of temporality.  As far as

2    dose response, Hidajat has a much more robust

3    database to assess dose response than does the

4    Valsartan studies.

5              MR. TRANGLE:  Okay.  But my question is

6    a little different than that.

7

8    BY MR. TRANGLE:

9        Q.    My question is:  Do you believe that

10   different studies can be more relevant and more

11   informative when assessing whether NDMA in Valsartan

12   can cause cancer in humans?

13             MR. NIGH:  Form objection.

14             THE WITNESS:  Well, either I'm getting

15   tired or it's not a good question, because I don't

16   understand.

17             MR. TRANGLE:  Right.

18

19   BY MR. TRANGLE:

20       Q.    So do you believe that studies can be

21   more or less relevant to a specific -- sorry, when I

22   say specific, I mean a given exposure and a given

23   cancer outcome in humans?

24       A.    I still don't understand.

25       Q.    Do you think that studies can be more

Page 123

1    relevant to the inquiry under Bradford Hill or less

2    relevant to the inquiry under Bradford Hill depending

3    on what exposure, what kind of exposure, and what

4    outcomes they assessed?

5              MR. NIGH:  Form objection.

6              THE WITNESS:  I already answered that.

7    The individual prongs of Bradford Hill, such as

8    strength, consistency, specificity, temporality, dose

9    response, plausibility, et cetera, those are

10   individually weighted and very different for each

11   study.  For example, in Hidajat, some of those prongs

12   were better assessed with more strength in Hidajat

13   than they were in the Valsartan studies.  And the

14   opposite is true as well.  There are some prongs of

15   Bradford Hill and the Valsartan studies that are more

16   relevant than that in Hidajat.  So it's -- you have

17   to assess it by reviewing each of these prongs, not

18   just -- you can't just throw it out there and say

19   well, this study is better than that one.

20             MR. TRANGLE:  It wasn't about better,

21   sorry.

22

23   BY MR. TRANGLE:

24        Q.    My question, stepping back:  In general,

25   do you agree that some studies are more and some

```
                                        Page 124
 1    studies are less relevant when you're doing a
 2    causation analysis for a specific exposure and a
 3    specific outcome?
 4              MR. NIGH:  Form objection.
 5              MR. TRANGLE:  This is a general question
 6    that I'm asking.
 7              MR. NIGH:  Form objection.
 8              THE WITNESS:  Again, it's too general.
 9    You have to look at each of the prongs of Bradford
10    Hill and some studies have greater relevance and
11    strength than certain prongs of Bradford Hill than
12    others.  You can't just sweep a study under the rug
13    because one of the prongs was weak and another one
14    was strong.  Each aspect of the study has to be
15    assessed.  Not just strength of the association or
16    not just temporality, each study has to be assessed
17    and weighed by each parameter.
18
19    BY MR. TRANGLE:
20         Q.    Do you believe, Dr. Sawyer, if I was to
21    look at this causal analysis between NDMA and
22    Valsartan liver cancer, it would be informative and
23    relevant for me to look at a study about UV radiation
24    and stomach cancer?
25              MR. NIGH:  Form objection.
```

Page 125

1              THE WITNESS:  Yes, in that example,
2      certainly.

3

4      BY MR. TRANGLE:
5          Q.    Do you think that a study that reports
6      on UV radiation and stomach cancer should be included
7      in a causal analysis on NDMA in Valsartan and liver
8      cancer?
9              MR. NIGH:  Form objection.
10             THE WITNESS:  No.  As I stated, each
11     study has to be evaluated for all of the different
12     prongs and determine which is -- carries more weight
13     and relevance.  The wild example you just gave me of
14     stomach cancer and radiation, that's not at all what
15     I'm referring to.  I'm referring to studies that are
16     being assessed in the current matter that have to do
17     with hepatocellular carcinoma and NDMA.

18

19     BY MR. TRANGLE:
20         Q.    So you agree that there are studies that
21     are not relevant to the question at hand.  Right?
22             MR. NIGH:  Form objection.

23

24     BY MR. TRANGLE:
25         Q.    In the universe of scientific

Page 126

1    literature, there will be studies that are not

2    relevant to the causal question at hand.  Right?

3                 MR. NIGH:  Form objection.

4                 THE WITNESS:  Yes.  Such as that wild

5    example you gave me of stomach cancer and radiation,

6    of course that's not the same degree of relevance.

7    I'm not --

8                 MR. TRANGLE:  Right.  Does that measure

9    only --

10               THE WITNESS:  I'm not including such

11   weird examples.  I'm focusing on the NDMA studies

12   that are peer reviewed and published and many of them

13   generally recognized by the worldwide regulatory

14   agencies.

15               MR. TRANGLE:  Right.

16

17   BY MR. TRANGLE:

18        Q.    So that's what -- so you would agree

19   that studies can be of relatively greater relevance

20   to the causal question at hand and some studies could

21   be less relevant to the causal question at hand?

22               MR. NIGH:  Form objection.  Hold on.

23   Hold on.  Hold on, Dr. Sawyer.  I'm lodging an

24   objection.  Form objection.  This has been asked and

25   answered several times.

```
                                          Page 127

 1                   THE WITNESS:  Yeah, I've answered it
 2         three times now.  If you want me to answer it again,
 3         I'll do it again.
 4                   MR. TRANGLE:  Please.
 5                   THE WITNESS:  Okay.  There are studies
 6         that contain information on all of the prongs of
 7         Bradford Hill and each of those prongs has to be
 8         individually reviewed and weighed.  And I'm speaking
 9         of studies that involve NDMA, hepatocellular
10         carcinoma, and Valsartan.  My answer is specific to
11         such studies as opposed to that wild example you gave
12         me of stomach cancer and radiation.  Of course,
13         that's not relevant to the matter we're discussing.
14
15         BY MR. TRANGLE:
16              Q.    Are studies on Ranitidine that contain
17         NDMA and liver cancer more relevant to the causal
18         question at hand than dietary studies of NDMA that do
19         not look for outcomes of liver cancer?
20                   MR. NIGH:  Form objection.
21                   THE WITNESS:  It depends on the quality
22         of the study.  One has to look at the different
23         prongs.  In the Ranitidine study, for example, there
24         is some weaknesses in the study that are severe.  You
25         mentioned the dietary studies.  In some cases, the
```

Page 128

```
 1    dietary studies do carry more relevance, because of
 2    their size, of the dose response data that's
 3    associated in the study, and other factors.  So,
 4    again, I have to evaluate each study using the
 5    correct methodology and not just looking at a study
 6    at face value and either using it or disposing of it.
 7    It's necessary to look at all the studies and to find
 8    the weaknesses and strengths and use that weighted
 9    approach in the Bradford Hill assessment.
10
11    BY MR. TRANGLE:
12         Q.    So what studies were sufficiently
13    relevant for you to include within your Bradford Hill
14    causation analysis?
15                   MR. NIGH:  Form objection.
16                   THE WITNESS:  Those in my report.
17
18    BY MR. TRANGLE:
19         Q.    Sorry did you say those in your report?
20         A.    Those in my report.
21                   THE VIDEOGRAPHER:  Time is 4:27 p.m.
22    We're going off the record.
23
24                   (Whereupon, a brief recess was taken off
25    the record.)
```

Page 129

1

2                    THE VIDEOGRAPHER:  The time is 4:42 p.m.

3    and we are back on the record.

4

5    BY MR. TRANGLE:

6         Q.    Dr. Sawyer, how many studies are needed

7    to be able to assess whether there's a consistent

8    effect for Bradford Hill?

9         A.    Bradford Hill doesn't specifically

10   specify a number.

11        Q.    What about for you when you apply

12   Bradford Hill and you do causal analyses?

13        A.    I follow Bradford Hill.  I'm not going

14   to create some magic number that doesn't exist.  No

15   thank you.

16        Q.    Would you agree that one would not be

17   enough?

18                    MR. NIGH:  Form objection.

19                    THE WITNESS:  I am not going to comment

20   on any guess work.  Bradford Hill does not place a

21   specific number on the number of studies.

22

23   BY MR. TRANGLE:

24        Q.    So you aren't able to tell me whether or

25   not one study would be enough to know whether there

Page 130

1     is a consistent association across studies and

2     literature?

3                    MR. NIGH:  Form objection.  That's a

4     different question.

5                    THE WITNESS:  I can't answer that.

6                    MR. TRANGLE:  Okay.

7

8     BY MR. TRANGLE:

9          Q.     In this case, do you believe that the

10    consistency consideration has been satisfied?

11         A.     Yes.

12         Q.     There are only two studies that show a

13    statistically significant association between NDMA in

14    Valsartan and liver cancer.  Right?

15         A.     Wrong.  There are other studies that I

16    relied on, both dietary and occupational.

17         Q.     When you say occupational, are there

18    studies beyond Hidajat that you were relying on in

19    your Bradford Hill analysis?

20         A.     Yes.  I reviewed most recently other

21    rubber industry studies.  Unfortunately, they don't

22    provide, as I knew they didn't provide, quantitative

23    dose response information.

24         Q.     Are those studies on NDMA exposure?

25         A.     Yes.

```
                                        Page 131
 1          Q.     What are the names of the studies that
 2     you're referring to?
 3          A.     I can give you the names, the list I
 4     worked off of, if that will help.
 5          Q.     So you're relying on non-quantitative
 6     studies in the rubber industry that you aren't
 7     identifying today, here?
 8               MR. NIGH:  Form objection.
 9               THE WITNESS:  I refer you to ATSDR.
10
11     BY MR. TRANGLE:
12          Q.     Did you rely on these studies for your
13     Bradford Hill analysis in your report?
14               THE WITNESS:  I'm sorry, I didn't finish
15     the answer.
16               MR. TRANGLE:  Well, I think that you're
17     actually just looking through a report or document
18     right now.  Is that right?
19               MR. NIGH:  You asked for the names of
20     the studies and he's trying to give an answer.
21               MR. TRANGLE:  I asked if he's able to
22     tell me the names of the studies.
23               MR. NIGH:  No, you asked what are the
24     names of the studies that you're referring to?  I
25     mean, that's the question.
```

```
                                              Page 132

 1                  MR. TRANGLE:  Right.

 2                  MR. NIGH:  You just want him to answer

 3       that or you want to strike that?

 4                  MR. TRANGLE:  He's referred to a

 5       document that is not a study.

 6                  MR. NIGH:  He's looking at the document

 7       to give you the answer to the studies.

 8

 9       BY MR. TRANGLE:

10            Q.    In your report, Dr. Sawyer, in your

11       causal analysis section of Bradford Hill, do you cite

12       or refer to any rubber studies, other than Hidajat?

13            A.    No, because none of the studies were

14       quantitative with respect to dose response.  And that

15       is my assignment in this matter is dose response as

16       opposed to general causation.  I point to Figure 2.1

17       on Page 11 of the --

18                  MR. NIGH:  He's still answering.

19                  MR. TRANGLE:  Sorry, what did you say?

20       What page?  What figure, sorry?

21                  THE WITNESS:  Page 11, Figure 2.1.

22

23       BY MR. TRANGLE:

24            Q.    Of your report?

25            A.    No.
```

Page 133

1          Q.     Of what document?

2          A.     ATSDR 2023, I believe it is.

3          Q.     Sorry, and you said which page?

4          A.     11.

5          Q.     Did you cite the U.S. ATSDR in your

6     Bradford Hill analysis?

7               MR. NIGH:  Hold on.  This transcript's

8     getting very messy.  There was a question about what

9     are the studies?  He's trying to answer the studies.

10    He's looking at a document.  You're asking him

11    additional questions about the document before he's

12    even answered the question and you're not withdrawing

13    prior questions.  So for the last, like, three to

14    five minutes, the transcript will be very misleading.

15               MR. TRANGLE:  Okay.

16

17    BY MR. TRANGLE:

18         Q.     Doctor, are you looking right now at

19    Exhibit 8, the U.S. ATSDR document?

20               MR. NIGH:  Counsel, are you withdrawing

21    the prior questions for the last three to five

22    minutes?  Because you're asking new questions while

23    he's trying to answer questions.  All you did was ask

24    him to clarify where in the table.  He finished that

25    answer, but he didn't finish the prior answer.  And

Page 134

1    you know that.

2                MR. TRANGLE:  Respectfully, he went to a

3    document and started talking about something I had no

4    idea what he was referring to, so I asked him what he

5    was looking at.

6                MR. NIGH:  I get it, but then you moved

7    on to another question.  He was answering the

8    question to give you names of studies.  Then you ask,

9    where are you looking out of the document?  He

10   answers that question.  And then you ask another

11   question to cut off his train of thought, to cut off

12   his answer to what are the names of the studies.  He

13   was answering what are the names of the studies.  So

14   this sort of asking questions to get some help to see

15   where he may be is causing an incomplete record.

16               MR. TRANGLE:  Are you finished and can I

17   respond?

18               MR. NIGH:  You absolutely can.

19               MR. TRANGLE:  Thank you.

20

21   BY MR. TRANGLE:

22        Q.    Doctor, since your counsel wishes you to

23   answer the question about which studies you're

24   referring to, can you identify the studies that you

25   were referring to?

Page 135

1              MR. NIGH:  And that was not my

2     instruction.  I mean, if he -- he should be able to

3     finish his answers.  It's not my wish to have him

4     answer the list of the studies.  But that is what

5     we're seeing happening, is he's answering questions

6     and he's trying to give a full answer and you're

7     interrupting in the middle of the question and then

8     moving on to another topic within the question.

9              MR. TRANGLE:  If you want to go off the

10    record and discuss this, we can.  Otherwise, I'm

11    going to ask him to finish answering the question.

12             MR. NIGH:  Okay.  My point is, if you're

13    going to move on to new questions, we have to have

14    the prior questions withdrawn.

15             MR. TRANGLE:  Dr. Sawyer, can you finish

16    answering the question?

17             THE WITNESS:  Yes.  Please ask the

18    question.

19             MR. TRANGLE:  Okay.

20

21    BY MR. TRANGLE:

22        Q.    Dr. Sawyer, which studies are you

23    referring to, other than Hidajat, on rubber

24    occupational studies on NDMA and cancer that are

25    non-quantitative that are forming your analysis?

Page 136

1           A.      Yes, if you look at, I think it was,

2      Figure 2.1, you'll see at the bottom of the chart,

3      human cancer studies.  And summaries of those studies

4      begin on Page 52 of the ATSDR document.  And some of

5      those studies I have read in full, many of them I

6      looked at in full to see if there was any

7      quantitative data, and there was not.  Hidajat, of

8      course, was included in the analysis, which is

9      quantitative.

10          Q.      Okay.  So other than Hidajat, there's no

11     quantitative studies on rubber exposure -- on

12     occupational exposure to NDMA that you're relying on

13     for your Bradford Hill analysis?

14          A.      Could you repeat that, so I'm clear.

15          Q.      I want to repeat it verbatim.  Other

16     than the Hidajat study, there are no quantitative

17     studies on occupational exposure to NDMA that you're

18     relying on for your Bradford Hill analysis?

19          A.      That's correct.

20          Q.      Okay.  Are you including those studies

21     that are not quantitative in your assessment of the

22     consistency consideration for Bradford Hill?

23          A.      Yes.  And I did review the rubber

24     industry cohort meta-analysis and looked at those

25     studies as well.

Page 137

1          Q.     What is the name of this meta-analysis?
2     Sorry, I was unclear.
3          A.     Yeah, there's a meta-analysis of the
4     rubber industry studies.
5          Q.     Sorry, what's the name of that?  I just
6     have never heard of that before, so I'm curious.
7          A.     I believe it was by Boniol, B-O-N-I-O-L,
8     2017.
9          Q.     Can you spell that again?  Sorry.
10         A.     I think it's B-O-N-I-P-L 2017 --
11    B-O-N-I-O-L.
12         Q.     Is that on your reliance list?
13         A.     No.
14         Q.     Is it on your -- okay.  I just had never
15    heard of this and it's not on your reliance list, but
16    you are considering it for your opinions?
17         A.     Yes.  I did review it and it includes a
18    fairly large number of publications.
19              MR. TRANGLE:  Counsel, can you send this
20    to us?  Because we've never seen this before or heard
21    about it, if its something that he's relying on.
22              MR. NIGH:  We can send it to you, yes.
23              MR. TRANGLE:  I honestly -- I can't find
24    it with just B-O-N-I-A-L.
25              MR. NIGH:  Yeah.  If I can just --

Page 138

1    Doctor, did you read the study itself or are you

2    talking about the study description within ATSDR?

3              THE WITNESS:  I did both.

4              MR. NIGH:  Okay.

5              THE WITNESS:  I looked at the --

6              MR. NIGH:  We can provide it to you.

7              THE WITNESS:  I don't know that I have

8    it printed, because I didn't save it, but I should

9    have it and I should be able to produce the PDF.

10             MR. TRANGLE:  Okay.

11

12   BY MR. TRANGLE:

13         Q.    Did you consider the Ranitidine studies?

14         A.    Certainly.

15         Q.    Okay.  I wasn't entirely finished, sorry

16   -- in your consistency assessment, basically?

17         A.    Well, the problem with the Ranitidine

18   study is that it -- it was at considerably lower

19   levels of NDMA, but more importantly, the NDMA level

20   in the pills was highly variable and through a large

21   level of variants into the study results so that the

22   study has a severe weakness.  With respect to the

23   Valsartan studies, we have a much better handle and

24   the researchers had a much better handle on the

25   quantity of NDMA per pill, which was documented and

Page 139

1      more consistent.  Whereas in the Ranitidine studies,

2      it was highly variable.  And when you try to run an

3      epi study with highly variable analysis, it would be

4      very difficult to end up with reliable results.

5              Q.      But those form part of your assessments

6      of the consistency factor?

7                      MR. NIGH:  Form objection.

8                      THE WITNESS:  No.  The study had too

9      severe of a weakness to be reliable.

10                     MR. TRANGLE:  Okay.

11

12     BY MR. TRANGLE:

13             Q.      It looks like we have identified the

14     Boniol study, so I would like to mark -- sorry, it

15     might take a minute because Audrey just sent it to

16     me, but let's mark as Exhibit DX-10 this Boniol study

17     that you just referred to.

18

19                     (Whereupon, Exhibit DX-10 was marked for

20     identification.)

21

22     BY MR. TRANGLE:

23             Q.      It might take a minute, sorry.

24             A.      It might take me a second, too.  It

25     looks like I closed the file by accident.

Page 140

1           Q.    All right.  Do you want to go off the

2     record so you can open it back up?

3           A.    No, I think I'm almost there.  I'm just

4     going to do a reload now and see if it shows up.

5           Q.    Thank you, Audrey.

6           A.    Okay.  So Exhibit Share.  I have --

7     which exhibit should I be opening?

8           Q.    Number 10.

9           A.    Okay.  I'll reload.  Then I'll do a back

10    and there it is.

11          Q.    Is this the study that you were

12    referring to before?

13          A.    It is.

14          Q.    Does this study contain any data on

15    NDMA?

16          A.    What do you mean by data?

17          Q.    Does it refer to any specific exposure

18    cancer outcomes based on NDMA?

19          A.    I don't think so.

20          Q.    Does it contain any data on any specific

21    potential carcinogens?

22          A.    As opposed to the specific NDMA, no.

23    But, you know, as far as the rubber industry, yes.

24          Q.    And if we go to Figure 2, which is on

25    Page 1943.

Page 141

1        A.      Right.

2        Q.      It looks like this is sort of the

3    results of the meta-analysis for each cancer site?

4        A.      Correct, but it's not for NDMA.  It's

5    for the rubber industry in general.

6        Q.      Okay.  There are 21 studies, it looks

7    like, for liver cancer?

8        A.      That's correct.

9        Q.      And the SRR effect estimate here is

10    0.96.  Right?

11        A.      Correct.

12        Q.      That's below one?

13        A.      That's right.

14        Q.      Meaning there's no increase in risk,

15    regardless of significance, identified in this

16    meta-analysis you just disclosed between liver cancer

17    and occupational exposure to the rubber industry?

18        A.      Yes, that's right.  It's not specific to

19    NDMA as Hidajat is.

20        Q.      And you considered this study as part of

21    your consistency assessment in this case?

22                MR. NIGH:  Form objection.

23                THE WITNESS:  No.  It does not provide

24    NDMA specific data.

25

Page 142

1      BY MR. TRANGLE:

2           Q.    So because it doesn't provide NDMA

3      specific data, would you say it's less relevant to

4      your causal analysis?

5           A.    Yes.

6                 MR. NIGH:  Form objection.

7                 THE WITNESS:  It's less relevant

8      because, if we look at each prong of Bradford Hill,

9      the data is not -- does not supply any dose response

10     information for the dose response prong of Bradford

11     Hill nor does it speciate out NDMA or any other

12     co-contaminants, but rather it's simply that of

13     working in the rubber industry, in general.

14

15     BY MR. TRANGLE:

16          Q.    And it's important to separate out

17     different exposures when working in the rubber

18     industry?

19                MR. NIGH:  Form objection.

20                THE WITNESS:  Well, certainly.  If you

21     have NDMA in the control group and NDMA in the

22     consideration analysis, it wouldn't make any sense.

23     I mean, you have to -- as done in Hidajat, one has to

24     speciate out each of the chemicals.

25

Page 143

1    BY MR. TRANGLE:

2         Q.    Would you agree that scientists have

3    tended to overestimate the importance of consistency

4    when assessing causation under Bradford Hill?

5                   MR. NIGH:  Form objection.

6                   THE WITNESS:  I have seen that in a

7    follow up to Bradford Hill, written by Bradford Hill,

8    and Bradford Hill specifically stated, and this is in

9    my exhibit that you showed earlier, in my Monsanto

10   Round-up report, I have a summary of that study that

11   Bradford Hill, himself, tried to explain that should

12   not hold any one prong as a necessary requirement and

13   put overemphasis on a specific prong, especially if

14   it lacks relevancy.  And consistency, how would one

15   expect consistency of an NDMA study versus a study

16   that included NDMA in the control group?  It's not a

17   valid approach.  It doesn't follow the proper

18   methodology.

