# **EXHIBIT B**

VICTORIA CHERNYAK, MD, MS

Page 1

```
 1          UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
 2                CAMDEN VICINAGE
 3                  -   -   -
 4
      IN RE: VALSARTAN,       :  MDL No. 2875
 5    LOSARTAN, AND           :
      IRBESARTAN PRODUCTS      :
 6    LIABILITY LITIGATION     :
      _____ :
 7    THIS DOCUMENT RELATES    :
      TO:                      :
 8    Gaston Roberts et al.    :
      v. Zhejiang Huahai       :
 9    Pharmaceutical Co., et   :
      al.                      :
10                            :
      Case No.                 :
11    1:20-cv-00946-RMB-SAK    :
12
                    -   -   -
13
                  May 5, 2025
14
                    -   -   -
15
                Remote videotape expert
16    deposition of VICTORIA CHERNYAK, MD, MS,
      taken pursuant to notice, was conducted
17    at the location of the witness in New
      York, New York, beginning at 9:02 a.m.,
18    on the above date, before Kimberly A.
      Cahill, a Federally Approved Registered
19    Merit Reporter and Notary Public.
20
                    -   -   -
21
22
23
24
```

VICTORIA CHERNYAK, MD, MS

```
 1  APPEARANCES:
 2
 3  NIGH GOLDENBERG RASO & VAUGHN, PLLC
      BY:  C. BRETT VAUGHN, ESQUIRE
 4  BY:  DANIEL A. NIGH, ESQUIRE
      BY:  KATHRYN AVILA, ESQUIRE
 5  14 Ridge Square NW
      Third Floor
 6  Washington, D.C.  20016
      (202) 792-7927
 7  bvaughn@nighgoldenberg.com
      dnigh@nighgoldenberg.com
 8  kavila@nighgoldenberg.com
      Representing the Plaintiffs
 9
10  KIRKLAND & ELLIS, LLP
      BY:  NINA ROSE, ESQUIRE
11  1301 Pennsylvania Avenue, N.W.
      Washington, D.C.  20004
12  (202) 389-3394
      nina.rose@kirkland.com
13  Representing the Defendant, Zhejiang
      Huahai Pharmaceutical Co., Ltd.
14
15  KIRKLAND & ELLIS, LLP
      BY:  AUDREY ASPEGREN, ESQUIRE
16  601 Lexington Avenue
      New York, New York  10022
17  (212) 446-4800
      audrey.aspegren@kirkland.com
18  Representing the Defendant, Zhejiang
      Huahai Pharmaceutical Co., Ltd.
19
20  VIDEOTAPE TECHNICIAN:
      William Geigert
21
    ALSO PRESENT:
22    Stephanie Iken
      Nigh Goldenberg Raso & Vaughn,
23    PLLC
24        - - -
```

```
 1      and 4 Observations:
          Improved
 2        Categorization to
          Indicate the Risk
 3        of Hepatic
          Malignancy"
 4
    Chernyak-6   2023 Article by     107
 5        Chernyak, et al,
          "LI-RADS: Looking
 6        Back, Looking
          Forward"
 7
    Chernyak-7   Review Article by   156
 8        Chernyak, et al,
          "Liver Imaging
 9        Reporting and Data
          System (LI-RADS)
10        Version 2018:
          Imaging of
11        Hepatocellular
          Carcinoma
12        in At-Risk
          Patients"
13
    Chernyak-8   CT/MRI LI-RADS      219
14        v2018 CORE Document
15  Chernyak-9   2016 CT Images of   255
          the Abdomen
16
17
18
19
20
21
22
23
24
```

```
 1            - - -
 2         I N D E X
 3            - - -
 4
 5  Testimony of:  VICTORIA CHERNYAK, MD, MS
 6  By Attorney Vaughn        7
      By Attorney Rose      261
 7  By Attorney Vaughn      266
 8
 9            - - -
       E X H I B I T S
10
              - - -
11
12  NO.       DESCRIPTION      PAGE
13
      Chernyak-1   4/24/25 Invoice of  12
14        Victoria Chernyak,
          MD, MS
15
      Chernyak-2   Expert Report of   18
16        Victoria Chernyak,
          MD, MS
17
      Chernyak-3   4/8/16 Report of   34
18        Ultrasound for
          Gaston J. Roberts
19
      Chernyak-4   4/19/16 Report of  38
20        CT Abdomen WO/W
          Contrast for Gaston
21        J. Roberts
22  Chernyak-5   2020 Article by     90
          Kim, et al, "MRI
23        Ancillary Features
          for
24        LI-RADS Category 3
```

```
 1            - - -
 2      DEPOSITION SUPPORT INDEX
 3            - - -
 4
 5  Direction to Witness Not to Answer
 6  Page Line    Page Line    Page Line
 7
 8  Request for Production of Documents
 9  Page Line    Page Line    Page Line
10
11
      Stipulations
12
      Page Line    Page Line    Page Line
13
14
15  Question Marked
16  Page Line    Page Line    Page Line
17
18
19
20
21
22
23
24
```

VICTORIA CHERNYAK, MD, MS

Page 6

1           - - -
2           THE VIDEO TECHNICIAN: Good
3 morning. We are now on the
4 record. My name is Bill Geigert.
5 I'm a videographer for Golkow, a
6 Veritext Division. Today's date
7 is May 5th, 2025 and the time is
8 9:02 a.m.
9           This remote video deposition
10 is being held in the matter of
11 Valsartan, Losartan, and
12 Irbesartan Products Liability
13 Litigation for the United States
14 District Court for the District of
15 New Jersey. The deponent is Dr.
16 Victoria Chernyak.
17           All parties to this
18 deposition are appearing remotely
19 and have agreed to the witness
20 being sworn in remotely. Due to
21 the nature of remote reporting,
22 please pause briefly before
23 speaking to ensure all parties are
24 heard completely.

Page 7

1           All counsel will be noted on
2 the stenographic record. The
3 court reporter is Kim Cahill and
4 she will now swear in the witness.
5           - - -
6           VICTORIA CHERNYAK, MD, MS,
7 after having been duly sworn, was
8 examined and testified as follows:
9           - - -
10           EXAMINATION
11           - - -
12 BY ATTORNEY VAUGHN:
13    Q.   Dr. Chernyak, have you ever
14 been deposed before?
15    A.   Yes.
16    Q.   In what matters have you
17 been deposed before?
18    A.   I was named in a malpractice
19 lawsuit, so I was deposed during that.
20    Q.   Have you ever served as an
21 expert witness before?
22    A.   No, sir.
23    Q.   Just some base rules you
24 probably know from your prior deposition.

Page 8

1 We'll try not to talk over each other so
2 that the court reporter can get a clean
3 transcript.
4           Does that make sense?
5    A.   Yes, sir.
6    Q.   I'll do my best not to
7 interrupt you when you're answering. We
8 are on Zoom and if, you know, there's a
9 break in your cadence, I might
10 accidentally interrupt you. I apologize
11 if I do. I'll let you finish your
12 answer.
13           Like you just did, you know,
14 give yes or no answers or full answers as
15 opposed to nodding or shaking your head
16 so the court reporter can get a
17 transcript.
18           Does that make sense?
19    A.   Yes, sir.
20    Q.   And then when I ask
21 questions, like they were saying, pause
22 for a second before you answer so that
23 Nina has a chance to launch her
24 objections.

Page 9

1           Does that make sense?
2    A.   Yes.
3    Q.   And then I typically take
4 breaks every hour or so. I drink coffee.
5 It looks like you are as well. So if you
6 ever need a break, let me know. As long
7 as we're not, like, in mid-question or
8 right with a document, we'll take a break
9 probably right then or as soon as I
10 finish my line of questioning.
11           Okay?
12    A.   Yes.
13    Q.   Did you bring any notes with
14 you today?
15    A.   In electronic form.
16    Q.   What notes did you bring
17 with you in electronic form?
18    A.   I brought a copy of my
19 report and copy of my exhibits.
20    Q.   Are there actual notes on
21 your report or is it just a printed copy
22 of your report and exhibits?
23    A.   Printed a copy -- well, not
24 printed, just --

3 (Pages 6 - 9)

VICTORIA CHERNYAK, MD, MS

Page 10

1    Q.    An electronic copy.
2    A.    Yes.
3    Q.    I'm sorry.  I didn't mean to
4  talk over you just then.
5          Do you have any programs
6  open on your computer besides the Zoom
7  and whatever you're using to view those
8  documents?
9    A.    I have a browser open with a
10  link to the remote files where the files
11  will be dropped if we need them.
12    Q.    Understood.  You don't have
13  any messaging programs open; correct?
14    A.    No.
15    Q.    Is there anyone else in the
16  room with you?
17    A.    No humans.
18    Q.    Is there a cat?
19    A.    There's a dog.  I apologize
20  if she starts snoring.
21    Q.    I do not want to know any
22  conversations you had with your
23  attorneys, but did you prep with the
24  attorneys before today?

Page 11

1    A.    Yes.
2    Q.    And approximately how many
3  days did you prepare with the attorneys
4  for this deposition?
5          ATTORNEY ROSE:  Object to
6      the form.
7          ATTORNEY VAUGHN:  Let me
8      reask -- let me reask that.  I'm
9      sorry.
10  BY ATTORNEY VAUGHN:
11    Q.    Approximately how many
12  different times did you prepare with the
13  attorneys today for this deposition?
14    A.    Four or five.
15    Q.    And approximately how many
16  hours in total did you prepare with the
17  attorneys for this deposition?
18    A.    I have it written down.
19  Maybe like six or seven hours?
20    Q.    Okay.
21    A.    Maybe less.  I have to look
22  it up on my notes.
23    Q.    And which attorneys were
24  present in your preparation?

Page 12

1    A.    Ms. Rose and one of her
2  associates whose name I don't remember.
3    Q.    Prior to being retained for
4  this litigation, were you familiar with
5  the substance N-nitrosodimethylamine,
6  which is also abbreviated NDMA?
7    A.    No.
8    Q.    Have you made yourself
9  familiar with that substance in the
10  course of this litigation?
11    A.    No.
12          ATTORNEY VAUGHN:  Kathryn,
13      can we drop the invoice in for
14      Exhibit 1?
15              - - -
16          (Deposition Exhibit No.
17      Chernyak-1, 4/24/25 Invoice of
18      Victoria Chernyak, MD, MS, was
19      marked for identification.)
20              - - -
21          THE WITNESS:  Refresh now?
22          ATTORNEY AVILA:  Yes, it
23      should be in there now.
24          ATTORNEY VAUGHN:  And I'm

Page 13

1      going to screen-share as well, but
2      feel free at any time to pull the
3      documents up yourself to look
4      through them.
5  BY ATTORNEY VAUGHN:
6    Q.    And is what I'm sharing, is
7  this the invoice that you produced for
8  your Notice of Deposition?
9    A.    Yes, sir.
10    Q.    And was there a reason you
11  didn't start reviewing materials for your
12  report until 3/27/2025?
13    A.    Yes.  I was away at a
14  conference, so I told the counsel right
15  had away I won't be able to do anything
16  until the conference is done.
17    Q.    And 4/8/25 is when you
18  finalized your report?
19    A.    Yes, sir.
20    Q.    So would you say you started
21  working on your report 3/27/25?
22    A.    That's when I started
23  reviewing the materials.
24    Q.    So in total, would you say

4 (Pages 10 - 13)

VICTORIA CHERNYAK, MD, MS

Page 14

1 that you spent 9.75 hours on your actual
2 report?
3      A.    Whatever that number comes
4 out to be, yes -- 1, 2, 3, 4, 5, 6, 7 --
5 yep.
6      Q.    Okay.
7      A.    10 -- 10.25.
8      Q.    You started with reviewing
9 materials; correct?
10     A.    Yes.
11     Q.    What materials did you
12 review?
13     A.    I reviewed the CT and MR
14 from 2016 and 2018, respectively.  I've
15 reviewed the Dr. Mele and Dr. Siddiqui's
16 reports, and I've referenced any
17 additional imaging that was relevant --
18 that I found relevant at the time of
19 review.
20     Q.    And you didn't review any of
21 the general causation expert reports;
22 correct?
23        ATTORNEY ROSE:  Object to
24     the form.

Page 15

1        THE WITNESS:  I didn't -- I
2     didn't review what?
3        ATTORNEY VAUGHN:  Any
4     general causation expert reports?
5        THE WITNESS:  I'm not sure
6     what that is.
7 BY ATTORNEY VAUGHN:
8      Q.    The only two expert reports
9 you reviewed were Dr. Siddiqui's and Dr.
10 Mele's; correct?
11     A.    Those are the two reports
12 that I referenced in detail.
13     Q.    Are you aware if any defense
14 experts relied on your expert report?
15     A.    Can you ask that -- can you
16 say that one more time?
17     Q.    Are you aware if any of the
18 defense experts relied on your expert
19 report?
20     A.    No.
21     Q.    Do you know who Dr. Mohmed
22 is?
23        ATTORNEY ROSE:  Object to
24     the form.

Page 16

1        THE WITNESS:  I think that's
2     the hepatologist?
3 BY ATTORNEY VAUGHN:
4      Q.    Have you ever talked to Dr.
5 Mohmed?
6      A.    No.
7      Q.    Did you review any medical
8 records specific to Mr. Roberts outside
9 of his scans?
10     A.    Outside of his scans, I -- I
11 think there was a link to them, but I
12 didn't review them.
13     Q.    Do you know Mr. Roberts'
14 past medical history?
15     A.    Only as it pertains to the
16 CT and MR that I've reviewed.
17     Q.    And so what past medical
18 history are you aware of based on that?
19     A.    I believe he had fatty liver
20 disease.
21     Q.    And is that all you're aware
22 of?
23     A.    Yes.
24     Q.    Did you do a literature

Page 17

1 review?
2      A.    In my life, yes, many times.
3      Q.    As part of this expert
4 report, did you do a literature review?
5      A.    I -- yes.
6      Q.    Can you describe your
7 literature review?
8      A.    It's -- what specific --
9 like, can you just make it more -- like,
10 what -- there's a PubMed.  A lot of
11 literature that I cited, I've read many
12 times and have cited in many of my works,
13 so I knew what I was looking for, so I
14 would go into PubMed for most of the
15 cited papers.
16        I knew the -- either the
17 name of the papers, the main authors, I
18 would go into PubMed, put that in, find
19 the relevant article that I needed,
20 provide -- provide a citation.
21     Q.    Did you have to re-review
22 what you felt like were relevant articles
23 or were you already familiar with them?
24        ATTORNEY ROSE:  Object to

5 (Pages 14 - 17)

VICTORIA CHERNYAK, MD, MS

Page 18

1    the form.
2        THE WITNESS:  I was very
3    familiar with most of them and if
4    I needed specific numbers, precise
5    numbers, then I reviewed them.
6        ATTORNEY VAUGHN:  Will you
7    drop her expert report in next,
8    Kathryn?  This will be Exhibit 2.
9            - - -
10       (Deposition Exhibit No.
11   Chernyak-2, Expert Report of
12   Victoria Chernyak, MD, MS, was
13   marked for identification.)
14           - - -
15       ATTORNEY AVILA:  Yes, it
16   should be in there now.
17   BY ATTORNEY VAUGHN:
18       Q.   And is this your expert
19   report, Dr. Chernyak?
20       A.   Yes, sir.
21       Q.   83 pages total counting your
22   exhibits?
23       A.   Yes.
24       ATTORNEY ROSE:  Mr. Vaughn,

Page 19

1    I just want to confirm with the
2    witness that she has the full
3    exhibit in the exhibit share and
4    not just what you're showing on
5    your screen.
6        ATTORNEY VAUGHN:  Not a
7    problem.  I think she has it
8    printed, too.
9        THE WITNESS:  I do.  It's my
10   report and -- and there is my
11   C.V., which probably takes up most
12   of the 83 pages, and it's my
13   exhibit -- I'll get there --
14   Exhibit B are the images and
15   Exhibit C are -- and D -- yep, I
16   have it all.
17   BY ATTORNEY VAUGHN:
18       Q.   And before we start going
19   through all of your expert report, are
20   there any corrections you would like to
21   make to your expert report, any errors?
22       A.   Yes.  There was a typo with
23   a date of CT.  I said it was April 8,
24   2016.  It's actually April 19th.

Page 20

1        Q.   Can you point me to -- is
2    that on page 3 we're talking about?
3        A.   That is on page -- the pages
4    are not numbered.  Under section B, it
5    says review of imaging examination.
6        Q.   (Indicating.)
7        A.   That's it, yep.
8        Q.   Right here, so this was the
9    first mistake?
10       A.   Yep.
11       ATTORNEY ROSE:  Object to
12   the form.
13   BY ATTORNEY VAUGHN:
14       Q.   And is this a mistake again
15   where you have this date here, April 8,
16   2016 is the wrong date again?
17       A.   A typographical mistake,
18   yes.
19       Q.   Does this mistake appear
20   throughout your report or is it just
21   right here twice?
22       A.   Wherever the date was that's
23   the date that --
24       Q.   Okay.

Page 21

1        A.   Wherever I mention specific
2    date.  I think in some places I just say
3    April 2016, so that's correct, but the
4    number 8 is incorrect.  It's the 19th.
5        Q.   And what caused you to get
6    the date wrong?
7        A.   I think I have dyslexia to
8    numbers, so sometimes I mix them up.
9        Q.   So was it supposed to be
10   8/4/2016?
11       A.   It was supposed to be April
12   19th, 2016.  So I -- I don't remember the
13   numbers very well, so I probably looked
14   -- glanced at a different date.
15       Q.   Is there any other studies
16   that were done on this date, April 8th,
17   2016, to your recollection?
18       A.   The ultrasound, ultrasound.
19       Q.   And did you review the
20   ultrasound?
21       A.   I did.
22       Q.   Is there a reason you don't
23   discuss the ultrasound anywhere in your
24   expert report?

6 (Pages 18 - 21)

VICTORIA CHERNYAK, MD, MS

Page 22

1    A.    It was not contributory to
2 my opinion.
3    Q.    What do you mean by that?
4    A.    It -- the opinions that I've
5 provided are based on CT and ultrasound
6 didn't add or added those opinions or --
7 it was not relevant to my opinion.
8    Q.    Did the ultrasound go
9 against your opinion?
10    A.    No.
11    Q.    Is there any other errors
12 that you notice in your expert report?
13    A.    No, sir.
14    Q.    When did you last review
15 your expert report?
16    A.    This morning.
17    Q.    Did Mr. Roberts undergo an
18 MRI in April of 2016?
19    A.    Yes, he did undergo MRI in
20 April 2016.
21    Q.    He did?
22    A.    I'm sorry.  August '16.
23    Q.    Can you tell me about that
24 MRI he underwent in 2016?

Page 23

1    A.    It was a standard multiphase
2 MRI with a standard protocol which is
3 utilized for assessment of multiple
4 abdominal pathologies, but in this case
5 specifically was done to evaluate liver
6 lesions which were noted on the CT that
7 was done a few days -- within the week of
8 that MRI.
9         What -- how much more
10 details do you want me to go into?
11    Q.    An MRI gives better imaging
12 than a CT; correct?
13    A.    No.  It's -- well, it's not
14 a yes or no question.  It depends on
15 which -- it depends on really multiple
16 factors, including what pathology we're
17 looking at, patient factors, lesion
18 location.
19         So it's -- for some
20 situation, the answer is yes.  For some
21 situation, the answer is no.
22    Q.    Does an MRI have a higher
23 specificity of diagnosing cancer than a
24 CT?

Page 24

1    A.    That is not a categorical
2 correct statement.  So, again, as I
3 mentioned, it depends on the type of
4 cancer.  It depends on the type of
5 patient.  For some cancers, generally,
6 the statement is yes.  For some cancers,
7 generally, the statement is no.
8         Also, a lot of patient
9 factors, right, if the patient -- if the
10 patient cannot hold still and cannot
11 comply with a quiet breath holding, then
12 generally MRI will be far less diagnostic
13 than a well-conformed CT.
14    Q.    Would you agree that this
15 2016 MRI was important to your expert
16 opinion?
17    A.    2000 --
18         ATTORNEY ROSE:  Object to
19    the form.  Mr. Vaughn, clearly
20    that there is a typographical
21    error here that I think --
22         ATTORNEY VAUGHN:  Excuse me.
23         ATTORNEY ROSE:  Okay.
24         THE WITNESS:  Okay.

Page 25

1         ATTORNEY VAUGHN:  No more
2    speaking objections in this.  I've
3    made it very clear on my
4    questions.  Do not coach your
5    witness.
6         THE WITNESS:  It was an --
7    okay -- typographical error --
8         ATTORNEY VAUGHN:  Now you're
9    saying typographical error after
10    your attorney said it's a
11    typographical error.
12         THE WITNESS:  However the
13    lesion's -- however's the lesion's
14    present on April -- okay.  It was
15    supposed to be CT --
16 BY ATTORNEY VAUGHN:
17    Q.    What's supposed to be CT?
18    A.    Instead of MRI, it's
19 supposed to be CT.
20    Q.    So this is another error in
21 your expert report?
22    A.    Another error --
23 typographical error, yes.
24    Q.    Were you in a rush when you

7 (Pages 22 - 25)

VICTORIA CHERNYAK, MD, MS

Page 26

1  were doing your expert report?
2      A.   No.
3      Q.   And so you haven't talked to
4  Dr. Mohmed.  Right?
5      A.   No.
6      Q.   Did you let Dr. Mohmed know
7  there wasn't actually a CT in 2016, like
8  you say in your expert report?
9          ATTORNEY ROSE:  Object to
10     the form and this is becoming
11     harassing.
12         THE WITNESS:  I mean, I --
13     there is an entire -- part of my
14     report talks about 2016 CT.  Part
15     of my report talks about MRI.  So
16     --
17 BY ATTORNEY VAUGHN:
18     Q.   Part of your report says the
19 CT was on the wrong date and part of your
20 report calls the CT an MRI; correct?
21         ATTORNEY ROSE:  Object to
22     the form.
23         THE WITNESS:  We already
24     discussed this.  I made a mistake

Page 27

1      in the date.
2  BY ATTORNEY VAUGHN:
3      Q.   And on the type of imaging
4  that was done.  Right?
5          ATTORNEY ROSE:  Object to
6      the form.
7          THE WITNESS:  In one
8      sentence.
9  BY ATTORNEY VAUGHN:
10     Q.   And these are the materials
11 that you considered for your expert
12 report?
13     A.   Yes.
14     Q.   And you're the author of one
15 of these articles.  Right?
16     A.   Yes.
17     Q.   And you author a lot of
18 articles on LI-RADS?
19     A.   LI-RADS, yes.
20     Q.   LI-RADS.  Thank you.
21     That's the only study of
22 yours or literature on LI-RADS that you
23 considered?
24     A.   The paper that says Lee,

Page 28

1  Sunyoung, percentages, I am one of the
2  authors on that paper.
3      Q.   Where's that at -- right
4  down here?
5      A.   Yep.
6      Q.   Okay.  And have you
7  published other literature on LI-RADS?
8      A.   Yes.
9      Q.   And is that literature
10 consistent with your opinions in this
11 report?
12     A.   Yes.
13     Q.   And you reviewed these
14 deposition transcripts, Dr. Hooks and Dr.
15 Lockhart?
16     A.   Briefly, yes.
17     Q.   And you didn't review any
18 pharmacy records for Mr. Roberts, did
19 you?
20     A.   No.
21     Q.   Do you have any idea of the
22 total amount of NDMA he was exposed to?
23     A.   No.
24         ATTORNEY ROSE:  Object to

Page 29

1      the form.
2          THE WITNESS:  No.
3  BY ATTORNEY VAUGHN:
4      Q.   Is the earliest imaging you
5  reviewed 2016?
6      A.   Yes.
7      Q.   Do you know if Mr. Roberts
8  had HIV?
9      A.   No.
10     Q.   Do you know if Mr. Roberts
11 had hep B?
12     A.   My understanding is, no,
13 that was not mentioned.
14     Q.   In your opinion, did Mr.
15 Roberts have cirrhosis?
16     A.   On which date?
17     Q.   2016.
18     A.   Yes.
19     Q.   Do you believe that Mr.
20 Roberts had significant cirrhosis as of
21 2016?
22     A.   Significant cirrhosis is not
23 a medical term, so I'm not sure how to
24 answer that question.

8 (Pages 26 - 29)

VICTORIA CHERNYAK, MD, MS

Page 30

1    Q.   Do you believe that Mr.
2  Roberts had advanced cirrhosis in 2016?
3    A.   Mr. Roberts had imaging
4  features of cirrhosis which were
5  detectable by CT.  He also had evidence
6  of portal hypertension, so he -- his
7  cirrhosis was enough to cause portal
8  hypertension.
9    Q.   And you say he has features
10 of cirrhosis.  As a radiologist, do you
11 make the actual diagnosis of cirrhosis?
12   A.   I -- as a radiologist, we
13 provide things like -- statements like
14 morphologic features consistent with
15 cirrhosis.
16   Q.   And then who makes the
17 actual diagnosis of cirrhosis?
18   A.   It -- you know, clinical
19 picture.  Sometimes patients get
20 biopsies.  Sometimes this is enough to
21 make the diagnosis.
22   Q.   Did any of Mr. Roberts'
23 treaters diagnose him with cirrhosis, if
24 you know?

Page 31

1    A.   I'm not sure.
2    Q.   So you didn't look through
3  the medical records to see if his actual
4  treating physicians didn't or did
5  diagnose him with cirrhosis?
6        ATTORNEY ROSE:  Object to
7    the form.
8        THE WITNESS:  That was not
9    relevant to what I was asked to
10   do, so I focused on things that
11   were relevant to what I was -- the
12   opinion that I was provide -- was
13   asked to provide.
14 BY ATTORNEY VAUGHN:
15   Q.   And so it wouldn't change
16 your opinion in any way if his treating
17 physicians did not think he had cirrhosis
18 in 2016?
19       ATTORNEY ROSE:  Object to
20   the form.
21       THE WITNESS:  No.
22 BY ATTORNEY VAUGHN:
23   Q.   In your opinion, did Mr.
24 Roberts have liver damage as of 2016?

Page 32

1    A.   Yes.  Liver cirrhosis is a
2  advanced form of liver damage.
3    Q.   In your opinion, did Mr.
4  Roberts have significant liver disease as
5  of 2016?
6    A.   Again, significant liver
7  disease is not a medically defined term,
8  so I'm not sure how to answer that.
9        He had a cirrhosis in 2016
10 which was a -- was advanced enough to
11 cause portal hypertension.
12   Q.   Is there only one potential
13 cause of portal hypertension?
14   A.   No.
15   Q.   And you didn't review all of
16 Mr. Roberts' medical records, did you?
17   A.   No.
18   Q.   Did Mr. Roberts have liver
19 disease in your opinion in 2016?
20   A.   Yes.
21   Q.   As of 2016, did Mr. Roberts
22 have a weakened liver?
23   A.   I'm not -- again, this is
24 not a medically defined term, so I don't

Page 33

1  know how to answer that question.
2    Q.   Does a liver disease weaken
3  one's liver?
4    A.   I -- you have to define what
5  you mean by weaken liver.
6    Q.   Make one's liver more
7  susceptible?
8        ATTORNEY ROSE:  Object to
9    the form.
10       THE WITNESS:  Susceptible to
11   what?
12       ATTORNEY VAUGHN:  Make one's
13   liver more susceptible to a
14   carcinogenic exposure.
15       ATTORNEY ROSE:  Object to
16   the form.
17       THE WITNESS:  Not -- not to
18   my knowledge.  I -- I have no
19   knowledge to answer this question,
20   I have no knowledge.
21       ATTORNEY VAUGHN:  Kathryn,
22   let's drop in that 4/8/2016
23   ultrasound.
24       ATTORNEY AVILA:  Okay.  This

9 (Pages 30 - 33)

VICTORIA CHERNYAK, MD, MS

Page 34

1    is Exhibit 3.
2         - - -
3         (Deposition Exhibit No.
4    Chernyak-3, 4/8/16 Report of
5    Ultrasound for Gaston J. Roberts,
6    was marked for identification.)
7         - - -
8         ATTORNEY ROSE:  Doctor, can
9    you see the whole document on your
10   exhibit viewer?
11   THE WITNESS:  Yes.
12   BY ATTORNEY VAUGHN:
13   Q.    And this ultrasound was
14   taken 4/8/2016; correct?
15   A.    Yes.
16   Q.    This is the date that you
17   said a CT was done?
18   A.    Yes.
19   Q.    And you have reviewed this
20   ultrasound report; correct?
21   A.    Yes.
22   Q.    Did you review the native
23   ultrasound files yourself or just this
24   report?

