# EXHIBIT C

VICTORIA CHERNYAK, MD, MS

Page 1

```
 1        UNITED STATES DISTRICT COURT
             DISTRICT OF NEW JERSEY
 2               CAMDEN VICINAGE
 3               - - -
 4
    IN RE: VALSARTAN,        :  MDL No. 2875
 5  LOSARTAN, AND            :
    IRBESARTAN PRODUCTS      :
 6  LIABILITY LITIGATION     :
    _____:
 7  THIS DOCUMENT RELATES    :
    TO:                      :
 8  Gaston Roberts et al.    :
    v. Zhejiang Huahai       :
 9  Pharmaceutical Co., et   :
    al.                      :
10                           :
    Case No.                 :
11  1:20-cv-00946-RMB-SAK    :
12
                 - - -
13
              May 5, 2025
14
                 - - -
15
           Remote videotape expert
16  deposition of VICTORIA CHERNYAK, MD, MS,
    taken pursuant to notice, was conducted
17  at the location of the witness in New
    York, New York, beginning at 9:02 a.m.,
18  on the above date, before Kimberly A.
    Cahill, a Federally Approved Registered
19  Merit Reporter and Notary Public.
20
                 - - -
21
22
23
24
```

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

## VICTORIA CHERNYAK, MD, MS

Page 2

```
 1  APPEARANCES:
 2
 3  NIGH GOLDENBERG RASO & VAUGHN, PLLC
      BY:  C. BRETT VAUGHN, ESQUIRE
 4  BY:  DANIEL A. NIGH, ESQUIRE
      BY:  KATHRYN AVILA, ESQUIRE
 5  14 Ridge Square NW
      Third Floor
 6  Washington, D.C.  20016
      (202) 792-7927
 7  bvaughn@nighgoldenberg.com
      dnigh@nighgoldenberg.com
 8  kavila@nighgoldenberg.com
      Representing the Plaintiffs
 9
10  KIRKLAND & ELLIS, LLP
      BY:  NINA ROSE, ESQUIRE
11  1301 Pennsylvania Avenue, N.W.
      Washington, D.C.  20004
12  (202) 389-3394
      nina.rose@kirkland.com
13  Representing the Defendant, Zhejiang
      Huahai Pharmaceutical Co., Ltd.
14
15  KIRKLAND & ELLIS, LLP
      BY:  AUDREY ASPEGREN, ESQUIRE
16  601 Lexington Avenue
      New York, New York  10022
17  (212) 446-4800
      audrey.aspegren@kirkland.com
18  Representing the Defendant, Zhejiang
      Huahai Pharmaceutical Co., Ltd.
19
20  VIDEOTAPE TECHNICIAN:
          William Geigert
21
      ALSO PRESENT:
22        Stephanie Iken
          Nigh Goldenberg Raso & Vaughn,
23        PLLC
24            - - -
```

Page 3

```
 1             - - -
 2         I N D E X
 3             - - -
 4
 5  Testimony of:  VICTORIA CHERNYAK, MD, MS
 6  By Attorney Vaughn          7
      By Attorney Rose        261
 7  By Attorney Vaughn        266
 8
             - - -
 9
         E X H I B I T S
10
             - - -
11
12  NO.      DESCRIPTION         PAGE
13
      Chernyak-1   4/24/25 Invoice of   12
14         Victoria Chernyak,
           MD, MS
15
      Chernyak-2   Expert Report of    18
16         Victoria Chernyak,
           MD, MS
17
      Chernyak-3   4/8/16 Report of    34
18         Ultrasound for
           Gaston J. Roberts
19
      Chernyak-4   4/19/16 Report of   38
20         CT Abdomen WO/W
           Contrast for Gaston
21         J. Roberts
22  Chernyak-5   2020 Article by    90
           Kim, et al, "MRI
23         Ancillary Features
           for
24         LI-RADS Category 3
```

