# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

|  |  |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 2875<br><br>Honorable Robert B. Kugler, District Court Judge |
| **This Document Relates to the TPP Trial Subclasses** | Oral Argument Requested |

## JOINT FINAL PRETRIAL ORDER

The following shall constitute the Final Pretrial Order pursuant to Rule 16, Federal Rules of Civil Procedure. This Final Pretrial Order shall govern the conduct of the trial of this case. Amendments to this Order will be allowed only in exceptional circumstances to prevent manifest injustice. See Fed. R. Civ. P. 16(e). Counsel are urged to move to amend in a timely fashion any portion of the Order that must be changed or modified between the filing of the Order and the trial date.

**APPEARANCES:**

For Plaintiff MSP Recovery Claims, Series, LLC ("MSP"), individually and on behalf of TPP Breach of Express Warranty subclass b, TPP Fraud subclass c, and TPP State Consumer Protection Laws subclass a (collectively, "Plaintiffs" or "TPP Classes"):

| | |
|---|---|
| Ruben Honik<br>**Honik LLC**<br>1515 Market Street, Suite 1100<br>Philadelphia, PA 19102<br>Phone: (267) 435-1300<br>ruben@honiklaw.com | Adam Slater<br>Christopher J. Geddis<br>**Mazie, Slater, Katz & Freeman, LLC**<br>103 Eisenhower Pkwy, 2nd Flr.<br>Roseland, NJ 07068<br>Phone: (973) 228-9898<br>aslater@mazieslater.com |

| | |
|---|---|
| Conlee S. Whiteley<br>David J. Stanoch<br>**Kanner & Whiteley, LLC**<br>701 Camp Street<br>New Orleans, LA 70130<br>Phone: (504)-524-5777<br>c.whiteley@kanner-law.com | Daniel Nigh<br>Marlene Goldenberg<br>Brett Vaughn<br>**Nigh Goldenberg Raso & Vaughn, PLLC**<br>14 Ridge Square NW<br>Third Floor<br>Washington, D.C. 20016<br>Phone: (850) 600-8090<br>dnigh@nighgoldenberg.com |
| Andres Rivero<br>Jorge Mestre<br>Zalman Kass<br>**Rivero Mestre LLP**<br>2525 Ponce de Leon Blvd., Suite 1000<br>Miami, FL 33134<br>Phone (305) 445-2500<br>jmestre@riveromestre.com | Gregory P. Hansel<br>John J. Cronan, III<br>Elizabeth F. Quinby<br>**Preti, Flaherty, Beliveau & Pachios, Chartered, LLP**<br><br>One City Center<br>P.O. Box 9546<br>Portland, ME 04112<br>Phone: (207) 791-3000<br>ghansel@preti.com |
| Madeline Pendley<br>**Levin Papantonio Rafferty Proctor Buchanan O'Brien Barr & Mougey, P.A.**<br>Pensacola, FL 32502-5996<br>850.435.7003 (office)<br>mpendley@levinlaw.com | John R. Davis<br>**Slack Davis Sanger, LLP**<br>6001 Bold Ruler Way, Suite 100<br>Austin, TX 78746<br>(512) 795 8686<br>jdavis@slackdavis.com |

For Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai U.S., Inc.,
Prinston Pharmaceutical Inc., and Solco Healthcare U.S., LLC (collectively, "ZHP")

    Allison M. Brown
    Jessica Davidson

2

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3222
allison.brown@skadden.com
jessica.davidson@skadden.com

Nina R. Rose
Geoffrey M. Wyatt
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Phone: (202) 371-7000
nina.rose@skadden.com
geoffrey.wyatt@skadden.com

For Defendants Teva Pharmaceuticals USA, Inc., Actavis LLC, and Actavis Pharma,
Inc. (collectively, "Teva")

Victoria Davis Lockard
Steven M. Harkins
Terminus 200
3333 Piedmont Rd., NE, Suite 2500
Atlanta, Georgia 30305
Tel: (678) 553-2385
lockardv@gtlaw.com

Gregory E. Ostfeld
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel: (312) 456-8400
ostfeldg@gtlaw.com

Liza M. Walsh
Walsh Pizzi O'Reilly Falanga LLP
Three Gateway Center
100 Mulberry Street, 15th Floor

3

Newark, NJ 07102
lwalsh@walsh.law

For Defendants Torrent Pharmaceuticals Ltd. and Torrent Pharma, Inc. (collectively, "Torrent")

Devora W. Allon, P.C.
Alexia R. Brancato
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022

# PART I.    JURISDICTION and BRIEF SUMMARY OF THE CASE:

A. Subject Matter Jurisdiction

This Court has original subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the class consists of more than 100 class members, and (d) none of the exceptions under the subsection applies to this action.

Plaintiff MSP Recovery Claims, Series LLC ("MSP") is a Delaware limited liability company with its principal place of business in Florida. MSP's two at-issue assignors are EmblemHealth (including EmblemHealth Services Company, Group Health Incorporated, and Health Insurance Plan of Greater New York), which has its principal place of business in New York, and SummaCare, Inc., which is a not-for-profit corporation with its principal place of business in Ohio.

Defendant Zhejiang Huahai Pharmaceutical Co. Ltd. is a Chinese corporation with its principal place of business in China. Defendant Huahai U.S., Inc. is a New Jersey corporation with its principal pace of business in New Jersey. Defendant Prinston Pharmaceutical Inc. ("Prinston") is a Delaware corporation with its principal place of business in New Jersey. Defendant Solco Healthcare U.S., LLC ("Solco") is a Delaware limited liability company with its principal place of business in New Jersey. Collectively, these defendants are referred to herein as "ZHP" or "the ZHP Defendants" unless stated otherwise.

Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business in New Jersey. Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in New Jersey.

Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business in New Jersey. Collectively, these defendants are referred to herein as "Teva" or the "Teva Defendants" unless stated otherwise.

Defendant Torrent Pharmaceuticals Ltd. is an Indian corporation with its principal place of business in India. Defendant Torrent Pharma, Inc. is a New Jersey corporation with its principal place of business in New Jersey. Collectively, these defendants are referred to herein as "Torrent" unless stated otherwise.

Plaintiffs submit the amount in controversy in this TPP Plaintiff subclass trial is $1,336,744,346 (subject to the potential impact of an alternative calculation with a minimum of $319,015,400), plus potential doubling trebling, statutory fines and penalties, pre-judgment and post-judgment interest, punitive damages (whether awarded by the jury or by the Court post-verdict as applicable), attorneys' fees, costs, and other equitable relief deemed just and appropriate. Defendants deny entitlement to any damages.

B. Summary of the Case

Plaintiffs assert three claims, individually and on behalf of the certified TPP trial subclasses, against Defendants ZHP, Teva, and Torrent: (i) breach of express warranty[1]; (ii) common-law fraud[2]; and (iii) violation of state consumer protection laws.[3]

*Plaintiffs' General Statement of Claims.* These claims are intended to compensate Plaintiffs for their payments for Defendants' sale of valsartan blood pressure pills contaminated with the genotoxic, probable human carcinogens NDMA

---

[1] This certified claim is proceeding under the laws of Alabama, Arkansas, Florida, Georgia, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New York, North Carolina, Ohio, Oregon, Rhode Island, South Carolina, Texas, Utah, Vermont, Wisconsin, and Wyoming.

[2] This certified claim is proceeding under the laws of Alaska, Arkansas, Colorado, District of Columbia, Florida, Idaho, Iowa, Louisiana, Massachusetts, Minnesota, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Rhode Island, South Dakota, Vermont, Virginia, Washington, Wyoming, and Puerto Rico.

[3] This certified claim is proceeding under the laws of Alaska, Arizona, California, Connecticut, Florida, Hawaii, Idaho, Louisiana, Missouri, Nebraska, New Hampshire, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, and Washington.

and NDEA (substances used to intentionally give cancer to laboratory animals for research purposes).

*Plaintiffs' Statement of Claims Against ZHP.* Plaintiffs assert that the claims against ZHP arise from ZHP's manufacture and sale of valsartan active pharmaceutical ingredient ("API") contaminated with genotoxic probable human carcinogens NDMA and NDEA, due at least in part to ZHP's violation of current good manufacturing practices ("cGMP"), as well as incorporation of the contaminated API into valsartan finished dose pills for sale. The valsartan API and finished dose were adulterated, was not pharmaceutically or therapeutically equivalent to the reference listed drugs Diovan and Exforge due to the lack of quality and purity, and failed to meet the compendial specifications, due to the presence of NDMA and NDEA, and ZHP's deviations from cGMP. The FDA investigated ZHP's conduct and issued a Warning Letter on November 27, 2018, finding significant violations of cGMPs in the manufacturing of the at-issue valsartan, stating that ZHP was obligated to identify and prevent the contamination, and consequently determined that ZHP's valsartan was adulterated, and imposed an import ban on ZHP. At no time did the FDA exculpate ZHP for its violations, including in general information statements that included specific language pointing to ZHP's violations and the issuance of the Warning Letter.

Plaintiffs further assert that ZHP was aware of the NDMA contamination at least as early as July 27, 2017 according to an internal ZHP communication. Notwithstanding, ZHP represented and warranted at all times that the valsartan API and finished dose it sold was the FDA-approved, compendial compliant formulation, manufactured in compliance with cGMPs, and consistent with the representations in the applicable abbreviated new drug application ("ANDA"), and drug master file ("DMF"). ZHP also failed to adequately respond to a series of complaints from ZHP's API customers arising from unidentified peaks on residual solvent chromatograms for years, until ZHP customer Novartis identified the source of the unknown peaks as NDMA in June 2018, and compelled ZHP to disclose the contamination, which ZHP unreasonably delayed while continuing to sell the contaminated valsartan (and allowing its customers to do so as well), until Novartis insisted and threatened to do so unilaterally. This led to a recall of the contaminated valsartan. ZHP also attempted to persuade the FDA to agree to allow ZHP and others to continue to sell the contaminated valsartan with high levels of NDMA and NDEA, but the FDA rejected this effort. ZHP's press release announcing the recall indicated that it was due to the "unacceptable carcinogenic risk to the intended patient population."

But for the at-issue representations and warranties, and fraudulent or

6

otherwise deceptive conduct, ZHP could not have sold the contaminated API or finished dose themselves, or to downstream manufacturers, wholesalers and retailers. Plaintiffs and other class members would not have been able or willing to pay for the contaminated valsartan finished dose on behalf of their consumer insureds. As a result, Plaintiffs and other class members paid for valsartan finished dose that was contaminated with unapproved genotoxic, probable human carcinogens, and thus adulterated, not compendially compliant, not cGMP compliant, carried unacceptable carcinogenic risk, and, accordingly, had no economic value.

*Plaintiffs' Statement of Claims Against Teva.* Plaintiffs assert that the claims against Teva arise in part from the same underlying facts as those set forth above as to ZHP, given that Teva sourced the contaminated valsartan API from ZHP, and incorporated it into Teva's own valsartan finished dose pills. Due to this, Teva's valsartan finished dose was contaminated with unapproved genotoxic, probable human carcinogens, and thus adulterated, not compendially compliant, not cGMP compliant, carried unacceptable carcinogenic risk, and, accordingly, had no economic value. Teva's valsartan finished dose was additionally adulterated, not compendially compliant, not cGMP compliant, and carried unacceptable carcinogenic risk because of Teva's own cGMP failures in overseeing its API supplier and manufacturing and producing its own valsartan finished dose. Teva represented and warranted at all times that the valsartan finished dose it sold was the FDA approved, compendial compliant formulation, manufactured in compliance with cGMPs, and consistent with the applicable ANDAs and DMF. But for the at-issue representations and warranties, and fraudulent or otherwise deceptive conduct, Teva could not have sold the contaminated finished dose in the United States, the retailers would not have purchased or offered the contaminated finished dose for sale; and Plaintiffs and other class members would not have been able or willing to pay for the contaminated valsartan finished dose on behalf of their consumer insureds. As a result, the Plaintiffs and other class members paid for valsartan finished dose that was contaminated with unapproved genotoxic, probable human carcinogens, and thus adulterated, not compendially compliant, not cGMP compliant, carried unacceptable carcinogenic risk, and, accordingly, had no economic value.

*Plaintiffs' Statement of Claims Against Torrent.* Plaintiffs assert that the claims against Torrent arise in part from the same underlying facts as those set forth above as to ZHP, given that Torrent sourced the contaminated valsartan API from ZHP, and incorporated it into Torrent's own valsartan finished dose pills. Due to this, Torrent's valsartan finished dose was adulterated, not compendially compliant,

7

not cGMP compliant, carried unacceptable carcinogenic risk, and, accordingly, had no economic value. Torrent's valsartan finished dose was additionally adulterated, not compendially compliant, not cGMP compliant, and carried unacceptable carcinogenic risk because of Torrent's own cGMP failures in overseeing its API supplier and manufacturing and producing its own valsartan finished dose. Torrent represented and warranted at all times that the valsartan finished dose it sold was the FDA approved, compendial compliant formulation, manufactured in compliance with cGMPs, and consistent with the applicable ANDAs and DMF. But for the at-issue representations and warranties, and fraudulent or otherwise deceptive conduct, Torrent could not have sold the contaminated finished dose in the United States, the retailers would not have purchased or offered the contaminated finished dose for sale; and Plaintiffs and other class members would not have been able or willing to pay for the contaminated valsartan finished dose on behalf of their consumer insureds. As a result, Plaintiffs and other class members paid for valsartan finished dose that was adulterated, not compendially compliant, not cGMP compliant, carried unacceptable carcinogenic risk, and, accordingly, had no economic value.

***Defendants' General Response to Plaintiffs' Claims.*** Defendants ZHP, Teva, and Torrent assert that all three claims raised by Plaintiffs—breach of express warranty; common-law fraud; and violation of state consumer protection laws—fail because Plaintiffs are unable to prove the elements of any of those claims under any of the relevant state laws. While the precise elements of Plaintiffs' claims vary on a state-by-state basis, certain common failings will cause all of Plaintiffs' claims to fail. Specifically, and non-exhaustively, Plaintiffs will be unable to prove that: (1) any of the Defendants made any express warranties to Plaintiffs or class members; (2) any of the Defendants breached any express warranties to Plaintiffs or class members; (3) any of the Defendants knowingly made any false statement or misrepresentation to Plaintiffs or class members; (4) Plaintiffs or any class members relied on any alleged misstatements made by Defendants; (5) any of the Defendants engaged in any unfair, deceptive, or unconscionable conduct related to valsartan API and/or VCDs ; (6) Plaintiffs or class members incurred any injury or loss caused by any warranties, representations, statements, acts, or omissions by Defendants concerning valsartan API or VCDs; (7) the VCDs failed to provide effective treatments for hypertension, heart failure, or other medical conditions as indicated on the FDA approved label; (8) the VCDs were economically worthless; (9) Plaintiffs or class members are entitled to any damages; and (10) any punitive damages should be assessed against Defendants.

***ZHP's Response to Plaintiffs' Claims Against ZHP.*** ZHP denies each of Plaintiffs' claims against it, as well as the allegations of wrongdoing underlying

those claims.

Beginning in July 2018, the ZHP Defendants and other manufacturers of VCDs voluntarily recalled VCDs manufactured using API sold by ZHP after trace amounts of NDMA and NDEA were identified in the VCDs. In its first announcement regarding the valsartan recall, the United States Food & Drug Administration ("FDA") stated that the presence of NDMA was unexpected and was thought to be related to certain changes to the valsartan API manufacturing process. Subsequent statements by the FDA clarified that, prior to the discovery of NDMA and NDEA in valsartan in 2018, neither the FDA nor the pharmaceutical industry knew that these impurities, which are difficult to identify, were likely to form during the processes used to manufacture valsartan API. Accordingly, at the time of the recalls, there were no validated, required, or industry-standard methods or practices to test for the presence or absence of NDMA or NDEA in valsartan API or VCDs. In fact, the FDA did not develop or issue any methods for the detection of NDMA or NDEA in VCDs until October 11, 2018, months after the valsartan recalls.

There is no evidence that any of the VCDs were recalled from the market because of efficacy concerns; nor is there evidence that any of the VCDs failed to provide effective blood pressure treatment to the patients who purchased and used them. Further, the evidence in the record establishes that any risk posed by the presence of trace levels of NDMA and/or NDEA in the medication was extremely low. Indeed, the FDA stated in its initial news release about the recall that patients should continue taking VCDs until they were able to obtain a replacement product because the risk associated with abruptly discontinuing the use of VCDs to treat hypertension far outweighed the extremely low risk estimates the FDA identified as being associated with continuing use of the medicine.

In light of the undisputed efficacy of the VCDs in treating hypertension and the FDA's acknowledgement that the trace impurities posed a low risk (if any) of cancer, there is no merit to Plaintiffs' allegation that the VCDs were worthless due to the presence of NDMA and/or NDEA. To the contrary, these effective medications provided the full value of what was paid by MSP's assignors and the class members to cover VCD prescriptions.

Moreover, MSP lacks standing to sue on the assignments by EmblemHealth and SummaCare. Any such assignments were made or ultimately transferred to other entities that are not plaintiffs in this lawsuit. And even if the claims were assigned to MSP, they would not be enforceable under the doctrine of champerty because they were purchased with the intent and primary purpose of bringing a lawsuit or because MSP will receive a stake in any recovery if it prevails in this suit. And any

9

assignment by SummaCare is separately void under Ohio law because it had not established its right to recover from these Defendants prior to assigning its putative claims.

In addition, ZHP's valsartan API—and VCDs manufactured by indirect ZHP subsidiary Prinston d/b/a Solco using that API—were manufactured and tested consistent with the regulatory requirements applicable at the time they were sold. Specifically, the ZHP Defendants' valsartan API and VCDs were manufactured and sold in compliance with ANDA requirements, compendial requirements, cGMP requirements, standard operating procedures, as well as all other relevant and applicable requirements, standards, or specifications. The processes used by ZHP to manufacture its API were appropriately designed and evaluated consistent with applicable regulations. Indeed, the details of ZHP's API manufacturing processes were disclosed to the FDA in ZHP's Drug Master File for valsartan API, which was reviewed and approved by the FDA on multiple occasions. In addition, VCDs containing ZHP's API were bioequivalent, pharmaceutically equivalent and therapeutically equivalent to Diovan and Exforge, the branded referenced listed drugs for which VCDs are generic versions, and were not adulterated at the time of sale. ZHP also responded diligently and appropriately to inquiries from companies that purchased its valsartan API regarding potential unidentified impurities, including by identifying impurities and/or confirming they were within applicable thresholds and guidelines. There is no evidence that any unknown impurity identified prior to 2018 was NDMA or NDEA.

Contrary to Plaintiffs' allegations, the ZHP Defendants did not make any warranties or representations on labels, websites, or anywhere else regarding the presence or absence of NDMA or NDEA in valsartan API or VCDs. Nor is there evidence that MSP's assignors—nor any class member—received or relied upon any representation from the ZHP Defendants. The ZHP Defendants also did not engage in any fraudulent or deceptive conduct, and made no fraudulent misrepresentations or omissions on which Plaintiffs or class members relied. While Plaintiffs allege that ZHP was aware of the presence of NDMA in valsartan API as of July 27, 2017, this assertion is based on a misreading of an English translation of a highly technical email that was written in Chinese and relates to a different potential impurity in an entirely different drug product. ZHP only became aware of the potential presence of NDMA in valsartan API or VCDs in 2018, leading to the voluntary recall shortly thereafter.

In addition, even if any of Plaintiffs' claims had merit, Plaintiffs' calculations of the damages that were allegedly sustained by MSP's assignors and class members are grossly overstated because they are based on exaggerated pricing data and fail to

exclude amounts for which MSP's assignors and the class members were never responsible.

ZHP asserts the following specific defenses to Plaintiffs' claims: (1) venue; (2) personal jurisdiction; (3) statute of limitations; (4) superseding/intervening cause; (5) state of the art; (6) Defendants' good faith; (7) regulatory compliance; (8) offset; (9) sophisticated user; (10) consent and/or ratification; (11) punitive damages; (12) champerty; and (13) invalid assignment.

***Teva's Response to Plaintiffs' Claims Against Teva.*** Teva denies each of Plaintiffs' claims against it, as well as the allegations of wrongdoing underlying those claims. In addition to the matters raised in ZHP's response to Plaintiffs' claims, Teva specifically denies that Plaintiffs have proven or can prove any of their claims against Teva.

Teva first learned of the presence of "a previously unknown impurity" in ZHP's API on June 20, 2018, and Teva did not learn of the presence of a nitrosamine impurity until June 25, 2018 upon receiving notice from ZHP. Teva immediately put a hold on all valsartan finished-dose product manufactured using ZHP's API the following day. Teva never released any new product containing ZHP's API to the U.S. market after June 20, 2018, and was one of the first manufacturers to voluntarily recall its valsartan in response to the discovery of the impurity.

Teva's valsartan provided therapeutic treatment to patients just as safely and effectively as valsartan that did not contain NDMA or NDEA impurities above acceptable intake limits, or at all, and had full economic value both to the patients who took it and to the TPPs that paid for or reimbursed its costs. Teva's valsartan was bioequivalent, pharmaceutically equivalent and therapeutically equivalent to the referenced listed drug Diovan.

Teva's valsartan was not adulterated and complied with the relevant and applicable regulatory requirements, ANDA requirements, compendial requirements from United States Pharmacopeia ("USP"), cGMP requirements, and standard operating procedures, as well as all other relevant and applicable requirements, standards, or specifications. Teva exercised effective oversight of its API supplier, and met or exceeded applicable and relevant requirements, standards, and specifications pertaining to oversight, testing, process changes, and all other applicable processes. Teva had in place appropriate Quality Assurance Agreements with ZHP. Teva regularly audited ZHP's manufacturing site producing the API for its valsartan products, including audits of ZHP's Chuannan site in 2011, 2012, 2015, and 2018. Each audit found acceptable quality assurance requirements and

qualification of the API, appropriate premises and procedures in place, facilities and equipment in acceptable condition, and a documented and implemented quality management system with professional and experienced personnel. Teva required rigorous testing by ZHP and Certificates of Analysis, and performed its own testing on the API prior to manufacturing its finished dose valsartan. Teva also rigorously evaluated ZHP's manufacturing process change in accordance with its standard operating procedures for change control processes. In addition to its own quality procedures and processes, Teva also appropriately relied on ZHP's declarations that asserted the absence of any potential for genotoxic impurities, including nitrosamines, in Valsartan API. To the extent Plaintiff relies on translated ZHP internal communications from 2017 in its case against ZHP, Teva was not privy to such communications, nor was Teva aware otherwise, from any source, of the potential for the presence of nitrosamines in ZHP's API prior to notification in June of 2018. As a result, there was no period of time in which Teva sold VCDs that Teva knew contained nitrosamines.

The FDA conducted several inspections of Teva's facilities manufacturing valsartan for the United States market. None of these inspections identified any issues or contained observations that did or reasonably could have led to the discovery of nitrosamine impurities. The FDA never issued a 483 notice or warning letter to Teva related to its valsartan and never made any finding, formally or informally, that Teva's valsartan was adulterated or misbranded.

Teva's valsartan did not pose any increased carcinogenic risk to patients, as the trace amounts of NDMA or NDEA found in Teva's valsartan has never been associated with a genotoxic or carcinogenic risk.

Teva did not make or breach any express warranties with respect to its valsartan, Plaintiffs and class members did not rely on any express warranties by Teva, Plaintiffs and class members were not injured by any asserted breach of express warranty by Teva, and Plaintiffs and class members did not give notice of any warranty claims to Teva. Teva did not engage in any fraudulent or deceptive conduct, made no fraudulent misrepresentations or omissions on which Plaintiffs or class members relied, and did not cause any injury to Plaintiffs or class members as a result of any such reliance. Plaintiffs and class members suffered no injury as a result of the presence of NDMA or NDEA impurities in Teva's valsartan, because the valsartan was not "worthless" and was worth its full purchase price. Plaintiffs' and class members' damages calculations are grossly overstated because they are based on exaggerated pricing data and fail to exclude amounts for which Plaintiffs and class members were never responsible. Further, Plaintiff cannot meet its burden of establishing the elements of their underlying claims, nor can Plaintiff meet its

burden of establishing culpable conduct by Teva giving rise to punitive damages under each applicable state's law.

Teva also asserts, *inter alia*, the following affirmative defenses: (1) venue; (2) lack of standing; (3) personal jurisdiction; (4) preemption; (5) primary jurisdiction; (6) state of the art; (7) sophisticated user; (8) bona fide error; (9) unavoidable circumstances; (10) statutes of limitations; and (11) causation by another product, process, occurrence, event, service, or person over which Teva exercised no control.

***Torrent's Response to Plaintiffs' Claims Against Torrent.*** Torrent sold generic versions of finished dose valsartan-containing drugs ("VCDs") which had been approved by the US Food and Drug Administration ("FDA") based on Torrent's Abbreviated New Drug Applications ("ANDA"). Torrent's VCDs were, at all relevant times, FDA-approved, pharmaceutically equivalent, bioequivalent, and therapeutically equivalent to their reference listed drugs, and met all compendial requirements. Torrent also manufactured its VCDs in compliance with current Good Manufacturing Practices ("cGMPs"). Torrent followed appropriate procedures to vet and audit ZHP as an API supplier before it began sourcing Valsartan API from ZHP, Torrent continued to appropriately and periodically audit ZHP while purchasing Valsartan API from ZHP, Torrent tested every batch of Valsartan API it received from ZHP in accordance with the appropriate specifications from United States Pharmacopeia ("USP") and from ZHP, and Torrent had in place an appropriate Quality and Technical Agreement with ZHP, among other measures Torrent took to procure Valsartan API and manufacture VCDs in compliance with cGMPs. Furthermore, Torrent's VCDs were never determined to be adulterated by the FDA.

Torrent did not know that its VCDs contained nitrosamines until August 16, 2018, and Torrent initiated a voluntary recall of its VCDs beginning the very next day, August 17, 2018. Torrent did not have access to the restricted parts of ZHP's DMF for Valsartan API and therefore appropriately relied on ZHP's genotoxicity declarations that asserted the absence of any potential for genotoxic impurities, including nitrosamines, in Valsartan API. As a result, there was no period of time in which Torrent sold VCDs that Torrent knew contained nitrosamines.

Torrent states the following specific defenses against Plaintiffs' claims:

*First*, Torrent never made any representations or warranties to Plaintiffs or the TPP subclass members regarding its VCDs.

*Second*, Torrent never knowingly made any false statements or misrepresentations regarding the content or nature of its VCDs. Specifically,

13

Torrent's VCDs were, at all relevant times, FDA-approved generic versions of their reference listed drugs, pharmaceutically equivalent, bioequivalent, and therapeutically equivalent to their reference listed drugs, met all compendial requirements, and were manufactured in compliance with cGMP.

*Third*, Torrent's VCDs were at all times effective treatments for hypertension.

*Fourth*, Torrent did not ever knowingly sell VCDs containing nitrosamines.

*Fifth*, Torrent never made any statements, representations, or warranties concerning whether its VCDs contained nitrosamines.

*Sixth*, the TPP class members never relied upon any of the statements, representations, or warranties that Plaintiffs allege were false or misleading.

*Seventh*, Torrent's VCDs were never determined to be adulterated by the FDA. Further, Torrent's VCDs did not pose any increased carcinogenic risk to patients.

*Eighth*, the TPP subclass members suffered no economic injury that was caused by any statements, representations, or warranties made by Torrent.

*Ninth*, the TPP subclass members were not financially harmed by reimbursing their insureds for a cost-effective and efficacious hypertension treatment that was lower priced than alternative hypertension medicines the TPP subclass members would otherwise have needed to pay reimbursements for.

*Tenth*, independent superseding actions by physicians (who prescribed VCDs), pharmacies (who filled those prescriptions using Torrent's products), and formularies (who determined that Torrent's VCDs were reimbursable) break any chain of causation connecting any of the alleged misrepresentations by Torrent to the TPP subclass members' reimbursement decisions.

*Eleventh*, Plaintiffs will not be able to prove that Torrent's VCDs, which at all times were an effective treatment for hypertension, were economically worthless.

*Twelfth*, Plaintiffs are not entitled to any damages for amounts that they have already received as reimbursement from other sources.

*Thirteenth*, Plaintiffs' and class members' damages calculations are grossly overstated because they are based on exaggerated pricing data and fail to exclude amounts for which Plaintiffs and class members were never responsible.

14

*Fourteenth*, Plaintiffs' and class members' breach of express warranty claims are also barred in part by the applicable statutes of limitations.

*Fifteenth*, Plaintiffs' and class members' consumer protection claims are barred in some states by the doctrine of bona fide error or state of the art.

# PART II.    STIPULATED FACTS:

## Preliminary Facts

1. On September 24, 2007, ZHP filed a Drug Master File ("DMF") with the FDA for Valsartan API that was given the number DMF 20939. The process described in DMF 20939 is generally referred to as the "TIN Process."

2. On January 22, 2010, ZHP filed a second DMF with the FDA for Valsartan API that was given the number DMF 23491. The process described in DMF 23491 is generally referred to as the "TEA process."

3. On April 16, 2012, ZHP submitted Amendment-002 to DMF 23491 ("Amendment 002"). The process described in DMF 23491 following Amendment 002 is referred to as the "TEA with quenching process."

4. On December 10, 2013, ZHP submitted an amendment to DMF 2391 ("Amendment 004"). The process described in DMF 23491 following Amendment 004 is referred to as the "Zinc chloride process" or "$ZnCl_2$ process."

5. Diovan, Diovan HCT, Exforge, and Exforge HCT are the reference listed drugs ("RLDs") for Defendants' VCDs.

6. Torrent Pharmaceuticals Limited is an Indian company that manufactures and sells pharmaceutical products to countries throughout the world, including the United States.

7. Torrent Pharma, Inc. is a United States subsidiary of Torrent Pharmaceuticals Limited that distributes and sells pharmaceutical products within the United States.

8. Torrent manufactured and sold finished dose valsartan tablets (ANDA 202728), amlodipine and valsartan tablets (ANDA 202377), amlodipine,

valsartan, and hydrochlorothiazide tablets, and valsartan and hydrochlorothiazide tablets (ANDA 201593) for the United States market between 2015 and 2018.

9. The DMF holder for the valsartan active pharmaceutical product (API) used by Torrent in its finished dose valsartan was Zhejiang Huahai Pharmaceuticals (ZHP).

10. Torrent began the process of qualifying ZHP as an API supplier in 2006.

11. ZHP used two routes of synthesis to manufacture valsartan API, which Torrent referred to as the "old process" and "new process."

12. To manufacture finished dose valsartan for the United States market, Torrent purchased only valsartan API batches designated with the letter "C" (hereinafter "C code") from ZHP to indicate that they were synthesized with the "old" process.

13. The "old" process was the manufacturing process that used triethylamine (TEA) with sodium nitrite quenching.

14. Torrent did not manufacture finished dose valsartan using D code (new process) batches of ZHP's valsartan API.

15. ANDA 202728 referenced DMF registration number 23491.

16. Torrent's finished dose valsartan was designated as "USP," which stands for "United States Pharmacopeia."

17. In its ANDA submission for finished dose valsartan, Torrent stated that its valsartan-containing drugs were therapeutically equivalent to the name brand drug, Diovan.

18. Torrent had a quality agreement with ZHP for the purchase of valsartan API titled "Technical and Quality Agreement."

19. Torrent initiated a voluntary recall of 14 lots of its Valsartan/Amlodipine/HCTZ tablets to the consumer level on August 17, 2018.

20. The Torrent recall was finalized and announced at 7:08 PM ET on August 17, 2018.

21. On August 21, 2018, Torrent expanded this recall to include "all lots within expiry of Valsartan/Amlodipine/HCTZ, Valsartan/Amlodipine and Valsartan tablets to the consumer level."

22. On December 19, 2018, the United States Food and Drug Administration published an interim daily acceptable intake limit for NDMA of 96 ng/day or 0.3 ppm.

23. On December 19, 2018, the United States Food and Drug Administration published an interim daily acceptable intake limit for NDEA of 26.5 ng/day or 0.083 ppm.

## ZHP and Its United States Subsidiaries Huahai US, Prinston, and Solco

24. Zhejiang Huahai Pharmaceutical Co., Ltd ("ZHP") is a Chinese corporation, with its principal place of business at Xunqiao, Linhai, Zhejiang 317024, China.

25. Huahai U.S., Inc. ("Huahai"), is a wholly-owned subsidiary of ZHP, and a New Jersey corporation with its principal place of business located at 2002 Eastpark Blvd., Cranbury, New Jersey, 08512.

26. ZHP, through direct and indirect holdings, owns approximately 93.5% of Prinston Pharmaceutical Inc. ("Prinston"), which is a Delaware corporation with its principal place of business located at 700 Atrium Drive, Somerset, NJ 08873.

27. ZHP, through direct and indirect holdings, owns approximately 93.5% of Solco Healthcare U.S., LLC, which is a wholly-owned subsidiary of Prinston and a Delaware limited liability company with its principal place of business located at 700 Atrium Drive, Somerset, NJ 08873.

28. The ZHP Defendants' May 13, 2022 stipulation is accurate and true.

## The Manufacture and Sale of Valsartan

29. Valsartan is a generic drug known as an angiotensin receptor blocker ("ARB"), used for the treatment of hypertension (high blood pressure), heart failure, to reduce mortality following myocardial infarction (heart attack), and other cardiovascular conditions.

30. ZHP manufactured the valsartan API at its Chuannan manufacturing facility using a series of manufacturing processes individually referred to as the TIN Process, TEA Process, TEA with quenching process, and Zinc Chloride or ZnCl2 Process.

**Teva and Torrent Purchased and Utilized ZHP's Valsartan**

31. ZHP sold valsartan API manufactured by ZHP with the zinc chloride process to Teva, which then utilized that API in the manufacture of Teva finished dose valsartan for sale in the United States.

32. Valsartan API manufactured by ZHP with the TEA process with sodium nitrite quenching was sold to Torrent and then utilized by Torrent in the manufacture of Torrent finished dose valsartan for sale in the United States.

**Teva/Actavis Pertinent Corporate History**

33. Actavis-labeled valsartan was sold in the United States by Actavis pre-acquisition, and by Teva post-acquisition, from approximately March 21, 2013 until July 16, 2018.

34. The two recalled Actavis-labeled products were made under ANDA 090642 (valsartan tablets) and ANDA 091519 (valsartan and hydrochlorothiazide tablets).

35. The two recalled Actavis-labeled products were manufactured at an Actavis facility in Malta, Europe.

36. In August 2016, Teva acquired the Actavis generics business, including the Actavis entities that manufactured and sold finished dose valsartan in the United States.

37. Both prior to and after its acquisition by Teva, Actavis used valsartan API purchased from ZHP for all of the valsartan product manufactured for distribution in the United States under the Actavis label.

38. Initially, Actavis-labeled product contained valsartan API from ZHP that was manufactured by ZHP's TEA process.

39. Teva's records show which lot/batch of valsartan API sourced from ZHP was incorporated into which lot/batch of Teva's valsartan finished dose.

40. Teva (through Actavis) had two quality agreements with ZHP that related to the purchase of valsartan API.

41. Teva audited ZHP in September 2011, December 2012, June 2015, and May 2018.

## Teva Recalls

42. ZHP notified Teva of "a previously unknown impurity that may have genotoxic potential" in valsartan API on June 20, 2018. On June 25, 2018 ZHP first notified Teva that the previously unknown impurity was suspected to be N-nitrosdimethylamine and likely to be process related.

43. July 13, 2018, the FDA announced that Teva was issuing a voluntary product-wide recall for all Teva VCDs in the United States that contained valsartan API sourced from ZHP.

44. In June 2018, prior to announcing the recall, Teva's quality department put a hold on the sale of all VCDs because of the impurity reported by ZHP.

## Torrent's Structure and Role in the Manufacture of Valsartan

45. Torrent Pharmaceuticals Limited is an Indian company that supplies pharmaceutical products to countries throughout the world, including the United States.

46. The DMF holder for the valsartan active pharmaceutical product (API) used by Torrent in its finished dose valsartan was Zhejiang Huahai Pharmaceuticals (ZHP).

47. Torrent's ANDAs for finished dose valsartan tablets and finished dose combination VCD tablets (amlodipine and valsartan tablets, amlodipine,

valsartan, and hydrochlorothiazide tablets, and valsartan and hydrochlorothiazide tablets) referenced DMF registration number 23491.

48. All VCDs manufactured or sold by Torrent in the United States market between 2015 and 2018 were manufactured using Old Process (or C Code) API Torrent purchased from ZHP.

## Torrent's Manufacture of Valsartan

49. ZHP used two routes of synthesis to manufacture valsartan API, which Torrent referred to as the "old process" and "new process."

50. To manufacture finished dose valsartan for the United States market, Torrent purchased only valsartan API batches designated with the letter "C" (hereinafter "C code") from ZHP to indicate that they were synthesized with the "old" process.

51. Valsartan API batches designated with the letter "D" (hereinafter "D code") were synthesized with the "new" process. The "new" process was the manufacturing process that used zinc chloride.

52. For the United States market, Torrent did not manufacture finished dose valsartan using D code (new process) batches of ZHP's valsartan API.

## The Discovery and Response to Nitrosamine Impurities by Torrent

53. Torrent initiated its recall of valsartan with valsartan amlodipine hydrochlorothiazide on August 17, 2018.

54. On August 21, 2018, Torrent expanded this recall to include "all lots within expiry of Valsartan/Amlodipine/HCTZ, Valsartan/Amlodipine and Valsartan tablets to the consumer level."

55. On August 29, 2018, ZHP tested selected valsartan API batches and determined that NDEA was present in valsartan manufactured with triethylamine (the TEA process).

56. Torrent, in its ANDA submission, stated that its generic valsartan drugs were bioequivalent to the name brand drug, Diovan.

57. Torrent's valsartan products were designated "USP," which stands for "United States Pharmacopeia."

58. The designation USP indicates that a drug complies with all the testing requirements that are posted in the United States Pharmacopeia for that drug's monograph.

## **Data**

59. Data produced by MSP, EmblemHealth, SummaCare, and the Retailer Defendants and relied on by the parties' experts Conti and Gibson in their supplemental damages declarations are authentic and admissible.[4] The authentic and admissible data sets are:

   a. REDACTED - Albertsons Valsartan Summary 2023.08.23.xlsx
   b. REDACTED - CVS_MDL2875_0000002494 - RESTRICTED CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER.xlsx through REDACTED - CVS_MDL2875_0000002514 - RESTRICTED CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER.xlsx.
   c. REDACTED - Express_Scripts_1120_00001080_RESTRICTED PBM CONFIDENTIAL.xlsx through REDACTED - Express_Scripts_1120_00001091_RESTRICTED PBM CONFIDENTIAL.xlsx.
   d. REDACTED - HUM001426 - RESTRICTED CONFIDENTIAL - Valsartan Mail Report 8-18-2023.xlsx
   e. REDACTED - HUM001427 - RESTRICTED CONFIDENTIAL - Valsartan Retail Report 8-18-2023
   f. REDACTED - OPTUM00000131.xlsx
   g. REDACTED - OPTUM00000132.xlsx
   h. REDACTED - OPTUM00000133.xlsx
   i. REDACTED - OPTUM00000188.xlsx
   j. REDACTED - OPTUM00000267.xlsx
   k. REDACTED - OPTUM00000493.xlsx

---

[4] Plaintiffs note that certain content of the data are subject to pending motions in limine, such as the PDE reports that show CMS subsidies and reimbursements, and Plaintiffs' *Daubert* motion to exclude the opinions of Gibson. In stipulating to the admissibility and authenticity of the data, Plaintiffs are not waiving those motions in limine. If the motions in limine are granted, the data would need to be redacted to conform with the Court's rulings. Additionally, MSP's data needs to be redacted to remove any personally identifiable information.

l.   REDACTED - OPTUM00000494.xlsx

m.  REDACTED - OPTUM00000611.xlsx

n.   REDACTED - OPTUM00000615.xlsx

o.   REDACTED - RiteAid_MDL2875_0000001337 - RESTRICTED CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER.xlsx through REDACTED - RiteAid_MDL2875_0000001344 - RESTRICTED CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER.xlsx.

p.   REDACTED - WALGREENS_MDL2875_0000002906 - RESTRICTED CONFIDENTIAL.xlsx through REDACTED - WALGREENS_MDL2875_0000002986 – RESTRICTED CONFIDENTIAL.xlsx

q.   REDACTED - WALMART_MDL2875_0001465_RESTRICTED CONFIDENTIAL INFORMATION.xlsx through REDACTED - WALMART_MDL2875_0001498_RESTRICTED CONFIDENTIAL INFORMATION.xlsx.

r.   REDACTED Kro_Valsartan_PHI_TP_1(KROG-010008) - Restricted Confidential Information.xlsx

s.   19-4475 - Detail claim report - 01-19-2023 (additional fields) REDACTED-CONFIDENTIAL.xlsx

t.   PDE Data_20230208-CONFIDENTIAL

u.   VALS_VALSARTAN_PDES-CONFIDENTIAL

## PART III.  **PLAINTIFFS' CONTESTED FACTS**: [5]

### **Preliminary Facts**

1.  On September 20, 2007, ZHP filed a DMF with the FDA for Valsartan API and is given the number DMF 20939. The Process uses tributyl tin chloride and sodium azide "instead of tributyl tin azide . . . which helps lower the cost" of manufacturing. This process was referred to as the "tributyl tin chloride process" or "TIN process." PRINSTON00078386.

2.  "NDMA should not be formed in [the] Tin Process since dimethylamine or other materials that might introduce secondary amines is not used in this process. Furthermore, there is no quenching step using sodium nitrite in this process. Hence, the conclusion from the evaluation is that Valsartan using

---

[5] Plaintiffs reserve their right to rely on all exhibits on their exhibit list to support the below facts. The below citations are examples for the Parties and the Court.

[the] Tin Process should not carry this impurity." PRINSTON0075818.

3.  On January 22, 2010, ZHP filed a second DMF with the FDA for Valsartan API and is given the number DMF 23491. This process removes the Tributyl Tin from Step 4 -- which is used in process 20939 and replaces it with Triethylamine hydrochloride ("TEA") which is used as a phase transfer catalyst and provided with much lower toxicity risk and economic cost than Tributyl tin chloride.  The solvent used in the process is Toluene instead of xylene. This process is referred to as the "Triethylamine process without quenching" or "TEA process without quenching." PRINSTON00073120.

4.  "Based on the process analysis of TEA process without quenching and Tin process, the three factors required for formation of NDMA, and the test results of batched selected, it is concluded that Valsartan manufactured by TEA process without quenching and Tin process should not carry this NDMA impurity." PRINSTON0075820.

5.  On April 16, 2012, ZHP filed an amendment to DMF 23491 ("Amendment 002"), and indicates that "it is preferred to add a quenching procedure after tetrazole reaction with sodium nitrite solution / hydrochloric acid to guarantee azide destroyed thoroughly and minimize the risk of residual azide carry-over into the final drug substance (potential genotoxic impurity. . . ." This process is known as the "Triethylamine process with quenching" or "TEA process with quenching." PRINSTON00071518.

6.  "Triethylamine hydrochloride is used (the manufacturing process of this raw material might introduce dimethylamine as impurity); quenching takes place by using sodium nitrite in the presence of product. There is [a] risk of NDMA formation during the process based on the elucidated generation mechanism of NDMA." PRINSTON0075819.

7.  On December 10, 2013, ZHP filed a technical amendment to DMF 2391 ("Amendment 004"), and proposed the following "minor changes": "In step 4, catalyst reagent "Et3N•HCl" is alternatively changed with "ZnCl2" to reduce racemization and waste for quality (impurity A) & EHS concern; In step 3 and step 4, DMF and MTBE are added to facilitate the process and will be successively removed." This process is referred to as the "Zinc chloride process" or "ZnCl2 process." PRINSTON00073120.

8.  On September 16, 2014, the FDA issued a "no further comments letter" to ZHP regarding its ZnCl2 process approving the ANDA referencing DMF

23

2391. PRINSTON0074760 (pg. 41).

9. On May 22, 2018, Novartis emailed ZHP regarding unknown peaks in ZHP's valsartan API, stating that "[d]uring our analysis of residual solvents by GC . . . at Novartis we have found a number of solvents that we cannot identify. . . ." ZHP00405021.

10. On June 5, 2018, Novartis emailed ZHP stating that Novartis had used a third-party lab (Solvias Labs) to test 3 batches of ZHP's valsartan API and that N-nitrosodimethylamine (NDMA) had been tentatively identified in each of the tested batches. ZHP00359796.

11. Defendants are in the business and trade of manufacturing, distributing, and selling pharmaceutical products into the stream of commerce in the United States.

12. The VCDs manufactured, distributed, and sold by Defendants, were intended and reasonably expected by Defendants to be ingested by U.S. consumer patients, after payment to retailers by consumers and TPP's.

13. Defendants' obligation to ensure the safe and non-contaminated and non-adulterated supply of prescription pharmaceuticals in the U.S. is a matter of public interest.

14. ZHP's testing for all USDMF grade valsartan, regardless of the process used, showed NDMA levels in excess of the FDA's limit for all Defendants in this case. (ZHP02563814; ZHP02563015 (sending ZHP02563814 to the FDA with the title "Annex 1a.1_NDMA & NDEA test results for all ARBs in USDMF grade_20190413.xlsx"); PRINSTON00158425 (stating that "An Excel spreadsheet of all ARBs USDMF grade (only US market) batches and their associated NDEA and NDMA finished batch testing results are provided in Annex la.1."); *see also* ZHP00079913). ZHP's testing also revealed NDEA levels in excess of the FDA's limit.

15. ZHP filed a patent for its ZnCl2 process on June 28, 2014, and it has been publicly available since at least September 17, 2014.

16. ZHP filed a patent for its TEA process on March 22, 2007, and it has been publicly available since at least September 24, 2008.

17. ZHP filed a patent for its a kind of method of Valsartan wastewater treatment on March 21, 2014, and it has been publicly available since at least July 16,

2014.

18. ZHP filed a patent for its optimized ZnCl2 process on July 17, 2018, demonstrating the feasibility of manufacturing valsartan without contamination by NDMA and NDEA, and it has been publicly available since at least January 16, 2020.

19. ZHP manufactured the valsartan API at issue for all Defendants, and it manufactured the valsartan FD at its Xunqiao manufacturing facility that was then marketed and distributed via Prinston and Solco. (PRINSTON00000012). ZHP put the label on the individual bottles in China, and ZHP and as jointly "prepare[d] and approve[d] all artwork, inserts, labeling and packaging materials." (PRINSTON00463676, p. 13-14; PRINSTON00463638, p. 13-14; ZHP01890025, p. 13-14; ZHP01890037-38). ZHP was responsible for "Manufacturing" and "Packaging/Labeling" the FD VCDs. (PRINSTON00019546; PRINSTONO0177054).

20. The ZHP Defendants' VCD labels warranted that the VCDs were USP compliant. (PRINSTON00035229; PRINSTON00065545).

21. The ZHP Defendants' prescribing information explicitly stated it was USP and FDA approved. (PRINSTON00032437; PRINSTON00248665).

22. The USP and FDA approvals and specifications at issue did not allow for the inclusion of NDMA and NDEA in VCDs.

23. NDMA and NDEA are mutagenic, genotoxic, probable human carcinogens.

24. The FDA found that ZHP's VCDs were adulterated and therefore illegal to sell under 21 U.S.C. § 331.

25. On September 28, 2018, the FDA banned ZHP from importing drugs from the facility that manufactured its valsartan API, and it did not lift that ban until November 10, 2021.

26. ZHP's commercially sourced DMF contained dimethylamine.

27. ZHP's commercially sourced TEA contained diethylamine and dimethylamine.

28. ZHP's ZnCl2 process caused the DMF to yield dimethylamine as a degradant.

29. ZHP's TEA with sodium nitrite quenching process caused the TEA to yield

diethylamine as a degradant.

30. Dimethylamine was nitrosated by nitrous acid (from the sodium nitrite and hydrochloric acid) into NDMA in the ZnCl2 process.

31. Triethylamine, diethylamine, and dimethylamine were nitrosated by nitrous acid (from the sodium nitrite and hydrochloric acid) into NDMA and NDEA in the TEA with sodium nitrite quenching process.

32. Prior to ZHP's use of the ZnCl2 process, scientific and industry literature showed that DMF contains and degrades to yield dimethylamine.

33. Prior to ZHP's use of the ZnCl2 process, scientific and industry literature showed that dimethylamine nitrosates in the presence of sodium nitrite.

34. Prior to ZHP's use of the TEA with sodium nitrite quenching process, scientific and industry literature showed that TEA contains dimethylamine and contains and degrades to yield diethylamine.

35. Prior to ZHP's use of the TEA with sodium nitrite quenching process, scientific and industry literature showed that TEA, dimethylamine, and diethylamine nitrosate in the presence of sodium nitrite.

36. FDA guidances, ICH guidelines, and other sources of current good manufacturing practices that were in effect and known to ZHP required ZHP to identify the potential for nitrosamine contamination with the ZnCl2 and TEA with sodium nitrite quenching processes , the mechanism of potential creation of NDMA and NDEA, to test for and identify NDMA and NDEA with available technology and methods, and to not utilize the processes due to the formation of NDMA and NDEA.

37. The three at-issue Actavis-labeled products were manufactured at an Actavis facility in Malta.

38. In August 2016, Teva acquired the Actavis generics business, including the Actavis entities that were responsible for manufacturing and selling finished dose valsartan in the United States.

39. Both prior to and after its acquisition by Teva, Actavis used valsartan API purchased from ZHP for all of the valsartan product manufactured for distribution in the United States under the Actavis label.

40. Initially, Actavis-labeled product contained valsartan API from ZHP that was manufactured by ZHP's TEA process

41. In late 2014, after agreeing to initiate a manufacturing change, Actavis-labeled product sold in the United States contained valsartan API made by ZHP's Zinc Chloride process, which involved the solvent dimethylamine (DMF), as well as quenching sodium nitrite (NaNo2) in hydrochloric acid (HCl).

42. Teva submitted its initial Field Alert Report to the FDA on July 3, 2018.

43. Teva lifted the hold in July 6, 2018, except for VCDs that contained valsartan API sourced from ZHP.

44. Teva's commercial group could not sell any valsartan product for which the quality department had placed a hold.

45. In response to the FDA's July 27, 2018 Request for Information to Teva, ZHP provided Teva with the NDMA testing results for all valsartan API batches sold to Teva.

46. ZHP's test results of the valsartan API batches it sold to Teva reflected that all batches tested contained NDMA above the interim limit of 0.3 ppm later set by the FDA. Specifically, NDMA levels per batch reported by ZHP to Teva were all between 0.8ppm and 240.1ppm.

47. Teva confirmed that the levels of NDMA in valsartan API sourced from ZHP would be the same as the levels in the finished dose product. This was because the NDMA arose from a process impurity.

48. As ZHP's test results showed NDMA in every batch of valsartan API sold to Teva, those same levels carried over into Teva's finished dose VCDs.

49. Post-June 2018, Teva also tested 83 batches of valsartan API from ZHP for NDMA using its own methodology and all batches were found to contain NDMA in excess of 0.3 ppm.

50. Teva also tested six batches of its own finished dose valsartan product for the United States market that had been made with API purchased from ZHP. These finished dose lots were intended for sale in the United States. All six

27

batches tested positive for NDMA, with results ranging from 14.8ppm to 31.3ppm.

51. Teva itself tested 121 batches of valsartan API sourced from ZHP. These ZHP valsartan API batches tested by Teva all contained NDMA above 0.3 ppm.

52. Teva told the FDA that the ZHP manufacturing process is expected to generate NDMA with levels above the FDA established limit of 0.3ppm.

53. NDMA was never an approved specification of the API in Teva's finished dose valsartan products.

54. NDMA was never an approved specification of Teva's finished dose valsartan products.

55. The product labels for Teva's at-issue finished dose valsartan products never disclosed NDMA.

56. NDMA is classified as probable human carcinogen.

57. NDMA is a potent mutagenic carcinogen.

58. NDMA is genotoxic.

59. At all times relevant it was known that nitrosamine formation may arise from nitrous acid in the presence of a secondary amine.

60. Actavis initiated change control CC_01595_2013 in May 2013 to evaluate whether ZHP's change in API manufacturing process can affect the current validated method for testing the API, especially as regards the residual solvents for the new valsartan tin-free with ZnCl2 process. TEVA-MDL2875-0950662.

61. This change control stated: "Perform risk assessment whether the new material from the new CEP and 3rd dedicated workshop (upscaled batch size) can have any impact on the process validation of Valsartan finished product." TEVA-MDL2875-0950662.

62. The "Action Completion" section stated: "No further validation required.

28

Specification parameters and limits are already covered by previous validations performed for Valsartan." TEVA-MDL2875-0950662.

63. It further stated: "Fully test first five batches of the upscaled batch size (new item number) of Valsartan (Zhejiang Huahai) tin-free coarse produced from new workshop (manufactured using the new CEP rev 01)." TEVA-MDL2875-0090662.

64. The risk assessment required the following action: "...five batches will be fully tested by the AS Lab to confirm that the batches manufactured as per the revised CEP are compliant to specifications." TEVA-MDL2875-00950663.

65. The risk assessment copied data provided to Actavis from ZHP's internal change control documentation. EVA-MDL2875-00950663.

66. The change control and risk assessment did not attach any Actavis testing data. TEVA-MDL2875-0090662; TEVA-MDL2875-00950663.

67. Actavis's regulatory submissions to the FDA about the ZHP manufacturing process change did not attach or cite independent testing performed by Actavis.

68. Actavis characterized ZHP's manufacturing process change as "major" in the DMF change control initiated July 2, 2014.

69. Actavis's risk assessment supporting change control CC_01595_2013 states that ZHP's manufacturing process change was "minor," that "no further risk reduction measures are required," and that the change "imposes no risk on the manufacturing process of Valsartan or Valsartan HCT." TEVA-MDL2875-00950663.

70. ZHP's own internal change control for the ZnCl2 process change categorized the change as "critical" due to the risk to product quality. ZHP01843066.

71. The change notification that ZHP sent to customers dated January 17, 2012, attached to ZHP's internal change control document inaccurately categorized the change as "minor." ZHP01843066, at 116.

72. There is no evidence ZHP ever provided Teva with any chromatograms for the testing ZHP purportedly conducted of valsartan API sold to Teva.

73. There is no documented report of Actavis auditing ZHP prior to the August 2016 audit by Teva.

74. There is no documented request by Teva to ZHP for information concerning the FDA inspection of ZHP in May 2017.

75. ZHP did not provide the FDA's full, unredacted May 2017 report to Teva until August 2018.

76. Torrent began the process of qualifying ZHP as an API supplier in 2006. As part of this vendor qualification process, Torrent received a vendor qualification package including chromatograms and viewed the open part of the DMF.

77. The chromatograms Torrent received from ZHP as part of the vendor qualification process showed unknown peaks next to toluene and xylene.

78. Torrent's corporate representative and Head of Quality testified that one need only perform "chemistry on paper" to ascertain whether NDMA or NDEA could be formed from the route of synthesis for valsartan API once provided access to the route of synthesis information.

79. The valsartan API Torrent purchased from ZHP were designated as "USP," which stands for "United States Pharmacopeia."

80. In its ANDA submission for finished-dose valsartan, Torrent stated that its product complied with applicable quality standards.

81. Torrent had a quality agreement with ZHP for the purchase of valsartan API titled "Technical and Quality Agreement," which was periodically renewed including on May 7, 2017.  (*See* TORRENT-MDL2875-00291332.)

82. NDMA and NDEA are classified as probable human carcinogens.

83. NDMA and NDEA are potent mutagenic carcinogens.

84. NDMA and NDEA are genotoxic.

85. NDMA and NDEA are part of the "cohort of concern" under ICH M7

guidance.

86. Torrent was aware that NDMA and NDEA are classified as probable human carcinogens prior to June 20, 2018.

87. Torrent was aware that NDMA and NDEA are potent mutagenic carcinogens prior to June 20, 2018.

88. Torrent was aware that NDMA and NDEA are genotoxic prior to June 20, 2018.

89. Torrent was aware that NDMA and NDEA are part of the "cohort of concern" under ICH M7 guidance prior to June 20, 2018.

90. Neither NDMA nor NDEA are part of the approved specification for any valsartan containing drug manufactured by Torrent.

91. Neither NDMA nor NDEA are listed in the valsartan monograph. TORRENT-MDL2875-00232735.

92. On June 20, 2018, ZHP sent a notification to Torrent stating: "Recently, [ZHP] came to be aware of a previously unknown impurity that may have genotoxic potential." ZHP00496536.

93. On June 26, 2018, ZHP notified Torrent that the "previously unknown impurity" from the June 20, 2018 notification is "suspected to be N-Nitrosodimethylamine [NDMA] which is very likely to be process-related."

94. ZHP's June 25, 2018 notice to Torrent also stated that this "issue is exclusively related to the New/Existing Process" and that "the material out of Old Process, with the Code No. C5069 that [ZHP] supplied to Torrent up until now, has NO Genotoxic impurity potential."

95. On August 3, 2018, ZHP notified Torrent that API manufactured with the "old process," or C code API, also contained NDMA.

96. On August 7, 2018, European health authorities inquired with ZHP whether there was a possibility that n-nitrosodiethylamine (NDEA) could be formed during its API manufacturing process. ZHP00496536.

31

97. ZHP began developing an analytical method to test its API for NDEA.

98. Torrent did not recall or quarantine any valsartan product between August 3, 2018 to August 17, 2018.

99. On August 17, 2018, the FDA notified Torrent five batches of its valsartan finished dose product were made from C code valsartan API containing NDMA above acceptable levels. TORRENT-MDL2875-0072713.

100.    On August 23, 2018, Torrent expanded this recall to include "all lots within expiry of Valsartan/Amlodipine/HCTZ, Valsartan/Amlodipine and Valsartan tablets to the consumer level." The recall confirmed the presence of an "impurity" in Torrent's valsartan-containing drugs classified as a "probable human carcinogen" by the International Agency for Research on Cancer.

101.    On August 29, 2018, ZHP tested selective valsartan API batches and determined NDEA was present in valsartan API manufactured with the "old process." ZHP00496536.

102.    All of the valsartan manufactured and sold by Torrent in the United States eventually tested positive for NDMA and NDEA.

103.    Torrent's finished dose valsartan-containing drugs were manufactured with batches of ZHP API that contained NDMA and NDEA in excess of the interim acceptable limits set by the United States Food and Drug Administration.

104.    Torrent audited ZHP on June 2015.

105.    The United States Food and Drug Administration conducted Establishment Inspections of Torrent's Indrad facility, where it manufactured finished dose valsartan drugs on, at least, May 16-20, 2016 and April 17-28, 2017. (TORRENT-MDL2875-00004357, TORRENT-MDL2875-00004362). The FDA issued an Establishment Inspection Report on July 18. 2017. (TORRENT-MDL2875-00004362).

106.    By way of assignment, MSP's designated Series 16-08-483 has legal title to claims based on valsartan purchases that EmblemHealth made between the years of September 29, 2011 and September 29, 2017.

107.    By way of assignment, MSP's designated Series 16-11-509 has legal

32

title to claims based on valsartan purchases that SummaCare made between the years of January 1, 2009 through March 24, 2019.

108.     MSP has the legal right to bring this lawsuit on behalf of its designated Series 16-08-483 and Series 16-11-509.

109.     On July 13 or 16, 2018, Teva announced a product-wide recall for every Teva VCD in the United States that contained valsartan API sourced from ZHP.

110.     All VCDs manufactured or sold by Torrent in the United States market between 2015 and 2018 were manufactured using API Torrent purchased from ZHP.

111.     The levels of NDMA and NDEA in the valsartan API Torrent used to manufacture its finished dose valsartan products carried over to the finished dose valsartan products.

## ZHP and Its United States Subsidiaries Huahai US, Prinston, and Solco

112.     Zhejiang Huahai Pharmaceutical Co., Ltd ("ZHP") is "[a] vertically integrated pharmaceutical manufacturer of API's and finished products," based in China, with "20 sub-branches/subdivisions located in USA, shanghai, Hangzhou and Jiangsu, etc." ZHP's sales and marketing operations are based in China, New Jersey, and other locations around the world. ZHP also has three research and development centers, two in China, and one in Cranbury, New Jersey. (ZHP-6; ZHP-7; ZHP-9).

113.     Jun Du was the Vice Chairman of the Board of Directors of ZHP. He also held the title of Executive Vice President of ZHP on an interim basis as necessary to attend audits by the FDA or European Union or EHS, when ZHP's Chairman Baohua Chen was unavailable, including in July and August 2018. (Jun Du 5/27/21 Dep. Tr. 25:13-34:24).

114.     In addition to his executive positions with ZHP, Jun Du was the CEO of Huahai U.S., Inc., CEO of Prinston Pharmaceuticals, and CEO of Solco Healthcare. (Jun Du 5/27/21 Dep. Tr. 40:1-44:11, 49:3-9, 54:7-21).

115.     Hai Wang, who testified as a 30(b)(6) corporate representative, is the President of Solco Healthcare, Senior Vice President of Prinston

33

Pharmaceutical Inc., and Senior Vice President of Huahai US, Inc., and directly reported to Jun Du in all of his positions. (Hai Wang 3/10/21 Dep. Tr. 31:16-33:1, 34:7-12).

116.    Huahai, U.S., Prinston, and Solco are wholly owned subsidiaries of ZHP. (ZHP Defs.' Answer (ECF 2549, ¶ 76-78)). ZHP has produced numerous documents showing that Mr. Chen, its CEO, micromanaged the price for its Valsartan API, and efforts to obtain market share, even at the level of its U.S. subsidiaries. (SOLCO00012089 (stating that "Mr. Chen is not satisfied with our share [of Valsartan- HCTZ] and wants us to target 40%!" (emphasis added); SOLCO00189499 ("Mr Chen wants to know the update March sale since the last month went to very bad. Could you give me some rough number based on your estimate?" (sic)); SOLCO00025179; SOLCO00033301; SOLCO00181380; SOLCO00180393).

117.    Jun Du explained the relationship between ZHP's United States entities: "ZHP sells their API products directly in the U.S. market through Huahai U.S., including both the research and development APIs, as well as commercialized APIs." Prinston, "engages in the finished dose products, research and development, as well as the regulatory affairs of such products. It owns an ANDA of generic drugs…" He described Solco as, "a company that sells the generic drugs of Prinston for which Prinston holds the ANDA." (Jun Du 5/27/21 Dep. Tr. 40:1-44:11, 49:3-9, 54:7-21).

118.    The valsartan DMF holder was ZHP and its US agent was Huahai US. (Hai Wang 3/10/21 Dep. Tr. 134:11-21). (*See, e.g.*, ZHP00079956; PRINSTON00012473).

119.    According to Hai Wang, "Prinston is the corporate of the pharmaceutical organization, it's the corporate body…Prinston pretty much does everything except the manufacture and except the marketing and sales as a pharmaceutical company. And the marketing and sales is through Solco…Solco is the marketing arm for Prinston Pharmaceutical…" Hai Wang confirmed that Solco was a wholly owned subsidiary of ZHP. (Hai Wang 3/10/21 Dep. Tr. 45:13-21, 218:23-220:9).

## **The Manufacture and Sale of Valsartan**

120.    The brand name drug, or reference listed drug ("RLD") for valsartan, is Diovan, and another version of the brand name drug is Exforge, which was

a combination of valsartan and amlodipine (a calcium channel blocker). The brand drugs were sold by Novartis pursuant to an NDA in the United States. The approved forms of Diovan and Exforge did not include NDMA or NDEA impurities in any regulatory or compendial document describing the approved formulation of those drugs. (ZHP01303141; ZHP02614594; PRINSTON00141349; https://www.canada.ca/en/health-canada/services/drugs-health-products/compliance-enforcement/information-health-product/drugs/angiotensin-receptor-blocker.html; Novartis, *Novartis Pharmaceuticals Corporation (Novartis) Statement on Recall Outside the United States of Sandoz Generic Valsartan and Sandoz Valsartan and Hydrochlorothiazide Film-Coated Tablets* (July 16, 2018) (stating: "The valsartan API (active pharmaceutical ingredient) in these products does not come from the same source as those products affected outside the United States. Patients in the United States currently taking Sandoz valsartan tablets, Sandoz valsartan and hydrochlorothiazide tablets, Sandoz amlodipine and valsartan tablets, Sandoz amlodipine, valsartan, hydrochlorothiazide tablets, Diovan®, Diovan HCT®, Exforge®, Exforge HCT® or Entresto® should continue to take their medication as directed by a physician."), https://www.novartis.com/us-en/news/novartis-pharmaceuticals-corporation-novartis-statement-recall-outside-united-states-sandoz-generic-valsartan-and-sandoz-valsartan-and-hydrochlorothiazide-film-coated-tablets).

121.    ZHP manufactured the valsartan API at its Chuannan manufacturing facility using a series of manufacturing processes. One of the Deviation Investigation Reports ("DIR's") prepared by ZHP and submitted to the FDA provides "Historical background information of Valsartan manufacturing process." It explains, "There are three synthetic routes of Valsartan in Huahai Chuannan Site, including TIN process, TEA process and $ZnCl_2$ process." ZHP Deviation Investigation Report dated November 5, 2018 (DC-18003, PRINSTON0075797), beginning at 56 of 236 ("TEA DIR"). According to Table 4-3, the "Summary of Valsartan production history" at 62-63 of 236:

- The Tin process was utilized in Workshop 4 from October 2006 to March 2011, and in Workshop 2 from September 2010 to May 2014.

- The TEA process without sodium nitrite quenching was utilized in Workshop 4 from June 2008 to July 2011, and in Workshop 2 from December 2010 to May 2011.

- The TEA process with sodium nitrite quenching was utilized in Workshop 2 from May 2011 to May 2014, in Workshop W02 from May 2012 to March 2013, and in Workshop 4 from July 2011 to July 2015.

- The zinc chloride process was utilized in Workshop 2 beginning in November 2011 (no end date provided), and in Workshop W02 beginning in April 2012 (no end date provided).

122.    These dates correspond to the dates provided in Table 4-1 at 57-58 of 236, providing the dates of process validation and registration.

123.    Of note, following table 4-3, at 63 of 236, ZHP states that, "different manufacturing processes for Valsartan may coexist in Workshop 2, Workshop 4 and Workshop W02." This created the potential for cross-contamination between drug product manufactured with the TEA with sodium nitrite quenching and zinc chloride processes.

124.    ZHP initially manufactured its valsartan API with what was referred to by ZHP as the Valsartan TIN process. This process utilized tributyl tin chloride as a catalyst for Xylene, the solvent used in the crude step of the manufacturing process. Of note: "no dimethylamine and its derivative reagents were used. No nitrite was used for quenching after reaction. 2. Triethylamine hydrochloride is not used, and sodium nitrite is not used to quench. **No NDMA or NDEA impurities will be formed.**" **ZHP's conclusion was that this process, which was the process utilized by the brand/RLD manufacturer Novartis for the manufacture of Diovan and Exforge, could not create NDMA or NDEA.** (TEA DIR at 60-61, 68 of 236).

125.    In 2011, ZHP developed an alternative manufacturing process which it named TEA without sodium nitrite quenching, then the TEA process with sodium nitrite quenching, and yet another new process, the zinc chloride process which also included sodium nitrite quenching. The NDMA and NDEA impurities at issue were formed as a result of chemical reactions that involved the use of sodium nitrite for quenching, during the TEA with sodium nitrite quenching and zinc chloride processes. (Pages 57-62 in the TEA DIR).

## The TEA With Sodium Nitrite Quenching Manufacturing Process

36

126.    The root cause of the NDEA and NDMA impurities is set forth in the ZHP Deviation Investigation Report dated November 5, 2018 (DC-18003, PRINSTON0075797) ("TEA DIR"). ZHP discussed the various pathways for the creation of NDEA in the TEA with sodium nitrite quenching process on page 50-55, and 61 of 236. ZHP established the three factors required to form NDEA in the final drug substance on 52 of 236:

- Presence of diethylamine in the manufacturing process, such as its presence in quenching step;

- Presence of nitrous acid in the manufacturing process, such as quenching of azide using sodium nitrite;

- The possibility of direct contact between secondary amines and nitrite in the presence of the target product.

127.    Stated another way at 53 of 236: "Trace amount of diethylamine hydrochloride in triethylamine hydrochloride can react with nitrous acid (formed in situ between $NaNO_2$ and HCl) during the quenching of excess azide with sodium nitrite." ZHP's final valsartan DIR also conceded that based on a 2010 study from the Journal of Physical Chemistry, triethylamine could directly nitrosate with nitrous acid to form NDEA. (PRINSTON00761002-03).

128.    Min Li of ZHP, Vice-President for ZHP Analytical Operations and a 30(b)(6) corporate representative, started with ZHP in September 2014. He graduated from Johns Hopkins with a Ph.D in organic chemistry. (Min Li 4/20/21 Dep. Tr., 12:7-11, 23:19-24:2, 33:22-24).

129.    Dr. Li confirmed that the presence of NDEA resulted from the manufacturing process: "the DEA [diethylamine] is a typical process impurity of TEA, so DEA would also, yeah, would react with the nitrous acid to perform NDEA." He confirmed that the presence of NDMA resulted from the use of solvents containing the secondary amine impurities that were needed to form NDMA and NDEA through the manufacturing process, as well as cross-contamination: "in some of the TEA raw material it may contain a trace amount of, you know, of dimethylamine, okay, so that's one root cause…for some of the, you know, product, they were manufactured, you know, using the share line, you know, with the zinc chloride valsartan." (Min Li 4/20/21 Dep. Tr. 77:8-80:16).

37

130.    The TEA DIR provides a detailed analysis of the causes of cross-contamination, including due to shared production lines and solvent recovery, at 126-135 of 236.  With reference to cross-contamination due to shared production lines, the Report states in part on 129-130 of 236, "the residual NDMA and NDEA in the equipment after cleaning for process switch were not analyzed….Based on the analysis of the NDMA and NDEA data, the original equipment cleaning procedure applied might not be able to get rid of the NDMA and NDEA residue on the equipment completely."  On 138 of 236, the Report states: "no special cleaning and testing control were set in the process of cleaning focus on the trace amount of NDMA or NDEA impurity, it likely had trace amount of NDMA or NDEA impurity remaining in the equipment and resulted in carry-over into other grade of Valsartan."

131.    As stated in the TEA DIR, comparing the root cause for the formation of NDEA in the TEA with sodium nitrite quenching process to the root cause for the formation of NDMA in the zinc chloride process, "NDMA is generated by nitrosation reaction of the simultaneously presented dimethylformamide (containing degradation product/impurity dimethylamine) and nitrous acid; NDEA is similar to NDMA in structure, and the formation mechanism is similar too, i.e., Nitrosation of diethylamine." (TEA DIR at 145 of 236).

## The Zinc Chloride Process

132.    In 2011, ZHP developed yet another alternative manufacturing process for its generic valsartan.  ZHP changed certain substances used in the manufacturing process, including the substitution of the solvent dimethylformamide ("DMF") for trimethylamine, and zinc chloride for toluene in the tetrazole ring formation step, and increased the quantities of sodium azide and sodium nitrite.  (ZHP01843066, ZHP 195).

133.    During a meeting with an FDA investigator following the disclosure of the NDMA in the ZHP valsartan in June 2018, Jun Du stated that the increased production capacity and cheaper cost with the zinc chloride process change allowed ZHP to dominate the world market for valsartan. (PRINSTON00162373).

134.    The root cause of the zinc chloride process NDMA contamination is set forth in the ZHP Deviation Investigation Report dated July 20, 2018 (DC-18001, ZHP00004363-4471) ("ZNCL DIR"), and is also discussed in the TEA

DIR cited above. On page 17 of 33 of the ZNCL DIR, ZHP states, "Based on the previous mechanism analysis, this impurity is probably generated in the quenching process in which the product of the reaction is also present." On page 19 of 33, ZHP stated, "Based on the above elucidated root cause, the presence of trace amount of NDMA in the final Valsartan API requires the convergence of the following three factors: i) use of dimethylformamide (DMF) in the tetrazole formation step, ii) quenching of azide using nitrous acid, and iii) quenching takes place in the presence of the product." These are the same three factors described in the TEA DIR. This is further reiterated on page 22 of 33, including, "It seems clear that NDMA is only formed in Process II (ZNCL) associated with the use of solvent dimethylformamide (DMF) during the quenching of unreacted azide AND in the presence of the product of that step, indicating NDMA is a process impurity in Process II (ZNCL)."

135.    ZHP's test results show that some of ZHP's zinc chloride process valsartan was also cross-contaminated with NDEA, meaning those batches contained both NDMA and NDEA. (ZHP02364173).

136.    Valsartan API manufactured with the zinc chloride process was utilized by the finished dose manufacturing arm of ZHP to manufacture finished dose product that ZHP then marketed and distributed in the United States through Prinston and Solco. (PRINSTON00000013-14, 00000016-17; PRINSTON00000023, 00000031-32).

137.    ZHP first sold valsartan via Prinston and Solco in the United States in October, 2015, "the first valsartan pills manufactured by ZHP and sold in the United States, **the first time they were received was October 2, 2015**." (Hai Wang 3/10/21 Dep. Tr. 96:8-97:8).

138.    Prinston provided information to the FDA in connection with the recall notice which included the ANDA numbers of A204821 for valsartan and A206083 for valsartan/HCTZ, and the beginning and ending manufacturing dates of May 2015 to March 2018, and that **Prinston first marketed valsartan on June 9, 2015 and valsartan-HCTZ on February 9, 2016**. (Hai Wang 3/10/21 Dep. Tr. 205:28-266:14).

### The NDMA/NDEA Contamination Levels in ZHP's Valsartan

139.    All of the valsartan sold by Prinston and Solco in the United States contained NDMA. The FDA was advised that "NDMA is present at a level

greater than 0.5 ppm in all Huahai's drug substance batches for DMF 023491." (Hai Wang 3/10/21 Dep. Tr. 93:10-16, 154:3-16).

140.    ZHP established that the NDMA levels in the API carried over to the levels in the finished dose because this was a process related impurity, "not a result of degradation of the product" and this information was provided by Prinston to the FDA. (Hai Wang 3/10/21 Dep. Tr. 116:22-118:23, 144:15-147:1, 152:8-12, 158:8-159:6).

141.    Minli Zhang, ZHP's Director of Finished Dose Formulation Quality, testified that ZHP, "compared the NDMA level in the API and the NDMA level in the finished dose products, and we found the results basically matched each other." (Minli Zhang Dep. 3/26/21 Dep. Tr., 509:15-17, 518:18-519:3, 521:8-19). The relevant deviation investigation report states:

In order to qualify the impurity relationship between the dosage form and API, some batches of API and corresponding dosage form were choose at random to test this impurity by Quality Research Department (QR), the testing result is below:

表1：制剂成品及对应 API 批次检测结果列表

Table 1: testing result between dosage form batches and corresponding API

| 序号 SN | 产品名称 Product Name | 产品批号 Batch No. | 产品规格 Strength (mg) | API厂家批号 Vendor batch No. Of API | API 结果 Result for API NDMA 含量(ppm) Assay of NDMA (ppm) | 制剂结果 Result for dosage form |
|---|---|---|---|---|---|---|
| 1. | 缬沙坦片 USP Valsartan Tablets USP | 341A18007 | 40 | C5523-17-382 | 81.4 | 83.1 |
| 2. | 缬沙坦片 USP Valsartan Tablets USP | 342B17012 | 80 | C5523-17-190 | 101.9 | 101.0 |
| | | | | C5523-17-191 | 101.7 | |
| 3. | 缬沙坦片 USP Valsartan Tablets USP | 343G17002 | 160 | C5355-17-132 | 120.0 | 110.3 |
| | | | | C5355-17-133 | 104.5 | |
| 4. | 缬沙坦片 USP Valsartan Tablets USP | 344B17071 | 320 | C5355-17-131 | 119.3 | 123.2 |
| | | | | C5355-17-132 | 120.0 | |
| 5. | 缬沙坦氢氯噻嗪片 USP Valsartan HCTZ Tablets USP | 609B18003 | 80/25 | D5191-16-133 | 3.4 | 2.9 |
| 6. | 缬沙坦氢氯噻嗪片 USP Valsartan HCTZ Tablets USP | 611B17003 | 320/25 | D5191-16-027 | 27.7 | 31.3 |
| 7. | 缬沙坦氢氯噻嗪片 USP Valsartan HCTZ Tablets USP | 611B17007 | 320/25 | D5191-15-149 | 7.9 | 6.4 |

从上表数据分析，制剂产品与 API 的检测结果的差值接近(0.5~9.7ppm)。

Based on analysis above, the testing difference value of API and dosage form is almost the same (0.5~9.7ppm)

(ZHP00683571, 683578). ZHP determined that it was unnecessary to test any additional finished dose and used the API levels to determine the FD levels. (3/26/2021 Minli Zhang Dep. Tr., 520:22-523:19, 525:12-22 (discussing ZHP 189)). This holds true for both NDMA and NDEA: "According to the previous

raw material investigation, i.e. presence of diethylamine impurities in triethylamine hydrochloride, combined with the formation mechanism of NDEA, it should be the nitrosation of diethylamine impurities (in triethylamine hydrochloride) by nitrite to produce NDEA impurities, which is carried over into crude products, and finally remain in valsartan finished products." (PRINSTON0075797, 75977).

142.    Eric Gu confirmed the NDMA levels for the zinc chloride process as stated in a September 1, 2018 letter to the FDA.  This included NDMA levels measured in various batches of 148.2, 158.8, 167.3, and 188.1 parts per million. (Eric Gu 4/6/21 Dep. Tr., 387:14-390:19).

143.    **Dr. Li confirmed that every batch of valsartan manufactured with the zinc chloride process exceeded the FDA limit of 96 nanograms**. (Min Li 4/21/21 Dep. Tr., 306:15-23).

144.    Dr. Li confirmed that ZHP's testing, documented in ZHP's September 1, 2018 Response to DMF Information Request Letter, showed that all 783 batches tested and listed in the document exceeded the limit set by the FDA, ranging up to 627 times the limit for NDMA. (Min Li 4/21/21 Dep. Tr. 472:12-476:19).

145.    ZHP has documented the levels of NDMA and NDEA resulting from the at-issue manufacturing processes.  ZHP's September 1, 2018 Response to DMF Information Request Letter (ZHP00079913) includes Table 1, titled NDMA Test Results for Batches Manufactured Using the ZnCl Process at page 8 of 33.  The table documents the results of testing of 783 batches, all containing NDMA well in excess of the 0.3 ppm level the FDA first adopted as an interim limit, and later adopted as a final limit for NDMA in valsartan. Table 2, titled NDMA Test Results for Batches Manufactured Using the TEA Process with sodium nitrite quenching at page 27-28 of 33 documents the results of testing of 55 batches, most containing NDMA and in each instance the NDMA level exceeds 0.3 ppm.

146.    ZHP's Deviation Investigation Report, dated November 11, 2018, titled Investigation regarding unknown impurity (genotoxic impurity) of Valsartan API (TEA process), documents NDEA levels for the TEA process with sodium nitrite quenching for valsartan API.  (PRINSTON0075797).  Six validation batches had NDEA results of 0.03, 5.33, 12.77, 13.60, 18.83, and 13.51 ppm.  (PRINSTON0075846).  A separate table in that Report provides

41

ranges and averages for the testing of 85 batches manufactured with the TEA process, documenting a range of 0.03-42.14, an average of 13.46 ppm. That table also shows NDEA levels in 111 batches manufactured with the zinc chloride process, documenting a range of 0-4.23 and average of 0.18 ppm. (PRINSTON0075858). Thus, every batch was contaminated with NDMA, and many were also contaminated with NDEA, and every batch at issue contained NDMA and/or NDEA contamination in excess of the limits set by the FDA.

147.    ZHP's September 1, 2018 Response to DMF Information Request Letter provided to the FDA responds at page 29-30 of 33 to a question regarding a batch that was confirmed to have been manufactured with the TEA process with sodium nitrite quenching. **ZHP confirmed that the TEA process with sodium nitrite quenching was last used to manufacture valsartan API for the US market in July 2015.** This is consistent with the manufacturing dates per the TEA DIR cited above. Of note, ZHP's testing of this batch demonstrated NDMA contamination of 63.1 ppm, and ZHP stated that this could not be a process related impurity due to the, "elucidated generation mechanism of NDMA," which was described only in the context of the zinc chloride process (use of DMF, impurity/degradant dimethylamine, reaction with nitrous acid, "during the subsequent quenching step in the presence of the product"). ZHP stated: "Probable contamination is suspected as source of this impurity in the TEA process, such as raw material, contamination due to shared production line etc., the investigation is ongoing." This is consistent with ZHP's recognition in the TEA DIR that there was cross-contamination due to shared production lines.

## CEMAT and the July 27, 2017 Jinsheng Lin, Ph.D Email

148.    CEMAT, which was wholly owned by ZHP and located in the ZHP Xunqiao site where the valsartan finished dose was manufactured, was created by ZHP to improve ZHP's capabilities in the identification of impurities in API and finished dose. (Min Li 4/20/21 Dep. Tr., 72:7-74:6).

149.    **The identification of impurities is, "part of the CGMP requirements**." (Min Li 4/20/21 Dep. Tr., 72:7-74:6).

150.    The "Mission of CEMAT [is t]o solve the most challenging technical problems encountered from research and development to scale up and manufacture of drug substances and finished products, particularly those

42

related to process impurities, degradation products, and solid state and polymorphism." Dr. Li confirmed that "Process impurities would include, for example, the NDMA created by the zinc chloride process…And the creation of NDMA and NDEA in the TEA process with sodium nitrite quenching…." (Min Li 4/20/21 Dep. Tr., 74:17-76:10).

151.    Jun Du confirmed that CEMAT, where the author of the email, Jinsheng Lin, Ph.D, was employed, conducted quality research including analytical methods for identification of impurities. (Jun Du 5/27/21 Dep. Tr. 101:8-18, 102:4-107:5).

152.    A ZHP PowerPoint regarding CEMAT and the role of Jinsheng Lin, Ph.D, stated that Dr. Lin was in charge of the "lab for process and degradation impurity research," which was responsible, "to systematically design and conduct forced degradation research on drugs to research the mechanism of process impurity formation, to study the degradation pathway of the degradation impurities…" Jun Du confirmed that the NDMA and NDEA impurities in the valsartan at issue were process impurities. (Jun Du 5/27/21 Dep. Tr. 116:11-120:5).

153.    Dr. Li testified to the contents of the July 27, 2017 email sent to him and others within ZHP by Jinsheng Lin, Ph.D, who worked at CEMAT. The email explicitly documented that it was known at that time that **ZHP's valsartan API contained NDMA, which occurred due to the quenching with sodium nitrite, and that this was a "common problem in the production and synthesis of sartan APIs**." The email also confirmed that the presence of nitrosamines would create, "an extremely high GMP risk." (Min Li 4/20/21 Dep. Tr., 82:11-83:7, 85:7-86:2, 86:6-14, 87:19-88:7, 88:13-90:2, 90:7-10, 90:14-23). To be complete, Dr. Li reviewed the Chinese version of the email and confirmed that the email stated the following:

> Through the secondary mass spectrometry analysis, it can be inferred that the extra NO substituent is in the cyclic compound fragment, and it is very likely that it is an N-NO compound; **it is similar to the N-nitrosodimethylamine that occurs in valsartan when quenched with sodium nitrite, and its structure is very toxic.**

* * *

43

> **If it is confirmed as the above speculated structure, then its toxicity will be very strong, and there will be an extremely high GMP risk**. **This is a common problem in the production and synthesis of sartan APIs**. **It is recommended** to improve other quenching processes (such as NaClO) along with **the optimization of the valsartan sodium azide quenching process.**
>
> \* \* \*
>
> I've also attached a patent of a 2013 sodium azide NaClO quenching method by Zhejiang Second Pharma Co., Limited. They proposed that the use of NaNO2 quenching will result in the formation of N-NO impurities. At the same time, they used ZHP's crude Valsartan in their LC-MS test and detected this impurity. **This indicates that other companies have paid attention to the quality problem very early on. So leaders please pay attention to this issue.**

(Min Li 4/20/2021 Dep. 82:11-12, 87:19-88:7, 88:13-89:18 (discussing ZHP-295)).

154.    ZHP subsequently confirmed that its irbesartan was contaminated with NDEA due to its use of triethylamine and sodium nitrite quenching in the manufacturing process. (ZHP00367403, 367435-36).

155.    Mr. Du confirmed the substance of the July 27, 2017 email, including that the impurity seen in the irbesartan was likely an N-NO compound, and that, "**it was similar to the NDMA from the sodium nitrite quenching in valsartan.**" (Jun Du 5/27/21 Dep. Tr. 107:12-115:23).

156.    ZHP did not disclose its knowledge of and about the NDMA contamination of its valsartan to the FDA at the time of the July 27, 2017 email. (Min Li 4/20/21 Dep. Tr., 177:11-178:4, 178:19-179:1).  In fact, ZHP did not disclose the contamination at all before the disclosure in June 2018. (PRINSTON00000001).

44

157.    The translation of the July 27, 2017 email provided and used by ZHP during depositions is consistent with the testimony of ZHP's corporate representatives, and also clearly states that there was NDMA in ZHP's valsartan.

158.    Plaintiffs' original translation was confirmed by Min Li.

**CGMP Violations and Adulteration of ZHP's Valsartan:**
**The FDA Investigation and Findings**

159.    Following ZHP's disclosure of the NDMA impurity to the FDA, the FDA initiated an investigation. On July 23-August 3, 2018 FDA performed a foreign comprehensive "For Cause" inspection of the API manufacturing site located at Chuannan, Linhai, Taizhour, Zhejiang.

160.    Eleven (11) observations were cited on Form FDA 483, Inspectional Observations, date issued August 3, 2018. (ZHP00061069-79). The observations included:

QUALITY SYSTEM
OBSERVATION 1

The change control system to evaluate all changes that may affect the production and control of intermediates or Active Pharmaceutical Ingredients (APIs)is not adequate. Specifically,

a) you do not always conduct a formal risk assessment for critical changes to evaluate the potential impact of proposed changes on the quality of intermediates or APIs. Critical Change Request PCRC-11025 was initiated November 27, 2011 and closed November 29, 2011, for the stated purpose of making changes to the Valsartan manufacturing process to reduce the current conversion rate (60% - 70%) of the known isomer impurity D-Valsartan in the final API and increase batch yields (current batch yield 400 - 500 Kg per batch).

i) **you did not conduct and document a formal risk assessment for Change Request PCRC-1 1025 to**

45

**evaluate the potential impact of proposed changes on the quality of the intermediates or the final API for this critical change to your validated manufacturing process prior to your quality unit approving the change**.

ii) you hired an outside laboratory to conduct a small lab scale research project. Based on the results of a lab scale research project you initiated validation on a commercial scale to change your validated manufacturing process without conducting pilot scale or other small scale batches. Your Deputy Director of Manufacturing stated you have commercial experience and since you only changed the catalyst and the solvent there was no need to conduct pilot scale trial batches before instituting critical changes on a commercial scale.

**You initiated validation on a commercial scale without conducting a formal risk assessment to evaluate the potential impact of changes to your validated manufacturing process on the quality of intermediates and APIs.** You do not have a quality agreement with the outside laboratory you used to perform a lab scale research project requiring (prior to initiating testing and reporting results): qualification of all instruments used to conduct tests; validation of all software used with qualified instruments to conduct tests; calibration of all applicable measurement devices against traceable standards prior to use; use of official standards as appropriate; if applicable, establishing system suitability prior to testing samples and processing data; and validation of all test methods used for testing.

b) **you do not have an adequate change control system requiring scientific judgement to determine what additional testing and validation studies are appropriate to justify changes to a validated manufacturing process. You do not always have data to support approval of changes to validated processes**.

46

i) You did not identify specific parameters and specify acceptance criteria for those parameters prior to implementing changes, as part of critical Change Request PCRC-11025, to use to evaluate if the implemented changes decreased the isomer conversion of D-Valsartan and increased the batch yield.

ii) **Additional testing requirements associated with critical changes are not always based on sound scientific judgement. Change Request PCRC-11025 included changing both the catalyst and the solvent in your validated manufacturing process. Additional testing requirements associated with these changes were limited to three validation batches and a commitment to conduct additional testing on three batches a year.**

c) **you do not have an adequate classification procedure for determining the level of testing, validation, and documentation needed to justify changes to a validated process**. You do not consistently classify changes. You do not always increase testing, validation, and the documentation required to justify changes to a validated process based on the classification of a proposed change. Amendment to Drug Master File Valsartan USP (Process II) DMF# 23491 dated December 10, 2013 indicates the amendment was submitted for minor changes for drug substance manufacturing. Amendment to Drug Master File Valsartan USP (Process II) DMF# 23491 contradicts your internal Change Request PCRC-11025 which lists change control classification as critical change.

d) written change control procedures should provide for the identification, documentation, appropriate review, and approval of changes in raw materials, specifications, analytical methods, facilities, support systems, equipment (including computer hardware), processing steps, labeling and packaging materials, and computer software. Any proposals for GMP relevant changes should be drafted, reviewed, and approved by the appropriate organizational

47

units and reviewed and approved by the quality unit. Your quality unit does not always follow your written procedure for change control. Your written procedure Change Control System SMP-018.05 effective December 30, 2017 section 5.3.6 (3) specifies QA shall reject the change if the action cannot meet predetermined expectations. Critical Change Request PCRC-11025 did not include acceptance criteria with predetermined expectations. Valsartan Product Development Report-01 dated April 13, 2012 Table 8 includes D-Valsartan isomer impurity (specification < 1.0%) from three batches manufactured according to the validated manufacturing process (results range from 0.46% - 0.57%) and Table 10 includes D-Valsartan isomer impurity from the three validation batches manufactured using a different catalyst and solvent (results range from 0.38% - 0.40%). The product development report is silent regarding evaluation of the ability of the implemented changes to reduce isomer conversion rates. Valsartan Product Development Report-01 did not compare the batch weights from batches manufactured immediately before the change to the validated manufacturing process and the first batches manufactured after implementing changes to the manufacturing process.

* * *

OBSERVATION 3

The system for managing quality to ensure confidence that the API will meet its intended specifications for quality and purity is not adequate in that your quality unit lacks written procedures and the authority and responsibility to ensure all critical deviations are thoroughly investigated. Specifically,

* * *

b) major Deviation DDW02-17003 was initiated August 2, 2017 and closed September 11, 2017 for Valsartan

48

batches D5191-17-023 and D5191-17-024 with OOS results for a single unknown impurity (specification < 0.10%). You confirmed OOS results for Valsartan batches D5191-17-023 single unknown impurity 0.33%, and D5191-17-024 single unknown impurity 0.38%.

i) you did not identify a root cause for the single unknown impurity results in batches D5191-17-023 and D5191-17-024. You stated the root cause was probably due to occasional fluctuation in your manufacturing process. You did not attempt to identify this single unknown impurity. You did not attempt to identify the source of fluctuations in your manufacturing process for Valsartan.

ii) you did not develop an adequate Corrective Action and Preventive Action (CAPA) plan. The CAPA you listed on Deviation Investigation Report Form for Deviation DDW02-17003 included: discarding both batches, and following-up on the next 30 batches to see if a similar issue occurs. You did not review your manufacturing process and manufacturing batch records to determine if your manufacturing process and manufacturing batch records could be revised to reduce process variation. You did not interview employees to determine if employees consistently and reproducibly follow your manufacturing instructions.

iii) you did not conduct a thorough risk assessment. Your risk assessment consisted of answering 26 generic questions: yes, no, or NA (Not Applicable). Deviation DDW02-17003 investigation did not include documentation showing a more thorough risk assessment was conducted by your risk management team. Your written procedure for Quality Risk Management SMP-023.03 effective November 1, 2017 section 7.1.3 specifies a risk management team should be established when solving major risk issues, and section 7.1.5 of the same procedure specifies to select different tools according to the risk category. Quality Risk Management SMP-023.03 section 8.3 specifies all activities should be defined and documented. Quality Risk Management SMP-023.03 does

49

not specify which risk management methods and tools to use in association with specific deviation categories.

c) you do not always thoroughly document investigations. your written procedure Deviation Investigation Management System SMP-017.05 effective January 1, 2018 section 6.4.2 specifies the investigation should be well documented including the quality risk assessment (the same specification as included in version SMP~17.04 effective May 30, 2016). Deviation Investigation Management System SMP-017.05 like SMP-017.04 does not specify which risk management methods and tools to use in association with specific deviation categories.

d) you do not always thoroughly investigate deviations before closing the deviation. Deviation was initiated October 10, 2017 and closed February 1, 2018 for single unknown impurity (specification <0.50%) Valsartan intermediate condensate HC] batches C20213-17-339 (0.56%) and C20214-17-340 (0.56%). The Deviation Investigation Report states unspecified impurity at RRT (Relative Retention Time) 3.2 minutes is an in process impurity observed in other batches but at levels not more than 0.10%. You did not identify a root cause.

Your corrective action plan included: use LC-MS to identify the impurity, conduct further investigations once the impurity is identified, and conduct a lab trial study to determine if reprocessing removes the impurity. You did not develop a preventive action plan. You did not identify the single unknown impurity. You reprocessed Valsartan intermediate condensate HC] batches C20213-17-339 and C20214-17-340 and assigned the reprocessed batches final API batch numbers C5355-18-023M and C5355-17-024M. You then closed the investigation without identifying the single unknown impurity.

e) you do not always follow your written procedures. Returned Products Management Procedure SMP-012.02 effective October 30, 2013 defines a quality-related issue

50

as any non-compliance to physical, chemical or
microbiological feature. You classified Return No. RC-
18006 as not quality related for Valsartan batches C5069-
15-034MM and C5069-15-037MMM returned for not
complying with customer PSD specifications, a physical
feature. The Treatment Record section and closure date on
Return No. RC-18006 were left blank.

(*Id.* at 1-3, 5-7) (emphasis added).

161.    In a letter from the FDA to Mr. Du dated September 21, 2018, which
enclosed the Form FDA 483, the FDA stated the July 23-August 3, 2018
inspection resulted in an "Official Action Indicated" (OAI) inspection
classification, and that **the facility was "considered to be in an
unacceptable state of compliance with regards to CGMP**."
(ZHP00061068).

162.    On September 28, 2018, FDA issued a letter to Mr. Du of ZHP,
informing him that ZHP had been placed on the Import Alert list (Import Alert
66-40) and that **future shipments were subject to refusal of admission to
the United States until ZHP could demonstrate their products were in
cGMP compliance**.  (ZHP00061080).

163.    **On November 29, 2018, the FDA issued a Warning Letter (320-19-
04) to ZHP notifying ZHP of significant deviations from cGMPs for their
API manufacturing operations, and stating that the API was
consequently adulterated within the meaning of section 501(a)(2)(B) of
the Federal Food, Drug, and Cosmetic Act (FD&C Act) and 21 U.S.C.
351(a)(2)(B).**

164.    The FDA Warning Letter catalogued a number of cGMP violations
directly tied to the manufacture of the contaminated ZHP valsartan.  This
included:

        **1. Failure of your quality unit to ensure that quality-
        related complaints are investigated and resolved.**

        *Valsartan API*

51

Your firm received a complaint from a customer on June 6, 2018, after an unknown peak was detected during residual solvents testing for valsartan API manufactured at your facility. **The unknown peak was identified as the probable human carcinogen N-nitrosodimethylamine (NDMA).** Your investigation (DCe-18001) determined that the presence of NDMA was caused by the convergence of three process-related factors, one factor being the use of the solvent dimethylformamide (DMF). Your investigation concluded that only one valsartan manufacturing process (referred to as the process in your investigation) was impacted by the presence of NDMA.

However, FDA analyses of samples of your API, and finished drug product manufactured with your API, identified NDMA in multiple batches manufactured with a different process, namely the triethylamine process, which did not use the solvent DMF. These data demonstrate that your investigation was inadequate and failed to resolve the control and presence of NDMA in valsartan API distributed to customers. Your investigation also failed:

- To include other factors that may have contributed to the presence of NDMA. For example, your investigation lacked a comprehensive evaluation of all raw materials used during manufacturing, including potable water.

- To assess factors that could put your API at risk for NDMA cross-contamination, including batch blending, solvent recovery and re-use, shared production lines, and cleaning procedures.

- To evaluate the potential for other mutagenic impurities to form in your products.

Our investigators also noted other examples of your firm's inadequate investigation of unknown peaks observed in chromatograms. For example, valsartan intermediates

52

(C20213-17-339 and C20213-17-340) failed testing for an unknown impurity (specification < 0.5%) with results of 0.56% for both batches. Your action plan indicated that the impurity would be identified as part of the investigation; however, you failed to do this. In addition, no root cause was determined for the presence of the unknown impurity. You stated that you reprocessed the batches and released them for further production.

Your response states that NDMA was difficult to detect. However, if you had investigated further, you may have found indicators in your residual solvent chromatograms alerting you to the presence of NDMA. For example, you told our investigators you were aware of a peak that eluted after the toluene peak in valsartan API residual solvent chromatograms where the presence of NDMA was suspected to elute. At the time of testing, you considered this unidentified peak to be noise and investigated no further. Additionally, residual solvent chromatograms for valsartan API validation batches manufactured using your ZnCl2 process, with DMF in 2012 (C5355-12-001, C5355-12-002, and C5355-12-003) show at least one unidentified peak eluting after the toluene peak in the area where the presence of NDMA was suspected to elute.

Your response also states that you were not the only firm to identify NDMA in valsartan API. In your case, FDA analyses of samples identified amounts of NDMA in valsartan API manufactured at your firm that were significantly higher than the NDMA levels in valsartan API manufactured by other firms. FDA has grave concerns about the potential presence of mutagenic impurities in all intermediates and API manufactured at your facility, both because of the data indicating the presence of impurities in API manufactured by multiple processes, and because of the significant inadequacies in your investigation.

* * *

53

**2. Failure to evaluate the potential effect that changes in the manufacturing process may have on the quality of your API.**

In November 2011 you approved a valsartan API process change (PCRC - 11025) that included the use of the solvent DMF. **Your intention was to improve the manufacturing process, increase product yield, and lower production costs. However, you failed to adequately assess the potential formation of mutagenic impurities when you implemented the new process. Specifically, you did not consider the potential for mutagenic or other toxic impurities to form from DMF degradants, including the primary DMF degradant, dimethylamine.** According to your ongoing investigation, dimethylamine is required for the probable human carcinogen NDMA to form during the valsartan API manufacturing process. NDMA was identified in valsartan API manufactured at your facility.

**You also failed to evaluate the need for additional analytical methods to ensure that unanticipated impurities were appropriately detected and controlled in your valsartan API before you approved the process change. You are responsible for developing and using suitable methods to detect impurities when developing, and making changes to, your manufacturing processes. If new or higher levels of impurities are detected, you should fully evaluate the impurities and take action to ensure the drug is safe for patients**.

**Your response states that predicting NDMA formation during the valsartan manufacturing process required an extra dimension over current industry practice, and that that your process development study was adequate. We disagree. We remind you that common industry practice may not always be consistent with CGMP requirements and that you are responsible for the quality of drugs you produce.**

54

Your response does not describe sufficient corrective actions to ensure that your firm has adequate change management procedures in place: (1) to thoroughly evaluate your API manufacturing processes, including changes to those processes; and (2) to detect any unsafe impurities, including potentially mutagenic impurities. For FDA's current thinking on control of potentially mutagenic impurities, see FDA's guidance document M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk for approaches that FDA considers appropriate for evaluating mutagenic impurities, at https://www.fda.gov/downloads/Drugs/GuidanceComplia nceRegulatoryInformation/Guidances/UCM347725.pdf.

(ZHP01344159) (emphasis added). The Letter also stated: "Your firm's executive management remains responsible for fully resolving all deficiencies and ensuring ongoing CGMP compliance," and "You are responsible for investigating these deviations, for determining the causes, for preventing their recurrence, and for preventing other deviations." (*Id.* at 5).

165.    The November 29, 2018 Warning Letter was written in response to the August 26, 2018 letter to the FDA signed by Jun Du, which was ZHP's response to the 483 notification issued August 3, 2018.  The FDA stated in part: **"This warning letter summarizes significant deviations from current good manufacturing practice (CGMP) for active pharmaceutical ingredients (API),"** including, **"Failure to evaluate the potential effect that changes in the manufacturing process may have on the quality of your API**." (Jun Du 5/28/21 Dep. Tr. 234:13-237:16).

166.    Jun Du acknowledged that The Warning Letter listed a number of CGMP violations, including: "you failed to adequately assess the potential formation of mutagenic impurities when you implemented the new process. Specifically, you did not consider the potential for mutagenic or other toxic impurities to form from DMF degradants, including the primary DMF degradant, dimethylamine," and, **"You also failed to evaluate the need for additional analytical methods to ensure that unanticipated impurities were appropriately controlled in your valsartan API before you approved the process change**.  **You are responsible for developing and using**

55

**suitable methods to detect impurities when developing, and making changes to your manufacturing processes. If new or higher levels of impurities are detected, you should fully evaluate the impurities and take action to ensure the drug is safe for patients**." (Jun Du 5/28/21 Dep. Tr. 237:18-243:20).

167.    The Warning Letter directly rejected ZHP's position set forth in the August 26, 2018 letter signed by Mr. Du, in response to the 483 notification, that it could not have been expected to identify the nitrosamine impurities. The FDA stated, "**Your response states that predicting NDMA formation during the valsartan manufacturing process required an extra dimension over current industry practice and that your process development study was adequate. We disagree. We remind you that common industry practice may not always be consistent with CGMP requirements and that you are responsible for the quality of drugs you produce.**" **Mr. Du agreed that ZHP was responsible for the quality of the drugs produced by ZHP**. (Jun Du 5/28/21 Dep. Tr. 247:17-250:22).

168.    This is consistent with the USP requirement that nonmonograph tests must be utilized to detect impurities that result from a change in manufacturing process if its presence is inconsistent with good manufacturing practices or good pharmaceutical practices:

> Nonmonograph tests and acceptance criteria suitable for detecting and controlling impurities that may result from a change in the processing methods or that may be introduced from external sources should be employed in addition to the tests provided in the individual monograph, where the presence of the impurity is inconsistent with good manufacturing practices or good pharmaceutical practices.

Put differently, USP requires manufacturers to characterize their products' impurity profiles, including by conducting a "sound scientific appraisal of the chemical reactions involved in the synthesis of the drug substance." And when they modify the manufacturing process they are required to identify all impurities, via whatever analytical method is necessary to do so. The monographs for valsartan USP did not contain a test or limit for NDMA or NDEA. (ZHP01303141; ZHP02614594; PRINSTON00141349). USP also provided that any substance known to be toxic shall not listed under the other

56

impurities section thereby requiring specific identification. USP defines toxic impurities as follows:

> Toxic impurities have significant undesirable biological activity, even as minor components, and require individual identification and quantification by specific tests. These impurities may arise out of the synthesis, preparation, or degradation of compendial articles. Based on validation data, individualized tests and specifications are selected. These feature comparison to a Reference Standard of the impurity, if available. It is incumbent on the manufacturer to provide data that would support the classification of such impurities as toxic impurities.

(Genotoxic impurities, such as NDMA and NDEA, can damage and mutate genes/DNA and then cause cancer. According to the USP's definition, they are a paradigmatic example of toxic impurities that drug manufacturers are required to identify, quantify, and then include in their specifications.

169.    Mr. Du confirmed that the FDA placed ZHP on Import Alert on September 28, 2018, and that, "This import ban stopped the manufacturing of API products at our Chuannan facility.  Not limited to valsartan.  That's a decision made by the FDA."  (Jun Du 5/28/21 Dep. Tr. 251:2-15).

170.    Jucai Ge, ZHP's Quality Assurance Director, API Division **confirmed that when the FDA informed ZHP that its Valsartan was adulterated, "That means that in our manufacturing process, our methods, facilities, and controls did not conform to cGMP**." (Jucai Ge 5/26/22 Dep. Tr.  26:10-29:5).

## ZHP'S Admissions Regarding Violations of cGMPs

171.    Eric Gu, a 30(b)(6) corporate representative, was the President/General Manager of Shanghai Syncores since February, 2014.  The function of Shanghai Syncores, which was a wholly owned subsidiary owned by ZHP and based in ZHP's finished dose manufacturing facility as set forth above, is described in a PowerPoint dated in July, 2013, as  "[p]rovid[ing] world-class R&D and manufacturing services to global pharmaceutical and biotechnology companies." (Eric Gu 4/5/21 Dep. Tr., 49:17-56:3; ZHP 225, p. 16).

172.    Shanghai Syncores developed the zinc chloride manufacturing process, at the lab scale.  (Eric Gu 4/5/21 Dep. Tr., 60:6-10).

173.    **Shanghai Syncores and ZHP were required to conduct a genotoxic impurity analysis when they developed the zinc chloride process, and were aware of the FDA guidance titled "Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommended Approaches" dated December 2008.**  (Eric Gu 4/5/21 Dep. Tr., 58:15-60:4).

174.    In connection with the FDA Guidance titled "Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommended Approaches" dated December 2008, Mr. Gu confirmed that as a matter of risk assessment both ZHP and Syncores were responsible to know in 2011, as set forth in Section 4-A titled "Prevention of Genotoxic and Carcinogenic Impurity Formation," that, "**Since drug-related impurities presumably provide limited, if any, therapeutic benefits and because of their potential to cause cancer in humans, every feasible technical effort should be made to prevent the formation of genotoxic or carcinogenic compounds during drug substance synthesis or drug product manufacturing**."  (Eric Gu 4/5/21 Dep. Tr., 69:1-70:23).

175.    The 1978 IARC Monograph on the Evaluation of the Carcinogenic Risk of Chemicals to Humans" stated in part: "**It has been known since 1865 that the reaction of dimethylamine hydrochloride with sodium nitrite at an acidic pH yields NDMA**."  (Eric Gu 4/5/21 Dep. Tr., 65:3-65:24).

176.    **Mr. Gu could not identify anybody at Syncores who, "evaluated potential degradation of DMF as part of the zinc chloride process" during the development of the zinc chloride process**.  (Eric Gu 4/5/21 Dep. Tr., 77:21-78:10).

177.    Mr. Gu confirmed that ZHP and Syncores were aware of the EMA guidelines titled "Guideline on the Limits of Genotoxic Impurities" in effect from January 1, 2007, to January 31, 2018 when developing the zinc chloride process and TEA process with sodium nitrite quenching.  Section 4, titled "Toxicological Background," provided in part that "According to current regulatory practice, it is assumed that in vivo genotoxic compounds have the potential to damage DNA at any level of exposure and that such damage may lead/contribute to tumor development…**Thus, for genotoxic carcinogens, it is prudent to assume that there is no discernible threshold and that any**

58

**level of exposure carries a risk**." Also, "some structural groups" including n-nitroso compounds including NDMA and NDEA, "were identified to be of such high potency that intakes even below the threshold of toxicological concern, or TTC, would be associated with a high probability of a significant carcinogenic risk…**this group of high potency genotoxic carcinogens…have to be excluded from the TTC approach. Risk assessment of such groups requires compound-specific toxicity data.**" (Eric Gu 4/5/21 Dep. Tr., 90:6-97:16).

178.    ZHP "would have been aware these guidelines were put out in 2007 and **ZHP would have known as of 2007 that nitrosamines, including NDEA and NDMA belonged to a class of very potent genotoxic carcinogens as of that time in 2007**," which per the Guideline required control, "as low as reasonably practical," as opposed to according to the threshold of toxicological concern. (Eric Gu 4/6/21 Dep. Tr., 381:6-386:21).

179.    A 2009 article published in the scientific journal Tetrahedron Letters, titled: DMF, Much More Than a Solvent, indicated in part that "DMF decomposes slightly at its boiling point to afford dimethylamine and carbon monoxide, this reaction occurring even at room temperature in the presence of acidic or basic materials…" **Mr. Gu confirmed that it was known in the chemistry community that under certain circumstances DMF could decompose to yield dimethylamine**. (Eric Gu 4/5/21 Dep. Tr., 172:13-174:9, 183:12-21).

180.    Mr. Gu confirmed that the root cause for the formation of NDMA in the valsartan API manufactured with the zinc chloride process was in part attributable to the degradation or decomposition of DMF to yield dimethylamine, and the reaction of nitrous acid with the dimethylamine. (Eric Gu 4/5/21 Dep. Tr., 178:24-181:4).

181.    **Mr. Gu confirmed that Syncores did not evaluate the potential decomposition of DMF to yield DMA as part of the zinc chloride process**. (Eric Gu 4/5/21 Dep. Tr., 98:17-99:5).

182.    Qiangming Li, a 30(b)(6) witness, is the Senior Director of the Chuannan QC Department.  (ZHP 255).

183.    Qiangming Li confirmed that ZHP received a series of customer complaints regarding unknown, or aberrant peaks on gas chromatography for

valsartan API, some of which were focused on the area surrounding toluene – where the NDMA peak was located.  These included:

- Ranbaxy/SunPharma on September 30, 2014 (Qiangming Li 4/14/2021 Dep. Tr. 130:7-170:11; ZHP01748896, ZHP 260).

- Shanghai Pharmtech on November 20, 2014 (Qiangming Li 4/14/2021 Dep. Tr. 177:22-199:20; ZHP01748905, ZHP 264).

- SunPharma on November 17, 2016 (Qiangming Li 4/15/2021 Dep. Tr. 290:16-318:10; ZHP00405069, ZHP 277; ZHP01313866, ZHP 278).

- Vertex on December 21, 2016 (Qiangming Li 4/14/2021 Dep. Tr. 204:11-214:17; ZHP02630924, ZHP 265; ZHP02630926, ZHP 266).

- Glenmark on December 29, 2016 (Qiangming Li 4/15/2021 Dep. Tr. 254:22-290:4; ZHP00496153, ZHP 271; ZHP00496155, ZHP 272; ZHP02118712, ZHP 273).

- Aurobindo on August 23, 2017 (Qiangming Li 4/15/2021 Dep. Tr. 343:21-372:9; ZHP02094739, ZHP 281).

- Novartis on May 22, 2018 (Qiangming Li 4/15/2021 Dep. Tr. 386:17-466:17; ZHP00405021, ZHP 284).

184.    Qiangming Li testified that, "NDMA elutes near the toluene peak in the residual solvent gas chromatography of ZHP's valsartan API" and that ZHP never used GC-MS to test valsartan API prior to June 2018.  (Qiangming Li 4/13/2021 Dep. Tr. 77:4-6; 4/14/2021 Dep. Tr. 168:11-17).

185.    Jie Wang is ZHP's Vice President of Corporate Business Development and VP of ZHP for marketing and sales of API and finished dose, and testified as a 30(b)(6) representative.  Jie Wang confirmed that an internal ZHP email chain indicated that CEMAT was involved with the investigation of the "unknown peaks" including as of September 14, 2017 when an email indicated "CEMAT has details." (Jie Wang 5/18/21 Dep. Tr., 30:3-33:6, 35:10-37:16, 128:9-129:11).

186.    Mr. Gu testified with regard to the "unknown peaks" that were seen on routine gas chromatography by ZHP and some of its customers. He confirmed that an unknown peak was required to be investigated by ZHP, but could not provide any specific reason why Novartis discovered that the unknown peak at issue indicated the presence of NDMA, before ZHP, stating that, "it was not so easy to detect" and "it's quite a challenging work." (Eric Gu 4/5/21 Dep. Tr., 210:24-219:5, 236:24-237:8).

187.    When asked why, despite every batch showing the "NDMA peak just after the Toluene peak on the chromatograms. . . nobody at ZHP realized that it needed to be tested and identified," Mr. Gu stated that ZHP was aware of these peaks and, "did whatever they can," but ultimately that, "**They are struggling, I guess, in the past**." (Eric Gu 4/6/21 Dep. Tr., 333:21-335:19).

188.    Mr. Gu confirmed that ZHP was obligated to update the valsartan API impurity profile with the FDA and European authorities at all times. (Eric Gu 4/6/21 Dep. Tr., 330:18-332:11).

189.    The November 29, 2018 FDA Warning Letter found in part that ZHP, "failed to adequately assess the potential formation of mutagenic impurities when you implemented the new process. . . Specifically, you did not consider the potential for mutagenic or other toxic impurities to form from DMF degradants, including the primary DMF degradant, dimethylamine." Mr. Gu agreed that NDMA was a probable human carcinogen, but stated, "In 2011, okay, we didn't know. We didn't know that there were probable human carcinogens like NDMA or NDEA in the product." However, in this context, Mr. Gu agreed that, "**ZHP was responsible for the quality of the valsartan that it manufactured,**" and "**Yes, you know, ZHP is responsible for the API they are making**." (Eric Gu 4/6/21 Dep. Tr., 360:8-374:12).

190.    Mr. Gu also agreed with the statement in the FDA Warning Letter that if new or higher levels of impurities were detected, **ZHP was responsible to, "fully evaluate the impurities to take action to ensure the drug is safe for patient[s]**." (Eric Gu 4/6/21 Dep. Tr., 375:16-376:11).

191.    Peng Dong, a 30(b)(6) corporate representative, was the Deputy Director of the ZHP Technical Department, which was responsible, "to improve and upgrade the manufacturing process for the products under our management." (Peng Dong 3/29/21 Dep. Tr., 27:18-31:13).

61

192.    Mr. Dong confirmed that the **ZHP internal protocol titled: Guideline for Genotoxic Impurity Evaluation** (No. API-R&D-002) (bates ZHP01447235-242), Section 2, provided that, "**All intermediates and APIs produced under GMP conditions must be identified for genotoxic impurities," and per ICH the risk assessment evaluation included identification of genotoxic impurities and confirmation of the quality specifications of any API, including valsartan**. (Peng Dong 3/29/21 Dep. Tr., 33:9-34:10).

193.    Mr. Dong stated that in 2011 ZHP, "did not know whether DMF could decompose in the zinc chloride process for valsartan." The most he could say is that "Maybe an idea popped into someone's mind momentarily" or "it could be that suddenly someone dreamt about the scene." (Peng Dong 3/30/21 Dep. Tr., 161:8-17, 162:7-18, 163:15-23, 164:11-165:7, 166:13-167:6).

194.    ZHP's risk assessment was limited to evaluation of the newly added solvent DMF, "DMF was treated as a new impurity." ZHP could produce no documentation of any testing in 2011, "to find out whether DMF could…decompose or not during the zinc chloride process for valsartan." (Peng Dong 3/29/21 Dep. Tr., 167:7-168:19).

195.    The table of impurity evaluation at section 7.2.1.2 of the Change Request Form for the zinc chloride process actually confirms that, **"Dimethylamine is not listed as a potential impurity that was evaluated**." (Peng Dong 3/30/21 Dep. Tr., 213:10-22, 214:18-22, 215:19-216:19, 218:2-9).

196.    Mr. Dong confirmed that, "**ZHP never assessed how nitrite or nitrous acid might react with dimethylamine as part of the zinc chloride process to manufacture valsartan between 2011 and June 2018**." (Peng Dong 3/30/21 Dep. Tr., 227:1-7).

197.    Mr. Dong discussed the zinc chloride process including the use of DMF as a reaction solvent "to dissolve raw materials during the reaction," and confirmed that **ZHP did not do any investigation into the potential for DMF to decompose and yield dimethylamine until June 2018**." (Peng Dong 3/31/21 Dep. Tr., 241:3-256:17).

198.    Min Li confirmed the location on chromatograms of the peak attributable to the NDMA. (Min Li 4/20/21 Dep. Tr., 209:8-217:10).

199.    Dr. Li ultimately agreed that, "**the technology and the methodology was clearly available to identify the NDMA**," as long as you "know what to look for" based on a risk assessment – which he confirmed is an ongoing process for the lifecycle of the drug.  (Min Li 4/20/21 Dep. Tr., 230:9-19, 233:10-18).

200.    In the context of the November 28, 2018 FDA Warning Letter, Dr. Li confirmed that the FDA disagreed with ZHP's position that it could not have been expected to foresee or detect the NDMA due to a 'knowledge gap." With regard to the risk assessment, the FDA stated "**You also failed to evaluate the need for additional analytical methods to ensure that unanticipated impurities were appropriately detected and controlled in your valsartan API before you approved the process change**." And the FDA stated further, "Your response states that predicting NDMA formation during the valsartan manufacturing process required an extra dimension over current industry practice, and that your process development study was adequate.  We disagree.  We remind you that common industry practice may not always be consistent with CGMP requirements and that you are responsible for the quality of drugs you produce."  **Finally, the FDA confirmed, and Dr. Li agreed, that ZHP was "responsible for the quality of the drugs" produced by ZHP**.  (Min Li 4/21/21 Dep. Tr., 426:8-427:5, 430:11-434:10).

201.    Dr. Li confirmed that NDMA and NDEA were "drug-related impurities" as referenced in the FDA's 2008 Guidance for Industry, Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommended Approaches, which states that "drug-related impurities presumably provide limited, if any, therapeutic benefits and because of their potential to cause cancer in humans, **every feasible technical effort should be made to prevent the formation of genotoxic or carcinogenic compounds during drug substance synthesis or drug product manufacturing.**"  (Min Li 4/21/21 Dep. Tr., 296:23-298:4).

202.    Dr. Li acknowledged that due to the "extremely high carcinogenic potency" of n-nitroso compounds including NDMA and NDEA the FDA's Guidance for Industry: Genotoxic and Carcinogenic Impurities in Drug Substances and Products excluded those substances from the threshold approach.  The European Medicines Agency Guidelines on the Limits of Genotoxic Impurities in effect from 2007 to 2018 similarly stated that due to, "the potential to damage DNA at any level of exposure and that such damage

may lead/contribute to tumour development….for genotoxic carcinogens [including NDMA and NDEA] it is prudent to assume that there is no discernible threshold and that any level of exposure carries a risk." (Min Li 4/21/21 Dep. Tr. 308:14-309:2, 322:2-323:13, 329:3-13, 339:5-340:6).

203.    Dr. Li also discussed the ICH guideline titled, "Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk – M7," dated February 6, 2013.  This regulatory guideline stated that **cohort of concern carcinogens**, which, "may occur as impurities in pharmaceuticals," **are to be excepted from the Threshold of Toxicological Concern approach, because they, "display extremely high carcinogenic potency**.  Acceptable intakes for these high-potency carcinogens would likely be significantly lower than the acceptable intakes defined in this guideline." **Dr. Li confirmed that per the ICH guideline the threshold approach would not apply to these substances**. (Min Li 4/21/21 Dep. Tr. 381:1-390:20, 467:14-470:7).

204.    Dr. Li acknowledged a textbook, Purification of Laboratory Chemicals, published in 1996 through 2000, which reflected "scientific knowledge as of the late 1990s and 2000" that DMF could decompose to yield dimethylamine. (Min Li 4/21/21 Dep. Tr. 391:13-395:5).

205.    Dr. Li acknowledged another scientific article published in 2009 titled "N.N-Dimethylformamide:   much more than a solvent," which also recognized that DMF could decompose to produce dimethylamine, referencing a textbook published in 1966.  (Min Li 4/21/21 Dep. Tr. 411:19-413:22).

206.    Dr. Li acknowledged an article authored by a group from Beijing University of Technology published in 2010 in the Journal of Physical Chemistry titled "Theoretical Investigation of N-Nitrosodimethylamine Formation from Nitrosation of Triethylamine," which included a discussion of the formation mechanism of NDMA from the reaction of dimethylamine and nitrous acid – exactly what occurred here with the zinc chloride process. (Min Li 4/21/21 Dep. Tr. 414:2-416:12).

207.    Due to a "knowledge gap" nobody at ZHP "considered the potential decomposition of the DMF to yield dimethylamine as part of the process." This included **no indication that anybody at ZHP reviewed scientific**

**literature on the subject, despite the requirement by the ICH guideline to do so.** (Min Li 4/21/21 Dep. Tr. 408:13-24, 409:16-410:21).

208.     ZHP's deviation investigation report listed Shandong Hualu Hengsheng Chemicals as a supplier of ZHP's DMF for use in the zinc chloride process. (PRINSTONO0075959-60). **The certificate of analysis from that supplier documented dimethylamine as an impurity in the DMF as purchased**. (Shandong Hualu-Hengsheng Chem Co., *Certification of Analysis for N,H-Dimethylformamide*). Importantly, the certificate of analysis is for batch number "20101026," indicating that the batch was produced in 2010. The same deviation investigation report lists Zhejiang Jianye Chemicals Co. Ltd. as a supplier of ZHP's triethylamine, the namesake of the TEA process. (PRINSTONO0075957). That company's certificate of analysis for triethylamine, dated November 12, 2012, and also available online, lists DEA as an impurity in the solvent as purchased.

209.     Dr. Li confirmed that the solvents contained the secondary amine impurities that were needed to form NDMA and NDEA, as purchased: "**in some of the TEA raw material it may contain a trace amount of, you know, of dimethylamine, okay, so that's one root cause**…" (Min Li 4/20/21 Dep. Tr. 77:8-80:16).

210.     The TEA DIR also documented ZHP's understanding that dimethylamine was a known impurity of the raw DMF used in the zinc chloride process: "NDMA is generated by nitrosation reaction of the simultaneously presented dimethylformamide (**containing degradation product/impurity dimethylamine**) and nitrous acid; NDEA is similar to NDMA in structure, and the formation mechanism is similar too, i.e., Nitrosation of diethylamine." (TEA DIR at 145 of 236).

211.     ZHP further confirmed that it was understood that DMF would include dimethylamine as an impurity – since it was confirmed that introduction of the DMF was enough to ensure the NDMA would be formed, in the ZHP Deviation Investigation Report dated July 20, 2018 (DC-18001, ZHP00004363-4471) ("ZNCL DIR"), as also discussed in the TEA DIR cited above. On page 19 of 33, ZHP stated, "Based on the above elucidated root cause, the presence of trace amount of NDMA in the final Valsartan API requires the convergence of the following three factors: i) use of **dimethylformamide (DMF)** in the tetrazole formation step, ii) quenching of azide using nitrous acid, and iii) quenching takes place in the presence of the

65

product." These are the same three factors described in the TEA DIR. This is further reiterated on page 22 of 33, including, "It seems clear that NDMA is only formed in Process II (ZNCL) associated with the **use of solvent dimethylformamide (DMF)** during the quenching of unreacted azide AND in the presence of the product of that step, indicating NDMA is a process impurity in Process II (ZNCL)."

212.    ZHP never investigated the potential for NDMA or NDEA formation in the TEA with sodium nitrite quenching process or for the chemical interactions of triethylamine, diethylamine, dimethylamine, and sodium nitrite in that process before preparing its ZNCL DIR and TEA DIR. (ZHP00004371-72; PRINSTONO0075804-05). In fact, it was the EDQM that brought the idea of potential NDEA contamination to ZHP's attention in the first place in August 20-18. (PRINSTONO0075804-05).

213.    The May 1978 IARC Monograph on the Evaluation of the Carcinogenic Risk of Chemicals to Humans, discussion on N-nitroso compounds, indicated that, "It has been known since 1865 that the reaction of dimethylamine hydrochloride with sodium nitrite at an acidic pH yields NDMA." **Dr. Li confirmed that this reaction is what occurred in the zinc chloride process: "the zinc chloride process for the formation of NDMA, you know, was also under the acidic, you know, pH. So, yes, so from that perspective, yeah, they are consistent." He also confirmed that this is information "scientists would be aware of and have available to them" in 2011**. (Min Li 4/21/21 Dep. Tr. 458:13-465:11).

214.    Dr Li acknowledged that it was known, as stated in the 1978 Monograph that, "The principal techniques employed for the analysis of volatile N-nitrosamines [including NDMA] have been described in a recent publication… high- and low-resolution mass spectrometry are discussed, since use of mass spectrometry as a confirmatory technique is particularly important." (Min Li 4/21/21 Dep. Tr. 458:13-465:11).

215.    Dr. Li acknowledged that a draft of the ZHP Deviation Investigation Report titled "Investigation Regarding an Unknown Impurity (Genotoxic Impurity)," indicated, "**Due to insufficient extent and depth of process research at the early stage, as well as insufficient study and understanding of potential genotoxic impurities, only side reaction product and degradation products were studied, and was unaware of the**

**further reaction between degradation products and raw material**." (Min Li 4/22/21 Dep. Tr. 528:5-531:4).

216.    Jucai Ge, ZHP's Quality Assurance Director, API Division and a 30(b)(6) corporate representative, was one of the recipients of the July 27, 2017 email from Dr. Lin. She confirmed that the technology to identify NDMA was available prior to June 2018, "**Had we known prior to June 2018 that there was an impurity called NDMA, I believe my company would have been capable of developing such an analytical method for this impurity, just like what we did when we became aware of such an impurity in June 2018**. (Jucai Ge 5/26/22 Dep. Tr., 119:7-120:21).

217.    Jun Du testified with regard to the quality agreement between ZHP and Prinston that was applicable to the sales of valsartan, and confirmed that "The finished dose facility of ZHP was supposed to make sure that their API would comply with the requirements of the GMP." (Jun Du 5/27/21 Dep. Tr. 90:6-21).

218.    Prinston did not ever test the finished dose based on its position that this was the responsibility of ZHP as the finished dose manufacturer per the terms of the quality agreement, according to Hai Wang. (Hai Wang 3/10/21 Dep. Tr. 152:8-153:16).

219.    Hai Wang testified that the manufacturing process utilized by ZHP to manufacture the valsartan was of no interest to Prinston and Solco. (Hai Wang 3/10/21 Dep. Tr. 166:9-170:11).

220.    Minli Zhang, was the head of QA for Xunqiao, and was responsible for quality testing and in-process research. (Minli Zhang 3/22/2021 Dep. Tr. 41:23–43:9).

221.    The Chuannan and Xunqiao sites were about an hour away from one another by car. (Minli Zhang 3/22/2021 Dep. Tr. 35:18–23).

222.    Chuannan, where the API was manufactured, was treated like a supplier. (Minli Zhang 3/22/2021 Dep. Tr. 99:14–23).

223.    Xunqiao, where the finished dose was manufactured using the contaminated API manufactured in Chuannan, never conducted its own residual solvent testing of the valsartan API manufactured at Chuannan, and

instead relied on the reported testing conducted at Chuannan. (Minli Zhang 3/24/2021 Dep. Tr. 316:12–317:24).

224.    Remonda Gergis, Prinston's Vice President of Quality Assurance (ZHP 88), confirmed that Prinston expected ZHP to follow the specifications they set forth for their finished drug products, before selling the finished dose pills in the United States. (Remonda Gergis 2/1/2021 Dep. Tr. 115:13–116:6).

225.    ZHP has stipulated to the material gaps in its risk assessment of the zinc chloride process:

> Pursuant to Special Master Report and Order No. 56, in exchange for Plaintiffs' agreement not to further examine a witness at deposition regarding the statements identified herein, Defendant Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP") hereby stipulates as follows:
>
> 1.    ZHP states that there are no health benefits associated with the presence of NDMA or NDEA in valsartan.
>
> 2.    ZHP states that the publication *Purification of Laboratory Chemicals* (4th ed.) by W.L.F. Armarego and D.D. Perrin, which was first published in 1996 and documented scientific knowledge at that time, states on page 192 that DMF "[d]ecomposes slightly at its normal boiling point to give small amounts of dimethylamine and carbon monoxide."
>
> 3.    ZHP states that it was required to perform a risk assessment in connection with the process change to the zinc chloride process. ZHP further states the following:
>
>> a. ZHP states that the scientific research relied on to use DMF as part of the zinc chloride process did not include scientific research into the potential decomposition products of DMF under the conditions of the zinc chloride process.

b. The risk assessment of DMF did not specifically evaluate whether DMF was degrading to yield dimethylamine as part of the zinc chloride process.

c. Therefore, there is no document from Shanghai SynCores or ZHP that documents that potential degradation of DMF as part of the zinc chloride process was evaluated as part of the risk assessment for the zinc chloride process.

d. ZHP states that it did not perform a risk assessment on the potential degradation of DMF because it did not realize that DMF would degrade in the way it ultimately degraded in the zinc chloride manufacturing process of valsartan. ZHP is not saying that it was not possible to know that DMF could degrade.

e. ZHP never identified the nitrosamine impurities in connection with its 2011 Risk Assessment and therefore did not evaluate the nitrosamine impurities as part of any steps of the risk assessment process.

4.    With regard to the Change Request Form … to the March 28/29, 2021 deposition of Peng Dong …, ZHP states the following:

a. The "Explanation Section" in Section 2 of the Change Request form on the page bearing Bates number ZHP01843067 provides a summary of the explanation for why the process change from the triethylamine hydrochloride process to the zinc chloride process was undertaken.

b. One of the reasons for the quality review described in Section 3 of the Change Request Form on the page bearing Bates number ZHP01843069 was to identify impurities due to the new process.

69

c. Section 3 of the Change Request Form on the page bearing Bates number ZHP01843070 provided that if this change was against CGMP code, it was supposed to be rejected.

## The Discovery of the NDMA Contamination

226.     The NDMA and NDEA contamination of ZHP's valsartan API and finished dose was first disclosed by ZHP to ZHP's customers, and the FDA and other regulatory authorities, in June, 2018. This occurred after ZHP's API customer Novartis in Europe was provided valsartan API manufactured with the $ZnCl_2$ process for evaluation for commercial purchase. Novartis tested the API and noted unexpected/unknown peaks on gas chromatography. Solvias, a third-party laboratory retained by Novartis, identified NDMA using gas chromatography and mass spectrometry ("GC-MS"). ZHP notified Prinston on June 6, 2018 that it believed the impurity causing unexpected/unknown peaks on gas chromatography was NDMA. Prinston notified the FDA as ZHP's agent 10 days later, on June 18, 2018. (ZHP00400220; ZHP00400281; ZHP00400236; PRINSTON00000022).

227.     On May 22, 2018, an Irish subsidiary of Novartis asked ZHP to identify the source of various peaks seen on chromatography that Novartis had performed on valsartan API provided by ZHP to Novartis for evaluation for commercial sale. (Min Li 4/20/21 Dep. Tr., 198:13-204:2).

228.     On June 5, 2018, Novartis communicated its preliminary assessment that the unidentified peaks indicated the presence of NDMA in the valsartan API. (Min Li 4/20/21 Dep. Tr., 198:13-204:2).

229.     Solvias, the third-party laboratory hired by Novartis to test the API, used GC-MS technology to identify the NDMA. This technology had been available as of 2011 when the, "processes were being developed," and ZHP purchased that technology at least as of 2013. (Min Li 4/20/21 Dep. Tr., 204:3-206:13).

## Representations and Warranties
## Regarding Valsartan in the DMFs and ANDAs

230.     According to the TEA DIR at 57-58 of 236:

- The DMF for the TEA process (without sodium nitrite quenching) was filed with USDMF registration number 23491. The date is not provided in the TEA DIR, but the filing date of January 22, 2010, is confirmed at PRINSTON00000005.

- The DMF for the TEA process with sodium nitrite quenching was filed in April 16, 2012. The USDMF registration number is not provided there, but is confirmed to be USDMF registration number 23491 at PRINSTON00000005.

- The DMF for the zinc chloride process was filed in December 2013 with USDMF registration number 23491.

231.     The ANDAs filed by Prinston on September 13, 2012, and August 26, 2013, respectively, referenced USDMF registration number 23491, and the known list of impurities for that process, **not including NDMA or any other nitrosamine – because that was never approved or even raised as a possibility**. (PRINSTON00000012; ZHP01451842, -874; PRINBURY00058078; PRINBURY00058083; PRINSTON00037968, -972; PRINSTON00183155; PRINSTON00177677). The ANDAs also stated the valsartan was USP. (PRINSTON00000012; ZHP01451842, -874; PRINBURY00058078; PRINBURY00058083; PRINSTON00037968, -972; PRINSTON00183155; PRINSTON00177677).

232.     On December 10, 2013 ZHP submitted its Technical Amendment to Valsartan USP (Process II), DMF# 23491 to the FDA DMF Staff, for the change to the zinc chloride process, indicating in part the substitution of zinc chloride in step 4, and "in step 3 and step 4, DMF and MTBE are added to facilitate the process and will be successively removed." (ZHP01713711).

233.     The Amendment to Drug Master File dated December 10, 2013 states on page 11/16: "**There is no adverse change in qualitative and quantitative impurity profile, the process change/optimization does not impact the drug quality**." In addition, on page 15/16, "**The change does not affect the reproducibility of the production and the specification of intermediates & the final substance remains the same**." (PRINSTON00073102).

234.     Module 3.2.S.3.2 of the zinc chloride DMF dated November 10, 2013, titled Impurities, indicates on page 147 of 172 that the application of the "FDA draft guideline *Genotoxic and Carcinogenic Impurities in Drug Substances*

*and Products: Recommended Approaches* is applicable to the applications for existing active substances." The Module unequivocally states on pages 148-149 of 172 that all of the potential impurities were evaluated and**, NO "high potency genotoxic" N-nitroso- compounds are among the impurities, and the impurities pose "no genotoxic risk in Valsartan." The same is stated with regard to residual solvents.** (HUAHAI-US00007752). The DMF also stated the valsartan was USP. (*Id.*).

235.     Module 3.2.S.3.2 of the TEA with sodium nitrite quenching DMF dated January 20, 2012, titled Impurities, indicates on page 108 of 133 that the application of the "FDA draft guideline *Genotoxic and Carcinogenic Impurities in Drug Substances and Products:  Recommended Approaches* is applicable to the applications for existing active substances." The Module unequivocally states on pages 109-110 of 133 that all of the potential impurities were evaluated and**, NO "high potency genotoxic" N-nitroso-compounds are among the impurities, and the impurities pose "no genotoxic risk in Valsartan."** (PRINSTON00080011; PRINSTON00079747; PRINSTON00071532). The DMF also stated the valsartan was USP. (PRINSTON00080011; PRINSTON00079747; PRINSTON00071532).

236.     The ANDAs filed by Prinston referenced the DMF number 23491, and listed the drug formulations and impurities, with no mention of NDMA or NDEA.     (PRINSTON00000012;     ZHP01451842,     -874; PRINBURY00058078; PRINBURY00058083; PRINSTON00037968, -972; PRINSTON00183155; PRINSTON00177677).

237.     In connection with the change notification provided by ZHP to Prinston for the change to the zinc chloride process, **Hai Wang confirmed that ZHP notified Prinston that there was "no adverse change in qualitative and quantitative impurity profile.**" (Hai Wang 3/11/21 Dep. Tr. 569:3-577:16).

238.     Mr. Dong confirmed that the December 10, 2013 DMF amendment for the zinc chloride process represented that "There is no adverse change in qualitative and quantitative impurity profile, the process change/optimization does not impact the drug quality." Notwithstanding that representation, Mr. Dong admitted that **the three validation batches for the zinc chloride process were addressed in the July 20, 2018 DIR for the zinc chloride process and shown to contain NDMA levels of 53.3, 51.6, and 76 ppm**." (Peng Dong 3/31/21 Dep. Tr., 322:15-340:22).

72

## ZHP's Valsartan Contained Probable Human Carcinogens
## and Presented an Unacceptable Carcinogenic Risk

239.     Jucai Ge admitted that NDMA is a genotoxic impurity with mutagenic effects. (Jucai Ge 5/27/22 Dep. Tr., 173:11-20).

240.     NDMA and NDEA are probable human carcinogens.   (Min Li 4/20/2021 Dep. Tr., 102:5-8; Jun Du 5/27/21 Dep. Tr., 96:2-3; Hai Wang 3/10/21 Dep. Tr., 276:5-11, 321:16-22; John Iozzia 1/20/2021 Dep. Tr., 266:18-267:4). The World Health Organization's International Agency for Research on Cancer, the USP, and EPA all agree and classify NDMA and NDEA as probable human carcinogens. For example, the WHO states that "NDMA is highly likely to be carcinogenic to humans."

241.     Eric Gu also agreed that NDMA was a probable human carcinogen. (Eric Gu 4/6/21 Dep. Tr., 360:8-374:12).

242.     Published literature has confirmed that the use of the contaminated valsartan increased the risk of liver cancer, and that the increased risk was statistically significant.   "A statistically significant association was found, however, between exposure to NDMA-contaminated valsartan and hepatic cancer." Gomm W, Röthlein C, Schüssel K, Brückner G, Schröder H, Heß S, Frötschl R, Broich K, Haenisch B. *N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer—A Longitudinal Cohort Study Based on German Health Insurance Data*. Dtsch Arztebl Int. 2021 May 28;118(21):357-362. doi: 10.3238/arztebl.m2021.0129. PMID: 34247699; PMCID: PMC8372009. This study also states, "The immediate recall of all potentially NDMA-contaminated valsartan drug products by regulatory authorities worldwide was necessary **in order to protect public health.**" (*Id.* at 4).

243.     Min Li confirmed that it would be unethical to perform a clinical study deliberately giving the contaminated valsartan/NDMA to human subjects due to the risk to health.  (Min Li. 4/22/21 Dep. Tr., 685:11-687:4).

244.     Shortly after disclosing the contamination of its valsartan, ZHP filed a patent for an optimized manufacturing process to prevent nitrosamine contamination in valsartan, on July 17, 2018.   The inventors were listed,

including but not limited to Min Li, Peng Dong, Jinsheng Lin, and others. (Jucai Ge 5/27/22 Dep. Tr., 159:12-161:10).

245.    The July 17, 2018 patent, "correctly referred to NDMA as a **highly toxic impurity**…" (Jucai Ge 5/27/22 Dep. Tr., 159:12-161:20).

246.    Ms. Ge also agreed the patent confirmed that, "**These changes to the manufacturing process were necessary to ensure the valsartan medication safety**." (Jucai Ge 5/27/22 Dep. Tr., 159:12-162:5).

247.    Jun Du confirmed that the press releases issued by both Prinston and Solco announcing the recall of the valsartan containing the NDMA impurity stated in part that the recall was due to, "**an unacceptable carcinogenic risk to the intended patient population**." (Jun Du 5/27/21 Dep. Tr., 91:17-94:22). The notices recalled all valsartan products within expiry. (SOLCO00024231; SOLCO00024226).

248.    Jie Wang confirmed that ZHP was not supposed to release a batch for sale, "if the manufacturing process produced API that contained a genotoxic impurity…" and/or if the product did not comply with cGMPs and the related regulations. (Jie Wang 5/19/21 Dep. Tr., 279:7-282:8, 288:14-20).

249.    The corporate representatives of the pharmacies also confirmed that they would not have sold the valsartan if they knew that it was adulterated due to the unacceptable contamination. Owen McMahon, Rite Aid's Vice President of Pharmaceutical Purchasing confirmed that "Rite Aid could not … knowingly sell adulterated drug products." (Owen McMahon 9/23/21 Dep. Tr., 52:13-16, 51:17-18, 51:22-52:6, 52:20-23, 65:10-13, 65:15-18, 65:20-22, 65:25-66:5, 137:8-11). John Holderman, CVS's Senior Director at CVS Health for Pharmacy Merchandising testified that "CVS would not knowingly sell" adulterated or misbranded products. (John Holderman 10/1/2021 Dep. Tr., 113:3-5, 113:7-8, 122:2-5, 122:11-12, 158:20-22, 195:4-5). Humana's Cesar Cedeno confirmed that it can't sell drugs that are adulterated, like valsartan that's contaminated with NDMA." (Cesar Cedeno 9/27/21 Dep. Tr., 28:1-3, 28:6, 28:25:20-23, 26:2-3, 28:10-11, 28:13, 30:25-31:5, 31:8-9, 31:14-15, 31:20-21). Walgreen's Director of Pharmacy Quality Assurance and Patient Safety, Catherine Stimmel, agreed that "a product considered adulterated can't be sold." (Catherine Stimmel 9/20/2021 Dep. Tr., 32:4-6, 32:10, 32:17-19, 32:24-33:2, 33:4-6, 33:9, 76:12-19, 77:5-11, 77:13-15, 78:8-11, 78:14).

## Warranties and Representations

250.     **ZHP represented at all times that the valsartan, "released and distributed in the US at all times met appropriate standards reviewed and approved by the FDA.  Since the product had the USP designations, or the USP specification, the requirement has been met."** (Hai Wang 3/10/21 Dep. Tr. 62:18-63:7). The valsartan's labelling explicitly stated it was USP and included the National Drug Codes (NDCs) representing the inclusion of valsartan at specific dosages. (PRINSTON00035229; PRINSTON00065545). These NDCs were listed in the National Drug Code Directory  referencing ANDAs held by Prinston. (https://www.fda.gov/drugs/drug-approvals-and-databases/national-drug-code-directory).   The   valsartan's   prescribing information   explicitly   stated   it   was   USP   and   FDA   approved. (PRINSTON00032437; PRINSTON00248665).

251.     **The use of the USP designation was a representation "to anybody who is buying it or using it," that "all the USP requirements were applied."** (Hai Wang 3/10/21 Dep. Tr. 63:9-18).

252.     ZHP sold its API designated as "Valsartan USDMF Grade API," which meant that the product is what they, "submitted with the US FDA under our DMF." (Jie Wang 5/19/21 Dep. Tr., 184:22-186:11).

253.     ZHP always represented that the valsartan it sold was Orange Book AB rated, meaning, "**it's the therapeutic equivalent of the brand name product…it has the same quality and purity as the brand name product…the drug was manufactured in compliance with current good manufacturing practice regulations**." (Hai Wang 3/10/21 Dep. Tr. 82:4-83:22, 84:2-5, 84:19, 84:22-85:10). For the Orange Book, "[t]he main criterion for the inclusion of any product is that the product is the subject of an   application   with   an   approval." (*Orange   Book   Preface*, https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface). The Orange Book's "[a]pproved drug products are considered to be therapeutic equivalents." (*Id.* at 4; *see also* 21 C.F.R. § 314.3).  More specifically:

> FDA classifies as therapeutically equivalent those drug products that meet the following general criteria: (1) they are   approved   as   safe   and   effective;   (2)   they   are

pharmaceutical equivalents in that they (a) contain identical amounts of the identical active drug ingredient in the identical dosage form and route of administration, and (b) **meet compendial or other applicable standards of strength, quality, purity, and identity**; (3) they are bioequivalent in that (a) they do not present a known or potential bioequivalence problem, and they meet an acceptable in vitro standard, or (b) if they do present such a known or potential problem, they are shown to meet an appropriate bioequivalence standard; **(4) they are adequately labeled; and (5) they are manufactured in compliance with Current Good Manufacturing Practice regulations**.

Additionally, the valsartan was listed in the Orange Book as AB rated to the RLD Diovan.

254.     In other words, ZHP represented to all of its customers, "that they were being sold valsartan that was compliant with the current USP and Orange Book standards…the product is approved by the FDA.  It meets all the FDA's requirement and specifications." (Hai Wang 3/10/21 Dep. Tr. 89:7-16).

255.     The Prinston website represents that the products sold by Prinston (manufactured by ZHP), "are manufactured in state-of-the-art GMP facilities using the highest quality assurance standards that meet the FDA regulatory requirements."  (Hai Wang 3/10/21 Dep. Tr. 37:3-11).

256.     Those representations have been made to all of Prinston's customers and it was expected that since 2012, "**anybody buying products from Prinston**," would, "**expect that those products were manufactured in state-of-the-art GMP facilities using the highest quality assurance standards that meet the FDA regulatory requirements.**"  (Hai Wang 3/10/21 Dep. Tr. 37:12-38:6).

257.     At all times that Solco has, "distributed products for Prinston…it has represented to its customers that the products were high quality…" and that, "Our products are manufactured in state-of-the-art GMP facilities in the US and overseas using the highest quality assurance standards that meet the FDA regulatory requirements." (Hai Wang 3/10/21 Dep. Tr. 42:19-43:8, 43:10-17, 44:1-4, 44:7-45:6).

258.    At all times it has always been understood, "that **when people buy products from Prinston and Solco that they trust that the products are what they're supposed to be and that they were manufactured in the highest quality way**."  (Hai Wang 3/10/21 Dep. Tr. 47:5-13).

259.    John Iozzia, Director of Marketing for the API division of Huahai, US, confirmed that ZHP had internally recognized that CGMPs were applicable throughout the lifecycle of the products it sold. (John Iozzia 1/20/21 Dep. Tr. 86:10-90:11).

260.    Mr. Iozzia discussed a marketing PowerPoint that represented, "Huahai commits that quality is our life. Employs quality practices during the whole life cycle of products.   Meets and exceeds the regulatory agency's requirement…Huahai uses high quality standard and adopts continuous quality improvement and innovation strategy to ensure strict scientific and systematic quality management system," and agreed that, "**this is something that your company has always represented to other companies and the public, that this is how your company conducts its quality operations…**". (John Iozzia 1/20/21 Dep. Tr. 86:10-90:11).

261.    The quality agreements between ZHP and Teva/Torrent represented, among other things, that the equipment and facilities were "in compliance with the current EU and/or FDA regulatory standards and guidance documents," each batch would be manufactured, "in accordance with the cGMP and legal and regulatory requirements," and ZHP would comply with ICH Q7 – Good Manufacturing Practices for Active Pharmaceutical Agents. (Jie Wang 5/19/21 Dep. Tr., 269:19-273:23, 274:10-277:14, 278:2-279:4, 286:2-13, 288;21-289:5). ZHP also represented that "The reagents, intermediates and impurities including Azide susceptible of generating genotoxic impurities have been taken into account, no genotoxic impurities are present in the substance, and it comply with TTC rule concluded an acceptable limit of 4.7 ppm based on the maximum dosage for Valsartan 320 mg/day."

### The Warranties Were Breached

262.    **ZHP's recall notices confirmed that the NDMA contamination constituted, "an unacceptable carcinogenic risk to the intended patient population**."  (Hai Wang 3/10/21 Dep. Tr. 274:19-283:19).

263.    Hai Wang testified that "if that spec has been established, and the product has NDMA level exceeding that 96-nanogram part, the product … [c]ould not be sold because it's not meeting spec, period." (Hai Wang 3/10/2021 Dep. Tr. 301:6-13).

264.    Hai Wang confirmed that "No wants to have NDMA," in valsartan. (Hai Wang 3/10/21 Dep. Tr. 325:18-326:1).

265.    Eric Gu of Shanghai Syncores/ZHP, which developed the zinc chloride process in the laboratory confirmed that if the NDMA and NDEA in the valsartan API manufactured with the zinc chloride and TEA process with sodium nitrite quenching had been known the drug products could not have been sold: "**If we known that, it shouldn't be sell on the market**." (Eric Gu 4/6/21 Dep. Tr. 391:12-394:7, 395:10-397:10).

266.    Jucai Ge confirmed, "From the regulatory point of view, ZHP, our company, agrees that to FDA the level of NDMA was unacceptable…the pills with such a level would be unacceptable." (Jucai Ge 5/27/22 Dep. Tr., 188:21-189:8, 190:19-191:3).

267.    **Mr. Gu confirmed that, "If we knew, okay, there's NDMA in the valsartan, you know, ZHP wouldn't sell that,"** and as a matter of evaluation of the health or safety issues at the levels of NDMA shown on the testing, ZHP stopped selling and recalled all the pills containing NDMA. (4/6/21, 391:12-394:7).

268.    **Mr. Gu confirmed the same with regard to the TEA process with sodium nitrite quenching, "If we known that, it shouldn't be sell on the market," for the same reasons as with the zinc chloride process**. (4/6/21, 395:10-397:10).

269.    John Iozzia, Director of Marketing for the API division of Huahai, US, testified that **the API sold by ZHP was not, "supposed to contain dangerous unintended impurities…If it was determined that there was such an issue with the product, then it would not be a quality product**." (John Iozzia 1/20/21 Dep. Tr. 21:1-22:9, 79:12-80:2).

270.    Mr. Iozzia testified that **there was not, "any customer you're aware of that would purchase Valsartan API if they knew that it was either**

**contaminated or it might be contaminated and that could not be ruled out**." (John Iozzia 1/20/21 Dep. Tr., 294:2-14).

271.    Min Li admitted that "NDMA is highly likely to be carcinogenic to humans," as concluded in a 2002 peer reviewed WHO publication cited by ZHP in its own Deviation Investigation Report, stating, "highly likely, you know, is probable." Dr. Li then agreed that ZHP stopped selling the contaminated valsartan because it was deemed "highly likely to be carcinogenic to humans," and confirmed that, "At the levels of contamination that we've gone through in this deposition, it would be unacceptable and, using your word, unethical to sell valsartan with those levels of NDMA contamination [documented by ZHP]," if that was knowingly done.  (Min Li 4/22/21 Dep. Tr., 696:3-697:4; 699:24-700:15).

272.    At all times, ZHP had, "a responsibility to be truthful with its customers," and ZHP was obligated to disclose its knowledge about the NDMA contamination of its valsartan as discussed in the July 27, 2017 email. (Jie Wang 5/18/21 Dep. Tr., 86:21-87:1; 5/19/21 Dep. Tr., 292:13-294:21).

## Teva and Torrent Purchased and Utilized ZHP's Contaminated Valsartan

273.    ZHP sold valsartan API manufactured with the zinc chloride process to Teva which then utilized that API in the manufacture of Teva finished dose valsartan for sale in the United States. (PRINSTON00000001-46; ZHP02364173; Teva 230; Michelle Osmian 5/06/2021 Dep. Tr. 33:2-236:24; 239:7-240:2).

274.    In a September 13, 2018 letter from Teva to ZHP, Teva stated in part, (Teva-MDL2875-00324735):

> By letter dated June 20, 2018, Teva received formal notification from Huahai, indicating a previously unknown impurity was identified that may have genotoxic potential with respect to Valsartan API. This notification was followed by a subsequent notification letter dated June 25, 2018, indicating that based on a preliminary investigation, the previously unknown impurity was suspected to be NDMA, and was likely to be process-related.

275.     Valsartan API manufactured by ZHP with the TEA process with sodium nitrite quenching was sold to Torrent and then utilized by Torrent in the manufacture of Torrent finished dose valsartan for sale in the United States. (TORRENT-MDL2875-00072650; Sushil Jaiswal Dep. Tr. 6/04/20211, 67:21-24, 68:1-7).

276.     Torrent unequivocally notified ZHP that it never would have purchased or used the valsartan API manufactured with the TEA process with sodium nitrite quenching if it had known of the NDEA and NDMA contamination, having relied on the DMF and ZHP's inaccurate representations as to genotoxic impurities, which did not disclose the NDEA or NDMA.  In the February 13, 2019 letter from Makesh Agravad of Torrent to "Mr. Zenson, ye" of ZHP, Torrent stated in part:

> As notified in Huahai in its various communications to Torrent starting from 20.06.2018, it is now clear that **contrary to Huahai's declarations regarding the absence of genotoxic impurities, the API supplied by Huahai to Torrent did contain certain genotoxic impurities, namely, N-Nitroso-dimethylamine ("NDMA") and N-Nitrosodiethylamine ("NDEA") on account of the manufacturing process employed by Huahai and thus there has been a clear breach of the representations and warranties provided by Huahai to Torrent**. It is also clear that these impurities were present in all batches of the API supplied by Huahai. **Since NDMA and NDEA have been classified as a probable human carcinogenic, Torrent had to recall all its existing batches of formulations containing Valsartan from the various jurisdictions, including, United States and stop any further sale.**

(ZHP02592303, Paragraph 5).

## The NDMA/NDEA Contamination of
## ZHP's API Could Have Been Easily Prevented

277.     ZHP established that the zinc chloride process could have been "optimized" to prevent NDMA contamination of the product by extracting the product prior to quenching the sodium azide, "any formation of NDMA will

not be carried over into the product." Moreover, this simple step would not have required any change to the manufacturing process, "**This approach can be done without any change of manufacturing process.**" (July 1, 2018 Investigation of the Source of this Impurity, NDMA, ZHP01495188).

278.     ZHP also stated that the process could have been optimized in the same way in the TEA process with sodium nitrite quenching, stating in part: "After optimization, the ROS remains the same, the product in Valsartan Crude Step (Step 4) is separated before the addition of $NaNO_2$ (and the subsequent addition of HCl)…Therefore, the product in the organic phase has **no chance to be contaminated by NDMA**." (TEA DIR at 29-35 of 236 ).

279.     Accordingly, in July 2018 (after disclosure of the NDMA contamination) ZHP submitted an Amendment to Drug Master File, in an attempt to modify the zinc chloride process to extract the product before quenching the sodium azide, in order to eliminate the risk of NDMA contamination. (ZHP00097775, ZHP00097777). Section 2 indicates "The purpose of this technical amendment is to provide the quality control of newly identified **genotoxic impurity** N-Nitrosodimethylamine (NDMA) in the specification of final drug substance." The optimization is described (at ZHP00097782) as, "the product in Step 4 will be separated before the addition of NaNO2 (and the subsequent addition of HCl)….Since there is no chance for residual dimethylamine to react with HNO2 (NaNO2/HCl) in the presence of the product, there will be no chance for NDMA to be produced in this optimized process [hereafter referred to as Process (separated quenching)]. **In the optimized process, the sequence and the principles of the chemical reactions have no change, and the process remains the same, as well as the crystallization step leading to the final drug substance. Hence, this is a very minor change from a drug substance process perspective.**" (ZHP00097775, ZHP00097777).

### Miscellaneous Facts

280.     ZHP attempted to avoid a recall. (PRINSTON00000041-42 (seeking to leave the contaminated valsartan in the U.S. market and continue introducing their FD VCDs with high levels of contamination into the U.S. market); *see also* PRINSTON00000001; PRINSTON00000005; PRINSTON00000011; PRINSTON00000019; ZHP01344159).

### Teva/Actavis Pertinent Corporate History

281.    In late 2014, after agreeing to initiate a manufacturing change, Actavis-labeled product sold in the United States contained valsartan API made by ZHP's Zinc Chloride process, which involved the solvent dimethylamine (DMF), as well as quenching sodium nitrite ($NaNo_2$) in hydrochloric acid (HCl). *See, e.g.*, TEVA-MDL2875-00001886 (Sept. 9, 2014 Actavis Ltr. to FDA re CBE notice for ZHP manufacturing process change relating to ANDA 091519); TEVA-MDL2875-00013107 (Jan. 9, 2015 Actavis Ltr. to FDA re CBE notice for ZHP manufacturing process change relating to ANDA 090642).

## Teva Recalls

282.    ZHP contacted Teva about the potential genotoxic impurity in valsartan API on June 20, 2018.

283.    Teva submitted its initial Field Alert Report to the FDA on July 3, 2018.

284.    All of Teva's recalled VCDs were defective. *See* Williams 2/17/22 Dep. at 161:18-164:4 ("...But I don't think I'm debating you, Mr. Stanoch. Let me agree that the [Teva] recall was because of a defective product.").

## Every Teva VCD Was Contaminated with NDMA

285.    In response to the FDA's July 27, 2018 Request for Information to Teva, ZHP provided Teva with the NDMA testing results for all valsartan API batches sold to Teva.

286.    ZHP's own results shared with Teva showed that every single valsartan API batch sold to Teva was contaminated with NDMA, and moreover at levels in excess of the FDA's eventual interim threshold of 0.3ppm. *See* TEVA-MDL2875-00546489.

287.    Specifically, NDMA levels per batch reported by ZHP to Teva were all between 0.8ppm and 240.1ppm. *See* TEVA-MDL2875-00546489.

288.    Mr. Daniel Barretto, Teva's Head of Quality of Compliance and corporate designee, confirmed that the levels of NDMA in valsartan API sourced from ZHP would be the same as the levels in the finished dose product.

289.    Mr. Barretto testified: "Q: Right. And [because NDMA was a process impurity] that means that the concentration of the impurity in the API carries over to the finished product, right? A: Yes." Barreto Dep. Vol. I 201:10-202:9. This was because the NDMA arose from a process impurity. *Id.* 367:19-368:2 ("Q: And that's consistent with what we talked about earlier, in terms of the NDMA being a process impurity, that the concentration and testing of the API could be extrapolated and you would expect the results to be the same for the finished dose, right? A: Right."); *see also id.* 275:24-276:5 (Teva's position was that it was appropriate to "extrapolate[e] the nitrosamine test results of the API to the valsartan finished dose").

290.    Thus, as ZHP's test results showed NDMA in every batch of valsartan API sold to Teva, those same levels would be expected to carryover in Teva's finished dose VCDs. *See, e.g.*, Barreto Dep. Vol. I at 201:10-202:9; 275:24-276:5; 367:19-368:2; TEVA-MDL2875-00042637.

291.    Teva also developed its own NDMA detection method. Using its own method, Teva initially tested 83 batches of Valsartan API from ZHP. All batches tested in excess of 0.3ppm, with results ranging from 30.01ppm to 221.63ppm. *See* TEVA-MDL2875-00546489.

292.    Teva also tested six batches of its own finished dose valsartan product for the United States market that had been made with API purchased from ZHP. These finished dose lots were intended for sale in the United States. TEVA-MDL2875-00546489; TEVA-MDL2875-00693423. All six batches tested positive for NDMA, with results ranging from 14.8ppm to 31.3ppm. TEVA-MDL2875-00546489; TEVA-MDL2875-00693423.

293.    This was consistent with the FDA's testing results for Teva finished dose valsartan sold in the United States, which showed NDMA present in every sample of Teva finished dose valsartan tested by the agency. TEVA-MDL2875-00154181.

294.    Teva's Global Quality Report summarizing the company's testing of valsartan API from ZHP and finished dose valsartan containing same concluded: "The results of the testing shows that all drug product lots [of finished dose valsartan] yielded impurity results that were above the FDA established limit of 0.3ppm." TEVA-MDL2875-00693423; TEVA-MDL2875-00765609.

295.    Post-June 2018, Teva also tested 83 batches of valsartan API from ZHP for NDMA using its own methodology and all batches were found to contain NDMA in excess of 0.3 ppm.

296.    In total, Teva tested 121 batches of valsartan API sourced from ZHP. TEVA-MDL2875-00693423; TEVA-MDL2875-00765609.

297.    These ZHP valsartan API batches tested by Teva all contained NDMA above 0.3 ppm.

298.    Teva considered the route of synthesis for the valsartan API when it derived its testing, to ensure the results were applicable to VCDs sold in the United States. *See, e.g.*, TEVA-MDL2875-00693423; TEVA-MDL2875-00765609.

299.    All API batches tested by Teva had NDMA levels well above the eventual 0.3pm interim threshold. TEVA-MDL2875-00693423; TEVA-MDL2875-00765609.

300.    Teva concluded, and told the FDA, that the "ZHP manufacturing process is expected to generate NDMA with levels above the FDA established limit of 0.3ppm." TEVA-MDL2875-00693423; TEVA-MDL2875-00765609.

301.    Thus, as Teva's quality director Claire Lyons testified one hundred percent (100%) of the batches that ZHP sold to Teva which ZHP had tested contained NDMA in excess of 0.3ppm. *See* Lyons Dep. 130:3 to 132:2 ("Q: … it looks like 100 percent of the batches that ZHP sold to Teva which had been tested were reporting NDMA, correct? A: Correct.") Lyons Dep. 130:3 to 132:2.

302.    Teva's expert, Dr. Roger Williams, agreed. Williams 2/17/22 Dep. at 163:24-164:1.

303.    Accordingly, Teva's Ms. Claire Lyons testified: "Teva had no assurance that any of the valsartan API it was sourcing from ZHP was free of nitrosamine contamination." Lyons Dep. at 131:16-132:2; TEVA-MDL2875-00103248.

304.    In June 2018, prior to announcing the recall, Teva's quality department put a hold on the sale of all VCDs because of the genotoxic impurity reported by ZHP. *See, e.g.*, TEVA-MDL2875-00791611.

305.    Teva lifted the hold in July 6, 2018, except for VCDs that contained valsartan API sourced from ZHP. *See, e.g.*, TEVA-MDL2875-00549885. Teva did this without testing or requesting testing from API suppliers.

306.    Teva's commercial group could not sell any valsartan product for which the quality department had placed a hold. *See, e.g.*, Osmian Dep. at 325:18-326:7. This included all of Teva's VCDs that contained valsartan API sourced from ZHP. *See id.*; TEVA-MDL2875-00791611; TEVA-MDL2875-00549885.

307.    NDMA was never an approved specification of the API in Teva's finished dose valsartan products.

308.    NDMA was never an approved specification of Teva's finished dose valsartan products.

309.    The product labels for Teva's at-issue finished dose valsartan products never disclosed NDMA.

**Teva, as Finished Dose Manufacturer, Was Ultimately Responsible for the Valsartan API Incorporated Into Teva's Finished Dose VCDs**

310.    Even though ZHP manufactured the valsartan API in which the NDMA contamination arose, Teva's corporate designee Mr. Barreto testified that Teva, as the ANDA holder, was ultimately responsible for its finished-dose products, including the API incorporated therein. *See* Barreto Dep. Vol. I. at 62:5-63:6 ("So Teva's responsibility for the finished product includes the API, it includes the excipients, and it includes ensuring that the manufacturing process and the testing activities and anything that is associated with ensuring the safety, quality, and efficacy and purity of that product that those – those expectation are set; not just for the API but for everything.").

311.    Claire Lyons, also of Teva's quality department, similarly testified: "Q: In fact, as the – in the US, at least, as the ANDA holder for a finished dose product, Teva bears responsibility for the product that it sells in the US

market, including the materials therein, correct? A: Yes, that's correct. Q: That would include API, correct? A: Yes, it does include API." Lyons Dep. at 285:3-12.

312.    Teva's expert, Dr. Roger Williams, testified: "Q: Do you agree that a drug-product manufacturer is ultimately responsible for the API that it incorporates into its finished-dose product? A: Yes, I think that's generally a fair statement, Mr. Stanoch. Q: Yeah. So Teva is ultimately responsible for the valsartan API that was in its finished-dose valsartan product, correct? A: Yes, I think I can agree with that." Williams 2/17/22 Dep. at 40:7-15.

313.    Teva expected its API suppliers, such as ZHP, to take appropriate steps to ensure the quality of their valsartan API sold to Teva. For instance, it was Teva's expectation that ZHP, through their own processes, would (i) control the level of residual nitrites in water used during the API manufacturing process, *see, e.g.*, TEVA-MDL-00158603; Binsol Dep. at 47:14-24, (ii) employ proper procedures and techniques to manage the recovery of solvents being used to manufactured valsartan API being sold to Teva, *see, e.g.*, TEVA-MDL-00158603; Binsol Dep. at 50:8-51:2; *see also* TEVA-MDL2875-00399168, at -200, -238, (iii) properly clean production equipment, TEVA-MDL2875-00684220; Binsol Dep. at 54:2-16, (iv) ensure that the suppliers' own process chemists identify potential chemical reactions in the valsartan API manufacturing process, TEVA-MDL2875-00259905; Binsol Dep. at 60:4-61:5 ("I would say it would be the supplier of the material. It is their responsibility to appropriately characterize their API[.]"); *id.* at 90:2-18 ("I do agree that genotoxic impurities should be examined during the drug development process when the potential for their existence is identified in the API...So again my experience has been that the expectation is that the API supplier appropriate and fully characterizes their API."), (v)    identify genotoxic impurities through literature, data, structural alerts, and specialized software, *see, e.g.*, TEVA-MDL2875-00259910; Binsol Dep. at 96:22-97:7, (vi) undertake toxicological assessments to characterize the suppliers' API to identify potential genotoxic impurities, TEVA-MDL2875-00259910; TEVA-MDL2875-00259910; Binsol Dep. at 102:15-103:-103:19, (vii) notify Teva promptly of the discovery of a potential genotoxic impurity, (Binsol Dep. at 108:1-109:-109:8), and (viii) perform appropriate specification testing such as gas chromatography and to follow-up on and inform Teva about any atypical or unknown peaks, *see* Binsol Dep. at 121:5-122:12; *see also* TEVA-MDL2875-00020279, at ¶¶ 1.2, 6.6, which Teva would not be privy to just

86

from receiving a certificate of analysis from the supplier, *see* Binsol Dep. at 122:13-22; *see also* TEVA-MDL2875-00791611.

314.    Notably, Teva's API suppliers, including ZHP, were already supposed to be testing valsartan API with gas chromatography to measure residual solvents. *See* Binsol Dep. at 117:18-119:19; *see also* TEVA-MDL2875-00082321, at -323.

315.    Gas chromatography is the preferred approach to test for volatile or semi-volatile compounds. Binsol Dep. at 123:17-124:16; TEVA-MDL2875-00280442.

316.    Teva admits NDMA is a semi-volatile compound. *See* Binsol Dep. at 80:12-21, 123:17-124:16; *see also* TEVA-MDL2875-00022457, at -258.

317.    Teva also expected its API suppliers, such as ZHP, to follow appropriate procedures to appropriately qualify their materials, including investigating unknown peaks in chromatogram tests. *See, e.g.*, Binsol Dep. at 203:20-205:7; TEVA-MDL2875-00514869.

318.    Teva's quality agreement with ZHP provided that ZHP would supply non-adulterated, non-misbranded API (including valsartan API) that was of represented quality and purity to comply with US grade, FDA-approved valsartan API. *See* TEVA-MDL2875-00020212 (requiring ZHP to "take all actions to comply with . . .the most current version of the ICH Guidelines pertaining to Active Pharmaceutical Ingredient (API) manufacturing, specifically ICH Q7A, Good Manufacturing Practice Guidelines for Active Pharmaceutical Ingredients" and certificates of analysis shall include statement "that the PI has been manufactured in accordance with cGMPs"); TEVA-MDL2875-00020279 (nearly identical requirements).

319.    ZHP entered into a settlement agreement with Teva, providing consideration to Teva for the unused valsartan API that Teva had on hand at the time of the recalls. *See* Nassall Dep. at 312:21-313:7; TEVA-MDL2875-00492240.

320.    Teva entered into this settlement agreement with ZHP because Teva could not use or sell VCDs containing ZHP's valsartan API. *See* Nassall Dep. at 312:21-313:7; TEVA-MDL2875-00492240.

## Teva Representations

321.     Teva, at all relevant time times, sold its VCDs as generic equivalents to the RLD listed formulations in the Orange Book. *See* https://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm.

322.     Teva's product labeling did not disclose the presence of any nitrosamines, including NDMA. *See, e.g.*, TEVA-MDL2875-00000771; TEVA-MDL2875-00012648; TEVA-MDL2875-00014087; TEVA-MDL2875-00432240; TEVA-MDL2875-00757591; TEVA-MDL2875-00757917.

323.     Teva's Senior Global Vice President of Quality and Compliance, and corporate designee, Daniel Barreto, testified that nitrosamines were never disclosed on any Teva finished dose valsartan product labels.  Barreto Dep. Vol. II at 600:5-14 ("Q:  Do nitrosamines appear on the FDA-approved labels for any Teva finished-dose products that you know of, regardless of time period?  A: No.  Q: Prior to July 3, 2018, did nitrosamines appear on any FDA-approved label for Teva's finished-dose valsartan products?  A: No.").

324.     Mr. Barreto also testified that Teva did not disclose to United States customers prior to July 2018 that any of Teva's finished dose VCDs might contain nitrosamine impurities. Barreto Dep. Vol. II at 597:3-14 ("Q: To your knowledge, did Teva ever disclose to its U.S. customers, prior to July 3, 2018, that any Teva finished-dose valsartan products might contain nitrosamine impurities.?  A: I would – I would doubt that.").

## Teva cGMP Deviations

325.     NDMA was never an approved specification of the API incorporated into Teva's VCDs, as told by ZHP to Teva: "is not part of controls in the current approved specifications of the drug substance [valsartan API]." TEVA-MDL2875-00680841.  Nevertheless, NDMA was present in all the valsartan API that Teva had sourced from ZHP, as per ZHP's and Teva's testing. *See infra* ¶¶ 7-20.

326.     Teva (via legacy Actavis) did not follow its own change control procedures relating to analysis and approval of ZHP's manufacturing process change for valsartan API.

327.    ZHP changed its manufacturing process for valsartan API to include $ZnCl_2$, sodium azide and solvent dimethylformamide (DMF) during the tetrazole ring formation step instead of triethylamine hydrochloride, sodium azide, and toluene; and the addition of a new solvent, MTBE, being utilized during the quenching process. *See* TEVA-MDL2875-00950663; TEVA-MDL2875-00950662.

328.    In May 2013, Actavis initiated change control CC_01595_2013 to handle both ZHP's valsartan API manufacturing process change to the $ZnCl2$ process in the DMF and CEP, and ZHP's plan to add a 3rd dedicated manufacturing workshop. *See* TEVA-MDL2875-0950662.

329.    One of the actions from the change was: "To evaluate whether this change can affect the current validated method for testing the API, especially as regards the residual solvents for the new valsartan tin-free with $ZnCl2$ process." TEVA-MDL2875-0950662.

330.    The change further control stated: "Perform risk assessment whether the new material from the new CEP and 3rd dedicated workshop (upscaled batch size) can have any impact on the process validation of Valsartan finished product." TEVA-MDL2875-0950662.

331.    The "Action Completion" section stated: "No further validation required. Specification parameters and limits are already covered by previous validations performed for Valsartan." TEVA-MDL2875-0950662.

332.    The test method evaluation did not include any actual testing of the API from the new $ZnCl2$ process compared with data from the previous process to see if there was any change or impact on the residual solvents testing. *Id.*

333.    It further stated: "Fully test first five batches of the upscaled batch size (new item number) of Valsartan (Zhejiang Huahai) tin-free coarse produced from new workshop (manufactured using the new CEP rev 01)." TEVA-MDL2875-0090662.

334.    The risk assessment required the following action: "…five batches will be fully tested by the AS Lab to confirm that the batches manufactured as per the revised CEP are compliant to specifications." TEVA-MDL2875-00950663, at -65.

335.    There is no evidence Actavis ever conducted its own testing in connection with the change control and risk assessment.

336.    The change control and risk assessment themselves do not attach any testing data. *See* TEVA-MDL2875-0090662; TEVA-MDL2875-00950663.

337.    The risk assessment merely copied data provided to Actavis from ZHP's internal change control documentation. *See* TEVA-MDL2875-00950663.

338.    Actavis's regulatory submissions to the FDA about the ZHP manufacturing process change did not attach or cite any data about testing performed by Actavis. *See* TEVA-MDL2875-00001886; TEVA-MDL2875-00013107; Gray Dep. at 103:22-105:4.

339.    Teva's expert, Dr. Roger Williams, agreed that no Actavis testing results are attached to the change control or the risk assessment: "Q: …So we can agree, then, Doctor, that there's no testing results for Actavis tests of the valsartan API from ZHP in the risk assessment, the actual last exhibit we looked at, or to the change control instance report that we're now looking at in Exhibit 17; right? [objection] A: Yes.  I agreed, Mr. Stanoch." Williams 1/31/23 Dep. at 193:2-10.

340.    Actavis characterized ZHP's manufacturing process change as "major" in the DMF change control initiated July 2, 2014. *See* TEVA-MDL2875-00279311.

341.    In contrast, Actavis's risk assessment supporting change control CC_01595_2013 states that ZHP's manufacturing process change was "minor," that "no further risk reduction measures are required," and that the change "imposes no risk on the manufacturing process of Valsartan or Valsartan HCT." *See* TEVA-MDL2875-00950663.

342.    The change control and risk assessment did not attach any Actavis testing data. TEVA-MDL2875-0090662; TEVA-MDL2875-00950663.

343.    ZHP's own internal change control for the ZnCl2 process change was categorized as "critical."  ZHP01843066.

344.     However, the change notification that ZHP sent to customers dated January 17, 2012, attached to ZHP's internal change control document categorized the change as "minor." ZHP01843066, at 116.

345.     Teva's head of quality characterized the FDA's position on ZHP as follows: "FDA tells [ZHP] that if they had looked deeper into the chromatograms, they would have seen the peaks. In other words, their methods did indicate the presence of the NDMA. They just ignored them." TEVA-MDL2875-00067084.

346.     There is no evidence ZHP ever provided Teva with any chromatograms for the testing ZHP purportedly conducted of valsartan API sold to Teva. *See, e.g.*, Binsol Dep. at 120:12-15 ("A:  To my understanding, they would not provide any chromatograms as part of the C of A [certificate of analysis]".).

347.     Teva did not perform its own gas chromatography testing of valsartan API sourced from ZHP. *See* Binsol Dep. at 137:13-138:10.

348.     Without requesting chromatograms from ZHP, or generating its own through testing, Actavis knew it would not have any way to identify unknown peaks (such as NDMA) in valsartan API. *See* Binsol Dep. at 122:13-22.

349.     No evidence suggests that Teva's predecessor Actavis ever audited ZHP prior to Teva's acquisition of Actavis in 2016. *See, e.g.*, Anderson 2/9/23 Dep. at 264:21-267:17.

350.     Teva's audited of ZHP in September 2011, December 2012, June 2015, and May 2018.

351.     Teva's audits of ZHP in September 2011, December 2012, June 2015, and May 2018 found multiple serious cGMP deviations. *See, e.g.*, TEVA-MDL2875-00244213 (email attaching report for September 2011 audit); TEVA-MDL2875-00244725 (report for December 2012 audit); TEVA-MDL2875-00399168 (report June 2015 audit report); TEVA-MDL2875-00118210 (report for May 2018 audit report).

352.     Teva did not appropriately follow-up on the cGMP deviations Teva had identified during its audits of ZHP. *See* TEVA-MDL2875-00244213 (email attaching report for September 2011 audit); TEVA-MDL2875-00244725 (report for December 2012 audit); TEVA-MDL2875-00399168 (report June

2015 audit report); TEVA-MDL2875-00118210 (report for May 2018 audit report).

353.    For instance, Teva's June 2015 audit report noted, in bold, that ZHP had "ignored [unknown peaks] without any identification and investigation." TEVA-MDL2875-00399168; *see* Pan Lin 5/26/21 Dep. at 57:9-59:5.

354.    In connection with Teva's May 2018 audit of ZHP, Teva never requested any information from ZHP about the FDA inspection of ZHP in May 2017 that identified unknown peaks in valsartan API. *See* TEVA-MDL2875-00118210; Pan Lin 5/27/21 Dep. 163:5-171:15.

355.    Teva finally asked ZHP in August 2018 for information about the FDA's May 2017 inspection. ZHP009129692.

356.    ZHP did not provide the FDA's full, unredacted report to Teva at that time in August 2018; ZHP merely provided the report's cover letter. ZHP009129692; Nassall Dep. at 260:3-267:4.

357.    Teva's global procurement officer, Jens Nassall, wrote and testified that: "the concern here [about the FDA's May 2017 inspection of ZHP] is that Huahai completed testing and found unknown peaks that were not fully investigated. These peaks may or may not have related to NDMA. So if you [ZHP] found them a year previously you [ZHP] could of potentially have known about NDMA sooner[.]" ZHP009129692; Nassall Dep. at 260:3-267:4.

358.    Because Teva never identified the FDA's May 2017 inspection earlier, never followed up on publicly available information suggesting the inspection took place, and never asked for the FDA's inspection report during Teva's May 2018 audit of ZHP, Teva missed an opportunity to evaluate whether ZHP was complying with cGMPs vis-à-vis valsartan API manufacturing and the potential presence of NDMA.

359.    Teva did not inform the FDA about the potential of NDMA contamination within the time prescribed by its own standard operating procedures.

360.    ZHP contacted Teva about the potential genotoxic impurity in valsartan API on June 20, 2018. *See* TEVA-MDL2875-00549883.

361.    Because the NDMA contamination impacted product that was already distributed in the market, Teva had to notify the FDA within three (3) days of its own notification through a Field Alert Report. *See* 21 CFR 314.81(b)(1); TEVA-MDL2875-00595257 (Teva SOP requiring submission to FDA "within **3 working days** of discovery," even if investigation is not "conclude[d]" in those three days) (emphasis original).

362.    TEVA did not submit its initial Field Alert Report to the FDA until July 3, 2018. *See* TEVA-MDL2875-00063796.

363.    Teva released VCDs containing non-ZHP API back into the United States market before testing, or requiring its suppliers to test, the API in those VCDs for nitrosamines. *See* TEVA-MDL2875-00549885; TEVA-MDL2875- 00057196; TEVA-MDL2875-00042637; TEVA-MDL2875-00154157; Barreto Dep. Vol. I at 282:1-286:23.

364.    There is no evidence that Teva or pre-acquisition Actavis ever performed a risk assessment of ZHP's valsartan API made through the tin process, or of ZHP's manufacturing change from the tin process to the TEA process. *See, e.g.*, Wliams 1/31/23 Dep. at 149:22-150:20.

365.    There is no evidence of any actual standard operating procedures (SOPs) or policies of Actavis, pre-acquisition by Teva, governing change controls, risk assessments, quality oversight of API suppliers. *See, e.g.*, Anderson 2/9/23 Dep. at 216:6-217:15).

366.    During its audits of 2015 and 2018, Teva never fully inspected the ZHP workshop that made valsartan API. *See, e.g.*, Pan Lin 5/26/21 Dep. at 110:7-13 , 115:17-116:3; Pan Lin 5/27/21 Dep. at 191:11-14; Vadsola Dep. at 217:23-218:20, 220:6-12.

367.    In 2015, this workshop purportedly "was under reconstructing at the audit time." TEVA-MDL2875-00399168. In 2018, the same workshop was "under maintenance" and "the equipment maintenance plan and executed maintenance record were not available. A maintenance plan (dated May 22, 2018) presented to auditor later was neither reviewed nor approved by QA to ensure all critical equipment was properly maintained." TEVA-MDL2875-00118147.

93

368.    No evidence suggests ZHP informed Teva's auditors ahead of time about the reconstruction or maintenance at the valsartan workshop. *See, e.g.*, Pan Lin 5/26/21 Dep. at 112:6-10; Vadsola Dep. at 219:4-11.

369.    Teva personnel also looked the other way about ZHP on numerous occasions.

370.    For instance, in Fall 2018, the Teva audit team that conducted the for-cause audit of ZHP relating to the NDMA contamination recommended that ZHP be given a "not acceptable" rating. *See* TEVA-MDL2875-00522655; Vadsola Dep. at 253:3-254:3, 256:14-261:15.

371.    Then, Teva's Mr. Barreto intervened.  He wrote that he was "not pleased" with the draft audit report.  *See* TEVA-MDL2875-0073283.  He further wrote it was "too critical." *Id.*

372.    Mr. Barreto, a non-lawyer, then advised other non-lawyer business personnel to market the draft audit report "privileged and confidential prepared at the direction of counsel." *Id.*; Vadsola Dep. at 266:23-272:13.

373.    Then, Mr. Barreto instructed that the audit team's recommendation of "not acceptable" be changed to "conditionally acceptable."  TEVA-MDL2875-00400391; Vadsola Dep. at 283:9-297:24.

374.    This instance, involving the for-cause audit of ZHP, is the only time ever that Teva's audit hub manager for the Asia region, including China where ZHP is located, recalled Mr. Barreto ever making "comments to downgrade observations or ratings of facilities that [his] auditors had audited."  Vadsola Dep. at 293:22-294:6.

375.    Similarly, Teva's in-house toxicologist internally wrote that NDMA is a "potent mutagenic carcinogen. TEVA-MDL287500549882. Yet, in Teva's final health hazard assessment—which Mr. Barreto again stepped in to oversee—the final toxicological assessment was altered by an unknown person to change "potent" to "potential." TEVA-MDL2875-00549867; TEVA-MDL2875-00020519; Barreto Dep. Vol. I at 167:18-176:12; 269:8-270:14.

376.    In the settlement agreement with ZHP concerning the NDMA-contaminated valsartan API on hand that Teva could no longer use, Teva

actually agreed to buy more product from ZHP, not less. TEVA-MDL2875-00492240.

377.    Even after discovering that ZHP was selling valsartan contaminated with NDMA, Teva was primarily concerned with the business and operational issues, not quality issues. As Teva's global procurement officer, Jens Nassall, explained in an internal email sent after the recalls: "We can not really afford to break the relationship [with ZHP]." TEVA-MDL2875-00423475.

378.    Teva's audit team that had visited ZHP in May 2018 did not post an approved version of their audit report until August 14, 2018. *See* Pan Lin 5/27/2021 Dep. at 187:5-192:12.

379.    The report for Teva's May 2018 audit of ZHP was not prepared and submitted within the timeframe mandated by Teva's own SOPs. *See* TEVA-MDL2875-00489580.

380.    Teva's auditor, Mr. Pan Lin, who participated in multiple audits of ZHP over the years, wrote: "Since they [ZHP] have the genotoxic impurity caused by change of process, insufficient change control and risk assessment is absolutely to blame by the authorities." TEVA-MDL2875-00325033.

381.    Yet, Mr. Pan Lin wrote colleagues not to "panic" and, in spite of his and other auditors' own findings at ZHP, he said ZHP was "working very hard," "tried great efforts," and ZHP's facility was in "good condition." *See* TEVA-MDL2875-00022372; TEVA-MDL2875-00318605.

382.    He also sided with ZHP at times, calling some of the FDA's observations "not so objective." TEVA-MDL2875-00485626.

383.    Far from being in "good condition," the FDA was still finding cGMP deficiencies at ZHP a year later in 2019. *See, e.g.*, ZHP02499075.

## Teva Acknowledges Genotoxicity of NDMA

384.    Teva's internal toxicological assessment states that "NDMA is a potential mutagenic carcinogen considered by the ICH M7(R1) guideline as a Class one substance." TEVA-MDL2875-00549882.

385.    Internal emails between Teva's quality and toxicology personnel – including the senior toxicologist who signed the final report – characterized

NDMA as a "potent mutagenic carcinogen," TEVA-MDL2875-00020519, as did the toxicologist's final report.  TEVA-MDL287500549882.

386.    Mr. Barreto testified that NDMA is a potent mutagenic impurity. Barreto Dep. Vol. I at 167:1-173:22; *see, e.g.*, TEVA-MDL2875-00020519; TEVA-MDL287500549882; Binsol Dep. at 80:12-21 ("Q: It says, 'NDMA is a semivolatile chemical that forms in both industrial and natural processes.  It is a member of n-nitrosamines, a family of potent carcinogens."  Did I read that right?  A:  You did.  Q: And do you agree with that?  A: Based on the literature I've seen, yes.").

387.    Teva's internal toxicologist and corporate designee also testified that "NDMA is a potent mutagenic carcinogen", (Raphael Nudelman 04/08/21 Dep. at 170:18-20) "mutagenicity is the toxicity of highest concern" and that NDMA "is known to be a mutagenic substance."  Nudelman Dep. at 82:12-83:4.

388.    He also testified that NDMA is a carcinogen in animals and a probable human carcinogen.  *Id.* at 88:16-91:13.

389.    Mr. Nudelman also specifically explained to Teva's pharmacovigilance management team that ZHP's assessment was totally inacceptable [sic] given its misunderstanding of IARC categories, incorrect use of the ICH M7 categories, and incorrect use of the less then lifetime LTC. Nudelman Dep. at 170:5-171:23.

### Teva Identified
### the Root Cause of the NDMA Contamination To Be ZHP's cGMP Failures

390.    Nitrosamine formation may arise from nitrous acid in the presence of a secondary amine.

391.    Teva's internal investigation identified six potential sources of nitrosamine contamination:

> The formation of nitrosamines in any compound with a tetrazole ring is dependent upon the use of certain reagents and certain manufacturing process conditions, specifically:
> • Presence of nitrite in the manufacturing process

• Presence of a secondary amine in the API manufacturing process (or presence thereof in any reagent in the process, degradants or impurities of solvents, intentionally present as a raw material), and

• The possibility of direct contact between secondary amines and nitrite in the presence of the target product, e.g., quenching in the presence of a nitrosating agent.

Additional potential sources of nitrosamine impurities include:

• Cross contamination from contaminated process water

• Recovered and contaminated solvents

• Contaminated or poorly cleaned production equipment.

TEVA-MDL2875-00049024.

392.    Teva identified the first three bullets listed above as the root cause of the NDMA contamination in ZHP's valsartan API. *See* TEVA-MDL2875-00549883 at p.1 of 4; ("The root cause was identified as process-related and attributed to generation of the NDMA in the crude step of process (ZnCl2) linked with the use of solvent dimethylformamide.").

393.    Teva further identified issues concerning the last three bullets above as well.  Specifically, Teva identified the root causes as: (i) use of the solvent dimethylamine (DMF) in the tetrazole formation step, (ii) quenching of azide using nitrous acid, and (iii) quenching takes place in the presence of the product during the manufacturing process." *See* TEVA-MDL2875-00737506.

394.    Mr. Binsol confirmed that sodium nitrite ($NaNO_2$) treated with hydrochloric acid (HCl) results in the release of nitrous acid. *See* Binsol Dep. at 56:14-60:7; *see also* TEVA-MDL2875-00737506.

395.    The nitrous acid then has a side reaction with the solvent being used, the dimethylamine (DMF), to form NDMA.  *See* Binsol Dep. at 59-160:20; *see also*  TEVA-MDL2875-00737506.

396.    Teva additionally identified a number of other causes after-the-fact contributing to nitrosamine contamination of ZHP's valsartan API, such as contamination from waste water and improperly cleaned production equipment.  *See, e.g.*, TEVA-MDL2875-00737506; TEVA-MDL2875-00247808.

397.    Teva's director of risk management testified that she was not surprised that, at the time of the recalls in 2018, there was published literature on nitrosamines and nitrosation and mechanisms of their formation dating back 20-plus years. *See* Lyons Dep. at 164:11-165:21.

398.    Mr. Nudelman testified that the chemical reaction that forms nitrosamines was basic chemistry knowledge. When asked which reagents he believed played the role in creating NDMA during the tetrazole ring formation step, he explained: "Yeah, Yeah. I mean this is common chemistry knowledge that you would need nitrous acid in the presence of a secondary amine in order to form – in the presence of acid would potentially form a nitrosamine. And the sodium – the nitrous acid could come from the sodium nitrite that is used in the formation of the tetrazole ring in the presence of HCl that could form the nitrous acid which would be the nitrosating agent. And from very commonly known chemistry, organic chemistry, that would potentially nitrosate a free secondary amine." Nudelman Dep. at 55:13-56:3; *see also* TEVA-MDL5875-00158603.

399.    Publicly available information in the patent realm explicitly recognized the formation of nitrosamines during valsartan API manufacture for years prior to the summer of June 2018. For instance, a patent originally filed in November 2013 disclosed a method for manufacturing valsartan API to avoid creating a "nitroso compound, toxicity is larger." TEVA-MDL2875-00049024, at p.3 of 13.

400.    This patent specifically instructed *not* to use sodium nitrite to negate the potential for any reaction with nitrous acid, which "can eliminate the generation of impurity." TEVA-MDL2875-00049024 at p.3 of 13; Binsol Dep. at 70:9-72:24 ("Q: So I'm now -- what that means, right, and I'm saying by reference to the last exhibit we looked at, the diagram of the chemical reaction, this patent is saying if you don't use sodium nitrite in the manufacture of the valsartan API, you're not going to get the nitrous acid. And that was one of the components that we agreed could theoretically lead to the formation of NDMA, right? A: Right. So again, I will say that I'm, you know, not an API Chemist, but based on how we're read this, it appears accurate what you're saying.").

401.    In other words, years prior to the 2018 recalls, this publicly available patent disclosed a production method explicitly designed to avoid the exact

mechanism through which NDMA was formed during the valsartan API manufacturing process. TEVA-MDL2875-00049024 at p.3 of 13; Binsol Dep. at 57:3-60:7 ("If you take away the Sodium Nitrite (NaNo2) or Hydrochloric Acid (HCl), you're not going to get the nitrous acid, and then you're not going to get the NDMA").

402.    In 2014, a Teva research and development scientist emailed her colleagues in procurement about the presence of "genotoxic impurities" in APIs. TEVA-MDL2875-00101997. The Teva scientist cautioned her colleagues that "The API supplier frequently address in their DMFs that there is no genotoxic impurities in the API produced, but often it turns out buy our inspection there is!" TEVA-MDL2875-00101997.

403.    She proceeded to recommend to her colleagues that they use the same "tool" that she does for detecting impurities in API – a 2006 article entitled "A rationale for determining, testing, and controlling specific impurities in pharmaceuticals that possess potential for genotoxicity." TEVA-MDL2875-00101997 (cover email); TEVA-MDL2875-00101999 (Müller, et al., A RATIONALE FOR DETERMINING, TESTING, AND CONTROLLING SPECIFIC IMPURITIES IN PHARMACEUTICALS THAT POSSESS POTENTIAL FOR GENOTOXICITY, Regulatory Toxicology and Pharmacology (2006)).

404.    The article, authored by scientists at branded drug manufacturers described as "Big Pharma" companies by Teva's own deponent, (*see* Karlsson Dep. at 274:15-276:1), explicitly identifies nitrosamines among the genotoxic impurities that should be determined, tested, and controlled. TEVA-MDL2875-00101997 (cover email); TEVA-MDL2875-00101999 (attached article).

405.    Other literature predating the recalls taught about genotoxic impurities, including NDMA. TEVA-MDL2875-00259905 (Giordani, et al., OVERALL IMPACT OF THE REGULATORY REQUIREMENTS FOR GENOTOXIC IMPURITIES ON THE DRUG DEVELOPMENT PROCESS, European Journal of Pharmaceutical Sciences 43 (2011) 1-; *see also* TEVA-MDL2875-00562588.

406.    One such article, published in 2011, was written by scientists employed by co-defendant Hetero. TEVA-MDL2875-00259910 (Raman, et al., STRATEGIES FOR THE IDENTIFICATION, CONTROL AND DETERMINATION OF GENOTOXIC IMPURITIES IN DRUG SUBSTANCES: A PHARMACEUTICAL INDUSTRY

PERSPECTIVE, Journal of Pharmaceutical and Biomedical Analysis 55 (2011) 662-667).

407.    In other instances, regulators highlighted literature to Teva, such as when SwissMedic forwarded an article that warned of the formation of NDEA. TEVA-MDL2875-00043320.

408.    Additionally, technical data sheets from the United States Environmental Protection Agency (EPA) from 2014, which characterizes NDMA as a "member of N-nitrosamines, a family of potent carcinogens," notes the potential for NDMA to be "produced in and released from industrial sources through chemical reactions, such as those that involve alkylamines with nitrogen oxides, nitrous acid, or nitrite salts." TEVA-MDL2875-00280442.

409.    The EPA also notes that exposure to NDMA "may cause liver damage in humans," and that animal studies show "exposure to NDMA has caused tumors primarily of the liver, respiratory tract, kidney and blood vessels." *Id.*

410.    When Teva characterized NDMA during its for-cause audit of ZHP, its chemist referenced literature dating back to 1983 for the proposition that: "N-Nitrosodimethylamine is formed by the reaction of Dimethylamine with a nitrosating agent NANO2/HCl[.]" *See* TEVA-MDL2875-00318577 at -580.

## **Damages**

411.    Mr. Gibson states in his supplemental report that the "pharmacy claims data set reflects actual amounts paid in real-world transactions." Gibson Suppl. Rpt. at ¶ 9.

412.    Mr. Gibson testified: "Q:  Okay.  Did you – as part of your work for any of those retail pharmacies, did you look at transaction data or the dispensation of prescription drugs?  A: Again, without being specific to any given client, I've look at transactional data before with respect to dispensing prescription drugs, yes.  Q:  Okay.  And is it fair to say that those – that transactional data that you've looked at in those past cases includes point of sale payments by the – by the patient as well as payment amounts by third-party payers in those data fields?  A: The transactional data indicates both payments by – typically payments by the – I'll call it the beneficiary or the

100

patient, and then whatever is assigned to payers at the time of sale, point of sale." Gibson Dep. 282:25 – 283:13.

413.    Mr. Gibson also testified that at point of sale, "[t]he third-party payer has engaged in a transaction with the pharmacy." Gibson Dep. at 122:6-8; Gibson Dep. at 123:18-20 ("The underlying transactions are what's triggering this specific payment").

414.    Mr. Gibson also testified that he agrees that IQVIA data "reflects the responses to the survey data on pricing information, you know, about the point of sale. Q: The total price for the drug at point of sale, right? A: The total price for the drug at point of sale, correct." Gibson Dep. at 179:20 – 180:7.

415.    Mr. Gibson testified: "Q: ..Where is the typical point of sale for a prescription drug? A: Well, for the – for many prescription drugs, including I believe the prescriptions at issue in this case, are frequently sold at the retail pharmacies, for example." Gibson Dep. at 238:7-13.

416.    A preparation method of valsartan patent that is publicly available on google patents features  publication dates in 2014 and 2015. *See* Binsol Deposition Exhibit Teva 249; Binsol Dep. at 66:5-67:19.

417.    The patent disclosed a method to avoid a chemical reaction in valsartan API manufacture that could lead to a "nitroso compound." *See* Binsol Deposition Exhibit Teva 249; Binsol Dep. at 68:23-75:10.

418.    Mr. Binsol testified that Teva's quality department does not review patent information in connection with selecting an API supplier. Binsol Dep. at 63:6-12, 64:16-65:18.

419.    An employee at Teva's Japan subsidiary identified an unknown peak in valsartan. *See* TEVA-MDL-00514869.

420.    Mr. Binsol testified that he did not know what if any follow-up took place with respect to this unknown peak. Binsol Dep. at 207:9-18.

421.    In a September 13, 2018 letter from Teva directed to ZHP's General Counsel, Teva issued a "notice of claim and tender of defense and indemnification" to ZHP for "all current claims, and any future claims, asserted against [Teva]" including specifically economic loss claims for

"damages or refunds for costs associated with Teva's supply of Valsartan" contaminated with NDMA and/or NDEA.   TEVA-MDL2875-00137377.

422.     Teva issued another letter to ZHP on April 15, 2019, to update the prior September 13, 2018 letter.  TEVA-MDL2875-00964578.

423.     Multiple consumer plaintiffs issued pre-suit notice letters to ZHP, Teva, and Torrent.

424.     At least one TPP plaintiff issued pre-suit notice letters to ZHP, Teva, and Torrent.

425.     Plaintiffs served another pre-suit notice letter on all defendants in this MDL prior to filing the operative Third Amended Master Economic Loss Complaint.

426.     Dr. Conti has repeatedly opined that therapeutic benefit is a separate issue from economic value, and that adulterated drugs have no economic value.  *See, e.g.*, Conti 2/10/22 Dep. at 114:20-116:3, 204:11-24. 145:-12-146:24.

427.     Defendants cite an annotated snippet of testimony of Dr. Conti's testimony in response to a question about medical marijuana; Dr. Conti's full answer (uncited by Defendants) frames her answer consistently with her prior testimony.  *See* Conti 7/13/23 Dep. at 26:2-18.

428.     Teva discontinued sales of VCDs under ANDA#091519 and ANDA#09062.  *See, e.g.*, FDA Orange Book August 2018 Changes List, showing discontinuation of ANDA#091519 and ANDA#09062, the two Teva ANDAs for VCDs containing valsartan API from ZHP).

**Torrent's Structure and Role in the Manufacture of Valsartan**

429.     Torrent Pharma, Inc. is the United States subsidiary of Torrent Pharmaceuticals Limited which, along with Torrent Pharmaceuticals Limited has responsibility for products in the United States market (Gegenheimer Dep. 20:19–21:10; Chitty Dep. 190:15–191:7.) Sanjay Gupta is the President and Chief Executive Officer of Torrent Pharma, Inc. (Gegenheimer Dep. 644:10–11.)

430.    Torrent manufactured finished dose valsartan tablets, amlodipine and valsartan tablets, amlodipine, valsartan, and hydrochlorothiazide tablets, and valsartan and hydrochlorothiazide tablets for the United States market between 2015 and 2018. (TORRENT-MDL-2875-00133890; Jaiswal Dep. 78:15–18; Jaiswal Dep. 373:4–8.) Torrent's corporate representative agreed that, as the finished dose manufacturer, Torrent bore ultimate responsibility for the manufacture of a "quality" drug. (Jaiswal Dep. 736:9–737:4.)

  a. Specifically, Mr. Jaiswal agreed that Torrent was responsible for ensuring that Torrent's facilities were manufacturing "quality" drugs. (Id. at 697:11–24.)
  b. In addition, Mr. Jaiswal agreed that Torrent is responsible for testing the product before putting it on the market. (Id. at 736:17–21.)

431.    Sanjay Gupta is the President and Chief Executive Officer of Torrent Pharma, Inc.

432.    Sushil Jaiswal, who testified as a 30(b)(6) corporate representative, is the Executive Director of Global Quality and Regulatory Affairs for Torrent Pharmaceuticals Limited.

433.    Kelly Gegenheimer, who testified as a 30(b)(6) corporate representative, is the Vice President of Sales of Torrent Pharma, Inc.

434.    The "old" process was the manufacturing process that used triethylamine (TEA) with sodium nitrite quenching.

**The Discovery and Response to Nitrosamine Impurities by Torrent**

435.    On June 20, 2018, ZHP notified Torrent of a genotoxic impurity in its valsartan API. (ZHP00496536.)

436.    Torrent placed its valsartan on hold but did not perform any testing for genotoxic impurities at this time. (Id. at 31; Jaiswal Dep. 226:17–227:2.)

437.    On June 26, 2018, ZHP notified Torrent that its D code valsartan API manufactured with the "new" (zinc chloride) process contained NDMA. (ZHP00496536; Jaiswal Dep. 227:3–228:1.) Accordingly, Torrent concluded that its C code valsartan products manufactured with the "old" TEA process

API, including those manufactured for the United States market, were not contaminated with NDMA. (ZHP00496536; Jaiswal Dep. 227:3–228:1.)

438.    At this time, Torrent did not perform any testing to confirm that ZHP was correct; rather, Torrent relied on the representation from ZHP and chose not to recall its valsartan. (Jaiswal Dep. 230:4–17, 23:41–1–10.)

439.    Customers in the United States could therefore purchase Torrent valsartan made from ZHP C code API. (Id.)

440.    However, ZHP was incorrect about the absence of NDMA in its C code (old process) valsartan API. (Jaiswal Dep. 234:24–235:3.)

441.    On July 7, 2018, Torrent carried out an impact assessment for the United States market and concluded that it manufactured 129 batches of finished dose valsartan using API from C code batches indicating that they used the "old process" with triethylamine. (TORRENT-MDL2875-0072713.) Torrent determined that it did not manufacture any finished dose valsartan using API from D code batches indicating that they used the "new process" with zinc chloride. (Id.)

442.    On July 21, 2018, Torrent confirmed that there were 103 batches in the market which were manufactured with the C code of API, indicating that they used the "old process" with triethylamine. (Id.)

443.    By August 3, 2018, ZHP notified Torrent that API manufactured with the "old process," that is, C code API, contained NDMA. (Jaiswal Dep. 121:23–123:22, 138:5–8.)

444.    Torrent did not recall or quarantine any valsartan product between August 3, 2018 to August 17, 2018.

445.    On August 17, 2018, the FDA informed Torrent that five batches of its valsartan finished dose product were made from C code API containing NDMA above acceptable levels. (TORRENT-MDL2875-0072713.)

446.    The FDA communicated to Torrent that it considered these batches adulterated. (Id.) Torrent initiated a recall of the five impacted batches and began analyzing the 25 lots of API used in the remaining 103 batches on the

market. (Id.) Torrent did not analyze API batches used in finished dose product that was not within expiry. (Id.)

447.     On August 7, 2018, European health authorities inquired with ZHP whether there was a possibility that n-nitrosodiethylamine (NDEA) could be formed during its API manufacturing process. (ZHP00496536.) ZHP began developing an analytical method to test its API for NDEA. (Id.)

448.     On August 18, 2018, the Director of Torrent Pharmaceuticals Ltd. questioned what had been done since Torrent received the notification from ZHP on June 26, 2018, regarding contamination of "D" code valsartan API to "conclude if c batches had any issues or not." (TORRENT-MDL2875-00072713 at 2; Jaiswal Dep. 110:13–15, 114:20–24, 115:1–20.) Torrent's operations department cited the "declaration" received from its vendor, ZHP. (Id.)

449.     However, between June 26 and August 18, 2018, Torrent did not perform any of its own testing to confirm the accuracy of ZHP's declaration. (Jaiswal Dep. 231:15–18, 239:9–21.) Nonetheless, it is undisputed that Torrent had capacity to develop a test for NDMA given that it did, in fact, develop and use such a test. (Id. at 236:11–21.) Torrent admitted that it was under no obligation to wait for ZHP, as the DMF holder, to develop a test for NDMA. (Id. at239:9–17.) Ultimately, it took Torrent only about five weeks to develop a test for NDMA. (Id. at 245:3–8, 245:18–23.)

450.     Torrent initiated its recall of valsartan with valsartan amlodipine hydrochlorothiazide on August 17, 2018. (TORRENT-MDL2875-00007721.) This was two weeks after Torrent was notified by ZHP that "old" process API used to make that product was contaminated with NDMA. (TORRENTMDL2875-00131255.)

451.     On August 23, 2018, Torrent expanded this recall to include "all lots within expiry of Valsartan/Amlodipine/HCTZ, Valsartan/Amlodipine and Valsartan tablets to the consumer level." The recall confirmed the presence of an "impurity" in Torrent's valsartan-containing drugs classified as a "probable human carcinogen" by the International Agency for Research on Cancer.

**The NDMA/NDEA Contamination Levels in Torrent's Valsartan**

452. On August 29, 2018, ZHP tested selective valsartan API batches and determined that NDEA was present in valsartan manufactured with triethylamine (the TEA process). (ZHP00496536.) Torrent evaluated its valsartan for NDEA after it had initiated a recall of its product for NDMA contamination. (Jaiswal Dep. 77:15–17.)

453. All of the valsartan manufactured and sold by Torrent in the United States contained NDMA and NDEA. (Jaiswal Dep. 386:3–15.)

454. Torrent's Director of Quality, Sushil Jaiswal, and Director of Regulatory Affairs, Dawn Chitty, both confirmed that the level of NDMA carried over into Torrent's finished dose products exceeded the interim limits set by the FDA. (See, e.g., TORRENT-MDL2875-00133890, TORRENT-MDL2875-00366172.) For example:

   a. Various batches of product contained 12.3 ppm, 12.88 ppm, 65.29 ppm, and 125.03 ppm NDMA which is 41 times, 42 times, 85 times, 217, and 416 times the acceptable daily limit for NDMA set by the FDA, respectively. (Jaiswal Dep. 79:3–14, 81:4–83:11, 84:4–87:2.)
   b. Various batches of product contained 7.89 ppm, 14.13 ppm, 15.29 ppm, and 6.93 ppm NDEA which is 95 times, 170 times, 184 times, and 203 times the acceptable daily limit for NDEA set by the FDA, respectively. (Id.; Chitty 59:15–61:18.)

455. These NDMA and NDEA results reflect the nitrosamine content of batches that Torrent had purchased. (Id. at 64:15–19.) The batch numbers from Torrent's own test results demonstrating that the batches of valsartan API it purchased from ZHP contained NDMA and NDEA correspond to the batch numbers from Torrent's finished dose valsartan, demonstrating that contaminated valsartan API was used to make finished dose valsartan. (Id. at 65:16–69:10.)

456. The levels of NDMA and NDEA in the valsartan API Torrent used to manufacture its finished dose valsartan products are expected to carry over to the finished dose valsartan products.

## Causes of Contamination

457. For D code valsartan API, which is manufactured with the "new" (zinc chloride) process, API manufacturer ZHP concluded "N-Nitrosodimethylamine (NDMA) is most likely the side reaction product which

is formed by reaction of nitrous acid (raw material) and dimethylamine. The latter is formed by decomposition of dimethylformamide (DMF) during the tetrazole formation in the crude step of the ZnCl, Process as follows": (ZHP00496536.)

458.    For C code valsartan API, which is manufactured with the "old" (TEA) process, API manufacturer ZHP concluded "NDEA is most likely formed in Step 4 crude stage, where toluene is used as solvent and triethylamine hydrochloride as catalyst for the tetrazole formation. Specifically, triethylamine (TEA) may contain trace amount of diethylamine as an impurity. Furthermore, triethylamine may be susceptible to low level decomposition under certain conditions to produce trace amount of diethylamine. Consequently, during the subsequent quenching of excess azide by sodium nitrite, trace amount of NDEA can be formed by reaction between diethylamine and nitrous acid (formed in situ between NaNO, and HCl)." (Id.) ZHP identified three factors, the convergence of which is required for NDEA to form in valsartan; (1) use of triethylformamide in the process; (2) quenching of azide using sodium nitrite; and (3) quenching takes place in the presence of the product. (Id.). Thus, the reaction mechanism is as follows: (Id.)

459.    Though the route of synthesis for C Code valsartan would not suggest high levels of NDMA, both NDMA and NDEA were present in C code valsartan API at levels multiple to hundreds of times the acceptable daily limit set by the FDA. (Jaiswal Dep. 79:3–14, 81:4–83:11, 84:4–87:2; Chitty Dep. 59:15–61:18.)

460.    ZHP reasoned, "the likely reason for the presence of NDMA in Valsartan produced using TEA process would be cross contamination from the ZnCl, process." (ZHP00496536.) Specifically, ZHP noted that "Valsartan of different processes shared the same production line in Workshop 2 as well as in Workshop W02; hence the possibility of cross contamination could not be excluded. However, since ZnCl, process had not been used in Workshop 4, it would not be possible for Valsartan API produced in this workshop to be contaminated by NDMA." (Id.) ZHP acknowledged that valsartan produced in workshop 4 nonetheless tested positive for NDMA. (Id.) According to ZHP the "only reasonable expla[]nation … would be that NDMA is formed due to the residual amount of dimethylamine in TEA," particularly given that some suppliers also have shared production lines." (Id.)

107

461.    ZHP explained that that while there were dedicated production lines for valsartan API, valsartan API manufactured with different processes (e.g., old process and new process) shared production lines) and "trace amount[s] of NDMA or NDEA residue might remain in the equipment after cleaning and subsequently [be] carried over into the next batch of Valsartan manufactured by different processes." (Id.)

462.    31. Further, ZHP noted that NDMA and NDEA "are generated in the crude Valsartan step" resulting in contamination o of "recovered ethyl acetate from [the] Purification step." (Id.) This is because "the solvent recovery equipme[n]ts are shared in different processes in Workshop 2, Workshop W02, and Workshop 4" creating a "risk of cross contamination" via recovered solvents. (Id.)

### Nitrosamine Formation was Knowable

463.    Torrent began the process of qualifying ZHP as an API supplier in 2006. As part of this vendor qualification process, Torrent received a vendor qualification package including chromatograms and viewed the open part of the DMF.

464.    The chromatograms Torrent received from ZHP as part of the vendor qualification process showed unknown peaks next to toluene and xylene.

465.    Torrent's corporate representative and Head of Quality testified that one need only perform "chemistry on paper" to ascertain whether NDMA or NDEA could be formed from the route of synthesis for valsartan API once provided access to the route of synthesis information.

### Torrent's Admissions Regarding Nitrosamines

466.    NDMA and NDEA are classified as probable human carcinogens.

467.    Torrent was aware that NDMA and NDEA are classified as probable human carcinogens prior to June 20, 2018.

468.    NDMA and NDEA are potent mutagenic carcinogens.

469.    Torrent was aware that NDMA and NDEA are potent mutagenic carcinogens prior to June 20, 2018.

470.    NDMA and NDEA are genotoxic.

471.    Torrent was aware that NDMA and NDEA are genotoxic prior to June 20, 2018.

472.    Neither NDMA nor NDEA are part of the approved specification for any valsartan containing drug manufactured by Torrent.

473.    Neither NDMA nor NDEA are listed in the valsartan monograph. TORRENT-MDL2875-00232735.

**Torrent's Representations and Warranties Concerning Its Valsartan**

474.    Torrent represented at all times that its finished dose valsartan-containing drugs were valsartan, valsartan amlodipine, or valsartan amlodipine hydrochloride USP. TORRENT-MDL2875-00003355; TORRENT-MDL2875-00000003; TORRENT-MDL2875-00019489.)

475.    Torrent represented at all times that its finished dose valsartan complied with all applicable standards, including identity, strength, quality, and purity standards.

476.    In the course of marketing and selling finished dose valsartan in the United States market, Torrent communicated with customers and third-party payors. (Gegenheimer Dep. 56:9–18.)

477.    The ANDAs filed by Torrent referenced DMF registration number 23491 and the known list of impurities for that process but did not include NDMA, NDEA, or any other nitrosamine. (TORRENT-MDL2875-00003433.)

478.    In its ANDA submission, Torrent stated that its product complied with applicable quality standards. (Rivera Dep. 106:21–107:1.) Additionally, Torrent, in its ANDA submission, stated that its generic valsartan drugs were bioequivalent to the name brand drug, Diovan. (Rivera Dep. 119:2–6; Torrent Ex. 4, Gegenheimer Dep. 244:21–23.)

479.    The designation USP indicates that a drug complies with all the testing requirements that are posted in the United States Pharmacopeia for that drug's monograph. (Perry Dep. 177:15–21.) It is only if a product meets those standards that a manufacturer "can use the USP after [its] drug name." (Perry Dep. 177:21–24.)

480.    The valsartan monograph does not include NDMA or NDEA.
(TORRENT-MDL2875-00232735.) Similarly, the valsartan API Torrent
purchased from ZHP was designated as "U.S.P." (Jaiswal Dep. 451.9–18.)

481.    Torrent represented "At Torrent, we strongly believe in providing
quality medicines at affordable price," on its publicly accessible website.
(Chitty Dep. 16:20– 17:14.)

482.    According to Dawn Chitty, Torrent USA's Vice President of
Regulatory Affairs, "quality" in that context generally "means that it meets
the standards that have been set by the regulatory bodies that we interact with
and are governed by." (Id.)

483.    Torrent acknowledged that, as the finished dose manufacturer, it is
Torrent's duty to follow industry standards regarding genotoxic impurities.
(Jaiswal Dep. 193:17–21.)

484.    Since at least 2015, Torrent provided customers materials stating that
there were no hazardous materials or cytotoxic agents involved in valsartan.
(Gegenheimer Dep. 201:14–202:11.)

485.    When other generic manufacturers of valsartan-containing drugs
recalled their products due to the presence of nitrosamine impurities on July
13, Torrent represented that its valsartan-containing drugs were not recalled
and did not contain nitrosamines. (Chitty Dep. 297:7–13, 299:13–300:16.) At
the time these representations were made, Torrent had not tested its valsartan-
containing drugs to confirm that they were free of nitrosamines. (Id. at
284:10–19, 287:13–288:9; TORRENT-MDL2875-00511197.)

486.    Even after ZHP notified Torrent that the "old" (TEA) process API by
Torrent to make valsartan for the United States market contained NDMA,
Torrent did not immediately test its product. (Id.)

487.    From the time that Torrent had first been notified of nitrosamines in
"new" process valsartan API on June 26, 2018 through August 3, 2018,
Torrent represented that its valsartan did not contain nitrosamines—though it
never confirmed this. (Id.; TORRENT-MDL2875-00555405.) Then, when
Torrent learned NDMA was present in "old" process API on August 3rd, it

continued to represent that its valsartan-containing drugs were free of impurities and not included in the recall and held off on initiating a recall for nearly two-weeks rather than notifying customers. (Id.)

488.    Even on the day the recall was issued, Torrent continued to tell its customers that its valsartan was not recalled. (Id.)

## Breach of Warranties

489.    For a maximum daily dose of 320 mg valsartan/day, the acceptable intake limit for NDMA, set by the FDA, is 96 ng/day, or 0.3 ppm.

490.    For a maximum daily dose of 320 mg valsartan/day, the acceptable intake limit for NDEA, set by the FDA is 26.5 ng/day or 0.083 ppm.

491.    Mr. Jaiswal, as Torrent's Head of Quality, testified that its customers "expect a right and quality medicine" and that "pharmaceutical quality," as per the FDA means "assuring every dose is safe and effective, free of contamination and defects." (Jaiswal Dep. 685:15–687:2.) He explained that in order for a product, like valsartan, to be "quality" it must be "free of contamination and defects" and, additionally "it is supposed to meet the specification which is always [] part of [the] ANDA." (Id. at 688:5–21.)

492.    The recall notices sent by Torrent to customers confirmed the presence of an "impurity" in Torrent's valsartan-containing drugs classified as a "probable human carcinogen" by the International Agency for Research on Cancer (IARC). (TORRENT-MDL2875-00515246.)

493.    For all batches of Torrent's valsartan product in the market, the levels of NDMA and NDEA exceeded the acceptable intake levels set by the FDA. (TORRENT-MDL2875-00133890, TORRENT-MDL2875-00366172.)

494.    Torrent had to recall its valsartan product because the FDA considered it adulterated. (TORRENT-MDL2875-007213.)

495.    Upon initiating a recall of its valsartan for the presence of NDMA, Torrent admitted that NDMA was "classified as a probable human carcinogen." (TORRENTMDL2875-00190373.) Torrent acknowledged "clear evidence of carcinogenicity" and "ample evidence that NDMA is genotoxic both in vivo and in vitro." (Id.) In fact, Torrent stated that "humans may be especially sensitive to the carcinogenicity of NDMA." (Id.)

111

496.    Torrent relied on its API vendor, ZHP, to confirm that its valsartan API was free of genotoxic impurities. (See, e.g., Jaiswal Dep. 206:7–207:19, 210:3–212:8.) Torrent did not actually test the valsartan API for genotoxic impurities. (Id. at 212:5–213:12.) In fact, Torrent admitted that it did nothing to control for genotoxic impurities in the valsartan API it purchased except to (1) rely on the genotoxicity declaration from ZHP, the API vendor; and (2) review the route of synthesis for genotoxicity alert, even though "those informations are always limited." (Id. 86:23–88:19.)

497.    However, those methods were inadequate:

a. Sushil Jaiswal, Torrent's 30(b)(6) representative agreed that, ultimately, declarations upon which Torrent chose to rely were wrong. (Id. 234:24–235:3.)
b. The route of synthesis information, though limited, demonstrated the potential to generate nitrosamines; Mr. Jaiswal further agreed that this potential was apparent well before Torrent sold nitrosamines in the United States, including as early as the 1980s or 1990s. (Id. 327:19–328:5.)

**Torrent's Admissions Regarding cGMP**

498.    Sushil Jaiswal, Torrent's Head of Quality and Torrent's 30(b)(6) representative agreed that in the pharmaceutical industry, there are several chemical and physical properties to evaluate in a drug substance to satisfy FDA and ICH regulations but "genotoxic impurity control" is the "most significant factor." (Jaiswal Dep. 369:6–370:5.)

499.    Torrent agreed that one set of applicable regulations is found in the FDA's M7 Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk Guidance for Industry, published in 2015. (371:1–7, 372:12–17, 373:4–8.) Torrent agreed that, at least as of the date of publication of these guidelines, it was necessary to keep genotoxic impurities under the level specified therein, including specifically for compounds that were part of the "cohort of the concern." (Id. 37:12–18, 381:22–382:18.)

500.    Torrent was aware that NDMA and NDEA are part of the "cohort of concern" under ICH M7 guidance prior to June 20, 2018.

501.    The "cohort of concern," Torrent agreed, is a "group of high potency mutagenic carcinogens" such as n-nitroso compounds like NDEA and NDMA. (Id.)

502.    For the cohort of concern, the "threshold of toxicological concern" is lower than the 4.7 ppm threshold of toxicological concern for other genotoxic impurities. (Jaiswal Dep. 383:15–386:1.) Torrent's valsartan-containing drugs contained nitrosamines at levels greater than 4.7 ppm—the level for impurities not included in the cohort of concern. (Id. at 386:3–15.) Torrent agreed that lower levels than even 4.7 ppm are required for n-nitroso compounds because they are part of the cohort of concern. (Id. at 375:6–377:9, 383:15–386:1.) In other words, Torrent's valsartan contained genotoxic impurities in excess of the threshold of toxicological concern for genotoxic impurities generally and for genotoxic impurities within the cohort of concern (to which NDMA and NDEA belong). The ICH M7 guidance was published in May 2015, at or around the time Torrent began supplying valsartan to the United States market. (Id. at 373:4–8.)

503.    On behalf of Torrent, Mr. Jaiswal further agreed that genotoxic compounds in a drug "should be investigated." (Jaiswal Dep. 52:11–14.) Specifically, it would be important to investigate to make sure the genotoxic compound does not exceed threshold levels. (Id. at 53:18–54:1.)

504.    Presented with the European Medicines Agency document "Guidelines on the Limits of Genotoxic Impurities" from 2006," Mr. Jaiswal acknowledged on behalf of Torrent that genotoxic compounds, like NDMA, have the potential to damage DNA at any level of exposure. (Id. at 55:17–57:4.) Torrent agreed with EMA that for "genotoxic carcinogens, it's prudent to assume there's no discernable threshold and any level of exposure carries a risk" and further agreed that "NDMA is a genotoxic compound." (Id. at 56:16–19, 58:16–22.)

505.    Mr. Jaiswal admitted that he was aware of the EMA Guidelines on the Limits of Genotoxic Impurities. (Id. at 59:4–9.) Dawn Chitty, Torrent's Head of Regulatory and Scientific Affairs, agreed that if Torrent could not ensure that its drugs met identity, strength, quality, and purity standards, then its drugs would be adulterated and could not be sold. (Chitty Dep. 111:15–112:10.) Similarly, Torrent's Regulatory Affairs Manager, Jocelyn Rivera, admitted, however, that it was required to show that its drugs comply with,

113

among other standards, identity, strength, quality, and purity standards. (Id. at 112:17–113:17; Rivera Dep. 111:24–15.)

506.    In an April 2017 Establishment Inspection Report (EIR) for Torrent's manufacturing facilities, the FDA issued FDA 483 observations including that "Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure the drug product conforms to the appropriate standards of identity, strength, quality, and purity." (Rivera Dep. 108:9–111:22.)

507.    Following the recall of valsartan-containing drugs for nitrosamine contamination, the FDA and EMA explained that one of the reasons for the contamination was that there was a lack of "good science" on the part of manufacturers; Mr. Jaiswal agreed that Torrent lacked good science leading up to the recall. (Jaiswal Dep. 672:17–673:17.)

508.    In its ANDA for valsartan, Torrent was required to state that the drug satisfied strength, identity, quality, and purity standards. (Chitty Dep. 115:21–116:2.)

509.    Dawn Chitty, Torrent's head of Regulatory and Scientific Affairs, testified that "any type of situation that potentially could impact [Torrent's] products should be investigated" and that responsibility also means Torrent is "obligated to test API." (Id. at 127:8–128:4.)

510.    Torrent had a quality agreement with ZHP for the purchase of valsartan API titled "Technical and Quality Agreement," which was periodically renewed including on May 7, 2017.  (*See* TORRENT-MDL2875-00291332.)

**Torrent's Focus on Profit**

511.    After ZHP had notified Torrent that its "new" process valsartan contained NDMA, ZHP and Torrent discussed minimizing the profits they would lose due to the genotoxic contamination, stating: "Hopefully with our joint efforts, we could minimize the impact to our products and markets." (see TORRENT-MDL2875-00090456.)

512.    Rather than testing its product for nitrosamine contamination (Jaiswal Dep. 23:41–1–10, 230:4–17.) Torrent internally discussed how nitrosamine contamination would affect Torrent financially (TORRENTMDL2875-

00072542.). For example, on July 17, 2018, Torrent's Chief Operating Officer wrote an email stating, "All customers have been back-ordered and every single day counts, as our failure to supply penalties will start kicking in…" (Id.; Chitty Dep. 245:3–246:11; see also TORRENT-MDL2875-00090456.)

## Miscellaneous

513.    Torrent acquired sufficient information about the route of synthesis for valsartan API during the supplier qualification process for ZHP to ascertain or discover the potential for nitrosamines to form in the API. Torrent had this information prior to June 20, 2018.

514.    Torrent had the capability to test its valsartan products for nitrosamines, such as NDMA or NDEA prior to the recall

515.    Torrent violated cGMP with respect to qualifying, monitoring, and overseeing its API supplier, ZHP.

516.    Torrent violated cGMP and its own standard operating procedures with respect to testing valsartan API and finished dose valsartan products, responding to out-of-specification (OOS) results, and implementing corrective-and-preventative-actions (CAPAs).

517.    Torrent's finished dose valsartan products were adulterated, did not meet compendial standards, and were not made in cGMP-compliant manner.

518.    Torrent declined to issue a recall and continued to supply its finished dose valsartan products to the United States market even after it was aware that the valsartan API it used to manufacture its finished dose valsartan products was contaminated with a genotoxic impurity.

## Payor Facts

519.    Emblem and SummaCare and the Class Members were aware that for the Defendants to sell their generic valsartan in the United States it had to be represented as and actually be FDA approved, uncontaminated and unadulterated, and therapeutically equivalent and bioequivalent to the brand name reference drug. SummaCare and Emblem and the Class Members were aware that the Defendants must have made related representations to have sold their drugs in the United States, and SummaCare and Emblem and the Class Members relied on those representations. Additionally, there are many documents, such as the contracts with the PBMs that support those facts, establishing that without the relevant representations the drugs could not have been purchased. For instance, SummaCare's contract with its PBM contractually requires the PBM to immediately remove from its formulary a

115

drug that is "deemed unsafe" by the FDA, makes reference to the Orange Book when specifying what drugs would be included in generic drug pricing, and requires the PBM to insert a clause into its contract with the pharmacy requiring the pharmacy to offer its members the "lowest priced generic version of [a] drug that is **therapeutically equivalent** and bioequivalent." And Emblem's contract with its PBM specifies that **only FDA approved drugs** are Part D Covered drugs and required it to take a number of actions when a drug is recalled for safety reasons, and Emblem's formulary specifically states that it will immediately remove any drug that the FDA determines to be unsafe. The documents also show that the moment the NDMA contamination was disclosed, both SummaCare and Emblem worked proactively with their PBMs to notify members, ensure that none of the recalled and contaminated drugs could be paid for under their health plans, and made exceptions to their formulary to ensure that non-contaminated valsartan would be available to their members.

520.    The mere fact that Emblem's corporate representative did not know whether pre-suit notice was sent, does not mean that pre-suit notice was not sent by SummaCare, MSP, or by or on behalf of, "any of the TPP Class members," as defendants assert. Notice was sent.

521.    P&T Committees use the Orange Book to determine therapeutic equivalence rating for generic drugs.

522.    P&T Committees rely on labels and prescribing information to determine whether a drug should be included in a formulary.

523.    MSP and the Class Members had no knowledge of the adulteration and/or NDMA- and/or NDEA-contamination of ZHP's, Teva's, and/or Torrent's VCDs on or prior to ZHP's, Teva's, and Torrent's respective dates of recall of their VCDs.

524.    Plaintiff MSP's assignors Emblem and Summa paid an amount for ZHP's, Teva's, and Torrent's VCDs in question.

## Data

525.    IQVIA data produced and relied on by parties' experts are authentic and admissible.

## Retailers

526.    CVS corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

527.    Walgreens corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

528.    Albertson's corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

529.    Walmart corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

530.    Express Scripts corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

531.    OptumRx corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

532.    Humana Pharmacy corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

533.    Kroger corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.

534.    Rite Aid corporate witness testified that the company does not knowingly sell or dispense adulterated drugs.[6]

## Statutes and Regulations

535.    The following statutes and regulations applied to Defendants' manufacturing, distribution, and sale of VCDs:

- 21 U.S.C. § 321 (definitions)
- 21 U.S.C. § 331 prohibited acts)
- 21 U.S.C. § 351 (adulteration)
- 21 C.F.R. Part 314 (FDA market approval)
- 21 C.F.R. Part 210 (cGMP for manufacturing, processing, packing, or holding drugs)
- 21 C.F.R. Part 211 (cGMP for finished dose)
- 21 CFR 820 (Quality Regulation Management)

## USP Monographs

536.    The following USP sections and monographs applied to Defendants'

---

[6] Plaintiffs will move the court overseeing the Rite Aid bankruptcy for permission to use this testimony if necessary.

VCDs:

- USP's General Notices and Requirements, dated April 1, 2015
- USP Pharmacists' Pharmacopeia on USP's General Notices and Requirements, dated May 1, 2009 to August 1, 2009
- USP's <1086> Impurities in Drug Substances and Drug Products, dated December 1, 2012
- USP's PowerPoint on Impurities in Drug Products and Drug Substances - A USP Approach, dated March 18, 2018
- USP's FAQ: Organic Impurities, https://www.usp.org/frequently-asked-questions/organic-impurities
- USP's PowerPoint on SUMMARY, HIGHLIGHTS and TIMELINE of GENERAL CHAPTER <1469> NITROSAMINE IMPURITIES, dated July 28, 2020
- Valsartan USP, dated May 1, 2018, ZHP01303141
- Valsartan Tablets USP, dated May 1, 2017, ZHP02614594
- Valsartan and HCTZ USP, dated December 1, 2016, PRINSTON00141349
- USP-NF 467 Residual Solvents

## **FDA Guidelines**

537.    The following FDA guidelines applied to Defendants' VCDs:

- Guidance for Industry Genotoxic and Carcinogenic Impurities in Drug Substances and Products: Recommended Approaches
  - December 16, 2008 to May 28, 2015
- M7 Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk
  - May 28, 2015 to March 2018
- M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk
  - March 2018 to July 2023
- Guidance for Industry Q3A Impurities in New Drug Substances
  - June 2008
- Guidance for Industry Q3B(R2) Impurities in New Drug Products
  - August 2006

118

- Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients Guidance for Industry
    - September 2016
- Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients Questions and Answers Guidance for Industry
    - April 2018
- Guidance for Industry Q9 Quality Risk Management
    - June 2006
- Guidance for Industry Q10 Pharmaceutical Quality System
    - April 2009
- Guidance for Industry Q11 Development and Manufacture of Drug Substances
    - November 2012
- Drug Master Files, Guidance for Industry
- Contract Manufacturing Agreements for Drugs: Quality Agreements, Guidance for Industry
- Guidance for Industry, Control of Nitrosamine Impurities in Human Drugs

## **ICH Guidances**

538.    The following ICH Guidances applied to Defendants' VCDs:

- ICH S2, Genotoxicity Testing and Data Interpretation for Pharmaceuticals Intended for Human Use
    - S2(R1) Approval by the Steering Committee of S2(R1) under Step 4 and recommendation for adoption to the three ICH regulatory bodies. 9 November 2011
- ICH Q3A, Impurities in New Drug Substances
    - Q3A(R2) Approval by the Steering Committee of the revision of the Attachment 2 directly under Step 4 without further public consultation. 25 October 2006
- ICH Q3B, Impurities in New Drug Products
    - Q3B(R2) Approval by the Steering Committee of the revision of the Attachment 2 directly under Step 4 without further public consultation. 2 June 2006 ICH Q7A, Good Manufacturing Practice Guidelines for Active Pharmaceutical Ingredients
- Q7A    Good    Manufacturing    Practice    Guide    for    Active

119

Pharmaceutical Ingredients
- o Approval by the Steering Committee under Step 4 and recommendation for adoption to the three ICH regulatory bodies. 10 November 2000
- ICH Guideline Q8(R2): Pharmaceutical Development
  - o Q8(R2) Corrigendum to titles of "Figure 2a" and "Figure 2b" of "Example 2" on page 23. August 2009
- ICH Q9, Quality Risk Management
  - o Q9 Approval by the Steering Committee under Step 4 and recommendation for adoption to the three ICH regulatory bodies. 9 November 2005ICH Guideline Q10: Pharmaceutical Quality System
- Q10 Approval by the Steering Committee under Step 4 and recommendation for adoption to the three ICH regulatory bodies. 4 June 2008
- ICH M7, Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk
  - o February 6, 2013 (approval under Step 2)
  - o June 5, 2014 (approval under Step 4)
  - o June 23, 2014 (corrigendum to fix typographical errors)
  - o June 11, 2015 (addendum R1 under Step 2)
  - o May 31, 2017 (addendum R1 under Step 4)

## Other Guidelines

539.    The following other guidelines applied to Defendants' VCDs:

- EMA Guideline on the Limits of Genotoxic Impurities
  - o January 1, 2007 to January 31, 2018
- EMA Questions and Answers on the 2006 EMA Guideline
  - o September 24, 2010 to January 31, 2018
- EudraLex - Volume 4 - Good Manufacturing Practice (GMP) Guidelines

## SOPs and SMPs

540.    The following SOPs and SMPs applied to the ZHP Defendants' VCDs:

- Guideline for Genotoxic Impurity Evaluation, API-R&D-002

- o June 17, 2011
- SMP-001 - Quality Manual
  - o February 15, 2011
- SMP-17.04 - Deviation Investigation Management System
  - o Version 1: 2011.05.20
  - o Version 2: 2011.08.01
  - o Version 3: 2011.08.10
  - o Version 8: 2017.10.20
- SMP-018.01 - Change Control System
  - o Version 1: 2011.06.15
  - o Version 2: 2012.04.15
  - o Version 3: 2015.06.01
  - o Version 4: 2015.11.25
  - o Version 5: 2017.12.30
  - o Version 6: 2018.09.30
  - o Version 7: 2018.11.30
- ZHP's Draft SOP TE-002-4: Standard Operation Procedure for Process Validation
- ZHP's SMP-023.03: Standard Management Procedure for Quality Risk Management
  - o Version 1: 2011.09.01
  - o Version 2: 2016.05.01
  - o Version 3: 2017.11.01
- ZHP's SMP-021.07: Standard Management Procedure (SMP) for Lab OOS/OOT Investigation Management System
  - o Version 1: 2011.05.01
  - o Version 2: 2012.12.16
  - o Version 3: 2013.06.10
  - o Version 4: 2013.10.01
  - o Version 5: 2014.04.30
  - o Version 6: 2015.10.01
  - o Version 7: 2016.03.01
- ZHP's SMP-020.06: Standard Management Procedure for Annual Product Review Management System
  - o Version 1: 2011.05.15
  - o Version 2: 2011.11.25
  - o Version 3: 2013.10.01
  - o Version 4: 204.11.01
  - o Version 5: 2015.09.25

o Version 6: 2017.11.15
- ZHP's SMP-011.08: Standard Management Procedure for Complaint Management Procedure
  o Version 1: 2011.05.20
  o Version 2: 2011.08.01
  o Version 3: 2011.08.10
  o Version 8: 2017.10.20

541.    The following SOPs applied to the Teva Defendants' VCDs:

- CORP-0001 Quality Policy
- CORP-0004 Facilities
- CORP-0005 Material Purchasing, Receiving, Storage and Distribution
- CORP-0006 Manufacture
- CORP-0008 Quality Control Laboratory Charter
- CORP-0008 Stability
- CORP-0016 Auditing Vendors
- CORP-0027 Quality Risk Management for Cross Contamination Control
- CORP-0046 Contract Manufacture and Analysis
- CORP-0051 Equivalency of APIs
- CORP-0053 Field Alert Reporting
- CORP-0070 Risk Assessment; Computerized Systems
- CORP-0076 Notification of Management of Critical Quality Incidents
- CORP-0082 Vendor Qualification
- CORP-0092 Handling of Out of Specification (OOS) and Out of Trend (OOT) Test Results
- CORP-0097 Change Control
- CORP-0109 Audit of Contract Manufacturers (3rd Party)
- CORP-0111 Third Party Suppliers and Contract Laboratories Compliance Status
- CORP-0114 Investigations
- CORP-0126 GxP Audit Program
- CORP-0134 Auditing of API Manufacturers
- CORP-0141 Quality Risk Management Q9
- CORP-0148 Procurement Controls
- CORP-0150 Process Validation
- CORP-0175 Quality Technical Agreements

- CORP-0301 Rating of Third Party Site Status Following Teva Audit
- CORP-0348 Annual Review for Commercial Drug Product
- CORP-0377 GMP Compliance Auditor Qualification
- CORP-0420 Compendia Update
- CORP-0429 Recall and Withdrawal of Product
- CORP-0433 ICP-MS Elemental Impurities Method Validation
- CORP-0533 Batch Disposition
- CORP-0539 Management of Quality Technical Agreements
- CORP-0617 CAPA
- CORP-0780 Health Hazard and Safety Assessments
- CORP-0896 Data Integrity
- CORP-0912 In-Vitro Bioequivalene, Analytical Validation and Testing Requirements Supported by Bioanalytical Method Validation
- CORP-1031 Global Regulatory Audits
- CORP-1034 Managing Critical Vendor Issues
- CORP-1041 Testing Practices and Procedures
- CORP-1043 Determination of Related Chromatographic Methods
- CORP-1045 Chromatographic Procedure for Assay and Identification Determination Tests
- CORP-1327 Guidance on the Risk Evaluation Process for the Potential Formation of Nitrosamine Impurities

## **DEFENDANTS' FINANCES**

542.    ZHP's total revenue in 2022 was $8.27B RMB.
543.    ZHP's enterprise value YE 2022 was $38.02B RMB.
544.    As of Q3 2023, ZHP's enterprise value was $30.92B RMB.
545.    Teva's enterprise value YE 2023 was $29.33B USD.
546.    Teva's total revenue 2023 was $15.85B USD.
547.    Torrent's total revenue in 2022 (YE March 23) was 9,620 INR.
548.    Torrent's total enterprise value in 2022 was 5,567 INR.
549.    ZHP's 2022 total revenue reported as $1,157,800,000 USD
550.    ZHP's enterprise value of $4,328,800,000 USD as of Q3 2023
551.    Torrent's 2022 total revenue (year-end March 2023) reported as $1,154,400,000 USD
552.    Torrent's enterprise value of $668,040,000 USD as of year-end March 2023

553.    In 2022, Torrent paid a dividend of $0.264 USD per share with a total of 338.45M outstanding shares, resulting in a total payout of $89,350,800 USD

## Torrent SOPs and SMPs

554.    The following SOPs and SMPs applied to the Torrent Defendants' VCDs:

- SOP CQA-055 Change Control Management Across all the Locations
  - Version 4: 01.12.2016
  - Version 5: 01.07.2017 (effective 3 years)
- SOP, CQA-027 Qualification of Vendors for Active Pharmaceutical Ingredients (Regulated Market)
  - Version 15: 11.30.2019
  - Version 14: 01.10.2019
  - Version 11: 12.12.2016
  - Version 10: 08.19.2015
    Version 6: 03.30.2012
- Procurement Process, SOP PRS-001-11
  - 08.14.2018
- Vendor Rating, Reference SOP No. CQA-092
  - Version 1: 08.07.2016
  - Version 2: 01.08.2019
- SOP CQA-058 Procedure for Handling Investigation Deviation
  - Version 3: 01/12/2016)
- SOP CQA-088 Corrective Action and Preventative Action
  - Version 1: Effective 01.12.2016
- SOP CQA-089 Quality Risk Management
  - Version 1: Effective 01.06.2017

## PART IV.  EACH DEFENDANT'S CONTESTED FACTS:

A.    Contested Facts Common to All Defendants

1.    Defendants' valsartan did not pose any carcinogenic risk to patients.

2.    Defendants' valsartan provided therapeutic treatment to patients just as effectively as valsartan that did not contain NDMA or NDEA impurities.

3. Defendants' valsartan provided therapeutic treatment to patients just as effectively as valsartan that contained NDMA or NDEA impurities below acceptable daily intake limits later published by the FDA.

4. Defendants' valsartan had full economic value both to the patients who took it and to the TPPs that paid for or reimbursed its costs.

5. Defendants' valsartan complied with all regulatory requirements, ANDA requirements, and standard operating procedures, as well as all other applicable requirements, standards, or specifications.

6. Defendants did not make any express warranties with respect to their valsartan.

7. Defendants did not breach any express warranties with respect to their valsartan.

8. Plaintiffs and class members did not rely on any express warranties by Defendants.

9. Plaintiffs and class members were not injured by any asserted breach of express warranty by Defendants.

10. Plaintiffs and class members did not give notice of any warranty claims to Defendants.

11. Defendants did not engage in any fraudulent or deceptive conduct.

12. Defendants made no fraudulent misrepresentations or omissions on which Plaintiffs or class members relied.

13. Defendants did not have scienter as to any representations or omissions to Plaintiffs or class members.

14. Defendants did not cause any injury to Plaintiffs or class members as a result of any such reliance.

15. Plaintiffs and class members suffered no injury as a result of the presence of NDMA or NDEA impurities in Defendants' valsartan.

16. Defendants' valsartan was not "worthless" and was worth its full purchase price.

17.    Plaintiffs' and class members' damages calculations are grossly overstated because they are based on exaggerated pricing data and fail to exclude amounts for which Plaintiffs and class members were never responsible.

18.    The RLDs Diovan and Exforge contained nitrosamine impurities.

19.    The levels of all impurities in the valsartan at issue were within the specification limits approved by the FDA via the ANDA.

20.    The presence of impurities does not implicate pharmaceutical equivalence, bioequivalence, or AB ratings.

21.    The FDA allows different impurity profiles in drugs, and changes in impurities do not create different or new drugs.

22.    The presence of NDMA in generic valsartan did not alter the valsartan's bioequivalence or clinical efficacy; nor did it have any impact on how the valsartan works—i.e., its pharmacokinetics or pharmacodynamics.

23.    The presence of NDMA impurities did not impact the efficacy of the valsartan at issue at all, and the valsartan provided the same therapeutic benefit as valsartan that did not contain NDMA impurities.

24.    In its first announcement regarding the Valsartan recall in July 2018, the FDA expressly stated that "the presence of NDMA was unexpected and [was] thought to be related to changes in the way the active substance was manufactured."

25.    Dr. Gottlieb also noted that "NDMA's properties make it difficult to find," and that "[b]ecause it was not anticipated that NDMA would occur at these levels in the manufacturing of the valsartan API, manufacturers would not have been testing for it."

26.    In a subsequent statement issued by Dr. Gottlieb on January 25, 2019, the FDA again reiterated that "[o]ne challenge [the FDA] faced is that NDMA's properties make it hard to detect in standard laboratory testing – the kind of testing results that are reviewed during a surveillance inspection."

27.    The FDA also explained that "it generally needs to be recognized that there's a risk of an impurity occurring as a result of a manufacturing

126

process to know the impurity should be tested for."

28. Analyzing low-level impurities such as the NDMA and NDEA found in valsartan is extremely difficult and requires specialized equipment, analytical testing methods and expertise. Drug manufacturers could not test for every conceivable impurity without knowing the structure of the impurity, and it is particularly difficult to detect and quantify unknown impurities at such low levels as the NDMA and NDEA impurities found in valsartan because the peaks were so low that they would not have stood out as unknown to flag and investigate.

29. At the time the recalled valsartan was approved by the FDA, and continuing through the time of the recalls beginning in July 2018, there was no specification for nitrosamine impurities in valsartan. Specification testing for valsartan prior to 2018 did not include testing capable of detecting NDMA at the levels at issue here.

30. At the time the valsartan at issue was approved by the FDA, and continuing through the time of the recalls beginning in July 2018, there were also no validated or industry-standard methods or practices to test for the presence or absence of NDMA or NDEA in valsartan.

31. The levels of all unknown impurities in valsartan medications, including the NDMA and NDEA impurities that were discovered, were within the limits of the specifications approved by the FDA for unknown impurities at all times that the valsartan at issue was available to patients.

32. Plaintiffs' organic chemistry expert, Dr. Stephen Hecht, stated that Defendants "would not have identified NDMA in the chromatograms unless they were specifically looking for it, because the peaks would be too small."

33. At the time the valsartan at issue was approved by the FDA, and continuing through the time of the recalls beginning in July 2018, the United States Pharmacopeia ("USP") did not contain any standard relating to permissible or impermissible quantities of NDMA or NDEA in valsartan.

34. The FDA did not develop and issue any method for the detection of NDMA or NDEA in valsartan until October 11, 2018, after the valsartan recalls.

35. The FDA did not publish a table of interim acceptable intake limits for nitrosamines, including NDMA and NDEA, in valsartan, until December 19, 2018, and did not confirm those limits until February 2021.

36. USP first published a chapter on nitrosamine impurities in September 2020.

37. "Adulteration" is a statutorily defined regulatory determination, and the FDA alone determines whether a product is adulterated.

38. The FDA "estimated that if 8,000 people took the highest valsartan dose (320 mg) from NDMA-affected medicines daily for four years (the amount of time we believed the affected products had been on the U.S. market), there may be one additional case of cancer over the lifetimes of these 8,000 people beyond the average cancer rate among Americans. This estimate represented the highest possible level of NDMA exposure. It was a measure of the risk under the most extreme circumstances. Most patients who were exposed to the impurity through the use of valsartan received less exposure than this worst-case scenario."

39. Similarly, the FDA stated that it "estimate[s] that if 18,000 people took valsartan at the highest dose (320 mg) containing NDEA from recalled batches daily for four years, there may be one additional case of cancer over the lifetime of these 18,000 people."

40. Indeed, in January 2019, the FDA again reiterated that the "risk to individual patients remains very small."

41. There is no evidence that any VCD subject to the recall did not serve its intended purpose of providing effective antihypertension treatment. Plaintiffs' expert Dr. Rena Conti admitted she could not identify any scientific evidence indicating that, between 2012 and 2018, generic valsartan available on the market was not effective in treating hypertension.

42. Plaintiffs' expert Dr. Ramin Najafi was unable to dispute that "the defendant's valsartan products . . . lower[ed] blood pressure in adults and children" who used the products.

43. Given the efficacy and important medical benefits provided by

valsartan, the FDA stated in its July 13 News Release about the recall that individuals should not stop taking the drug immediately. According to the FDA: "[b]ecause valsartan is used in medicines to treat serious medical conditions, patients taking the recalled valsartan-containing medicines should continue taking their medicine until they have a replacement product."

44.    In a statement from Dr. Gottlieb dated April 4, 2019, the FDA stated that "[t]he risk associated with abruptly discontinuing the use of these important medicines far outweighs the low risk that our scientists estimate to be associated with continuing the medicine until the patient's doctor or pharmacist provides a safe replacement or a different treatment option."

45.    Defendants did not make any warranties or representations on their labels, websites, or anywhere else regarding the presence or absence of NDMA in their respective valsartan API or valsartan prior to the recalls beginning in July 2018.

46.    Neither EmblemHealth nor SummaCare, on whose behalf named Plaintiff MSP has brought suit, received any representations from any Defendant. Tiffanie Mrakovich, the Rule 30(b)(6) representative witness for SummaCare, testified that SummaCare "does not have any direct relationship with manufacturers" and "we do not have any warranties in place with manufacturers directly."

47.    Both representative witnesses for EmblemHealth testified that they did not know whether anyone from EmblemHealth had ever read any Defendant's website or otherwise had any communications with any of the Defendants in this action regarding valsartan.

48.    EmblemHealth's representatives did not know of anyone at EmblemHealth ever going to any Defendant's website or reviewing printed literature regarding valsartan from any Defendant, and did not know of any express warranties made by any Defendant to EmblemHealth regarding valsartan.

49.    For an ANDA holder to obtain approval for a generic drug, it must demonstrate to the FDA that its product is pharmaceutically equivalent and bioequivalent to the RLD.

50.    Pharmaceutical equivalence means, among other things, that the

129

generic drug is the same as the RLD in terms of active ingredient(s), strength, dosage form, and route of administration.

51.    Bioequivalence means the generic product is absorbed into the blood-stream at a similar rate and similar extent as the RLD.

52.    When an ANDA product is approved by the FDA as therapeutically equivalent and bioequivalent, it is typically given an AB-rating, allowing it to be substituted by a pharmacist for the branded drug.

53.    Dr. Conti also testified that the "clinical benefit of a product affect[s] its economic value" and "by definition" is "reflected in the demand curve" of the product.

54.    There is no evidence that the TPPs would have saved money if they had purchased an alternative hypertension drug other than the VCDs at issue at the time, and in fact it is likely alternative drugs would have been more expensive.

55.    MSP is not a TPP and has never been a plan sponsor.

56.    MSP's affiliate entity, MSP Recovery, LLC, stores, reviews and analyzes claims data, and its affiliated law firm sues over them.

57.    SummaCare's corporate representative testified that SummaCare does "not have any warranties in place with manufacturers directly."

58.    Similarly, EmblemHealth's corporate representative replied "I don't know" when asked if it was EmblemHealth's "position that any defendants in this action made express warranties to [it] regarding valsartan."

59.    Pharmacy and Therapeutics Committees ("P&T Committees") evaluate medications for inclusion on formularies.

60.    Both EmblemHealth and SummaCare have their own P&T Committees.

61.    P&T Committees rely on a wide range of documents and sources to develop formularies.

62.    These documents and sources include medical and clinical evidence from the literature, relevant patient utilization and experience,

130

economic data, provider recommendations, FDA-approved package inserts, the product label, published data from clinical trials, and relevant patient experiences.

63.    TPPs do not pay for VCDs at the point of sale. Either the TPP or its PBM is charged at the point of sale, but payments occur at a later point in time, may be made in a different location than the point of sale, may be aggregated with other transactions, and are subject to numerous pre- and post-point-of-sale adjustments.

64.    TPPs are not responsible for and do not incur all amounts charged at the point of sale for VCDs. For example, TPPs may offer self-insured or self-funded plans under which the employer is responsible for all charges at the point of sale.

65.    TPPs also are not responsible for and do not incur amounts paid by others towards the cost of VCDs, including amounts paid by the Centers for Medicare & Medicaid Services ("CMS") (e.g., the low-income cost-sharing subsidy, the catastrophic coverage reinsurance subsidy, and the direct subsidy), and amounts covered by direct and indirect remuneration.

66.    EmblemHealth, SummaCare, and TPP class members did not incur any economic losses as the result of the recall of VCDs. They did not have to refund or reimburse any money to plan members or anyone else as a result of the recall, nor did they have to purchase replacement drugs for VCDs that had already been purchased and used prior to the recall.

67.    EmblemHealth, SummaCare, and TPP class members did not have to pay more for members' replacement drugs following the recall, and in multiple instances paid less.

B.    ZHP'S Contested Facts

1.    ZHP manufactured the active pharmaceutical ingredient ("API") used in certain recalled VCDs but did not market, sell or hold an Abbreviated New Drug Application ("ANDA") for any of the recalled VCDs.

2.    ZHP's indirect subsidiary Prinston d/b/a Solco manufactured and sold approximately 16 finished dose VCDs with unique National Drug

131

Codes ("NDCs") using ZHP's API that were included in the recall.

3.    On September 24, 2007, ZHP submitted the original Drug Master File for its "valsartan drug substance" to the FDA, which recorded it as Drug Master File No. 020939.

4.    Drug Master File No. 020939 detailed ZHP's proposed manufacturing process for valsartan API, comprising a five-step route of synthesis (the "Valsartan ROS").

5.    The Valsartan ROS outlined in Drug Master File No. 020939 used tributyl tin chloride as the catalyst for the reaction in Step 4.

6.    The manufacturing process described in Drug Master File No. 020939 is generally referred to as the "TIN Process." This Drug Master File is no longer active.

7.    ZHP subsequently elected to move away from the TIN Process and, on January 22, 2010, submitted Drug Master File No. 023491 for the "valsartan USP (process II)."

8.    This Drug Master File is still "active" today. Among other changes, Drug Master File No. 023491 substituted triethylamine hydrochloride for tributyl tin chloride in Step 4 of the Valsartan ROS.

9.    The manufacturing process described in Drug Master File No. 023491 is generally referred to as the "TEA Process."

10.   On April 16, 2012, ZHP submitted Amendment-002 to Drug Master File No. 023491 ("Amendment 002").

11.   Amendment-002 added a quenching procedure after the tetrazole formation reaction with sodium nitrite/HCl solution.

12.   ZHP explained in its FDA filing that this change was made to limit the presence of a potentially dangerous substance known as azide, which was used in the TEA Process to optimize the tetrazole formation reaction.

13.   However, excess azide after the tetrazole formation reaction would introduce acidic azide gas with high toxicity and raise Environmental Health & Safety concerns during manufacturing.

14.    To address the excess azide, ZHP proposed adding the quenching step to guarantee excess azide was destroyed thoroughly and minimize the risk of residual azide carry-over into the final drug substance (a potential genotoxic impurity) and the environment.

15.    Prior to submitting Amendment-002, ZHP ran a number of tests to determine the effect, if any, that adding the quenching step would have on the manufacturing process.

16.    Following Amendment-002, ZHP separated the TEA Process into two subcategories: the "TEA without quenching" process (original "Process II" prior to Amendment-002) and the "TEA with quenching" process, which referred to product made with the change identified in Amendment-002.

17.    On December 10, 2013, ZHP submitted Amendment-004 to Drug Master File No. 023491 ("Amendment 004").

18.    Amendment 004 changed Step 3 of the Valsartan ROS by adding the common solvent dimethylformamide ("DMF" or "DMF solvent") to facilitate the reaction in that step.

19.    In addition, Amendment-004 also changed Step 4 of the Valsartan ROS by: (1) replacing triethylamine hydrochloride with zinc chloride as the catalyst reagent; (2) substituting DMF solvent for toluene as the solvent used in the reaction; and (3) adding methyl tertiary butyl ether ("MTBE") to facilitate the reaction in that step.

20.    The manufacturing process documented in Amendment-004 is generally referred to as the "Zinc Chloride" process.

21.    In its submission of Amendment-004 to the FDA, ZHP explained that it was adopting the Zinc Chloride process "to reduce racemization and waste for quality (impurity A)" and to address an "EHS [Environment, Health & Safety] concern."

22.    ZHP also noted that the substitution of zinc chloride for triethylamine hydrochloride as the applicable reagent provided satisfactory yields while lowering EHS and quality concerns.

23.    ZHP further explained that testing showed that the new solvents DMF and MTBE, and the reagent zinc chloride, were all easily removable

133

from the final product, and testing confirmed their absence in the final drug substance.

24.    The primary purpose of ZHP's changes to its manufacturing process "was to reduce impurity A in valsartan."

25.    ZHP's regulatory inspection history with the FDA reflects predominantly compliant findings with cGMP.

26.    The sole Warning Letter ever issued to ZHP by the FDA as a result of ZHP's voluntary reporting of its NDMA discovery was resolved to the FDA's satisfaction and closed without any further enforcement action.

27.    On May 21, 2018, Novartis AG ("Novartis"), a prospective customer of ZHP, contacted ZHP regarding several unknown peaks—i.e., unidentified substances, that it had discovered when testing samples of ZHP's API using gas chromatography flame ionization detection, also known as GC-FID.

28.    The two companies exchanged a series of emails as they worked together to investigate the unknown peaks.

29.    In the course of the investigation, Novartis suggested that a third-party laboratory—Solvias AG ("Solvias")—conduct an analysis to identify the peaks using gas chromatography-mass spectrometry ("GC-MS") technology.

30.    On June 11, 2018, Novartis informed ZHP via email that Solvias had identified one of the unknown peaks as NDMA, a type of nitrosamine.

31.    Following Solvias's identification of NDMA in ZHP's API, ZHP immediately developed a quantitative analytical method for identifying NDMA, confirmed the presence of NDMA, and notified the FDA of its findings through its U.S. subsidiary, Prinston.

32.    After notifying the FDA of the finding of NDMA, ZHP and Prinston continued to work closely with the agency to determine the appropriate path forward and identify the root cause of the impurity.

33.    On July 13, 2018, shortly after confirming the presence of NDMA in certain samples of valsartan API, ZHP initiated a voluntary Class II recall of finished dose VCDs containing its valsartan API in

conjunction with the FDA.

34. ZHP was the first manufacturer to provide data regarding the discovery of NDMA to the FDA.

35. During a teleconference with the European Directorate for the Quality of Medicines & HealthCare ("EDQM") and other European Union authorities on August 7, 2018, ZHP was asked if there was the possibility that N-Nitrosodiethylamin[e] ("NDEA"), a different nitrosamine, could potentially also be present in ZHP's API.

36. ZHP immediately initiated the development of an analytical method for NDEA.

37. On August 29, 2018, batches of valsartan API were tested using this method, and the data obtained indicated the presence of trace amounts of NDEA in batches of ZHP's valsartan API.

38. ZHP informed the EDQM and the FDA of these findings, and the FDA shared them with the public on September 13, 2018.

39. The FDA stated that its own "testing show[ed] that not all products made using ZHP valsartan API contain[ed] the NDEA impurity."

40. ZHP's 2018 investigation regarding the origins of the NDMA and NDEA identified in valsartan API is summarized in Deviation Investigation Report Nos. DC DCE-18001 ("the Preliminary DIR") and DCE-18003 ("Final DIR").

41. In the Final DIR, ZHP noted that the "presence of trace amount[s] of NDMA in the final [v]alsartan API requires the convergence of the following three factors . . . i) presence of dimethylamine [('DMA')] in the manufacturing process . . . ii) presence of nitrous acid in the manufacturing process . . . and; iii) [t]he possibility of direct contact between secondary amines [(i.e., DMA)] and nitrite in the presence of the target product [(i.e., valsartan)]."

42. ZHP explained in the Final DIR that "[t]he presence of trace amount[s] of NDEA in the final Valsartan drug substance requires the convergence of the following three factors: . . . [i)] [p]resence of diethylamine [('DEA')] in the manufacturing process . . . [ii)] [p]resence of nitrous acid in the manufacturing process . . . [iii)]

135

[p]ossibility of direct contact between secondary amines [i.e., NDEA] and nitrite in the presence of the target product."

43.    Plaintiffs' expert, Dr. Ramin Najafi, has testified—consistent with ZHP's findings in the Final DIR—that the nitrosamine NDMA cannot form without the presence of the secondary amine DMA, and that the nitrosamine NDEA cannot form without the presence of the secondary amine DEA.

44.    ZHP's investigation into the root causes of how NDEA and NDMA came to be present in its valsartan API focused on identifying whether and how DMA and DEA had been introduced into the processes that ZHP used to manufacture its valsartan API during the proposed class period, and whether that DMA and DEA was exposed to nitrous acid in such a way that it was possible for NDMA and/or NDEA to form.

45.    ZHP determined that "the ultimate reason for the presence of NDEA in Valsartan API (TEA [with quenching] process) [was] due to the process change in which triethylamine (TEA) was introduced as a catalyst and its impurity/degradant, diethylamine, unexpectedly react[ed] with nitrous acid during the subsequent quenching step in the presence of the product of that step."

46.    ZHP also concluded that NDMA was able to form in its valsartan API because the DMF solvent used in the Zinc Chloride process had "degraded into dimethylamine, [which] react[ed] with nitrous acid (formed by sodium nitrite and hydrochloric acid) during the next quenching reaction, and [formed] NDMA."

47.    A limited number of publications, including Purification of Laboratory Chemicals, Armarego, WLF (4th Edition 1996, 6th Edition 2009) ("Armarego"), have suggested (in passing) that DMF solvent could decompose at its boiling point into DMA, a necessary component of NDMA.

48.    Both Dr. Najafi and Dr. Hecht conceded that ZHP's manufacturing processes never reached the temperature necessary for DMF to boil.

49.    Dr. Najafi was not aware of Armarego until his retention for this litigation, while Dr. Hecht does not know if the isolated statements regarding DMF decomposition are common knowledge even today.

50.     Dr. Najafi testified that, despite having a Ph.D. in chemistry and operating his own laboratory, he first became aware of the possibility that TEA exposed to sodium nitrite could ultimately form NDEA in connection with this litigation.

51.     Dr. Hecht was unable to identify any scientific literature that documented a reaction between TEA and sodium nitrite leading to the creation of NDEA prior to or during the time that the TEA with quenching process was being used to manufacture ZHP's API.

52.     Dr. Najafi also advanced a theory that the TEA used by ZHP itself may have contained DEA. But none of Plaintiffs' experts points to any evidence that ZHP's TEA contained DEA; instead, they cite a single record discussing it as a potential issue raised after the recall, underscoring the lack of evidence that ZHP could have known NDEA formation occurred during the class period.

53.     Plaintiffs assert that a 2017 email from ZHP employee Jinsheng Lin shows that ZHP did have knowledge of the potential for NDMA or NDEA resulting from its manufacturing processes, but that email is not even about valsartan API—the product in question.

54.     Rather, Mr. Lin's email addresses a hypothetical nitrosated impurity in the lab-scale production of Irbesartan, a different drug molecule than valsartan API.

55.     Prior to July 2018, there was no FDA standard, testing methodology, or other regulatory or industry standards or requirements pertaining to limits of NDMA in VCDs.

56.     The FDA stated in August 2018 that "the levels of NDMA in ZHP's valsartan API" constituted "trace amounts."

57.     The FDA did not find or declare any API used to manufacture VCDs "adulterated" until, at the earliest, November 29, 2018, by which time all medications containing the affected ZHP API had been voluntarily recalled.

C.     Teva's Contested Facts

1.     ZHP first notified Teva of "a previously unknown impurity that may have genotoxic potential" in valsartan API on June 20, 2018. On June

137

25, 2018 ZHP first notified Teva that the previously unknown impurity was suspected to be N-nitrosdimethylamine and likely to be process related. Prior to this, Teva had never received notice from ZHP regarding a nitrosamine impurity in valsartan API.

2.  Teva did not know of NDMA or NDEA in its valsartan, or of any propensity for NDMA or NDEA to form, prior to June 20, 2018.

3.  The presence of NDMA in ZHP's valsartan API was unexpected and not detectable under any validated test or industry standard prior to June 20, 2018.

4.  Prior to July 2018, there was no FDA standard, testing methodology, or other regulatory or industry standards or requirements pertaining to limits of NDMA or NDEA in VCDs.

5.  As Plaintiffs' own expert, Dr. Stephen Hecht, admits, there is no evidence Teva was aware of the potential for nitrosamine formation in valsartan API or valsartan prior to June 2018.

6.  None of the "unknown peaks" observed by Teva in ZHP's valsartan API or Teva's valsartan were the result of nitrosamine impurities.

7.  Teva complied with all unknown impurities requirements in valsartan API and finished dose prior to the recalls, and there was no separate limit on NDMA impurities until well after the recalls.

8.  Teva complied with all cGMPs in overseeing its valsartan API supplier, ZHP.

9.  Teva complied with its own procedures for overseeing API suppliers as to ZHP and ZHP's valsartan API.

10. Teva's valsartan finished dose was not adulterated, met compendial standards, and was made in compliance with all cGMPs.

11. Teva met or exceeded all requirements, standards, and specifications pertaining to oversight, testing, process changes, and all other applicable processes.

12. At no time did the FDA make the regulatory determination that Teva's valsartan drugs were adulterated.

13. Teva did not make any representations or warranties regarding its valsartan's Orange Book listing.

14. Teva (via legacy Actavis) followed its own change control and risk assessment procedures relating to analysis and approval of ZHP's manufacturing process change for valsartan API.

15. Teva complied with its own procedures for issuing field alerts.

16. The Teva Defendants' manufacturing facilities received acceptable cGMP inspections from all regulators during the relevant time period, with no issues to which the presence of nitrosamine impurities may be attributed.

17. The FDA did not issue any Warning Letters to put any import hold on Teva's valsartan, did not take any regulatory action with respect to Teva's valsartan in connection with nitrosamine impurities, and did not send any communications to Teva that products sold under its ANDAs were no longer AB-rated to their corresponding RLDs.

18. The Teva Defendants' Quality Control and Standard Operating Procedures at all relevant times were consistent with cGMP requirements.

19. The Teva Defendants tested all incoming ZHP API.

20. The Teva Defendants tested their VCDs in accordance with compendial requirements, approved regulatory specifications, and industry standards, including performing all testing required by the USP Monograph and ANDA, as well as all testing required and contemplated by genotoxic / mutagenic impurity guidances, including ICH M7, and performing appropriate evaluation and testing of residual solvents.

21. Plaintiffs' expert, Phillip Russ, concedes that he saw no evidence to suggest out of trend results that Teva failed to act upon.

22. When ZHP's manufacturing process for its API changed, the Teva Defendants performed a risk assessment to assess the potential for the formation of additional or different impurities as a result of the process change.

23. The Teva Defendants' Annual Products Reviews, which Plaintiffs' own expert described as "one of the best, in my opinion, summary documents that points to all the records that [the FDA] want[s] to see," reflected that Teva performed its own testing and did not copy data from ZHP's certificates of analysis.

24. The Teva Defendants were not denied inspection of ZHP's facilities, did not ignore unfavorable information, and did not prioritize price ahead of patient safety.

25. The Teva Defendants first learned that there was a previously unknown impurity in ZHP's API when ZHP informed them of the issue on June 20, 2018.

26. Neither the Teva Defendants' testing of their valsartan nor their audits of ZHP and other suppliers provided evidence to suggest NDMA would be present in the API purchased from ZHP.

27. Upon learning of the presence of impurities in ZHP's valsartan API, the Teva Defendants initiated a voluntary recall of their corresponding valsartan on July 16, 2018.

28. Teva did not make any warranties or representations regarding the presence or absence of nitrosamines in its valsartan.

29. Teva did not make any representations or warranties regarding its valsartan to EmblemHealth or SummaCare.

30. Teva did not make any representations or warranties regarding its valsartan to any TPP Class Member.

31. Teva did not breach any warranties regarding its valsartan to Plaintiffs and class members.

32. Plaintiffs and class members were not damaged as a result of any alleged breach of warranty by Teva.

33. Teva's valsartan was not adulterated.

34. Teva never received notice that FDA made a regulatory determination that Teva's valsartan was adulterated.

35. At all relevant times prior to Teva's recall, Teva's valsartan met all

compendial and approved DMF and ANDA specifications and its labeling conformed to those of the Reference Listed Drugs.

36.    Teva did not lie or make any misstatements regarding the presence or absence of nitrosamines in its valsartan.

37.    Prior to August 2018, Teva did not know or have reason to know of the possibility of nitrosamine impurities in valsartan API that Teva had purchased from ZHP.

38.    Plaintiffs and class members did not rely on any alleged misstatements by Teva.

39.    Plaintiffs and class members were not damaged as a result of any alleged fraud by Teva.

40.    Teva did not engage in any unfair, deceptive, or unconscionable conduct regarding its valsartan.

D.    Torrent's Contested Facts

1.    In the years leading up to the valsartan recall, Torrent's Indrad facility regularly passed FDA inspections.

2.    Torrent conducted independent testing of every batch of API that it received from ZHP in accordance with the testing specifications established by the USP monograph for valsartan API and those provided by ZHP.

3.    Torrent tested its valsartan in accordance with compendial requirements, approved regulatory specifications, and industry standards.

4.    Torrent fully complied with cGMP regulations.

5.    None of the observations listed in the FDA's October 2019 Warning Letter pertained to API testing or trace impurities in Torrent's products.

6.    Torrent's Quality Control and Standard Operating Procedures at all relevant times were consistent with cGMP requirements.

7.    Torrent conducted an appropriate risk assessment for its API supplier, ZHP.

8.  Torrent properly audited ZHP as an API supplier in compliance with Torrent's internal SOPs as well as cGMPs and applicable ICH guidelines.

9.  Torrent's reliance on third-party auditors to audit its API suppliers was consistent with cGMP requirements.

10. Torrent used a well-qualified third-party auditor to audit ZHP.

11. ZHP took appropriate corrective and preventative actions ("CAPA") to address all observations made by Torrent's independent auditor, which CAPAs were deemed satisfactory by that independent auditor.

12. ZHP passed all of the audits conducted by Torrent's independent, third-party auditor.

13. Neither Torrent's testing of its valsartan, its audits of ZHP, nor any other source of information available to Torrent provided any evidence to suggest nitrosamines would be present in the API that Torrent purchased from ZHP.

14. On June 20, 2018, Torrent first learned that there was the potential for a previously unknown genotoxic impurity to exist in valsartan API manufactured by ZHP. Torrent received this information in a notice from ZHP but did not learn the identity of the impurity, the level of the impurity, which ZHP manufacturing process generated the potential for the impurity, in what batches the impurity had been detected, or whether the impurity had been detected at levels above or below FDA standards.

15. Torrent took immediate steps to quarantine its valsartan and put its valsartan on hold on June 22, 2018. Torrent also placed its valsartan API purchased from ZHP on hold.

16. On June 26, 2018, ZHP told Torrent that the impurity it had previously referenced in its June 20, 2018 notice was NDMA and that it was only potentially present in "new process" ZHP Valsartan API, which Torrent did not use to manufacture valsartan for the US Market. ZHP told Torrent that the impurity issue did not implicate batches of API manufactured with the "old process," which ZHP declared had no potential for genotoxic impurities.

142

17.    Once Torrent knew that the impurity ZHP had identified in New Process valsartan API was NDMA, Torrent immediately began working to develop a test to detect NDMA in valsartan API.

18.    After ZHP told Torrent that there was no potential for NDMA to exist in Old Process API, Torrent coordinated with the FDA to determine the appropriate course of action for Torrent's finished dose valsartan products, which were manufactured exclusively with Old Process API.

19.    On July 18, 2018, the FDA determined that no market action was required for Torrent's valsartan and authorized Torrent to begin selling its valsartan products again in order to address the risk of supply shortages generated by recalls of valsartan sold by other companies that had been manufactured with ZHP's New Process API.

20.    Torrent did not resume manufacturing valsartan and kept Valsartan API purchased from ZHP on hold.

21.    On August 3, 2018, Torrent first learned that trace amounts of NDMA were detected in valsartan API manufactured using the Old Process. Torrent received this information in a notice from ZHP but did not learn of the level of the impurity, in what batches it had been detected, or whether it was above FDA standards.

22.    On August 9, 2018, ZHP informed Torrent that it had initially tested 12 batches of Old Process API, none of which were batches that had been sold to Torrent. Of those 12 batches, 7 had NDMA levels below 0.3 ppm and 5 had NDMA levels above 0.3 ppm. At this time, the FDA had told Torrent it was using 0.5 ppm as an acceptable level for NDMA in valsartan. Torrent did not know if any of ZHP's testing results for Old Process API exceeded that limit.

23.    On August 10, 2018, Torrent finished developing its own testing method for detecting NDMA in valsartan API and began testing its finished dose valsartan.

24.    On August 11, 2018, the FDA informed Torrent that one batch of Old Process API that had been sold to Torrent contained NDMA above acceptable levels. Upon investigation, Torrent confirmed that it had not manufactured any finished dose valsartan products using API from that batch.

143

25. On August 16, 2018, the FDA told Torrent that it had discovered nitrosamine impurities in samples of Torrent's finished dose valsartan. Torrent further received, on August 17, 2018, results of testing performed by Torrent and ZHP that indicated the presence of NDMA in API batches that Torrent had used to manufacture valsartan.

26. Torrent did not learn that there was a potential for NDEA to be present as a process-related impurity in valsartan API manufactured by ZHP until after Torrent had voluntarily recalled all of its valsartan.

27. Torrent did not make any warranties or representations regarding the presence or absence of nitrosamines in its valsartan.

28. Torrent did not make any warranties or representations regarding its valsartan's Orange Book listing.

29. Torrent did not make any representations or warranties regarding its valsartan to EmblemHealth or SummaCare.

30. Torrent did not make any representations or warranties regarding its valsartan to any TPP Class Member.

31. Torrent did not breach any warranties regarding its valsartan to Plaintiffs and class members.

32. Plaintiffs and class members were not damaged as a result of any alleged breach of warranty by Torrent.

33. Torrent never received notice that FDA made a regulatory determination that Torrent's valsartan was adulterated.

34. At all relevant times prior to Torrent's recall, Torrent's valsartan met compendial and approved DMF and ANDA specifications and its labeling conformed to those of the Reference Listed Drugs.

35. Torrent did not lie or make any misstatements regarding the presence or absence of nitrosamines in its valsartan.

36. Prior to August 2018, Torrent did not know or have reason to know of the possibility of nitrosamine impurities in valsartan API that Torrent had purchased from ZHP.

37. Plaintiffs and class members did not rely on any alleged misstatements

144

by Torrent.

38.    Plaintiffs and class members were not damaged as a result of any alleged fraud by Torrent.

39.    Torrent did not engage in any unfair, deceptive, or unconscionable conduct regarding its valsartan.

## PART V.    WITNESSES and SUMMARY OF TESTIMONY:

**Only the witnesses whose <u>names and addresses</u> are listed herein will be permitted to testify at the time of trial. For each witness listed, there must be a <u>description of their testimony</u>. Any objection to a witness must be noted by opposing counsel and for each such witness objected to, the name of the witness and the reason for the objection shall be given.**

A.    <u>Plaintiffs' Witnesses and Summary of Their Testimony</u>

1.    Plaintiffs intend to call the following witnesses with regard to liability and anticipate they will testify as follows:

- Current or former ZHP employees:

  o Hai Wang
    - *Address:* 4 Craftwood Dr, Princeton, New Jersey 08540
    - *General Description of Testimony*

At the time of his deposition, Hai Wang was Solco's President, Prinston's Senior Vice President of Business Development and Marketing, and Huahai US's Senior Vice President. He reported to Jun Du, who was the top executive of each entity, and the Vice Chairman of the Board of Directors of ZHP, in all three positions. Mr. Wang's testimony at trial is expected to encompass some or all of the following:

- The corporate organization and relationship between and among the ZHP entities.
- The expectations of any purchaser or payor in paying for the valsartan products regarding quality, purity, safety, and manufacturing in compliance with cGMP.
- The significance of the USP and Orange Book AB listings/designations for the valsartan products.

145

- ZHP's oral and written communications with ZHP's valsartan finished dose customers or other downstream entities (i.e. wholesalers, retailers, consumers, TPP's) regarding quality, purity, or contamination issues related to the ZHP valsartan finished dose.
- Tracing of batches and lots of ZHP's valsartan finished dose sold downstream and ultimately intended for use by consumers in the United States.
- The quantity/units of ZHP's valsartan finished dose sold in the United States.
- Oral and written communications by or on behalf of ZHP, Huahai US, Inc., Solco, and/or Prinston with their valsartan finished dose customers or other downstream entities (i.e. wholesalers, retailers, consumers, TPP's) regarding quality, purity, or contamination issues related to the ZHP valsartan finished dose.
- ZHP's product recall for ZHP's valsartan API or ZHP's valsartan finished dose, including who ZHP, Huahai US, Inc., Solco, and/or Prinston communicated with, how, about what, and the retention of recalled or sequestered ZHP valsartan API or ZHP valsartan finished dose.
- The extent of the actual and potential nitrosamine contamination of ZHP's valsartan API and finished dose sold in the United States, both in terms of the concentration per pill, and across all of the lots/batches.
- Oral and written communications by or on behalf of ZHP, Huahai US, Inc., Solco, and/or Prinston with their valsartan finished dose customers or other downstream entities (i.e. wholesalers, retailers, consumers, TPP's) regarding quality, purity, or contamination issues related to the ZHP valsartan finished dose.
- Oral and written statements (defined to include representations and warranties) by or on behalf of ZHP, Huahai US, Inc., Solco, and/or Prinston to finished dose manufacturers, wholesalers, retailers, and consumers with regard to the contents and purity of ZHP's valsartan API or ZHP's valsartan finished dose.
- ZHP's product recall for ZHP's valsartan API or ZHP's valsartan finished dose, including who ZHP, Huahai US, Inc., Solco, and/or Prinston communicated with, how, about what, and the retention of recalled or sequestered ZHP valsartan API or ZHP valsartan finished dose.
- Tracing of batches and lots of ZHP's valsartan finished dose sold downstream and ultimately intended for use by consumers in the United States.
- The pricing of ZHP's valsartan finished dose that was ultimately sold in the United States.
- The gross and net profits to ZHP, Huahai US, Inc., Solco, and/or Prinston from the sale of ZHP's valsartan finished dose in the United States.

146

- The quantity/units of ZHP's valsartan finished dose sold in the United States.

He is also expected to testify regarding pre-suit knowledge/notice if necessary. The deposition designations that plaintiffs currently intend to present for Hai Wang are attached hereto as Exhibit 1.

- o Jun Du
  - ▪ *Address:* 20 Annett Ave., Edgewater, New Jersey 07020
  - ▪ *General Description of Testimony*

At the time of his deposition, Jun Du was ZHP's Vice President and a Vice Chairman of its Board of Directors as well as Huahai U.S.'s, Prinston's, and Solco's CEO. He reported to ZHP's CEO Baohua Chen. He testified to his knowledge of the corporate structure of the ZHP Defendants, their development of their valsartan manufacturing processes, their inadequate and failed attempts to ensure the quality of those processes, Jinsheng Lin's notification of the contamination on July 27, 2017, and the surrounding events, their risk assessment and deviation investigation of the contamination, their interaction with the FDA after reporting the contamination, and the recall of the contaminated valsartan. He is also expected to testify regarding pre-suit knowledge/notice if necessary. The deposition designations that plaintiffs currently intend to present for Jun Du are attached hereto as Exhibit 2.

- o Eric Gu
  - ▪ *Address:* Shanghai, China
  - ▪ *General Description of Testimony*

At the time of his deposition, Eric Gu was the General of Shanghai Syncores, the subsidiary of ZHP that developed the $ZnCl_2$ process at lab scale. He reported to ZHP's CEO Baohua Chen. His testimony at trial is expected to encompass some or all of the following:

- Any evaluation conducted by or on behalf of ZHP with regard to health or safety issues arising from the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's valsartan API (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.
- ZHP's evaluation and knowledge of the risk of the creation of nitrosamines including NDMA and NDEA as a result of the manufacturing process for ZHP's valsartan API (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.

147

- ZHP's development of and use of the ZnCl2 process for manufacturing valsartan API.
- The statutes, regulations, other regulatory guidelines/guidances, and internal SOPs and SMPs controlling the above issues, and ZHP's failure to comply with these requirements, including the FDA's and EMA's conclusions in this regard.

He is also expected to testify regarding pre-suit knowledge/notice if necessary. The deposition designations that plaintiffs currently intend to present for Eric Gu are attached hereto as Exhibit 3.

- o Peng Dong
  - ▪ *Address:* Gongan, Hubei Province, China
  - ▪ *General Description of Testimony*

At the time of his deposition, Peng Dong was ZHP's Deputy Director of its Technical Department. His testimony at trial is expected to encompass some or all of the following:

- ZHP's evaluation of the potential risks to the purity or contents of ZHP's valsartan API posed or caused by solvents used during the manufacturing process (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The "primary process validation of Process II (ZnCl2) completed in April 2012" referenced on ZHP00004372.
- The modifications with regard to the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's valsartan API, including: (1) the reasons for the modifications, (2) the testing and evaluation in connection with the modification, and (3) the relationship between the modifications and the nitrosamine contamination of ZHP's valsartan API (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.
- Any evaluation conducted by or on behalf of ZHP with regard to health or safety issues arising from the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's valsartan API (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The process changes referenced in section 3.4.1 on ZHP00004371.
- The statutes, regulations, other regulatory guidelines/guidances, and internal SOPs and SMPs controlling the above issues, and ZHP's failure to comply

with these requirements, including the FDA's and EMA's conclusions in this regard.

He is also expected to testify regarding pre-suit knowledge/notice if necessary. The deposition designations that plaintiffs currently intend to present for Peng Dong are attached hereto as Exhibit 4.

- o Min Li
  - ▪ *Address:* Linhai, Zhejiang Province, China
  - ▪ *General Description of Testimony*

At the time of his deposition, Min Li was ZHP's Vice President of Analytical Operation and the leader of its Center of Excellence for Modern Analytical Technologies (CEMAT). He reported to ZHP's CEO Baohua Chen. His testimony at trial is expected to encompass some or all of the following:

- The cause of the contamination of ZHP's valsartan API with nitrosamines including NDMA.
- The root cause investigation for the nitrosamine impurities, including NDMA and NDEA in the ZHP API.
- The chromatogram and mass spectrometry results for all testing by ZHP or its agents of ZHP's valsartan API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.
- ZHP's evaluation and knowledge of the health risks of nitrosamines including NDMA and NDEA, including but not limited to as a contaminant of ZHP's valsartan API, and ZHP's valsartan finished dose.
- The statutes, regulations, other regulatory guidelines/guidances, and internal SOPs and SMPs controlling the above issues, and ZHP's failure to comply with these requirements, including the FDA's and EMA's conclusions in this regard.

He confirmed Plaintiffs' translation of the July 27, 2017 email and the events surrounding that email. He is also expected to testify regarding pre-suit knowledge/notice if necessary. The deposition designations that plaintiffs currently intend to present for Min Li are attached hereto as Exhibit 5.

- o Jucai Ge
  - ▪ *Address:* Linhai, Zhejiang Province, China
  - ▪ *General Description of Testimony*

149

At the time of her first deposition, Jucai Ge was ZHP's Director of Quality for the API Division. Her testimony at trial is expected to encompass some or all of the following:

- The root cause investigation for the nitrosamine impurities, including NDMA and NDEA in the ZHP API.
- ZHP's Standard Operating Procedures ("SOPs"), policies or procedures intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in connection with the manufacture and contents of ZHP's valsartan API (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.
- ZHP's application of cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in connection with the manufacture of ZHP's valsartan API (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The "relevant SOP's, QS, testing method, validation reports, equipment calibration records, preventive maintenance plan and change control records, etc." referenced at b.6. on ZHP00004355.
- The distinction between technical inquiries and deviation reports, as those terms are defined in ZHP's documents and in the ordinary course of business.
- The processes and procedures for handling technical inquiries.
- The processes and procedures for handling deviation reports.
- The technical inquiries received by ZHP relating to ZHP's valsartan API, (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The deviation reports drafted by or received by ZHP relating to ZHP's valsartan API (regardless of intended sale location) in any facility that manufactured ZHP's valsartan API for sale in the United States.
- ZHP's product recall for ZHP's valsartan API or ZHP's valsartan finished dose, including who ZHP communicated with, how, about what, and the retention of recalled or sequestered ZHP valsartan API or ZHP valsartan finished dose.
- ZHP's compliance or non-compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as

150

nitrosamines, and residual solvents, as it relates to the manufacture, quality assurance, quality control, and sale of ZHP's API and ZHP's valsartan finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API and ZHP's valsartan finished dose for sale in the United States.

- The "GMP and process training" referenced in the Personnel section on ZHP00004368.

She is also expected to testify regarding pre-suit knowledge/notice if necessary. The deposition designations that plaintiffs currently intend to present for Jucai Ge are attached hereto as Exhibit 6.

- o Jie Wang
  - ▪ *Address:* Shanghai, China
  - ▪ *General Description of Testimony*

At the time of his deposition, Jie Wang was ZHP's Vice President of Business Development. He reported to ZHP's CEO Baohua Chen. His testimony at trial is expected to encompass some or all of the following:

- ZHP's oral and written communications with Novartis with regard to the content/purity/contamination of ZHP's valsartan API.
- ZHP's oral and written communications with ZHP's valsartan API Customers or other downstream entities (i.e. wholesalers, retailers, consumers, TPP's) regarding quality, purity, or contamination issues related to the ZHP valsartan API.
- Tracing of batches and lots of ZHP's valsartan API sold downstream and ultimately intended for use by consumers in the United States.
- The pricing of ZHP's valsartan API that as ultimately sold in the United States.
- The gross and net profits to ZHP from the sale of ZHP's valsartan API in the United States.
- The quantity/units of ZHP's valsartan API sold in the United States.

The deposition designations that plaintiffs currently intend to present for Jie Wang are attached hereto as Exhibit 7.

- o John Iozzia
  - ▪ *Address:* 35 Haines Avenue, Piscataway, New Jersey, 08854
  - ▪ *General Description of Testimony*

At the time of deposition, John Iozzia was Huahai US's Director of Business Development for API. He testified regarding the ZHP Defendants' corporate structure, their sale of valsartan API in the United States, and their general obligations for the sale of valsartan API as well as their customer's expectations. He is also expected to testify regarding pre-suit knowledge/notice if necessary. The deposition designations that plaintiffs currently intend to present for John Iozzia are attached hereto as Exhibit 8.

- o Linda Lin
  - ▪ *Address:* Linhai, Zhejiang Province, China
  - ▪ *General Description of Testimony*

At the time of the deposition, Linda Lin was ZHP's Director of Regulatory Affairs. She reported to ZHP's CEO Baohua Chen. Her testimony at trial is expected to encompass some or all of the following:

- The communications with any regulatory authority, including but not limited to the FDA, with regard to the modifications with regard to the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's valsartan API.
- The communications with any regulatory authority, including but not limited to the FDA, with regard to the modifications with regard to the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's finished dose.
- ZHP's disclosures to regulatory authorities, including the FDA, with regard to the actual or potential contamination of ZHP's valsartan API with nitrosamines including NDMA and NDEA.
- ZHP's filings with regulatory authorities, including the FDA, regarding manufacturing process changes for ZHP's Valsartan API Drug Master Filings.

The deposition designations that plaintiffs currently intend to present for Linda Lin are attached hereto as Exhibit 9.

- o Lijie Wang
  - *Address:* 11 Hanging Rock Road, Freehold, New Jersey, 07728
  - *General Description of Testimony*

At the time of her deposition, Lijie Wang was Prinston's Vice President of Regulatory Affairs. She testified regarding the following topics:

- ZHP's evaluation and knowledge of the health risks of nitrosamines including NDMA and NDEA, including but not limited to as a contaminant of ZHP's valsartan API, and ZHP's valsartan finished dose.
- The communications with any regulatory authority, including but not limited to the FDA, with regard to the modifications with regard to the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's valsartan API.
- The communications with any regulatory authority, including but not limited to the FDA, with regard to the modifications with regard to the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's finished dose.
- Disclosures by or on behalf of ZHP, Huahai US, Inc., Solco, and/or Prinston to regulatory authorities including the FDA, with regard to the actual or potential contamination of ZHP's valsartan API with nitrosamines including NDMA and NDEA.
- The communications with any regulatory authority, including but not limited to the FDA, with regard to the modifications with regard to the use of solvents, and the Tetrazole ring formation step, in the manufacturing process for ZHP's valsartan API.
- Disclosures by Huahai or by Huahai on behalf of ZHP, Solco, and/or Prinston to regulatory authorities, including the FDA, with regard to the actual or potential contamination of ZHP's valsartan API with nitrosamines including NDMA and/or NDEA.
- ZHP's filings by Huahai or by Huahai on behalf of ZHP, Solco, and/or Prinston with regulatory authorities, including the FDA, regarding manufacturing process changes for ZHP's Valsartan API Drug Master Filings.

The deposition designations that plaintiffs currently intend to present for Lijie Wang are attached hereto as Exhibit 10.

- o Minli Zhang
  - *Address:* Linhai, Zhejiang Province, China
  - *General Description of Testimony*

Minli Zhang is ZHP's Deputy Director of Non-Sterile Formulation Preparations Manufacturing. She was produced as a 30(b)(6) witness on the following topics:

- The testing performed by ZHP or its agents, to evaluate the purity and contents of ZHP's finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.
- The testing performed by any entity or person other than ZHP or its agents but known to ZHP, to evaluate the purity and contents of ZHP's finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by ZHP or its agents of ZHP's finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by any entity or person other than ZHP or its agents but known to ZHP, of ZHP's finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by ZHP or its agents of the solvents utilized in the manufacture of ZHP's finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by any entity or person other than ZHP or its agents but known to ZHP, of the solvents utilized in the manufacture of ZHP's finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by ZHP or its agents of the production equipment utilized in the manufacture of ZHP's valsartan finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by any entity or person other than ZHP or its agents but known to ZHP, of the production

154

equipment utilized in the manufacture of ZHP's finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.

- The extent of the actual and potential nitrosamine contamination of ZHP's valsartan API and finished dose sold in the United States, both in terms of the concentration per pill, and across all of the lots/batches.

- ZHP's Standard Operating Procedures ("SOPs"), policies or procedures intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in connection with the manufacture and contents of ZHP's valsartan finished dose (regardless of intended sale location) in any facility that manufactured ZHP's finished dose for sale in the United States.

- ZHP's application of cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, in connection with the manufacture of ZHP's finished dose (regardless of intended sale location) in any facility that manufactured ZHP's finished dose for sale in the United States.

- The distinction between technical inquiries and deviation reports, as those terms are defined in ZHP's documents and in the ordinary course of business.

- The processes and procedures for handling technical inquiries.

- The processes and procedures for handling deviation reports.

- The technical inquiries received by ZHP relating to ZHP's valsartan Finished Dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.

- The deviation reports drafted by or received by ZHP relating to ZHP's valsartan Finished Dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's finished dose for sale in the United States.

- ZHP's oral and written communications with ZHP's valsartan finished dose customers or other downstream entities (i.e. wholesalers, retailers, consumers, TPP's) regarding quality, purity, or contamination issues related to the ZHP valsartan finished dose.

- ZHP's oral and written statements (defined to include representations and warranties) to finished dose manufacturers, wholesalers, retailers, and consumers with regard to the contents and purity of ZHP's valsartan API or ZHP's valsartan finished dose.

155

- ZHP's product recall for ZHP's valsartan API or ZHP's valsartan finished dose, including who ZHP communicated with, how, about what, and the retention of recalled or sequestered ZHP valsartan API or ZHP valsartan finished dose.
- ZHP's compliance or non-compliance with cGMPs intended to prevent, detect, or act in response to any impurity or contamination, for example carcinogens, general toxic impurities (including genotoxic impurities) such as nitrosamines, and residual solvents, as it relates to the manufacture, quality assurance, quality control, and sale of ZHP's API and ZHP's valsartan finished dose (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API and ZHP's valsartan finished dose for sale in the United States.

Her testimony is expected to address the distance between the Chuannan and Xunqiao facilities, the importance of documentation in drug manufacturing, the quality agreement between Prinston and ZHP Xunqiao, the finished dose manufacturing facility, the requirements in connection with documenting a process change, Prinston's responsibility to make appropriate filings as the ANDA holder, the importance of process validation with a manufacturing change, the quality risk management process and the tools used in that process, including the use of a fishbone chart. Plaintiffs' proposed designations to be submitted to the jury are attached hereto as Exhibit 11.

  o Remonda Gergis
    ▪ *Address:* 18 Gerard Pl, Parlin, New Jersey, 08859
    ▪ *General Description of Testimony*

Remonda Gergis was the Director of Quality for Prinston. Her testimony is expected to address the importance and details of the application of cGMPs, including investigations, corrective actions, the quality agreement between Prinston and ZHP, the delineation of the responsibilities of the parties to the agreement, review of master batch records, Prinston's responsibility to monitor manufacturing process changes, the importance of ZHP providing information about the product so that Prinston can provide accurate information to the FDA and others as the ANDA holder, audits of suppliers, Prinston audits of API manufacturer for cGMP compliance, the need for ZHP to qualify its suppliers of raw materials for the API, Prinston as ANDA holder needed to know if any changes to the product. Plaintiffs' proposed designations to be submitted to the jury are attached hereto as Exhibit 12.

- o Eric Tsai
  - ▪ *Address:* Shanghai, China
  - ▪ *General Description of Testimony*

At the time of his deposition, Eric Tsai was the General Manager of Prinbury. He testified regarding Prinbury's development of the valsartan finished dose manufacturing process for the ZHP Defendants. The deposition designations that plaintiffs currently intend to present for Eric Tsai are attached hereto as Exhibit 13.

- o Qiangming Li
  - ▪ *Address:* Linhai, Zhejiang Province, China
  - ▪ *General Description of Testimony*

At the time of his deposition, Qiangming Li was ZHP's Senior Director of Quality Control Department at its Chuannan facility, where ZHP manufacturers the valsartan API at issue here. He reported to Min Li. His testimony at trial is expected to encompass some or all of the following:

- The testing performed by ZHP or its agents, to evaluate the purity and contents of ZHP's API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The testing performed by any entity or person other than ZHP or its agents but known to ZHP, to evaluate the purity and contents of ZHP's valsartan API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by ZHP or its agents of ZHP's valsartan API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by any entity or person other than ZHP or its agents but known to ZHP, of ZHP's valsartan API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by ZHP or its agents of the solvents utilized in the manufacture of ZHP's valsartan API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.
- The chromatogram and mass spectrometry results for all testing by any entity or person other than ZHP or its agents but known to ZHP, of the solvents

157

utilized in the manufacture of ZHP's API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.

- The chromatogram and mass spectrometry results for all testing by ZHP or its agents of the production equipment utilized in the manufacture of ZHP's valsartan API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.

- The chromatogram and mass spectrometry results for all testing by any entity or person other than ZHP or its agents but known to ZHP, of the production equipment utilized in the manufacture of ZHP's valsartan API (regardless of intended sale location) manufactured in any facility that manufactured ZHP's valsartan API for sale in the United States.

- The extent of the actual and potential nitrosamine contamination of ZHP's valsartan API and finished dose sold in the United States, both in terms of the concentration per pill, and across all of the lots/batches.

The deposition designations that plaintiffs currently intend to present for Qiangming Li are attached hereto as Exhibit 14.

- o Yuelin Hu
  - ▪ *Address:* Linhai, Zhejiang Province, China
  - ▪ *General Description of Testimony*

Yuelin Hu was ZHP's Assistant Quality Assurance Director. Her testimony is expected to address ZHP's change control system and obligation to comply with current good manufacturing practices. The deposition designations that plaintiffs currently intend to present for Yuelin Hu are attached hereto as Exhibit 15.

- o Xiaodi Guo
  - ▪ *Address:* Linhai, Zhejiang Province, China
  - ▪ *General Description of Testimony*

Xiaodi Guo was the Chief Science Officer and Executive Vice President of Huahai, US. His testimony is expected to address the role of Huahai US as the DMF agent for ZHP in the US, the function of the DMF including to file with the FDA the key information about the manufacturing process, and to be referenced in an ANDA, the importance of following cGMPs, NDMA is not included in the specifications for valsartan, Prinston and ZHP did not know NDMA was in the valsartan when the specifications were established, NDMA is genotoxic and poses serious hazards

including in trace amounts per his own published article. Plaintiffs' proposed designations to be submitted to the jury are attached hereto as Exhibit 16.

- o  Mi Xu
  - ▪ *Address:* Linhai, Zhejiang Province, China
  - ▪ *General Description of Testimony*

Mi Xu is ZHP's Associate Vice President of Business and Marketing. Her testimony is expected to address ZHP's API sales to finished dose manufacturers.

- o  Charles Wang
  - ▪ *Address:* 628 Olympia Hills Cir., Berwyn, Pennsylvania 19312
  - ▪ *General Description of Testimony*

Charles Wang is a toxicologist. He was the Director of the Safety Assessment group at another pharmaceutical company, GlaxoSmithKline, when ZHP hired him as a consultant to evaluate the safety risk of the nitrosamine contamination of its drugs, including its valsartan, including ZHP's effort to continue to sell the contaminated valsartan. His testimony is expected to address his work for ZHP as well as his communications with others on behalf of ZHP regarding the same issues, including James MacDonald, who was consulted at ZHP's request regarding the possibility of continuing to sell the contaminated valsartan. This testimony is also previewed in detail in the proposed designations of Min Li submitted herewith.

- o  James MacDonald
  - ▪ *Address:* 7 Deer Hill Rd., Chester, New Jersey 07930
  - ▪ *General Description of Testimony*

James MacDonald is a toxicologist and a founding partner of Synergy Partners Team. His testimony is expected to address how and why Charles Wang contacted him on behalf of ZHP to assess the safety risk of the NDMA contamination of its valsartan in ZHP's effort to continue to sell its contaminated valsartan, and his response to that inquiry, which was that this was not feasible or advisable. This testimony is previewed in detail in the proposed designations of Min Li submitted herewith, which include review of Mr. MacDonald's emails setting forth his analysis and advice to ZHP.

- o  Records custodian(s)
  - ▪ *Address:* Not provided by Defendants
  - ▪ *General Description of Testimony:*

159

Corporate records custodians will be called to testify to the extent necessary to authenticate and admit ZHP documents and data, including as business records.

- Current or former Teva employees:

  - Daniel Barreto
    - *Address:* 1612 Drakestone Avenue, Nichols Hills, OK 73120
    - *General Description of Testimony:* Teva's quality practices, oversight of ZHP as valsartan API supplier, investigation of nitrosamine contamination, communications with the FDA, recall issues, and pre-suit knowledge/notice (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 17.)
  - Anthony Binsol
    - *Address:* 81 Kayharts Lane, Washington, NJ 07882
    - *General Description of Testimony:* Teva's quality practices, testing of valsartan API and finished dose, investigation of nitrosamine contamination, and pre-suit knowledge/notice (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 18.)
  - Elisabeth Gray
    - *Address:* 18 Trevor Lake Drive, Congers, NY 10920
    - *General Description of Testimony:* Teva's communications with the FDA as to valsartan finished dose, nitrosamine investigation, and recall issues (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 19.)
  - Claire Lyons
    - *Address:* 3051 NE 47th Court, Apt 107, Fort Lauderdale FL 33308
    - *General Description of Testimony:* Teva's quality practices, investigation of nitrosamine contamination, recall issues, and pre-suit knowledge/notice (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 20.)
  - Stefan Karlsson
    - *Address:* Vallentuna. Sweden
    - *General Description of Testimony:* Teva's procurement and vendor qualification practices, investigation of nitrosamine contamination, and recall issues (The deposition designations

160

that plaintiffs currently intend to present are attached hereto as Exhibit 21.)

- o Pan Lin
  - ▪ *Address:* Shanghai, China
  - ▪ *General Description of Testimony:* Teva's quality practices, and oversight of ZHP as valsartan API supplier (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 22.)
- o Jens Nassall
  - ▪ *Address:* Ulm, Germany
  - ▪ *General Description of Testimony:* Teva's sourcing of valsartan API; Teva recall issues (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 23.)
- o Raphael Nudelman
  - ▪ *Address:* Rehovot, Israel
  - ▪ *General Description of Testimony:* Teva evaluation of health and safety issues relating to ZHP's valsartan API (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 24.)
- o Michelle Keller (Osmian)
  - ▪ *Address:* 5843 S. Deer Run Rd., Doylestown, PA 18902
  - ▪ *General Description of Testimony:* Teva's communications with and representations to downstream customers, entities or persons about Teva's valsartan finished dose; Teva recall issues; Teva sales and pricing data, and pre-suit knowledge/notice (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 25.)
- o Narendra Vadsola
  - ▪ *Address:* Thane, Maharashtra, India
  - ▪ *General Description of Testimony:* Teva's quality practices, and quality oversight of ZHP as valsartan API supplier (The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 26.)

- o Records custodian(s)
  - ▪ *Address:* Not provided by Defendants
  - ▪ *General Description of Testimony:* Corporate records custodians will be called to testify to the extent necessary to authenticate and admit Teva documents and data, including as business records.

161

- Current or former Torrent employees:

  - Dawn Chitty
    - *Address:* 5047 West Main Street, Kalamazoo, MI 49009
    - *General Description of Testimony:* Dawn Chitty was employed by Torrent from 2004 through 2018, serving as Vice President of Scientific Affairs. Ms. Chitty is expected to testify regarding the following:
      - Torrent's obligations regarding product quality, testing, cGMP, and communications with regulators;
      - The NDMA and NDEA content of the valsartan API Torrent used to manufacture its finished dose VCDs, which exceeded the acceptable intake levels set by the FDA;
      - Torrent's selection and qualification of ZHP as a vendor for valsartan API, including financial considerations;
      - The results of FDA inspections of Torrent's Indrad facility where VCDs were manufactured;
      - Torrent's market actions in response to ZHP's notification that "new process" valsartan API contained a genotoxic impurity, including decisions relating to testing, recall, and product quarantine;
      - Torrent's market actions in response to ZHP's notification that "old process" valsartan API contained NDMA, including decisions relating to testing, recall, and product quarantine;
      - Torrent's communications with customers and regulators following ZHP's notification that "new process" valsartan API contained a genotoxic impurity;
      - Torrent's communications with customers and regulators following ZHP's notification that "old process" valsartan API contained a genotoxic impurity;
      - Torrent's representations that its VCDs were free from nitrosamine contamination despite not testing its products for NDMA or NDEA;
    - The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 27.

- ○ Sushil Jaiswal
  - ▪ *Address:* Ahmedabad, India
  - ▪ *General Description of Testimony:* Sushil Jaiswal testified as the corporate representative for Torrent. At the time of his testimony, Mr. Jaiswal was Torrent's Head of Quality at its Indrad facility, where Torrent manufactures the VCDs at issue here. Mr. Jaiswal is expected to testify regarding the following:
    - Torrent's knowledge of the carcinogenicity and genotoxicity of nitrosamines including NDMA/NDEA;
    - Torrent's purchase of API from ZHP made with the "old process" designated as "C code" valsartan API, indicating that it was made with triethylamine (TEA);
    - Nitrosamine testing levels indicating that Torrent's VCDs were made with ZHP valsartan API contained NDMA and NDEA in excess of the acceptable intake limits for NDMA and NDEA;
    - Torrent's reliance on genotoxicity declarations from ZHP;
    - Torrent's ability, as a finished dose manufacturer, to develop a test for genotoxic impurities such as NDMA or NDEA upon learning that "new process" valsartan API contained NDMA;
    - Torrent's qualification of ZHP as an API vendor, including financial considerations;
    - The ability of any person with access to the route of synthesis for ZHP's valsartan API, to determine that the formation of NDMA or NDEA was possible by performing chemistry on paper;
    - Chromatograms provided by ZHP to Torrent, as early as 2009, showing unknown peaks in the ZHP API sold to Torrent;
    - The contents of the Technical and Quality Agreements between Torrent and ZHP, including the obligations and responsibilities of each party;
    - Torrent's failure to investigate or otherwise identify unknown peaks in the valsartan API it purchased from ZHP and used to manufacture its VCDs;
    - Torrent's duty to ensure ZHP's compliance with cGMP;
    - Torrent's obligations as a finished dose manufacturer of VCDs;

163

- ▪ . The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 28.

- o Kalpesh Patel
  - ▪ *Address:* Secundrabad, India
  - ▪ *General Description of Testimony:* Mr. Patel was, at the time of his testimony, employed by Torrent Pharmaceuticals Limited and worked in its research center. Mr. Patel will testify regarding the following:
    - Torrent's ongoing responsibility, as a finished dose manufacturer, to conduct testing on commercialized products;
    - Audit processes to qualify vendors, including API manufacturers;
    - Out-of-Specification (OOS) investigations and OOS procedures at Torrent;
    - Torrent's obligations with respect to cGMP, including quality management systems and ensuring that API vendors comply with cGMP.
  - ▪ The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 29.

- o Bernadette Attinger
  - ▪ *Address:* 214 Rt 152, Perkasie, PA 18944
  - ▪ *General Description of Testimony:* Ms. Attinger was employed by Torrent from September 2018 through July 2019, serving as the Senior Director of Regulatory Affairs. Ms. Attinger is expected to testify regarding the following:
    - The duty to investigate and identify unknown peaks, or ghost peaks, in testing results;
    - Torrent's obligations regarding drug quality, audits, testing, and cGMP;
    - Torrent's ultimate responsibility, as the ANDA holder, for products given to consumers;
    - The amount of time Torrent took to develop a method to test its VCDs for NDMA, compared to the amount of time it took the FDA to develop a method;
    - The inspection results for Torrent's Indrad facility where it manufactured VCDs, including Form 483s received

from the FDA;

- Torrent's Out-of-Specification (OOS) investigations and Corrective-and-Preventative-Actions (CAPAs), including related standard operating procedures (SOPs) and the inadequate adherence to SOPs;

- The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 30.

o Sue Perry
  - *Address:* 38893 County Road 669, Decatur, MI 49045
  - *General Description of Testimony:* Susan Perry was employed by Torrent in the regulatory department from 2014 to 2019. Ms. Perry is anticipated to testify regarding the following matters:
    - Torrent's ANDA submissions for its VCDs;
    - Torrent's standard operating procedures (SOPs) applicable to its VCDs, including vendor qualification and vendor management and out-of-specification (OOS) results;
    - Torrent's obligations with respect to good manufacturing practices;
    - Torrent's knowledge of the route of synthesis for the valsartan API it purchased from ZHP;
    - Concerns regarding potential impurities in the valsartan API raised by Ms. Perry prior to 2018;
    - The differing roles of Torrent India and Torrent U.S. and the exchange of information between the two entities;
    - Testing specifications for Torrent's VCDs and the Torrent entities that performed testing, to the extent it was done;
    - Torrent's recall process, including communications and representations made in the absence of testing for nitrosamines;
  - The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 31.

o Kelly Gegenheimer
  - *Address:* 730 Emerald, New Orleans, LA 70124
  - *General Description of Testimony:* Kelly Gegenheimer has been employed by Torrent Pharma as the Vice President of Sales since 2007. He testified on behalf of Torrent as a corporate

representative. Mr. Gegenheimer is expected to testify regarding the following matters:

- Torrent's communications with downstream customers, including specifically related to the sale of VCDs and recall of VCDs;
- Communications regarding cGMPs;
- Documentation regarding Torrent's VCDs'

- The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 32.

o Reddy Neravetla
  - *Address:* 136 Briarwood Lane, Colmar PA 18915
  - *General Description of Testimony:* Mr. Neravetla testified on behalf of Torrent as a corporate representative. At the time of his testimony, Mr. Neravetla was employed by Torrent Pharma in the regulatory department. Mr. Neravetla is anticipated to testify regarding the following matters:
    - The relationship between the Torrent entities;
    - Torrent's sourcing of valsartan API from ZHP, specifically, valsartan API made with the "old process";
  - The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 33.

o Jocelyn Rivera
  - *Address:* 72 Regal Dr, Monmouth Jct., NJ 08852
  - *General Description of Testimony:* At the time of her deposition, Ms. Rivera was employed by Torrent as a regulatory affairs manager. Ms. Rivera is expected to testify regarding the following matters:
    - Torrent's obligations regarding communications with regulators;
    - Torrent's responsibilities with respect to audits and inspections;
    - The contamination of Torrent's VCDs.
  - The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 34.

o Paras Sheth
  - *Address:* Ahmedabad, India.

- - *General Description of Testimony:* At the time of his deposition, Mr. Sheth was employed at Torrent as the General Management of Procurement. He will testify as to the following matters:
    - Responsibilities of the Procurement department when selecting an API supplier; and
    - Interactions between Procurement and Quality and Regulatory departments at Torrent.
  - The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 67.

- o Records custodian(s)
  - *Address:* Not provided by Defendants
  - *General Description of Testimony:* Corporate records custodians will be called to testify to the extent necessary to authenticate and admit Torrent documents and data, including as business records.

- Retailer Witnesses

  - o Owen McMahon
    - *Address:* Not provided by Defendants
    - *General Description of Testimony:* Owen McMahon, Rite Aid's Vice President of Pharmaceutical Purchasing is expected to testify regarding Rite Aid's inability to sell adulterated drugs as well as Defendants' pre-suit notice/knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 35.

  - o John Holderman
    - *Address:* Not provided by Defendants
    - *General Description of Testimony:* John Holderman, CVS's Senior Director at CVS Health for Pharmacy Merchandising is expected to testify regarding CVS Health's inability to sell adulterated drugs as well as Defendants' pre-suit notice/knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 36.

  - o Cesar Cedeno
    - *Address:* Southwest Ranches, Florida
    - *General Description of Testimony:* Humana's Cesar Cedeno is expected to testify regarding Humana's inability to sell

167

adulterated drugs as well as Defendants' pre-suit notice/knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 37.

- o Catherine Stimmel
  - ▪ *Address:* Not provided by Defendants
  - ▪ *General Description of Testimony:* Walgreen's Director of Pharmacy Quality Assurance and Patient Safety, Catherine Stimmel, is expected to testify regarding Walgreen's inability to sell adulterated drugs as well as Defendants' pre-suit notice/knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 38.

- o Daniel Brais
  - ▪ *Address:* Buckeye, Arizona
  - ▪ *General Description of Testimony:* Humana's Daniel Brais is expected to testify regarding Humana's inability to sell adulterated drugs as well as Defendants' pre-suit notice/knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 39.

- o Steven Taylor
  - ▪ *Address:* Denver, CO
  - ▪ *General Description of Testimony:* Optum's Steven Taylor is expected to testify regarding Optum's inability to sell adulterated drugs as well as Defendants' pre-suit knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 40.

- o Julie Webb
  - ▪ *Address:* Dublin, Ohio
  - ▪ *General Description of Testimony:* Cardinal Health's Julie Webb is expected to testify regarding Cardinal Health's inability to sell adulterated drugs as well as Defendants' pre-suit notice/knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 41.

- o Wendy Woon-Fat
  - ▪ *Address:* Irvine, CA
  - ▪ *General Description of Testimony:* OptumRx's Wendy Woon-

Fat is expected to testify regarding OptumRx's inability to sell adulterated drugs as well as Defendants' pre-suit notice/knowledge. The deposition designations that plaintiffs currently intend to present are attached hereto as Exhibit 42.

1.    Plaintiffs intend to call the following witnesses with regard to damages and anticipate they will testify as follows:

- Plaintiff MSP and Assignor representatives

  o Jorge Lopez
    - *Address:* 2701 S Le Jeune Rd, Coral Gables, FL 33134
    - *General Description of Testimony:*

Jorge Lopez is a corporate representative of MSP. He is expected to testify about the assignments from EmblemHealth and SummaCare to MSP and its related entities, any subsequent assignments, the scope of the claims that were assigned, the related purchase agreements, and MSP's corporate structure.

  o Christopher Miranda
    - *Address:* 2701 S Le Jeune Rd, Coral Gables, FL 33134
    - *General Description of Testimony:*

Christopher Miranda is a corporate representative of MSP. He is expected to testify about the data and business records that were received from EmblemHealth and SummaCare, the method by which those records were received, processed, validated, maintained, stored, and produced in this litigation. He is also expected to testify about the scope of the claims that were assigned, the retailer data and its contents, and the content of the data of the following excel sheets: MSP_0005958, MSP_0005942, MSP_0005945, and MSP_0001655.

  o Andrew Colby
    - *Address:* 55 Water Street in Lower Manhattan, New York City
    - *General Description of Testimony:*

Andrew Colby is the corporate representative of EmblemHealth. His testimony is expected to include testimony about:

- EmblemHealth's purchase of the at issue valsartan;
- EmblemHealth's formulary;
- EmblemHealth's contract with its PBM;

- EmblemHealth's evidence of coverage documentation;
- EmblemHealth's P&T Committee's decisions related to valsartan;
- The information and considerations that EmblemHealth relied on in placing valsartan on its formulary;
- The data and business records that EmblemHealth transferred to MSP, including the creation, storage and transfer of those records;
- The redacted PDE data that EmblemHealth produced in this case, including the creation, storage and transfer of those records;
- EmblemHealth's actions after the valsartan recall was announced; and
- EmblemHealth's damages.

  o Tiffanie Mrakovich
    ▪ *Address:* 141 N. Forge St. Akron, OH 44304
    ▪ *General Description of Testimony:*

Ms. Mrakovich is the corporate representative of SummaCare. Her testimony is expected to include testimony about:

- SummaCare's purchase of the at issue valsartan;
- SummaCare's formulary;
- SummaCare's contract with its PBM;
- SummaCare's evidence of coverage documentation;
- SummaCare's P&T Committee's decisions related to valsartan;
- The information and considerations that SummaCare relied on in placing valsartan on its formulary;
- The data and business records that SummaCare transferred to MSP, including the creation, storage and transfer of those records;
- The redacted PDE data that SummaCare produced in this case, including the creation, storage and transfer of those records;
- SummaCare's actions after the valsartan recall was announced; and
- SummaCare's damages.

    2.    Plaintiffs intend to call the following witnesses with regard to liability and anticipate they will testify as follows:

- Plaintiff MSP and Assignor representatives

  o Jorge Lopez
    ▪ *Address:* 2701 S Le Jeune Rd, Coral Gables, FL 33134

- - *General Description of Testimony:*

Jorge Lopez is a corporate representative of MSP. He is expected to testify about the assignments from EmblemHealth and SummaCare to MSP and its related entities, any subsequent assignments, the scope of the claims that were assigned, the related purchase agreements, and MSP's corporate structure.

- o Christopher Miranda
    - *Address:* 2701 S Le Jeune Rd, Coral Gables, FL 33134
    - *General Description of Testimony:*

Christopher Miranda is a corporate representative of MSP. He is expected to testify about the data and business records that were received from EmblemHealth and SummaCare, the method by which those records were received, processed, validated, maintained, stored, and produced in this litigation. He is also expected to testify about the scope of the claims that were assigned, the retailer data and its contents, and the content of the data of the following excel sheets: MSP_0005958, MSP_0005942, MSP_0005945, and MSP_0001655.

- o Andrew Colby
    - *Address:* 55 Water Street in Lower Manhattan, New York City
    - *General Description of Testimony:*

Andrew Colby is the corporate representative of EmblemHealth. His testimony is expected to include testimony about:

- EmblemHealth's purchase of the at issue valsartan;
- EmblemHealth's formulary;
- EmblemHealth's contract with its PBM;
- EmblemHealth's evidence of coverage documentation;
- EmblemHealth's P&T Committee's decisions related to valsartan;
- The information and considerations that EmblemHealth relied on in placing valsartan on its formulary;
- The data and business records that EmblemHealth transferred to MSP, including the creation, storage and transfer of those records;
- The redacted PDE data that EmblemHealth produced in this case, including the creation, storage and transfer of those records;
- EmblemHealth's actions after the valsartan recall was announced; and
- EmblemHealth's damages.

- o Tiffanie Mrakovich

171

- ▪ *Address:* 141 N. Forge St. Akron, OH 44304
- ▪ *General Description of Testimony:*

Ms. Mrakovich is the corporate representative of SummaCare. Her testimony is expected to include testimony about:

- SummaCare's purchase of the at issue valsartan;
- SummaCare's formulary;
- SummaCare's contract with its PBM;
- SummaCare's evidence of coverage documentation;
- SummaCare's P&T Committee's decisions related to valsartan;
- The information and considerations that SummaCare relied on in placing valsartan on its formulary;
- The data and business records that SummaCare transferred to MSP, including the creation, storage and transfer of those records;
- The redacted PDE data that SummaCare produced in this case, including the creation, storage and transfer of those records;
- SummaCare's actions after the valsartan recall was announced; and
- SummaCare's damages.

3. Plaintiffs intend to call the following witnesses regarding pre-suit notice:

- o John R. Davis
  - ▪ *Address:* 6001 Bold Ruler, Suite 100, Austin, TX 78746
  - ▪ *General Description of Testimony:*

Mr. Davis is anticipated to testify to his communications with Defendants constituting pre-suit notice.

- o Neal J. Deckant
  - ▪ *Address:* 888 Seventh Ave., 3rd Floor, New York, NY 10019
  - ▪ *General Description of Testimony:*

Mr. Deckant is anticipated to testify to his communications with Defendants constituting pre-suit notice.

- o Daniel C. Levin
  - ▪ *Address:* 510 Walnut St., Suite 500, Philadelphia, PA 19106
  - ▪ *General Description of Testimony:*

Mr. Levin is one of the attorneys for the TPP Class. His testimony is expected to include testimony about:

- TPP Class Member Employers and Laborers Locals 100 and 397 Health and Welfare Fund and Steamfitters Local 439 provided, in early 2020, putative nationwide TPP class pre-suit notice to ZHP, Teva, and Torrent. Those letters were served long before the operative Third Amended Master Economic Loss Complaint was filed on November 1, 2021;

  o Andrew J. Obergfell
    ▪ *Address:* 888 Seventh Ave., 3rd Floor, New York, NY 10019
    ▪ *General Description of Testimony:*

Mr. Obergfell is anticipated to testify to his communications with Defendants constituting pre-suit notice.

  o David Stanoch
    ▪ *Address:* 701 Camp Street, New Orleans, LA 70130
    ▪ *General Description of Testimony:*

Mr. Stanoch is anticipated to testify to his communications with Defendants constituting pre-suit notice.

B.    Defendants' Objections to Plaintiffs' Witnesses: If there are no objections to any of the witnesses, Defendants shall so state that in this portion of the Order. If there are objections to any of Plaintiffs' witnesses, they shall be listed here.

All Defendants

1.    Defendants adopt and incorporate by reference their previously served objections and all forthcoming objections to Plaintiffs' deposition designations for Plaintiffs' witnesses, and Defendants' counter-designations for Plaintiffs' witnesses.

2.    Defendants adopt and incorporate by reference their motions in limine with respect to all topics and subject matter for any witness within the scope of the motions in limine.

3.    Defendants object to the testimony of John R. Davis, Neal J. Deckant, Daniel C. Levin, Andrew J. Obergefell, and David Stanoch, on the grounds that their putative testimony regarding pre-suit notice by other

173

parties in other lawsuits is not relevant to the question of whether Plaintiff MSP gave pre-suit notice in this lawsuit, is prejudicial, is likely to confuse the jury, and is untimely. Defendants further object to the testimony of John R. Davis, Daniel C. Levin, and David Stanoch as improper under RPC 3.7(a).

4.  Defendants object to Christopher Miranda testifying regarding retailers' data, as he has no foundation to testify about data not in the possession, custody, or control of MSP.

5.  Defendants object to the testimony of the retailer witnesses, Owen McMahon, John Holderman, Cesar Cedeno, Catherine Stimmel, Daniel Brais, Steven Taylor, Julie Webb and Wendy Woon-fat, and ask that the Court exclude these witnesses on the grounds of Fed. R. Evid. 104, 106, 401, 402, 403, 602, 701, 802/802, Fed. R. Civ. P. 32 and as beyond the scope of their 30(b)6 designation, as set forth more fully in Defendants' trial brief. In the event that Plaintiffs are permitted to use testimony for any of these witnesses at trial, Defendants have submitted to Plaintiffs objections and counter-designations to their deposition designations for these witnesses, which are attached as Exhibits A to A.7.

6.  This is not intended to be a comprehensive recitation of all possible objections that may arise during trial. Defendants reserve all evidentiary and other objections that may come up as to any specific witness during the course of trial.

ZHP

1.  In addition to the foregoing objections by all Defendants, which ZHP adopts and incorporates by reference, ZHP adopts and incorporates by reference its previously served objections and all forthcoming objections to Plaintiffs' deposition designations for all current and former ZHP employees on Plaintiffs' witness list, and Defendants' counter-designations for all current and former ZHP employees on Plaintiffs' witness list, which are currently being negotiated by the parties and are subject to change. ZHP's current objections and counter-designations are attached hereto as Exhibits B to B.3, and are subject to change in light of the parties' ongoing meet-and-confer negotiations

with respect to Plaintiffs' designations.[7]

2.    The ZHP Defendants object to the testimony of James MacDonald, a third party who has never worked for or consulted with any of the ZHP Defendants and therefore has no facts relevant to this case. Contrary to Plaintiffs' suggestion, Mr. MacDonald is not permitted to testify regarding his communications with Charles Wang, which are hearsay not subject to any exception, nor is he permitted to provide undisclosed expert testimony regarding the alleged safety of trace levels of NDMA in VCDs.

3.    The ZHP Defendants object to the testimony of Charles Wang, whom ZHP understands currently resides in Beijing, China and therefore is outside the subpoena power of this Court. Additionally, Mr. Wang was never deposed in this matter, and therefore there are no deposition transcripts from which testimony could be designated.

4.    The ZHP Defendants object to Plaintiffs using the deposition testimony of Jucai Ge or Hai Wang at trial. Ms. Ge and Mr. Wang are current and former ZHP employees, respectively. Ms. Ge will be testifying live at trial as part of ZHP's case, and Plaintiffs have issued a subpoena to Mr. Wang's for live trial testimony. Having Ms. Ge and Mr. Wang testify in a bifurcated manner—first via video and later via live testimony—is inefficient and will waste valuable trial time, will be confusing to the jury, and is contrary to the long-standing preference in the United States legal system for live testimony. *See* Fed. R. Civ. P. 32(a)(4) (permitting use of depositions at trial only where the witness is unavailable to testify live). Plaintiffs should not be permitted to waste the Court's and the jury's time presenting deposition video from either Ms. Ge or Mr. Wang when both witnesses are available and will be testifying live at trial.

5.    ZHP objects to the extent Plaintiffs have not identified which witnesses they intend to call live.

---

[7] Pursuant to agreement between the parties, ZHP is providing its current objections and counter-designations for all current and former ZHP employees on Plaintiffs' witness list, but has not yet created marked transcripts reflecting such objections and counter-designations for every witness given that the parties are currently engaged in active negotiations regarding Plaintiffs' designations.

175

6.      ZHP objects to the testimony of any witness presented by Plaintiffs to the extent that testimony includes information, or relates to subjects or topics, that any Defendant has moved to exclude in a motion in limine.

7.      This is not intended to be a comprehensive recitation of all possible objections that may arise during trial. ZHP reserves all evidentiary and other objections that may come up as to any specific witness during the course of trial.

Teva

1.      In addition to the foregoing objections by all Defendants, which Teva adopts and incorporates by reference, Teva adopts and incorporates by reference its previously served motions in limine and all objections and all forthcoming objections to Plaintiffs' deposition designations for all current and former Teva employees on Plaintiffs' witness list, and Defendants' counter-designations for all current and former Teva employees on Plaintiffs' witness list. Teva's current objections and counter-designations are attached hereto as Exhibit C and are subject to change in light of the parties' ongoing meet-and-confer negotiations with respect to the Plaintiffs' designations.

2.      Teva objects to the general descriptions of testimony provided by Plaintiffs to the extent they mischaracterize the testimony Plaintiffs have designated from those witnesses or to the extent that they reflect argument or characterizations of testimony rather than objective descriptions of the general subject matter of that testimony.

3.      This is not intended to be a comprehensive recitation of all possible objections that may arise during trial. Teva reserves all evidentiary and other objections that may come up as to any specific witness during the course of trial.

Torrent

1.      In addition to the foregoing objections by all Defendants, which Torrent adopts and incorporates by reference, Torrent adopts and incorporates by reference its previously served objections and all forthcoming objections to Plaintiffs' deposition designations for all current and former Torrent employees on Plaintiffs' witness list, and Defendants' counter-designations for all current and former Torrent employees on Plaintiffs' witness list. Torrent's current objections and counter-

176

designations, as well as its affirmative designations for Mr. Nevratela and Mr. Sheth, are attached hereto as Exhibits D to E.3, and are subject to change in light of the parties' ongoing meet-and-confer negotiations with respect to the Plaintiffs' designations.

2.  Torrent objects to the general descriptions of testimony provided by Plaintiffs to the extent they mischaracterize the testimony Plaintiffs have designated from those witnesses or to the extent that they reflect argument or characterizations of testimony rather than objective descriptions of the general subject matter of that testimony. Torrent sets forth a non-exhaustive list of objections to those descriptions below to the extent Torrent has objections that are not already explained in more detail in any motion in limine filed by any Defendant, which motions Torrent incorporates by reference herein.

> ▪ Torrent objects to the claim in the description of the testimony of Ms. Chitty and Dr. Jaiswal that levels of NDMA or NDEA in valsartan API used by Torrent "exceeded the acceptable intake levels set by the FDA" without any reference to the time at which the FDA established those acceptable intake levels as it misleadingly implies that the FDA had established acceptable intake levels at the time Torrent was purchasing Valsartan API from ZHP and/or manufacturing finished dose VCDs using that Valsartan API.

> ▪ Torrent objects to Plaintiffs' designation from Dr. Jaiswal related to chromatograms showing diluent peaks without labeling them, as is customary, which Plaintiffs apparently intend to use to misleadingly imply to the jury that those unlabeled peaks were "unknown" or potentially reflected nitrosamines. Any such testimony would only serve to confuse the jury as Plaintiffs' own expert, Dr. Hecht, admits that peaks associated with nitrosamines would not have been visible on ordinary gas chromatograms.

> ▪ Torrent objects to the description of and playing of testimony of Ms. Attinger related to "ghost peaks." Plaintiffs' description of that testimony, which appears on pages 63 to 65 of her deposition transcript, misleadingly implies that Ms. Attinger provided testimony related to Torrent being aware of "unknown peaks," and that Torrent referred to such peaks as "ghost peaks." Both claims are untrue. Ms. Attinger testified that she had heard the

term "ghost peak" before, but at a prior, non-Torrent employer. *See* Attinger Tr. 63:12-24. Ms. Attinger specifically testified that she did not recall ever hearing the term used while at Torrent. *Id.* 65: 13-16. And Plaintiffs have identified no testimony from Ms. Attinger addressing any observations made by Torrent related to chromatography. Nor did Ms. Attinger testify as to any purported duties to investigate or identify unknown peaks. Instead, Ms. Attinger was asked questions about how she, as a person with a background in biology, would respond to unknown information in the context of her biology training. Ms. Attinger's testimony makes clear that her answers do not relate to chemistry or pharmaceutical manufacturing, areas where she has no skills, experience, or training. Plaintiffs' misleading description of this testimony also highlights the need to play Defendants' counters at the same time as Plaintiffs' affirmative designations and in order, as the context highlighted above that shows the misleading way in which Plaintiffs intend to present Ms. Attinger's testimony is only apparent as a result of the counters Torrent has designated to present a complete portrayal of Ms. Attinger's testimony regarding her familiarity with the term "ghost peaks."

▪ Torrent objects to testimony from Ms. Perry, or any other Torrent witness, related to an April 16, 2014 email chain that was marked for identification as Exhibit 243 to the deposition of Ms. Perry and Exhibit 83 to the deposition of Ms. Chitty. That email chain reflected certain preliminary questions Ms. Perry asked regarding the information ZHP provided to Torrent regarding ZHP's New Process API. That exhibit, and any testimony related to it, are irrelevant and likely to mislead the jury, confuse issues in the case, and unfairly prejudice Torrent. *See* Fed. R. Evid. 401, 403. Any discussion at Torrent related to what Torrent knew or considered regarding ZHP's New Process is irrelevant since it is undisputed that Torrent exclusively used Old Process API in manufacturing the at-issue VCDs. The designated testimony of Ms. Chitty and Ms. Perry related to that document is likely to confuse and mislead the jury—thereby unfairly prejudicing Torrent—by encouraging the jury to believe that the discussion in that document relates to a type of API that Torrent purchased from ZHP for use in the at-issue VCDs. Since the Parties agree and have stipulated that Torrent did not use New Process API,

178

testimony or documents reflecting Torrent's internal discussions related to the process change should not be presented to the jury.

3. Torrent objects to Plaintiffs calling at trial any witness not identified in this Pre-Trial Order. Torrent's objection specifically includes the calling of any purported "Records custodian(s)," when no actual person Plaintiffs intend to call for that purpose has been identified.

4. Torrent objects to the extent Plaintiffs have not identified which witnesses they intend to call live.

5. Torrent objects to the testimony of any witness presented by Plaintiffs to the extent that testimony includes information, or relates to subjects or topics, that any Defendant has moved to exclude in a motion in limine.

6. Torrent objects to Plaintiffs using the depositions of Dr. Sushil Jaiswal or Dawn Chitty instead of having them testify live at trial. Dr. Jaiswal and Ms. Chitty are current and former Torrent employees, respectively. Both Dr. Jaiswal and Ms. Chitty will be testifying live at trial as part of Torrent's defense case. Having Dr. Jaiswal and Ms. Chitty testify in a bifurcated manner—first via video and later via live testimony—is inefficient and will waste valuable trial time, will be confusing to the jury, and is contrary to the long-standing preference in the United States legal system for live testimony. *See* Fed. R. Civ. P. 32(a)(4) (permitting use of depositions at trial only where the witness is unavailable to testify live). Plaintiffs should not be permitted to waste the Court and the jury's time presenting deposition video from either Dr. Jaiswal or Ms. Chitty when both witnesses are available and will be testifying live at trial.

7. This is not intended to be a comprehensive recitation of all possible objections that may arise during trial. Torrent reserves all evidentiary and other objections that may come up as to any specific witness during the course of trial.

C. Defendants' Witnesses and Summary of Their Testimony

1. All Defendants may call the following witnesses with regard to liability and anticipate they will testify as follows:

- **Jorge Lopez**, 2701 S Le Jeune Rd, Coral Gables, FL 33134, is expected to testify about: the terms of the putative assignments from EmblemHealth and SummaCare to MSP and other MSP entities; the consideration paid for the assignments; the history, structure, activities, and business model of MSP and other MSP entities; MSP's status as a non-TPP; the absence of any relationship between MSP, EmblemHealth, or SummaCare and any Defendant; the absence of any representations or warranties by any Defendant to MSP, EmblemHealth, or SummaCare; the absence of any statements regarding valsartan by any Defendant to MSP, EmblemHealth, or SummaCare; the absence of any breach of warranties by any Defendant; the absence of any loss or harm to MSP, EmblemHealth, or SummaCare; MSP's failure to provide pre-suit notice to any Defendant; the lack of reliance by MSP, EmblemHealth, or SummaCare on any representation or warranty by any Defendant; the absence of any unfair or deceptive conduct by any Defendant directed to MSP, EmblemHealth, or SummaCare; the absence of any loss or injury caused to MSP, EmblemHealth, or SummaCare as a result of any Defendant's acts or omissions; MSP's role and inadequacy as a class representative; and any subjects set forth in Plaintiffs' disclosures or discussed during his testimony in Plaintiffs' case-in-chief. This is not intended to be a comprehensive recitation of his anticipated testimony, and Mr. Lopez may testify to other facts. Defendants expect Mr. Lopez to testify live, and have issued a trial subpoena for his testimony, but reserve the right to present his deposition testimony if for some reason he does not appear. Defendants' designations from Mr. Lopez's deposition that may be played at the time of trial are attached as Exhibit F.

- **Christopher Miranda**, 2701 S Le Jeune Rd, Coral Gables, FL 33134, is expected to testify about: the claims data and PDE data for EmblemHealth and SummaCare; the terms of the putative assignments from EmblemHealth and SummaCare to MSP and other MSP entities; the consideration paid for the assignments; the history, structure, activities, and business model of MSP and other MSP entities; MSP's status as a non-TPP; the absence of any relationship between MSP, EmblemHealth, or SummaCare and any Defendant; the absence of any representations or warranties by any Defendant to MSP, EmblemHealth, or SummaCare; the absence of any statements regarding valsartan by any Defendant to MSP, EmblemHealth, or SummaCare; the absence of any breach of warranties by any Defendant; the absence of any loss or harm to MSP, EmblemHealth, or SummaCare; MSP's failure to provide pre-suit notice to any Defendant; the lack of reliance by MSP, EmblemHealth, or SummaCare on any representation or warranty by

180

any Defendant; the absence of any unfair or deceptive conduct by any Defendant directed to MSP, EmblemHealth, or SummaCare; the absence of any loss or injury caused to MSP, EmblemHealth, or SummaCare as a result of any Defendant's acts or omissions; MSP's role and inadequacy as a class representative; MSP's data infrastructure, proprietary technology, and claims identification process; and any subjects set forth in Plaintiffs' disclosures or discussed during his testimony in Plaintiffs' case-in-chief. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to other facts. Defendants expect Mr. Miranda to testify live, and have issued a trial subpoena for his testimony, but reserve the right to present his deposition testimony if for some reason he does not appear. Defendants' designations from Mr. Miranda's deposition that may be played at the time of trial are attached as Exhibit G.

- **Andrew Colby**, 55 Water Street in Lower Manhattan, New York City, is expected to testify about: EmblemHealth's purchase of valsartan; the recall of valsartan and EmblemHealth's actions in response to the recall; the fact that EmblemHealth did not have to purchase replacement valsartan; the claims data and PDE data for EmblemHealth; the terms of the putative assignments from EmblemHealth to MSP and other MSP entities; the consideration paid for the assignments; what EmblemHealth stands to gain from the claims at issue in this case; EmblemHealth's relationship with other claims recovery vendors; the absence of any relationship between EmblemHealth and any Defendant; the absence of any representations or warranties by any Defendant to EmblemHealth; the absence of any statements regarding valsartan by any Defendant to EmblemHealth; the absence of any breach of warranties by any Defendant; the absence of any loss or harm to EmblemHealth; EmblemHealth's failure to provide pre-suit notice to any Defendant; the lack of reliance by EmblemHealth on any representation or warranty by any Defendant; EmblemHealth's use of formularies and P&T Committees; the absence of any unfair or deceptive conduct by any Defendant directed to EmblemHealth; the absence of any loss or injury caused to EmblemHealth as a result of any Defendant's acts or omissions; and any subjects set forth in Plaintiffs' disclosures or discussed during his testimony in Plaintiffs' case-in-chief. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to other facts. Defendants expect Mr. Colby to testify live, and have issued a trial subpoena for his testimony, but reserve the right to present his deposition testimony if for some reason he does not appear.

Defendants' designations from Mr. Colby's deposition that may be played at the time of trial are attached as Exhibits H to H.2.

- **Margaret Finn**, Hilton Head Island, South Carolina, is expected to testify about: EmblemHealth's purchase of valsartan, the recall of valsartan and EmblemHealth's actions in response to the recall; the fact that EmblemHealth did not have to purchase replacement valsartan; the claims data and PDE data for EmblemHealth; the terms of the putative assignments from EmblemHealth to MSP and other MSP entities; the consideration paid for the assignments; what EmblemHealth stands to gain from the claims at issue in this case; EmblemHealth's relationship with other claims recovery vendors; the absence of any relationship between EmblemHealth and any Defendant; the absence of any representations or warranties by any Defendant to EmblemHealth; the absence of any statements regarding valsartan by any Defendant to EmblemHealth; the absence of any breach of warranties by any Defendant, the absence of any loss or harm to EmblemHealth; EmblemHealth's failure to provide pre-suit notice to any Defendant; the lack of reliance by EmblemHealth on any representation or warranty by any Defendant; EmblemHealth's use of formularies and P&T Committees; the absence of any unfair or deceptive conduct by any Defendant directed to EmblemHealth; the absence of any loss or injury caused to EmblemHealth as a result of any Defendant's acts or omissions; and any subjects set forth in Plaintiffs' disclosures or discussed during her testimony in Plaintiffs' case-in-chief. This is not intended to be a comprehensive recitation of her anticipated testimony, and she may testify to any other facts as stated in her deposition. Defendants' designations from Ms. Finn's deposition to be played at the time of trial are attached as Exhibits H, H.1 and H.3.

- **Tiffanie Mrakovich**, 141 N. Forge St. Akron, OH 44304, is expected to testify about: SummaCare's purchase of valsartan; the recall of valsartan and SummaCare's actions in response to the recall; the fact that SummaCare did not have to purchase replacement valsartan; the claims data and PDE data for SummaCare; the terms of the putative assignments from SummaCare to MSP and other MSP entities; the consideration paid for the assignments; what SummaCare stands to gain from the claims at issue in this case; SummaCare's relationship with other claims recovery vendors; the absence of any relationship between SummaCare and any Defendant; the absence of any representations or warranties by any Defendant to SummaCare; the absence of any statements regarding valsartan by any Defendant to SummaCare; the absence of any breach of warranties by any Defendant; the absence of any loss

or harm to SummaCare; SummaCare's failure to provide pre-suit notice to any Defendant; the lack of reliance by SummaCare on any representation or warranty by any Defendant; SummaCare's use of formularies and P&T Committees; the absence of any unfair or deceptive conduct by any Defendant directed to SummaCare; the absence of any loss or injury caused to SummaCare as a result of any Defendant's acts or omissions; and any subjects set forth in Plaintiffs' disclosures or discussed during her testimony in Plaintiffs' case-in-chief. This is not intended to be a comprehensive recitation of her anticipated testimony, and she may testify to other facts. Defendants expect Ms. Mrakovich to testify live, and have issued a trial subpoena for her testimony, but reserve the right to present her deposition testimony if for some reason she does not appear. Defendants' designations from Ms. Mrakovich's deposition that may be played at the time of trial are attached as Exhibits I and I.1.

- **John Ruiz, Esq.,** 2701 S Le Jeune Rd, Coral Gables, FL 33134, is the CEO of the parent company of Plaintiff MSP and serves as manager of Plaintiff MSP. He is also the original signatory for the March 20, 2018 Assignment Agreement between Plaintiff MSP and EmblemHealth—one of the dozens of non-party Third Party Payors that assigned their valsartan-related claims to Plaintiff MSP—and therefore presumably oversaw the formation of that agreement, which forms the basis for Plaintiffs' lawsuit. Mr. Ruiz later became the trustee of the EmblemHealth claims. Mr. Ruiz is expected to provide testimony about the formation of the claims assignment agreements for which he was the signatory, including Plaintiffs' motive in pursuing those agreements, in filing this lawsuit, and the negotiations that took place between Plaintiff MSP and the non-party assignors prior to and after formation of the assignment. Mr. Ruiz is also expected to testify about his knowledge of Plaintiff MSP, the reliability of the company, and its standing to bring suit. Defendants expect Mr. Ruiz to testify live.

- **MSP Corporate Representative,** 2701 S Le Jeune Rd, Coral Gables, FL 33134. In addition to the other witnesses from Plaintiff MSP listed above, Defendants seek live testimony from a corporate representative of Plaintiff MSP regarding the issues set forth with respect to the MSP, EmblemHealth and SummaCare witnesses listed above, and any additional issues that may arise at trial.

- **Owen McMahon**, address not yet identified, is Rite Aid's Vice President of Pharmaceutical Purchasing and his testimony will cover rebuttal of any of the

topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial.

- **John Holderman**, address not yet identified, is Senior Director at CVS Health for Pharmacy Merchandising and his testimony will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial.

- **Cesar Cedeno**, Southwest Ranches, Florida, works at Humana and his testimony will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial.

- **Catherine Stimmel**, address not yet identified, is Walgreen's Director of Pharmacy Quality Assurance and Patient Safety and her testimony will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial.

2.    In addition to their damages experts, All Defendants may call the following witnesses with regard to damages and anticipate they will testify as follows.

- **Jorge Lopez**, 2701 S Le Jeune Rd, Coral Gables, FL 33134, is expected to testify about: the absence of any loss or harm to MSP, EmblemHealth, or SummaCare; the absence of any loss or injury caused to MSP, EmblemHealth, or SummaCare as a result of any Defendant's acts or omissions; any damages-specific subjects set forth in Plaintiffs' disclosures or discussed during his testimony in Plaintiffs' case-in-chief.

- **Christopher Miranda**, 2701 S Le Jeune Rd, Coral Gables, FL 33134, is expected to testify about: the absence of any loss or harm to MSP, EmblemHealth, or SummaCare; the absence of any loss or injury caused to MSP, EmblemHealth, or SummaCare as a result of any Defendant's acts or omissions; and any damages-specific subjects set forth in Plaintiffs' disclosures or discussed during his testimony in Plaintiffs' case-in-chief.

- **Andrew Colby**, 55 Water Street in Lower Manhattan, New York City, is expected to testify about: the absence of any loss or harm to EmblemHealth; the absence of any loss or injury caused to EmblemHealth as a result of any Defendant's acts or omissions; and any damages-specific subjects set forth in Plaintiffs' disclosures or discussed during his testimony in Plaintiffs' case-in-chief.

184

- **Margaret Finn**, Hilton Head Island, South Carolina, is expected to testify about: the absence of any loss or harm to EmblemHealth; the absence of any loss or injury caused to EmblemHealth as a result of any Defendant's acts or omissions; and any damages-specific subjects set forth in Plaintiffs' disclosures or discussed during her testimony in Plaintiffs' case-in-chief.

- **Tiffanie Mrakovich**, 141 N. Forge St. Akron, OH 44304, is expected to testify about: the absence of any loss or harm to SummaCare; the absence of any loss or injury caused to SummaCare as a result of any Defendant's acts or omissions; and any damages-specific subjects set forth in Plaintiffs' disclosures or discussed during her testimony in Plaintiffs' case-in-chief.

- **John Ruiz, Esq.**, 2701 S Le Jeune Rd, Coral Gables, FL 33134, is expected to testify about: the absence of any loss or harm to MSP, EmblemHealth, or SummaCare; the absence of any loss or injury caused to MSP, EmblemHealth, or SummaCare as a result of any Defendant's acts or omissions; any damages-specific subjects set forth in Plaintiffs' disclosures or discussed during Plaintiffs' case-in-chief.

- **MSP Corporate Representative**, 2701 S Le Jeune Rd, Coral Gables, FL 33134, is expected to testify about: the absence of any loss or harm to MSP, EmblemHealth, or SummaCare; the absence of any loss or injury caused to MSP, EmblemHealth, or SummaCare as a result of any Defendant's acts or omissions; any damages-specific subjects set forth in Plaintiffs' disclosures or discussed during Plaintiffs' case-in-chief.

- **Owen McMahon**, address not yet identified, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial, including but not limited to the fact that Rite Aid was able to sell Defendants' VCDs prior to July 2018.

- **John Holderman**, address not yet identified, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial, including but not limited to the fact that CVS Health was able to sell Defendants' VCDs prior to July 2018.

- **Cesar Cedeno**, address not yet identified, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that

may become relevant at trial, including but not limited to the fact that Humana was able to sell Defendants' VCDs prior to July 2018.

- **Catherine Stimmel**, address not yet identified, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial, including but not limited to the fact that Walgreens was able to sell Defendants' VCDs prior to July 2018.

- **Daniel Brais**, Buckeye, Arizona, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial, including but not limited to the fact that Rite Aid was able to sell Defendants' VCDs prior to July 2018.

- **Steven Taylor**, Denver, CO, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial, including but not limited to the fact that Rite Aid was able to sell Defendants' VCDs prior to July 2018.

- **Julie Webb**, Dublin, Ohio, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial, including but not limited to the fact that Rite Aid was able to sell Defendants' VCDs prior to July 2018.

- **Wendy Woon-Fat**, Irvine, CA, will cover rebuttal of any of the topics raised by Plaintiffs and also additional retailer-related information that may become relevant at trial, including but not limited to the fact that Rite Aid was able to sell Defendants' VCDs prior to July 2018.

3. ZHP intends to call the following witnesses (in addition to its expert witnesses) with regard to liability and anticipates they will testify as follows:

- **Xiaofang "Maggie" Kong**, Linhai, Zhejiang Province, China, is the Vice President, Globalization & Development for Zhejiang Huahai Pharmaceutical Co. and has been employed there since 2017. Ms. Kong may testify about (i) ZHP's structure, products and business; (ii) the company's response to the discovery of NDMA in Valsartan in 2018 (during which time Ms. Kong was Chief of Staff), including temporary product holds, the voluntary recall, communications with pharmaceutical customers regarding product returns and reimbursement, investment in testing equipment, coordination of company personnel to test batches of Valsartan and collect information to be passed on to regulators, pharmaceutical customers, and the public at large, and

identification of manufacturing process changes; and (iii) the impact of the recall and import ban on the company.

- **Jucai Ge,** Linhai, Zhejiang Province, China, has been a member of the QA (Quality Assurance) Department since joining ZHP in 2000. During the relevant time period, she was the QA Director for the Chuannan plant where Valsartan API was manufactured and then the QA Director for all API manufactured by ZHP. Ms. Ge is expected to testify about the Valsartan API manufacturing process and its compliance with company, regulatory, and customers' standards and specifications. She is also expected to testify about the process changes made to Valsartan API during the relevant time period and investigations into alleged deviations and unidentified peaks in Valsartan API. ZHP expects Ms. Ge to testify live but reserves the right to present her deposition testimony to counter deposition testimony from Ms. Ge presented by Plaintiffs in their case-in-chief. Defendants' designations from Ms. Ge's deposition that may be played at the time of trial are attached as Exhibit J.

- **Jinsheng Lin, Ph.D.**, Linhai City, Zhejiang Province, PR China, is an Associate Director in the Center of Excellence for Modern Analytical Technologies ("CEMAT") at Zhejiang Huahai Pharmaceutical Co., Ltd. Dr. Lin is expected to testify about his role within CEMAT, including how an impurity observed during the evaluation of a proposed manufacturing process change for irbesartan was brought to his attention, his investigation of that impurity, his email on July 27, 2017 reporting the results of his investigation, and related follow-up regarding the irbesartan investigation.

ZHP also reserves the right to call any other fact witnesses identified and listed by Plaintiffs or Co-Defendants.

4.    ZHP intends to call the following witnesses with regard to damages and anticipates they will testify as follows:

In addition to damages experts Dr. Lauren Stiroh and Wayne Gibson, ZHP reserves the right to call any witness, whether identified and listed by Plaintiffs or Co-Defendants, to rebut any ZHP-specific damages testimony offered by Plaintiffs during Plaintiffs' case-in-chief.

5.    Teva may call the following witnesses (including live or by video) with regard to liability (in addition to its expert witnesses) and anticipates they will testify

as follows[8]:

- **Mayra Avila**, 400 Interpace Parkway, Parsippany, NJ 07054, is Teva's Head of Finance Operations North America and Complex Manufacturing, a position she has held since March 2021. Prior to that, she was the Senior Director of Finance for U.S. generics at Teva, and has been employed at Teva since 2008. Ms. Avila may testify to the pricing of Teva's valsartan finished dose product that was sold in the U.S., the gross and net profits to Teva from the sale of its finished dose valsartan products.

  Ms. Avila may testify regarding Teva's internal systems that contain transactional data for accounting, products, and sales. She may also testify regarding Teva's valsartan product sales, including sales by Actavis, which was later acquired by Teva. She may testify to reimbursements or refunds that Teva issued in connection with the valsartan recall. This is not intended to be a comprehensive recitation of her anticipated testimony, and she may testify to any other facts as stated in her deposition.

- **Daniel Barreto**, 1612 Drakestone Avenue, Nichols Hills, OK 73120, is the former Vice President of Quality and Compliance at Teva. Mr. Barreto held the position from 2017 to 2020. Mr. Barreto may testify on a range of topics including: testing of Valsartan API and finished doses, quality assurance, and

---

[8] Counsel for the Teva Defendants continue to actively meet and confer with Plaintiffs' counsel to narrow the deposition designations and objections for Teva witnesses referenced in this subsection. The Teva Defendants reserve the right to supplement, amend, edit, modify, or withdraw these objections and counter-designations at any time before or during trial. Teva further reserves the right to amend its counter-deposition designations or objections in the event further issues arise prior to trial or if additional evidence or testimony is adduced during trial or pre-trial proceedings, and specifically may serve further objections, counter-designations, and/or affirmative designations for these witnesses in response to subsequent meet and confers, additional designations served by Plaintiffs or Co-Defendants, the Court's rulings on motions for summary judgment and motions in limine, stipulations reached by the parties, witness availability issues or other reasons. In designating portions of the depositions above, Teva does not waive, and expressly reserves, any and all objections to the admissibility of the designated testimony at the trial of this matter.

quality control activities, Teva's communications with API manufacturers and downstream customers, compliance with cGMPs, and corporate relationships.

Related to the testing of valsartan and API, Mr. Barreto's testimony may cover several facets of Teva's quality operation related to testing. Mr. Barreto may testify related to the formulation of testing specifications in the ANDA for the products at issue, including adherence to USP and ICH standards therein. Mr. Barreto can also detail the FDA involvement in approval of the testing specifications in Teva's ANDA submissions. Mr. Barreto can also testify on Teva's internal testing procedures for the products at issue, including the mechanics, frequency, results, and documentation of such testing. Further, Mr. Barreto can testify on the compendial standards for testing unknown impurities in the relevant period, including NDMA.

Related to quality assurance, quality control, and cGMP activities, Mr. Barreto can testify on the existence, functions, and capabilities of Teva's overall quality department. This testimony will include examination of internal operating procedures and adherence thereto. Mr. Barreto can also testify about Teva's adherence to cGMP related to its manufacture of its VCDs in the relevant period, including, but not limited to, testing of its VCDs, change control procedures, required submissions to the FDA, audits of ZHP, and response procedures after being informed of the nitrosamine issue. Additionally, Mr. Barreto's testimony may include examination of Teva's interactions with the FDA related to warning letters, 483 notices, and cGMP issues in the relevant time period.

Related to communications with API manufacturers and downstream customers, Mr. Barreto can testify to Teva's relationship with ZHP. Mr. Barreto can detail Teva's history with ZHP as a supplier, Teva's internal procedures related to oversight of API suppliers, communications with FDA and ZHP about the process change, audits of ZHP, and communications with ZHP both before and after the recall. Additionally, Mr. Barreto can testify about Teva's response to the FDA and customers after ZHP informed them of the nitrosamine issue, including related to the recall of the VCDs at issue.

Related to corporate relationships, Mr. Barreto can testify about Teva's acquisitions of other companies in the relevant period. Specifically, Mr. Barreto can testify about Teva's acquisition of the Actavis and other predecessor entities that previously held the ANDAs for the VCDs at issue. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to any other facts as stated in his deposition.

189

Teva's counter-designations from Mr. Barreto's deposition to be played at the time of trial are attached as Exhibits C.5 and C.6.

- **Anthony Binsol**, 81 Kayharts Lane, Washington, NJ 07882, is the Senior Director of Global Quality Management Systems at Teva. Mr. Binsol may testify on topics related to the testing of Valsartan API, testing of valsartan finished dose products, and process development of investigational and validated testing methodologies.

  Related to the testing of valsartan finished dose products and API, Mr. Binsol's testimony may cover several facets of Teva's testing operations. Mr. Binsol can testify to Teva's overall quality systems and the compendial testing standards in the relevant period. Relatedly, Mr. Binsol can testify that Teva's testing for incoming API for the products at issue was performed pursuant to its ANDA specifications, which incorporated all applicable regulatory standards including the USP monograph and ICH. Mr. Binsol can also testify that the selection and use of a validated testing method depends on the appropriateness of the molecule being tested, including analysis of its physical and chemical properties. Related to API suppliers, Mr. Binsol can testify that Teva has the data to trace the valsartan API batch from the supplier to each of its finished dose valsartan lots. Further, Mr. Binsol can testify that Teva's systems do require the appropriate characterization of its API by an API manufacturer and that Teva expects its API suppliers to perform all testing as described in the DMF. Mr. Binsol can also testify about the API supplier's responsibility to adequately characterize its API.

  Related to process development, Mr. Binsol can testify on the state of knowledge at Teva and within the industry prior to June 2018 as to whether NDMA was known or expected to form in valsartan API. He can further testify to the conditions under which it is now understood at Teva and within the industry, following notification from ZHP in June 2018, that NDMA can potentially form in valsartan API. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to any other facts as stated in his deposition.

  Teva's counter-designations from Mr. Binsol's deposition to be played at the time of trial are attached as Exhibit C.9.

- **Elisabeth Gray**, 18 Trevor Lake Drive, Congers, NY 10920, is the Director of Regulatory Affairs for Teva Pharmaceuticals USA, Inc. Ms. Gray can testify as to Teva's regulatory submissions to the FDA related to the ZHP

190

valsartan API at issue and Teva's finished dose products incorporating ZHP's valsartan API. She can testify as to Teva's disclosures made to and communications with the FDA with regard to the actual or potential presence of NDMA impurities in valsartan API and valsartan finished dose products following notification to Teva of the impurity from ZHP in June 2018.

Ms. Gray may testify as to how Teva and Teva's predecessor entities prepared and submitted regulatory materials related to valsartan finished dose products, including the valsartan ANDAs, ANDA updates including CBE-30s, Field Alert Reports, recall notifications, and recall updates. She can identify the relevant groups and departments responsible for performing and overseeing the analyses incorporated by regulatory into these submissions.

Ms. Gray may testify as to communications with the FDA on the scope, timing, and classification of Teva's valsartan recalls. She may testify as to discussions with the FDA on specific information to be included in the valsartan recall notices and communicated to patients. This is not intended to be a comprehensive recitation of her anticipated testimony, and she may testify to any other facts as stated in her deposition.

Teva's counter-designations from Ms. Gray's deposition to be played at the time of trial are attached as Exhibit C.1.

- **Stefan Karlsson**, Vallentuna, Sweden, worked as the Associate Director of API sourcing at Teva. Mr. Karlsson can testify as to Teva's assessment, evaluation, and selection of API suppliers for valsartan. He can testify as to Teva's sourcing of and negotiation with API suppliers. He can testify as to the testing and selection of API for drugs in the development phase, prior to commercialization. Mr. Karlsson may testify as to the materials and information Teva would request from potential API suppliers and may testify regarding specific API suppliers used by Teva. Mr. Karlsson may testify as to the qualifications Teva required when selecting an API supplier.

Mr. Karlsson may also testify as to certain emails and communications that he drafted regarding the discovery of nitrosamine impurities in 2018 while he was working in API sourcing. Mr. Karlsson can explain how these emails related to his job responsibilities at that time and what information he was or was not privy to based on his role in API sourcing at the time those emails were drafted. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to any other facts as stated in his deposition.

Teva's counter-designations and affirmative designations from Mr. Karlsson's deposition to be played at the time of trial are attached as Exhibit C.2.

- **Michelle Keller (Osmian)**, 5843 S. Deer Run Rd., Doylestown, PA 18902, is Teva's Vice President of Commercial Operations, a position that she has held since 2019.

  Ms. Keller may testify regarding Teva's oral and written communications with ZHP, Teva's finished dose customers or other downstream entities, regarding Teva's recall of its finished dose valsartan products. Specifically, she may testify regarding Teva's recall of valsartan, including communications regarding the recall and any credits, refunds, or penalties paid or provided by Teva in connection with the valsartan recall. She may also testify regarding Teva's internal processes and procedures from a commercial/sales perspective when there is a product recall or in cases where there are quality issues that may impact Teva's ability to sell a certain product. She may testify to the return and destruction of recalled product in connection with the valsartan recall.

  Ms. Keller may also testify to tracing of batches and lots of Teva's valsartan finished dose during the relevant time period. Ms. Keller may testify regarding oral and written communications with Teva's customers and other downstream entities. Her testimony may include general communications with, and complaints or inquiries from, Teva's customers regarding Teva's finished dose valsartan products. This is not intended to be a comprehensive recitation of her anticipated testimony, and she may testify to any other facts as stated in her deposition.

  Teva's counter-designations from Ms. Keller's deposition to be played at the time of trial are attached as Exhibit C.8.

- **Pan Lin**, Shanghai, China, is a Quality Assurance Auditor at Teva. He has been responsible for conducting audits of Teva's API suppliers and Teva's intermediates suppliers since 2009. Mr. Pan is expected to testify regarding Teva's audit group's practices and procedures, specifically as it relates to Teva's auditing of ZHP. Mr. Pan is expected to testify concerning his involvement with audits of ZHP's Chuannan facility, the practices and procedures employed during those audits, and the documentation and reports generated from those audits. Mr. Pan is also expected to testify concerning whether the findings from those audits gave any indication of a potential

192

nitrosamine impurity in ZHP's API. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to any other facts as stated in his deposition.

Teva's counter-designations and affirmative designations from Mr. Pan's deposition to be played at the time of trial are attached as Exhibits C.10 and C.11.

- **Claire Lyons**, 3051 NE 47th Court, Apt 107, Fort Lauderdale FL 33308 , is the Senior Director, European Quality Audits at Teva. As specifically detailed below, Teva may introduce Ms. Lyons at trial to testify on several topics related to quality procedures at Teva.

  Ms. Lyons may testify as to quality operating procedures at Teva, including risk management, data integrity, and vendor oversight. Additionally, Ms. Lyons may testify as to her understanding of cGMP, and the importance of having systems in place to ensure proper design, monitoring, and control of manufacturing processes and facilities. Ms. Lyons can also testify as to Teva's adherence to cGMP in its quality processes.

  Ms. Lyons may also testify as to topics related to testing. This may include testimony on the compendial standards in the relevant period, development of test methods, and communications with regulators regarding interim limits of nitrosamines.

  Ms. Lyons may also testify as to Teva's response to the nitrosamine issue. This may include testimony related to communications with ZHP, communications with the FDA, communications with customers, product holds, and the recall. Ms. Lyons may also testify as to steps taken internally at Teva to respond to the nitrosamine issue following notification from ZHP about the existence of the impurity. This is not intended to be a comprehensive recitation of her anticipated testimony, and she may testify to any other facts as stated in her deposition.

  Teva's counter-designations from Ms. Lyons's deposition to be played at the time of trial are attached as Exhibit C.7.

- **Jens Nassall**, Ulm, Germany, is the Senior Director of Global Strategy Implementation for API, Excipients and Raw Materials, and China Procurement for Teva Global Operations. Mr. Nassall can testify as to how Teva first learned of the issues which led to Teva's product recall for the

193

finished dose valsartan products. He can testify as to Teva's communications with ZHP regarding valsartan API. He may testify as to indemnifications sought or provided by Teva in connection with the nitrosamine impurity found in valsartan. Mr. Nassall may testify as to sourcing of API for Teva, and the procedures involved. He may testify as to agreements with API suppliers entered by Teva, the provisions of such agreements, and price negotiations. He may testify to Teva's history with certain suppliers and the type of considerations made when deciding to procure API. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to any other facts as stated in his deposition.

Teva's counter-designations and affirmative designations from Mr. Nassall's deposition to be played at the time of trial are attached as Exhibit C.12.

- **Raphael Nudelman**, Rehovot, Israel, is Teva's Director, Chemical & Computational Toxicology, Nonclinical Safety Department. Dr. Nudelman may testify about Teva's internal processes and procedures for performing toxicological assessments. He may further testify about relevant internal and industry standards referenced by Teva in performing said assessments.

Dr. Nudelman can testify as to how Teva performed its toxicological assessment of the NDMA impurity identified in valsartan following notification of the impurity by ZHP in June 2018. He can testify as to how Teva prepared its toxicology analysis for incorporation into Teva's Health Hazard Assessment for the valsartan products at issue. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to any other facts as stated in his deposition.

Teva's counter-designations and affirmative designations from Dr. Nudelman's deposition to be played at the time of trial are attached as Exhibit C.4.

- **Narendra Vadsola**, Thane, Maharashtra, India, serves as Regional Audit Hub Manager for Teva. He has been responsible for overseeing audits in the APAC region since 2017. Mr. Vadsola is expected to testify regarding Teva's auditing group's practices and procedures, including Teva's corporate standards as related to Teva's auditing program. Mr. Vadsola is expected to testify concerning the classifications of observations noted in the auditing process and the significance of different observations as it relates to cGMP compliance and product quality.

194

Mr. Vadsola is also expected to testify concerning the specific audits Teva conducted of ZHP, including the audit procedures employed during those audits, the findings those audits revealed, and whether the findings from those audits gave any indication of a potential nitrosamine impurity in ZHP's API. Mr. Vadsola is also expected to testify concerning the corporate structure of Teva as it relates to the auditing and quality functions at Teva and what auditors are and are not required to look for and document when conducting an audit and preparing audit reports. This is not intended to be a comprehensive recitation of his anticipated testimony, and he may testify to any other facts as stated in his deposition.

Teva's counter-designations and affirmative designations from Mr. Vadsola's deposition to be played at the time of trial are attached as Exhibit C.3.

Teva reserves the right to call any other fact witnesses identified and listed by Plaintiffs or Co-Defendants.

6.      Teva intends to call the following witnesses with regard to damages and anticipates they will testify as follows:

In addition to damages experts Dr. Lauren Stiroh and Wayne Gibson, Teva reserves the right to call any witness, whether identified and listed by Plaintiffs or Co-Defendants, to rebut any Teva-specific damages testimony offered by Plaintiffs during Plaintiffs' case-in-chief.

7.      Torrent intends to call the following witnesses with regard to liability and anticipates they will testify as follows:

• **Sushil Jaiswal**, Ahmedabad, India. Dr. Jaiswal will provide testimony regarding the following topics: Torrent's API vendor decisions and qualification process, Torrent's auditing process and auditing of ZHP, Torrent's testing and quality programs, Torrent's testing of ZHP's API, Torrent's cGMP compliance process, Torrent's receipt of notifications from ZHP regarding nitrosamine impurities and actions taken by Torrent related to those notifications, Torrent's development of a testing method for nitrosamines, Torrent's lack of knowledge of the possibility of nitrosamine impurities in valsartan API, actions taken by the FDA with respect to Torrent, Torrent's recall of its Valsartan products and the timing of that recall, and

Torrent's communications with ZHP.[9]

- **Dawn Chitty**, 5047 West Main Street, Kalamazoo, MI 49009. Ms. Chitty will provide testimony regarding the following topics: Torrent's communications with the FDA, actions taken by the FDA with respect to Torrent, Torrent's recall decision-making and timing, Torrent's communications with ZHP, and Torrent's communications with customers.[10]

- **Reddy Neravetla**, 136 Briarwood Lane, Colmar, PA 18915. Mr. Neravetla will provide testimony regarding the following topics: Torrent's communications with the FDA, Torrent's recall decision-making and timing, and Torrent's communication with its recall vendor. Torrent intends to call Mr. Neravetla by video, relying on affirmative deposition designations served on February 2, 2024. Torrent's affirmative designations for Mr. Neravetla's deposition, which are to be played at the time of trial, are included in Exhibits E to E.2, which also contain Torrent's objections to Plaintiffs' affirmative designations of Mr. Neravetla's testimony and Torrent's counters to Plaintiffs' affirmative designations.

- **Paras Sheth**, Ahmedabad, India. Mr. Sheth will provide testimony regarding the following topics: Torrent's procurement process, Torrent's SOPs and internal policies regarding procurement, Torrent's processes for vetting and qualifying API vendors, and Torrent's selection of ZHP as an API vendor. Torrent intends to call Mr. Sheth by video, relying on affirmative deposition designations served on February 2, 2024. Torrent's affirmative designations for Mr. Sheth's deposition, which are to be played at the time of trial, are included in Exhibits E, E.1 and E.3, which also contain Torrent's objections

---

[9]    Torrent intends to call Dr. Jaiswal to testify live at trial. In the unlikely event that unanticipated circumstances might make it impossible for Dr. Jaiswal to appear live at trial, Torrent served affirmative deposition designations on February 2, 2024. Torrent reserves the right to call Dr. Jaiswal by video to testify at trial, relying on those affirmative deposition designations, should there be a circumstance where Dr. Jaiswal is unable to attend trial and testify live.

[10]    Torrent intends to call Ms. Chitty to testify live at trial. In the unlikely event that unanticipated circumstances might make it impossible for Ms. Chitty to appear live at trial, Torrent served affirmative deposition designations on February 2, 2024. Torrent reserves the right to call Ms. Chitty by video to testify at trial, relying on those affirmative deposition designations, should there be a circumstance where Ms. Chitty is unable to attend trial and testify live.

to Plaintiffs' affirmative designations of Mr. Sheth's testimony and Torrent's counters to Plaintiffs' affirmative designations.

8.    Torrent intends to call the following witnesses with regard to damages and anticipates they will testify as follows:

> In addition to damages experts Dr. Lauren Stiroh and Wayne Gibson, Torrent reserves the right to call any witness, whether identified and listed by Plaintiffs or Co-Defendants, to rebut any Torrent-specific damages testimony offered by Plaintiffs during Plaintiffs' case-in-chief.

D.    <u>Plaintiffs' Objections to Defendants' Witnesses</u>: If there are no objections to any of the witnesses, Plaintiffs shall so state that in this portion of the Order. If there are objections to any of Defendants' witnesses, they shall be listed here.

<u>All Defendants</u>

1.    Plaintiffs adopt and incorporate by reference their previously served objections and all forthcoming objections to Defendants' deposition designations for Defendants' witnesses, and Plaintiffs' counter-designations for Defendants' witnesses.

2.    Plaintiffs adopt and incorporate by reference their motions in limine and other trial briefing to the extent such motions and briefing pertain to any of the subject matter of any witness testimony.

3.    Plaintiffs' incorporate by reference their motion to preclude improper deposition designations, such as Defendants' affirmative deposition designations.

4.    This is not intended to be a comprehensive recitation of all possible objections that may arise during trial. Plaintiffs reserve all evidentiary and other objections that may come up as to any specific witness during the course of trial.

5.    Plaintiffs object to Defendants calling John Ruiz at trial. None of the bases that Defendants identify for calling Mr. Ruiz are relevant to this case and introducing that evidence at trial will only serve to distract the jury and confuse the issues. Rule 401 and 403. There is no champerty affirmative defense in this case, and as will be shown in plaintiffs' opposition to ZHP's motion to amend its affirmative defenses, ZHP's request to add that affirmative defense 10 days before trial is

197

undoubtably untimely. It's also futile because the assignments are undisputably not champertous. Further, there is no record support for defendants' assertion that "Mr. Ruiz later became the trustee of the EmblemHealth claims," and it is plain that when defendants state that Mr. Ruiz is expected to testify about "his knowledge of the plaintiff" and the "reliability of the company," Defendants intend to raise topics that the Court already rejected in its order on Defendants' motion to decertify [ECF 2657 at 9] and that are also subject to pending motions in limine. Mr. Ruiz has also not been deposed in this action and he is beyond the subpoena power of the Court. As for damages testimony, Defendants have not established that Mr. Ruiz would have any knowledge as to the loss or harm to MSP, Emblem, and SummaCare, nor why they need a fifth witness to testify about the same subject. It also calls for expert testimony.

6.   Plaintiffs object to Defendants calling Margarett Finn live at trial. Ms. Finn no longer works for EmblemHealth, and she no longer is EmblemHealth's corporate representative. She is also beyond the subpoena power of the Court. EmblemHealth has designated a replacement corporate representative, Andrew Colby, who has been deposed and will be testifying at trial. Further, Defendants' expected testimony from Ms. Finn about "what EmblemHealth stands to gain from the claims at issue in this case" is subject to a pending MIL and is also an additional attempt to insert a champerty argument—without there being a champerty affirmative defense. Also, "EmblemHealth's relationship with other claims recovery vendors" is simply irrelevant, as is the amount of consideration paid for the assignments.

7.   Plaintiffs object to the described proposed testimony of Andew Colby, which includes "what EmblemHealth stands to gain from the claims at issue in this case." That is subject to a pending MIL and is also an additional attempt to insert a champerty argument—without there being a champerty affirmative defense. Also, "EmblemHealth's relationship with other claims recovery vendors" is simply irrelevant, as is the amount of consideration paid for the assignments.

8.   Plaintiffs object to the described proposed testimony of Tiffanie Mrakovich, which includes "what SummaCare stands to gain from the claims at issue in this case." That is subject to a pending MIL and is also an additional attempt to insert a champerty argument—without there being a champerty affirmative defense. Also, "SummaCare's

relationship with other claims recovery vendors" is simply irrelevant, as is the amount of consideration paid for the assignment.

9.    Plaintiffs object to plaintiffs attempting to call an unidentified third corporate representative of MSP to testify about the same subjects that defendants already expect other witnesses and corporate representatives to testify about. Plaintiffs also object to the catch-all description of "any additional issues that may arise at trial."

10.    Plaintiffs object to the described proposed testimony of Jorge Lopez and Chris Miranda as it seeks to highlight MSP's status as an assignee and other purported bad acts by affiliated MSP companies, all of which are currently subject to pending MILs.

ZHP

1.    Plaintiffs object to the testimony of Maggie Kong, Jinsheng Lin, and the proposed affirmative designations for Jucai Ge, and incorporate by reference their objections from their motion regarding deposition designations, trial brief, and MILs on these points.
2.    Plaintiffs also object to Jucai Ge's proposed testimony to the extent it goes beyond her personal knowledge as a member of the QA Department and its eventual but now former head of that Department at the Chuannan facility.
3.    This is not intended to be a comprehensive recitation of all possible objections that may arise during trial. Plaintiffs reserve all evidentiary and other objections that may come up as to any specific witness during the course of trial.
4.    Plaintiffs' objections to Dr. Lauren Stiroh and Wayne Gibson are addressed below in the expert section of this order and/or in the *Daubert* briefing to exclude these witness, incorporated herein by reference. Moreover, their testimony must be limited to the opinions disclosed in their expert report(s) in this case and cannot opine on anything else.

Teva

1.    Plaintiffs object to the live testimony of Stefan Karlsson, Jens Nassall, Pan Lin, and Narendra Vadsola to the extent Teva may have represented that each of these witnesses, who work and reside overseas, would not be available for live testimony in Plaintiffs' case in chief.

2.     This is not intended to be a comprehensive recitation of all possible objections that may arise during trial. Plaintiffs reserve all evidentiary and other objections that may come up as to any specific witness during the course of trial.

Torrent

1.     Plaintiffs object to Defendants calling Paras Sheth and Reddy Neraveta by video, as explained in their motion to preclude improper deposition designations by reference.

## PART VI.  **EXPERT WITNESSES**:

Any prior Scheduling Order of the court concerning experts is applicable to this action and the directives of the Scheduling Order shall govern expert testimony in this case. Any expert not listed in this portion of the Final Pretrial Order shall not be permitted to testify at the time of trial. Additionally, the curriculum vitae of every expert expected to testify at the time of trial shall be attached to this Final Pretrial Order. The curriculum vitae or summary of the expert's qualifications may be read into the record at the time the expert takes the stand, and no opposing counsel shall be permitted to question the qualifications of the expert unless the basis of the objection is set forth in or incorporated by reference in this Final Pretrial Order. The reading of a summary of the expert's qualifications into the record at the time the expert takes the stand will not prevent the expert from further testifying regarding his or her background and qualifications to provide context for his or her testimony and opinions. No expert will be permitted to testify at trial unless all opposing counsel have received the curriculum vitae of the expert and the information required by Fed.R.Civ.P. 26(a)(2) as directed in the Scheduling Order.

If any hypothetical questions are to be put to an expert witness on direct examination, they shall be written in advance and submitted to the court and counsel prior to commencement of trial.

1.     Plaintiffs' expert witnesses are:

- Susan Bain
  - Ms. Bain is a former consumer safety officer/investigator with the FDA and current assistant professor with the department of regulatory and quality sciences at the University of Southern California. She received a BS in biology from California State Polytechnic University in 1978, an MS in regulatory science from University of Southern California in

2003, and a DRSc in regulatory science from University of Southern California in 2011. Plaintiffs' summary of her qualifications that will be read into the record at the time she takes the stand is attached hereto as Exhibit 43, and her current curriculum vitae is attached hereto as Exhibit 44.

- Rena Conti, Ph.D.
  - o Dr. Conti is an associate professor of markets, public policy, and law in the Questrom School of Business at Boston University. She received a BA from Kenyon College in 1992, and a Ph.D. in health policy (economics track) from Harvard University in 2007. Plaintiffs' summary of her qualifications that will be read into the record at the time she takes the stand is attached hereto as Exhibit 45, and her current curriculum vitae is attached hereto as Exhibit 46.

- Laura R. Craft, MPH
  - o Ms. Craft is co-founder of OnPoint Analytics, Inc. an economic and statistical consulting firm specializing in database services, including pharmaceutical data analysis. She received a BA from University of California, Los Angeles in 1978, a juris doctor from University of California, Hastings College of Law in 1980, and an MPH from University of California, Berkeley, in 2021. Plaintiffs' summary of her qualifications that will be read into the record at the time she takes the stand is attached hereto as Exhibit 47, and her current curriculum vitae is attached hereto as Exhibit 48.

- Stephen S. Hecht, Ph.D.
  - o Dr. Hecht currently is a professor with the Department of Laboratory Medicine and Pathology, in the University of Minnesota Medical School. He received a B.S. in chemistry from Duke University in 1964, and his Ph.D. in organic chemistry from the Massachusetts Institute of Technology (MIT) in 1968. Plaintiffs' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit 49, and his current curriculum vitae is attached hereto as Exhibit 50.

- Ramin (Ron) Najafi, Ph.D.
  - o Dr. Najafi is founder and CEO of Emory Pharma, an FDA registered cGMP/GLP compliant contract research laboratory. He received a B.S. and M.S. in organic chemistry from the University of San Francisco in

201

1983. He received his Ph.D. in organic chemistry from the University of California, Davis in 1988. Plaintiffs' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit 51, and his current curriculum vitae is attached hereto as Exhibit 52.

- Kali Panagos, Pharm.D., RPH
  - Dr. Panagos currently is executive vice-president of ARMSRx Pharmacy Benefit Consulting, a firm providing pharmacy benefit guidance to TPPs. She received two BS degrees in biology and pharmacy from St. John's University in 1997 and 2000, and a Pharm.D. from Shenandoah University in 2006. Plaintiffs' summary of her qualifications that will be read into the record at the time she takes the stand is attached hereto as Exhibit 53, and her current curriculum vitae is attached hereto as Exhibit 54.

- Laura M. Plunkett, Ph.D.
  - Dr. Plunket is a pharmacologist and toxicologist who received a B.S. degree in 1980 from the University of Georgia and a Ph.D. in pharmacology from University of Georgia in 1984. She is a current adjunct professor at Baylor University. Plaintiffs' summary of her qualifications that will be read into the record at the time she takes the stand is attached hereto as Exhibit 55, and her current curriculum vitae is attached hereto as Exhibit 56.

- Philip Russ
  - Mr. Russ is owner and president of Innovative Consultants GXP, which provides a range of regulatory compliance and quality assurance services to clients in the pharmaceutical, medical device and biologics industry. He holds a B.S. in chemistry from the University of Sciences. Plaintiffs' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit 57, and his current curriculum vitae is attached hereto as Exhibit 58.

- Dipak Panigrahy, MD
  - Dr. Panigrahy currently is a cancer researcher and is currently an assistant professor of pathology at Harvard Medical School. He received a BMedSci from Boston University in 1988. He received his M.D. from Boston University School of Medicine in 1994. Plaintiffs'

summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit 59, and his current curriculum vitae is attached hereto as Exhibit 60.

- Stephen Lagana, MD
  - Dr. Lanaga currently is an Associate Professor of Pathology and Cell Biology at Columbia University. He received a BA from Hofstra University in 2004, and a M.D. from the University of Pittsburgh School of Medicine in 2008. Plaintiffs' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit 61, and his current curriculum vitae is attached hereto as Exhibit 62.

- Mahyar Etminan PharmD, MSc
  - Dr. Etminan currently is a research scientist at the Center for Clinical Epidemiology and Evaluation at Vancouver Coastal Health Research Institute. He received a MSc in clinical epidemiology from the University of Toronto in 2003, and a Doctor of Pharmacy from Idaho State University in 2001. Plaintiffs' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit 63, and his current curriculum vitae is attached hereto as Exhibit 64.

- Greg Cowhey
  - Gregory Cowhey, ASA CVA, AVP is a financial consultant and Principal of RSM US, LLP ("RSM") in the Firm's Financial Investigations & Disputes Group where he leads multidisciplinary engagement teams providing forensic services, litigation support, and other related consulting services to law firms, middle market corporations, private equity funds, governmental agencies, and private individuals. Plaintiffs' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit 64, and his current curriculum vitae is attached hereto as Exhibit 65.

2.    Defendants' objection to the qualifications of Plaintiffs' expert witnesses are: (The objections shall be referenced to the name of each listed expert.)

<u>All Defendants</u>

1.    Defendants adopt and incorporate by reference all objections to the foregoing experts designated by Plaintiffs that are set forth in Defendants' Rule 702 and *Daubert* motions with respect to each such expert.

2.    Defendants reserve all rights to challenge the qualification statements submitted by Plaintiffs with respect to their experts.

3.    Defendants object to Greg Cowhey on the grounds that Plaintiffs did not timely disclose Mr. Cowhey and did not timely provide proper Rule 26(a)(2) disclosures or expert reports by Mr. Cowhey by the deadline(s) set by the Court for expert witness disclosures, including disclosure of damages experts. Mr. Cowhey should therefore be barred from testifying at trial on grounds of non-disclosure, untimely disclosure, failure to comply with Rule 26(a)(2), unfair surprise, and prejudice.

4.    Defendants reserve all evidentiary and other objections that may come up as to any specific expert witness during the course of trial.

5.    With those reservations, Defendants anticipate raising the specific objections to the qualifications of Plaintiffs' experts below:

- **Susan Bain**
  - Ms. Bain is not qualified to offer her regulatory opinions in this case. First, she lacks the requisite experience to serve as a regulatory expert because, among other reasons, she never worked on drugs meant for human consumption while at the FDA and appears to have fabricated several items on her CV. Second, she demonstrated a lack of basic regulatory competency at her deposition because she could not answer even the most basic questions about the regulatory framework underlying her opinions.
  - Similarly, Ms. Bain is not qualified to offer her science-based opinions. Specifically, she lacks the requisite experience and knowledge to opine about chemical reactions and chemical testing. For example, Ms. Bain admitted that she is not an organic chemist and is not qualified to offer opinions regarding how nitrosamines form.
  - Defendants further object to the "Summary of Qualifications" for Ms. Bain as follows:
    - The following phrase is misleading as it inaccurately suggests that Ms. Bain spent two or more years at the FDA when she, in fact, only worked as a Consumer Safety Officer a little over a

year and a half, and should be struck – "and several years working at the U.S. FDA as a Consumer Safety Officer/Investigator."

- ▪ The following sentence should be stricken as it is confusingly written in the first person – "For the last 10 years, I have been a Professor, teaching graduate-level courses in Regulatory, Clinical Research and Quality Assurance/Control. Additionally, for the last 12 years I have been a consultant in the pharmaceutical and medical device industries and co-authored and co-edited a textbook titled 'An Overview of FDA Regulated Products; From Drugs and Cosmetics to Food and Tobacco.'"
- ▪ The following phrase is misleading as it inaccurately suggests Ms. Bain is a full professor when Ms. Bain testified in her deposition and states in her CV that she is currently and has been for the last seven years an "assistant professor" – "For the last 10 years, I have been a Professor, teaching graduate-level courses in Regulatory, Clinical Research and Quality Assurance/Control."

o Defendants also reserve the right to cross examine Ms. Bain regarding her qualifications to provide specific testimony on direct that may fall outside her stated qualifications.

- **Rena Conti, Ph.D.**
  - o To the extent Plaintiffs seek to elicit testimony from Dr. Conti regarding the importance of CGMP compliance in the pharmaceutical industry or what P&T Committees rely upon to determine therapeutic equivalence, Dr. Conti lacks any experience in that field and is therefore not qualified to offer such opinions.
  - o Defendants further object to the "Summary of Qualifications" for Dr. Conti as follows:
    - ▪ The following sentences are not sufficiently specific to be subject to verification and constitute improper bolstering of Dr. Conti's qualifications – "She has published extensively on the pricing of pharmaceuticals for consumers and payers. Dr. Conti has also researched extensively on pharmaceuticals undergoing patent expiration and generic entry and the resulting effects on prices, spending, and utilization and the pricing, supply and quality of prescription drugs post-generic launch. Some of her work focuses on pharmaceuticals dispensed through retail pharmacies, while other papers have focused on pharmaceuticals prescribed or used at a physician's medical practice."

205

- Defendants also reserve the right to cross examine Dr. Conti regarding her qualifications to provide specific testimony on direct that may fall outside her stated qualifications.

- **Laura R. Craft, MPH**
  - Ms. Craft's opinion that consumers would consider allegedly contaminated VCDs valueless falls outside of Ms. Craft's theoretical area of expertise. Among other things, Ms. Craft has admitted she is not an expert in consumer behavior and admits she has not performed any survey or other analysis to determine whether consumers would continue taking VCDs if aware of the presence of nitrosamines. Similarly, Ms. Craft is not qualified to offer an opinion on Medicare Part D Sponsors, including their allocation, characterization, or application of subsidies. Specifically, Ms. Craft lacks any specialized knowledge as to how Medicare Part D sponsors operate in practice, including how they allocate or characterize subsidies received from the federal government.
  - Defendants further object to the "Summary of Qualifications" for Ms. Craft as follows:
    - The sentence "She has personally worked on more than 65 pharmaceutical cases involving unfair competition and other cases related to drug pricing and distribution" should be replaced with a sentence reading "She has personally worked on more than 65 pharmaceutical cases involving, among other things, unfair competition and other cases related to drug pricing and distribution." The replacement avoids the misleading suggestion that all of Ms. Craft's 65 cases are either unfair competition or related to drug pricing and distribution, which is incorrect.
  - Defendants also reserve the right to cross examine Ms. Craft regarding her qualifications to provide specific testimony on direct that may fall outside her stated qualifications.

- **Stephen S. Hecht, Ph.D.**
  - Dr. Hecht is not qualified to offer any opinions regarding whether Defendants' manufacturing practices or processes adhered to state and federal regulations because he does not possess any regulatory experience, as Plaintiffs have conceded.
  - Defendants further object to the "Summary of Qualifications" for Dr. Hecht as follows:

206

- The following phrase is a subjective judgment which constitutes improper bolstering of Dr. Hecht's qualifications and is not sufficiently specific to be subject to verification – "in the laboratory of Professor Klaus Biemann, a pioneer in the application of mass spectrometry to organic chemical analysis."
- The following sentence is not sufficiently specific to be subject to verification and constitutes improper bolstering of Dr. Hecht's qualifications – "Dr. Hecht's research helped lay the groundwork for analysis of samples to be returned by NASA astronauts from the moon, and analyzed for trace organic molecules using mass spectrometry."
- The description of an "eminent epidemiologist" founder is a subjective judgment and constitutes improper bolstering of Dr. Hecht's qualifications – "The American Health Foundation was a private research institute founded by the eminent epidemiologist Ernst L. Wynder."
- The following sentence is not sufficiently specific to be subject to verification and not appropriate in a reading of Dr. Hecht's qualifications – "These nitrosamines are widely viewed as some of the main cancer causing agents in tobacco products."
- The following sentence is, by its own admission, not specifically subject to verification and an improper bolstering of Dr. Hecht's qualifications – "To the best of his knowledge, he is the only scientist who has ever held the latter two awards from the American Chemical Society and the American Cancer Society simultaneously."
- The following sentence is not specifically subject to verification and an improper bolstering of Dr. Hecht's qualifications – "Respected researchers are invited by the National Institutes of Health as well as private foundations to serve on peer review groups for evaluation of research proposals submitted by scientists from the U.S. and abroad."
- The following sentence is irrelevant to Dr. Hecht's qualifications – "This series reviews and evaluates specific exposures and chemicals for evidence of carcinogenicity. The series is currently in Volume 127."
- The following sentences constitute subjective judgments, are not sufficiently specific to be subject to verification and constitute improper bolstering of Dr. Hecht's qualifications – "Dr. Hecht's first publication on nitrosamines was in 1974 when he and his

207

colleagues discovered N'-nitrosonornicotine (NNN) in smokeless tobacco. This was the first example of a carcinogenic nitrosamine in unburned tobacco; in fact, the first example of any carcinogen in unburned tobacco. This paper was published in Science, and revolutionized the characterization and carcinogenicity assessment of tobacco products. Dr. Hecht's publication entitled 'Tobacco Smoke Carcinogens and Lung Cancer', published in the Journal of the National Cancer Institute in 1999, can be found on the University of Minnesota Medical School 'Wall of Scholarship' because it was cited more than 1,000 times in the peer-reviewed literature."

- o Defendants also reserve the right to cross examine Dr. Hecht regarding his qualifications to provide specific testimony on direct that appears to fall outside his stated qualifications.

- **Ramin (Ron) Najafi, Ph.D.**
  - o Dr. Najafi is not qualified to offer any opinions as to whether Defendants' manufacturing practices or processes adhered to state and federal regulations because he does not possess any regulatory experience. Specifically, Dr. Najafi's various professional experiences have not given him particularized expertise in pharmaceutical API regulation.
  - o Additionally, because he is not a physician, epidemiologist or toxicologist, Dr. Najafi should be barred from offering opinions regarding the toxicity or carcinogenicity of valsartan API with NDMA or NDEA impurities.
  - o Defendants further object to the "Summary of Qualifications" for Dr. Najafi as follows:
    - ▪ The following sentence is not sufficiently specific to be subject to verification and constitutes improper bolstering of Dr. Hecht's qualifications – "Dr. Najafi has extensive experience working as a chemist in the pharmaceutical industry."
    - ▪ The following sentence is not sufficiently specific to be subject to verification and constitutes improper bolstering of Dr. Najafi's qualifications – "Through these roles, Dr. Najafi developed extensive experience in all aspects of pharmaceutical and chemical development, spanning from the R&D stage to pilot plant manufacturing and beyond."
  - o Defendants also reserve the right to cross examine Dr. Najafi regarding his qualifications to provide specific testimony on direct that appears to

208

fall outside his stated qualifications.

- **Kali Panagos, Pharm.D., RPH**
  - o Dr. Panagos lacks the qualifications and or experience to opine on: (1) FDA-related issues; (2) the type of information TPPs rely on when considering for formulary inclusion and reimbursing for generic drugs; and (3) the process by which drugs are included in the Orange Book.
  - o First, Dr. Panagos has never worked in regulatory affairs in any capacity, which renders her unqualified to opine on any issues involving compliance with FDA regulations or guidance. This includes, but is not limited to, opining with respect to: whether or not Defendants' products were consistent with their respective ANDAs; Defendants' obligations with respect to information presented in the ANDA and reported to FDA to obtain approval; what Defendants' regulatory obligations were with respect to quality standards, quality processes, manufacturing processes, and safety obligations; whether or not Defendants' FDA-approved generic drug labels, inserts, and/or pamphlets are accurate; and whether Defendants' generic drug products were required to be and were "the same as the RLD."
  - o Second, as a pharmacy benefit consultant, Dr. Panagos works with clients that create and manage drug formularies—she does not create and manage drug formularies. Thus, she is not qualified to opine on what TPPs rely on when making those decisions.
  - o Third, Dr. Panagos's general familiarity with the Orange Book does not qualify her as an expert to opine on the specific process by which a drug is included in the Orange Book, particularly as she has never been involved with the decision to include a drug in the Orange Book.
  - o Defendants further object to the "Summary of Qualifications" for Dr. Panagos as follows:
    - ▪ The following sentence erroneously implies active clinical affiliations, when all occurred only during her training, and should be deleted: "Dr. Panagos' clinical affiliations include a focus on pain management and anesthesia at The Hospital for Special Surgery, cardiovascular and lipid focus at Bellevue Hospital, and internal medicine at Northwell Health, all in New York City."
    - ▪ In the following sentence, the phrase "served on the faculty" should be replaced with "served as an adjunct assistant professor" to avoid the misleading impression that she was full-time faculty.

209

- The phrase "nationally recognized" with respect to ARMSRx Pharmacy Benefits Consulting is a subjective judgment and constitutes improper bolstering of her qualifications.
  - Defendants reserve the right to cross examine Dr. Panagos regarding differences in the various versions of her CV produced in this litigation.
  - Defendants also reserve the right to cross examine Dr. Panagos regarding her qualifications to provide specific testimony on direct that appears to fall outside her stated qualifications.

- **Laura M. Plunkett, Ph.D.**
  - Dr. Plunkett lacks the qualifications and or experience: (1) to provide science-based opinions; or (2) to provide legal or regulatory opinions.
  - First, Dr. Plunkett is not a medical doctor and has conceded that she does not have the requisite credentials to opine regarding general causation. She also lacks any degree or practical experience in organic chemistry and thus any chemistry-based opinions are beyond the scope of her expertise.
  - Second, Dr. Plunkett does not have any legal or regulatory training and should therefore be prohibited from offering any such opinions.
  - Defendants further object to the "Summary of Qualifications" for Dr. Plunkett as follows:
    - The following sentence is a subjective judgment which constitutes improper bolstering of Dr. Plunkett's qualifications and is not sufficiently specific to be subject to verification – "As a result of her education and work history, Dr. Plunkett has developed extensive knowledge and experience related to FDA regulations that govern the manufacturing of drugs, such as compliance with Good Manufacturing Practice (GMP) and US Pharmacopeia (USP) standards."
  - Defendants also reserve the right to cross examine Dr. Plunkett regarding her qualifications to provide specific testimony on direct that appears to fall outside her stated qualifications.

- **Philip Russ**
  - Defendants object to the "Summary of Qualifications" for Mr. Russ as follows:
    - Defendants object to the description of Mr. Russ as an "experienced quality/compliance senior technical management professional with nearly thirty years applied experience

developing and managing quality systems to support major pharmaceutical, biologics, diagnostic and medical device businesses" because it is vague as to the nature of Mr. Russ's experience and also misleadingly implies that Mr. Russ is experienced across quality systems when his expert report disclosed that his focus is on Quality Management systems, specifically. That sentence should be replaced by a description that Mr. Russ is an "experienced quality/compliance professional with twenty-eight years of experience developing and managing Quality Management systems to support major pharmaceutical, biologics, diagnostic and medical device businesses."

▪ Defendants object to the third paragraph of Mr. Russ's summary of qualifications because it is vague and does not identify which positions Mr. Russ held for which companies, which will prevent the jury from understanding whether those prior positions have any relevance to Mr. Russ's opinions in this case. Defendants similarly object to the listing of clients of Mr. Russ without any identification of the nature of work or advice provided to those clients, as it misleadingly implies that the jury should infer that Mr. Russ is qualified based on the identity of the companies he has offered advice to rather than nature of his background, skills, experience, and training.

▪ Defendants further object to the identification of work Mr. Russ has done in the past on behalf of Watson Pharmaceuticals and Teva Pharmaceuticals as that listing could confuse the jury as to the fact that Mr. Russ's role in this case is as an expert testifying on behalf of Plaintiffs, not Teva. To the extent an appropriate description of Mr. Russ's prior work experience for pharmaceutical companies is substituted for the current vague and misleading description in paragraph 3, that description should omit references to his history of working for or with Teva or Watson.

- Defendants object to the use of the term cGXP in the description of Mr. Russ's qualifications as that made-up term has the potential to confuse and mislead the jury as to the nature of Mr. Russ's experience.

    o Defendants also reserve the right to cross examine Mr. Russ regarding his qualifications to provide specific testimony on direct that appears to fall outside his stated qualifications.

- **Dipak Panigrahy, MD**
    o Dr. Panigraphy is not qualified to opine regarding whether NDMA or NDEA can cause human cancer given, among other things: (1) his research is related to cancer treatment, not causation; (2) he has no advanced degree or training in cancer biology; (3) he is not licensed to practice medicine, nor board-certified or board-eligible in any specialty; (4) his medical education did not include an oncology rotation; (5) he has never studied genotoxic compounds, including NDMA and NDEA; and (6) he is not a toxicologist, pathologist, pharmacologist, pharmacokinetics expert, or statistician.
    o Defendants further object to the "Summary of Qualifications" for Dr. Panigrahy as follows:
        - The following sentence is misleading as it inaccurately suggests that Dr. Panigrahy successfully completed a surgical residency, which he in fact did not, and should be struck. "Following medical school, Dr. Panigrahy trained in a surgical residency at the University of Medicine and Dentistry of New Jersey-Robert Wood Johnson Medical School from 1994 to 1996."
        - The following phrase is a subjective judgment which constitutes improper bolstering of his qualifications and is not sufficiently specific to be subject to verification – "which today serve as the foundation for studying mechanisms of cancer causation and pathogenesis in the cancer field worldwide."
        - In the next sentence, the phrase "substantial" is a subjective judgment and constitutes improper bolstering of his qualifications.
    o Defendants also reserve the right to cross examine Dr. Panigraphy regarding his qualifications to provide specific testimony on direct that appears to fall outside his stated qualifications.

- **Stephen Lagana, MD**
  - Dr. Lagana, a clinical and anatomical pathologist, is not qualified by dint of his practice in that field to offer general causation opinions regarding whether NDMA or NDEA cause cancer in humans based on investigation and evaluation of epidemiological literature. Moreover, he lacks expertise in epidemiology, biostatistics, cancer biology, toxicology, hypertension, molecular pathology, oncology, pharmacology, FDA, and regulatory issues, and should also be excluded from offering any testimony in those fields as well. Finally, Dr. Lagana had no preexisting experience with NDMA, NDEA, or valsartan prior to his involvement in this case.
  - Defendants further object to the "Summary of Qualifications" for Dr. Lagana as follows:
    - In the following sentence the phrase "extensively" is a subjective judgment and constitutes improper bolstering of his qualifications. "He has published extensively on both inflammatory conditions and neoplasms of the GI tract and liver."
    - The following sentence is a subjective judgment which constitutes improper bolstering of his qualifications and is not sufficiently specific to be subject to verification. "His contributions in these fields have been acknowledged by his peers in the form of national and international lecturing invitations and visiting professorships."
  - Defendants also reserve the right to cross examine Dr. Lagana regarding his qualifications to provide specific testimony on direct that may fall outside his stated qualifications.

- **Mahyar Etminan, PharmD, MSc**
  - o Defendants object to the "Summary of Qualifications" for Dr. Etminan as follows:
    - ▪ The use of the phrase "top-tier" in the following sentence is a subjective judgment and constitutes improper bolstering of Dr. Etminan's qualifications – "Dr. Etminan has published approximately 180 peer-reviewed articles on various drug safety topics in top-tier journals, including the Journal of the American Medical Association, the British Medical Journal, the Canadian Medical Association Journal, and the Journal of the National Cancer Institute."
  - o Defendants also reserve the right to cross examine Dr. Etminan regarding his qualifications to provide specific testimony on direct that appears to fall outside his stated qualifications.

- **Greg Cowhey**
  - o Defendants object to Greg Cowhey's qualifications as an expert, and request that the Court strike the entirety of Mr. Cowhey's summary of qualifications and declare Mr. Cowhey unqualified. As will be explained in Defendants' trial brief, Plaintiffs' disclosure of Mr. Cowhey as an expert on the eve of trial is untimely and Plaintiffs are automatically precluded from calling him at trial. Fed. R. Civ. P. 26(a)(2)(B), 26(a)(2)(D), 37(c)(1). Because Plaintiffs have not served Mr. Cowhey's expert report as required under the Federal Rules of Civil Procedure, his qualifications cannot be assessed in light of any opinions and thus amount to nothing more than freestanding empty promises. Defendants also have not had any opportunity to depose Mr. Cowhey, and therefore are unable to assess what aspects of the provided summary of his qualifications may be incorrectly, improperly, or misleadingly stated.
  - o Defendants further object to Mr. Cowhey's experience "provid[ing] expert testimony in more than 500 matters during the past 40 years" because Plaintiffs have failed to list "all other cases in which, during the previous 4 years, [Mr. Cowhey] testified as an expert at trial or by deposition," as required under Fed. R. Civ. P. 26(a)(2)(B)(v). Defendants are unable to assess whether the provided summary of qualifications is accurate when Plaintiffs have failed to satisfy their obligations to disclose the details of Mr. Cowhey's testifying

214

background to Defendants.

- o Defendants also object to Mr. Cowhey's being described as having "been qualified for … more than 500 matters" because there is no evidence in the public record of Mr. Cowhey having been found qualified by a court or adjudicator nearly as many times as represented by Plaintiffs. Defendants also have not had the opportunity to depose Mr. Cowhey as to the veracity of that claim. Defendants further object to any reference to Mr. Cowhey having been qualified as an expert in "more than 500 matters" as unduly prejudicial because it risks misleading the jury into believing that they do not need to reassess Mr. Cowhey's qualifications if previous decision-makers have already done so hundreds of times. Fed. R. Evid. 403.

- o Defendants further object to Mr. Cowhey as being qualified to testify in this trial involving the sale of pharmaceutical products because he has no experience with the pharmaceutical industry and he is instead "most well-known for his work in the family law arena" where he "is retained in high net worth, celebrity and other types of high-profile divorce matters around the globe"—a subject matter area that bears no relationship to this case. Exhibit K, Greg Cowhey's Online Biography (https://rsmus.com/people/cowhey-gregory.html).

- o Should Mr. Cowhey be allowed to testify, Defendants reserve the right to cross examine Mr. Cowhey regarding his qualifications to provide specific testimony on direct that appears to fall outside his stated qualifications.

3.    Defendants' expert witnesses are:

All Defendants

- **Michael B. Bottorff, Pharm.D., FCCP, FNLA, CLS**
  - o Dr. Bottorff is a pharmacologist with over forty years of experience as a professor and researcher. He currently serves as an adjunct professor at the College of Pharmacy at Manchester University and the University of Cincinnati. He has taught pharmacology, including cardiovascular pharmacology, to medical students, pharmacy students, and residents. Dr. Bottorff holds a B.S. in Industrial Management from the Georgia Institute of Technology and completed his Doctor of Pharmacy and residency at the University of Kentucky, where he served as Chief Resident. Defendants' summary of his qualifications that will be read

into the record at the time he takes the stand is attached hereto as Exhibit L. His curriculum vitae is attached hereto as Exhibit M.

- **Lewis A. Chodosh, M.D., Ph.D.**
  - Dr. Chodosh is a renowned physician and cancer researcher who has devoted his career to studying the mechanisms of cancer causation. He is the Perelman Professor and Chairman of the Department of Cancer Biology at the University of Pennsylvania, a position that includes an annual research endowment, as well as a Professor in the Department of Cell and Developmental Biology. He is on the executive committee of the Abramson Family Cancer Research Institute, and the Editor in Chief of the scientific journal Breast Cancer Research. In these roles, Dr. Chodosh conducts research, teaches medical students, and contributes to the peer-reviewed body of literature on cancer causation. He holds a B.S. in Molecular Biophysics and Biochemistry from Yale University and earned his M.D. from Harvard Medical School. He obtained his Ph.D. in Biochemistry from the Massachusetts Institute of Technology (MIT) in 1988, where he worked in the laboratory of Nobel-prize winning researcher Phillip Sharp. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit N. His curriculum vitae is attached hereto as Exhibit O.

- **John Flack**
  - Dr. Flack is a physician and an expert in the field of hypertension. Dr. Flack serves as the Professor and Chair of the Department of Internal Medicine at Southern Illinois University (SIU). He is also the Sergio Rabinovich Endowed Chair of Internal Medicine and Chief of the Hypertension Section in the Division of General Internal Medicine at SIU, where he teaches, conducts hypertension research, runs an active hypertension clinical practice and leads the Department of Medicine. Dr. Flack earned a BS degree in Chemistry (Math minor) with distinction from Langston University and attended the University of Oklahoma School of Medicine, graduating in 1982 with an MD degree. In 1990, he also earned a Master of Public Health (MPH) degree in Epidemiology from the University of Minnesota. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit P. His current curriculum vitae is attached hereto as Exhibit Q.

- **Herman Gibb**
  - Dr. Gibb holds a Ph.D. in Epidemiology from Johns Hopkins University, an MPH in Environmental Health, and a Bachelor's degree in Pre-Medicine. With over 35 years of experience in health risk assessment, Dr. Gibb has provided epidemiology consultation to a variety of clients and has testified as an expert witness in federal and state courts, as well as before two U.S. Senate committees. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit R. His current curriculum vitae is attached hereto as Exhibit S.

- **Wayne Gibson**
  - Mr. Gibson is a Senior Managing Director at FTI Consulting in its Healthcare Risk Management & Advisory practice. He has over 25 years of experience in financial modeling and complex claims analysis as a healthcare consultant for clients that include Medicare Part D Plans, Medicare Advantage Organizations, pharmacy benefits managers, retailers, wholesalers, and manufacturers. He holds a B.S. in Environmental Science from the College of William and Mary, with a minor in Economics. He obtained his M.A. in Economics from the University of Delaware. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit T. His current curriculum vitae is attached hereto as Exhibit U.

- **George Johnson**
  - Mr. Johnson is an Associate Professor of Biomedical Studies at Swansea University. His work focuses on the assessment and control of genotoxic compounds and defining acceptable limits for human exposure. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit V. His current curriculum vitae is attached hereto as Exhibit W.

- **Tim Kosty**
  - Mr. Kosty is President and Co-Founder of Pharmacy Healthcare Solutions, a pharmaceutical consulting firm. He has over thirty-eight years of pharmacy experience, predominantly in the upper level management of pharmacy chains and pharmacy benefit managers. He received his B.S. in Pharmacy from the Ohio State University in 1983. He received his M.B.A. from Pennsylvania State University in

217

1993. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit X. His current curriculum vitae is attached hereto as Exhibit Y.

- **Lauren Stiroh**
  - Dr. Stiroh is an economist and Managing Director of NERA Economic Consulting. Dr. Stiroh has extensive experience with economic damages issues in a range of industries, including pharmaceuticals, medical devices, and biotechnology. Dr. Stiroh received her Ph.D. in economics from Harvard University in 1996. Dr. Stiroh completed her B.A. in economics from the University of Western Ontario in 1990, and received her M.A. from the University of British Columbia in 1991. Defendants' summary of her qualifications that will be read into the record at the time she takes the stand is attached hereto as Exhibit Z. Her current curriculum vitae is attached hereto as Exhibit AA.

ZHP Defendants

- **Ali Afnan, Ph.D.**
  - Dr. Afnan is President and Founder of Step Change Pharma Inc., a pharmaceutical consulting firm. He has more than 30 years of experience working in the pharmaceutical industry and overseeing the regulation of the pharmaceutical industry while working at the FDA. He received his B.Sc. in 1985 from the University of Wales Institute of Science and Technology. He received his M.Sc. in 1986 from the University of Manchester Institute of Science and Technology ("UMIST") and earned his Ph.D. at UMIST in 1989. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit X, and his current curriculum vitae is attached hereto as Exhibit BB.

- **Fengtian Xue, Ph.D.**
  - Dr. Xue is an Associate Professor in the Department of Pharmaceutical Sciences in the University of Maryland Baltimore's School of Pharmacy. He received his B.S. from the University of Science and Technology of China in 2001 and his Ph.D. from Brown University's Department of Chemistry in 2007, and he has nearly two decades of experience working as a professor at the University of Louisiana at Lafayette and the University of Maryland, Baltimore. Defendants' summary of his qualifications that will be read into the record at the

218

time he takes the stand is attached hereto as Exhibit X, and his current curriculum vitae is attached hereto as Exhibit CC.

Teva

**Tim A. Anderson, MS, MBA**

- o Mr. Anderson serves as an expert consultant for NDA Partners and is principal consultant for The AquaMarine Group, Inc. He has over 40 years of experience in pharmaceutical research and development, quality assurance, and regulatory affairs, having worked as a review chemist for the FDA and in the pharmaceutical industry. Mr. Anderson holds bachelor's degrees in chemistry and biology from Virginia Commonwealth University, a master's degree in biochemistry from New York Medical College, and an MBA from the University of Bridgeport. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit DD. His curriculum vitae is attached hereto as Exhibit EE.

- **Steven Baertschi, Ph.D.**
  - o Mr. Baertschi is the President of Baertschi Pharmaceutical Consulting, LLC. He has over 30 years of experience in scientific and technical aspects of pharmaceutical research and development. During his decades-long career at Eli Lilly and Company, from which he retired in 2015, he worked as a researcher in the Small Molecule Design and Development department, supervised the Microcalorimetry and Thermal Analysis Group, and led the Degradation Chemistry Group, among other positions. He holds a B.S. in Chemistry from Lipscomb University, and an M.S. in Organic Chemistry from Vanderbilt University. He obtained his doctorate in Organic Chemistry at Vanderbilt University in 1989, with a minor in Biochemistry. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit FF. His current curriculum vitae is attached hereto as Exhibit GG.

- **Roger Williams, M.D.**
  - o Dr. Williams is a partner and expert consultant with NDA Partners. He is an expert in clinical pharmacology and board-certified in clinical pharmacology and internal medicine. He served as Chief Executive Officer and Chair of the Council of Experts of the US Pharmacopeial Convention (USP) and has held numerous positions at the FDA. Dr.

Williams holds a bachelor's degree in chemistry from Oberlin College and a medical degree from the University of Chicago School of Medicine, where he also completed his residency in internal medicine. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit HH. His curriculum vitae is attached hereto as Exhibit II.

Torrent

- **Dr. Akhilesh K. Nagaich**,
  - o Dr. Nagaich is a senior regulatory and quality consultant for drugs and biologics at FDAInsight LLC. Dr. Nagaich advises pharmaceutical companies on regulatory strategies and clinical development of drugs, biologics, vaccines, cell and gene therapy products, and combination products. Dr. Nagaich worked as a principle investigator and drug quality reviewer for the FDA for eight years, and was the Scientific Liaison in the Department of Health Quality Standards at United States Pharmacopeia ("USP") for two years. Defendants' summary of his qualifications that will be read into the record at the time he takes the stand is attached hereto as Exhibit JJ. His curriculum vitae is attached hereto as Exhibit KK.

4.    Plaintiffs' objections to the qualifications of Defendants' expert witnesses are: (The objections shall be referenced to the name of each listed expert.)

1.    Plaintiffs adopt and incorporate by reference all objections to the foregoing experts designated by Defendants that are set forth in Defendants' Rule 702 and *Daubert* motions with respect to each such expert.

2.    Plaintiffs reserve all rights to challenge the qualification statements submitted by Defendants with respect to its experts, as Defendants have advised that they amended their qualification statements without Plaintiffs having the opportunity to review them before the filing of this PTO.

3.    Plaintiffs reserve all evidentiary and other objections that may come up as to any specific expert witness during the course of trial.

4.    With those reservations, Plaintiffs anticipate raising the specific objections to the qualifications of Defendants' experts below:

- **Michael B. Bottorff, Pharm.D., FCCP, FNLA, CLS**
  - Plaintiffs object to Defendants' use of non-factual hyperbole in the proposed summary of qualifications, specifically "Dr. Michael Bottorff is an accomplished pharmacologist".

- **Lewis A. Chodosh, M.D., Ph.D.**
  - Plaintiffs object to Defendants' use of non-factual hyperbole in the proposed summary of qualifications, such as "Dr. Lewis Chodosh is a world-renowned physician", "the Abramson Family Cancer Research Institute, a core group of the most influential cancer-focused laboratories at the University of Pennsylvania", "gaining recognition as a leading scholar in the field of cancer research", "the American Society for Clinical Investigation (ASCI), one of the nation's oldest and most respected medical honor societies", "In 2017, he received one of the highest professional".
  - Plaintiffs object to the reading of the qualifications of others: "where he worked in the laboratory of Nobel-prize winning researcher Phillip Sharp. Dr. Sharp won the Nobel Prize in Physiology or Medicine in 1993 for his discoveries in DNA research. Dr. Chodosh performed a postdoctoral research fellowship in cancer genetics and developmental biology with the Chairman of the Department of Genetics at Harvard Medical School, Dr. Philip Leder, who is widely credited for his discovery of one of the first oncogenes recognized to cause human cancer."
  - Plaintiffs object to the reference to "the Abramson Cancer Center, one of only 51 National Cancer Institute-designated Comprehensive Cancer Centers" when there are 72 (see https://www.cancer.gov/research/infrastructure/cancer-centers).

- **John Flack**
  - Para. 1: object to sentence "He has been recognized as an international expert and leading authority in hypertension." This is lawyer spin, not qualifications.
  - Para. 3: object to "influential" – otherwise ok
  - Para. 4: object to "high-level" and "respected" and "most preeminent"
  - Para. 5: object to "distinguished" and "remarkable individuals" and "distinguished"

- **Herman Gibb**
  - Plaintiffs object to the reference that Gibb "has testified as an expert witness in federal and state courts".
  - Plaintiffs object to Defendants' use of non-factual hyperbole in the proposed summary of qualifications, specifically "Dr. Gibb has held a number of <u>prominent</u> positions", and "Dr. Gibb's <u>extensive</u> research".

- **Wayne Gibson**
  - Para. 1: Object to "his expertise" – would be fine with "his experience"
  - Para. 2: object to "respected" organizations – would be fine if "respected" was omitted
  - Para. 3: Object to "litigation related to industry pricing practices" as vague and unconnected to Gibson's experience aside from this litigation
  - Para. 5: Object to "big data in litigation" as vague and unconnected to Gibson's experience aside from this litigation

- **George Johnson**
  - Plaintiffs object to the following language from Defendants' summary of his qualifications:
    - "at most of the major international"
    - "awarded the prestigious UKEMS"
    - "won the very prestigious EEM(G)S"

- **Tim Kosty**
  - Objection to first paragraph, first sentence re "is an expert on the pharmaceutical industry." It is prejudicial to self-refer to him as an "expert" and he is not offered as an expert on the "pharmaceutical industry" writ large.
  - Objection to last paragraph, last sentence re "His colleagues at PHSI…". His "colleagues" are not offered as experts/witnesses, this is irrelevant and prejudicial. Further, remainder of sentence do not apply to himself, e.g., he does not attend "most" conferences, and whether he "stays current" is largely irrelevant.

- **Lauren Stiroh**
  - Objection to the sentence "Dr. Stiroh has worked on a number of cases involving various aspects of the pharmaceutical, medical, and health sciences industries" as this makes her experience more expansive than it actually is – she only focused on the issue of pricing for certain of

these products and hasn't worked in "various aspects" of the larger health sciences industry writ large.

ZHP Defendants

- **Ali Afnan, Ph.D.**
  - o  Dr. Afnan was not offered as a chemistry expert, and defense counsel objected to questions requiring chemistry expertise during his deposition, confirming he was not proffered as an expert in chemistry. Plaintiffs' incorporate by reference their objections to any attempt to qualify Dr. Afnan as a chemistry expert or elicit chemistry opinions from him, as discussed in their *Daubert* motion and opposition to Defendants' motion to amend the Court's *Daubert* decision and Plaintiffs' related cross motion.
  - o Plaintiffs' also object to Defendants' use of non-factual hyperbole and exaggeration in the proposed summary of qualifications, such as stating that at the FDA he was "overseeing the regulation of the pharmaceutical industry," references to "Dr. Afnan's pathbreaking work at Zeneca," "He was one of the key contributors," and "Through this extensive education and experience, Dr. Afnan has developed extensive expertise in all aspects of pharmaceutical development and manufacturing."

- **Fengtian Xue, Ph.D.**
  - o Plaintiffs incorporate by reference the Court's exclusion of Dr. Xue's substantive opinions in this case and the grounds for that exclusion.
  - o Plaintiffs' also object to Defendants' use of non-factual hyperbole in the proposed summary of qualifications, such as "[t]hrough this extensive education, experience and training as an chemist, Dr. Xue has developed extensive expertise in organic chemistry."

Teva

- **Tim A. Anderson, MS, MBA**
  - o Objection to third paragraph re "served in various positions" and re "most-recently". He served in one such position, not "various." Further, "most-recently" is misleading. He left the FDA in 1994 for Sandoz, then left Sandoz in 1996.

223

- **Steven Baerschi, Ph.D.**
  - Plaintiffs object to any attempt to elicit opinions from Dr. Baertschi that have been precluded by the Court in its Daubert decision.
  - Plaintiffs' also object to Defendants' use of non-factual hyperbole in the proposed summary of qualifications, such as "Dr. Baertschi was <u>continually</u> promoted."
  - Objection to first paragraph re "decades-long" career at Eli Lilly as ambiguous and misleading. He worked at Lilly at most for two decades ( ~22 years).
  - Objection to first paragraph, last sentence, re the organization "specifically focused on degradation chemistry and stability-related issues." Vague as to whether Dr. Baertschi himself or the SMDD organization "specifically focused on specified subjects. Same objection as to ensuing sentence.
  - Objection to second paragraph, second sentence re "industry leaders." This vague term is not mentioned anywhere in his CV, and no information reasonably appears in his CV to substantiate it.
  - Objection to third paragraph, third sentence re receiving an award "for" research on mutagenicity/ carcinogenicity of Aflatoxins. That subject was not the exclusive focus of his predoctoral research, it was at best a "significant portion" of it, and it is ambiguous that he received the service award for specific research or not.

- **Roger Williams, M.D.**
  - Objection to last paragraph first sentence that Dr. Williams "is an expert in clinical pharmacology and is board-certified in clinical pharmacology and internal medicine." He is not being offered as an expert in clinical pharmacology or internal medicine, and it is prejudicial to self-refer to him as an "expert." His medical degree is mentioned later in same paragraph, which suffices to capture his educational credentials.

Torrent

- **Dr. Akhilesh K. Nagaich**,
  - Plaintiffs also adopt and incorporate by reference herein their previously-filed Rule 702/*Daubert* motions with respect to Defendants' expert witnesses.

## PART VII. **EXHIBITS**

In this section of the Final Pretrial Order, counsel should number each proposed exhibit and upon receipt of the exhibit list of an adversary, opposing counsel should prepare a response to this exhibit list indicating as to each exhibit whether there will be an objection and if there is, the nature of the objection. Absent an extraordinary showing of good cause, **ONLY THE EXHIBITS LISTED BELOW SHALL BE INTRODUCED AT THE TIME OF TRIAL**. You are not required to list exhibits that will be used, if at all, only for impeachment purposes.

Counsel are reminded that each such exhibit shall be physically pre-marked corresponding to the designation below. Copies of exhibit lists shall be provided to the District Judge and the assigned court reporter at the time of trial.

A.    Plaintiffs' Exhibits[11]

1.    Plaintiffs intend to introduce the following exhibits into evidence (list by numbers with a description of each exhibit).

2.    Defendants object to the introduction of Plaintiffs' exhibit (set forth number of exhibit and grounds for objection).

**See Plaintiffs' Exhibit List (Exhibit 68) and Defendants' Objections to Plaintiffs' Exhibit List (Exhibit LL).**[12]

---

[11] Plaintiffs' exhibit lists include exhibits conditional on the decisions on dispositive motions, motions in limine, and deposition designations. Inclusion on Plaintiffs' exhibit lists does not act as a waiver of any objections, which are specifically reserved. Plaintiffs also reserve their rights to modify their exhibit lists in advance of trial.

[12] Defendants received an updated version of Plaintiffs' exhibit list at 12:06 a.m. on March 14, 2024 including significant substantive changes that Defendants did not have the opportunity to fully address prior to the submission of this Pretrial Order. As a result, there may be some misalignment between Plaintiffs' exhibit list and Defendants' objections. Defendants reserve their right to provide a more complete response to Plaintiffs' exhibit list to address these and any other potential future changes to the exhibit list. Defendants' objections to Plaintiffs' exhibit list identify objections on a Defendant-specific basis, however Defendants' objections should be treated as collective. In other words, to the extent any Defendant is indicated in Defendants' objections as having objected to any exhibit on a particular basis, all

Defendants object to any exhibits implicated in whole or in part by Defendants' Motions in Limine, which are incorporated by reference.

Defendants object to the admissibility of entire deposition transcripts; the admissibility of deposition testimony is being addressed through the Parties' exchange and discussion of proposed deposition designations, and the Court's rulings as to any remaining disputes. Defendants reserve the right to use any deposition testimony or deposition transcript for purposes of impeachment.

B.   Defendants' Exhibits[13],[14]

1.   Each Defendant intends to introduce the following exhibits into evidence (list by number with a description of each exhibit).

2.   Plaintiffs object to the introduction of each Defendant's exhibits (set forth number of exhibit and grounds for objection).

**See ZHP's Exhibit List (Exhibit MM) and Plaintiffs' Objections to ZHP's Exhibit List (Exhibit 69).**

**See Teva's Exhibit List (Exhibit NN)  and Plaintiffs' Objections to Teva's Exhibit List (Exhibit 70).**

**See Torrent's Exhibit List (Exhibit OO) and Plaintiffs' Objections**

---

Defendants are making that objection.  Each Defendant further adopts, incorporates by reference, and preserves any objection made by any other Defendant. Plaintiffs reserve reciprocal rights.

[13]  Defendants' exhibit lists include exhibits conditional on the decisions on dispositive motions, motions in limine, and deposition designations. Inclusion on Defendants' exhibit lists does not act as a waiver of any objections, which are specifically reserved. Defendants also reserve their rights to modify their exhibit lists in advance of trial.

[14] Plaintiffs received Defendants' final exhibit lists hours before the due date of the PTO, so Plaintiffs did not have the opportunity to compare the final version with the ones previously provided, which were also provided without enough time for a fulsome review, prior to the submission of this PTO. As a result, there may be some misalignment between Defendants' exhibit list and Plaintiffs' objections. Plaintiffs reserve their right to provide a more complete response to Defendants' exhibit lists to address these and any other potential future changes to the exhibit list.

**to Torrent's Exhibit List (Exhibit 71).[15]**

Defendants reserve the right to use any exhibit from Plaintiffs' or Co-Defendants' Exhibit Lists, subject to Defendants' objections and the Court's rulings.

Plaintiffs reserve the right to use any exhibit from Defendants' Exhibit Lists, subject to Plaintiffs' objections and the Court's rulings.

Plaintiffs object to any exhibits implicated in whole or in part by Plaintiffs' MILs, which are incorporated by reference.

Defendants object to any exhibits implicated in whole or in part by Defendants' MILs, which are incorporated by reference.

Plaintiffs object to the admissibility of entire deposition transcripts, the admissibility of deposition testimony is being addressed through the Parties' exchange and discussion of proposed deposition designations, and the Court's rulings as to any remaining disputes.

## PART VIII. <u>LAW</u>

A.    <u>Plaintiffs</u>

- As to ZHP
  - Whether ZHP is liable for breach of express warranty for its sale of contaminated valsartan API.
  - Whether ZHP is liable for breach of express warranty for its sale of contaminated valsartan finished dose.
  - Whether ZHP is liable for violation of consumer protection statutes for its sale of contaminated valsartan API.
  - Whether ZHP is liable for violation of consumer protection statutes for its sale of contaminated valsartan finished dose.
  - Whether ZHP is liable for common law fraud for its continuing representations as to the quality and purity of

---

[15] Torrent has included documents produced as recently as March 6, 2024, on its exhibit list. Plaintiffs object to the use of these exhibits and reserve all rights to further objections concerning those exhibits, and the same applies to any other defendant with similarly belatedly produced documents on their exhibit list.

and sale of contaminated valsartan API and finished dose after it knew of the NDMA and/or NDEA contamination, beginning at least as early as July 27, 2017, after being notified of unidentified peaks on chromatography beginning in 2014, and after being notified that Novartis identified an unidentified peak as NDMA.

- o Was the contaminated valsartan API adulterated as a matter of law.
- o Was the contaminated valsartan finished dose adulterated as a matter of law.
- o Did ZHP violate cGMPs in the manufacture of the contaminated valsartan API.
- o Did ZHP violate cGMPs in the manufacture of the contaminated valsartan finished dose.

- As to Teva
  - o Whether Teva is liable for breach of express warranty for its sale of contaminated valsartan finished dose.
  - o Whether Teva is liable for violation of consumer protection statutes for its sale of contaminated valsartan finished dose.
  - o Whether Teva is liable for common law fraud for its sale of contaminated valsartan finished dose
  - o Was Teva's the contaminated valsartan finished dose adulterated as a matter of law.
  - o Did Teva violate cGMPs in the manufacture of the contaminated valsartan finished dose.

- As to Torrent
  - o Whether Torrent is liable for breach of express warranty for its sale of contaminated valsartan finished dose.
  - o Whether Torrent is liable for violation of consumer protection statutes for its sale of contaminated valsartan finished dose.
  - o Whether Torrent is liable for common law fraud for its sale of contaminated valsartan finished dose
  - o Whether Torrent is liable for common law fraud for its sale of contaminated valsartan API and finished dose after it knew of the NDMA and/or NDEA contamination.
  - o Was Torrent's contaminated valsartan finished dose

228

adulterated as a matter of law.
- o Did Torrent violate cGMPs in the manufacture of the contaminated valsartan finished dose.

B.    Defendants

The following list is not intended to be a comprehensive recitation of every question of law that may need to be decided by the Court during this trial or that may be charged to the jury at the end of trial, but as a representative list of the general legal topics and issues on which the jury is to be charged or that will need to be determined by the Court.

ZHP

1.    Whether EmblemHealth assigned its claims with respect to the valsartan API and finished dose products at issue.

2.    Whether SummaCare assigned its claims with respect to the valsartan API and finished dose products at issue.

3.    Whether MSP has the right to sue based on these assignments, assuming they were made.

4.    Whether the assignments, if made, are void.

5.    Whether ZHP is liable for breach of express warranties where no warranties regarding the absence of nitrosamines or impurities in its valsartan API and finished dose products were made or breached.

6.    Whether ZHP's sale of valsartan API and finished dose products containing nitrosamine impurities breached any warranties ZHP expressly made to Plaintiffs and class members.

7.    Whether ZHP's alleged breach of any express warranties made to Plaintiffs and class members was material.

8.    Whether Plaintiffs and class members sustained any damages resulting from ZHP's alleged breach of express warranties.

9.    Whether ZHP is liable for alleged breach of express warranty if Plaintiffs and class members did not suffer any losses as a result.

10. Whether ZHP is liable for alleged breach of express warranty if Plaintiffs and class members did not provide pre-suit notice.

11. Whether ZHP is liable for fraud where ZHP made no representations of fact regarding the absence of nitrosamines or impurities in its valsartan.

12. Whether ZHP is liable for fraud where representations regarding the absence of nitrosamines or impurities in its valsartan were not material.

13. Whether ZHP is liable for fraud where ZHP did not fail to disclose a material fact regarding the absence of nitrosamines or impurities in its valsartan.

14. Whether ZHP ever made any misrepresentations to Plaintiffs and class members regarding whether ZHP's valsartan API contained nitrosamines.

15. Whether ZHP is liable for fraud where none of ZHP's representations about its valsartan were false.

16. Whether ZHP is liable for fraud if ZHP had no knowledge that its representations were false when made.

17. Whether ZHP is liable for fraud when ZHP did not recklessly disregard the truth.

18. Whether ZHP is liable for fraud when ZHP did not intend for Plaintiffs or class members to rely on its representations.

19. Whether ZHP ever knowingly sold valsartan API or finished dose products containing nitrosamine impurities.

20. Whether ZHP is liable for fraud when Plaintiffs and class members did not rely on its representations.

21. Whether, if Plaintiffs and class members did rely on any representations, such reliance was justifiable and/or reasonable.

22. Whether Plaintiffs and class members sustained any damages resulting from ZHP's alleged fraud.

23. Whether ZHP's alleged unfair and deceptive practices caused Plaintiffs and class members to suffer any damages.

24. Whether ZHP engaged in unfair or deceptive manufacturing and selling practices where it sold approved, effective valsartan API and finished dose products that complied with all standards at the time.

25. Whether ZHP is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not suffer any losses as a result.

26. Whether ZHP engaged in the alleged unfair or deceptive practices in connection with a consumer transaction.

27. Whether ZHP's alleged deceptive or unfair conduct had an impact on the public interest.

28. Whether ZHP's alleged deceptive or unfair conduct occurred in trade or commerce.

29. Whether ZHP's alleged deceptive or unfair conduct occurred in the relevant state(s) at issue.

30. Whether Plaintiffs and class members sustained any damages resulting from ZHP's alleged unfair and deceptive practices.

31. Whether ZHP is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not rely on ZHP's acts or practices.

32. Whether ZHP is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not suffer any losses as a result.

33. Whether ZHP manufactured finished dose valsartan products in compliance with cGMPs.

34. Whether finished dose valsartan products that were effective at treating hypertension can be rendered economically worthless due to the presence of nitrosamines.

35. Whether Plaintiffs and class members have been economically injured by their purchase of the VCDs when alternative hypertension treatments would have cost more.

36. Whether the fact that physicians prescribed the VCDs at issue, they were approved for inclusion on drug formularies used by Plaintiffs and class members, and they were filled by pharmacies constitute superseding causes that break any chain of proximate causation connecting any alleged misrepresentations by ZHP to Plaintiffs' and class members' reimbursement for the VCDs.

37. Whether Plaintiffs and class members can obtain damages for amounts that they paid for the VCDs but were also reimbursed to them from other sources.

38. Whether ZHP is liable for adulteration of valsartan where its manufacturing practices complied with all applicable statutes, standards, and regulations.

39. Whether ZHP is liable for adulteration of valsartan if its manufacturing practices were reasonable as a matter of law.

40. Whether ZHP is liable for violation of cGMPs where its manufacture of VCDs complied with all applicable statutes, standards, and regulations.

41. Whether ZHP is liable for alleged violation of cGMPs if ZHP's response to the discovery of the nitrosamine impurity was reasonable and compliant with all applicable statutes, standards, and regulations.

42. Whether Plaintiffs and class members failed to sustain any damages because of ZHP's alleged violation of cGMPs.

43. Whether ZHP is liable for alleged violation of cGMPs if Plaintiffs and class members did not suffer any losses as a result

44. Whether Plaintiffs' claims are barred in whole or in part by any applicable statute of limitations.

45. Whether Plaintiffs' claims are barred in whole or in part by bona fide error.

46. Whether Plaintiffs' claims are barred in whole or in part because ZHP's manufacturing processes and testing for its valsartan at the time were state of the art.

47. Whether ZHP's alleged misconduct demonstrated reckless indifference to the interests of others.

48. Whether ZHP's alleged misconduct was outrageous, oppressive, or intolerable.

49. Whether ZHP's alleged conduct was intended to cause harm.

50. Whether ZHP's alleged conduct was motivated by spite or ill will.

51. Whether ZHP knew or intentionally disregarded that its conduct created a substantial risk of significant harm to others.

52. Whether any of ZHP's alleged misconduct was authorized or ratified by management.

53. Whether any of ZHP's alleged misconduct was committed by employees acting in furtherance of ZHP's business or within the scope of the employees' employment.

54. ZHP further adopts and incorporates by reference all legal issues previously asserted in Defendants' motions to dismiss, oppositions to class certification, motions for summary judgment, and motion for decertification, and expressly reserves its appellate rights with respect to all orders leading up to and entered through the date of any final judgment at trial.

<u>Teva</u>

1. Whether EmblemHealth assigned its claims with respect to the valsartan API and finished dose products at issue.

2. Whether SummaCare assigned its claims with respect to the valsartan API and finished dose products at issue.

3. Whether MSP has the right to sue based on these assignments, assuming they were made.

4.    Whether the assignments, if made, are void.

5.    Whether Teva is liable for breach of express warranties where no warranties regarding the absence of nitrosamine impurities in its valsartan were made or breached.

6.    Whether Teva's sale of finished dose valsartan products containing nitrosamine impurities breached any warranties Teva expressly made to Plaintiffs and class members.

7.    Whether Teva's alleged breach of any express warranties made to Plaintiffs and class members was material.

8.    Whether Plaintiffs and class members sustained any damages resulting from Teva's alleged breach of express warranties.

9.    Whether Teva is liable for alleged breach of express warranty if Plaintiffs and class members did not suffer any losses as a result.

10.    Whether Teva is liable for alleged breach of express warranty if Plaintiffs and class members did not provide pre-suit notice.

11.    Whether Teva is liable for fraud where Teva made no representations of material fact regarding the absence of nitrosamines or impurities in its valsartan.

12.    Whether Teva is liable for fraud where representations regarding the absence of nitrosamines or impurities in its valsartan were not material.

13.    Whether Teva is liable for fraud where Teva did not fail to disclose a material fact regarding the absence of nitrosamines or impurities in its valsartan.

14.    Whether Teva ever made any misrepresentations to Plaintiffs and class members regarding whether ZHP's valsartan API contained nitrosamines.

15.    Whether Teva is liable for fraud where none of Teva's representations about its valsartan were false.

16.    Whether Teva is liable for fraud if Teva had no knowledge that its representations were false when made.

234

17.    Whether Teva is liable for fraud when Teva did not recklessly disregard the truth.

18.    Whether Teva is liable for fraud when Teva did not intend for Plaintiffs or class members to rely on its representations.

19.    Whether Teva ever knowingly sold finished dose valsartan products containing nitrosamine impurities.

20.    Whether Teva is liable for fraud when Plaintiffs and class members did not rely on its representations.

21.    Whether, if Plaintiffs and class members did rely on any representations, such reliance was justifiable and/or reasonable.

22.    Whether Plaintiffs and class members sustained any damages resulting from Teva's alleged fraud.

23.    Whether Teva is liable for fraud if Plaintiffs and class members did not suffer any damages.

24.    Whether Teva engaged in unfair or deceptive manufacturing and selling practices where it sold approved, effective valsartan that complied with all standards at the time.

25.    Whether Teva is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not suffer any losses as a result.

26.    Whether Teva engaged in the alleged unfair or deceptive practices in connection with a consumer transaction.

27.    Whether Teva's alleged deceptive or unfair conduct had an impact on the public interest.

28.    Whether Teva's alleged deceptive or unfair conduct occurred in trade or commerce.

29.    Whether Teva's alleged deceptive or unfair conduct occurred in the relevant state(s) at issue.

30.    Whether Plaintiffs and class members sustained any damages resulting from Teva's alleged unfair and deceptive practices.

31.    Whether Teva is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not rely on Teva's acts or practices.

32.    Whether Teva is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not suffer any losses as a result.

33.    Whether Teva manufactured finished dose valsartan products in compliance with cGMPs.

34.    Whether finished dose valsartan products that were effective at treating hypertension can be rendered economically worthless due to the presence of nitrosamines.

35.    Whether Plaintiffs and class members have been economically injured by their purchase of VCDs when alternative hypertension treatments would have cost more.

36.    Whether the fact that physicians prescribed the VCDs, they were approved for inclusion on drug formularies used by Plaintiffs and class members, and they were filled by pharmacies constitute superseding causes that break any chain of proximate causation connecting any alleged misrepresentations by Teva to Plaintiffs' and class members' reimbursement for the VCDs.

37.    Whether Plaintiffs and class members can obtain damages for amounts that they paid for the VCDs but were also reimbursed to them from other sources.

38.    Whether Teva is liable for adulteration of valsartan where its manufacturing practices complied with all applicable statutes, standards, and regulations.

39.    Whether Teva is liable for adulteration of valsartan if its manufacturing practices were reasonable as a matter of law.

40.    Whether Teva is liable for violation of cGMPs where its manufacture of VCDs complied with all applicable statutes, standards, and regulations.

41.    Whether Teva is liable for alleged violation of cGMPs if Teva's response to the discovery of the nitrosamine impurity was reasonable and compliant with all applicable statutes, standards, and regulations.

42.    Whether Plaintiffs and class members failed to sustain any damages because of Teva's alleged violation of cGMPs.

43.    Whether Teva is liable for alleged violation of cGMPs if Plaintiffs and class members did not suffer any losses as a result.

44.    Whether Plaintiffs' claims are barred in whole or in part by any applicable statute of limitations.

45.    Whether Plaintiffs' claims are barred in whole or in part by bona fide error.

46.    Whether Plaintiffs' claims are barred in whole or in part because Teva's manufacturing processes and testing for its valsartan at the time were state of the art.

47.    Whether Teva's alleged misconduct demonstrated reckless indifference to the interests of others.

48.    Whether Teva's alleged misconduct was outrageous, oppressive, or intolerable.

49.    Whether Teva's alleged conduct was intended to cause harm.

50.    Whether Teva's alleged conduct was motivated by spite or ill will.

51.    Whether Teva knew or intentionally disregarded that its conduct created a substantial risk of significant harm to others.

52.    Whether any of Teva's alleged misconduct was authorized or ratified by management.

53.    Whether any of Teva's alleged misconduct was committed by employees acting in furtherance of Teva's business or within the scope of the employees' employment.

54. Teva further adopts and incorporates by reference all legal issues previously asserted in Defendants' motions to dismiss, oppositions to class certification, motions for summary judgment, and motion for decertification, and expressly reserves its appellate rights with respect to all orders leading up to and entered through the date of any final judgment at trial.

Torrent

1. Whether EmblemHealth assigned its claims with respect to the valsartan API and finished dose products at issue.

2. Whether SummaCare assigned its claims with respect to the valsartan API and finished dose products at issue.

3. Whether MSP has the right to sue based on these assignments, assuming they were made.

4. Whether the assignments, if made, are void.

5. Whether Torrent is liable for breach of express warranties where no warranties regarding the absence of nitrosamines or impurities in its valsartan were made or breached.

6. Whether Torrent's sale of finished dose valsartan products containing nitrosamine impurities breached any warranties Torrent expressly made to Plaintiffs and class members.

7. Whether Torrent's alleged breach of any express warranties made to Plaintiffs and class members was material.

8. Whether Plaintiffs and class members sustained any damages resulting from Torrent's alleged breach of express warranties.

9. Whether Torrent is liable for alleged breach of express warranty if Plaintiffs and class members did not suffer any losses as a result.

10. Whether Torrent is liable for alleged breach of express warranty if Plaintiffs and class members did not provide pre-suit notice.

11. Whether Torrent is liable for fraud where Torrent made no representations of material fact regarding the absence of nitrosamines or impurities in its valsartan.

12. Whether Torrent is liable for fraud where the alleged representations regarding the absence of nitrosamines or impurities in its valsartan were not material.

13. Whether Torrent is liable for fraud where Torrent did not fail to disclose a material fact regarding the absence of nitrosamines or impurities in its valsartan.

14. Whether Torrent ever made any misrepresentations to Plaintiffs and class members regarding whether ZHP's valsartan API contained nitrosamines.

15. Whether Torrent is liable for fraud where none of Torrent's representations about its valsartan were false.

16. Whether Torrent is liable for fraud if Torrent had no knowledge that its representations were false when made.

17. Whether Torrent is liable for fraud when Torrent did not recklessly disregard the truth.

18. Whether Torrent is liable for fraud when Torrent did not intend for Plaintiffs or class members to rely on its representations.

19. Whether Torrent ever knowingly sold finished dose valsartan products containing nitrosamine impurities. Whether Torrent is liable for fraud when Plaintiffs and class members did not rely on Torrent's representations.

20. Whether, if Plaintiffs and class members did rely on any representations, such reliance was justifiable and/or reasonable.

21. Whether Plaintiffs and class members sustained any damages resulting from Torrent's alleged fraud.

22. Whether Torrent is liable for fraud if Plaintiffs and class members did not suffer any damages.

23. Whether Torrent engaged in unfair or deceptive manufacturing and selling practices where it sold approved, effective valsartan that complied with all standards at the time of sale.

24. Whether Torrent is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not suffer any losses as a result.

25. Whether Torrent engaged in the alleged unfair or deceptive practices in connection with a consumer transaction.

26. Whether Torrent's alleged deceptive or unfair conduct had an impact on the public interest.

27. Whether Torrent's alleged deceptive or unfair conduct occurred in trade or commerce.

28. Whether Torrent's alleged deceptive or unfair conduct occurred in the relevant state(s) at issue.

29. Whether Plaintiffs and class members sustained any damages resulting from Torrent's alleged unfair and deceptive practices.

30. Whether Torrent is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not rely on Torrent's acts or practices.

31. Whether Torrent is liable for alleged unfair and deceptive practices if Plaintiffs and class members did not suffer any losses as a result.

32. Whether Torrent manufactured finished dose valsartan products in compliance with cGMPs.

33. Whether finished dose valsartan products that were effective at treating hypertension can be rendered economically worthless due to the presence of nitrosamines.

34. Whether Plaintiffs and class members have been economically injured by their purchase of the VCDs when alternative hypertension treatments would have cost more.

35.    Whether the fact that physicians prescribed the VCDs, they were approved for inclusion on drug formularies used by Plaintiffs and class members, and they were filled by pharmacies constitute superseding causes that break any chain of proximate causation connecting any alleged misrepresentations by Torrent to Plaintiffs' and class members' reimbursement for the VCDs.

36.    Whether Plaintiffs and class members can obtain damages for amounts that they paid for the VCDs but were also reimbursed to them from other sources.

37.    Whether Torrent is liable for adulteration of valsartan where its manufacturing practices complied with all applicable statutes, standards, and regulations.

38.    Whether Torrent is liable for adulteration of valsartan if its manufacturing practices were reasonable as a matter of law.

39.    Whether Torrent is liable for violation of cGMPs where its manufacture of VCDs complied with all applicable statutes, standards, and regulations.

40.    Whether Torrent is liable for alleged violation of cGMPs if Torrent's response to the discovery of the nitrosamine impurity was reasonable and compliant with all applicable statutes, standards, and regulations.

41.    Whether Plaintiffs and class members failed to sustain any damages because of Torrent's alleged violation of cGMPs.

42.    Whether Torrent is liable for alleged violation of cGMPs if Plaintiffs and class members did not suffer any losses as a result.

43.    Whether Plaintiffs' claims are barred in whole or in part by any applicable statute of limitations.

44.    Whether Plaintiffs' claims are barred in whole or in part by bona fide error.

45.    Whether Plaintiffs' claims are barred in whole or in part because Torrent's manufacturing processes and testing for its valsartan at the time were state of the art.

46.     Whether Torrent's alleged misconduct demonstrated reckless indifference to the interests of others.

47.     Whether Torrent's alleged misconduct was outrageous, oppressive, or intolerable.

48.     Whether Torrent's alleged misconduct was intended to cause harm.

49.     Whether Torrent's alleged misconduct was motivated by spite or ill will.

50.     Whether Torrent knew or intentionally disregarded that its conduct allegedly created a substantial risk of significant harm to others.

51.     Whether any of Torrent's alleged misconduct was authorized or ratified by management.

52.     Whether any of Torrent's alleged misconduct was committed by employees acting in furtherance of Torrent's business or within the scope of the employees' employment.

53.     Torrent further adopts and incorporates by reference all legal issues previously asserted in Defendants' motions to dismiss, oppositions to class certification, motions for summary judgment, and motion for decertification, and expressly reserves its appellate rights with respect to all orders leading up to and entered through the date of any final judgment at trial.

## PART IX.   <u>MISCELLANEOUS</u>

In addition to Motions in Limine, including briefs regarding the use of deposition designations at trial, the parties have filed or anticipate filing the following motions:

1.     Plaintiffs' Motion for Partial Summary Judgment against all Defendants (ECF No. 2569);

2.     Plaintiffs' Motion for Partial Summary Judgment against ZHP (ECF No. 2569);

3.     Plaintiffs' Motion for Partial Summary Judgment against Torrent (ECF

No. 2558);

4.    Defendants' Omnibus Motion for Summary Judgment (ECF No. 2562);

5.    ZHP's Supplemental Motion for Summary Judgment (ECF No. 2564);

6.    Teva's Motion for Summary Judgment (ECF No. 2565);

7.    Torrent's Motion for Partial Summary Judgment (ECF No. 2570);

8.    ZHP's Motion to Amend/Correct the Court's Opinion on the Parties' Liability Experts (ECF No. 2591);

9.    Plaintiffs' Cross Motion to Exclude Dr. Afnan's Opinions that Rely on Dr. Xue's Excluded Opinions (ECF No. 2626);

10.    Plaintiffs' Motion to Exclude Testimony of Lauren J. Stiroh, Ph.D. (ECF No. 2630);

11.    Plaintiffs' Motion to Exclude Opinions of Wayne Gibson (ECF No. 2631);

12.    Plaintiffs' Motion to Amend/Correct Revised *Daubert* Order as to Opinions of Teva Liability Expert Timothy Anderson (ECF No. 2632);

13.    Defendants' Motion to Exclude the Opinions of Dr. Rena Conti (ECF No. 2633);

14.    ZHP's Motion for Leave to File Second Amended Answer and Affirmative Defenses (ECF No. 2672).

15.    Plaintiffs' Motion to Preclude Improper Deposition Designations (ECF No. 2647).

16.    Allocation and Apportionment of Trial Time:

Defendants request an equal division of time at trial between Plaintiffs and Defendants with respect to opening and closing statements and the presentation of witness testimony. Defendants do not agree to less than equal time for the presentation of evidence. Defendants also have witnesses who require translation from Chinese, so that issue impacts both sides equally. Additionally, there are three sets of Defendants represented by separate counsel with three separate and distinct

sets of fact witnesses and experts to address issues distinct to each Defendant. Without such equal apportionment, there is a significant risk that this trial will need far longer than the four weeks the Court has allotted or that Plaintiff's case will consume the vast majority of the designated four weeks currently set aside. Much of Plaintiff's evidence and witnesses are cumulative and/or tangential to the central issues in the case. Without limitations, Plaintiff has no incentive to streamline such evidence. Any resulting frustration from the jury about the length of a trial will likely be directed at Defendants, because it is the defense case that will be underway if the proceedings continue longer than expected.

Plaintiffs agree to equal time with the Defendants, collectively, in opening statements. Plaintiffs do not agree to the equal division of time for the presentation of testimony and evidence at trial, Plaintiffs have the burden of proof and are necessarily presenting a far more substantial number of witnesses, live and by video, and evidence, than defendants. In addition, Plaintiffs' deposition designations include a significant number of witnesses that testified via a Chinese translator, artificially lengthening the presentation of the testimony (the Court provided significant extra time for the conduct of depositions where a translator was necessary). The length of time needed for trial, and each party's case, is dependent upon the Court's forthcoming rulings on dispositive motions and motions in limine, and the ongoing meet and confers and ultimate decisions of the Court on the remaining disputes as to the deposition designations to be presented to the Court. Depending on the Court's rulings, the overall time to try this case could be less or more, potentially substantially so, than the estimated 4 weeks currently in place.

The following notices (if any) are given under Rules 609(b) or 807(b), Federal Rules of Evidence: None.

1.    NOTE THAT 609(b) relates to evidence of a prior conviction more than 10 years old, and 807 (b) is the residual exception for hearsay where 803 or 804 exceptions don't apply.

## PART X.    <u>JURY TRIALS</u>

No later than seven days prior to the scheduled trial date or at such time as the court may direct:

1.    Each party shall submit to the District Judge and to opposing counsel a <u>trial brief</u> or memorandum with citations and authorities and arguments in support of the party's position on all issues of law. The trial brief shall be electronically filed.

2.      Each party shall submit to the District Judge and to opposing counsel written requests for charges to the jury. Supplemental requests to charge that could not have been anticipated may be submitted any time prior to the arguments to the jury. All requests for charge shall be on a separate page or pages, plainly marked with the name and number of the case; shall contain citations of supporting authorities; shall designate the party submitting same; and shall be numbered in sequence. Parties may submit objections to opposing parties' requests for charge.

IF you have the capability, the Proposed Requests for Charge should be submitted on computer disk, Word Perfect format. All proposed requests for charges shall be electronically filed, and a paper copy must also be provided.

3.      The Parties have previously submitted a jury questionnaire.

**EACH OF THESE ITEMS IS TO BE FILED PRIOR TO THE FIRST TRIAL DATE EVEN IF THE CASE IS CONTINUED.**

**COUNSEL ARE ON NOTICE THAT FAILURE TO PROVIDE TIMELY COMPLIANCE WITH THE REQUESTS OF PART X MAY RESULT IN THE POSTPONEMENT OF TRIAL AND THE ASSESSMENT OF JUROR AND OTHER COSTS AND/OR THE IMPOSITION OF SANCTION.**

## <u>CONCLUDING CERTIFICATION</u>

We hereby certify by the affixing of our signatures to this Final Pretrial Order that it reflects the efforts of all counsel and that we have carefully and completely reviewed all parts of this Order prior to its submission to the Court. Further, it is acknowledged that amendments to this Joint Final Pretrial Order will not be permitted except where the Court determines that manifest injustice would result if the amendment is not allowed.

Attorney(s) for Plaintiff(s):

/s/ Adam M. Slater
Adam M. Slater
Christopher J. Geddis
**Mazie, Slater, Katz & Freeman, LLC**
103 Eisenhower Pkwy, 2nd Flr.
Roseland, NJ 07068
Phone: (973) 228-9898
aslater@mazieslater.com

/s/ Ruben Honik
Ruben Honik
**Honik LLC**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (267) 435-1300
ruben@honiklaw.com

/s/ Conlee Whiteley
Conlee S. Whiteley
David J. Stanoch
**Kanner & Whiteley, LLC**
701 Camp Street
New Orleans, LA 70130
Phone: (504)-524-5777
c.whiteley@kanner-law.com

Attorney(s) for Defendant(s):

/s/ Allison M. Brown
Allison M. Brown
Jessica Davidson
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3222
allison.brown@skadden.com
jessica.davidson@skadden.com

/s/ Nina Rose
Nina R. Rose
Geoffrey M. Wyatt
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Phone: (202) 371-7000
nina.rose@skadden.com
geoffrey.wyatt@skadden.com

*For Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai U.S., Inc., Prinston Pharmaceutical Inc., and Solco Healthcare U.S., LLC*

246

/s/ Daniel Nigh
Daniel Nigh
Marlene Goldenberg
Brett Vaughn
**Nigh Goldenberg Raso & Vaughn, PLLC**
14 Ridge Square NW
Third Floor
Washington, D.C. 20016
Phone: (850) 600-8090
dnigh@nighgoldenberg.com


/s/ Andres Rivero
Andres Rivero
Jorge Mestre
Zalman Kass
**Rivero Mestre LLP**
2525 Ponce de Leon Blvd., Suite 1000
Miami, FL 33134
Phone (305) 445-2500
jmestre@riveromestre.com

/s/ Gregory P. Hansel
Gregory P. Hansel
John J. Cronan, III
Elizabeth F. Quinby
**Preti, Flaherty, Beliveau & Pachios,
Chartered, LLP**
One City Center
P.O. Box 9546
Portland, ME 04112
Phone: (207) 791-3000
ghansel@preti.com

/s/ Victoria Davis Lockard
Victoria Davis Lockard
Steven M. Harkins
Terminus 200
3333 Piedmont Rd., NE, Suite 2500
Atlanta, Georgia 30305
Tel: (678) 553-2385
lockardv@gtlaw.com

/s/ Gregory E. Ostfeld
Gregory E. Ostfeld
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel: (312) 456-8400
ostfeldg@gtlaw.com


/s/ Liza M. Walsh
Liza M. Walsh
Walsh Pizzi O'Reilly Falanga LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
lwalsh@walsh.law

*For          Defendants          Teva
Pharmaceuticals USA, Inc., Actavis
LLC, and Actavis Pharma, Inc.*

/s/ Devora W. Allon
Devora W. Allon, P.C.
Alexia R. Brancato
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022

*For          Defendants          Torrent
Pharmaceuticals Ltd. and Torrent
Pharma, Inc.*

247

/s/ Madeline Pendley
Madeline Pendley
**Levin Papantonio Rafferty Proctor**
**Buchanan O'Brien Barr & Mougey, P.A.**
Pensacola, FL 32502-5996
850.435.7003 (office)
mpendley@levinlaw.com

/s/ John R. Davis
John R. Davis
**Slack Davis Sanger, LLP**
6001 Bold Ruler Way, Suite 100
Austin, TX 78746
(512) 795 8686
jdavis@slackdavis.com

*For Plaintiffs*

Entry of the foregoing Joint Final Pretrial Order is hereby APPROVED this
___day of _____, 2024.

_____

UNITED STATES DISTRICT JUDGE
ROBERT B. KUGLER
United States District Court
For the District of New Jersey