# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*Gaston Roberts et al. v. Zhejiang Huahai Pharmaceutical Co., et al.,*<br><br>Case No. 1:20-cv-00946-RBK-JS | MDL No. 2875<br><br>Honorable Renée Marie Bumb<br>District Court Judge |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINIONS OF ANDREW THOMPSON, PH.D.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................4

ARGUMENT ......................................................................................................7

I.     DR. THOMPSON IS CLEARLY QUALIFIED TO RESPOND TO
       PLAINTIFF'S EXPERTS' OPINIONS. ........................................................8

II.    DR. THOMPSON'S REBUTTAL OPINIONS ARE BASED ON A
       RELIABLE METHODOLOGY..................................................................12

       A.     Dr. Thompson Properly Rebuts Plaintiff's Experts' Opinions
              Regarding The State Of Knowledge In The Field Of Chemistry
              Prior To 2018.......................................................................................15

       B.     Dr. Thompson Properly Rebuts Unreliable Opinions Offered
              By Drs. Hecht And Najafi Regarding The July 27, 2017 Email.........20

III.   DR. THOMPSON SHOULD BE PERMITTED TO RESPOND TO
       ANY TESTIMONY OFFERED BY DRS. HECHT AND NAJAFI
       ABOUT THE CHINESE CERTICATES OF ANALYSIS. .........................22

CONCLUSION .................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abilify (Aripiprazole) Products Liability Litigation*,
299 F. Supp. 3d 1291 (N.D. Fla. 2018) ................................................. 12-13, 16

*Capri Sun GmbH v. American Beverage Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022) ..................................................................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
43 F.3d 1311 (9th Cir. 1995) ............................................................................14

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) ..............................................................................14

*Feliciano v. CoreLogic Saferent, LLC*,
No. 17-cv-5507 (AKH), 2020 U.S. Dist. LEXIS 199069
(S.D.N.Y. June 11, 2020)...................................................................................13

*Frobe v. UPMC St. Margaret*,
No. 2:20-cv-00957-CCW, 2023 WL 3740782
(W.D. Pa. May 31, 2023)....................................................................................22

*Holbrook v. Lykes Brothers S.S. Co.*,
80 F.3d 777 (3d Cir. 1996) ..........................................................................7, 12

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 584 (D.N.J. 2002).....................................................................14

*In re Mirena IUS Levonorgestrel-Related Products Liability
Litigation (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018) ...............................................................13

*In re NuvaRing Products Liability Litigation*,
No. 4:08-MD-01964-RWS, 2013 WL 791828
(E.D. Mo. Mar. 4, 2013) ....................................................................................19

*Padillas v. Stork-Gamco, Inc.*,
186 F.3d 412 (3d Cir. 1999) ..............................................................................14

*In re Paoli Railroad Yard PCB Litigation,*
35 F.3d 717 (3d Cir. 1994) ...............................................................8, 13

*In re Paoli Railroad Yard PCB Litigation,*
916 F.2d 829 (3d Cir. 1990) ...................................................................8

*Pineda v. Ford Motor Co.,*
520 F.3d 237 (3d Cir. 2008) ...................................................................7

*Player v. Motiva Enterprises LLC,*
No. Civ. 02-3216(RBK), 2006 WL 166452 (D.N.J. Jan. 20, 2006).............14, 15

*Poust v. Huntleigh Healthcare,*
998 F. Supp. 478 (D.N.J. 1998) ..............................................................8

*Rhoads Industries, Inc. v. Shoreline Foundation, Inc.,*
No. 15-921, 2021 WL 2778562 (D.N.J. July 2, 2021) ......................................17

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation,*
MDL No. 2445, 2020 WL 6887885 (E.D. Pa. Nov. 24, 2020) .................... 17-18

*United States v. Velasquez,*
64 F.3d 844 (3d Cir. 1995) ...............................................................7, 12

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative,*
No. CV 15-6480, 2021 WL 2352016 (E.D. Pa. June 9, 2021)....................*passim*

*Wolfe v. McNeil-PPC, Inc.,*
No. 07-348, 2011 WL 1673805 (E.D. Pa. May 4, 2011) .............................19, 21

*In re Zoloft (Sertraline Hydrochloride) Products Liability Litigation,*
858 F.3d 787 (3d Cir. 2017) ................................................................13

## INTRODUCTION

Dr. Andrew Thompson, an organic chemist, has 38 years of experience as a pharmaceutical process research chemist and was involved in the development of more than 250 active pharmaceutical ingredient ("API") products. Dr. Thompson rebuts the opinions offered by ***Plaintiff's*** experts Drs. Stephen Hecht and Ramin Najafi that ZHP should have known prior to 2018 that the valsartan manufacturing process could lead to the formation of trace amounts of nitrosamine N-nitrosodimethylamine ("NDMA"), explaining that those opinions "'are unsupported by scientific evidence and are inconsistent with the knowledge, general practice, and concerns held by chemists in the pharmaceutical industry at that time.'" (Pl.'s Br. at 1 (citing Expert Rep. of Andrew Thompson ("Thompson Rep.") at 10, Apr. 10, 2025 (Pl.'s Br. Ex. 1)).) Plaintiff's various challenges to Dr. Thompson's opinions are all meritless.

