# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>*Gaston Roberts et al. v. Zhejiang Huahai Pharmaceutical Co., et al.,*<br><br>Case No. 1:20-cv-00946-RBK-JS | MDL No. 2875<br><br>Honorable Renée Marie Bumb<br>District Court Judge |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE DEFENSE EXPERT VICTORIA CHERNYAK, M.D., M.S.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................5

      A.     April 2016 CT. ...............................................................................6

      B.     August 2018 MRI. ..........................................................................7

      C.     Additional Responses To Plaintiff's Experts. .....................................7

ARGUMENT .........................................................................................................8

I.     DR. CHERNYAK'S OPINION THAT THE LIVER LESIONS
      IDENTIFIED ON THE APRIL 2016 CT MAY HAVE ALREADY
      BEEN HCC, OR MAY HAVE LATER DEVELOPED INTO HCC,
      IS RELIABLE AND RELEVANT. ..............................................................9

      A.     Dr. Chernyak Reliably Applied LI-RADS To The April 2016
            CT. ...........................................................................................10

      B.     Dr. Chernyak's LI-RADS Opinions Are Highly Relevant And
            Will Assist The Jury. ......................................................................17

II.    DR. CHERNYAK'S DOUBLING TIME OPINION IS GROUNDED
      IN HER EXTENSIVE RELEVANT EXPERTISE AND A
      RELIABLE METHODOLOGY AND IS RELEVANT. .............................20

III.   DR. CHERNYAK'S CRITIQUE OF DR. SIDDIQUI'S CLAIM
      THAT NDMA IN VALSARTAN WAS THE "ONLY" CAUSE OF
      MR. ROBERTS' HCC IS ADMISSIBLE. ..................................................24

CONCLUSION ...................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aycock v. R.J. Reynolds Tobacco Co.*,
   769 F.3d 1063 (11th Cir. 2014) ........................................................................18

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D.N.J. 2004) ....................................................................2

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) ..............................................................................16

*Ferlito v. Harbor Freight Tools USA, Inc.*,
   No. 20-5615 (GRB) (SIL), 2025 WL 1181699
   (E.D.N.Y. Apr. 23, 2025) ..................................................................................22

*Holbrook v. Lykes Brothers S.S. Co.*,
   80 F.3d 777 (3d Cir. 1996) ......................................................................*passim*

*Magistrini v. One Hour Martinizing Dry Cleaning*,
   180 F. Supp. 2d 584 (D.N.J. 2002) ............................................................. 16-17

*National Bank of Commerce v. Associated Milk Producers, Inc.*,
   22 F. Supp. 2d 942 (E.D. Ark. 1998) ..........................................................20, 23

*In re Paoli R.R. Yard PCB Litigation*,
   35 F.3d 717 (3d Cir. 1994) ................................................................................16

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008) ................................................................................8

*Qeisi v. Patel*,
   No. 02-8211, 2007 WL 527445 (E.D. Pa. Feb. 9, 2007) ...................................21

*Shadrick v. Southern Health Partners, Inc.*,
   No. 4:11-CV-00033-JHM, 2016 WL 4555611
   (W.D. Ky. Aug. 31, 2016) ................................................................................18

*United States v. Salko*,
   No. 1:07-CR-0286, 2008 WL 4682804 (M.D. Pa. Oct. 22, 2008) ....................22

*United States v. Velasquez*,
  64 F.3d 844 (3d Cir. 1995) ....................................................................9

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*,
  No. CV 15-6480, 2021 WL 2352016 (E.D. Pa. June 9, 2021)............................9

*Wolfe v. Rayford*,
  No. 2:08-CV-168, 2010 WL 3894101 (N.D. Miss. Sept. 30, 2010) ..................21

## INTRODUCTION

Dr. Victoria Chernyak is a Professor of Radiology at Columbia University Irving Medical Center, as well as an attending radiologist at New York-Presbyterian Hospital. She is also the current Co-Chair of the American College of Radiology's steering committee for the Liver Imaging Reporting and Data System ("LI-RADS"), the standard methodology for diagnosing hepatocellular carcinoma ("HCC") based on radiological imaging. Dr. Chernyak seeks to rebut the specific causation opinions of Plaintiff's experts, Dr. Fareeha Siddiqui and Dr. Christopher Mele, based on her expert review of Mr. Roberts' radiological imaging and her more than 20 years of experience in diagnosing HCC based on such imaging.

While Plaintiff asks the Court to exclude Dr. Chernyak's opinions in full, she does not actually challenge the bulk of Dr. Chernyak's report, including Dr. Chernyak's opinions that:

- Cirrhosis is "a recognized major risk factor for development of HCC" (Rep. of Victoria Chernyak ("Chernyak Rep.") at 7-8 (Pl.'s Br. Ex. A)), and there is no scientific basis to exclude cirrhosis as a cause of HCC in a patient like Mr. Roberts with cirrhosis (*id.* at 8);

- Mr. Roberts' CT scan in April 2016—taken before Mr. Roberts was ever exposed to valsartan potentially contaminated with NDMA— demonstrated morphologic features consistent with a diagnosis of cirrhosis (*id.* at 3-5) and indicates that the cirrhosis "had been present for some time and was not in the early stages" (*id.* at 8);

- The same morphologic features of cirrhosis that Dr. Chernyak observed on the April 2016 CT scan were also present on Mr. Roberts' August 2018 MRI, which was the basis for his diagnosis of HCC (*id.* at 6);

1

- Mr. Roberts' April 2016 CT scan, performed prior to Mr. Roberts' use of valsartan potentially contaminated with NDMA, showed three possibly malignant lesions on Mr. Roberts' liver (*id.* at 5);

- One of the lesions visible on the April 2016 CT scan was in the same location as one of the tumors diagnosed as HCC in 2018 (*id.* at 6); and

- There is no valid scientific basis to rule out the possibility that the lesion visible on the April 2016 CT scan progressed into the HCC tumor on the 2018 MRI scan (*id.* at 6, 9).

