# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | **MDL No. 2875** |
| **THIS DOCUMENT RELATES TO:** *Roberts v. Zhejiang Huahai Pharmaceutical Co. Ltd.,*<br><br>Case No. 1:20-cv-00946-RMB-SAK | **HON. RENÉE MARIE BUMB** |

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DR. FAREEHA SIDDIQUI

---

NIGH GOLDENBERG RASO & VAUGHN, PLLC
*Attorneys for Plaintiffs*
14 Ridge Square NW
Third Floor
Washington, D.C. 20016
Tel: 202-792-7927
Fax: 202-792-7927

On the Brief:
C. Brett Vaughn RN, BSN, JD
Daniel Nigh, Esq.
Ashleigh Raso, Esq.
Kathryn Avila, Esq.
Stephanie Iken, Esq.

## **TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................1

II. BACKGROUND .................................................................................3

   A. Cirrhosis is a Clinical Diagnosis, Not an Imaging Finding.............................3

   B. NDMA is a Known Liver Toxin and Carcinogen ..............................................4

   C. Defendants Mischaracterize Risk Factors NASH, Diabetes, and Obesity .......5

   D. Latency and Imaging Support the Timeline of NDMA-Induced Cancer .........6

   E. Dr. Siddiqui Reliably Ruled Out Alternative Causes and Ruled In NDMA ....7

III. LEGAL STANDARD ..........................................................................8

IV. ARGUMENT ....................................................................................10

   A. What is Cirrhosis?...................................................................................10

   B. When Was Mr. Roberts Diagnosed with Cirrhosis? ......................................11

   C. Mr. Roberts Was Never Diagnosed with NASH/MASH ...............................14

   D. Diabetes.....................................................................................................17

   E. Ruling Out Obesity & Other Risk Factors.....................................................19

   F. Dr. Siddiqui Reliably Ruled In NDMA ........................................................20

      1. NDMA Human Epidemiological Studies..................................................22

      2. NDMA Animal Studies ............................................................................27

      3. Dr. Siddiqui Was Able to Reliably Quantify the Amount of NDMA Present in Each Prescription of Valsartan Mr. Roberts Consumed.........................29

      4. Latency ....................................................................................................32

   G. Calculating a Tumor Volume Doubling Time was Unnecessary ...................35

   H. Dr. Siddiqui Appropriately Ruled Out Mr. Roberts Having Liver Cancer Prior to Being Exposed to NDMA-Contaminated Valsartan .................................37

   I.  There Is No Evidence That Mr. Roberts Did Not Follow Medical Advice ....39

V.  CONCLUSION.................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Heller v. Shaw Indus., Inc.*,
   167 F.3d 146, 156 (3d Cir. 1999)..........................................................................8, 9

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717, 758–61 (3d Cir. 1994)..........................................................................8

*In Re Silicone Gel Breast Impl. Prods Liab. Litig.*,
   318 F. Supp. 2d 879, 921 (C.D. Cal. 2004) .........................................................33

*In re Valsartan*, MDL 2785, 2025 U.S. Dist. LEXIS 66185, at *39
   (D.N.J. Apr. 7, 2025) ................................................................................................8

*Westberry v. Gislaved Gummi AB*,
   178 F.3d 257, 265–66 (4th Cir. 1999) ....................................................................9

**Rules**

Rule 702 of the Federal Rules of Evidence ..............................................................8

# I.    <u>INTRODUCTION</u>

Defendants moved to exclude the opinions of Dr. Fareeha Siddiqui by misstating what she actually did and said. In their Motion, Defendants mischaracterize Dr. Siddiqui's methodology, ignore the case-specific foundation of her analysis, and apply an overly rigid, legally inaccurate interpretation of Rule 702.

Dr. Siddiqui, a board-certified hematologist and medical oncologist, rendered a case-specific causation opinion based on a detailed review of Mr. Roberts' medical history, the scientific literature on NDMA exposure, and validated principles of differential diagnosis. Her methodology is reliable, her conclusions are supported by the data, and her opinion fits the facts of this case.

Dr. Siddiqui opines that NDMA-contaminated valsartan was the most substantial contributing factor in the development of Mr. Roberts' liver cancer. In reaching this conclusion, Dr. Siddiqui considered and addressed potential alternative risk factors, including but not limited to metabolic dysfunction, diabetes, obesity, and liver disease. Dr. Siddiqui concluded that none of these conditions, individually or in combination, were more likely causes of Mr. Roberts' liver cancer than his prolonged daily exposure to high levels of NDMA via contaminated valsartan. Dr. Siddiqui's reasoning is supported by multiple human epidemiological studies, animal toxicological data, mechanistic data, and the scientific understanding that

NDMA is both a tumor initiator and promoter, capable of accelerating cancer development and progression.

Defendants incorrectly assert that Mr. Roberts was clinically diagnosed with cirrhosis years before taking valsartan.[1] That is not what the records state. While imaging in 2016 may have shown some morphological changes, no treating physician diagnosed Mr. Roberts with cirrhosis until 2018, after the onset of cancer.[2] In fact, Mr. Roberts' treating hepatologist noted that his cirrhosis work-up was "essentially negative" contemporaneously with his liver cancer diagnosis.[3] Defendants' reliance on radiological descriptions as a substitute for clinical diagnosis reflects a fundamental misunderstanding of how cirrhosis is diagnosed and how imaging is used in clinical practice.[4]

Dr. Siddiqui did not "brush aside" Mr. Roberts' other health conditions.[5] She acknowledged and analyzed them as part of her differential diagnosis, consistent with her training and medical standards. Her treatment of metabolic syndrome risk factors follows accepted medical groupings, which aggregate conditions such as obesity, diabetes, and steatosis into a single construct when assessing liver cancer risk. This approach is supported by peer-reviewed literature and recognized by both

---

[1] Siddiqui Daubert, ECF No. 3069 at 29-33.
[2] Ex. 1, GRobertsJr-TH-MD-000944; Ex. 2, GRobertsJR-SouCC-000252.
[3] Ex. 3, GRobertsJr-PPR-000096.
[4] Siddiqui Daubert, ECF No. 3069 at 11–12.
[5] Siddiqui Daubert, ECF No. 3069 at 1.

Plaintiff and Defense experts.

Defendants further suggest that Dr. Siddiqui failed to support her opinions with scientific evidence.[6] That claim is incorrect. Dr. Siddiqui considered epidemiological studies linking NDMA-contaminated valsartan with liver cancer, evaluated toxicological assessments from Plaintiff's experts, and incorporated real-world testing data showing the extraordinarily high levels of NDMA present in the corresponding valsartan batches Mr. Roberts consumed. Dr. Siddiqui also addressed the issue of latency, explaining why Mr. Roberts' rapid tumor development was most consistent with a carcinogenic exposure and not unusual in the context of a tumor initiator and promotor taken on a daily basis, such as valsartan pills contaminated with the high doses of NDMA here.

Defendants' criticisms go to the weight, not the admissibility, of evidence. Dr. Siddiqui's opinions are grounded in science, consistent with the medical record, and meet all legal requirements for expert testimony under Rule 702 and *Daubert*. Defendants' motion to exclude Dr. Siddiqui's testimony should be denied.

## II.    BACKGROUND

### A. Cirrhosis is a Clinical Diagnosis, Not an Imaging Finding

Defendants claim that Mr. Roberts had cirrhosis as early as 2016 based solely

---

[6] Siddiqui Daubert, ECF No. 3069 at 26.

on a radiologist's description of "imaging findings consistent with cirrhosis."[7] However, radiologists do not diagnose cirrhosis. As explained by Dr. Mele, radiologists identify morphological changes that may suggest cirrhosis, but the diagnosis is made clinically by a treating physician.[8] Dr. Mele confirmed that he does not diagnose cirrhosis in practice and that the 2016 imaging only demonstrated morphological manifestations that could be consistent with cirrhosis.[9]

Defendants provided no evidence that any of Mr. Roberts' treating physicians diagnosed him with cirrhosis prior to 2018. In fact, medical records from 2018, contemporaneous to Mr. Roberts' cancer diagnosis, indicate that a thorough cirrhosis work-up was performed and found to be "essentially negative."[10] Dr. Siddiqui concluded that if any cirrhosis existed in 2016, it was extraordinarily mild and would not have warranted diagnosis at the time.[11]

## B. NDMA is a Known Liver Toxin and Carcinogen

Dr. Siddiqui's opinion that NDMA caused or substantially contributed to causing the cancer diagnosed in 2018 is supported by decades of toxicological research and recent human epidemiological studies. Dr. Siddiqui relied on data from both the *Gomm* and *Mansouri* studies, which both found a statistically significant

---

[7] Siddiqui Daubert, ECF No. 3069 at 22-24.
[8] Ex. 4, Mele Expert Report at 3.
[9] Ex. 5, Mele Dep. Tr. at 290:23-291:5.
[10] Ex. 3, GRobertsJr-PPR-000096.
[11] Ex. 6, Siddiqui Expert Report at 30.

increase in the risk of liver cancer in patients exposed to any amount of NDMA-contaminated valsartan, despite limitations, including exposure quantification which made it less likely that any increased risk would be identified.[12]

Mr. Roberts' valsartan pills, manufactured by Zhejiang Huahui Pharmaceuticals ("ZHP") and distributed by Prinston and Solco in the United States, contained the highest levels of NDMA found by the FDA.[13] Dr. Siddiqui opined that Mr. Roberts consumed over 681 pills that corresponded to testing that found between 13,180 and 20,190 nanograms of NDMA per pill.[14] The acceptable limit adopted by the FDA after the contamination was disclosed was 96 nanograms.[15]

### C. Defendants Mischaracterize Risk Factors NASH, Diabetes, and Obesity

Defendants repeatedly conflate nonalcoholic fatty liver disease (NAFLD), metabolic dysfunction-associated steatotic liver disease (MASLD), and steatohepatitis (NASH/MASH), without evidence that Mr. Roberts had the advanced inflammatory form of these conditions. No liver biopsy was ever performed, and Mr.

