# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION | MDL No. 2875 |
| THIS DOCUMENT RELATES TO: *Roberts v. Zhejiang Huahai Pharmaceutical Co. Ltd.,* <br><br> Case No. 1:20-cv-00946-RMB-SAK | HON. RENÉE MARIE BUMB |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DR. WILLIAM SAWYER

NIGH GOLDENBERG RASO & VAUGHN, PLLC
*Attorneys for Plaintiffs*
14 Ridge Square NW
Third Floor
Washington, D.C. 20016
Tel: 202-792-7927
Fax: 202-792-7927

On the Brief:
Daniel Nigh, Esq.
C. Brett Vaughn RN, BSN, JD
Ashleigh Raso, Esq.
Kathryn Avila, Esq.
Stephanie Iken, Esq.

# **TABLE OF CONTENTS**

I. INTRODUCTION ....................................................................................3

II. BACKGROUND ....................................................................................5

III. LEGAL STANDARD.............................................................................7

IV. ARGUMENT.........................................................................................9

   A. Dr. Sawyer Opines on Specific Causation..........................................9

   B. Dr. Sawyer Uses Standard Methodology to Form His Opinion ....................12

   C. Dr. Sawyer Did Not Improperly Infer Causation from Animal or Non-Liver Studies............................................................................17

   D. Dr. Sawyer's Specific Causation Opinion Is Based on Reliable Dose-Response  Methodology...........................................................20

   E. Dr. Sawyer Applied a Reliable, Well-Accepted Dose Extrapolation Methodology ..............................................................23

   F. Dr. Sawyer's Latency Opinion Reflects Reliable Methodology and Fits the Facts of the Case .........................................................26

   G. The Defense Misrepresents Dr. Sawyer's Application of the Bradford Hill Criteria ...................................................................28

   H. Hidajat Study Was Not Biased by Factory Exposures ...................................31

   I. Incorrect Citations in Dr. Sawyer's Report .....................................32

   J. Defendants Mischaracterize the Consistency Analysis and Misstate the Record ..........................................................................36

   K. Other Courts' Rulings on NDMA (Zantac) Experts Are Neither Binding nor Persuasive Here..............................................................38

V. CONCLUSION...................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharms., Inc*.,
   509 U.S. 579, 596 (1993) ........................................................................8

*Heller v. Shaw Indus., Inc*.,
   167 F.3d 146, 155 (3d Cir. 1999) ............................................. 7, 22, 28

*In re Acetaminophen - ASD/ADHD Prods. Liab. Litig*.,
   707 F. Supp. 3d 309, 361–362 (S.D.N.Y. 2023) ....................................8

*In re Paoli R.R. Yard PCB Litig*.,
   35 F.3d 717, 742 (3d Cir. 1994) .................................................. passim

*In re Valsartan*, MDL No. 19-2875, 2025 U.S. Dist. LEXIS 66185, at *39
   (D.N.J. Apr. 7, 2025) ............................................................................8

*In re Zoloft Prods. Liab. Litig*.,
   858 F.3d 787, 796–800 (3d Cir. 2017) ......................................... 12, 29

*Mata v. Avianca, Inc.*, No. 22-CV-1461 (PKC),
   2023 WL 4114965 (S.D.N.Y. June 22, 2023) .....................................32

*Oddi v. Ford Motor Co.*,
   234 F.3d 136, 146 (3d Cir. 2000) ................................................. 12, 23

*Schneider v. Fried*,
   320 F.3d 396, 404 (3d Cir. 2003) .........................................................8

**Rules**

Fed. R. Evid. 702 ........................................................................................7, 9

# I.  **INTRODUCTION**

Plaintiff respectfully submits this response in opposition to Defendants' *Daubert* Motion to Exclude the Opinions of Dr. William Sawyer.

Dr. Sawyer was retained in this case to provide a *specific causation opinion*: "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of NDMA from the defective valsartan exceeded the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[1] Dr. Sawyer does not purport to offer primarily a general causation opinion. His role is limited to applying generally accepted scientific methodology to Mr. Roberts' clinical history and exposure data to determine whether NDMA-contaminated valsartan increased Mr. Roberts' risk of developing liver cancer.

Dr. Sawyer's specific causation opinion is grounded in reliable, well-established toxicological principles and a detailed case-specific analysis. He employed standard methodologies accepted throughout the scientific community, including cumulative dose assessment, dose-response evaluation, and latency analysis. These methods are not novel or speculative; they are consistent with the scientific rigor demanded under Rule 702 and have been applied in countless toxicology assessments. Defendants argue that Dr. Sawyer improperly inferred causation from animal studies, relied on non-liver data, and applied flawed

---

[1] Ex. B - Sawyer Rep. at 84.

extrapolation techniques. They challenge his latency assessment, distort his application of the Bradford Hill criteria, and attempt to discredit supporting literature, including the Hidajat study, based on unfounded speculation. They also point to isolated citation issues and selectively quote the record to portray Dr. Sawyer's analysis as inconsistent or unreliable. Finally, they invoke rulings from unrelated NDMA litigation involving ranitidine, which involved a different chemical mechanism, different scientific uncertainties, and are neither binding nor persuasive in this case.

Defendants devote much of their brief to rhetoric, not reliability. They accuse Dr. Sawyer of fabricated citations, "shattered" credibility, and mischaracterize his methodology.[2] These claims are baseless. While Dr. Sawyer made several citation errors, he acknowledged his mistakes at his deposition and explained that those references were included only in the background section and not relied upon in his actual analysis. His core methodology remains grounded in peer-reviewed literature, validated dose-extrapolation calculations, and accepted weight-of-evidence analysis, including but not relying solely on the Bradford Hill criteria.

The defense resorts to language like "lied," "made up," and "shattered credibility" to imply fraud.[3]  Dr. Sawyer's opinions satisfy Rule 702 because they are the product

---

[2] Ex. A - Sawyer Daubert at 1-2
[3] Ex. A - Sawyer Daubert at 1-3

4

of reliable principles and methods, applied to the specific facts of this case. His conclusions may be tested on cross-examination, but they should be heard by a jury.

This brief addresses each of these arguments in turn. It explains why Dr. Sawyer's methodology is standard and reliable, how his conclusions are firmly grounded in the record, and why the defense's critiques either misstate the facts or mischaracterize the science. The arguments against admissibility amount to disagreements with Dr. Sawyer's conclusions, not the reliability of his methods.

