# **EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
MDL NO. 2875

IN RE:
VALSARTAN, LOSARTAN, and
IRBESARTAN PRODUCTS LIABILITY
LITIGATION

-------------------------------------------------

DEPOSITION OF DR. WILLIAM SAWYER, Ph.D.
THURSDAY, MAY 1, 2025

Deposition of DR. WILLIAM SAWYER, Ph.D. in the above-mentioned matter before Jomanna DeRosa, a Certified Court Reporter (License No. 30XI00188500), and Notary Public of the State of New Jersey, taken via Zoom on Thursday, May 1, 2025, commencing at 1:07 p.m. Eastern Standard Time.

DAY 1, VOLUME I

A. I did. As part of my training, I was required to take all of the medical school courses, through pathology, at the same time that I was in training for toxicology. That was how our department worked.

Q. So you were enrolled in a medical school program to obtain an MD?

A. No, but I was --

MR. NIGH: Objection.

THE WITNESS: I was involved in the course work required for an M.D. After the -- about two and a half years in, most of the students branch off into specific medical activities rather than the basic medical sciences.

BY MR. TRANGLE:

Q. Is it your testimony that you fulfilled the requirements to obtain an MD?

A. No.

Q. So you're not licensed to practice medicine anywhere?

A. No, but I think you're missing the point.

Q. That's fine. Not able to see patients or treat patients?

A. I'm not a physician and I was not trained as a physician, of course not.

Q. Okay. So that would include for high blood pressure, for liver disease or liver cancer?

A. I don't understand the question.

Q. Okay. Well, the fact -- because you are not a licensed physician, you were not able to see or treat patients with high blood pressure, liver disease or liver cancer?

MR. NIGH: Form objection. Asked and answered.

THE WITNESS: Only if they're dead, as I routinely am involved in sending tissues out for analysis at MMS labs and other facilities. But, no, I don't treat patients, no.

BY MR. TRANGLE:

Q. Right. So you're not an oncologist either, then. Right?

A. No. I think you're well aware of that.

Q. Not a hematologist?

A. Again, you're familiar with my certifications. That's not what I was trained in.

Q. Okay. Never told a patient that their cancer was caused by NDMA?

on the mechanistic data of the toxic metabolites form, such as diazonium ion, formaldehyde, et cetera.

BY MR. TRANGLE:

Q. Do you agree that different kinds of liver cancer have different causes and ideologies?

A. Certainly. For example --

Q. That's fine.

A. No, I'm going to finish the question. For example, angiosarcoma is known to be induced by vinyl chloride.

Q. Okay. So my question is --

A. I didn't finish, sir. Please listen.

Q. To formulate your opinions in this case, you conducted a literature review?

MR. NIGH: Hold on. Hold on. You interrupted twice during the answer and then he says, "please let me finish", and then you're going to just keep going on to another question? No, no, no. There has been so many interruptions. You have to let him finish the answer. I don't know if you know about the orders that have taken place in this litigation, but Vanaskie has given you very harsh warning for this type of behavior. And I've asked earlier to stop. And here we had it, you interrupted

to his prior question; the more prior question.

THE WITNESS: And the answer is that the incident rate varies with what chemical we're dealing with. For example, the hepatocellular carcinoma in NDMA versus vinyl chloride in angiosarcoma, so different chemicals do vary the incident rate of different types of cancer. But any of the liver cancers have potential to form from NDMA exposures based on the metabolite pattern of the pharmacodynamic studies.

BY MR. TRANGLE:

Q. To formulate your opinions in this case, Dr. Sawyer, you conducted a literature review of all the relevant existing epidemiological evidence. Right?

A. Yes.

Q. Why did you conduct a literature review?

A. Because that is part of the methodology that toxicologists use to assess dose response and other areas of assessment.

Q. When you say other areas, do you mean it helped you reach and form your causal opinions?

A. My causal opinion, in this case, is simply a dose response opinion with respect to

specific causation of the specific malignancy of this specific client that is being opined on by the oncologist.

Q. Okay. Are you not offering an opinion on general causation in this case?

A. If asked, I could. But I don't believe that is the assignment I was given.

Q. Okay. So you're not offering the opinion that exposure to NDMA in Valsartan causes liver cancer in humans as a general matter?

MR. NIGH: Form objection.

THE WITNESS: In a general matter, I have to consider that, because I can't effectively and accurately assess a dose response without -- without that knowledge.

BY MR. TRANGLE:

Q. It's your opinion that in order to conduct a dose response analysis, you have to already form an opinion about a general causation?

MR. NIGH: Form objection.

THE WITNESS: I would word that as an understanding of the general causation in terms of the various animal, human epidemiological studies.

