# EXHIBIT G

Page 1

1            UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW JERSEY

3         CASE NUMBER:  1:19-MD-02875 (RBK)(JS)

4                   MDL NO. 2875

5

6    IN RE:

7    VALSARTAN, LOSARTAN, and

8    IRBESARTAN PRODUCTS LIABILITY

9    LITIGATION

10   -------------------------------------------------

11

12     CONTINUED DEPOSITION OF DR. WILLIAM SAWYER, Ph.D.

13                FRIDAY, MAY 2, 2025

14

15                 Deposition of DR. WILLIAM SAWYER,

16   Ph.D. in the above-mentioned matter before Jomanna

17   DeRosa, a Certified Court Reporter (License No.

18   30XI00188500), and Notary Public of the State of New

19   Jersey, taken via Zoom on Friday, May 2, 2025,

20   commencing at 9:08 a.m. Eastern Standard Time.

21

22

23

24

25

Page 17

1          your risk estimates?

2                     MR. NIGH:  Form objection.

3                     THE WITNESS:  Hypothetically, it could.

4

5          BY MR. TRANGLE:

6              Q.  Dr. Sawyer, you have never published your dose

7          extrapolation methodology in any peer-reviewed

8          scientific journal; have you?

9                     MR. NIGH:  Form objection.

10                    THE WITNESS:  No.  It's not my

11         methodology.  It's the generally accepted

12         methodology endorsed by peer-reviewed studies and

13         multiple international agencies.

14

15         BY MR. TRANGLE:

16             Q.  Okay.  So it's your testimony here today that the

17         methodology that you used has been published?

18             A.  Yes.

19             Q.  Is it your testimony that pieces of your

20         methodology had been published or your entire

21         methodology, as you did it here, has been published?

22                    MR. NIGH:  Form objection.

23                    THE WITNESS:  It needed to describe

24         which pieces or be more descriptive of the --

25                    MR. TRANGLE:  Okay.  Do you want me to

1       ask it differently?

2                   THE WITNESS:  Yes, so I can understand

3       it and answer correctly.

4

5       BY MR. TRANGLE:

6          Q.  My understanding of your analysis is that you

7       rely in part on the U.S. EPA equation.  You also rely on

8       assessments of particulate matter based on the Monarca

9       study.  You also rely on methodology for assessing oral

10      bioavailability and you also rely on different

11      methodologies for inhalation bioavailability.  And you

12      also rely on application of data from the Hidajat

13      studies.

14              Is it your understanding that all of those pieces

15      together have been published as a methodology?

16                  MR. NIGH:  Form objection.

17                  THE WITNESS:  Published, yes, not in all

18      one bundle.  Inhalation toxicology is a separate

19      discipline of toxicology, which focuses on particle

20      size, distribution, and inhalation of such

21      particles, and the methodology for determining

22      bioavailability through inhalation.

23

24      BY MR. TRANGLE:

25          Q.  So it's your testimony that it has been published

1    the trachea or the branches within the lung of the

2    bronchials or all the way to the deep lung alveoli.

3    That's basic toxicology, textbook toxicology, and

4    there isn't a study that shows that.  It's too basic

5    to publish.  I could point you to Casarett & Doull's

6    textbook, which I have in my office, and point you

7    to the basic toxicology methodology of particle size

8    distribution.  I included a figure in my report that

9    shows particle size distribution and

10   bioavailability.

11

12   BY MR. TRANGLE:

13      Q.  So your testimony here today is that the Casarett

14   textbook contains the application of the methodology

15   that you outlined in your report, exactly as you have

16   done it in your report?

17            MR. NIGH:  Form objection.

18            THE WITNESS:  With respect to particle

19   size distribution and the various levels of

20   bioavailability based on the aerodynamic particle

21   size, yes.

