## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | **MDL No. 2875** |
| **THIS DOCUMENT RELATES TO:** *Roberts v. Zhejiang Huahai Pharmaceutical Co. Ltd.,*  Case No. 1:20-cv-00946-RMB-SAK | **HON. RENÉE MARIE BUMB** |

---

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

NIGH GOLDENBERG RASO & VAUGHN, PLLC
*Attorneys for Plaintiff*
14 Ridge Square NW
Third Floor
Washington, D.C. 20016
Tel: 202-792-7927
Fax: 202-792-7927

On the Brief:
C. Brett Vaughn RN, BSN, JD
Daniel Nigh, Esq.
Ashleigh Raso, Esq.
Kathryn Avila, Esq.
Stephanie Iken, Esq.

i

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..............................................................................1

II.  BACKGROUND ..............................................................................1

  A. The Valsartan Recall ................................................................. 1

  B. Mr. Roberts Was Not Diagnosed With Cirrhosis Prior to Ingesting NDMA-
     Contaminated Valsartan ............................................................. 2

  C. Mr. Roberts' Additional Risk Factors Were Captured By the Degree of
     Cirrhosis at the Time Mr. Roberts Ingested NDMA-Contaminated Valsartan  6

  D. Mr. Roberts Did Not Have Pre-Existing HCC .................................... 9

  E. Valsartan Epidemiology Studies Underestimate the Actual Increased Risk of
     Liver Cancer that Mr. Roberts Had from Ingesting Valsartan with NDMA ...11

  F. Mr. Roberts' Was Exposed to the High-End Amount of NDMA Captured by
     the Valsartan Epidemiology Studies ..............................................17

III. LEGAL STANDARD........................................................................19

  A. The Third Circuit Governs Procedural Law......................................19

  B. Summary Judgment Standard......................................................20

IV.  ARGUMENT ...............................................................................21

  A. Causation Is A Genuine Issue of Material Fact................................21

  B. Plaintiff Has Proven General and Specific Causation ......................23

     1. General Causation Has Been Determined and The Evidence Supports
        General Causation ..............................................................23

     2. There Is Ample Support to Demonstrate That Mr. Roberts' Cancer Was
        Caused By the NDMA In The Valsartan He Took ..........................28

V.   PLAINTIFF'S CLAIMS SURVIVE .....................................................33

  A. Plaintiff's Strict Liability Claims Survive.......................................33

  B. Plaintiff's Warranty Claims Survive .............................................34

  C. Plaintiff's ADTPA Claim Survives................................................35

VI.  CONCLUSION .............................................................................38

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Adickes v. S.H. Kress & Co.,*

    398 U.S. 144, 157 (1970) ....................................................................21

*Aldridge v. Ethicon, Inc.,*

    No. 1:20-cv-039, 2020 WL 1308335, at *3 (S.D. Ala. Mar. 19, 2020)...............34

*Anderson v. Liberty Lobby, Inc.,*

    477 U.S. 242, 248 (1986) ....................................................................20

*Burton v. Teleflex Inc.,*

    707 F.3d 417, 425 (3d Cir. 2013)..........................................................21

*Barcal v. EMD Serono, Inc.,* No. 14-c-CV-1709 (MHH),

    2016 WL 1086028, at *5 (N.D. Ala. Nov. 17, 2015) ...........................................35

*Bell v. T.R. Miller Mill Co.,*

    768 So. 2d 953, 957 (Ala. 2000) ..........................................................22

*Beloit Corp. V. Harrell,*

    339 So. 2d 992, 993 (Ala. 1976) ..........................................................30

*Bethel v. Jendoco Constr. Corp.,*

    570 F.2d 1168, 1174 (3d Cir. 1978)......................................................37

*Bodie v. Purdue Pharma Co.,*

    236 Fed. App'x, 511, 571 n.9 ..............................................................34

*Bond v. Solvay Specialty Polymers, USA, LLC,*

    583 F. Supp. 3d 643, 650-51 (D.N.J. 2022)........................................29

*Broach-Buttsv. Therapeutic Alternatives, Inc.,*

    191 A.3d 702, 711 (App. Div. 2018) ..................................................29

*Brock v. Chevron U.S.A., Inc.,*

    976 F.2d 969, 971 (5th Cir. 1992)........................................................19

*Cash Reg. Co. v. Sarokin*,

    669 F.2d 162, 165 (3d Cir. 1982) ................................................................26

*Christianson v. Colt Indus. Operating Corp.*,

    486 U.S. 800, 816 (1988) ........................................................................26

*City of Mobile v. Largay*,

    346 So.2d 393, 395 (Ala. 1977) ................................................................28

*Collins v. Davol, Inc.*,

    56 F.Supp.3d 1222, 1227 n.2 (N.D. Ala. 2014) ......................................35

*Copley v. Bactolac Pharm., Inc.*, No. 18-CV-575 (FB) (PK),

    2021 WL 918313, at *2 (E.D.N.Y. Mar. 10, 2021) ..............................37

*Daubert v. Merrell Dow Pharms., Inc.*,

    509 U.S. 579, 595 (1993) ........................................................................23

*Davis v. Wal-Mart Stores, Inc.*,

    64 F. Supp. 2d 1176, 1179 (M.D. Ala. 1999) ........................................30

*Dixon v. Bd. of Water & Sewer Comm'rs of the City of Mobile*,

    865 So. 2d 1161, 1165 (Ala. 2003) .................................................. 22, 28

*Ex parte Diversey*,

    742 So.2d 1250, 1254 (Ala. 1999) ..........................................................29

*Ex parte Valdez*,

    636 So. 2d 401, 404 (Ala. 1994) ...................................................... 29, 30

*Ex Parte Vongsouvanh*,

    795 So. 2d 625, 627 (Ala. 2000) ............................................................30

*Fagan v. City of Vineland*,

    22 F.3d 1283, 1290 (3d Cir. 1994) ..........................................................26

*Ford v. Jeffries*,

    474 Pa. 588, 379 A.2d 111 (1977) ..........................................................20

*General Motors Corp. v. Edwards*,
  482 So. 2d 1176, 1195 (Ala. 1985)..........................................................30

*Gilmore v. Shell Oil Co.*,
  613 So. 2d 1272, 1274-75 (Ala. 1993) ...................................................30

*Gremo v. Bayer Corp.*,
  469 F. Supp. 3d 240, 252 (D.N.J. 2020) ................................................28

*Hart v. Yamaha-Parts Distrib., Inc.*,
  787 F.2d 1468, 1474 (11th Cir. 1986)....................................................34

*Healy v. N.Y. Life Ins. Co.*,
  860 F.2d 1209, 1919 n. 3 (3d Cir. 1988)................................................20

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146, 156 (3d Cir. 1999)................................................... 23, 29

*Ibid. See also Dzielak v. Whirlpool Corp.*,
  83 F.4th 244, 250, 259 (3d Cir. 2023) ...................................................20

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
  679 F. Supp. 3d 1314, 1320 (N.D. Fla. 2023) .......................................34

*In re Gen. Motors LLC Ignition Switch Litig.*,
  257 F. Supp. 3d 372, 405 (S.D.N.Y. 2017)...........................................36

*In re Paoli R.R. Yard PCB Litig.* (Paoli II),
  35 F.3d 717, 760 (3d Cir. 1994).............................................................29

*In re Pharmacy Benefit Managers Antitrust Litig.*,
  582 F.3d 432, 439 (3d Cir. 2009)...........................................................27

*In re Sulfuric Acid Litigation*,
  847 F. Supp. 2d 1079 (N.D. Ill. 2011) ...................................................27

*Jones v. Coty Inc.*,
  362 F. Supp. 3d 1182, 1212 (S.D. Ala. 2018).................................. 36, 37

*Kaucher v. County of Bucks*,

    455 F.3d 418, 423 (3d Cir. 2006)...........................................................................20

*King v. E.I DuPont Nemours and Co*,

    741 F. Sup. 2d 699, 701 (E.D. Pa. 2010)................................................................19

*Klonowski v. International Armament Corp.*,

    17 F.3d 992, 995 (7th Cir.1994)..............................................................................20

*Lemond Const. Co. v. Wheeler*,

    669 So. 2d 855, 862 (Ala. 1995) ............................................................................22

*Lowery v. Sanofi-Aventis LLC*,

    535 F. Supp. 3d 1157, 1174-75 (N.D. Ala. 2021)..................................................35

*Maloney v. Cent. Aviation, Inc.*,

    450 F. Supp. 2d 905, 910 (W.D. Wis. 2006)..........................................................20

*Marshall County v. Uptain*,

    409 So. 2d 423, 425 (Ala. 1981) ............................................................................28

*Miller v. Cleckler*,

    51 So. 3d 379, 383 (Ala. Civ. App. 2010) .............................................................28

*Miller v. Pfizer Inc.*, No. 4:13cv1687,

    2014 WL 2155020, at *2 (N.D. Ala. May 22, 2014).............................................34

*Morgan v. City of Tuscaloosa*,

    108 So. 2d 342, 346 (1959) ....................................................................................31

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,

    998 F.2d 1224, 1230 (3d Cir. 1993).......................................................................21

*Primiano v. Cook,*

    598 F.3d 558, 563 (9th Cir. 2010)...........................................................................19

*Pritchard v. Dow Agro Scis.*, 705 F. Supp. 2d 471, 495

    (W.D. Pa. 2010), aff'd, 430 F. App'x 102 (3d Cir. 2011) ......................................20

