# **<u>EXHIBIT 11</u>**

```
                                                    Page 1

  1                          UNITED STATES DISTRICT COURT
                             FOR THE DISTRICT OF NEW JERSEY
  2                          CAMDEN VICINAGE

  3
                                         :
  4     IN RE: VALSARTAN, LOSARTAN,      :
        AND IRBESARTAN PRODUCTS          :      VIDEO-RECORDED
  5     LIABILITY LITIGATION             :    DEPOSITION UPON
                                         :    ORAL EXAMINATION
  6                                      :          OF
        This Document Relates to        :    RALPH S.
  7     Gaston J. Roberts, Jr., and      :    BUCKLEY, M.D.
        wife Jan Roberts                 :
  8                                      :
        Case No.                         :
  9     1:20-cv-00946-RBK-SAK            :
                                         :
 10     ------------------------      X

 11

 12                   TRANSCRIPT of the stenographic notes of

 13     the proceedings in the above-entitled matter, as

 14     taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,

 15     held via ZOOM VIDEOCONFERENCE from various locations,

 16     with the witness located at 23067 Main Street,

 17     Fairhope, Alabama, on Friday, February 7, 2025,

 18     commencing at 9:39 a.m. Central time.

 19

 20

 21

 22

 23

 24

 25
```

Page 2

1  A P P E A R A N C E S :
2
3  NIGH GOLDENBERG RASO & VAUGHN, LLP
   BY:   DANIEL NIGH, ESQ.
4  14 Ridge Square NW
   Washington, DC 20016
5  202-792-7927
   dnigh@nighgoldenberg.com
6  Attorneys for Plaintiffs
7
8  SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
   BY:   NINA R. ROSE, ESQ.
9  1440 New York Avenue NW
   Washington, DC 20005
10 202-371-7000
   nina.rose@skadden.com
11 Attorneys for Defendants
12
13 ALSO PRESENT:
14 Diana Castrillon
   VP of Human Resources
15
   Alan Paller, Legal Video Specialist
16 Jason Novak, Technical Concierge
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2
3  Examinations                    Page
4
   R A L P H   B U C K L E Y, M.D.     7
5
6  EXAMINATION BY MS. ROSE            7
7
   EXAMINATION BY MR. NIGH            77
8
9
10
11
              EXHIBITS
12
13 Number    Description        Page
14
   Buckley-1    Notice of Subpoena for the     8
15             Video Deposition of Dr. Ralph
              S. Buckley, MD
16
17 Buckley-2   Curriculum Vitae of Ralph S.    20
              Buckley, MD, Five Pages
18
19 Buckley-3   Medical Records dated January   28
              30, 2012, Bates
20             GRobertsJr-CA-000539 through
              544
21
22 Buckley-4   Medical Records dated           31
              21-July-2003, Bates
23             GRobertsJr-CA-000798 through
              803
24
25

Page 4

1        E X H I B I T S  (Continued)
2
   Number    Description        Page
3
4  Buckley-5   Medical Record dated       40
              31-July-2003, Bates
5             GRobertsJr-CA-000792 through
              794
6
7  Buckley-6   Medical Record dated       43
              14-November-2006, Bates
8             GRobertsJr-CA-000741 through
              744
9
10 Buckley-7   Medical Record dated       47
              4-November-2008, Bates
11             GRobertsJr-CA-000710 through
              712
12
13 Buckley-8   Medical Record dated       50
              14-May-2009, Bates
14             GRobertsJr-CA-000700 through
              703
15
16 Buckley-9   Medical Record             52
              16-September-2009, Bates
17             GRobertsJr-CA-000654 through
              655
18
19 Buckley-10   Medical Record dated      54
              7-December-2010, Bates
20             GRobertsJr-CA-000572 through
              574
21
22 Buckley-11   Medical Record dated      56
              3-January-2011, Bates
23             GRobertsJr-CA-000568 through
              571
24
25

Page 5

1        E X H I B I T S  (Continued)
2
   Number    Description          Page
3
4  Buckley-12   Alabama BCBS Drug Prior     60
              Authorization Form dated
5             February 9, 2011, Bates
              GRobertsJr-CA-000561
6
7  Buckley-13   Medical Record dated January   68
              30, 2012 (Later Withdrawn as
8             Duplicate of Exhibit
              Buckley-3)
9
10 Buckley-14   Medical Record dated        73
              2-July-2012, Bates
11             GRobertsJr-CA-000517 through
              522
12
13
14
              REQUESTS
15
16             Page    Line
17
18 .................... 16    14
19 .................... 76    20
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1    THE VIDEOGRAPHER:  Good morning.  We are
2  going on the record at 9:39 a.m. Central time on
3  February 7, 2025.
4    Please note that this deposition is
5  being conducted virtually.  The quality of the
6  recording depends on the quality of the camera and
7  Internet connection of the participants.  What is
8  seen from the witness and heard on the screen is what
9  will be recorded.
10    Audio and video recording will continue
11  to take place unless all parties agree to go off the
12  record.
13    This begins Media Unit Number 1 of the
14  video-recorded deposition of Ralph S. Buckley, M.D.,
15  taken by counsel for the defendant in the matter of:
16  Valsartan, Losartan, and Irbesartan Product Liability
17  Litigation, related to the following case:  Robert B.
18  Kugler [sic], Gaston Roberts, et al. versus Zhejiang
19  Pharmaceutical Company, et al.; Case Number
20  1:20-cv-00946.  This case is filed in the United
21  States District Court for the District of New Jersey,
22  Case Number MDL-2875.
23    This deposition is being conducted
24  remotely, using virtual technology.  My name is Alan
25  Paller, representing Veritext; I am the legal

Page 7

1  videographer, and the court reporter is Ellen Godino,
2  also from Veritext.
3    I'm not authorized to administer an
4  oath, I am not related to any party in the action,
5  nor am I financially interested in the outcome.
6    If there are any objections to
7  proceeding, please state them at the time of your
8  appearance.
9    And at this time, counsel will now state
10  their appearances and affiliations for the record,
11  beginning with the noticing attorney.
12    MS. ROSE:  Nina Rose of Skadden Arps for
13  the defendant, Zhejiang Huahai Pharmaceutical
14  Company.
15    MR. NIGH:  Daniel Nigh on behalf of Jan
16  Roberts, the wife of the deceased, Gaston Roberts.
17    I think that's all.
18    THE VIDEOGRAPHER:  All right.  The court
19  reporter will swear in the witness.
20  R A L P H   B U C K L E Y, M.D., 23067 Main Street,
21  Fairhope, Alabama, having been duly sworn, testified
22  as follows:
23  EXAMINATION BY MS. ROSE:
24    Q.    Good morning, Dr. Buckley.  Thank you so
25  much for appearing here today.  We very much

Page 8

1  appreciate you giving your time; I know you are a
2  very busy physician.
3    As I just said, my name is Nina Rose,
4  and I represent Zhejian Huahai Pharmaceutical
5  Company, which is also known as ZHP; as well as
6  Princeton Pharmaceuticals and Solco Healthcare.
7    Today, I'm going to refer to ZHP,
8  Princeton and Solco collectively as "ZHP."  Is that
9  okay with you?
10    A.    That's fine.
11    Q.    Do you understand that you're here in
12  connection with a lawsuit filed by Gaston Roberts
13  against ZHP?
14    A.    I do.
15    MS. ROSE:  I'm going to introduce Tab 1
16  as Exhibit 1.
17    (Exhibit Buckley-1, Notice of Subpoena
18  for the Video Deposition of Dr. Ralph S. Buckley, MD,
19  was received and marked for identification.)
20    Q.    Do you see the document, Dr. Buckley?
21    A.    I do.
22    Q.    Have you seen this document before?
23    A.    I did, I think.
24    Q.    And what is the title of this document?
25    A.    Notice of subpoena for the video

Page 9

1  deposition of Dr. Ralph S. Buckley.
2    Q.    Is it your understanding that you're
3  appearing as a witness here today pursuant to this
4  subpoena for testimony?
5    A.    It is apparent to me.
6    Q.    About four lines down from where we are
7  now, it states that you're testifying as a nonparty
8  to this action and one of Mr. Roberts' treating
9  physicians.  Correct?
10    A.    That's correct.
11    Q.    Do you understand that you're here today
12  as one of Mr. Robert's medical providers to testify
13  about your care and treatment of him?
14    A.    I do.
15    Q.    And do you understand that you're not a
16  party to this litigation?
17    A.    I do.
18    Q.    And do you understand that no one is
19  making any allegations against you?
20    A.    I do.
21    Q.    And do you understand that you're here
22  as a fact witness only, and not as an expert witness?
23    A.    I do.
24    Q.    Is it your understanding that you will
25  be paid your customary hourly fee for your time spent

3 (Pages 6 - 9)

1 testifying as a fact witness in this case?
2     A.    It is my understanding.
3     Q.    And you're not receiving any money from
4 defendants or plaintiffs in exchange for your
5 testimony here today?
6     A.    I'm not.
7     Q.    And you are not being compensated by
8 defendants or plaintiffs as a consultant. Correct?
9     A.    I am not.
10     Q.    You are also not being compensated as an
11 expert witness by either party. Correct?
12     A.    I am not.
13     Q.    Dr. Buckley, have you ever been deposed
14 before?
15     A.    Yes.
16     Q.    When?
17     A.    Several years ago, interestingly, a
18 similar case to this, about an Avandia case.
19     Q.    Is that the only time you were deposed?
20     A.    Yeah.
21     Q.    Do you remember the name of the
22 plaintiff in that case?
23     A.    I don't.
24     Q.    And am I right to assume it was a
25 product liability case, based on one of your

1 patient's uses of Avandia?
2     A.    Yes, it was a -- I think an attorney
3 from -- representing Pfizer, I believe that came down
4 and talked to me.
5     Q.    And were you appearing there as a fact
6 witness in that case as well?
7     A.    Yes.
8     Q.    Do you know the outcome of that case?
9     A.    I don't.
10     Q.    Have you ever been deposed, apart from
11 the Avandia case?
12     A.    No.
13     Q.    Have you ever testified in court before?
14     A.    Other than that Avandia case, no.
15     Q.    Did you end up testifying in court?
16     A.    No, just the deposition.
17     Q.    Just the deposition, okay. Thanks.
18 Okay. Given that you've been deposed before, but
19 only once and it was several years ago, I'm just
20 going to go over some really basic deposition tips to
21 help this go as smoothly and efficiently as possible,
22 and get you out of here as soon as we can. Okay?
23     A.    Sure.
24     Q.    So as you can see, there's a court
25 reporter taking down everything that we say, so if

1 you'll do your best to let me finish my question
2 before you begin your answer, that would be very
3 helpful to the court reporter. And I'll do my best
4 to do the same, and not start a question until you've
5 finished your previous answer. Okay?
6     A.    That's fine.
7     Q.    Okay, great. From time to time,
8 Mr. Nigh, who represents the plaintiff in this case,
9 may object to one of my questions; that's just part
10 of the process. But you can still answer the
11 question. Okay?
12     A.    Okay.
13     Q.    If you need to take a break at any time,
14 if you have to take a call or deal with something,
15 just let me know and we'll find a good stopping point
16 so you can take that break. Okay?
17     A.    The only danger points are my bathroom
18 breaks and my dogs.
19     Q.    Okay. Well, if you need a bathroom
20 break or if you need to go attend to dogs, just let
21 me know, and we can take a break for you, no problem.
22     A.    Sure.
23     Q.    Are you represented in this deposition
24 today by a lawyer -- oh, I'm sorry?
25         THE VIDEOGRAPHER: Yes, excuse me. I'm

1 sorry to interrupt. But I didn't realize you are
2 sharing the screen of your Exhibit Share, so I'm
3 recording that right now onto the video.
4         If you don't want me to record the
5 shared screen, I have to sign off and sign back in
6 again. So currently, I have the doctor in a small
7 box, and then when the document comes up, that's on
8 the left side. Is that okay?
9         MS. ROSE: I think we want the
10 document -- do you want me to have -- tell you when
11 I'm done with a document, so you can take it down and
12 put the doctor back up on the main screen?
13         THE VIDEOGRAPHER: Well, Jason actually
14 is handling that. But I'm recording the document;
15 that's the question. Do you want it recorded onto
16 the video?
17         MS. ROSE: I don't think we need the
18 document recorded onto the video. It will be -- it
19 will be in the record.
20         THE VIDEOGRAPHER: So I need to go off
21 the record, re-sign onto Zoom, and change the setting
22 so that I'm not recording that, though.
23         MS. ROSE: Okay. Let me just confirm
24 with Mr. Nigh that he doesn't have an issue with
25 that.

4 (Pages 10 - 13)

Page 14

1    MR. NIGH: I think it's fine for this
2 one, but it sounds a little puzzling to me, because I
3 haven't seen that issue before.
4    THE VIDEOGRAPHER: Yeah, I have the
5 option of recording the shared document or not, where
6 it will just stay on the doctor the whole time.
7    MR. NIGH: But isn't the doctor on a
8 large screen right now?
9    THE VIDEOGRAPHER: Yes, right now. But
10 when you share the document, the doctor goes to a
11 small screen, and then the document is on the left
12 side.
13    MR. NIGH: Oh, I think that's fine.
14    MS. ROSE: Apologies.
15    MR. NIGH: What do you think, Nina? I
16 think that's fine; the document is up there and he
17 gets smaller. But...
18    MS. ROSE: Oh, that's fine.
19    MR. NIGH: Okay. And when I say that
20 I'm done -- we can take the document down, Jason, you
21 can put the doctor back in the big screen, is that
22 workable?
23    MR. NOVAK: Sure thing. And I've been
24 doing this a long time, so sometimes I just get a
25 feel and I'll take it down and go back to it if you

Page 15

1 go off on a tangent or something like that. So.
2    MS. ROSE: Okay, thank you so much.
3    MR. NIGH: Thank you.
4    MS. ROSE: I'm not sure if we ever went
5 off the record, if we need to go back on? Have we
6 been on the whole time?
7    THE VIDEOGRAPHER: We did not.
8    MS. ROSE: Okay. Great.
9 BY MS. ROSE:
10    Q.    I will re-ask my last question, just
11 because it's been a while, and you might not have a
12 heard it. Are you represented in this deposition
13 today by a lawyer?
14    A.    I have a malpractice attorney that I
15 received counsel that it was fine to go ahead with
16 this, without an attorney present.
17    Q.    So there's no lawyer in the room with
18 you right now?
19    A.    No.
20    Q.    And is anyone else in the room with you?
21    A.    No.
22    Q.    What, if anything, did you do to prepare
23 for today's deposition beyond consulting with your
24 malpractice attorney?
25    A.    I went through the record yesterday, and

Page 16

1 I looked up some articles on valsartan and the issues
2 that came up in 2018, in terms of the
3 N-nitrosodimethylamine contamination literature.
4    Q.    Did you print any of the articles that
5 you looked at?
6    A.    Yes.
7    Q.    And do you have those there with you at
8 the deposition?
9    A.    Yeah.
10    Q.    Okay.
11    A.    I can't tell you that I've read in
12 detail all of them, but I did scan them.
13    Q.    I may ask you for -- to -- for copies of
14 them, or just the names of them a little later?
15    A.    Fine. I can scan them in and email them
16 to you, or I can just give you the references.
17 They're pretty standard references.
18    Q.    Okay, thank you.
19    And when you said you reviewed the
20 record, are you referring to the medical record of
21 Gaston Roberts maintained by Cardiology Associates?
22    A.    Yes.
23    Q.    And where did you get those records?
24    A.    I just accessed my chart in our system.
25    Q.    Is that an electronic health record

Page 17

1 system?
2    A.    It is.
3    Q.    What is the name of that system?
4    A.    AllScripts.
5    Q.    I'm sorry, can you say that again?
6    A.    Sure. AllScripts. A-l-l S-c-r-i-p-t-s.
7    Q.    Do you know how long Cardiology
8 Associates has been using AllScripts as its EHR
9 system?
10    A.    I think 2012.
11    Q.    Did they use a different system prior to
12 2012?
13    A.    Paper.
14    Q.    Okay. Did you review any paper records
15 regarding Gaston Roberts that were created prior to
16 2012?
17    A.    I reviewed everything that was in the
18 chart back to 1995, and they were just scanned-in
19 paper records.
20    Q.    Perfect. Thank you.
21    Dr. Buckley, before today, have you and
22 I ever spoken before?
23    A.    No.
24    Q.    And before that, have you ever spoken
25 with anyone else from the law firm Skadden Arps?

5 (Pages 14 - 17)

Page 18

1    A.    No, not that I'm aware of.
2    Q.    Are you aware that someone from my
3  office has spoken to your, I believe, scheduler to
4  schedule this deposition?
5    A.    Amber?  Yes.
6    Q.    Before today, have you ever spoken with
7  Mr. Nigh, who is representing Mr. Roberts' estate
8  here today?
9    A.    No.
10    Q.    And have you ever spoken with Kathryn
11  Avila, who is part of the firm representing
12  Mr. Roberts today?
13    A.    No.
14    Q.    Have you ever spoken with any other
15  lawyer involved in litigation regarding valsartan?
16    A.    No.
17    Q.    Have you had any conversations with
18  anyone else about today's deposition?
19    A.    Just the fact that I was having it, but
20  nothing -- no particulars.
21    Q.    And who did you discuss that with?
22    A.    My wife, one of the docs that I work
23  with, and that's it.
24    Q.    And who is the doctor that you work with
25  that you discussed the deposition with?

Page 19

1    A.    Dr. Robichaux, who I think is also one
2  of the people that was asked to be deposed.
3    Q.    And did you discuss Mr. Roberts or his
4  treatment at all with Dr. Robichaux?
5    A.    No, not really.  We were more discussing
6  sort of ideas of what kind of things might be asked.
7    Q.    Okay.  And did you consult with
8  Dr. Robichaux about Mr. Roberts' records, prior to
9  the deposition?
10    A.    No.
11    Q.    Dr. Buckley, can you tell me about your
12  undergraduate and graduate-level degrees?
13    A.    I received a bachelor of science from
14  Brown University in 1985/'6.  And then a medical
15  degree from University of Virginia, resident --
16  internal medical residency, chief residency in
17  cardiology fellowship from the University of
18  Virginia, and then I've been practicing since then.
19    Q.    And fair to say that you practice in the
20  field of medicine known as cardiology?
21    A.    Yes.
22    Q.    Would you describe cardiology as the
23  study and treatment of heart conditions?
24    A.    Yes.
25    MS. ROSE:  I'm going to introduce Tab 2

Page 20

1  as Exhibit 2. (Exhibit Buckley-2, Curriculum Vitae of
2  Ralph S. Buckley, MD, Five Pages, was received and
3  marked for identification.)
4    (Audio dropout.)
5    (Court Stenographer clarification.)
6    (A discussion is held off the record.)
7    MS. ROSE:  Let me go back.  Okay.  So
8  the last thing you heard was introducing the exhibit?
9  Okay.
10    Q.    I'll start over there.  Apologies,
11  Dr. Buckley.  All right.  So again, Dr. Buckley, do
12  you recognize this document?
13    A.    I do.
14    Q.    Okay.  And what is it?
15    A.    It's my CV.
16    Q.    I'll represent again that this CV was
17  produced to us by your office in response to the
18  deposition subpoena, and ask if this CV is current,
19  complete, and accurate?
20    A.    I have not seen the document that she
21  sent over to you, but the first page looks good.
22    Q.    All right.  And do you have available --
23  the document available to you in Exhibit Share, so
24  you can just take a quick look through all of the
25  pages?

Page 21

1    A.    Yeah.  Looks good.
2    Q.    There's nothing that you would add to
3  the CV to bring it up-to-date?
4    A.    No.  I mean, a few memberships on
5  committees, but really not relevant.  This all looks
6  good.
7    Q.    Okay.  Thank you.
8    MS. ROSE:  We can take down that
9  exhibit.
10    Q.    Dr. Buckley, you work at Cardiology
11  Associates in Mobile, Alabama.  Correct?
12    A.    I do.
13    Q.    And you've been practicing there since
14  2003.  Is that correct?
15    A.    I have.
16    Q.    Have you been practicing continuously
17  there since 2003?
18    A.    Yes.
19    Q.    Do you have a subspecialty within the
20  field of cardiology?
21    A.    No.
22    Q.    Do you recall treating a patient named
23  Gaston Roberts?
24    A.    Yes.
25    Q.    And you treated Mr. Roberts in your

6 (Pages 18 - 21)

Page 22

1  capacity as a cardiologist. Correct?
2      A.    I did.
3      Q.    And that treatment took place when you
4  were working at Cardiology Associates?
5      A.    It did.
6      Q.    Do you recall when you began treating
7  Mr. Roberts?
8      A.    Based on my records, from 2003. Soon
9  after I started.
10     Q.    Do you recall how he came into your
11 care?
12     A.    I don't specifically, but the quick
13 notes that I wrote down from yesterday's review,
14 just -- he was following up with me for some chest
15 pain. He had been established with the practice
16 before.
17     Q.    When you say he'd been established with
18 the practice, that means he saw someone else at
19 Cardiology Associates in the past?
20     A.    Yes, yeah.
21     Q.    Do you recall when your treatment of
22 Mr. Roberts ended?
23     A.    I think that he saw me until about 2014,
24 but then he continued on in the practice, and he saw
25 mainly Electrophysiology, because arrhythmias were

Page 23

1  the issue, and I did not see him, I don't think, as a
2  patient since then. Although I -- yeah, I don't
3  think I saw him since then. I think I may have read
4  one study on him since then, but that's it.
5      Q.    Have you had any contact with
6  Mr. Roberts or his family since your treatment of him
7  ended around 2014?
8      A.    Yeah. It's sort of out -- I saw her,
9  his wife, in the practice on -- a couple of days ago.
10 Which I was sort of surprised to see that. But she's
11 seen me before, but she just -- she saw me in the
12 practice.
13     Q.    Okay. And when you say "her," I assume
14 you're referring to Jan Roberts --
15     A.    Yes.
16     Q.    Mr. Roberts' wife?
17     A.    Yes.
18     Q.    Okay. And is she a patient, a regular
19 patient of yours?
20     A.    I don't know whether by HIPAA rules, I
21 can tell you that.
22     Q.    Okay. When you say you most recently
23 saw Ms. Roberts, did you discuss this deposition at
24 all, or the fact that you were going to be deposed?
25     A.    Not at all.

