# **EXHIBIT 13**

Page 1

1              UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3           CASE NUMBER:  119-MD-02875 (RMB)(SAK)

4             MDL NO. 2875 - CAMDEN VICINAGE

5

6     IN RE:

7     VALSARTAN, LOSARTAN, and

8     IRBESARTAN PRODUCTS LIABILITY

9     LITIGATION

10    --------------------------------------------------

11

12         DEPOSITION OF CHRISTOPHER M. MELE, M.D.

13                THURSDAY, MAY 8, 2025

14

15              Deposition of CHRISTOPHER M. MELE,

16    M.D. in the above-mentioned matter before Jomanna

17    DeRosa, a Certified Court Reporter (License No.

18    30XI00188500), and Notary Public of the State of New

19    Jersey, taken via Zoom on Thursday, May 8, 2025,

20    commencing at 9:10 a.m. Eastern Standard Time.

21

22

23

24

25

Page 2

1    A P P E A R A N C E S (via Zoom)
2
3    KIRKLAND & ELLIS
4    BY: JOHN NOLAN, ESQ.
5    601 Lexington Avenue, Floor 50
6    New York, New York 10022
7    (212)341-7591
8    jack.nolan@kirkland.com
9
10
11   KIRKLAND & ELLIS LLP
12   BY: AUDREY ASPEGREN, ESQ.
13   1301 Pennsylvania Avenue Northwest
14   Washington, DC 20004
15   (646)444-9164
16   audrey.aspegren@kirkland.com
17
18
19   NIGH GOLDENBERG RASO & VAUGHN
20   BY: BRETT VAUGHN, ESQ.
21   12022 Blue Valley Parkway, Suite 1020
22   Overland Park, Kansas 66213
23   (913)800-8518
24   Bvaughn@nighgoldenberg.com
25

Page 3

1    A P P E A R A N C E S (CONT'D)
2
3    NIGH GOLDENBERG RASO & VAUGHN
4    BY: KATHRYN AVILA, ESQ.
5        STEPHANIE IKEN, LAW CLERK
6    14 Ridge Square Northwest, 3rd Floor
7    Washington, DC 20016
8    (771)210-5557 (KA)
9    (202)978-1188 (SI)
10   kavila@nighgoldenberg.com
11   siken@nighgoldenberg.com
12
13
14   ALSO PRESENT: HOWARD BRODSKY, VIDEOGRAPHER
15       KEITH SHULMAN
16
17
18
19
20
21
22
23
24
25

Page 4

1
2            I N D E X
3
4    WITNESS:
5    TYPE OF    EXAMINATION BY        PAGE
6    EXAMINATION
7    Direct    Mr. Nolan        8
8    Cross    Mr. Vaughn        290
9    Redirect    Mr. Nolan        292
10
11
12          E X H I B I T S
13
14   EXHIBIT    DESCRIPTION        PAGE
15   Mele-1    Prior Testimony History    13
16   Mele-2    Deposition Notice    72
17   Mele-3    Copy of the Invoice    76
18   Mele-4    Report        105
19   Mele-5    CV        117
20   Mele-6    Image of the Hepatic Sections    123
21   of the Liver
22   Mele-7    Report        134
23   Mele-8    Liver Images    140
24   Mele-9    Report of the CT scan From    153
25   April 19th

Page 5

1    Mele-10    Subcentimeter Foci in    186
2    Segments 6 and 7 in the 301
3    Series
4    Mele-A    Segment 7        197
5    Mele-B    Screenshot of Image 27    203
6    Mele-C    Screenshot of Image 18    206
7    Mele-11    401 Series Scan From April of    209
8    2016
9    Mele-D    Image 35, Series 401    211
10   Mele-E    Image 17 From Series 401    227
11   Mele-F    Areas of Hypodensity    234
12   Mele-G    Area of Hypodensity    236
13   Mele-12    CT Report From July 17th,    240
14   2018
15   Mele-13    Radiology Report    260
16   Mele-14    Radiology Order    268
17   Mele-15    Image 48        270
18   Mele-16    Tab 42I        271
19   Mele-H    Image Number 35    272
20   Mele-I    Observation in Segment 6    274
21   Mele-J    Image 31        275
22   Mele-K    Image 46        278
23   Mele-17    Exhibit From Dr. Chernyak's    286
24   Report
25   Mele-18    Another Image From    288

2 (Pages 2 - 5)

Page 6

1          Dr. Chernyak's Report
2    Mele-19      Exhibit B From Dr. Chernyak's   289
3          Report
4
5    (ALL EXHIBITS ARE ATTACHED HERETO.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          THE VIDEOGRAPHER:  Good morning.  Here
2    begins the video recorded virtual remote deposition
3    of Dr. Christopher Mele, M.D. appearing from his
4    location in Kinnelon, New Jersey.  This deposition is
5    taken by the defendants In Re Valsartan, Losartan,
6    and Irbesartan Products liability litigation, Case
7    Number 119-MD-02875 (RMB)(SAK) in the United States
8    District Court for the District of New Jersey, Camden
9    vicinage.
10          Today is Thursday, May 8th, 2025, and
11   the time is approximately 9:10 a.m. Eastern Daylight
12   Time.  My name is Howard Brodsky and I'm the legal
13   video specialist in association with Veritext Legal
14   Solutions with offices located in Livingston, New
15   Jersey.  The court reporter is Jomanna DeRosa in
16   association with Veritext.
17          Counsel have stipulated that the court
18   reporter shall enter all appearances for this
19   proceeding into the stenographic court record and
20   further stipulate and agree that the court reporter
21   may take the deponent's oath remotely.  Will the
22   court reporter please swear in the witness.
23
24
25

Page 8

1          CHRISTOPHER M. MELE, M.D., residing at
2    752 West Shore Drive, Kinnelon, New Jersey 07405,
3    having first been duly sworn by the Notary, then
4    testified as follows:
5
6    DIRECT EXAMINATION
7    BY MR. NOLAN:
8          Q.   Good morning, Dr. Mele.  Am I
9    pronouncing it right?
10          A.   That's correct.  And good morning to
11   you, Counselor.
12          Q.   Good morning.  My name is Jack Nolan.  I
13   represent the ZHP defendants.
14          Could you please state your name for the
15   record?
16          A.   Sure.  Christopher Mark Mele.
17          Q.   And you are a medical doctor?
18          A.   I am.
19          Q.   A diagnostic radiologist?
20          A.   Yes.
21          Q.   And for how long have you been a
22   radiologist?
23          A.   I completed my diagnostic radiology
24   residency in 2002, so about 23 years.
25          Q.   And when did you graduate from medical

Page 9

1    school?
2          A.   1997.
3          Q.   As you know, today's deposition is being
4    conducted remotely over Zoom.  Have you used the Zoom
5    or other video conference platforms before?
6          A.   Sure, yes.
7          Q.   So there may be times where, because of
8    the Internet connection or whatever, we sort of lose
9    each other; and so we may have to go off the record
10   to reconnect.  I just want to preview that now.  Is
11   that fair?
12          A.   Understood.
13          Q.   Is there anyone in the room where you're
14   testifying today?
15          A.   No.
16          Q.   Can anyone, other than the online
17   participants in this deposition, hear your testimony
18   today?
19          A.   No, I even have these headphones in.  My
20   wife works from home.  She's on the other side of the
21   house, so.
22          Q.   Okay.  And you're participating in this
23   remote deposition using your computer and headphones?
24          A.   Yes.
25          Q.   Do you have a telephone line available

3 (Pages 6 - 9)

Page 10

1  in the event that, for some reason, the audio doesn't
2  work?
3      A.    Yeah.  I have my cell phone available if
4  we need to change something up.
5      Q.    Okay.  I'll ask that during the
6  deposition you sort of put your cell phone to the
7  side and you don't look at it while we're
8  questioning.  Is that -- is that okay?
9      A.    Absolutely.
10     Q.    All right.  Is there any reason you
11  can't give accurate and truthful testimony today?
12     A.    No.
13     Q.    Okay.  I know you've been deposed
14  before.  So is it safe -- is it safe to assume that
15  you know some of the basic rules?
16     A.    Yes, Counselor.
17     Q.    Okay.  I'm going to go over a few of
18  them; and you're doing a great job so far.  The most
19  important rule is, because the court reporter is
20  taking down everything that we say, you and I can't
21  speak over one another.  So I will do my best to wait
22  for you to finish responding to my question and I'll
23  ask that you wait until I finish my question before
24  you start providing your response.  Does that sound
25  fair?

Page 11

1      A.    Understood.
2      Q.    And another thing is that, because the
3  court reporter is taking down what we say, verbal
4  yes/nos are what we need to do instead of "uh-huh",
5  "uh-uh", or shaking your head or nodding your head.
6  Does that sound fair?
7      A.    Understood.
8      Q.    Another rule is that, you know, I'm not
9  trying to trick you, so if there's something about my
10  question that you don't understand, let me know and
11  I'll try to rephrase, so that way you understand the
12  question.  Does that sound good?
13     A.    Will do.
14     Q.    And if you respond to a question, we're
15  all going to assume that you understood what my
16  question meant.  Does that sound fair?
17     A.    Understood.
18     Q.    Another rule is that we can take a break
19  at any time.  We'll probably take a break every hour,
20  but if you need to use the restroom or anything else,
21  let us know.  We can go off the record.  Okay?
22     A.    Sounds good.
23     Q.    The only exception to that rule is I'll
24  ask -- if I ask -- if there's a question pending,
25  I'll ask that you provide the response before we go

Page 12

1  on the break.  Does that sound fair?
2      A.    Yes.
3      Q.    Okay.  On your computer, do you have,
4  like, your e-mail open or anything like that?
5      A.    No.
6      Q.    No messaging software of any kind open
7  to you?
8      A.    No.
9      Q.    And will you agree to keep your e-mail
10  and any messaging software closed while we're asking
11  questions during the deposition?
12     A.    Absolutely.
13     Q.    Do you have any documents open in front
14  of you or on your computer?
15     A.    Just a copy of the report that I
16  produced in this matter.
17     Q.    Okay.  And that's the March 9th, 2025
18  report?
19     A.    That's correct.  I don't know if you're
20  going to ask me to reference it, so I just want to
21  have some version of it available.
22     Q.    Totally fair.  And do you have a
23  physical copy or an electronic copy?
24     A.    I have it on my computer.  If you prefer
25  that I print it out, I'm happy to print the copy out.

Page 13

1      Q.    Just to cut to the chase, at some point,
2  I am going to introduce it as an exhibit.  And so
3  whichever way you're more comfortable viewing it,
4  that works for me.  But it'll be an exhibit and the
5  trial tech will put it up on the screen and so we'll
6  be able to look at it together.  All right?
7      A.    Understood.
8      Q.    And so -- and will you agree not to have
9  any private communications while we're on the record
10  during today's deposition?
11     A.    Yes.
12     Q.    Okay.  Let's look at Tab 43 and mark
13  that as Exhibit 1.
14
15          (Whereupon, Exhibit Mele-1 was marked
16  for identification.)
17
18          MR. VAUGHN:  Doctor, are you able to
19  access this exhibit in the Exhibit Share?
20          THE WITNESS:  I can see it on the
21  screen.  I don't know what this Exhibit Share thing
22  is all about.  I don't even know where I'd even go
23  for that, but I can see it on the screen.
24          MR. VAUGHN:  We're going to want to make
25  sure he's able to access the Exhibit Share, if you're

4 (Pages 10 - 13)

Page 14

1 going to be sharing additional exhibits in the
2 future, so he can download them and review them in
3 full, if necessary.
4          Let's go ahead and go off the record
5 real quick. Sorry about that, guys.
6          THE VIDEOGRAPHER: Counsel, the time is
7 9:17. We are off the record.
8
9          (Whereupon, a brief recess was taken off
10 the record.)
11
12          THE VIDEOGRAPHER: The time is 9:21. We
13 are on the record.
14
15 BY MR. NOLAN:
16     Q.   Welcome back, Dr. Mele.
17     A.   Thank you.
18     Q.   So we've just marked as Exhibit 1 the
19 list your counsel shared with us of your prior
20 testimony history?
21     A.   Yes.
22     Q.   Is this list accurate and current, to
23 the best of your knowledge?
24     A.   Yes, the most recent case on there is
25 April 28th.

Page 15

1     Q.   Okay. Now, this only goes back until
2 November 12th, 2021. Do you ever serve as an expert
3 witness before then?
4     A.   I've consulted on cases, but November
5 2021 was my first testimony.
6     Q.   Got it, okay. So was the case for
7 November 2021 the first time you submitted an expert
8 report in a litigation?
9     A.   You know, I submitted reports to
10 attorneys. Where they go in the chain of how these
11 litigations proceed, I don't know, but that was the
12 first time that I had produced a report and I was
13 asked to provide testimony about that report.
14     Q.   Okay. I want to break that down into
15 two separate pieces. The November 2021 was the first
16 time you provided testimony in connection with expert
17 opinions you offered in a litigation. True?
18          MR. VAUGHN: Asked and answered.
19          THE WITNESS: True.
20          MR. NOLAN: Okay.
21
22 BY MR. NOLAN:
23     Q.   Prior to November of 2021, had you
24 submitted an expert report in any litigation?
25     A.   Yes.

Page 16

1     Q.   Okay. Had you submitted an expert
2 report in a prior litigation before the Portillo
3 case?
4          MR. VAUGHN: I'm just going to caution
5 you, real quick, Doctor, on, you know, if you
6 submitted an expert report to an attorney versus them
7 actually turning it over, and answer to the extent
8 that you know. Please do not speculate.
9          THE WITNESS: Right. I don't know which
10 reports get turned over or produced or disclosed.
11 You know, I produce a report to an attorney at their
12 request. And unless I'm asked to testify in that
13 matter, I don't know what they do with them. I don't
14 know if they produce them or if they keep them in a
15 secret file.
16          But to answer your question, I just want
17 to ask you to clarify the question. Do you mean
18 prior to Portillo in 2021 or prior to the report that
19 I produced for Portillo, to begin with?
20
21 BY MR. NOLAN:
22     Q.   So in advance of your testimony in the
23 Portillo case, did you prepare an expert report?
24     A.   Yes.
25     Q.   Was that the first time you had ever

Page 17

1 prepared an expert report for litigation?
2          MR. VAUGHN: Object to form.
3          THE WITNESS: No.
4          MR. NOLAN: Okay.
5
6 BY MR. NOLAN:
7     Q.   When was the first time you prepared an
8 expert report for litigation?
9     A.   I've never looked at this question that
10 way. I began doing expert consulting, roughly,
11 around 2018. I don't believe I produced a report
12 until approximately 2019 or 2020.
13     Q.   Okay.
14     A.   But I never looked at it. I don't -- I
15 don't know the exact date that I produced my first
16 report, but it was before Portillo.
17     Q.   Got it. So in around 2018, you started
18 doing litigation consulting. Right?
19     A.   Yes.
20     Q.   Okay. And then sometime in 2019 or 2020
21 is when you prepared your first expert report?
22     A.   To my knowledge, right now, I believe
23 that's when I -- in that time frame is when I may
24 have produced my first report. But I don't --
25     Q.   Okay. About how many -- go ahead?

5 (Pages 14 - 17)

Page 18

1     A.   But I don't know for sure.  That's
2  something I'd have to look at.  I've never even
3  looked at that.
4     Q.   Understood.  My question is:  About how
5  many expert reports would you say that you prepared
6  between the 2019/2020 time frame when you first
7  started and the one you prepared for the Portillo
8  case in 2021?
9          MR. VAUGHN:  Object to form.
10         THE WITNESS:  Not a whole lot because I
11  had just started.  It really wasn't until 2020 where
12  I began to get any real meaningful work as a medical
13  consultant.  So between 2018 and the Portillo report
14  to -- I don't know the exact number, but it was no
15  more than, I would say, between five and ten, but I'm
16  totally, totally guessing.  Probably closer to five
17  or less.
18         MR. NOLAN:  Okay.  That's fair.
19
20  BY MR. NOLAN:
21     Q.   So between the 2019/2020 time frame,
22  when you first started preparing expert reports, and
23  November of 2021, when you did the Portillo report or
24  you testified relating to the report you did in the
25  Portillo case, you may have done five to ten reports,

Page 19

1  perhaps closer to five.  Is that fair?
2          MR. VAUGHN:  Object to form.
3          THE WITNESS:  Yes, that's fair.  I don't
4  know the exact number.  It's a question I've never
5  been asked before, actually.
6          MR. NOLAN:  Okay.
7
8  BY MR. NOLAN:
9     Q.   And what was the nature of those cases,
10  if you remember?
11         MR. VAUGHN:  Object to form.
12         MR. NOLAN:  In the pre2021 time frame.
13         THE WITNESS:  Certainly.  It's a good
14  introduction to how I got involved in medical
15  consulting.
16         I was contacted by a personal injury
17  attorney who had received my name from a colleague
18  who was working with them, who no longer wanted to
19  engage in medical legal work.  And they gave them my
20  name based on the nature of that first case that they
21  contacted me about.  And so --
22         MR. NOLAN:  Okay.
23         THE WITNESS:  Up until -- up until
24  Portillo, I would say, there may have been one other.
25  But up until Portillo, I would say the overwhelming

Page 20

1  majority of the work that I was doing, even though it
2  wasn't really much, was of a personal injury
3  liability nature.
4          MR. NOLAN:  Understood, okay.  So I have
5  a few follow-up questions.
6
7  BY MR. NOLAN:
8     Q.   You said you were contacted by a
9  personal injury attorney.  Do you remember who that
10  was?
11     A.   The firm was Levinson Axelrod.
12     Q.   And is that -- do you remember the name
13  of the attorney who specifically contacted you?
14     A.   I believe he was an attorney named Cook.
15  He's no longer with them.  And after we met, he left
16  shortly thereafter.
17     Q.   Do you remember, is it Mr. Cook or
18  Ms. Cook?
19     A.   Oh, it was a gentleman.  It was a
20  Mr. Cook.
21     Q.   Do you remember Mr. Cook's first name?
22     A.   I believe it was David.
23     Q.   And so, Mr. Cook worked at the firm
24  Levinson Axelrod; and then has since left that firm?
25     A.   That is my understanding, yes.

Page 21

1     Q.   Have you worked with Mr. Cook since that
2  point in time?
3     A.   No.  I believe he has left the legal
4  profession.
5     Q.   Okay.  And you mentioned that Mr. Cook
6  was put in contact with you by a colleague who no
7  longer wanted to do medical legal work?
8     A.   That's correct.
9     Q.   Do you remember the name of the
10  colleague?
11     A.   I believe it was a gentleman named
12  Dr. Hinrichs.
13     Q.   Dr. Hinrichs, how do you spell that?
14     A.   H-I-N-R-I-C-H-S.
15     Q.   And what kind of doctor is Dr. Hinrichs?
16     A.   He's a radiologist.
17     Q.   Got it.  And were you two working
18  together at that point?
19     A.   No.  He was a resident of mine.
20     Q.   Understood.  And where was he a
21  resident?
22     A.   At the Rutgers New Jersey Medical
23  School.
24     Q.   Do you have any understanding as to why
25  Dr. Hinrichs no longer wanted to do medical legal

Page 22

1  consulting work?
2        MR. VAUGHN: Object to form.
3        THE WITNESS: It was my understanding
4  that he was tired having that much fun.
5        MR. NOLAN: Okay.
6
7  BY MR. NOLAN:
8     Q.    And so, you said the majority of the
9  cases that you worked on before Portillo were of the
10  personal injury nature. Do you -- do you know what
11  sorts of injuries those individuals had?
12    A.    Yes. You know, a majority of those
13  cases do involve some kind of skeletal trauma and
14  spinal trauma, and that's the overwhelming majority
15  of what's involved in those cases. Some neurological
16  trauma, you know, going along, you know, with the
17  spine, obviously. But that's -- it's a wide variety
18  of, you know -- it's pretty much what those cases
19  entail.
20    Q.    Okay. And do you recall what the --
21  what caused that spinal or neurological trauma?
22        MR. VAUGHN: Object to form.
23        THE WITNESS: In a particular case or in
24  all cases?
25

Page 23

1  BY MR. NOLAN:
2     Q.    Well, let's start with any one
3  particular case, and then we'll go from there.
4     A.    I can probably best categorize it this
5  way: The overwhelming majority of the ideologies of
6  the injuries in the cases that I reviewed are of a
7  personal liability nature, and that I still review of
8  a personal liability nature, are motor vehicle
9  accidents. Occasionally, there's, you know, a trauma
10  in a place of business or on a piece of property.
11  The majority of those cases, though, do involve motor
12  vehicle trauma.
13    Q.    Understood. So they were car crashes
14  and someone was asking you to take a look at the
15  scans of their spine or whatever to say what types of
16  injuries they have?
17        MR. VAUGHN: Object to form.
18        THE WITNESS: Correct.
19        MR. NOLAN: Okay.
20
21  BY MR. NOLAN:
22    Q.    And for the cases that you worked on
23  before Portillo, were they all with the Levinson
24  Axelrod firm?
25    A.    No. Going back to think about it, I

Page 24

1  would say there was another firm where I was doing,
2  again, exclusively personal injury work. The name of
3  that firm was Laddey, Clark & Ryan. Oh, they're on
4  the sheet here.
5     Q.    Laddey, Clark & Ryan, the Number 7?
6     A.    Correct, yeah, there you go. Yep.
7     Q.    Okay. All right.
8     A.    That's them.
9     Q.    And so, how did you wind up getting put
10  in touch with the Laddey, Clark, Ryan firm?
11    A.    Same way.
12    Q.    Through your colleague, Dr. Hinrichs?
13    A.    Correct.
14    Q.    Got it, okay. So have you ever served
15  as -- strike that.
16        For every instance where you served as
17  an expert in a litigation matter, have you always
18  been retained by the law firm representing the
19  plaintiff?
20    A.    Regarding the testimony list, those are
21  all plaintiff cases. I have consulted on defense
22  cases, very few. They are very difficult to acquire
23  as a medical consultant. It's not for a lack of
24  trying, just, it's the way my workload has been
25  distributed, is a function of the way in which I

Page 25

1  receive referrals and requests. I have actively
2  tried to pursue and speak with defense attorneys,
3  when I can, in situations like this where I get
4  deposed and I'm asked this question. I always say,
5  you know, to defense counsel, you know who I am. If
6  you need a radiologist, you know where to find me.
7  You know, I don't really have a preference for what
8  side I opine for. It's really, you know, been a
9  function of the way the work comes to me.
10    Q.    Okay. I want to break that down a
11  little bit.
12        So every time you've testified, it's
13  been for the law firm representing the plaintiff.
14  True?
15    A.    True.
16    Q.    And you said that it's not for lack of
17  trying. What efforts have you made to try to be
18  retained by lawyers representing defendants in
19  lawsuits?
20    A.    Sure.
21        MR. VAUGHN: Object to form.
22        THE WITNESS: So when I first started
23  out, and I still, you know, and I still use this, I
24  signed up for a free database called The Expert
25  Institute. It's not a secret. I think the whole

7 (Pages 22 - 25)

Page 26

1  planet knows about it.  It's a -- basically, it's
2  like a database where you can enter your information
3  that you're seeking to be a medical consultant -- and
4  they claim to have attorneys from both, you know, the
5  plaintiff and defense side of the matter.  They're
6  looking for medical consultants and, you know, they
7  refer you accordingly.
8        Like I said, whenever I have a
9  deposition, it's kind of, you know, that group of
10  defense counsel is aware, you know, that I'm working
11  in the environment.  They're welcome to contact me.
12  I try and it's just a colossal waste of time.  I
13  wasted many hours on LinkedIn seeking, you know,
14  like, defense counsel, plaintiff counsel, some
15  opportunities to do some additional consulting work,
16  when I first started out.  And the attorneys that I
17  did speak with made it very clear that, you know,
18  defense counsel seems to acquire their experts in a
19  different way.  That some of them get them through,
20  you know, the insurance carrier panels, and et
21  cetera.  And unless you're in the cycle, it's not
22  impossible, but it's not exactly, you know, an easy
23  thing to get yourself into.
24        And I kind of, like, dialed back from,
25  like, the LinkedIn network thing, because I was

Page 27

1  getting more invitations about a franchise in my area
2  that wasn't about medicine.  Or some woman from
3  Singapore who thought that my profile looked
4  interesting.  And I just kind of went back to the,
5  you know, organic ways of trying to get work as a
6  medical consultant.  Kind of how it all started.
7  Word of mouth, through a recommendation, from a, you
8  know, maybe an attorney talked to a colleague and out
9  of the blue, you know, they said, hey, you know, I
10  need a radiologist.  Do you know any?  That's kind of
11  been how it's, you know, how it's gone up to this
12  point.
13        I've tried a few things.  I don't
14  actively market.  I don't actively pay for
15  advertising.  I don't -- I don't pay to be on a
16  website.  It's kind of not my main focus.  You know,
17  I'm a clinical diagnostic radiologist first.  I work
18  full-time.  So as the consulting comes in, that's,
19  you know, that's great.  If it doesn't, it doesn't.
20  That's fine.  I'm sure you've met some physicians
21  along the way and we also engage in some consulting
22  work trying to advance the practice of medicine; and
23  I'm doing some of that.  And a large amount of my
24  consulting now has become artificial intelligence in
25  radiology.

Page 28

1        So I've been doing some of that.  And
2  I've also, if you -- we'll get to my CV, but about a
3  year ago, I acquired an advanced certification in
4  just radiography.  I'm a NIOSH-certified B reader.
5  So I've now brought that into my, you know,
6  consulting realm.  So where I started out working
7  primarily as a medical consultant doing medical
8  expert work, I'm now effectively working in three
9  different areas of medical consulting at this point;
10  and it's not all medical legal.
11        MR. NOLAN:  Okay.  I have a few
12  follow-up questions there.
13
14  BY MR. NOLAN:
15     Q.    The first one, because I don't want to
16  forget it, you said you're now effectively working in
17  three different areas of medical consulting at this
18  point.  What are those three areas?
19     A.    Sure.  So, you know, medical legal work
20  like this, you know, working with attorneys, whether
21  it be a medical malpractice nature or a personal
22  liability nature.  I have done some product work,
23  but, like, kind of indirectly.  We can explore that,
24  if you like.  And then it's the artificial
25  intelligence and the B reading.

Page 29

1     Q.    Let me just try to break that down.  So
2  I think the three that you mentioned are the medical
3  legal work, like personal injury, medical
4  malpractice; and then the second one is the
5  artificial intelligence and radiology; and then the
6  third one is B reading?
7     A.    Correct.
8     Q.    Okay.  So what is the -- you mentioned
9  that you're a NIOSH-certified B reader.  What does
10  that mean?
11     A.    So I have to go down to the ACR, and I
12  had to take a class and a very rigorous exam with a
13  low passing rate to become certified as a NIOSH B
14  reader.  And what that is, it is, essentially the --
15  it's an epidemiologic or it's more of a
16  classification system of chest radiographs or x-rays,
17  for lack of a better term, in workers with
18  occupational lung disease.  Something we call
19  pneumoconiosis.  You'll know them as coal miners and
20  other industrial workers who are exposed to
21  inhalational hazards.  And so, I carry a special
22  certification in the evaluation of those chest x-rays
23  to apply what they call an ILO classification.  And
24  it lets those who employ them know about their
25  exposure levels in their occupational environment,

8 (Pages 26 - 29)

Page 30

1  based upon what we see on the chest x-ray. Kind of
2  like a scoring system.
3      Q.  Okay. And you mentioned, is it ILO
4  classification or IOO classification?
5      A.  Yeah, International Labor Organization,
6  ILO.
7      Q.  Okay. And so, are you hired -- to do
8  that, are you hired by the employer? Are you hired
9  by NIOSH? How does that work and, like, who are you
10  doing the readings for and for what purpose?
11      MR. VAUGHN: Object to form.
12      THE WITNESS: Sure. So I am not hired
13  by NIOSH. They only provide us --they use, you know
14  -- this is an area where NIOSH and the CDC are kind
15  of like the same entity and they only certify us. So
16  after I take the examination, NIOSH says that I am
17  certified and I am qualified to be a B reader or to
18  interpret these examinations and occupational lung
19  disease.
20      How I've been doing that work so far is,
21  actually, at the moment, zero that has been legal. I
22  have been doing it as part of surveillance programs
23  for individuals who have been exposed to inhalational
24  toxins as part of a -- part of an occupational health
25  program.

Page 31

1  BY MR. NOLAN:
2      Q.  Okay. Are you done? I didn't want to
3  cut you off.
4      A.  No. And just -- that's basically what
5  I've been -- I've been -- the best way to describe it
6  is I've been part of a -- I've been -- I've been
7  working with surveillance.
8      Q.  Okay. And so you look at the scans
9  because someone wants to track or understand what, if
10  any, occupational, I guess, lung diseases or
11  conditions certain types of employees may have?
12      MR. VAUGHN: Object to form.
13      THE WITNESS: A more eloquent way to say
14  it is that there are certain findings on chest
15  radiographs, which are -- it's an x-ray, so it's not
16  a scan. There are -- there are certain findings on
17  chest radiographs that are seen in certain types of
18  inhalational lung and disease. And what we do is we
19  score what type are present and essentially score how
20  much of it is present.
21
22  BY MR. NOLAN:
23      Q.  Okay. And who is doing this
24  surveillance?
25      A.  It's typically done by either the

Page 32

1  employer or a clinic to which they refer them to.
2      Q.  Okay. When did you start becoming
3  involved in the NIOSH-certified B reader type work?
4      A.  So I got my NIOSH certification,
5  roughly, about this time last year. I want to say it
6  was February or March. I think it's officially March
7  of 2024. And I began working with some surveillance
8  program, first -- yeah, I began working with the
9  surveillance program, I want to say, this fall. So
10  before the new year, I started working with my first
11  surveillance program.
12      Q.  Understood. And how did you get
13  involved in this type of work?
14      MR. VAUGHN: Object to form.
15      THE WITNESS: It started because we had
16  a B reader in our practice who decided to not
17  recertify and this was going to create kind of a
18  potential void. You know, I work for the Department
19  of Veterans Affairs. And as you would -- as you
20  would imagine, you know, service men and women may --
21  may be exposed to some of these inhalational toxins,
22  you know, in the field or while on base. And we also
23  have, you know -- we also have an occupational health
24  program. And so it has come up on occasion that
25  someone would need a B read, infrequently. And we

Page 33

1  were going to be in a position where we were unable
2  to provide that service. And I knew that there were
3  also additional consulting opportunities, being a B
4  reader. There's only 180 or so of us in the world.
5  And so, if you read up on B reading, the demand is
6  staying the same or it's going up; the number of B
7  readers is going down. So it seemed like a kind of
8  an avenue, you know, to expand my skills, fill in a
9  deficiency that we may have had in the practice, and
10  could be something else that I could do as a medical
11  consultant.
12
13  BY MR. NOLAN:
14      Q.  Understood. So one of your former
15  colleagues -- or one of your current colleagues or
16  former colleagues; one of your colleagues who was
17  NIOSH B-certified was not interested in renewing that
18  certification. Right?
19      MR. VAUGHN: Object to form.
20      THE WITNESS: That's one way of
21  explaining it, yes.
22
23  BY MR. NOLAN:
24      Q.  And then, so you said, there may be a
25  void at work. I'm going to get myself certified to

9 (Pages 30 - 33)

Page 34

1  help potentially fill that void. Right?
2          MR. VAUGHN: Object to form.
3          THE WITNESS: Correct.
4
5  BY MR. NOLAN:
6      Q.   And then, there's also consulting
7  opportunities that may arise from this, and so it's
8  sort of a win-win situation?
9          MR. VAUGHN: Object to form.
10         THE WITNESS: You know, it's not
11 inexpensive to become a B reader and I had to
12 leverage that expense on my own. So if there's an
13 opportunity to, you know, offset some of that
14 expense, and there is an opportunity with B reading,
15 you know, as a medical consultant.
16         MR. NOLAN: Understood.
17
18 BY MR. NOLAN:
19     Q.   So how did you get involved in B reading
20 as a medical consultant?
21     A.   So there's not a lot of us. And what
22 happens is these medical surveillance programs
23 typically lose an incumbent B reader. And what
24 they'll do is they'll go to the NIOSH website and
25 they look to find someone who they can convince to do

Page 35

1  it for them. It's tedious. And I think a lot of the
2  attrition with B reading is the nature of the work
3  and the complexity of the exam. So they just keep --
4  they go down a list of us. It's available on the
5  NIOSH website. They have a list of the current and
6  active B readers. And they just keep on calling
7  someone until they find someone who's willing to work
8  with them. And that's how I've been contacted in
9  nearly every instance where someone asked me if I was
10 interested in doing B reading for them.
11     Q.   Got it. So the way that you -- the way
12 that you became involved in medical consulting, as it
13 relates to the NIOSH B reading, is that there's a
14 list on the NIOSH website and somebody calls you up
15 and asks if you'd be interested?
16     A.   Correct.
17     Q.   Okay. About how much of your consulting
18 time relates to the NIOSH B reading?
19         MR. VAUGHN: Object to form.
20         THE WITNESS: I would say now, with all
21 facets of what I'm doing, I'm about a third in each
22 area.
23         MR. NOLAN: Okay, that's helpful. Now,
24 I want to ask about the AI in radiography.
25

Page 36

1  BY MR. NOLAN:
2      Q.   Tell me about that.
3          MR. VAUGHN: Object to form.
4          THE WITNESS: So machine learning is
5  something that's a hot topic in radiology. And there
6  are certain organizations that are looking to develop
7  software to assist radiologists in detection of
8  something. I mean, it's almost, like, limitless, at
9  this point, of what they're trying to detect and see
10 if they can create a model where something can be
11 detected, almost kind of like a screen. So what they
12 look for is they look for radiologists -- and I don't
13 know how they find us. There must be a secret list
14 of radiologists somewhere. And if they want to find
15 a certain pathology, they try to find radiologists
16 who work within that realm or who are subspecialized
17 in that realm, and they ask them if they can review
18 images with a set of parameters. And based on those
19 parameters and requirements, if they can just
20 essentially mark an image where they think the
21 abnormality is. And then, they take that and they do
22 whatever they do on their, you know, computer science
23 side, which I don't really have any involvement with.
24 So my work in AI has been, hey, we're looking for
25 pathology X. If we send you 300 CTs of this organ or

Page 37

1  this body part, can you label those examinations in
2  which you think this pathology is present?
3      Q.   Okay. And so what -- as it relates to
4  the AI program that you do or the AI work that you
5  do, which pathologies have you been asked to identify
6  as part of that process?
7      A.   So as a fellowship-trained
8  musculoskeletal radiologist, that's where it started.
9  And so I was asked to identify fractures. And not
10 even necessarily the fracture or just sometimes the
11 image that I think the fracture was on, without even
12 looking -- without even putting anything on the
13 abnormality itself. So it's been varieties of that.
14 Where I'm looking to, you know, what they -- the
15 correct term is medical annotation. They ask you if
16 you will annotate an image where the pathology is
17 present or just identify the image where you believe
18 the pathology is present. So starting with
19 fractures. It's then included things like vascular
20 calcifications. These are all things that are kind
21 of, like, distinct on imaging. There's a way for
22 them to, I guess, create an algorithm where there's
23 thresholds they can set that this -- you know, these
24 are some of, kind of, the easier ones. So, yeah. So
25 fractures or, you know, fractures of in your ribs and

10 (Pages 34 - 37)

Page 38

1  long bones and spine, vascular calcifications and
2  some organ calcifications; that seems to be a theme
3  that comes up. And then, the only other one that I
4  can recall has been renal cysts was another one.
5      Q.   Okay. I just want to make sure I get --
6  I'm going to go through the list and just make sure
7  that I got everything.
8          So as part of the -- let me -- let me
9  start here. When did you start working, sort of in
10 the AI space as part of the consulting aspect of your
11 work?
12     A.   I want to say in the last, like, 12 to
13 16 months.
14     Q.   Okay. And as part of that work for
15 artificial intelligence identifying pathologies on
16 slides or scans, you've been asked to look at
17 fractures. Right?
18     A.   Yes.
19     Q.   And I believe you mentioned rib
20 fractures, long bone fractures, and spinal fractures?
21     A.   Yeah. When I say long bone, I'm
22 referring to the axial skeleton at that point.
23 Anywhere that's not the -- you know, that's not just
24 the spine.
25     Q.   Got it, okay. And then, you also

Page 39

1  mentioned vascular calcifications. What is that?
2      A.   Well, I can't divulge the work because
3  there's NDAs, but. So vessels, they've been looking
4  at, you know -- the best way I can describe it is
5  calcifications in the vasculature in the vessels.
6  And some of those vessels involve the heart. That's
7  been pretty much -- that's really as far as I can go
8  on that.
9      Q.   Okay. I'm a lawyer. I'm not a -- I
10 never went to medical school or anything like that.
11 I barely took biology past high school. But the
12 vascular calcification, that's pieces of bone in the
13 blood vessels?
14     A.   We don't call it bone. We call it,
15 like, calcification. You may know it as
16 arthrosclerosis.
17     Q.   And what does that mean?
18     A.   So that's -- that's literally, it's what
19 we refer to as a dystrophic calcification. Yes,
20 bones contain calcium; and that's true. But there's
21 a whole osteo matrix that makes them bone. Calcium
22 is a discreet deposit. And so it's not bone forming.
23 It's actually calcium.
24     Q.   Understood. So it's calcium deposits in
25 the vessel?

Page 40

1      A.   Yes.
2      Q.   And some of those are in the heart
3  vessels?
4      A.   The heart vessels and, if we're talking,
5  you know -- there's other parts of the heart. I
6  don't want to get too far. I'm into my NDAs, but my
7  work does involve the heart and the blood vessels.
8      Q.   Okay. You also mentioned -- and I can't
9  read my notes here. You mentioned another type of
10 calcification besides vascular calcification?
11         MR. VAUGHN: Object to form.
12         THE WITNESS: I might have said renal
13 cysts. Does that sound familiar?
14         MR. NOLAN: That's the next one I have
15 written down.
16         THE WITNESS: Okay.
17
18 BY MR. NOLAN:
19     Q.   So fractures, vascular calcifications,
20 renal cysts; have you done any other type of
21 pathologies for the AI work that you do?
22     A.   No.
23     Q.   So you've never been asked to identify a
24 cancer of any kind as part of the AI work that you
25 do?

Page 41

1      A.   I was asked to sign onto an AI project
2  involving lung cancer, but I declined that project.
3      Q.   And aside from that, you've never been
4  asked to help identify cancers of any kind as part of
5  the AI work that you do. True?
6      A.   I've never engaged in the annotation of
7  malignancies in the realm of AI.
8      Q.   Okay. And then, the third category of
9  consulting work that you do is the PI, medical
10 malpractice. Is there any other type of medical
11 legal consulting that you do besides personal injury
12 and medical malpractice?
13         MR. VAUGHN: Object to form.
14         THE WITNESS: I have a -- I have
15 worked -- the best way I know how to describe it,
16 Counselor, is I have worked indirectly on some prior
17 product liability medical device matter. It was a
18 single matter.
19         MR. NOLAN: Okay.
20
21 BY MR. NOLAN:
22     Q.   So is that matter listed on your
23 testimony list here, if we pull that back up?
24     A.   I have -- I have not testified in any of
25 those.

11 (Pages 38 - 41)

Page 42

1    Q.   Okay.  As between the medical
2  malpractice and personal injury, can you attribute a
3  percentage?  How many have been medical malpractice
4  cases?  How many have been personal injury cases?
5         MR. VAUGHN:  Object to form.
6         THE WITNESS:  Can I give you an answer
7  over time?
8         MR. NOLAN:  Yeah.
9         THE WITNESS:  I would say that, by this
10  point, it's probably half and half.
11         MR. NOLAN:  Okay.
12
13  BY MR. NOLAN:
14    Q.   So a third of your consulting work is in
15  the medical legal field; and half of that is medical
16  malpractice and half of that is personal injury?
17         MR. VAUGHN:  Object to form.
18         THE WITNESS:  That's -- yeah, that's
19  reasonable.
20
21  BY MR. NOLAN:
22    Q.   So let's look at the testimony history
23  here today.  If we look in the case column, none of
24  the defendants are listed here.  Is this maintained
25  in an Excel spreadsheet of some kind?

Page 43

1    A.   No.  That's the way that I have the
2  captions entered.  I've used this list 15 other
3  times, because I didn't have one for Portillo,
4  obviously.  And this is -- this is really the first
5  time I've been asked why the caption is not complete.
6  This is the way that I've produced this list every
7  time.
8    Q.   Okay.  Do you know the names of the
9  defendants in these cases?
10    A.   Right now, no.
11    Q.   And for each of the 16 cases listed
12  here, did you submit a report every time?
13         MR. VAUGHN:  Object to form.
14         THE WITNESS:  The best answer that I can
15  give you, Counselor, is that it was either a report
16  or an affidavit, depending on the jurisdiction.
17
18  BY MR. NOLAN:
19    Q.   Okay, understood.  But something that
20  was written down and your name was signed at the end
21  of it.  Right?
22    A.   That's correct.
23    Q.   Okay.  Let's go through each case, and
24  we'll go one-by-one, but I just sort of want to
25  understand -- and if you don't remember, that's fine

Page 44

1  -- what type of case it was and what was the nature
2  of your opinion.  So we'll start with Portillo.
3    A.   Portillo was a matter, I believe, which
4  involved the presence of pneumoperitoneum and the
5  allegation was that it was not reported by the
6  interpreting radiologist.
7    Q.   Okay.  So was this a medical malpractice
8  case?
9    A.   Yes.
10    Q.   And what is pneumoperitoneum?
11    A.   Pneumoperitoneum is free air in the
12  abdomen.
13    Q.   Okay.  And then, the Morgan Flash case?
14    A.   Morgan Flash was, again, a medical
15  malpractice.  The premise there was necrotizing
16  fasciitis that was not timely diagnosed.
17    Q.   And what is necrotizing fasciitis?  Is
18  that like dead skin?
19    A.   It's a -- it's a severe soft tissue
20  infection.
21    Q.   Okay.  And then, the Cayton (sounds
22  like) case?
23    A.   Yes, Cayton.  That was a case
24  involving -- I don't remember if it was the mis- or
25  delayed diagnosis of a rib tumor.

Page 45

1    Q.   So, again, a medical malpractice case
2  for Cayton?
3    A.   I apologize.  Yes, I apologize.  Yes.
4    Q.   All right.  And then, Willet?
5    A.   Willet was a medical malpractice case.
6  It was a matter in which a chiropractor had obtained
7  radiographs on a patient and the allegation was that
8  they were never interpreted.  And when they were,
9  they were interpreted incorrectly, and a lung cancer
10  was undiagnosed.
11    Q.   Got it.  And so, in these medical
12  malpractice cases, and correct me if I'm wrong here,
13  is it the case that you're looking at the scans from
14  the past and saying, you know, Dr. So and So should
15  have seen this and didn't?
16         MR. VAUGHN:  Object to form.
17         THE WITNESS:  Well, you know, the way it
18  works is, more often than not, I'm sent a bunch of
19  imaging studies and it's like, what do you think?
20  And I provide kind of an opinion on it.  And then,
21  you know, I'll -- once that's usually over with, I'll
22  review with the attorney what the original
23  interpretation was and then a determination is made
24  if there was a breach of the standard of care or not,
25  which is the overwhelming majority of cases is it's

12 (Pages 42 - 45)

Page 46

1  not a breach of the standard of care.
2       MR. NOLAN: Understood.
3
4  BY MR. NOLAN:
5       Q.    And so, if it's your opinion that there
6  was a breach of the -- of the standard of care, do
7  you then opine that it was a breach of the standard
8  of care or you just opine as to what you see on the
9  scans or images?
10      MR. VAUGHN: Object to form.
11      THE WITNESS: It'll depend on what's in
12 contention, to be honest. You know, Counselor,
13 sometimes the case is, you know, the radiologist is
14 or isn't involved in the case and they're looking for
15 me to verify the findings or present other findings
16 that may be brought up at the time of other's
17 testimony. But for the most part, if there's a
18 radiology defendant and I'm asked to opine on the
19 case, I will provide an opinion, if I can support it,
20 that there was a breach of the standard of care.
21 And, like I said, overwhelming majority of these
22 cases is I tell -- I'm telling plaintiff's counsel
23 that there is no merit in the case.
24      MR. NOLAN: Got it.
25

Page 47

1  BY MR. NOLAN:
2       Q.    And so, I just want to put a finer point
3  on it. Have you ever written an opinion saying that
4  there was a breach of the standard of care for
5  another radiologist?
6       A.    Yes.
7       Q.    Okay.
8       MR. NOLAN: Let's take a break.
9       THE VIDEOGRAPHER: Counsel, the time is
10 10:08. We're off the record.
11
12      (Whereupon, a brief recess was taken off
13 the record.)
14
15      THE VIDEOGRAPHER: The time is 10:21.
16 We are on the record.
17
18 BY MR. NOLAN:
19      Q.    Welcome back, Dr. Mele.
20      A.    Thank you.
21      Q.    And I believe we discussed the Willet
22 case just before. That was also a medical
23 malpractice case?
24      A.    Yes, Counselor.
25      Q.    The Walker case, what type of case was

Page 48

1  that and what were the natures of -- nature of your
2  opinion?
3       A.    Walker was a medical malpractice case.
4  This was a case, to my recollection, involved the
5  delayed or misdiagnosis of an aortic dissection or
6  aneurysm. I believe it was a dissection.
7       Q.    What is an aortic dissection?
8       A.    So an aortic dissection is when the --
9  when the blood that's normally in the aorta tracks
10 abnormally in the wall, through a defect in the wall,
11 that then it goes into the wall and trans -- and kind
12 of dissects the aorta. I don't want to say transect,
13 because it's not a transection. It's literally a
14 dissection. It splits the wall apart and the blood
15 flows in there instead of the channel in which it's
16 supposed to flow in.
17      Q.    Okay. And the Stagner case, what type
18 of case was that and what was the nature of your
19 opinions?
20      A.    Stagner was a medical malpractice case.
21 And that case had more to do with, on the radiology
22 side, about the timing of an MRI examination, the
23 necessity for the MRI examination and, I believe, it
24 was a case where there was an epidural abscess of the
25 spine.

Page 49

1       Q.    Okay. And what's an epidural abscess of
2  the spine?
3       A.    So that's an infection in the area
4  surrounding the spinal cord or the spinal column.
5       Q.    And the MRI would have allowed a better
6  image of that potential infection?
7       A.    Yes. There was -- there was some
8  contention in that matter. It's still pending, to my
9  knowledge, so I don't want to go too deep into it,
10 but there's some contention about the timing and how
11 it would have been helpful in the diagnosis.
12      Q.    Understood. The Hosking case?
13      A.    So that's a personal injury case.
14      Q.    What type -- sorry, I didn't mean to
15 interrupt.
16      A.    Yeah, I was going to say it was a
17 personal injury case in which the plaintiff was
18 involved in a motor vehicle accident.
19      Q.    Understood. The Hartsfield case?
20      MR. VAUGHN: Object to form.
21      THE WITNESS: Hartsfield case was an
22 interesting case. It was a combination of medical
23 malpractice and, not product liability, but it
24 involved product. The allegation was that a
25 neurosurgeon used the wrong product of a dural

13 (Pages 46 - 49)

Page 50

1 sealing agent in the wrong part of the body and it
2 led to -- the allegation was that it resulted in
3 spinal cord compression.
4
5 BY MR. NOLAN:
6     Q.   Got it. The Harris case, what was the
7 nature of that case and the nature of your testimony?
8     A.   Harris case was another medical
9 malpractice case; that went to trial. That was a
10 case involving the alleged delayed or misdiagnosis of
11 osteomyelitis of the spine and spinal epidural
12 abscess.
13     Q.   And spinal epidural abscess, that's the
14 possible infection. Right?
15     A.   Correct. And the osteomyelitis part is
16 the infection of -- specifically, to the bone of the
17 spine, in that instance.
18     Q.   Okay. And the Ramirez case, what type
19 of case was that and what was the nature of your
20 testimony?
21     A.   Oh, that's -- that's -- that's a cool
22 one. That was a case that was a criminal matter that
23 had medical malpractice stuff in it as part of the --
24 as part of a wrongful death that was partially med
25 mal and partially criminal. An individual, I

Page 51

1 believe, was stabbed and it created an abdominal wall
2 defect. And the allegation was that the abdominal
3 wall defect was not repaired to the standard of care
4 and it resulted in a lethal bowel herniation.
5     Q.   Lethal bowel herniation?
6     MR. VAUGHN: Object to form.
7     THE WITNESS: Yeah. You really want --
8 you know, if you want, like, you know like --
9
10 BY MR. NOLAN:
11     Q.   I just want to know is that the term you
12 used?
13     A.   Well, yes, it was an incarcerate -- I
14 didn't use the word incarcerated hernia because he
15 incarcerated his hernia, he became septic, and he
16 died. So it was kind of I tried to make it as simple
17 as I could for the nonmedical people. It was like a
18 lethal bowel hernia. That's why I said it was a cool
19 case.
20     Q.   Understood. And I appreciate the
21 putting things in layman's terms.
22     A.   The correct term, for those listening at
23 home, is an incarcerated hernia.
24     Q.   Okay. And then, the Castelli case, what
25 kind of case was that and what was the nature of your

Page 52

1 opinion?
2     A.   Castelli case was a medical malpractice
3 case. It was a case which involved the allegation of
4 a delayed or misdiagnosis of a stroke.
5     Q.   And the next one, the Gonzalez case,
6 what was the nature -- what type of case was that and
7 what was the nature of your opinion?
8     A.   Gonzalez was a medical malpractice case.
9 Gonzalez was a case where there was an alleged
10 allegation of a failure to diagnose quadriceps tendon
11 rupture.
12     Q.   And quadriceps, those are the muscles in
13 your leg?
14     A.   Yes. It's the extension mechanism of
15 the knee, yes.
16     Q.   Okay. The Browner case, what type of
17 case was that and what was the nature of your
18 testimony?
19     A.   Browner was a medical malpractice case.
20 The nature of my testimony was surrounding the
21 allegation of delayed or misdiagnosis of septic
22 arthritis, which is an infection of the joint. And
23 to my recollection, the joint involved was the knee.
24 And I believe that case is still active, so that's
25 about all I'll say on that.

Page 53

1     Q.   Understood. Corley is the next one.
2 What type of case was that and what was the nature of
3 your testimony?
4     A.   Corley was a medical malpractice case.
5 It involved the allegation of a failure to timely
6 diagnose and communicate metastatic prostate cancer.
7     Q.   And metastatic prostate cancer, that's
8 cancer of the prostate?
9     A.   Yes, Counselor.
10     Q.   Barnes, what type of case was that and
11 what was the nature of your testimony?
12     A.   Barnes was another medical malpractice
13 matter. It's not surprising that most of these are
14 med mal, obviously. Barnes was a case in which there
15 was -- and this is current. You can see the date of
16 the deposition. This case involves the allegation of
17 a missed femoral fracture.
18     Q.   And a femoral fracture is a fracture of
19 the femur?
20     A.   Yes, which would be, you know, the
21 colloquial thigh.
22     Q.   Got it. And then, the Credit case, what
23 type of case was that and what was the nature of your
24 testimony?
25     A.   Credit is -- this is a, obviously, a

14 (Pages 50 - 53)

Page 54

1  very fresh case. Credit is a medical malpractice
2  case. It's -- the allegation is failure to diagnose
3  essentially spinal trauma in the setting of a motor
4  vehicle accident.
5      Q.  Okay. So the -- is Hosking the only
6  case that's a sort of personal injury case on this
7  list?
8      A.  Yes. You know, they tend to not go
9  beyond, you know, two lawyers yelling at each other.
10  They rarely go to anything beyond, you know, battle
11  of the expert reports, I guess.
12     Q.  Have you -- is Hosking the only personal
13  injury case where you've submitted an expert report?
14     A.  In a personal injury case, no.
15     Q.  No, okay. What other -- how many other
16  times have you submitted an expert report in a
17  personal injury case?
18          MR. VAUGHN:  Object to form. You can
19  answer.
20          THE WITNESS:  Can I give it to you over
21  the last seven years? I mean, I don't know
22  temporally where they, you know, where they lie. I
23  don't know an exact number, to be honest with you. I
24  never -- I've never counted them.
25

Page 55

1  BY MR. NOLAN:
2      Q.  Can you give me an estimate of how many
3  times you've submitted an expert report in a personal
4  injury case?
5          MR. VAUGHN:  Object to form. Answer to
6  the extent that you can.
7          THE WITNESS:  25, 20.
8
9  BY MR. NOLAN:
10     Q.  But Hosking is the only case where
11  you've testified. Fair?
12     A.  Correct.
13         MR. VAUGHN:  Object to form.
14         THE WITNESS:  Correct.
15
16  BY MR. NOLAN:
17     Q.  And in -- is this case, the one for
18  Gaston Roberts, aside from this case for Gaston
19  Roberts, have you ever submitted an expert report
20  relating to hepatocellular carcinoma or HCC?
21         MR. VAUGHN:  Object to form.
22         THE WITNESS:  Counselor, I recognize the
23  question. I will answer it. I just want to clarify
24  my answer regarding the personal injury work. I want
25  to make sure that we understand and just my answer is

Page 56

1  inclusive of whether I gave a report or some kind of
2  affidavit.
3          MR. NOLAN:  Understood.
4
5  BY MR. NOLAN:
6      Q.  So the 20 to 25 figure that you provided
7  earlier for report in personal injury cases also
8  includes affidavits. True?
9      A.  Correct. And something with my
10  signature on it, yes.
11     Q.  And aside from this case relating to
12  Gaston Roberts, have you ever been -- have you ever
13  submitted a report or affirmation or declaration in a
14  case involving hepatocellular carcinoma or HCC?
15     A.  To my knowledge, no.
16     Q.  Before this case, have you ever worked
17  with any of the lawyers representing Mr. Gaston
18  Roberts before?
19     A.  You know, I -- you know, there's an --
20  there's an attorney Bogdan, who I've spoken with
21  regarding this case. I don't know what her status
22  of, you know, representation or advisor is in the
23  legal realm, but I said, when I had done some product
24  liability work, it's my understanding that that's how
25  Ms. Bogdan came to contact me about this case. So I

Page 57

1  had -- I had worked with her firm at least -- at
2  least once before this matter.
3      Q.  What's Ms. Bogdan's first name?
4      A.  Rosemarie.
5      Q.  Rosemarie. And Ms. Rosemarie Bogdan is
6  who contacted you about this case for Gaston Roberts?
7      A.  Yes.
8      Q.  And you've worked with her at least once
9  in the past?
10     A.  She's received my work once in the past,
11  yes.
12     Q.  Okay. Do you remember which case that
13  was for?
14         MR. VAUGHN:  Object to form.
15         THE WITNESS:  I don't. This was --
16  again, this was part of what I had explained earlier,
17  where I was doing some indirect work in some medical
18  device product liability during the, like,
19  adjudication process, as I understood it. And my
20  role there was essentially verifying some CTs and
21  some individuals who had indwelling inferior vena
22  cava filters. And so I had produced just kind of a
23  report for her of what was on the CT and what was
24  going on with -- with the filter. And I don't recall
25  the name of the individual. I don't know that it was

15 (Pages 54 - 57)

Page 58

1  a case. I've done case -- I mean, you know, I've
2  done that type of work for her in the past or for her
3  firm in the past.
4      Q.   What firm is she part of?
5      A.   I want to say there's a Harding and a
6  Marzzotti in there or something like that.
7      Q.   Okay. We can Google her at the next
8  break.
9           And so, you said you were doing some
10 medical device product liability work for Ms. Bogdan.
11 Do you remember what type of device that was?
12     A.   It was an inferior vena cava filter.
13     Q.   Okay. That was the type of device?
14     A.   Yes.
15     Q.   So that's a filter that goes into the
16 vena cava that's in your heart?
17     A.   It's in your abdominal cavity. It's the
18 main venous return channel in the abdomen that goes
19 up into the chest.
20     Q.   Okay. Before this case, have you ever
21 worked with Mr. Vaughn?
22     A.   No.
23     Q.   Have you ever worked with any of the
24 lawyers at Nigh Goldberg before this case?
25     A.   I don't believe so, no.

Page 59

1      Q.   All right. And do you remember when
2  Ms. Bogdan contacted you for this case?
3      A.   Sure. It was the end of February.
4      Q.   2025?
5      A.   Yes, Counselor.
6      Q.   And when you say end of February, what
7  does that mean? Can you be a little more specific?
8      A.   The last week of February; I think it
9  was maybe, like, the 24th or the 25th.
10     Q.   Okay. All right. What, if anything,
11 did you do to prepare for today's deposition?
12     A.   I reviewed my report. I reviewed the
13 report of Dr. Chernyak. I reviewed the medical --
14 the imaging studies that I mention in my report. I
15 reviewed the associated final radiology reports that
16 go with those studies. I reviewed the deposition
17 testimony of Dr. Chernyak.
18     Q.   So you reviewed your own report. You
19 reviewed the report of Dr. Chernyak and her
20 deposition testimony. You reviewed the imaging
21 studies referenced in your report, as well as the
22 radiology reports associated with those imaging
23 studies. True?
24     A.   Correct.
25     Q.   Did you do anything else to prepare for

Page 60

1  today's deposition?
2      A.   I met with counsel.
3      Q.   Did you do anything else besides meet
4  with counsel and review the documents we just
5  discussed?
6      A.   Oh, you know, I should probably state,
7  even though, you know, I did review Dr. Chernyak's
8  report, because she cited them, I reviewed two
9  articles that she relied upon, it seems, during her
10 testimony, as well as the ACR LI-RADS manual, version
11 2018.
12     Q.   Okay. So before I ask you some
13 questions about counsel, I'm going to go through the
14 documents, just to make sure, because I want to know
15 what you know. So in addition to reviewing
16 Dr. Chernyak's report and her deposition testimony,
17 you reviewed two articles.
18          Do you remember which two articles those
19 were?
20     A.   Yes. It was the articles that she was
21 opining on during her testimony. She referred to a
22 2018 article in which she was the primary author in a
23 journal we refer to as Radiology or the Gray Journal.
24 And she referred to an article in 2020 from the
25 American Journal of Roentgenology, which we refer to

Page 61

1  as the Yellow Journal. And I believe the primary
2  author on that article was a Dr. Kim. And I think
3  she offered, during her testimony, that she was also
4  an author on that -- on that article, but honestly I
5  don't -- I mean, I didn't look. And we can see -- if
6  we go through it, we can -- I mean, I don't know if
7  we will, but, you know, all the authors are listed.
8          And then, because, again, it was
9  discussed during her testimony, I followed along and
10 went through the ACR LI-RADS manual. While it was
11 being -- while they were walking through it, I was,
12 you know -- while I'm reading, you know, the text,
13 I'm following where they are, like, in the documents,
14 you know, and the articles that were relevant,
15 really, you know, to my opinion. Dr. Chernyak offers
16 some other opinions that are not relevant to my
17 opinions that are really, you know, non-radiologic,
18 based on what we're looking at, in terms of, you
19 know, the imaging studies. And I will leave those
20 opinions to those experts who can handle those topics
21 within their area of, you know, knowledge, training,
22 and experience.
23     Q.   Understood. And so did you review the
24 entirety of Dr. Chernyak's report?
25     A.   Her written report?

16 (Pages 58 - 61)

Page 62

1    Q.    Yes.
2    A.    Yes.
3    Q.    Okay.  And did you review the entirety
4  of her deposition transcript?
5    A.    I did.
6    Q.    Okay.  But as it relates to any
7  documents that may have been referenced during her
8  deposition, the three that you looked at were the
9  2018 article from the Gray Journal, the 2020 article
10  from the Yellow Journal, and then the ACR LI-RADS
11  manual, version 2018.  True?
12    A.    Yes.  I just want to say that the
13  LI-RADS manual from 2018 is a document which exceeds
14  800 pages.  And so I followed -- I followed along
15  with the relevant sections that were being discussed.
16    Q.    Understood.  Were there any other
17  documents that you followed along with that were
18  being discussed, besides those three?
19    A.    No.
20        MR. VAUGHN:  Object to form.
21
22  BY MR. NOLAN:
23    Q.    And as it relates to documents, aside
24  from those three documents from Dr. Chernyak's
25  deposition transcript and then the imaging studies

Page 63

1  and the radiology reports associated with them and
2  your own report and Dr. Chernyak's report, were there
3  any other documents you looked at to prepare for
4  today's deposition?
5    A.    Outside of the NOD, no.
6    Q.    Okay.  And by NOD, you mean notice of
7  deposition?
8    A.    Yes, Counselor.
9    Q.    Now, you said you met with counsel as
10  well?
11    A.    Yes.
12    Q.    Who did you meet with?
13    A.    I met with attorneys Vaughn, attorney
14  Nigh, and attorney Avila.
15    Q.    Okay.  Was there anyone else -- well,
16  let me scratch that for a second.
17        How many times did you meet with
18  counsel?
19    A.    In what time period?
20    Q.    To prepare for your deposition.
21    A.    I met with attorney Vaughn and attorney
22  Avila one time to prepare for my deposition today.
23    Q.    Okay.  And when did that take place?
24    A.    It took place last night.
25    Q.    For about how long did it take place?

Page 64

1    A.    About an hour.
2    Q.    And was there anyone else on the video
3  conference or phone call or however you met?
4    A.    No.  I believe it was just the three of
5  us.
6    Q.    Okay.  And earlier, you mentioned that
7  you had met with Mr. Nigh at some point?
8    A.    Correct.
9    Q.    When was the first time you met with
10  Mr. Nigh or any of the counsel?
11    A.    Sure.  Our first meeting was, I want to
12  say, that week, the end of February.  And I believe
13  we met a few times, primarily as an introduction.  I
14  guess, to check me out a little bit.  And then, I had
15  reviewed the materials and we met after that.  And
16  then, I met with Mr. Nigh again on Sunday of this
17  past week, and Mr. Vaughn.
18    Q.    So on Sunday of this past week, you had
19  a meeting with Mr. Nigh and Mr. Vaughn?
20    A.    And attorney -- and I believe attorney
21  Avila was there, yes.
22    Q.    About how long did that meeting go?
23    A.    About an hour.
24    Q.    And you mentioned that the first time
25  you met with any of the lawyers was at the end --

Page 65

1  that last week of February?
2        MR. VAUGHN:  Asked and answered.
3
4  BY MR. NOLAN:
5    Q.    Is that correct?
6    A.    I'm sorry, I didn't hear the entire
7  question, Counselor.
8    Q.    The first time you met with any of
9  Mr. Roberts's lawyers was at the end of February.
10  Correct?
11        MR. VAUGHN:  Asked and answered.
12        THE WITNESS:  Correct.
13
14  BY MR. NOLAN:
15    Q.    About how many times would you say you
16  met Mr. Roberts' lawyers since that point in time
17  until today?
18    A.    Are we including this week, as well, in
19  that number?
20    Q.    Yeah.
21    A.    Five times, between four and five times.
22    Q.    And about how much time did each of
23  those meetings last?
24    A.    You know, meetings with attorneys
25  typically last about an hour.

17 (Pages 62 - 65)

Page 66

1      Q.    So about four or five hours spent
2   meeting with attorneys between the end of February
3   and last night?
4           MR. VAUGHN:  Object to form.
5           THE WITNESS:  Correct.
6
7   BY MR. NOLAN:
8      Q.    And during each of those meetings, was
9   anyone other than Mr. Roberts's lawyers present,
10  besides you?
11     A.    I'm including attorney Bogdan in this
12  list also, by the way.  So, yeah, that was pretty
13  much it.  It was just me and, you know, me and
14  counsel.  And some people were, you know, were there
15  one day and not there another day.
16     Q.    Understood.  During the meeting to
17  prepare for your deposition, were you shown any
18  materials by any of the lawyers?
19     A.    No.  Aside from only, you know, just
20  receiving the transcript from the testimony of
21  Dr. Chernyak earlier that day, I kind of had
22  everything already.
23     Q.    Got it.
24     A.    And by yesterday, I had gone through it,
25  you know, on my own already.

Page 67

1      Q.    Okay.  And when did you receive the
2   material from Dr. Chernyak's deposition?
3      A.    Yesterday afternoon.
4      Q.    And how much time did you spend
5   reviewing those materials?
6      A.    Three to four hours.  And by -- and by
7   materials, it's the deposition transcript.  I had had
8   the articles that had been referenced in her report
9   and the manual already.
10     Q.    Okay.  Did you get those after
11  Dr. Chernyak submitted a report or did you -- or did
12  you already have those in your own file?
13          MR. VAUGHN:  Object to form.
14          THE WITNESS:  You know, no, there's the
15  -- the days of keeping articles in a file cabinet in
16  your office are, like, long gone.  So, you know, I
17  had read the -- I had read the ACR manual in the
18  past.  I'm sure we'll get into that.  The article
19  from 2018 is basically kind of a companion to the ACR
20  manual, so there was nothing new or exciting in that
21  compared to the manual, which is 800 pages, as
22  opposed to, you know, maybe like a double digit page
23  publication.  The only thing that I hadn't looked at
24  before her report was produced was the 2020 Kim
25  article; just because it's not something that I would

Page 68

1   normally be looking at in my capacity as, you know,
2   as a clinical diagnostic radiologist.
3           MR. NOLAN:  Okay.
4
5   BY MR. NOLAN:
6      Q.    And so you had -- had you read the 2018
7   article from the Gray Journal?
8           MR. VAUGHN:  Object to form.
9
10  BY MR. NOLAN:
11     Q.    Before your involvement in this case?
12     A.    No.
13     Q.    And you had not read the 2020 article
14  from the Yellow Journal before your involvement in
15  this case.  True?
16          MR. VAUGHN:  Object to form.
17          THE WITNESS:  Correct, I had not.
18
19  BY MR. NOLAN:
20     Q.    And you said it's -- it's not something
21  that you'd normally be looking at in your capacity as
22  a clinical diagnostic radiologist.
23          What do you mean by that?
24          MR. VAUGHN:  Object to form.
25          THE WITNESS:  Well, I meant -- that's in

Page 69

1   reference to the 2020 article.  It's a very
2   epidemiologic-based article about ratios of
3   transformation and expectation of what lesions, how
4   lesions are going to behave down the road.  That all
5   kind of are after, like, the diagnostic part of what
6   we do as diagnostic radiologists.  They're really,
7   you know, management type -- it's more of a
8   management type of topic.  Like a patient with this,
9   what will happen to them, you know, two, three, four
10  years down the road?  Once we kind of, you know,
11  plant our flag on a diagnosis or at least as a flag
12  on an interpretation as a diagnostic radiologist,
13  what follows with, you know, transformation of
14  lesions, how lesions are managed, and all these kind
15  of things, that's really kind of more of an
16  epidemiologic thing that, you know, treating
17  clinicians would really rely upon for outcomes and
18  prognosis.  You know, when you're interpreting
19  diagnostic imaging examinations, you're more focused
20  on that 2018 article, which is just more of, like, a
21  synopsis of the ACR manual, finding the observations,
22  describing them, making your conclusions, and kind
23  of, you know, moving on from there.  It's kind of
24  like that 2020 article was a part, too, of, like,
25  what happens after you do all of that.

18 (Pages 66 - 69)

Page 70

1       MR. NOLAN: Understood. Understood.
2
3   BY MR. NOLAN:
4       Q.    And so you're not an oncologist. Right?
5       A.    That is correct; I am not.
6       Q.    And as a diagnostic radiologist, and
7   correct me if I'm wrong here, is it fair to say that
8   your role is to look at the imaging and provide an
9   opinion as to then diagnosis of what you're seeing on
10  the image might be?
11      A.    To the best of our ability, yes.
12      Q.    Of course. And then, in terms of
13  treatment for whatever that diagnosis is, another
14  type of doctor is the one that handles that type of
15  care?
16      A.    Correct.
17      Q.    Okay. So during your meetings with
18  counsel to prepare for the deposition, did they show
19  you any documents on the screen or anything like
20  that?
21      MR. VAUGHN: Asked and answered.
22      THE WITNESS: You know, Counsel, I'm
23  going to say yes, but they didn't show me anything
24  new. We were talking about a portion of a report or
25  hey, look at this paragraph, you know, that, but

Page 71

1   nothing new and exciting that I hadn't already seen.
2       MR. NOLAN: Understood.
3
4   BY MR. NOLAN:
5       Q.    I just want to know, so what types of
6   documents did they show you on the screen?
7       MR. VAUGHN: Object to form.
8       THE WITNESS: You know, we would look at
9   a paragraph in a report. I don't know if it was my
10  report or Dr. Chernyak's report. I know he didn't
11  flash around the deposition because I hadn't looked
12  at it in its entirety yet. And we did look at parts
13  of the manual that were relevant to the discussion
14  and parts of the articles that may have been relevant
15  to our discussion. But, you know, it was all stuff
16  we had all seen before we got on the call, so.
17      MR. NOLAN: Okay.
18
19  BY MR. NOLAN:
20      Q.    Did you bring any documents with you
21  today?
22      A.    As we discussed, I have a copy of my
23  report available, if I need to refer to it.
24      Q.    Did you speak with anyone else, besides
25  counsel, about today's deposition?

Page 72

1       A.    No.
2       MR. NOLAN: Let's mark as Mele-2 what's
3   Tab 00, the deposition notice.
4
5       (Whereupon, Exhibit Mele-2 was marked
6   for identification.)
7
8   BY MR. NOLAN:
9       Q.    Dr. Mele, you've seen this document
10  before. Right?
11      A.    Yes.
12      MR. VAUGHN: Is this in the Exhibit
13  Share? I'm sorry, Jack. Is this in the Exhibit
14  Share? I'm not seeing it.
15      MR. NOLAN: You may just have to
16  refresh.
17      MR. VAUGHN: I've hit refresh, like, six
18  times. It's in there now. It's in there now.
19      THE VIDEOGRAPHER: Yeah, it took a
20  second, sorry, Counsel.
21      MR. VAUGHN: You're okay. I'm just
22  making sure it's working on my end. Sorry, Jack, go
23  ahead.
24      THE WITNESS: Are you all okay if I just
25  view the documents here, as best I can? If I have to

Page 73

1   flip back to the share --
2       MR. NOLAN: Yes.
3       THE WITNESS: Do you want me to tell you
4   or -- I don't want to be moving my hand and you're
5   wondering what I'm doing. If I need to go look at a
6   document, do you want me to say something?
7       MR. NOLAN: Yes, absolutely, that would
8   be great.
9       THE WITNESS: I'm looking at it right
10  now as it's on the screen.
11      MR. NOLAN: Sure.
12
13  BY MR. NOLAN:
14      Q.    So, Dr. Mele, you've seen a copy of this
15  document before, the notice for today's deposition?
16      A.    Yes.
17      Q.    And if we go to the document requests
18  that are a part of this, so let's scroll down. Keep
19  going. All right. Let's go up one page. Did you
20  look through -- let's go up one page, to Page 3.
21      Did you -- did you look through the
22  document requests to see if you had anything that was
23  responsive to this?
24      A.    I believe I have provided my CV.
25      Q.    Let's look at request -- oh, this is

19 (Pages 70 - 73)

Page 74

1  definitions. Sorry, let's go to requests, so scroll
2  down to the requests. Here we go. And zoom in on
3  three. Request Number 3 is for: "A list of all
4  papers, books, articles" -- I'll let you read it --
5  "related to drug safety and cancer risk, nitrosamines
6  and/or any other data opinions or topics contained
7  within your report."
8      A.  I provided nothing in response to this.
9      Q.  Got it. So you've never written an
10  article or a paper or a presentation or anything like
11  that related to drug safety and cancer risk. True?
12     A.  True, Counselor. No.
13     Q.  And you've never published anything or
14  written anything related to nitrosamine. True?
15     A.  True.
16     Q.  And your CV, which we can look at in a
17  little bit, has a list of some of your research. But
18  do you have any other articles or papers to disclose
19  aside from what's identified in your CV?
20     A.  No.
21     Q.  Let's look at 5A. Sorry, 5B, 5B as in
22  beta. So this asks for: "All notes, calculations,
23  memoranda, drawings, models, illustrations, diagrams,
24  recordings or records generated or utilized by you in
25  connection with your involvement in the case, whether

Page 75

1  handwritten, oral and electronic form."
2          Do you have any documents responsive to
3  this request?
4      A.  No, I don't.
5      Q.  And if we zoom in on 5C, as in Charlie,
6  this asks for: "All materials and documents you
7  relied upon and/or may rely upon in reaching your
8  opinions in this case, including any reference
9  materials."
10         Do you have any documents responsive to
11  this request?
12     A.  I don't. I relied upon the imaging
13  examinations in arriving at my opinion. I believe we
14  all have those already.
15     Q.  And so the materials identified in your
16  report, those are the ones that you relied on in
17  arriving at your opinions. Right?
18         MR. VAUGHN: Objection to form.
19         THE WITNESS: Yes, I believe we hit all
20  of those. The imaging studies and their associated
21  final radiology reports.
22         MR. NOLAN: Okay. All right. Let's go
23  to Tab 44. We'll mark that as Mele-3.
24
25

Page 76

1          (Whereupon, Exhibit Mele-3 was marked
2  for identification.)
3
4          MR. VAUGHN: I've got it, by the way.
5          MR. NOLAN: All right. And let's zoom
6  in, so that way we can see a little bit better on the
7  screen. Basically, just every part of it that has
8  text on it, yeah.
9
10  BY MR. NOLAN:
11     Q.  So this -- Dr. Mele, this is a copy of
12  the invoice that we received from Mr. Roberts's
13  counsel. It's dated March 9th, 2025.
14         Have you submitted any other invoices
15  for this matter?
16     A.  No, I have not.
17     Q.  Okay. And so, as of March 9th, 2025,
18  you had spent ten hours related to this case. True?
19     A.  True.
20     Q.  Okay. At an hourly rate of $600 per
21  hour?
22     A.  Correct.
23     Q.  Does this include time spent speaking
24  with counsel?
25     A.  Yeah. I include that under the

Page 77

1  consultation section.
2      Q.  Got it. So this ten hours represents
3  the entirety of the time you spent through March 9th?
4          MR. VAUGHN: Object to form.
5          THE WITNESS: I would say it -- I would
6  say it a different way.
7          MR. NOLAN: Okay.
8          THE WITNESS: It includes all of my
9  work, and the time it took to complete that work, to
10  the production of my radiology report.
11         MR. NOLAN: Understood.
12
13  BY MR. NOLAN:
14     Q.  And so since that time, since March 9th,
15  can you estimate how much time you spent working on
16  this matter?
17     A.  Well, if you consider that I spent at
18  least, you know, four hours just -- just alone,
19  reviewing Dr. Chernyak's testimony. I have not added
20  it up, but it's probably in the same area of, you
21  know, roughly ten hours, could be a little more,
22  could be less. I'm not certain.
23     Q.  Okay. So somewhere between 20 and,
24  maybe, 25 hours total on this matter?
25     A.  To date?

20 (Pages 74 - 77)

Page 78

1      Q.    To date.
2      A.    That seems reasonable.
3      Q.    Okay.  Did anyone assist you in writing
4  your report?
5            MR. VAUGHN:  Object to form.  That's an
6  improper question.  You can go ahead and answer if
7  you want to, Doctor.
8            THE WITNESS:  No.
9
10 BY MR. NOLAN:
11     Q.    You wrote the whole thing yourself?
12     A.    Yes, Counselor.
13           MR. VAUGHN:  Improper question.
14           THE WITNESS:  Yes, Counselor.
15
16 BY MR. NOLAN:
17     Q.    Do you intend to offer any opinions in
18 this case that are not included in your report?
19     A.    You know, as a medical expert, this is
20 always a bit of a -- of a thorny question; because
21 you're going to ask me some kind of a hypothetical
22 or, like, a leading question at some point that may
23 not be within the four corners of my report; and I'm
24 going to do my best, to my ability, to answer that.
25 I'm also going to need to probably respond to some

Page 79

1  questions or some opinions raised by Dr. Chernyak,
2  which were not known to me at the time of my report.
3  So I guess that's the purpose of a deposition.  I
4  will have opinions, if asked or if I need to explain,
5  based on additional information that's been made
6  available to me since the 9th of March.  It's kind of
7  the best way I can answer that.
8      Q.    Okay.  What information has been made
9  available to you since the 9th of March that you may
10 have opinions about?
11     A.    Sure.  So I mean, the most, you know,
12 the most significant items are Dr. Chernyak's report
13 and Dr. Chernyak's deposition testimony.
14     Q.    Anything else?
15     A.    I would just say in the -- in the
16 umbrella of her report and both -- I guess, both her
17 report and her deposition, the additional
18 publications from 2018 and 2020.
19     Q.    Okay.  Have you been provided with the
20 expert reports of any of the other experts in this
21 case?
22     A.    No.
23     Q.    Have you been provided with the
24 deposition testimony of any of the other experts in
25 this case?

Page 80

1      A.    No.
2      Q.    And so, as it relates to Dr. Chernyak's
3  report and testimony, what, if any, opinions do you
4  have in response to her?
5            MR. VAUGHN:  Object to form.
6            THE WITNESS:  I don't agree with some
7  aspects of her opinion, which I just basically, for
8  the most part, reiterated and perhaps, you know,
9  solidified in her -- on deposition testimony.
10
11 BY MR. NOLAN:
12     Q.    Which aspects of Dr. Chernyak's opinions
13 don't you agree with?
14     A.    We can kind of take it sequentially.
15 It's my opinion that the CT scan performed on
16 4/19/2016 is inadequate for the application of the
17 LI-RADS categorization.  That's where I kind of
18 start.  And, you know, her -- her opinions thereafter
19 are kind of causation, to a certain degree, and I
20 don't want to get into that, because I'm not a
21 causation expert, regarding what could have been and
22 why and how and, you know, it could have been this,
23 but it can't be that.  I would just like to stick to
24 the morphologic or the conspicuous findings on the
25 studies we have available.  But I would say that my

Page 81

1  opinion starts at that 4/19/2016 CT is not
2  categorizable under the LI-RADS criteria.
3      Q.    Okay.  I'm going to follow up with that
4  in a second.
5            Are you offering any opinions as to what
6  caused Mr. Roberts to develop HCC?
7      A.    No.
8      Q.    Now, you said that your opinion is that
9  the 4/19/2016 CT scan is inadequate for LI-RADS
10 categorization.  Right?
11     A.    Correct.
12     Q.    Why?
13     A.    Well, it starts out we don't have the
14 requisite phases that are outlined in the version
15 2018 manual, as well as Dr. Chernyak's own article
16 that she authored in the Gray Journal.  So at face
17 value, it doesn't meet the minimal requirements to be
18 classified under LI-RADS.  And so, I guess, in a way,
19 and it depends on how one would look at it.  I then,
20 I guess, theoretically object to the majority of her
21 opinion, or I don't agree -- I'm not an attorney -- I
22 don't agree with the majority of her opinion with
23 respect to how it gets categorized.  I'm going to
24 leave her discussions about causation to be argued
25 among the experts who have causation opinions.  So I

21 (Pages 78 - 81)

Page 82

1  guess my opinion starts at, you know, the foundation,
2  I guess, of what is being stated about the liver
3  itself on that date.
4      Q.   Okay.  Now, you said that the
5  April 19th, 2016, CT scan didn't have the requisite
6  phases.  What phases are you referring to?
7      A.   So the manual and the article, mostly
8  the manual, are very descriptive about what the
9  minimal CT images are.  And it states that there's a
10  requirement for an arterial phase.  There's a
11  requirement for a portal venous phase and a delayed
12  phase.  And we'll get into this, I'm sure, but, at
13  best, if you take the three phases independently and
14  you take the phases we have available for review on
15  4/19/2016, as they're described and presented by
16  Dr. Chernyak, they don't represent the requisite
17  sequences in the manner in which she discusses them,
18  for the following reasons:
19          The quote/unquote "arterial phase," I'm
20  going to use this terminology, because I want to make
21  sure that we're talking about the exam in the -- in
22  the context in which Dr. Chernyak discussed it.  And
23  I'm going to talk about in terms of what's really
24  there, and then what you can really do about it.  So
25  what has been referred to by Dr. Chernyak as the

Page 83

1  arterial phase, which is, so we're all clear, the
2  first phase in which we understand that contrast
3  material was administered to this patient, is
4  Series 301.  Series 301 is not an arterial phase CT.
5  Dr. Chernyak says it is and I'm going to explain to
6  you the reasons why it's not.
7          When you look at Series 301, which, I
8  believe, on the imaging itself is labeled axial W,
9  meaning with contrast.  If you start at the top of
10  the scan, all of the contrast material that's --
11  well, the majority, I should say.  The overwhelming
12  majority of the contrast material that has been
13  administered is still in the right heart, meaning
14  that this is a great scan to look at the lungs, but
15  an inadequate scan to look at the viscera.  It's
16  essentially, for the purposes of the liver, the
17  closest thing you can get to a noncontrast scan.  And
18  there's a variety of ways that we can come to this
19  conclusion.
20          One is you look at the CT, it's there.
21  The majority of the contrast is still in the right
22  side of the heart.  So it still needs to go through
23  the atrium to the ventricle to the lungs, back to the
24  heart, and then out to the aorta and then out to the
25  rest of the organs; in this case, particularly, the

Page 84

1  target organ, which is the liver.  So the phase of
2  contrast is not a true arterial phase.
3          We know that also because you can
4  measure the Hounsfield Units.  It's a measure of the
5  relative density of structures on CT to one another
6  and the Hounsfield value of the aorta at the expected
7  location where LI-RADS says to measure it, at the L1
8  vertebral level or at the approximate L1 vertebral
9  level, it's 100 Hounsfield Units.  And that's the
10  aorta trigger point, meaning that when the aorta
11  registers that number, that's when you delay even
12  further before you start scanning.  And why?  Because
13  you want the contrast to get from the right heart,
14  through the lungs, and out through the arterial
15  system.
16          So this scan or this arterial phase
17  likely needed to cook for, like, at a minimum 30
18  additional seconds, at that point.
19          The other part of it is that -- and this
20  is from the LI-RADS, you know, and this is from my
21  clinical experience, the hepatic arteries and its
22  branches need to be fully enhanced.  And that's just
23  not there.  And that's -- proving a negative is, you
24  know, kind of pointless.  The hepatic arteries and
25  their branches are not fully enhanced.

Page 85

1          When you look at the liver and you look
2  at the spleen and you take stock of the fact that
3  there is actually, you know, a noncontrast scan or
4  noncontrast series that started all of this, there
5  really is no significant degree of attenuation
6  increase between the noncontrast scan and what's the
7  -- this alleged pseudo arterial scan, what they call
8  axial W.  I don't want to give it the dignity of
9  calling it, you know, like an arterial scan, because
10  it's not.  If anything, you know, at a minimum, you
11  would say it's the earliest arterial phase, meaning
12  it's -- they just gave some contrast, at that point.
13  And you have, you know, so you have that.
14          If you look at the kidneys, and this is
15  kind of, you know, another reason, you know, the
16  kidneys aren't really enhancing.  Normally, you'd see
17  what we call this, you know, cortical phase in the
18  kidneys during an arterial phase scan.  And the other
19  part of it is, you know, LI-RADS, or at least the
20  criteria, are pretty descriptive about, you know,
21  this strongly preferred late arterial phase.  So, I
22  mean, we're not even in the -- in the ballpark of a
23  late arterial phase.  We're scratching the surface at
24  wanting to make believe that this thing is an
25  arterial phase image.  And the reason why we know

22 (Pages 82 - 85)

Page 86

1  that is because there are also criteria for the late
2  arterial phase.
3         And one of the indicators of that is,
4  you have, you know, opacification, where you have
5  contrast within the hepatic arteries and its
6  branches, as well as the portal vein.  And on the
7  quote/unqute "arterial phase" that we have, there is
8  no opacification or conspicuous opacification of the
9  portal venous system on that first series.  So for
10  those reasons, that's a few, I don't believe that
11  what we're really dealing with on axial W or
12  Series 301 is the requisite arterial phase that is
13  needed to make observations about arterial phase
14  hyper-enhancement or, frankly, any enhancement.
15         Now, I can get into Dr. Chernyak's
16  opinions about that series or I can continue to
17  critique the study, if you -- if you'd like me to
18  continue on that.
19     Q.   So I have a few follow-up questions and
20  then we're going to sort of -- I'm going to take you
21  up on that, Dr. Chernyak's opinions and your critique
22  of the study.
23     A.   Great.
24     Q.   Okay.  So what you were just talking
25  about was Series 301 and that was the first phase

Page 87

1  with contrast?
2     A.   Correct.
3     Q.   And you said that, in your opinion,
4  the -- it needed to cook for an additional 30 seconds
5  or so because, at that point, it was not a true
6  arterial phase?
7         MR. VAUGHN:  Object to form.
8         THE WITNESS:  Yeah.  I mean, you know,
9  part of it is my opinion and, you know, part of it is
10  some of, you know, the objective information that we
11  have.  When you look at the LI-RADS criteria, the
12  trigger for the aortic phase is when you measure the
13  aorta at a level, just as you get into the abdomen,
14  below the diaphragm, they make reference to the L1
15  area, the subdiaphragmatic area.  When you see that
16  area is measuring about 100, that's when you wait an
17  additional 30 seconds.  And by that point, the
18  contrast will have moved through the right heart.  So
19  don't forget, the contrast is still in the right
20  heart, so, you know, all timing aside, we have
21  objective evidence that there is the majority of the
22  contrast still in the right side of the heart.  So we
23  can get into seconds and minutes and all that, but we
24  have a picture of where this contrast really is.
25         So my -- so my point is, is that if you

Page 88

1  know all of that and you take that information and
2  you know that the, you know -- if you're using the
3  aortic measurement correct, there would have been an
4  additional 30 second delay with that.  Attenuation of
5  the aorta should have been used to ensure that the
6  contrast or the requisite amount of contrast material
7  is in the arterial system at that point.
8
9  BY MR. NOLAN:
10     Q.   Okay.  And what's the arterial system?
11     A.   So once you leave the left ventricle,
12  starting with the aorta, down to the -- down to the
13  origin of the mesenteric vessels and then to the
14  vessels that go to the liver, and then the rest of
15  the body, obviously.
16     Q.   Got it.  And so, do you use LI-RADS in
17  your every day practice?
18     A.   We do use LI-RADS in our -- yes, at the
19  VA, yes.
20     Q.   And for how long have you been using
21  LI-RADS in your practice?
22     A.   That's a -- that's a great question.  So
23  in our -- in our structure, in our network, I'll call
24  it; we're a network of several hospitals in the New
25  York and New Jersey area.  It's not a mystery that

Page 89

1  there is a significant population of individuals with
2  liver disease in the VA Healthcare System.  It's not
3  an uncommon diagnosis that we work with.
4         I want to say, going back -- I'm being
5  very conservative, actually, about this.  I want to
6  say, going back about ten years, we had a very
7  enthusiastic gastroenterologist who brought us all on
8  a journey of HCC surveillance and we embarked on a
9  network-wide program for hepatocellular carcinoma
10  surveillance.  And I believe this individual is, you
11  know, fairly well-known in the GI hepatology world.
12  And to my knowledge, we were one of the initial, if
13  not the first healthcare networks to really take a
14  look at standardizing our liver imaging, our exam
15  interpretations.  And we adopted LI-RADS fairly early
16  on amongst our peers, at least in the VA.  And so
17  we've been -- we've been doing this in our, you know,
18  in our routine, clinical practice now -- I'm saying,
19  you know, thinking back ten years, based upon the
20  radiologists who have come and gone and how long I've
21  known this individual and thinking about where I was
22  in the organization kind of at the time.
23     Q.   Okay.  And so you've been using LI-RADS
24  for at least the past ten years or so as part of the
25  VA network?

23 (Pages 86 - 89)

Page 90

1      MR. VAUGHN: Object to form.
2      THE WITNESS: Yeah, I think that's a
3  fair estimate. I mean, we're going on my memory.
4  I'd have to look back at, you know, historical stuff.
5  But we've been talking about LI-RADS for a long time,
6  years. At a minimum, I'm thinking ten. We have a
7  weekly tumor board where we discuss, you know, liver
8  cases only and we are discussing, you know, LI-RADS
9  and we're critiquing our examinations. And I'm
10  particularly sensitive to the quality aspect, because
11  as the chief of service, when these exams aren't done
12  to the protocol, I get involved with our work group
13  trying to figure out what we could have done better
14  to time the scan better, to get the requisite
15  sequences; or if we're talking about an MRI or the
16  requisite series, if we're talking about CT. And so
17  those quality issues would normally come to my
18  attention as the supervising physician for our
19  service.
20      MR. NOLAN: Understood.
21
22  BY MR. NOLAN:
23      Q.    And before we get too far ahead, what is
24  LI-RADS?
25      A.    So, you know, do you want to know what

Page 91

1  the letters stand for? I'll give you a general idea
2  of what it is. So it's the Liver Imaging Reporting
3  Data System. It's essentially, to really make it the
4  most simple way, it's a standardization of liver
5  imaging and reporting. So it's standardized
6  protocols to produce standardized reports using a
7  very -- a very lengthy and radiology lexicon in order
8  to have someone's liver report look just like the
9  other person's liver report in terms of the language
10  used and the scale that is used. So when a referring
11  physician receives that information, there is some
12  standardization that, you know, the communication is
13  very clear. So it's a whole, you know -- it's an
14  algorithm. It's a movement to kind of standardize
15  the acquisition of these examinations so that you can
16  produce a standardized report based on that
17  information.
18      Q.    Right. And LI-RADS can be used to
19  diagnose HCC without the need of an invasive biopsy.
20  Right?
21      MR. VAUGHN: Object to form.
22      THE WITNESS: I'm going to just qualify
23  that saying that, you know, it is widely accepted
24  that the categorization of LR-5 can preclude a
25  biopsy.

Page 92

1      MR. NOLAN: Understood.
2
3  BY MR. NOLAN:
4      Q.    And in order to apply the LI-RADS
5  algorithm or the LI-RADS scale, if someone who is at
6  higher risk for HCC, right, so if they have a
7  cirrhotic liver or if they have some other sort of
8  liver disease. Right?
9      MR. VAUGHN: Object to form.
10      THE WITNESS: Yeah, I believe the way to
11  capture all of that is it should be done in
12  populations where there's a high pretest probability
13  or risk factors for HCC.
14
15  BY MR. NOLAN:
16      Q.    And when you say "pretest", what do you
17  mean in that context?
18      A.    Meaning that, you know, you subject
19  someone to a -- to a test. I'm going to give us a
20  very simplistic term, you know, that where you have a
21  -- you have a suspicion that this disease may be
22  present or you're looking for it because they're at
23  risk for it.
24      Q.    And what are the sorts of things that
25  may be present that would lead to that suspicion that

Page 93

1  they may -- that the patient may have HCC?
2      MR. VAUGHN: Object to form.
3      THE WITNESS: These aren't things that I
4  normally get into as a diagnostic radiologist, so I
5  don't want to get outside of my scope. I mean, I'm
6  familiar with the pathophysiology of disease, so I
7  know what the physics on the imaging examination. So
8  I don't want to offer an opinion here where it can be
9  misconstrued that I'm going too far.
10      MR. NOLAN: Okay.
11
12  BY MR. NOLAN:
13      Q.    But what are the sorts of risk factors
14  or conditions that a patient may have that would
15  allow a diagnostic radiologist to apply the LI-RADS
16  scale to a scan of their liver?
17      MR. VAUGHN: Object to form.
18      THE WITNESS: I'm going to answer your
19  question, Counselor, and you're going to -- and
20  you're going to promise not to hold me to going
21  beyond my scope, because you're asking me to answer
22  it, so I will. But I want to make sure that we
23  understand that I'm -- you're asking me to color
24  outside the lines a little bit. So let me explain to
25  you, the best way that I can, how I would be in

24 (Pages 90 - 93)

Page 94

1  receipt of that information and I would determine
2  whether or not a -- whether or not the utilization of
3  a scan technique and the application of LI-RADS would
4  be reasonable.
5          So, you know, the scenario I'll present
6  to you is I get a requisition saying, you know,
7  patient history has this. And if it's appendicitis,
8  I would not recommend that we do a triple phase and,
9  you know, and a LI-RADS on that person.
10         If I get a clinical history of patient
11  with mild hepatitis or patient with evidence of, you
12  know, clinical liver disease, one of them could be
13  viral infection, could be known cirrhotic, could be a
14  history of, you know, HCC suspected elsewhere on
15  another type of imaging study. If those raise to the
16  level where, you know, this type of examination is
17  appropriate, they would be -- they would be done
18  under the LI-RADS protocol and interpreted
19  accordingly.
20
21  BY MR. NOLAN:
22      Q.   So one of the examples you gave is if
23  the liver was cirrhotic. Right?
24          MR. VAUGHN: Object to form. Misstates
25  prior testimony.

Page 95

1          THE WITNESS: Yes. I indicated that I
2  may see cirrhosis as an indication on an -- on an
3  exam order that I receive.
4
5  BY MR. NOLAN:
6      Q.   And so if you receive a scan and you see
7  that it has cirrhotic features and you notice a
8  lesion of some kind, would you then apply the LI-RADS
9  protocol to determine what you could about that
10  lesion?
11         MR. VAUGHN: Object to form.
12         THE WITNESS: If I had the requisite
13  phases to do so, I could.
14         MR. NOLAN: Okay.
15
16  BY MR. NOLAN:
17      Q.   Would you ever order the requisite
18  phases if you saw a scan, noticed cirrhotic features
19  as well as a lesion?
20         MR. VAUGHN: Object to form.
21         THE WITNESS: I do not order -- I do not
22  order any radiology examinations.
23
24  BY MR. NOLAN:
25      Q.   Would you recommend to someone else to

Page 96

1  order it?
2          MR. VAUGHN: Object to form.
3          THE WITNESS: Yes.
4
5  BY MR. NOLAN:
6      Q.   And then, we're coming up on a break.
7  We've been going for a long time, but I just want to
8  make sure that I nail this down.
9          You mentioned a three-phase scan?
10     A.   Yes.
11     Q.   Is that the arterial phase, the portal
12  venous phase, and the delay phase?
13     A.   Correct. That's what we strive for,
14  yes.
15     Q.   Got it. And so that's what you strive
16  for in applying the LI-RADS algorithm. Right?
17         MR. VAUGHN: Object to form.
18         THE WITNESS: That's what the algorithm
19  requires.
20
21  BY MR. NOLAN:
22     Q.   Have you ever applied LI-RADS where one
23  of those three phases was missing?
24     A.   So that's -- that's a judgment call by
25  the interpreting radiologist. I think that you would

Page 97

1  be working outside of the requirements for sure,
2  because they're written very -- they're very, very
3  clear; three phases are required. So I think you
4  have to make note that you would be -- you would be
5  doing so outside of the required phases as is
6  outlined in the various documents. You would only do
7  so for the benefit of the patient at that point. But
8  you'd have to have, minimally, what you need to
9  evaluate, what are the major features. If you don't
10  have scanned phases to do so, you cannot apply
11  LI-RADS, no matter how many you have. You could have
12  six, you could have 12, you could have three. If
13  none of them are able for you to make unequivocal
14  observations about that scan, you cannot apply the
15  LI-RADS categories.
16     Q.   So my question, though, was: Have you
17  ever applied LI-RADS where you didn't have the
18  arterial phase, the portal venous phase, and the
19  delayed phase?
20         MR. VAUGHN: Object to form. Asked and
21  answered.
22         THE WITNESS: I would offer that if you
23  don't have those, you can't.
24
25  BY MR. NOLAN:

25 (Pages 94 - 97)

Page 98

1    Q.    But have you ever done it, yes or no?
2    A.    No.
3         MR. VAUGHN: Object to form.
4
5    BY MR. NOLAN:
6    Q.    And when we were talking about the
7    arterial phase earlier, you were talking about the
8    contrast. Right?
9    A.    Yes.
10   Q.    And you said that for Series 301, the
11   contrast was still in the -- had not made its way to
12   the liver?
13        MR. VAUGHN: Object to form.
14        THE WITNESS: Yeah, the way -- the way I
15   had explained it was that the -- what would be the
16   requisite amount of, you know, contrast material
17   could not have been delivered to the liver, simply
18   based upon the appearance of the heart at that same
19   time.
20        MR. NOLAN: Okay.
21        THE WITNESS: And based upon, you know,
22   other factors.
23
24   BY MR. NOLAN:
25   Q.    But the contrast is what allows the

Page 99

1    radiologist or whoever is looking at the scan to see
2    that particular organ better. Right?
3         MR. VAUGHN: Object to form.
4         THE WITNESS: It depends on what you're
5    looking for. It can also be a confounder, but --
6
7    BY MR. NOLAN:
8    Q.    For purposes of observing a liver, is
9    contrast a confounder or is it something that allows
10   you to see things like lesions or scarring better?
11        MR. VAUGHN: Object to form.
12        THE WITNESS: It depends on what the --
13   it depends on what you're looking for, Counselor.
14
15   BY MR. NOLAN:
16   Q.    Okay. Explain that to me.
17   A.    So one of the confounding things with
18   contrast material is things that look similar to it
19   on CT. And I think, you know, the big two are areas
20   of calcification and areas of blood. As you start
21   bringing contrast into the structure you're
22   evaluating, you would not be able, in certain
23   instances, to discern between is that contrast or is
24   that blood that was there before we gave the
25   contrast? Is that contrast or is that calcification

Page 100

1    that was there before we gave the contrast? And it's
2    not just like, you know, a little dribble. There's a
3    whole way that contrast has to be administered,
4    particularly in these cases where you're looking for
5    an arterial phase. It's a combination of bolus rate
6    or injection rate and timing. Working with the
7    physiology of the human condition, determining where
8    you're injecting, where it's going, what it has to
9    get to, and how quick it can get to where you need it
10   to be in order to render your opinion. So sub
11   administration of contrast renders the image
12   inadequate, lower quality, insufficient. I mean,
13   whatever you want to call it; which is the reason why
14   they set up, you know, protocol parameters to
15   minimize this and to give you an idea of what you
16   should be looking for when you're critiquing these
17   examinations before you try to interpret them inside
18   of a classification system, like LI-RADS. And, you
19   know, we have others, but LI-RADS is what we're, you
20   know, discussing here.
21        So, you know, the degree of enhancement
22   is equally as important as, well, there's just some
23   contrast in there somewhere. It doesn't quite work
24   that way.
25   Q.    Okay. The contrast enhances the images

Page 101

1    of the liver. Right? There may -- agreed?
2         MR. VAUGHN: Object to form.
3         THE WITNESS: Contrast instilled will
4    enhance or increase the CT attenuation of an organ
5    like the liver, yes. Yes, I can agree with that.
6
7    BY MR. NOLAN:
8    Q.    All right. And the -- and contrast can
9    be confounding for blood or calcification. Right?
10        MR. VAUGHN: Object to form.
11        THE WITNESS: Yes. Those are the big
12   ones, yeah.
13
14   BY MR. NOLAN:
15   Q.    When it comes to something like a lesion
16   on the liver, does the contrast allow that image to
17   be viewed more clearly?
18        MR. VAUGHN: Object to form.
19        THE WITNESS: It doesn't change the --
20   it doesn't change the resolution of the image,
21   because the image is -- the image is based in
22   radiography. It's based on the scanner, the
23   requisite or the foundational technique that's used
24   to acquire it. The administration of IV contrast can
25   enhance features or can enhance parts of an organ or

26 (Pages 98 - 101)

Page 102

1  pathology or even normal structures, like the blood
2  vessels. Right? They enhance too.
3          MR. NOLAN: Okay.
4          THE WITNESS: And there are normal
5  enhancement patterns, by the way. So, you know, the
6  liver enhancing or the spleen enhancing or the kidney
7  enhancing or the brain or any anywhere else that we
8  use -- you know, any other organ, after you give an
9  IV contrast, is normal.
10
11  BY MR. NOLAN:
12      Q.    So the contrast doesn't change any of
13  the features that can be viewed on the liver. True?
14          MR. VAUGHN: Object to form. Misstates
15  prior testimony.
16          THE WITNESS: It absolutely changes what
17  you can say about the liver.
18          MR. NOLAN: That wasn't my question.
19
20  BY MR. NOLAN:
21      Q.    My question is: It doesn't change any
22  of the -- any of the features of the liver that
23  you're looking at. Right?
24          MR. VAUGHN: Object to form. Misstates
25  prior testimony.

Page 103

1          THE WITNESS: I have to disagree with
2  that statement.
3          MR. NOLAN: Okay. So then, I guess,
4  maybe we need to understand what we mean by features
5  then.
6          All right. We'll just take a break now.
7  That's fine.
8          THE VIDEOGRAPHER: The time is 11:41.
9  We are off the record.
10
11          (Whereupon, a brief recess was taken off
12  the record.)
13
14          THE VIDEOGRAPHER: The time is 11:59.
15  We are on the record.
16
17  BY MR. NOLAN:
18      Q.    So you mentioned that you read
19  Dr. Chernyak's deposition transcript. Have you read
20  the deposition transcript of any of the other
21  witnesses in this case?
22          MR. VAUGHN: Asked and answered.
23          THE WITNESS: No.
24
25  BY MR. NOLAN:

Page 104

1      Q.    And you haven't read the reports of any
2  of the other experts hired by plaintiff?
3          MR. VAUGHN: Asked and answered.
4          THE WITNESS: No, I have not.
5
6  BY MR. NOLAN:
7      Q.    Now, you mention that you apply LI-RADS
8  in your medical practice. Do you agree that if
9  something is characterized as an LR-3, there's a
10  33 percent chance that it is HCC?
11          MR. VAUGHN: Object to form.
12          THE WITNESS: It has a 33 percent chance
13  of -- that observation has a 33 percent chance of
14  containing HCC, is how I would say it.
15          MR. NOLAN: Okay. That's totally fair.
16
17  BY MR. NOLAN:
18      Q.    And if there are instances like that
19  throughout the deposition where I'm sort of mangling
20  the medical interpretation, please feel free to
21  correct me.
22      A.    Sure.
23          MR. NOLAN: Let's pull up your report,
24  which is Tab 1, and we'll mark that Mele-4, I
25  believe.

Page 105

1          (Whereupon, Exhibit Mele-4, Report, was
2  marked for identification.)
3
4          MR. NOLAN: And let's zoom in on the top
5  paragraph there, request for statement of opinion.
6
7  BY MR. NOLAN:
8      Q.    It says that you were asked by
9  Mr. Roberts's lawyers to evaluate certain imaging and
10  final radiology reports. True?
11      A.    True.
12      Q.    What does that -- what does that mean
13  exactly?
14      A.    I was asked to review them, as I would,
15  and then to offer any opinions on any findings that
16  would be present. And then I would, in turn, then
17  review -- this doesn't happen all the time, by the
18  way -- and then, in turn, I would review any
19  radiology reports that were made available that, you
20  know, corresponded with the imaging that I was asked
21  to look at, to see what the original -- what I
22  normally refer to as the original interpreting
23  radiologists would have had to say about it or their
24  interpretation of the study or the examination that
25  I'm reviewing.

27 (Pages 102 - 105)

Page 106

1    Q.    Okay.  And you're not an epidemiologist.
2    True?
3    A.    True.
4    Q.    You're not a toxicologist.  True?
5    A.    True.
6    Q.    You're not offering any opinions on
7    whether NDMA or Valsartan causes cancer.  True?
8    A.    True.
9    Q.    You're not offering any opinions on
10   whether NDMA or Valsartan caused Mr. Roberts's
11   cancer.  True?
12   A.    True.
13   Q.    Let's look at the next section, that has
14   the materials reviewed.  And so there are two
15   categories here.  One is imaging studies and one is
16   medical documentation.  Right?
17   A.    Correct.
18   Q.    As it relates to the imaging studies,
19   were you provided with any others except for the five
20   that are listed here?
21   A.    No, I wasn't.  I know that there is --
22   there is an ultrasound, I believe it is, from 2009,
23   but I don't believe anyone has that.
24   Q.    Okay.  But the only imaging studies that
25   you have are the ones -- the five that are listed

Page 107

1    here.  Right?
2    A.    That is correct.
3    Q.    And each of those imaging studies were
4    provided to you by Mr. Roberts's attorney?
5    A.    Yes.
6    Q.    Did you ask Mr. Roberts's attorneys for
7    any additional imaging studies?
8    A.    You know, when I had -- when I had seen
9    the studies and I saw the companion radiology
10   reports, I asked if anyone had the -- the prior
11   imaging that I could see referenced, and I believe it
12   was in the ultrasound final report, or any prior
13   imaging.  And at the time, I don't know if that's
14   changed for anyone, but, at the time, these were the
15   only studies that were available.
16   Q.    Okay.  So the answer is you asked for
17   earlier imaging studies and did not receive them?
18       MR. VAUGHN:  Object to form.
19       THE WITNESS:  Correct.  I was told that
20   no one was in possession of them.
21       MR. NOLAN:  Okay.
22
23   BY MR. NOLAN:
24   Q.    Did you review any imaging studies from
25   after the August 7th, 2018 date identified here?

Page 108

1       MR. VAUGHN:  Asked and answered.
2       THE WITNESS:  I did not.
3
4    BY MR. NOLAN:
5    Q.    Did you ever ask for any of those?
6    A.    I -- I would think, the way that imaging
7    gets delivered, that I likely had them, but they're
8    not relevant to the opinion that I rendered.
9    Q.    Okay.  Why is it that they're not
10   relevant?
11       MR. VAUGHN:  Object to form.
12       THE WITNESS:  Well, I think, you know,
13   for the episode of care that I was asked to review,
14   as I understood it, and, you know, as I -- as I
15   outline as best I can in the report is, you know,
16   upon, you know, what -- what is, you know, an
17   objective diagnosis, with regards to radiology, that
18   a hepatocellular carcinoma is present.  And then I
19   was asked, you know, to look and see if that was the
20   only examination in which, you know, that
21   hepatocellular carcinoma was present or not.  So,
22   really, going beyond that was not germane to my
23   scope.
24       MR. NOLAN:  Okay.
25       THE WITNESS:  And it wouldn't -- and it

Page 109

1    wouldn't change my opinions based upon, you know, the
2    period between 2016 and 2018, based on what we had
3    available.
4
5    BY MR. NOLAN:
6    Q.    And so you were specifically asked to
7    look at the period between April of 2016 and August
8    of 2018.  Fair?
9    A.    Correct.
10   Q.    Okay.  Now, the time stamps for each of
11   these imaging studies, what does that indicate?
12   A.    So when you -- when you -- what's the
13   best way to compartmentalize this?  When you perform
14   a radiology exam and then you make it available or
15   you want to view it, it's what we call in DICOM
16   format.  It's a standard medical grade imaging.  And
17   with that comes the ability to preserve certain
18   demographic information about the patient and, also,
19   legacy information about the examination itself.  So
20   when you view these -- these studies, whether it be
21   in a work list or as individual images in a series,
22   they have a date and a time on them.  And that's the
23   date and time, either according to the radiology
24   information system or the equipment that the
25   examination was performed on, as the date and time at

Page 110

1  that moment when that image was obtained and it
2  doesn't get corrupted as time goes by. It's kind of
3  etched in stone on this stuff. So that's the date
4  and the time that the radiology images are telling me
5  that the exam was most likely initiated.
6       And as you go into the imaging
7  examinations themselves, if there's multiple series
8  or multiple images, it's not uncommon that as the
9  exam goes on, the time moves forward. So, you know,
10  the ultrasound may have started at 1000. There may
11  be images there that are from, you know, 1005. The
12  CT on 4/19/2016 may have started at 1250, but there's
13  images there that I know from 1259 and 1300. I'm
14  going to use military time, if that's okay with you.
15  That's how I do it every day. Much like, you know,
16  the time is 1518, there's probably images in the scan
17  on 7/17/2018 that are beyond 1518. And similarly for
18  the following ultrasound and the MRI. So that time
19  is typically best estimate you have as what time the
20  exam started or it could be at the time when the
21  technologist told the computer, I'm going to start
22  this examination. It may not be when the first image
23  was obtained. It could just be when they, you know,
24  hit ready to go on the computer. And that will look
25  differently at different places, depending on the

Page 111

1  radiology information systems that they're using.
2       MR. NOLAN: Okay.
3
4  BY MR. NOLAN:
5       Q. And so for the April 8th, 2016
6  ultrasound examination, did you look at every series
7  of images that were available?
8       A. Yes.
9       Q. And did you look at every series of
10  images that were available for each of the five
11  imaging studies identified here?
12       A. Yes.
13       Q. Okay. Were there any imaging studies or
14  series that you thought might be missing?
15       A. So the ultrasounds are always very
16  different from facility to facility, technologist to
17  technologist. One of the one things that we are
18  involved in as radiologists where it's really what we
19  call operator dependent. And you're relying on an
20  ultrasound technologist, another human in this
21  instance, instead of a machine, to get the best
22  images they can of that organ or that target feature,
23  that target pathology that you're looking for. So
24  you can lineup, you know, a bunch of ultrasounds of
25  the same organ and, you know, a couple of techs may

Page 112

1  do it a little bit differently, in a different order,
2  kind of a different angle, do their measurements one
3  way or another. We discussed, you know, the 2016 CT
4  that, you know, there was some phases. There
5  were some series that were inadequate. And, you
6  know, we'll get to my opinions on that, I'm sure,
7  further. But the CT scan of the abdomen on 7/17/2018
8  suffers from the same insufficiencies. It's
9  essentially a single phase post-contrast CT. There's
10  nothing special about it. And I believe that, you
11  know, Dr. Chernyak shared that opinion, and that it
12  was kind of another study that you couldn't apply
13  LI-RADS to, because it was a single phase. It was
14  essentially a single phase post-contrast CT.
15       The ultrasound, again -- and then, you
16  know, the MRI is pretty complete and it's pretty --
17  there's a lot of series there and I would not be
18  critical of that examination.
19       Q. Okay. Thank you for that. Not really
20  my question.
21       My question was more: Were you
22  provided, for example, Series 301 and 303, but not
23  302?
24       MR. VAUGHN: Object to form.
25       THE WITNESS: I was provided the CTs

Page 113

1  with both coronal and sagittal multiplanar
2  reconstructions, if that's what you're asking.
3
4  BY MR. NOLAN:
5       Q. I'm more asking from your review of the
6  imaging studies that you reviewed, did it appear that
7  anything might be missing?
8       MR. VAUGHN: Asked and answered.
9       THE WITNESS: No.
10
11  BY MR. NOLAN:
12       Q. So your best understanding is that you
13  received all the imaging studies from each of the
14  five incidents identified here?
15       A. I believe so, yes.
16       Q. And then, the next section is --
17       A. Counselor, I just want to point out
18  that, unless you were like a computer science expert,
19  when you provide imaging in this format, in a DICOM
20  format, someone would have had to have gone in
21  deliberately to remove images. So we're all
22  operating under the assumption that if we received
23  DICOM studies, that everything that was obtained has
24  been provided to us. Because part of that is the
25  custody of that data. You can trust that you more

29 (Pages 110 - 113)

Page 114

1  likely than not -- (technical difficulties.)
2      MR. NOLAN: I think he froze.
3      Dr. Mele, are you still there?
4      THE WITNESS: I'm here.
5
6      (Whereupon, the requested portion of the
7  record was read by the reporter.)
8
9      THE WITNESS: (Continuing his response)
10 -- that you've been provided with the complete, you
11 know, DICOM data set, when you're given imaging this
12 way, unless someone deliberately took stuff out of
13 it. I don't even know how you would do that. But
14 you're operating on the premise that the study you
15 received can be trusted to be complete.
16     MR. NOLAN: Okay.
17
18 BY MR. NOLAN:
19     Q.   The reason I'm asking is just because
20 there are certain times identified here and, I know
21 from looking at the images myself, as time goes on,
22 they get stamped with something different. And so I
23 just -- I want to know if this is a subset of all of
24 the images that were taken of Mr. Roberts on these
25 dates or you reviewed all of the imaging studies from

Page 115

1  those dates?
2      A.   (Technical difficulties.) If you'll
3  allow me to, you know, clarify that for you, so
4  there's no confusion. Like I had said, this is
5  typically the timing that I would get from the --
6  from what would be, like, the work list, when you
7  first opened, like, you know, the viewer and you can
8  pick exams. This is typically the time that, you
9  know, something went on where the patient -- they
10 were engaged with the patient. So, yeah, it would
11 follow that series that come later would have
12 different or later time stamps on them.
13     Q.   Okay. And so -- got it. And other than
14 the two categories of information identified here,
15 did you review any other materials in advance of
16 preparing your report?
17     MR. VAUGHN: Object to form. Asked and
18 answered.
19     THE VIDEOGRAPHER: I think he's frozen.
20     MR. NOLAN: Go off the record.
21     THE VIDEOGRAPHER: Time is 12:16. We
22 are off the record.
23
24     (Whereupon, a brief recess was taken off
25 the record.)

Page 116

1
2      THE VIDEOGRAPHER: The time is 12:18.
3  We are on the record.
4
5      (Whereupon, the requested portion of the
6  record was read by the reporter.)
7
8      THE WITNESS: May I answer? So, no, the
9  materials that I reviewed are laid out between those
10 two sections in arriving to my opinion and generating
11 my report.
12     MR. NOLAN: Okay.
13
14 BY MR. NOLAN:
15     Q.   So other than the five radiology reports
16 identified in your report, you didn't review any of
17 Mr. Roberts's other medical records. True?
18     A.   I did not.
19     Q.   And in your report, you don't cite to
20 any medical literature. Did you rely on any medical
21 literature in arriving at your opinions in this case?
22     A.   No. I relied on my, you know,
23 knowledge, training, and experience as a board
24 certified diagnostic radiologist who interprets this
25 type of imaging in my routine clinical practice.

Page 117

1      Q.   Understood. So your opinions are based
2  on the imaging studies and the final radiology report
3  identified on Page 1 of your report as well as your
4  experience as a diagnostic radiologist?
5      MR. VAUGHN: Object to form.
6      THE WITNESS: Yes.
7      MR. NOLAN: Let's pull up Tab 3 and
8  we'll mark that as Mele-5, which is your CV.
9
10     (Whereupon, Exhibit Mele-5 was marked
11 for identification.)
12
13 BY MR. NOLAN:
14     Q.   Dr. Mele, my question is going to be:
15 Is your CV accurate and current? And so you can
16 direct the trial tech to scroll through it as you
17 want, but that's going to be the question I
18 ultimately want you to answer.
19     A.   I can tell by the first page. I
20 provided an update to counsel last evening. There's
21 a really -- there's a -- there's a change. I'm happy
22 to tell you what it is. It's not really anything --
23 it's a continuation of a responsibility that's
24 already there.
25     Q.   Okay. Tell me about that.

30 (Pages 114 - 117)

Page 118

1    A.    So if you look under healthcare network
2 lead radiologist, 2006 --
3    Q.    Yes?
4    A.    Yeah.  I've been -- I was recently
5 reappointed to that role.
6    Q.    How recently?
7    A.    January.
8    Q.    January 2025?
9    A.    Yeah.
10    Q.    And you continue in that role to present
11 day?
12    A.    Correct.
13    Q.    Any other updates or changes to your CV?
14    A.    No, that's the -- that's the most recent
15 update that I've made.
16    Q.    Okay.  Let's go to Page 3, under
17 "articles, presentations, chapters, reviews".  Does
18 this section of your CV include all the medical
19 research you've conducted to date?
20    A.    Yes.
21    Q.    And how would you describe your research
22 focus over your career?
23    A.    I'm a clinical diagnostic radiologist
24 and you have my CV.  I have not conducted any recent
25 research.  I will tell you though, at the time, I was

Page 119

1 focused on interventional radiology, so you'll see a
2 couple of interventional radiology articles in there.
3 The lead article is about a, you know, biopsy system
4 that I had worked with.  And then, after that, there
5 was some, basically, trauma-related research, working
6 in a Level 1 trauma center.  You know, the
7 opportunities to conduct research in that area was
8 kind of easy.  Someone was always looking at
9 something.  And then, the rest are, you know,
10 presentations and just some general academic work.
11        You know, I've worked on providing
12 guidance to other VA Hospitals, how to embark on a
13 teleradiology adventure, which was -- which was a new
14 concept when I did it.  So I was able to give a
15 presentation on, you know, how one could, you know,
16 go about doing those things.  I have given some
17 presentations at national meetings.  I've had some --
18 I've had some displays at international meetings.
19 Did some chapters for, you know, resident education.
20        And then, the bottom section is
21 essentially providing continuing medical education
22 for other radiologists, reviewing literature.  And
23 that was providing, essentially, synopses that were
24 being used by that organization.  I believe it was,
25 like, Oak Stone or something, and people would have a

Page 120

1 subscription service for that.  But, you know, I am
2 a, you know, clinical diagnostic radiologist day
3 in/day out.
4    Q.    Understood.  Have you ever done any
5 research on liver cancer?
6    A.    Primary research, no.
7    Q.    What do you mean by "primary research"
8 in that regard?
9    A.    You know, in the articles or in the
10 presentation section.  The only thing is, you know,
11 I'm just, you know, full disclosure so no one thinks
12 I'm pulling any punches, you know.  The first article
13 is about a biopsy system, you know, for the kidney.
14 It wasn't primarily on -- you know, it wasn't
15 primarily oncology driven, but, you know, one could
16 read that and think I maybe worked on a biopsy
17 system.  But outside of that, no.  When I say -- I
18 mean my own particular research.  Me doing a review
19 of an article, I don't consider that any kind of
20 research and I don't believe there's anything in
21 there about hepatocellular carcinoma.  I haven't
22 really -- nothing is coming to mind.  It's mostly
23 orthopedic, which is, you know, my subspecialty, and
24 other general radiology topics.  But I didn't -- I'm
25 not relying or recalling any type of literature to be

Page 121

1 used in, you know, rendering my opinions here.
2    Q.    Okay.  Have you done any research
3 related to LI-RADS?
4    A.    No.
5    Q.    And have you ever conducted any research
6 on the drug Valsartan?
7    A.    No.
8    Q.    Have you ever conducted any research on
9 NDMA?
10    A.    No.
11    Q.    Have you ever conducted any research on
12 drug safety?
13    A.    No.
14    Q.    Have you ever conducted any research on
15 the causes of cancer, generally?
16    A.    No.
17    Q.    Let's go back to your report and discuss
18 the April 8th, 2016 ultrasound.
19        MR. VAUGHN:  Is this an exhibit yet?
20 Yeah, it is, Exhibit 4, sorry.
21
22 BY MR. NOLAN:
23    Q.    So down at the bottom of the page, it's
24 a -- yeah, let's zoom in on the last paragraph on the
25 first page and the first paragraph on the second

31 (Pages 118 - 121)

Page 122

1  page. And this is the portion of your report that
2  relates to the April 8th, 2016 ultrasound. Right?
3      A.  Yes.
4      Q.  And you write that: "It demonstrated
5  increased echogenicity of an enlarged liver."?
6      A.  Yes. Yes.
7      Q.  And increased echogenicity, that means
8  it was brighter?
9      A.  Correct.
10     Q.  Okay. And Mr. Roberts's liver was
11  enlarged at this time?
12     A.  Correct.
13     Q.  And when you say "consistent with fatty
14  infiltration", what does that mean?
15     A.  So to your -- to your point of the liver
16  appearing brighter, you know, when we're interpreting
17  an examination, we do try to, you know, provide any
18  etiology, if we can, based on what we're seeing
19  morphologically. And one of the things that
20  increases the echogenicity or the brightness of the
21  liver, and we do that in comparison to the adjacent
22  kidneys, when you can, is fat. And, you know,
23  there's a term for that, you know, fatty
24  infiltration.
25     Q.  Okay. And so is this evidence of a

Page 123

1  fatty liver?
2      A.  Correct.
3      Q.  And then, the next sentence is: "A
4  2.0 centimeter hyperechoic (sic hypoechoic) area
5  located on images labeled as anterior right hepatic
6  lobe without posterior acoustic enhancement and
7  demonstrated low level Doppler flow."
8          Did I read that right?
9      A.  I would just say that, I believe you
10  said "hyper," but I want to make sure that the
11  written word there says "hypo".
12     Q.  Hypoechoic.
13     A.  Yes.
14     Q.  And what does hypoechoic mean?
15     A.  So hypoechoic is meaning that it's more
16  dark, lower in echogenicity.
17     Q.  And then, the right hepatic lobe, what
18  does that mean?
19     A.  So the liver is divided into two lobes,
20  right and left.
21         MR. NOLAN: And let's just pull up
22  Tab 19 and mark that really quickly.
23
24         (Whereupon, Exhibit Mele-6 was marked
25  for identification.)

Page 124

1  BY MR. NOLAN:
2      Q.  And this is an image of the hepatic
3  sections of the liver. Right?
4      A.  Yes.
5      Q.  And so the right hepatic lobe are the
6  sides that are on the left side of the screen and the
7  left are on the right side of the screen?
8      A.  Correct.
9      Q.  Why is that?
10     A.  Why is it done that way?
11     Q.  Yeah.
12     A.  'Cause it's done with you -- it's done
13  with respect to the patient, not you.
14     Q.  Got it. So the right hepatic lobe is on
15  Mr. Roberts's right side, but appears to be on the
16  left side from the person looking at it. True?
17         Can you hear us Dr. Mele?
18         VERITEXT CONCIERGE: He's frozen.
19         MR. NOLAN: All right. Let's go off the
20  record.
21         THE VIDEOGRAPHER: All right. The time
22  is 12:31 we are -- here. Here, he's back. He's
23  back.
24         MR. NOLAN: Let's go a couple more
25  minutes and then we can take a lunch break.

Page 125

1          Dr. Mele, can you hear us?
2          THE WITNESS: Yes, sir.
3
4          (Whereupon, the requested portion of the
5  record was read by the reporter.)
6
7          THE WITNESS: Yes.
8          MR. VAUGHN: Object to form.
9
10  BY MR. NOLAN:
11     Q.  And let's go back to the report, which I
12  believe is Mele-5, 4?
13         VERITEXT CONCIERGE: Exhibit 4.
14         MR. NOLAN: Okay.
15
16  BY MR. NOLAN:
17     Q.  So there was a two centimeter dark spot
18  on the ultrasound?
19     A.  Yes.
20     Q.  And then, in the next sentence at the
21  top of the next page, it says: "In addition, a
22  second 1.8 centimeter hypoechoic area located more
23  centrally in the liver on images labeled as trans and
24  sag was without posterior acoustic enhancement or
25  Doppler flow."

32 (Pages 122 - 125)

Page 126

1        Did I read that right?
2    A.    Yes.
3    Q.    So this is a second dark spot that's
4 located more centrally?
5    A.    Yes.
6    Q.    Okay.  What can cause these dark areas
7 on an ultrasound?
8    A.    Well, it's a combination of their
9 appearance on ultrasound and how they behave when
10 they're being examined.  So in this instance, you
11 really kind of have a background of a bright liver.
12 And so what you're kind of dealing with is, well, is
13 that something or is that liver that's not fatty
14 infiltration?  But what you -- what you do know is
15 you're dealing with something that isn't a cyst.
16 Because if you had a cyst -- when we say posterior
17 acoustic enhancement, what we mean is that the
18 ultrasound waves travel through something like cystic
19 full of fluid, because of the acceleration or in
20 relation to the tissue around it, which is more
21 solid.  Behind a cyst, you would see the organ you're
22 investigating to be even more bright.  So you would
23 have a hypoechoic cyst with a hyperechoic tissue
24 behind it.  So the reason why I say following, that
25 this certainly would favor a solid over a cystic

Page 127

1 etiology, and because I don't know what's fat and
2 what's liver, it could be focal fatty sparing,
3 meaning that could be a part of the liver where fat
4 has not yet infiltrated.  So it would appear darker
5 compared to the area where fat has infiltrated it,
6 surrounding it.
7    Q.    Okay.  So --
8    A.    Can I continue or are you good with
9 that?
10    Q.    You can go ahead.
11        MR. VAUGHN:  You can continue.
12        THE WITNESS:  And I offered a
13 differential in my report.  You know, a cirrhotic
14 nodule could have this appearance and, you know,
15 because ultrasound is not as precise as other
16 modalities.  You, you know, you don't know that it's
17 not a neoplasm, whether it's a benign or a malignant
18 one.  You don't -- you don't know based on just these
19 ultrasound images.
20        MR. NOLAN:  Understood.
21
22 BY MR. NOLAN:
23    Q.    So your differential diagnosis for these
24 findings would favor solid over cystic etiology.
25 Right?

Page 128

1    A.    Correct.  Yes.
2    Q.    And the focal fat sparing of the liver
3 parenchyma, is focal fat sparing a cystic etiology or
4 a solid etiology?
5        MR. VAUGHN:  Object to form.
6        THE WITNESS:  Solid.  It's liver, so
7 it's solid.
8        MR. NOLAN:  Okay.
9
10 BY MR. NOLAN:
11    Q.    Cirrhotic nodules are also a solid
12 etiology?
13    A.    Yes.
14    Q.    Okay.  What are cirrhotic nodules?
15    A.    So it's basically like a response.  It's
16 like kind of -- some say that it's an inflammatory
17 response of the liver regenerating areas in response
18 to liver injury, like can be seen in cirrhosis.
19    Q.    Okay.  And so cirrhotic nodules are
20 something that's indicative of cirrhosis?
21    A.    It's seen with cirrhosis.  I think it's
22 kind of like the chicken or the egg, you know.
23    Q.    Okay.  Understood.  And then, neoplasm,
24 that's a solid etiology as well?  That's cancer?
25        MR. VAUGHN:  Object to form.

Page 129

1        THE WITNESS:  Neoplasm is just -- could
2 be a growth of abnormal cells or normal cells and
3 neoplasms are further split into, you know, benign or
4 malignant etiologies.
5        MR. NOLAN:  Understood.  Understood.
6
7 BY MR. NOLAN:
8    Q.    So the neoplasm -- so what you're saying
9 here is that what we're looking at is probably not a
10 cyst.  It's more likely focal fat sparing, cirrhotic
11 nodules or neoplasm?
12        MR. VAUGHN:  Object to form.  Misstates.
13        THE WITNESS:  What I would say is that,
14 you know, those were the most likely that had that
15 appearance and that's why you would progress to, you
16 know, a more resolute imaging technique, like a CT
17 or, you know, or an MR because, again, you know,
18 you're working with the human element here.  And the
19 ultrasound tech is providing images of what they
20 think this thing looks like.  And doing it this way,
21 as an expert, after the fact, you're really at a
22 further disadvantage because you can't say to the
23 technologist:  "Hey, let's go back and look at this
24 area again.  Do this, do that."
25        And so, yeah, I'm taking the images, at

Page 130

1  this point, for what they are. And you're relying on
2  the discretion of the individual who obtained them,
3  who I have no professional relationship with. So you
4  could do a CT NMR or an MR and find even something
5  solid. Let's just be -- you know, something solid.
6  And, you know, a solid etiology that it may be among
7  or it could be something different than this. But
8  these are like the big sellers based on what we have.
9        MR. NOLAN: Understood.
10
11 BY MR. NOLAN:
12    Q.   I was just sort of -- I just wanted to
13 make sure I understood the sentence. And so you're
14 saying one of those three big sellers is more likely
15 than not what we have versus a cyst of some kind?
16       MR. VAUGHN: Object to form.
17       THE WITNESS: Correct. I'm favoring
18 these over a cyst based on the imaging
19 characteristics on this scan. Again, understanding
20 that the tech may have done something where they're
21 not showing the posterior acoustic enhancement. You
22 know, again, because I couldn't go back and say:
23 "Hey, are you sure there's no enhancement on this
24 thing? Could you, you know, scan it in the other
25 plane or let me come in with you?"

Page 131

1        These are things that go on during a
2  regular day. This is based on what we got.
3
4  BY MR. NOLAN:
5     Q.   Right. And then you say: "Further
6  characterization with CT or MRI imaging was
7  indicated."
8        My question about this sentence: Is
9  that based on your review of the images or based on
10 the radiologist's at the time view of the images?
11    A.   Based on my review. I mean, I wouldn't
12 have felt comfortable giving a definitive diagnosis
13 based on this ultrasound. I would want more
14 information.
15    Q.   Understood. Including to determine
16 whether or not this solid mass was benign or
17 malignant?
18       MR. VAUGHN: Object to form.
19       THE WITNESS: I would just think to go
20 back and see if we're truly dealing with something
21 solid. And you'll always be able to generate a
22 better differential diagnosis with either CT or MR
23 compared to ultrasound for findings like this.
24       MR. NOLAN: Understood.
25

Page 132

1  BY MR. NOLAN:
2     Q.   And then, in the next sentence: "This
3  examination was otherwise significant for an enlarged
4  spleen measuring approximately 14.7 centimeters."
5        Did I read that correctly?
6     A.   Correct.
7     Q.   What, if any, significance does an
8  enlarged spleen have for someone like Mr. Roberts
9  with potentially cirrhotic nodules?
10    A.   Yeah, so I mean, aside from, you know,
11 if you're out in the wild, some viral etiology or
12 some, you know, other type of neoplastic disease,
13 like a lymphoma, which these things could also cause
14 enlarged spleens. In the context of, you know,
15 suspecting the possibility of cirrhotic nodules,
16 splenomegaly, you know, if you're suspecting
17 cirrhosis, splenomegaly goes -- it's an indirect
18 sign, I should say, it goes with the indirect -- it's
19 an indirect sign for the, you know, for the
20 possibility of oral hypertension.
21    Q.   Got it. So an enlarged spleen is an
22 indirect sign for the possibility of portal
23 hypertension?
24       MR. VAUGHN: Object to form. Misstates.
25       THE WITNESS: It can be.

Page 133

1
2  BY MR. NOLAN:
3     Q.   And what is portal hypertension?
4     A.   So, you know, portal hypertension is
5  kind of a phenomenon that's observed physiologically.
6  So, you know, we get some morphologic indications of
7  this, but much of the studies we do or much of the
8  examinations that we obtain and review are not
9  physiologic. They're not functional in a, you know,
10 kind of in a very true sense. So what you can see is
11 you're seeing indirect evidence of poor hypertension.
12 And what that is, is that as there is liver
13 dysfunction or liver disease, the portal venous
14 system travels into and essentially through the
15 liver. And if there's reasons for that blood flow to
16 be obstructed or to be -- I guess, yeah, the reasons
17 for it to be obstructed, that what happens is that
18 there will be a build up of kind of back pressure,
19 for lack of -- for lack of a better term. And spleen
20 is one of the organs that, you know, drains very
21 closely into the, you know, portal vein as it forms.
22 And so it would -- as pressure builds up in the
23 portal system, the structures that feed into it can
24 become enlarged, like the spleen, just due to a back
25 flow of blood in that organ, making it -- making it

34 (Pages 130 - 133)

Page 134

1  larger.
2
3  BY MR. NOLAN:
4      Q.    And is portal hypertension an indication
5  of cirrhosis?
6          MR. VAUGHN: Object to form. Scope.
7          THE WITNESS: It can be seen in
8  cirrhosis.
9          MR. NOLAN: Understood, okay. I want to
10 look at the ultrasound report from this, that's
11 associated with this -- these particular images and
12 then we're going to take a lunch break.
13         Does that sound good to everybody?
14         THE WITNESS: Sure.
15
16 BY MR. NOLAN:
17     Q.    So let's look at Tab 10 and are we on
18 Exhibit 7 now?
19         MR. VAUGHN: I believe so, Jack.
20
21         (Whereupon, Exhibit Mele-7 was marked
22 for identification.)
23
24         MR. NOLAN: Let's zoom in where it says,
25 underneath Dr. Christopher Ives all the way through

Page 135

1  the impression. Yeah.
2
3  BY MR. NOLAN:
4      Q.    Is this the report that you reviewed in
5  connection with Mr. Roberts's April 8th, 2016
6  ultrasound?
7      A.    Yes.
8      Q.    Okay. And so here, the technician noted
9  that the liver shows hepatomegaly measuring
10 20 centimeters?
11         MR. VAUGHN: Object to form.
12         THE WITNESS: I believe that's the
13 radiologist, but we're using the measurements that
14 were provided to us by the ultrasound technologist,
15 yes.
16
17 BY MR. NOLAN:
18     Q.    Understood. So the radiologist is the
19 one writing this report?
20     A.    Yes.
21     Q.    Okay. So the radiologist knows that
22 there was an enlarged liver. Right?
23     A.    He uses the word hepatomegaly, and, yes.
24     Q.    And that means it's enlarged?
25     A.    Yes.

Page 136

1      Q.    Fatty infiltrated noted within the
2  liver. Right?
3      A.    Uh-huh, yes. I apologize, yes.
4          MR. VAUGHN: Sorry, Jack. Do you want
5  to re-ask that for a clear record?
6          MR. NOLAN: Sure.
7
8  BY MR. NOLAN:
9      Q.    The radiologist says that "fatty
10 infiltrated noted within the liver."
11         Is that the same thing you observed?
12     A.    Yes. We're just describing it using
13 different language.
14     Q.    Right. And then: "Two solid densities
15 are noted within the liver measuring 2.0 and 1.8
16 centimeters at their widest diameter."
17         Those are the same two dark areas that
18 you described in your report. Correct?
19     A.    Right, correct. I just gave more of the
20 ultrasonic graphic description.
21     Q.    And the radiologist says: "These do not
22 appear to represent cysts."
23         You reached the same conclusion. Right?
24     A.    Correct. I believe I worded it in a
25 different fashion.

Page 137

1      Q.    But same conclusion?
2          MR. VAUGHN: Object to form.
3          THE WITNESS: Yes. Yes.
4      Q.    And then you say while this may -- or,
5  sorry, the radiologist says: "While this may
6  represent focal fatty sparing, neoplastic or other
7  soft tissue disease cannot be excluded."
8          Did I read that right?
9      A.    Yes.
10     Q.    Okay. And that was the same opinion you
11 reached. "We can't tell what it is at this point.
12 It could be neoplastic or some other soft tissue
13 disease." True?
14         MR. VAUGHN: Object to form. Misstates.
15         THE WITNESS: And as well as focal fatty
16 sparing, yeah.
17
18 BY MR. NOLAN:
19     Q.    "CT would be recommended for further
20 evaluation, if required clinically."
21         And you recommended further imaging on
22 CT or MRI based on your review of the images. Right?
23     A.    Correct.
24     Q.    And then, "splenomegaly is noted."
25 That's the enlarged spleen. Correct?

35 (Pages 134 - 137)

Page 138

1     A.    Correct.
2     Q.    Okay.  And then, let's look at the
3   radiologist's impression.  "Two soft tissue densities
4   noted within the liver as described.  CT would be
5   recommended for further evaluation, if required
6   clinically.  Fatty hepatic infiltrate is also noted
7   within the liver with hepatomegaly."
8          Did I read that right?
9     A.    Yes.
10    Q.    And then, the second impression is:
11  "Splenomegaly."  That's the enlarged spleen.  Right?
12    A.    Yes.
13    Q.    And the third impression is simple:  "A
14  renal cyst."
15         Did I read that right?
16    A.    Yes.
17    Q.    And so, Dr. Khanna Gargar (sounds like)
18  was the radiologist here.  Recommended a CT scan for
19  further evaluation.  Agreed?
20         MR. VAUGHN:  Object to form.
21  Foundation.
22         THE WITNESS:  Correct.  And that will
23  vary by the practice at the institution.
24
25  BY MR. NOLAN:

Page 139

1     Q.    But it coincides with your own view of
2   these ultrasound images.  Right?
3          MR. VAUGHN:  Object to form.
4          THE WITNESS:  Correct.
5          MR. NOLAN:  I think we can take a break.
6          THE VIDEOGRAPHER:  The time is 12:50.
7   We are off the record.
8
9          (Luncheon recess:  12:50 to 1:23.)
10
11         THE VIDEOGRAPHER:  The time is 1:23.  We
12  are on the record.
13
14  BY MR. NOLAN:
15    Q.    Welcome back, Dr. Mele.
16    A.    Welcome to you.
17    Q.    So for the next section, I'm going to
18  show you the ultrasound images and I just want you to
19  sort of walk me through the particular images where
20  you saw the 2.0 hypoechoic area and the 1.0
21  centimeter hypoechoic area.
22    A.    Sure.
23    Q.    And so let me start by asking:  Is there
24  one image that has both on it, because that may be
25  easier to just jump to right at the outset?

Page 140

1     A.    No, they're actually -- they're actually
2   independent images, yeah.
3     Q.    Okay.  So let's start with the 2.0
4   centimeter hypoechoic area.  Let's move to Tab 25,
5   which is going to be Exhibit 8.
6
7          (Whereupon, Exhibit Mele-8 was marked
8   for identification.)
9
10  BY MR. NOLAN:
11    Q.    And I believe the liver images start on
12  Page 16 of this document, but you correct me if I'm
13  wrong, Dr. Mele.
14    A.    Are you going to show it or will I be
15  looking for it in the share thing?
16         MR. NOLAN:  Let's pull up Tab 25, which
17  is marked as Exhibit 8.
18         VERITEXT CONCIERGE:  Yeah, I'm about to.
19  For whatever reason, the exhibit did not want to
20  introduce.
21         MR. VAUGHN:  Looks like it just uploaded
22  to Exhibit Share.
23         VERITEXT CONCIERGE:  Okay.  It should be
24  in there now.  And you said Image 8.  Is that what
25  you said, Counsel?

Page 141

1          MR. NOLAN:  Exhibit 8, Image 16 is, I
2   believe, where the liver images start.
3          MR. VAUGHN:  This is a 62-page document,
4   Dr. Mele, so feel free to look through it.
5          THE WITNESS:  Oh, so I can go on the
6   share thing and I can look through it.  Is that what
7   I'm supposed to do now?
8          MR. VAUGHN:  Correct.
9          MR. NOLAN:  And can we pull up Page 16
10  of the document?
11         VERITEXT CONCIERGE:  My apologies, did
12  not realize it wasn't displaying.
13
14  BY MR. NOLAN:
15    Q.    And so, Dr. Mele, I believe Page 16 is
16  where the liver images start and they go to Page 34.
17  So my first question is:  What image should we be
18  looking at to look at the 2.0 centimeter hypoechoic
19  area that you observed?
20    A.    Let me find something representative,
21  yeah.  I would say we're probably good with starting
22  on -- I would say 20 -- let's start with -- let's
23  start with 22.
24    Q.    Okay.  So now we're looking at Page 22
25  of Exhibit 8.  It says "trans liver RT ANT" at the

Page 142

1  bottom. And is the hypoechoic area the space in
2  between those two white cross hairs?
3      A.    Correct. So what would happen in a
4  situation like this is, this is how the image would
5  be presented and the calipers, that's what we call
6  those little -- those little crosses, the calipers
7  are on the edges of this hypoechoic area.
8      Q.    Okay. And can you put the calipers on
9  the image to then do a measurement of some kind? Is
10 that how that works?
11         MR. VAUGHN: Object to form.
12         THE WITNESS: Right. So then what
13 happens is, you know, again, the images come through
14 calibrated. So you can do that also. And there's no
15 reason why they wouldn't line up; why they wouldn't
16 match.
17     Q.    Okay. And down in the bottom left of
18 this page, it says: "DIST 1.99 centimeters."
19 Is that -- that's the measurement?
20     A.    Correct. And I just used two.
21     Q.    Perfect, okay. And so, then if we look
22 at the next slide, or the next page, which is 23,
23 that's essentially the same image. It just doesn't
24 have the calipers, so it doesn't have the
25 measurements?

Page 143

1      A.    Correct. That's -- that's how it's
2  done. It may come first. It may come after.
3      Q.    Understood, okay. So let's go back to
4  22 for a second. Or -- yeah, 22. So this is the
5  first dark spot that you note in your report. Right?
6      A.    Yes.
7      Q.    Okay. Can you confidently state to a
8  medical degree of certainty that this 2.0 centimeter
9  hypoechoic area was not malignant in 2016?
10         MR. VAUGHN: Object to form.
11         THE WITNESS: No one could.
12
13 BY MR. NOLAN:
14     Q.    Can you confidently state to a medical
15 degree of certainty that this 2.0 centimeter
16 hypoechoic area -- let me start the question over.
17 Dr. Mele, can you state -- can you
18 confidently state to a degree of medical certainty
19 that this 2.0 centimeter hypoechoic spot is not
20 associated with Mr. Roberts's HCC diagnosis in 2018?
21         MR. VAUGHN: Object to form.
22         THE WITNESS: As we see it in 2018; is
23 that what you're asking?
24
25 BY MR. NOLAN:

Page 144

1      Q.    Can you confidently state that this
2  hypoechoic spot observed in 2016 is not associated
3  with Mr. Roberts's HCC?
4          MR. VAUGHN: Object to form.
5          THE WITNESS: I would say that it's
6  unlikely, based on the image that we have. And let
7  me explain why. This doesn't appear to be in the
8  same location, either of the two locations, where
9  there is a later diagnosis made. And you're kind of
10 limited here because we have some static images here
11 that, based on what I'm looking at here, it's labeled
12 right anterior and I used that so we all knew what
13 images we were -- we were discussing, so you could
14 find them as well. But looking at this, I suspect
15 that we're close to the liver dome and I don't recall
16 the HCC in 2018 being that close to the liver dome.
17 So given what I've got, it doesn't appear to be in
18 the same location. And I'm limited by the
19 information that I have at this point. And there's
20 other reasons why, you know, going forward -- I don't
21 want to -- I don't want to, you know, put the cart
22 before the horse. But Dr. Chernyak and I are of the
23 opinion that neither one of us were able to
24 definitively resolve these -- these areas on the
25 following CT. So it's kind of a weird kind of a

Page 145

1  question that really can't be answered because
2  neither one of us saw it again. We see it here and
3  we move on. If we're going to discuss it in this
4  location, you know, it's where it is on this image
5  doesn't really line up with where the, you know,
6  where the HCC is later, based on this. And we also
7  don't see this same focus, this same area, on this CT
8  eight days -- 11 days later. And I think, you know,
9  Dr. Chernyak and I share that opinion, for both of
10 these lesions. You know, for both of these, you
11 know, foci, these areas of low echogenicity, neither
12 she nor I were able to resolve on the sequential or
13 the subsequent CT. So we're kind of like stabbing in
14 the dark a little bit, because there's a step in
15 between that we're -- that we're kind of ignoring.
16
17 BY MR. NOLAN:
18     Q.    Well, we're going to get the April CT,
19 but my question is: Sitting here today, can you rule
20 out the possibility that this 2.0 centimeter
21 hypoechoic foci -- hypoechoic area is associated with
22 Mr. Roberts's HCC; yes or no?
23         MR. VAUGHN: Object to form.
24         THE WITNESS: I don't know, because we
25 don't -- we haven't come to a determination of what

37 (Pages 142 - 145)

Page 146

1  it is at this point.
2
3  BY MR. NOLAN:
4      Q.   Okay.  So you -- but you cannot rule out
5  the possibility that this 2.0 centimeter hypoechoic
6  area is associated with Mr. Roberts's HCC because you
7  don't know what it is.  Right?
8          MR. VAUGHN:  Object to form.
9          THE WITNESS:  And I'm also going to use
10  -- I'm also going to use some anatomy.  And it's
11  unlikely because this does not appear to be in the
12  same anatomic location.  Now, again, I'm trusting
13  what I have here and I could not explore this further
14  with the human who obtained it.  So I'm taking it as
15  being near the dome.  And I don't know where on the
16  dome I am.  It's just not -- you're not able to
17  really, like, co-locate based on this.  So, you know,
18  I think without a -- I think equally you couldn't say
19  it was or it wasn't with any degree of medical
20  certainty based on this.
21          MR. NOLAN:  Okay.  I'm going to try to
22  break that down a little bit.
23
24  BY MR. NOLAN:
25      Q.   So based on the information provided on

Page 147

1  this image, you believe that this is near the dome of
2  the liver.  Right?
3      A.   Yes.
4      Q.   Okay.  And based on that location, you
5  believe that it's unlikely that this spot is
6  associated with the HCC observed in the MRI taken of
7  Mr. Roberts in April of 2018.  True?
8          MR. VAUGHN:  Object to form.
9          THE WITNESS:  I guess what I'm saying is
10  I don't know.  I don't know, really, where I am in
11  the liver here, to be honest.  Because we have an
12  image labeled -- I don't have the landmarks to
13  confirm that this labeling is right.  And that's the
14  problem with ultrasound is you --
15          MR. NOLAN:  Okay.
16
17  BY MR. NOLAN:
18      Q.   And so, because you don't know where you
19  are in the liver, you don't know the precise location
20  of this 2.0 centimeter area.  True?
21      A.   Correct.
22      Q.   Okay.  And you're unable to determine
23  whether or not this area is associated with the HCC
24  observed in Mr. Roberts's liver in the MRI in 2018.
25  True?

Page 148

1          MR. VAUGHN:  Object to form.
2          THE WITNESS:  Correct.
3
4  BY MR. NOLAN:
5      Q.   Now, as it relates to -- you mentioned
6  that there were -- you didn't see this particular
7  spot in subsequent scans or analyses of Mr. Roberts's
8  liver.  Right?
9      A.   Correct.
10      Q.   Okay.  But you also have not looked at
11  any of the scans that were taken after August of 2018
12  of Mr. Roberts's liver.  True?
13      A.   True.
14      Q.   And so we don't know if this particular
15  spot developed into an HCC lesion some time after
16  August of 2018.  True?
17          MR. VAUGHN:  Object to form.
18          THE WITNESS:  Unknown.  We don't get to
19  ignore the imaging in between.
20          MR. NOLAN:  Understood.
21          THE WITNESS:  Yeah.
22
23  BY MR. NOLAN:
24      Q.   But you don't know whether or not this
25  particular spot developed into an HCC lesion at some

Page 149

1  point in the future, after August of 2018.  True?
2          MR. VAUGHN:  Object to form.  Misstates.
3          THE WITNESS:  We don't know that this
4  spot exists in May of 2016 -- I mean, sorry, April of
5  2016.  You know, I have some -- I have some, you
6  know -- some -- some thoughts on what's going on here
7  based on the differential and it's location.  If
8  you're really anterior like they say you are, and
9  they're kind of mid to high or higher up in the
10  liver, you know, you wonder if this is, you know, fat
11  near the anterior abdominal wall or near the, you
12  know, the diomatic reflection, so.  But then, you're
13  ignoring the fact that in between we can't see this
14  area on three additional imaging studies.  And then,
15  suddenly, it's reappearing after 2018 in an
16  individual who has HCC in the same liver, that any
17  other lesion at that point could equally be from the
18  lesion that you see in 2018.  So it's kind of like
19  you're ignoring the imaging studies in between where
20  this is not discernable, if that makes sense.  Like,
21  you're saying -- you're alleging that this thing is
22  here on April 8th and then it disappears, because
23  you're -- you know, even Dr. Chernyak can't resolve
24  this thing.  And then, it's suddenly reappearing, you
25  know, two more years later in the same exact spot.  I

38 (Pages 146 - 149)

Page 150

1  mean, it's kind of a weird way to ask it.  And it
2  kind of ignores a lot of the information in between.
3  It's the kind of a question you really can't answer.
4
5  BY MR. NOLAN:
6      Q.    Have you ruled out the possibility that
7  this particular spot developed into an HCC lesion at
8  some point in Mr. Roberts's life?
9          MR. VAUGHN:  Object to form.
10         THE WITNESS:  No.
11         MR. NOLAN:  Okay.
12
13 BY MR. NOLAN:
14     Q.    Let's look -- I want to look at the 1.8
15 centimeter hypoechoic area.  I believe that's on
16 Slide 25 or Page 25.
17     A.    Yes, I'm going to go back and look at
18 the other thing for a minute.
19         MR. NOLAN:  And while you're doing that,
20 I just want to clarify.  I think I've been mistakenly
21 saying hyperechoic, with an E-R, but I meant
22 hypoechoic this entire time.
23         MR. VAUGHN:  In your questions; is that
24 what you're talking about?
25         MR. NOLAN:  Yes.

Page 151

1          MR. VAUGHN:  So do we need to go through
2  and do all the questions again that you asked?  I
3  don't think we can just change.  I don't think he can
4  just change what he asked and go with the Doctor's
5  answers.
6          MR. NOLAN:  I mean, it's an errata
7  issue.  We can -- we can fix it.  I'm just saying --
8          MR. VAUGHN:  It's not an errata issue.
9  You're not the one answering.  You're the one asking
10 questions.  You can't change what your questions were
11 and then keep the same answers from the expert.
12 That's not allowed.
13
14 BY MR. NOLAN:
15     Q.    Dr. Mele, do your answers to any of my
16 questions change now that I've clarified that I meant
17 hypoechoic in every one of my questions?
18     A.    In reference to the area that we were
19 discussing, that area is hypoechoic.
20     Q.    Right.
21     A.    Oh, I'm sorry, I'm supposed to tell you
22 about the next location.  Correct?  We can probably
23 start on -- what'd you recommend, 25?  Is that what
24 you said?
25     Q.    I did, but I'm going to amend that.  I

Page 152

1  think 28 might be the actual one.
2      A.    Yeah, that's fine.
3      Q.    Okay.  Is this the image that is best
4  for you or is there another one that you prefer to
5  look at?
6      A.    I'm trying to get back to the zoom, just
7  give me a second.  It's not letting me open the zoom.
8  That's fine.  Yeah, that's fine.  I can work with
9  this.
10     Q.    So is this an image, we're on Page 28 of
11 Exhibit 8, is this an image of the 1.8 centimeter
12 hypoechoic area that you describe in your report?
13     A.    Yes.  This is the one that's a little
14 more central in the liver.
15     Q.    And have you ruled out the possibility
16 that this hypoechoic spot was malignant in 2016?
17         MR. VAUGHN:  Object to form.
18         THE WITNESS:  No.  And I think that's
19 consistent with the differential that I had offered.
20         MR. NOLAN:  Right.
21
22 BY MR. NOLAN:
23     Q.    And have you ruled out the possibility
24 that this 1.8 centimeter hypoechoic area is
25 associated with HCC lesions that Mr. Roberts

Page 153

1  developed at any point in his life?
2          MR. VAUGHN:  Object to form.
3          THE WITNESS:  You know, based on what I
4  have here, no, I would not be able to do that.
5          MR. NOLAN:  Okay.
6
7  BY MR. NOLAN:
8      Q.    Now, let's take a look at the CT report
9  from April 19th, 2016.  I want to make sure that I
10 know which document it is that you're relying on.  So
11 let's go to Tab 11, which will be Exhibit 9.
12
13         (Whereupon, Exhibit Mele-9 was marked
14 for identification.)
15
16         MR. NOLAN:  And we're going to go to
17 Page 7 of this document.  Let's zoom in on the
18 portion underneath the line across that says CT
19 scanning and then go all the way down to the
20 impression.
21
22 BY MR. NOLAN:
23     Q.    So following the ultrasound it was
24 recommended that Mr. Roberts receive or undergo a CT
25 scan.  Right?

39 (Pages 150 - 153)

Page 154

1    A.    Yes.
2    Q.    And is this the report of the CT scan
3  from April 19th that you reference in your report?
4    A.    Yes.  I -- you know, it looks exactly
5  the same.
6    Q.    Okay.  And so, if we look at the second
7  sentence under "findings", it says:  "Peripheral
8  margin of liver is somewhat lobulated."
9         What does that mean?
10    A.    So it means that it's kind of
11  undulating.  If I use the word undulating, will that
12  be okay?
13    Q.    What does undulating mean?
14    A.    So it means that it was kind of, for
15  really, you know, really, really kind of drilling
16  that down for the nose bleed seats, it's kind of,
17  like, wavy.  And so when we say lobulated, it means,
18  like, he may be seeing a bunch of semi circles, is
19  how the appearance or the edge of the liver looks.
20    Q.    So instead of having a smooth, rounded
21  edge, it's got sort of a wavy or a lumpy or bumpy
22  contour?
23    A.    Yes.
24    Q.    All right.  Has protrusions or bulges?
25         MR. VAUGHN:  Object to form.

Page 155

1         THE WITNESS:  You know, I save words --
2  I should say, I preserve lexicon like that for
3  findings in the intervertebral disc.  This is just,
4  you know, lobulated or it's undulating, yeah.
5
6  BY MR. NOLAN:
7    Q.    And could a liver of somewhat lobulated
8  appearance be evidence of a liver lesion?
9         MR. VAUGHN:  Object to form.
10         THE WITNESS:  It really depends on its
11  morphology and where it's located and, you know, the
12  distribution of it.  You have to have something
13  exophytic, meaning that it's -- it's -- what you're
14  saying is supposed to be kind of pushing out the
15  surface as opposed to contracting the surface.  So
16  they're two different concepts, but they can appear
17  similarly.
18         MR. NOLAN:  Okay.
19
20  BY MR. NOLAN:
21    Q.    Now, particularly along the infra aspect
22  of the left lobe, what does that mean?
23    A.    So we're playing a little bit of what
24  was he thinking.  I'm going with infra meant
25  inferior, or the lower, meaning as you went from top

Page 156

1  to bottom, more towards the bottom.
2    Q.    Okay.  And then, the left lobe would be
3  on the right side of the page, if we're looking at
4  the liver, but on the left side of Mr. Roberts.
5  Right?
6    A.    Correct.  His left, yes.
7    Q.    His left.  "Gallbladder is surgically
8  absent."  And then, it says:  "8 millimeter focal
9  hypodensity is seen in the right lobe."
10         Did I read that right?
11    A.    Correct.
12    Q.    And then, the next sentence is:  "No
13  other focal liver lesions are seen."
14         So does that mean the radiologist is
15  saying that there's an 8 millimeter lesion seen in
16  the right lobe?
17         MR. VAUGHN:  Object to form.
18         THE WITNESS:  This individual appears to
19  have identified an 8 millimeter focal hypodensity in
20  the right hepatic lobe.  I agree.
21
22  BY MR. NOLAN:
23    Q.    And that's a lesion?
24    A.    No.  Lesion carries a very specific
25  connotation.  And you have to be very careful,

Page 157

1  especially in a proceeding like this.  A hypodensity
2  like that can be a lesion or a pseudolesion or a
3  nonlesion and the appropriate term one would use is
4  either hypodensity, explaining what it looks like
5  morphologically, because he can't give, really, a
6  pathologic diagnosis based on what he's offered here.
7  The appropriate term in this setting, if you really
8  want to be on point with the liver imaging, would be
9  observation.
10    Q.    So -- but the radiologist says:  "No
11  other focal liver lesions are seen."  Right?
12    A.    Yeah, that's, you know, that's his
13  lexicon.
14    Q.    Okay.  And then, if we go to the
15  impression, it says:  "Although nonspecific, findings
16  may be evidence of liver cirrhosis."
17         Did I read that right?
18    A.    Correct.
19    Q.    And you arrived at the same conclusion
20  when you looked at the CT scans from April 2016?
21    A.    Yes, Counselor.
22    Q.    And then, the second impression is:
23  "Indeterminate hyperdense lesion in the right lobe of
24  liver, too small to definitively characterize."
25         Did I read that right?

Page 158

1     A.    You read it right. I think he got it
2  wrong, because I think there's a -- there's a switch.
3  I think you guys have the same tick with
4  hyper/hypodense.
5     Q.    Okay.
6     A.    He calls it hypodense in the body of his
7  report and then, maybe when he used voice recognition
8  or however he does his reports, it came out hyper.
9  You know, you've done it. A lot of people do it.
10 You know, I'm guessing what he meant, but we have to
11 resolve what he said and what he said and what's
12 there. And I would expect him to have meant to say
13 hypodense there, right, because he's talking about
14 the same thing.
15    Q.    Got it. And hypodense means it's darker
16 than the surrounding area of the liver?
17    A.    Yes, correct.
18    Q.    Okay. And then, the next sentence says:
19 "Benign or malignant etiologies could have this
20 appearance." Right?
21    A.    Yes.
22    Q.    And so that means this particular lesion
23 or observation could be malign or malignant. True?
24    A.    In his opinion, yes.
25    Q.    Do you have an opinion as to whether or

Page 159

1  not this is definitively benign or malignant?
2     A.    I am looking at it in a different light.
3  I'm looking at it in terms of likelihoods. And to
4  say it cannot be malignant would equally not be true.
5  There's information on the CT that we may get to
6  discussing that I don't see this particular
7  radiologist making use of the information that is
8  available to arrive at his conclusion here. I would
9  say, based upon my review of the CT, the best way to
10 characterize my impression would be that it's more
11 likely than not benign. Similarly, because we've
12 touched upon this a little bit, you cannot entirely
13 exclude malignancy based upon what he's describing.
14       Now, I don't really know what he's
15 looking at. He didn't give us image numbers. He
16 didn't give us a series number. He's just kind of
17 throwing out this 8 millimeter thing in the right
18 lobe. And you know the right lobe has four segments,
19 so where is this guy? So we don't even know the
20 lesion he's talking about. We can, you know, propose
21 and suspect and we can guess and speculate. But he's
22 giving you nothing on this about features and
23 anything he can say about it, except it's hypodense.
24 So he's kind of stuck there because of what he's
25 said. So he's the type that it's indeterminate.

Page 160

1  He's saying that it's too small to characterize
2  definitively. He's saying that, you know, benign or
3  malignant etiologies could have this appearance. And
4  that's true, but he's not giving you any degree of
5  probabilities or likelihood based on what is
6  objectively present.
7        So I agree that it could have -- so I
8  agree that it's hypodense, whatever, because I've
9  seen other hypodensities and maybe we're talking
10 about the same one. I have no idea. I agree that
11 there's something hypodense in there. I agree that
12 there's nothing that you can definitively
13 characterize on that scan. And I do believe that at
14 some point, with the ability to apply likelihoods,
15 that it could be a benign or malignant etiology. And
16 that's all -- that's all he's given you here. He
17 hasn't given you percentages, likelihoods or
18 anything. He's just saying yep, you know, could be.
19 I don't know what it is.
20    Q.    I want to just break down some of that.
21    A.    Sure.
22    Q.    So you agree that there were hypodense
23 areas on Mr. Roberts's liver on this CT examine from
24 April 19th, 2016. Right?
25    A.    Yes.

Page 161

1     Q.    Okay. You agree that -- well, let me
2  scratch that.
3        Were you able to identify the particular
4  8 millimeter focal hypodensity that this radiologist
5  saw?
6        MR. VAUGHN: Object to form.
7        THE WITNESS: I believe I identified
8  something similar and, if you probably asked him, it
9  could likely be the same thing.
10       MR. NOLAN: Okay.
11
12 BY MR. NOLAN:
13    Q.    But sitting here today, you're not sure
14 whether or not you observed this specific
15 8 millimeter area that he's talking about. Fair?
16       MR. VAUGHN: Object to form. Asked and
17 answered.
18       THE WITNESS: Correct. We may not come
19 down to the, you know, millimeter on it, so.
20
21 BY MR. NOLAN:
22    Q.    And you agree that, based on the scan,
23 it's impossible to characterize whether or not the
24 hypodensities you viewed are malignant or benign.
25 True?

41 (Pages 158 - 161)

Page 162

1      MR. VAUGHN: Object to form.
2      THE WITNESS: Definitely, I agree.
3      MR. NOLAN: Okay.
4
5  BY MR. NOLAN:
6      Q.    And so, then this radiologist says:
7  "The relationship of this nodule to the findings on
8  comparison ultrasound is unknown."
9          How did you interpret that?
10     A.    I interpreted it similarly with my
11 experience and, you know, equally, Dr. Chernyak's
12 experience. We could not resolve the ultrasound
13 findings with the areas -- the observations that we
14 made on the same CT study in comparison to the same
15 ultrasound. And a lot of it has to do with the size
16 isn't even close. When you look at 1.8 or even 2
17 versus, you know, less than a centimeter.
18         And then, again, you know, this --
19 this -- I don't know. I don't remember the name of
20 this radiologist. It wasn't the same one who had the
21 benefit of supervising the ultrasound. They were
22 stuck in the same position where they're relying on
23 some very generic labeling as to where this -- where
24 these -- where these areas are anatomically. So,
25 yeah, he couldn't resolve it. He may have done it

Page 163

1  based on size. He may have -- he may have done it
2  based on, you know, the imaging that was available.
3  He couldn't figure out where one was versus the
4  other. But, you know, I honestly agree with him.
5      Q.    And just to sort of put it in my own
6  words. Basically, what you're saying and what he's
7  saying is the 2.0 centimeter and the 1.8 centimeter
8  spots that were observed on the ultrasound are not
9  observed on the CT?
10     MR. VAUGHN: Object to form.
11     THE WITNESS: Correct. I did not
12 observe them.
13     MR. NOLAN: Okay.
14
15 BY MR. NOLAN:
16     Q.    And then, the radiologist says: "Follow
17 up liver protocol CT four to six months on date of
18 study would be useful for further characterization."
19         Did I read that right?
20     A.    Yes.
21     Q.    Would you have recommended a follow up
22 CT in four to six months based on what you saw on the
23 CT?
24     A.    Yes, I think -- I think the appropriate
25 follow up is actually a little bit of a wider window,

Page 164

1  three to six months, but I think that's appropriate.
2      Q.    Okay. Now --
3      A.    But it's also important to point out,
4  you know, again, you and I touched upon this. Show
5  me the reason for the exam or the clinical history on
6  this document. Where it says other -- so he
7  starts -- so, to my recollection, going back to the
8  ultrasound, and I don't know if other specified
9  diseases of the liver is pertinent to the ultrasound
10 or if it's pertinent to something about Mr. Roberts.
11 But the same history is following epigastric pain.
12 Right? So this goes back to what we discussed before
13 where, you know, someone with epigastric pain, what
14 is the pretest probability of it being, you know,
15 HCC? Without a de facto background liver injury,
16 liver disease, you don't know. So just to cover the
17 base that, you know, some might say that a three to
18 six was appropriate. Some might say that this other
19 qualifier here of, you know, specified diseases of
20 the liver, depending on its origin, may change that
21 window. But I think three to six is absolutely fine.
22 Again, I want to make sure we understand we're going
23 to do all that in light of what we do know about the
24 individual from the radiology order, which is that he
25 started with epigastric pain.

Page 165

1      Q.    And we know that his liver was
2  cirrhotic. Right?
3      MR. VAUGHN: Object to form. Misstates.
4      THE WITNESS: Based on the CT?
5      MR. NOLAN: Yes.
6      THE WITNESS: Yes.
7
8  BY MR. NOLAN:
9      Q.    And so, because his liver was cirrhotic,
10 he's at higher risk for HCC. Agreed?
11     MR. VAUGHN: Object to form. Scope.
12     THE WITNESS: He has an increased risk,
13 yes.
14
15 BY MR. NOLAN:
16     Q.    And so, because he has an increased risk
17 of developing HCC, surveillance of the spots noticed
18 on his liver is prudent?
19     MR. VAUGHN: Object to form.
20     THE WITNESS: Yes.
21
22 BY MR. NOLAN:
23     Q.    All right. And let's look at your
24 report, Page 2, which is Exhibit 4. And so, then
25 there's two paragraphs on Page 2 where you discuss

42 (Pages 162 - 165)

Page 166

1  the CT exam. Right? It's the first full two
2  paragraphs?
3      A.    Yes.
4      Q.    Okay. And so you say that: "The CT
5  scan was performed both without and with intravenous
6  contrast administration on April 19th, 2016."?
7      A.    Yes.
8      Q.    And so what is the difference between
9  with contrast and without contrast there?
10     A.    Sure. So this is a -- this is a
11 situation where, you know, a decision was made. I
12 don't know what the radiologist who, I would hope,
13 protocol of the exam was considering. So, first is
14 kind of a noncontrast scan. You don't give anything.
15 You don't give any -- you don't give any contrast
16 material and you just scan through. And like we said
17 before, that gives us an opportunity to look at areas
18 where, if there is enhancement, we want to know what
19 it looked like without the intravenous contrast,
20 right, so things that may hide behind contrast.
21 Things that may be confounded by the -- by the
22 installation of contrast material. And then,
23 obviously, with is, you know, the moment it's
24 administered and every series that follows after
25 that.

Page 167

1      Q.    Okay. And so the noncontrast images
2  demonstrate an enlarged liver. Right?
3      A.    Uh-huh.
4      MR. VAUGHN: I'm sorry, what's going on?
5      THE WITNESS: Yeah, who's asking the
6  questions?
7      THE COURT REPORTER: No, no, I didn't
8  get your answer. You said "uh-huh".
9      THE WITNESS: I didn't say anything yet.
10 He was still asking.
11     MR. VAUGHN: Let's go ahead and just
12 have you re-ask the question, Jack.
13
14 BY MR. NOLAN:
15     Q.    The noncontrast images demonstrate an
16 enlarged liver. True?
17     A.    Yes.
18     Q.    With a nodular surface contour, is that
19 the somewhat lobulated lobe that was described in the
20 radiology report?
21     MR. VAUGHN: Object to form.
22     THE WITNESS: Correct. That's my way of
23 describing it.
24
25 BY MR. NOLAN:

Page 168

1      Q.    And a nodular surface contour of the
2  liver is often indicative of underlying liver
3  disease. True?
4      MR. VAUGHN: Object to form. Scope.
5      THE WITNESS: Yes. I mean, particularly
6  cirrhosis.
7
8  BY MR. NOLAN:
9      Q.    And the nodularity is primarily caused
10 by the formation of nodules or fibrosis or scarring
11 within the liver. Right?
12     MR. VAUGHN: Object to form.
13     THE WITNESS: Yes, all of those. You
14 know, the formation of regenerating nodules,
15 fibrosis, and scarring will, you know, change the
16 architecture of the liver.
17
18 BY MR. NOLAN:
19     Q.    And he also had enlargement of the
20 caudate lobe. What's that?
21     MR. VAUGHN: Object to form.
22     THE WITNESS: So that's Segment 1. It's
23 another finding that is seen in patients with
24 cirrhosis.
25

Page 169

1  BY MR. NOLAN:
2      Q.    Is cirrhosis the most common cause of
3  enlargement of the caudate lobe?
4      MR. VAUGHN: Object to form. Scope.
5      THE WITNESS: Again, I would say it's
6  not uncommonly seen with cirrhosis.
7
8  BY MR. NOLAN:
9      Q.    Does scarring and damage to the liver
10 lead to compensatory enlargement of the caudate lobe?
11     MR. VAUGHN: Object to form.
12     THE WITNESS: It's more of a function of
13 the liver dysfunction where the liver is looking to,
14 you know, take up some of the liver activities in
15 another portion. The liver is very good about, you
16 know, undoing stuff like that.
17
18 BY MR. NOLAN:
19     Q.    So because of the scarring or the
20 fibrosis, some functionality is lost and so other
21 portions of the liver are picking up the slack, so to
22 speak?
23     MR. VAUGHN: Object to form.
24     THE WITNESS: Yes, correct. You know,
25 it will depend upon what areas or what portions are

43 (Pages 166 - 169)

Page 170

1  dysfunctional and other portions will go -- undergo
2  hypotrophy in order to keep, you know, the
3  biophysiology of the body going, yes.
4
5  BY MR. NOLAN:
6      Q.   And then, the low -- or: "The no
7  contrast imaging also demonstrated diffuse
8  heterogeneous attenuation throughout the liver
9  parenchyma, including subcentimeter foci of both
10 increased and decreased attenuation."
11         Did I read that right?
12     A.   Yes.  Yes.
13     Q.   Okay.  And the liver parenchyma, that's
14 the functional tissue of the liver?
15     A.   It's the liver tissue, yes.
16     Q.   And diffuse heterogeneous attenuation,
17 that means that some areas of the liver tissue appear
18 to be less dense?
19         MR. VAUGHN:  Object to form.
20         THE WITNESS:  Correct.  I would say
21 another way of saying it a little more succinctly is
22 that the liver is inhomogeneous.  Normally, it has a
23 very homogeneous attenuation.  And as I, you know, as
24 I -- as I explain further that, you know, this
25 heterogeneity, you know, and it -- it carries

Page 171

1  through, even when you give these individuals, you
2  know, contrast material, which we're going to see as
3  well.  And that's, you know, also present in this
4  individual.  This heterogeneous background, this
5  heterogeneous attenuation goes with individuals who
6  have cirrhosis.  It's a combination of the things
7  we've already spoken about; regenerating nodules,
8  fibrosis, scarring, areas of, you know, fat that are
9  in the liver.  It's just -- it all kind of looks like
10 that -- (multiple speakers).
11
12 BY MR. NOLAN:
13     Q.   So that's the constellation of imaging
14 findings that you're describing?
15         MR. VAUGHN:  Object to form.
16         THE WITNESS:  Yes.
17
18 BY MR. NOLAN:
19     Q.   And what -- I just want to make sure
20 that I understand totally.  Could you list the
21 constellation of imaging findings that's commonly
22 observed in patients with underlying cirrhosis that
23 you're describing here?
24     A.   Do you mind if I refer to my report?
25     Q.   Not at all.

Page 172

1      A.   Okay.  So you can have a degree of liver
2  enlargement in cirrhosis.  And I think it wouldn't be
3  surprising to anyone, you know, to know that as the
4  cirrhosis goes on, and you can't grade or stage it in
5  any way, but what I've seen in my experience is that
6  the liver is either on a spectrum -- it's either --
7  it's either large or it's shrunken from, you know,
8  from the fibrosis.
9          But in this -- but in this situation,
10 we're seeing an enlarged liver, at this point.
11 That's one -- one thing.  On its own, does it mean
12 cirrhosis?  No.  We're talking about a constellation
13 of all these things.  So the enlarged liver, the
14 nodular surface contour, caudate enlargement, and
15 then this background of diffuse heterogeneous
16 attenuation is the foundation for why I'm saying
17 constellation.  I'm putting all those findings
18 together and then I'm surmising that it's, you know,
19 commonly seen, in my experience, in patients who have
20 background -- background cirrhosis or underlying
21 cirrhosis.
22     Q.   Understood.  Is there any way of knowing
23 from a CT scan how long a patient has had cirrhosis?
24     A.   You know, the best answer is no.  Like I
25 said, only through experience do radiologists see

Page 173

1  other findings that, you know, may go along with,
2  like, the clinical investigation that stages this at
3  an earlier or a later stage.  We don't have ascites
4  here, which means we don't have free fluid in the
5  abdomen as a result of this, you know, cirrhosis and
6  portal hypertension.  We have an enlarged liver
7  instead of a small liver.  So all those things would
8  be taken into account when a clinician -- we're going
9  to look at, you know, the imaging, the clinical data,
10 the patient history, the clinical condition.  So, no,
11 you can't do it by radiology on it's own.
12     Q.   Understood.  And heterogeneous
13 attenuation, could that be a sign of malignancy in
14 the liver?
15     A.   It can be associated with malignancies.
16 It's not a, you know, de facto absolute finding.
17 But, again, like we've been saying all along, that
18 can be seen with -- yes, that can be seen with
19 malignancies.
20     Q.   Understood.
21     A.   But just to point out to you, this, you
22 know, to this degree, diffusely, you know,
23 experientially understanding the body and
24 pathophysiology, someone who had diffused malignancy
25 of the liver and you were to attribute that to a

44 (Pages 170 - 173)

Page 174

1  heterogeneous attenuation, and I don't know
2  Mr. Roberts's clinical condition at this point,
3  because I have not reviewed any other medical
4  records, this would be a very sick individual with
5  that much of a burden of a malignancy, so.
6      Q.  I'm sorry, I didn't quite understand.
7      A.  So, you know, I'm using -- I'm using the
8  word diffuse, right, which means everywhere. Right?
9  Everywhere you look, you find it. If someone had
10  that degree of malignancy in their liver, as a
11  physician, I would expect them to be very sick. But,
12  again, I don't know his clinical picture and so I
13  would just say that it can be associated with it.
14  But to this degree, it would almost be knocking out,
15  like, the entire liver and this gentleman would be
16  very sick. And I don't know what was going on with
17  him beyond what he looks like on a CT scan.
18      Q.  Right. Okay. But the areas of
19  heterogeneous attenuation, those could be malignant
20  spots. Right?
21      A.  You know, they could -- could any --
22  could there be some kind of malignancy on the
23  cellular level? I mean, you can't say yes or no to
24  that.
25      Q.  Okay. So then, in the next paragraph,

Page 175

1  you discuss the subsequent multiphasic contrast
2  enhanced imaging?
3      A.  Yes.
4      Q.  And you say: "Aside from the
5  subcentimeter foci of low attenuation noted within
6  Segments 6, 7, and 8 of the right hepatic lobe, there
7  were no focal areas of abnormal enhancement,
8  architectural distortion, portal vein or vessel
9  thrombosis."
10      Did I read that right?
11      A.  Yes.
12      Q.  Okay. So I want to focus on the
13  subcentimeter foci of low attenuation noted within
14  Segments 6, 7, and 8 of the right hepatic lobe?
15      A.  Sure.
16      Q.  Is this, like, a new concept from the
17  earlier paragraph or is this referring to something
18  in the earlier paragraph in your report?
19      MR. VAUGHN: Object to form.
20      THE WITNESS: So what I'm -- what I'm
21  doing here is I'm making a reference to the fact that
22  this individual has now received multiphasic
23  contrast administration. So it's just a fancy word
24  for, you know, at one time. And we scanned him at
25  various points down the line; in this case two. So

Page 176

1  these are findings specific to Series 301 and 401,
2  which are the post contrast images. So I've, you
3  know -- that's what I'm making reference to here.
4  I've moved over to those images now or those series
5  now.
6
7  BY MR. NOLAN:
8      Q.  I want to get through the rest of the
9  paragraph and then we'll look at Series 301 and 401
10  with you. Okay?
11      You mentioned recanalization of the
12  paraumbilical vein?
13      A.  Yes.
14      Q.  What's that?
15      A.  So it's an association, just like the --
16  just like the splenomegaly. It's related to whatever
17  degree is present of, you know, portal hypertension.
18  It's a -- it's kind of a detour for the venous system
19  to bypass the portal venous system to get the blood
20  back up to the heart. So it's kind of a dormant
21  vessel that gets reopened when you need to get, you
22  know, blood through it. It will -- it will kind of,
23  what we call, recanalize, which means it's just kind
24  of opening.
25      Q.  And the dormant vessel that you're

Page 177

1  referring to, that's the umbilical vein, that's,
2  like, the way babies feed?
3      MR. VAUGHN: Object to form.
4      THE WITNESS: You know, I call it the
5  paraumbilical vein, because I think there's confusion
6  with the umbilical vein between the mother and the
7  fetus. So this is -- this is the one inside your
8  abdomen, yeah.
9
10  BY MR. NOLAN:
11      Q.  And it generally closes after birth?
12      A.  It's there, correct, and it's not used,
13  correct.
14      Q.  But in patients like Mr. Roberts, it
15  reopens to allow blood to bypass the liver?
16      MR. VAUGHN: Object to form.
17      THE WITNESS: Right. It will actually
18  redirect blood from the portal circulation, yes.
19
20  BY MR. NOLAN:
21      Q.  And does recanalization of the
22  paraumbilical vein occur when the resistance to blood
23  flow in the liver becomes too high?
24      MR. VAUGHN: Object to form.
25      THE WITNESS: Correct. When there's --

45 (Pages 174 - 177)

Page 178

1  when there's portal hypertension, this will happen.
2
3  BY MR. NOLAN:
4      Q.   In the healthy liver of an adult male,
5  is the umbilical vein normally detectable on -- the
6  paraumbilical vein normally detectable on a CT scan?
7           MR. VAUGHN: Object to form.
8           THE WITNESS: It's detectable. We know
9  where it is. It's in its location anterior to the
10 liver, but you wouldn't necessarily see it filling.
11 There's ligaments in the area that it kind of lives
12 in, and we know where those are, and we can see them
13 and that general area is kind of used to
14 differentiate, you know, the lateral and medial
15 segments of the left hepatic lobe. But, normally,
16 you don't see that vessel itself. You know where
17 it's living.
18          MR. NOLAN: Understood.
19          THE WITNESS: It's not conspicuous, I
20 should say. It's there, but it's not conspicuous.
21
22 BY MR. NOLAN:
23     Q.   Understood. And so when it becomes
24 recanalized -- am I pronouncing that right?
25     A.   Yes.

Page 179

1      Q.   So when it becomes recanalized because
2  of portal hypertension, it then becomes conspicuous
3  or visible on a CT scan. Fair?
4           MR. VAUGHN: Object to form.
5           THE WITNESS: Yes.
6
7  BY MR. NOLAN:
8      Q.   And cirrhosis is one of the major causes
9  of portal vein hypertension and consequently,
10 umbilical vein or paraumbilical vein recanalization.
11 Agreed?
12          MR. VAUGHN: Object to form.
13          THE WITNESS: It is a known common
14 cause, yes.
15
16 BY MR. NOLAN:
17     Q.   If someone's experiencing portal vein
18 hypertension resulting in paraumbilical vein
19 recanalization, does that mean it's likely that their
20 liver has been cirrhotic for quite some time?
21          MR. VAUGHN: Object to form. Scope.
22          THE WITNESS: Yeah, I have no comment on
23 that. There's no way to age or grade cirrhosis on a
24 CT.
25          MR. NOLAN: Okay.

Page 180

1
2  BY MR. NOLAN:
3      Q.   So then you say: "It's impossible to
4  confirm with any degree of medical certainty that any
5  of the areas of decreased attenuation within the
6  liver parenchyma represents the same hypoechoic foci
7  observed on the preceding April 8th, 2016 US
8  examination."
9           That means ultrasound?
10     A.   Yes.
11     Q.   And this is what we were talking about
12 earlier, how the things that were seen on the
13 ultrasound were not seen on the CT. Right?
14          MR. VAUGHN: Object to form.
15          THE WITNESS: Correct.
16          MR. NOLAN: Okay.
17
18 BY MR. NOLAN:
19     Q.   And then, the next sentence: "While the
20 findings are not specific, the differential diagnosis
21 would include benign etiology such as regenerative or
22 cirrhotic nodules over neoplastic disease when
23 considering the presence of cirrhosis and the absence
24 of other findings more suggestive of malignancy."
25          Did I read that right?

Page 181

1      A.   Yes.
2      Q.   Okay. So correct me if I'm wrong,
3  you're saying a benign etiology is more likely than a
4  malignant etiology because I'm not seeing other
5  things that are suggestive of cancer in the liver?
6           MR. VAUGHN: Object to form.
7           THE WITNESS: I'm not seeing a couple of
8  things. You know, I'm not seeing imaging findings
9  that are favoring malignancy over it being a benign
10 lesion. I'm not seeing lymphadenopathy, you know,
11 around the liver or where the liver would normally,
12 you know, drain to, where one would expect to see
13 lymphadenopathy. And I'm focused, I think, at this
14 point, with what the information I have is and I
15 don't have enhancement. I don't see architectural
16 distortion. You know, I don't see something
17 destroying the liver. I know that he has, you know,
18 cirrhotic and all this background stuff, but I don't
19 see, really, anything that's, like, destroying the
20 architecture. I just see, you know -- I just see
21 these -- this background pattern of heterogeneity,
22 which is kind of nonspecific, really. But I'm really
23 relying on, and you can see it here, you know, and I
24 said it, you know, kind of earlier, is that I'm not
25 seeing enhancement. I'm not seeing what would be a

Page 182

1  stronger indicator of a malignancy. So I'm still
2  trying to apply likelihoods here, which is why I'm
3  favoring benign etiologies, but I'm not excluding
4  malignant ones either. And I'm pretty explicit about
5  that.
6
7  BY MR. NOLAN:
8      Q.    Yeah. Yeah, yeah, yeah. And so, at
9  this point in April of 2016, based on the CT scans,
10 we cannot exclude the possibility of a malignant
11 etiology. True?
12     A.    Correct. Even though you can clearly
13 see I'm favoring or I'm saying there's more of a
14 likelihood of it not being, based on what we've got.
15     Q.    Understood, okay. Okay. Let's pull up
16 the Series 301 and Series 401 are the ones that have
17 the subcentimeter foci that you described here in
18 Segments 6, 7, and 8?
19     A.    Yes.
20     Q.    Okay. Let's look at Series 301. Let
21 me, before we do that, are all of the subcentimeter
22 foci available in both series or is -- do we need to
23 look at both?
24          MR. VAUGHN: Object to form.
25          THE WITNESS: We have to look at both

Page 183

1  because a couple of things are going on in this
2  study. One, it's my -- it's my opinion or it looks
3  to me to be evident that Mr. Roberts was not in the
4  same phase of breathing, is the best way I can
5  describe it. So the anatomy is going to change a
6  little bit based upon the pressure that's being
7  applied on the diaphragm. It's going to move his
8  liver up and down and his abdominal contents up and
9  down. So we have to do our best to try to
10 triangulate some of the findings that we think we see
11 on one series versus another.
12         What I've done, in my opinion in my
13 report, my confidence level on observing these areas
14 is better on the -- on the contrast imaging, but you
15 can, in my opinion, point out or discern certainly
16 the areas in 6 and 7; 8, I'm kind of really only
17 seeing as a hypodensity on the 401. And I don't
18 know, again, if that's just a function of the
19 background liver and 301 is just not enhanced and
20 maybe they're just becoming a little more conspicuous
21 on the background of enhancing the liver. But you
22 can -- you can discern 6 and 7.
23
24 BY MR. NOLAN:
25     Q.    On 301?

Page 184

1      A.    On 301, yeah.
2      Q.    And 301 is the noncontrast image?
3      A.    No, 301 is the first phase where they,
4  you know, started the installation of the contrast.
5      Q.    And what's 401?
6      A.    401 is a phase that's obtained about a
7  minute later. Do you want to get into what I think
8  about 401 or you just --
9      Q.    Well, before we do that, I want to
10 understand what 301 is versus 401. I'm not a
11 radiologist.
12     A.    So 301, you should have seen as W axial.
13 And 401 you should be seeing on your end as
14 Delayed 1.
15     Q.    Okay. And so what does W axial mean in
16 that context?
17     A.    I'm going to go with W means width. I
18 don't think it means something else, but I think it
19 means width. And I think axial means that it's in
20 the, you know, it's in the axial plane. And,
21 obviously, there are, you know, corresponding, you
22 know, other series with these, I think. I believe
23 each phase has, you know, certainly, you know, normal
24 sections. I believe they're 5 millimeter sections
25 and I think there's a thin section and then there is

Page 185

1  coronals and sags for every series. You know,
2  radiologists, we look at all of it. I don't know
3  which ones you've got, but we, you know, as far as
4  looking at where things are, I'm comfortable, you
5  know, trying to figure out where you're looking. So
6  the W axials are that first phase of contrast and
7  then Delayed 1 is just another series obtained in the
8  axial plane, roughly about a minute or less after
9  W axial, taken in -- taken in the same way.
10     Q.    Okay. Understood. All right.
11         So Series 301 was the first phase of
12 contrast and was taken before series 401, which is
13 about a minute or so later?
14          MR. VAUGHN: Object to form.
15          THE WITNESS: Yeah, about a minute or
16 less later, yeah.
17          MR. NOLAN: So let's look at Tab 31,
18 which is the 301 series. We're going to go through
19 the same thing that we did last time, which is -- and
20 we can pull that up on the screen and we'll mark it
21 as Exhibit 10.
22          VERITEXT CONCIERGE: Exhibit 10,
23 Counsel.
24          MR. NOLAN: Okay. So we'll mark the 301
25 series as Exhibit Mele-10 and I believe you said that

47 (Pages 182 - 185)

Page 186

1  the -- you could observe the segments or the
2  subcentimeter foci in Segments 6 and 7 in the 301
3  series. And so why don't you just direct us to the
4  best page to look at.
5         MR. VAUGHN: And, Doctor, if you need to
6  go to that Exhibit Share, then, to open the exhibit
7  to look through the 46 pages of it, take your time.
8
9         (Whereupon, Exhibit Mele-10 was marked
10 for identification.)
11
12        THE WITNESS: Counselor, I would like --
13 I would like to mention something, though. I just
14 want to point out that -- and I should have said this
15 sooner with regards to the ultrasound and I will say
16 that this applies to the ultrasound as well. You
17 understand that we're looking at this image. It's a
18 low res image, just so we know. You're providing me
19 with a PDF. That's not normally how we interpret
20 diagnostic radiology examinations. When I did review
21 these examinations, I reviewed them on a medical
22 grade monitor and I'm relying on my recollection of
23 those images while I'm walking through these PDFs
24 with you, which, you know, are not going to be as
25 resolute due to, you know, there is some data loss

Page 187

1  when you go to this format. So I'm going to do the
2  best I can with kind of what you've got.
3         MR. NOLAN: Understood. I have a
4  follow-up question.
5
6  BY MR. NOLAN:
7      Q.  When you were observing the images for
8  this case in the medical grade quality, did you make
9  any annotations on any of the images that you
10 observed?
11     A.  No.
12     Q.  Okay. So it's not like you have a file
13 somewhere that says, you know, this is the image for
14 Segment 6 where there is subcentimeter foci here,
15 here, here, and here?
16     A.  No, I just know the imaging. You know,
17 I mean, I look at it and I can tell you what's going
18 on, on the image.
19     Q.  Okay.
20        MR. VAUGHN: And, Doctor, if you need to
21 review the medical grade images at any point, feel
22 free.
23        THE WITNESS: Well, let's just see how
24 it goes. All right. You want me just to start kind
25 of pointing out what I can?

Page 188

1
2  BY MR. NOLAN:
3      Q.  Yeah. Well, so, I want to focus on your
4  language: "Aside from the subcentimeter foci of low
5  attenuation noted within Segments 6, 7, and 8."
6         And so, I want to be able to -- to know
7  what page you were looking at or you were thinking
8  about when you wrote that down?
9      A.  Okay, certainly. So, if you don't mind,
10 Counsel, would you mind showing the first image in
11 this, please, so I can just -- I want to verify if
12 it's the same images that I remember.
13        Okay. This is the image where the
14 majority of the contrast material is actually still
15 in the right atrium. Okay. So let's go down to --
16 the image number is on there, let's try Image
17 Number 15. Okay.
18        So when you -- this is my recollection
19 of the best image where you're trying to coordinate
20 401 where I think some of these things are seen
21 better, because of the background, trying to
22 correlate anatomically where the observations of
23 hypodensities are also on 301. And I don't know how
24 I can really point to it, but on this -- on this
25 image -- and, again, we're dealing with the fact that

Page 189

1  if you look at the same area on 401, the lung is more
2  kind of aerated, so the anatomy is getting pushed
3  around. But on this image, I do see a hypodensity
4  that, in my opinion, would correspond with the better
5  contrast-enhanced image that follows in 401.
6      Q.  Okay. I'm going to ask you to point out
7  where and the trial tech is going to, like, draw an
8  arrow. But let me -- before we go through all of
9  that, would it be better to just skip right to the
10 401 series because that's better because of the
11 contrast?
12     A.  You mean you want to -- you know, you're
13 trying to answer a question of where I'm -- where I'm
14 seeing them. So if you want to go sequentially, we
15 can go retrospectively. It's whatever you think
16 would be easier. I'm happy to do it either way.
17        MR. VAUGHN: Are we able to give the
18 doctor control of the cursor to point out what he's
19 looking at? Or is that not a possibility here? Do
20 we have to use the trial tech and communicate through
21 him?
22        VERITEXT CONCIERGE: I can give him
23 control of the cursor. This is just going to be
24 pointing out, if he wants to draw something, I'll
25 have to give him a different tool. But if you just

48 (Pages 186 - 189)

Page 190

1  want him to be able to point things out --
2          MR. VAUGHN:  Are you capable of giving
3  him that different tool?
4          VERITEXT CONCIERGE:  I can, here.  This
5  is --
6          MR. VAUGHN:  Doctor, would you prefer
7  that?  Would that be easier for you?
8          THE WITNESS:  I will do whatever is
9  asked of me, to the best of my ability.
10         VERITEXT CONCIERGE:  Okay.  This will
11 act as a cursor.  If you point something out, I'm
12 just going to do it up on the top of the document
13 here.  Wherever you click and then pull from, it will
14 draw an arrow.
15         THE WITNESS:  Okay.  So the arrow head
16 comes from --
17         VERITEXT CONCIERGE:  From the beginning.
18         THE WITNESS:  Gotcha.  Okay.
19         VERITEXT CONCIERGE:  Okay.  And I will
20 give you control of the document now.
21         MR. VAUGHN:  Is there a way for him to
22 draw or do circles as well?
23         VERITEXT CONCIERGE:  Okay.  There's two
24 ways to do that.  He can do that within the Zoom
25 using the annotation tool within Zoom.  By clicking

Page 191

1  at the top of the screen, you'll either see something
2  that says "annotate" or something that says "more".
3  And then, that will open up the annotation tools and
4  he can do that without me giving him control.  It's
5  up to you whether you want to go through that on the
6  record or off, Counsel.
7          MR. VAUGHN:  You can do it on the
8  record.  If you have questions as you're going,
9  Doctor, or difficulty, just let us know.  If we need
10 to take a break, we can.
11         VERITEXT CONCIERGE:  Do you see
12 annotation tools, Doctor?
13         THE WITNESS:  I have a thing that looks
14 like a pencil.
15         VERITEXT CONCIERGE:  Yes.  And if you
16 click on that, there are different tools that would
17 come up and then would allow you to make circles, Xs,
18 arrows, et cetera.
19         THE WITNESS:  Do I just make a dot?
20         MR. NOLAN:  Yeah, I think we're going to
21 have to do this with the trial tech, just because
22 they're going to be more familiar with the
23 technology, Dr. Mele.
24         THE WITNESS:  That's fine.
25         MR. VAUGHN:  Well, we need it to be

Page 192

1  accurate as well, though.  So if Dr. Mele is able to
2  show exactly what he's looking at, that's going to be
3  more accurate than the trial tech trying to convert
4  what he's saying into where he's inputting an image.
5  That's the only way can do it.  We can -- I think,
6  Jack -- or I think Dr. Mele is able to annotate
7  himself.
8          MR. NOLAN:  Well, let's try it first and
9  then we'll see how it goes.
10         MR. VAUGHN:  Try what?
11         MR. NOLAN:  With the trial tech, first.
12         MR. VAUGHN:  Okay.
13
14 BY MR. NOLAN:
15     Q.    And so, Dr. Mele, you said that, on this
16 image, you can point out some of the subcentimeter
17 foci that you were discussing in your report?
18     A.    Correct.  I believe that on this image I
19 can co-locate Segment 7.  Okay?
20     Q.    Okay.  So where would that be on this
21 screen?
22     A.    Do I do any of this here or is this
23 other guy going to draw it?
24     Q.    The trial tech is going to try drawing
25 it first.  So we have the R on the left-hand side of

Page 193

1  the screen.  We want to be near that, right, on the
2  right-hand side -- or the left-hand side?
3          MR. VAUGHN:  Object to form.
4          THE WITNESS:  We want to be on the
5  individual's right.
6          MR. NOLAN:  Okay.
7
8  BY MR. NOLAN:
9      Q.    And so where is it that we are looking
10 on the screen for this?
11         MR. VAUGHN:  Object to form.
12         THE WITNESS:  He would have to go south.
13 Stop.  And to their right, meaning the individual
14 driving the --
15         MR. VAUGHN:  Jack, this isn't working
16 then.  Object.  With a different right, this is stage
17 right and patient right.  This is incredibly
18 confusing.  Is he even going the right direction,
19 Dr. Mele?
20         Jack, I think, it's going to make for a
21 lot cleaner depo if you allow the expert to actually
22 control it.
23         MR. NOLAN:  We'll try that, Dr. Mele.
24         VERITEXT CONCIERGE:  Okay.  This is --
25 this is the trial tech.  Do you want him to do the

49 (Pages 190 - 193)

Page 194

1 Zoom annotations or using my annotations and you can
2 just tell me whether you want a circle or an arrow or
3 whatever and I can give it back and forth to you.
4 You tell me how you want to do it.
5        MR. VAUGHN: What's easiest for you,
6 Doctor, so it can be accurate?
7        THE WITNESS: I mean, I'm okay with a
8 circle.
9        VERITEXT CONCIERGE: Okay. I'm going to
10 create a circle. And all you'll do is draw a circle
11 like that. Okay? So wherever you start, it's going
12 to draw a circle. Okay?
13        MR. VAUGHN: Do you click and hold or do
14 you just click?
15        VERITEXT CONCIERGE: You click and then
16 hold and then release. Let me clear this one and
17 then I will give the doctor control.
18        THE WITNESS: If I'm off center, can I
19 move it a little bit? Or once I draw it, I'm done
20 for?
21        VERITEXT CONCIERGE: You'll have to tell
22 me and I'll have to delete it and then we'll do
23 another one. Okay?
24        THE WITNESS: Okay.
25        VERITEXT CONCIERGE: So if you double

Page 195

1 click now on the screen or you say take control,
2 there you go.
3        THE WITNESS: All right. So like I --
4 like I normally do in situations like this, so you
5 have it on the record as to what I'm doing, I'll
6 describe what I'm doing, obviously. I'll let you
7 know what I'm looking at and, you know, where I'm
8 working.
9        So I'm looking at Image 15 of Series 301
10 of the CT examination from 4/19/2016. We have
11 described this as the initial contrast phase.
12 Dr. Chernyak used different language. She defined
13 this as the arterial phase image. We're looking at
14 Segment 7 and I'm trying to demonstrate for you that
15 what we're going to see on 401, the best way that I
16 could try to, you know, show that on the 301 is
17 trying to find the same anatomic region based upon
18 changes in the individual's condition in the course
19 of obtaining this examination. Before I draw
20 anything, there's an area of hypodensity right here,
21 (indicating) which, in my opinion, is likely the best
22 demonstration of what we will see on 401 in the same
23 location based on the change in the imaging dynamics
24 between the two studies. So I'm going to try to draw
25 a circle around this area, which I believe is

Page 196

1 representative of what I would -- what I would say
2 here, even though I found it on -- or I described my
3 observation of it on 401. But if you were asking me
4 to show to you where I think it is on 301, it would
5 be at this location. (Drawing.)
6
7 BY MR. NOLAN:
8        Q.    And which segment are we in, Doctor?
9        A.    It is my opinion that we are in
10 Segment 7.
11        Q.    Okay. And is there any other areas of
12 focal hypodensity on this line?
13        MR. VAUGHN: Object to form and to the
14 extent that you can answer on this PDF nonmedical
15 grade image.
16        THE WITNESS: Yeah, I mean, in general,
17 it still kind of carries that background
18 heterogeneity. And we would be here for hours if I
19 had to point out every one. The reason why this is
20 being annotated is because it is more conspicuous on
21 the following series. And this looks a little bit
22 distinct, but part of it is knowing where it's really
23 distinct on 401.
24        MR. NOLAN: Okay.
25        THE WITNESS: And you've asked me to try

Page 197

1 to find it on 301 and this is -- this is the best
2 that I can do with that.
3        MR. NOLAN: Okay.
4
5 BY MR. NOLAN:
6        Q.    Are there any areas of focal hypodensity
7 from Segment 6 on this image?
8        A.    No. We have to go to a different image
9 for that.
10        MR. NOLAN: Okay. So before we do that,
11 I would like to mark this as Mele-A, so that way it's
12 preserved.
13        MR. VAUGHN: What do you mean by that,
14 Jack?
15        VERITEXT CONCIERGE: One moment,
16 Counsel.
17
18        (Whereupon, Exhibit Mele-A, Segment 7
19 was marked for identification.)
20
21        MR. VAUGHN: Like a new exhibit?
22        MR. NOLAN: Yep.
23        MR. VAUGHN: Okay. So we're going to do
24 numbers and we're going to do letters in the
25 exhibits?

50 (Pages 194 - 197)

Page 198

1    MR. NOLAN: We're going to do numbers
2 for the documents that I'm showing the Doctor and
3 letters for the documents that he is creating.
4    MR. VAUGHN: Understood.
5    VERITEXT CONCIERGE: And give me one
6 moment.
7    MR. VAUGHN: And by creating, you mean
8 that he's annotating?
9    MR. NOLAN: Yes.
10    VERITEXT CONCIERGE: I just want to make
11 sure that it saved it properly, counsel. Okay. This
12 will be saved as A. It will take some time to be
13 uploaded into the portal, but this has been marked as
14 Exhibit A.
15    MR. NOLAN: Okay.
16
17 BY MR. NOLAN:
18    Q.    Dr. Mele, can you confidently state to a
19 degree of medical certainty that the area of hypo
20 focal -- the area of hypodensity that you circled
21 here -- let me start over.
22    Dr. Mele, can you confidently state to a
23 degree of medical certainty that the area that you
24 circled here in red was not malignant in 2016?
25    MR. VAUGHN: Object to form.

Page 199

1    THE WITNESS: In a way, Counselor,
2 you're giving me a question that's kind of
3 hamstringing me, because I don't just have this
4 image. I have the entire study. So I would not make
5 a diagnosis based on a single image in an exam that
6 could be hundreds or even thousands of images.
7    MR. NOLAN: Okay.
8
9 BY MR. NOLAN:
10    Q.    After reviewing the hundreds or
11 thousands of images, can you confidently state that
12 this area was not malignant in 2016?
13    MR. VAUGHN: Object to form.
14    THE WITNESS: You're allowing me to use
15 the -- the full force of all the images I have
16 available to me in this study. Correct, when I give
17 this opinion?
18    MR. NOLAN: Yes.
19    THE WITNESS: I cannot exclude it
20 entirely, but, again, based on the imaging findings,
21 it's more likely to be benign.
22    MR. NOLAN: Okay. That's fair.
23
24 BY MR. NOLAN:
25    Q.    Now, for the area of hypodensity in

Page 200

1 Segment 6, should we go to series 401 or should we
2 stay on Series 301?
3    A.    No, let's -- let's stay here. Because I
4 think it will be a good lesson to how inadequate this
5 is. It will, you know, it'll show you that we're
6 dealing with essentially a noncontrast scan. So for
7 the -- for the hypodensity in Segment 6, I would
8 recommend going to Image 27, if we have that.
9    Q.    Okay. Yep.
10    A.    Okay.
11    Q.    And why don't you take the controls
12 again and draw another circle on Image 27 for the
13 area of hypodensity in Segment 6?
14    A.    Sure. So, again, the same rules apply.
15 You know, this is -- these are, at this point,
16 they're static. So we have Mr. Roberts at that point
17 in his cycle of respirations, so the organs are where
18 they are, from Image 1 to, you know, the last image.
19 At that point, they're stacked, so they're not
20 changing when we go to a different image. He's where
21 he was on image -- what were we on before, 15? And
22 so you'll see that when we look at 401, the anatomy
23 might look a little bit different, but it's because
24 we're dealing with the phases of inspiration or
25 expiration. So I could get -- and, again, so we're

Page 201

1 trying to approximate the -- trying to approximate
2 the anatomy as best we can with what we have to work
3 with. So if I can get control of the.
4    VERITEXT CONCIERGE: Just double click
5 on the screen. You got it.
6    THE WITNESS: Okay. There you go. So
7 in this area, (indicating), we're looking at
8 Image 27. It's from the first phase, Series 301,
9 where contrast has been instilled or has begun to be
10 administered. We are in Segment 6 and there is a --
11 based on what is on 401 extrapolating to 301, is an
12 area of hypodensity, down -- can I redraw that? It
13 came out as an oval.
14    VERITEXT CONCIERGE: Go ahead.
15    THE WITNESS: There's an area of -- are
16 we still on 27? Yes. There's an area of hypodensity
17 here (indicating) that, in my best estimation,
18 corresponds to the observation I see in Series 401
19 and, you know, what I saw on an image with the
20 improved resolution or higher resolution.
21
22 BY MR. NOLAN:
23    Q.    Okay. Are there any other areas -- so I
24 just want to make sure. From the paragraph in your
25 report where you talk about the subcentimeter foci,

51 (Pages 198 - 201)

Page 202

1  because that's the plural of focus. Right?
2      MR. VAUGHN: Object to form.
3      THE WITNESS: Correct.
4
5  BY MR. NOLAN:
6      Q.  So the subcentimeter foci below
7  attenuation noted within Segments 6, 7, and 8, is it
8  one area in each of those segments? Or are there
9  multiple areas in each of those segments?
10     MR. VAUGHN: Object to form.
11     THE WITNESS: So 6 and 7, there was one
12 area. In 8, when we go to 401, there's two --
13 there's two areas that could be or were interpreted
14 by me as being hypodense compared to the background
15 of the liver.
16     What's also on here is the -- is another
17 hypodensity in Segment 5 that I believe is the focus
18 that Dr. Chernyak is -- that she opines on was
19 isodense on this series, and it's not. And so I
20 don't know if you want to cover that now or if you
21 want to cover that later?
22     MR. NOLAN: Okay. Well, first of all,
23 I'm going to have some follow-up questions about
24 that. But before we do that, let's take a screenshot
25 of this and mark it as Mele-B.

Page 203

1      (Whereupon, Exhibit Mele-B, Screenshot
2  of Image 27, was marked for identification.)
3
4      VERITEXT CONCIERGE: So marked.
5
6  BY MR. NOLAN:
7      Q.  And so the area that Dr. Chernyak opined
8  is isodense on this series, that is not, where is
9  that area?
10     MR. VAUGHN: Object to form.
11     VERITEXT CONCIERGE: Counsel, sorry,
12 before he answers, do you want me to remove this
13 circle or leave it since it's already been marked?
14     MR. NOLAN: Yeah, we can remove it.
15     THE WITNESS: Yeah, we'll be changing
16 images next.
17     MR. VAUGHN: So are we going with
18 Exhibit 10 or Exhibit B?
19     VERITEXT CONCIERGE: We are still in
20 Exhibit 10, Counsel. Exhibit B was simply the
21 screenshot with the red circle.
22     MR. VAUGHN: Understood.
23     THE WITNESS: I just want to say it is
24 dark in here right now, but this is working to my
25 advantage of being able to view the -- this is what

Page 204

1  we do. We kind of work in the shadows like this. So
2  I'm -- given these images, this is probably like what
3  the lighting would be like, even if -- even if the
4  lights were on in here, so.
5      Yeah, so, you know, Dr. Chernyak, does
6  not say what image she interprets the lesion or her
7  lesion or the observation in Segment 5 to be on. I
8  believe she's talking about Image 18 in this series.
9      So when you -- when you consider where
10 we are on 401, and I'm sure we're going to get to
11 that next, you're, again, trying to figure out where
12 you are anatomically with respect to where we're
13 seeing all of these -- all of these things. And
14 we're on this image that it's Dr. Chernyak's opinion
15 that it's an arterial phase image. It's an
16 appropriately timed and sufficient arterial phase
17 image and she has the opinion that there's
18 isoattenuation or it's isodense on this image -- or
19 this location. Again, she didn't give us image
20 numbers or anything like that.
21     And it's my opinion that there is a
22 hypodensity that's present in that location that she
23 makes reference to later as "washing out and saying
24 that it was hypodense here." So I'm going to take
25 control and I'm going to say that we're on Image 18

Page 205

1  in Series 301 and with using, you know, the best
2  tools we have in terms of anatomy and, you know,
3  looking at the, you know, hilum of the liver or, you
4  know, the kind of, like, the business end of the
5  liver where everything kind of enters, there is a
6  hypodensity out here, which co-locates with the
7  hypodensity on 401 and that's not isodense.
8
9  BY MR. NOLAN:
10     Q.  What does isodense mean?
11     A.  So when we use the terminology isodense,
12 we literally mean equal, so equal density or equal
13 appearance, equal shading to the background liver.
14 So when we talk about hypodense, we're talking about
15 relative darkness, you know, on the gray scale.
16 Relative darkness compared to the background liver in
17 that same area on that same image. And we're seeing
18 here that, in the same location as 401 is, you know,
19 this area (indicating); it's hypodense, not isodense.
20 It's less dense. It's not enhancing. If you were to
21 look at this, and we'll see it on 401 as well, you
22 know, we could -- we could go out and, you know, grab
23 all of these areas that are, you know, hypodense.
24 They're small. That's kind of heterogeneity. It's
25 in multiple areas. It's here in, you know -- it's

52 (Pages 202 - 205)

Page 206

1  here in five. It's -- you can -- this is probably --
2  this is, you know, four. There's other areas in
3  three that we'll see when we get the appropriate
4  background of liver attenuation to what is closer to
5  an arterial phase than this.
6        This is being described as an arterial
7  phase. This is kind of like when it happened. Kind
8  of totally ignoring what's going on with the contrast
9  elsewhere and, you know, with the other requirements
10 that aren't being met. It's just kind of being
11 described as an arterial phase because of where it
12 occurred sequentially, independent of what's actually
13 on it.
14       MR. NOLAN: Let's take a screenshot and
15 mark this as Mele-C as in Charlie.
16
17       (Whereupon, Exhibit Mele-C, Screenshot
18 of Image 18, was marked for identification.)
19
20 BY MR. NOLAN:
21    Q.    But the answer to my question, Dr. Mele,
22 is that isodense means the same density and hypodense
23 means less density?
24       MR. VAUGHN: Object to form. Asked and
25 answered.

Page 207

1        THE WITNESS: Correct. And also, to be
2  complete, hyperdense or hyperenhanced means brighter
3  than or more than.
4        MR. NOLAN: Okay.
5
6  BY MR. NOLAN:
7     Q.    Is it your view that Dr. Chernyak looked
8  at images from Series 301 to identify the lesions on
9  Mr. Roberts's liver?
10       MR. VAUGHN: Object to form.
11       THE WITNESS: Based on her testimony, I
12 believe that counsel walked her through Phase I,
13 Phase II, Phase III. Even though there was no
14 Phase III, at first, there. At first, she thought
15 there was a Phase III and then there wasn't, when
16 they went through the images in some depth. And the
17 only reference she makes is to the arterial phase,
18 which is -- would be without -- without taking into
19 stock what's on the image. This was the first series
20 where contrast was administered. And I think she
21 makes a point of saying -- she goes back and forth at
22 length, the Delayed 1 is really the delayed phase and
23 then she goes back to, oh, it's really the portal
24 venous phase. This is the only series that's left,
25 aside from the non-con, where someone gave contrast

Page 208

1  material. So we're only -- we can only understand
2  that she meant this to be the arterial phase.
3  Because she makes a point of saying the next phase is
4  the portal venous phase and she's talking about
5  washout. So in order for her to have that opinion,
6  she'd have to consider this the arterial phase.
7        MR. NOLAN: Okay.
8
9  BY MR. NOLAN:
10    Q.    Is there anything else from Series 301
11 that we need to discuss as it relates to your
12 statements regarding Segments 6, 7, and 8 in your
13 report?
14       MR. VAUGHN: Object to form.
15       THE WITNESS: No, because I really made
16 them off of Series 401, so.
17       MR. NOLAN: Okay. Why don't we take a
18 break and then we'll look at Series 401.
19       THE WITNESS: Okay.
20       THE VIDEOGRAPHER: The time is 2:59. We
21 are off the record.
22
23       (Whereupon, a brief recess was taken off
24 the record.)
25

Page 209

1        THE VIDEOGRAPHER: The time is 3:15. We
2  are on the record.
3
4        MR. NOLAN: Okay, Dr. Mele. Let's mark
5  as Exhibit Mele-11, Tab 33A, which is the 401 series
6  scan from April of 2016.
7        Pull that up on the screen.
8        VERITEXT CONCIERGE: Coming up now,
9  Counsel. I was just marking it in Exhibit Share.
10
11       (Whereupon, Exhibit Mele-11 was marked
12 for identification.)
13
14 BY MR. NOLAN:
15    Q.    So this is Series 401. Right, Doctor?
16    A.    Yes.
17    Q.    Okay. And so which images or image
18 should we go to for the subcentimeter foci of low
19 attenuations that are within Segments 6, 7, and 8?
20    A.    Let's start with 6, so let's go to Image
21 Number 35.
22    Q.    3-5?
23    A.    3-5.
24    Q.    Okay. So on the right side of the
25 screen, is this what you were talking about where the

Page 210

1  -- because maybe his breathing was compressed or
2  something, it looks a little different?
3        MR. VAUGHN:  Object to form.
4        THE WITNESS:  Yeah.  You know, you're
5  trying to triangulate the anatomy.  You're seeing the
6  kidney a little bit differently because now we have,
7  you know, like, some contrast going on and the liver
8  is going to move in relation to the kidney.  And when
9  there's kind of breathing, but, you know, what I'll
10  -- what I'll show here is that we're not dealing
11  with, really, an enormous observation to begin with.
12  So going back to look at it on what, in my opinion,
13  is essentially, you know, a noncontrast scan or a
14  very limited scan, which explains why it's not, you
15  know, jumping out to the untrained eye.  This is what
16  we do.  So you're going to get a little bit of a
17  flavor to how we see things differently, depending on
18  the information that we have.
19        So, again, I just want to make sure
20  we're talking about now Series 401 from the CT on
21  4/19/2016.  And, again, I just want to make sure that
22  it's clear that we're looking at PDFs and not the
23  medical grade imaging and that there's going to be
24  some degradation of the image quality due to data
25  loss.  So I will do the best job that I can,

Page 211

1  utilizing my knowledge of the examination from having
2  reviewed it on a superior system.  And I believe I'm
3  able to extrapolate what we're -- what we're kind of
4  what we're after here.  But if there is some
5  uncertainty about that, it's really related to the
6  quality of what we have here.
7        So we're looking at Image 35,
8  Series 401.  It's my opinion that we're in Segment 6,
9  the liver, and I'm going to take control.  And over
10  here (indicating), there is an area of hypodensity,
11  which I'm going to attempt to draw a circle around,
12  and that's what I was making reference to in my
13  report.
14        MR. NOLAN:  Okay.  Let's mark this as
15  Exhibit D as in dog.
16
17        (Whereupon, Exhibit Mele-D, Image 35,
18  Series 401, was marked for identification.)
19
20  BY MR. NOLAN:
21     Q.   Dr. Mele, did you observe any washout in
22  Series 401?
23        MR. VAUGHN:  Object to form.
24        THE WITNESS:  This is not an image where
25  one can comment on washout because the preceding

Page 212

1  phase is inferior and not sufficient to determine
2  wash-in or enhancement, in my opinion.
3
4  BY MR. NOLAN:
5     Q.   What do you mean?
6     A.   It's not a -- so 301 is not the
7  requisite arterial phase series you would need to
8  make comments here on washout.  And I can expand upon
9  that.  What I --
10     Q.   What would you need?  Sorry.
11     A.   What I would need to comment on washout
12  in this study is a series beyond this one.  This
13  image is labeled in the image stack as Delayed 1.
14  Dr. Chernyak refers to it as a portal venous phase
15  and she thinks it's, you know, sufficient.  When you
16  look at this image and you take stock of what's --
17  what's available here.  We have what is, in my
18  opinion, best -- best described as a phase which is
19  existing in between what would be a better late
20  arterial phase and the portal venous phase.
21        And I will similarly state that these
22  CTs are done -- I think Dr. Chernyak said these are
23  done on a spectrum of the time from contrast
24  administration to the final series that you look at.
25  When I look at this series, with respect to the perog

Page 213

1  -- you have to do that.  You have to have two
2  sequential series that'll allow you to have
3  unequivocal findings.  This examination doesn't give
4  you two series that provide you with information to
5  give unequivocal findings.  The preceding 301 is not
6  useful as an arterial scan to talk about arterial
7  phase enhancement on that for reasons I've already
8  stated.  There's contrast in the right heart.  The
9  timing is off.  The bull was rigged or the injection
10  rate may be off.  We don't have full enhancement of
11  the hepatic artery and its branches.  We don't have
12  portal vein enhancement, which is part of what's
13  utilized to determine the late arterial phase.
14        However, on this series, we do have
15  better opacification, better enhancement of the
16  mesenteric and the hepatic arteries.  We do have
17  portal vein enhancement.  We have very faint hepatic
18  vein enhancement, but compared to background liver,
19  but it is faint.  So you have this kind of in between
20  late arterial and early portal venous phase that's
21  kind of sitting there in between.  And in my opinion,
22  this is the series best used to talk about
23  enhancement.  This closer or closest to the arterial
24  phase that we need to do so.  It's less useful for
25  washout because, and I would say not useful for

54 (Pages 210 - 213)

Page 214

1  washout, because the preceding phase is so inferior
2  that you can't say reliably or unequivocally that
3  that study can reliably talk about enhancement. So
4  you're left with this. And this is not dissimilar to
5  what we're left with or what we're dealing with on
6  the subsequent CT from 2018; but we're talking about
7  this right now.
8      Q.   Okay.
9      A.   So I would -- I would use this study
10 based on what's available, based on what I see, based
11 on the understanding of what the LI-RADS criteria
12 calls for. I would really use this more for
13 determination of enhancement and I would be unable to
14 use it for washout, based on the timing of
15 everything.
16     Q.   Okay. And so Series 401, in your
17 opinion, is -- you would use it for a determination
18 of enhancement. What does that mean?
19         MR. VAUGHN: Object to form.
20         THE WITNESS: It's more of a, you know
21 -- and I'm, you know, I'm giving this a little more
22 credit, perhaps, than it really deserves. But I'm
23 really treating this more as a late or a very late
24 arterial phase. So that's the phase in which you
25 look for enhancement.

Page 215

1      Q.   Got it.
2      A.   Because the -- because the preceding
3  series is so poor that you don't have the requisite
4  sequential to say, oh, well, it had the ability to
5  enhance here and now we're looking at the aftermath
6  of that. We don't have that preceding reliable
7  series to give us unequivocal evidence that it's
8  enhancing. And, in fact, we just saw that they're
9  not enhancing there, either. And they're not
10 enhancing here, either. So that's why I'm saying
11 that, you know, I would treat it, in this instance,
12 more as -- and I was reading the examination
13 clinically, I would be using this more for evidence
14 or more for unequivocal findings of enhancement than,
15 you know, de-enhancement or washout because you don't
16 have good foundation from the 301 that it -- that it
17 enhanced nor was the scan capable of -- nor that
18 phase, I should say, capable of determining so. It
19 was essentially like -- it was not as useful as a
20 noncontrast scan.
21     Q.   When you refer to enhancement, are you
22 talking about arterial phase hyperenhancement, APHE?
23         MR. VAUGHN: Object to form.
24 Foundation.
25         THE WITNESS: It's included under that.

Page 216

1  You know, we can talk about arterial phase
2  enhancement. We can talk about arterial phase
3  hyperenhancement. Given the quality and timing of
4  this scan, you kind of got to take what you can get.
5
6  BY MR. NOLAN:
7      Q.   Okay. And Series 401, in your view, is
8  more of an arterial phase enhancement?
9      A.   It's leaning arterial, yes.
10     Q.   As opposed to the portal venous phase?
11     A.   Correct. It's imperfectly placed in
12 between the two and, again, you know, it's some --
13 see, we're really splitting hairs to how far. Are we
14 closer to portal venous? How far? Are we closer to
15 arterial? If you really wanted an answer from me
16 about that, I'd say we're closer to late arterial
17 than we are to true portal venous. And you would
18 have to say, at a minimum, it's very early portal
19 venous because the other characteristics, which is,
20 you know, you don't have full enhancement of the
21 hepatic vein. And that's part of the discriminator
22 for the portal venous phase. And it's only obtained
23 a minute after a scan that was poorly delayed to
24 begin with. So there was additional delay that would
25 have been required on the 301 to make that series

Page 217

1  useful. And now you've taken that out and you've
2  only obtained this scan about a minute or less later.
3  So you're really still not even where you would have
4  taken the portal vein, the portal venous phase, had
5  the arterial phase been timed appropriately.
6      Q.   Okay. And I believe you said earlier
7  that Series 301, they should have waited about 30
8  seconds longer?
9          MR. VAUGHN: Object to form.
10         THE WITNESS: That would be the basic --
11 that would be the basic, most common recommendation
12 based on the attenuation of the aorta at that time,
13 which is the way you should do it. One of the ways
14 that you could do it is in line with what we
15 recommend in the LI-RADS manual.
16     Q.   Okay. And then, for Series 401 to be a
17 true portal venous phase, how long after that 30
18 seconds that 301 should have been delayed should
19 Series 401 have been taken?
20         MR. VAUGHN: Object to form.
21         THE WITNESS: If you had, you know -- if
22 301 had been -- had been timed appropriately, I would
23 say probably, like, no -- you wouldn't even consider
24 it going into the portal venous phase until about a
25 minute after that phase was -- was imaged.

55 (Pages 214 - 217)

Page 218

1        MR. NOLAN: Understood.
2
3    BY MR. NOLAN:
4        Q.   Did you apply LI-RADS to this particular
5    area of hypoattenuation in preparing your report?
6        MR. VAUGHN: Object to form. Asked and
7    answered.
8        THE WITNESS: No, because one cannot on
9    a single phase.
10
11   BY MR. NOLAN:
12       Q.   Did you apply LI-RADS in any of the
13   areas of hypo -- did you apply LI-RADS at all when
14   you were reviewing the 2016 scan of Mr. Roberts?
15       MR. VAUGHN: Object to form.
16       THE WITNESS: Let me answer the question
17   and I think maybe I can answer, maybe, another
18   question for you.
19       In evaluating this scan, one of the
20   things that I would do as a diagnostic radiologist is
21   consider applying the LI-RADS categorization to the
22   examination. So I considered. When I see a case
23   where there's, you know, cirrhosis where it's
24   reasonable that there could be a, you know, a
25   pretest, you know, or, you know, a pretest

Page 219

1    probability of needing to apply the LI-RADS criteria,
2    I consider it. When I looked at what I was left
3    with, I could not, because of what the imaging phases
4    looked like. I did not have sequential phases that
5    were appropriate and were done in accordance to how
6    one should apply the LI-RADS, which precluded me from
7    having the opinion or the ability to find unequivocal
8    findings in sequential images that would allow me to
9    call, you know, enhancement on one and, you know, the
10   followup to that, which could be, you know,
11   de-enhancement or, you know, washout or not; or, you
12   know, arterial phase enhancement or not based on
13   Series 301.
14       So given what we have, with the data we
15   have available, I treated this more as useful for
16   enhancement, arterial phase enhancement. It was the
17   closest thing we had to the arterial phase. By
18   definition, not having, in this case, a delayed phase
19   after this to draw any conclusions, I could not apply
20   the LI-RADS to it.
21       MR. NOLAN: Okay. I just want to try to
22   break that down a little bit.
23
24   BY MR. NOLAN:
25       Q.   So you considered applying LI-RADS.

Page 220

1    True?
2        A.   True.
3        Q.   And you did not apply LI-RADS because,
4    in your opinion, the timing, starting with Series
5    301, did not meet the criteria for applying LI-RADS.
6    Fair?
7        MR. VAUGHN: Object to form. Misstates
8    prior testimony.
9        THE WITNESS: Yeah, this examination
10   does not meet the minimal required CT images. It
11   doesn't -- it doesn't even include a delayed phase.
12
13   BY MR. NOLAN:
14       Q.   Have you ever applied LI-RADS to CT scan
15   images that were taken earlier in time?
16       MR. VAUGHN: Object to form.
17       THE WITNESS: In where? I'm not sure I
18   understand.
19       MR. NOLAN: Let me clarify.
20
21   BY MR. NOLAN:
22       Q.   Have you ever applied the LI-RADS
23   algorithm or scale to CT images that you were
24   observing that were taken years before you were
25   observing them?

Page 221

1        MR. VAUGHN: Object to form.
2        THE WITNESS: No. Any categorizations
3    I've done, have been, you know, from when we started
4    applying LI-RADS as a facility.
5        When we go back and we do comparisons,
6    whether it's between colleagues or in a -- or in a
7    conference, we've looked at prior scans to see if we
8    couldn't find some way to do it informally. But I
9    haven't gone back and read a scan and then said, oh,
10   by the way, in comparison, retrospectively, hey, I
11   think back five years ago, it was a LI-RADS whatever.
12   I have -- I have not done that. I haven't been asked
13   to do that, actually.
14       MR. NOLAN: Okay.
15
16   BY MR. NOLAN:
17       Q.   About how many times would you say that
18   you look at liver scans during the course of your
19   ordinary practice?
20       MR. VAUGHN: Object to form.
21       MR. NOLAN: (Technical difficulty.)
22       MR. VAUGHN: Sorry, I couldn't hear that
23   last part, Jack. Can you say that again?
24       MR. NOLAN: I'll ask a new question.
25

56 (Pages 218 - 221)

Page 222

1  BY MR. NOLAN:
2      Q.   About how many times a week are you
3  asked to look at CT scans of a liver?
4      A.   I would say, per week, no less than ten
5  times a week.
6      Q.   Okay.  And so have you ever been
7  involved in a study or some sort of retrospective
8  where let's look at liver scans from five years ago
9  and see what type of diagnosis we would do now using
10 LI-RADS?
11          MR. VAUGHN:  Object to form.
12          THE WITNESS:  No.  I've never been asked
13 to do something like that.
14          MR. NOLAN:  Okay.
15
16 BY MR. NOLAN:
17     Q.   And have you ever applied LI-RADS to a
18 set of scans that were not properly timed, as -- as
19 you put it?
20          MR. VAUGHN:  Object to form.
21          THE WITNESS:  No, because you can't.
22
23 BY MR. NOLAN:
24     Q.   And -- and why is that?
25     A.   Well, you know, so let's -- let's -- I

Page 223

1  think that's -- it's a -- that's a reasonable
2  question.  I think I can answer it in terms of what
3  we're looking for, for example.  You know, the door
4  opens, is the best way I describe it.  I told my
5  residents, the door opens with arterial phase
6  enhancement and, you know, specifically arterial
7  phase hyperenhancement.  When you -- when you look at
8  the, you know, the table we all use.  We all have,
9  you know, committed to memory as best we can.  I know
10 Dr. Chernyak is familiar with it.  I would expect her
11 to be, she talks about left and right sides of the
12 table.  We all do that when we discuss cases.
13 There's essentially three things we have to cover
14 from Jump Street.  And one is enhancement,
15 particularly hyperenhancement.  But to be fair, you
16 can discuss these areas, these observations with
17 respect to isoenhancement or hyperenhancement.  So to
18 not say that any degree of enhancement would suffice,
19 because that's more for the ultrasound realm, but it
20 has to be hyperenhancement or isoenhancement before
21 you can talk about the second major feature that we
22 look for, which is washout or de-enhancement.  And
23 you have to have a protocol or a set of images where
24 you are certain that you have been able to reliably
25 determine background liver versus anything you see as

Page 224

1  an observation, whether it matches or if it's
2  brighter.  So that prerequisite is that the timing of
3  the scan is precise.  That it's on point for what you
4  need to be doing.
5          Then you have the sequential series that
6  allow you to evaluate washout, that'll allow you to
7  consider rim enhancement another one of the major
8  features that are all kind of what you need to be
9  looking at.  And let's be honest, in a situation like
10 this, where this is the first CT or the first imaging
11 study in what could be a series of exams down the
12 road, but this is the first one.  So it's not like
13 Mr. Roberts had a CT we could've compared it to, to
14 then have it be more of a surveillance or more of a
15 followup scan.  It's the first one.  It's the one
16 where you're -- where you're going to see what's on
17 it for the first time.
18         So you really need to have the
19 sequential series to make these conclusions
20 unequivocally.  And in order to do that, you need a
21 standard quality, you know, scan.  You need to have
22 -- in order to get the standard report, you need the
23 standard protocol so you're talking the same
24 language.  And with this -- with this case, you don't
25 have -- you don't have an exam in total that meets

Page 225

1  those minimal requirements.  We have a series that
2  we're dancing around where I'm giving it more credit
3  than it probably deserves, but I'm willing to say
4  that this is more arterial than it is portal venous,
5  so I'm comfortable making comments on enhancement.
6  But we also don't even have a scan where you can make
7  a comment on enhancement before that.  This is kind
8  of like all you got.  This would be like a CT you got
9  off the street for someone who came in for another
10 reason, not related to, you know, HCC surveillance.
11 This would be like, you know, like the basket
12 contrast enhanced scan that you get on someone for,
13 you know, like diverticulitis or, you know,
14 appendicitis or for some issue not specifically
15 tailored for HCC surveillance, diagnosis, treatment
16 response, and all the reasons why you would do them
17 under the umbrella of LI-RADS.
18     Q.   So is it your opinion that the only way
19 to apply LI-RADS is by having the properly phased
20 images; the arterial phase, the portal venous phase,
21 and the delayed phase?
22          MR. VAUGHN:  Object to form.
23          THE WITNESS:  It is my impression and my
24 understanding that those are the minimal requirements
25 that are laid out by LI-RADS in their manual, in

57 (Pages 222 - 225)

Page 226

1  their documents, in Dr. Chernyak's publication. If
2  you had at least two sequential sufficient images or
3  two series, you could offer an opinion to the benefit
4  of the patient. But just understand, as the -- as
5  the guidelines are written, you would be going
6  outside of what LI-RADS recommends and what the
7  guidelines currently state.
8        MR. NOLAN: Understood.
9
10 BY MR. NOLAN:
11      Q.  Let's look at the -- this was what we're
12 looking at now, which is Mele-D. This is for
13 Segment 6?
14      A.  Yes.
15      Q.  Okay. Let's look at the image for
16 Segment 7.
17      A.  Okay. Can we go to Image Number 17?
18      Q.  And then, we'll give you control and you
19 can draw the circle.
20      A.  Sure. Okay. So with regards to
21 Segment 7 --
22        MR. VAUGHN: One second, Doctor.
23        Did we lose the court reporter? There
24 we go. You're good. You're good.
25        THE WITNESS: So with regards to

Page 227

1  Segment 7, we are looking at Image 17 from Series 401
2  and I'm going to draw for you this -- what is a
3  distinct hypodensity in Segment 7, which follows with
4  the contents of my written report. I'm going to take
5  control and that's going to be this observation here
6  (indicating).
7        MR. NOLAN: Okay. Let's mark that as
8  Mele-E as in echo.
9
10      (Whereupon, Exhibit Mele-E, Image 17
11 from Series 401 was marked for identification.)
12
13 BY MR. NOLAN:
14      Q.  Dr. Mele, can you confidently state to a
15 degree of medical certainty that what you just
16 circled in Exhibit Mele-E was not malignant in 2016?
17        MR. VAUGHN: Object to form.
18        THE WITNESS: Within a reasonable degree
19 of medical certainty, based on the information we
20 have, it's unlikely to be a malignancy. It's more
21 likely to be a benign entity with the lack of
22 enhancement. However, malignancy cannot be entirely
23 excluded.
24
25 BY MR. NOLAN:

Page 228

1        Q.  Okay. Can you state to a medical degree
2  of certainty that what you just circled in Mele-E is
3  not associated with Mr. Roberts's HCC?
4        MR. VAUGHN: Object to form.
5        THE WITNESS: That's a different
6  question. And this is gonna be -- we're gonna be
7  able to go a little bit deeper on this than the
8  ultrasound. And it's an important point. I'm glad
9  that you actually brought it up.
10       When we look at the HCC that we're --
11 that we're contending in -- I'm just gonna limit
12 myself to the images that I reviewed. When we're
13 looking at the images from 2018, this is in
14 Segment 7, I am not seeing a corresponding lesion
15 consistent with HCC in this location in Segment 7 in
16 2018.
17
18 BY MR. NOLAN:
19      Q.  Did you see this lesion in 2018 on the
20 MRI?
21      A.  I was not able to discern this on the
22 2018 MRI to this -- to this --
23      Q.  Do lesions go away?
24      A.  You know, so that's part of what is
25 discussed in the umbrella of LI-RADS as well. Some

Page 229

1  of these observations do regress. To make it very
2  simple, to say that they go away, I don't know that
3  it's a word I would -- a description I would use
4  medically, but they -- but they can move to a lower
5  categorization.
6        Q.  And by categorization, you mean from
7  like an LR-4 to an LR-3 or an LR-3 to an LR-2?
8        A.  Correct. And how that manifests itself
9  on imaging is going to be variable.
10       Q.  Okay. But should you still be able to
11 see it on MRI two years later, if you can see it on
12 CT in 2016?
13        MR. VAUGHN: Object to form. Asked and
14 answered.
15        THE WITNESS: Not necessarily.
16 Depending on what's going on in that -- in that
17 location.
18
19 BY MR. NOLAN:
20      Q.  What would cause you to not be able to
21 -- no longer be able to see it two years later on an
22 MRI, if you could see it on a CT?
23        MR. VAUGHN: Object to form.
24        THE WITNESS: You have to really go to
25 the cellular level. I mean, these things could go,

58 (Pages 226 - 229)

Page 230

1  you know, like as we've been discussing, they could
2  go both directions. And, you know, with a
3  regenerating nodule or so it may have the appearance
4  down the road of looking like regular background
5  liver. And then, you scan an individual three to six
6  months later and it could make its -- it could be
7  conspicuous again. I can just tell you that, you
8  know, you look at a lesion -- I'm sorry, you look at
9  a liver on these individuals, and it's not uncommon,
10  I think Dr. Chernyak said something, I believe
11  similar, where you could look at a liver image like
12  this and sometimes you may see something you didn't
13  really appreciate the first time, because they are,
14  indeed, a bit complex.
15     MR. NOLAN: Understood.
16
17  BY MR. NOLAN:
18     Q.  I understand that you may be able to see
19  something later in time that you didn't see earlier
20  in time. My question is more, if you see something
21  in 2016 like this particular lesion, would you expect
22  to see it in 2018 as well?
23     MR. VAUGHN: Object to form. Asked and
24  answered, but go ahead.
25     THE WITNESS: It would be reasonable to

Page 231

1  expect to see it. But it would not be out of the
2  realm of possibilities that you wouldn't, and for a
3  number of reasons. Let's just take out the fact that
4  it, you know, disappeared. As you've seen, as we
5  even compare sequences in the same study on the same
6  day, the morphology of the same thing can change even
7  on the -- even between minutes, depending on what the
8  patient is doing at that time. Did they move on the
9  table? Did they -- did they breathe?
10     Now, you're going down the road months
11  or years later where the scan technique, you're
12  talking about MRI versus CT, in this instance.
13  You're talking about the patient may have been
14  positioned in a different way. You're talking about
15  was that area included in the image acquisition? So
16  there's a -- there's a variety of reasons besides
17  biology why you don't always see lesions on study
18  after study after study. Or you don't see it and
19  then you see it, and then you see it twice, but you
20  don't see it a third time. And then, the fourth
21  time, you don't see it, but then, the fifth time you
22  see it again because the stars align at that point.
23  So it's also technique as opposed to just physiology.
24  It can be either reason.
25     MR. NOLAN: Understood.

Page 232

1     THE WITNESS: And we're changing
2  modalities like that. For example, with this
3  ultrasound thing. When you're changing modalities,
4  you even reshuffle the deck again.
5
6  BY MR. NOLAN:
7     Q.  Let's go to the image where you observed
8  the lesion from Segment 8.
9     A.  All right. I'd like to stay here
10  because this is -- I think I can -- I can at least
11  give you where I was -- again, this is going to be a
12  little bit of a sequel of what we're working with,
13  but I can recall where I saw them in 8 on this image
14  and then we'll also go to another image where I
15  believe that there was a similar finding in 8.
16     Q.  Okay. So we're on Image 17 of
17  Series 401, which has been marked as Exhibit 11, I
18  believe.
19     VERITEXT CONCIERGE: Correct, this is
20  Exhibit 11.
21     THE WITNESS: Okay. And this might --
22  again, this might be a -- this may be a judgment
23  call. Because, you know, I don't know that I agree
24  with completely where Dr. Chernyak, she gives this
25  junctional location. She might give this the same

Page 233

1  kind of junctional location. But there's a
2  hypodensity here and there's an area of -- I'm trying
3  to find it with this image. There was an area of
4  hypodensity in this location and there's another
5  area of hypodensity a little more anterior. I'm
6  going to draw around what appears to be the most
7  conspicuous one on this. And we're in -- we might
8  disagree that we're on the border of, you know, 7 and
9  8, and that's fine, but that's, you know, what we're
10  talking about here. And then, these are more
11  anterior. You have -- you kind of have these
12  nondescriptive kind of hypodense areas all up in
13  here, but they don't look as discreet, necessarily,
14  but they are present. And I don't want to make it
15  out that I'm not looking at this here (indicating).
16  I think this is related to the liver hilum. It's a
17  phenomenon, I believe, where we're dealing with
18  there's volume averaging where we're seeing a little
19  bit of the slice next to it, and it's appearing like
20  fat there. I don't think it's a true observation
21  there, based on my recollection of my review of the
22  exam.
23     MR. NOLAN: Okay. So let's mark this as
24  Mele-F as in Frank. And then, I just want to make
25  sure that we're clear.

Page 234

1    (Whereupon, Exhibit Mele-F was marked
2  for identification.)
3
4  BY MR. NOLAN:
5    Q.    When you were describing the
6  subcentimeter foci of low attenuation noted within
7  Segment 8, there were multiple of those?
8    A.    Yeah, I mean, you know, I just didn't
9  give a number because they were, I mean, again, there
10  are many and if you were to spend, you know, hours on
11  this -- on this exam, you would find more, I'm sure.
12  So try to find the ones that are most representative
13  of what I would call a hypodensity.
14    Q.    Okay.  And did you -- can you state with
15  medical certainty that the areas of hypodensity that
16  you observed in Segment 8 were not malignant in 2016;
17  yes or no?
18    MR. VAUGHN:  Object to form.
19    THE WITNESS:  Same answer.  With a
20  reasonable degree of medical certainty I don't think
21  exists.  More likely than not, these are benign
22  appearing based on their imaging characteristics, but
23  one could not exclude the, you know, less likely or
24  the lower likelihood of it being malignant based on
25  its imaging features.

Page 235

1
2  BY MR. NOLAN:
3    Q.    Right.  You can't rule out that it's
4  malignant.  True?
5    MR. VAUGHN:  Object to form.
6    THE WITNESS:  At all?  Yes, true.
7    MR. NOLAN:  Okay.
8
9  BY MR. NOLAN:
10    Q.    Now, you said that there's another image
11  that we may want to look at for Segment 8, so let's
12  turn to that now.  Which image should we look at?
13    A.    Yeah, I think, if I remember, I believe
14  it was Image 20.
15    Q.    So you said that you believe it's
16  Image 20.  Right?
17    A.    Yeah, it's, you know, it's trying to
18  figure it out on here is a little bit challenging.  I
19  suspect, based on what we have here, is I'm up in
20  this area, here.
21    Q.    Okay.  Any other areas on this
22  particular spot -- image?
23    MR. VAUGHN:  Object to form.
24    THE WITNESS:  I mean, again, I'm gonna
25  just reiterate that there are areas of heterogeneity

Page 236

1  there are, you know, back here in this area.  There's
2  these smaller foci.  And then, again, the reason why
3  you don't comment on every one is because they're not
4  distinct.  It's kind of like the background.  It's
5  like the pas dich (sounds like) of what's going on,
6  where you're trying to find these more distinct
7  areas.  I'm a little bit, you know, it's a little bit
8  difficult based on -- based on this.  But we also
9  have -- I'll let you -- I'll let you go ahead.
10    MR. NOLAN:  I would like to mark this as
11  Mele Exhibit G as in gulf.
12
13    (Whereupon, Exhibit Mele-G was marked
14  for identification.)
15
16  BY MR. NOLAN:
17    Q.    And is it the same for this particular
18  area of hypodensity that you identified in Exhibit G
19  that you cannot rule out the possibility that this
20  spot was malignant in 2016, true?
21    A.    Correct.  Despite it being my opinion
22  that this is more likely than not to be benign, one
23  cannot rule out the lower likelihood of it being a
24  malignant lesion.
25    Q.    And after reviewing Mr. Roberts's scans

Page 237

1  from 2016, you would've recommended that he come back
2  for repeat or alternative diagnostic imaging in three
3  to six months?
4    MR. VAUGHN:  Object to form.  Asked and
5  answered.
6    THE WITNESS:  Yes.
7
8  BY MR. NOLAN:
9    Q.    Okay.  And it's your opinion that more
10  likely than not the spots that you've identified were
11  benign, but there was a possibility that they were
12  malignant.  Fair?
13    A.    There's, I mean, you know, there's an
14  additional spot, if we're going to, you know, if
15  we're going to cover this.  We're gonna also gonna
16  need to cover the spot that Dr. Chernyak has
17  formulated her opinion from.
18    Q.    I'll show you that separately.
19    A.    Okay.
20    Q.    But my question is:  Based on your view
21  of Mr. Roberts's scans in 2016, your opinion is more
22  likely than not those spots or lesions or areas were
23  benign, but there's still a possibility that they're
24  malignant.  Fair?
25    MR. VAUGHN:  Object to form.

Page 238

1      THE WITNESS: Yes.
2      MR. NOLAN: Okay. Let's take another
3  break because we're going to switch topics.
4      THE VIDEOGRAPHER: All right. So the
5  time is 3:57. We are off the record.
6
7      (Whereupon, a brief recess was taken off
8  the record.)
9
10      THE VIDEOGRAPHER: The time is 4:11. We
11  are on the record.
12
13  BY MR. NOLAN:
14      Q.   Welcome back, Dr. Mele.
15      A.   Welcome to you.
16      Q.   So we were just talking about the CT
17  scans of Mr. Roberts from April of 2016. Right?
18      A.   Yes.
19      Q.   Okay. And you would have recommended
20  that he come back for surveillance monitoring
21  sometime within the next three to six months after
22  seeing those scans. Correct?
23      MR. VAUGHN: Object to form. Asked and
24  answered multiple times.
25      THE WITNESS: Yes. Based on what I saw

Page 239

1  on that imaging examination, it would have been my
2  usual practice to recommend some follow-up imaging.
3
4  BY MR. NOLAN:
5      Q.   And the radiologist at the time
6  recommended that he come back in four to six months.
7  Right?
8      MR. VAUGHN: Object to form. Asked and
9  answered.
10      THE WITNESS: Correct, he did.
11
12  BY MR. NOLAN:
13      Q.   But the next CT that we have isn't until
14  2018. True?
15      A.   Yes.
16      Q.   Yes. And so is it your understanding
17  that Mr. Roberts did not return for a follow-up CT
18  examination?
19      A.   Yeah. The best -- the best answer I
20  have for that is as the materials have been presented
21  to me, there does not appear to be an intervening
22  scan.
23      Q.   Right.
24      And in terms of tracking the lesions
25  that you identified in 2016, it would have been

Page 240

1  helpful to have subsequent surveillance imaging.
2  Agree?
3      MR. VAUGHN: Object to form. Misstates
4  prior testimony.
5      THE WITNESS: You know, that applies to
6  any observation that someone would make. And when
7  you recommend, you know, following at that interval,
8  it would make it -- it would make it easier to see
9  what their trajectory is.
10
11  BY MR. NOLAN:
12      Q.   Correct. Okay. So let's -- I'm going
13  to introduce the CT report for Mr. Roberts's medical
14  records from July 17th, 2018, just to confirm that
15  these are the CT reports that you reference in your
16  own report. Okay?
17      A.   Yes.
18      MR. NOLAN: So let's mark Tab 12 as
19  Exhibit 12.
20
21      (Whereupon, Exhibit Mele-12 was marked
22  for identification.)
23
24      MR. NOLAN: And pull that up on the
25  screen.

Page 241

1
2  BY MR. NOLAN:
3      Q.   And if we go to Page 42 of the PDF, and
4  if we zoom in on the CT screening section all the way
5  through the impression.
6      Is this the CT report from July 17th,
7  2018, that you reviewed in -- in preparing your
8  report?
9      MR. VAUGHN: Object to form.
10      And, Doctor, if you need to view the
11  whole document to answer, feel free.
12      THE WITNESS: Yeah, I believe -- can I
13  just see the header again, if you wouldn't mind?
14  Just kind of, like, you know, zooming out.
15      Okay. Yeah, that -- that looks like the
16  CT report that I would have reviewed.
17      MR. NOLAN: Okay.
18
19  BY MR. NOLAN:
20      Q.   If we go to your -- before we change
21  documents, let's go to Page 44 and zoom in on that
22  whole top of the screen. Is this the follow-up
23  ultrasound that you discuss in your report?
24      A.   Yeah. There was an ultrasound, I
25  believe, on -- on the same day.

61 (Pages 238 - 241)

Page 242

1    Q.   Right.  And we can see here that
2  procedure date and time is from 7/17/2018?
3    A.   Yes.
4    Q.   Okay.  And so these are the CT reports
5  and the follow-up ultrasound that you reviewed.
6  Right?
7    A.   Yes.  Yes.
8    Q.   Okay.  Let's go to your report, which
9  has been marked as Exhibit 4 and go to Page 2.  And
10  then, there are two paragraphs that relate to the
11  July 17th, 2018, imaging that was performed on
12  Mr. Roberts.  And so it's the second and third
13  paragraphs from the bottom.  Exactly.
14       And, Dr. Mele, these are the two
15  paragraphs that discuss the July 17th, 2018 CT and
16  ultrasound in your report?
17    A.   Yes.
18    Q.   Okay.  And so you say that: "The
19  appearance of the enlarged liver was unchanged in
20  contour".
21       What does that mean?
22    A.   It was the same nodular contour that I
23  had seen in 2016.
24    Q.   Great.  And then you say: "A
25  heterogeneous attenuation consistent with underlying

Page 243

1  hepatic cirrhosis".  Correct?
2    A.   Yes.
3    Q.   Okay.  And so is it the case that
4  Mr. Roberts's liver appeared more cirrhotic at this
5  point in time?
6       MR. VAUGHN:  Object to form.
7       THE WITNESS:  No.  I don't have any way
8  to say that it was more or less cirrhotic based on --
9  on imaging study.  They were just morphologic changes
10  that were still consistent with cirrhosis that cannot
11  be quantified on an imaging examination.
12       MR. NOLAN:  Understood.  Understood.
13
14  BY MR. NOLAN:
15    Q.   And so in the first -- in the top
16  paragraph here, you discuss an 8 centimeter area that
17  was present in Segments 5 and 8 of the right hepatic
18  lobe?
19    A.   Yes.
20    Q.   Okay.  And you also, later in the
21  paragraph, discuss a 5 centimeter, in maximum
22  diameter, masslike area with irregular -- irregular
23  parenchymal heterogeneity.  Right?
24    A.   Yes.
25    Q.   Okay.  And so these two masses -- are

Page 244

1  these two masses that you observed on the CT?
2    A.   You know, I -- based on the language
3  that I -- that I used, the second area, I was more --
4  it appeared to be more masslike, and that's why I
5  used that language in the preceding area.  And I know
6  that perhaps it may seem that geographic and masslike
7  are kind of -- kind of, you know, pedantic.  But from
8  an imaging point of view, they -- they are.  And by
9  geographic, I mean that there's an -- there's an
10  ill-defined area of a finding.  In this case, you
11  know, heterogeneity, but it was predominantly low
12  attenuating.  And the other area seemed more
13  masslike.  It seemed more distinct, in my opinion.
14    Q.   Okay.  So the 8 centimeter area in
15  Segments 5 and 8 was an ill-defined geographic area
16  of the liver?
17    A.   On the CT, yeah.
18    Q.   Right.
19       And then, on the CT, there was a
20  masslike figure in Segments 5 and 6 of the right
21  hepatic lobe.  Right?
22       MR. VAUGHN:  Object to form.
23       THE WITNESS:  It was -- it appeared to
24  be more masslike, in my opinion, yes.
25

Page 245

1  BY MR. NOLAN:
2    Q.   Okay.  And then, you said that: "It's
3  your opinion, within a reasonable degree of medical
4  certainty, that these findings were new when compared
5  to the 2016 CT study and were highly suggestive of --
6  highly suggestive of hepatic neoplasm warranting
7  further imaging investigation with MRI and/or
8  definitive tissue biopsy".
9       Did I read that right?
10    A.   Yes.  Because you don't know what the
11  referring doctor is going to do at that point.  You
12  know, you -- you can lead them, so -- and, you know,
13  experientially they would either get, you know, a
14  different exam or a, you know, a more sensitive exam
15  or they would just -- some would just jump to tissue
16  biopsy.  And I don't have an opinion on, you know,
17  what -- what someone should do with that information.
18    Q.   Okay.  But, at a minimum, based on the
19  CT findings from July of 2018, your view was that
20  more sensitive MRI imaging was warranted.  Right?
21       MR. VAUGHN:  Object to form.
22       THE WITNESS:  Correct.  We already had a
23  CT.  And, you know, if you really want to get into
24  what -- what the thinking would be here as a
25  diagnostician, we've already irradiated this guy

62 (Pages 242 - 245)

Page 246

1  for a CT, we've already given him intravenous
2  contrast material. And kind of looking, you know,
3  where I'm sitting at that point as reviewing --
4  being -- having had an opportunity to review the case
5  at this point, you know, essentially, forensically,
6  what would have lended the best information next
7  would have been an MRI.
8         It's entirely possible that, at
9  the point of care, someone might have done and gone
10  back and done another CT for a variety of reasons.
11  You know, the unavailability of MRI, the, you know,
12  comfort level with CT. But essentially, you know,
13  follow up. I'm recommending some, you know, timely
14  followup here.
15        MR. NOLAN: Understood.
16
17  BY MR. NOLAN:
18     Q.  And the -- the 8 centimeter irregular
19  area that you observed, was that (technical
20  difficulty) that particular area is not discussed in
21  the radiologist report. That's something that you
22  identified independently. True?
23        MR. VAUGHN: Object to form.
24        THE WITNESS: Correct. My -- my
25  findings are independent of what the initial -- you

Page 247

1  know, the original interpreting radiologist
2  documented.
3
4  BY MR. NOLAN:
5     Q.  And that's -- the same is true for the
6  5 centimeter masslike figure?
7     A.  Yes.
8        MR. VAUGHN: Object to form.
9        THE WITNESS: Yes.
10
11  BY MR. NOLAN:
12     Q.  And then there is the subsequent
13  abdominal ultrasound. And you discuss an ill-defined
14  and irregular hypoechoic area measuring 3.9
15  centimeters in maximum diameter was present on images
16  provided within the right hepatic lobe.
17        MR. VAUGHN: Object to form.
18
19  BY MR. NOLAN:
20     Q.  Right?
21     A.  Yes. And that's based upon what's given
22  to me and, you know, the images that we had. There
23  was that -- there was -- there was an ill-defined
24  area that measured out, you know, to that.
25

Page 248

1  BY MR. NOLAN:
2     Q.  Right. And, actually, that 3.9
3  centimeter irregular hypoechoic area was identified
4  by the radiologist on the ultrasound report. True?
5        MR. VAUGHN: Object to form.
6        THE WITNESS: You would have to show me
7  the report. I would believe it was, but I'd have to
8  see the report.
9        MR. NOLAN: Okay. Let's pull back up
10  Exhibit 12 and go to Page 44. And let's zoom in on
11  the -- the top part, yeah. Perfect.
12        THE WITNESS: Yes. So I -- so I see it
13  there. They describe it as a -- as a vague
14  hypoechoic area. And we're using the measurements
15  that -- that were provided to us by the ultrasound
16  technologist.
17        MR. NOLAN: Got it.
18
19  BY MR. NOLAN:
20     Q.  And then the impression of the
21  radiologist was that: "A hepatic MRI may be helpful
22  for further characterization as underlying mass not
23  excluded."
24        And that's essentially the same opinion
25  you reached. Right?

Page 249

1        MR. VAUGHN: Object to form.
2        THE WITNESS: Correct. I think by, you
3  know, by that point, some, you know, reasonable
4  imaging options had been exhausted. And it would be
5  reasonable based on -- because remember these were
6  both done on the same day. Right? So, at that
7  point, you would be faced with, you know, repeating
8  an exam you already did or moving to an exam with,
9  you know, improved sensitivity, some, you know,
10  benefits of resolution, you know, soft tissue
11  resolution, all that kind of stuff.
12        MR. NOLAN: Okay. Let's go back to
13  Exhibit 4, which is your report.
14
15  BY MR. NOLAN:
16     Q.  As it relates to the 8 centimeter area
17  and the 5.0 centimeter masslike area, did you capture
18  any images of those when you were reviewing those
19  images to prepare your report?
20        MR. VAUGHN: Object to form.
21        THE WITNESS: No. I just looked at the
22  study.
23
24  BY MR. NOLAN:
25     Q.  Okay. And in terms of actually doing

63 (Pages 246 - 249)

Page 250

1  the measurements of the diameter, were those provided
2  in the images that you looked at or is that something
3  that you did yourself afterwards?
4       MR. VAUGHN:  Object to form.
5       THE WITNESS:  Yeah.  While I was
6  interpreting, I was likely doing what I do at work,
7  which would be to kind of measure things as I go,
8  when I need to add that level of detail.
9
10 BY MR. NOLAN:
11      Q.   And you didn't, like, save that image
12 that had the measurements on it?
13      A.   No.
14      MR. VAUGHN:  Asked and answered.
15      THE WITNESS:  They -- they exist in, you
16 know, perpetuity.
17
18 BY MR. NOLAN:
19      Q.   So you still have access to them?
20      MR. VAUGHN:  Object to form.
21      THE WITNESS:  We -- we have access to
22 the imaging study.
23
24 BY MR. NOLAN:
25      Q.   Okay.  But in terms of the -- what you

Page 251

1  did to the imaging study to actually measure the
2  diameters to be 8.0 centimeters and 5.0 centimeters,
3  do you still have access to that?
4       MR. VAUGHN:  Object to form.
5       THE WITNESS:  No, those images don't
6  exist.
7
8  BY MR. NOLAN:
9       Q.   Okay.  And in your report, you talk
10 about how contrast enhanced MRI examinations are far
11 superior to CT examinations in the imaging diagnosis
12 of hepatocellular carcinoma?
13      A.   That's in my practical and clinical
14 experience.  It has to do with, you know, the --
15 the -- ability to resolve structures on NMR.  I'm
16 familiar with the concept that, you know, LI-RADS
17 doesn't really make a recommendation of one over the
18 other.  I think we're all in agreement that MRI is
19 more sensitive, just in my practice.  I find that the
20 MRIs are more informative.
21      And, you know, I'm using the word, you
22 know, superior as relative to, you know, a CT.  It's
23 not to say that, you know, you can't make these
24 diagnoses on CT.  But if I was given a choice, at
25 this point in this workup, I would like -- I would

Page 252

1  have liked to have been making some observations from
2  an MRI since, you know, CT was only showing us what
3  it -- what it -- what it could.
4       There's a possibility that one will gain
5  additional information from an imaging study, like an
6  MRI.  So it's kind of like, you know, given carte
7  blanche to get what I want, you know, I would, you
8  know, be adding a -- be able -- the idea is I
9  would -- my impression, I would add additional detail
10 with the benefit of an MRI.
11      MR. NOLAN:  Understood.
12
13 BY MR. NOLAN:
14      Q.   Fair to say MRIs are more detailed
15 imaging than CTs?
16      MR. VAUGHN:  Object to form.
17      THE WITNESS:  You know, that's a good
18 question.  You're asking the right kind of guy.  You
19 know, I'm a musculoskeletal imager by fellowship
20 training.  You know, it's certainly better to look
21 at -- and I -- and I do some spine as well.  And I
22 think that I would agree that the degree of
23 resolution, we talk about, you know, tissue contrast.
24 But, basically, the ability to discern different
25 types of tissues is certainly better, in certain

Page 253

1  instances, on MRI, just because of the way that
2  it's -- just the way it's done.  You get -- you get
3  to see more of the varying tissue types based on --
4  based on -- based on the physics of how they're
5  obtained and how they present on -- on an imaging
6  study.
7       Specific to the liver, you know.  And I
8  think it's pretty much a uniform opinion, you can
9  derive a lot of information from an appropriately
10 performed CT with respect to the, you know,
11 surveillance and diagnosis of hepatic lesions using
12 CT.  And once you get to a point where you want some
13 more definition, you want, you know, you want to --
14 you want to be more confident in the, you know,
15 opinions or the -- or the impressions that you're
16 offering.  It's not uncommon for practitioners to,
17 you know, radiology report be damned.  They
18 recommended a six-month CT.  I'm ordering an MRI.
19 Because, you know, they're of the opinion as well
20 that, you know, additional information may be gained
21 from doing the MRI.
22      Certain pathologies, you know, depending
23 on the -- depending on the anatomical compartment
24 that we're talking about, depending on the -- on the
25 pathophysiology or the physics of that disease, some

64 (Pages 250 - 253)

Page 254

1  things don't require an MRI over a CT. But some
2  things are seen better on one modality than the
3  other. And it really depends on the indication. So
4  that -- so I know it's a long answer to your
5  question, but the resolution or the utility of CT
6  versus MRI to a -- to a significant degree and -- and
7  importantly, it depends on what you're looking for.
8
9  BY MR. NOLAN:
10      Q.   Okay. MRI can be more detailed. True?
11          MR. VAUGHN: Object to form.
12          THE WITNESS: Yes. MRI can be more
13  detailed, depending on what you're comparing it to.
14  If you're comparing it, you know, to your pictures
15  from, you know, Cancun on your cellphone, yeah,
16  you -- you know, you can see more there.
17          And -- but if you're comparing imaging
18  modalities, it can be, depending on what you're
19  looking for.
20
21  BY MR. NOLAN:
22      Q.   Okay. Mr. Roberts never got an MRI
23  examination of his abdomen in 2016. True?
24      A.   To my knowledge and the information
25  presented to me, there was only a CT performed in

Page 255

1  2016.
2      Q.   Right.
3          And so is it fair to say that we don't
4  know what an MRI would have shown of Mr. Roberts's
5  abdomen in 2016?
6      A.   We're speculating. But based upon what
7  we -- what we know about CT versus -- versus MRI,
8  it's impossible to know what his liver would have
9  looked like on an MRI at that time.
10      Q.   Right.
11          And so, on Pages 2 and 3 of your report,
12  you discuss the August 7th, 2018, MRI?
13      A.   Yes.
14      Q.   And so you say: "An MRI examination of
15  the abdomen was performed without and with
16  administration of intravenous contrast material."
17          That's the contrast that we've been
18  talking about a lot today?
19      A.   Yes.
20      Q.   Okay. "The examination confirmed the
21  presence of multifocal liver lesions demonstrating
22  arterial enhancement."
23          Did I read that right?
24      A.   You did.
25      Q.   "Washout and imaging features consistent

Page 256

1  with hepatocellular carcinoma in Segments 5, 6, and 8
2  of the right hepatic lobe, which corresponded to the
3  lesions present on the July 17th, 2018, CT
4  examination."
5          Did I read that right?
6      A.   Yes.
7      Q.   And so, basically, the MRI is confirming
8  that the lesions seen on the CT are in the same spot
9  in Segments 5, 6 and 8 of the right hepatic lobe?
10          MR. VAUGHN: Object to form.
11          THE WITNESS: Yeah, they were -- they
12  were -- there were -- there were lesions in the same
13  areas.
14
15  BY MR. NOLAN:
16      Q.   Okay. And then you say: "In addition,
17  another lesion not conspicuous on the preceding July
18  2018 CT was present within Segment 8."
19          Did I read that right?
20      A.   Yes. Yes.
21      Q.   So does that mean that with the MRI, you
22  were able to see a lesion that you could not see on
23  the July 2018 CT?
24      A.   That I did not see, correct.
25      Q.   Okay. And then: "Interior to the

Page 257

1  inferior vena cava demonstrating imaging features
2  indeterminate for the presence of hepatocellular
3  carcinoma, such as the lack of definitive early
4  arterial enhancement, but demonstrating washout."
5          And so -- did I read that right?
6      A.   Yes.
7      Q.   Okay. And so what does that mean,
8  everything after the comma, starting with
9  "demonstrating"?
10          MR. VAUGHN: Object to form.
11          THE WITNESS: Okay. I just want to say
12  that this is another area where, you know, different
13  radiologists may not -- may not agree on -- on the
14  anatomic segment. You can see why. You know, you
15  looked at -- you looked at the picture. Some might
16  call this one, they may have thought it was more
17  parked than, you know, caudate than where I put it.
18  But, again -- all the time. But beyond that, so
19  we're, you know -- (technical difficulties).
20          MR. NOLAN: I think the doctor may have
21  frozen.
22          MR. VAUGHN: Yes, I think you're right.
23          THE VIDEOGRAPHER: He's back.
24          MR. NOLAN: Are you there?
25          THE WITNESS: I'm here, yeah.

65 (Pages 254 - 257)

Page 258

1    MR. NOLAN: I think you froze.
2    MR. VAUGHN: You want to re-ask the
3 question, Jack? That might be the cleanest.
4    MR. NOLAN: Yeah.
5
6 BY MR. NOLAN:
7    Q.    So as it relates to the lesion that was
8 not conspicuous on the July 2018 CT, in Segment 8,
9 what are you describing here in this paragraph?
10    A.    Sure. I -- I don't know if you heard
11 me, but, you know, mine, you know, what I'm -- what
12 I'm calling 8 here, I -- you know, there's another
13 radiologist who might call this, more or less, 1 or
14 like an 8/1. Or -- so, you know, the location, I'm
15 happy, you know -- you know, to show it if we have
16 to. But, again, this goes on all the time, that we
17 have some discrepancy with what segment we're in
18 sometimes, depending on where you're looking.
19    But, essentially, beyond that, so we're
20 describing some of the major features that we've --
21 that we talked about, you know, previously,
22 regarding, you know, major features, things -- things
23 we look for on these -- on these scans, such as early
24 arterial enhancement and washout.
25    And so those are -- those are -- those

Page 259

1 are features that -- well, I'm sorry, in this case,
2 the lack of enhancement, but washout. Since this
3 appeared on this MRI to start out as what we referred
4 to earlier as isodense and then going to washout
5 afterwards on the -- on a sequential phase.
6    Q.    Okay. So you're saying that this
7 particular lesion did not have earlier arterial
8 enhancement, but it did have washout?
9    MR. VAUGHN: Object to form.
10    THE WITNESS: Yes. That's --
11
12 BY MR. NOLAN:
13    Q.    Okay. And -- and, again, I'm not a
14 doctor. What does washout mean?
15    A.    So washout is best described as
16 de-enhancement, where the level of enhancement
17 goes -- goes down over time compared to the study
18 you're comparing it to, where it was either
19 isointense in this case or, you know, isoenhancing or
20 hyperintense or hyperenhancing.
21    Q.    And so by hyperintense or
22 hyperenhancing, does that mean it gets brighter?
23    MR. VAUGHN: Object to form.
24    THE WITNESS: So when we say -- when we
25 give -- when we use the vernacular "hyper" and "iso",

Page 260

1 it's in relation to the background liver in the same
2 area. So you would be looking for areas that are
3 brighter than or more intense than the background
4 liver or equal to the background liver in the same
5 area.
6
7 BY MR. NOLAN:
8    Q.    Got it. And when you say it decreases
9 over time, it starts out brighter than the background
10 liver and then, over time, it blends more into the
11 surrounding liver?
12    MR. VAUGHN: Object to form.
13    THE WITNESS: What you're describing as
14 hyperenhancement, I would say that what I observed
15 here was -- was likely isoenhancement or, you know,
16 isointensity going to hypo or low intensity.
17    MR. NOLAN: Okay. Let's take a look at
18 the MRI report. I just want to confirm this is what
19 you looked at.
20    Which is, sorry, Tab 13 and we'll mark
21 it as Exhibit 13.
22
23    (Whereupon, Exhibit Mele-13 was marked
24 for identification.)
25

Page 261

1    MR. NOLAN: And let's zoom in on the top
2 portion there that says "Radiology Report", just to
3 orient ourselves.
4
5 BY MR. NOLAN:
6    Q.    Is this the MRI report that you
7 reviewed?
8    A.    It looks like it, yep.
9    Q.    Okay. It's from August 7th, 2018?
10    A.    Yes.
11    Q.    Okay. And then, in the findings
12 section, there's two paragraphs. Right? And the --
13 the second paragraph goes on to the next page, so
14 let's do a little side-by-side so that way we can --
15 yeah. Let's do the whole -- yeah.
16    There's two paragraphs in the findings
17 section?
18    MR. VAUGHN: Is that a question?
19
20 BY MR. NOLAN:
21    Q.    Dr. Mele?
22    MR. NOLAN: Let's go off the record.
23    THE VIDEOGRAPHER: Time is 4:43. We are
24 off the record -- oh, he's back.
25    THE WITNESS: Yeah, I apologize. It is

66 (Pages 258 - 261)

Page 262

1 like monsoon in here.
2        THE VIDEOGRAPHER: Yes, we're still on.
3
4 BY MR. NOLAN:
5     Q.    Dr. Mele, the findings section of the
6 MRI report is two paragraphs. True?
7     A.    True.
8     Q.    Okay. And the first paragraph talks
9 about: "An ill-defined mass in the right hepatic
10 lobe posterior segment measuring 5.0 by 3.6
11 centimeters with heterogeneous arterial
12 hyperenhancement and mildly increased T-2 signal."?
13     A.    Yes.
14     Q.    Okay. Is that the same 5.0 centimeter
15 area that you describe in your report related to the
16 July 17th, 2018 CT report?
17        MR. VAUGHN: Object to form.
18        THE WITNESS: This was -- this was, from
19 my recollection of this MRI and the images in my --
20 in my head, I would have -- I believe I put this in
21 Segment 6. So it would have been posterior right
22 hepatic lobe. Side-by-side, I don't -- I don't
23 recall being able to say it's exactly the same thing,
24 but I can tell you that it's posterior segment of
25 the -- it's -- (technical difficulties).

Page 263

1        MR. NOLAN: I think we lost him again.
2 Let's go off the record.
3        MR. VAUGHN: Yeah. Sorry, Jack. He's
4 having a massive, like, rainstorm in Jersey. I've
5 never seen his internet do this.
6        THE VIDEOGRAPHER: Yeah. He keeps
7 freezing and unfreezing. So what do you -- do you
8 still want to go off and reboot or what? He's good
9 now.
10        MR. NOLAN: Can you hear us, Dr. Mele?
11        THE WITNESS: Yeah. Yeah. I mean, yes,
12 I can. And I heard the whole thing. We are, like,
13 under, like, monsoon conditions here. So I don't
14 know if the wires are swaying around or what, but.
15        MR. VAUGHN: Do you want to try a little
16 bit more, Jack? If we have a continued problem, he
17 can still view it on his computer and do audio
18 through his phone.
19        MR. NOLAN: Yeah.
20        MR. VAUGHN: Let's try it one more time.
21 But if this becomes a problem, I think that would be
22 a solution, because his phone reception should still
23 work.
24
25 BY MR. NOLAN:

Page 264

1     Q.    Okay. And so, Dr. Mele, the 5.0 by
2 3.6 centimeter ill-defined mass described in the MRI
3 report, I believe you said you placed that in
4 Segment 6?
5     A.    Correct. Which would be the
6 posterior -- it would be a posterior segment of the
7 right hepatic lobe.
8     Q.    Okay. And then, in the next paragraph,
9 there's a similar appearing mass in the right hepatic
10 lobe, anterior segment measuring 5.8 by
11 5.1 centimeters.
12        Which segment, if any, did you place
13 that particular mass in?
14        MR. VAUGHN: Object to form.
15        THE WITNESS: So that would be in 5 and
16 8. It was kind of extending across.
17
18 BY MR. NOLAN:
19     Q.    Okay. And so, in your report, when you
20 refer to the multifocal liver lesions consistent with
21 hepatocellular carcinoma in Segments 5, 6, and 8,
22 you're referring to these two masses that were also
23 observed in the MRI report. Right?
24     A.    Yeah. I think, you know, this is an
25 area where, you know -- I -- you know, I'm familiar

Page 265

1 with Dr., you know, Chernyak's take on it also.
2 She -- we're -- you know, I think we're talking about
3 all the same areas. It's split out, in her report,
4 into three separate locations. And I didn't discern
5 them in -- into three areas because I could see
6 continuity between one and not the other. So instead
7 of having, you know, know, three discreet areas or three
8 separate areas, I have just, you know, two.
9     Q.    Well, in your -- I just want to make
10 sure I'm understanding. Because in your report, you
11 refer to three segments; but are you only referring
12 to two masses when you're referring to those?
13     A.    Yes. Yes, that's a better way to
14 describe it, yes.
15     Q.    And the -- and the two masses that
16 you're referring to are the same two that are in this
17 MRI that are in the three segments 5, 6 and 8?
18        MR. VAUGHN: Object to form.
19        THE WITNESS: Yes. The -- the region --
20 the -- right. The -- the -- you know, the areas of,
21 you know, enhancement and et cetera, they -- the best
22 way I can describe it is I believe that there's one
23 focus, and I, you know, believe Dr. Chernyak does
24 it -- does it differently. But she describes it as
25 5/8, we're talking about the same area. And then I

67 (Pages 262 - 265)

Page 266

1  described, or it's my opinion, that the second focus
2  is in Segment 6.
3           MR. NOLAN: Got it.
4
5  BY MR. NOLAN:
6      Q.    And then you also observed a third
7  lesion that was just in Segment 8 that we were just
8  talking about. Right? That's the one that was not
9  seen by the MRI or by the radiologist doing the MRI
10  report?
11           MR. VAUGHN: Object to form.
12           THE WITNESS: Correct. And if -- and if
13  someone called it one, I wouldn't argue with them
14  either, so.
15           MR. NOLAN: Okay.
16           THE WITNESS: Yeah.
17           MR. NOLAN: I just want to make sure I
18  know how many masses you're talking about when you
19  described it.
20           Okay. So now, I think we're going to
21  look at the MRI images. And I just -- I want to do
22  the circle thing again, just to identify which ones
23  are each of the three masses.
24           MR. VAUGHN: And, Dr. Mele, if you need
25  to turn your lights down again to view the images

Page 267

1  properly, feel free.
2           THE WITNESS: Yeah, no. I'm familiar
3  with this -- with this study. These are -- these are
4  more conspicuous. I should be able to make due here.
5
6  BY MR. NOLAN:
7      Q.    And -- and do you know which MRI series
8  these would be in?
9      A.    There's a lot here. I think, in an
10  effort to kind of get to -- let's start with -- I
11  want to say it's called like -- it's towards the
12  bottom. It's like Phase I. It would be the arterial
13  phase, essentially.
14
15  BY MR. NOLAN:
16      Q.    Okay. I have CT001. Is that the one to
17  look at?
18      A.    You got to throw it up for me. I don't
19  have the series names memorized.
20           MR. NOLAN: Okay. Let's look at Tab 42L
21  as in Lima.
22           VERITEXT CONCIERGE: To be marked as 14,
23  Counsel?
24           MR. NOLAN: Yes.
25

Page 268

1           (Whereupon, Exhibit Mele-14 was marked
2  for identification.).
3
4           MR. NOLAN: So I don't know that this is
5  going to be the right one, because I think this is
6  just text.
7           THE WITNESS: Yeah. It's just the
8  radiology order. Yeah. It's maybe the screening
9  tool. Yeah.
10
11  BY MR. NOLAN:
12      Q.    Okay. And rather than going through all
13  of these, because they go through A through L, do you
14  know which series --
15      A.    I don't want -- I don't know these --
16  these are not numbers that I have committed to
17  memory, but I want to -- I want to say it's -- to
18  help you find it, it was like Lava Phase 1.
19      Q.    Okay. I don't know that I can identify
20  them like that.
21      A.    Do you want me -- do you want me to take
22  a peek at the MRI, kind of on my end, and maybe find
23  the series numbers for you or something?
24           MR. NOLAN: Yes, let's take a break and
25  do that.

Page 269

1           THE WITNESS: Okay.
2           THE VIDEOGRAPHER: Off the record,
3  Counsel?
4           MR. NOLAN: Yes.
5           THE VIDEOGRAPHER: Time is 4:52, we are
6  off the record.
7
8           (Whereupon, a brief recess was taken off
9  the record.)
10
11           THE VIDEOGRAPHER: The time is 5:06. We
12  are on the record.
13
14  BY MR. NOLAN:
15      Q.    Welcome back, Dr. Mele. During the
16  break, were you able to identify which series from
17  the MRI contained the segments described in your
18  report?
19      A.    Well, I went back to look at
20  specifically for the -- for the lesions that we
21  discussed, which was the observation that we had
22  discussed, which was not enhancing, but was washing
23  out. So we can start -- and we can -- we can go from
24  there, actually, which would be fine. I would just
25  recommend, you know, in the interest of getting to

Page 270

1  the findings, would be starting with 601, if you have
2  that available.
3       Q.   So Series 601 should -- I do not have
4  that available. Actually, no, sorry. 601 should be
5  Tab 42F, as in Frank.
6            MR. VAUGHN: What was that? 42 Frank?
7            MR. NOLAN: Yep.
8            VERITEXT CONCIERGE: That will be
9  Exhibit 15, Counsel. It hasn't been added yet. It's
10  being added right now.
11
12            (Whereupon, Exhibit Mele-15 was marked
13  for identification.)
14
15  BY MR. NOLAN:
16       Q.   And which image should we be looking at,
17  Dr. Mele?
18       A.   Can we go to 48?
19       Q.   We're now on Image 48. Is this the
20  image that you wanted to look at?
21       A.   This would be, you know -- you know,
22  a -- this would be an image to start showing that
23  there is -- where I -- where I see hypoenhancement
24  later. I'm seeing essentially, you know,
25  isoenhancement here, or isointensity on this. And if

Page 271

1  you go to 604-48, I can explain -- I can -- I can
2  show where I believe that there is an area of the
3  enhancement washout. It may be better to start
4  there, depending on how we go about this.
5       Q.   Okay. So I just want to make sure that
6  we're clear. Right now, we're talking about the
7  third lesion that was not observed in the MRI report
8  that you identified as being present within Segment
9  8. True?
10       A.   Yes.
11       Q.   Okay. And you want to start with
12  Series 604?
13       A.   Yeah. That would probably be -- be
14  better for the -- for our purposes.
15            MR. NOLAN: All right. So let's mark
16  Tab 42I as Exhibit 16.
17
18            (Whereupon, Exhibit Mele-16 was marked
19  for identification.)
20
21            MR. NOLAN: 16 -- or Exhibit 15, I
22  guess. Whatever it is.
23            VERITEXT CONCIERGE: Counsel, this is
24  Exhibit 15 is on the screen right now.
25            MR. VAUGHN: Are you meaning to go to

Page 272

1  letters, Jack? Is that what you're trying to do?
2            VERITEXT CONCIERGE: No. He's talking
3  about the tabs that I have in my -- in my system. So
4  Tab 42I as in igloo, will now be introduced as
5  Exhibit 16. And heading into your system right now
6  and up on the Zoom screen.
7            THE WITNESS: All right. Let's see if
8  we can get to Image 48, please. So on -- so on -- on
9  this -- on this image, you're seeing what I believe
10  to be an area of washout. And I -- I would say that
11  I probably should have called this Segment 6 or
12  Segment 1. I know, in my report, it says 8. It's,
13  you know, posterior right hepatic lobe or caudate
14  junction, which is why someone might say, you know, 6
15  or 1. I do realize that I have 8 in my report. And
16  that as a typo. But it's -- it's this area here.
17            MR. NOLAN: Okay. Let's mark that as
18  Mele Exhibit H as in hotel.
19
20            (Whereupon, Exhibit Mele-H was marked
21  for identification.)
22
23  BY MR. NOLAN:
24       Q.   And for the masses that you observed in
25  Segment 6 -- or the mass that you observed in

Page 273

1  Segment 6, what series is that in?
2       A.   We can start on 601. Are these
3  available in the -- in the drop, at this point?
4            MR. VAUGHN: They are, if you refresh
5  it.
6            THE WITNESS: Yeah. I gotta go back and
7  look, because it wasn't when I went out to do just
8  now. Is -- 601 is 42F, I believe?
9            MR. NOLAN: Yes.
10            VERITEXT CONCIERGE: And it's Exhibit
11  15.
12            MR. VAUGHN: Yeah. I think it will be
13  at the very bottom of the -- for me, it's the very
14  last one. Okay.
15            THE WITNESS: Okay. I got it. Okay. I
16  think what we'll do is, because there's a lot of --
17  there's a lot of images of the same thing. I'm going
18  to try to go for what is the most representative of
19  what I'm discussing in each segment, just to make it
20  a little easier, a little more clear.
21            So let's -- let's start with Segment 6
22  and let's start with image -- let's start with Image
23  Number 35.
24
25  BY MR. NOLAN:

69 (Pages 270 - 273)

Page 274

1    Q.    And on Image 35, can you draw a circle
2    around the area that you observed the mass?
3        A.    This is one of the areas, just so you
4    understand, they're on multiple images. I'm trying
5    to give you the most representative of the findings
6    we're likely going to be discussing, so this area
7    here (indicating).
8        MR. NOLAN: Okay. Let's mark that as
9    Mele Exhibit I as in India.
10
11        (Whereupon, Exhibit Mele-I was marked
12    for identification.)
13
14        THE WITNESS: And I'm just going to go
15    back -- it's easier for me to scroll through the
16    other one in the share. I guess we can go to -- I
17    don't know how -- that's why I want to just give you
18    one more of -- of -- of 6 because there's multi --
19    they don't have a single feature, you know. So I
20    don't want to -- that's showing one -- one -- one
21    part of the -- of the observation in 6. I want to
22    show you another view of the same observation on
23    another slice. Let's go with 31.
24        And then, you know, in my opinion, these
25    are all -- this is, you know, contiguous through

Page 275

1    other images that are, you know, in between it,
2    with -- with the other -- with the other -- with the
3    other finding that we just annotated.
4        MR. NOLAN: Okay. And let's mark this
5    as Mele Exhibit J as in Juliet.
6
7        (Whereupon, Exhibit Mele-J, Image 31,
8    was marked for identification.)
9
10    BY MR. NOLAN:
11        Q.    And so, now I believe we need to
12    identify the mass or lesion that you identified in
13    Segment 5 or 5 and 8. Right?
14        A.    One more -- (technical difficulties).
15        MR. NOLAN: Go off the record.
16        THE VIDEOGRAPHER: All right. Counsel,
17    the time is 5:16. We're off the record.
18
19        (Whereupon, a brief recess was taken off
20    the record.)
21
22        THE VIDEOGRAPHER: We're on the record
23    at 5:18, Counsel.
24        MR. NOLAN: Great.
25

Page 276

1    BY MR. NOLAN:
2        Q.    Welcome back, Dr. Mele. Let's look at
3    Exhibit 15, which is Series 601. Which image should
4    we look at to understand the area or mass that you
5    describe in your report as being in Segment 5/8, or 5
6    or 8?
7        A.    Sure. I just wanted -- before we got
8    lost. If we, you know -- I don't know how -- if
9    we -- I don't know how you want to do this, but I
10    want to make sure that I, you know, that I do
11    provide, you know, as much information as I can. You
12    know, we spoke about Dr. Chernyak splitting this up
13    into three. I can show you what I -- what I think
14    she called three that I bundled in -- into two or we
15    can move on to 5/8. That's entirely up to you.
16        Q.    First, I want to understand the ones
17    that you observed, that you discuss in your report.
18    And so what I'm -- I believe you said earlier that
19    you observed one mass that was in Segment 6 and then
20    one mass that was in 5 or 8, which is why we
21    discussed -- why you discussed three segments and two
22    masses in your report, so. And then you had
23    separately talked about the mass that was just in
24    Segment 8. And we've gone through the one that's
25    just in Segment 8 and the one that's just in

Page 277

1    Segment 6. And so now I want to talk about the third
2    one.
3        So what's the best image to look at for
4    the third one?
5        A.    Sure. Let me find that for you. And
6    just -- and just for the record, I -- I did
7    state that -- I probably should have said that the
8    lesion that we -- that we just referred to as 8 would
9    have been more correctly placed in 6 or 1. And that
10    must have been -- must have been an error on my part.
11        Q.    Got it.
12        A.    And let me find a good example of what
13    we're talking about in the other segment -- segments.
14    And, again, there are multiples that are
15    representative. I'm going to try to pick the most
16    comprehensive one. You know, I want to try to stay
17    with 601. But is it okay if I look and see if one of
18    the other series or sequences is better? Or
19    otherwise, we can just go with, I guess, 46 on 601.
20        Q.    And then, could you draw a circle around
21    the area?
22        A.    Sure.
23        Q.    On Image 46.
24        A.    Sure.
25        MR. NOLAN: And just so the record is

70 (Pages 274 - 277)

Page 278

1  clear, we're going to mark this as Mele Exhibit K as
2  in kilo.
3
4          (Whereupon, Exhibit Mele-K, Image 46,
5  was marked for identification.)
6
7  BY MR. NOLAN:
8      Q.    And in which segment would you describe
9  this area or lesion as being in, Dr. Mele?
10     A.    Well, here -- let me go back to the
11  stack. I want to -- I want to find the relevant
12  anatomy. So I gave you 46. Right?
13     Q.    Yes.
14     A.    I would say, at that level, we're in --
15  we're in 5. But like I said, there's multiple images
16  where this is visible. It does continue up into 8.
17     Q.    Okay. And is this the same spot that
18  Dr. Chernyak, in her -- in her report, references as
19  being section or Segment 5/8?
20         MR. VAUGHN: Object to form.
21         THE WITNESS: I believe so, yes.
22         MR. NOLAN: Okay. Has this been marked
23  as Exhibit Mele-K in kilo?
24         VERITEXT CONCIERGE: It has. And it
25  should be in your marked exhibits folder.

Page 279

1          MR. NOLAN: Okay. Let's go back to your
2  report, which I believe has been marked as Exhibit 6.
3          VERITEXT CONCIERGE: It's Exhibit 4,
4  Counsel.
5          MR. NOLAN: Sorry. I thought it was 4
6  and then I corrected myself.
7
8  BY MR. NOLAN:
9      Q.    So if we go to Page 3, in the paragraph
10  that starts "subsequent". Let's zoom in on that.
11  And so you're of the opinion that: "None of the
12  lesions and their associated imaging findings
13  consistent with hepatocellular carcinoma identified
14  in 2018 were present on the initial 2016 CT
15  examination." True?
16     A.    Yes.
17     Q.    Okay. And you say: "Furthermore, the
18  hepatocellular carcinoma discovered in 2018 does not
19  correspond with the precise locations of the
20  subcentimeter foci of decreased attenuation observed
21  on the 2016 CT examination in Segments 6, 7, or 8."
22         Did I read that right?
23     A.    Yes.
24     Q.    Okay. Now, are you saying that they're
25  not in the exact same spot?

Page 280

1      A.    I'm saying that they're not in the --
2  the same exact spot that we had previously gone
3  through on the 2016 CT earlier.
4      Q.    Right.
5          And the dark areas that we looked at in
6  the 2016 CT, those were all on the right hepatic
7  lobe?
8          MR. VAUGHN: Form.
9          THE WITNESS: These are also in the
10  right hepatic lobe, they both are.
11
12  BY MR. NOLAN:
13     Q.    Got it.
14         And you also write: "Therefore, it is
15  my opinion, and within a reasonable degree of medical
16  certainty, that the April 19th, 2016, CT examination
17  does not demonstrate any definitive imaging evidence
18  of the hepatocellular carcinoma present on the 2018
19  CT or MRI examinations."
20         Did I read that right?
21     A.    Yes.
22     Q.    Okay. So what you're saying is that the
23  imaging from 2016 does not show definitive proof of
24  cancer at that time. True?
25         I'm sorry, you're muted. Can we go off

Page 281

1  the record and unmute him?
2          THE VIDEOGRAPHER: Okay. The time is
3  5:27. We are off the record.
4
5          (Whereupon, a brief recess was taken off
6  the record.)
7
8          THE VIDEOGRAPHER: It's 5:28, we're on
9  the record, Counsel.
10
11  BY MR. NOLAN:
12     Q.    Okay. So what you're saying here is
13  that the imaging from 2016 does not show definitive
14  proof of cancer at that time. True?
15     A.    What I'm saying is written there,
16  Counselor. It doesn't show any definitive imaging
17  evidence of hepatocellular carcinoma. That's present
18  later in 2018.
19     Q.    Okay. But you can't rule out the
20  possibility that the lesions or masses you saw in
21  2016 were malignant. True?
22         MR. VAUGHN: Object to form.
23         THE WITNESS: Yes. I believe that we've
24  already covered that. That based on the imaging
25  characteristics, I was favoring benign etiologies,

71 (Pages 278 - 281)

Page 282

1 but no one could rule out the possibility of a less
2 likely malignancy.
3
4 BY MR. NOLAN:
5    Q.   Okay.  And you have not reviewed any of
6 the imaging from after August of 2018.  True?
7        MR. VAUGHN:  Asked and answered.
8        THE WITNESS:  No, I have not.
9
10 BY MR. NOLAN:
11    Q.   Okay.  Can you rule out to a medical
12 certainty that Mr. Roberts's cirrhosis from 2016
13 played a role in the HCC observed on his liver in
14 2018?
15        MR. VAUGHN:  Object to form.  Scope.
16        THE WITNESS:  Yeah, that's not -- that's
17 not really an opinion I -- I have regarding his
18 underlying clinical condition and the likelihood that
19 he would develop any kind of malignancy as a result
20 of that.  That's not what I would do as a
21 radiologist.  And I don't have that opinion here in
22 my report.
23
24 BY MR. NOLAN:
25    Q.   But you cannot rule out that his

Page 283

1 cirrhosis played a role in the development of his
2 HCC.  Fair?
3        MR. VAUGHN:  Object to form.  Scope.
4 And now asked and answered.
5        THE WITNESS:  I don't have the requisite
6 expertise to, you know, to provide you with an
7 opinion on that.
8
9 BY MR. NOLAN:
10    Q.   And you don't have the -- you cannot
11 rule out that Mr. Roberts's cirrhosis from 2016 was
12 the cause of his HCC.  True?
13        MR. VAUGHN:  Object to form.  Scope.
14 And, again, asked and answered multiple times.  Move
15 on, Counselor.
16        THE WITNESS:  Again, I'm not -- I do not
17 have the expertise to -- to be rendering an opinion
18 on the causation of what we see morphologically on
19 the imaging examinations.
20
21 BY MR. NOLAN:
22    Q.   So you can't say one way or another.
23 Fair?
24        MR. VAUGHN:  Object to form.  Scope.
25 Asked and answered.

Page 284

1        MR. NOLAN:  You can answer.  He's
2 frozen.
3        MR. VAUGHN:  I don't think he is.
4        THE WITNESS:  My answer to your
5 question, Counselor, was I don't have an opinion on
6 that.
7
8 BY MR. NOLAN:
9    Q.   And so, because you don't have an
10 opinion, you can't say one way or another that
11 Mr. Roberts's cirrhosis was the cause of his HCC.
12 True?
13        MR. VAUGHN:  Object to form.  Scope.
14 Asked and answered.  Move on.
15        THE WITNESS:  It would not be -- I don't
16 have any opinion on what, if any, cause of the
17 hepatocellular carcinoma was.
18
19 BY MR. NOLAN:
20    Q.   Okay.  Is it possible that Mr. Roberts's
21 lesions progressed to HCC in the two years between
22 April 2016 and August of 2018?
23        MR. VAUGHN:  Object to form.  Scope.
24        THE WITNESS:  I don't have an opinion on
25 that.

Page 285

1
2 BY MR. NOLAN:
3    Q.   Are you saying it's not possible?
4        MR. VAUGHN:  Object to form.  Scope.
5 Asked and answered.  Move on.
6        THE WITNESS:  I'm saying I -- I have not
7 offered that opinion.
8
9 BY MR. NOLAN:
10    Q.   But do you have an opinion on it?
11    A.   I do not.
12        MR. VAUGHN:  This is becoming borderline
13 harassment.  Object to form.  Asked and answered.
14 Scope.
15        THE WITNESS:  I do not have an opinion
16 on it.
17
18 BY MR. NOLAN:
19    Q.   During your practice, have you ever seen
20 someone that had cirrhosis and lesions on their liver
21 and then within two years developed HCC?
22        MR. VAUGHN:  Object to form.
23        THE WITNESS:  No specific case comes to
24 mind.
25

72 (Pages 282 - 285)

Page 286

1  BY MR. NOLAN:
2      Q.   Is it possible that that can happen
3  within two years?
4          MR. VAUGHN:  Object to form.  Scope.
5          THE WITNESS:  Again, Counselor, I don't
6  have an opinion on the -- on the etiology of this
7  hepatocellular carcinoma.
8
9  BY MR. NOLAN:
10     Q.   Can you rule it out?
11         MR. VAUGHN:  Object to form.  Scope.
12         THE WITNESS:  I don't have the -- I
13  don't have the requisite experience to rule it in or
14  out.  I don't have an opinion on it.
15         MR. NOLAN:  Okay.  Let's look at Tab 6A,
16  which is Segment 7 from Dr. Chernyak's report.
17         VERITEXT CONCIERGE:  To be marked as
18  Exhibit 17, Counsel?
19         MR. NOLAN:  Yes.
20
21         (Whereupon, Exhibit Mele-17 was marked
22  for identification.)
23
24  BY MR. NOLAN:
25     Q.   This is Dr. -- this is an exhibit from

Page 287

1  Dr. Chernyak's report.  Are you familiar with it?
2      A.   Yes, I've seen it.
3      Q.   Okay.  Have you ruled out the
4  possibility that the lesion identified by
5  Dr. Chernyak progressed into HCC in Mr. Roberts's
6  liver?
7          MR. VAUGHN:  Object to form.
8          THE WITNESS:  Just so we're very clear,
9  this is a manipulated image, to begin with.  We don't
10  even have the demographic information on here.  So
11  how this image was created remains unknown.  And
12  you've seen, we've gone through a bunch of images
13  today, and they usually contain, you know, the basic
14  demographic information.  So this is an image that
15  was manipulated and, you know, it was enhanced,
16  obviously.
17         MR. NOLAN:  Move to strike,
18  nonresponsive.  Doctor --
19         MR. VAUGHN:  Hey, hey, hey, our -- we
20  have an order in this litigation, you do not move to
21  strike an expert after they answer.  They've talked
22  about sanctions for it.  You do it again, we'll take
23  it to the judge.
24         THE WITNESS:  I was just predicating my
25  answer to your question, so we're all clear of what

Page 288

1  I'm looking at.  There is an arrow on a hypodensity
2  in Segment 7.  And to answer your question, I don't
3  have -- I don't have an opinion on whether or not
4  this could have become a hepatocellular carcinoma.
5          MR. NOLAN:  Okay.  Let's look at Tab
6  B -- Tab 6B and mark that as Exhibit 18.
7
8          (Whereupon, Exhibit Mele-18 was marked
9  for identification.)
10
11  BY MR. NOLAN:
12     Q.   This is another image from
13  Dr. Chernyak's report, the 0.5 centimeter lesion in
14  Segment 5/8.  And my question is:  Have you ruled out
15  the possibility that this lesion progressed into HCC
16  in Mr. Roberts's liver?
17         MR. VAUGHN:  Object to form.
18         THE WITNESS:  It remains my opinion that
19  one cannot rule out or rule in, based on my expertise
20  as -- as a diagnostic radiologist, what this
21  progressed to, if anything.  There are other similar
22  areas on the same image in Segments 4 and 3.  You
23  know, we don't have hepatocellular carcinomas there
24  on the MRI available, so it's impossible to say.
25

Page 289

1  BY MR. NOLAN:
2      Q.   Okay.  So you cannot rule out the
3  possibility that the lesion identified on Exhibit 18
4  progressed into HCC in Mr. Roberts's liver.  True?
5          MR. VAUGHN:  Object to -- object to
6  form.  Asked and answered.
7          THE WITNESS:  I can neither rule it in
8  nor out.
9          MR. NOLAN:  Okay.  Let's look at Tab 6C
10  and mark that as Exhibit 19.
11
12         (Whereupon, Exhibit Mele-19 was marked
13  for identification.)
14
15         MR. NOLAN:  And this is Exhibit B from
16  Dr. Chernyak's report, Page 3, a 0.5 centimeter
17  lesion in Segment 6.
18
19  BY MR. NOLAN:
20     Q.   Dr. Mele, same question.  Can you, to a
21  medical degree of certainty, rule out the possibility
22  that this lesion observed in 2016 progressed into HCC
23  in Mr. Roberts's liver?
24         MR. VAUGHN:  Object to form.  Asked and
25  answered multiple times.

73 (Pages 286 - 289)

Page 290

1    THE WITNESS: I can neither rule in nor
2  rule out if this lesion progressed.
3    MR. NOLAN: Okay. Those are all the
4  questions that I have for now. I will pass the
5  witness.
6    MR. VAUGHN: Can we break for a few
7  minutes?
8    MR. NOLAN: Sure.
9    VERITEXT CONCIERGE: Waiting for Howard
10  to get us off the record.
11    THE VIDEOGRAPHER: Please standby. Time
12  is 5:39. We're off the record.
13
14    (Whereupon, a brief recess was taken off
15  the record.)
16
17    THE VIDEOGRAPHER: The time is 5:51, we
18  are on the record.
19
20  CROSS-EXAMINATION
21  BY MR. VAUGHN:
22    Q.   Doctor, do you -- strike that. Sorry.
23  Doctor, do you diagnose cirrhosis in
24  practice?
25    A.   I do not. Cirrhosis is a clinical

Page 291

1  diagnosis. What I'm able to provide are some of the
2  morphologic manifestations that are part of cirrhosis
3  on imaging examinations. And clinicians will use
4  those, among a variety of other factors, to arrive at
5  their clinical diagnosis.
6    Q.   Do you know if Mr. Roberts's treating
7  physician actually communicated a recommendation to
8  Mr. Roberts to follow up for additional imaging after
9  the 2016 CT?
10    A.   I do not, no.
11    Q.   In your opinion, was there any breach in
12  the standard of care regarding Mr. Roberts's imaging
13  in 2016?
14    A.   I do not believe that there was a breach
15  of the standard of care.
16    Q.   You testified that there was a typo in
17  your report noting that a mass in the MRI in 2018 was
18  in Section 1 or 8, but you meant to say 1 or 6. Is
19  that correct?
20    A.   That is correct.
21    Q.   And does that change your opinion in any
22  way?
23    A.   No, it does not. Because -- because the
24  findings are independent of the -- the exact
25  location.

Page 292

1    Q.   And were the findings in the 2016 CT
2  more consistent with a benign or malignant lesion?
3    A.   It would be my opinion that the imaging
4  characteristics of the various findings that I've
5  discussed with respect to the 2016 CT were more
6  likely to represent benign over malignant lesions.
7    Q.   And did you give all the opinions in
8  your expert report to a reasonable degree of medical
9  certainty?
10    A.   Based on the information I have
11  available to me at this time, yes.
12    MR. VAUGHN: I have no further
13  questions.
14    MR. NOLAN: I think I just have a
15  couple, Dr. Mele.
16
17  REDIRECT EXAMINATION
18  BY MR. NOLAN:
19    Q.   So you mentioned just now that you don't
20  diagnose cirrhosis. Right?
21    A.   Correct.
22    Q.   You look at the morphological
23  characteristics of the liver and then make a
24  recommendation to the clinician who is dealing with
25  the patient. Right?

Page 293

1    A.   I don't make a recommendation about
2  cirrhosis. What I -- what I would say is there is a
3  series of imaging findings that are compatible with
4  an underlying diagnosis of cirrhosis.
5    Q.   For Mr. Roberts in 2016?
6    MR. VAUGHN: Object to form.
7    THE WITNESS: You asked me if -- if
8  that's what I said about the scan in 2016, then the
9  answer is yes.
10
11  BY MR. NOLAN:
12    Q.   Okay. And you said that it's your
13  opinion that there was not a breach of the standard
14  of care. I don't really want to get into that too
15  much. But you have not reviewed all of Mr. Roberts's
16  medical records. True?
17    A.   True. And the question I -- I maybe
18  didn't answer the question with the level of
19  detailing required, but my opinions are confined
20  solely to the care provided under the umbrella of
21  diagnostic radiology.
22    Q.   Understood. And so you're not opining
23  on whether or not the clinician treating Dr. Roberts
24  breached the standard of care, one way or the other,
25  by -- sorry. Let me just start that over.

74 (Pages 290 - 293)

Page 294

1     Your -- your opinion as to whether or
2 not the standard of care was breached is limited to
3 the diagnostic radiology findings. True?
4     A.    True.
5     Q.    Okay. And because you haven't read all
6 of Mr. Roberts's medical reports -- or medical
7 records, you don't know if the doctor articulated to
8 Mr. Roberts that he should return for a follow-up CT
9 in 2016. True?
10     MR. VAUGHN: Object to form.
11     THE WITNESS: I -- I do not know
12 anything beyond what's available to me on the imaging
13 examinations and their corresponding radiology
14 reports.
15
16 BY MR. NOLAN:
17     Q.    And as it relates to the lesions that
18 were observed in 2016, your opinion is that they're
19 more likely benign than malignant. True?
20     A.    I would refer to them as observations at
21 that point. And, yes, they were more likely to be
22 benign findings than malignant findings, based on
23 their imaging characteristics.
24     Q.    And is it also true that an LR-3 is more
25 likely to be benign than malignant under the

Page 295

1 LI-RAD --
2     MR. VAUGHN: Object to form.
3 Foundation.
4     THE WITNESS: That is true. I agree
5 with that statement.
6     MR. NOLAN: Okay. Those are all the
7 questions that I have for now.
8     THE VIDEOGRAPHER: Counsel, if there are
9 no further questions, I will conclude the video
10 recording for this proceeding.
11     MR. VAUGHN: We're done.
12     THE VIDEOGRAPHER: Here ends media unit
13 number six. This concludes the video-recorded
14 virtual remote deposition of Dr. Christopher Mele,
15 M.D. taken by the parties on Thursday, May 8th, 2025.
16 The time is 5:57 p.m. Eastern Daylight Time and we
17 are going off the record.
18
19
20     (Whereupon, the deposition was concluded
21 at 5:57 p.m.)
22
23
24
25

Page 296

1     CERTIFICATE OF DEPONENT
2
3     I have read the foregoing transcript of
4 my deposition and except for any corrections or
5 changes noted on the errata sheet, I hereby
6 subscribe to the transcript as an accurate record
7 of the statements made by me.
8
9
     _____
10     CHRISTOPHER M. MELE, M.D.
11
12     SUBSCRIBED AND SWORN before and to me
13 this ____ day of _____, 20___.
14
15
16     _____
17     NOTARY PUBLIC
18
19
20 My Commission expires:
21
22
23
24
25

Page 297

1     CERTIFICATE
2
3
4     I, JOMANNA DEROSA, a Certified Court
5 Reporter and Notary Public of the State of New
6 Jersey, do hereby certify that the foregoing is a
7 true and accurate transcript of the testimony as
8 taken stenographically and digitally at the time,
9 place and on the date hereinbefore set forth, to the
10 best of my ability.
11
12
13     I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor Counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or Counsel,
17 and that I am not financially interested in the
18 action.
19
20
21
22     JOMANNA DEROSA, C.C.R.
     License No. 30XI00188500
23     Notary Public of the
     State of New Jersey
24
25

75 (Pages 294 - 297)

Page 298

```
 1            ERRATA SHEET
            VERITEXT/NEW YORK REPORTING, LLC
 2  CASE NAME: In Re: Valsartan, Losartan, Et Al v. Zhejiang
    Huahai Pharmaceutical Co., Ltd., Et Al. (Gaston Roberts)
 3  DATE OF DEPOSITION: 5/8/2025
    WITNESSES' NAME: Christopher M Mele , MD
 4
 5   PAGE  LINE (S)    CHANGE       REASON
     _____
 6   |    |        |            |
     _____
 7   |    |        |            |
     _____
 8   |    |        |            |
     _____
 9   |    |        |            |
     _____
10   |    |        |            |
     _____
11   |    |        |            |
     _____
12   |    |        |            |
     _____
13   |    |        |            |
     _____
14   |    |        |            |
     _____
15   |    |        |            |
     _____
16   |    |        |            |
     _____
17   |    |        |            |
     _____
18   |    |        |            |
     _____
19   |    |        |            |
     _____
20
21           _____
             Christopher M Mele , MD
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24  _____
25  (NOTARY PUBLIC)          MY COMMISSION EXPIRES:
```

[& - 2016]                                                                        Page 1

| **&** |
| --- |
| **&**   2:3,11,19 3:3 24:3,5 |

| **0** |
| --- |
| **0.5**   288:13 289:16 |
| **00**   72:3 |
| **02875**   1:3 7:7 |
| **07405**   8:2 |

| **1** |
| --- |
| **1**   4:15 13:13,15 14:18 104:24 117:3 119:6 168:22 184:14 185:7 200:18 207:22 212:13 258:13 268:18 272:12,15 277:9 291:18 291:18 |
| **1.0**   139:20 |
| **1.8**   125:22 136:15 150:14 152:11,24 162:16 163:7 |
| **1.99**   142:18 |
| **10**   5:1 134:17 185:21,22,25 186:9 203:18 203:20 |
| **100**   84:9 87:16 |

**1000**   110:10
**10022**   2:6
**1005**   110:11
**1020**   2:21
**105**   4:18
**10:08**   47:10
**10:21**   47:15
**11**   5:7 145:8 153:11 209:5 209:11 232:17 232:20
**117**   4:19
**119**   1:3 7:7
**11:41**   103:8
**11:59**   103:14
**12**   5:13 38:12 97:12 240:18 240:19,21 248:10
**12022**   2:21
**123**   4:20
**1250**   110:12
**1259**   110:13
**12:16**   115:21
**12:18**   116:2
**12:31**   124:22
**12:50**   139:6,9
**12th**   15:2
**13**   4:15 5:15 260:20,21,23
**1300**   110:13
**1301**   2:13
**134**   4:22

**14**   3:6 5:16 267:22 268:1
**14.7**   132:4
**140**   4:23
**15**   5:17 43:2 188:17 195:9 200:21 270:9 270:12 271:21 271:24 273:11 276:3
**1518**   110:16,17
**153**   4:24
**16**   5:18 38:13 43:11 140:12 141:1,9,15 271:16,18,21 272:5
**17**   5:10,23 226:17 227:1 227:10 232:16 286:18,21
**17th**   5:13 240:14 241:6 242:11,15 256:3 262:16
**18**   5:6,25 204:8 204:25 206:18 288:6,8 289:3
**180**   33:4
**186**   5:1
**19**   6:2 123:22 289:10,12
**197**   5:4

**1997**   9:2
**19th**   4:25 82:5 153:9 154:3 160:24 166:6 280:16
**1:23**   139:9,11

| **2** |
| --- |
| **2**   4:16 72:2,5 162:16 165:24 165:25 229:7 242:9 255:11 262:12 |
| **2.0**   123:4 136:15 139:20 140:3 141:18 143:8,15,19 145:20 146:5 147:20 163:7 |
| **20**   55:7 56:6 77:23 135:10 141:22 235:14 235:16 296:13 298:22 |
| **20004**   2:14 |
| **20016**   3:7 |
| **2002**   8:24 |
| **2006**   118:2 |
| **2009**   106:22 |
| **2016**   5:8 82:5 109:2,7 111:5 112:3 121:18 122:2 135:5 143:9 144:2 |

**[2016 - 301]**                                                                Page 2

149:4,5 152:16
153:9 157:20
160:24 166:6
180:7 182:9
198:24 199:12
209:6 218:14
227:16 229:12
230:21 234:16
236:20 237:1
237:21 238:17
239:25 242:23
245:5 254:23
255:1,5 279:14
279:21 280:3,6
280:16,23
281:13,21
282:12 283:11
284:22 289:22
291:9,13 292:1
292:5 293:5,8
294:9,18
**2018**  5:14
17:11,17 18:13
60:11,22 62:9
62:11,13 67:19
68:6 69:20
79:18 81:15
107:25 109:2,8
143:20,22
144:16 147:7
147:24 148:11
148:16 149:1
149:15,18
214:6 228:13

228:16,19,22
230:22 239:14
240:14 241:7
242:11,15
245:19 255:12
256:3,18,23
258:8 261:9
262:16 279:14
279:18 280:18
281:18 282:6
282:14 284:22
291:17
**2019**  17:12,20
**2019/2020**  18:6
18:21
**202**  3:9
**2020**  17:12,20
18:11 60:24
62:9 67:24
68:13 69:1,24
79:18
**2021**  15:2,5,7
15:15,23 16:18
18:8,23
**2024**  32:7
**2025**  1:13,19
7:10 12:17
59:4 76:13,17
118:8 295:15
**203**  5:5
**206**  5:6
**209**  5:7
**210-5557**  3:8

**211**  5:9
**212**  2:7
**22**  141:23,24
143:4,4
**227**  5:10
**23**  8:24 142:22
**234**  5:11
**236**  5:12
**240**  5:13
**24th**  59:9
**25**  55:7 56:6
77:24 140:4,16
150:16,16
151:23
**25th**  59:9
**260**  5:15
**268**  5:16
**27**  5:5 200:8,12
201:8,16 203:2
**270**  5:17
**271**  5:18
**272**  5:19
**274**  5:20
**275**  5:21
**278**  5:22
**28**  152:1,10
**286**  5:23
**2875**  1:4
**288**  5:25
**289**  6:2
**28th**  14:25
**290**  4:8
**292**  4:9

**2:59**  208:20

**3**

**3**  4:17 73:20
74:3 75:23
76:1 104:9
117:7 118:16
229:7,7 255:11
279:9 288:22
289:16 294:24
**3-5**  209:22,23
**3.6**  262:10
264:2
**3.9**  247:14
248:2
**30**  84:17 87:4
87:17 88:4
217:7,17
**300**  36:25
**301**  5:2 83:4,4
83:7 86:12,25
98:10 112:22
176:1,9 182:16
182:20 183:19
183:25 184:1,2
184:3,10,12
185:11,18,24
186:2 188:23
195:9,16 196:4
197:1 200:2
201:8,11 205:1
207:8 208:10
212:6 213:5
215:16 216:25

**[301 - 604-48]**                                                Page 3

217:7,18,22
219:13 220:5
**302**   112:23
**303**   112:22
**30xi00188500**
   1:18 297:22
**31**   5:21 185:17
   274:23 275:7
**33**   104:10,12,13
**33a**   209:5
**34**   141:16
**341-7591**   2:7
**35**   5:9,19
   209:21 211:7
   211:17 273:23
   274:1
**3:15**   209:1
**3:57**   238:5
**3rd**   3:6

**4**

**4**   4:18 104:24
   105:1 121:20
   125:12,13
   165:24 229:7
   242:9 249:13
   279:3,5 288:22
**4/19/2016**
   80:16 81:1,9
   82:15 110:12
   195:10 210:21
**401**   5:7,9,10
   176:1,9 182:16
   183:17 184:5,6

184:8,10,13
185:12 188:20
189:1,5,10
195:15,22
196:3,23 200:1
200:22 201:11
201:18 202:12
204:10 205:7
205:18,21
208:16,18
209:5,15
210:20 211:8
211:18,22
214:16 216:7
217:16,19
227:1,11
232:17
**42**   241:3 270:6
**42f**   270:5 273:8
**42i**   5:18 271:16
   272:4
**42l**   267:20
**43**   13:12
**44**   75:23
   241:21 248:10
**444-9164**   2:15
**46**   5:22 186:7
   277:19,23
   278:4,12
**4656**   297:21
**48**   5:17 270:18
   270:19 272:8
**4:11**   238:10

**4:43**   261:23
**4:52**   269:5

**5**

**5**   4:19 91:24
   117:8,10
   125:12 184:24
   202:17 204:7
   243:17,21
   244:15,20
   247:6 256:1,9
   264:15,21
   265:17 275:13
   275:13 276:5
   276:20 278:15
**5.0**   249:17
   251:2 262:10
   262:14 264:1
**5.1**   264:11
**5.8**   264:10
**5/8**   265:25
   276:5,15
   278:19 288:14
**5/8/2025**   298:3
**50**   2:5
**5:06**   269:11
**5:16**   275:17
**5:18**   275:23
**5:27**   281:3
**5:28**   281:8
**5:39**   290:12
**5:51**   290:17
**5:57**   295:16,21

**5a**   74:21
**5b**   74:21,21
**5c**   75:5

**6**

**6**   4:20 5:2,20
   123:24 175:6
   175:14 182:18
   183:16,22
   186:2 187:14
   188:5 197:7
   200:1,7,13
   201:10 202:7
   202:11 208:12
   209:19,20
   211:8 226:13
   244:20 256:1,9
   262:21 264:4
   264:21 265:17
   266:2 272:11
   272:14,25
   273:1,21
   274:18,21
   276:19 277:1,9
   279:2,21
   289:17 291:18
**600**   76:20
**601**   2:5 270:1,3
   270:4 273:2,8
   276:3 277:17
   277:19
**604**   271:12
**604-48**   271:1

**[62 - academic]**

| | | | |
|---|---|---|---|
| **62**  141:3 | **8** | **800-8518**  2:23 | **able**  13:6,18,25 |
| **646**  2:15 | **8**  1:13,19 4:7 | **8th**  7:10 111:5 | 97:13 99:22 |
| **66213**  2:22 | 4:23 140:5,7 | 121:18 122:2 | 119:14 131:21 |
| **6a**  286:15 | 140:17,24 | 135:5 149:22 | 144:23 145:12 |
| **6b**  288:6 | 141:1,25 | 180:7 295:15 | 146:16 153:4 |
| **6c**  289:9 | 152:11 156:8 | **9** | 161:3 188:6 |
| **7** | 156:15,19 | **9**  4:24 153:11 | 189:17 190:1 |
| **7**  4:22 5:2,4 | 159:17 161:4 | 153:13 | 192:1,6 203:25 |
| 24:5 134:18,21 | 161:15 175:6 | **913**  2:23 | 211:3 223:24 |
| 153:17 175:6 | 175:14 182:18 | **978-1188**  3:9 | 228:7,21 |
| 175:14 182:18 | 183:16 188:5 | **9:10**  1:20 7:11 | 229:10,20,21 |
| 183:16,22 | 202:7,12 | **9:17**  14:7 | 230:18 252:8 |
| 186:2 188:5 | 208:12 209:19 | **9:21**  14:12 | 256:22 262:23 |
| 192:19 195:14 | 232:8,13,15 | **9th**  12:17 76:13 | 267:4 269:16 |
| 196:10 197:18 | 233:9 234:7,16 | 76:17 77:3,14 | 291:1 |
| 202:7,11 | 235:11 243:16 | 79:6,9 | **abnormal** |
| 208:12 209:19 | 243:17 244:14 | **a** | 129:2 175:7 |
| 226:16,21 | 244:15 246:18 | **a.m.**  1:20 7:11 | **abnormality** |
| 227:1,3 228:14 | 249:16 256:1,9 | **abdomen**  44:12 | 36:21 37:13 |
| 228:15 233:8 | 256:18 258:8 | 58:18 87:13 | **abnormally** |
| 279:21 286:16 | 258:12 264:16 | 112:7 173:5 | 48:10 |
| 288:2 | 264:21 265:17 | 177:8 254:23 | **above**  1:16 |
| **7/17/2018** | 266:7 271:9 | 255:5,15 | **abscess**  48:24 |
| 110:17 112:7 | 272:12,15 | **abdominal** | 49:1 50:12,13 |
| 242:2 | 275:13 276:6 | 51:1,2 58:17 | **absence**  180:23 |
| **72**  4:16 | 276:20,24,25 | 149:11 183:8 | **absent**  156:8 |
| **752**  8:2 | 277:8 278:16 | 247:13 | **absolute** |
| **76**  4:17 | 279:21 291:18 | **ability**  70:11 | 173:16 |
| **771**  3:8 | **8.0**  251:2 | 78:24 109:17 | **absolutely**  10:9 |
| **7th**  107:25 | **8/1**  258:14 | 160:14 190:9 | 12:12 73:7 |
| 255:12 261:9 | **800**  62:14 | 215:4 219:7 | 102:16 164:21 |
| | 67:21 | 251:15 252:24 | **academic** |
| | | 297:10 | 119:10 |

[acceleration - allegation]                                                    Page 5

**acceleration**
  126:19
**accepted**  91:23
**access**  13:19,25
  250:19,21
  251:3
**accident**  49:18
  54:4
**accidents**  23:9
**accordance**
  219:5
**account**  173:8
**accurate**  10:11
  14:22 117:15
  192:1,3 194:6
  296:6 297:7
**acoustic**  123:6
  125:24 126:17
  130:21
**acquire**  24:22
  26:18 101:24
**acquired**  28:3
**acquisition**
  91:15 231:15
**acr**  29:11 60:10
  61:10 62:10
  67:17,19 69:21
**act**  190:11
**action**  297:15
  297:18
**active**  35:6
  52:24
**actively**  25:1
  27:14,14

**activities**
  169:14
**actual**  152:1
**actually**  16:7
  19:5 30:21
  39:23 85:3
  89:5 140:1,1
  163:25 177:17
  188:14 193:21
  206:12 221:13
  228:9 248:2
  249:25 251:1
  269:24 270:4
  291:7
**add**  250:8
  252:9
**added**  77:19
  270:9,10
**adding**  252:8
**addition**  60:15
  125:21 256:16
**additional**  14:1
  26:15 33:3
  79:5,17 84:18
  87:4,17 88:4
  107:7 149:14
  216:24 237:14
  252:5,9 253:20
  291:8
**adjacent**
  122:21
**adjudication**
  57:19

**administered**
  83:3,13 100:3
  166:24 201:10
  207:20
**administration**
  100:11 101:24
  166:6 175:23
  212:24 255:16
**adopted**  89:15
**adult**  178:4
**advance**  16:22
  27:22 115:15
**advanced**  28:3
**advantage**
  203:25
**adventure**
  119:13
**advertising**
  27:15
**advisor**  56:22
**aerated**  189:2
**affairs**  32:19
**affidavit**  43:16
  56:2
**affidavits**  56:8
**affirmation**
  56:13
**aftermath**
  215:5
**afternoon**  67:3
**age**  179:23
**agent**  50:1
**ago**  28:3
  221:11 222:8

**agree**  7:20 12:9
  13:8 80:6,13
  81:21,22 101:5
  104:8 156:20
  160:7,8,10,11
  160:22 161:1
  161:22 162:2
  163:4 232:23
  240:2 252:22
  257:13 295:4
**agreed**  101:1
  138:19 165:10
  179:11
**agreement**
  251:18
**ahead**  14:4
  17:25 72:23
  78:6 90:23
  127:10 167:11
  201:14 230:24
  236:9
**ai**  35:24 36:24
  37:4,4 38:10
  40:21,24 41:1
  41:5,7
**air**  44:11
**al**  298:2,2
**algorithm**
  37:22 91:14
  92:5 96:16,18
  220:23
**align**  231:22
**allegation**  44:5
  45:7 49:24

**[allegation - applied]**                                    Page 6

| | | | |
|---|---|---|---|
| 50:2 51:2 52:3 | 189:2 200:22 | **answered** | **aphe** 215:22 |
| 52:10,21 53:5 | 201:2 205:2 | 15:18 65:2,11 | **apologies** |
| 53:16 54:2 | 210:5 278:12 | 70:21 97:21 | 141:11 |
| **alleged** 50:10 | **aneurysm** 48:6 | 103:22 104:3 | **apologize** 45:3 |
| 52:9 85:7 | **angle** 112:2 | 108:1 113:8 | 45:3 136:3 |
| **alleging** 149:21 | **annotate** 37:16 | 115:18 145:1 | 261:25 |
| **allow** 93:15 | 191:2 192:6 | 161:17 206:25 | **appear** 113:6 |
| 101:16 115:3 | **annotated** | 218:7 229:14 | 127:4 136:22 |
| 177:15 191:17 | 196:20 275:3 | 230:24 237:5 | 144:7,17 |
| 193:21 213:2 | **annotating** | 238:24 239:9 | 146:11 155:16 |
| 219:8 224:6,6 | 198:8 | 250:14 282:7 | 170:17 239:21 |
| **allowed** 49:5 | **annotation** | 283:4,14,25 | **appearance** |
| 151:12 | 37:15 41:6 | 284:14 285:5 | 98:18 126:9 |
| **allowing** | 190:25 191:3 | 285:13 289:6 | 127:14 129:15 |
| 199:14 | 191:12 | 289:25 | 154:19 155:8 |
| **allows** 98:25 | **annotations** | **answering** | 158:20 160:3 |
| 99:9 | 187:9 194:1,1 | 151:9 | 205:13 230:3 |
| **alternative** | **answer** 16:7,16 | **answers** 151:5 | 242:19 |
| 237:2 | 42:6 43:14 | 151:11,15 | **appearances** |
| **amend** 151:25 | 54:19 55:5,23 | 203:12 | 7:18 |
| **american** 60:25 | 55:24,25 78:6 | **ant** 141:25 | **appeared** 243:4 |
| **amount** 27:23 | 78:24 79:7 | **anterior** 123:5 | 244:4,23 259:3 |
| 88:6 98:16 | 93:18,21 | 144:12 149:8 | **appearing** 7:3 |
| **analyses** 148:7 | 107:16 116:8 | 149:11 178:9 | 122:16 233:19 |
| **anatomic** | 117:18 150:3 | 233:5,11 | 234:22 264:9 |
| 146:12 195:17 | 167:8 172:24 | 264:10 | **appears** 124:15 |
| 257:14 | 189:13 196:14 | **aorta** 48:9,12 | 156:18 233:6 |
| **anatomical** | 206:21 216:15 | 83:24 84:6,10 | **appendicitis** |
| 253:23 | 218:16,17 | 84:10 87:13 | 94:7 225:14 |
| **anatomically** | 223:2 234:19 | 88:5,12 217:12 | **application** |
| 162:24 188:22 | 239:19 241:11 | **aortic** 48:5,7,8 | 80:16 94:3 |
| 204:12 | 254:4 284:1,4 | 87:12 88:3 | **applied** 96:22 |
| **anatomy** | 287:21,25 | **apart** 48:14 | 97:17 183:7 |
| 146:10 183:5 | 288:2 293:9,18 | | 220:14,22 |

**[applied - arterial]** Page 7

| | | | |
|---|---|---|---|
| 222:17 | 135:5 145:18 | 200:13 201:7 | 201:23 202:9 |
| **applies** 186:16 | 147:7 149:4,22 | 201:12,15,16 | 202:13 205:23 |
| 240:5 | 153:9 154:3 | 202:8,12 203:7 | 205:25 206:2 |
| **apply** 29:23 | 157:20 160:24 | 203:9 205:17 | 218:13 223:16 |
| 92:4 93:15 | 166:6 180:7 | 205:19 211:10 | 233:12 234:15 |
| 95:8 97:10,14 | 182:9 209:6 | 218:5 231:15 | 235:21,25 |
| 104:7 112:12 | 238:17 280:16 | 233:2,3,5 | 236:7 237:22 |
| 160:14 182:2 | 284:22 | 235:20 236:1 | 256:13 260:2 |
| 200:14 218:4 | **architectural** | 236:18 243:16 | 265:3,5,7,8,20 |
| 218:12,13 | 175:8 181:15 | 243:22 244:3,5 | 274:3 280:5 |
| 219:1,6,19 | **architecture** | 244:10,12,14 | 288:22 |
| 220:3 225:19 | 168:16 181:20 | 244:15 246:19 | **argue** 266:13 |
| **applying** 96:16 | **area** 5:12 27:1 | 246:20 247:14 | **argued** 81:24 |
| 218:21 219:25 | 30:14 35:22 | 247:24 248:3 | **arrive** 159:8 |
| 220:5 221:4 | 49:3 61:21 | 248:14 249:16 | 291:4 |
| **appreciate** | 77:20 87:15,15 | 249:17 257:12 | **arrived** 157:19 |
| 51:20 230:13 | 87:16 88:25 | 260:2,5 262:15 | **arriving** 75:13 |
| **appropriate** | 119:7 123:4 | 264:25 265:25 | 75:17 116:10 |
| 94:17 157:3,7 | 125:22 127:5 | 271:2 272:10 | 116:21 |
| 163:24 164:1 | 129:24 139:20 | 272:16 274:2,6 | **arrow** 189:8 |
| 164:18 206:3 | 139:21 140:4 | 276:4 277:21 | 190:14,15 |
| 219:5 | 141:19 142:1,7 | 278:9 | 194:2 288:1 |
| **appropriately** | 143:9,16 145:7 | **areas** 5:11 28:9 | **arrows** 191:18 |
| 204:16 217:5 | 145:21 146:6 | 28:17,18 99:19 | **arterial** 82:10 |
| 217:22 253:9 | 147:20,23 | 99:20 126:6 | 82:19 83:1,4 |
| **approximate** | 149:14 150:15 | 128:17 136:17 | 84:2,14,16 |
| 84:8 201:1,1 | 151:18,19 | 144:24 145:11 | 85:7,9,11,18,21 |
| **approximately** | 152:12,24 | 160:23 162:13 | 85:23,25 86:2 |
| 7:11 17:12 | 158:16 161:15 | 162:24 166:17 | 86:7,12,13 |
| 132:4 | 178:11,13 | 169:25 170:17 | 87:6 88:7,10 |
| **april** 4:25 5:7 | 189:1 195:20 | 171:8 174:18 | 96:11 97:18 |
| 14:25 82:5 | 195:25 198:19 | 175:7 180:5 | 98:7 100:5 |
| 109:7 111:5 | 198:20,23 | 183:13,16 | 195:13 204:15 |
| 121:18 122:2 | 199:12,25 | 196:11 197:6 | 204:16 206:5,6 |

[arterial - attorneys]                                                    Page 8

206:11 207:17
208:2,6 212:7
212:20 213:6,6
213:13,20,23
214:24 215:22
216:1,2,8,9,15
216:16 217:5
219:12,16,17
223:5,6 225:4
225:20 255:22
257:4 258:24
259:7 262:11
267:12
**arteries**  84:21
84:24 86:5
213:16
**artery**  213:11
**arthritis**  52:22
**arthrosclerosis**
39:16
**article**  60:22,24
61:2,4 62:9,9
67:18,25 68:7
68:13 69:1,2
69:20,24 74:10
81:15 82:7
119:3 120:12
120:19
**articles**  60:9,17
60:18,20 61:14
67:8,15 71:14
74:4,18 118:17
119:2 120:9

**articulated**
294:7
**artificial**  27:24
28:24 29:5
38:15
**ascites**  173:3
**aside**  41:3
55:18 56:11
62:23 66:19
74:19 87:20
132:10 175:4
188:4 207:25
**asked**  15:13,18
16:12 19:5
25:4 35:9 37:5
37:9 38:16
40:23 41:1,4
43:5 46:18
65:2,11 70:21
79:4 97:20
103:22 104:3
105:8,14,20
107:10,16
108:1,13,19
109:6 113:8
115:17 151:2,4
161:8,16 190:9
196:25 206:24
218:6 221:12
222:3,12
229:13 230:23
237:4 238:23
239:8 250:14
282:7 283:4,14

283:25 284:14
285:5,13 289:6
289:24 293:7
**asking**  12:10
23:14 93:21,23
113:2,5 114:19
139:23 143:23
151:9 167:5,10
196:3 252:18
**asks**  35:15
74:22 75:6
**aspect**  38:10
90:10 155:21
**aspects**  80:7,12
**aspegren**  2:12
**assist**  36:7 78:3
**associated**
59:15,22 63:1
75:20 134:11
143:20 144:2
145:21 146:6
147:6,23
152:25 173:15
174:13 228:3
279:12
**association**
7:13,16 176:15
**assume**  10:14
11:15
**assumption**
113:22
**atrium**  83:23
188:15

**attached**  6:5
**attempt**  211:11
**attention**  90:18
**attenuating**
244:12
**attenuation**
85:5 88:4
101:4 170:8,10
170:16,23
171:5 172:16
173:13 174:1
174:19 175:5
175:13 180:5
188:5 202:7
206:4 217:12
234:6 242:25
279:20
**attenuations**
209:19
**attorney**  16:6
16:11 19:17
20:9,13,14
27:8 45:22
56:20 63:13,14
63:21,21 64:20
64:20 66:11
81:21 107:4
297:14,16
**attorneys**  15:10
25:2 26:4,16
28:20 63:13
65:24 66:2
107:6

[attribute - based]                                                    Page 9

| | | | |
|---|---|---|---|
| **attribute** 42:2 | **averaging** | 129:23 130:22 | **base** 32:22 |
| 173:25 | 233:18 | 131:20 133:18 | 164:17 |
| **attrition** 35:2 | **avila** 3:4 63:14 | 133:24 139:15 | **based** 19:20 |
| **audio** 10:1 | 63:22 64:21 | 143:3 150:17 | 30:1 36:18 |
| 263:17 | **aware** 26:10 | 152:6 164:7,12 | 61:18 69:2 |
| **audrey** 2:12 | **axelrod** 20:11 | 176:20 194:3 | 79:5 89:19 |
| **audrey.aspeg...** | 20:24 23:24 | 207:21,23 | 91:16 98:18,21 |
| 2:16 | **axial** 38:22 | 210:12 221:5,9 | 101:21,22 |
| **august** 107:25 | 83:8 85:8 | 221:11 236:1 | 109:1,2 117:1 |
| 109:7 148:11 | 86:11 184:12 | 237:1 238:14 | 122:18 127:18 |
| 148:16 149:1 | 184:15,19,20 | 238:20 239:6 | 130:8,18 131:2 |
| 255:12 261:9 | 185:8,9 | 246:10 248:9 | 131:9,9,11,13 |
| 282:6 284:22 | **axials** 185:6 | 249:12 257:23 | 137:22 144:6 |
| **author** 60:22 | | 261:24 269:15 | 144:11 145:6 |
| 61:2,4 | **b** | 269:19 273:6 | 146:17,20,25 |
| **authored** 81:16 | **b** 4:12 5:5 6:2 | 274:15 276:2 | 147:4 149:7 |
| **authors** 61:7 | 28:4,25 29:6,9 | 278:10 279:1 | 153:3 157:6 |
| **available** 9:25 | 29:13 30:17 | **background** | 159:9,13 160:5 |
| 10:3 12:21 | 32:3,16,25 | 126:11 164:15 | 161:22 163:1,2 |
| 35:4 71:23 | 33:3,5,6,17 | 171:4 172:15 | 163:22 165:4 |
| 79:6,9 80:25 | 34:11,14,19,23 | 172:20,20 | 182:9,14 183:6 |
| 82:14 105:19 | 35:2,6,10,13,18 | 181:18,21 | 195:17,23 |
| 107:15 109:3 | 202:25 203:1 | 183:19,21 | 199:5,20 |
| 109:14 111:7 | 203:18,20 | 188:21 196:17 | 201:11 207:11 |
| 111:10 159:8 | 288:6 289:15 | 202:14 205:13 | 214:10,10,10 |
| 163:2 182:22 | **babies** 177:2 | 205:16 206:4 | 214:14 217:12 |
| 199:16 212:17 | **back** 14:16 | 213:18 223:25 | 219:12 227:19 |
| 214:10 219:15 | 15:1 23:25 | 230:4 236:4 | 233:21 234:22 |
| 270:2,4 273:3 | 26:24 27:4 | 260:1,3,4,9 | 234:24 235:19 |
| 288:24 292:11 | 41:23 47:19 | **ballpark** 85:22 | 236:8,8 237:20 |
| 294:12 | 73:1 83:23 | **barely** 39:11 | 238:25 243:8 |
| **avenue** 2:5,13 | 89:4,6,19 90:4 | **barnes** 53:10 | 244:2 245:18 |
| 33:8 | 121:17 124:22 | 53:12,14 | 247:21 249:5 |
| | 124:23 125:11 | | 253:3,4,4 |

**[based - bit]**                                                        Page 10

255:6 281:24
288:19 292:10
294:22
**basic**   10:15
217:10,11
287:13
**basically**   26:1
31:4 67:19
76:7 80:7
119:5 128:15
163:6 252:24
256:7
**basket**   225:11
**battle**   54:10
**becoming**   32:2
183:20 285:12
**began**   17:10
18:12 32:7,8
**beginning**
190:17
**begins**   7:2
**begun**   201:9
**behave**   69:4
126:9
**believe**   17:11
17:22 20:14,22
21:3,11 37:17
38:19 44:3
47:21 48:6,23
51:1 52:24
58:25 61:1
64:4,12,20
73:24 75:13,19
83:8 85:24

86:10 89:10
92:10 104:25
106:22,23
107:11 112:10
113:15 119:24
120:20 123:9
125:12 134:19
135:12 136:24
140:11 141:2
141:15 147:1,5
150:15 160:13
161:7 184:22
184:24 185:25
192:18 195:25
202:17 204:8
207:12 211:2
217:6 230:10
232:15,18
233:17 235:13
235:15 241:12
241:25 248:7
262:20 264:3
265:22,23
271:2 272:9
273:8 275:11
276:18 278:21
279:2 281:23
291:14
**benefit**   97:7
162:21 226:3
252:10
**benefits**   249:10
**benign**   127:17
129:3 131:16

158:19 159:1
159:11 160:2
160:15 161:24
180:21 181:3,9
182:3 199:21
227:21 234:21
236:22 237:11
237:23 281:25
292:2,6 294:19
294:22,25
**best**   10:21
14:23 23:4
31:5 39:4
41:15 43:14
70:11 72:25
78:24 79:7
82:13 93:25
108:15 109:13
110:19 111:21
113:12 152:3
159:9 172:24
183:4,9 186:4
187:2 188:19
190:9 195:15
195:21 197:1
201:2,17 205:1
210:25 212:18
212:18 213:22
223:4,9 239:19
239:19 246:6
259:15 265:21
277:3 297:10
**beta**   74:22

**better**   29:17
49:5 76:6
90:13,14 99:2
99:10 131:22
133:19 183:14
188:21 189:4,9
189:10 212:19
213:15,15
252:20,25
254:2 265:13
271:3,14
277:18
**beyond**   54:9,10
93:21 108:22
110:17 174:17
212:12 257:18
258:19 294:12
**big**   99:19
101:11 130:8
130:14
**biology**   39:11
231:17
**biophysiology**
170:3
**biopsy**   91:19
91:25 119:3
120:13,16
245:8,16
**birth**   177:11
**bit**   25:11 64:14
74:17 76:6
78:20 93:24
112:1 145:14
146:22 155:23

159:12 163:25
183:6 194:19
196:21 200:23
210:6,16
219:22 228:7
230:14 232:12
233:19 235:18
236:7,7 263:16
**blanche** 252:7
**bleed** 154:16
**blends** 260:10
**blood** 39:13
40:7 48:9,14
99:20,24 101:9
102:1 133:15
133:25 176:19
176:22 177:15
177:18,22
**blue** 2:21 27:9
**board** 90:7
116:23
**body** 37:1 50:1
88:15 158:6
170:3 173:23
**bogdan** 56:20
56:25 57:5
58:10 59:2
66:11
**bogdan's** 57:3
**bolus** 100:5
**bone** 38:20,21
39:12,14,21,22
50:16

**bones** 38:1
39:20
**books** 74:4
**border** 233:8
**borderline**
285:12
**bottom** 119:20
121:23 142:1
142:17 156:1,1
242:13 267:12
273:13
**bowel** 51:4,5,18
**brain** 102:7
**branches** 84:22
84:25 86:6
213:11
**breach** 45:24
46:1,6,7,20
47:4 291:11,14
293:13
**breached**
293:24 294:2
**break** 11:18,19
12:1 15:14
25:10 29:1
47:8 58:8 96:6
103:6 124:25
134:12 139:5
146:22 160:20
191:10 208:18
219:22 238:3
268:24 269:16
290:6

**breathe** 231:9
**breathing**
183:4 210:1,9
**brett** 2:20
**brief** 14:9
47:12 103:11
115:24 208:23
238:7 269:8
275:19 281:5
290:14
**bright** 126:11
126:22
**brighter** 122:8
122:16 207:2
224:2 259:22
260:3,9
**brightness**
122:20
**bring** 71:20
**bringing** 99:21
**brodsky** 3:14
7:12
**brought** 28:5
46:16 89:7
228:9
**browner** 52:16
52:19
**build** 133:18
**builds** 133:22
**bulges** 154:24
**bull** 213:9
**bumpy** 154:21
**bunch** 45:18
111:24 154:18

287:12
**bundled** 276:14
**burden** 174:5
**business** 23:10
205:4
**bvaughn** 2:24
**bypass** 176:19
177:15

**c**

**c** 2:1 3:1 5:6
21:14 206:15
206:17
**c.c.r.** 297:22
**cabinet** 67:15
**calcification**
39:12,15,19
40:10,10 99:20
99:25 101:9
**calcifications**
37:20 38:1,2
39:1,5 40:19
**calcium** 39:20
39:21,23,24
**calculations**
74:22
**calibrated**
142:14
**calipers** 142:5
142:6,8,24
**call** 29:18,23
39:14,14 64:3
71:16 85:7,17
88:23 96:24

[call - caused]                                                                        Page 12

| | | | |
|---|---|---|---|
| 100:13 109:15 | 89:9 108:18,21 | 48:3,4,17,18,20 | 100:4 223:12 |
| 111:19 142:5 | 120:21 251:12 | 48:21,24 49:12 | **castelli**  51:24 |
| 176:23 177:4 | 256:1 257:3 | 49:13,17,19,21 | 52:2 |
| 219:9 232:23 | 264:21 279:13 | 49:22 50:6,7,8 | **categories** |
| 234:13 257:16 | 279:18 280:18 | 50:9,10,18,19 | 97:15 106:15 |
| 258:13 | 281:17 284:17 | 50:22 51:19,24 | 115:14 |
| **called**  25:24 | 286:7 288:4 | 51:25 52:2,3,3 | **categorizable** |
| 266:13 267:11 | **carcinomas** | 52:5,6,8,9,16 | 81:2 |
| 272:11 276:14 | 288:23 | 52:17,19,24 | **categorization** |
| **calling**  35:6 | **care**  45:24 46:1 | 53:2,4,10,14,16 | 80:17 81:10 |
| 85:9 258:12 | 46:6,8,20 47:4 | 53:22,23 54:1 | 91:24 218:21 |
| **calls**  35:14 | 51:3 70:15 | 54:2,6,6,13,14 | 229:5,6 |
| 158:6 214:12 | 108:13 246:9 | 54:17 55:4,10 | **categorizations** |
| **camden**  1:4 7:8 | 291:12,15 | 55:17,18 56:11 | 221:2 |
| **cancer**  40:24 | 293:14,20,24 | 56:14,16,21,25 | **categorize**  23:4 |
| 41:2 45:9 53:6 | 294:2 | 57:6,12 58:1,1 | **categorized** |
| 53:7,8 74:5,11 | **career**  118:22 | 58:20,24 59:2 | 81:23 |
| 106:7,11 120:5 | **careful**  156:25 | 68:11,15 74:25 | **category**  41:8 |
| 121:15 128:24 | **carrier**  26:20 | 75:8 76:18 | **caudate**  168:20 |
| 181:5 280:24 | **carries**  156:24 | 78:18 79:21,25 | 169:3,10 |
| 281:14 | 170:25 196:17 | 83:25 103:21 | 172:14 257:17 |
| **cancers**  41:4 | **carry**  29:21 | 116:21 175:25 | 272:13 |
| **cancun**  254:15 | **cart**  144:21 | 187:8 218:22 | **causation** |
| **capable**  190:2 | **carte**  252:6 | 219:18 224:24 | 80:19,21 81:24 |
| 215:17,18 | **case**  1:3 7:6 | 243:3 244:10 | 81:25 283:18 |
| **capacity**  68:1 | 14:24 15:6 | 246:4 259:1,19 | **cause**  124:12 |
| 68:21 | 16:3,23 18:8 | 285:23 298:2 | 126:6 132:13 |
| **caption**  43:5 | 18:25 19:20 | **cases**  15:4 19:9 | 169:2 179:14 |
| **captions**  43:2 | 22:23 23:3 | 22:9,13,15,18 | 229:20 283:12 |
| **capture**  92:11 | 42:23 43:23 | 22:24 23:6,11 | 284:11,16 |
| 249:17 | 44:1,8,13,22,23 | 23:22 24:21,22 | **caused**  22:21 |
| **car**  23:13 | 45:1,5,13 | 42:4,4 43:9,11 | 81:6 106:10 |
| **carcinoma** | 46:13,14,19,23 | 45:12,25 46:22 | 168:9 |
| 55:20 56:14 | 47:22,23,25,25 | 56:7 90:8 | |

[causes - chernyak's]    Page 13

causes  106:7
121:15 179:8
caution  16:4
cava  57:22
58:12,16 257:1
cavity  58:17
cayton  44:21
44:23 45:2
cdc  30:14
cell  10:3,6
cellphone
254:15
cells  129:2,2
cellular  174:23
229:25
center  119:6
194:18
centimeter
123:4 125:17
125:22 139:21
140:4 141:18
143:8,15,19
145:20 146:5
147:20 150:15
152:11,24
162:17 163:7,7
243:16,21
244:14 246:18
247:6 248:3
249:16,17
262:14 264:2
288:13 289:16
centimeters
132:4 135:10

136:16 142:18
247:15 251:2,2
262:11 264:11
central  152:14
centrally
125:23 126:4
certain  31:11
31:14,16,17
36:6,15 77:22
80:19 99:22
105:9 109:17
114:20 223:24
252:25 253:22
certainly  19:13
126:25 183:15
184:23 188:9
252:20,25
certainty  143:8
143:15,18
146:20 180:4
198:19,23
227:15,19
228:2 234:15
234:20 245:4
280:16 282:12
289:21 292:9
certificate
296:1 297:1
certification
28:3 29:22
32:4 33:18
certified  1:17
28:4 29:9,13
30:17 32:3

33:17,25
116:24 297:4
certify  30:15
297:6,13
cetera  26:21
191:18 265:21
chain  15:10
challenging
235:18
chance  104:10
104:12,13
change  10:4
101:19,20
102:12,21
109:1 117:21
151:3,4,10,16
164:20 168:15
183:5 195:23
231:6 241:20
291:21 298:5
changed
107:14
changes  102:16
118:13 195:18
243:9 296:5
changing
200:20 203:15
232:1,3
channel  48:15
58:18
chapters
118:17 119:19
characteristics
130:19 216:19

234:22 281:25
292:4,23
294:23
characterizati...
131:6 163:18
248:22
characterize
157:24 159:10
160:1,13
161:23
characterized
104:9
charlie  75:5
206:15
chase  13:1
check  64:14
chernyak  59:13
59:17,19 61:15
66:21 67:11
79:1 82:16,22
82:25 83:5
112:11 144:22
145:9 149:23
195:12 202:18
203:7 204:5
207:7 212:14
212:22 223:10
230:10 232:24
237:16 265:23
276:12 278:18
287:5
chernyak's
5:23 6:1,2 60:7
60:16 61:24

[chernyak's - column]                                                              Page 14

| | | | |
|---|---|---|---|
| 62:24 63:2 | **circles** 154:18 | **clarify** 16:17 | 251:13 282:18 |
| 67:2 71:10 | 190:22 191:17 | 55:23 115:3 | 290:25 291:5 |
| 77:19 79:12,13 | **circulation** | 150:20 220:19 | **clinically** |
| 80:2,12 81:15 | 177:18 | **clark** 24:3,5,10 | 137:20 138:6 |
| 86:15,21 | **cirrhosis** 95:2 | **class** 29:12 | 215:13 |
| 103:19 162:11 | 128:18,20,21 | **classification** | **clinician** 173:8 |
| 204:14 226:1 | 132:17 134:5,8 | 29:16,23 30:4 | 292:24 293:23 |
| 265:1 286:16 | 157:16 168:6 | 30:4 100:18 | **clinicians** 69:17 |
| 287:1 288:13 | 168:24 169:2,6 | **classified** 81:18 | 291:3 |
| 289:16 | 171:6,22 172:2 | **cleaner** 193:21 | **close** 144:15,16 |
| **chest** 29:16,22 | 172:4,12,20,21 | **cleanest** 258:3 | 162:16 |
| 30:1 31:14,17 | 172:23 173:5 | **clear** 26:17 | **closed** 12:10 |
| 58:19 | 179:8,23 | 83:1 91:13 | **closely** 133:21 |
| **chicken** 128:22 | 180:23 218:23 | 97:3 136:5 | **closer** 18:16 |
| **chief** 90:11 | 243:1,10 | 194:16 210:22 | 19:1 206:4 |
| **chiropractor** | 282:12 283:1 | 233:25 271:6 | 213:23 216:14 |
| 45:6 | 283:11 284:11 | 273:20 278:1 | 216:14,16 |
| **choice** 251:24 | 285:20 290:23 | 287:8,25 | **closes** 177:11 |
| **christopher** | 290:25 291:2 | **clearly** 101:17 | **closest** 83:17 |
| 1:12,15 7:3 8:1 | 292:20 293:2,4 | 182:12 | 213:23 219:17 |
| 8:16 134:25 | **cirrhotic** 92:7 | **clerk** 3:5 | **coal** 29:19 |
| 295:14 296:10 | 94:13,23 95:7 | **click** 190:13 | **coincides** 139:1 |
| 298:3,21 | 95:18 127:13 | 191:16 194:13 | **colleague** 19:17 |
| **circle** 194:2,8 | 128:11,14,19 | 194:14,15 | 21:6,10 24:12 |
| 194:10,10,12 | 129:10 132:9 | 195:1 201:4 | 27:8 |
| 195:25 200:12 | 132:15 165:2,9 | **clicking** 190:25 | **colleagues** |
| 203:13,21 | 179:20 180:22 | **clinic** 32:1 | 33:15,15,16,16 |
| 211:11 226:19 | 181:18 243:4,8 | **clinical** 27:17 | 221:6 |
| 266:22 274:1 | **cite** 116:19 | 68:2,22 84:21 | **colloquial** |
| 277:20 | **cited** 60:8 | 89:18 94:10,12 | 53:21 |
| **circled** 198:20 | **claim** 26:4 | 116:25 118:23 | **color** 93:23 |
| 198:24 227:16 | **clarified** | 120:2 164:5 | **colossal** 26:12 |
| 228:2 | 151:16 | 173:2,9,10 | **column** 42:23 |
| | | 174:2,12 | 49:4 |

[combination - conditions]                                    Page 15

| | | | |
|---|---|---|---|
| **combination** | **common** 169:2 | **compatible** | 141:11 185:22 |
| 49:22 100:5 | 179:13 217:11 | 293:3 | 189:22 190:4 |
| 126:8 171:6 | **commonly** | **compensatory** | 190:10,17,19 |
| **come** 32:24 | 171:21 172:19 | 169:10 | 190:23 191:11 |
| 83:18 89:20 | **communicate** | **complete** 43:5 | 191:15 193:24 |
| 90:17 115:11 | 53:6 189:20 | 77:9 112:16 | 194:9,15,21,25 |
| 130:25 142:13 | **communicated** | 114:10,15 | 197:15 198:5 |
| 143:2,2 145:25 | 291:7 | 207:2 | 198:10 201:4 |
| 161:18 191:17 | **communication** | **completed** 8:23 | 201:14 203:4 |
| 237:1 238:20 | 91:12 | **completely** | 203:11,19 |
| 239:6 | **communicati...** | 232:24 | 209:8 232:19 |
| **comes** 25:9 | 13:9 | **complex** | 267:22 270:8 |
| 27:18 38:3 | **companion** | 230:14 | 271:23 272:2 |
| 101:15 109:17 | 67:19 107:9 | **complexity** | 273:10 278:24 |
| 190:16 285:23 | **compare** 231:5 | 35:3 | 279:3 286:17 |
| **comfort** 246:12 | **compared** | **comprehensive** | 290:9 |
| **comfortable** | 67:21 127:5 | 277:16 | **conclude** 295:9 |
| 13:3 131:12 | 131:23 202:14 | **compressed** | **concluded** |
| 185:4 225:5 | 205:16 213:18 | 210:1 | 295:20 |
| **coming** 96:6 | 224:13 245:4 | **compression** | **concludes** |
| 120:22 209:8 | 259:17 | 50:3 | 295:13 |
| **comma** 257:8 | **comparing** | **computer** 9:23 | **conclusion** |
| **commencing** | 254:13,14,17 | 12:3,14,24 | 83:19 136:23 |
| 1:20 | 259:18 | 36:22 110:21 | 137:1 157:19 |
| **comment** | **comparison** | 110:24 113:18 | 159:8 |
| 179:22 211:25 | 122:21 162:8 | 263:17 | **conclusions** |
| 212:11 225:7 | 162:14 221:10 | **con** 207:25 | 69:22 219:19 |
| 236:3 | **comparisons** | **concept** 119:14 | 224:19 |
| **comments** | 221:5 | 175:16 251:16 | **condition** 100:7 |
| 212:8 225:5 | **compartment** | **concepts** | 173:10 174:2 |
| **commission** | 253:23 | 155:16 | 195:18 282:18 |
| 296:20 298:25 | **compartment...** | **concierge** | **conditions** |
| **committed** | 109:13 | 124:18 125:13 | 31:11 93:14 |
| 223:9 268:16 | | 140:18,23 | 263:13 |

**[conduct - contrast]**

**conduct**  119:7
**conducted**  9:4
  118:19,24
  121:5,8,11,14
**conference**  9:5
  64:3 221:7
**confidence**
  183:13
**confident**
  253:14
**confidently**
  143:7,14,18
  144:1 198:18
  198:22 199:11
  227:14
**confined**
  293:19
**confirm**  147:13
  180:4 240:14
  260:18
**confirmed**
  255:20
**confirming**
  256:7
**confounded**
  166:21
**confounder**
  99:5,9
**confounding**
  99:17 101:9
**confusing**
  193:18
**confusion**
  115:4 177:5

**connection**  9:8
  15:16 74:25
  135:5
**connotation**
  156:25
**consequently**
  179:9
**conservative**
  89:5
**consider**  77:17
  120:19 204:9
  208:6 217:23
  218:21 219:2
  224:7
**considered**
  218:22 219:25
**considering**
  166:13 180:23
**consistent**
  122:13 152:19
  228:15 242:25
  243:10 255:25
  264:20 279:13
  292:2
**conspicuous**
  80:24 86:8
  178:19,20
  179:2 183:20
  196:20 230:7
  233:7 256:17
  258:8 267:4
**constellation**
  171:13,21
  172:12,17

**consultant**
  18:13 24:23
  26:3 27:6 28:7
  33:11 34:15,20
**consultants**
  26:6
**consultation**
  77:1
**consulted**  15:4
  24:21
**consulting**
  17:10,18 19:15
  22:1 26:15
  27:18,21,24
  28:6,9,17 33:3
  34:6 35:12,17
  38:10 41:9,11
  42:14
**cont'd**  3:1
**contact**  21:6
  26:11 56:25
**contacted**
  19:16,21 20:8
  20:13 35:8
  57:6 59:2
**contain**  39:20
  287:13
**contained**  74:6
  269:17
**containing**
  104:14
**contending**
  228:11

**contention**
  46:12 49:8,10
**contents**  183:8
  227:4
**context**  82:22
  92:17 132:14
  184:16
**contiguous**
  274:25
**continuation**
  117:23
**continue**  86:16
  86:18 118:10
  127:8,11
  278:16
**continued**
  263:16
**continuing**
  114:9 119:21
**continuity**
  265:6
**contour**  154:22
  167:18 168:1
  172:14 242:20
  242:22
**contracting**
  155:15
**contrast**  83:2,9
  83:10,12,21
  84:2,13 85:12
  86:5 87:1,18
  87:19,22,24
  88:6,6 98:8,11
  98:16,25 99:9

**[contrast - counsel]**                                                    Page 17

99:18,21,23,25
99:25 100:1,3
100:11,23,25
101:3,8,16,24
102:9,12 112:9
112:14 166:6,9
166:9,15,19,20
166:22 170:7
171:2 175:1,23
176:2 183:14
184:4 185:6,12
188:14 189:5
189:11 195:11
201:9 206:8
207:20,25
210:7 212:23
213:8 225:12
246:2 251:10
252:23 255:16
255:17
**control** 189:18
189:23 190:20
191:4 193:22
194:17 195:1
201:3 204:25
211:9 226:18
227:5
**controls** 200:11
**convert** 192:3
**convince** 34:25
**cook** 20:14,17
20:18,20,23
21:1,5 84:17
87:4

**cook's** 20:21
**cool** 50:21
51:18
**coordinate**
188:19
**copy** 4:17
12:15,23,23,25
71:22 73:14
76:11
**cord** 49:4 50:3
**corley** 53:1,4
**corners** 78:23
**coronal** 113:1
**coronals** 185:1
**correct** 8:10
12:19 21:8
23:18 24:6,13
29:7 34:3
35:16 37:15
43:22 45:12
50:15 51:22
55:12,14 56:9
59:24 64:8
65:5,10,12
66:5 68:17
70:5,7,16
76:22 81:11
87:2 88:3
96:13 104:21
106:17 107:2
107:19 109:9
118:12 122:9
122:12 123:2
124:8 128:1

130:17 132:6
136:18,19,24
137:23,25
138:1,22 139:4
140:12 141:8
142:3,20 143:1
147:21 148:2,9
151:22 156:6
156:11 157:18
158:17 161:18
163:11 167:22
169:24 170:20
177:12,13,25
180:15 181:2
182:12 192:18
199:16 202:3
207:1 216:11
229:8 232:19
236:21 238:22
239:10 240:12
243:1 245:22
246:24 249:2
256:24 264:5
266:12 291:19
291:20 292:21
**corrected** 279:6
**corrections**
296:4
**correctly** 132:5
277:9
**correlate**
188:22
**correspond**
189:4 279:19

**corresponded**
105:20 256:2
**corresponding**
184:21 228:14
294:13
**corresponds**
201:18
**corrupted**
110:2
**cortical** 85:17
**could've**
224:13
**counsel** 7:17
14:6,19 25:5
26:10,14,14,18
46:22 47:9
60:2,4,13 63:9
63:18 64:10
66:14 70:18,22
71:25 72:20
76:13,24
117:20 140:25
185:23 188:10
191:6 197:16
198:11 203:11
203:20 207:12
209:9 267:23
269:3 270:9
271:23 275:16
275:23 279:4
281:9 286:18
295:8 297:14
297:16

[counselor - d]                                                    Page 18

| | | | |
|---|---|---|---|
| **counselor** 8:11 | **created** 51:1 | 153:8,18,24 | **ct001** 267:16 |
| 10:16 41:16 | 287:11 | 154:2 157:20 | **cts** 36:25 57:20 |
| 43:15 46:12 | **creating** 198:3 | 159:5,9 160:23 | 112:25 212:22 |
| 47:24 53:9 | 198:7 | 162:14 163:9 | 252:15 |
| 55:22 59:5 | **credit** 53:22,25 | 163:17,22,23 | **current** 14:22 |
| 63:8 65:7 | 54:1 214:22 | 165:4 166:1,4 | 33:15 35:5 |
| 74:12 78:12,14 | 225:2 | 172:23 174:17 | 53:15 117:15 |
| 93:19 99:13 | **criminal** 50:22 | 178:6 179:3,24 | **currently** 226:7 |
| 113:17 157:21 | 50:25 | 180:13 182:9 | **cursor** 189:18 |
| 186:12 199:1 | **criteria** 81:2 | 195:10 210:20 | 189:23 190:11 |
| 281:16 283:15 | 85:20 86:1 | 214:6 220:10 | **custody** 113:25 |
| 284:5 286:5 | 87:11 214:11 | 220:14,23 | **cut** 13:1 31:3 |
| **counted** 54:24 | 219:1 220:5 | 222:3 224:10 | **cv** 4:19 28:2 |
| **couple** 111:25 | **critical** 112:18 | 224:13 225:8 | 73:24 74:16,19 |
| 119:2 124:24 | **critique** 86:17 | 229:12,22 | 117:8,15 |
| 181:7 183:1 | 86:21 | 231:12 238:16 | 118:13,18,24 |
| 292:15 | **critiquing** 90:9 | 239:13,17 | **cycle** 26:21 |
| **course** 70:12 | 100:16 | 240:13,15 | 200:17 |
| 195:18 221:18 | **cross** 4:8 142:2 | 241:4,6,16 | **cyst** 126:15,16 |
| **court** 1:1,17 | 290:20 | 242:4,15 244:1 | 126:21,23 |
| 7:8,15,17,19,20 | **crosses** 142:6 | 244:17,19 | 129:10 130:15 |
| 7:22 10:19 | **ct** 4:24 5:13 | 245:5,19,23 | 130:18 138:14 |
| 11:3 167:7 | 57:23 80:15 | 246:1,10,12 | **cystic** 126:18 |
| 226:23 297:4 | 81:1,9 82:5,9 | 251:11,22,24 | 126:25 127:24 |
| **cover** 164:16 | 83:4,20 84:5 | 252:2 253:10 | 128:3 |
| 202:20,21 | 90:16 99:19 | 253:12,18 | **cysts** 38:4 |
| 223:13 237:15 | 101:4 110:12 | 254:1,5,25 | 40:13,20 |
| 237:16 | 112:3,7,9,14 | 255:7 256:3,8 | 136:22 |
| **covered** 281:24 | 129:16 130:4 | 256:18,23 | |
| **crashes** 23:13 | 131:6,22 | 258:8 262:16 | **d** |
| **create** 32:17 | 137:19,22 | 279:14,21 | **d** 4:2 5:9 |
| 36:10 37:22 | 138:4,18 | 280:3,6,16,19 | 211:15,17 |
| 194:10 | 144:25 145:7 | 291:9 292:1,5 | 226:12 |
| | 145:13,18 | 294:8 | |

[damage - demonstrate]                                        Page 19

**damage** 169:9
**damned** 253:17
**dancing** 225:2
**dark** 123:16
  125:17 126:3,6
  136:17 143:5
  145:14 203:24
  280:5
**darker** 127:4
  158:15
**darkness**
  205:15,16
**data** 74:6 91:3
  113:25 114:11
  173:9 186:25
  210:24 219:14
**database** 25:24
  26:2
**date** 17:15
  53:15 77:25
  78:1 82:3
  107:25 109:22
  109:23,25
  110:3 118:19
  163:17 242:2
  297:9 298:3
**dated** 76:13
**dates** 114:25
  115:1
**david** 20:22
**day** 66:15,15
  66:21 88:17
  110:15 118:11
  120:2,3 131:2

231:6 241:25
249:6 296:13
298:22
**daylight** 7:11
  295:16
**days** 67:15
  145:8,8
**dc** 2:14 3:7
**de** 164:15
  173:16 215:15
  219:11 223:22
  259:16
**dead** 44:18
**dealing** 86:11
  126:12,15
  131:20 188:25
  200:6,24
  210:10 214:5
  233:17 292:24
**death** 50:24
**decided** 32:16
**decision** 166:11
**deck** 232:4
**declaration**
  56:13
**declined** 41:2
**decreased**
  170:10 180:5
  279:20
**decreases**
  260:8
**deep** 49:9
**deeper** 228:7

**defect** 48:10
  51:2,3
**defendant**
  46:18
**defendants** 7:5
  8:13 25:18
  42:24 43:9
**defense** 24:21
  25:2,5 26:5,10
  26:14,18
**deficiency** 33:9
**defined** 195:12
  244:10,15
  247:13,23
  262:9 264:2
**definition**
  219:18 253:13
**definitions** 74:1
**definitive**
  131:12 245:8
  257:3 280:17
  280:23 281:13
  281:16
**definitively**
  144:24 157:24
  159:1 160:2,12
  162:2
**degradation**
  210:24
**degree** 80:19
  85:5 100:21
  143:8,15,18
  146:19 160:4
  172:1 173:22

174:10,14
176:17 180:4
198:19,23
223:18 227:15
227:18 228:1
234:20 245:3
252:22 254:6
280:15 289:21
292:8
**delay** 84:11
  88:4 96:12
  216:24
**delayed** 44:25
  48:5 50:10
  52:4,21 82:11
  97:19 184:14
  185:7 207:22
  207:22 212:13
  216:23 217:18
  219:18 220:11
  225:21
**delete** 194:22
**deliberately**
  113:21 114:12
**delivered** 98:17
  108:7
**demand** 33:5
**demographic**
  109:18 287:10
  287:14
**demonstrate**
  167:2,15
  195:14 280:17

**[demonstrated - diagnosed]**                              Page 20

**demonstrated**
  122:4 123:7
  170:7
**demonstrating**
  255:21 257:1,4
  257:9
**demonstration**
  195:22
**dense**  170:18
  205:20
**densities**
  136:14 138:3
**density**  84:5
  205:12 206:22
  206:23
**department**
  32:18
**depend**  46:11
  169:25
**dependent**
  111:19
**depending**
  43:16 110:25
  164:20 210:17
  229:16 231:7
  253:22,23,24
  254:13,18
  258:18 271:4
**depends**  81:19
  99:4,12,13
  155:10 254:3,7
**depo**  193:21
**deponent**  296:1

**deponent's**
  7:21
**deposed**  10:13
  25:4
**deposit**  39:22
**deposition**  1:12
  1:15 4:16 7:2,4
  9:3,17,23 10:6
  12:11 13:10
  26:9 53:16
  59:11,16,20
  60:1,16 62:4,8
  62:25 63:4,7
  63:20,22 66:17
  67:2,7 70:18
  71:11,25 72:3
  73:15 79:3,13
  79:17,24 80:9
  103:19,20
  104:19 295:14
  295:20 296:4
  298:3
**deposits**  39:24
**depth**  207:16
**derive**  253:9
**derosa**  1:17
  7:15 297:4,22
**describe**  31:5
  39:4 41:15
  118:21 152:12
  183:5 195:6
  223:4 248:13
  262:15 265:14
  265:22 276:5

  278:8
**described**
  82:15 136:18
  138:4 167:19
  182:17 195:11
  196:2 206:6,11
  212:18 259:15
  264:2 266:1,19
  269:17
**describes**
  265:24
**describing**
  69:22 136:12
  159:13 167:23
  171:14,23
  234:5 258:9,20
  260:13
**description**
  4:14 136:20
  229:3
**descriptive**
  82:8 85:20
**deserves**
  214:22 225:3
**despite**  236:21
**destroying**
  181:17,19
**detail**  250:8
  252:9
**detailed**  252:14
  254:10,13
**detailing**
  293:19

**detect**  36:9
**detectable**
  178:5,6,8
**detected**  36:11
**detection**  36:7
**determination**
  45:23 145:25
  214:13,17
**determine**  94:1
  95:9 131:15
  147:22 212:1
  213:13 223:25
**determining**
  100:7 215:18
**detour**  176:18
**develop**  36:6
  81:6 282:19
**developed**
  148:15,25
  150:7 153:1
  285:21
**developing**
  165:17
**development**
  283:1
**device**  41:17
  57:18 58:10,11
  58:13
**diagnose**  52:10
  53:6 54:2
  91:19 290:23
  292:20
**diagnosed**
  44:16

**diagnoses**
251:24
**diagnosis** 44:25
49:11 69:11
70:9,13 89:3
108:17 127:23
131:12,22
143:20 144:9
157:6 180:20
199:5 222:9
225:15 251:11
253:11 291:1,5
293:4
**diagnostic** 8:19
8:23 27:17
68:2,22 69:5,6
69:12,19 70:6
93:4,15 116:24
117:4 118:23
120:2 186:20
218:20 237:2
288:20 293:21
294:3
**diagnostician**
245:25
**diagrams** 74:23
**dialed** 26:24
**diameter**
136:16 243:22
247:15 250:1
**diameters**
251:2
**diaphragm**
87:14 183:7

**dich** 236:5
**dicom** 109:15
113:19,23
114:11
**died** 51:16
**difference**
166:8
**different** 26:19
28:9,17 77:6
110:25 111:16
112:1,2 114:22
115:12 130:7
136:13,25
155:16 159:2
189:25 190:3
191:16 193:16
195:12 197:8
200:20,23
210:2 228:5
231:14 245:14
252:24 257:12
**differential**
127:13,23
131:22 149:7
152:19 180:20
**differentiate**
178:14
**differently**
110:25 112:1
210:6,17
265:24
**difficult** 24:22
236:8

**difficulties**
114:1 115:2
257:19 262:25
275:14
**difficulty** 191:9
221:21 246:20
**diffuse** 170:7
170:16 172:15
174:8
**diffused** 173:24
**diffusely**
173:22
**digit** 67:22
**digitally** 297:8
**dignity** 85:8
**diomatic**
149:12
**direct** 4:7 8:6
117:16 186:3
**direction**
193:18
**directions**
230:2
**disadvantage**
129:22
**disagree** 103:1
233:8
**disappeared**
231:4
**disappears**
149:22
**disc** 155:3
**discern** 99:23
183:15,22

228:21 252:24
265:4
**discernable**
149:20
**disclose** 74:18
**disclosed** 16:10
**disclosure**
120:11
**discovered**
279:18
**discreet** 39:22
233:13 265:7
**discrepancy**
258:17
**discretion**
130:2
**discriminator**
216:21
**discuss** 90:7
121:17 145:3
165:25 175:1
208:11 223:12
223:16 241:23
242:15 243:16
243:21 247:13
255:12 276:17
**discussed** 47:21
60:5 61:9
62:15,18 71:22
82:22 112:3
164:12 228:25
246:20 269:21
269:22 276:21
276:21 292:5

[discusses - dr]                                                        Page 22

| | | | |
|---|---|---|---|
| **discusses** 82:17 | **distortion** | **documentation** | **dormant** |
| **discussing** 90:8 | 175:8 181:16 | 106:16 | 176:20,25 |
| 100:20 144:13 | **distributed** | **documented** | **dot** 191:19 |
| 151:19 159:6 | 24:25 | 247:2 | **double** 67:22 |
| 192:17 230:1 | **distribution** | **documents** | 194:25 201:4 |
| 273:19 274:6 | 155:12 | 12:13 60:4,14 | **download** 14:2 |
| **discussion** | **district** 1:1,2 | 61:13 62:7,17 | **dr** 5:23 6:1,2 |
| 71:13,15 | 7:8,8 | 62:23,24 63:3 | 7:3 8:8 14:16 |
| **discussions** | **diverticulitis** | 70:19 71:6,20 | 21:12,13,15,25 |
| 81:24 | 225:13 | 72:25 75:2,6 | 24:12 45:14 |
| **disease** 29:18 | **divided** 123:19 | 75:10 97:6 | 47:19 59:13,17 |
| 30:19 31:18 | **divulge** 39:2 | 198:2,3 226:1 | 59:19 60:7,16 |
| 89:2 92:8,21 | **doctor** 8:17 | 241:21 | 61:2,15,24 |
| 93:6 94:12 | 13:18 16:5 | **dog** 211:15 | 62:24 63:2 |
| 132:12 133:13 | 21:15 70:14 | **doing** 10:18 | 66:21 67:2,11 |
| 137:7,13 | 78:7 186:5 | 17:10,18 20:1 | 71:10 72:9 |
| 164:16 168:3 | 187:20 189:18 | 24:1 27:23 | 73:14 76:11 |
| 180:22 253:25 | 190:6 191:9,12 | 28:1,7 30:10 | 77:19 79:1,12 |
| **diseases** 31:10 | 194:6,17 196:8 | 30:20,22 31:23 | 79:13 80:2,12 |
| 164:9,19 | 198:2 209:15 | 35:10,21 57:17 | 81:15 82:16,22 |
| **displaying** | 226:22 241:10 | 58:9 73:5 | 82:25 83:5 |
| 141:12 | 245:11 257:20 | 89:17 97:5 | 86:15,21 |
| **displays** 119:18 | 259:14 287:18 | 119:16 120:18 | 103:19 112:11 |
| **dissection** 48:5 | 290:22,23 | 129:20 150:19 | 114:3 117:14 |
| 48:6,7,8,14 | 294:7 | 175:21 195:5,6 | 124:17 125:1 |
| **dissects** 48:12 | **doctor's** 151:4 | 224:4 231:8 | 134:25 138:17 |
| **dissimilar** | **document** | 249:25 250:6 | 139:15 140:13 |
| 214:4 | 62:13 72:9 | 253:21 266:9 | 141:4,15 |
| **dist** 142:18 | 73:6,15,17,22 | **dome** 144:15 | 143:17 144:22 |
| **distinct** 37:21 | 140:12 141:3 | 144:16 146:15 | 145:9 149:23 |
| 196:22,23 | 141:10 153:10 | 146:16 147:1 | 151:15 162:11 |
| 227:3 236:4,6 | 153:17 164:6 | **door** 223:3,5 | 191:23 192:1,6 |
| 244:13 | 190:12,20 | **doppler** 123:7 | 192:15 193:19 |
| | 241:11 | 125:25 | 193:23 195:12 |

[dr - enhanced]                                                                        Page 23

198:18,22
202:18 203:7
204:5,14
206:21 207:7
209:4 211:21
212:14,22
223:10 226:1
227:14 230:10
232:24 237:16
238:14 242:14
261:21 262:5
263:10 264:1
265:1,23
266:24 269:15
270:17 276:2
276:12 278:9
278:18 286:16
286:25 287:1,5
288:13 289:16
289:20 292:15
293:23 295:14
**drain** 181:12
**drains** 133:20
**draw** 189:7,24
190:14,22
192:23 194:10
194:12,19
195:19,24
200:12 211:11
219:19 226:19
227:2 233:6
274:1 277:20
**drawing**
192:24 196:5

**drawings** 74:23
**dribble** 100:2
**drilling** 154:15
**drive** 8:2
**driven** 120:15
**driving** 193:14
**drop** 273:3
**drug** 74:5,11
121:6,12
**due** 133:24
186:25 210:24
267:4
**duly** 8:3
**dural** 49:25
**dynamics**
195:23
**dysfunction**
133:13 169:13
**dysfunctional**
170:1
**dystrophic**
39:19

**e**

**e** 2:1,1 3:1,1 4:2
4:12 5:10 12:4
12:9 150:21
227:8,10,16
228:2
**earlier** 56:7
57:16 64:6
66:21 98:7
107:17 173:3
175:17,18

180:12 181:24
217:6 220:15
230:19 259:4,7
276:18 280:3
**earliest** 85:11
**early** 89:15
213:20 216:18
257:3 258:23
**easier** 37:24
139:25 189:16
190:7 240:8
273:20 274:15
**easiest** 194:5
**eastern** 1:20
7:11 295:16
**easy** 26:22
119:8
**echo** 227:8
**echogenicity**
122:5,7,20
123:16 145:11
**edge** 154:19,21
**edges** 142:7
**education**
119:19,21
**effectively** 28:8
28:16
**effort** 267:10
**efforts** 25:17
**egg** 128:22
**eight** 145:8
**either** 31:25
43:15 109:23
131:22 144:8

157:4 172:6,6
172:7 182:4
189:16 191:1
215:9,10
231:24 245:13
259:18 266:14
**electronic**
12:23 75:1
**element** 129:18
**ellis** 2:3,11
**eloquent** 31:13
**embark** 119:12
**embarked** 89:8
**employ** 29:24
**employee**
297:14,16
**employees**
31:11
**employer** 30:8
32:1
**ends** 295:12
**engage** 19:19
27:21
**engaged** 41:6
115:10
**enhance** 101:4
101:25,25
102:2 215:5
**enhanced**
84:22,25 175:2
183:19 189:5
215:17 225:12
251:10 287:15

enhancement
86:14,14
100:21 102:5
123:6 125:24
126:17 130:21
130:23 166:18
175:7 181:15
181:25 212:2
213:7,10,12,15
213:17,18,23
214:3,13,18,25
215:14,15,21
216:2,8,20
219:9,11,12,16
219:16 223:6
223:14,18,22
224:7 225:5,7
227:22 255:22
257:4 258:24
259:2,8,16,16
265:21 271:3
enhances
100:25
enhancing
85:16 102:6,6
102:7 183:21
205:20 215:8,9
215:10 269:22
enlarged   122:5
122:11 132:3,8
132:14,21
133:24 135:22
135:24 137:25
138:11 167:2

167:16 172:10
172:13 173:6
242:19
enlargement
168:19 169:3
169:10 172:2
172:14
enormous
210:11
ensure   88:5
entail   22:19
enter   7:18 26:2
entered   43:2
enters   205:5
enthusiastic
89:7
entire   65:6
150:22 174:15
199:4
entirely   159:12
199:20 227:22
246:8 276:15
entirety   61:24
62:3 71:12
77:3
entity   30:15
227:21
environment
26:11 29:25
epidemiologic
29:15 69:2,16
epidemiologist
106:1

epidural   48:24
49:1 50:11,13
epigastric
164:11,13,25
episode   108:13
equal   205:12
205:12,12,13
260:4
equally   100:22
146:18 149:17
159:4 162:11
equipment
109:24
errata   151:6,8
296:5 298:1
error   277:10
especially
157:1
esq   2:4,12,20
3:4
essentially
29:14 31:19
36:20 54:3
57:20 83:16
91:3 112:9,14
119:21,23
133:14 142:23
200:6 210:13
215:19 223:13
246:5,12
248:24 258:19
267:13 270:24
estimate   55:2
77:15 90:3

110:19
estimation
201:17
et   26:20 191:18
265:21 298:2,2
etched   110:3
etiologies   129:4
158:19 160:3
182:3 281:25
etiology   122:18
127:1,24 128:3
128:4,12,24
130:6 132:11
160:15 180:21
181:3,4 182:11
286:6
evaluate   97:9
105:9 224:6
evaluating
99:22 218:19
evaluation
29:22 137:20
138:5,19
evening   117:20
event   10:1
everybody
134:13
evidence   87:21
94:11 122:25
133:11 155:8
157:16 215:7
215:13 280:17
281:17

**[evident - expectation]**                                     Page 25

| | | | |
|---|---|---|---|
| **evident** 183:3 | 256:4 279:15 | **excluded** 137:7 | 240:19,21 |
| **exact** 17:15 | 279:21 280:16 | 227:23 248:23 | 242:9 248:10 |
| 18:14 19:4 | 290:20 292:17 | **excluding** | 249:13 260:21 |
| 54:23 149:25 | **examinations** | 182:3 | 260:23 268:1 |
| 279:25 280:2 | 30:18 37:1 | **exclusively** | 270:9,12 |
| 291:24 | 69:19 75:13 | 24:2 | 271:16,18,21 |
| **exactly** 26:22 | 90:9 91:15 | **exhausted** | 271:24 272:5 |
| 105:13 154:4 | 95:22 100:17 | 249:4 | 272:18,20 |
| 192:2 242:13 | 110:7 133:8 | **exhibit** 4:14 | 273:10 274:9 |
| 262:23 | 186:20,21 | 5:23 6:2 13:2,4 | 274:11 275:5,7 |
| **exam** 29:12 | 251:10,11 | 13:13,15,19,19 | 276:3 278:1,4 |
| 35:3 82:21 | 280:19 283:19 | 13:21,25 14:18 | 278:23 279:2,3 |
| 89:14 95:3 | 291:3 294:13 | 72:5,12,13 | 286:18,21,25 |
| 109:14 110:5,9 | **examine** | 76:1 105:1 | 288:6,8 289:3 |
| 110:20 164:5 | 160:23 | 117:10 121:19 | 289:10,12,15 |
| 166:1,13 199:5 | **examined** | 121:20 123:24 | **exhibits** 6:5 |
| 224:25 233:22 | 126:10 | 125:13 134:18 | 14:1 197:25 |
| 234:11 245:14 | **example** | 134:21 140:5,7 | 278:25 |
| 245:14 249:8,8 | 112:22 223:3 | 140:17,19,22 | **exist** 250:15 |
| **examination** | 232:2 277:12 | 141:1,25 | 251:6 |
| 4:5,6 8:6 30:16 | **examples** 94:22 | 152:11 153:11 | **existing** 212:19 |
| 48:22,23 93:7 | **exams** 90:11 | 153:13 165:24 | **exists** 149:4 |
| 94:16 105:24 | 115:8 224:11 | 185:21,22,25 | 234:21 |
| 108:20 109:19 | **exceeds** 62:13 | 186:6,6,9 | **exophytic** |
| 109:25 110:22 | **excel** 42:25 | 197:18,21 | 155:13 |
| 111:6 112:18 | **except** 106:19 | 198:14 203:1 | **expand** 33:8 |
| 122:17 132:3 | 159:23 296:4 | 203:18,18,20 | 212:8 |
| 180:8 195:10 | **exception** | 203:20 206:17 | **expect** 158:12 |
| 195:19 211:1 | 11:23 | 209:5,9,11 | 174:11 181:12 |
| 213:3 215:12 | **exciting** 67:20 | 211:15,17 | 223:10 230:21 |
| 218:22 220:9 | 71:1 | 227:10,16 | 231:1 |
| 239:1,18 | **exclude** 159:13 | 232:17,20 | **expectation** |
| 243:11 254:23 | 182:10 199:19 | 234:1 236:11 | 69:3 |
| 255:14,20 | 234:23 | 236:13,18 | |

**[expected - february]**                                                Page 26

| | | | |
|---|---|---|---|
| **expected**  84:6 | **explain**  79:4 | **fact**  85:2 | 185:3 216:13 |
| **expense**  34:12 | 83:5 93:24 | 129:21 149:13 | 216:14 251:10 |
| 34:14 | 99:16 144:7 | 175:21 188:25 | **fasciitis**  44:16 |
| **experience** | 170:24 271:1 | 215:8 231:3 | 44:17 |
| 61:22 84:21 | **explained** | **facto**  164:15 | **fashion**  136:25 |
| 116:23 117:4 | 57:16 98:15 | 173:16 | **fat**  122:22 |
| 162:11,12 | **explaining** | **factors**  92:13 | 127:1,3,5 |
| 172:5,19,25 | 33:21 157:4 | 93:13 98:22 | 128:2,3 129:10 |
| 251:14 286:13 | **explains**  210:14 | 291:4 | 149:10 171:8 |
| **experiencing** | **explicit**  182:4 | **failure**  52:10 | 233:20 |
| 179:17 | **explore**  28:23 | 53:5 54:2 | **fatty**  122:13,23 |
| **experientially** | 146:13 | **faint**  213:17,19 | 123:1 126:13 |
| 173:23 245:13 | **exposed**  29:20 | **fair**  9:11 10:25 | 127:2 136:1,9 |
| **expert**  15:2,7 | 30:23 32:21 | 11:6,16 12:1 | 137:6,15 138:6 |
| 15:16,24 16:1 | **exposure**  29:25 | 12:22 18:18 | **favor**  126:25 |
| 16:6,23 17:1,8 | **extending** | 19:1,3 55:11 | 127:24 |
| 17:10,21 18:5 | 264:16 | 70:7 90:3 | **favoring** |
| 18:22 24:17 | **extension**  52:14 | 104:15 109:8 | 130:17 181:9 |
| 25:24 28:8 | **extent**  16:7 | 161:15 179:3 | 182:3,13 |
| 54:11,13,16 | 55:6 196:14 | 199:22 220:6 | 281:25 |
| 55:3,19 78:19 | **extrapolate** | 223:15 237:12 | **feature**  111:22 |
| 79:20 80:21 | 211:3 | 237:24 252:14 | 223:21 274:19 |
| 113:18 129:21 | **extrapolating** | 255:3 283:2,23 | **features**  95:7 |
| 151:11 193:21 | 201:11 | **fairly**  89:11,15 | 95:18 97:9 |
| 287:21 292:8 | **eye**  210:15 | **fall**  32:9 | 101:25 102:13 |
| **expertise**  283:6 | | **familiar**  40:13 | 102:22 103:4 |
| 283:17 288:19 | **f** | 93:6 191:22 | 159:22 224:8 |
| **experts**  26:18 | | 223:10 251:16 | 234:25 255:25 |
| 61:20 79:20,24 | **f**  5:11 233:24 | 264:25 267:2 | 257:1 258:20 |
| 81:25 104:2 | 234:1 | 287:1 | 258:22 259:1 |
| **expiration** | **face**  81:16 | **fancy**  175:23 | **february**  32:6 |
| 200:25 | **faced**  249:7 | **far**  10:18 30:20 | 59:3,6,8 64:12 |
| **expires**  296:20 | **facets**  35:21 | 39:7 40:6 | 65:1,9 66:2 |
| 298:25 | **facility**  111:16 | 90:23 93:9 | |
| | 111:16 221:4 | | |

**feed** 133:23
177:2
**feel** 104:20
141:4 187:21
241:11 267:1
**fellowship** 37:7
252:19
**felt** 131:12
**femoral** 53:17
53:18
**femur** 53:19
**fetus** 177:7
**fibrosis** 168:10
168:15 169:20
171:8 172:8
**field** 32:22
42:15
**fifth** 231:21
**figure** 56:6
90:13 163:3
185:5 204:11
235:18 244:20
247:6
**file** 16:15 67:12
67:15 187:12
**fill** 33:8 34:1
**filling** 178:10
**filter** 57:24
58:12,15
**filters** 57:22
**final** 59:15
75:21 105:10
107:12 117:2
212:24

**financially** 297:17
**find** 25:6 34:25
35:7 36:13,14
36:15 130:4
141:20 144:14
174:9 195:17
197:1 219:7
221:8 233:3
234:11,12
236:6 251:19
268:18,22
277:5,12
278:11
**finding** 69:21
168:23 173:16
232:15 244:10
275:3
**findings** 31:14
31:16 46:15,15
80:24 105:15
127:24 131:23
154:7 155:3
157:15 162:7
162:13 171:14
171:21 172:17
173:1 176:1
180:20,24
181:8 183:10
199:20 213:3,5
215:14 219:8
245:4,19
246:25 261:11
261:16 262:5

270:1 274:5
279:12 291:24
292:1,4 293:3
294:3,22,22
**fine** 27:20
43:25 103:7
152:2,8,8
164:21 191:24
233:9 269:24
**finer** 47:2
**finish** 10:22,23
**firm** 20:11,23
20:24 23:24
24:1,3,10,18
25:13 57:1
58:3,4
**first** 8:3 15:5,7
15:12,15 16:25
17:7,15,21,24
18:6,22 19:20
20:21 25:22
26:16 27:17
28:15 32:8,10
43:4 57:3 64:9
64:11,24 65:8
83:2 86:9,25
89:13 110:22
115:7 117:19
120:12 121:25
121:25 141:17
143:2,5 166:1
166:13 184:3
185:6,11
188:10 192:8

192:11,25
201:8 202:22
207:14,14,19
224:10,10,12
224:15,17
230:13 243:15
262:8 276:16
**five** 18:15,16
18:25 19:1
65:21,21 66:1
106:19,25
111:10 113:14
116:15 206:1
221:11 222:8
**fix** 151:7
**flag** 69:11,11
**flash** 44:13,14
71:11
**flavor** 210:17
**flip** 73:1
**floor** 2:5 3:6
**flow** 48:16
123:7 125:25
133:15,25
177:23
**flows** 48:15
**fluid** 126:19
173:4
**focal** 127:2
128:2,3 129:10
137:6,15 156:8
156:13,19
157:11 161:4
175:7 196:12

197:6 198:20
**foci** 5:1 145:11
145:21 170:9
175:5,13 180:6
182:17,22
186:2 187:14
188:4 192:17
201:25 202:6
209:18 234:6
236:2 279:20
**focus** 27:16
118:22 145:7
175:12 188:3
202:1,17
265:23 266:1
**focused** 69:19
119:1 181:13
**folder** 278:25
**follow** 20:5
28:12 81:3
86:19 115:11
163:16,21,25
187:4 202:23
239:2,17
241:22 242:5
246:13 291:8
294:8
**followed** 61:9
62:14,14,17
**following** 61:13
82:18 110:18
126:24 144:25
153:23 164:11
196:21 240:7

**follows** 8:4
69:13 166:24
189:5 227:3
**followup**
219:10 224:15
246:14
**force** 199:15
**foregoing**
296:3 297:6
**forensically**
246:5
**forget** 28:16
87:19
**form** 17:2 18:9
19:2,11 22:2
22:22 23:17
25:21 30:11
31:12 32:14
33:19 34:2,9
35:19 36:3
40:11 41:13
42:5,17 43:13
45:16 46:10
49:20 51:6
54:18 55:5,13
55:21 57:14
62:20 66:4
67:13 68:8,16
68:24 71:7
75:1,18 77:4
78:5 80:5 87:7
90:1 91:21
92:9 93:2,17
94:24 95:11,20

96:2,17 97:20
98:3,13 99:3
99:11 101:2,10
101:18 102:14
102:24 104:11
107:18 108:11
112:24 115:17
117:5 125:8
128:5,25
129:12 130:16
131:18 132:24
134:6 135:11
137:2,14
138:20 139:3
142:11 143:10
143:21 144:4
145:23 146:8
147:8 148:1,17
149:2 150:9
152:17 153:2
154:25 155:9
156:17 161:6
161:16 162:1
163:10 165:3
165:11,19
167:21 168:4
168:12,21
169:4,11,23
170:19 171:15
175:19 177:3
177:16,24
178:7 179:4,12
179:21 180:14
181:6 182:24

185:14 193:3
193:11 196:13
198:25 199:13
202:2,10
203:10 206:24
207:10 208:14
210:3 211:23
214:19 215:23
217:9,20 218:6
218:15 220:7
220:16 221:1
221:20 222:11
222:20 225:22
227:17 228:4
229:13,23
230:23 234:18
235:5,23 237:4
237:25 238:23
239:8 240:3
241:9 243:6
244:22 245:21
246:23 247:8
247:17 248:5
249:1,20 250:4
250:20 251:4
252:16 254:11
256:10 257:10
259:9,23
260:12 262:17
264:14 265:18
266:11 278:20
280:8 281:22
282:15 283:3
283:13,24

**[form - give]**                                                                Page 29

284:13,23
285:4,13,22
286:4,11 287:7
288:17 289:6
289:24 293:6
294:10 295:2
**format** 109:16
113:19,20
187:1
**formation**
168:10,14
**former** 33:14
33:16
**forming** 39:22
**forms** 133:21
**formulated**
237:17
**forth** 194:3
207:21 297:9
**forward** 110:9
144:20
**found** 196:2
**foundation**
82:1 138:21
172:16 215:16
215:24 295:3
**foundational**
101:23
**four** 65:21 66:1
67:6 69:9
77:18 78:23
159:18 163:17
163:22 206:2
239:6

**fourth** 231:20
**fracture** 37:10
37:11 53:17,18
53:18
**fractures** 37:9
37:19,25,25
38:17,20,20,20
40:19
**frame** 17:23
18:6,21 19:12
**franchise** 27:1
**frank** 233:24
270:5,6
**frankly** 86:14
**free** 25:24
44:11 104:20
141:4 173:4
187:22 241:11
267:1
**freezing** 263:7
**fresh** 54:1
**front** 12:13
**froze** 114:2
258:1
**frozen** 115:19
124:18 257:21
284:2
**full** 14:3 27:18
120:11 126:19
166:1 199:15
213:10 216:20
**fully** 84:22,25
**fun** 22:4

**function** 24:25
25:9 169:12
183:18
**functional**
133:9 170:14
**functionality**
169:20
**further** 7:20
84:12 112:7
129:3,22 131:5
137:19,21
138:5,19
146:13 163:18
170:24 245:7
248:22 292:12
295:9 297:13
**furthermore**
279:17
**future** 14:2
149:1

**g**

**g** 5:12 236:11
236:13,18
**gain** 252:4
**gained** 253:20
**gallbladder**
156:7
**gargar** 138:17
**gaston** 55:18
55:18 56:12,17
57:6 298:2
**gastroenterol...**
89:7

**general** 91:1
119:10 120:24
178:13 196:16
**generally**
121:15 177:11
**generate**
131:21
**generated**
74:24
**generating**
116:10
**generic** 162:23
**gentleman**
20:19 21:11
174:15
**geographic**
244:6,9,15
**germane**
108:22
**getting** 24:9
27:1 189:2
269:25
**gi** 89:11
**give** 10:11 42:6
43:15 54:20
55:2 85:8 91:1
92:19 100:15
102:8 119:14
152:7 157:5
159:15,16
166:14,15,15
171:1 189:17
189:22,25
190:20 194:3

[give - going]                                                    Page 30

| | | | |
|---|---|---|---|
| 194:17 198:5 | 74:1,2 75:22 | 270:18 271:1,4 | 100:8 108:22 |
| 199:16 204:19 | 78:6 83:22 | 271:25 273:6 | 110:14,21 |
| 213:3,5 215:7 | 88:14 110:6,24 | 273:18 274:14 | 117:14,17 |
| 226:18 232:11 | 115:20 118:16 | 274:16,23 | 134:12 139:17 |
| 232:25 234:9 | 119:16 121:17 | 275:15 277:19 | 140:5,14 |
| 259:25 274:5 | 124:19,24 | 278:10 279:1,9 | 144:20 145:3 |
| 274:17 292:7 | 125:11 127:10 | 280:25 | 145:18 146:9 |
| **given** 114:11 | 129:23 130:22 | **goes** 15:1 48:11 | 146:10,21 |
| 119:16 144:17 | 131:1,19 141:5 | 58:15,18 110:2 | 149:6 150:17 |
| 160:16,17 | 141:16 143:3 | 110:9 114:21 | 151:25 153:16 |
| 204:2 216:3 | 150:17 151:1,4 | 132:17,18 | 155:24 164:7 |
| 219:14 246:1 | 153:11,16,19 | 164:12 171:5 | 164:22 167:4 |
| 247:21 251:24 | 157:14 167:11 | 172:4 187:24 | 170:3 171:2 |
| 252:6 | 170:1 173:1 | 192:9 207:21 | 173:8 174:16 |
| **gives** 166:17 | 184:17 185:18 | 207:23 258:16 | 183:1,5,7 |
| 232:24 | 186:6 187:1 | 259:17,17 | 184:17 185:18 |
| **giving** 131:12 | 188:15 189:8 | 261:13 | 186:24 187:1 |
| 159:22 160:4 | 189:14,15 | **going** 10:17 | 187:17 189:6,7 |
| 190:2 191:4 | 191:5 193:12 | 11:15 12:20 | 189:23 190:12 |
| 199:2 214:21 | 195:2 197:8 | 13:2,24 14:1 | 191:8,20,22 |
| 225:2 | 200:1,20 201:6 | 16:4 22:16 | 192:2,23,24 |
| **glad** 228:8 | 201:14 202:12 | 23:25 32:17 | 193:18,20 |
| **go** 9:9 10:17 | 205:22 209:18 | 33:1,6,7,25 | 194:9,11 |
| 11:21,25 13:22 | 209:20 221:5 | 38:6 49:16 | 195:15,24 |
| 14:4,4 15:10 | 226:17,24 | 57:24 60:13 | 197:23,24 |
| 17:25 23:3 | 228:7,23 229:2 | 69:4 70:23 | 198:1 200:8 |
| 24:6 29:11 | 229:24,25 | 73:19 78:21,24 | 202:23 203:17 |
| 34:24 35:4 | 230:2,24 232:7 | 78:25 81:3,23 | 204:10,24,25 |
| 38:6 39:7 | 232:14 236:9 | 82:20,23 83:5 | 206:8 210:7,8 |
| 43:23,24 49:9 | 241:3,20,21 | 86:20,20 89:4 | 210:12,16,23 |
| 54:8,10 59:16 | 242:8,9 248:10 | 89:6 90:3 | 211:9,11 |
| 60:13 61:6 | 249:12 250:7 | 91:22 92:19 | 217:24 224:16 |
| 64:22 72:22 | 261:22 263:2,8 | 93:9,18,19,20 | 226:5 227:2,4 |
| 73:5,17,19,20 | 268:13 269:23 | 93:20 96:7 | 227:5 229:9,16 |

**[going - hear]**                                                    Page 31

| | | h | hazards 29:21 |
|---|---|---|---|

231:10 232:11
233:6 236:5
237:14,15
238:3 240:12
245:11 259:4
260:16 266:20
268:5,12
273:17 274:6
274:14 277:15
278:1 295:17
**goldberg** 58:24
**goldenberg**
2:19 3:3
**gonna** 228:6,6
228:11 235:24
237:15,15
**gonzalez** 52:5,8
52:9
**good** 7:1 8:8,10
8:12 11:12,22
19:13 127:8
134:13 141:21
169:15 200:4
215:16 226:24
226:24 252:17
263:8 277:12
**google** 58:7
**gotcha** 190:18
**gotta** 273:6
**grab** 205:22
**grade** 109:16
172:4 179:23
186:22 187:8
187:21 196:15

210:23
**graduate** 8:25
**graphic** 136:20
**gray** 60:23 62:9
68:7 81:16
205:15
**great** 10:18
27:19 73:8
83:14 86:23
88:22 242:24
275:24
**group** 26:9
90:12
**growth** 129:2
**guess** 31:10
37:22 54:11
64:14 79:3,16
81:18,20 82:1
82:2 103:3
133:16 147:9
159:21 271:22
274:16 277:19
**guessing** 18:16
158:10
**guidance**
119:12
**guidelines**
226:5,7
**gulf** 236:11
**guy** 159:19
192:23 245:25
252:18
**guys** 14:5 158:3

**h**

**h** 4:12 5:19
21:14,14
272:18,20
**hairs** 142:2
216:13
**half** 42:10,10
42:15,16
**hamstringing**
199:3
**hand** 73:4
192:25 193:2,2
**handle** 61:20
**handles** 70:14
**handwritten**
75:1
**happen** 69:9
105:17 142:3
178:1 286:2
**happened**
206:7
**happens** 34:22
69:25 133:17
142:13
**happy** 12:25
117:21 189:16
258:15
**harassment**
285:13
**harding** 58:5
**harris** 50:6,8
**hartsfield**
49:19,21

**hazards** 29:21
**hcc** 55:20 56:14
81:6 89:8
91:19 92:6,13
93:1 94:14
104:10,14
143:20 144:3
144:16 145:6
145:22 146:6
147:6,23
148:15,25
149:16 150:7
152:25 164:15
165:10,17
225:10,15
228:3,10,15
282:13 283:2
283:12 284:11
284:21 285:21
287:5 288:15
289:4,22
**head** 11:5,5
190:15 262:20
**header** 241:13
**heading** 272:5
**headphones**
9:19,23
**health** 30:24
32:23
**healthcare** 89:2
89:13 118:1
**healthy** 178:4
**hear** 9:17 65:6
124:17 125:1

221:22 263:10
**heard**  258:10
263:12
**heart**  39:6 40:2
40:4,5,7 58:16
83:13,22,24
84:13 87:18,20
87:22 98:18
176:20 213:8
**help**  34:1 41:4
268:18
**helpful**  35:23
49:11 240:1
248:21
**hepatic**  4:20
84:21,24 86:5
123:5,17 124:2
124:5,14 138:6
156:20 175:6
175:14 178:15
213:11,16,17
216:21 243:1
243:17 244:21
245:6 247:16
248:21 253:11
256:2,9 262:9
262:22 264:7,9
272:13 280:6
280:10
**hepatitis**  94:11
**hepatocellular**
55:20 56:14
89:9 108:18,21
120:21 251:12

256:1 257:2
264:21 279:13
279:18 280:18
281:17 284:17
286:7 288:4,23
**hepatology**
89:11
**hepatomegaly**
135:9,23 138:7
**hereinbefore**
297:9
**hereto**  6:5
**hernia**  51:14,15
51:18,23
**herniation**  51:4
51:5
**heterogeneity**
170:25 181:21
196:18 205:24
235:25 243:23
244:11
**heterogeneous**
170:8,16 171:4
171:5 172:15
173:12 174:1
174:19 242:25
262:11
**hey**  27:9 36:24
70:25 129:23
130:23 221:10
287:19,19,19
**hide**  166:20
**high**  39:11
92:12 149:9

177:23
**higher**  92:6
149:9 165:10
201:20
**highly**  245:5,6
**hilum**  205:3
233:16
**hinrichs**  21:12
21:13,15,25
24:12
**hired**  30:7,8,8
30:12 104:2
**historical**  90:4
**history**  4:15
14:20 42:22
94:7,10,14
164:5,11
173:10
**hit**  72:17 75:19
110:24
**hold**  93:20
194:13,16
**home**  9:20
51:23
**homogeneous**
170:23
**honest**  46:12
54:23 147:11
224:9
**honestly**  61:4
163:4
**hope**  166:12
**horse**  144:22

**hosking**  49:12
54:5,12 55:10
**hospitals**  88:24
119:12
**hot**  36:5
**hotel**  272:18
**hounsfield**  84:4
84:6,9
**hour**  11:19
64:1,23 65:25
76:21
**hourly**  76:20
**hours**  26:13
66:1 67:6
76:18 77:2,18
77:21,24
196:18 234:10
**house**  9:21
**howard**  3:14
7:12 290:9
**huahai**  298:2
**huh**  11:4 136:3
167:3,8
**human**  100:7
111:20 129:18
146:14
**hundreds**
199:6,10
**hyper**  86:14
123:10 158:4,8
259:25
**hyperdense**
157:23 207:2

**hyperechoic**
123:4 126:23
150:21
**hyperenhanced**
207:2
**hyperenhanc...**
215:22 216:3
223:7,15,17,20
260:14 262:12
**hyperenhanci...**
259:20,22
**hyperintense**
259:20,21
**hypertension**
132:20,23
133:3,4,11
134:4 173:6
176:17 178:1
179:2,9,18
**hypo** 123:11
198:19 218:13
260:16
**hypoattenuati...**
218:5
**hypodense**
158:4,6,13,15
159:23 160:8
160:11,22
202:14 204:24
205:14,19,23
206:22 233:12
**hypodensities**
160:9 161:24
188:23

**hypodensity**
5:11,12 156:9
156:19 157:1,4
161:4 183:17
189:3 195:20
196:12 197:6
198:20 199:25
200:7,13
201:12,16
202:17 204:22
205:6,7 211:10
227:3 233:2,4
233:5 234:13
234:15 236:18
288:1
**hypoechoic**
123:4,12,14,15
125:22 126:23
139:20,21
140:4 141:18
142:1,7 143:9
143:16,19
144:2 145:21
145:21 146:5
150:15,22
151:17,19
152:12,16,24
180:6 247:14
248:3,14
**hypoenhance...**
270:23
**hypothetical**
78:21

**hypotrophy**
170:2

**i**

**idea** 91:1
100:15 160:10
252:8
**identification**
13:16 72:6
76:2 105:2
117:11 123:25
134:22 140:8
153:14 186:10
197:19 203:2
206:18 209:12
211:18 227:11
234:2 236:14
240:22 260:24
268:2 270:13
271:19 272:21
274:12 275:8
278:5 286:22
288:9 289:13
**identified**
74:19 75:15
107:25 111:11
113:14 114:20
115:14 116:16
117:3 156:19
161:7 236:18
237:10 239:25
246:22 248:3
271:8 275:12
279:13 287:4

289:3
**identify** 37:5,9
37:17 40:23
41:4 161:3
207:8 266:22
268:19 269:16
275:12
**identifying**
38:15
**ideologies** 23:5
**igloo** 272:4
**ignore** 148:19
**ignores** 150:2
**ignoring**
145:15 149:13
149:19 206:8
**ii** 207:13
**iii** 207:13,14,15
**iken** 3:5
**illustrations**
74:23
**ilo** 29:23 30:3,6
**image** 4:20 5:5
5:6,9,10,17,19
5:21,22,25
36:20 37:11,16
37:17 49:6
70:10 85:25
100:11 101:16
101:20,21,21
110:1,22 124:2
139:24 140:24
141:1,17 142:4
142:9,23 144:6

**[image - impression]**                                                      Page 34

| | | | |
|---|---|---|---|
| 145:4 147:1,12 | 276:3 277:3,23 | 247:22 249:18 | 199:20 210:23 |
| 152:3,10,11 | 278:4 287:9,11 | 249:19 250:2 | 219:3 224:10 |
| 159:15 184:2 | 287:14 288:12 | 251:5 262:19 | 229:9 234:22 |
| 186:17,18 | 288:22 | 266:21,25 | 234:25 237:2 |
| 187:13,18 | **imaged**  217:25 | 273:17 274:4 | 239:1,2 240:1 |
| 188:10,13,16 | **imager**  252:19 | 275:1 278:15 | 242:11 243:9 |
| 188:16,19,25 | **images**  4:23 | 287:12 | 243:11 244:8 |
| 189:3,5 192:4 | 36:18 46:9 | **imagine**  32:20 | 245:7,20 249:4 |
| 192:16,18 | 82:9 100:25 | **imaging**  37:21 | 250:22 251:1 |
| 195:9,13 | 109:21 110:4,8 | 45:19 59:14,20 | 251:11 252:5 |
| 196:15 197:7,8 | 110:11,13,16 | 59:22 61:19 | 252:15 253:5 |
| 199:4,5 200:8 | 111:7,10,22 | 62:25 69:19 | 254:17 255:25 |
| 200:12,18,18 | 113:21 114:21 | 70:8 75:12,20 | 257:1 279:12 |
| 200:20,21 | 114:24 123:5 | 83:8 89:14 | 280:17,23 |
| 201:8,19 203:2 | 125:23 127:19 | 91:2,5 93:7 | 281:13,16,24 |
| 204:6,8,14,15 | 129:19,25 | 94:15 105:9,20 | 282:6 283:19 |
| 204:17,18,19 | 131:9,10 | 106:15,18,24 | 291:3,8,12 |
| 204:25 205:17 | 134:11 137:22 | 107:3,7,11,13 | 292:3 293:3 |
| 206:18 207:19 | 139:2,18,19 | 107:17,24 | 294:12,23 |
| 209:17,20 | 140:2,11 141:2 | 108:6 109:11 | **imperfectly** |
| 210:24 211:7 | 141:16 142:13 | 109:16 110:6 | 216:11 |
| 211:17,24 | 144:10,13 | 111:11,13 | **important** |
| 212:13,13,16 | 167:1,15 176:2 | 113:6,13,19 | 10:19 100:22 |
| 226:15,17 | 176:4 186:23 | 114:11,25 | 164:3 228:8 |
| 227:1,10 | 187:7,9,21 | 116:25 117:2 | **importantly** |
| 230:11 231:15 | 188:12 199:6 | 129:16 130:18 | 254:7 |
| 232:7,13,14,16 | 199:11,15 | 131:6 137:21 | **impossible** |
| 233:3 235:10 | 203:16 204:2 | 148:19 149:14 | 26:22 161:23 |
| 235:12,14,16 | 207:8,16 | 149:19 157:8 | 180:3 255:8 |
| 235:22 250:11 | 209:17 219:8 | 163:2 170:7 | 288:24 |
| 270:16,19,20 | 220:10,15,23 | 171:13,21 | **impression** |
| 270:22 272:8,9 | 223:23 225:20 | 173:9 175:2 | 135:1 138:3,10 |
| 273:22,22 | 226:2 228:12 | 181:8 183:14 | 138:13 153:20 |
| 274:1 275:7 | 228:13 247:15 | 187:16 195:23 | 157:15,22 |

159:10 225:23
241:5 248:20
252:9
**impressions**
253:15
**improper**  78:6
78:13
**improved**
201:20 249:9
**inadequate**
80:16 81:9
83:15 100:12
112:5 200:4
**incarcerate**
51:13
**incarcerated**
51:14,15,23
**incidents**
113:14
**include**  76:23
76:25 118:18
180:21 220:11
**included**  37:19
78:18 215:25
231:15
**includes**  56:8
77:8
**including**  65:18
66:11 75:8
131:15 170:9
**inclusive**  56:1
**incorrectly**
45:9

**increase**  85:6
101:4
**increased**
122:5,7 165:12
165:16 170:10
262:12
**increases**
122:20
**incredibly**
193:17
**incumbent**
34:23
**independent**
140:2 206:12
246:25 291:24
**independently**
82:13 246:22
**indeterminate**
157:23 159:25
257:2
**india**  274:9
**indicate**  109:11
**indicated**  95:1
131:7
**indicating**
195:21 201:7
201:17 205:19
211:10 227:6
233:15 274:7
**indication**  95:2
134:4 254:3
**indications**
133:6

**indicative**
128:20 168:2
**indicator**  182:1
**indicators**  86:3
**indirect**  57:17
132:17,18,19
132:22 133:11
**indirectly**
28:23 41:16
**individual**
50:25 57:25
89:10,21
109:21 130:2
149:16 156:18
164:24 171:4
174:4 175:22
193:13 230:5
**individual's**
193:5 195:18
**individuals**
22:11 30:23
57:21 89:1
171:1,5 230:9
**industrial**
29:20
**indwelling**
57:21
**inexpensive**
34:11
**infection**  44:20
49:3,6 50:14
50:16 52:22
94:13

**inferior**  57:21
58:12 155:25
212:1 214:1
257:1
**infiltrate**  138:6
**infiltrated**
127:4,5 136:1
136:10
**infiltration**
122:14,24
126:14
**inflammatory**
128:16
**informally**
221:8
**information**
26:2 79:5,8
87:10 88:1
91:11,17 94:1
109:18,19,24
111:1 115:14
131:14 144:19
146:25 150:2
159:5,7 181:14
210:18 213:4
227:19 245:17
246:6 252:5
253:9,20
254:24 276:11
287:10,14
292:10
**informative**
251:20

**infra** 155:21,24
**infrequently**
32:25
**inhalational**
29:21 30:23
31:18 32:21
**inhomogeneo...**
170:22
**initial** 89:12
195:11 246:25
279:14
**initiated** 110:5
**injecting** 100:8
**injection** 100:6
213:9
**injuries** 22:11
23:6,16
**injury** 19:16
20:2,9 22:10
24:2 29:3
41:11 42:2,4
42:16 49:13,17
54:6,13,14,17
55:4,24 56:7
128:18 164:15
**inputting** 192:4
**inside** 100:17
177:7
**inspiration**
200:24
**installation**
166:22 184:4
**instance** 24:16
35:9 50:17

111:21 126:10
215:11 231:12
**instances** 99:23
104:18 253:1
**instilled** 101:3
201:9
**institute** 25:25
**institution**
138:23
**insufficiencies**
112:8
**insufficient**
100:12
**insurance**
26:20
**intelligence**
27:24 28:25
29:5 38:15
**intend** 78:17
**intense** 260:3
**intensity**
260:16
**interest** 269:25
**interested**
33:17 35:10,15
297:17
**interesting**
27:4 49:22
**interior** 256:25
**international**
30:5 119:18
**internet** 9:8
263:5

**interpret** 30:18
100:17 162:9
186:19
**interpretation**
45:23 69:12
104:20 105:24
**interpretations**
89:15
**interpreted**
45:8,9 94:18
162:10 202:13
**interpreting**
44:6 69:18
96:25 105:22
122:16 247:1
250:6
**interprets**
116:24 204:6
**interrupt** 49:15
**interval** 240:7
**intervening**
239:21
**interventional**
119:1,2
**intervertebral**
155:3
**intravenous**
166:5,19 246:1
255:16
**introduce** 13:2
140:20 240:13
**introduced**
272:4

**introduction**
19:14 64:13
**invasive** 91:19
**investigating**
126:22
**investigation**
173:2 245:7
**invitations** 27:1
**invoice** 4:17
76:12
**invoices** 76:14
**involve** 22:13
23:11 39:6
40:7
**involved** 19:14
22:15 32:3,13
34:19 35:12
44:4 46:14
48:4 49:18,24
52:3,23 53:5
90:12 111:18
222:7
**involvement**
36:23 68:11,14
74:25
**involves** 53:16
**involving** 41:2
44:24 50:10
56:14
**ioo** 30:4
**irbesartan** 1:8
7:6
**irradiated**
245:25

[irregular - kind] Page 37

**irregular**
  243:22,22
  246:18 247:14
  248:3
**iso** 259:25
**isoattenuation**
  204:18
**isodense**
  202:19 203:8
  204:18 205:7
  205:10,11,19
  206:22 259:4
**isoenhancem...**
  223:17,20
  260:15 270:25
**isoenhancing**
  259:19
**isointense**
  259:19
**isointensity**
  260:16 270:25
**issue** 151:7,8
  225:14
**issues** 90:17
**it'll** 13:4 46:11
  200:5
**items** 79:12
**iv** 101:24 102:9
**ives** 134:25

**j**

**j** 5:21 275:5,7
**jack** 8:12 72:13
  72:22 134:19

  136:4 167:12
  192:6 193:15
  193:20 197:14
  221:23 258:3
  263:3,16 272:1
**jack.nolan** 2:8
**january** 118:7
  118:8
**jersey** 1:2,19
  7:4,8,15 8:2
  21:22 88:25
  263:4 297:6,23
**job** 10:18
  210:25
**john** 2:4
**joint** 52:22,23
**jomanna** 1:16
  7:15 297:4,22
**journal** 60:23
  60:23,25 61:1
  62:9,10 68:7
  68:14 81:16
**journey** 89:8
**judge** 287:23
**judgment**
  96:24 232:22
**juliet** 275:5
**july** 5:13
  240:14 241:6
  242:11,15
  245:19 256:3
  256:17,23
  258:8 262:16

**jump** 139:25
  223:14 245:15
**jumping**
  210:15
**junction**
  272:14
**junctional**
  232:25 233:1
**jurisdiction**
  43:16

**k**

**k** 5:22 278:1,4
  278:23
**ka** 3:8
**kansas** 2:22
**kathryn** 3:4
**kavila** 3:10
**keep** 12:9 16:14
  35:3,6 73:18
  151:11 170:2
**keeping** 67:15
**keeps** 263:6
**keith** 3:15
**khanna** 138:17
**kidney** 102:6
  120:13 210:6,8
**kidneys** 85:14
  85:16,18
  122:22
**kilo** 278:2,23
**kim** 61:2 67:24
**kind** 12:6 21:15
  22:13 26:9,24

  27:4,6,10,16
  28:23 30:1,14
  32:17 33:7
  36:11 37:20,24
  40:24 41:4
  42:25 45:20
  48:11 51:16,25
  56:1 57:22
  66:21 67:19
  69:5,10,14,15
  69:22,23 78:21
  79:6 80:14,17
  80:19 84:24
  85:15 89:22
  91:14 95:8
  110:2 112:2,12
  119:8 120:19
  126:11,12
  128:16,22
  130:15 133:5
  133:10,18
  142:9 144:9,25
  144:25 145:13
  145:15 149:9
  149:18 150:1,2
  150:3 154:10
  154:14,15,16
  155:14 159:16
  159:24 166:14
  171:9 174:22
  176:18,20,22
  176:23 178:11
  178:13 181:22
  181:24 183:16

**[kind - know]**                                                                Page 38

| | | | |
|---|---|---|---|
| 187:2,24 189:2 | 23:9 25:5,5,6,7 | 84:3,20,24 | 127:13,14,16 |
| 196:17 199:2 | 25:8,23 26:4,6 | 85:3,9,10,13,15 | 127:16,18 |
| 204:1 205:4,5 | 26:9,10,13,17 | 85:15,17,19,20 | 128:22 129:3 |
| 205:24 206:7,7 | 26:20,22 27:5 | 85:25 86:4 | 129:14,16,17 |
| 206:10 210:9 | 27:8,9,9,10,11 | 87:8,9,10,20 | 129:17 130:5,6 |
| 211:3 213:19 | 27:16,19 28:5 | 88:1,2,2 89:11 | 130:22,24 |
| 213:21 216:4 | 28:19,20 29:19 | 89:17,19 90:4 | 132:10,12,14 |
| 224:8 225:7 | 29:24 30:13 | 90:7,8,25,25 | 132:16,19 |
| 233:1,11,12 | 32:18,20,22,23 | 91:12,13,23 | 133:4,6,9,20,21 |
| 236:4 241:14 | 33:8 34:10,13 | 92:18,20 93:7 | 142:13 144:20 |
| 244:7,7 246:2 | 34:15 36:13,22 | 94:5,6,9,12,14 | 144:21 145:4,5 |
| 249:11 250:7 | 37:14,23,25 | 94:16 98:16,21 | 145:8,10,11,24 |
| 252:6,18 | 38:23 39:4,15 | 99:19 100:2,14 | 146:7,15,17 |
| 264:16 267:10 | 40:5 41:15 | 100:19,20,21 | 147:10,10,18 |
| 268:22 282:19 | 43:8 45:14,17 | 102:5,8 105:20 | 147:19 148:14 |
| **kinnelon**  7:4 | 45:21 46:12,13 | 106:21 107:8 | 148:24 149:3,5 |
| 8:2 | 51:8,8,11 | 107:13 108:12 | 149:6,10,10,12 |
| **kirkland**  2:3,11 | 53:20 54:8,9 | 108:14,15,16 | 149:23,25 |
| **kirkland.com** | 54:10,21,22,23 | 108:16,19,20 | 153:3,10 154:4 |
| 2:8,16 | 56:19,19,21,22 | 109:1 110:9,11 | 154:15 155:1,4 |
| **knee**  52:15,23 | 57:25 58:1 | 110:13,15,23 | 155:11 157:12 |
| **knew**  33:2 | 60:6,7,14,15 | 111:24,25 | 158:9,10 |
| 144:12 | 61:6,7,12,12,14 | 112:3,4,6,11,16 | 159:14,18,19 |
| **knocking** | 61:15,17,19,21 | 114:11,13,20 | 159:20 160:2 |
| 174:14 | 65:24 66:13,14 | 114:23 115:3,7 | 160:18,19 |
| **know**  9:3 10:13 | 66:19,25 67:14 | 115:9 116:22 | 161:19 162:11 |
| 10:15 11:8,10 | 67:16,22 68:1 | 119:3,6,9,11,15 | 162:17,18,19 |
| 11:21 12:19 | 69:7,9,10,13,16 | 119:15,19 | 163:2,4 164:4 |
| 13:21,22 15:9 | 69:18,23 70:22 | 120:1,2,9,10,11 | 164:8,13,14,16 |
| 15:11 16:5,8,9 | 70:25 71:5,8,9 | 120:12,13,14 | 164:17,19,23 |
| 16:11,13,14 | 71:10,15 77:18 | 120:15,23 | 165:1 166:11 |
| 17:15 18:1,14 | 77:21 78:19 | 121:1 122:16 | 166:12,18,23 |
| 19:4 22:10,12 | 79:11 80:8,18 | 122:17,22,23 | 168:14,15 |
| 22:16,16,18 | 80:22 82:1 | 126:14 127:1 | 169:14,16,24 |

**[know - late]**

170:2,23,24,25
171:2,3,8
172:3,3,7,18,24
173:1,5,9,16,22
173:22 174:1,7
174:12,16,21
175:24 176:3
176:17,22
177:4 178:8,12
178:14,16
181:8,10,12,16
181:17,17,20
181:23,24
183:18 184:4
184:20,21,22
184:23,23
185:1,2,3,5
186:18,24,25
187:13,16,16
188:6,23
189:12 191:9
195:7,7,16
200:5,15,18
201:19 202:20
204:5 205:1,2
205:3,4,15,18
205:22,22,23
205:25 206:2,9
210:4,7,9,13,15
212:15 214:20
214:21 215:11
215:15 216:1
216:12,20
217:21 218:23

218:24,25,25
219:9,9,10,11
219:12 221:3
222:25 223:3,6
223:8,9,9
224:21 225:10
225:11,13,13
228:24 229:2
230:1,2,8
231:4 232:23
232:23 233:8,9
234:8,10,23
235:17 236:1,7
237:13,14
240:5,7 241:14
244:2,5,7,11
245:10,12,12
245:13,14,16
245:23 246:2,5
246:11,11,12
246:13 247:1
247:22,24
249:3,3,7,9,9
249:10 250:16
251:14,16,21
251:22,22,23
252:2,6,7,8,17
252:19,20,23
253:7,10,13,14
253:17,19,20
253:22 254:4
254:14,15,16
255:4,7,8
257:12,14,17

257:19 258:10
258:11,11,12
258:14,15,15
258:21,22
259:19 260:15
263:14 264:24
264:25,25
265:1,2,7,8,20
265:21,23
266:18 267:7
268:4,14,15,19
269:25 270:21
270:21,24
272:12,13,14
274:17,19,24
274:25 275:1
276:8,8,9,10,11
276:12 277:16
283:6 287:13
287:15 288:23
291:6 294:7,11
**knowing**
172:22 196:22
**knowledge**
14:23 17:22
49:9 56:15
61:21 89:12
116:23 211:1
254:24
**known** 79:2
89:11,21 94:13
179:13
**knows** 26:1
135:21

**l**

**l** 268:13
**l1** 84:7,8 87:14
**label** 37:1
**labeled** 83:8
123:5 125:23
144:11 147:12
212:13
**labeling** 147:13
162:23
**labor** 30:5
**lack** 24:23
25:16 29:17
133:19,19
227:21 257:3
259:2
**laddey** 24:3,5
24:10
**laid** 116:9
225:25
**landmarks**
147:12
**language** 91:9
136:13 188:4
195:12 224:24
244:2,5
**large** 27:23
172:7
**larger** 134:1
**late** 85:21,23
86:1 212:19
213:13,20
214:23,23

[late - lighting]                                                    Page 40

216:16
**lateral** 178:14
**lava** 268:18
**law** 3:5 24:18
25:13
**lawsuits** 25:19
**lawyer** 39:9
**lawyers** 25:18
54:9 56:17
58:24 64:25
65:9,16 66:9
66:18 105:9
**layman's** 51:21
**lead** 92:25
118:2 119:3
169:10 245:12
**leading** 78:22
**leaning** 216:9
**learning** 36:4
**leave** 61:19
81:24 88:11
203:13
**led** 50:2
**left** 20:15,24
21:3 88:11
123:20 124:6,7
124:16 142:17
155:22 156:2,4
156:6,7 178:15
192:25 193:2
207:24 214:4,5
219:2 223:11
**leg** 52:13

**legacy** 109:19
**legal** 7:12,13
19:19 21:3,7
21:25 28:10,19
29:3 30:21
41:11 42:15
56:23
**lended** 246:6
**length** 207:22
**lengthy** 91:7
**lesion** 95:8,10
95:19 101:15
148:15,25
149:17,18
150:7 155:8
156:15,23,24
157:2,23
158:22 159:20
181:10 204:6,7
228:14,19
230:8,21 232:8
236:24 256:17
256:22 258:7
259:7 266:7
271:7 275:12
277:8 278:9
287:4 288:13
288:15 289:3
289:17,22
290:2 292:2
**lesions** 69:3,4
69:14,14 99:10
145:10 152:25
156:13 157:11

207:8 228:23
231:17 237:22
239:24 253:11
255:21 256:3,8
256:12 264:20
269:20 279:12
281:20 284:21
285:20 292:6
294:17
**lesson** 200:4
**lethal** 51:4,5,18
**letters** 91:1
197:24 198:3
272:1
**letting** 152:7
**level** 84:8,9
87:13 94:16
119:6 123:7
174:23 183:13
229:25 246:12
250:8 259:16
278:14 293:18
**levels** 29:25
**leverage** 34:12
**levinson** 20:11
20:24 23:23
**lexicon** 91:7
155:2 157:13
**lexington** 2:5
**li** 60:10 61:10
62:10,13 80:17
81:2,9,18 84:7
84:20 85:19
87:11 88:16,18

88:21 89:15,23
90:5,8,24
91:18 92:4,5
93:15 94:3,9
94:18 95:8
96:16,22 97:11
97:15,17
100:18,19
104:7 112:13
121:3 214:11
217:15 218:4
218:12,13,21
219:1,6,20,25
220:3,5,14,22
221:4,11
222:10,17
225:17,19,25
226:6 228:25
251:16 295:1
**liability** 1:8 7:6
20:3 23:7,8
28:22 41:17
49:23 56:24
57:18 58:10
**license** 1:17
297:22
**lie** 54:22
**life** 150:8 153:1
**ligaments**
178:11
**light** 159:2
164:23
**lighting** 204:3

[lights - liver]                                                        Page 41

| | | | |
|---|---|---|---|
| **lights** 204:4 | 298:5 | 152:13 155:23 | 147:2,11,19,24 |
| 266:25 | **lines** 93:24 | 159:12 163:25 | 148:8,12 |
| **liked** 252:1 | **lineup** 111:24 | 170:21 183:6 | 149:10,16 |
| **likelihood** | **linkedin** 26:13 | 183:20 194:19 | 152:14 154:8 |
| 160:5 182:14 | 26:25 | 196:21 200:23 | 154:19 155:7,8 |
| 234:24 236:23 | **list** 14:19,22 | 210:2,6,16 | 156:4,13 157:8 |
| 282:18 | 24:20 35:4,5 | 214:21 219:22 | 157:11,16,24 |
| **likelihoods** | 35:14 36:13 | 228:7 232:12 | 158:16 160:23 |
| 159:3 160:14 | 38:6 41:23 | 233:5,18 | 163:17 164:9 |
| 160:17 182:2 | 43:2,6 54:7 | 235:18 236:7,7 | 164:15,16,20 |
| **likely** 84:17 | 66:12 74:3,17 | 261:14 263:15 | 165:1,9,18 |
| 108:7 110:5 | 109:21 115:6 | 273:20,20 | 167:2,16 168:2 |
| 114:1 129:10 | 171:20 | **liver** 4:21,23 | 168:2,11,16 |
| 129:14 130:14 | **listed** 41:22 | 82:2 83:16 | 169:9,13,13,14 |
| 159:11 161:9 | 42:24 43:11 | 84:1 85:1 | 169:15,21 |
| 179:19 181:3 | 61:7 106:20,25 | 88:14 89:2,14 | 170:8,13,14,15 |
| 195:21 199:21 | **listening** 51:22 | 90:7 91:2,4,8,9 | 170:17,22 |
| 227:21 234:21 | **literally** 39:18 | 92:7,8 93:16 | 171:9 172:1,6 |
| 234:23 236:22 | 48:13 205:12 | 94:12,23 98:12 | 172:10,13 |
| 237:10,22 | **literature** | 98:17 99:8 | 173:6,7,14,25 |
| 250:6 260:15 | 116:20,21 | 101:1,5,16 | 174:10,15 |
| 274:6 282:2 | 119:22 120:25 | 102:6,13,17,22 | 177:15,23 |
| 292:6 294:19 | **litigation** 1:9 | 120:5 122:5,10 | 178:4,10 |
| 294:21,25 | 7:6 15:8,17,24 | 122:15,21 | 179:20 180:6 |
| **lima** 267:21 | 16:2 17:1,8,18 | 123:1,19 124:3 | 181:5,11,11,17 |
| **limit** 228:11 | 24:17 287:20 | 125:23 126:11 | 183:8,19,21 |
| **limited** 144:10 | **litigations** | 126:13 127:2,3 | 202:15 205:3,5 |
| 144:18 210:14 | 15:11 | 128:2,6,17,18 | 205:13,16 |
| 294:2 | **little** 25:11 59:7 | 133:12,13,15 | 206:4 207:9 |
| **limitless** 36:8 | 64:14 74:17 | 135:9,22 136:2 | 210:7 211:9 |
| **line** 9:25 | 76:6 77:21 | 136:10,15 | 213:18 221:18 |
| 142:15 145:5 | 93:24 100:2 | 138:4,7 140:11 | 222:3,8 223:25 |
| 153:18 175:25 | 112:1 142:6,6 | 141:2,16,25 | 230:5,9,11 |
| 196:12 217:14 | 145:14 146:22 | 144:15,16 | 233:16 242:19 |

[liver - looking]                                                        Page 42

| | | | |
|---|---|---|---|
| 243:4 244:16 | **located**  7:14 | 73:20,21,25 | 258:23 260:17 |
| 253:7 255:8,21 | 123:5 125:22 | 74:16,21 81:19 | 266:21 267:17 |
| 260:1,4,4,10,11 | 126:4 155:11 | 83:7,14,15,20 | 267:20 269:19 |
| 264:20 282:13 | **locates**  205:6 | 85:1,1,14 | 270:20 273:7 |
| 285:20 287:6 | **location**  7:4 | 87:11 89:14 | 276:2,4 277:3 |
| 288:16 289:4 | 84:7 144:8,18 | 90:4 91:8 | 277:17 286:15 |
| 289:23 292:23 | 145:4 146:12 | 99:18 105:21 | 288:5 289:9 |
| **lives**  178:11 | 147:4,19 149:7 | 106:13 108:19 | 292:22 |
| **living**  178:17 | 151:22 178:9 | 109:7 110:24 | **looked**  17:9,14 |
| **livingston**  7:14 | 195:23 196:5 | 111:6,9 118:1 | 18:3 27:3 62:8 |
| **llc**  298:1 | 204:19,22 | 129:23 134:10 | 63:3 67:23 |
| **llp**  2:11 | 205:18 228:15 | 134:17 138:2 | 71:11 148:10 |
| **lobe**  123:6,17 | 229:17 232:25 | 141:4,6,18 | 157:20 166:19 |
| 124:5,14 | 233:1,4 258:14 | 142:21 150:14 | 207:7 219:2,4 |
| 155:22 156:2,9 | 291:25 | 150:14,17 | 221:7 249:21 |
| 156:16,20 | **locations**  144:8 | 152:5 153:8 | 250:2 255:9 |
| 157:23 159:18 | 265:4 279:19 | 154:6 162:16 | 257:15,15 |
| 159:18 167:19 | **long**  8:21 38:1 | 165:23 166:17 | 260:19 280:5 |
| 168:20 169:3 | 38:20,21 63:25 | 173:9 174:9 | **looking**  26:6 |
| 169:10 175:6 | 64:22 67:16 | 176:9 182:20 | 36:6,24 37:12 |
| 175:14 178:15 | 88:20 89:20 | 182:23,25 | 37:14 39:3 |
| 243:18 244:21 | 90:5 96:7 | 185:2,17 186:4 | 45:13 46:14 |
| 247:16 256:2,9 | 172:23 217:17 | 186:7 187:17 | 61:18 68:1,21 |
| 262:10,22 | 254:4 | 189:1 200:22 | 73:9 92:22 |
| 264:7,10 | **longer**  19:18 | 200:23 205:21 | 99:1,5,13 |
| 272:13 280:7 | 20:15 21:7,25 | 208:18 210:12 | 100:4,16 |
| 280:10 | 217:8 229:21 | 212:16,24,25 | 102:23 111:23 |
| **lobes**  123:19 | **look**  10:7 13:6 | 214:25 221:18 | 114:21 119:8 |
| **lobulated**  154:8 | 13:12 18:2 | 222:3,8 223:7 | 124:16 129:9 |
| 154:17 155:4,7 | 23:14 31:8 | 223:22 226:11 | 140:15 141:18 |
| 167:19 | 34:25 36:12,12 | 226:15 228:10 | 141:24 144:11 |
| **locate**  146:17 | 38:16 42:22,23 | 230:8,8,11 | 144:14 156:3 |
| 192:19 | 61:5 70:8,25 | 233:13 235:11 | 159:2,3,15 |
| | 71:8,12 73:5 | 235:12 252:20 | 169:13 185:4,5 |

**[looking - malignancies]**                                    Page 43

186:17 188:7
189:19 192:2
193:9 195:7,9
195:13 201:7
205:3 210:22
211:7 215:5
223:3 224:9
226:12 227:1
228:13 230:4
233:15 246:2
254:7,19
258:18 260:2
270:16 288:1
**looks**  129:20
140:21 154:4
154:19 157:4
171:9 174:17
183:2 191:13
196:21 210:2
241:15 261:8
**losartan**  1:7
7:5 298:2
**lose**  9:8 34:23
226:23
**loss**  186:25
210:25
**lost**  169:20
263:1 276:8
**lot**  18:10 34:21
35:1 112:17
150:2 158:9
162:15 193:21
253:9 255:18
267:9 273:16

273:17
**low**  29:13
123:7 145:11
170:6 175:5,13
186:18 188:4
209:18 234:6
244:11 260:16
**lower**  100:12
123:16 155:25
229:4 234:24
236:23
**lr**  91:24 104:9
229:7,7,7,7
294:24
**lumpy**  154:21
**lunch**  124:25
134:12
**luncheon**  139:9
**lung**  29:18
30:18 31:10,18
41:2 45:9
189:1
**lungs**  83:14,23
84:14
**lymphadenop...**
181:10,13
**lymphoma**
132:13

| m |
| --- |

**m**  1:12,15 8:1
296:10 298:3
298:21

**m.d.**  1:12,16
7:3 8:1 295:15
296:10
**machine**  36:4
111:21
**made**  25:17
26:17 45:23
79:5,8 98:11
105:19 118:15
144:9 162:14
166:11 208:15
296:7
**mail**  12:4,9
**main**  27:16
58:18
**maintained**
42:24
**major**  97:9
179:8 223:21
224:7 258:20
258:22
**majority**  20:1
22:8,12,14
23:5,11 45:25
46:21 81:20,22
83:11,12,21
87:21 188:14
**make**  13:24
38:5,6 51:16
55:25 60:14
82:20 85:24
86:13 87:14
91:3 93:22
96:8 97:4,13

109:14 123:10
130:13 153:9
164:22 171:19
187:8 191:17
191:19 193:20
198:10 199:4
201:24 210:19
210:21 212:8
216:25 224:19
225:6 229:1
230:6 233:14
233:24 240:6,8
240:8 251:17
251:23 265:9
266:17 267:4
271:5 273:19
276:10 292:23
293:1
**makes**  39:21
149:20 204:23
207:17,21
208:3
**making**  69:22
72:22 133:25
133:25 159:7
175:21 176:3
211:12 225:5
252:1
**mal**  50:25
53:14
**male**  178:4
**malign**  158:23
**malignancies**
41:7 173:15,19

[malignancy - matter]                                    Page 44

| | | | |
|---|---|---|---|
| **malignancy** | **managed**  69:14 | 272:17 274:8 | **masses**  243:25 |
| 159:13 173:13 | **management** | 275:4 278:1 | 244:1 264:22 |
| 173:24 174:5 | 69:7,8 | 288:6 289:10 | 265:12,15 |
| 174:10,22 | **mangling** | **marked**  13:15 | 266:18,23 |
| 180:24 181:9 | 104:19 | 14:18 72:5 | 272:24 276:22 |
| 182:1 227:20 | **manifestations** | 76:1 105:2 | 281:20 |
| 227:22 282:2 | 291:2 | 117:10 123:24 | **massive**  263:4 |
| 282:19 | **manifests** | 134:21 140:7 | **masslike** |
| **malignant** | 229:8 | 140:17 153:13 | 243:22 244:4,6 |
| 127:17 129:4 | **manipulated** | 186:9 197:19 | 244:13,20,24 |
| 131:17 143:9 | 287:9,15 | 198:13 203:2,4 | 247:6 249:17 |
| 152:16 158:19 | **manner**  82:17 | 203:13 206:18 | **match**  142:16 |
| 158:23 159:1,4 | **manual**  60:10 | 209:11 211:18 | **matches**  224:1 |
| 160:3,15 | 61:10 62:11,13 | 227:11 232:17 | **material**  67:2 |
| 161:24 174:19 | 67:9,17,20,21 | 234:1 236:13 | 83:3,10,12 |
| 181:4 182:4,10 | 69:21 71:13 | 240:21 242:9 | 88:6 98:16 |
| 198:24 199:12 | 81:15 82:7,8 | 260:23 267:22 | 99:18 166:16 |
| 227:16 234:16 | 217:15 225:25 | 268:1 270:12 | 166:22 171:2 |
| 234:24 235:4 | **march**  12:17 | 271:18 272:20 | 188:14 208:1 |
| 236:20,24 | 32:6,6 76:13 | 274:11 275:8 | 246:2 255:16 |
| 237:12,24 | 76:17 77:3,14 | 278:5,22,25 | **materials**  64:15 |
| 281:21 292:2,6 | 79:6,9 | 279:2 286:17 | 66:18 67:5,7 |
| 294:19,22,25 | **margin**  154:8 | 286:21 288:8 | 75:6,9,15 |
| **malpractice** | **mark**  8:16 | 289:12 | 106:14 115:15 |
| 28:21 29:4 | 13:12 36:20 | **market**  27:14 | 116:9 239:20 |
| 41:10,12 42:2 | 72:2 75:23 | **marking**  209:9 | **matrix**  39:21 |
| 42:3,16 44:7 | 104:24 117:8 | **marzzotti**  58:6 | **matter**  1:16 |
| 44:15 45:1,5 | 123:22 185:20 | **mass**  131:16 | 12:16 16:13 |
| 45:12 47:23 | 185:24 197:11 | 248:22 262:9 | 24:17 26:5 |
| 48:3,20 49:23 | 202:25 206:15 | 264:2,9,13 | 41:17,18,22 |
| 50:9,23 52:2,8 | 209:4 211:14 | 272:25 274:2 | 44:3 45:6 49:8 |
| 52:19 53:4,12 | 227:7 233:23 | 275:12 276:4 | 50:22 53:13 |
| 54:1 | 236:10 240:18 | 276:19,20,23 | 57:2 76:15 |
| | 260:20 271:15 | 291:17 | 77:16,24 97:11 |

| | | | |
|---|---|---|---|
| **maximum** | 256:21 257:7 | **measurements** | 58:10 59:13 |
| 243:21 247:15 | 259:14,22 | 112:2 135:13 | 78:19 104:8,20 |
| **md** 1:3 7:7 | 263:11 | 142:25 248:14 | 106:16 109:16 |
| 298:3,21 | **meaning** 83:9 | 250:1,12 | 116:17,20,20 |
| **mdl** 1:4 | 83:13 84:10 | **measuring** | 118:18 119:21 |
| **mean** 16:17 | 85:11 92:18 | 87:16 132:4 | 143:8,14,18 |
| 29:10 36:8 | 123:15 127:3 | 135:9 136:15 | 146:19 174:3 |
| 39:17 49:14 | 155:13,25 | 247:14 262:10 | 180:4 186:21 |
| 54:21 58:1 | 193:13 271:25 | 264:10 | 187:8,21 |
| 59:7 61:5,6 | **meaningful** | **mechanism** | 198:19,23 |
| 63:6 68:23 | 18:12 | 52:14 | 210:23 227:15 |
| 79:11 85:22 | **means** 122:7 | **med** 50:24 | 227:19 228:1 |
| 87:8 90:3 | 135:24 154:10 | 53:14 | 234:15,20 |
| 92:17 93:5 | 154:14,17 | **media** 295:12 | 240:13 245:3 |
| 100:12 103:4 | 158:15,22 | **medial** 178:14 | 280:15 282:11 |
| 105:12 120:7 | 170:17 173:4 | **medical** 8:17 | 289:21 292:8 |
| 120:18 122:14 | 174:8 176:23 | 8:25 18:12 | 293:16 294:6,6 |
| 123:14,18 | 180:9 184:17 | 19:14,19 21:7 | **medically** |
| 126:17 131:11 | 184:18,19,19 | 21:22,25 24:23 | 229:4 |
| 132:10 149:4 | 206:22,23 | 26:3,6 27:6 | **medicine** 27:2 |
| 150:1 151:6 | 207:2 | 28:7,7,9,10,17 | 27:22 |
| 154:9,13 | **meant** 11:16 | 28:19,21 29:2 | **meet** 60:3 |
| 155:22 156:14 | 68:25 150:21 | 29:3 33:10 | 63:12,17 81:17 |
| 168:5 172:11 | 151:16 155:24 | 34:15,20,22 | 220:5,10 |
| 174:23 179:19 | 158:10,12 | 35:12 37:15 | **meeting** 64:11 |
| 184:15 187:17 | 208:2 291:18 | 39:10 41:9,10 | 64:19,22 66:2 |
| 189:12 194:7 | **measure** 84:4,4 | 41:12,17 42:1 | 66:16 |
| 196:16 197:13 | 84:7 87:12 | 42:3,15,15 | **meetings** 65:23 |
| 198:7 205:10 | 250:7 251:1 | 44:7,14 45:1,5 | 65:24 66:8 |
| 205:12 212:5 | **measured** | 45:11 47:22 | 70:17 119:17 |
| 214:18 229:6 | 247:24 | 48:3,20 49:22 | 119:18 |
| 229:25 234:8,9 | **measurement** | 50:8,23 52:2,8 | **meets** 224:25 |
| 235:24 237:13 | 88:3 142:9,19 | 52:19 53:4,12 | **mele** 1:12,15 |
| 242:21 244:9 | | 54:1 57:17 | 4:15,16,17,18 |

4:19,20,22,23
4:24 5:1,4,5,6,7
5:9,10,11,12,13
5:15,16,17,18
5:19,20,21,22
5:23,25 6:2 7:3
8:1,8,16 13:15
14:16 47:19
72:2,5,9 73:14
75:23 76:1,11
104:24 105:1
114:3 117:8,10
117:14 123:24
124:17 125:1
125:12 134:21
139:15 140:7
140:13 141:4
141:15 143:17
151:15 153:13
185:25 186:9
191:23 192:1,6
192:15 193:19
193:23 197:11
197:18 198:18
198:22 202:25
203:1 206:15
206:17,21
209:4,5,11
211:17,21
226:12 227:8
227:10,14,16
228:2 233:24
234:1 236:11
236:13 238:14

240:21 242:14
260:23 261:21
262:5 263:10
264:1 266:24
268:1 269:15
270:12,17
271:18 272:18
272:20 274:9
274:11 275:5,7
276:2 278:1,4
278:9,23
286:21 288:8
289:12,20
292:15 295:14
296:10 298:3
298:21
**memoranda**
74:23
**memorized**
267:19
**memory** 90:3
223:9 268:17
**men** 32:20
**mention** 59:14
104:7 186:13
**mentioned** 1:16
21:5 29:2,8
30:3 38:19
39:1 40:8,9
64:6,24 96:9
103:18 148:5
176:11 292:19
**merit** 46:23

**mesenteric**
88:13 213:16
**messaging** 12:6
12:10
**met** 20:15
27:20 60:2
63:9,13,21
64:3,7,9,13,15
64:16,25 65:8
65:16 206:10
**metastatic** 53:6
53:7
**mid** 149:9
**mild** 94:11
**mildly** 262:12
**military** 110:14
**millimeter**
156:8,15,19
159:17 161:4
161:15,19
184:24
**mind** 120:22
171:24 188:9
188:10 241:13
285:24
**mine** 21:19
258:11
**miners** 29:19
**minimal** 81:17
82:9 220:10
225:1,24
**minimally** 97:8
**minimize**
100:15

**minimum**
84:17 85:10
90:6 216:18
245:18
**minute** 150:18
184:7 185:8,13
185:15 216:23
217:2,25
**minutes** 87:23
124:25 231:7
290:7
**mis** 44:24
**misconstrued**
93:9
**misdiagnosis**
48:5 50:10
52:4,21
**missed** 53:17
**missing** 96:23
111:14 113:7
**misstates** 94:24
102:14,24
129:12 132:24
137:14 149:2
165:3 220:7
240:3
**mistakenly**
150:20
**modalities**
127:16 232:2,3
254:18
**modality** 254:2
**model** 36:10

[models - necrotizing]                                              Page 47

| | | | |
|---|---|---|---|
| **models** 74:23 | **move** 140:4 | 266:9,9,21 | 20:12,21 21:9 |
| **moment** 30:21 | 145:3 183:7 | 267:7 268:22 | 24:2 43:20 |
| 110:1 166:23 | 194:19 210:8 | 269:17 271:7 | 57:3,25 162:19 |
| 197:15 198:6 | 229:4 231:8 | 280:19 288:24 | 298:2,3 |
| **monitor** 186:22 | 276:15 283:14 | 291:17 | **named** 20:14 |
| **monitoring** | 284:14 285:5 | **mris** 251:20 | 21:11 |
| 238:20 | 287:17,20 | 252:14 | **names** 43:8 |
| **monsoon** 262:1 | **moved** 87:18 | **multi** 274:18 | 267:19 |
| 263:13 | 176:4 | **multifocal** | **national** 119:17 |
| **month** 253:18 | **movement** | 255:21 264:20 | **nature** 19:9,20 |
| **months** 38:13 | 91:14 | **multiphasic** | 20:3 22:10 |
| 163:17,22 | **moves** 110:9 | 175:1,22 | 23:7,8 28:21 |
| 164:1 230:6 | **moving** 69:23 | **multiplanar** | 28:22 35:2 |
| 231:10 237:3 | 73:4 249:8 | 113:1 | 44:1 48:1,18 |
| 238:21 239:6 | **mri** 48:22,23 | **multiple** 110:7 | 50:7,7,19 |
| **morgan** 44:13 | 49:5 90:15 | 110:8 171:10 | 51:25 52:6,7 |
| 44:14 | 110:18 112:16 | 202:9 205:25 | 52:17,20 53:2 |
| **morning** 7:1 | 131:6 137:22 | 234:7 238:24 | 53:11,23 |
| 8:8,10,12 | 147:6,24 | 274:4 278:15 | **natures** 48:1 |
| **morphologic** | 228:20,22 | 283:14 289:25 | **ndas** 39:3 40:6 |
| 80:24 133:6 | 229:11,22 | **multiples** | **ndma** 106:7,10 |
| 243:9 291:2 | 231:12 245:7 | 277:14 | 121:9 |
| **morphological** | 245:20 246:7 | **muscles** 52:12 | **near** 146:15 |
| 292:22 | 246:11 248:21 | **musculoskele...** | 147:1 149:11 |
| **morphologic...** | 251:10,18 | 37:8 252:19 | 149:11 193:1 |
| 122:19 157:5 | 252:2,6,10 | **muted** 280:25 | **nearly** 35:9 |
| 283:18 | 253:1,18,21 | **mystery** 88:25 | **necessarily** |
| **morphology** | 254:1,6,10,12 | **n** | 37:10 178:10 |
| 155:11 231:6 | 254:22 255:4,7 | | 229:15 233:13 |
| **mother** 177:6 | 255:9,12,14 | **n** 2:1 3:1 4:2 | **necessary** 14:3 |
| **motor** 23:8,11 | 256:7,21 259:3 | 21:14 | **necessity** 48:23 |
| 49:18 54:3 | 260:18 261:6 | **nail** 96:8 | **necrotizing** |
| **mouth** 27:7 | 262:6,19 264:2 | **name** 7:12 8:12 | 44:15,17 |
| | 264:23 265:17 | 8:14 19:17,20 | |

**[need - nolan]**                                                          Page 48

| | | | |
|---|---|---|---|
| **need**  10:4 11:4 | **neoplastic** | **night**  63:24 | 19:12,22 20:4 |
| 11:20 25:6 | 132:12 137:6 | 66:3 | 20:7 22:5,7 |
| 27:10 32:25 | 137:12 180:22 | **niosh**  28:4 29:9 | 23:1,19,21 |
| 71:23 73:5 | **network**  26:25 | 29:13 30:9,13 | 28:11,14 31:1 |
| 78:25 79:4 | 88:23,24 89:9 | 30:14,16 32:3 | 31:22 33:13,23 |
| 84:22 91:19 | 89:25 118:1 | 32:4 33:17 | 34:5,16,18 |
| 97:8 100:9 | **networks**  89:13 | 34:24 35:5,13 | 35:23 36:1 |
| 103:4 151:1 | **neurological** | 35:14,18 | 40:14,18 41:19 |
| 176:21 182:22 | 22:15,21 | **nitrosamine** | 41:21 42:8,11 |
| 186:5 187:20 | **neurosurgeon** | 74:14 | 42:13,21 43:18 |
| 191:9,25 | 49:25 | **nitrosamines** | 46:2,4,24 47:1 |
| 208:11 212:7 | **never**  17:9,14 | 74:5 | 47:8,18 50:5 |
| 212:10,11 | 18:2 19:4 | **nmr**  130:4 | 51:10 55:1,9 |
| 213:24 224:4,8 | 39:10 40:23 | 251:15 | 55:16 56:3,5 |
| 224:18,20,21 | 41:3,6 45:8 | **nod**  63:5,6 | 62:22 65:4,14 |
| 224:22 237:16 | 54:24,24 74:9 | **nodding**  11:5 | 66:7 68:3,5,10 |
| 241:10 250:8 | 74:13 222:12 | **nodular**  167:18 | 68:19 70:1,3 |
| 266:24 275:11 | 254:22 263:5 | 168:1 172:14 | 71:2,4,17,19 |
| **needed**  84:17 | **new**  1:2,18 2:6 | 242:22 | 72:2,8,15 73:2 |
| 86:13 87:4 | 2:6 7:4,8,14 | **nodularity** | 73:7,11,13 |
| **needing**  219:1 | 8:2 21:22 | 168:9 | 75:22 76:5,10 |
| **needs**  83:22 | 32:10 67:20 | **nodule**  127:14 | 77:7,11,13 |
| **negative**  84:23 | 70:24 71:1 | 162:7 230:3 | 78:10,16 80:11 |
| **neither**  144:23 | 88:24,25 | **nodules**  128:11 | 88:9 90:20,22 |
| 145:2,11 289:7 | 119:13 175:16 | 128:14,19 | 92:1,3,15 |
| 290:1 297:13 | 197:21 221:24 | 129:11 132:9 | 93:10,12 94:21 |
| 297:15 | 245:4 297:5,23 | 132:15 168:10 | 95:5,14,16,24 |
| **neoplasm** | 298:1 | 168:14 171:7 | 96:5,21 97:25 |
| 127:17 128:23 | **nigh**  2:19 3:3 | 180:22 | 98:5,20,24 |
| 129:1,8,11 | 58:24 63:14 | **nolan**  2:4 4:7,9 | 99:7,15 101:7 |
| 245:6 | 64:7,10,16,19 | 8:7,12 14:15 | 101:14 102:3 |
| **neoplasms** | **nighgoldenbe...** | 15:20,22 16:21 | 102:11,18,20 |
| 129:3 | 2:24 3:10,11 | 17:4,6 18:18 | 103:3,17,25 |
| | | 18:20 19:6,8 | 104:6,15,17,23 |

**[nolan - noncontrast]**                                    Page 49

| | | | |
|---|---|---|---|
| 105:4,7 107:21 | 156:22 161:10 | 219:24 220:13 | 264:18 266:3,5 |
| 107:23 108:4 | 161:12,21 | 220:19,21 | 266:15,17 |
| 108:24 109:5 | 162:3,5 163:13 | 221:14,16,21 | 267:6,15,20,24 |
| 111:2,4 113:4 | 163:15 165:5,8 | 221:24 222:1 | 268:4,11,24 |
| 113:11 114:2 | 165:15,22 | 222:14,16,23 | 269:4,14 270:7 |
| 114:16,18 | 167:14,25 | 226:8,10 227:7 | 270:15 271:15 |
| 115:20 116:12 | 168:8,18 169:1 | 227:13,25 | 271:21 272:17 |
| 116:14 117:7 | 169:8,18 170:5 | 228:18 229:19 | 272:23 273:9 |
| 117:13 121:22 | 171:12,18 | 230:15,17 | 273:25 274:8 |
| 123:21 124:1 | 176:7 177:10 | 231:25 232:6 | 275:4,10,15,24 |
| 124:19,24 | 177:20 178:3 | 233:23 234:4 | 276:1 277:25 |
| 125:10,14,16 | 178:18,22 | 235:2,7,9 | 278:7,22 279:1 |
| 127:20,22 | 179:7,16,25 | 236:10,16 | 279:5,8 280:12 |
| 128:8,10 129:5 | 180:2,16,18 | 237:8 238:2,13 | 281:11 282:4 |
| 129:7 130:9,11 | 182:7 183:24 | 239:4,12 | 282:10,24 |
| 131:4,24 132:1 | 185:17,24 | 240:11,18,24 | 283:9,21 284:1 |
| 133:2 134:3,9 | 187:3,6 188:2 | 241:2,17,19 | 284:8,19 285:2 |
| 134:16,24 | 191:20 192:8 | 243:12,14 | 285:9,18 286:1 |
| 135:3,17 136:6 | 192:11,14 | 245:1 246:15 | 286:9,15,19,24 |
| 136:8 137:18 | 193:6,8,23 | 246:17 247:4 | 287:17 288:5 |
| 138:25 139:5 | 196:7,24 197:3 | 247:11,19 | 288:11 289:1,9 |
| 139:14 140:10 | 197:5,10,22 | 248:1,9,17,19 | 289:15,19 |
| 140:16 141:1,9 | 198:1,9,15,17 | 249:12,15,24 | 290:3,8 292:14 |
| 141:14 143:13 | 199:7,9,18,22 | 250:10,18,24 | 292:18 293:11 |
| 143:25 145:17 | 199:24 201:22 | 251:8 252:11 | 294:16 295:6 |
| 146:3,21,24 | 202:5,22 203:6 | 252:13 254:9 | **non**   61:17 |
| 147:15,17 | 203:14 205:9 | 254:21 256:15 | 207:25 |
| 148:4,20,23 | 206:14,20 | 257:20,24 | **noncontrast** |
| 150:5,11,13,19 | 207:4,6 208:7 | 258:1,4,6 | 83:17 85:3,4,6 |
| 150:25 151:6 | 208:9,17 209:4 | 259:12 260:7 | 166:14 167:1 |
| 151:14 152:20 | 209:14 211:14 | 260:17 261:1,5 | 167:15 184:2 |
| 152:22 153:5,7 | 211:20 212:4 | 261:20,22 | 200:6 210:13 |
| 153:16,22 | 216:6 218:1,3 | 262:4 263:1,10 | 215:20 |
| 155:6,18,20 | 218:11 219:21 | 263:19,25 | |

**[nondescriptive - object]**                                                    Page 50

| | | | |
|---|---|---|---|
| **nondescriptive** 233:12 | **notes** 40:9 74:22 | 33:19 34:2,9 35:19 36:3 | 149:2 150:9 152:17 153:2 |
| **nonlesion** 157:3 | **notice** 4:16 63:6 72:3 | 40:11 41:13 42:5,17 43:13 | 154:25 155:9 156:17 161:6 |
| **nonmedical** 51:17 196:14 | 73:15 95:7 | 45:16 46:10 | 161:16 162:1 |
| **nonresponsive** 287:18 | **noticed** 95:18 165:17 | 49:20 51:6 54:18 55:5,13 | 163:10 165:3 165:11,19 |
| **nonspecific** 157:15 181:22 | **noting** 291:17 | 55:21 57:14 | 167:21 168:4 |
| **normal** 102:1,4 102:9 129:2 184:23 | **november** 15:2 15:4,7,15,23 18:23 | 62:20 66:4 67:13 68:8,16 68:24 71:7 | 168:12,21 169:4,11,23 170:19 171:15 |
| **normally** 48:9 68:1,21 85:16 90:17 93:4 105:22 170:22 178:5,6,15 181:11 186:19 195:4 | **number** 1:3 5:19 7:7 18:14 19:4 24:5 33:6 54:23 65:19 74:3 84:11 159:16 188:16 188:17 209:21 226:17 231:3 234:9 273:23 295:13 | 77:4 78:5 80:5 81:20 87:7 90:1 91:21 92:9 93:2,17 94:24 95:11,20 96:2,17 97:20 98:3,13 99:3 99:11 101:2,10 101:18 102:14 102:24 104:11 107:18 108:11 | 175:19 177:3 177:16,24 178:7 179:4,12 179:21 180:14 181:6 182:24 185:14 193:3 193:11,16 196:13 198:25 199:13 202:2 202:10 203:10 206:24 207:10 |
| **northwest** 2:13 3:6 | **numbers** 159:15 197:24 198:1 204:20 268:16,23 | 112:24 115:17 117:5 125:8 128:5,25 129:12 130:16 131:18 132:24 | 208:14 210:3 211:23 214:19 215:23 217:9 217:20 218:6 218:15 220:7 |
| **nos** 11:4 | | | |
| **nose** 154:16 | | | |
| **notary** 1:18 8:3 296:17 297:5 297:23 298:25 | **o** | 134:6 135:11 137:2,14 | 220:16 221:1 221:20 222:11 |
| **note** 97:4 143:5 | **oak** 119:25 | 138:20 139:3 | 222:20 225:22 |
| **noted** 135:8 136:1,10,15 137:24 138:4,6 175:5,13 188:5 202:7 234:6 296:5 | **oath** 7:21 **object** 17:2 18:9 19:2,11 22:2,22 23:17 25:21 30:11 31:12 32:14 | 142:11 143:10 143:21 144:4 145:23 146:8 147:8 148:1,17 | 227:17 228:4 229:13,23 230:23 234:18 235:5,23 237:4 |

[object - okay]                                                              Page 51

| | | | |
|---|---|---|---|
| 237:25 238:23 | 269:21 274:21 | 185:7 216:22 | **oh**  20:19 24:3 |
| 239:8 240:3 | 274:22 | 217:2 253:5 | 50:21 60:6 |
| 241:9 243:6 | **observations** | **obtaining** | 73:25 141:5 |
| 244:22 245:21 | 69:21 86:13 | 195:19 | 151:21 207:23 |
| 246:23 247:8 | 97:14 162:13 | **obviously** | 215:4 221:9 |
| 247:17 248:5 | 188:22 223:16 | 22:17 43:4 | 261:24 |
| 249:1,20 250:4 | 229:1 252:1 | 53:14,25 88:15 | **okay**  9:22 10:5 |
| 250:20 251:4 | 294:20 | 166:23 184:21 | 10:8,13,17 |
| 252:16 254:11 | **observe**  163:12 | 195:6 287:16 | 11:21 12:3,17 |
| 256:10 257:10 | 186:1 211:21 | **occasion**  32:24 | 13:12 15:1,6 |
| 259:9,23 | **observed**  133:5 | **occasionally** | 15:14,20 16:1 |
| 260:12 262:17 | 136:11 141:19 | 23:9 | 17:4,13,20,25 |
| 264:14 265:18 | 144:2 147:6,24 | **occupational** | 18:18 19:6,22 |
| 266:11 278:20 | 161:14 163:8,9 | 29:18,25 30:18 | 20:4 21:5 22:5 |
| 281:22 282:15 | 171:22 180:7 | 30:24 31:10 | 22:20 23:19 |
| 283:3,13,24 | 187:10 232:7 | 32:23 | 24:7,14 25:10 |
| 284:13,23 | 234:16 244:1 | **occur**  177:22 | 28:11 29:8 |
| 285:4,13,22 | 246:19 260:14 | **occurred** | 30:3,7 31:2,8 |
| 286:4,11 287:7 | 264:23 266:6 | 206:12 | 31:23 32:2 |
| 288:17 289:5,5 | 271:7 272:24 | **offer**  78:17 | 35:17,23 37:3 |
| 289:24 293:6 | 272:25 274:2 | 93:8 97:22 | 38:5,14,25 |
| 294:10 295:2 | 276:17,19 | 105:15 226:3 | 39:9 40:8,16 |
| **objection**  75:18 | 279:20 282:13 | **offered**  15:17 | 41:8,19 42:1 |
| **objective**  87:10 | 289:22 294:18 | 61:3 127:12 | 42:11 43:8,19 |
| 87:21 108:17 | **observing**  99:8 | 152:19 157:6 | 43:23 44:7,13 |
| **objectively** | 183:13 187:7 | 285:7 | 44:21 47:7 |
| 160:6 | 220:24,25 | **offering**  81:5 | 48:17 49:1 |
| **observation** | **obstructed** | 106:6,9 253:16 | 50:18 51:24 |
| 5:20 104:13 | 133:16,17 | **offers**  61:15 | 52:16 54:5,15 |
| 157:9 158:23 | **obtain**  133:8 | **office**  67:16 | 57:12 58:7,13 |
| 196:3 201:18 | **obtained**  45:6 | **offices**  7:14 | 58:20 59:10 |
| 204:7 210:11 | 110:1,23 | **officially**  32:6 | 60:12 62:3,6 |
| 224:1 227:5 | 113:23 130:2 | **offset**  34:13 | 63:6,15,23 |
| 233:20 240:6 | 146:14 184:6 | | 64:6 67:1,10 |

| | | | |
|---|---|---|---|
| 68:3 70:17 | 155:18 156:2 | 217:6,16 | 277:17 278:17 |
| 71:17 72:21,24 | 157:14 158:5 | 219:21 221:14 | 278:22 279:1 |
| 75:22 76:17,20 | 158:18 161:1 | 222:6,14 | 279:17,24 |
| 77:7,23 78:3 | 161:10 162:3 | 226:15,17,20 | 280:22 281:2 |
| 79:8,19 81:3 | 163:13 164:2 | 227:7 228:1 | 281:12,19 |
| 82:4 86:24 | 166:4 167:1 | 229:10 232:16 | 282:5,11 |
| 88:10 89:23 | 170:13 172:1 | 232:21 233:23 | 284:20 286:15 |
| 93:10 95:14 | 174:18,25 | 234:14 235:7 | 287:3 288:5 |
| 98:20 99:16 | 175:12 176:10 | 235:21 237:9 | 289:2,9 290:3 |
| 100:25 102:3 | 179:25 180:16 | 237:19 238:2 | 293:12 294:5 |
| 103:3 104:15 | 181:2 182:15 | 238:19 240:12 | 295:6 |
| 106:1,24 | 182:15,20 | 240:16 241:15 | **once** 45:21 57:2 |
| 107:16,21 | 184:15 185:10 | 241:17 242:4,8 | 57:8,10 69:10 |
| 108:9,24 | 185:24 187:12 | 242:18 243:3 | 88:11 194:19 |
| 109:10 110:14 | 187:19 188:9 | 243:20,25 | 253:12 |
| 111:2,13 | 188:13,15,17 | 244:14 245:2 | **oncologist** 70:4 |
| 112:19 114:16 | 189:6 190:10 | 245:18 248:9 | **oncology** |
| 115:13 116:12 | 190:15,18,19 | 249:12,25 | 120:15 |
| 117:25 118:16 | 190:23 192:12 | 250:25 251:9 | **ones** 37:24 |
| 121:2 122:10 | 192:19,20 | 254:10,22 | 75:16 101:12 |
| 122:25 125:14 | 193:6,24 194:7 | 255:20 256:16 | 106:25 182:4 |
| 126:6 127:7 | 194:9,11,12,23 | 256:25 257:7 | 182:16 185:3 |
| 128:8,14,19,23 | 194:24 196:11 | 257:11 259:6 | 234:12 266:22 |
| 134:9 135:8,21 | 196:24 197:3 | 259:13 260:17 | 276:16 |
| 137:10 138:2 | 197:10,23 | 261:9,11 262:8 | **online** 9:16 |
| 140:3,23 | 198:11,15 | 262:14 264:1,8 | **opacification** |
| 141:24 142:8 | 199:7,22 200:9 | 264:19 266:15 | 86:4,8,8 |
| 142:17,21 | 200:10 201:6 | 266:20 267:16 | 213:15 |
| 143:3,7 146:4 | 201:23 202:22 | 267:20 268:12 | **open** 12:4,6,13 |
| 146:21 147:4 | 207:4 208:7,17 | 268:19 269:1 | 152:7 186:6 |
| 147:15,22 | 208:19 209:4 | 271:5,11 | 191:3 |
| 148:10 150:11 | 209:17,24 | 272:17 273:14 | **opened** 115:7 |
| 152:3 153:5 | 211:14 214:8 | 273:15,15 | **opening** 176:24 |
| 154:6,12 | 214:16 216:7 | 274:8 275:4 | |

[opens - p.m.]                                                    Page 53

| | | | |
|---|---|---|---|
| **opens** 223:4,5 | 237:17,21 | **opposed** 67:22 | **original** 45:22 |
| **operating** | 244:13,24 | 155:15 216:10 | 105:21,22 |
| 113:22 114:14 | 245:3,16 | 231:23 | 247:1 |
| **operator** | 248:24 253:8 | **options** 249:4 | **orthopedic** |
| 111:19 | 253:19 266:1 | **oral** 75:1 | 120:23 |
| **opine** 25:8 46:7 | 274:24 279:11 | 132:20 | **osteo** 39:21 |
| 46:8,18 | 280:15 282:17 | **order** 5:16 91:7 | **osteomyelitis** |
| **opined** 203:7 | 282:21 283:7 | 92:4 95:3,17 | 50:11,15 |
| **opines** 202:18 | 283:17 284:5 | 95:21,22 96:1 | **outcomes** 69:17 |
| **opining** 60:21 | 284:10,16,24 | 100:10 112:1 | **outline** 108:15 |
| 293:22 | 285:7,10,15 | 164:24 170:2 | **outlined** 81:14 |
| **opinion** 44:2 | 286:6,14 288:3 | 208:5 224:20 | 97:6 |
| 45:20 46:5,19 | 288:18 291:11 | 224:22 268:8 | **outset** 139:25 |
| 47:3 48:2 52:1 | 291:21 292:3 | 287:20 | **outside** 63:5 |
| 52:7 61:15 | 293:13 294:1 | **ordering** | 93:5,24 97:1,5 |
| 70:9 75:13 | 294:18 | 253:18 | 120:17 226:6 |
| 80:7,15 81:1,8 | **opinions** 15:17 | **ordinary** | **oval** 201:13 |
| 81:21,22 82:1 | 48:19 61:16,17 | 221:19 | **overland** 2:22 |
| 87:3,9 93:8 | 61:20 74:6 | **organ** 36:25 | **overwhelming** |
| 100:10 105:5 | 75:8,17 78:17 | 38:2 84:1 99:2 | 19:25 22:14 |
| 108:8 112:11 | 79:1,4,10 80:3 | 101:4,25 102:8 | 23:5 45:25 |
| 116:10 137:10 | 80:12,18 81:5 | 111:22,25 | 46:21 83:11 |
| 144:23 145:9 | 81:25 86:16,21 | 126:21 133:25 | **own** 34:12 |
| 158:24,25 | 105:15 106:6,9 | **organic** 27:5 | 59:18 63:2 |
| 183:2,12,15 | 109:1 112:6 | **organization** | 66:25 67:12 |
| 189:4 195:21 | 116:21 117:1 | 30:5 89:22 | 81:15 120:18 |
| 196:9 199:17 | 121:1 253:15 | 119:24 | 139:1 163:5 |
| 204:14,17,21 | 292:7 293:19 | **organizations** | 172:11 173:11 |
| 208:5 210:12 | **opportunities** | 36:6 | 240:16 |
| 211:8 212:2,18 | 26:15 33:3 | **organs** 83:25 | **p** |
| 213:21 214:17 | 34:7 119:7 | 133:20 200:17 | **p** 2:1,1 3:1,1 |
| 219:7 220:4 | **opportunity** | **orient** 261:3 | **p.m.** 295:16,21 |
| 225:18 226:3 | 34:13,14 | **origin** 88:13 | |
| 236:21 237:9 | 166:17 246:4 | 164:20 | |

[page - pdf]                                                                Page 54

| page 4:5,14 | paragraphs | 228:24 248:11 | 58:2,3 64:17 |
|---|---|---|---|
| 67:22 73:19,20 | 165:25 166:2 | 274:21 277:10 | 64:18 67:18 |
| 73:20 117:3,19 | 242:10,13,15 | 291:2 | 89:24 |
| 118:16 121:23 | 261:12,16 | **partially** 50:24 | **pathologic** |
| 121:25 122:1 | 262:6 | 50:25 | 157:6 |
| 125:21 140:12 | **parameters** | **participants** | **pathologies** |
| 141:3,9,15,16 | 36:18,19 | 9:17 | 37:5 38:15 |
| 141:24 142:18 | 100:14 | **participating** | 40:21 253:22 |
| 142:22 150:16 | **paraumbilical** | 9:22 | **pathology** |
| 152:10 153:17 | 176:12 177:5 | **particular** | 36:15,25 37:2 |
| 156:3 165:24 | 177:22 178:6 | 22:23 23:3 | 37:16,18 102:1 |
| 165:25 186:4 | 179:10,18 | 99:2 120:18 | 111:23 |
| 188:7 241:3,21 | **parenchyma** | 134:11 139:19 | **pathophysiol...** |
| 242:9 248:10 | 128:3 170:9,13 | 148:6,14,25 | 93:6 173:24 |
| 261:13 279:9 | 180:6 | 150:7 158:22 | 253:25 |
| 289:16 298:5 | **parenchymal** | 159:6 161:3 | **patient** 45:7 |
| **pages** 62:14 | 243:23 | 218:4 230:21 | 69:8 83:3 93:1 |
| 67:21 186:7 | **park** 2:22 | 235:22 236:17 | 93:14 94:7,10 |
| 255:11 | **parked** 257:17 | 246:20 259:7 | 94:11 97:7 |
| **pain** 164:11,13 | **parkway** 2:21 | 264:13 | 109:18 115:9 |
| 164:25 | **part** 30:22,24 | **particularly** | 115:10 124:13 |
| **panels** 26:20 | 30:24 31:6 | 83:25 90:10 | 172:23 173:10 |
| **paper** 74:10 | 37:1,6 38:8,10 | 100:4 155:21 | 193:17 226:4 |
| **papers** 74:4,18 | 38:14 40:24 | 168:5 223:15 | 231:8,13 |
| **paragraph** | 41:4 46:17 | **parties** 295:15 | 292:25 |
| 70:25 71:9 | 50:1,15,23,24 | 297:15 | **patients** 168:23 |
| 105:5 121:24 | 57:16 58:4 | **parts** 40:5 | 171:22 172:19 |
| 121:25 174:25 | 69:5,24 73:18 | 71:12,14 | 177:14 |
| 175:17,18 | 76:7 80:8 | 101:25 | **pattern** 181:21 |
| 176:9 201:24 | 84:19 85:19 | **pas** 236:5 | **patterns** 102:5 |
| 243:16,21 | 87:9,9 89:24 | **pass** 290:4 | **pay** 27:14,15 |
| 258:9 261:13 | 113:24 127:3 | **passing** 29:13 | **pdf** 186:19 |
| 262:8 264:8 | 196:22 213:12 | **past** 39:11 | 196:14 241:3 |
| 279:9 | 216:21 221:23 | 45:14 57:9,10 | |

[pdfs - planet]                                                         Page 55

**pdfs**  186:23
    210:22
**pedantic**  244:7
**peek**  268:22
**peers**  89:16
**pencil**  191:14
**pending**  11:24
    49:8
**pennsylvania**
    2:13
**people**  51:17
    66:14 119:25
    158:9
**percent**  104:10
    104:12,13
**percentage**
    42:3
**percentages**
    160:17
**perfect**  142:21
    248:11
**perform**  109:13
**performed**
    80:15 109:25
    166:5 242:11
    253:10 254:25
    255:15
**period**  63:19
    109:2,7
**peripheral**
    154:7
**perog**  212:25
**perpetuity**
    250:16

**person**  94:9
    124:16
**person's**  91:9
**personal**  19:16
    20:2,9 22:10
    23:7,8 24:2
    28:21 29:3
    41:11 42:2,4
    42:16 49:13,17
    54:6,12,14,17
    55:3,24 56:7
**pertinent**  164:9
    164:10
**pharmaceutical**
    298:2
**phase**  82:10,11
    82:12,19 83:1
    83:2,4 84:1,2
    84:16 85:11,17
    85:18,21,23,25
    86:2,7,12,13,25
    87:6,12 94:8
    96:9,11,12,12
    97:18,18,19
    98:7 100:5
    112:9,13,14
    183:4 184:3,6
    184:23 185:6
    185:11 195:11
    195:13 201:8
    204:15,16
    206:5,7,11
    207:12,13,13
    207:14,15,17

    207:22,24
    208:2,3,4,6
    212:1,7,14,18
    212:20,20
    213:7,13,20,24
    214:1,24,24
    215:18,22
    216:1,2,8,10,22
    217:4,5,17,24
    217:25 218:9
    219:12,16,17
    219:18 220:11
    223:5,7 225:20
    225:20,21
    259:5 267:12
    267:13 268:18
**phased**  225:19
**phases**  81:14
    82:6,6,13,14
    95:13,18 96:23
    97:3,5,10
    112:4 200:24
    219:3,4
**phenomenon**
    133:5 233:17
**phone**  10:3,6
    64:3 263:18,22
**physical**  12:23
**physician**
    90:18 91:11
    174:11 291:7
**physicians**
    27:20

**physics**  93:7
    253:4,25
**physiologic**
    133:9
**physiologically**
    133:5
**physiology**
    100:7 231:23
**pi**  41:9
**pick**  115:8
    277:15
**picking**  169:21
**picture**  87:24
    174:12 257:15
**pictures**  254:14
**piece**  23:10
**pieces**  15:15
    39:12
**place**  23:10
    63:23,24,25
    264:12 297:9
**placed**  216:11
    264:3 277:9
**places**  110:25
**plaintiff**  24:19
    24:21 25:13
    26:5,14 49:17
    104:2
**plaintiff's**
    46:22
**plane**  130:25
    184:20 185:8
**planet**  26:1

[plant - preceding]                                                      Page 56

| | | | |
|---|---|---|---|
| **plant** 69:11 | 189:18 190:1 | 212:20 213:12 | 237:11,23 |
| **platforms** 9:5 | 190:11 192:16 | 213:17,20 | 252:4 281:20 |
| **played** 282:13 | 196:19 200:15 | 216:10,14,17 | 282:1 287:4 |
| 283:1 | 200:16,19 | 216:18,22 | 288:15 289:3 |
| **playing** 155:23 | 207:21 208:3 | 217:4,4,17,24 | 289:21 |
| **please** 7:22 | 224:3 228:8 | 225:4,20 | **possible** 50:14 |
| 8:14 16:8 | 231:22 243:5 | **portillo** 16:2,18 | 246:8 284:20 |
| 104:20 188:11 | 244:8 245:11 | 16:19,23 17:16 | 285:3 286:2 |
| 272:8 290:11 | 246:3,5,9 | 18:7,13,23,25 | **post** 112:9,14 |
| **plural** 202:1 | 249:3,7 251:25 | 19:24,25 22:9 | 176:2 |
| **pneumoconio...** | 253:12 273:3 | 23:23 43:3 | **posterior** 123:6 |
| 29:19 | 294:21 | 44:2,3 | 125:24 126:16 |
| **pneumoperit...** | **pointing** | **portion** 70:24 | 130:21 262:10 |
| 44:4,10,11 | 187:25 189:24 | 114:6 116:5 | 262:21,24 |
| **point** 13:1 21:2 | **pointless** 84:24 | 122:1 125:4 | 264:6,6 272:13 |
| 21:18 27:12 | **points** 175:25 | 153:18 169:15 | **potential** 32:18 |
| 28:9,18 36:9 | **poor** 133:11 | 261:2 | 49:6 |
| 38:22 42:10 | 215:3 | **portions** | **potentially** |
| 47:2 64:7 | **poorly** 216:23 | 169:21,25 | 34:1 132:9 |
| 65:16 78:22 | **population** | 170:1 | **practical** |
| 84:10,18 85:12 | 89:1 | **position** 33:1 | 251:13 |
| 87:5,17,25 | **populations** | 162:22 | **practice** 27:22 |
| 88:7 97:7 | 92:12 | **positioned** | 32:16 33:9 |
| 113:17 122:15 | **portal** 82:11 | 231:14 | 88:17,21 89:18 |
| 130:1 137:11 | 86:6,9 96:11 | **possession** | 104:8 116:25 |
| 144:19 146:1 | 97:18 132:22 | 107:20 | 138:23 221:19 |
| 149:1,17 150:8 | 133:3,4,13,21 | **possibilities** | 239:2 251:19 |
| 153:1 157:8 | 133:23 134:4 | 231:2 | 285:19 290:24 |
| 160:14 164:3 | 173:6 175:8 | **possibility** | **practitioners** |
| 172:10 173:21 | 176:17,19 | 132:15,20,22 | 253:16 |
| 174:2 181:14 | 177:18 178:1 | 145:20 146:5 | **pre2021** 19:12 |
| 182:9 183:15 | 179:2,9,17 | 150:6 152:15 | **preceding** |
| 186:14 187:21 | 198:13 207:23 | 152:23 182:10 | 180:7 211:25 |
| 188:24 189:6 | 208:4 212:14 | 189:19 236:19 | 213:5 214:1 |

**[preceding - prognosis]**                                      Page 57

215:2,6 244:5
256:17
**precise**  127:15
147:19 224:3
279:19
**preclude**  91:24
**precluded**
219:6
**predicating**
287:24
**predominantly**
244:11
**prefer**  12:24
152:4 190:6
**preference**  25:7
**preferred**
85:21
**premise**  44:15
114:14
**prepare**  16:23
59:11,25 63:3
63:20,22 66:17
70:18 249:19
**prepared**  17:1
17:7,21 18:5,7
**preparing**
18:22 115:16
218:5 241:7
**prerequisite**
224:2
**presence**  44:4
180:23 255:21
257:2

**present**  3:14
31:19,20 37:2
37:17,18 46:15
66:9 92:22,25
94:5 105:16
108:18,21
118:10 160:6
171:3 176:17
204:22 233:14
243:17 247:15
253:5 256:3,18
271:8 279:14
280:18 281:17
**presentation**
74:10 119:15
120:10
**presentations**
118:17 119:10
119:17
**presented**
82:15 142:5
239:20 254:25
**preserve**
109:17 155:2
**preserved**
197:12
**pressure**
133:18,22
183:6
**pretest**  92:12
92:16 164:14
218:25,25
**pretty**  22:18
39:7 66:12

85:20 112:16
112:16 182:4
253:8
**preview**  9:10
**previously**
258:21 280:2
**primarily**  28:7
64:13 120:14
120:15 168:9
**primary**  60:22
61:1 120:6,7
**print**  12:25,25
**prior**  4:15
14:19 15:23
16:2,18,18
41:16 94:25
102:15,25
107:10,12
220:8 221:7
240:4
**private**  13:9
**probabilities**
160:5
**probability**
92:12 164:14
219:1
**probably**  11:19
18:16 23:4
42:10 60:6
77:20 78:25
110:16 129:9
141:21 151:22
161:8 204:2
206:1 217:23

225:3 271:13
272:11 277:7
**problem**
147:14 263:16
263:21
**procedure**
242:2
**proceed**  15:11
**proceeding**
7:19 157:1
295:10
**process**  37:6
57:19
**produce**  16:11
16:14 91:6,16
**produced**
12:16 15:12
16:10,19 17:11
17:15,24 43:6
57:22 67:24
**product**  28:22
41:17 49:23,24
49:25 56:23
57:18 58:10
**production**
77:10
**products**  1:8
7:6
**profession**  21:4
**professional**
130:3
**profile**  27:3
**prognosis**
69:18

[program - questions]                                                        Page 58

| | | | |
|---|---|---|---|
| **program** 30:25 32:8,9,11,24 37:4 89:9 | 33:2 45:20 46:19 70:8 113:19 122:17 | **pull** 41:23 104:23 117:7 123:21 140:16 | 211:6 216:3 224:21 |
| **programs** 30:22 34:22 | 213:4 276:11 283:6 291:1 | 141:9 182:15 185:20 190:13 | **quantified** 243:11 |
| **progress** 129:15 | **provided** 15:16 56:6 73:24 | 209:7 240:24 248:9 | **question** 10:22 10:23 11:10,12 |
| **progressed** 284:21 287:5 288:15,21 289:4,22 290:2 | 74:8 79:19,23 106:19 107:4 112:22,25 113:24 114:10 | **pulling** 120:12 **punches** 120:12 **purpose** 30:10 79:3 | 11:14,16,24 16:16,17 17:9 18:4 19:4 25:4 55:23 65:7 |
| **project** 41:1,2 **promise** 93:20 **pronouncing** 8:9 178:24 | 117:20 135:14 146:25 247:16 248:15 250:1 293:20 | **purposes** 83:16 99:8 271:14 **pursue** 25:2 **pushed** 189:2 | 78:6,13,20,22 88:22 93:19 97:16 102:18 102:21 112:20 |
| **proof** 280:23 281:14 | **providing** 10:24 119:11 | **pushing** 155:14 **put** 10:6 13:5 | 112:21 117:14 117:17 131:8 |
| **properly** 198:11 222:18 225:19 267:1 | 119:21,23 129:19 186:18 | 21:6 24:9 47:2 142:8 144:21 163:5 222:19 | 141:17 143:16 145:1,19 150:3 167:12 187:4 |
| **property** 23:10 **propose** 159:20 **prostate** 53:6,7 53:8 | **proving** 84:23 **prudent** 165:18 **pseudo** 85:7 **pseudolesion** 157:2 | 257:17 262:20 **putting** 37:12 51:21 172:17 | 189:13 199:2 206:21 218:16 218:18 221:24 223:2 228:6 |
| **protocol** 90:12 94:18 95:9 100:14 163:17 166:13 223:23 224:23 | **public** 1:18 296:17 297:5 297:23 298:25 **publication** 67:23 226:1 | **q** | 230:20 237:20 252:18 254:5 258:3 261:18 284:5 287:25 288:2,14 |
| **protocols** 91:6 **protrusions** 154:24 | **publications** 79:18 | **quadriceps** 52:10,12 **qualified** 30:17 **qualifier** 164:19 **qualify** 91:22 | 289:20 293:17 293:18 **questioning** 10:8 |
| **provide** 11:25 15:13 30:13 | **published** 74:13 | **quality** 90:10 90:17 100:12 187:8 210:24 | **questions** 12:11 20:5 28:12 |

**[questions - read]**                                                    Page 59

| | | | |
|---|---|---|---|
| 60:13 79:1 | 96:25 99:1 | 116:15 117:2 | **raise** 94:15 |
| 86:19 150:23 | 116:24 117:4 | 119:1,2 120:24 | **raised** 79:1 |
| 151:2,10,10,16 | 118:2,23 120:2 | 164:24 167:20 | **ramirez** 50:18 |
| 151:17 167:6 | 135:13,18,21 | 173:11 186:20 | **rarely** 54:10 |
| 191:8 202:23 | 136:9,21 137:5 | 253:17 261:2 | **raso** 2:19 3:3 |
| 290:4 292:13 | 138:18 156:14 | 268:8 293:21 | **rate** 29:13 |
| 295:7,9 | 157:10 159:7 | 294:3,13 | 76:20 100:5,6 |
| **quick** 14:5 16:5 | 161:4 162:6,20 | **rads** 60:10 | 213:10 |
| 100:9 | 163:16 166:12 | 61:10 62:10,13 | **rather** 268:12 |
| **quickly** 123:22 | 184:11 218:20 | 80:17 81:2,9 | **ratios** 69:2 |
| **quite** 100:23 | 239:5 246:21 | 81:18 84:7,20 | **ray** 30:1 31:15 |
| 174:6 179:20 | 247:1 248:4,21 | 85:19 87:11 | **rays** 29:16,22 |
| **quote** 82:19 | 258:13 266:9 | 88:16,18,21 | **reached** 136:23 |
| 86:7 | 282:21 288:20 | 89:15,23 90:5 | 137:11 248:25 |
| | **radiologist's** | 90:8,24 91:18 | **reaching** 75:7 |
| **r** | 131:10 138:3 | 92:4,5 93:15 | **read** 32:25 33:5 |
| **r** 2:1 3:1 21:14 | **radiologists** | 94:3,9,18 95:8 | 40:9 67:17,17 |
| 150:21 192:25 | 36:7,12,14,15 | 96:16,22 97:11 | 68:6,13 74:4 |
| **rad** 295:1 | 69:6 89:20 | 97:15,17 | 103:18,19 |
| **radiographs** | 105:23 111:18 | 100:18,19 | 104:1 114:7 |
| 29:16 31:15,17 | 119:22 172:25 | 104:7 112:13 | 116:6 120:16 |
| 45:7 | 185:2 257:13 | 121:3 214:11 | 123:8 125:5 |
| **radiography** | **radiology** 5:15 | 217:15 218:4 | 126:1 132:5 |
| 28:4 35:24 | 5:16 8:23 | 218:12,13,21 | 137:8 138:8,15 |
| 101:22 | 27:25 29:5 | 219:1,6,20,25 | 156:10 157:17 |
| **radiologic** | 36:5 46:18 | 220:3,5,14,22 | 157:25 158:1 |
| 61:17 | 48:21 59:15,22 | 221:4,11 | 163:19 170:11 |
| **radiologist** | 60:23 63:1 | 222:10,17 | 175:10 180:25 |
| 8:19,22 21:16 | 75:21 77:10 | 225:17,19,25 | 221:9 245:9 |
| 25:6 27:10,17 | 91:7 95:22 | 226:6 228:25 | 255:23 256:5 |
| 37:8 44:6 | 105:10,19 | 251:16 | 256:19 257:5 |
| 46:13 47:5 | 107:9 108:17 | **rainstorm** | 279:22 280:20 |
| 68:2,22 69:12 | 109:14,23 | 263:4 | 294:5 296:3 |
| 70:6 93:4,15 | 110:4 111:1 | | |

**[reader - recommended]**                                      Page 60

**reader** 28:4
29:9,14 30:17
32:3,16 33:4
34:11,23
**readers** 33:7
35:6
**reading** 28:25
29:6 33:5
34:14,19 35:2
35:10,13,18
61:12 215:12
**readings** 30:10
**ready** 110:24
**real** 14:5 16:5
18:12
**realize** 141:12
272:15
**really** 18:11
20:2 25:7,8
36:23 39:7
43:4 51:7
61:15,17 69:6
69:15,17 82:23
82:24 85:5,16
86:11 87:24
89:13 91:3
108:22 111:18
112:19 117:21
117:22 120:22
123:22 126:11
129:21 145:1,5
146:17 147:10
149:8 150:3
154:15,15,15

155:10 157:5,7
159:14 181:19
181:22,22
183:16 188:24
196:22 207:22
207:23 208:15
210:11 211:5
214:12,22,23
216:13,15
217:3 224:18
229:24 230:13
245:23 251:17
254:3 282:17
293:14
**realm** 28:6
36:16,17 41:7
56:23 223:19
231:2
**reappearing**
149:15,24
**reappointed**
118:5
**reason** 10:1,10
85:15,25
100:13 114:19
126:24 140:19
142:15 164:5
196:19 225:10
231:24 236:2
298:5
**reasonable**
42:19 78:2
94:4 218:24
223:1 227:18

230:25 234:20
245:3 249:3,5
280:15 292:8
**reasons** 82:18
83:6 86:10
133:15,16
144:20 213:7
225:16 231:3
231:16 246:10
**reboot** 263:8
**recall** 22:20
38:4 57:24
144:15 232:13
262:23
**recalling**
120:25
**recanalization**
176:11 177:21
179:10,19
**recanalize**
176:23
**recanalized**
178:24 179:1
**receipt** 94:1
**receive** 25:1
67:1 95:3,6
107:17 153:24
**received** 19:17
57:10 76:12
113:13,22
114:15 175:22
**receives** 91:11
**receiving** 66:20

**recent** 14:24
118:14,24
**recently** 118:4
118:6
**reception**
263:22
**recertify** 32:17
**recess** 14:9
47:12 103:11
115:24 139:9
208:23 238:7
269:8 275:19
281:5 290:14
**recognition**
158:7
**recognize**
55:22
**recollection**
48:4 52:23
164:7 186:22
188:18 233:21
262:19
**recommend**
94:8 95:25
151:23 200:8
217:15 239:2
240:7 269:25
**recommendat...**
27:7 217:11
251:17 291:7
292:24 293:1
**recommended**
137:19,21
138:5,18

153:24 163:21
237:1 238:19
239:6 253:18
**recommending**
246:13
**recommends**
226:6
**reconnect** 9:10
**reconstructions**
113:2
**record** 7:19
8:15 9:9 11:21
13:9 14:4,7,10
14:13 47:10,13
47:16 103:9,12
103:15 114:7
115:20,22,25
116:3,6 124:20
125:5 136:5
139:7,12 191:6
191:8 195:5
208:21,24
209:2 238:5,8
238:11 261:22
261:24 263:2
269:2,6,9,12
275:15,17,20
275:22 277:6
277:25 281:1,3
281:6,9 290:10
290:12,15,18
295:17 296:6
**recorded** 7:2
295:13

**recording**
295:10
**recordings**
74:24
**records** 74:24
116:17 174:4
240:14 293:16
294:7
**red** 198:24
203:21
**redirect** 4:9
177:18 292:17
**redraw** 201:12
**refer** 26:7 32:1
39:19 60:23,25
71:23 105:22
171:24 215:21
264:20 265:11
294:20
**reference** 12:20
69:1 75:8
87:14 151:18
154:3 175:21
176:3 204:23
207:17 211:12
240:15
**referenced**
59:21 62:7
67:8 107:11
**references**
278:18
**referrals** 25:1
**referred** 60:21
60:24 82:25

259:3 277:8
**referring** 38:22
82:6 91:10
175:17 177:1
245:11 264:22
265:11,12,16
**refers** 212:14
**reflection**
149:12
**refresh** 72:16
72:17 273:4
**regard** 120:8
**regarding**
24:20 55:24
56:21 80:21
208:12 258:22
282:17 291:12
**regards** 108:17
186:15 226:20
226:25
**regenerating**
128:17 168:14
171:7 230:3
**regenerative**
180:21
**region** 195:17
265:19
**registers** 84:11
**regress** 229:1
**regular** 131:2
230:4
**reiterate**
235:25

**reiterated** 80:8
**relate** 242:10
**related** 74:5,11
74:14 76:18
119:5 121:3
176:16 211:5
225:10 233:16
262:15
**relates** 35:13
35:18 37:3
62:6,23 80:2
106:18 122:2
148:5 208:11
249:16 258:7
294:17
**relating** 18:24
55:20 56:11
**relation** 126:20
210:8 260:1
**relationship**
130:3 162:7
**relative** 84:5
205:15,16
251:22 297:14
297:16
**release** 194:16
**relevant** 61:14
61:16 62:15
71:13,14 108:8
108:10 278:11
**reliable** 215:6
**reliably** 214:2,3
223:24

**[relied - represents]**                                            Page 62

| | | | |
|---|---|---|---|
| **relied** 60:9 75:7 | **renewing** 33:17 | 115:16 116:11 | 292:8 |
| 75:12,16 | **reopened** | 116:16,19 | **reported** 44:5 |
| 116:22 | 176:21 | 117:2,3 121:17 | **reporter** 1:17 |
| **rely** 69:17 75:7 | **reopens** 177:15 | 122:1 125:11 | 7:15,18,20,22 |
| 116:20 | **repaired** 51:3 | 127:13 134:10 | 10:19 11:3 |
| **relying** 111:19 | **repeat** 237:2 | 135:4,19 | 114:7 116:6 |
| 120:25 130:1 | **repeating** | 136:18 143:5 | 125:5 167:7 |
| 153:10 162:22 | 249:7 | 152:12 153:8 | 226:23 297:5 |
| 181:23 186:22 | **rephrase** 11:11 | 154:2,3 158:7 | **reporting** 91:2 |
| **remains** 287:11 | **report** 4:18,22 | 165:24 167:20 | 91:5 298:1 |
| 288:18 | 4:24 5:13,15 | 171:24 175:18 | **reports** 15:9 |
| **remember** | 5:24 6:1,3 | 183:13 192:17 | 16:10 18:5,22 |
| 19:10 20:9,12 | 12:15,18 15:8 | 201:25 208:13 | 18:25 54:11 |
| 20:17,21 21:9 | 15:12,13,24 | 211:13 218:5 | 59:15,22 63:1 |
| 43:25 44:24 | 16:2,6,11,18,23 | 224:22 227:4 | 75:21 79:20 |
| 57:12 58:11 | 17:1,8,11,16,21 | 240:13,16 | 91:6 104:1 |
| 59:1 60:18 | 17:24 18:13,23 | 241:6,8,16,23 | 105:10,19 |
| 162:19 188:12 | 18:24 43:12,15 | 242:8,16 | 107:10 116:15 |
| 235:13 249:5 | 54:13,16 55:3 | 246:21 248:4,7 | 158:8 240:15 |
| **remote** 7:2 9:23 | 55:19 56:1,7 | 248:8 249:13 | 242:4 294:6,14 |
| 295:14 | 56:13 57:23 | 249:19 251:9 | **represent** 8:13 |
| **remotely** 7:21 | 59:12,13,14,18 | 253:17 255:11 | 82:16 136:22 |
| 9:4 | 59:19,21 60:8 | 260:18 261:2,6 | 137:6 292:6 |
| **remove** 113:21 | 60:16 61:24,25 | 262:6,15,16 | **representation** |
| 203:12,14 | 63:2,2 67:8,11 | 264:3,19,23 | 56:22 |
| **renal** 38:4 | 67:24 70:24 | 265:3,10 | **representative** |
| 40:12,20 | 71:9,10,10,23 | 266:10 269:18 | 141:20 196:1 |
| 138:14 | 74:7 75:16 | 271:7 272:12 | 234:12 273:18 |
| **render** 100:10 | 77:10 78:4,18 | 272:15 276:5 | 274:5 277:15 |
| **rendered** 108:8 | 78:23 79:2,12 | 276:17,22 | **representing** |
| **rendering** | 79:16,17 80:3 | 278:18 279:2 | 24:18 25:13,18 |
| 121:1 283:17 | 91:8,9,16 | 282:22 286:16 | 56:17 |
| **renders** 100:11 | 104:23 105:1 | 287:1 288:13 | **represents** 77:2 |
| | 107:12 108:15 | 289:16 291:17 | 180:6 |

**request**  16:12
 73:25 74:3
 75:3,11 105:5
**requested**
 114:6 116:5
 125:4
**requests**  25:1
 73:17,22 74:1
 74:2
**require**  254:1
**required**  97:3,5
 137:20 138:5
 216:25 220:10
 293:19
**requirement**
 82:10,11
**requirements**
 36:19 81:17
 97:1 206:9
 225:1,24
**requires**  96:19
**requisite**  81:14
 82:5,16 86:12
 88:6 90:14,16
 95:12,17 98:16
 101:23 212:7
 215:3 283:5
 286:13
**requisition**
 94:6
**res**  186:18
**research**  74:17
 118:19,21,25
 119:5,7 120:5

120:6,7,18,20
 121:2,5,8,11,14
**reshuffle**  232:4
**residency**  8:24
**resident**  21:19
 21:21 119:19
**residents**  223:5
**residing**  8:1
**resistance**
 177:22
**resolute**  129:16
 186:25
**resolution**
 101:20 201:20
 201:20 249:10
 249:11 252:23
 254:5
**resolve**  144:24
 145:12 149:23
 158:11 162:12
 162:25 251:15
**respect**  81:23
 124:13 204:12
 212:25 223:17
 253:10 292:5
**respirations**
 200:17
**respond**  11:14
 78:25
**responding**
 10:22
**response**  10:24
 11:25 74:8
 80:4 114:9

128:15,17,17
 225:16
**responsibility**
 117:23
**responsive**
 73:23 75:2,10
**rest**  83:25
 88:14 119:9
 176:8
**restroom**  11:20
**result**  173:5
 282:19
**resulted**  50:2
 51:4
**resulting**
 179:18
**retained**  24:18
 25:18
**retrospective**
 222:7
**retrospectively**
 189:15 221:10
**return**  58:18
 239:17 294:8
**review**  14:2
 23:7 36:17
 45:22 60:4,7
 61:23 62:3
 82:14 105:14
 105:17,18
 107:24 108:13
 113:5 115:15
 116:16 120:18
 131:9,11 133:8

137:22 159:9
 186:20 187:21
 233:21 246:4
**reviewed**  23:6
 59:12,12,13,15
 59:16,18,19,20
 60:8,17 64:15
 106:14 113:6
 114:25 116:9
 135:4 174:3
 186:21 211:2
 228:12 241:7
 241:16 242:5
 261:7 282:5
 293:15
**reviewing**
 60:15 67:5
 77:19 105:25
 119:22 199:10
 218:14 236:25
 246:3 249:18
**reviews**  118:17
**rib**  38:19 44:25
**ribs**  37:25
**ridge**  3:6
**rigged**  213:9
**right**  8:9 10:10
 13:6 16:9
 17:18,22 24:7
 33:18 34:1
 38:17 43:10,21
 45:4 50:14
 59:1,10 70:4
 72:10 73:9,19

**[right - rule]**                                                                 Page 64

| | | | |
|---|---|---|---|
| 75:17,22 76:5 | 174:8,8,18,20 | 292:20,25 | 160:23 174:2 |
| 81:10 83:13,21 | 175:6,10,14 | **rigorous** 29:12 | 207:9 228:3 |
| 84:13 87:18,19 | 177:17 178:24 | **rim** 224:7 | 236:25 237:21 |
| 87:22 91:18,20 | 180:13,25 | **risk** 74:5,11 | 240:13 243:4 |
| 92:6,8 94:23 | 185:10 187:24 | 92:6,13,23 | 255:4 282:12 |
| 96:16 98:8 | 188:15 189:9 | 93:13 165:10 | 283:11 284:11 |
| 99:2 101:1,8,9 | 193:1,2,5,13,16 | 165:12,16 | 284:20 287:5 |
| 102:2,23 103:6 | 193:17,17,18 | **rmb** 1:3 7:7 | 288:16 289:4 |
| 106:16 107:1 | 195:3,20 202:1 | **road** 69:4,10 | 289:23 291:6 |
| 122:2 123:5,8 | 203:24 209:15 | 224:12 230:4 | 291:12 293:15 |
| 123:17,20 | 209:24 213:8 | 231:10 | 294:6 |
| 124:3,5,7,14,15 | 214:7 223:11 | **roberts** 55:18 | **roentgenology** |
| 124:19,21 | 232:9 235:3,16 | 55:19 56:12,18 | 60:25 |
| 126:1 127:25 | 238:4,17 239:7 | 57:6 65:16 | **role** 57:20 70:8 |
| 131:5 135:22 | 239:23 242:1,6 | 81:6 114:24 | 118:5,10 |
| 136:2,14,19,23 | 243:17,23 | 132:8 147:7 | 282:13 283:1 |
| 137:8,22 138:8 | 244:18,20,21 | 152:25 153:24 | **room** 9:13 |
| 138:11,15 | 245:9,20 | 156:4 164:10 | **rosemarie** 57:4 |
| 139:2,25 | 247:16,20 | 177:14 183:3 | 57:5,5 |
| 142:12 143:5 | 248:2,25 249:6 | 200:16 218:14 | **roughly** 17:10 |
| 144:12 146:7 | 252:18 255:2 | 224:13 238:17 | 32:5 77:21 |
| 147:2,13 148:8 | 255:10,23 | 239:17 242:12 | 185:8 |
| 151:20 152:20 | 256:2,5,9,19 | 254:22 291:8 | **rounded** |
| 153:25 154:24 | 257:5,22 | 293:5,23 294:8 | 154:20 |
| 156:3,5,9,10,16 | 261:12 262:9 | 298:2 | **routine** 89:18 |
| 156:20 157:11 | 262:21 264:7,9 | **roberts's** 65:9 | 116:25 |
| 157:17,23,25 | 264:23 265:20 | 66:9 76:12 | **rt** 141:25 |
| 158:1,13,20 | 266:8 268:5 | 105:9 106:10 | **rule** 10:19 11:8 |
| 159:17,18 | 270:10 271:6 | 107:4,6 116:17 | 11:18,23 |
| 160:24 163:19 | 271:15,24 | 122:10 124:15 | 145:19 146:4 |
| 164:12 165:2 | 272:5,7,13 | 135:5 143:20 | 235:3 236:19 |
| 165:23 166:1 | 275:13,16 | 144:3 145:22 | 236:23 281:19 |
| 166:20 167:2 | 278:12 279:22 | 146:6 147:24 | 282:1,11,25 |
| 168:11 170:11 | 280:4,6,10,20 | 148:7,12 150:8 | 283:11 286:10 |

**[rule - scratching]**                                                    Page 65

| | | | |
|---|---|---|---|
| 286:13 288:19 | **saying** 45:14 | **scan** 4:24 5:7 | **scans** 23:15 |
| 288:19 289:2,7 | 47:3 89:18 | 31:16 80:15 | 31:8 38:16 |
| 289:21 290:1,2 | 91:23 94:6 | 81:9 82:5 | 45:13 46:9 |
| **ruled** 150:6 | 129:8 130:14 | 83:10,14,15,17 | 148:7,11 |
| 152:15,23 | 147:9 149:21 | 84:16 85:3,6,7 | 157:20 182:9 |
| 287:3 288:14 | 150:21 151:7 | 85:9,18 90:14 | 221:7,18 222:3 |
| **rules** 10:15 | 155:14 156:15 | 93:16 94:3 | 222:8,18 |
| 200:14 | 160:1,2,18 | 95:6,18 96:9 | 236:25 237:21 |
| **rupture** 52:11 | 163:6,7 170:21 | 97:14 99:1 | 238:17,22 |
| **rutgers** 21:22 | 172:16 173:17 | 110:16 112:7 | 258:23 |
| **ryan** 24:3,5,10 | 181:3 182:13 | 130:19,24 | **scarring** 99:10 |
| | 192:4 204:23 | 138:18 153:25 | 168:10,15 |
| **s** | 207:21 208:3 | 154:2 160:13 | 169:9,19 171:8 |
| **s** 2:1 3:1 4:12 | 215:10 259:6 | 161:22 166:5 | **scenario** 94:5 |
| 21:14 298:5 | 279:24 280:1 | 166:14,16 | **school** 9:1 |
| **safe** 10:14,14 | 280:22 281:12 | 172:23 174:17 | 21:23 39:10,11 |
| **safety** 74:5,11 | 281:15 285:3,6 | 178:6 179:3 | **science** 36:22 |
| 121:12 | **says** 30:16 83:5 | 200:6 209:6 | 113:18 |
| **sag** 125:24 | 84:7 105:8 | 210:13,14 | **scope** 93:5,21 |
| **sagittal** 113:1 | 123:11 125:21 | 213:6 215:17 | 108:23 134:6 |
| **sags** 185:1 | 134:24 136:9 | 215:20 216:4 | 165:11 168:4 |
| **sak** 1:3 7:7 | 136:21 137:5 | 216:23 217:2 | 169:4 179:21 |
| **sanctions** | 141:25 142:18 | 218:14,19 | 282:15 283:3 |
| 287:22 | 153:18 154:7 | 220:14 221:9 | 283:13,24 |
| **save** 155:1 | 156:8 157:10 | 224:3,15,21 | 284:13,23 |
| 250:11 | 157:15 158:18 | 225:6,12 230:5 | 285:4,14 286:4 |
| **saved** 198:11 | 162:6 163:16 | 231:11 239:22 | 286:11 |
| 198:12 | 164:6 187:13 | 293:8 | **score** 31:19,19 |
| **saw** 95:18 | 191:2,2 261:2 | **scanned** 97:10 | **scoring** 30:2 |
| 107:9 139:20 | 272:12 | 175:24 | **scratch** 63:16 |
| 145:2 161:5 | **scale** 91:10 | **scanner** 101:22 | 161:2 |
| 163:22 201:19 | 92:5 93:16 | **scanning** 84:12 | **scratching** |
| 215:8 232:13 | 205:15 220:23 | 153:19 | 85:23 |
| 238:25 281:20 | | | |

| | | | |
|---|---|---|---|
| **screen**  13:5,21 | **secret**  16:15 | 192:9 195:15 | **seeking**  26:3,13 |
| 13:23 36:11 | 25:25 36:13 | 195:22 200:22 | **seem**  244:6 |
| 70:19 71:6 | **section**  77:1 | 201:18 205:21 | **seemed**  33:7 |
| 73:10 76:7 | 106:13 113:16 | 206:3 210:17 | 244:12,13 |
| 124:6,7 185:20 | 118:18 119:20 | 214:10 216:13 | **seems**  26:18 |
| 191:1 192:21 | 120:10 139:17 | 218:22 221:7 | 38:2 60:9 78:2 |
| 193:1,10 195:1 | 184:25 241:4 | 222:9 223:25 | **seen**  31:17 |
| 201:5 209:7,25 | 261:12,17 | 224:16 228:19 | 45:15 71:1,16 |
| 240:25 241:22 | 262:5 278:19 | 229:11,11,21 | 72:9 73:14 |
| 271:24 272:6 | 291:18 | 229:22 230:12 | 107:8 128:18 |
| **screening** | **sections**  4:20 | 230:18,19,20 | 128:21 134:7 |
| 241:4 268:8 | 62:15 116:10 | 230:22 231:1 | 156:9,13,15 |
| **screenshot**  5:5 | 124:3 184:24 | 231:17,18,19 | 157:11 160:9 |
| 5:6 202:24 | 184:24 | 231:19,20,21 | 168:23 169:6 |
| 203:1,21 | **see**  13:20,23 | 231:22 240:8 | 172:5,19 |
| 206:14,17 | 30:1 36:9 46:8 | 241:13 242:1 | 173:18,18 |
| **scroll**  73:18 | 53:15 61:5 | 248:8,12 253:3 | 180:12,13 |
| 74:1 117:16 | 73:22 76:6 | 254:16 256:22 | 184:12 188:20 |
| 274:15 | 85:16 87:15 | 256:22,24 | 231:4 242:23 |
| **sealing**  50:1 | 95:2,6 99:1,10 | 257:14 265:5 | 254:2 256:8 |
| **seats**  154:16 | 105:21 107:11 | 270:23 272:7 | 263:5 266:9 |
| **second**  29:4 | 108:19 119:1 | 277:17 283:18 | 285:19 287:2 |
| 63:16 72:20 | 126:21 131:20 | **seeing**  70:9 | 287:12 |
| 81:4 88:4 | 133:10 143:22 | 72:14 122:18 | **segment**  5:4,20 |
| 121:25 125:22 | 145:2,7 148:6 | 133:11 154:18 | 168:22 187:14 |
| 126:3 138:10 | 149:13,18 | 172:10 181:4,7 | 192:19 195:14 |
| 143:4 152:7 | 159:6 171:2 | 181:8,10,25,25 | 196:8,10 197:7 |
| 154:6 157:22 | 172:25 178:10 | 183:17 184:13 | 197:18 200:1,7 |
| 223:21 226:22 | 178:12,16 | 189:14 204:13 | 200:13 201:10 |
| 242:12 244:3 | 181:12,15,16 | 205:17 210:5 | 202:17 204:7 |
| 261:13 266:1 | 181:19,20,20 | 228:14 233:18 | 211:8 226:13 |
| **seconds**  84:18 | 181:23 182:13 | 238:22 270:24 | 226:16,21 |
| 87:4,17,23 | 183:10 187:23 | 272:9 | 227:1,3 228:14 |
| 217:8,18 | 189:3 191:1,11 | | 228:15 232:8 |

**[segment - shortly]**                                    Page 67

234:7,16
235:11 256:18
257:14 258:8
258:17 262:10
262:21,24
264:4,6,10,12
266:2,7 271:8
272:11,12,25
273:1,19,21
275:13 276:5
276:19,24,25
277:1,13 278:8
278:19 286:16
288:2,14
289:17
**segments** 5:2
159:18 175:6
175:14 178:15
182:18 186:1,2
188:5 202:7,8
202:9 208:12
209:19 243:17
244:15,20
256:1,9 264:21
265:11,17
269:17 276:21
277:13 279:21
288:22
**sellers** 130:8,14
**semi** 154:18
**send** 36:25
**sense** 133:10
149:20

**sensitive** 90:10
245:14,20
251:19
**sensitivity**
249:9
**sent** 45:18
**sentence** 123:3
125:20 130:13
131:8 132:2
154:7 156:12
158:18 180:19
**separate** 15:15
265:4,8
**separately**
237:18 276:23
**septic** 51:15
52:21
**sequel** 232:12
**sequences**
82:17 90:15
231:5 277:18
**sequential**
145:12 213:2
215:4 219:4,8
224:5,19 226:2
259:5
**sequentially**
80:14 189:14
206:12
**series** 5:3,7,9
5:10 83:4,4,7
85:4 86:9,12
86:16,25 90:16
98:10 109:21

110:7 111:6,9
111:14 112:5
112:17,22
115:11 159:16
166:24 176:1,4
176:9 182:16
182:16,20,22
183:11 184:22
185:1,7,11,12
185:18,25
186:3 189:10
195:9 196:21
200:1,2 201:8
201:18 202:19
203:8 204:8
205:1 207:8,19
207:24 208:10
208:16,18
209:5,15
210:20 211:8
211:18,22
212:7,12,24,25
213:2,4,14,22
214:16 215:3,7
216:7,25 217:7
217:16,19
219:13 220:4
224:5,11,19
225:1 226:3
227:1,11
232:17 267:7
267:19 268:14
268:23 269:16
270:3 271:12

273:1 276:3
277:18 293:3
**serve** 15:2
**served** 24:14,16
**service** 32:20
33:2 90:11,19
120:1
**set** 36:18 37:23
100:14 114:11
222:18 223:23
297:9
**setting** 54:3
157:7
**seven** 54:21
**several** 88:24
**severe** 44:19
**shading** 205:13
**shadows** 204:1
**shaking** 11:5
**share** 13:19,21
13:25 72:13,14
73:1 140:15,22
141:6 145:9
186:6 209:9
274:16
**shared** 14:19
112:11
**sharing** 14:1
**she'd** 208:6
**sheet** 24:4
296:5 298:1
**shore** 8:2
**shortly** 20:16

**[show - sorry]**                                          Page 68

**show** 70:18,23
  71:6 139:18
  140:14 164:4
  192:2 195:16
  196:4 200:5
  210:10 237:18
  248:6 258:15
  271:2 274:22
  276:13 280:23
  281:13,16
**showing** 130:21
  188:10 198:2
  252:2 270:22
  274:20
**shown** 66:17
  255:4
**shows** 135:9
**shrunken**
  172:7
**shulman** 3:15
**si** 3:9
**sic** 123:4
**sick** 174:4,11
  174:16
**side** 9:20 10:7
  25:8 26:5
  36:23 48:22
  83:22 87:22
  124:6,7,15,16
  156:3,4 192:25
  193:2,2 209:24
  261:14,14
  262:22,22

**sides** 124:6
  223:11
**sign** 41:1
  132:18,19,22
  173:13
**signal** 262:12
**signature** 56:10
  297:21
**signed** 25:24
  43:20
**significance**
  132:7
**significant**
  79:12 85:5
  89:1 132:3
  254:6
**siken** 3:11
**similar** 99:18
  161:8 230:11
  232:15 264:9
  288:21
**similarly**
  110:17 155:17
  159:11 162:10
  212:21
**simple** 51:16
  91:4 138:13
  229:2
**simplistic**
  92:20
**simply** 98:17
  203:20
**singapore** 27:3

**single** 41:18
  112:9,13,14
  199:5 218:9
  274:19
**sir** 125:2
**sitting** 145:19
  161:13 213:21
  246:3
**situation** 34:8
  142:4 166:11
  172:9 224:9
**situations** 25:3
  195:4
**six** 72:17 97:12
  163:17,22
  164:1,18,21
  230:5 237:3
  238:21 239:6
  253:18 295:13
**size** 162:15
  163:1
**skeletal** 22:13
**skeleton** 38:22
**skills** 33:8
**skin** 44:18
**skip** 189:9
**slack** 169:21
**slice** 233:19
  274:23
**slide** 142:22
  150:16
**slides** 38:16
**small** 157:24
  160:1 173:7

  205:24
**smaller** 236:2
**smooth** 154:20
**soft** 44:19
  137:7,12 138:3
  249:10
**software** 12:6
  12:10 36:7
**solely** 293:20
**solid** 126:21,25
  127:24 128:4,6
  128:7,11,24
  130:5,5,6
  131:16,21
  136:14
**solidified** 80:9
**solution** 263:22
**solutions** 7:14
**somebody**
  35:14
**someone's** 91:8
  179:17
**somewhat**
  154:8 155:7
  167:19
**sooner** 186:15
**sorry** 14:5
  49:14 65:6
  72:13,20,22
  74:1,21 121:20
  136:4 137:5
  149:4 151:21
  167:4 174:6
  203:11 212:10

**[sorry - standardizing]**                                      Page 69

221:22 230:8
259:1 260:20
263:3 270:4
279:5 280:25
290:22 293:25
**sort**  9:8 10:6
34:8 38:9
43:24 54:6
86:20 92:7
104:19 130:12
139:19 154:21
163:5 222:7
**sorts**  22:11
92:24 93:13
**sound**  10:24
11:6,12,16
12:1 40:13
134:13
**sounds**  11:22
44:21 138:17
236:5
**south**  193:12
**space**  38:10
142:1
**sparing**  127:2
128:2,3 129:10
137:6,16
**speak**  10:21
25:2 26:17
71:24 169:22
**speakers**
171:10
**speaking**  76:23

**special**  29:21
112:10
**specialist**  7:13
**specific**  59:7
156:24 161:14
176:1 180:20
253:7 285:23
**specifically**
20:13 50:16
109:6 223:6
225:14 269:20
**specified**  164:8
164:19
**spectrum**  172:6
212:23
**speculate**  16:8
159:21
**speculating**
255:6
**spell**  21:13
**spend**  67:4
234:10
**spent**  66:1
76:18,23 77:3
77:15,17
**spinal**  22:14,21
38:20 49:4,4
50:3,11,13
54:3
**spine**  22:17
23:15 38:1,24
48:25 49:2
50:11,17
252:21

**spleen**  85:2
102:6 132:4,8
132:21 133:19
133:24 137:25
138:11
**spleens**  132:14
**splenomegaly**
132:16,17
137:24 138:11
176:16
**split**  129:3
265:3
**splits**  48:14
**splitting**  216:13
276:12
**spoke**  276:12
**spoken**  56:20
171:7
**spot**  125:17
126:3 143:5,19
144:2 147:5
148:7,15,25
149:4,25 150:7
152:16 235:22
236:20 237:14
237:16 256:8
278:17 279:25
280:2
**spots**  163:8
165:17 174:20
237:10,22
**spreadsheet**
42:25

**square**  3:6
**stabbed**  51:1
**stabbing**
145:13
**stack**  212:13
278:11
**stacked**  200:19
**stage**  172:4
173:3 193:16
**stages**  173:2
**stagner**  48:17
48:20
**stamped**
114:22
**stamps**  109:10
115:12
**stand**  91:1
**standard**  1:20
45:24 46:1,6,7
46:20 47:4
51:3 109:16
224:21,22,23
291:12,15
293:13,24
294:2
**standardization**
91:4,12
**standardize**
91:14
**standardized**
91:5,6,16
**standardizing**
89:14

**[standby - submitted]**                                    Page 70

**standby**  290:11
**stars**  231:22
**start**  10:24
   23:2 32:2 38:9
   38:9 44:2
   80:18 83:9
   84:12 99:20
   110:21 139:23
   140:3,11 141:2
   141:16,22,23
   143:16 151:23
   187:24 194:11
   198:21 209:20
   259:3 267:10
   269:23 270:22
   271:3,11 273:2
   273:21,22,22
   293:25
**started**  17:17
   18:7,11,22
   25:22 26:16
   27:6 28:6
   32:10,15 37:8
   85:4 110:10,12
   110:20 164:25
   184:4 221:3
**starting**  37:18
   88:12 141:21
   220:4 257:8
   270:1
**starts**  81:1,13
   82:1 164:7
   260:9 279:10

**state**  1:18 8:14
   60:6 143:7,14
   143:17,18
   144:1 198:18
   198:22 199:11
   212:21 226:7
   227:14 228:1
   234:14 277:7
   297:5,23
**stated**  82:2
   213:8
**statement**
   103:2 105:5
   295:5
**statements**
   208:12 296:7
**states**  1:1 7:7
   82:9
**static**  144:10
   200:16
**status**  56:21
**stay**  200:2,3
   232:9 277:16
**staying**  33:6
**stenographic**
   7:19
**stenographic...**
   297:8
**step**  145:14
**stephanie**  3:5
**stick**  80:23
**stipulate**  7:20
**stipulated**  7:17

**stock**  85:2
   207:19 212:16
**stone**  110:3
   119:25
**stop**  193:13
**street**  223:14
   225:9
**strike**  24:15
   287:17,21
   290:22
**strive**  96:13,15
**stroke**  52:4
**stronger**  182:1
**strongly**  85:21
**structure**  88:23
   99:21
**structures**  84:5
   102:1 133:23
   251:15
**stuck**  159:24
   162:22
**studies**  45:19
   59:14,16,21,23
   61:19 62:25
   75:20 80:25
   106:15,18,24
   107:3,7,9,15,17
   107:24 109:11
   109:20 111:11
   111:13 113:6
   113:13,23
   114:25 117:2
   133:7 149:14
   149:19 195:24

**study**  86:17,22
   94:15 105:24
   112:12 114:14
   162:14 163:18
   183:2 199:4,16
   212:12 214:3,9
   222:7 224:11
   231:5,17,18,18
   243:9 245:5
   249:22 250:22
   251:1 252:5
   253:6 259:17
   267:3
**stuff**  50:23
   71:15 90:4
   110:3 114:12
   169:16 181:18
   249:11
**sub**  100:10
**subcentimeter**
   5:1 170:9
   175:5,13
   182:17,21
   186:2 187:14
   188:4 192:16
   201:25 202:6
   209:18 234:6
   279:20
**subdiaphrag...**
   87:15
**subject**  92:18
**submit**  43:12
**submitted**  15:7
   15:9,24 16:1,6

**[submitted - tab]**                                    Page 71

| | | | |
|---|---|---|---|
| 54:13,16 55:3 | **superior** 211:2 | 277:22,24 | **swear** 7:22 |
| 55:19 56:13 | 251:11,22 | 290:8 | **switch** 158:2 |
| 67:11 76:14 | **supervising** | **surface** 85:23 | 238:3 |
| **subscribe** | 90:18 162:21 | 155:15,15 | **sworn** 8:3 |
| 296:6 | **support** 46:19 | 167:18 168:1 | 296:12 298:22 |
| **subscribed** | **supposed** 48:16 | 172:14 | **synopses** |
| 296:12 298:22 | 141:7 151:21 | **surgically** | 119:23 |
| **subscription** | 155:14 | 156:7 | **synopsis** 69:21 |
| 120:1 | **sure** 8:16 9:6 | **surmising** | **system** 29:16 |
| **subsequent** | 13:25 18:1 | 172:18 | 30:2 84:15 |
| 145:13 148:7 | 25:20 27:20 | **surprising** | 86:9 88:7,10 |
| 175:1 214:6 | 28:19 30:12 | 53:13 172:3 | 89:2 91:3 |
| 240:1 247:12 | 38:5,6 55:25 | **surrounding** | 100:18 109:24 |
| 279:10 | 59:3 60:14 | 49:4 52:20 | 119:3 120:13 |
| **subset** 114:23 | 64:11 67:18 | 127:6 158:16 | 120:17 133:14 |
| **subspecialized** | 72:22 73:11 | 260:11 | 133:23 176:18 |
| 36:16 | 79:11 82:12,21 | **surveillance** | 176:19 211:2 |
| **subspecialty** | 93:22 96:8 | 30:22 31:7,24 | 272:3,5 |
| 120:23 | 97:1 104:22 | 32:7,9,11 | **systems** 111:1 |
| **succinctly** | 112:6 123:10 | 34:22 89:8,10 | **t** |
| 170:21 | 130:13,23 | 165:17 224:14 | |
| **suddenly** | 134:14 136:6 | 225:10,15 | **t** 4:12 262:12 |
| 149:15,24 | 139:22 153:9 | 238:20 240:1 | **tab** 5:18 13:12 |
| **suffers** 112:8 | 160:21 161:13 | 253:11 | 72:3 75:23 |
| **suffice** 223:18 | 164:22 166:10 | **suspect** 144:14 | 104:24 117:7 |
| **sufficient** | 171:19 175:15 | 159:21 235:19 | 123:22 134:17 |
| 204:16 212:1 | 198:11 200:14 | **suspected** | 140:4,16 |
| 212:15 226:2 | 201:24 204:10 | 94:14 | 153:11 185:17 |
| **suggestive** | 210:19,21 | **suspecting** | 209:5 240:18 |
| 180:24 181:5 | 220:17 226:20 | 132:15,16 | 260:20 267:20 |
| 245:5,6 | 233:25 234:11 | **suspicion** 92:21 | 270:5 271:16 |
| **suite** 2:21 | 258:10 265:10 | 92:25 | 272:4 286:15 |
| **sunday** 64:16 | 266:17 271:5 | **swaying** 263:14 | 288:5,6 289:9 |
| 64:18 | 276:7,10 277:5 | | |

**[table - testimony]**                                                    Page 72

| | | | |
|---|---|---|---|
| **table** 223:8,12 | 269:8 275:19 | **tech** 13:5 | **telling** 46:22 |
| 231:9 | 281:5 290:14 | 117:16 129:19 | 110:4 |
| **tabs** 272:3 | 295:15 297:8 | 130:20 189:7 | **temporally** |
| **tailored** 225:15 | **talk** 82:23 | 189:20 191:21 | 54:22 |
| **take** 7:21 11:18 | 201:25 205:14 | 192:3,11,24 | **ten** 18:15,25 |
| 11:19 23:14 | 213:6,22 214:3 | 193:25 | 76:18 77:2,21 |
| 29:12 30:16 | 216:1,2 223:21 | **technical** 114:1 | 89:6,19,24 |
| 36:21 47:8 | 251:9 252:23 | 115:2 221:21 | 90:6 222:4 |
| 63:23,25 80:14 | 277:1 | 246:19 257:19 | **tend** 54:8 |
| 82:13,14 85:2 | **talked** 27:8 | 262:25 275:14 | **tendon** 52:10 |
| 86:20 88:1 | 258:21 276:23 | **technician** | **term** 29:17 |
| 89:13 103:6 | 287:21 | 135:8 | 37:15 51:11,22 |
| 124:25 134:12 | **talking** 40:4 | **technique** 94:3 | 92:20 122:23 |
| 139:5 153:8 | 70:24 82:21 | 101:23 129:16 | 133:19 157:3,7 |
| 169:14 186:7 | 86:24 90:5,15 | 231:11,23 | **terminology** |
| 191:10 195:1 | 90:16 98:6,7 | **technologist** | 82:20 205:11 |
| 198:12 200:11 | 150:24 158:13 | 110:21 111:16 | **terms** 51:21 |
| 202:24 204:24 | 159:20 160:9 | 111:17,20 | 61:18 70:12 |
| 206:14 208:17 | 161:15 172:12 | 129:23 135:14 | 82:23 91:9 |
| 211:9 212:16 | 180:11 204:8 | 248:16 | 159:3 205:2 |
| 216:4 227:4 | 205:14 208:4 | **technology** | 223:2 239:24 |
| 231:3 238:2 | 209:25 210:20 | 191:23 | 249:25 250:25 |
| 260:17 265:1 | 214:6 215:22 | **techs** 111:25 | **test** 92:19 |
| 268:21,24 | 224:23 231:12 | **tedious** 35:1 | **testified** 8:4 |
| 287:22 | 231:13,14 | **telephone** 9:25 | 18:24 25:12 |
| **taken** 1:19 7:5 | 233:10 238:16 | **teleradiology** | 41:24 55:11 |
| 14:9 47:12 | 253:24 255:18 | 119:13 | 291:16 |
| 103:11 114:24 | 265:2,25 266:8 | **tell** 36:2 46:22 | **testify** 16:12 |
| 115:24 147:6 | 266:18 271:6 | 73:3 117:19,22 | **testifying** 9:14 |
| 148:11 173:8 | 272:2 277:13 | 117:25 118:25 | **testimony** 4:15 |
| 185:9,9,12 | **talks** 223:11 | 137:11 151:21 | 9:17 10:11 |
| 208:23 217:1,4 | 262:8 | 187:17 194:2,4 | 14:20 15:5,13 |
| 217:19 220:15 | **target** 84:1 | 194:21 230:7 | 15:16 16:22 |
| 220:24 238:7 | 111:22,23 | 262:24 | 24:20 41:23 |

| | | | |
|---|---|---|---|
| 42:22 46:17 | 263:12 266:22 | 158:2,3 163:24 | 231:20 242:12 |
| 50:7,20 52:18 | 273:17 | 163:24 164:1 | 266:6 271:7 |
| 52:20 53:3,11 | **things** 27:13 | 164:21 172:2 | 277:1,4 |
| 53:24 59:17,20 | 37:19,20 51:21 | 177:5 181:13 | **thorny** 78:20 |
| 60:10,16,21 | 69:15 92:24 | 183:10 184:7 | **thought** 27:3 |
| 61:3,9 66:20 | 93:3 99:10,17 | 184:18,18,19 | 111:14 207:14 |
| 77:19 79:13,24 | 99:18 111:17 | 184:22,25 | 257:16 279:5 |
| 80:3,9 94:25 | 119:16 122:19 | 188:20 189:15 | **thoughts** 149:6 |
| 102:15,25 | 131:1 132:13 | 191:20 192:5,6 | **thousands** |
| 207:11 220:8 | 166:20,21 | 193:20 196:4 | 199:6,11 |
| 240:4 297:7 | 171:6 172:13 | 200:4 207:20 | **three** 28:8,17 |
| **text** 61:12 76:8 | 173:7 180:12 | 212:22 218:17 | 28:18 29:2 |
| 268:6 | 181:5,8 183:1 | 221:11 223:1,2 | 62:8,18,24 |
| **thank** 14:17 | 185:4 188:20 | 230:10 232:10 | 64:4 67:6 69:9 |
| 47:20 112:19 | 190:1 204:13 | 233:16,20 | 74:3 82:13 |
| **theme** 38:2 | 210:17 218:20 | 234:20 235:13 | 96:9,23 97:3 |
| **theoretically** | 223:13 229:25 | 249:2 251:18 | 97:12 130:14 |
| 81:20 | 250:7 254:1,2 | 252:22 253:8 | 149:14 164:1 |
| **thigh** 53:21 | 258:22,22 | 257:20,22 | 164:17,21 |
| **thin** 184:25 | **think** 23:25 | 258:1 263:1,21 | 206:3 223:13 |
| **thing** 11:2 | 25:25 29:2 | 264:24 265:2 | 230:5 237:2 |
| 13:21 26:23,25 | 32:6 35:1 | 266:20 267:9 | 238:21 265:4,5 |
| 67:23 69:16 | 36:20 37:2,11 | 268:5 273:12 | 265:7,7,11,17 |
| 78:11 83:17 | 45:19 59:8 | 273:16 276:13 | 266:23 276:13 |
| 85:24 120:10 | 61:2 90:2 | 284:3 292:14 | 276:14,21 |
| 129:20 130:24 | 96:25 97:3 | **thinking** 89:19 | **thresholds** |
| 136:11 140:15 | 99:19 108:6,12 | 89:21 90:6 | 37:23 |
| 141:6 149:21 | 114:2 115:19 | 155:24 188:7 | **thrombosis** |
| 149:24 150:18 | 120:16 128:21 | 245:24 | 175:9 |
| 158:14 159:17 | 129:20 131:19 | **thinks** 120:11 | **throw** 267:18 |
| 161:9 172:11 | 139:5 145:8 | 212:15 | **throwing** |
| 185:19 191:13 | 146:18,18 | **third** 29:6 | 159:17 |
| 219:17 231:6 | 150:20 151:3,3 | 35:21 41:8 | **thursday** 1:13 |
| 232:3 262:23 | 152:1,18 158:1 | 42:14 138:13 | 1:19 7:10 |

[thursday - trajectory]                                                    Page 74

295:15
**tick**  158:3
**time**  1:20 7:11
7:12 11:19
14:6,12 15:7
15:12,16 16:25
17:7,23 18:6
18:21 19:12
21:2 25:12
26:12 27:18
32:5 35:18
42:7 43:5,7,12
46:16 47:9,15
63:19,22 64:9
64:24 65:8,16
65:22 67:4
76:23 77:3,9
77:14,15 79:2
89:22 90:5,14
96:7 98:19
103:8,14
105:17 107:13
107:14 109:10
109:22,23,25
110:2,4,9,14,16
110:18,19,20
114:21 115:8
115:12,21
116:2 118:25
122:11 124:21
131:10 139:6
139:11 148:15
150:22 175:24
179:20 185:19

186:7 198:12
208:20 209:1
212:23 217:12
220:15 224:17
230:13,19,20
231:8,20,21,21
238:5,10 239:5
242:2 243:5
255:9 257:18
258:16 259:17
260:9,10
261:23 263:20
269:5,11
275:17 280:24
281:2,14
290:11,17
292:11 295:16
295:16 297:8
**timed**  204:16
217:5,22
222:18
**timely**  44:16
53:5 246:13
**times**  9:7 43:3
54:16 55:3
63:17 64:13
65:15,21,21
72:18 114:20
221:17 222:2,5
238:24 283:14
289:25
**timing**  48:22
49:10 87:20
100:6 115:5

213:9 214:14
216:3 220:4
224:2
**tired**  22:4
**tissue**  44:19
126:20,23
137:7,12 138:3
170:14,15,17
245:8,15
249:10 252:23
253:3
**tissues**  252:25
**today**  7:10 9:14
9:18 10:11
42:23 63:22
65:17 71:21
145:19 161:13
255:18 287:13
**today's**  9:3
13:10 59:11
60:1 63:4
71:25 73:15
**together**  13:6
21:18 172:18
**told**  107:19
110:21 223:4
**took**  39:11
63:24 72:19
77:9 114:12
**tool**  189:25
190:3,25 268:9
**tools**  191:3,12
191:16 205:2

**top**  83:9 105:4
125:21 155:25
190:12 191:1
241:22 243:15
248:11 261:1
**topic**  36:5 69:8
**topics**  61:20
74:6 120:24
238:3
**total**  77:24
224:25
**totally**  12:22
18:16,16
104:15 171:20
206:8
**touch**  24:10
**touched**  159:12
164:4
**towards**  156:1
267:11
**toxicologist**
106:4
**toxins**  30:24
32:21
**track**  31:9
**tracking**
239:24
**tracks**  48:9
**trained**  37:7
**training**  61:21
116:23 252:20
**trajectory**
240:9

[trans - type]                                                                        Page 75

**trans**  48:11
  125:23 141:25
**transcript**  62:4
  62:25 66:20
  67:7 103:19,20
  296:3,6 297:7
**transect**  48:12
**transection**
  48:13
**transformation**
  69:3,13
**trauma**  22:13
  22:14,16,21
  23:9,12 54:3
  119:5,6
**travel**  126:18
**travels**  133:14
**treat**  215:11
**treated**  219:15
**treating**  69:16
  214:23 291:6
  293:23
**treatment**
  70:13 225:15
**trial**  13:5 50:9
  117:16 189:7
  189:20 191:21
  192:3,11,24
  193:25
**triangulate**
  183:10 210:5
**trick**  11:9
**tried**  25:2
  27:13 51:16

**trigger**  84:10
  87:12
**triple**  94:8
**true**  15:17,19
  25:14,15 39:20
  41:5 56:8
  59:23 62:11
  68:15 74:11,12
  74:14,15 76:18
  76:19 84:2
  87:5 102:13
  105:10,11
  106:2,3,4,5,7,8
  106:11,12
  116:17 124:16
  133:10 137:13
  147:7,20,25
  148:12,13,16
  149:1 158:23
  159:4 160:4
  161:25 167:16
  168:3 182:11
  216:17 217:17
  220:1,2 233:20
  235:4,6 236:20
  239:14 246:22
  247:5 248:4
  254:10,23
  262:6,7 271:9
  279:15 280:24
  281:14,21
  282:6 283:12
  284:12 289:4
  293:16,17

  294:3,4,9,19,24
  295:4 297:7
**truly**  131:20
**trust**  113:25
**trusted**  114:15
**trusting**  146:12
**truthful**  10:11
**try**  11:11 25:17
  26:12 29:1
  36:15 100:17
  122:17 146:21
  183:9 188:16
  192:8,10,24
  193:23 195:16
  195:24 196:25
  219:21 234:12
  263:15,20
  273:18 277:15
  277:16
**trying**  11:9
  24:24 25:17
  27:5,22 36:9
  90:13 152:6
  182:2 185:5
  188:19,21
  189:13 192:3
  195:14,17
  201:1,1 204:11
  210:5 233:2
  235:17 236:6
  272:1 274:4
**tumor**  44:25
  90:7

**turn**  105:16,18
  235:12 266:25
**turned**  16:10
**turning**  16:7
**twice**  231:19
**two**  15:15
  21:17 54:9
  60:8,17,18
  69:9 99:19
  106:14 115:14
  116:10 123:19
  125:17 136:14
  136:17 138:3
  142:2,20 144:8
  149:25 155:16
  165:25 166:1
  175:25 190:23
  195:24 202:12
  202:13 213:1,4
  216:12 226:2,3
  229:11,21
  242:10,14
  243:25 244:1
  261:12,16
  262:6 264:22
  265:8,12,15,16
  276:14,21
  284:21 285:21
  286:3
**type**  4:5 31:19
  32:3,13 40:9
  40:20 41:10
  44:1 47:25
  48:17 49:14

[type - undiagnosed]

50:18 52:6,16
53:2,10,23
58:2,11,13
69:7,8 70:14
70:14 94:15,16
116:25 120:25
132:12 159:25
222:9
**types**   23:15
31:11,17 71:5
252:25 253:3
**typically**   31:25
34:23 65:25
110:19 115:5,8
**typo**   272:16
291:16

**u**

**uh**   11:4,5,5
136:3 167:3,8
**ultimately**
117:18
**ultrasonic**
136:20
**ultrasound**
106:22 107:12
110:10,18
111:6,20
112:15 121:18
122:2 125:18
126:7,9,18
127:15,19
129:19 131:13
131:23 134:10

135:6,14 139:2
139:18 147:14
153:23 162:8
162:12,15,21
163:8 164:8,9
180:9,13
186:15,16
223:19 228:8
232:3 241:23
241:24 242:5
242:16 247:13
248:4,15
**ultrasounds**
111:15,24
**umbilical**   177:1
177:6 178:5
179:10
**umbrella**   79:16
225:17 228:25
293:20
**unable**   33:1
147:22 214:13
**unavailability**
246:11
**uncertainty**
211:5
**unchanged**
242:19
**uncommon**
89:3 110:8
230:9 253:16
**uncommonly**
169:6

**under**   76:25
81:2,18 94:18
113:22 118:1
118:16 154:7
215:25 225:17
263:13 293:20
294:25
**undergo**
153:24 170:1
**underlying**
168:2 171:22
172:20 242:25
248:22 282:18
293:4
**underneath**
134:25 153:18
**understand**
11:10,11 31:9
43:25 55:25
83:2 93:23
103:4 164:22
171:20 174:6
184:10 186:17
208:1 220:18
226:4 230:18
274:4 276:4,16
**understanding**
20:25 21:24
22:3 56:24
113:12 130:19
173:23 214:11
225:24 239:16
265:10

**understood**
9:12 11:1,7,15
11:17 13:7
18:4 20:4
21:20 23:13
32:12 33:14
34:16 39:24
43:19 46:2
49:12,19 51:20
53:1 56:3
57:19 61:23
62:16 66:16
70:1,1 71:2
77:11 90:20
92:1 108:14
117:1 120:4
127:20 128:23
129:5,5 130:9
130:13 131:15
131:24 134:9
135:18 143:3
148:20 172:22
173:12,20
178:18,23
182:15 185:10
187:3 198:4
203:22 218:1
226:8 230:15
231:25 243:12
243:12 246:15
252:11 293:22
**undiagnosed**
45:10

**undoing**  169:16
**undulating**
154:11,11,13
155:4
**unequivocal**
97:13 213:3,5
215:7,14 219:7
**unequivocally**
214:2 224:20
**unfreezing**
263:7
**uniform**  253:8
**unit**  295:12
**united**  1:1 7:7
**units**  84:4,9
**unknown**
148:18 162:8
287:11
**unmute**  281:1
**unquote**  82:19
86:7
**untrained**
210:15
**update**  117:20
118:15
**updates**  118:13
**uploaded**
140:21 198:13
**use**  11:20 25:23
30:13 51:14
82:20 88:16,18
102:8 110:14
146:9,10
154:11 157:3

159:7 189:20
199:14 205:11
214:9,12,14,17
223:8 229:3
259:25 291:3
**used**  9:4 43:2
49:25 51:12
88:5 91:10,10
91:18 101:23
119:24 121:1
142:20 144:12
158:7 177:12
178:13 195:12
213:22 244:3,5
**useful**  163:18
213:6,24,25
215:19 217:1
219:15
**uses**  135:23
**using**  9:23 88:2
88:20 89:23
91:6 111:1
135:13 136:12
174:7,7 190:25
194:1 205:1
215:13 222:9
248:14 251:21
253:11
**usual**  239:2
**usually**  45:21
287:13
**utility**  254:5
**utilization**  94:2

**utilized**  74:24
213:13
**utilizing**  211:1

**v**

**v**  298:2
**va**  88:19 89:2
89:16,25
119:12
**vague**  248:13
**valley**  2:21
**valsartan**  1:7
7:5 106:7,10
121:6 298:2
**value**  81:17
84:6
**variable**  229:9
**varieties**  37:13
**variety**  22:17
83:18 231:16
246:10 291:4
**various**  97:6
175:25 292:4
**vary**  138:23
**varying**  253:3
**vascular**  37:19
38:1 39:1,12
40:10,19
**vasculature**
39:5
**vaughn**  2:19,20
3:3 4:8 13:18
13:24 15:18
16:4 17:2 18:9

19:2,11 22:2
22:22 23:17
25:21 30:11
31:12 32:14
33:19 34:2,9
35:19 36:3
40:11 41:13
42:5,17 43:13
45:16 46:10
49:20 51:6
54:18 55:5,13
55:21 57:14
58:21 62:20
63:13,21 64:17
64:19 65:2,11
66:4 67:13
68:8,16,24
70:21 71:7
72:12,17,21
75:18 76:4
77:4 78:5,13
80:5 87:7 90:1
91:21 92:9
93:2,17 94:24
95:11,20 96:2
96:17 97:20
98:3,13 99:3
99:11 101:2,10
101:18 102:14
102:24 103:22
104:3,11
107:18 108:1
108:11 112:24
113:8 115:17

[vaughn - veritext]                                                    Page 78

| | | | |
|---|---|---|---|
| 117:5 121:19 | 192:10,12 | 258:2 259:9,23 | 96:12 97:18 |
| 125:8 127:11 | 193:3,11,15 | 260:12 261:18 | 133:13 176:18 |
| 128:5,25 | 194:5,13 | 262:17 263:3 | 176:19 207:24 |
| 129:12 130:16 | 196:13 197:13 | 263:15,20 | 208:4 212:14 |
| 131:18 132:24 | 197:21,23 | 264:14 265:18 | 212:20 213:20 |
| 134:6,19 | 198:4,7,25 | 266:11,24 | 216:10,14,17 |
| 135:11 136:4 | 199:13 202:2 | 270:6 271:25 | 216:19,22 |
| 137:2,14 | 202:10 203:10 | 273:4,12 | 217:4,17,24 |
| 138:20 139:3 | 203:17,22 | 278:20 280:8 | 225:4,20 |
| 140:21 141:3,8 | 206:24 207:10 | 281:22 282:7 | **ventricle**  83:23 |
| 142:11 143:10 | 208:14 210:3 | 282:15 283:3 | 88:11 |
| 143:21 144:4 | 211:23 214:19 | 283:13,24 | **verbal**  11:3 |
| 145:23 146:8 | 215:23 217:9 | 284:3,13,23 | **verify**  46:15 |
| 147:8 148:1,17 | 217:20 218:6 | 285:4,12,22 | 188:11 |
| 149:2 150:9,23 | 218:15 220:7 | 286:4,11 287:7 | **verifying**  57:20 |
| 151:1,8 152:17 | 220:16 221:1 | 287:19 288:17 | **veritext**  7:13,16 |
| 153:2 154:25 | 221:20,22 | 289:5,24 290:6 | 124:18 125:13 |
| 155:9 156:17 | 222:11,20 | 290:21 292:12 | 140:18,23 |
| 161:6,16 162:1 | 225:22 226:22 | 293:6 294:10 | 141:11 185:22 |
| 163:10 165:3 | 227:17 228:4 | 295:2,11 | 189:22 190:4 |
| 165:11,19 | 229:13,23 | **vehicle**  23:8,12 | 190:10,17,19 |
| 167:4,11,21 | 230:23 234:18 | 49:18 54:4 | 190:23 191:11 |
| 168:4,12,21 | 235:5,23 237:4 | **vein**  86:6 | 191:15 193:24 |
| 169:4,11,23 | 237:25 238:23 | 133:21 175:8 | 194:9,15,21,25 |
| 170:19 171:15 | 239:8 240:3 | 176:12 177:1,5 | 197:15 198:5 |
| 175:19 177:3 | 241:9 243:6 | 177:6,22 178:5 | 198:10 201:4 |
| 177:16,24 | 244:22 245:21 | 178:6 179:9,10 | 201:14 203:4 |
| 178:7 179:4,12 | 246:23 247:8 | 179:10,17,18 | 203:11,19 |
| 179:21 180:14 | 247:17 248:5 | 213:12,17,18 | 209:8 232:19 |
| 181:6 182:24 | 249:1,20 250:4 | 216:21 217:4 | 267:22 270:8 |
| 185:14 186:5 | 250:14,20 | **vena**  57:21 | 271:23 272:2 |
| 187:20 189:17 | 251:4 252:16 | 58:12,16 257:1 | 273:10 278:24 |
| 190:2,6,21 | 254:11 256:10 | **venous**  58:18 | 279:3 286:17 |
| 191:7,25 | 257:10,22 | 82:11 86:9 | 290:9 298:1 |

[vernacular - want]                                    Page 79

| | | | |
|---|---|---|---|
| **vernacular** | 262:2 263:6 | 185:6,9 | 117:17,18 |
| 259:25 | 269:2,5,11 | **wait** 10:21,23 | 123:10 131:13 |
| **version** 12:21 | 275:16,22 | 87:16 | 134:9 136:4 |
| 60:10 62:11 | 281:2,8 290:11 | **waited** 217:7 | 139:18 140:19 |
| 81:14 | 290:17 295:8 | **waiting** 290:9 | 144:21,21 |
| **versus** 16:6 | 295:12 | **walk** 139:19 | 150:14,20 |
| 130:15 162:17 | **view** 72:25 | **walked** 207:12 | 153:9 157:8 |
| 163:3 183:11 | 109:15,20 | **walker** 47:25 | 160:20 164:22 |
| 184:10 223:25 | 131:10 139:1 | 48:3 | 166:18 171:19 |
| 231:12 254:6 | 203:25 207:7 | **walking** 61:11 | 175:12 176:8 |
| 255:7,7 | 216:7 237:20 | 186:23 | 184:7,9 186:14 |
| **vertebral** 84:8 | 241:10 244:8 | **wall** 48:10,10 | 187:24 188:3,6 |
| 84:8 | 245:19 263:17 | 48:11,14 51:1 | 188:11 189:12 |
| **vessel** 39:25 | 266:25 274:22 | 51:3 149:11 | 189:14 190:1 |
| 175:8 176:21 | **viewed** 101:17 | **want** 9:10 | 191:5 193:1,4 |
| 176:25 178:16 | 102:13 161:24 | 12:20 13:24 | 193:25 194:2,4 |
| **vessels** 39:3,5,6 | **viewer** 115:7 | 15:14 16:16 | 198:10 201:24 |
| 39:13 40:3,4,7 | **viewing** 13:3 | 25:10 28:15 | 202:20,21 |
| 88:13,14 102:2 | **viral** 94:13 | 31:2 32:5,9 | 203:12,23 |
| **veterans** 32:19 | 132:11 | 35:24 36:14 | 210:19,21 |
| **vicinage** 1:4 7:9 | **virtual** 7:2 | 38:5,12 40:6 | 219:21 233:14 |
| **video** 7:2,13 | 295:14 | 43:24 47:2 | 233:24 235:11 |
| 9:5 64:2 295:9 | **viscera** 83:15 | 48:12 49:9 | 245:23 252:7 |
| 295:13 | **visible** 179:3 | 51:7,8,11 | 253:12,13,13 |
| **videographer** | 278:16 | 55:23,24 58:5 | 253:14 257:11 |
| 3:14 7:1 14:6 | **voice** 158:7 | 60:14 62:12 | 258:2 260:18 |
| 14:12 47:9,15 | **void** 32:18 | 64:11 71:5 | 263:8,15 265:9 |
| 72:19 103:8,14 | 33:25 34:1 | 73:3,4,6 78:7 | 266:17,21 |
| 115:19,21 | **volume** 233:18 | 80:20 82:20 | 267:11 268:15 |
| 116:2 124:21 | **w** | 84:13 85:8 | 268:17,17,21 |
| 139:6,11 | | 89:4,5 90:25 | 268:21 271:5 |
| 208:20 209:1 | **w** 83:8 85:8 | 93:5,8,22 96:7 | 271:11 274:17 |
| 238:4,10 | 86:11 184:12 | 100:13 109:15 | 274:20,21 |
| 257:23 261:23 | 184:15,17 | 113:17 114:23 | 276:9,10,16 |

**[want - witness]**    Page 80

| | | | |
|---|---|---|---|
| 277:1,16 | **way**  11:11 13:3 | **ways**  27:5 | **whichever**  13:3 |
| 278:11,11 | 17:10 23:5 | 83:18 190:24 | **white**  142:2 |
| 293:14 | 24:11,24,25 | 217:13 | **wide**  22:17 |
| **wanted**  19:18 | 25:9 26:19 | **we've**  14:18 | 89:9 |
| 21:7,25 130:12 | 27:21 31:5,13 | 89:17,17 90:5 | **widely**  91:23 |
| 216:15 270:20 | 33:20 35:11,11 | 96:7 159:11 | **wider**  163:25 |
| 276:7 | 37:21 39:4 | 171:7 173:17 | **widest**  136:16 |
| **wanting**  85:24 | 41:15 43:1,6 | 182:14 221:7 | **width**  184:17 |
| **wants**  31:9 | 45:17 66:12 | 230:1 245:25 | 184:19 |
| 189:24 | 76:4,6 77:6 | 246:1 255:17 | **wife**  9:20 |
| **warranted** | 79:7 81:18 | 258:20 276:24 | **wild**  132:11 |
| 245:20 | 91:4 92:10 | 281:23 287:12 | **willet**  45:4,5 |
| **warranting** | 93:25 98:11,14 | **website**  27:16 | 47:21 |
| 245:6 | 98:14 100:3,24 | 34:24 35:5,14 | **willing**  35:7 |
| **wash**  212:2 | 102:5 105:18 | **week**  59:8 | 225:3 |
| **washing**  204:23 | 108:6 109:13 | 64:12,17,18 | **win**  34:8,8 |
| 269:22 | 112:3 114:12 | 65:1,18 222:2 | **wind**  24:9 |
| **washington** | 124:10 129:20 | 222:4,5 | **window**  163:25 |
| 2:14 3:7 | 134:25 150:1 | **weekly**  90:7 | 164:21 |
| **washout**  208:5 | 153:19 159:9 | **weird**  144:25 | **wires**  263:14 |
| 211:21,25 | 167:22 170:21 | 150:1 | **witness**  4:4 |
| 212:8,11 | 172:5,22 177:2 | **welcome**  14:16 | 7:22 13:20 |
| 213:25 214:1 | 179:23 183:4 | 26:11 47:19 | 15:3,19 16:9 |
| 214:14 215:15 | 185:9 189:16 | 139:15,16 | 17:3 18:10 |
| 219:11 223:22 | 190:21 192:5 | 238:14,15 | 19:3,13,23 |
| 224:6 255:25 | 195:15 197:11 | 269:15 276:2 | 22:3,23 23:18 |
| 257:4 258:24 | 199:1 217:13 | **went**  27:4 | 25:22 30:12 |
| 259:2,4,8,14,15 | 221:8,10 223:4 | 39:10 50:9 | 31:13 32:15 |
| 271:3 272:10 | 225:18 231:14 | 61:10 115:9 | 33:20 34:3,10 |
| **waste**  26:12 | 241:4 243:7 | 155:25 207:16 | 35:20 36:4 |
| **wasted**  26:13 | 253:1,2 261:14 | 269:19 273:7 | 40:12,16 41:14 |
| **waves**  126:18 | 265:13,22 | **west**  8:2 | 42:6,9,18 |
| **wavy**  154:17,21 | 283:22 284:10 | **what'd**  151:23 | 43:14 45:17 |
| | 291:22 293:24 | | 46:11 49:21 |

**[witness - work]**                                                    Page 81

| | | | |
|---|---|---|---|
| 51:7 54:20 | 148:2,18,21 | 218:16 220:9 | 286:5,12 287:8 |
| 55:7,14,22 | 149:3 150:10 | 220:17 221:2 | 287:24 288:18 |
| 57:15 65:12 | 152:18 153:3 | 222:12,21 | 289:7 290:1,5 |
| 66:5 67:14 | 155:1,10 | 225:23 226:25 | 293:7 294:11 |
| 68:17,25 70:22 | 156:18 161:7 | 227:18 228:5 | 295:4 |
| 71:8 72:24 | 161:18 162:2 | 229:15,24 | **witnesses** |
| 73:3,9 75:19 | 163:11 165:4,6 | 230:25 232:1 | 103:21 |
| 77:5,8 78:8,14 | 165:12,20 | 232:21 234:19 | **witnesses'** |
| 80:6 87:8 90:2 | 167:5,9,22 | 235:6,24 237:6 | 298:3 |
| 91:22 92:10 | 168:5,13,22 | 238:1,25 | **woman**  27:2 |
| 93:3,18 95:1 | 169:5,12,24 | 239:10 240:5 | **women**  32:20 |
| 95:12,21 96:3 | 170:20 171:16 | 241:12 243:7 | **wonder**  149:10 |
| 96:18 97:22 | 175:20 177:4 | 244:23 245:22 | **wondering** |
| 98:14,21 99:4 | 177:17,25 | 246:24 247:9 | 73:5 |
| 99:12 101:3,11 | 178:8,19 179:5 | 248:6,12 249:2 | **word**  27:7 |
| 101:19 102:4 | 179:13,22 | 249:21 250:5 | 51:14 123:11 |
| 102:16 103:1 | 180:15 181:7 | 250:15,21 | 135:23 154:11 |
| 103:23 104:4 | 182:25 185:15 | 251:5 252:17 | 174:8 175:23 |
| 104:12 107:19 | 186:12 187:23 | 254:12 256:11 | 229:3 251:21 |
| 108:2,12,25 | 190:8,15,18 | 257:11,25 | **worded**  136:24 |
| 112:25 113:9 | 191:13,19,24 | 259:10,24 | **words**  155:1 |
| 114:4,9 116:8 | 193:4,12 194:7 | 260:13 261:25 | 163:6 |
| 117:6 125:2,7 | 194:18,24 | 262:18 263:11 | **work**  10:2 |
| 127:12 128:6 | 195:3 196:16 | 264:15 265:19 | 18:12 19:19 |
| 129:1,13 | 196:25 199:1 | 266:12,16 | 20:1 21:7 22:1 |
| 130:17 131:19 | 199:14,19 | 267:2 268:7 | 24:2 25:9 |
| 132:25 134:7 | 201:6,15 202:3 | 269:1 272:7 | 26:15 27:5,17 |
| 134:14 135:12 | 202:11 203:15 | 273:6,15 | 27:22 28:8,19 |
| 137:3,15 | 203:23 207:1 | 274:14 278:21 | 28:22 29:3 |
| 138:22 139:4 | 207:11 208:15 | 280:9 281:23 | 30:9,20 32:3 |
| 141:5 142:12 | 208:19 210:4 | 282:8,16 283:5 | 32:13,18 33:25 |
| 143:11,22 | 211:24 214:20 | 283:16 284:4 | 35:2,7 36:16 |
| 144:5 145:24 | 215:25 217:10 | 284:15,24 | 36:24 37:4 |
| 146:9 147:9 | 217:21 218:8 | 285:6,15,23 | 38:11,14 39:2 |

**[work - zoom]**                                          Page 82

40:7,21,24
41:5,9 42:14
55:24 56:24
57:10,17 58:2
58:10 77:9,9
89:3 90:12
100:23 109:21
115:6 119:10
152:8 201:2
204:1 250:6
263:23
**worked** 20:23
21:1 22:9
23:22 41:15,16
56:16 57:1,8
58:21,23 119:4
119:11 120:16
**workers** 29:17
29:20
**working** 19:18
21:17 26:10
28:6,8,16,20
31:7 32:7,8,10
38:9 72:22
77:15 97:1
100:6 119:5
129:18 193:15
195:8 203:24
232:12
**workload**
24:24
**works** 9:20
13:4 45:18
142:10

**workup** 251:25
**world** 33:4
89:11
**would've** 237:1
**write** 122:4
280:14
**writing** 78:3
135:19
**written** 40:15
43:20 47:3
61:25 74:9,14
97:2 123:11
226:5 227:4
281:15
**wrong** 45:12
49:25 50:1
70:7 140:13
158:2 181:2
**wrongful** 50:24
**wrote** 78:11
188:8

| **x** |
|---|

**x** 4:2,12 29:16
29:22 30:1
31:15 36:25
**xs** 191:17

| **y** |
|---|

**yeah** 10:3 24:6
30:5 32:8
37:24 38:21
42:8,18 49:16
51:7 65:20
66:12 72:19

76:8,25 87:8
90:2 92:10
98:14 101:12
115:10 118:4,9
121:20,24
124:11 129:25
132:10 133:16
135:1 137:16
140:2,18
141:21 143:4
148:21 152:2,8
155:4 157:12
162:25 167:5
177:8 179:22
182:8,8,8,8
184:1 185:15
185:16 188:3
191:20 196:16
203:14,15
204:5 210:4
220:9 234:8
235:13,17
239:19 241:12
241:15,24
244:17 248:11
250:5 254:15
256:11 257:25
258:4 261:15
261:15,25
263:3,6,11,11
263:19 264:24
266:16 267:2
268:7,8,9
271:13 273:6

273:12 282:16
**year** 28:3 32:5
32:10
**years** 8:24
54:21 69:10
89:6,19,24
90:6 149:25
220:24 221:11
222:8 229:11
229:21 231:11
284:21 285:21
286:3
**yelling** 54:9
**yellow** 61:1
62:10 68:14
**yep** 24:6
160:18 197:22
200:9 261:8
270:7
**yesterday**
66:24 67:3
**york** 2:6,6
88:25 298:1

| **z** |
|---|

**zero** 30:21
**zhejiang** 298:2
**zhp** 8:13
**zoom** 1:19 2:1
9:4,4 74:2 75:5
76:5 105:4
121:24 134:24
152:6,7 153:17
190:24,25

**[zoom - zooming]**                                                      Page 83

194:1 241:4,21
248:10 261:1
272:6 279:10
**zooming**
241:14

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.