# **EXHIBIT 21**

ROBYN L. PRUEITT, Ph.D., DABT

```
                                              Page 1

 1        UNITED STATES DISTRICT COURT
            DISTRICT OF NEW JERSEY
 2              CAMDEN VICINAGE
                   -  -  -
 3
 4   IN RE: VALSARTAN,     :  MDL No. 2875
     LOSARTAN, AND         :
 5   IRBESARTAN PRODUCTS   :
     LIABILITY LITIGATION  :
 6   _____  :
     THIS DOCUMENT RELATES :
 7   TO:                   :
     Gaston Roberts et al. :
 8   v. Zhejiang Huahai    :
     Pharmaceutical Co., et :
 9   al.                   :
                           :
10   Case No.              :
        -cv-00946-RMB-SAK  :              1:20
11
12              -  -  -
13          April 30, 2025
14              -  -  -
15          Remote videotape expert
     deposition of ROBYN L. PRUEITT, Ph.D.,
16   DABT, taken pursuant to notice, was
     conducted at the location of the witness
17   in Seattle, Washington, beginning at 9:08
     a.m. Pacific Time, on the above date,
18   before Kimberly A. Cahill, a Federally
     Approved Registered Merit Reporter and
19   Notary Public.
20
                   -  -  -
21
22
23
24
```

ROBYN L. PRUEITT, Ph.D., DABT

Page 2

1 APPEARANCES:
2
3 NIGH GOLDENBERG RASO & VAUGHN, PLLC
    BY:  DANIEL A. NIGHT, ESQUIRE
4 BY:  KATHRYN AVILA, ESQUIRE
    14 Ridge Square NW
5 Third Floor
    Washington, D.C.  20016
6 (202) 792-7927
    dnigh@nighgoldenberg.com
7 kavila@nighgoldenberg.com
    Representing the Plaintiffs
8
9 KIRKLAND & ELLIS, LLP
    BY:  NINA ROSE, ESQUIRE
10 BY:  ASHER S. TRANGLE, ESQUIRE
    1301 Pennsylvania Avenue, N.W.
11 Washington, D.C.  20004
    (202) 389-3394
12 nina.rose@kirkland.com
    asher.trangle@kirkland.com
13 Representing the Defendant, Zhejiang
    Huahai Pharmaceutical Co., Ltd.
14
15 GREENBERG TRAURIG, LLP
    BY:  VICTORIA DAVIS LOCKHARD, ESQUIRE
16 Terminus 200
    3333 Piedmont Road NE
17 Suite 2500
    Atlanta, Georgia 30305
18 (678) 553-2100
    lockhardv@gtlaw.com
19 Representing the Defendant, Teva
20
    VIDEOTAPE TECHNICIAN:
21     David Lane
22
    TRIAL TECHNICIAN:
23     Tejash Patel
24

Page 3

1 ALSO PRESENT:
    Stephanie Iken
2     Nigh Goldenberg Raso & Vaughn,
    PLLC
3
4
5
6
7         - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         - - -
2       I N D E X
3         - - -
4
5 Testimony of:
    ROBYN L. PRUEITT, Ph.D., DABT
6
    By Attorney Nigh        7
7 By Attorney Rose        148
    By Attorney Nigh        151
8
9         - - -
10       E X H I B I T S
11
12
    NO.      DESCRIPTION        PAGE
13
14 NONE MARKED
15
16
17
18
19
20
21
22
23
24

Page 5

1         - - -
2    DEPOSITION SUPPORT INDEX
3         - - -
4
5 Direction to Witness Not to Answer
6 Page Line    Page Line    Page Line
7
8 Request for Production of Documents
9 Page Line    Page Line    Page Line
10
11
    Stipulations
12
    Page Line    Page Line    Page Line
13
14
15 Question Marked
16 Page Line    Page Line    Page Line
17
18
19
20
21
22
23
24

2 (Pages 2 - 5)

ROBYN L. PRUEITT, Ph.D., DABT

Page 6

1             - - -
2        THE VIDEO TECHNICIAN:  We
3   are now on the record.  My name is
4   David Lane, videographer for
5   Golkow, a Veritext division.
6   Today's date is April 30th, 2025.
7   Our time on the record is 9:08
8   a.m. Pacific Time.
9        This remote video deposition
10  is being held in the matter of
11  Gaston Roberts, et al versus
12  Zhejiang Huahai Pharmaceutical
13  Company Limited, et al.  Our
14  deponent today is Dr. Robyn
15  Prueitt.
16       All parties to this
17  deposition are appearing remotely
18  and have agreed to the witness
19  being sworn in remotely.  Due to
20  the nature of remote reporting,
21  please pause briefly before
22  speaking to ensure all parties are
23  heard completely.
24       Our counsel will be noted on

Page 7

1   the stenographic record.  Our
2   court reporter today is Kim Cahill
3   and will now swear in our witness.
4             - - -
5        ROBYN L. PRUEITT, Ph.D.,
6   DABT, after having been duly
7   sworn, was examined and testified
8   as follows:
9             - - -
10       THE VIDEO TECHNICIAN:
11  Please begin.
12            - - -
13          EXAMINATION
14            - - -
15  BY ATTORNEY NIGH:
16       Q.   Good morning, Doctor.
17       A.   Good.
18       Q.   Could you please state your
19  name and spell your last name, please?
20       A.   Yes.  It's Robyn Lynn
21  Prueitt, P-R-U-E-I-T-T.
22       Q.   And where are you currently
23  located right now?
24       A.   I'm located in my office in

Page 8

1   Seattle, Washington.
2        Q.   And what is that office?
3        A.   So it's the office for
4   Gradient in Seattle.
5        Q.   Is there anyone else in the
6   room with you?
7        A.   No.
8        Q.   What devices are you using
9   for this deposition?
10       A.   I'm using my laptop computer
11  with extra monitors.  Is that what you
12  mean?
13       Q.   Yes, that's right.  And how
14  many monitors do you have there?
15       A.   I have two monitors plus the
16  laptop screen.
17       Q.   Okay.  Great.  Are there any
18  other devices with you in the room?
19       A.   My cellphone on mute.
20       Q.   And I would just ask that
21  during the deposition that you keep the
22  cellphone off; is that okay?
23       A.   Sure.
24       Q.   Okay.

Page 9

1        A.   Okay.
2        Q.   Doctor, have you ever been
3   deposed before?
4        A.   Yes.
5        Q.   Do you have an estimate of
6   approximately how many times?
7        A.   Yes, I believe it's four
8   times.
9        Q.   Four times total in your
10  lifetime?
11       A.   Yes.
12       Q.   I'll still go over some of
13  the rules of deposition here even though
14  you've been deposed before.
15       So first is, this isn't an
16  endurance contest.  If you feel like you
17  need to take a break, just let me know,
18  we can take a break.
19       Okay?
20       A.   Okay.
21       Q.   Second, if you don't
22  understand a question that I ask, please
23  let me know and I'll ask it again or
24  rephrase it for you; but if you answer

3 (Pages 6 - 9)

ROBYN L. PRUEITT, Ph.D., DABT

Page 10

1 the question, I'm going to assume that
2 you understood the question; is that
3 fair?
4     A.   Yes.
5     Q.   And, finally, the court
6 reporter is still taking everything down
7 that we say, so we need a verbal response
8 for each of your answers as opposed to
9 uh-uhs, uh-huhs, or shaking of the head
10 or hand gestures.
11       Okay?
12     A.   Okay.
13     Q.   Doctor, you received a
14 deposition notice for today's deposition;
15 correct?
16     A.   Yes.
17     Q.   Did you review that
18 deposition notice?
19     A.   Yes.
20     Q.   And that deposition notice
21 included some requests for documents;
22 correct?
23     A.   Correct.
24     Q.   Our office received five

Page 11

1 documents in response to that deposition
2 notice.  We received an invoice, a C.V.,
3 NDMA ASTDR tox profile, and two documents
4 from the EPA.
5       Do you have any other
6 documents that were responsive to the
7 Notice of Deposition?
8     A.   Not that I'm aware of.
9     Q.   Let's take a look at your
10 C.V., Doctor.  Do you have your expert
11 report in front of you printed out?
12     A.   I don't have it printed out.
13 I have a PDF on the screen.
14     Q.   You're free to take a look
15 at your expert report.  And do you have
16 your C.V. with you as well?
17     A.   Yes.
18     Q.   And you're free to look at
19 that as well.
20       I'm going to take a look at
21 your C.V. first.  And you gave us a C.V.
22 that was attached to your expert report
23 as appendix A; correct?
24     A.   Yes.

Page 12

1     Q.   Doctor, first, you received
2 your Bachelor's of Science in biology
3 from Pacific Lutheran University in 1994?
4     A.   Yes.
5     Q.   And where is Pacific
6 Lutheran University located?
7     A.   It's located in Tacoma,
8 Washington.
9     Q.   And then you received your
10 Ph.D. in cell and molecular biology of
11 human genetics from the University of
12 Texas South Western Medical Center; is
13 that correct?
14     A.   Yes.
15     Q.   And that was in 2001?
16     A.   Yes.
17     Q.   And that's located in
18 Dallas?
19     A.   Yes, Dallas, Texas.
20     Q.   I want to turn your
21 attention to the past testimony.  You
22 said you have given a deposition in four
23 cases?
24     A.   Yes.

Page 13

1     Q.   Is one of those cases Mark
2 DeCoster, et al versus -- I guess the
3 defendant was Seroflo Products.  Do you
4 recall that?
5     A.   Yes.
6     Q.   What was the nature of that
7 case?
8     A.   That case involved a copper
9 recycling facility with claims of
10 exposure to dioxins in the air from that
11 facility by nearby residents and their
12 claims of cancer development from those
13 alleged exposures?
14     Q.   And what was your
15 involvement in that case?
16     A.   I was a testifying expert to
17 evaluate a plaintiff's expert's report
18 and a calculation of cancer risks for the
19 plaintiffs.
20     Q.   Were route-to-route
21 extrapolations performed by the
22 plaintiff's expert in that case?
23     A.   Actually, yes, I believe --
24 I believe there -- that he did do that.

4 (Pages 10 - 13)

ROBYN L. PRUEITT, Ph.D., DABT

Page 14

1    Q.    And do you recall which
2  route to which route?
3    A.    Well, he -- he calculated a
4  dose in micrograms from the inhalation
5  exposures that he had calculated for the
6  plaintiff for the purposes of assessing
7  risks.
8    Q.    And was your opinion that
9  route-to-route extrapolation was
10  inappropriate?
11    A.    Yes, for the purposes that
12  he used it, there is clear EPA guidance
13  that states that there's no need to do
14  that type of extrapolation when doing
15  risk assessment if you have the
16  concentration of the chemical in air.
17    Q.    Okay.  How about the Patrick
18  Feindt versus United States of America;
19  do you recall that case?
20    A.    Yes.
21    Q.    What was the nature of that
22  case?
23    A.    That case involved
24  contamination of the drinking water

Page 15

1  supply with jet fuel and claims of
2  adverse health effects from plaintiffs
3  who had that water supply as their
4  drinking water supply.
5    Q.    And what was your
6  involvement in that case?
7    A.    I was asked to evaluate the
8  potential exposures and health risks of
9  the plaintiffs in that matter.
10    Q.    Did any of the plaintiff's
11  experts perform route-to-route
12  extrapolations in that case?
13    A.    No.
14    Q.    What were the other two
15  cases that you were involved in where you
16  gave deposition testimony?
17    A.    One was involving a
18  implanted medical device and whether the
19  constituents of the device were cytotoxic
20  or toxic to cells in humans, and the
21  other was a class action matter involving
22  variability in exposures to PFAS
23  chemicals in a group of people with PFAS
24  contamination in their drinking water.

Page 16

1    Q.    What was the name of the
2  medical device?
3    A.    It involved -- I think the
4  name -- it involved Prolene sutures, it
5  was made out of I think?  It was a type
6  of polypropylene fiber.
7       Sorry.  I don't remember the
8  exact name.
9    Q.    Who was your client in that
10  case -- in the medical device case?
11    A.    Ethicon.
12    Q.    And which court was involved
13  in that case?  Was it in state court or
14  federal court?
15    A.    It was in West Virginia.
16  That's all I remember.
17    Q.    Do you remember of the name
18  of the federal -- do you remember the
19  name of the judge?
20    A.    No.
21    Q.    Approximately when did you
22  give testimony in that case?
23    A.    For the medical device, that
24  was back in I think 2015, so that's --

Page 17

1  that's why I don't quite remember.
2    Q.    Do you remember the name of
3  the Prolene sutures?
4       ATTORNEY ROSE:  Objection to
5  form.
6       THE WITNESS:  No, I don't.
7  BY ATTORNEY NIGH:
8    Q.    Do you recall who the
9  defense attorney was?
10    A.    The attorney who was with me
11  for the deposition was Chad Hutchinson.
12    Q.    And do you recall who the
13  plaintiff attorney was in that case?
14    A.    No, I don't.
15    Q.    You don't recall who
16  questioned you in that deposition?
17    A.    No, I don't remember the
18  name.
19    Q.    Okay.  How about the class
20  action matter regarding PFAS; was that in
21  federal court or state court?
22    A.    I think that was state
23  court.
24    Q.    Do you remember which judge

5 (Pages 14 - 17)

ROBYN L. PRUEITT, Ph.D., DABT

Page 18

1 presided over that litigation?
2     A.   No.
3     Q.   Which court was it -- which
4 state was it located in?
5     A.   I assume -- I think it was
6 Delaware, because that's where the -- the
7 area at issue was located.
8     Q.   And you say the area at
9 issue --
10     A.   The area that the --
11     Q.   -- what specifically was the
12 area at issue?
13     A.   It was a particular city in
14 Delaware.
15     Q.   Which city?
16     A.   Blades.
17     Q.   Did you say Blades?
18     A.   Yeah, B-L-A-D-E-S, Blades.
19     Q.   Odd city name.
20     A.   Yeah.
21     Q.   I may have asked you this
22 before, but do you recall the judge who
23 was presiding over that case?
24     A.   No.

Page 19

1     Q.   Do you recall who the
2 defense attorney was that defended you in
3 that case?
4     A.   No.  It's only a few weeks
5 ago, but I don't remember his name.
6 Sorry.  I don't -- I don't remember
7 things like courts and judges and --
8     Q.   No problem.
9     A.   -- lawyers.
10     Q.   Do you remember the
11 plaintiff's lawyer that took your
12 deposition in that case?
13     A.   Oh.  I thought that's what
14 you were asking before.
15     Q.   I asked the defense attorney
16 before.
17     A.   Oh, sorry.  I -- I do
18 remember the defense attorney.  And now
19 of course I'm blanking on his -- oh.  Tom
20 Waskom.
21     Q.   Do you know how that last
22 name's spelled, Waskom?
23     A.   W -- yeah, W-A-S-K-O-M.
24     Q.   And you didn't know who the

Page 20

1 plaintiff attorney was in that case.
2     A.   No.  I can picture his face,
3 but I -- I don't remember his exact name.
4 Sorry.
5     Q.   No problem.
6          You said this occurred a few
7 days -- a few weeks ago?
8     A.   Yes.
9     Q.   Was it a deposition?
10     A.   Yes.
11     Q.   So that one hasn't gone to
12 trial yet?
13     A.   No.
14     Q.   And the medical device, did
15 you give testimony at a deposition?
16     A.   Yes, just deposition.
17     Q.   So no trial testimony for
18 that one either?
19     A.   No.
20     Q.   Have you given deposition,
21 trial testimony, or even testimony at a
22 hearing in any other case other than
23 these four cases we just discussed?
24     A.   I gave sworn testimony at a

Page 21

1 regulatory hearing.  It wasn't
2 litigation, so I don't know if that's
3 what you're asking.
4     Q.   Is that just one time where
5 you've done that?
6     A.   Yes.
7     Q.   And what was the name of
8 that case -- sorry.  Not case.  What was
9 the nature of that -- of what you were
10 giving testimony for?
11     A.   It was for a regulatory
12 agency in Illinois and it was sworn
13 testimony on the State's development of
14 groundwater standards for PFAS.
15     Q.   Who was your client in that
16 case -- in regards to that sworn
17 testimony?
18          ATTORNEY ROSE:  Object to
19     the form.
20          THE WITNESS:  I don't know
21     if I can say.
22 BY ATTORNEY NIGH:
23     Q.   Did you disclose during that
24 sworn testimony who your client was?

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

ROBYN L. PRUEITT, Ph.D., DABT

Page 22

1    ATTORNEY ROSE: Object to
2    the form.
3    THE WITNESS: Yeah, I
4    believe I must -- yes, I must
5    have.
6 BY ATTORNEY NIGH:
7    Q.   Who did you disclose was
8 your client?
9    A.   3M.
10    Q.   And 3M, they are a medical
11 device manufacturer and pharmaceutical
12 company?
13    A.   No. They are a chemical
14 production and products company.
15    Q.   Do they also do medical
16 device manufacturing?
17    A.   I'm not aware if they do.
18    Q.   Have you ever provided sworn
19 testimony on behalf of plaintiffs?
20    A.   No, I have not.
21    Q.   Are there any other cases or
22 litigation that you've been disclosed as
23 an expert, other than these four cases
24 and the sworn testimony that you gave for

Page 23

1 the regulatory agency?
2    A.   I -- yes, I think so. I
3 assume that if I have issued a report
4 that I have -- was noted as an expert?
5    Q.   Which other cases have you
6 issued a report?
7    A.   Oh, gosh. Let's see. So
8 another class action matter in
9 Massachusetts involving PFAS in drinking
10 water, a matter involving potential
11 exposure to, I think it was sulfuric acid
12 or hydrogen sulfide in a cleaning product
13 in an occupational setting.
14    Let's see. What else?
15    (Pause.)
16    THE WITNESS: And I guess if
17    -- I'm sure there are others, but
18    I'm sort of blanking on them know.
19    I know there are -- there are a
20    few cases where I started a
21    report, but for whatever reason,
22    it, you know, didn't get issued
23    because the case settled or
24    something.

Page 24

1    So, yeah, that's what I can
2    remember right now.
3 BY ATTORNEY NIGH:
4    Q.   Were there any situations
5 where you started a report and you were
6 starting on behalf of plaintiffs, where
7 you were hired by plaintiffs?
8    A.   No, I have not been hired by
9 plaintiffs.
10    Q.   The class action in
11 Massachusetts, were you hired on behalf
12 of defense?
13    A.   Yes.
14    Q.   And was that 3M?
15    A.   Yes.
16    Q.   The hydrogen sulfide in
17 occupational setting, who was -- who
18 hired you in that case?
19    A.   The Port Authority of New
20 York and New Jersey.
21    Q.   Were they a defendant in
22 that case?
23    A.   Yes.
24    Q.   Any other cases you can

Page 25

1 think of where you've issued a report?
2    A.   Just the cases where I was
3 deposed that we already talked about and
4 -- yeah, I'm just drawing a blank on any
5 others right now.
6    Q.   In the medical device case
7 you were talking about the Prolene
8 sutures, were there any route-to-route
9 extrapolations involved in that case by
10 plaintiffs or defendants?
11    A.   No.
12    Q.   In the class action matter
13 with PFAS from the City of Blades, were
14 there any route-to-route extrapolations
15 involved in that case by either side?
16    A.   No.
17    Q.   In the class action in
18 Massachusetts regarding PFAS, were there
19 any route-to-route extrapolations
20 involved in that case?
21    A.   No.
22    Q.   And in the hydrogen sulfide
23 in occupational setting, were there any
24 route-to-route extrapolations involved in

7 (Pages 22 - 25)

ROBYN L. PRUEITT, Ph.D., DABT

Page 26

1  that case?
2      A.   No.
3      Q.   Doctor, you've worked for
4  Gradient since 2007; is that correct?
5      A.   Yes.
6      Q.   When you get hired to do
7  litigation work, do the proceeds go to
8  Gradient?
9      A.   When I'm hired to do
10 litigation work, yes, the -- for example,
11 my hourly rate is paid to Gradient, not
12 to me directly.
13     Q.   And then Gradient pays you a
14 yearly salary for your work?
15     A.   Yes.  Yes.
16     Q.   Doctor, Gradient receives
17 tens of millions of dollars from
18 pharmaceutical companies each year;
19 correct?
20         ATTORNEY ROSE:  Object to
21     the form.
22         THE WITNESS:  I have no
23     idea.
24 BY ATTORNEY NIGH:

Page 27

1      Q.   Have you ever seen the
2  financials of Gradient and how they
3  receive money from various companies?
4          ATTORNEY ROSE:  Object to
5      the form.
6          THE WITNESS:  No.
7  BY ATTORNEY NIGH:
8      Q.   So you don't review any of
9  the financials from Gradient?
10         ATTORNEY ROSE:  Objection;
11     asked and answered.
12         THE WITNESS:  No, I don't.
13 BY ATTORNEY NIGH:
14     Q.   Do you have any idea how
15 much funding Gradient receives from
16 pharmaceutical companies each year?
17         ATTORNEY ROSE:  Object to
18     the form.
19         THE WITNESS:  No, I have no
20     idea.
21 BY ATTORNEY NIGH:
22     Q.   Do you have any idea how
23 much funding Gradient receives from
24 medical device manufacturing companies

Page 28

1  each year?
2          ATTORNEY ROSE:  Object to
3      the form.
4          THE WITNESS:  No, I don't.
5  BY ATTORNEY NIGH:
6      Q.   Doctor, most of -- most of
7  the articles that involve scientists that
8  work at Gradient are published in
9  Toxicology or Regulatory Toxicology &
10 Pharmacology; correct?
11         ATTORNEY ROSE:  Object to
12     the form.
13         THE WITNESS:  I think -- I
14     believe Gradient publishes in a
15     variety of different journals
16     involving toxicology or
17     environmental science.
18 BY ATTORNEY NIGH:
19     Q.   And most of Gradient's
20 articles are published in Toxicology and
21 Regulatory Toxicology & Pharmacology;
22 correct?
23     A.   I don't know if that's the
24 case.

Page 29

1      Q.   Have you ever analyzed and
2  looked to see the authors of articles
3  that are employed by Gradient to analyze
4  where the majority of those articles are
5  being published?
6      A.   No, I've never looked into
7  that.
8      Q.   Have you ever reviewed
9  studies that have analyzed this?
10         ATTORNEY ROSE:  Object to
11     the form.
12         THE WITNESS:  No.
13 BY ATTORNEY NIGH:
14     Q.   Would you have any
15 commentary to results that suggest from
16 studies that analyzed that and discussed
17 that most of the articles authored by
18 scientists employed by Gradient are
19 published in Toxicology and Regulatory
20 Toxicology & Pharmacology?
21         ATTORNEY ROSE:  Object to
22     the form.
23         THE WITNESS:  So are you
24     saying they're mostly published in

8 (Pages 26 - 29)

ROBYN L. PRUEITT, Ph.D., DABT

Page 30

1 in a journal called Toxicology and
2 a journal called Regulatory
3 Toxicology & Pharmacology?
4         ATTORNEY NIGH:  Correct.
5         THE WITNESS:  I don't have
6 any commentary on that except I --
7 I do know that there have been
8 publications with Gradient authors
9 in Regulatory Toxicology &
10 pharmacology, including myself.
11         I'm not aware of many
12 articles in a journal called
13 Toxicology.
14 BY ATTORNEY NIGH:
15    Q.    Journal of Toxicology?
16    A.    Journal of Toxicology?
17    Q.    Yes.
18    A.    No, I'm -- I -- I don't -- I
19 don't know about publications in that
20 journal.
21    Q.    Many of the articles you
22 authored are published in Regulatory
23 Toxicology & Pharmacology; correct?
24    A.    I wouldn't say many, but a

Page 31

1 few.
2    Q.    Do you know which substances
3 that regulatory agencies have stated pose
4 a risk to human health that Gradient has
5 disagreed with those regulatory agencies?
6         ATTORNEY ROSE:  Object to
7    the form.
8         THE WITNESS:  No.
9 BY ATTORNEY NIGH:
10    Q.    Do you know any substances
11 that regulatory agencies have stated pose
12 a risk to human health that scientists
13 who are employed by Gradient that
14 disagreed in articles with those
15 regulatory agencies?
16         ATTORNEY ROSE:  Object to
17    the form.
18         THE WITNESS:  I mean, I know
19    some of the substances that I've
20    worked with, but I don't know
21    about -- I can't speak for what
22    other people at Gradient have
23    done.
24 BY ATTORNEY NIGH:

Page 32

1    Q.    What would be the substances
2 that you've worked with?
3    A.    So can you repeat the
4 original question?
5    Q.    Yes.  I had asked, do you
6 know which substances that regulatory
7 agencies stated pose a -- have stated
8 pose a risk to human health that
9 scientists from Gradient have authored
10 articles or studies that have disagreed
11 with regulatory agencies, and you stated
12 that you know some of the substances that
13 you authored, but not the other
14 scientists at Gradient.  And I asked
15 which substances.
16    A.    Yeah, so --
17         ATTORNEY ROSE:  Object to
18    the form.
19         THE WITNESS:  So I would say
20    asbestos would be one.
21 BY ATTORNEY NIGH:
22    Q.    Any others?
23    A.    I'm just -- I'm looking at
24 my publication list to be able to tell

Page 33

1 you, since you asked about what we've
2 done in -- in publications.
3         I mean, it's hard to say
4 because regulatory agencies usually
5 indicate that almost every chemical they
6 evaluate has some sort of health risk,
7 because every -- actually, every chemical
8 has a health risk.  It just depends on
9 how high the exposure is.
10         That's sort of the basic
11 tenant of toxicology, that the dose makes
12 the poison, so how much risk there is
13 depends on the amount.
14         So -- so, I mean, I can't
15 really pinpoint anything exactly besides
16 -- besides, you know, asbestos, you know,
17 we did have a publication commenting on
18 EPA's risk assessment approach about it,
19 where they did indicate it was a health
20 risk at certain -- in certain situations.
21         I guess -- I've also
22 published on particulate matter in ozone.
23 I think for ozone, specifically
24 evaluating studies -- the same studies

9 (Pages 30 - 33)

ROBYN L. PRUEITT, Ph.D., DABT

Page 34

1 that EPA has evaluated and set the
2 National Ambient Air Quality Standard to
3 a certain level.
4        And so I think I have some
5 publications arguing that perhaps the
6 standards are not, I guess, correct or,
7 you know, not -- are lower than they need
8 to be.
9     Q.   What about any other
10 substances?
11    A.   Yeah, I'm -- I'm not sure
12 exactly how the publications relate to
13 any particular substance.  It's kind of
14 vague in saying that a regulatory agency
15 considers it to be a health risk, because
16 again, it depends on the exposure level
17 and -- and many other things, so I -- I
18 can't really pinpoint anything else.
19    Q.   Are you aware that for lead,
20 that Gradient or scientific authors that
21 work for Gradient disagreed with
22 regulatory agencies as to whether or not
23 lead posed a risk to human health and the
24 classification of that risk?

