# EXHIBIT B

VICTORIA CHERNYAK, MD, MS

Page 1

```
 1         UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
 2               CAMDEN VICINAGE
 3                   - - -
 4
   IN RE: VALSARTAN,       :  MDL No. 2875
 5 LOSARTAN, AND           :
   IRBESARTAN PRODUCTS     :
 6 LIABILITY LITIGATION    :
   _____:
 7 THIS DOCUMENT RELATES   :
   TO:                     :
 8 Gaston Roberts et al.   :
   v. Zhejiang Huahai      :
 9 Pharmaceutical Co., et  :
   al.                     :
10                         :
   Case No.                :
11 1:20-cv-00946-RMB-SAK   :
12
                   - - -
13
              May 5, 2025
14
                   - - -
15
              Remote videotape expert
16 deposition of VICTORIA CHERNYAK, MD, MS,
   taken pursuant to notice, was conducted
17 at the location of the witness in New
   York, New York, beginning at 9:02 a.m.,
18 on the above date, before Kimberly A.
   Cahill, a Federally Approved Registered
19 Merit Reporter and Notary Public.
20
                   - - -
21
22
23
24
```

VICTORIA CHERNYAK, MD, MS

Page 30

1  Q.  Do you believe that Mr.
2  Roberts had advanced cirrhosis in 2016?
3     A.  Mr. Roberts had imaging
4  features of cirrhosis which were
5  detectable by CT.  He also had evidence
6  of portal hypertension, so he -- his
7  cirrhosis was enough to cause portal
8  hypertension.
9     Q.  And you say he has features
10 of cirrhosis.  As a radiologist, do you
11 make the actual diagnosis of cirrhosis?
12    A.  I -- as a radiologist, we
13 provide things like -- statements like
14 morphologic features consistent with
15 cirrhosis.
16    Q.  And then who makes the
17 actual diagnosis of cirrhosis?
18    A.  It -- you know, clinical
19 picture.  Sometimes patients get
20 biopsies.  Sometimes this is enough to
21 make the diagnosis.
22    Q.  Did any of Mr. Roberts'
23 treaters diagnose him with cirrhosis, if
24 you know?

Page 31

1     A.  I'm not sure.
2     Q.  So you didn't look through
3  the medical records to see if his actual
4  treating physicians didn't or did
5  diagnose him with cirrhosis?
6        ATTORNEY ROSE:  Object to
7     the form.
8        THE WITNESS:  That was not
9     relevant to what I was asked to
10    do, so I focused on things that
11    were relevant to what I was -- the
12    opinion that I was provide -- was
13    asked to provide.
14 BY ATTORNEY VAUGHN:
15    Q.  And so it wouldn't change
16 your opinion in any way if his treating
17 physicians did not think he had cirrhosis
18 in 2016?
19       ATTORNEY ROSE:  Object to
20    the form.
21       THE WITNESS:  No.
22 BY ATTORNEY VAUGHN:
23    Q.  In your opinion, did Mr.
24 Roberts have liver damage as of 2016?

Page 32

1     A.  Yes.  Liver cirrhosis is a
2  advanced form of liver damage.
3     Q.  In your opinion, did Mr.
4  Roberts have significant liver disease as
5  of 2016?
6     A.  Again, significant liver
7  disease is not a medically defined term,
8  so I'm not sure how to answer that.
9        He had a cirrhosis in 2016
10 which was a -- was advanced enough to
11 cause portal hypertension.
12    Q.  Is there only one potential
13 cause of portal hypertension?
14    A.  No.
15    Q.  And you didn't review all of
16 Mr. Roberts' medical records, did you?
17    A.  No.
18    Q.  Did Mr. Roberts have liver
19 disease in your opinion in 2016?
20    A.  Yes.
21    Q.  As of 2016, did Mr. Roberts
22 have a weakened liver?
23    A.  I'm not -- again, this is
24 not a medically defined term, so I don't

Page 33

1  know how to answer that question.
2     Q.  Does a liver disease weaken
3  one's liver?
4     A.  I -- you have to define what
5  you mean by weaken liver.
6     Q.  Make one's liver more
7  susceptible?
8        ATTORNEY ROSE:  Object to
9     the form.
10       THE WITNESS:  Susceptible to
11    what?
12       ATTORNEY VAUGHN:  Make one's
13    liver more susceptible to a
14    carcinogenic exposure.
15       ATTORNEY ROSE:  Object to
16    the form.
17       THE WITNESS:  Not -- not to
18    my knowledge.  I -- I have no
19    knowledge to answer this question,
20    I have no knowledge.
21       ATTORNEY VAUGHN:  Kathryn,
22    let's drop in that 4/8/2016
23    ultrasound.
24       ATTORNEY AVILA:  Okay.  This

9 (Pages 30 - 33)

VICTORIA CHERNYAK, MD, MS

Page 46

1 the radiologist treating Mr. Roberts did
2 not see; correct?
3    A.   Correct.
4    Q.   How many additional liver
5 lesions did you find?
6    A.   Two more, so I saw three in
7 total.
8    Q.   Did you look for any other
9 liver lesions throughout his liver?
10        ATTORNEY ROSE:  Object to
11    the form.
12        THE WITNESS:  I mean, I
13    looked through the liver, the
14    entire liver.
15 BY ATTORNEY VAUGHN:
16   Q.   And you didn't find any
17 other lesions besides those three?
18   A.   Those are three that I
19 found.
20   Q.   If you found other ones that
21 were similar, would you have noted those
22 as well?
23   A.   I hope so.
24   Q.   Would it make a difference

Page 47

1 if he had more liver lesions than the
2 three that you saw?
3        ATTORNEY ROSE:  Object to
4    the form.
5        THE WITNESS:  Make a
6    difference to what?
7        ATTORNEY VAUGHN:  Your
8    opinion.
9        THE WITNESS:  No.
10 BY ATTORNEY VAUGHN:
11   Q.   If he had a lot of the same
12 liver lesions, would that decrease the
13 chance or increase the chance that they
14 were carcinogenic?
15        ATTORNEY ROSE:  Object to
16    the form.
17        THE WITNESS:  No.
18 BY ATTORNEY VAUGHN:
19   Q.   So the number of lesions
20 present is irrelevant to the risk of it
21 being HCC; correct?
22        (Pause.)
23        THE WITNESS:  It depends.
24 BY ATTORNEY VAUGHN:

