# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | **MDL No. 2875**<br><br>**HON. RENÉE MARIE BUMB** |
| **THIS DOCUMENT RELATES TO:**<br>*Roberts v. Zhejiang Huahai Pharmaceutical Co. Ltd.*,<br><br>Case No. 1:20-cv-00946 | |

### PLAINTIFFS' REPLY BRIEF IN SUPPORT OF *DAUBERT* MOTION TO PRECLUDE OPINIONS OF DEFENSE EXPERT ANDREW THOMPSON, PH.D.

MAZIE SLATER KATZ & FREEMAN, LLC
103 Eisenhower Parkway, Suite 207
Roseland, New Jersey 07068
973-228-9898

.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ........................................................................................................... 2

    I.   DR. THOMPSON'S OPINIONS
        SHOULD BE PRECLUDED PURSUANT TO *DAUBERT* .................. 2

        A.  Rebuttal Experts Must Comply with *Daubert* .................................... 2

        B.  Dr. Thompson's Lack of Experience with Nitrosamines
            Is Relevant ............................................................................................. 3

        C.  Dr. Thompson's Ipse Dixit Experience Is Not an Adequate Basis
            For His Opinions ................................................................................... 4

        D.  Dr. Thompson Cannot Offer Regulatory Opinions ............................ 6

        E.  Dr. Thompson's Failure to Consider the Warning Letter ................. 6

        F.  Dr. Thompson Cannot Be Permitted to Testify About the
            July 2017 Email .................................................................................... 7

        G.  Dr. Thompson Cannot Be Permitted to Testify About
            the Certificates of Analysis ................................................................. 8

        H.  At Most, Only Rebuttal Opinions Should Be Permitted ................... 9

CONCLUSION ...................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
　　509 U.S. 579 (1993).................................................................................. *passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
　　43 F.3d 1311 (9th Cir. 1995) ...........................................................................3

*Decker v. GE Healthcare Inc.*,
　　770 F.3d 378 (6th Cir. 2014) ............................................................................3

*Freedom Mortg. Corp. v. LoanCare, LLC*,
　　No. CV1602569-RMB/AMD, 2023 WL 2570201
　　(D.N.J. Mar. 20, 2023) (Bumb, J.)...............................................................2,3,6

*Montgomery County v. Microvote Corp.*,
　　320 F.3d 440 (3d Cir. 2003) .............................................................................3

*In re Mirena*,
　　341 F. Supp. 3d 213 (S.D.N.Y. 2018) ..............................................................7

*United States v. Ancient Coin Collectors Guild*,
　　899 F.3d 295 (2018) .........................................................................................3

**Rules**

Fed. R. Evid. 702 .......................................................................................*passim*

ii

## **PRELIMINARY STATEMENT**

Dr. Thompson is characterized as a rebuttal expert in an attempt to shield him from scrutiny as to the basis and reliability for his opinions. However, his opinions are not purely rebuttal to Plaintiffs experts. Moreover, Defendants are incorrect that rebuttal opinions do not need to satisfy Rule 702 and *Daubert*. In fact, this Court has excluded rebuttal experts for failing to comply with those requirements, and it should do so again here, to the extent the opinions are rebuttal opinions. And to the extent the opinions are affirmative opinions, they should be precluded since the defense has chosen to present him only as a rebuttal expert.

Dr. Thompson's complete lack of experience with nitrosamines is relevant. The applicable regulatory framework required ZHP to use "every feasible technical effort" to prevent the formation of genotoxic or carcinogenic compounds, including nitrosamines like NDMA, which are specifically mentioned as being of "extremely high carcinogenic potency." Dr. Thompson's ipse dixit "experience" to the contrary does not satisfy Rule 702 or *Daubert,* and raises the bar for him to establish his qualifications and the reliability of his methodology.

