UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>*Gaston Roberts et al. v. Zhejiang Huahai Pharmaceutical Co., et al.,*<br><br>Case No. 1:20-cv-00946-RBK-JS | MDL No. 2875<br><br>Honorable Renée Marie Bumb<br>District Court Judge |

**<u>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE THE OPINIONS OF DR. WILLIAM SAWYER</u>**

# TABLE OF CONTENTS

    **Page**

ARGUMENT ..................................................................................................2

I.    DR. SAWYER'S USE OF FALSIFIED CITATIONS WAS NOT A RELIABLE METHODOLOGY, SOUGHT TO DECEIVE THE COURT, AND SHATTERED HIS CREDIBILITY. ......................................2

II.    DR. SAWYER'S GENERAL CAUSATION OPINION IS UNRELIABLE REGARDLESS OF HOW IT IS LABELED. ........................4

    A.    Dr. Sawyer Improperly Relies On Animal, Dietary And Occupational Studies, As Well As Studies That Do Not Involve Liver Cancer. ................................................................5

    B.    Dr. Sawyer's Bradford Hill "Assessment" Is Not The Product Of A Reliable Methodology. ..........................................6

III.    DR. SAWYER'S DOSE EXTRAPOLATION CALCULATIONS ARE UNRELIABLE. ..........................................................................10

CONCLUSION ..............................................................................................12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Acetaminophen - ASD-ADHD Products Liability Litigation*,
    707 F. Supp. 3d 309 (S.D.N.Y. 2023) ...........................................................8, 10

*Burst v. Shell Oil Co.*,
    No. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015) ................................11

*Jones v. Novartis Pharmaceuticals Corp.*,
    235 F. Supp. 3d 1244 (N.D. Ala. 2017)...............................................................9

*Kohls v. Ellison*,
    No. 24-CV-3754, 2025 WL 66514 (D. Minn. Jan. 10, 2025) ........................3, 4

*Mata v. Avianca, Inc.*,
    678 F. Supp. 3d 443 (S.D.N.Y. 2023) .................................................................3

*In re Rezulin Products Liability Litigation*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005) ..........................................................7, 12

*Tamraz v. Lincoln Electric Co.*,
    620 F.3d 665 (6th Cir. 2010) ...............................................................................7

*In re Zantac (Ranitidine) Products Liability Litigation*,
    644 F. Supp. 3d 1075 (S.D. Fla. 2022)......................................................*passim*

*In re Zantac (Ranitidine) Litig.*,
    No. 255, 2024, 2025 WL 1903760, --A.3d-- (Del. July 10, 2025).............2, 6, 12

Plaintiff attempts to argue that Dr. Sawyer did not misuse Artificial Intelligence; that he can offer general causation opinions without opining on general causation; and that his dose-exposure estimates for Mr. Roberts are not speculative. All of these arguments fail.

***First***, Plaintiff seeks to deflect the Court's attention from Dr. Sawyer's misuse of AI by burying the issue at the end of her brief and downplaying it as a mere "citation error." But this is not some trivial citation error; rather, Dr. Sawyer blindly relied on as-yet-unidentified AI tools to generate sources that do not exist. He then used those fake sources to write his report and he lied about having read those non-existent sources at his deposition. This alone disqualifies him from testifying at trial.

***Second***, Plaintiff insists that Dr. Sawyer is not offering a general causation opinion at trial but should still be allowed to discuss the valsartan epidemiology and apply the Bradford Hill factors as part of his broader toxicology opinions. Changing the label of Dr. Sawyer's opinions does not solve any of the fundamental problems with his approach to these subjects, including (most fundamentally) his unreliable attempt to compensate for the extremely weak risk reported in the epidemiologic literature with inapposite occupational, dietary, and animal studies. Accordingly, this argument, too, should be rejected.

***Lastly***, Plaintiff fails to demonstrate that Dr. Sawyer's dose calculations—

1

which he produced by engaging in highly speculative extrapolations from the Hidajat study—are reliable. Notably, Dr. Sawyer's "wholesale dependence" on Hidajat led the Delaware Supreme Court (just last week) to exclude similarly speculative and unreliable dose calculations with regard to NDMA in ranitidine. *See In re Zantac (Ranitidine) Litig.*, No. 255, 2024, 2025 WL 1903760, at *17 -- A.3d-- (Del. July 10, 2025) ("Dr. Sawyer's opinions faced numerous challenges," including that study involved "other exposures" and "other established carcinogens" and was "'a bridge too far'") (citation omitted).

