# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>*Gaston Roberts et al. v. Zhejiang Huahai Pharmaceutical Co., et al.,*<br><br>Case No. 1:20-cv-00946-RBK-JS | MDL No. 2875<br><br>Honorable Renée Marie Bumb<br>District Court Judge |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE OPINIONS OF DR. FAREEHA SIDDIQUI

## **Table of Contents**

**Page**

ARGUMENT ...................................................................................................1

I.    DR. SIDDIQUI FAILED TO ADEQUATELY "RULE IN"
      VALSARTAN USE AS A CAUSE OF MR. ROBERTS' HCC. ...............2

II.   DR. SIDDIQUI FAILED TO RELIABLY "RULE OUT" MR.
      ROBERTS' MANY ESTABLISHED RISK FACTORS FOR HCC. .........8

CONCLUSION ...............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Glastetter v. Novartis Pharmaceuticals Corp.*,
  107 F. Supp. 2d 1015 (E.D. Mo. 2000) ........................................................ 10-11

*In re Rezulin Prods. Liab. Litig.*,
  369 F. Supp. 2d 398 (S.D.N.Y. 2005) .................................................................10

*Tamraz v. Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) ...............................................................................10

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
  MDL No. 19-2875, 2025 U.S. Dist. LEXIS 66185
  (D.N.J. Apr. 7, 2025) ......................................................................................... 2-3

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
  644 F. Supp. 3d 1075 (S.D. Fla. 2022) ............................................................3, 4

*In re Zantac (Ranitidine) Litig.*,
  No. 255, 2024, 2025 WL 1903760, --A.3d-- (Del. July 10, 2025)...................3, 4

Dr. Siddiqui's specific cause opinion is based on: (1) a few epidemiologic studies that report (at most) an absolute cancer risk of **1.00191 (or 0.191%)** associated with NDMA in valsartan, while disclaiming any causal inference between the two; and (2) pretending away Mr. Roberts' cirrhosis and other well-established, independent risk factors for HCC, which made him a prime candidate for this devastating disease. It is hard to imagine a more result-oriented expert opinion, and Plaintiff does not show otherwise in her opposition.

## ARGUMENT

In an effort to defend an expert opinion that rejects basic medical knowledge about HCC and is thus stunningly unscientific, Plaintiff seeks to persuade the Court that it is "not tasked with deciding whether the expert is right," any that any challenges to Dr. Siddiqui's purported "differential diagnosis" must go to "weight of the testimony, not its admissibility[.]" (Opp'n at 8-9.)

That is incorrect. While Plaintiff relies on Third Circuit authorities stating that an expert need not "rule out every possible alternative cause" in a differential diagnosis, that is a gross minimization of Dr. Siddiqui's errors here. (*Id*.) Defendants do not fault Dr. Siddiqui for failing to rule out "every possible cause." Defendants fault her for ignoring the elephant in the room: Mr. Roberts' long list of very serious and unfortunate risk factors for HCC.

As explained below, Dr. Siddiqui did not methodically find that valsartan with NDMA can ever cause HCC, and she unscientifically brushed aside the most obvious and potent risk factors Mr. Roberts had for HCC.

I.     **DR. SIDDIQUI FAILED TO ADEQUATELY "RULE IN" VALSARTAN USE AS A CAUSE OF MR. ROBERTS' HCC.**

Plaintiff fails to refute Defendants' argument that Dr. Siddiqui lacked a reliable scientific basis for "ruling in" exposure to valsartan containing NDMA as a potential factor in causing Mr. Roberts' HCC.

***First*** and most importantly, Plaintiff fails to justify Dr. Siddiqui's extreme departure from the conclusions of the epidemiologic literature: two studies that find a very weak elevated risk of liver cancer and expressly disclaim causation. Although Plaintiff claims that Dr. Siddiqui "spent numerous pages of her expert report" discussing these two studies (Gomm 2021 and Mansouri 2021) (Opp'n at 22-23), those pages do not even mention—much less grapple with—the very low risk levels reported by those studies (1.16 and 1.12, respectively). (*See* Siddiqui Rep. at 25-26 (Mem. Ex. 1).) Instead, as Plaintiff acknowledges, Dr. Siddiqui's discussion seeks to call the study findings into question, speculating that the "results are diluted and under-estimate the increased risk of liver cancer" because the studies did not capture individuals who were exposed to the highest amounts of NDMA in valsartan. (Opp'n at 23-24 (citing Siddiqui Rep. at 26-29).) This, of course, was a pure "*ipse dixit* assertion[.]" *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No.

