# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION | MDL No. 2875 |
| THIS DOCUMENT RELATES TO: *Roberts v. Zhejiang Huahai Pharmaceutical Co. Ltd., et al.,* Case No. 1:20-cv-00946-RMB-SAK | HON. RENÉE MARIE BUMB |

**PLAINTIFF JAN ROBERTS' OPPOSITION TO DEFENDANTS'**
**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Civ. Rule 56.1(a), Plaintiff Jan Roberts on behalf of the Estate of Gaston Roberts, Jr. hereby furnishes her Responses in Opposition to Defendants' statement of material facts as to which there does not exist a genuine issue.

I.    **PROCEDURAL HISTORY & NATURE OF SUIT**

1.    Gaston Roberts filed a short-form complaint initiating this case on January 29, 2020. (ECF No. 1.) In his initial short-form complaint, Mr. Roberts alleged the following claims: manufacturing defect, failure to warn, design defect, negligence, negligence per se, breach of express warranty, breach of implied warranty, fraud, negligent misrepresentation, breach of Alabama state consumer protection statutes, loss of consortium, and punitive damages. (See generally *Id*.).

1

**RESPONSE: Admitted.**

2.      Mr. Roberts was a resident of Bay Minette, Alabama. (Second Am. Pl. Fact Sheet at 9 (Ex. 1 to Decl. of Nina Rose ("Rose Decl.").)

**RESPONSE: Admitted.**

3.      Mr. Roberts died on March 17, 2020. (GRobertsJr-DCPOA-0000001; GRobersJr-CA-000014 (collectively, Rose Decl. Ex. 2)

**RESPONSE: Admitted.**

4.      On October 5, 2020, Mr. Roberts' wife, Jan Roberts, filed a motion to substitute herself as Plaintiff on behalf of Mr. Roberts in her capacity as Personal Representative of his estate. (ECF No. 5.) On October 25, 2020, the Court granted Ms. Roberts' motion for substitution. (ECF No. 6.)

**RESPONSE: Admitted.**

5.      On December 15, 2020, Ms. Roberts filed an amended short-form complaint in which she re-asserted all the claims listed in the original short-form complaint and added claims for wrongful death and a survival action. (ECF No. 7.)

**RESPONSE: Admitted.**

6.      Ms. Roberts alleges that her spouse, the decedent, Gaston J. Roberts, Jr.,

developed hepatocellular cancer ("HCC"), a subtype of liver cancer, and ultimately passed away as a result of his exposure to trace amounts of N- Nitrosodimethylamine ("NDMA") in valsartan containing NDMA ("valsartan") manufactured by Zhejiang Huahai Pharmaceutical Co., Ltd., Prinston Pharmaceutical Inc., and Solco Healthcare U.S., LLC (collectively, "Defendants"). (*Id.*)

**RESPONSE: Disputed in part. Admit the valsartan-containing drugs were manufactured by Zhejiang Huahai Pharmaceutical Co., Ltd., Prinston Pharmaceutical Inc., and Solco Healthcare U.S., LLC (collectively, "Defendants"). However, Disputed to the extent Mr. Roberts was exposed to *excessive* amounts of NDMA. (*See* ECF No. 3099-9, Siddiqui Report at 27-29 (calculating that Mr. Roberts consumed over 681 NDMA-contaminated valsartan pills, thus consuming approximately 13,180 and 20,190 nanograms of NDMA per pill, which is approximately 137 and 210 times the "interim allowable levels" limits by the FDA).)**

## II.    SAFETY AND EFFICACY OF VALSARTAN

7.      On July 13, 2018, manufacturers voluntarily recalled certain batches of valsartan tablets due to detection of an impurity, N-nitrosodimethylamine ("NDMA"). Press Release, FDA announces voluntary recall of several medicines containing valsartan  following detection of an impurity, July 13, 2018, https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-    recall-several-medicines-containing-valsartan-

3

following-detection-impurity. In its initial news release about the recall, the FDA stated that patients "should continue taking their medicine until they have a replacement product." *Id.*

**RESPONSE: Admitted.**

8.      On August 30, 2018, the FDA estimated that "if 8,000 people took the highest valsartan dose (320 mg) from NDMA-affected medicines daily for four years (the amount of time we believed the affected products had been on the U.S. market), there may be one additional case of cancer over the lifetimes of these 8,000 people beyond the average cancer rate among Americans," and that "[m]ost patients who were exposed to the impurity through the use of valsartan received less exposure than this worse-case scenario." FDA Statement, FDA Statement on FDA's ongoing investigation into valsartan impurities and recalls and an update on FDA's current findings, Aug. 30, 2018, https://www.fda.gov/news-events/press-    announcements/fda-statement-fdas-ongoing-investigation-valsartan-impurities-and-recalls-and-update-fdas-current.

**RESPONSE: Admitted in part. Disputed to the extent that the FDA was not aware of the highest contamination levels or duration that contaminated valsartan was on the market.**

9.      On April 4, 2019, the FDA stated that "[t]he risk associated with abruptly discontinuing the use of these important medicines far outweighs the low risk that our

scientists    estimate    to    be    associated    with    continuing    the    medicine."
https://www.fda.gov/news-events/press-announcements/fda-statement-agencys-    list-
known-nitrosamine-free-valsartan-and-arb-class-medicines-part-agencys.

**RESPONSE: Admitted in part, to the extent that increased the risk of cancer due to a couple of extra pills was low in comparison to the risk that a patient could suffer a heart attack or stroke if abruptly discontinuing their blood pressure medication without properly transitioning. Nonetheless, patients and physicians were instructed to transition to alternatives as soon as possible, because the long-term risk was assessed to be serious enough to warrant a recall of all pills contaminated with NDMA in amounts that exceeded the FDA's interim thresholds.**

10.    The valsartan recall was widely publicized in the media. See, e.g., Jacqueline Howard, Valsartan recall: 4 things patients should know, CNN HEALTH (Nov. 1, 2018), https://edition.cnn.com/2018/07/19/health/valsartan-recall-  explainer/index.html;  Sheila Kaplan, Blood Pressure Medication is Recalled, THE NEW YORK TIMES (July 16, 2018), https://www.nytimes.com/2018/07/16/health/fda-blood-pressure-valsartan.html.

