

September 2, 2025

***VIA ECF***
Honorable Renée Marie Bumb
United States District Court
Mitchell H. Cohen Building and
U.S. Courthouse Courtroom 3D
4th and Cooper Streets
Camden, New Jersey 08101

**Re:** ***In re Valsartan, Losartan, and Irbesartan Liability Litigation, Plaintiffs' Letter Brief in support of Dr. Siddiqui***

Dear Chief Judge Bumb,

Pursuant to the Court's Order at the August 26, 2025 hearing (8/26/25 Hr'g Tr. at 243:4-243:17), Plaintiff submits the following letter brief:

**I. Rule 702 Standard**

**A. Daubert and Rule 702**

The *Daubert* standard is a rule of liberal admissibility that permits expert testimony even where on-point studies may not exist. That principle applies here: there are few studies because NDMA is too toxic to ethically test on humans. (8/26/25 Hr'g Tr. at 207:25-208:9). Rule 702 governs expert testimony. Subsection (c) requires an expert's opinion be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Subsection (d) requires that an expert reliably appl[y]e application the principles and methods to the facts of the case. The question for the Court is not which side's science is more persuasive, but only whether the expert's process is reliable enough to go to the jury. *"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert v. Merrel Dow Pharms.*, 509 U.S. 579, 596 (1993). Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("Nothing in the amendment imposes any new, specific procedures. ...nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection.....").

The Third Circuit has repeatedly emphasized that this burden is light. Reliability requires only "good grounds," not perfection; flaws go to weight, not admissibility. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

**B. Preponderance of the Evidence.**

The proponent of expert testimony must only show that it is more likely than not that the expert's opinion is the product of reliable principles and methods and not the "best possible" evidence. 35 F.3d at 744.

**II. Dr. Siddiqui's Reliable Methodology**

**A. Literature Review.** Dr. Siddiqui based her analysis on extensive published literature. She reviewed large epidemiologic studies including Gomm (2021) and Mansouri (2022), which examined cancer risk in valsartan users exposed to pills contaminated with NDMA. (8/26/25 Hr'g

Tr. at 33:5-34:9, 40:5-44:2). She also reviewed mechanistic studies such as George (2019), which explains NDMA's genotoxic effect in the liver, and relied on WHO publications describing NDMA as a positive-control carcinogen used in animal studies. (*Id*. at 26:23-27:25). Furthermore, she reviewed and analysed Mr. Roberts medical records.

**B. Experience and Expertise.** Dr. Siddiqui brings more than twenty years of direct clinical experience as a hematologist and oncologist treating patients with hepatocellular carcinoma ("HCC"). (8/26/25 Hr'g Tr. 12:11-14) Clinical expertise strengthens reliability. *See Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 808 (3d Cir. 1997).

**C. Reviewed General Causation Reports.** Dr. Siddiqui also reviewed the general causation reports in this MDL and integrated their findings into her own analysis. (8/26/25 Hr'g Tr at 15:5-12). For example, she testified that she reviewed over twenty pages of Dr. Panigrahy's report that discusses the initiator and promoter capabilities of NDMA (8/26/25 Hr'g Tr. 48:10-48:21).

**D. Differential Diagnosis.** Most importantly, Dr. Siddiqui applied a differential diagnosis. She identified possible causes of Mr. Roberts' HCC, including hepatitis B, hepatitis C, alcohol, NAFLD/NASH, obesity, diabetes, and NDMA exposure. From her review of Mr. Roberts' medical records and the scientific literature, and from applying her own experience and education, she ruled in the NDMA as the cause of his HCC diagnosed in 2018. (8/26/25 Hr'g Tr. at 13:15-23). She concluded that Mr. Roberts' high ingested doses of NDMA-contaminated valsartan caused his cirrhosis and liver cancer and without the NDMA-contaminated valsartan, he would not have gotten liver cancer. *Id.* at 54:22-55:3.

The Third Circuit has repeatedly recognized that differential diagnosis is a reliable method for medical causation. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154 (3d Cir. 1999); *Kannankeril*, 128 F.3d at 808–09. Medical experts need not rule out every possible alternative cause or point to a single dispositive study. *Heller,* 167 F.3d at 156.