19

20   BY MR. TRANGLE:

21        Q.    So would you agree today, as you're

22   sitting here being deposed, that scientists in 2025

23   have tended to overestimate the importance of

24   consistency when they're performing causal analyses

25   under Bradford Hill?

Page 144

1           MR. NIGH:  Form objection.

2           THE WITNESS:  No.  I can refer you to

3    the Bradford Hill follow-up commentary that was

4    published in the peer-reviewed literature.

5           MR. TRANGLE:  Well, thank you.

6

7    BY MR. TRANGLE:

8      Q.    Do you think that scientists -- sorry.

9           Do you agree that the dietary studies

10   were less consistent when you were evaluating them in

11   your assessment in this case?

12          MR. NIGH:  Form objection.

13          THE WITNESS:  The design of such

14   studies, it is the dietary studies is quite variable.

15   Yet, there was consistency found in those studies,

16   but not to the same degree as in Hidajat, but I

17   attribute that, in part, to the large variation in

18   study designs in the dietary studies.

19

20   BY MR. TRANGLE:

21     Q.    The Hidajat is a single study.  Right?

22     A.    No.  I just said into the dietary

23   studies; highly variable design in the dietary

24   studies.

25     Q.    Right.  But you said that the dietary

Page 145

1    studies had less consistency than the Hidajat.  So my

2    question is:  Hidajat is a single study.  Right?

3         A.    Yes.

4               MR. NIGH:  Form.

5               THE WITNESS:  But it's a very large

6    database.

7

8    BY MR. TRANGLE:

9         Q.    Do you agree that the Pottegârd 2018

10   study found no association between liver cancer and

11   NDMA from Valsartan?

12               (Repeating for the court reporter.)  Do

13   you agree that the Pottegârd 2018 study found no

14   association between liver cancer and NDMA from

15   Valsartan?

16        A.    I'm looking at my report to answer the

17   question.

18        Q.    Okay.

19        A.    Page 41 --

20        Q.    Wait.  The question is -- do you want me

21   to repeat the question?  I'm going to repeat it.

22               The question is:  Do you agree that the

23   Pottegârd 2018 study found no association between

24   liver cancer and NDMA from Valsartan?

25        A.    Yes.  And the problem with that study

Page 146

1    was, and if you look at Page 42, Paragraph 3, I

2    included a quote from the author:  "A markedly

3    increased risk of liver cancer associated with NDMA

4    exposure thus seems unlikely."  And I wrote --

5                    MR. TRANGLE:  You don't have to read

6    your whole paragraphs and paragraphs from your

7    report, Doctor.

8                    THE WITNESS:  This is my opinion and

9    it's important.

10

11   BY MR. TRANGLE:

12        Q.    But my question was if you agree that

13   they found an association and your counsel can ask

14   you why you don't think that might be important.

15        A.    They could find an association based on

16   the number of subjects.

17        Q.    Yes, I understand.  I read your report.

18   I know what your opinion is, thank you.

19                    So, Dr. Sawyer, is it your opinion that

20   the evidence on NDMA in Valsartan and liver cancer

21   satisfies the dose response consideration of Bradford

22   Hill?

23        A.    Based upon all of the studies I've

24   cited, yes.

25        Q.    Would you say it's the most important

Page 147

1    consideration for your analysis, dose response?

2                    MR. NIGH:  Form objection.

3                    THE WITNESS:  I'm not sure what you mean

4    by most important.

5

6    BY MR. TRANGLE:

7         Q.    The reason I ask is you said that it was

8    your primary duty was to assess dose response.  Is

9    that right?

10        A.    That's correct.  And the -- whether or

11   not there is a risk at the doses measured and what

12   those risk levels would be.

13        Q.    Dr. Sawyer, the Gomm 2021 study authors

14   stated that they found no dose response relationship

15   between NDMA from Valsartan and liver cancer.

16   Correct?

17        A.    That's correct.

18                    MR. NIGH:  Objection.

19                    THE WITNESS:  However, if we look at the

20   statistically significant association between NDMA

21   contaminated Valsartan and cancer, we see that that

22   the association was statistically significant with a

23   ratio of only -- has a ratio of 1.16 and that change

24   with adjustment for age and gender is 1.2, which was

25   still statistically significant after additional

Page 148

1   adjustments for hepatitis and other liver diseases.

2       Q.    Okay.  So for Mansouri 2022, did the

3   study authors also state that they found no dose

4   response relationship between NDMA from Valsartan and

5   liver cancer?

6       A.    Yeah, the study did not establish a

7   clear dose response relationship between Valsartan

8   and cancer risk.

9       Q.    Okay.  And the same Pottegârd 2018 study

10  that we just asked about, the study authors there

11  also stated that they could not identify a dose

12  response relationship between NDMA from Valsartan and

13  cancer.  Right?

14      A.    In which study?

15      Q.    Pottegârd 2018.

16      A.    They couldn't.  They were, obviously,

17  not enough participants in the study to -- I mean, an

18  expected rate of .05 cases per 100,000, plus 19.4

19  liver cases, cancer cases would be needed to reach a

20  one percent equivalent.  There's insufficient

21  statistical power of Type II error to detect the

22  significant changes -- it's not possible.  The study

23  was not large enough to find a dose response because

24  it could barely find enough cases to achieve

25  background.

Page 149

1              Q.     Dr. Sawyer, is it your opinion that, in
2       this case, the dose response consideration has been
3       met?
4                      MR. NIGH:  Form objection.
5                      THE WITNESS:  Based upon the human
6       dietary studies as well as the occupational Hidajat
7       study, yes.
8                      MR. TRANGLE:  Okay.  Do you want to take
9       a break now?
10                     THE VIDEOGRAPHER:  Time is 5:10 p.m.
11      We're going off record.
12
13                     (Whereupon, a brief recess was taken off
14      the record.)
15
16                     THE VIDEOGRAPHER:  Time is 5:12 p.m.
17      We're going back on the record.
18
19      BY MR. TRANGLE:
20             Q.     Dr. Sawyer, do you agree that
21      temporality is considered a fundamental predicate to
22      causality?
23                     MR. NIGH:  Form objection.
24                     THE WITNESS:  It's an important prong of
25      the Bradford Hill criteria, yes.

```
                                            Page 150
```

1              MR. TRANGLE:  There can't be causation

2    without satisfying temporality.

3              MR. NIGH:  Form objection.

4              THE WITNESS:  It depends on what kind of

5    toxicological endpoint you're referring to.  There

6    are examples of noncancer endpoints that would not

7    involve temporality.

8

9    BY MR. TRANGLE:

10        Q.    In this case, do you believe that

11   temporality has been satisfied?

12        A.    Yes.  We're at the very early stages of

13   the temporality bell curve.

14             MR. TRANGLE:  I could stop here.  Do you

15   want to go off the record for a minute?

16             THE VIDEOGRAPHER:  Time is 5:14 p.m.

17   We're going off the record.

18

19             (Whereupon, a brief recess was taken off

20   the record.)

21

22             THE VIDEOGRAPHER:  Time is 5:22 p.m.

23   We're back on the record.

24

25   BY MR. TRANGLE:

Page 151

1          Q.     Dr. Sawyer, let's go look at your report

2      for a minute.

3          A.     So, I have it open.

4          Q.     Perfect.  So Exhibit 3 and I want to go

5      to Page -- to the Table of Contents.

6          A.     All right.

7          Q.     So, in your Table of Contents, you have

8      a section on dietary studies of NDMA.  Right?

9          A.     Yes.

10          Q.     And I counted 15 studies that you

11      analyzed in your report in this section?

12          A.     Yes, I count 15 as well.

13          Q.     And the only study of those 15 that

14      relates to liver cancer is Zhang, et al. 2021?

15          A.     Yes.

16          Q.     Zhang 2021 is a study on dietary NDMA

17      intake and risk of HCC.  Right?

18          A.     Yes.

19          Q.     Let's go to your report on Page 30,

20      where you discuss this study.

21          A.     I have it open.

22          Q.     It's on Page 30 of your report.  You

23      write here:  "Control subjects were free of cancer at

24      recruitment and they were spouses of cancer patients

25      were diagnosed with cancers other than liver."

Page 152

1           Do you see that?

2      A.     Yes, I have it underlined.

3      Q.     What does that mean, control subjects

4   were free of cancer or treatment?

5      A.     Yes.

6      Q.     Sorry, what does that mean?

7      A.     That they didn't have cancer.

8      Q.     Who?

9      A.     The control subjects.  They were regular

10  people without cancer.

11     Q.     Okay.  So the controls, as opposed to

12  the cases, is what you're saying here?

13     A.     Yes.  They happened to be spouses of

14  cancer patients.

15     Q.     I see.  Is it your opinion that this

16  study supports a causal association between NDMA and

17  HCC in humans?

18     A.     Well, the study characterized dietary

19  intake of N-nitroso compounds and each of the 21

20  individual nitroso compounds, nitrite, nitrate,

21  according questionnaire specific data.  So, yeah,

22  NDMA was included, yes.

23     Q.     Is it your opinion that this study

24  supports a causal association between NDMA and HCC in

25  humans?

Page 153

1          A.    Alone, no.  But as part of the full
2     picture, yes.
3          Q.    When you say alone, no, why do you say
4     that?
5          A.    Well, if it were the only study on
6     earth, there were no other dietary studies, no
7     Hidajat studies, no Valsartan studies, then it would
8     simply be an association.
9          Q.    And it's your testimony that there is an
10    association identified in this study between NDMA and
11    HCC?
12         A.    Could you repeat that?
13         Q.    Sure.  It's your testimony that there is
14    an association identified in this study between NDMA
15    and HCC?
16         A.    No.  My opinion is that for N-nitroso
17    compounds there was an association with
18    hepatocellular carcinoma and there was also
19    multivariable adjusted out ratios performed.
20         Q.    Right.  But NDMA was also analyzed in
21    this study, not just nitrosamine compounds.  Right?
22         A.    Yes.
23         Q.    Is it your testimony that there is an
24    association between NDMA and HCC in this study?
25         A.    Could you repeat the question?

Page 154

1        Q.     Sure.  Is it your testimony that this

2    study identifies an association between NDMA and HCC?

3        A.     Only from plant source NDMA.

4        Q.     Okay.  And you believe the results from

5    this study support a causal relationship between NDMA

6    and HCC?

7        A.     Same answer I said about the study

8    isolated versus combining it with the data from the

9    other dietary Valsartan and Hidajat occupational

10   exposure studies.  It's part of the -- it's part of

11   the picture.  It's not the only picture.

12       Q.     But analyzing this study in isolation,

13   does it support or not support an association that's

14   causal between NDMA and HCC?

15            MR. NIGH:  Form objection and incomplete

16   hypothetical.

17            THE WITNESS:  Only for plant source

18   N-nitroso and NDMA.

19

20   BY MR. TRANGLE:

21       Q.     So overall, this study did not identify

22   an association between NDMA intake overall and HCC.

23   Right?

24            MR. NIGH:  Form objections.

25            THE WITNESS:  I don't understand the

Page 155

1    question.

2              MR. TRANGLE:  Okay.  Let's pull up the

3    study.  Let's mark as Exhibit 11, Tab 25.

4

5              (Whereupon, Exhibit DX-11 was marked for

6    identification.)

7

8    BY MR. TRANGLE:

9        Q.    Okay.  Do you have this study -- do you

10   have this study here, Dr. Sawyer, Exhibit 11?

11       A.    I'm working on it.  Yes, Exhibit 11, out

12   of order, but, yes, found it.

13       Q.    Yes, it is.  I think it does it by "1"

14   and then "2", so 11 before 2.

15             This is the Zhang study that you cite in

16   your report.  Right?

17       A.    Yes.

18       Q.    If we go to Table 2 on Page 3167, you're

19   going to have to zoom in, I'm going to have to zoom

20   in.  This study is reporting on multivariable

21   adjusted alaRS between exposures and HCC risk

22   according to quartiles of dietary intake.  Is that

23   true?

24       A.    Yes.

25       Q.    Do you see that there's a section on --

Page 156

1    NDMA?

2          A.    Yes.

3          Q.    So overall, for quartile 2, the authors

4    identified an association of 0.89, a confidence

5    interval of 0.59 to 1.34 for the second quartile of

6    intake of NDMA and HCC risk?

7          A.    Yes.

8          Q.    That's below the 1.0.  Right?

9          A.    Yes.

10         Q.    Not a statistically significant increase

11   in risk?

12         A.    Correct.  But NDMA from plant sources do

13   show significantly increased hepatocellular carcinoma

14   risk of 1.54 with a CI of 1.01 to 2.34.

15         Q.    The third quartile of overall NDMA

16   intake is 0.67, the confidence interval is 0.43 to

17   1.05.  Is that right?

18         A.    Yes.  But back to the plant sourced

19   NDMA, it's a different story.

20         Q.    And if you move to the highest exposure

21   overall to NDMA in this study, the authors identify

22   an association of 0.80 with a confidence interval of

23   0.53 to 1.21.  Is that right?

24         A.    Yes.

25         Q.    The p-trend is 0.22?

```
                                            Page 157

 1          A.     Right.

 2          Q.     P-trend is used to identify whether or

 3    not there's a statistically significant dose

 4    response.  Is that true?

 5          A.     Yes.

 6          Q.     If you look at the plant sources for

 7    NDMA, neither the second nor the third quartile show

 8    an increase in risk from NDMA of HCC?

 9          A.     That's correct.

10          Q.     And none of the values for the animal

11    sources of NDMA or any quartile of intake show a

12    significant association between NDMA intake from

13    animal sources and HCC?

14          A.     Correct.

15                 MR. TRANGLE:  Okay.  Okay.  I think

16    that's all the questions for today.  It sounds like

17    they have someone for tomorrow.  Do you want to go

18    off the record?

19                 MR. NIGH:  Yeah.  Do you want to just

20    end it for today?

21                 MR. TRANGLE:  Yes, if that's okay with

22    you guys.

23                 THE VIDEOGRAPHER:  So I'm going to close

24    the record.  Hearing no objections, we are off the

25    record at 5:34 p.m. and this concludes today's
```

Page 158

1    testimony given by William Sawyer, Ph.D.  Total

2    number of media used was three and will be retained

3    by Veritext.  And we are off for today.

4

5                    (Whereupon, the deposition was adjourned

6    at 5:34 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 159

1                        CERTIFICATE

2

3

4               I, JOMANNA DEROSA, a Certified Court

5        Reporter and Notary Public of the State of New

6        Jersey, do hereby certify that the foregoing is a

7        true and accurate transcript of the testimony as

8        taken stenographically and digitally at the time,

9     place and on the date hereinbefore set forth, to the

10                      best of my ability.

11

12

13               I DO FURTHER CERTIFY that I am neither a

14     relative nor employee nor attorney nor Counsel of any

15     of the parties to this action, and that I am neither

16     a relative nor employee of such attorney or Counsel,

17        and that I am not financially interested in the

18                          action.

19

20

21

22        JOMANNA DEROSA, C.C.R.

             License No. 30XI00188500

23           Notary Public of the

             State of New Jersey

24

25

```
                                                    Page 160

 1    DANIEL NIGH, ESQ.

 2    dnigh@nighgoldenberg.com

 3                        May 7, 2025

 4    RE:     In Re: Valsartan, Losartan, Et Al v. Zhejiang Huahai

                 Pharmaceutical Co., Ltd., Et Al. (Gaston Roberts)

 5        5/1/2025, William  R Sawyer , Ph.D. (#7344745)

 6        The above-referenced transcript is available for

 7    review.

 8        Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com

16     Return completed errata within 30 days from

17    receipt of testimony.

18      If the witness fails to do so within the time

19    allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25
```

Page 161

1    In Re: Valsartan, Losartan, Et Al v. Zhejiang Huahai

     Pharmaceutical Co., Ltd., Et Al. (Gaston Roberts)

2    William  R Sawyer , Ph.D. (#7344745)

3              E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   William  R Sawyer , Ph.D.                          Date

25

```
                                               Page 162

 1    In Re: Valsartan, Losartan, Et Al v. Zhejiang Huahai

      Pharmaceutical Co., Ltd., Et Al. (Gaston Roberts)

 2    William  R Sawyer , Ph.D. (#7344745)

 3                 ACKNOWLEDGEMENT OF DEPONENT

 4        I, William  R Sawyer , Ph.D., do hereby declare that I

 5    have read the foregoing transcript, I have made any

 6    corrections, additions, or changes I deemed necessary as

 7    noted above to be appended hereto, and that the same is

 8    a true, correct and complete transcript of the testimony

 9    given by me.

10

11    _____    _____

12    William  R Sawyer , Ph.D.                     Date

13    *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20____.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25
```

[& - 2016]                                                                    Page 1

| & | | | 2 |
|---|---|---|---|
| **&**  2:3,14 3:3 4:3 5:23 87:16 88:16 | **1.5.**  111:23 **1.54**  156:14 **1.6**  113:18 **1.86**  66:3,6 68:1,11,15,18 70:24 73:20 74:3,17 | **139**  6:5 **14**  3:7 5:12 17:1 **141**  94:6 96:13 **15**  11:10 12:8 20:19 21:5 23:5 24:6 96:7 151:10,12,13 | **2**  5:13 26:8,11 26:16 75:14 79:23 80:4 140:24 155:14 155:14,18 156:3 **2,3,7,8**  71:25 |
| **0** | | | **2.1**  132:16 136:2 |
| **0.22**  156:25 **0.43**  156:16 **0.53**  156:23 **0.59**  156:5 **0.67**  156:16 **0.80**  156:22 **0.89**  156:4 **0.96.**  141:10 **00946**  7:15 **05**  148:18 **07**  42:7 | **10**  6:5 30:20 93:3,7 95:23 96:8 139:16,19 140:8 **10.1**  113:22 **10.8**  89:14 **10.81**  89:11 90:9 **100**  15:22 19:16,20 20:3 20:3,5,6,11,14 20:20 21:1 60:15,16 | **15219**  4:7 **155**  6:6 **15th**  16:4 **16**  96:1,11 **176**  87:11 **178**  84:7,11 **179**  85:6 87:11 87:12,20 **19**  6:10 **19.4**  148:18 **1943**  140:25 | **2.1.**  132:21 **2.3**  89:23 **2.34.**  156:14 **20**  12:13 36:23 162:15 **200**  3:18 **2000**  12:21 13:17 **20004**  2:17 **2000s**  13:2,3 |
| **1** | | | **20016**  3:8 **2004**  10:24 **2009**  10:25 |
| **1**  1:12,18,25 5:12 14:22 15:15 66:17 67:10 75:13,15 79:19,19 89:17 89:20 155:13 **1.0.**  156:8 **1.01**  156:14 **1.05.**  156:17 **1.16**  114:6 115:1 147:23 **1.2**  147:24 **1.21.**  156:23 **1.34**  156:5 | **100,000**  148:18 **10022**  2:7 **109**  6:3 **10th**  15:19 27:6 31:3,6 32:2,11 **11**  6:6 132:17 132:21 133:4 155:3,5,10,11 155:14 **12**  81:5 **120**  7:15 **1301**  2:16 **137**  6:10 | **1980s**  39:21 **1984**  12:23 **1988**  13:8 32:17 **1989**  32:17 **1990**  9:13 10:21 **1990s**  39:21 **19th**  68:4 **1:07**  1:19 7:2 **1:18**  15:4 **1:20**  15:10 **1st**  7:3 | **2010**  11:15,22 13:4 20:19 24:1 **2013**  87:16 88:2 **2014**  68:24 **2015**  24:3,4,7 **2016**  17:15 68:4 |

**[2017 - 68]**

Page 2

**2017**  17:15
 137:8,10
**2018**  5:20
 44:12 66:17
 67:10,20 86:2
 87:5 145:9,13
 145:23 148:9
 148:15
**202**  3:11
**2020**  108:10,24
**2021**  5:19 44:9
 82:7 83:2
 147:13 151:14
 151:16
**2022**  44:5
 148:2
**2023**  13:20
 23:16 133:2
**2025**  1:12,18
 7:3 15:19 16:4
 27:6 30:20
 31:3,6 32:11
 143:22 160:3
**21**  84:17,22
 85:12,23 141:6
 152:19
**21.2**  89:23
**210-5557**  3:10
**212**  2:8,9
**22**  11:7
**23**  24:25
**23rd**  5:20 87:4
**24**  11:7

**24th**  5:19 83:2
 87:9
**25**  14:6 31:9,11
 32:1 76:15,22
 84:13 155:3
**2500**  3:19
**26**  5:13
**263-4397**  4:8
**2875**  1:3 7:14
**2:35**  73:6
**2:5**  111:4,13,18
**2:52**  73:13

**3**

**3**  5:15 14:20
 66:21,23 88:23
 92:9,11 111:7
 146:1 151:4
**30**  29:17,17
 151:19,22
 160:16
**300**  18:18
**300,000**  22:11
 23:9,19 24:2
**301**  4:6
**30305**  3:20
**30xi00188500**
 1:17 159:22
**3167**  155:18
**32**  39:11
**320**  75:25
**3333**  3:19
**33957**  8:6

**341-7597**  2:9
**35**  13:11 31:9
 31:11 32:1
**350**  18:20
**36**  41:13
**37**  41:13
**38**  94:12
**38th**  4:6
**3:00**  79:9
**3:02**  79:15
**3:25**  94:16
**3:38**  94:23
**3rd**  3:7

**4**

**4**  5:16 26:9
 78:14,17 88:22
 89:1,2,3,5
 110:10
**4.2**  24:7
**40**  16:18
**400,000**  22:15
 22:20 23:1
**41**  82:11
 145:19
**412**  4:8
**42**  78:14 146:1
**43**  88:2
**444-9164**  2:18
**446-4723**  2:8
**45**  86:17
**4656**  159:21
**4:27**  128:21