Page 35

1    A.    I looked at the images, yes.
2    Q.    And you see that there was a
3    comparison to a 2009 ultrasound?
4    A.    Uh-hum.
5    Q.    Did you review that
6    ultrasound?
7    A.    I did not have images of
8    that ultrasound provided for me.
9    Q.    But the radiologist that was
10   treating Mr. Roberts as of 2016 would
11   have had access to that; correct?
12        ATTORNEY ROSE:  Object to
13        the form.
14        THE WITNESS:  I presume that
15        the report said comparison, that
16        means that that report was
17        available.
18   BY ATTORNEY VAUGHN:
19   Q.    And so they were comparing
20   it to a prior one, but you were unable to
21   do that; correct?
22   A.    Correct.
23   Q.    And two solid densities are
24   noted on this ultrasound; correct?

Page 36

1    A.    Yes.
2    Q.    Measuring 2 centimeters and
3    1.8 centimeters?
4    A.    Yes.
5    Q.    In your opinion, were these
6    cancerous?
7    A.    This is not something that
8    can be answered based on ultrasound.
9    Q.    Based on the subsequent
10   imaging, did you see these densities?
11        ATTORNEY ROSE:  Object to
12        the form.
13        THE WITNESS:  Can I proceed?
14        ATTORNEY ROSE:  Yes.
15        THE WITNESS:  There were no
16        -- no corresponding lesions on the
17        subsequent CT that I could
18        correlate to these lesions.
19   BY ATTORNEY VAUGHN:
20   Q.    Would this therefore be
21   considered a negative ultrasound?
22   A.    No.
23   Q.    And can you explain that?
24   A.    The ultrasound demonstrating

Page 37

1    -- demonstrated findings.  These findings
2    were visible, so you can't say it's
3    negative.
4         Subsequent CT did not
5    demonstrate a corollary to these
6    findings, but that doesn't make the
7    ultrasound negative.
8    Q.    So in your opinion, are
9    these two densities cancerous?
10        ATTORNEY ROSE:  Object to
11        the form.
12        THE WITNESS:  This is not --
13        these are indeterminate, as stated
14        in the -- I completely report
15        it -- if we see something on
16        ultrasound that is indeterminate,
17        we have to follow up with CT, they
18        follow up with CT.
19   BY ATTORNEY VAUGHN:
20   Q.    And the follow-up on CT
21   determined that these were not cancerous;
22   correct?
23   A.    The follow-up CT did not
24   find a lesion that corresponded to these

10 (Pages 34 - 37)

VICTORIA CHERNYAK, MD, MS

Page 38

1 2 centimeter lesions.
2      Q.   And so you wouldn't be able
3 to say to a reasonable degree of medical
4 certainty that these two lesions were
5 cancerous; correct?
6           ATTORNEY ROSE:  Object to
7      the form.
8           THE WITNESS:  Can you repeat
9      the question?
10 BY ATTORNEY VAUGHN:
11      Q.   You can't say to a
12 reasonable degree of medical certainty
13 that these two lesions were cancerous;
14 correct?
15      A.   Correct.
16           ATTORNEY VAUGHN:  Kathryn,
17      can we go to the 4/19/2016 CT
18      next?
19           ATTORNEY AVILA:  Yes, and
20      this is Exhibit 4.
21           -  -  -
22           (Deposition Exhibit No.
23      Chernyak-4, 4/19/16 Report of CT
24      Abdomen WO/W Contrast for Gaston

Page 39

1      J. Roberts, was marked for
2      identification.)
3           -  -  -
4 BY ATTORNEY VAUGHN:
5      Q.   And so this is the CT you
6 were referring to that was actually done
7 on 4/19/2016; correct?
8      A.   Correct.
9      Q.   And when they did it, they
10 compared it to the ultrasound on that
11 4/8/2016.  Did you also compare it to
12 that ultrasound when you were reviewing
13 this?
14      A.   Yes.
15      Q.   And is this 8 millimeter
16 lesion the only one that is detected in
17 this CT?
18           ATTORNEY ROSE:  Object to
19      the form.
20           ATTORNEY VAUGHN:  I'll reask
21      it.
22 BY ATTORNEY VAUGHN:
23      Q.   Is this 8 millimeter lesion
24 the only lesion that is detected in this

Page 40

1 C.V.?
2           ATTORNEY ROSE:  Object to
3      the form.
4           THE WITNESS:  Can you
5      actually zoom in?  This is a
6      little too small --
7           ATTORNEY VAUGHN:  I can.
8      And if you need to download it and
9      review it in more detail, please,
10      take your time.
11           THE WITNESS:  That's fine,
12      no, no.  This is the only lesion
13      that is described on the report.
14 BY ATTORNEY VAUGHN:
15      Q.   And in your opinion, does
16 this 8 millimeter lesion go on to become
17 cancer?
18           ATTORNEY ROSE:  Object to
19      the form.
20           THE WITNESS:  I have formed
21      my opinion based on reviewing the
22      images, not this report, so
23      actually the report is -- does not
24      specify which of the -- I actually

Page 41

1      see three lesions on the CT, so
2      I'm not sure which one of these
3      they are specifically referencing.
4 BY ATTORNEY VAUGHN:
5      Q.   Did you see any lesion that
6 was 8 millimeters in size?
7           ATTORNEY ROSE:  Object to
8      the form.
9           THE WITNESS:  The largest
10      lesion that I've measured was 6
11      millimeters.
12 BY ATTORNEY VAUGHN:
13      Q.   So is the answer to my
14 question, no, you did not see this 8
15 millimeter lesion that is described?
16      A.   It's a 2 millimeter
17 measuring difference, so it's quite
18 possible that what I measured as 6
19 millimeters, they measured at 8
20 millimeters.
21      Q.   Does that also mean that
22 what you measured at 6 millimeters could
23 be measured at 4 millimeters?
24      A.   Unlikely.

11 (Pages 38 - 41)

VICTORIA CHERNYAK, MD, MS

Page 42

1    Q.    Why is that?
2    A.    The 4 millimeter difference
3  is -- is more than 2 millimeters.
4    Q.    But you measured it at 6
5  millimeters; correct?
6    A.    Yes.
7    Q.    And isn't 4 two less than
8  six?
9    A.    Is 4 two less than six?
10   Q.    It's 6 minus 2.
11   A.    Yes.
12   Q.    So why can't it -- why can't
13  your measurement be off 2 to the bottom
14  as opposed to -- as opposed to 2 to the
15  top?
16        ATTORNEY ROSE:  Object to
17    the form.
18        THE WITNESS:  I provided the
19    images with my measurements and
20    calipers on.  You can judge for
21    yourself if my measurements is
22    off.
23  BY ATTORNEY VAUGHN:
24    Q.    Is 2 plus or minus a normal

Page 43

1  range?
2    A.    Millimeters?
3    Q.    Yeah.
4    A.    There's -- there's always a
5  measurement error that we reference in
6  radiology report that sometimes, you
7  know, we have to say that -- like, if
8  you're looking at the follow-up and
9  you're making a determination if
10  something grew or not, sometimes you can
11  say that the differences is measurement
12  or differences in reports is maybe due to
13  measurement error.  That's...
14   Q.    Is there some subjectivity
15  in measurement?
16   A.    Minimal, but some,
17  especially when we're talking about such
18  lesions, such tiny lesions.
19   Q.    And you see here where the
20  radiologist finding was, nonspecific
21  findings may be evidence of liver
22  cirrhosis?  Is that consistent with your
23  opinion?
24   A.    My opinion is that he had

Page 44

1  cirrhosis at this time in the scan.
2    Q.    And is that how you would
3  normally say it as a radiologist when
4  you're reading a report?  You would
5  actually diagnose him with cirrhosis as
6  opposed to saying that it is consistent
7  with cirrhosis?
8        ATTORNEY ROSE:  Object to
9    the form.
10        THE WITNESS:  Consistent
11    with represent 90 percent
12    probability that -- not the
13    probability -- 90 percent
14    confidence in my subjective scale.
15    So when I say consistent with, I'm
16    about 90 percent confident in the
17    diagnosis.
18  BY ATTORNEY VAUGHN:
19   Q.    And that's a suggestive
20  scale?
21   A.    Well, interesting you should
22  ask.  It -- yes and no.  I use the
23  objective scale that was set upon forth
24  by Memorial Sloan Kettering Cancer

Page 45

1  Center, so I use very defined certainty
2  scale.
3        It's not adopted by every
4  radiologist everywhere, but that is the
5  scale that I use.
6    Q.    And is that scale considered
7  diagnostic?
8    A.    That scale provides
9  interpretation of certainty lexicon, so
10  there are only specific words that are
11  used to provide certainty in diagnosis.
12  And based on that scale, consistent with
13  means that radiologist is about 90
14  percent -- 70 to 90 percent confident in
15  diagnosis.
16   Q.    Do you see where he says no
17  other focal liver -- scratch that.
18        Do you see where it says:
19  No other focal liver lesions are seen?
20   A.    Yes.
21   Q.    You disagree with that;
22  correct?
23   A.    Yes.
24   Q.    You saw liver lesions that

12 (Pages 42 - 45)

VICTORIA CHERNYAK, MD, MS

1 the radiologist treating Mr. Roberts did
2 not see; correct?
3     A.   Correct.
4     Q.   How many additional liver
5 lesions did you find?
6     A.   Two more, so I saw three in
7 total.
8     Q.   Did you look for any other
9 liver lesions throughout his liver?
10        ATTORNEY ROSE:  Object to
11     the form.
12        THE WITNESS:  I mean, I
13     looked through the liver, the
14     entire liver.
15 BY ATTORNEY VAUGHN:
16     Q.   And you didn't find any
17 other lesions besides those three?
18     A.   Those are three that I
19 found.
20     Q.   If you found other ones that
21 were similar, would you have noted those
22 as well?
23     A.   I hope so.
24     Q.   Would it make a difference

1 if he had more liver lesions than the
2 three that you saw?
3        ATTORNEY ROSE:  Object to
4     the form.
5        THE WITNESS:  Make a
6     difference to what?
7        ATTORNEY VAUGHN:  Your
8     opinion.
9        THE WITNESS:  No.
10 BY ATTORNEY VAUGHN:
11     Q.   If he had a lot of the same
12 liver lesions, would that decrease the
13 chance or increase the chance that they
14 were carcinogenic?
15        ATTORNEY ROSE:  Object to
16     the form.
17        THE WITNESS:  No.
18 BY ATTORNEY VAUGHN:
19     Q.   So the number of lesions
20 present is irrelevant to the risk of it
21 being HCC; correct?
22        (Pause.)
23        THE WITNESS:  It depends.
24 BY ATTORNEY VAUGHN:

1     Q.   What does it depend on?
2     A.   It depends on appearance of
3 the lesions and...
4     Q.   If he had a lot more lesions
5 that looked the exact same, would it be
6 more or less likely that he had cancer?
7        ATTORNEY ROSE:  Object to
8     the form.
9        THE WITNESS:  It depends how
10     many.  If his entire liver was
11     replaced by nodules and they all
12     look identical -- and I'm talking
13     about entire liver -- then we
14     would probably just say these are
15     cirrhotic nodules.
16 BY ATTORNEY VAUGHN:
17     Q.   And you didn't see
18 additional nodules?
19     A.   No.
20     Q.   Not even in that frame 24?
21        ATTORNEY ROSE:  Object to
22     the form.
23        THE WITNESS:  In what?
24        ATTORNEY VAUGHN:  I'll go

1 back to it later.
2 BY ATTORNEY VAUGHN:
3     Q.   Do you have any critiques of
4 this CT?
5     A.   What do you mean?
6     Q.   Was this an ideally done CT
7 in your opinion?
8     A.   It was done with appropriate
9 required protocol with and without
10 contrast with arterial phase, portal
11 venous phase, and delayed.
12        THE COURT REPORTER:  I'm
13     sorry.  Can you repeat that?
14        THE WITNESS:  It was done in
15     compliance with what LI-RADS
16     recommends to have a multiphase
17     CT.
18 BY ATTORNEY VAUGHN:
19     Q.   Can you tell the jury what
20 LI-RADS recommends on a CT?
21     A.   LI-RADS recommends at least
22 arterial phase, which was obtained in
23 this case, portal venous phase, and the
24 precontrast images in this context are

13 (Pages 46 - 49)

VICTORIA CHERNYAK, MD, MS

Page 50

1 optional. In this case, they were
2 obtained.
3      Q.   You're a professor; correct?
4      A.   Yes.
5      Q.   Were you previously a
6 radiology professor at Harvard?
7      A.   At Harvard, I was associate
8 professor.
9      Q.   Associate? And where are
10 you a professor of radiology now?
11     A.   Columbia.
12     Q.   And would you tell your
13 students that this was an appropriate CT
14 to apply LI-RADS to?
15     A.   Yes.
16     Q.   Would you tell them this is
17 an ideal CT to apply LI-RADS to?
18     A.   Define "ideal."
19     Q.   Are there better CTs that
20 would be more appropriate to apply
21 LI-RADS to?
22          ATTORNEY ROSE: Object to
23 the form.
24          THE WITNESS: I'm really not

Page 51

1      sure what you mean by more
2      appropriate. It was done with
3      correct protocol.
4 BY ATTORNEY VAUGHN:
5      Q.   And can you please explain
6 that protocol to me again? I was trying
7 to -- the realtime was a little jumbled.
8 You said there's a portal venous phase
9 and a what phase?
10     A.   Arterial phase.
11     Q.   So there's two phases that
12 LI-RADS needs in a CT?
13     A.   At least two phases:
14 Arterial phase, portal venous phase,
15 delayed phase. And then precontrast is
16 required if patient had prior treatment.
17 In cases like this, the precontrast is
18 optional. In this case, it was obtained.
19     Q.   So is there three phases to
20 this CT?
21     A.   I don't remember if -- I
22 believe there -- there was definitely
23 arterial and portal venous phase and pre.
24 I'm blanking if there was delayed. I

Page 52

1 believe so.
2      Q.   Out of those three phases,
3 which three would be the -- which one
4 would be the most important phase?
5      A.   Well, arterial phase is
6 crucial, but --
7      Q.   Why is arterial phase
8 crucial?
9      A.   Because presence of arterial
10 phase hyperintense enhancement is a
11 required feature to diagnose HCC
12 noninvasively.
13     Q.   You said hyperenhancement is
14 a required feature to diagnose HCC
15 noninvasively; correct?
16     A.   Yes, sir.
17     Q.   And then what was the second
18 phase?
19     A.   Portal venous phase.
20     Q.   And is that an important
21 phase?
22     A.   Yes.
23     Q.   Why is that phase important?
24     A.   Because -- because you need

Page 53

1 multiphase -- I mean -- because in order
2 to diagnose HCC, we need to assess for at
3 least five features.
4          Do you want me to go through
5 them?
6      Q.   Please.
7      A.   Size, arterial phase
8 hyperenhancement, washout which is
9 assessed either in portal venous phase or
10 in delayed phase, enhancing capsule, and
11 threshold growth.
12          Threshold growth has a very
13 specific definition and it has to be
14 prepared to an appropriately performed
15 study bound within six months of original
16 study, so if no ascites present, we
17 consider threshold growth as absent, as
18 in this case.
19          Arterial phase
20 hyperenhancement is only assessable on
21 arterial phase. It is a required feature
22 to diagnose a lesion as a HCC
23 noninvasively. Size of 10 millimeter is
24 required to diagnose something as HCC

14 (Pages 50 - 53)

VICTORIA CHERNYAK, MD, MS

Page 54

1 noninvasively.
2        Portal venous phase and/or
3 delayed phase is necessary to assess
4 something as having washout and enhancing
5 capsule.
6    Q.   I'm sorry.  What's the third
7 phase?
8    A.   Delayed phase.
9    Q.   And why is that phase
10 necessary?
11    A.   It may be necessary because
12 sometimes small HCCs don't wash out until
13 delayed phase.  But if you see washout in
14 portal venous phase, that's enough.
15    Q.   If you have no wash-in, can
16 you have washout?
17    A.   Yes.
18    Q.   Explain that.
19    A.   According to LI-RADS
20 definition, the arterial -- if the lesion
21 is iso-enhancing in the arterial phase
22 and then hypoenhancing on subsequent
23 phase, that is sufficient to call
24 washout.

Page 55

1    Q.   What is --
2        THE COURT REPORTER:  I'm
3    sorry.  Can you just -- can you
4    just go a little bit slower?
5    Thank you.
6        THE WITNESS:  I'm sorry.
7    LI-RADS provides very specific
8    definition of washout.  For
9    washouts to be present, the lesion
10    has to be either iso or
11    hyperenhancing on earlier phase
12    and then become hypoenhancing on
13    subsequent phase.
14        So one of the ways that
15    lesion can have washout is
16    iso-enhancing on arterial phase
17    and hypoenhancing on portal venous
18    phase.
19 BY ATTORNEY VAUGHN:
20    Q.   What is iso-enhancing?
21    A.   Enhances identical similar
22 to the background parenchyma.
23    Q.   So it's enhancing the same
24 as the liver?

Page 56

1    A.   Yes.
2    Q.   And that's enough for you
3 then to later say there's washout?
4    A.   No.  As I said, you need two
5 components.  You need either iso or
6 hyperenhancing early on and then
7 hypoenhancing later on.
8    Q.   What's a stronger indication
9 of washout, if you have iso-enhancing or
10 hyperenhancing initially?
11    A.   It doesn't matter.  Both are
12 acceptable definitions of washout.
13    Q.   Can you have hypoenhancement
14 and washout in the same lesion in the
15 same image at the same time?
16    A.   Can you say that again?
17    Q.   Can you have hypoenhancement
18 and washout of the same lesion in the
19 same image at the same time?
20        ATTORNEY ROSE:  Object to
21    the form.
22        THE WITNESS:  The definition
23    of washout is -- requires two
24    phases.  So, technically, if you

Page 57

1    have only one phase, technically,
2    if you want to be a stickler,
3    which I am, washout is not
4    diagnosable.  So you need at least
5    two phases to diagnose washout, to
6    characterize something as having
7    washout.
8 BY ATTORNEY VAUGHN:
9    Q.   And so you cannot have
10 hypoenhancement and washout in the same
11 phase; correct?
12    A.   I'm not sure that -- what
13 you're asking me.  If I see a portal
14 venous phase and the lesion is
15 hypoenhancing, that's part of washout
16 definition.
17        So you have to have
18 hypoenhancement to say something has
19 washout.
20    Q.   But they would have to be in
21 two different phases; correct?
22    A.   You need to have an earlier
23 phase showing something is iso or
24 hyperenhancing to precisely say

15 (Pages 54 - 57)

VICTORIA CHERNYAK, MD, MS

Page 58

1 something's washout.
2    Q.   Was his lesion visible in
3 phase one to you?
4         ATTORNEY ROSE:  Object to
5    the form.
6         THE WITNESS:  It was
7    iso-enhancing to me.
8 BY ATTORNEY VAUGHN:
9    Q.   To you.
10   A.   To me.
11   Q.   Is that a subjective
12 determination?
13   A.   It is -- it is a qualitative
14 assessment and therefore by definition
15 has some subjectivity.
16   Q.   And what's the subjectivity
17 in that?
18   A.   That I with my eyes look at
19 the lesion and compare it to background
20 and determine if it's iso/hypo.
21 According to the -- according to the
22 literature, the -- you know, there's
23 moderate interreader agreement for
24 qualitative imaging features and that is

Page 59

1 true for pretty much any qualitative
2 imaging features.  That's probably as
3 best as humans can agree on qualitative
4 imaging features.
5         CAPAs are around high .6,
6 low .7.  I'm happy to provide you with
7 references for that statement.
8         ATTORNEY VAUGHN:  We can be
9    done with this for a second.  Go
10   back to your expert report, which
11   was Exhibit 2.
12 BY ATTORNEY VAUGHN:
13   Q.   I'm looking at the second
14 paragraph, it's the first full paragraph
15 on the third page.  You say:  Diagnostic
16 LI-RADS includes seven diagnostic
17 criteria -- categories --
18   A.   Yes.
19   Q.   -- each representing a
20 diagnostic certainty of HCC verse --
21 benignity?
22   A.   Benignity, yep.
23   Q.   So what does this mean?
24   A.   That each category provides

Page 60

1 a probability that the lesion is HCC.
2 The probabilities are defined by multiple
3 meta-analysis.
4         So if I say, you know, LR-1
5 definitely benign, that means that lesion
6 has zero probability of being malignant
7 and 100 percent probability of being
8 benign.
9         If I say that LR-5, right,
10 LI-RADS 5, definite HCC based on the
11 literature, the probability that this
12 lesion is HCC is 95 percent.  Probability
13 that this lesion is malignant is about 99
14 percent.
15   Q.   The only diagnostic parts of
16 LI-RADS are LI-RADS 1 and 5; correct?
17   A.   No.  That's incorrect.
18 LI-RADS -- each category provides a
19 defined probability.  Right?  So LR-M
20 probably or definitely malignant non-HCC
21 specific, 99 percent malignancy --
22 probability of malignancy.  Of them,
23 about 67 percent are HCC.  The rest are
24 mostly non-HCC malignancy.

Page 61

1         LI-RADS tumor vein --
2 definite tumor vein -- 100 percent
3 malignancy rate, 70 to 85 percent HCC.
4    Q.   You didn't put a citation
5 for this sentence, did you?
6    A.   I did.
7    Q.   What citation goes with this
8 sentence?
9    A.   I believe number 6 -- no,
10 wait.  Not number 6.  Number 7.
11   Q.   Number 7.
12   A.   Both 6 and 7 -- you can use
13 both 6 and 7 for that.  But 7 provides --
14 is a meta-analysis which looks at all the
15 different probabilities and provides all
16 these numbers.
17   Q.   So this 2018 article is what
18 you're citing for there being seven
19 different diagnostic categories?
20   A.   Yes.
21         ATTORNEY ROSE:  Object to
22    the form.
23 BY ATTORNEY VAUGHN:
24   Q.   And you agree with that that

16 (Pages 58 - 61)

VICTORIA CHERNYAK, MD, MS

Page 62

1 this supports that there's seven
2 different diagnostic categories?
3      A.   For diagnostic LI-RADS, yes.
4      Q.   Can we go to page 5 of your
5 expert report?
6      A.   Which one is that?  Because
7 my number -- they're not numbered.
8      Q.   PDF page 5.  It's the one
9 where you have -- you identify different
10 segments that you see lesions.
11      A.   Okay.
12      Q.   And, again, you noted it was
13 an April 8th, 2006 CT.  This was supposed
14 to be that later date of --
15      A.   18 -- 18?  19?  19.
16      Q.   19th?  Okay.
17          This first lesion, this .6
18 centimeter --
19      A.   Uh-hum.
20      Q.   -- you're not saying that
21 this turned into cancer; correct?
22          ATTORNEY ROSE:  Object to
23      the form.
24          ATTORNEY VAUGHN:  You can

Page 63

1      still answer.
2          THE WITNESS:  I -- can you
3      rephrase your question, please?
4 BY ATTORNEY VAUGHN:
5      Q.   Yeah, this .6 centimeter
6 lesion that you detected, you then looked
7 in the 2018 CT; correct?
8      A.   Yes.
9      Q.   In your opinion, did this 6
10 centimeter lesion in image 17 turn into
11 cancer?
12      A.   0.6 centimeter lesion.
13      Q.   Thank you.
14      A.   Without interim imaging
15 between 2016 and 2018, I don't -- I
16 cannot say definitively, but I cannot
17 rule it out.
18      Q.   Was there any cancer in the
19 spot of where this .6 centimeter lesion
20 was in image 17?
21          ATTORNEY ROSE:  Object to
22      the form.
23          THE WITNESS:  That lesion
24      met criteria for LI-RADS 3, which

Page 64

1      has intermediate probability of
2 being malignancy.  About 33
3 percent of LI-RADS 3 lesions are
4 HCCs, so there's a possibility
5 that it was small HCC at the time.
6 BY ATTORNEY VAUGHN:
7      Q.   And by 2018, when you looked
8 at the same spot, was there any HCC in
9 that spot?
10      A.   That spot correspond -- in
11 that spot, there was a LI-RADS 5 lesion.
12      Q.   You're saying the spot --
13 segment 7, the 0.6 centimeter in image
14 17, you're telling me in 2018, there was
15 an HCC there?
16          ATTORNEY ROSE:  Object to
17      the form.
18          THE WITNESS:  May I please
19      reference my --
20          ATTORNEY VAUGHN:  You may.
21          THE WITNESS:  -- exhibit?
22      Thank you.
23          (Pause.)
24          THE WITNESS:  Segment 5/8

Page 65

1      lesion -- so segment 5/8 lesion --
2          ATTORNEY VAUGHN:  I didn't
3      realize I wasn't sharing.
4          THE WITNESS:  So segment 5/8
5      lesion, so the next one, .5
6      centimeter.
7 BY ATTORNEY VAUGHN:
8      Q.   Sorry.  I didn't realize I
9 wasn't scree-sharing.  So I'm talking
10 about the one in segment 6, this 0.6
11 centimeter on image 17, in your opinion,
12 in 2018, was there HCC at this site?
13      A.   Okay.  So in segment 7 -- so
14 all these three lesions, they look very
15 similar to each other in terms of their
16 imaging features, each and every one of
17 them meets criteria for LI-RADS 3.
18          So each and every one of
19 them has a about a third of a chance of
20 being HCC at that time.
21      Q.   And you are not answering my
22 question.  My question is simply, when
23 you looked at the 2018 CT, was there HC
24 -- excuse me?