Page 4

```
 1         and 4 Observations:
           Improved
 2         Categorization to
           Indicate the Risk
 3         of Hepatic
           Malignancy"
 4
      Chernyak-6   2023 Article by    107
 5         Chernyak, et al,
           "LI-RADS: Looking
 6         Back, Looking
           Forward"
 7
      Chernyak-7   Review Article by  156
 8         Chernyak, et al,
           "Liver Imaging
 9         Reporting and Data
           System (LI-RADS)
10         Version 2018:
           Imaging of
11         Hepatocellular
           Carcinoma
12         in At-Risk
           Patients"
13
      Chernyak-8   CT/MRI LI-RADS    219
14         v2018 CORE Document
15  Chernyak-9   2016 CT Images of   255
           the Abdomen
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1             - - -
 2      DEPOSITION SUPPORT INDEX
 3             - - -
 4
 5  Direction to Witness Not to Answer
 6  Page Line   Page Line   Page Line
 7
 8  Request for Production of Documents
 9  Page Line   Page Line   Page Line
10
11
    Stipulations
12
    Page Line   Page Line   Page Line
13
14
15  Question Marked
16  Page Line   Page Line   Page Line
17
18
19
20
21
22
23
24
```

VICTORIA CHERNYAK, MD, MS

Page 22

1   A.   It was not contributory to
2  my opinion.
3   Q.   What do you mean by that?
4   A.   It -- the opinions that I've
5  provided are based on CT and ultrasound
6  didn't add or added those opinions or --
7  it was not relevant to my opinion.
8   Q.   Did the ultrasound go
9  against your opinion?
10   A.   No.
11   Q.   Is there any other errors
12  that you notice in your expert report?
13   A.   No, sir.
14   Q.   When did you last review
15  your expert report?
16   A.   This morning.
17   Q.   Did Mr. Roberts undergo an
18  MRI in April of 2016?
19   A.   Yes, he did undergo MRI in
20  April 2016.
21   Q.   He did?
22   A.   I'm sorry.  August '16.
23   Q.   Can you tell me about that
24  MRI he underwent in 2016?

Page 23

1   A.   It was a standard multiphase
2  MRI with a standard protocol which is
3  utilized for assessment of multiple
4  abdominal pathologies, but in this case
5  specifically was done to evaluate liver
6  lesions which were noted on the CT that
7  was done a few days -- within the week of
8  that MRI.
9        What -- how much more
10  details do you want me to go into?
11   Q.   An MRI gives better imaging
12  than a CT; correct?
13   A.   No.  It's -- well, it's not
14  a yes or no question.  It depends on
15  which -- it depends on really multiple
16  factors, including what pathology we're
17  looking at, patient factors, lesion
18  location.
19        So it's -- for some
20  situation, the answer is yes.  For some
21  situation, the answer is no.
22   Q.   Does an MRI have a higher
23  specificity of diagnosing cancer than a
24  CT?

Page 24

1   A.   That is not a categorical
2  correct statement.  So, again, as I
3  mentioned, it depends on the type of
4  cancer.  It depends on the type of
5  patient.  For some cancers, generally,
6  the statement is yes.  For some cancers,
7  generally, the statement is no.
8        Also, a lot of patient
9  factors, right, if the patient -- if the
10  patient cannot hold still and cannot
11  comply with a quiet breath holding, then
12  generally MRI will be far less diagnostic
13  than a well-conformed CT.
14   Q.   Would you agree that this
15  2016 MRI was important to your expert
16  opinion?
17   A.   2000 --
18        ATTORNEY ROSE:  Object to
19     the form.  Mr. Vaughn, clearly
20     that there is a typographical
21     error here that I think --
22        ATTORNEY VAUGHN:  Excuse me.
23        ATTORNEY ROSE:  Okay.
24        THE WITNESS:  Okay.

Page 25

1        ATTORNEY VAUGHN:  No more
2     speaking objections in this.  I've
3     made it very clear on my
4     questions.  Do not coach your
5     witness.
6        THE WITNESS:  It was an --
7     okay -- typographical error --
8        ATTORNEY VAUGHN:  Now you're
9     saying typographical error after
10     your attorney said it's a
11     typographical error.
12        THE WITNESS:  However the
13     lesion's -- however's the lesion's
14     present on April -- okay.  It was
15     supposed to be CT --
16  BY ATTORNEY VAUGHN:
17   Q.   What's supposed to be CT?
18   A.   Instead of MRI, it's
19  supposed to be CT.
20   Q.   So this is another error in
21  your expert report?
22   A.   Another error --
23  typographical error, yes.
24   Q.   Were you in a rush when you