***First***, Plaintiff's assertion that Dr. Thompson has "minimal applicable experience" (*id.* at 4) is frivolous. While Drs. Hecht, Najafi, and Thompson are all organic chemists, Dr. Thompson's relevant experience exceeds that of Plaintiff's experts because he has spent decades working as a process research chemist in the pharmaceutical industry, and particularly with respect to the development of APIs. While Plaintiff asserts that Dr. Thompson is not qualified because he became familiar with nitrosamines as a result of the 2018 valsartan recall (*id.* at 1), that was

more than six years **before** Dr. Thompson was retained in this case. In the intervening six-year period, Dr. Thompson, by virtue of his role as a process chemist running an API development lab, became well versed in issues related to nitrosamine formation. The fact that neither Dr. Thompson nor his colleagues at his API lab were focused on the possibility of nitrosamine formation until the 2018 valsartan recall supports, rather than undermines, his opinions that reasonable chemists were not expecting nitrosamine formation in valsartan API prior to that. And although Plaintiff challenges Dr. Thompson's expertise with respect to regulatory issues, Dr. Thompson is not seeking to offer regulatory opinions; instead, he merely rebuts Plaintiff's experts' assertions regarding the "state of knowledge" among chemists involved in a heavily regulated industry. (Thompson Rep. at 1.)

**Second**, Plaintiff fundamentally misapprehends the nature of Dr. Thompson's rebuttal testimony, complaining that he did not perform "independent research" and "cherry-picked" information in critiquing the opinions of Drs. Hecht and Najafi. Dr. Thompson appropriately performed a comprehensive review of the literature and materials that Plaintiff's experts cite in forming their opinions that ZHP chemists should have suspected nitrosamine formation prior to 2018 and explained why those materials do not support Plaintiff's experts' assertions. *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. CV 15-6480, 2021 WL 2352016, at *14 (E.D. Pa. June 9, 2021) (rebuttal "experts have a less demanding task, since they have no

burden to produce models or methods of their own; they need only attack those of plaintiffs' experts"). Similarly, in rebutting opinions offered by Drs. Hecht and Najafi that a July 2017 email written by a ZHP chemist demonstrates that the company was aware of the presence of NDMA in valsartan at that time, Dr. Thompson reliably explains why ***Plaintiff's*** experts' interpretations of this document "make[] no sense" given that the "substance of the email is about irbesartan"—an entirely different drug. (Thompson Rep. at 6.)

***Finally***, Plaintiff seeks to preclude Dr. Thompson from offering opinions regarding the meaning of certificates of analysis that ZHP received from the supplier of the dimethylformamide ("DMF") solvent used in the valsartan manufacturing process. Dr. Thompson does not discuss these materials in his rebuttal report because Plaintiff's experts did not address them. But to the extent Plaintiff's experts testify at trial that these documents demonstrate that ZHP should have been aware that DMF solvent contained dimethylamine, Dr. Thompson is entitled to present a rebuttal based on his interpretation of the same materials, which Plaintiff's counsel questioned him about at length at his deposition.

For all of these reasons, Dr. Thompson's rebuttal opinions satisfy the requirements of Rule 702 and should be admitted.

## BACKGROUND

Dr. Thompson has spent his 38-year career "as an organic chemist and pharmaceutical process research chemist," working primarily on the development of APIs, including "evaluating and implementing new synthetic processes to prepare APIs" and "implementing changes to the steps used to prepare API." (Thompson Rep. at 2.) In 1987, he began his professional career as a Process Chemist at Merck Research Laboratories ("Merck"), where he had responsibility for developing APIs. (*Id.*; *see also* Dep. of Andrew Thompson ("Thompson Dep.") 42:4-13, May 9, 2025 (Pl.'s Br. Ex. 2).) In 1996, Dr. Thompson founded J-STAR Research, Inc. ("J-STAR"), where he oversaw approximately 70 process chemists and "built and put into place the groups required to prepare and deliver API . . . to drug product manufacturers," which included a group responsible for material preparation ("Synthesis Group") and analytical testing ("Analytical Group"). (Thompson Rep. at 2.) The Analytical Group overseen by Dr. Thompson included a specific sub-group that was "responsible for isolation of process impurities and identifying their chemical structure by spectroscopic means[.]" (*Id.*)

Over the course of his career, Dr. Thompson has been involved in the development of more than 250 APIs. (*Id.* at 3.) As part of the development process for each API, Dr. Thompson and his team "anticipate[d] impurities that may form in the production of the drug substance. (*Id.*) And, in 2018, "[w]hen nitrosamines were

discovered in various drug substances, including generic valsartan," Dr. Thompson began "evaluating and implementing various analytical procedures for detecting nitrosamines in drug substances." (*Id.* at 2.) Through this experience, Dr. Thompson gained substantial knowledge "regarding potential routes for nitrosamine formation and methods sensitive enough to identify and quantify nitrosamines potentially present in API." (*Id.*)