Plaintiff's failure to challenge these particular opinions effectively concedes their admissibility. While Plaintiff challenges three other specific opinions offered by Dr. Chernyak, her arguments are meritless.

**First**, Plaintiff challenges Dr. Chernyak's application of LI-RADS to support her opinion that the liver lesions visible on Mr. Roberts' April 2016 CT[1] scan— which was taken before Mr. Roberts ingested valsartan potentially contaminated with NDMA—qualify as "LR-3" lesions and therefore had a roughly 33% chance of being HCC at that time. Plaintiff also challenges Dr. Chernyak's related opinion that

---

[1] Plaintiff's assertion that Dr. Chernyak "relied on non-existent imaging" in reaching her opinions (Pl.'s Br. at 1), is false. As Dr. Chernyak explained at her deposition, she made a typographical error on the final page of her report, referring to Mr. Roberts' April 2016 imaging as an MRI rather than a CT scan. (Dep. of Victoria Chernyak ("Chernyak Dep.") 25:18-19, May 5, 2025 (Pl.'s Br. Ex. B) ("Instead of MRI, it's supposed to be CT.").) It is abundantly clear from the report— which *identifies the April 2016 imaging as a CT scan approximately two dozen times*—that Dr. Chernyak's inadvertent reference to an April 2016 MRI was a scrivener's error. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 540 (D.N.J. 2004) (noting that "[t]here is no stigma attached to" an expert's typographical "error correction").

these LR-3 lesions had a 60% chance of progressing to HCC within 48 months. Although Plaintiff contends that Dr. Chernyak applied LI-RADS incorrectly, Dr. Chernyak—**who co-led the group that wrote the current LI-RADS Manual and is a leading authority on this methodology**—made clear that she followed the same, well-accepted LI-RADS procedures that she applies in her clinical practice to identify HCC. Plaintiff also claims that these opinions will not "assist the jury" because Dr. Chernyak does not say with "medical certainty that Mr. Roberts had liver cancer in 2016." (Pl.'s Br. at 17.) But it is entirely appropriate for Dr. Chernyak—a rebuttal expert—to criticize Plaintiff's experts for failing to rule out the possibility that the lesions on the 2016 CT were, or became, HCC. *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996) (raising possibility of alternative cause will "help the jury to evaluate testimony by plaintiff's experts . . . [on] an issue on which plaintiff b[ea]r[s] the burden of proof").

**Second**, Plaintiff seeks to preclude Dr. Chernyak from applying the Tumor Volume Doubling Time ("TVDT") for HCC to rebut Dr. Siddiqui's assertion that the progression of Mr. Roberts' HCC was abnormally fast and therefore must have been caused by NDMA in valsartan. Plaintiff argues that Dr. Chernyak is not qualified to offer such an analysis, but her extensive clinical and academic experience diagnosing cancer more than satisfies the Third Circuit's liberal qualifications standard. And although Plaintiff claims that Dr. Chernyak's analysis

is irrelevant because there is a several-month discrepancy between the amount of time Dr. Chernyak estimated it would take for a tumor to grow from 0.5 cm (the size of the lesion observed in 2016) to 5.8 cm (the size of the lesion observed in 2018), TVDT analyses necessarily entail some margin of error, which courts have recognized do not implicate their admissibility.

**Third**, Plaintiff contends that Dr. Chernyak lacks a sufficient basis to opine that cirrhosis was the most likely cause of Mr. Roberts' HCC given the presence of cirrhosis on both his 2016 and 2018 imaging. But as Dr. Chernyak explains, "the scientific literature and international guidelines recognize cirrhosis as *the* major risk factor for HCC." (Chernyak Rep. at 8 (emphasis added).) This evidence not only constitutes good grounds for Dr. Chernyak's testimony; it highlights the extreme nature of Dr. Siddiqui's outlier contention that Mr. Roberts' use of valsartan was the "only" substantial factor in causing his HCC. (*Id.*)

In short, Plaintiff's challenges to Dr. Chernyak's rebuttal opinions appear intended to create a "battle of the experts" by suggesting that Defendants' experts' opinions contain similar problems to the flagrant methodological flaws in Plaintiff's expert reports. There is no such equivalence. Unlike Plaintiff's experts, who offer highly speculative, non-scientific opinions, Dr. Chernyak applies the same methodologies that radiologists use every day in top hospitals across the country.

For these reasons, discussed further below, her opinions are admissible and Plaintiff's motion should be denied.

## **BACKGROUND**

Dr. Chernyak is a board-certified practicing radiologist at New York-Presbyterian Hospital, one of the largest hospitals in the country. (Chernyak Rep. at 1) Dr. Chernyak is also a Professor of Radiology at Columbia University, has authored more than 150 peer-reviewed publications and serves as the deputy editor of Radiology (the leading radiology journal). (*Id.* at 2; Ex. A.) Dr. Chernyak is a nationally and internationally recognized expert on LI-RADS, a diagnostic system developed by the American College of Radiology and endorsed by the American Association for Study of Liver Diseases and the United Network for Organ Sharing. (*Id.* at 1-2.) For the past 10 years, Dr. Chernyak has been a member of the LI-RADS Steering Committee, and, since 2020, she has served as Chair or Co-Chair of that committee, leading the development, adaptation, and application of LI-RADS to the entire spectrum of liver cancer imaging. (*Id.* Ex. A.) Dr. Chernyak also co-edited the 2018 LI-RADS Manual and co-led the development of the current LI-RADS Lexicon. (*Id.*)

Dr. Chernyak offers a number of opinions based on her review of Mr. Roberts' radiological scans, including his April 19, 2016 CT scan (the "April 2016 CT"), and

the August 7, 2018 MRI (the "August 2018 MRI"), as well as additional opinions responding to specific opinions offered by Drs. Siddiqui and Mele.