---

[12] Ex. 6, Siddiqui Expert Report at 26. Gomm W, Röthlein C, Schüssel K, Brückner G, Schröder H, Heß S, Frötschl R, Broich K, Haenisch B. N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer—A Longitudinal Cohort Study Based on German Health Insurance Data. Dtsch Arztebl Int. 2021 May 28;118(21):357-362.; Mansouri et al. N-nitrosodimethylamine-Contaminated Valsartan and Risk of Cancer: A Nationwide Study of 1.4 Million Valsartan Users. Journal of the American Heart Association, 2022, https://www.ahajournals.org/doi/pdf/10.1161/JAHA.122.026739.

[13] Ex. 6, Siddiqui Expert Report at 27; https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products.

[14] Ex. 6, Siddiqui Expert Report at 28.

[15] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cder-nitrosamine-impurity-acceptable-intake-limits

Roberts' treating gastroenterologist confirmed that Mr. Roberts showed no symptoms of NASH and only evidence of fatty liver.

Dr. Siddiqui conservatively conducted her differential analysis as if Mr. Roberts had NASH, even though she believed he did not.[16] Dr. Siddiqui explained that any increased risk from metabolic factors would be captured in the degree of cirrhosis.[17] Dr. Siddiqui's grouping of obesity, diabetes, and hyperlipidemia under the umbrella of metabolic liver disease reflects standard medical practice and is consistent with expert testimony on both sides.[18]

### D. Latency and Imaging Support the Timeline of NDMA-Induced Cancer

Defendants argue that liver cancer has a minimum latency period of four years and that Mr. Roberts' cancer could not have developed so quickly.[19] This argument fails for several reasons. First, the latency period cited by Defendants is based on ionizing radiation, not chemical carcinogens.[20] Second, NDMA is both a tumor initiator and promoter, capable of reducing latency significantly, as explained in detail in Dr. Panigrahy's report.[21]

Mr. Roberts underwent both ultrasound and CT imaging in 2016 that did not

---

[16] Ex. 6, Siddiqui Expert Report at 29-30.
[17] Ex. 6, Siddiqui Expert Report at 29-30.
[18] Ex. 9 Mahmud Dep. 181:7-182:13
[19] Siddiqui Daubert, ECF No. 3069 at 17.
[20] Siddiqui Daubert, ECF No. 3069 at 17-19
[21] Ex. 7, Panigrahy Report at 6, 33-34, 50, 65-67, 76, 84, 107, 153, 201, 204-209.

detect liver cancer.[22] Within two years of daily multi-nanogram NDMA exposure, a 5.8 cm tumor was discovered.[23] The facts of this case are that Mr. Roberts did not have liver cancer in 2016 and then two years later had liver cancer measuring 5.8 cm, which is due to the known effects of nanogram levels of NDMA exposure, which is a tumor initiator and promotor. It is further supported by the valsartan epidemiological studies, which detected a statistically significant risk of liver cancer within this same timeframe.[24]

### E. Dr. Siddiqui Reliably Ruled Out Alternative Causes and Ruled In NDMA

Dr. Siddiqui applied a medically accepted differential diagnosis after reviewing medical records, imaging, toxicology reports, and batch-specific NDMA content.[25] Dr. Siddiqui ruled in NDMA as a substantial contributing factor and ruled out other causes, including cirrhosis, metabolic disease, and diabetes, as more likely contributors.[26] There is no significant potential cause that was not considered.

Dr. Siddiqui also addressed and explained why the "indeterminate hyperdense lesion" seen on 2016 imaging could not be the origin of Mr. Roberts' cancer, which was later found in a different liver segment.[27] Dr. Siddiqui's opinion is consistent

---

[22] Ex. 1, GRobertsJr-TH-MD-000944.
[23] Ex. 8, GRobertsJr-CA-000166.
[24] *See supra* n. 12.
[25] Ex. 6, Siddiqui Expert Report at 1.
[26] Ex. 6, Siddiqui Expert Report at 1.
[27] Ex. 6, Siddiqui Expert Report at 6.

with the findings of Plaintiff's radiology expert, Dr. Mele, and her own independent review of the images.

### III.    LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible if the proponent demonstrates that it is more likely than not that the expert's opinion is the product of reliable principles and methods properly applied to the facts of the case.[28] The recent amendments to Rule 702 emphasize the trial court's gatekeeping responsibility, clarifying, but not heightening, the standard for admissibility.[29]

A differential diagnosis that entirely ignores plausible alternative causes may be so deficient that it cannot support a reliable opinion on causation.[30] However, under binding Third Circuit precedent, a medical expert's opinion is not inadmissible merely because the expert did not rule out every conceivable alternative cause.[31] The Third Circuit has repeatedly held that the failure to eliminate all potential causes goes to the weight of the testimony, not its admissibility, so long as the expert offers a reasoned explanation for discounting other possible causes.[32] "[A] medical expert's causation conclusion should not be excluded because he or she has failed to rule out

---

[28] *See* Fed. R. Evid. 702.
[29] *In re Valsartan*, MDL 2785, 2025 U.S. Dist. LEXIS 66185, at *39 (D.N.J. Apr. 7, 2025).
[30] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758–61 (3d Cir. 1994).
[31] *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999).
[32] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 764–65.

every possible alternative cause," and only when the expert offers "no explanation" for rejecting an alternative cause identified by the opposing party does the opinion risk exclusion.[33] As the court explained in *Kannankeril*, once a defendant identifies a plausible alternative cause, it becomes necessary for the expert to offer a good explanation as to why their conclusion remains reliable in light of that cause.[34] This principle is well established across circuits. For example, the Fourth Circuit has held that an alternative cause suggested by a defendant does not necessarily make an expert's opinion inadmissible but may "affect the weight that the jury should give the expert's testimony and *not the admissibility of that testimony*," unless the expert can offer *no* explanation for why he or she did not consider the alternative theory.[35] The critical question is whether the expert reliably applied accepted methods, not whether they completely eliminated every possible explanation. There is no consequential alternate cause that was ignored here.

Challenges to an expert's conclusions typically go to the weight of the testimony rather than its admissibility.[36] Courts are not tasked with deciding whether the expert is right, but whether the expert reached their conclusion using a reliable and reasoned process.[37] Dr. Siddiqui's methodology was sound, and the testimony

---

[33] *Heller v. Shaw Indus., Inc.*, 167 F.3d at 156–57.
[34] *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir. 1997).
[35] *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265–66 (4th Cir. 1999).
[36] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).
[37] *Heller v. Shaw Indus., Inc.*, 167 F.3d at 156–57.

should be presented to the jury.

## IV.    ARGUMENT

Defendants' motion rests on a mischaracterization of both the facts and the law. Dr. Siddiqui applied a methodologically sound differential diagnosis that considered all potentially relevant risk factors, including Mr. Roberts' liver health, metabolic history, and exposure to NDMA-contaminated valsartan. Dr. Siddiqui's conclusions are not only consistent with accepted medical science, but are also supported by the medical record, the testimony of the treating physicians, peer-reviewed literature, and the opinions of other experts in this litigation. Defendants' objections reflect disagreements with her conclusions, not flaws in her methodology. Defendants' criticisms are addressed below, beginning with their fundamental misunderstanding of cirrhosis.

### A. What is Cirrhosis?

Scarring of the liver **_and_** poor liver function are required to diagnose cirrhosis. Scarring of the liver is also known as fibrosis, which a radiologist can view and stage on imaging. Dr. Mahmud (Defendant's expert hepatologist) explained that a patient can have advanced fibrosis and not have cirrhosis, but that most radiologists just use the term "cirrhosis" instead of "advanced fibrosis," because the radiologists are just looking for the signs that are observed on imaging.[38] Radiologists look for the signs

---

[38] Ex. 9, Mahmud Dep. Tr. at 123:13-124:7.

of cirrhosis, but do not diagnosis cirrhosis. Defendant incorrectly claimed that Plaintiff's expert radiologist, Dr. Mele (whom Defense did not attempt to *Daubert*), opined "that Mr. Roberts had cirrhosis in April 2016", without providing any citation.[39] Dr. Mele merely opined that "the CT scan performed in April 19, 2016 demonstrated _morphologic changes_ of the liver and imaging findings _consistent with_ cirrhosis."[40] When asked if he diagnoses cirrhosis in practice, Dr. Mele explained:[41]

> I do not. Cirrhosis is a clinical diagnosis. What I'm able to provide are some of the morphological manifestations that are part of cirrhosis on imaging examinations. And clinicians will use those, among a variety of other factors, to arrive at their clinical diagnosis.