Defendants' motion does not satisfy their burden under Rule 702 and should be denied in full.

## II. BACKGROUND

***NDMA in Valsartan.*** NDMA (N-nitrosodimethylamine) is a small organic nitrosamine molecule, classified as a "probable human carcinogen" by both the EPA and IARC. Decades ago, its powerful tumor-inducing effects were reported in animal organs, especially the liver.[4] In 2018, the FDA identified various lots of Valsartan, a blood-pressure medication, that were contaminated with NDMA because of certain manufacturers' processes.[5]

---

[4] WHO International Programme on Chemical Safety (IPCS), Concise International Chemical Assessment Document 38, 2002, N-NITROSODIMETHYLAMINE, pgs. 16-17. https://iris.who.int/bitstream/handle/10665/42422/a73568.pdf.
[5] https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products

***Plaintiff's Case.*** Plaintiff Mr. Roberts ingested NDMA-contaminated Valsartan tablets for an extended period (approximately 2016–2018).[6] In less than two years from the start of this exposure, he was diagnosed with hepatocellular carcinoma (liver cancer).[7] Mr. Roberts had no history of hepatitis infection, excessive alcohol use, or other predominant liver cancer risk factors.[8] The chronology and lack of alternative causes pointed to NDMA as a suspect agent. Plaintiff retained Dr. William Sawyer to provide expert opinions on specific causation, specifically "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of NDMA from the defective valsartan exceeded the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[9]

***Dr. Sawyer's Qualifications.*** Dr. William Sawyer is a forensic toxicologist with more than 37 years of experience in evaluating chemical exposures and their health effects. He has testified in over 270 matters, has been appointed by federal and state courts, and is a former member of the U.S. Navy with a doctorate in toxicology. He serves as the Principal Toxicologist at Toxicology Consultants &

---

[6] Ex. B - Sawyer Rep. at 75.
[7] Ex. B - Sawyer Rep. at 70.
[8] Ex. B - Sawyer Rep. at 71
[9] Ex. B - Sawyer Rep. at 84.

Assessment Specialists, Inc., and has consulted on countless cases involving alleged chemical-induced diseases.

Defendants deride him as a "professional expert." This label is both inaccurate and legally irrelevant. Courts evaluate methodology, not career paths. Dr. Sawyer has dedicated his life to the field of toxicology and brings with him a wealth of experience relevant to this case. Dr. Sawyer testified that he was required to take medical school courses in pathology, biostatistics, and epidemiology and regularly uses epidemiological data in his practice.[10] He even taught portions of a medical epidemiology course as an assistant professor in a medical school.[11] While Dr. Sawyer is not a physician and does not treat patients (and has never represented himself as an M.D.), toxicology by its nature involves determining how chemical exposures affect human health. He routinely performs risk assessments and causation analyses for toxins. Unlike defendants' experts, Dr. Sawyer has routinely provided expert testimony on behalf of both plaintiffs and defendants.

### III. LEGAL STANDARD

Under Federal Rule of Evidence 702, the plaintiff bears the burden of proving admissibility by a preponderance of the evidence. See Fed. R. Evid. 702; see also *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). This requires

---

[10] Ex. C - Sawyer Dep. at 34:01-35:02
[11] Ex. B - Sawyer Rep. at 94

demonstrating that the expert is qualified, the methodology is reliable, and the opinion fits the facts. *Id*.

The Third Circuit has emphasized that the trial court's role is not to determine whether an expert's conclusions are correct, but rather whether the methods used are reliable. See *In re Paoli R.R. Yard PCB Litig*., 35 F.3d at 744. Even if the judge believes there are better grounds for another conclusion, the expert's opinion is admissible if based on good grounds. *Id*. at 744–745.

In toxic tort cases, the Third Circuit has repeatedly accepted differential diagnosis, dose reconstruction, and exposure assessment as valid methods. See *Heller v. Shaw Indus., Inc*., 167 F.3d 146, 155 (3d Cir. 1999); *In re Paoli R.R. Yard PCB Litig*., 35 F.3d at 758. Dr. Sawyer used all of these well-established techniques. He relied on peer-reviewed literature, government reports, and accepted toxicological principles. His conclusions flow from scientifically valid reasoning, not subjective speculation.

Defendants cite *In re Valsartan*, MDL No. 19-2875, 2025 U.S. Dist. LEXIS 66185, at *39 (D.N.J. Apr. 7, 2025), arguing that the 2023 amendments require more rigorous gatekeeping. Plaintiffs agree that courts must ensure experts apply reliable methods. But nothing in Rule 702 authorizes exclusion based solely on disagreement with conclusions. Courts must not exclude an expert because there is a flaw in their

reasoning unless the flaw renders the opinion unreliable. See *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744.

Scientific disagreements are for the jury to resolve. See *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Rule 702 is not intended to replace the adversarial process. Id. So long as the expert uses sound methods, any weaknesses go to weight, not admissibility. See *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

Defendants' reliance on *In re Acetaminophen - ASD/ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 361–362 (S.D.N.Y. 2023), is misplaced. That expert relied on speculative theories and unsupported data. Dr. Sawyer does not. He applies accepted methods to known facts, based on established science.

Dr. Sawyer's testimony is admissible because he uses reliable methods and applies them reliably to the facts of this case. Any disputes about his conclusions are for the jury. Disagreements about interpretation or emphasis are appropriate subjects for cross-examination, not exclusion. Because Dr. Sawyer applied reliable methods to the facts of the case, his testimony meets the standard of Rule 702 and should be admitted.

## IV.  <u>ARGUMENT</u>

### A.    Dr. Sawyer Opines on Specific Causation

Defendants argue that Dr. Sawyer "equivocated on whether he is offering a general causation opinion," claiming he "vaguely suggest[s]" an intent to rely on general causation opinions previously offered in the MDL. They further state that "to the extent he has retracted his general causation opinion, it should be excluded from trial".[12] This argument mischaracterizes Dr. Sawyer's position and reflects a fundamental misunderstanding of the role of a toxicologist in assessing dose-response.

Dr. Sawyer's expert opinion focuses on specific causation, specifically "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of NDMA from the defective valsartan exceeded the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[13] Unlike experts Defendants rely on, such as Dr. Diette (who conceded in his deposition that his own opinion was almost entirely general causation and did not reference Mr. Roberts),[14] Dr. Sawyer performed a detailed review of Mr. Roberts' medical and pharmaceutical records to form a specific causation opinion based on Mr. Roberts.