BY MR. TRANGLE:

Q. So at trial, are you intending to offer the opinion that exposure to NDMA in Valsartan causes liver cancer as a general causation matter?

MR. NIGH: Form objection.

THE WITNESS: I don't believe that's my assignment. I think I was asked to assess dose response and whether or not there was a significant and substantial risk of hepatocellular carcinoma.

BY MR. TRANGLE:

Q. Did you personally identify and pull all the studies that you reviewed?

A. I think largely, if not all of them, yes.

Q. Did plaintiff's lawyers --

A. I don't recall any studies being -- well, it's possible there might have been a couple of studies sent to me. But largely, studies that I've researched and pulled. Of course, some of those are, in some cases, just abstracts, but primarily, full studies.

Q. If the study was relevant to your analysis, did you include it on the materials considered list?

Q. Sorry, you're searching the document right now?

A. Yes.

Q. Okay. But I have a question pending.

A. All right.

Q. So without having to search the document through a selective word search, can you answer the question that's pending?

A. Go ahead.

Q. That is the question.

A. Go ahead and ask the question.

MR. TRANGLE: Just for the record, Dr. Sawyer is searching the document with a text search tool right now.

BY MR. TRANGLE:

Q. Doctor, my question is: Without -- without searching through this document, are you able to tell me the answer to my question as to whether somewhere in this document U.S. ATSDR has labeled NDMA a complete carcinogen?

A. No. It appears that I made an error in my footnote.

Q. Okay. We're going to put that exhibit away for now. Did you conduct a Bradford Hill

analysis on NDMA in Valsartan and liver cancer in this case?

A. Yes.

Q. When did you perform that analysis?

A. Prior to the date of this report.

Q. Had you done a Bradford Hill analysis on NDMA cancer prior to this case?

MR. NIGH: Form objection.

THE WITNESS: Not formally.

BY MR. TRANGLE:

Q. How many studies are needed to be able to have a sufficiently robust body of evidence to reach a causal opinion using Bradford Hill?

MR. NIGH: Form objection.

THE WITNESS: It really varies depending upon the strength of the association, the consistency, coherence, number of subjects is a biggy, and other factors; so there is no magic number. That would be something that an attorney would make up.

BY MR. TRANGLE:

Q. So if there's one study with a very large sample size, would you be able to perform a

Bradford Hill analysis with just that evidence?

A. No. Another prong in the Bradford Hill are animal studies as well as mechanistic studies and the combined data from other human studies. There are other human studies I've looked at that show liver cancer with NDMA. However, not quantitatively that I could use in my dose response assessment.

Q. That actually gets to my next question, which is: Are you planning to testify about Bradford Hill at trial?

A. Certainly.

MR. NIGH: Form objection.

BY MR. TRANGLE:

Q. So you're planning to testify about Bradford Hill, but you're not planning to testify about general causation?

MR. NIGH: Form objection.

THE WITNESS: As my prior answer, if asked, but that's not my assignment. I'm assessing dose response.

MR. TRANGLE: Okay.

THE WITNESS: However, I have to understand the specifics of general causation, especially the pharmacokinetics as well as the mode

of action.

MR. TRANGLE: Okay.

THE WITNESS: And other factors that relate to causation.

BY MR. TRANGLE:

Q. How many epidemiological studies that focus on NDMA contaminated Valsartan and cancer in humans are you relying on to form your causal opinions?

MR. NIGH: Form objection.

THE WITNESS: The combined animal and human studies.

BY MR. TRANGLE:

Q. How many human studies are you relying on that deal with Valsartan with NDMA and cancer in humans?

MR. NIGH: Form objection.

THE WITNESS: If I'm understanding you correctly, you only are interested in Valsartan studies, so there are three.

MR. TRANGLE: Okay.

THE WITNESS: Now, obviously, I've relied on more than that. I've relied on

BY MR. TRANGLE:

Q. So because it doesn't provide NDMA specific data, would you say it's less relevant to your causal analysis?

A. Yes.

MR. NIGH: Form objection.

THE WITNESS: It's less relevant because, if we look at each prong of Bradford Hill, the data is not -- does not supply any dose response information for the dose response prong of Bradford Hill nor does it speciate out NDMA or any other co-contaminants, but rather it's simply that of working in the rubber industry, in general.

BY MR. TRANGLE:

Q. And it's important to separate out different exposures when working in the rubber industry?

MR. NIGH: Form objection.

THE WITNESS: Well, certainly. If you have NDMA in the control group and NDMA in the consideration analysis, it wouldn't make any sense. I mean, you have to -- as done in Hidajat, one has to speciate out each of the chemicals.