22

23   BY MR. TRANGLE:

24      Q.  Okay.  So does this textbook have a section on

25   route-to-route extrapolation from inhalation to an

Page 21

```
 1          individual's oral ingestion?
 2                    MR. NIGH:   Form objection.
 3                    THE WITNESS:   There are examples of that
 4          in the peer-reviewed literature and there's also
 5          sufficient worldwide documentation of the exact
 6          methodology published by Federal Institute of
 7          Occupational Safety and Health, Freiberg, Germany,
 8          the Dutch Expert Committee on, I think MIT's
 9          Occupational Safety, and many other agency
10          publications that provide the exact methodology and
11          the various guidelines that are met to ensure its
12          reliability.
13                    MR. TRANGLE:   I'm sorry.
14                    THE WITNESS:   In fact, even if there is
15          pieces of the guideline missing, the methodology
16          actually permits the use of route-to-route
17          extrapolation with factors, safety factors.  Now, I
18          did not need any safety factors because, in this
19          particular case of NDMA, it meets all of the
20          requirements of the methodology to provide an
21          accurate result without any safety factors.
22
23          BY MR. TRANGLE:
24             Q.  So it's your testimony that there is a
25          publication by the Federal Institute of Occupational
```

Page 29

```
 1                    MR. NIGH:  Form objection.
 2                    THE WITNESS:  It's not what I said.  I
 3          said the internal methodologies in design, that's
 4          what I said, so you misquoted me.
 5                    MR. TRANGLE:  Let's mark as Exhibit 13,
 6          Tab 30.
 7
 8                    (Whereupon, Exhibit DX-13 was marked for
 9          identification.)
10
11          BY MR. TRANGLE:
12             Q.  You were deposed in September of 2023 in a Zantac
13          case.  Do you recall that deposition?
14             A.  Yes.
15             Q.  You were asked:
16                 "QUESTION:  Okay.  So is it fair to say that
17          you're not prepared to offer any opinions about whether
18          the methodology of the Hidajat paper was appropriate
19          with respect to this design issue?
20                    ANSWER:  Yes.  I would defer that to the
21          epidemiologist."
22                    Is it still the case today that you
23          would have to defer to an epidemiologist to offer
24          opinions about the methodology and the design of the
25          Hidajat paper?
```

Page 30

1            MR. NIGH:  Hold on.  Counsel, if you're

2      going to ask him about prior testimony and then show

3      him a document with prior testimony, I think you

4      need to point out the line and page -- the page and

5      line of the testimony.

6            MR. TRANGLE:  Okay.  Page 208, Line 16

7      to Page 209, Line 5.

8            THE WITNESS:  The problem I have with

9      your question is that within that deposition, I

10      specifically said "internal design of the

11      meta-analysis and other internal methodologies."  So

12      you're cherry picking.  What you read is a question

13      posed to me, but in that document, you'll find that

14      I've described the process in more detail.

15

16      BY MR. TRANGLE:

17         Q.  Dr. Sawyer, is it no longer the case that you

18      would have to defer to an epidemiologist to offer

19      opinions about whether the methodology of the Hidajat

20      paper was appropriate?

21            MR. NIGH:  Form objection.

22      Mischaracterizes testimony.

23            THE WITNESS:  Again, I will defer

24      internal design of both the Hidajat study or any

25      meta-analyses in the design of the multifactorial

1      analysis or sensitivity analyses; these are issues,

2      design issues that I would defer to the

3      epidemiologist.

4

5      BY MR. TRANGLE:

6          Q.  Are you also deferring to an epidemiology expert

7      opinions about the strengths or limitations of the

8      Hidajat study?

9          A.  I definitely will be speaking in terms of

10     reliability of the study based on basic principles

11     that toxicologists routinely assess.  For example,

12     Type I, Type II error, number of subjects, results

13     of multifactorial analyses for sensitivity,

14     confounding factor analyses, prevalence factoring

15     within the study.  For example, the occurrence of

16     rubber dust at various levels throughout the

17     facility, comparing the dose of N-morpholine to the

18     dose of NDMA in the study.  There are things that

19     affect the strengths or weaknesses of the study that

20     toxicologists examine when reading an

21     epidemiological study.  So simple aspects, as what I

22     just stated, I would certainly feel comfortable

23     discussing as it is part of my training and

24     experience.  But in terms of internal design, I

25     would defer that to the epidemiologist.

1      paragraphs in Hidajat cancer study, in the results

2      section, it explains what I just did.  It explains

3      the -- for example, there was no significant dose

4      response for rubber dust and rubber fumes.  The

5      trend analyses, as I recall, are around .3.