*Pub. Interest Res. Grp. of N.J. v. Magnesium Elektron, Inc.*,

    123 F.3d 111, 116 (3d Cir. 1997) ...........................................................................27

*Reed v. Tracker Marine, LLC*,

    574 F. Supp. 3d 1065, 1086 (N.D. Ala. 2021) ......................................................28

*Robinson v. Gen. Motors LLC*, No. CV 20-663-RGA-SRF,

    2021 WL 3036353, at *12 (D. Del. July 19, 2021) ...................................... 36, 37

*Shelcusky v. Garjulio*,

    172 N.J. 185, 206 (2002) .....................................................................................28

*Simmons v. Clemco Indus.*,

    368 So. 2d 509, 513 (Ala. 1979) ................................................................... 34, 35

*SodexoMAGIC, LLC v. Drexel Univ.*,

    24 F.4th 183, 203-04 (3d Cir. 2022) ...................................................................20

*Swanstrom v. Teledyne Cont'l Motors, Inc.*,

    43 So. 3d 564, 584 (Ala. 2009) ...........................................................................22

*Tidwell v. Upjohn*,

    626 So. 2d 1297, 1301 (Ala. 1993) .....................................................................29

*Trujillo v. CBS Corp.*, No. CIV.A. 2:11-06791-ER,

    2013 WL 9796586, at *1 (E.D. Pa. Dec. 20, 2013)..............................................19

*Tuscaloosa County v. Barnett*,

    562 So.2d 166, 169 (Ala. 1990) ..........................................................................28

*Vesta Fire Ins. Corp. v. Milam & Co. Const.*,

    901 So. 2d 84, 100 (Ala. 2004) ...........................................................................22

*Vines v. Plantation Motor Lodge*,

    336 So. 2d 1338, 1340 (Ala. 1976) .....................................................................31

*Wheeler v. George*,

    39 So. 3d 1061, 1081 (Ala. 2009) ................................................................. 36, 37

*Wilbanks v. United Refractories, Inc.*,

    112 So. 3d 472, 474 (Ala. 2012)..............................................................................23

**Statutes**

Ala. Code § 7-2-607.............................................................................................34

Ala. Code § 8-19-14.............................................................................................36

**Rules**

F. R. Civ. P. 56.....................................................................................................20

Rule 8(d)(3) of the Federal Rules of Civil Procedure.........................................35

Under Rule 702....................................................................................................23

# I.  INTRODUCTION

Plaintiff responds and opposes Defendants' Motion for Summary Judgment and respectfully requests this Court deny Defendants' Motion. Defendants' entire motion hinges on relitigating causation and misleading claims about Mr. Roberts' liver condition prior to his ingestion of NDMA-contaminated valsartan. While Defendants may disagree with Plaintiffs' experts and their theory of the case, their Motion only serves to highlight the glaring factual issues that must be decided by a jury. Summary judgement is therefore improper.

# II.  BACKGROUND

## A. The Valsartan Recall

By July 27, 2017, and likely earlier, Defendants knew that their valsartan was contaminated with NDMA, a potent carcinogen.[1] Despite this alarming discovery, Defendants chose to remain silent, failing to notify the FDA or take corrective action. It was only after an outside customer independently detected the NDMA in Defendants' valsartan that Defendants were forced to acknowledge the issue and initiate a recall.

Mr. Roberts' valsartan pills, manufactured by Zhejiang Huahai Pharmaceuticals ("ZHP") and distributed by Prinston and Solco in the United States,

---

[1] Ex. 1, ZHP00190573.

1

contained the highest levels of NDMA found by the FDA.[2] As a temporary measure put in place to avoid a drug shortage, FDA set interim acceptable limits adopted by the FDA after the contamination was disclosed was for NDMA at 96 nanograms per day.[3] Mr. Roberts consumed over 681 pills that corresponded to testing that found between 13,180 and 20,190 nanograms of NDMA per pill.[4,5]

## B. Mr. Roberts Was Not Diagnosed With Cirrhosis Prior to Ingesting NDMA-Contaminated Valsartan

Defendants hope to distract the Court from their negligence by claiming Mr. Roberts was diagnosed with cirrhosis prior to ingesting NDMA-contaminated Valsartan. Defendants contend, without sufficient support, that this concocted cirrhosis diagnosis somehow means that their pills did not cause Mr. Roberts' cancer. This is wrong on several levels, but at a minimum, it is one of myriad factual disputes that are properly decided by a jury.

First and foremost, Defense hepatologist, Dr. Mahmud, admitted that Mr. Roberts did not have any symptoms associated with NASH.[6] Furthermore, Dr.

---

[2] Ex. 8, Siddiqui Expert Report at 27; *see also* https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products.
[3] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cder-nitrosamine-impurity-acceptable-intake-limits
[4] Ex. 8, Siddiqui Expert Report at 28; Ex. 24, GRobertsJr-PPR-000135.
[5] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan
[6] Ex. 9, Mahmud Dep. Tr. at 154:7-155:13.

2

Mahmud explained that you need a biopsy to diagnose NASH and a liver biopsy was never conducted on Mr. Roberts to make such a diagnosis.[7]

However, even assuming Defendants are correct that Mr. Roberts had cirrhosis as early as 2016 (even though he did not), Defendants hang their hat on the association between liver cancer and cirrhosis (a scarred liver that has become non-functioning) as if this is the only fact that matters (MSJ at 1-2, 4-6, 14, 18). This could not be further from the truth. There is an association between cirrhosis and liver cancer, but that is where the credibility of Defendants' argument ends. Simply pointing out an association while skipping over all of the steps in between a cirrhosis diagnosis and its progression to liver cancer skips several steps in a medically sound analysis, which Plaintiffs' experts conducted in full. [8] As Plaintiffs' experts explain in great detail, cirrhosis has a predictable and sequential progression from a healthy pristine liver to a scarred liver, to a cirrhotic non-functioning liver, which takes 7-10 year to develop, to possible, eventually liver cancer.[9] Defendants' experts oversimplify this and seem to believe that a cirrhosis diagnosis automatically means that Mr. Roberts would have gotten liver cancer without the valsartan. But this lacks scientific support and only highlights the factual dispute at issue. First, Defendants falsely claim that Mr. Roberts' treating physicians diagnosed cirrhosis as the cause

---

[7] Ex. 9, Mahmud Dep. Tr. at 159:14-160:5, 161:10-13, 164:15-165:6.
[8] See Siddiqui Report, 21-22, 30
[9] Siddiqui Report at 22.

of his cancer. (ECF No. 3062, MSJ at 1). Dr. Hooks, Mr. Roberts' gastroenterologist, did not make a casual determination of why Mr. Roberts developed Hepatocellular Carcinoma ("HCC") and was unaware Mr. Roberts was exposed to NDMA-contaminated valsartan when treating Mr. Roberts and thus could not have conducted a proper differential diagnosis without all of the relevant potential causes of Mr. Roberts' cancer.[10]

Not only was Dr. Hooks unable to account for the NDMA in Mr. Roberts' cancer diagnosis, he was further unable to account for the impact of NDMA on any potential cirrhosis diagnosis. Dr. Buckley, Mr. Roberts' cardiologist, did not have an opinion on the cause of Mr. Roberts' cancer. Defendants' uncited statement that Mr. Roberts' own providers diagnosed Mr. Roberts with cirrhosis before ingesting contaminated NDMA is unsupported. In fact, Dr. Hooks affirmatively states that he was unaware of Mr. Roberts ever being diagnosed with cirrhosis until the summer of 2018 (when he was also diagnosed with cancer).[11] Dr. Siddiqui also agreed and opined that, like Mr. Robert's treating physicians, she would not have diagnosed Mr. Roberts with cirrhosis prior to him being exposed to NDMA-contaminated valsartan.[12] Defendants cannot cite to a single treating provider who supports their theory. Instead, their experts are on an island of their own.

---

[10] Ex. 7, Hooks Dep. Tr. at 61:15-62:1, 74:20-76:17.
[11] Ex. 7, Hooks Dep. Tr. at 74:3-8.
[12] Ex. 8, Siddiqui Expert Report at 30.