Page 24

1      Q.    Did you discuss valsartan at all?
2      A.    No.
3      Q.    And did you discuss Mr. Roberts or his
4  medical conditions at all?
5      A.    No.
6      Q.    Are you aware that Mr. Roberts was
7  diagnosed with hepatocellular carcinoma, or HCC, in
8  2018?
9      A.    Yes.
10     Q.    And how are you aware of that?
11     A.    By review of the chart yesterday.
12     Q.    Are you aware that Mr. Roberts passed
13 away in March of 2020?
14     A.    Yes.
15     Q.    Is that also information you obtained
16 yesterday from review of the chart?
17     A.    No, I knew it. And I don't know exactly
18 why; whether Dr. Robichaux mentioned it to me then,
19 or whether his wife had mentioned it to me, or I got
20 notified by one of the nurses, I don't remember.
21     Q.    Do you recall when you first learned
22 that Mr. Roberts had passed away?
23     A.    I think soon after he passed away, but I
24 don't -- I don't know for sure, but I think soon
25 after he passed away.

Page 25

1      Q.    And you said that you saw Mrs. Roberts
2  recently in your practice. Besides that visit, have
3  you had any contact with her or any member of
4  Mr. Roberts' family since he passed away?
5      A.    I think I had seen her since then --
6  since he passed away, but I don't -- you know, I
7  didn't look up her chart and go back and see when I
8  had seen her.
9      Q.    Okay. And anytime that you have
10 interacted with Mrs. Roberts since Mr. Roberts passed
11 away, have you discussed Mr. Roberts' use of
12 valsartan?
13     A.    No.
14     Q.    Have you discussed this lawsuit at all?
15     A.    No.
16     Q.    Were you aware that Ms. Roberts was --
17 or Ms. Roberts was representing Mr. Roberts' estate
18 in the lawsuit regarding valsartan, before you
19 received the deposition notice --
20     A.    No.
21     Q.    That we looked at earlier today?
22     A.    No.
23     Q.    Do you document every patient encounter
24 that you have at Cardiology Associates?
25     A.    Yes.

7 (Pages 22 - 25)

Page 26

1     Q.    And that's the medical record -- in
2  Mr. Roberts' case, that would be the medical record
3  that you reviewed yesterday.  Correct?
4     A.    That's correct.
5     Q.    Are you aware that Mr. Roberts' estate
6  gave us permission to request and review the medical
7  records that you prepared in the course of treating
8  him?
9     A.    That's correct, yes.
10     Q.    And are you aware that your office
11  produced records relating to the treatment of
12  Mr. Roberts?
13     A.    Let me see if I can mute this.  I don't
14  know if you're hearing beeping in the background,
15  but --
16     Q.    I'm not hearing it, but --
17     A.    Then you can go ahead.
18     Q.    Okay.
19     A.    It's my son's birthday, and I'm
20  receiving about a hundred family texts about it.
21     Q.    Oh, happy birthday to your son.
22     A.    But go ahead.
23     Q.    Let me try to remember the question.
24         Are you aware that your office produced
25  records relating to the treatment of Mr. Roberts?

Page 27

1     A.    Yes.
2     Q.    Do you know who collected those records?
3     A.    I don't.
4     Q.    And did you review them before they were
5  produced?
6     A.    No.
7     Q.    Is it your practice to take down a
8  patient's social and family history when you begin
9  treating them?
10     A.    Yeah.  It's standard when they're a new
11  patient, and then it's updated.
12     Q.    And how would you define "social
13  history"?
14     A.    His social history?
15     Q.    Or just like social -- when you say you
16  take a patient's social history, what -- what is
17  included within that?
18     A.    Their employment, their smoking status,
19  drinking status, and, you know, marital status;
20  things like that.
21     Q.    Okay.  And what information is usually
22  included in the family history?
23     A.    The family history of heart disease,
24  mainly, for cardiovascular; but cancer and diabetes
25  and other things.

Page 28

1     Q.    And that information is relevant to your
2  treatment of the patient and informs the patient's
3  particular risk factors.  Is that right?
4     A.    Right, correct.
5         MS. ROSE:  I'm going to introduce Tab 12
6  as Exhibit 3.
7         (Exhibit Buckley-3, Medical Records
8  dated January 30, 2012, Bates GRobertsJr-CA-000539
9  through 544, was received and marked for
10  identification.)
11     Q.    Dr. Buckley, taking a look at this
12  document, is it fair to say, this is a record of an
13  appointment between you and Mr. Roberts on
14  January 30, 2012?
15     A.    That is correct.
16     Q.    So Dr. Buckley, I'll explain it -- maybe
17  you're already familiar from your deposition in the
18  Avandia litigation.  But when documents are produced
19  in litigation, they get assigned something called a
20  Bates number.  And that's the stamp that is printed,
21  you can see, in the bottom right of the document?
22     A.    Correct.
23     Q.    And ending -- each Bates number ends in
24  a different number.  So as we're looking at documents
25  today in the medical records, I'm probably going to

Page 29

1  direct you to look at a certain page by referring to
2  the last three digits of the Bates number.
3         Does that make sense?
4     A.    That's fine.
5     Q.    Okay, great.  So I want to take a look
6  at the page of this document ending with the Bates
7  number 541?
8     A.    Yes.
9         MS. ROSE:  Jason, was the document that
10  was just up not Tab 12?
11         MR. NOVAK:  It's weird.  It is Tab 12 on
12  my -- let me see.  Is this correct?
13         MS. ROSE:  Yes, that's Tab 12.  Sorry I
14  didn't catch that earlier.
15         MR. NOVAK:  No worries.
16     Q.    All right.  So now looking at --
17  perfect.  Okay.  Looking at this document, I just
18  want to clarify that this is the record of an
19  appointment between you and Mr. Roberts on
20  January 30, 2012.  Correct?
21     A.    Yes.
22         MS. ROSE:  So now, we're going to look
23  at the Bates number ending in 541.  Thank you.
24     Q.    So there's a social history recorded for
25  this visit.

8 (Pages 26 - 29)

Page 30

1      A.   Yes.
2      Q.   Okay.  And the social history states
3   that Mr. Roberts is a former smoker?
4      A.   Uh-huh.
5      Q.   It also states that he has a history of
6   alcohol use?
7      A.   Uh-huh.
8      Q.   And it indicates that Mr. Roberts has
9   both a paternal and a maternal history of
10  hypertension.  Correct?
11     A.   You've highlighted the social history,
12  so I can't see the rest.
13     Q.   Oh, I apologize.
14         MS. ROSE:  If we can go up to Family
15  History --
16     A.   Yes.
17         MS. ROSE:  Just one section above.
18     A.   Yes.
19     Q.   Did the fact that Mr. Roberts had a
20  family history of hypertension on both sides of his
21  family increase the likelihood that he would develop
22  hypertension?
23     A.   It can, yes.
24     Q.   And did it increase the likelihood that
25  he might experience medical problems related to

Page 31

1   hypertension, such as stroke?
2      A.   It can, yes.
3      Q.   Okay.
4          MS. ROSE:  We can take this document
5   down, and I'm going to introduce Tab 4 as Exhibit 4.
6          (Exhibit Buckley-4, Medical Records
7   dated 21-July-2003, Bates GRobertsJr-CA-000798
8   through 803, was received and marked for
9   identification.)
10     Q.   Dr. Buckley, the documents produced by
11  your office suggest that Mr. Roberts entered your
12  care specifically on July 21st, 2003.
13         Do you have any reason to dispute that?
14     A.   No.
15         MS. ROSE:  And if we turn to Bates
16  number 799 in this document.
17     Q.   Do you see this page, Dr. Buckley?
18     A.   I do.
19     Q.   Okay, great.  This is a letter written
20  by you to a Dr. Kolb about Mr. Roberts.  Correct?
21     A.   Correct.
22     Q.   Who is Dr. Kolb?
23     A.   He's a primary care doctor in
24  Bay Minette, north of Fairhope.
25     Q.   And is it your understanding that

Page 32

1   Dr. Kolb was Mr. Roberts' primary care physician, at
2   the time this letter was written?
3      A.   It is.
4      Q.   The first line of this letter says that
5   Mr. Roberts was self-referred.  Does that
6   mean that --
7      A.   Yes.
8      Q.   Oh, apologies.
9          (Court Stenographer clarification.)
10         THE WITNESS:  I understand.
11         MS. ROSE:  I apologize.  I thought the
12  doctor -- I was interrupting the doctor, so I
13  wanted --
14     A.   I said yes.
15     Q.   Okay, great.  Does that mean that
16  Mr. Roberts came to you on his own, rather than being
17  referred by Dr. Kolb?
18     A.   Yes.
19     Q.   And in the highlighted portion of the
20  document, you wrote that you saw Mr. Roberts in
21  connection with his experience of chest pains?
22     A.   Correct.
23     Q.   And in the third paragraph of the
24  letter, you state that your examination of
25  Mr. Roberts found him to be, quote, "a bit

Page 33

1   hypertensive, at 130/90."  Do you see that?
2      A.   Correct.
3      Q.   Do you see that, Dr. Buckley?
4      A.   I'm sorry.  I said correct, yes.
5      Q.   Oh, great.  Sorry I missed that.
6          Is 130 over 90 considered a high blood
7   pressure reading?
8      A.   It is.
9      Q.   And right after that, it states that
10  Mr. Roberts "had a prominent P2 component of S2, with
11  a question of a slit S2."
12     A.   Correct.
13     Q.   Can you explain to me what -- or as a
14  layperson, not a doctor, what that means?
15     A.   That can be a finding that you see with
16  either pulmonary hypertension or an atrial septal
17  defect.  And as a result, you just want to make sure
18  that you're not dealing with a structural heart issue
19  in that kind of setting.
20     Q.   Okay.  I'm going to ask you a very basic
21  question, again, as a non-medical professional.
22         Is there a difference between
23  hypertension and pulmonary hypertension?
24     A.   Yes.
25     Q.   Okay.  Can you explain what each of

9 (Pages 30 - 33)

Page 34

1  those is?
2     A.   Hypertension is where your systemic or
3  arm blood pressures or body blood pressures are high;
4  and pulmonary hypertension is a separate circulation,
5  that runs usually at 20, 25 millimeters of mercury,
6  rather than 120 or 130, and is the -- is the
7  circulation that delivers blood to the lungs.
8     Q.   Okay.  Under the "Impression" section of
9  this document, you state you'd like an echocardiogram
10 to evaluate the "prominent P2." Correct?
11    A.   Correct.
12    Q.   You also state that an echocardiogram
13 would allow you to better evaluate pulmonary
14 hypertension, which -- "which you may have from his
15 sleep apnea."  Is that correct?
16    A.   Which -- yeah, which one might have from
17 his sleep apnea, that's what I mean, not "you."
18        (Court stenographer clarification.)
19    A.   Which one might have from his sleep
20 apnea.  So that "you" is a general "you," not "you"
21 referring to Dr. Kolb.
22    Q.   Oh, got it.  How is pulmonary
23 hypertension related to sleep apnea?
24    A.   Sleep apnea causes elevation of
25 pulmonary pressures from the process of sleep apnea

Page 35

1  causing hypoxia or decreased oxygen levels when
2  you're sleeping and stop breathing, because you're
3  either obstructed or you don't breathe appropriately.
4     Q.   Is sleep apnea related to hypertension?
5     A.   It can be.
6     Q.   Is it your understanding from this
7  record that Mr. Roberts had sleep apnea?
8     A.   Yeah, I think that Dr. Goetter, who's
9  one of the pulmonologists, was evaluating that.  I
10 can't remember the details on whether he had it, or
11 was being treated for it or not.
12    Q.   If Mr. Roberts had sleep apnea, was he
13 at a higher risk for pulmonary hypertension as a
14 result?
15    A.   Yes.
16    Q.   Was he also at a higher risk for
17 hypertension generally?
18    A.   Yes.
19    Q.   In Subpoint 2, beneath that, it states
20 that -- apologies.  I think we lost the screen.
21        MR. NOVAK:  I'm sorry.  I'm having an
22 issue with this document all of a sudden.
23        MS. ROSE:  Oh, that's okay.
24        MR. NOVAK:  I'm sorry.  Give me one
25 moment.

Page 36

1         MS. ROSE:  Thank you, Jason.
2  BY MS. ROSE:
3     Q.   Okay, I'll start over again.
4         If you can look at Subpoint 2 here, it
5  states that "his [sic] is considering reevaluation of
6  his CPAP with Dr. Goetter.  I would encourage this,
7  as this can contribute to hypertension."
8         Do you see that?
9     A.   Yes.
10    Q.   Okay.  So I just want to make sure I
11 understand this sentence.  Were you intending to say
12 that Mr. Roberts is considering reevaluation of his
13 CPAP with Dr. Goetter?
14    A.   Correct.
15    Q.   Okay.  And a CPAP is a machine used by a
16 patient to address sleep apnea.  Is that correct?
17    A.   Correct.
18    Q.   Based on this, does this refresh your--
19 refresh your recollection that Mr. Roberts was being
20 treated for sleep apnea at this time?
21    A.   No, because I -- the statement really
22 says that I'm asking him to be reevaluated.  I just
23 don't remember whether he was on CPAP at that time or
24 not.
25    Q.   Okay.  And when you say "I would

Page 37

1  encourage this as this can contribute to
2  hypertension," do you mean that you would encourage
3  evaluation of using a CPAP machine, because sleep
4  apnea can contribute to hypertension?
5     A.   Correct.
6     Q.   Okay, great.
7         MR. NIGH:  Objection.
8     Q.   Dr. Buckley, do you know if Mr. Roberts
9  reevaluated use of CPAP with Dr. Goetter?
10    A.   I don't remember.
11        MS. ROSE:  I'm going to look at the page
12 ending in Bates number 801 of the same document.
13        MR. NOVAK:  Bear with me, Counsel.  My
14 program is fighting me.  What page now, Counsel?  I'm
15 sorry.
16        MS. ROSE:  Bates number ending in 801.
17        MR. NOVAK:  Can we go off just one
18 moment?  I need to restart my computer -- the
19 program, I'm sorry.
20        MS. ROSE:  No problem.
21        MR. NOVAK:  It's just glitching on me
22 for some reason.
23        THE VIDEOGRAPHER:  We are off the record
24 at 10:16 Central time.
25        (A brief recess takes place.)

10 (Pages 34 - 37)

Page 38

1    THE VIDEOGRAPHER: We're back on the
2  record at 10:20.
3  BY MS. ROSE:
4    Q.  Dr. Buckley, this document is a patient
5  evaluation for Mr. Roberts from July 2003. Correct?
6    A.  Yes.
7    Q.  And it says that Mr. Roberts was 5'10"
8  in height, with a weight of 261. Correct?
9    A.  That's correct.
10    Q.  Do you know what BMI would be associated
11  with those measurements?
12    A.  No, not off the cuff, but probably
13  around 37.
14    Q.  And would you describe that as obese?
15    A.  Yeah.
16    Q.  Did obesity put Mr. Roberts at an
17  increased risk of hypertension?
18    A.  Yes.
19    Q.  And under the Medication section of this
20  document, it looks like you listed -- I'm going to
21  mispronounce this -- bisoprolol HCTZ --
22    A.  Right.
23    Q.  As a medication that Mr. Roberts was on
24  at the time?
25    A.  Correct.

Page 39

1    Q.  What is bisoprolol HCTZ?
2    A.  It's a blood pressure medicine.
3    Q.  Do you recall if Mr. Roberts was on this
4  medication for hypertension or for pulmonary
5  hypertension?
6    A.  Hypertension.
7    Q.  So blood pressure equals hypertension;
8  pulmonary hypertension, a different issue from blood
9  pressure. Is that correct?
10    A.  Correct.
11    Q.  Great. Is bisoprolol a beta blocker?
12    A.  It is.
13    Q.  What is a beta blocker?
14    A.  It's an agent that blocks the beta
15  receptors, and decreases sympathetic tone, and drops
16  blood pressure. And also decreases heart rate.
17    Q.  In your care and treatment of
18  Mr. Roberts, were you aware of any risks or side
19  effects associated with bisoprolol?
20    A.  Other than the standard risks of blood
21  pressure medicines and specifically those, not
22  anything in particular.
23    Q.  Are there specific risks or side effects
24  associated with beta blockers?
25    A.  Yes.

Page 40

1    Q.  And what are those?
2    A.  A low heart rate, drop in blood
3  pressure, are the main ones.
4    Q.  And what is HCTZ?
5    A.  It's a diuretic.
6    Q.  And is that also used in the treatment
7  of high blood pressure?
8    A.  Yes.
9    Q.  And what -- how does it work to treat
10  high blood pressure?
11    A.  It is a diuretic that decreases volume,
12  and affects sympathetic tone, and decreases blood
13  pressure.
14    Q.  An is bisoprolol always combined with
15  HCTZ?
16    A.  No.
17    MS. ROSE: I'm going to introduce Tab 5
18  as Exhibit 5.
19    (Exhibit Buckley-5, Medical Record dated
20  31-July-2003, Bates GRobertsJr-CA-000792 through 794,
21  was received and marked for identification.)
22    MS. ROSE: Do we have it up? Okay,
23  great. We're going to look at page 792, which is on
24  the screen.
25    Q.  And about halfway down the document,

Page 41

1  you'll see a section called "Description"?
2    A.  Yes.
3    Q.  Okay. Before we look at that, I just
4  want to generally say, this document indicates that
5  you performed a treadmill stress test on Mr. Roberts
6  on July 31st, 2003. Is that correct?
7    A.  Yes.
8    Q.  What is a treadmill stress test?
9    A.  It's a test where you have a patient
10  walk on the treadmill to assess their response to
11  exercise.
12    Q.  And why did you order that for
13  Mr. Roberts?
14    A.  In general, to look for evidence for any
15  heart blockages or ischemia or abnormal exercise
16  response that might be indicative of a heart problem.
17    Q.  And you state in the document that
18  Mr. Roberts had an "abnormal treadmill stress ECG
19  test with an abnormal blood pressure response"?
20    A.  Correct.
21    Q.  And what does that mean? Does that mean
22  that he -- well, I'll just leave it at that, okay?
23  For -- to a lay person, how would you describe that?
24    A.  Well, in general, your blood pressure
25  should go up with exercise. And his went from about

Page 42

1  130 to 140, which would be a blunted blood pressure
2  response.
3      Q.   Is that a common result in an individual
4  with hypertension?
5      A.   No, not -- not usually.
6      Q.   In your care and treatment of
7  Mr. Roberts, what did you suspect this was
8  attributable to?
9      A.   It can be seen as an artifact of blood
10  pressure measurement; but it can also be associated
11  with blockages in the heart arteries.
12      Q.   In your care and treatment of
13  Mr. Roberts, were you ever aware that he had
14  blockages in the heart arteries?
15      A.   Yeah, a couple of times.  He would come
16  in with chest pain, and we would either do stress
17  testing or even heart catheterizations, as I recall
18  from reviewing his chart.
19      Q.   And were the heart catheterizations
20  intended to remove a blockage, or just to evaluate
21  it?
22      A.   Well, first to evaluate for a blockage;
23  and then if present, decide if it needed to be
24  addressed with a stent or a balloon.
25      Q.   Do you know if Mr. Roberts ever had a

Page 43

1  heart blockage addressed with a stent or a balloon?
2      A.   I don't think he did.  I'm trying to
3  see.  Yeah, I don't think he ever had a blockage that
4  was addressed with a stent.
5          MS. ROSE:  I'm going to introduce Tab 17
6  as Exhibit 6.
7          (Exhibit Buckley-6, Medical Record dated
8  14-November-2006, Bates GRobertsJr-CA-000741 through
9  744, was received and marked for identification.)
10          MS. ROSE:  And I'm going to look at
11  Bates number 742.
12      Q.   This is a letter you wrote to Dr. Kolb
13  about Mr. Roberts on November 14, 2006.  Correct?
14      A.   Correct.
15      Q.   And you write that you saw Mr. Roberts
16  that day in follow-up of his coronary artery
17  disease -- or apologies; just coronary disease.
18  Correct?
19      A.   Correct.
20      Q.   And is "coronary disease," as it's used
21  here, short for coronary artery disease?
22      A.   Yes.
23      Q.   And what is coronary artery disease?
24      A.   The presence of plaque in the arteries
25  that represents some buildup of cholesterol plaque,

Page 44

1  usually.
2      Q.   Is hypertension a risk factor for
3  coronary artery disease?
4      A.   Yes.
5          (Court Stenographer clarification.)
6          MS. ROSE:  Oh, yes, of course, I
7  apologize.  Sorry.  I'm a fast talker generally.
8      Q.   In your care and treatment of
9  Mr. Roberts, what did you view as the potential
10  complications of having coronary artery disease?
11      A.   Standard complications of having
12  coronary artery disease would be development of
13  blockages that cause angina, the development of heart
14  attacks, things like that.
15      Q.   Is stroke a potential complication of
16  having coronary artery disease?
17      A.   It can be associated with coronary
18  artery disease, but may not be directly related to a
19  blockage in the coronary arteries.
20      Q.   And is stroke a potential complication
21  of hypertension?
22      A.   Yes.
23      Q.   What medical -- sorry, what treatments
24  did you consider to treat Mr. Roberts' coronary
25  artery disease?