Page 35

1        ATTORNEY ROSE:  Object to
2     the form.
3        THE WITNESS:  I'm aware that
4     some of my colleagues at Gradient
5     work on issues related to lead,
6     but I don't know what they've
7     concluded.  I wasn't involved.
8 BY ATTORNEY NIGH:
9     Q.   Same question for soot.
10    A.   Soot?
11    Q.   Yes.
12       ATTORNEY ROSE:  Object to
13    the form.
14       THE WITNESS:  I also -- I
15    don't know who has worked on that
16    and I don't know what they've
17    concluded.
18 BY ATTORNEY NIGH:
19    Q.   Same question for tobacco.
20       ATTORNEY ROSE:  Object to
21    the form.
22       THE WITNESS:  I don't think
23    Gradient has worked on tobacco for
24    quite some time, but even if they

Page 36

1     did, I'm not aware of the
2     conclusions.
3 BY ATTORNEY NIGH:
4     Q.   Scientists that are employed
5 by Gradient rarely do their own animal or
6 human studies; correct?
7        ATTORNEY ROSE:  Object to
8     the form.
9        THE WITNESS:  Correct, we
10    don't have a laboratory.
11 BY ATTORNEY NIGH:
12    Q.   But Gradient does oftentimes
13 criticize the work of others who use --
14 who conduct animal or human studies;
15 correct?
16    A.   We routinely evaluate the
17 literature, including human and animal
18 studies, yes.
19    Q.   And Gradient often attacks
20 others' work through letters to journals;
21 correct?
22       ATTORNEY ROSE:  Object to
23    the form.
24       THE WITNESS:  I wouldn't say

Page 37

1     Gradient attacks the work of
2     others, but Gradient critically
3     reviews the work of others and if
4     someone finds an issue that they
5     believe needs to be put out in the
6     literature, then they will write a
7     letter to the editor or a
8     commentary or something of that
9     nature.
10 BY ATTORNEY NIGH:
11    Q.   And letters to the journal
12 or the editor rarely go through peer
13 review process; correct?
14       ATTORNEY ROSE:  Object to
15    the form.
16       THE WITNESS:  I -- it may
17    depend on the journal.  I know at
18    least one of the last ones that I
19    wrote, it was peer reviewed.  I
20    think journals are moving more
21    towards that now, so I'm not --
22    I'm not sure.
23 BY ATTORNEY NIGH:
24    Q.   How many times have you

10 (Pages 34 - 37)

ROBYN L. PRUEITT, Ph.D., DABT

Page 38

1 written letters to the editors?
2      A.   Not -- only a couple times.
3 I've written a few letters or
4 commentaries, which are kind of similar,
5 or responses to letters to the editor, so
6 I think just a -- maybe a handful of
7 times I -- yeah.
8      Q.   How often have your letters
9 to editors been peer reviewed?
10      A.   So I can only think of --
11 let's see.  So -- yeah, so I really only
12 have I think maybe one that's truly a
13 letter to the editor and that one was
14 peer reviewed.  I had to -- we had to
15 respond to comments from a peer reviewer.
16      Q.   You had to respond to what
17 from a peer reviewer?
18      A.   Comments.
19      Q.   And what does that process
20 entail?
21      A.   So the letter was sent to at
22 least one peer reviewer -- it's the same
23 thing as if it was any other type of
24 publication and not just a letter, but

Page 39

1 it's sent to one or more peer reviewers
2 and they read it and then if they have
3 any issues or think that something, you
4 know, has -- is problematic or needs to
5 be clarified, they will provide a list of
6 comments about it and then the editor
7 will send those back to the authors and,
8 as authors, we have to respond to those
9 comments by either making changes in the
10 paper or if we don't agree with the
11 comments from the peer reviewer, then we
12 have to justify why we are not making the
13 change.
14           And then the peer reviewer
15 receives that feedback and -- as well as
16 the editor, and then the editor decides
17 if we've sufficiently acknowledged the
18 peer reviewer comments.
19      Q.   Which journal was that for?
20 You said that was the one letter that you
21 had done where there was peer review.
22      A.   Yeah, mSystems.
23      Q.   Doctor, what is the Center
24 for Public Integrity?

Page 40

1      A.   The Center for Public
2 Integrity?
3      Q.   Yes.
4      A.   I'm not sure.
5      Q.   Do you know of anything that
6 sounds like a Center for Public
7 Integrity?
8           ATTORNEY ROSE:  Object to
9      the form.
10           THE WITNESS:  I believe I've
11      heard of organizations with a
12      similar name to that or maybe that
13      name, I'm not sure, but I just
14      don't recall.
15 BY ATTORNEY NIGH:
16      Q.   Do you know what the purpose
17 of that organization is?
18           ATTORNEY ROSE:  Object to
19      the form.
20           THE WITNESS:  No, I don't.
21 BY ATTORNEY NIGH:
22      Q.   Doctor, have you ever
23 reviewed any studies that -- or articles
24 that the Center for Public Integrity has

Page 41

1 done regarding Gradient and the
2 scientists that are employed by Gradient?
3      A.   I'm not sure, because I'm
4 just not a hundred percent sure about
5 that name, the Center for Public
6 Integrity.
7      Q.   Have you reviewed any
8 information that sounds like the
9 following, that 149 scientific articles
10 and letters published by Gradient
11 scientists found that in 98 percent of
12 the time, they found that substance in
13 question was harmless as levels to which
14 people are typically exposed?
15           ATTORNEY ROSE:  Object to
16      the form.  Counsel, are you
17      reading from a document?  Could
18      you show the --
19           ATTORNEY NIGH:  I don't need
20      to show a document.
21           THE WITNESS:  So is the
22      question whether I'm familiar with
23      something that says that?
24           ATTORNEY NIGH:  Anything

11 (Pages 38 - 41)

ROBYN L. PRUEITT, Ph.D., DABT

Page 42

1    closely resembling that.
2         ATTORNEY ROSE:  Object to
3    the form.
4         THE WITNESS:  I -- I don't
5    recall.  I'm not sure.
6  BY ATTORNEY NIGH:
7    Q.    That's something that you
8  would probably recall if you had seen it;
9  correct?
10        ATTORNEY ROSE:  Object to
11   the form.
12        THE WITNESS:  If it was
13   fairly recent.  If it was a while
14   ago, I might not remember.  I'm
15   not sure.
16 BY ATTORNEY NIGH:
17   Q.    Doctor, I want to go through
18 your publications.  This is listed on
19 page 7 of your.
20        C.V. Doctor, the first
21 publication that you have listed, the
22 title is:  Evaluating dermal absorption
23 of -- call that PFOA -- and implications
24 for other PFAS; correct?

Page 43

1    A.    Yes.
2    Q.    Which substance or
3  substances were analyzed in that study?
4    A.    PFOA.
5    Q.    And also PFAS?
6    A.    Well, no, no other specific
7  PFAS were directly evaluated.
8    Q.    Did this article find
9  whether PFOA was harmful at levels to
10 which people are typically exposed?
11   A.    No.  The purpose of that
12 study was not to evaluate health risks at
13 all.  It was purely to evaluate the
14 degree to which PFOA can be absorbed
15 through the skin.
16   Q.    Did you perform any
17 route-to-route extrapolations in the
18 study?
19   A.    No.
20   Q.    Doctor, the next study is,
21 commentary: Understanding IARC's PFOA and
22 PFOS carcinogenicity assessments.
23        Do you see that?
24   A.    Yes.

Page 44

1    Q.    And which substances were
2  evaluated in this article?
3    A.    Well, it's an evaluation of
4  IARC's evaluation of PFOA and PFOS.
5    Q.    Did this article find
6  whether PFOA or PFOS was harmful at
7  levels to which people are typically
8  exposed?
9    A.    That wasn't the purpose of
10 this.  The purpose was to discuss how the
11 agency IARC evaluates mechanistic data,
12 particularly for PFOA and PFOS, so there
13 were no findings of whether or not these
14 substances cause adverse health effects.
15   Q.    Your article states that it
16 is your -- this article states it is your
17 opinion that IARC got it wrong in
18 classifying PFOA as a group 1 carcinogen
19 and PFOS as a group 2B carcinogen;
20 correct?
21        ATTORNEY ROSE:  Object to
22   the form.
23        Are you reading from the
24   article?

Page 45

1         ATTORNEY NIGH:  No.
2         ATTORNEY ROSE:  Oh, okay.
3         ATTORNEY NIGH:  I don't have
4    to show -- I don't have any show
5    any documents during this.  I'm
6    asking a question.
7  BY ATTORNEY NIGH:
8    Q.    Doctor, your article states
9  that it is your opinion that IARC got it
10 wrong in classifying PFOA as a group 1
11 carcinogen and PFOS as a group 2B
12 carcinogen; correct?
13   A.    It's that their use of the
14 mechanistic data and their evaluation of
15 the existing evidence is overstated.
16   Q.    That was my next question:
17 Your article states that IARC overstated
18 the available evidence for
19 carcinogenicity of PFOA and PFOS;
20 correct?
21   A.    Yes.
22   Q.    The next study is, Talc and
23 human cancer: A systematic review of the
24 experimental animal and mechanistic

12 (Pages 42 - 45)

ROBYN L. PRUEITT, Ph.D., DABT

Page 46

1  evidence.
2          Do you see that?
3      A.   Yes.
4      Q.   Which substances were
5  analyzed in that study?
6      A.   Just talc.
7      Q.   Did this article find
8  whether talc was harmful at levels to
9  which people are typically exposed?
10     A.   Well, the article was an
11 evaluation of the animal evidence and the
12 mechanistic evidence, so it didn't really
13 involve actual human exposures; but the
14 overall conclusion is that while talc can
15 cause cancer in experimental animals,
16 it's generally only at extremely high
17 doses that overwhelm the ability to clear
18 the talc particles from the respiratory
19 tract.
20     Q.   Doctor, the next article is:
21 A systemic review of the epidemiology
22 evidence on talc and cancer; correct?
23     A.   Yes.
24     Q.   And which substance was

Page 47

1  analyzed in that article?
2      A.   Talc.
3      Q.   Did this article find
4  whether talc was harmful at levels to
5  which people are typically exposed?
6      A.   It found that there is --
7  there are some studies that indicate that
8  exposure to talc at human relevant
9  exposure levels were associated with
10 certain cancers.
11     Q.   What was the overall
12 takeaway, though, in the systemic review?
13     A.   That the more longitudinal
14 evidence from cohort studies was not
15 indicative that -- of talc causing
16 cancer, but that certain studies that
17 were case-control studies that likely
18 suffered from recall bias in the exposure
19 assessment were the only types of studies
20 where the associations were seen.
21     Q.   And so, therefore, what was
22 the overall takeaway?
23         ATTORNEY ROSE:  Object to
24     the form.

Page 48

1          THE WITNESS:  That the
2      association seen in studies of
3      talc and cancer were likely
4      affected by recall bias.
5  BY ATTORNEY NIGH:
6      Q.   So this article did not find
7  that talc was harmful at levels to which
8  people are typically exposed; correct?
9      A.   Correct.
10     Q.   Doctor, just to go back up,
11 the Commentary: Understanding IARC's PFOA
12 and PFOS carcinogenicity assessments, did
13 that include any route-to-route
14 extrapolations analysis?
15     A.   No.
16     Q.   The article, Talc and human
17 cancer: A systematic review of the
18 experimental animal and mechanistic
19 evidence, did that include any analysis
20 regarding route-to-route extrapolations?
21     A.   No.
22     Q.   The article:  A systematic
23 review of epidemiology evidence on talc
24 and cancer, did that involve any

Page 49

1  route-to-route extrapolations?
2      A.   No.
3      Q.   The next article is:
4  Real-world -- bisphenol?  How do you
5  pronounce that?
6      A.   Bisphenol.
7      Q.   The next article is:
8  Real-world bisphenol A exposure not
9  linked to microbiota dynamics and
10 childhood obesity; correct?
11     A.   Yes.
12     Q.   What was the substance that
13 was analyzed in that article?
14     A.   Bisphenol A.
15     Q.   Did this article find
16 whether bisphenol A was harmful at levels
17 to which people are typically exposed?
18     A.   No, because that wasn't
19 really the goal of this.  This was a
20 letter to the editor about another study
21 where they were -- I think they used
22 metabolomics and extremely high exposures
23 to bisphenol A that people would not be
24 exposed to to suggest that it could be

13 (Pages 46 - 49)

ROBYN L. PRUEITT, Ph.D., DABT

Page 50

1 related to childhood obesity, but I'm --
2 I'm a little fuzzy on the details just
3 because it's been awhile since I -- I
4 looked at that one.
5      Q.   Sure.  The next article --
6 were any route-to-route extrapolations
7 performed in that article or analyzed?
8      A.   No.
9      Q.   Next article is:  Evaluation
10 of neural reflex activation as a
11 potential mode of action for respiratory
12 and cardiovascular effects of fine
13 particulate matter.
14        Do you see that?
15      A.   Yes.
16      Q.   What is the substance
17 analyzed in that article?
18      A.   Particulate matter.
19      Q.   And did this article find
20 that particulate matter was harmful at
21 levels to which people are typically
22 exposed?
23      A.   This article did not look at
24 whether particulate matter was harmful or

Page 51

1 not.  It was to evaluate a potential
2 mechanism for particulate matter to be
3 harmful to the respiratory system or the
4 cardiovascular system.
5      Q.   Did this find -- this
6 article find that fine particulate matter
7 can have an effect, be harmful to the
8 respiratory or cardiovascular system in
9 humans?
10        ATTORNEY ROSE:  Object to
11      the form.
12        THE WITNESS:  It didn't look
13      to find harm.  It looked -- it
14      assumes there was harm and was
15      looking at the pathway, the
16      mechanism, for how that harm could
17      occur.
18 BY ATTORNEY NIGH:
19      Q.   The next article is:  Nickel
20 in ambient particulate matter in
21 respiratory or cardiovascular outcomes: A
22 critical review.
23        Do you see that?
24      A.   Yes.

Page 52

1      Q.   And did -- what was the
2 substance that was analyzed in this
3 article?
4      A.   Nickel specifically within
5 particulate matter.
6      Q.   And did this article find
7 that nickel within particulate matter was
8 harmful at levels to which people are
9 typically exposed?
10      A.   I -- actually, I don't
11 remember what the conclusions were for
12 that paper.
13        (Pause.)
14        THE WITNESS:  I -- actually,
15      I -- I only recall that we looked
16      at the limitations and strengths
17      of the papers, and I believe that
18      there were too many uncertainties
19      in the papers to really draw any
20      solid conclusions.
21 BY ATTORNEY NIGH:
22      Q.   The next study is:  Evidence
23 evaluated by European Food Safety
24 Authority does not support lowering the

Page 53

1 temporary tolerable daily intake for --
2 bisphenol A?
3      A.   Bisphenol A.
4      Q.   And what was
5 the substance that was analyzed there?
6      A.   Bisphenol A.
7      Q.   Does this -- did this
8 article find whether bisphenol A was
9 harmful at levels to which people are
10 typically exposed?
11      A.   That wasn't really the
12 purpose.  This was just to -- let's see
13 -- evaluate evidence that a regulatory
14 agency in Europe looked at and sort of
15 how they decided on which health effect
16 to use as the basis for their value.
17      Q.   The European Food Safety
18 Authority had decided to lower the
19 temporary tolerable daily intake for
20 bisphenol A; correct?
21      A.   Yes, they came up with a
22 value that was lower than their previous
23 value.
24      Q.   And this article discusses

14 (Pages 50 - 53)

ROBYN L. PRUEITT, Ph.D., DABT

Page 54

1 why that was unnecessary; correct?
2     A.   I'm trying to think if
3 "unnecessary" is the right word.  It
4 discusses why it was not scientifically
5 appropriate to use the endpoints that
6 they used as the basis for their value.
7     Q.   The next article is:  Use of
8 toxicology in the regulatory process;
9 correct?
10    A.   Yes.
11    Q.   Is this a textbook?
12    A.   Yes, it's a textbook
13 chapter.
14    Q.   Is this just general
15 principles of toxicology in the
16 regulatory process?
17    A.   Yes, it is.
18    Q.   Are there any specific
19 substances analyzed in that article?
20    A.   There are a lot of different
21 substances mentioned just as examples for
22 things, so there's no specific -- or no
23 analysis of any specific chemical.
24    Q.   Sorry.  Going back up, the

Page 55

1 fifth article:  Real-world bisphenol A
2 exposure not linked to microbiota
3 dynamics -- do you see that article?
4     A.   Yes.
5     Q.   -- did that have any
6 route-to-route extrapolations analyzed or
7 performed?
8     A.   No.
9     Q.   The next article is:
10 Evaluation of neural reflex activation,
11 starts with that.  Do you see that?
12    A.   Yes.
13    Q.   Did that article have any
14 route-to-route analysis or extrapolation?
15    A.   No.
16    Q.   The next article is:  Nickel
17 in ambient particulate matter, starts
18 with that.  Do you see that?
19    A.   Yes.
20    Q.   Did that article have any
21 route-to-route extrapolations or analysis
22 of those?
23    A.   No.
24    Q.   The next article is:

Page 56

1 Evidence evaluated by European Food
2 Safety Authority.
3         Do you see that?
4     A.   Yes.
5     Q.   Did that article have any
6 route-to-route extrapolation performed or
7 analyses of route-to-route extrapolations
8 that were performed?
9     A.   No.
10    Q.   Does the textbook chapter,
11 does that have any route-to-route
12 analyses -- route-to-route extrapolation
13 performed or analyses of those
14 extrapolations?
15    A.   Not that I'm aware of.
16    Q.   Okay.  The next one is:
17 Systematic review of the potential
18 carcinogenicity of -- I mess up this word
19 every type.  Bisphenol?  Bisphenol.
20    A.   Bisphenol.
21    Q.   Bisphenol.  The next one is:
22 Systematic review of the potential
23 carcinogenicity of bisphenol A in humans.
24        Do you see that?

Page 57

1     A.   Yes.
2     Q.   And which substance was
3 analyzed?
4     A.   Bisphenol A.
5     Q.   And did this article find
6 whether bisphenol A was harmful at levels
7 to which people are typically exposed?
8     A.   Well, it only evaluated
9 whether bisphenol A, or BPA, as it's
10 known, could be carcinogenic to humans
11 and this article did not find that the
12 evidence was sufficient that bisphenol A
13 would -- can cause cancer in humans at
14 the exposures levels to which people are
15 exposed.
16    Q.   Thank you for letting me
17 know BPA.
18    A.   Yeah --
19    Q.   I'll do that instead.
20    A.   -- I should -- I should have
21 said that earlier.
22    Q.   The next article is:
23 Response to letter to editor, letter to
24 the editors regarding the conundrum of

15 (Pages 54 - 57)

ROBYN L. PRUEITT, Ph.D., DABT

Page 58

1 the PFOA human half-life, an internal
2 collaboration.
3        Do you see that?
4        ATTORNEY ROSE:  Object to
5    the form.
6        THE WITNESS:  Yes.  It's an
7    international collaboration, but,
8    yes, I see it.
9        ATTORNEY NIGH:  I see.
10 BY ATTORNEY NIGH:
11    Q.   Which substance was
12 analyzed?
13    A.   Well, it was -- I mean, it
14 was responding to a letter to the editor.
15 It wasn't really an analysis, but it
16 involved the substance PFOA.
17    Q.   I mean, any response
18 includes an analysis.  Right?
19        ATTORNEY ROSE:  Object to
20    the form.
21        THE WITNESS:  It could just
22    be a comment.
23 BY ATTORNEY NIGH:
24    Q.   Okay.  Was this response to

Page 59

1 letter to editor, was it peer reviewed?
2    A.   I'm trying to remember.  I'm
3 -- I cannot remember.  I'm not sure.
4    Q.   This is just a response to
5 somebody who's responding to an article
6 that you're an author of; correct?
7    A.   Right, yes.
8    Q.   Next article is:  The
9 conundrum of the PFOA human half-life, an
10 international collaboration; correct?
11    A.   Yes.
12    Q.   What was the substance that
13 was analyzed in this article?
14    A.   PFOA.
15    Q.   And did this article find
16 whether PFOA was harmful at levels to
17 which people are typically exposed?
18    A.   This article did not
19 evaluate harm to people in any way.  It
20 only evaluated the potential half-life of
21 PFOA in the body, which is the amount of
22 time it takes for half of a substance to
23 be eliminated from the body, so there was
24 no -- no evaluation of potential health

Page 60

1 effects or harm at all.
2    Q.   How does the amount of time
3 that PFOA, the human half-life, how does
4 that affect human health?
5    A.   Well, if a chemical stays
6 around in the body longer, for a longer
7 period of time, it has more potential to
8 cause harm, if it does indeed cause harm,
9 just simply because it's -- it's there in
10 the body and it hasn't been eliminated as
11 quickly as other substances.
12    Q.   Were any route-to-route
13 extrapolations performed or analyzed in
14 this study?
15    A.   No.
16    Q.   Going back to the systematic
17 review of the potential carcinogenicity
18 of BPA in humans, were any route-to-route
19 analyses -- route-to-route extrapolation
20 analyses performed or analyses regarding
21 those that were performed conducted in
22 this study?
23    A.   No.
24    Q.   Going on to the next

Page 61

1 article, U.S. EPA's TSCA risk assessment
2 approach: A case study of asbestos in
3 automotive brakes.
4        Do you see that?
5    A.   Yes.
6    Q.   What was the substance that
7 was analyzed in this case?
8    A.   Asbestos.
9    Q.   And, specifically, that
10 would be asbestos in automotive brakes?
11    A.   Yes.
12    Q.   And did this article find
13 whether asbestos in automotive brakes is
14 harmful at levels to which people are
15 typically exposed?
16    A.   Well, it didn't so much
17 evaluate the harm.  It was more an
18 evaluation of how EPA assessed exposure
19 to asbestos in people who work with
20 automotive brakes, so it was, you know,
21 commenting on the numbers that they used
22 for the amount of exposure.
23    Q.   And this article disagreed
24 with how the EPA assessed that exposure

16 (Pages 58 - 61)

ROBYN L. PRUEITT, Ph.D., DABT

Page 62

1 to people who work with automotive
2 brakes; correct?
3    A.   Yes, I believe so.
4    Q.   Were any route to route
5 analyses -- or were any route-to-route
6 extrapolations performed here or was
7 there any analysis of route-to-route
8 extrapolations that were performed by the
9 EPA?
10        ATTORNEY ROSE:  Object to
11    the form.
12        THE WITNESS:  No, there
13    weren't.
14 BY ATTORNEY NIGH:
15    Q.   The next article is:
16 Systematic review of the association
17 between long-term exposure to fine
18 particulate matter and mortality;
19 correct?
20    A.   Yes.
21    Q.   What is the substance matter
22 that was analyzed here?
23    A.   Fine particulate matter.
24    Q.   And did this article find

Page 63

1 whether exposure to fine particulate
2 matter at levels to which people are
3 typically exposed was harmful to people?
4    A.   I don't recall the specific
5 conclusions, but I believe it was similar
6 to what we found in the article that I
7 talked about earlier with nickel in
8 particulate matter, where there are a lot
9 of issues with the assessment of exposure
10 in the studies, which introduce a lot of
11 uncertainty in trying to evaluate whether
12 there is an association between fine
13 particulate matter and mortality.
14    Q.   And because of that
15 uncertainty, this article does not find
16 that exposure to the fine particulate
17 matter demonstrates a harm to people at
18 the levels at which people are typically
19 exposed; correct?
20    A.   I think it found that there
21 would -- it would be hard to say whether
22 or not it does, but that because of the
23 uncertainties, it cannot specifically be
24 confirmed whether it does cause harm at

Page 64

1 human relevant exposure levels.
2    Q.   And were any route-to-route
3 extrapolations performed in this study or
4 any analyses of route-to-route
5 extrapolations that were performed?
6        ATTORNEY ROSE:  Object to
7    the form.
8        THE WITNESS:  No.  It was
9    only dealing with inhalation
10    exposure.
11 BY ATTORNEY NIGH:
12    Q.   The next study is:  In
13 defense of the weight-of-evidence
14 approach to literature review in the
15 Integrated Science Assessment.
16        Do you see that?
17    A.   Yes.
18    Q.   What does the Integrated
19 Science Assessment refer to?
20    A.   That is EPA's Integrated
21 Science Assessments, which are
22 evaluations of criteria air pollutants.
23    Q.   And what does the
24 weight-of-evidence approach refer to?

Page 65

1    A.   That refers to how -- a
2 methodology for evaluating all of the
3 different types of evidence available on
4 whether a particular substance can cause
5 a particular health effect, so the
6 epidemiology or human evidence, the
7 animal toxicology evidence, and the
8 mechanistic evidence.
9        So it's a -- it's a type of
10 methodology to integrate all of the
11 different -- those different types of
12 studies together to come to conclusions.
13    Q.   This is not specifically
14 analyzing any substance in particular,
15 correct, this article?
16    A.   No.  In fact, I think that
17 it's a letter to the editor possibly, if
18 I can remember, because it's saying
19 regarding and then I think that it's in
20 regard to an article by someone else,
21 yeah.
22    Q.   Do you know if it was peer
23 reviewed?
24    A.   I do not recall.

17 (Pages 62 - 65)

ROBYN L. PRUEITT, Ph.D., DABT

Page 66

1    Q.    The next article is:
2 Systematic review of the potential --
3 sorry. Going back up to that prior, the
4 regarding in defense of the weight of
5 evidence, were any route-to-route
6 extrapolations performed or analyzed in
7 this study -- I mean in this letter?
8    A.    No.
9    Q.    Next article is: Systematic
10 review of the potential respiratory
11 carcinogenicity of metallic nickel in
12 humans.
13        Do you see that?
14    A.    Yes.
15    Q.    What is the substance at
16 issue in this study?
17    A.    Metallic nickel.
18    Q.    And did this article find
19 whether metallic nickel was harmful at
20 levels to which people are typically
21 exposed?
22    A.    Well, it only looked at
23 potential carcinogenicity and not other
24 types of potential harm, and I believe

Page 67

1 that we found that nickel -- excuse me --
2 metallic nickel did not have sufficient
3 evidence to show that it could cause
4 respiratory cancer specifically in humans
5 at the levels that humans are exposed to.
6    Q.    The next article is: Good
7 epidemiology practice guidelines for
8 pesticide exposure assessment.
9        Do you see that?
10    A.    Yes.
11    Q.    Is there any specific
12 pesticide exposure that's assessed in
13 this article?
14    A.    No.
15    Q.    Sorry. Going back up to the
16 systematic review of potential
17 respiratory carcinogenicity of metallic
18 nickel in humans, were any route-to-route
19 extrapolations performed or analyzed in
20 that study?
21    A.    No.
22    Q.    In good epidemiology
23 practice guidelines for pesticide
24 exposure assessment, are any

Page 68

1 route-to-route analyses performed or
2 analyzed?
3    A.    No.
4    Q.    Next is: Systematically
5 evaluating and integrating evidence in
6 national ambient air quality reviews.
7        Do you see that?
8    A.    Yes.
9    Q.    What specific substances are
10 analyzed in this study?
11    A.    There are no specific
12 substances.
13    Q.    Are any route-to-route
14 analyses performed or analyzed in this
15 study?
16    A.    No.
17    Q.    Next is: A critical review
18 of talc and ovarian cancer.
19        Do you see that?
20    A.    Yes.
21    Q.    And is talc the substance
22 that's analyzed in this study?
23    A.    Yes, it is.
24    Q.    And did this article find

Page 69

1 whether talc was harmful at levels to
2 which people are typically exposed in
3 terms of getting ovarian cancer?
4    A.    It was similar to the talc
5 study we talked about earlier, where
6 there are some associations reported, but
7 they are likely affected by recall bias.
8    Q.    And the ultimate
9 determination from this study would be
10 that because of the recall bias, that
11 talc is not associated or talc does not
12 cause ovarian cancer in humans?
13    A.    I think it's more that
14 because of the recall bias, it's
15 difficult to know, but that if there
16 truly is recall bias, then -- that
17 explains those associations, that, yes,
18 because of that and the other evidence
19 available, it does not indicate that talc
20 is a causal factor for ovarian cancer at
21 the exposure levels that people are
22 exposed to.
23    Q.    Were any route-to-route
24 analyses performed or evaluated in that

18 (Pages 66 - 69)

ROBYN L. PRUEITT, Ph.D., DABT

Page 70

1 study?
2    A.   No.
3    Q.   The next article is a
4 bounding --
5         ATTORNEY ROSE:  Counsel?
6         ATTORNEY NIGH:  Yes?
7         ATTORNEY ROSE:  I'm sorry to
8 interrupt, Daniel.  I don't mean
9 to interrupt while you're on a
10 roll, but we've been going for
11 over an hour, so I wanted to
12 request that we take a quick
13 break.
14        ATTORNEY NIGH:  No problem.
15        ATTORNEY ROSE:  Okay.
16        ATTORNEY NIGH:  How long?
17        THE VIDEO TECHNICIAN:  All
18 right.  We're going to go off the
19 record.  Time is 10:20 a.m.
20        (A recess was taken from
21 10:20 a.m. to 10:33 a.m.)
22        THE VIDEO TECHNICIAN:  Back
23 on the record at 10:33 a.m.
24 BY ATTORNEY NIGH:

Page 71

1    Q.   Doctor, were you asked by
2 defense counsel to examine anything else
3 that is not contained in your report?
4    A.   Was I asked by them?
5    Q.   Yes.
6    A.   You mean just now or --
7    Q.   No.  Were you asked by
8 defense counsel to analyze any other
9 issues that are not contained in your
10 report?
11   A.   Oh.  No.
12   Q.   And did you examine any
13 other issues that are not contained in
14 your report?
15   A.   No, I didn't examine
16 anything that wasn't relevant to what's
17 contained in the report.
18   Q.   And, Doctor, on page 9 of
19 your report, it states "References."  Do
20 you see that?
21   A.   Yes.
22   Q.   I count 11 references, 10 on
23 page 9 and one on page 11 -- or 10 on
24 page 9, one on page 10; is that correct?