Page 48

1    Q.   What does it depend on?
2    A.   It depends on appearance of
3 the lesions and...
4    Q.   If he had a lot more lesions
5 that looked the exact same, would it be
6 more or less likely that he had cancer?
7        ATTORNEY ROSE:  Object to
8    the form.
9        THE WITNESS:  It depends how
10    many.  If his entire liver was
11    replaced by nodules and they all
12    look identical -- and I'm talking
13    about entire liver -- then we
14    would probably just say these are
15    cirrhotic nodules.
16 BY ATTORNEY VAUGHN:
17   Q.   And you didn't see
18 additional nodules?
19   A.   No.
20   Q.   Not even in that frame 24?
21        ATTORNEY ROSE:  Object to
22    the form.
23        THE WITNESS:  In what?
24        ATTORNEY VAUGHN:  I'll go

Page 49

1    back to it later.
2 BY ATTORNEY VAUGHN:
3    Q.   Do you have any critiques of
4 this CT?
5    A.   What do you mean?
6    Q.   ==Was this an ideally done CT==
7 ==in your opinion?==
8    A.   ==It was done with appropriate==
9 ==required protocol with and without==
10 ==contrast with arterial phase, portal==
11 ==venous phase, and delayed.==
12        THE COURT REPORTER:  I'm
13    sorry.  Can you repeat that?
14        THE WITNESS:  It was done in
15    compliance with what LI-RADS
16    recommends to have a multiphase
17    CT.
18 BY ATTORNEY VAUGHN:
19   Q.   Can you tell the jury what
20 LI-RADS recommends on a CT?
21   A.   LI-RADS recommends at least
22 arterial phase, which was obtained in
23 this case, portal venous phase, and the
24 precontrast images in this context are

13 (Pages 46 - 49)

VICTORIA CHERNYAK, MD, MS

Page 66

1    A.   2016 CT?
2    Q.   No.  I'm talking about the
3  2018.  You were talking about the '16
4  here.  You looked at the '16 and the '18;
5  correct?
6    A.   You said 2016 C -- okay.
7    Q.   Okay.
8         ATTORNEY ROSE:  I think the
9    confusion -- Brett, the confusion
10   is that in your question you
11   referenced a 2018 CT.
12        ATTORNEY VAUGHN:  Well,
13   because that's what I'm asking her
14   to compare.
15        You looked at the 2018 CT
16   and on image 17 -- in 2016, you
17   see this .6 centimeter and you say
18   it's a LI-RADS 3.  And then you go
19   and you look at the 2018 and you
20   look at where image 17 would be.
21        Did it correspond to where
22   any HCC was?
23        THE WITNESS:  So 2018 MRI.
24        ATTORNEY VAUGHN:  MRI.  Was

Page 67

1  there a CT in 2018?
2         THE WITNESS:  There was, but
3    it was not done with multiphase
4    protocol, so it's not -- you can't
5    apply LI-RADS to that, so --
6  BY ATTORNEY VAUGHN:
7    Q.   And what's a multiphase
8  protocol?
9    A.   The one that has arterial
10 phase and portal venous phase --
11   Q.   And so if you don't -- if
12 you don't do all the phases, you can't
13 apply LI-RADS; correct?
14   A.   Correct.
15   Q.   Okay.
16   A.   So in the lesion in segment
17 7, on series 401, image 17, had no
18 corollary on MRI done in August of 2018.
19   Q.   So this first one that you
20 listed definitely did not turn into HCC;
21 correct?
22        ATTORNEY ROSE:  Object to
23   the form.
24        THE WITNESS:  There was no

Page 68

1    -- it -- in 2018, there was no
2    correlation to this lesion.
3  BY ATTORNEY VAUGHN:
4    Q.   And then let's look at the
5  bottom one, the segment 6, half
6  centimeter, image 35, did you look to
7  correspond that one in the MRI in 2018?
8    A.   Yes.
9         ATTORNEY ROSE:  Object to
10   the form.
11 BY ATTORNEY VAUGHN:
12   Q.   And in your opinion, did
13 this one overlay with where HCC
14 developed?
15   A.   No.
16   Q.   And so the one that we're
17 left with is here in the middle, in
18 section 5 and section 8, where there's
19 the half centimeter on image 24.  In your
20 opinion, when you looked at the 2018 MRI,
21 did this one overlay with where HCC
22 developed?
23   A.   Yes.
24   Q.   And so it's only the middle

Page 69

1 one, the one in section 5 and section 8,
2 that ended up overlaying with where HCC
3 was; correct?
4    A.   Yes.
5    Q.   And that specific one, the
6 one in segment 5 and 8 on image 24, in
7 your opinion, had a 33 percent chance of
8 become being HCC; correct?
9         ATTORNEY ROSE:  Object to
10   the form.
11        THE WITNESS:  No.  It was --
12   it had 33 percent chance of being
13   HCC at that particular moment.
14 BY ATTORNEY VAUGHN:
15   Q.   So I want to be very clear
16 then.  This one in segment 5 and segment
17 8 that was a half centimeter in image 24,
18 in your opinion, there was a 33 percent
19 chance that that was cancerous as of
20 2016; correct?
21   A.   Correct.
22        ATTORNEY VAUGHN:  Now is a
23   good time for a break.
24        THE VIDEO TECHNICIAN:  Off

18 (Pages 66 - 69)