Perhaps recognizing the weaknesses, ZHP admits Dr. Thompson will not proffer any regulatory opinions, and so the Court should exclude them to the extent found in his report, such as his cherry-picked reliance on FDA press releases while ignoring the applicable FDA standards and FDA Warning Letter issued to ZHP

1

concerning the valsartan at issue in this case. It is fundamental that he cannot pick and choose the parts of the relevant body of documents to consider, excluding the parts that are not aligned with his opinions. Dr. Thompson's concession that his "interpretation" of the July 27, 2017 email does not "have much of a basis" and his "speculating" understanding of ZHP's certificates of analysis also warrants the exclusion of those opinions.

Last, to the extent the Court admits him to testify at all, Dr. Thompson's opinions should be narrowly limited to direct rebuttals of Plaintiffs' experts, as ZHP conceded he would in its opposition brief.

## ARGUMENT

### I. DR. THOMPSON'S OPINIONS SHOULD BE PRECLUDED PURSUANT TO *DAUBERT*

**A. Rebuttal Experts Must Comply with *Daubert*.**

Defendants contend that a rebuttal expert need not comply with *Daubert*. However, to the extent that Dr. Thompson is actually a rebuttal expert, he still must provide opinions based on his expertise, based on a reliable methodology. *Freedom Mortg. Corp. v. LoanCare, LLC*, No. CV1602569-RMB/AMD, 2023 WL 2570201, at *8 (D.N.J. Mar. 20, 2023) (Bumb, J.) ("Connally's rebuttal opinions are too speculative, despite her generalized industry experience. The Court thus finds that Freedom has not met its burden to establish that Connally's rebuttal opinions are

2

sufficiently reliable." (citing *Daubert*)); *see also, e.g.*, *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 447-49 (3d Cir. 2003) (excluding the defense expert after reciting the standard *Daubert* analysis); *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 318-19 (2018) (applying the standard *Daubert* analysis and holding: "The district court's application of the particularization requirement thus ensured that the Guild's rebuttal expert evidence 'fit' the questions presented in the forfeiture proceedings"); *Decker v. GE Healthcare Inc.*, 770 F.3d 378, 394 (6th Cir. 2014) (denying the defendants' appeal that "the district court violated *Daubert* because it excluded key rebuttal evidence proffered by [its] experts"). Rule 702 applies to all experts, there is no exclusion for rebuttal experts.

**B. Dr. Thompson's Lack of Experience with Nitrosamines Is Relevant.**

Dr. Thompson presents himself as an expert in organic chemistry, yet he admitted in his deposition that he had no knowledge of or experience with nitrosamines until very recently. Although this alone is not a basis for exclusion, it is a relevant consideration for the Court. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). His lack of knowledge or experience simply heightens the scrutiny of his knowledge and methodology. *Id*. This is especially true when the applicable regulatory framework discusses the need to consider and exclude the presence of nitrosamines. FDA, Guidance for Industry, *Genotoxic ad Carcinogenic Impurities in Drug Substances and Products*, p. 7, 8

3

(**Dec. 2008**) (stating, "Since drug-related impurities presumably provide limited, if any, therapeutic benefits and because of their potential to cause cancer in humans, **every feasible technical effort should be made to prevent the formation of genotoxic or carcinogenic compounds** during drug substance synthesis or drug product manufacturing," and "there are some compounds containing certain structural groups (aflatoxin-like-, **N-nitroso-**, and azoxy-structures) that **have extremely high carcinogenic potency** and are excluded from the threshold approach." (emphasis added)) (Ex. 4).[1]

### C. Dr. Thompson's Ipse Dixit Experience Is Not an Adequate Basis For His Opinions.

Defendants lean heavily on Dr. Thompson's work experience and job title. However, he admitted that his experience did not involve any evaluation or understanding of the knowledge in the scientific community of the significance of nitrosamines. Instead, he based his opinions only on what happened at the company he worked at – with no basis to extrapolate that out to the wider community:

> Q. And when you talked about industry practice, you were basing that on your own experience and the work that you did in your own labs; correct?
> \* \* \*
> THE WITNESS: Yes.

---

[1] All exhibits are attached to Plaintiffs' original motion.

> Q. You didn't do a study or analysis of what other people were doing or what was being done across the industry, you based it on your own experience in your own work; correct?
>
> A. Yes.