For all of these reasons, and the reasons set forth in Defendants' opening brief, Dr. Sawyer's expert opinions should be excluded in their entirety.

## ARGUMENT

**I.   DR. SAWYER'S USE OF FALSIFIED CITATIONS WAS NOT A RELIABLE METHODOLOGY, SOUGHT TO DECEIVE THE COURT, AND SHATTERED HIS CREDIBILITY.**

Plaintiff does not dispute that Dr. Sawyer relied on numerous fabricated, non-existent, and apparently AI-generated scientific articles in his expert report. (*See* Mem. at 9-12; Opp'n at 32-33, 35 (noting "ten citations at issue (roughly 7% of the total references)" were fake).) Instead, Plaintiff attempts to excuse these egregious methodological defects by arguing that: (1) Dr. Sawyer "forthrightly explained" that he used AI (Opp'n at 32); and (2) the 10 falsified sources were "not central to Dr. Sawyer's core analysis" (Opp'n at 33; *id.* at 36-37). Neither excuse

2

passes muster.

***First***, far from "forthrightly explain[ing]" that he used AI in writing his report, Dr. Sawyer falsely testified on multiple occasions that the phantom articles he cited exist and that he had reviewed them. (*See* Sawyer 5/2/2025 Dep. 63:14-25 (Mem. Ex. 5) (asserting that Yuan 2027 "is a real article that [he] reviewed"); *see also id.* 70:12-71:7 ("I recall reviewing [the Sokolow paper,] and I included the link . . . which was functional.").) Only ***after*** repeated questioning by defense counsel on the topic did Dr. Sawyer finally admit the citations were false and that they resulted from his use of either Google or AI. (*Id.* 72:13-17.) To this day, Dr. Sawyer and Plaintiff's counsel have not identified the particular tool that Dr. Sawyer used to "create" the fake citations, rendering Dr. Sawyer's dishonesty even more egregious than that in *Kohls v. Ellison*, No. 24-CV-3754 (LMP/DLM), 2025 WL 66514, at *3 (D. Minn. Jan. 10, 2025) (cited in Mem. at 1, 10-12). Plaintiff does not address this squarely on-point authority, effectively conceding its applicability.[1]

***Second***, Plaintiff's attempt to paint Dr. Sawyer's citation to ***10*** fake sources as insubstantial and "peripheral" (Opp'n at 35), is foreclosed by Dr. Sawyer's

---

[1] While Plaintiff cites *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 461-62 (S.D.N.Y. 2023) (sanctioning attorney for use of false citations), for the proposition that Dr. Sawyer's use of fake citations did not amount to the "bad faith" required for Rule 11 sanctions (Opp'n at 34-35), the question here is whether Dr. Sawyer's opinions are reliable, not whether he acted in bad faith.

3

testimony. At his deposition, Dr. Sawyer made clear that he used "wording [taken] directly" from the fake sources in drafting sections of his report. (Sawyer 5/2/2025 Dep. 67:22-24, 73:17-20; *see also id.* 60:10-23 (agreeing some of the language "is a quote from Yuan").) Moreover, those non-existent sources comprise the bases of Dr. Sawyer' causation opinions, which is presumably why he originally falsely claimed to have read them when questioned about them at his deposition. As the *Kohls* court explained, an expert's "citation to fake, AI-generated sources . . . shatters his credibility with th[e] Court" and "undermine[s] [the expert's] competence and credibility[.]" *Kohls*, 2025 WL 66514, at *4-5. That is precisely what happened here, which should be dispositive.

## II. DR. SAWYER'S GENERAL CAUSATION OPINION IS UNRELIABLE REGARDLESS OF HOW IT IS LABELED.

Plaintiff attempts to avoid the unreliability of Dr. Sawyer's general causation opinion by recharacterizing it as a specific cause opinion that happens to rely on general cause literature. Plaintiff then argues that Dr. Sawyer's discussion of the epidemiologic literature and his proffered Bradford Hill analysis should be admitted as part of his "case-specific toxicological analysis." (Opp'n at 11-12; *id.* at 23 (contending that Dr. Sawyer's "reliance on general causation literature" does not mean he is offering a "general causation opinion").)