19-2875 (RMB/SAK), 2025 U.S. Dist. LEXIS 66185, at *52-53 (D.N.J. Apr. 7, 2025) (excluding expert who "provides no basis from which to find that her methodology for valuing the VCDs is reliable, accepted, or appropriate"). Moreover, Dr. Siddiqui's dilution theory cannot be squared with the fact that the hazard ratio reported in Mansouri was **higher** in patients who received the **lowest** dose (HR 1.14 (95% CI: 1.02-1.27)) than patients who received the highest dose (HR 0.99 (95% CI: 0.71-1.37)).[1] In short, Dr. Siddiqui's theory is not just speculative; it flies in the face of the epidemiologic literature.

**Second**, Plaintiff also argues that Dr. Siddiqui reliably "ruled in" NDMA in valsartan as a cause or Mr. Roberts' cancer by relying on occupational and animal studies. Of course, these are the **very** studies that the *Zantac* MDL court recognized are not reliable substitutes for human epidemiologic data. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075 (S.D. Fla. 2022). For example, Plaintiff trumpets Dr. Siddiqui's reliance on the Hidajat 2019 study of rubber workers, which another Plaintiff's expert, Dr. Sawyer, uses in speculating that Mr. Roberts' risk of liver cancer from NDMA in valsartan was supposedly 2.86-fold. (Opp'n at 26-27.) But, as the Delaware Supreme Court explained last week in the

---

[1]    Mansouri 2022 at 9 (Mem. Ex. 31). Similarly, in Gomm, "[h]igher exposure to potentially NDMA-contaminated valsartan, based on defined daily doses (DDDs), had no effect on the overall cancer rate" and "[l]ong-term use showed no association with the change in overall cancer rate[.]" Gomm 2021 at 358 (Mem. Ex. 30).

*Zantac* litigation, the Hidajat study involved workers with "other exposure[s]" to "other established carcinogens," and therefore Dr. Sawyer's dose calculations based on Hidajat (which are methodologically similar to those offered here) were speculative and unreliable. *See In re Zantac (Rantidine) Litig.*, No. 255, 2024, 2025 WL 1903760, at *17, --A.3d-- (Del. July 10, 2025) ("Dr. Sawyer's opinions faced numerous challenges" and was "'a bridge too far'") (citation omitted). Plaintiff suggests that because the government has "noted" the findings of Hidajat in an NDMA toxicology profile, that somehow validates Dr. Siddiqui's reliance on the study. (Opp'n at 26.) But the document cited by Plaintiff expressly cautions that the "limitations" of that study "make it difficult to establish clear associations between NDMA exposure and mortality from specific cancers." (Opp'n Ex. 12 at 53.) Dr. Siddiqui ignores that warning, "exceed[ing] the limitations the [Hidajat] authors themselves place on the study[.]" *In re Zantac*, 644 F. Supp. 3d at 1216-17.[2]

Plaintiff also inexplicably seeks to defend Dr. Siddiqui's reliance on animal studies by suggesting that Defendants' experts embrace them. For example, Plaintiff

---

[2]     Plaintiff contends that, unlike valsartan, the ranitidine in Zantac "itself can breakdown into NDMA," making it difficult to "quantify[] the amount of NDMA a specific ranitidine user was exposed to." (Opp'n at 30.) That is a distinction without a difference. As the *In re Zantac* court explained, a "critical, important benefit of the ranitidine epidemiology is that it removes this question from the estimate of cancer risk" by evaluating whether "consumption, regardless of how much NDMA was in the ranitidine over time, result in cancer?" 644 F. Supp. 3d at 1218. The same is true with respect to the epidemiologic studies on NDMA in valsartan and liver cancer.