**RESPONSE: Disputed in part. The valsartan recall was referenced in various publications, but not "widely publicized." Thus, this cannot constitute a statement of undisputed fact.**

5

11.     The very first cases in this litigation were filed in August 2018. (See, e.g.,
Compl., Kruk v. Zhejiang Huahai Pharm. Co., No. 18-cv-005944 (N.D. Ill. Aug. 29, 2018)
(Rose Decl. Ex. 3).)

**RESPONSE: Admitted.**

12.     A 2021 longitudinal cohort study of 780,871 persons who filled valsartan
prescriptions between 2012 and 2017 by Gomm et al. found a "slightly increased risk of
hepatic cancer" associated with NDMA-contaminated valsartan. Willy Gomm et al., N-
Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer, 118 Deutsches
Arzteblatt Int'l 357 (2021) (Rose Decl. Ex. 4). The study reported an odds ratio of 1.16 and
a confidence interval of 1.03-1.31 with respect to the association between NDMA-
contaminated valsartan and hepatic cancer and no association with overall cancer risk or
other single cancer outcomes. See id. at 357, 360. The authors stated that "the present study
can only state the existence of a statistical association" and that "[c]ausality cannot be
inferred" from the study's results. Id. at 360. The authors referred to liver cancer generally
and did not differentiate between HCC and other types of liver cancers. Id. at 358.

**RESPONSE: Disputed in part. The 2021 NDMA-contaminated valsartan study
by Gomm found "a significant association between potentially NDMA-contaminated
valsartan and liver cancer." Willy Gomm et al.,** ***N-Nitrosodimethylamine-***

*Contaminated Valsartan and the Risk of Cancer*, 118 Deutsches Arzteblatt Int'l 357 (2021) (ECF No. 3099-6, Ex. 5). The study found that "[t]he association with liver cancer remained stable after basic adjustment for age and gender" "and also after additional adjustment for hepatitis" "and other liver diseases". *Id.* In light of the significant association, the study authors noted "This is interesting, as from a biological perspective liver cancer is the most likely form of cancer resulting from NDMA contamination. That is the reason why we classified the occurrence of liver cancer as an independent primary endpoint compared with other specific types or cancer." *Id.* at 359. Furthermore, the authors note, "due to the limited follow-up tie we were not able to monitor the long-term effects of NDMA-contaminated valsartan for more than 3 years." *Id.* at 359-360.

13.    A 2022 study of 1.4 million consumers of valsartan between 2013 and 2017 by Mansouri et al. found "a slight increased risk of liver cancer and melanoma in patients exposed to NDMA," and reported an odds ratio of 1.12 and a confidence interval of 1.04-1.22 with respect to the association between NDMA-contaminated valsartan and liver cancer. Imene Mansouri et al., N-nitrosodimethylamine- Contaminated Valsartan and Risk of Cancer: A Nationwide Study of 1.4 Million Valsartan Users, 11(24) J. Am. Heart Ass'n 1 (2022) (Rose Decl. Ex. 5). The authors stated that they "used proxies to measure smoking behaviors, alcohol abuse, and morbid obesity in [their] study population," but that "residual

7

confounding may still be present." *Id*. at 11. The authors referred to liver cancer generally and did not differentiate between HCC and other types of liver cancers. See *Id*. at 5.

**RESPONSE: Disputed in part. The 2022 NDMA-contaminated valsartan study by Mansouri found "exposed patients had a higher risk of liver cancer." Imene Mansouri et al.,** *N-nitrosodimethylamine Contaminated valsartan and Risk of Cancer: A Nationwide Study of 1.4 Million Valsartan Users***, 11(24) J. Am. Heart Asss'n 1 (2022) (ECF No. 3099-5, Ex 4). The study authors noted "Male patients treated with NDMA-contaminated valsartan were also at a significantly higher risk of liver cancer."** *Id.* **at 7, 9. The study even detected that "the risks for overall cancer were statistically significant".** *Id.* **at 9. The authors concluded, "Our study raises concerns regarding the risks of cancer in patients exposed to NDMA in regularly taken medications."**

14.    Plaintiff's expert, Dr. William Sawyer, testified that a moderate association between a risk factor and disease is "less than two" and a weak association is "around 1.5." (Deposition of Dr. William Sawyer, Ph.D. 111:20-23, May 1, 2025 (Rose Decl. Ex. 6).) At 1.16, Dr. Sawyer characterized the association between valsartan allegedly contaminated with NDMA and cancer overall in humans as "low." (*Id.* 113:13-18.)

**RESPONSE: Disputed. Dr. Sawyer testified "generally" as what constitutes various associations. (Ex. A, Sawyer Dep Tr. at 111:20-23 (May 1, 2025)). Dr. Sawyer**

8

testified as follows regarding the early detected association between NDMA-contaminated valsartan and cancer, "we're only at the beginning of the bell curve of latency and that number is going to grow at the peak of the latent period, which we don't know what it is yet. If the latent period peak was at 10.1 years, there is going to be a much larger risk ratio at that point in time as opposed to early on in the temporality curve." (*Id.* at 113:18-24). Also, Dr. Sawyer explained that valsartan epidemiological studies has various reasons, including non-differential misclassification bias, that the studies would show a lower increased risk than the true increased risk caused by consuming the amount of NDMA contaminated valsartan that Mr. Roberts consumed. (ECF No. 3099-20, Sawyer Report at 39-41). Finally, Dr. Sawyer discussed that Mansouri and Gomm found an even higher increased risk for users of contaminated valsartan when they were ages 60 to 69, male, or when they used valsartan for more than 3 years - all of which applied to Mr. Roberts. (Ex. B, Sawyer Dep Tr. at 122:2-124:18 (May 2, 2025))

### III.    MR. ROBERTS' NON-VALSARTAN-RELATED RISK FACTORS FOR HCC

15.    Plaintiff's expert, Dr. Fareeha Siddiqui, stated in her expert report that there are a wide variety of risk factors for HCC, including cirrhosis, non-alcoholic liver steatohepatitis ("NASH"), non-alcoholic fatty liver disease ("NAFLD"), obesity, Type 2

9

diabetes, NDMA, and NDMA exposure from valsartan. (Report of Fareeha Siddiqui ("Siddiqui Rep.") at 20-26, Mar. 10, 2025 (Rose Decl. Ex. 7).)