**III. Ruling in NDMA**

**A. Mechanistic Study.** George et al. (2019) explains how NDMA causes DNA alkylation and oxidative stress, triggering fibrosis, cirrhosis, and carcinoma. Dr. Siddiqui cited this research in support of her conclusion that NDMA acts as a potent hepatocarcinogen in humans, including causation of cirrhosis as well (8/26/25 Hr'g Tr. at 26:23-27:25).

**B. Valsartan Epidemiology.** She relied on population-based epidemiology, including Gomm (2021) and Mansouri (2022), which both found elevated cancer incidence in valsartan users exposed to NDMA contamination. (8/26/25 Hr'g Tr. at 33:5-34:9, 40:5-44:2).

**C. General Causation Reports.** Dr. Siddiqui considered the Plaintiffs' general causation reports filed in this MDL, which demonstrate that NDMA exposure increases the risk of liver cancer. (8/26/25 Hr'g Tr. at 13:24-14:2). This reliance was entirely appropriate under Rule 703 and consistent with standard medical practice.

**D. Dose Response.**

**1. Lifetime Cumulative Exposure.** Dr. Siddiqui testified that the record contains quantitative evidence of Mr. Roberts' NDMA exposure compared to thresholds identified in the literature. (8/26/25 Hr'g Tr. at 114:6-114:14). Drs. Panigrahy, Madigan and Sawyer each calculated lifetime cumulative exposures ("LCE") to NDMA that lead to increased risks of liver cancer in humans. (Panigrahy Rep. at 88; Madigan Rep. at 10; Sawyer Rep. at 76). Dr. Siddiqui testified that her opinions were consistent with the LCE to NDMA calculated by these experts.

(8/26/25 Hr'g Tr. at 114:6-114:14). This places Roberts firmly within the range associated with statistically significant increased risk of liver cancer in the published literature.

Defendants argue that Dr. Siddiqui did not identify a precise numeric dose threshold for NDMA-induced liver cancer. But the Third Circuit does not require calculating the exact dose necessary to cause cancer, it only requires a reliable methodology. *Kannankeril,* 128 F.3d at 808–09; *Heller*, 167 F.3d 146, 154 (3d Cir. 1999). In *Hartle v. FirstEnergy Generation Corp.*, the court rejected the very argument Defendants make here: "Gochfeld's failure to identify a precise thallium exposure does not render his opinions inadmissibly unreliable… His lack of direct test results for the dose received is a matter for the jury to weigh in determining credibility, not a basis for exclusion." No. 08-1019, 2014 U.S. Dist. LEXIS 27755, at *9–11 (W.D. Pa. Mar. 4, 2014).

Judge Wolfson's decision in the Talc MDL emphasizes that Defendants' dose response arguments do not warrant exclusion: "A strong dose-response is not necessarily required for an expert to find a causal nexus," and disagreements about how to interpret studies are ***"issues for cross-examination and not exclusion."*** *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 509 F. Supp. 3d 116, 177–80 (D.N.J. 2020) (emphasis added); *see also Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999) (Explaining expert testimony remains admissible "even without exact dose numbers" so long as the methods are sound and reliably applied). The law does not require Dr. Siddiqui to calculate "the dose at which NDMA causes cancer."

**D. The Timeline of NDMA**

The timeline in this case strongly supports NDMA as the cause of Roberts' HCC. Roberts had imaging as late as April 2016, with nothing significant enough to diagnose cirrhosis or cancer. (8/26/25 Hr'g Tr at 15:24-17:16). He began ingesting NDMA-contaminated valsartan in September 2016. (8/26/25 Hr'g Tr at 15:18-15:19). By August 2018, less than two years later, he was diagnosed with cirrhosis and advanced HCC. (8/26/25 Hr'g Tr at 15:19-15:20).

This rapid onset matches NDMA's known carcinogenic potency. Strong temporality supports causation. In *Kannankeril*, the Third Circuit emphasized that the **"temporal relationship and the nature of her complaints**" gave the expert good grounds for concluding causation to a reasonable degree of medical certainty. 128 F.3d at 809, emphasis added. "**The strong temporal connection between exposure and symptoms" supports admissibility even without dose calculations**. *Hartle,* 2014 U.S. Dist. LEXIS 27755, at *9–11, emphasis added.