**4:42**  129:2

**5**

**5**  5:19 67:5
 81:3,19 82:11
 82:13,21,23
 87:8 89:1
**5/1/2025**  160:5
**50**  2:6 17:22
**52**  136:4
**53**  18:7,7
**553-7392**  3:21
**5:10**  149:10
**5:12**  149:16
**5:14**  150:16
**5:22**  150:22
**5:34**  157:25
 158:6

**6**

**6**  5:20 80:11
 86:16,19 87:2
 88:7
**60**  16:17 17:25
**600-8090**  3:9
**601**  2:6
**63,349.50**  30:21
**6450**  8:6
**646**  2:18
**66**  5:15
**678**  3:21
**68**  96:5,10,14
 96:15,20 97:4
 97:17

**7**

**7** 5:21 65:25
88:2,4,9 92:11
92:13,21 96:21
160:3
**713** 2:10
**7344745** 160:5
161:2 162:2
**74** 67:2,4 68:20
**771** 3:10
**78** 5:16 97:5,22
98:4,7
**785** 32:10

**8**

**8** 5:6,24 65:24
95:8,10 96:19
96:22 97:7
98:24 133:19
**8/1/18** 69:6,11
**80** 17:2 32:25
**80.7** 27:8 28:2
28:4 29:21
**800,000** 22:11
23:20
**82** 5:19
**836-3531** 2:10
**84** 15:25 16:21
17:1 18:8
**850** 3:9
**86** 5:20
**875** 110:11
**877** 111:2,8,9

**88** 5:21

**9**

**9** 6:3 92:24
95:19 109:5,7
**9/11** 72:22
86:12 87:19
**9/19/2016** 69:1
69:6,10
**95** 5:24 21:2
61:24 109:23
112:20
**95th** 117:19
**96** 21:2
**978-1188** 3:11

**a**

**ab** 2:9
**ability** 159:10
**able** 34:24 35:7
48:17 51:4
62:7 64:22
65:5,15 99:18
100:12,25
103:25 104:13
115:15 129:7
129:24 131:21
135:2 138:9
**above** 1:15
111:9 160:6
162:7
**absolutely**
37:16 46:4
64:13 134:18

**absorption**
46:18,20 106:5
106:9,15
**abstract** 55:25
**abstracts** 54:21
**absurd** 51:10
**ac** 2:10
**acceptable**
84:25
**accessible**
83:10,11
**accident**
139:25
**account** 48:12
72:10
**accuracy** 20:5
120:8 160:9
**accurate** 10:13
159:7
**accurately**
53:14
**achieve** 148:24
**acknowledge...**
162:3
**acknowledg...**
160:12
**action** 47:12
90:6 102:1
159:15,18
**activities** 34:13
**activity** 33:14
**acts** 107:9
**actual** 72:8
74:23 90:24

**120:15**
**actually** 10:6
18:6 21:8 26:3
30:24 42:23
57:13 83:6
101:8 109:22
111:8 131:17
**added** 31:8
**adding** 27:20
**additional**
133:11 147:25
**additions** 162:6
**adequate**
107:24
**adjourned**
158:5
**adjunct** 11:6
**adjusted**
153:19 155:21
**adjustment**
147:24
**adjustments**
148:1
**adopted** 105:16
110:12
**advisable** 58:9
**affiliations**
7:22
**afternoon** 7:1
8:12
**age** 24:25
147:24
**agencies**
126:14

[agency - appended]                                                           Page 4

| | | | |
|---|---|---|---|
| **agency** 105:16 105:17 | **alleged** 92:3 | 128:14 130:19 | 103:15,19 |
| **agent** 80:8 | **alleging** 18:24 | 131:13 132:11 | 104:5,7,13 |
| **agents** 47:15 49:2 72:4 | **allotted** 160:19 | 133:6 135:25 | 111:1 112:4 |
| **aggressiveness** 67:19 | **allowed** 21:17 103:17 104:4 104:16 | 136:8,13,18,24 137:1,3 139:3 141:3,16 142:4 | 115:19 120:21 127:2,10 130:5 131:15,20 |
| **agree** 7:8 16:10 20:10,13 31:1 37:13 50:5 55:15 56:14,20 59:5 63:25 64:8,20 65:1 65:15 67:12 68:10 69:14,17 107:23 111:11 112:14 114:23 117:9 118:11 123:25 125:20 126:18 129:16 143:2,21 144:9 145:9,13,22 146:12 149:20 | **allows** 114:8 **american** 32:19 32:22 **amount** 21:9,17 21:20 23:9 24:13 25:19 31:2 61:16 62:8,20,20 63:9 64:1 107:1 **amounts** 63:12 **analyses** 37:17 37:17 39:20 48:13 59:23 62:2 107:3,6 118:16,17 129:12 143:24 | 142:22 147:1 **analyzed** 151:11 153:20 **analyzing** 58:1 103:13 154:12 **angiosarcoma** 47:4 48:3,11 50:10 52:5 **animal** 42:5 53:24 60:8,16 101:3 102:12 106:7 107:23 108:3,5 113:4 157:10,13 **animals** 41:15 60:12,16,21 113:2 | 132:2,7 133:9 133:23,25,25 134:12,23 135:4,6 145:16 154:7 **answered** 35:11 61:11 116:3,6,13 123:6 126:25 127:1 133:12 **answering** 28:23 51:22 57:9 104:9 119:11 132:18 134:7,13 135:5 135:11,16 |
| **ah** 12:12 **ahead** 99:9,11 **airway** 75:1 **al** 89:19 108:10 151:14 160:4,4 161:1,1 162:1 162:1 **alars** 155:21 **alfano** 4:3 **allege** 92:6 | **analysis** 35:14 38:16 40:12,19 53:19 54:24 58:19,21 100:1 100:4,6 101:1 103:12,24 106:5,11 107:1 107:16 109:12 112:1 120:25 121:12,13,15 124:2,21 125:7 | **answer** 19:23 24:22 27:12,16 36:1 38:6 44:17 48:3 49:24 50:17,21 51:25 52:2 57:17 58:5 61:20,21,21 62:12 77:10 81:15 98:18 99:7,19 101:19 | **answers** 38:4 134:10 135:3 **anybody** 25:10 **apologies** 11:19 **appearance** 7:21,22 **appearances** 3:1 **appears** 84:2 99:22 **appended** 162:7 |

[applicable - audrey]                                                    Page 5

**applicable**
  71:21 160:8
**apply**  38:11
  46:11 68:2
  129:11
**appointment**
  11:7
**approach**  45:5
  110:13 128:9
  143:17
**appropriate**
  73:4
**approximate**
  29:15
**approximately**
  13:12
**area**  106:10
**areas**  52:21,22
  106:15
**article**  6:3
  13:22 73:19
  87:22 88:14,18
  90:21 108:9,13
  108:20 109:11
  109:18 110:8
  110:11
**articles**  71:5
**asher**  2:4 7:24
  95:17
**asher.trangle**
  2:11
**asked**  22:14
  35:10 46:17
  50:24 51:1

53:6 54:7
57:16 61:10
69:21 77:9
101:20 116:5
116:12 119:11
126:24 131:19
131:21,23
134:4 148:10
**asking**  38:6
  47:23 76:16
  98:22,23 124:6
  133:10,22
  134:14
**aspect**  124:14
**aspegren**  2:15
**assess**  39:1
  46:17 52:20
  53:14 54:7
  61:25 62:1
  82:3 122:3
  123:17 129:7
  147:8
**assessed**  60:6
  64:9 107:19
  114:9 123:4,12
  124:15,16
  125:16
**assessing**  38:11
  61:22 64:16
  101:20 109:2
  110:13 120:2
  122:11 143:4
**assessment**
  10:16 52:21

59:20 61:22
101:7 110:20
128:9 136:21
138:16 141:21
144:11
**assessments**
  12:1 46:9
  139:5
**assignment**
  53:7 54:7
  101:20 132:15
**assistant**  11:6
  24:24 36:17
**assisted**  39:18
**associated**
  64:22 65:3
  81:6 128:3
  146:3
**association**
  74:2 100:17
  106:23 107:22
  111:4,12,17,20
  111:21,22
  112:23 113:13
  114:24 116:24
  117:11,18,25
  118:11,13
  124:15 130:1
  130:13 145:10
  145:14,23
  146:13,15
  147:20,22
  152:16,24
  153:8,10,14,17

153:24 154:2
154:13,22
156:4,22
157:12
**associations**
  106:25 112:1
  114:1 115:8
  121:22
**assume**  74:10
**assumes**  77:24
**assumption**
  28:1
**assured**  83:15
**atlanta**  3:20
**atsdr**  93:18,22
  93:24 94:1,9
  95:4 97:7
  98:15 99:20
  118:25 131:9
  133:2,5,19
  136:4 138:2
**attached**
  160:11
**attempt**  90:20
**attention**  92:10
**attorney**  7:23
  83:21 100:20
  159:14,16
  160:13
**attribute**  76:3
  144:17
**audio**  7:6
**audrey**  2:15
  14:20 139:15

[audrey - bradford]                                                              Page 6

| | | | |
|---|---|---|---|
| 140:5 | 72:21 79:16 | **behalf** 7:25 | 60:10 71:12 |
| **audrey.aspeg...** | 82:17 87:6,7 | 14:4 56:10 | 130:18 |
| 2:19 | 87:10 92:9 | **behavior** 50:24 | **big** 112:5 |
| **august** 66:17 | 119:16,18 | **believe** 15:1 | **biggy** 100:19 |
| 67:10 | 123:24 129:3 | 19:14 21:14 | **billion** 24:7 |
| **author** 146:2 | 140:2,9 149:17 | 44:25 47:11 | **bio** 36:13 |
| **authored** 86:2 | 150:23 156:18 | 49:19 53:6 | 111:15 |
| **authoring** 82:6 | **background** | 54:6 61:1 | **biochemistry** |
| **authors** 56:22 | 48:13 57:15 | 65:21 76:21 | 39:12,13 |
| 57:6,20 88:19 | 148:25 | 77:11 86:13 | **biological** |
| 147:13 148:3 | **bananas** 72:8 | 96:13 110:10 | 107:8,16 |
| 148:10 156:3 | **barely** 148:24 | 111:24 115:3 | **blood** 35:4,8 |
| 156:21 | **base** 62:3 | 116:11 122:9 | **board** 32:13,18 |
| **available** 43:7 | **based** 21:19 | 122:20 124:20 | 32:19,21,22 |
| 55:19 80:13 | 22:21 23:1 | 130:9 133:2 | 33:11,12 |
| 86:24 160:6 | 45:18 47:18 | 137:7 150:10 | **body** 43:6 58:5 |
| **avenue** 2:6,16 | 49:6,25 52:9 | 154:4 | 100:13 107:13 |
| 8:6 | 63:15 66:12 | **believed** 43:2 | **bond** 107:12 |
| **average** 22:15 | 72:19 80:12 | **bell** 59:13 86:4 | **boniol** 6:5 |
| 22:25 23:20 | 86:14 107:10 | 89:13,16 90:12 | 137:7 139:14 |
| 37:9 | 117:3 140:18 | 113:19 150:13 | 139:16 |
| **avila** 3:5 8:2 | 146:15,23 | **bella** 8:19 | **bonnie** 26:2 |
| **aware** 35:20 | 149:5 | **belly** 33:14 | **book** 33:1 |
| 41:14 74:16,21 | **basic** 34:14 | **belong** 78:11 | **bookkeeper** |
| 74:24 90:19 | 58:11 108:3 | **benefit** 40:12 | 25:22,23 |
| 93:14 113:3 | **basically** | 40:19 86:23 | **bosick** 4:3 |
| **b** | 138:16 | **benefits** 25:2 | **bottom** 111:2 |
| **b** 5:9 6:1 81:20 | **basing** 105:1 | **best** 80:13 | 136:2 |
| 137:7,10,11,24 | **basis** 84:15 | 90:23 159:10 | **bradford** 45:23 |
| **baby** 33:1 | 119:16,17 | **better** 114:9,25 | 46:10,22 58:12 |
| **back** 15:11 | **beginning** 7:23 | 123:12,19,20 | 61:4,12 64:12 |
| 21:24 32:17 | 73:14 94:24 | 138:23,24 | 99:25 100:6,14 |
| 39:21 51:19,20 | 113:19 | **beyond** 28:24 | 101:1,2,9,16 |
| | | 56:21 58:1 | 103:24 105:2 |

**[bradford - carried]**                                        Page 7

| | | | |
|---|---|---|---|
| 106:1 108:4 | **c.c.r.** 159:22 | 72:17,21 73:20 | 80:7,15,16 |
| 109:13 110:7 | **calculated** 27:8 | 74:4,18 76:2,3 | 81:10,20,22 |
| 110:23 112:1 | 66:16 67:6,14 | 76:22 77:2,20 | 88:20,24 |
| 116:24 120:2 | 68:12,20 69:9 | 78:1,7,22 | 151:25 |
| 120:25 121:18 | **calculations** | 79:22 81:6,25 | **capacity** 31:7 |
| 123:1,2,7,15 | 17:20 28:22 | 88:15,19 89:6 | **captures** 122:1 |
| 124:9,11 127:7 | **calculator** | 89:11,14 90:21 | **carcinogen** |
| 128:9,13 129:8 | 27:11,20 | 91:5,10 100:1 | 41:15 64:2 |
| 129:9,12,13,20 | **call** 30:11 | 100:7 101:6 | 70:23 72:16 |
| 130:19 131:13 | **called** 11:24 | 102:8,17 103:5 | 74:19,19 90:4 |
| 132:11 133:6 | 31:18,21 82:8 | 105:21,23 | 92:17 93:12,16 |
| 136:13,18,22 | 86:3 88:14 | 106:13 107:19 | 93:25 94:10 |
| 142:8,10 143:4 | 92:14 | 112:11,25 | 97:21 98:12,16 |
| 143:7,7,8,11,25 | **camden** 7:13 | 113:14 114:1 | 99:21 107:25 |
| 144:3 146:21 | **camera** 7:5 | 114:18 115:1 | 119:2 |
| 149:25 | **cancer** 5:18,22 | 115:16,16,23 | **carcinogenesis** |
| **branch** 34:12 | 24:25 35:4,9 | 117:1 118:6 | 91:24 |
| **break** 21:16 | 35:25 41:4,12 | 121:2,16 | **carcinogenic** |
| 94:15 95:3 | 41:16,24,25 | 122:12,23 | 93:8 |
| 149:9 | 42:5 43:3,13 | 124:22,24 | **carcinogens** |
| **brief** 15:7 | 45:1 47:3,5,9 | 125:6,8,14 | 71:7 72:5 |
| 73:10 79:12 | 47:15,20 48:1 | 126:5 127:12 | 140:21 |
| 94:20 128:24 | 48:19 49:5,11 | 127:17,19 | **carcinoma** |
| 149:13 150:19 | 49:20,25 50:6 | 130:14 135:24 | 48:10 52:4 |
| **broke** 70:7 | 52:7 53:10 | 136:3 140:18 | 54:9 74:22 |
| **broken** 120:9 | 54:4 58:16,17 | 141:3,7,16 | 75:5 77:24 |
| **bulk** 15:24 | 58:18,20 60:5 | 145:10,14,24 | 81:12,24 |
| **business** 22:2 | 60:9,14,17,20 | 146:3,20 | 125:17 127:10 |
| 22:16 | 61:3,18 62:10 | 147:15,21 | 153:18 156:13 |
| **button** 79:1 | 62:14,22 63:13 | 148:5,8,13,19 | **carcinomas** |
| **c** | 63:22 64:2,24 | 151:14,23,24 | 49:4 |
| **c** 2:1 4:1 | 65:7,17,19 | 152:4,7,10,14 | **career** 42:23 |
| | 66:12 67:24 | **cancers** 52:8 | **carried** 36:22 |
| | 70:22 71:6,18 | 76:18 79:24,25 | 114:16 |

[carries - chemist]                                                    Page 8

| | | | |
|---|---|---|---|
| **carries** 125:12 | **category** 81:10 | 49:11,20 50:6 | **certify** 159:6,13 |
| **carry** 106:21 | **causal** 43:12 | 53:9 54:3 | **certifying** |
| 106:25 128:1 | 52:23,24 | 62:21 | 33:13 |
| **case** 5:13 7:14 | 100:14 102:9 | **causing** 64:24 | **cetera** 25:15 |
| 15:24 16:9 | 124:21 125:7 | 65:7,17 134:15 | 38:15 50:2 |
| 17:6 21:19 | 126:2,20,21 | **cell** 9:22 | 123:9 |
| 23:16 26:5,6 | 127:17 129:12 | **center** 5:16 | **change** 45:17 |
| 26:17 27:2,5 | 132:11 142:4 | 76:12 77:5 | 46:24 58:9 |
| 27:10 30:4,21 | 143:24 152:16 | 78:21 79:20 | 112:6 147:23 |
| 31:6 32:8 36:8 | 152:24 154:5 | 85:9 86:12 | 161:4,7,10,13 |
| 42:11 43:2,21 | 154:14 | 87:15 | 161:16,19 |
| 45:18 46:3,6 | **causality** 109:2 | **centre** 4:5 | **changes** 112:9 |
| 50:14 52:13,24 | 112:16 149:22 | **certain** 105:25 | 148:22 160:10 |
| 53:5 55:4 | **causally** 62:22 | 110:7 114:17 | 162:6 |
| 56:11 59:8 | **causation** 45:6 | 120:16 124:11 | **changing** 89:8 |
| 74:23 82:7 | 45:17 46:16 | **certainly** 28:11 | **characterized** |
| 83:25 84:16 | 53:1,5,20,23 | 28:16 42:2 | 152:18 |
| 85:2 86:3,6,9 | 54:4 64:10,17 | 47:17,20 49:25 | **charge** 25:14 |
| 91:19,22 100:2 | 101:17,24 | 50:7 58:25 | **charged** 30:21 |
| 100:7 106:19 | 102:4 109:12 | 59:22 78:11 | 31:3 |
| 108:12 109:13 | 124:2 128:14 | 101:11 107:22 | **chart** 89:7 |
| 120:2 130:9 | 132:16 143:4 | 109:24 125:2 | 136:2 |
| 141:21 144:11 | 150:1 | 138:14 142:20 | **check** 103:14 |
| 149:2 150:10 | **causative** 80:8 | **certainty** 47:24 | **checking** 66:19 |
| **cases** 17:12,18 | **cause** 36:4 60:5 | 61:25 110:13 | **chemical** 39:15 |
| 17:23 18:3,3 | 61:17 62:10 | **certificate** | 52:3 73:2 74:7 |
| 54:21 57:15 | 63:12 85:19 | 159:1 | 74:9 77:4,4 |
| 90:14 127:25 | 122:12 | **certification** | 80:23 90:3,25 |
| 148:18,19,19 | **caused** 18:25 | 32:15,22 33:12 | 107:9 |
| 148:24 152:12 | 35:25 74:11 | **certifications** | **chemicals** 52:6 |
| **categories** 5:18 | 75:15 106:13 | 35:23 | 74:10 142:24 |
| 78:22 79:22 | **causes** 41:3,11 | **certified** 1:16 | **chemist** 26:2 |
| 80:15 | 41:25 43:3 | 32:13,18 33:11 | 39:9 |
| | 47:8,25 48:18 | 159:4 | |

**[chemistry - confounding]**                                      Page 9

**chemistry**
39:12
**cherry**  56:15
**chief**  10:15
**childhood**
79:25 80:16
81:22
**chloride**  50:11
52:5 72:24
81:6
**ci**  156:14
**citation**  87:16
92:21 95:25
**cite**  84:4 89:25
132:11 133:5
155:15
**cited**  71:8
80:18,22 84:21
85:16 104:1
146:24
**citing**  96:16
**city**  72:22
**clarify**  43:25
65:10 133:24
**clark**  25:25
**class**  36:19,25
**classes**  37:1,2
**clear**  45:12
69:21 75:17
90:4 136:14
148:7
**clearly**  120:13
122:1

**client**  30:11
46:25 53:2
**clinically**  64:3
80:9
**close**  9:19
19:17 91:25
157:23
**closed**  9:21
139:25
**closer**  19:5
70:15
**coherence**
100:18 107:18
107:22
**cohort**  136:24
**coincides**  58:4
**colon**  24:25
**combined**
101:4 102:12
**combining**
154:8
**come**  20:20
21:23 41:10
87:6
**comes**  26:18
114:2 116:25
**coming**  44:22
**commencing**
1:19
**comment**  83:12
129:19
**commentary**
144:3

**common**  48:10
**company**  10:19
11:24 12:10,15
12:20 13:1
23:1 24:9,16
25:12,21 40:2
**compared**
121:24
**comparing**
71:24 72:7
92:7
**compilation**
84:16
**complete**  10:13
57:16 92:17
93:12,16,25
94:10 97:21
98:12,16 99:21
162:8
**completed**
160:16
**completely**
21:22 51:9
73:1
**compounds**
42:25 152:19
152:20 153:17
153:21
**comprehensive**
55:3
**computer**  8:24
9:15
**concept**  94:2

**concern**  12:4
**concerned**
106:6
**concerning**
82:7
**conclude**  64:23
65:6 84:12
**concluded**
48:18 74:2,17
98:15
**concludes**
157:25
**conclusion**
41:11 55:17,21
57:5
**conclusions**
110:5 115:20
**conclusive**
107:3
**conduct**  52:18
53:19 99:25
**conducted**  7:4
8:16 12:1
50:15 52:14
**confidence**
112:20 117:9
117:14 156:4
156:16,22
**confidential**
19:25 83:4
**confirm**  43:6
**confounding**
19:2 59:20
62:2 118:5,14