17 (Pages 62 - 65)

VICTORIA CHERNYAK, MD, MS

Page 66

1    A.   2016 CT?
2    Q.   No. I'm talking about the
3 2018. You were talking about the '16
4 here. You looked at the '16 and the '18;
5 correct?
6    A.   You said 2016 C -- okay.
7    Q.   Okay.
8         ATTORNEY ROSE: I think the
9 confusion -- Brett, the confusion
10 is that in your question you
11 referenced a 2018 CT.
12        ATTORNEY VAUGHN: Well,
13 because that's what I'm asking her
14 to compare.
15        You looked at the 2018 CT
16 and on image 17 -- in 2016, you
17 see this .6 centimeter and you say
18 it's a LI-RADS 3. And then you go
19 and you look at the 2018 and you
20 look at where image 17 would be.
21        Did it correspond to where
22 any HCC was?
23        THE WITNESS: So 2018 MRI.
24        ATTORNEY VAUGHN: MRI. Was

Page 67

1 there a CT in 2018?
2         THE WITNESS: There was, but
3 it was not done with multiphase
4 protocol, so it's not -- you can't
5 apply LI-RADS to that, so --
6 BY ATTORNEY VAUGHN:
7    Q.   And what's a multiphase
8 protocol?
9    A.   The one that has arterial
10 phase and portal venous phase --
11   Q.   And so if you don't -- if
12 you don't do all the phases, you can't
13 apply LI-RADS; correct?
14   A.   Correct.
15   Q.   Okay.
16   A.   So in the lesion in segment
17 7, on series 401, image 17, had no
18 corollary on MRI done in August of 2018.
19   Q.   So this first one that you
20 listed definitely did not turn into HCC;
21 correct?
22        ATTORNEY ROSE: Object to
23 the form.
24        THE WITNESS: There was no

Page 68

1    -- it -- in 2018, there was no
2 correlation to this lesion.
3 BY ATTORNEY VAUGHN:
4    Q.   And then let's look at the
5 bottom one, the segment 6, half
6 centimeter, image 35, did you look to
7 correspond that one in the MRI in 2018?
8    A.   Yes.
9         ATTORNEY ROSE: Object to
10 the form.
11 BY ATTORNEY VAUGHN:
12   Q.   And in your opinion, did
13 this one overlay with where HCC
14 developed?
15   A.   No.
16   Q.   And so the one that we're
17 left with is here in the middle, in
18 section 5 and section 8, where there's
19 the half centimeter on image 24. In your
20 opinion, when you looked at the 2018 MRI,
21 did this one overlay with where HCC
22 developed?
23   A.   Yes.
24   Q.   And so it's only the middle

Page 69

1 one, the one in section 5 and section 8,
2 that ended up overlaying with where HCC
3 was; correct?
4    A.   Yes.
5    Q.   And that specific one, the
6 one in segment 5 and 8 on image 24, in
7 your opinion, had a 33 percent chance of
8 become being HCC; correct?
9         ATTORNEY ROSE: Object to
10 the form.
11        THE WITNESS: No. It was --
12 it had 33 percent chance of being
13 HCC at that particular moment.
14 BY ATTORNEY VAUGHN:
15   Q.   So I want to be very clear
16 then. This one in segment 5 and segment
17 8 that was a half centimeter in image 24,
18 in your opinion, there was a 33 percent
19 chance that that was cancerous as of
20 2016; correct?
21   A.   Correct.
22        ATTORNEY VAUGHN: Now is a
23 good time for a break.
24        THE VIDEO TECHNICIAN: Off

18 (Pages 66 - 69)

VICTORIA CHERNYAK, MD, MS

Page 70

1    the record at 9:56 a.m.
2         - - -
3         (A discussion off the record
4    occurred.)
5         - - -
6         (A recess was taken from
7    9:59 a.m. to 10:12 a.m.)
8         THE VIDEO TECHNICIAN: We
9    are back on the record at 10:12
10   a.m.
11   BY ATTORNEY VAUGHN:
12       Q.   Doctor, LI-RADS is a
13   diagnostic tool; correct?
14       A.   Yes.
15       Q.   I'm going back to your
16   expert report, I'm on PDF page 5. I'm
17   looking at that paragraph below the
18   different lesions that you identified
19   that we were talking about earlier.
20       A.   Okay.
21       Q.   And you note that these
22   lesions do not demonstrate arterial phase
23   hyperenhancement. And you're talking
24   about all three of those do not exhibit

Page 71

1    that; correct?
2        A.   Yes.
3        Q.   So in all series, do these
4    appear less dense?
5        ATTORNEY ROSE: Object to
6    the form.
7        ATTORNEY VAUGHN: Let me
8    rephrase.
9    BY ATTORNEY VAUGHN:
10       Q.   In all the series, do these
11   lesions appear less dense than the liver?
12       A.   They are less dense than
13   liver on the delayed phase, like series
14   401, which is labeled delayed. They are
15   hyperenhancing, hypodense, less dense.
16       Q.   You note that
17   hyperenhancement is the hallmark of
18   progressed HCC; correct?
19       A.   Yes. Yes.
20       Q.   Is hyperenhancement also
21   just the hallmark of HCC?
22       ATTORNEY ROSE: Object to
23   the form.
24       THE WITNESS: No. It's

Page 72

1    progressed HCC.
2    BY ATTORNEY VAUGHN:
3        Q.   Can you explain why that is?
4        A.   Early HCC does not yet --
5    typically, generally, most early HCCs do
6    not yet develop enough angiogenesis --
7    Kim, are you okay with that word --
8    angiogenesis to manifest as arterial
9    phase hyperenhancement.
10       So usually early HCCs are
11   either iso or hypoenhancing on arterial
12   phase, and generally most early HCCs fall
13   into either LI-RADS 3 or LI-RADS 4
14   categories.
15       Q.   And then you go on to say:
16   and appeared as hypoenhancing foci on the
17   portal venous phase, i.e., they had
18   washout.
19       Can you explain that to me?
20       A.   Yes. So by LI-RADS
21   definition, washout is defined as a
22   lesion which is iso or hyperenhancing on
23   earlier phase and then becomes
24   hypoenhancing, meaning hypodense or

Page 73

1    hypointense, to liver on subsequent
2    phase.
3        In this case, the lesions
4    did not have arterial hyperenhancement,
5    but appeared hypoenhancing, hypodense,
6    and therefore they had washout.
7        Q.   So are you saying that in
8    the portal venous phase, there is both
9    hypoenhancing and washout?
10       A.   Hypoenhancement is part of
11   definition of washout.
12       Q.   And so you're using
13   hypoenhancement and washout synonymously?
14       ATTORNEY ROSE: Object to
15   the form.
16       THE WITNESS: No. When --
17   when I wrote the report, I said
18   they had washout and I was asked
19   to spell it out and I spell it out
20   -- spelled it out.
21       The fact that the lesions
22   were hypoenhancing on portal
23   venous and delayed phase and/or
24   iso-enhancing in arterial phase

19 (Pages 70 - 73)

VICTORIA CHERNYAK, MD, MS

Page 74

1    allowed me to say that they had
2    washout.
3 BY ATTORNEY VAUGHN:
4        Q.   Did you say portal venous
5 and delayed phase?
6        A.   Yes.  In this case, they're
7 interchangeable.
8        Q.   Why?
9        A.   Because in this case,
10 they're hypoenhancing on both phases.
11 You need --
12       Q.   Sorry.
13       A.   You need to have
14 hypoenhancement in only one of them, so
15 --
16       Q.   Which two phases are you
17 saying are hypoenhancing?
18       A.   Portal venous and delayed.
19       Q.   What do you base that on?
20       A.   Looking at the images.
21       Q.   What part of the image do
22 you look at to see that there was a
23 delayed phase?
24       A.   It's usually labeled.

Page 75

1        Q.   And was it labeled in this
2 case?
3        A.   It was, yep, delayed, comma,
4 5 millimeter, that's what the name of
5 series 401.
6        Q.   And how long was the delayed
7 phase?
8        A.   I'm not privy to their exact
9 protocols.  Generally, delayed phase
10 should be obtained somewhere between two
11 to five -- two to five minutes after
12 contrast injection.
13       Q.   And then this 4/8/2016 was a
14 typo again.  Right?  This one again
15 should be 4/19/2016 CT?
16       A.   Yes.
17       Q.   But you note LI-RADS 3s are
18 33 percent malignant.  You were
19 discussing that earlier.  Right?
20       A.   Uh-hum.
21            Yes.  Sorry.  Yes.
22 Apologize.
23       Q.   Are there certain types of
24 LI-RADS 3s that are more likely to be

Page 76

1 malignant than others?
2        A.   That is a million-dollar
3 question that we do not yet have an
4 answer for, but certainly want to have an
5 answer for, but not yet.
6        Q.   In your opinion, are there
7 certain types of LI-RADS 3s that are more
8 likely to be malignant than others?
9            ATTORNEY ROSE:  Object to
10       the form.
11            THE WITNESS:  Again, we
12       don't have data to state that --
13       accurately state that this type of
14       LI-RADS 3, with these imaging
15       features, is more likely to be
16       malignant than -- we just dont'
17       have -- we don't have data.  There
18       are actually NIH grant proposals
19       that are being performed because
20       it is an important question to ask
21       scientifically.
22            As of 2025, we do not have
23       objective criteria to say that
24       these LI-RADS 3 lesions are going

Page 77

1       to progress versus these LI-RADS 3
2       lesions which are going to behave
3       more benignly.
4            So unfortunately I don't
5       have scientific data to say these
6       are okay and these are not going
7       to be okay.
8 BY ATTORNEY VAUGHN:
9        Q.   And has the National
10 Institutes of Health told you that --
11 sorry.  Scratch that.
12            Has the National Institute
13 of Health opined that LI-RADS 3s are
14 lacking data to determine if they are
15 going to be malignant or not?
16            ATTORNEY ROSE:  Object to
17       the form.
18            THE WITNESS:  There is --
19       okay.  So LI-RADS 3 lesions have
20       intermediate probability of
21       malignancy, meaning that it's not
22       high enough to treat and it's not
23       low enough to dismiss.
24            Therefore, all LI-RADS 3

20 (Pages 74 - 77)

VICTORIA CHERNYAK, MD, MS

Page 78

1 lesions have to be followed up
2 according to AASLD -- that's
3 American Association for Study of
4 Liver Diseases -- and LI-RADS have
5 -- the management recommendation
6 is that lesions which meet
7 criteria for LI-RADS 3 have to be
8 monitored every three to six
9 months with an imaging modality,
10 because we don't know which one of
11 these will turn and progress and
12 which will not.
13     It is, as you can imagine, a
14 very large healthcare burden
15 recognized by scientists,
16 clinicians, and NIH.
17     Unfortunately, as of right
18 now, we have no accurate way to
19 predict which of the LI-RADS 3
20 lesions can be monitored less
21 aggressively and which of the
22 LI-RADS 3 lesions need to be
23 monitored more aggressively.
24     As a result, all LI-RADS 3

Page 79

1 lesions have to be monitored every
2 three to six months.
3 BY ATTORNEY VAUGHN:
4     Q.   And that monitoring schedule
5 is left to the treating physician to
6 determine; correct?
7     ATTORNEY ROSE:  Object to
8 the form.
9     THE WITNESS:  Recommendation
10 is every three to six months.
11 BY ATTORNEY VAUGHN:
12     Q.   And is the treating
13 physician supposed to take patient
14 specifics into consideration?
15     A.   I mean, if we're looking at
16 a patient whose survival -- expected
17 projected survival is six months, I would
18 hope that the treating clinician won't
19 subject the patient to unnecessary
20 monitoring.
21     But in general, in a patient
22 with, you know, sufficient life
23 expectancy, recommendation for follow-up
24 is every three to six months.

Page 80

1     Q.   But it's the physician, the
2 treating physician, that makes that
3 determination; correct?
4     A.   Makes a determination of?
5     Q.   If follow-up is necessary
6 based on that patient's clinical history.
7     A.   The recommendations are
8 every three to six months.
9     Q.   Do the recommendations say
10 to take patient specifics into
11 consideration?
12     A.   No.
13     Q.   Is that a plan for future
14 LI-RADS, to take patient specifics into
15 consideration?
16     ATTORNEY ROSE:  Object to
17 the form.
18     THE WITNESS:  No.  Right
19 now, no.  We have no -- right now,
20 we only take into consideration
21 imaging appearance -- again, if
22 the patient is bedbound and, you
23 know, life expectancy is very
24 limited, then obviously you would

Page 81

1 not necessarily subject this
2 patient.
3     But in, again, healthy
4 patient who's expected to survive
5 for a substantial amount of
6 patient, these lesions need to be
7 followed.
8 BY ATTORNEY VAUGHN:
9     Q.   Based on this 2016 imaging,
10 would you expect that Mr. Roberts to
11 survive for a long amount of time?
12     ATTORNEY ROSE:  Object to
13 the form.
14     THE WITNESS:  I can't use
15 imaging to determine how long he's
16 going to be surviving.
17 BY ATTORNEY VAUGHN:
18     Q.   LI-RADS does not look at
19 patient-specific histories; correct?
20     A.   LI-RADS looks at imaging
21 features of a particular lesion in
22 LI-RADS population and provides a risk
23 stratification, which that risk
24 stratification is used to manage the

21 (Pages 78 - 81)

VICTORIA CHERNYAK, MD, MS

Page 82

1 patient.
2       According to LI-RADS and
3 AASLD, patients who have LI-RADS 3
4 observation need to be followed up every
5 three to six months.  THE decision if
6 it's three months or six months is left
7 to the physician, conversation with
8 patient, but they have to be followed up.
9       Q.   You can't diagnose a patient
10 with HCC based on a LI-RADS 3; correct?
11       A.   LI-RADS 3 provides an
12 intermediate probability of being
13 malignant, so LI-RADS 3 is about 33
14 percent of being malignant.
15       Q.   And so you can't say to a
16 reasonable degree of medical certainty
17 that the lesion in segment 5 and segment
18 8 on image 24 was HCC at the time in
19 2016; correct?
20       A.   It had a probability -- it
21 had a 33 probability of being malignant.
22       Q.   Can you say to a reasonable
23 degree of medical certainty that it was
24 malignant in 2016?

Page 83

1       ATTORNEY ROSE:  Object to
2 the form.
3       THE WITNESS:  What's a
4 reasonable degree?  Is 33 percent
5 reasonable degree?  I'm not sure
6 what's reasonable degree.
7       The -- the LI-RADS
8 specifically is designed to take
9 away at least some of the
10 subjectivity from conversation
11 between radiologists and
12 clinicians, and there are a lot of
13 studies that are performed to
14 validate LI-RADS and LI-RADS
15 works.
16       And the probabilities that
17 I'm citing to you have been
18 validated in multiple studies.  So
19 when I say something meets
20 criteria for LI-RADS 3, that
21 communicates that that probability
22 of HCC is about 33 percent.
23 BY ATTORNEY VAUGHN:
24       Q.   You -- I'm sorry.

Page 84

1       A.   So, hence -- hence, the
2 patient should be followed every three to
3 six months.
4       Q.   The opinions stated in your
5 expert report, did you give them to a
6 reasonable degree of medical certainty?
7       A.   I'm sorry.  Can you repeat
8 that again?
9       Q.   The expert opinions within
10 your report, did you give them to a
11 reasonable degree of medical certainty?
12       A.   I'm not -- I'm not sure what
13 you're exactly asking me.  I provided my
14 opinion based on my medical training and
15 my years of practice and my expertise in
16 LI-RADS, so this is how I interpret the
17 imaging.
18       Q.   And can you say to a
19 reasonable degree of medical certainty as
20 of 2016 that Mr. Roberts had cancer?
21       ATTORNEY ROSE:  Object to
22       the form.
23       THE WITNESS:  Mr. Roberts
24       had three lesions.  Each one of

Page 85

1       them met criteria for LI-RADS 3
2       observation.  LI-RADS 3
3       observation has 33 percent of
4       probability of being malignant.
5       I have no tools to stratify
6       that probability.  Nobody has
7       those tools.  Those tools yet do
8       not exist.
9 BY ATTORNEY VAUGHN:
10       Q.   Your next sentence, you say:
11 When they are followed long term, up to
12 60 percent of LR-3 observations progress
13 to HCC within 48 months.
14       Did I read that right?
15       A.   Yes.
16       Q.   Why did you choose 48
17 months?
18       A.   That is the study that I
19 quoted followed the lesions up to 48
20 months.  That's the number that they've
21 -- they've reported.
22       Q.   And how long was between Mr.
23 Roberts' 2016 scan and 2018 scan?
24       A.   Two years and I think --

22 (Pages 82 - 85)

VICTORIA CHERNYAK, MD, MS

Page 86

1 May, June -- four months.  Two years and
2 four months, about.
3    Q.   And you cited -- you cited
4 two studies for this one, didn't you?
5    A.   I have -- no, for that
6 statement, it was 18.
7    Q.   18?  Is there two citations
8 here in 18?  Did you cite to yourself as
9 well?
10    A.   That is a statement about --
11 that is a statement about the 33 percent
12 being malignant.
13    Q.   Well, that 33 percent
14 malignant, you cite as 17.  18, you cited
15 two different sources.  Right?
16    A.   The statement for 48 months
17 is Kim YY, et al, for 18.
18    Q.   Do you know why there's a
19 second citation on this one?
20    A.   It may have been
21 inadvertently pasted there.
22    Q.   Okay.
23    A.   Again, that citation is a
24 general citation of LI-RADS --

Page 87

1    Q.   Uh-hum.
2    A.   -- its application, its
3 concepts, how it applies.  This is the --
4 the release of version 2018, that's the
5 citation.
6    Q.   How did you choose this Kim
7 article?
8    A.   Because that Kim article
9 specifically looked at outcomes of
10 LI-RADS 3 and LI-RADS 4 observation.
11 This is about that looked at the
12 longest follow-up, 48 months.  This is
13 the paper that I cite in my -- in my
14 papers, in my -- when I talk about --
15 give lectures, this is the paper that I
16 cite.
17    Q.   Oh, so you were familiar
18 with this paper prior to writing your
19 expert report?
20    A.   Yes.
21    Q.   Does this paper give time
22 points before 48 months?
23    A.   Yes.
24    Q.   Does this paper give time

Page 88

1 points closer to what would be relevant
2 in this case, which is, what you said,
3 two years and about four months?
4    A.   Yes.
5        ATTORNEY ROSE:  Object to
6    the form.
7 BY ATTORNEY VAUGHN:
8    Q.   And what percent increase --
9 scratch that.
10        What percent of LR-3s go on
11 to be HCC within the relevant timeframe,
12 approximately two years?
13        ATTORNEY ROSE:  Object to
14    the form.
15        THE WITNESS:  May I
16    reference the graph so --
17        ATTORNEY VAUGHN:  You may.
18        THE WITNESS:  Thank you.
19        ATTORNEY VAUGHN:  Can we go
20    ahead and drop that one in,
21    Kathryn?  I believe it's 2020 MRI
22    LI-RADS.
23        THE WITNESS:  About 20
24    percent.

Page 89

1 BY ATTORNEY VAUGHN:
2    Q.   About 20 percent.  And so
3 that would be the case for Mr. Roberts?
4 It would be just about 20 percent chance
5 that his LR-3 would have progressed to
6 HCC at the time they caught it?
7        ATTORNEY ROSE:  Object to
8    the form.
9        THE WITNESS:  About 20
10    percent of all LI-RADS 3s progress
11    to HCC by about 48 months -- I
12    mean -- sorry -- 24 months, 24
13    months.
14 BY ATTORNEY VAUGHN:
15    Q.   And you didn't put that in
16 your expert report, did you, that there
17 would only have been a 20 percent chance
18 for him?
19        ATTORNEY ROSE:  Object to
20    form.
21        THE WITNESS:  I cited the --
22    I cited the reference there, that
23    long-term follow-up results --
24    that a substantial proportion of

23 (Pages 86 - 89)

VICTORIA CHERNYAK, MD, MS

Page 90

1  these will eventually end up being
2  cancerous.
3      - - -
4      (Deposition Exhibit No.
5  Chernyak-5, 2020 Article by Kim,
6  et al, "MRI Ancillary Features for
7  LI-RADS Category 3 and
8  4 Observations: Improved
9  Categorization to Indicate the
10  Risk of Hepatic Malignancy", was
11  marked for identification.)
12      - - -
13 BY ATTORNEY VAUGHN:
14    Q.   At the time frame for Mr.
15 Roberts, it would have only been a 20
16 percent chance; correct?
17      ATTORNEY ROSE:  Object to
18    the form.
19      THE WITNESS:  It's not 20
20    percent chance.  It's 20 percent
21    of all LI-RADS 3s progress.
22 BY ATTORNEY VAUGHN:
23    Q.   And all LI-RADS 3s would
24 include LI-RADS 3s that have a viral

Page 91

1 etiology; correct?
2    A.   Yes, all LI-RADS 3s -- all
3 LI-RADS 3s within LI-RADS population.
4    Q.   Are those with a viral
5 etiology more likely to go on to develop
6 HCC than those without a viral etiology?
7    A.   I have no data to support
8 that statement.
9    Q.   Have you done any research
10 into that?
11    A.   Into?
12    Q.   Have you done any research
13 to see if viral -- scratch that.
14      Have you done any research
15 to see if those with LI-RADS 3s that have
16 a viral etiology are more likely to go on
17 to develop HCC than those with LI-RADS 3s
18 without a viral etiology?
19    A.   I personally have not done
20 this research.
21    Q.   Do you remember at the end
22 of your expert report when you said there
23 was an MRI done in 2016 that was
24 incorrect?

Page 92

1      ATTORNEY ROSE:  Object to
2    the form.
3      THE WITNESS:  At the end of
4    the report, there was a -- it was
5    a mistake, MRI of 2 -- can you go
6    back to the report?
7      ATTORNEY VAUGHN:  Right here
8    (Indicating).
9      THE WITNESS:  Yes.
10 BY ATTORNEY VAUGHN:
11    Q.   And there was no MRI done in
12 2016.  Right?
13    A.   It was supposed --
14      ATTORNEY ROSE:  Object to
15    the form.
16      THE WITNESS:  It was
17    supposed to be April 2016 CT.
18      ATTORNEY VAUGHN:  You know
19    what?  I pulled up the wrong one.
20    Give me one second.  Kathryn
21    probably dropped the right one.
22      Sorry.  This is the one I
23    meant to pull up.
24 BY ATTORNEY VAUGHN:

Page 93

1    Q.   And this is what you cite,
2 correct, this 2020 paper by Kim?
3    A.   Uh-hum --
4    Q.   MRI --
5      ATTORNEY ROSE:  I'm sorry.
6    Mr. Vaughn?
7      ATTORNEY VAUGHN:  Yeah?
8      ATTORNEY ROSE:  I'm sorry.
9    I just want to make sure I have
10    what you're looking at.  This is
11    Exhibit 5?
12      ATTORNEY AVILA:  Yes, this
13    is Exhibit 5.
14      ATTORNEY ROSE:  Doctor, so
15    you know, Exhibit 5 is available
16    to you in the --
17      ATTORNEY VAUGHN:  Feel free
18    to download it and look it all
19    over.  Take your time with it.
20      ATTORNEY ROSE:  And the
21    study that you had up on the
22    screen earlier --
23      ATTORNEY VAUGHN:  We haven't
24    dropped it yet.  I opened up the

24 (Pages 90 - 93)

VICTORIA CHERNYAK, MD, MS

Page 94

1    wrong PDF.  That was my fault.
2         ATTORNEY ROSE:  Oh, okay.
3    You didn't intend to introduce
4    that as an exhibit; correct?
5         ATTORNEY VAUGHN:  No, yeah,
6    that was my fault.
7         ATTORNEY ROSE:  Thank you
8    for the clarification.
9    BY ATTORNEY VAUGHN:
10        Q.   All right, Doctor.  And this
11   study was done on those with an MRI;
12   correct?
13        A.   Yes.
14        Q.   And there was not an MRI
15   done on Mr. Roberts in 2016, was there?
16        A.   Correct.
17        Q.   On page 2, do you see where
18   they say: The progression of malignancy
19   is greater in untreated LR-4 observations
20   than untreated LR-3 observations?
21        A.   Yes.
22        Q.   Do you agree with that?
23        A.   Yes.
24        Q.   And this was a retrospective

Page 95

1    study.  You don't have any problems using
2    retrospective studies, do you?
3         A.   I do not.
4         Q.   Do you have any critiques of
5    people using retrospective studies as an
6    expert?
7         ATTORNEY ROSE:  Object to
8    the form and outside the scope.
9         THE WITNESS:  Do I answer?
10        ATTORNEY ROSE:  Yes, please.
11        THE WITNESS:  Retrospective
12   studies have well-established
13   limitations; however, vast
14   majority -- not vast, but majority
15   of the data that we have for
16   clinical research is
17   retrospective, just by nature of
18   the beast.
19   BY ATTORNEY VAUGHN:
20        Q.   Understood.
21        What patient population was
22   this study done in; do you recall?
23        A.   No.  I would have to go back
24   and look.

Page 96

1    Q.   That's fine.  I can take you
2    to it.
3         On the third page, in the
4    results section, actually, do you see
5    where it says:  57, which is 73 percent
6    of the patients, had a hep B virus
7    infection?
8         A.   Uh-hum, is it -- liver
9    cirrhosis or chronic hep B, yeah.
10        Q.   So three-fourths of the
11   patient population here had hep B;
12   correct?
13        A.   Uh-hum.
14        Q.   And you don't know if Mr.
15   Roberts had hep B, do you?
16        A.   But the next statement is:
17   85 percent have liver cirrhosis, in that
18   -- in this study.
19        Q.   Does liver cirrhosis
20   progress differently in those with a
21   viral etiology versus those without a
22   viral etiology?  Or is that outside your
23   expertise?
24        ATTORNEY ROSE:  Object to

Page 97

1    the form.
2         THE WITNESS:  That is
3    outside of my expertise.
4    BY ATTORNEY VAUGHN:
5         Q.   And so you wouldn't know if
6    it's proper to apply a study where the
7    patients had hep B cirrhosis to a person
8    who does not have hep B; correct?
9         ATTORNEY ROSE:  Object to
10        the form.
11        THE WITNESS:  LI-RADS
12   population -- if you would like to
13   pull up the study that you've just
14   referenced and showed, LI-RADS
15   population is patients who have
16   cirrhosis and those who have
17   hepatitis B infection with or
18   without cirrhosis and patients who
19   have personal history of HCC.
20        LI-RADS does not
21   differentiate between these
22   patients, meaning that the LI-RADS
23   criteria are all applicable
24   equally to any person who falls

25 (Pages 94 - 97)

VICTORIA CHERNYAK, MD, MS

Page 98

1    into the criteria of LI-RADS
2    population.
3 BY ATTORNEY VAUGHN:
4        Q.   Well, now, you say LI-RADS
5 is applicable to each person equally.
6 You don't actually know that yet.  Right?
7 It just applies it equally to each type
8 of person.  Right?
9        ATTORNEY ROSE:  Object to
10    the form.
11       THE WITNESS:  Can you please
12    specify what you're asking me?
13 BY ATTORNEY VAUGHN:
14       Q.   A LI-RADS 3 automatically
15 applies the same way to any patient,
16 regardless if they have a viral etiology
17 or don't have a viral etiology; correct?
18       A.   Correct.
19       Q.   I'm on page 7 of this study.
20 The bottom left-hand corner, it says:
21 Observations with HBP -- what is HBP?
22       A.   Hepatobiliary phase.
23       Q.   And which phase is that?
24 There's three phases, right -- oh, this

Page 99

1 is an MRI, so this wouldn't have been
2 done in a CT, would it?
3        A.   This is MRI and this is MRI
4 done with a very specific contrast agent
5 that this -- that Mr. Roberts did not
6 have this MRI.
7        Q.   And it says:  Isointensity
8 showed a considerably lower risk of
9 progression to LR-5 from LR-3
10 observations.
11       What is an LR-5 observation?
12       A.   LI-RADS 5 observation
13 definite HCC has about 95 percent
14 probability of being HCC, about 99
15 probability of being malignant.
16       Q.   So is this talking about
17 going from an LR-3 to HCC?
18       A.   Yes.
19       Q.   And you're saying those with
20 isointensity have a low risk of
21 progression?
22       A.   Have lower risk based on the
23 study.
24       Q.   And earlier were you telling

Page 100

1 me that Mr. Roberts had isointensity?
2        A.   No.  Again, this -- Mr.
3 Roberts never had MRI with hepatobiliary
4 phrase.
5        Q.   But you think this study
6 still applies to Mr. Roberts even though
7 he didn't have an MRI like it said he did
8 in your expert report in 2016?
9        ATTORNEY ROSE:  Object to
10    the form.
11       THE WITNESS:  Also, the
12    sentence you're highlighting talks
13    about a different study.  It says:
14    Similarly, a prior study including
15    a large proportion of observation
16    with hepatogram.
17       So it's -- the sentence
18    you're highlighting references a
19    prior study, but again, you know,
20    there are studies that look into
21    trying to figure out how we can
22    risk stratify LR-3 and LR-4
23    observations.
24       Again, there's no consistent

Page 101

1    results and there's no consistent
2    way in which we can say this
3    lesion will progress and this
4    lesion will not, and that's why
5    it's a considerable interest to
6    researchers and NIH particularly
7    to create such models, but such
8    models do not exist.
9 BY ATTORNEY VAUGHN:
10       Q.   And of all the studies that
11 you could have cited, this is the one you
12 decide to cite.  Right?
13       ATTORNEY ROSE:  Object to
14    the form.
15       THE WITNESS:  Yes, because
16    this study has the longest LR-3
17    follow-up.
18 BY ATTORNEY VAUGHN:
19       Q.   The risk of malignancy in
20 untreated final LR-3 observations seemed
21 low?
22       A.   Low enough to warrant
23 routine surveillance.
24       Q.   What does that mean?

26 (Pages 98 - 101)

VICTORIA CHERNYAK, MD, MS

1    A.    That patients with LR-3
2 observations need to be surveilled.  You
3 don't need to treat them right away, but
4 you do need to follow them.
5        It says:  low enough to
6 warrant routine surveillance.
7    Q.    And did you review the major
8 limitations of this study?
9    A.    Yes.
10    Q.    And you realize that one of
11 the limitations, again, of this study is
12 not only is a single-center study, but
13 the majority of patients have the hep B
14 virus, which may limit the
15 generalizability of our results?
16    A.    Generalizability, yes.
17    Q.    What does that mean?
18    A.    These are standard
19 limitations which are applicable to
20 retrospective studies, because you work
21 with sample that you have.  The study was
22 -- happened to be in the population that
23 has majority of patients who had
24 hepatitis B infection.