VICTORIA CHERNYAK, MD, MS

Page 62

1  this supports that there's seven
2  different diagnostic categories?
3      A.  For diagnostic LI-RADS, yes.
4      Q.  Can we go to page 5 of your
5  expert report?
6      A.  Which one is that?  Because
7  my number -- they're not numbered.
8      Q.  PDF page 5.  It's the one
9  where you have -- you identify different
10 segments that you see lesions.
11     A.  Okay.
12     Q.  And, again, you noted it was
13 an April 8th, 2006 CT.  This was supposed
14 to be that later date of --
15     A.  18 -- 18?  19?  19.
16     Q.  19th?  Okay.
17         This first lesion, this .6
18 centimeter --
19     A.  Uh-hum.
20     Q.  -- you're not saying that
21 this turned into cancer; correct?
22         ATTORNEY ROSE:  Object to
23     the form.
24         ATTORNEY VAUGHN:  You can

Page 63

1     still answer.
2         THE WITNESS:  I -- can you
3     rephrase your question, please?
4  BY ATTORNEY VAUGHN:
5     Q.  Yeah, this .6 centimeter
6  lesion that you detected, you then looked
7  in the 2018 CT; correct?
8     A.  Yes.
9     Q.  In your opinion, did this 6
10 centimeter lesion in image 17 turn into
11 cancer?
12    A.  0.6 centimeter lesion.
13    Q.  Thank you.
14    A.  Without interim imaging
15 between 2016 and 2018, I don't -- I
16 cannot say definitively, but I cannot
17 rule it out.
18    Q.  Was there any cancer in the
19 spot of where this .6 centimeter lesion
20 was in image 17?
21        ATTORNEY ROSE:  Object to
22    the form.
23        THE WITNESS:  That lesion
24    met criteria for LI-RADS 3, which

Page 64

1     has intermediate probability of
2     being malignancy.  About 33
3     percent of LI-RADS 3 lesions are
4     HCCs, so there's a possibility
5     that it was small HCC at the time.
6  BY ATTORNEY VAUGHN:
7     Q.  And by 2018, when you looked
8  at the same spot, was there any HCC in
9  that spot?
10    A.  That spot correspond -- in
11 that spot, there was a LI-RADS 5 lesion.
12    Q.  You're saying the spot --
13 segment 7, the 0.6 centimeter in image
14 17, you're telling me in 2018, there was
15 an HCC there?
16        ATTORNEY ROSE:  Object to
17    the form.
18        THE WITNESS:  May I please
19    reference my --
20        ATTORNEY VAUGHN:  You may.
21        THE WITNESS:  -- exhibit?
22    Thank you.
23        (Pause.)
24        THE WITNESS:  Segment 5/8

Page 65

1     lesion -- so segment 5/8 lesion --
2         ATTORNEY VAUGHN:  I didn't
3     realize I wasn't sharing.
4         THE WITNESS:  So segment 5/8
5     lesion, so the next one, .5
6     centimeter.
7  BY ATTORNEY VAUGHN:
8     Q.  Sorry.  I didn't realize I
9  wasn't scree-sharing.  So I'm talking
10 about the one in segment 6, this 0.6
11 centimeter on image 17, in your opinion,
12 in 2018, was there HCC at this site?
13    A.  Okay.  So in segment 7 -- so
14 all these three lesions, they look very
15 similar to each other in terms of their
16 imaging features, each and every one of
17 them meets criteria for LI-RADS 3.
18        So each and every one of
19 them has a about a third of a chance of
20 being HCC at that time.
21    Q.  And you are not answering my
22 question.  My question is simply, when
23 you looked at the 2018 CT, was there HC
24 -- excuse me?