Dr. Thompson was retained in this case "to evaluate opinions by Drs. Najafi and Hecht regarding the state of knowledge in the field of chemistry . . . regarding the potential for formation of nitrosamines in valsartan drug substance . . . prior to the discovery of trace amounts of [NDMA]" in 2018. (Thompson Rep. at 1.) As Dr. Thompson explains, Plaintiff's experts' opinions "are based on projection of current-day knowledge about NDMA formation (which Drs. Hecht and Najafi admit was developed *as a result of* the discovery of nitrosamines in valsartan in 2018) onto the pre-2018 time frame." (*Id.* at 4.) In addition, he states that "to the extent Drs. Hecht and Najafi do cite pre-2018 literature, none of those materials would have put a reasonable chemist involved in the development of drug substance[s] on notice of the potential for NDMA formation in valsartan API." (*Id.*)

Dr. Thompson also analyzes an internal July 27, 2017 email from ZHP employee Jinsheng Lin that Drs. Hecht and Najafi claim shows that ZHP was aware of the potential for nitrosamine formation roughly a year before the 2018 valsartan

recall. According to Dr. Thompson, Plaintiff's experts' subjective interpretation of that document "makes no sense" given the broader context of the email. (Thompson Rep. at 6.) As Dr. Thompson explains, the email is not about valsartan API—the product in question. (*Id.*) Rather, Mr. Lin's email addresses a potential impurity identified in a lab-scale trial of Irbesartan, a different drug molecule than valsartan API, and compares it to a known impurity (Impurity K) that can form in deacylated valsartan, which is also an entirely different drug molecule. (*Id.*)

At Dr. Thompson's deposition, Plaintiff's counsel questioned Dr. Thompson at length about certain documents that he did not address in his report—because they were not cited by Drs. Hecht and Najafi—but that he had reviewed, including: (1) an English translation of the Ministry of Industry and Information Technology of the People's Republic of China's chemical industry standard for DMF solvent; and (2) certificates of analysis ("COAs") for DMF solvent that ZHP received from its DMF supplier. (Thompson Dep. 162:13-163:4, 164:8-167:7.) Plaintiff's counsel's questions implied that the COAs should have put ZHP on notice that DMF solvent contained dimethylamine, which ultimately reacted with sodium nitrite in the valsartan manufacturing process to form NDMA. (*Id.* 162:20-163:4.) In response to that questioning, Dr. Thompson explained that the reference to "alkalinity []] calculated as dimethylamine" in the COAs meant that the molar weight of dimethalymine was used in the mathematical formula designed to calculate the trace

amounts of *all* base chemicals in the DMF solvent—and would "not put anybody on notice that dimethylamine could be introduced to the process," much less that it would have led to the formation of NDMA. (*Id.* 155:1-17, 178:16-25.)

## ARGUMENT

Rule 702 has three core requirements: "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). The Third Circuit "ha[s] interpreted Rule 702's qualification requirement liberally." *Id.* Although Rule 702 applies to both plaintiff and defense experts, "the test is different" for defense experts because the burden of proof is one that "the defense d[oes] not bear[.]" *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996). "In order to demonstrate reliability to meet the requirements of Rule 702, a rebuttal expert . . . need only show 'good grounds' for the proposed testimony." *Winn-Dixie Stores*, 2021 WL 2352016, at *14 (citing *United States v. Velasquez*, 64 F.3d 844, 851 (3d Cir. 1995) (reversing conviction where defense expert "had 'good grounds' for his rejection of handwriting analysis")). Plaintiff's motion fails under these standards.

I.    **DR. THOMPSON IS CLEARLY QUALIFIED TO RESPOND TO PLAINTIFF'S EXPERTS' OPINIONS.**

The Third Circuit has "eschewed imposing overly rigorous requirements of expertise[.]" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (cited in Pl.'s Br. at 5). Rather, the Court need only determine "whether the proffered expert has minimal qualifications, either through experience or education, in a field that is relevant to a subject which will assist the trier of fact." *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 491 (D.N.J. 1998); *see also In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855-56 (3d Cir. 1990) ("In light of the liberal Rule 702 expert qualification standard, we hold that the district court abused its discretion in excluding portions of [experts'] testimony simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate.").

Dr. Thompson easily satisfies this standard. As described in detail above, Dr. Thompson has spent his 38-year career "as an organic chemist and pharmaceutical process research chemist, primarily with respect to the development of drug substance/API." (Thompson Rep. at 2.) "When nitrosamines were discovered in . . . generic valsartan" in 2018, Dr. Thompson "became involved in evaluating and implementing various analytical procedures for detecting nitrosamines in drug substances," giving him "substantial knowledge regarding potential routes for nitrosamine formation and methods sensitive enough to identify and quantify

nitrosamines potentially present in API." (*Id.*) This extensive experience qualifies Dr. Thompson to opine on the state of knowledge within the field of chemistry.