### A.    April 2016 CT

According to Dr. Chernyak, the 2016 CT "strongly indicates presence of cirrhosis and portal hypertension" based on the presence of a recanalized umbilical vein, enlargement of the left hepatic lobe, and nodular liver contour on the scan. (Chernyak Rep. at 4.) Dr. Chernyak also opines that "the fact that the cirrhosis was visibly present on a CT scan in April 2016 indicates that the cirrhosis was not new at that time." (*Id.* at 4-5.) Dr. Chernyak further observes that the April 2016 CT shows three possibly malignant lesions on the right lobe of Mr. Roberts' liver, each measuring up to 0.6 cm. (*Id.* at 5; *see id.* Ex. B (lesions in Segment VII, 0.6 cm; Segment V/VIII, 0.5 cm; and Segment VI, 0.5 cm).)

In evaluating these April 2016 lesions, Dr. Chernyak applies LI-RADS, a system that allows noninvasive diagnosis (i.e., based on imaging only, without a biopsy) of HCC in certain populations, including patients with cirrhosis. (*Id.* at 2.) LI-RADS is performed with multiphase imaging (i.e., multiple scans to assess how the contrast behaves over time). The LI-RADS diagnostic categories range from LR-1 (definitely benign) to LR-5 (definitely HCC), and also include LR-TIV (definitely tumor in vein) and LR-M (probably or definitely malignant, not specific to HCC). (*Id.* at 3.) Dr. Chernyak opines that the lesions reflected on the 2016 CT "met the

criteria for LR-3," which means that there is an "intermediate probability of malignancy." (*Id.* at 5.) Dr. Chernyak also opines that "about 33% [of LR-3 observations] are malignant" and "up to 60% of LR-3 observations progress to HCC within 48 months." (*Id.*)

### B.    August 2018 MRI

Dr. Chernyak also reviewed the August 2018 MRI, which, like the April 2016 CT, "showed morphologic changes consistent with a diagnosis of cirrhosis." (*Id.* at 6.) Dr. Chernyak observed three lesions on the 2018 MRI that met the criteria for LR-5, which means that the lesion had a greater than 95% probability of being HCC. (*Id.* (lesions in Segment V/VIII, 5.8cm; Segment V, 3.8cm; Segment VI, 1.5cm).) Dr. Chernyak observed that one of the LR-5 lesions on the 2018 MRI (the 5.8cm lesion in Segment V/VIII) was in the same location as one of the LR-3 lesions she observed on the 2016 CT. (*Id.*; *see id.* at 8-9 (responding to Dr. Mele's opinions on the same basis).) Based on her review of the April 2016 CT, the August 2018 MRI, and her extensive experience in diagnosing HCC, Dr. Chernyak concludes that "it is possible that the LR-3 lesion progressed into the LR-5 lesion, and there is no scientifically valid means to conclusively rule out that possibility." (*Id.* at 6.)

### C.    Additional Responses To Plaintiff's Experts

Dr. Chernyak also responds to Dr. Siddiqui's opinion that "Mr. Roberts' exposure to NDMA contaminated valsartan promoted his cancer to be more

aggressive and progress faster." (*Id.* at 8 (citing Siddiqui Rep. at 29).) Dr. Chernyak calculates that it would take approximately 2 years and 8 months for a tumor of size 0.5 cm (the size of the Segment VIII LR-3 lesion in the 2016 CT) to grow to 5.8 cm (the size of the Segment VIII LR-5 lesion in the 2018 CT), using a three-month TVDT for HCC. (*Id.*; Chernyak Dep. 186:14-17.) Thus, Dr. Chernyak explains that "if the LR-3 lesion observed in April 2016 progressed into the LR-5 lesion observed in August 2018, the timing of that progress would be consistent with the normal observed progression of HCC." (*Id.* at 8.)

Dr. Chernyak also opines that Mr. Roberts had cirrhosis more than "two years prior to his HCC diagnosis" (Chernyak Rep. at 9); cirrhosis is a "recognized major risk factor for development of HCC as soon as it can be observed on imaging" (*id.*); and there is no scientific basis to exclude cirrhosis as a cause of HCC in a patient with cirrhosis (*id.* at 7). As a result, Dr. Chernyak refutes Dr. Siddiqui's opinion that Mr. Roberts' valsartan use was the "only substantial factor" in causing his HCC. (*Id.* at 8.)

## ARGUMENT

The Third Circuit "ha[s] interpreted Rule 702's qualification requirement liberally." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). In addition, the reliability test is "different" for rebuttal experts because "the defense d[oes] not bear" the burden of disproving causation. *Holbrook*, 80 F.3d at 786. Instead, "a

rebuttal expert . . . need only show 'good grounds' for the proposed testimony." *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. CV 15-6480, 2021 WL 2352016, at *14 (E.D. Pa. June 9, 2021) (citing *United States v. Velasquez*, 64 F.3d 844, 851 (3d Cir. 1995) (reversing conviction where defense expert "had 'good grounds' for his rejection of handwriting analysis")). Plaintiff's motion to exclude Dr. Chernyak's rebuttal opinions fails under these standards.