## B. When Was Mr. Roberts Diagnosed with Cirrhosis?

Defendants go to great lengths in their brief to make it appear as if Mr. Roberts had cirrhosis prior to ingesting NDMA-contaminated valsartan in 2016. Even going as far as asserting, "there is no question that Mr. Roberts **did in fact have cirrhosis** by at least April 2016, before he started using valsartan" without a supporting citation.[42] However, even though Mr. Roberts underwent imaging of his liver in 2016, none of his treating physicians diagnosed Mr. Roberts with cirrhosis. It was not until 2018, at the same time Mr. Roberts' liver cancer was discovered, that Mr. Roberts' treating physicians diagnosed him with cirrhosis.[43] Furthermore,

---

[39] Siddiqui Daubert, ECF No. 3069 at 23.
[40] Ex. 4, Mele Expert Report at 3 (emphasis added).
[41] Ex. 5, Mele Dep. Tr. at 209:23-291:5.
[42] Siddiqui Daubert, ECF No. 3069 at 33 (emphasis native).
[43] Ex. 10, Hooks Dep. Tr. at 74:3-13.

Defendants' expert agreed that Mr. Roberts did not have any symptoms consistent with cirrhosis.[44] In an attempt to diagnose Mr. Roberts with cirrhosis, Dr. Mahmud had to apply an unreliable FIB-4 calculation.[45] Mr. Roberts' treating physicians did not calculate a FIB-4 score and Defendants improperly critique Dr. Siddiqui for not utilizing this inapplicable and non-diagnostic scoring system.[46]

In order to bolster their baseless argument that Mr. Robert had cirrhosis prior to NDMA exposure, Defendants misleadingly partially quote Dr. Siddiqui as opining that Mr. Roberts "had… cirrhosis prior to being exposed to valsartan."[47] Dr. Siddiqui's opinion actually reads:[48]

> Mr. Roberts was not diagnosed with cirrhosis prior to being exposed to valsartan contaminated with NDMA. However, it is my opinion that Mr. Roberts had incredibly mild, the earliest stages of cirrhosis prior to being exposed to valsartan contaminated with NDMA. Mr. Roberts cirrhosis was so mild and at such an early stage in 2016 that I would not have expected him to receive an actual diagnosis of cirrhosis (**I would not have given him an actual diagnosis of cirrhosis at this time**).

Defendants also conveniently failed to note that Dr. Siddiqui also based her opinion that Mr. Roberts did not have cirrhosis in 2016 on the opinion of Mr. Roberts' treating hepatologist.  Dr. Siddiqui noted in her report that her opinion that Mr. Roberts did not have cirrhosis in 2016, "is further supported by **Dr. White's**

---

[44] Ex. 9, Mahmud Dep. Tr. at 127:6-129:8.
[45] *See* Mahmud Daubert, ECF No. 3067 at 21-32.
[46] Siddiqui Daubert, ECF No. 3069 at 29, footnote 29.
[47] Siddiqui Daubert, ECF No. 3069 at 3.
[48] Ex. 6, Siddiqui Expert Report at 30 (emphasis added).

**(Mr. Roberts' hepatologist)** note on August 22, 2018, contemporaneous with Mr. Roberts' liver diagnosis, that Mr. Roberts had "**undergone extensive work up for cirrhosis**' and that the '**work up for cirrhosis is essentially negative**.'"[49]

It is inaccurate and misleading for Defendants to claim that it is undisputed that Mr. Roberts had cirrhosis no later than 2016.  What is undisputed, is that Mr. Roberts had cirrhosis in 2018 when he was diagnosed with liver cancer.[50]  Further, it is Dr. Siddiqui's opinion that Mr. Roberts' cirrhosis was caused by his exposure to NDMA.[51]  Without any support, Defendants argue, "These assertions are not supported—and in fact are contradicted—by established science."[52]  It is unclear what established science Defendants are referring to. However, the U.S. Department of Health and Humans Services, Agency for Toxic Substances and Disease Registry had the following to say regarding NDMA causing cirrhosis:[53]

> Rubber workers with occupational exposure to nitrosamines, the rate of mortality form non-alcoholic cirrhosis of the liver was elevated compared with the rate in the general population
>
> Another fatality due to ingestion of NDMA was attributed to liver failure (Fussgaenger and Ditschuneit 1980; Pedal et al 1982). Autopsies of the subjects described above showed that the primary effects were hemorrhagic and cirrhotic changes in the liver and necrosis and hemorrhage in other internal organs. Barnes and Magee (1954) briefly described two cases of liver cirrhosis among three men using NDMA in a research laboratory for about 10 months. In one, cirrhosis was discovered at autopsy after the man

---

[49] Ex. 6, Siddiqui Expert Report at 30 (emphasis added).
[50] Siddiqui Daubert, ECF No. 3069 at 23.
[51] Ex. 6, Siddiqui Expert Report at 21; Ex. 11, Siddiqui Dep. Tr. at 160:5-11.
[52] Siddiqui Daubert, ECF No. 3069 at 24.
[53] Ex. 12, Tox Profile NDMA HHS 4/2023 at 41-42, 45-46.

died from bronchopneumonia. In the second, cirrhosis was discovered during follow-up for an unrelated operation. The latter patient showed improved liver function after 3 months with no exposure to NDMA (Barnes and Magee 1954).

Hepatoxicity is the most prominent and characteristic systemic effect of NDMA, resulting in centrilobular necrosis, hemorrhage, fibrosis, cirrhosis, and ascites.

Mechanisms of Hepatotoxicity. NDMA treatment in dogs and rats has been used as a model for human liver fibrosis (and its sequelae of cirrhosis, portal hypertension, and hepatocellular carcinoma) for nearly 40 years. As a result, a great deal of research has been performed to investigate the molecular mechanisms and pathophysiology of NDMA-related hepatic effects. George et al. (2019) published a succinct review of this research, detailing the effects of NDMA and its metabolites on hepatic cell populations. As discussed therein and summarized briefly below, NDMA induces liver effects through inflammation and oxidative stress mediated by metabolites.

Protein alkylation and cross-linking is a candidate molecular initiating event leading to hepatic fibrosis and NDMA-exposed organisms.

Deposition of collagen fibrils in the extracellular matrix leads to fibrosis, cirrhosis, and portal hypertension. In addition to the DNA damage induced by reactive intermediates of NDMA metabolism, repeated injury and repair induced by these metabolites may also be involved in the mechanism of liver cancer from NDMA exposure (George et al. 2019.)

To the extent that Mr. Roberts had cirrhosis, it only increased his susceptibility to NDMA. As explained by the U.S. Health and Human Services[54]:

> **Other Factors Influencing Susceptibility:** Because the liver is the primary target of NDMA toxicity, individuals with liver disease may be at increased risk from NDMA exposure.

## C. Mr. Roberts Was Never Diagnosed with NASH/MASH

---

[54] Ex. 12, Tox Profile NDMA HHS 4/2023 at 94.

Defendants frequently refer to MASLD/MASH interchangeably.[55] MASLD (metabolic dysfunction-associated steatotic liver disease) is interchangeable with NAFLD (nonalcoholic fatty liver disease).[56] MASLD/NAFLD merely means that a person has fat in their liver, therefore "most people who are obese likely have NAFLD."[57] MASLD/NAFLD is a fatty liver without inflammation. MASLD/NAFLD (a fatty liver) "generally does not cause symptoms."[58]

NASH (nonalcoholic steatohepatitis) is interchangeable with MASH (metabolic dysfunction-associated steatohepatitis). NASH/MASH is an advanced form of NAFLD/MASLD, where there is fat in the liver plus inflammation that typically causes symptoms, including weakness, loss of appetite, nausea, yellow skin and eyes, itching, fluid buildup, swelling of the legs, and abdomen, mental confusion, and GI bleeding.[59] Defense expert hepatologist, Dr. Mahmud, testified that Mr. Roberts did not have any symptoms associated with NASH.[60] Furthermore, Dr. Mahmud explained that you need a biopsy to diagnose NASH[61] and a liver biopsy was never performed on Mr. Roberts to make such a diagnosis.[62]

---

[55] Siddiqui Daubert, ECF No. 3069 at 4-5
[56] Ex. 9, Mahmud Dep. Tr. at 149:10-153:4, 159:14-19.
[57] Ex. 9, Mahmud Dep. Tr. at 186:12-19.
[58] Ex. 9, Mahmud Dep. Tr. at 151:11-16.
[59] Ex. 9, Mahmud Dep. Tr. at 411:22-24; 152:9-10.
[60] Ex. 9, Mahmud Dep. Tr. at 154:7-155:13.
[61] Defense claims a 2018 MRI showed Mr. Roberts had NASH (Siddiqui Daubert, ECF No. 3069 at 2); however, NASH cannot be diagnosed via MRI.
[62] Ex. 9, Mahmud Dep. Tr. at 159:14-160:5, 161:10-13, 164:15-165:6.