Dr. Sawyer has explicitly and repeatedly stated that he is not offering a general causation opinion in this case. He has not previously offered such an opinion, and thus has nothing to "retract." Toxicology is a multidisciplinary investigative science

---

[12] Ex. A - Sawyer Daubert at 1.
[13] Ex. B - Sawyer Rep. at 84.
[14] Ex. D - Diette Dep. at 10:13-13:01

that draws upon pharmacology, chemistry, pathology, and epidemiology. Toxicologists assess case-specific exposure and apply objective scientific data to determine whether the level of exposure was sufficient to produce a known toxic effect in a particular individual. In doing so, they rely on the toxicological method, which involves identifying a chemical's absorption, distribution, metabolism, and excretion (ADME), as well as its mechanisms of action, known dose-response relationships, and established health effects.[15] These assessments necessarily draw upon the same data that support general causation, but they do so in service of a case-specific dose reconstruction and risk assessment, not to offer an opinion on whether a substance is generally capable of causing a disease.

In his report, Dr. Sawyer clearly stated that his role is to determine whether "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of NDMA from the defective valsartan exceeded the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[16] He concluded, to a reasonable degree of toxicological certainty, that Mr. Roberts' oral NDMA dosage from defective valsartan exceeded the dose-response threshold that significantly increased his risk of liver cancer. This is not a general causation opinion. It is a case-

---

[15] Ex. B - Sawyer Rep. at 4.
[16] Ex. B - Sawyer Rep. at 84.

specific toxicological analysis grounded in peer-reviewed scientific literature and validated methods.

Accordingly, Defendants' suggestion that Dr. Sawyer is offering a general causation opinion, or that he has retracted one, is unfounded. His testimony is limited to specific causation and dose-response, and it should be admitted as such.

### B.    Dr. Sawyer Uses Standard Methodology to Form His Opinion

Defendants argue that Dr. Sawyer created a "novel" methodology to compare NDMA inhalation exposure in rubber workers[17] to oral NDMA exposure in Mr. Roberts from contaminated valsartan.[18] They claim his approach has never been validated and that the data relied upon were deemed unreliable by the Zantac court. These accusations are incorrect and misleading.

Dr. Sawyer followed a well-established toxicological approach, consistent with both peer-reviewed science and accepted legal standards under Rule 702. He began by calculating Mr. Roberts' cumulative NDMA exposure based on pharmacy dispensing records from North Baldwin Pharmacy, which documented valsartan prescriptions from February 22, 2011, through March 17, 2020.[19] He cross-referenced these records with manufacturing data showing that Prinston/Solco/ZHP valsartan contained some of the highest NDMA contamination levels identified by

---

[17] Ex. E – Hidajat 2019
[18] Ex. A - Sawyer Daubert at 8
[19] Ex. B - Sawyer Rep. at 75-77

the FDA. *Id*. Dr. Sawyer then compared Mr. Roberts' estimated NDMA intake to doses linked to liver cancer in published toxicological and epidemiological literature. *Id*. For example, he cited the Hidajat study, which found that individuals in the highest quartile of dietary NDMA intake had a 286% increased risk of liver cancer (HR 2.86, 95% CI 1.78–4.59), and concluded that Mr. Roberts' pharmaceutical NDMA exposure significantly exceeded that level.[20]

Next, Dr. Sawyer then applied a toxicological weight-of-evidence framework, relying on dose-response relationships observed in animal and human studies, species-specific toxicology data, peer-reviewed literature, and Mr. Roberts's clinical history.[21] This methodology is well recognized in the scientific community and has been accepted by courts evaluating toxic tort claims. See *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 796–800 (3d Cir. 2017); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000).

Dr. Sawyer also incorporated pharmacoepidemiological evidence, including the Gomm and Mansouri studies.[22] Gomm et al. reported a hazard ratio of 1.16 (95% CI 1.00–1.34), and Mansouri et al. found a hazard ratio of 1.12 (95% CI 1.01–1.25) for liver cancer associated with NDMA-contaminated valsartan. *Id*. He testified that these figures likely *underestimated* the true risk because both studies failed to stratify

---

[20] *Id* at 34.
[21] *Id* at 80.
[22] *Id* at 35-39.

patients based on the degree of NDMA exposure. Patients who took heavily contaminated valsartan were grouped with those who took uncontaminated pills, which diluted the measured effect. Both studies also included patients with mixed exposures in both the control and exposed groups, blurring distinctions and biasing the results toward the null. Dr. Sawyer noted that when Mansouri et al. reanalyzed the data to exclude mixed-exposure patients (Supplementary Table S10), the observed liver cancer risk increased significantly.[23] Even defense experts, including Dr. Diette and Dr. Chodosh, acknowledged that controlling for these confounding factors made the signal more pronounced.[24, 25]

Finally, Dr. Sawyer emphasized that Mr. Roberts falls squarely within the high-risk subgroups identified in the Mansouri study, male sex, age 60-69 and long-term valsartan use (three or more years).[26] Mr. Roberts took valsartan for more than nine years. While the study did not publish a combined hazard ratio specifically for 60–69-year-old males with prolonged exposure, Dr. Sawyer explained in his deposition that the increased risk was clear and additive: males exposed to contaminated valsartan had a 23% increased risk of liver cancer (adjusted Hazard Ratio [aHR] 1.23), and those using valsartan for more than three years had a 22%

---

[23] *Id* at 40-41.
[24] Ex. D - Diette Dep. at 60:23-63:21
[25] Ex. F - Chodosh Dep. at 167:22-174:08
[26] Ex. B – Sawyer Report at 39

increased risk (aHR 1.22).[27] Dr. Diette likewise acknowledged that these risk factors were independently significant and that it is biologically plausible for risk to increase at the intersection of multiple high-risk categories.[28] This testimony reflects a reasoned interpretation of the *Mansouri* data and is entirely consistent with the expectations of a qualified toxicologist applying standard methodology.