6      Hidajat, if you look at the end of the report,

7      assessed rubber dust, rubber fumes, and so on, based

8      on locations in the plant, and found that it did not

9      at all correlate with NDMA.  NDMA was also measured

10     on a quantitative basis, far higher concentrations

11     than that of N-morpholine.

12

13     BY MR. TRANGLE:

14         Q.  So you're relying on the Hidajat study authors'

15     attempts to separate out exposures?  You didn't

16     independently do anything yourself, apart from what the

17     Hidajat authors did, in terms of separating out NDMA

18     from other exposures?

19              MR. NIGH:  Form objection.  Vague.

20              THE WITNESS:  That's incorrect.  I laid

21     out all of the numbers in the supplement, which

22     provide the actual mean and median for each

23     department, including all departments, and examined

24     the numbers.  And there's certainly no pattern

25     correlating rubber dust or rubber fumes or

Page 35

1      N-morpholine to that of NDMA.

2

3      BY MR. TRANGLE:

4          Q.   Does that data contain data on polycyclic

5      aromatic hydrocarbons?

6          A.   No. No, that --

7          Q.   Did it contain data on phthalates?

8          A.   I'd ask that question -- say it again.

9          Q.   Does it contain data on phthalates,

10     P-H-T-H-A-L-A-T-E-S?

11         A.   Oh, phthalates (pronounced as fthalates).

12         Q.   Sorry, yes.

13         A.   No.

14         Q.   Does it contain data on benzene?

15         A.   No.

16         Q.   Did you use a multi-pollutant model?

17             MR. NIGH:   Form objection.

18             THE WITNESS:   I reviewed -- I reviewed

19     the data and made comparisons, but I leave the

20     creation of epidemiologic reports to the

21     epidemiologist.

22

23     BY MR. TRANGLE:

24         Q.   Are you aware that the cancer study only

25     contained job information for the UK cancer study cohort

Page 73

1          A.  Hallucinations, no.  AI, of course.
2          Q.  Is it possible that the reason you cite
3      nonexistent articles is because you used AI to generate
4      parts of your report?
5          A.  I used it to find studies.
6          Q.  So you used AI tools to find studies?
7          A.  Yes.  Yeah, it's very powerful in terms of
8      finding studies.
9          Q.  Which AI tool did you use?
10         A.  I don't know.  Google, I think, through
11     Google.
12         Q.  Is Google an AI tool?
13         A.  Not directly, no.
14         Q.  So you can't recall which tool you used to find
15     these studies?
16         A.  No.
17         Q.  Did you use AI to help with drafting any parts of
18     this report?
19         A.  Only in instances where I referenced the
20     study.
21         Q.  And those sections don't have quotes around them,
22     do they; the portions that you quoted from these
23     articles in your report?
24         A.  No, but footnote citation.
25         Q.  But you testified that it was taken verbatim from

Page 74

1     these articles.  Right?

2          A.  In some cases, yes.

3          Q.  And what tool did you -- so you didn't use a tool

4     to do any of the drafting of the text of the body of

5     your report; that's your testimony today?

6          A.  Could you repeat that, please?

7          Q.  Sure.  Did you use any tools to assist with the

8     drafting of the text of the body of your report?

9          A.  I read the referenced summaries, yes.

10         Q.  Did you use an AI tool to draft, to write any of

11    the text that appears in the body of your report, and

12    not the citations?

13         A.  I'm not sure what you're asking.

14         Q.  There are portions that are written and are above

15    the citation footnotes in your report.  Right?

16         A.  Yes.

17         Q.  Did you use any AI tools to draft any portions of

18    that text?

19         A.  Only if it were directly from the study.

20         Q.  How can I know which portions are taken from

21    these studies, looking at your report?

22         A.  There would be a footnote.

23         Q.  Which citations in your report are real?

24         A.  I'm sorry.

25         Q.  Which citations in your report are real?

Page 75

1          A.  All of them.

2          Q.  Can you go through and tell me which ones are

3     real articles and which ones were generated by the AI

4     tool that you used?

5          A.  As I recall, the AI, I only used that in this

6     introductory section at the beginning of the report

7     to prepare a summary.