4

Even at the time Mr. Roberts was diagnosed with liver cancer and cirrhosis in 2018, his treating physician noted that Mr. Roberts had "undergone extensive work up for cirrhosis" and that the "**work up for cirrhosis is essentially negative**."[13] As Dr. Siddiqui noted in her expert report, NDMA causes oxidative stress, inflammation, and cirrhosis.[14] The U.S. HHS also notes, "Hepatoxicity is the most prominent and characteristic systemic effect of NDMA, resulting in centrilobular necrosis, hemorrhage, fibrosis, **cirrhosis**, and ascites."[15] To the extent that Mr. Roberts' liver was weakened at the time he was exposed to NDMA-contaminated valsartan, it only increased his susceptibility to developing liver cancer. The U.S. Health and Human Services Toxicological profile for NDMA supports this: "**Other Factors Influencing Susceptibility:** Because the liver is the primary target of NDMA toxicity, individuals with liver disease may be at increased risk from NDMA exposure."[16]

Defendants' own experts concede that Mr. Roberts did not have any of the symptoms associated with cirrhosis and was not diagnosed with cirrhosis until 2018, two years after ingesting contaminated valsartan.[17]

---

[13] Ex. 20, GRobertsJr-PPR-000093; Ex. 8, Siddiqui Expert Report at 30 (emphasis added).
[14] Ex. 8, Siddiqui Report at 21.
[15] Ex. 6, Toxicological Profile for N-Nitrosodimethylamine (NDMA) at 42.
[16] Ex. 6, Toxicological Profile for N-Nitrosodimethylamine (NDMA) at 94.
[17] Ex. 9, Mahmud Dep. Tr. at 298:12-20, 311:6-10, 127:6-129:8.

## C. Mr. Roberts' Additional Risk Factors Were Captured By the Degree of Cirrhosis at the Time Mr. Roberts Ingested NDMA-Contaminated Valsartan

Defendants incorrectly claimed "Mr. Roberts was diagnosed with NASH,"[18] when he was not.[19] Instead, Mr. Roberts' records reference MASLD (metabolic dysfunction-associated steatotic liver disease), which merely means that a person has fat in their liver, a condition most people who are obese likely have.[20] The distinction between the two is important, because NASH is a more advanced condition where there is not only fat in the liver, but also symptoms, including weakness, loss of appetite, nausea, yellow skin and eyes, itching, fluid build-up, swelling of the legs and abdomen, mental confusion, and GI bleeding.[21] While MASLD generally does not cause symptoms, as was the case for Mr. Roberts, NASH is an advanced form of MASLD.

Defendants would have the Court believe that a diagnosis of NASH is a forgone conclusion of liver cancer. Not so. In fact, as Dr. Mahmud makes sure to point out, NAFLD is the "most common liver disease in the world."[22] Dr. Mahmud believes over one-third of Americans haveobesity[23] He also believes that most

---

[18] MSJ at 6
[19] Defendants repeatedly incorrectly equate NASH/MASH to NASLD/MASLD (MSJ at 6, 18-19).
[20] Ex. 9, Mahmud Dep. Tr. at 186:12-19.
[21] Ex. 9, Mahmud Dep. Tr. at 411:22-24; 152:9-10.
[22] Ex. 3, Mahmud Expert Report at 23 (*citing* Ex. 8, Siddiqui Expert Report at 21).
[23] Ex. 9, Mahmud Dep. Tr. at 185:2-186:11.

people who are obese have MASLD.[24] Yet, as Dr. Mahmud agrees, a very small population go on to develop the more serious condition of cirrhosis.[25] Even fewer go on to develop cancer.

Dr. Siddiqui also explained in her deposition that the diagnosis of NASH in Mr. Roberts' medical records was incorrectly made. Dr. Siddiqui gave the following interpretation of Mr. Roberts' 2009 medical record from a visit with Dr. Ives:

> He said, "He has been told over the years that he probably has a fatty liver," that is NASH, but again, that was, to me, not consistent with a diagnosis. Then Dr. Ives, in September on follow-ups said "demonstrated fatty liver." Then, Dr. Ives – there was an ultrasound in 20 – then we come back to the 2016 ultrasound where it says "fatty infiltrate noted within the liver." So my – from my review of it, he probably had fatty liver or they were considering it and not making a diagnosis".[26]

Again, a "fatty liver" is just one indication of NALFD. A diagnosis of NASH requires much more.

Mr. Roberts' treating gastroenterologist was also deposed on the difference between NASH and a fatty liver:

> Q. And I see NASH used in conjunction with the term fatty liver – fatty liver disease. Are they the same thing or are they slightly different?
>
> A. They're different.
>
> Q. Okay. And if you could briefly explain how they're different.

---

[24] Ex. 9, Mahmud Dep. Tr. at 186:12-19.
[25] Ex. 9, Mahmud Dep. Tr. at 184:21-185:1.
[26] Ex. 10, Siddiqui Dep. Tr. at 200:19-201:5.

> A. NASH is where you have elevated liver tests. And if a biopsy is taken, you'll see inflammation within the hepatocytes or within the hepatic parenchyma.
>
> Q. Okay. Was your understanding that Mr. Roberts had fatty liver disease?
>
> A. Based on this record, yes.[27]

Even though Dr. Siddiqui also doesn't believe that Mr. Roberts was actually diagnosed with or had NASH, for purposes of her expert report, Dr. Siddiqui approached her differential diagnosis as if Mr. Roberts did actually have NASH.[28] As explained by Dr. Siddiqui in her expert report, whether or not Mr. Roberts actually had NASH is of little significance, because even if Mr. Roberts had NASH:[29]

> his resulting increased risk of liver cancer would be captured based on the degree of his liver cirrhosis. Mr. Roberts took medications for hyperlipidemia. The mechanism whereby hyperlipidemia would increase the risk of liver cancer is by causing NASH, which can then cause cirrhosis. Any increased risk of liver cancer that Mr. Roberts was at due to hyperlipidemia would be captured by the increased risk he was at due to his very mild and undiagnosed cirrhosis.
> The same is true for the other risk factors listed by Defendants – obesity and

diabetes – the increased risk posed would have been captured by the extent of cirrhosis (if any) at the time Mr. Roberts first ingested NDMA-contaminated

---

[27] Ex. 7, Hooks Dep. Tr. at 54:15-55:5.
[28] Ex. 8, Siddiqui Expert Report at 3, 29, 30.
[29] Ex. 8, Siddiqui Expert Report at 30.

valsartan.[30] Like Dr. Siddiqui, Mr. Roberts' treating physicians did not believe that NASH, obesity, or diabetes caused or was even a risk factor for Mr. Robert's liver cancer.[31]

### D. Mr. Roberts Did Not Have Pre-Existing HCC

First, Defendants incorrectly claim that Mr. Roberts did not heed advice to undergo additional imaging after his 2016 liver scans. (MSJ at 8). This argument is based on a single line from Mr. Roberts' April 19, 2016, radiology report, which states, "Follow-up liver protocol CT 4-6 months from date of study would be useful for further characterization."[32] There is absolutely no evidence that Mr. Roberts' treating physician ever communicated this recommendation to Mr. Roberts.[33] It is not even clear if Mr. Roberts' treating physicians agreed with the recommendation to follow up, because there is no follow-up note from them. Two months later on June 23, 2016, Dr. Ives noted that the prior "ultrasound and CT revealed some cysts in the liver for which a 4-6 month follow up is recommended" and that Mr. Roberts' "[liver function tests] were [slightly] increased and he has been told all of his life that they have been up a bit and [ultrasound] show[ed] fatty infiltration."[34]

---

[30] Ex. 8, Siddiqui Expert Report at 30.
[31] Ex. 7, Hooks Dep. Tr. at 52:12-19, 54:3-14, 55:9-21, 67:4-21; Ex. 11, Buckley Dep. Tr. at 53:7-17.
[32] Ex. 12, GRobertsJR-TH-MD-000944 – 945.
[33] Ex. 13, Mele Dep. Tr. at 291:6-10.
[34] Ex. 8, Siddiqui Expert Report at 6; Ex. 14, GRobertsJr-ESMS-000029.