Page 45

1      A.   Cholesterol management and aspirin,
2  usually, and management of blood pressure, and
3  lifestyle modification.
4      Q.   And when you say "cholesterol
5  management," would that include medicinal treatments
6  with medications to treat cholesterol?
7      A.   Correct.
8      Q.   It says in this letter that Mr. Roberts
9  stated that he wants to avoid medications.  Correct?
10      A.   Correct.
11      Q.   So is it your understanding that as of
12  this time, you didn't prescribe any medicine to treat
13  Mr. Roberts' coronary artery disease?
14      A.   I think he was on aspirin, and I think
15  that was more addressing his desire to add a
16  cholesterol medicine, and also manage blood pressure
17  with medicines -- or medicine changes.  But I
18  can't -- I don't recall specifically.
19      Q.   Did Mr. Roberts have high cholesterol?
20      A.   He did, yeah.  As in this document, he
21  had an LDL of 153.
22      Q.   What is a normal LDL?
23      A.   It depends on the year you're looking
24  at, in terms of how we define what normal LDL is.
25  But at birth, your LDL is very low, down in the

12 (Pages 42 - 45)

Page 46

1 thirties, forties, fifties range.
2      And the condition of being an American
3 in this country makes the LDL normal not really so
4 good. So it depends on what you're saying, it
5 depends what you mean by "normal."
6      Q.   Fair, fair point. I'm trying to figure
7 out how to rephrase the question.
8      Just would you consider an LDL of 153 in
9 Mr. Roberts, based on his age, to be abnormally high,
10 or just slightly high?
11      A.   Abnormally high. If they have mild
12 coronary disease, I'm usually pretty aggressive in
13 terms of recommending Crestor or Lipitor, a statin to
14 reduce the LDL.
15      Q.   And is the reason that you didn't
16 prescribe a statin to reduce the LDL at this time
17 because Mr. Roberts indicated he didn't want to take
18 medication?
19      A.   You have to look at the documents, I
20 can't remember. But at the bottom of that paragraph
21 I did say, at this time, we'll decide to add Crestor
22 after he rechecked it. But he did not -- I don't
23 think he wanted to start one at that time.
24      Q.   Got it. Do you know if Mr. Roberts ever
25 started Crestor?

Page 47

1      A.   I don't recall.
2      MS. ROSE:   I'm going to introduce Tab 7
3 as Exhibit 7.
4      (Exhibit Buckley-7, Medical Record dated
5 4-November-2008, Bates GRobertsJr-CA-000710 through
6 712, was received and marked for identification.)
7      Q.   And I'm going -- okay. So I'll start
8 here.
9      This is a record from a November 4,
10 2008, visit that you had with Mr. Roberts. Correct?
11      A.   Correct.
12      MS. ROSE:   Let's look at the page with
13 Bates number ending in 711.
14      Q.   This is another note you wrote to
15 Dr. Kolb on November 4, 2008, regarding your
16 appointment with Mr. Roberts. Correct?
17      A.   Correct.
18      Q.   And in that letter, you wrote that you
19 saw Mr. Roberts for an evaluation -- for an
20 evaluation of his coronary artery disease. Correct?
21      A.   Correct.
22      Q.   And you stated in the letter that you
23 asked Mr. Roberts to have his lipid profile checked?
24      A.   Correct.
25      Q.   Does that mean his cholesterol checked?

Page 48

1      A.   Correct.
2      Q.   The letter says that if Mr. Roberts'
3 lipid profile is abnormal and he has persistent
4 elevated liver enzymes, he may want to see a GI
5 doctor before starting statin therapy. Correct?
6      A.   Correct.
7      Q.   So at this point in 2008, Mr. Roberts
8 still has not started a statin. Correct?
9      A.   Correct.
10      Q.   But you were considering him starting on
11 one if his cholesterol remained high. Correct?
12      A.   Well, there were two things there. One
13 is that he -- I was considering starting one, with
14 his cholesterol level being elevated. But also, he
15 was concerned about elevated liver enzymes, so I
16 wanted to make sure that we addressed that by having
17 him see a GI doctor.
18      Because although the concern for statin
19 therapy and liver enzyme elevation may be a bit
20 overstated, it's a big concern for patients. And so
21 I usually get a GI to help with that, if that's a
22 concern.
23      Q.   Got it. So based on your recollection
24 of this visit, Mr. Roberts raised the issue of his
25 elevated liver enzymes?

Page 49

1      A.   I can't remember if it was him, or
2 whether I discussed it with him and we decided
3 together to see GI -- or to recommend GI.
4      Q.   Do you recall at the time having a
5 reason to believe that Mr. Roberts had persistent
6 elevated liver enzymes?
7      A.   I don't -- I don't know the answer to
8 that specifically. I would assume, since I wrote it
9 in the notes, that I reviewed labs and saw that they
10 their liver enzymes were elevated.
11      Q.   And you just talked about patients
12 having a concern about using statins with elevated
13 liver enzymes. What is the connection there, or what
14 is the perceived connection between elevated liver
15 levels and the use of statins?
16      A.   Well, there is some connection between
17 the elevation of liver enzymes and the use of
18 statins, although the concern may be overstated in
19 terms of it's being a problem, developing liver
20 failure, or something like that.
21      Q.   But Mr. Roberts had some concern that if
22 he used a statin, he may be at an increased risk of
23 liver failure?
24      A.   I can't remember. I don't -- yeah, I
25 just can't remember if it was him that stated it, or

13 (Pages 46 - 49)

Page 50

1  that it just came up in the discussion; or that I
2  noticed that the liver enzymes were elevated, and
3  said that I'd like him to see a GI at the same time.
4      Q.   Okay.
5           MS. ROSE:  I'm going to introduce Tab 20
6  as Exhibit 8.
7           (Exhibit Buckley-8, Medical Record dated
8  14-May-2009, Bates GRobertsJr-CA-000700 through 703,
9  was received and marked for identification.)
10          MS. ROSE:  And I'm going to go to
11 page 703.
12     Q.   Dr. Buckley, this is a call log from
13 May 19, 2009, created by your office.  Correct?
14     A.   Yes.
15     Q.   And looking down to the entry --
16          MS. ROSE:  There you go, right there.
17     Q.   The entry from May 19, 2009, at
18 9 o'clock a.m.?
19     A.   Yes.
20     Q.   This indicates that you wrote, "HX
21 elevated LFTS.  Will have to discuss at follow-up
22 whether to use statins."  Correct?
23     A.   Correct.
24     Q.   Again for a non-medical professional,
25 can you tell me what "HX" means?

Page 51

1      A.   History of elevated liver enzymes, liver
2  function.
3           (Court stenographer clarification.)
4           THE WITNESS:  History -- I'm sorry, for
5  me, or for --
6           (Court Stenographer clarification.)
7      A.   History of elevated liver function
8  tests.
9      Q.   And then right below that, there's a
10 message from Rebecca Garlock to you that says, "Here
11 are the LFTs to go with the FLP."  Is that correct?
12          THE WITNESS:  Can you go up a little
13 bit?  Further up?  There, then go back down again.
14 Yeah, that was before that.
15     Q.   Okay.  So who is Rebecca Garlock?
16     A.   One of the nurses.
17     Q.   At your practice?
18     A.   Yes.
19     Q.   And is she -- is it your understanding
20 that she's sending you the results of Mr. Roberts'
21 liver function test?
22     A.   That is what I would infer from that
23 message, yes.
24     Q.   And what does "FLP" stand for?
25     A.   Fasting lipid profile.

Page 52

1      Q.   So that's like a test where you test the
2  lipids --
3      A.   Yes.
4      Q.   After the patient has fasted?
5      A.   Correct.
6      Q.   Okay.  Great.  So based on your
7  response, is it your understanding that the liver
8  function tests for Mr. Roberts conducted in 2009
9  indicated elevated liver enzymes?
10     A.   Yes, based on my response there.
11     Q.   All right.
12          MS. ROSE:  I'm going to introduce Tab 8
13 as Exhibit 9.
14          (Exhibit Buckley-9, Medical Record
15 16-September-2009, Bates GRobertsJr-CA-000654 through
16 655, was received and marked for identification.)
17     Q.   Dr. Buckley, this is a record from an
18 appointment Mr. Roberts had with a Dr. Christopher
19 Ives on September 16, 2009.  Correct?
20     A.   Correct.
21     Q.   At the bottom of the record, it says
22 that you were cc'd.  Does that mean that you received
23 a copy of this record?
24     A.   Correct.
25     Q.   Do you know how Mr. Roberts began seeing

Page 53

1  Dr. Ives?
2      A.   I don't recall whether the primary
3  referred or whether we referred.
4      Q.   Do you recall referring patients
5  generally to Dr. Ives?
6      A.   I have referred to Dr. Ives in the past.
7      Q.   In the "Impression" section of this
8  document, it states that Mr. Roberts has
9  "non-alcoholic steatohepatitis," or NASH.  Correct?
10     A.   Correct.
11     Q.   What is non-alcoholic steatohepatitis?
12     A.   It's a fatty liver from unclear
13 etiologies that can lead to cirrhosis.
14     Q.   In the context of your care and
15 treatment of Mr. Roberts, did you believe NASH to be
16 a risk factor for any other conditions?
17     A.   No.
18     Q.   In the context of your care of
19 Mr. Roberts, did you have a reason to believe that
20 Mr. Roberts' NASH may heighten the risk of
21 Mr. Roberts having complications related to
22 hypertension, or coronary artery disease?
23     A.   Possibly for coronary artery disease.
24 I'm not quite sure about hypertension.
25     Q.   And in the record, Dr. Ives states that

14 (Pages 50 - 53)

Page 54

1  he discussed doing a liver biopsy with Mr. Roberts,
2  but that Mr. Roberts was not interested in having
3  one. Is that correct?
4      A.    Yes, that's what the record says.
5      Q.    And it also states that "if he is to
6  start a lipid-lowering agent, I think as long as his
7  LFPs are monitored, then it would probably be safe to
8  at least just go ahead and start one." Correct?
9      A.    Correct.
10     Q.    And "lipid-lowering agent," as used in
11  that sentence, means statin therapy?
12     A.    Correct.
13     Q.    So is it fair -- your understanding of
14  this document that Dr. Ives gave the go-ahead to
15  start Mr. Roberts on statin therapy, but indicated
16  that Mr. Roberts' liver levels were high enough that
17  they needed to be monitored?
18     A.    Correct.
19     Q.    Okay.
20         MS. ROSE: I'm going to introduce Tab 9
21  as Exhibit 10.
22         (Exhibit Buckley-10, Medical Record
23  dated 7-December-2010, Bates GRobertsJr-CA-000572
24  through 574, was received and marked for
25  identification.)

Page 55

1         MS. ROSE: And I'm going to turn to the
2  Bates number ending in 573.
3      Q.    This is a log of phone calls between
4  your practice and Mr. Roberts, starting on
5  December 20, 2010. Correct?
6      A.    Correct.
7      Q.    And there's an entry for December 22nd,
8  2010, that states, "Please call and take away the
9  HCTZ part, as he's having some palps. Call him to
10  inform of script. He's seeing JAS soon."
11         Do you see that?
12     A.    Correct.
13     Q.    And that note is signed "RSB." Those
14  are your initials. Correct?
15     A.    Yes.
16     Q.    Okay. So this is a directive from you?
17     A.    It is, yeah, what I typed in there.
18     Q.    Do you understand the reference to "JAS"
19  to refer to a Dr. James Storey?
20     A.    Yes.
21     Q.    Who is Dr. Storey?
22     A.    He's one of our electrophysiologists
23  that worked with us at that time.
24     Q.    Does he still work at Cardiology
25  Associates?

Page 56

1      A.    No.
2      Q.    And what is an electro -- now, I'm going
3  to -- I've already lost the word.
4  Electrophysiologist, is that what you said?
5      A.    It's a doctor that handles irregular
6  rhythms; pacemakers, defibrillators, arrhythmias.
7      Q.    And why did you recommend that
8  Mr. Roberts see Dr. Storey?
9      A.    He was bothered by palpitations, and I
10  didn't have additional therapy, on top of the beta
11  blocker that he was already on, to manage the
12  palpitations, and wanted him seen by Dr. Storey.
13     Q.    And when you say, "Please call and take
14  away the HCTZ part," does that mean that you were
15  informing someone on your staff to change
16  Mr. Roberts' prescriptions to take away the HCTZ?
17     A.    Yeah. The idea is there is that HCTZ
18  may cause electrolyte abnormalities, and might
19  contribute to palpitations, and then -- that's it.
20     Q.    But Mr. Roberts would still continue on
21  the bisoprolol?
22     A.    Yes.
23         MS. ROSE: I'm going to introduce Tab 10
24  as Exhibit 10 [sic].
25         (Exhibit Buckley-11, Medical Record

Page 57

1  dated 3-January-2011, Bates GRobertsJr-CA-000568
2  through 571, was received and marked for
3  identification.)
4         MS. ROSE: And we're going to look at
5  page 568.
6         MR. NOVAK: Counsel, I think this is --
7  Tab 10 is Exhibit 11, I believe.
8         MS. ROSE: Oh, I apologize.
9         MR. NOVAK: Of course. Thank you.
10         MS. ROSE: Oh, yes, you're right,
11  apologies.
12     Q.    Okay. This is a clinic note for a
13  appointment Mr. Roberts had with Dr. Storey on
14  January 3rd, 2011. Correct?
15     A.    Correct.
16         MS. ROSE: And if we look at Bates
17  number 570 for the same document.
18     A.    Correct.
19     Q.    All right. So in the notes for this
20  record, under "Medication Changes," it says, "Stop
21  bisoprolol HCTZ." Correct?
22     A.    Correct.
23     Q.    Do you understand that to mean
24  Dr. Storey was recommending that Mr. Roberts come off
25  bisoprolol as well as HCTZ?

15 (Pages 54 - 57)

Page 58

1    A.    Correct.
2    Q.    And then below that, the note says,
3  "Start Diovan 40 milligrams."
4    A.    Correct.
5    Q.    And do you know what that word is, right
6  after the "40 milligrams"?
7    A.    "Daily."
8    Q.    Daily.  Oh, thank you.  You're better at
9  reading handwriting than I am.
10    Do you agree that Diovan is the brand
11  name for valsartan, which is an angiotensin II
12  receptor blocker?
13    A.    Correct.
14    Q.    Do you know why Dr. Storey is
15  recommending stopping the bisoprolol?
16    THE WITNESS:  Can you go back to the
17  previous note that he had -- the clinic note that was
18  one back?
19    A.    It might say, but I don't recall why he
20  would have done that, other than thinking that it was
21  causing bradycardia that was excessive.
22    Yes, so if you look at the HPI, it says
23  that --
24    Q.    Right.
25    MS. ROSE:  You had it a second ago.  I

Page 59

1  think that was Bates number 568.
2    A.    So when I was reviewing the chart
3  yesterday, I inferred that that note meant that
4  because the patient was saying that his heart was
5  running too slow, that Dr. Storey was deciding to
6  take away a medicine that slowed down the heart rate,
7  and exchange it for another blood pressure medicine
8  that did not slow down the heart rate.
9    Q.    So the other blood pressure in there
10  you're referring to, that was Diovan.  Correct?
11    A.    So to take away the beta blocker and
12  start the angiotensin receptor blocker.
13    Q.    Right.  So those are both hypertension
14  medicines, but they work in different ways.  Is that
15  correct?
16    A.    Correct.
17    Q.    And how does Diovan work differently
18  from a beta blocker?
19    A.    I'm not here as an expert witness, but
20  in general, Diovan is an angiotensin receptor blocker
21  that works through the renin-angiotensin system in
22  the kidneys, and reduces blood pressure through that
23  mechanism.
24    Q.    Got it.  And I appreciate your
25  clarification.  And I should have prefaced my

Page 60

1  question as saying that in your care and treatment of
2  Mr. Roberts, your understanding of how Diovan would
3  work differently for Mr. Roberts.
4    Does that change your answer at all?
5    A.    No.
6    MS. ROSE:  I'm going to introduce Tab 19
7  as Exhibit 12.
8    (Exhibit Buckley-12, Alabama BCBS Drug
9  Prior Authorization Form dated February 9, 2011,
10  Bates GRobertsJr-CA-000561, was received and marked
11  for identification.)
12    Q.    Have you seen this document before,
13  Dr. Buckley?
14    A.    Yesterday.
15    Q.    In your review of the records, I assume?
16    A.    Yes.
17    Q.    Fair to say, this is a general
18  prescription drug coverage authorization request form
19  from Blue Cross Blue Shield of Alabama?
20    A.    Yes, correct.
21    Q.    And this is a prior authorization form
22  that was submitted on behalf of Mr. Roberts.  Is that
23  correct?
24    A.    Correct.
25    Q.    Fair to say that Dr. Storey completed

Page 61

1  this prior authorization form so that Mr. Roberts'
2  insurance would pay for the Diovan that Dr. Storey
3  prescribed?
4    A.    Correct.
5    Q.    Have you ever filled out a prior
6  authorization request form?
7    A.    Yes.
8    Q.    Just for my clarity, when filling out
9  a --
10    THE WITNESS:  Can I -- can I pause this
11  for one second?
12    MS. ROSE:  Yes, sure.
13    THE WITNESS:  My wife just walked in and
14  needs the checkbook, so I'm going to talk to her for
15  a few minutes, and --
16    MS. ROSE:  We can pause.  Thank you so
17  much for letting me know.
18    THE WITNESS:  She also sells chocolate,
19  so if you guys need any chocolate, let us know.
20    THE VIDEOGRAPHER:  This concludes --
21  we're going off the record, right?
22    MS. ROSE:  Yes, right.
23    THE VIDEOGRAPHER:  This concludes Media
24  Number 1 of the videotaped deposition of Dr. Ralph
25  Buckley.  The time is 10:49 Central time.  We are off

16 (Pages 58 - 61)

Page 62

1  the record.
2      (A brief recess takes place.)
3      THE VIDEOGRAPHER: This begins Media
4  Number 2 of the videotaped deposition of Dr. Ralph S.
5  Buckley. The time is 10:50 Central time. We're on
6  the record.
7  BY MS. ROSE:
8      Q.   I'll start my question over, since we
9  were interrupted, and I honestly can't remember if
10 you answered or not.
11     So I guess my question is in looking at
12 this form, is it your understanding that Dr. Storey
13 was explaining to the insurance company why
14 Mr. Roberts needed Diovan?
15     A.   I -- yeah, I mean I think you can
16 interpret it that way. I think that he's more just
17 filling out the form so he can get the drug -- so the
18 patient can get the drug that was ordered.
19     MS. ROSE: If we can look at the section
20 that's entitled "Treatment Information." I think
21 we're there.
22     Q.   As you were saying, this is a prior
23 authorization request for Diovan 40 milligram. And
24 there are diagnosis codes or ICD-9 codes listed?
25     A.   Yes.

Page 63

1      Q.   Am I right that ICD-9 codes are uniform
2  codes for different medical conditions and diagnoses,
3  that are used for purposes of identifying medical
4  issues in the context of the insurance -- you know,
5  insurance coverage of medical treatment?
6      A.   Correct.
7      Q.   And the ICD-9 codes that Mr. [Sic]
8  Storey identified are 401.1 and 427.81. Correct?
9      A.   Yes, that's what it says.
10     Q.   Okay. Do you know what the ICD-9 code
11 401.1 stands for?
12     A.   I don't remember. It seems like it
13 represents CAD, but I can't remember.
14     Q.   Okay. And do you know what the ICD-9
15 code 427.81 represents?
16     A.   I don't. I think it's palpitations, but
17 I honestly don't remember.
18     Q.   If I were to represent to you that ICD-9
19 427.81 is the code for "sick sinus syndrome," would
20 you have a reason to disagree with that?
21     A.   No, no. And that would go along with
22 the heart-rate dropping issue that Dr. Storey was
23 documenting.
24     Q.   What is sick sinus syndrome?
25     A.   Where your pacemaker, your native

Page 64

1  pacemaker that's in your heart, does not keep up with
2  the needs of your heart, and ends up being a little
3  slower than it should be.
4      Q.   And if I were to represent to you that
5  ICD-9 401.1 was the code for benign essential
6  hypertension, would you have a reason to disagree
7  with that?
8      A.   No, that's fine.
9      Q.   So based on this document, is it your
10 understanding that the basis for the prior
11 authorization request for Diovan was the fact that
12 Mr. Roberts had both hypertension and sick sinus
13 syndrome?
14     A.   Yeah, based on that document, that's
15 what it says. And it goes along with his note, which
16 was he was worried that his heart rate was going too
17 slow, so he wanted to treat his blood pressure with
18 something else other than the bisoprolol.
19     Q.   And the next box to the right states,
20 "Duration of Disease," and Dr. Storey's written
21 "July '03." Correct?
22     A.   Yeah. That's what written in this, yes.
23     Q.   So do you understand that to mean that
24 Mr. Roberts suffered from hypertension and sick sinus
25 syndrome since July of 2003?

Page 65

1      A.   I don't know that you can say that,
2  based on the review of the records. But certainly
3  recently -- more recently, he had slower heart rates
4  that indicated that they wanted to switch him off of
5  a beta blocker. I think you may be reading more into
6  the accuracy and meaning of that July '03 than I can.
7      Q.   I appreciate that. That's why I'm
8  asking you the question; you're the doctor. I'm just
9  a lawyer, so I'm hoping you can help me so I can
10 understand it, but thank you for that explanation.
11     In your care and treatment of
12 Mr. Roberts, was it your understanding that Diovan
13 and -- treats hypertension without the same potential
14 effect on patient heart rate as a beta blocker?
15     A.   Yes.
16     Q.   Did you agree with Dr. Storey's decision
17 to put Mr. Roberts on Diovan?
18     A.   I was not involved with that decision.
19     Q.   Would you say in your care and treatment
20 of Mr. Roberts that you believe Diovan to be a
21 logical choice to treat Mr. Roberts, in light of his
22 particular conditions?
23     A.   I treat a lot of patients with
24 angiotensin receptor blockers for high blood
25 pressure.