Page 72

1    A.   Yes.
2    Q.   And then we were given -- in
3 response to the deposition notice, we
4 were given your invoice, C.V., NDMA ASTDR
5 tox profile, and two other documents from
6 the EPA.
7         Other than those documents
8 and the references that are listed here,
9 were there any other materials that you
10 considered for your opinions in this
11 case?
12   A.   Let's see.  I think I looked
13 at a textbook just for some kind of
14 general information; but otherwise, no,
15 it's really just my own experience in
16 toxicology and risk assessment.
17   Q.   Do you know which textbook
18 you looked at for general information?
19   A.   Casarett & Doull's, The
20 Basic Science of Poisons.
21   Q.   And I'm sorry.  You said
22 Casarett & Doull's?
23   A.   Casarett, although actually
24 -- I looked at that after I issued the

Page 73

1 report just to -- in preparation for this
2 deposition, so sorry if you were asking
3 if I -- about things I looked at to
4 prepare the actual report.
5    Q.   Okay.  That document -- and
6 that would have been after preparing your
7 report?
8    A.   Yes.
9    Q.   Did you look at any other
10 documents in preparing your report?
11   A.   No, I don't believe so.
12   Q.   And before your testimony
13 here today, other than Casarett & Doull's
14 and the references that are listed on
15 page 9 and 10, and the NDMA ASTDR tox
16 profile, two documents that we received
17 from the EPA, did you receive any -- did
18 you review any other documents in
19 preparation for this deposition?
20   A.   No, I think I pretty much
21 stuck to those.
22   Q.   And that's Casarett &
23 Doull's Toxicology?
24   A.   It's Casarett and Doull's,

19 (Pages 70 - 73)

ROBYN L. PRUEITT, Ph.D., DABT

Page 74

1 The Basic Science of Poisons I think is
2 what it's called.  It's the classic
3 toxicology textbook.
4     Q.    Casarett & Doull's
5 Toxicology, The Basic Science of Poisons.
6 Do you remember which edition?
7     A.    I could turn around and --
8 and look at it.  It's right behind me.
9     Q.    That's fine if you want to
10 tell us which edition it is.
11     A.    Oh, where did it go?  It is
12 the eighth edition.
13     Q.    And other than that textbook
14 and the 11 references that you cite and
15 the documents that we received in
16 response to the Notice of Deposition, did
17 you consider any other materials in terms
18 of your preparation for today's
19 deposition?
20         ATTORNEY ROSE:  Object to
21     form.
22         THE WITNESS:  Let's see.
23     I'm trying to remember.  I mean, I
24     may have looked up some things on

Page 75

1     Google just for some basic
2     concepts, but not any, you know,
3     studies like -- like what's in the
4     reference list or other guidance,
5     things like that.
6 BY ATTORNEY NIGH:
7     Q.    Do you know what those basic
8 concepts may have been that you looked up
9 on Google?
10     A.    I don't remember.
11     Q.    Doctor, looking at your
12 references on page 9, you don't list Dr.
13 Siddiqui's expert opinion report;
14 correct?
15     A.    No.  I'm not aware of that
16 report.
17     Q.    You didn't review Dr.
18 Siddiqui's expert report in this case;
19 correct?
20     A.    Correct.
21     Q.    So you wouldn't know how Dr.
22 Siddiqui applies Dr. Sawyer's opinions in
23 her report; correct?
24     A.    That's right.

Page 76

1     Q.    Doctor, I want to turn your
2 attention to page 4 and 5 of your expert
3 report.  At the bottom, the last
4 paragraph, you discuss:  Second, Dr.
5 Sawyer does not respect the limited
6 purposes -- do you see that?
7     A.    Yes.
8     Q.    -- it states:  Second, Dr.
9 Sawyer does not respect the limited
10 purposes for which this extrapolation
11 method may be used.  As recognized in the
12 literature, the conversion equation
13 employed by Dr. Sawyer can be
14 appropriately applied in select
15 situations where accurate representations
16 of exposure are not necessary, including,
17 for example, in risk assessments that are
18 designed to screen for the mere
19 possibility of risk rather than to
20 quantify given risk of an individual.
21         Do you see that?
22     A.    Yes.
23     Q.    And you cite the Kuempel
24 study?  K-U-E-M-P-E-L?

Page 77

1     A.    Yes.
2     Q.    And, Doctor, even the
3 Kuempel article discusses other
4 appropriate uses of route-to-route
5 extrapolations other than just screening
6 purposes; correct?
7     A.    I don't remember.  I'd have
8 to look at the article.
9     Q.    And the Kuempel article
10 cites to other articles that discuss
11 other appropriate uses of route-to-route
12 extrapolations other than just for
13 screening purposes; correct?
14         ATTORNEY ROSE:  Object to
15     the form.
16         THE WITNESS:  I don't
17     recall.  Again, I'd have to see
18     the article.
19 BY ATTORNEY NIGH:
20     Q.    Do you recall if you
21 reviewed the other articles that are
22 cited by Kuempel 2015?
23     A.    I don't.  I don't recall.
24 I'd have to see what those are, to see if

20 (Pages 74 - 77)

ROBYN L. PRUEITT, Ph.D., DABT

Page 78

1 they are any of the others that I've
2 cited.
3      Q.   And, Doctor, as you state in
4 this paragraph that I just read on page
5 4, you state:  As recognized in the
6 literature -- do you see that part of the
7 statement?  Last paragraph that I -- that
8 piece that I just read --
9      A.   Oh, yes.  On page 4, yes.
10      Q.   Other than Kuempel, what
11 other literature are you referring to?
12      A.   I would have to check, but I
13 believe it's the Pauluhn and the Kabadi
14 references as well.
15      Q.   Doctor, you're aware that
16 route-to-route extrapolations are
17 routinely performed in situations other
18 than risk assessments that are designed
19 to screen for the mere possibility of
20 risk; correct?
21      A.   No, I'm not aware that
22 they're routinely used for that.  I know
23 that -- I mean, they've been used for
24 developing occupational exposure limits,

Page 79

1 but that's also part of risk assessment
2 and, you know, if you don't have good
3 information about how the chemical moves
4 through the body by both routes, then
5 even -- even in those cases, it's really
6 only useful for -- for screening, because
7 it -- as many of the references that I
8 cited indicate, that you really cannot
9 get an accurate and reliable estimate of
10 a -- of a dose at a -- from a different
11 exposure route without that type of
12 information.
13      Q.   Doctor, are you aware that
14 pharmaceutical companies use
15 route-to-route extrapolations?
16          ATTORNEY ROSE:  Object to
17      the form.
18          THE WITNESS:  No, I'm not
19      aware of what pharmaceutical
20      companies do.  My work is mostly
21      with evaluation of chemicals,
22      things that would be regulated by
23      EPA, and so risk assessment
24      methodology from U.S. EPA.

Page 80

1 BY ATTORNEY NIGH:
2      Q.   Have you reviewed any
3 studies where pharmaceutical companies
4 use route-to-route extrapolations?
5      A.   Not that I'm aware of.
6      Q.   Have you reviewed any
7 studies where pharmaceutical companies
8 use route-to-route extrapolations to
9 determine what systemic doses are
10 necessary for efficacy?
11      A.   No, I haven't, although I
12 would assume that they probably have
13 evaluated the pharmaceutical
14 pharmacokinetics to a better extent than
15 what's known, for example, for NDMA and
16 for, you know, any -- for certain other
17 chemicals.
18      Q.   And why do you make that
19 assumption?
20      A.   Because everything that I
21 have seen indicates that a route-to-route
22 extrapolation is not going to be reliable
23 or accurate without having that type of
24 pharmacokinetic information about the

Page 81

1 chemical or the pharmaceutical.
2          So if pharmaceutical
3 companies are doing that type of
4 extrapolation, I don't know if it -- you
5 know, how accurate they're trying to be.
6 I really can't -- can't say.
7      Q.   And have you reviewed any
8 pharmaceutical company publications where
9 they perform route-to-route
10 extrapolations to determine what systemic
11 doses lead to toxicity in the human body?
12          ATTORNEY ROSE:  Object to
13      form.
14          THE WITNESS:  No, I haven't
15      read anything like that.
16 BY ATTORNEY NIGH:
17      Q.   Doctor, isn't it true that
18 the EPA generally uses route-to-route
19 extrapolation from animals to humans?
20      A.   I -- so you're asking
21 extrapolation from one route and one
22 species to another route and another
23 species?
24      Q.   My question is, the EPA,

21 (Pages 78 - 81)

ROBYN L. PRUEITT, Ph.D., DABT

Page 82

1  when they use route-to-route
2  extrapolations, isn't it true that they
3  more commonly use extrapolations from
4  animals to humans than humans to humans?
5        ATTORNEY ROSE:  Object to
6     the form.
7        THE WITNESS:  So I know in
8     the past, there were situations
9     where EPA would often need to
10    extrapolate from oral studies in
11    animals, because that was all that
12    was available, to the inhalation
13    route and try to estimate an
14    inhalation exposure to set a
15    regulatory value for inhalation
16    because there wasn't one.
17        But even then, that would be
18    for risk assessment purposes,
19    where they would include a lot of
20    assumptions that overestimate the
21    -- the risk.
22        So that's, you know, really
23    what this type of extrapolation,
24    because it's not very reliable, as

Page 83

1     indicated in -- in guidance and
2     several publications, it's not
3     very reliable, particularly
4     without information on the
5     pharmacokinetics and especially
6     metabolism of the chemical, that
7     -- you know, so it can -- that's
8     why I say it's mainly used for
9     screening purposes or at least
10    risk assessment, because the whole
11    point of risk assessment is to
12    overestimate risks so -- to
13    protect everyone.
14        So it's not determining an
15    exact exposure concentration,
16    particularly for a specific
17    individual.  It's to evaluate
18    risks to everyone.  And so it --
19    it doesn't need to be exact.  It
20    just has to be an -- you know, an
21    overestimate of risk.
22 BY ATTORNEY NIGH:
23    Q.   Doctor, did you do a
24 systematic review of literature to

Page 84

1  determine when route-to-route
2  extrapolations are not used for risk
3  assessment?
4        ATTORNEY ROSE:  Objection --
5        THE WITNESS:  No, that's not
6     anything that I felt I needed to
7     do when I could see in the
8     literature and in the guidance
9     that it mentions that it's not a
10    very reliable way to estimate
11    dose.
12 BY ATTORNEY NIGH:
13    Q.   Doctor, one of your opinions
14 criticizes Dr. Sawyer's use of 20 percent
15 for inhalation bioavailability of NDMA;
16 correct?
17    A.   Yes.
18    Q.   Did you assess what the
19 impact would have been even if Dr. Sawyer
20 had assumed a hundred percent for
21 inhalation bioavailability of NDMA?
22    A.   Well, just generally noting
23 that his numbers would have been fivefold
24 higher, but I mean, I didn't know really

Page 85

1  what to evaluate that for any -- you
2  know, any real purposes because I don't
3  believe it's a reliable method to even do
4  the extrapolation.
5    Q.   I understand.  Did you
6  assess that even if it was fivefold
7  higher, the cumulative amount of NDMA
8  ingested by Mr. Roberts would still have
9  been higher than the quartile 4 Hidajat
10 exposure to NDMA?
11       ATTORNEY ROSE:  Object to
12    the form.
13       THE WITNESS:  Well, that
14    assumes that the rest of the
15    equation -- or the rest of the
16    extrapolation has any meaning, and
17    I don't believe that there's any
18    reliability to it.
19       Even if the bioavailability
20    portion was changed to be a
21    hundred percent instead of 20
22    percent, there's still too many
23    issues with the calculated doses
24    that I don't believe they can be

22 (Pages 82 - 85)

ROBYN L. PRUEITT, Ph.D., DABT

Page 86

1    reliably compared to Mr. Roberts'
2       oral dose at all.
3 BY ATTORNEY NIGH:
4       Q.   So because of that, does
5 that mean that, no, you didn't assess
6 that?
7           ATTORNEY ROSE:  Object to
8       the form.
9           ATTORNEY NIGH:  I'll read
10      the whole question because there's
11      a form objection.
12 BY ATTORNEY NIGH:
13      Q.   So does that mean that, no,
14 you didn't assess that the cumulative
15 amount of NDMA ingested by Mr. Roberts
16 would still have been higher than
17 quartile 4 in the Hidajat exposure to
18 NDMA even if 100 percent was used for
19 inhalation bioavailability of NDMA?
20      A.   I believe I did notice that
21 even if the converted doses were five
22 times higher, meaning if a hundred
23 percent bioavailability was used instead
24 of 20 percent, that -- that I think I

Page 87

1 recall that the estimated oral dose for
2 Mr. Roberts would still be in the range
3 of those concentrations.
4       I -- I can't remember the
5 exact numbers.
6       Q.   And, Doctor, you didn't
7 attempt to quantify the risk of the
8 amount of -- the risk that the amount of
9 NDMA that Mr. Roberts consumed, you
10 didn't attempt to quantify that risk in
11 any way; correct?
12      A.   No.  I wasn't asked to do
13 that.
14      Q.   And, Doctor, you didn't
15 review any of the valsartan epidemiology;
16 correct?
17      A.   No, I wasn't asked to -- to
18 look at that.
19      Q.   And, Doctor, you didn't --
20 other than Hidajat, you didn't review any
21 of the other epidemiology studies
22 regarding NDMA; correct?
23      A.   Correct.  I was focused just
24 on Dr. Sawyer's route-to-route

Page 88

1 extrapolation analysis and the studies
2 associated with that.
3       Q.   Doctor, on page 3 at the
4 bottom paragraph, you see it starts with
5 "Finally"?
6       A.   Yes.
7       Q.   And you state that there is
8 no legitimate basis to conclude that Mr.
9 Roberts' risk of liver cancer from
10 exposure to NDMA in valsartan would be
11 equivalent to risk estimates for rubber
12 factory workers who were exposed to a
13 host of other toxic substances, including
14 known human carcinogens.
15          Do you see that?
16      A.   Yes.
17      Q.   Doctor, did you do anything
18 to try and calculate what the risks would
19 have been to the other known human
20 carcinogens or other toxic substances?
21      A.   No.  I wasn't asked to do
22 that and I don't know how easily that
23 could be done.
24      Q.   Doctor, did you look at any

Page 89

1 analyses that Hidajat did in looking at
2 the other known substances in the rubber
3 factory?
4       A.   Well, I looked at the --
5 yeah, the analyses for the specific
6 chemical mixtures that Hidajat looked at,
7 though I was really just focused on the
8 NDMA.
9          But, you know, it clearly
10 states in the Hidajat study that there
11 were other carcinogens and it's known
12 that rubber factories, you know, also can
13 have exposures to, for example, benzene,
14 which I don't believe Hidajat looked at.
15          So, you know, there were
16 some -- some of these potential
17 carcinogens that Hidajat looked at, but
18 there could be others that they didn't
19 look at.
20      Q.   Did you look at any of the
21 multicarcinogen assessments that Hidajat
22 performed either in that study or other
23 studies that are cited by Hidajat?
24      A.   The multicarcinogen -- wait.

23 (Pages 86 - 89)

ROBYN L. PRUEITT, Ph.D., DABT

Page 90

1  Is that what you said?  I'm sorry.
2      Q.   Yes.
3      A.   I'm not sure what you mean.
4      Q.   That when there are multiple
5  carcinogens, an analysis to discuss the
6  risk of each of the carcinogens.
7           ATTORNEY ROSE:  Object to
8      the form.
9           THE WITNESS:  Yeah, I'm
10     still -- I'm still not really
11     understanding what you're asking.
12 BY ATTORNEY NIGH:
13     Q.   Did you look at any analysis
14 that looked at multivariable terms of
15 multicarcinogens to see the individual
16 risk that each carcinogen posed?
17     A.   Yeah, so I don't know what
18 your term "multicarcinogens" means.  I
19 just know that Hidajat had results for
20 cancer risks for NDMA and a few other
21 carcinogens; but in each case, they did
22 not do multipollutant models to really
23 tease out and make sure that it really is
24 that particular chemical and that there

Page 91

1  are no -- that the -- that the risks are
2  truly attributable to that particular
3  chemical.
4      Q.   Did you evaluate any of the
5  multipollutant analyses that Hidajat
6  performed?
7      A.   I don't believe that Hidajat
8  performed multipollutant models.
9      Q.   And did you look at any of
10 the studies that are cited by Hidajat as
11 to whether multipollutant analyses were
12 performed in those studies?
13          ATTORNEY ROSE:  Object to
14     the form.
15          THE WITNESS:  No, I -- no,
16     I'm not aware that Hidajat cited
17     anything like that.  I'm not sure.
18 BY ATTORNEY NIGH:
19     Q.   Doctor, are you aware, other
20 than benzene, what other toxic substances
21 for known human carcinogens were these
22 rubber factory workers exposed to?
23     A.   Rubber fumes and potentially
24 nitrosamines, not just NDMA, but others.

Page 92

1  What else?  I'd have to look.  I think --
2  I think the Hidajat study may mention it
3  in the beginning, so I'd have to
4  double-check.
5      Q.   Other than the rubber fumes,
6  nitrosamines, rubber dust, and more, do
7  you recall any other -- or are you aware
8  of any other toxic substances, including
9  known human carcinogens, other than those
10 and other than benzene?
11          ATTORNEY ROSE:  Object to
12     the form.
13 BY ATTORNEY NIGH:
14     Q.   And, sorry, let me finish
15 that -- that are in the rubber factories
16 that Hidajat assessed?
17          ATTORNEY ROSE:  Object to
18     the form.
19          THE WITNESS:  No, I'd have
20     -- I don't know off the top of my
21     head.
22 BY ATTORNEY NIGH:
23     Q.   Did you do any search to
24 look for other carcinogens that these

Page 93

1  workers would have been exposed to?
2      A.   I don't think so.  I think
3  just seeing what was listed by Hidajat
4  and probably Monarca.
5      Q.   Any others?
6      A.   I'm not sure if the -- if
7  that was listed in the ATSDR
8  toxicological profile for NDMA or not, so
9  I can't think of any others right now.
10     Q.   Doctor, are you aware of any
11 scientists that have worked for Gradient
12 that have published articles suggesting
13 that benzene should not be a known
14 carcinogen?
15          ATTORNEY ROSE:  Object to
16     the form.
17          THE WITNESS:  No, I'm not
18     aware.
19 BY ATTORNEY NIGH:
20     Q.   Are you aware of any
21 scientists that have published for Gradient
22 that have published on benzene?
23     A.   I -- yes, I believe one of
24 my colleagues has a publication on

24 (Pages 90 - 93)

ROBYN L. PRUEITT, Ph.D., DABT

Page 94

1  benzene. I don't know if it's more than
2  one, but that's the only one I know of.
3  There could be others. I'm just not
4  sure.
5      Q.   And who is that colleague?
6      A.   Julie Goodman.
7      Q.   Are you aware of any
8  scientists that have worked for Gradient
9  that have assessed the exposure in the
10  rubber factories and concluded that
11  benzene is not carcinogenic at the levels
12  that factory workers were exposed to?
13     A.   I'm not aware. I don't
14  know.
15     Q.   Doctor, do you have any
16  information or any evidence to point that
17  people in quartile 4 exposure to NDMA
18  versus people in quartile 1 exposure of
19  NDMA, that the people in quartile 4 would
20  have been exposed to more benzene than
21  the people in quartile 1?
22     A.   I don't -- don't have that
23  information because it wasn't evaluated
24  in that -- in the Hidajat study.

Page 95

1      Q.   And do you have any
2  information or evidence that may point to
3  whether or not people in quartile 4 were
4  -- of exposure to NDMA versus people in
5  quartile 1 exposure to NDMA in the
6  Hidajat study, that the people in
7  quartile 4 would have been exposed to
8  more NMOR in quartile 4 than quartile 1?
9          ATTORNEY ROSE: Object to
10     the form.
11         THE WITNESS: No, I don't
12     know that there's a way to know
13     that because the quartiles are
14     different for NMOR than for NDMA,
15     so I don't know.
16         That's why a multipollutant
17     analysis would need to be done.
18  BY ATTORNEY NIGH:
19     Q.   And, Doctor, are you aware
20  of whether or not people in quartile 4 of
21  exposure to NDMA versus people in
22  quartile 1 exposure to NDMA in the
23  Hidajat study, whether they would have
24  been exposed to more rubber fumes in

Page 96

1  quartile 4 NDMA versus quartile 1 NDMA?
2      A.   No, I don't know that that
3  can be known given -- given the -- the
4  data presented.
5      Q.   Same question for rubber
6  dust.
7      A.   Yeah, I don't know that that
8  can be known given the information
9  presented.
10     Q.   And the same question for
11  nitrosamines, total nitrosamines.
12         ATTORNEY ROSE: Object to
13     the form.
14         THE WITNESS: Yeah, I don't
15     -- I'm not sure that can be known.
16  BY ATTORNEY NIGH:
17     Q.   Doctor, do you know which
18  area of the factory that people were
19  mostly exposed to NDMA?
20         ATTORNEY ROSE: Object to
21     the form.
22         THE WITNESS: I'd have to
23     look at the study. I believe it
24     was broken down into at least a

Page 97

1      certain department or type of work
2      where there may have been more,
3      but I -- I can't remember off the
4      top of my head.
5  BY ATTORNEY NIGH:
6      Q.   And did you ever assess
7  whether or not people that were exposed
8  to more NDMA in that department were
9  exposed to more of any of these other
10  carcinogens or toxic substances that
11  we've discussed?
12     A.   No. And I don't think that
13  can be really determined, at least not
14  from the way that the data were presented
15  in the paper.
16     Q.   Did you try to assess that?
17     A.   No, it -- no, I didn't. It
18  wasn't relevant to what I needed to do.
19     Q.   And, Doctor, next to what I
20  read in your report, it says: And whose
21  risk factors for liver cancer are
22  unknown.
23         Do you see that?
24     A.   Yes.

25 (Pages 94 - 97)

ROBYN L. PRUEITT, Ph.D., DABT

Page 98

1    Q.   What liver cancer risk
2 factors are you aware of that would be
3 different for rubber factory workers
4 compared to just the general population?
5    A.   Well, I don't know exactly
6 because the -- it's -- that wasn't looked
7 at.  I mean, it could be smoking -- you
8 know, smoking or -- I don't know -- the
9 various factors for liver cancer -- or
10 risk factors for liver cancer weren't
11 evaluated and -- what's the word --
12 controlled for by Hidajat, and I think
13 they even mention that they didn't look
14 at that.
15       So we -- you know, it's not
16 even clear, so that's why I'm saying, you
17 know, we don't even know if they could
18 have had risk -- you know, what risk
19 factors for liver cancer they could have
20 had versus Mr. Roberts, so -- you know,
21 and it wasn't something that was
22 controlled for in the study.
23    Q.   Let me just make sure I
24 understand your opinion.  You're talking

Page 99

1 about the risk factors that even the
2 general population would have, that you
3 don't know the degree as to which those
4 presented in rubber workers in the
5 Hidajat study?
6       ATTORNEY ROSE:  Object to
7    the form.
8       THE WITNESS:  Correct,
9    because that wasn't looked at.
10 BY ATTORNEY NIGH:
11    Q.   But there aren't any other
12 risk factors that you're aware of other
13 than -- that the general population
14 doesn't have other than the degree as to
15 which those risk factors are presented in
16 rubber workers; correct?
17       ATTORNEY ROSE:  Object to
18    the form.
19       THE WITNESS:  Sorry, I don't
20    understand the question.
21 BY ATTORNEY NIGH:
22    Q.   We talked about your opinion
23 being the degree as to which those risk
24 factors presented within the rubber

Page 100

1 factory workers.
2       Do you remember that?
3    A.   Yes.
4    Q.   Okay.  And my question is,
5 are there any other risk factors other
6 than -- are there any unknown risk --
7 liver risk factors that you're assessing
8 other than those that are known to be
9 risk factors in the general population?
10       ATTORNEY ROSE:  Object to
11    the form.
12       THE WITNESS:  I'm -- yeah, I
13    don't know.
14 BY ATTORNEY NIGH:
15    Q.   Doctor, did you do any
16 analysis as to whether or not benzene at
17 the levels that people were exposed to in
18 the rubber factory, whether or not they
19 can even cause cancer in humans -- liver
20 cancer in humans?
21    A.   No, I not only didn't see
22 any benzene exposure levels for this
23 cohort of workers, but -- and also
24 looking at cancer risk was not something

Page 101

1 that I was asked to do.
2    Q.   But, Doctor, the American
3 Cancer Society indicates there's less
4 evidence linking benzene exposure to
5 liver cancer in humans; correct?
6    A.   I don't know.
7    Q.   Do you know benzene to be a
8 high risk factor for liver cancer?
9       ATTORNEY ROSE:  Objection to
10    form.
11       THE WITNESS:  No.  I know it
12    to be a high -- or I know it to be
13    a risk factor for blood cancers.
14 BY ATTORNEY NIGH:
15    Q.   Doctor, in the Hidajat
16 study, in order to be included as passing
17 away from the specific type of liver
18 cancer, that specific type of liver
19 cancer would have needed to be listed as
20 the reason of their cause of death or a
21 reason of cause of death; correct?
22       ATTORNEY ROSE:  Object to
23    the form.
24       THE WITNESS:  Sorry.  Can

26 (Pages 98 - 101)

ROBYN L. PRUEITT, Ph.D., DABT

Page 102

1    you repeat the question?
2 BY ATTORNEY NIGH:
3        Q.    The endpoint in Hidajat is
4 the passing away due to cancer; correct?
5        A.    Yes.  I believe it's a
6 mortality study, yes.
7        Q.    And the endpoint for the
8 individual cancer analyses would be
9 passing away due to that individual type
10 of cancer; correct?
11        ATTORNEY ROSE:  Object to
12    the form.
13        THE WITNESS:  Yes, I believe
14    so.
15 BY ATTORNEY NIGH:
16        Q.    Doctor, did you review the
17 Gombar studies at all?
18        A.    The what studies?
19        Q.    Gombar, G-O-M-B-A-R?
20        A.    No.
21        Q.    Doctor, on page 6, you state
22 that: Further, the status of protective
23 gear was unknown on the workers assessed
24 by Hidajat at all, which further

Page 103

1 complicates the bioavailability
2 estimation.
3        Do you see that?
4        A.    Yes.
5        Q.    Did you do any systematic
6 review or any research to try to figure
7 out what protective gear those workers
8 would have been wearing?
9        A.    No, I didn't.
10        Q.    And, Doctor, any protective
11 gear that the workers would have been
12 wearing would only cause the workers to
13 inhale less NDMA than what was in the
14 air; correct?  Or the same amount of NDMA
15 that was in the air.
16        ATTORNEY ROSE:  Object to
17    the form.
18        THE WITNESS:  Sure, if the
19    protective gear was working and it
20    was the type of gear to block
21    inhalation exposures, then, yes,
22    it would certainly not cause them
23    to be exposed to more than without
24    the gear.