VICTORIA CHERNYAK, MD, MS

Page 170

1 image omission or degradation precludes
2 categorization.
3          Can you explain what image
4 omission means?
5     A.   Let's say if all
6 post-contrast phases were not done or the
7 patient -- you know, it was MR, patient
8 is unable to hold their breath, and the
9 arterial portal, venous, and delayed
10 phases are completely degraded and you
11 really cannot tell anything and then all
12 you see is a lesion, let's say on
13 T2-weighted sequences, but you can't
14 really say how this lesion enhances and
15 what it does and so you can't say am I
16 looking at benign hemangioma more likely
17 or am I looking at probable definite HCC
18 or any other malignancy, that is the case
19 where you apply LR-NC.
20          If you look at publications,
21 LR-NC is actually quite uncommon.  Hence,
22 I did not put in my report because it's
23 not relevant to this case.
24     Q.   But there are eight unique

Page 171

1 diagnostic categories, not seven;
2 correct?
3          ATTORNEY ROSE:  Object to
4     the form.
5          THE WITNESS:  When you look
6     at any publications, they don't
7     talk about LR-NC because, again,
8     it's not a diagnostic category.
9     It's more a communication that
10    this lesion is not categorizeable
11    and the imaging needs to be
12    repeated.
13 BY ATTORNEY VAUGHN:
14     Q.   And over here, the minimum
15 required images is in figure 4 and this
16 is figure 4 here on page 6, page 821 of
17 the study; correct?
18     A.   Yes.
19     Q.   And for CT, what are the
20 required images?
21     A.   Arterial phase, portal
22 venous phase, and delayed phase.
23     Q.   In the arterial phase, the
24 late arterial phase is strongly

Page 172

1 preferred, what does that mean?
2     A.   Arterial phase -- late
3 timing of arterial phase has a better
4 chance of showing arterial phase
5 hyperenhancement; therefore, when you
6 calibrate your studies and you set the
7 timing parameters for your CT, it should
8 be done in a way that you should obtain
9 late arterial phase in most patients.
10     Q.   What would happen if it was
11 an early phase instead on the arterial
12 phase?  Does that impact anything?
13     A.   You may or may not be able
14 to diagnose -- to detect arterial phase
15 hyperenhancement.
16     Q.   In your opinion, was the
17 arterial phase late in the 2016 scan of
18 Mr. Roberts?
19     A.   I'd have to go back and
20 relook.
21     Q.   And then there's the portal
22 venous phase that this mentions is a
23 required phase.
24     A.   Uh-hum.

Page 173

1     Q.   Can you explain that one
2 again?
3     A.   It's a phase that obtained
4 about 60 to 90 seconds after the arterial
5 -- after the injection of contrast.
6     Q.   And do you have an opinion
7 if the portal venous phase was early in
8 the 2016 CT?
9     A.   There's no such thing as
10 early portal venous phase --
11     Q.   And so --
12     A.   -- or -- not -- there's no
13 -- it's a continuum, so, really, early
14 portal venous phase is late arterial
15 phase.
16          Does that make sense?
17     Q.   Uh-huh.
18     A.   It's a continuum.
19     Q.   So if the portal venous
20 phase was done early, it would actually
21 be a late arterial phase and there would
22 be no portal venous phase?
23     A.   Yes.
24     Q.   And it mentions the delayed

VICTORIA CHERNYAK, MD, MS

Page 174

```
 1  phase of two to five minutes after
 2  injection.  Can you explain that one to
 3  me?
 4      A.   It's an acquisition done two
 5  to five minutes after contrast is
 6  injected.
 7      Q.   And is it important that
 8  it's done two to five minutes afterward?
 9      A.   That's usually the timing of
10  delayed phase that is recommended when
11  you create the protocols for your CT
12  scanner.
13      Q.   And do you consider this the
14  most important phase?
15      A.   No, you cannot say that.
16      Q.   Do you have an opinion on
17  which of the three is the most important
18  phase?
19      A.   You need all three to make
20  LI-RADS --
21      Q.   Okay.
22      A.   -- at least you need -- at
23  the very least -- at the very least, you
24  need arterial -- it's a complicated
```

Page 175

```
 1  discussion because you have to take into
 2  account the -- you know, the patient --
 3  the patient population you're working
 4  with and exposure to radiation therapy.
 5           For example, I work, you
 6  know -- in the two of the institutions
 7  I've worked on, the delayed phase was
 8  routinely omitted because -- because we
 9  wanted to reduce amount of radiation we
10  subject our patients to, so we routinely
11  would get arterial and portal venous
12  phase.
13           In other institution I've
14  worked, routinely they've obtained all
15  four phases, meaning precontrast,
16  arterial, portal venous, and delayed and
17  there they were not as concerned about
18  radiation exposure as the other
19  institutions, institutional preference.
20           There are studies that show
21  that you actually can omit a portal
22  venous phase and just acquire arterial
23  and delayed phase and -- because if you
24  see the washout in delayed phase, that's
```

Page 176

```
 1  sufficient.  You can apply washout to
 2  either portal venous or delayed phase.
 3           So there are institutional
 4  preferences that -- that are in place.
 5      Q.   But your publication says
 6  that all three phases are required to
 7  apply LI-RADS; correct?
 8      A.   As of 2018, yes.
 9      Q.   And so you're saying that's
10  changed since 2018?
11      A.   Again, there's at least one
12  study that came out that showed you can
13  omit the portal venous phase.
14      Q.   Is that your study?
15      A.   No.
16      Q.   Do you agree with that
17  study?
18      A.   I actually do.
19      Q.   Are you going to update your
20  paper?
21      A.   We are discussing it.
22      Q.   And so is there a split
23  opinion on if it should be required or
24  not?
```

Page 177

```
 1      A.   As it pertains to the liver
 2  imaging, it can be omitted.  The question
 3  is, when you talk about it -- because
 4  we're not just looking at liver, right,
 5  we're looking at other organs.
 6           So the question is, we need
 7  to know, if you omit the portal venous
 8  phase, are you -- are you -- how will
 9  this affect other organ appearances?
10  That's the conversation that we're
11  having.
12      Q.   And your specified as
13  currently -- scratch that.  I mumbled a
14  bunch.
15           You're currently having a
16  conversation if all three phases are
17  required in the CT for LI-RADS; correct?
18      A.   It's --
19           ATTORNEY ROSE:  Object to
20      form.
21           THE WITNESS:  It's a
22      conversation that is being had by
23      the technical working group.  I
24      cannot tell you what the final
```