(Thompson Dep. Tr. 86:25-87:11 (Ex. 2)).

He also failed to address any of the governing standards from the FDA, ICH, ZHP's own SOPs, or ZHP's corporate testimony as to its obligations. (*Id.* at 61:8-62:3, 63:12-18, 65:16-22, 85:8-24). For example, he did not reference the scientific analysis required by the standards, directly or indirectly. He also failed to perform any research or analysis into the questions he purported to answer. (*Id.* at 28:19-20).

Defendants attempt to deflect this damaging lack of basis by pointing to his lack of knowledge of nitrosamines as representative of the lack of knowledge within the industry. First, he cannot extrapolate what happened in his laboratory to the rest of the chemistry community as he offers absolutely no basis to do so. He admitted to not knowing the knowledge in the overall community. He did nothing to study and establish a basis. (*Id.* at 86:25-87:11). Second, industry practice is a red herring and of no moment. The FDA specifically criticized ZHP in its Warning Letter for relying on purported industry practice, confirming that industry practice does not always equate to what is required by cGMPs. (*Id.* at 86:11-21 ("Your response states that predicting NDMA formation during the valsartan manufacturing process required an extra dimension over current industry practice, and that your process

5

development study was adequate. We disagree. We remind you that common industry practice may not always be consistent with CGMP requirements, and that you are responsible for the quality of drugs you produce."). This Court has also excluded "rebuttal" experts based on mere experience and "industry practice." *Freedom Mortg. Corp.*, 2023 WL 2570201, at *8 (Bumb, J.) ("Connally's rebuttal opinions are too speculative, **despite her generalized industry experience**." (emphasis added)). It should do the same here.

### D. Dr. Thompson Cannot Offer Regulatory Opinions.

Defendants concede Dr. Thompson is not a regulatory expert, or an expert with regard to cGMPs, so he should be precluded from offering such opinions.

### E. Dr. Thompson's Failure to Consider the Warning Letter.

Dr. Thompson predictably relies on isolated cherry-picked statements in FDA communications to assert that the FDA did not expect ZHP or any other manufacturer to be able to foresee the potential nitrosamine issues. (Dr. Thompson R. 5 (Ex. 1)). However, in his deposition, Dr. Thompson admitted to decisive methodological flaws. First, he was not aware that the FDA communication actually criticized ZHP's lack of awareness, and pointed out that ZHP was issued a Warning Letter and was put on import ban as a result. (Dr. Thompson Dep. Tr. 67:25-69:18). Second, he never read the FDA Warning Letter in which the FDA explicitly rejected ZHP's argument that it was not expected to anticipate the risk of nitrosamine

6

formation. (*Id.* at 86:9-21). Dr. Thompson's methodology, in which he considered only parts of what the FDA said, and did not consider (or even know about) other directly on point statements by the FDA that refute his opinion, is fatally flawed. *In re Mirena*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) (holding, **"[M]ethodology ... aimed at achieving one result ... is unreliable, and ... must be excluded"**).

### F. Dr. Thompson Cannot Be Permitted to Testify About the July 2017 Email.

Dr. Thompson offers an ipse dixit opinion that the statement in the July 27, 2017 email stating that the impurity seen in an experimental Irbesartan batch looked like the NDMA in Valsartan, which was created by the sodium nitrite quenching does not mean what it says.

> Q. You state in your report, "It is difficult to interpret this e-mail." Why did you say that?
>
> A. ….**And then out of the blue comes this sentence, you know, similar to the NDMA found in valsartan.** It's kind of a non -- it's a non sequitur. **So, I mean, quite honestly, I thought it was poorly interpreted. I just thought my interpretation was wrong, and that those words weren't right -- weren't a perfect interpretation of what was written in the e-mail.**
>
> **And, you know, I don't have much of a basis for saying that.**

(Dr. Thompson Dep. Tr. 105:20-106:25 (emphasis added)). As he admits, he has no basis for this opinion other than his bias as a ZHP expert.