The Court should not allow Plaintiff to muddy the waters in this manner. For one thing, Dr. Sawyer is not a medical doctor and does not offer any sort of

4

differential diagnosis opinion. Thus, he is not offering a specific cause opinion. In any event, giving Dr. Sawyer's opinions a new name cannot magically make them reliable. Regardless of how Plaintiff seeks to characterize Dr. Sawyer's opinions, he cannot offer unreliable testimony at trial on the published literature or the Bradford Hill factors.

### A.  Dr. Sawyer Improperly Relies On Animal, Dietary And Occupational Studies, As Well As Studies That Do Not Involve Liver Cancer.

Plaintiff argues that Dr. Sawyer should be allowed to rely on inapposite occupational, dietary, and animal studies because they support his biological plausibility opinion. (Opp'n at 18.) Of course, if Dr. Sawyer were a mere specific causation expert as Plaintiff now attempts to characterize him, he would not be offering an opinion on biological plausibility. Moreover, Dr. Sawyer does not limit his reliance on occupational, dietary, and animal studies to his biological plausibility opinions. (*See, e.g.*, Sawyer Rep. at 79 (Mem. Ex. 1) (explicitly relying on "dietary studies" and "occupational studies" to support Bradford Hill analysis).) And even if he did, his analysis of the literature still must be reliable.

Plaintiff also argues that Dr. Sawyer's use of occupational, dietary, and animal study data is appropriate because "[t]oxicologists routinely consider" these types of studies. (Opp'n at 18.) But Defendants have never argued that these types of studies are categorically off-limits as part of a causation analysis. Rather, their

5

point is that Dr. Sawyer does not grapple with the fundamental limitations of the NDMA dietary, rubber, and animal studies he relies on—including that they indisputably assess different species, vastly different exposures, and/or different cancers than those at issue in this case. (Mem. at 14-18.) The *Zantac* MDL court recognized that the exact same animal, dietary, and occupational studies could not support a causal opinion due to their limitations. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075 (S.D. Fla. 2022). And just last week, the Delaware Supreme Court reached the same conclusion with respect to Dr. Sawyer and others, finding that the experts did not adequately "explain their reliance on these studies and their rejection of epidemiological, peer-reviewed studies of the product[.]" *In re Zantac*, 2025 WL 1903760, at *10; *see also id.* at 17 (Dr. Sawyer's "wholesale dependence on the Hidajat study was [not] reliable"). Plaintiff cannot avoid the limitations of various cited papers by saying he will use them for "toxicological" opinions rather than "general causation" opinions.

### B. Dr. Sawyer's Bradford Hill "Assessment" Is Not The Product Of A Reliable Methodology.

Plaintiff also fails to demonstrate that Dr. Sawyer's cursory Bradford Hill analysis is sufficiently reliable under recently amended Rule 702. Once again, Plaintiffs cannot introduce unreliable Bradford Hill testimony at trial by couching it as a non-general causation opinion.

Plaintiff does not seriously address Dr. Sawyer's specificity, coherence,

6

biological plausibility, and analogy opinions, rendering ZHP's challenges to those Bradford Hill factors uncontested. (Mem. at 31-35.) And Plaintiff's smattering of arguments with respect to the strength of association, temporality, dose response and consistency factors lack any merit.

**Strength of Association**. Plaintiff ignores Dr. Sawyer's concession that the relative risk reported in the valsartan epidemiology is "weak" (Mem. at 21 (quoting Sawyer 5/1/2025 Dep. 111:16-23, 113:13-24)), and does not even try to defend Dr. Sawyer's speculative claim that studies with longer follow-up periods would show an increased risk ratio. (*See id.* at 22.) Rather, Plaintiff cherry-picks reanalyzed data within the Mansouri study to argue that it "underestimated the true risk[.]" (Opp'n at 13-15 (emphasis omitted); *see also id.* at 28.) But Dr. Sawyer never relied on this cherry-picked data to support his Bradford Hill opinion. Plaintiff cannot prop up his opinions with post-hoc rationalizations for it. *See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 407 (S.D.N.Y. 2005) ("None of these elaborations by counsel is relevant" because "[t]he subject of this motion is the proposed testimony of experts, not the theories of the lawyers."); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 672-73 (6th Cir. 2010) (the expert's "opinion cannot escape its own logic"). And in any event, Plaintiff's counsel's twisting of the authors' own reported conclusions contravenes basic epidemiology. *See In re Zantac*, 644 F. Supp. 3d at 1258 (excluding expert who "relies upon crude,