claims that Dr. Nadim Mahmud testified that results from the NDMA animal studies are "conservative" when compared to the human epidemiologic studies involving valsartan. (Opp'n at 28.) But that is not what he said. Dr. Mahmud testified that "you have to be very cautious in translating animal study findings to humans," and that such caution includes consideration of the fact that the animal studies relied upon by Plaintiff's experts involved rodents with "healthy liver[s]" (i.e., without cirrhosis, like Mr. Roberts had) which could make absorption of NDMA into the bloodstream more likely. (Mahmud Dep. 371:22-372:7 (Opp'n Ex. 9).) Similarly, while Plaintiff points out that Defendants' expert, Dr. Chodosh, acknowledged the large sample size of Peto, one of the animal studies Dr. Siddiqui cites (*see* Opp'n at 28), Dr. Chodosh clearly testified that extrapolating from that study would be ***inappropriate*** because Mr. Roberts' cumulative exposure to NDMA was "several thousand times lower" than the dose in Peto. (Dep. of Lewis Chodosh 227:4-15, May 16, 2025 (Ex. 1 to Decl. of Nina Rose).) Accordingly, Defendants' experts make clear that Dr. Siddiqui's heavy reliance on animal studies is inappropriate.

***Third***, Plaintiff fails to defend Dr. Siddiqui's approach to dose and latency in "ruling in" NDMA in valsartan. With respect to the former issue, Plaintiff asserts that Dr. Siddiqui was able to "quantify" the amount of NDMA in valsartan consumed by Mr. Roberts based on the levels detected by the FDA in valsartan tablets. (Opp'n at 29.) But Plaintiff misses the point, which is that Dr. Siddiqui did not even attempt

to determine the **minimum dose of orally-ingested NDMA in valsartan that is capable of causing HCC**. Rather, as Plaintiff appears to concede, Dr. Siddiqui just assumed that one pill is enough to cause HCC (and assumes that the latency period is equal to the entire time Mr. Roberts was taking valsartan with NDMA).

Even if that extreme position were plausible, Plaintiff also fails to point to any scientific support for Dr. Siddiqui's two-year latency period. Instead, Plaintiff asserts that the CDC guidance cited by Defendants establishing a minimum four-year latency period was based on "risk modeling for low-level ionizing radiation studies" rather than a chemical carcinogen. (Opp'n at 32.) However, that guidance document **is** based on a chemical carcinogen, vinyl chloride.[3] Plaintiff also claims that a short latency period is supported by Dr. Siddiqui's claim that NDMA acts as a "tumor promoter." (Opp'n at 34.) However, Dr. Siddiqui could not cite any scientific support for her theory that NDMA promotes existing malignancies (Siddiqui Dep. 162:10-163:17 (Mem. Ex. 7)), and she repeatedly conflates cancer **induction** (inducing a new cancer) with **promotion** (accelerating growth of an existing cancer), revealing that Dr. Siddiqui does not understand her own theory

---

[3]     *See* World Trade Center Health Program, *Minimum Latency & Types or Categories of Cancer* (Jan. 6, 2015) at 5, https://www.cdc.gov/wtc/pdfs/policies/WTCHP-Minimum-Cancer-Latency-PP-01062015-508.pdf. Notably, the CDC specifically found that HCC required 12 years to develop from radiation. *Id.*

(*e.g.*, *id.* 294:22-295:16 (pointing to a study stating merely that "NDMA in Valsartan [is] carcinogenic" to support her assertion that NDMA is a promoter); 300:1-7 (stating "NDMA is given to promote cancer growth, to give them liver cancer")).