**RESPONSE: Admitted.**

### A.   <u>CIRRHOSIS</u>

16.   Dr. Siddiqui defined cirrhosis as occurring "when scar tissue (fibrosis) replaces the healthy tissue of the liver; the fibrosed parts of the liver become non-functioning." (Siddiqui Rep. at 21.)

**RESPONSE: Disputed in part. A cirrhosis diagnosis also requires clinical manifestations. (ECF No. 3099-11, Siddiqui Dep. Tr. at 244:9-246:20). Thus, this decontextualized and incomplete statement cannot constitute a statement of undisputed material fact.**

17.   The American Liver Foundation describes cirrhosis as a condition related to "fibrosis." Fibrosis is scored from Stage 0 ("[h]ealthy liver") to Stage 1 ("[b]eginning of liver damage"), Stage 2 ("[m]oderate liver damage"), Stage 3 ("[s]ignificant liver damage"), and finally Stage 4—"[s]evere liver damage," also known as "cirrhosis." See American Liver Foundation, "Fibrosis (Scarring)," https://liverfoundation.org/about-your-liver/how-liver-diseases-progress/fibrosis- scarring/.

**RESPONSE: Admitted.**

18.     Mr. Roberts underwent a CT scan of his abdomen with and without contrast on April 19, 2016. (GRobertsJr-TH-MD-000943-45 (Rose Decl. Ex. 8).)

**RESPONSE: Admitted.**

19.     Plaintiff's expert, Dr. Christopher Mele, acknowledges that Mr. Roberts' April 19, 2016 CT scan reflects a "constellation of imaging findings [which are] commonly observed in patients with underlying cirrhosis." (Report of Christopher Mele at 2, Mar. 9, 2025 (Rose Decl. Ex. 9).

**RESPONSE: Disputed in part. In his Report, Dr. Mele does reference the presence of these findings based on imaging alone; however, he never diagnoses Mr. Roberts with cirrhosis. Dr. Mele testified that cirrhosis is a clinical diagnosis and is not a diagnosis that he makes based on imaging alone. (ECF No. 3099-14, Mele Dep. Tr. at 243:3-11; 290:25-291:5.) Thus, this cannot constitute a statement of undisputed fact.**

20.     Dr. Mele testified at his deposition that, as of April 2016, Mr. Roberts' imaging was "compatible with an underlying diagnosis of cirrhosis." (Deposition of Christopher Mele, M.D. ("Mele Dep.") 292:22-293:4, May 8, 2025 (Rose Decl. Ex. 10).)

**RESPONSE: Disputed in part. In his Report, Dr. Mele does reference the**

11

**presence of these findings based on imaging alone; however, he never diagnoses Mr.**

**Roberts with cirrhosis. Dr. Mele testified that cirrhosis is a clinical diagnosis and is**

**not a diagnosis that he makes based on imaging alone. (ECF No. 3099-14, Mele Dep.**

**Tr. 243:3-11; 290:25-291:5.) Thus, this cannot constitute a statement of undisputed**

**fact.**

21.    Dr. Siddiqui stated in her report that Mr. Roberts had cirrhosis prior to being

exposed to recalled valsartan. The report states that "it is my opinion that Mr. Roberts had

. . . cirrhosis prior to being exposed to valsartan contaminated with NDMA," although Dr.

Siddiqui further opines that the cirrhosis at this time was "incredibly mild." (Siddiqui Rep.

at 30.) Dr. Siddiqui stated at her deposition that Mr. Roberts' cirrhosis was "compensated"

in April 2016, meaning that he was not yet exhibiting clinical symptoms of cirrhosis. (See

Deposition of Fareeha Siddiqui ("Siddiqui Dep.") 129:5-13, Apr. 29, 2025 (Rose Decl. Ex.

11).)

**RESPONSE: Disputed. In the quoted statement above, Defendants**

**misrepresent Dr. Siddiqui's opinion wherein she opined, "I would not have given him**

**an actual diagnosis of cirrhosis at this time." (ECF No. 3099-9, Siddiqui Report at 30.)**

**Thus, this cannot constitute a statement of undisputed material fact.**

22.    Mr. Roberts also had cirrhosis in August 2018, at the time of his HCC

diagnosis. Dr. Siddiqui testified that Mr. Roberts' cirrhosis at the time of his HCC diagnosis in August 2018 was "obvious," "overwhelming," and "aggressive," resulting in "his liver [being] significantly scarred and fibrosed." (Siddiqui Dep. 92:9-15, 136:20-21, 244:17-19; 247:10-12, 267:10-12.)

**RESPONSE: Disputed in part. Dr. Siddiqui agreed that Mr. Roberts had cirrhosis at the time of August 2018 and that Mr. Roberts' HCC was "obvious," "overwhelming," and "aggressive," but in the context of comparing his liver in 2016 and 2018. (ECF No. 3099-11, Siddiqui Dep Tr. at 92:9-15 (describing the change from possible minor cirrhosis in 2016 to aggressive cirrhosis with a massive HCC tumor burden); 136:20-21 ("In 2018, he had aggressive cirrhosis at the same time as as hepatocellular disease."); 244:13-19 ("in 2016, he didn't have any clinical… signs of cirrhosis. He didn't. Which then, again, calls into question the fact that within 2 years, for 2016, 2018, he then had obvious signs of cirrhosis and multiple huge liver lesions consistent with aggressive HCC."); 247:10-17 (And then within two years, he has this aggressive cirrhosis that had led or is part of this whole HCC… medical issue… the timeline doesn't make sense…I feel that the – the only risk factor for this was NDMA in the Valsartan that caused the HCC."); 267:8-16 ("He is not diagnosed with cirrhosis in 2016… Then within two years in 2018, he comes back again, he has overwhelming cirrhosis, his liver is significantly scarred and fibrosed… He has**

13

significant signs of an acute and extremely aggressive hepatocellular carcinoma.").)
Taken out of context, this purported "fact" cannot constitute a statement of
undisputed material fact.