Here, the temporality is clear. Mr. Roberts had scans without a cirrhosis diagnosis before valsartan, began NDMA ingestion in 2016, and within two years developed aggressive cirrhosis and HCC. This timeline, combined with mechanistic, epidemiologic, and toxicologic evidence, confirms the reliability of Dr. Siddiqui's methodology,

**IV. Ruling Out Other Conditions**

**A. Cirrhosis**

**a. Johnson Study.** Dr. Siddiqui relied in part on the Johnson study to evaluate the latency period between cirrhosis and HCC. (8/26/25 Hr'g Tr at 49:16-52:10). ***With no support,*** Dr. Mahmud criticized her use of this study, claiming cured hepatitis C patients progress differently from uncured NASH patients. (*Id.* at 160:17-162:7). His bare assertion cannot undermine Dr. Siddiqui's reliance on published science.

**b. The Timeline of Cirrhosis to HCC.** Mr. Roberts had liver imaging as late as April 2016, which demonstrated some architectural changes, but nothing significant enough to diagnosis



him with cirrhosis. (8/26/25 Hr'g Tr. at 22:12-24:12). He began contaminated valsartan in September 2016 and was diagnosed with cirrhosis and multiple large cancerous liver tumors in August 2018. (*Id*. at 15:16-21; 52:4-6; 53:17-22). The latency period from diagnosis of cirrhosis to HCC, when this occurs, is typically 7-10 years. (8/26/25 Hr'g Tr at 49:16-52:10). Mr. Roberts was not diagnosed with cirrhosis until August 2018; thus, absent NDMA exposure, he would normally not be expected to develop HCC from cirrhosis until August 2025. Even if Mr. Roberts had cirrhosis in April of 2016, absent NDMA exposure, an HCC diagnosis would not be expected (if at all) until April 2023. Roberts developed cirrhosis and HCC in under two years, immediately after starting NDMA-contaminated valsartan. Courts recognize that strong temporality is itself good grounds for admissibility. The "temporal relationship and the nature of [the plaintiff's] complaints" gave the expert good grounds to conclude causation to a reasonable degree of medical certainty. *Kannankeril,* 128 F.3d at 809. Thus, Roberts' rapid progression from normal scans to cirrhosis and HCC within two years of NDMA exposure provides the kind of strong temporal relationship that courts have repeatedly recognized as reliable evidence of causation.

**c. 2018 Negative Workup.** Dr. White (Mr. Roberts' treating liver doctor who was not deposed by the defense) noted that Mr. Roberts "has undergone extensive work up for cirrhosis" and later notes that his prior "work up for cirrhosis is essentially negative", but does have a past medical history of diabetes, hypertension, and obesity. GRobertsJr-PPR-000222. Dr. Siddiqui testified that Dr. White's record referred to a negative workup in the past, not in 2018 when she agrees he had cirrhosis. (8/26/25 Hr'g Tr. at 44:15-44:24). Moreover, the medical record also states, "Patient w/o significant h/o liver disease other than risk factors for NASH cirrhosis." Cirrhosis is a severe form of liver and risk factors are not the same as a diagnosis.

**A. NASH.**

Dr. Siddiqui also assumed *in arguendo* that Roberts had NASH in 2016. (8/26/25 Hr'g Tr at 53:10-54:9). Therefore, whether Mr. Roberts actually had NASH does not impact Dr. Siddiqui's opinion. As she explained, NASH that leads to cirrhosis that leads to HCC is a slow-moving process that is not supported by Mr. Roberts' timeline. (*Id*. at 46:15-47:23).