[confused - course]                                                    Page 10

| | | | |
|---|---|---|---|
| **confused**  75:19 | 138:16 139:6 | **contaminant** | 141:11 147:10 |
| **connection**  7:6 | 141:21 143:3 | 120:15 | 147:16,17 |
| 10:9 43:12 | 143:14,15,24 | **contaminants** | 156:12 157:9 |
| **consider**  19:1 | 144:15 145:1 | 119:5,7 142:12 | 157:14 162:8 |
| 40:8,11,18 | **consistent** | **contaminated** | **corrections** |
| 53:13 55:2 | 64:21 65:2,18 | 67:20 68:7 | 162:6 |
| 58:5 76:25 | 85:21 129:7 | 102:8 112:24 | **correctly**  71:21 |
| 78:9,11 92:6 | 130:1 139:1 | 113:14 117:1 | 80:17 81:23 |
| 121:14 138:13 | 144:10 | 147:21 | 102:21 |
| **considerable** | **constructed** | **contents**  151:5 | **corrupt**  33:14 |
| 28:21 | 91:9 | 151:7 | **costs**  25:15 |
| **considerably** | **consultant**  11:9 | **continue**  7:7 | **counsel**  7:21 |
| 23:6 138:18 | 13:11 19:25 | 9:1 61:21 | 24:12 25:6 |
| **consideration** | 20:21 25:11 | **contracted** | 29:22 30:15 |
| 59:16 64:9 | **consultants** | 11:23 | 31:14 32:8 |
| 111:25 116:24 | 10:16 | **control**  118:4 | 108:9 133:20 |
| 130:10 136:22 | **consulting** | 142:21 143:16 | 134:22 137:19 |
| 142:22 146:21 | 10:19 11:14,21 | 151:23 152:3,9 | 146:13 159:14 |
| 147:1 149:2 | 12:11,25 19:12 | **controls**  152:11 | 159:16 160:14 |
| **considerations** | 19:21,24 20:9 | **cooper**  4:12 | **count**  17:6 |
| 106:1 | 20:16 22:12,21 | 7:16 | 151:12 |
| **considered** | 22:22 23:2 | **copies**  160:14 | **counted**  17:1 |
| 54:25 64:17 | 24:2,8,14 | **corporation** | 18:4 151:10 |
| 77:3 84:4 | 25:20 | 39:18 | **couple**  11:1 |
| 141:20 149:21 | **consumption** | **correct**  13:18 | 54:18 61:7 |
| **considering** | 73:5 | 17:5 23:2 28:2 | **course**  33:6 |
| 77:18 78:5 | **cont**  3:1 | 30:23 32:20 | 34:11 35:2 |
| 110:23 137:16 | **cont'd**  4:1 6:1 | 33:24 63:23 | 37:2 38:21 |
| **considers** | **contain**  77:18 | 67:11 68:4 | 47:1 54:20 |
| 111:12 | 78:5 127:6,16 | 70:12 72:9 | 57:23 89:12 |
| **consistency** | 140:14,20 | 81:12 84:2,6 | 108:2 117:13 |
| 100:18 106:24 | **contains**  40:16 | 92:5,18 93:13 | 118:1 126:6 |
| 121:21 123:8 | 77:19 78:6 | 115:4 128:5 | 127:12 136:8 |
| 130:10 136:22 | 83:3 | 136:19 141:4,8 | |

**[courses - description]**                                    Page 11

| courses 34:2 | **d** | davidson 2:5 | degree 36:10 |
|---|---|---|---|

**courses** 34:2
**court** 1:1,16
  7:12,17 51:3,4
  51:16 77:8
  83:7 145:12
  159:4
**cousin** 91:25
  92:8
**covered** 121:20
  121:21
**create** 129:14
**criteria** 149:25
**cs** 160:15
**cumulative**
  63:8 66:13,15
  67:6,13 68:11
  68:19 69:4,8
  69:15,18 70:5
  70:11
**cumulatively**
  70:8
**curious** 137:6
**current** 59:13
  125:16
**currently** 25:22
**curve** 59:13
  89:13,16 90:12
  90:16 113:19
  113:24 150:13
**cut** 89:8 111:23
  134:11,11
**cv** 7:15 13:13
  13:16

**d**

**d** 5:1 44:12
  107:4
**daily** 76:1
**daniel** 3:4 7:25
  160:1
**data** 28:21,22
  47:18 49:7
  50:1 56:6,7,15
  62:1,4 63:16
  63:16 65:18
  68:25 69:12
  72:11 77:19,19
  78:6,6 81:4
  85:22 86:11
  90:19 101:4
  105:12 106:7
  121:25 128:2
  136:7 140:14
  140:16,20
  141:24 142:3,9
  152:21 154:8
**database** 86:24
  122:3 145:6
**date** 16:5 30:12
  66:17 67:9,14
  100:5 159:9
  161:24 162:12
**dated** 5:19 83:2
**dates** 70:16
**dating** 32:17
  72:21

**davidson** 2:5
**day** 1:25 31:12
  36:14 69:14,17
  69:24 70:1,5,8
  70:11 75:13,14
  75:15,19,23
  76:2 162:15
**days** 160:16
**dc** 2:17 3:8
**dea** 20:24
**dead** 35:12
**deal** 102:17
  120:8
**dealing** 52:3
**decades** 80:9
**deceased** 8:1
**declare** 162:4
**declined** 33:3
**decreased**
  69:19
**decreases**
  69:16 70:17
**dedicated**
  17:17
**deemed** 162:6
**defendant** 16:8
  16:18
**defendants**
  17:1
**defer** 37:16
  38:17,25 39:7
  40:10
**defined** 110:21

**degree** 36:10
  47:24 67:19
  84:25 106:24
  126:6 144:16
**department**
  32:16 34:4
  36:16
**dependent** 74:7
**depending** 48:5
  100:16 123:2
**depends** 7:5
  23:24 58:18
  106:9 112:5,17
  127:21 150:4
**deponent**
  160:13 162:3
**deposed** 18:16
  23:15 143:22
**deposing**
  160:13
**deposition** 1:11
  1:14 7:3,9 8:16
  29:7 31:12
  158:5
**depositions**
  10:1 14:15
**dermal** 46:17
  46:18,20 106:5
**derosa** 1:16
  7:18 159:4,22
**describes** 110:8
**description**
  5:11 138:2

[design - document]                                                    Page 12

| | | | |
|---|---|---|---|
| **design** 37:16 | 66:17 67:15,17 | 156:19 | **disrespectful** |
| 38:16 39:8 | 70:16 | **differential** | 51:9 |
| 144:13,23 | **diazonium** | 36:3,6,9 | **disrupted** 48:6 |
| **designed** 39:17 | 47:14 50:2 | **difficult** 139:4 | **distribution** |
| 39:23 | 72:3 86:14 | **difficulty** 79:1 | 106:14 107:12 |
| **designs** 144:18 | **died** 24:25 | **digitally** 159:8 | **district** 1:1,2 |
| **detect** 58:9 | **diet** 107:21 | **dioxin** 77:6 | 7:12,13 |
| 148:21 | **dietary** 9:10 | **direct** 5:6 8:10 | **divided** 18:4 |
| **detected** 64:3 | 42:4,14,17,21 | 47:14 73:5 | **dn** 3:9 |
| 112:10 | 59:7 71:16 | **directorships** | **dnigh** 3:12 |
| **determination** | 73:5 90:24 | 11:5 | 160:2 |
| 84:16,19 108:5 | 103:1 105:23 | **disagree** 21:23 | **docket** 7:14 |
| **determine** 36:4 | 107:5 127:18 | 68:14 70:19 | **doctor** 16:10 |
| 57:15 107:24 | 127:25 128:1 | **disaster** 72:22 | 22:3 33:22 |
| 125:12 | 130:16 144:9 | **disclosed** | 61:7 82:17 |
| **determined** | 144:14,18,22 | 141:16 | 83:19,24 97:24 |
| 79:21 | 144:23,25 | **discounting** | 98:16,24 99:17 |
| **develop** 70:23 | 149:6 151:8,16 | 24:7 | 115:7 120:21 |
| 73:20 74:4,18 | 152:18 153:6 | **discuss** 135:10 | 133:18 134:22 |
| 89:14,15 91:5 | 154:9 155:22 | 151:20 | 138:1 146:7 |
| 91:10 | **different** 16:22 | **discussed** 85:9 | **doctors** 105:5 |
| **developed** | 37:1 38:20 | 114:14 | **document** 5:18 |
| 60:17 76:1 | 45:13,13 47:2 | **discussing** | 11:24 12:9 |
| **developing** | 47:5 48:4 50:5 | 78:23 127:13 | 13:1 76:13,17 |
| 5:21 88:14 | 50:6 52:6,7 | **discussion** | 76:21 77:1,18 |
| 115:23 | 57:5 72:2,6 | 26:22 79:6 | 78:5,23 80:12 |
| **development** | 73:1 75:4 | 92:25 96:25 | 80:19 81:14 |
| 65:23 110:14 | 76:18 77:4 | **disease** 35:4,9 | 82:2 83:7,13 |
| **develops** 88:19 | 80:23 88:20 | 36:5 63:22 | 83:16 84:1 |
| **diagnosed** | 94:1,7 98:5 | 64:22 65:3 | 85:9,13 86:2,9 |
| 75:13 151:25 | 121:22 122:6 | **diseases** 148:1 | 87:15 90:1,6 |
| **diagnosis** 36:4 | 122:10 123:10 | **disposing** 128:6 | 92:12 94:5 |
| 36:6,9 63:21 | 125:11 127:22 | **dispute** 86:7 | 97:13 98:3,5 |
| 63:24 64:18 | 130:4 142:17 | | 98:15,19,22 |

[document - epi]                                               Page 13

99:1,6,13,18,20
131:17 132:5,6
133:1,10,11,19
134:3,9 136:4
**documented**
107:10 138:25
**documents**
9:25 11:25
12:2,2,16
78:12 119:1
**doing**  29:12
46:6 106:5,8
121:11 124:1
**dose**  19:2 45:1
48:14 52:20,25
53:14,19 54:7
55:16 60:4,6
60:11,15,19,21
61:2,22,23,25
62:4,8 66:12
66:15 67:6,13
68:11 69:4,8
69:15,20 70:12
101:7,21 107:1
107:3,6,15
119:9 120:9
122:2,3 123:8
128:2 130:23
132:14,15
142:9,10
146:21 147:1,8
147:14 148:3,7
148:11,23
149:2 157:3

**doses**  60:9,10
68:20 147:11
**doubt**  27:13
**dr**  1:11,14 5:3
8:5,12 9:5
10:15 13:13
15:14 27:1
32:5,13 33:23
36:10 39:9
41:2 45:4 47:3
51:7,19 52:14
55:14 63:19
73:18 77:9
80:18 82:2,6
86:1 91:18
95:3,22 97:6
99:13 103:24
104:13,21
108:19 109:20
118:20 119:10
119:24 120:19
124:20 126:23
129:6 132:10
135:15,22
146:19 147:13
149:1,20 151:1
155:10
**drawn**  110:5
**drug**  39:17
107:9 120:15
**due**  33:14
118:13 120:8
**duly**  8:7

**duration**  59:11
**dust**  118:18
119:5
**duties**  19:1
62:2
**duty**  147:8
**dx**  5:12,13,15
5:16,19,20,21
5:24 6:3,5,6
14:22 26:11
66:23 78:17
82:13 86:19
88:4 95:10
109:7 139:16
139:19 155:5

**e**

**e**  2:1,1 4:1,1 5:1
5:9 6:1 9:17,18
9:18 16:16
44:12 161:3,3
161:3
**earlier**  50:25
89:15 115:20
117:6 143:9
**early**  44:10
113:24 114:11
115:22 150:12
**earn**  22:11
**earned**  21:4
22:20 23:1,9
24:1,7
**earns**  22:2

**earth**  153:6
**easier**  96:12
**eastern**  1:19
**effect**  60:12,13
60:14 111:17
112:24 117:15
129:8 141:9
**effectively**
53:13
**either**  35:19
73:5 122:14
128:6
**elapses**  64:1
**electronic**  10:4
10:7
**ellis**  2:3,14
**employee**  40:2
159:14,16
**employees**
24:24 25:2,14
25:15
**endpoint**  150:5
**endpoints**
118:12 150:6
**enrolled**  34:6
**entire**  55:15
84:1
**entirely**  77:3
138:15
**entitled**  21:11
**entry**  85:8
87:14,19,20
**epi**  139:3

[epidemiologic - expert]                                                           Page 14

| | | | |
|---|---|---|---|
| **epidemiologic** 65:25 | **especially** 101:25 143:13 | 64:13 80:13 84:25 85:17 | 26:8,11,15,16 66:21,23 78:14 |
| **epidemiologi...** 38:12,19 39:2 52:15 53:24 62:1 102:7 118:4 | **esq** 2:4,5,15 3:4 3:5,6,17 4:4 160:1 | 100:13 101:1 110:13,14 121:12,19 146:20 | 78:17 82:11,13 82:21,23 86:16 86:19 87:2,8 88:2,4,9 92:9 |
| **epidemiologist** 37:22 38:17,25 56:5,10 57:24 | **establish** 148:6 **established** 47:19 94:10 107:11,17 118:24 | **evidentiary** 119:25 120:1 **exactly** 13:2 67:14 116:15 | 92:11,11 95:8 95:10 96:19,21 96:22 97:7 98:24 99:24 |
| **epidemiologi...** 37:18 117:10 | **estimate** 5:22 88:15,19 90:20 | **exam** 32:23 **examination** | 108:16 109:5,7 133:19 139:16 |
| **epidemiology** 36:11,12,13,16 36:19 37:3,14 38:25 109:3 111:15 | 112:24 117:15 141:9 **estimated** 72:17 89:17 91:4 | 5:4,5 8:10 **examining** 71:6 **example** 46:21 48:11 50:7,10 | 139:19 140:6,7 143:9 151:4 155:3,5,10,11 **exist** 129:14 |
| **equal** 120:5 | **estimates** 84:17 84:21 91:9 | 52:4 56:24 71:24 105:20 | **existing** 52:15 **exists** 112:7 |
| **equally** 121:21 | **et** 25:15 38:15 | 106:12 112:7 | **expect** 143:15 |
| **equivalent** 148:20 | 50:2 89:18 108:10 123:9 | 116:16 118:15 119:5 121:20 | **expected** 148:18 |
| **era** 11:24 12:12 12:14 | 151:14 160:4,4 161:1,1 162:1 | 123:11 125:1 125:13 126:5 | **expenses** 24:10 24:13 |
| **erase** 16:20 | 162:1 | 127:11,23 | **experience** |
| **errata** 160:11 160:13,16 | **evaluate** 57:10 128:4 | **examples** 126:11 150:6 | 72:20 94:13 **experiencing** |
| **erroneous** 49:6 74:12,15 110:5 | **evaluated** 125:11 | **exceedance** 112:20 | 90:7 **experimental** |
| **error** 27:21 57:12 58:8 99:22 107:15 112:19,19 114:8 148:21 | **evaluating** 144:10 **events** 72:22 **evidence** 45:24 52:15 61:13 | **exceeds** 117:20 117:20 **excel** 28:21 **excuse** 36:22 **exhibit** 5:11 14:20,22 15:15 | 106:7 **expert** 10:24 11:9,14,21 13:7,24 14:4,8 14:16 15:22 17:22 18:23 |

**[expert - fluoxetine]**                                                        Page 15

19:6,12,20
20:10,10,15,21
20:22 21:10,13
21:18,20 32:5
39:14 40:8,11
40:18 43:2
45:6 82:7
**experts**  13:23
40:10
**explain**  24:11
49:24 143:11
**exposed**  49:12
68:19 75:12
92:4,6
**exposure**  18:24
41:3 48:14
53:9 54:3 59:6
63:20,24 64:1
64:18,21 65:2
65:16,22 66:13
66:15 68:2
69:18 70:5,8
70:23 71:7
72:23 74:4
77:19 78:6
80:7,23 81:6
86:14 90:22
91:10 114:25
118:12 120:14
122:22 123:3,3
124:2 130:24
136:11,12,17
140:17 141:17
146:4 154:10

156:20
**exposures**  52:8
142:17 155:21
**extension**  5:22
88:15
**extra**  49:1

**f**

**face**  29:25,25
30:4,4 128:6
**facilities**  35:14
**facility**  119:6
**fact**  33:5 35:6
72:25 77:4,25
86:8 93:21
117:23
**factor**  64:23
65:6,16 105:10
105:19 106:19
112:5,16 139:6
**factors**  19:2
62:2 100:19
102:3 105:15
107:18 112:5
120:11 128:3
**failing**  32:23
**fails**  160:18
**fair**  11:13,20
15:23 21:19
106:25 113:10
**fairly**  44:21
48:11 74:25
137:18

**familiar**  35:22
42:14,16,17
57:20 76:11,20
83:19 108:12
108:19
**far**  27:10 30:20
30:22 68:24
105:22 114:12
122:1 140:23
**fashion**  91:25
**faster**  26:18
**fault**  33:2
**favor**  8:13
**fda**  20:24 28:22
40:4,5,9
**february**  16:4
**fell**  66:3 84:20
**fhs**  4:8
**figure**  89:1,2,3
89:5 132:16,20
132:21 136:2
140:24
**file**  139:25
**filed**  7:12 10:9
83:6
**files**  10:4,4
**financially**
159:17
**find**  21:17
109:19 118:17
128:7 137:23
146:15 148:23
148:24

**finding**  79:1
**findings**  38:14
42:6 55:24
**fine**  29:16
34:24 40:24
50:8 104:6
**finish**  24:19,20
24:21 38:1,5
50:9,13,18,21
51:1,22,23,25
118:21 131:14
133:25 135:3
135:11,15
**finished**  120:20
133:24 134:16
138:15
**fires**  12:1
**firm**  7:18
**first**  8:7 13:6
14:20 17:14
41:2 42:22
44:4,8,11,15
68:2,7 76:2
80:5,11 85:23
**five**  66:2 79:22
82:25 90:9
133:14,21
**floods**  11:25
**floor**  2:6 3:7
4:6
**florida**  8:6
**fluoxetine**
39:20

[focus - fundamental]                                          Page 16

| | | | |
|---|---|---|---|
| **focus** 10:4 | 52:8,23 53:11 | 126:22,24 | 146:13 147:14 |
| 102:8 | 53:20,21 54:5 | 127:20 128:15 | 148:3 155:12 |
| **focused** 46:20 | 55:11 56:1,8 | 129:18 130:3 | **four** 14:16 |
| **focusing** | 56:16,23 57:7 | 131:8 139:5,7 | 15:18,23 16:12 |
| 106:14 126:11 | 58:3,24 59:9 | 141:22 142:6 | 17:3,12,18,22 |
| **follow** 45:5,7,9 | 59:21 60:11 | 142:19 143:5 | 18:8,16 19:11 |
| 45:25 46:3,5 | 61:10,19 62:11 | 144:1,12 145:4 | 38:2 51:7,8,10 |
| 59:25 61:4,12 | 62:24 63:14 | 147:2 149:4,23 | 80:1,14 81:11 |
| 129:13 143:7 | 64:4,11 65:8 | 150:3 154:15 | 107:3 114:15 |
| 143:17 144:3 | 66:7 68:5,13 | 154:24 | 116:16 120:10 |
| **following** 79:22 | 68:22 70:2,10 | **formaldehyde** | **fourth** 85:11 |
| **follows** 8:8 | 70:18 71:19 | 47:14 50:2 | **frame** 23:12 |
| **footnote** 96:1,5 | 72:18 73:21 | 72:3 74:24 | 64:20 65:1 |
| 96:11 99:23 | 74:5,20 75:6 | 75:7 | **frank** 4:4 |
| **foregoing** | 75:16 76:5,19 | **formally** 100:9 | **free** 151:23 |
| 159:6 162:5 | 77:21 78:8 | **formed** 41:24 | 152:4 |
| **forensic** 11:11 | 80:21 81:13 | 43:20 47:13 | **frequently** |
| 32:17 33:13 | 85:20 86:10 | 67:21 74:9 | 57:21 |
| **forgot** 77:12 | 90:11 91:12,20 | 75:8 | **front** 84:2 |
| **form** 16:13 | 93:17 94:11 | **forming** 55:4,9 | **fulfilled** 34:17 |
| 17:4 18:10 | 100:8,15 | 108:11 109:12 | **full** 8:13 10:23 |
| 21:7,8 27:15 | 101:12,18 | 110:2 135:25 | 11:9,14 32:25 |
| 28:5,12,19 | 102:9,11,19 | **forms** 47:5 | 40:2 43:6 |
| 29:4,13,23 | 103:6 106:3 | **formulate** | 54:21 111:9 |
| 30:17 33:4,17 | 108:1,14,21 | 50:14 52:13 | 135:6 136:5,6 |
| 35:10 36:8 | 109:1,14 112:3 | **forth** 37:18 | 153:1 |
| 37:4 39:3 | 113:1,6 114:3 | 159:9 | **fully** 41:6 |
| 40:21 41:2,5 | 115:2,10,18 | **found** 56:6 | **fumes** 118:18 |
| 41:20 42:1 | 116:5,12 117:2 | 109:18 112:1 | 119:6 |
| 43:4,14,22 | 118:7 120:3 | 112:15 114:1 | **function** 27:21 |
| 45:11,21 46:7 | 121:4,17 | 115:8 117:11 | 36:23 |
| 47:10,15,19 | 122:13 123:5 | 117:15 119:6 | **fundamental** |
| 48:2,21 49:13 | 124:4,7,25 | 144:15 145:10 | 45:7 149:21 |
| 49:22,25 50:2 | 125:9,22 126:3 | 145:13,23 | |