1        In this case -- in this
2 case, actually, this is a comparable
3 study because 85 percent of these
4 patients had HCC.
5    Q.    Are the study authors
6 warning against using their results in
7 patients without hep B?
8    A.    No.  They just --
9        ATTORNEY ROSE:  Object to
10    form.
11        THE WITNESS:  It's a
12    standard acknowledgment of caution
13    that if you open up any studies,
14    it discusses limitations, because
15    every studies -- every study has
16    limitations, even prospective,
17    randomized, controlled.
18        You know, any study you
19    find, the next to the last
20    paragraph will say, our study has
21    limitations, because that's --
22    unfortunately, every study has
23    limitations.  Nothing's perfect.
24 BY ATTORNEY VAUGHN:

1    Q.    Did you apply caution when
2 applying this study to this case?
3    A.    I did not just -- this study
4 was used to show the long-term, you know,
5 outcomes.  The results in these studies
6 are repeated in -- are supported by other
7 studies.  This one just happens to be the
8 longest one, which is -- that's why I --
9 I tend to cite it.
10        The opinions that I've
11 provided are based on meta-analyses,
12 which again, do not distinguish between
13 patients who have cirrhosis versus
14 patients who have hepatitis B infection
15 versus those who have personal history of
16 HCC.
17    Q.    And as you testified
18 earlier, you weren't aware of the patient
19 population in this study when you were
20 doing your expert report, correct, that
21 they were hep B patients?
22        ATTORNEY ROSE:  Object to
23    the form.
24        THE WITNESS:  I -- I don't

1    -- I'm not sure why this is
2    relevant.
3        This patient -- this study
4    is applicable to patients -- this
5    study uses patients who have
6    fallen into LI-RADS population.
7    LI-RADS applies to all patients
8    within the LI-RADS population
9    equally.  There's no caution,
10    limitation, or restrictions to how
11    we apply results like this.
12 BY ATTORNEY VAUGHN:
13    Q.    And you didn't cite to a
14 study where the patient population was
15 not hep B; correct?
16        ATTORNEY ROSE:  Object to
17    the form.
18        THE WITNESS:  The study that
19    I cited, the Lee, et al, has all
20    kinds of patient populations.
21 BY ATTORNEY VAUGHN:
22    Q.    I'm sorry.  I'm talking
23 about citation 8, Kim -- let me go back
24 here.

27 (Pages 102 - 105)

VICTORIA CHERNYAK, MD, MS

Page 106

1    So when you said:  When
2 followed long term, up to 60 percent of
3 LR-3 observations progress to HCC within
4 48 months --
5    A.   Yes.
6    Q.   -- you cited to Kim --
7    A.   Yes.
8    Q.   -- which is the hep B study
9 we just went over, and then you cited to
10 yourself and said that that was a
11 miss-cite.  So the only one you cited to
12 was a hep B study; correct?
13    A.   For this particular
14 statement, yes.
15    Q.   And in that statement, you
16 were talking about 48 months, even though
17 our client developed cancer within 28
18 months?
19    ATTORNEY ROSE:  Object to
20    the form.
21    THE WITNESS:  I was
22    providing the context of what
23    LI-RADS 3 means, is, and why it
24    requires follow-up.

Page 107

1 BY ATTORNEY VAUGHN:
2    Q.   Do you have a 2023
3 publication regarding looking back on
4 LI-RADS?  Do you recall that publication?
5    A.   Can you be more specific?  I
6 have a bunch of them.
7    ATTORNEY VAUGHN:  Yeah.
8    Kathryn, can you drop in the 2023
9    LI-RADS looking back?
10    ATTORNEY AVILA:  Okay.  This
11    is Exhibit 6.
12    - - -
13    (Deposition Exhibit No.
14    Chernyak-6, 2023 Article by
15    Chernyak, et al, "LI-RADS: Looking
16    Back, Looking Forward", was marked
17    for identification.)
18    - - -
19 BY ATTORNEY VAUGHN:
20    Q.   Doctor, do you recall this
21 paper that you published?
22    A.   Uh-hum.  Yes.
23    Q.   And you're the lead author
24 on this; correct?

Page 108

1    A.   Yes, sir.
2    Q.   And it's a 2023 publication?
3    A.   Yes, sir.
4    Q.   And you didn't cite this in
5 your expert report, did you?
6    A.   No.
7    Q.   And so did LI-RADS initially
8 come out in 2011?
9    A.   Yes.
10    Q.   And it says it has evolved
11 and expanded in scope.
12    A.   Yes.
13    Q.   Can you explain that?
14    A.   LI-RADS initially was
15 developed as a diagnostic scale.  Since
16 then, it includes the surveillance
17 algorithm that allows -- it's applied for
18 surveillance.  It also includes a
19 diagnostic algorithm that's applicable to
20 contrast enhanced ultrasound.  It also
21 includes posttreatment assessment
22 algorithms.  It includes lexicon...
23    Q.   Why has it evolved over
24 time?

Page 109

1    A.   Because the evidence was
2 accumulating and you can't start with
3 everything all at once, so we started
4 with something that was doable in 2011
5 and as that solidified, expanded to cover
6 other areas of HCC surveillance,
7 diagnosis, and posttreatment assessment.
8    Q.   And is LI-RADS still
9 evolving?
10    A.   Yeah.  Yes.
11    Q.   And it notes here that the
12 authors discuss the current gaps of
13 knowledge -- gaps in knowledge?
14    A.   Yes.
15    Q.   And were you one of those
16 authors that was discussing the knowledge
17 gaps regarding LI-RADS?
18    A.   Yes.
19    Q.   Can you go over those
20 knowledge gaps with us, if you recall?
21    A.   Do you want me to go into
22 very detail?
23    Q.   Yes.
24    A.   So in -- let's see -- in --

28 (Pages 106 - 109)

VICTORIA CHERNYAK, MD, MS

Page 110

1 you know, there are challenges in HCC
2 surveillance, primarily because
3 ultrasound is a very subjective modality
4 based on the way it's performed. It's
5 everywhere.
6        And at the time that this
7 paper came out in 2023, the visualization
8 scores, which is the assessment of how
9 diagnostic or how clear the liver is
10 visualized on ultrasound, at the time,
11 the visualization scores were not yet
12 incorporated into management and
13 assessment schema.
14       Since then, in 2024, an
15 updated ultrasound surveillance came out
16 that addressed that gap.
17       The next gap is diagnostic
18 population. Right now, the diagnostic
19 population is very restrictive, means
20 that we only can apply LI-RADS to
21 patients who have cirrhosis, who have
22 hepatitis B infection with or without
23 cirrhosis, or patients who have personal
24 history of HCC.

Page 111

1        We do know that this is very
2 restrictive, because patients who have,
3 for example, advanced fibrosis and have
4 underlying MASLD or hepatitis C infection
5 and have an advanced fibrosis, such
6 patients are, too, at higher risk of HCC.
7        Right now, we cannot use
8 LI-RADS criteria to diagnose the HCC
9 noninvasively in such patients and we're
10 proposing that potentially there some can
11 be imaging biomarkers, including
12 elastography values or some, you know,
13 blood biomarkers that eventually may help
14 us to expand patient population, but at
15 this point, it is not yet so.
16       LI-RADS is complex. We have
17 a decision tree. We have a -- a lot of
18 rules and regulations. Sometimes users
19 express that this is a very complex
20 system. Unfortunately, it is complex
21 because the nature of HCC diagnosis is
22 quite complex.
23       In the next release of
24 LI-RADS, we're trying to simplify it as

Page 112

1 much as we can; however, there's only so
2 much that you can do because, again, the
3 diagnosis of HCC is a complex matter as
4 it is.
5        The next question -- next
6 gap is the application of ancillary
7 features. Ancillary features are -- in
8 the current version of LI-RADS diagnostic
9 algorithm, we have many of them; however,
10 we have now accumulated sufficient data
11 to narrow that. We probably don't need
12 all of them and we can decrease this
13 number and we're planning to do that in
14 the next release.
15       The next, limited
16 sensitivity of LI-RADS 5 or HCC, because
17 we have very stringent criteria, very
18 demanding criteria, to ensure that when
19 we say something is LI-RADS 5 that it is
20 indeed LI-RADS 5, that means that we
21 maximize specificity of the diagnosis.
22       It is a general statement
23 for any test that if you maximize
24 specificity, you sacrifice sensitivity,

Page 113

1 meaning that if I say that LI-RADS 5 is
2 HCC, I am 95 percent probability that
3 something is HCC; however, only about
4 half to two-thirds of HCCs meet criteria
5 for LI-RADS 5.
6        So that's another gap that
7 we discussed that it would be great if we
8 could improve the sensitivity for LI-RADS
9 5 without sacrificing specificity. There
10 are certain things that we may consider,
11 but we do not yet know if we have enough
12 data to support these, so that may or may
13 not be applicable.
14       Challenges of indeterminate
15 observation is what I've discussed with
16 you, is that we have LI-RADS 3
17 observations that are -- that we stop
18 following them. Some of them progress,
19 some of them don't, but we just don't
20 know which one, so we cannot identify
21 exactly what -- what can be followed less
22 aggressively or not -- or more
23 aggressively, so that's a major
24 challenge, as I've discussed before.

29 (Pages 110 - 113)

VICTORIA CHERNYAK, MD, MS

Page 114

1    LI-RADS M is less of a
2 challenge. LI-RADS M means malignant,
3 but not HCC specific. Right now, LR-M
4 observations have to be biopsied even
5 though about a third of them end up being
6 HCC.
7        So there's a desire to
8 create some sort of criteria to recover
9 some of these HCCs back into LI-RADS
10 category. Probably we do not have yet
11 data, again, to identify these HCCs with
12 high enough specificity.
13        LI-RADS 4 is a lessor
14 challenge but because in -- it has about
15 60 to 70 percent probability of being
16 HCC, so depending on the context,
17 sometimes these patients get a biopsy,
18 sometimes these patients get just
19 treatment with presumptive diagnosis of
20 HCC, sometimes these patients get a
21 follow-up.
22        So there's, again, some
23 uncertainty there that would be great if
24 we could have some data to guide the

Page 115

1 management in more consistent manner, so
2 that's the challenge that we discuss
3 there.
4        What else? What other
5 challenges? Challenges in reporting,
6 again, there are certain requirements
7 that -- that unfortunately in a very busy
8 practice, people may not necessarily
9 adhere to.
10        So we are working on
11 figuring out how to make reporting
12 challenging -- less challenging,
13 including automatic reporting, including
14 natural language processing things,
15 providing templates for people to use.
16        There are also now work on
17 providing standardized templates for
18 treatment, for, like -- for IR -- for
19 interventional radiology to do so that we
20 can easier correlate for posttreatment
21 assessment, so that's reporting issues.
22        Treatment response
23 algorithm, the challenges that we discuss
24 here have been addressed, because a

Page 116

1 recent release has happened last year.
2 So last year, we have a treatment
3 response algorithm that came out that
4 addressed some of the challenges we
5 showed here, including incorporation of
6 ancillary features including separating
7 the treatment response assessment based
8 on radiation versus nonradiation
9 treatment.
10        Do you want me to go on to
11 future directions?
12    Q.   Please.
13    A.    So with future directions,
14 of course, this is, you know, very
15 nebulous, we hope things will, you know,
16 happen the way we hope, but may not, our
17 most important thing is incorporating of
18 AI into some of the assessments to
19 decrease some of the subjectivity that is
20 inherent right now in qualitative
21 assessment.
22        If you look at page 12 of
23 this paper, you will see this is the
24 grand vision -- this is the grand vision

Page 117

1 of something that we hope that will
2 happen eventually. This is probably 10
3 to 20 years from now, where we will have
4 some sort of AI model that will
5 incorporate a lot of information,
6 including imaging modality that we have,
7 including the features that are
8 pertaining to each particular
9 observation, including features that are
10 pertaining to the liver and to the
11 patient, including incorporating patient
12 factors, including all of these genetics,
13 including all of these things, and then
14 providing a much more precise
15 probability, so instead of saying, you
16 know, Mr. -- you know, patient X has
17 LI-RADS 3, which is 33 percent
18 probability, it would say something like,
19 this patient has, I don't know, 52.3
20 percent probability of having HCC and his
21 -- you know, this lesion has 92 percent
22 probability of responding to treatment X.
23        That is all theoretical and
24 really a desired hope. A lot of -- a lot

30 (Pages 114 - 117)

VICTORIA CHERNYAK, MD, MS

Page 118

1 of this will need computation power we
2 don't have, AI models we don't have.  It
3 requires us to create a large amount of
4 institutionalized registries, which is
5 proving to be very challenging.
6          So this vision is unlikely
7 to implement itself in the next five
8 years, hopefully in ten years.  But --
9 maybe I'm wrong, maybe, you know, a
10 breakthrough in some technology will
11 happen and it will be -- happen even
12 earlier.
13      Q.    So as you were saying, the
14 authors, which is you, envision LI-RADS
15 to eventually transform and will
16 integrate patient characteristics;
17 correct?
18      A.    Eventually.  Again --
19      Q.    Sorry.
20      A.    Eventually, hopefully next
21 -- many, many years.
22      Q.    Hopefully it does
23 eventually.  Right?
24      A.    Hopefully eventually.

Page 119

1      Q.    At this time, though, it
2 does not consider patient
3 characteristics.
4      A.    Correct.
5      Q.    And as you pointed me out to
6 page 12, patient factors that it is not
7 considering would be things like age,
8 sex, race, genetics, viruses -- would
9 that be like if they had a hep B virus --
10      A.    Hep B --
11          ATTORNEY ROSE:  Form.
12 BY ATTORNEY VAUGHN:
13      Q.    -- biomarkers and
14 circulating tumor DNA.  Currently, it is
15 not -- LI-RADS is not looking at the
16 patient factors; correct?
17      A.    Correct.
18      Q.    And in addition, you did not
19 look at Mr. Roberts' medical records to
20 identify all of his specific patient
21 factors; correct?
22          ATTORNEY ROSE:  Object to
23      the form.
24          THE WITNESS:  Correct.

Page 120

1 BY ATTORNEY VAUGHN:
2      Q.    I think earlier you
3 testified that you have to have certain
4 risk factors for LI-RADS to apply; is
5 that correct?
6      A.    Yes.
7      Q.    What risk factor does Mr.
8 Roberts have that allows you to apply
9 LI-RADS?
10      A.    He has imaging features of
11 cirrhosis.
12      Q.    And if he did not have
13 cirrhosis, you could not apply LI-RADS;
14 correct?
15          ATTORNEY ROSE:  Object to
16      the form.
17          THE WITNESS:  Patients who
18      do not have cirrhosis or viral
19      hepatitis or personal history of
20      HCC, LI-RADS, we cannot apply.
21 BY ATTORNEY VAUGHN:
22      Q.    And so if Mr. Roberts did
23 not have cirrhosis or hepatitis or a
24 history of HCC, you could not apply

Page 121

1 LI-RADS; correct?
2      A.    A patient without risk
3 factors, without precise -- who does not
4 fall into LI-RADS definition of LI-RADS
5 population, LI-RADS is not applicable.
6      Q.    And here on page 4, it says:
7 Therefore, research is needed to divine
8 the conditional probabilities of HCC
9 based on age, sex, etiology, and severity
10 of liver disease and possibly other
11 factors, such as quantitative imaging and
12 circulating biomarkers.
13          Is that talking about what
14 we were just talking about, things that
15 they're hoping LI-RADS does in the
16 future?
17      A.    Yes.
18      Q.    And why would they want
19 LI-RADS to be considering patient age?
20          ATTORNEY ROSE:  Object to
21      the form.
22          THE WITNESS:  These are all
23      theoretical things that we think
24      eventually may, you know -- to

31 (Pages 118 - 121)

VICTORIA CHERNYAK, MD, MS

Page 122

1  provide that precise probability,
2  eventually we hope that that will
3  somehow contribute to calculation
4  of the risk, you know, that you
5  have these imaging features in
6  this particular-looking liver, in
7  this particular patient.  All of
8  that, AI would take and do some,
9  you know, black box calculation --
10  or not black box calculation --
11  and spit out a number.
12      These are -- these are our
13  theoretical thoughts of what could
14  go into calculation of conditional
15  probability of HCC.
16 BY ATTORNEY VAUGHN:
17   Q.   And so currently, LI-RADS
18 cannot give a precise probability for an
19 individual patient on their LI-RADS 3
20 being an HCC; correct?
21      ATTORNEY ROSE:  Object to
22   the form.
23      THE WITNESS:  No.  We're
24   talking here about conditional

Page 123

1   probability.
2 BY ATTORNEY VAUGHN:
3   Q.   And you're saying eventually
4 you're hoping AI considers all these
5 patient-specific factors.  Right now, it
6 is the treating physician that considers
7 all the patient-specific factors;
8 correct?
9      ATTORNEY ROSE:  Object to
10   the form.
11      THE WITNESS:  No, because
12   right now, we -- we have a
13   well-established probability that
14   works -- right, if we take all
15   LI-RADS 3 observations everywhere
16   across the world and have a magic
17   wand and right now we will know
18   exactly precisely what each and
19   every one of those things is,
20   about 33 percent of all LI-RADS
21   observations in the world will be
22   -- will be HCC.
23 BY ATTORNEY VAUGHN:
24   Q.   And that's counting the

Page 124

1  people that have viral etiologies;
2 correct?
3   A.   That is anybody who falls
4 into LI-RADS population.
5      So what we are hoping, what
6 our future vision is, but we're nowhere
7 near this, is instead of saying that
8 patient has -- patient X has 33 percent
9 -- you know, has LI-RADS 3 and that means
10 that his probability of HCC is 33
11 percent, that that number would be edited
12 based on all kinds of different things
13 that we may not even can see right now,
14 texture analysis, we don't know any of
15 that yet.
16      So that's our hope because
17 then we can't -- we would be able to say,
18 okay, this patient -- these patients'
19 lesion needs to be -- have more attention
20 or less attention.  We do not have that
21 right now.
22      Right now, if you have
23 LI-RADS 3 observation, the recommendation
24 is for the patient -- for that lesion to

Page 125

1  be followed every three to six months.
2   Q.   And your hope or your goal
3 is for LI-RADS to be more accurate in the
4 future; correct?
5      ATTORNEY ROSE:  Object to
6   the form.
7      THE WITNESS:  Our hope and
8   goal eventually to provide more
9   precise probability of
10   patient-specific probability.
11 BY ATTORNEY VAUGHN:
12   Q.   Looking at page 5 of your
13 study, it notes:  The granularity of
14 LI-RADS burdens radiologists more than
15 systems that classify observations
16 dichotomously as definitive HCC versus
17 not.
18      Can you explain what that
19 means?
20   A.   Certainly.  So most other
21 diagnostic system only provide diagnostic
22 criteria for lesions that meet criteria
23 for HCC.  So what we -- what we provide
24 for LI-RADS 5, they provide for something

32 (Pages 122 - 125)

VICTORIA CHERNYAK, MD, MS

Page 126

1  that they call definite HCC or whatever
2  diagnostically -- whatever the criteria
3  they perform.
4        They do not provide any
5  criteria for anything that doesn't meet
6  the LI-RADS 5 criteria -- LI-RADS 5
7  criteria. Right?
8        So then everything else is
9  left up to a radiologist's discretion to
10 define, to describe. So there's an
11 enormous amount of inconsistencies or
12 interreader variability in terms of
13 opinions.
14       So LI-RADS takes that -- or
15 minimize -- or decreases that so that,
16 you know, if I look at this lesion and I
17 apply LI-RADS criteria, I provide the
18 category LR-3, as opposed to this patient
19 was -- you know, was -- let's say, used,
20 you know, former, you know, EASL
21 criteria, it would just be called
22 indeterminate and there would be no way
23 to say, you know, what the probability of
24 anything is and how this lesion should be

Page 127

1  treated.
2        Does that -- does that make
3  sense? Should I -- should I clarify that
4  in any way?
5     Q.   If you feel like you need to
6  clarify it, feel free.
7     A.   Only -- only if it's not
8  clear.
9     Q.   LI-RADS is the only system
10 that gives a probability of it being HCC;
11 correct?
12       ATTORNEY ROSE: Object to
13    form.
14       THE WITNESS: LI-RADS --
15    LI-RADS is the only system that
16    provides risk stratification based
17    on probabilities for categories.
18 BY ATTORNEY VAUGHN:
19    Q.   All other systems are, do
20 you have HCC or do you not have HCC;
21 correct?
22    A.   Correct.
23    Q.   How many other systems are
24 there besides LI-RADS?

Page 128

1     A.   Well, it's decreasing,
2  because in United States, there's no
3  other system, because LI-RADS was adopted
4  in AASLD in 2018 and UNOS, which is the
5  system for liver transplantation
6  allocation graft, they've adopted LI-RADS
7  criteria as of 2023, I believe -- '23 or
8  '24. I think -- it is I think '23, but I
9  would have to get the precise date -- and
10 as of January of this year, so January of
11 2025, the EASL criteria, which is
12 European criteria for HCC, have adopted
13 LI-RADS.
14       So as of right now, LI-RADS
15 is a unified imaging criteria used for
16 assessment of liver in high-risk patients
17 in North America, Europe. Either all or
18 parts of LI-RADS are used in South
19 America either as is or adopted into
20 their specific -- you know,
21 country-specific guidelines.
22       The Korean KCL criteria,
23 they've adopted LI-RADS lexicon. They're
24 a definite HCC -- so there -- there --

Page 129

1  the Western criteria are basically
2  harmonized. Every -- you know, most of
3  the countries adopted LI-RADS.
4        The Eastern criteria are a
5  little tricky because they have different
6  treatment paradigm for their patients and
7  therefore they -- they are interested in
8  maximizing sensitivity of HCC diagnosis
9  as opposed to Western guidelines which
10 maximize specificity.
11       So the Eastern guidelines,
12 including the Korean and APASL criteria,
13 which is Asian Pacific Study for Liver
14 Disease, they -- they have cited
15 different criteria expanding so that they
16 improve sensitivity by -- you know, at
17 the expense of specificity.
18       So -- does that make -- did
19 I answer your question?
20    Q.   Do you know why the Eastern
21 civilians are more concerned with the
22 specificity than the Western
23 civilizations?
24       ATTORNEY ROSE: Object to

33 (Pages 126 - 129)

VICTORIA CHERNYAK, MD, MS

Page 130

1 the form.
2      THE WITNESS: It's the other
3 way around. Because they have
4 different patient population and
5 they treat patients differently
6 than we do --
7 BY ATTORNEY VAUGHN:
8    Q.  What's different -- sorry.
9    A.  Our -- we -- our Western
10 populations have a higher proportion of
11 patients with cirrhosis, where resection
12 is not always a possibility because of
13 liver reserve, and the -- really the goal
14 or the best treatment that we can offer
15 patients is liver transplantation.
16      And as you can imagine, you
17 know, there's only so many liver organs
18 that are available, so when we prioritize
19 somebody to receive a liver organ, we
20 want to make sure that we are
21 prioritizing patients who truly have HCC.
22      So that's why we maximize
23 specificity, meaning that when I say
24 somebody has LR-5, it is almost -- it's

Page 131

1 as good as biopsy that this is indeed an
2 HCC.
3      In Asia, where the
4 proportion of -- of hepatitis B patients
5 is much higher and a lot of them have
6 preserved liver function, they -- they
7 more often are treated with resection, so
8 they can afford to be less specific, but
9 more sensitive because they were --
10 they're able to treat their patients in a
11 different manner that we can't.
12    Q.  And so the Asian populations
13 have higher rates of hep B than Western
14 civilization?
15    A.  Yes.
16    Q.  And so they want their
17 LI-RADS different because their patients
18 have hep B; correct?
19      ATTORNEY ROSE: Object to
20 the form.
21      THE WITNESS: No. They have
22 patient -- they have -- their
23 patients -- they have patients who
24 because hepatitis B virus is

Page 132

1 tumorigenic, means that it can
2 cause HCC without going through
3 the process of cirrhosis, that
4 means that they have higher
5 proportion of patients who have
6 HCC without actually having
7 cirrhosis, that means that they
8 are able to offer resection to
9 these patients because their liver
10 is not -- they have substantial
11 liver reserve, meaning that you
12 can lose part of the liver and
13 still survive and have reasonable
14 liver function.
15      Patients with cirrhosis,
16 their liver function may be such
17 that they don't have livers or
18 meaning that if they lose half of
19 their liver, they won't be able to
20 function -- the liver won't be
21 able to function.
22      So there's different patient
23 populations, different paradigms.
24 BY ATTORNEY VAUGHN:

Page 133

1    Q.  So you agree that those with
2 hep B are at higher risk of HCC than
3 those without hep B?
4    A.  No, that's not why I'm
5 saying.
6    Q.  Do you agree with the
7 statement I just made?
8    A.  I disagree with --
9      ATTORNEY ROSE: Object to
10 the form.
11 BY ATTORNEY VAUGHN:
12    Q.  You don't believe that those
13 with hep B are more likely to develop HCC
14 than those without hep B?
15    A.  That statement is correct,
16 that patients who have hepatitis B of
17 course have higher risk of development of
18 HCC than patients who don't have HCC --
19 I'm sorry -- who don't have hepatitis B.
20    Q.  And those with a LI-RADS 3
21 that have hepatitis B are more likely to
22 progress to HCC than those without hep B;
23 correct?
24      ATTORNEY ROSE: Object to

VICTORIA CHERNYAK, MD, MS

Page 134

1  the form.
2      THE WITNESS:  I do not have
3  scientific evidence that -- I
4  don't have -- I am not aware of
5  any study that looked at LI-RADS 3
6  progression in the setting of
7  cirrhosis but no hepatitis B
8  versus progression of LR-3s in the
9  setting of hepatitis B without
10  cirrhosis.
11      There's no study based on my
12  knowledge that looked at this
13  particular question, so I have no
14  scientific evidence to compare the
15  rates of progression in patients
16  who have cirrhosis versus patients
17  who just have hepatitis B.
18      ATTORNEY ROSE:  Brett, we've
19  been going for about an hour.  I
20  just wanted to flag that, if you
21  have a good stopping point.
22      ATTORNEY VAUGHN:  Do you
23  mind if I get through this study,
24  Doctor, or do you want to take a

Page 135

1  break right now?  I'm fine either
2  way.
3      THE WITNESS:  Can you be off
4  the record for a second?
5      ATTORNEY VAUGHN:  Say again?
6      THE WITNESS:  Can you be off
7  the record for a second?
8      ATTORNEY VAUGHN:  We can
9  take a break.  Let's go ahead and
10  take a break.
11      THE WITNESS:  I just need to
12  use the restroom.
13      ATTORNEY VAUGHN:
14  Absolutely.
15      THE VIDEO TECHNICIAN:  Off
16  the record, 11:13.
17          - - -
18      (A discussion off the record
19  occurred.)
20          - - -
21      (A recess was taken from
22  11:14 a.m. to 11:30 a.m.)
23      THE VIDEO TECHNICIAN:  We
24  are back on the record at 11:30

Page 136

1  a.m.
2  BY ATTORNEY VAUGHN:
3      Q.   Earlier, Doctor, you were
4  testifying about ancillary factors?  Do
5  you recall if Mr. Roberts had any
6  ancillary factors in his 2016 scans?
7      ATTORNEY ROSE:  Object to
8  the form.
9      ATTORNEY VAUGHN:  Sorry.
10  Let me rephrase that.  I said
11  factor.  I believe it was
12  ancillary features.
13      THE WITNESS:  Yes.
14  BY ATTORNEY VAUGHN:
15      Q.   Did Mr. Roberts have any
16  ancillary features in his 2016 scan?
17      A.   No.
18      Q.   And do ancillary features --
19  scratch that.
20      If ancillary features are
21  present, is it more likely to be HCC?
22      ATTORNEY ROSE:  Object to
23  the form.
24      THE WITNESS:  It depends

Page 137

1  what features.
2  BY ATTORNEY VAUGHN:
3      Q.   Which ancillary features
4  would make it more likely to be HCC?
5      ATTORNEY ROSE:  Object to
6  the form.
7      THE WITNESS:  There are
8  ancillary features favoring
9  malignancy in general.  There are
10  ancillary features that favor HCC
11  specifically, and there are
12  ancillary features of benignity.
13      Ancillary features that
14  favor HCC specifically are nodule
15  -- nodular appearance, mosaic
16  appearance, nonenhancing capsule
17  and -- am I too fast, Kim?  It's
18  okay?  You good?  Okay.  Sorry --
19  and blood products in mass, also
20  fat in mass, so these are fairly
21  specific for HCC, although recent
22  data, again, demonstrates that
23  these present very uncommonly in
24  clinical practice.  Even though

35 (Pages 134 - 137)

VICTORIA CHERNYAK, MD, MS

Page 138

1    they're quite specific for HCC,
2    they are very -- we -- we see them
3    uncommonly.
4 BY ATTORNEY VAUGHN:
5    Q.   And you didn't see any of
6 the ancillary features supporting HCC in
7 Mr. Roberts' 2016 imaging; correct?
8    A.   There were no ancillary
9 features present, and because -- had they
10 -- you know, so if ancillary features are
11 present, we increase the category.
12        So if either of them were
13 present, then I would -- I would have
14 said that these are LR-4 observation, not
15 LR-3.
16    Q.   And if the same workup was
17 in LR-2, the ancillary feature would bump
18 it up to an LR-3 or would it bump it all
19 the way to LR-4?
20    A.   No, you can only bump up one
21 category.
22    Q.   So you can have ancillary
23 features and still be an LR-3?
24    A.   Yes. Ancillary feature

Page 139

1 application is not mandatory, so it is --
2 it is left to the interpreting
3 radiologist whether or not they want to
4 apply ancillary features assigning the
5 final category.
6        There are rules about how to
7 apply them, but you're not -- you're not
8 required to apply them.
9    Q.   I'm going to go back to the
10 study that we were previously on, your
11 2023 LI-RADS study. I'm on page 8 and
12 I'm at the paragraph --
13    A.   Exhibit 6?
14    Q.   What was that?
15    A.   Exhibit 6?
16    Q.   I believe it was Exhibit 6,
17 the most recent one we've admitted.
18    A.   Page?
19    Q.   Page 8, and I'm on the
20 section where it starts in bold:
21 Challenges of Intermediate Observations.
22 And intermediate observations, that's an
23 LR-3; correct?
24        ATTORNEY ROSE: Object to

Page 140

1    the form. I think you read the
2    document incorrectly, Brett.
3        ATTORNEY VAUGHN: Challenges
4    of -- I did that the other day,
5    too. Thanks, Nina.
6        Challenges of indeterminate
7    observations, is that an LR-3?
8        THE WITNESS: For the
9    purposes of this particular text,
10    you can see that the indeterminate
11    is placed in quotations, and this
12    entire paragraph discusses the
13    observation -- the challenges that
14    we see with LR-3, 4, and M
15    category.
16 BY ATTORNEY VAUGHN:
17    Q.   So LR-3, LR-4, and LR-M are
18 all indeterminate observations?
19    A.   They are indeterminate for
20 the purposes of this application.
21    Q.   What do you mean by that?
22    A.   This is not the term that's
23 used in LI-RADS. This is just a section
24 header kind of putting them together so

Page 141

1 we can discuss these challenges with
2 these categories in one section.
3        As you can see, the way that
4 the paper is structured, that every
5 paragraph has its own kind of header
6 unifying the theme of the paragraph, so
7 that's what we call it. The
8 indeterminate observation is not a
9 LI-RADS-specific or defined term.
10    Q.   Gotcha. But in your own
11 publication, you call an LR-3
12 indeterminate; correct?
13        ATTORNEY ROSE: Object to
14    the form.
15        THE WITNESS: No, we did
16    not. We said -- we -- we use this
17    as a header to discuss the
18    challenges with LR-3, 4, and M
19    category; but if go and start
20    reading the text, it's either LR-3
21    or LR-3 means indeterminate
22    probability of malignancy.
23        So --
24 BY ATTORNEY VAUGHN:

36 (Pages 138 - 141)

VICTORIA CHERNYAK, MD, MS

1    Q.   Is it intermediate or
2 indeterminate?
3    A.   LR-3 means intermediate
4 probability of malignancy.
5    Q.   What does this mean,
6 challenges of indeterminate observations,
7 in your study that you published?
8    A.   So challenges that are -- we
9 face with LR-3, 4, and M categories
10 where, again, for LR-3 category, as we've
11 discussed, the challenges is that right
12 now, we have no way to risk stratify them
13 and the probability of HCC and malignancy
14 in these observations is now -- is not
15 low enough where we can say forget about
16 them and patient just can go back to
17 routine surveillance, and it's not high
18 enough where we can say patient needs to
19 be biopsied or treated.  Right?
20        So we're struck with these
21 observations.  We know some of them will
22 progress.  We know some of them will not.
23 We just don't have a good way of saying
24 which one, so then we're stuck.