17 (Pages 62 - 65)

VICTORIA CHERNYAK, MD, MS

Page 66

1   A.   2016 CT?
2   Q.   No.  I'm talking about the
3  2018.  You were talking about the '16
4  here.  You looked at the '16 and the '18;
5  correct?
6   A.   You said 2016 C -- okay.
7   Q.   Okay.
8       ATTORNEY ROSE:  I think the
9  confusion -- Brett, the confusion
10  is that in your question you
11  referenced a 2018 CT.
12       ATTORNEY VAUGHN:  Well,
13  because that's what I'm asking her
14  to compare.
15       You looked at the 2018 CT
16  and on image 17 -- in 2016, you
17  see this .6 centimeter and you say
18  it's a LI-RADS 3.  And then you go
19  and you look at the 2018 and you
20  look at where image 17 would be.
21       Did it correspond to where
22  any HCC was?
23       THE WITNESS:  So 2018 MRI.
24       ATTORNEY VAUGHN:  MRI.  Was

Page 67

1  there a CT in 2018?
2       THE WITNESS:  There was, but
3  it was not done with multiphase
4  protocol, so it's not -- you can't
5  apply LI-RADS to that, so --
6  BY ATTORNEY VAUGHN:
7   Q.   And what's a multiphase
8  protocol?
9   A.   The one that has arterial
10  phase and portal venous phase --
11  Q.   And so if you don't -- if
12  you don't do all the phases, you can't
13  apply LI-RADS; correct?
14  A.   Correct.
15  Q.   Okay.
16  A.   So in the lesion in segment
17  7, on series 401, image 17, had no
18  corollary on MRI done in August of 2018.
19  Q.   So this first one that you
20  listed definitely did not turn into HCC;
21  correct?
22       ATTORNEY ROSE:  Object to
23  the form.
24       THE WITNESS:  There was no

Page 68

1  -- it -- in 2018, there was no
2  correlation to this lesion.
3  BY ATTORNEY VAUGHN:
4   Q.   And then let's look at the
5  bottom one, the segment 6, half
6  centimeter, image 35, did you look to
7  correspond that one in the MRI in 2018?
8   A.   Yes.
9       ATTORNEY ROSE:  Object to
10  the form.
11  BY ATTORNEY VAUGHN:
12  Q.   And in your opinion, did
13  this one overlay with where HCC
14  developed?
15  A.   No.
16  Q.   And so the one that we're
17  left with is here in the middle, in
18  section 5 and section 8, where there's
19  the half centimeter on image 24.  In your
20  opinion, when you looked at the 2018 MRI,
21  did this one overlay with where HCC
22  developed?
23  A.   Yes.
24  Q.   And so it's only the middle

Page 69

1  one, the one in section 5 and section 8,
2  that ended up overlaying with where HCC
3  was; correct?
4   A.   Yes.
5   Q.   And that specific one, the
6  one in segment 5 and 8 on image 24, in
7  your opinion, had a 33 percent chance of
8  become being HCC; correct?
9       ATTORNEY ROSE:  Object to
10  the form.
11       THE WITNESS:  No.  It was --
12  it had 33 percent chance of being
13  HCC at that particular moment.
14  BY ATTORNEY VAUGHN:
15  Q.   So I want to be very clear
16  then.  This one in segment 5 and segment
17  8 that was a half centimeter in image 24,
18  in your opinion, there was a 33 percent
19  chance that that was cancerous as of
20  2016; correct?
21  A.   Correct.
22       ATTORNEY VAUGHN:  Now is a
23  good time for a break.
24       THE VIDEO TECHNICIAN:  Off

18 (Pages 66 - 69)

VICTORIA CHERNYAK, MD, MS

Page 82

1  patient.
2         According to LI-RADS and
3  AASLD, patients who have LI-RADS 3
4  observation need to be followed up every
5  three to six months.  THE decision if
6  it's three months or six months is left
7  to the physician, conversation with
8  patient, but they have to be followed up.
9     Q.   You can't diagnose a patient
10 with HCC based on a LI-RADS 3; correct?
11    A.   LI-RADS 3 provides an
12 intermediate probability of being
13 malignant, so LI-RADS 3 is about 33
14 percent of being malignant.
15    Q.   And so you can't say to a
16 reasonable degree of medical certainty
17 that the lesion in segment 5 and segment
18 8 on image 24 was HCC at the time in
19 2016; correct?
20    A.   It had a probability -- it
21 had a 33 probability of being malignant.
22    Q.   Can you say to a reasonable
23 degree of medical certainty that it was
24 malignant in 2016?