Plaintiff's various arguments to the contrary lack merit.

***First***, Plaintiff repeatedly downplays Dr. Thompson's experience running J-STAR as being relegated to a "small-scale research lab" engaged in "small-scale process development[.]" (Pl.'s Br. at 3; *see also, e.g.*, *id.* at 10 (dismissing Dr. Thompson's "small-scale research lab"); *id.* at 13 (same); *id.* at 15 (similar).) This is inaccurate. As founder and CEO of J-STAR, Dr. Thompson led the entire process for "prepar[ing] and deliver[ing] API . . . to drug product manufacturers," including material preparation and analytical testing, and he oversaw a specific group "responsible for isolation of process impurities[.]" (Thompson Rep. at 1-2.) In addition, Dr. Thompson also worked for eight years at Merck, where he had responsibility for developing the chemistry used to create APIs at one of the largest pharmaceutical companies in the world. (*Id.*; *see also* Thompson Dep. 42:4-13.)

Plaintiff's suggestion that Dr. Thompson's focus on the initial development of APIs, rather than the manufacture of APIs for sale, somehow affects his qualifications is illogical. The exact stage of development and manufacture in which he was involved does not affect Dr. Thompson's knowledge about industry knowledge generally or his qualifications as an organic chemist. In any event, this argument would also effectively require the exclusion of Drs. Najafi and Hecht, who

9

have only minimal first-hand experience with respect to *either* the development or manufacture of APIs.

**Second**, Plaintiff also argues that the timing of Dr. Thompson's familiarity with nitrosamines somehow disqualifies him from serving as a rebuttal expert. This argument, too, should be rejected.

As an initial matter, Plaintiff's claim that Dr. Thompson "never considered or be[came] aware of nitrosamines at all before he was retained in this case" (Pl.'s Br. at 8) is false. Dr. Thompson's report clearly states that "[w]hen nitrosamines were discovered in . . . generic valsartan, around 2018"—***seven years before he was retained as an expert in this litigation***—"I became involved in evaluating and implementing various analytical procedures for detecting nitrosamines in drug substances." (Thompson Rep. at 2.)[1]

Plaintiff also appears to suggest that Dr. Thompson's failure to discover the potential for nitrosamine formation before 2018 renders him incompetent to testify as an expert. (Pl.'s Br. at 1; *see also id.* at 4.) The fact that Dr. Thompson, a process chemist working on the development of APIs during the relevant time period, was not on notice to look for nitrosamines in drug substances only confirms the reliability

---

[1]     Plaintiff's argument is again self-defeating since Dr. Najafi does not claim to have studied or researched nitrosamines prior to his involvement in nitrosamine-related litigation. (*See* generally 10/31/2022 Expert Report of Ramin (Ron) Najafi, Ph.D. ("Najafi Rep.") (Ex. 1 to Decl. of Nina Rose) ("Rose Decl.") and Ex. B.)

of his opinions regarding what ZHP chemists should have known at the time. And as Dr. Thompson explains, "the FDA stated in multiple announcements about the valsartan recall that the presence of NDMA in valsartan was unexpected by both industry and regulators." (Thompson Rep. at 5 (citations omitted).)

***Third***, Plaintiff repeatedly argues that Dr. Thompson is "not a regulatory expert" (Pl.'s Br. at 8, 14) and "did not know or apply the regulatory standards . . . ." (*Id.* at 2.) But Dr. Thompson is not being offered to express any opinions about ZHP's compliance with regulatory requirements or internal procedures.[2] Rather, as the very first page of Plaintiff's brief plainly acknowledges, Dr. Thompson's "central opinion" pertains to "'the knowledge, general practice, and concerns held by chemists in the pharmaceutical industry" prior to the 2018 recall. (*Id.* at 1 (citing Thompson Rep. at 10).) That fundamental opinion—i.e., nitrosamine impurities such as NDMA were not expected, much less routinely tested for, prior to the recall—is based on both Dr. Thompson's analysis of the "literature cited by Drs. Hecht and Najafi" as well as his "own substantial experience in the development of drug API[.]" (Thompson Rep. at 4-5.) To the extent Dr. Thompson addresses the FDA or regulatory requirements in his report, it is merely to elaborate on that

---

[2]      Dr. Thompson testified that he reviewed and is relying on Dr. Ali Afnan's regulatory expert opinions. (Thompson Dep. 170:19-171:4.) Plaintiff does not challenge Dr. Thompson's reliance on Dr. Afnan's opinions.

11

experience. (*See id.* at 3 (FDA required chemists such as Dr. Thompson to consider "the potential formation of genotoxic impurities . . . with respect to every API that [he] developed").) The fact that some of Dr. Thompson's experience in a heavily regulated industry has necessarily been shaped by what the FDA has said or done does not transform Dr. Thompson's chemistry-based opinions into regulatory ones.