I.     **DR. CHERNYAK'S OPINION THAT THE LIVER LESIONS IDENTIFIED ON THE APRIL 2016 CT MAY HAVE ALREADY BEEN HCC, OR MAY HAVE LATER PROGRESSED INTO HCC, IS RELIABLE AND RELEVANT.**

Plaintiff's and Defendants' expert radiologists agree that the April 2016 CT shows at least three lesions present on Mr. Roberts' liver at that time. (Expert Report of Christopher Mele ("Mele Rep.") at 2 (Ex. 1 to Decl. of Nina Rose ("Rose Decl.")); Deposition of Christopher Mele ("Mele Dep.") 202:6-15, May 8, 2025 (Rose Decl. Ex. 2); Chernyak Rep. at 5.) Plaintiff's radiologist, Dr. Mele, asserts that these lesions were most likely benign. (Mele Rep. at 3.) Dr. Chernyak disagrees, applying the well-established LI-RADS criteria and opining that all three lesions met the criteria for LR-3. (Chernyak Rep. at 5.) Plaintiff argues that these opinions are inadmissible because: (1) LI-RADS cannot be reliably applied to the April 2016 CT, and (2) Dr. Chernyak's testimony about the likelihood of an LR-3 lesion being or progressing into HCC will not aid the finder of fact. Plaintiff is wrong on both counts.

## A.    Dr. Chernyak Reliably Applied LI-RADS To The April 2016 CT.

Dr. Chernyak determined that Mr. Roberts was an appropriate patient for the application of LI-RADS based on his demonstrated features of cirrhosis and the presence of liver lesions, and she then assessed the features of the lesions on the 2016 CT against the LI-RADS criteria. (Chernyak Rep. at 3-5; Chernyak Dep. 226:14-21.) This is a paradigmatic example of admissible rebuttal testimony. *See Holbrook*, 80 F.3d at 784 ("If the expert has 'good grounds' for the testimony, the scientific evidence is deemed sufficiently reliable."). Plaintiff's arguments to the contrary fail.

*First*, Plaintiff argues that LI-RADS cannot be used to reliably determine the probability that Mr. Roberts had HCC as of April 2016 because it does not consider patient-specific factors. (Pl.'s Br. at 19-20.) However, LI-RADS is an internationally accepted method for diagnosing HCC embraced by all relevant U.S. medical societies. (*See* Chernyak Rep. at 2.) That is presumably why Plaintiff's own experts admit they use LI-RADS "all the time." (Siddiqui Dep. 76:8-9 (Pl.'s Br. Ex. D) ("I use LI-RADS all the time."); *see* Mele Dep. 88:16-90:20 (Dr. Mele explaining that he had used LI-RADS in his practice for the past 10 years).) Dr. Chernyak also clearly testified that LI-RADS offers a "well-established probability that works" to determine the probability that a liver lesion is HCC. (Chernyak Dep. 123:11-22.) While Plaintiff highlights Dr. Chernyak's acknowledgement that it is a *future* goal

of the LI-RADS steering committee to find a way to include patient information in the analysis (*see id.* 125:7-10), such an aspiration does not undermine the soundness of this internationally accepted methodology under current science.

**Second**, Plaintiff argues that a radiologist such as Dr. Chernyak cannot reliably apply LI-RADS to assess the probability that lesions are, or will become, HCC unless the patient has received a formal, clinical diagnosis of cirrhosis from a different physician. (Pl.'s Br. at 9-10.) This argument is frivolous because there is no real dispute that Mr. Roberts had cirrhosis in April 2016. According to Plaintiff's own expert, Dr. Mele, the 2016 CT "demonstrated morphologic changes of the liver and imaging findings consistent with cirrhosis." (Mele Rep. at 3.) And, at her deposition, Dr. Siddiqui agreed that it was her opinion that "Mr. Roberts had mild cirrhosis in 2016" based on the CT scan. (Siddiqui Dep. 101:17-21.) As a result, Plaintiff's argument is foreclosed by her own experts' testimony.

In attempting to argue otherwise, Plaintiff presents a cropped portion of a single sentence in Dr. Chernyak's report, carefully cut to read that a "diagnosis of cirrhosis . . . is sufficient to allow application of LI-RADS." (Pl.'s Br. at 9.) But the full sentence in the report states that a "[d]iagnosis of cirrhosis (either based on **morphologic changes to the liver detected on imaging**, or based on quantitative imaging assessment or biopsy) is sufficient to allow application of LI-RADS."

11

(Chernyak Rep. at 2-3 (emphasis added).)[2] Plaintiff also falsely suggests that Dr. Chernyak conceded that "as a radiologist she does not diagnose cirrhosis." (Pl.'s Br. at 10.) To the contrary, Dr. Chernyak clearly testified that she routinely provides opinions about whether the morphologic features of imaging are "consistent" with cirrhosis, which means "that [a] radiologist is about 90 percent . . . ***confident in diagnosis***." (Chernyak Dep. 30:12-15, 44:2-45:15 (emphasis added).) Although patients may undergo a further biopsy, "sometimes this [the imaging features] is enough to make the diagnosis" of cirrhosis. (*Id.* 30:18-21.)[3] Here, both parties' expert radiologists agreed that the imaging was "consistent" with cirrhosis.

---

[2]    In addition, the LI-RADS Manual itself states that LI-RADS can be applied even if the presence of cirrhosis cannot be confirmed based on imaging (which it could in this case). *See, e.g.*, LI-RADS Manual Ch. 4, at 6 (2018) ("LI-RADS 2018 Manual") (Rose Decl. Ex. 3) ("If the presence of cirrhosis cannot be confirmed but the imaging findings are compelling, LIRADS can be applied conditionally."); *Id.* at 29 (FAQs) ("I am not sure if my patient has cirrhosis. Can I apply CT/MRI LI-RADS? You can apply LI-RADS and provide a conditional category.").