Dr. Siddiqui also explained in her deposition that she does not believe Mr. Roberts was diagnosed with NASH, even though it does appear in his medical record briefly. Dr. Siddiqui gave the following interpretation of Mr. Roberts' 2009 medical record from a visit with Dr. Ives:[63]

> He said, "He has been told over the years that he probably has a fatty liver," that is NASH, but again, that was, to me, not consistent with a diagnosis. Then Dr. Ives, in September on follow-ups said "demonstrated fatty liver." Then, Dr. Ives – there was an ultrasound in 20 – then we come back to the 2016 ultrasound where it says "fatty infiltrate noted within the liver." So my – from my review of it, he probably had fatty liver or they were considering it and not making a diagnosis."

Mr. Roberts' treating gastroenterologist was also deposed on the difference between NASH and a fatty liver:[64]

> Q. And I see NASH used in conjunction with the term fatty liver – fatty liver disease. Are they the same thing or are they slightly different?
>
> A. They're different.
>
> Q. Okay. And if you could briefly explain how they're different.
>
> A. NASH is where you have elevated liver tests. And if a biopsy is taken, you'll see inflammation within the hepatocytes or within the hepatic parenchyma.
>
> Q. Okay. Was your understanding that Mr. Roberts had fatty liver disease?
>
> A. Based on this record, yes.

Even though Dr. Siddiqui also doesn't believe that Mr. Roberts was actually diagnosed with or had NASH, for purposes of her expert report, Dr. Siddiqui approached her differential diagnosis conservatively as if Mr. Roberts did actually

---

[63] Ex. 11, Siddiqui Dep. Tr. at 200:19-201:5.
[64] Ex. 10, Hooks Dep. Tr. at 54:15-55:5.

have NASH, because NASH was listed in Mr. Roberts' medical records.[65] As explained by Dr. Siddiqui in her expert report, whether or not Mr. Roberts actually had NASH is of little significance, because even if Mr. Roberts had NASH:[66]

> his resulting increased risk of liver cancer would be captured based on the degree of his liver cirrhosis. Mr. Roberts took medications for hyperlipidemia. The mechanism whereby hyperlipidemia would increase the risk of liver cancer is by causing NASH, which can then cause cirrhosis. Any increased risk of liver cancer that Mr. Roberts was at due to hyperlipidemia would be captured by the increased risk he was at due to his very mild and undiagnosed cirrhosis.

Defense then repeatedly chastises Dr. Siddiqui for colloquially explaining that radiological imaging consistent with cirrhosis, but without symptoms, thus not diagnosable as cirrhosis, as cirrhosis that was "very mild," "incredibly mild," or at "such an early stage."[67] However, Defendants' own expert hepatologist utilizes similar adjectives when explaining cirrhosis:[68]

> If I say "advanced cirrhosis," I'm doing that just for the benefit of, I suppose, just being able to communicate the principle more easily without having to rely exclusively on the medical terminology

## D. Diabetes

Defendants misrepresent that "Mr. Roberts had Type II diabetes dating back to at least 2007."[69] To support this claim, Defendants cite to GRobertsJR-CA-

---

[65] Ex. 6, Siddiqui Expert Report at 3, 29, 30.
[66] Ex. 6, Siddiqui Expert Report at 30.
[67] *See* Siddiqui Daubert, ECF No. 3069 at 10, 24 -25.
[68] Ex. 9, Mahmud Dep. Tr. at 158:15-19.
[69] Siddiqui Daubert, ECF No. 3069 at 6.

000731 and GRobertsJR-CA000729 (Rose Decl. Ex. 12). However, Rose Decl. Ex. 12 is GRobertsJR-CA-000730, which was likely inadvertent, as this 2007 medical record notes "?DM".[70] GRobertsJR-CA-000731, which was not included in Rose Decl. Ex. 12 as claimed in the brief, notes "refer to for poss DM."[71] When deposing Dr. Siddiqui on GRobertsJR-CA-000731, Defendants were aware that this wasn't an actual diagnosis of diabetes: "Q: In this record, Dr. Buckley reported possible diabetes; correct?"[72] Dr. Siddiqui also explained that the medical record GRobertsJR-CA-000731 was merely questioning the possibility of diabetes:[73]

> A. … It's specifically written here questionable diabetes, so—
>
> Q. I'm sorry – I'm sorry, Doctor where are you reading from?
>
> A. Your – your thing, your exhibit. I don't know what happened. It just went away. Sorry, Exhibit 20, second page. Under the gray box, "Account Number., Under that, is a set of numbers. Under that, is referring physician. Under that, is "Cardiac DX." And under that, is "Noncardiac DX." And the last thing written on noncardiac DX is "?DM."
>
> Q. I see.

Mr. Roberts was not diagnosed with diabetes until 2016, and both sides' experts agree that from that point forward Mr. Roberts' diabetes was well-controlled with medication.[74] Furthermore, Mr. Roberts' treating gastroenterologist testified that he didn't consider Mr. Roberts' diabetes to be a risk factor for his liver cancer.[75]

---

[70] ECF No. 3065-11
[71] ECF No. 3065-11
[72] Ex. 11, Siddiqui Dep. Tr. at 236:8-9.
[73] Ex. 11, Siddiqui Dep. Tr. at 240:3-16.
[74] Ex. 11, Siddiqui Dep. Tr. at 239:12-15; Ex. 9, Mahmud Dep. Tr. at 174:23-175:1.
[75] Ex. 10, Hooks Dep. Tr. at 52:12-19.

### E. Ruling Out Obesity & Other Risk Factors

Defendants critique Dr. Siddiqui for lumping MASH,[76] diabetes,[77] and obesity together as part of a metabolic syndrome and assessing the risk by the degree of cirrhosis present, if any.[78] Defendants incorrectly claim that Dr. Siddiqui had no scientific evidence to support considering these risk factors together.[79] Defendants even questioned Dr. Siddiqui on this exact topic:[80]

> Q. You don't cite any support for the notion that NASH, diabetes, and obesity can be considered together when ruling out whether they are a cause of HCC. What is your support for that?
>
> A. It's here. So what I did was I put down each on separately, but the way we do it in basically medicine now, is we put it all under MAFLD and that was cited as 151, Mantovani. So basically, the MAFLD has now – instead of – so they changed the nomenclature because they felt fatty is too simple and fatty is too – it's – it's – it's not a nice way to put it. So they put all these three diseases – actually, they also put in hyperlipidemia. They put in hyperlipidemia, diabetes, and obesity into a group of diseases when talking about liver cancer or liver disease. And so for the purposes of this case, when talking about liver cancer, I put diabetes, obesity, and fatty liver into one group, which is the group that they always use to discuss HCC, which is the MAFLD or the – the – the – the syndrome that they call it and I gave citations for that.
>
> Q. Okay.

Defendants' expert hepatologist, Dr. Mahmud, explained the same methodology when asked, "If Mr. Roberts was not obese, do you believe that he

---

[76] As discussed above, Mr. Roberts wasn't actually diagnosed with NASH/MASH.

[77] As discussed above, Mr. Roberts wasn't actually diagnosed with diabetes in 2007 and once he was in 2016, his diabetes was well-controlled.

[78] Siddiqui Daubert, ECF No. 3069 at 11, 34-36.

[79] Siddiqui Daubert, ECF No. 3069 at 36.

[80] Ex. 11, Siddiqui Dep. Tr. at 197:1-25.

would have developed cancer when he did?":[81]

> A. Okay. So if you take it out. It's a little bit tough to tease out entirely because the obesity is interrelated to things. If he wasn't obese, if he was a completely normal weight, *he would be less likely to have MASLD*. He'd be less likely to have NASH. He'd be less likely to have diabetes, high blood pressure, hyperlipidemia, coronary artery disease. So in that hypothetical, he would be a much, much healthier patient. So it's – it's hard to perfectly project what would have happened. *But if he was a normal weight, there's a very good chance that he would have never developed cirrhosis*; and therefore, you know there's a very good chance that he would have never developed hepatocellular carcinoma. Yes.