Dr. Sawyer's assessment did not rely on speculation. It reflected accepted toxicological practice: calculate cumulative dose, compare exposure to carcinogenic thresholds, and integrate multiple lines of evidence. His approach used standard toxicological techniques endorsed by international regulatory bodies. In deposition, he testified that his methodology was not his own invention but a combination of well-established approaches used in exposure assessment and dose extrapolation.[29] He specifically applied the EPA/600/8-90/066F method using size distribution data from Monarca (2001), consistent with EPA guidance on particulate mass estimation.[30] He used the accepted conversion of inhalation dose ($\mu g/m^3$) to annual cumulative dose and incorporated documented bioavailability values, such as the 49% oral absorption rate found in primates.[31]

---

[27] Ex. G - Sawyer Dep. at 122:08-122:13; 124:02-124:10.
[28] Ex. D - Diette Dep. at 60:23-63:21.
[29] Ex. G - Sawyer Dep. at 17:06-17:13
[30] Ex. B - Sawyer Rep. at 57-59
[31] *Id* at 52

His report clearly outlines each step of the extrapolation, including particle size fractions, pulmonary absorption efficiency, and species-relevant bioavailability.[32] For oral bioavailability, he used the highest reported value, favoring the defense.[33] He did not apply safety factors associated with full-scale risk assessments because his extrapolation was route-to-route (human inhalation to human oral), not species-to-species or risk-based.

In deposition, Dr. Sawyer confirmed that the methodology has been applied in peer-reviewed literature and by agencies including the Federal Institute for Occupational Safety and Health (Germany), and the Dutch Expert Committee.[34] He emphasized that while the exact combination of elements may not appear in a single paper, each method used has independent scientific validation.[35]

Defendants also argue that the Hidajat data were deemed unreliable. However, Dr. Sawyer deferred to epidemiologists for judgments on study design and confounding analyses.[36] He only discussed aspects within the toxicological purview such as sample size, particle distribution, and general statistical power.[37] This is well within his expertise.

---

[32] *Id* at 54
[33] *Id* at 59
[34] Ex. G - Sawyer Dep. May 2, 2025 at 20:24-21:12
[35] *Id* at 21:14-21:21
[36] *Id* at 29:16-31:25
[37] Ex. B - Sawyer Rep. at 81

Finally, Dr. Sawyer made no novel assumptions. He followed published EPA formulas and peer-reviewed bioavailability metrics, and documented each step of his extrapolation in his March 10, 2025 report. His methods are grounded in regulatory science, not invention. Defendants' accusation that Dr. Sawyer "made up" his methodology is not supported by the record.[38] His dose extrapolation followed accepted practices in inhalation toxicology and exposure science. Attacks on the integration of established methods go to weight, not admissibility.

### C.    Dr. Sawyer Did Not Improperly Infer Causation from Animal or Non-Liver Studies

Defendants argue that Dr. Sawyer "relies heavily on animal, dietary and occupational studies that the Zantac MDL court recognized cannot support a causal opinion regarding what (if any) relationship exists between exposure to NDMA in medication and cancer in humans," and that "an expert cannot determine that an exposure causes one type of cancer based on studies involving a different cancer."[39] This argument misunderstands both the purpose of the cited studies and the nature of a toxicological analysis.

Dr. Sawyer does not assert that NDMA was the sole cause of Mr. Roberts' liver cancer. Rather, his opinion, stated "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of NDMA from the defective valsartan exceeded

---

[38] Ex. A at 8
[39] Ex. A at 7

the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[40] This conclusion is based on peer-reviewed studies, dose estimation methods, and NDMA's classification as a probable human carcinogen by the International Agency for Research on Cancer due to its DNA methylating effects.

The studies Defendants challenge do not serve as the sole basis for causation but instead support biological plausibility. Toxicologists routinely consider animal studies, mechanistic data, and epidemiological literature in assessing dose-response. NDMA is recognized as a complete carcinogen capable of initiating and promoting cancer at multiple sites. Its ability to induce tumors in animal models is well established and accepted by regulatory bodies, including IARC, which has classified NDMA as Group 2A. *See IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*, Vol. 100F (2012).

Scientific authorities support this approach. The National Toxicology Program has long recognized that most known human carcinogens produce tumors in animal models, often at multiple sites. The authors of *Mechanisms of Carcinogenesis* explain that the multistage process of cancer, including initiation, promotion, and progression, is often evaluated using animal studies because animals are the most reliable experimental proxy for humans. See *Mechanisms of Carcinogenesis* 35, 42–45 (WHO Press, 2006). Likewise, the 2004 NRC report

---

[40] Ex. B - Sawyer Rep. at 84.

*Science and Practice of Carcinogen Identification and Evaluation* confirms that reliable carcinogen assessment draws on "human epidemiologic studies, long-term bioassays in experimental animals, and other data relevant to an evaluation of carcinogenicity and its mechanisms." See *Science and Practice of Carcinogen Identification and Evaluation* 3–5 (National Academies Press, 2004).

Dr. Sawyer's analysis is consistent with these established practices. He reviewed nineteen peer-reviewed studies and conducted a detailed evaluation of each study's design, strengths, weaknesses, and relevance to human health. He considered factors such as absorption, metabolism, and mechanism of action, which are essential components of toxicological risk assessment.[41]

Toxicologists do not rely on a single study or endpoint. They weigh the collective evidence to assess the likelihood of harm at a given dose. In this case, Dr. Sawyer identified NDMA dose thresholds associated with increased liver cancer risk and applied that framework to Mr. Roberts' exposure.[42] Mechanistic and animal studies, when interpreted alongside human data, strengthen the plausibility of his findings. Defendants' argument that a toxicologist cannot consider studies involving other cancers fails to acknowledge that chemicals like NDMA often cause multiple

---

[41] Ex. B - Sawyer Rep. at 11–41
[42] Ex. B - Sawyer Rep. at 30

malignancies and that differences in tumor site are frequently dose-related or species-specific.

Dr. Sawyer did not improperly infer causation from unrelated data. He conducted a rigorous toxicological assessment, using accepted methods and sources, to determine whether "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of NDMA from the defective valsartan exceeded the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[43] His testimony satisfies Rule 702 and should be admitted.

### D. Dr. Sawyer's Specific Causation Opinion Is Based on Reliable Dose-Response Methodology

Defendants argue that Dr. Sawyer's opinion is "incoherent" because the epidemiological literature does not support a dose-response relationship, citing the Mansouri 2022 study as allegedly showing an inverse relationship between NDMA dose and liver cancer.[44]  This claim is factually incorrect and scientifically misleading. Defendants mischaracterize both the study and Dr. Sawyer's analysis.