8          Q.  You didn't use it in your Bradford Hill section

9     that we just looked at?

10          A.  In part, I downloaded, from my website, the

11     Bradford Hill information.

12          Q.  So is the text of your report that has the

13     Bradford Hill analysis something that you downloaded

14     from a website?

15          A.  My website.  I have a summary of Bradford

16     Hill on my website and, in terms of this listing,

17     the various prongs.

18          Q.  Do you use AI to help you understand the

19     materials that you rely on in this case?

20          A.  No.  As I said, I used it to research and

21     find studies.

22          Q.  How much text in your report and your opinions

23     were cut and pasted from AI?

24          A.  The only portion I used AI on was this

25     initial summary.

Page 92

1    It's really a function of how low the GC mass

2    spectrometer can reliably read at the lowest level

3    of calibration.

4

5    BY MR. TRANGLE:

6        Q.  Do you know what the level is anywhere between 0

7    and 0.3 UG for those 90 percents or 88.7 percent numbers

8    that were below the detection limit?

9        A.  No.  There's no way to know that without

10   achieving a lower detection limit.

11       Q.  Do you know how the authors decided to impute

12   data for the 88.7 percent missing data in this study

13   where they could not detect NDMA?

14       A.  Yes.  I read that in the methodology section.

15       Q.  What did they do?

16       A.  Take me to the section and I'll read it to

17   you.  I'm not going to try to recall exactly what

18   was said.

19       Q.  Dr. Sawyer, did you use an EPA formula to

20   calculate oral bioavailability of NDMA in your dose

21   extrapolation analysis?

22       A.  Yes, it's a very simple equation.

23       Q.  For the oral?

24       A.  Oh, I'm sorry, for oral, no.  I relied upon

25   the peer-reviewed studies and, as I recall, I looked

Page 93

1     at the range, and the mid-point of the range, and

2     also, the actual primate level of oral absorption,

3     which was 49 percent.

4          Q.  Dr. Sawyer, did you look to see if there is an

5     oral bioavailability equation from the U.S. EPA to

6     calculate oral bioavailability for ingested drugs?

7                    MR. NIGH:  Form objection.

8                    THE WITNESS:  There is a risk assessment

9     methodology, but I am not performing a risk

10    assessment, a regulatory risk assessment.  Rather, I

11    rely directly on the peer-reviewed studies.

12

13    BY MR. TRANGLE:

14         Q.  Was the U.S. EPA inhalation formula that you used

15    a risk assessment methodology?

16                    MR. NIGH:  Form objection.

17                    MR. TRANGLE:  Are you going to some

18    document?

19                    THE WITNESS:  Yeah, I'm looking at my

20    report.

21

22    BY MR. TRANGLE:

23         Q.  I'm not asking -- I'm asking you about the U.S.

24    EPA formula that you used, is that a risk assessment

25    methodology?

1      Q.  And you relied on that, in part, for your

2    opinions as well?

3      A.  Yes.

4      Q.  And Doctor, on Page 33 of Dr. Panigrahy's report,

5    discusses in detail how NDMA is a complete carcinogen.

6    Correct?

7      A.  That's right.

8      Q.  And you relied on Dr. Panigrahy's report, in

9    part, as to how NDMA is a complete carcinogen.  Correct?

10     A.  Yes.

11     Q.  What does it mean to be a complete carcinogen?

12     A.  The ability to initiate damaged -- generally,

13   direct damage to DNA as well as promoting the growth

14   of the tumor, including much more rapid growth and

15   vascularization and so forth.  Those are the two

16   primary features.

17     Q.  And is it your opinion that NDMA is a complete

18   carcinogen?

19     A.  Yes.  That's well recognized in the generally

20   accepted studies.

21            MR. NIGH:  Let's go ahead and pull up

22   the Gomm study.  Let's see which exhibit that is.

23   That's Exhibit 25.

24

25   BY MR. NIGH:

Page 113

1          Q.   Doctor, you recall being asked questions about

2      this study?

3          A.   Yes.

4          Q.   Doctor, I want to draw your attention to Page 360

5      of the study, but it's the fourth page, Table 2.

6      Doctor, you recall being asked whether or not alcohol

7      was one of the potential confounders that was analyzed

8      in the Gomm study?