Mr. Roberts continued to regularly follow up with his treating physicians, including multiple blood draws to monitor his liver enzymes. He saw his physicians multiple times between 2016 and 2018. None of Mr. Roberts' medical records suggest that Mr. Roberts was refusing to undergo additional imaging. Even if he did though, no amount of follow up would change the fact that he took pills with levels of NDMA that were more than 137.8 to 210.3 times the FDA's recommended daily limit. In fact, Mr. Roberts was so compliant with his medical treatment that Dr. Siddiqui noted that his medical course would serve as an ideal case study because "there is an extensive amount of documented relevant medical history, including labs and imaging prior to his exposure to NDMA, and is then followed closely for the 2 years in which he is exposed to daily multi-microgram bouses of NDMA.[35] Mr. Roberts' compliance with his doctors' recommendations was not limited to his cancer treatment. His medical records also note, for example, that his diabetes was "well-controlled.", and there is no suggestion in his medical records to the contrary.[36] In fact, both sides' experts agree that Mr. Roberts' diabetes was well-controlled with medication.[37]

Defendants then quote Plaintiff's expert radiologist (who Defendants deposed and yet did not attempt to limit through the *Daubert* process out of context to make

---

[35] Ex. 8, Siddiqui Expert Report at 31.
[36] Ex. 15, GRobertsJr-CA-000243
[37] Ex. 10, Siddiqui Dep. 218:14-16 and Ex. 9, Mahmud Dep. 174:23-175:1.

it appear as if Plaintiff's expert believes Mr. Roberts might have had cancer prior to ingesting NDMA-contaminated valsartan. (MSJ at 1, 8). Dr. Mele merely opined that at the time the imaging was obtained, "[you] cannot entirely exclude malignancy".[38] However, Dr. Mele was also able to compare what was observed in the 2016 imaging to the 2018 imaging that detected liver cancer. Dr. Mele opines multiple times in his expert report that the location of Mr. Roberts' liver cancer detected in 2018 does not correspond to any of the observations Mr. Roberts' radiologist made in 2016.[39]

### E. Valsartan Epidemiology Studies Underestimate the Actual Increased Risk of Liver Cancer that Mr. Roberts Had from Ingesting Valsartan with NDMA

As Dr. Siddiqui explains in her expert report, the *Gomm* and *Mansouri* studies did not adequately address a dose-response relationship for NDMA because the study was measuring the amount of valsartan consumed, not the amount of NDMA. As explained by Dr. Siddiqui, this approach significantly dilutes the results. As Dr. Siddiqui explains:

> While animal studies clearly demonstrate a dose response regardless of how much NDMA is administered, none of the valsartan epi studies detected a dose response. **However, the valsartan epi studies did not measure whether increased cumulative exposure to NDMA**

---

[38] Ex. 13, Mele Dep. Tr. at 159:2-13, 161:22-162:2.
[39] Ex. 16, Mele Expert Report at 2-3; Ex. 13, Mele Dep. Tr. at 144:1-145:15; *see also* Plaintiff's Daubert Motion to Exclude Dr. Chernyak (ECF No. 3066) and Plaintiff's Daubert Motion to Exclude Dr. Mahmud (ECF No. 3067) demonstrating the unreliable methods Defendants' experts utilized to opine that Mr. Roberts might have had pre-existing liver cancer.

**increased the risk of liver cancer, but rather, erroneously assumed that cumulative exposure to valsartan would be associated with cumulative exposure to NDMA**. The fact that valsartan epi studies were able to detect an increased risk of liver cancer just by comparing those who were ever-exposed to NDMA containing valsartan to never-exposed to NDMA containing valsartan is incredibly significant.

*****

It is important to note the wide range of NDMA levels the FDA detected when testing various manufacturers' valsartan. For instance, the 320 mg valsartan made by Hetero Labs Ltd contained as little as 330 nanograms of NDMA, while Prinston Pharmaceutical's 320mg valsartan HCTZ contained up to 20,190 nanograms. Therefore, if Prinston utilized the same active pharmaceutical ingredient (API) to make a 40mg pill of valsartan, it would contain 2,523 nanograms of NDMA. This is key to understanding why the valsartan epi studies all failed to detect a dose response – **the studies wrongly assumed that NDMA exposure scaled proportionally with the milligram of valsartan**. As demonstrated above, a 40mg pill of valsartan from Prinston could contain 7 times the amount of NDMA as a 320mg pill of valsartan from Hetero Labs. Furthermore, someone who filled a single 30-day prescription of Hetero Labs 320mg valsartan with 330 nanograms of NDMA per pill would have been included in the "ever-exposed to contaminated valsartan" group in the valsartan epi studies. The entire exposure for someone who consumed Hetero Labs 320mg valsartan with 330 nanograms of NDMA per pill would have had a total cumulative exposure of 9,900 nanograms – half of what one pill of valsartan 320mg from Prinston contained. If the same Hetero Lab's API was utilized to make a 160mg valsartan pill, it would have only contained 115 nanograms of NDMA per pill or 4,500 nanograms for an entire 30-day fill. Thus, a single 320mg valsartan pill from Prinston could contain four times as much NDMA as an entire 30-day prescription of Hetero Labs 160mg valsartan. The fact that valsartan epi studies detected an increased risk of liver cancer based solely on ever being exposed to contaminated valsartan is of incredible significance. It has been well established that there is a clear dose-response to NDMA. **Therefore, the valsartan epi findings on an increased risk of liver cancer based on ever being exposed to NDMA contaminated valsartan massively underestimates the**

12

**increased risk of someone who was exposed to the higher levels of NDMA contaminated valsartan, as the results are significantly diluted by those with the lowest exposure levels.**

*****

Mr. Roberts' Valsartan HCTZ 320-25 mg was manufactured by Zhejiang Huahai Pharmaceuticals (ZHP) and was distributed by Prinston Pharmaceutical. This corresponds to the red box in the FDA testing data above, where between 13,180 nanograms and 20,190 nanograms of NDMA were detected per pill. **Each of the valsartan pills that Mr. Roberts consumed could have contained multiple times more NDMA than would have been present in an entire month's prescription of NDMA-contaminated valsartan from a different company**. Mr. Roberts took 681 of these valsartan pills with incredibly high levels of NDMA before he was diagnosed with HCC (liver cancer).[40]

Dr. Siddiqui testified as follows when questioned about the valsartan

epidemiological studies that demonstrated a statistically significant increased risk of

liver cancer for those ever-exposed to NDMA-contaminated valsartan:

> ...they didn't have the data for which batches or lots were contaminated. So for me, it was astounding the fact that even though there was such a propensity for dilution because you have all these patients that they have looked at but they're not looking at the patients who have the most amount of contaminated valsartan. Because as we went over before, there are certain pills from certain manufacturers, like, Zhejiang Chemicals that have a significant amount of NDMA per pill. But then there are other production houses or pharmaceuticals that have a significantly less amount. So they never took that into account. They didn't even have access to that data which we do now. And not taking that into account, so they pooled everybody together, they pooled the valsartan group – basically the contaminated group was basically

---

[40] Ex. 8, Siddiqui Expert Report at 26-29 (emphasis added); *see also* Ex. 5, Gomm Study ("The study also features limitations… Although detailed batch-wise information on potentially NDMA-contaminated valsartan was provided, we had no information on the exact NDMA content of individual valsartan tablets."); *see also* Ex. 4, Mansouri Study ("[W]e were unable to obtain information regarding the number of valsartan packages sold containing impurities to evaluate the extent of nitrosamine contamination.").

altogether in – as far as if someone took valsartan once, one pill that maybe had a small amount of NDMA was put into the same group as someone who took valsartan for 2 years with a full amount of NDMA or an exorbitant amount of NDMA, they put that together. And even despite all of that, even despite not knowing that information, even despite having such a big dilution effect, they still found an increased risk of HCC in both the Gomm and Mansouri studies.

*****

They were good studies but there are issues with the way they played out because they didn't have the information that we have now sitting here in 2025. They don't have the batches. They didn't have any of that. They didn't know the difference in the pill. They assumed that having one valsartan pill means one dose but now we know – now, we know very well that someone with one pharmaceutical company can have a smaller dose of valsartan – of NDMA in that one pill whereas someone with – form another company, like, Zhejiang Pharmaceuticals can have another 20,000 – I mean, that's exponentially increasing the amount of NDMA, basically, in one pill, as much as they would have in maybe from a 30-day supply, for example. So we know the limitations. But what I'm saying is, based on all of this, based on all the review of the medical literature, the animal literature, the human epi studies and Mr. Roberts himself, I understand that there is a hazard ratio that points towards a statistical significance between being exposed to contaminated valsartan, which has NDMA and getting HCC and I am basing my opinion that Mr. Roberts had HCC because of his NDMA, because he took such high levels of it, based on all of that.[41]

Dr. Sawyer in his report incorporated pharmacoepidemiological evidence, including the *Gomm* and *Mansouri* studies.[42] Gomm et al. reported a hazard ratio of 1.16 (95% CI 1.00–1.34), and Mansouri et al. found a hazard ratio of 1.12 (95% CI 1.01–1.25) for liver cancer associated with NDMA-contaminated valsartan. *Id*. He testified that these figures likely underestimated the true risk because both studies

---

[41] Ex. 10, Siddiqui Dep. Tr. at 275:23-277:2, 284:25-286:1.
[42] Ex. 19, Sawyer Expert Report at 35-39.