17 (Pages 62 - 65)

Page 66

1    Q.   In your care and treatment of
2  Mr. Roberts, would you say that at this point, Diovan
3  was the best choice for treatment of Mr. Roberts'
4  hypertension, in light of his particular
5  circumstances?
6    A.   I think it's a good choice that an
7  angiotensin receptor blocker was used.
8    Q.   Looking back at the document, in the
9  prior authorization document, there's a reference to
10 "ACE cough," if you look at "Treatment Information"?
11   A.   Yes.
12   Q.   It says "HIS of ACE cough also"?
13   A.   Correct.
14   Q.   Do you understand that to mean
15 Mr. Roberts had a history of ACE cough?
16   A.   I would interpret it that way.
17   Q.   You would, or would not?
18   A.   I would.
19   Q.   Okay, great.  What is ACE cough?
20   A.   It's a cough caused by ACE inhibitors
21 that affect maybe one out of 20 patients, that can --
22 that develop a nagging cough.
23   Q.   And what is an ACE inhibitor?  I don't
24 think we talked about those yet.
25   A.   It's part of the same pathway, that

Page 67

1  angiotensin receptor blockers are lowering blood
2  pressure.  And it is an angiotensin converting enzyme
3  inhibitor.
4    Q.   So --
5    A.   It's a drug -- that's a drug that's used
6  for blood pressure that's in a slightly different
7  class than the ARBs, or the angiotensin receptor
8  blockers.
9    Q.   Understood.  Is it fair to say, then,
10 that Mr. Roberts wasn't a good candidate to use an
11 ACE inhibitor to treat his hypertension, because he
12 had a history of ACE cough?
13   A.   Yes.
14   Q.   So fair to say that for that reason as
15 well, Diovan was a reasonable choice to treat
16 Mr. Roberts' hypertension?
17   A.   Yes.
18        MR. NIGH:  Form objection.
19   Q.   And in your care and treatment of
20 Mr. Roberts, did you understand that Diovan
21 successfully treated Mr. Roberts' hypertension while
22 he was on it?
23   A.   Can you repeat that question?
24   Q.   Sure.  In your care and treatment of
25 Mr. Roberts, was it your understanding that Diovan

Page 68

1  successfully treated Mr. Roberts' hypertension?
2    A.   I believe so.  I'd have to look back at
3  his records to see what his blood pressure response
4  was with the Diovan.  But it certainly was a -- if
5  you're going to stop the bisoprolol, putting him on
6  something else to treat the blood pressure seemed
7  reasonable.
8        And you'll have to just update me when
9  you go through the future records to see if his blood
10 pressure was controlled with it.
11   Q.   Okay.
12        MS. ROSE:  I want to introduce Tab 12 as
13 Exhibit 13.
14        (Exhibit Buckley-13, Medical Record
15 dated January 30, 2012 (Later Withdrawn as Duplicate
16 of Exhibit Buckley-3), was received and marked for
17 identification.)
18        (Court stenographer clarification.)
19        MS. ROSE:  Of course.  No problem.
20        If you can turn to page 541 of this
21 document.  Oh, you know what, I want to pause for a
22 second.  Oh no, I'm actually good, never mind.
23   Q.   So we're at Exhibit 13, and we're
24 looking at page 541.  This is a record from your
25 appointment with Mr. Roberts on January 30, 2012.

Page 69

1  Correct?
2    A.   Yes.
3    Q.   Okay.  Thanks.  So looking again at --
4  under "Social History," you continue to list
5  Mr. Roberts as having a history of alcohol use,
6  caffeine use, and a former smoker.  Correct?
7    A.   (Audio dropout.)
8    Q.   Sorry.  I didn't hear you if you
9  answered, Doctor --
10   A.   I'm sorry.  I said correct.
11   Q.   Okay, great.  So I don't know what's
12 happening, but sometimes when you answer just
13 "correct," it doesn't come through on my speaker, so
14 I apologize for that.
15   A.   That's okay, I can repeat myself.
16   Q.   Okay.  So looking at the page ending in
17 540, under "Reason For Visit," it says that "The
18 patient is being seen for routine clinic follow-up."
19   A.   Uh-huh.
20   Q.   "Reason for visit:  Coronary artery
21 disease, hyperlipidemia, and hypertension."  Correct?
22   A.   Correct.
23   Q.   And is hyperlipidemia high cholesterol?
24   A.   It is.
25   Q.   And under "Active Problems," the

18 (Pages 66 - 69)

Page 70

1  document lists coronary artery disease,
2  hyperlipidemia, hypertension, and obstructive sleep
3  apnea. Correct?
4      A.    Correct.
5      Q.    So based on this record, would you say
6  that as of 2012, Mr. Roberts had been diagnosed with
7  obstructive sleep apnea?
8      A.    Correct.
9      Q.    If you look at the page of the records
10 with the Bates number ending in 542, about halfway
11 down the page.
12         MS. ROSE: And with apologies to the
13 court reporter, I'm going to read a little bit of
14 this record, so I will try to go slow.
15     Q.    It states that "Mr. Roberts is a
16 56-year-old with a history of sleep apnea,
17 decongestants, and a note that he had PAF yesterday,
18 now in sinus rhythm." Correct?
19     A.    Correct.
20     Q.    What is PAF?
21     A.    Paroxysmal atrial fibrillation.
22     Q.    And what is that?
23     A.    An irregular rhythm.
24     Q.    And is that associated with high blood
25 pressure?

Page 71

1      A.    It can be.
2      Q.    The next sentence says, "He declines
3  Coumadin," if I'm pronouncing that correctly, "after
4  discussing benefits and risks." Correct?
5      A.    Correct.
6      Q.    What is Coumadin?
7      A.    Coumadin is an anticoagulant that is
8  used to reduce the stroke risk in patients with
9  atrial fibrillation.
10     Q.    And is Coumadin ever used for patients
11 with hypertension?
12     A.    No. It can be used if the patient has
13 AFib and they may have hypertension, but it's not
14 used just for hypertension.
15     Q.    So Mr. Roberts at this point had both
16 AFib and hypertension. Correct?
17     A.    At this point, yes.
18     Q.    Going down to the next sentence --
19 sorry, next paragraph, you say, "He did have some
20 brady with bisoprolol." Correct?
21     A.    Correct.
22     Q.    Is that a reference to the low heart
23 rate that Mr. Roberts previously experienced when he
24 was on the bisoprolol, that led to him being taken
25 off that medication?

Page 72

1      A.    Correct.
2      Q.    And then later on in that same
3  paragraph, it says, "I'll give him some metroprolol
4  tartrate and he can use a low dose if he has
5  recurrent tachycardias."
6      A.    Correct.
7      Q.    What is metroprolol?
8      A.    A beta blocker, like bisoprolol.
9      Q.    And the metroprolol tartrate was
10 intended to treat a racing heartbeat? Is that
11 what a tachycardia is?
12     A.    Correct.
13     Q.    Based on this note, is it fair to say
14 you prescribed Mr. Roberts medication for him to use
15 on an as-needed basis for tachycardias, but not
16 continuous use?
17     A.    I don't think so, but it would be
18 acceptable to also use it daily.
19     Q.    Did you have any concern that
20 Mr. Roberts would have the same adverse response he
21 had to bisoprolol, if he took the metroprolol
22 regularly?
23     A.    Yes, a little bit.
24     Q.    I'm going -- actually, Tab 13 may have
25 already been introduced. Let me look.

Page 73

1         (Court Stenographer clarification.)
2         MS. ROSE: Oh, yeah, we can stop right
3  now. I just have a couple documents left. So -- but
4  yeah, why don't we take a stop.
5         THE VIDEOGRAPHER: We're off the record
6  at 11:06.
7         (A brief recess takes place.)
8         THE VIDEOGRAPHER: We're back on the
9  record at 11:16 Central time.
10        MS. ROSE: Just to clarify for the
11 record, we had -- before the break had been
12 discussing what I had been referring to as
13 Exhibit 13, which was -- I also referred to as
14 Tab 12. I just wanted to clarify for the record that
15 that document, which is a record from an appointment
16 that Dr. Buckley had with Mr. Roberts on January 30,
17 2012, had already been entered as Exhibit 3.
18        So all of those references to that
19 document should be to Exhibit 3.
20 BY MS. ROSE:
21     Q.    And then I'm going to start again by
22 introducing Tab 14, which this will now be
23 Exhibit 13, I believe.
24        (Exhibit Buckley-14, Medical Record
25 dated 2-July-2012, Bates GRobertsJr-CA-000517 through

19 (Pages 70 - 73)

Page 74

1 522, was received and marked for identification.)
2       MS. ROSE:  Can we go to the Bates number
3 page ending in 520.
4       Q.   Dr. Buckley, this page is a document, a
5 page documenting your evaluation of Mr. Roberts on
6 July 2nd, 2012.  Correct?
7       A.   Right.
8       Q.   Down the page, under "Plan" --
9       A.   Yes.
10       Q.   At Point 4, you note that you were
11 referring Doctor -- sorry -- you were referring
12 Mr. Roberts to Dr. Robichaux.  Correct?
13       A.   Correct.
14       Q.   And we said that Dr. Robichaux is
15 another cardiologist who worked with you at
16 Cardiology Associates.  Correct?
17       A.   Correct.
18       Q.   And I'm trying to recall if I asked you
19 this before, and if I did, I apologize.
20            Does Dr. Robichaux have a particular
21 specialty?
22       A.   He's an electrophysiologist, similar to
23 Dr. Storey.
24       Q.   Okay.  And why did you refer Mr. Roberts
25 to Dr. Robichaux?

Page 75

1       A.   Because he had -- the patient had atrial
2 fibrillation.
3       Q.   And was there a reason to refer him to
4 Dr. Robichaux, in addition to Dr. Storey?
5       A.   Dr. Storey was not there at that time,
6 so he was being referred to Dr. Robichaux.  Either
7 that, or he was still there and he worked over in
8 Mobile, and we got some EP doctors across the bay in
9 our offices that Dr. Robichaux started.  I can't
10 remember if he was still with the practice or not at
11 that time.
12            But there was a flip-flop, where Storey
13 started working over in Mobile, and Dr. Robichaux,
14 who had a house over here, switched and started
15 working in Baldwin County.
16       Q.   Got it.  And you testified earlier that
17 Dr. Robichaux eventually took over Mr. Roberts'
18 cardiology care.  Correct?
19       A.   Correct.
20       Q.   And that was in around 2014.  Correct?
21       A.   Correct.
22       MS. ROSE:  We can take down this
23 document.
24       Q.   At the very beginning of the deposition,
25 we talked about the fact that you had done some

Page 76

1 research yesterday in advance of the deposition, and
2 had looked at some articles.  Correct?
3       A.   Correct.
4       Q.   Is it correct that you had not read or
5 looked at any of those articles that you saw
6 yesterday, prior to yesterday?
7       A.   I can't remember if, during the time
8 when those articles first came out, whether I'd
9 looked at them or not, but I don't -- not enough to
10 have remembered them.
11       Q.   Okay.  And -- but you didn't consider
12 those articles in the context of your care and
13 treatment of Mr. Roberts.  Correct?
14       A.   Not that I recall.  But certainly, I was
15 aware that the nurses were saying that we weren't
16 able to get Diovan, and we were having to switch over
17 to different agents at some point; I just can't
18 remember when.
19       Q.   Okay.  Looking at those documents, which
20 I am going to ask you to send to me, can you just
21 look and see if any of those articles that you read
22 are dated prior to, let's say, 2015?
23       A.   I don't think so.  I've got 2022 and
24 2021.  No.
25       Q.   So all of those -- apologies, were you

Page 77

1 finished?
2       A.   I think one of them is from 2018, the
3 BMJ article.
4       Q.   So none of those articles were available
5 or written when you were treating Mr. Roberts --
6       A.   No.
7       Q.   Correct?
8       A.   No, not that I'm aware of.
9       Q.   And some of those articles were
10 published after Mr. Roberts' death in 2020.  Correct?
11       A.   Yes.
12       MS. ROSE:  I'm going to reserve some
13 time, but I believe that Mr. Nigh has some questions
14 for you.  So I might have some other questions for
15 you after he talks to you, but for now, I'll turn it
16 over.
17       THE WITNESS:  Thanks.
18 EXAMINATION BY MR. NIGH:
19       Q.   Good afternoon, Doctor -- or good
20 morning, Doctor?
21       A.   Yes, it is still morning.
22       Q.   My name is Daniel Nigh, and I represent
23 Jan Roberts, who's the wife of Gaston Roberts.
24            Do you understand that?
25       A.   I do.

Page 78

1    Q.    Okay.  And we're -- we have sued the
2  manufacturers and the sellers of valsartan, because
3  of a change in the manufacturing process that we
4  allege probable human carcinogens to become
5  present in the pills themselves.
6        Do you understand that?
7    A.    Yes.
8    Q.    And Doctor, you're here today as a fact
9  witness, meaning you're here to just talk about facts
10 as you know them.  Is that right?
11   A.    That's true.
12   Q.    And you don't have any opinions on what
13 may have caused Mr. Roberts' cancer.  Correct?
14   A.    No.  I mean, correct.
15   Q.    And Doctor, are you familiar with
16 something called NDMA?
17   A.    Yes.
18   Q.    Okay.  And is that because of the
19 articles that you looked at yesterday?
20   A.    I've heard of the agent before, but I
21 can't tell you that I have any particular knowledge
22 on it before, or other than the articles that I
23 perused yesterday.
24   Q.    Okay.  So you wouldn't consider yourself
25 an expert in NDMA?

Page 79

1    A.    No, not at all.
2    Q.    Okay.  Do you understand that it's a
3  probable human carcinogen?
4    A.    Yes.
5    Q.    Okay.  Now, Doctor, I want to ask you a
6  couple of questions about what was listed in your
7  social history.
8        Do you recall previously being asked
9  about social history for Gaston Roberts' records in
10 your medical records?
11   A.    I don't understand the question, sorry.
12   Q.    Do you recall Ms. Rose previously asking
13 you about the social history, and showing you some
14 documents?
15   A.    Yes, yes.
16   Q.    And Doctor, if Gaston Roberts reported
17 to Dr. Ives in 2009 that he drank alcohol only on
18 rare occasions, you wouldn't have any reason to
19 dispute that.  Correct?
20   A.    No.
21   Q.    Meaning that's correct?
22   A.    That is correct.
23   Q.    Okay.  And Doctor, based on --
24        MS. ROSE:  Objection -- sorry, I meant
25 to lodge an objection to the form of your prior

Page 80

1  question.
2    Q.    And Doctor, based on your records, you
3  wouldn't know if or when Mr. Roberts stopped drinking
4  any alcohol.  Correct?
5    A.    That's correct.
6    Q.    Okay.  Now, Doctor, I'd like to talk to
7  you about some general questions about your care and
8  treatment of Mr. Roberts.  Is that all right?
9    A.    Please.
10   Q.    Okay.  And, you know, one of the main
11 purposes we're talking with you today is to get at
12 what you knew and what you didn't know about what was
13 in the valsartan from 2012 to 2018.
14        Do you understand that?
15        MS. ROSE:  Object to the form.
16   A.    Yes.
17   Q.    Okay.  What I'd like to talk to you
18 about is if you'd been given certain information
19 about what was or was not in the valsartan pills
20 manufactured and sold by the defendants in this case,
21 whether that might have affected how you decided to
22 prescribe valsartan.  Does that make sense?
23   A.    That does.
24   Q.    Okay.  Now, you treated Mr. Roberts in
25 part for hypertension for approximately ten years.

Page 81

1  Correct?
2    A.    Correct.
3    Q.    In a patient like Mr. Roberts, does
4  treating hypertension typically require the use of
5  medicine or medication?
6    A.    Yes.
7    Q.    And in the time that you treated him,
8  did Mr. Roberts, in your opinion, require some sort
9  of medication to treat his hypertension?
10   A.    Yes.
11   Q.    Okay.  It appears from what we looked at
12 today that at least as of 2011, you were prescribing
13 a brand name for valsartan, which was at that time
14 manufactured solely by Novartis, called Diovan.
15        Does that comport with your
16 recollection?
17        MS. ROSE:  Object to the form.
18   A.    I don't recall whether it was Diovan or
19 valsartan specifically.
20   Q.    Okay.  Do you recall that previously, he
21 was prescribed Diovan in 2011?
22   A.    Yeah, I don't recall.  In general, my
23 policy that I give the nurses is to give them the
24 generic or the brand name, according to their
25 preference.  And then if there's a problem with the

Page 82

1  generic or the brand name, I sort of rely on the FDA
2  and other agencies to help me figure that out.
3      Q.    Understood.  And Doctor, just to -- does
4  it help -- Diovan went off patent in 2012.  Does that
5  help refresh your recollection?
6      A.    Only in that my standard doesn't change.
7  And I write -- you know, the nurses that I take care
8  of know that I don't mind generic or brand name, as
9  long as the FDA is still letting it be in pharmacies.
10     Q.    Okay.  And if it was in 2011, and Diovan
11 doesn't go off patent till 2012, in 2011, he would
12 have -- he would have been receiving name-brand
13 Diovan.  Right?
14         MS. ROSE:  Object to the form.
15     A.    That would make sense.
16     Q.    Okay.  Now, Doctor, from 2012 through
17 2018, just as a general matter, were there several
18 other drugs capable of treating hypertension like
19 Mr. Roberts had?
20     A.    Yes.
21     Q.    Diovan and valsartan are in the class of
22 drugs known as angio retention [sic] receptor
23 blockers.  Correct?
24     A.    Yes, angiotensin receptor blockers.
25     Q.    And there are some -- other than

Page 83

1  valsartan and Diovan, there are several other drugs
2  that are in the class of angiotensin receptor
3  blockers.  Correct?
4      A.    Correct.
5      Q.    And what are some of those other drugs?
6      A.    Losartan, olmesartan, telmisartan.  I'm
7  sure there are others that I'm forgetting, but...
8      Q.    And during your treatment of
9  Mr. Roberts, were there any other angiotensin
10 receptor blockers, other than valsartan, that you
11 used to treat Mr. Roberts' hypertension that didn't
12 work?
13     A.    No.
14     Q.    Okay.  And just to be clear, the only
15 angiotensin receptor blockers that you had treated
16 Mr. Roberts with was valsartan and Diovan.  Correct?
17     A.    That is what he was put on.
18     Q.    Okay.  Okay.  So whether or not, or for
19 whatever reason, you decided to say, "I'm going to
20 take Mr. Roberts off valsartan," did you have any
21 reason to believe that there were any other
22 angiotensin receptor blockers that couldn't have been
23 equally as effective as the valsartan?
24         MS. ROSE:  Objection to form.
25     A.    Can you say that question again?

Page 84

1      Q.    Sure.  So whether or not, or for
2  whatever reason, you decide to say, "I'm going to
3  take Mr. Roberts off valsartan," did you have any
4  reason to believe that there were any other
5  angiotensin receptor blockers that could have been as
6  equally effective as the valsartan?
7          MR. NIGH:  Object to the form.
8      A.    There are other angiotensin receptor
9  blockers that can be used for hypertension.
10     Q.    Okay.  And they could be just as
11 effective as valsartan in treating hypertension.
12 Correct?
13     A.    I don't have the expertise to say
14 whether one was better than the other, but I've
15 certainly used different angiotensin receptor
16 blockers on patients with hypertension.
17     Q.    Okay.  Doctor, you've been prescribing
18 medications for a long time.  Is that fair?
19     A.    Yes.
20     Q.    Okay.  Approximately how many years?
21     A.    Since 1990.
22     Q.    Okay.  And when prescribing drugs to
23 your patients, do you rely, at least in part, on
24 safety information from the FDA about the drugs
25 you're prescribing for your patients?

Page 85

1      A.    Yes.
2      Q.    And during your experience, do you
3  sometimes, when you're prescribing drugs to your
4  patients, rely on safety information that came from
5  the manufacturers or sellers of the drugs, when
6  making a prescription decision?
7          MS. ROSE:  Object to the form.
8      A.    At times.  It's hard for me to recall
9  where the information comes from sometimes.
10     Q.    Okay.  Now, Doctor, do you believe that
11 a drug manufacturer has a duty to give you the best
12 safety information it can about its drug that you're
13 prescribing?
14         MS. ROSE:  Object to the form.
15         We're going beyond his care and
16 treatment of --
17         MR. NIGH:  Please just object to the
18 form.  No speaking objections.
19     Q.    Let me ask the question again --
20     A.    Repeat that question again, yeah.
21     Q.    Doctor, do you believe that a drug
22 manufacturer has a duty to give you the best safety
23 information they can about its drugs that you're
24 prescribing?
25     A.    Yeah.  In general, yes.

22 (Pages 82 - 85)

Page 86

1    Q.    Do you expect that information that you
2    get from a drug company that's manufacturing and
3    selling a drug that you're prescribing, do you expect
4    that information to be complete?
5          MS. ROSE:  Object to the form.
6    A.    Yes.
7    Q.    Do you expect it to be up-to-date?
8    A.    Yes.
9    Q.    And do you expect it to be truthful?
10         MS. ROSE:  Object to the form.
11   A.    Yes.
12   Q.    Now, Doctor, if a drug manufacturer is
13   aware that their pills contain substances that could
14   cause cancer in humans, is that something you would
15   expect the drug manufacturer and seller to let you
16   know about?
17         MS. ROSE:  Object to the form.
18   A.    At least to the FDA, so that then more
19   accurate information is given to me.
20   Q.    So if the drug manufacturer possesses
21   information that their drug contains cancer-causing
22   agents in the pills, is that information you would
23   want to know about, when you're deciding whether or
24   not to prescribe that drug for your patients?
25         MS. ROSE:  Object to the form.