Page 104

1 BY ATTORNEY NIGH:
2        Q.    So in terms of the analysis
3 that Dr. Sawyer performed, if there was
4 protective gear that was analyzed and
5 considered, that would only lower the
6 percentage of NDMA that would reach
7 bioavailability inhalation for the rubber
8 factories; correct?
9        A.    Yes, but we don't really
10 know whether the workers had any of that
11 protective gear or not.  It wasn't
12 reported in the study.
13        Q.    Did you try to look to see
14 whether or not any protective gear would
15 cause more NDMA to be inhaled and
16 bioavailable in those rubber factory
17 workers?
18        ATTORNEY ROSE:  Object to
19    the form.
20        THE WITNESS:  No, because
21    that wasn't something that I felt
22    that I needed to look into.  I
23    was, you know, more focused on Dr.
24    Sawyer's route-to-route

Page 105

1    extrapolation.
2 BY ATTORNEY NIGH:
3        Q.    Doctor, how would clearance
4 affect bioavailability?
5        A.    So clearance of a substance,
6 for example, in the respiratory tract
7 would remove a portion of the chemical
8 from being able to be absorbed.
9        So if there's more
10 clearance, there's less absorption and
11 therefore less bioavailability.  If
12 there's not as much clearance, then there
13 would be more potential for absorption
14 and higher bioavailability.
15        Q.    Did you see anything in Dr.
16 Sawyer's route-to-route extrapolation for
17 inhalation where he would have used
18 clearance to lower the amount of
19 bioavailability?
20        A.    Not directly.  I didn't -- I
21 don't recall him talking about clearance
22 so much as just deposition -- yeah, no, I
23 don't recall him discussing clearance.
24        Q.    So if he had applied a

27 (Pages 102 - 105)

ROBYN L. PRUEITT, Ph.D., DABT

Page 106

1 clearance factor in the respiratory
2 tract, this would only cause even less of
3 the NDMA that was inhaled by the factory
4 workers to be bioavailable than what he
5 calculated; correct?
6         ATTORNEY ROSE:  Object to
7     the form.
8         THE WITNESS:  No -- well, it
9     would -- it would depend.  I mean,
10     he -- he does have a
11     bioavailability percentage that he
12     used from the beagle dog study
13     which would have accounted -- or,
14     you know, clearance -- if there
15     had been clearance, then that
16     would have affected that
17     bioavailability percentage.
18         But I -- you know, I don't
19     know how -- I don't know that it
20     can be known how clearance would
21     affect the bioavailability one way
22     or another in his calculation.
23 BY ATTORNEY NIGH:
24     Q.   Doctor, if you assumed a

Page 107

1 hundred percent inhalation, if you had
2 used that calculation, 100 percent
3 inhalation bioavailability, clearance
4 could only cause -- adjusting for
5 clearance could only cause that number to
6 be less; correct?
7         ATTORNEY ROSE:  Object to
8     the form.
9         THE WITNESS:  Sorry.  The
10     screen froze for a second for that
11     question.  Can you repeat it?
12         ATTORNEY NIGH:  Yeah, no
13     problem.
14 BY ATTORNEY NIGH:
15     Q.   Doctor, if Dr. Sawyer had
16 assumed 100 percent for inhalation
17 bioavailability, clearance -- considering
18 clearance in the respiratory tract could
19 only lower that percentage of what would
20 be bioavailable; correct?
21     A.   Yes.  I mean, clearance is a
22 factor that would decrease the amount of
23 bioavailability.  That's why you usually
24 don't have a hundred percent

Page 108

1 bioavailability from what you've --
2 what's in the air that you've inhaled.
3 We know that not all of it is going to be
4 bioavailable for various reasons,
5 including clearance.
6     Q.   Did you attempt to calculate
7 what would be bioavailable for NDMA for
8 the rubber factories -- or for the rubber
9 factory workers?
10     A.   No.  I didn't see any -- or
11 I wasn't aware of any good studies of bio
12 -- or bioavailability from inhalation of
13 NDMA in humans, so -- and, you know, I
14 wasn't asked to do a route-to-route
15 extrapolation where I would need to
16 understand that.
17         I was only asked to comment
18 on Dr. Sawyer's calculation and because I
19 don't believe that it should be -- that
20 it's -- it's a reliable way to estimate a
21 dose and I don't believe that the way he
22 did it is reliable either, so it's not
23 something that I was going to try to do.
24     Q.   Doctor, how would metabolism

Page 109

1 affect bioavailability?
2     A.   So metabolism is the
3 transformation of the chemical at issue
4 so -- which would be in this case the
5 parent chemical, NDMA.
6         If it's metabolized, then
7 it's transformed into something else, to
8 a different chemical, and so metabolism
9 will decrease the amount of the parent
10 NDMA, yeah, so...
11     Q.   Doctor, did you look for any
12 studies that discussed how NDMA is
13 metabolized?
14     A.   Well, I looked at the ATSDR
15 toxicological profile.  It discusses
16 that.  And Dr. Sawyer's report discusses
17 it somewhat as well and seems to have the
18 same information about metabolism that
19 the ATSDR toxicological profile reports,
20 so I did see information about NDMA
21 metabolism in that document.
22         (Pause.)
23 BY ATTORNEY NIGH:
24     Q.   Doctor, the Hidajat study

28 (Pages 106 - 109)

ROBYN L. PRUEITT, Ph.D., DABT

Page 110

1  assumed ten-year employment; correct?
2     A.   No.  The Hidajat study had a
3  sensitivity analysis where they looked at
4  alternative simulated exposure durations
5  for the cancer workers from a different,
6  but partly overlapping, group of British
7  rubber industry workers.
8        In that group, they knew the
9  exposure durations for because they
10 didn't know the exposure duration for
11 anybody in the actual -- or for most --
12 at least -- probably most of the workers
13 in the cancer studies, but they did know
14 it for this other cohort.
15       And so that cohort had a
16 median employment duration of ten years,
17 but that does not mean that the workers
18 in the cancer risk study had a median
19 employment duration of ten years because
20 we don't know what their employment
21 duration was.
22    Q.   Doctor, you had some
23 criticisms about Dr. Sawyer not including
24 first-pass liver metabolism in his

Page 111

1  route-to-route extrapolations.
2        Do you recall that?
3     A.   Yes.
4     Q.   And any first-pass effect
5  that would happen in the liver on oral
6  ingestion would only cause there to be
7  more NDMA that's available in the liver;
8  correct?
9     A.   No.
10    Q.   Why?
11    A.   It would not cause more NDMA
12 to be in the liver.  It would cause more
13 of the metabolites produced from the
14 metabolism to be in the liver, although,
15 of course, saying "more," I mean, that --
16 more than what?
17       I mean, because you can also
18 have metabolism in the respiratory tract
19 when you inhale a chemical and the ATSDR
20 toxicological profile does provide some
21 indication that NDMA may be metabolized
22 outside of the liver, which means it
23 could be metabolized in the respiratory
24 tract.

Page 112

1        It's known -- the
2  respiratory tract has quite a capacity
3  for metabolism, so it could also be
4  metabolized there from inhalation, but
5  the first-pass metabolism in the liver
6  would cause metabolites to be developed
7  in the liver prior to going into the
8  systemic circulation or the blood.
9     Q.   And, Doctor, it's the
10 metabolites of NDMA that causes the
11 carcinogenic effect; correct?
12    A.   That is what is believed
13 from the -- as mentioned in the ATSDR
14 toxicological profile.  It is believed
15 that it is likely the metabolites that
16 have the potential to be -- be
17 carcinogenic.
18    Q.   So more metabolites of NDMA
19 in the liver would only lead to a more
20 likelihood of carcinogenic effect in the
21 liver; correct?
22    A.   If -- if NDMA metabolites
23 do, indeed, cause cancer and if they do,
24 indeed, cause liver cancer, then -- then,

Page 113

1  yes, they would be -- those metabolites
2  would be there in the liver before they
3  get pulled out into the general
4  circulation.
5     Q.   And, Doctor, you just
6  explained previously that first-pass
7  metabolism when inhaled can occur for
8  NDMA in the respiratory tract.
9        Do you recall that?
10    A.   Yes.
11    Q.   Doctor, isn't it true that
12 there's more first-pass effect that
13 occurs in the liver when NDMA is orally
14 digested than first-pass effect that
15 happens in the respiratory tract when
16 NDMA is inhaled?
17    A.   No, I don't think that's
18 known.  I -- the extent of metabolism in
19 the respiratory tract is not known for
20 sure for NDMA.  I think it's hypothesized
21 and it's possible, but I don't believe --
22 I haven't seen anything in the extent of
23 it.
24    Q.   Where is it hypothesized?

29 (Pages 110 - 113)

ROBYN L. PRUEITT, Ph.D., DABT

Page 114

1    A.   In the ATSDR toxicological
2 profile.
3    Q.   So the ATSDR toxicological
4 profile hypothesizes that there would be
5 more first-pass effect in the liver for
6 oral ingestion compared to first-pass
7 effect in inhalation in the respiratory
8 tract.
9    A.   No, it doesn't --
10        ATTORNEY ROSE:  Object to
11    the form.
12        THE WITNESS:  -- hypothesize
13    that there's more.  I don't think
14    it makes any sort of comparison
15    between metabolism by the two
16    routes.  It just suggests from the
17    data that it cited that metabolism
18    outside of the liver is possible
19    and may even be likely in larger
20    organisms compared to, you know,
21    small laboratory organisms.  I saw
22    a statement about that.
23 BY ATTORNEY NIGH:
24    Q.   Doctor, did you assess any

Page 115

1 of the animal studies where they assessed
2 first-pass metabolism effect in
3 inhalation in the respiratory tract?
4    A.   No.  I don't know that there
5 are such studies.
6    Q.   Did you look for them?
7    A.   No.  I would have just
8 looked at what was discussed in the ATSDR
9 toxicological profile.
10    Q.   And, Doctor, did you look at
11 studies that discuss the first-pass
12 effect in the liver in animals that
13 orally ingested NDMA?
14    A.   No, I didn't look at any
15 specific studies.
16    Q.   Did you look for -- did you
17 search for any of them?
18    A.   No.  I just relied on the
19 ATSDR toxicological profile for that type
20 of information because it's a good
21 resource for general information about
22 the toxicokinetics of a chemical.
23    Q.   But you didn't see the
24 comparison in the ATSDR, first-pass

Page 116

1 effect inhalation in the respiratory
2 tract versus first-pass effects oral in
3 the liver?
4    A.   No.
5    Q.   Doctor, did you review any
6 of the expert reports that were submitted
7 in this case on general causation?
8    A.   No.  Aside from Dr.
9 Sawyer's, no.  I only evaluated -- or I
10 only looked at Dr. Sawyer's report.
11    Q.   So you wouldn't be aware of
12 whether or not any defense experts in
13 general causation opine that there's more
14 first-pass effect in the liver when
15 valsartan with NDMA is ingested compared
16 to first-pass effect that would occur in
17 the respiratory tract when NDMA is
18 inhaled?
19        ATTORNEY ROSE:  Object to
20    the form.
21        THE WITNESS:  Yeah, no, I
22    haven't seen that.
23        ATTORNEY NIGH:  Is now a
24    good time to take a break?

Page 117

1        ATTORNEY ROSE:  Yes.
2        THE VIDEO TECHNICIAN:  We're
3    going to go off the record.  The
4    time is 11:30 a.m.
5        (A recess was taken from
6    11:30 a.m. to 11:45 a.m.)
7        THE VIDEO TECHNICIAN:  We're
8    back on the record at 11:45 a.m.
9 BY ATTORNEY NIGH:
10    Q.   Doctor, I'm going to go back
11 to your publications, that list that we
12 were looking at before.  I left off at
13 page 8 on your publications list.
14        Do you see where it shows
15 starting the first author is Robert
16 R-H-O-M-B-E-R-G about the middle of the
17 page?
18    A.   Yes, I do.
19    Q.   And this article is titled:
20 A bounding quantitative cancer risk
21 assessment for occupational exposures to
22 asphalt emissions during road paving
23 operation.
24        What are asphalt emissions?

30 (Pages 114 - 117)

ROBYN L. PRUEITT, Ph.D., DABT

Page 118

1    A.   Emissions of chemicals from
2  -- so chemicals that are being released
3  into the air from asphalt as it's being
4  used for paving.
5    Q.   And are those the substances
6  that you analyzed in that study?
7    A.   Yes.
8    Q.   And did you find that
9  asphalt emissions was harmful at levels
10 to which people are typically exposed?
11   A.   I actually don't recall the
12 specific conclusions from this paper.  I
13 mean, it was a cancer risk assessment, so
14 it would have evaluated cancer risk and
15 so cancer risk is not something that's
16 ever stated as, like, being zero, for
17 example, so saying not harmful or not
18 harmful as far as causing cancer.
19       So the paper wouldn't have
20 said that asphalt emission exposure would
21 not be harmful at the concentrations
22 people are exposed to, because that's not
23 the purpose of it and that's not what was
24 looked at for this.  It was a risk

Page 119

1  assessment, so there would have been some
2  risks calculated.
3    Q.   But the paper doesn't find
4  that the asphalt emissions were harmful
5  at levels to which people are typically
6  exposed; correct?
7    A.   Again, that's not really how
8  it would have been presented because it
9  was a risk assessment.  There would have
10 been some risk.  There's a number, a risk
11 number, and that's what the risk is.  You
12 can't say that there's no harm or there
13 is harm.  There's just simply a risk for
14 cancer associated with that.
15   Q.   Was there any determination
16 in the paper that that risk level would
17 be harmful at levels to which people are
18 typically exposed?
19   A.   Well, the risk incorporates
20 the levels that people were exposed, so
21 whatever the risk is, that is the risk of
22 harm at the levels that people were
23 exposed.
24       Beyond that, this paper is

Page 120

1  several years old at this point, so I --
2  I just can't remember specifics about it.
3    Q.   Were any route-to-route
4  extrapolations utilized or calculations
5  performed in this study or analyzed in
6  this study?
7    A.   No.  So even though it was a
8  risk assessment, we still would not have
9  used route-to-route extrapolation.  It's
10 not something that is -- would have been
11 needed or is commonly used in something
12 like this.
13   Q.   The next paper is:  Critique
14 of the ACGIH 2016 derivation of toluene
15 -- and I don't know that next word di --
16   A.   Diisocyanate.
17   Q.   -- diisocyanate threshold
18 limit values; correct?
19   A.   Yes.
20   Q.   And what was the substance
21 at issue here?
22   A.   Toluene diisocyanate or TDI.
23   Q.   Thank you.
24       What is the ACGIH?

Page 121

1    A.   It's the American Conference
2  for Governmental and Industrial -- for
3  Governmental Industrial Hygienists.
4    Q.   And the ACGIH had
5  established or stated a threshold limit
6  for TDI; correct?
7    A.   Yes.
8    Q.   And this paper critiques or
9  criticizes that threshold limit from the
10 ACGIH for toluene TDI; correct?
11   A.   Yes.
12   Q.   And were any route-to-route
13 extrapolations performed or analyzed in
14 this study?
15   A.   No.  It would have been
16 relevant only to inhalation.
17   Q.   The next study is:  Critical
18 review of long-term ozone exposure and
19 asthma development.
20       Do you see that?
21   A.   Yes.
22   Q.   What was the substance at
23 issue here?
24   A.   Ozone.

31 (Pages 118 - 121)

ROBYN L. PRUEITT, Ph.D., DABT

Page 122

1    Q.    How are people exposed to
2  ozone?
3    A.    Ozone is in the air, so
4  people inhale it.  It's a gas in the air.
5    Q.    Are there products that
6  cause a release of ozone?
7    A.    I don't know.
8    Q.    Were any route-to-route
9  analyses performed or analyzed in this
10  study?
11    A.    No.  It only evaluated
12  inhalation exposure, so there was no need
13  to look at other exposure routes.
14    Q.    Doctor, we've gone through a
15  lot of these studies.  I want to just
16  turn your attention to the balance of the
17  studies that you have listed here on page
18  8, 9, 10, and 11 that you've authored.
19        Do any of these studies
20  perform route-to-route calculations or
21  analyses on route-to-route calculations
22  that were performed?
23    A.    No, because they're --
24  they're not the type of analysis that

Page 123

1  there would even be a consideration of
2  doing such an extrapolation.  They're
3  based on either a single exposure route
4  or if multiple exposure routes, they
5  assess risks using, you know, risk
6  assessment guidance values specifically
7  for that route of exposure, so there
8  would be no need to do any type of
9  extrapolation.
10        And as I've mentioned, it's
11  not even a reliable methodology,
12  particularly when you don't have a lot of
13  good information about the toxicokinetics
14  of a chemical.
15        And so it's just not
16  something that I believe is routinely
17  done in the literature -- in the
18  literature or at least particularly not
19  in the types of analyses that I have
20  published on.
21    Q.    And just to be clear, we've
22  gone through all of your publications in
23  which you were an author and none of them
24  was -- and in none of them were a

Page 124

1  route-to-route extrapolation performed or
2  analyzed; correct?
3    A.    That's correct, because it's
4  not something that is commonly done in
5  the types of publications that -- that
6  I'm involved in.
7    Q.    Looking at page 2, do you
8  see where you have "Selected Projects"?
9    A.    Yes.
10    Q.    And those projects run
11  through to page 7 -- top of page 7;
12  correct?
13    A.    Yes.
14    Q.    And for all of those
15  projects, are you aware of whether or not
16  you performed a route-to-route
17  extrapolation or analyzed a
18  route-to-route extrapolation?
19    A.    So I -- out of all of those
20  projects listed, I have not performed a
21  route-to-route extrapolation because it's
22  not something that is -- that produces
23  reliable doses from.
24        And I haven't even used it

Page 125

1  in a risk assessment screening purpose
2  because if I needed to assess risks, I
3  always had an appropriate toxicity value
4  for the route of interest.
5        And then as far as if I have
6  evaluated or critiqued route-to-route
7  extrapolations in any of these projects,
8  if the project that I mentioned earlier
9  where I was deposed for dioxins, I
10  believe I mentioned that the plaintiff's
11  expert in that matter did do a conversion
12  from an inhalation dose to a systemic
13  dose in micrograms and that I discussed
14  how that's not appropriate and not even
15  necessary because we do -- we do have
16  inhalation-based toxicity guidance values
17  to use in risk assessment for inhalation,
18  so there's no need to convert the dose
19  from an inhalation dose to a systemic
20  dose, particularly given all the issues
21  with doing that, because you can compare
22  the air exposure directly to the
23  inhalation toxicity value.
24    Q.    Other than dioxins, are

32 (Pages 122 - 125)

ROBYN L. PRUEITT, Ph.D., DABT

Page 126

1 there any other of the selected projects
2 that you worked on where you've analyzed
3 or critiqued route-to-route
4 extrapolations?
5    A.   No, that's it.
6    Q.   In all of these projects,
7 page 2 through 7, have you represented an
8 individual client who was alleging that
9 they were exposed to a toxic substance
10 that caused them harm?
11    A.   No.  So only a portion of
12 these projects are even related to
13 litigation and of those, if you're asking
14 if I worked on the side of the plaintiff
15 for these projects, no, I have not.
16    Q.   I'm not just asking about
17 plaintiffs.  My question is a little bit
18 more broad than that.  Your answer may
19 still be no.  But in any of these
20 projects that you've worked on, have you
21 ever been retained or hired by a
22 individual or individuals who were
23 exposed to a substance or toxin that they
24 considered or wanted you to investigate

Page 127

1 whether or not it was harmful to them?
2    A.   No, I haven't.  We don't
3 usually have individuals hiring us as
4 consultants.
5    Q.   You usually have
6 manufacturing companies that hire you as
7 the consultants; correct?
8        ATTORNEY ROSE:  Object to
9    the form.  Sorry.  I just wanted
10   to note for the record, I think I
11   may have been on mute for previous
12   objections.  I just got a notice
13   on my computer that I needed to
14   unmute, and so I'm concerned that
15   my objections were not being noted
16   on the record.
17       ATTORNEY NIGH:  That
18   happened to me yesterday, too.
19       ATTORNEY ROSE:  Oh, it did?
20       ATTORNEY NIGH:  On a few,
21   but -- do you need the question
22   again, Doctor?
23       THE WITNESS:  So, yeah, I
24   guess I need the question again.

Page 128

1        THE COURT REPORTER:  Nina,
2    did you want to go off the record?
3        ATTORNEY ROSE:  I can look.
4    It looks like none of my
5    objections for this entire segment
6    have been noted, and I did not
7    realize I was on mute, so I'm
8    trying to look back and figure out
9    where I objected, which maybe what
10   we can do on the next break, I can
11   look at that and see if we have --
12   Daniel, you and I can discuss
13   that.
14       ATTORNEY NIGH:  Sure.  I'm
15   not exactly sure how you want to
16   re-create --
17       ATTORNEY ROSE:  I don't --
18   well, we'll discuss.
19       ATTORNEY NIGH:  Okay.
20 BY ATTORNEY NIGH:
21    Q.   So my question was, you
22 usually have manufacturing consultants
23 that -- or sorry -- you usually have
24 manufacturing clients that hire you as

Page 129

1 consultants; correct?
2        ATTORNEY ROSE:  Object to
3    the form.
4        THE WITNESS:  I mean, we
5    have a variety of different client
6    types and, yes, some of them are
7    -- some of them manufacture
8    things.
9 BY ATTORNEY NIGH:
10    Q.   Manufacturers, industries as
11 well; correct?
12    A.   Yes, certain different types
13 of industry, yes.
14    Q.   That may include factories?
15       ATTORNEY ROSE:  Object to
16   the form.
17 BY ATTORNEY NIGH:
18    Q.   Correct?
19    A.   It -- it may include
20 companies that have factories, yes.
21    Q.   It may include, like, waste
22 management companies as well; correct?
23    A.   I think so.  I have not been
24 hired by such a company, but I -- I

33 (Pages 126 - 129)

ROBYN L. PRUEITT, Ph.D., DABT

Page 130

1 believe it's possible others at Gradient
2 have.
3      Q.   Doctor, on page 4, one of
4 your projects states:  State
5 environmental agencies -- or two of them
6 state:  State environmental agencies.
7          Do you see that?
8      A.   Yes.
9      Q.   Which state was that -- were
10 they?
11     A.   Texas.
12     Q.   For both of them?
13     A.   I believe so.
14     Q.   And -- actually, strike
15 that.
16         Doctor, have you ever had a
17 client that was interested in talc?
18         ATTORNEY ROSE:  Object to
19     the form.
20         THE WITNESS:  So that's --
21     that's a little vague.  Can you be
22     more specific?
23 BY ATTORNEY NIGH:
24     Q.   Have you ever had a

Page 131

1 manufacturing company or a -- any other
2 company that's been a client of yours
3 that has hired you in terms of assessing
4 the risk of talc?
5          ATTORNEY ROSE:  Object to
6      the form.
7          THE WITNESS:  Hiring me
8      specifically as an expert?
9          ATTORNEY NIGH:  No, not
10     necessarily just as an expert, but
11     just hiring you in any capacity.
12         THE WITNESS:  Hiring me --
13     no, I -- while I have worked on
14     projects related to talc, as we
15     discussed with some of my
16     publications, I specifically have
17     not been hired by anyone who
18     manufactures talc.
19 BY ATTORNEY NIGH:
20     Q.   Do you know if any of the
21 authors -- or sorry.  Strike that.
22         Do you know if any of the
23 scientists that work at Gradient have
24 been hired by a manufacturer that's

Page 132

1 involved with talc?
2      A.   Yes, others at Gradient have
3 been hired by clients who are involved
4 with talc in some manner.
5      Q.   And what kind of clients are
6 those?
7      A.   I believe product
8 manufacturers who -- where there are
9 allegations that their products contain
10 talc -- or excuse me -- that their
11 products that have talc in them -- yeah,
12 that they have products with talc in
13 them.
14         Sorry.  I didn't say that
15 very well.
16     Q.   No, that's okay.
17         PFOS, PFOA, and PFAS, have
18 you been hired by any clients that have
19 an interest in PFOS, PFOA, and PFAS?
20     A.   Yes.
21         ATTORNEY ROSE:  Object to
22     the form.
23 BY ATTORNEY NIGH:
24     Q.   And who would that be?

Page 133

1      A.   As we discussed earlier, 3M.
2      Q.   Any others?
3      A.   Yes, I had been hired by an
4 oil and gas company.  Again, I don't know
5 if I can say the name, but they did have
6 a interest in my expertise in PFAS for an
7 issue.
8      Q.   And are there any other
9 scientists at Gradient that have been
10 hired in relation to PFOS, PFOA, and
11 PFAS?
12     A.   Yes.
13         ATTORNEY ROSE:  Object to
14     the form.
15         THE WITNESS:  Yes.
16 BY ATTORNEY NIGH:
17     Q.   And they would be hired by
18 manufacturers?
19     A.   I -- it -- I guess at least
20 some of them, yes.  I don't -- I don't
21 know the full extent to clients that
22 others at Gradient have been hired by for
23 PFAS issues, but I do know at least some
24 were manufacturers, yes.

34 (Pages 130 - 133)

ROBYN L. PRUEITT, Ph.D., DABT

Page 134

1    Q.   And BPA, have you been hired
2 by any clients for your work on BPA?
3         ATTORNEY ROSE:  Object to
4    the form.
5         THE WITNESS:  Yes.  Yes.
6 BY ATTORNEY NIGH:
7    Q.   And who would those clients
8 be?
9    A.   Trade associations
10 representing different chemical
11 manufacturers.
12    Q.   And are there other
13 scientists at Gradient who have been
14 hired by BPA as a client?
15         ATTORNEY ROSE:  Object to
16    the form.
17         THE WITNESS:  There are
18    other scientists at Gradient who
19    have been hired to look at
20    BPA-related issues.
21 BY ATTORNEY NIGH:
22    Q.   And they would be hired by
23 either trade associations or
24 manufacturers?

Page 135

1    A.   I know by trade
2 associations.  I'm not sure about
3 manufacturers.
4    Q.   How about fine particulate
5 matter; have you been hired by any
6 clients in regards to fine particulate
7 matter?
8    A.   I'm trying to think if I --
9 I don't believe I was hired specifically,
10 but I did work -- work on projects
11 related to fine particulate matter.
12    Q.   And those projects that you
13 were working on, were those funded by
14 manufacturers?
15         ATTORNEY ROSE:  Object to
16    the form.
17         THE WITNESS:  No.  Usually
18    trade associations.
19 BY ATTORNEY NIGH:
20    Q.   And that would be trade
21 associations representing manufacturers?
22    A.   I think -- yeah, trade
23 associations representing I think energy
24 and oil and gas-type companies.  I'm not

Page 136

1 sure about manufacturers.
2    Q.   Nickel in ambient
3 particulate matter, have you been hired
4 by anyone in regards to work related to
5 nickel in ambient particulate matter?
6    A.   Yes.
7    Q.   And who would that be?
8    A.   A trade association.
9    Q.   And would that be trade
10 associations that represent
11 manufacturers?
12    A.   I'm not sure.  I -- maybe
13 some manufacturers, maybe some mining.
14 I'm not exactly sure.
15    Q.   And are there other
16 scientists at Gradient that were hired to
17 work on nickel in ambient particulate
18 matter issues?
19    A.   To work on nickel issues in
20 general.  I think we only had the one
21 project with the publication that was
22 specifically nickel in particulate
23 matter.  Other work has been more on
24 nickel broadly.