VICTORIA CHERNYAK, MD, MS

Page 182

 1  that?
 2      A.  I have looked into
 3  literature when I was giving a recent
 4  talk about growth patterns, so -- I have
 5  not encountered a single paper that talks
 6  about etiology and rate of growth.
 7      Q.  And so you've never read any
 8  literature that says that HCC caused by
 9  hep B is more aggressive?
10      A.  Well, first of all, more
11  aggressive is not always equivalent to
12  faster growth, but no.
13      Q.  Can you explain to me the
14  difference between aggressiveness and
15  faster growth?
16      A.  There are things other than
17  growth that can indicate aggressiveness.
18      Q.  Can you explain those to me?
19      A.  Vascular invasion; if the
20  tumor extends into adjacent blood
21  vessels, that's -- that's a feature of
22  aggressiveness.  There are subtypes of
23  HCC which -- which are associated with
24  more aggressive phenotypes, meaning that

Page 183

 1  they are more likely to not respond to
 2  treatment or recur after treatment.
 3          Again, unfortunately, these
 4  are not something that we can predict
 5  based on imaging.  We can -- at least not
 6  accurately, so...
 7      Q.  An HCC that is caused by
 8  NASH cirrhosis, would you expect that to
 9  be quick growing or slow growing?
10      A.  It depends --
11          ATTORNEY ROSE:  Object to
12      the form.  I'm sorry.  I'm sorry.
13      I didn't mean to speak over you,
14      Doctor.
15          THE WITNESS:  That's okay.
16      It depends on the lesion and
17      there's no way for me -- again,
18      when I look at the scan, there is
19      no way for me to predict that this
20      particular HCC's going to grow
21      fast or slow.
22          You know, it -- I have cases
23      where a very small HCC doubled in
24      size in six weeks.  I have cases

Page 184

 1  where a large mass over, you know,
 2  31/2 centimeters, grew size wise
 3  very minimally in the course of
 4  eight months.
 5          It's impossible to predict
 6  for any -- for particular lesion.
 7  We can talk about population what
 8  on average can happen, but, you
 9  know, again, apply population
10  statistics to a particular case is
11  always problematic.
12  BY ATTORNEY VAUGHN:
13      Q.  And you're only reviewing
14  imaging.  You're not reviewing Mr.
15  Roberts' case-specific factors, such as
16  his medical history and other risk
17  factors; correct?
18      A.  Correct.
19      Q.  You note two-thirds of HCCs
20  have a tumor volume doubling time of
21  three months or longer; correct?
22      A.  Yes.
23      Q.  And so would you agree that
24  HCCs with a tumor volume doubling time of

Page 185

 1  three months or less are fast growing?
 2      A.  Okay.
 3      Q.  Do you --
 4      A.  I mean, it's not -- fast
 5  growing, slow growing is not a medical
 6  concept.
 7          I can only provide -- the
 8  data is, you know, generally we accept
 9  that, in general, we have the feature
10  called threshold growth and we -- and
11  it's 50 percent or greater size increase
12  in -- within six months, that's accepted
13  as threshold growth.  But we also know
14  that some HCCs don't meet that criteria.
15  Some do.
16          While it's true that HCC --
17  all HCCs grow over time, predicting the
18  rate of growth is very problematic
19  because, you know, any particular HCC,
20  it's not a steady growth, right, it can
21  -- it can kind of not grow for a little
22  bit, then grow, then stop growing.
23          So the -- so the rate of
24  growth is not constant for any -- for

VICTORIA CHERNYAK, MD, MS

Page 186

1  even particular with a lesion that we
2  follow over time, you know, that there's
3  -- there's -- the only definitive thing
4  we can say more or less is that HCCs
5  don't become smaller without treatment.
6      Q.   Would you agree that most
7  HCCs take three months or longer to
8  double in size?
9      A.   The volume, the volume.
10     Q.   It takes three months or
11 longer for most HCCs to double volume;
12 correct?
13     A.   Yes.
14     Q.   Then why in this case did
15 you assume a tumor doubling volume time
16 of three months?
17     A.   Because that's the median.
18     Q.   What do you mean?
19     A.   Median?
20     Q.   Yeah.
21     A.   Means that it's in the
22 center, the value's in the center.
23     Q.   Isn't it only one-third of
24 them are doubling at three months or

Page 187

1  less?
2      A.   So the -- again, the way
3  that you -- the six months -- the six
4  months of 50 percent size increase is
5  based on three months' tumor volume
6  doubling time, so that's an accepted
7  statement.
8      Q.   But two-thirds of HCCs
9  wouldn't double that quickly; correct?
10     A.   Two-thirds would -- of HCCs
11 would double at least this quickly --
12 right, this quickly or longer, yes.
13     Q.   And by longer, you mean
14 slower, like four months or five months?
15     A.   Yes.
16     Q.   And then why -- so why is it
17 that you assumed the faster growth rate?
18     A.   It's not fast.  It's median.
19 It's median -- it's median -- it's a
20 median value that we assume which is used
21 by -- like, that's the value that's used
22 to arrive at -- at the threshold growth
23 value of six months.
24     Q.   How did you calculate this

Page 188

1  median?
2      A.   It's just data.
3      Q.   So you're applying the
4  fastest one-third growth and you're
5  saying that's the median?
6      A.   That is the data that is
7  used to arrive at the threshold growth,
8  so that's the data that's used -- that's
9  the assumption that's used by UNOS, by
10 LI-RADS.  It's the threshold growth of
11 six months.
12     Q.   What is threshold growth?
13     A.   Size increase, the longest
14 dimension increase of 50 percent or
15 greater.
16     Q.   Do you need two images to
17 determine threshold growth?
18     A.   You need to have a study
19 that is at least -- that is done at least
20 within six months prior --
21     Q.   And do you have that with
22 Mr. Roberts?
23     A.   No.
24     Q.   Then how can you apply