He has no basis to contradict the translation of the email by Plaintiffs and ZHP – which are consistent, or the reading of the email by ZHP 30(b)(6) witness Min Li,

7

who was a recipient of the email. Apart from the fact that he does not speak, read, or write Chinese, he cannot rely on the translation of the email itself to opine that the translation makes no sense and must be incorrect. But that is his opinion. Again, the record contains translations from Plaintiffs and ZHP, and Min Li's testimony, and Dr. Thompson cannot be permitted to opine to the contrary based on his own biased interpretation, which has no basis in fact.

### G. Dr. Thompson Cannot Be Permitted to Testify About the Certificates of Analysis.

Defendants attempt to deflect from Dr. Thompson's clear admission that he had no knowledge of the interpretation or application of the Chinese DMF standard for a manufacturer's certificate of analysis – most important the references to Dimethylamine. He testified that his purported understanding was speculation:

> Q. ….You mentioned that the alkalinity could be due to bases including dimethylamine and a few other substances. Can you tell me again what those substances are?
>
> A. So hold on. Let me get to the equation. The possibility -- so one of the possibilities potentially -- I mean, the bases that would be stable in DMF would be a carbonate base. Now I see methoxide for methylformate. There could be methoxide in there. There's a number of different bases that could be in there. Not just -- there's a number of different bases that could be in there.
>
> Q. Well, I want to know the ones that you can identify for me. You said carbonate base or methoxide?
>
> A. Carbonate base -- yeah, so methylformate and methylamine, that will give off methanol, not methoxide. So -- **and I don't know if they used**

**carbonate in the process at all, if there are any catalysts that use it. So this -- you know, I don't know exactly if they just mix those two ingredients with no catalyst and heat them up, or what they do,** but...

**So I'm just -- you know, assuming there's a catalyst, there could be things that come off the catalyst that are bases, like carbonate.** You know, that's -- so that's a total base content. Otherwise they would just say this is the amount of dimethylamine in there. Why don't they say that? Why do they say calculated as dimethylamine? **There must be other bases in there for them to make a generic formula like that.**

**Q. You're speculating as to that; correct?**

**A. I'm speculating.** …. **Yeah, of course I'm speculating. I'm sorry. Yes, I'm -- I didn't put the formula together. I'm speculating.**

Q. The only base referenced here is dimethylamine; correct?

A. Yes.

(Thompson Dep. Tr. 165:15-167:7 (emphasis added)). Moreover, his speculation is contrary to the plain language of the standard, which references the presence of the most prevalent base in the DMF, dimethylamine, as an impurity. His speculation for how he (and ZHP) would like to think the COA should be interpreted is without any objective basis, and should be precluded.

### H. At Most, Only Rebuttal Opinions Should Be Permitted.

Based on the Defendants' position that he is a rebuttal expert, any opinions that are affirmative opinions dressed up as "rebuttal" opinions must be excluded.

9

This includes the following opinions – which do not even directly rebut the opinions he claims to respond to, and in some cases do not even fit the case:

- "It is impossible, however, for any drug substance developer or manufacturer to anticipate, in advance of production, every impurity (including genotoxic impurities) that may form in a drug substance based solely on a review of the manufacturing components and processes. This is because the world of potential impurities, and the mechanisms by which they can form, in any drug substance is nearly infinite, and trace and sub-trace amounts of countless impurities can be present in any drug substance. Further, the formation of low-level, trace impurities in drug substances is often the result of multi-step processes, by non-typical, minor reaction pathways in which drug components interact, often in unexpected ways, in the different reactions used in the development and manufacturing processes. It is therefore inaccurate, as a matter of science and basic logic, to suggest that it is possible for a chemist—or drug substance development lab—to anticipate the formation of all, or even a majority, of previously-unknown impurities in a drug product based on general chemistry knowledge. This is also true in circumstances in which a change is made to the process for manufacturing drug substances. In my experience, most trace impurities that appear during the research and development phase for a drug substance are unexpected. At my lab, we were generally alerted to the presence of impurities by the observation of new peaks on a chromatogram that were above the identification threshold of 0.10%." (Dr. Thompson R. 3).