7

unadjusted data taken from supplementary tables appended to a study publication in lieu of the adjusted data forming the basis for the authors' conclusions").[2]

*Temporality*. Plaintiff highlights Dr. Sawyer's claim that NDMA is a "promoter" that allows for a shorter latency period (Opp'n at 26-27), but she ignores that Dr. Sawyer admitted that the only support he cited for this theory was an "error." (Sawyer 5/1/2025 Dep. 99:17-23.) Plaintiff also claims that a latency period as short as 6 months was established in Gomm because that study reported an overall small 16% increased risk of liver cancer among users of NDMA-contaminated valsartan (Opp'n at 27), but this reasoning is circular and requires the assumption that valsartan causes liver cancer—even though the Gomm authors explicitly stated that "[c]ausality cannot be inferred."[3] *See, e.g.*, *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 371 (S.D.N.Y. 2023) ("[A]n expert's opinion may not exceed the limitations that authors place on their own studies."); *In re Zantac*, 644 F. Supp. 3d at 1234 (excluding expert opinions on the basis that they "have no independent,

---

[2] Notably, the reanalyzed data from the Mansouri study on which Plaintiff relies—data that excludes mixed-exposure patients, data that includes only men, and data that includes only individuals using valsartan for more than three years— report risk ratios between 1.15 and 1.23: i.e., associations that are still considered weak by the scientific community, the study authors, and Dr. Sawyer himself. (*See* Sawyer 5/1/2025 Dep. 111:16-23, 113:13-24 (Mem. Ex. 6).)

[3] Willy Gomm et al., *N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer*, 118 Medicine 357, 360 (2021) (Mem. Ex. 3).

8

epidemiological scientific support for their conclusions" where "[e]ven the studies that facially found some evidence of an association exercised great restraint and caution in their conclusions, a far cry from any conclusion that ranitidine causes cancer").

***Dose-Response***. Plaintiff argues that the Mansouri authors never "claim[ed]" that their dose-response findings were "inverse." (Opp'n at 21.) But even Dr. Sawyer readily conceded that Mansouri "did not establish a clear dose response relationship between Valsartan and cancer risk." (5/1/2025 Sawyer Dep. 148:2-8.). Indeed, the Mansouri authors explicitly noted that they "found no evidence of a dose–response relationship between the daily dose of valsartan and the risk of any cancer by location" and that for liver cancer specifically, the hazard ratios were 1.14 "in patients treated with 80 mg/day or less and 0.99 . . . in those who received the highest dosage[.]"[4] That is the definition of an inverse relationship.[5]

***Consistency of Association***. Although Plaintiff broadly claims that Dr. Sawyer's consistency opinion is based on "a well-documented analysis of

---

[4] Imene Mansouri et al., *N-nitrosodimethylamine-Contaminated Valsartan and Risk of Cancer: A Nationwide Study of 1.4 Million Valsartan Users*, 11 J. of the Am. Heart Ass'n 1, 9 (2022) (Mem. Ex. 4).

[5] Plaintiff's suggestion that a risk ratio should be disregarded in favor of the highest endpoint of the confidence internal (Opp'n at 21), fundamentally misunderstands statistics. *See Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1286-88 (N.D. Ala. 2017) (expert's opinion was unreliable where plaintiff "failed to adequately demonstrate why [expert's] use of the lower bound of the confidence interval rather than the full confidence interval was appropriate").

9

statistically significant studies" (Opp'n at 38), Plaintiff ignores the multiple methodological flaws highlighted in Defendants' motion, including: (1) that the authors of all three valsartan studies uniformly disclaimed any findings of causality (Mem. at 27-28); (2) Dr. Sawyer's concession that the dietary studies—only one of which examined liver cancer—were "quite variable" (*id.* at 29-30 (quoting Sawyer 5/1/2025 Dep. 144:13-18)); and (3) that the single occupational study, Hidajat, cannot demonstrate consistency (*id.* at 30-31).

In short, Plaintiff's opposition confirms that Dr. Sawyer's Bradford Hill analysis is cursory and unreliable.

### III. DR. SAWYER'S DOSE EXTRAPOLATION CALCULATIONS ARE UNRELIABLE.

Plaintiff also fails to demonstrate how Dr. Sawyer's "route-to-route" method that purportedly converts the occupational inhalation exposures in Hidajat 2019 to Mr. Roberts' ingestion of valsartan is reliable. (*See* Mem. at 35-39.)