Finally, Plaintiff asserts that Defendants' latency arguments are irrelevant because Mr. Roberts' scans establish that he was cancer-free as of April 2016 and therefore Mr. Roberts "did develop liver cancer in a 2-year period." (Opp'n at 33-34; *see also id.* at 7.) This is patently false. Mr. Roberts' treating radiologist observed at least one liver lesion on Mr. Roberts' 2016 CT scan that he explained could be either "benign or malignant," leading him to recommend a follow-up CT scan "4-6 months from date of study[.]" (Mem. at 31 (quoting GRobertsJr-TH-MD-000944).) Because no additional scans were conducted for more than two years, Plaintiff's own expert radiologist, who himself identified multiple liver hypodensities/lesions on the April 2016 CT scan,[4] admitted that he could not rule out the possibility that Mr. Roberts had HCC before he started taking valsartan; as he explained, "it's impossible to characterize whether" these lesions "were malignant or benign" in April 2016. (SUMF ¶ 50.) This evidence puts the lie to Plaintiff's definitive claim that Mr. Roberts was cancer-free in April 2016, and is yet another reason why Dr. Siddiqui

---

[4]     As Plaintiff notes, page 32 of Defendants' opening brief contains a typographical error indicating that Dr. Mele identified "seven" lesions on the April 2016 CT scan. (Opp'n at 39.) That sentence was intended to state that Dr. Mele identified "several" lesions.

had no scientific basis for "ruling in" NDMA in valsartan.[5]

## II.    DR. SIDDIQUI FAILED TO RELIABLY "RULE OUT" MR. ROBERTS' MANY ESTABLISHED RISK FACTORS FOR HCC.

Plaintiff makes no attempt to address the wealth of cited scientific literature demonstrating that Mr. Roberts' cirrhosis, MASH/MASLD,[6] NASH/NAFLD, diabetes, and obesity all independently increased Mr. Roberts' risk of developing HCC by *exponentially more* than the small risk reported in two studies of users of valsartan potentially contaminated with NDMA. (Mem. at 38-39 (comparison chart of risk ratios associated with Mr. Roberts' various conditions).) Nor does Plaintiff address Defendants' cited authorities making clear that a differential diagnosis that purports to rule in a potential cause with a low risk while dismissing other possible causes associated with higher risks is unreliable. (*See id.* at 36-37.) Instead, Plaintiff debates whether and when Mr. Roberts developed his risk factors for HCC, in many instances contradicting Dr. Siddiqui's own report and testimony on these issues.

*First*, Dr. Siddiqui fails to rule out Mr. Roberts' cirrhosis, which the literature

---

[5]    Even assuming Mr. Roberts did not have cancer at the time of his April 2016 CT scan, it does not follow that the cause of the cancer must have post-dated that scan. The concept of latency is that cancer takes years to develop.

[6]    As explained in Defendants' opening brief and agreed by Plaintiff, there was a change in nomenclature concerning these conditions in 2023. MASLD (or Metabolic Dysfunction-Associated Steatotic Liver Disease), was formerly known as NAFLD (or Non-Alcoholic Fatty Liver Disease). MASH (or Metabolic Dysfunction-Associated Steatohepatitis) was formerly known as NASH (or Non-Alcoholic steatohepatitis). (Mem. at 4-5.)

describes as the single "most potent risk factor" for HCC, as the cause of his cancer.[7]

Plaintiff dedicates the majority of her argument to insisting that Mr. Roberts did not have an official "diagnosis of cirrhosis" prior to using valsartan containing NDMA in 2016. But, as explained in Defendants' opening memorandum and addressed below, Dr. Siddiqui has expressly stated that Mr. Roberts **did** have some level of cirrhosis in April 2016, regardless of whether it was officially diagnosed at that point. In any event, whether Mr. Roberts had cirrhosis in 2016 is largely irrelevant because Plaintiff admits that "[w]hat is undisputed, is that Mr. Roberts had cirrhosis in 2018 when he was diagnosed with liver cancer." (Opp'n at 13; *see also* Siddiqui Rep. at 7-8 (noting that Mr. Roberts received a clinical diagnosis of cirrhosis in August 2018 and was diagnosed with HCC in early September 2018).) Indeed, Dr. Siddiqui took the position at her deposition that Mr. Roberts had "overwhelming cirrhosis" at the time he was diagnosed with HCC. (Siddiqui Dep. 265:5-6.) Yet, Plaintiff offers no justification for Dr. Siddiqui's dismissal of Mr. Roberts' 2018 cirrhosis as the cause of Mr. Roberts' cancer. For example, Plaintiff does not dispute that: (1) the literature makes clear that cirrhosis is often identified at the same time as HCC (Mem. at 28); (2) the "prevalence of cirrhosis in persons with HCC is about

---

[7]    Kazuo Tarao et al., *Real impact of liver cirrhosis on the development of hepatocellular carcinoma in various liver diseases—meta-analytic assessment*, 8 Cancer Med. 1054 (2019) (Mem. Ex. 2); *see also* Siddiqui Rep. 21 (noting that cirrhosis is "one of the most significant risk factors for liver cancer.").