23.    Dr. Siddiqui also testified at her deposition that Mr. Roberts "presented with
decompensated cirrhosis in 2018." (Siddiqui Dep. 303:4-7.)

**RESPONSE:   Disputed. In the quote cited by Defendants, Dr. Siddiqui was
asked whether she agreed with a statement from one of Mr. Roberts' doctors, Mr.
McEvoy. (ECF No. 3099-11, Siddiqui Dep. Tr. at 302:7-15.) Dr. Siddiqui disagreed
with the statement that "Mr. Roberts ascites is secondary to his decompensated
cirrhosis" and clarified, "my opinion is, is that his recurrent ascites is secondary to
his HCC." (*Id.* at 303:2-3.) Further, she testified that "[h]e did not have ascites until
the very end of his life, when… the cancer grew to such high levels that basically the
liver function went down significantly. It became more scarred, more fibrotic and his
liver was dying and that's what caused the ascites." (*Id.* at 304:11-17.) Thus, the quote
cannot constitute a statement of undisputed material fact.**

24.    A study by Tarao et al. published in Cancer Medicine on January 6, 2019,
found the "ratio of HCC incidence for the cirrhotic state . . . was 45.00-fold" (i.e., a 4500%
increased risk). Kazuo Tarao et al., Real impact of liver cirrhosis on the development of

14

hepatocellular carcinoma in various liver diseases—meta- analytic assessment, 8 Cancer

Medicine 1054, 1056 (2019) (Rose Decl. Ex. 12).

**RESPONSE: Disputed in part. The partial and ellipsed quote pulled by
Defendants is taken out of context and does not support the proposition that cirrhosis
increases the risk of HCC by 4,500%, as Defendants attempt to represent. The quote
is specific to a subset of the population that has progressed to cirrhosis.  In any event,
the accuracy of the quoted statement calls for expert analysis and so cannot constitute
a statement of undisputed material fact.**

25.    The same study by Tarao states that cirrhosis is "the most potent risk factor"

for HCC. Id. at 1054.

**RESPONSE: Disputed in part. While the quoted language does appear in the
Tarao study, Plaintiffs dispute that Defendants have accurately characterized the
scientific literature on HCC and cirrhosis. Defendants have cherry-picked scientific
literature _and_ quotations from within that literature. "Chronic hepatitis B or C virus
is associated with more than 70% of cases of hepatocellular carcinoma, making it the
most common and significant risk factor for liver cancer." (ECF No. 3099-9, Siddiqui
Report at 20). In any event, the accuracy of the quoted statement calls for expert
analysis and so cannot constitute a statement of undisputed material fact.**

26.    A study by Lai et al. published on October 25, 2024 found that "for those with cirrhosis, the incidence [of HCC] was significantly higher at 4.29 (95% CI [4.06, 4.51]) compared to those without cirrhosis (0.14 . . . )" (i.e., a 3000% increased risk). Rongtao Lai et al., Incidence rates of hepatocellular carcinoma based on risk stratification in steatotic liver disease for precision medicine: A real- world longitudinal nationwide study, PLoS Med. at 1 (2024) (Rose Decl. Ex. 13).

**RESPONSE: Disputed in part. While the quoted language does appear in the *Lai* study, Plaintiffs dispute that Defendants have accurately characterized the scientific literature on HCC and cirrhosis. Defendants have cherry-picked scientific literature *and* quotations from within that literature. "Any increased risk of liver cancer that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA." (ECF No. 3099-9, Siddiqui Report at 30). In any event, the accuracy of the quoted statement calls for expert analysis and so cannot constitute a statement of undisputed material fact.**

27.    A study by Bengtsson et al. published in the United European Gastroenterol Journal on April 14, 2022 reported a hazard ratio of 167 (CI 116.5- 241.1) for patients with compensated cirrhosis. Bonnie Bengtsson et al., The risk of hepatocellular carcinoma

differs by etiology, age and sex: A Swedish nationwide population-based cohort study, 10
United European Gastroenterology J. 465, 470 (2022) (Rose Decl. Ex. 14).

**RESPONSE: Disputed in part. While the referenced statistic does appear in the**
***Bengston*** **study, Plaintiffs dispute that Defendants have accurately characterized the**
**scientific literature on HCC and cirrhosis. Defendants have cherry-picked scientific**
**literature *and* statistics from within that literature. "Any increased risk of liver cancer**
**that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he**
**had prior to being exposed to valsartan contaminated with NDMA." (ECF No. 3099-**
**9, Siddiqui Report at 30). In any event, the accuracy of the quoted statement calls for**
**expert analysis and so cannot constitute a statement of undisputed material fact.**

28.    Mr. Roberts' treating gastroenterologist, Dr. Samuel Hooks, testified that "[i]f
you have cirrhosis, there's a two hundred times greater chance of having [HCC] than the
general population." (Deposition of Samuel Hooks 27:13-16, Jan. 29, 2025 (Rose Decl.
Ex. 15).)

**RESPONSE: Admitted.**

29.    The American Association for the Study of Liver Diseases recommends that
all patients with cirrhosis of any type immediately begin screening for HCC every six

months. Amit G. Singal et al., AASLD Practice Guidance on prevention, diagnosis, and treatment of hepatocellular carcinoma, 78 Hepatology 1922, 1929 (2023) (Rose Decl. Ex. 16).