**a. Questionable Diagnosis.** Mr. Roberts' medical records are unclear about whether Mr. Roberts was definitively diagnosed with NASH (Non-Alcoholic Steatohepatitis). Although the term "NASH" shows up sporadically in Mr. Roberts' records, its origin appears to stem from a 2009 record in which Dr. Ives notes that "[Roberts] has been told over the years that he probably has a fatty liver, i.e., NASH." GRobertsJr-CA-000661. Such brief mention of being told he "has a fatty liver" by an unknown person is not a conclusive diagnosis of NASH.[1] A liver biopsy is the only definitive method to diagnose NASH because non-invasive tests like imaging and blood tests cannot differentiate between a simple fatty liver (NAFLD) or NASH, where fat, inflammation, and liver cell damage are present. Mr. Roberts did not have a liver biopsy done to make any such

---

[1] Hooks Dep. Tr. at 54:15-55:5 (Dr. Hooks explains that NASH and fatty liver disease are different and confirms that Mr. Roberts had fatty liver disease).

diagnosis.[2] Still, Dr. Siddiqui's methodology assumed *in arguendo* that Roberts had NASH in 2016, so the issue has been addressed. (*Id*. at 53:10-54:9).

**b. Slow Progression.** Both Dr. Siddiqui and Dr. Mahmud agree that NASH progresses slowly to cirrhosis and then to HCC.(8/26/25 Hr'g Tr. at 46:15-47:23; Mahmud Dep. 185:2-186:3). Mr. Roberts' two-year progression is inconsistent with this timeline.

**C. NASH Without Cirrhosis.** Even if Mr. Roberts had NASH, an increased risk of HCC arises only once cirrhosis develops. (8/26/25 Hr'g Tr at 54:12-20). Mr. Roberts' cirrhosis was diagnosed simultaneously with HCC in 2018. The jury must resolve the entire timeline, especially where key points are established based on the embedded opinion of non-testifying treating doctors.

**D. Obesity, Diabetes, and Hyperlipidemia.**Obesity, diabetes, and hyperlipidemia are part of metabolic syndrome. These conditions can increase the risk of developing NAFLD and NASH, which may then slowly progress to cirrhosis. Dr. Siddiqui considered these conditions within her differential diagnosis, and **correctly recognized they are indirect risk factors, not independent causes of HCC**. (8/26/25 Hr'g Tr. at 52:11-54:20).

Dr. Hooks, Roberts' treating gastroenterologist, confirmed that obesity and diabetes are not direct risk factors for hepatocellular carcinoma. Instead, they serve as risk factors for cirrhosis, which in turn can increase HCC risk. (Hooks Dep. 52:9-19; 55:6-21, Oct. 14, 2024).

**a. Inapplicability Without Cirrhosis.** Mr. Roberts' cirrhosis was diagnosed by his clinicians with his hepatocellular carcinoma in 2018 (8/26/25 Hr'g Tr. At 15:16-21; 52:4-6; 53:17-22). Any arguments that diabetes, obesity or hyperlipidemia can lead to HCC without cirrhosis are inapplicable in this case as they do not fit the facts of Mr. Roberts' medical history. He did not have HCC without cirrhosis.

**V. Imaging and Timeline Trump "Increased Risk" Studies**

Defendants rely on generalized epidemiology about increased HCC risk in patients with metabolic conditions such as obesity and diabetes. Those studies cannot substitute for Roberts' individual clinical course. As Dr. Siddiqui opines, Mr. Roberts' imaging in April 2016 did not detect cancer. He began ingesting NDMA contaminated valsartan in September 2016, and shortly thereafter, he was diagnosed with hepatocellular carcinoma in August 2018. Temporality, combined with differential diagnosis, provides reliable grounds for causation. *Kannankeril*, 128 F.3d at 809; *Hartle,* 2014 U.S. Dist. LEXIS 27755, at *9–11. The most reliable evidence in Roberts' case is not population-level "increased risk" studies but his actual imaging and clinical timeline. The evidence is that his aggressive cancer appeared within two years of NDMA ingestion.

[2] GRobertsJr-CA-000654 ("I did discuss liver biopsy with Mr. Roberts who is not really too interested in having liver biopsy which is understandable and probably not completely necessary at this time.").

Respectfully submitted,

Dated: September 2, 2025

By: /s/ Daniel A. Nigh

Daniel A. Nigh, Esq.
NIGH GOLDENBERG RASO & VAUGHN, PLLC
*Attorneys for Plaintiffs*
14 Ridge Square NW Third Floor
Washington, D.C. 20016
Tel: 202-792-7927
Fax: 202-792-7927
Email: dnigh@nighgoldenberg.com



**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ Daniel A. Nigh*
Daniel A. Nigh