[further - h]                                                    Page 17

| further   159:13 | 59:2,19 61:7 | goes   23:6 66:16 | great   67:5 |
|---|---|---|---|
| **g** | 121:1 131:3,20 | going   7:2 9:21 | 84:11 103:16 |
| g   16:16 44:12 | 132:7 134:8 | 15:5 20:4 38:3 | 106:22 120:8 |
| game   21:19 | 135:6 | 50:9,18,19 | greater   17:21 |
| gaston   8:1 | given   15:18 | 51:12,15 65:10 | 17:25 18:18,20 |
| 160:4 161:1 | 50:23 53:7 | 73:7 79:10 | 112:15 117:19 |
| 162:1 | 106:20 111:25 | 94:17 99:24 | 119:25 124:10 |
| gender   147:24 | 122:22,22 | 113:20,22 | 126:19 |
| general   18:15 | 158:1 162:9 | 114:12 128:22 | greatest   106:20 |
| 53:5,10,12,20 | gives   88:25 | 129:13,19 | 106:21 |
| 53:23 54:4 | giving   10:13 | 135:11,13 | greatly   121:19 |
| 55:14 72:15 | 45:6 105:5 | 140:4 145:21 | greenberg   3:16 |
| 78:1 84:21 | glyphosate | 149:11,17 | group   81:11 |
| 90:5 101:17,24 | 13:22 14:2 | 150:17 155:19 | 110:22 111:3 |
| 123:24 124:5,8 | 16:15 18:24 | 155:19 157:23 | 111:12 142:21 |
| 132:16 141:5 | 19:8 82:3 85:4 | golden   8:19 | 143:16 |
| 142:13 | 85:12,18,22 | goldenberg   3:3 | grouped   30:12 |
| generally   72:4 | glyphosates | gombar   9:13 | grow   113:20 |
| 105:17 111:22 | 82:8 | gomm   44:9 | gtlaw.com   3:22 |
| 126:13 | go   7:8 14:25 | 147:13 | guess   12:5 |
| generated | 15:1 26:15 | good   7:1 8:12 | 13:10 46:23 |
| 24:14 25:10 | 51:2,15 56:21 | 55:24 56:5 | 86:7 129:20 |
| 48:25 | 58:1 67:2 79:3 | 57:8 97:10 | guidance   40:9 |
| genome   48:5 | 80:4 81:19 | 105:20 107:6 | 72:15 76:12,17 |
| genotoxic | 82:17 85:5 | 122:15 | 76:25 80:12,19 |
| 47:14 48:25 | 87:7,10 88:22 | gordon   4:3 | guideline |
| 49:2 71:24 | 92:9 94:5,7,14 | gosh   29:17 | 110:14 |
| 72:4 74:8 | 96:15,19,20 | governmental | guys   157:22 |
| georgia   3:20 | 97:4 99:9,11 | 74:2,16 | **h** |
| getting   122:14 | 135:9 140:1,24 | grade   110:9,12 | h   4:4 5:9 6:1 |
| 133:8 | 150:15 151:1,4 | 110:17,21 | 16:16 107:4 |
| give   30:21 | 151:19 155:18 | 111:3,11 | 161:3 |
| 56:24 58:15,23 | 157:17 | grant   4:6 | |

[half - human]                                                                  Page 18

**half** 28:17
  34:12 107:13
**hallmark** 57:23
**hand** 27:20
  105:6 125:21
  126:2,20,21
  127:18
**handle** 11:25
  138:23,24
**happened**
  152:13
**happening**
  135:5
**hard** 72:1
**harsh** 50:23
**hcc** 65:23
  151:17 152:17
  152:24 153:11
  153:15,24
  154:2,6,14,22
  155:21 156:6
  157:8,13
**header** 81:19
**health** 32:16
  76:12 79:20
  86:8,12
**healthy** 25:1
**hear** 8:21 9:5
  11:16 113:7
**heard** 137:6,15
  137:20
**hearing** 48:20
  157:24

**help** 131:4
  134:14
**helped** 52:23
**helpful** 110:22
  110:24
**helps** 44:14
**hematologist**
  35:21
**hematopoietic**
  74:25 82:5
**hepatitis** 148:1
**hepato** 47:5
**hepatocarcin...**
  48:4
**hepatocellular**
  48:10 52:4
  54:9 74:22
  75:5 77:24
  81:12,24
  125:17 127:9
  153:18 156:13
**hepatocytes**
  49:1
**herbal** 20:23
**hereinbefore**
  159:9
**hereto** 162:7
**hhs** 76:13
**hidajat** 63:9
  107:4,4 118:15
  119:4,25 120:7
  120:11,18
  121:1,14,25
  122:2 123:11

123:12,16
130:18 132:12
135:23 136:7
136:10,16
141:19 142:23
144:16,21
145:1,2 149:6
153:7 154:9
**high** 35:3,8
  114:7
**higher** 60:15
  111:18 112:14
  118:12
**highest** 23:19
  114:23 156:20
**highly** 71:23
  72:4 138:20
  139:2,3 144:23
**hill** 45:23 46:10
  46:22 58:12
  61:4,12 64:13
  99:25 100:6,14
  101:1,2,10,16
  103:24 105:2
  106:1 108:4
  109:13 110:7
  110:23 112:1
  116:24 120:2
  120:25 121:18
  123:1,2,7,15
  124:10,11
  127:7 128:9,13
  129:8,9,12,13
  129:20 130:19

131:13 132:11
133:6 136:13
136:18,22
142:8,11 143:4
143:7,7,8,11,25
144:3 146:22
149:25
**hired** 43:1
**historically**
  25:23
**hodgkin's**
  18:25
**hold** 21:7 24:20
  33:17 37:21
  43:22,22 50:16
  50:16 61:6,6
  77:8 89:9
  105:22 120:20
  126:22,23,23
  133:7 143:12
**honestly**
  137:23
**hour** 32:11
**hourly** 25:14
**hours** 27:4,9
  28:2,4,9,15
  29:18 31:5,10
  31:11 32:1,2
  32:25 39:11
  55:19
**huahai** 160:4
  161:1 162:1
**human** 53:24
  71:3,13 101:4

[human - information]                                            Page 19

101:5 102:13
102:16 103:1
106:9 136:3
149:5
**humans** 8:20
41:12,15,25
43:3 49:20
53:10 60:5,25
61:3 62:18,23
63:13 102:9,18
103:5 107:25
113:2,3,15
114:2,24 117:1
121:3,16
122:12,23
152:17,25
**husband's** 26:3
**hypothetical**
154:16
**hypothetically**
30:23 68:6
116:16

**i**

**idea** 30:14 32:9
134:4
**identification**
14:23 26:12
66:24 78:18
82:14 86:20
88:5 95:11
109:8 139:20
155:6

**identified**
57:14 65:5
93:22 139:13
141:15 153:10
153:14 156:4
**identifies** 154:2
**identify** 54:12
55:15 134:24
148:11 154:21
156:21 157:2
**identifying**
131:7
**ideologies** 50:6
**ii** 39:19 57:12
58:8 112:19
114:8 148:21
**iii** 39:19
**iken** 3:6 8:3
78:15 95:17
**illegal** 83:13
**immediately**
80:7
**importance**
39:1 143:3,23
**important**
51:12 55:15
56:14,20 57:4
57:25 58:21
64:9 106:23,25
107:2,8,17
120:12,12
142:16 146:9
146:14,25
147:4 149:24

**importantly**
114:11 138:19
**improper** 21:8
104:3,16
**inaccurate**
23:22 25:17
**inappropriate**
73:3 77:24
**incident** 52:3,6
90:16
**include** 35:3
46:21 54:24
81:12 128:13
**included** 58:19
58:20 85:23
125:6 136:8
143:16 146:2
152:22
**includes** 24:23
25:15 137:17
**including** 32:5
38:3 39:12
56:6 105:16
126:10 136:20
**income** 19:12
19:20 20:14,20
24:13 25:10
**incomplete**
134:15 154:15
**increase** 61:3
70:9 115:24
141:14 156:10
157:8

**increased**
60:20 67:18
69:18 70:6,12
146:3 156:13
**increases** 69:15
**increasing**
69:21
**indianapolis**
39:19
**indicate** 27:4
90:13
**indicated** 111:4
111:17
**individual**
75:12,25 105:5
112:18 123:7
152:20
**individual's**
64:24
**individually**
123:10 127:8
**individuals**
114:10
**induced** 50:10
**induction** 49:4
**industry** 11:25
72:24 130:21
131:6 136:24
137:4 140:23
141:5,17
142:13,18
**information**
127:6 130:23
142:10

[informative - know]                                                        Page 20

| informative | interest 46:24 | involving 90:4 | jury 25:18 |
|---|---|---|---|
| 121:13 122:11 | interested | ion 50:2 | **k** |
| 124:22 | 102:21 106:7 | ions 72:3 86:14 | ka 3:10 |
| informed | 159:17 | ira 25:2 | kathryn 3:5 8:2 |
| 110:15 | interesting | irbesartan 1:7 | kavila 3:13 |
| informs 117:10 | 12:3 | 7:11 | keep 50:19 |
| ingested 61:18 | internal 37:16 | irrelevant | kind 13:25 |
| 62:10 69:5,10 | 38:16 39:8 | 106:12 | 45:18 77:11 |
| ingesting 67:24 | internet 7:5 | isolated 154:8 | 117:5 123:3 |
| ingestion 42:3 | interrupt 24:21 | isolation | 150:4 |
| 107:21 | interrupted | 154:12 | kinds 47:25 |
| inhalation 42:6 | 50:17,25 61:20 | issue 91:18 | 48:19 49:11,20 |
| 106:11 107:20 | 63:5 | it'd 30:25 | 50:5 |
| initial 39:19 | interrupting | itemizing 30:12 | kirkland 2:3,14 |
| 63:20 | 38:1 51:14 | **j** | kirkland.com |
| initiation 63:23 | 135:7 | j 107:4 | 2:11,12,19 |
| 92:25 | interruptions | jan 7:25 | knew 130:22 |
| initiator 92:16 | 50:20 | jd 2:8 | know 12:2 13:2 |
| 93:4,9 | interval 66:1,2 | jennifer 25:25 | 17:19 18:1,2 |
| inquiry 123:1,2 | 112:20 117:10 | jersey 1:2,18 | 18:17,22 19:18 |
| instruction | 117:14,19,20 | 7:13 159:6,23 | 25:9 27:16 |
| 104:4,9 135:2 | 117:21 121:24 | jessica 2:5 | 28:23 30:6 |
| insufficient | 121:25 156:5 | jessica.david... | 32:4 37:22 |
| 115:9,15,21 | 156:16,22 | 2:12 | 38:4 40:22 |
| 148:20 | inverse 62:13 | job 11:14,21 | 50:21,21 60:21 |
| intake 59:7 | 62:19 | 12:11 | 67:3 82:19 |
| 151:17 152:19 | invoice 5:13 | jomanna 1:15 | 83:20 84:8 |
| 154:22 155:22 | 26:5,17 27:1,4 | 7:18 159:4,22 | 86:23 95:13 |
| 156:6,16 | 30:8,25 | judge 51:13 | 103:17,25 |
| 157:11,12 | involve 127:9 | judgmental | 107:19 109:23 |
| intending 54:2 | 150:7 | 27:22 | 113:16,21 |
| interaction | involved 34:10 | june 5:19 67:20 | 114:16,17 |
| 118:17 | 35:13 44:6,23 | 83:2 87:9 | 116:17,18 |
| | 44:24 49:3 | | |

[know - little]                                                    Page 21

120:14 129:25
134:1 138:7
140:23 146:18
**knowledge**
53:15
**known**  50:10
72:23 107:15

**l**

**l**  16:16 137:7
137:10,11,24
**labeled**  93:12
93:15,25 99:20
**labels**  40:9
**laboratory**
11:5
**labs**  35:14
**lack**  57:12
**lacks**  143:14
**lag**  89:17,22
**langton**  3:17
**langtont**  3:22
**large**  97:12
100:25 112:8
114:10 120:8
120:13 137:18
138:20 144:17
145:5 148:23
**largely**  54:14
54:19 121:23
**larger**  113:23
**latencies**  73:3
79:21 105:22

**latency**  5:17,23
55:22 59:13
63:19 64:8,17
64:21 65:4,17
65:19,22 66:1
66:2,6 67:13
67:19 68:1,11
69:15,19 70:16
70:23 71:6,18
72:17,23,24,25
73:20 74:3,11
74:18,25 75:20
75:23 76:15,17
76:21 77:1
78:22 81:5,11
84:12,15,17,20
85:1,18 88:15
88:20,24 89:6
89:11 90:10,15
90:21 91:4
105:23 113:19
114:12 115:8
115:15,21,22
115:24 116:2
116:11
**latent**  71:3
113:20,22
**law**  83:19,22
**lawsuit**  10:9
**lawyers**  27:9
54:16
**learned**  111:15
**led**  43:11

**legal**  83:16,21
160:23
**length**  89:5
**level**  60:13,14
61:24 109:24
112:23,24
138:19,21
**levels**  59:15
138:19 147:12
**lexington**  2:6
**liability**  1:7
7:11
**liable**  5:21
88:15
**license**  1:16
159:22
**licensed**  34:20
35:7
**life**  107:13
**likelihood**
112:15 118:13
**likely**  59:14
**lily**  39:18
**limitations**
38:20 39:1
56:21 57:21
58:1
**limited**  59:14
**limits**  38:12
**line**  6:10 161:4
161:7,10,13,16
161:19
**list**  5:12 9:8
14:15 15:17,21

16:21 17:1
54:25 55:2,6
57:21 98:20,21
98:24 131:3
135:4 137:12
137:15
**listed**  18:3
43:15
**listen**  50:13
**literature**
29:12 41:23
42:18 47:19
50:15 52:14,18
57:10 60:7
65:5 112:2
118:5 126:1
130:2 144:4
**litigation**  1:8
7:12 10:24
11:9 12:6,6,7
13:7,11 14:8
16:11 18:23
19:7,21,25
20:7,11,15,22
20:25 21:5
22:12,21 23:2
24:2,8,14
25:11 42:19
44:7,10,20,23
44:25 50:23
**little**  11:18 19:5
26:4 58:10
59:2 122:6

[liver - malignant]                                                 Page 22

| | | | |
|---|---|---|---|
| **liver**  35:4,4,8,9 | 148:19 151:14 | 72:5 83:16 | 81:21 |
| 41:4,11,16,24 | 151:25 | 87:18 98:4,20 | |
| 41:25 42:4 | **llc**  10:17 | 98:24 103:4,25 | **m** |
| 43:3,13 45:1 | **llp**  2:14 4:3 | 104:1,6,10,14 | **m.d.**  34:11 |
| 47:3,5,8,15,20 | **loaded**  97:9 | 104:22 106:10 | **machine**  27:20 |
| 48:1,19,25 | **loading**  97:6 | 110:22 111:7 | **made**  17:19 |
| 49:5,11,20,25 | **lodge**  61:8 | 121:12 128:5 | 21:12,21 23:19 |
| 50:6 52:7 | **lodging**  126:23 | 131:17 132:6 | 27:21 36:6 |
| 53:10 54:4 | **long**  72:25 91:4 | 133:10,18 | 59:16 73:1 |
| 58:16,18,20,25 | 91:9 116:19 | 134:5,9 145:16 | 99:22 162:5 |
| 60:5,9,17,20 | 121:25 | **looks**  15:21,25 | **magic**  100:19 |
| 61:3,18 62:10 | **longer**  25:1 | 18:7 27:8 56:5 | 129:14 |
| 62:14,22 63:12 | 114:17 | 67:9 72:16 | **magnification** |
| 66:12 67:21,23 | **look**  12:3 16:22 | 96:4,10 97:8 | 89:8 |
| 70:22 71:6,18 | 26:16 38:22 | 98:9 139:13,25 | **magnitude** |
| 72:17,21 73:19 | 51:5,19 71:12 | 141:2,6 | 113:25 117:15 |
| 74:3,18 76:2,3 | 71:15,17 72:15 | **losartan**  1:6 | 117:24 |
| 76:21 77:25 | 74:10 94:5 | 7:11 160:4 | **mail**  9:17,18,18 |
| 78:7 81:5 | 96:12 98:7 | 161:1 162:1 | **maintain**  33:16 |
| 88:23 89:10,23 | 103:17,18 | **lost**  96:6 | **majority**  16:11 |
| 90:21 91:5,10 | 104:4,16 | **louder**  11:18 | **make**  22:24 |
| 100:1 101:6 | 109:22 124:9 | **low**  42:7 112:2 | 25:18 39:15 |
| 105:21 107:19 | 124:21,23 | 113:18 114:2,6 | 100:21 142:22 |
| 112:11 114:1 | 127:19,22 | 115:8 | **makes**  51:2 |
| 114:18,25 | 128:7 136:1 | **lower**  114:12 | 96:11 |
| 115:16,23 | 142:8 146:1 | 138:18 | **making**  21:10 |
| 117:1 118:6 | 147:19 151:1 | **lowest**  23:9,19 | 21:18 108:5 |
| 119:3 124:22 | 157:6 | 60:9,10,13,19 | **malignancies** |
| 125:7 127:17 | **looked**  101:5 | 113:16 114:5 | 74:25 75:1,4 |
| 127:19 130:14 | 113:4 136:6,24 | **lung**  88:23 | **malignancy** |
| 141:7,16 | 138:5 | **lymphoma** | 53:1 82:5 |
| 145:10,14,24 | **looking**  9:24 | 18:25 | **malignant**  91:2 |
| 146:3,20 | 10:3 16:25 | **lymphoprolif...** | 92:17 |
| 147:15 148:1,5 | 28:9 64:10 | 79:25 80:16 | |

**[manager - methodology]**                                              Page 23

| | | | |
|---|---|---|---|
| **manager**  25:25 | **math**  13:10 | **measurement** | **melanoma** |
| **manifest**  80:9 | 27:14 28:1 | 114:9 | 75:14,15 |
| **manner**  91:22 | 30:23,25 | **measurements** | **memory**  104:9 |
| **mansouri**  44:5 | **matter**  1:15 | 19:4 107:15 | **mentioned**  1:15 |
| 148:2 | 7:10 53:10,12 | **mechanism** | 127:25 |
| **manton**  89:18 | 54:4 55:14 | 48:24 72:2,3 | **merits**  105:6,10 |
| **manufacturing** | 105:6 125:16 | 73:1 107:9 | **mesothelioma** |
| 39:24 | 127:13 132:15 | **mechanisms** | 79:24 80:15 |
| **march**  5:20 | **maximum**  66:1 | 72:7 | 81:21 |
| 15:19 27:6 | **mcl**  9:8 55:6 | **mechanistic** | **messy**  51:3 |
| 30:20 31:3,6 | **mcos**  103:11 | 47:18 49:7 | 133:8 |
| 32:2,11 87:4 | **md**  34:7,18 | 50:1 72:11 | **met**  29:24 |
| **mark**  14:19 | **mdea**  91:18 | 74:8 90:25 | 57:16 61:2 |
| 26:8 66:20 | 92:4,6 | 101:3 | 116:25 118:3 |
| 78:13 82:10 | **mdl**  1:3 7:13 | **mechanistica...** | 149:3 |
| 86:16 88:1 | **mean**  17:2 | 49:3 | **meta**  38:16 |
| 95:7 108:15 | 19:15 30:24 | **media**  7:8 73:7 | 136:24 137:1,3 |
| 109:4 139:14 | 36:21,25 37:5 | 73:14 94:17,24 | 141:3,16 |
| 139:16 155:3 | 46:14 47:16 | 158:2 | **metabolic** |
| **marked**  14:22 | 52:22 65:4 | **medical**  28:24 | 72:10 |
| 26:11 66:23 | 83:8,20 89:13 | 29:2 30:10 | **metabolite**  52:9 |
| 78:17 82:13 | 105:9,18 | 33:22,25 34:2 | 91:23 |
| 86:19 88:4 | 106:22 110:25 | 34:6,13,14 | **metabolites** |
| 95:10 109:7 | 111:14 118:19 | 36:18,19 39:12 | 47:13 48:25 |
| 139:19 155:5 | 122:22 131:25 | 74:1,16 83:4 | 49:2 50:1 |
| **markedly** | 135:2 140:16 | 93:14 | 71:24 74:8,23 |
| 115:23 146:2 | 142:23 147:3 | **medication** | 75:8 91:1 |
| **marketing** | 148:17 152:3,6 | 40:9,20 | **methodologi...** |
| 33:10 | **meaning**  70:16 | **medicine**  33:13 | 45:5 |
| **match**  56:6 | 141:14 | 34:21 | **methodologies** |
| **material**  9:20 | **means**  67:12 | **meet**  31:14 | 45:13 |
| **materials**  10:5 | **measure**  126:8 | **meeting**  29:22 | **methodology** |
| 33:10 54:24 | **measured**  66:1 | 30:3,15 32:8 | 45:8,18,23,24 |
| 108:11 | 147:11 | | 46:24 47:12 |

[methodology - ndma]                                                          Page 24

52:19 58:11
59:24 61:13
62:3 71:1 72:9
73:3,4 74:12
105:2 110:9,12
110:17 128:5
143:18
**methylguanine**
97:18
**microgram**
63:8
**microphone**
19:5
**mid** 12:21 13:2
**middle** 13:3
135:7
**milligrams**
75:25
**million** 42:7
**minimizes**
114:8
**minimum** 5:16
24:6 66:4
76:17 78:22
79:21 80:14
81:4,11 84:12
85:13,18 86:13
**minus** 89:23
**minute** 51:7,10
51:11 84:20
139:15,23
150:15 151:2
**minutes** 51:8
133:14,22

**mischaracteri...**
48:22 77:22
**mischaracteri...**
78:10
**misinterpreta...**
90:15
**misinterpreting**
117:5
**misleading**
133:14
**missed** 112:10
**missing** 34:22
**misunderstood**
43:24
**mms** 35:14
**mode** 47:11
90:6 101:25
**model** 5:21
88:15,19
**moderate**
111:21 114:20
**money** 21:4,9
21:18,20
**monitoring**
86:12
**monologue**
51:7,10
**monsanto**
16:15,21 17:6
17:12,18,23
18:3,9,24 19:7
82:8 85:1,16
143:9

**month** 76:1,2
**morning** 31:15
**move** 38:7
80:11 81:3
84:7 92:24
97:24 135:13
156:20
**moved** 134:6
**moving** 81:3
135:8
**multifactorial**
59:22 118:16
**multiple** 71:23
118:12 119:2
**multipoint**
41:14
**multitude**
71:22,23
119:14
**multivariable**
153:19 155:20

| n |
| --- |

**n** 2:1 4:1 5:1
42:25 118:19
137:7,10,11,24
152:19 153:16
154:18
**n7** 97:18
**nadler** 5:23
87:16 88:2,16
**name** 7:16 8:13
71:25 83:20
94:2,3 137:1,5