1        We're saying every person
2 who has LR-3 observation has to have
3 three- to six-month follow-up and as I
4 mentioned before, this of course produces
5 quite a bit of a healthcare burden, so
6 therefore this is a challenge recognized
7 by us, recognized by NIH.
8        Unfortunately, this
9 challenge is -- as of 2025 is unsolved,
10 so right now, we still have to follow
11 LR-3 observations every three to six
12 months.
13        ATTORNEY VAUGHN:  Is that
14 your dog snoring in the
15 background?
16        THE WITNESS:  Yes.  I'm
17 really sorry.  Should I kick her
18 out?  Let me wake her up.
19        (Pause.)
20        THE WITNESS:  I changed --
21 I'm really sorry.  I changed her
22 position.
23        ATTORNEY VAUGHN:  You're
24 okay.

1        THE WITNESS:  Sorry about
2    that.
3 BY ATTORNEY VAUGHN:
4    Q.   So when it's talking about
5 these challenges, is this one of them, an
6 additional complication that LR-3 and
7 LR-4 observations have variable natural
8 history?
9    A.   Yes.
10    Q.   And can you explain that
11 sentence for me?
12    A.   Again, if we take all LR-3
13 observations and follow them, some of
14 them will progress to HCC fairly quickly.
15 Some of them will progress to HCC very
16 slowly.  Some of them will be unchanged.
17 Some of them will resolve.
18        So, again, we don't have a
19 good model that identifies those LR-3s
20 which will end up progressing to HCC.
21    Q.   And what does the word
22 "variable natural histories" mean?
23    A.   Just what it says.  Natural
24 history means if you just let it go

1 without treating, like, what will happen
2 to it, that's what natural history means.
3 Variable means some progress quickly,
4 some don't progress, some regress, some
5 stay the same.
6    Q.   And then in your study, you
7 noted that several studies found that all
8 LR-3 observations 23 to 60 percent,
9 remained LR-3; is that correct?
10    A.   Yes.
11    Q.   And do you stand by that?
12    A.   That is not my cite.  These
13 are the citations that I provide.
14    Q.   And you found in your study
15 that this is worth citing to and
16 discussing; correct?
17        ATTORNEY ROSE:  Object to
18    the form.
19        THE WITNESS:  This is not a
20    -- this paper that you're
21    referring to is not a study.  It's a
22    review paper.
23 BY ATTORNEY VAUGHN:
24    Q.   So your publication, your

VICTORIA CHERNYAK, MD, MS

Page 146

1 review paper, you noted that several
2 studies found that all LR-3 observations,
3 23 to 60 percent remained LR-3; correct?
4     A.    Yes.
5     Q.    And that's what Mr. Roberts
6 had -- that you say Mr. Roberts had, was
7 an LR-3; correct?
8     A.    Yes.
9     Q.    And so in your opinion, did
10 Mr. Roberts have a 23 to 60 percent
11 chance of that LR-3 remaining as an LR-3?
12         ATTORNEY ROSE:  Object to
13     the form.
14         THE WITNESS:  Based on the
15     evidence that we have, he had 23
16     to 60 percent chance that it would
17     remain, 7 to 24 percent chance of
18     progression.
19         You can -- you can see how
20     these numbers are very, very --
21     the ranges are big and that
22     underscores the challenges, that
23     we don't have a good sense of
24     which of the LR-3 observations

Page 147

1     will stay the same, progress, or
2     change.  We just don't know.
3     That's why we have to follow them.
4 BY ATTORNEY VAUGHN:
5     Q.    Is LR-3 kind of just
6 guesswork?
7         ATTORNEY ROSE:  Object to
8     the form.
9         THE WITNESS:  It is a
10     collection of observations that
11     imaging features are such that the
12     probability of HCC at that
13     particular moment is 33 percent.
14         So it's not low enough to
15     say forget about it.  It's not
16     high enough to say we must do
17     something about it right this very
18     second.  It's intermediate, as the
19     name states, and therefore we have
20     to follow these patients.
21         Unfortunately, we don't have
22     any good tools other than let's
23     just wait and see what it does.
24         But it's enough probability

Page 148

1     that -- or enough of them progress
2     that we can -- that we have to say
3     that we need to follow them more
4     closely than a person who doesn't
5     have anything in their liver.
6 BY ATTORNEY VAUGHN:
7     Q.    And you agree that Mr.
8 Roberts' LR-3 in 2016 had a 15 to 68
9 percent chance of decreasing to an LR-1
10 or LR-2?
11     A.    Based on available image --
12 literature, yeah.
13     Q.    And so would you agree it's
14 most likely that Mr. Roberts LR-3 in 2016
15 would have either stayed as an LR-3 or
16 decreased to an LR-1 or 2?
17         ATTORNEY ROSE:  Object to
18     the form.
19         THE WITNESS:  I have --
20     we're looking at probabilities as
21     they apply to the entire
22     population and it comes to -- so
23     if you said -- if, you know, any
24     given LR-3 has a -- then it's

Page 149

1     true.  The problem is applying
2     population probabilities to a
3     particular patient is difficult,
4     because it is a very specific
5     lesion we're talking about.
6         Because we cannot say with
7     any degree of reasonable certainty
8     that this particular lesion in Mr.
9     Roberts' case would actually
10     regress or stay the same, that is
11     why this lesion requires a
12     follow-up, because there's no way
13     to say how this lesion will
14     behave, because there is up to 24
15     percent chance of progression and
16     -- and if it progresses, it's an
17     aggressive disease.
18         So the goal is to monitor
19     and if they, you know, resolve,
20     then the patient can go back to a
21     routine surveillance schedule.
22         By the way, patients once
23     they have cirrhosis have to be
24     under routine surveillance, so

38 (Pages 146 - 149)

VICTORIA CHERNYAK, MD, MS

Page 150

1 having cirrhosis and even having
2 nothing, meaning that -- let's say
3 if you have a patient who has
4 cirrhosis and they have an
5 imaging, CT or MR, and there's
6 nothing -- there's not a lesion in
7 this liver, that patient still
8 requires fairly close monitoring
9 because presence of cirrhosis
10 indicates the patient is at risk
11 for HCC and it has to be
12 monitored.
13 BY ATTORNEY VAUGHN:
14     Q.    You just testified that
15 there's no way to tell if an LR-3 will
16 progress to HCC; correct?
17         ATTORNEY ROSE:  Object to
18     the form.
19         THE WITNESS:  Other than
20     following it up.
21 BY ATTORNEY VAUGHN:
22     Q.    And then in your 2023 study,
23 you also noted that some retrospective
24 studies have identified independent

Page 151

1 predictors of progression, such as hep C
2 virus, personal history of HCC, threshold
3 growth, presence of arterial
4 hyperenhancement, size greater than 10
5 millimeters, T2 hyperintensity, diffusion
6 restriction, and HBP hypointensity.
7         Did I read that right?
8     A.    Yes.
9     Q.    And do you agree with what
10 you said here in your publication?
11     A.    Yes, but finish the
12 sentence: But other studies have failed
13 to show associations of these factors
14 with outcomes.  That's why I'm saying --
15 some studies say, you know, this feature
16 is associated with progression.  There
17 are also studies that fail to show this.
18 That's why we don't have a good way of
19 determining what will progress, what will
20 not, other than following it up.
21     Q.    How many studies say that
22 those independent predictors do indicate
23 risk of it progressing to HCC?
24         ATTORNEY ROSE:  Object to

Page 152

1 the form.
2         THE WITNESS:  I'm not -- I'm
3     not sure I followed your question.
4 BY ATTORNEY VAUGHN:
5     Q.    Are there more studies that
6 say that these independent predictors are
7 valid to use to see if it will progress
8 to HCC or are there more saying that
9 these are irrelevant?
10         ATTORNEY ROSE:  Object to
11     the form.
12         THE WITNESS:  I couldn't
13     tell you off the top of my head
14     how many studies, you know, state
15     one versus another.
16         The point is that the data
17     that we have right now is
18     insufficient to say only lesions
19     that, say, are over 10 millimeters
20     need to be followed or only
21     lesions that have T2
22     hyperintensity need to be
23     followed.  We just don't have that
24     data; therefore, anybody with LR-3

Page 153

1     observation needs to have three to
2     six months' follow-up.
3 BY ATTORNEY VAUGHN:
4     Q.    If a patient had multiple of
5 those independent predictors of
6 progression of HCC, would they be at
7 higher risk in your opinion of an LR-3
8 turning to HCC?
9     A.    If -- if a -- if the lesion
10 had more than one of these features
11 present, I would not categorize it as
12 LR-3.  I would categorize it as LR-4.
13     Q.    Why does your publication
14 then talk about stratifying LR-3 and list
15 these?
16         ATTORNEY ROSE:  Object to
17     the form.
18         THE WITNESS:  Because we
19     have some data, but the data is
20     inconsistent and insufficient to
21     say, if you have -- if you don't
22     have these, don't worry about
23     them.  We just don't have that
24     data.

39 (Pages 150 - 153)

VICTORIA CHERNYAK, MD, MS

Page 154

1    So you can see the next
2    sentence:  Reliable and accurate
3    stratification of LR-3 and LR-4
4    observation has been identified as
5    a major unmet clinical need by
6    National Institutes for Health,
7    provided so you can see that -- as
8    I -- I think I -- I believe I
9    mentioned that before, that this
10   is an important -- an important
11   thing that we encounter in
12   clinical practice a lot and,
13   again, the -- there's a really
14   significant need to say -- to have
15   some sort of reliable method to
16   say, this lesion will progress,
17   this lesion will not, and right
18   now we don't have that reliable
19   method.
20       The only way -- the only
21   thing that we can do is say that
22   this lesion meets criteria for
23   LI-RADS 3.  It needs to be
24   followed up every three to six

Page 155

1    months.
2  BY ATTORNEY VAUGHN:
3    Q.   And the National Institutes
4  for Health is saying that not stratifying
5  LR-3s is a major unmet clinical need;
6  correct?
7       ATTORNEY ROSE:  Object to
8    the form.
9       THE WITNESS:  No.  It says
10   that we need to have reliable and
11   accurate stratification methods
12   developed.
13  BY ATTORNEY VAUGHN:
14   Q.   And, currently, LI-RADS does
15  not have reliable and accurate
16  stratification of LR-3s; correct?
17   A.   Correct.
18   Q.   And that is what the
19  National Institutes of Health is saying
20  is a major unmet clinical need; correct?
21   A.   The major unmet clinical
22  need is the necessity to develop such
23  tools to stratify -- to risk stratify
24  LR-3s and LR-4s.

Page 156

1    Q.   Which currently LI-RADS does
2  not do.
3    A.   Which currently is not
4  available in any system across the board.
5    Q.   Looking at page 11 of that
6  same study you published in 2023, and do
7  you agree that an inherent and
8  intractable challenge in any radiological
9  system is the subjectivity in
10  interpretation?
11   A.   Yes.
12   Q.   And that includes even
13  features that are reported numerically,
14  such as size, are subject to interreader
15  variability?
16   A.   Yes.
17       ATTORNEY VAUGHN:  Kathryn,
18   can we do the 2018 article by Dr.
19   Chernyak next?
20       ATTORNEY AVILA:  Okay.  This
21   is Exhibit 7.
22          -  -  -
23       (Deposition Exhibit No.
24   Chernyak-7, Review Article by

Page 157

1    Chernyak, et al, "Liver Imaging
2    Reporting and Data System
3    (LI-RADS)
4    Version 2018: Imaging of
5    Hepatocellular Carcinoma
6    in At-Risk Patients", was marked
7    for identification.)
8          -  -  -
9  BY ATTORNEY VAUGHN:
10   Q.   Are you familiar with this
11  study, Dr. Chernyak?
12   A.   This is a review article.
13  It's not a study.
14   Q.   Oh, I'm sorry.  This
15  publication.
16   A.   Yes.
17   Q.   You were the lead author on
18  this publication?
19   A.   Yes.
20   Q.   In 2018?
21   A.   Yes.
22   Q.   And it was published in --
23  is this Radiology, is that a journal?
24   A.   Yes.

40 (Pages 154 - 157)

VICTORIA CHERNYAK, MD, MS

Page 158

1    Q.   Is this peer reviewed?
2    A.   This is the leading journal
3 in our field -- in our field.  Yes, it is
4 peer reviewed.
5    Q.   And this study is on
6 LI-RADS; correct?
7    A.   This publication is on
8 LI-RADS, correct.
9    Q.   Sorry.  Publication.
10        We can go to the end of it
11 really quickly on page 13.
12    A.   Page --
13    Q.   Yeah, I'm just looking at
14 the very end of it where it notes author
15 contributions.  It says:  The guarantors
16 of the integrity of the entire study, VC.
17 Are you VC?
18    A.   Yes.
19    Q.   So you guarantee the
20 integrity of this study?
21    A.   This is a --
22        ATTORNEY ROSE:  Object to
23     the form.
24        THE WITNESS:  This is a

Page 159

1     standardized templated statement.
2     This is not a study, but I -- does
3     that make sense?
4 BY ATTORNEY VAUGHN:
5    Q.   So you guarantee the
6 integrity of the publication?
7    A.   As an author, yeah.
8    Q.   And you would be responsible
9 for updating it if anything was
10 inaccurate within it?
11        ATTORNEY ROSE:  Object to
12     the form.
13        THE WITNESS:  Yes.
14 BY ATTORNEY VAUGHN:
15    Q.   And you had no conflicts of
16 interest at this time, correct, or at
17 least you did not disclose any?
18    A.   I did not have any.
19    Q.   Would you consider at this
20 point you having a conflict of interest,
21 now that you're working for ZHP?
22        ATTORNEY ROSE:  Object to
23     the form.
24 BY ATTORNEY VAUGHN:

Page 160

1    Q.   If you were to publish this
2 today.
3        ATTORNEY ROSE:  Object to
4     the form.
5        THE WITNESS:  No.
6 BY ATTORNEY VAUGHN:
7    Q.   If you were to publish this
8 study today, would you disclose that you
9 were an expert in this case?
10        ATTORNEY ROSE:  Object to
11     the form.  She said multiple times
12     it's not a study.
13        ATTORNEY VAUGHN:  My
14     apologies.
15 BY ATTORNEY VAUGHN:
16    Q.   If you published this
17 article today, would you disclose working
18 for ZHP as a conflict of interest?
19        ATTORNEY ROSE:  Object to
20     the form.
21        THE WITNESS:  I -- when we
22     submit the articles, it asks
23     specific things, including
24     consulting, and some -- some

Page 161

1     journals do ask about expert
2     testimonies, which I would.
3        I don't remember if
4     Radiology asks for it, so
5     depending on what it asks for.  So
6     if it did ask, I would disclose
7     it.
8 BY ATTORNEY VAUGHN:
9    Q.   Up here at "CT/MRI
10 Technique," it notes:  The minimal
11 required and optimal images for CT and
12 MRI are listed in figure 4.
13        ATTORNEY ROSE:  I'm sorry.
14     Brett, what page are we on?  I
15     can't see --
16        ATTORNEY VAUGHN:  I'm on
17     page -- it's page 4, 819 of the
18     study, but PDF page 4.
19        ATTORNEY ROSE:  Thank you.
20     I'm there.
21 BY ATTORNEY VAUGHN:
22    Q.   And do you see what I'm
23 talking about, Doctor, where it says, "CT
24 MRI Technique":  The minimal required and

41 (Pages 158 - 161)

VICTORIA CHERNYAK, MD, MS

Page 162

1 optimal images for CT and MRI are listed
2 on figure 4?
3      A.   Yep.
4      Q.   And then I did want to go
5 right down here.  In your publication,
6 you note that MRI is more sensitive than
7 CT.  You agree with that statement;
8 correct?
9      A.   With the simplest
10 specificity; however, the difference are
11 small and the -- and the comparative
12 performance of CT and MR has not yet been
13 studied in community settings.
14          I can provide you -- well,
15 one of the papers that I cited in my
16 report actually looked at MRI and CT and
17 we found no statistically significant
18 difference in proportions of HCC between
19 CT/MR with extracellular contrast agent
20 and hepatobiliary agents in the
21 meta-analyses for probabilities of HCC
22 per each category.
23          This is -- this is 2018.
24 This is the initial study that announced

Page 163

1 -- initial publication that announced
2 release of version 2018 of LI-RADS and
3 the study that I'm referring to is Lee,
4 et al, study published in 2023.
5      Q.   What does "more sensitive"
6 mean?
7      A.   It means that it is able to
8 pick up disease better or it's more
9 likely to pick up disease when it's
10 present.
11     Q.   This -- right here, it says:
12 Late arterial phase imaging is strongly
13 preferred over early arterial phase
14 imaging to maximize the likelihood of
15 depicting APHE, which is a major feature
16 of HCC.
17          Do you agree with that
18 statement?
19     A.   Yes.
20     Q.   Can you explain that
21 statement?
22     A.   Arterial -- APHE, A-P-H-E,
23 arterial phase hyperenhancement, is a
24 requirement for noninvasive diagnosis of

Page 164

1 HCC, and we need arterial phase to
2 determine it, to see it.  And it is, late
3 arterial phase has a better chance of
4 showing it.
5      Q.   What is late arterial phase
6 versus early arterial phase?
7      A.   It refers to the timing of
8 acquisition of arterial phase.
9      Q.   Is that the third phase of
10 the CT?
11     A.   It is the first
12 post-contrast phase.
13     Q.   What makes it late versus
14 early?
15         ATTORNEY ROSE:  Object to
16     the form.
17         THE WITNESS:  Certain
18     appearances and feeling of certain
19     vessels in the liver.
20 BY ATTORNEY VAUGHN:
21     Q.   In the 2016 CT for Mr.
22 Roberts, was it a late arterial phase or
23 early arterial phase?
24     A.   I would have to go back and

Page 165

1 double-check.
2      Q.   What would you check for
3 that?
4      A.   I would check the appearance
5 of the vessels.
6      Q.   And did you check that at
7 the time you were forming your expert
8 opinions?
9      A.   Yes.
10     Q.   But you didn't note if it
11 was late or early?
12         ATTORNEY ROSE:  Object to
13     the form.
14         THE WITNESS:  It's not a
15     requirement for LI-RADS to -- for
16     -- to note that and even though
17     the late arterial phase is
18     preferred, not having one does not
19     render the exam nondiagnostic or
20     LI-RADS not applicable.
21 BY ATTORNEY VAUGHN:
22     Q.   And when you say preferred,
23 it's strongly preferred; correct?
24     A.   Strongly preferred because

42 (Pages 162 - 165)

VICTORIA CHERNYAK, MD, MS

Page 166

1  it has a better chance of showing
2  arterial phase hyperenhancement; and as I
3  mentioned, without it, you cannot
4  diagnose something as -- as noninvasive
5  HCC.
6        I would like to note that in
7  2016 case, all the lesions were under 10
8  millimeters, means that there was, by
9  definition, regardless of anything else,
10  they cannot be assigned LI-RADS 5
11  category.
12        So if I were reading this
13  case, I would still not -- I -- the
14  recommendation would be the same,
15  follow-up in three to six months, because
16  these lesions are not diagnosable as HCC
17  even if every -- if the timing was
18  perfect and there was an arterial phase
19  hyperenhancement, it still would not
20  allow us to diagnose something as HCC and
21  the patient would just have to come back
22  in three to six months for follow-up.
23     Q.   And you said if all imaging
24  was perfectly done.  What if it wasn't

Page 167

1  perfectly done?  You would still just be
2  an LR-3?
3        ATTORNEY ROSE:  Object to
4  the form.
5        THE WITNESS:  This study in
6  2016 was -- was done in a way that
7  LI-RADS was applicable and there
8  was no need to repeat the study
9  immediately.
10        There is a category called
11  LR-NC.  LR-noncategorizable is
12  what we assign when a study is so
13  bad that you really can't tell
14  heads or tails.  This is not the
15  case.
16  BY ATTORNEY VAUGHN:
17     Q.   What makes a study so bad
18  that you can't tell --
19        ATTORNEY ROSE:  Object to
20  the form -- object to the form.
21        THE WITNESS:  If the -- if
22  the imaging limitations are such
23  that you cannot determine whether
24  the lesion is more likely to be

Page 168

1        benign, LR-1 or 2, or more likely
2        to be malignant LR-5 and M.
3           So in those cases, you apply
4        LR-NC noncategorizeable and you
5        request that the study is either
6        repeated or a different study is
7        performed, but something has to be
8        done immediately.
9           In the case of such small
10        lesions where HCC diagnosis is not
11        -- cannot be made regardless of
12        anything, you would not demand
13        that the study is repeated
14        immediately.  You would recommend
15        the study is repeated three to six
16        months.
17  BY ATTORNEY VAUGHN:
18     Q.   As this says, APHE is a
19  major feature of HCC.  There was no APHE
20  in Mr. Roberts' 2016 scan; correct?
21     A.   Correct.
22     Q.   I want to flip back to your
23  expert report very quickly on page 3.  Do
24  you remember earlier we were talking

Page 169

1  about these seven diagnostic criteria?
2     A.   Categories.
3     Q.   Categories?
4     A.   Uh-hum.
5     Q.   And that's what you put in
6  your expert report, that there were
7  seven?
8     A.   Uh-hum.
9     Q.   And in your 2018
10  publication, let's go to page 5, you note
11  that there's eight unique diagnostic
12  categories in your publication; correct?
13     A.   So LR-NC is a category, but
14  it's not a diagnostic category.  It is
15  noncategorizeable.  It has no
16  probabilities because it just -- we can't
17  -- as I mentioned.  So it is a category,
18  but it's not considered diagnostic
19  because that means that the lesion is not
20  assessable and it needs to be repeated.
21     Q.   And you didn't include that
22  in your expert report, did you?
23     A.   No, it is not relevant.
24     Q.   So it says:  is applied when

43 (Pages 166 - 169)

VICTORIA CHERNYAK, MD, MS

Page 170

1 image omission or degradation precludes
2 categorization.
3         Can you explain what image
4 omission means?
5     A.   Let's say if all
6 post-contrast phases were not done or the
7 patient -- you know, it was MR, patient
8 is unable to hold their breath, and the
9 arterial portal, venous, and delayed
10 phases are completely degraded and you
11 really cannot tell anything and then all
12 you see is a lesion, let's say on
13 T2-weighted sequences, but you can't
14 really say how this lesion enhances and
15 what it does and so you can't say am I
16 looking at benign hemangioma more likely
17 or am I looking at probable definite HCC
18 or any other malignancy, that is the case
19 where you apply LR-NC.
20         If you look at publications,
21 LR-NC is actually quite uncommon.  Hence,
22 I did not put in my report because it's
23 not relevant to this case.
24     Q.   But there are eight unique

Page 171

1 diagnostic categories, not seven;
2 correct?
3         ATTORNEY ROSE:  Object to
4     the form.
5         THE WITNESS:  When you look
6     at any publications, they don't
7     talk about LR-NC because, again,
8     it's not a diagnostic category.
9     It's more a communication that
10     this lesion is not categorizeable
11     and the imaging needs to be
12     repeated.
13 BY ATTORNEY VAUGHN:
14     Q.   And over here, the minimum
15 required images is in figure 4 and this
16 is figure 4 here on page 6, page 821 of
17 the study; correct?
18     A.   Yes.
19     Q.   And for CT, what are the
20 required images?
21     A.   Arterial phase, portal
22 venous phase, and delayed phase.
23     Q.   In the arterial phase, the
24 late arterial phase is strongly

Page 172

1 preferred, what does that mean?
2     A.   Arterial phase -- late
3 timing of arterial phase has a better
4 chance of showing arterial phase
5 hyperenhancement; therefore, when you
6 calibrate your studies and you set the
7 timing parameters for your CT, it should
8 be done in a way that you should obtain
9 late arterial phase in most patients.
10     Q.   What would happen if it was
11 an early phase instead on the arterial
12 phase?  Does that impact anything?
13     A.   You may or may not be able
14 to diagnose -- to detect arterial phase
15 hyperenhancement.
16     Q.   In your opinion, was the
17 arterial phase late in the 2016 scan of
18 Mr. Roberts?
19     A.   I'd have to go back and
20 relook.
21     Q.   And then there's the portal
22 venous phase that this mentions is a
23 required phase.
24     A.   Uh-hum.