Page 83

1         ATTORNEY ROSE:  Object to
2      the form.
3         THE WITNESS:  What's a
4      reasonable degree?  Is 33 percent
5      reasonable degree?  I'm not sure
6      what's reasonable degree.
7         The -- the LI-RADS
8      specifically is designed to take
9      away at least some of the
10     subjectivity from conversation
11     between radiologists and
12     clinicians, and there are a lot of
13     studies that are performed to
14     validate LI-RADS and LI-RADS
15     works.
16        And the probabilities that
17     I'm citing to you have been
18     validated in multiple studies.  So
19     when I say something meets
20     criteria for LI-RADS 3, that
21     communicates that that probability
22     of HCC is about 33 percent.
23 BY ATTORNEY VAUGHN:
24    Q.   You -- I'm sorry.

Page 84

1     A.   So, hence -- hence, the
2  patient should be followed every three to
3  six months.
4     Q.   The opinions stated in your
5  expert report, did you give them to a
6  reasonable degree of medical certainty?
7     A.   I'm sorry.  Can you repeat
8  that again?
9     Q.   The expert opinions within
10 your report, did you give them to a
11 reasonable degree of medical certainty?
12    A.   I'm not -- I'm not sure what
13 you're exactly asking me.  I provided my
14 opinion based on my medical training and
15 my years of practice and my expertise in
16 LI-RADS, so this is how I interpret the
17 imaging.
18    Q.   And can you say to a
19 reasonable degree of medical certainty as
20 of 2016 that Mr. Roberts had cancer?
21        ATTORNEY ROSE:  Object to
22     the form.
23        THE WITNESS:  Mr. Roberts
24     had three lesions.  Each one of

Page 85

1      them met criteria for LI-RADS 3
2      observation.  LI-RADS 3
3      observation has 33 percent of
4      probability of being malignant.
5         I have no tools to stratify
6      that probability.  Nobody has
7      those tools.  Those tools yet do
8      not exist.
9  BY ATTORNEY VAUGHN:
10    Q.   Your next sentence, you say:
11 When they are followed long term, up to
12 60 percent of LR-3 observations progress
13 to HCC within 48 months.
14        Did I read that right?
15    A.   Yes.
16    Q.   Why did you choose 48
17 months?
18    A.   That is the study that I
19 quoted followed the lesions up to 48
20 months.  That's the number that they've
21 -- they've reported.
22    Q.   And how long was between Mr.
23 Roberts' 2016 scan and 2018 scan?
24    A.   Two years and I think --

22 (Pages 82 - 85)

VICTORIA CHERNYAK, MD, MS

Page 146

1  review paper, you noted that several
2  studies found that all LR-3 observations,
3  23 to 60 percent remained LR-3; correct?
4      A.   Yes.
5      Q.   And that's what Mr. Roberts
6  had -- that you say Mr. Roberts had, was
7  an LR-3; correct?
8      A.   Yes.
9      Q.   And so in your opinion, did
10 Mr. Roberts have a 23 to 60 percent
11 chance of that LR-3 remaining as an LR-3?
12          ATTORNEY ROSE:  Object to
13     the form.
14          THE WITNESS:  Based on the
15     evidence that we have, he had 23
16     to 60 percent chance that it would
17     remain, 7 to 24 percent chance of
18     progression.
19          You can -- you can see how
20     these numbers are very, very --
21     the ranges are big and that
22     underscores the challenges, that
23     we don't have a good sense of
24     which of the LR-3 observations

Page 147

1      will stay the same, progress, or
2      change.  We just don't know.
3      That's why we have to follow them.
4  BY ATTORNEY VAUGHN:
5      Q.   Is LR-3 kind of just
6  guesswork?
7          ATTORNEY ROSE:  Object to
8      the form.
9          THE WITNESS:  It is a
10     collection of observations that
11     imaging features are such that the
12     probability of HCC at that
13     particular moment is 33 percent.
14          So it's not low enough to
15     say forget about it.  It's not
16     high enough to say we must do
17     something about it right this very
18     second.  It's intermediate, as the
19     name states, and therefore we have
20     to follow these patients.
21          Unfortunately, we don't have
22     any good tools other than let's
23     just wait and see what it does.
24          But it's enough probability