In short, Dr. Thompson's decades of experience as a process chemist (including his development of hundreds of APIs and implementation of analytical procedures for detecting nitrosamines in drug substances) more than qualify him to testify as an expert in this litigation.

## II.  DR. THOMPSON'S REBUTTAL OPINIONS ARE BASED ON A RELIABLE METHODOLOGY.

It is well settled that "'defendants' experts have a less demanding task . . . they need only attack [the opinions] of plaintiffs' experts.'" *Winn-Dixie Stores*, 2021 WL 2352016, at *14 (citation omitted). Consistent with this standard, the Third Circuit has made it clear that rebuttal opinions offered by a defense expert are admissible where they are "sufficiently certain and could help the jury to evaluate testimony by plaintiff's experts" on "an issue on which plaintiff b[ears] the burden of proof." *Holbrook*, 80 F.3d at 786; *see also, e.g.*, *Velasquez*, 64 F.3d at 851. In other words, it is "entirely appropriate" for defense experts to offer what are "essentially, critiques of [p]laintiffs' experts' evidence, methodologies, and conclusions." *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291,

1368 (N.D. Fla. 2018); *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 140 (S.D.N.Y. 2022) ("a rebuttal expert need not proffer a methodology or model, but only critique the opposing expert's"); *Feliciano v. CoreLogic Saferent, LLC*, No. 17-cv-5507 (AKH), 2020 U.S. Dist. LEXIS 199069, at *8 (S.D.N.Y. June 11, 2020) (defense expert can simply "pok[e] holes in [other side's] argument").

Notably, none of the cases cited by Plaintiff on the question of reliability involved a rebuttal expert. Instead, Plaintiff primarily relies on cases excluding ***plaintiffs'*** experts who failed to follow their own stated methodology in forming affirmative opinions on the issue of general or specific causation. *See, e.g.*, *In re Paoli*, 35 F.3d at 770-71 (cited in Pl.'s Br. at 5, 6, 10) ("upholding," for example, the district court's exclusion of expert testimony regarding causation as "based on an unreliable methodology -- he failed to examine the plaintiffs, review their medical records, or consider alternative causes of their illnesses"); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 800 (3d Cir. 2017) (cited in Pl.'s Br. at 5, 7) ("By applying different techniques to subsets of the data and inconsistently discussing statistical significance, [plaintiffs' general causation expert] does not reliably analyze the weight of the evidence."); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 251-52 (S.D.N.Y. 2018) (cited in Pl.'s Br. at 10, 15) (excluding plaintiffs' expert who "ignore[d] scientific standards that he ha[d] conceded govern inquiries into general

13

causation"), *aff'd*, 982 F.3d 113 (2d Cir. 2020).[3] In the one case in which a plaintiff moved to exclude a defense expert, the challenged opinion was not a direct critique of the plaintiff's experts and, in any event, the court denied the motion. *See Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 612 (D.N.J. 2002) (cited in Pl.'s Br. at 7) (denying motion to exclude defense expert's opinion regarding the cause of plaintiff's illness, which was "based upon his own extensive knowledge of the peer-reviewed medical literature . . . his review of the data . . . [and] his decades of clinical experience . . . ."), *aff'd*, 68 F. App'x 356 (3d Cir. 2023).

Plaintiff's heavy reliance on Judge Kugler's exclusion of expert testimony in *Player v. Motiva Enterprises LLC*, No. Civ. 02-3216(RBK), 2006 WL 166452 (D.N.J. Jan. 20, 2006) (cited in Pl.'s Br. at 16), is similarly misplaced. There, the court held that the plaintiffs' damages expert lacked a reliable basis for quantifying the diminution in value of the plaintiffs' property following alleged contamination,

---

[3]    *See also, e.g.*, *Elcock v. Kmart Corp.*, 233 F.3d 734, 750 (3d Cir. 2000) (cited in Pl.'s Br. at 6-7) ("[G]iven the serious doubts raised by Kmart regarding [plaintiff's psychologist expert's] methods, and in light of [plaintiff's] failure to adduce much evidence validating his methods, we feel compelled [] to vacate the District Court's decision to admit [the expert]'s testimony . . . ."); *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999) (cited in Pl.'s Br. at 6) (noting that district court excluded plaintiff's engineering expert on Rule 702 grounds "but express[ing] no view on the merits of the ruling"); *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (cited in Pl.'s Br. at 9) (affirming exclusion of plaintiffs' causation experts where plaintiffs "fail[ed] to make any objective showing as to admissibility under . . . Rule 702").

a critical element of the plaintiffs' negligence claim, because he made those calculations "without discussing, or even recognizing, the extent to which the property was actually contaminated." *Id.* at *7. There, the expert had never "conducted any physical inspection of or visit to the properties prior to writing the report." *Id.* Further, the expert sought to opine on the specific percentage of property value decline without disclosing his mathematical calculations or the assumptions underlying them. *Id.* at *8.