[3]    Dr. Chernyak's testimony is in accord with medical guidelines for diagnosing HCC. *See* Richard K. Sterling et al., *AASLD Practice Guideline on noninvasive liver disease assessment of portal hypertension*, 81 Hepatology 1060, 1063 (2025) (Rose Decl. Ex. 4) (discussing use of "[f]eatures of general imaging studies to diagnose cirrhosis and portal hypertension"); Perry J. Pickhardt et al., *Multiparametric CT for Noninvasive Staging of Hepatitis C Virus-Related Liver Fibrosis: Correlation With the Histopathologic Fibrosis Score*, 212 AJR 547, 552 (2019) (Rose Decl. Ex. 5) (noting "excellent diagnostic performance" of "key CT-based and laboratory-based biomarkers" in diagnosing cirrhosis).

(Chernyak Rep. at 4; Mele Dep. 293:2-4), defeating Plaintiff's diagnosis-based challenge.[4]

**_Third_**, Plaintiff argues that Dr. Chernyak failed to consider whether Mr. Roberts had any genetic/congenital causes of cirrhosis. (Pl.'s Br. at 11.) That is not true. Although LI-RADS does not apply to patients with cirrhosis due to congenital hepatic fibrosis or a vascular disorder, LI-RADS 2018 Manual at 6, Dr. Chernyak specifically looked for (but did not find) any evidence that Mr. Roberts had such a condition (_see_ Chernyak Dep. 226:14-21 ("There was no sign[] of Budd-Chiari syndrome. There was no sign[] of vascular-related cirrhosis.")). Moreover, Dr. Chernyak explained that the features of such conditions would have appeared on Mr. Roberts' imaging if they were present. (_Id._ 223:2-12 ("[P]atients who have congenital hepatic fibrosis . . . would not be asymptomatic into the age that Mr. Roberts was.").) While Plaintiff points to a statement in Mr. Roberts' medical records that "ever since [Mr. Roberts] was a teenager . . . his liver numbers were high" (Pl.'s Br. at 11), Plaintiff fails to connect this to any genetic/congenital

---

[4]    Plaintiff claims that Defendants' expert, Dr. Nadim Mahmud, testified that "diagnosing cirrhosis takes both radiological changes and physical symptoms or markers." (Pl.'s Br. at 10.) That is false. As Dr. Mahmud explained at his deposition, "these days [hepatologists] don't need to rely on biopsies because we have very well-validated ways of identifying cirrhosis just based on labs, imaging, prediction models, et cetera." (Mahmud Dep. 110:14-21 (Pl.'s Br. Ex C).)

condition that would preclude application of LI-RADS. In any event, if Plaintiff has any evidence that Mr. Roberts had a genetic or congenital cause of cirrhosis, her counsel is free to explore that evidence in cross-examining Dr. Chernyak.

***Fourth***, Plaintiff argues that LI-RADS can only be applied if the imaging includes an arterial phase, a portal venous phase, and a delayed phase—and that the 2016 CT was missing the delayed phase. (Pl.'s Br. at 12-14.) However, the import of Dr. Chernyak's testimony is clear: the application of LI-RADS requires an arterial phase and another post-contrast phase, which can be ***either*** a portal venous phase or a delayed phase. While arterial phase imaging ensures that there is arterial phase hyperenhancement (Chernyak Dep. 53:19-23), LI-RADS requires another post-contrast phase to assess whether there is washout (i.e., a lesion that is iso- or hyper-enhancing on an earlier phase and then becomes hypo-enhancing on a subsequent phase (*id.* 72:20-73:2). However, as Dr. Chernyak explained, washout can be assessed using ***either*** a portal venous phase ***or*** a delayed phase—i.e., "if you see washout in portal venous phase, that's enough." (*Id.* 54:12-14; *see also id.* 176:1-10 ("You can apply washout to either portal venous or delayed phase."); *id.* 74:4-15 ("In this case, they're interchangeable.").) And because washout was visible on the portal venous phase, delayed phase imaging was unnecessary.[5] (*Id.* 54:12-14,

---

[5]    A delayed phase captures more HCCs than a portal venous phase because some small HCCs do not become visible until the delayed phase. (Chernyak Dep. 54:12-14.) As Dr. Chernyak explained, a number of the institutions where she has

262:19-24; *id.* 262:8-12 ("Q. Were you able to apply LI-RADS to evaluate the lesions on Mr. Roberts' 2016 CT without having delayed phase images? A. Yes.").)

Plaintiff is wrong that this approach is contrary to the 2018 LI-RADS Manual and a December 2018 article authored by Dr. Chernyak. (Pl.'s Br. at 12 (referring to Chernyak et al., *Liver Imaging Reporting and Data System (LI-RADS) Version 2018*, Radiology 289:3 (Dec. 2018) ("Chernyak 2018") (Rose Decl. Ex. 6).) Those sources recommend a portal venous phase and a delayed phase, but do not require ***both***. *See* Chernyak 2018 at 821 ("[LI-RADS features] . . . can be assessed in either the portal venous phase or the delayed phase."); LI-RADS 2018 Manual at 20 (same). In fact, the LI-RADS 2018 Manual expressly states that "[a] specific LI-RADS category often can be assigned ***even if recommended images are omitted***." LI-RADS 2018 Manual at 48 (emphasis added). Accordingly, Plaintiff's citations confirm that Dr. Chernyak's approach to LI-RADS is well-grounded.

***Fifth***, Plaintiff also claims that Dr. Chernyak intentionally failed to discuss a LI-RADS category called LR-NC (noncategorizable) in her report. (Pl.'s Br. at 14.) That is false. As Dr. Chernyak explained, there are seven LI-RADS categories that are diagnostic, "each representing a diagnostic certainty of HCC vs benignity."

---

practiced clinically do not take delayed phase imaging to avoid subjecting patients to unnecessary radiation. (*See id.* 174:24-175:12 ("delayed phase was routinely omitted").)