Defendants' critique of Dr. Siddiqui not attributing Mr. Roberts' obesity as a cause of his liver cancer is without merit.[82] Mr. Roberts' treating physician also did not believe obesity to be a risk factor for Mr. Roberts' liver cancer.[83] Furthermore, Dr. Siddiqui's opinion that Mr. Roberts' alleged NASH was not a risk factor for his liver cancer and that any potential increased risk would be captured by the degree of cirrhosis in 2016 is consistent with the testimony of Mr. Roberts' treating physicians.[84]

### F. Dr. Siddiqui Reliably Ruled In NDMA

Defendants critique Dr. Siddiqui for not performing a Bradford Hill analysis at the specific causation stage.[85] When asked if she performed a Bradford Hill

---

[81] Ex. 9, Mahmud Dep. Tr. at 181:7-182:13.
[82] Siddiqui Daubert, ECF No. 3069 at 7, 34.
[83] Ex. 10, Hooks Dep. Tr. at 55:9-21.
[84] NASH is only a risk factor for cirrhosis (Ex. 13, Buckley Dep. Tr. at 53:7-17); Nash is a risk factor for cirrhosis, not HCC (Ex. 10, Hooks Dep. Tr. at 54:3-14, 67:4-21).
[85] Siddiqui Daubert, ECF No. 3069 at 14.

analysis, Dr. Siddiqui explained:[86]

> So we in medicine – Bradford Hill analysis and the differential etiology is so tightly connected with what we do everyday when we're reviewing. So I'm not being asked to give an opinion – a general causation opinion, so I haven't offered that in my expert opinion, but when I was reviewing the case, I reviewed the Bradford Hill analysis. I reviewed the other general causation, basically. I reviewed the – the items that would be reviewed in general causation, but I'm not being asked to give an expert opinion on that.

Plaintiff has already passed the general causation phase and established to a reasonable degree of certainty that NDMA in the levels found in valsartan are capable of causing liver cancer in humans.[87] Dr. Siddiqui reviewed the general causation expert reports, including Dr. Etminan (epidemiologist), Dr. Madigan (biostatistician), and Dr. Panigrahy (cancer researcher), and the NDMA literature relating to their opinions, including more recently published studies.[88] Defendants argue that Dr. Siddiqui cannot rely on the general causation experts because "none of those experts addressed the purported relationship between NDMA in valsartan and HCC; nor did they consider Mansouri 2022 - which awas published well after they formulated their opinions."[89] Defendants' argument is disingenuous. Plaintiff's

---

[86] Ex. 11, Siddiqui Dep. Tr. at 49:16-50:3.
[87] "As to the opinions of **Dipak Panigrahy, M.D.**, which concern NDMA and all cancers as well as NDEA and pancreatic cancer, Defendant's Motion to Preclude is **DENIED**" "As to the opinions of **Mahyar Etminan**, Pharm. D., M.S., which concern NDMA and all cancers as well as NDEA and pancreatic cancer, Defendant's Motion to Preclude is **Denied**" "As to the opinions of **Dr. Madigan**, Ph.D, which concern NDMA and all cancers, Defendant's motion to Preclude is **DENIED**" (3/4/2022 Daubert Hearing Order 1, ECF No. 1958).
[88] Ex. 6, Siddiqui Expert Report at 1; Ex. 11, Siddiqui Dep. Tr. at 316:1-18.
[89] Siddiqui Daubert, ECF No. 3069 at 15, Footnote 13.

general causation expert, Dr. Panigrahy, a cancer researcher with his own laboratory at Havard, dedicated 10 pages of his expert report to a section titled "**Cancer Type #1 – NDMA Causes Liver Cancer**."[90] During Dr. Panigrahy's discussion on NDMA causing liver cancer, Dr. Panigrahy addressed *Gomm*, a valsartan epidemiological study that found a statistically significant increased risk of hepatic (liver cancer) in those exposed to NDMA-contaminated valsartan.[91]

Furthermore, Dr. Siddiqui reviewed and discussed the additional valsartan epidemiological study (*Mansouri* 2022) that was published after general causation reports were submitted, which further supports that NDMA in the doses found in contaminated valsartan can cause liver cancer in humans.

## 1. NDMA Human Epidemiological Studies

Defendants critique Dr. Siddiqui for relying in part on two valsartan epidemiological studies (*Gomm* 2021 and *Mansouri* 2022) that found a statistically significant association between liver cancer and any exposure to NDMA-contaminated valsartan use, because the association was weak and there was no dose-response.[92] However, Dr. Siddiqui spent numerous pages of her expert report explaining why a dose-response was not observed in these studies, why the studies'

---

[90] Ex. 7, Panigrahy Expert Report at 96-105.
[91] Ex. 7, Panigrahy Expert Report at 95, 97.
[92] Siddiqui Daubert, ECF No. 3069 at 15.

results are diluted and under-estimate the increased risk of liver cancer, and how to interpret and apply the studies specifically to Mr. Roberts.[93] Dr. Siddiqui explained:

> While animal studies clearly demonstrate a dose response regardless of how much NDMA is administered, none of the valsartan epi studies detected a dose response. **However, the valsartan epi studies did not measure whether increased cumulative exposure to NDMA increased the risk of liver cancer, but rather, erroneously assumed that cumulative exposure to valsartan would be associated with cumulative exposure to NDMA**. The fact that valsartan epi studies were able to detect an increased risk of liver cancer just by comparing who were ever-exposed to NDMA containing valsartan to never-exposed to NDMA containing valsartan is incredibly significant.
>
> *****
>
> It is important to note the wide range of NDMA levels the FDA detected when testing various manufacturers valsartan. For instance, the 320 mg valsartan made by Hetero Labs Ltd contained as little as 330 nanograms of NDMA, while Prinston Pharmaceutical's 320mg valsartan HCTZ contained up to 20,190 nanograms. Therefore, if Prinston utilized the same active pharmaceutical ingredient (API) to make a 40mg pill of valsartan, it would contain 2,523 nanograms of NDMA. This is key to understanding why the valsartan epi studies all failed to detect a dose response – **the studies wrongly assumed that NDMA exposure scaled proportionally with the milligram of valsartan**. As demonstrated above, a 40mg pill of valsartan from Prinston could contain 7 times the amount of NDMA as a 320mg pill of valsartan from Hetero Labs. Furthermore, someone who filled a single 30-day prescription of Hetero Labs 320mg valsartan with 330 nanograms of NDMA per pill would have been included in the "ever-exposed to contaminated valsartan" group in the valsartan epi studies. The entire exposure for someone who consumed Hetero Labs 320mg valsartan with 330 nanograms of NDMA per pill would have had a total cumulative exposure of 9,900 nanograms – half of what one pill of valsartan 320mg from Prinston contained. If the same Hetero Lab's API was utilized to make a 160mg valsartan pill, it would have only contained 115 nanograms of NDMA per pill or 4,500 nanograms for an entire 30-day fill. Thus, a single 320mg valsartan pill from Prinston could contain four times as much NDMA as an entire 30-day prescription of Hetero Labs 160mg valsartan.

---

[93] Ex. 6, Siddiqui Expert Report at 26-29 (emphasis added).

23

The fact that valsartan epi studies detected an increased risk of liver cancer based solely on ever being exposed to contaminated valsartan is of incredible significance. It has been well established that there is a clear dose-response to NDMA. **Therefore, the valsartan epi findings on an increased risk of liver cancer based on ever being exposed to NDMA contaminated valsartan massively underestimates the increased risk of someone who was exposed to the higher levels of NDMA contaminated valsartan, as the results are significantly diluted by those with the lowest exposure levels.**

*****

Mr. Roberts' Valsartan HCTZ 320-25 mg was manufactured by Zhejiang Huahai Pharmaceuticals (ZHP) and was distributed by Prinston Pharmaceutical. This corresponds to the red box in the FDA testing data above, where between 13,180 nanograms and 20,190 nanograms of NDMA were detected per pill. **Each of the valsartan pills that Mr. Roberts consumed could have contained multiple times more NDMA than would have been present in an entire month's prescription of NDMA-contaminated valsartan from a different company.** Mr. Roberts took 681 of these valsartan pills with incredibly high levels of NDMA before he was diagnosed with HCC (liver cancer).[94]

Dr. Siddiqui testified as follows when questioned about the valsartan epidemiological studies that demonstrated a statistically significant increased risk of liver cancer for those ever-exposed to NDMA-contaminated valsartan[95]:

> They didn't have the data for which batches or lots were contaminated. So for me, it was astounding the fact that even though there was such a propensity for dilution because you have all these patients that they have looked at but they're not looking at the patients who have the most amount of contaminated valsartan. Because as we went over before, there are certain pills from certain manufacturers, like, Zhejiang Chemicals that have a significant amount of NDMA per pill. But then there are other production houses or pharmaceuticals that have a significantly less amount. So they never took that into account. They didn't even have access to that data

---

[94] Defenses' expert hepatologist agreed that Mr. Roberts' cumulative NDMA exposure was on "the high end." (Ex. 9, Mahmud Dep. Tr. at 62:7-12).
[95] Ex. 11, Siddiqui Dep. Tr. at 275:23-277:2, 284:25-286:1.

which we do now. And not taking that into account, so they pooled everybody together, they pooled the valsartan group – basically the contaminated group was basically altogether in – as far as if someone took valsartan once, one pill that maybe had a small amount of NDMA was put into the same group as someone who took valsartan for 2 years with a full amount of NDMA or an exorbitant amount of NDMA, they put that together. And even despite all of that, even despite not knowing that information, even despite having such a big dilution effect, they still found an increased risk of HCC in both the Gomm and Mansouri studies.