First, nowhere does Mansouri 2022 state that there is an inverse relationship between NDMA dose and liver cancer. In fact, Table S9 of the study shows that among patients exposed to 80 mg or less of valsartan, there was a statistically significant hazard ratio (HR) of 1.14 for liver cancer. In the higher-dose groups (81–

---

[43] Ex. B - Sawyer Rep. at 84.
[44] Ex. A at 7-8

160 mg and >160 mg), the HRs were 1.14 and 0.99, respectively, but these were not statistically significant.[45] Moreover, the confidence intervals for those groups ranged from 0.99 to 1.3 and 0.71 to 1.37, indicating that the HRs could plausibly have been as high as 1.31 and 1.37. *Id.* As such, the data do not show an inverse relationship and the authors made no such claim.

Second, Defendants fail to recognize the distinction between statistical significance and sample size. The >160 mg group had only 93 exposed cancer cases, making it statistically underpowered. *Id.* Toxicologists understand that the absence of statistical significance in a subgroup does not support an inference of an inverse relationship. Dr. Sawyer made no such inference. Instead, he noted that the Mansouri study, despite its limitations, was broadly consistent with other human studies, including Hidajat and Gomm, which did report statistically significant associations between NDMA-contaminated valsartan and liver cancer.

Dr. Sawyer's opinion is grounded in well-established toxicological principles. He reviewed 19 studies and assessed each for study design, sample size, exposure characterization, and statistical strength.[46] Toxicologists routinely use 95% confidence intervals to assess dose-response trends.[47] Dr. Sawyer consistently

---

[45] Ex. H – Mansouri 2022 at 27
[46] Ex. B - Sawyer Rep. at 11–41
[47] *Id* at 31

applied this standard to assess whether Mr. Roberts' cumulative NDMA exposure exceeded levels associated with increased liver cancer risk.

Defendants also ignore the biological mechanism that supports a liver-specific dose-response. NDMA is a known hepatotoxic agent.[48] It is metabolized in the liver through CYP450 enzymes, generating methylating metabolites that cause DNA damage.[49] This first-pass hepatic metabolism explains why liver cancer is a consistent outcome of NDMA exposure.[50] Regulatory agencies, including IARC, have classified NDMA as a Group 2A probable human carcinogen based on its ability to induce tumors in animal studies and mechanistic evidence of genotoxicity. See *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*, Vol. 100F (2012).

Coherence, as Dr. Sawyer uses the term, arises from the convergence of statistical association, biological plausibility, and consistency across multiple studies.[51] It does not require every study to show a linear dose-response.[52] Nor does the presence of statistical noise or variability in some dose strata negate the broader trend.[53] Dr. Sawyer reasonably concluded, based on multiple peer-reviewed studies, "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of

---

[48] *Id* at 6-11
[49] *Id* at 45
[50] *Id*
[51] Ex. B - Sawyer Rep. at 80–82
[52] *Id* at 81
[53] *Id*

NDMA from the defective valsartan exceeded the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[54]

Defendants also confuse Dr. Sawyer's reliance on general causation literature with offering a general causation opinion. As Dr. Sawyer explained, toxicologists must understand general causation to conduct a proper dose-response assessment.[55] His role is to determine whether Mr. Roberts' exposure reached levels that have been associated with liver cancer in the literature.[56] That analysis necessarily relies on literature establishing NDMA's carcinogenic potential and mechanisms of action, but it does not cross the line into a general causation opinion.

Dr. Sawyer's assessment was methodical, based on peer-reviewed literature, applied toxicological principles, and supported by statistically significant data. His methods are consistent with those routinely accepted in toxic tort litigation. See *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). Any critique of his conclusions goes to weight, not admissibility. See *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

### E.    Dr. Sawyer Applied a Reliable, Well-Accepted Dose Extrapolation Methodology

---

[54] Ex. B - Sawyer Rep. at 84.
[55] Ex. C at 53:04–54:09
[56] *Id* at 52:18–53:03

Defendants argue that Dr. Sawyer fabricated his dose extrapolation methodology.[57] That argument misrepresents both the law and the facts. In the Third Circuit, expert testimony remains admissible if the expert reliably applies a well-grounded methodology to the facts of the case, even if the methodology has not been published in a single bundled article. See *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). The *Daubert* inquiry does not require the exact methodology to appear in a peer-reviewed article, so long as the method is grounded in reliable scientific principles. See *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).

Dr. Sawyer used a step-by-step application of U.S. EPA guidance to perform his dose extrapolation.[58] He based his inhalation dose estimates on EPA/600/8-90/066F, using particle distribution data from Monarca et al. (2001).[59] He then calculated bioavailability based on Raabe (1986) and Phalen et al., comparing the average fraction of respirable particulate matter to the maximum absorption reported.[60] These inputs allowed him to quantify the likely NDMA dose received via inhalation, a standard toxicological approach consistent with regulatory guidelines and peer-reviewed literature.[61]

---

[57] Ex. A at 8
[58] Ex. B - Sawyer Rep. at 56.
[59] *Id* at 56-59
[60] Ex. B - Sawyer Rep. at 58.
[61] *Id* at 59-64

Dr. Sawyer testified that this method involves widely accepted principles across multiple agencies. He stated: "It's not my methodology. It's the generally accepted methodology endorsed by peer-reviewed studies and multiple international agencies"[62] When defense counsel questioned whether this multi-step methodology had ever been published together, Dr. Sawyer responded: "Published, yes, not in all one bundle. Inhalation toxicology is a separate discipline of toxicology... and the methodology for determining bioavailability through inhalation"[63]

Dr. Sawyer also explained how he used the EPA's equation to calculate microgram-per-year dose estimates, relying on the primate-derived oral bioavailability figure of 49%, which was most favorable to Defendants.[64] He did not apply additional safety factors because he conducted a human-to-human extrapolation, not a risk assessment.[65] He explained that risk assessments add tiers of safety factors, which he did not do because the available bioavailability and toxicokinetic data supported a direct extrapolation.