9          A.   Yes.

10         Q.   Doctor, do you see where it says "hazard ratio"

11     in Table 2 and it shows 95 percentile confidence

12     interval and it's got an asterisk with the Number 1.

13              Do you see that?

14              MR. TRANGLE:   Object to form.

15              THE WITNESS:   Table 2 that's on page --

16              MR. NIGH:  The fourth page.

17              THE WITNESS:   Yeah.  All right.  So

18     exposure to NDMA contaminated Valsartan, no

19     exposure, exposure.

20              MR. NIGH:  Right.

21              THE WITNESS:   Okay.  So you're looking

22     at the asterisk one?

23              MR. NIGH:  Yes.

24              THE WITNESS:   Yes, it's lag time one

25     year, fully adjusted, et cetera.

Page 114

1

2    BY MR. NIGH:

3        Q.   And in that list of potential confounders that

4    they adjust for, do you see where it says "and

5    alcohol-related diseases"?

6                    MR. TRANGLE:   Object to form.

7                    THE WITNESS:   Oh, in the footnote, you

8    mean?

9                    MR. NIGH:   Yes.

10

11   BY MR. NIGH:

12       Q.   Doctor, do you see where it says alcohol-related

13   diseases in Footnote 1?

14       A.   Now I do.   I missed that.   It's kind of tiny

15   print on my screen.   Yes.   Heart failure and

16   alcohol-related diseases, yes.

17       Q.   So this study did adjust for the central

18   confounder of alcohol-related diseases.   Correct?

19       A.   Yes, it did.

20       Q.   And do you see under the confidence interval for

21   exposure, under exposure to NDMA contaminated Valsartan,

22   the confidence -- the exposure shows 1.16.   Correct?

23       A.   Right, with a confidence interval of 1.03 to

24   1.31.

25       Q.   Because that confidence interval does not cross

Page 115

1          one, does that mean it's statistically significant?

2              A.  The reverse, actually; it's statistically

3          significant because it crossed one.  It's greater

4          than one.  It's at -- within the 95 percent

5          confidence interval.

6                        MR. NIGH:  Okay.  And my question may

7          have been a little unclear.

8

9          BY MR. NIGH:

10             Q.  If -- the confidence interval goes from 1.03 to

11         1.31.  Correct?

12             A.  Yes, it's greater than one.

13             Q.  So one is not within that confidence interval.

14         Correct?

15             A.  That's right.

16             Q.  Okay.  And because one is not within that

17         confidence interval, it's statistically significant.

18         Correct?

19             A.  Yes, one would be right on the 95 percent,

20         but not greater than.

21             Q.  Okay.  So this study shows a 16 percent increased

22         risk based on exposure to NDMA contaminated Valsartan.

23         That is statistically significant.  Correct?

24             A.  Yes.  And keep in mind, this is early in.  It

25         hasn't reached the peak latency.

1     Q.   And why is that important?

2     A.   Well, at the peak latency period, the

3   expected hazard ratio would be much higher than it

4   is early in the latency phase.

5     Q.   Doctor, this -- they did a sensitivity analysis

6   for long-term Valsartan use.

7        Do you see that in this table as well?

8     A.   Yes.

9     Q.   And underneath there, it shows Footnote 2 where

10   it defines long-term Valsartan use is defined as

11   "Valsartan prescription in at least nine quarters within

12   the first three years of the study period."

13        Do you see that?

14     A.   I do.

15     Q.   That doesn't necessarily mean only exposure or

16   only no exposure in the sensitivity analysis.  Correct?

17     A.   Right.

18     Q.   Okay.  But even still, long-term Valsartan use or

19   exposure demonstrated a higher risk than the overall

20   analysis of just exposure.  In other words, 16 percent

21   for exposure, but long-term Valsartan use is 22 percent

22   increased risk.  Correct?

23     A.   Right.

24            MR. NIGH:  Okay.  We can go ahead and

25   take this study down.  Let's look at the Mansouri

Page 120

1          A.   Yes.

2          Q.   And under liver cancer, it would show a 15

3     percent increased risk for liver cancer comparing

4     exposed to unexposed.   Correct?