failed to stratify patients based on the degree of NDMA exposure. Patients who took heavily contaminated valsartan were grouped with those who took uncontaminated pills, which diluted the measured effect. Both studies also included patients with mixed exposures in both the control and exposed groups, blurring distinctions and biasing the results toward the null. Dr. Sawyer noted that when Mansouri et al. reanalyzed the data to exclude mixed-exposure patients (Supplementary Table S10), the observed liver cancer risk increased significantly. *Id.* at 40-41. Even defense experts, including Dr. Diette and Dr. Chodosh, acknowledged that controlling for these confounding factors made the signal more pronounced.[43]

Finally, Dr. Sawyer emphasized that Mr. Roberts falls squarely within the high-risk subgroups identified in the Mansouri study, male sex, age 60-69 and long-term valsartan use (three or more years).[44] Mr. Roberts took valsartan for more than nine years. While the study did not publish a combined hazard ratio specifically for 60–69-year-old males with prolonged exposure, Dr. Sawyer explained in his deposition that the increased risk was clear and additive: males exposed to contaminated valsartan had a 23% increased risk of liver cancer (adjusted Hazard Ratio [aHR] 1.23), and those using valsartan for more than three years had a 22% increased risk (aHR 1.22).[45] Dr. Diette likewise acknowledged that these risk factors

---

[43] Ex. 22, Diette Dep. Tr. at 60:23-63:21; Ex. 27, Chodosh Dep. Tr. at 167:22-174:08.
[44] Ex. 19, Sawyer Expert Report at 39.
[45] ECF No. 3098-8, Sawyer Dep. Tr. at 122:08-122:13; 124:02-124:10.

were independently significant and that it is biologically plausible for risk to increase at the intersection of multiple high-risk categories.[46] This testimony reflects a reasoned interpretation of the Mansouri data and is entirely consistent with the expectations of a qualified toxicologist applying standard methodology.

In addition, Dr. Panigrahy, whose expert opinion has been admitted, and who has a cancer researcher with his own laboratory, dedicated over 10 pages of his report to a section titled "Cancer Type #1- NDMA Causes Liver Cancer."[47] Relying on valsartan epidemiology studies, NDMA occupational studies, NDMA food studies, NDMA animal studies, and mechanism action, Dr. Panigrahy concluded that NDMA in VCD's causes cancer. *Id.*

Because Plaintiffs aren't alleging that valsartan itself causes liver cancer, but the NDMA that was negligently present in some valsartan can cause liver cancer, Dr. Siddiqui also reviewed studies that assessed the risk of humans being exposed to varying levels NDMA. This included an occupational study known as *Hidajat*[48], which Dr. Siddiqui noted found that those "exposed to higher amounts of NDMA in the industry were more likely to die due to liver cancer than workers who were exposed to lower amounts of NDMA in the factory. Like the animal studies, this

---

[46] Ex. 22, Diette Dep. Tr. at 60:23-63:21.
[47] Ex. 17, Panigrahy Expert Report at 96-105.
[48] Ex. 18, Hidajat M, McElvenny DM, Ritchie P, et al. Lifetime exposure to rubber dusts, fumes and N-nitrosamines and cancer mortality in a cohort of British rubber workers with 49 years follow-up. Occup Environ Med. 2019;76(4):250-258. doi:10.1136/oemed-2018-105181.

human study also demonstrated a dose-response; as the workers were exposed to more NDMA, they died of liver cancer at a higher rate."[49]

### F. Mr. Roberts' Was Exposed to the High-End Amount of NDMA Captured by the Valsartan <u>Epidemiology Studies</u>

Furthermore, Dr. Siddiqui explains how the risk would also be much greater for Mr. Roberts, as the valsartan Mr. Roberts ingested for nearly two years contained the highest levels of NDMA of any contaminated valsartan on the market.[50] Defense's expert hepatologist agreed that Mr. Roberts' cumulative NDMA exposure was on "the high end."[51] Dr. Siddiqui included the following FDA testing results in her expert report with a red box around the testing results that correspond to the valsartan Mr. Roberts consumed:[52]

---

[49] Ex. 8, Siddiqui Expert Report at 26.
[50] Ex. 8, Siddiqui Expert Report at 25-26.
[51] Ex. 9, Mahmud Dep. Tr. at 62:7-12.
[52] Ex. 8, Siddiqui Expert Report at 27.

| Company | Product (tablets) | Lots Tested | NDMA level (micrograms - mcg/tablet) |
|---|---|---|---|
| Aurobindo Pharma Ltd | Amlodipine 10mg/Valsartan 320 mg | VKSA18005-A, VKSA18007-A, VKSA18001-A | Below LOD |
| Aurobindo Pharma Ltd | Valsartan 320mg | VUSD17008-A, VUSD17001-A, VUSD17009-A | Below LOD |
| Aurobindo Pharma Ltd | Valsartan 320mg/HCT 25mg | HTSB18001-A, HTSB18028-A, HTSB18029-A | Below LOD |
| Hetero Labs Ltd | Valsartan 320mg | VLS18049, VLS18051, VLS18050 | 0.33-0.44 |
| Mylan Pharmaceutical Inc. | Amlodipine 10mg/Valsartan 320 mg | 3079709, 3077618, 3079708 | Below LOD |
| Mylan Pharmaceutical Inc. | Amlodipine 10mg/Valsartan 320 mg/HCT 25mg | 2008702 | Below LOD |
| Mylan Pharmaceutical Inc. | Valsartan 320mg | 3080009, 3080010, 3079205 | Below LOD |
| Mylan Pharmaceutical Inc. | Valsartan 320mg/HCT 25mg | 3084886, 3093804, 3084862 | Below LOD |
| Prinston Pharmaceutical | Valsartan 320mg | 344B18027, 344B18028, 344B18029 | 15.18-16.30 |
| Prinston Pharmaceutical | Valsartan 320mg/HCTZ 25mg | 611B18025, 611B18026, 611B18027 | 13.18-20.19 |
| Teva Pharmaceutical | Amlodipine 10mg/Valsartan 320 mg | 26X053, 26X054, 26X055, 26X051, 26X044, 26X048 | Below LOD |
| Teva Pharmaceutical | Amlodipine 10mg/Valsartan 320 mg/HCT 25mg | 22X045, 22X046, 22X047, 22X038, 22X041 | Below LOD |
| Teva Pharmaceuticals | Valsartan 320mg | 1240425A, 1247282M | 7.92-16.55 |
| Teva Pharmaceuticals | Valsartan 320mg/HCTZ 25mg | 1217576M, 1217577M, 1217578M | 6.94-10.35 |
| Torrent Pharmaceuticals | Amlodipine 10mg/Valsartan 320 mg/HCTZ 25mg | BBX2E001, BBX2E002, BBX2E003 | 10.24-11.53 |
| Torrent Pharmaceuticals | Valsartan 320mg | BV48D001, BV48D002 | 0.56-0.62 |
| Torrent Pharmaceuticals | Valsartan 160mg | BV47D001 | 0.45 |

Dr. Sawyer also conservatively calculated Mr. Roberts' increased risk of dying from liver cancer due to the lowest amount of NDMA that Mr. Roberts could have been exposed to via valsartan as 2.86-fold.[53] Dr. Siddiqui noted in her expert report, "Dr. Sawyer's calculations and opinions are consistent with my understanding

---

[53] Ex. 19, Sawyer Expert Report at 52.

regarding Mr. Roberts' NDMA exposure level and associated increased risk of liver cancer."[54]

### III. LEGAL STANDARD

#### A. The Third Circuit Governs Procedural Law

Defendants attempt to conflate substantive and procedural law. Although issues of substantive law will involve Alabama state law, when it comes to procedure and admissibility of expert testimony, the Third Circuit controls.

The federal summary judgment rule is not substantive; it is procedural. *Brock v. Chevron U.S.A., Inc.,* 976 F.2d 969, 971 (5th Cir. 1992). (*See also Trujillo v. CBS Corp.*, No. CIV.A. 2:11-06791-ER, 2013 WL 9796586, at *1 (E.D. Pa. Dec. 20, 2013) (summary judgment is a procedural issue so the court will apply federal law for the transferor court). (*See also King v. E.I DuPont Nemours and Co*, 741 F. Sup. 2d 699, 701 (E.D. Pa. 2010) (summary judgment pleading requirements are procedural).

The admissibility of evidence is governed by federal law because a court sitting in diversity applies state substantive law, but federal procedural law. *Primiano v. Cook,* 598 F.3d 558, 563 (9th Cir. 2010). The Court applies federal law to determine the admissibility of expert testimony. State substantive law does not change the admissibility of expert testimony. *Pritchard v. Dow Agro Scis.*, 705 F.

---

[54] Ex. 8, Siddiqui Expert Report at 29.

Supp. 2d 471, 495 (W.D. Pa. 2010), aff'd, 430 F. App'x 102 (3d Cir. 2011) (citing *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111 (1977)).  In diversity actions such as this one, federal law governs all procedural and evidentiary issues, including the admissibility of expert testimony. *Maloney v. Cent. Aviation, Inc.*, 450 F. Supp. 2d 905, 910 (W.D. Wis. 2006) (*citing Klonowski v. International Armament Corp.*, 17 F.3d 992, 995 (7th Cir.1994)).