Page 87

1    A.    I would want them to make sure the FDA
2    tells me whether to keep using that drug.
3    Q.    Okay.  Fair to say, that kind of
4    information, if you knew that a drug manufacturer or
5    sellers' pills contained potentially human
6    cancer-causing agents, would that affect whether or
7    not you decided to prescribe a drug for your patient?
8          MS. ROSE:  Object to the form.
9    A.    Yes, but I -- again, I rely on the FDA
10   to help me with all those issues, or whether the
11   pharmacy takes it off the market.
12   Q.    Now, Doctor, if you found out that a
13   drug you had been prescribing -- through whatever
14   medium, the FDA or the manufacturer -- that a drug
15   you'd been prescribing, their pills had potential
16   human cancer-causing substances in those pills, would
17   you try to put your patients on a different drug?
18         MS. ROSE:  Object to the form.
19   A.    Yes, in general, but it's hard, because
20   there are a lot of side effects on different
21   medicines that I prescribe that I worry about.  But
22   that I rely on the FDA to help me decide.
23   For example, the GLP-1 agonists that are
24   used for weight loss; there have been some reports
25   that it causes blindness in a small number of

Page 88

1    patients.  And so I've been thinking about that
2    myself, in terms of:  I really need to wait for
3    better data and the FDA to tell me.  So in general, I
4    wait for the FDA to tell me and pull it off the
5    market.
6    Q.    And Doctor, are you aware that when the
7    FDA became aware of this issue, shortly thereafter,
8    the valsartan drugs were pulled off the market?
9          MS. ROSE:  Object to the form.
10   A.    I'm not aware of that timeline.
11   Q.    Okay.  Now, Doctor, if at any time from
12   2012 to 2018, you had been informed that valsartan
13   pills contained substances that are probable human
14   carcinogens, would have that affected your decision
15   as to whether to prescribe valsartan to your
16   patients?
17         MS. ROSE:  Object to the form.
18   A.    If the FDA had told me to take the
19   drug off -- that they were taking the drug off the
20   market, then yes.  We get reports on adverse effects
21   on a lot of different drugs, and it's hard to sort
22   out, as a physician.  But we rely on advisory bodies
23   to help us determine that.
24   Q.    Now, Doctor --
25   A.    I hope that clarifies it.  It's not that

Page 89

1    it -- I mean, I hear things about certain drugs a
2    lot.  And I just -- there's so much out there that I
3    need to rely on a body that sort of analyzes that
4    data to determine whether or not it's enough to pull
5    a drug off the market.
6    Q.    And Doctor, if you had been warned at
7    any time from 2012 to 2018 by the manufacturers and
8    sellers of valsartan that their pills contained
9    probable human cancer-causing substances, would it --
10   would you have relayed that information to
11   Mr. Roberts?
12         MS. ROSE:  Object to the form.
13   A.    I would have tried to, yeah.
14         MR. NIGH:  Okay, that's all the
15   questions I have, thank you.
16         MS. ROSE:  Dr. Buckley, you have been
17   extremely generous with your time today.  Thank you
18   so much.  I know you have a very busy job and an
19   important practice, so I thank you so much for giving
20   us the time, and I think you can go and have the rest
21   of your day.  Thank you.
22         THE VIDEOGRAPHER:  Let me take us off
23   the video record real fast.
24         This concludes today's testimony, given
25   by Ralph Buckley, M.D.  The total number of media

23 (Pages 86 - 89)

Page 90

1 units used was two, and will be retained by Veritext.
2 We are off the record at 11:36 Central time.
3         (The proceedings concluded at 11:36
4 Central time.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1             C E R T I F I C A T E
2
3     I, ELLEN J. GODINO, CCR, CRCR, RPR, do hereby
4 certify that prior to the commencement of the
5 examination, RALPH S. BUCKLEY, M.D. was duly sworn by
6 me to testify the truth, the whole truth and nothing
7 but the truth.
8     I DO FURTHER CERTIFY that the foregoing is a
9 true and accurate transcript of the testimony as
10 taken stenographically by and before me at the time,
11 place and on the date hereinbefore set forth, to the
12 best of my ability.
13     I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19                         .
20
       ELLEN J. GODINO
21     CERTIFIED COURT REPORTER
       REGISTERED PROFESSIONAL REPORTER
22     CERTIFIED REALTIME COURT REPORTER
       DATED: February 13, 2025
23
24
25

Page 91

1             J U R A T
2
3     I DO HEREBY CERTIFY that I have read the
4 foregoing transcript of my deposition testimony and I
5 certify that is it true and correct to the best of my
6 knowledge.
7
8
9
10     RALPH S. BUCKLEY, M.D.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1 DANIEL NIGH, ESQ.
2 dnigh@nighgoldenberg.com
3     February 14, 2025
4 In Re: Valsartan, Losartan, Et Al
5     2/7/2025, Ralph S. Buckley , M.D. (#7151036)
6     The above-referenced transcript is available for
7 review.
8     Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 CS-NY@veritext.com
16  Return completed errata within 30 days from
17 receipt of testimony.
18   If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22     Yours,
23     Veritext Legal Solutions
24
25

24 (Pages 90 - 93)

Page 94

1  In Re: Valsartan, Losartan, Et Al
2  Ralph S. Buckley , M.D. (#7151036)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Ralph S. Buckley , M.D.        Date
25

Page 95

1  In Re: Valsartan, Losartan, Et Al
2  Ralph S. Buckley , M.D. (#7151036)
3          ACKNOWLEDGEMENT OF DEPONENT
4      I, Ralph S. Buckley , M.D., do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____   _____
12 Ralph S. Buckley , M.D.        Date
13 *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18      _____
19          NOTARY PUBLIC
20
21
22
23
24
25

25 (Pages 94 - 95)

**[& - 261]**                                                          Page 1

| | | | |
|---|---|---|---|
| **&** | **10**  4:19 54:21 | **1985**  19:14 | 82:11 |
| **&**  2:3,8 | 54:22 56:23,24 | **1990**  84:21 | **2012**  3:19 5:7 |
| **0** | 57:7 | **1995**  17:18 | 5:10 17:10,12 |
| **000517**  5:11 | **10:16**  37:24 | **1:20**  1:9 6:20 | 17:16 28:8,14 |
| 73:25 | **10:20**  38:2 | **2** | 29:20 68:15,25 |
| **000539**  3:20 | **10:49**  61:25 | **2**  3:17 5:10 | 70:6 73:17,25 |
| 28:8 | **10:50**  62:5 | 19:25 20:1,1 | 74:6 80:13 |
| **000561**  5:5 | **11**  4:22 56:25 | 35:19 36:4 | 82:4,11,16 |
| 60:10 | 57:7 | 62:4 73:25 | 88:12 89:7 |
| **000568**  4:23 | **11:06**  73:6 | **2/7/2025**  93:5 | **2014**  22:23 |
| 57:1 | **11:16**  73:9 | **20**  3:17 5:19 | 23:7 75:20 |
| **000572**  4:20 | **12**  5:4 28:5 | 34:5 50:5 55:5 | **2015**  76:22 |
| 54:23 | 29:10,11,13 | 66:21 95:15 | **2018**  16:2 24:8 |
| **000654**  4:17 | 60:7,8 68:12 | **20005**  2:9 | 77:2 80:13 |
| 52:15 | 73:14 | **20016**  2:4 | 82:17 88:12 |
| **000700**  4:14 | **120**  34:6 | **2003**  3:22 4:4 | 89:7 |
| 50:8 | **13**  5:7 68:13,14 | 21:14,17 22:8 | **202-371-7000** |
| **000710**  4:11 | 68:23 72:24 | 31:7,12 38:5 | 2:10 |
| 47:5 | 73:13,23 92:22 | 40:20 41:6 | **202-792-7927** |
| **000741**  4:8 | **130**  33:6 34:6 | 64:25 | 2:5 |
| 43:8 | 42:1 | **2006**  4:7 43:8 | **2020**  24:13 |
| **000792**  4:5 | **130/90**  33:1 | 43:13 | 77:10 |
| 40:20 | **14**  2:4 4:7,13 | **2008**  4:10 47:5 | **2021**  76:24 |
| **000798**  3:23 | 5:10,17 43:8 | 47:10,15 48:7 | **2022**  76:23 |
| 31:7 | 43:13 50:8 | **2009**  4:13,16 | **2025**  1:17 6:3 |
| **00946**  1:9 6:20 | 73:22,24 93:3 | 50:8,13,17 | 92:22 93:3 |
| **03**  64:21 65:6 | **140**  42:1 | 52:8,15,19 | **21**  3:22 31:7 |
| **1** | **1440**  2:9 | 79:17 | **21st**  31:12 |
| **1**  3:14 6:13 | **153**  45:21 46:8 | **2010**  4:19 | **22nd**  55:7 |
| 8:15,16,17 | **16**  4:16 5:17 | 54:23 55:5,8 | **23067**  1:16 |
| 61:24 87:23 | 52:15,19 | **2011**  4:22 5:5 | 7:20 |
| | **17**  43:5 | 57:1,14 60:9 | **25**  34:5 |
| | **19**  50:13,17 | 81:12,21 82:10 | **261**  38:8 |
| | 60:6 | | |

[28 - address]

**28** 3:19
**2875** 6:22
**2nd** 74:6

**3**

**3** 3:19 4:22 5:8
28:6,7 57:1
68:16 73:17,19
**30** 3:19 5:7
28:8,14 29:20
68:15,25 73:16
93:16
**31** 3:22 4:4
40:20
**31st** 41:6
**37** 38:13
**3rd** 57:14

**4**

**4** 3:22 4:10
31:5,5,6 47:5,9
47:15 74:10
**40** 4:4 58:3,6
62:23
**401.1** 63:8,11
64:5
**427.81** 63:15,19
**427.81.** 63:8
**43** 4:7
**47** 4:10

**5**

**5** 4:4 40:17,18
40:19

**5'10** 38:7
**50** 4:13
**52** 4:16
**520** 74:3
**522** 5:11 74:1
**54** 4:19
**540** 69:17
**541** 29:7,23
68:20,24
**542** 70:10
**544** 3:20 28:9
**56** 4:22 70:16
**568** 57:5 59:1
**570** 57:17
**571** 4:23 57:2
**573** 55:2
**574** 4:20 54:24

**6**

**6** 4:7 19:14
43:6,7
**60** 5:4
**655** 4:17 52:16
**68** 5:7

**7**

**7** 1:17 3:4,6
4:10,19 6:3
47:2,3,4 54:23
**703** 4:14 50:8
50:11
**711** 47:13
**712** 4:11 47:6
**7151036** 93:5
94:2 95:2

**73** 5:10
**742** 43:11
**744** 4:8 43:9
**76** 5:19
**77** 3:7
**792** 40:23
**794** 4:5 40:20
**799** 31:16

**8**

**8** 3:14 4:13
50:6,7 52:12
**801** 37:12,16
**803** 3:23 31:8

**9**

**9** 4:16 5:5
50:18 52:13,14
54:20 60:9
62:24 63:1,7
63:10,14,18
64:5
**90** 33:6
**9251** 92:19
**9:39** 1:18 6:2

**a**

**a.m.** 1:18 6:2
50:18
**ability** 92:12
**able** 76:16
**abnormal**
41:15,18,19
48:3

**abnormalities**
56:18
**abnormally**
46:9,11
**above** 1:13
30:17 93:6
95:7
**acceptable**
72:18
**accessed** 16:24
**accuracy** 65:6
93:9
**accurate** 20:19
86:19 92:9
**ace** 66:10,12,15
66:19,20,23
67:11,12
**acknowledge...**
95:3
**acknowledg...**
93:12
**action** 7:4 9:8
92:15,18
**active** 69:25
**actually** 13:13
68:22 72:24
**add** 21:2 45:15
46:21
**addition** 75:4
**additional**
56:10
**additions** 95:6
**address** 36:16

**[addressed - asked]**                                                    Page 3

**addressed**
42:24 43:1,4
48:16
**addressing**
45:15
**administer** 7:3
**advance** 76:1
**adverse** 72:20
88:20
**advisory** 88:22
**affect** 66:21
87:6
**affected** 80:21
88:14
**affects** 40:12
**affiliations**
7:10
**afib** 71:13,16
**afternoon**
77:19
**age** 46:9
**agencies** 82:2
**agent** 39:14
54:6,10 78:20
**agents** 76:17
86:22 87:6
**aggressive**
46:12
**ago** 10:17
11:19 23:9
58:25
**agonists** 87:23
**agree** 6:11
58:10 65:16

**ahead** 15:15
26:17,22 54:8
54:14
**al** 6:18,19 93:4
94:1 95:1
**alabama** 1:17
5:4 7:21 21:11
60:8,19
**alan** 2:15 6:24
**alcohol** 30:6
69:5 79:17
80:4
**alcoholic** 53:9
53:11
**allegations**
9:19
**allege** 78:4
**allotted** 93:19
**allow** 34:13
**allscripts** 17:4
17:6,8
**amber** 18:5
**american** 46:2
**analyzes** 89:3
**angina** 44:13
**angio** 82:22
**angiotensin**
58:11 59:12,20
59:21 65:24
66:7 67:1,2,7
82:24 83:2,9
83:15,22 84:5
84:8,15

**answer** 12:2,5
12:10 49:7
60:4 69:12
**answered**
62:10 69:9
**anticoagulant**
71:7
**anytime** 25:9
**apart** 11:10
**apnea** 34:15,17
34:20,23,24,25
35:4,7,12
36:16,20 37:4
70:3,7,16
**apologies** 14:14
20:10 32:8
35:20 43:17
57:11 70:12
76:25
**apologize** 30:13
32:11 44:7
57:8 69:14
74:19
**apparent** 9:5
**appearance** 7:8
**appearances**
7:10
**appearing** 7:25
9:3 11:5
**appears** 81:11
**appended** 95:7
**applicable** 93:8
**appointment**
28:13 29:19

47:16 52:18
57:13 68:25
73:15
**appreciate** 8:1
59:24 65:7
**appropriately**
35:3
**approximately**
80:25 84:20
**arbs** 67:7
**arm** 34:3
**arps** 2:8 7:12
17:25
**arrhythmias**
22:25 56:6
**arteries** 42:11
42:14 43:24
44:19
**artery** 43:16,21
43:23 44:3,10
44:12,16,18,25
45:13 47:20
53:22,23 69:20
70:1
**article** 77:3
**articles** 16:1,4
76:2,5,8,12,21
77:4,9 78:19
78:22
**artifact** 42:9
**asked** 19:2,6
47:23 74:18
79:8

[asking - birth]                                                    Page 4

**asking**  36:22
  65:8 79:12
**aspirin**  45:1,14
**assess**  41:10
**assigned**  28:19
**associated**
  38:10 39:19,24
  42:10 44:17
  70:24
**associates**
  16:21 17:8
  21:11 22:4,19
  25:24 55:25
  74:16
**assume**  10:24
  23:13 49:8
  60:15
**atrial**  33:16
  70:21 71:9
  75:1
**attached**  93:11
**attacks**  44:14
**attend**  12:20
**attorney**  7:11
  11:2 15:14,16
  15:24 92:14,16
  93:13
**attorneys**  2:6
  2:11
**attributable**
  42:8
**audio**  6:10 20:4
  69:7

**authorization**
  5:4 60:9,18,21
  61:1,6 62:23
  64:11 66:9
**authorized**  7:3
**available**  20:22
  20:23 77:4
  93:6
**avandia**  10:18
  11:1,11,14
  28:18
**avenue**  2:9
**avila**  18:11
**avoid**  45:9
**aware**  18:1,2
  24:6,10,12
  25:16 26:5,10
  26:24 39:18
  42:13 76:15
  77:8 86:13
  88:6,7,10

**b**

**b**  3:4 4:1 5:1
  6:17 7:20
**bachelor**  19:13
**back**  13:5,12
  14:21,25 15:5
  17:18 20:7
  25:7 38:1
  51:13 58:16,18
  66:8 68:2 73:8
**background**
  26:14

**baldwin**  75:15
**balloon**  42:24
  43:1
**based**  10:25
  22:8 36:18
  46:9 48:23
  52:6,10 64:9
  64:14 65:2
  70:5 72:13
  79:23 80:2
**basic**  11:20
  33:20
**basis**  64:10
  72:15
**bates**  3:19,22
  4:4,7,10,13,16
  4:19,22 5:5,10
  28:8,20,23
  29:2,6,23 31:7
  31:15 37:12,16
  40:20 43:8,11
  47:5,13 50:8
  52:15 54:23
  55:2 57:1,16
  59:1 60:10
  70:10 73:25
  74:2
**bathroom**
  12:17,19
**bay**  31:24 75:8
**bcbs**  5:4 60:8
**bear**  37:13
**beeping**  26:14

**began**  22:6
  52:25
**beginning**  7:11
  75:24
**begins**  6:13
  62:3
**behalf**  7:15
  60:22
**believe**  11:3
  18:3 49:5
  53:15,19 57:7
  65:20 68:2
  73:23 77:13
  83:21 84:4
  85:10,21
**beneath**  35:19
**benefits**  71:4
**benign**  64:5
**best**  12:1,3 66:3
  85:11,22 91:5
  92:12
**beta**  39:11,13
  39:14,24 56:10
  59:11,18 65:5
  65:14 72:8
**better**  34:13
  58:8 84:14
  88:3
**beyond**  15:23
  85:15
**big**  14:21 48:20
**biopsy**  54:1
**birth**  45:25

**birthday** 26:19
 26:21
**bisoprolol**
 38:21 39:1,11
 39:19 40:14
 56:21 57:21,25
 58:15 64:18
 68:5 71:20,24
 72:8,21
**bit** 32:25 48:19
 51:13 70:13
 72:23
**blindness** 87:25
**blockage** 42:20
 42:22 43:1,3
 44:19
**blockages**
 41:15 42:11,14
 44:13
**blocker** 39:11
 39:13 56:11
 58:12 59:11,12
 59:18,20 65:5
 65:14 66:7
 72:8
**blockers** 39:24
 65:24 67:1,8
 82:23,24 83:3
 83:10,15,22
 84:5,9,16
**blocks** 39:14
**blood** 33:6 34:3
 34:3,7 39:2,7,8
 39:16,20 40:2

40:7,10,12
 41:19,24 42:1
 42:9 45:2,16
 59:7,9,22
 64:17 65:24
 67:1,6 68:3,6,9
 70:24
**blue** 60:19,19
**blunted** 42:1
**bmi** 38:10
**bmj** 77:3
**bodies** 88:22
**body** 34:3 89:3
**bothered** 56:9
**bottom** 28:21
 46:20 52:21
**box** 13:7 64:19
**brady** 71:20
**bradycardia**
 58:21
**brand** 58:10
 81:13,24 82:1
 82:8,12
**break** 12:13,16
 12:20,21 73:11
**breaks** 12:18
**breathe** 35:3
**breathing** 35:2
**brief** 37:25
 62:2 73:7
**bring** 21:3
**brown** 19:14
**buckley** 1:7
 3:14,15,17,17

3:19,22 4:4,7
 4:10,13,16,19
 4:22 5:4,7,8,10
 6:14 7:24 8:17
 8:18,20 9:1
 10:13 17:21
 19:11 20:1,2
 20:11,11 21:10
 28:7,11,16
 31:6,10,17
 33:3 37:8 38:4
 40:19 43:7
 47:4 50:7,12
 52:14,17 54:22
 56:25 60:8,13
 61:25 62:5
 68:14,16 73:16
 73:24 74:4
 89:16,25 91:10
 92:5 93:5 94:2
 94:24 95:2,4
 95:12
**buildup** 43:25
**busy** 8:2 89:18

**c**

**c** 2:1 3:4 7:20
 17:6 92:1,1
**ca** 3:20,23 4:5,8
 4:11,14,17,20
 4:23 5:5,11
 28:8 31:7
 40:20 43:8
 47:5 50:8

52:15 54:23
 57:1 60:10
 73:25
**cad** 63:13
**caffeine** 69:6
**call** 12:14
 50:12 55:8,9
 56:13
**called** 28:19
 41:1 78:16
 81:14
**calls** 55:3
**camden** 1:2
**camera** 6:6
**cancer** 27:24
 78:13 86:14,21
 87:6,16 89:9
**candidate**
 67:10
**capable** 82:18
**capacity** 22:1
**carcinogen**
 79:3
**carcinogens**
 78:4 88:14
**carcinoma** 24:7
**cardiologist**
 22:1 74:15
**cardiology**
 16:21 17:7
 19:17,20,22
 21:10,20 22:4
 22:19 25:24
 55:24 74:16

**[cardiology - concern]**                                   Page 6

75:18
**cardiovascular**
  27:24
**care**  9:13 22:11
  31:12,23 32:1
  39:17 42:6,12
  44:8 53:14,18
  60:1 65:11,19
  66:1 67:19,24
  75:18 76:12
  80:7 82:7
  85:15
**case**  1:8 6:17
  6:19,20,22
  10:1,18,18,22
  10:25 11:6,8
  11:11,14 12:8
  26:2 80:20
**castrillon**  2:14
**catch**  29:14
**catheterizatio...**
  42:17,19
**cause**  44:13
  56:18 86:14
**caused**  66:20
  78:4,13
**causes**  34:24
  87:25
**causing**  35:1
  58:21 86:21
  87:6,16 89:9
**cc'd**  52:22
**ccr**  1:14 92:3

**central**  1:18 6:2
  37:24 61:25
  62:5 73:9 90:2
  90:4
**certain**  29:1
  80:18 89:1
**certainly**  65:2
  68:4 76:14
  84:15
**certified**  92:21
  92:22
**certify**  91:3,5
  92:4,8,13
**change**  13:21
  56:15 60:4
  78:3 82:6 94:4
  94:7,10,13,16
  94:19
**changes**  45:17
  57:20 93:10
  95:6
**chart**  16:24
  17:18 24:11,16
  25:7 42:18
  59:2
**checkbook**
  61:14
**checked**  47:23
  47:25
**chest**  22:14
  32:21 42:16
**chief**  19:16
**chocolate**  61:18
  61:19

**choice**  65:21
  66:3,6 67:15
**cholesterol**
  43:25 45:1,4,6
  45:16,19 47:25
  48:11,14 69:23
**christopher**
  52:18
**circulation**
  34:4,7
**circumstances**
  66:5
**cirrhosis**  53:13
**clarification**
  20:5 32:9
  34:18 44:5
  51:3,6 59:25
  68:18 73:1
**clarifies**  88:25
**clarify**  29:18
  73:10,14
**clarity**  61:8
**class**  67:7
  82:21 83:2
**clear**  83:14
**clinic**  57:12
  58:17 69:18
**code**  63:10,15
  63:19 64:5
**codes**  62:24,24
  63:1,2,7
**collected**  27:2
**collectively**  8:8