Page 137

1    Q.   Asbestos in automotive
2 brakes, were you hired by anyone to work
3 on asbestos in relation to automotive
4 brakes?
5    A.   Yes, automotive brakes or
6 other types of friction products.
7    Q.   And who would have hired you
8 for that?
9    A.   I believe they are the
10 manufacturer of the friction products
11 themselves.
12    Q.   And was there anyone else at
13 -- any other scientists at Gradient hired
14 to work on asbestos in automotive brakes
15 or other friction products?
16    A.   Yes.
17    Q.   Metallic nickel, were you
18 hired by any client to work on metallic
19 nickel?
20         ATTORNEY ROSE:  Object to
21    the form.
22         THE WITNESS:  I don't
23    believe I was hired specifically
24    for the metallic nickel work, but

35 (Pages 134 - 137)

ROBYN L. PRUEITT, Ph.D., DABT

Page 138

1    I did work on projects related to
2    metallic nickel.
3  BY ATTORNEY NIGH:
4       Q.   Were other scientists at
5  Gradient hired to work on metallic
6  nickel?
7       A.   Yes.
8       Q.   And who hired them?
9       A.   The same trade association
10  that I mentioned earlier for the nickel
11  in particulate matter.
12       Q.   So that would be trade
13  associations that either represent a
14  manufacturer or mining?
15           ATTORNEY ROSE:  Object to
16       the form.
17           THE WITNESS:  Yes, as far as
18       -- as far as I know.
19  BY ATTORNEY NIGH:
20       Q.   Asphalt levels, were you
21  hired by a client to look into asphalt
22  levels -- sorry.  Strike that.
23           Asphalt emission -- asphalt
24  emissions, were you hired by a client to

Page 139

1  work on asphalt emissions?
2       A.   No, I was not hired myself,
3  but I did work on that -- the project
4  related to asphalt emissions for the
5  publication that we talked about earlier.
6       Q.   Was there another scientist
7  at Gradient who was hired to work on
8  asphalt emissions?
9       A.   Yes.
10       Q.   What kind of client would
11  that have been?
12       A.   I actually do not remember.
13       Q.   Would it be a road paving
14  company?  Do you recall that?
15       A.   I don't recall.
16       Q.   TDI, were you hired by a
17  client to work on TDI?
18       A.   Yes, I have been.
19       Q.   And what kind of client was
20  that?
21       A.   So one was for a litigation
22  matter.  It's one of the cases that I
23  talked about earlier -- well, I think I
24  did -- where I didn't end up issuing a

Page 140

1  report, so I don't think I was designated
2  as an expert, but I was hired and did
3  start a report, and that involved
4  exposure to TDI.
5       Q.   What kind of client would
6  that have been?  Manufacturing?
7           ATTORNEY ROSE:  Object to
8       the form.
9           THE WITNESS:  No, I -- I
10       think it was a transportation
11       company, because the exposure
12       happened with something related to
13       transportation.
14           I can't remember.  It's been
15       several years ago at this point.
16  BY ATTORNEY NIGH:
17       Q.   Was anyone else hired by
18  Gradient to work on TDI?
19       A.   Yes.
20       Q.   And who would have hired
21  them?  Would that have been a
22  transportation company, too?
23       A.   No.  That would have been a
24  trade association related to isocyanates.

Page 141

1       Q.   Which trade association
2  would be interested in isocyanate?
3       A.   The International Isocyanate
4  Institute.
5       Q.   Is that trade association
6  funded by manufacturers?
7           ATTORNEY ROSE:  Object to
8       form.
9           THE WITNESS:  I don't know.
10  BY ATTORNEY NIGH:
11       Q.   Ozone exposure, were you
12  hired by a client to work on ozone
13  exposure?
14       A.   I don't believe that I was
15  hired myself, but I have worked on ozone
16  projects.
17       Q.   Was there a scientist at
18  Gradient who was hired to work on zone
19  exposure?
20       A.   Yes.
21       Q.   And what kind of client
22  would that have been?
23       A.   I think there were more than
24  one type.  I believe -- I believe a state

ROBYN L. PRUEITT, Ph.D., DABT

Page 142

1 agency, state regulatory agency, may have
2 been a client for at least one of those
3 projects and then a trade association
4 related to oil and gas and energy.
5     Q.   And the state agency, was
6 that a Texas state agency?
7     A.   Yes.
8     Q.   Doctor, turning to page 8 in
9 your literature, your next study I want
10 to point to is Peterson, NK, and the
11 title is:  Comprehensive multipathway
12 risk assessment of chemicals associated
13 with recycled crumb rubber in synthetic
14 turf fields.
15         Do you see that?
16     A.   Yes.
17     Q.   Which substance was analyzed
18 in that study?
19     A.   It would have been a large
20 number of different chemicals within
21 recycled rubber.
22     Q.   Did this article find
23 whether that substance was harmful at
24 levels to which people are typically

Page 143

1 exposed?
2     A.   I don't recall the findings,
3 but it was a risk assessment, so it would
4 have found some level of risk.  I just --
5 I don't know.  It's been too long and I
6 had a minor role in that assessment, so I
7 just can't remember.
8     Q.   And you don't recall whether
9 or not the risk assessment found would be
10 the risk level that people would
11 typically be exposed to with crumb
12 rubber?
13     A.   Yeah, I don't recall one way
14 or another.
15     Q.   Did you have a client that
16 hired you in relation to crumb rubber?
17     A.   I did not.
18     Q.   And did one of the
19 scientists at Gradient have a client that
20 hired them in relation to crumb rubber?
21     A.   Yes.
22     Q.   And who would that have
23 been?
24     A.   Mike Peterson -- you're --

Page 144

1 wait.  Sorry.  You're asking the who at
2 Gradient was hired?
3     Q.   No.  I'm sorry.  Which
4 client -- who would the client have been
5 --
6     A.   Oh.
7     Q.   -- that hired Gradient?
8         ATTORNEY ROSE:  Object to
9     the form.
10        THE WITNESS:  I do not
11     recall the client for that work
12     since I was not the one who was
13     hired.
14 BY ATTORNEY NIGH:
15     Q.   Was it a manufacturer?
16     A.   I'm not sure.  I don't
17 remember.
18     Q.   Doctor, the next study is:
19 Short-term ozone exposure and asthma
20 severity, weight-of-evidence analysis.
21         Do you see that?
22     A.   Yes.
23     Q.   Which substance was analyzed
24 here?

Page 145

1     A.   Ozone.
2     Q.   And did this study find
3 whether or not ozone was harmful at
4 levels to which people are typically
5 exposed?
6     A.   I don't recall.  I believe
7 from the title, this one looked at asthma
8 severity, not necessarily whether asthma
9 -- or ozone concentrations that people
10 are exposed to cause harm or not, but
11 whether they have an effect on the
12 severity of asthma.
13     Q.   Well, having an effect on
14 the severity of asthma, that still could
15 be causing harm.  Right?
16        ATTORNEY ROSE:  Object to
17     the form.
18        THE WITNESS:  Yes, so I -- I
19     think for this case, it was
20     assuming that there was harm from
21     asthma and so then it's just
22     looking more specifically at the
23     severity of the asthma.
24 BY ATTORNEY NIGH:

ROBYN L. PRUEITT, Ph.D., DABT

Page 146

1     Q.   Do you recall whether or not
2 there were any findings in this study as
3 to whether or not the short-term ozone
4 exposure was having any increased
5 severity in people's asthma?
6     A.   I do not recall.
7     Q.   Doctor, are you aware of
8 whether or not anybody at Gradient has
9 worked on NDMA?
10     A.   I'm not aware.
11     Q.   And you've never published
12 on NDMA yourself; correct?
13     A.   Correct, I have not.
14          ATTORNEY NIGH:  Let me take
15 a minute just to look at my notes
16 real quick.
17          THE VIDEO TECHNICIAN:  Do
18 you want to go off the record?
19          ATTORNEY NIGH:  No, I don't
20 -- I don't need to.  That's fine.
21          THE VIDEO TECHNICIAN:  Okay.
22 (Pause.)
23          ATTORNEY NIGH:  Nina, do you
24 mind if we take five minutes?  I'm

Page 147

1 going to just look at my notes to
2 see if I have anything left.
3          ATTORNEY ROSE:  Yeah, that's
4 fine.
5          ATTORNEY NIGH:  I'm nearly
6 finished.
7          ATTORNEY ROSE:  That's fine.
8          THE VIDEO TECHNICIAN:  We're
9 going to go off the record at
10 12:25 p.m.
11          (A recess was taken from
12 12:25 p.m. to 12:30 p.m.)
13          THE VIDEO TECHNICIAN:  Back
14 on the record at 12:30 p.m.
15          ATTORNEY NIGH:  Doctor, I
16 don't have any further questions.
17 Thank you.
18          THE WITNESS:  Okay.  Thank
19 you.
20          ATTORNEY ROSE:  Can we go
21 off the record for a minute?
22          THE VIDEO TECHNICIAN:  We're
23 going to go off the record at
24 12:30 p.m.

Page 148

1          - - -
2          (A discussion off the record
3 occurred.)
4          - - -
5          (A lunch recess was taken
6 from 12:31 p.m. to 1:02 p.m.)
7          THE VIDEO TECHNICIAN:  Back
8 on the record at 1:02 p.m.
9          - - -
10          EXAMINATION
11          - - -
12 BY ATTORNEY ROSE:
13     Q.   Dr. Prueitt, thank you so
14 much for your time today.  I just have a
15 few requests for you if you're up for it.
16     A.   Sure.
17     Q.   Throughout your career,
18 regardless of your assignment or who has
19 hired you, do you always strive for an
20 objective assessment of the scientific
21 data?
22          ATTORNEY NIGH:  Form
23 objection.
24          THE WITNESS:  Yes, I

Page 149

1 definitely do.  I always, you
2 know, try to interpret the data
3 based on what the data are saying
4 and I've always tried to adhere to
5 the scientific method and to risk
6 assessment guidance and principles
7 and toxicology principles and, you
8 know, this stems back to my time
9 as a graduate student and at the
10 National Cancer Institute doing
11 research, you know, following the
12 scientific method through my work
13 as a consultant where I definitely
14 strive to be objective in my
15 reviews and evaluations of what
16 the science is saying.
17 BY ATTORNEY ROSE:
18     Q.   What was your methodology in
19 assessing the reliability of Dr. Sawyer's
20 extrapolation analysis?
21     A.   Well, I reviewed -- I
22 carefully reviewed the portions of his
23 report that were relevant to the
24 route-to-route extrapolation analysis

38 (Pages 146 - 149)

ROBYN L. PRUEITT, Ph.D., DABT

Page 150

1 that he performed.
2        I looked at the different
3 steps that he took for the extrapolation,
4 including the bioavailability estimation
5 and the inputs to the calculation where
6 he calculated the systemic dose from the
7 inhalation exposure concentration.
8        And I looked to toxicology
9 principles and risk assessment guidances
10 to see if his steps followed those
11 principles and guidance and looked at the
12 data that he used and -- and any
13 assumptions that he made and looked at
14 what are the uncertainties associated
15 with any of the data or the assumptions
16 that he made and whether those
17 uncertainties would compromise the
18 reliability of what he calculated.
19    Q.   Is the methodology that you
20 used in this case the same as that which
21 is used by toxicologists in the
22 scientific community for assessing the
23 reliability of exposure analyses?
24    A.   Yes, I believe it is.

Page 151

1        ATTORNEY ROSE:  That's all I
2 have.  Thanks, Doctor.
3        THE WITNESS:  Thank you.
4        ATTORNEY NIGH:  Well, one
5 second.
6        (Pause.)
7           - - -
8        EXAMINATION
9           - - -
10 BY ATTORNEY NIGH:
11    Q.   Doctor, you were asked a
12 question at the end by defense counsel:
13 Is the methodology that you used in this
14 case the same as that which is used by
15 toxicologists in the scientific community
16 for assessing the reliability of exposure
17 analyses?
18        Do you have any additional
19 scientific studies or cites to support
20 that statement?
21    A.   I think it's mainly based on
22 my experience and expertise in toxicology
23 and risk assessment and from looking at
24 EPA guidance, including the EPA guidance

Page 152

1 that I cited in my report about
2 inhalation dosimetry and assessing risks
3 from inhalation exposures and issues with
4 route-to-route extrapolation.
5        So I would say, you know,
6 that I -- because I mentioned that I --
7 you know, I do try to follow that type of
8 guidance in my work and that I look to
9 that guidance for Dr. Sawyer's evaluation
10 here.
11        And so I think that many
12 people in -- you know, many toxicologists
13 would also, you know, follow that type of
14 guidance and the types of information in
15 the -- in the literature that I used to
16 support my opinions.
17    Q.   Other than your experience
18 and the documents that you cited in your
19 report, you don't have any other
20 scientific literature to support this
21 statement in terms of your methodology
22 being the same as to which is used by
23 toxicologists in the scientific community
24 for assessing the reliability of exposure

Page 153

1 analyses; correct?
2        ATTORNEY ROSE:  Object to
3 the form.  That's misstating what
4 the witness said.  She's also
5 asked and answered it.
6        ATTORNEY NIGH:  No, it's not
7 misstating what she said.
8        THE WITNESS:  I mean, it's
9 all in the documents I reviewed.
10 I mean, there's -- there's not --
11 I don't know that there's any
12 specific guidance for how do you
13 specifically critique an
14 individual's calculation of
15 something.
16        You just -- you know what
17 scientific principles are.  You
18 know what risk assessment guidance
19 says.  You -- it provides
20 information to you to know when
21 something is going to be -- have
22 more uncertainty than something
23 else.
24        Some of the documents state,

39 (Pages 150 - 153)

ROBYN L. PRUEITT, Ph.D., DABT

Page 154

1  for example, that the
2  route-to-route extrapolation is
3  not reliable if you don't have,
4  you know, good information on X,
5  Y, Z.
6        So, you know, I don't think
7  it's something that has been
8  spelled out in some sort of
9  guidance, but it's, you know,
10  adhering to principles of
11  toxicology and an understanding of
12  what data in a particular
13  publication mean and understanding
14  what regulatory agencies are
15  providing guidance for and when
16  they state that there's
17  uncertainty -- so, I mean,
18  uncertainty analysis is a big part
19  of assessing risks. There's also
20  uncertainties that you have to be
21  aware of and usually spell out, so
22  I think in that respect, it's very
23  consistent with how I approached
24  this.

Page 156

1
2            CERTIFICATE
3
4
5        I, Kimberly A. Cahill, a
   Federally Approved Registered Merit
6  Reporter, Certified Court Reporter and
   Notary Public, do hereby certify that
7  prior to the commencement of the
   examination, the witness was duly
8  remotely sworn by me to testify to the
   truth, the whole truth and nothing but
9  the truth.
10        I DO FURTHER CERTIFY that
   the foregoing is a verbatim transcript of
11  the testimony as taken stenographically
   by me at the time, place and on the date
12  hereinbefore set forth, to the best of my
   ability.
13
        I DO FURTHER CERTIFY that I
14  am neither a relative nor employee nor
   attorney nor counsel of any of the
15  parties to this action, and that I am
   neither a relative nor employee of such
16  attorney or counsel, and that I am not
   financially interested in the action.
17
18
19  _____
   KIMBERLY A. CAHILL, a
   Federally Approved Registered
20  Merit Reporter
   Certified Court Reporter
21  Notary Public
   Dated: May 1, 2025
22
23
24

Page 155

1        (Pause.)
2        ATTORNEY ROSE: Mr. Nigh, do
3  you have any more questions for
4  the witness?
5        ATTORNEY NIGH: Sure. I'm
6  reading the last answer.
7        ATTORNEY ROSE: Oh, okay.
8        (Pause.)
9        ATTORNEY NIGH: No, I don't
10  have any other questions.
11        ATTORNEY ROSE: Thank you
12  very much, Dr. Prueitt.
13        ATTORNEY NIGH: Thank you,
14  Doctor.
15        THE WITNESS: Thank you.
16        THE VIDEO TECHNICIAN: This
17  ends today's deposition. We're
18  going to go off the record at 1:12
19  p.m.
20        (Witness excused.)
21        (Deposition concluded at
22  approximately 1:12 p.m.)
23
24

Page 157

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4  over carefully and make any necessary
5  corrections. You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8        After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you. If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

40 (Pages 154 - 157)

ROBYN L. PRUEITT, Ph.D., DABT

Page 158

```
 1      - - - - - -
          E R R A T A
 2      - - - - - -
 3  PAGE  LINE  CHANGE
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 160

```
 1         LAWYER'S NOTES
 2  PAGE  LINE
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 159

```
 1
 2      ACKNOWLEDGMENT OF DEPONENT
 3
 4      I,_____, do
 5  hereby certify that I have read the
 6  foregoing pages, 1 - 160, and that the
 7  same is a correct transcription of the
 8  answers given by me to the questions
 9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16   ROBYN L. PRUEITT, Ph.D., DABT    DATE
17
18
19  Subscribed and sworn
     to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22
    _____
23  Notary Public
24
```

[& - actually]                                                                 Page 1

| & | | | |
|---|---|---|---|
| **&**  2:3,9 3:2 28:9,21 29:20 30:3,9,23 72:19,22 73:13 73:22 74:4 | **148**  4:7<br>**149**  41:9<br>**151**  4:7<br>**160**  159:6<br>**1994**  12:3<br>**1:02**  148:6,8 | **4** | **able**  32:24 105:8 |

**0**

**00946**  1:10

**1**

**1**  44:18 45:10
94:18,21 95:5
95:8,22 96:1
156:21 159:6
**10**  71:22,23,24
73:15 122:18
**100**  86:18
107:2,16
**1068**  156:18
**10:20**  70:19,21
**10:33**  70:21,23
**11**  71:22,23
74:14 122:18
**11:30**  117:4,6
**11:45**  117:6,8
**12:25**  147:10
147:12
**12:30**  147:12
147:14,24
**12:31**  148:6
**1301**  2:10
**14**  2:4

**2**

**2**  124:7 126:7
**20**  84:14 85:21
86:24 159:20
**200**  2:16
**20004**  2:11
**2001**  12:15
**20016**  2:5
**2007**  26:4
**2015**  16:24
77:22
**2016**  120:14
**202**  2:6,11
**2025**  1:13 6:6
156:21
**2500**  2:17
**2875**  1:4
**2b**  44:19 45:11

**3**

**3**  88:3
**30**  1:13 157:16
**30305**  2:17
**30th**  6:6
**3333**  2:16
**389-3394**  2:11
**3m**  22:9,10
24:14 133:1

**4**

**4**  76:2 78:5,9
85:9 86:17
94:17,19 95:3
95:7,8,20 96:1
130:3

**5**

**5**  76:2
**553-2100**  2:18

**6**

**6**  102:21
**678**  2:18

**7**

**7**  4:6 42:19
124:11,11
126:7
**792-7927**  2:6

**8**

**8**  117:13
122:18 142:8

**9**

**9**  71:18,23,24
73:15 75:12
122:18
**98**  41:11

**a**

**a.m.**  1:17 6:8
70:19,21,21,23
117:4,6,6,8
**ability**  46:17
156:12

**able**  32:24
105:8
**above**  1:17
**absorbed**  43:14
105:8
**absorption**
42:22 105:10
105:13
**accounted**
106:13
**accurate**  76:15
79:9 80:23
81:5 157:20
**acgih**  120:14
120:24 121:4
121:10
**acid**  23:11
**acknowledged**
39:17
**acknowledg...**
159:2
**action**  15:21
17:20 23:8
24:10 25:12,17
50:11 156:15
156:16
**activation**
50:10 55:10
**actual**  46:13
73:4 110:11
**actually**  13:23
33:7 52:10,14
72:23 118:11
130:14 139:12

[additional - article]                                                          Page 2

additional
  151:18
adhere  149:4
adhering
  154:10
adjusting  107:4
adverse  15:2
  44:14
affect  60:4
  105:4 106:21
  109:1
affected  48:4
  69:7 106:16
agencies  31:3,5
  31:11,15 32:7
  32:11 33:4
  34:22 130:5,6
  154:14
agency  21:12
  23:1 34:14
  44:11 53:14
  142:1,1,5,6
ago  19:5 20:7
  42:14 140:15
agree  39:10
agreed  6:18
air  13:10 14:16
  34:2 64:22
  68:6 103:14,15
  108:2 118:3
  122:3,4 125:22
al  1:7,9 6:11,13
  13:2

allegations
  132:9
alleged  13:13
alleging  126:8
alternative
  110:4
ambient  34:2
  51:20 55:17
  68:6 136:2,5
  136:17
america  14:18
american  101:2
  121:1
amount  33:13
  59:21 60:2
  61:22 85:7
  86:15 87:8,8
  103:14 105:18
  107:22 109:9
analyses  56:7
  56:12,13 60:19
  60:20,20 62:5
  64:4 68:1,14
  69:24 89:1,5
  91:5,11 102:8
  122:9,21
  123:19 150:23
  151:17 153:1
analysis  48:14
  48:19 54:23
  55:14,21 58:15
  58:18 62:7
  88:1 90:5,13
  95:17 100:16

104:2 110:3
122:24 144:20
149:20,24
154:18
analyze  29:3
  71:8
analyzed  29:1
  29:9,16 43:3
  46:5 47:1
  49:13 50:7,17
  52:2 53:5
  54:19 55:6
  57:3 58:12
  59:13 60:13
  61:7 62:22
  66:6 67:19
  68:2,10,14,22
  104:4 118:6
  120:5 121:13
  122:9 124:2,17
  126:2 142:17
  144:23
analyzing
  65:14
animal  36:5,14
  36:17 45:24
  46:11 48:18
  65:7 115:1
animals  46:15
  81:19 82:4,11
  115:12
answer  5:5
  9:24 126:18
  155:6

answered
  27:11 153:5
answers  10:8
  159:8
anybody
  110:11 146:8
appearances
  2:1
appearing  6:17
appendix  11:23
applied  76:14
  105:24
applies  75:22
approach
  33:18 61:2
  64:14,24
approached
  154:23
appropriate
  54:5 77:4,11
  125:3,14 157:6
appropriately
  76:14
approved  1:18
  156:5,19
approximately
  9:6 16:21
  155:22
april  1:13 6:6
area  18:7,8,10
  18:12 96:18
arguing  34:5
article  43:8
  44:2,5,15,16,24

[article - attempt]                                                    Page 3

| | | | |
|---|---|---|---|
| 45:8,17 46:7 | **aside** 116:8 | **assessment** | **assume** 10:1 |
| 46:10,20 47:1 | **asked** 15:7 | 14:15 33:18 | 18:5 23:3 |
| 47:3 48:6,16 | 18:21 19:15 | 47:19 61:1 | 80:12 |
| 48:22 49:3,7 | 27:11 32:5,14 | 63:9 64:15,19 | **assumed** 84:20 |
| 49:13,15 50:5 | 33:1 71:1,4,7 | 67:8,24 72:16 | 106:24 107:16 |
| 50:7,9,17,19,23 | 87:12,17 88:21 | 79:1,23 82:18 | 110:1 |
| 51:6,19 52:3,6 | 101:1 108:14 | 83:10,11 84:3 | **assumes** 51:14 |
| 53:8,24 54:7 | 108:17 151:11 | 117:21 118:13 | 85:14 |
| 54:19 55:1,3,9 | 153:5 | 119:1,9 120:8 | **assuming** |
| 55:13,16,20,24 | **asking** 19:14 | 123:6 125:1,17 | 145:20 |
| 56:5 57:5,11 | 21:3 45:6 73:2 | 142:12 143:3,6 | **assumption** |
| 57:22 59:5,8 | 81:20 90:11 | 143:9 148:20 | 80:19 |
| 59:13,15,18 | 126:13,16 | 149:6 150:9 | **assumptions** |
| 61:1,12,23 | 144:1 | 151:23 153:18 | 82:20 150:13 |
| 62:15,24 63:6 | **asphalt** 117:22 | **assessments** | 150:15 |
| 63:15 65:15,20 | 117:24 118:3,9 | 43:22 48:12 | **astdr** 11:3 72:4 |
| 66:1,9,18 67:6 | 118:20 119:4 | 64:21 76:17 | 73:15 |
| 67:13 68:24 | 138:20,21,23 | 78:18 89:21 | **asthma** 121:19 |
| 70:3 77:3,8,9 | 138:23 139:1,4 | **assignment** | 144:19 145:7,8 |
| 77:18 117:19 | 139:8 | 148:18 | 145:12,14,21 |
| 142:22 | **assess** 84:18 | **associated** 47:9 | 145:23 146:5 |
| **articles** 28:7,20 | 85:6 86:5,14 | 69:11 88:2 | **atlanta** 2:17 |
| 29:2,4,17 | 97:6,16 114:24 | 119:14 142:12 | **atsdr** 93:7 |
| 30:12,21 31:14 | 123:5 125:2 | 150:14 | 109:14,19 |
| 32:10 40:23 | **assessed** 61:18 | **association** | 111:19 112:13 |
| 41:9 77:10,21 | 61:24 67:12 | 48:2 62:16 | 114:1,3 115:8 |
| 93:12 | 92:16 94:9 | 63:12 136:8 | 115:19,24 |
| **asbestos** 32:20 | 102:23 115:1 | 138:9 140:24 | **attached** 11:22 |
| 33:16 61:2,8 | **assessing** 14:6 | 141:1,5 142:3 | 157:12 159:11 |
| 61:10,13,19 | 100:7 131:3 | **associations** | **attacks** 36:19 |
| 137:1,3,14 | 149:19 150:22 | 47:20 69:6,17 | 37:1 |
| **asher** 2:10 | 151:16 152:2 | 134:9,23 135:2 | **attempt** 87:7 |
| **asher.trangle** | 152:24 154:19 | 135:18,21,23 | 87:10 108:6 |
| 2:12 | | 136:10 138:13 | |

[attention - beagle]                                                    Page 4

| | | | |
|---|---|---|---|
| **attention**  12:21 | 84:4,12 85:11 | 145:24 146:14 | 36:1 56:15 |
| 76:2 122:16 | 86:3,7,9,12 | 146:19,23 | 75:15 78:15,21 |
| **attorney**  4:6,7 | 90:7,12 91:13 | 147:3,5,7,15,20 | 79:13,19 80:5 |
| 4:7 7:15 17:4,7 | 91:18 92:11,13 | 148:12,22 | 91:16,19 92:7 |
| 17:9,10,13 | 92:17,22 93:15 | 149:17 151:1,4 | 93:10,18,20 |
| 19:2,15,18 | 93:19 95:9,18 | 151:10 153:2,6 | 94:7,13 95:19 |
| 20:1 21:18,22 | 96:12,16,20 | 155:2,5,7,9,11 | 98:2 99:12 |
| 22:1,6 24:3 | 97:5 99:6,10 | 155:13 156:14 | 108:11 116:11 |
| 26:20,24 27:4 | 99:17,21 | 156:16 157:16 | 124:15 146:7 |
| 27:7,10,13,17 | 100:10,14 | **attributable** | 146:10 154:21 |
| 27:21 28:2,5 | 101:9,14,22 | 91:2 | **awhile**  50:3 |
| 28:11,18 29:10 | 102:2,11,15 | **author**  59:6 | **b** |
| 29:13,21 30:4 | 103:16 104:1 | 117:15 123:23 | |
| 30:14 31:6,9 | 104:18 105:2 | **authored**  29:17 | **b**  4:10 18:18 |
| 31:16,24 32:17 | 106:6,23 107:7 | 30:22 32:9,13 | 102:19 117:16 |
| 32:21 35:1,8 | 107:12,14 | 122:18 | **bachelor's**  12:2 |
| 35:12,18,20 | 109:23 114:10 | **authority**  24:19 | **back**  16:24 |
| 36:3,7,11,22 | 114:23 116:19 | 52:24 53:18 | 39:7 48:10 |
| 37:10,14,23 | 116:23 117:1,9 | 56:2 | 54:24 60:16 |
| 40:8,15,18,21 | 127:8,17,19,20 | **authors**  29:2 | 66:3 67:15 |
| 41:15,19,24 | 128:3,14,17,19 | 30:8 34:20 | 70:22 117:8,10 |
| 42:2,6,10,16 | 128:20 129:2,9 | 39:7,8 131:21 | 128:8 147:13 |
| 44:21 45:1,2,3 | 129:15,17 | **automotive** | 148:7 149:8 |
| 45:7 47:23 | 130:18,23 | 61:3,10,13,20 | **balance**  122:16 |
| 48:5 51:10,18 | 131:5,9,19 | 62:1 137:1,3,5 | **based**  123:3 |
| 52:21 58:4,9 | 132:21,23 | 137:14 | 125:16 149:3 |
| 58:10,19,23 | 133:13,16 | **available**  45:18 | 151:21 |
| 62:10,14 64:6 | 134:3,6,15,21 | 65:3 69:19 | **basic**  33:10 |
| 64:11 70:5,6,7 | 135:15,19 | 82:12 111:7 | 72:20 74:1,5 |
| 70:14,15,16,24 | 137:20 138:3 | **avenue**  2:10 | 75:1,7 |
| 74:20 75:6 | 138:15,19 | **avila**  2:4 | **basis**  53:16 |
| 77:14,19 79:16 | 140:7,16 141:7 | **aware**  11:8 | 54:6 88:8 |
| 80:1 81:12,16 | 141:10 144:8 | 22:17 30:11 | **beagle**  106:12 |
| 82:5 83:22 | 144:14 145:16 | 34:19 35:3 | |