Page 189

1  threshold growth to Mr. Roberts?
2      A.   I was providing the
3  theoretical numbers.  I'm not -- right?
4      Q.   So you don't have the actual
5  imaging necessary for threshold growth on
6  Mr. Roberts, correct, you're just
7  applying theoretical numbers?
8          ATTORNEY ROSE:  Object to
9      the form.
10         THE WITNESS:  I was
11     providing the possible scenario of
12     how would -- how would a 5
13     millimeter lesion progress to --
14     could progress to 5.6 centimeter
15     lesion.
16 BY ATTORNEY VAUGHN:
17     Q.   You were given a possible
18 scenario, not a probable scenario;
19 correct?
20         ATTORNEY ROSE:  Object to
21     the form.
22         THE WITNESS:  I'm not sure
23     how to -- again, I cannot predict
24     how things grow, any particular

48 (Pages 186 - 189)

VICTORIA CHERNYAK, MD, MS

Page 198

```
 1    cirrhosis by detecting HCC at
 2    stages where it can be treated.
 3         So I was just providing
 4    numbers.  These numbers -- nobody
 5    can provide you with exact numbers
 6    because, again, there was no
 7    follow-up that was required --
 8    that should have happened.
 9  BY ATTORNEY VAUGHN:
10    Q.   So you have no way to know
11  if this assumption that you made of a
12  constant tumor volume doubling time of
13  three months was applicable to Mr.
14  Roberts; correct?
15         ATTORNEY ROSE:  Object to
16    the form.
17         THE WITNESS:  I am showing
18    that it is within the realms of
19    possibility that this was so.
20  BY ATTORNEY VAUGHN:
21    Q.   In your expert opinion, did
22  Mr. Roberts' HCC have a constant growth
23  rate?
24    A.   This is not an answerable
```

Page 199

```
 1  question because I don't -- because the
 2  patient didn't have the follow-up, so...
 3    Q.   Can you explain to me how
 4  you did this calculation, this tumor
 5  volume doubling time, to come to your
 6  answer that it would take approximately
 7  two years and eight months for it to grow
 8  to the size that was seen?
 9    A.   There is a -- a calculator
10  you can plug in.  There's a formula.  You
11  can plug in the numbers.  So I said, you
12  know, tumor volume doubling time three
13  months, initial size this, and it -- and
14  the calculator spit out the two years and
15  eight months using the formula.  I can
16  look up the formula for you.
17    Q.   What calculator did you use?
18    A.   ChatGPT, which provided me
19  with --
20    Q.   ChatGPT?
21    A.   Well, it provided me with a
22  formula, so I can --
23    Q.   So you entered some data in
24  this ChatGPT and it shot out it would
```

Page 200

```
 1  take two years and eight months for it to
 2  grow to that size?
 3    A.   It provided me with a
 4  formula which -- which is the formula you
 5  use for -- for this.  I looked at the
 6  formula.  It was correct.  It just made
 7  the calculations faster than me entering
 8  into Excel and recalculating everything
 9  myself.
10    Q.   And did you include
11  ChatGPT's formula in your expert report
12  anywhere?
13    A.   No.
14    Q.   How would I find what
15  ChatGPT's formula was?
16    A.   It's in -- it -- it's a
17  standard formula for tumor -- tumor
18  volume doubling time.  There's a --
19  there's a formula and it just made the
20  calculation faster.
21    Q.   Does that formula appear
22  anywhere in your expert report?
23    A.   No.
24    Q.   Does the data that you
```

Page 201

```
 1  entered in that formula appear anywhere
 2  in your expert report?
 3    A.   Yes, three months and .05
 4  centimeter.
 5    Q.   So is all you typed into
 6  ChatGPT was three months and 0.5
 7  centimeters and ChatGPT shot out that
 8  it's going to take two years and eight
 9  months?
10    A.   I said tumor -- tumor volume
11  doubling time is three months.  Initial
12  size is .5 centimeters.  How long will it
13  take to grow to this 5.8 centimeter?  It
14  provided me with step-by-step
15  calculations.  They appeared correctly.
16    Q.   For the tumor volume
17  doubling time of three months, you chose
18  the three-month doubling time, not
19  ChatGPT; correct?
20    A.   Yes.
21    Q.   Did ChatGPT give you a
22  suggestion of what doubling time you
23  should be using?
24    A.   No.  It just provided me
```

VICTORIA CHERNYAK, MD, MS

Page 198

```
 1    cirrhosis by detecting HCC at
 2    stages where it can be treated.
 3          So I was just providing
 4    numbers.  These numbers -- nobody
 5    can provide you with exact numbers
 6    because, again, there was no
 7    follow-up that was required --
 8    that should have happened.
 9  BY ATTORNEY VAUGHN:
10    Q.    So you have no way to know
11  if this assumption that you made of a
12  constant tumor volume doubling time of
13  three months was applicable to Mr.
14  Roberts; correct?
15          ATTORNEY ROSE:  Object to
16    the form.
17          THE WITNESS:  I am showing
18    that it is within the realms of
19    possibility that this was so.
20  BY ATTORNEY VAUGHN:
21    Q.    In your expert opinion, did
22  Mr. Roberts' HCC have a constant growth
23  rate?
24    A.    This is not an answerable
```

Page 199

```
 1  question because I don't -- because the
 2  patient didn't have the follow-up, so...
 3    Q.    Can you explain to me how
 4  you did this calculation, this tumor
 5  volume doubling time, to come to your
 6  answer that it would take approximately
 7  two years and eight months for it to grow
 8  to the size that was seen?
 9    A.    There is a -- a calculator
10  you can plug in.  There's a formula.  You
11  can plug in the numbers.  So I said, you
12  know, tumor volume doubling time three
13  months, initial size this, and it -- and
14  the calculator spit out the two years and
15  eight months using the formula.  I can
16  look up the formula for you.
17    Q.    What calculator did you use?
18    A.    ChatGPT, which provided me
19  with --
20    Q.    ChatGPT?
21    A.    Well, it provided me with a
22  formula, so I can --
23    Q.    So you entered some data in
24  this ChatGPT and it shot out it would
```