- "Nitrosamine Impurities Such As NDMA Were Not Expected—Or Routinely Tested For—In Drug Substance Prior to 2018." (*Id.* at 4).[2]

- "After the discovery of NDMA in valsartan API, 'many investigations were carried out, which detected traces of these impurities in Ranitidine, a H2 blocker used to treat acidity or stomach ulcers' and '[e]xtremely low levels were also identified in some batches of Metformin hydrochloride.' As a result of these discoveries, '[m]ajor pharmaceutical regulatory agencies in the world like European Medicines Agency (EMA) and US-Food and Drug Administration (USFDA) have provided guidelines on controlling nitrosamines in human medicines for approved marketing authorization holders,' have 'requested all marketing authorization holders of pharmaceutical products to complete an initial

---

[2] This type of unqualified opinion is not tailored to rebut Plaintiffs' experts, as they never made this assertion.

risk evaluation of their respective products,' and have 'taken steps to provide specific and sensitive analytical methods for nitrosamine detection from drug substances and products.' In addition, 'pharmaceutical companies are now required to monitor the presence and level of nitrosamine contamination.'" (*Id.* (citing Akkaraju et al. "A comprehensive review of sources of nitrosamine contamination of pharmaceutical substances and products." Regul Toxicol Pharmacol. 2023 Mar:139:105355. doi: 10.1016/j.yrtph.2023.105355. Epub 2023 Feb 13.)).[3]

- "In my own substantial experience in the development of drug API, I did not expect NDMA in any of the hundreds of drug substances on which I worked prior to the discovery of NDMA in multiple drug substances around the 2018 timeframe…. It was not until after the valsartan recall (and subsequent recalls of other pharmaceutical drug products based on the discovery of nitrosamines in valsartan) that there was a broad awareness of the potential for NDMA in drug substance or product that triggered routine investigation and testing for it." (*Id.* at 5).[4]

- "Prior to 2018, my lab (which as noted included 70 process chemists among many other scientifically knowledgeable employees) never considered the possibility of NDMA formation in the intermediates or API we prepared. My lab never encountered a stable nitrosamine, like NDMA, that was capable of being isolated. After the Valsartan recall in 2018, the potential for formation of nitrosamines, including NDMA, became one of the most important and discussed topics in the industry. Seminars were given, panel discussions were happening at trade shows that I attended (such as Chem Outsourcing in Parsippany, New Jersey), and company training for nitrosamine education became standard. It remained a hot topic for years. Test methods for NDMA detection and low-level quantitation became available. Analytical contract labs began advertising the ability to test for NDMA. At that point, all or nearly all of J-STAR's customers (nationwide) began to inquire about the company's strategy for nitrosamine risk mitigation and testing. Discussion of the issue of nitrosamines in drug substance, including their

---

[3] Drs. Hecht and Najafi did not discuss this article, and Dr. Thompson's analysis even references drugs and regulatory actions outside the scope of this case.

[4] Drs. Hecht and Najafi did not assert that nitrosamine formation was expected across hundreds of drugs. They focused on the actual chemicals and chemical reactions introduced to the manufacturing process by ZHP, and the need to address the potential formation of NDMA only in that manufacturing process based on the constituents.

11

potential formation, prevention, and appropriate analytical testing, is now a widespread, commonplace industry standard—but was not prior to 2018." (*Id.*).[5]

- "However, IARC monographs are not a source of literature on which process chemists are trained; nor are they used in our work. It is not reasonable to expect that any process chemist at ZHP or elsewhere would seek out this literature prior to the first observation of a nitrosamine impurity in API in 2018." (*Id.*).[6]

- "The Test Methods For Identifying And Measuring NDMA In Pharmaceutical Drug Substance Were Not Developed By The FDA Until After The Valsartan Recall." (*Id.* at 6).[7]