***First***, Plaintiff does not dispute that Dr. Sawyer's route-to-route extrapolation method has not been peer-reviewed or published in its entirety in any scientific source. (Mem. at 36-37; Opp'n at 25 (acknowledging Dr. Sawyer's "multi-step methodology" had not been published in "one bundle" (quoting 5/2/2025 Sawyer Dep. 18:6-18:22).) Although Plaintiff repeatedly emphasizes that Dr. Sawyer's individual steps, in isolation, have been published (*see, e.g.*, Opp'n at 15-16, 24-25), it does not suffice that pieces of Dr. Sawyer's methodology may be

10

acceptable; rather, the methodology *as a whole* must be scientifically validated. *See Burst v. Shell Oil Co.*, No. 14-109, 2015 WL 3755953, at *17 (E.D. La. June 16, 2015) ("The Court must examine an expert's overall methodology to determine whether it is reliable, and not simply accept an otherwise deficient methodology because there is a scintilla of material that might arguably support the expert's opinion."), *aff'd*, 650 F. App'x 170 (5th Cir. 2016).

*Second*, Plaintiff does not dispute that the Hidajat 2019 study suffers from a "staggering" "number of assumptions and estimations" regarding the exposures of the factory workers studied that significantly undermine the reliability of Dr. Sawyer's calculations based on the Hidajat 2019 exposure estimates. (Mem. at 37-38 (quoting *In re Zantac*, 644 F. Supp. 3d at 1215).) Instead, Plaintiff claims that Dr. Sawyer is unqualified to assess whether Hidajat utilized "unreliable" data because he is not an epidemiologist, and therefore has no "judgments on [the] study design and confounding analyses." (Opp'n at 16; *id.* at 25.) But that is self-defeating. The fact that Dr. Sawyer is not even qualified to evaluate the reliability of the one study that is the cornerstone of his dose-estimate calculations necessarily means that those estimates are not the product of reliable methods and principles.

*Lastly*, Plaintiff argues that confounding could not impact the Hidajat study's results because a single study (Boniol 2017) found no elevated risk of liver

11

cancer in rubber and chemical industry workers, thus "undercut[ting] the notion that the liver cancer signal in Hidajat's NDMA-exposed workers was simply due to some other chemical or the occupational setting itself." (Opp'n at 31.) But Dr. Sawyer does not cite or rely on Boniol 2017 for his opinions; Plaintiff therefore cannot superimpose his own supposed scientific reasoning onto Dr. Sawyer. *See In re Rezulin*, 369 F. Supp. 2d at 407. In any event, Plaintiff's argument is at odds with IARC's classification of employment in the rubber industry itself as "carcinogenic to humans" precisely due to the prevalence of exposure to known carcinogenic substances. (*See* Mem. at 38.)

In sum, as the Delaware Supreme Court explained last week, Dr. Sawyer's "wholesale dependence on the Hidajat study" in attempting to convert inhalation doses of NDMA into an equivalent oral dose of a pharmaceutical medication "face[s] numerous challenges" and is ultimately "'a bridge too far[.]'" *In re Zantac*, 2025 WL 1903760, at *17 (citation omitted).

## CONCLUSION

For the foregoing reasons, and those set forth in Defendants' opening brief, Dr. Sawyer's unreliable general causation and dose opinions should be excluded.

Dated: July 17, 2025                                Respectfully submitted,

                                                    /s/ Jessica Davidson
                                                    _____
                                                    Jessica Davidson (*pro hac vice*)

12

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com

Allison M. Brown
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Nina R. Rose (*pro hac vice*)
Jordan M. Schwartz (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue
Washington, D.C. 20004
Tel: (202) 389-3394
Fax: (202) 389-5200
nina.rose@kirkland.com
jordan.schwartz@kirkland.com

*Attorneys for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Solco Healthcare U.S., LLC, and Prinston Pharmaceutical Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 17, 2025, a true and correct copy of the foregoing document was served upon counsel of record via operation of the Court's electronic filing system.

Dated: July 17, 2025

Respectfully submitted,

*/s/ Jessica Davidson*

Jessica Davidson (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com

*Attorney for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Solco Healthcare U.S., LLC, and Prinston Pharmaceutical Inc.*