80%-90%" (*id*. at 22); and (3) studies have found that cirrhosis increases the risk of HCC by approximately ***3,000-4,500%*** (*id*. at 23). Nor does Plaintiff attempt to distinguish cited caselaw holding that a differential diagnosis is unreliable where an expert purports to rule out a major risk factor of the plaintiff's disease, even when there is merely a possibility that it applies to the plaintiff. (Mem. at 33.)

Plaintiff appears to argue that Dr. Siddiqui properly ruled out cirrhosis based on a finding that Mr. Roberts' "cirrhosis was caused by his exposure to NDMA" in valsartan. (Opp'n at 13.) But this opinion does not actually appear in Dr. Siddiqui's expert report. While Dr. Siddiqui broadly asserts that cirrhosis in humans generally can be caused by a variety of factors, including "NDMA exposure," she does not cite anything to support this *ipse dixit* claim (Siddiqui Rep. at 21) and did not identify any such authority at her deposition (aside from asserting that "animal studies that show that NDMA is a promoter of carcinoma" in rodents suggest that NDMA can cause cirrhosis in humans) (*see* Siddiqui Dep. 162:10-163:17).[8] In addition, Dr.

---

[8]    Plaintiff cites a report from the Agency for Toxic Substances and Disease Registry ("ATSDR") as demonstrating that "NDMA cause[s] cirrhosis." (Opp'n at 13-14.) But Dr. Siddiqui did not rely on this report to support an opinion that NDMA in valsartan can cause cirrhosis, and Plaintiff cannot unilaterally supplement her opinion in *Daubert* briefing. *See In re Rezulin Prods. Liab. Litig*., 369 F. Supp. 2d 398, 407 (S.D.N.Y. 2005) ("The subject of [a *Daubert*] motion is the proposed testimony of experts, not the theories of the lawyers."); *see also Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 672-73 (6th Cir. 2010). In any event, the ATSDR report merely describes case reports related to individuals with occupational exposure to NDMA—and it is well established that case reports "are not reliable in establishing causation." *Glastetter v. Novartis Pharms. Corp*., 107 F. Supp. 2d 1015, 1037 n.21

Siddiqui fails to offer any evidence or analysis to support an opinion that ***Mr. Roberts' cirrhosis*** was caused by exposure to NDMA in valsartan, rather than his long history of MASLD, which she admits is an established cause of cirrhosis. (Siddiqui Rep. at 21.) As a result, she lacks a reliable basis to disregard Mr. Roberts' diagnosed cirrhosis in 2018 as a cause of his HCC.

In any event, Dr. Siddiqui admitted at her deposition that, to the extent that Mr. Roberts had cirrhosis prior to his first use of valsartan containing NDMA in September 2016, that cirrhosis could not have been caused by NDMA. (Siddiqui Dep. 161:1-23.) And, in both her report and in her deposition, Dr. Siddiqui stated that Mr. Roberts had what she described as "mild," "minor," or "low-grade" cirrhosis at the time of his April 2016 CT. (*See, e.g.*, Siddiqui Rep. at 30 ("[I]t is my opinion that Mr. Roberts had incredibly mild, the earliest stages of cirrhosis prior to being exposed to valsartan contaminated with NDMA."); *see also* Siddiqui Dep. 92:9-15, 99:1-9.) Indeed, Dr. Siddiqui had no choice but to acknowledge that Mr. Roberts had some level of cirrhosis in April 2016 because Plaintiff's radiology expert, Dr. Mele, described the CT scan taken at that time as including a "constellation of imaging findings [] commonly observed in patients with underlying cirrhosis" (Mele Rep. at 2 (Mem. Ex. 39)) and "compatible with an underlying