**RESPONSE: Disputed in part. While the AASLD does make this recommendation for patients *diagnosed* with cirrhosis, Plaintiffs dispute that this guidance applies to Mr. Roberts, who was not diagnosed with cirrhosis. (*See*, *e.g.*, ECF No. 3099-11, Siddiqui Dep. Tr. 142:12-25.)**

30.    Numerous other international guidelines also recommend screening all cirrhotic patients for HCC every six months, regardless of the cause of cirrhosis or whether it is characterized as compensated or decompensated. See, e.g., EASL [European Association for the Study of the Liver] Clinical Practice Guidelines on the management of hepatocellular carcinoma, 82 J. of Hepatology 315 (2025) (Rose Decl. Ex. 17); Yuri Cho et al., Overview of Asian clinical practice guidelines for the management of hepatocellular carcinoma: An Asian perspective comparison, 29 Clinical & Molecular Hepatology 252 (2023) (Rose Decl. Ex. 18).

**RESPONSE: Disputed in part. While the EASL makes this recommendation for patients diagnosed with cirrhosis, Plaintiff disputes that this guidance applies to Mr. Roberts, who was not diagnosed with cirrhosis. (*See*, *e.g.*, ECF No. 3099-11,**

18

**Siddiqui Dep. Tr. 142:12-25.)**

### B. OBESITY

31.      Mr. Roberts' medical records show that from 2008 through early 2018, he consistently had a Body Mass Index ("BMI") score ranging from 37.16 to 40.11. (*See*, *e.g.*, GRobertsJR-AMG-000028-35;   GRobertsJR-CA-000209-11;   GRobertsJR-CA-000722; GRobertsJR-ESMS-000002-6;   GRobertsJR-ESMS-  000016-20;   GRobertsJR-ESMS-000045-50;   GRobertsJR-ESMS-000051-56(collectively, Rose Decl. Ex. 19).)

**RESPONSE: Disputed. For example, Mr. Roberts' BMI was 34.36 on December 27, 2011 (Ex. C, GRobertsJr-CA-000553).** ***See*** **ECF No. 3099-9, Siddiqui Report at 3.**

32.      According to Mr. Roberts' treating physicians, Drs. Darryle Bullard and Donald Sanders, Mr. Roberts qualified as "morbidly obese" as of February 2016 and remained in that category as of September 2017. (See Deposition of Darryle Bullard, M.D. ("Bullard Dep.") 66:21-68:7, Feb. 13, 2025 (Rose Decl. Ex. 20); Deposition of Donald B. Sanders, M.D. 102:4-103:13, Oct 8, 2021 (Rose Decl. Ex. 21).)

**RESPONSE: Disputed in part. Drs. Bullard and Sanders agreed that they characterized Mr. Roberts' condition as "morbidly obese" specifically during a**

19

**doctor visit in February 2016 and during a doctor visit in September 2017, not that**

**he was morbidly obese throughout the entire timeframe. Moreover, Mr. Roberts'**

**medical records show BMI calculations between February 2016 and September 2017**

**that were below 40.0, which are not "morbidly obese." For example, his BMI during**

**a November 14, 2016 visit was calculated at 35.04. (Ex. D, GRobertsJr-CA-000819-**

**000821.) Thus, this cannot constitute a statement of undisputed material fact.**

33.    At his deposition, Dr. Bullard testified that "patients who are one hundred

pounds over their ideal body weight . . . are at significantly-increased risk for death and

worsening of many conditions." (See Bullard Dep. 67:25-68:7.) A 2011 scientific article

authored by Dr. Marc-Andrew Cornier and several other doctors defined Class II obesity

as a BMI of 35-39.9. See Marc-Andre Cornier et al., Assessing adiposity: A Scientific

Statement From the American Heart Association, 124 Circulation 1996, 1997 (2011) (Rose

Decl. Ex. 22).

**RESPONSE: Disputed in part. This calls for expert analysis. Dr. Bullard is a**

**pulmonologist and testified that he is not giving any causation opinions. (Ex. E,**

**Bullard Dep. Tr. at 91:5-8.) In the statement above, Defendants cut out the middle of**

**Dr. Bullard's testimony where he is referring to patients with BMIs over 40. (*Id.* at**

**68:1-7.) Moreover, the study cited by Defendants with the statement of a BMI of 35-**

**39.9 is inapplicable to Dr. Bullard's statement.**

34.    A 2022 study by Xie et al. reported that obesity is associated with a 286%
increased risk of HCC, even after adjusting for cirrhosis, and concluded that obesity is an
"independent risk factor[] for the development of HCC." See Xuancheng Xie et al.,
Correlation analysis of metabolic characteristics and the risk of metabolic-associated fatty
liver disease - related hepatocellular carcinoma, Scientific Reports (2022) at 6 (OR 3.86,
CI 2.02-7.40) ("Xie 2022") (Rose Decl. Ex. 23); see also Baek Gyu Jun et al., Impact of
overweight and obesity on the risk of hepatocellular carcinoma: a prospective cohort study
in 14.3 million Koreans, 127 Brit. J. of Cancer 109 (2022) (Rose Decl. Ex. 24) (reporting
a statistically significant hazard ratio of 1.55 (CI 1.50-1.60) associated with obesity after
adjusting for diabetes, as well as a statistically significant hazard ratio of 1.60 (CI 1.55-
1.66) for each 5 kg/m2 increase in BMI).

**RESPONSE: Disputed in part. While the quoted statistic does appear in the *Xie*
study, Plaintiffs dispute that Defendants have accurately characterized the scientific
literature on obesity and HCC. Defendants have cherry-picked scientific literature
*and* quotations from within that literature. In any event, the accuracy of the quoted
statement calls for expert analysis and so cannot constitute a statement of undisputed
material fact.**

35.    Other studies have also reported that obesity is associated with increased HCC risk. See Yi Chen et. al., *Excess body weight and the risk of primary liver cancer: An updated meta-analysis of prospective studies*, 48 Eur. J. of Cancer 2137 (2012) (Rose Decl. Ex. 25) (reporting a statistically significant risk ratio of 1.69 (CI 1.41-2.04) associated with obesity after adjusting for alcohol use; a statistically significant risk ratio of 1.89 (CI 1.43-2.50) associated with obesity after adjusting for hepatitis, and a statistically significant risk ratio of 2.06 (CI of 1.53- 2.78) associated with obesity after adjusting for diabetes).