**names** 131:1,3
131:19,22,24
134:8,12,13
**narrow** 46:9,15
59:12
**nature** 38:5
**ndma** 14:11
35:25 40:16,20
41:3,11,14,23
41:25 42:3,6
42:24 43:3,12
44:18,25 47:7
47:25 48:18
49:10,12,19
52:5,8 53:9
54:3 58:16
59:6,7 60:4
61:17 62:8,19
62:20 63:9,12
65:22 66:16
67:17,22,24
68:2 69:5,9,15
69:18,24 70:5
70:8 71:16,17
71:22 72:4,8
73:4 74:4,11
74:23 76:1,4
80:24 86:15
90:5,8,22,24
91:1,5,11 92:8
92:16 93:4,9
93:15,25 94:9
95:5 97:21
98:12,16 99:21

[ndma - nitromorpholine]    Page 25

| | | | |
|---|---|---|---|
| 100:1,7 101:6 | **nearly** 15:22 | 28:19 29:4,13 | 104:15 106:3 |
| 102:8,17 103:5 | 36:14,23 | 29:23 30:17 | 108:1,14,21 |
| 105:21,23 | **necessarily** | 33:4,17 34:9 | 109:1,14 112:3 |
| 106:5 107:2,17 | 38:13 112:17 | 35:10 37:4,24 | 113:1,6 114:3 |
| 107:20 112:25 | **necessary** | 39:3 40:21 | 115:2,10,18 |
| 113:4,14 114:1 | 63:12 128:7 | 41:5,20 42:1 | 116:5,12 117:2 |
| 114:2,25 | 143:12 162:6 | 43:4,14,22 | 118:7 120:3,20 |
| 115:16 116:25 | **need** 19:22 | 45:11,21 46:7 | 121:4,17 |
| 118:5 119:1 | 51:20 98:18 | 47:10 48:2,21 | 122:13 123:5 |
| 120:1 121:2,15 | **needed** 100:12 | 49:13,22 50:16 | 124:4,7,25 |
| 122:11 124:21 | 129:6 148:19 | 51:8,25 53:11 | 125:9,22 126:3 |
| 125:7,17 | **needs** 91:5 | 53:21 54:5 | 126:22 127:20 |
| 126:11 127:9 | **neither** 157:7 | 55:11 56:1,8 | 128:15 129:18 |
| 127:17,18 | 159:13,15 | 56:16,23 57:7 | 130:3 131:8,19 |
| 130:13,24 | **never** 14:11 | 58:3,24 59:9 | 131:23 132:2,6 |
| 135:24 136:12 | 17:19 20:1 | 59:21 61:6,10 | 132:18 133:7 |
| 136:17 138:19 | 33:1,25 35:24 | 61:19 62:11,24 | 133:20 134:6 |
| 138:19,25 | 36:1,3 116:14 | 63:14 64:4,11 | 134:18 135:1 |
| 140:15,18,22 | 137:6,14,20 | 65:8 66:7 68:5 | 135:12 137:22 |
| 141:4,19,24 | **new** 1:2,17 2:7 | 68:13,22 70:2 | 137:25 138:4,6 |
| 142:2,11,21,21 | 2:7 7:13 32:15 | 70:10,18 71:19 | 139:7 141:22 |
| 143:15,16 | 72:22 103:23 | 72:18 73:21 | 142:6,19 143:5 |
| 145:11,14,24 | 133:22 135:13 | 74:5,20 75:6 | 144:1,12 145:4 |
| 146:3,20 | 159:5,23 | 75:16 76:5,19 | 147:2,18 149:4 |
| 147:15,20 | **newest** 82:21 | 77:8,21 78:8 | 149:23 150:3 |
| 148:4,12 151:8 | **nhl** 18:25 84:12 | 80:21 81:13 | 154:15,24 |
| 151:16 152:16 | 85:19 | 85:20 86:10 | 157:19 160:1 |
| 152:22,24 | **nigh** 3:3,4 7:25 | 90:11 91:12,20 | **nighgoldenbe...** |
| 153:10,14,20 | 7:25 14:25 | 93:17 94:11 | 3:12,13,14 |
| 153:24 154:2,3 | 16:13 17:4 | 97:6,10 100:8 | 160:2 |
| 154:5,14,18,22 | 18:10 21:7,14 | 100:15 101:12 | **nitrate** 152:20 |
| 156:1,6,12,15 | 21:25 22:3,7 | 101:18 102:11 | **nitrite** 152:20 |
| 156:19,21 | 23:10 24:19 | 102:19 103:6 | **nitromorphol...** |
| 157:7,8,11,12 | 27:15 28:5,12 | 103:17 104:3,8 | 118:19 |

**nitrosamine** 153:21

**nitroso** 42:25 118:18 152:19 152:20 153:16 154:18

**non** 18:25 105:21 131:5 135:25

**noncancer** 150:6

**normal** 12:10

**northeast** 3:19

**northwest** 2:16 3:7

**notary** 1:17 8:7 159:5,23 162:13,19

**note** 7:3 160:10

**noted** 83:14 162:7

**noticing** 7:23

**nuisance** 9:22

**number** 7:14 9:10 39:20 47:5 57:13 79:23 96:6 100:18,20 112:6,8 113:20 114:7,10 115:22 120:9 129:10,14,21 129:21 137:18 140:8 146:16

158:2

**ny** 160:15

**o**

**o** 16:16 44:12 137:7,7,10,11 137:11,24

**objection** 16:13 17:4 18:10 21:7,8 23:10 27:15 28:5,12 28:19 29:4,13 29:23 30:17 33:4,17 34:9 35:10 37:4 39:3 40:21 41:5,20 42:1 43:4,14,23 45:11,21 46:7 47:10 48:2,21 49:13,22 53:11 53:21 54:5 55:11 56:1,8 56:16,23 57:7 58:3,24 59:9 59:21 61:8,10 61:19 62:11,24 63:14 64:4,11 65:8 66:7 68:5 68:13,22 70:2 70:10,18 71:19 72:18 73:21 74:5,20 75:6 75:16 76:5,19

77:21 78:8 80:21 81:13 85:20 86:10 90:11 91:12,20 93:17 94:11 100:8,15 101:12,18 102:11,19 103:6 106:3 108:1,14,21 109:1,14 112:3 113:1,6 114:3 115:2,10,18 116:5,12 117:2 118:7 120:3 121:4,17 122:13 123:5 124:4,7,25 125:9,22 126:3 126:22,24,24 127:20 128:15 129:18 130:3 131:8 139:7 141:22 142:6 142:19 143:5 144:1,12 147:2 147:18 149:4 149:23 150:3 154:15

**objections** 7:19 154:24 157:24

**objective** 84:25

**observable** 60:12,13

**observed** 60:7 118:13

**obtain** 32:21 34:7,18

**obviously** 29:6 102:24 148:16

**occupational** 103:1 130:16 130:17 135:24 136:12,17 141:17 149:6 154:9

**occur** 49:6 62:15 80:7 107:19,20

**occurred** 12:1 68:7 114:14

**offer** 13:24 14:3 43:1 49:10 54:2 62:7

**offered** 33:6

**offering** 53:4,8 119:18

**offers** 84:24 110:21

**office** 8:2 25:3 25:25

**official** 63:24

**offs** 111:23

**oh** 11:18 12:16 31:1 48:9 82:25 111:10 112:21 118:22

**okay**  9:4,8,9,12
10:5,22 11:3,8
11:13 15:3,25
16:3,10,19,25
17:11 18:2,6
18:12,22 19:3
20:6,13 21:22
22:6,7,17 23:4
24:4,18 25:16
26:1 27:13,18
27:23 28:17
29:2,8 30:3
31:1,2,11,14,17
32:7,10 33:9
33:19 35:3,6
35:24 36:3,15
37:10,20 38:4
38:7,18,24
39:23 44:11
45:9 46:19
47:2 49:16
50:12 53:4,8
55:7 63:19
65:12 66:5
71:9 74:15
76:8,25 78:13
80:25 81:9,16
82:2,10,25
83:14,22,23
84:3,19 85:5
86:7 87:14,22
88:1 89:2
91:15 94:15
95:16,25 96:9

96:16 97:10,20
98:7 99:4,24
101:22 102:2
102:23 103:12
105:14,25
109:4 111:2,10
111:11 113:8
120:6,22 122:5
127:5 130:6
133:15 135:12
135:19 136:10
136:20 137:14
138:4,10,15
139:10 140:6,9
141:6 145:18
148:2,9 149:8
152:11 154:4
155:2,9 157:15
157:15,21
**once**  13:17 14:7
16:6,7
**oncologist**
35:18 53:3
**oncologists**
36:7
**ones**  42:13
**open**  8:24 9:8
9:15,18 92:13
95:15 96:21
140:2 151:3,21
**opened**  33:1
**opening**  140:7
**operate**  72:5

**operates**  91:25
**opined**  53:2
**opinion**  41:3,25
46:17 47:7,25
49:10 52:24,25
53:4,9,18,20
54:3 60:3,11
62:7 63:11
67:23 70:22
71:2 84:24
85:17 94:9
100:14 109:24
111:16 112:25
113:15,25
115:14 116:15
116:23 119:17
119:24 146:8
146:18,19
149:1 152:15
152:23 153:16
**opinions**  30:21
43:2,21 45:6
50:14 52:13,23
55:4,9 58:21
66:11 83:21
85:1 102:10
105:1 108:12
110:2,21
137:16
**opposed**  12:10
51:4 58:10
113:24 127:11
132:16 140:22
152:11

**opposite**
123:14
**oral**  42:3
107:21
**order**  47:17
53:18 61:2
65:5 155:12
**orders**  50:22
**organ**  59:1
**organization**
33:14 74:17
93:15
**outcome**  77:20
122:23 124:3
**outcomes**  123:4
127:19 140:18
**outside**  11:14
11:21 71:17
**overall**  66:3
112:25 113:14
154:21,22
156:3,15,21
**overemphasis**
143:13
**overemphasi...**
110:6
**overestimate**
143:3,23
**overhead**  25:15
**overinterpret**
57:5
**own**  10:20 33:2
**oxford**  4:5

[p - period]                                                              Page 28

| p | | | |
|---|---|---|---|
| **p**  2:1,1 4:1,1 | 140:25 145:19 | 119:7 | 126:12 144:4 |
| 16:16 44:12 | 146:1 151:5,19 | **parties**  7:8 | **pending**  22:5 |
| 77:6 137:10 | 151:22 155:18 | 159:15 | 98:17 99:4,8 |
| 156:25 157:2 | 161:4,7,10,13 | **parts**  39:7 42:7 | **pennsylvania** |
| **p.m.**  1:19 7:2 | 161:16,19 | **past**  11:10 14:6 | 2:16 4:7 |
| 15:4,10 73:6 | **paid**  13:23 14:3 | 14:16 15:18,23 | **people**  25:20,24 |
| 73:13 79:9,15 | **paper**  10:3 14:2 | 22:14 72:21 | 37:13 152:10 |
| 94:16,23 | 110:24 | 84:3 | **percent**  12:8,12 |
| 128:21 129:2 | **paragraph** | **pathology**  34:3 | 12:13 16:17,18 |
| 149:10,16 | 65:25 80:5,12 | **pathways** | 17:2,22,25 |
| 150:16,22 | 87:18 92:14,21 | 72:10 | 18:2 19:16,20 |
| 157:25 158:6 | 93:6,7 98:8,11 | **patient**  35:24 | 20:3,5,6,11,14 |
| **page**  5:4,11 | 146:1 | 36:1 | 20:20 21:2 |
| 6:10 65:24 | **paragraphs** | **patient's**  36:4 | 60:16 61:24 |
| 67:2,4 68:20 | 85:23 146:6,6 | **patients**  34:24 | 109:23 112:20 |
| 79:19,19 80:4 | **parameter** | 34:25 35:8,15 | 148:20 |
| 80:4,11 81:3,4 | 124:17 | 151:24 152:14 | **percentage** |
| 81:19 84:2,7,8 | **part**  13:14 | **pattern**  52:9 | 17:11,17 19:12 |
| 84:11 85:6,6 | 28:22 34:1 | **payments** | **perfect**  8:20 |
| 87:11,12,20 | 39:4 52:19 | 24:23 | 9:24 38:21 |
| 88:22,23 89:1 | 59:24 62:3 | **pays**  24:17 | 151:4 |
| 92:11,13,21,24 | 64:12 108:10 | **pdf**  8:25 9:2 | **perform**  19:2 |
| 93:3,7 94:6 | 115:7 121:23 | 97:5 98:5 | 36:8 100:4,25 |
| 95:23 96:5,6,7 | 139:5 141:20 | 138:9 | **performed**  18:5 |
| 96:7,8,10,13,14 | 144:17 153:1 | **pdfs**  9:14 | 36:3 153:19 |
| 96:15,20 97:4 | 154:10,10 | **peak**  59:12,15 | **performing** |
| 97:5,17,21,22 | **participants** | 89:13,16 90:12 | 104:23 106:11 |
| 97:25 98:1,4,6 | 7:6 112:6 | 113:20,22 | 143:24 |
| 98:7 110:11 | 148:17 | 114:13,14,14 | **period**  12:19 |
| 111:2,8 132:17 | **particle**  106:12 | 115:24 116:2 | 20:25 63:19 |
| 132:20,21 | 106:14 | 116:11,20 | 64:18 65:4,17 |
| 133:3 136:4 | **particular** | 122:1 | 65:19 66:4,6 |
|  | 46:25 49:1 | **peer**  73:19 | 67:13 68:1,11 |
|  | 58:7 77:25 | 84:17 105:13 | 68:19 69:16,19 |

[period - prescribe]                                                    Page 29

70:17,24 71:3
71:18 72:17
73:20 74:3,18
75:20,23 84:20
89:11 90:10,21
113:21,22
115:9
**periods**  59:11
64:22 65:3,4
71:6 72:23
76:18 77:1
88:20,24
**permission**
83:4
**person's**  75:15
**personally**  21:6
54:12
**pete**  7:16
**peter**  4:12
**ph.d.**  1:11,15
5:3 7:10 8:5
37:22 38:25
158:1 160:5
161:2,24 162:2
162:4,12
**ph.d.s**  37:14
**pharmaceutical**
39:24 40:1
160:4 161:1
162:1
**pharmacodyn...**
52:10 72:6
**pharmacodyn...**
47:12 90:7

**pharmacokin...**
72:6
**pharmacokin...**
101:25 107:11
**phase**  39:19,19
**phenomenon**
89:16
**phone**  9:22
30:4,11
**physician**  35:1
35:2,7
**physiologically**
107:10
**pick**  56:15
**picture**  153:2
154:11,11
**pieces**  121:13
**piedmont**  3:19
**pietragallo**  4:3
**pill**  68:3,7
138:25
**pills**  107:21
138:20
**pinares**  86:3
**pine**  8:6
**pittsburgh**  4:7
**place**  7:7 26:22
50:22 79:6
96:25 129:20
159:9
**plaintiff**  16:7,9
16:17 64:17
83:5

**plaintiff's**  27:9
54:16
**plaintiffs**  13:24
14:4,9 16:12
17:3 19:7
**planning**  101:9
101:15,16
**plant**  154:3,17
156:12,18
157:6
**platform**  26:16
**plausibility**
107:8,16 123:9
**please**  7:3,20
9:19 14:1 20:8
37:25 38:5
50:13,18 51:9
51:19 69:7
118:21 127:4
135:17
**plus**  25:2 89:23
120:16 148:18
**point**  22:1,4
25:13 34:23
46:23 73:18
74:1 75:7
113:23 132:16
135:12
**pointing**  96:4
**points**  72:23
110:4
**pops**  82:19
**portion**  36:18
36:20,24

**pose**  25:17
**posed**  60:18
**positions**  11:2
**possibilities**
48:5
**possible**  18:11
27:21 47:20
54:18 148:22
**potent**  49:2
**potential**  12:6
47:15 48:24
49:24 52:8
59:20 63:21
64:2 74:19
140:21
**pottegârd**
44:12 145:9,13
145:23 148:9
148:15
**power**  57:11
112:6,18 120:8
148:21
**powerful**  67:18
**powers**  58:8
**practice**  34:20
**precise**  75:18
**predicate**
149:21
**preparation**
33:6
**prepare**  33:1
**preparing**  32:3
**prescribe**  40:19

**[prescribing - quality]**                                      Page 30

**prescribing**
  40:12,15
**present** 4:12
  7:21 49:25
**presented** 10:5
**president** 33:15
  33:15
**pressure** 35:4,8
**pretty** 12:3
**prevalence**
  119:3,4
**preventing**
  10:12
**previous** 10:1
**previously**
  10:22 22:10
  23:8
**primarily**
  19:14 54:21
  55:9 71:10
  77:5
**primary** 19:1
  147:8
**primates**
  107:13
**principles**
  45:10 46:5
**printed** 30:24
  138:8
**prior** 11:21
  16:14,16 33:18
  42:10 44:24
  52:1,1 67:24
  100:5,7 101:19

116:3 133:13
133:21,25
135:14
**probable** 47:16
  47:17
**probably** 12:13
  17:24 19:17
  24:5 29:17
  31:8,9 41:13
  41:19 87:24
  121:21
**problem** 69:16
  138:17 145:25
**problematic**
  60:18 120:17
**proceeding**
  7:20
**process** 39:24
  91:2 92:17
**processed**
  12:17
**processing**
  12:10 13:1
**produce** 57:13
  138:9
**produced** 26:5
  27:2 60:19
**product** 39:24
**production**
  108:11,25
**products** 1:7
  7:11 20:23
**professor** 11:6
  36:15,17

**profile** 5:24
  95:5 96:1,20
**profiles** 91:23
**program** 34:7
  76:12 79:20
  86:9,13
**programs** 8:23
  9:15
**project** 17:13
**promoted**
  67:22
**promoter** 67:18
  92:16 93:5,9
  94:10
**promoters** 91:2
**promotion** 90:5
  92:15 93:1
**prong** 101:2
  108:4 142:8,10
  143:12,13
  149:24
**prongs** 46:10
  46:22 106:16
  110:7,23
  121:19 123:7
  123:11,14,17
  124:9,11,13
  125:12 127:6,7
  127:23
**proper** 92:7
  143:17
**proportion**
  30:14

**provide** 25:1
  62:13 110:19
  130:22,22
  138:6 141:23
  142:2
**provided** 13:13
  14:8,15 105:12
**provides** 63:8
**pruitt's** 32:5
**public** 1:17
  159:5,23
  162:19
**publications**
  137:18
**publicly** 83:8
  83:10,11 86:24
**published**
  13:17,19 14:7
  14:11 47:12
  60:15 126:12
  144:4
**pull** 54:12
  155:2
**pulled** 54:20
**purposes** 45:14
**push** 79:2
**put** 58:9 87:25
  99:24 143:13
**putting** 78:10

**q**

**quality** 7:4,5
  127:21

**quantitation**
68:25
**quantitative**
42:4 69:12
105:12 110:20
130:22 131:5
132:14 135:25
136:7,9,11,16
136:21
**quantitatively**
101:6 109:22
116:10
**quantity**
138:25
**quartile** 48:14
156:3,5,15
157:7,11
**quartiles** 63:9
107:4 120:10
155:22
**question** 11:17
13:25 17:16
19:23 21:9
22:4,5,13,14,24
33:18 35:5
38:1,6,15,18,24
41:7 43:25
45:12 46:18
49:23 50:9,12
50:19 51:2,20
51:22,24 52:1
52:1 56:25
57:8,16 60:18
60:25 61:1

62:19 64:25
65:10 69:7
75:18 76:7,16
77:23 81:9
91:6,7,14
92:15 93:10,11
94:8 98:17,17
98:23 99:4,8
99:10,11,17,19
101:8 103:20
103:23 104:14
104:16,17
110:25 113:9
116:4 119:11
119:16,21
121:6 122:5,9
122:15 123:24
124:5 125:21
126:2,20,21
127:18 130:4
131:25 133:8
133:12 134:7,8
134:10,11,23
135:7,8,11,16
135:18 145:2
145:17,20,21
145:22 146:12
153:25 155:1
**questioning**
105:21
**questionnaire**
152:21
**questions** 25:6
38:2 103:19

104:9 133:11
133:13,21,22
133:23 134:14
135:5,13,14
157:16
**quick** 8:14 15:2
**quite** 120:13
144:14
**quote** 146:2

**r**

**r** 2:1 4:1 44:12
160:5 161:2,3
161:3,24 162:2
162:4,12
**radiation** 75:13
75:15 124:23
125:6,14 126:5
127:12
**radiological**
86:5,14
**range** 31:9,9
64:21 65:2
66:3 84:24
88:25 113:16
114:20
**ranged** 84:12
**ranitidine**
103:5 104:2,24
121:2,15
127:16,23
138:13,17
139:1

**rank** 47:16
120:4
**rare** 48:11
**raso** 3:3
**raspnati** 4:3
**rate** 25:14
32:10 48:13
52:3,6 107:15
114:17 148:18
**rates** 60:9,20
**rather** 34:13
46:16 65:9
121:6 142:12
**ratio** 111:4,13
113:23 147:23
147:23
**ratios** 153:19
**reach** 52:23
55:16 57:5
59:12 71:2
100:14 109:24
148:19
**reached** 59:15
**read** 44:4,9,12
51:20,24 80:17
81:23 87:22
119:16,18
136:5 138:1
146:5,17 160:9
162:5
**readily** 18:5
**reading** 98:19
**reads** 55:24

Case 1:19-md-02875-RMB-SAK    Document 3060-8    Filed 05/22/25    Page 195 of 211
PageID: 111023