Page 173

1     Q.   Can you explain that one
2 again?
3     A.   It's a phase that obtained
4 about 60 to 90 seconds after the arterial
5 -- after the injection of contrast.
6     Q.   And do you have an opinion
7 if the portal venous phase was early in
8 the 2016 CT?
9     A.   There's no such thing as
10 early portal venous phase --
11     Q.   And so --
12     A.   -- or -- not -- there's no
13 -- it's a continuum, so, really, early
14 portal venous phase is late arterial
15 phase.
16         Does that make sense?
17     Q.   Uh-huh.
18     A.   It's a continuum.
19     Q.   So if the portal venous
20 phase was done early, it would actually
21 be a late arterial phase and there would
22 be no portal venous phase?
23     A.   Yes.
24     Q.   And it mentions the delayed

44 (Pages 170 - 173)

VICTORIA CHERNYAK, MD, MS

Page 174

1 phase of two to five minutes after
2 injection. Can you explain that one to
3 me?
4     A.   It's an acquisition done two
5 to five minutes after contrast is
6 injected.
7     Q.   And is it important that
8 it's done two to five minutes afterward?
9     A.   That's usually the timing of
10 delayed phase that is recommended when
11 you create the protocols for your CT
12 scanner.
13     Q.   And do you consider this the
14 most important phase?
15     A.   No, you cannot say that.
16     Q.   Do you have an opinion on
17 which of the three is the most important
18 phase?
19     A.   You need all three to make
20 LI-RADS --
21     Q.   Okay.
22     A.   -- at least you need -- at
23 the very least -- at the very least, you
24 need arterial -- it's a complicated

Page 175

1 discussion because you have to take into
2 account the -- you know, the patient --
3 the patient population you're working
4 with and exposure to radiation therapy.
5         For example, I work, you
6 know -- in the two of the institutions
7 I've worked on, the delayed phase was
8 routinely omitted because -- because we
9 wanted to reduce amount of radiation we
10 subject our patients to, so we routinely
11 would get arterial and portal venous
12 phase.
13         In other institution I've
14 worked, routinely they've obtained all
15 four phases, meaning precontrast,
16 arterial, portal venous, and delayed and
17 there they were not as concerned about
18 radiation exposure as the other
19 institutions, institutional preference.
20         There are studies that show
21 that you actually can omit a portal
22 venous phase and just acquire arterial
23 and delayed phase and -- because if you
24 see the washout in delayed phase, that's

Page 176

1 sufficient. You can apply washout to
2 either portal venous or delayed phase.
3         So there are institutional
4 preferences that -- that are in place.
5     Q.   But your publication says
6 that all three phases are required to
7 apply LI-RADS; correct?
8     A.   As of 2018, yes.
9     Q.   And so you're saying that's
10 changed since 2018?
11     A.   Again, there's at least one
12 study that came out that showed you can
13 omit the portal venous phase.
14     Q.   Is that your study?
15     A.   No.
16     Q.   Do you agree with that
17 study?
18     A.   I actually do.
19     Q.   Are you going to update your
20 paper?
21     A.   We are discussing it.
22     Q.   And so is there a split
23 opinion on if it should be required or
24 not?

Page 177

1     A.   As it pertains to the liver
2 imaging, it can be omitted. The question
3 is, when you talk about it -- because
4 we're not just looking at liver, right,
5 we're looking at other organs.
6         So the question is, we need
7 to know, if you omit the portal venous
8 phase, are you -- are you -- how will
9 this affect other organ appearances?
10 That's the conversation that we're
11 having.
12     Q.   And your specified as
13 currently -- scratch that. I mumbled a
14 bunch.
15         You're currently having a
16 conversation if all three phases are
17 required in the CT for LI-RADS; correct?
18     A.   It's --
19         ATTORNEY ROSE: Object to
20     form.
21         THE WITNESS: It's a
22     conversation that is being had by
23     the technical working group. I
24     cannot tell you what the final

45 (Pages 174 - 177)

VICTORIA CHERNYAK, MD, MS

Page 178

1  decision will be.
2      ATTORNEY VAUGHN:  Nina, what
3  time do you want to do lunch
4  today?
5      ATTORNEY ROSE:  I'm happy to
6  stop now if that works for you or
7  we can keep going --
8      ATTORNEY VAUGHN:  We haven't
9  been on the record a ton, but like
10  I'm at a pretty good time for a
11  break if we want to do lunch.  I
12  know that you're on East Coast.
13  Right?
14      ATTORNEY ROSE:  We're both
15  on East Coast.
16      ATTORNEY VAUGHN:  You're
17  both on East Coast?  Yeah, do you
18  want to go ahead and do lunch now?
19      ATTORNEY ROSE:  Yeah, that's
20  fine, that works.
21      THE VIDEO TECHNICIAN:  Off
22  record, 12:08.
23      (A luncheon recess was taken
24  from 12:08 p.m. to 12:53 p.m.)

Page 179

1      THE VIDEO TECHNICIAN:  We
2  are back on the record at 12:53.
3  BY ATTORNEY VAUGHN:
4      Q.  Doctor, I want to go to page
5  8 of your expert report, which I believe
6  is Exhibit 2.  And, Doctor, do you plan
7  to tell the jury that Mr. Roberts might
8  have had cancer in 2016?
9      A.  Mr. Roberts had lesions
10  which had about 33 percent chance of
11  having cancer in 2016.
12      Q.  And so would your -- sorry.
13  Go ahead.
14      A.  I cannot definitively rule
15  out that he had cancer.  I cannot
16  definitively rule in.  I can only provide
17  probability based on imaging features.
18      Q.  Would you agree that a 33
19  percent chance is equivalent to saying he
20  might have cancer at the time in 2016?
21      ATTORNEY ROSE:  Object to
22  the form.
23      THE WITNESS:  If I were to
24  use the certainty lexicon adopted

Page 180

1  by Memorial, it would be possible.
2  BY ATTORNEY VAUGHN:
3      Q.  Possible, not probable;
4  correct?
5      A.  Possible, yep.
6      Q.  You note the growth of HCC
7  is variable.  What do you mean by that?
8      A.  It means that there are some
9  HCCs that grow very quickly; some HCCs
10  grow relatively slowly.
11      Q.  What type of HCCs grow
12  relatively quickly?
13      A.  I'm not certain what you're
14  asking me.
15      Q.  You testified some types of
16  HCCs grow very quickly.  Which types of
17  HCCs grow very quickly?
18      A.  It's not types.  It's the --
19  you know, the -- even though we talk
20  about HCC as a single entity, it's, you
21  know, the -- each individual tumor, just
22  like people, are -- you know, have some
23  individual genetic blueprint,
24  environmental blueprint.  So some HCCs

Page 181

1  grow faster, some HCCs grow slower,
2  again, just like with LR-3.
3      Unfortunately, our
4  diagnostic tools are relatively crude,
5  so, you know, we talk about HCC as a
6  single entity, but, you know, there are
7  some variabilities within it.
8      So some grow quickly, some
9  grow slowly and just it -- sometimes --
10  it's actually not possible to predict by
11  looking at the scan which HCC is going to
12  grow fast or not.
13      Q.  Just by looking at the scan,
14  you can't tell; correct?
15      A.  If it's going to grow fast
16  or not, no, you can't.
17      Q.  But would the underlying
18  etiology for why the HCC developed impact
19  if it is going to be a fast-growing HCC
20  or slow-growing HCC?
21      A.  Not to my knowledge.
22      Q.  Have you researched that?
23      A.  I'm sorry?
24      Q.  Have you done research into

46 (Pages 178 - 181)

VICTORIA CHERNYAK, MD, MS

Page 182

1  that?
2     A.   I have looked into
3  literature when I was giving a recent
4  talk about growth patterns, so -- I have
5  not encountered a single paper that talks
6  about etiology and rate of growth.
7     Q.   And so you've never read any
8  literature that says that HCC caused by
9  hep B is more aggressive?
10    A.   Well, first of all, more
11  aggressive is not always equivalent to
12  faster growth, but no.
13    Q.   Can you explain to me the
14  difference between aggressiveness and
15  faster growth?
16    A.   There are things other than
17  growth that can indicate aggressiveness.
18    Q.   Can you explain those to me?
19    A.   Vascular invasion; if the
20  tumor extends into adjacent blood
21  vessels, that's -- that's a feature of
22  aggressiveness.  There are subtypes of
23  HCC which -- which are associated with
24  more aggressive phenotypes, meaning that

Page 183

1  they are more likely to not respond to
2  treatment or recur after treatment.
3        Again, unfortunately, these
4  are not something that we can predict
5  based on imaging.  We can -- at least not
6  accurately, so...
7     Q.   An HCC that is caused by
8  NASH cirrhosis, would you expect that to
9  be quick growing or slow growing?
10    A.   It depends --
11        ATTORNEY ROSE:  Object to
12  the form.  I'm sorry.  I'm sorry.
13  I didn't mean to speak over you,
14  Doctor.
15        THE WITNESS:  That's okay.
16  It depends on the lesion and
17  there's no way for me -- again,
18  when I look at the scan, there is
19  no way for me to predict that this
20  particular HCC's going to grow
21  fast or slow.
22        You know, it -- I have cases
23  where a very small HCC doubled in
24  size in six weeks.  I have cases

Page 184

1  where a large mass over, you know,
2  3 1/2 centimeters, grew size wise
3  very minimally in the course of
4  eight months.
5        It's impossible to predict
6  for any -- for particular lesion.
7  We can talk about population what
8  on average can happen, but, you
9  know, again, apply population
10  statistics to a particular case is
11  always problematic.
12  BY ATTORNEY VAUGHN:
13    Q.   And you're only reviewing
14  imaging.  You're not reviewing Mr.
15  Roberts' case-specific factors, such as
16  his medical history and other risk
17  factors; correct?
18    A.   Correct.
19    Q.   You note two-thirds of HCCs
20  have a tumor volume doubling time of
21  three months or longer; correct?
22    A.   Yes.
23    Q.   And so would you agree that
24  HCCs with a tumor volume doubling time of

Page 185

1  three months or less are fast growing?
2     A.   Okay.
3     Q.   Do you --
4     A.   I mean, it's not -- fast
5  growing, slow growing is not a medical
6  concept.
7        I can only provide -- the
8  data is, you know, generally we accept
9  that, in general, we have the feature
10  called threshold growth and we -- and
11  it's 50 percent or greater size increase
12  in -- within six months, that's accepted
13  as threshold growth.  But we also know
14  that some HCCs don't meet that criteria.
15  Some do.
16        While it's true that HCC --
17  all HCCs grow over time, predicting the
18  rate of growth is very problematic
19  because, you know, any particular HCC,
20  it's not a steady growth, right, it can
21  -- it can kind of not grow for a little
22  bit, then grow, then stop growing.
23        So the -- so the rate of
24  growth is not constant for any -- for

47 (Pages 182 - 185)

VICTORIA CHERNYAK, MD, MS

Page 186

1 even particular with a lesion that we
2 follow over time, you know, that there's
3 -- there's -- the only definitive thing
4 we can say more or less is that HCCs
5 don't become smaller without treatment.
6     Q.    Would you agree that most
7 HCCs take three months or longer to
8 double in size?
9     A.    The volume, the volume.
10     Q.    It takes three months or
11 longer for most HCCs to double volume;
12 correct?
13     A.    Yes.
14     Q.    Then why in this case did
15 you assume a tumor doubling volume time
16 of three months?
17     A.    Because that's the median.
18     Q.    What do you mean?
19     A.    Median?
20     Q.    Yeah.
21     A.    Means that it's in the
22 center, the value's in the center.
23     Q.    Isn't it only one-third of
24 them are doubling at three months or

Page 187

1 less?
2     A.    So the -- again, the way
3 that you -- the six months -- the six
4 months of 50 percent size increase is
5 based on three months' tumor volume
6 doubling time, so that's an accepted
7 statement.
8     Q.    But two-thirds of HCCs
9 wouldn't double that quickly; correct?
10     A.    Two-thirds would -- of HCCs
11 would double at least this quickly --
12 right, this quickly or longer, yes.
13     Q.    And by longer, you mean
14 slower, like four months or five months?
15     A.    Yes.
16     Q.    And then why -- so why is it
17 that you assumed the faster growth rate?
18     A.    It's not fast. It's median.
19 It's median -- it's median -- it's a
20 median value that we assume which is used
21 by -- like, that's the value that's used
22 to arrive at -- at the threshold growth
23 value of six months.
24     Q.    How did you calculate this

Page 188

1 median?
2     A.    It's just data.
3     Q.    So you're applying the
4 fastest one-third growth and you're
5 saying that's the median?
6     A.    That is the data that is
7 used to arrive at the threshold growth,
8 so that's the data that's used -- that's
9 the assumption that's used by UNOS, by
10 LI-RADS. It's the threshold growth of
11 six months.
12     Q.    What is threshold growth?
13     A.    Size increase, the longest
14 dimension increase of 50 percent or
15 greater.
16     Q.    Do you need two images to
17 determine threshold growth?
18     A.    You need to have a study
19 that is at least -- that is done at least
20 within six months prior --
21     Q.    And do you have that with
22 Mr. Roberts?
23     A.    No.
24     Q.    Then how can you apply

Page 189

1 threshold growth to Mr. Roberts?
2     A.    I was providing the
3 theoretical numbers. I'm not -- right?
4     Q.    So you don't have the actual
5 imaging necessary for threshold growth on
6 Mr. Roberts, correct, you're just
7 applying theoretical numbers?
8         ATTORNEY ROSE:  Object to
9     the form.
10         THE WITNESS:  I was
11     providing the possible scenario of
12     how would -- how would a 5
13     millimeter lesion progress to --
14     could progress to 5.6 centimeter
15     lesion.
16 BY ATTORNEY VAUGHN:
17     Q.    You were given a possible
18 scenario, not a probable scenario;
19 correct?
20         ATTORNEY ROSE:  Object to
21     the form.
22         THE WITNESS:  I'm not sure
23     how to -- again, I cannot predict
24     how things grow, any particular

48 (Pages 186 - 189)

VICTORIA CHERNYAK, MD, MS

Page 190

1    lesion.
2  BY ATTORNEY VAUGHN:
3     Q.   So you're having to guess;
4  correct?
5         ATTORNEY ROSE:  Object to
6     the form.
7         THE WITNESS:  I'm providing
8     numbers.
9  BY ATTORNEY VAUGHN:
10    Q.   And you made this assumption
11 that it would double in size or in volume
12 every three months and you come to the
13 calculation that it would take two years
14 and eight months for that tumor to go
15 from the half centimeter size that you
16 saw in 2016 to the 5.8 centimeter size
17 saw in 2018; correct?
18    A.   Yes, but it says assuming
19 constant growth, and as I mentioned, the
20 growth is usually not constant.
21    Q.   So are you opining that you
22 think the growth in Mr. Roberts might
23 have been even more aggressive than a
24 tumor volume doubling time of every three

Page 191

1  months?
2         ATTORNEY ROSE:  Object to
3     the form.
4         THE WITNESS:  I cannot -- I
5     was just -- I was asked to provide
6     -- so the statement was, it was --
7     here's the statement -- I was
8     asked to respond to statements.
9     Right?
10        The statement was that his
11    cancer is more aggressive, were to
12    progress faster, and I was
13    providing numbers that -- there's
14    -- there's nothing in -- in my
15    opinion in Mr. Roberts'
16    progression or course of
17    development of HCC that's
18    outlandishly impossible without --
19    or -- you know, without just
20    having H -- you know, cirrhosis.
21    Right?
22        So as I said, it's very
23    common in my experience that we
24    have a patient who presents with

Page 192

1     advanced HCC and prior imaging
2     shows nothing.
3         The numbers that I'm
4     providing you here are not
5     outlandish.  This is what would
6     have -- what could -- what should
7     have happened if -- right, if we
8     assume this very reasonable tumor
9     volume doubling time.
10        So what I'm trying to show
11    that the numbers are not
12    outlandish and they're not -- he's
13    -- assuming that his original
14    lesion progressed to his final
15    lesion, the progression is not
16    outlandishly fast.  It's
17    reasonable.
18 BY ATTORNEY VAUGHN:
19    Q.   And you can't say with a
20 reasonable degree of medical certainty
21 that that initial lesion actually did
22 progress into HCC; correct?
23    A.   I cannot exclude this
24 possibility.

Page 193

1     Q.   And what do you mean by
2  that?  You can't for 100 percent
3  certainty that it didn't?
4     A.   Without having --
5         ATTORNEY ROSE:  Object to
6     the form.
7         THE WITNESS:  I'm sorry.
8     Without having interim imaging,
9     which should have happened, I
10    cannot tell you what exactly
11    happened, because he -- you have
12    an imaging and then two years and
13    four months later, you have
14    another imaging.
15        What should have happened is
16    that in between these two time
17    points, there should have been at
18    least every six months imaging, at
19    which point you could say, okay,
20    this is what happened to this
21    lesion.
22        Without having, you know,
23    what's in -- you know, without
24    having the required imaging in

49 (Pages 190 - 193)

VICTORIA CHERNYAK, MD, MS

Page 194

1    between, it's not possible to say
2    what happened.
3  BY ATTORNEY VAUGHN:
4        Q.    And so without that imaging
5  in between, you're having to speculate;
6  correct?
7            ATTORNEY ROSE:  Object to
8    the form.
9            THE WITNESS:  I am providing
10    -- I'm stating that you cannot
11    exclude a possibility that this
12    LR-3 lesion progressed to LR-5.
13    It's possible.
14  BY ATTORNEY VAUGHN:
15        Q.    But you want to tell the
16  jury there's a chance the LR-3 progressed
17  to LR-5; correct?
18        A.    There's a chance.
19        Q.    And using these assumptions
20  that you used, it would take
21  approximately two years and eight months
22  for it to grow from that .5 to the 5.8;
23  correct?
24        A.    Yes.

Page 195

1        Q.    And how many months were
2  between that CT scan in 2016 and the MRI
3  in 2018?
4        A.    Two years and four months.
5        Q.    So even by your calculation,
6  it wouldn't have been that size when they
7  did the MRI; correct?
8            ATTORNEY ROSE:  Object to
9    the form.
10            THE WITNESS:  Four months,
11    yeah.  As -- as I mentioned, this
12    assumes a constant tumor volume
13    doubling time.
14            Unfortunately, while -- you
15    know, unfortunately, there's
16    dearth of data to provide you with
17    exact growth curve of HCCs because
18    generally once HCC is diagnosed,
19    it's treated, we don't tend to
20    follow them.
21            So the -- you know, my -- my
22    experience with -- you know, with
23    longitudinal untreated HCC growth
24    is limited, just like it is

Page 196

1    limited for anybody, because
2    again, we don't follow these
3    patients.
4            The only data we have is
5    patients who get lost to
6    follow-up, who doesn't get
7    followed, so that we can
8    retrospectively come back and say
9    this is what happens.  But we
10    don't intentionally follow these
11    patients.
12            So -- however, in my
13    experience, in my experience, HCCs
14    don't grow constantly.  They grow
15    -- they grow, then they kind of
16    pause, then they grow faster, then
17    they pause, then they grow faster.
18            It's a very -- not a
19    constant growth pattern, so it is
20    not, you know -- if I gave you
21    here a calculation of two years
22    and eight months, two years and
23    four months is not -- is -- would
24    -- it's essentially statistically

Page 197

1    the same thing and it's not --
2    it's not inconsistent with the
3    statement.
4  BY ATTORNEY VAUGHN:
5        Q.    And so you assumed a
6  constant tumor volume doubling time, but
7  you don't think that Mr. Roberts had a
8  constant tumor volume doubling time;
9  correct?
10            ATTORNEY ROSE:  Object to
11    the form; misstates the witness'
12    testimony.
13            THE WITNESS:  The -- the
14    statement was that his cancer is
15    more aggressive and progresses
16    faster.  I'm providing numbers
17    that show that his growth is
18    within the -- what's would be
19    expected for -- you know, for a
20    patient who has cirrhosis and
21    unfortunately left to develop HCC,
22    not undergo surveillance.
23            We know that surveillance
24    improves survival of patients with

50 (Pages 194 - 197)

VICTORIA CHERNYAK, MD, MS

Page 198

1 cirrhosis by detecting HCC at
2 stages where it can be treated.
3        So I was just providing
4 numbers.  These numbers -- nobody
5 can provide you with exact numbers
6 because, again, there was no
7 follow-up that was required --
8 that should have happened.
9 BY ATTORNEY VAUGHN:
10    Q.   So you have no way to know
11 if this assumption that you made of a
12 constant tumor volume doubling time of
13 three months was applicable to Mr.
14 Roberts; correct?
15        ATTORNEY ROSE:  Object to
16 the form.
17        THE WITNESS:  I am showing
18 that it is within the realms of
19 possibility that this was so.
20 BY ATTORNEY VAUGHN:
21    Q.   In your expert opinion, did
22 Mr. Roberts' HCC have a constant growth
23 rate?
24    A.   This is not an answerable

Page 199

1 question because I don't -- because the
2 patient didn't have the follow-up, so...
3    Q.   Can you explain to me how
4 you did this calculation, this tumor
5 volume doubling time, to come to your
6 answer that it would take approximately
7 two years and eight months for it to grow
8 to the size that was seen?
9    A.   There is a -- a calculator
10 you can plug in.  There's a formula.  You
11 can plug in the numbers.  So I said, you
12 know, tumor volume doubling time three
13 months, initial size this, and it -- and
14 the calculator spit out the two years and
15 eight months using the formula.  I can
16 look up the formula for you.
17    Q.   What calculator did you use?
18    A.   ChatGPT, which provided me
19 with --
20    Q.   ChatGPT?
21    A.   Well, it provided me with a
22 formula, so I can --
23    Q.   So you entered some data in
24 this ChatGPT and it shot out it would

Page 200

1 take two years and eight months for it to
2 grow to that size?
3    A.   It provided me with a
4 formula which -- which is the formula you
5 use for -- for this.  I looked at the
6 formula.  It was correct.  It just made
7 the calculations faster than me entering
8 into Excel and recalculating everything
9 myself.
10    Q.   And did you include
11 ChatGPT's formula in your expert report
12 anywhere?
13    A.   No.
14    Q.   How would I find what
15 ChatGPT's formula was?
16    A.   It's in -- it -- it's a
17 standard formula for tumor -- tumor
18 volume doubling time.  There's a --
19 there's a formula and it just made the
20 calculation faster.
21    Q.   Does that formula appear
22 anywhere in your expert report?
23    A.   No.
24    Q.   Does the data that you

Page 201

1 entered in that formula appear anywhere
2 in your expert report?
3    A.   Yes, three months and .05
4 centimeter.
5    Q.   So is all you typed into
6 ChatGPT was three months and 0.5
7 centimeters and ChatGPT shot out that
8 it's going to take two years and eight
9 months?
10    A.   I said tumor -- tumor volume
11 doubling time is three months.  Initial
12 size is .5 centimeters.  How long will it
13 take to grow to this 5.8 centimeter?  It
14 provided me with step-by-step
15 calculations.  They appeared correctly.
16    Q.   For the tumor volume
17 doubling time of three months, you chose
18 the three-month doubling time, not
19 ChatGPT; correct?
20    A.   Yes.
21    Q.   Did ChatGPT give you a
22 suggestion of what doubling time you
23 should be using?
24    A.   No.  It just provided me

51 (Pages 198 - 201)

VICTORIA CHERNYAK, MD, MS

Page 202

1  with calculations to make my report
2  faster. I could have taken the time of
3  putting this formula into Excel and I
4  would have arrived at the same. It was
5  just faster to do this way.
6      Q. Did you not have time to do
7  that for this expert report?
8          ATTORNEY ROSE: Object to
9      form.
10         THE WITNESS: No, as I'm not
11     a mathematician, as I'm not a
12     statistician, it was a -- as I'm a
13     radiologist, so I was focusing my
14     energy on radiology and using the
15     available tools, which are used
16     routinely by many people.
17 BY ATTORNEY VAUGHN:
18     Q. Do you use ChatGPT routinely
19  in your practice?
20     A. Not in my practice, but if I
21  need to calculate something...
22     Q. So in your practice, you
23  don't calculate tumor volume doubling
24  times with ChatGPT; correct?

Page 203

1      A. No.
2      Q. Did ChatGPT ask you if he
3  had hep B infection or any type of viral
4  infection?
5          ATTORNEY ROSE: Object to
6      the form.
7          THE WITNESS: ChatGPT didn't
8      ask me anything, because I didn't
9      even -- I literally provided
10     numbers and said put it into
11     formula and spit out the numbers,
12     so it didn't know -- it had no
13     information other than tumor
14     volume doubling time, initial
15     size, and the final size.
16 BY ATTORNEY VAUGHN:
17     Q. So ChatGPT also wasn't aware
18  of any of the patient-specific facts to
19  Mr. Roberts, such as his prior medical
20  history or if he had a viral or nonviral
21  etiology, ChatGPT was unaware of that?
22         ATTORNEY ROSE: Object to
23     the form.
24         THE WITNESS: ChatGPT only

Page 204

1      was providing me calculation,
2      nothing else. Just plugged in the
3      numbers to make my life easier.
4  BY ATTORNEY VAUGHN:
5      Q. And the only numbers you
6  plugged into ChatGPT was assuming a
7  three-month doubling time and what the
8  initial size of the lesion was?
9      A. And the final size, yeah.
10     Q. And how do you type that
11  into ChatGPT? What's the first thing you
12  typed in?
13     A. Assuming a tumor volume
14  doubling time of three months, an initial
15  size of .5 centimeters, how long will it
16  take to grow to 5.8 centimeters?
17     Q. And then did ChatGPT show
18  you each stage of the doubling, how much
19  volume and how many centimeters it would
20  be?
21     A. It showed me the formula
22  that's used and the step by step how we
23  used it and what the answer was.
24     Q. And do you know what the

Page 205

1  volume would be at this time at two years
2  and eight months or do you just simply
3  know that that would be 5.8 centimeters?
4      A. Well, 5.8 centimeters can be
5  transformed into double -- into volume
6  using the formula --
7      Q. And what volume would that
8  be?
9      A. Again, so if you have the
10  5.8 centimeter diameter, so you have to
11  half it to radius, right, so radius -- I
12  think it's PR -- I don't remember this --
13  like, I don't remember off the top of my
14  head the formula for sphere.
15         I -- you know, I'm not --
16  again, I'm not a mathematician, so I
17  doubt people walk around with that
18  knowledge. But I could look it up and
19  say, you know, what's the volume for this
20  sphere?
21     Q. Would you need to ask
22  ChatGPT for that?
23     A. I can ask Google.
24     Q. Google. Okay.

VICTORIA CHERNYAK, MD, MS

Page 206

1        HCCs, do they typically grow
2 from the center outwards proportionally?
3      A.   Depending on the type of --
4 it depends.
5      Q.   Depends on what?
6      A.   Depends on the growth type.
7 There's some -- some that do like that,
8 then they grow from the center outwards.
9 Some have what's called cirrhotomimetic
10 growth pattern where just they -- the
11 lesions look like multiple cirrhotic
12 nodules and they may spread out outwards
13 in the form of nodules.  That's less
14 common.
15        Most common is you have a
16 nidus and over time, you have a cirrhotic
17 nodule and over time, after -- you know,
18 then you have progression to high-grade
19 dysplastic nodule.
20        And then you have
21 progression into early HCC that replaces
22 -- and eventually there's progression to
23 progressed HCC.  That replaces the
24 underlying nodule and then expands

Page 207

1 outwards.  That's a more common pattern.
2      Q.   Are there any factors that
3 help predict what type of growth pattern
4 you will see?
5      A.   No.
6      Q.   Does cancer require blood
7 supply?
8      A.   HCC, yes.
9      Q.   The lesion that you
10 identified in 2016 that you believe might
11 have turned into HCC, did you see any
12 blood supply near that lesion?
13      A.   It was not a dead lesion,
14 therefore there was a blood -- I mean, it
15 was -- I'm not sure how to answer your
16 question.
17      Q.   Were there any major vessels
18 near the LR-3 that you identified that
19 you believe might have turned into HCC in
20 2018?
21      A.   I'm looking at the images
22 from my report.  There were hepatic veins
23 nearby.  There was a posterior branch, a
24 right portal vein nearby.  There --

Page 208

1 portal venous branch sitting right
2 posterior to it.
3        But the lesion is in the
4 liver, therefore there's blood supply.
5      Q.   What was the shape of the
6 LR-3 in 2016 that you believe might have
7 turned into HCC by 2018?
8      A.   Rounded.
9      Q.   Spherical?
10      A.   Rounded.
11      Q.   Can you explain the
12 difference between rounded and spherical
13 to me?
14      A.   Sphere is a 3D shape.  I'm
15 looking at 2D representation.  So on the
16 maximum size, it is -- it is rounded, so
17 -- on series 401, image 24, it looked
18 like a little round -- close to a round
19 circle.
20      Q.   Are you able to determine if
21 it was spherical?
22      A.   We do not routinely utilize
23 3D extraction tools in clinical practice
24 to provide with 3D implementation.