Page 148

1      that -- or enough of them progress
2      that we can -- that we have to say
3      that we need to follow them more
4      closely than a person who doesn't
5      have anything in their liver.
6  BY ATTORNEY VAUGHN:
7      Q.   And you agree that Mr.
8  Roberts' LR-3 in 2016 had a 15 to 68
9  percent chance of decreasing to an LR-1
10 or LR-2?
11     A.   Based on available image --
12 literature, yeah.
13     Q.   And so would you agree it's
14 most likely that Mr. Roberts LR-3 in 2016
15 would have either stayed as an LR-3 or
16 decreased to an LR-1 or 2?
17         ATTORNEY ROSE:  Object to
18     the form.
19         THE WITNESS:  I have --
20     we're looking at probabilities as
21     they apply to the entire
22     population and it comes to -- so
23     if you said -- if, you know, any
24     given LR-3 has a -- then it's

Page 149

1      true.  The problem is applying
2      population probabilities to a
3      particular patient is difficult,
4      because it is a very specific
5      lesion we're talking about.
6          Because we cannot say with
7      any degree of reasonable certainty
8      that this particular lesion in Mr.
9      Roberts' case would actually
10     regress or stay the same, that is
11     why this lesion requires a
12     follow-up, because there's no way
13     to say how this lesion will
14     behave, because there is up to 24
15     percent chance of progression and
16     -- and if it progresses, it's an
17     aggressive disease.
18          So the goal is to monitor
19     and if they, you know, resolve,
20     then the patient can go back to a
21     routine surveillance schedule.
22          By the way, patients once
23     they have cirrhosis have to be
24     under routine surveillance, so

38 (Pages 146 - 149)

VICTORIA CHERNYAK, MD, MS

Page 162

1  optimal images for CT and MRI are listed
2  on figure 4?
3      A.   Yep.
4      Q.   And then I did want to go
5  right down here.  In your publication,
6  you note that MRI is more sensitive than
7  CT.  You agree with that statement;
8  correct?
9      A.   With the simplest
10 specificity; however, the difference are
11 small and the -- and the comparative
12 performance of CT and MR has not yet been
13 studied in community settings.
14          I can provide you -- well,
15 one of the papers that I cited in my
16 report actually looked at MRI and CT and
17 we found no statistically significant
18 difference in proportions of HCC between
19 CT/MR with extracellular contrast agent
20 and hepatobiliary agents in the
21 meta-analyses for probabilities of HCC
22 per each category.
23          This is -- this is 2018.
24 This is the initial study that announced

Page 163

1  -- initial publication that announced
2  release of version 2018 of LI-RADS and
3  the study that I'm referring to is Lee,
4  et al, study published in 2023.
5      Q.   What does "more sensitive"
6  mean?
7      A.   It means that it is able to
8  pick up disease better or it's more
9  likely to pick up disease when it's
10 present.
11     Q.   This -- right here, it says:
12 Late arterial phase imaging is strongly
13 preferred over early arterial phase
14 imaging to maximize the likelihood of
15 depicting APHE, which is a major feature
16 of HCC.
17          Do you agree with that
18 statement?
19     A.   Yes.
20     Q.   Can you explain that
21 statement?
22     A.   Arterial -- APHE, A-P-H-E,
23 arterial phase hyperenhancement, is a
24 requirement for noninvasive diagnosis of

Page 164

1  HCC, and we need arterial phase to
2  determine it, to see it.  And it is, late
3  arterial phase has a better chance of
4  showing it.
5      Q.   What is late arterial phase
6  versus early arterial phase?
7      A.   It refers to the timing of
8  acquisition of arterial phase.
9      Q.   Is that the third phase of
10 the CT?
11     A.   It is the first
12 post-contrast phase.
13     Q.   What makes it late versus
14 early?
15         ATTORNEY ROSE:  Object to
16     the form.
17         THE WITNESS:  Certain
18     appearances and feeling of certain
19     vessels in the liver.
20 BY ATTORNEY VAUGHN:
21     Q.   In the 2016 CT for Mr.
22 Roberts, was it a late arterial phase or
23 early arterial phase?
24     A.   I would have to go back and