By contrast, here, and as explained in detail below, Dr. Thompson has good grounds to: (1) rebut opinions offered by Drs. Hecht and Najafi "regarding the state of knowledge in the field of chemistry" prior to 2018; and (2) respond to these experts' interpretations of an internal ZHP email from 2017 based on his own review of the same document. (Thompson Rep. at 1, 6.) Thus, Plaintiff's various claims that Dr. Thompson "has no reliable basis to offer" these critiques (Pl.'s Br. at 1) lack merit.

### A.    Dr. Thompson Properly Rebuts Plaintiff's Experts' Opinions Regarding The State Of Knowledge In The Field Of Chemistry Prior To 2018.

Plaintiff appears to argue that Dr. Thompson's critiques of Dr. Najafi's and Dr. Hecht's claims about the state of pre-2018 knowledge lack sufficient grounds because: (1) Dr. Thompson did not perform "independent research" (Pl.'s Br. at 1-2, 4); (2) Dr. Thompson improperly opines on what "he would have known" rather

15

than what ZHP should have known (*id.* at 2); and (3) Dr. Thompson "cherry-picked" information in forming his opinions (*id.*). Each of these arguments is meritless.

**First**, Plaintiff repeatedly argues that Dr. Thompson's opinions lack a sufficient basis because he "did not perform any literature search whatsoever." (Pl.'s Br. at 2; *see also id.* at 1 (Dr. Thompson did "no independent research"); *id.* at 4, 10, 12-13 (similar).) However, as a rebuttal expert, Dr. Thompson "did not need to **perform** his own" research; rather, he need only "review[] the underlying facts and data on which" **Plaintiff's** experts relied in formulating their opinions. *See Winn-Dixie Stores*, 2021 WL 2352016, at *15 (defense expert's methodology was sufficiently reliable where he had "reviewed the underlying facts and data on which [the plaintiff's expert] relied to reach his opinions") (emphasis added); *see also In re Abilify*, 299 F. Supp. 3d at 1368 (it is "entirely appropriate" for defense experts to offer what are, "essentially, critiques of [p]laintiffs' experts' evidence").

That is precisely what Dr. Thompson did. For example, Dr. Thompson addresses the 1979 IARC Monograph, which Dr. Hecht cites as evidence that the reactions leading to NDMA and the use of mass spectrometry were "widely known for many years." (Thompson Rep. at 5 (citing 2022 Hecht Rep. at 1; 7/6/2021 Expert Report of Stephen S. Hecht, Ph.D. ("2021 Hecht Rep.") at 18 (Rose Decl. Ex. 2)).) Dr. Thompson explains in his report that, even assuming IARC monographs were informative to chemists, the section of the monograph that discusses NDMA

16

"appears 125 pages into the publication" and "does not reference DMF solvent" (the substance used in ZHP's manufacturing process), much less "state that it can lead to the formation of NDMA." (*Id.* at 6.) Similarly, although Drs. Najafi and Hecht both rely on a textbook in opining that use of a DMF solvent "'should have raised concern'" (*id.* at 8-9 (citation omitted)), Dr. Thompson explains that this source "merely mentions that DMF could decompose" ***at its boiling point*** to dimethylamine—an outcome that neither Dr. Hecht nor Dr. Najafi claims occurred during the valsartan manufacturing process (*id.* at 9). Plaintiff does not address Dr. Thompson's treatment of these or any of the other sources cited by her own experts, effectively conceding that it is well-grounded.

***Second***, Plaintiff also argues that Dr. Thompson improperly "base[s] his opinion on what he knew and would do rather than what ZHP could or should have done." (Pl.'s Br. at 1; *see also id.* at 13 ("The only standard he applied was what he knew at the time . . . .").) But it is entirely proper for Dr. Thompson to rely on his extensive experience as a process chemist to opine on knowledge in the industry in which he worked for 38 years. *See, e.g.*, *Rhoads Indus., Inc. v. Shoreline Found., Inc.*, No. 15-921, 2021 WL 2778562, at *28-29 (D.N.J. July 2, 2021) ("[I]t is permissible for [defense expert], as a rebuttal expert, to have reviewed [Plaintiff's] experts' reports and to have applied his experience and training to opine as to whether those reports are sound."); *In re Suboxone (Buprenorphine Hydrochloride*

17

& *Naloxone) Antitrust Litig.*, MDL No. 2445, 2020 WL 6887885, at \*36-37 (E.D. Pa. Nov. 24, 2020) (testimony regarding cGMPs based on expert's "review of documents and application of her experience" was admissible). This is particularly true because Dr. Thompson made clear that he "applied th[e] same level of rigor to preparing this [expert] report" as he did at J-STAR and Merck. (Thompson Dep. 41:15-22.) Plaintiff's experts similarly invoke their own "education, training, and knowledge" in opining on the state of knowledge before 2018. (2021 Hecht Rep. at 1; *see also* Najafi Rep. at 2 ("My opinions are based upon my education, practice, and experience . . . .").) Plaintiff does not cite any authority purporting to hold a rebuttal expert to a higher methodological standard than Plaintiff's own experts.