(Chernyak Rep. at 3.) LR-NC is not one of those diagnostic categories, because "it has no probabilities" of HCC or benignity. (Chernyak Dep. 169:13-18 ("[I]t is a category, but it's not considered diagnostic.").) Rather, LR-NC applies "when image omission or degradation precludes categorization." (*Id.* 169:24-170:2.) Dr. Chernyak's testimony is consistent with the LI-RADS 2018 Manual, which confirms that LR-NC is only applicable if the major features of LI-RADS "cannot be assessed" because of image omission or degradation, and "as a direct result, possible categories range from [LR-1 to LR-5 (or LR-M)]." LI-RADS 2018 Manual, Ch. 8, at 7. That is not the case here because, as Dr. Chernyak explained, she was able to observe all the major feature of LI-RADS (including washout on the portal venous phase) on Mr. Roberts' 2016 CT. (Chernyak Rep. at 5.)

In sum, Plaintiff's effort to best the co-chair of the committee that oversees LI-RADS fails at every turn. Dr. Chernyak provides an opinion that is supported by science and extensive clinical practice, in stark contrast to Plaintiff's experts, who engage in rank speculation in an effort to blame valsartan for Mr. Roberts' HCC.[6]

---

[6]    Although Plaintiff claims that the objections discussed in text are the kind that warrant exclusion (Pl.'s Br. at 14-15), her cited cases involved ***plaintiffs'*** experts whose opinions had fundamental methodological defects. *See, e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745, 770 (3d Cir. 1994) (plaintiffs' specific causation expert "failed to examine the plaintiffs, review [plaintiffs'] medical records, or consider alternative causes of their illnesses"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 750 (3d Cir. 2000) (criticizing "[plaintiff's] failure to adduce much evidence validating his methods"); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.

## B.    Dr. Chernyak's LI-RADS Opinions Are Highly Relevant And Will Assist The Jury.

Plaintiff also contends that Dr. Chernyak's LI-RADS opinions do not "fit" the facts of the case because: (1) they are too "indeterminate"; and (2) Dr. Chernyak's statement that "up to 60% of LR-3 observations progress to HCC within 48 months [of] LR-3 observation" is irrelevant to the two-year window between Mr. Roberts' 2016 CT scan and his 2018 HCC diagnosis. (Pl.'s Br. at 15-20.) Neither argument has merit.

***First***, Plaintiff argues that Dr. Chernyak's opinion that Mr. Roberts' April 2016 liver lesions qualify as "LR-3" is irrelevant because an LR-3 categorization is supposedly an "indeterminate finding" that is only associated with a 33% chance of being HCC and, therefore, cannot establish with "medical certainty" that Mr. Roberts had HCC in April 2016. (Pl.'s Br. at 15-17.) This is of a piece with Plaintiff's repeated misapplication of the Rule 702 standard for defense witnesses. As explained above and in Defendants' other opposition briefs, while ***Plaintiff's*** experts are required to establish their causal theories to a "degree of certainty," "the test is different" for a defense rebuttal expert like Dr. Chernyak, who need only have "good grounds" for proffering a "distinct possible [alternative] cause of [the plaintiff's] cancer." *See Holbrook*, 80 F.3d at 784-86. Such testimony will "help the jury to

_____

Supp. 2d 584, 607 (D.N.J. 2002) (plaintiff's causation expert "has failed to explain how he valued each piece of evidence . . . ."), *aff'd*, 68 F. App'x 356 (3d Cir. 2003).

evaluate testimony by plaintiff's experts that . . . [the] exposure [at issue] caused the cancer, an issue on which plaintiff b[ea]r[s] the burden of proof." *Id.* at 786; *see also Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) ("While the plaintiff bears the burden of proving [causation], that burden does not logically compel the conclusion that the defendant is precluded from offering evidence of possible explanations other than his [conduct].") (citation omitted); *Shadrick v. S. Health Partners, Inc.*, No. 4:11-CV-00033-JHM, 2016 WL 4555611, at *10 (W.D. Ky. Aug. 31, 2016) ("[D]efendants are not required to 'disprove' causation. Instead, they must only produce 'credible evidence which tends to discredit or rebut the plaintiff's evidence[.]'") (citation omitted).

Dr. Chernyak's testimony easily satisfies these standards. In responding to Dr. Siddiqui's claim that Mr. Roberts did not have cancer prior to being exposed to NDMA in valsartan, Dr. Chernyak states that Dr. Siddiqui "fails to account for th[e] possibility" that one or more of the LR-3 lesions present on Mr. Roberts' April 2016 CT "presented a small HCC." (Chernyak Rep. at 6-7.) Similarly, in criticizing Dr. Mele's claim that none of the lesions reflected in the 2018 MRI was present on the initial CT scan, Dr. Chernyak explains that "one of the LR-3 lesions was located in the same region as an LR-5 (Definite HCC) in 2018" such that "it is not possible to rule out the possibility that the LR-3 le[s]ion progressed into the LR-5 lesion." (*Id.*

18

at 8-9.) This testimony is all the more relevant given Dr. Mele's own concession that he "can neither rule [that possibility] in nor out." (Mele Dep. 289:2-8.)