*****

They were good studies but there are issues with the way they played out because they didn't have the information that we have now sitting here in 2025. They don't have the batches. They didn't have any of that. They didn't know the difference in the pill. They assumed that having one valsartan pill means one dose but now we know – now, we know very well that someone with one pharmaceutical company can have a smaller dose of valsartan – of NDMA in that one pill whereas someone with – form another company, like, Zhejiang Pharmaceuticals can have another 20,000 – I mean, that's exponentially increasing the amount of NDMA, basically, in one pill, as much as they would have in maybe from a 30-day supply, for example. So we know the limitations. But what I'm saying is, based on all of this, based on all the review of the medical literature, the animal literature, the human epi studies and Mr. Roberts himself, I understand that there is a hazard ratio that points towards a statistical significance between being exposed to contaminated valsartan, which has NDMA and getting HCC and I am basing my opinion that Mr. Roberts had HCC because of his NDMA, because he took such high levels of it, based on all of that.

Because Plaintiff isn't alleging that valsartan itself causes liver cancer, but the NDMA that was inadvertently present in some valsartan causes liver cancer, Dr. Siddiqui also reviewed studies that assessed the risk of humans being exposed to varying levels NDMA. This included an occupational study known as *Hidajat*, which Dr. Siddiqui noted found that those "exposed to higher amount of NDMA in the industry were more likely to die due to liver cancer than workers who were

exposed to lower amounts of NDMA in the factory. Like the animal studies, this human study also demonstrated a dose-response; as the workers were exposed to more NDMA, they died of liver cancer at a higher rate."[96] Defendants also critique Dr. Siddiqui utilizing *Hidajat* to further support her opinion that increased levels of NDMA increase the risk of liver cancer.[97] However, the very first study that the United States Health and Human Services, Agency for Toxic Substances and Disease Registry cites when discussing the hepatic (liver) health effects of NDMA is *Hidajat*.[98] The US HHS noted, "A large cohort mortality study of 36,144 male U.K rubber factory workers reported an increased risk of mortality from liver disease for workers in the third quartile of cumulative NDMA exposure (SHR 2.22; 95% CI 1.24, 3.99) (Hidajat et al. 2020)."[99] It was appropriate for Dr. Siddiqui to consider *Hidajat* and use it as further support that the carcinogenic effects of NDMA in humans exhibit a dose-response as it does in animals, and then apply that well-established concept to provide additional insight into the NDMA-contaminated valsartan epidemiological studies and why Mr. Roberts was at a significantly greater risk than the studies found for someone ever exposed to any level of NDMA-contaminated valsartan.

---

[96] Ex. 6, Siddiqui Expert Report  at 26.
[97] Siddiqui Daubert, ECF No. 3069 at 16.
[98] Ex. 12, Tox Profile NDMA HHS 4/2023 at 41.
[99] Ex. 12, Tox Profile NDMA HHS 4/2023 at 41.

Defendants incorrectly frame Dr. Siddiqui's opinion as the NDMA that Mr. Roberts was exposed to via his contaminated valsartan only conferred a "small increased risks of HCC" of 12% - 16% as observed in the valsartan epidemiological studies.[100] However, as explained above, it is Dr. Siddiqui's opinion that due to the amount of NDMA Mr. Roberts was exposed to via his contaminated valsartan, Mr. Roberts increased risk of liver cancer would have been substantially higher. Furthermore, Dr. Sawyer conservatively calculated Mr. Roberts' increased risk of dying from liver cancer due to the lowest amount of NDMA that Mr. Roberts was potentially exposed to via valsartan as 2.86-fold.[101] Dr. Siddiqui noted in her expert report, "Dr. Sawyer's calculations and opinions are consistent with my understanding regarding Mr. Roberts' NDMA exposure level and associated increased risk of liver cancer."[102]

## 2. NDMA Animal Studies

Defendants also fault Dr. Siddiqui for considering and relying in part on NDMA animal studies in forming her opinions.[103] In support of their argument, Defendants cites *Gen. Elec. Co. v Joiner*, 522 U.S. 136, 144 (1997), noting "The United States Supreme Court therefore recommends caution when considering

---

[100] Siddiqui Daubert, ECF No. 3069 at 37.
[101] Ex. 14, Sawyer Expert Report at 52.
[102] Ex. 6, Siddiqui Expert Report at 29.
[103] Siddiqui Daubert, ECF No. 3069 at 19-21.

causation opinions related to humans based on animal studies ***alone***."[104] As discussed, Dr. Siddiqui did not rely on animal studies alone, but also human studies.

One of the animal studies that Defendants fault Dr. Siddiqui for considering and relying in part on is Peto et al, *Dose and time relationships for tumor induction in the liver and esophagus of 4,080 inbred rats by chronic ingestion of N-nitrosodiethylamine or N-nitrosodimethylamine*, 51 Cancer Research 6452 (1991). *Peto* was one of the largest animal studies ever conducted, including non-NDMA animal studies, with over 4,000 rats. Defendant's expert cancer biologist explained how gargantuan of an undertaking and rare an animal study of this size is:[105]

> Well, it certainly wouldn't be feasible in my laboratory, nor any academic lab at Penn for instance, that I'm familiar with. Whether that's possible, you know, in some other setting, like a pharmaceutical setting, is that conceivable? Well, in theory, it could be done."

The results from the NDMA animal studies are also likely conservative when compared to the patient population exposed to NDMA via contaminated valsartan, because on average, adults on antihypertensives are not going to have pristinely healthy livers. Defendants' expert hepatologist succinctly explained this key difference in the animals that were administered NDMA, "I have to emphasize that *all of these animal studies study animals that have normal livers at baseline.* They're exposing normal healthy, you know, rodents or whatever animal model they're

---

[104] Siddiqui Daubert, ECF No. 3069 at 20 (emphasis added).
[105] Ex. 15, Chodosh Dep. Tr. at 45:5-18.

using. *They have a healthy liver*."[106] The US HHS explains that those with an unhealthy liver would be more susceptible to NDMA, "because the liver is the primary target of NDMA toxicity, individuals with liver disease may be at increased risk from NDMA exposure."[107]

### 3. Dr. Siddiqui Was Able to Reliably Quantify the Amount of NDMA Present in Each Prescription of Valsartan Mr. Roberts Consumed

Defendants claim, "Dr. Siddiqui ruled 'in' valsartan as a risk factor for Mr. Roberts' HCC based on the *assertion* that ZHP's valsartan *purportedly* contained 13,180 to 20,190 nanograms of NDMA" and cited to page 27 of her expert report.[108] Page 27 of Dr. Siddiqui's expert report is a screenshot of the levels of NDMA that the FDA detected in various manufacturers valsartan tablets, with a red box added around the FDA testing results that correspond to the NDMA-contaminated valsartan consumed by Mr. Roberts.[109] Additionally, Dr. Siddiqui reviewed and considered Plaintiff's toxicologist expert report in coming to her opinion, which gave even more precise levels of the amount of NDMA present in each lot of valsartan consumed by Mr. Roberts.[110] Dr. Siddiqui was able to reliably quantify to a reasonable degree of certainty the amount of NDMA present in the valsartan consumed by Mr. Roberts.

---

[106] Ex. 9, Mahmud Dep. Tr. at 372:2-7 (emphasis added).
[107] Ex. 12, Tox Profile NDMA HHS 4/2023 at 94.
[108] Siddiqui Daubert, ECF No. 3069 at 10 (emphasis added).
[109] Ex. 6, Siddiqui Expert Report at 27-28.
[110] Ex. 6, Siddiqui Expert Report at 1; Ex. 14, Sawyer Expert Report at 104-06 (the amount of NDMA present in the various batches of valsartan API were determined by testing conducted by Defendants).

The ability to reliably quantify the amount of NDMA present in any valsartan pill to a reasonable degree to certainty on a consistent basis is a key difference between valsartan and ranitidine (Zantac). Because the ranitidine molecule itself can breakdown into NDMA, the presence and amount of NDMA in a pill of ranitidine could potentially vary based on the storage conditions of the medication, thereby increasing the difficulty in quantifying the amount of NDMA a specific ranitidine user was exposed to. However, NDMA is not inherent to the valsartan molecule – valsartan does not break down into NDMA. Unlike the NDMA present in ranitidine, the NDMA present in valsartan is a contaminate/impurity.[111] Furthermore, the amount of NDMA in a pill of valsartan doesn't change over time due to heat or other storage conditions.[112] Dr. Chodosh, who was also a defense expert in the ranitidine litigation[113], testified to this difference in the difficulty of being able to reliably quantify the amount of NDMA in ranitidine[114]:

> Part of the complexity of the ranitidine litigation was that was hypothesized to be dependent on storage conditions and things of that nature. And so, you know, it's not – in those cases, not possible to say – it was not – the issue was not – what is present at the time of manufacture in the ranitidine litigation, it was, well, under the conditions in which people used ranitidine what might the concentration have been?