To the extent Defendants challenge his reliance on the *Hidajat* study, Dr. Sawyer explicitly deferred internal epidemiological assessments to the designated epidemiology experts. He testified: "I will defer [to the epidemiologist]... for design

---

[62] Ex. G at 17:10–17:13
[63] *Id* at 18:6-18:22
[64] *Id* at 92:19–93:3
[65] *Id* at 140:11–141:20

issues that I would defer to the epidemiologist" [66] However, he noted that toxicologists routinely assess elements such as study power, confounders, and prevalence, which inform the reliability of an epidemiological study.[67]

Dr. Sawyer's methodology aligns with regulatory practice and peer-reviewed standards. It follows accepted principles, relies on real-world data, and rests on expert application of well-established toxicological methods. The Court should reject Defendants' attempt to cast doubt on Dr. Sawyer's credibility by mischaracterizing his testimony and methodology.

### F.    Dr. Sawyer's Latency Opinion Reflects Reliable Methodology and Fits the Facts of the Case

Defendants claim that Dr. Sawyer's latency opinion conflicts with the "near-universal recognition by scientists" that liver cancer develops over a longer period than Mr. Roberts' alleged exposure duration.[68] This assertion lacks scientific support and mischaracterizes Dr. Sawyer's opinion and methodology.

First, Dr. Sawyer did not misstate the concept of latency. He explained that the average latency period is not a minimum threshold but the midpoint of a statistical distribution. Some cases will naturally fall at the lower end of that range. Dr. Sawyer testified that NDMA is a complete carcinogen that acts as both an

---

[66] Ex. G at 30:23–31:3
[67] *Id* at 31:6–31:25
[68] Ex. A at 8.

initiator and promoter, allowing for shorter latency at high doses, especially when accounting for first-pass liver effects.[69]

Second, peer-reviewed human studies support Dr. Sawyer's latency opinion. The *Gomm* study "reported a statistically significant association between NDMA-contaminated valsartan exposure and hepatic cancer (adjusted HR 1.16; 95% CI 1.03-1.31; p=0.017).The association with liver cancer remained stable after basic adjustment for age and gender (HR 1.20 [1.06; 1.35]) and also after additional adjustment for hepatitis and other liver diseases."[70] *Gomm* found a statistically significant 16% increased risk of liver cancer among users of NDMA-contaminated valsartan, with latency ranging from 6 months to 2 years.[71] Dr. Sawyer testified that Mr. Roberts' exposure to high doses of NDMA-contaminated valsartan placed him within that window and that higher hazard ratios would be expected at peak latency.[72]

Third, the U.S. CDC's 12-year latency estimate, which Defendants rely upon, concerns vinyl chloride exposure and not NDMA. Dr. Sawyer clarified that the mechanism of vinyl chloride differs entirely from NDMA and that CDC has not published latency data for NDMA-induced liver cancer.[73]

---

[69] Ex. G at 112:04-112:20.
[70] Ex. B - Sawyer Rep. at 58.
[71] Ex. G at 112:21-115:25.
[72] *Id*. at 115:21-116:04
[73] Ex. C at 50:05-11; 52:02-52:10

The Third Circuit does not require an expert to prove general causation or statistical certainty to survive a *Daubert* challenge. Instead, the expert must use a reliable methodology and "fit" it to the facts of the case. See *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). Dr. Sawyer followed accepted toxicological methods, applied peer-reviewed human data, and accounted for dose-response and mechanism-of-action to form his latency opinion. His testimony therefore satisfies Rule 702 and should be admitted.

### G. The Defense Misrepresents Dr. Sawyer's Application of the Bradford Hill Criteria

Defendants argue that Dr. Sawyer's Bradford Hill analysis is "superficial" and "results-driven," and they claim that he "misapplies the applicable criteria.".[74] They specifically point to his description of the association between NDMA and liver cancer as "potent," noting that he acknowledged in deposition that the overall 1.12 and 1.16 relative risks in *Mansouri* and *Gomm* were "weak."[75] First, as discussed previously, this argument ignores Dr. Sawyer's descriptions regarding the  higher relative risks for sub-analyses in *Mansouri* and *Gomm* that apply specifically to Mr. Roberts (gender, age and years of valsartan use) and that *Mansouri* and *Gomm* lumped all NDMA valsartan into one group (as opposed to separating between valsartan that contained high amounts of NDMA versus low amounts of NDMA). In

---

[74] Ex. A at 7
[75] *Id.*

addition, defendant's argument mischaracterizes both the purpose and application of the Bradford Hill criteria in Dr. Sawyer's analysis.

Dr. Sawyer applied the Bradford Hill framework to supplement his opinion, which relies on a rigorous evaluation of dose-response and toxicological data. Courts in the Third Circuit have made clear that Rule 702 permits expert opinions grounded in a "reliable scientific or technical framework," including methodologies that synthesize multiple strands of data. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742–43 (3d Cir. 1994).

Dr. Sawyer analyzed nineteen peer-reviewed studies in total, including fifteen dietary NDMA studies, three valsartan-specific studies, and one large occupational exposure study[76], involving more than 36,000 workers. Nearly half of his report addresses the dose-response findings in these studies, including reported odds ratios and hazard ratios frequently exceeding 1.5. He explained in deposition that the Bradford Hill criteria serve as a contextual framework for plausibility, not as an independent proof of causation.[77]

Defendants criticize the *Mansouri* study's findings as weak, citing a 1.15 hazard ratio for liver cancer. But they fail to mention that this association was statistically significant, with a p-value of 0.003. Dr. Sawyer clarified in deposition

---

[76] Ex. E - Hidajat, 2019
[77] Ex. C at 99:25-102:04

that this value indicates a less than 0.3% probability that the result occurred by chance, which supports the strength and reliability of the association.[78]  In addition, Defendants point to the finding in *Mansouri* that shows a decreased risk of liver cancer for women.  However, this is wholly irrelevant for Mr. Roberts.  He was a man and the *Mansouri* study found an even higher increased risk of liver cancer for men consuming valsartan with NDMA compared to the overall population consuming valsartan with NDMA.

The Bradford Hill framework does not require each criterion to be satisfied, nor does it demand that only studies showing statistically significant results be considered.  Courts routinely accept Bradford Hill analyses as part of a broader causation methodology. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154–55 (3d Cir. 1999) (upholding the admissibility of an expert's opinion based on differential diagnosis and Bradford Hill).

Defendants' narrow focus on two valsartan studies ignores the broader context of NDMA's well-documented carcinogenicity, recognized by agencies like IARC and the EPA. A toxicologist evaluating risk must consider mechanistic plausibility, dose-response data, and consistency across studies. Dr. Sawyer's application of the Bradford Hill criteria aligns with these standards and helps reinforce his scientifically grounded opinion.