5                    MR. TRANGLE:   Object to form.

6                    THE WITNESS:   That's correct and

7     statistically significant.

8

9     BY MR. NIGH:

10         Q.   And the p-value is .003.   Is that correct?

11         A.   Yes, highly significant.

12         Q.   What is the importance of that p-value?

13         A.   Well, a .05 means a 5 percent chance of it

14    occurring by chance alone.   A .003 means that

15    there's really no practical chance of this -- of

16    this occurring by chance.

17         Q.   And this study also -- sorry, strike that.

18              Do you remember being asked questions about

19    whether the Valsartan NDMA epidemiology adjusted for

20    multiplicity?

21         A.   Yes.

22         Q.   One of the ways to adjust for multiplicity is

23    FDR, faults discovery rate, adjustments.   Correct?

24         A.   Yes.

25         Q.   Doctor, do you remember being asked a question

Page 122

1       A.   Yes.

2       Q.   And they did an analysis that was broken down

3   between men and women.   Correct, females and males?

4       A.   Yes.

5       Q.   And for males, the odds ratio or the AHR was

6   increased even from the overall analyses.   Correct?

7       A.   Yes.

8       Q.   And men have a 23 percent increased risk when

9   they're exposed -- of liver cancer when they're exposed

10  to contaminated -- NDMA contaminated Valsartan compared

11  to uncontaminated Valsartan in this study.   Correct?

12      A.   Yes.   And again, highly significant,

13  0.0001 --

14      Q.   And it was highly significant -- sorry, I didn't

15  mean to interrupt you.   What did you say?

16      A.   Highly significant with a p-value of 0.0001.

17      Q.   And it was still highly significant even after

18  adjusting for multiplicity?

19      A.   Yes.

20      Q.   And Doctor, this would still be on the front of

21  the bell curve.   Correct?

22      A.   That's right.

23      Q.   And what does that mean?

24      A.   That as time progresses, that number will go

25  up, that adjusted HR value.

Page 124

1      A.  Yes.

2      Q.  And Table S22, when looking at long-term use,

3   those who used at least three years of Valsartan, has a

4   higher increased risk than the overall findings.

5   Correct?

6      A.  Right.

7      Q.  They had a 1.22 or a 22 percent increased risk of

8   liver cancer if they were using Valsartan for three or

9   more years.  Correct?

10      A.  Yes.

11      Q.  And that Valsartan could still be, you know, many

12   of the prescriptions could have been uncontaminated and

13   some of them contaminated.  Correct?

14      A.  That's right.

15      Q.  So this table still wouldn't show us the true

16   risk in this study for those who had three or more years

17   of NDMA contaminated Valsartan.  Correct?

18      A.  Correct.

19          MR. NIGH:  We can take that down.  Let's

20   look at the Hidajat job matrix exposure study.

21   Looking for which exhibit that was.  Exhibit 24.

22

23   BY MR. NIGH:

24      Q.  Do you have that, Doctor, Exhibit 24?

25      A.  That's the job exposure matrix study?

Page 140

1        Q.  And a lot of the factors and guidances that

2    they're pointing to are pointing to recognizing the

3    differences between the animals to humans and their

4    route-to-route extrapolation.  Correct?

5        A.  Yes.  They are simply -- the methodology has

6    a number of guidance factors that, if they're not

7    met, in some cases results in various safety factors

8    added.  In the case of NDMA, all of the guidance

9    factors have been met and I'd be happy to discuss

10    that, if it comes up.

11        Q.  And, Doctor, you performed a human-to-human

12    route-to-route extrapolation.  Correct?

13        A.  Yes.

14        Q.  Well, what does that mean?

15        A.  Simply that one looks at the pharmacokinetics

16    metabolism, whether or not the compound circulates

17    equally to all areas of the body, and that the

18    toxicological cancer endpoints are systemic, not

19    just occurring at the point of entry, for example,

20    oral cancer.  And that there's no critical or

21    substantial first pass effects.  That is, first pass

22    effects should be minimal.  There's other factors

23    one considers, such as an inhalation macrophage in

24    the lung cause metabolism in the lung and that's

25    been ruled out in studies that I've cited.  As long

Page 141

1    as the data is well established in all of these, or

2    most of these, in this case, all of these guidance

3    values are met, then the human inhalation to route

4    extraction or extrapolation is reliable.  That is,

5    the toxicological data, if it's complete, then the

6    extrapolation is considered reliable.