### B. Summary Judgment Standard

A court should only grant summary judgment if the movant can show there is no genuine dispute as to any material fact. F. R. Civ. P. 56. An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it can affect the outcome of the suit under governing law. *Ibid. See also Dzielak v. Whirlpool Corp.*, 83 F.4th 244, 250, 259 (3d Cir. 2023) *citing SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203-04 (3d Cir. 2022) [*quoting Anderson*, 477 U.S. at 248]; *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) and *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1919 n. 3 (3d Cir. 1988) [*quoting* same].

The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in

the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). Importantly, in evaluating whether a genuine issue of material fact exists, the court considers all facts and ambiguities in the light most favorable to the non-moving party (*Anderson*, 477 U.S. at 242, 255; *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013)). The court decides not "the truth of the matter," but whether a genuine issue of material fact necessitates a trial. *Anderson*, 477 U.S. at 242. Therefore, the court neither weighs the evidence nor makes credibility judgment as these tasks are for the fact-finder. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

## IV. <u>ARGUMENT</u>

### A. Causation Is A Genuine Issue of Material Fact

Defendants' request for summary judgment is a second bite at the 702 apple and is completely dependent on the Court ruling in its favor on nearly every request to exclude expert evidence. In support of this claim, Defendants erroneously cite Alabama and Eleventh Circuit law. However, as discussed above, when it comes to admissibility of evidence, New Jersey and the Third Circuit controls. The Court has already found the general causation experts admissible under Third Circuit law. As outlined in Plaintiff's 702 motions, Plaintiff's specific causation experts should also be admitted.

Even though the Third Circuit applies to the admissibility of expert evidence on causation, even if Alabama law applied, summary judgment would still be improper: the question of whether a defect or negligent conduct caused injury is one of fact, which is ordinarily to be determined by the jury. *Bell v. T.R. Miller Mill Co.*, 768 So. 2d 953, 957 (Ala. 2000) (trial court erred removing a AEMLD claim from the jury (*citing Lemond Const. Co. v. Wheeler*, 669 So. 2d 855, 862 (Ala. 1995)); *Swanstrom v. Teledyne Cont'l Motors, Inc.*, 43 So. 3d 564, 584 (Ala. 2009) (trial court erred in entering summary judgment on negligence and strict liability claims where there an expert report and eyewitness testimony); *Vesta Fire Ins. Corp. v. Milam & Co. Const.*, 901 So. 2d 84, 100 (Ala. 2004) (trial court erred in entering summary judgment on AEMLD claims); *Dixon v. Bd. of Water & Sewer Comm'rs of the City of Mobile*, 865 So. 2d 1161, 1165 (Ala. 2003) (trial court erred in granting summary judgment because there were genuine issues of material fact relating to causation of negligence claim).

Indeed, it is well-established that causation "is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence." *E.g.*, *Lemond Const.*, 669 So. 2d at 862. Defendants are entitled to summary judgment only where "there is a total lack of evidence from which the fact-finder may

22

reasonably infer a direct causal relation." *Wilbanks v. United Refractories, Inc.*, 112 So. 3d 472, 474 (Ala. 2012) (internal citation and quotations omitted).

## B. Plaintiff Has Proven General and Specific Causation

General and specific causation are often proven through expert support. The admissibility of those experts are governed by procedural law. *See supra, Section-Legal Standard.* Under Rule 702, expert testimony is admissible if the proponent demonstrates that it is more likely than not that the expert's opinion is the product of reliable principles and methods properly applied to the facts of the case.[55] A medical expert's opinion is not inadmissible because it does not rule out every conceivable alternative cause. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999). Challenges to an expert's conclusions go to the weight of testimony rather than its admissibility. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

### 1. General Causation Has Been Determined and The Evidence Supports General Causation

On March 4, 2022, Judge Kugler ruled Plaintiffs' experts on general causation passed scientific muster. ECF No. 1958. Specifically, as to Dr. Lagana, the Court found that "[Dr. Lagana's] opinion is not controversial...And what he did in this is he employed the usual research in finding and discussing relevant animal studies,

---

[55] See Fed. R. Evid. 702. *See also* Plaintiff's Memorandum in Opposition to Defendant's Motion to Exclude the Opinions of Dr. William Sawyer (ECF No. 3098); Plaintiff's Memorandum in Opposition to Defendants' Motion to Exclude the Opinions of Dr. Fareeha Siddiqui (ECF No. 3097).

observational studies and other data. He does discuss the contrary data… He has an opinion as to how these chemicals can cause cancer… Accordingly I find no problems with his methodology, and the motion to bar his testimony is denied."[56]

As for Dr. Panigrahy, the Court said "… Now I've talked about animal studies. We all are aware that there are certain shortcomings of animal studies. But folks, that's what researchers use, particularly where you can't do human studies, as you can't do here… I think the associational evidence is certainly sufficient to get this to the jury…".[57]  "[T]he defendants complain about the heavy reliance on *Hidajat*… but this is a jury question. The jury is going to have to determine which of these studies they think are important and which are not for the reasons that you're going to illustrate to them.". *Id.* "He has an opinion about the development of cancer in downstream organs, how much NDMA survives the liver. And again, it's based on animal studies and based on these studies that show, for whatever reason, the larger the animal species, the greater the amount that escapes through the liver". *Id.* "There's nothing new about extrapolating from animal studies, particularly here where apparently every species of animal seems to have been studies and seems to have developed cancer." *Id.* "He uses the same methodology he would in his own research, and of course the jury doesn't have to believe anything he says, but that's

---

[56] Hr'g Tr., ECF No. 1959 at 149:4-24 (Mar. 2, 2022).
[57] Hr'g Tr., ECF No. 1959 at 149:25-152:1 (Mar. 2, 2022).

up to them." *Id.*

As to Dr. Etminan, "the methodology Dr. Etminan uses is sound".[58] "Again the defendants raise the issue of… [relying] on some studies and not others… the jury may reject that. They're free to reject that, and [Defendants] are free to argue to the jury that they have to reject that." *Id.* "Defendants complain of his reliance on *Hidajat*. I'm not going to be the one to determine whether these are good studies or bad studies..." *Id.* "Again, [why some studies are noteworthy and others aren't] is a question for the jury. *Id.*

As for Stephen Hecht, the court found that "[Dr. Hecht] is entitled to rely on [FDA threshold level calculations]."[59]*Id.* "The methodology he uses is the same as everyone else. He examines all the studies that are available, he explains why he thought some were not terribly helpful or relevant and why some were. The jury will have to straighten this out." *Id.*

Defendants' use of the Summary Judgement process as a vehicle to re-litigate findings previously made by this Court after extensive briefing and hearings is not only improper; it is an inefficient use of this Court's time and resources. This Court previously noted the "need to focus on the whole picture, what was done and what wasn't done. These weaknesses in all these experts are certainly going to be fertile

---

[58] Hr'g Tr., ECF No. 1959 at 152:2-153:11 (Mar. 2, 2022).
[59] Hr'g Tr., ECF No. 1959 at 153:23-155:17 (Mar. 2, 2022).

ground for counsel in examining and cross-examining these experts.".[60]

On December 22, 2022, in response to Defendants' Motion to Reconsider based on the Zantac MDL rulings, Judge Kugler, after considering the Zantac orders, again admitted Plaintiffs' general causation experts stating "there is no scientific doubt about the presence of nitrosamines in the human body upon the ingestion of the 'valsartan-containing drugs containing NDMA or NDEA', because the VCDs contained nitrosamines before ingestion. Accordingly, there is no sufficient reason for this Court to re-consider its Daubert Opinions....". [Dkt. 2210].

This is not Defendants' first or even second attempt to relitigate causation. For nearly a year Defendants have tried to get a redo before this Court on the Daubert rulings issued by Judge Kugler years earlier, and this Court (Bumb) has repeatedly rebuffed those overtures.[61]

These efforts have were deemed "not helpful" by this court. [Dkt. 2771]. As Plaintiffs have pointed out "[C]ourts should be loathe" to depart from prior decisions. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994) ("a successor judge should not lightly overturn decisions of his predecessors in a given case"); Hayman *Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982) (if the law of the case

---

[60] Hr'g Tr., ECF No. 1959 at 155:6-12 (Mar. 2, 2022).
[61] Joint Agenda Letter, ECF No. 2770 (Jul. 9, 2024); Agenda Letter, ECF No. 2916 (Oct. 29, 2024); Hr'g Tr., ECF No. 3039 at (Apr. 28, 2025).

doctrine applied, "Judge Sarokin should have deferred to Judge Richey's [prior] decision"). Indeed, "to maintain consistency and avoid judicial reconsideration of matters once decided during the course of a single continuing litigation," the "law of the case doctrine directs courts from re-deciding issues that were resolved earlier in the litigation." *Pub. Interest Res. Grp. of N.J. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) and *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009). *See also In re Sulfuric Acid Litigation*, 847 F. Supp. 2d 1079 (N.D. Ill. 2011) (successor judge refused to relitigate issues, noting that the twin goals of the law of the case- judicial economy and unfair prejudice- did not warrant reconsideration).