**combined**
  40:14
**come**  42:15
  57:24 69:13
**comes**  13:7
  85:9
**commencem...**
  92:4
**commencing**
  1:18
**committees**
  21:5
**common**  42:3
**company**  6:19
  7:14 8:5 62:13
  86:2
**compensated**
  10:7,10
**complete**  20:19
  86:4 95:8
**completed**
  60:25 93:16
**complication**
  44:15,20
**complications**
  44:10,11 53:21
**component**
  33:10
**comport**  81:15
**computer**
  37:18
**concern**  48:18
  48:20,22 49:12
  49:18,21 72:19

**[concerned - court]**

**concerned**
48:15
**concierge** 2:16
**concluded** 90:3
**concludes**
61:20,23 89:24
**condition** 46:2
**conditions**
19:23 24:4
53:16 63:2
65:22
**conducted** 6:5
6:23 52:8
**confirm** 13:23
**connection** 6:7
8:12 32:21
49:13,14,16
**consider** 44:24
46:8 76:11
78:24
**considered**
33:6
**considering**
36:5,12 48:10
48:13
**consult** 19:7
**consultant** 10:8
**consulting**
15:23
**contact** 23:5
25:3
**contain** 86:13
**contained** 87:5
88:13 89:8

**contains** 86:21
**contamination**
16:3
**context** 53:14
53:18 63:4
76:12
**continue** 6:10
56:20 69:4
**continued** 4:1
5:1 22:24
**continuous**
72:16
**continuously**
21:16
**contribute** 36:7
37:1,4 56:19
**controlled**
68:10
**conversations**
18:17
**converting**
67:2
**copies** 16:13
93:14
**copy** 52:23
**coronary** 43:16
43:17,20,21,23
44:3,10,12,16
44:17,19,24
45:13 46:12
47:20 53:22,23
69:20 70:1
**correct** 9:9,10
10:8,11 21:11

21:14 22:1
26:3,4,9 28:4
28:15,22 29:12
29:20 30:10
31:20,21 32:22
33:2,4,12
34:10,11,15
36:14,16,17
37:5 38:5,8,9
38:25 39:9,10
41:6,20 43:13
43:14,18,19
45:7,9,10
47:10,11,16,17
47:20,21,24
48:1,5,6,8,9,11
50:13,22,23
51:11 52:5,19
52:20,24 53:9
53:10 54:3,8,9
54:12,18 55:5
55:6,12,14
57:14,15,18,21
57:22 58:1,4
58:13 59:10,15
59:16 60:20,23
60:24 61:4
63:6,8 64:21
66:13 69:1,6
69:10,13,21,22
70:3,4,8,18,19
71:4,5,16,20,21
72:1,6,12 74:6
74:12,13,16,17

75:18,19,20,21
76:2,3,4,13
77:7,10 78:13
78:14 79:19,21
79:22 80:4,5
81:1,2 82:23
83:3,4,16
84:12 91:5
95:8
**corrections**
95:6
**correctly** 71:3
**cough** 66:10,12
66:15,19,20,22
67:12
**coumadin** 71:3
71:6,7,10
**counsel** 6:15
7:9 15:15
37:13,14 57:6
92:14,16 93:14
**country** 46:3
**county** 75:15
**couple** 23:9
42:15 73:3
79:6
**course** 26:7
44:6 57:9
68:19
**court** 1:1 6:21
7:1,18 11:13
11:15,24 12:3
20:5 32:9
34:18 44:5

[court - different]                                              Page 8

| | | | |
|---|---|---|---|
| 51:3,6 68:18 | **date**  21:3 86:7 | **declare**  95:4 | 15:12,23 16:8 |
| 70:13 73:1 | 92:11 94:24 | **declines**  71:2 | 18:4,18,25 |
| 92:21,22 | 95:12 | **decongestants** | 19:9 20:18 |
| **coverage**  60:18 | **dated**  3:19,22 | 70:17 | 23:23 25:19 |
| 63:5 | 4:4,7,10,13,19 | **decreased**  35:1 | 28:17 61:24 |
| **cpap**  36:6,13 | 4:22 5:4,7,10 | **decreases** | 62:4 75:24 |
| 36:15,23 37:3 | 28:8 31:7 | 39:15,16 40:11 | 76:1 91:4 |
| 37:9 | 40:19 43:7 | 40:12 | **describe**  19:22 |
| **crcr**  1:14 92:3 | 47:4 50:7 | **deemed**  95:6 | 38:14 41:23 |
| **created**  17:15 | 54:23 57:1 | **defect**  33:17 | **description**  4:2 |
| 50:13 | 60:9 68:15 | **defendant**  6:15 | 5:2 41:1 |
| **crestor**  46:13 | 73:25 76:22 | 7:13 | **desire**  45:15 |
| 46:21,25 | 92:22 | **defendants** | **detail**  16:12 |
| **cross**  60:19 | **day**  43:16 | 2:11 10:4,8 | **details**  35:10 |
| **cs**  93:15 | 89:21 95:15 | 80:20 | **determine** |
| **cuff**  38:12 | **days**  23:9 93:16 | **defibrillators** | 88:23 89:4 |
| **current**  20:18 | **dc**  2:4,9 | 56:6 | **develop**  30:21 |
| **currently**  13:6 | **deal**  12:14 | **define**  27:12 | 66:22 |
| **curriculum** | **dealing**  33:18 | 45:24 | **developing** |
| 3:17 20:1 | **death**  77:10 | **degree**  19:15 | 49:19 |
| **customary**  9:25 | **deceased**  7:16 | **degrees**  19:12 | **development** |
| **cv**  1:9 6:20 | **december**  4:19 | **delivers**  34:7 | 44:12,13 |
| 20:15,16,18 | 54:23 55:5,7 | **depends**  6:6 | **diabetes**  27:24 |
| 21:3 | **decide**  42:23 | 45:23 46:4,5 | **diagnosed**  24:7 |
| | 46:21 84:2 | **deponent**  93:13 | 70:6 |
| **d** | 87:22 | 95:3 | **diagnoses**  63:2 |
| **d**  3:1 | **decided**  49:2 | **deposed**  10:13 | **diagnosis**  62:24 |
| **daily**  58:7,8 | 80:21 83:19 | 10:19 11:10,18 | **diana**  2:14 |
| 72:18 | 87:7 | 19:2 23:24 | **difference** |
| **danger**  12:17 | **deciding**  59:5 | **deposing**  93:13 | 33:22 |
| **daniel**  2:3 7:15 | 86:23 | **deposition**  1:5 | **different**  17:11 |
| 77:22 93:1 | **decision**  65:16 | 3:15 6:4,14,23 | 28:24 39:8 |
| **data**  88:3 89:4 | 65:18 85:6 | 8:18 9:1 11:16 | 59:14 63:2 |
| | 88:14 | 11:17,20 12:23 | 67:6 76:17 |

**[different - drugs]**                                                      Page 9

84:15 87:17,20
88:21
**differently**
59:17 60:3
**digits**  29:2
**diovan**  58:3,10
59:10,17,20
60:2 61:2
62:14,23 64:11
65:12,17,20
66:2 67:15,20
67:25 68:4
76:16 81:14,18
81:21 82:4,10
82:13,21 83:1
83:16
**direct**  29:1
**directive**  55:16
**directly**  44:18
**disagree**  63:20
64:6
**discuss**  18:21
19:3 23:23
24:1,3 50:21
**discussed**  18:25
25:11,14 49:2
54:1
**discussing**  19:5
71:4 73:12
**discussion**  20:6
50:1
**disease**  27:23
43:17,17,20,21
43:23 44:3,10

44:12,16,18,25
45:13 46:12
47:20 53:22,23
64:20 69:21
70:1
**dispute**  31:13
79:19
**district**  1:1,1
6:21,21
**diuretic**  40:5
40:11
**dnigh**  2:5 93:2
**docs**  18:22
**doctor**  13:6,12
14:6,7,10,21
18:24 31:23
32:12,12 33:14
48:5,17 56:5
65:8 69:9
74:11 77:19,20
78:8,15 79:5
79:16,23 80:2
80:6 82:3,16
84:17 85:10,21
86:12 87:12
88:6,11,24
89:6
**doctors**  75:8
**document**  1:6
8:20,22,24
13:7,10,11,14
13:18 14:5,10
14:11,16,20
20:12,20,23

25:23 28:12,21
29:6,9,17 31:4
31:16 32:20
34:9 35:22
37:12 38:4,20
40:25 41:4,17
45:20 53:8
54:14 57:17
60:12 64:9,14
66:8,9 68:21
70:1 73:15,19
74:4 75:23
**documenting**
63:23 74:5
**documents**
28:18,24 31:10
46:19 73:3
76:19 79:14
**dogs**  12:18,20
**doing**  14:24
54:1
**dose**  72:4
**dr**  3:15 7:24
8:18,20 9:1
10:13 17:21
19:1,4,8,11
20:11,11 21:10
24:18 28:11,16
31:10,17,20,22
32:1,17 33:3
34:21 35:8
36:6,13 37:8,9
38:4 43:12
47:15 50:12

52:17,18 53:1
53:5,6,25
54:14 55:19,21
56:8,12 57:13
57:24 58:14
59:5 60:13,25
61:2,24 62:4
62:12 63:22
64:20 65:16
73:16 74:4,12
74:14,20,23,25
75:4,4,5,6,9,13
75:17 79:17
89:16
**drank**  79:17
**drinking**  27:19
80:3
**drop**  40:2
**dropout**  20:4
69:7
**dropping**  63:22
**drops**  39:15
**drug**  5:4 60:8
60:18 62:17,18
67:5,5 85:11
85:12,21 86:2
86:3,12,15,20
86:21,24 87:2
87:4,7,13,14,17
88:19,19 89:5
**drugs**  82:18,22
83:1,5 84:22
84:24 85:3,5
85:23 88:8,21

[drugs - expert]                                                    Page 10

| | | | |
|---|---|---|---|
| 89:1 | electrophysio... | enzymes  48:4 | examinations |
| **duly**  7:21 92:5 | 55:22 | 48:15,25 49:6 | 3:3 |
| **duplicate**  5:8 | electrophysio... | 49:10,13,17 | **example**  87:23 |
| 68:15 | 22:25 | 50:2 51:1 52:9 | **excessive**  58:21 |
| **duration**  64:20 | **elevated**  48:4 | **ep**  75:8 | **exchange**  10:4 |
| **duty**  85:11,22 | 48:14,15,25 | **equally**  83:23 | 59:7 |
| **e** | 49:6,10,12,14 | 84:6 | **excuse**  12:25 |
| **e**  2:1,1 3:1,4 4:1 | 50:2,21 51:1,7 | **equals**  39:7 | **exercise**  41:11 |
| 5:1 7:20 92:1,1 | 52:9 | **errata**  93:11,13 | 41:15,25 |
| 94:3,3,3 | **elevation**  34:24 | 93:16 | **exhibit**  5:8 8:16 |
| **earlier**  25:21 | 48:19 49:17 | **esq**  2:3,8 93:1 | 8:17 13:2 20:1 |
| 29:14 75:16 | **ellen**  1:14 7:1 | **essential**  64:5 | 20:1,8,23 21:9 |
| **ecg**  41:18 | 92:3,20 | **established** | 28:6,7 31:5,6 |
| **echocardiogr...** | **email**  16:15 | 22:15,17 | 40:18,19 43:6 |
| 34:9,12 | **employee**  92:14 | **estate**  18:7 | 43:7 47:3,4 |
| **effect**  65:14 | 92:16 | 25:17 26:5 | 50:6,7 52:13 |
| **effective**  83:23 | **employment** | **et**  6:18,19 93:4 | 52:14 54:21,22 |
| 84:6,11 | 27:18 | 94:1 95:1 | 56:24,25 57:7 |
| **effects**  39:19,23 | **encounter** | **etiologies**  53:13 | 60:7,8 68:13 |
| 87:20 88:20 | 25:23 | **evaluate**  34:10 | 68:14,16,23 |
| **efficiently** | **encourage**  36:6 | 34:13 42:20,22 | 73:13,17,19,23 |
| 11:21 | 37:1,2 | **evaluating**  35:9 | 73:24 |
| **ehr**  17:8 | **ended**  22:22 | **evaluation**  37:3 | **exhibits**  3:11 |
| **either**  10:11 | 23:7 | 38:5 47:19,20 | **expect**  86:1,3,7 |
| 33:16 35:3 | **ends**  28:23 64:2 | 74:5 | 86:9,15 |
| 42:16 75:6 | **entered**  31:11 | **eventually** | **experience** |
| **electro**  56:2 | 73:17 | 75:17 | 30:25 32:21 |
| **electrolyte** | **entitled**  1:13 | **evidence**  41:14 | 85:2 |
| 56:18 | 62:20 | **exactly**  24:17 | **experienced** |
| **electronic** | **entry**  50:15,17 | **examination** | 71:23 |
| 16:25 | 55:7 | 1:5 3:6,7 7:23 | **expert**  9:22 |
| **electrophysio...** | **enzyme**  48:19 | 32:24 77:18 | 10:11 59:19 |
| 56:4 74:22 | 67:2 | 92:5 | 78:25 |

**[expertise - generally]**                                                    Page 11

| | | | |
|---|---|---|---|
| **expertise** 84:13 | **family** 23:6 | **find** 12:15 | 85:18 86:5,10 |
| **explain** 28:16 | 25:4 26:20 | **finding** 33:15 | 86:17,25 87:8 |
| 33:13,25 | 27:8,22,23 | **fine** 8:10 12:6 | 87:18 88:9,17 |
| **explaining** | 30:14,20,21 | 14:1,13,16,18 | 89:12 |
| 62:13 | **fast** 44:7 89:23 | 15:15 16:15 | **former** 30:3 |
| **explanation** | **fasted** 52:4 | 29:4 64:8 | 69:6 |
| 65:10 | **fasting** 51:25 | **finish** 12:1 | **forth** 92:11 |
| **extremely** | **fatty** 53:12 | **finished** 12:5 | **forties** 46:1 |
| 89:17 | **fda** 82:1,9 | 77:1 | **found** 32:25 |

| **f** | 84:24 86:18 | **firm** 17:25 | 87:12 |

| | 87:1,9,14,22 | 18:11 | **four** 9:6 |
|---|---|---|---|
| **f** 92:1 | 88:3,4,7,18 | **first** 20:21 | **friday** 1:17 |
| **fact** 9:22 10:1 | **february** 1:17 | 24:21 32:4 | **function** 51:2,7 |
| 11:5 18:19 | 5:5 6:3 60:9 | 42:22 76:8 | 51:21 52:8 |
| 23:24 30:19 | 92:22 93:3 | **five** 3:17 20:2 | **further** 51:13 |
| 64:11 75:25 | **fee** 9:25 | **flip** 75:12 | 92:8,13 |
| 78:8 | **feel** 14:25 | **flom** 2:8 | **future** 68:9 |
| **factor** 44:2 | **fellowship** | **flop** 75:12 | |

| 53:16 | 19:17 | **flp** 51:11,24 | **g** |

| | | | |
|---|---|---|---|
| **factors** 28:3 | **fibrillation** | **follow** 43:16 | **garlock** 51:10 |
| **facts** 78:9 | 70:21 71:9 | 50:21 69:18 | 51:15 |
| **fails** 93:18 | 75:2 | **following** 6:17 | **gaston** 1:7 6:18 |
| **failure** 49:20 | **field** 19:20 | 22:14 | 7:16 8:12 |
| 49:23 | 21:20 | **follows** 7:22 | 16:21 17:15 |
| **fair** 19:19 | **fifties** 46:1 | **foregoing** 91:4 | 21:23 77:23 |
| 28:12 46:6,6 | **fighting** 37:14 | 92:8 95:5 | 79:9,16 |
| 54:13 60:17,25 | **figure** 46:6 | **forgetting** 83:7 | **general** 34:20 |
| 67:9,14 72:13 | 82:2 | **form** 5:4 60:9 | 41:14,24 59:20 |
| 84:18 87:3 | **filed** 6:20 8:12 | 60:18,21 61:1 | 60:17 80:7 |
| **fairhope** 1:17 | **filled** 61:5 | 61:6 62:12,17 | 81:22 82:17 |
| 7:21 31:24 | **filling** 61:8 | 67:18 79:25 | 85:25 87:19 |
| **familiar** 28:17 | 62:17 | 80:15 81:17 | 88:3 |
| 78:15 | **financially** 7:5 | 82:14 83:24 | **generally** 35:17 |
| | 92:17 | 84:7 85:7,14 | 41:4 44:7 53:5 |

[generic - higher]                                              Page 12

**generic**  81:24
  82:1,8
**generous**  89:17
**gi**  48:4,17,21
  49:3,3 50:3
**give**  16:16
  35:24 72:3
  81:23,23 85:11
  85:22
**given**  11:18
  80:18 86:19
  89:24 95:9
**giving**  8:1
  89:19
**glitching**  37:21
**glp**  87:23
**go**  6:11 11:20
  11:21 12:20
  13:20 14:25
  15:1,5,15 20:7
  25:7 26:17,22
  30:14 37:17
  41:25 50:10,16
  51:11,12,13
  54:8,14 58:16
  63:21 68:9
  70:14 74:2
  82:11 89:20
**godino**  1:14 7:1
  92:3,20
**goes**  14:10
  64:15
**goetter**  35:8
  36:6,13 37:9

**going**  6:2 8:7
  8:15 11:20
  19:25 23:24
  28:5,25 29:22
  31:5 33:20
  37:11 38:20
  40:17,23 43:5
  43:10 47:2,7
  50:5,10 52:12
  54:20 55:1
  56:2,23 57:4
  60:6 61:14,21
  64:16 68:5
  70:13 71:18
  72:24 73:21
  76:20 77:12
  83:19 84:2
  85:15
**goldenberg**  2:3
**good**  6:1 7:24
  12:15 20:21
  21:1,6 46:4
  66:6 67:10
  68:22 77:19,19
**graduate**  19:12
**great**  12:7 15:8
  29:5 31:19
  32:15 33:5
  37:6 39:11
  40:23 52:6
  66:19 69:11
**grobertsjr**  3:20
  3:23 4:5,8,11
  4:14,17,20,23

  5:5,11 28:8
  31:7 40:20
  43:8 47:5 50:8
  52:15 54:23
  57:1 60:10
  73:25
**guess**  62:11
**guys**  61:19

**h**

**h**  3:4 4:1 5:1
  7:20 94:3
**halfway**  40:25
  70:10
**handles**  56:5
**handling**  13:14
**handwriting**
  58:9
**happening**
  69:12
**happy**  26:21
**hard**  85:8
  87:19 88:21
**hcc**  24:7
**hctz**  38:21 39:1
  40:4,15 55:9
  56:14,16,17
  57:21,25
**health**  16:25
**healthcare**  8:6
**hear**  69:8 89:1
**heard**  6:8 15:12
  20:8 78:20

**hearing**  26:14
  26:16
**heart**  19:23
  27:23 33:18
  39:16 40:2
  41:15,16 42:11
  42:14,17,19
  43:1 44:13
  59:4,6,8 63:22
  64:1,2,16 65:3
  65:14 71:22
**heartbeat**
  72:10
**height**  38:8
**heighten**  53:20
**held**  1:15 20:6
**help**  11:21
  48:21 65:9
  82:2,4,5 87:10
  87:22 88:23
**helpful**  12:3
**hepatocellular**
  24:7
**hereinbefore**
  92:11
**hereto**  95:7
**high**  33:6 34:3
  40:7,10 45:19
  46:9,10,11
  48:11 54:16
  65:24 69:23
  70:24
**higher**  35:13,16

**[highlighted - introduce]**    Page 13

| | | | |
|---|---|---|---|
| **highlighted** 30:11 32:19 | 34:14,23 35:4 35:13,17 36:7 | **identified** 63:8 **identifying** 63:3 | **informed** 88:12 **informing** 56:15 |
| **hipaa** 23:20 | 37:2,4 38:17 | **ii** 58:11 | **informs** 28:2 |
| **history** 27:8,13 27:14,16,22,23 29:24 30:2,5,9 30:11,15,20 51:1,4,7 66:15 67:12 69:4,5 70:16 79:7,9 79:13 | 39:4,5,6,7,8 42:4 44:2,21 53:22,24 59:13 64:6,12,24 65:13 66:4 67:11,16,21 68:1 69:21 70:2 71:11,13 | **important** 89:19 **impression** 34:8 53:7 **include** 45:5 **included** 27:17 27:22 **increase** 30:21 30:24 | **inhibitor** 66:23 67:3,11 **inhibitors** 66:20 **initials** 55:14 **insurance** 61:2 62:13 63:4,5 **intended** 42:20 72:10 |
| **honestly** 62:9 63:17 | 71:14,16 80:25 81:4,9 82:18 | **increased** 38:17 49:22 | **intending** 36:11 |
| **hope** 88:25 **hoping** 65:9 **hourly** 9:25 **house** 75:14 | 83:11 84:9,11 84:16 **hypertensive** 33:1 **hypoxia** 35:1 | **indicated** 46:17 52:9 54:15 65:4 **indicates** 30:8 | **interacted** 25:10 **interested** 7:5 54:2 92:17 **interestingly** 10:17 |
| **hpi** 58:22 | | 41:4 50:20 | **internal** 19:16 |
| **huahai** 7:13 8:4 | **i** | **indicative** 41:16 | **internet** 6:7 |
| **huh** 30:4,7 69:19 | **icd** 62:24 63:1 63:7,10,14,18 | **individual** 42:3 **infer** 51:22 | **interpret** 62:16 66:16 |
| **human** 2:14 78:4 79:3 87:5 87:16 88:13 89:9 | 64:5 **idea** 56:17 **ideas** 19:6 **identification** | **inferred** 59:3 **inform** 55:10 **information** 24:15 27:21 28:1 62:20 | **interrupt** 13:1 **interrupted** 62:9 **interrupting** 32:12 |
| **humans** 86:14 **hundred** 26:20 **hx** 50:20,25 **hyperlipidemia** 69:21,23 70:2 **hypertension** 30:10,20,22 31:1 33:16,23 33:23 34:2,4 | 8:19 20:3 28:10 31:9 40:21 43:9 47:6 50:9 52:16 54:25 57:3 60:11 68:17 74:1 | 66:10 80:18 84:24 85:4,9 85:12,23 86:1 86:4,19,21,22 87:4 89:10 | **introduce** 8:15 19:25 28:5 31:5 40:17 43:5 47:2 50:5 |