**beginning** 1:17 92:3
**behalf** 22:19 24:6,11
**believe** 9:7 13:23,24 22:4 28:14 37:5 40:10 52:17 62:3 63:5 66:24 73:11 78:13 85:3,17 85:24 86:20 89:14 91:7 93:23 96:23 102:5,13 108:19,21 113:21 123:16 125:10 130:1 130:13 132:7 135:9 137:9,23 141:14,24,24 145:6 150:24
**believed** 112:12 112:14
**benzene** 89:13 91:20 92:10 93:13,22 94:1 94:11,20 100:16,22 101:4,7
**best** 156:12
**better** 80:14
**beyond** 119:24

**bias** 47:18 48:4 69:7,10,14,16
**big** 154:18
**bio** 108:11
**bioavailability** 84:15,21 85:19 86:19,23 103:1 104:7 105:4,11 105:14,19 106:11,17,21 107:3,17,23 108:1,12 109:1 150:4
**bioavailable** 104:16 106:4 107:20 108:4,7
**biology** 12:2,10
**bisphenol** 49:4 49:6,8,14,16,23 53:2,3,4,6,8,20 55:1 56:19,19 56:20,21,23 57:4,6,9,12
**bit** 126:17
**blades** 18:16,17 18:18 25:13
**blank** 25:4
**blanking** 19:19 23:18
**block** 103:20
**blood** 101:13 112:8
**body** 59:21,23 60:6,10 79:4

81:11
**bottom** 76:3 88:4
**bounding** 70:4 117:20
**bpa** 57:9,17 60:18 134:1,2 134:14,20
**brakes** 61:3,10 61:13,20 62:2 137:2,4,5,14
**break** 9:17,18 70:13 116:24 128:10
**briefly** 6:21
**british** 110:6
**broad** 126:18
**broadly** 136:24
**broken** 96:24

**c**

**c.v.** 11:2,10,16 11:21,21 42:20 72:4
**cahill** 1:18 7:2 156:5,19
**calculate** 88:18 108:6
**calculated** 14:3 14:5 85:23 106:5 119:2 150:6,18
**calculation** 13:18 106:22

107:2 108:18 150:5 153:14
**calculations** 120:4 122:20 122:21
**call** 42:23
**called** 30:1,2,12 74:2
**camden** 1:2
**cancer** 13:12 13:18 45:23 46:15,22 47:16 48:3,17,24 57:13 67:4 68:18 69:3,12 69:20 88:9 90:20 97:21 98:1,9,10,19 100:19,20,24 101:3,5,8,18,19 102:4,8,10 110:5,13,18 112:23,24 117:20 118:13 118:14,15,18 119:14 149:10
**cancers** 47:10 101:13
**capacity** 112:2 131:11
**carcinogen** 44:18,19 45:11 45:12 90:16 93:14

[carcinogenic - clear]                                                    Page 6

carcinogenic
  57:10 94:11
  112:11,17,20
carcinogenicity
  43:22 45:19
  48:12 56:18,23
  60:17 66:11,23
  67:17
carcinogens
  88:14,20 89:11
  89:17 90:5,6
  90:21 91:21
  92:9,24 97:10
cardiovascular
  50:12 51:4,8
  51:21
career  148:17
carefully
  149:22 157:4
casarett  72:19
  72:22,23 73:13
  73:22,24 74:4
case  1:10 13:7
  13:8,15,22
  14:19,22,23
  15:6,12 16:10
  16:10,13,22
  17:13 18:23
  19:3,12 20:1
  20:22 21:8,8
  21:16 23:23
  24:18,22 25:6
  25:9,15,20
  26:1 28:24

47:17 61:2,7
72:11 75:18
90:21 109:4
116:7 145:19
150:20 151:14
cases  12:23
  13:1 15:15
  20:23 22:21,23
  23:5,20 24:24
  25:2 79:5
  139:22
causal  69:20
causation
  116:7,13
cause  44:14
  46:15 57:13
  60:8,8 63:24
  65:4 67:3
  69:12 100:19
  101:20,21
  103:12,22
  104:15 106:2
  107:4,5 111:6
  111:11,12
  112:6,23,24
  122:6 145:10
caused  126:10
causes  112:10
causing  47:15
  118:18 145:15
cell  12:10
cellphone  8:19
  8:22

cells  15:20
center  12:12
  39:23 40:1,6
  40:24 41:5
certain  33:20
  33:20 34:3
  47:10,16 80:16
  97:1 129:12
certainly
  103:22
certificate
  156:2
certified  156:6
  156:20
certify  156:6,10
  156:13 159:5
chad  17:11
change  39:13
  158:3
changed  85:20
changes  39:9
  157:11 159:10
chapter  54:13
  56:10
check  78:12
  92:4
chemical  14:16
  22:13 33:5,7
  54:23 60:5
  79:3 81:1 83:6
  89:6 90:24
  91:3 105:7
  109:3,5,8
  111:19 115:22

123:14 134:10
chemicals
  15:23 79:21
  80:17 118:1,2
  142:12,20
childhood
  49:10 50:1
circulation
  112:8 113:4
cite  74:14 76:23
cited  77:22
  78:2 79:8
  89:23 91:10,16
  114:17 152:1
  152:18
cites  77:10
  151:19
city  18:13,15
  18:19 25:13
claims  13:9,12
  15:1
clarified  39:5
class  15:21
  17:19 23:8
  24:10 25:12,17
classic  74:2
classification
  34:24
classifying
  44:18 45:10
cleaning  23:12
clear  14:12
  46:17 98:16
  123:21

**[clearance - control]**                                                                 Page 7

**clearance**
  105:3,5,10,12
  105:18,21,23
  106:1,14,15,20
  107:3,5,17,18
  107:21 108:5
**clearly** 89:9
**client** 16:9
  21:15,24 22:8
  126:8 129:5
  130:17 131:2
  134:14 137:18
  138:21,24
  139:10,17,19
  140:5 141:12
  141:21 142:2
  143:15,19
  144:4,4,11
**clients** 128:24
  132:3,5,18
  133:21 134:2,7
  135:6
**closely** 42:1
**cohort** 47:14
  100:23 110:14
  110:15
**collaboration**
  58:2,7 59:10
**colleague** 94:5
**colleagues** 35:4
  93:24
**come** 65:12
**commencem...**
  156:7

**comment** 58:22
  108:17
**commentaries**
  38:4
**commentary**
  29:15 30:6
  37:8 43:21
  48:11
**commenting**
  33:17 61:21
**comments**
  38:15,18 39:6
  39:9,11,18
**commission**
  159:21
**commonly** 82:3
  120:11 124:4
**community**
  150:22 151:15
  152:23
**companies**
  26:18 27:3,16
  27:24 79:14,20
  80:3,7 81:3
  127:6 129:20
  129:22 135:24
**company** 6:13
  22:12,14 81:8
  129:24 131:1,2
  133:4 139:14
  140:11,22
**compare**
  125:21

**compared** 86:1
  98:4 114:6,20
  116:15
**comparison**
  114:14 115:24
**completely**
  6:23
**complicates**
  103:1
**comprehensive**
  142:11
**compromise**
  150:17
**computer** 8:10
  127:13
**concentration**
  14:16 83:15
  150:7
**concentrations**
  87:3 118:21
  145:9
**concepts** 75:2,8
**concerned**
  127:14
**conclude** 88:8
**concluded** 35:7
  35:17 94:10
  155:21
**conclusion**
  46:14
**conclusions**
  36:2 52:11,20
  63:5 65:12
  118:12

**conduct** 36:14
**conducted** 1:16
  60:21
**conference**
  121:1
**confirmed**
  63:24
**consider** 74:17
**consideration**
  123:1
**considered**
  72:10 104:5
  126:24
**considering**
  107:17
**considers** 34:15
**consistent**
  154:23
**constituents**
  15:19
**consultant**
  149:13
**consultants**
  127:4,7 128:22
  129:1
**consumed** 87:9
**contain** 132:9
**contained** 71:3
  71:9,13,17
**contamination**
  14:24 15:24
**contest** 9:16
**control** 47:17

**[controlled - department]**                                    Page 8

controlled
  98:12,22
conundrum
  57:24 59:9
conversion
  76:12 125:11
convert  125:18
converted
  86:21
copper  13:8
correct  10:15
  10:22,23 11:23
  12:13 26:4,19
  28:10,22 30:4
  30:23 34:6
  36:6,9,15,21
  37:13 42:9,24
  44:20 45:12,20
  46:22 48:8,9
  49:10 53:20
  54:1,9 59:6,10
  62:2,19 63:19
  65:15 71:24
  75:14,19,20,23
  77:6,13 78:20
  84:16 87:11,16
  87:22,23 99:8
  99:16 101:5,21
  102:4,10
  103:14 104:8
  106:5 107:6,20
  110:1 111:8
  112:11,21
  119:6 120:18

121:6,10 124:2
  124:3,12 127:7
  129:1,11,18,22
  146:12,13
  153:1 159:7
corrections
  157:5,7 159:10
counsel  6:24
  41:16 70:5
  71:2,8 151:12
  156:14,16
count  71:22
couple  38:2
course  19:19
  111:15
court  1:1 7:2
  10:5 16:12,13
  16:14 17:21,21
  17:23 18:3
  128:1 156:6,20
  157:20
courts  19:7
create  128:16
criteria  64:22
critical  51:22
  68:17 121:17
critically  37:2
criticisms
  110:23
criticize  36:13
criticizes  84:14
  121:9
critique  120:13
  153:13

critiqued  125:6
  126:3
critiques  121:8
crumb  142:13
  143:11,16,20
cumulative
  85:7 86:14
currently  7:22
cv  1:10
cytotoxic  15:19

**d**

d  4:2 18:18
d.c.  2:5,11
dabt  1:16 4:5
  7:6 159:16
daily  53:1,19
dallas  12:18,19
daniel  2:3 70:8
  128:12
data  44:11
  45:14 96:4
  97:14 114:17
  148:21 149:2,3
  150:12,15
  154:12
date  1:17 6:6
  156:11 157:9
  159:16
dated  156:21
david  2:21 6:4
davis  2:15
day  159:20

days  20:7
  157:16
dealing  64:9
death  101:20
  101:21
decided  53:15
  53:18
decides  39:16
decoster  13:2
decrease
  107:22 109:9
deemed  157:19
defendant  2:13
  2:19 13:3
  24:21
defendants
  25:10
defended  19:2
defense  17:9
  19:2,15,18
  24:12 64:13
  66:4 71:2,8
  116:12 151:12
definitely  149:1
  149:13
degree  43:14
  99:3,14,23
delaware  18:6
  18:14
demonstrates
  63:17
department
  97:1,8

[depend - documents]                                                    Page 9

| depend 37:17 | determine 80:9 | direction 5:5 | 43:20 45:8 |
|---|---|---|---|
| 106:9 | 81:10 84:1 | directly 26:12 | 46:20 48:10 |
| depends 33:8 | determined | 43:7 105:20 | 71:1,18 75:11 |
| 33:13 34:16 | 97:13 | 125:22 | 76:1 77:2 78:3 |
| deponent 6:14 | determining | disagreed 31:5 | 78:15 79:13 |
| 159:2 | 83:14 | 31:14 32:10 | 81:17 83:23 |
| deposed 9:3,14 | developed | 34:21 61:23 | 84:13 87:6,14 |
| 25:3 125:9 | 112:6 | disclose 21:23 | 87:19 88:3,17 |
| deposing | developing | 22:7 | 88:24 91:19 |
| 157:16 | 78:24 | disclosed 22:22 | 93:10 94:15 |
| deposition 1:15 | development | discuss 44:10 | 95:19 96:17 |
| 5:2 6:9,17 8:9 | 13:12 21:13 | 76:4 77:10 | 97:19 100:15 |
| 8:21 9:13 | 121:19 | 90:5 115:11 | 101:2,15 |
| 10:14,14,18,20 | device 15:18,19 | 128:12,18 | 102:16,21 |
| 11:1,7 12:22 | 16:2,10,23 | discussed 20:23 | 103:10 105:3 |
| 15:16 17:11,16 | 20:14 22:11,16 | 29:16 97:11 | 106:24 107:15 |
| 19:12 20:9,15 | 25:6 27:24 | 109:12 115:8 | 108:24 109:11 |
| 20:16,20 72:3 | devices 8:8,18 | 125:13 131:15 | 109:24 110:22 |
| 73:2,19 74:16 | di 120:15 | 133:1 | 112:9 113:5,11 |
| 74:19 105:22 | different 28:15 | discusses 53:24 | 114:24 115:10 |
| 155:17,21 | 54:20 65:3,11 | 54:4 77:3 | 116:5 117:10 |
| 157:3,13,17,19 | 65:11 79:10 | 109:15,16 | 122:14 127:22 |
| derivation | 95:14 98:3 | discussing | 130:3,16 142:8 |
| 120:14 | 109:8 110:5 | 105:23 | 144:18 146:7 |
| dermal 42:22 | 129:5,12 | discussion | 147:15 151:2 |
| description | 134:10 142:20 | 148:2 | 151:11 155:14 |
| 4:12 | 150:2 | district 1:1,1 | document 1:6 |
| designated | difficult 69:15 | division 6:5 | 41:17,20 73:5 |
| 140:1 | digested 113:14 | dnigh 2:6 | 109:21 |
| designed 76:18 | diisocyanate | doctor 7:16 9:2 | documents 5:8 |
| 78:18 | 120:16,17,22 | 10:13 11:10 | 10:21 11:1,3,6 |
| details 50:2 | dioxins 13:10 | 12:1 26:3,16 | 45:5 72:5,7 |
| determination | 125:9,24 | 28:6 39:23 | 73:10,16,18 |
| 69:9 119:15 | | 40:22 42:17,20 | 74:15 152:18 |

[documents - errata]                                                    Page 10

153:9,24
dog  106:12
doing  14:14
  81:3 123:2
  125:21 149:10
  157:8
dollars  26:17
dose  14:4 33:11
  79:10 84:11
  86:2 87:1
  108:21 125:12
  125:13,18,19
  125:20 150:6
doses  46:17
  80:9 81:11
  85:23 86:21
  124:23
dosimetry
  152:2
double  92:4
doull's  72:19
  72:22 73:13,23
  73:24 74:4
dr  6:14 75:12
  75:17,21,22
  76:4,8,13
  84:14,19 87:24
  104:3,23
  105:15 107:15
  108:18 109:16
  110:23 116:8
  116:10 148:13
  149:19 152:9
  155:12

draw  52:19
drawing  25:4
drinking  14:24
  15:4,24 23:9
due  6:19 102:4
  102:9
duly  7:6 156:7
duration
  110:10,16,19
  110:21
durations
  110:4,9
dust  92:6 96:6
dynamics  49:9
  55:3

**e**

e  4:2,10 7:21
  18:18 76:24,24
  117:16 158:1
earlier  57:21
  63:7 69:5
  125:8 133:1
  138:10 139:5
  139:23
easily  88:22
edition  74:6,10
  74:12
editor  37:7,12
  38:5,13 39:6
  39:16,16 49:20
  57:23 58:14
  59:1 65:17

editors  38:1,9
  57:24
effect  51:7
  53:15 65:5
  111:4 112:11
  112:20 113:12
  113:14 114:5,7
  115:2,12 116:1
  116:14,16
  145:11,13
effects  15:2
  44:14 50:12
  60:1 116:2
efficacy  80:10
eighth  74:12
either  20:18
  25:15 39:9
  89:22 108:22
  123:3 134:23
  138:13
eliminated
  59:23 60:10
ellis  2:9
emission
  118:20 138:23
emissions
  117:22,24
  118:1,9 119:4
  138:24 139:1,4
  139:8
employed  29:3
  29:18 31:13
  36:4 41:2
  76:13

employee
  156:14,15
employment
  110:1,16,19,20
endpoint  102:3
  102:7
endpoints  54:5
ends  155:17
endurance  9:16
energy  135:23
  142:4
ensure  6:22
entail  38:20
entire  128:5
environmental
  28:17 130:5,6
epa  11:4 14:12
  34:1 61:18,24
  62:9 72:6
  73:17 79:23,24
  81:18,24 82:9
  151:24,24
epa's  33:18
  61:1 64:20
epidemiology
  46:21 48:23
  65:6 67:7,22
  87:15,21
equation  76:12
  85:15
equivalent
  88:11
errata  157:6,9
  157:12,15

**[errata - exposure]**                                    Page 11

159:12
**especially** 83:5
**esquire** 2:3,4,9
    2:10,15
**established**
    121:5
**estimate** 9:5
    79:9 82:13
    84:10 108:20
**estimated** 87:1
**estimates** 88:11
**estimation**
    103:2 150:4
**et** 1:7,8 6:11,13
    13:2
**ethicon** 16:11
**europe** 53:14
**european** 52:23
    53:17 56:1
**evaluate** 13:17
    15:7 33:6
    36:16 43:12,13
    51:1 53:13
    59:19 61:17
    63:11 83:17
    85:1 91:4
**evaluated** 34:1
    43:7 44:2
    52:23 56:1
    57:8 59:20
    69:24 80:13
    94:23 98:11
    116:9 118:14
    122:11 125:6

**evaluates** 44:11
**evaluating**
    33:24 42:22
    65:2 68:5
**evaluation** 44:3
    44:4 45:14
    46:11 50:9
    55:10 59:24
    61:18 79:21
    152:9
**evaluations**
    64:22 149:15
**evidence** 45:15
    45:18 46:1,11
    46:12,22 47:14
    48:19,23 52:22
    53:13 56:1
    57:12 64:13,24
    65:3,6,7,8 66:5
    67:3 68:5
    69:18 94:16
    95:2 101:4
    144:20
**exact** 16:8 20:3
    83:15,19 87:5
**exactly** 33:15
    34:12 98:5
    128:15 136:14
**examination**
    7:13 148:10
    151:8 156:7
**examine** 71:2
    71:12,15

**examined** 7:7
**example** 26:10
    76:17 80:15
    89:13 105:6
    118:17 154:1
**examples** 54:21
**except** 30:6
    159:9
**excuse** 67:1
    132:10
**excused** 155:20
**existing** 45:15
**experience**
    72:15 151:22
    152:17
**experimental**
    45:24 46:15
    48:18
**expert** 1:15
    11:10,15,22
    13:16,22 22:23
    23:4 75:13,18
    76:2 116:6
    125:11 131:8
    131:10 140:2
**expert's** 13:17
**expertise** 133:6
    151:22
**experts** 15:11
    116:12
**expires** 159:21
**explained**
    113:6

**explains** 69:17
**exposed** 41:14
    43:10 44:8
    46:9 47:5 48:8
    49:17,24 50:22
    52:9 53:10
    57:7,15 59:17
    61:15 63:3,19
    66:21 67:5
    69:2,22 88:12
    91:22 93:1
    94:12,20 95:7
    95:24 96:19
    97:7,9 100:17
    103:23 118:10
    118:22 119:6
    119:18,20,23
    122:1 126:9,23
    143:1,11 145:5
    145:10
**exposure** 13:10
    23:11 33:9
    34:16 47:8,9
    47:18 49:8
    55:2 61:18,22
    61:24 62:17
    63:1,9,16 64:1
    64:10 67:8,12
    67:24 69:21
    76:16 78:24
    79:11 82:14
    83:15 85:10
    86:17 88:10
    94:9,17,18

Golkow Technologies,
A Veritext Division

95:4,5,21,22
100:22 101:4
110:4,9,10
118:20 121:18
122:12,13
123:3,4,7
125:22 140:4
140:11 141:11
141:13,19
144:19 146:4
150:7,23
151:16 152:24
**exposures**
13:13 14:5
15:8,22 46:13
49:22 57:14
89:13 103:21
117:21 152:3
**extent** 80:14
113:18,22
133:21
**extra** 8:11
**extrapolate**
82:10
**extrapolation**
14:9,14 55:14
56:6,12 60:19
76:10 80:22
81:4,19,21
82:23 85:4,16
88:1 105:1,16
108:15 120:9
123:2,9 124:1
124:17,18,21

149:20,24
150:3 152:4
154:2
**extrapolations**
13:21 15:12
25:9,14,19,24
43:17 48:14,20
49:1 50:6 55:6
55:21 56:7,14
60:13 62:6,8
64:3,5 66:6
67:19 77:5,12
78:16 79:15
80:4,8 81:10
82:2,3 84:2
111:1 120:4
121:13 125:7
126:4
**extremely**
46:16 49:22

**f**

**face** 20:2
**facility** 13:9,11
**fact** 65:16
**factor** 69:20
101:8,13 106:1
107:22
**factories** 89:12
92:15 94:10
104:8 108:8
129:14,20
**factors** 97:21
98:2,9,10,19

99:1,12,15,24
100:5,7,9
**factory** 88:12
89:3 91:22
94:12 96:18
98:3 100:1,18
104:16 106:3
108:9
**fail** 157:18
**fair** 10:3
**fairly** 42:13
**familiar** 41:22
**far** 118:18
125:5 138:17
138:18
**federal** 16:14
16:18 17:21
**federally** 1:18
156:5,19
**feedback** 39:15
**feel** 9:16
**feindt** 14:18
**felt** 84:6 104:21
**fiber** 16:6
**fields** 142:14
**fifth** 55:1
**figure** 103:6
128:8
**finally** 10:5
88:5
**financially**
156:16
**financials** 27:2
27:9

**find** 43:8 44:5
46:7 47:3 48:6
49:15 50:19
51:5,6,13 52:6
53:8 57:5,11
59:15 61:12
62:24 63:15
66:18 68:24
118:8 119:3
142:22 145:2
**findings** 44:13
143:2 146:2
**finds** 37:4
**fine** 50:12 51:6
62:17,23 63:1
63:12,16 74:9
135:4,6,11
146:20 147:4,7
**finish** 92:14
**finished** 147:6
**first** 9:15 11:21
12:1 42:20
110:24 111:4
112:5 113:6,12
113:14 114:5,6
115:2,11,24
116:2,14,16
117:15
**five** 10:24
86:21 146:24
**fivefold** 84:23
85:6
**floor** 2:5

**[focused - gradient]**                                        Page 13

**focused**  87:23
    89:7 104:23
**follow**  152:7,13
**followed**
    150:10
**following**  41:9
    149:11
**follows**  7:8
**food**  52:23
    53:17 56:1
**foregoing**
    156:10 159:6
**form**  17:5
    21:19 22:2
    26:21 27:5,18
    28:3,12 29:11
    29:22 31:7,17
    32:18 35:2,13
    35:21 36:8,23
    37:15 40:9,19
    41:16 42:3,11
    44:22 47:24
    51:11 58:5,20
    62:11 64:7
    74:21 77:15
    79:17 81:13
    82:6 85:12
    86:8,11 90:8
    91:14 92:12,18
    93:16 95:10
    96:13,21 99:7
    99:18 100:11
    101:10,23
    102:12 103:17

    104:19 106:7
    107:8 114:11
    116:20 127:9
    129:3,16
    130:19 131:6
    132:22 133:14
    134:4,16
    135:16 137:21
    138:16 140:8
    141:8 144:9
    145:17 148:22
    153:3 159:10
**forth**  156:12
**found**  41:11,12
    47:6 63:6,20
    67:1 143:4,9
**four**  9:7,9
    12:22 20:23
    22:23
**free**  11:14,18
**friction**  137:6
    137:10,15
**front**  11:11
**froze**  107:10
**fuel**  15:1
**full**  133:21
**fumes**  91:23
    92:5 95:24
**funded**  135:13
    141:6
**funding**  27:15
    27:23
**further**  102:22
    102:24 147:16

    156:10,13
**fuzzy**  50:2

**g**

**g**  102:19
    117:16
**gas**  122:4 133:4
    135:24 142:4
**gaston**  1:7 6:11
**gear**  102:23
    103:7,11,19,20
    103:24 104:4
    104:11,14
**general**  54:14
    72:14,18 98:4
    99:2,13 100:9
    113:3 115:21
    116:7,13
    136:20
**generally**  46:16
    81:18 84:22
**genetics**  12:11
**georgia**  2:17
**gestures**  10:10
**getting**  69:3
**give**  16:22
    20:15
**given**  12:22
    20:20 72:2,4
    76:20 96:3,3,8
    125:20 159:8
**giving**  21:10
**go**  9:12 26:7
    37:12 42:17

    48:10 70:18
    74:11 117:3,10
    128:2 146:18
    147:9,20,23
    155:18
**goal**  49:19
**going**  10:1
    11:20 54:24
    60:16,24 66:3
    67:15 70:10,18
    80:22 108:3,23
    112:7 117:3,10
    147:1,9,23
    153:21 155:18
**goldenberg**  2:3
    3:2
**golkow**  6:5
**gombar**  102:17
    102:19
**good**  7:16,17
    67:6,22 79:2
    108:11 115:20
    116:24 123:13
    154:4
**goodman**  94:6
**google**  75:1,9
**gosh**  23:7
**governmental**
    121:2,3
**gradient**  8:4
    26:4,8,11,13,16
    27:2,9,15,23
    28:8,14 29:3
    29:18 30:8

[gradient - human]                                                    Page 14

31:4,13,22
32:9,14 34:20
34:21 35:4,23
36:5,12,19
37:1,2 41:1,2
41:10 93:11,21
94:8 130:1
131:23 132:2
133:9,22
134:13,18
136:16 137:13
138:5 139:7
140:18 141:18
143:19 144:2,7
146:8
**gradient's**
28:19
**graduate** 149:9
**great** 8:17
**greenberg** 2:15
**groundwater**
21:14
**group** 15:23
44:18,19 45:10
45:11 110:6,8
**gtlaw.com** 2:18
**guess** 13:2
23:16 33:21
34:6 127:24
133:19
**guidance** 14:12
75:4 83:1 84:8
123:6 125:16
149:6 150:11

151:24,24
152:8,9,14
153:12,18
154:9,15
**guidances**
150:9
**guidelines** 67:7
67:23

**h**

**h** 4:10 117:16
**half** 58:1 59:9
59:20,22 60:3
**hand** 10:10
**handful** 38:6
**happen** 111:5
**happened**
127:18 140:12
**happens**
113:15
**hard** 33:3
63:21
**harm** 51:13,14
51:16 59:19
60:1,8,8 61:17
63:17,24 66:24
119:12,13,22
126:10 145:10
145:15,20
**harmful** 43:9
44:6 46:8 47:4
48:7 49:16
50:20,24 51:3
51:7 52:8 53:9

57:6 59:16
61:14 63:3
66:19 69:1
118:9,17,18,21
119:4,17 127:1
142:23 145:3
**harmless** 41:13
**head** 10:9
92:21 97:4
**health** 15:2,8
31:4,12 32:8
33:6,8,19
34:15,23 43:12
44:14 53:15
59:24 60:4
65:5
**heard** 6:23
40:11
**hearing** 20:22
21:1
**held** 6:10
**hereinbefore**
156:12
**hidajat** 85:9
86:17 87:20
89:1,6,10,14,17
89:21,23 90:19
91:5,7,10,16
92:2,16 93:3
94:24 95:6,23
98:12 99:5
101:15 102:3
102:24 109:24
110:2