Page 200

```
 1  take two years and eight months for it to
 2  grow to that size?
 3    A.    It provided me with a
 4  formula which -- which is the formula you
 5  use for -- for this.  I looked at the
 6  formula.  It was correct.  It just made
 7  the calculations faster than me entering
 8  into Excel and recalculating everything
 9  myself.
10    Q.    And did you include
11  ChatGPT's formula in your expert report
12  anywhere?
13    A.    No.
14    Q.    How would I find what
15  ChatGPT's formula was?
16    A.    It's in -- it -- it's a
17  standard formula for tumor -- tumor
18  volume doubling time.  There's a --
19  there's a formula and it just made the
20  calculation faster.
21    Q.    Does that formula appear
22  anywhere in your expert report?
23    A.    No.
24    Q.    Does the data that you
```

Page 201

```
 1  entered in that formula appear anywhere
 2  in your expert report?
 3    A.    Yes, three months and .05
 4  centimeter.
 5    Q.    So is all you typed into
 6  ChatGPT was three months and 0.5
 7  centimeters and ChatGPT shot out that
 8  it's going to take two years and eight
 9  months?
10    A.    I said tumor -- tumor volume
11  doubling time is three months.  Initial
12  size is .5 centimeters.  How long will it
13  take to grow to this 5.8 centimeter?  It
14  provided me with step-by-step
15  calculations.  They appeared correctly.
16    Q.    For the tumor volume
17  doubling time of three months, you chose
18  the three-month doubling time, not
19  ChatGPT; correct?
20    A.    Yes.
21    Q.    Did ChatGPT give you a
22  suggestion of what doubling time you
23  should be using?
24    A.    No.  It just provided me
```

51 (Pages 198 - 201)

VICTORIA CHERNYAK, MD, MS

Page 202

1  with calculations to make my report
2  faster.  I could have taken the time of
3  putting this formula into Excel and I
4  would have arrived at the same.  It was
5  just faster to do this way.
6      Q.   Did you not have time to do
7  that for this expert report?
8           ATTORNEY ROSE:  Object to
9      form.
10          THE WITNESS:  No, as I'm not
11     a mathematician, as I'm not a
12     statistician, it was a -- as I'm a
13     radiologist, so I was focusing my
14     energy on radiology and using the
15     available tools, which are used
16     routinely by many people.
17 BY ATTORNEY VAUGHN:
18     Q.   Do you use ChatGPT routinely
19 in your practice?
20     A.   Not in my practice, but if I
21 need to calculate something...
22     Q.   So in your practice, you
23 don't calculate tumor volume doubling
24 times with ChatGPT; correct?

Page 203

1      A.   No.
2      Q.   Did ChatGPT ask you if he
3  had hep B infection or any type of viral
4  infection?
5           ATTORNEY ROSE:  Object to
6      the form.
7           THE WITNESS:  ChatGPT didn't
8      ask me anything, because I didn't
9      even -- I literally provided
10     numbers and said put it into
11     formula and spit out the numbers,
12     so it didn't know -- it had no
13     information other than tumor
14     volume doubling time, initial
15     size, and the final size.
16 BY ATTORNEY VAUGHN:
17     Q.   So ChatGPT also wasn't aware
18 of any of the patient-specific facts to
19 Mr. Roberts, such as his prior medical
20 history or if he had a viral or nonviral
21 etiology, ChatGPT was unaware of that?
22          ATTORNEY ROSE:  Object to
23     the form.
24          THE WITNESS:  ChatGPT only

Page 204

1      was providing me calculation,
2      nothing else.  Just plugged in the
3      numbers to make my life easier.
4  BY ATTORNEY VAUGHN:
5      Q.   And the only numbers you
6  plugged into ChatGPT was assuming a
7  three-month doubling time and what the
8  initial size of the lesion was?
9      A.   And the final size, yeah.
10     Q.   And how do you type that
11 into ChatGPT?  What's the first thing you
12 typed in?
13     A.   Assuming a tumor volume
14 doubling time of three months, an initial
15 size of .5 centimeters, how long will it
16 take to grow to 5.8 centimeters?
17     Q.   And then did ChatGPT show
18 you each stage of the doubling, how much
19 volume and how many centimeters it would
20 be?
21     A.   It showed me the formula
22 that's used and the step by step how we
23 used it and what the answer was.
24     Q.   And do you know what the

Page 205

1  volume would be at this time at two years
2  and eight months or do you just simply
3  know that that would be 5.8 centimeters?
4      A.   Well, 5.8 centimeters can be
5  transformed into double -- into volume
6  using the formula --
7      Q.   And what volume would that
8  be?
9      A.   Again, so if you have the
10 5.8 centimeter diameter, so you have to
11 half it to radius, right, so radius -- I
12 think it's PR -- I don't remember this --
13 like, I don't remember off the top of my
14 head the formula for sphere.
15          I -- you know, I'm not --
16 again, I'm not a mathematician, so I
17 doubt people walk around with that
18 knowledge.  But I could look it up and
19 say, you know, what's the volume for this
20 sphere?
21     Q.   Would you need to ask
22 ChatGPT for that?
23     A.   I can ask Google.
24     Q.   Google.  Okay.

52 (Pages 202 - 205)

VICTORIA CHERNYAK, MD, MS

Page 250

1  there was washout.
2  BY ATTORNEY VAUGHN:
3     Q.  Did you cite this updated
4  criteria anywhere in your expert report?
5     A.  No.
6     Q.  And you produced this
7  document, this 2018 CORE, in response to
8  your Notice of Deposition.  Did you
9  produce these updated guidelines that
10 you're now talking about?
11    A.  It's -- I can provide you
12 with lexicon.  I was providing this
13 mostly for the first page so you can see
14 how the imaging features are applied and
15 how the diagnostic categories are arrived
16 at.
17    Q.  I want to go to page 15 of
18 this LI-RADS CORE.  And we discussed this
19 earlier.  These are required images for a
20 CT; correct?
21    A.  Uh-hum.
22    Q.  And these are the same that
23 you listed in your paper that are
24 required; correct?