- "As detailed in the Amended Report of Dr. Ali Afnan, ZHP tested its valsartan API for impurities using gas chromatography with flame ionization detection ('GC-FID') consistent with the procedures set forth in accordance with the United States Pharmacopeia ('USP') monograph on valsartan and USP's standards for testing for residual solvents. (*See* Afnan Rep. ¶¶ 173-79.) It was not until after NDMA was first discovered in valsartan API in 2018 that the FDA developed a 'gas chromatography-mass spectrometry (GC/MS) headspace method to detect the presence of NDMA . . . in valsartan' and other different drug substances. (*Id.* ¶ 182.)." (*Id.* at 7).[8]

- "But prior to 2018, GC-MS would not have been the standard for routine residual solvent analysis used in API release testing. Since nitrosamines were not detected or expected in API prior to 2018, it is not reasonable to suggest that a non-routine

---

[5] Same as the prior opinion, except that Dr. Thompson's ipse dixit experience after the recall is even more beyond the scope of the opinions of Plaintiffs' experts and this case in general.
[6] This opinion is based on Dr. Thompson's limited ipse dixit "experience," and no research in the literature. On the other hand, Dr. Thompson's subsequent analysis of the IARC monograph is an example of an actual rebuttal opinion. (*Id.* at 5-6).
[7] This opinion does not rebut any opinion given by Plaintiffs' experts.
[8] Dr. Thompson's ipse dixit experience and Dr. Afnan's own affirmative opinion are not a direct rebuttal to Plaintiffs' experts. Dr. Thompson even admits that Plaintiffs' experts actually agree with the facts underlying Dr. Thompson's attempt to use the FDA's 2018 testing as a red herring to distract the jury from the real question at issue—whether such testing was feasible before 2018 if ZHP had attempted to conduct it—which is admitted. (*Id.*).

12

instrument such as GC-MS should have been procured and used to test for them." (*Id.*).[9]

- "….especially because it does not match my experience in the field. At J-STAR, we tested residual solvents for API release testing using headspace GC-FID during my entire tenure there."[10]

- "Further, it is notable that even Novartis, the potential customer that first identified the impurity peak that turned out to be NDMA in 2018, was not using GC-MS for its qualification of ZHP-supplied valsartan—and instead had to go to an outside laboratory, Solvias AG, for GC-MS testing once the peak was observed. (*See* Afnan Rep. ¶¶ 104-105.)" (*Id.* at 8).[11]

- "Based on the information known to me, as a research process chemist developing drug substances, prior to 2018, I would not have expected the decomposition of DMF into DMA and the subsequent nitrosation of DMA during the quenching process to form NDMA." (*Id.*).[12]

- "If I had reviewed valsartan's API manufacturing process steps and components prior to 2018, I would not have expected that nitrosamines would or could form in valsartan API. Indeed, as explained in Dr. Afnan's report, chemists at the FDA reviewed the Drug Master Files for valsartan API that detailed the manufacturing

---

[9] Plaintiffs' experts do not opine that GC-MS was required on a routine basis. Rather, they opine that it was required here based on the specific inputs to the manufacturing process and risk of nitrosamine formation.

[10] More ipse dixit experience, and he does not address whether the risk of nitrosamine formation even existed in any of those processes. Without that threshold, the opinion is untethered to this case.

[11] Dr. Thompson cannot turn Dr. Afnan's affirmative opinions into rebuttal opinions of Plaintiffs' experts. Moreover, he does not know that the ZHP new manufacturing process was unknown to Novartis.

[12] Dr. Thompson's ipse dixit experience is not a rebuttal opinion, and it is also a red herring, as Plaintiffs' case is premised on what a reasonable chemist would have known and what they should/could have known based on the regulatory standards requiring a robust scientific assessment of the processes at issue, including independent research into the chemistry, something Dr. Thompson completely failed consider or to do in this case.