---

(E.D. Mo. 2000), *aff'd*, 252 F.3d 986 (8th Cir. 2001).

diagnosis of cirrhosis" (Mele Dep. 293:1-4 (Mem. Ex. 40)). Notably, neither Plaintiff nor Dr. Siddiqui provides any scientific basis to rule out Mr. Roberts' so-called "mild" cirrhosis prior to his exposure to valsartan containing NDMA as a cause of his HCC. As noted in Defendants' opening brief, Dr. Siddiqui has not identified any scientific evidence suggesting that "mild" cirrhosis is a recognized medical term (Mem. at 25), and Plaintiff does not even attempt to dispute this in her opposition. And even if it were, Dr. Siddiqui cites zero scientific evidence suggesting that "mild" cirrhosis is not associated with an increased risk of HCC. In fact, the scientific evidence is clear that cirrhosis, regardless of stage or whether it is associated with any clinical symptoms, is associated with a high risk of HCC. (*See* Mem. at 25-27.)

**Second**, Plaintiff fails to justify Dr. Siddiqui's dismissal of Mr. Roberts' documented metabolic liver conditions, including MASLD/NAFLD and MASH/NASH, as causes of his HCC. Plaintiff does not dispute that scientific studies have found that both MASLD/NAFLD and MASH/NASH are associated with a statistically significant increased risk of HCC separate and apart from cirrhosis. Nor does Plaintiff dispute that Mr. Roberts had a documented history of MASLD/NAFLD, which was identified in a recent study as putting patients at an 80% increased risk for developing HCC, independent of cirrhosis.[9] Instead, Plaintiff

---

[9]    Fahim Ebrahimi et al., *Familial coaggregation of MASLD with hepatocellular*

focuses entirely on MASH/NASH, and insists that Dr. Siddiqui ruled it out as a cause because she "doesn't believe that Mr. Roberts was actually diagnosed with or had NASH" and she merely included it in her differential diagnosis because NASH was mentioned in Mr. Roberts' medical records. (Opp'n at 16-17.) But Dr. Siddiqui herself never said that. To the contrary, Dr. Siddiqui expressly opines that "[w]hile *Mr. Roberts had NASH* with no evidence of decompensation, his resulting increased risk of liver cancer would be captured based on the degree of his liver cirrhosis." (Siddiqui Rep. at 30 (emphasis added).) And when Dr. Siddiqui was asked at deposition whether she believes Mr. Roberts had NASH prior to his HCC diagnosis, she answered: "*Yes, I do believe that he had NASH before his diagnosis based on my review of his medical records*[.]" (Siddiqui Dep. 200:1-6 (emphasis added).) It is telling that Plaintiff feels the need to completely rewrite Dr. Siddiqui's opinions to defend her deficient differential diagnosis.

**Third**, Plaintiff concedes that Mr. Roberts was diagnosed with Type II Diabetes ("diabetes") as of July 2016—two years before his HCC diagnosis and months before his use of valsartan with NDMA—and does not dispute that, even independent of cirrhosis, diabetes is associated with a far higher increased risk of HCC than reported in the studies regarding NDMA in valsartan. (Opp'n at 17-18.)

---

*carcinoma and adverse liver outcomes: Nationwide multigenerational cohort study*, 79 J. of Hepatology 1374 (2023) (Mem. Ex. 11).

Instead, Plaintiff asserts that Mr. Roberts' diabetes could not have caused his HCC because it was "well-controlled." (*Id*. at 18.) This is false. As Defendants noted it their opening brief, Mr. Roberts' A1C levels greater were greater than 9.0% in 2016, which represents uncontrolled glucose levels. (Mem. at 6.) While Plaintiff asserts that Defendants' expert Dr. Mahmud "agree[d] that . . . Mr. Roberts' diabetes was well-controlled with medication" in 2016 (Opp'n at 18), Dr. Mahmud merely noted, that at times, Mr. Roberts was taking medication to manage his diabetes (Mahmud Dep. 174:23-175:1 (Opp'n Ex. 9)). Further, Plaintiff, like Dr. Siddiqui, cites no evidence suggesting that diabetes is no longer a risk factor for HCC if it is being managed with medication.