**RESPONSE: Disputed in part. While the quoted statistic does appear in the *Yi Chen* study, Plaintiffs dispute that Defendants have accurately characterized the scientific literature on obesity being an independent risk for HCC. "Any increased risk of liver cancer that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA." (ECF No. 3099-9, Siddiqui Report at 30). Defendants have cherry-picked scientific literature *and* quotations from within that literature. In any event, the accuracy of the quoted statement calls for expert analysis and so cannot constitute a statement of undisputed material fact.**

### C. MASH/MASLD

36.    As stated in a 2023 study by Rinella et al., "patients with steatosis [i.e., "fatty

22

liver"] and any one of" several additional "cardiometabolic criteria"— including obesity, high blood pressure, and diabetes, "would be considered to have MASLD." See Mary E. Rinella et al., *A multisociety Delphi consensus statement on new fatty liver disease nomenclature*, 79 J. of Hepatology 1542, 1550 (2023) (Rose Decl. Ex. 26).

**RESPONSE: Disputed in part. While the quoted language does appear in the *Rinella* study, Plaintiffs dispute that Defendants have accurately characterized the scientific literature on MASH/MASLD. Defendants have cherry-picked scientific literature *and* quotations from within that literature. "Any increased risk of liver cancer that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA." (ECF No. 3099-9, Siddiqui Report at 30). In any event, the accuracy of the quoted statement calls for expert analysis and so cannot constitute a statement of undisputed material fact.**

37.     Plaintiff's expert, Dr. Siddiqui, testified at her deposition that metabolic dysfunction-associated steatohepatitis ("MASH") is the advanced form of MASLD in which the fat is causing inflammation and damage to the liver. (See Siddiqui Dep. 87:13-88:25.)

**RESPONSE: Admitted.**

23

38.    In 2023, there was a change in nomenclature concerning MASLD and MASH. MASLD was formerly known as Non-Alcoholic Fatty Liver Disease, or NALFD, whereas MASH was formerly known as Non-Alcoholic steatohepatitis, or NASH. (See Siddiqui Dep. 13:25-114:13.)

**RESPONSE: Admitted.**

39.    A radiological scan performed in 2009 revealed that Mr. Roberts had "fatty liver" and "non-alcoholic steatohepatitis," or MASH in modern medical parlance. (GRobertsJr-CA-000654-55 (Rose Decl. Ex. 27).)

**RESPONSE: Disputed. Mr. Roberts' 2009 ultrasound only demonstrated a fatty liver, which is synonymous with MASLD/NAFLD. Mr. Roberts did not receive an actual diagnosis of MASH/NASH at this time. While it was in the differential, Mr. Robert's was asymptomatic, which is why Dr. Ives told Mr. Roberts it was not necessary to undergo a liver biopsy but he could if he wanted. Further, it is inaccurate to conflate "fatty liver" with MASH or NASH. Fatty liver is not synonymous with MASH or NASH. (ECF No. 3099-8, Hooks Dep. Tr. at 54:15-19 (testifying that NASH and fatty liver disease are different)).**

40.    A June 2016 ultrasound demonstrated that Mr. Roberts had "fatty infiltration"

of the liver. (GRobertsJr ESMS-000029 (Rose Decl. Ex. 28).)

**RESPONSE: Admitted.**

41.    According to a medical record dated August 2009, Mr. Roberts noted that
doctors had told him "ever since he was a teenager" that his "liver numbers were high" and
he had also been "told over the years that he probably has a fatty liver, i.e. NASH."
(GRobertsJr-CA-000661-663 (Rose Decl. Ex. 29).)

**RESPONSE: Disputed in part. A diagnosis of NASH was never given. (ECF No.
3099-11, Siddiqui Dep Tr. at 116:7-12 ("they don't diagnose him with NASH, NASLD,
MASLD, MASH, nothing, they just say it's fatty infiltration").) Further, it is
inaccurate to conflate "fatty liver" with MASH or NASH. Fatty liver is not
synonymous with MASH or NASH. (ECF No. 3099-8, Hooks Dep. Tr. at 54:15-19
(testifying that NASH and fatty liver disease are different)).**

42.    Dr. Siddiqui acknowledged in her deposition that Mr. Roberts was
consistently told he had fatty liver or MASH "over the years." (See Siddiqui Dep. 116:18-
22, 200:7-201:7.)

**RESPONSE: Disputed. It is inaccurate to conflate "fatty liver" with MASH or
NASH. Fatty liver is not synonymous with MASH or NASH. (ECF No. 3099-8, (Hooks**

25

**Dep. Tr. at 54:15-19 (testifying that NASH and fatty liver disease are different)).**

43.    Dr. Siddiqui stated in her report that "[a]pproximately 13% of patients diagnosed with HCC without a background of cirrhosis were noted to have" MASLD. (Siddiqui Rep. at 21.)

**RESPONSE: Disputed in part. The correct quote reads: "Approximately 13% of patients diagnosed with HCC without a background of cirrhosis were noted to have NAFLD." (ECF No. 3099-9, Siddiqui Report at 21.) Thus, this cannot constitute a statement of undisputed material fact.**

44.    Dr. Siddiqui also stated in her report that MASLD is "increasingly linked to liver cancer, especially in individuals with progression to [MASH]." (Siddiqui Rep. at 21.)