**[real - relevancy]**                                                          Page 32

| | | | |
|---|---|---|---|
| **real** 9:22 15:2 120:13 | **recognized** 105:17 126:13 | **reference** 9:20 85:11 92:20 118:25 | **regarding** 40:9 42:24 105:21 110:25 |
| **realize** 118:22 | **recommendat...** 110:15 | **referenced** 9:3 14:14 17:8 71:13 73:23 91:8 93:18 96:9 119:1 160:6 | **regardless** 141:15 |
| **really** 69:21 100:16 106:7,8 107:24 111:1 | **reconsider** 19:22 | | **regular** 152:9 |
| **reason** 27:13 57:9 77:7,17 78:4 115:7 147:7 160:11 161:6,9,12,15 161:18,21 | **record** 7:2,8,22 8:14 14:25 15:2,5,8,11 18:17 26:23 30:5,7 73:8,11 73:15 79:3,7 79:10,13,16 94:14,18,21,25 97:1 99:12 128:22,25 129:3 134:15 135:10 140:2 149:11,14,17 150:15,17,20 150:23 157:18 157:24,25 | | **regulatory** 126:13 |
| | | **references** 85:3 | **relate** 102:4 |
| | | **referencing** 89:18 95:4 | **related** 12:5 19:7,25 20:11 20:15,22,25 21:5 28:3 37:3 42:19 62:22 |
| **reasonable** 60:10,22 74:9 | | **referred** 80:19 132:4 139:17 | |
| **recall** 14:17 22:12 23:11,15 23:18 28:6 29:5 41:16 44:22 45:3 54:17 82:6 87:24 111:23 | | **referring** 23:12 23:25 75:19 108:22 125:15 125:15 131:2 131:24 134:4 134:24,25 135:23 140:12 150:5 | **relates** 20:7 151:14 |
| | | | **relating** 7:14 |
| | | | **relationship** 45:1 147:14 148:4,7,12 154:5 |
| **receipt** 160:17 | | **refers** 63:20 76:14 | **relative** 39:1 112:15 159:14 159:16 |
| **receive** 22:18 | **recorded** 7:9 | **reflect** 51:12 | |
| **received** 24:10 24:16 108:25 | **recording** 7:4,7 | **reformulate** 121:7,10 | **relatively** 88:24 126:19 |
| **recent** 44:21 107:11 | **records** 28:3,10 28:18,24 29:2 30:10 83:4 | **refresh** 26:18 78:25 79:4 82:18 86:22 | **released** 83:9 |
| | | | **releases** 71:22 |
| **recently** 130:20 | **recruitment** 151:24 | **refreshing** 82:22 | **relevance** 105:6,19,22 124:10 125:13 126:6,19 128:1 |
| **recess** 15:7 73:10 79:12 94:20 128:24 149:13 150:19 | **refer** 45:23 62:25 63:7 65:24 89:25 131:9 132:12 140:17 144:2 | **regard** 80:6 | |
| **recognize** 57:25 91:1 | | | **relevancy** 143:14 |

Veritext Legal Solutions

800-227-8440                                                                973-410-4040

**relevant** 52:15
  54:23 55:16
  59:6 106:2,8
  106:16 108:4
  121:14 122:10
  122:21 123:1,2
  123:16 124:1
  124:23 125:21
  126:2,21
  127:13,17
  128:13 142:3,7
**reliability**
  111:1
**reliable** 55:16
  55:21 77:1
  109:18,19,23
  139:4,9
**reliance** 73:2
  137:12,15
**relied** 55:3 72:8
  86:1,8 102:25
  102:25 104:1
  108:11 130:16
**reload** 96:23
  140:4,9
**rely** 36:6 37:18
  38:13 44:19
  51:4 59:23
  61:23 72:15
  73:4 103:4
  131:12
**relying** 55:8
  94:8 102:9,16
  109:12 117:4

  119:12,13,13
  130:18 131:5
  136:12,18
  137:21
**remember**
  111:6 116:18
**remotely** 8:17
**remove** 119:21
**rental** 25:3
**repeat** 14:1
  20:8 22:23
  43:25 69:7,16
  113:8 136:14
  136:15 145:21
  145:21 153:12
  153:25
**repeating**
  121:6 145:12
**report** 5:15,19
  5:20 8:25
  13:14 32:6
  43:16,20 44:14
  55:6,8 57:14
  58:16 63:1,1,8
  65:24 66:19,21
  68:20 71:8
  77:25 80:19,23
  82:7,19 83:2,3
  83:24 84:8,11
  85:16 86:2
  87:4,9,15,25
  90:1 92:5,10
  92:13,21 95:15
  95:16,22 96:8

  100:5 103:10
  103:13,14,16
  103:18,19,25
  104:4,6,10,14
  104:17,20,24
  105:4 128:16
  128:19,20
  131:13,17
  132:10,24
  143:10 145:16
  146:7,17 151:1
  151:11,19,22
  155:16
**reported** 81:5
  91:22 114:23
**reporter** 1:16
  7:18 77:8
  145:12 159:5
**reporting** 59:5
  59:7 71:5
  155:20
**reports** 32:5
  84:3 125:5
**represented**
  33:9
**representing**
  7:16
**reprocessors**
  11:24
**request** 31:21
**requests** 6:9
**required** 34:2
  34:11 80:14
  162:13

**requirement**
  143:12
**requirements**
  34:18
**research** 42:18
**researched**
  54:20
**researchers**
  138:24
**researching**
  30:10 55:19
**residing** 8:5
**respect** 41:15
  45:22 52:25
  58:7 69:12
  107:2 132:14
  138:22
**respectfully**
  25:5 119:15
  134:2
**respond** 134:17
**response** 19:2
  45:1 51:21
  52:20,25 53:14
  53:19 54:8
  55:17 60:6,11
  61:23,25 62:4
  101:7,21 107:1
  107:3,6,16
  119:9 120:10
  122:2,3 123:9
  128:2 130:23
  132:14,15
  142:9,10

[response - rr]                                                    Page 34

| | | | |
|---|---|---|---|
| 146:21 147:1,8 | 109:19 126:12 | 82:24 83:1,1,2 | 113:23 115:16 |
| 147:14 148:4,7 | 127:8 130:20 | 83:7,12 84:5 | 141:14 146:3 |
| 148:12,23 | 144:4 | 84:10,13,18 | 147:11,12 |
| 149:2 157:4 | **reviewing** | 85:10,14 87:9 | 148:8 151:17 |
| **restricted** | 12:16 28:3,18 | 87:10 88:10,17 | 155:21 156:6 |
| 119:2 | 30:10 32:5,6 | 89:6,9 90:10 | 156:11,14 |
| **result**  57:13 | 55:19 123:17 | 91:19 92:4,22 | 157:8 |
| **resulting**  91:23 | **reviews**  73:2 | 93:22 95:23 | **road**  3:19 |
| **results**  37:19 | 110:14 | 96:2,5,14 | **robert**  8:15 |
| 118:17 138:21 | **reword**  65:10 | 97:25 98:9,19 | **roberts**  5:14 |
| 139:4 141:3 | **ridge**  3:7 | 98:23 99:2,5 | 8:1,1 10:9 |
| 154:4 | **ridiculous** | 99:14 104:20 | 26:17 27:2 |
| **retained**  42:11 | 108:6 | 105:2,7 110:9 | 28:4,10,18 |
| 43:21 44:20 | **right**  10:17,25 | 110:18 121:10 | 66:6 68:12 |
| 158:2 | 13:14,17,20 | 122:17 125:21 | 69:9,23 80:20 |
| **retract**  103:20 | 14:9,12 15:14 | 126:2,8,15 | 90:1,10 92:3 |
| **retriever**  8:19 | 15:19 16:1 | 130:14 131:18 | 160:4 161:1 |
| **return**  160:13 | 17:16 18:25 | 131:18 132:1 | 162:1 |
| 160:16 | 20:2 22:5,6,25 | 133:18 140:1 | **roberts's**  65:22 |
| **reveal**  42:5 | 23:5,9 24:15 | 141:1,10,13,18 | 66:2,11 67:6 |
| 119:8 | 25:4 26:6 30:8 | 144:21,25 | 69:18 |
| **review**  29:12 | 30:9,16,25 | 145:2 147:9 | **robust**  58:11 |
| 42:10,18,21 | 31:12 32:14,19 | 148:13 151:6,8 | 59:20 100:13 |
| 50:15 52:14,18 | 33:22 35:18,19 | 151:17 153:20 | 122:2 |
| 61:23 71:3 | 37:23 38:20 | 153:21 154:23 | **robustness** |
| 84:1 136:23 | 45:10 46:25 | 155:16 156:8 | 105:11 |
| 137:17 160:7 | 47:23 52:16 | 156:17,23 | **rod**  26:3 |
| **reviewed**  29:6 | 55:25 63:22 | 157:1 | **room**  8:18 |
| 36:8 41:23 | 66:6,13,18 | **ring**  86:4 | **round**  82:7 |
| 42:13 43:6,10 | 67:7 68:21 | **ringer**  9:23 | 143:10 |
| 43:19 44:16,19 | 69:4,6,24 70:6 | **risk**  40:12,19 | **routinely**  35:13 |
| 54:13 71:20 | 75:5,23 76:18 | 54:9 61:3 | **rr**  111:17 |
| 72:20 73:19 | 77:13 79:23 | 66:12 111:4,13 | 114:12 117:19 |
| 84:17 105:13 | 80:9 81:7,22 | 112:15,23 | 117:20 |

**[rubber - separate]**                                               Page 35

| | | | |
|---|---|---|---|
| **rubber** 118:18 | 52:14 55:14 | **science** 58:6 | 89:12,20,24 |
| 118:18 119:5,5 | 63:19 73:18 | **sciences** 34:14 | 97:22 98:5,17 |
| 130:21 131:6 | 77:9 80:18 | **scientific** 47:24 | 110:16,19 |
| 132:12 135:23 | 82:2,6 86:1 | 73:19 80:13 | 111:5 112:6 |
| 136:11,23 | 91:18 95:3,22 | 84:25 93:15 | 121:12 134:14 |
| 137:4 140:23 | 97:6 99:13 | 125:25 | 136:2,6 140:4 |
| 141:5,17 | 103:24 104:13 | **scientist** 55:24 | 147:21 152:1 |
| 142:13,17 | 104:21 108:19 | **scientists** 143:2 | 152:15 155:25 |
| **rug** 124:12 | 109:20 118:20 | 143:22 144:8 | **seeing** 82:20 |
| **ruled** 51:13 | 119:10,24 | **screen** 95:14 | 135:5 |
| **run** 116:19 | 120:19 124:20 | **search** 71:5 | **seem** 19:10 |
| 139:2 | 126:23 129:6 | 98:25 99:6,7 | 92:24 96:6 |
| | 132:10 135:15 | 99:14 104:23 | **seems** 87:5 |
| **s** | 135:22 146:19 | **searched** 18:6 | 146:4 |
| | 147:13 149:1 | **searching** 99:1 | **seen** 137:20 |
| **s** 2:1 4:1 5:9 6:1 | 149:20 151:1 | 99:13,18 | 143:6 |
| 16:16 161:3 | 155:10 158:1 | 103:15 104:20 | **selective** 99:7 |
| **safety** 12:1,4,16 | 160:5 161:2,24 | **second** 19:23 | **seller** 39:21 |
| **sample** 100:25 | 162:2,4,12 | 32:24 37:25 | **semester** 37:1,9 |
| **sanibel** 8:6 | **saying** 22:25 | 93:7 139:24 | **send** 137:19,22 |
| **satisfied** 116:25 | 38:4 98:2 | 156:5 157:7 | **sending** 35:13 |
| 130:10 150:11 | 116:18 152:12 | **seconds** 61:8 | **sense** 92:7 |
| **satisfies** 146:21 | **says** 21:17 | **section** 81:20 | 142:22 |
| **satisfying** | 50:17 79:19,23 | 132:11 151:8 | **sensitivity** |
| 150:2 | 80:4 81:4,20 | 151:11 155:25 | 118:16 |
| **save** 138:8 | 84:16 87:15 | **sections** 32:23 | **sent** 12:17 |
| **saves** 27:20 | 89:10,22 96:14 | **see** 9:7,17 | 54:19 108:9 |
| **sawyer** 1:11,14 | 111:3 | 15:14 17:7 | 139:15 160:14 |
| 5:3 7:10 8:5,12 | **scenario** 75:20 | 22:2 25:18 | **sentence** 80:5 |
| 8:15 9:5 10:15 | **school** 33:25 | 26:19,20 31:23 | 111:9 |
| 13:13 15:14 | 34:2,6 36:18 | 34:24 35:7 | **sep** 25:2 |
| 27:1 32:13 | **schroeder** | 78:24 80:2,10 | **separate** |
| 33:23 36:10 | 108:23 | 87:2,17,21 | 142:16 |
| 39:9 41:2 45:4 | | 88:23 89:1,3,9 | |
| 47:3 51:7,19 | | | |

**[separately - specific]**                                                Page 36

| | | | |
|---|---|---|---|
| **separately** | **shown**  49:3 | **single**  17:6 37:5 | 61:7,9 63:6 |
| 25:14 | **shows**  140:4 | 38:22 49:5 | 76:16 79:19 |
| **september** | **shut**  9:21,23,23 | 58:6,6 73:18 | 81:9 87:7,11 |
| 23:16 68:4 | **si**  3:11 | 92:20 93:14 | 88:8 95:18 |
| **sequence**  80:6 | **sic**  107:4 | 144:21 145:2 | 97:24 98:21 |
| **serling**  26:2,3 | **sign**  160:12 | **sir**  50:13 | 99:1 112:21 |
| **serve**  46:24 | **signature** | **site**  119:2 141:3 | 113:7 116:7 |
| **served**  14:16 | 159:21 | **sitting**  143:22 | 118:22 122:21 |
| 18:23 67:17 | **signed**  160:19 | **six**  41:18 | 123:21 128:19 |
| **serving**  11:8 | **significance** | **size**  100:25 | 131:14 132:19 |
| 19:6 21:12 | 117:23 141:15 | 106:12,14 | 132:20 133:3 |
| **set**  159:9 | **significant** | 128:2 | 137:2,5,9 |
| **several**  75:9 | 38:14,14 42:6 | **skill**  37:14 | 138:15 139:14 |
| 80:9 105:15 | 54:8 60:8 | **skin**  106:9 | 139:23 144:8 |
| 112:5 126:25 | 61:24 62:4,14 | **slow**  77:9 | 152:6 |
| **severe**  127:24 | 63:10,16 71:11 | **smaller**  112:10 | **sort**  10:3 |
| 138:22 139:9 | 106:24 107:7 | **snowplowed** | 109:25 134:14 |
| **share**  26:15 | 107:14 112:9 | 51:21 | 141:2 |
| 140:6 | 113:17 114:19 | **solely**  108:5 | **sounds**  157:16 |
| **sharing**  91:23 | 114:24 117:12 | **solid**  79:24 | **source**  77:1 |
| 92:12 | 117:18,22 | 80:15 81:10,20 | 154:3,17 |
| **sheet**  160:11 | 119:8 130:13 | 81:24 | **sourced**  156:18 |
| **shimanovich** | 147:20,22,25 | **solubility** | **sources**  90:23 |
| 108:10,24 | 148:22 156:10 | 107:13 | 156:12 157:6 |
| **short**  74:25 | 157:3,12 | **solutions** | 157:11,13 |
| 88:24 94:15 | **significantly** | 160:23 | **speak**  56:9 |
| 121:23 | 60:20 156:13 | **somebody's** | **speaking**  127:8 |
| **show**  21:16 | **siken**  3:14 | 62:22 | **specialists** |
| 38:3 60:8 | **similar**  17:7 | **someone's** | 10:16 |
| 101:5 107:14 | 91:24 111:14 | 61:18 62:10 | **speciate**  142:11 |
| 130:12 156:13 | **simply**  52:25 | 65:7,16 | 142:24 |
| 157:7,11 | 110:4 142:12 | **sorry**  9:1 11:16 | **specific**  9:2 |
| **showed**  143:9 | 153:8 | 12:18,25 25:4 | 30:12 34:13 |
| | | 36:24 48:9 | 42:24 43:10 |

[specific - studies]                                                    Page 37

| | | | |
|---|---|---|---|
| 45:17,23 46:16 | spouses  151:24 | 63:16 71:11 | 111:24 112:16 |
| 53:1,1,2 58:2 | 152:13 | 106:23 107:7 | 116:23 117:24 |
| 64:10,16 72:16 | square  3:7 | 107:14 112:9 | 121:22 123:8 |
| 74:22 81:15 | srr  141:9 | 113:17 114:9 | 123:12 124:11 |
| 85:4,12,22 | stages  150:12 | 114:19,24 | 124:15 |
| 90:3,6,25 | standard  1:19 | 117:11,18,21 | strengths  57:11 |
| 98:22 122:21 | started  10:21 | 119:8 130:13 | 128:8 |
| 122:22 124:2,3 | 10:23 17:13 | 147:20,22,25 | strike  132:3 |
| 127:10 129:21 | 68:23 134:3 | 156:10 157:3 | strive  45:4,9 |
| 140:17,20,22 | starting  12:23 | statistics  36:13 | strong  90:5 |
| 141:18,24 | 27:5 68:25 | 105:12 109:22 | 111:3,12,16 |
| 142:3 143:13 | 93:7 | 111:15 119:7 | 124:14 |
| 152:21 | starts  97:17 | stenographic... | students  34:12 |
| specifically | state  1:17 7:20 | 159:8 | 36:19 |
| 41:16 45:25 | 7:21 8:13 | stephanie  3:6 | studied  60:14 |
| 57:17 63:1 | 32:16 49:4 | 8:3 | 107:14 |
| 119:12 129:9 | 93:11 148:3 | stepping | studies  9:2,4,10 |
| 143:8 | 159:5,23 | 123:24 | 9:11 30:10 |
| specificity | stated  48:24,24 | stomach | 32:6 38:19,22 |
| 118:3,3 121:20 | 56:21 74:6 | 124:24 125:6 | 42:3,4,5,10,15 |
| 123:8 | 125:10 143:8 | 125:14 126:5 | 42:17,21 43:7 |
| specifics | 147:14 148:11 | 127:12 | 43:15,20 44:18 |
| 101:24 | states  1:1 7:12 | stop  19:10 | 44:21 47:13 |
| specify  129:10 | 80:12 89:5 | 37:24 50:25 | 52:10 53:24 |
| speculate  60:21 | 97:21 98:12 | 150:14 | 54:13,17,19,19 |
| spell  72:1 137:9 | stating  73:19 | story  156:19 | 54:22 55:3,5,7 |
| spelling  77:12 | statistical | stoy  4:4 | 55:16,20 57:20 |
| spellings  44:13 | 48:12 57:11 | stratification | 58:15 59:5,7 |
| spend  28:3,9 | 59:15 117:23 | 37:17 | 59:12,13,19 |
| 29:3 | 148:21 | strawberries | 60:7,8,16,19 |
| spent  12:9 | statistically | 72:7 | 61:23 65:18,25 |
| 28:17 29:11,21 | 38:14 42:5 | street  4:6 | 66:4 71:4,11 |
| 30:15 31:5 | 60:8 61:24 | strength | 71:12,13,16,18 |
| 32:1,2,7 55:18 | 62:4,13 63:10 | 100:17 106:22 | 71:21 72:8 |

**[studies - supposed]**                                                   Page 38

| | | | |
|---|---|---|---|
| 73:4,23 74:10 | 134:12,13,23 | 124:12,14,16 | **submitted** |
| 74:22,24 84:21 | 134:24 135:4 | 124:23 125:5 | 20:24 |
| 90:19,24,25 | 135:22,24 | 125:11 127:22 | **subscribed** |
| 91:4,8 100:12 | 136:3,3,5,11,17 | 127:23,24 | 162:14 |
| 101:3,3,4,5 | 136:20,25 | 128:3,4,5 | **substance** |
| 102:7,13,16,22 | 137:4 138:13 | 129:25 132:5 | 107:25 |
| 103:1,4,13 | 138:23 139:1 | 136:16 138:1,2 | **substances** |
| 104:2,24 | 141:6 144:9,14 | 138:18,21,22 | 93:8 |
| 105:24 107:5,5 | 144:14,15,18 | 139:3,8,14,16 | **substantial** |
| 107:12,23 | 144:23,24 | 140:11,14 | 54:9 64:23 |
| 108:4,6 112:18 | 145:1 146:23 | 141:20 143:10 | 65:6,16 |
| 113:4 114:6,16 | 149:6 151:8,10 | 143:15,15 | **subtypes**  47:8 |
| 114:18 115:9 | 153:6,7,7 | 144:18,21 | **sufficient**  57:12 |
| 115:14 116:19 | 154:10 | 145:2,10,13,23 | 63:25 65:21 |
| 117:3,5 118:4 | **study**  6:5,6 | 145:25 147:13 | 74:3,18 85:18 |
| 119:13,14 | 33:3 38:12,16 | 148:3,6,9,10,14 | **sufficiently** |
| 120:1,13,18 | 38:21,23 39:2 | 148:17,22 | 100:13 128:12 |
| 121:2,15,20,21 | 39:8 44:5,16 | 149:7 151:13 | **suggest**  118:12 |
| 121:24 122:4 | 54:23 55:25 | 151:16,20 | **suite**  3:19 |
| 122:10,20,25 | 56:6,15 57:14 | 152:16,18,23 | **summaries** |
| 123:13,15,25 | 57:22 58:2,6,7 | 153:5,10,14,21 | 136:3 |
| 124:1,10 | 58:10,11 59:1 | 153:24 154:2,5 | **summary** |
| 125:15,20 | 59:11 63:10 | 154:7,12,21 | 143:10 |
| 126:1,11,19,20 | 89:11,18 | 155:3,9,10,15 | **sunlight**  75:12 |
| 127:5,9,11,16 | 100:24 105:11 | 155:20 156:21 | **supplemental** |
| 127:18,25 | 105:13,23 | **study's**  56:21 | 56:7 |
| 128:1,7,12 | 106:9,13 | **studying** | **supply**  142:9 |
| 129:6,21 130:1 | 109:21,25 | 120:14 | **support**  85:1 |
| 130:12,15,18 | 110:4,20 112:8 | **subject**  38:20 | 85:17 94:9 |
| 130:21,24 | 112:11 114:11 | **subjects**  57:13 | 154:5,13,13 |
| 131:1,6,12,20 | 118:15 119:4 | 100:18 112:9 | **supports** |
| 131:22,24 | 120:7,17 121:1 | 114:7 115:23 | 152:16,24 |
| 132:7,12,13 | 121:14,24,25 | 120:9 146:16 | **supposed**  82:23 |
| 133:9,9 134:8 | 123:11,19 | 151:23 152:3,9 | |