Page 209

1        Generally, as you move up
2 and down, as you scroll up and down
3 through the lesion, you get a sense if
4 it's a very long lesion, this was not, so
5 -- and, again, the working assumption is
6 that we're looking at a spheric lesion
7 and using the diameter as a
8 representation of something that can be
9 easily calculated into volume.
10      Q.   And so you had to make an
11 assumption that the initial LR-3 was
12 spherical; correct?
13      A.   That is assumption that is
14 made routinely for these cases, correct.
15      Q.   And at the time in 2018 when
16 he was diagnosed with HCC, what did his
17 HCC look like at that time?
18        ATTORNEY ROSE:  Object to
19      the form.
20        THE WITNESS:  It met
21      criteria for LI-RADS 5.
22 BY ATTORNEY VAUGHN:
23      Q.   What about shape?  What
24 shape was his HCC at that time?

53 (Pages 206 - 209)

## VICTORIA CHERNYAK, MD, MS

Page 210

1    A.   He had three.  Which one do
2  you -- do you want to talk about?
3    Q.   The one that you believe the
4  LR-3 turned into HCC or that you believe
5  might have turned into HCC.
6    A.   Oval-ish.
7    Q.   Oval-ish?  So it's not a
8  sphere; correct?
9        ATTORNEY ROSE:  Object to
10      the form.
11        THE WITNESS:  Again, you
12      know, if I did a 3D
13      reconstruction, it would not be --
14      like, nothing is a perfect sphere,
15      right, because perfect shapes are
16      -- usually don't happen in nature.
17        We approximate the shape to
18      being an irregular sphere, meaning
19      it's not perfect, but it's as
20      close to sphere as nature makes
21      it.
22  BY ATTORNEY VAUGHN:
23    Q.   You didn't do a 3D
24  reconstruction in this case, did you?

Page 211

1    A.   I did not.  I interpreted
2  this case like I would interpret it in
3  real life, in my practice, which is where
4  we provide the longest dimension, which
5  is what LI-RADS requests.
6    Q.   You note that his
7  progression would be consistent with the
8  normal observed progression of HCC?
9    A.   It's not outlandishly fast.
10    Q.   What do you mean by
11  outlandishly fast?
12    A.   Look, if you showed me -- if
13  you showed me his 2018 scan and then six
14  months before, there was not a single
15  lesion, I would say this is quite
16  unusually fast.
17    Q.   What about 12 months?
18    A.   I've seen cases.
19    Q.   How many?
20    A.   Many.
21    Q.   What percentage of cases
22  you've seen have grown that quickly
23  within 12 months?
24    A.   Within 12 months?  I've

Page 212

1  seen.  I have a collection.
2    Q.   How many patients have you
3  seen over your career?
4    A.   With HCC?
5    Q.   Yeah.
6    A.   A lot.
7    Q.   Can you give me a percentage
8  of how many would progress that quickly
9  in 12 months?
10        ATTORNEY ROSE:  Object to
11      the form.
12        THE WITNESS:  Again, there's
13      no -- I cannot give you this -- we
14      don't follow patients with HCC
15      routinely.
16        So it's not impossible, but
17      I can't give you the precise
18      percentage, just -- there's no
19      data on this and...
20  BY ATTORNEY VAUGHN:
21    Q.   It could happen though.
22    A.   It could happen, 12 months,
23  but, again, we have no 12-month study
24  prior here.

Page 213

1    Q.   Go to page 9 of your report
2  real quick.  You gave the opinion that
3  Mr. Roberts' cirrhosis was the most
4  likely cause of his HCC; correct?
5    A.   Yes.
6    Q.   But, again, you did nothing
7  to look into Mr. Roberts' medical records
8  other than his imaging; correct?
9    A.   Correct.
10    Q.   You didn't look into his
11  pharmacy records; correct?
12    A.   Correct.
13    Q.   You don't know the total
14  dose of NDMA that he was exposed to;
15  correct?
16    A.   Correct.
17    Q.   And you've done no research
18  on NDMA; correct?
19    A.   Correct.
20    Q.   But you want to go and tell
21  the jury that the most likely cause of
22  his HCC was cirrhosis?
23    A.   Yes.
24        ATTORNEY ROSE:  Object to

VICTORIA CHERNYAK, MD, MS

Page 214

1    the form.
2 BY ATTORNEY VAUGHN:
3      Q.  Without -- without
4 considering any of his other risk
5 factors, you want to go in and tell the
6 jury that the most likely cause was
7 cirrhosis for Mr. Roberts' HCC.
8           ATTORNEY ROSE:  Object to
9     the form.
10         THE WITNESS:  HCC is the
11 sixth most commonly diagnosed
12 cancer in the world and 80 percent
13 of HCCs occur in patients with
14 cirrhosis.
15         Every guideline, LI-RADS
16    included, once you have the
17    diagnosis of cirrhosis, you're
18    considered to be at high risk for
19    HCC, which means that we can apply
20    imaging criteria to diagnose the
21    HCC noninvasively, which means
22    that the patient is supposed to
23    undergo routine imaging
24    surveillance and this is a

Page 215

1    cost-effective strategy to prevent
2    advanced HCC from happening.
3         I'm not aware of a single
4    guideline that says look at
5    patients from a collagen exposure
6    to determine whether this patient
7    is at high risk for HCC.
8         So just statistically
9    speaking, since 80 percent of all
10    HCCs in the world occur in
11    patients with cirrhosis and
12    cirrhosis is recognized as a major
13    risk factor for HCC so that you
14    can diagnose HCC noninvasively,
15    which I understand you're not --
16    you're not a physician, so -- so
17    it may not seem very amazing to
18    you, but HCC is the only solid
19    malignancy in abdomen and pelvis
20    where we can be so precise with
21    imaging, that we don't need to --
22    we don't need to confirm a
23    diagnosis with biopsy.  It's
24    actually quite remarkable.

Page 216

1         But it only works, only
2    works -- and I cannot underscore
3    this enough -- it only works in
4    patients who fall into high risk
5    as defined by LI-RADS population.
6         So when I teach people,
7    residents, other physicians, about
8    LI-RADS, I -- this is a point
9    that's stressed again and again
10    and again:  This only works in
11    patients who have high enough
12    pretest probability of HCC.  And
13    it works.  We have a lot of data
14    to show that LI-RADS works.  Okay?
15         So if the scan that Mr.
16    Roberts had has cirrhosis, which
17    means that he falls into LI-RADS
18    definition and AASLD definition
19    and UNOS definition and EASL
20    definition and KCL definition,
21    APASL definition of a person who
22    is at high risk for HCC, as a
23    radiologist, I don't need to look
24    at anything else.  This is

Page 217

1    sufficient for me to say the
2    patient is at high risk for HCC.
3    LI-RADS is applicable.  I can
4    provide the LI-RADS categories for
5    any lesion that happens and I can
6    -- you know, as in 2018, when he
7    developed LI-RADS 5 lesions, he
8    didn't have to have a biopsy
9    proof.
10         He -- we know that he had
11    HCC and it was diagnosable
12    precisely because he has
13    underlying risk factor for HCC, so
14    --
15 BY ATTORNEY VAUGHN:
16      Q.   And that's in 2018.  You
17 can't make a diagnosis in 2016 off
18 LI-RADS; correct?
19         ATTORNEY ROSE:  Object to
20    the form.
21         THE WITNESS:  Incorrect.  In
22    2018 -- if in 2016 he had a lesion
23    that met criteria for LI-RADS 5, I
24    would have been able to diagnose

55 (Pages 214 - 217)

VICTORIA CHERNYAK, MD, MS

Page 218

1      --
2   BY ATTORNEY VAUGHN:
3      Q.   But he did not have a lesion
4   that met LI-RADS 5 in 2016, did he?
5      A.   He did not have a lesion
6   that met the criteria for LI-RADS 5, but
7   LI-RADS was applicable and the lesions
8   that he did have had a category assigned
9   to them, which is LI-RADS 3.
10     Q.   And with LI-RADS 3, you
11  cannot diagnose him with HCC, can you?
12     A.   Not with precision that
13  obviates the need for biopsy.
14     Q.   Not to a reasonable degree
15  of medical certainty, you can't say he
16  had HCC in 2016, can you?
17     A.   He -- his lesions had a 33
18  percent probability of being HCC at 2016.
19         ATTORNEY VAUGHN:  Do you
20     have the 2018 LI-RADS stuff,
21     Kathryn?
22         ATTORNEY AVILA:  This will
23     be Exhibit 8.
24         - - -

Page 219

1         (Deposition Exhibit No.
2     Chernyak-8, CT/MRI LI-RADS v2018
3     CORE Document, was marked for
4     identification.)
5         - - -
6   BY ATTORNEY VAUGHN:
7      Q.   Dr. Chernyak, did you
8   produce this document in response to your
9   notice for deposition?
10     A.   Yes, I think so.
11     Q.   And what is this document?
12     A.   This is a CORE -- did I say
13  -- yep, this is the CORE document that is
14  available to all radiologists explaining
15  how to use LI-RADS, how to apply LI-RADS.
16     Q.   What percent of people with
17  cirrhosis never develop HCC?
18     A.   The probability -- the
19  annual incidence of HCC of patients with
20  cirrhosis is 2 to 4 percent.
21     Q.   So after two years, 92
22  percent of people with cirrhosis wouldn't
23  have developed HCC; is that correct?
24         ATTORNEY ROSE:  Object to

Page 220

1   the form; misstates testimony.
2         THE WITNESS:  What was the
3     last --
4   BY ATTORNEY VAUGHN:
5      Q.   So you said 2 to 4 percent
6   of people with cirrhosis develop HCC per
7   year.
8      A.   Yes.
9      Q.   You were saying that Mr.
10  Roberts had cirrhosis in 2016.
11     A.   Yes.
12     Q.   What was his odds of
13  developing HCC then by 2018?
14     A.   He at 2016 already was not
15  a, quote, unquote, general population of
16  cirrhotics.  He had a -- he had three
17  lesions.  So -- I can't calculate those
18  odds.
19         The probability -- we
20  discussed, the probability that any one
21  of those particular lesions would
22  progress to -- diagnostically to HCC in
23  two years and four months is about 20
24  percent based on the study that we

Page 221

1   discussed.
2      Q.   And is this LI-RADS 2018, is
3   this like a guidance document?  How would
4   you describe this document?
5      A.   This is called a CORE
6   document.  It means that -- it means that
7   let's say you want to apply LI-RADS and
8   if you're not familiar, you would open
9   this up and it tells you step by step how
10  to apply LI-RADS.
11     Q.   And for diagnostic
12  categories, it lists 1, 2, 3, 4, 5, 6, 7,
13  8; correct?
14     A.   Yes.
15     Q.   And you only listed seven in
16  your expert report; correct?
17         ATTORNEY ROSE:  Object to
18     the form.
19         THE WITNESS:  As I mentioned
20     before, as you can see, LR-NC is
21     -- is put in slightly separate.
22     It's not categorizeable.  It's
23     really not a category so much as
24     communication to a physician that

VICTORIA CHERNYAK, MD, MS

Page 222

1 the imaging that we obtained is
2 insufficient to make reasonable
3 determination of whether or not
4 the lesion is more likely to be
5 benign, more likely to be
6 malignant. It means that the
7 patient needs another story.
8 BY ATTORNEY VAUGHN:
9     Q.   Did you evaluate the
10 sufficiency of the imaging done in Mr.
11 Roberts in 2016?
12     A.   Yes.
13     Q.   Here on page 8, it talks
14 about patients not to apply LI-RADS in;
15 correct?
16     A.   Yes.
17     Q.   One of these is those with
18 cirrhosis to congenital hepatic fibrosis.
19 Now, you never reviewed Mr. Roberts'
20 medical records to see if he had any
21 congenital abnormalities or issues with
22 his liver dating back to before he was
23 18; correct?
24     ATTORNEY ROSE:  Object to

Page 223

1 the form.
2     THE WITNESS:  I believe that
3 there was -- there was -- well, I
4 had the report, right, of
5 ultrasound and ultrasound stated
6 the patient had steatosis.
7     Also, patients who have
8 congenital hepatic fibrosis don't
9 necessarily -- well, first of all,
10 they would -- they would not be
11 asymptomatic into the age that Mr.
12 Roberts was --
13 BY ATTORNEY VAUGHN:
14     Q.   Do you agree that Mr.
15 Roberts was asymptomatic?
16     ATTORNEY ROSE:  Object to
17 the form.
18 BY ATTORNEY VAUGHN:
19     Q.   In 2016?
20     A.   Based on Dr. Siddiqui's
21 report.
22     Q.   Are you relying on Dr.
23 Siddiqui?
24     A.   Dr. Siddiqui said he was

Page 224

1 asymptomatic.
2     Q.   Are you relying on Dr.
3 Siddiqui?
4     ATTORNEY ROSE:  Object to
5 the form.
6     THE WITNESS:  That's what
7 she said.
8 BY ATTORNEY VAUGHN:
9     Q.   Are you relying on her to
10 give your opinion?
11     A.   I'm relying on that
12 statement that there was no symptoms,
13 which is actually quite common.
14     Q.   If he was having liver
15 problems before he was 18, would LI-RADS
16 be appropriate to apply?
17     ATTORNEY ROSE:  Object to
18 the form.
19     THE WITNESS:  But he wasn't.
20 BY ATTORNEY VAUGHN:
21     Q.   My question is, if he was,
22 would it have been appropriate to apply
23 LI-RADS?
24     A.   LI-RADS is not applicable to

Page 225

1 pediatric patients less than 18 years
2 old.
3     Q.   What about once -- if he had
4 liver issues when he was -- before 18,
5 even though he is now past 18, is it
6 appropriate to apply LI-RADS?
7     A.   It depends what kind of
8 liver issues he had.
9     Q.   And did you do any
10 investigation into that?
11     A.   I have reviewed the reports
12 and none of them talked about having
13 congenital hepatic fibrosis. I was
14 seeing his heart. His heart didn't look
15 like a patient who had congenital hepatic
16 fibrosis. There was nothing on the
17 imaging to alert me that this patient has
18 a significant cardiac morbidity.
19     Q.   And you didn't review
20 defense expert report Dr. Mohmed, did
21 you?
22     A.   No.
23     Q.   So you don't know if Dr.
24 Mohmed is saying that he had issues going

57 (Pages 222 - 225)

VICTORIA CHERNYAK, MD, MS

Page 226

1 back to before he was 18, do you?
2        ATTORNEY ROSE: Object to
3    the form.
4        THE WITNESS: No.
5        ATTORNEY VAUGHN: Okay.
6        THE WITNESS: I was -- I was
7    tasked with reviewing imaging and
8    addressing certain statements,
9    which is what I did.
10 BY ATTORNEY VAUGHN:
11    Q. But you need to make sure
12 that applying LI-RADS is proper, right,
13 to a specific patient?
14    A. Based on the imaging I had
15 and the reports that I had for the
16 original imaging, it was proper.
17        There was no signs of
18 Budd-Chiari syndrome. There was no signs
19 of vascular-related cirrhosis. It has a
20 certain appearance and that's not -- it
21 wasn't --
22    Q. So you weren't aware of any
23 type of liver problems prior to him being
24 18; correct?

Page 227

1        ATTORNEY ROSE: Object to
2    the form.
3        THE WITNESS: It's not about
4    him having liver problems before
5    18. It's congenital hepatic
6    fibrosis is a very specific
7    disease. It's not, you know, you
8    have a -- it's like a -- it's a
9    disease.
10 BY ATTORNEY VAUGHN:
11    Q. What about all these other
12 things? It lists cirrhosis due to a
13 whole bunch of other things. Did you
14 rule all of that out as well?
15    A. Yes, based on the imaging,
16 none of these applied.
17    Q. You can tell all of that
18 through imaging.
19    A. Correct.
20        ATTORNEY ROSE: Object to
21    the form.
22        THE WITNESS: Yes.
23 BY ATTORNEY VAUGHN:
24    Q. And we went through these, I

Page 228

1 believe, earlier. These ancillary
2 features favoring malignancy, you did not
3 see any of these in Mr. Roberts' 2016
4 scan; correct?
5    A. Correct.
6    Q. And then ancillary features
7 favoring it being benign, the size
8 stability of greater than two years, you
9 couldn't see that because you didn't look
10 at the prior imaging; correct?
11        ATTORNEY ROSE: Objection to
12    form.
13        THE WITNESS: I didn't have
14    prior imaging available.
15 BY ATTORNEY VAUGHN:
16    Q. So you were not able to see
17 the imaging prior to 2016 to see if it
18 was stable in size; correct?
19    A. Correct. Also, by default,
20 if prior imaging is not available, then
21 -- and size stability and size increase
22 are not applicable if it's --
23    Q. But prior imaging was
24 available to his treating physicians.

Page 229

1 Right?
2        ATTORNEY ROSE: Object to
3    the form.
4        THE WITNESS: I don't know.
5 BY ATTORNEY VAUGHN:
6    Q. You don't know.
7    A. (Witness shakes head.)
8    Q. Do you not remember at the
9 beginning of the deposition where we went
10 over where they were comparing the
11 imaging to prior imaging?
12    A. They were comparing to
13 ultrasound. That's not -- these features
14 that you're pointing out to are not
15 applicable to ultrasound. They're
16 applicable to CT and MR.
17    Q. Do you know if a prior CT or
18 MR was done on this patient before 2016?
19    A. I was not given the images
20 from anything before.
21    Q. Did you notice any of these
22 other ancillary features that would favor
23 it being benign?
24    A. No.

58 (Pages 226 - 229)

VICTORIA CHERNYAK, MD, MS

Page 230

1    Q.    And page 12 talks about
2  tiebreaker rules.  Can you explain what a
3  tiebreaker rule is on the LI-RADS?
4    A.    Tiebreaker rules means that
5  if there's any uncertainty between the
6  two categories, the rule is to default to
7  something that provides lowest certainty.
8        So if I was reviewing the
9  study and I wasn't sure if I should apply
10 LR-3 or LR-2, I would apply LR-3 because
11 it provides a lower certainty of
12 benignity.
13        If I was reviewing the study
14 and I wasn't sure if I should apply LR-4
15 or LR-3, I would default to LR-3 because
16 that provides lower certainty of
17 malignancy.
18        If I was not sure between
19 LI-RADS 5, which is definite HCC, versus
20 LR-M, which is malignant, but not HCC
21 specific, I would default to LR-M, which
22 is lower certainty of hepato-cell origin.
23 It means that it's lower certainty that
24 it -- the tumor arose from primary liver

Page 231

1  sites.  Okay?
2        So all of these rules are
3  there to preserve the specificity of
4  LI-RADS 5 diagnosis.  As I mentioned
5  before, our goal is to make the criteria
6  for LI-RADS 5 so good that you don't need
7  a biopsy once you arrive at LR-5.  That
8  means that if there's any uncertainty,
9  you default away from LR-5.
10       So any uncertainty defaults
11 toward a lower -- toward the category
12 that provides lower certainty.
13    Q.    And so LR-3 provides the
14 lowest certainty out of all the LRs;
15 correct?
16    A.    It provides -- no.  It --
17 LR-3 provides lowest certainty of
18 malignancy and lowest certain of
19 benignity.
20    Q.    And so if you weren't sure
21 between LR-2 and LR-3 with Mr. Roberts,
22 you would call it an LR-3; correct?
23    A.    Yes.
24       ATTORNEY ROSE:  Object to

Page 232

1  the form.
2        THE WITNESS:  Yes.
3  BY ATTORNEY VAUGHN:
4    Q.    And then it says:  Final
5  check.  Ask yourself if the assigned
6  category seems reasonable and
7  appropriate.
8        Can you explain what that
9  means?
10    A.    This means that if you are
11 assigning a LR-2 category -- let's say
12 you are applying an LR-M category and the
13 lesion had been stable for 20 years, you
14 have to ask yourself is it -- is it
15 likely that a malignancy would be stable
16 for 20 years?  That's literally what it
17 comes down to, to make sure that what you
18 are saying makes sense.
19    Q.    So you get the LI-RADS and
20 then you see if it makes sense and if
21 it's reasonable for that specific
22 patient; correct?
23       ATTORNEY ROSE:  Object to
24 the form.

Page 233

1        ATTORNEY VAUGHN:  I'm sorry.
2  I couldn't hear your answer.
3        THE WITNESS:  This step is
4  there for that precise reason.
5  You don't assign a category that
6  is -- completely makes no sense.
7  BY ATTORNEY VAUGHN:
8    Q.    But you have to consider the
9  patient specifically, the
10 patient-specific factors.
11    A.    No.  You consider the
12 lesion-specific factors.  So, again, if
13 your, you know, lesion was 5 centimeters
14 a year ago and now it's 1 centimeter and
15 you're applying LR-M category, it's
16 probably not -- it doesn't make sense,
17 because again, tumors don't decrease in
18 size without treatment.
19       That's what this step is
20 there for, to make sure that you're not
21 applying a category that doesn't fit what
22 the imaging is doing.  That you're not
23 applying, you know -- that's literally --
24 that's what it means.

59 (Pages 230 - 233)

VICTORIA CHERNYAK, MD, MS

Page 234

1    It's actually a problematic
2 step that will be removed, because
3 sometimes people use it as, you know, a
4 free for all -- carte blanche to whatever
5 they feel like applying, but that's not
6 -- that's not the intent.
7    The intent is that you look
8 at it and you make sure that what you're
9 applying makes sense, that you're not
10 applying a definitely malignant category
11 to a lesion that's half in size.
12    Q.   And so do some practitioners
13 take the LI-RADS system and apply it to a
14 specific patient and that's why you're
15 saying this step's going to get removed?
16    ATTORNEY ROSE:  Object to
17    the form.
18    THE WITNESS:  This step was
19    -- was placed in there as a kind
20    of, like, make sure things makes
21    change.
22    What came to our attention
23    is that occasionally people
24    applied the step incorrectly,

Page 235

1    meaning, for example, I have a
2    very good colleague who's an
3    expert in HCC and when he applied
4    LI-RADS criteria, they came back
5    -- you know, he should have
6    applied LR-M category, but in his
7    experience, the feature that was
8    present in that particular case
9    made him feel like this is more
10    likely to be HCC than a non-HCC.
11    So he said, well, I used
12    this final check to revert back to
13    LR-5, but that is problematic
14    because you're not supposed to do
15    that.
16    So that is why we're
17    probably going to remove the step
18    to make sure that people aren't
19    confused.
20 BY ATTORNEY VAUGHN:
21    Q.   But it hasn't been removed
22 yet?
23    A.   Yeah, we're working on the
24 -- on the updates.  Hopefully, this year,

Page 236

1 they'll come out.
2    Q.   Do you consider this a
3 current problem with the LI-RADS system?
4    A.   No.
5    Q.   No.
6    A.   So in -- in -- how many --
7 six years, seven years since -- since its
8 release -- this step has been there for
9 longer, probably for about 10, 12 years.
10 This is the first time that I'm aware
11 that somebody used this step as a carte
12 blanche to go from LR-M to LR-5.
13    But since it is possible, we
14 probably are going to remove the step.
15    Q.   On PDF page 37, page 35 of
16 the document on the bottom, do you see
17 here where it says:  LR-3.  Many LR-3s
18 are vascular pseudolesions?
19    What's a pseudolesion?
20    A.   A lesion that looks like a
21 lesion, but it's not a real lesion.  It
22 doesn't have a pathologic correlate.
23    Q.   Do you agree with this
24 statement that's in the guidance

Page 237

1 documents for LI-RADS?
2    A.   Yes.
3    Q.   And can you put a percentage
4 on how many LR-3s are actually
5 pseudolesions?
6    A.   That's not -- that's not --
7 that's -- the literature doesn't give me
8 the percentages.  The only percentages
9 that we know are percentages of HCC.
10 That's what's studied.
11    In my clinical practice, it
12 really depends.  It depends on the type
13 of study that's done, depending on
14 contrast that's used.  I know that
15 inexperienced people assign LR-3 category
16 to things that I would assign LR-2
17 category.
18    Mr. Roberts' imaging --
19 images -- sorry -- lesions did not fall
20 into vascular lesion appearance.
21    Q.   Would some practitioners
22 categorize Mr. Roberts' 2016 lesion as an
23 LR-2?
24    ATTORNEY ROSE:  Object to

60 (Pages 234 - 237)

VICTORIA CHERNYAK, MD, MS

Page 238

1 the form.
2      THE WITNESS:  If they do,
3 it's incorrect.
4 BY ATTORNEY VAUGHN:
5    Q.    What makes it incorrect?
6    A.    LR-2 means it's -- you are
7 very -- that in your professional
8 opinion, this lesion is most likely
9 benign, but you don't have enough
10 certainty to say hundred percent it's
11 benign.
12      So there's nothing in this
13 -- in this -- on this scan to indicate
14 that it is -- it's an indeterminate.
15      I know that the original
16 interpreting radiologist didn't -- excuse
17 me -- didn't provide the LI-RADS
18 category, but they did say it's
19 indeterminate.  They didn't know what it
20 was, which is -- which is appropriate.
21    Q.    Could it have been possible
22 that the radiologist at the time didn't
23 think that the imaging qualified for
24 LI-RADS?