Page 165

1  double-check.
2      Q.   What would you check for
3  that?
4      A.   I would check the appearance
5  of the vessels.
6      Q.   And did you check that at
7  the time you were forming your expert
8  opinions?
9      A.   Yes.
10     Q.   But you didn't note if it
11 was late or early?
12         ATTORNEY ROSE:  Object to
13     the form.
14         THE WITNESS:  It's not a
15     requirement for LI-RADS to -- for
16     -- to note that and even though
17     the late arterial phase is
18     preferred, not having one does not
19     render the exam nondiagnostic or
20     LI-RADS not applicable.
21 BY ATTORNEY VAUGHN:
22     Q.   And when you say preferred,
23 it's strongly preferred; correct?
24     A.   Strongly preferred because

42 (Pages 162 - 165)

VICTORIA CHERNYAK, MD, MS

Page 198

1  cirrhosis by detecting HCC at
2  stages where it can be treated.
3       So I was just providing
4  numbers.  These numbers -- nobody
5  can provide you with exact numbers
6  because, again, there was no
7  follow-up that was required --
8  that should have happened.
9  BY ATTORNEY VAUGHN:
10     Q.   So you have no way to know
11 if this assumption that you made of a
12 constant tumor volume doubling time of
13 three months was applicable to Mr.
14 Roberts; correct?
15          ATTORNEY ROSE:  Object to
16     the form.
17          THE WITNESS:  I am showing
18     that it is within the realms of
19     possibility that this was so.
20 BY ATTORNEY VAUGHN:
21     Q.   In your expert opinion, did
22 Mr. Roberts' HCC have a constant growth
23 rate?
24     A.   This is not an answerable

Page 199

1  question because I don't -- because the
2  patient didn't have the follow-up, so...
3       Q.   Can you explain to me how
4  you did this calculation, this tumor
5  volume doubling time, to come to your
6  answer that it would take approximately
7  two years and eight months for it to grow
8  to the size that was seen?
9       A.   There is a -- a calculator
10 you can plug in.  There's a formula.  You
11 can plug in the numbers.  So I said, you
12 know, tumor volume doubling time three
13 months, initial size this, and it -- and
14 the calculator spit out the two years and
15 eight months using the formula.  I can
16 look up the formula for you.
17      Q.   What calculator did you use?
18      A.   ChatGPT, which provided me
19 with --
20      Q.   ChatGPT?
21      A.   Well, it provided me with a
22 formula, so I can --
23      Q.   So you entered some data in
24 this ChatGPT and it shot out it would

Page 200

1  take two years and eight months for it to
2  grow to that size?
3       A.   It provided me with a
4  formula which -- which is the formula you
5  use for -- for this.  I looked at the
6  formula.  It was correct.  It just made
7  the calculations faster than me entering
8  into Excel and recalculating everything
9  myself.
10      Q.   And did you include
11 ChatGPT's formula in your expert report
12 anywhere?
13      A.   No.
14      Q.   How would I find what
15 ChatGPT's formula was?
16      A.   It's in -- it -- it's a
17 standard formula for tumor -- tumor
18 volume doubling time.  There's a --
19 there's a formula and it just made the
20 calculation faster.
21      Q.   Does that formula appear
22 anywhere in your expert report?
23      A.   No.
24      Q.   Does the data that you

Page 201

1  entered in that formula appear anywhere
2  in your expert report?
3       A.   Yes, three months and .05
4  centimeter.
5       Q.   So is all you typed into
6  ChatGPT was three months and 0.5
7  centimeters and ChatGPT shot out that
8  it's going to take two years and eight
9  months?
10      A.   I said tumor -- tumor volume
11 doubling time is three months.  Initial
12 size is .5 centimeters.  How long will it
13 take to grow to this 5.8 centimeter?  It
14 provided me with step-by-step
15 calculations.  They appeared correctly.
16      Q.   For the tumor volume
17 doubling time of three months, you chose
18 the three-month doubling time, not
19 ChatGPT; correct?
20      A.   Yes.
21      Q.   Did ChatGPT give you a
22 suggestion of what doubling time you
23 should be using?
24      A.   No.  It just provided me

51 (Pages 198 - 201)