**Third**, Plaintiff claims that Dr. Thompson "cherry-picked" the information he relied on in forming his opinions. (Pl.'s Br. at 14; *see also id.* at 2.)[4] As set forth above, however, Dr. Thompson specifically "analyzed literature cited by Drs. Hecht and Najafi as supposed evidence that the industry had this pre-2018 knowledge" and formulated his opinions based on those sources. (Thompson Rep. at 4.) Plaintiff asserts that Dr. Thompson "relies only on favorable FDA statements, and disregards

---

[4]    Plaintiff's claim that Dr. Thompson "conceded that he 'cherry-picked' the documents that he wanted to rely on" (Pl.'s Br. at 14), is another misrepresentation of Dr. Thompson's testimony. Dr. Thompson explained that he considered all the documents cited in Drs. Hecht and Najafi's reports (Thompson Dep. 15:9-12; *id.* 16:6-12) for his expert opinions, but that he chose to discuss the "most important" ones as examples in his report (*id.* 56:16-24).

unfavorable FDA statements," including those made in the Warning Letter issued to ZHP. (Pl.'s Br. at 13-14.) This is false. Dr. Thompson clearly testified that he considered the FDA Warning Letter cited in Dr. Najafi's report, but considered it "irrelevant" to his opinions because nothing in the warning letter was "directly attribute[d] to [ZHP] not observing this impurity"—i.e., disregarding the state of scientific knowledge. (Thompson Dep. 68:13-69:11.) While Plaintiff and her experts may disagree with that statement, that is a basis for cross-examination—not grounds for excluding Dr. Thompson's critiques of Dr. Najafi's and Dr. Hecht's opinions. *See Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011) (the argument that an expert "did not consult certain sources that [an adversary] deem[s] relevant goes only to the weight of h[is] testimony, not its admissibility"); *In re NuvaRing Prods. Liab. Litig.*, No. 4:08-MD-01964-RWS, 2013 WL 791828, at *4 (E.D. Mo. Mar. 4, 2013) (noting that an expert's "reasons for exclusion of data" or consideration of only certain documents "is a topic best left for cross-examination").

In sum, Plaintiff's critiques of Dr. Thompson's challenges to Plaintiff's experts misunderstand Dr. Thompson's role as a rebuttal expert and distort his testimony—and should therefore be rejected.

**B.** **Dr. Thompson Properly Rebuts Unreliable Opinions Offered By Drs. Hecht And Najafi Regarding The July 27, 2017 Email.**

Drs. Hecht and Najafi rely heavily on a single sentence in a July 27, 2017 email from ZHP employee Jinsheng Lin as support for their opinions that ZHP was aware that "nitrosation could occur during the synthesis of Valsartan" as of 2017. (Najafi Rep. at 31; *see also* 2021 Hecht Rep. at 19.) Dr. Thompson responds that Plaintiff's experts' subjective interpretations of the email "make[] no sense" because "the substance of the email is about irbesartan," a different drug, and the patent attached to it describes deacylated valsartan and a different impurity known as "Impurity K." (Thompson Rep. at 6.) Plaintiff's challenges to this rebuttal testimony should also be rejected.

***First***, Plaintiff argues that Dr. Thompson "admitted" that his interpretation of the July 2017 email is "ipse dixit" by stating that "'I don't have much of a basis for'" it. (Pl.'s Br. at 17 (citing Thompson Dep. 106:13-14).) Plaintiff is once again twisting Dr. Thompson's words, which were simply aimed at explaining why he believed the translation of the email was not a "perfect interpretation of what was written in the e-mail." (Thompson Dep. 106:5-17.) But Dr. Thompson's critiques of Drs. Hecht and Najafi are not based on whether the translation they relied upon was accurate. As Dr. Thompson explained, "the body [of the email] and the patent that [the author] references, is really about" ***Irbesartan***, a different drug molecule than Valsartan API, as well as Impurity K, a nitrosated impurity of a third drug molecule known as

deacylated Valsartan. (*Id.* 105:23-106:4.) Dr. Thompson goes on to explain that the entire email is about Irbesartan and Impurity K, then "out of the blue comes this sentence," relied upon by Plaintiff's experts, stating "similar to the NDMA found in valsartan," which Dr. Thompson testified is a "non sequitur" given the broader context of the email. (*Id.* 106:3-8.) As a result, Dr. Thompson opines that "[g]iven that the substance of the email is about irbesartan, and the attachment describes deacylated valsartan and Impurity K, Dr. Hecht's and Dr. Najafi's interpretation" of the email "makes no sense." (Thompson Rep. at 6.) Again, this is proper rebuttal testimony.