**Second**, Plaintiff similarly takes issue with Dr. Chernyak's opinion that "up to 60% of LR-3 observations progress to HCC within 48 months" of LR-3 observation. (Pl.'s Br. at 17-18.) Plaintiff argues that because one cannot say with certainly which LR-3 lesions will fall within the 60% that progress to HCC, this statistic is unhelpful. (*Id.*) Plaintiff's argument proves too much. If she were correct, no epidemiology could ever be introduced at trial since there is no way to know with certainty if a relative risk applies to the plaintiff at issue. Indeed, all probabilistic evidence would be excluded from trial. Plaintiff fails to appreciate the irony of her arguments that seek to bar Defendants from introducing evidence based on a "more probably than not" 60 percent statistic, while allowing her to pursue claims based on an extremely weak, inconsistent association that amounts (at most) to an increased absolute risk of ***0.0045%***.[7]

Plaintiff also argues that 48 months is an "irrelevant time point[]" because only 28 months passed between the 2016 CT and the 2018 MRI. (Pl.'s Br. at 18-19.) But, as Dr. Chernyak explained at her deposition, her report simply "cited the

---

[7]    *See* Willy Gomm et al., *N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer*, 118 Medicine 357 (2021) (Rose Decl. Ex. 7). The increased absolute risk is the difference between the incidence rates reported in Table 2. *See id.* at Table 2.

reference" in the literature to "long-term follow-up results"—the validity of which Plaintiff does not appear to dispute. (Chernyak Dep. 89:21-90:2.) The same literature also includes statistics for a 24-month period, during which 20 percent of LR-3 observations progress to HCC. (*Id.* 89:2-13.) These opinions are all scientific and relevant to evaluating Plaintiff's claims.

## II.     DR. CHERNYAK'S DOUBLING TIME OPINION IS GROUNDED IN HER EXTENSIVE RELEVANT EXPERTISE AND A RELIABLE METHODOLOGY AND IS RELEVANT.

Plaintiff's expert, Dr. Siddiqui, posits that Mr. Roberts' exposure to NDMA in valsartan "promoted his cancer to be more aggressive and progress faster." (Expert Report of Fareeha Siddiqui, M.D. ("Siddiqui Rep.") at 29, Mar. 10, 2025 (Rose Decl. Ex. 8).) In response, Dr. Chernyak opines that "it would take approximately 2 years and 8 months for a tumor to grow from" the size of the LR-3 lesion reflected on the 2016 CT to the size of the LR-5 lesion visible on the 2018 MRI, using a constant TVDT of 3 months for HCC. (Chernyak Rep. at 8.) Thus, if the LR-3 lesion progressed to the LR-5 lesion, such growth would be "consistent with normal observed progression of HCC." (*Id.*) This testimony directly undermines Dr. Siddiqui's causal theory and is thus admissible. *See Nat'l Bank of Com. v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 975 (E.D. Ark. 1998) (defense expert's TVDT analysis that plaintiff's cancer had been growing for 8.7 years meant that the "cancer must have started" before plaintiff's exposure and

"create[d] one more negative for the plaintiff" requiring exclusion of his expert's causation evidence), *aff'd*, 191 F.3d 858 (8th Cir. 1999); *Wolfe v. Rayford*, No. 2:08-CV-168, 2010 WL 3894101, at *2 (N.D. Miss. Sept. 30, 2010) (defense expert's "doubling time calculation theory is relevant and reliable"); *Qeisi v. Patel*, No. 02-8211, 2007 WL 527445, at *6 (E.D. Pa. Feb. 9, 2007) (similar with respect to plaintiff's expert). Plaintiff's cursory efforts to exclude this opinion should all be rejected.

*First*, Plaintiff claims that Dr. Chernyak is not qualified because she acknowledged that her "'experience with . . . longitudinal untreated HCC growth is limited.'" (Pl.'s Br. at 23 (citing Chernyak Dep. 195:21-24).) But Plaintiff is once again misrepresenting Dr. Chernyak's testimony. As Dr. Chernyak explained in testimony omitted from Plaintiff's brief, her experience with "untreated HCC growth is limited, *just like it is limited for anybody*, because again, we don't follow these patients." (Chernyak Dep. 195:21-196:3 (emphasis added).) Dr. Chernyak elaborated that "generally[,] once HCC is diagnosed, it's treated, we don't tend to follow them," meaning that "there's [a] dearth of data" on the "exact growth curve of HCCs[.]" (*Id.* 195:14-20.) Dr. Chernyak then clearly testified that "in my experience, HCCs don't grow constantly. They grow . . . then they kind of pause, then they grow faster . . . ." (*Id.* 196:12-17.) Dr. Chernyak's "extensive clinical . . . experience" easily qualifies her to opine on tumor volume doubling time. *See United*

21

*States v. Salko*, No. 1:07-CR-0286, 2008 WL 4682804, at *2 (M.D. Pa. Oct. 22, 2008) ("The fact that an oncologist or pathologist may be more qualified to discuss tumor growth rates does not force the conclusion that a surgeon is unqualified.").

***Second***, Plaintiff argues that Dr. Chernyak's opinion is "methodologically unsound" because she used ChatGPT. (Pl.'s Br. at 20-24.) However, Dr. Chernyak merely used ChatGPT as a calculator. (Chernyak Dep. 264:14-19.) As she explained at her deposition, Dr. Chernyak entered the inputs of initial size (0.5 cm), the TVDT (3 months), and the target size (5.8 cm), and used ChatGPT to obtain "step-by-step calculations" to determine the time period. (*Id.* 201:10-24.) Plaintiff has not identified any errors in those calculations. Moreover, Dr. Chernyak did ***not*** use ChatGPT to identify any of the sources cited in her report (*id.* 265:1-4) or to generate any of the cited materials (*id.* 265:5-8), much less to write any of her report. (*Id.* 265:9-11.) This stands in sharp contrast to Dr. William Sawyer, who used artificial intelligence to repeatedly cite to, and rely upon, numerous ***falsified*** sources throughout his report. (Dep. of Dr. William Sawyer 67:22-68:3, 72:13-17, 73:2-11, 73:17-20, May 2, 2025 (Rose Decl. Ex. 9).) In short, in contrast to Plaintiff's expert, "[t]here is no indication that [Dr. Chernyak] used ChatGPT to generate a report with false authority . . . ." *Ferlito v. Harbor Freight Tools USA, Inc.*, No. 20-5615 (GRB) (SIL), 2025 WL 1181699, at *4 (E.D.N.Y. Apr. 23, 2025).