---

[111] Ex. 16, Plunkett Expert Report at 41.

[112] *See* Clevenger Daubert (ECF No. 2047-1) and subsequent Order Excluding Dr. Clevenger (ECF No. 2262) opining that the amount of NDMA detected in valsartan API (Active Pharmaceutical Ingredient) could decrease when made into a finished dose tablet due to heat or other manufacturing process.

[113] Ex. 15, Chodosh Dep. Tr. at 67:14-16.

[114] Ex. 15, Chodosh Dep. Tr. at 175:23-176:11.

Dr. Chodosh was questioned additionally on this critical difference in being able to more reliably quantify the amount of NDMA in valsartan compared to ranitidine:[115]

> Q: Doctor, earlier you stated that the amount of NDMA in ranitidine was dependent on heat, humidity time or how it was stored; is that correct?

> A: I believe what I said was that sort of a central part of both ranitidine litigation and the theories surrounding what exposure might have been in patients taking the drug, that an important factor was evaluating the impact of certain environmental variables on the rate at which the chemical molecule ranitidine might decompose to form NDMA, where I would say what emerged from those studies was that temperature, humidity and time were each apparently variables. Although I would say there wasn't a simple conclusion that came out of that, as in, there wasn't an accurate formula that would enable you to go plug in those things and to – and to figure it out. But – there were studies in particular of those three factors, amongst others.

> Q: Doctor, the amounts of NDMA that are in valsartan are not dependent on the factors of heat, humidity, time or how it's stored, correct?

> A: I think that's fair to say. Or at least to my understanding, I have not seen any indication in the literature that it is.

This Court came to a similar conclusion regarding the differences in the valsartan litigation and the ranitidine litigation when denying Defendants' Motion for Reconsideration of this Court's Daubert Order or, in the alternative, to certify this matter for interlocutory appeal. This Court's December 22, 2022, Order notes:[116]

> That the Ranitidine MDL Court observed no methodologically reliable study which either showed that, or proposed how, the human body actually catalyzed ranitidine into a nitrosamine, thus raising scientific doubt as to a nitrosamine-induced genotoxic effect caused by the ingestion of a ranitidine containing pharmaceutical,

---

[115] Ex. 15, Chodosh Dep. Tr. at 216:2-24.
[116] ECF No. 2210 (emphasis added).

That there is, and has been, no showing that a ranitidine pharmaceutical contained before ingestion an amount of NDMA or NDEA, which upon repeated exposure could lead to a lifetime cumulative threshold ["LCT"] sufficient to cause cancer, and

That in this MDL, unlike in the Ranitidine MDL, **there is no scientific doubt about the presence of nitrosamines in the human body upon the ingestion of the "valsartan-containing drugs containing NDMA or NDMEA" ["VCDs"], because the VCDs contained nitrosamines before ingestion**

## 4. Latency

Defendants then argue that even if NDMA can cause liver cancer, NDMA couldn't have caused liver cancer as quickly as it did in Mr. Roberts.[117] Defendants then cite "CDC guidance and relevant studies addressing the latency period for [liver cancer] ***generally*** suggest a minimum latency period of four years".[118] Defendants failed to disclose that the CDC based this on "risk modeling for low-level ionizing radiation studies."[119]  This same CDC guidance also notes "the minimum latency may be significantly shortened" for those exposed to "cancer initiators and promoters".[120] Plaintiff's expert cancer researcher, Dr. Panigrahy, has a section of his report titled, "**NDMA is a Tumor Initiator and Tumor Promoter**".[121] Dr. Panigrahy also has a section of his report titled, "NDMA reduces latency as a cancer initiator and cancer promoter".[122] In total, Dr. Panigrahy devotes approximately 20

---

[117] Siddiqui Daubert, ECF No. 3069 at 16.
[118] Siddiqui Daubert, ECF No. 3069 at 17 (emphasis added).
[119] *See* Ex. 22, WTC Health Guidance Document at 1.
[120] *See* Ex. 22, WTC Health Guidance Document at 5.
[121] Ex. 7, Panigrahy Expert Report at 33-34.
[122] Ex. 7, Panigrahy Expert Report at 202.

pages of his expert report explaining how NDMA reduces the latency.[123]

Defendants' arguments regarding latency don't fit the facts of this case. Mr. Roberts underwent multiple imaging studies of his liver that did not detect cancer just months before Mr. Roberts was exposed to NDMA-contaminated valsartan and then approximately two years later Mr. Roberts underwent additional imaging which revealed liver cancer.[124] Defendants could be right that it *generally* takes 4 years for liver cancer to develop under normal processes (when the patient isn't exposed to potent cancer initiators and promoters). However, as evidenced by numerous liver imaging studies, Mr. Roberts did develop liver cancer in a 2-year period. Dr. Siddiqui goes over Mr. Roberts' medical history in detail in her expert report and notes, "Mr. Roberts' case is unique in that there is an extensive amount of documented relevant medical history, including labs and imaging prior to his exposure to NDMA, and is then followed closely for the 2 years in which he is exposed to daily multi-microgram boluses of NDMA."[125]

Unlike *In Re Silicone Gel Breast Impl. Prods Liab. Litig.*, 318 F. Supp. 2d 879, 921 (C.D. Cal. 2004) where there was no mention of negative imaging prior to Plaintiff's breast implantation (only physical exams feeling for lumps), imaging of

---

[123] Ex. 7, Panigrahy Expert Report at 33-34; 201-216.
[124] Ex. 17, Composite Exhibit - GRobertsJr-CA-000166-67; GRobertsJr-SouCC-000252-53; GRobertsJr-TH-MD-000944l; Infirmary_GRobertsJr00014-15
[125] Ex. 6, Siddiqui Expert Report at 31.

Mr. Roberts' liver demonstrates that Mr. Roberts did not have liver cancer prior to ingesting NDMA-contaminated valsartan and then developed liver cancer measuring approximately 5.8cm in a 2 year period. The real question is how Mr. Roberts developed a 5.8cm malignant liver tumor in a 2-year period, and the answer strongly supports Dr. Siddiqui's opinion that NDMA-contaminated valsartan caused Mr. Roberts' liver cancer – Mr. Roberts was exposed to high levels of a potent tumor initiator and tumor promoter. On this point, Dr. Siddiqui opined, "The aggressive behavior and rapidity of Mr. Roberts' cancer progression was atypical and was most consistent with a carcinogenic exposure."[126] While testifying regarding her differential diagnosis, Dr. Siddiqui also explained how the short latency supports her opinion:[127]

> So we start with the very basic risk factors of diabetes, obesity and hyperlipidemia. We start with that. We put those under the MASLD… we already know that in 2016, there were some changes, but the changes were not significant enough to be shown – he had no physical sequelae from those changes. [There] [were] radiological changes and we wouldn't have diagnosed him with cirrhosis then. But ultimately in 2018, he did get cirrhosis very fast and a large amount of HCC. It – again, the timeline does not fit, the timeline does not make sense. I believe that everything was sped up by a promoter, which was the carcinogen NDMA in valsartan.

Furthermore, the NDMA-contaminated valsartan epidemiological studies that found a statistically significant increased risk of liver cancer, published in 2021 and

---

[126] Ex. 6, Siddiqui Expert Report at 31.
[127] Ex. 11, Siddiqui Dep. Tr. at 208:6-22.

2022, detected statistically significant increased risk of liver cancer within just a couple years of exposure to contaminated-NDMA valsartan.[128]  Even the authors of the NDMA-contaminated valsartan epidemiological studies believed that NDMA is capable of causing and promoting cancer progression to a degree that the cancer is diagnosable within 2 years of exposure, as evidenced by their study design. Dr. Siddiqui testified to the fact that the valsartan epidemiological studies support the latency observed with Mr. Roberts:[129]

> The human epi studies that show that even despite that, even despite mixing with lower doses, you have patients coming out with HCC within the short term follow-up that these studies did. So all of these together, we again can't look at it in a bubble, we have to look at it in context. All of these together point towards the fact that the carcinogen that Mr. Roberts was exposed to at the high doses that he was exposed to caused liver cancer. And I just want to go in here and just tell you about the number, which I had mentioned before. It was – it's a 320-miligram tablet of valsartan contained up to 20,190-nanograms. He took this every single day for nearly 2 years and the FDA – FDA lists a reasonably safe level at 96-nanograms.