---

[78] Ex. G at 120:09-120:16

Because Dr. Sawyer applied this framework in conjunction with other accepted methods, and because his conclusions rest on a comprehensive review of peer-reviewed data, his testimony satisfies the admissibility standards under Rule 702. See *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 794–95 (3d Cir. 2017) (emphasizing the importance of a flexible, holistic evaluation of expert methodology under *Daubert*).

## H.    Hidajat Study Was Not Biased by Factory Exposures

Defendants argue that any association seen in studies like Hidajat 2019 must be due to confounders (for example, that rubber factory workers have other exposures that cause liver cancer).[79] However, a published meta-analysis by Boniol et al. (2017) examined overall cancer incidence among various industrial worker cohorts and found *no elevated baseline risk of liver cancer* in rubber and chemical industry workers as a group compared to the general population.[80] This undercuts the notion that the liver cancer signal in Hidajat's NDMA-exposed workers was simply due to some other chemical or the occupational setting itself.

Dr. Sawyer noted that Hidajat 2019 was valuable precisely because it "speciated" the exposures.[81] It separated out NDMA exposure from other concurrent exposures, and showed that higher NDMA exposure correlated with higher liver

---

[79] Ex. A at 20
[80] Ex. I - Boniol 2017; Ex. D at 105:13-106:19.
[81] Ex. C at 142:15–142:25

cancer risk.[82] Thus, NDMA stands out as the likely driver of the liver cancer association in that occupational study. Defendants have not identified any specific confounder that would explain away the NDMA–liver cancer link in the data, especially given that Mr. Roberts himself lacked known risk factors (the usual confounders like hepatitis or alcoholism are absent here).

Dr. Sawyer's specific causation opinion is rooted in well-accepted scientific methodology and should not be excluded.

## I.    Incorrect Citations in Dr. Sawyer's Report

Defendants devote a substantial portion of their brief to mistaken citations in Dr. Sawyer's report, insinuating that these mistakes render Dr. Sawyer's entire report invalid.[83] The record shows otherwise. During his May 2, 2025 deposition, Dr. Sawyer forthrightly explained that he used a software tool employing artificial intelligence to assist him in locating scientific articles and toxicology studies for his report.[84] This tool was meant to expedite literature searches for well-established background information on NDMA. While drafting, a handful of references (ten, to be exact) were inadvertently cited incorrectly in Dr. Sawyer's report. These errors were largely confined to a two-page section of the report summarizing general

---

[82] Ex. G at 34:14–35:21
[83] Ex. A at 7
[84] Ex. G at 73:2–73:5

background facts about NDMA (such as its carcinogenic classification, its genotoxic potential, and common exposure pathways).[85]

Many of the citations at issue, such as those in footnotes 3, 4, 5, 6, 7, and 14, are used only for introductory or background context and are not central to Dr. Sawyer's core analysis of NDMA or his application of toxicological principles.[86] These references merely provide general scientific context regarding mechanisms of NDMA metabolism, oxidative stress, or DNA repair and have no bearing on the methodologies Dr. Sawyer applied in forming his case-specific opinion. Footnote 8 contains a broken FDA hyperlink, but the referenced announcement clearly exists and is readily accessible.[87] In footnote 66 the correct studies were cited, but minor formatting or author-order errors scrambled the reference.[88] Finally, footnote 109 relates to background information on Bradford Hill criteria and was not used in the causation analysis itself.[89] In sum, none of these minor citation discrepancies affect the substance or reliability of Dr. Sawyer's opinion.

Importantly, Dr. Sawyer testified, and Defendants do not dispute, that the underlying *substance* of the background information was accurate and derived from reliable sources that Dr. Sawyer had reviewed, even though the specific footnote

---

[85] Ex. B - Sawyer Rep. at 6–7.
[86] *Id.* at 6, 9.
[87] *Id.* at 7.
[88] *Id.* at 53.
[89] *Id.* at 81.

attributions were wrong.[90] Dr. Sawyer did not conjure fake data; he discussed real scientific concepts but accidentally cited the wrong supporting articles due to his use of AI. Dr. Sawyer only used this method of reference search once while proofing his report just prior to submission to find supporting study references in his 2 page "Overview" section.

He also made clear that he did *not* rely on the AI tool to draft any portion of his narrative, he merely used it to help find references at the 11th Hour. The references were misidentified by the software. Such inadvertent errors, in an introductory section, hardly warrant exclusion of an otherwise methodologically sound expert opinion.

***Limited Impact and Redundant Support.*** Defendants attempt to cast these citation errors as purposeful misrepresentation, but that characterization finds no support in the record.  Unlike the egregious scenario of an attorney submitting fictitious cases to a court (as in the *Mata* incident). *Mata v. Avianca, Inc.*, No. 22-CV-1461 (PKC), 2023 WL 4114965 (S.D.N.Y. June 22, 2023). In *Mata*, an attorney submitted a brief citing fake cases generated by an AI chatbot and misrepresented to the court that the cases were real. The court emphasized the attorney's bad faith and made clear the sanctionable conduct was the knowing submission of fictitious authorities. *Id.* Here, we have a scientist who accurately conveyed well-known

---

[90] Ex. G at 165:20–171:6

scientific facts, with other sources in the record to back them up, but who inadvertently cited journal titles incorrectly in his introductory paragraphs. There is no indication of bad faith. Indeed, the context makes clear that these mistakes were peripheral.

Dr. Sawyer's report spans over 80 pages and cites more than 140 peer-reviewed studies, government reports, and authoritative texts. Defendants have identified only ten citations at issue (roughly 7% of the total references). And those ten citations are largely limited to two introductory pages summarizing NDMA's general properties, information that is cumulative of other evidence throughout the report. Dr. Sawyer's report elsewhere correctly cites authoritative sources for the same NDMA background propositions (for example, IARC monographs, EPA reports, and published textbooks on chemical carcinogenesis). Furthermore, Dr. Sawyer explicitly relied on the MDL general causation experts, such as Dr. Panigrahy, whose own expert report included the same foundational NDMA information but with proper citations.[91] Dr. Sawyer also noted that the U.S. HHS/ATSDR Draft Toxicological Profile (2023) independently corroborates nearly all of the NDMA background facts in question.[92] In short, the mis-cited references had *redundant support* in the scientific record.