7        Q.  And, Doctor, in a human-to-human extrapolation,

8    why is it important or why is it appropriate to use some

9    animal data for various individual pieces of that

10   calculation or extrapolation?

11       A.  Well, actually, the methodology speaks on

12   that very clearly.  And that is, there are certain

13   toxicological agents that would be unethical to use

14   in a controlled human study and the next closest

15   analog is that of the monkey, which was what I used

16   for the oral dose portion.

17       Q.  And then, also, larger animals would be more

18   acceptable to use in that extrapolation than smaller

19   animals?

20       A.  Correct.

21       Q.  Doctor, human-to-human extrapolations are

22   performed commonly where there may be certain pieces in

23   the calculation that need to rely on animal data.

24   Correct?

25       A.  Yes.  They're used in -- by the

```
 1              THE WITNESS:  Well, I'll wait till you
 2      look at what you read, because that's clearly not
 3      what was said.
 4              MR. TRANGLE:  Let's go off the record
 5      for a second, because I want to search this
 6      transcript to get exactly what you said.  Okay?
 7              MR. NIGH:  I think it's inappropriate to
 8      go off the record for that purpose.
 9              THE VIDEOGRAPHER:  Time is 3:07.  We are
10      now off the record.
11
12              (Whereupon, a brief recess was taken off
13      the record.)
14
15              THE VIDEOGRAPHER:  This marks unit
16      eight.  The time is 3:08.  You are back on the
17      record and may proceed.
18
19      BY MR. TRANGLE:
20         Q.  Doctor, it says here that you relied entirely --
21      it says you did rely on all that information that's
22      reflected here in Pages 5 to 7 that came from Dr.
23      Panigrahy's report.  Right?
24              MR. NIGH:  Form objection.
25      Mischaracterizes testimony.
```

Page 166

1                    THE WITNESS:  I don't believe you're

2        wording is correct there, "that came from".  It did

3        not all come from this report.

4

5        BY MR. TRANGLE:

6            Q.  Did some of it come from his report?

7                    MR. NIGH:  Form objection.

8        Mischaracterizes testimony.

9                    THE WITNESS:  Probably in part.

10

11       BY MR. TRANGLE:

12           Q.  But you didn't copy and paste from

13       Dr. Panigrahy's report.  Right?

14           A.  I don't believe so.  If I did, I would have

15       quoted it.

16           Q.  So for these topics that you're relying on for

17       Dr. Panigrahy, what you did is you replaced these

18       sections with citations to nonexistent articles?

19                    MR. NIGH:  Form objection.  Just

20       mischaracterizes testimony.

21                    THE WITNESS:  No.  And Panigrahy didn't

22       prepare an overview like I did.

23

24       BY MR. TRANGLE:

25           Q.  Okay.  But I thought you said all this

1  information was coming from Dr. Panigrahy's report?

2  MR. NIGH:  Form objection.

3  Mischaracterizes testimony.

4  THE WITNESS:  "All of this information"

5  is incorrect.  I don't know why you're making up

6  stuff.

7

8  BY MR. TRANGLE:

9  Q.  When you say all this information, you mean the

10  stuff in your report?

11  A.  You just said that all the information.  No

12  one ever said that.

13  Q.  Dr. Sawyer, I'm just trying to understand here

14  which parts are coming from Dr. Panigrahy's report,

15  which parts are your own.  And -- 'cause I had no idea

16  that some of this came from Panigrahy's report, it seems

17  like, or something, that's what you were testifying to

18  when counsel asked you.  If that's not correct, please

19  tell me right now.

20  MR. NIGH:  That's completely

21  mischaracterizes his testimony.

22  MR. TRANGLE:  So it just -- okay.  None

23  of this is coming -- just so I understand, truly,

24  none of this is coming from Dr. Panigrahy's report,

25  Dr. Sawyer?

Page 168

1          MR. NIGH:  He said all the information

2     that's contained there.  You can see a lot of that

3     information is from Dr. Panigrahy's report as well.