In addition to the already admitted experts, Defendants' own experts admit that NDMA has "the potential to be... carcinogenic. ",[62] and that it is a "promoter" of cancer in animals.[63]

Many of Defendants experts rely on the fact that there are not human studies available but acknowledge that "it would not be ethical to perform a randomized control trial where you give individuals NDMA..." and that it would be "unethical to randomize someone to the daily exposure [above the FDA threshold].[64]

---

[62] Ex. 21, Prueitt Dep. Tr. at 112:9-113:4.
[63] Ex. 22, Diette Dep. Tr. at 16:13-17:7.
[64] Ex. 9, Mahmud Depo. 55:24-58:6.

In this case, the issue of whether NDMA-contaminated valsartan is capable of causing cancer has been resolved and Plaintiff continue to offer support in the form of reliable, qualified expert evidence in furtherance of that issue.

### 2. There Is Ample Support to Demonstrate That Mr. Roberts' Cancer Was Caused By the NDMA In The Valsartan He Took

In this case, the issue of cause should survive summary judgement and go to the jury is a procedural one. Proximate cause is a question for the jury. *Gremo v. Bayer Corp.*, 469 F. Supp. 3d 240, 252 (D.N.J. 2020) ("Ordinarily, the jury considers issues of proximate cause." (citing *Shelcusky v. Garjulio*, 172 N.J. 185, 206 (2002)).

Again, even under Alabama law, the question of proximate causation and intervening cause are questions of fact to be resolved by the jury. *Miller v. Cleckler*, 51 So. 3d 379, 383 (Ala. Civ. App. 2010) (*citing Dixon v. Board of Water & Sewer Commrs of Mobile*, 865 So.2d 1161, 1166 (Ala. 2003); *City of Mobile v. Largay*, 346 So.2d 393, 395 (Ala. 1977); *see also Tuscaloosa County v. Barnett*, 562 So.2d 166, 169 (Ala. 1990) (stating that questions of proximate causation and intervening cause are questions for the jury). The question must go to the jury if reasonable inferences from the evidence support the theory of the complaint. *Reed v. Tracker Marine, LLC*, 574 F. Supp. 3d 1065, 1086 (N.D. Ala. 2021) (*citing Marshall County v. Uptain*, 409 So. 2d 423, 425 (Ala. 1981).

Defendants' made-up causation standard should not be adopted by this Court. In order to prove specific causation, Plaintiff must show that the substance more

likely than not caused the injury. *Heller v. Shaw Idus.* 167 F.3d 146, 154 (3rd Circ. 1999). A plaintiff must show that the negligence was a "substantial factor" contributing to the injury. *Bond v. Solvay Specialty Polymers, USA, LLC*, 583 F. Supp. 3d 643, 650-51 (D.N.J. 2022) (*citing Broach-Buttsv. Therapeutic Alternatives, Inc.*, 191 A.3d 702, 711 (App. Div. 2018).

A medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness. *Id.* at 156. An expert may explain why the proffered cause was more likely than an alternative cause. *In re Paoli R.R. Yard PCB Litig.* (Paoli II), 35 F.3d 717, 760 (3d Cir. 1994).

Once again, even if Alabama law applied, Plaintiff satisfies the burden on specific causation. Alabama's standard for establishing causation also requires a showing of probable cause, or at least that exposure to the substance more likely than not caused the injury. *See Tidwell v. Upjohn*, 626 So. 2d 1297, 1301 (Ala. 1993); *see also Ex parte Diversey*, 742 So.2d 1250, 1254 (Ala. 1999). Contrary to Defendants' arguments, **Alabama law does not require that the product be the sole cause of plaintiff's illness or death;** instead, it suffices that the agent was a contributing cause. *See Ex parte Valdez*, 636 So. 2d 401, 404 (Ala. 1994).

*In Ex parte Valdez*, the claim was brought by the widow and children of an industrial painter who died of lung cancer. The decedent was a smoker, but argued

that the cancer was caused by his occupational exposure to epoxy, a known carcinogen. The court held that the painter was not required to show that occupational exposure was the direct or sole cause of the cancer, but only that it was a contributing cause. *Id.* at 402-3.

The court analyzed *Valdez* in another case and found that "recognizing that multiple factors may have caused the employee's cancer, we held that the correct standard was whether exposure to the occupational hazard was a **contributing cause** of the employee's illness and resultant death". *Ex Parte Vongsouvanh*, 795 So. 2d 625, 627 (Ala. 2000) (emphasis added).

Proximate cause is the "natural and probable consequence of the negligent act", "which an ordinarily prudent person ought reasonably to foresee would result in injury". *Davis v. Wal-Mart Stores, Inc.*, 64 F. Supp. 2d 1176, 1179 (M.D. Ala. 1999) *(citing Gilmore v. Shell Oil Co.*, 613 So. 2d 1272, 1274-75 (Ala. 1993)).

The proximate cause element is not met if another act or event was the **sole** proximate cause of the injury. *General Motors Corp. v. Edwards*, 482 So. 2d 1176, 1195 (Ala. 1985), overruled on other grounds (emphasis added). A sole proximate cause is an intervening cause. *Beloit Corp. V. Harrell*, 339 So. 2d 992, 993 (Ala. 1976). An intervening cause is "one which occurs after an act committed by a tortfeasor which relieves him of his liability by breaking the chain of causation between his act and the resulting injury." *Edwards*, 482 So. 2d at 1194 (*citing Vines*

30

*v. Plantation Motor Lodge*, 336 So. 2d 1338, 1340 (Ala. 1976)). An intervening cause must have also been "unforeseeable and must have been sufficient in and of itself to have been the sole 'cause in fact' of the injury." *Vines*, 336 So 2d at 1339. If an intervening cause could have reasonably been foreseen at the time the tortfeasor acted, it does not break the chain of causation between his act and the injury. *Morgan v. City of Tuscaloosa*, 108 So. 2d 342, 346 (1959).

As outlined in Plaintiff's opposition to exclude Dr. Sawyer's and Dr. Siddiqui's opinion, Plaintiff's experts are qualified and used reliable methodologies to conclude that Mr. Robert's liver cancer was caused by NDMA-contaminated Valsartan. Dr. Sawyer found a 2.86-fold increased risk of liver cancer after Mr. Roberts' ingestion of NDMA-contaminated valsartan. Dr. Sawyer concluded that "to reasonable toxicological certainty, that Mr. Roberts' ingested oral dosage of NDMA from the defective valsartan exceeded the upper dose-response criteria that statistically and significantly increased his risk of liver cancer."[65]

Defendants inaccurately suggest Plaintiff rest solely on a particular study and infer causality. (MSJ at 4). Plaintiffs can only assume that Defendants overlooked numerous studies cited by Plaintiffs' experts in support of their specific causation findings. As discussed in more detail in the expert reports, multiple epidemiology valsartan studies, along with human occupational, and animal studies have found the

---

[65] Ex. 19, Sawyer Expert Report at 84.

association between NDMA and liver cancer. Dr. Siddiqui explains why the valsartan epidemiological studies underestimate the risk due to both studies incorrectly assuming the amount of NDMA in a contaminated valsartan pill.[66] Instead, Dr. Siddiqui applies the facts of Mr. Roberts' case (amount of NDMA consumed) to the valsartan epidemiological studies and concludes that Mr. Roberts would have been at a significantly higher risk of liver cancer. Dr. Siddiqui concluded "It is also my opinion that NDMA in Mr. Roberts' valsartan was the most substantial factor in Mr. Roberts developing liver cancer. Simply put, if Mr. Roberts was never exposed to NDMA contaminated valsartan, it is my opinion that Mr. Roberts would not have developed liver cancer when he did."[67] When Dr. Siddiqui was questioned, she further stated that the NDMA caused HCC.[68]

Plaintiff's expert radiologist, Dr. Mele, will testify that in 2016, before ingesting NDMA-contaminated valsartan, CT examination of Mr. Roberts revealed no focal contract enhancement nor lesions consistent with HCC.[69] Furthermore, he will testify that it wasn't until 2018, after ingesting NDMA-contaminated valsartan for nearly two years, that Roberts' CT and MR imaging demonstrate the presence of lesions consistent with HCC. *Id.* These lesions, Dr. Mele reports, were not present

---

[66] Siddiqui Report at 26
[67] Ex. 8, Siddiqui Expert Report at 31.
[68] Ex. 10, Siddiqui Dep. Tr. at 36:7-24.
[69] Ex. 16, Mele Expert Report at 3.

on the 2016 CT examination and therefore the "carcinoma discovered in 2018 does not correspond with the precise locations of the sub-centimeter foci of decreased attenuation observed on the 2016 scan." *Id.* In sum, Dr. Mele will testify that "the April 19, 2016, CT examination does not demonstrate any definitive imagine evidence of the hepatocellular carcinoma present on the 2018 CT or MRI examinations." *Id.*

The Plaintiff will present expert testimony that the defendants' NDMA-contaminated Valsartan proximately caused Mr. Roberts' cancer. In addition, Plaintiffs' experts' testimony establishes that it is foreseeable that drugs contaminated with NDMA, a carcinogen, would cause cancer. Finally, Plaintiff's experts opine that the NDMA contaminated drugs did, in fact, cause Mr. Roberts' cancer, and no intervening act between ingesting contaminated VCDs and his cancer diagnosis caused Mr. Roberts' cancer. Therefore, defendants are liable and the issue is not ripe for summary judgement.