52:12 54:20
56:23 60:6
68:12
**introduced**
72:25
**introducing**
20:8 73:22
**involved** 18:15
65:18
**irbesartan** 1:4
6:16
**irregular** 56:5
70:23
**ischemia** 41:15
**issue** 13:24
14:3 23:1
33:18 35:22
39:8 48:24
63:22 88:7
**issues** 16:1 63:4
87:10
**ives** 52:19 53:1
53:5,6,25
54:14 79:17

**j**

**j** 1:7,14 91:1
92:3,20
**james** 55:19
**jan** 1:7 7:15
23:14 77:23
**january** 3:19
4:22 5:7 28:8
28:14 29:20

57:1,14 68:15
68:25 73:16
**jas** 55:10,18
**jason** 2:16
13:13 14:20
29:9 36:1
**jersey** 1:1 6:21
**job** 89:18
**jr** 1:7
**july** 3:22 4:4
5:10 31:7,12
38:5 40:20
41:6 64:21,25
65:6 73:25
74:6

**k**

**k** 3:4 7:20
**kathryn** 18:10
**keep** 64:1 87:2
**kidneys** 59:22
**kind** 19:6 33:19
87:3
**knew** 24:17
80:12 87:4
**know** 8:1 11:8
12:15,21 17:7
23:20 24:17,24
25:6 26:14
27:2,19 37:8
38:10 42:25
46:24 49:7
52:25 58:5,14
61:17,19 63:4

63:10,14 65:1
68:21 69:11
78:10 80:3,10
80:12 82:7,8
86:16,23 89:18
**knowledge**
78:21 91:6
**known** 8:5
19:20 82:22
**kolb** 31:20,22
32:1,17 34:21
43:12 47:15
**kugler** 6:18

**l**

**l** 3:4,4 7:20,20
17:6,6
**labs** 49:9
**large** 14:8
**law** 17:25
**lawsuit** 8:12
25:14,18
**lawyer** 12:24
15:13,17 18:15
65:9
**lay** 41:23
**layperson**
33:14
**ldl** 45:21,22,24
45:25 46:3,8
46:14,16
**lead** 53:13
**learned** 24:21

**leave** 41:22
**led** 71:24
**left** 13:8 14:11
73:3
**legal** 2:15 6:25
93:23
**letter** 31:19
32:2,4,24
43:12 45:8
47:18,22 48:2
**letting** 61:17
82:9
**level** 19:12
48:14
**levels** 35:1
49:15 54:16
**lfps** 54:7
**lfts** 50:21 51:11
**liability** 1:5
6:16 10:25
**lifestyle** 45:3
**light** 65:21 66:4
**likelihood**
30:21,24
**line** 5:16 32:4
94:4,7,10,13,16
94:19
**lines** 9:6
**lipid** 47:23 48:3
51:25 54:6,10
**lipids** 52:2
**lipitor** 46:13
**list** 69:4

[listed - mechanism]                                              Page 15

| | | | |
|---|---|---|---|
| **listed**  38:20 | 68:2 70:9 | **made**  95:5 | 47:6 50:9 |
| 62:24 79:6 | 72:25 76:21 | **main**  1:16 7:20 | 52:16 54:24 |
| **lists**  70:1 | **looked**  16:1,5 | 13:12 40:3 | 57:2 60:10 |
| **literature**  16:3 | 25:21 76:2,5,9 | 80:10 | 68:16 74:1 |
| **litigation**  1:5 | 78:19 81:11 | **maintained** | **market**  87:11 |
| 6:17 9:16 | **looking**  28:24 | 16:21 | 88:5,8,20 89:5 |
| 18:15 28:18,19 | 29:16,17 45:23 | **make**  29:3 | **maternal**  30:9 |
| **little**  14:2 16:14 | 50:15 62:11 | 33:17 36:10 | **matter**  1:13 |
| 51:12 64:2 | 66:8 68:24 | 48:16 80:22 | 6:15 82:17 |
| 70:13 72:23 | 69:3,16 76:19 | 82:15 87:1 | **md**  3:15,17 |
| **liver**  48:4,15,19 | **looks**  20:21 | **makes**  46:3 | 8:18 20:2 |
| 48:25 49:6,10 | 21:1,5 38:20 | **making**  9:19 | **mdl**  6:22 |
| 49:13,14,17,19 | **losartan**  1:4 | 85:6 | **meagher**  2:8 |
| 49:23 50:2 | 6:16 83:6 93:4 | **malpractice** | **mean**  21:4 32:6 |
| 51:1,1,7,21 | 94:1 95:1 | 15:14,24 | 32:15 34:17 |
| 52:7,9 53:12 | **loss**  87:24 | **manage**  45:16 | 37:2 41:21,21 |
| 54:1,16 | **lost**  35:20 56:3 | 56:11 | 46:5 47:25 |
| **llp**  2:3,8 | **lot**  65:23 87:20 | **management** | 52:22 56:14 |
| **located**  1:16 | 88:21 89:2 | 45:1,2,5 | 57:23 62:15 |
| **locations**  1:15 | **low**  40:2 45:25 | **manufactured** | 64:23 66:14 |
| **lodge**  79:25 | 71:22 72:4 | 80:20 81:14 | 78:14 89:1 |
| **log**  50:12 55:3 | **lowering**  54:6 | **manufacturer** | **meaning**  65:6 |
| **logical**  65:21 | 54:10 67:1 | 85:11,22 86:12 | 78:9 79:21 |
| **long**  14:24 17:7 | **lungs**  34:7 | 86:15,20 87:4 | **means**  22:18 |
| 54:6 82:9 | | 87:14 | 33:14 50:25 |
| 84:18 | **m** | **manufacturers** | 54:11 |
| **look**  20:24 25:7 | **m.d.**  1:7 3:4 | 78:2 85:5 89:7 | **meant**  59:3 |
| 28:11 29:1,5 | 6:14 7:20 | **manufacturing** | 79:24 |
| 29:22 36:4 | 89:25 91:10 | 78:3 86:2 | **measurement** |
| 37:11 40:23 | 92:5 93:5 94:2 | **march**  24:13 | 42:10 |
| 41:3,14 43:10 | 94:24 95:2,4 | **marital**  27:19 | **measurements** |
| 46:19 47:12 | 95:12 | **marked**  8:19 | 38:11 |
| 57:4,16 58:22 | **machine**  36:15 | 20:3 28:9 31:8 | **mechanism** |
| 62:19 66:10 | 37:3 | 40:21 43:9 | 59:23 |

[media - notice]                                                          Page 16

media   6:13
  61:23 62:3
  89:25
medical   3:19
  3:22 4:4,7,10
  4:13,16,19,22
  5:7,10 9:12
  16:20 19:14,16
  24:4 26:1,2,6
  28:7,25 30:25
  31:6 33:21
  40:19 43:7
  44:23 47:4
  50:7,24 52:14
  54:22 56:25
  63:2,3,5 68:14
  73:24 79:10
medication
  38:19,23 39:4
  46:18 57:20
  71:25 72:14
  81:5,9
medications
  45:6,9 84:18
medicinal   45:5
medicine   19:20
  39:2 45:12,16
  45:17 59:6,7
  81:5
medicines
  39:21 45:17
  59:14 87:21
medium   87:14

member   25:3
memberships
  21:4
mentioned
  24:18,19
mercury   34:5
message   51:10
metroprolol
  72:3,7,9,21
mild   46:11
milligram
  62:23
milligrams
  58:3,6
millimeters
  34:5
mind   68:22
  82:8
minette   31:24
minutes   61:15
mispronounce
  38:21
missed   33:5
mobile   21:11
  75:8,13
modification
  45:3
moment   35:25
  37:18
money   10:3
monitored   54:7
  54:17
morning   6:1
  7:24 77:20,21

mute   26:13

**n**

n   2:1 3:1 16:3
nagging   66:22
name   6:24 8:3
  10:21 17:3
  58:11 77:22
  81:13,24 82:1
  82:8,12
named   21:22
names   16:14
nash   53:9,15,20
native   63:25
ndma   78:16,25
necessary   95:6
need   12:13,19
  12:20 13:17,20
  15:5 37:18
  61:19 88:2
  89:3
needed   42:23
  54:17 62:14
  72:15
needs   61:14
  64:2
neither   92:13
  92:15
never   68:22
new   1:1 2:9
  6:21 27:10
nigh   2:3,3 3:7
  7:15,15 12:8
  13:24 14:1,7

14:13,15,19
  15:3 18:7 37:7
  67:18 77:13,18
  77:22 84:7
  85:17 89:14
  93:1
nighgoldenbe...
  2:5 93:2
nina   2:8 7:12
  8:3 14:15
nina.rose   2:10
nitrosodimet...
  16:3
non   33:21
  50:24 53:9,11
nonparty   9:7
normal   45:22
  45:24 46:3,5
north   31:24
notary   95:13
  95:19
note   6:4 47:14
  55:13 57:12
  58:2,17,17
  59:3 64:15
  70:17 72:13
  74:10 93:10
noted   95:7
notes   1:12
  22:13 49:9
  57:19
notice   3:14
  8:17,25 25:19

[noticed - page]                                                    Page 17

noticed  50:2
noticing  7:11
notified  24:20
novak  2:16
  14:23 29:11,15
  35:21,24 37:13
  37:17,21 57:6
  57:9
novartis  81:14
november  4:7
  4:10 43:8,13
  47:5,9,15
number  4:2 5:2
  6:13,19,22
  28:20,23,24
  29:2,7,23
  31:16 37:12,16
  43:11 47:13
  55:2 57:17
  59:1 61:24
  62:4 70:10
  74:2 87:25
  89:25
numberdescri...
  3:13
nurses  24:20
  51:16 76:15
  81:23 82:7
nw  2:4,9
ny  93:15

o

o'clock  50:18

oath  7:4
obese  38:14
obesity  38:16
object  12:9
  80:15 81:17
  82:14 84:7
  85:7,14,17
  86:5,10,17,25
  87:8,18 88:9
  88:17 89:12
objection  37:7
  67:18 79:24,25
  83:24
objections  7:6
  85:18
obstructed
  35:3
obstructive
  70:2,7
obtained  24:15
occasions  79:18
office  18:3
  20:17 26:10,24
  31:11 50:13
offices  75:9
oh  12:24 14:13
  14:18 26:21
  30:13 32:8
  33:5 34:22
  35:23 44:6
  57:8,10 58:8
  68:21,22 73:2
okay  8:9 11:17
  11:18,22 12:5

12:7,11,12,16
12:19 13:8,23
14:19 15:2,8
16:10,18 17:14
19:7 20:7,9,14
21:7 23:13,18
23:22 25:9
26:18 27:21
29:5,17 30:2
31:3,19 32:15
33:20,25 34:8
35:23 36:3,10
36:15,25 37:6
40:22 41:3,22
47:7 50:4
51:15 52:6
54:19 55:16
57:12 63:10,14
66:19 68:11
69:3,11,15,16
74:24 76:11,19
78:1,18,24
79:2,5,23 80:6
80:10,17,24
81:11,20 82:10
82:16 83:14,18
83:18 84:10,17
84:20,22 85:10
87:3 88:11
89:14
old  70:16
olmesartan
  83:6

once  11:19
ones  40:3
opinion  81:8
opinions  78:12
option  14:5
oral  1:5
order  41:12
ordered  62:18
outcome  7:5
  11:8
overstated
  48:20 49:18
own  32:16
oxygen  35:1

p

p  2:1,1 3:4 7:20
  17:6
p2  33:10 34:10
pacemaker
  63:25 64:1
pacemakers
  56:6
paf  70:17,20
page  3:3,13 4:2
  5:2,16 20:21
  29:1,6 31:17
  37:11,14 40:23
  47:12 50:11
  57:5 68:20,24
  69:16 70:9,11
  74:3,4,5,8 94:4
  94:7,10,13,16
  94:19

**pages**  3:17 20:2
  20:25
**paid**  9:25
**pain**  22:15
  42:16
**pains**  32:21
**paller**  2:15 6:25
**palpitations**
  56:9,12,19
  63:16
**palps**  55:9
**paper**  17:13,14
  17:19
**paragraph**
  32:23 46:20
  71:19 72:3
**paroxysmal**
  70:21
**part**  12:9 18:11
  55:9 56:14
  66:25 80:25
  84:23
**participants**
  6:7
**particular**  28:3
  39:22 65:22
  66:4 74:20
  78:21
**particulars**
  18:20
**parties**  6:11
  92:15
**party**  7:4 9:16
  10:11

**passed**  24:12
  24:22,23,25
  25:4,6,10
**past**  22:19 53:6
**patent**  82:4,11
**paternal**  30:9
**pathway**  66:25
**patient**  21:22
  23:2,18,19
  25:23 27:11
  28:2 36:16
  38:4 41:9 52:4
  59:4 62:18
  65:14 69:18
  71:12 75:1
  81:3 87:7
**patient's**  11:1
  27:8,16 28:2
**patients**  48:20
  49:11 53:4
  65:23 66:21
  71:8,10 84:16
  84:23,25 85:4
  86:24 87:17
  88:1,16
**pause**  61:10,16
  68:21
**pay**  61:2
**people**  19:2
**perceived**
  49:14
**perfect**  17:20
  29:17

**performed**  41:5
**permission**
  26:6
**persistent**  48:3
  49:5
**person**  41:23
**perused**  78:23
**pfizer**  11:3
**pharmaceutical**
  6:19 7:13 8:4
**pharmaceutic...**
  8:6
**pharmacies**
  82:9
**pharmacy**
  87:11
**phone**  55:3
**physician**  8:2
  32:1 88:22
**physicians**  9:9
**pills**  78:5 80:13
  80:19 86:13,22
  87:5,15,16
  88:13 89:8
**place**  6:11 22:3
  37:25 62:2
  73:7 92:11
**plaintiff**  10:22
  12:8
**plaintiffs**  2:6
  10:4,8
**plan**  74:8
**plaque**  43:24
  43:25

**please**  6:4 7:7
  55:8 56:13
  80:9 85:17
**point**  12:15
  46:6 48:7 66:2
  71:15,17 74:10
  76:17
**points**  12:17
**policy**  81:23
**portion**  32:19
**possesses**  86:20
**possible**  11:21
**possibly**  53:23
**potential**  44:9
  44:15,20 65:13
  87:15
**potentially**
  87:5
**practice**  19:19
  22:15,18,24
  23:9,12 25:2
  27:7 51:17
  55:4 75:10
  89:19
**practicing**
  19:18 21:13,16
**prefaced**  59:25
**preference**
  81:25
**prepare**  15:22
**prepared**  26:7
**preference**
  81:25
**prescribe**  45:12
  46:16 80:22
  86:24 87:7,21

[prescribe - rare]                                                    Page 19

88:15
**prescribed**
61:3 72:14
81:21
**prescribing**
81:12 84:17,22
84:25 85:3,13
85:24 86:3
87:13,15
**prescription**
60:18 85:6
**prescriptions**
56:16
**presence** 43:24
**present** 2:13
15:16 42:23
78:5
**pressure** 33:7
39:2,7,9,16,21
40:3,7,10,13
41:19,24 42:1
42:10 45:2,16
59:7,9,22
64:17 65:25
67:2,6 68:3,6
68:10 70:25
**pressures** 34:3
34:3,25
**pretty** 16:17
46:12
**previous** 12:5
58:17
**previously**
71:23 79:8,12

81:20
**primary** 31:23
32:1 53:2
**princeton** 8:6,8
**print** 16:4
**printed** 28:20
**prior** 5:4 17:11
17:15 19:8
60:9,21 61:1,5
62:22 64:10
66:9 76:6,22
79:25 92:4
**probable** 78:4
79:3 88:13
89:9
**probably** 28:25
38:12 54:7
**problem** 12:21
37:20 41:16
49:19 68:19
81:25
**problems** 30:25
69:25
**proceeding** 7:7
**proceedings**
1:13 90:3
**process** 12:10
34:25 78:3
**produced**
20:17 26:11,24
27:5 28:18
31:10
**product** 6:16
10:25

**products** 1:4
**professional**
33:21 50:24
92:21
**profile** 47:23
48:3 51:25
**program** 37:14
37:19
**prominent**
33:10 34:10
**pronouncing**
71:3
**providers** 9:12
**public** 95:19
**published**
77:10
**pull** 88:4 89:4
**pulled** 88:8
**pulmonary**
33:16,23 34:4
34:13,22,25
35:13 39:4,8
**pulmonologists**
35:9
**purposes** 63:3
80:11
**pursuant** 9:3
**put** 13:12 14:21
38:16 65:17
83:17 87:17
**putting** 68:5
**puzzling** 14:2

| **q** |
| --- |

**quality** 6:5,6
**question** 12:1,4
12:11 13:15
15:10 26:23
33:11,21 46:7
60:1 62:8,11
65:8 67:23
79:11 80:1
83:25 85:19,20
**questions** 12:9
77:13,14 79:6
80:7 89:15
**quick** 20:24
22:12
**quite** 53:24
**quote** 32:25

| **r** |
| --- |

**r** 2:1,8 3:4 7:20
17:6 91:1 92:1
94:3,3
**racing** 72:10
**raised** 48:24
**ralph** 1:6 3:15
3:17 6:14 8:18
9:1 20:2 61:24
62:4 89:25
91:10 92:5
93:5 94:2,24
95:2,4,12
**range** 46:1
**rare** 79:18

| | | | |
|---|---|---|---|
| **raso**   2:3 | **rebecca**   51:10 | **rechecked** | 13:18 29:24 |
| **rate**   39:16 40:2 | 51:15 | 46:22 | **recording**   6:6 |
| 59:6,8 63:22 | **recall**   21:22 | **recognize** | 6:10 13:3,14 |
| 64:16 65:14 | 22:6,10,21 | 20:12 | 13:22 14:5 |
| 71:23 | 24:21 39:3 | **recollection** | **records**   3:19,22 |
| **rates**   65:3 | 42:17 45:18 | 36:19 48:23 | 16:23 17:14,19 |
| **rather**   32:16 | 47:1 49:4 53:2 | 81:16 82:5 | 19:8 22:8 26:7 |
| 34:6 | 53:4 58:19 | **recommend** | 26:11,25 27:2 |
| **rbk**   1:9 | 74:18 76:14 | 49:3 56:7 | 28:7,25 31:6 |
| **read**   16:11 23:3 | 79:8,12 81:18 | **recommending** | 60:15 65:2 |
| 70:13 76:4,21 | 81:20,22 85:8 | 46:13 57:24 | 68:3,9 70:9 |
| 91:3 93:9 95:5 | **receipt**   93:17 | 58:15 | 79:9,10 80:2 |
| **reading**   33:7 | **received**   8:19 | **record**   4:4,7,10 | **recurrent**   72:5 |
| 58:9 65:5 | 15:15 19:13 | 4:13,16,19,22 | **reduce**   46:14 |
| **real**   89:23 | 20:2 25:19 | 5:7,10 6:2,12 | 46:16 71:8 |
| **realize**   13:1 | 28:9 31:8 | 7:10 13:4,19 | **reduces**   59:22 |
| **really**   11:20 | 40:21 43:9 | 13:21 15:5,25 | **reevaluated** |
| 19:5 21:5 | 47:6 50:9 | 16:20,20,25 | 36:22 37:9 |
| 36:21 46:3 | 52:16,22 54:24 | 20:6 26:1,2 | **reevaluation** |
| 88:2 | 57:2 60:10 | 28:12 29:18 | 36:5,12 |
| **realtime**   92:22 | 68:16 74:1 | 35:7 37:23 | **refer**   8:7 55:19 |
| **reason**   31:13 | **receiving**   10:3 | 38:2 40:19 | 74:24 75:3 |
| 37:22 46:15 | 26:20 82:12 | 43:7 47:4,9 | **reference**   55:18 |
| 49:5 53:19 | **recently**   23:22 | 50:7 52:14,17 | 66:9 71:22 |
| 63:20 64:6 | 25:2 65:3,3 | 52:21,23 53:25 | **referenced**   93:6 |
| 67:14 69:17,20 | **receptor**   58:12 | 54:4,22 56:25 | **references** |
| 75:3 79:18 | 59:12,20 65:24 | 57:20 61:21 | 16:16,17 73:18 |
| 83:19,21 84:2 | 66:7 67:1,7 | 62:1,6 68:14 | **referred**   32:5 |
| 84:4 93:11 | 82:22,24 83:2 | 68:24 70:5,14 | 32:17 53:3,3,6 |
| 94:6,9,12,15,18 | 83:10,15,22 | 73:5,9,11,14,15 | 73:13 75:6 |
| 94:21 | 84:5,8,15 | 73:24 89:23 | **referring**   16:20 |
| **reasonable** | **receptors**   39:15 | 90:2 | 23:14 29:1 |
| 67:15 68:7 | **recess**   37:25 | **recorded**   1:4 | 34:21 53:4 |
| | 62:2 73:7 | 6:9,14 13:15 | 59:10 73:12 |