**high** 33:9 46:16
49:22 101:8,12
**higher** 84:24
85:7,9 86:16
86:22 105:14
**hire** 127:6
128:24
**hired** 24:7,8,11
24:18 26:6,9
126:21 129:24
131:3,17,24
132:3,18 133:3
133:10,17,22
134:1,14,19,22
135:5,9 136:3
136:16 137:2,7
137:13,18,23
138:5,8,21,24
139:2,7,16
140:2,17,20
141:12,15,18
143:16,20
144:2,7,13
148:19
**hiring** 127:3
131:7,11,12
**host** 88:13
**hour** 70:11
**hourly** 26:11
**huahai** 1:8 2:13
6:12
**huhs** 10:9
**human** 12:11
31:4,12 32:8

**[human - integrated]**                                                    Page 15

34:23 36:6,14
36:17 45:23
46:13 47:8
48:16 58:1
59:9 60:3,4
64:1 65:6
81:11 88:14,19
91:21 92:9
**humans**  15:20
51:9 56:23
57:10,13 60:18
66:12 67:4,5
67:18 69:12
81:19 82:4,4,4
100:19,20
101:5 108:13
**hundred**  41:4
84:20 85:21
86:22 107:1,24
**hutchinson**
17:11
**hydrogen**
23:12 24:16
25:22
**hygienists**
121:3
**hypothesize**
114:12
**hypothesized**
113:20,24
**hypothesizes**
114:4

**i**
**iarc**  44:11,17
45:9,17
**iarc's**  43:21
44:4 48:11
**idea**  26:23
27:14,20,22
**iken**  3:1
**illinois**  21:12
**impact**  84:19
**imperative**
157:14
**implanted**
15:18
**implications**
42:23
**inappropriate**
14:10
**include**  48:13
48:19 82:19
129:14,19,21
**included**  10:21
101:16
**includes**  58:18
**including**  30:10
36:17 76:16
88:13 92:8
108:5 110:23
150:4 151:24
**incorporates**
119:19
**increased**
146:4

**index**  5:2
**indicate**  33:5
33:19 47:7
69:19 79:8
**indicated**  83:1
**indicates**  80:21
101:3
**indication**
111:21
**indicative**
47:15
**individual**
76:20 83:17
90:15 102:8,9
126:8,22
**individual's**
153:14
**individuals**
126:22 127:3
**industrial**
121:2,3
**industries**
129:10
**industry**  110:7
129:13
**information**
41:8 72:14,18
79:3,12 80:24
83:4 94:16,23
95:2 96:8
109:18,20
115:20,21
123:13 152:14
153:20 154:4

**ingested**  85:8
86:15 115:13
116:15
**ingestion**  111:6
114:6
**inhalation**  14:4
64:9 82:12,14
82:15 84:15,21
86:19 103:21
104:7 105:17
107:1,3,16
108:12 112:4
114:7 115:3
116:1 121:16
122:12 125:12
125:16,17,19
125:23 150:7
152:2,3
**inhale**  103:13
111:19 122:4
**inhaled**  104:15
106:3 108:2
113:7,16
116:18
**inputs**  150:5
**institute**  141:4
149:10
**instructions**
157:1
**intake**  53:1,19
**integrate**  65:10
**integrated**
64:15,18,20

**[integrating - known]**                                   Page 16

**integrating**
68:5
**integrity** 39:24
40:2,7,24 41:6
**interest** 125:4
132:19 133:6
**interested**
130:17 141:2
156:16
**internal** 58:1
**international**
58:7 59:10
141:3
**interpret** 149:2
**interrupt** 70:8
70:9
**introduce**
63:10
**investigate**
126:24
**invoice** 11:2
72:4
**involve** 28:7
46:13 48:24
**involved** 13:8
14:23 15:15
16:3,4,12 25:9
25:15,20,24
35:7 58:16
124:6 132:1,3
140:3
**involvement**
13:15 15:6

**involving** 15:17
15:21 23:9,10
28:16
**irbesartan** 1:5
**isocyanate**
141:2,3
**isocyanates**
140:24
**issue** 18:7,9,12
37:4 66:16
109:3 120:21
121:23 133:7
**issued** 23:3,6
23:22 25:1
72:24
**issues** 35:5 39:3
63:9 71:9,13
85:23 125:20
133:23 134:20
136:18,19
152:3
**issuing** 139:24

**j**

**jersey** 1:1
24:20
**jet** 15:1
**journal** 30:1,2
30:12,15,16,20
37:11,17 39:19
**journals** 28:15
36:20 37:20
**judge** 16:19
17:24 18:22

**judges** 19:7
**julie** 94:6
**justify** 39:12

**k**

**k** 19:23 76:24
**kabadi** 78:13
**kathryn** 2:4
**kavila** 2:7
**keep** 8:21
**kim** 7:2
**kimberly** 1:18
156:5,19
**kind** 34:13 38:4
72:13 132:5
139:10,19
140:5 141:21
**kirkland** 2:9
**kirkland.com**
2:12,12
**knew** 110:8
**know** 9:17,23
19:21,24 21:2
21:20 23:18,19
23:22 28:23
30:7,19 31:2
31:10,18,20
32:6,12 33:16
33:16 34:7
35:6,15,16
37:17 39:4
40:5,16 57:17
61:20 65:22
69:15 72:17

75:2,7,21
78:22 79:2
80:16 81:4,5
82:7,22 83:7
83:20 84:24
85:2 88:22
89:9,12,15
90:17,19 92:20
94:1,2,14
95:12,12,15
96:2,7,17 98:5
98:8,8,15,17,17
98:18,20 99:3
100:13 101:6,7
101:11,12
104:10,23
106:14,18,19
106:19 108:3
108:13 110:10
110:13,20
114:20 115:4
120:15 122:7
123:5 131:20
131:22 133:4
133:21,23
135:1 138:18
141:9 143:5
149:2,8,11
152:5,7,12,13
153:11,16,18
153:20 154:4,6
154:9
**known** 57:10
80:15 88:14,19

**[known - look]**                                                        Page 17

| | | | |
|---|---|---|---|
| 89:2,11 91:21 92:9 93:13 96:3,8,15 100:8 106:20 112:1 113:18 113:19 **kuempel** 76:23 77:3,9,22 78:10 | 66:7 **letters** 36:20 37:11 38:1,3,5 38:8 41:10 **letting** 57:16 **level** 34:3,16 119:16 143:4 143:10 **levels** 41:13 | **limitations** 52:16 **limited** 6:13 76:5,9 **limits** 78:24 **line** 5:6,6,6,9,9 5:9,12,12,12,16 5:16,16 158:3 160:2 | 100:7,19 101:5 101:8,17,18 110:24 111:5,7 111:12,14,22 112:5,7,19,21 112:24 113:2 113:13 114:5 114:18 115:12 116:3,14 |

**l**

l 1:15 4:5 7:5 18:18 76:24 159:16 **laboratory** 36:10 114:21 **lane** 2:21 6:4 **laptop** 8:10,16 **large** 142:19 **larger** 114:19 **lawyer** 19:11 **lawyer's** 160:1 **lawyers** 19:9 **lead** 34:19,23 35:5 81:11 112:19 **left** 117:12 147:2 **legitimate** 88:8 **letter** 37:7 38:13,21,24 39:20 49:20 57:23,23 58:14 59:1 65:17

43:9 44:7 46:8 47:4,9 48:7 49:16 50:21 52:8 53:9 57:6 57:14 59:16 61:14 63:2,18 64:1 66:20 67:5 69:1,21 94:11 100:17 100:22 118:9 119:5,17,20,22 138:20,22 142:24 145:4 **liability** 1:5 **life** 58:1 59:9 59:20 60:3 **lifetime** 9:10 **likelihood** 112:20 **likely** 47:17 48:3 69:7 112:15 114:19 **limit** 120:18 121:5,9

**linked** 49:9 55:2 **linking** 101:4 **list** 32:24 39:5 75:4,12 117:11 117:13 **listed** 42:18,21 72:8 73:14 93:3,7 101:19 122:17 124:20 **literature** 36:17 37:6 64:14 76:12 78:6,11 83:24 84:8 123:17,18 142:9 152:15 152:20 **litigation** 1:5 18:1 21:2 22:22 26:7,10 126:13 139:21 **little** 50:2 126:17 130:21 **liver** 88:9 97:21 98:1,9,10,19

**llp** 2:9,15 **located** 7:23,24 12:6,7,17 18:4 18:7 **location** 1:16 **lockhard** 2:15 **lockhardv** 2:18 **long** 62:17 70:16 121:18 143:5 **longer** 60:6,6 **longitudinal** 47:13 **look** 11:9,14,18 11:20 50:23 51:12 73:9 74:8 77:8 87:18 88:24 89:19,20 90:13 91:9 92:1,24 96:23 98:13 104:13,22 109:11 115:6 115:10,14,16 122:13 128:3,8

**[look - mess]**                                                                 Page 18

128:11 134:19
138:21 146:15
147:1 152:8
**looked**  29:2,6
50:4 51:13
52:15 53:14
66:22 72:12,18
72:24 73:3
74:24 75:8
89:4,6,14,17
90:14 98:6
99:9 109:14
110:3 115:8
116:10 118:24
145:7 150:2,8
150:11,13
**looking**  32:23
51:15 75:11
89:1 100:24
117:12 124:7
145:22 151:23
**looks**  128:4
**losartan**  1:4
**lot**  54:20 63:8
63:10 82:19
122:15 123:12
**lower**  34:7
53:18,22 104:5
105:18 107:19
**lowering**  52:24
**lunch**  148:5
**lutheran**  12:3,6
**lynn**  7:20

**m**

**m**  19:23 76:24
102:19 117:16
**made**  16:5
150:13,16
157:7
**majority**  29:4
**make**  80:18
90:23 98:23
157:4
**makes**  33:11
114:14
**making**  39:9,12
**management**
129:22
**manner**  132:4
**manufacture**
129:7
**manufacturer**
22:11 131:24
137:10 138:14
144:15
**manufacturers**
129:10 132:8
133:18,24
134:11,24
135:3,14,21
136:1,11,13
141:6
**manufactures**
131:18
**manufacturing**
22:16 27:24

127:6 128:22
128:24 131:1
140:6
**mark**  13:1
**marked**  4:14
5:15
**massachusetts**
23:9 24:11
25:18
**materials**  72:9
74:17
**matter**  6:10
15:9,21 17:20
23:8,10 25:12
33:22 50:13,18
50:20,24 51:2
51:6,20 52:5,7
55:17 62:18,21
62:23 63:2,8
63:13,17
125:11 135:5,7
135:11 136:3,5
136:18,23
138:11 139:22
**mdl**  1:4
**mean**  8:12
31:18 33:3,14
58:13,17 66:7
70:8 71:6
74:23 78:23
84:24 86:5,13
90:3 98:7
106:9 107:21
110:17 111:15

111:17 118:13
129:4 153:8,10
154:13,17
**meaning**  85:16
86:22
**means**  90:18
111:22
**mechanism**
51:2,16
**mechanistic**
44:11 45:14,24
46:12 48:18
65:8
**median**  110:16
110:18
**medical**  12:12
15:18 16:2,10
16:23 20:14
22:10,15 25:6
27:24
**mention**  92:2
98:13
**mentioned**
54:21 112:13
123:10 125:8
125:10 138:10
152:6
**mentions**  84:9
**mere**  76:18
78:19
**merit**  1:18
156:5,20
**mess**  56:18

[metabolism - needed]                                                    Page 19

**metabolism**
  83:6 108:24
  109:2,8,18,21
  110:24 111:14
  111:18 112:3,5
  113:7,18
  114:15,17
  115:2
**metabolites**
  111:13 112:6
  112:10,15,18
  112:22 113:1
**metabolized**
  109:6,13
  111:21,23
  112:4
**metabolomics**
  49:22
**metallic**  66:11
  66:17,19 67:2
  67:17 137:17
  137:18,24
  138:2,5
**method**  76:11
  85:3 149:5,12
**methodology**
  65:2,10 79:24
  123:11 149:18
  150:19 151:13
  152:21
**microbiota**
  49:9 55:2
**micrograms**
  14:4 125:13

**middle**  117:16
**mike**  143:24
**millions**  26:17
**mind**  146:24
**mining**  136:13
  138:14
**minor**  143:6
**minute**  146:15
  147:21
**minutes**  146:24
**misstating**
  153:3,7
**mixtures**  89:6
**mode**  50:11
**models**  90:22
  91:8
**molecular**
  12:10
**monarca**  93:4
**money**  27:3
**monitors**  8:11
  8:14,15
**morning**  7:16
**mortality**  62:18
  63:13 102:6
**moves**  79:3
**moving**  37:20
**msystems**
  39:22
**multicarcino...**
  89:21,24
**multicarcino...**
  90:15,18

**multipathway**
  142:11
**multiple**  90:4
  123:4
**multipollutant**
  90:22 91:5,8
  91:11 95:16
**multivariable**
  90:14
**mute**  8:19
  127:11 128:7

**n**

**n**  4:2
**n.w.**  2:10
**name**  6:3 7:19
  7:19 16:1,4,8
  16:17,19 17:2
  17:18 18:19
  19:5 20:3 21:7
  40:12,13 41:5
  133:5
**name's**  19:22
**national**  34:2
  68:6 149:10
**nature**  6:20
  13:6 14:21
  21:9 37:9
**ndma**  11:3 72:4
  73:15 80:15
  84:15,21 85:7
  85:10 86:15,18
  86:19 87:9,22
  88:10 89:8

  90:20 91:24
  93:8 94:17,19
  95:4,5,14,21,22
  96:1,1,19 97:8
  103:13,14
  104:6,15 106:3
  108:7,13 109:5
  109:10,12,20
  111:7,11,21
  112:10,18,22
  113:8,13,16,20
  115:13 116:15
  116:17 146:9
  146:12
**ne**  2:16
**nearby**  13:11
**nearly**  147:5
**necessarily**
  131:10 145:8
**necessary**
  76:16 80:10
  125:15 157:4
**need**  9:17 10:7
  14:13 34:7
  41:19 82:9
  83:19 95:17
  108:15 122:12
  123:8 125:18
  127:21,24
  146:20
**needed**  84:6
  97:18 101:19
  104:22 120:11
  125:2 127:13

**[needs - object]**                                              Page 20

| | | | |
|---|---|---|---|
| **needs** 37:5 39:4 | 70:6,14,16,24 | **nina** 2:9 128:1 | **obesity** 49:10 |
| **neither** 156:14 | 75:6 77:19 | 146:23 | 50:1 |
| 156:15 | 80:1 81:16 | **nina.rose** 2:12 | **object** 21:18 |
| **neural** 50:10 | 83:22 84:12 | **nitrosamines** | 22:1 26:20 |
| 55:10 | 86:3,9,12 | 91:24 92:6 | 27:4,17 28:2 |
| **never** 29:6 | 90:12 91:18 | 96:11,11 | 28:11 29:10,21 |
| 146:11 | 92:13,22 93:19 | **nk** 142:10 | 31:6,16 32:17 |
| **new** 1:1 24:19 | 95:18 96:16 | **nmor** 95:8,14 | 35:1,12,20 |
| 24:20 | 97:5 99:10,21 | **notary** 1:19 | 36:7,22 37:14 |
| **nickel** 51:19 | 100:14 101:14 | 156:6,21 | 40:8,18 41:15 |
| 52:4,7 55:16 | 102:2,15 104:1 | 159:23 | 42:2,10 44:21 |
| 63:7 66:11,17 | 105:2 106:23 | **note** 127:10 | 47:23 51:10 |
| 66:19 67:1,2 | 107:12,14 | **noted** 6:24 23:4 | 58:4,19 62:10 |
| 67:18 136:2,5 | 109:23 114:23 | 127:15 128:6 | 64:6 74:20 |
| 136:17,19,22 | 116:23 117:9 | 157:11 159:11 | 77:14 79:16 |
| 136:24 137:17 | 127:17,20 | **notes** 146:15 | 81:12 82:5 |
| 137:19,24 | 128:14,19,20 | 147:1 160:1 | 85:11 86:7 |
| 138:2,6,10 | 129:9,17 | **notice** 1:16 | 90:7 91:13 |
| **nigh** 2:3 3:2 4:6 | 130:23 131:9 | 10:14,18,20 | 92:11,17 93:15 |
| 4:7 7:15 17:7 | 131:19 132:23 | 11:2,7 72:3 | 95:9 96:12,20 |
| 21:22 22:6 | 133:16 134:6 | 74:16 86:20 | 99:6,17 100:10 |
| 24:3 26:24 | 134:21 135:19 | 127:12 | 101:22 102:11 |
| 27:7,13,21 | 138:3,19 | **noting** 84:22 | 103:16 104:18 |
| 28:5,18 29:13 | 140:16 141:10 | **number** 107:5 | 106:6 107:7 |
| 30:4,14 31:9 | 144:14 145:24 | 119:10,11 | 114:10 116:19 |
| 31:24 32:21 | 146:14,19,23 | 142:20 | 127:8 129:2,15 |
| 35:8,18 36:3 | 147:5,15 | **numbers** 61:21 | 130:18 131:5 |
| 36:11 37:10,23 | 148:22 151:4 | 84:23 87:5 | 132:21 133:13 |
| 40:15,21 41:19 | 151:10 153:6 | **nw** 2:4 | 134:3,15 |
| 41:24 42:6,16 | 155:2,5,9,13 | **o** | 135:15 137:20 |
| 45:1,3,7 48:5 | **nighgoldenbe...** | **o** 19:23 102:19 | 138:15 140:7 |
| 51:18 52:21 | 2:6,7 | 117:16 | 141:7 144:8 |
| 58:9,10,23 | **night** 2:3 | | 145:16 153:2 |
| 62:14 64:11 | | | |

[objected - particularly]                                                    Page 21

objected   128:9
objection   17:4
   27:10 84:4
   86:11 101:9
   148:23
objections
   127:12,15
   128:5
objective
   148:20 149:14
occupational
   23:13 24:17
   25:23 78:24
   117:21
occur   51:17
   113:7 116:16
occurred   20:6
   148:3
occurs   113:13
odd   18:19
office   7:24 8:2
   8:3 10:24
oftentimes
   36:12
oh   19:13,17,19
   23:7 45:2
   71:11 74:11
   78:9 127:19
   144:6 155:7
oil   133:4
   135:24 142:4
okay   8:17,22
   8:24 9:1,19,20
   10:11,12 14:17

17:19 45:2
56:16 58:24
70:15 73:5
100:4 128:19
132:16 146:21
147:18 155:7
old   120:1
ones   37:18
operation
   117:23
opine   116:13
opinion   14:8
   44:17 45:9
   75:13 98:24
   99:22
opinions   72:10
   75:22 84:13
   152:16
opposed   10:8
oral   82:10 86:2
   87:1 111:5
   114:6 116:2
orally   113:13
   115:13
order   101:16
organisms
   114:20,21
organization
   40:17
organizations
   40:11
original   32:4
   157:15

outcomes   51:21
outside   111:22
   114:18
ovarian   68:18
   69:3,12,20
overall   46:14
   47:11,22
overestimate
   82:20 83:12,21
overlapping
   110:6
overstated
   45:15,17
overwhelm
   46:17
own   36:5 72:15
ozone   33:22,23
   121:18,24
   122:2,3,6
   141:11,12,15
   144:19 145:1,3
   145:9 146:3

                p

p   7:21 76:24
p.m.   147:10,12
   147:12,14,24
   148:6,6,8
   155:19,22
pacific   1:17 6:8
   12:3,5
page   4:12 5:6,6
   5:6,9,9,9,12,12
   5:12,16,16,16

42:19 71:18,23
71:23,24,24
73:15 75:12
76:2 78:4,9
88:3 102:21
117:13,17
122:17 124:7
124:11,11
126:7 130:3
142:8 158:3
160:2
pages   159:6
paid   26:11
paper   39:10
   52:12 97:15
   118:12,19
   119:3,16,24
   120:13 121:8
papers   52:17
   52:19
paragraph
   76:4 78:4,7
   88:4
parent   109:5,9
part   78:6 79:1
   154:18
particles   46:18
particular
   18:13 34:13
   65:4,5,14
   90:24 91:2
   154:12
particularly
   44:12 83:3,16

**[particularly - plaintiff]**                                                                 Page 22

123:12,18
125:20
**particulate**
33:22 50:13,18
50:20,24 51:2
51:6,20 52:5,7
55:17 62:18,23
63:1,8,13,16
135:4,6,11
136:3,5,17,22
138:11
**parties**  6:16,22
156:15
**partly**  110:6
**pass**  110:24
111:4 112:5
113:6,12,14
114:5,6 115:2
115:11,24
116:2,14,16
**passing**  101:16
102:4,9
**past**  12:21 82:8
**patel**  2:23
**pathway**  51:15
**patrick**  14:17
**pauluhn**  78:13
**pause**  6:21
23:15 52:13
109:22 146:22
151:6 155:1,8
**paving**  117:22
118:4 139:13

**pays**  26:13
**pdf**  11:13
**peer**  37:12,19
38:9,14,15,17
38:22 39:1,11
39:14,18,21
59:1 65:22
**pennsylvania**
2:10
**people**  15:23
31:22 41:14
43:10 44:7
46:9 47:5 48:8
49:17,23 50:21
52:8 53:9 57:7
57:14 59:17,19
61:14,19 62:1
63:2,3,17,18
66:20 69:2,21
94:17,18,19,21
95:3,4,6,20,21
96:18 97:7
100:17 118:10
118:22 119:5
119:17,20,22
122:1,4 142:24
143:10 145:4,9
152:12
**people's**  146:5
**percent**  41:4,11
84:14,20 85:21
85:22 86:18,23
86:24 107:1,2
107:16,24

**percentage**
104:6 106:11
106:17 107:19
**perform**  15:11
43:16 81:9
122:20
**performed**
13:21 50:7
55:7 56:6,8,13
60:13,20,21
62:6,8 64:3,5
66:6 67:19
68:1,14 69:24
78:17 89:22
91:6,8,12
104:3 120:5
121:13 122:9
122:22 124:1
124:16,20
150:1
**period**  60:7
**pesticide**  67:8
67:12,23
**peterson**
142:10 143:24
**pfas**  15:22,23
17:20 21:14
23:9 25:13,18
42:24 43:5,7
132:17,19
133:6,11,23
**pfoa**  42:23 43:4
43:9,14,21
44:4,6,12,18

45:10,19 48:11
58:1,16 59:9
59:14,16,21
60:3 132:17,19
133:10
**pfos**  43:22 44:4
44:6,12,19
45:11,19 48:12
132:17,19
133:10
**ph.d.**  1:15 4:5
7:5 12:10
159:16
**pharmaceutical**
1:8 2:13 6:12
22:11 26:18
27:16 79:14,19
80:3,7,13 81:1
81:2,8
**pharmacokin...**
80:24
**pharmacokin...**
80:14 83:5
**pharmacology**
28:10,21 29:20
30:3,10,23
**picture**  20:2
**piece**  78:8
**piedmont**  2:16
**pinpoint**  33:15
34:18
**place**  156:11
**plaintiff**  14:6
17:13 20:1

**[plaintiff - providing]**                                                      Page 23

126:14

**plaintiff's**
13:17,22 15:10
19:11 125:10

**plaintiffs** 2:7
13:19 15:2,9
22:19 24:6,7,9
25:10 126:17

**please** 6:21
7:11,18,19
9:22 157:3,8

**pllc** 2:3 3:2

**plus** 8:15

**point** 83:11
94:16 95:2
120:1 140:15
142:10

**poison** 33:12

**poisons** 72:20
74:1,5

**pollutants**
64:22

**polypropylene**
16:6

**population**
98:4 99:2,13
100:9

**port** 24:19

**portion** 85:20
105:7 126:11

**portions**
149:22

**pose** 31:3,11
32:7,8

**posed** 34:23
90:16

**possibility**
76:19 78:19

**possible** 113:21
114:18 130:1

**possibly** 65:17

**potential** 15:8
23:10 50:11
51:1 56:17,22
59:20,24 60:7
60:17 66:2,10
66:23,24 67:16
89:16 105:13
112:16

**potentially**
91:23

**practice** 67:7
67:23

**preparation**
73:1,19 74:18

**prepare** 73:4

**preparing** 73:6
73:10

**present** 3:1

**presented** 96:4
96:9 97:14
99:4,15,24
119:8

**presided** 18:1

**presiding** 18:23

**pretty** 73:20

**previous** 53:22
127:11

**previously**
113:6

**principles**
54:15 149:6,7
150:9,11
153:17 154:10

**printed** 11:11
11:12

**prior** 66:3
112:7 156:7

**probably** 42:8
80:12 93:4
110:12

**problem** 19:8
20:5 70:14
107:13

**problematic**
39:4

**proceeds** 26:7

**process** 37:13
38:19 54:8,16

**produced**
111:13

**produces**
124:22

**product** 23:12
132:7

**production** 5:8
22:14

**products** 1:5
13:3 22:14
122:5 132:9,11
132:12 137:6
137:10,15

**profile** 11:3
72:5 73:16
93:8 109:15,19
111:20 112:14
114:2,4 115:9
115:19

**project** 125:8
136:21 139:3

**projects** 124:8
124:10,15,20
125:7 126:1,6
126:12,15,20
130:4 131:14
135:10,12
138:1 141:16
142:3

**prolene** 16:4
17:3 25:7

**pronounce**
49:5

**propounded**
159:9

**protect** 83:13

**protective**
102:22 103:7
103:10,19
104:4,11,14

**provide** 39:5
111:20

**provided** 22:18

**provides**
153:19

**providing**
154:15

**[prueitt - receives]**                                              Page 24

**prueitt**  1:15 4:5
  6:15 7:5,21
  148:13 155:12
  159:16
**public**  1:19
  39:24 40:1,6
  40:24 41:5
  156:6,21
  159:23
**publication**
  32:24 33:17
  38:24 42:21
  93:24 136:21
  139:5 154:13
**publications**
  30:8,19 33:2
  34:5,12 42:18
  81:8 83:2
  117:11,13
  123:22 124:5
  131:16
**published**  28:8
  28:20 29:5,19
  29:24 30:22
  33:22 41:10
  93:12,22
  123:20 146:11
**publishes**  28:14
**pulled**  113:3
**purely**  43:13
**purpose**  40:16
  43:11 44:9,10
  53:12 118:23
  125:1

**purposes**  14:6
  14:11 76:6,10
  77:6,13 82:18
  83:9 85:2
**pursuant**  1:16
**put**  37:5

**q**

**quality**  34:2
  68:6
**quantify**  76:20
  87:7,10
**quantitative**
  117:20
**quartile**  85:9
  86:17 94:17,18
  94:19,21 95:3
  95:5,7,8,8,20
  95:22 96:1,1
**quartiles**  95:13
**question**  5:15
  9:22 10:1,2
  32:4 35:9,19
  41:13,22 45:6
  45:16 81:24
  86:10 96:5,10
  99:20 100:4
  102:1 107:11
  126:17 127:21
  127:24 128:21
  151:12
**questioned**
  17:16

**questions**
  147:16 155:3
  155:10 159:8
**quick**  70:12
  146:16
**quickly**  60:11
**quite**  17:1
  35:24 112:2

**r**

**r**  7:21 102:19
  117:16,16
  158:1,1
**range**  87:2
**rarely**  36:5
  37:12
**raso**  2:3 3:2
**rate**  26:11
**rather**  76:19
**reach**  104:6
**read**  39:2 78:4
  78:8 81:15
  86:9 97:20
  157:3 159:5
**reading**  41:17
  44:23 155:6
**real**  49:4,8 55:1
  85:2 146:16
**realize**  128:7
**really**  33:15
  34:18 38:11
  46:12 49:19
  52:19 53:11
  58:15 72:15