Page 251

1     A.  Yes.
2     Q.  And then there's a suggested
3  image which is the precontrast phase.
4  You don't have to do a precontrast phase
5  to do a LI-RADS; correct?
6     A.  Not unless the patient had
7  prior treatment.  Then it becomes
8  required.
9     Q.  But these other three are
10 all required.  Right?
11    A.  Yes.
12    Q.  Mr. Roberts, in his 2016 CT,
13 did they do a precontrast phase?
14    A.  Yes.
15    Q.  Was that phase one?
16    A.  Are you asking me
17 specifically about this?
18    Q.  That's correct.
19    A.  So unfortunately I tried to
20 open this study up, but I think my
21 computer cannot handle the Zoom and
22 stuff, so I actually cannot open the
23 study for some reason.
24       I'm not seeing the images.

Page 252

1     Q.  Were you able to open that
2  study on your computer previously?
3     A.  Yes, obviously, because I
4  read it.
5     Q.  I didn't know if maybe you
6  were on a different computer.
7     A.  I think that the --
8  everything else that's running is
9  preventing me from opening it up right
10 now.
11       ATTORNEY ROSE:  Sorry, Dr.
12 Chernyak.  Are you referring to
13 one of the exhibits?
14       THE WITNESS:  No.  I
15 actually tried to open the actual
16 CT.
17       ATTORNEY ROSE:  Oh, okay.
18       ATTORNEY VAUGHN:  Would it
19 help you if we took a break so you
20 could open up the CT and review
21 everything before we started
22 asking questions on it?
23       ATTORNEY ROSE:  Sorry.  I
24 have a question:  Are you going to

Page 253

1  ask her questions about a specific
2  CT?  Are you going to introduce a
3  CT as an exhibit?
4        ATTORNEY VAUGHN:  Well, I
5  mean, she's able to go through the
6  different phases, so I thought it
7  might be easier for her to
8  actually look at it herself, but
9  --
10       ATTORNEY ROSE:  Why don't we
11 go off the record and discuss
12 that.
13       ATTORNEY VAUGHN:  Okay.
14       THE VIDEO TECHNICIAN:  Off
15 the record, 2 o'clock.
16          - - -
17       (A discussion off the record
18 occurred.)
19          - - -
20       (A recess was taken from
21 2:05 p.m. to 2:20 p.m.)
22       THE VIDEO TECHNICIAN:  We
23 are back on the record at 2:20
24 p.m.

64 (Pages 250 - 253)

VICTORIA CHERNYAK, MD, MS

Page 266

1           - - -
2        EXAMINATION
3           - - -
4  BY ATTORNEY VAUGHN:
5      Q.    With Excel, you have to put
6  the formula in yourself; correct?
7      A.    Yes.
8      Q.    With ChatGPT, you didn't
9  have to put the formula in; it decided
10 the formula; correct?
11     A.    It showed me the formula as
12 it -- it showed me every step of the
13 calculation so that it was transparent in
14 how every step was applied and how it
15 arrived, basically, at every step of the
16 calculation.
17     Q.    And how do I see every step
18 of the calculation that ChatGPT decided
19 to do?
20         ATTORNEY ROSE:  Object to
21    the form.
22         THE WITNESS:  Do I show you
23    -- should I show you the screen?
24    It literally --

Page 267

1  BY ATTORNEY VAUGHN:
2      Q.    I mean, is there anywhere in
3  your expert report that I can see the
4  actual formula that ChatGPT applied?
5      A.    No.  I didn't put that.
6      Q.    And then I want to go
7  quickly back to the 2018 CORE for
8  LI-RADS.
9      A.    Okay.
10     Q.    Going back to page 57 PDF,
11 where -- at what time did you see
12 enhancement?  What phase did you see
13 enhancement, if you saw any enhancement?
14         ATTORNEY ROSE:  Object to
15    the form.
16         THE WITNESS:  On arterial
17    phase, the lesion was
18    iso-enhancing or isodense to the
19    background liver.
20 BY ATTORNEY VAUGHN:
21     Q.    And isodense to the
22 background liver, does that mean it
23 looked the same as the background liver?
24     A.    Yes.

Page 268

1      Q.    And you think that's
2  adequate enhancement to then say that
3  there was washout in the next phase?
4      A.    As I stated before, in the
5  updated lexicon, there are two patterns
6  that satisfy the diagnosis or
7  characterization of washout.
8  Isoenhancement, isodensity, isointensity,
9  those are all synonyms depending on what
10 modality you used.
11         So iso, meaning looking the
12 same, and then on the subsequent phase,
13 looking less enhanced, less dense, less
14 intense in hypo or hyper, meaning
15 enhancing more, looking brighter, and
16 then going back to hypo.
17         Those two are acceptable,
18 equally applicable definitions.  I'll be
19 happy to share the reference document
20 with you after we're done.
21     Q.    And, again, this 2000
22 LI-RADS CORE is what is current today;
23 correct?
24         ATTORNEY ROSE:  Object to

Page 269

1    the form.  I'm sorry.  I just want
2    to make sure.  Did you say 2000?
3         ATTORNEY VAUGHN:  2018
4    LI-RADS CORE, the one we're
5    looking at, this current exhibit,
6    that is current today; correct?
7         ATTORNEY ROSE:  Object to
8    the form.
9         THE WITNESS:  As I stated
10   before, there are updates that are
11   available on the -- on the
12   website, including, most
13   importantly, the lexicon is
14   clarified and made -- made less --
15   like, made -- made much more
16   clearer how to apply it.
17        There's no -- there's no
18   contradiction in the lexicon to
19   what is in the CORE.  It's just
20   clarification and more operational
21   definitions so that people are --
22   it's more clear how to apply these
23   definitions.
24 BY ATTORNEY VAUGHN:

68 (Pages 266 - 269)