13

processes and changes at issue and did not raise any concerns about nitrosamine formation prior to 2018. (*See* Afnan Rep. ¶¶ 66-67; 76-79.)." (*Id.*).[13]

- "Further, chemists purchasing DMF that is already pure grade, from a qualified supplier, would not be consulting an undergraduate-level handbook outlining how to purify the solvent, especially because DMF is a well-known and widely used solvent in process chemistry and API manufacturing processes. In my experience as a chemist who has long worked with DMF solvent in processes for developing drug substances, the focus of a chemist using DMF is on how well the desired reaction performs using the solvent, as well as isolating the desired product from the DMF reaction mixture. The quenching process will turn the DMF into a waste stream (typically in a separated aqueous phase containing inorganic salts), and minor reactions taking place in a waste stream are not a significant focus." (*Id.* at 9).[14]

- "This is consistent with my substantial experience in investigating and identifying the cause of impurities in drug substance over the course of my career. As explained above, once an impurity over the relevant investigation threshold is identified, chemists can work backwards to determine the mechanism by which the impurity developed and how it can be prevented in the drug substance. This process of investigating an impurity provides chemists with new knowledge and information that often could not have been reasonably foreseen prior to the impurity being identified, often due to the complex and multi-step nature of the chemical reactions involved in creating drug substances." (*Id.* at 9).[15]

---

[13] As already explained, Dr. Thompson's ipse dixit experience is not a reliable touchstone, as he offers no evidence that his experience is representative of the experience of other chemists. Dr. Afnan's independent affirmative opinions are not narrowly tailored rebuttals to Plaintiffs' experts.

[14] Plaintiffs have already explained why Dr. Thompson's opinions on ZHP's certificates of analysis should be excluded. This opinion directly implicates the fact that ZHP's certificates of analysis for DMF explicitly reference the DMA that resulted in the NDMA contamination at issue in this case. Moreover, Dr. Thompson's isolated experience is not a reasonable basis to opine at trial.

[15] This is another example of Dr. Thompson's affirmative "industry practice" or "experience" opinions. He does not have any basis to extrapolate his experience to any other chemist based on his own concessions at the deposition.

14

- "In short, at the time that ZHP was using DMF solvent to manufacture valsartan, it was a widely popular solvent used routinely in API manufacturing processes. **In my experience**, it was not a well-known concern within the pharmaceutical industry that DMF solvent could include, or degrade into, the secondary amine DMA prior to the valsartan recall. Further, the possibility of nitrosamine formation directly from DMF in a manufacturing process that included NaN3 (sodium azide) and NaNO2 (sodium nitrite), which could give off the nitrous acid necessary to form nitrosamines, was not reasonably expected at that time. To the contrary, these reactions only became widely known to research chemists in the pharmaceutical industry because of the valsartan recall leading to this litigation. **In my substantial experience** and work in the pharmaceutical industry, the use of DMF solvent—even in the context of a reaction involving sodium nitrite—would not have raised a concern about nitrosamine formation among reasonable process chemists until after the valsartan recall." (*Id.* at 9-10).[16]

- "…and are inconsistent with the knowledge, general practice, and concerns held by chemists in the pharmaceutical industry at that time." (*Id.* at 10).[17]

The affirmative opinions must be barred. Defendants cannot have it both ways. The lack of basis, and reliance on his own narrow experience, is dispositive.

## CONCLUSION

For the foregoing reasons and those set forth in the original moving papers, Dr. Thompson should be precluded from offering any of his proffered opinions.

---

[16] Dr. Thompson does not qualify this opinion as a rebuttal to Plaintiffs' experts, and his ipse dixit "experience" is an affirmative opinion itself. He posits himself as representative of the industry's knowledge with no basis to do so.

[17] As already explained, Dr. Thompson's ipse dixit "experience" and "industry practice" opinions are affirmative, not rebuttal.

15

Respectfully,

PLAINTIFFS' CO-LEAD COUNSEL

By: /s/Adam M. Slater
ADAM M. SLATER
Mazie Slater Katz & Freeman, LLC
103 Eisenhower Parkway
Roseland, NJ 07068
973-228-9898
Fax: 973-228-0303
aslater@mazieslater.com

Dated: July 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2025, I electronically filed this brief and my supporting certification with the Clerk of the Court using CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

                                                **MAZIE SLATER KATZ & FREEMAN, LLC**
                                                Attorneys for Plaintiffs

                                                By:   /s/ Adam M. Slater

Dated:  July 17, 2025