In any event, Plaintiff cannot escape the fact that medical records dating as far back as 2007 refer to diabetes. While Plaintiff claims that the medical records "merely question[] the possibility of diabetes" in 2007 (Opp'n at 18), she ignores a 2007 record that clearly lists diabetes as one of Mr. Roberts' conditions. (*See* GRobertsJr-CA-000729 (Mem. Ex. 12).)

***Fourth***, Plaintiff does not even attempt to defend Dr. Siddiqui's failure to rule out Mr. Roberts' (at times, morbid) obesity as an independent cause of his HCC. While Plaintiff asserts that Dr. Mahmud applied "the same methodology" in conflating obesity with Mr. Roberts' cirrhosis and other conditions (Opp'n at 19), that, too, is false. At his deposition, Dr. Mahmud testified that obesity can cause or

contribute to conditions like cirrhosis, MASLD/NAFLD, and MASH/NASH. (*Id.*) But he also clearly stated in both his report and at deposition that Dr. Siddiqui's differential diagnosis is scientifically unreliable because she did not consider the independent risk of HCC associated with obesity alone, including "data demonstrating a ~3-fold increased risk of HCC in individuals with class II obesity (such as Mr. Roberts) relative to non-obese individuals." (Mahmud Rep. at 39 (Mem. Ex. 9); *see also* Mahmud Dep. 180:11-18.) Once again, Plaintiff does not address this literature; nor does she address—much less refute—the many other studies cited in Defendants' briefing that have found that obesity is independently associated with a significantly higher risk of HCC than the small risk attributed to NDMA in valsartan in the two studies relied upon by Dr. Siddiqui. (Mem. at 7-8, 38-39.)[10]

## CONCLUSION

For all of the reasons set forth above, the Court should exclude Dr. Siddiqui's causation opinions from trial.

Dated: July 17, 2025                    Respectfully submitted,

---

[10]    Notably, Plaintiff quotes from Dr. Siddiqui's deposition testimony referring to the Mantovani (2017) study as supporting her decision not to consider the risk of HCC posed by Mr. Roberts' obesity separate from any risk posed by his cirrhosis. But that paper says nothing of the sort, and in fact emphasizes the "independent" nature of risk factors for HCC, including obesity, and notes that these risks are "additive" in individuals, like Mr. Roberts, with multiple risk factors for HCC. *See* Alessandro Mantovani & Giovanni Targher, *Type 2 diabetes mellitus and risk of hepatocellular carcinoma: spotlight on nonalcoholic fatty liver disease*. 5 Ann. Transl. Med. 1, 3 (2017) (Mem. Ex. 53).

*/s/ Jessica Davidson*

Jessica Davidson (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com

Allison M. Brown
**KIRKLAND & ELLIS LLP**
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Telephone: (215) 268-5000
alli.brown@kirkland.com

Nina R. Rose (*pro hac vice*)
Jordan M. Schwartz (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue
Washington, D.C. 20004
Tel: (202) 389-3394
Fax: (202) 389-5200
nina.rose@kirkland.com
jordan.schwartz@kirkland.com

*Attorneys for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Solco Healthcare U.S., LLC, and Prinston Pharmaceutical Inc.*

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 17, 2025, a true and correct copy of the foregoing document was served upon counsel of record via operation of the Court's electronic filing system.

Dated: July 17, 2025                          Respectfully submitted,

                                              */s/ Jessica Davidson*
                                              Jessica Davidson (*pro hac vice*)
                                              **KIRKLAND & ELLIS LLP**
                                              601 Lexington Avenue
                                              New York, NY 10022
                                              Tel: (212) 446-4723
                                              jessica.davidson@kirkland.com

                                              *Attorney for Defendants Zhejiang*
                                              *Huahai Pharmaceutical Co., Ltd., Solco*
                                              *Healthcare U.S., LLC, and Prinston*
                                              *Pharmaceutical Inc.*