**RESPONSE: Disputed in part. The correct quote reads that NAFLD is "increasingly linked to liver cancer, especially in individuals with progression to NASH." (ECF No. 3099-9, Siddiqui Report at 21.) Thus, this cannot constitute a statement of undisputed material fact.**

45.    A 2023 study by Ebrahimi et al. that examined the association between MASH and HCC found that non-cirrhotic patients with MASLD are at an 80% increased risk of developing HCC. See Fahim Ebrahimi et al., Familial coaggregation of MASLD with

26

hepatocellular carcinoma and adverse liver outcomes: Nationwide multigenerational cohort study, 79 J. of Hepatology 1374 (2023) (Rose Decl. Ex. 30).

**RESPONSE: Disputed in part. While the quoted statistic does appear in the *Ebrahmimi* study, Plaintiffs dispute that Defendants have accurately characterized the scientific literature on MASH and HCC. Defendants have cherry-picked scientific literature *and* quotations from within that literature. "Any increased risk of liver cancer that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA." (ECF No. 3099-9, Siddiqui Report at 30). In any event, the accuracy of the quoted statement calls for expert analysis and so cannot constitute a statement of undisputed material fact.**

### D.    DIABETES

46.    Mr. Roberts' treating cardiologist listed "DM" (for "diabetes mellitus") as a condition in his medical record and diagnosed him with diabetes in December 2007. (GRobertsJr-CA-000729 (Rose Decl. Ex. 31).)

**RESPONSE: Disputed. Mr. Roberts was not diagnosed with diabetes in 2007. (ECF No. 3099-11, Siddiqui Dep. Tr. at 210:5-12.)**

47.    A 2012 meta-analysis study by Wang et al. reported a statistically significant 2.31-fold increased HCC risk in patients with diabetes, a 131% increase in risk (odds ratio=2.31, CI: 1.87-2.84). See Ping Wang et al., Diabetes mellitus and risk of hepatocellular carcinoma: a systematic review and meta-analysis, 28 Diabetes Metab. Res. Rev. 109 (2012) (Rose Decl. Ex. 32).

**RESPONSE: Disputed in part. While the quoted statistic does appear in the *Wang* study, Plaintiffs dispute that Defendants have accurately characterized the scientific literature on diabetes and HCC. Defendants have cherry-picked scientific literature *and* quotations from within that literature. "Any increased risk of liver cancer that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA." (ECF No. 3099-9, Siddiqui Report at 30). In any event, the accuracy of the quoted statement calls for expert analysis and so cannot constitute a statement of undisputed material fact.**

48.    Other researchers have reported that Type II diabetes confers a statistically significant 139% increase in risk of HCC (odds ratio = 2.39, CI=1.35- 4.23), even after adjusting for cirrhosis. See Xie 2022.

**RESPONSE: Disputed in part. Plaintiff dispute that Defendants have**

**accurately characterized the scientific literature on diabetes and HCC. Defendants have cherry-picked scientific literature and quotations from within that literature. "Any increased risk of liver cancer that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA." (ECF No. 3099-9, Siddiqui Report at 30). In any event, the accuracy of the calls for expert analysis and so cannot constitute a statement of undisputed material fact. Further, the accuracy of the quoted statement cannot be assessed as the "[o]ther researchers" (and their work) are not identified.**

**E. MR. ROBERTS' HIGH RISK OF PRE-EXISTING HCC.**

49. Mr. Roberts' treating radiologist, who read Mr. Roberts' April 2016 CT scan, observed "[i]ndeterminate hyperdense lesion in the right lobe of the liver, too small to definitively characterize. Benign or malignant etiologies could have this appearance . . . Follow-up liver protocol CT 4-6 months from date of study would be useful for further characterization." (GRobertsJr-TH-MD-000944 (Rose Decl. Ex. 8).)

**RESPONSE: Disputed in part. Agreed that Mr. Roberts' treating radiologist observed "[i]ndeterminate hyperdense lesion in the right lobe of the liver, too small to definitively characterize. Benign or malignant etiologies could have this appearance." (Ex. F, GRobertsJr-TH-MD-000944.) Disputed that Mr. Roberts'**

**treating doctor ever asked Mr. Roberts to follow up with a CT 4-6 months after the study. Rather, Mr. Roberts' treating doctor classified these findings as non-malignant cysts. (Ex. G, Ives Dep. Tr. 110:13-111:1.) No expert in this litigation has opined that the lesions observed in this 2016 CT are in the same location as Mr. Roberts' liver cancer was found in 2018.**

50.    Plaintiff's own expert radiologist, Dr. Mele, testified at his deposition that Mr. Roberts' April 2016 CT scan demonstrated several lesions on Mr. Roberts' liver and observed that "[y]ou cannot entirely exclude malignancy" at that time. (Mele Dep. 159:2-13.) He further agreed that "it's impossible to characterize whether" the lesions revealed on Mr. Roberts' liver months before he started taking recalled valsartan "[we]re malignant or benign." (Id. 161:22-162:2.)

**RESPONSE:    Disputed in part. While Dr. Mele acknowledged the presence of lesions in 2016, he opined that "Subsequent CT and MR imaging examinations performed in 2018 demonstrated the presence of lesions with imaging features consistent with the biopsy proven hepatocellular carcinoma. None of the lesions, and their associated imaging findings, consistent with the hepatocellular carcinoma identified in 2018 were present on the initial 2016 CT examination." (ECF No. 309-17, Mele Rep. at 3.)**

## IV.    MR. ROBERTS' USE OF RECALLED VALSARTAN

51.    Mr. Roberts filled his prescriptions, including his prescriptions for valsartan, at North Baldwin Family Pharmacy in Bay Minette, Alabama. (Second Am. Pl. Fact Sheet at 55; see, e.g., GRobertsJr-PPR-000135-152 at GRobertsJr-PPR- 000143 (Rose Decl. Ex. 33).)

**RESPONSE: Admitted.**

52.    Mr. Roberts filled his first prescription for valsartan allegedly containing NDMA on September 19, 2016. (GRobertsJr-PPR-000143.) He filled his last prescription of valsartan allegedly containing NDMA on June 13, 2018. (GRobertsJr-PPR-000135-152 at GRobertsJr-PPR-000151 (Rose Decl. Ex. 33).)