[sure - think]                                              Page 39

| | | | |
|---|---|---|---|
| **sure**  14:2 15:3 | **take**  7:7 21:15 | **tells**  117:17 | 15:17 22:21 |
| 18:21 20:9,17 | 34:2 40:20 | **temporal**  80:6 | 32:3 34:17 |
| 22:20,24 40:23 | 80:8 139:15,23 | **temporality** | 48:22 77:22 |
| 41:17 57:1 | 139:24 149:8 | 46:21 106:6 | 91:3,7 93:24 |
| 69:8 79:1 | **taken**  1:18 7:10 | 113:24 122:1 | 97:20 98:14 |
| 119:20 147:3 | 15:7 45:2 | 123:8 124:16 | 105:25 153:9 |
| 153:13 154:1 | 48:12 50:22 | 149:21 150:2,7 | 153:13,23 |
| **surprise**  18:7 | 73:10 79:12 | 150:11,13 | 154:1 158:1 |
| **suspect**  43:11 | 94:20 128:24 | **ten**  19:19 20:14 | 159:7 160:9,17 |
| **suspected**  43:5 | 149:13 150:19 | 28:15 114:15 | 162:8 |
| **sweep**  124:12 | 159:8 | 116:17 | **tests**  33:3 |
| **sworn**  8:7 | **takes**  26:22 | **tended**  143:3 | **tetrachlorodi...** |
| 162:14 | 72:9 79:6 | 143:23 | 77:6 |
| **symptoms**  80:6 | 91:10 96:25 | **terminus**  3:18 | **text**  99:13 |
| **systematic** | 97:10 | **terms**  40:12 | 104:20,23 |
| 110:14 | **talk**  21:23 26:4 | 48:13 53:23 | 111:8 |
|  | **talked**  18:22 | 62:1,9,21 82:4 | **textual**  103:12 |
| **t** | 25:5 31:20 | 91:4,23 112:16 | **thank**  51:6 |
|  | **talking**  32:7 | **test**  33:6 60:16 | 129:15 134:19 |
| **t**  5:9 6:1 16:16 | 98:21 134:3 | 104:9 | 140:5 144:5 |
| 44:12,12 107:4 | 138:2 | **tested**  59:1 60:9 | 146:18 |
| 161:3,3 | **taught**  36:18 | 118:16 | **thanks**  8:23 |
| **tab**  14:20 26:9 | **tcdd**  71:25 72:2 | **testified**  8:7 | 38:7 |
| 78:14 82:11,18 | 77:5,12 | 10:23 15:22 | **theoretical** |
| 86:17 87:5,7 | **teach**  37:3 | 16:4 18:8 | 63:16 |
| 88:2,7,8 95:17 | **technologies** | 22:10 23:8 | **theory**  59:10 |
| 95:18,19 155:3 | 86:3 | 43:19 | **thing**  118:2 |
| **table**  63:7 67:5 | **tell**  31:19 48:17 | **testify**  20:1 | **things**  38:4 |
| 84:17,22 85:8 | 49:19 51:11 | 101:9,15,16 | **think**  10:22 |
| 85:12,14,23 | 60:11 99:19 | **testifying**  8:18 | 11:4 13:6 16:6 |
| 87:11,11,20 | 117:14,24 | 20:10,21 23:18 | 17:21 18:11 |
| 89:17,20 | 129:24 131:22 | **testimony**  5:12 | 19:22 21:8,11 |
| 110:10 111:7,9 | **telling**  51:13 | 8:21 10:13 | 21:20 23:8 |
| 133:24 151:5,7 | 72:14 | 13:24 14:4,8 | 25:17 28:23 |
| 155:18 | | | |

[think - training]                                          Page 40

| | | | |
|---|---|---|---|
| 29:6 34:22 | **throw** 123:18 | **times** 15:23,25 | **touch** 116:19 |
| 35:20 38:3 | **thursday** 1:12 | 16:3 17:1 18:8 | **towards** 29:11 |
| 39:11 41:13 | 1:18 7:2 | 18:15,20 36:7 | **toxic** 50:1 |
| 42:20 43:24 | **thyroid** 79:25 | 90:9 126:25 | 74:23 |
| 44:10 51:3,15 | 80:16 81:21 | 127:2 | **toxicological** |
| 54:7,14 55:5 | **time** 1:19 7:20 | **tired** 122:15 | 5:24 45:7 46:9 |
| 61:17 62:9,21 | 10:23 11:4,9 | **tissues** 35:13 | 47:19 95:4 |
| 76:11,14,22 | 11:14,20 12:19 | **titanic** 12:3 | 96:1 150:5 |
| 78:10,14 82:17 | 13:6,19 15:4 | **title** 89:7 | **toxicologist** |
| 86:5 91:9 94:1 | 15:10 17:17 | **today** 7:14 8:21 | 10:15 11:11 |
| 94:3 97:4 | 20:24 23:12 | 8:24 9:25 10:8 | 24:24 32:14 |
| 105:4 110:24 | 28:2,17 29:3 | 10:13 25:21 | 33:11 36:14 |
| 111:23 118:3 | 29:11,21 30:15 | 31:11 32:3,11 | 37:19 59:24 |
| 122:25 125:5 | 32:7,25 34:3 | 44:7 62:8 | 61:22 64:10 |
| 131:16 136:1 | 36:7 40:2 | 131:7 143:21 | **toxicologists** |
| 137:10 140:3 | 42:22 43:1,20 | 157:16,20 | 52:20 |
| 140:19 144:8 | 44:4,8,11,15 | 158:3 | **toxicology** |
| 146:14 155:13 | 57:12 59:14 | **today's** 157:25 | 10:16 32:16,17 |
| 157:15 | 63:20,21,24 | **together** | 32:19,22 34:4 |
| **third** 22:18 | 64:1,10,20 | 110:24 | 42:24 106:10 |
| 156:15 157:7 | 65:1,3,4 67:16 | **told** 35:24 | 106:11,15 |
| **thoroughly** | 67:17 68:19 | **tomorrow** | 108:3 |
| 60:6 72:20 | 70:15 73:6,13 | 157:17 | **toxin** 63:21 |
| **thought** 134:11 | 74:7 79:9,15 | **took** 51:10 68:3 | **trade** 5:16 |
| **three** 25:23 | 89:15,18,22 | 69:24 75:25 | 76:12 77:5 |
| 37:9 38:2 | 94:16,23 98:18 | **tool** 99:14 | 78:21 79:20 |
| 44:18 66:1 | 103:18 113:23 | **topic** 13:23 | 85:9 86:12 |
| 85:3,23 94:24 | 115:15 128:21 | 14:3,7 135:8 | 87:15 |
| 102:22 127:2 | 129:2 149:10 | **tori** 3:17 | **train** 134:11 |
| 133:13,21 | 149:16 150:16 | **total** 15:25 | **trained** 11:12 |
| 158:2 | 150:22 159:8 | 21:17,20 27:8 | 19:15 35:2,23 |
| **threshold** 60:4 | 160:18 | 28:2 31:2 | **training** 34:1,4 |
| 61:1 62:8,14 | **timeframe** | 158:1 | 36:12 37:14 |
| 62:20 63:12 | 160:8 | | 42:24 72:20 |

**[training - twisted]**                                                    Page 41

| | | | |
|---|---|---|---|
| 94:13 | 65:12,14 66:10 | 118:10 119:21 | **traurig** 3:16 |
| **trangle** 2:4 5:6 | 66:20 67:1 | 119:23 120:6 | **treat** 34:25 |
| 7:24,24 8:11 | 68:9,17 69:3 | 120:24 121:9 | 35:8,15 |
| 14:19 15:3,13 | 70:4,14,21 | 122:5,8,17,19 | **treatment** |
| 16:19,24 17:10 | 72:13 73:17,25 | 123:20,23 | 152:4 |
| 18:12,14 21:11 | 74:14 75:3,11 | 124:5,19 125:4 | **trend** 119:8 |
| 21:22 22:9 | 75:22 76:8,10 | 125:19,24 | 156:25 157:2 |
| 23:14 25:4,8 | 76:24 77:13,16 | 126:8,15,17 | **trends** 38:15 |
| 26:8,14,25 | 78:3,13,20 | 127:4,15 | 120:10 |
| 27:18,23,25 | 79:3,18 80:25 | 128:11,18 | **trial** 17:14 54:2 |
| 28:8,14 29:1,8 | 81:2,16,18 | 129:5,23 130:6 | 101:10 |
| 29:10,16,20 | 82:10,16 83:14 | 130:8 131:11 | **trials** 14:15 |
| 30:2,19 31:19 | 83:18 85:25 | 131:16,21 | **tried** 143:11 |
| 31:23,25 33:8 | 86:16,22 87:1 | 132:1,4,9,19,23 | **trimester** 37:6 |
| 33:19,21 34:16 | 88:1,8,13 | 133:15,17 | 37:7 |
| 35:17 37:7,10 | 90:18 91:15,17 | 134:2,16,19,21 | **trouble** 57:9 |
| 37:12,25 38:7 | 92:2 93:20 | 135:9,15,19,21 | **true** 123:14 |
| 38:10 39:6 | 94:14 95:2,7 | 137:19,23 | 155:23 157:4 |
| 40:24 41:1,9 | 95:13,16,18,21 | 138:10,12 | 159:7 162:8 |
| 41:22 42:9 | 97:3,12,16 | 139:10,12,22 | **try** 10:4 49:4 |
| 43:9,18 44:3 | 99:12,16 | 142:1,15 143:1 | 51:1 82:21 |
| 45:16 46:2,13 | 100:11,23 | 143:20 144:5,7 | 96:23 97:22 |
| 47:22 48:8,16 | 101:14,22 | 144:20 145:8 | 139:2 |
| 49:9,16,18 | 102:2,6,15,23 | 146:5,11 147:6 | **trying** 9:6 65:9 |
| 50:4 51:6,18 | 103:3,9,20,22 | 149:8,19 150:1 | 121:5 131:20 |
| 51:23 52:12 | 104:5,12,19 | 150:9,14,25 | 133:9,23 135:6 |
| 53:17 54:1,11 | 106:18 108:8 | 154:20 155:2,8 | **tumor** 67:21 |
| 55:13 56:4,13 | 108:15,18,24 | 157:15,21 | 93:4,4,9,9 |
| 56:19 57:1,3 | 109:4,10,17 | **transcript** 51:3 | 94:10 |
| 57:19 58:14 | 112:13 113:3 | 51:4 133:14 | **turn** 92:10 |
| 59:4,18 60:2 | 113:10,12 | 159:7 160:6,19 | **twice** 32:23 |
| 60:24 61:15 | 114:22 115:6 | 162:5,8 | 50:17 51:1 |
| 62:6,17 63:3 | 115:13 116:1,7 | **transcript's** | **twisted** 115:20 |
| 63:18 64:7,15 | 116:9,22 117:8 | 133:7 | |

**[two - vanaskie]** Page 42

two 17:14
25:22 28:9
34:12 42:2
65:25 71:10
73:14 84:12,20
85:13,17 86:13
94:17 111:22
114:18 117:3,4
130:12
twofold 13:25
type 5:4 49:5
50:24 57:12
58:8 89:6,16
109:21,25
112:19,19
114:8 148:21
types 5:17 47:2
52:7 76:18
78:22 79:22
80:14
typically 16:17

**u**

u.s. 93:22 94:1
94:9 95:4
98:15 99:20
133:5,19
ug 62:9,18,21
unable 32:21
uncle 26:3
unclear 137:2
under 20:4
21:1,2 28:1
58:12 72:5

79:23 110:17
116:24 123:1,2
124:12 143:4
143:25
underemphas...
110:6
underlined
152:2
underlying
74:8
understand
10:8 22:24
35:5 38:19
41:6 56:25
64:25 66:5
76:6 91:6,13
101:24 115:16
121:5 122:16
122:24 146:17
154:25
understanding
53:23 69:23
102:20 107:8
unfortunately
19:9 24:25
130:21
united 1:1 7:12
86:3
universe 55:16
125:25
university
36:16
unreliable 84:5

upper 75:1
use 36:13 37:18
52:20 76:3,3
83:5 94:4
101:7 110:3,6
128:8
used 71:1 92:7
110:1,2 116:15
157:2 158:2
160:19
uses 94:1 110:8
using 100:14
128:4,6
usually 80:8
uv 75:13,14
124:23 125:6

**v**

v 160:4 161:1
162:1
valid 107:7
143:17
valsartan 1:6
7:10 40:13,15
40:20 41:3,11
41:24 42:3
43:11,12 44:19
45:2 47:8,25
48:18 49:12,20
53:9 54:3 59:6
59:11,13 60:4
61:17 62:9,21
65:25 66:4,16
67:20,24 68:3

68:24,25 69:5
69:10,24 71:10
73:5,22 76:1,4
90:24 92:4
100:1 102:8,17
102:21 105:24
107:21 112:8
112:10,24
113:5,8,14
114:2,6,18,25
115:17 117:1,4
118:5 119:13
120:2,12,17
121:24 122:4
122:11 123:13
123:15 124:22
125:7 127:10
130:14 138:23
145:11,15,24
146:20 147:15
147:21 148:4,7
148:12 153:7
154:9 160:4
161:1 162:1
valsartan's
39:14
value 27:21
90:14 114:5
119:25 120:1
128:6
values 157:10
vanaskie 50:23
51:13

[variable - witness]                                                        Page 43

| | | | |
|---|---|---|---|
| **variable**  138:20 | **videographer** | **wanted**  78:25 | **weighted** |
| 139:2,3 144:14 | 4:12 7:1,17 | **wants**  51:25 | 105:10,19 |
| 144:23 | 15:4,10 73:6 | 103:18 | 123:10 128:8 |
| **variants**  138:21 | 73:13 79:9,15 | **warning**  40:9 | **weird**  126:11 |
| **variation** | 94:16,23 | 50:24 | **went**  33:14,25 |
| 144:17 | 128:21 129:2 | **washington** | 134:2 |
| **varies**  52:3 | 149:10,16 | 2:17 3:8 | **west**  83:19,22 |
| 74:7 100:16 | 150:16,22 | **way**  9:7 72:21 | **widely**  110:12 |
| **various**  49:4 | 157:23 | 84:7 | **wife**  8:1 32:25 |
| 53:24 63:9 | **vinyl**  50:11 | **we've**  18:22 | **wife's**  29:7 |
| **vary**  52:6 | 52:5 72:24 | 36:7 78:23 | **wild**  125:13 |
| 121:19 | 81:6 | 137:20 | 126:4 127:11 |
| **vast**  16:11 | **virtually**  7:4 | **weak**  111:20,22 | **william**  1:11,14 |
| **vaughn**  3:3 | 30:3 | 114:19 120:17 | 7:9 8:5,15 |
| **verbatim** | **vl**  3:21 | 124:13 | 158:1 160:5 |
| 136:15 | **volume**  1:25 | **weakness**  58:7 | 161:2,24 162:2 |
| **verify**  160:9 | **vosburg**  82:8 | 138:22 139:9 | 162:4,12 |
| **veritext**  7:17,18 | | **weaknesses** | **window**  46:9 |
| 31:22 158:3 | **w** | 57:11 120:16 | 46:14 82:18 |
| 160:14,23 | | 127:24 128:8 | **windows**  9:7 |
| **veritext.com** | **wait**  145:20 | **website**  33:10 | **wise**  12:12 |
| 160:15 | **want**  8:17 | 83:11 | 19:12 |
| **versus**  48:14 | 21:15,15,15,18 | **week**  32:25 | **wish**  43:25 |
| 52:5 60:13 | 22:3,23 25:9 | **weighed**  124:17 | 135:3 |
| 82:8 86:3 | 26:4 27:22 | 127:8 | **wishes**  134:22 |
| 112:19 143:15 | 51:23,24 56:9 | **weight**  45:24 | **withdrawing** |
| 154:8 | 71:25 83:12 | 58:10,15,23 | 133:12,20 |
| **vice**  33:15 | 87:10 92:10 | 59:2,19 61:13 | **withdrawn** |
| **vicinage**  7:13 | 96:22 113:9 | 64:13 105:5 | 135:14 |
| **victoria**  3:17 | 118:2 127:2 | 106:20,21,22 | **witness**  5:3 |
| **video**  7:6,9 | 132:2,3 135:9 | 107:1 111:25 | 10:24 11:9 |
| 51:5 | 136:15 140:1 | 121:1,11 | 14:16 15:22 |
| **video's**  38:3 | 145:20 149:8 | 125:12 | 16:14,20 17:5 |
| | 150:15 151:4 | | 18:11 22:1,6 |
| | 157:17,19 | | |

[witness - years]                                                          Page 44

| | | | |
|---|---|---|---|
| 23:11 24:23 | 101:19,23 | 17:6,11,22 | **wrote** 87:16 |
| 27:16,19 28:6 | 102:3,12,20,24 | 19:13,21,24 | 92:15 93:3,5,8 |
| 28:20 29:5,14 | 103:7 106:4 | 20:6,15,21,23 | 93:21 146:4 |
| 29:17,24 31:21 | 108:2,22 109:2 | 21:5 22:12,21 | **wtc** 80:12 86:2 |
| 33:5 34:10 | 109:15 112:4 | 23:2 24:2,8,14 | 86:8 90:20 |
| 35:12 37:5,8 | 113:2,7 114:4 | 25:11,20 27:2 | **x** |
| 38:5 39:4 | 115:3,11,19 | 32:4,24 34:11 | **x** 5:1,9 6:1 |
| 40:22 41:6 | 116:14 117:3 | 42:19 45:6 | **y** |
| 42:2 43:5,15 | 118:8 120:4,7 | 129:20 | **y** 16:16 |
| 43:24 45:12,22 | 120:22 121:5 | **worked** 13:6 | **yeah** 8:25 9:6 |
| 46:8 47:11 | 121:18 122:14 | 27:5,9 34:5 | 19:9,17 26:20 |
| 48:3,23 49:14 | 123:6 124:8 | 40:1,4 110:24 | 31:1 40:24 |
| 49:23 51:14 | 125:1,10 126:4 | 131:4 | 51:6 78:15 |
| 52:2 53:12,22 | 126:10 127:1,5 | **working** 10:23 | 83:1,6 88:25 |
| 54:6 56:2,9,17 | 127:21 128:16 | 12:9,15,18,19 | 95:24 96:13,15 |
| 56:24 57:8 | 129:19 130:5 | 12:25 17:13 | 96:23 97:12 |
| 58:4,25 59:10 | 131:9,14 | 30:9 31:6 | 108:3,3 111:10 |
| 59:22 61:9,12 | 132:21 135:17 | 32:25 44:7 | 111:14 116:5 |
| 61:20 62:12,25 | 138:3,5,7 | 45:18 110:21 | 127:1 137:3,25 |
| 63:15 64:5,12 | 139:8 141:23 | 111:3,12 | 148:6 152:21 |
| 65:9 66:8 68:6 | 142:7,20 143:6 | 142:13,17 | 157:19 |
| 68:14,23 70:11 | 144:2,13 145:5 | 155:11 | **year** 12:22,24 |
| 70:19 71:20 | 146:8 147:3,19 | **world** 5:16 | 13:3 17:14 |
| 72:19 73:22 | 149:5,24 150:4 | 76:12 77:4 | 22:11,14 23:7 |
| 74:6,21 75:7 | 154:17,25 | 78:21 79:20 | 23:7,20 24:3 |
| 75:17 76:6,20 | 160:8,10,12,18 | 85:9 86:12 | 32:24 37:6 |
| 77:11,23 78:9 | **word** 53:22 | 87:14 120:14 | 66:4,6 68:11 |
| 80:22 81:14 | 98:25 99:7 | **worldwide** | 68:24 73:20 |
| 83:15 85:21 | 113:8 | 126:13 | 76:15 84:20 |
| 86:11 88:7,10 | **words** 78:10 | **write** 105:4 | 86:13 116:10 |
| 90:12 91:13,21 | 91:24 117:20 | 151:23 | 116:15 |
| 93:18 94:12 | **work** 11:15,21 | **written** 143:7 | **years** 11:6,7,10 |
| 95:15 97:8,14 | 12:5,9 16:11 | **wrong** 87:5 | 12:8 13:11 |
| 100:9,16 | 16:15,21 17:2 | 130:15 | |

[years - zurbenko]                                                    Page 45

| | |
|---|---|
| 14:6,16 15:18 | 9:25 10:5 |
| 15:23 16:12,16 | 155:19,19 |
| 17:3,12,18,23 | **zurbenko**   5:23 |
| 18:9,16 19:11 | 87:16 88:16 |
| 19:19 20:14,19 | |
| 21:5 23:5,24 | |
| 24:6 34:12 | |
| 36:23 41:13,18 | |
| 66:2,3 68:1,15 | |
| 68:18 70:24 | |
| 74:3,17 76:22 | |
| 80:1,8,14 81:5 | |
| 81:11 84:13 | |
| 85:14,18 89:6 | |
| 89:11,14,22,23 | |
| 94:12 113:22 | |
| 114:15,15 | |
| 116:17,17 | |

**yesterday**
108:9

**york**   2:7,7
32:16 72:22

**z**

**zantac**   23:16
**zero**   67:14
**zhang**   6:6
151:14,16
155:15
**zhejiang**   160:4
161:1 162:1
**zhp**   7:24 10:10
**zoom**   1:18 8:17
8:24 9:16,20

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.