Page 239

1      ATTORNEY ROSE:  Object to
2 the form.
3      THE WITNESS:  I have no
4 basis to judge what the original
5 interpreting radiologist thought.
6 BY ATTORNEY VAUGHN:
7    Q.    A pseudolesion, that's
8 noncancerous; correct?
9    A.    A pseudolesion is a thing
10 that looks like a lesion on the imaging,
11 but has no pathologic correlate.
12    Q.    I'm going to go to PDF page
13 53 of this document, it is 51 on the
14 bottom.  And do you see here, it says:
15 As two recent studies -- as shown by two
16 recent studies, most CT or MRI detected
17 LR-3 observations are benign perfusion
18 alterations or indolent lesions that can
19 be followed safely.
20      What is an indolent lesion?
21    A.    Indolent.
22    Q.    Indolent?  What is that?
23    A.    Indolent means they're not
24 aggressive and can be followed safely,

Page 240

1 meaning that you don't have to
2 immediately aggressively treat them,
3 biopsy, remove them, but you can
4 carefully watch them and see how they
5 progress.
6    Q.    And it says most of them are
7 -- most LR-3 observations are benign.
8 What does that mean?
9      ATTORNEY ROSE:  Object to
10 the form.
11      THE WITNESS:  Counselor,
12 this -- this is a -- this is a
13 CORE that was released in 2018, as
14 you can see, it is cited.  We have
15 many more studies that came out
16 after this.
17      So at the time, this
18 statement, right, two recent
19 studies showed that the -- in
20 these two studies, the LR-3s that
21 they saw were benign perfusion
22 alteration.
23      We know, based on follow-up
24 data, including meta-analyses

Page 241

1 performed on thousands of
2 patients, that 33 percent of LR-3
3 observations are HCC.
4      Moreover, the appearance of
5 the LR-3 lesions on 2016 study
6 would not qualify as a benign
7 perfusion alteration because
8 that's not what they look like.
9 BY ATTORNEY VAUGHN:
10    Q.    This 2018 CORE is still the
11 most current; correct?
12    A.    It is still most current,
13 correct.
14    Q.    It hasn't been -- it has not
15 been revised?
16    A.    We're working on it.
17    Q.    When you reviewed the 2016
18 CT, was there any enhancement of the
19 lesion that you believe might have turned
20 into HCC?
21    A.    There was no arterial phase
22 hyperenhancement and there was washout.
23 Combination of features -- in combination
24 -- in conjunction with size of -- if you

61 (Pages 238 - 241)

VICTORIA CHERNYAK, MD, MS

Page 242

1  move to page 1 of this CORE document, I
2  will show you how I arrive at LR-3
3  diagnosis.
4          So if you see that -- you
5  see on top, you have to go step by step,
6  consider each one of these categories;
7  and then if its LR-NC -- that wasn't the
8  case, right, because there was -- there
9  was nothing that was so egregious that I
10 couldn't say if it's a benign or
11 malignant, so LR-NC is not applicable.
12         There was no evidence of
13 tumor in vein, so LR-TIV is not
14 applicable.  This lesion is not
15 definitively benign, it wasn't a cyst, it
16 wasn't a hemangioma, so not LR-1.
17         There was nothing in this
18 lesion that made me think that it was
19 probable -- good chance it was benign, so
20 it's not LR-2.
21         The next step is, does it
22 have targetoid appearance, it did not, so
23 LR-M is not applicable.
24         So then the next step is to

Page 243

1  go to diagnostic table.  You can see on
2  the bottom, the lesion that is less than
3  20 -- you know, first thing is, do we
4  have arterial phase hyperenhancement, no.
5  Right?  So we are going to stay in the
6  column that says no APHE.
7          Observation size is less
8  than 20 millimeter.  We're going to stay
9  in the most left-hand side of the table.
10 Then we're going to count additional
11 imaging features.  Enhancing capsule was
12 not present.  Washout was present.
13 Threshold growth was not present because
14 we have no present studies.
15         So we have one additional
16 major feature.  And if you see it on top,
17 right, you see 1, so intersection of 1
18 and less than 20 is LR-3.  So that's what
19 makes me say LR-3.
20         Because I didn't see any
21 ancillary features of malignancy, I did
22 not alter the category and LR-3 is the
23 appropriate category here.
24     Q.    And so you are saying he

Page 244

1  only had one major feature and that was
2  washout?
3      A.    Yes.
4      Q.    And my question to you was,
5  did that lesion enhance?  When you're
6  saying washed out, did it enhance in that
7  2016?
8      A.    I did not see arterial phase
9  hyperenhancement on 2016 study.
10     Q.    Did you see enhancement?  Is
11 there a difference between arterial phase
12 hyperenhancement and enhancement?  Or are
13 those two synonymous?
14     A.    No, they're not synonymous.
15     Q.    Did you see enhancement?
16     A.    That's not part of LI-RADS
17 assessment.  I need to see either it's --
18 either see arterial phase
19 hyperenhancement or not.  I did not.
20     Q.    You did not.
21     A.    There's no arterial phase
22 hyperenhancement, which has a very
23 specific definition.
24     Q.    To be clear, you saw no

Page 245

1  enhancement of the lesion that you
2  believe might have turned into HCC;
3  correct?
4          ATTORNEY ROSE:  Object to
5      the form; misstates the witness
6      testimony.
7          THE WITNESS:  There was no
8      arterial phase hyperenhancement.
9  BY ATTORNEY VAUGHN:
10     Q.    You just told me that
11 there's a difference between arterial
12 phase hyperenhancement and just regular
13 enhancement.  I'm asking you about
14 regular enhancement.
15     A.    I'm not sure how to answer
16 that question because regular enhancement
17 is not defined by LI-RADS.  Arterial
18 phase hyperenhancement is defined by
19 LI-RADS and therefore I can apply
20 definition as provided by LI-RADS and say
21 it's not present.
22     Q.    I'm going to go to page 57
23 of the PDF, it's page 55 down here of the
24 LI-RADS CORE, and the question that was

62 (Pages 242 - 245)

VICTORIA CHERNYAK, MD, MS

Page 246

1 posed in the LI-RADS CORE is: Does
2 washout appearance apply only to
3 observations with APHE? Can you read the
4 answer?
5     A.   No. You can -- counsel,
6 we've discussed this. I said that as
7 long as it's in -- it's iso-enhancing on
8 arterial phase, washout is applicable.
9     Q.   Can you read what the answer
10 is in the CORE for does washout
11 appearance apply only if observations
12 with APHE? What's the answer in that
13 CORE document?
14     A.   No, washout may apply even
15 in the absence of APHE as long as there
16 is some enhancement.
17     Q.   And I just asked you, like,
18 five times was there was some enhancement
19 and you told me no; correct?
20     A.   That's not what I said --
21         ATTORNEY ROSE: Object to
22 the form.
23         THE WITNESS: That's not
24 what I said. So, again, I'm going

Page 247

1 to point something out. This --
2 this CORE document was released in
3 2018.
4     Since then, there are
5 additional documents that were
6 released, including precise
7 definitions of all imaging
8 features, which are available on
9 the same website. I can certainly
10 point it to you.
11     And because this is a very
12 commonly asked question, the
13 definition of washout was
14 clarified to be very precise,
15 meaning that the lesion can go
16 either from being hyper to liver
17 to hypo to liver or being iso to
18 hypo, so this wording that you're
19 pointing out is outdated.
20     Yes, this is on the website.
21 Unfortunately, because of how
22 things are, we are not able to
23 update CORE in real life -- in
24 realtime. Excuse me.

Page 248

1     However, the definitions,
2 the definitions and lexicon, are
3 all available on the same website
4 and it's clearly stated that this
5 is what we we're supposed to refer
6 to. However, what I said is not
7 inconsistent.
8     Again, as long -- what we
9 cannot do is say something that
10 was, you know, nonenhancing,
11 nonenhancing, nonenhancing and you
12 say it's washout. That's what --
13 that's what it's getting at.
14     There is very long -- not
15 very long -- but very complex
16 history, because if you look at
17 the studies which were done before
18 LI-RADS was implemented, there was
19 inconsistencies in how washout was
20 defined.
21     Some studies would say it
22 has to be applied only to lesions
23 that had arterial phase
24 hyperenhancement. Some studies

Page 249

1 said, as long as you see something
2 that's looking like hypoenhancing
3 or portal veinous phase, that's
4 what they considered washout.
5     There's a huge variability
6 in how this feature was defined
7 before LI-RADS defined the
8 features before LI-RADS provided
9 very specific definition of how
10 features were defined, thereby
11 providing a more consistent --
12 consistent way of assessing
13 things.
14     So this -- again, there's a
15 follow-up to this document which
16 clarifies how to apply arterial
17 phase hyperenhancement.
18     The lesions that I saw were
19 isodense on arterial phase and
20 became hypodense on the subsequent
21 phase, which based on the LI-RADS
22 lexicon, which is -- which is
23 available and was updated, that
24 meets criteria for me to say that

63 (Pages 246 - 249)

VICTORIA CHERNYAK, MD, MS

Page 250

1     there was washout.
2  BY ATTORNEY VAUGHN:
3     Q.    Did you cite this updated
4  criteria anywhere in your expert report?
5     A.    No.
6     Q.    And you produced this
7  document, this 2018 CORE, in response to
8  your Notice of Deposition.  Did you
9  produce these updated guidelines that
10 you're now talking about?
11    A.    It's -- I can provide you
12 with lexicon.  I was providing this
13 mostly for the first page so you can see
14 how the imaging features are applied and
15 how the diagnostic categories are arrived
16 at.
17    Q.    I want to go to page 15 of
18 this LI-RADS CORE.  And we discussed this
19 earlier.  These are required images for a
20 CT; correct?
21    A.    Uh-hum.
22    Q.    And these are the same that
23 you listed in your paper that are
24 required; correct?

Page 251

1     A.    Yes.
2     Q.    And then there's a suggested
3  image which is the precontrast phase.
4  You don't have to do a precontrast phase
5  to do a LI-RADS; correct?
6     A.    Not unless the patient had
7  prior treatment.  Then it becomes
8  required.
9     Q.    But these other three are
10 all required.  Right?
11    A.    Yes.
12    Q.    Mr. Roberts, in his 2016 CT,
13 did they do a precontrast phase?
14    A.    Yes.
15    Q.    Was that phase one?
16    A.    Are you asking me
17 specifically about this?
18    Q.    That's correct.
19    A.    So unfortunately I tried to
20 open this study up, but I think my
21 computer cannot handle the Zoom and
22 stuff, so I actually cannot open the
23 study for some reason.
24         I'm not seeing the images.

Page 252

1     Q.    Were you able to open that
2  study on your computer previously?
3     A.    Yes, obviously, because I
4  read it.
5     Q.    I didn't know if maybe you
6  were on a different computer.
7     A.    I think that the --
8  everything else that's running is
9  preventing me from opening it up right
10 now.
11         ATTORNEY ROSE:  Sorry, Dr.
12 Chernyak.  Are you referring to
13 one of the exhibits?
14         THE WITNESS:  No.  I
15 actually tried to open the actual
16 CT.
17         ATTORNEY ROSE:  Oh, okay.
18         ATTORNEY VAUGHN:  Would it
19 help you if we took a break so you
20 could open up the CT and review
21 everything before we started
22 asking questions on it?
23         ATTORNEY ROSE:  Sorry.  I
24 have a question:  Are you going to

Page 253

1  ask her questions about a specific
2  CT?  Are you going to introduce a
3  CT as an exhibit?
4         ATTORNEY VAUGHN:  Well, I
5  mean, she's able to go through the
6  different phases, so I thought it
7  might be easier for her to
8  actually look at it herself, but
9  --
10         ATTORNEY ROSE:  Why don't we
11 go off the record and discuss
12 that.
13         ATTORNEY VAUGHN:  Okay.
14         THE VIDEO TECHNICIAN:  Off
15 the record, 2 o'clock.
16             - - -
17         (A discussion off the record
18 occurred.)
19             - - -
20         (A recess was taken from
21 2:05 p.m. to 2:20 p.m.)
22         THE VIDEO TECHNICIAN:  We
23 are back on the record at 2:20
24 p.m.

64 (Pages 250 - 253)

VICTORIA CHERNYAK, MD, MS

Page 254

1    ATTORNEY VAUGHN:  Give me
2  one second to get back where I
3  was.
4    (Pause.)
5  BY ATTORNEY VAUGHN:
6    Q.   All right, Doctor.  And so
7  on the suggested images, it lists
8  precontrast; correct?
9    A.   Yes, sir.
10    Q.   And how do you tell in a CT
11  image if it is a precontrast or if it is
12  a contrast image?
13    A.   You see brightness in the
14  vessels or lack thereof.
15    Q.   Is there any indication as
16  far as like words or letters that would
17  be on the CT to indicate that it was
18  without contrast?
19    A.   I mean, depends on how the
20  scanner is set up.  It could say without
21  or pre or WO.  Occasionally -- well, we
22  don't have to get into --
23    Q.   Understood.
24    A.   If everything is done

Page 255

1  correctly, it should be labeled either
2  precontrast or pre or without or C minus
3  or noncon or noncontrast.  So there are
4  -- there are multiple ways depending on
5  the facility how it's quoted.
6    ATTORNEY VAUGHN:  And,
7  Kathryn, can you drop in those
8  2016 CT images of Mr. Roberts now?
9    ATTORNEY AVILA:  Yes, this
10  is Exhibit 9.
11    - - -
12    (Deposition Exhibit No.
13  Chernyak-9, 2016 CT Images of the
14  Abdomen, was marked for
15  identification.)
16    - - -
17    ATTORNEY VAUGHN:  Thank you,
18  Kathryn.
19  BY ATTORNEY VAUGHN:
20    Q.   And can you see those on my
21  share screen now --
22    A.   Yes.
23    Q.   -- the image?
24    And so this is series 201,

Page 256

1  it says down here in the bottom left-hand
2  corner; correct?
3    A.   Yes.
4    Q.   And this 1253, is that what
5  time it was taken, in the top left?
6    A.   It depends.  It depends on
7  the scanner setting.  Sometimes these
8  numbers are not reliable, so
9  theoretically, it should -- it should
10  provide with the timestamp of the image
11  acquisition.  I know that for some of our
12  scanners, it doesn't propagate them.  It
13  just shows you when the scan was started,
14  so it's not a reliable measure -- or may
15  not be a reliable measure depending on
16  the scanner is configured.
17    Q.   But is it intended to take
18  the time of when the image was taken?
19    A.   Correct.
20    Q.   And this WO right here, is
21  this indicating without contrast?
22    A.   Yes.
23    Q.   And so the first series was
24  without contrast; correct?

Page 257

1    A.   Yes.
2    Q.   And that is an optional
3  image for LI-RADS; correct?
4    A.   For patients --
5    ATTORNEY ROSE:  Object to
6  the form --
7    THE WITNESS:  -- who do not
8  have --
9    ATTORNEY ROSE:  Sorry.  I
10  apologize, Doctor.  Just give me
11  one second to --
12    THE WITNESS:  Understood.  I
13  apologize.
14    ATTORNEY ROSE:  You can
15  answer.
16    THE WITNESS:  For patients
17  who had prior treatment, it is a
18  required phase.  For patients who
19  had no prior treatment, it is
20  often omitted to decrease exposure
21  to radiation.
22  BY ATTORNEY VAUGHN:
23    Q.   So for Mr. Roberts, this
24  would not have been required for his

65 (Pages 254 - 257)

VICTORIA CHERNYAK, MD, MS

Page 258

1 LI-RADS; correct?
2    A.    Correct.
3    Q.    And then this is the second
4 phase of the image, correct, series 301?
5    A.    This is the arterial phase.
6    Q.    And the arterial phase was
7 taken at 1259 and 20 seconds; correct?
8    A.    Based on the timestamp.
9    Q.    Do you have any reason to
10 disagree with that timestamp?
11    A.    As I mentioned, that
12 depending on scanner configuration, that
13 may or may not be an accurate timestamp.
14 I don't know --
15    Q.    Sorry.
16    A.    I don't know how their
17 scanners are configured, so I -- I -- I
18 believe -- I relied on the date.  The
19 timing, you have to be cautious with.
20    Q.    You have no reason to
21 believe that this timing is inaccurate,
22 do you?
23        ATTORNEY ROSE:  Object to
24    the form.

Page 259

1 BY ATTORNEY VAUGHN:
2    Q.    Are you again just saying it
3 might be inaccurate?
4    A.    I -- I don't consider these
5 numbers.  I'm looking at the images, so I
6 see without looking at the numbers that
7 this is the arterial phase.
8    Q.    Did you not look at the
9 numbers of when the scans were done at
10 all when forming your opinions?
11        ATTORNEY ROSE:  Object to
12    the form.
13        THE WITNESS:  It's not a
14    routine practice to look at the
15    numbers.
16 BY ATTORNEY VAUGHN:
17    Q.    How much after the venous
18 phase -- how long after the venous phase
19 should the delayed phase be?
20    A.    Two to five minutes.
21    Q.    And so right now, we're at
22 12:59 and 20 seconds.  Right?
23    A.    Okay.
24    Q.    And then this is the next

Page 260

1 series in the CT, correct, which would be
2 series 401?
3    A.    Okay.
4    Q.    And it was done at 1300 and
5 15 seconds; correct?
6        (Pause.)
7        THE WITNESS:  Okay.
8 BY ATTORNEY VAUGHN:
9    Q.    So this image was done 55
10 seconds after the image before it;
11 correct?
12    A.    Okay.
13    Q.    And this would be the portal
14 venous phase; correct?
15    A.    Yes.
16    Q.    In your opinion, was this
17 portal venous phase done early or on
18 time?
19    A.    On looking at the images,
20 it's done appropriately.
21    Q.    And was there any phase
22 after this?
23    A.    Is this 401?
24    Q.    Uh-huh.

Page 261

1    A.    No.
2    Q.    So there was no delayed
3 phase in this CT, was there?
4    A.    There was no delayed phase
5 on the CT.
6    Q.    And the LI-RADS 2018 CORE
7 says that is a required phase, the
8 delayed phase, doesn't it?
9    A.    It does.
10        ATTORNEY VAUGHN:  I pass the
11    witness.
12        ATTORNEY ROSE:  We can go
13    off the record.
14        THE VIDEO TECHNICIAN:  Off
15    the record at 2:26.
16        (A recess was taken from
17    2:26 p.m. to 2:57 p.m.)
18        THE VIDEO TECHNICIAN:  We
19    are back on the record at 2:57
20    p.m.
21            - - -
22        EXAMINATION
23            - - -
24 BY ATTORNEY ROSE:

66 (Pages 258 - 261)

VICTORIA CHERNYAK, MD, MS

Page 262

1     Q.   Hi, Dr. Chernyak.  How are
2 you?
3     A.   Okay.
4     Q.   Dr. Chernyak, are you the
5 co-chair of the LI-RADS steering
6 committee currently?
7     A.   Yes.
8     Q.   Were you able to apply
9 LI-RADS to evaluate the lesions on Mr.
10 Roberts' 2016 CT without having delayed
11 phase images?
12     A.   Yes.
13         ATTORNEY VAUGHN:  Object to
14     form.
15 BY ATTORNEY ROSE:
16     Q.   How?
17     A.   Yes.
18     Q.   Okay.
19     A.   How?  I'm sorry.  I thought
20 -- because I saw the washout on the
21 portal venous phase, so once you see a
22 feature on the portal venous phase,
23 that's sufficient for me to say that it's
24 present.

Page 263

1         There's no requirement that
2 it has to be present on both portal
3 venous and delayed phase.  As long as I
4 can see it, I can call it and apply
5 LI-RADS.
6     Q.   Why is the delayed phase
7 important in using LI-RADS?
8     A.   In a minority of HCCs,
9 especially early HCCs, they may not show
10 washout until the delayed phase.  So if
11 you don't see the washout on a portal
12 venous phase, you may be missing washout
13 and therefore, you know, delayed phase is
14 supposed to catch that.
15         However, if you already see
16 the washout in portal venous phase,
17 that's enough to say that it is --
18 washout is present.
19     Q.   Doctor, do you recall Mr.
20 Vaughn asking you earlier about how you
21 use the tumor volume doubling time to
22 calculate how long it would take for the
23 LI-RADS 3 lesion on Mr. Roberts' 2016 CT
24 to grow?

Page 264

1     A.   Yes.
2     Q.   And you testified that you
3 used ChatGPT as a calculator; correct?
4     A.   Yes.
5     Q.   Were you aware of the
6 formula for using the tumor volume
7 doubling time to calculate the growth of
8 a tumor prior to writing your report?
9     A.   Yes.
10     Q.   And does applying the
11 formula require the use of a scientific
12 calculator?
13     A.   Yes.
14     Q.   Is it fair to say that you
15 used the computing power of ChatGPT to
16 run the math of the calculation you did
17 in the same way that you would use a
18 scientific calculator?
19     A.   Yes.
20     Q.   And would you say that you
21 used the computing power of ChatGPT to
22 run the math of the calculation in the
23 same way you would have used Excel?
24     A.   Yes.

Page 265

1     Q.   Did you use ChatGPT to
2 identify any of the sources you cite in
3 your report?
4     A.   No.
5     Q.   Did you use ChatGPT to
6 generate any sources or articles to
7 support your opinions?
8     A.   No.
9     Q.   Did you use ChatGPT to write
10 any of the text in your report?
11     A.   No.
12     Q.   Did you use ChatGPT to
13 summarize or to understand any of the
14 concepts or literature cited in your
15 report?
16     A.   No.
17     Q.   And did you use ChatGPT for
18 any purpose other than as a scientific
19 calculator?
20     A.   No.
21         ATTORNEY ROSE:  That's all I
22     have.  Thank you.
23         ATTORNEY VAUGHN:  All right,
24     Doctor, I'll be really quick.

67 (Pages 262 - 265)

VICTORIA CHERNYAK, MD, MS

Page 266

1           - - -
2         EXAMINATION
3           - - -
4  BY ATTORNEY VAUGHN:
5      Q.   With Excel, you have to put
6  the formula in yourself; correct?
7      A.   Yes.
8      Q.   With ChatGPT, you didn't
9  have to put the formula in; it decided
10 the formula; correct?
11     A.   It showed me the formula as
12 it -- it showed me every step of the
13 calculation so that it was transparent in
14 how every step was applied and how it
15 arrived, basically, at every step of the
16 calculation.
17     Q.   And how do I see every step
18 of the calculation that ChatGPT decided
19 to do?
20         ATTORNEY ROSE:  Object to
21     the form.
22         THE WITNESS:  Do I show you
23     -- should I show you the screen?
24     It literally --

Page 267

1  BY ATTORNEY VAUGHN:
2      Q.   I mean, is there anywhere in
3  your expert report that I can see the
4  actual formula that ChatGPT applied?
5      A.   No.  I didn't put that.
6      Q.   And then I want to go
7  quickly back to the 2018 CORE for
8  LI-RADS.
9      A.   Okay.
10     Q.   Going back to page 57 PDF,
11 where -- at what time did you see
12 enhancement?  What phase did you see
13 enhancement, if you saw any enhancement?
14         ATTORNEY ROSE:  Object to
15     the form.
16         THE WITNESS:  On arterial
17     phase, the lesion was
18     iso-enhancing or isodense to the
19     background liver.
20 BY ATTORNEY VAUGHN:
21     Q.   And isodense to the
22 background liver, does that mean it
23 looked the same as the background liver?
24     A.   Yes.

Page 268

1      Q.   And you think that's
2  adequate enhancement to then say that
3  there was washout in the next phase?
4      A.   As I stated before, in the
5  updated lexicon, there are two patterns
6  that satisfy the diagnosis or
7  characterization of washout.
8  Isoenhancement, isodensity, isointensity,
9  those are all synonyms depending on what
10 modality you used.
11         So iso, meaning looking the
12 same, and then on the subsequent phase,
13 looking less enhanced, less dense, less
14 intense in hypo or hyper, meaning
15 enhancing more, looking brighter, and
16 then going back to hypo.
17         Those two are acceptable,
18 equally applicable definitions.  I'll be
19 happy to share the reference document
20 with you after we're done.
21     Q.   And, again, this 2000
22 LI-RADS CORE is what is current today;
23 correct?
24         ATTORNEY ROSE:  Object to

Page 269

1  the form.  I'm sorry.  I just want
2  to make sure.  Did you say 2000?
3         ATTORNEY VAUGHN:  2018
4  LI-RADS CORE, the one we're
5  looking at, this current exhibit,
6  that is current today; correct?
7         ATTORNEY ROSE:  Object to
8  the form.
9         THE WITNESS:  As I stated
10 before, there are updates that are
11 available on the -- on the
12 website, including, most
13 importantly, the lexicon is
14 clarified and made -- made less --
15 like, made -- made much more
16 clearer how to apply it.
17         There's no -- there's no
18 contradiction in the lexicon to
19 what is in the CORE.  It's just
20 clarification and more operational
21 definitions so that people are --
22 it's more clear how to apply these
23 definitions.
24 BY ATTORNEY VAUGHN:

68 (Pages 266 - 269)

VICTORIA CHERNYAK, MD, MS

Page 270

1    Q.   And the 2018 LI-RADS CORE
2  lists a required image as the delayed
3  phase; correct?
4    A.   It -- yes.
5    Q.   And you did not have a
6  delayed phase with Mr. Roberts; correct?
7    A.   Correct.
8    Q.   And when did you realize
9  that you did not have a delayed phase in
10 the 2016 of Mr. Roberts?
11   A.   When I was reviewing the
12 study, as I would review the study in
13 realtime, things don't always function
14 the way you want them to be.  For that
15 particular study, what I had was
16 sufficient to apply LI-RADS 3 category.
17      I knew that the addition of
18 delayed phase wouldn't change that and so
19 I didn't make a big deal out of it
20 because I knew that it would just add to
21 confusion rather than clarity.
22   Q.   So you didn't talk about the
23 fact that there's a missing image that
24 was required because it would cause

Page 271

1  confusion?
2      ATTORNEY ROSE:  Object to
3    the form.
4      THE WITNESS:  Again, as I
5    think -- I believe I mentioned,
6    there are multiple institutions
7    that choose to omit the delayed
8    phase for the sake of saving
9    radiation exposure to patients.
10     I've worked at two such
11   institutions -- I'm actually
12   working currently at such
13   institution -- and I apply LI-RADS
14   on a virtually daily basis.
15     So it is -- is it perfect in
16   compliance with what the CORE
17   says?  No.  Is it done in clinical
18   practice?  Yes.  Is it done in
19   clinical practice a lot?  Yes.
20 BY ATTORNEY VAUGHN:
21   Q.   And would you tell your
22 students that the 2016 CT of Mr. Roberts
23 is an ideal scan to apply LI-RADS to?
24      ATTORNEY ROSE:  Object to

Page 272

1    the form.  This is asked and
2    answered.
3      THE WITNESS:  I'm sorry.
4    What was the last thing you said?
5  BY ATTORNEY VAUGHN:
6    Q.   Would you tell your students
7  that the 2016 CT --
8    A.   No, no -- I'm sorry.
9    Q.   -- of Mr. Roberts is an
10 ideal scan to apply LI-RADS to?
11   A.   Again, great question.  And
12 we are working right now on what's called
13 an adequacy score that reflects the
14 adequacy of examination, recognizing that
15 imperfect exam in terms of quality may
16 still be adequate to -- to answer the
17 question.
18     So right now, a similar
19 score is available for ultrasound, but
20 not for CT and MR, and we are going to
21 introduce a similar score for CT and MR.
22     So if I were to discuss this
23 case with a student, I would explain to
24 them that in this case, even though this

Page 273

1  study is not -- would not qualify as a
2  perfect study, it is adequate for
3  answerable clinical question.
4      So in this case, I would
5  assign as a category B, which means that
6  the exam is not perfect, but adequate to
7  answer a clinical question.
8      So in this case, the
9  obtained images are sufficient and
10 adequate for me to assign LR-3 category.
11 BY ATTORNEY VAUGHN:
12   Q.   You said there is a similar
13 score available for ultrasound.  What do
14 you mean by that?
15   A.   There -- excuse me.  Let me
16 just shift the dog.  I apologize.
17     (Pause.)
18     THE WITNESS:  There is a --
19   remember I said that there are
20   other algorithms?  So right now,
21   there is a -- there's an
22   ultrasound LI-RADS and it
23   incorporates the visualization
24   score as an A, B, and C, which

69 (Pages 270 - 273)

VICTORIA CHERNYAK, MD, MS

Page 274

1  reflects how well an examination
2  is able to assess the liver.
3       This is not in my report
4  because I was not discussing the
5  ultrasound, but I'm saying that
6  we're using that to model a
7  similar idea for -- for a CT and
8  MR.
9       So, again, if I were to
10  discuss this case with my student
11  currently, today, that's what I
12  would explain to them, that even
13  though the study is not --
14  technically meets perfect the
15  requirement, it's still adequate
16  to answer clinical question.
17  BY ATTORNEY VAUGHN:
18      Q.   And he had an ultrasound
19  done on this 4/8/2016 that you called a
20  CT.  Did you attempt to apply the
21  ultrasound LI-RADS to this April 8th,
22  2016 ultrasound?
23      A.   No.
24           ATTORNEY ROSE:  Object to

Page 275

1  the form.
2           THE WITNESS:  I was -- I was
3  -- I was not asked to provide an
4  opinion on that ultrasound.  I did
5  look at it.  There are technical
6  requirements for -- you know, for
7  the ultrasound, including sending
8  images, which I don't believe were
9  available.
10  BY ATTORNEY VAUGHN:
11      Q.   What LI-RADS would you have
12  given the ultrasound?
13           ATTORNEY ROSE:  Object to
14  the form.
15           THE WITNESS:  I would have
16  to go back and look, but it would
17  -- based on the report and I
18  believe my -- my recollection of
19  that -- those images is concordant
20  with the report, there was an
21  observation there that was over a
22  centimeter, which makes a -- which
23  means a category -- which means
24  positive, which should trigger

Page 276

1  diagnostic CT and MR, which
2  happened in this case, so things
3  are concordant.
4  BY ATTORNEY VAUGHN:
5       Q.   And what was seen in the
6  ultrasound when it was followed up by the
7  CT was found to be noncancerous; correct?
8           ATTORNEY ROSE:  Object to
9  the form.
10           THE WITNESS:  What we did
11  not see on CT something that
12  corresponding to what was seen on
13  ultrasound.
14           ATTORNEY VAUGHN:  I have no
15  further questions.
16           THE VIDEO TECHNICIAN:  Any
17  additional questions?
18           ATTORNEY ROSE:  No
19  additional questions, thank you.
20           ATTORNEY VAUGHN:  Thanks,
21  Nina.  Thank you, Dr. Chernyak.
22  Enjoy the rest of your day.
23           THE VIDEO TECHNICIAN:  That
24  concludes today's deposition.  The

Page 277

1  time is 3:10 p.m.
2       (Witness excused.)
3       (Deposition concluded at
4  approximately 3:10 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

70 (Pages 274 - 277)