*Second*, there is no truth to Plaintiff's assertion that Dr. Thompson failed to "acknowledg[e]" ZHP 30(b)(6) witness Min Li's testimony on the email in forming his opinion. (Pl.'s Br. at 18.) Dr. Thompson clearly testified that he reviewed Min Li's deposition in forming his expert opinions (*see* Thompson Dep. 36:9-10, 37:10-14 (Dr. Thompson "read the deposition of Min Li"); *id.* 107:9-12), and he credited Min Li's testimony that "the company didn't know" about NDMA formation in valsartan (*id.* 107:21-108:18 ("Every time [Min Li] was asked [what the] company knew, and his response was the company did not know.")). And while Plaintiff's experts may disagree with Dr. Thompson's interpretation of Min Li's testimony, that is fodder for cross-examination, not a basis for exclusion. *See Wolfe*, 2011 WL 1673805, at *6 (the argument that an expert "did not consult certain sources that [an

adversary] deem[s] relevant goes only to the weight of h[is] testimony, not its admissibility").

Accordingly, Plaintiff has not identified any basis for excluding Dr. Thompson's critiques of her experts' subjective interpretation of the July 2017 email.

## III. DR. THOMPSON SHOULD BE PERMITTED TO RESPOND TO ANY TESTIMONY OFFERED BY DRS. HECHT AND NAJAFI ABOUT THE CHINESE CERTICATES OF ANALYSIS.

Finally, Plaintiff also seeks to preclude Dr. Thompson from addressing Chinese COAs, which enable a manufacturer to confirm that a specific batch of DMF solvent meets applicable specifications. (*See* Pl.'s Br. at 18-19.) Dr. Thompson does not intend to offer affirmative opinions regarding the COAs. However, if Drs. Hecht and Najafi (who did not address the COAs in their respective expert reports) seek to testify on the topic, then Dr. Thompson should be permitted to rebut those opinions. *See Winn-Dixie Stores*, 2021 WL 2352016, at *14 (expert testimony permissible "to contradict or rebut evidence on the same subject matter identified by another party"). This is particularly true because Plaintiff's counsel thoroughly examined Dr. Thompson on his COA opinions at his deposition in this case. *See, e.g., Frobe v. UPMC St. Margaret*, No. 2:20-cv-00957-CCW, 2023 WL 3740782, at *4 n.2 (W.D. Pa. May 31, 2023) (allowing expert testimony not contained in expert report where

such testimony "was the subject of lengthy portions of his deposition . . . [t]hus, there [was] no real risk of unfair surprise").

To the extent Plaintiff argues that Dr. Thompson's interpretation of the COAs for DMF solvent is based solely on speculation, she is wrong. Dr. Thompson opines, based on his knowledge and experience as a chemist and his review of a translation of the Chinese national standard for COAs related to DMF, that the reference to "[a]lkalinity calculated as dimethylamine" in the COAs does not indicate that dimethylamine was present in the DMF solvent. (Thompson Dep. 155:21-23, 157:17-158:3.) Instead, it means that the DMF manufacturer used the "molecular weight of dimethylamine" in the scientific formula used to determine the total amount of **all base** substances in the solvent. (*Id*.) Indeed, that is precisely what is stated in the portion of the Chinese national standard that describes the method for calculating alkalinity. (*Id.* 155:1-17; *see also* Thompson Dep. Ex. 9 (certified translation of *Dimethlformamide for industrial use*) at 6 (Rose Decl. Ex. 3).) Further, Dr. Thompson noted that the COAs show that the total of all base substances (or alkalinity) in the DMF solvent reported in the COAs was far below the set specification for alkalinity, and was so "low" that ZHP chemists using DMF solvent would not have had a concern about potential impurities resulting from base substances; to the contrary, they would have been reassured that the solvent met purity standards. (Thompson Dep. 158:8-17, 178:10-25; *see also id.* 162:20-163:4

23

(ZHP "would have been on notice not to worry about" the possibility of dimethylamine introduction).)

While Dr. Thompson used the word "speculating" in his testimony, he used it in the context of explaining that he would have to guess about the identity of the exact base "substances" beyond dimethylamine that may have made up the alkalinity of the DMF solvent because he "didn't put the formula together." (*Id.* 166:3-167:3.) He did not, as Plaintiff suggests, assert that he was "speculating" about his interpretation of the meaning of the COAs or with respect to his opinion that the COAs would "not put anybody on notice that dimethylamine could be introduced" to a process involving DMF solvent. (*Id.* 178:16-25.)

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's motion to exclude Dr. Thompson's expert opinions.

Dated: June 26, 2025

Respectfully submitted,

/s/ Jessica Davidson

Jessica Davidson (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com

Allison M. Brown, P.C.
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel: (215) 268-5000
alli.brown@kirkland.com

Nina R. Rose (*pro hac vice*)
Jordan M. Schwartz (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue
Washington, D.C. 20004
Tel: (202) 389-3394
nina.rose@kirkland.com
jordan.schwartz@kirkland.com

*Attorneys for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Solco Healthcare U.S., LLC, and Prinston Pharmaceutical Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 26, 2025, a true and correct copy of the foregoing document was served upon counsel of record via operation of the Court's electronic filing system.

Dated: June 26, 2025

Respectfully submitted,

*/s/ Jessica Davidson*

Jessica Davidson (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com

*Attorney for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Solco Healthcare U.S., LLC, and Prinston Pharmaceutical Inc.*