***Third***, Plaintiff argues that Dr. Chernyak's TVDT opinions are irrelevant because, while she estimates that it would take approximately 2 years and 8 months for a tumor to grow from the size of the LR-3 lesion reflected in the 2016 CT to the LR-5 lesion observed on the 2018 MRI, there were only 2 years and 4 months between the two. (Pl.'s Br. at 20-21.) However, as Dr. Chernyak explained, the point of her opinion is to "show that [the] growth is within" a range that "would be expected . . . for a patient who has cirrhosis" and develops HCC. (Chernyak Dep. 197:13-22.) In other words, no scientist "can provide you with exact numbers" in tumor volume doubling time because there is necessarily some variation from patient to patient. (*Id.* 198:3-8.) That does not undermine the methodological basis of Dr. Chernyak's opinion; nor does it make her opinion any less helpful in evaluating ***Plaintiff's*** expert's claim that NDMA in valsartan somehow made Mr. Roberts' cancer develop faster. *See Nat'l Bank of Com.*, 22 F. Supp. 2d at 975 (defense expert's TVDT opinion with an approximately 20% margin of error and range of 3.95 years to 5.9 years "creates one more negative for the plaintiff," supporting exclusion of plaintiff's expert and justifying summary judgment).[8]

---

[8]     Plaintiff also takes issue with Dr. Chernyak's use of a 3-month TVDT because Defendants' expert, Dr. Mahmud, testified that 3.9 months is the "quickest tumor doubling time" reflected in the literature. (Pl.'s Br. at 21 & n.55.) This argument is disingenuous given Plaintiff's simultaneous acknowledgement in other briefing that "liver tumors can double every 2.2 months." (ECF No. 3067, at 15.) Regardless, as

**III.    DR. CHERNYAK'S CRITIQUE OF DR. SIDDIQUI'S CLAIM THAT NDMA IN VALSARTAN WAS THE "ONLY" CAUSE OF MR. ROBERTS' HCC IS ADMISSIBLE.**

Plaintiff's expert, Dr. Siddiqui, seeks to opine that "Mr. Roberts' exposure to NDMA [in] valsartan was the only substantial factor in causing his liver cancer." (Siddiqui Rep. at 31-32.) In rebutting that claim, Dr. Chernyak states that "I am not aware of any valid scientific basis to attribute development of HCC *only* to factors other than cirrhosis in a patient with cirrhosis." (Chernyak Rep. at 8.) Rather, "the scientific literature and international guidelines recognize cirrhosis as the major risk factor of HCC." (*Id.*) As a result, "it is not possible [for Dr. Siddiqui] to state that cirrhosis was not a cause or the substantial factor in causing Mr. Roberts' HCC." (*Id.*)

Plaintiff's only asserted basis for challenging this opinion is that Dr. Chernyak "assumes that Mr. Roberts had cirrhosis prior to his liver cancer diagnosis, even though no treating physician ever diagnosed" him with that condition. (Pl.'s Br. at 25; *see also id.* at 24.) However, as discussed above, ***Plaintiff's*** own experts agree that Mr. Roberts had cirrhosis as of April 2016, more than two years before he was ever exposed to valsartan potentially contaminated with NDMA. (*See* Siddiqui Rep. at 30 (acknowledging that Mr. Roberts had cirrhosis in 2016, but labeling it

---

previously discussed in text, the point of Dr. Chernyak's opinion is that Mr. Roberts' tumor "growth is within" a range. (Chernyak Dep. 197:13-22.)

"minor"); Mele Rep. at 3 (the 2016 CT "demonstrated . . . findings consistent with cirrhosis").) And as Dr. Chernyak explains, in light of the literature strongly associating cirrhosis with HCC, "[t]he presence of visible cirrhosis on imaging . . . is what allows radiologists to use the LI-RADS algorithm to conclusively diagnose HCC via imaging." (Chernyak Rep. at 9; *see also id.* at 7 (citing "guidelines across the world" addressing cirrhosis as recognized risk factor for HCC).) This opinion not only has "good grounds"; it will "help the jury to evaluate testimony by plaintiff's expert[] that" NDMA in valsartan caused Mr. Roberts' cancer, "an issue on which plaintiff b[ea]r[s] the burden of proof." *Holbrook*, 80 F.3d at 784-86.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion to exclude the testimony of Dr. Chernyak.

Dated: June 26, 2025

Respectfully submitted,

/s/ Jessica Davidson

Jessica Davidson, P.C. (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com

Allison M. Brown, P.C.
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel: (215) 268-5000
alli.brown@kirkland.com

Nina R. Rose, P.C. (*pro hac vice*)
Jordan M. Schwartz (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue
Washington, D.C. 20004
Tel: (202) 389-3394
nina.rose@kirkland.com
jordan.schwartz@kirkland.com

*Attorneys for Defendants Zhejiang
Huahai Pharmaceutical Co., Ltd., Solco
Healthcare U.S., LLC, and Prinston
Pharmaceutical Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 26, 2025, a true and correct copy of the

foregoing document was served upon counsel of record via operation of the Court's

electronic filing system.


Dated: June 26, 2025                    Respectfully submitted,

                                        */s/ Jessica Davidson*
                                        Jessica Davidson (*pro hac vice*)
                                        **KIRKLAND & ELLIS LLP**
                                        601 Lexington Avenue
                                        New York, NY 10022
                                        Tel: (212) 446-4723
                                        jessica.davidson@kirkland.com

                                        *Attorney for Defendants Zhejiang*
                                        *Huahai Pharmaceutical Co., Ltd., Solco*
                                        *Healthcare U.S., LLC, and Prinston*
                                        *Pharmaceutical Inc.*