### G. Calculating a Tumor Volume Doubling Time was Unnecessary

Defendants fault Dr. Siddiqui for not calculating a tumor volume doubling time to estimate if Mr. Roberts had liver cancer at the time he was exposed to NDMA-contaminated valsartan.[130] As explained above, Mr. Roberts had imaging performed contemporaneous with his first exposure to NDMA-contaminated valsartan that did not detect liver cancer. Furthermore, tumor volume doubling time

---

[128] Ex. 18, *Gomm* Study; Ex. 19, *Mansouri* Study.
[129] Ex. 11, Siddiqui Dep. Tr. at 293:18-294:9.
[130] Siddiqui Daubert, ECF No. 3069 at 18.

formulas are not intended to be applied to individual patients and there is insufficient data to accurately apply such formula to an individual patient.[131] Dr. Chodosh (Defense's expert cancer biologist), succinctly explained why it would be unhelpful and unreliable to apply to tumor volume doubling time formula to Mr. Roberts:[132]

> Tumor volume doubling times are generally used across – well, in the clinical setting – clinical research setting or human studies setting, tumor volume doubling time studies are generally studies of multiple individuals with a particular type of cancer at a particular stage that's consistent in attempting to arrive at some kind of estimates, across that population, of what tumor volume doubling time might be. Whereas it's not typically – **not typically something that's done on an individual patient basis. And very commonly it's because there aren't sufficient data** to do that in the great majority of oncology cases. ***Again, nor would it be helpful***.
>
> *****
>
> It's a research metric, **it's not a clinical metric**, at least for the types of solid tumors that I am thinking of right now.
>
> *****
>
> **Cancer growth rates** are a function of time. They are not – even in a patient, they are not necessarily constant, and **almost certainly are not constant**. So it's a function of time. And cancer – even the notion of cancer type is fundamentally dependent on our ability to classify and subclassify cancers, because at some level **every cancer is different** based on the **mutations that are present and a number of host features**.

Defendants also misleading explain a meta-analysis of HCC tumor volume doubling times to make it appear that the fastest tumor volume doubling time possible is 3.9 months.[133] Very similar language appears in defense expert

---

[131] *See* Mahmud Daubert, ECF No. 3067 and Chernyak Daubert, ECF No. 3066.
[132] Ex. 15, Chodosh Dep. Tr. at 86:19-92:20 (emphasis added).
[133] Siddiqui Daubert, ECF No. 3069 at 17-18. Of note, none of the studies within the meta-analysis are evaluating the tumor volume doubling time of patients being actively exposed to potent cancer initiators and promoters.

hepatologist, Dr. Mahmud's expert report.[134] Dr. Mahmud even testified that he believed that 3.9 months was the fastest possible time that liver cancer can double in volume.[135] However, the meta-analysis cited by both Dr. Mahmud and Defendants notes that liver tumors can double in volume every 2.2 months.[136] Defendants' own expert conceded that back calculating Mr. Roberts' liver cancer growth based on a 2.2-month tumor volume doubling time (in patients not even exposed to cancer initiators and promotors), Mr. Roberts would not have had cancer prior to ingesting NDMA-contaminated valsartan.[137] Defendants' latency arguments are misleading and without merit.[138]

### H. Dr. Siddiqui Appropriately Ruled Out Mr. Roberts Having Liver Cancer Prior to Being Exposed to NDMA-Contaminated Valsartan

Even though Dr. Siddiqui notes in her expert report that, "I have reviewed the [2016] imaging myself and see no evidence that Mr. Roberts had liver cancer at this time"[139], Defendants claim that Dr. Siddiqui cannot reliably rule out that Mr. Roberts had liver cancer prior to being exposed to NDMA-contaminated valsartan because a 2016 CT of Mr. Roberts' liver noted, "indeterminate hyperdense lesion in the right lobe of liver, too small to definitively characterize. Benign or malignant etiologies

---

[134] Ex. 20, Mahmud Expert Report at 33.
[135] Ex. 9, Mahmud Dep. Tr. at 357:1-3, 397:4-7, 398:10-15.
[136] Ex. 9, Mahmud Dep. Tr. at 406:5-14.
[137] Ex. 9, Mahmud Dep. Tr. at 408:4-11.
[138] Defendants even concede later in their brief that Mr. Roberts' "cancer almost certainly developed" after starting valsartan. *See* Siddiqui Daubert, ECF No. 3069 at 21.
[139] Ex. 6, Siddiqui Expert Report at 5.

could have this appearance."[140] This argument is another red herring – no Plaintiff or Defense expert[141] opines that the small indeterminate lesion observed on Mr. Roberts' liver in 2016 by his treating radiologist corresponded to the location of Mr. Roberts' liver cancer discovered in 2018. Plaintiff's expert radiologist opined:[142]

> None of the lesions, and their associated imaging findings, consistent with hepatocellular carcinoma identified in 2018 were present on the initial 2016 CT examination. Furthermore, the hepatocellular carcinoma discovered in 2018 **does not correspond** with the precise locations of the sub-centimeter foci of decreased attenuation observed on the 2016 CT examination

Dr. Siddiqui also reviewed the actual imaging studies herself, as she would in practice, in giving her opinion that "Mr. Roberts did not have cancer prior to ingesting valsartan containing NDMA."[143] When asked if she reviews imaging and diagnose cancer in practice, Dr. Siddiqui explained, "yes, I diagnose patients all the time. But to come to that diagnosis, I need to review the data, I need to review the images. Sometimes I even pick up a phone – most of the time I pick up the phone and I discuss with the radiologist.[144] Dr. Mele finalized his expert report prior to Dr. Siddiqui, and therefore Dr. Siddiqui reviewed and considered his expert radiological

---

[140] Siddiqui Daubert, ECF No. 3069 at 31.

[141] Of note, Defendants' expert radiologist claimed to have detected another observation on Mr. Roberts' liver not noted by Mr. Roberts' treating radiologist in 2016 that allegedly corresponds to the area of Mr. Roberts' subsequent liver cancer (*See* Chernyak Daubert, ECF No. 3066).

[142] Ex. 4, Mele Expert Report at 3 (emphasis added).

[143] Ex. 6, Siddiqui Expert Report at 20.

[144] Ex. 11, Siddiqui Dep. Tr. at 74:5-10.

opinion prior to finalizing her opinion.[145]

Defendants also claim that "Plaintiff's own expert radiologist, Dr. Mele, has stated that Mr. Roberts' April 2016 CT scan shows seven liver lesions"[146], however Defendants' citation supports no such statement, and Dr. Mele gave no such opinion.

## I.  There Is No Evidence That Mr. Roberts Did Not Follow Medical Advice

Defendants improperly victim blame, claiming that "Notably, Mr. Roberts did not follow the recommendation to return for follow-up imaging in four to six months", and providing no supporting citation.[147] Mr. Roberts' April 19, 2016 radiology report simply has a line of text noting, "Follow-up liver protocol CT 4-6 months from date of study would be useful for further characterization."[148] There is absolutely no evidence that Mr. Roberts' treating physician ever communicated this recommendation to Mr. Roberts.[149] It is not even clear if Mr. Roberts' treating physician agreed with the recommendation. Two months later on June 23, 2016, Dr. Ives noted that the prior "ultrasound and CT revealed some cysts in the liver for which a 4-6 month follow up is recommended" and that "liver function tests slightly increased and has been told all his life that they have been up a bit and ultrasound showed fatty infiltration."[150] Furthermore, Mr. Roberts continued to regularly follow

---

[145] Ex. 6, Siddiqui Expert Report at 1; Ex. 11, Siddiqui Dep. Tr. at 316:1-25.
[146] Siddiqui Daubert, ECF No. 3069 at 32, *citing* Mele Dep. Tr. at 158:22-162:3.
[147] Siddiqui Daubert, ECF No. 3069 at 32.
[148] Ex. 1, GRobertsJR-TH-MD-000944 - 945.
[149] Ex. 5, Mele Dep. Tr. at 291:6-10.
[150] Ex. 6, Siddiqui Expert Report at 6; Ex. 21, GRobertsJr-ESMS-000006.

up with his treating physicians, including multiple blood draws to monitor his liver enzymes. None of Mr. Roberts' medical records suggest that Mr. Roberts was refusing to undergo additional imaging. In fact, Mr. Roberts was so compliant with his medical treatment that Dr. Siddiqui noted that his medical course would serve as an ideal case study because "there is an extensive amount of documented relevant medical history, including labs and imaging prior to his exposure to NDMA, and is then followed closely for the 2 years in which he is exposed to daily multi-microgram bouses of NDMA."[151]

## V.    **CONCLUSION**

Because Dr. Siddiqui's opinions are based on reliable methods, grounded in peer-reviewed science, consistent with Mr. Roberts' clinical history, and meets the legal standards for admissibility under Rule 702, Defendants' motion to exclude Dr. Siddiqui's testimony should be denied.

Respectfully submitted,

Dated: June 26, 2025

By*: /s/ C. Brett Vaughn*
C. Brett Vaughn, RN, BSN, JD
NIGH GOLDENBERG RASO &
VAUGHN, PLLC
*Attorneys for Plaintiffs*
14 Ridge Square NW Third Floor
Washington, D.C. 20016
Tel: 202-792-7927
Fax: 202-792-7927
Email: bvaughn@nighgoldenberg.com

---

[151] Ex. 6, Siddiqui Expert Report at 31.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ C. Brett Vaughn*

C. Brett Vaughn, RN, BSN, JD