---

[91] Ex. G at 165:20–171:6
[92] *Id.*

Even if one were to hypothetically strike the two pages of Dr. Sawyer's report containing the disputed citations, it would not affect the validity of his opinions in this case. Those pages were general background that did not factor into Dr. Sawyer's specific causation analysis. The core of Dr. Sawyer's work, linking Mr. Roberts's NDMA exposure from valsartan to his development of liver cancer, rests on an entirely separate body of evidence: Mr. Roberts's exposure history and dose calculations, the epidemiological studies of NDMA and liver cancer, the toxicological experiments, and the application of Bradford Hill criteria. None of that analysis is tainted by the citation errors in the background section. Defendants' argument is thus a red herring, focusing on a narrow issue that has no real bearing on Dr. Sawyer's methodology or conclusions.

## J.    Defendants Mischaracterize the Consistency Analysis and Misstate the Record

Defendants claim that Dr. Sawyer "relies on a fake article that does not exist" to support his opinion on the consistency prong of the Bradford Hill criteria.[93] This argument misrepresents both the nature of the citation error and Dr. Sawyer's actual methodology.

As explained, Dr. Sawyer inadvertently cited ten incorrect references in his report, all generated by an AI-based reference tool used at the proofing stage.[94] Most

---

[93] Ex. A at 7
[94] Ex. G at 74:7–75:21

of these citations appeared in the general background section on pages 6, 7, and 9.[95] One additional incorrect reference appeared on page 81 in a footnote relating to the "consistency" prong of the Bradford Hill analysis.[96] Dr. Sawyer testified that this footnote was added at the last minute under time pressure and that the underlying scientific statement it purported to support remained accurate and based on his review of the actual literature.[97]

The incorrect citation did not inform or substantively support Dr. Sawyer's opinion regarding consistency. In fact, Dr. Sawyer clearly stated in his report that "[t]here is reasonable consistency of liver cancer, especially in the valsartan and occupational studies of industrial rubber production industry workers."[98] That conclusion relied on three specific epidemiological studies with sufficient statistical power to detect liver cancer associations: Gomm (2021), Mansouri (2022), and Hidajat (2023).[99]

Both Gomm and Mansouri analyzed large valsartan-exposed populations and reported hazard ratios consistent with an elevated liver cancer risk.[100] In contrast, the Pottegård (2018) study did not detect an elevated risk of liver cancer, but Dr. Sawyer explained that the sample size of 5,150 subjects lacked sufficient statistical power to

---

[95] Ex. B at 6-9
[96] Id at 81
[97] Ex. G at 74:7–75:21
[98] Ex. B at 81
[99] Id. at 42, 81.
[100] *Id*. at 42–43

detect such an association. Based on U.S. SEER data showing a baseline liver cancer incidence of 9.4 per 100,000 people, the expected number of liver cancers in the Pottegård cohort would be less than one.[101] Thus, Pottegård's null finding does not undermine the consistency of the association seen in the larger studies.

Defendants' assertion that Dr. Sawyer relied on a "fake article" misconstrues the record.[102] Dr. Sawyer did not rely on the erroneous footnote for his opinion. Instead, he based his consistency conclusion on a well-documented analysis of statistically significant studies that individually and collectively support a liver cancer association with NDMA exposure.[103]

Under *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994), courts must assess whether the expert applied a reliable methodology, not whether every single citation is flawless. The alleged "fake article" neither informed the methodology nor played any role in the scientific basis for Dr. Sawyer's opinion. Defendants' argument is therefore legally irrelevant and factually inaccurate.

### K. Other Courts' Rulings on NDMA (Zantac) Experts Are Neither Binding nor Persuasive Here

Defendants cite the Zantac (Ranitidine) MDL to support exclusion of expert testimony, but that litigation involved entirely different facts and legal posture.

---

[101] *Id.* at 42; see also U.S. Cancer Statistics, SEER (2017–2021).
[102] Ex. A at 7
[103] See Ex. B at 42–43, 81; Ex. G at 74:7–75:21.

Judge Kugler, in denying defendants' motion for reconsideration of the Daubert Order, directly rejected these comparisons. He explained that the Zantac court found "no methodologically reliable study which either showed that, or proposed how, the human body actually catalyzed ranitidine into a nitrosamine," which created doubt about whether ingesting ranitidine could cause a nitrosamine-related genotoxic effect. The court in Zantac also found no evidence that ranitidine contained NDMA or NDEA before ingestion at levels that, when repeated over time, could meet a lifetime cumulative threshold sufficient to cause cancer. (*See* ECF No. 2210 at 1).

Judge Kugler made clear that this MDL presents a very different situation. He noted that unlike in Zantac, "there is no scientific doubt about the presence of nitrosamines in the human body upon the ingestion of the 'valsartan-containing drugs containing NDMA or NDEA' ['VCDs'], because the VCDs contained nitrosamines before ingestion." The contaminated valsartan pills already contained high levels of NDMA at the time patients took them, and multiple labs, including the FDA, confirmed this through independent testing.

The court in Zantac excluded experts at the general causation phase. That court ruled on multiple cancer types without allowing those claims to proceed to specific causation. Here, general causation has already been resolved. The litigation now focuses on individual claims, and Dr. Sawyer offers a case-specific causation

opinion based on Mr. Roberts' documented exposure to highly contaminated valsartan tablets.

Dr. Sawyer's testimony rests on measurable, pill-based contamination, confirmed by the FDA and quantified through prescription records and pill batch testing. Zantac cases involved varying internal conversion, which never provided the same evidentiary clarity. Judge Kugler recognized these differences and declined to apply the Zantac rulings to this MDL. His analysis confirms that defendants cannot rely on Zantac to avoid expert testimony in this case.

## V. **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court **DENY** Defendants' motion to exclude Dr. William Sawyer's expert testimony.

Respectfully submitted,

Dated: June 26, 2025

By: */s/ Daniel A. Nigh*
Daniel A. Nigh, Esq.
NIGH GOLDENBERG RASO
& VAUGHN, PLLC
*Attorneys for Plaintiffs*
14 Ridge Square NW Third Floor
Washington, D.C. 20016
Tel: 202-792-7927
Fax: 202-792-7927
Email: dnigh@nighgoldenberg.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.

By*: /s/ Daniel A. Nigh*

Daniel A. Nigh, Esq.