4     It's not cut and pasted.  If you'd just look up and

5     look at his testimony, you're mischaracterizing it.

6     You've asked, like, 20 questions on this.

7          MR. TRANGLE:  That's testifying for the

8     witness.

9

10    BY MR. TRANGLE:

11        Q.  Dr. Sawyer, is it -- is it just that you are

12    relying -- all this information is also contained in Dr.

13    Panigrahy's report and you're relying on that?  Is that

14    what you were saying?

15        A.  There are sections of this report which I

16    relied on.  I'll give you an example, Page 81,

17    regarding the liver.

18        Q.  Page 81 of your report, sorry, or

19    Dr. Panigrahy's?

20        A.  Panigrahy's report, last paragraph.

21        Q.  Okay.

22        A.  I know that because I highlighted it.  Page

23    85, the same thing.  First full paragraph.  There

24    are sections in here that I've read and I've relied

25    on and, in many cases, I obtain additional studies

1    beyond what was in Dr. Panigrahy's report.

2        Q.  And those additional studies are what's in

3    Footnotes 3 to 7.  Is that what you're saying?

4            MR. NIGH:  Form objection.

5    Mischaracterizes testimony.

6                THE WITNESS:  No.  The footnotes are

7    invalid.  They're wrong.  And that had happened due

8    to my use of the AI.

9

10   BY MR. TRANGLE:

11       Q.  And I think that you said that you're relying on

12   Dr. Panigrahy's report for your opinion about NDMA being

13   a complete carcinogen.  Is that right?

14           MR. NIGH:  Form objection.

15   Mischaracterizes testimony.

16               THE WITNESS:  Could you repeat the

17   question, please?

18

19   BY MR. TRANGLE:

20       Q.  Yeah.  I believe that you were answering Daniel

21   when you said that you relied on Dr. Panigrahy's

22   opinions and report for the fact of NDMA being a

23   complete carcinogen.  Is that right?

24           MR. NIGH:  Form objection.

25   Mischaracterizes testimony.

Page 170

```
 1              THE WITNESS:  Not exact and words have
 2     meaning.  So I'm not going to answer yes or no,
 3     unless you correct the -- the entire question that
 4     was asked and answered.
 5
 6     BY MR. TRANGLE:
 7        Q.  Wait.  So then what is the basis for your opinion
 8     that NDMA is a complete carcinogen?
 9        A.  Primarily, training and experience and it's
10     also corroborated by Dr. Panigrahy.
11        Q.  Did you go and look at all the studies cited by
12     Dr. Panigrahy for the idea that NDMA is a complete
13     carcinogen?
14        A.  No.  I reviewed sections of his report where
15     he discusses it.
16        Q.  I think you talked today about a route-to-route
17     extrapolation involving benzene.  Is that right?
18        A.  Yes.
19        Q.  Is that something that's in your report?
20        A.  Yes -- well, wait.  No, it's not in my
21     report.
22        Q.  Is it on your materials considered list?
23        A.  Yes.  The ATSDR benzene document is on my
24     considered list, yes.
25        Q.  Is it in the NDMA U.S. ATSDR document or a
```

Page 171

1    different one?

2         A.   The ATSDR benzene document.

3              MR. TRANGLE:   I'd like to request that

4    be produced because I don't see it anywhere on this

5    materials considered list, Daniel.

6              MR. NIGH:   I think it has been produced.

7              MR. TRANGLE:   Okay.

8

9    BY MR. TRANGLE:

10        Q.   Is it your testimony that in that benzene

11   route-to-route extrapolation, the U.S. EPA used the same

12   methodology that you've used in your report?

13        A.   For the --

14             MR. NIGH:   Hold on.   Hold on.   Form

15   objection.   You can answer.

16             THE WITNESS:   For the extrapolation, not

17   for the risk assessment factors.   I didn't perform a

18   risk assessment.   And I'm referring to Page 8 of

19   the --

20             MR. TRANGLE:   I honestly don't have this

21   document, because you guys have -- it's not on your

22   materials considered list.   So I don't know what

23   page you're talking about and what document.   So, I

24   mean, we might have to hold this deposition open so

25   we can get ahold of this document and ask questions