## V.  PLAINTIFF'S CLAIMS SURVIVE

### A. Plaintiff's Strict Liability Claims Survive

Plaintiff's strict liability claims survive under Alabama's Extended Manufacturer's Liability Doctrine ("AEMLD"). "An AEMLD claim is similar to a traditional strict product liability claim," such that a claim pled as strict liability is properly construed as "being based upon the AEMLD." *See Bodie v. Purdue Pharma*

*Co.*, 236 Fed. App'x, 511, 571 n.9 (construing strict liability claim as an AEMLD claim under Alabama law); *Aldridge v. Ethicon, Inc.*, No. 1:20-cv-039, 2020 WL 1308335, at *3 (S.D. Ala. Mar. 19, 2020) (same); *Miller v. Pfizer Inc.*, No. 4:13cv1687, 2014 WL 2155020, at *2 (N.D. Ala. May 22, 2014) (same). This issue was taken up in MDL 2885, *In re 3M Combat Arms Earplug Products Liability Litigation*. The plaintiff in that case alleged product liability claims under Alabama law, and the court found that the strict liability claims are properly construed as AEMLD claims. *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 679 F. Supp. 3d 1314, 1320 (N.D. Fla. 2023). The same should be true here.

### B. Plaintiff's Warranty Claims Survive

Defendants misstate the requirements of pre-suit notice under Alabama law. Alabama's Uniform Commerical Code states: "The buyer must within a reasonable time after he discovers or should have discovered any breach, notify the seller of the breach...." however, where the buyer is suing for breach, "he **may** give his seller written notice of the litigation." (Ala. Code § 7-2-607) (emphasis added).

Therefore, Alabama law "requires only buyers to give notice" of a breach as a condition of bringing a breach of warranty claim. *See Simmons v. Clemco Indus.*, 368 So. 2d 509, 513 (Ala. 1979) (interpreting pre-suit notice statute, Ala. Code § 7-2-607); *see also Hart v. Yamaha-Parts Distrib., Inc.*, 787 F.2d 1468, 1474 (11th Cir. 1986) (applying Alabama law); *Lowery v. Sanofi-Aventis LLC*, 535 F. Supp. 3d 1157,

1174-75 (N.D. Ala. 2021) (same). Those receiving the benefits of a warranty are not required to give pre-suit notice. *Simmons*, 368 So. 2d 513. ("Since the express language of the [Alabama] Code requires only buyers to give notice and a warranty beneficiary is not within the definition of buyer, notice is not required of such beneficiaries.").

### C. Plaintiff's ADTPA Claim Survives

Plaintiff's claim under Alabama Deceptive Trade Practices Act should survive. Rule 8(d)(3) of the Federal Rules of Civil Procedure "allows parties to plead alternative, even inconsistent, theories." *Barcal v. EMD Serono, Inc.*, No. 14-c-CV-1709 (MHH), 2016 WL 1086028, at *5 (N.D. Ala. Nov. 17, 2015). *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). *See also Collins v. Davol, Inc.*, 56 F.Supp.3d 1222, 1227 n.2 (N.D. Ala. 2014) (There is no prohibition against a plaintiff pleading two alternative claims.) (internal cites omitted).

MDL. 2543, *In re General Motors LLC Ignition Switch Litigation* considered this issue with an Alabama plaintiff and found 1) the plain language of the savings clause does not specify when in the proceedings a plaintiff must decide which remedy to pursue, 2) plaintiffs may elect either of the two kinds of remedy, and 3) that an Alabama plaintiff does not waive claims under the ADPTA any more than they waive claims under common law. *In re Gen. Motors LLC Ignition Switch Litig.*,

35

257 F. Supp. 3d 372, 405 (S.D.N.Y. 2017), modified on reconsideration for other reasons, No. 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017). Finding the Court will not "dismiss either kind of claim on the dubious ground that it was 'procedurally waived.'" *See id.*

As to Defendants' meritless statute of limitations claim, under the ADTPA, plaintiffs have one year from when they "discover or reasonably should have discovered the act or practice which is the subject of the action...." Ala. Code § 8-19-14. Under "well-settled Alabama law," the issue of "when a plaintiff should have discovered" the fraud alleged in connection with an ADTPA claim "should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud." *Jones v. Coty Inc.*, 362 F. Supp. 3d 1182, 1212 (S.D. Ala. 2018) (quoting *Wheeler v. George*, 39 So.3d 1061, 1082–83 (Ala. 2009) (emphasis added). This analysis is so fact intensive, a motion to dismiss ADTPA claims should be denied. *Robinson v. Gen. Motors LLC*, No. CV 20-663-RGA-SRF, 2021 WL 3036353, at *12 (D. Del. July 19, 2021), report and recommendation adopted, No. 1:20-CV-00663, 2021 WL 7209365 (D. Del. Nov. 30, 2021).

Encountering the defect does not automatically trigger Alabama's DTPA's statute of limitations. *See Jones*, 362 F. Supp. 3d at 1213 (declining to resolve the timeliness of the plaintiffs' claims under the Alabama DTPA at the summary

36

judgment stage despite the fact that the plaintiffs "had experienced an adverse reaction to the" product at issue longer than one year before filing their complaint because a factual issue remained as to whether the plaintiffs "had actual knowledge" that "the warnings on the [product at issue] were misleading or deceptive" when they first experienced an adverse reaction to the product). Whether Mr. Roberts had actual knowledge of ZHP's fraud more than one year before they filed their claims are factual issues not appropriate for resolution at the motion to dismiss stage. *Robinson v. Gen. Motors LLC*, No. CV 20-663-RGA-SRF, 2021 WL 3036353, at *13 (D. Del. July 19, 2021). *See Jones, 362 F. Supp. 3d at 1213.*; *Miller*, 2014 WL 12617598, at *2 ("Where the timeliness of a cause of action is not apparent from the face of the complaint, 'then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).'") (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).

The court has considered this in other cases. *See Copley v. Bactolac* ("The court cannot say that experiencing illness and receiving a recall notice two years later would put a reasonable person on even inquiry notice of a connection to [the product]"). *Copley v. Bactolac Pharm., Inc.*, No. 18-CV-575 (FB) (PK), 2021 WL 918313, at *2 (E.D.N.Y. Mar. 10, 2021); *see also Wheeler v. George*, 39 So. 3d 1061, 1081 (Ala. 2009). ("[T]he question of when the party discovered or should have discovered the fraud is generally one for the jury.")

According to Defendants, Mr. Roberts should have made the connection between the contaminated Valsartan and the cancer before he was even diagnosed with cancer. (MSJ at 24). Despite having the opportunity to question Mrs. Roberts regarding when the connection was made between the contaminated Valsartan and the liver cancer, Defendants did not ask the question. Instead, Defendants asked Mrs. Roberts if any doctor told her the valsartan products caused the liver cancer or if she asked any of his doctors what caused the cancer, to which she responded that she did not recall.[70]

Plaintiff's ADTPA claims are not barred and any question as to limitations should be reserved for the jury.

## VI. <u>CONCLUSION</u>

For the above stated reasons, the Court should deny Defendants' Motion for Summary Judgement.

Respectfully submitted,

Dated: June 26, 2025                By*: /s/ C. Brett Vaughn*

C. Brett Vaughn, RN, BSN, JD
NIGH GOLDENBERG RASO &
VAUGHN, PLLC
*Attorneys for Plaintiff*
14 Ridge Square NW
Third Floor
Washington, D.C. 20016
Tel: 202-792-7927

---

[70] Ex. 2, Jan Roberts Dep. Tr. at 184:13-24.

38

Fax: 202-792-7927
Email: bvaughn@nighgoldenberg.com

39

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ C. Brett Vaughn*

C. Brett Vaughn, RN, BSN, JD