**[referring - roberts]**                                              Page 21

| | | | |
|---|---|---|---|
| 74:11,11 | **remembered** | **residency** | 20:11,22 28:3 |
| **refresh**  36:18 | 76:10 | 19:16,16 | 28:4,21 29:16 |
| 36:19 82:5 | **remotely**  6:24 | **resident**  19:15 | 33:9 38:22 |
| **regarding** | **remove**  42:20 | **resources**  2:14 | 50:16 51:9 |
| 17:15 18:15 | **renin**  59:21 | **response**  20:17 | 52:11 57:10,19 |
| 25:18 47:15 | **repeat**  67:23 | 41:10,16,19 | 58:5,24 59:13 |
| **registered** | 69:15 85:20 | 42:2 52:7,10 | 61:21,22 63:1 |
| 92:21 | **rephrase**  46:7 | 68:3 72:20 | 64:19 73:2 |
| **regular**  23:18 | **reported**  79:16 | **rest**  30:12 | 74:7 78:10 |
| **regularly**  72:22 | **reporter**  7:1,19 | 89:20 | 80:8 82:13 |
| **related**  6:17 7:4 | 11:25 12:3 | **restart**  37:18 | **risk**  28:3 35:13 |
| 30:25 34:23 | 70:13 92:21,21 | **result**  33:17 | 35:16 38:17 |
| 35:4 44:18 | 92:22 | 35:14 42:3 | 44:2 49:22 |
| 53:21 | **reports**  87:24 | **results**  51:20 | 53:16,20 71:8 |
| **relates**  1:6 | 88:20 | **retained**  90:1 | **risks**  39:18,20 |
| **relating**  26:11 | **represent**  8:4 | **retention**  82:22 | 39:23 71:4 |
| 26:25 | 20:16 63:18 | **return**  93:13,16 | **robert**  6:17 |
| **relative**  92:14 | 64:4 77:22 | **review**  17:14 | **robert's**  9:12 |
| 92:16 | **represented** | 22:13 24:11,16 | **roberts**  1:7,7 |
| **relayed**  89:10 | 12:23 15:12 | 26:6 27:4 | 6:18 7:16,16 |
| **relevant**  21:5 | **representing** | 60:15 65:2 | 8:12 9:8 16:21 |
| 28:1 | 6:25 11:3 18:7 | 93:7 | 17:15 18:7,12 |
| **rely**  82:1 84:23 | 18:11 25:17 | **reviewed**  16:19 | 19:3,8 21:23 |
| 85:4 87:9,22 | **represents**  12:8 | 17:17 26:3 | 21:25 22:7,22 |
| 88:22 89:3 | 43:25 63:13,15 | 49:9 | 23:6,14,16,23 |
| **remained**  48:11 | **request**  26:6 | **reviewing** | 24:3,6,12,22 |
| **remember** | 60:18 61:6 | 42:18 59:2 | 25:1,4,10,10,11 |
| 10:21 24:20 | 62:23 64:11 | **rhythm**  70:18 | 25:16,17,17 |
| 26:23 35:10 | **requests**  5:14 | 70:23 | 26:2,5,12,25 |
| 36:23 37:10 | **require**  81:4,8 | **rhythms**  56:6 | 28:13 29:19 |
| 46:20 49:1,24 | **required**  95:13 | **ridge**  2:4 | 30:3,8,19 |
| 49:25 62:9 | **research**  76:1 | **right**  7:18 | 31:11,20 32:1 |
| 63:12,13,17 | **reserve**  77:12 | 10:24 13:3 | 32:5,16,20,25 |
| 75:10 76:7,18 | | 14:8,9 15:18 | 33:10 35:7,12 |

**[roberts - see]**                                                      Page 22

| | | | |
|---|---|---|---|
| 36:12,19 37:8 | **robichaux** 19:1 | 87:8,18 88:9 | 51:10 52:21 |
| 38:5,7,16,23 | 19:4,8 24:18 | 88:17 89:12,16 | 54:4 57:20 |
| 39:3,18 41:5 | 74:12,14,20,25 | **routine** 69:18 | 58:2,22 63:9 |
| 41:13,18 42:7 | 75:4,6,9,13,17 | **rpr** 1:14 92:3 | 64:15 66:12 |
| 42:13,25 43:13 | **room** 15:17,20 | **rsb** 55:13 | 69:17 71:2 |
| 43:15 44:9,24 | **rose** 2:8 3:6 | **rules** 23:20 | 72:3 |
| 45:8,13,19 | 7:12,12,23 8:3 | **running** 59:5 | **scan** 16:12,15 |
| 46:9,17,24 | 8:15 13:9,17 | **runs** 34:5 | **scanned** 17:18 |
| 47:10,16,19,23 | 13:23 14:14,18 | | **schedule** 18:4 |
| 48:2,7,24 49:5 | 15:2,4,8,9 | **s** | **scheduler** 18:3 |
| 49:21 51:20 | 19:25 20:7 | **s** 1:6 2:1 3:15 | **science** 19:13 |
| 52:8,18,25 | 21:8 28:5 29:9 | 3:17 4:1 5:1 | **screen** 6:8 13:2 |
| 53:8,15,19,20 | 29:13,22 30:14 | 6:14 8:18 9:1 | 13:5,12 14:8 |
| 53:21 54:1,2 | 30:17 31:4,15 | 17:6,6 20:2 | 14:11,21 35:20 |
| 54:15,16 55:4 | 32:11 35:23 | 62:4 91:10 | 40:24 |
| 56:8,16,20 | 36:1,2 37:11 | 92:5 93:5 94:2 | **script** 55:10 |
| 57:13,24 60:2 | 37:16,20 38:3 | 94:3,24 95:2,4 | **second** 58:25 |
| 60:3,22 61:1 | 40:17,22 43:5 | 95:12 | 61:11 68:22 |
| 62:14 64:12,24 | 43:10 44:6 | **s2** 33:10,11 | **section** 30:17 |
| 65:12,17,20,21 | 47:2,12 50:5 | **safe** 54:7 | 34:8 38:19 |
| 66:2,3,15 | 50:10,16 52:12 | **safety** 84:24 | 41:1 53:7 |
| 67:10,16,20,21 | 54:20 55:1 | 85:4,12,22 | 62:19 |
| 67:25 68:1,25 | 56:23 57:4,8 | **sak** 1:9 | **see** 8:20 11:24 |
| 69:5 70:6,15 | 57:10,16 58:25 | **saw** 22:18,23 | 23:1,10 25:7 |
| 71:15,23 72:14 | 60:6 61:12,16 | 22:24 23:3,8 | 26:13 28:21 |
| 72:20 73:16 | 61:22 62:7,19 | 23:11,23 25:1 | 29:12 30:12 |
| 74:5,12,24 | 68:12,19 70:12 | 32:20 43:15 | 31:17 33:1,3 |
| 75:17 76:13 | 73:2,10,20 | 47:19 49:9 | 33:15 36:8 |
| 77:5,10,23,23 | 74:2 75:22 | 76:5 | 41:1 43:3 48:4 |
| 78:13 79:9,16 | 77:12 79:12,24 | **saying** 46:4 | 48:17 49:3 |
| 80:3,8,24 81:3 | 80:15 81:17 | 59:4 60:1 | 50:3 55:11 |
| 81:8 82:19 | 82:14 83:24 | 62:22 76:15 | 56:8 68:3,9 |
| 83:9,11,16,20 | 85:7,14 86:5 | **says** 32:4 36:22 | 76:21 |
| 84:3 89:11 | 86:10,17,25 | 38:7 45:8 48:2 | |

[seeing - start]                                                        Page 23

| | | | |
|---|---|---|---|
| **seeing** 52:25 | **share** 13:2 | 35:4,7,12 | 35:21,24 37:15 |
| 55:10 | 14:10 20:23 | 36:16,20 37:3 | 37:19 44:7,23 |
| **seemed** 68:6 | **shared** 13:5 | 70:2,7,16 | 51:4 69:8,10 |
| **seems** 63:12 | 14:5 | **sleeping** 35:2 | 71:19 74:11 |
| **seen** 6:8 8:22 | **sharing** 13:2 | **slightly** 46:10 | 79:11,24 |
| 14:3 20:20 | **sheet** 93:11 | 67:6 | **sort** 19:6 23:8 |
| 23:11 25:5,8 | **shield** 60:19 | **slit** 33:11 | 23:10 81:8 |
| 42:9 56:12 | **short** 43:21 | **slow** 59:5,8 | 82:1 88:21 |
| 60:12 69:18 | **shortly** 88:7 | 64:17 70:14 | 89:3 |
| **self** 32:5 | **showing** 79:13 | **slowed** 59:6 | **sounds** 14:2 |
| **seller** 86:15 | **sic** 6:18 36:5 | **slower** 64:3 | **speaker** 69:13 |
| **sellers** 78:2 | 56:24 63:7 | 65:3 | **speaking** 85:18 |
| 85:5 87:5 89:8 | 82:22 | **small** 13:6 | **specialist** 2:15 |
| **selling** 86:3 | **sick** 63:19,24 | 14:11 87:25 | **specialty** 74:21 |
| **sells** 61:18 | 64:12,24 | **smaller** 14:17 | **specific** 39:23 |
| **send** 76:20 | **side** 13:8 14:12 | **smoker** 30:3 | **specifically** |
| **sending** 51:20 | 39:18,23 87:20 | 69:6 | 22:12 31:12 |
| **sense** 29:3 | **sides** 30:20 | **smoking** 27:18 | 39:21 45:18 |
| 80:22 82:15 | **sign** 13:5,5,21 | **smoothly** 11:21 | 49:8 81:19 |
| **sent** 20:21 | 93:12 | **social** 27:8,12 | **spent** 9:25 |
| 93:14 | **signature** 92:19 | 27:14,15,16 | **spoken** 17:22 |
| **sentence** 36:11 | **signed** 55:13 | 29:24 30:2,11 | 17:24 18:3,6 |
| 54:11 71:2,18 | 93:19 | 69:4 79:7,9,13 | 18:10,14 |
| **separate** 34:4 | **similar** 10:18 | **solco** 8:6,8 | **square** 2:4 |
| **septal** 33:16 | 74:22 | **sold** 80:20 | **staff** 56:15 |
| **september** 4:16 | **sinus** 63:19,24 | **solely** 81:14 | **stamp** 28:20 |
| 52:15,19 | 64:12,24 70:18 | **solutions** 93:23 | **stand** 51:24 |
| **set** 92:11 | **skadden** 2:8 | **son** 26:21 | **standard** 16:17 |
| **setting** 13:21 | 7:12 17:25 | **son's** 26:19 | 27:10 39:20 |
| 33:19 | **skadden.com** | **soon** 11:22 22:8 | 44:11 82:6 |
| **several** 10:17 | 2:10 | 24:23,24 55:10 | **stands** 63:11 |
| 11:19 82:17 | **slate** 2:8 | **sorry** 12:24 | **start** 12:4 |
| 83:1 | **sleep** 34:15,17 | 13:1 17:5 | 20:10 36:3 |
| | 34:19,23,24,25 | 29:13 33:4,5 | 46:23 47:7 |

54:6,8,15 58:3
59:12 62:8
73:21
**started** 22:9
46:25 48:8
75:9,13,14
**starting** 48:5
48:10,13 55:4
**state** 7:7,9
32:24 34:9,12
41:17
**stated** 45:9
47:22 49:25
**statement**
36:21 51:23
**states** 1:1 6:21
9:7 30:2,5 33:9
35:19 36:5
53:8,25 54:5
55:8 64:19
70:15
**statin** 46:13,16
48:5,8,18
49:22 54:11,15
**statins** 49:12
49:15,18 50:22
**status** 27:18,19
27:19
**stay** 14:6
**steatohepatitis**
53:9,11
**stenographer**
20:5 32:9
34:18 44:5

**street** 51:3,6 68:18
73:1
**stenographic**
1:12
**stenographic...**
92:10
**stent** 42:24
43:1,4
**stop** 35:2 57:20
68:5 73:2,4
**stopped** 80:3
**stopping** 12:15
58:15
**storey** 55:19,21
56:8,12 57:13
57:24 58:14
59:5 60:25
61:2 62:12
63:8,22 74:23
75:4,5,12
**storey's** 64:20
65:16
**street** 1:16 7:20
**stress** 41:5,8,18
42:16
**stroke** 31:1
44:15,20 71:8
**structural**
33:18
**study** 19:23
23:4
**submitted**
60:22

**subpoena** 3:14
8:17,25 9:4
20:18
**subpoint** 35:19
36:4
**subscribed**
95:14
**subspecialty**
21:19
**substances**
86:13 87:16
88:13 89:9
**successfully**
67:21 68:1
**sudden** 35:22
**sued** 78:1
**suffered** 64:24
**suggest** 31:11
**sure** 11:23
12:22 14:23
15:4 17:6
24:24 33:17
36:10 48:16
53:24 61:12
67:24 83:7
84:1 87:1
**surprised**
23:10
**suspect** 42:7
**swear** 7:19
**switch** 65:4
76:16
**switched** 75:14

**sworn** 7:21
92:5 95:14
**sympathetic**
39:15 40:12
**syndrome**
63:19,24 64:13
64:25
**system** 16:24
17:1,3,9,11
59:21
**systemic** 34:2

**t**

**t** 4:1 5:1 17:6
91:1 92:1,1
94:3,3
**tab** 8:15 19:25
28:5 29:10,11
29:13 31:5
40:17 43:5
47:2 50:5
52:12 54:20
56:23 57:7
60:6 68:12
72:24 73:14,22
**tachycardia**
72:11
**tachycardias**
72:5,15
**take** 6:11 12:13
12:14,16,21
13:11 14:20,25
20:24 21:8
27:7,16 29:5

**[take - treadmill]**                                                      Page 25

| | | | |
|---|---|---|---|
| 31:4 46:17 | 49:19 88:2 | **think**  7:17 8:23 | 84:18 88:11 |
| 55:8 56:13,16 | **test**  41:5,8,9,19 | 11:2 13:9,17 | 89:7,17,20 |
| 59:6,11 73:4 | 51:21 52:1,1 | 14:1,13,15,16 | 90:2,4 92:10 |
| 75:22 82:7 | **testified**  7:21 | 17:10 19:1 | 93:18 |
| 83:20 84:3 | 11:13 75:16 | 22:23 23:1,3,3 | **timeframe**  93:8 |
| 88:18 89:22 | **testify**  9:12 | 24:23,24 25:5 | **timeline**  88:10 |
| **taken**  1:14 6:15 | 92:6 | 35:8,20 43:2,3 | **times**  42:15 |
| 71:24 92:10 | **testifying**  9:7 | 45:14,14 46:23 | 85:8 |
| **takes**  37:25 | 10:1 11:15 | 54:6 57:6 59:1 | **tips**  11:20 |
| 62:2 73:7 | **testimony**  9:4 | 62:15,16,20 | **title**  8:24 |
| 87:11 | 10:5 89:24 | 63:16 65:5 | **today**  7:25 8:7 |
| **talk**  61:14 78:9 | 91:4 92:9 93:9 | 66:6,24 72:17 | 9:3,11 10:5 |
| 80:6,17 | 93:17 95:8 | 76:23 77:2 | 12:24 15:13 |
| **talked**  11:4 | **testing**  42:17 | 89:20 | 17:21 18:6,8 |
| 49:11 66:24 | **tests**  51:8 52:8 | **thinking**  58:20 | 18:12 25:21 |
| 75:25 | **texts**  26:20 | 88:1 | 28:25 78:8 |
| **talker**  44:7 | **thank**  7:24 15:2 | **third**  32:23 | 80:11 81:12 |
| **talking**  80:11 | 15:3 16:18 | **thirties**  46:1 | 89:17 |
| **talks**  77:15 | 17:20 21:7 | **thought**  32:11 | **today's**  15:23 |
| **tangent**  15:1 | 29:23 36:1 | **three**  29:2 | 18:18 89:24 |
| **tartrate**  72:4,9 | 57:9 58:8 | **till**  82:11 | **together**  49:3 |
| **technical**  2:16 | 61:16 65:10 | **time**  1:18 6:2 | **told**  88:18 |
| **technology** | 89:15,17,19,21 | 7:7,9 8:1 9:25 | **tone**  39:15 |
| 6:24 | **thanks**  11:17 | 10:19 12:7,7 | 40:12 |
| **tell**  13:10 16:11 | 69:3 77:17 | 12:13 14:6,24 | **took**  22:3 72:21 |
| 19:11 23:21 | **therapy**  48:5 | 15:6 32:2 | 75:17 |
| 50:25 78:21 | 48:19 54:11,15 | 36:20,23 37:24 | **top**  56:10 |
| 88:3,4 | 56:10 | 38:24 45:12 | **total**  89:25 |
| **tells**  87:2 | **thing**  14:23 | 46:16,21,23 | **transcript**  1:12 |
| **telmisartan** | 20:8 | 49:4 50:3 | 91:4 92:9 93:6 |
| 83:6 | **things**  19:6 | 55:23 61:25,25 | 93:19 95:5,8 |
| **ten**  80:25 | 27:20,25 44:14 | 62:5,5 73:9 | **treadmill**  41:5 |
| **terms**  16:2 | 48:12 89:1 | 75:5,11 76:7 | 41:8,10,18 |
| 45:24 46:13 | | 77:13 81:7,13 | |

**treat** 40:9
44:24 45:6,12
64:17 65:21,23
67:11,15 68:6
72:10 81:9
83:11
**treated** 21:25
35:11 36:20
67:21 68:1
80:24 81:7
83:15
**treating** 9:8
21:22 22:6
26:7 27:9 77:5
81:4 82:18
84:11
**treatment** 9:13
19:4,23 22:3
22:21 23:6
26:11,25 28:2
39:17 40:6
42:6,12 44:8
53:15 60:1
62:20 63:5
65:11,19 66:1
66:3,10 67:19
67:24 76:13
80:8 83:8
85:16
**treatments**
44:23 45:5
**treats** 65:13
**tried** 89:13

**true** 78:11 91:5
92:9 95:8
**truth** 92:6,6,7
**truthful** 86:9
**try** 26:23 70:14
87:17
**trying** 43:2
46:6 74:18
**turn** 31:15 55:1
68:20 77:15
**two** 48:12 90:1
**typed** 55:17
**typically** 81:4

**u**

**u** 3:4 7:20 91:1
**uh** 30:4,7 69:19
**unclear** 53:12
**under** 34:8
38:19 57:20
69:4,17,25
74:8
**undergraduate**
19:12
**understand**
8:11 9:11,15
9:18,21 32:10
36:11 55:18
57:23 64:23
65:10 66:14
67:20 77:24
78:6 79:2,11
80:14

**understanding**
9:2,24 10:2
31:25 35:6
45:11 51:19
52:7 54:13
60:2 62:12
64:10 65:12
67:25
**understood**
67:9 82:3
**uniform** 63:1
**unit** 6:13
**united** 1:1 6:20
**units** 90:1
**university**
19:14,15,17
**update** 68:8
**updated** 27:11
**use** 17:11 25:11
30:6 37:9
49:15,17 50:22
67:10 69:5,6
72:4,14,16,18
81:4
**used** 36:15 40:6
43:20 49:22
54:10 63:3
66:7 67:5 71:8
71:10,12,14
83:11 84:9,15
87:24 90:1
93:19
**uses** 11:1

**using** 6:24 17:8
37:3 49:12
87:2
**usually** 27:21
34:5 42:5 44:1
45:2 46:12
48:21

**v**

**valsartan** 1:4
6:16 16:1
18:15 24:1
25:12,18 58:11
78:2 80:13,19
80:22 81:13,19
82:21 83:1,10
83:16,20,23
84:3,6,11 88:8
88:12,15 89:8
93:4 94:1 95:1
**various** 1:15
**vaughn** 2:3
**verify** 93:9
**veritext** 6:25
7:2 90:1 93:14
93:23
**veritext.com**
93:15
**versus** 6:18
**vicinage** 1:2
**video** 1:4 2:15
3:15 6:10,14
8:18,25 13:3
13:16,18 89:23

| | | | |
|---|---|---|---|
| **videoconfere...** 1:15 | **wanted** 32:13 46:23 48:16 56:12 64:17 65:4 73:14 | 55:24 59:14,17 60:3 83:12 | 56:17 62:15 64:14,22 73:2 73:4 81:22 85:20,25 89:13 |
| **videographer** 6:1 7:1,18 12:25 13:13,20 14:4,9 15:7 37:23 38:1 61:20,23 62:3 73:5,8 89:22 | **wants** 45:9 | **workable** 14:22 | **year** 45:23 70:16 |
| | **warned** 89:6 | **worked** 55:23 74:15 75:7 | **years** 10:17 11:19 80:25 84:20 |
| | **washington** 2:4 2:9 | **working** 22:4 75:13,15 | |
| | **way** 62:16 66:16 | **works** 59:21 | **yesterday** 15:25 24:11,16 26:3 59:3 60:14 70:17 76:1,6,6 78:19 78:23 |
| **videotaped** 61:24 62:4 | **ways** 59:14 | **worried** 64:16 | |
| **view** 44:9 | **weight** 38:8 87:24 | **worries** 29:15 | |
| **virginia** 19:15 19:18 | **weird** 29:11 | **worry** 87:21 | |
| **virtual** 6:24 | **went** 15:4,25 41:25 82:4 | **write** 43:15 82:7 | **yesterday's** 22:13 |
| **virtually** 6:5 | **wife** 1:7 7:16 18:22 23:9,16 24:19 61:13 77:23 | **written** 31:19 32:2 64:20,22 77:5 | **york** 2:9 |
| **visit** 25:2 29:25 47:10 48:24 69:17,20 | | | |
| | | **wrote** 22:13 32:20 43:12 47:14,18 49:8 50:20 | **z** |
| **vitae** 3:17 20:1 | | | **zhejian** 8:4 |
| **volume** 40:11 | **withdrawn** 5:7 68:15 | **x** | **zhejiang** 6:18 7:13 |
| **vp** 2:14 | | **x** 1:10 3:1 4:1 5:1 | **zhp** 8:5,7,8,13 |
| **w** | **witness** 1:16 6:8 7:19 9:3,22 9:22 10:1,11 11:6 32:10 51:4,12 58:16 59:19 61:10,13 61:18 77:17 78:9 93:8,10 93:12,18 | **y** | **zoom** 1:15 13:21 |
| **wait** 88:2,4 | | **y** 3:4 7:20 | |
| **walk** 41:10 | | **yeah** 10:20 14:4 16:9 21:1 22:20 23:2,8 27:10 34:16 35:8 38:15 42:15 43:3 45:20 49:24 51:14 55:17 | |
| **walked** 61:13 | | | |
| **want** 13:4,9,10 13:15 29:5,18 33:17 36:10 41:4 46:17 48:4 68:12,21 79:5 86:23 87:1 | | | |
| | **word** 56:3 58:5 | | |
| | **work** 18:22,24 21:10 40:9 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.