  79:5,8 81:6
  82:22 84:24
  89:7 90:10,22
  90:23 97:13
  104:9 119:7
**reason**  23:21
  101:20,21
  157:5
**reasons**  108:4
**recall**  13:4 14:1
  14:19 17:8,12
  17:15 18:22
  19:1 40:14
  42:5,8 47:18
  48:4 52:15
  63:4 65:24
  69:7,10,14,16
  77:17,20,23
  87:1 92:7
  105:21,23
  111:2 113:9
  118:11 139:14
  139:15 143:2,8
  143:13 144:11
  145:6 146:1,6
**receipt**  157:17
**receive**  27:3
  73:17
**received**  10:13
  10:24 11:2
  12:1,9 73:16
  74:15
**receives**  26:16
  27:15,23 39:15

**recent**  42:13
**recess**  70:20
  117:5 147:11
  148:5
**recognized**
  76:11 78:5
**record**  6:3,7
  7:1 70:19,23
  117:3,8 127:10
  127:16 128:2
  146:18 147:9
  147:14,21,23
  148:2,8 155:18
**recycled**
  142:13,21
**recycling**  13:9
**refer**  64:19,24
**reference**  75:4
**references**
  71:19,22 72:8
  73:14 74:14
  75:12 78:14
  79:7
**referring**  78:11
**refers**  65:1
**reflex**  50:10
  55:10
**regard**  65:20
**regarding**
  17:20 25:18
  41:1 48:20
  57:24 60:20
  65:19 66:4
  87:22

**regardless**
  148:18
**regards**  21:16
  135:6 136:4
**registered**  1:18
  156:5,19
**regulated**
  79:22
**regulatory**  21:1
  21:11 23:1
  28:9,21 29:19
  30:2,9,22 31:3
  31:5,11,15
  32:6,11 33:4
  34:14,22 53:13
  54:8,16 82:15
  142:1 154:14
**relate**  34:12
**related**  35:5
  50:1 126:12
  131:14 134:20
  135:11 136:4
  138:1 139:4
  140:12,24
  142:4
**relates**  1:6
**relation**  133:10
  137:3 143:16
  143:20
**relative**  156:14
  156:15
**release**  122:6
**released**  118:2

**relevant**  47:8
  64:1 71:16
  97:18 121:16
  149:23
**reliability**
  85:18 149:19
  150:18,23
  151:16 152:24
**reliable**  79:9
  80:22 82:24
  83:3 84:10
  85:3 108:20,22
  123:11 124:23
  154:3
**reliably**  86:1
**relied**  115:18
**remember**  16:7
  16:16,17,18
  17:1,2,17,24
  19:5,6,10,18
  20:3 24:2
  42:14 52:11
  59:2,3 65:18
  74:6,23 75:10
  77:7 87:4 97:3
  100:2 120:2
  139:12 140:14
  143:7 144:17
**remote**  1:15 6:9
  6:20
**remotely**  6:17
  6:19 156:8
**remove**  105:7

**repeat**  32:3
  102:1 107:11
**rephrase**  9:24
**report**  11:11,15
  11:22 13:17
  23:3,6,21 24:5
  25:1 71:3,10
  71:14,17,19
  73:1,4,7,10
  75:13,16,18,23
  76:3 97:20
  109:16 116:10
  140:1,3 149:23
  152:1,19
**reported**  69:6
  104:12
**reporter**  1:18
  7:2 10:6 128:1
  156:6,6,20,20
**reporting**  6:20
**reports**  109:19
  116:6
**represent**
  136:10 138:13
**representations**
  76:15
**represented**
  126:7
**representing**
  2:7,13,19
  134:10 135:21
  135:23
**request**  5:8
  70:12

[requests - rose]                                                    Page 26

| | | | |
|---|---|---|---|
| **requests**   10:21 | **retained** | 75:24 93:9 | 91:1 119:2 |
| 148:15 | 126:21 | 145:15 | 123:5 125:2 |
| **research**   103:6 | **return**   157:15 | **risk**   14:15 31:4 | 152:2 154:19 |
| 149:11 | **review**   10:17 | 31:12 32:8 | **rmb**   1:10 |
| **resembling** | 27:8 37:13 | 33:6,8,12,18,20 | **road**   2:16 |
| 42:1 | 39:21 45:23 | 34:15,23,24 | 117:22 139:13 |
| **residents**   13:11 | 46:21 47:12 | 61:1 72:16 | **robert**   117:15 |
| **resource** | 48:17,23 51:22 | 76:17,19,20 | **roberts**   1:7 |
| 115:21 | 56:17,22 60:17 | 78:18,20 79:1 | 6:11 85:8 86:1 |
| **respect**   76:5,9 | 62:16 64:14 | 79:23 82:18,21 | 86:15 87:2,9 |
| 154:22 | 66:2,10 67:16 | 83:10,11,21 | 88:9 98:20 |
| **respiratory** | 68:17 73:18 | 84:2 87:7,8,10 | **robyn**   1:15 4:5 |
| 46:18 50:11 | 75:17 83:24 | 88:9,11 90:6 | 6:14 7:5,20 |
| 51:3,8,21 | 87:15,20 | 90:16 97:21 | 159:16 |
| 66:10 67:4,17 | 102:16 103:6 | 98:1,10,18,18 | **role**   143:6 |
| 105:6 106:1 | 116:5 121:18 | 99:1,12,15,23 | **roll**   70:10 |
| 107:18 111:18 | **reviewed**   29:8 | 100:5,6,7,9,24 | **room**   8:6,18 |
| 111:23 112:2 | 37:19 38:9,14 | 101:8,13 | **rose**   2:9 4:7 |
| 113:8,15,19 | 40:23 41:7 | 110:18 117:20 | 17:4 21:18 |
| 114:7 115:3 | 59:1 65:23 | 118:13,14,15 | 22:1 26:20 |
| 116:1,17 | 77:21 80:2,6 | 118:24 119:9 | 27:4,10,17 |
| **respond**   38:15 | 81:7 149:21,22 | 119:10,10,11 | 28:2,11 29:10 |
| 38:16 39:8 | 153:9 | 119:13,16,19 | 29:21 31:6,16 |
| **responding** | **reviewer**   38:15 | 119:21,21 | 32:17 35:1,12 |
| 58:14 59:5 | 38:17,22 39:11 | 120:8 123:5 | 35:20 36:7,22 |
| **response**   10:7 | 39:14,18 | 125:1,17 131:4 | 37:14 40:8,18 |
| 11:1 57:23 | **reviewers**   39:1 | 142:12 143:3,4 | 41:15 42:2,10 |
| 58:17,24 59:4 | **reviews**   37:3 | 143:9,10 149:5 | 44:21 45:2 |
| 72:3 74:16 | 68:6 149:15 | 150:9 151:23 | 47:23 51:10 |
| **responses**   38:5 | **ridge**   2:4 | 153:18 | 58:4,19 62:10 |
| **responsive**   11:6 | **right**   7:23 8:13 | **risks**   13:18 | 64:6 70:5,7,15 |
| **rest**   85:14,15 | 24:2 25:5 54:3 | 14:7 15:8 | 74:20 77:14 |
| **results**   29:15 | 58:18 59:7 | 43:12 83:12,18 | 79:16 81:12 |
| 90:19 | 70:18 74:8 | 88:18 90:20 | 82:5 84:4 |

**[rose - screen]**                                                    Page 27

85:11 86:7
90:7 91:13
92:11,17 93:15
95:9 96:12,20
99:6,17 100:10
101:9,22
102:11 103:16
104:18 106:6
107:7 114:10
116:19 117:1
127:8,19 128:3
128:17 129:2
129:15 130:18
131:5 132:21
133:13 134:3
134:15 135:15
137:20 138:15
140:7 141:7
144:8 145:16
147:3,7,20
148:12 149:17
151:1 153:2
155:2,7,11
**route** 13:20,20
14:2,2,9,9
15:11,11 25:8
25:8,14,14,19
25:19,24,24
43:17,17 48:13
48:13,20,20
49:1,1 50:6,6
55:6,6,14,14,21
55:21 56:6,6,7
56:7,11,11,12

56:12 60:12,12
60:18,18,19,19
62:4,4,5,5,7,7
64:2,2,4,4 66:5
66:5 67:18,18
68:1,1,13,13
69:23,23 77:4
77:4,11,11
78:16,16 79:11
79:15,15 80:4
80:4,8,8,21,21
81:9,9,18,18,21
81:22 82:1,1
82:13 84:1,1
87:24,24
104:24,24
105:16,16
108:14,14
111:1,1 120:3
120:3,9,9
121:12,12
122:8,8,20,20
122:21,21
123:3,7 124:1
124:1,16,16,18
124:18,21,21
125:4,6,6
126:3,3 149:24
149:24 152:4,4
154:2,2
**routes** 79:4
114:16 122:13
123:4

**routinely** 36:16
78:17,22
123:16
**rubber** 88:11
89:2,12 91:22
91:23 92:5,6
92:15 94:10
95:24 96:5
98:3 99:4,16
99:24 100:18
104:7,16 108:8
108:8 110:7
142:13,21
143:12,16,20
**rules** 9:13
**run** 124:10

**s**

**s** 2:10 4:10
18:18 19:23
**safety** 52:23
53:17 56:2
**sak** 1:10
**salary** 26:14
**saw** 114:21
**sawyer** 76:5,9
76:13 84:19
104:3 107:15
110:23
**sawyer's** 75:22
84:14 87:24
104:24 105:16
108:18 109:16
116:9,10

149:19 152:9
**saying** 29:24
34:14 65:18
98:16 111:15
118:17 149:3
149:16
**says** 41:23
97:20 153:19
**science** 12:2
28:17 64:15,19
64:21 72:20
74:1,5 149:16
**scientific** 34:20
41:9 148:20
149:5,12
150:22 151:15
151:19 152:20
152:23 153:17
**scientifically**
54:4
**scientist** 139:6
141:17
**scientists** 28:7
29:18 31:12
32:9,14 36:4
41:2,11 93:11
93:21 94:8
131:23 133:9
134:13,18
136:16 137:13
138:4 143:19
**screen** 8:16
11:13 76:18
78:19 107:10

**[screening - specifically]**                                                        Page 28

| | | | |
|---|---|---|---|
| **screening** 77:5 | **seeing** 93:3 | **shows** 117:14 | 70:7 72:21 |
| 77:13 79:6 | **seems** 109:17 | **siddiqui** 75:22 | 73:2 90:1 |
| 83:9 125:1 | **seen** 27:1 42:8 | **siddiqui's** | 92:14 99:19 |
| **search** 92:23 | 47:20 48:2 | 75:13,18 | 101:24 107:9 |
| 115:17 | 80:21 113:22 | **side** 25:15 | 127:9 128:23 |
| **seattle** 1:17 8:1 | 116:22 | 126:14 | 131:21 132:14 |
| 8:4 | **segment** 128:5 | **sign** 157:8 | 138:22 144:1,3 |
| **second** 9:21 | **select** 76:14 | **signature** | **sort** 23:18 33:6 |
| 76:4,8 107:10 | **selected** 124:8 | 156:18 | 33:10 53:14 |
| 151:5 | 126:1 | **signing** 157:10 | 114:14 154:8 |
| **see** 23:7,14 | **send** 39:7 | **similar** 38:4 | **sounds** 40:6 |
| 29:2 38:11 | **sensitivity** | 40:12 63:5 | 41:8 |
| 43:23 46:2 | 110:3 | 69:4 | **south** 12:12 |
| 50:14 51:23 | **sent** 38:21 39:1 | **simply** 60:9 | **space** 157:6 |
| 53:12 55:3,11 | **seroflo** 13:3 | 119:13 | **speak** 31:21 |
| 55:18 56:3,24 | **set** 34:1 82:14 | **simulated** | **speaking** 6:22 |
| 58:3,8,9 61:4 | 156:12 | 110:4 | **species** 81:22 |
| 64:16 66:13 | **setting** 23:13 | **single** 123:3 | 81:23 |
| 67:9 68:7,19 | 24:17 25:23 | **situations** 24:4 | **specific** 43:6 |
| 71:20 72:12 | **settled** 23:23 | 33:20 76:15 | 54:18,22,23 |
| 74:22 76:6,21 | **several** 83:2 | 78:17 82:8 | 63:4 67:11 |
| 77:17,24,24 | 120:1 140:15 | **skin** 43:15 | 68:9,11 83:16 |
| 78:6 84:7 88:4 | **severity** 144:20 | **small** 114:21 | 89:5 101:17,18 |
| 88:15 90:15 | 145:8,12,14,23 | **smoking** 98:7,8 | 115:15 118:12 |
| 97:23 100:21 | 146:5 | **society** 101:3 | 130:22 153:12 |
| 103:3 104:13 | **shaking** 10:9 | **solid** 52:20 | **specifically** |
| 105:15 108:10 | **sheet** 157:7,9 | **somebody** 59:5 | 18:11 33:23 |
| 109:20 115:23 | 157:12,15 | **somewhat** | 52:4 61:9 |
| 117:14 121:20 | 159:12 | 109:17 | 63:23 65:13 |
| 124:8 128:11 | **short** 144:19 | **soot** 35:9,10 | 67:4 123:6 |
| 130:7 142:15 | 146:3 | **sorry** 16:7 19:6 | 131:8,16 135:9 |
| 144:21 147:2 | **show** 41:18,20 | 19:17 20:4 | 136:22 137:23 |
| 150:10 | 45:4,4 67:3 | 21:8 54:24 | 145:22 153:13 |
| | | 66:3 67:15 | |

[specifics - supply]                                                              Page 29

**specifics**  120:2
**spell**  7:19
    154:21
**spelled**  19:22
    154:8
**square**  2:4
**standard**  34:2
**standards**
    21:14 34:6
**start**  140:3
**started**  23:20
    24:5
**starting**  24:6
    117:15
**starts**  55:11,17
    88:4
**state**  7:18
    16:13 17:21,22
    18:4 78:3,5
    88:7 102:21
    130:4,6,6,9
    141:24 142:1,5
    142:6 153:24
    154:16 157:5
**state's**  21:13
**stated**  31:3,11
    32:7,7,11
    118:16 121:5
**statement**  78:7
    114:22 151:20
    152:21
**states**  1:1 14:13
    14:18 44:15,16
    45:8,17 71:19

76:8 89:10
    130:4
**status**  102:22
**stays**  60:5
**stems**  149:8
**stenographic**
    7:1
**stenographic...**
    156:11
**stephanie**  3:1
**steps**  150:3,10
**stipulations**
    5:11
**strengths**  52:16
**strike**  130:14
    131:21 138:22
**strive**  148:19
    149:14
**stuck**  73:21
**student**  149:9
**studies**  29:9,16
    32:10 33:24,24
    36:6,14,18
    40:23 47:7,14
    47:16,17,19
    48:2 63:10
    65:12 75:3
    80:3,7 82:10
    87:21 88:1
    89:23 91:10,12
    102:17,18
    108:11 109:12
    110:13 115:1,5
    115:11,15

122:15,17,19
    151:19
**study**  43:3,12
    43:18,20 45:22
    46:5 49:20
    52:22 60:14,22
    61:2 64:3,12
    66:7,16 67:20
    68:10,15,22
    69:5,9 70:1
    76:24 89:10,22
    92:2 94:24
    95:6,23 96:23
    98:22 99:5
    101:16 102:6
    104:12 106:12
    109:24 110:2
    110:18 118:6
    120:5,6 121:14
    121:17 122:10
    142:9,18
    144:18 145:2
    146:2
**subject**  157:10
**submitted**
    116:6
**subscribed**
    159:19
**substance**
    34:13 41:12
    43:2 46:24
    49:12 50:16
    52:2 53:5 57:2
    58:11,16 59:12

59:22 61:6
    62:21 65:4,14
    66:15 68:21
    105:5 120:20
    121:22 126:9
    126:23 142:17
    142:23 144:23
    159:11
**substances**
    31:2,10,19
    32:1,6,12,15
    34:10 43:3
    44:1,14 46:4
    54:19,21 60:11
    68:9,12 88:13
    88:20 89:2
    91:20 92:8
    97:10 118:5
**suffered**  47:18
**sufficient**  57:12
    67:2
**sufficiently**
    39:17
**suggest**  29:15
    49:24
**suggesting**
    93:12
**suggests**  114:16
**suite**  2:17
**sulfide**  23:12
    24:16 25:22
**sulfuric**  23:11
**supply**  15:1,3,4

**[support - think]**                                                      Page 30

**support** 5:2
52:24 151:19
152:16,20
**sure** 8:23 23:17
34:11 37:22
40:4,13 41:3,4
42:5,15 50:5
59:3 90:3,23
91:17 93:6
94:4 96:15
98:23 103:18
113:20 128:14
128:15 135:2
136:1,12,14
144:16 148:16
155:5
**sutures** 16:4
17:3 25:8
**swear** 7:3
**sworn** 6:19 7:7
20:24 21:12,16
21:24 22:18,24
156:8 159:19
**synthetic**
142:13
**system** 51:3,4,8
**systematic**
45:23 48:17,22
56:17,22 60:16
62:16 66:2,9
67:16 83:24
103:5
**systematically**
68:4

**systemic** 46:21
47:12 80:9
81:10 112:8
125:12,19
150:6

**t**

**t** 4:10 7:21,21
158:1
**tacoma** 12:7
**take** 9:17,18
11:9,14,20
70:12 116:24
146:14,24
**takeaway**
47:12,22
**taken** 1:16
70:20 117:5
147:11 148:5
156:11
**takes** 59:22
**talc** 45:22 46:6
46:8,14,18,22
47:2,4,8,15
48:3,7,16,23
68:18,21 69:1
69:4,11,11,19
130:17 131:4
131:14,18
132:1,4,10,11
132:12
**talked** 25:3
63:7 69:5
99:22 139:5,23

**talking** 25:7
98:24 105:21
**tdi** 120:22
121:6,10
139:16,17
140:4,18
**tease** 90:23
**technician** 2:20
2:22 6:2 7:10
70:17,22 117:2
117:7 146:17
146:21 147:8
147:13,22
148:7 155:16
**tejash** 2:23
**tell** 32:24 74:10
**temporary** 53:1
53:19
**ten** 110:1,16,19
**tenant** 33:11
**tens** 26:17
**term** 62:17
90:18 121:18
144:19 146:3
**terminus** 2:16
**terms** 69:3
74:17 90:14
104:2 131:3
152:21
**testified** 7:7
**testify** 156:8
**testifying** 13:16
**testimony** 4:5
12:21 15:16

16:22 20:15,17
20:21,21,24
21:10,13,17,24
22:19,24 73:12
156:11
**teva** 2:19
**texas** 12:12,19
130:11 142:6
**textbook** 54:11
54:12 56:10
72:13,17 74:3
74:13
**thank** 57:16
120:23 147:17
147:18 148:13
151:3 155:11
155:13,15
**thanks** 151:2
**thing** 38:23
**things** 19:7
34:17 54:22
73:3 74:24
75:5 79:22
129:8
**think** 16:3,5,24
17:22 18:5
23:2,11 25:1
28:13 33:23
34:4 35:22
37:20 38:6,10
38:12 39:3
49:21 54:2
63:20 65:16,19
69:13 72:12

[think - type]                                                                                    Page 31

73:20 74:1
86:24 92:1,2
93:2,2,9 97:12
98:12 113:17
113:20 114:13
127:10 129:23
135:8,22,23
136:20 139:23
140:1,10
141:23 145:19
151:21 152:11
154:6,22
**third** 2:5
**thirty** 157:16
**thought** 19:13
**threshold**
    120:17 121:5,9
**time** 1:17 6:7,8
    21:4 35:24
    41:12 59:22
    60:2,7 70:19
    116:24 117:4
    148:14 149:8
    156:11
**times** 9:6,8,9
    37:24 38:2,7
    86:22
**title** 42:22
    142:11 145:7
**titled** 117:19
**tobacco** 35:19
    35:23
**today** 6:14 7:2
    73:13 148:14

**today's** 6:6
    10:14 74:18
    155:17
**together** 65:12
**tolerable** 53:1
    53:19
**toluene** 120:14
    120:22 121:10
**tom** 19:19
**took** 19:11
    150:3
**top** 92:20 97:4
    124:11
**total** 9:9 96:11
**towards** 37:21
**tox** 11:3 72:5
    73:15
**toxic** 15:20
    88:13,20 91:20
    92:8 97:10
    126:9
**toxicity** 81:11
    125:3,16,23
**toxicokinetics**
    115:22 123:13
**toxicological**
    93:8 109:15,19
    111:20 112:14
    114:1,3 115:9
    115:19
**toxicologists**
    150:21 151:15
    152:12,23

**toxicology** 28:9
    28:9,16,20,21
    29:19,20 30:1
    30:3,9,13,15,16
    30:23 33:11
    54:8,15 65:7
    72:16 73:23
    74:3,5 149:7
    150:8 151:22
    154:11
**toxin** 126:23
**tract** 46:19
    105:6 106:2
    107:18 111:18
    111:24 112:2
    113:8,15,19
    114:8 115:3
    116:2,17
**trade** 134:9,23
    135:1,18,20,22
    136:8,9 138:9
    138:12 140:24
    141:1,5 142:3
**trangle** 2:10
**transcript**
    156:10 157:17
    157:19
**transcription**
    159:7
**transformation**
    109:3
**transformed**
    109:7

**transportation**
    140:10,13,22
**traurig** 2:15
**trial** 2:22 20:12
    20:17,21
**tried** 149:4
**true** 81:17 82:2
    113:11
**truly** 38:12
    69:16 91:2
**truth** 156:8,8,9
**try** 82:13 88:18
    97:16 103:6
    104:13 108:23
    149:2 152:7
**trying** 54:2
    59:2 63:11
    74:23 81:5
    128:8 135:8
**tsca** 61:1
**turf** 142:14
**turn** 12:20 74:7
    76:1 122:16
**turning** 142:8
**two** 8:15 11:3
    15:14 72:5
    73:16 114:15
    130:5
**type** 14:14 16:5
    38:23 56:19
    65:9 79:11
    80:23 81:3
    82:23 97:1
    101:17,18

**[type - want]**                                                                Page 32

102:9 103:20
115:19 122:24
123:8 135:24
141:24 152:7
152:13
**types**  47:19
65:3,11 66:24
123:19 124:5
129:6,12 137:6
152:14
**typically**  41:14
43:10 44:7
46:9 47:5 48:8
49:17 50:21
52:9 53:10
57:7 59:17
61:15 63:3,18
66:20 69:2
118:10 119:5
119:18 142:24
143:11 145:4

**u**

**u**  7:21 76:24
**u.s.**  61:1 79:24
**uh**  10:9,9
**uhs**  10:9
**ultimate**  69:8
**uncertainties**
52:18 63:23
150:14,17
154:20
**uncertainty**
63:11,15

153:22 154:17
154:18
**understand**
9:22 85:5
98:24 99:20
108:16
**understanding**
43:21 48:11
90:11 154:11
154:13
**understood**
10:2
**united**  1:1
14:18
**university**  12:3
12:6,11
**unknown**  97:22
100:6 102:23
**unmute**  127:14
**unnecessary**
54:1,3
**use**  36:13 45:13
53:16 54:5,7
79:14 80:4,8
82:1,3 84:14
125:17
**used**  14:12
49:21 54:6
61:21 76:11
78:22,23 83:8
84:2 86:18,23
105:17 106:12
107:2 118:4
120:9,11

124:24 150:12
150:20,21
151:13,14
152:15,22
157:20
**useful**  79:6
**uses**  77:4,11
81:18
**using**  8:8,10
123:5
**usually**  33:4
107:23 127:3,5
128:22,23
135:17 154:21
**utilized**  120:4

**v**

**v**  1:8
**vague**  34:14
130:21
**valsartan**  1:4
87:15 88:10
116:15
**value**  53:16,22
53:23 54:6
82:15 125:3,23
**values**  120:18
123:6 125:16
**variability**
15:22
**variety**  28:15
129:5
**various**  27:3
98:9 108:4

**vaughn**  2:3 3:2
**verbal**  10:7
**verbatim**
156:10
**veritext**  6:5
**versus**  6:11
13:2 14:18
94:18 95:4,21
96:1 98:20
116:2
**vicinage**  1:2
**victoria**  2:15
**video**  6:2,9
7:10 70:17,22
117:2,7 146:17
146:21 147:8
147:13,22
148:7 155:16
**videographer**
6:4
**videotape**  1:15
2:20
**virginia**  16:15

**w**

**w**  19:23,23
**wait**  89:24
144:1
**want**  12:20
42:17 74:9
76:1 122:15
128:2,15 142:9
146:18

**[wanted - years]**                                          Page 33

| | | | |
|---|---|---|---|
| **wanted**  70:11 | 27:19 28:4,13 | **word**  54:3 | 110:5,7,12,17 |
| 126:24 127:9 | 29:12,23 30:5 | 56:18 98:11 | **working** |
| **washington** | 31:8,18 32:19 | 120:15 | 103:19 135:13 |
| 1:17 2:5,11 8:1 | 35:3,14,22 | **work**  26:7,10 | **world**  49:4,8 |
| 12:8 | 36:9,24 37:16 | 26:14 28:8 | 55:1 |
| **waskom**  19:20 | 40:10,20 41:21 | 34:21 35:5 | **write**  37:6 |
| 19:22 | 42:4,12 48:1 | 36:13,20 37:1 | **written**  38:1,3 |
| **waste**  129:21 | 51:12 52:14 | 37:3 61:19 | **wrong**  44:17 |
| **water**  14:24 | 58:6,21 62:12 | 62:1 79:20 | 45:10 |
| 15:3,4,24 | 64:8 74:22 | 97:1 131:23 | **wrote**  37:19 |
| 23:10 | 77:16 79:18 | 134:2 135:10 | **x** |
| **way**  59:19 | 81:14 82:7 | 135:10 136:4 | **x**  4:2,10 154:4 |
| 84:10 87:11 | 84:5 85:13 | 136:17,19,23 | **y** |
| 95:12 97:14 | 90:9 91:15 | 137:2,14,18,24 | **y**  154:5 |
| 106:21 108:20 | 92:19 93:17 | 138:1,5 139:1 | **yeah**  18:18,20 |
| 108:21 143:13 | 95:11 96:14,22 | 139:3,7,17 | 19:23 22:3 |
| **we've**  33:1 | 99:8,19 100:12 | 140:18 141:12 | 24:1 25:4 |
| 39:17 70:10 | 101:11,24 | 141:18 144:11 | 32:16 34:11 |
| 97:11 122:14 | 102:13 103:18 | 149:12 152:8 | 38:7,11 39:22 |
| 123:21 | 104:20 106:8 | **worked**  26:3 | 57:18 65:21 |
| **wearing**  103:8 | 107:9 114:12 | 31:20 32:2 | 89:5 90:9,17 |
| 103:12 | 116:21 127:23 | 35:15,23 93:11 | 96:7,14 100:12 |
| **weeks**  19:4 | 129:4 130:20 | 93:21 94:8 | 105:22 107:12 |
| 20:7 | 131:7,12 | 126:2,14,20 | 109:10 116:21 |
| **weight**  64:13 | 133:15 134:5 | 131:13 141:15 | 127:23 132:11 |
| 64:24 66:4 | 134:17 135:17 | 146:9 | 135:22 143:13 |
| 144:20 | 137:22 138:17 | **workers**  88:12 | 147:3 |
| **west**  16:15 | 140:9 141:9 | 91:22 93:1 | **year**  26:18 |
| **western**  12:12 | 144:10 145:18 | 94:12 98:3 | 27:16 28:1 |
| **witness**  1:16 | 147:18 148:24 | 99:4,16 100:1 | 110:1 |
| 5:5 6:18 7:3 | 151:3 153:4,8 | 100:23 102:23 | **yearly**  26:14 |
| 17:6 21:20 | 155:4,15,20 | 103:7,11,12 | **years**  110:16,19 |
| 22:3 23:16 | 156:7 157:1 | 104:10,17 | 120:1 140:15 |
| 26:22 27:6,12 | | 106:4 108:9 | |

**[yesterday - zone]**                                         Page 34

| |
| --- |
| **yesterday**<br>  127:18<br>**york**   24:20 |
| **z** |
| **z**  154:5<br>**zero**   118:16<br>**zhejiang**   1:8<br>  2:13 6:12<br>**zone**   141:18 |