VICTORIA CHERNYAK, MD, MS

Page 270

1  Q. And the 2018 LI-RADS CORE
2 lists a required image as the delayed
3 phase; correct?
4  A. It -- yes.
5  Q. And you did not have a
6 delayed phase with Mr. Roberts; correct?
7  A. Correct.
8  Q. And when did you realize
9 that you did not have a delayed phase in
10 the 2016 of Mr. Roberts?
11  A. When I was reviewing the
12 study, as I would review the study in
13 realtime, things don't always function
14 the way you want them to be. For that
15 particular study, what I had was
16 sufficient to apply LI-RADS 3 category.
17   I knew that the addition of
18 delayed phase wouldn't change that and so
19 I didn't make a big deal out of it
20 because I knew that it would just add to
21 confusion rather than clarity.
22  Q. So you didn't talk about the
23 fact that there's a missing image that
24 was required because it would cause

Page 271

1 confusion?
2   ATTORNEY ROSE: Object to
3   the form.
4   THE WITNESS: Again, as I
5   think -- I believe I mentioned,
6   there are multiple institutions
7   that choose to omit the delayed
8   phase for the sake of saving
9   radiation exposure to patients.
10   I've worked at two such
11   institutions -- I'm actually
12   working currently at such
13   institution -- and I apply LI-RADS
14   on a virtually daily basis.
15   So it is -- is it perfect in
16   compliance with what the CORE
17   says? No. Is it done in clinical
18   practice? Yes. Is it done in
19   clinical practice a lot? Yes.
20 BY ATTORNEY VAUGHN:
21  Q. And would you tell your
22 students that the 2016 CT of Mr. Roberts
23 is an ideal scan to apply LI-RADS to?
24   ATTORNEY ROSE: Object to

Page 272

1   the form. This is asked and
2   answered.
3   THE WITNESS: I'm sorry.
4   What was the last thing you said?
5 BY ATTORNEY VAUGHN:
6  Q. Would you tell your students
7 that the 2016 CT --
8  A. No, no -- I'm sorry.
9  Q. -- of Mr. Roberts is an
10 ideal scan to apply LI-RADS to?
11  A. Again, great question. And
12 we are working right now on what's called
13 an adequacy score that reflects the
14 adequacy of examination, recognizing that
15 imperfect exam in terms of quality may
16 still be adequate to -- to answer the
17 question.
18   So right now, a similar
19 score is available for ultrasound, but
20 not for CT and MR, and we are going to
21 introduce a similar score for CT and MR.
22   So if I were to discuss this
23 case with a student, I would explain to
24 them that in this case, even though this

Page 273

1 study is not -- would not qualify as a
2 perfect study, it is adequate for
3 answerable clinical question.
4   So in this case, I would
5 assign as a category B, which means that
6 the exam is not perfect, but adequate to
7 answer a clinical question.
8   So in this case, the
9 obtained images are sufficient and
10 adequate for me to assign LR-3 category.
11 BY ATTORNEY VAUGHN:
12  Q. You said there is a similar
13 score available for ultrasound. What do
14 you mean by that?
15  A. There -- excuse me. Let me
16 just shift the dog. I apologize.
17   (Pause.)
18   THE WITNESS: There is a --
19   remember I said that there are
20   other algorithms? So right now,
21   there is a -- there's an
22   ultrasound LI-RADS and it
23   incorporates the visualization
24   score as an A, B, and C, which

69 (Pages 270 - 273)

VICTORIA CHERNYAK, MD, MS

Page 274

1 reflects how well an examination
2 is able to assess the liver.
3     This is not in my report
4 because I was not discussing the
5 ultrasound, but I'm saying that
6 we're using that to model a
7 similar idea for -- for a CT and
8 MR.
9     So, again, if I were to
10 discuss this case with my student
11 currently, today, that's what I
12 would explain to them, that even
13 though the study is not --
14 technically meets perfect the
15 requirement, it's still adequate
16 to answer clinical question.
17 BY ATTORNEY VAUGHN:
18   Q.   And he had an ultrasound
19 done on this 4/8/2016 that you called a
20 CT. Did you attempt to apply the
21 ultrasound LI-RADS to this April 8th,
22 2016 ultrasound?
23   A.   No.
24        ATTORNEY ROSE:  Object to

Page 275

1 the form.
2        THE WITNESS:  I was -- I was
3 -- I was not asked to provide an
4 opinion on that ultrasound.  I did
5 look at it.  There are technical
6 requirements for -- you know, for
7 the ultrasound, including sending
8 images, which I don't believe were
9 available.
10 BY ATTORNEY VAUGHN:
11   Q.   What LI-RADS would you have
12 given the ultrasound?
13        ATTORNEY ROSE:  Object to
14 the form.
15        THE WITNESS:  I would have
16 to go back and look, but it would
17 -- based on the report and I
18 believe my -- my recollection of
19 that -- those images is concordant
20 with the report, there was an
21 observation there that was over a
22 centimeter, which makes a -- which
23 means a category -- which means
24 positive, which should trigger

Page 276

1 diagnostic CT and MR, which
2 happened in this case, so things
3 are concordant.
4 BY ATTORNEY VAUGHN:
5   Q.   And what was seen in the
6 ultrasound when it was followed up by the
7 CT was found to be noncancerous; correct?
8        ATTORNEY ROSE:  Object to
9 the form.
10        THE WITNESS:  What we did
11 not see on CT something that
12 corresponding to what was seen on
13 ultrasound.
14        ATTORNEY VAUGHN:  I have no
15 further questions.
16        THE VIDEO TECHNICIAN:  Any
17 additional questions?
18        ATTORNEY ROSE:  No
19 additional questions, thank you.
20        ATTORNEY VAUGHN:  Thanks,
21 Nina.  Thank you, Dr. Chernyak.
22 Enjoy the rest of your day.
23        THE VIDEO TECHNICIAN:  That
24 concludes today's deposition.  The

Page 277

1 time is 3:10 p.m.
2        (Witness excused.)
3        (Deposition concluded at
4 approximately 3:10 p.m.)

70 (Pages 274 - 277)