**RESPONSE:  Admitted.**

## V. MR. ROBERTS' HCC DIAGNOSIS

53.    On July 17, 2018, Mr. Roberts presented to the Emergency Room at Thomas Hospital in Fairhope, Alabama with abdominal pain radiating through to the center of his back. (GRobertsJr-TH-MD-001026-001029;  GRobertsJr-TH-MD- 001031 (collectively, Rose Decl. Ex. 34).)

**RESPONSE: Admitted.**

54.     On August 7, 2018, Mr. Roberts was diagnosed with HCC following an MRI revealing HCC tumors. Mr. Roberts' treating radiologist, Dr. Mark Lockhart, interpreted Mr. Roberts' MRI results, stating "[m]ultiple hyperenhancing hepatic masses with washout and pseudocapsule are highly suspicious for multifocal HCC."   (GRobertsJr-UABHIM-MD-000002-6;    GRobertsJr-PPR-000106; GRobertsJr-PPR-000235 (collectively, Rose Decl. Ex. 35).) Dr. Siddiqui testified that Mr. Roberts had "multiple huge liver lesions" by the time he was diagnosed in 2018. (Siddiqui Dep. 244:12-19.)

**RESPONSE: Admitted.**

55.     Dr. Lockhart testified that Mr. Roberts' "underlying cirrhosis" was one reason why the August 2018 MRI that was the basis for Mr. Roberts' HCC diagnosis "was not one of the more challenging studies [he] read on a daily basis." (Dep. of Mark Lockhart 41:24-42:3, Feb. 13, 2025 (Rose Decl. Ex. 36).)

**RESPONSE: Admitted.**

56.     Another of Mr. Roberts' treating physicians, Dr. Rojymon Jacob, stated that his liver cancer was "HCC arising out of NASH cirrhosis." (GRobertsJr- UABHIM-MD-00083-90 at GRobertsJr-UABHIM-MD-00085 (Rose Decl. Ex. 37).)

**RESPONSE: Disputed in part. Mr. Roberts was never given an actual diagnosis of NASH. (ECF No. 3099-11, Siddiqui Dep Tr. at 116:7-12 ("they don't diagnose him with NASH, NASLD, MASLD, MASH, nothing, they just say it's fatty infiltration");** *see also* **Siddiqui Dep. Tr. 186:23-189:1 (describing how informal reports of possible NASH were carried over in medical records over time, despite no formal diagnosis being given).**

57.    Mr. Roberts' treating radiologist, Dr. Jack Cunningham, described a "[p]air of masses in the right hepatic lobe" that were "highly concerning for HCC, especially in the setting of cirrhosis" after reading his 2018 MRI. (GRobertsJr- SouCC-000250-251 at GRobertsJr-SouCC-000251. (Rose Decl. Ex. 38).)

**RESPONSE: Admitted.**

58.    Mr. Roberts' interventional radiologist, Dr. Michael Larson, described Mr. Roberts in October of 2018 as experiencing "NASH cirrhosis and multifocal HCC." (GRobertsJr-UABHIM-MD-000029-037   at   GRobertsJr-UABHIM-MD-00032   (Rose Decl. Ex. 39).)

**RESPONSE: Disputed in part. Mr. Roberts was never actually given a formal diagnosis of NASH. (ECF No. 3099-11, Siddiqui Dep Tr. at 116:7-12 ("they don't**

33

**diagnose him with NASH, NASLD, MASLD, MASH, nothing, they just say it's fatty
infiltration");** *see also* **Siddiqui Dep. Tr. 186:23-189:1 (describing how informal
reports of possible NASH were carried over in medical records over time, despite no
formal diagnosis being given).**

59.     Mr. Roberts' surgeon, Dr. Jared White, described his case as "a 62 year old
male NASH cirrhosis and two hepatic lesions w/total tumor diameter 10.8cm in the setting
of cirrhosis and elevated AFP concerning for HCC." (GRobertsJr-PPR- 000093-097 at
GRobertsJr-PPR-000096 (Rose Decl. Ex. 40).)

**RESPONSE: Disputed in part. Mr. Roberts was never actually given a formal
diagnosis of NASH. (ECF No. 3099-11, Siddiqui Dep Tr. at 116:7-12 ("they don't
diagnose him with NASH, NASLD, MASLD, MASH, nothing, they just say it's fatty
infiltration").;** *see also* **ECF No. 3099-11, Siddiqui Dep. Tr. at 186:23-189:1
(describing how informal reports of possible NASH were carried over in medical
records over time, despite no formal diagnosis being given).**

60.     Mr. Roberts continued to be treated at Thomas Hospital in Fairhope, Alabama
from his admission to the Emergency Room in July of 2018 until his death. (See,  e.g.,
GRobertsJr-TH-MD-001026-001029;  GRobertsJr-TH-MD-001031;GRobertsJr-TH-MD-
002758-002761 (collectively, Rose Decl. Ex. 34).)

**RESPONSE: Admitted.**

61. Mr. Roberts died March 17, 2020. (GRobertsJr-DCPOA-0000001; GRobersJr-CA-000014 (collectively, Rose Decl. Ex. 2).)

**RESPONSE: Admitted.**

Dated: July 17, 2025                  Respectfully submitted,

                                      By: */s/ C. Brett Vaughn*
                                      C. Brett Vaughn, RN, BSN, JD
                                      NIGH GOLDENBERG RASO &
                                      VAUGHN, PLLC
                                      *Attorneys for Plaintiffs*
                                      14 Ridge Square NW
                                      Third Floor
                                      Washington, D.C. 20016
                                      Tel: 202-792-7927
                                      Fax: 202-792-7927
                                      Email: bvaughn@nighgoldenberg.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.


<u>*/s/ C. Brett Vaughn*</u>

C. Brett Vaughn, RN, BSN, JD